# EXHIBIT PX0681

# Union Pacific

## 2009 SUSTAINABILITY AND CITIZENSHIP REPORT



UNION PACIFIC BUILDING AMERICA®

# Table of Contents


## INTRODUCTION
Letter to Stakeholders .................... 4
About this Report ........................ 6
About Union Pacific ...................... 7
Sustainability Highlights .................. 9
Sustainability and Citizenship Goals ...... 11

## ENVIRONMENT
Environment ............................ 13
Environmental Management ............. 14
Climate Change .......................... 16
Union Pacific Emissions ................. 18
Building it Green ........................ 21
Water .................................. 22
Responsible Waste Management ........ 23
Environmental Collaboration ............. 25
Wind Energy ............................ 28

## SOCIETY
Commitment to Employees .............. 30
Commitment to Communities ............ 39
Commitment to Customers .............. 47

## GOVERNANCE AND ETHICS
Board of Directors ...................... 50
Guiding Policies and Principles .......... 51

## RECOGNITION
Company Awards and Honors ........... 54
Individual Awards and Honors ........... 56

Moving Forward ......................... 57
Cautionary Information .................. 58
Feedback ............................... 59


*Published in June 2010 via the company's website at www.up.com. Revised 7/8/10.*



# INTRODUCTION



Our values:

Focus on performance.

Ensure high ethical standards.

Work as a team.

# Letter to Stakeholders



On behalf of Union Pacific, I am proud to present our company's inaugural Sustainability and Citizenship Report.

***Above**: Chairman, President and CEO Jim Young, left, surveys operations with Union Pacific Superintendent Andy Yedlick in El Paso, Texas. Doublestack intermodal trains, like the one shown, can take up to 300 trucks off of America's congested highways.*

We have a strong legacy of running our business profitably, safely and responsibly. Combining innovative technology, capital investment and a dedication to safety and service, we reduce our environmental footprint, provide attractive jobs that bolster our economy and support communities nationwide.

For nearly 150 years, Union Pacific has exemplified a commitment to excellent service and delivering the goods American families and businesses use daily. Today, we continue to build on this tradition by providing one of the safest, most fuel-efficient and environmentally responsible modes of freight transportation. Despite recent economic challenges, Union Pacific maintains a commitment to excellence and getting the job done safely, ethically, efficiently and with respect for all stakeholders.

*continued* ▸



Our achievements include:

**Putting Safety First**
The safety of our employees, customers and the public is a top priority. Since 2001, we have reduced the employee reportable injury rate by 50 percent, achieved a 37 percent reduction in rail crossing accident rate and attained a 34 percent reduction in derailment reportable rate. But we believe we can do better. We continue to engage in safety education and outreach, make investments in our infrastructure and work with government and private industries to make the railroad industry even safer.

**Reducing Fuel Consumption**
Since 1998, we've improved fuel efficiency 20 percent, which helps reduce costs, emissions and America's dependency on foreign oil. Today, we operate North America's cleanest locomotive fleet, with more than 75 percent of our locomotives certified under existing EPA standards.

**Valuing Employees**
The true power behind our railroad isn't our locomotives – it's our employees who have helped make us North America's premier railroad franchise. We put high value on teamwork, diversity and dedication to excellence. We are committed to providing award-winning wellness programs, competitive benefits, training, career opportunities and a safe, rewarding work environment to maintain our position as an employer of choice.

**Supporting Communities**
We annually purchase billions of dollars in supplies. In 2009 alone, we spent more than $5.3 billion on purchases in the states where we operate and gave more than $13 million in community contributions. We offer good jobs that won't be outsourced overseas. Our annual wages and retiree payments help support local and state economies.

We are proud of our role in building America and know it will be even greater in the future. We will continue to run our operations in a manner that honors the generations that preceded us and serves as a promise for generations to follow.

At Union Pacific, we are very optimistic about tomorrow, despite today's challenges. Our goal is to produce the best results possible and emerge from the global economic recession as a stronger, more profitable company. We're also working to get our nation back on track by serving as a vital link to the country's economic future. Staying true to our mission to serve has made Union Pacific one of America's iconic companies and remaining focused on that mission will help us continue to build a sustainable future.

Jim Young

**Jim Young**
Chairman, President and CEO

# About this Report



The 2009 Union Pacific Sustainability and Citizenship Report shares our initiatives and progress in three critical areas: environment, society and governance.

While previously communicating these efforts via our website, annual report and other public forums, our inaugural Sustainability and Citizenship report represents the next step in our journey to becoming an even stronger corporate citizen.

In formulating this report, consideration was given to the Global Reporting Initiative's (GRI) 2006 Sustainability Reporting Guidelines. GRI Sustainability Reporting Guidelines provide a standard framework and guidance for organizations to report on their sustainability performance.

The information in this report applies to railroad and select other operations. This publication is primarily focused on initiatives and accomplishments from the 2009 calendar year and performance data are primarily for 2009, unless otherwise noted.

# About Union Pacific




Union Pacific Corporation (NYSE:UNP) is one of America's leading transportation companies. Incorporated in Utah in 1969, its principal operating company, Union Pacific Railroad Company, is North America's premier railroad franchise.

With headquarters in Omaha, Neb., Union Pacific employs nearly 42,000 people and provides Americans with a safe, fuel-efficient and environmentally responsible mode of freight transportation. The company is a member of the Association of American Railroads and The Business Roundtable.

We emphasize excellent customer service and offer competitive routes from all major West Coast and Gulf Coast ports to eastern gateways. Union Pacific connects with Canada's rail systems and is the only railroad serving all six major gateways to Mexico, making it North America's premier rail franchise.

Union Pacific's diversified business mix includes Agricultural, Automotive, Chemicals, Energy, Industrial Products and Intermodal. In 2009, Union Pacific reported operating revenue totaling $14.1 billion.

Combining innovation, technology, capital investment and dedication to service, Union Pacific is reducing its environmental footprint, providing attractive jobs that support our country's economy, and participating as an integral member of the communities in which we live and work.

## SUSTAINABILITY AT UNION PACIFIC

For nearly 150 years, Union Pacific has helped connect a continent. Since President Abraham Lincoln signed the Pacific Railway Act in 1862 that created Union Pacific, we have helped transport the products America needs. We want to be as vital to our nation's future as we've been to its history.

Today, our trains operate in 23 states over more than 32,000 miles of track. We can haul almost anything from origin to destination. But what's truly special about Union Pacific is the way we get the job done: Safely; Ethically; Efficiently; and with respect for each other, the environment, our customers, communities and anyone who encounters our railroad. This approach defines us as a company – and as a responsible corporate citizen.

### UNION PACIFIC FAST FACTS*

| | |
|---|---|
| Route Miles | 32,100 |
| Employees | 41,700 |
| Annual Payroll | $3.5 billion |
| Community Giving | $13.1 million |
| Capital Spending | $2.5 billion |
| Locomotives | 8,350 |
| Freight Cars | 83,200 |
| Customers | 25,000 |

**for the year ending 12/31/09*



Case 1:07-mc-00489-BAH Document 1229-7 Filed 11/22/24 Page 10 of 3766



# Sustainability Highlights

## ENVIRONMENT

With more than 75 percent of our locomotive fleet certified under existing standards, Union Pacific operates the cleanest locomotive fleet in North America.

We continue to invest in fuel-efficient locomotives. Since 2000, we have:

- Spent approximately $6 billion to purchase new, environmentally friendly locomotives,
- Added more than 3,400 new fuel-efficient, long-haul, high-horsepower locomotives,
- Retired more than 2,300 older, less-fuel-efficient locomotives,
- Overhauled or rebuilt almost 3,200 locomotive diesel engines to run cleaner and more efficiently.

Union Pacific pioneered Genset technology and with 165 Gensets in our locomotive fleet we operate more than half of all Gensets in service in the United States.

Since 1998, Union Pacific has improved fuel efficiency by 20 percent. In 2009 alone, Union Pacific saved more than 40 million gallons of diesel fuel.

Today, we can move one ton 865 miles on a single gallon of fuel – the equivalent of a passenger vehicle getting more than 400 miles per gallon.

## GOVERNANCE AND ETHICS

Union Pacific works diligently to be among the best-governed companies in America. Efforts begin with our Board of Directors, which is comprised of all independent directors except for our Chairman and CEO.

Union Pacific has in place the following codes of ethics and conduct to guide its employees and leaders:

- The Union Pacific Corporation Code of Ethics for the CEO and Senior Financial Officers
- The Statement of Policy on Ethics and Business Conduct for Employees
- The Union Pacific Corporation Code of Business Conduct and Ethics for Members of the Board of Directors.

Our commitment to a diverse work force exceeds federal and state Equal Employment Opportunity laws and applies to all terms and conditions of employment.

Compensation is evaluated by an independent consultant to maintain competitive salaries and benefits for non-agreement employees and leadership.



## SOCIETY

Union Pacific offers a nationally recognized employee wellness program that contributes to making us an employer of choice.

We have reduced the employee reportable injury rate by 50 percent since 2001.

Since 2001, we have achieved a 37 percent reduction in the rail crossing accident rate and a 34 percent reduction in the derailment reportable rate.

Since 1986, more than 900 local response personnel have been trained at a formal test center in Pueblo, Colo., with Union Pacific paying for 100 percent of their expenses. In addition, we provide one-on-one training to any emergency response team upon request. Since 1979, Union Pacific has trained more than 170,000 local fire and law enforcement personnel.

Union Pacific was the first U.S. railroad to be named a partner in the Customs-Trade Partnership Against Terrorism (C-TPAT), a Customs and Border Patrol (CBP) program designed to develop, enhance and maintain effective security processes throughout the global supply chain.

Union Pacific has taken a number of significant actions on the U.S. side of the border to help CBP prevent illegal drug smuggling, spending at least $3.6 million annually on UP police officers and K-9 patrol, and $72.5 million over the last decade on support for drug interdiction programs.

Support includes constructing the Eagle Pass, Texas, border patrol building that opened in July 2009; installing lighting at the Nogales, Ariz. border; adding fencing; and building inspection towers to facilitate CBP inspections at various border crossings.

UP continues to enhance technology at the border with plans to launch a new rail inspection portal at Eagle Pass in June 2010.

We maintain a dedicated police force, supplemented by security teams and K-9 teams, devoted primarily to detecting and removing illegal drugs once trains cross into the United States.



***Above:*** *Many employees volunteer to support the Susan G. Komen for the Cure, which recognized Union Pacific with its Outstanding Volunteer Group Award.*

Additionally, we have provided K-9 training to DEA and FBI task forces, conducted joint exercises and developed computer profiles to identify drug traffickers.

In 2009, Union Pacific donated more than $13 million in community giving and supported more than 600 nonprofit organizations. The Principals' Partnership, our award-winning signature giving program, provides resources, links and education for more than 1,000 public high school principals in 21 states.

# Sustainability and Citizenship Goals



Union Pacific is committed to excellent service, delivering the goods American families and businesses use every day. As one of America's leading transportation companies, Union Pacific works to grow our business profitably, responsibly and safely.

Combining innovation, technology, capital investment and dedication to service, Union Pacific is reducing our environmental footprint, providing attractive jobs that support our country's economy, and participating as an integral member of the communities in which we live and work. Our goals include continuing to:

- Operate a safe, efficient and environmentally responsible rail network,
- Improve employee, customer and public safety through training, education and investment,
- Develop employee programs and processes that make us an employer of choice,
- Invest in our network infrastructure to enhance service, productivity and safety,
- Increase fuel efficiency and reduce emissions through technology and process improvements,
- Grow our business profitably and responsibly in order to invest in future growth, and
- Make a positive impact on the 7,000 communities we touch.

***Above:*** *As part of the original transcontinental route, Union Pacific tracks still wind through Palisade Canyon, Nev. We believe when you are part of the American landscape, you protect it. We strive to do just that in our daily operations.*

# ENVIRONMENT



We understand that protecting the environment is part of every job, and we are creating and implementing world-class energy conservation techniques that are helping us move more freight with less fuel.

UNION PACIFIC BUILDING AMERICA®

# Environment



Union Pacific is an engine of change, striving to be a leader in developing technology that will reduce our environmental impact.

Our trains provide a cleaner, safer, more fuel-efficient method of shipping freight across the country thus reducing emissions and improving air quality.

We are committed to protecting the environment now and for future generations. This means complying with all environmental laws and regulations, and providing the most sustainable mode of surface freight transportation.

As North America's premier railroad, Union Pacific is positioned to help the nation realize the benefits of freight rail transportation. We have the cleanest locomotive fleet in North America and are an industry pioneer in identifying and adopting new locomotive technologies that deliver better fuel efficiency and reduce our environmental impact. Our trains provide a cleaner, safer, more fuel-efficient method of shipping freight across the country, thus reducing emissions and improving air quality.

## ENVIRONMENTAL ADVANTAGE

Railroads are the most sustainable mode of ground freight transportation. One train can transport as much freight as 300 trucks, and freight trains are almost four times more fuel-efficient than trucks. This translates into significant fuel savings, improved air quality and reduced greenhouse gas emissions. Additionally, increased rail traffic can remove trucks from the road, reducing traffic congestion and potential for traffic accidents.

# Environmental Management



At Union Pacific, we meet our commitment to be an environmentally responsible transportation leader. We take this responsibility seriously.

By implementing systems and processes to train employees and maintain equipment, we reduce or avoid environmental impacts from the materials and products we haul.

Our systematic approach to environmental management led to the creation of our federal permit planning process. Union Pacific changed from a local project-centric approach to a systemwide program with centralized, documented procedures, utilities and compliance assurance for its engineering group. This created a standardized approach across our network.

***Above:*** *Outside of Missouri Valley, Iowa, a track renewal train is hard at work. This extremely efficient machine can lay 5,000 concrete ties in an 8-hour day. High-tech equipment, a strong focus on research and development and continuous process improvements have allowed railroads to move nearly twice the amount of freight today using virtually the same amount of fuel as in 1980.*

Union Pacific owns the cleanest locomotive fleet in the industry, with more than 75 percent of our locomotives certified under existing EPA emissions standards.

## ENVIRONMENTAL GOVERNANCE

Union Pacific employees are critical to operating a safe and environmentally sound railroad and are actively engaged in identifying opportunities that support safe operations.

Union Pacific has environmental field managers and hazardous material managers strategically assigned to specific locations. These managers are knowledgeable about environmental issues and address local community needs and requirements.

## COMPLIANCE

Our environmental compliance efforts include monitoring and inspecting facilities. For example, a team is dedicated to tracking all rail cars containing chemicals that are time sensitive. Union Pacific was the first railroad to monitor – on a daily basis – every time-sensitive chemical shipment. If a rail car appears delayed en route to its destination, this team initiates a series of actions to ensure safe arrival of the material in the designated time period.

Regular inspections also are performed on sources that generate air emissions, industrial wastewaters and storm-water runoff, or that store hazardous waste and petroleum products. Periodic testing is performed on locomotive fuel storage tanks and underground petroleum pipelines to maintain container integrity and prevent releases of fuel or oil into the environment.

### UNION PACIFIC ENVIRONMENTAL POLICY

At Union Pacific, we are committed to protecting the environment now and for future generations. Our employees, customers, shareholders and the communities we serve can expect our full compliance with all laws and regulations.

Union Pacific is developing and investing in new technologies that provide for cleaner air and water, including a locomotive fleet that is the greenest in the industry.

Our employees understand protecting the environment is part of every job, and we are creating and implementing world-class energy conservation techniques that are helping us to move more freight with less fuel.

We will continue our leadership in caring for the environment while delivering the goods that America needs.

# Climate Change

***Below:*** *A doublestack intermodal train is moved across the Great Salt Lake using distributed power technology. Distributed power improves fuel efficiency, reliability and safety as it reduces the physical forces on the train.*



Our rail infrastructure investment allows us to move goods across the country more efficiently than other modes of ground freight transportation while emitting less greenhouse gas. According to the United States Environmental Protection Agency (EPA), all freight railroads contribute less than 1 percent of the greenhouse gas emissions in the United States.

According to the EPA, freight railroads account for 0.7 percent of U.S. greenhouse gas emissions. Passenger transportation accounts for 19.8 percent and trucking 5.7 percent.

Our locomotives emitted approximately 10,030,000 metric tons of greenhouse gas in 2009, which we estimate to be more than 95 percent of Union Pacific's total greenhouse gas emissions. We remain committed to continuing our fuel conservation efforts, which are directly related to our greenhouse gas emissions.

Union Pacific identifies significant risks and/or opportunities from certain climate change legislation through our risk management processes and application of our environmental policy. As part of that analysis, members of Union Pacific's environmental management group worked with an outside consultant to prepare an inventory of our greenhouse gas emissions.

Although climate change could have an adverse impact on our operations and financial performance in the future (see our Risk Factors in our Annual report on Form 10-K), we are currently unable to predict the manner or severity of such impact. However, we continue to look for new ways to maximize every drop of fuel, focusing on conservation through better locomotive technology, engineer training and employee development.

Case 1:07-mc-00489-BAH Document 1229-7 Filed 11/22/24 Page 18 of 3766



## OPERATING SMARTER – REDUCING FUEL USE

A crucial element of our fuel-efficiency strategy is to improve our operating policies and procedures, as well as to encourage employees to support this effort.

Union Pacific has developed a comprehensive plan to reduce the amount of time locomotive engines idle, saving fuel and reducing emissions. As a part of this strategy, all new locomotives have automatic stop-start equipment that eliminates unnecessary idling.

We are retrofitting older locomotives with the technology as well. Locomotive shutdowns can save 15-24 gallons of fuel, per locomotive, per day. Nearly two-thirds of our locomotive fleet is now outfitted with automatic stop-start equipment.

Balancing speed and customer service requirements, our Fuel Conservation Speed (FCS) programs save fuel by limiting speeds on trains hauling certain commodities. These programs are helping push fuel-consumption rates to record low levels.

More than 6,000 locomotive engineers, nearly 98 percent of all road engineers, participate in the Union Pacific Fuel Masters Unlimited program. Fuel Masters Unlimited is an employee-driven conservation initiative that rewards locomotive engineers' fuel-saving efforts. The program is so successful that other railroads have implemented versions of it in their operations.



## UNION PACIFIC LOCOMOTIVE FUEL EFFICIENCY



# Union Pacific Emissions




Union Pacific is committed to preserving the environment by improving fuel efficiency, thus reducing air emissions to help improve air quality. Our operating procedures, investments in environmentally friendly locomotives and efforts to reduce emissions from older locomotives are all part of this commitment.

UNION PACIFIC LOCOMOTIVE GHG EMISSIONS



## FUEL-EFFICIENT LOCOMOTIVES

With more than 75 percent of our locomotive fleet certified under existing EPA standards and 186 ultra-low emission switchers including Gensets and Green Goats, Union Pacific operates the cleanest locomotive fleet in North America. We continue to invest in fuel-efficient locomotives. Since 2000, Union Pacific has:

- Spent approximately $6 billion to purchase new, environmentally friendly locomotives,
- Added more than 3,400 new fuel-efficient, long-haul, high-horsepower locomotives,
- Retired more than 2,300 older, less fuel-efficient locomotives,
- Overhauled or rebuilt almost 3,200 locomotive diesel engines to run cleaner and more efficiently.

### PIONEERING SUSTAINABLE TECHNOLOGIES: THE BIRTH OF THE GENSET

From its very beginnings, the key to a locomotive's power has been its ability to convert fuel into motion. During the 19th and early 20th centuries, locomotives harnessed steam to move trains. In the early 1930s, electricity began replacing steam. Locomotives became electric power generators, producing electricity to drive motors attached to axles and wheels. Diesel became the fuel of choice to power the on-board engine that helped generate the electricity.

In 2002, Union Pacific's Mike Iden, general director of car and locomotive engineering, thought it was time to take locomotive technology to the next level. Since many locomotives do not require maximum horsepower all the time, Iden investigated the development of a switching locomotive that would use modern, off-road diesel engines. These modern, off-road diesel engines would be capable of providing the lower power required by typical switching locomotives, while reducing fuel consumption and, most importantly, exhaust emissions. Instead of having one large conventional locomotive diesel engine operating at various speeds, only one of which was most fuel efficient, he wondered if multiple smaller diesel engines, running in combinations of one, two or three engines, could produce the required horsepower levels.

Though no manufacturer offered such a locomotive, and many doubted the feasibility or need for one, Iden was undaunted. He started discussions about such switch technology with a small Illinois-based locomotive remanufacturing company, National Railway Equipment, and spent more than a year refining the concept and making preliminary plans for a prototype called the "Genset switcher." In 2004, his vision became a reality when Union Pacific authorized construction of a prototype, low-emission Genset locomotive.

Today, Union Pacific operates 165 Gensets, the industry's largest fleet.



*Mike Iden*

## EXPLORING INNOVATIVE TECHNOLOGIES

Union Pacific is proud to be an industry pioneer in identifying and adopting new, lower-emitting diesel locomotive technologies. These technologies include the Generator-Set, also known as the Genset locomotive, the Green Goat locomotive, the Oxidation Catalyst Device and diesel particulate filters on yard switchers.

### Genset Locomotives

Union Pacific led the industry with development of the revolutionary Genset – ultra-low-emitting, environmentally friendly diesel locomotive. Union Pacific began testing the prototype Genset switcher locomotive in 2002 and now has 165 units. This represents more than half of all Gensets in service in the United States.

The Society of Automotive Engineers (SAE) recognized Union Pacific with its Engineering Excellence in Transportation award in 2007 for our work in developing and promoting the Genset. This was the first SAE award presented to any railroad.

The Genset reduces greenhouse gas emissions by as much as 37 percent, emissions of the oxides of nitrogen by up to 80 percent and particulate matter by 90 percent, as compared to older switching locomotives. While traditional locomotives have one large diesel engine, the Genset uses multiple smaller diesel engines and generators. The latest version has six traction motors to increase power over previous Gensets. The locomotive uses all of the small engines when necessary and automatically shuts down excess engines when not needed, conserving fuel and cutting greenhouse gas emissions.

### Green Goat Locomotives

In 2002, Union Pacific tested the world's first diesel-battery, hybrid-switch locomotive, and in 2005 acquired our first Green Goat. Similar in concept to a hybrid automobile, which relies on both a gasoline engine and a battery-powered electric motor, the Green Goat depends entirely on its small diesel-powered engine to charge onboard storage batteries. This hybrid locomotive is estimated to reduce oxides of nitrogen and particulate matter emissions by up to 80 percent and reduce fuel consumption by at least 16 percent as compared to a conventional switch locomotive. Currently, 10 Green Goats are serving Texas and an additional 11 are in California, most in the Los Angeles area.

### Diesel Particulate Filters

Union Pacific has tested the use of Diesel Particulate Filters (DPF) on a 1,500-horsepower yard switch locomotive built in 1982. The DPF acts as a filter that uses high-temperature silicon carbide blocks to trap particulate matter in the exhaust. As the gases containing the carbon particles accumulate, the device periodically heats the carbon, causing it to ignite and burn off as water and carbon dioxide. Initial tests demonstrate a 75 percent reduction in particulate matter. These results are undergoing third-party review.

### Oxidation Catalyst Device

Union Pacific is exploring an emission-reduction device for older locomotives. From 2006-2009, we conducted field tests on the Oxidation Catalyst Device (OxiCat), which acts like a catalytic converter found on a car. As the diesel engine's exhaust flows through these converters, microscopic particles, known as particulate matter, generated by the diesel combustion process will be converted into water and carbon dioxide. This technology has the potential to reduce particulate emissions by about 50 percent, hydrocarbons by 38 percent and carbon monoxide by 82 percent.

While field tests uncovered durability issues, we are awaiting third-party review of the tests conducted on a 3,800-horsepower locomotive built in 1992. This is the first freight locomotive in North America to be equipped with a set of OxiCat converter devices.

# Building It Green



In 2004, Union Pacific opened the doors to our new headquarters building in Omaha, Neb. When constructing the 19-story Union Pacific Center, energy efficiency was a critical consideration.

The building includes an atrium incorporating natural light into the workplace, an under-floor cooling system and a computerized energy-management system.

For optimal efficiency, the building is equipped with an air-handling system that has variable speed fans and direct digital controls for computerized management of mechanical equipment and lighting. Instead of drawing in a standard amount of outside air, the ventilation system automatically adjusts fresh air for the number of people in the building. In addition, a hydraulic economizer is used in the cooling tower for optimal energy savings.

As a result of our efforts, Union Pacific Center was recognized as one of the nation's most energy-efficient buildings, receiving an Energy Star® designation from the EPA and an Energy Innovators Award from the Department of Energy.

***Above:*** *We are pursuing Leadership in Energy and Environmental Design (LEED®) certification for Union Pacific Center, which is more than just a work place. With more than a dozen training rooms, a 19,000-square-foot fitness center and a 600-seat dining room offering nutritious meal options, employees can enjoy healthy lifestyles.*

# Water



Union Pacific is committed to following federal, state and local laws regarding water discharges. As part of this effort, we operate and maintain more than 100 wastewater treatment facilities across our system.

Our wastewater treatment facilities are designed to capture and process wastewater from our fueling and maintenance operations. Wastewater is treated to a quality standard set by the regulating agency. After treatment, wastewater is either discharged to surface waters, such as adjacent rivers or streams, or transferred to publicly owned treatment works to receive additional treatment prior to surface discharge.

# Responsible Waste Management



Union Pacific's comprehensive waste reduction and recycling programs touch nearly every part of the company. These programs include minimizing hazardous waste, working closely with our customers to avoid a release of hazardous materials, and recycling railroad ties, fuel, oil and e-waste.

## HAZARDOUS WASTE MANAGEMENT

Union Pacific complies with hazardous waste requirements. A critical element of our hazardous waste management is minimizing waste in the supply chain. We have changed processes and established procurement controls to require centralized purchasing of chemicals, reduce the number of toxic materials purchased, and find ways to reuse and recycle waste materials.

***Above:*** *An undercutter excavates the ballast, or rock bed, on the rail line in Gore Canyon, Colo. With conveyor belts and screens, the undercutter separates reusable ballast from waste material. The "clean" ballast is reinstalled, providing proper drainage and reinforced track foundation. This entire recycling effort is done onsite, minimizing fuel use and emissions.*

## RECYCLING EFFORTS

Recycling is encouraged at all company locations. Union Pacific has recycling programs for wooden railroad ties, used oil and e-waste. In addition, we have a successful environmental stewardship program that provides recycling training and has led to significant recycling at Union Pacific Center, the company's headquarters building in Omaha.

### Railroad Ties

Whenever possible, railroad ties are salvaged, rehabbed and reused on Union Pacific's 32,000-mile network. In 2009, we replaced more than 3.5 million wood railroad ties, of which 86 percent were re-used in some manner in 2009.

Union Pacific has been using concrete ties for nearly 20 years and continues to add concrete ties to its system. Concrete ties are used in high-tonnage, high-traffic areas such as the Powder River Basin. Because concrete lasts longer, it generates less waste. Composite ties are used as an alternative to wood ties in the Gulf Coast area, where wet weather reduces the lifespan of wood ties.

The tie replacement cycle is monitored on an ongoing basis so we do not replace ties before it is necessary.

### Fuel and Oil

Union Pacific's standard operating equipment for fueling and locomotive-maintenance activities includes automatic fuel-nozzle shutoffs to prevent overflows, drip pans to catch spills, and separators to recover oil from industrial wastewater. On-board retention tanks capture residual oil from locomotive engines for proper disposal.

In addition, recycling used oil is a high priority at Union Pacific. One hundred percent of the oil captured at fueling and servicing facilities is recycled.

### E-waste

As the number of electronic devices for personal and business use continues to grow, so does the amount of electronic waste. At Union Pacific, electronic equipment no longer needed is evaluated to determine if it can be recycled, reused or rebuilt. The company has recycled more than 1.1 million pounds of electronic equipment and nearly 3.5 million pounds of signal batteries from 2007 to 2009.

### Employee Stewardship and Recycling

Union Pacific manages an employee environmental stewardship program with the theme "Caring for the Environment: My Company, My Work, My Life." The program provides education to employees about environmental stewardship on the job and at home. Information and training cover topics such as fuel conservation, locomotive shutdown, an energy audit checklist and recycling guidelines. Each month, Union Pacific recycles nearly 20 tons at its Omaha headquarters in addition to recycling at field locations.

A cornerstone of the company's environmental stewardship is engaging employees to make a positive environmental impact. In 2009, Union Pacific employees invested thousands of volunteer hours to support community efforts including school presentations and cleanup activities.

**86% OF WOOD TIES WERE RE-USED IN SOME MANNER IN 2009**



# Environmental Collaboration




Union Pacific believes collaboration with federal, state and local authorities is key to meeting our environmental objectives. We also work with our employees to reduce our operational environmental impacts and collaborate with third-party organizations to reduce emissions and improve air quality.

SmartWay℠ Transport Partnership
U.S. Environmental Protection Agency

## SMARTWAY℠

Union Pacific participates in the SmartWay Transport Partnership – a voluntary alliance between the EPA and freight industry. Commercial, industrial and public sector participants commit to reduce greenhouse gas emissions and air pollution, and to improve fuel efficiency of ground freight transportation. The EPA assists with efforts, providing fleet management tools, technical support, information, public recognition and, for exceptional environmental performers such as Union Pacific, use of the SmartWay Transport Partner logo.

***Above:*** *Union Pacific Director of Public Affairs Lupe Valdez speaks in Colton, Calif., as part of a "green tour" that presented technology like the Genset yard locomotive, which can reduce emissions by more than 80 percent while using up to 37 percent less fuel than traditional yard locomotives.*



## COLLABORATION WITH CUSTOMERS

A common carrier obligation means railroads are mandated by the U.S. government to transport hazardous materials because rail is the safest mode of freight transportation.

It is a common misconception that trains made up of tank cars are owned by the railroad. In fact, while Union Pacific owns the locomotive, customers own the tank cars. Therefore, Union Pacific works closely with customers to protect materials by properly securing cars that contain hazardous materials. Each year, approximately 5,000 tank cars are selected for inspection throughout Union Pacific's system. Although not required by any rule or regulation, Union Pacific believes these regular examinations help identify defective cars and provide opportunities for the training necessary to reduce accidents and spills.

Union Pacific also recognizes customers who maintain zero releases of hazardous materials from their cars each year, while offering separate awards for customers demonstrating excellence in their billing procedures. Billing description of a rail car's contents is critical and needs to be exact for the proper response in the event an emergency occurs.

### Dow Chemical Company and Union Pacific On Track to Improve Rail Safety and Security

The Dow Chemical Company and Union Pacific Railroad have made great advancements goals to enhance the safe transport of chemicals across the United States.

Dow and Union Pacific are working to enhance chemical transportation over the more than 160,000 miles of rail in the U.S. through a variety of innovative solutions and public-private partnerships. Examples include industry wide railway crossing safety initiatives, Global Positioning Satellite (GPS) sensors that track rail car movements, and designing the next generation of rail tank cars.

Dow and Union Pacific's eight jointly created goals are consistent with the principles and practices of Responsible Care®, a voluntary chemical industry initiative that Dow and other leading companies helped establish in 1985 to drive continuous improvement in the safe and secure manufacture, distribution and use of chemical products.

Each of the following goals plays a distinctive role in improving the rail bulk transportation infrastructure.

1. Expand the TRANSportation Community Awareness and Emergency Response (TRANSCAER®) Program
2. Improve Shipment Visibility
3. Develop the Next Generation Rail Tank Car
4. Improve Supply Chain Design
5. Eliminate Non-Accidental Releases (NAR)
6. Deploy Communications-Based Train Control/Anti-Collision System (Positive Train Control)
7. Reduce Movement in High-Threat Urban Areas
8. Improve Accident Prevention

Case 1:07-mc-00489-BAH Document 1229-7 Filed 11/22/24 Page 28 of 3766






## CALIFORNIA AIR RESOURCES BOARD

For more than 15 years, Union Pacific has worked closely with the California Air Resources Board (CARB) in a cooperative effort to reduce emissions and improve California's air quality.

The genesis of these efforts began with a first-of-its-kind commitment in 1998 to bring the most advanced and environmentally friendly technology to the South Coast Air Basin by January 2010. This 1998 Memorandum of Understanding (MOU) has achieved major reductions and is expected to reduce locomotive NOx emissions in the South Coast Air Basin by 65 percent by 2010. In 1999, Union Pacific provided data to CARB, which CARB used to prepare the first-ever comprehensive Health Risk Assessment (HRA) of an operating rail yard. CARB published these findings in the Roseville Rail Yard Study (CARB 2004).

Based on the success of that project and the identification of effective emission reduction measures, CARB brought the two California Class I railroads, Union Pacific and BNSF Railway, together to sign a voluntary MOU in 2005. As part of that MOU, Union Pacific agreed to and completed the phase out of non-essential idling within six months of the agreement, and installed Automatic Engine Shutoff Systems (AESS) on California-based locomotives by 2008.

In addition, Union Pacific agreed with CARB to expeditiously repair locomotives that were excessively smoking and that 99 percent of all locomotives pass CARB smoke inspections. We also agreed to maximize the use of ultra-low sulfur diesel fuel by Jan. 1, 2007, six years prior to regulatory mandates and prepare a progress report by January 2006 on feasible air emission mitigation at eight major rail yards.

By 2007, Union Pacific had reduced overall emissions significantly from year 2000 levels while still accommodating growth in the volume of goods and materials moved through the region. The railroad achieved these reductions using a combination of new technology, operational changes, new equipment, fuel-quality improvements and collaboration with CARB.

Union Pacific is committed to seeking reduced emissions. Compared to 2005 levels, CARB has estimated Union Pacific and BNSF actions will reduce rail yard diesel particulate matter emissions by an average of 50 percent as early as 2010, 65 percent by 2015 and 80 percent by 2020. Union Pacific is on track to meet or exceed our commitment to reducing emissions.

# Wind Energy

***Below:*** *A Union Pacific train moves wind turbine components across Iowa.*



Union Pacific was the first railroad to offer door-to-door transportation service for wind turbine components. The company began shipping them in 2003, and in 2007, responding to growing interest in wind power technology, we joined the American Wind Energy Association (AWEA).

Union Pacific plays an important role in supporting renewable energy by providing the wind energy industry with safe and sustainable transportation solutions.

The wind power business is an emerging market, and Union Pacific is proving to be a valuable transportation service provider in this growing industry. In fact, the wind energy industry continues to ship additional products with Union Pacific.

Union Pacific provides numerous advantages for its wind energy customers:

- With our wealth of experience, we have a clear understanding of the wind industry's unique shipping requirements and work closely with customers to engineer new equipment.
- Union Pacific's rail transportation solution provides greater value than trucks due to simplified logistics and economies of scale achieved by working with our Union Pacific Distribution Services subsidiary.
- Union Pacific owns our own tracks and does not require the state-by-state permitting necessary for trucks when hauling oversized loads.
- Our trains operate in a more controlled and safer environment than trucks.
- Moving wind turbine components via Union Pacific trains helps reduce highway congestion; it would require considerably more trucks to deliver the same number of wind turbines.

According to AWEA and our own research, many of the ports served by Union Pacific are expanding investments and capacity to make it easier to unload shipments of wind energy components and equipment. These investments, along with those of Union Pacific, are critical to create new sources of energy – a top priority for our nation.

# SOCIETY




Union Pacific's success is attributed to the hard work and dedication of our employees, our partnerships with communities and our focus on serving the needs of customers. It is with these three groups that we believe the future success of Union Pacific lies. We will continue our strong commitment to providing the best workplace, keeping our trains and structures safe, partnering with communities, and offering the best service to customers today and into the future.

***Above:*** *Union Pacific helped the Boy Scouts of America's centennial by commemorating a special locomotive. Both groups have been serving our country for a century or more.*

# Commitment to Employees



Our employees don't just work for Union Pacific – they are Union Pacific. And after nearly 150 years, they continue to be our most valuable asset.

To maintain our position as North America's premier railroad franchise, we need the best people, doing their best work. That is why we provide our employees competitive benefits and a safe and rewarding place to work, enabling all members of our team to reach their greatest potential.

***Above:*** *Workers prepare to weld steel rail. One mile of non-constricted rail can contract or expand more than 2 feet in extreme weather, so steel rail is tempered and anchored during installation to improve the infrastructure's integrity. Union Pacific's robust maintenance program has helped reduce our derailment rate by 34 percent over the past eight years.*

**OUR EMPLOYEES**

41,700 – at year-end 2009.

85 – Percentage of employees represented by 14 major rail unions.

$3.5 billion – annual payroll.

## BENEFITS

We strive to be an employer of choice and offer strong benefits to help recruit top talent and retain our dedicated work force.

### Benefits Packages

Union Pacific offers non-union employees competitive benefit packages, including medical, prescription drugs, life, disability and long-term care insurance. All medical plans include preventive care covered at 100 percent with no deductible. Union employee benefits are determined through collective bargaining agreements and are unique to each representative union and operating area.

In addition to benefits provided by Union Pacific, railroad employees are covered under the Railroad Retirement Board – a federal agency that administers retirement and unemployment benefits to workers and families. Union Pacific and our employees contribute to this program. Non-union employees also receive benefits under the Union Pacific pension plan. The pension is funded by Union Pacific, and an employee is vested after five years of service with the company. Finally, our employees also may participate in a 401(k) plan, which includes an employer match option for non-union employees.

### Auxiliary Work and Training Status (AWTS)

Union Pacific is not immune to the challenges facing the global economy. However, if and when a furlough status must be implemented, we strive to get employees back to work as soon as possible. In fact, we are the only company in the industry that invests in these employees after they are furloughed to get them back to work as soon as possible. Through initiatives such as our Auxiliary Work and Training Status agreements (AWTS), which cover train and yard service employees on more than half of Union Pacific's system, many employees are given the opportunity to work and train on a part-time basis in lieu of being furloughed. Often, it can take up to 90 days for an employee to complete the necessary refresher training and examinations when returning to work from furlough status. The AWTS program helps employees maintain their training and proficiency while working on a part-time basis, thereby making it possible for them to return more quickly once they have been recalled to work on a full-time basis. Employees taking advantage of this program retain full healthcare benefits, as well as accrue service time toward Railroad Retirement benefits.

### Flexible Work Options

Union Pacific offers alternative schedules to accommodate the diverse needs of our work force, when possible. Flexible work options provide arrangements to help balance employee, business and Union Pacific customer demands. Options include a compressed work week, job sharing and phased retirement.



Case 1:07-mc-00489-BAH Document 1229-7 Filed 11/22/24 Page 33 of 3766



## HEALTH AND WELLNESS

Union Pacific's vision is to have the healthiest employees of any industry. At Union Pacific, we support employee efforts to live a healthier, fuller life. Our health promotion initiatives are incorporated into the company structure because healthy employees contribute to a safer work environment and increase productivity.

Union Pacific's commitment to employee health includes our broad menu of comprehensive health insurance plans, but the real benefit includes more than just helping pay doctors' bills. We strive to avert medical problems by offering nationally recognized employee wellness programs that focus on prevention. We provide assessments and resources, incentives for making good choices, and regular health-centered events such as blood pressure and cholesterol screenings.

### Union Pacific Wellness

We want to help employees make healthy decisions every day, at every stage of life. That's why, in 1987, we launched Union Pacific Wellness, a health promotion program aimed at improving employee health and safety. The initiative specifically targets diabetes, asthma, high blood pressure, stress, smoking, inactivity, excess weight, fatigue, high cholesterol and depression. It also teaches employees how to reduce their personal risk for these problems. We embrace Union Pacific Wellness as any other business initiative and place priority on measuring its impact on employee health and well-being. Each year we dedicate more than $4 million to support the program and track its effectiveness.



Union Pacific wellness programs are nationally recognized.

*Union Pacific Wellness key components include:*

**Wellness Assessment**
The cornerstone is the wellness assessment. Employees complete a confidential wellness assessment, which serves as an individual baseline for improving health and wellness. Employees participate in the program knowing that Union Pacific's goal is to help them identify health risks and learn ways to improve their health. We provide financial incentives to encourage employees to complete the wellness assessment, obtain an annual physical exam from their doctor and to stop or continue not smoking.

**Lifestyle Coaching**
Employees who want to improve their health through lifestyle changes may participate in our telephonic health coaching program. Participants are paired with a health coach who helps them set and achieve goals for healthy lifestyles.

**Fitness Centers**
Union Pacific contracts with more than 600 facilities across the country where employees may exercise free of charge. Our headquarters building includes a 19,000-square-foot fitness center for employees, retirees and spouses. The facility features state-of-the art equipment including elliptical machines, treadmills, stationary bicycles, weight machines and free weights.

**Injury Prevention Program**
Employees at risk for injury because of low fitness levels may participate in the System Health Injury Prevention program (SHIP). SHIP participants are paired with a personal trainer who works with them to improve their overall fitness level.

**Health Education Programs**
Employees are provided several opportunities to better understand their health. A Know Your Numbers program educates employees on optimal health numbers, such as blood pressure, cholesterol and Body Mass Index. Our occupational health nurses also provide health education training as part of our safety meetings.

*continued* ▸

**Occupational Health Nurses (OHN)**
As part of our commitment to the safety and well-being of our work force, Union Pacific employs occupational health nurses (OHN). Our nurses receive training to ensure they understand the railroad culture and safety regulations. They develop strong relationships with employees and have become a trusted health resource. In 2008, we expanded our OHN program, targeting train service employees who travel across the system. Today, Union Pacific has more than 40 OHNs across our network dedicated to improving employee health.

Union Pacific nurses deliver our health message face to face.

**Tobacco Cessation**
Employees and spouses who use tobacco are eligible for a tobacco cessation program. This program includes lifestyle coaching as well as pharmacological interventions.

## Peer Support

When employees face a difficult situation, whether a tragic accident or personal crisis, they can turn to the Union Pacific Peer Support team. In the face of these experiences, individuals can feel significant loss of their sense of control. Understandably, events such as these may seriously affect an employee's ability to perform job functions safely and efficiently for a period of time, due to physical, emotional or psychological reactions.



REACH OUT BEFORE LIFE GETS OUT OF HAND.

More than 1,000 employee volunteers stand ready to support co-workers and their families when traumatic incidents occur. Members of the Peer Support team undergo special training and draw from their own experiences to support fellow employees. Their role has been vital to affected employees and families, and secondarily, their work enhances the safety and welfare of other employees in our network.

## SAFE WORKPLACE

Not only is rail the safest mode of ground freight transportation, it is also one of the safest industries in which to be employed. Union Pacific is committed to making our industry even safer. According to the U.S. Bureau of Labor Statistics, railroads have lower employee injury rates than other modes of transportation and most other major industry groups, even grocery stores.

At Union Pacific, we have reduced employee reportable injury rates by 50 percent since 2001.

Safety briefings are standard at meetings across all company locations, and daily job briefings for Union Pacific employees as well as contractors focus on operating safely.



## EMPLOYEE REPORTABLE INJURY RATES

### Reduced by Half in 8 Years



## Total Safety Culture

Employees caring for each other describes Union Pacific's Total Safety Culture (TSC) approach. What makes TSC unique is it is a voluntary, employee-owned process, rather than an outcome-based program, that focuses on training, observations and feedback and empowers employees to address at-risk behaviors. All these values are shared by the company's senior management.

Union Pacific TSC locations have Implementation Teams that are representative of the entire Union Pacific work force. Together, with the TSC facilitator and master trainers, the Implementation Team works to train employees on safe workplace standards.

### TSC CHARACTERISTICS

- Safety is held as a value by all employees.
- Each individual feels a sense of responsibility for the safety of their co-workers, as well as themselves.
- Each individual is willing and able to go beyond the call-of-duty on behalf of the safety of others.
- Each individual routinely performs actively-caring and/or safety behaviors for the benefit of others.



## TRAINING AND CAREER DEVELOPMENT

Employee development is critical to Union Pacific. The technologies required to safely and successfully operate our trains and rail lines, as well as maintain railroad infrastructure are constantly evolving. To help employees meet this challenge and keep up with the latest industry trends, Union Pacific invests in employee training and career development. Training, daily job briefings, operating rules application and testing, and constant focus on safety are integrated into all work processes.

### Training Facilities

Union Pacific has training facilities located across our network. Major training facilities are located in Salt Lake City, West Chicago, Houston and Omaha. The major training facilities are equipped with full-size simulators and laboratories to support highly technical training. To increase the availability of and access to ongoing training opportunities, Union Pacific offers onsite training at many locations across our service area.

Union Pacific partners with several community colleges across our service area to provide continued and enhanced employee training. These partnerships include sharing facilities, lab equipment, classrooms and, in some cases, instructors. In Salt Lake City, Union Pacific's Technical Training Center is located on the campus of Salt Lake Community College, where we utilize more than 40,000 square feet of office and classroom space.

### Virtual Simulation Training

Union Pacific has engaged in innovative approaches to ensure that all employees have access to training. Our video simulation training programs help employees learn how to sort cars onto tracks, stop and start locomotives and uncouple rail cars. The simulator enables employees to become familiar with rail yard surroundings in a controlled environment, and such training creates a safer, more proficient and confident work force. The program is now being used at 45 training locations across Union Pacific's network.

### Employee Performance Management

To thrive in a competitive and frequently changing environment, our employees must have a clear understanding of what is expected of them, how their work relates to the company's business objectives, values and competencies, and how they will be measured. Performance management at Union Pacific is an ongoing process, with regular discussions between an employee and manager being the critical component. The performance management process comprises three phases for non-union employees: goal planning, coaching and reviews.



### Education Assistance

Union Pacific values continuing education. Our education assistance program encourages full-time employees to enroll in job- or career-related courses at accredited schools, colleges and universities. The program pays up to 85 percent of the cost of tuition.

### Management Development

Management development opportunities are available to employees throughout their careers and include a series of leadership and skills performance programs and courses. These programs and courses are offered to support the company's mission and values, strategic initiatives and individual development needs.

## VALUING EMPLOYEE DIVERSITY AND INCLUSION

To remain an innovative, industry-leading and customer-focused company, Union Pacific draws upon the expertise and experiences of individuals from all backgrounds. We work to increase our diversity from our headquarters to the train yard. It is a priority for Union Pacific to reflect the customer base and the communities in which we live and work.

### Employee Resource Groups

Raising awareness and providing a nurturing environment where all employees can do their best work is critical to successful diversity management. Employee resource groups are important to achieving this objective. Some of these groups work with management to raise awareness of diversity issues and to support recruiting, retaining and advancing careers of women and minorities within our company.

**Black Employee Network (BEN)**
The Black Employee Network was established in 1979 with the mission to recruit, retain and advance the careers of African-American employees within Union Pacific by promoting and facilitating both personal and professional growth, and by working with Union Pacific senior leadership toward an awareness of diversity issues.

BEN led the initiative that resulted in the creation of "CNET," which makes access to job openings available to all qualified individuals, and also played a key role in the development and pilot of the "Accountability Partners," mentoring program which has subsequently been adopted by Union Pacific.

On a community involvement level, BEN supports local African-American communities by providing scholarships to graduating seniors and college freshmen, and by working to encourage high school graduates to pursue post-secondary education. Since 1980, BEN chapters system-wide have awarded more than $300,000 in scholarships.

**Council of Native American Heritage, (CONAH)**
In 2006, a group of Union Pacific employees of Native American heritage began planning a November celebration at Union Pacific's Omaha headquarters to coincide with the national Native American celebrations. The celebration has continued since then, and the organizing group was formalized in 2008. CONAH works with Union Pacific leadership and human resources to discuss and plan efforts to balance diversity at Union Pacific and support the professional growth of Native American employees.

*continued* ▸

**Lead, Educate, Achieve and Develop (LEAD)**
Established in 2003, Lead, Educate, Achieve and Develop (LEAD) is a women's initiative whose mission is to foster an environment that increases opportunities for women to be recruited, retained and advanced as Union Pacific leaders. Through diverse committees and organization-wide activities, LEAD offers members the opportunity to interact with other employees through professional programming, mentoring, skills training, informal networking, work/life balance projects and LEAD-sponsored community activities.

LEAD's organization of Union Pacific's annual Susan G. Komen Race for the Cure effort earned LEAD and the company the Outstanding Volunteer Group Award at the 2010 Komen for the Cure Affiliate Conference for dedication, commitment, creativity and initiative to help breast cancer awareness and programs in Nebraska. Each year, Union Pacific's LEAD group organizes one of the largest corporate Race for the Cure teams, and in 2009, broke its own team member record with 2,481 participants. LEAD and Union Pacific have raised more than $500,000 since the first Union Pacific group was formed, with $76,500 raised in 2009 alone.

Additionally, LEAD works with Operation Lifesaver to promote awareness of rail safety in the communities served by Union Pacific.

LEAD's membership has grown to more than 500 members in 2010, representing employees at headquarters and 10 field chapters.

**Latino Employee Network (LEN)**
Established in 2004, the Latino Employee Network works to recruit, retain and advance the careers of Union Pacific's Latino employees. LEN supports Latino communities by sponsoring clothing and food drives, translating for Spanish-speaking parents enrolling their children in kindergarten and sponsoring families during the holidays. In addition, LEN chapters systemwide have awarded $46,000 in scholarships to graduating high school seniors and college students.

**UP Ties**
UP Ties provides opportunities for emerging professionals to enhance their understanding of Union Pacific, strengthen cross-departmental knowledge, heighten leadership and communication skills, become involved in the community with co-workers, build a professional network, and foster new relationships and friendships.





## Military Recruiting

Union Pacific values the commitment, training and diversity that members of our armed forces bring to the workplace, and we actively recruit men and women in uniform.

We have continued our involvement at military transition offices, military education offices, reserve units, military panels, National Guard units, career fairs, information sessions, employer panels and resume review assistance opportunities. Union Pacific representatives serve on local military committees and boards. Since 2005, Union Pacific has hired approximately 5,000 members of the armed forces.

# Commitment to Communities



The Union Pacific team extends beyond our employees and their families to include the communities in which we work and live.

Many of the more than 7,000 communities throughout the railroad's system can trace their origins directly to a Union Pacific depot. These communities were with us in the beginning, sustained us over time and have helped make us an industry leader today. They play a vital role in maintaining the safety and security of our railways. They provide well-trained employees that foster Union Pacific's commitment to excellent service. Through our programs and the Union Pacific Foundation, we seek to enhance our relationships with the communities in our network for their good as well as the benefit of our employees and customers.

***Above:*** *Elmhurst, Ill., was officially incorporated as a village in 1882. At the time, the Galena and Chicago Union Railroad, now part of Union Pacific, provided local farmers convenient rail access to and from Chicago. More than a century later, Union Pacific still carries critical produce and grains to cities and towns across America.*

## PUBLIC SAFETY

Safety is a top priority for Union Pacific. As a company, we continuously look for innovative approaches to enhance the safety and security of our employees, our communities and the customers we serve. Our partnership with local community teams is a key element in our safety profile.

### Rail Crossings

Union Pacific works with federal, state and local officials to promote safety at rail crossings. Government officials determine signal placements, upgrades and crossing improvements, implementing the necessary safety upgrades. However, technical and structural enhancements are just two components of reducing railroad crossing injuries. Union Pacific also partners with communities on important educational programming.

Union Pacific helped create and now collaborates with Operation Lifesaver, a non-profit safety education and outreach organization.

Union Pacific helped create and now collaborates with Operation Lifesaver, a non-profit safety education and outreach organization. It was created in 1972 as a state initiative in Idaho to end collisions, deaths and injuries at intersections of train tracks and roadways and on railroads' rights of way. Today, Operation Lifesaver is an independent program that works cooperatively with government and private industries to educate the public on the importance of railroad safety.

Volunteer Union Pacific representatives discuss the importance of railroad safety with school and community groups. In 2009, Union Pacific sponsored more than 6,000 programs reaching more than 378,000 people in local communities across the 23 states we serve.

UP CARES
Crossing Accident Reduction Education and Safety

In addition to community group presentations, we hold Union Pacific Crossing Accident Reduction Education and Safety (UP CARES) events across the country. Union Pacific invites local school groups, law enforcement, judges and prosecutors, and community leaders to ride a Union Pacific safety train to observe motorist behavior on television monitors that transmit live footage from a video camera mounted on the locomotive. In 2009, Union Pacific held 523 UP CARES events across the country.



Case 1:07-mc-00489-BAH Document 1229-7 Filed 11/22/24 Page 42 of 3766



## Preventing Derailments

Our derailment reportable rate decreased 34 percent from 2001 to 2009. Union Pacific continues to incorporate innovative technology and solutions to decrease derailments and enhance safety.

*Innovative Technology:*

**Ultrasonic Wheel-Defect Detection**
Union Pacific installed an ultrasonic detection machine in 2009 that can quickly scan all of a train's wheels for damage. As the train rolls down the track, ultrasonic sensors detect defects and instantly flag problems. The goal of the new system is to scan every wheel in our coal-car fleet every 60 days and eliminate derailments related to broken wheels.

**Wayside Detectors**
Union Pacific's wayside detection systems have evolved during the past two decades to more accurately identify potential failures in rail equipment components that can lead to derailments. Data from these systems is networked through a centralized computing system, allowing us to produce a report card for each car and locomotive. This improves our ability to predict and prioritize work.

*New Approaches and Training:*

**Distributed Power Units (DPU)**
Distributed power involves putting locomotives in the middle and/or end of trains rather than having all locomotives at the front end. Distributed power enhances train safety because it reduces the physical forces on the train, making it less prone to derailments. Distributed power also facilitates more even braking and has the potential to reduce wheel and track wear.

Union Pacific began using distributed power in 1995 on trains traveling on mountain grade territory, as well as coal trains. Distributed power usage is increasing across the entire Union Pacific network and moved approximately 65 percent of 2009's gross-ton miles. Union Pacific plans to increase that amount to approximately 70 percent in 2010.

**First-Responder Training**
Union Pacific partners with local emergency responders to help minimize the impact of a derailment on a community. We believe this partnership is vital to our company. Since 1979, Union Pacific has trained more than 170,000 local fire and law enforcement personnel. In 2009, approximately 4,800 emergency responders received training through our programs.



## Safe Hazardous Materials Transport

Rail is the safest method of transport for hazardous materials. We are required to transport hazardous materials according to federal law known as the common carrier obligation. Railroads haul 20 percent of the chemicals used in the United States – from chlorine that not only cleans water but also is used in pharmaceuticals, building materials and many products we use every day.

Currently, 99.99 percent of our chemicals shipments move without incident or loss. However, we will not be satisfied until we meet our 100 percent objective. Union Pacific has developed the following procedures and programs to help meet this objective.

### Precision in Tracking

We manage every move with the utmost precision. Leading-edge technology helps Union Pacific track sensitive materials shipped on the railroad. With the click of a mouse on our secure surveillance network, security personnel can find Toxic Inhalation Hazard shipments anywhere on the system, whether the cars are moving or not. We can focus in on any shipment and see greater detail with every level we define – down to the trip history and plan for each car, train information and more. Prior to receipt, the company receiving the delivery must be confirmed and documented along with the car number, location, date and time. This assists in our efforts to work with the Transportation Security Administration to ensure safe transport of these materials through our communities.

In addition, we have a process to randomly select tank cars for inspection each month throughout Union Pacific's system. Although not legally mandated, Union Pacific believes these regular, proactive examinations can help identify defective cars and provide opportunities for the training needed to reduce accidents and spills.

### Training

We work with community emergency response personnel to implement preparedness tools and approaches. This includes sharing best practices and jointly educating our mutual team members. We have trained approximately 19,000 public responders in the last four years.

Each year, Union Pacific participates in industrywide whistle stop training tours. Nearly 6,000 local emergency responders have been reached through these locally administered training programs at Union Pacific-sponsored sites, which focus on emergency response as it relates to all forms of transportation, including railroads and truck lines.

### PUBLIC SAFETY: UNION PACIFIC FACTS

37 percent reduction in rail crossing accident rate since 2001.

11 percent reduction in rail crossing accident rate between 2008 and 2009.

More than 95 percent of our lead locomotives have train image recorders (TIRs).

34 percent reduction in derailment reportable rate since 2001.

Union Pacific uses lasers and ultrasound to find rail imperfections, and we track the acoustic vibration on wheels to forecast potential failures before they happen.



***Above:*** *Even though rail is already the safest mode of ground freight transportation, we continue to plan, communicate and train for all possible scenarios. Community emergency responders across our 23-state network travel to Pueblo, Colo., for specialized rail car safety training.*

*continued* ▸

### Emergency Response Committees

Keeping our communities safe also requires partnering with multiple community stakeholders to discuss and prepare for emergencies. Union Pacific employees actively participate in state and local emergency planning committees which include representatives from local fire and health departments, education institutions, industry organizations, transportation departments and the public. The committees receive information about chemicals moving through their communities and use this information to help formulate local emergency plans. Union Pacific requires its hazardous materials managers to participate in local planning committees.

### Partnering With Customers

TRANSCAER®: Union Pacific and Dow Chemical created the Transportation Community Awareness and Emergency Response, TRANSCAER, a national initiative to improve emergency responder awareness of hazardous materials transportation throughout the country.

Together we have created a safety train that provides free training to local firefighters and emergency response personnel.

### Responsible Care

Union Pacific participates in Responsible Care, the chemical industry's national quality initiative to improve processes related to safety, health, environment and security beyond levels required by the U.S. government. Union Pacific was the only railroad to be certified under Responsible Care 2000 standards and was the first railroad to be certified under 2004 standards. Certification requires outside auditors to review the company's management practices at headquarters and in the field.

### TRANSCAER OBJECTIVES

- Improve community awareness of hazardous materials found in transportation.
- Encourage partnerships between citizens and industry.
- Assist emergency responders in planning and preparing for hazardous material-related incidents.
- Assist emergency responders in evaluating their community's emergency response plan.

### PINNACLE AWARDS RECOGNIZE CHEMICAL TRANSPORTATION SAFETY

Union Pacific's Pinnacle Awards recognize customers that have implemented successful prevention and corrective plans and have achieved a rate of zero non-accident releases (NARs) for shipments of regulated hazardous materials.

We work closely with our customers to help prevent a release during transit of chemical shipments and jointly demonstrate a commitment to the safe transportation of hazardous materials.

The awards program, which began in 1996, is open to all of Union Pacific chemical and petrochemical customers. Criteria include safe loading techniques, securement of shipments and zero NARs.

Non-accident releases of hazardous material on Union Pacific's network have declined approximately 15 percent since 2002 due in part to increased inspections by the railroad's hazardous material safety field personnel and the Pinnacle Awards criteria.

Railroads annually transport more than 1.5 million carloads of hazardous cargo. Rail is the safest way to move this material. In fact, 2009 was the safest year in freight railroad history according to preliminary data from the Federal Railroad Administration.

## Safety Through Security

Efforts to ensure railroad security are a way of life at Union Pacific. The company's robust security program operates 24/7 on what amounts to a 32,000-mile outdoor factory. In conjunction with our own highly-trained, commissioned police force, Union Pacific coordinates security efforts with a number of agencies, including U.S. Customs and Border Protection (CBP), U.S. Coast Guard, Federal Bureau of Investigation, Central Intelligence Agency, Department of Homeland Security and Transportation Security Administration.




Union Pacific was the first U.S. railroad to be named a partner in the Customs-Trade Partnership Against Terrorism, a CBP program designed to develop, enhance and maintain effective security processes throughout the global supply chain.

As part of our efforts to keep trains secure and communities safe, Union Pacific employs state-of-the-art security technology that focuses on detecting unauthorized access.

### SECURITY

**Union Pacific's security efforts include:**

- Our own police force consisting of more than 200 UP police officers.
- Officers and K-9 units dedicated to border protection.
- Response Management Communication Center and Department of Defense-certified operation center.
- Newly deployed technology called Train Rider Identification Detection System (TriDS) at McNary, Texas.
- A surveillance network that can report the location and movement of hazardous cargo within seconds.
- Employee and contractor background checks and training.
- Smart cameras, impact recorders and other sensors that are being piloted near bridges, rail yards, tank farms, tunnels and sidings.
- $72.5 million invested over the last decade on support for drug interdiction programs at the U.S.-Mexico border.
- A virtual-fencing pilot program around our facilities that triggers an alarm to our Response Management Communication Center.

## COMMUNITY GIVING

Union Pacific plays an active role in our communities, and we are constantly working to improve the quality of life in the communities where we live and work. Our employees give their time and talents and provide generous contributions to local community programs. We take pride in providing opportunities for children and families in thousands of communities across our network.

The Union Pacific Foundation is the philanthropic arm of Union Pacific Corporation and Union Pacific Railroad. The Foundation was established in 1959 and provides support through The Principals' Partnership and community-based grants. In 2009, Union Pacific donated more than $13 million in community giving and supported more than 600 nonprofit organizations.

| STATE | EMPLOYEES | PAYROLL (s)* | ROUTE MILES | CAPITAL SPENDING (s)* | IN-STATE PURCHASES* |
|---|---|---|---|---|---|
| Arizona | 1,177 | 95.9 | 641.63 | 106.1 | 40.7 |
| Arkansas | 2,493 | 179.3 | 1,330.99 | 117.5 | 24.6 |
| California | 4,581 | 388.4 | 3,383.49 | 273.2 | 167.9 |
| Colorado | 1,299 | 108.9 | 1,534.93 | 87.7 | 176.4 |
| Idaho | 817 | 70.8 | 849.04 | 27.6 | 30.7 |
| Illinois | 3,587 | 282.1 | 2,203.86 | 256.4 | 1,200.0 |
| Iowa | 1,640 | 128.5 | 1,434.45 | 67.7 | 49.0 |
| Kansas | 1,446 | 131.7 | 2,205.13 | 81.6 | 159.9 |
| Louisiana | 1,004 | 88.3 | 1137.82 | 45.5 | 17.9 |
| Minnesota | 358 | 31.1 | 659.10 | 12.2 | 78.1 |
| Missouri | 2,477 | 174.4 | 1,505.05 | 85.4 | 265.8 |
| Montana | 16 | 1.1 | 125.23 | ** | 1.9 |
| Nebraska | 7,501 | 748.5 | 1,067.60 | 224.1 | 276.0 |
| Nevada | 588 | 40.2 | 1,192.60 | 67.6 | 10.8 |
| New Mexico | 318 | 22.5 | 618.15 | 43.4 | 9.2 |
| Oklahoma | 349 | 29.4 | 1,172.56 | 37.9 | 91.8 |
| Oregon | 1,543 | 121.3 | 1,072.56 | 75.5 | 56.8 |
| Tennessee | 47 | 2.8 | 14.14 | ** | 81.8 |
| Texas | 6,929 | 553.9 | 6,336.31 | 307.0 | 1,100.0 |
| Utah | 1,379 | 118.2 | 1,253.73 | 42.8 | 173.9 |
| Washington | 296 | 21.5 | 531.68 | 10.3 | 72.1 |
| Wisconsin | 325 | 32.1 | 928.53 | 19.7 | 45.9 |
| Wyoming | 1,262 | 96.4 | 878.73 | 61.5 | 52.1 |

*2009 data.*   ** in millions*   *** Nominal capital spent due to low route miles in state.*

## The Principals’ Partnership

Union Pacific understands the important role schools play in strengthening communities and we are committed to providing educational support. National research shows that highly-skilled principals are a critical factor in the success of high school students; however, despite the tremendous influence principals have on students, teachers, parents and communities, there are few leadership programs specifically for them.

To fill the void and improve public education, Union Pacific enlisted education professionals to design a unique principals’ program emphasizing leadership development, encouraging information sharing and promoting innovative strategies. The result was The Principals’ Partnership.

The Principals’ Partnership brings together high school principals from states served by Union Pacific to receive year-round, self-directed assistance from some of the nation’s top education professionals. In addition, Union Pacific sponsors a Summer Leadership Institute, where principals have the opportunity to learn from nationally renowned speakers and, most importantly, to network with one another.

Today, this award-winning program includes more than 1,000 public high school principals in 21 states. These principals touch the lives of more than 1 million students and thousands of teachers.

### THE PRINCIPALS’ PARTNERSHIP

In early 2010, the National Governor’s Association honored the state of Nebraska and The Principals’ Partnership with its annual Public-Private Partnership Award. The award was presented to the NGA Corporate Fellow companies that partnered with a governor’s office to implement a program or project that positively affects the state’s citizens.

THE PRINCIPALS' PARTNERSHIP
A PROGRAM OF UNION PACIFIC FOUNDATION

## Community-Based Grants

The Union Pacific Foundation provides funding to non-profits that enhance the quality of life in their communities, support visual and performing arts and improve the level of healthcare or provide human services. The intent is to build capacity in these organizations and increase their effectiveness in serving residents and families.

# Commitment to Customers




Union Pacific handles the products America needs. Our customers represent nearly every business imaginable: consumer goods of all types, including whole grains and packaged foods; autos and auto parts, including personal vehicles; chemicals for a variety of uses; construction products such as lumber, rock, asphalt and cement; energy-related products from coal and ethanol to wind turbine components; and thousands of other products.

In everything we do, Union Pacific strives to improve the service and consistency we offer our customers. At the most basic level, customers hire us to transport their goods in the fastest, safest, most cost-effective manner possible. In addition to meeting those needs, we also offer customers the most efficient, environmentally friendly transportation solutions available today. Our safety programs benefit our employees and communities as well as our customers by keeping their employees safe and contributing to their bottom lines. Our customer satisfaction reviews are at record levels, and our investments in improving our infrastructure improve service and enhance safety.

## SUPPLY CHAIN ASSISTANCE

As additional pressure is placed on companies to include their supply chains in determining their environmental impact, we offer our customers the opportunity to leverage the benefits of railroads to haul their products in a manner that will have less impact on the environment. If just 10 percent of the long-haul freight currently moved on highways was diverted to rail, annual fuel savings would exceed 1 billion gallons. This reduced fuel consumption would mean more than 12 billion fewer tons of greenhouse gas emissions, equivalent to the emissions of nearly 2 million passenger vehicles or the $CO_2$ emissions from electricity used by more than 1 million homes for one year.

Over the past two years, we have invested more than $18 million to upgrade our refrigerated boxcars with new diesel refrigeration units that will reduce diesel particulate emissions by 50 percent. Union Pacific's entire boxcar fleet of mechanical refrigerated cars complies with California Air Resources Board standards.

## CUSTOMER SERVICE

We pride ourselves on the service we provide customers. We continue to receive customer awards for responsiveness, process standardization, problem solving and consistent transportation service performance.

Union Pacific is not just about freight rail – we are a comprehensive transportation solutions provider. We offer flexible transportation options to help our customers with nearly every type of shipment. We are prepared to ship just about anything safely and on time. In order to meet customers' needs, we use our extensive system map and coordinate shipments through our network, other railroads and over-the-road transportation, providing complete, door-to-door service.



***Right:*** *Fresh fruits and vegetables are loaded onto Union Pacific's RailExpress train, where air composition and temperature are monitored in real time thousands of miles away. This technology offers local farmers an environmentally friendly and cost-effective option.*

### WHY CUSTOMERS CHOOSE UNION PACIFIC

**Flexible Solutions**
Union Pacific offers shipment solutions to handle most transportation needs, whether a customer's facility is located on rail track or not.

**Strong Value Equation**
Union Pacific provides cost-competitive economies of scale versus truck. In fact, just one of our rail cars can hold up to four times the freight of a single truck, lowering unit costs.

**Reliable, Secure and Safe Delivery**
Union Pacific will speed shipments to their destinations, keeping them secure along the way. For products that require sensitive handling, rail is the safest form of ground freight transportation.

**Green Transportation**
Union Pacific shipments cut emissions by two-thirds compared to truck. Check out the Carbon Calculator to see how we can reduce our customers' carbon footprint.

# GOVERNANCE AND ETHICS



Union Pacific is proud of the position we have earned as an industry leader and we are committed to maintaining it. Part of that leadership position is due to the high ethical standards of our company and employees. We invest resources so we can continue to provide quality service and value to our customers and investors.

BUILDING AMERICA®

# Board of Directors

Union Pacific works diligently on behalf of our shareholders, employees and customers to be among the best-governed companies in America.

Our efforts begin with our Board of Directors, which is comprised of at least a majority of independent directors, including no more than two management directors at any given time. At year-end 2009, our Board consisted of 11 independent directors and one management director. Our Board has four standing Committees – the Audit Committee, Finance Committee, Compensation and Benefits Committee, and Corporate Governance and Nominating Committee – each of which is comprised entirely of independent directors and operates under a written charter adopted by the Board. Additionally, each year the Board elects a chairman, who may or may not be the CEO of the company. If the individual elected as chairman of the Board is not an independent director, the independent directors also elect a lead independent director.

## Board Membership Criteria

The Corporate Governance and Nominating Committee is responsible for developing and periodically reviewing the appropriate skills and characteristics required of our Board members. The Committee develops and recommends membership criteria to the Board, including factors such as business and management experience, familiarity with the business, customers and suppliers of Union Pacific, diverse talents, backgrounds and perspectives, as well as relevant regulatory and stock exchange membership requirements for the Board and its Committees.

The Board of Directors and Union Pacific management team are united in the goal that the company and its subsidiaries are among the best-governed companies in America.

## Evaluation of Board and Committee Performance

The Board and its Committees conduct self-evaluations annually to assess their performance. The evaluation process includes a self-assessment that invites comments on all aspects of the Board and each Committee's process. These evaluations serve as the basis for a discussion of Board and Committee performance as well as recommended improvements.

## Communications with the Board of Directors

We believe it is important for shareholders to have access to members of Union Pacific's Board of Directors, and we ensure that information and inquiries are received by the intended director or directors. The Board has appointed and authorized the Secretary of the company to be responsible for processing communications from interested parties addressed to directors. All communications from shareholders are forwarded directly to the appropriate Board members.

Employees, too, are provided avenues for communication on governance issues. The Union Pacific Values Line allows employees to report concerns or complaints with regard to governance issues. Employee concerns may be reported either anonymously or in name. If requested, employee concerns are held in confidence to the extent legally permitted.

# Guiding Policies and Principles

As a publicly traded and owned company, we take pride in achieving our success by maintaining the highest ethical standards. As a company and as individuals, we strive to do the right thing.

Our reputation will always be a source of pride for employees and a bond with customers, investors and community partners. In support of that goal, our employees, both union and non-union, are expected to comply with applicable laws and regulations and adhere to high ethical standards, which include honesty, fairness, integrity and respect. We offer employees ethics training incorporated in their education opportunities. Additionally, Union Pacific has developed a number of policies and principles that guide our company.

## Equal Opportunity

Union Pacific is strongly committed to equal opportunity in all employment matters. We strive to maintain a work environment that always respects differences so that all employees can contribute to their fullest potential. Union Pacific's Equal Employment Opportunity Policy helps us provide equal opportunity to all employees and applicants, without regard to race, color, gender, national origin, age, religion, sexual orientation, veteran status or disability. Our policy exceeds federal and state Equal Employment Opportunity laws and applies to all terms and conditions of employment including hiring placement, promotion, demotion, termination, transfer, leaves of absence, compensation and training, among others.

We are committed to affirmative action for women, minorities, individuals with disabilities and veterans at all levels and in every segment of our work force. We also extend our commitment beyond the current legal definitions of protected classes to include marital status, family status, political affiliations, educational background, socioeconomic status, lifestyle, sexual orientation, disability and other non-job-related factors.

## Ethical Standards

The Corporate Governance and Nominating Committee developed and maintains the principles and practices that guide our company. The Board has adopted the Union Pacific Corporation Code of Ethics for the CEO and Senior Financial Officers, the Statement of Policy on Ethics and Business Conduct for employees and the Union Pacific Corporation Code of Business Conduct and Ethics for Members of the Board of Directors. We continually assess the appropriateness of these guiding principles and practices, recommend changes that will comply with federal regulations and promote the effective and efficient governance of the company.

Additional information is available in our Annual Report on Form 10-K and the Union Pacific Proxy Statement.

## Union Pacific Harassment Policy

We are committed to providing a work environment free from offensive behavior directed at a person's race, color, national origin, religion, gender, sexual orientation, age, veteran status or disability. That includes behavior toward other employees, customers, visitors to company facilities and anyone our employees come in contact with during the normal course of work or while representing the company.

A discrimination-free workplace and fair treatment are fundamental rights of all Union Pacific employees.

## Fostering Supplier Diversity

Valuing diversity includes recognizing the contributions businesses owned by minorities and women offer Union Pacific and the communities we serve. Our policy is to offer qualifying businesses the maximum opportunity to compete in the marketplace. From 2005 to 2009, our minority- and woman-owned supplier base for materials and service providers increased by 55 percent. We will assist in developing and strengthening these business relationships by maintaining active efforts to seek, identify and encourage their participation in our procurement processes.

## Compliance

Employees and third parties are encouraged to report any concerns regarding questionable accounting, internal accounting controls or auditing matters. Employees can report concerns – either anonymously or openly – via the Union Pacific Values Line or the company's internal audit department.

## Compensation

Union Pacific offers competitive compensation to our employees and leadership. Our Board of Directors evaluates our compensation plans and reviews recommendations from the Compensation and Benefits Committee. We use an independent compensation consultant to review and evaluate programs to confirm they are designed with the best interest of employees and shareholders in mind. The Compensation and Benefits Committee uses information from the consultant to make recommendations to the Board with regards to adjustments and changes needed to maintain competitive salaries and benefits for non-agreement employees and leadership.

# RECOGNITION




***Above:*** *U.S. service men and women attend Union Pacific's steam exhibition during Oklahoma's centennial celebration. Union Pacific has been recognized by multiple military organizations for our recruiting efforts and dedication to employees serving in the military.*

UNION PACIFIC BUILDING AMERICA®

# Company Awards and Honors

**BusinessWeek Best Places to Launch a Career (2009, 2008):** BusinessWeek selected Union Pacific as one of the nation's top 50 Best Places to Launch a Career. BusinessWeek ranked employers based on input from career services directors, benefits and training programs at identified companies and undergraduate surveys. Union Pacific moved from No. 39 in 2008 to No. 28 in 2009.

**CALSTART Blue Sky Merit AwardTM (2008):** The annual award recognizes outstanding marketplace contributions to clean air, energy efficiency and to the clean transportation industry overall by companies, organizations and individuals. Union Pacific was recognized for our commitment to developing and operating cleaner, energy-efficient Genset switching locomotives.

**C.H. Robinson Intermodal Rail Carrier of the Year, C.H. Robinson (2010)*:** C.H. Robinson, one of the world's largest third-party logistics companies, named Union Pacific the 2009 Intermodal Rail Carrier of the Year based on our commitment to service and overall value to C.H. Robinson's business.

**Corporate Responsibility Officer 100 Best Corporate Citizens (2010):** The 100 Best Corporate Citizens for 2010 measures Russell 1000 Index companies in approximately 360 data points across seven categories: governance, environmental, human rights, employee relations, climate change, philanthropy and financial. The only railroad named to the list, Union Pacific ranked second among all transportation companies and No. 69 overall.

**Department of Defense Freedom Award (2008):** For consistent dedication to employees serving in the National Guard and Reserve, Union Pacific was presented the Freedom Award – the U.S. government's highest employer recognition.

**Eastman Chemical Company Supplier of Excellence Award (2010)*:** Union Pacific became the first railroad to earn the Eastman Chemical Company Supplier Excellence Award for overall company performance. The award signifies consistent performance in providing Eastman with high-quality products and services, and working on Eastman's behalf to improve the company's efficiency and competitiveness. It represents the highest level of all awards presented in the Eastman Supplier Excellence Program.

**Forbes Reputation Rankings (2009):** Forbes named Union Pacific Railroad as one of America's most reputable companies.

**Fortune Most Admired Railroad (2009):** Fortune magazine named Union Pacific the railroad industry's Most Admired company three times in four years as part of the magazine's World's Most Admired Companies survey.

**General Electric Excellence in Customer Centricity Award (2009)*:** Union Pacific received GE's Excellence in Customer Centricity award for our work in transporting wind energy components. The award is given to a supplier that consistently meets all sourcing critical to quality and price, delivery quality, and demonstrates flexibility and responsiveness to GE and GE's customers.

**General Motors Supplier of the Year (2009)*:** Union Pacific was the only railroad named by General Motors as one of its suppliers of the year. The award recognizes the significant contributions of GM's suppliers as part of the company's global product and performance achievements. Award decisions were based on supplier performance in the areas of quality, service, technology and price.

**G.I. Jobs Top Military-Friendly Employer (2010, 2009, 2008):** Union Pacific has been named America's top military-friendly employer by G.I. Jobs six times in seven years.

**Great Plains Minority Supplier Development Council Corporation of the Year (2009):** Presented annually, this award recognized Union Pacific for its many efforts to increase and improve its minority supplier business relations, as well as assist other companies and their key suppliers to recognize the value of supplier diversity.

**Harbor Association of Industry & Commerce of Southern California Salute to Industry Award (2009):** Union Pacific was recognized for air pollution reduction and environmental stewardship efforts, along with our significant contribution to the improvement of the business environment with the Port of Los Angeles and the Port of Long Beach.

*continued* ▸

**Human Resource Executive Most Admired for Human Resources (2010, 2009)*:** Human Resource Executive selects companies for the Most Admired for Human Resources list based on quality management, people management, innovativeness and quality of human resources products and services. Union Pacific was ranked No. 19 on the list of top 50 companies as named in January 2010, up 10 spots from the previous year.

**Military Officers Association of America Distinguished Service Award (2009):** For strongly supporting military people, especially employees in the National Guard and Reserve deployed to Iraq and Afghanistan, the Military Officers Association of America honored Union Pacific with its Distinguished Service Award. Union Pacific was the only company cited by the MOAA for this honor.

**National Business Group on Health Best Employers for Healthy Lifestyles (2009):** Union Pacific was the only railroad and only transportation company to be recognized, as well as one of only 17 companies to receive the platinum level honor. The award is given to employers that demonstrate exceptional commitments to healthy lifestyles for employees and their families.

**Susan G. Komen for the Cure® Outstanding Volunteer Award (2010)*:** Union Pacific's women's initiative, LEAD (Lead, Educate, Achieve, Develop), a group of advocates for the Nebraska Affiliate of Susan G. Komen for the Cure®, received the annual Outstanding Volunteer Group Award for dedication, commitment, creativity and initiative to help breast cancer awareness and programs in Nebraska.

**Toyota On-Time Service Performance and Customer Service by Toyota (2010)*:** Union Pacific was recognized as the top railroad in on-time service performance and customer service by Toyota Logistics Services. These two Toyota Logistics Excellence Awards are presented to the transportation supplier that provides superior on-time service performance and customer service that excels in communication, equipment supply, responsiveness, collaboration, business controls and overall ease of doing business.

**Toyota Top Railroad in Customer Service (2009):** Union Pacific was recognized as the top railroad in customer service by Toyota Logistics Services. A concerted focus on responsiveness, standardization, problem solving and overall quality contributed to the company's success in being recognized with this prestigious award.

**TRANSCAER National Achievement Award (2010, 2009, 2008)*:** The award recognizes extraordinary achievement in support of the TRANSCAER (Transportation Community Awareness and Emergency Response) initiative. TRANSCAER is the voluntary national outreach effort to help communities prepare for and respond to a possible hazardous material transportation incident.

**UnitedHealth Group Apex Award (2010)*:** This award honors innovation and thought leadership displayed by employers and brokers working to improve the health care system. Union Pacific earned the award for reducing employee prescription drug costs 27 percent since 2006 for an average savings of $500 per employee plan participant.

**UPS Outstanding Peak Season Performance (2010, 2009, 2008)*:** UPS recognized Union Pacific for 100 percent performance of all package sorts to be delivered by UPS during the peak season from late November to Dec. 24.

# Individual Awards and Honors

**Black Enterprise 100 Most Powerful Executives in Corporate America (2009):** Black Enterprise, a national magazine for African-Americans, featured Union Pacific's Eric Butler in its February issue as one of the "100 Most Powerful Executives in Corporate America." Butler is vice president and general manager-Industrial Products.

**Employee Support of the Guard & Reserve (ESGR) Award (2009)*:** Union Pacific's Sue Wimmer, assistant director-Protection Management, was presented with one of the ESGR's highest awards for her work with UP's military employees. Wimmer was recognized for working with employees and their families to administer pay and benefits available under the railroad's Reservist policy. Union Pacific compensates any difference between military and railroad pay for employees called to duty.

**Harold F. Hammond Award (2010)*:** The Association of American Railroads named Union Pacific employee Willie Sandoval the 2009 winner of this award, which honors an individual railroad employee who has demonstrated outstanding safety achievement. Sandoval, a boilermaker, was recognized for his leadership role and work among fellow employees and within his community in Fort Worth, TX.

**Institute of Career Advancement Needs (ICAN) Tim Rouse Advocate for Women in Leadership Award (2009)*:** Jack Koraleski, executive vice president-Marketing and Sales at Union Pacific, was recognized for actively participating in the advancement of women in leadership, business and the community.

**John H. Chafee Environmental Excellence Award (2008):** Debra Schafer, general director maintenance of way-Environmental for Union Pacific was primarily recognized for developing innovative environmental management tools, creating and implementing the air emissions compliance audit program and leading Union Pacific's involvement in a federal Endangered Species Act planning permitting process.

**Network and Affinity Leadership Conference (NALC) Above and Beyond Award (2009):** The NALC recognized two Union Pacific Railroad employees for tirelessly supporting the railroad's diversity initiatives. NALC honored Union Pacific's Richard Gregory, general director-Labor Relations, and Arnold Nesbitt, director-Port Development, for their instrumental work in establishing the Black Employee Network (BEN), the railroad industry's first employee resource group formed in 1979.

**PINK Top Women in Business (2008):** Diane Duren, vice president and general manager-Chemicals, was honored as one of the Top 15 Women in Business by PINK, the national magazine for professional women. PINK's exclusive list profiles the most influential women driving innovation and revenue in corporate America. Duren was honored for her vision in creating the Express Lane food products train during her tenure as Union Pacific vice president and general manager-Agriculture Products.

**TRANSCAER Distinguished Service Award (2009):** Union Pacific's Lou Wagner, general director-Transportation Services, was presented the TRANSCAER Distinguished Service Award, which is presented in recognition of exceptionally meritorious service to the public in a TRANSCAER capacity. It was just the second time this award has been presented since TRANSCAER was formed in 1986. TRANSCAER (Transportation Community Awareness and Emergency Response) is the voluntary national outreach effort to help communities prepare for and respond to a possible hazardous material transportation incident.

**United Way of the Midlands Volunteer of the Year Award (2009)*:** Train Dispatcher Connie Rose was named Volunteer of the Year for her numerous efforts which included promoting rail safety as a certified Operation Lifesaver instructor and recruiting peers to fund and support a free medical clinic at Omaha's Open Door Mission.

**University of Nebraska Women of Color Award for Business and Entrepreneurship (2008):** Union Pacific's Jacqueline White, assistant vice president-Purchasing, was selected as a recipient of the 2008 University of Nebraska Women of Color Award for Business and Entrepreneurship. White was selected for making significant contributions to Union Pacific by increasing the company's visibility within the Omaha community and her recruiting efforts at historically black colleges and universities.

**UPS Railroad Partner of the Year (2009):** Marcia Donahue, director-Premium Operations, was named inaugural Railroad Partner of the Year by UPS. Donahue was recognized for her performance in surpassing UPS' transportation requirements.

** – awarded for prior year(s) performance*

# Moving Forward

As North America's premier railroad franchise, we continue to focus on providing excellent customer service, safety, productivity and being an employer of choice. Our strategy to address our environmental impact, support our employees, operate with integrity and improve the communities in which we work and play are reasons why Union Pacific is one of America's leading transportation companies.

The rail industry provides Americans with a fuel-efficient, environmentally responsible and safe mode of freight transportation. Union Pacific will continue to invest in innovative technology to advance and improve our sustainability efforts. In addition, we must continue to support our employees and the communities that play major roles in the growth and success of our company.

The 2009 Union Pacific Sustainability and Citizenship Report shares our initiatives and progress thus far. We will continuously strive for improvements and become an even stronger corporate citizen.

## Future Reporting

This report represents our inaugural review of our sustainability performance. Moving forward, we will provide an annual review of our social, environmental and governance efforts.

## Additional Resources

Links to Union Pacific Corporation's Annual Report on Form 10-K, Proxy Statement and other SEC filings are available on the Investor section of our website.

For more information on Union Pacific's environmental efforts, visit the Environmental section of our website.

Up-to-date news and information regarding Union Pacific can be found on the Media section of our website.

# Cautionary Information

The "2009 Sustainability and Citizenship Report" provides additional explanatory information regarding Union Pacific that may not be available, included or directly derived from information in the Company's Annual Report.

This Report includes statements and information regarding future expectations or results of the Company that are not historical facts. These statements and information are, or will be, forward looking as defined by the federal securities laws. Forward looking statements and information can be identified by use of forward looking terminology (and derivations thereof), such as "believes", "expects", "may", "should", "will", "would", "intends", "plans", "estimates", "anticipates", "projects" and other words or phrases of similar intent. Forward looking statements and information generally include statements and information regarding: the Company's expectations or forecasts with respect to general economic conditions in the U.S. and the world; the Company's financial and operational performance; increases of the Company's earnings; demand for the Company's rail service; improving customer service; enhancing profitability; volume and revenue growth; efficiency improvements and increasing returns; improving asset utilization; the effectiveness or growth of new and newer services; management of network volumes; increasing shareholder value; total amount of capital investments; completion and effectiveness of capacity expansion and other capital investments, and other investments in upgrading or adding signals and facilities; returns on capital investments; improvements regarding safety of our operations and equipment; and effectiveness of plans, programs and initiatives to reduce costs and other efficiency improvements.

Forward-looking statements and information should not be read as a guarantee of future performance or results, and will not necessarily be accurate indications of the times that, or by which, such performance or results will be achieved. Forward-looking statements and information are subject to risks and uncertainties that could cause actual performance or results to differ materially from those expressed in the statements.

Forward-looking statements and information reflect the good faith consideration by management of currently available information, and may be based on underlying assumptions believed to be reasonable under the circumstances. However, such information and assumptions (and, therefore, such forward-looking statements and information) are or may be subject to variables or unknown or unforeseeable events or circumstances over which management has little or no influence or control. The Risk Factors in Item 1A of the Company's Annual Report on Form 10-K, filed on February 5, 2010, could affect our future results and could cause those results or other outcomes to differ materially from those expressed or implied in the forward-looking statements and information. This Report should be read in consideration of these Risk Factors. To the extent circumstances require or the Company deems it otherwise necessary, the Company will update or amend these Risk Factors in subsequent Annual Reports, periodic reports on Form 10-Q or current reports on Form 8-K.

Forward-looking statements speak only as of the date the statement was made. We assume no obligation to update forward-looking information to reflect actual results, changes in assumptions or changes in other factors affecting forward-looking information. If we do update one or more forward-looking statements, no inference should be drawn that we will make additional updates with respect thereto or with respect to other forward-looking statements.

# Feedback

Thank you for reading Union Pacific's 2009 Sustainability and Citizenship Report. Union Pacific welcomes any and all feedback on our efforts. We encourage you to send comments or questions to sustainability@up.com.



# EXHIBIT PX0682

# Railroads: Green From the Start

ASSOCIATION OF AMERICAN RAILROADS JULY 2009

**Summary**

With railroads, affordable transportation and environmental responsibility go hand in hand. In fact, railroads are **the** environmentally-friendly way to move freight, thanks to their unique ability to fight highway gridlock, lower fuel consumption, reduce greenhouse gas emissions, and reduce pollution. Through the development of new "green" technologies and environmentally-responsible operating practices, railroads are committed to even greater environmental excellence in the years ahead.

## Freight Railroads = Fuel Efficiency

- Dictionaries should show a picture of a locomotive next to the word "efficient." In 2008, U.S. freight railroads moved a ton of freight an average of **457 miles per gallon** (up from **436** in 2007) Rail fuel efficiency is up 94 percent since 1980.
- Railroads are three or more times more fuel efficient than trucks. If just 10 percent of the long-distance freight that moves by truck moved by rail instead, estimated fuel savings would exceed a **billion gallons per year**. This is exactly the kind of solution to energy problems that America is looking for.
- Since 1980, railroads have nearly **doubled** how much freight they move — while using virtually the **same amount of fuel!** What other industry has doubled its output without using more fuel?
- Railroads aren't satisfied, though — they're constantly searching for new ways to save fuel. They've acquired thousands of new energy-efficient locomotives, including hybrids and modern "gensets" that have several independent engines that turn on and off depending on need. Railroads are also adopting innovative new technologies, such as hyper-intelligent computer systems that use a train's weight and location to calculate the most fuel-efficient speed.

**A freight train hauls one ton of freight an average of 457 miles on one gallon of fuel – more than three times farther than a truck.**

Gallons of Fuel Consumed Hauling One Ton of Freight Coast-to-Coast:

*Trains: 7 gallons* *Trucks: 27 gallons**



*AAR estimate based on U.S. DOT data.

**Since 1980, Rail Freight Volume Has Nearly Doubled But Rail Fuel Consumption Is Only Slightly Higher**
**(Index 1980 = 100)**




*in freight service **revenue ton-miles Data are for Class I railroads. Source: AAR

## Freight Railroads = Lower Greenhouse Gas Emissions

- Greenhouse gas emissions are directly related to fuel consumption. That means that **moving freight by rail instead of truck reduces greenhouse gas emissions by two-thirds or more**. If just 10 percent of long-distance freight now moving by truck moved by rail instead, annual greenhouse gas emissions would fall by more than 12 million tons. That's equivalent to taking **2 million cars off the road** or **planting 280 million trees**.

**Freight Railroads Account for Well Under 1% of U.S. Greenhouse Gas Emissions**




*On-road vehicles, aircraft, recreational boats, passenger rail
Data are 2006. Source: EPA

- America's seven largest freight railroads have all joined the Environmental Protection Agency's "SmartWay Transport," a voluntary partnership aimed at improving fuel efficiency and reducing greenhouse gas emissions.

## Freight Railroads = Less Highway Gridlock

- Because a freight train can do the work of **280 or more trucks**, railroads help fight highway gridlock. In a very real way, freight rail gives back one of the most valuable assets of all — time.

- Railroads also **reduce the huge economic costs** of highway gridlock. According to the 2009 Urban Mobility Report published by the Texas Transportation Institute, highway congestion in the United States costs us $87 billion just in wasted travel time (4.2 billion hours, or nearly a full week for every traveler) and wasted fuel (2.8 billion gallons, or three weeks' worth of gas for every traveler) per year. Lost productivity, cargo delays, and other costs add tens of billions of dollars to this tab.

- **Relief** for highway gridlock **is right in front of us** — but it's not on the highway. Shifting freight from trucks to rail reduces the pressure to build costly new roads and helps cut the cost of maintaining the roads we already have.

## Freight Railroads = Emissions Control

- We can all breathe easier with rail — literally. Moving freight by rail rather than truck significantly reduces emissions, and that means cleaner air for all of us.

- In March 2008, the EPA issued — and the rail industry immediately endorsed — stringent new locomotive emissions standards that will **cut** particulate emissions by up to **90 percent** and nitrogen oxide emissions by up to **80 percent**. The new standards will also yield big reductions in emissions of other harmful pollutants.

- Numerous environmental groups have praised the new standards. For example, the Natural Resources Defense Council calls them "a **strong program** that will go a long way towards solving the problem of diesel train and ship pollution in the future."

# EXHIBIT PX0683

# Analysis of Rail Fuel Surcharges During the Period 2003-2007

## A Report to The American Chemistry Council

## Prepared by

SK Snavely King Majoros O'Connor & Lee, Inc.
Economic and Management Consultants

1111 14th Street NW
Suite 300
Washington DC 20005
www.snavely-king.com

July 25, 2007

# I. Introduction

The American Chemistry Council ("ACC") requested Snavely King Majoros O'Connor & Lee, Inc. ("SK" or "Snavely King") to analyze railroad fuel surcharge revenue and fuel costs. The focus is U.S. Class I railroads during the period 2003 through the First Quarter 2007 ("Study Period"). The US Class I railroads included in this study are BNSF, CSXT, Kansas City Southern, Norfolk Southern, and Union Pacific[1]("Study Group").

Snavely King has previously studied Class I Railroad fuel surcharge programs on behalf of the ACC. Snavely King's reports on fuel surcharge were used in the ACC's filings in the Surface Transportation Board's ("STB") Ex Parte 661 Railroad Fuel Surcharges proceeding. In those reports, Snavely King identified some serious issues with the Class I railroads fuel surcharge process. In this report we show that those defects have persisted for years and have produced a multi-billion dollar over recovery of fuel costs by the major US railroads.

- As detailed in this report we estimate the over recovery of fuel surcharges for the Study Period to be more than $6 billion

Chart I
Preliminary Estimate of Over Recovery




[1] Two additional railroads have Class I status, the Canadian National ("CN") and the Canadian Pacific ("CP") each have a subsidiary that operates in the United States. A large portion of CN and CP's operations take place in Canada or are trans-border movements: the CN and CP subsidiaries have not been included in this study.

All of the carriers in the Study Group reported fuel costs for each year. UP and BNSF also reported their fuel surcharge revenues for each year. Snavely King estimated fuel surcharge revenue for CSXT, KCS and NS since they described but did not report fuel surcharge revenue. When estimating the fuel surcharge revenues collected by CSXT, KCS and NS, Snavely King used a conservative approach; applying the lowest fuel surcharge percentage for the given railroad and time period. Moreover we applied the lowest fuel surcharge percentage to a reduced revenue total, reflecting the fact that fuel surcharges would not apply to all shipments.

As a sensitivity test, SK also estimated the total fuel surcharge revenues collected using the average fuel surcharge for a given period, rather than the minimum. This change would have added another $1.472 billion of over recovery to the $6.402 billion shown in our Preliminary Estimate of Over Recovery.

On August 3, 2006 and January 25, 2007, the STB issued decisions in Ex Parte 661 – Rail Fuel Surcharges. Snavely King sees these decisions as steps in the right direction toward resolving the unreasonable practices leading to over recovery of fuel costs by Class I railroads' fuel surcharge programs. In its August 3, 2006 decision, the Board stated that it was:

> "…addressing what we believe is an unreasonable practice of applying what the railroads label a fuel surcharge in a manner that is not limited to recouping increased fuel costs that are not reflected in the base rate. The measures we are proposing are designed to preclude such an unreasonable practice."[2]

In its January 25, 2007 decision the Board stated that:

> "….After considering all of the comments received, we conclude that computing rail fuel surcharges as a percentage of a base rate is an unreasonable practice, and we direct carriers to change this practice. We also conclude that the practice of "double dipping," i.e., applying to the same traffic both a fuel surcharge and a rate increase that is based on a cost index that includes a fuel cost component, such as the Railroad Cost Adjustment Factor (RCAF), is an unreasonable practice, and we direct carriers to change this practice as well. We will proceed with a proposal to impose mandatory reporting requirements for all Class I railroads regarding their fuel surcharges, in STB Ex Parte No. 661 (Sub-No. 1).[3]

As the STB decision recognized, the fuel surcharge process as applied by the railroads was unreasonable. The Snavely King report filed in EP 661 estimated over recovery of fuel surcharges in 2005 at more than $900 million.[4]

---

[2] Surface Transportation Board Ex Parte No. 661 Rail Fuel Surcharges, Decided: August 3, 2006

[3] Surface Transportation Board Ex Parte No. 661 Rail Fuel Surcharges, Decided: January 25, 2007, page 1

[4] Tom O'Connor and Kim Hillenbrand submitted a report in STB Ex Parte No. 661 Rail Fuel Surcharges, on behalf of the American Chemistry Council on April 27th, 2006. CSXT and KCS did not include data on fuel surcharge revenue in their 10K and 10Q reports to the SEC; the April 2006 estimate of fuel surcharge over recovery included only NS, BNSF and UP. See Attachment III for the results of the 2005 report.

That preliminary estimate reflected only 3 of the 5 major US Class I railroads. Simply put, the railroad fuel surcharge programs had become profit centers for the railroads.

## II. Methodology

The Study Group includes five U.S. Class I railroads:

- The BNSF Railroad ("BNSF")
- CSXT
- Kansas City Southern ("KCS")
- Norfolk Southern ("NS")
- Union Pacific ("UP")

The Study Period is from 2003 to the First Quarter 2007. In April 2007, many Class I railroads instituted a mileage based fuel surcharge program.

Currently the STB does not require Class I railroads to report prior period revenues collected from their fuel surcharge programs. Accordingly Snavely King relied on railroad filings to the Securities and Exchange Commission ("SEC") and investor reports as the source of much of the study data.

In some cases the Railroads do not disclose how much revenue is generated from their fuel surcharge programs. While following the same basic methodology SK used in its April 2006 report, we have now developed reasonable and conservative analytical and estimating procedures to overcome gaps in the reported data. The conservative assumptions include:

- Applying the lowest fuel surcharge percentage of a given railroad to all of the reported revenue for that year or quarter.
- Reducing the fuel surcharge revenue to recognize rail freight to which the fuel surcharge was not applied

## III. Fuel Surcharges and Fuel Costs

Railroads, like most industries, have felt the impact of rising fuel costs. A fuel surcharge program is one method of recovering incremental increases in the fuel costs.

One important aspect of designing an index to reflect short term changes in fuel costs is selection of the base year. A flaw in many of the railroad's fuel surcharge programs is inappropriate selection of the base year for measurement of the fuel surcharge. As seen in the chart below, the price of Highway Diesel Fuel ("HDF") has not been below the base of BNSF's and UP's index since about September 2002. Both BNSF and UP use the EIA HDF index in their fuel surcharge programs. BNSF's base price is $1.29 a gallon and UP's base price per gallon is $1.35, though their base prices are different, once HDF price is above $1.35 both surcharges are virtually identical.




CSXT, KCS and NS all use West Texas Intermediate[5] ("WTI") as the index for their revenue based fuel surcharge programs. As seen in the chart below, WTI has not been below $23 since March of 2002. CSXT[6], KCS[7], and NS[8] currently use $23 per barrel as the WTI price base for revenue based fuel surcharges.

NS also published a fuel surcharge with a base price of $64 per barrel. The adoption of a $64 barrel price of WTI could preempt downward adjustment of fuel surcharge rate

[5] There are some issues with the use of West Texas Intermediate as an index that reflects the cost of diesel fuel. According to the EIA, only about 25% of the 42-U.S. gallon barrel of crude oil is used to make diesel and heating oil. (source: http://www.eia.doe.gov/neic/brochure/gas06/gasoline.htm)
[6] See www.csx.com
[7] See www.kcsi.com
[8] See www.nscorp.com

increases and it highlights the importance of selection of the base year. After NS published the fuel surcharge with a base price of $64 per barrel the WTI price per barrel fell below the $64 level, as shown in the following Chart. When the fuel price stays at a point below $64, or declines further, logic calls for a downward rate adjustment and a possible fuel cost refund; in effect a "negative surcharge".




It is essential that an effective index accurately captures short term changes in fuel prices. Though rates are not cost based, the railroad has the ability over the long term to change rates in order to reflect changes in its operating costs. Fuel as a percentage of operating cost has increased over the last five years, and railroads have considered those cost increases in proposing rates. Over time the fuel cost increases tend to be reflected in the base rate.

Accordingly, often fuel cost increases experienced in earlier time periods have been made a part of the base rate. When fuel costs decline, the railroads could continue collecting a fuel surcharge compensating for incremental fuel cost they no longer incur. This is clearly an unreasonable practice

## IV. Railroad Industry Fuel Costs and Fuel Surcharges

The U.S. Class I railroads saw dramatic increases in their fuel costs during the study period. During this period these railroads used their fuel surcharge programs aggressively, transforming cost recovery mechanisms into profit centers. The preliminary estimates shown in Table I indicate that during the 2003 to 2007 Q1 period five major US railroads over recovered their fuel costs by more than $6 billion dollars. These 2003-2007 results are consistent with our initial estimate of the over recovery for 2005 presented in our April 2006 Report[9].

Our April 2006 estimate of the 2005 Over Recovery totaled $902 million. This reflected only three of the five major US Class I railroads: BNSF, NS, and UP. Snavely King has now expanded this coverage to include CSX and KCS. We have also refined the estimates for NS and UP. Based on further analysis and review of additional data, we have increased our initial 2005 over recovery estimate for NS and reduced our initial 2005 over recovery estimate for UP.

Between 2003 and 2006 the U.S. Class I Railroads saw fuel cost increase dramatically. As shown in the table below, the fuel costs in 2003 for the Class I Railroads were $3.442 billion compared to $7.976 billion in 2006.

U.S. Class I Railroad Fuel Costs ($ Millions)

| Year | Fuel Cost | Year over Year Change |
|---|---|---|
| 2002 | $ 2,793 | |
| 2003 | $ 3,442 | $ 649 |
| 2004 | $ 4,322 | $ 880 |
| 2005 | $ 6,155 | $ 1,832 |
| 2006 | $ 7,976 | $ 1,821 |
| 1Q2007 | $ 1,847 | $ 78 |
| Total | $ 23,742 | $ 5,260 |

Through their fuel surcharge programs the U.S Class I railroads generated a vast amount of fuel surcharge revenues to offset the increase in fuel costs. For the Study Period, SK estimates that the railroads collected $11.663 billion in fuel surcharge revenue

[9] See Attachment III

Preliminary Estimate of Fuel Surcharge Revenue ($ Millions)




Source: SEC Filings and Snavely King Estimates

When comparing the fuel surcharge revenues collected by the Class I railroads and total year over year change in fuel costs during the study period, it is clear that the railroads have over recovered their fuel costs and the fuel surcharge mechanism has turned into a profit center. Snavely King estimates that the U.S Class I railroads over recovered their fuel costs by $6.402 billion.

While the graph below indicates that many of the fuel surcharge programs may have initially fallen short of recovering the incremental increase in fuel costs, over time these cost recovery mechanisms became profit centers for the railroads.

Year over Year Change in Fuel Cost and Preliminary Estimate of Fuel Surcharge Revenue ($ Millions)




Preliminary Estimate of Over Recovery



## V. Individual Railroad Analyses

In this section SK analyzes the fuel costs and the fuel surcharge revenues collected by each individual Class I railroad during the Study Period 2003 to the First Quarter 2007. Individual analysis has been carried out for the following U.S Class I railroads:

- BNSF Railroad ("BNSF")
- CSXT
- Kansas City Southern ("KCS")
- Norfolk Southern ("NS")
- Union Pacific ("UP")

Throughout the analysis we focus on carload fuel surcharges applied by five major US Class I railroads. Other railroads also imposed similar fuel surcharges as a percentage of the through rate. Moreover, the railroads also imposed intermodal fuel surcharges as a percentage of the through rate. Intermodal fuel surcharges were generally higher than carload fuel surcharges. Accordingly the over recovery estimate included in this report likely understates the full impact of rail fuel surcharges.

## BNSF

During the Study Period, BNSF experienced increases in its fuel costs. From 2003 to 2006, BNSF's fuel costs rose from $1.093 billion to $2.734 billion. As shown in the table below, while BNSF incurred an increase in operating expenses due to rising fuel costs, its operating ratio improved by 5 points to 77% in 2006.

Table – BNSF_I[10]
2003 – 2007 Fuel Costs and Operating Ratio ($ Millions)

| Year | Fuel Cost | Incremental Fuel Cost | Annual Operating Ratio |
|---|---|---|---|
| 2003 | $1,093 | $260 | 82% |
| 2004 | $1,335 | $242 | 85% |
| 2005 | $1,959 | $624 | 78% |
| 2006 | $2,734 | $775 | 77% |
| 1Q2007 | $652 | $91 | |

To offset rising fuel costs, BNSF established a fuel surcharge program that was applied as a percentage of the through rate. BNSF's fuel surcharge program was based on the average monthly price of No. 2 On – Highway Diesel Fuel ("HDF") published by the Department of Energy's Energy Information Agency (EIA). Based on review of BNSF's SEC filings and investor reports, Snavely King estimates that during the study period, BNSF collected $3.647 billion in surcharge revenue.

BNSF_II
Preliminary Estimate of Fuel Surcharge Revenue ($ Millions)




10 BNSF SEC Fillings

Chart BNSF_III
Year over Year Change in Fuel Cost and Preliminary Estimate of Fuel Surcharge Revenue ($ Millions)




Source: SEC Filings and Snavely King Estimates

Chart BNSF_III compares the year over year change in fuel costs to fuel surcharge revenues collected by the BNSF. Between 2003 and the first quarter of 2007, BNSF incurred year over year changes in fuel cost totaling $1.992 billion. Through the fuel surcharge mechanism, BNSF recovered $3.647 billion in fuel surcharge revenues. We estimate that, in 2003, BNSF's fuel costs were greater than the fuel surcharge revenues it recovered. Overall, during the 2003 to 2007 Q1 period our preliminary estimate is that, including the shortfall in 2003, BNSF over-recovered $1.655 billion.

Chart BNSF_IV
Preliminary Estimate of Fuel Surcharge Revenue Over recovery ($ Millions)




Source: SEC Filings and Snavely King Estimates

## CSXT

CSXT like other Class I Railroads saw a dramatic rise in the cost of diesel fuel during the study period. As shown in Table CSXT_ I below, during the Study period, CSXT's fuel cost rose from $0.581 billion in 2003 to $1.112 billion in 2006. While CSXT's diesel fuel cost rose, their Annual Operating Ratio (Operating Expenses / Operating Revenues) improved by more than 10 points from 93% in 2003 to 78% in 2006.

Table – CSXT_I[11]
2003 – 2007 Fuel Costs and Operating Ratio ($ Millions)

| Year | Fuel Cost | Incremental Fuel Cost | Annual Operating Ratio |
|---|---|---|---|
| 2003 | $581 | $66 | 93% |
| 2004 | $711 | $130 | 88% |
| 2005 | $783 | $72 | 82% |
| 2006 | $1112 | $329 | 78% |
| 1Q2007 | $259 | $6 | |

During the study period CSXT used a fuel surcharge that was applied as a percentage of the through rate. CSXT's fuel surcharge was based on the average monthly price of West Texas Intermediate two months earlier. In Chart CSXT_II below, Snavely King estimated the amount of fuel surcharges collected by CSXT during the study period. SK estimates that from 2003 to the First Quarter in 2007, CSXT collected $ 2.292 billion in fuel surcharge revenue.

Chart CSXT_II
Preliminary Estimate of Fuel Surcharge Revenue ($ Millions)




[11] Source: CSXT SEC Filings

Chart CSXT_III below compares the year over year change in fuel cost, to fuel surcharge revenues collected by CSXT. CSXT experienced a $0.603 billion increase in year over year cost of diesel fuel from 2003 to Q1 2007. During that period, CSXT collected an estimated $2.292 billion in fuel revenues[12]. The over recovery is defined as the difference between the incremental fuel costs, year over year, and the fuel surcharge revenue collected during that year or quarter.

Chart CSXT_III
Year over Year Change in Fuel Cost and Preliminary Estimate of Fuel Surcharge Revenue ($ Millions)




The preliminary estimate of the total over recovery realized by CSXT during the study period is $1.689 billion, as shown in chart CSXT_IV

As noted above, over recovery is defined as an excess of Fuel Surcharge revenue collected during that year or quarter over and above the incremental fuel costs, year over year during that same year or quarter. The over recovery is cumulated over a multi year time period.

---

[12] Snavely King conservatively estimated the fuel surcharges revenues collected by CSXT. If we had estimated the fuel surcharge revenues collected by CSXT using the average fuel surcharge for a given period, rather than the minimum monthly fuel surcharge percent, the total fuel surcharge revenues collected and the over recovery would increase by about $735 million

Chart CSXT_IV
Preliminary Estimate of Fuel Surcharge Revenue Over recovery ($ Millions)




Source: SEC Filings and Snavely King Estimates

## Kansas City Southern

The Kansas City Southern ("KCS") also saw a dramatic rise in the cost of diesel fuel during the study period. As shown in Table KCS_I below, during the Study period, KCS's fuel cost rose from $47 million in 2003 to $141 million in 2006.

Table – KCS_ I[13]
2003 – 2007 Fuel Costs and Operating Ratio ($ Millions)

| Year | Fuel Cost | Incremental Fuel Cost |
|---|---|---|
| 2003 | $47 | $9 |
| 2004 | $66 | $19 |
| 2005 | $124 | $57 |
| 2006 | $141 | $17 |
| 1Q2007 | $34 | $2 |

During the study period KCS used a fuel surcharge that was applied as a percentage of the through rate. KCS's fuel surcharge was based on the average monthly price of West Texas Intermediate. In Chart KCS_II below, Snavely King estimated the amount of fuel surcharges collected by KCS during the study period. SK estimates that from 2003 to the First Quarter in 2007, KCS collected $ 197 million.

KCS_II
Preliminary Estimate of Fuel Surcharge Revenue ($ Millions)




Chart KCS_III below compares the year over year change in fuel costs, to fuel surcharge revenues collected by KCS. KCS experienced a $104 million increase in fuel costs year over year during the 2003 - 2007 Q1 Study Period and KCS collected an estimated $197

[13] Source: Kansas City Southern Securities and Exchange Commission ("SEC") Filings

million in fuel revenues[14]. The over recovery is defined as the difference between the incremental fuel costs, year over year, and the fuel surcharge revenue collected during that year or quarter. The preliminary estimate of the total over recovery realized by KCS during the study period is $92 million, as shown in Chart KCS_IV

Chart KCS_III

Year over Year Change in Fuel Cost and Preliminary Estimate of Fuel Surcharge Revenue ($ Millions)




Chart KCS_IV below shows the over recovery of fuel surcharges during the base period. SK estimates that KCS over-recovered $92 million during the study period. It should be noted that this total includes the 2003 to 2005 period, when Snavely King preliminarily estimates that KCS did not recover enough fuel surcharge revenue to cover the year to year increase in fuel costs.

[14] Snavely King conservatively estimated the fuel surcharges revenues collected by KCS. If Snavely King had estimated the fuel surcharge revenues collected by KCS using its average fuel surcharge for a given period rather than the minimum monthly fuel surcharge percent, the total fuel surcharge revenues collected, and the resultant over recovery would increase by about $37 million

Chart KCS_IV

Preliminary Estimate of Fuel Surcharge Revenue Over-recovery ($ Millions)




Source: SEC Filings and Snavely King Estimates

## Norfolk Southern Railroad

The Norfolk Southern ("NS") also saw a dramatic rise in the cost of diesel fuel during the study period. As shown in Table NS_I below, during the Study period, NS's fuel cost rose from $0.380 billion in 2003 to $0.977 billion in 2006. While Norfolk Southern's diesel fuel cost rose, their Annual Operating Ratio (Operating Expenses / Operating Revenues) improved by more than 10 points from 83.5% in 2003 to 72.8% in 2006.

Table – NS_I[15]

2003 – 2007 Fuel Costs and Operating Ratio ($ Millions)

| Year | Fuel Cost | Incremental Fuel Cost | Annual Operating Ratio |
|---|---|---|---|
| 2003 | $380 | $38 | 83.5% |
| 2004 | $449 | $69 | 76.7% |
| 2005 | $727 | $278 | 75.2% |
| 2006 | $977 | $250 | 72.8% |
| 1Q2007 | $219 | $(12) | |

During the study period the NS used a fuel surcharge that was applied as a percentage of the through rate. NS's fuel surcharge was based on the average monthly price of West Texas Intermediate. In Chart NS_II below, Snavely King estimated the amount of fuel surcharge revenue collected by the NS during the study period. SK estimates that from 2003 to the First Quarter in 2007, NS collected $ 2.220 billion.

Chart NS_II

Preliminary Estimate of Fuel Surcharge Revenue ($ Millions)




[15] Norfolk Southern SEC Filings

Chart NS_III below compares the year over year change in fuel costs, to fuel surcharge revenues collected by the Norfolk Southern. NS experienced a $0.623 billion increase in year over year cost of diesel fuel from 2003 to Q1 2007. During that period, NS collected an estimated $2.220 billion in fuel revenues[16]. The over recovery is defined as the difference between the incremental fuel costs, year over year, and the fuel surcharge revenue collected during that year. The estimated total over recovery realized by NS during the study period is $1.597 billion.

Chart NS_III

Year over Year Change in Fuel Cost and Preliminary Estimate of Fuel Surcharge Revenue ($ Millions)




Chart NS_IV below shows the over recovery of fuel surcharges during the base period.

---

[16] Snavely King conservatively estimated the fuel surcharges revenues collected by NS. If Snavely King had estimated the fuel surcharge revenues collected by NS using its average fuel surcharge for a given period rather than the minimum monthly fuel surcharge percent, the total fuel surcharge revenues collected, and the resultant over recovery would increase by about $700 million

Chart NS_IV

Preliminary Estimate of Fuel Surcharge Revenue Over recovery ($ Millions)




Source: SEC Filings and Snavely King Estimates

## Union Pacific

The Union Pacific Railroad ("UP") saw its fuel and utilities costs double during the Study Period from 2003 to first quarter 2007. Between 2003 and 2006 UP's fuel and utilities cost increased from $1.341 billion to $3.012 million. During this time UP's operating ratio weakened from 2003 to 2004 and then improved in each year from 2004 through 2006. The UP operating ratio in 2006 improved relative to the 2003 level.

Table – UP_I[17]
2003 – 2007 Fuel Costs and Operating Ratio ($ Millions)

| Year | Fuel Cost | Incremental Fuel Cost | Annual Operating Ratio |
|---|---|---|---|
| 2003 | $1,341 | $276 | 82% |
| 2004 | $1,816 | $475 | 89% |
| 2005 | $2,562 | $746 | 87% |
| 2006 | $3,012 | $450 | 81% |
| 1Q2007 | $683 | $(9) | |

UP used a fuel surcharge program that applied the surcharge percentage to the through rate to offset changing fuel costs. Beginning in June 2003, UP's fuel surcharge program was based on the average monthly price of No. 2 On – Highway Diesel Fuel ("HDF") published by the Department of Energy's Energy Information Agency. Based on reviewing UP's SEC filings and investor reports, Snavely King estimates that during the study period, UP collected $3.307 billion in fuel surcharge revenues.

Chart UP_II
Preliminary Estimate of Fuel Surcharge Revenue ($ Millions)




---

[17] UP Securities and Exchange Commission ("SEC") Fillings

Chart UP_III below compares the year over year change in fuel costs, to fuel surcharge revenues collected by the UP. During the Study period, the total year over year change in UP's fuel and utilities costs was $1.938 billion. Through its fuel surcharge mechanism, UP recovered $3.307 billion in fuel surcharge revenues. Our preliminary estimate of the UP over-recovery is $1.369 billion, defined as fuel surcharge revenues less year over year change in fuel costs. This includes an estimated under recovery in 2003 and 2004.

Chart UP_III

Year over Year Change in Fuel Cost and Preliminary Estimate of Fuel Surcharge Revenue ($ Millions)




Source: SEC Filings and Snavely King Estimates

Chart UP_IV

Preliminary Estimate of Fuel Surcharge Revenue Over recovery ($ Millions)




Source: SEC Filings and Snavely King Estimates

## VI. Conclusions

While based on preliminary estimates the findings are clear:

- During the 2003 to 2007 Q1 study period, the five study railroads (BNSF, CSXT, KCS, NS, and UP have over-recovered more than $6 billion in fuel surcharge revenue, over and above their incremental fuel costs

- Other US railroads and Canadian railroads operating in the US may have over-recovered additional fuel surcharge revenue over and above their incremental fuel costs

- The newly installed mileage based fuel surcharges should be monitored carefully to prevent a recurrence of over recovery such as shown in this analysis

**SNAVELY KING MAJOROS O'CONNOR & LEE, INC.**

## BACKGROUND

Snavely King Majoros O'Connor & Lee, Inc. ("Snavely King") was founded in 1970 to conduct research on a consulting basis into the rates, revenues, costs and economic performance of regulated firms in the transportation and public utility industries. The firm has since expanded the scope of its activities to address the problems of unregulated firms and entities in these and other industries.

For more than three decades SK has built its success on developing and applying practical market and economic solutions.

The firm's financial and strategic advice is backed by the professional staff's wide experience in designing and applying business solutions, evaluating corporate transactions, analyzing start-up companies, and in providing strategic planning services to commercial, institutional and government clients.

Snavely King has provided consulting services to shippers, railroads, transportation companies, government agencies and hundreds of other clients in transportation, telecommunications and utilities in the US, Canada and Overseas.

In more than 2,000 projects, the analyses and expert advice provided by Snavely King have significantly assisted both private and public sector clients.

**ATTACHMENT II**
**Estimate of Railroad Fuel Surcharge Overcharges ($ Millions)**

| | BNSF[1/] | CSXT[2/] | KCS[3/] | NS[4/] | UP[5/] | West[6/] | East[7/] | Total |
|---|---|---|---|---|---|---|---|---|
| Preliminary - 1Q2007 | | | | | | | | |
| 1Q 2007 Fuel Costs | $652 | $259 | $34 | $219 | $683 | $1,335 | $512 | $1,847 |
| 1Q 2006 Fuel Costs | $561 | $253 | $32 | $231 | $692 | $1,253 | $516 | $1,769 |
| Quarter over Quarter Change in Fuel Costs | $91 | $6 | $2 | $(12) | $(9) | $82 | $(4) | $78 |
| 1Q07 Estimated Revenue from Fuel Surcharges | $380 | $264 | $42 | $222 | $340 | $720 | $528 | $1,248 |
| ***Estimated Over Recovery*** | ***$289*** | ***$258*** | ***$40*** | ***$234*** | ***$349*** | ***$638*** | ***$532*** | ***$1,170*** |
| 2006 | | | | | | | | |
| 2006 Fuel Costs | $2,734 | $1,112 | $141 | $977 | $3,012 | $5,746 | $2,230 | $7,976 |
| 2005 Fuel Costs | $1,959 | $783 | $124 | $727 | $2,562 | $4,521 | $1,634 | $6,155 |
| Year over Year Change in Fuel Costs | $775 | $329 | $17 | $250 | $450 | $1,225 | $596 | $1,821 |
| 2006 Estimated Revenue from Fuel Surcharges | $1,700 | $1,171 | $96 | $1,140 | $1,619 | $3,319 | $2,407 | $5,726 |
| **Estimated Over Recovery** | **$925** | **$842** | **$79** | **$890** | **$1,169** | **$2,094** | ***$1,811*** | **$3,905** |
| 2005 | | | | | | | | |
| 2005 Fuel Costs | $1,959 | $783 | $124 | $727 | $2,562 | $4,521 | $1,634 | $6,155 |
| 2004 Fuel Costs | $1,335 | $656 | $66 | $449 | $1,816 | $3,151 | $1,171 | $4,322 |
| Year over Year Change in Fuel Costs | $624 | $127 | $57 | $278 | $746 | $1,370 | $462 | $1,832 |
| 2005 Estimated Revenue from Fuel Surcharges | $1,100 | $579 | $52 | $609 | $963 | $2,063 | $1,240 | $3,303 |
| **Estimated Over Recovery** | **$476** | **$452** | **$(5)** | **$331** | **$217** | **$693** | ***$778*** | **$1,471** |
| 2004 | | | | | | | | |
| 2004 Fuel Costs | $1,335 | $656 | $66 | $449 | $1,816 | $3,151 | $1,171 | $4,322 |
| 2003 Fuel Costs | $1,093 | $581 | $47 | $380 | $1,341 | $2,434 | $1,008 | $3,442 |
| Year over Year Change in Fuel Costs | $242 | $75 | $19 | $69 | $475 | $717 | $163 | $880 |
| 2004 Estimated Revenue from Fuel Surcharges | $357 | $203 | $7 | $184 | $292 | $649 | $394 | $1,043 |
| ***Estimated Over Recovery*** | ***$115*** | ***$128*** | ***$(12)*** | ***$115*** | ***$(183)*** | ***$(68)*** | ***$231*** | ***$163*** |
| 2003 | | | | | | | | |
| 2003 Fuel Costs | $1,093 | $581 | $47 | $380 | $1,341 | $2,434 | $1,008 | $3,442 |
| 2002 Fuel Costs | $833 | $515 | $38 | $342 | $1,065 | $1,898 | $895 | $2,793 |
| Year over Year Change in Fuel Costs | $260 | $66 | $9 | $38 | $276 | $536 | $113 | $649 |
| 2004 Estimated Revenue from Fuel Surcharges | $110 | $76 | | $65 | $93 | $203 | $140 | $343 |
| ***Estimated Over Recovery*** | ***$(150)*** | ***$10*** | ***$(9)*** | ***$27*** | ***$(183)*** | ***$(333)*** | ***$27*** | ***$(306)*** |
| **Preliminary Total for all Years** | **$1,655** | **$1,689** | **$92** | **$1,597** | **$1,369** | **$3,024** | **$3,378** | **$6,402** |

ATTACHMENT II (continued)

Notes:

1/ BNSF reports Fuel Surcharge Revenues in their filings

2/ CSXT Fuel Surcharges Revenues are SK estimates. These estimates take into account the amount of revenue covered by fuel surcharge provisions and applied the lowest fuel surcharge used by CSXT during the year. CSXT's states in their 2006 10-K that "Approximately 85% of CSX's revenue was subject to fuel surcharges or cost escalation clauses which include a fuel element"(Page 20). For the First Quarter 2007, 85% was used for the amount of revenue covered by fuel surcharge provisions. In 2005, 2004, and 2003 estimates of 80%, 70% and 50% were used respectively.

3/ KCS Fuel Surcharge Revenues and fuel costs reflect cost and revenue data reported to the SEC and estimates of fuel surcharge revenue based on application of the lowest KCS fuel surcharge percent in a given year to a portion of the reported revenue for that year (2003-0%; 2004- 64%; 2005 - 64.7%; 2006 - 75%; 2007 - 80%)

4/Norfolk Southern's Fuel Surcharges Revenue are SK estimates. These estimates take into account the amount of revenue covered by fuel surcharge provisions and applied the lowest fuel surcharge used by NS during the year. NS states in the 2006 10-K that "fuel surcharge provisions covered approximately 91% of total revenues compared with about 85% at the end of 2005"(Page K21). For the First Quarter 2007, 91% was used for the amount of revenue covered by fuels surcharge provisions. In 2004 and 2003 estimates of 70% and 50% were used. SK estimates take into account NS modified Fuel Surcharge Program that went into effect in July 2006. NS estimates this program covered 15% of NS's revenues. SK has not included any fuel surcharges from the modified NS program.

5/The Union Pacific reports Fuel Surcharge Revenues in their filings. SK used UP's fuel and utilities for fuel costs.

6/West= BNSF+UP

7/East= CSXT+NS+KCS

Attachment III

**Results of Snavely King's April 26 Report**

Fuel Surcharge Analysis

| Line | | BNSF | CSXT 1/ | KCS 2/ | NS | UP | Total | Source |
|---|---|---|---|---|---|---|---|---|
| 1 | 2005 Fuel Costs | $ 1,959 | $ 783 | $ 124 | $ 727 | $ 2,393 | $ 5,986 | |
| 2 | 2004 Fuel Costs | $ 1,335 | $ 656 | $ 66 | $ 449 | $ 1,684 | $ 4,190 | |
| 3 | 2005 Increase in Fuel Costs, $ amount needed to be recovered | $ 624 | $ 127 | $ 57 | $ 278 | $ 709 | $ 1,795 | Ln.1 - Ln.2 |
| 4 | 2005 Estimated Revenue from fuel surcharge | $ 1,100 | | | $ 396 | $ 1,017 | $ 2,513 | |
| 5 | 2005 Over Recovery | $ 476 | $ - | $ - | $ 118 | $ 308 | $ 902 | Ln.3 - Ln.4 |

Note: Note: Fuel hedging benefits have not been factored in the analysis

1/CSXT estimated fuel surcharge revenue is for Q3 2005 only

2/ KCS estimated fuel surcharge revenue is currently unavailable

# EXHIBIT PX0684

# VOLUME 2

# ANALYSIS OF COMPETITION, CAPACITY, AND SERVICE QUALITY

Laurits R. Christensen Associates, Inc.
Madison, WI

November 2009

Revised Final Report

Prepared for
The Surface Transportation Board
Washington, DC

# Volume 2: Contents

**ABBREVIATIONS**
**LIST OF FIGURES**
**LIST OF TABLES**

**CHAPTER 6 INTRODUCTION AND OVERVIEW OF VOLUME 2**

INTRODUCTION .......... 6-1
SYNOPSIS OF VOLUME 2 CHAPTERS .......... 6-2

**CHAPTER 7 DATA AND METHODOLOGY**

INTRODUCTION .......... 7-1
7A. OVERVIEW OF INDUSTRY PERFORMANCE .......... 7-1
7B. COSTS AND TECHNOLOGY .......... 7-2
7C. PRICING BEHAVIOR .......... 7-2
7D. CAPACITY .......... 7-3
7E. SERVICE QUALITY .......... 7-3

**CHAPTER 8 OVERVIEW OF INDUSTRY PERFORMANCE**

INTRODUCTION .......... 8-1
8A. RAILROAD PRICING .......... 8-2
8B. RAILROAD INDUSTRY INPUT PRICE AND PRODUCTIVITY TRENDS .......... 8-13
Overview of STB RCAF and BLS MFP Methods .......... 8-14
Trends in RCAF and PAF, 1989-2008 .......... 8-15
Trends in MFP, 1958-2006 .......... 8-23
Summary .......... 8-26
8C. OVERVIEW OF RAILROAD INDUSTRY FINANCIAL PERFORMANCE AND CAPITAL SPENDING .......... 8-27
Description of Data and Benchmark Industries .......... 8-28
Railroad Industry Financial Performance, 1997-2006 .......... 8-29
Overview of Railroad Industry Financial Performance .......... 8-29
STB Cost of Capital Determination .......... 8-31
Railroad Industry Financial Performance and Capital Spending, 1997-2006 .......... 8-33
Railroad Industry Earnings, Capital Spending, Input Prices, and Productivity .......... 8-36
Summary—Railroad Financial Performance and Capital Spending .......... 8-47
CONCLUSION .......... 8-50
APPENDIX 8-A FIRMS IN VALUE LINE BENCHMARK INDUSTRIES .......... 8-53
APPENDIX 8-B COMPARISON OF RSE AND STB COST OF EQUITY CAPITAL FOR CLASS I RAILROADS .......... 8-55

**CHAPTER 9 RAILROAD COSTS AND TECHNOLOGY**

INTRODUCTION .......... 9-1
9A. THE VARIABLE COST FUNCTION .......... 9-1
9B. DATA AND ESTIMATION .......... 9-3
9C. RAILROAD TECHNOLOGY INFERRED FROM THE VARIABLE COST FUNCTION .......... 9-8
Economies of Density .......... 9-10
Economies of Scale .......... 9-13
Technological Change and Productivity Growth .......... 9-14
Input Demand and Substitution Elasticities .......... 9-19

Input Biases in Technical Change ... 9-20
Capacity and the Employment of Capital ... 9-21
Marginal Cost Analysis ... 9-25
CONCLUSIONS ... 9-32

**CHAPTER 10 AN OVERVIEW OF COSTS AND REVENUE**

INTRODUCTION ... 10-1
10A. DATA ... 10-1
10B. REVENUE PER TON-MILE AND COSTS ... 10-1
10C. REVENUE SUFFICIENCY ... 10-8
10D. MARKET POWER PRICING ... 10-9
10E. EXCESS MARKUP ... 10-10
CONCLUSIONS ... 10-11
APPENDIX 10A ... 10-13

**CHAPTER 11 RAILROAD PRICING BEHAVIOR**

INTRODUCTION ... 11-1
11A. PRICING BEHAVIOR UNDER PROFIT MAXIMIZATION ... 11-1
11B. CONSTRAINED "MARKET DOMINANCE" AND "CAPTIVE DEMANDERS" IN RAILROAD MARKETS ... 11-3
Captive Shipper with Participation Constraint ... 11-4
Shipper with Modal Options ... 11-4
11C. INCORPORATING MARGINAL COST INFORMATION IN THE PRICING MODEL ... 11-6
11D. DATA AND ESTIMATION ... 11-7
Pricing Model Specification ... 11-9
Sample Definition ... 11-14
Estimation Method ... 11-15
11E. MAIN RESULTS FROM MODEL ESTIMATION ... 11-16
Shipment Cost Characteristics ... 11-16
Market Structure Characteristics ... 11-18
Trends in Revenue per Ton-Mile ... 11-20
Commodity-Level Costs and Markups for Class I Railroads ... 11-21
Relationship of R/VC Ratio and Market Structure Factors ... 11-24
CONCLUSIONS ... 11-30

**CHAPTER 12 ANALYSIS OF COMPETITION: COAL**

12A. DESCRIPTION OF THE MARKET ... 12-1
Tonnage and Revenue Trends ... 12-3
Other Shipment Characteristics ... 12-4
12B. PRICING ANALYSIS ... 12-5
Cost Factors ... 12-5
Market Structure Factors ... 12-7
Inferences for Competition ... 12-10

**CHAPTER 13 ANALYSIS OF COMPETITION: CORN AND WHEAT**

13A. DESCRIPTION OF THE MARKET ... 13-1
Geography of Shipments ... 13-4
Tonnage and Revenue Trends ... 13-7
Other Shipment Characteristics ... 13-8
13.B PRICING ANALYSIS ... 13-10
Cost Factors ... 13-10
Market Structure Factors ... 13-11
Inferences for Competition ... 13-15

## CHAPTER 14 ANALYSIS OF COMPETITION: CHEMICALS


14A. DESCRIPTION OF THE MARKET ........ 14-1
Geography of Shipments ........ 14-1
Tonnage and Revenue Trends ........ 14-3
Other Shipment Characteristics ........ 14-4
14B. PRICING ANALYSIS ........ 14-5
Cost Factors ........ 14-5
Market Structure Factors ........ 14-6
Inferences for Competition ........ 14-9


## CHAPTER 15 ANALYSIS OF COMPETITION: INTERMODAL SHIPMENTS


15A. DESCRIPTION OF THE MARKET ........ 15-1
Geography of Shipments ........ 15-1
Tonnage and Revenue Trends ........ 15-2
Other Shipment Characteristics ........ 15-3
15B. PRICING ANALYSIS ........ 15-5
Cost Factors ........ 15-5
Market Structure Factors ........ 15-6
Inferences for Competition ........ 15-9


## CHAPTER 16 ANALYSIS OF RAILROAD CAPACITY


INTRODUCTION ........ 16-1
16A. SUMMARY OF THE STB'S EX PARTE 671, RAIL CAPACITY AND INFRASTRUCTURE REQUIREMENTS ........ 16-2
16B. DESCRIPTIVE MEASURES OF RAILROAD CAPACITY ........ 16-6
Miles of Track ........ 16-6
Terminal Dwell Time ........ 16-10
Rail Fleet Statistics ........ 16-20
Other Measures of Railroad Capacity and Capacity Changes—R-1 Data ........ 16-24
Transportation Systems Flow Modeling of Railroad Capacity ........ 16-26
16C. ECONOMETRIC ANALYSIS OF RAILROAD CAPACITY ........ 16-28
Results from Our Cost Function Estimation ........ 16-29
CONCLUSION ........ 16-30
APPENDIX 16-A CLASS I AVERAGE TERMINAL DWELL TIMES, OCTOBER 2005–DECEMBER 2007 ........ 16-32
APPENDIX 16-B SELECT TERMINAL DWELL TIMES, JANUARY 1999–SEPTEMBER 2005 ........ 16-35


## CHAPTER 17 SERVICE QUALITY


INTRODUCTION ........ 17-1
17A. TRAIN SPEED AND TERMINAL DWELL TIME ........ 17-2
Burlington Northern Santa Fe ........ 17-4
Canadian National ........ 17-6
Canadian Pacific ........ 17-8
CSX ........ 17-10
Kansas City Southern ........ 17-12
Norfolk Southern ........ 17-14
Union Pacific ........ 17-16
Summary ........ 17-18
17B. IMPLICATIONS FOR SERVICE QUALITY ........ 17-19
Changes in Average Speed by Train Type ........ 17-19
Variability in Average Speed by Train Type ........ 17-21
CONCLUSION ........ 17-21

**CHAPTER 18 CONCLUSIONS ON THE STATE OF COMPETITION IN THE U.S. FREIGHT RAILROAD INDUSTRY**

INTRODUCTION ..... 18-1
18A. AGGREGATE ASSESSMENT OF CLASS I INDUSTRY STRUCTURE AND PERFORMANCE ..... 18-1
Productivity and Input Prices ..... 18-1
Economic Costs, Revenue Sufficiency, and Market Power ..... 18-2
Financial Market Evidence ..... 18-6
Implications for Competitive Performance of Railroad Industry ..... 18-8
18B. COMMODITY-SPECIFIC ANALYSIS OF COMPETITION AND RATES ..... 18-9
Commodity-Level Costs and Markups for Class I Railroads ..... 18-10
Effectiveness of Competition ..... 18-13
Implications for Competitive Performance of Railroad Industry ..... 18-17
18C. ANALYSIS OF SHIPPER CAPTIVITY ..... 18-18
GAO Analysis ..... 18-18
R/VC Data Issues ..... 18-19
R/VC and Market Structure Factors ..... 18-20
Evaluating "Captivity" and Market Structure Factors ..... 18-23
18D. RAILROAD NETWORK CAPACITY AND PERFORMANCE ..... 18-24
Conceptual Framework for Assessing Railroad Network Capacity ..... 18-24
Indicators of Railroad Network Capacity ..... 18-25
Terminal Dwell Time ..... 18-29
Train Speed ..... 18-30
Changes in Average Speed by Train Type ..... 18-33
Variability in Average Speed by Train Type ..... 18-34
Summary ..... 18-35
CONCLUSION ..... 18-36

REFERENCES

# ABBREVIATIONS

| | |
|---|---|
| 3-R Act | Regional Rail Reorganization Act of 1973 |
| 4-R Act | Railroad Revitalization and Regulatory Reform Act of 1976 |
| AAR | Association of American Railroads |
| AFC | Average Fixed Cost |
| ATC | Average Total Cost |
| AVC | Average Variable Cost |
| BEA | Bureau of Economic Analysis |
| BLS | Bureau of Labor Statistics |
| the Board | Surface Transportation Board |
| BNSF | Burlington Northern Santa Fe |
| CAPM | Capital Asset Pricing Model |
| CBO | Congressional Budget Office |
| CCO | Common Carrier Obligation |
| CFR or C.F.R. | Code of Federal Regulations |
| CMP | Constrained Market Pricing |
| CN | Canadian National |
| the Commission | Interstate Commerce Commission |
| CP | Canadian Pacific |
| CSX | CSX Corporation |
| CWS | Carload Waybill Sample |
| DCF | Discounted Cash Flow |
| DOJ | Department of Justice |
| DOT | Department of Transportation |
| FCC | Federal Communications Commission |
| FDC | Fully Distributed Costing (methodology) |
| FTC | Federal Trade Commission |
| GAO | Government Accountability Office |
| GDP | Gross Domestic Product |
| ICC | Interstate Commerce Commission (also referred to as “the Commission”) |
| ICCTA | ICC Termination Act of 1995 |
| KCS | Kansas City Southern |
| MC | Marginal Cost |

| | |
|---|---|
| MFP | Multi-Factor Productivity |
| NS | Norfolk Southern |
| PAF | Productivity Adjustment Factor |
| PPI | Producer Price Index |
| R/VC | Revenue to Variable Cost ratio |
| R-1 | Form R-1 data from Class I railroads' Annual Reports filed with the STB |
| RCAF | Rail Cost Adjustment Factor |
| RCAF-A | Adjusted RCAF |
| RCAF-U | Unadjusted RCAF |
| RPM | Railroad Performance Measures |
| RPTM | Revenue per Ton-Mile |
| SAC | Stand-Alone Cost (methodology) |
| SARR | Stand-Alone Railroad (analysis) |
| SPLC | Standard Point Location Code |
| STB | Surface Transportation Board |
| STCC | Standard Transportation Commodity Code |
| TFP | Total Factor Productivity |
| TTX | TTX Company |
| UP | Union Pacific |
| URCS | Uniform Rail Costing System |
| USC or U.S.C. | United States Code |
| USO | Universal Service Obligation |
| USDA | U.S. Department of Agriculture |

# VOLUME 2 LIST OF FIGURES

## CHAPTER 8 OVERVIEW OF INDUSTRY PERFORMANCE

FIGURE 8-1 INDUSTRY-WIDE INDEXES OF RAILROAD RATES 1985 = 100 .......... 8-4
FIGURE 8-2 GRAIN AND FARM PRODUCT RATE INDEXES 1985= 100 .......... 8-5
FIGURE 8-3 COAL RATE INDEXES 1985= 100 .......... 8-5
FIGURE 8-4 MOTOR VEHICLE AND TRANSPORTATION RATE INDEXES 1985 = 100 .......... 8-6
FIGURE 8-5 INDUSTRY-WIDE INDEXES CONSTRUCTED FROM COMMODITY WAYBILL SAMPLE .......... 8-10
FIGURE 8-6 COAL RATE INDEXES 1987 = 100 .......... 8-12
FIGURE 8-7 RCAF-U, 1989-2008 .......... 8-15
FIGURE 8-8 PRODUCTIVITY ADJUSTMENT FACTOR (PAF), 1989-2008 .......... 8-16
FIGURE 8-9 RCAF-U AND PAF, 1989-2008 .......... 8-16
FIGURE 8-10 RCAF-A, 1989-2008 .......... 8-17
FIGURE 8-11 RCAF-U, PAF, AND RCAF-A—AVERAGE ANNUAL GROWTH .......... 8-18
FIGURE 8-12 RCAF-U COMPONENTS—AVERAGE ANNUAL GROWTH .......... 8-20
FIGURE 8-13 RCAF-U, PAF, AND RCAF-A .......... 8-21
FIGURE 8-14 RCAF-U, PAF, AND FUEL COSTS .......... 8-21
FIGURE 8-15 PRICES FOR RCAF-U COMPONENTS WITH WEIGHTS GREATER THAN 10 PERCENT .......... 8-22
FIGURE 8-16 PRICES FOR RCAF-U NON-FUEL COMPONENTS WITH WEIGHTS GREATER THAN 10 PERCENT .......... 8-22
FIGURE 8-17 RAILROAD INDUSTRY MFP GROWTH .......... 8-23
FIGURE 8-18 RAILROAD INDUSTRY AVERAGE ANNUAL MFP GROWTH BY DECADE .......... 8-25
FIGURE 8-19 MFP GROWTH DIFFERENTIAL: RAILROAD INDUSTRY V. PRIVATE BUSINESS SECTOR .......... 8-26
FIGURE 8-20 MEASURES OF RAILROAD INDUSTRY PROFITABILITY 1997-2006 .......... 8-30
FIGURE 8-21 RAILROAD INDUSTRY EARNINGS—EBIT/SHARE AND EPS 1997-2006 .......... 8-31
FIGURE 8-22 RAILROAD INDUSTRY EARNINGS—EBIT/REVENUE 1997-2006 .......... 8-31
FIGURE 8-23 RAILROAD INDUSTRY COST OF EQUITY AND RETURN ON SHAREHOLDERS' EQUITY 1997-2005 .......... 8-32
FIGURE 8-24 RAILROAD INDUSTRY FINANCIAL PERFORMANCE AND CAPITAL SPENDING 1997-2006 .......... 8-33
FIGURE 8-25 RAILROAD INDUSTRY CAPITAL SPENDING/EBIT AND CAPITAL SPENDING/REVENUE 1997-2006 .......... 8-34
FIGURE 8-26 RAILROAD INDUSTRY CAPITAL SPENDING/DEPRECIATION 1997-2006 .......... 8-35
FIGURE 8-27 RAILROAD INDUSTRY EARNINGS AND RCAF-A 1997 = 1.00 .......... 8-36
FIGURE 8-28 RAILROAD INDUSTRY EARNINGS, RCAF-A AND CAPITAL SPENDING 1997 = 1.00 .......... 8-37
FIGURE 8-29 EARNINGS PER SHARE 1997-2006 .......... 8-39
FIGURE 8-30 EARNINGS PER SHARE 1997 = 1.0 .......... 8-39
FIGURE 8-31 EBIT/REVENUE 1997-2006 .......... 8-40
FIGURE 8-32 RETURN ON SHAREHOLDERS' EQUITY 1997-2006 .......... 8-41
FIGURE 8-33 PRICE-EARNINGS RATIOS 1997-2006 .......... 8-42
FIGURE 8-34 EARNINGS MEASURES – AVERAGE ANNUAL GROWTH 1997-2006 .......... 8-43
FIGURE 8-35 CAPITAL SPENDING PER SHARE 1997-2006 .......... 8-44
FIGURE 8-36 CAPITAL SPENDING/REVENUE 1997-2006 .......... 8-45

FIGURE 8-37 CAPITAL SPENDING/EBIT 1997-2006 ............ 8-46
FIGURE 8-38 CAPITAL SPENDING/DEPRECIATION CHARGES 1997-2006 ............ 8-47
FIGURE 8-39 CAPITAL SPENDING METRICS – AVERAGE ANNUAL GROWTH 1997-2006 ............ 8-47

**CHAPTER 9 RAILROAD COSTS AND TECHNOLOGY**

FIGURE 9-1 INDUSTRY AVERAGE MARGINAL COST OF A REVENUE TON-MILE* 1987-2006 ............ 9-26
FIGURE 9-2 BNSF MARGINAL COST OF A REVENUE TON-MILE 1987-2006 ............ 9-27
FIGURE 9-3 UNION PACIFIC MARGINAL COST OF A REVENUE TON-MILE 1987-2006 ............ 9-27
FIGURE 9-4 CSX MARGINAL COST OF A REVENUE TON-MILE 1987-2006 ............ 9-28
FIGURE 9-5 NORFOLK SOUTHERN MARGINAL COST OF A REVENUE TON-MILE 1987-2006 ............ 9-28

**CHAPTER 10 AN OVERVIEW OF COSTS AND REVENUE**

FIGURE 10-1 INDUSTRY AVERAGE ANNUAL REVENUE PER TON-MILE AND MARGINAL COST FOR A TON-MILE ............ 10-2
FIGURE 10-2 PERCENT CHANGES FOR INDUSTRY AVERAGE ANNUAL REVENUE PER TON-MILE AND MARGINAL COST ............ 10-3
FIGURE 10-3 INDUSTRY AVERAGE COST, AVERAGE VARIABLE COST, AND AVERAGE FIXED COST ............ 10-4
FIGURE 10-4 INDUSTRY MARKUP RATIOS ............ 10-5
FIGURE 10-5 INDUSTRY LERNER MARKUP INDEX ............ 10-7

**CHAPTER 11 RAILROAD PRICING BEHAVIOR**

FIGURE 11-1 TRENDS IN “REAL” RPTM, FROM PRICING MODEL YEARLY INTERCEPTS, SELECTED COMMODITIES ............ 11-20
FIGURE 11-2 ANNUAL R/VC RATIOS FOR CHEMICAL AND INTERMODAL SHIPMENTS 1987-2006 CARLOAD WAYBILL SAMPLE ............ 11-26
FIGURE 11-3 R/VC AVERAGES BY ORIGIN COUNTY 2001-2006 CARLOAD WAYBILL SAMPLE ............ 11-27
FIGURE 11-4 COUNTY-LEVEL EFFECTS OF MARKET STRUCTURE VARIABLES IN WHEAT PRICING MODELS ON REAL REVENUE PER TON-MILE ............ 11-29

**CHAPTER 12 ANALYSIS OF COMPETITION: COAL**

FIGURE 12-1 U.S. COAL PRODUCTION BY REGION, 1987-2006 ............ 12-1
FIGURE 12-2 U.S. COAL CONSUMPTION BY MAJOR SECTOR, 1987-2006 ............ 12-2
FIGURE 12-3 ANNUAL REAL REVENUE, TONNAGE, TON-MILES, AND REAL REVENUE PER TON-MILE COAL SHIPMENTS, 1987-2006 CARLOAD WAYBILL SAMPLE ............ 12-3
FIGURE 12-4 SELECTED COAL SHIPMENT CHARACTERISTICS, 1987-2006 ............ 12-5

**CHAPTER 13 ANALYSIS OF COMPETITION: CORN AND WHEAT**

FIGURE 13-1 U.S. CORN PRODUCTION AND SUPPLY ............ 13-1
FIGURE 13-2 U.S. WHEAT PRODUCTION AND SUPPLY ............ 13-2
FIGURE 13-3 U.S. CORN DISPOSITION ............ 13-3
FIGURE 13-4 U.S. WHEAT DISPOSITION ............ 13-3
FIGURE 13-5 TONNAGE OF RAIL SHIPMENTS OF CORN BY ORIGIN COUNTY 2005 CARLOAD WAYBILL SAMPLE ............ 13-5
FIGURE 13-6 TONNAGE OF RAIL SHIPMENTS OF WHEAT BY ORIGIN COUNTY 2005 CARLOAD WAYBILL SAMPLE ............ 13-6
FIGURE 13-7 DISTANCE TO NEAREST WATERWAY FACILITY FOR COUNTIES WITH RAIL SHIPMENTS OF WHEAT ............ 13-6

FIGURE 13-8 ANNUAL REAL REVENUE, TONNAGE, TON-MILES, AND REAL REVENUE PER TON-MILE CORN SHIPMENTS, 1987-2006 CARLOAD WAYBILL SAMPLES ........ 13-7
FIGURE 13-9 ANNUAL REAL REVENUE, TONNAGE, TON-MILES, AND REAL REVENUE PER TON-MILE WHEAT SHIPMENTS, 1987-2006 CARLOAD WAYBILL SAMPLES ........ 13-8
FIGURE 13-10 SELECTED CORN SHIPMENT CHARACTERISTICS, 1987-2006 INDEXES FOR AVERAGE DISTANCES AND TONS/CAR (LEFT AXIS) PERCENTAGES FOR UNIT TRAINS AND PRIVATE CAR OWNERSHIP (RIGHT AXIS) CARLOAD WAYBILL SAMPLE ........ 13-9
FIGURE 13-11 SELECTED WHEAT SHIPMENT CHARACTERISTICS, 1987-2006 INDEXES FOR AVERAGE DISTANCES AND TONS/CAR (LEFT AXIS) PERCENTAGES FOR UNIT TRAINS AND PRIVATE CAR OWNERSHIP (RIGHT AXIS) CARLOAD WAYBILL SAMPLE ........ 13-9

**CHAPTER 14 ANALYSIS OF COMPETITION: CHEMICALS**

FIGURE 14-1 CHEMICAL SHIPMENT TONNAGE BY ORIGIN COUNTY 2006 CARLOAD WAYBILL SAMPLE ........ 14-2
FIGURE 14-2 CHEMICAL SHIPMENT TONNAGE BY TERMINATION COUNTY 2005 CARLOAD WAYBILL SAMPLE ........ 14-2
FIGURE 14-3 ANNUAL REAL REVENUE, TONNAGE, TON-MILES, AND REAL REVENUE PER TON-MILE CHEMICAL SHIPMENTS (INCLUDING HAZARDOUS MATERIALS), 1987-2006 CARLOAD WAYBILL SAMPLE ........ 14-3
FIGURE 14-4 SELECTED CHEMICAL SHIPMENT CHARACTERISTICS INDEXES FOR AVERAGE DISTANCES, TONS/CAR, AND TONS/WAYBILL (LEFT AXIS) PERCENTAGES FOR PRIVATE CAR OWNERSHIP (RIGHT AXIS) 1987-2006 CARLOAD WAYBILL SAMPLES ........ 14-4

**CHAPTER 15 ANALYSIS OF COMPETITION: INTERMODAL SHIPMENTS**

FIGURE 15-1 INTERMODAL RAIL SHIPMENTS BY ORIGIN COUNTY 2006 CARLOAD WAYBILL SAMPLE ........ 15-2
FIGURE 15-2 ANNUAL REAL REVENUE, TONNAGE, TON-MILES, AND REAL REVENUE PER TON-MILE INTERMODAL (COFC & TOFC) SHIPMENTS, 1987-2006 CARLOAD WAYBILL SAMPLE ........ 15-3
FIGURE 15-3 SELECTED INTERMODAL (COFC & TOFC) SHIPMENT CHARACTERISTICS INDEXES FOR AVERAGE DISTANCES AND TONS/CAR 1987-2006 CARLOAD WAYBILL SAMPLES ........ 15-4

**CHAPTER 16 ANALYSIS OF RAILROAD CAPACITY**

FIGURE 16-1 CLASS I MILES OF TRACK ........ 16-7
FIGURE 16-2 CLASS I MILES OF SWITCHING TRACK ........ 16-8
FIGURE 16-3 RATIO OF NET TON-MILES TO TOTAL TRACK MILES ........ 16-9
FIGURE 16-4 CLASS I PROPORTION OF U.S. RAILROAD MILES OF TRACK OWNED AND OPERATED ........ 16-10
FIGURE 16-5 BNSF TERMINAL DWELL TIME ........ 16-13
FIGURE 16-6 CN TERMINAL DWELL TIME ........ 16-14
FIGURE 16-7 CP TERMINAL DWELL TIME ........ 16-14
FIGURE 16-8 CSX TERMINAL DWELL TIME ........ 16-15
FIGURE 16-9 KCS TERMINAL DWELL TIME ........ 16-15
FIGURE 16-10 NS TERMINAL DWELL TIME ........ 16-16
FIGURE 16-11 UP TERMINAL DWELL TIME ........ 16-16

**CHAPTER 17 SERVICE QUALITY**

FIGURE 17-1 BNSF AVERAGE TRAIN SPEEDS ........ 17-5
FIGURE 17-2 BNSF AVERAGE TRAIN SPEEDS ........ 17-5
FIGURE 17-3 CN AVERAGE TRAIN SPEEDS ........ 17-7
FIGURE 17-4 CN AVERAGE TRAIN SPEEDS ........ 17-7
FIGURE 17-5 CP AVERAGE TRAIN SPEEDS ........ 17-9
FIGURE 17-6 CP AVERAGE TRAIN SPEEDS ........ 17-9
FIGURE 17-7 CSX AVERAGE TRAIN SPEED ........ 17-11
FIGURE 17-8 CSX AVERAGE TRAIN SPEEDS ........ 17-11
FIGURE 17-9 KCS AVERAGE TRAIN SPEEDS ........ 17-13
FIGURE 17-10 KCS AVERAGE TRAIN SPEEDS ........ 17-13
FIGURE 17-11 NS AVERAGE TRAIN SPEEDS ........ 17-15
FIGURE 17-12 NS AVERAGE TRAIN SPEEDS ........ 17-15
FIGURE 17-13 UP AVERAGE TRAIN SPEEDS ........ 17-17
FIGURE 17-14 UP AVERAGE TRAIN SPEEDS ........ 17-17
FIGURE 17-15 CHANGES IN AVERAGE SPEED BY RAILROAD AND TRAIN TYPE, 1999-2005 ........ 17-20

**CHAPTER 18 CONCLUSIONS ON THE STATE OF COMPETITION IN THE U.S. FREIGHT RAILROAD INDUSTRY**

FIGURE 18-1 QUARTERLY RCAF-A INDEX ........ 18-2
FIGURE 18-2 CLASS I RAILROADS' COST STRUCTURE ........ 18-3
FIGURE 18-3 CLASS I RATIO OF AVERAGE RPTM TO AVERAGE TOTAL COST ........ 18-3
FIGURE 18-4 CLASS I AVERAGE RPTM AND MARGINAL COSTS ........ 18-4
FIGURE 18-5 CLASS I RAILROAD'S LERNER MARKUP INDEX ........ 18-5
FIGURE 18-6 COMPARISON OF CLASS I REVENUE SUFFICIENCY AND LERNER MARKUP INDEX ........ 18-6
FIGURE 18-7 EARNINGS PER SHARE ........ 18-7
FIGURE 18-8 PRICE-EARNINGS RATIOS ........ 18-8
FIGURE 18-9 RAILROAD COMPETITION AT ORIGIN AND % CHANGE IN RPTM 2001-2006 SAMPLE PERIOD ........ 18-15
FIGURE 18-10 RAILROAD COMPETITION AT DESTINATION AND % CHANGE IN RPTM 2001-2006 SAMPLE PERIOD ........ 18-15
FIGURE 18-11 DISTANCE TO PORT OR WATERWAY FACILITIES AT ORIGIN AND % CHANGE IN RPTM 2001-2006 SAMPLE PERIOD ........ 18-16
FIGURE 18-12 DISTANCE TO PORT OR WATERWAY FACILITIES AT DESTINATION AND % CHANGE IN RATES 2001-2006 SAMPLE PERIOD ........ 18-17
FIGURE 18-13 R/VC AVERAGES BY ORIGIN COUNTY FOR WHEAT SHIPMENTS 2001-2006 CARLOAD WAYBILL SAMPLE ........ 18-22
FIGURE 18-14 COUNTY-LEVEL EFFECTS OF MARKET STRUCTURE VARIABLES IN WHEAT PRICING MODELS ON REAL REVENUE PER TON-MILE ........ 18-23
FIGURE 18-15 CLASS I MILES OF TRACK 1987-2006 ........ 18-26
FIGURE 18-16 RATIO OF NET TON-MILES TO TOTAL TRACK MILES 1987-2006 ........ 18-27

# VOLUME 2 LIST OF TABLES

## CHAPTER 8 OVERVIEW OF INDUSTRY PERFORMANCE


TABLE 8-1 CUMULATIVE CHANGES IN INDUSTRY-WIDE INDEXES OVER DIFFERENT TIME PERIODS....8-4
TABLE 8-2 CUMULATIVE CHANGES IN COMMODITY RATE INDEXES OVER DIFFERENT TIME PERIODS....8-6
TABLE 8-3 ANNUAL PERCENTAGE INCREASES IN INDUSTRY-WIDE RATE INDEXES....8-11
TABLE 8-4 ANNUAL PERCENTAGE INCREASES IN COAL RATE INDEXES....8-13
TABLE 8-5 GROWTH IN RCAF-U, PAF, AND RCAF-A AVERAGE ANNUAL GROWTH, 1989Q1-2008Q2....8-17
TABLE 8-6 GROWTH IN RCAF-U COMPONENTS AVERAGE ANNUAL GROWTH IN PRICES, 1994Q1-2008Q2....8-19
TABLE 8-7 RCAF-U COMPONENT COST WEIGHTS (PERCENT)....8-20
TABLE 8-8 RAILROAD INDUSTRY MFP GROWTH, 1960-2006....8-24
TABLE 8-9 MFP GROWTH COMPARISON....8-25
TABLE 8-10 COMPARISON OF RAILROAD INDUSTRY MFP AND PAF 1989-2006....8-26
TABLE 8-11 RAILROADS INCLUDED IN FINANCIAL ANALYSIS....8-28
TABLE 8-12 RAILROAD INDUSTRY FINANCIAL PERFORMANCE....8-29
TABLE 8-13 RAILROAD INDUSTRY EARNINGS AND CAPITAL SPENDING AVERAGE ANNUAL GROWTH RATES....8-33
TABLE 8-14 EARNINGS PER SHARE....8-38
TABLE 8-15 EBIT/REVENUE....8-40
TABLE 8-16 RETURN ON SHAREHOLDERS' EQUITY....8-41
TABLE 8-17 PRICE-EARNINGS RATIOS....8-42
TABLE 8-18 CAPITAL SPENDING/SHARE....8-43
TABLE 8-19 CAPITAL SPENDING/REVENUE....8-44
TABLE 8-20 CAPITAL SPENDING/EBIT....8-45
TABLE 8-21 CAPITAL SPENDING/DEPRECIATION CHARGES....8-46
TABLE 8-22 COMPARISON OF FINANCIAL PERFORMANCE AND CAPITAL SPENDING METRICS AVERAGE ANNUAL GROWTH, 1997-2004 AND 2004-2006....8-48


## CHAPTER 9 RAILROAD COSTS AND TECHNOLOGY


TABLE 9-1 CLASS I RAILROADS USED IN VARIABLE COST FUNCTION ESTIMATION....9-4
TABLE 9-2 SUMMARY STATISTICS FOR VARIABLE COST SYSTEM MODEL....9-7
TABLE 9-3 KEY VARIABLE COST ELASTICITY ESTIMATES....9-9
TABLE 9-4 INDUSTRY AVERAGE ECONOMIES OF DENSITY*....9-11
TABLE 9-5 ECONOMICS OF DENSITY SELECTED YEARS BY RAILROAD....9-12
TABLE 9-6 INDUSTRY AVERAGE ECONOMIES OF SCALE*....9-14
TABLE 9-7 ECONOMIES OF SCALE SELECTED YEARS BY RAILROAD....9-15
TABLE 9-8 INDUSTRY AVERAGE PRODUCTIVITY GAINS*....9-17
TABLE 9-9 PRODUCTIVITY GAINS SELECTED YEARS BY RAILROAD....9-18
TABLE 9-10 INDUSTRY AVERAGE OWN-PRICE ELASTICITIES OF INPUT DEMAND*....9-19
TABLE 9-11 INDUSTRY AVERAGE ALLEN-UZAWA ELASTICITIES OF SUBSTITUTION*....9-20
TABLE 9-12 INPUT BIASES IN TECHNICAL CHANGE....9-21
TABLE 9-13 INDUSTRY AVERAGE WAY AND STRUCTURES CAPITAL EMPLOYMENT*....9-23

TABLE 9-14 WAY AND STRUCTURES CAPITAL EMPLOYMENT SELECTED YEARS BY RAILROAD .......... 9-24
TABLE 9-15 CHANGES IN INDUSTRY AVERAGE MARGINAL COST OF A REVENUE TON-MILE OVER DIFFERENT TIME PERIODS .......... 9-29
TABLE 9-16 SOURCES OF INDUSTRY MARGINAL COST CHANGES* 2000-2006 .......... 9-31

**CHAPTER 10 AN OVERVIEW OF COSTS AND REVENUE**

TABLE 10-1 CHANGES IN EXCESS MARKUP 2000-2006 .......... 10-11

**CHAPTER 11 RAILROAD PRICING BEHAVIOR**

TABLE 11-1 COMMODITY GROUPS USED IN PRICING ANALYSIS .......... 11-8
TABLE 11-2 PRICING EQUATION VARIABLE DEFINITIONS AND SOURCES .......... 11-12
TABLE 11-3 SAMPLE SIZE AND SUMMARY STATISTICS BY COMMODITY GROUP (2001-2006 PERIOD) .......... 11-15
TABLE 11-4 SELECTED ESTIMATION RESULTS (2001-2006 SAMPLE PERIOD), SHIPMENT COST CHARACTERISTICS .......... 11-17
TABLE 11-5 SELECTED ESTIMATION RESULTS (2001-2006 SAMPLE PERIOD) .......... 11-19
TABLE 11-6 MEDIAN ESTIMATED ADJUSTED MARGINAL COSTS AND MARKUPS BY COMMODITY CLASS I RAILROADS, 2001-2006 .......... 11-22
TABLE 11-7 MEDIAN ESTIMATED ADJUSTED MARGINAL COSTS AND MARKUPS BY COMMODITY BY PERIOD CLASS I RAILROADS .......... 11-23
TABLE 11-8 PERCENT OF TONS AND TON-MILES BY R/VC CATEGORY 2000-2001 VS. 2005-2006 CARLOAD WAYBILL SAMPLE DATA .......... 11-25
TABLE 11-9 CORRELATIONS OF ORIGIN COUNTY* R/VC WITH REVENUE PER TON-MILE AND MARKET STRUCTURE FACTORS, 2001-2006 DATA, SELECTED COMMODITIES .......... 11-28

**CHAPTER 12 ANALYSIS OF COMPETITION: COAL**

TABLE 12-1 COST FACTOR COEFFICIENTS, COAL PRICING MODELS .......... 12-6
TABLE 12-2 MARKET STRUCTURE FACTOR COEFFICIENTS, COAL PRICING MODELS .......... 12-7
TABLE 12-3 ESTIMATED RAILROAD COMPETITION EFFECTS AT ORIGIN .......... 12-8
TABLE 12-4 ESTIMATED RAILROAD COMPETITION EFFECTS AT TERMINATION .......... 12-9
TABLE 12-5 ESTIMATED WATER COMPETITION EFFECTS AT ORIGIN .......... 12-10
TABLE 12-6 ESTIMATED WATER COMPETITION EFFECTS AT TERMINATION, COAL SHIPMENTS .......... 12-10

**CHAPTER 13 ANALYSIS OF COMPETITION: CORN AND WHEAT**

TABLE 13-1 COST FACTOR COEFFICIENTS, CORN AND WHEAT PRICING MODELS FULL AND SPLIT SAMPLE PERIODS .......... 13-11
TABLE 13-2 MARKET STRUCTURE FACTOR COEFFICIENTS, CORN AND WHEAT PRICING MODELS FULL AND SPLIT SAMPLE PERIODS .......... 13-12
TABLE 13-3 ESTIMATED RAILROAD COMPETITION EFFECTS AT ORIGIN CORN AND WHEAT SHIPMENTS .......... 13-13
TABLE 13-4 ESTIMATED RAILROAD COMPETITION EFFECTS AT TERMINATION CORN AND WHEAT SHIPMENTS .......... 13-14
TABLE 13-5 ESTIMATED WATER COMPETITION EFFECTS AT ORIGIN CORN AND WHEAT SHIPMENTS .......... 13-14
TABLE 13-6 ESTIMATED WATER COMPETITION EFFECTS AT TERMINATION CORN AND WHEAT SHIPMENTS .......... 13-15

**CHAPTER 14 ANALYSIS OF COMPETITION: CHEMICALS**


TABLE 14-1 COST FACTOR COEFFICIENTS, CHEMICAL PRICING MODELS FULL AND SPLIT SAMPLE PERIODS ........ 14-5
TABLE 14-2 MARKET STRUCTURE FACTOR COEFFICIENTS, CHEMICAL PRICING MODELS FULL AND SPLIT PERIODS ........ 14-7
TABLE 14-3 ESTIMATED RAILROAD COMPETITION EFFECTS AT ORIGIN CHEMICAL SHIPMENTS ........ 14-7
TABLE 14-4 ESTIMATED RAILROAD COMPETITION EFFECTS AT TERMINATION CHEMICAL SHIPMENTS ........ 14-8
TABLE 14-5 ESTIMATED WATER COMPETITION EFFECTS AT ORIGIN CHEMICAL SHIPMENTS ........ 14-8
TABLE 14-6 ESTIMATED WATER COMPETITION EFFECTS AT TERMINATION CHEMICAL SHIPMENTS ........ 14-9


**CHAPTER 15 ANALYSIS OF COMPETITION: INTERMODAL SHIPMENTS**


TABLE 15-1 COST FACTOR COEFFICIENTS, INTERMODAL PRICING MODELS FULL AND SPLIT SAMPLE PERIODS ........ 15-5
TABLE 15-2 MARKET STRUCTURE FACTOR COEFFICIENTS, INTERMODAL PRICING MODELS FULL AND SPLIT SAMPLE PERIODS ........ 15-6
TABLE 15-3 ESTIMATED RAILROAD COMPETITION EFFECTS AT ORIGIN INTERMODAL SHIPMENTS ........ 15-7
TABLE 15-4 ESTIMATED RAILROAD COMPETITION EFFECTS AT TERMINATION INTERMODAL SHIPMENTS ........ 15-8
TABLE 15-5 ESTIMATED WATER COMPETITION EFFECTS AT ORIGIN INTERMODAL SHIPMENTS ........ 15-8
TABLE 15-6 ESTIMATED WATER COMPETITION EFFECTS AT TERMINATION INTERMODAL SHIPMENTS ........ 15-8


**CHAPTER 16 ANALYSIS OF RAILROAD CAPACITY**


TABLE 16-1 CHANGES IN CLASS I MILES OF TRACK ........ 16-7
TABLE 16-2 CHANGES IN MILES OF TRACK OPERATED AND OWNED BY U.S. RAILROADS ........ 16-9
TABLE 16-3 TERMINAL DWELL TIME BY YEAR ........ 16-12
TABLE 16-4 BNSF TERMINAL DWELL TIME ........ 16-17
TABLE 16-5 CSX TERMINAL DWELL TIME ........ 16-18
TABLE 16-6 NS TERMINAL DWELL TIME ........ 16-18
TABLE 16-7 UP TERMINAL DWELL TIME ........ 16-19
TABLE 16-8 PERCENTAGE CHANGES IN AVERAGE NUMBER OF CARS ON LINE ........ 16-20
TABLE 16-9 PERCENT PRIVATELY OWNED CARS ON LINE ........ 16-21
TABLE 16-10 PERCENT SYSTEM CARS ON LINE 1999-2007 ........ 16-21
TABLE 16-11 FREIGHT CAR ACQUISITIONS ........ 16-22
TABLE 16-12 SELECTED CAR FLEET STATISTICS ........ 16-23
TABLE 16-13 CLASS I LOCOMOTIVE STATISTICS ........ 16-23
TABLE 16-14 CHANGES IN CLASS I ANNUAL EXPENDITURES (NOMINAL) ........ 16-24
TABLE 16-15 CHANGES IN CLASS I ANNUAL EXPENDITURES (REAL) ........ 16-25
TABLE 16-16 DISTRIBUTION OF CORRIDOR MILEAGE BY LEVELS OF SERVICE ........ 16-27
TABLE 16-17 INDUSTRY AVERAGE WAY AND STRUCTURES CAPITAL EMPLOYMENT ........ 16-30

**CHAPTER 17 SERVICE QUALITY**

TABLE 17-1 CHANGES IN OVERALL ANNUAL TRAIN SPEED BY RAILROAD ...... 17-3
TABLE 17-2 CHANGES IN BNSF AVERAGE ANNUAL TRAIN SPEEDS AND DWELL TIME ...... 17-4
TABLE 17-3 CHANGES IN CN AVERAGE ANNUAL TRAIN SPEEDS AND DWELL TIME ...... 17-6
TABLE 17-4 CHANGES IN CP AVERAGE ANNUAL TRAIN SPEEDS AND DWELL TIME ...... 17-8
TABLE 17-5 CHANGES IN CSX AVERAGE ANNUAL TRAIN SPEEDS AND DWELL TIME ...... 17-10
TABLE 17-6 CHANGES IN KCS AVERAGE ANNUAL TRAIN SPEEDS AND DWELL TIME ...... 17-12
TABLE 17-7 CHANGES IN NS AVERAGE ANNUAL TRAIN SPEEDS AND DWELL TIME ...... 17-14
TABLE 17-8 CHANGES IN UP AVERAGE ANNUAL TRAIN SPEEDS AND DWELL TIME ...... 17-16
TABLE 17-9 CORRELATIONS WITH CHANGES IN AVERAGE TRAIN SPEED ACROSS RAILROADS BY YEAR ...... 17-19
TABLE 17-10 CHANGES IN AVERAGE SPEED BY RAILROAD AND TRAIN TYPE, 1999-2005 ...... 17-20
TABLE 17-11 VARIABILITY IN AVERAGE TRAIN SPEED BY RAILROAD AND TRAIN TYPE ...... 17-21

**CHAPTER 18 CONCLUSIONS ON THE STATE OF COMPETITION IN THE U.S. FREIGHT RAILROAD INDUSTRY**

TABLE 18-1 MEDIAN ESTIMATED ADJUSTED MARGINAL COSTS AND LERNER MARKUP INDEXES ...... 18-10
TABLE 18-2 MEDIAN ESTIMATED ADJUSTED COSTS AND LERNER MARKUP INDEXES ...... 18-12
TABLE 18-3 PERCENT OF TONS AND TON-MILES BY R/VC CATEGORY 2000-2001 VS. 2005-2006 CARLOAD WAYBILL SAMPLE DATA ...... 18-19
TABLE 18-4 CORRELATIONS OF ORIGIN COUNTY* R/VC WITH REVENUE PER TON-MILE AND MARKET STRUCTURE FACTORS, 2001-2006 DATA, SELECTED COMMODITIES ...... 18-21
TABLE 18-5 CHANGES IN OVERALL ANNUAL TRAIN SPEED BY RAILROAD ...... 18-31
TABLE 18-6 CORRELATIONS WITH CHANGES IN AVERAGE TRAIN SPEED ACROSS RAILROADS BY YEAR ...... 18-33

# CHAPTER 9.
# RAILROAD COSTS AND TECHNOLOGY

## INTRODUCTION

In this chapter, we provide information about the rail freight production process by estimating a variable cost function. The estimated function applies to the Class I freight railroad industry as a whole, although the estimated function is used to generate year-specific and railroad-specific estimates of marginal costs and other relevant technological concepts. The estimated cost function is a "variable cost" function because it assumes that variable inputs are employed at cost-minimizing levels, but that way and structures capital is a "quasi-fixed input" that might not be employed at its long-run, cost-minimizing level.[1]

We chose to estimate a cost function for several reasons. First, this approach allows us to rely on economic theory to recover information about the production process of freight railroad transportation and how this process has been changing over time. Second, this approach lets us undertake analyses of how the marginal cost of rail transport has been changing over time and the factors underlying the changes. These analyses will provide a baseline from which to bifurcate rail rate changes into "competitive response" and "market power" components. Third, by using the "constrained" or "variable" cost function we can examine the incentives for railroads to undertake investment in additional capacity and infrastructure. Finally, the cost function provides a foundation for analyzing the impacts of the various policy options discussed in Volume 3 of this report.

## 9A. THE VARIABLE COST FUNCTION

We rely on the duality between the production and cost functions to retrieve technological information directly from cost data. Shephard established the duality between production and cost.[2] We summarize this duality relationship in the context of variable and quasi-fixed inputs. Let technology be represented by a production function

$$(9.1) \quad F(Y, X^V, X^F) \geq 0$$

[1] A "quasi-fixed" input is also called a conditional input, rather than a fixed input, because it may be adjusted over time, but not necessarily to its long-run, cost-minimizing level.

[2] R. Shephard, *Cost and Production Functions,* Princeton University Press, 1953, establishes the duality between production and cost.

where Y is the vector of outputs, $X^V$ is a vector of variable inputs, and $X^F$ is a vector of quasi-fixed inputs. If function F satisfies the following three properties,

f.1 F is continuous and twice differentiable in Y, $X^V$, and $X^F$

f.2 F is non-decreasing in Y, and F is non-increasing in $X^V$ and $X^F$

f.3 F is quasi-convex in Y, and F is quasi-concave in $X^V$ and $X^F$

then a firm that is a price taker in the variable input markets has a minimum variable cost function

(9.2) $C^V = C^V(Y, W^V, X^F)$

where $W^V$ is a vector of input prices corresponding to $X^V$. $C^V$ has the following properties or regularity conditions:

c.1 $C^V$ is continuous and twice differentiable in Y, $W^V$, and $X^F$

c.2 $C^V(Y, W^V, X^F) > 0$ for all $Y > 0$, $W^V > 0$ and $X^F > 0$

c.3 $\partial C^V(Y, W^V, X^F)/\partial W_i = X_i(Y, W^V, X^F) > 0$ for all $W_i$

c.4 $\partial C^V(Y, W^V, X^F)/\partial X_j < 0$ for all $X_j$

c.5 $C^V(Y, W^V, X^F)$ is linearly homogeneous in $W^V$

c.6 $C^V(Y, W^V, X^F)$ is concave in $W^V$ and convex in $X^F$

c.7 $\partial C^V(Y, W^V, X^F)/\partial Y_k > 0$ for all $Y_k$.

The duality result establishes that $C^V$ and F are equivalent representations of technology, and as such, $C^V$ can be used to capture technology even though the production function F is never explicitly specified.

Previous applications of the variable cost function approach include Indian agriculture,[3] U.S. agriculture,[4] U.S. hospitals,[5] U.S. telephones,[6] and U.S. railroads.[7]

## 9B. Data and Estimation

We estimate a variable cost function for U.S. Class I railroads over the period 1987-2006. In 1987, there were 17 U.S. Class I railroads. As a result of mergers and reclassification, seven Class I railroads remained operating in the U.S. in 2006. Table 9-1 provides a summary of the Class I railroads used in our variable cost estimation.

We model the railroads as producing one output, revenue ton-miles, through a network measured in miles of road. There are four variable inputs: labor, equipment, materials, and fuel. We treat way and structures capital as a quasi-fixed factor in the variable cost function. We also include the average length of haul and network size as variables in the cost function estimation.

Most of the data used in the variable cost function estimation come from the Rail Form 1 (R-1 data), which Class I railroads submit to the STB. From these data we construct measures of variable cost, variable input cost shares, output, network size, average length of haul, variable input prices, and quasi-fixed capital stock. We also construct a time-trend variable. Except for the capital stock variable, we define and measure the cost function variables as done by Bitzan and Wilson.[8] We adopt the methodology of Vellturo and Friedlaender et al. to extend their capital stock series for the period

[3] Lawrence Lau and Pan Yotopolus**,** "A Test for Relative Efficiency and an Application to Indian Agriculture," *American Economic Review*, March 1971, pp. 94-109**.**

[4] R. Brown and L. Christensen, "Estimating Elasticities of Substitution in a Model of Partial Static Equilibrium: An Application to U.S. Agriculture, 1947 to 1974," in Ernst R. Berndt and Barry C. Field, eds., *Measuring and Modelling Natural Resource Substitution*, (Cambridge, MA: MIT Press), 1981, pp. 209-229.

[5] T. Cowing and A. Holtmann, "The Multiproduct Short-run Hospital Cost Function: Empirical Evidence and Policy Implication from Cross-section Data," *Southern Economic Journal* 49, 1983, pp. 637-653.

[6] M. Schankerman and M. Nadiri, "A Test of Static Equilibrium Models and Rates of Return to Quasi-Fixed Factors, with an Application to the Bell System," *Journal of Econometrics* 33(1-2), 1986, pp. 97-118.

[7] D. Caves, L. Christensen, and J. Swanson, "Productivity Growth, Scale Economies, and Capacity Utilization in U.S. Railroads, 1955–74," *American Economic Review*, 1981, pp. 994-1002; and A. Friedlaender, E. Berndt, J. Chiang, M. Showalter, and C. Vellturo, "Rail Costs and Capital Adjustments in a Quasi-regulated Environment," *Journal of Transport Economics and Policy* 27 (2), pp. 131-152.

[8] J. Bitzan and W. Wilson, "A Hedonic Cost Function Approach to Estimating Railroad Costs," in Scott Dennis and Wayne K. Talley eds., *Research in Transport Economics: Railroad Economics*, 2007, pp. 119-152.

1987-2006.[9] A table of variable definitions, formulas, and sources is included in the appendix to this chapter. Variables in bold italics are the variables used in the cost function estimation.

**TABLE 9-1**
**CLASS I RAILROADS USED IN VARIABLE COST FUNCTION ESTIMATION**

| Railroads | Years in Data | Notes |
|---|---|---|
| ATSF | 1987-1995 | Merged with BN to form BNSF |
| BN | 1987-1995 | Merged with ATSF to form BNSF |
| BNSF | 1996-2006 | Formed by merger of ATSF and BN |
| CNGT | 2002-2006 | Formed by merger of GTW and IC |
| CNW | 1987-1994 | Merged into UP |
| CR | 1987-1998 | Divided between NS and CSX |
| CSX | 1987-2006 | |
| DRGW | 1987-1994 | Merged into SP |
| GTW | 1987-1998 | Merged with IC to form CNGT |
| IC | 1987-1998 | Merged with GTW to form CNGT |
| KCS | 1987-2006 | |
| MKT | 1987 | Merged into UP |
| NS | 1987-2006 | |
| SOO | 1987-2006 | |
| SP | 1987-1996 | Includes former DRGW and SSW: Merged into UP |
| SSW | 1987-1989 | Merged into SP |
| UP | 1987-2006 | Includes former CNW, MKT, and SP |

*Two railroads, Delaware & Hudson (DH) and Florida East Coast (FEC), are omitted from the sample. DH lost its Class I status after 1987 and FEC lost its Class I status after 1991. Observations for GTW and IC for 1999-2001 were also omitted. This was because of data reporting inconsistencies around the time of their mergers.

Variable cost, input prices, and the capital stock measure are converted into constant dollars (Year 2000 = 1.0) using the price index for gross domestic product. Finally, prior to estimation, the measures for variable cost, output, network size, average length of haul, input prices, and capital stock are divided by their sample mean values (mean-scaled).[10]

We choose a transcendental logarithmic specification (translog) for the variable cost function. The translog specification, developed by Christensen, Jorgenson, and Lau, is a second-order approximation to an unspecified

[9] C. Vellturo, *The Deregulation of the U.S. Rail Industry: Efficiency and Equity in Attaining Rail Viability*, Ph.D. Thesis, Massachusetts Institute of Technology, September 1989; and A. Friedlaender, E. Berndt, J. Chiang, M. Showalter, and C. Vellturo, "Rail Costs and Capital Adjustments in a Quasi-regulated Environment," *Journal of Transport Economics and Policy* 27(2), 1993, pp. 131-152.

[10] Mean-scaling the data facilitates the interpretation and evaluation, at the point of approximation, of the estimated variable cost function and many estimated production concepts since the point of approximation is a vector of 1's. This normalization is especially convenient with the translog specification because second order terms are zero at the point of approximation.

technology.[11] When the second-order terms are zero, the translog specification reduces to a Cobb-Douglas first-order approximation of an unspecified technology.[12]

Our translog specification of variable cost is

$$
\begin{aligned}
\ln C^V = {} & \alpha_0 + \alpha_Y \ln Y + \alpha_N \ln N \\
& + 1/2\,\alpha_{YY} (\ln Y)^2 + \alpha_{YN} \ln Y \ln N + 1/2\,\alpha_{NN} (\ln N)^2 \\
& + \textstyle\sum_i \beta_1 \ln W_i \\
& + 1/2 \textstyle\sum_i \sum_j \beta_{ij} \ln W_i \ln W_j \\
& + \eta_K \ln K + \eta_H \ln ALOH \\
& + 1/2\,\eta_{KK} (\ln K)^2 + 1/2\,\eta_{HH} (\ln ALOH)^2 \\
& + \textstyle\sum_i \alpha_{Yj} \ln Y \ln W_i \\
& + \textstyle\sum_i \alpha_{Nj} \ln N \ln W_i \\
& + \tau_T\, Time + 1/2\,\tau_{TT} (Time)^2 \\
& + \tau_T\, Time \ln Y + \tau_N\, Time \ln N \\
& + \textstyle\sum_i \tau_i\, Time \ln W \\
& + \textstyle\sum_k d_k\, Firm_k
\end{aligned}
\tag{9.3}
$$

where ln is the natural logarithm operator, Y represents revenue ton-miles, N the network size measured in miles of road,[13] $W_i$ the price of the ith variable input, K the quasi-fixed capital stock, and ALOH the average length of haul.

In addition to the independent variables and time trend, we have introduced the possibility of "firm effects" by including binary variables for each firm incarnation ($Firm_k$), taking into account the mergers that occurred over the sample period. We include these first-order binary terms in the cost function to control for unobserved railroad characteristics. Using the railroads listed in Table 9-1, there are 22 distinct Class I firm incarnations between 1987 and 2006. This results in 21 binary firm-indicator variables being included in equation (9.3).[14]

---

[11] L. Christensen, D. Jorgenson, and L. Lau, "Conjugate Duality and the Transcendental Logarithmic Production Function," *Econometrica*, 39, 1971, pp. 255-256; and L. Christensen, D. Jorgenson, and L. Lau, "Transcendental Logarithmic Production Frontiers," *Review of Economics and Statistics*, 55, pp. 28-45.

[12] C. Cobb and P. Douglas, "A Theory of Production," *American Economic Review*, 18, Supplement, 1928, pp. 139-165.

[13] The miles of road measure differs from the miles of track measure. A mile of road may have a single or multiple tracks. The miles of road variable captures the expanse of the railroad's network.

[14] The current UP organization is the excluded binary variable.

The translog specification automatically satisfies properties c.1 and c.2. In addition, symmetry of second derivatives can be easily imposed by specification.[15] Property c.3, called Shephard's lemma, gives the input demand expressions. In logarithmic form, Shephard's lemma yields the variable input share expressions. That is,

$$(9.4) \qquad M_i = \beta_i + \sum_j \beta_{ij} \ln W_j + \alpha_{Yj} \ln Y + \alpha_{Nj} \ln N + \tau_j \, Time \, .$$

Equations (9.3) and (9.4) comprise the system of estimating equations. Homogeneity of $C^V$ (property c.5) with respect to input prices is imposed by the following parameter restrictions:

$$(9.5) \qquad \begin{aligned} &\sum_i \beta_i = 1; \\ &\sum_i \beta_{ij} = \sum_j \beta_{ji} = 0; \\ &\sum_i \alpha_{Yj} = 0; \\ &\sum_i \alpha_{Rj} = 0; \\ &\sum_i \tau_j = 0 \end{aligned} \qquad .$$

The regularity conditions represented by properties c.4, c.6, and c.7 cannot be parsimoniously imposed via translog parameter restrictions. Instead, the cost function estimate must be evaluated at each observation to check these conditions.[16]

We introduce switching regression mechanisms for parameters associated with the first and direct second-order time trend terms. The reason for this is to allow the structure of technological change to differ over the sample period. The switching mechanisms are implemented by substituting the following expressions into the variable cost system:

$$(9.6) \qquad \begin{aligned} \tau_T &= \tau_{T1} T_1 + \tau_{T2} T_2 + \tau_{T3} \\ \tau_{TT} &= \tau_{TT1} T_1 + \tau_{TT2} T_2 + \tau_{TT3} \end{aligned}$$

where T1 = 1 for years 1987-92 and T1 = 0 for other years; T2 = 1 for years 1993-98 and T2 = 0 for other years; and $\tau_{T1}, \tau_{T2}, \tau_{T3}, \tau_{TT1}, \tau_{TT2}$, and $\tau_{TT3}$ are parameters to be estimated. With the specification given by equation (9.6), a

---

[15] Symmetry of second derivatives is a basic calculus result, sometimes referred to as Young's theorem, implying that the order of differentiation does not matter.

[16] We end up imposing the restriction $\beta_{FF} = 0$ in order to obtain property c.6 with respect to the price of fuel. Similar restrictions were necessary in the variable cost function system estimated by Friedlaender and her co-authors in A. Friedlaender, E. Berndt, J. Chiang, M. Showalter, and C. Vellturo, "Rail Costs and Capital Adjustments in a Quasi-regulated Environment," *Journal of Transport Economics and Policy* 27(2), 1993, pp. 131-152.

common time-trend structure across the 20-year period is a testable hypothesis represented by the special case $\tau_{T1} = \tau_{T2} = \tau_{TT1} = \tau_{TT2} = 0$.

We estimate a four-equation system consisting of the translog variable cost function given by equation (9.3) and three of the four input share equations given by equation (9.4),[17] with the switching parameter mechanisms embedded in equation (9.6). We estimate this system by the method of seemingly unrelated regressions.[18] This method allows for cross-equation correlation of error terms, which is appropriate because the share equations are first derivatives of the translog cost equation.[19]

Table 9-2 reports summary statistics for the estimated variable cost system model. Regularity conditions implied by theory (c.1 through c.7) are satisfied for 197 out of the 199 observations.[20]

**TABLE 9-2**
**SUMMARY STATISTICS FOR VARIABLE COST SYSTEM MODEL**

| Equation | R-Square | Adjusted R-Square |
|---|---|---|
| ln Variable Cost | 0.9858 | 0.9819 |
| Labor Share | 0.3906 | 0.3735 |
| Equipment Share | 0.2211 | 0.2162 |
| Fuel Share | 0.4049 | 0.4021 |

Parameter estimates for the variable cost function are reported in the appendix to this chapter. We first examine the firm-specific effects. These effects are relative to the omitted binary variable for UP in the 1997-2006 period. Fourteen of 21 firm-effect parameter estimates are statistically

[17] Because the share expressions must sum to one, only (any) three share equations are independent. In the estimation reported, we have dropped the materials share equation. However, parameter estimates are invariant to which share equation is omitted.

[18] A. Zellner, "An Efficient Method of Estimating Seemingly Unrelated Regression Equations and Tests for Aggregation Bias," *Journal of the American Statistical Association* 57, 1962, pp. 348-368.

[19] We constructed an instrumental variable for revenue ton-miles (Y) to investigate the possible endogeneity of Y. We included the instrumental variable in the variable cost function system along with Y in exactly the same manner. We tested for differences across specifications wherein Y is treated as exogenous and endogenous, and found that there was no statistical bias introduced by treating Y as exogenous. See Jan Kmenta, *Elements of Econometrics,* Second Edition, Macmillan Publishing Company, pp. 634-635. We do not reject the null hypothesis of exogeneity for Y. Furthermore, when the model is estimated with the instrumental variable proxy for Y replacing Y, that is by iterated three-stage least squares, the resulting variable cost function estimate does a poor job of meeting the regularity conditions. Consequently, we base our analysis on the iterated seemingly unrelated regressions.

[20] GTW has negative estimates for the marginal cost of ton-miles for 1997 and 1998.

insignificant,[21] indicating no evidence of cost structure differences from the current incarnation of UP. Seven of the firm-effect parameters are statistically significant and negative. These indicate cost structure differences from the current UP, but should not necessarily be interpreted as cost efficiency differences, as the parameters may merely reflect differences in unobserved network conditions.[22] Notably, there is no statistically significant evidence of cost structure differences between any of the incarnations of the SP and UP firms.

Estimates of the cost function model with expressions (6) incorporated result in statistical rejection of the hypothesis of a common time-trend structure across the sample. However, estimates for $\tau_{T1}$ and $\tau_{T2}$ are similar and not statistically different. Likewise, estimates for $\tau_{TT1} = \tau_{TT2}$ are similar and not statistically different. Thus, we estimate the model with the embedded restrictions $\tau_{T1} = \tau_{T2}$ and $\tau_{TT1} = \tau_{TT2}$. The implications of the switching regression parameters will be addressed below in the discussion of technological change.

## 9C. Railroad Technology Inferred from the Variable Cost Function

Duality theory allows us to infer the essential characteristics of freight rail technology directly from the estimated variable cost function. These characteristics include: economies of density, economies of scale, technological change, and input substitution possibilities. We use several cost elasticity concepts in our analysis of density, scale, and technological change. In Table 9-3, we report the "industry average" for the key elasticity estimates for selected years.[23] The industry average is a weighted average of railroad-specific elasticity measures, with the weights being the railroads' shares of

[21] Unless otherwise indicated, all statements of statistical significance are relative to a 10 percent significance level.

[22] The estimate of the difference in cost structures between any two of the included firms is simply the difference in their parameter estimates. The corresponding standard error estimate is the square root of the sum of the variances of the two binary variable estimates minus two times their covariance.

[23] We present 90 percent confidence intervals for many of the statistics reported in this chapter. The variable cost function system was re-estimated 1000 times using a bootstrap resampling method. The bootstrap estimates are used to construct confidence intervals by a simple percentile method. Details of this procedure can be found in B. K. Eakin, D. P. McMillen, and M. J. Buono, "Constructing Confidence Intervals Using the Bootstrap: An Application to a Multi-Product Cost Function," *The Review of Economics and Statistics*, 72(2), 1990, pp. 339-344.

total industry variable cost.[24] The elasticity measures for each railroad, which underlie these industry averages, are presented in the appendix to this chapter.

**TABLE 9-3**
**KEY VARIABLE COST ELASTICITY ESTIMATES**
**(INDUSTRY AVERAGE*)**

**[90 PERCENT CONFIDENCE INTERVALS IN BRACKETS]**

| | 1987 | 1995 | 2000 | 2006 |
|---|---|---|---|---|
| Ton-Mile Elasticity | 0.719 | 0.638 | 0.789 | 0.798 |
| ($\partial \ln C^V / \partial \ln Y$) | [0.48 – 0.96] | [0.39 – 0.88] | [0.52 – 1.05] | [0.52 – 1.07] |
| Length-of-Haul Elasticity | -0.121 | -0.050 | 0.037 | 0.088 |
| ($\partial \ln C^V / \partial \ln ALOH$) | [-0.30 – 0.06] | [-0.26 – 0.16] | [-0.21 – 0.28] | [-0.19 – 0.36] |
| Capital-Stock Elasticity | -0.127 | -0.126 | -0.129 | -0.129 |
| ($\partial \ln C^V / \partial \ln K$) | [-0.23 – -0.03] | [-0.22 – -0.03] | [-0.24 – -0.03] | [-0.24 – -0.03] |
| Network-Size Elasticity | 0.374 | 0.460 | 0.276 | 0.247 |
| ($\partial \ln C^V / \partial \ln N$) | [0.18 – 0.56] | [0.29 – 0.64] | [0.10 – 0.46] | [0.06 – 0.46] |
| Rate of Cost Change | -0.061 | -0.023 | -0.050 | 0.069 |
| ($\partial \ln C^V / \partial Time$) | [-0.07 – -0.05] | [-0.03 – -0.01] | [-0.07 – -0.03] | [0.05 – 0.09] |

* Firm variable cost shares are used as weights in averaging.

The ton-mile elasticity measures the percentage change in variable cost as a result of a one percent increase in revenue ton-miles, all else constant. The industry average for the ton-mile elasticity in recent years has been stable at about 0.79 percent. However, in earlier years this elasticity was smaller.

The length-of-haul elasticity shows the percentage change in variable cost resulting from increasing the average length of haul by one percent. The length-of-haul elasticity estimates indicate that, early in the sample period, variable cost could be reduced considerably by increasing the average length of haul. However, by about 1995, this source of cost saving appears to have been tapped out. In recent years, the industry length-of-haul elasticity is positive and has been increasing.

The elasticity of variable cost with respect to the way and structures capital is stable and statistically significant across the entire sample period. The capital-stock elasticity is negative, as implied by theory. That is, an increase in capital would lower variable cost.

The network-size elasticity shows the impact on variable cost from increasing the miles of road by one percent. This elasticity measure is positive and statistically significant, as suggested by theory. The industry average

[24] Throughout this chapter, firm variable cost shares are used as weights in averaging. For 1987 through 1995, the industry averages are calculated using data for ATSF, BN, CSX, NS, SP, and UP. For 1996, the industry averages are calculated using data for BNSF, CSX, NS, SP, and UP. For 1997-2006, the industry averages are calculated using data for BNSF, CSX, NS, and UP.

network-size elasticity gradually increases over time until 1995, after which it has been decreasing.

Finally, the derivative of the variable cost function with respect to time provides evidence of strong technological progress in the late 1980s, a resurgence of technological progress in the late 1990s, but a near disappearance of the technological change component of productivity in recent years. This impact is analyzed below in the discussion on technological change.

## Economies of Density

Economies of density indicate how variable cost changes as output increases. The capital stock and network size are held constant when measuring economies of density, and thus the measure is essentially a short-run concept. A railroad is said to experience: (a) *economies of density* if an increase in revenue ton-miles results in a less than proportional increase in variable cost, (b) *constant returns to density* if an increase in revenue ton-miles results in an increase in variable cost of equal proportion, or (c) *diseconomies of density* if an increase in revenue ton-miles results in a more than proportional increase in variable cost.

The measure of density economies depends upon whether the increase in revenue ton-miles results primarily from an increase in revenue tons or an increase in the average length of haul of shipments. Thus we report two density measures:[25]

(9.7) $$DENSITY_1 = 1/\left(\partial \ln C^V / \partial \ln Y\right)$$

(9.8) $$DENSITY_2 = 1/\left[\left(\partial \ln C^V / \partial \ln Y\right) + \left(\partial \ln C^V / \partial \ln ALOH\right)\right].$$

DENSITY_1 would be the relevant measure if the increase in revenue ton-miles results from an increase in revenue tons, holding the average length of haul constant. In contrast, DENSITY_2 would be relevant if the increase in revenue ton-miles results entirely from an increase in the average length of haul. The true density measure depends on the variability of average length of haul, and lies between DENSITY_1 and DENSITY_2. The density measures given by equations (9.7) and (9.8) indicate economies of density for values greater than 1.0, constant returns to density for a value of 1.0, and diseconomies of density for values less than 1.0.

[25] One can calculate "long-run density" measures by multiplying the short-run measures given by equations (9.7) and (9.8) by $(1 - \partial \ln C^V / \partial \ln K)$. However, in the long-run analysis we believe that scale is the more relevant concept.

The density measure has implications for revenue recovery. A railroad with economies of density cannot fully recover its variable cost by pricing ton-miles at short-run marginal cost, while a railroad experiencing diseconomies of density more than recovers its variable cost by pricing ton-miles at short-run marginal cost. The density measure indicates the average mark-up factor over short-run marginal cost mark-up factor (if any) needed to recover variable cost. Recovery of capital costs and other network and fixed costs may require additional markups. Marginal cost pricing and cost recovery is discussed at greater length in the pricing analysis chapters of this report.

Table 9-4 reports industry averages for the estimated density measures for selected years. Density estimates for each railroad by year are presented in the appendix to this chapter. The density estimates indicate that the Class I railroad industry still experiences economies of density although they have diminished over the years in our sample frame. However, the stronger density economies now appear to result from adding more shipments rather than from increasing the average length of a shipment.

**TABLE 9-4**
**INDUSTRY AVERAGE ECONOMIES OF DENSITY***
**(90 PERCENT CONFIDENCE INTERVALS IN BRAKETS)**

| | 1987 | 1995 | 2000 | 2006 |
|---|---|---|---|---|
| DENSITY_1 | 1.405 | 1.595 | 1.275 | 1.263 |
| (Average length of haul constant) | [1.05 – 2.14] | [1.14 – 2.71] | [0.95 – 1.98] | [0.93 – 1.98] |
| DENSITY_2 | 1.823 | 1.776 | 1.259 | 1.160 |
| (Revenue tons constant) | [1.25 – 3.78] | [1.26 – 3.20] | [0.94 – 1.95] | [0.86 – 1.83] |

* Firm variable cost shares are used as weights in averaging.

Table 9-5 presents some railroad-specific estimates of density economies. Examination of these estimates shows that the BN-ATSF merger in 1996 and the UP-SP merger in 1997 apparently resulted in the full extraction of economies of density resulting from increasing the average length of haul. BNSF and UP, the two largest railroad systems, currently appear to have mild economies of density from increasing the number of shipments, but virtually no economies of density from increasing the average length of haul. In contrast, CSX and NS still appear to experience greater economies of density from increasing the average length of haul than from increasing the number of shipments, although their density differentials have been shrinking over the twenty-year time frame. In fact, the economies of density from additional shipments appear to be almost exhausted for NS by 2006.

**TABLE 9-5**
**ECONOMICS OF DENSITY**
**SELECTED YEARS BY RAILROAD**
**(90 PERCENT CONFIDENCE INTERVALS IN BRACKETS)**

| Railroads | DENSITY_1 (Average length of haul constant) | DENSITY_2 (Revenue tons constant) |
|---|---|---|
| **ATSF-BN-BNSF** | | |
| ATSF 1987 | 1.521 | 1.333 |
| | [1.16 – 2.24] | [0.97 – 2.10] |
| BN 1987 | 1.456 | 1.255 |
| | [1.03 – 2.49] | [0.90 – 2.08] |
| ATSF 1995 | 2.202 | 1.851 |
| | [1.53 – 3.92] | [1.23 – 3.69] |
| BN 1995 | 1.586 | 1.264 |
| | [1.09 – 2.98] | [0.89 – 2.17] |
| BNSF 1996 | 1.253 | 1.012 |
| | [0.91 – 1.99] | [0.75 – 1.56] |
| BNSF 2006 | 1.394 | 1.021 |
| | [0.96 – 2.51] | [0.73 – 1.72] |
| **SP-UP** | | |
| SP 1987 | 1.720 | 1.507 |
| | [1.28 – 2.67] | [1.07 – 2.51] |
| UP1987 | 1.427 | 1.404 |
| | [1.04 – 2.26] | [1.02 – 2.32] |
| SP 1996 | 1.652 | 1.603 |
| | [1.21 – 2.60] | [1.14 – 2.66] |
| UP 1996 | 1.755 | 1.393 |
| | [1.15 – 3.64] | [0.95 – 2.57] |
| UP 1997 | 1.326 | 1.056 |
| | [0.94 – 2.22] | [0.77 – 1.68] |
| UP 2006 | 1.281 | 0.995 |
| | [0.92 – 2.05] | [0.72 – 1.60] |
| **CSX** | | |
| CSX 1987 | 1.281 | 2.617 |
| | [0.97 – 1.88] | [1.54 – 7.61] |
| CSX 1996 | 1.315 | 2.172 |
| | [1.02 – 1.86] | [1.48 – 3.99] |
| CSX 2006 | 1.210 | 1.402 |
| | [0.94 – 1.74] | [1.04 – 2.18] |
| **NS** | | |
| NS 1987 | 1.247 | 2.229 |
| | [0.96 – 1.76] | [1.49 – 4.59] |
| NS 1996 | 1.489 | 2.271 |
| | [1.14 – 2.15] | [1.56 – 4.09] |
| NS 2006 | 1.080 | 1.428 |
| | [0.85 – 1.49] | [1.06 – 2.18] |

## Economies of Scale

Economies of scale indicate how total cost changes as output increases. The scale measure is a "long-run" concept in that all factors of production (i.e., including capital stock), as well as network size, are allowed to adjust. A railroad is said to experience (a) *economies of scale* if an increase in revenue ton-miles results in a less than proportional increase in total cost, (b) *constant returns to scale* if an increase in revenue ton-miles results in an increase in total cost of equal proportion, or (c) *diseconomies of scale* if an increase in revenue ton-miles results in a more than proportional increase in total cost.

As was the case with the density measures, the measurement of scale economies depends upon whether the increase in revenue ton-miles is achieved from an increase in revenue tons or an increase in the average length of haul of shipments. Thus we also report two scale measures:[26]

(9.9) $$SCALE_1 = \left[1 - \left(\partial \ln C^V / \partial \ln K\right)\right] / \left[\left(\partial \ln C^V / \partial \ln Y\right) + \left(\partial \ln C^V / \partial \ln N\right)\right]$$

(9.10) $$SCALE_2 = \left[1 - \left(\partial \ln C^V / \partial \ln K\right)\right] / \left[\left(\partial \ln C^V / \partial \ln Y\right) + \left(\partial \ln C^V / \partial \ln ALOH\right) + \left(\partial \ln C^V / \partial \ln N\right)\right].$$

SCALE_1 would be the relevant measure if the increase in revenue ton-miles results from an increase in revenue tons, holding the average length of haul constant. In contrast, SCALE_2 would be relevant if the increase in revenue ton-miles results entirely from an increase in the average length of haul. The true scale measure depends on how average length of haul changes, and lies between SCALE_1 and SCALE_2. The scale measures given by equations (9.9) and (9.10) indicate economies of scale for values greater than 1.0, constant returns to scale for a value of 1.0, and diseconomies of scale for values less than 1.0.

Table 9-6 reports industry averages for the estimated scale measures for selected years. Scale estimates for each railroad by year are presented in the appendix to this chapter. The scale estimates indicate that in recent years the Class I railroad industry has been experiencing approximately constant returns to scale, regardless of which scale measure is used. The similarity of the industry averages for the two scale measures in recent years reflects the exhaustion of scale economies from changing the average length of haul. It is interesting to note that approximately constant returns to scale are implied when the number of shipments is changed while holding the average length of

[26] "Short-run scale" measures can be calculated by replacing the numerators in equations (9.9) and (9.10) with 1. However, we find the restriction of holding capital stock constant while adjusting network size in the short run to be somewhat inconsistent. Thus, we believe the economies of density measure is the more meaningful short-run concept.

haul constant. This result does not vary substantially over the sample time frame.

**TABLE 9-6**
**INDUSTRY AVERAGE ECONOMIES OF SCALE***
**(90 PERCENT CONFIDENCE INTERVALS IN BRACKETS)**

| | 1987 | 1995 | 2000 | 2006 |
|---|---|---|---|---|
| SCALE_1 | 1.033 | 1.027 | 1.064 | 1.086 |
| (Average length of haul constant) | [0.84 – 1.24] | [0.89 – 1.23] | [0.89 – 1.23] | [0.92 – 1.36] |
| SCALE_2 | 1.247 | 1.119 | 1.098 | 1.070 |
| (Revenue tons constant) | [1.02 – 1.68] | [0.91 – 1.47] | [0.88 – 1.50] | [0.85 – 1.45] |

* Firm variable cost shares are used as weights in averaging.

Table 9-7 presents some railroad-specific estimates of scale. Examination of these estimates shows that the BN-ATSF merger in 1996 and the UP-SP merger in 1997 apparently did not substantially impact either of the scale measures. This is in contrast to the apparent impact of these mergers on the density measures, as discussed above. CSX and NS appear to have approximately constant returns to scale from increasing the number of shipments, but significant economies of scale from increasing the average length of haul.

## Technological Change and Productivity Growth

Technological change is a fundamental component of productivity growth. This source of productivity can be viewed from two related perspectives. One view of technological change focuses on output growth. This view observes how the maximum possible output (the production possibilities curve) increases over time, holding the available inputs constant. We refer to this perspective as PGY (for productivity growth in output). Alternatively, the focus of technological change can be on input requirements. This view we refer to as PGX (for productivity growth of inputs). PGX shows how the resource requirements—for a given level of output—decrease over time.

**TABLE 9-7**
**ECONOMIES OF SCALE**
**SELECTED YEARS BY RAILROAD**
**(90 PERCENT CONFIDENCE INTERVALS IN BRACKETS)**

| Railroads | SCALE_1 (Average length of haul constant) | SCALE_2 (Revenue tons constant) |
|---|---|---|
| **ATSF-BN-BNF** | | |
| ATSF 1987 | 1.060 | 0.975 |
| | [0.94 – 1.22] | [0.78 – 1.33] |
| BN 1987 | 0.975 | 0.890 |
| | [0.83 – 1.21] | [0.70 – 1.23] |
| ATSF 1995 | 1.024 | 0.949 |
| | [0.92 – 1.17] | [0.76 – 1.25] |
| BN 1995 | 0.980 | 0.860 |
| | [0.83 – 1.21] | [0.67 – 1.18] |
| BNSF 1996 | 1.014 | 0.866 |
| | [0.84 – 1.30] | [0.67 – 1.23] |
| BNSF 2006 | 1.014 | 0.820 |
| | [0.84 – 1.30] | [0.64 – 1.17] |
| **SP-UP** | | |
| SP 1987 | 1.042 | 0.969 |
| | [0.93 – 1.19] | [0.78 – 1.31] |
| UP1987 | 1.008 | 0.998 |
| | [0.86 – 1.23] | [0.79 – 1.36] |
| SP 1996 | 1.038 | 1.020 |
| | [0.90 – 1.24] | [0.82 – 1.35] |
| UP 1996 | 0.968 | 0.859 |
| | [0.82 – 1.19] | [0.68 – 1.16] |
| UP 1997 | 1.004 | 0.857 |
| | [0.83 – 1.29] | [0.66 – 1.21] |
| UP 2006 | 1.044 | 0.865 |
| | [0.87 – 1.33] | [0.67 – 1.23] |
| **CSX** | | |
| CSX 1987 | 1.039 | 1.640 |
| | [0.89 – 1.26] | [1.28 – 2.31] |
| CSX 1996 | 1.096 | 1.548 |
| | [0.95 – 1.31] | [1.24 – 2.06] |
| CSX 2006 | 1.148 | 1.297 |
| | [0.99 – 1.39] | [1.04 – 1.72] |
| **NS** | | |
| NS 1987 | 1.085 | 1.644 |
| | [0.94 – 1.28] | [1.31 – 2.21] |
| NS 1996 | 1.082 | 1.392 |
| | [0.95 – 1.27] | [1.15 – 1.80] |
| NS 2006 | 1.210 | 1.597 |
| | [1.04 – 1.46] | [1.28 – 2.14] |

As shown by Caves, Christensen, and Swanson, the PGY and PGX perspectives are linked by the concept of economies of scale, with PGY and PGX being equivalent only in the case of constant returns to scale.[27]

We calculate three technological change-based productivity measures:

(9.11) $$PGY_1 = -\left(\partial \ln C^V / \partial Time\right) \times SCALE_1 / \left(1 - \partial \ln C^V / \partial \ln K\right)$$

(9.12) $$PGY_2 = -\left(\partial \ln C^V / \partial Time\right) \times SCALE_2 / \left(1 - \partial \ln C^V / \partial \ln K\right)$$

(9.13) $$PGX = -\left(\partial \ln C^V / \partial Time\right) / \left(1 - \partial \ln C^V / \partial \ln K\right).$$

PGY_1 would be the appropriate output-focused productivity measure if output growth results from increasing revenue tons while keeping the average length of haul constant. PGY_2 would be the output-focused measure if output growth results entirely from an increase in the average length of haul. The true value for PGY depends on how average length of haul changes, and lies between PGY_1 and PGY_2.[28]

The industry average productivity measures implied by the variable cost function are presented in Table 9-8. The implied rate of annual productivity gain due to technological progress was in the 5 to 7 percent range in the late 1980s, but down to about 2 percent by the mid-nineties. The switching parameter model indicates that there was a resurgence of productivity in the last half of the 1990s. However, productivity gains seem to have vanished in the first half of the next decade. These findings are consistent with the productivity trends reported in Chapter 8. As was shown in Table 9-6, the scale measures do not change much between 2000 and 2006. Thus the decline in productivity since 2000 is attributable almost entirely to the reversal of the time derivative, $\partial \ln C^V / \partial Time$.[29]

We note the puzzling result of apparently negative technical change. The estimated $\partial C^V / \partial Time$ becomes positive in 2003. The theoretical interpretation of this phenomenon is technical regress rather than technical progress. We believe that interpretation is fairly implausible, but the statistical significance of the effect, along with corroborating evidence from the

---

[27] D. Caves, L. Christensen, and J. Swanson, "Productivity Growth, Scale Economies, and Capacity Utilization in U.S. Railroads, 1955-1974," *American Economic Review*, 1981, pp. 994-1002.

[28] We note that SCALE_1 = PGY_1 / PGX and SCALE_2 = PGY_2 / PGX.

[29] Estimating the model without the switching regressions' parameters results in a less dramatic productivity reversal, but the productivity gains still disappear in the same time frame of 2002-2004 and become negative by 2005-2006.

productivity analyses, suggest that something happened around 2003 to cause the variable cost curve to shift up rather dramatically. We speculate about several possible causes for the upward shift in costs starting around 2003. These possible causes include major rail construction projects, extreme weather-related events, and changes in service mix to higher-valued express priority service.

**TABLE 9-8**
**INDUSTRY AVERAGE PRODUCTIVITY GAINS***
**(STANDARD ERRORS IN PARENTHESES)**

| | 1987 | 1995 | 2000 | 2006 |
|---|---|---|---|---|
| PGY_1 | 0.056 | 0.021 | 0.047 | -0.066 |
| | [0.04 – 0.07] | [0.01 – 0.03] | [0.03 – 0.07] | -0.10 – -0.04] |
| PGY_2 | 0.068 | 0.024 | 0.049 | -0.065 |
| | [0.05 – 0.09] | [0.02 – 0.03] | [0.03 – 0.07] | [-0.10 – -0.04] |
| PGX | 0.054 | 0.021 | 0.044 | -0.061 |
| | [0.04 – 0.06] | [0.01 – 0.03] | [0.03 – 0.06] | [-0.08 – -0.04] |

* Firm variable cost shares are used as weights in averaging.

Several major rail enhancement projects were initiated in the 2003-2007 period. For UP, these projects include: going from double- to triple-tracking between Gibbon Junction and North Platte, NE; going from double- to quadruple-tracking between North Platte and O'Fallons, NE; extending centralized traffic control between Nelson, IL and Missouri Valley, IA; and enhancements along the Sunset Route. During the same period, BNSF began several major enhancements including: improved signaling along the Transcontinental Route between Chicago and Kansas City; double-tracking of Abo Canyon, NM; and construction of a double-tracked bridge over the UP tracks at Grand Island, NE. In addition, improvements were inaugurated for the BNSF-UP shared track to the Powder River Basin and the BNSF-owned, UP-shared track at Cajon Pass, CA. These construction projects could have impacted operations, explaining the observed shift up in cost starting around 2003. To the extent that construction projects help explain the shift up in cost, these enhancements should yield productivity gains once they are completed and fully operational.

We also note that in 2005, heavy rainfall caused numerous cases of track and bridge outages, particularly for UP. To the extent that these weather-related problems contributed to the increased cost, repair and return to normal service should result in a return to normal productivity changes.

Finally, the growth of express priority service (e.g., BNSF's Z-train service) may have also contributed to the shift up in cost. However, it would be inaccurate to consider this effect a decline in productivity. In this case, the traditional productivity measure would be flawed because of its failure to

adjust the output measure for changes in quality. To the extent that the shift up in cost is due to higher-valued service, the cost increase may actually reflect a quality-adjusted productivity gain.

Table 9-9 presents some railroad-specific estimates of the productivity measures.

**TABLE 9-9**
**PRODUCTIVITY GAINS**
**SELECTED YEARS BY RAILROAD**
**(STANDARD ERRORS IN PARENTHESES)**

| Railroads | PGY_1 | PGY_2* | PGX |
|---|---|---|---|
| **ATSF-BN-BNSF** | | | |
| ATSF 1987 | 0.053 | 0.048 | 0.050 |
| | [0.04 – 0.06] | [0.03 – 0.07] | [0.04 – 0.06] |
| BN 1987 | 0.053 | 0.048 | 0.054 |
| | [0.04 – 0.07] | [0.03 – 0.07] | [0.04 – 0.07] |
| ATSF 1995 | 0.012 | 0.011 | 0.012 |
| | [0.00 – 0.02] | [0.00 – 0.02] | [0.00 – 0.02] |
| BN 1995 | 0.022 | 0.019 | 0.022 |
| | [0.01 – 0.03] | [0.01 – 0.03] | [0.01 – 0.03] |
| BNSF 1996 | 0.025 | 0.021 | 0.025 |
| | [0.02 – 0.03] | [0.01 – 0.03] | [0.01 – 0.03] |
| BNSF 2006 | -0.062 | -0.050 | -0.061 |
| | [-0.10 – -0.04] | [-0.08 – -0.03] | [-0.09 – -0.04] |
| **SP-UP** | | | |
| SP 1987 | 0.049 | 0.045 | 0.047 |
| | [0.04 – 0.06] | [0.03 – 0.06] | [0.04 – 0.06] |
| UP1987 | 0.054 | 0.053 | 0.053 |
| | [0.04 – 0.07] | [0.04 – 0.08] | [0.04 – 0.06] |
| SP 1996 | 0.015 | 0.015 | 0.015 |
| | [0.01 – 0.02] | [0.01 – 0.02] | [0.01 – 0.02] |
| UP 1996 | 0.014 | 0.013 | 0.012 |
| | [0.00 – 0.02] | [0.00 – 0.02] | [0.00 – 0.02] |
| UP 1997 | 0.019 | 0.016 | 0.019 |
| | [0.01 – 0.03] | [0.01 – 0.02] | [0.01 – 0.03] |
| UP 2006 | -0.064 | -0.053 | -0.061 |
| | [-0.10 – -0.04] | [-0.09 – -0.03 ] | [-0.08 – -0.04] |
| **CSX** | | | |
| CSX 1987 | 0.059 | 0.093 | 0.057 |
| | [0.05 – 0.07] | [0.07 – 0.13] | [0.05 – 0.07] |
| CSX 1996 | 0.022 | 0.032 | 0.020 |
| | [0.02 – 0.03] | [0.02 – 0.04] | [0.01 – 0.03] |
| CSX 2006 | -0.070 | -0.080 | -0.061 |
| | [-0.11 – -0.04] | [-0.13 – -0.05] | [-0.08 – -0.04] |
| NS | | | |
| NS 1987 | 0.061 | 0.092 | 0.056 |
| | [0.05 – 0.07] | [0.07 – 0.12] | [0.05 – 0.06] |
| NS 1996 | 0.017 | 0.022 | 0.021 |
| | [0.01 – 0.02] | [0.01 – 0.03] | [0.01 – 0.02] |
| NS 2006 | -0.073 | -0.096 | -0.060 |
| | [-0.11 – -0.04] | [-0.15 – -0.06] | [-0.08 – -0.04] |

The appendix to this chapter provides productivity estimates for each railroad by year. Examination of these estimates shows that the BN-ATSF merger in 1996 and the UP-SP merger in 1997 did not appear to immediately result in higher productivity gains. There is some evidence of a productivity resurgence in the late 1990s which disappears in the first half of the next decade. However, it is not possible to say whether the mergers contributed to the productivity resurgence or subsequent decline.[30] The apparently negative productivity effects for the last few years of the study time frame are translated into marginal cost increases, as discussed below. In the pricing analysis chapters of this report, we examine the extent to which the apparent productivity decline is reflected in recent pricing behavior.

## Input Demand and Substitution Elasticities

The variable cost function also reveals information about the input side of technology. We report below both the own-price elasticities of demand and the Allen-Uzawa partial elasticities of substitution.[31] The partial elasticities of substitution show the degree to which any pair of inputs substitute or complement one another in the production process.

The own-price elasticities of demand for the variable inputs are reported in Table 9-10. As required by theory, all the own-price elasticities are negative. These estimates are stable over time and indicate that the demands for equipment and fuel are relatively more price sensitive than the demands for labor and materials.

**TABLE 9-10**
**INDUSTRY AVERAGE OWN-PRICE ELASTICITIES OF INPUT DEMAND***
**(90 PERCENT CONFIDENCE INTERVALS IN BRACKETS)**

| Inputs | 1987 | 1995 | 2000 | 2006 |
|---|---|---|---|---|
| Labor | -0.432 | -0.480 | -0.493 | -0.498 |
| | [-0.51 – -0.34] | [-0.58 – -0.38] | [-0.59 – -0.39] | [-0.60 – -0.39] |
| Equipment | -0.825 | -0.820 | -0.815 | -0.813 |
| | [-0.88 – -0.77] | [-0.87 – -0.77] | [-0.87 – -0.77] | [-0.86 – -0.77] |
| Materials | -0.422 | -0.412 | -0.415 | -0.422 |
| | [-0.52 – -0.32] | [-0.51 – -0.31] | [-0.51 – -0.32] | [-0.52 – -0.32] |
| Fuel | -0.931 | -0.900 | -0.883 | -0.859 |
| | [-0.94 – -0.92] | [-0.91 – -0.89] | [-0.89 – -0.88] | [-0.87 – -0.85] |

* Firm variable cost shares are used as weights in averaging.

[30] When the model is estimated with the common time trend structure, the apparent productivity reversal is less dramatic, but approximates negative 1 percent in 2006. Regardless of the time trend specification, the variable cost function estimates clearly indicate some significant productivity decline in the last few years of the study time frame.

[31] R. G. D. Allen, *Mathematical Analysis for Economists*, (London: McMillan), 1938; and H. Uzawa, "Production Functions with Constant Elasticities of Substitution," *Review of Economic Studies*, 29(4) October 1962, pp. 291-99.

The industry average Allen-Uzawa elasticities of substitution are reported in Table 9-11. Elasticity of substitution estimates for each railroad by year are presented in the appendix to this chapter. These estimates indicate strong substitution possibilities between labor and fuel, and between equipment and materials. In recent years, all input pairs appear as substitutes in production. Interestingly, in the earlier years of the sample time period, material and fuels, and to a lesser extent equipment and materials, appear as complements in production.

**TABLE 9-11**
**INDUSTRY AVERAGE ALLEN-UZAWA ELASTICITIES OF SUBSTITUTION***
**(90 PERCENT CONFIDENCE INTERVALS IN BRACKETS)**

| | 1987 | 1995 | 2000 | 2006 |
|---|---|---|---|---|
| Labor-Equipment | 0.501 | 0.473 | 0.482 | 0.480 |
| | [0.31 – 0.68] | [0.27 – 0.66] | [0.28 – 0.66] | [0.28 – 0.66] |
| Labor-Materials | 0.583 | 0.545 | 0.514 | 0.477 |
| | [0.37 – 0.77] | [0.32 – 0.75] | [0.27 – 0.74] | [0.22 – 0.72] |
| Labor-Fuel | 2.452 | 2.167 | 2.047 | 1.902 |
| | [2.01 – 2.93] | [1.79 – 2.57] | [1.72 – 2.39] | [1.63 – 2.19] |
| Equipment-Materials | 1.695 | 1.592 | 1.565 | 1.588 |
| | [1.44 – 1.98] | [1.38 – 1.82] | [1.36 – 1.79] | [1.37 – 1.83] |
| Equipment-Fuel | -0.153 | 0.278 | 0.419 | 0.524 |
| | [-0.96 – 0.66] | [-0.20 – 0.78] | [0.02 – 0.83] | [0.19 – 0.86] |
| Materials-Fuel | -0.533 | 0.007 | 0.131 | 0.236 |
| | [-1.20 – 0.08] | [-0.41 – 0.39] | [-0.23 – 0.48] | [-0.12 – 0.54] |

* Firm variable cost shares are used as weights in averaging.

## Input Biases in Technical Change

The analysis of bias in technical change can be traced to Hicks in the context of general economic growth, with a focus on the distribution of income between capital and labor.[32] The concept of bias in technical change has been generalized to the case of multiple factors of production, and applied at a microeconomic level to describe how specific production technologies change over time.

As shown by Binswanger, input bias in technical change estimates can be retrieved directly from a dual cost function, and in fact are simply the time derivatives of the input share expressions.[33] That is,

[32] J. Hicks, *The Theory of Wages*, London: Macmillan & Co., Ltd., 1932.

[33] H. P. Binswanger, “The Measurement of Technical Change Biases with Many Factors of Production,” *American Economic Review*, 64(6), 1974, pp. 964-976.

(9.14) $Input\ Bias = \left(\partial^2 \ln C^V / \partial \ln W_i \partial Time\right) = \partial M_i / \partial Time$ .

Technical change is said to be (relatively) input-saving, input-neutral, or input-using as the bias measure is negative, zero or positive, respectively. With our specification of the variable cost function, the measures of input biases are the parameters $\tau_L$, $\tau_E$, $\tau_M$, and $\tau_F$.[34] The estimates of input biases in technical change are reported in Table 9-12. The magnitudes of the bias measures indicate the average annual rates of change in the input cost shares. For example, on average the labor share of variable cost has been decreasing by about 6/10 of a percentage point per year. The estimates indicate technical change in the freight railroad industry since 1987 has been labor-saving, material-neutral, and equipment- and fuel-using.

**TABLE 9-12**
**INPUT BIASES IN TECHNICAL CHANGE**

**(STANDARD ERRORS IN PARENTHESES)**

| | | |
|---|---|---|
| Labor | -0.006<br>(0.0007) | Labor-Saving |
| Equipment | 0.003<br>(0.0004) | Equipment-Using |
| Materials | 0.001<br>(0.0010) | Materials-Neutral |
| Fuel | 0.002<br>(0.0004) | Fuel-Using |

## Capacity and the Employment of Capital

Our estimated variable cost function allows us to investigate the issue of capacity investment by the railroads. Our approach is similar to that of Friedlaender and her co-authors, who used a variable cost function to evaluate trends in excess capacity prior to and after railroad regulatory reform.[35] We start by noting the relationship between total cost ($C^T$) and variable cost ($C^V$) when there is one quasi-fixed input. That is,

(9.15) $C^T = C^V + W_K K$

where K is way and structures capital input (the quasi-fixed input) and $W_K$ is the market price of K. When capital is employed at its cost-minimizing level, K*, the following condition holds:

[34] Estimates of $\tau_L$ are retrieved via the homogeneity restrictions.

[35] A. Friedlaender, E. Berndt, J. Chiang, M. Showalter, and C. Vellturo, "Rail Costs and Capital Adjustments in a Quasi-regulated Environment," *Journal of Transport Economics and Policy* 27, 1993, pp. 131-152.

$\partial C^T/\partial K = 0 \rightarrow \partial C^V/\partial K = -W_K$, or in logarithmic form, $\partial \ln C^V/\partial \ln K = -W_K K/C^V$. However, way and structures capital may not be optimally employed.

To investigate capital employment, we first imputed the price for way and structures capital. We tried two methods to impute this price. One approach calculates the way and structures capital cost as freight operating revenue minus variable cost. This is the approach used by Friedlaender et al. The alternative method follows Bitzan and Wilson and calculates way and structures capital cost as operating expenses attributed to road.[36] With both methods, dividing the way and structures capital cost by the way and structures capital stock gives the imputed price of capital. [37] We chose to use the latter approach, because the former resulted in several instances where revenue was less than variable cost or very close to variable cost.[38]

After imputing a price for way and structures capital, we compare that price to the marginal impact of capital on variable cost. Specifically,

(9.16) $$-\partial \ln C^V/\partial \ln K >=< W_K K/C^V \leftrightarrow -\partial C^V/\partial K >=< W_K \leftrightarrow K <=> K^*.$$

K < K* indicates underemployment of capital, also called constrained capacity. K > K* indicates overemployment of capital, also called excess capacity. The comparison can be expressed in terms of a "Q Ratio."[39]

(9.17) $$Q\,Ratio = -\left[\partial \ln C^V/\partial \ln K\right]/\left[W_K K/C^V\right]$$

where a Q ratio equal to one implies cost-minimizing employment of capital, while values greater than one imply underemployment of capital and values less than one imply overemployment of capital.

Table 9-13 presents industry average information on way and structures capital employment for selected years. At the industry level, the variable cost function does not provide evidence of constrained capacity. In fact, the

---

[36] J. Bitzan and W. Wilson, "A Hedonic Cost Function Approach to Estimating Railroad Costs," in Scott Dennis and Wayne K. Talley eds., *Research in Transport Economics: Railroad Economics*, 2007, pp. 119-152.

[37] The two capital cost variables are included in Table 9-2 as CAPCOST1 and CAPCOST2.

[38] Overall, the two methods gave similar results. However, 15 observations had variable cost exceeding revenue, yielding a negative capital price. There were several other observations with only a small difference between revenue and variable cost, resulting in an unreasonably large magnitude of the Q ratio, which is defined in equation (9.17).

[39] This terminology is from A. Friedlaender, E. Berndt, J. Chiang, M. Showalter, and C. Vellturo, "Rail Costs and Capital Adjustments in a Quasi-regulated Environment," *Journal of Transport Economics and Policy* 27, 1993, pp. 131-152.

evidence from the variable cost function is in the other direction, indicating overcapitalization continues to characterize the railroad industry. The variable cost savings from adding a dollar of capital has been increasing over time, most rapidly in recent years, but still remains modest. At the industry level in 2006, an additional dollar of way and structures capital put in place appears to reduce variable cost by about 7 cents. In contrast, the imputed market price of capital has risen much more rapidly such that the 2006 real price of capital is about 16 cents.[40]

**TABLE 9-13**
**INDUSTRY AVERAGE WAY AND STRUCTURES CAPITAL EMPLOYMENT***
**(90 PERCENT CONFIDENCE INTERVALS IN BRACKETS)**

| | **1987** | **1995** | **2000** | **2006** |
|---|---|---|---|---|
| Shadow Price of Capital<br>$-(\partial C^V/\partial K)$ | 0.039<br>[0.01 – 0.07] | 0.044<br>[0.01 – 0.08] | 0.047<br>[0.01 – 0.09] | 0.067<br>[0.01 – 0.13] |
| Imputed Price of Capital | 0.062 | 0.098 | 0.116 | 0.163 |
| – Capital Stock Elasticity<br>$-(\partial \ln C^V/\partial \ln K)$ | 0.127<br>[0.03 – 0.23] | 0.126<br>[0.03 – 0.22] | 0.129<br>[0.03 – 0.24] | 0.129<br>[0.03 – 0.24] |
| Capital Cost to Variable Cost Ratio<br>$(W_K K/C^V)$ | 0.207 | 0.283 | 0.307 | 0.302 |
| Q Ratio<br>$-(\partial \ln C^V/\partial \ln K) / (W_K K/C^V.)$ | 0.630<br>[0.16 – 1.13] | 0.461<br>[0.13 – 0.81] | 0.469<br>[0.10 – 0.87] | 0.410<br>[0.08 – 0.76] |

* Firm variable cost shares are used as weights in averaging.

Table 9-14 presents the way and structures capital employment information for selected railroads for selected years. The appendix to this chapter presents way and structures capital employment estimates for all railroads and all years. In 2006, CSX and NS appear to have lower shadow prices and imputed prices of capital than do the BNSF and UP systems, but the Q Ratios for all four systems have similar magnitudes and indicate excess capacity overall.

[40] All monetary figures are in real dollars with 2000 being the base year.

**TABLE 9-14**
**WAY AND STRUCTURES CAPITAL EMPLOYMENT**
**SELECTED YEARS BY RAILROAD**
**(90 PERCENT CONFIDENCE INTERVALS IN BRACKETS)**

| Railroads | Shadow $P_K$ | Imputed $P_K$ | Q Ratio |
|---|---|---|---|
| **ATSF-BN-BNSF** | | | |
| ATSF 1987 | 0.039 | 0.065 | 0.603 |
| | [0.01 – 0.07] | | [0.18 – 1.04] |
| BN 1987 | 0.033 | 0.057 | 0.588 |
| | [0.01 – 0.06] | | [0.12 – 1.09] |
| ATSF 1995 | 0.030 | 0.127 | 0.238 |
| | [0.01 – 0.06] | | [0.07 – 0.41] |
| BN 1995 | 0.042 | 0.077 | 0.547 |
| | [0.01 – 0.08] | | [0.14 -0.97] |
| BNSF 1996 | 0.039 | 0.117 | 0.348 |
| | [0.01 – 0.07] | | [0.06 – 0.66] |
| BNSF 2006 | 0.081 | 0.191 | 0.425 |
| | [0.01 – 0.15] | | [0.09-0.79] |
| **SP-UP** | | | |
| SP 1987 | 0.041 | 0.071 | 0.572 |
| | [0.01 – 0.07] | | [0.18-0.99] |
| UP1987 | 0.043 | 0.066 | 0.655 |
| | [0.01 – 0.08] | | [0.16-1.18] |
| SP 1996 | 0.069 | 0.131 | 0.526 |
| | [0.02 – 0.12] | | [0.17 – 0.90] |
| UP 1996 | 0.041 | 0.109 | 0.379 |
| | [0.01 – 0.08] | | [0.07 – 0.71] |
| UP 1997 | 0.051 | 0.145 | 0.353 |
| | [0.01 -0.10] | | [0.06 – 0.67] |
| UP 2006 | 0.078 | 0.191 | 0.409 |
| | [0.01 – 0.15] | | [0.07 – 0.77] |
| **CSX** | | | |
| CSX 1987 | 0.038 | 0.056 | 0.678 |
| | [0.01 – 0.07] | | [0.12 – 1.27] |
| CSX 1996 | 0.046 | 0.093 | 0.490 |
| | [0.01 – 0.08] | | [0.12 – 0.87] |
| CSX 2006 | 0.051 | 0.131 | 0.392 |
| | [0.01 – 0.09] | | [0.08 – 0.72] |
| **NS** | | | |
| NS 1987 | 0.039 | 0.062 | 0.631 |
| | [0.01 – 0.07] | | [0.16 – 1.13] |
| NS 1996 | 0.049 | 0.125 | 0.387 |
| | [0.02 – 0.08] | | [0.12 – 0.67] |
| NS 2006 | 0.042 | 0.103 | 0.406 |
| | [0.01 – 0.08] | | [0.09 – 0.74] |

## Marginal Cost Analysis

From the variable cost function, we are able to retrieve and analyze estimates of the short-run marginal cost of transporting rail freight.[41] Marginal cost is a key variable in analyzing several aspects of the performance of an industry. First, in competitive industries the marginal cost curve constitutes the price-taking firm's supply curve. In imperfectly competitive situations, the firm compares marginal cost to marginal revenue in making output decisions. Second, marginal cost provides the basis for assessing the exercise of market power. The deviation between the price a firm charges and the marginal cost it faces reflects the extent of market power. And third, marginal cost is central to social welfare analysis. The competitive result equating price and marginal cost implies an efficient allocation of resources, in that the marginal social benefit of production just equals the marginal social opportunity cost. In comparison to a competitive market, a situation where price exceeds marginal cost results in some economic value being taken from consumers, with some of that value being transferred to producers while other value is simply lost. The divergence between price and marginal cost is an important determinant of the magnitude of lost value. Thus, understanding marginal cost is fundamental to analyses of pricing, market power, and public policy.

We can manipulate the estimated variable cost function to obtain marginal cost estimates. That is,

(9.18) $$MC = (\partial \ln C^V / \partial \ln Y) \times (C^V / Y)\ .$$

Figure 9-1 presents the industry average estimates for the marginal cost of a revenue ton-mile over the period 1987 to 2006.[42] This figure shows that, in constant dollars, the marginal cost of a ton-mile steadily decreased from 2.4 cents in 1987 to 1.4 cents in 1994. Between 1994 and 2004, marginal cost appears fairly stable at around 1.4 cents, except for spiking to 1.6 cents in 1999. Marginal cost jumped to 1.6 cents in 2005, and further jumped to 1.75 cents in 2006. Interestingly, the pattern of marginal cost changes shown in Figure 9-1 very closely mirrors the pattern of industry-wide railroad rate changes presented in Figure 8-1.[43]

[41] Our use of the term marginal cost refers to short-run marginal cost. The measure of short-run marginal cost is the change in variable cost as ton-miles increase, holding average length of haul constant.

[42] Railroad-specific estimates of marginal costs are presented in the appendix to this chapter.

[43] The values in Figure 9-1 are in constant dollars, while the indexes presented in Figure 8-1 are based on nominal values. Nevertheless, the patterns should remain similar if both figures were based on constant-dollar values.

**FIGURE 9-1**
**INDUSTRY AVERAGE MARGINAL COST OF A REVENUE TON-MILE***
**1987-2006**
**(YEAR 2000 DOLLARS)**




*Firm variable cost shares are used as weights in averaging.

Figures 9-2 to 9-5 display the marginal cost of a revenue ton-mile for the period 1987-2006 for BNSF, UP, CSX, and NS. Marginal cost estimates by railroad and by year are presented in the appendix to this chapter. ATSF and BN, BNSF's predecessor firms, show declining marginal cost (and rapidly declining marginal cost in the case of ATSF) up to the time of their merger in 1995. BNSF's marginal cost initially increases after the merger, and then shows modest decline through 2004. In 2005 and 2006, BNSF's marginal cost increases. UP's marginal cost follows a somewhat similar pattern. Both UP and SP have rapidly declining marginal cost up until their merger in 1996, UP's marginal cost increases after the merger and then shows modest decreases until about 2002. From 2003 to 2006, UP's marginal cost increases substantially. Likewise, CSX and NS have marginal cost patterns very similar to each other, even sharing a spike in 1999, most likely related to the operational difficulties experienced when Conrail assets were absorbed into the CSX and NS systems.[44] Both of these railroads have seen substantial increases in marginal cost starting about 2005.

[44] In 1997, CSX and NS proposed an agreement to jointly acquire Conrail and to split the assets. The STB approved the agreement in August 1998, with CSX getting 42 percent of Conrail's assets and NS getting 58 percent. Operations under CSX and NS began in June 1999.

**FIGURE 9-2**
**BNSF MARGINAL COST OF A REVENUE TON-MILE**
**1987-2006**
**(YEAR 2000 DOLLARS)**




**FIGURE 9-3**
**UNION PACIFIC MARGINAL COST OF A REVENUE TON-MILE**
**1987-2006**
**(YEAR 2000 DOLLARS)**



**FIGURE 9-4**
**CSX MARGINAL COST OF A REVENUE TON-MILE**
**1987-2006**
**(YEAR 2000 DOLLARS)**




**FIGURE 9-5**
**NORFOLK SOUTHERN MARGINAL COST OF A REVENUE TON-MILE**
**1987-2006**
**(YEAR 2000 DOLLARS)**



These figures reinforce what already has been revealed in the cost analysis. Namely, the western railroads (BNSF and UP) have similar cost structures to each other, the eastern railroads (CSX and NS) have similar cost structures to each other, but the cost structures differ somewhat between the western and eastern railroads.

The similarity of cost structures can have implications for the competitive behavior of the railroad industry. BNSF and UP are about equal-sized railroads and dominate the industry in the western U.S. Likewise, CSX and NS are about the same size and dominate the eastern corridor freight traffic. In fact, many of the shippers we interviewed suggested that the U.S. railroad industry functions like two duopolies. Theories of oligopoly suggest that parallel behavior (whether coordinated or not) is more likely in situations where the industry has only a few firms, each offering a fairly standard product and facing a similar cost structure. Our cost analysis indicates that BNSF and UP face similar cost structures, and the same is true for CSX and NS. In particular, the similarities in marginal cost, because of its fundamental relationship to price, suggest conditions favorable for parallelism.[45]

We summarize the percentage changes in marginal cost over different time periods in Table 9-15. Between 1987 and 2006, marginal cost decreased on average by 1.5 percent per year. The most rapid decline occurred between 1987 and 1994, when marginal cost decreased at an average annual rate of 6 percent. Between 1994 and 2004, marginal cost was essentially constant. Since 2004, marginal cost has been increasing at an average annual rate of over 11 percent.

**TABLE 9-15**
**CHANGES IN INDUSTRY AVERAGE MARGINAL COST OF A REVENUE TON-MILE OVER DIFFERENT TIME PERIODS**

| Time Period | Cumulative Change | Average Annual Change |
|---|---|---|
| 1987-1994 | -42.2% | -6.0% |
| 1994-2004 | 0.6% | 0.1% |
| 2004-2006 | 22.9% | 11.5% |
| 1987-2006 | -28.6% | -1.5% |

We can further examine marginal cost changes over time by breaking down the changes into causal components. We do this by stating a first-order approximation to the percentage change in marginal cost. That is,

$$(9.19)\quad \textit{Percent Change in Marginal Cost} \approx \sum_i \left[\partial \ln MC_t / \partial \ln X_{i,t}\right] \times \left[\ln X_{i,t} - \ln X_{i,t-1}\right]$$

[45] We are deliberate in the choice of the term "parallel behavior." It should not be interpreted as "collusion." In fact, theory suggests that with very few firms facing very similar conditions, "conscious parallelism" makes collusion unnecessary.

where the $X_i$ variables are the exogenous arguments of the variable cost function, and t and t-1 indicate current year and one-year lagged values, respectively. From this expression, we can isolate the impact of each exogenous variable as

$$(9.20)\quad X_{i,t,}Impact = \left[\partial \ln MC_t / \partial \ln X_{i,t}\right] \times \left[\ln X_{i,t} - \ln X_{i,t-1}\right].$$

Table 9-16 shows the industry-wide year-to-year changes in the exogenous variables and their estimated impacts on marginal cost for the years 2000-2006. Difference and impact estimates by railroad and by year are presented in the appendix to this chapter. The last row of this table shows the sum of the variable impacts and the estimated year-to-year percentage change in marginal cost. Overall, the first-order approximation does a fairly good job of accounting for year-to-year marginal cost changes, especially in years when marginal cost changes are relatively large. This comparison for all railroads and all years appears in the appendix to this chapter.

The data in Table 9-16 provide an explanation for marginal cost changes in the railroad industry. Year 2000 saw a big jump in the fuel price paid by railroads, putting substantial upward pressure on marginal cost. However, overall marginal cost in 2000 declined by about seven percent, due mainly to revenue ton-mile growth, capital increase, labor price decline, and technical change. Technical change and output growth in 2001 decreased marginal cost by more than three percent. The decline in marginal cost continued at about the same pace in 2002, driven by decreases in fuel prices and road abandonment. It is noteworthy that at about this time the marginal cost savings from technical change vanish. Year 2003 marks the beginning of the current upturn in marginal cost (consistent with upturn in RCAF-A noted in Chapter 8). Increasing fuel prices and apparently negative technical change were the primary factors pushing up marginal cost, but this upward pressure was mitigated in part by renewed revenue ton-mile growth. In 2004, revenue ton-mile growth and road abandonment continued to put downward pressure on marginal cost, but this was offset by the fuel price increase and the negative technical change impact. These are the same factors that explain the marginal cost change in 2005 and 2006. Year 2006 also saw a substantial decrease in the price of equipment.

We make three observations about how the marginal cost of freight rail has been changing in recent years. First, since 2003 steadily increasing fuel prices have been driving up marginal cost. Between 2002 and 2006, fuel prices increased on average by about 20 percent per year, resulting in a three percent average increase in marginal cost per year. This effect alone would cause rail rates to increase by three percent per year in a competitive scenario.

TABLE 9-16
SOURCES OF INDUSTRY MARGINAL COST CHANGES*
2000-2006
(STANDARD ERRORS IN PARENTHESES)

| Variable | | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|---|---|
| **Revenue Ton-Mile** | Impact | -4.88% | -1.53% | -0.05% | -2.08% | -5.27% | -1.39% | -3.00% |
| | Difference | 7.25% | 1.69% | -0.08% | 2.78% | 6.81% | 1.75% | 3.67% |
| **Road** | Impact | -0.31% | 0.15% | -1.21% | -0.93% | -1.15% | -1.02% | -0.63% |
| | Difference | -0.26% | 0.05% | -1.00% | -0.84% | -1.10% | -1.02% | -0.56% |
| **Time** | Impact | -3.10% | -1.21% | 0.64% | 2.63% | 4.75% | 6.79% | 8.76% |
| | Difference | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| **Capital** | Impact | -2.44% | 0.41% | 0.34% | 0.32% | -1.12% | 0.26% | 0.09% |
| | Difference | 19.10% | -3.21% | -2.69% | -2.48% | 8.67% | -1.99% | -0.70% |
| **Labor Price** | Impact | -1.76% | 0.05% | 1.52% | 0.35% | 0.76% | 0.11% | 0.04% |
| | Difference | -4.88% | 0.08% | 4.43% | 1.03% | 2.17% | 0.30% | 0.11% |
| **Equipment Price** | Impact | 0.22% | -0.26% | -0.50% | -0.37% | 0.17% | 0.74% | -1.80% |
| | Difference | 2.33% | -2.79% | -5.47% | -4.19% | 0.60% | 7.31% | -19.46% |
| **Materials Price** | Impact | -0.95% | 0.18% | -0.94% | -0.79% | 1.43% | 1.95% | 2.55% |
| | Difference | -2.43% | 0.47% | -2.38% | -2.04% | 3.72% | 5.14% | 6.85% |
| **Fuel Price** | Impact | 6.92% | -0.72% | -2.93% | 2.97% | 2.54% | 5.61% | 3.91% |
| | Difference | 44.65% | -4.78% | -17.67% | 16.91% | 14.01% | 31.78% | 21.85% |
| **Average Haul Length** | Impact | -0.35% | 0.01% | -0.05% | -0.02% | -0.08% | 0.11% | 0.06% |
| | Difference | 1.48% | 1.85% | -0.45% | 1.12% | 1.21% | -0.46% | 0.28% |
| | **Total Impact** | -6.64% | -2.91% | -3.17% | 2.08% | 2.03% | 13.15% | 9.97% |
| | **Marginal Cost Change** | -7.06% | -3.79% | -3.89% | 1.02% | 1.22% | 12.90% | 9.43% |

* Firm variable cost shares are used as weights in averaging.

Second, there is a puzzling "negative technical change" impact that has also put substantial pressure on marginal cost since 2003. This effect alone would account for railroad rates increasing by five percent per year. Further investigation into what is truly behind this effect is warranted. However, for our immediate objective of distinguishing competitive response from the exercise of market power, merely knowing the magnitude of this unexplained effect is sufficient.

Third, over the period 2000 to 2006, revenue ton-miles grew by more than three percent per year on average. This strong output growth actually put downward pressure on marginal cost. This impact provides evidence against

the hypothesis that the freight railroad industry overall is experiencing significant congestion on a system-wide basis. The strong growth in revenue ton-miles has opposing implications for rail rates. The competitive effect from this output growth would be downward pressure on rates as marginal cost decreases. However, the increasing demand that is reflected in ton-mile growth strengthens the railroads' ability to price above marginal cost and possibly select more high-margin traffic.

Similar decomposition of the marginal cost changes for BNSF, UP, CSX, and NS are presented in the appendix to this chapter.

## CONCLUSIONS

In this chapter we have presented estimates of a variable cost function for U.S. freight railroads. From this variable cost function we have been able to infer important characteristics about freight railroad technology and the corresponding implications about industry structure, and how that structure has changed over time. We have also used the variable cost function to obtain marginal cost estimates. Our analysis of those estimates provides some understanding of the causes of changes in marginal cost over time for the freight railroad industry.

The cost analysis undertaken in this chapter provides a foundation for some of the analyses of pricing, reported in the subsequent chapters of this volume, and the evaluation of likely impacts from the policy alternatives discussed in Volume 3 of this report.

# EXHIBIT PX0685

Cheetah® Wolters Kluwer

# Antitrust Law: An Analysis of Antitrust Principles and Their Application - Areeda and Hovenkamp, ¶395. Damages in Overcharge Cases

Antitrust Law: An Analysis of Antitrust Principles and Their Application - Areeda and Hovenkamp
Phillip E. Areeda (late) & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶395. (4th and 5th Editions, 2021 Cum. Supp. 2013-2020)
4th and 5th Editions, 2021 Cum. Supp.

Click to open document in a browser

**Last Updated: 5/2021**

Antitrust plaintiffs may complain about overcharges—prices that are higher than they would otherwise be—as a result of illegal monopolization, a price-fixing conspiracy, an illegal merger, or an illegal vertical restraint such as tying, exclusive dealing, or resale price maintenance. [1] An immediate question is what the measure of damages should be in an overcharge case. There are two obvious alternatives: (1) lost profits and (2) the overcharge, which is the difference between the price actually paid and the price that would have been paid "but for" the unlawful conduct multiplied by the quantity purchased. As we will see in the next Subparagraph, these measures of damages are not economically equivalent.

What has come to be known as the overcharge measure of damages received early approval from the Supreme Court. In *Chattanooga Foundry*, [2] the manufacturers of cast-iron water pipe had been engaged in a price-fixing conspiracy. The city of Atlanta had purchased some of that pipe for use in its municipal waterworks at the collusive prices. The city suffered no lost profits because by definition not-for-profit entities have no profit to lose. The Court, however, found that the city "…was injured in its property, at least, if not in its business of furnishing water, by being led to pay more than the worth of the pipe." [3] As a result, the Court found that the city could recover damages for "the difference between the price paid and the market or fair value" of the pipe that it had purchased. This measure of damages was clearly appropriate in *Chattanooga Foundry*, given the not-for-profit nature of the city's undertaking. The direct loss caused by the price fixing cartel was the increased cost of providing the water service above the cost at which it could have been provided had pipe prices been competitively determined. In the case of for-profit businesses, however, it is not as easy to conclude that the overcharge is the appropriate measure of damages. Section 4 of the Clayton Act provides for the recovery of threefold the damages actually *sustained*. This is not necessarily captured by the overcharge, as we shall see below. The most accurate measure of the damages actually sustained is lost profit, but this will usually lead to smaller recoveries and therefore is not apt to be selected by plaintiffs if they are given a choice.

**395a. Lost profits versus overcharges [4].—**According to §4 of the Clayton Act, an antitrust victim is entitled to recover "threefold the damages by him *sustained*." [5] As we shall see, the most commonly used measure of damages, *viz.*, the overcharge, is an ambiguous proxy for the actual damages suffered. Initially, however, we should note that the overcharge measure of damages typically exceeds the unjust gains to the cartel members. This can be seen quite readily in Figure 1. Prior to the formation of the price-fixing cartel, a typical competitive firm will sell a quantity equal to $Q_1$ at the market-determined price of $P_1$. The firm earns no excess profit because price equals average cost at that quantity. The proportional demand curve, which is denoted as $d = (1/n) D$ in Figure 1, intersects marginal and average cost at the competitive price ( $P_1$) and output ( $Q_1$). Following the formation of a price-fixing cartel, each firm will restrict output to the point where its marginal revenue ( *mr*) equals its marginal cost ( *MC*)—that is, each firm will reduce output from $Q_1$ to $Q_2$. The collusive price will rise from $P_1$ to the collusive price of $P_2$, and the cartel members will each earn excess profits equal to ( $P_2 - C_2$) $Q_2$.

© 2021 CCH Incorporated and its affiliates and licensors. All rights reserved.




Figure 1

In contrast to the excess profit, the collusive overcharge will be equal to the difference between the unlawful price ( $P_2$) and the competitive price ( $P_1$) times the actual quantity sold ( $Q_2$):

$$O/C = (P_2 - P_1)Q_2.$$

It is clear that, since $C_2$ exceeds $P_1$, the collusive overcharge exceeds the illicit profits earned by the colluding sellers. [6] The difference is due to the inefficient level of output selected by the colluding firms. Consequently, the difference between the profits and the overcharge is borne appropriately by the colluding firms.

For business customers, purchases from the colluders are made in order to conduct their businesses. As a result, the damages sustained are captured most appropriately by their lost profits. Moreover, despite the prevalence of the overcharge as a measure of damages, it is a disconcerting fact of life that the overcharge is not precisely the same as the lost profit. The overcharge may be larger or smaller than the lost profit depending upon the economic circumstances. Several simple examples illustrate this point.

**395a1. *Overcharging a monopolist.*—**In the first example, suppose that a monopolist produces output at a constant marginal (and average) cost represented by the horizontal line labeled $MC_1$ in Figure 2. The demand for the product is represented by the negatively sloped line *D*, and the associated marginal revenue curve is *MR*. In order to maximize its profits, the monopolist will expand production until marginal cost equals marginal revenue, which occurs at a quantity of $Q_1$. The price that corresponds to $Q_1$ is $P_1$.

© 2021 CCH Incorporated and its affiliates and licensors. All rights reserved.




Figure 2

Assume that the firm's formerly competitive suppliers form a cartel and thereby raise the prices of an input needed by the monopolist. As a result of paying higher prices, the monopolist's marginal cost rises from $MC_1$ to $MC_2$. This causes the monopolist to reassess its own price and output decisions. Given a marginal cost of $MC_2$, it is now optimal (i.e., profit-maximizing) for the monopolist to reduce its output to $Q_2$ and increase its price to $P_2$.

At the initial price and output, profit was equal to $(P_1 - MC_1)Q_1$, while at the new price and output, the profit has fallen to $(P_2 - MC_2)Q_2$. The lost profit ($\Delta\pi$) is therefore equal to

$$\Delta\pi = (P_1 - MC_1)Q_1 - (P_2 - MC_2)Q_2.$$

The overcharge ( $O/C$) is captured by the increase in marginal cost multiplied by the quantity of output:

$$O/C = (MC_2 - MC_1)Q_2.$$

In this case, some algebraic rearrangement reveals that the lost profit exceeds the overcharge. [7]

***A numerical example* [8].—**We can provide a numerical example that corresponds to the graphical analysis. Suppose that the demand function assumes thefollowing simple form:

$$P = 100 - 0.01Q,$$

where $P$ denotes price and $Q$ represents quantity. The monopolist's total revenue is the product of price and quantity:

$$TR = PQ = 100Q - 0.01Q^2.$$

Marginal revenue [9] equals $100 - 0.02Q$. In the "but for" world, the monopolist's marginal (and average) cost is assumed to be constant at $4. Now, the maximum profits that the monopolist can earn require producing where marginal revenue equals marginal cost:

$$100 - 0.02Q = 4$$

Solving for the optimal quantity yields $Q = 4800$, and substituting that quantity into the demand function yields a profit-maximizing price of $P = \$52$. The firm's profit ( $\pi$) can be found by substituting into the profit function:

© 2021 CCH Incorporated and its affiliates and licensors. All rights reserved.

$$\pi = 100Q - 0.01Q^2 - 4Q.$$

In this case, the maximum profit is $230,400.

Now suppose that the firm is overcharged due to a price-fixing conspiracy and marginal cost rises from $4 to $8. Since there is no reason for the demand function to change, the firm's marginal revenue will not change. Once again, the firm will maximize its profit by producing the output where marginal revenue equals marginal cost:

$$100 - 0.02Q = 8$$

Solving this condition for *Q*, it follows that the optimal quantity falls from 4,800 to 4,600 units. Substituting a quantity of 4,600 into the demand curve reveals that the corresponding price will rise to $54. By substitution into the new profit function, $\pi = 100\,Q - 0.01\,Q - 8\,Q$, we find that profit is now $211,600. The lost profit is the difference between the actual profit following the illegal behavior of $211,600 and the "but for" profit of $230,400 —or $18,800.

The overcharge is the difference between the actual price of $8 paid and the "but for" price of $4 times the units purchased, which is 4,600. Accordingly, the total overcharge is ($4)(4,600) = $18,400, which is less than the lost profit. As a result, the overcharge damages will undercompensate the antitrust victim relative to a lost-profits calculation.

**395a2. *Overcharging competitors.*—**When the cartel overcharges competitive firms, the results are somewhat different. Suppose that each unit of the competitively produced output requires one unit of an input that the cartel supplies. The increase in the price of that input will cause the firms' average and marginal costs to rise by the amount of the overcharge. The effect on the profits of the overcharged firms will depend on what happens to the price, which is governed by supply and demand conditions.

In Figure 3, the competitive firm initially had average and marginal cost curves $AC_1$ and $MC_1$, respectively. At a competitive price of $P_1$, the firm maximized its profit by producing where price was equal to marginal cost—that is, at a quantity of $Q_1$. As Figure 3 reveals, the competitive firm sold $Q_1$ at the competitive price and earned a competitive return in doing so. [10] The influence of the cartel overcharge is to shift the average and marginal cost curves from $AC_1$ and $MC_1$ to $AC_2$ and $MC_2$, respectively. The effect on profit will depend on what happens to price.




Figure 3

At one extreme, suppose that the price does not rise at all. The competitive firm in Figure 3 will respond to the higher cost by producing that quantity where $MC_2$ equals $P_1$—that is, it will produce $Q_2$. In this case, the firm's lost profit will be equal to the loss that it experiences, which equals $(C_2 - P_1)\,Q_2$. The overcharge, however, is equal to the increase in average cost times the quantity purchased: $(C_2 - C_1)\,Q_2$. Now, one can

© 2021 CCH Incorporated and its affiliates and licensors. All rights reserved.

see by inspecting Figure 3 that the lost profit exceeds the overcharge. Thus, the overcharge estimate does not adequately compensate the antitrust victim in this case.

At the other extreme, we may assume that the competitive price rises by the full amount of the overcharge. In Figure 4, we show that $P_1$ rises to $P_2$. In that case, the competitive firm will continue to produce $Q_1$ because the new marginal cost ( $MC_2$) equals the new price ( $P_2$) at a quantity of $Q_1$. In this case, the overcharge equals the difference between $C_1$ and $C_2$ times the quantity: ( $C_2 – C_1$) $Q_1$. But there is no lost profit. The firm continues to earn a competitive return on its investment. In this case, the overcharge is grossly at odds with the damages sustained by the competitive firm because there were no damages at all.




Figure 4

We have shown the polar cases. If industry demand is perfectly elastic (i.e., horizontal), the price does not rise, and lost profits clearly exceed the overcharge. If industry demand is perfectly inelastic (i.e., vertical), the price rises by the full amount of the overcharge, but profits are unaffected. In one case, the overcharge measure of damages is inadequate, while it is excessive in the other. Now, demand is not apt to be perfectly elastic or perfectly inelastic, which means that the output price will rise but not by the full amount of the cost increase. In some cases, the price will rise enough for the overcharge to exceed the lost profits. In other cases, the price increase will be small enough for the overcharge to be less than the lost profit. The precise circumstances will dictate the final outcome because output demand elasticity and the shape of the firm's cost curves determine the relationship between the overcharge and lost profits. But the basic fact remains that the overcharge measure is an inexact proxy for the actual damages sustained, which are the lost profits.

**395b. Estimating the overcharge.—**In spite of the (arguably) theoretical superiority of lost profits as a measure of damages in a price enhancement case, nearly all plaintiffs claim damages on the basis of an overcharge calculation. Since the actual prices paid are usually straightforward to establish, [11] the real problem arises in establishing the "but for" price.

**395b1. *Before-and-after estimates.*—**Consider a before-and-after model applied to the price data presented in Table 1 and in Figure 5. The prices—suitably adjusted for inflation—of the proverbial widget were determined by competitive market forces from 2001 until 2011. It is well documented that a conspiracy began in 2012 and persisted through 2014. Just a glance at the data in either Table 1 or Figure 5 suggests that the substantially higher prices during 2012–2014 (the conspiracy period) were due to the conspiracy. Prior to the conspiracy, the average price was $51.82, in contrast to the prices of $80, $85, and $75 during the conspiracy period. But the question is not what the prices were in the past. Rather, the problem is estimating the prices for 2012–2014 had the conspiracy not occurred. The price data from the "before" period are (or at least may be) useful in estimating the "but for" prices during the "after" period.

**Table 1**

© 2021 CCH Incorporated and its affiliates and licensors. All rights reserved.

| Year | Price |
|---|---|
| 2001 | $50 |
| 2002 | $45 |
| 2003 | $50 |
| 2004 | $60 |
| 2005 | $55 |
| 2006 | $40 |
| 2007 | $50 |
| 2008 | $45 |
| 2009 | $60 |
| 2010 | $55 |
| 2011 | $60 |
| 2012 | $80 |
| 2013 | $85 |
| 2014 | $75 |



Figure 5

As a first approximation, one would look to see whether there was any trend in the price data. This can be done by fitting a regression line to the price observations prior to the conspiracy. The most basic model would be

$$P = \beta_0 + \beta_1 T$$

where *P* denotes price and *T* is time. Using the principles developed in ¶394, the data in Table 1 generate the following estimates:

$$\beta_0 = 47.18 \text{ and } \beta_1 = 0.77$$

The upward trend in the prices is captured by the estimate of $\beta_1$, which is positive and equal to 0.77. In other words, prior to the formation of the conspiracy, the price was drifting upward by $0.77 per year on average. In Figure 5, the regression line has been added to the price information. Based on the simple regression model, one would predict prices (rounded off) of $56 in 2002, $57 in 2003, and $58 in 2004. These "but for" prices would then be compared to the actual prices in order to estimate the overcharge per unit.

© 2021 CCH Incorporated and its affiliates and licensors. All rights reserved.

This simple model of damages presumes that whatever conditions were present during 2001–2011 continued to prevail during the conspiracy period. This is necessary in order to draw inferences regarding the 2012–2014 prices from the past prices. If something has changed-in addition to the fact of collusion—this must be taken into account in estimating the "but for" prices during the conspiracy period. For example, there could have been substantial increases in some input costs. If the cost of producing our widget is sensitive to petroleum prices and there was an oil shock in 2002, one would expect widget prices to rise without the help of a price-fixing conspiracy. This increased cost must be taken into account. One way of doing this is to assume that the entire cost increase was passed on in the form of higher prices. In other words, to the estimated "but for" prices, one would simply add the increased cost of the petroleum products used in producing widgets. This adjustment is extremely conservative because cost increases are not usually passed on in their entirety. [12] A less conservative approach would be to examine the relationship between widget prices and petroleum prices in the pre-conspiracy period. This would require a more complicated regression model:

$$P = \beta_0 + \beta_1 T + \beta_2 O$$

where *O* denotes the oil price. Now, the predicted price of the widget will take into account all of the conditions captured by the passage of time plus the influence of oil prices.

There are other changes that could also account for some of the price increase. Similar cost increases have to be considered. For example, there may have been substantial increases in wages due to a new labor contract. Insurance costs may have risen because of a revised risk assessment. Regulatory changes may have imposed added costs. All of these influences should be considered in estimating the "but for" prices.

Widget prices are influenced by demand factors as well as cost considerations. Many of us may recall the dramatic increase in the demand for oat bran when it was first touted for its cholesterol-reducing properties. Grocery store shelves quickly emptied and prices rose. In the short run, changing productive capacity can be difficult. As a result, a sudden increase in demand will lead to price increases even in the absence of a conspiracy. To the extent that an increase in demand coincided with the formation of the widget cartel, the influence of the demand shift should be taken into account when estimating the but-for prices. For example, if there is a large change in population, then one would expect demand to shift and prices to rise. To account for this, one could add population to the regression model:

$$P = \beta_0 + \beta_1 T + \beta_2 O + \beta_3 POP,$$

where *POP* denotes population in the market. Now, the influence of any change in population that coincided with the price increase can be taken into account.

In effect, we have built a so-called reduced-form price equation. The widget price is expressed as a function of supply and demand variables. The selection of the variables should be guided by economic theory and the realities of the market in question. In many cases, the data will be limited, and therefore only the most important explanatory variables can be employed. Once the model is specified, the pre-conspiracy observations are used to estimate the coefficients in the regression equation: $\beta_0$, $\beta_1$, $\beta_2$, $\beta_3$. Then, the equation that we use for prediction is

$$P = b_0 + b_1 T + b_2 O + b_3 POP,$$

where $b_0$, $b_1$, $b_2$, and $b_3$ are the estimated coefficients of the model. In order to estimate the prices during the conspiracy period but for the cartel behavior, one substitutes the actual values of the explanatory variables ( *T*, *O*, *POP*) for the conspiracy period in the estimated price equation. In this way, the plaintiff has controlled for changes in demand and supply determinants of price. The resulting prediction on price during the conspiracy period takes into account influences other than the conspiracy that could serve to increase the widget prices.

© 2021 CCH Incorporated and its affiliates and licensors. All rights reserved.

The differences between the predicted prices and the actual prices charged during the conspiracy period are inferred to be the overcharges due to the conspiracy.

An alternative formulation of the price equation is to add an indicator or dummy variable to the model. The equation would then be

$$P = \beta_0 + \beta_1 T + \beta_2 O + \beta_3 POP + \beta_4 D$$

where *D* is a binary variable that takes on the value 1 if the observation falls within the conspiracy period or 0 if the observation falls in the pre-conspiracy period. The coefficient on the dummy variable—that is, the estimate of $\beta_4$, is an estimate of the collusive overcharge—that is, the increase in price due solely to the anticompetitive behavior.

The data do not always cooperate in these econometric endeavors. As an example, consider the statistical results in the *Chicken Antitrust Litigation.* [13] The plaintiffs tried to use a price equation with a conspiracy dummy variable. In their price equation, they included the prices of beef, pork, and turkey, which are substitutes for chicken; seasonal dummy variables to control for time of the year; the consumer price index; consumer disposable income; per capita production of chicken to account for supply variation; and a dummy variable to isolate the effect of the conspiracy on price. Much to their surprise no doubt, the estimated coefficient on the collusion dummy variable was negative. This, of course, indicates that after taking other factors into account, the price of chicken during the conspiracy period was actually lower than it would have been absent the conspiracy. This, of course, is implausible because the point of a price-fixing conspiracy is to raise—not lower—price. [14] Assuming that there was, in fact, price-fixing behavior, the results suggest that a further refinement in the econometrics may be warranted. More sophisticated econometric methods may reveal the effects of conspiracy.

**395b2. *Some problems in practice.*—**The before-and-after approach to estimating overcharge damages may run into some problems in practice. First, the before-and-after approach necessarily relies on time series data. In the widget hypothetical, annual observations on price were available for the 2001–2011 period prior to the collusive behavior. Although one may be quite confident that there was no collusion during that period, some other things may well have changed. For example, the product itself is apt to change over time. All else being equal, product improvements may require higher prices because of higher costs. Moreover, product improvements that consumers presumably value will lead to shifts in the demand, which will also influence price. As the supply and demand conditions evolve over time, the plaintiff is forecasting outside the sample range. That is, the regression model estimates the relationship between supply and demand variables during one period while the forecast pertains to supply and demand variables that have not been incorporated in the estimation procedure. As a statistical matter, this tends to increase the standard errors of the estimates. In essence, the estimates are less precise. [15] One may argue that the observed price differential may be due to random error as well as the collusion, thereby casting doubt on the reliability of the damage estimates.

A second problem in practice involves identifying the beginning and ending of the conspiracy period. In some instances, there will be testimony regarding the advent of the conspiracy. In others, there may be a key event —a specific trade association meeting, for example—that provides a starting point. The plaintiff also needs to determine the end of the conspiracy if it wants to use post-conspiracy prices to estimate the "but for" prices during the damage period. It is obvious that a failure to identify precisely when the collusion occurred and when it did not will be critical to satisfactory damages estimation. A companion problem surfaces when the effect of the conspiracy lingers beyond the end of the formal collusion. This also taints the post-conspiracy prices and may give rise to extended damages.

Third, cartel activity may be subject to periodic episodes of cheating. If there is evidence that competition occurred from time to time during the conspiracy period, these prices may provide further evidence of "but for" prices. If there is no such evidence, then these competitive prices serve to confuse matters. In comparing the forecasted price with the actual prices, there will be instances where there is no measurable overcharge. In some cases, the difference may even be negative—that is, the predicted "but for" price will exceed the actual

© 2021 CCH Incorporated and its affiliates and licensors. All rights reserved.

price. These differences should not be netted out against the overcharges. Just because some of the prices were lower than anticipated is no reason to reduce the damages on those transactions where the prices were collusive.

Fourth, it may be true that one or more explanatory variables is influenced by the conspiracy. In an ideal cartel, all variables are specified: price, quantity, production quotas, nonprice variables (such as advertising, service, and warranty terms), credit terms, and so on. In practice, the cartel may not adequately control all of these variables. Suppose, for example, that the cartel members agree on price but do not allocate production quotas. As price is presumably higher than before the conspiracy began, each firm has an incentive to try to expand its output and thereby increase its market share. In effect, the colluders will compete on a nonprice basis. [16] To the extent that this inflates the expenditures on promotion, the "but for" estimate will be higher than it would have been otherwise. This, of course, will bias the damage estimate downward.

**395b3. *Yardstick estimates of overcharges.*—**In some instances, the plaintiff may be able to use the yardstick approach to estimate overcharge damages. It is especially useful in cases where the pre-conspiracy prices are unreliable predictors of future prices—that is, in cases where the before-and-after approach is unavailing. As Hovenkamp has observed, "[t]he ideal conspiracy for the yardstick approach is a local cartel where a nearby market can be found which has the same basic cost structure." [17] It is also necessary that the yardstick market be as comparable as possible in all respects: degree of competition, tax structure, regulatory requirements, population density, average income, and so on. The selected yardstick will be vulnerable to attack if there are meaningful differences between the plaintiff's market and the yardstick market. It is possible to make some adjustments to account for the differences across the two markets. For example, suppose there is a difference in labor costs. One way of coping with this is to determine the labor cost per unit of output and adjust the "but for" price for the labor cost difference. Similar adjustments must be made for any other differences as well. If there is an important difference that is beyond adjustment, this approach will have to be abandoned. Suppose, for example, that there are 3 competitors in the plaintiff's market and 20 in the yardstick market. There is a suspicion (at least) that, all else being equal, prices will be higher in a market with 3 participants relative to one with 20 competitors. There is, however, no a priori way to adjust for that difference. Consequently, one of these markets may not be a suitable yardstick for the other.

In some instances, an econometric approach to building a yardstick may be possible. The most prominent example involves bid-rigging claims. Since the bid riggers agree among themselves who is to win a particular job and no one submits a bid below that of the designated winner, this is a classic overcharge case. The measure of damage would be the difference between the rigged bid and the bid "but for" the collusion. Assuming that one knows which bids were rigged and which bids were competitively determined, it will be possible to apply a statistical yardstick. Using information on winning bids for sewer construction projects, Howard and Kaserman constructed two econometric models. [18] In the first model, the competitive winning bids were used to predict the "but for" bids on the jobs that were rigged. In the second model, they used all of the bids (rigged as well as competitive) but singled out the rigged bids by including a dummy variable.

Using the first approach, the competitive bids were assembled and all relevant characteristics were isolated. These characteristics included the number of bidders and the project size. In other circumstances, one might include other variables that would determine the bids in a competitive market. These bids, along with their associated characteristics, constituted the observations for a regression model of the following form:

$$B = \beta_0 + \beta_1 N + \beta_2 S + \varepsilon$$

where *B* is the bid, *N* is the number of bidders, *S* is the size of the project, and $\sigma$ is the random error term. [19] The estimated coefficients, $b_0$, $b_1$, and $b_2$ were determined by the competitive bidding process. Thus, the plaintiff could use the estimated relationship,

$$B = b_0 + b_1N + b_2S$$

to predict the "but for" competitive bids that can be compared to the collusive bids.

The first regression equation estimated by Howard and Kaserman was [20]

$$B = 225{,}905 - 22{,}142N + 0.74S.$$

Thus, the data indicate that a competitive bid (on average) will be equal to $225,905 plus 74 percent of the engineering estimate of the cost, minus $22,142 times the number of bidders. The signs of the coefficients make sense and the $R^2$ was 0.847, which means that the model explained 84.7 percent of the variation in the competitive winning bids. The actual values for *N* and *S*associated with a specific *rigged* bid would be substituted into the equation to obtain an estimate of a competitive bid. The difference between that estimate and the actual winning bid is an estimate of the overcharge on that job. For example, if the engineering cost estimate were $500,000 and there were three bidders, then the econometric results would forecast a competitive "but for" bid of

$$B = \$225{,}905 - \$22{,}142\ (3) + 0.74\ (\$500{,}000) = \$529{,}479.$$

If the actual winning rigged bid had been, say, $750,000, a point estimate of the overcharge would be the difference between the actual bid ( $B_A$) and the "but for" bid ( $B_{BF}$):

$$B_A - B_{BF} = \$750{,}000 - 529{,}479 = \$220{,}521.$$

Two caveats are in order. First, this procedure will not work unless the plaintiff can identify which bids are competitive and which are collusive. Second, the statistical results will be weak if the number of competitive bids is small. The precision of the parameter estimates falls as the number of observations falls.

There is another econometric approach to estimating the overcharge on rigged bids: pool all of the bids together and use a dummy variable for the rigged bids. Howard and Kaserman specified their second regression model as

$$B = \beta_0 + \beta_1N + \beta_2S + \beta_3R + \varepsilon$$

where *R* is a dummy variable that takes on the value of 1 for rigged bids and the value of 0 for competitive bids. Obviously, even with this approach the plaintiff must still be able to identify those bids that were rigged in order to use this variant. In this case, however, the coefficient on *R* provides an estimate of the average collusive overcharge on the rigged bids. Howard and Kaserman had a sample of 46 winning bids—39 competitive bids and 7 rigged bids. In their second model, they used all 46 observations. Their results were as follows:

$$B = 65{,}178 - 52{,}550N + 1.02S + 586{,}834R.$$

The regression results were very good in a statistical sense. The regression coefficients were statistically significant and had the predicted signs; the $R^2$ was 0.914, which means that the model explained 91.4 percent of the observed variation in the winning bids. The coefficient on *N* indicates that the presence of an additional bidder reduced the winning bid by $52,550. The coefficient on size indicates that the winning bid rose by $1.02 for every dollar increase in the engineering estimate of the project size. Finally, the coefficient on *R* indicates that the winning rigged bid was $586,834 higher than the winning competitive bid. Thus, the coefficient on *R* is a measure of the average overcharge across all of the rigged bids after controlling for differences in project size and the number of bidders. When there is a single plaintiff, the total damage estimate can be computed by

© 2021 CCH Incorporated and its affiliates and licensors. All rights reserved.

multiplying the average overcharge times the number of rigged bids. In such cases, it does not matter that the plaintiff has not identified the overcharge on a per-project basis. Because this formulation does not separate the overcharges on a per-project basis, however, it does not work when there are multiple plaintiffs. When there are several municipalities filing suit, for example, it would seem necessary to use the first regression model so that project-specific overcharges could be estimated.

**395c. Spurious damage estimates.—**Some damage methodologies will produce spurious damage estimates. Suppose that the plaintiff compares prices in the post-conspiracy period with prices during the conspiracy period. If the price of a major input has increased between the conspiracy and post-conspiracy periods, the plaintiff must control for that cost increase. One way of doing this is to construct a cost-adjusted price of the output equal to the ratio of the output price to input price. The cost-adjusted price is used as the dependent variable in a regression model estimated using observations in the post-conspiracy—presumably competitive—period. These regression results are used to predict "but for" prices during the conspiracy period. Any deviation between the observed cost-adjusted prices during the conspiracy period and the "but for" prices is then interpreted as an illegal overcharge.

If the input price that is used in constructing the cost-adjusted price is increasing over time, this approach will generate a positive damage estimate even if the defendants have charged competitive prices at all times. [21] This built-in bias toward a finding of overcharges when in fact there have not been any is due to the concavity of the long-run cost curve in input prices. [22] This can be seen quite easily. Let $P_1$ and $P_2$ represent the prices of the output in periods 1 and 2, respectively. Let $w_1$ and $w_2$ denote the prices of the input used as a cost proxy in periods 1 and 2, respectively. Finally, let $C_1$ and $C_2$ represent the total cost in periods 1 and 2, respectively. For simplicity, suppose that the firm's output is the same in both periods. If the price is at the competitive level in both periods, then $P_1 = C_1/Q$ and $P_2 = C_2/Q$—that is, price will equal average cost in each period.

The long-run cost curve is concave in input prices. This means that the cost curve increases at a decreasing rate. This relationship is depicted in Figure 6. It is apparent that the slope of a straight line from the origin to the cost curve gets flatter as the input price ( $w$) increases. But the slope of the straight line is $C_1/w_1$ and $C_2/w_2$, respectively. As a result,

$$\frac{C_1}{w_1} > \frac{C_2}{w_2}.$$

Since quantity was assumed to be constant, it will be true that

$$\frac{C_1/Q}{w_1} > \frac{C_2/Q}{w_2}.$$

Because price is equal to average cost in each period, it follows that

© 2021 CCH Incorporated and its affiliates and licensors. All rights reserved.

$$\frac{P_1}{w_1} > \frac{P_2}{w_2}.$$




Figure 6

Using the cost-adjusted price in period 2 as a competitive benchmark, the plaintiff will estimate positive damages even though there are no damages at all. This spurious result will be exacerbated if the quantity sold in period 2 increases due to, say, growth in the market.

***A simple numerical example.***—Suppose that the output is produced with inputs in fixed proportions. Each unit of output ( *Q*) requires exactly one unit of each input. [23] For example, a hammer requires one handle and one hammerhead. Suppose that in the alleged conspiracy period, the price of input 1 ( $w^1{}_1$) is $1.00 and that the price of input 2 ( $w^1{}_2$) is also $1.00. Because each unit of output requires one unit of each input, the average (and marginal) cost of production will be $2.00. In period 2, suppose that the price of input 1 ( $w^2{}_1$) increases to $2.00, but that the price of input 2 ( $w^2{}_2$) does not change. Thus, average cost in period 2 will be equal to $3.00. In period 2, the post-conspiracy period, output price is at the competitive level, which is equal to average cost—that is, $P^2$ = $3.00. If we look at the so-called cost-adjusted price, we observe

$$\frac{P^2}{w_1{}^2} = \frac{\$3.00}{\$2.00} = 1.5.$$

Suppose that the price in period 1 was at the competitive level—that is, $P^1$ = $2.00. Then the cost-adjusted price will be

$$\frac{P^1}{w_1{}^1} = \frac{\$2.00}{\$1.00} = 2.0.$$

Note that the firm charged a competitive price in both periods and therefore there is clearly no overcharge. But a comparison of the so-called cost-adjusted prices suggests that there was an overcharge:

$$\frac{P^1}{w_1^1} > \frac{P2}{w_1^2}.$$

© 2021 CCH Incorporated and its affiliates and licensors. All rights reserved.

This approach obviously generates purely spurious damage estimates. Irrespective of the competitiveness of the output prices, [24] this approach is guaranteed to produce positive damages as long as the input price that is used as a proxy for average cost increases in the post-conspiracy period. If the plaintiff is going to use this method, all of the costs must be used for the adjustment. In our simple example, one should compare $P^1/AC^1$ and $P^2/AC^2$:

$$\frac{P^1}{AC^1}=\frac{\$2.00}{\$2.00}=\frac{P^2}{AC^2}=\frac{\$3.00}{\$3.00}.$$

This avoids the problem of spurious inferences.

In some cases, the plaintiff will have price data before, after, and during the conspiracy. All of the data provide useful information for purposes of damage estimation, and therefore all of the data should be employed in the damage estimation. [25] Consider the price data plotted in Figure 7. There are 10 pre-conspiracy observations, 10 post-conspiracy prices, and 7 prices during the conspiracy period. It is fairly clear that the price data exhibit a general downward drift. Before, during, and after the alleged damage period, there appears to be a negative trend. This trend could be due to a continuing improvement in the production process that leads to declining costs. If the plaintiff estimates a reduced-form price equation over the post-conspiracy period and applies it to the conspiracy period, spurious damages may be estimated. It is difficult to model the gradual improvement in the production technology. As a result, the reduced-form price equation is apt to miss this influence. When the regression equation is applied to the damage period, it will generate positive damage estimates even if there are none because of the higher costs of production. This is an instance where the plaintiff should use all of the prices in the regression model and include a dummy variable for the conspiracy period. In this way, all of the available information will be used, and the effects of the conspiracy—if any—will be isolated in the coefficient on the dummy variable.




Figure 7

**395d. Overcharges and partial conspiracies [26].—**A complication arises when a price-fixing conspiracy does not involve the entire industry. [27] In an oligopoly, one firm could simply refuse to participate. [28] In an industry with a handful of large firms and a significant number of small firms, the dominant firms may decide to collude but not bother to include the smaller fringe firms. In this setting, the economic analysis is uncontroversial. Consider Figure 8, in which demand is represented by *D* and industry supply is $S_1 + S_2$. Absent collusion, the competitive

© 2021 CCH Incorporated and its affiliates and licensors. All rights reserved.

price will be $P_C$ and the corresponding quantity will be $Q_C$. Suppose we disaggregate industry supply into two components: $S_1$ is the supply of the noncolluders and $S_2$ is the supply of the colluders. The colluders will maximize their profits by taking into account the supply response of the noncolluders in their calculations. In effect, the colluders concede part of the market to the noncolluders. In Figure 8, this concession is reflected in the residual demand curve, which is the difference between the market demand ( *D*) and the supply response of the noncolluders ( $S_1$). Thus, the residual demand, labeled $d = D - S_1$, shows the quantity available for sale by the colluders after taking into account the supply responses of the noncolluders.




Figure 8

In order to maximize collusive profits, the cartel will produce the quantity where the cartel supply ( $S_2$) equals the marginal revenue associated with the residual demand ( *mr*). The optimal quantity for the colluders, which is shown as $Q_2$ in Figure 8, yields a cartel price of $P_M$. The noncolluders will respond to the higher price in the market by sliding along their supply curve ( $S_1$) to the price in the market. In this example, the noncolluders will produce $Q_1$ at a price of $P_M$. Together, the cartel output ( $Q_2$) and the noncolluders' output ( $Q_1$) will equal $Q_3$, which is the quantity that clears the market at the collusive price of $P_M$.

Consider the economic results of this conspiracy. The price in the market has risen from $P_C$ to $P_M$. That is, the overcharge is clearly equal to the difference between $P_M$ and $P_C$. It is also true that all buyers pay the same price, and therefore all buyers suffer the same overcharge. Every buyer faces the same problem: proving the price that it actually paid, proving the price that it would have paid "but for" the conspiracy, and proving the quantity that was actually purchased. It does not matter whether the buyer purchased from a colluder or a noncolluder—the overcharge is precisely the same. The problem of establishing the "but for" price is no more severe for purchasers from the conspirators. The damages cannot be characterized as speculative because purchases were not made from the actual colluders. If the damage claims are speculative, it is because the "but for" price was not proven with the appropriate degree of precision.

**395d1. *Duplicative recovery.*—**The next question is who should compensate the purchasers of the noncolluders. The obvious answer is that the cartel members should bear the full costs of their illegal behavior.

© 2021 CCH Incorporated and its affiliates and licensors. All rights reserved.

This, of course, would include the overcharges imposed on all buyers of the product in question. [29] This may raise concerns about duplicative recovery. Such concerns seem misplaced. First, the recoveries would not be duplicative in the sense that a single overcharge was being recovered by more than one antitrust victim. For example, in Figure 8, let $P_M$ be $10, $P_C$ be $8, and $Q_3$ be 300. The total overcharge will be ( $P_M - P_C$) $Q_M$ = ($10 − 8)(300), which is $600. Permitting the customers of the noncolluders to recover from the cartel members would not increase the total overcharge. Suppose that $Q_1$ equals 125 and $Q_2$ equals 175. It is true that the overcharge collected by the cartel members is ($10 − 8)(175) or $350. The customers of the noncolluders have been overcharged ($10 − 8)(125) or $250, but the conspirators did not collect that portion of the total overcharge. This does not make their recovery duplicative. It simply does not duplicate any part of the overcharge recovery accorded to the customers of the conspirators. It is true, of course, that the cartel members will have to repay more than they collected in overcharges, but it cannot be denied that they are responsible for the total overcharges suffered by all buyers.

**395d2. *Product differentiation.*—**The logic of the umbrella model is most compelling when the product is homogeneous. Product differentiation introduces some difficulties because the overcharge is not the same across all producers. [30] Product differentiation may lead to equilibrium price differentials across the various brands. A conspiracy among a subset of all producers will upset these differentials, and market forces will lead to price adjustments by the nonconspirators. Again, the overcharge will be the difference between the new price and the "but for" price. If the "but for" price cannot be estimated without speculation, the umbrella plaintiffs will be out of luck.

It may be appropriate, if data are available, to include observations of nonconspirators in the estimation of the overcharge. First, this requires being able to distinguish between firms that participated in a price-fixing cartel and firms that did not participate. If product differentiation or other reasons lead the identified nonconspirator firms to behave contrary to the umbrella pricing model, then an expert may include those nonconspirator observations in the econometric model, and code them as not part of the conspiracy in all periods considered: before, during, and after the conspiracy.

Consider a coffee cartel. There are many varieties of coffee: Colombian, Kona, Jamaican Blue Mountain, and so on. Even though there is product differentiation, the cartel can (in principle at least) agree on a new price structure. This case may pose some additional difficulties, but they should not be insurmountable. More troublesome, however, are consumers of tea, hot chocolate, milk, fruit juices, and other imperfect substitutes for coffee. As an economic matter, one would expect a collusive increase in the price of coffee to cause changes in the prices of these imperfect substitutes. Proving the extent of the price change in these products that can be attributed to the increased coffee price is apt to be quite difficult in practice. In principle, these antitrust victims should be afforded an opportunity to prove their damages, but they are apt to be denied standing.

**395e. Collusive monopsony and damages.—**When buyers collude, their aim is to reduce the quantity purchased and depress the price below the free market level. This is price-fixing behavior that imposes welfare losses that are analogous to those imposed by traditional cartels. Collusive monopsony is a per se violation of the Sherman Act [31] and invokes §4 of the Clayton Act. The principles of damage estimation can be used to estimate *undercharges* in the collusive monopsony cases.

**395e1. *Collusive monopsony* [32].—**The effects of collusive monopsony can be seen with the aid of Figure 9. The collective demand of the buyers is shown as *D* and the supply is shown as *S*. If the buyers compete with one another in the market, they will expand their purchases to the point where supply and demand are equal. As a result, the competitive price will be $P_C$ and the competitively determined quantity will be $Q_C$. Following the formation of a buying cartel, the firms collectively recognize their buying power, which flows from the positive slope of the supply curve. They will understand that the price can be depressed if they agree to buy less. This effect is reflected in the marginal factor cost ( *MFC*), which is the increase in total expenditures when the quantity purchased increases by a small amount. [33] Profit maximization by the colluders requires restricting purchases to the point where demand equals marginal factor cost. In Figure 9, we see that this occurs at a quantity of *Q*

© 2021 CCH Incorporated and its affiliates and licensors. All rights reserved.

$_M$. The price on the supply curve that corresponds to $Q_M$ is $P_M$. For the quantity $Q_M$, the price on the demand curve is $P_D$. The buying cartel, therefore, imposes an undercharge of $P_D - P_M$ per unit in the sense that the marginal value of the good is $P_D$, but the price paid is only $P_M$. This is a measure of monopsonistic exploitation. [34] The damage, however, is the difference between the actual price paid ( $P_M$) and the price "but for" the conspiracy, which would be $P_C$, times the quantity actually purchased ( $Q_M$): [35]



Figure 9

$$\Delta = (P_C - P_M)\,Q_M.$$

The problem, of course, is how to measure this collusive undercharge.

**395e2. *Measuring the damages.*—**Precisely the same empirical methods can be used for estimating undercharges as were used for estimating overcharges. All of the same problems arise in using the before-and-after approach: identifying the precise dates of the conspiracy and controlling for changes in supply and demand factors that would affect the "but for" price. Trying to use the yardstick model requires finding another market that is as similar to the plaintiffs' market as possible, which may be exceedingly difficult.

**395f. Overcharges in tying cases.—**A tying contract involves a conditional sale: the seller will sell good *A* on the condition that the buyer also purchases good *B*. [36] In such arrangements, the tying good is *A* and the tied good is *B*. Usually, the customer plaintiff alleges that it was overcharged on the tied good and therefore is entitled to recover the difference between the competitive price of the tied good and the price that it actually paid. [37] This measure of damages, however, is not correct. The plaintiff is entitled to recover only the difference between the firm's actual condition and its condition "but for" the tying contract. This means that the plaintiff is not entitled to reformulate only part of the contract. Instead, the plaintiff must determine the net effect of reformulating the entire contract. This will be a daunting task and perhaps not worth the effort.

Consider the tying contract in *Siegel.* [38] The franchisor charged neither a franchise fee nor a running royalty (as most franchisors do), but it required that its franchisees purchase a certain number of cookers and fryers as well as packaging supplies and mixes exclusively from Chicken Delight. The prices for these tied products were higher than the prices of comparable products sold by other suppliers of the tied goods. The franchisee's damage, however, is not equal to the "overcharge" on these tied products because it got a license granting it the right to assume Chicken Delight's identity, to adopt its business methods, and to prepare and market chicken under the Chicken Delight trademark without a separate charge. The license must have been worth something or the franchisees would not have agreed to the contract. The court recognized this and required the plaintiff to

© 2021 CCH Incorporated and its affiliates and licensors. All rights reserved.

deduct a reasonable franchise fee from the sum of the overcharges on the tied items in measuring the damages. The result of this requirement is that the franchisee's damage equals the difference between the price paid for the tied package and the sum of the market prices of the tied and tying products. This requirement is articulated quite clearly in *Kypta*:

> …injury resulting from a tie-in must be shown by establishing that payments for both the tied and tying products exceeded their combined fair market value. The rationale behind this requirement is apparent: a determination of the value of the tied products alone would not indicate whether the plaintiff indeed suffered any net economic harm, since a lower price might conceivably have been exacted by the franchisor for the tying product. Unless the fair market value of both the tied and tying products are determined and an overcharge in the complete price found, no injury can be claimed; suit, then, would be foreclosed. [39]

Usually, it will not be possible for a franchisee to prove any injury under this formula.

Suppose that over the life of Siegel's franchise he paid a premium for the cookers and fryers that he bought from Chicken Delight when he became a franchisee. In addition, suppose he paid a premium for the packaging materials and mixes that he needed to operate his fast-food restaurant. For illustrative purposes, suppose that the overcharge on the equipment plus the present value of the overcharges on the packaging supplies and mixes over the life of the franchise amounted to $250,000. The fair market value of the franchise license must have been worth at least $250,000 to Siegel or he would not have become a Chicken Delight franchisee. As a result, Siegel has suffered no injury at all. Of course, he would like to reformulate the contract in part. He would like to be a Chicken Delight franchisee with a zero franchise fee and no running royalty, and be able to buy equipment and supplies at competitive market prices. But if the contract were to be reformulated, Siegel might have to pay a franchise fee of $250,000. Alternatively, he might pay a combination of a franchise fee and a running royalty. The net result is that he will be better off (if at all) by less than the $250,000 that he is no longer "overcharged" on the equipment and supplies.

More generally, any time that there is an overcharge on the tied good, there must be an undercharge on the tying good. At a minimum, this creates a serious problem in estimating damages. In addition to estimating the overcharge on the tied goods, the plaintiff must estimate the discount on the tying good. In many cases, the plaintiff can readily measure the overcharge on the tied good(s) simply by comparing the actual price(s) paid to market price(s) on comparable products. Of course, it will be necessary to establish that the tied products are actually comparable to the products available from rivals. But the real problem is estimating the price of the tying good absent the tying contract. If the defendant possesses real market power in the tying good, there will be no close substitutes for comparison purposes.

**395g. Overcharges in merger cases.—**Horizontal mergers —that is, mergers between competitors—may cause a change in industry structure that is competitively significant. All horizontal mergers necessarily reduce the number of competitors. If the pre-merger industry structure is sufficiently unconcentrated, a merger may have no competitive significance. [40] Indeed, in such a setting, the merger is apt to be motivated by efficiencies and therefore would tend to be procompetitive and certainly no worse than competitively neutral. In other instances, however, the post-merger market structure may become sufficiently noncompetitive that price will rise following the merger. In those cases, there may be illegal overcharges that require estimation.

Suppose two firms merge and the post-merger price exceeds the pre-merger price. If the merger violates §7 of the Clayton Act, customers may sue for damages. In this case, the overcharge will be equal to the difference between the actual post-merger price and the price that would have prevailed but for the merger. The usual estimation problems surface: conducting a satisfactory before-and-after analysis or finding a suitable yardstick market. All of the remarks that were made above apply with equal force to damages in horizontal merger cases. Moreover, the analysis of partial conspiracies also applies here. If, say, two of the ten market participants merge

© 2021 CCH Incorporated and its affiliates and licensors. All rights reserved.

and industry price rises as a consequence, all buyers experience the overcharge and therefore all have suffered antitrust injury and damages. All buyers should be able to sue, and the newly merged entity would seem to be the culprit. Since no other supplier was involved in an antitrust violation, these firms cannot be held *responsible* for the overcharge even though they collected a part of it. The merging firms, however, are responsible for all of the overcharge because "but for" the merger there would not have been an overcharge.

**395h. Resale price maintenance and antitrust damages.—**Resale price maintenance (RPM) is a vertical price restraint. A seller conditions the sale of its product on an agreement not to resell the product at a price below some specific level. [41] As a contract in restraint of trade, RPM had been illegal per se since *Dr. Miles.* [42] But in 2007, the Supreme Court overturned *Dr. Miles* in its *Leegin* [43] decision. Now, RPM is subject to the rule of reason and, therefore, the economic consequences have to be analyzed. Most of the private cases are filed by terminated dealers who refused to acquiesce to the price restraint. [44] In principle, however, customers who cannot buy from discounters may claim that they have suffered overcharges. The measure of damages would be equal to the difference between the price actually paid and the price that would have prevailed absent the illegal RPM agreement. Such a claim poses conceptual problems as well as problems of estimation. [45]

**395h1. *Conceptual problems*.—**It is not entirely clear that consumers of products subject to RPM have been injured at all. If in fact the RPM was motivated by either a dealer cartel or a manufacturer cartel, then per se illegality follows and consumers are clearly overcharged. In cases involving a dealer cartel, there is no conceptual problem because the overcharges are clearly illegal. Consumers have suffered antitrust injury and antitrust damages. In cases involving a manufacturer cartel, the dealers are the direct purchasers who have been overcharged and presumably will sue for damages. Again, there is no conceptual problem: the overcharge is like any other resulting from a price-fixing cartel.

A substantial literature on RPM has developed, however, that does not involve cartel activity. This literature offers efficiency justification for RPM, which undermines anticompetitive concerns. [46] In essence, the manufacturer wants its distributors to provide product-specific services that lead to a shift in the demand curve for the product. [47] If the demand shift is parallel, this means that the value of the product with the product-specific services is higher than the value of the product without the services. As a simple example, consider Figure 10. Demand curve $D_1$ represents the value to consumers of a product without the services. When the distributor provides product-specific services, the value of the product rises and demand shifts to $D_2$. As an example, it is easy to see that a cell phone that has many bells and whistles and includes thorough instructions on how to use the phone is worth more to the consumer with than without the instructions. On the supply side, the provision of product-specific services is not free. Accordingly, the supply of the product with the services ( $S_2$) lies above the supply without the services. Notice that the provision of product-specific services not only leads to an increase in price from $P_1$ to $P_2$, but quantity also increases from $Q_1$ to $Q_2$. The reason for this outcome is that the demand curve shifted more than the supply curve. This can be seen at $Q_1$. The value of $Q_1$ with the services is $P_3$ whereas the cost of $Q_1$ with the services is $P_4$.

© 2021 CCH Incorporated and its affiliates and licensors. All rights reserved.




Figure 10

In these circumstances, RPM is used to prevent free riding. Because the product-specific services can often be consumed without buying the product, there is an incentive for discounters to skimp on services. The consumers will get the benefits of the full-service distributors but will be lured to the discounters by their lower prices. In effect, the discounters free-ride on the efforts of the full-service distributors. Now, the manufacturers are concerned about free riding because it undermines the incentives of the full-service distributors. As formerly full-service distributors begin to reduce their services, the demand curve will shift back to $D_1$. This results in fewer sales and lower profits for the manufacturer. By imposing RPM, the manufacturer can blunt the consumer's incentive to shop around for a lower price. There will be no reward for consuming product-specific services at one location while buying the product at a separate location.

It is true that RPM prevents discounting, and therefore the prices paid by some consumers will be higher than they would be if discounting were permitted. But the consequences of discounting may be the elimination of product-specific services and consequent reduction in the value of the product. Clearly, the marginal consumer at a quantity of $Q_1$ is no worse off paying $P_2$ and getting services along with the product than he or she would be paying $P_1$ but not getting the service. Consequently, the consumer arguably has not been injured.

**395h2. *Estimation problems.*—**In cases where cartel activity of the dealers or of the manufacturers explains the existence of RPM, the overcharges are the same as in any price-fixing case. If the distributors are fixing prices, the consumers are overcharged directly. As a consequence, they would have standing, and damage estimation would proceed as described above. If the manufacturers are engaging in cartel activity, RPM is used as a means of preventing cheating. Consumers in that case are overcharged indirectly. As a result, under *Illinois Brick*, [48] they will not have antitrust standing. The distributors would be the direct purchasers and therefore would have standing. Again, there is nothing special about their damage estimation problem.

Things are far more confused in the case of RPM that is motivated by a desire for product-specific services coupled with free riding. As a conceptual matter, it is not clear that there is an overcharge in the usual sense of the term. One possible measure of the "overcharge" would be the difference between the actual price paid and the price that a discounter would charge. If there are no discounters, it will be very difficult to estimate the "but for" price because there will be no evidence. If there are discounters, the discounted prices provide a benchmark, but the plaintiff would seem to have failed to mitigate if he or she did not buy from the discounter. If the discounted prices were only available for a short period, those prices provide a benchmark, but the manufacturer would seem to be entitled to an offset for the value of the product-specific services that RPM made possible.

© 2021 CCH Incorporated and its affiliates and licensors.
All rights reserved.

**Footnotes**

1 When buyers collude, the claim will involve prices that are too low—that is, undercharges. These cases will also be examined in this Paragraph. On buyer cartels, see Subchapter 20B ; *and see* Roger D. Blair & Jeffrey L. Harrison, Monopsony in Law and Economics 36–54 (2010).

2 *Chattanooga Foundry & Pipe Works v. City of Atlanta*, 203 U.S. 390 (1906).

3 *Id.* at 396.

4 For an argument in favor of lost profits, see Jeffrey L. Harrison, *The Lost Profits Measure of Damages in Price Enhancement Cases*, 64 Minn. L. Rev. 751 (1980). For an argument in favor of overcharges as opposed to lost profits, see Frank H. Easterbrook, *Treble What?*, 55 Antitrust L.J. 95 (1986). On lost profit damages when the direct purchaser is an intermediary, see Herbert Hovenkamp, The Antitrust Enterprise: Principle and Execution 72–76, 304–05 (2006).

5 15 U.S.C. §15(a).

6 All of this analysis assumes that the colluding firms do not cheat, that the cartel members are identical, and that the cartel maximizes industry profits.

7 We need to show that

$$\Delta\pi > O/C, \text{ i.e., } (P_1 - MC_1)Q_1 - (P_2 - MC_2)Q_2 > (MC_2 - MC_1)Q_2$$

or

$$(P_1 - MC_1)Q_1 - P_2Q_2 + MC_2Q_2 - MC_2Q_2 + MC_1Q_2 > 0$$

or

$$(P_1 - MC_1)Q_1 - (P_2 - MC_1)Q_2 > 0.$$

The first term on the left-hand side is the maximum profit obtainable by operating where marginal cost ( $MC_1$) equals marginal revenue. The second term is the profit associated with producing a quantity below that at which marginal cost ( $MC_1$) equals marginal revenue. Thus, the first term is necessarily larger than the second,and therefore the lost profit exceeds the overcharge.

8 The interested, albeit mathephobic, reader can omit this example without loss of continuity or can simply read around the technical material.

9 Marginal revenue is the first derivative of total revenue:

$$MR = dTR/dQ = 100 - 0.02Q.$$

10 Although price equals average cost at $Q_1$ and the competitive firm's profits are zero, the firm still earns a competitive return on its investment because that is part of the cost. In other words, the average cost curve has embedded within it a competitive return.

11 It is not always true that the actual prices paid can be measured easily. The plaintiff cannot rely on list prices because list prices do not reflect the actual payments. The plaintiff must present evidence of actual transaction prices that reflect all discounts, rebates, and allowances, whether on the invoice or not. The relevant figures are the prices actually paid in the most literal sense.

12 See ¶396 for an examination of passing on overcharges.

13 560 F. Supp. 963 (N.D. Ga. 1980).

© 2021 CCH Incorporated and its affiliates and licensors. All rights reserved.

14 This is only true of colluding *sellers*; colluding buyers will take steps to reduce the prices that they pay. See ¶395e below.

15 *See* Franklin M. Fisher, *Multiple Regression in Legal Proceedings*, 80 Colum. L. Rev. 702 (1980).

16 In the limit, the expenditures on nonprice competition could completely dissipate the collusive profits. *See* George J. Stigler, *Price and Nonprice Competition*, 72 J. Pol. Econ. 149 (1968).

17 *See* Herbert Hovenkamp, Federal Antitrust Policy: The Law of Competition and Its Practice §17.5b (5th ed. 2015).

18 *See* Jay H. Howard & David L. Kaserman, *Proof of Damages in Bid-Rigging Cases*, 34 Antitrust Bull. 359 (1989).

19 The size of the projects was determined by engineering cost estimates. *Id.* at 374.

20 *Id.* at 390.

21 We are indebted to David L. Kaserman for bringing this example to our attention.

22 A good exposition is provided by Eugene Silberberg, The Structure of Economics: A Mathematical Analysis 252–54 (2d ed. 1990).

23 This production function is written as

$$Q = \min [X_1, X_2]$$

where $X_1$ and $X_2$ are the quantities of inputs 1 and 2. For example, if we had 10 handles and 14 hammerheads, output would be the minimum of the two input quantities: $Q = 10$.

24 If the price of the input used as a proxy falls in the post-conspiracy period, there could be overcharges in period 1 that will go undetected.

25 As an econometric matter, the added observations will improve the precision of the estimates—that is, the standard errors of the estimates will be smaller with more observations.

26 In this section, we employ the dominant firm model, which has been used to good advantage by Thomas R. Saving, *Concentration Ratios and the Degree of Monopoly*, 11 Int'l Econ. Rev. 139 (1970), and William M. Landes & Richard A. Posner, *Market Power in Antitrust Cases*, 94 Harv. L. Rev. 937 (1981).

27 Partial conspiracies are analyzed in Roger D. Blair & David L. Kaserman, Antitrust Economics 146–51 (2d ed. 2009).

28 The following analysis has been used to identify nonparticipants when collusion is alleged. Roger D. Blair & Richard E. Romano, *Distinguishing Participants From Nonparticipants in a Price-Fixing Conspiracy: Liability and Damages*, 28 Am. Bus. L.J. 33 (1990).

29 For a more extensive analysis, see Roger D. Blair & Christine A. Piette, *Umbrella Pricing, in* Issues in Competition Law and Policy (Wayne D. Collins ed., 2007).

30 Herbert Hovenkamp, Federal Antitrust Policy: The Law of Competition and Its Practice §16.6 (5th ed. 2015), makes this point. *See* R.D. Blair & R.E. Romano, *supra*, 28 Am. Bus. L.J. at 33, for a technical demonstration that the logic carries through in the presence of product differentiation.

31 *Mandeville Island Farms v. American Crystal Sugar Co.*, 334 U.S. 835 (1947). See ¶2011 for a discussion. *Also see* Roger D. Blair & Jeffrey L. Harrison, *Antitrust Policy and Monopsony*, 76 Cornell L. Rev. 297 (1991); Roger D. Blair & Jeffrey L. Harrison, *Cooperative Buying, Monopsony Power, and Antitrust Policy*, 86 Nw. U. L. Rev. 331 (1991).

32 A more complete exposition of the theory of monopsony and its collusive variant is contained in Roger D. Blair & Jeffrey L. Harrison, Monopsony in Law and Economics 36–61 (2010).

33 Total expenditures will be $TE = PQ$. As $Q$ increases by a small amount, the effect on $TE$ is $dTE/dQ = P + QdP/dQ$. This is the marginal factor cost, which lies above the supply curve because $dP/dQ$ is positive.

© 2021 CCH Incorporated and its affiliates and licensors. All rights reserved.

34 *See* Joan Robinson, The Economics of Imperfect Competition 281–83 (1933), for a brief discussion of monopsonistic exploitation.

35 In Figure 9, it is clear that collusion leads to a reduction in sales of $Q_C - Q_M$. These unsold units involve losses but will be uncompensated for the same reason that those who are priced out of a market by a cartel of sellers cannot recover for their losses: problems of proof.

36 On tying, see Chapter 17. For a more compact examination, see Herbert Hovenkamp, Federal Antitrust Policy: The Law of Competition and Its Practice §§10.1–10.3 (5th ed. 2015).

37 In addition to the buyers, sellers of the tied good may complain that they have been foreclosed from the market or at least a part of it. These claims will be examined in ¶397.

38 *Siegel v. Chicken Delight*, 448 F.2d 43 (9th Cir. 1971), *cert. denied*, 405 U.S. 955 (1972).

39 *Kypta v. McDonald's Corp.*, 671 F.2d 1282, 1285 (11th Cir.), *cert. denied*, 459 U.S. 857 (1982).

40 While the merger may have little competitive effect, there would be small changes in price and output resulting from the merger. These changes may be extremely difficult to detect through statistical analysis.

41 For the substantive law, see Subchapter 16B-1.

42 *Dr. Miles Med. Co. v. John D. Park & Sons Co.*, 220 U.S. 373 (1911).

43 *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007).

44 Damages for terminated dealers are examined in ¶397.

45 For a detailed examination of the problems that arise, see Roger D. Blair, Jill B. Herndon, & John E. Lopatka, *Resale Price Maintenance and the Private Antitrust Plaintiff*, 83 Wash. U. L.Q. 657 (2005).

46 The result has been substantial controversy. For a review of the conflicting views, see Chapter 11 in Herbert Hovenkamp, Federal Antitrust Policy: The Law of Competition and Its Practice (5th ed. 2015).

47 *See* Lester Telser, *Why Should Manufacturers Want Free Trade?*, 3 J.L. & Econ. 86 (1960).

48 *Illinois Brick v. Illinois*, 431 U.S. 720 (1977), denies damage recoveries under federal law to indirect purchasers. See ¶¶346, 396.

© 2021 CCH Incorporated and its affiliates and licensors. All rights reserved.

# EXHIBIT PX0686

UNITED STATES SENATE

COMMITTEE ON COMMERCE, SCIENCE, AND TRANSPORTATION

OFFICE OF OVERSIGHT AND INVESTIGATIONS
MAJORITY STAFF

# THE CURRENT FINANCIAL STATE OF THE CLASS I FREIGHT RAIL INDUSTRY

**Staff Report for Chairman Rockefeller**
**September 15, 2010**

**Executive Summary**

Thirty years ago, Congress made sweeping changes to the laws regulating freight railroads to give the industry the opportunity to improve its finances and its ability to compete against other transportation modes. The Staggers Rail Act of 1980 allowed freight railroads to get rid of unprofitable lines and to consolidate their operations. The law also allowed the railroads to charge lower rates to their customers who operated in a competitive environment, and higher rates to customers who were "captive" to one railroad carrier for transportation service.

A review of the Class I railroads' recent financial results shows that the Staggers Act's goal of restoring financial stability to the U.S. rail system has been achieved. The restructuring of the industry that the Staggers Act set into motion thirty years ago has produced a so-called "rail renaissance." The four Class I railroads that today dominate the U.S. rail shipping market are achieving returns on revenue and operating ratios that rank them among the most profitable businesses in the U.S. economy.

After struggling with declining market share and rates in the years after the Staggers Act became law, the railroads have now regained their pricing power and begun increasing railroads' share of the freight transportation market. Unlike other transportation modes such as trucking, the railroads have been able to maintain their high profit margins even during the sustained economic downturn of 2008-10. Freight railroads have been assuring their investors the companies will take advantage of this "robust pricing environment" and continue to push rate increases on their customers.

While the freight railroads have been investing record amounts of their profits into much-needed capital projects, they have also doubled dividend payments to their shareholders and spent billions more dollars repurchasing their publicly-traded shares to boost the short-term value of their stocks. These large expenditures undermine the railroads' argument that they still lack the income to invest in their long-term capital needs. In addition to their own capital investments, the railroads have recently received hundreds of millions of dollars from state governments and the federal government to support their network improvement activities.

The companies' strong financial performance has attracted billions of new investment dollars, including the unprecedented $34 billion dollar purchase of the BNSF railroad by Berkshire Hathaway, the operating company of the investor Warren Buffett. Buffett predicts that BNSF and the other large Class I railroads will show "steady and certain growth" over the coming decades.

In spite of the obvious financial strength of the Class I railroads, their industry association, the Association of American Railroads (AAR), continues to tell Congress and the Surface Transportation Board (STB) that the freight rail industry is not yet financially stable and is not yet capable of meeting its capital needs without the differential pricing powers the Staggers Act gave the railroads in 1980. As the rail industry continues to operate profitably and to aggressively exercise its pricing power, these claims need to be more carefully scrutinized.

## I. Past Financial Problems in the Rail Industry

Faced with a national railroad system in financial decline and physical disrepair, Congress passed the Staggers Rail Act (Staggers Act) in 1980.[1] Citing the railroads' declining share of intercity freight transportation and the industry's poor financial performance, the authors of the Staggers Act said the purpose of the law was to provide "the opportunity for railroads to obtain adequate earnings to restore, maintain, and improve their physical facilities while achieving the financial stability of the national rail system."[2]

The law directed the Interstate Commerce Commission (and its successor, the Surface Transportation Board) to shift its regulatory focus from rate-making to the financial health of the railroad industry. Under this new approach, "the Commission is required to make efforts to ensure that rail carriers earn adequate revenues."[3] The Act legalized private transportation contracts, encouraged railroad mergers, and accelerated abandonment of unprofitable rail lines.

In order to increase the railroads' ability to earn "adequate revenues," the Staggers Act allowed railroads to charge higher rates to shippers over which they had "market dominance."[4] Because railroads could not build their fixed business costs into the rates they charged shippers who had access to competing transportation modes—such as trucks, barges, or other railroads—Congress allowed them to charge higher markups on so-called "captive" shippers without viable transportation alternatives. In order to increase the rail industry's revenues, the Act required regulators to accept as "reasonable" even rates with very high captive-shipper markups.[5] According to the authors of the Staggers Act, regulators would have greater authority to review this so-called "differential pricing" when the railroads were once again financially stable businesses.[6]

The pricing and regulatory reforms in the Staggers Act led to wide-ranging changes in the railroad industry. In 1980, there were 39 Class I railroads, employing 458,000 workers, and

---

[1] Staggers Rail Act of 1980, Pub. L. No. 96-448.

[2] U.S. House of Representatives, *Staggers Rail Act of 1980 Conference Report*, 96th Cong. (H.R. Rep. No. 96-1430) at 80.

[3] *Id.* at 89.

[4] *Id.* at 90-91; 49 U.S.C. § 10707.

[5] A captive shipper is not entitled to STB review of the reasonableness of a rate unless it can demonstrate that the rate produces revenues above 180% of the railroad's "variable costs" in providing the service, and that is has no other transportation alternatives. 49 U.S.C. § 10707. In the railroad industry, "variable costs" are the expenses a railroad carrier incurs in the course of a particular shipment of goods, while "fixed costs" (also known as "joint and common costs") are the expenses railroads incur to maintain their networks, but are not attributable to specific customers or shipments.

[6] *Staggers Rail Act of 1980 Conference Report*, *supra* note 2, at 91. ("The Conferees have adopted the concept of a jurisdictional level that varies according to the performance of the railroad industry. When the industry is earning revenues which are adequate, it is appropriate for the Commission to have the authority to review rate increases more carefully.").

owning 270,623 miles of track.[7] Thanks to a wave of mergers and consolidation in the 1980s and 1990s, today there are only seven Class I railroads. In 2008, these companies employed 164,000 workers and owned 160,734 miles of track.[8] In spite of the fact that the Class I railroads own significantly less track and employ fewer workers than they did in 1980, their network handled almost twice as much cargo in 2008 (1.7 trillion revenue ton-miles) than it did in 1980 (918 billion revenue ton-miles).[9]

Also unlike 1980, today four Class I railroads dominate the long-haul freight market and function as "regional duopolies" in the eastern and western United States.[10] Burlington Northern Santa Fe (BNSF) and Union Pacific dominate freight rail transportation west of the Mississippi, and CSX and Norfolk Southern dominate the business east of the Mississippi. In 2008, these four railroads accounted for over 90% of Class I freight shipments and over 92% of Class I railroads' $61 billion in revenues.[11]

## II. Current Financial Picture

In their official communications with the Surface Transportation Board (STB), freight railroad carriers consistently tell their regulators that while their industry's financial condition has significantly improved since 1980, they have not yet reached the "financial stability" goal established in the Staggers Act. In 2007, for example, the Association of American Railroads (AAR), the rail industry's trade group, told the STB that since the passage of the Staggers Act, Class I railroads have "only slowly made progress toward the goal of long-term financial sustainability."[12] While "freight railroads are finally showing tangible signs that financial sustainability might be within reach," the AAR concluded, the companies have not yet reached that point.[13]

A year later, in April 2008, AAR told the STB in written testimony that the railroads' profitability was "still far from stellar in comparison to the many other industries against which

---

[7] Association of American Railroads, *Railroad Facts, 2009 Edition* (2009).

[8] *Id.*

[9] *Id.* Railroads measure the total amount of freight they ship using the measure "revenue ton miles," which is the weight of paid tonnage multiplied by the total number of miles the freight has been transported.

[10] Wolfe Research, *A Training Manual. Will Rail Renaissance Survive Recession and Re-Regulation?* (May 2009), at 10. (hereinafter "Wolfe, Training Manual")

[11] Association of American Railroads, *Railroad Ten-Year Trends, 1999-2008* (Feb. 2010).

[12] Comments of the Association of American Railroads, *STB Ex Parte No. 671, Rail Capacity and Infrastructure Requirements* (April 4, 2007). The STB filings that are cited in this report can be obtained by searching the STB's online database by docket number at http://www.stb.dot.gov/home.nsf/EnhancedSearch?OpenForm&Type=F.

[13] *Id.*

railroads compete for capital" and that "rail industry profitability has consistently lagged most other industries – and that is still the case today."[14]

While the rail industry's regulatory filings with the STB portray an industry that is still struggling to attract capital and to compete with the other transportation modes, the railroads' public financial results tell a different story. According to the four largest rail companies' Securities and Exchange Commission (SEC) filings, in recent years, these companies have far exceeded the Staggers Act's goal of bringing the railroads back from the brink of ruin to financial sustainability. In fact, today, the large U.S. rail companies are some of the most profitable publicly-traded companies in the world.

Policy makers, outside analysts, and the railroads themselves agree that today's industry bears little resemblance to the financially failing, inefficient rail industry of 1980. In 2007, the U.S. Department of Transportation told the STB that the Staggers Act has been "profoundly successful," noting that the railroads are financially healthy, the industry's infrastructure has been modernized, productivity is high, and shippers have benefitted from lower average rates.[15] According to BNSF's CEO, Matthew Rose, after Staggers passed in 1980, the railroads spent two decades going on a "productivity binge, wringing out excess costs, getting rid of inefficient lines, finding wage rates that we all could live within, both for employees and our companies." He told *USA Today*, "we think we are a very productive institution at this time."[16]

As a result of these changes, as well as increases in highway congestion and fuel costs, the railroad industry is no longer at a competitive disadvantage to other transportation modes, as it was when the Staggers Act was passed in 1980. According to a financial analyst at BB&T Capital Markets, four years ago, trucks handled 80% of the freight hauls between 700 and 1,000 miles, while today trucks and railroads split this market.[17] A well-respected transportation analyst, Wolfe Research, predicts that railroads will "likely continue to take market share from the less fuel-efficient and increasingly less productive truck industry."[18]

A review of the largest four railroads' Securities and Exchange Commission (SEC) filings shows just how profitable the large rail companies have become over the last decade. Figure I demonstrates that the four largest U.S. rail carriers have nearly doubled their collective profit margin in the last ten years to 13%.[19] In fact, in 2008, the railroad companies' 12.6%

---

[14] Written Testimony of the Association of American Railroads, *STB Ex Parte No. 677, Common Carrier Obligation of Railroads* (April 17, 2008).

[15] Written testimony of Jeffrey N. Shane, Under Secretary for Policy, Department of Transportation, *STB Ex Parte No. 671, Rail Capacity and Infrastructure Requirements* (April 4, 2007).

[16] *Warren Buffett sees strong rail system as key to U.S. growth*, USA Today (Mar. 25, 2010).

[17] *Burned Before, Railroads Take Risks*, Wall Street Journal (June 28, 2010).

[18] Wolfe, Training Manual at 6.

[19] The accounting measure used to measure profitability in this report is "profit margin" or "return on revenue," which is the percentage of a company's revenues that is net income. AAR and other industry representatives sometimes selectively use another financial ratio, the "return on shareholders' equity," to argue that the railroad industry's profits are modest compared to other sectors. Return on equity measures

profit margin placed the industry fifth out of 53 industries on *Fortune*'s list of "most profitable industries," trailing only the communications, Internet, pharmaceutical, and medical device industries.[20] Between 2001 and 2008, the railroad industry was ranked in the top ten on *Fortune*'s profitability list seven out of eight times. While the railroads were telling their regulators that their profitability trailed most other U.S. companies, they were actually among the U.S. economy's top performers.




***Figure 1 – Combined Profit Margins (Net Income/Revenue) for BNSF, Union Pacific, CSX, and Norfolk Southern, 2000-09 (Source: SEC filings)***

## III. Investor Interest in the Freight Railroad Industry

The companies' SEC filings over the past decade do not show that the railroad industry is "lagging behind" other industries, as AAR told its regulators in 2008. In fact, the railroads' growth in earnings and profitability has outpaced almost all of the other large industries it competes with for capital in the equity markets. Over the last decade, the large railroad companies have reported higher revenues and stable or only slowly-growing expenses, even during the recent economic recession. This relationship between operating expenses and

---

not all net income, but only the income a company retains from year to year for future growth. Return on equity can be negatively affected by paying dividends or buying back stock. The Class I railroads' recent stock buyback activities are discussed in Section V of this report.

[20] Fortune, *2008's Top Industries: Most Profitable, Return on Revenues* (online at http://money.cnn.com/magazines/fortune/fortune500/2009/performers/industries/profits/) (accessed Aug. 27, 2010).

revenues is known as the "operating ratio," and is an important indicator of financial performance in many transportation sectors, including the rail and trucking industries.[21]

As Figure II demonstrates, railroads have been steadily lowering their operating ratios over the past decade, reaching a ten-year low in 2009. This 2009 result is especially impressive, since it was achieved in the midst of a severe economic downturn.




*Figure II – Combined Operating Ratios (Expenses/Revenues) for BNSF, Union Pacific, CSX, and Norfolk Southern, 2000-09 (Source: SEC filings)*

As the railroad industry's profit margins have risen and their operating ratios have dropped, investors have taken notice. As Figure III shows, the stock value of the four largest rail carriers over the past ten years has far exceeded the average stock value of the large U.S. companies that are part of the S&P 500. An index of large railroad company stocks monitored by Wolfe Research appreciated 119% between 2003 and 2009; the S&P index was down 0.3% during the same period.[22] Recent quantitative stock reports published by Standard & Poor's give quality rankings of "A", "A-", and "B+" to Union Pacific, Norfolk Southern, and CSX, respectively. Union Pacific and Norfolk Southern scored above the 90th percentile on S&P's

[21] *See e.g.*, Testimony of Michael J. Ward, Chairman and CEO, CSX Corporation, U.S. House Committee on Transportation and Infrastructure, Subcommittee on Railroads, Pipelines, and Hazardous Materials, *Hearing on Investment in the Rail Industry*, 110th Congress (March 5, 2008) (H. Rept. 110-104). ("Operating ratio, which is inverse margin or the ratio of operating expenses to operating revenues expressed as a percentage, is a widely used performance measurement in the railroad industry.")

[22] Wolfe, Training Manual at 6.

"Investability Quotient," a measure of an investment's desirability, while CSX received a score of 89%.[23]




***Figure III – Stock Performance of BNSF, Union Pacific, CSX, and Norfolk Southern Compared to the S&P 500 Index, 2000-09 (Source: Google Finance)***

In November 2009, the investor Warren Buffett expressed his great confidence in the financial sustainability of the railroad industry by announcing that his company, Berkshire Hathaway, would purchase the 77.4% of the BNSF railroad his company did not already own. The deal was valued at approximately $34 billion, making it the largest ever acquisition in Berkshire Hathaway history.[24]

In discussing his acquisition of BNSF, Buffett said he believed his investment in BNSF would deliver "steady and certain growth" over the coming decades.[25] He also predicted that the U.S. rail industry has a "dynamic and profitable future" and that all four big freight railroads will "do very well" in the coming decades because they are the only mode of freight transportation that will be able to keep up with the American economy's increasing demand for consumer

[23] Standard & Poor's, Union Pacific, *Quantitative Stock Report* (Sep. 4, 2010); Standard & Poor's, Norfolk Southern, *Quantitative Stock Report* (Sep. 4, 2010); Standard & Poor's, CSX, *Quantitative Stock Report* (Sep. 4, 2010). Since its purchase by Berkshire Hathaway (see below), BNSF shares are no longer listed on the New York Stock Exchange.

[24] Burlington Northern Santa Fe Corporation and Berkshire Hathaway, Inc. Joint Press Release, *Berkshire Hathaway Inc. to Acquire Burlington Northern Santa Fe Corporation (BNSF) for $100 Per Share in Cash and Stock* (Nov. 3, 2009).

[25] *Buffett: Railroad business is 'in tune with the future'*, USA Today (Nov. 4, 2009).

goods and raw materials.[26] Analysts suggest that as much as $18 billion poured into the rail industry in the wake of Mr. Buffett's BNSF announcement.[27]

In his annual letter to Berkshire shareholders, Mr. Buffett noted the similarities between the capital-intensive railroad industry and the regulated electric utilities his company already owned. Like electric utilities, railroads "provide fundamental services that are, and will remain, essential to the economic well-being of our customers, the communities we serve, and indeed the nation." He predicted that Berkshire's investment in BNSF would "deliver significantly increased earnings over time, albeit at the cost of our investing many tens – yes, tens – of billions of dollars of incremental equity capital."[28]

## IV. Railroad Industry Pricing Power

The railroad industry correctly points out that after the Staggers Act gave the railroads the ability to negotiate prices with shippers, railroad rates dropped significantly. According to the AAR, after adjusting for inflation, rail rates are still lower than they were in 1980.[29] The railroads' presumed inability to raise rates on freight shippers with competitive alternatives has long been the industry's justification for its differential pricing practices. Because they cannot adequately recover their costs from shippers with transportation alternatives, railroads are allowed to charge higher rates to "captive" shippers without alternatives.[30]

One of the recent structural changes that the railroad industry does not highlight is that since 2004, railroads have regained their ability to raise prices on their non-captive customers. One leading industry analyst, Wolfe Research, refers to this change as the industry's "pricing renaissance."[31] As Figure IV demonstrates, for a number of years after the Staggers Act was enacted, rail prices measured against inflation fell by an average of 3.6% a year. Since 2004, however, Class I railroads have been raising prices by an average of 5% a year above inflation.[32] And even during the recent recession, while other modes of freight transportation have cut their rates, the Class I railroads have been able to push year-over-year price increases onto their customers.[33]

---

[26] *Warren Buffett sees strong rail system as key to U.S. growth*, USA Today (Mar. 25, 2010).

[27] *Id.*

[28] Berkshire Hathaway Letter to Shareholders (Feb. 26, 2010) (online at http://www.berkshirehathaway.com/letters/2009ltr.pdf).

[29] Association of American Railroads, *A Short History of U.S. Freight Railroads* (May 2010) (online at http://www.aar.org/incongress/~/media/aar/backgroundpapers/ashorthistoryofusfreightrailroads.ashx).

[30] Government Accountability Office, *Freight Railroads: Industry Health Has Improved, but Concerns about Competition and Capacity Should Be Addressed* (Oct. 2006) (GAO 07-94). See also the discussion in Section I above.

[31] Wolfe, Training Manual at 33.

[32] *Id.* at 35.

[33] *Id.* at 43.

This new "pricing power" has led to significant top-line revenue growth for Class I railroads and has resulted in the swelling profit margins described in the sections above. And according to Wolfe Research, because railroad rates are still below their inflation-adjusted 1980 levels, the freight rail carriers believe they will have a "solid multi-year glide path to continued strong rail pricing hikes regardless of the economic environment."[34] A recent Morgan Stanley analysis of the rail industry notes that in the current environment of strong railroad pricing power, "[r]ate negotiations continue to be difficult for shippers and competition remains minimal."[35]




***Figure IV- Annual Class I Rail Rates and Revenues, 1980-2008 (Source: Wolfe Research using Association of American Railroads Data)***

In recent conversations with their investors, the rail companies have discussed this increase in pricing power and their expectation that it will continue in the future. In a recent investor call, Union Pacific's CEO, James Young, commented, "[t]he pricing environment is stronger today than it's been in a long time…I feel very good about the potential in the pricing

---

[34] *Id.* at 35.

[35] Morgan Stanley Research, North American Transportation, *Freight Transportation: Rails 2Q10 Review* (Aug. 6, 2010).

side going forward."[36] A CSX senior executive, Clarence Gooden, made a similar prediction in his company's second-quarter 2010 investment call, when he said, "[l]ooking forward, we continue to expect core price increases to exceed rail inflation."[37]

A number of factors seem to lie behind the railroads' new "robust pricing environment."[38] Post-Staggers Act industry consolidation and capacity reduction slowly eliminated the excess supply of rails and rail service, while the railroads invested in making their remaining operations more productive. One industry analyst estimates that the railroads moved from a position of "material excess capacity" to "tight capacity" in the late 1990s or early 2000s and that the pendulum has continued to swing further in the industry's favor as demand for rail services continues to grow, particularly in the intermodal, coal, and grain markets.[39]

Another factor that has contributed to the industry's renewed pricing power over the past few years is its shift to short-term contracts with its customers. After the passage of the Staggers Act, during the time they had weak pricing power, the freight railroads entered into long-term contracts with many of their customers. As these so-called "legacy contracts" are expiring, railroads are replacing them with shorter-term contracts—sometimes for terms as short as one year—at significantly higher rates. Shippers also report that railroads are more frequently offering unilateral "take-it-or-leave-it" contracts to customers, a practice that bears more resemblance to setting a tariff rate than establishing a price through negotiation.[40]

Analysts view these expiring legacy contracts as an important source of pricing gains over the next few years. According to Wolfe Research, "[a]s these rail contracts are repriced over the next several years for the first time since the rails gained pricing power in 2004, we believe the rails will be recording material rate increases that could exceed 100% in some cases of very old and underpriced business. (e.g., ten-year old coal contracts)."[41] Morgan Stanley recently rated Union Pacific as its top Class I rail stock based on the fact that the company has the largest percentage of "revenue under legacy contract left to reprice."[42]

---

[36] Union Pacific Corporation 2nd Quarter 2010 Earnings Conference Call (July 22, 2010).

[37] CSX Corporation 2nd Quarter 2010 Earnings Conference Call (July 13, 2010).

[38] Wolfe, Training Manual at 9.

[39] *Id.* at 34-35.

[40] These types of arrangements were the subject of a rulemaking by the STB that was discontinued because consensus on a new rule could not be reached. *See* STB Ex Parte No. 669 (*Interpretation of the Term "Contract" in 49 U.S.C. 10709*); STB Ex Parte 676 (*Rail Transportation Contracts Under 49 U.S.C. 10709*).

[41] Wolfe, Training Manual at 45.

[42] Morgan Stanley Research, North American Transportation, *Freight Transportation: Rails 2Q10 Review* (Aug. 6, 2010).

## V. Railroad Industry Capital Investments

Because they have the primary financial responsibility for their rail networks, Class I freight rail companies have both high fixed operating costs and constant needs for capital investments. In addition to the high costs of replacing and upgrading physical assets such as track, ties, and engines, major capital investments are required to expand the capacity of the rail network to address the growing demand for freight rail transportation in the United States.[43] While they tell Congress that they are still not producing sufficient revenue to address their long-term capital needs, a review of the railroads' financial filings and their statements to their investors suggests the opposite.

According to SEC reports filed by the four largest Class I railroads and summarized in Figure V, over the past ten years, the companies made a combined total of $62.5 billion in capital expenditures to replace and upgrade equipment and expand their rail networks. As the companies' revenues grew over the course of the decade, so did their capital investments. The four railroads spent $4.8 billion in 2000 on capital projects, while they spent $7.8 billion in 2009. While these capital investment figures are large, in their public relations materials, the freight railroad industry misleadingly makes them appear larger by adding maintenance costs to capital investments and calling the total "Spending on Infrastructure & Equipment."[44]

The railroad industry has consistently testified before Congress that while it has heavily invested in its network and will continue to do so, it will not be able to completely pay for all of the improvements necessary for freight railroads to meet the long-term capacity demands of the U.S. economy. These investments include upgrading tracks and signal control systems, expanding terminals, and improving bridges and tunnels. In testimony he delivered before the Senate Commerce Committee in 2009, for example, BNSF CEO, Matthew Rose, said that Class I railroads would fall short of paying for their long-term capital investments by approximately $40 billion.[45] A few months earlier, Union Pacific's CEO, James Young, told the House Transportation Committee that "our industry is only investing about half the level DOT studies say is needed to meet the demands on freight rail in the future."[46]

---

[43] The industry is also working to lower its future capital needs by shifting some of its traditional costs to its customers, such as the cost of railcars. In 1987, railcars owned by freight railroad companies moved 60% of tons carried; by 2005, that figure had decreased to 40% of tons carried. Government Accountability Office, *Freight Railroads*, *supra*, note 30.

[44] *See e.g.,* Association of American Railroads, *Rail Earnings Today Pay for Rail Capacity and Service Improvements for Tomorrow* (May 2010) (online at http://www.aar.org/incongress/~/media/aar/backgroundpapers/railearningstodaypayforrailcapacityandserviceimprovementsfortomorrow.ashx).

[45] Testimony of Matthew K. Rose, Chairman, President and CEO, BNSF Railway Company, U.S. Senate Committee on Commerce Science, and Transportation, Subcommittee on Surface Transportation and Merchant Marine Infrastructure, Safety and Security, *Addressing Surface Transportation Needs in Rural America*, 111th Congress (Aug. 10, 2009) (S. Hrg. 111-490).

[46] Testimony of James R. Young, Chairman, President, and CEO, Union Pacific Corporation, U.S. House Committee on Transportation and Infrastructure, Subcommittee on Railroads, Pipelines, and Hazardous Materials, *Freight and Passenger Rail: Present and Future Roles, Performance, Benefits, and Needs*, 111th Congress (Jan. 28, 2009).

These statements are inconsistent with statements Class I railroad officials make about their capital investments to financial analysts in quarterly conference calls. In these calls, company officials routinely assure analysts their capital investments are sufficient to address future needs. In an investor call in late 2007, for example, the CEO of CSX, Michael Ward, told investors that his company was making the capital investments necessary "to prepare for future growth" and that the company would continue to "generate the cash flow to be able to make capital investment for the future." [47] In an investor call in April 2010, Mr. Young, the Union Pacific CEO, assured analysts that his company was "continuing to make the critical, long-term capital investments that support the Company's growth strategy."[48]




***Figure V – Combined Capital Expenditures and Public Stock Repurchases of BNSF, Union Pacific, CSX, and Norfolk Southern – 2000-09 (Source: SEC filings)***

Another indication that the Class I railroads believe they are spending sufficient amounts of money on their long-term capital needs is that in recent years, they have used growing portions of their net income to increase their dividend payments and to repurchase their publicly-traded shares. By reducing the number of shares on the market, buybacks have the effect of increasing earnings per share and driving up share prices. The capital expended to buy back shares provides short-term gains in stock value at the expense of investments that increase capacity and productivity. As Figure V shows, the four major U.S. railroads cumulatively spent

[47] CSX Corporation 3rd Quarter 2007 Earnings Conference Call (Oct. 17, 2007).

[48] Union Pacific 1st Quarter 2010 Earnings Conference Call (Apr. 22, 2010).

over $2 billion in share repurchases in 2006, over $6 billion in 2007, and over $5 billion in 2008. Although none of these companies repurchased shares in 2009, they have resumed their share buyback programs in 2010.[49] According to their most recent SEC quarterly filings, CSX, Norfolk Southern, and Union Pacific have already bought back more than $1.6 billion worth of shares in 2010.

Another factor that freight railroads do not highlight in their discussions of their long-term capital needs is that several high-profile railroad capacity projects recently have been financed through a combination of public and private funds. Railroads lobby Congress and state governments for taxpayer contributions to their rail infrastructure improvements and have had a few recent successes in establishing such "public-private partnerships."[50]

For example, public money funded almost 50% of Norfolk Southern's recently completed "Heartland Corridor" project.[51] That project enlarged 28 tunnels along an old coal route, creating a faster and more direct path for double-stack freight trains carrying intermodal freight between the international shipping port in Hampton Roads, Virginia, and Columbus, Ohio.[52] Similarly, Norfolk Southern's rival, CSX, is looking to the states and federal government to contribute more than 50% of the cost of its "National Gateway" project, which will also create a more efficient route for intermodal freight between the Mid-Atlantic ports and the Midwest. CSX has committed $395 million to this $842 million initiative and has received $98 million in federal funding and over $180 million from the states so far.[53]

---

[49] *See, e.g.*, Morgan Stanley Research, North American Transportation, *Freight Transportation: Rails 2Q10 Review* (Aug. 6, 2010). ("Share repurchase activity is accelerating at a number of Class I's – a trend which is likely to add a few percentage points of EPS [earnings per share] growth annually to CNI, CSX, NSC, and UNP").

[50] *See, e.g.*, Testimony of Matthew K. Rose, Senate Committee on Commerce, Science, and Transportation, *Addressing Surface Transportation Needs in Rural America*, 111th Cong. (Aug. 10, 2009) ("As an industry, we're currently spending about $10 billion in the freight rail network. But, if policy leveraged those investments with public partnerships, these investments would happen more quickly, and with more certainty."); Testimony of James R. Young, House Committee on Transportation and Infrastructure, *Freight and Passenger Rail: Present and Future Roles, Performance, Benefits, and Needs*, 111th Cong. (Jan. 28, 2009) ("Congress should enact and fund programs that allow States to partner with freight railroads to move forward with projects that benefit both the freight railroad and the public.").

[51] Norfolk Southern put up $97.8 million for the project, the federal government added $83.3 million, and Ohio and Virginia provided $9.8 million. Associated Press, *Norfolk Southern Opens New $191 Million Route to Midwest* (Sept. 9, 2010).

[52] *Id.*

[53] *Railroads Redraw the Intermodal Map*, Journal of Commerce (Aug. 6, 2010).

## **Conclusion**

Thirty years ago, in order to restore the financial stability of the U.S. rail network, Congress gave railroads the authority to charge captive shippers higher rates than other shippers. Today, the goal of restoring the financial health of the rail industry has been achieved. Class I freight railroads have regained the pricing power they lacked in the 1980s, and are now some of the most highly profitable businesses in the U.S. economy. The railroads have high levels of capital investment and consistently produce strong results for their shareholders throughout the economic cycle. As Congress and the federal government look to the nation's rail system to meet the United States' future transportation needs, they also need to evaluate whether our country's current rail policy needs to be changed to reflect this new reality.

# EXHIBIT PX0687

EXHIBIT
PENGAD 800-631-6989
Seale - 1



Copyright 2004 FDCHeMedia, Inc. All Rights Reserved
Copyright 2004 CCBN, Inc. All Rights Reserved
FD (Fair Disclosure) Wire

July 28, 2004 Wednesday

Transcript 072804ag.780

**LENGTH:** 10341 words

**HEADLINE:** Q2 2004 Norfolk Southern Corp Earnings Conference Call - Final

**BODY:**

DAVID GOODE, CHAIRMAN, PRESIDENT AND CEO, NORFOLK SOUTHERN CORPORATION: Good morning, ladies and gentlemen. I'm David Goode, Chairman, President and Chief Executive Officer of Norfolk Southern and I'm pleased to welcome you to our second quarter 2004 analyst meeting.

I welcome the hearty souls that are here on kind of a tough day in New York and we appreciate those of you who came out to be with us. And I'd like to welcome those also who are listening by telephone conference and those who are otherwise participating on the Internet and, as usual, I remind everybody here to please use the microphones when the time comes so that everybody can hear.

And I also remind our listeners and Internet participants that the slides are available for your convenience on our website in the investor section. So, if you haven't already gotten to that, we urge you to do so. As usual, transcripts will be available from our public relations department and also will be posted on our Web site.

Now the lawyers have asked that I remind you that any forward-looking statements made during the course of this presentation represent our best good-faith judgment as to what may occur in the future, actual results may differ materially from those projected, and will depend on a number of variables, some of which may be outside the control of the company. And I'm asked to refer you to our annual Report and our quarterly Report filed with the SEC for a discussion of those variables.

Let me very quickly introduce those folks from Norfolk Southern who are here today. As always, we have our Vice Chairman in the front row who will be up later, Hank Wolf, Steve Tobias and Ike Prillaman, also present with us toady are Jim Hixon, our Senior Vice President of Legal and Government Affairs is here on the corner, Kathryn McQuade, Senior Vice President of Finance, over here with Mormon, our Senior Vice President of Corporate Planning and Services is with us somewhere, over here.

And we also have Bob Fort, our Vice President of Public Relations is with us, as is Bill Galanko, our Vice President of Taxation. Marta Stewart, our Vice President and Controller who I think most of you know and Lee Anne Marilli (ph). You will note the new last name for Lee Anne McGruder and she'll tell you about it later on if you ask her, Director of Investor Relations, but congratulations Lee Anne. We're happy to have you with us as always. And also Debbie Malvin, Hank Wolf's assistant is here in the back of the room if you need anything. Everybody has made the trip here to be available for questions and I hope you'll take the opportunity to do that.

When we last met in April, I indicated that we were ready for strong performance across the board in the second quarter. And you've seen the numbers and I am very pleased to report that, that turned out to be so and Norfolk Southern continued to set records again in the second quarter. Bottom line, our results reflect strong revenue growth and record income from operations with an improved operating ratio. This is a quarter that was marked by strong operational results for us.

Our board yesterday, you will undoubtedly have noted, increased our dividend by $0.2 or 25%, reflecting the strong improvement in our financial results. We intend to continue to strive as we have said to you before for continued

improvement in our shareholder returns, while at the same time, we paid down debt and improve our balance sheet and Hank will talk more about that in a minute.

Our railway operating revenues for the quarter of $1.8 billion were the highest in our history. They were up 11%. We posted our best-ever income from railway operations, that was up 43%.

And our net income of $213 million or $0.54 a share was up 55% year-over-year. Importantly, we've produced an operating ratio of 76.6%. That's a 5 percentage-point improvement over last year and 3 percentage points better than last quarter.

So, overall, I don't think there's any getting around the fact that this was a strong quarter for Norfolk Southern.

We were able this quarter to maintain our service levels, our net worth fluidity was good. We handled some 140,000 more carloads in the quarter, while the cars online remain stable and our other metrics either remain generally stable or improved.

Our Thoroughbred Operating Plan continues to demonstrate its capability of adapting to changing conditions and shifting business demands and our people executed very well in the quarter.

We continue to invest in hiring additional train and engine crews and they're helping Norfolk Southern absorb the strong business growth by consistently executing according to plan.

We continue to benefit from market-based pricing, as our service levels remain high and the demand for our service increases. Strength is broad and, most important, is driven largely by our core businesses.

In the second quarter, we handle an 8% increase in car loadings with just 4% in additional train starts. Now that's powerful leverage, as those who follow us know. Our service quality helped support the 11% increase in revenues in the second quarter. Simply put, the results you see today reflect our disciplined focus on continuous improvement in service. At the same time, Norfolk Southern employees improved our already award-winning safety record; our safety results are still leading the industry, and are better in 2004.

Intermodal revenues led our revenue growth. They grew 21% in the second quarter and 17% for the first half of the year, reflecting growth from truck competitive services, increased business with our trucking partners and strong international shipments. Coal revenues were up 9% in the second quarter and 11% for the first half. This growth was driven, in part, by an increased export coal, not only at Lamberts point, but also at Baltimore and further included strong utility demand and better revenue yields. General merchandise was up 9% in the second quarter, 7% for the first six months that was led by metals and construction and chemicals. Ike will give you considerable detail on these numbers shortly.

Now while our revenues increased $180 million or 11%, in the second quarter, our expenses were up only $53 million or 4% compared with last year. As a result, this kind of good leverage, income from railway operations set another new record up $127 million, an increase of 43% in the second quarter.

While fuel costs were up, despite our hedging program, and compensation increased as a result of higher train and engine employment and stock and incentive-based compensation, still we were able to control costs and posted a 76.6% operating ratio in second quarter. We're also pleased that, that improved over the first quarter, showing consistent improvement.

For the first six months, our railway-operating ratio of 78%, compared with 83.4% for the comparable period last year. All of you who follow Norfolk Southern on a regular basis know how pleased I am to be able to report that number. But I'm sure you also know that I think there's still room for improvement, even though the number starts with 7. We've been watching carefully to see if our record car loadings in the first half of the year continue into July. So far, there's been considerable traction on that.

As of -- as of yesterday, actually the day before yesterday, I guess, the overall car loadings for the month are up approximately 10% month -- July this year over July last year that's led primarily, again, by Intermodals, metals and coal.

And Norfolk Southern's exceptional second quarter and first half performance have given us one of the best foundations that we've seen in a long time from which to build in this company. We think our results validate our philosophy of providing higher-value transportation products and operating efficiencies.

As we move forward into peak season, although we believe we've already seen some of the peak and that peak season may not be as dramatic as it used to be, we will continue our commitment to value pricing that reflects the current market value of our rail service, particularly in today's strong market with its demand.

Our people are committed to maintaining and improving our service quality to give us a substantial competitive advantage and an increasingly valuable product going forward. We don't deny for a minute the difficulty of continuing to provide high service levels in today's transportation environment with surging demand. But we do believe our plan is showing its strength, improving it quarter after quarter and we have a lot of confidence in it.

In the first half of 2004, we've benefited by handling volume increases with a lesser percentage of train stocks. So, as I pointed out, that strong leverage, we still have room to add capacity. Obviously, as business volumes increase, our operating plan will have to be modified to handle the business and additional train starts will be required. However, we are going to be very careful about our business, to make sure we continue to operate efficiently in order to improve our margins. We want to grow aggressively and we have room to do so, but we'll be smart about it because we're mindful that our bottom line results still have a lot of improving to do.

As we move into the remainder of the year, I'm very confident that Norfolk Southern will continue its leverage. We'll continue to leverage our operational momentum, improving service equal and pursuing new business and margin improvement as we do that, reaffirming our position as a thoroughbred of transportation, which is our objective.

Now I'll ask Hank to review our numbers for the second quarter. Ike will then tell you about the specifics of our market. Steve does not have prepared remarks, but I'm sure in a quarter like this, he'll be more than happy to talk to you about operations and all that it supports. We'll take your questions in a minute.

HANK WOLF, VICE CHAIRMAN AND CFO, NORFOLK SOUTHERN CORPORATION: Thank you, David. Good morning. Let me begin by reminding you that our first quarter results last year included $114 million or $0.29 per share after tax benefit from the cumulative effects of two changes in accounting principles and a $10 million or $0.3 per share after tax gain from discontinued operations related to our 1998 sale of North American Vanlines. In order to provide you with the most meaningful comparisons this morning, I'll initially exclude these items from my remarks and then reconcile the totals to our reported 2003 results.

As David indicated, we're very pleased with our second quarter results. The strength that we saw in the economy and talked about earlier has continued. In the second quarter, we generated record railway operating revenues, which together with moderate increases and expenses, allowed us to produce record income from railway operations this quarter.

As a result of our strong financial performance, our board of directors increased our quarterly dividend by $0.2 per share or 25% from $0.8 to $0.10 per share. In addition, we have reduced our outstanding debt by more than $300 million in the first half of this year.

Now let me turn to our financial results for the quarter. Railway operating revenues for the second quarter were a record $1.8 billion, up $180 million or 11%, merchandise revenues increased 81 million. Intermodal revenues rose 64 million, and coal revenues were up 35 million. For the first six months, railway-operating revenues were a record 3.5 billion, an increase of 312 million or of 10%, with general merchandise revenues up 130 million, Intermodal revenues increased 103 million and coal revenues rose 79 million.

Second quarter volume increased by more than 139,000 carloads or 8% compared with last year, driven by a 100,000 unit or 17% gain in Intermodal units. In addition, our revenue per unit increased by 2.8%, resulting in a total increase in revenues of 11%. For the first six months, carloads were up approximately 248,000 units or 7.3%, largely driven by 170,000 unit or 14% increase in Intermodal volume.

Revenue per unit was up 2.2% and total operating railway revenues improved by 9.8%. And Ike Prillaman will give you the details of our revenues in just a moment.

Railway operating expenses for the second quarter were 1.4 billion, up 53 million or 4% compared with 2003. For the first six months, railway operating expense were 2.7 billion, 70 million or 3% higher than 2003.

As you can see from this graphic, the largest increase in railway operating expenses for the second quarter was in compensation of benefits expense. The increase in compensation of benefits was driven by higher incentive compensation of 19 million, including an increased bonus for locomotive engineers that added 9 million.

Higher stock-based compensation costs of 9 million, reflecting the $4.43 per share increase in our stock price during the quarter. And higher wage rates that rose 8 million and increased train and engine hours that added another 6 million. These increases were, in part, offset by reduced non-agreement head counts that saved $7 million and several other items, which collectively, net to 5 million.

The second largest increase in our operating expense in the second quarter was diesel fuel. As you can see, the average price per gallon of diesel fuel increased from $0.80 in the second quarter of 2003 to $0.86 this year.

Consumption of approximately 124 million gallons was up 6% in the quarter on an 8% increase in traffic volumes. In the second quarter, we hedged approximately 77% of our diesel fuel requirements. Those hedges produced $26 million in cost savings by offsetting the purchase cost of diesel fuel. The third and fourth quarters are 73 and 64% hedged, respectively.

During the second quarter, we hedged almost 96 million gallons of fuel at an average price per gallon of $0.79. We have approximately 86 and 78 million gallons hedged in the third and fourth quarters respectively. And the average price per gallon on those hedges is $0.82 in the third quarter and $0.84 in the fourth quarter.

I believe you all are familiar goal of our fuel-hedging strategy -- to reduce the volatility of our diesel fuel expense by averaging fuel prices over an extended period of time. As you can see from this graph, comparing our average quarterly hedged fuel prices, and the un-hedged price in red, the hedging program has increased the volatility of our diesel fuel expense.

However, with fuel prices near historic high and fuel surcharges being assessed under our recent contracts, we are not currently entering into additional hedges at today's market levels. Consequently, we're modifying our fuel-hedging strategy on a go-forward basis and our pattern of entering into regular monthly swaps may not be indicative of our future hedging activity. However, we will continue to advise you of our hedge position for each quarter and the balance of the year on a regular quarterly basis.

Materials, services, and rents increased by 12 million or 3% the second quarter. That increase was primarily due to an $11 million increase in materials costs, reflecting higher locomotive and freight car maintenance expenses.

Higher volume-related Intermodal purchase services were largely offset by lower equipment rent. Other expenses were 7 million higher than last year, which benefited from a favorable property tax settlement.

The most significant decline was in casualties and other claims, which was down $9 million or 19%, reflecting lower personal injury expense. As you may recall, the second quarter of last year included some unfavorable claims development.

For the first six months, railway operating expenses were up 70 million or 3%. As in the case of the second quarter, the largest increase for the year was in compensation and benefits expense.

In the first six months, we experienced a $49 million or 5% increase in compensation of benefits, compared with 2003, principally as a result of higher wage rates and increased lows for T&E employees that added $27 million. Increased management incentive compensation and B.L.E. bonus that each added $12 million to our expense. Increased stock-based compensation of 9 million that I related to you for the second quarter. And several other items that net to $4 million. These increases were partially offset by $15 million in savings from our reduced non-agreement workforce.

Materials, services, and rent was the second largest expense increase for the first six months at $17 million, an increase of 2%. As was the case for the quarter, this increase was driven by higher expenses for materials, principally for locomotive and car repairs, and higher volume-related purchase services driven by our increased Intermodal volumes. These increases were offset in part by lower equipment rent.

Diesel fuel expense was up $16 million or 8% higher, reflecting a 6% increase in consumption, combined with a small increase in the average price per gallon from $0.83 in 2003 to $0.84 in 2004.

Other expenses were up 11 million or 10%, again reflecting higher property and sales and use taxes this year than we had last year. Conrail rents and services increased 6 million or 3% because of lower-shared asset costs and casualties and other claims were $20 million lower in the first six months of 2004.

Last year's expenses again were burdened by unfavorable claims development, as well as some higher derailment costs that we experienced in the first quarter of 2003. The railway-operating ratio for the second quarter was 76.6%, compared with 81.8% last year. This was our best quarterly operating ratio since the Conrail integration.

For the first six months, the operating ratio was 78%, compared with 83.4% for the same period last year, which was an improvement of nearly 6.5% over last year. Second quarter income from railway operations was a records 425 million, up 127 million or 43% over the 298 million that we generated last year.

For the first six months, income from railway operations was also a record at 771 million, up 242 million or 46%. Total other income and expense for the second quarter was an expense of 121 million, compared with an expense of 99 million in 2003.

Gain on sales of property and investments was 5 million, compared with 7 million last year, a decrease of 2 million. Coal royalties of $11 million were up $1 million over last year. All other was an expense of 16 million, compared with income of 7 million last year.

The decline was primarily attributable to lower returns on corporate-owned life insurance, which were down $14 million and expenses related to a new investment in synthetic fuel facilities that generate tax credits under section 29 of the internal revenue code.

In May, we announced that we purchased an interest in a limited liability company that owns and operates facilities that produce synthetic fuel from coal.

The members of the L.L.C. are entitled to tax credits under section 29 of the internal revenue code for synthetic fuel produced through the year 2007.

Our investment will result in a pretax expense of our investment, which is reflected in other income net. But, it will also generate increased tax credit and other tax benefits that are recognized in the provision for us income taxes line.

As you may recall, the net effect of this investment will be to increase our net income and we now estimate that that increase in net income will be $12 million in the year 2004. Interest expense on debt was 121 million, which was 2 million lower than last year, due to less outstanding debt.

For the first six months, total other income and expense was an expense of 232 million, compared with an expense of 205 million in 2003. Gain on the sale of property and investments declined from 12 million last year to 6 million this year and coal royalties increased by $1 million.

All other was an expense of 16 million, compared with income of 14 million in 2003, primarily due to the reduced returns and corporate-owned life insurance and the expenses that are reflected for our synthetic fuel facilities investment.

Interest expense on debt for the first six months was 242 million, 8 million lower than last year, due to less outstanding debt.

Second quarter income before income taxes was 304 million, compared with 199 million last year, a 53% increase. And for the first six months, income before income taxes was 539 million, up 66% compared with 324 million in 2003.

The provision for income taxes for the second quarter was $91 million, compared with 62 million for the second quarter of 2003. And the effective tax rate for the second quarter was 29.9%, compared with 31.2% last year.

For the first six months, the provision for income taxes was 168 million, compared with 102 million last year and the effective tax rate was 31.2%, compared with 31.5% in 2003.

Our effective tax rate for the full year should be below 30% as a result of our recent investment in a synthetic fuel production facility.

Second quarter net income was 213 million, which is 76 million or 55% higher than the 137 million earned in 2003. And for the first six months, net income was 371 million compared with 222 million last year, an increase of 149 million or 67%.

This slide highlights the components of the change in net income for the second quarter. Railway operating revenues increased 180 million, while railway-operating expenses were only 53 million higher.

Other income net increased 24 million, interest expense on debt declined by 2 million and income taxes were $29 million higher, yielding a $76 million increase in net income. For the first six months, a $312 million increase in revenues was offset by $70 million more in expenses.

Other income net was $35 million lower, interest expense on debt was 8 million lower and the provision for income taxes was $66 million higher. Combined, these items generated $149 million more in net income.

Diluted earnings per share for the second quarter were $0.54, compared with $0.35 per share last year, a 54% increase. And for the first six months, diluted earnings per share were $0.94, which is 65% above the $0.57 per share that we earned a year ago.

This slide reconciles the net income and earnings per share for the first six months of 2003, excluding the effect of the accounting changes and income from discontinued operations to our reported 2003 net income of 346 million and earnings per share of $0.89 per share. This reconciliation is posted on our website.

Net income for the first six months of 2004 was 371 million or $0.94 per share, compared with the reported net income of 346 million or $0.89 per share that we reported last year. And that included the accounting changes and income from discontinued operations.

I want to thank you for your attention. Now I'll turn the program over to Ike Prillaman and give you an in depth report on our operating revenues.

IKE PRILLAMAN, VICE CHAIRMAN AND CHIEF MARKETING OFFICER, NORFOLK SOUTHERN CORPORATION: It's bright up here. Thanks, Hank. Good morning, everyone. Manufacturing has had 13 months of expansion that has not occurred since 1999-2000 and, accordingly, the freight market is booming.

As both David and Hank have indicated, second quarter revenue grew 180 million or 11% to a record 1.8 billion with the exception of automotive, all of our business groups achieved record quarterly revenues and as also -- as has been mentioned for the year-to-date, revenue increased to 312 million or 10%.

Volume for the period increased 8% while year-to-date was up 7 and this includes a 17% gain in Intermodal volume for three months and 14% gain for the six months, which our records Intermodal growth exceeded 100,000 loads for the first quarter while merchandise was up 32,000 loads or 5% and coal increased 2%.

Combined, our goal and merchandise volumes for the six months were up 78,000 carloads, which, as a footnote, we're still 95,000 carloads less than the corresponding six months of 2000 and my point being obviously we still have network capacity.

Excluding coke and iron ore, coal volumes increased 3% for the quarter and 4% for the year-to-date. Strong demand across all the markets drove higher coal production. Utility volume declined 1% for the period, but was up 1% for the six months.

During the quarter, the large increase in coal being shipped to Georgia Power plants here could not offset the decline of other utility coal markets, which principally were the shipments to the lake as well as some short haul shipments to the river and a lot of that was due to lack of availability.

Inventory stockpiles for the utility, the levels vary, but are generally on the low side. Higher prices for metallurgical coal, both domestic and export, have caused some diversions away from the utility market.

Export volume for us was up 50% from the quarter and 24% year-to-date, resulting from the increased demand for U.S. met coals. China has reduced the coke exports and has increased the importing of coal to meet its increasing domestic demand and this has caused the European steel makers to source or at least attempt to source more coal from the U.S.

Global growth in iron production, especially in India and Brazil, and I should add Japanese steel production as well is way up this year, also, along with the significant emerging demand in China for hard coking coals is projected to offset any increased metcoal production in Australia and Canada for the -- so the outlook, we believe, is bullish through 2006 for export volumes.

We are seeing multiple year contracts being signed with certain U.S. producers and one has been signed for up to five years, which is a real sea change in negotiations between the two parties.

Compared to last year, our met coal volumes are up and coke volumes are down due to the continued shortage of coke in the world market and its high price.

The metcoal availability is expected to improve as the Pinnacle Creek mine continues full production towards the end of July. It had been down for over a year and it has about four million tons of annual production capacity.

But due to the continued shortage and higher prices, I think an indication for the market going forward, we've -- there have been several coke batteries that have been constructed in the U.S. or announced and the market outlook, I believe, for domestic met coal for the future is positive.

And finally, the declines in iron ore volumes were primarily due to reduced production in steel. Merchandise revenue exceeded 1 billion as the industrial sectors produced solid increases across the board.

As David indicated, metals, construction and chemicals and paper volumes continue to benefit from overall manufacturing expansion and higher production. Metals and construction lead the merchandise gains with -- revenue growth for the quarter and 10% for year-to-date.

Even with reduced auto production demand, steel remains high. Low inventories and tight supply are keeping prices up. Our scrap and finished metals business grew 11,000 Conrail's and, but I would point out again that our demand, this demand or this business level is still 11% below the peak of 2000.

Chemicals revenue was up 13% for the quarter and 9% for the year-to-day. Plastics and petroleum or refinery products drove the increases with the industry benefiting from improved global demand led by China.

And the paper and forest industry has been experiencing stronger demand. Our revenue increases in track similarly and I might add that it was this eighth straight quarter that we have experienced year-over-year increases for our paper revenue.

Customers also, on outlook, are indicating strong orders into the second half of 2004. Ag revenue increased 4% for both the quarters and year-to-date. The 55% revenue increase in ethanol business more than offset the loss of the drought-related long haul corn business of 2003.

Looking ahead, we expect strong corn volume or grain volumes on NS for the second half as corn planning and production rates are currently running above a 10-year trend and yield is projected to reach - is expected to exceed 10.4 billion bushels and movement of fertilizer was also up with the increased plants.

Automotive revenue increased 252 million for the quarter and 500 million year-to-date, while carloads increased by 1% for both time periods, tracking the 17% to 21% increase in North American vehicle production.

Autocast projects a 2000 model year production of 16.5 million units and that compares with 15.8 million for 2004 model year. We expect to benefit from the full ramp up of Honda's second assembly plant at Lincoln, Alabama as well as Toyota's expansion at their Princeton, Indiana assembly plant and Ford is bringing two new models on to be produced at their Chicago plant and all of this will be occurring starting in September and going forward.

Serving 39 assembly plants, our automotive franchise, we believe is well positioned for the growth in 2005 and beyond and hopefully our pricing will also continue to improve as we certainly have plans for that.

Diversions from the highways have also added to merchandise revenues. A shortage of drivers and higher fuel prices created real opportunities in our metals market and construction as well as the paper markets.

Our Intermodal service product continues to attract truckload carriers as customers. Consistent service performance resulted in highway, the rail diversion for premium truckload business, the domestic IMC's as well as international volume.

Intermodal growth in the US reached 10.6% in the second quarter and this was the highest since 1994. As previously mentioned, our Intermodal business had both record volume and revenue for any quarter, which happens to be the second quarter and not the traditional third quarter.

Our sustained service and network investments and improved information technology has allowed us to market an overall truck-like product and make NS, we believe, a viable solution for truckload shippers and accordingly, our truckload business was up 34% for the quarter and 29% for the year-to-date.

International business grew 11% and was driven by increased consumer spending and international trade. I noticed this morning that consumer confidence is at a new high level and some of the volume increases that David mentioned certainly are being driven by that with Intermodal leading the way. The ship lines are reporting, they are booked to capacity through the end of the year.

There is debate on what specific factors are driving the growth, the Intermodal growth. Certainly the expanding economy is the primary factor.

However, shortage of drivers, fuel prices, equipment availability and the hours of service law have contributed and I would, again, add along with our service reliability.

Our challenge going forward is to appropriately manage demand, including pricing and capacity.

Looking forward, we anticipate record peak season volumes, which have already been surpassed during the second quarter.

Our revenue going -- looking at the revenue per unit, our revenue increase was a result of favorable changes in revenue per unit as well as volume. All of our business groups experienced revenue per load improvements for the quarter and year-to-date.

Our Ag, paper, chemicals and coal business reached the highest levels ever and, as you know, revenue per unit can increase because of traffics mixed changes, the long haul versus short haul business or increases due to higher prices or fuel surcharges.

Changes in mix impacted both automotive and Ag's revenue per unit. The Ag increase occurred in spite of the loss of longer hauled corn business, which was offset by significant increase in the new ethanol business.

Automotive benefited from longer hauls due to an ongoing redesign of our mixing center network and the extension of all of other businesses, this significantly as changed our mix.

As service improved for chemicals, metals and construction and paper revenues -- and we benefited from improved pricing as we continued to price to the market, particularly on truck diversions.

Obviously the large volume growth for metals and construction also changed the market mix. Intermodal gains resulted from yield improvement and mix, higher-rated trailer volumes increased by 44% for the quarter and 36% for the month.

We are pricing up our domestic transactional business to both market and capacity. The amount of revenue per unit increase was somewhat tempered by longer-term international contractual business, which is half of our volume.

New traffic mix of short haul business has been developed from the container ship lines, all water service to the east coast and obviously this is placed some downward pressure on the revenue per unit for Intermodal.

Coal's revenue per unit increase is the result of several factors. Export coal volumes increased while iron ore, coke, and coal shipments to the river have declined.

Mixed changes also impacted revenue per unit as greater volumes moved in longer haul service, such as spot moves of domestic metallurgical coal and increased Georgia powers plant share volume.

Coal traffic, with pricing over $900 increased by 27,000 carloads. This pricing from new contracts as well as last years rig cases working away through 2004. To conclude, we are having our best market results since the year 2000.

Our revenues are up $312 million for the first two quarters of year and $407 million over the last three running quarters. As David pointed out, our July volumes are up approximately 10%, including coal.

Our markets have all performed beyond expectation. The turnaround outlook for domestic integrated steel production and metallurgical coal is promising.

We believe that our automotive, Ag, Intermodal and utility coal franchises continue to have even more emerging opportunity and we welcome that opportunity and challenge to manage growth and have an the priced market and capacity. It's a good problem to have.

Thank you.

DAVID GOODE: Thank you, Ike. As a company, Norfolk Southern People are committed to continuous and systematic improvement and taking advantages of the opportunity the economy presents us and I think, in a way that's the story of this quarter.

So, I would be happy to take questions.

Yes?

UNIDENTIFIED SPEAKER: Thanks, Dave. I guess my first one really is for Hank on the ending of the fuel surcharge program and kind of your thought process in that because you've said for so long that the whole goal of it was to smooth out the volatility and now it seems like when prices are getting high, are you running for the hills and are you going to grab it if prices continue to go up?

HANK WOLF: Hank never runs for the hills.

UNIDENTIFIED SPEAKER: Or and then that the second thing is or have you changed your complete philosophy on fuel surcharges? And, if you have, what percentage would be pure pricing and what percentage would be from fuel within the quarter?

Thanks.

HANK WOLF: Well, as far as running to the hills, I probably include a parody that my mother told me when I was a small boy and that was he who fights and runs away lives to fight another day.

And I think that just looking at the overall market, what we see happening in the forward curve, what's happening in terms of fuel surcharges being applied to where we can apply, that we believe that a different strategy, rather than the mechanical placing of hedges is a judicious decision to make and that's the decision we've made.

UNIDENTIFIED SPEAKER: And then can you talk about the breakdown of that, which is fuel surcharge-related in that 2.8% increase?

HANK WOLF: No, because I would say that that really gets into our pricing and we'd rather not close there. But where we're able to institute fuel surcharges, we're doing it. The other railroads are doing it. The trucking companies are doing it. It makes sense in this environment and we do have the benefit of some significant hedges that are still in place as I indicated. We'll report that to you on a quarterly basis, what the numbers that you want to know?

UNIDENTIFIED SPEAKER: Percentage of revenues with fuel surcharges?

HANK WOLF: The percentage of --

UNIDENTIFIED SPEAKER: Revenues that have fuel surcharges attached to them?

HANK WOLF: I don't think we want to be that specific. I don't know that it would be helpful, either.

UNIDENTIFIED SPEAKER: OK. And while you're up there, just one quick one. On the losses that you had in the quarter from the synthetic fuel versus the tax gains, I know you said it was -- I think you gave a number for the year. Can you talk about the quarter-specific? Did it offset that negative $16 million contribution?

HANK WOLF: Yes. What's going to happen is the tax benefits in the bottom line will more than offset the expensing that's taking place in the other income net line, but in the past, there has been smaller transactions where we netted those transactions and there has been a change in -- or transition in the way folks who are accounting for these things and the way the SEC expects us to account for them and that's being reflected in our financial statement.

You're seeing it in a relatively larger transaction or larger investment in this synthetic fuel transaction than we've had in the past. That's why I say it's safe to assume, with that transaction only being reflected for approximately one month in the second quarter, that you're going to see our effective tax rate for the balance of the year staying under 30%.

UNIDENTIFIED SPEAKER: Thanks.

DAVID GOODE: Pass the microphone and start moving it around.

UNIDENTIFIED SPEAKER: We have two different lines of questions here. First on the Intermodal side, you saw great volume growth. The yields were accelerating as well. I'm wondering if you can give me a sense.

Did you see pretty significant expansion of the Intermodal margin or you really hitting the sweet spot on live ranting that network and how much more is there to go in terms of, you know, seeing that Intermodal margin expand significantly as the volumes and yields improve?

DAVID GOODE: Like volume getting up if you want to amplify. You saw from Ike's slides the answer is yes. Those margins are improving and, no, we don't think we've hit the sweet spot in that network yet. We're going to continue to try to find it. I think maybe it is a moving sweet spot.

But certainly we are very carefully considering, because there isn't obviously a lot of demand in the Intermodal business. We have a product that has very high value, and we're going to treat it accordingly.

STEVE TOBIAS, COO, NORFOLK SOUTHERN CORPORATION: Translating what he attempted to say was finding some of market and capacity, we are being very aggressive. We have the market, certain pieces of business based on that.

We will remain diligent, but I go back to what our product is with sustained, reliable service it's giving us, this leverage, and where it takes us. Its all part of the negotiating market process.

As long as we can continue to provide the high levels of service that the customers require, it gives us opportunities, obviously, in the market and we are working very closely with a lot of good partners, in the trucking business it gives us a good opportunity to pursue additional relation ships and help them grow their business. This is very -- this is really an emerging market still in a way, although it's become very large and important for us.

UNIDENTIFIED SPEAKER: OK. And then I have got one other question for you. On the capacity side, you saw some great leveraging in the quarter, the 8% unit growth, 4% train starts, at a certain point, does that begin to slow down where, you know, it becomes 8% unit growth and 7% train starts? Just give me a sense of overall capacity where you see things? Have you still got a lot of excess capacity?

DAVID GOODE: I'll ask Steve to amplify that. As I indicated, we continue to explore what our capacity is, because the more efficiently you run a train network, the better your capacity is in the existing -- with the existing infrastructure and the existing train.

We think that -- we think that we still have room to go. But naturally, at some point, you have additional trains.

And we're eager to do that and we've done some of that in the quarter and I hope we'll be doing more of it as it goes on. We think we've got some room to go.

STEVE TOBIAS: I'm not sure I can embellish a great deal more as David. Clearly we have more gain here, which will produce better utility and more capacity in and of itself. With that said, in the existing plan that we have in place, we build capacity into it.

We have not yet reached that capacity by several digits yet. So, in response to your question, there is a great deal more potential here on both sides of that coin.

UNIDENTIFIED SPEAKER: In that carload schedule plan, can you give us a rough capacity number? Are you at 85% utilization in that schedule or, you know, not a specific number, but any rough sense of where we are?

STEVE TOBIAS: Capacity is a very difficult thing to put your finger on. And I certainly wouldn't want to limit it because there are operational electives that we have at hand to address capacity.

The most prominent example I can give you is remote control or locomotive trains. Instead of running a train at full capacity, you run a train with additional locomotives and run a train at a half of capacity.

So as we increase our velocity, diminish our load time, there is double-digit improvement on both sides of this from the standpoint of performance and the standpoint of capacity that we have bill into the system.

DAVID GOODE: We improved the throughput of our hump yards Steve I think 6.17% is this quarter. Now that's building capacity without touching -- a piece of -- that's just people, systems, and efficiency.

The reason we resist giving you a percentage number on capacity is if we'd done that last year, we would have been wrong.

We discovered we have a lot more capacity than we might have told you last year. I fully expect that as we continue to -- as we continue to perfect and add systems and we're doing that -- we're doing that quarter after quarter, we're improving our operating systems, and as we do that, we're building train capacity and network capacity.

And we are excited about it and we're eager to see how far we can push that envelope.

UNIDENTIFIED SPEAKER: OK, thanks you for the time.

DAVID GOODE: Why don't you -- is that you, Tommy? All right. Next. You'll get your word in.

UNIDENTIFIED SPEAKER: Hi. Good morning.

DAVID GOODE: I can barely see people in this light. I apologize.

UNIDENTIFIED SPEAKER: Can you maybe address the potential or the ability you guys had, listening to your term, to gain some share relative to your eastern competitor who might be having more performance-related issues than yourselves?

And then assuming that has been the case, the sustainability of it or the philosophy you have towards it, share a gain on a longer-term basis?

DAVID GOODE: That is not our business philosophy. Our business philosophy is to go where the business is and the vast majority of the business is on the highway.

There is an enormous demand for that business right now to move off of the highway on to rail. That's our opportunity. That's the opportunity that we are pursuing eagerly and aggressively in marketing and that's the -- that's the philosophy in which we're selling and working.

We work very closely with other railroads in the east as we do with our partners in the west because the best thing for us, actually the best thing for the industry, is to have improved fluidity and efficiency in the entire rail system. When that -- when that clicks efficiently, then we're really going to see an acceleration in the business because that then speaks to the congestion of the highway, the high fuel costs, all the things you have heard me talk about many times that this produces this demand for our services.

So our principle interest is in doing everything we can to produce an overall efficiently operating rail network and like whomever it was that used to rob banks because that's where the money is.

We're interested in -- we're interested in looking at traffic that otherwise is moving on the highways because that's a huge piece of the pie.

UNIDENTIFIED SPEAKER: I guess sort of to that end with the network fluidity, can you maybe comment on the interchange connections and how those may be looking at this point?

DAVID GOODE: Sure, Steve. Why don't you do that?

STEVE TOBIAS: I think I answered it at the last session, interchange connections for us are going quite well. With these kinds of volumes, clearly our interchanges had to be opened. Now that's not to say that we can't improve.

The industry has launched, in the last five years, major efforts across the gateways of the country to improve our interchange arrangements among ourselves. We have in place interchange service agreements that stipulate what our format or pro forma is and then we each try to live up to those arrangements and there is a monitoring process that goes on internally within the industry, bilaterally, to ensure that those interchanges are not only maintained, but approved.

So it is not so say that we don't have problems in place, but we're -- we would not be producing the service levels that we're producing today without a consistent -- consistency in our interchange process.

UNIDENTIFIED SPEAKER: And just finally, then, Steve, obviously the network is running very well, given the numbers you produced. Care to venture out what sort of velocity targets you might be looking at?

DAVID GOODE: We're looking at velocity targets as high as we can get them. I'll refer to some of the commentary about mix. Certainly we can't change the laws of physics. We do, in fact, try to find opportunities maybe to bent it a little. But if your mix turns more to bulk commodities, it has an impact on velocity.

As we load trains up, if we don't adjust horsepower ratios for time, there tends to be a bit of slowing in the overall velocity, I.E.: Train speed. There is a balance we try to keep. Is there a sweet spot? It maybe we refer to certainly. But we will continue to try to drive performance from velocity, reduced well turn significant opportunities in the origin terminal to improve overall velocity and consistency.

Our ability to predict connections of traffic flows that impact the service portion of this to the customer is significant and that's one of things that we are driving very arduously now as we're able now with our systems to see the performance on a car-to-car basis, shipment-to-shipment basis, to produce those results.

As the microphone moves back -- go ahead.

GREG BURNS, ANALYST, JP MORGAN: Thank you, David.

DAVID GOODE: Let me -- I was going to point out that interestingly, when you look at the statistics, our train speeds declined slightly towards the end of the quarter. But our terminal well times improved rather significantly.

Our connection performance numbers improved significantly. So overall, the efficiency of the network and the effectiveness of the network improved as the quarter went on. So, be careful to look at the whole picture as you look at these statistics because it has a lot of moving parts.

GREG BURNS: Thanks, David. Specifically for -- I have two quick ones for Ike and a broader one probably for you or Hank. For Ike on Intermodal, just want to know how the hunt relationship is going on and why did the premium -- what is going on with the premium business and why did it only grow 13% when the rest of this grow so much more...

IKE PRILLAMAN: Only, Greg. I can't believe I heard you say that.

GREG BURNS: Never though I would ask a question like that. And basically for all you guys, right now, you're earning your cost-to-capital, whether you're willing to make a prediction on the year-end whether you're going to.

DAVID GOODE: I might let Hank respond to the last part of it, Ike. Our relationship with all of these carriers is good at the moment, I think.

IKE PRILLAMAN: It is. And we have a contract that is still in place to get us through '05. We see no problems after that. We are negotiating. We'll start negotiating soon. As far as the premium business, we somewhat have a mislabeling there as we bring more premium truckload business in and we put it under the caption "truckload" as opposed to premium.

Premium, essentially, is the express package business and obviously it reflects the UPS and downs that U.P.S. chooses between rail and truck and that volume has been fairly even. But even 9% is not a bad move. Did you have another --

I think we're thinking of relabeling some of our business because we're -- our philosophy is that our business -- all of our Intermodal business is premium business and we're going to treat it that. Yes, did you have followup question?

The cost of capital...

[AUDIO GAP]

HANK WOLF: We do. We talk about it in our company. Obviously we do not state that we view cost-to-capital or how we calculate cost-to-capital internally. I would say to you, generally, that the answer is no, we're not earning our cost-to-capital today, but I would remind you that we were one of the few railroads that earned cost-to-capital through most of 1990's and I think we can get that very clearly. I would also commend you in that question, not only with respect to Norfolk Southern, but with respect to others, to look at the numbers that the SEC produces on return on investments. In other words, the revenue numbers.

And there is an anomaly on average because the Conrail transactions, if you need to get into that, either Kathryn McQuade or Marta Stewart would be more than happy to help you with that. That represents a reasonable surrogate to look at overall.

IKE PRILLAMAN: I think you could take it as an article of faith that our board is looking hard and making sure that not only I, but everybody else in Norfolk Southern, focuses very hard on earning our cost of capital, exceeding our cost of capital, producing economic value added for our shareholders. We've got objective on that. We drive them.

We don't publicize them. We don't talk about it. You can take it as an article of faith that that is something is very much on the mind of our board of directors and, therefore, on management.

Yes, sir?

GREG BURNS: David, two quick questions. One, could you kind of explain your comment about peak shipping season?

Most of the carriers, both trucking and rail, have indicated that they are beginning to see what could be the best peak shipping season since potentially '99 and yet in your comments seem to indicate that you think it will be a little bit less in magnitude...

DAVID GOODE: What I meant to suggest was that we are -- we are planning very carefully for a peak season and a peak demand. What we find interesting is, and I've never seen July numbers in the Intermodal business or indeed in

business generally like we are seeing today. I think the economy is strong, but the numbers, we have not seen much -- nearly as much of a decline in July as we have historically seen over my career.

Therefore, we ask ourselves what's going on and we believe that there is some evidence that there is early shipping, there's more consistent shipping and that the peak season, while we do expect a significant run-up as fall goes on, and operationally we're preparing to handle that. And we expect to be in shape to handle as much business as the peak will bring us.

I'm just suggesting that we believe in some ways the business may have changed. The peak may be a longer duration and perhaps less peaks and valleys than it used to be and that would be good for the system as a whole if that can happen.

GREG BURNS: All right. Sure. OK.

DAVID GOODE: We, for example, understand that the ships are full, all the ships have been loaded, that they have been and that they're coming into the ports over the last couple of months full and that the flow of traffic into the ports has been at consistently high levels. You ask yourself how much higher can it get?

GREG BURNS: OK. Already. Your comments on planning for capacity is a, you know, a good segue to my next question. This may not be relevant given how well your network is impeaching. But the chairman Nobers latter told the CEOs about planning for peak shipping and what plans you have in place, your response to him. Is there any material deviation as to how you're running the network now or...

DAVID GOODE: No. We responded to him and we've told the -- in the letter and communications with Ford, we have reported how our planning is going. It's very much -- it's very much the kind of planning that we always do. We're trying to work it into our regular planning. And I don't know if those letters will be -- whether the chairman will choose to post those letters.

GREG BURNS: OK.

DAVID GOODE: No particular magic in our response to it, but rather it is a recitation of the way in which we systematically plan to handle the business. That's what we're doing. We think we've got it, think we got it now and we're hopeful that the business levels will definitely rise.

GREG BURNS: And then lastly, on your, you know, hiring plans, you know, a lot of the other rails are struggling with crew shortages and that type of thing. Can you elaborate a little bit on what's your hiring plans are, especially going into '05?

DAVID GOODE: As you notice we have more train and engine and other operating employees than we have and you also noticed we have tempered that by reduction in employment in other places. But we are carefully planning for continued strong and increasing volumes and commands and, Steve, I've forgotten the number of train, the train and engine employees we brought on. We have 1,300, 1,500, they're in the training pipeline.

We're continuing with that and we're also adding other operating employees that are required to and other employees required to do that. We are doing what we did last year and you will recall that we were early on that and I was standing before you one year ago today, some of you -- I'm sure not you -- but some of you were beating me up about our compensation line because we had gotten ahead of curve on that.

And we did that, but we planned ahead and we hope that we're continuing to plan accurately and do naturally. It's a challenge in the shipping targets, we've got it in our sight.

UNIDENTIFIED SPEAKER: Hello. Given your phenomenal quarter, especially on the revenue sides, just wanted to recheck your Capex budget, has that changed?

DAVID GOODE: No, it hasn't in any meaningful way, we always adjust it a little. I remind you that we did -- we did announce that we took -- that we were planning a predelivery of locomotives, which we otherwise were taking in 2005. We have moved that up to both to take advantage of the tax laws and that also will help us with increasing demand as the year goes forward.

So, I just remind you of that change but otherwise, Hank, I don't think there is any -- well, you would have seen that we did announce that we purchased building in Atlanta because for a long time we wanted to move our folks into a better building.

We had an opportunity there and that's not -- that is not an operating item. It is not a big increase in the budget what we do.

UNIDENTIFIED SPEAKER: OK. And the locomotives that you're purchasing a little bit early are out right purchases, they're not operating leases, OK?

DAVID GOODE: That's correct.

UNIDENTIFIED SPEAKER: And then another quickie, is can you give us an update on your '05 fuel hedging position?

DAVID GOODE: Hank, do you want to do that? Hank, just got through, quickly confirming that.

UNIDENTIFIED SPEAKER: I have one other question if you want to --

DAVID GOODE: Go ahead. You got it? Go ahead, ask your other question.

UNIDENTIFIED SPEAKER: The other question is on export coal. Our coal analyst seems to think that we, the US, won't start exporting a lot of coal until 2005. Clearly your numbers indicate differently.

DAVID GOODE: I would invite our investor's analyst to come to Lambert's Point or Baltimore --

UNIDENTIFIED ANALYSTS: But I guess my thought is I wonder if there is something to what he's saying in terms of the fact that a lot of it -- his theory is a lot of US coal has already been promised in '04 to domestic utilities. So, maybe we get an even bigger boost to export coal in '05 or is that just asking for the world kind of we're already seeing such enormous growth rates out of it?

DAVID GOODE: Are we prepared to speculate on that, Ike?

IKE PRILLAMAN: Some of your - I could get the line. On your fuel-hedging question, we're 38% hedged next year based on our projection. Now obviously that consumption may go up or down a bit and then 4% in 2006 projected so, very little for 2006 and a little under 40% for next year.

UNIDENTIFIED SPEAKER: Thanks.

DAVID GOODE: We prepared to predict the export coal next year? If you'd done that last year, you would have been wrong for this year.

HANK WOLF: But as I was pointing out there the European steel makers are turning to the US and there will be a question about availability. Exports were up 50% in the second quarter, which means there were metallurgical coals that were found and we see that and also interestingly are that investment is starting to occur, to bring back mines that used to operate.

We're seeing one produce in Pennsylvania that has been out for over a decade. So, there's all sources of coal coming in and it's almost a simple formula when it gets up around $104 to $120 a ton on the spot market, the coal is found somehow.

Ike is younger than I, but he and I both grew up in western Virginia and over a few years -- as did Steve Tobias for over a few years, we have learned never underestimate the coal business. And never give up on it.

Yes, Gary? How are you?

UNIDENTIFIED SPEAKER: How are you? Ike, one more for you on the export coal business. If I remember correctly, the -- some of your pricing is tied to the prices of export coal and could you talk to that a little bit? We're seeing prices in the world market that are absolutely crazy and how might that help your yields going forward?

IKE PRILLAMAN: Some of that is reflected in the financials and I guess it is publicly known that shipments to the Baltimore facility are attached to price where as the Lambert's point is not. So, we are starting to see some metallurgical move.

Now the Pennsylvania mines, which I just mentioned, is really unusual in recent history. We -- you know, the pricing is up because we're, again pricing to market and our prices are essentially insignificant to the price of coal.

UNIDENTIFIED SPEAKER: Would you share with us what percent of your export coal is Baltimore or is exposed there?

IKE PRILLAMAN: In the quarter, probably a 20% to 18% leverage point volume is involved.

UNIDENTIFIED SPEAKER: So not that much.

IKE PRILLAMAN: Not that much. Baltimore, historically, has been a steam export facility and steam is still -- I mentioned that -- I did mention Baltimore, however, because we are very pleased to see that, volume developing. That's important for us and it is -- and it is a good deal more than it is here.

UNIDENTIFIED SPEAKER: OK. Thank you.

DAVID GOODE: Another questions? I know you're a very patient group and I know that there is somebody else who is going to report shortly if you may have interest in that, any type of questions? If not, thank you all for coming.

We look forward to see you in next quarter, hopefully with equal or equally good or even better results.

Thank you.

[CCBN reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES CCBN ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS. Copyright 2004, CCBN, Inc. All Rights Reserved.]

**LOAD-DATE:** August 12, 2004

# EXHIBIT PX0688

2/9/05 Fin. Disclosure Wire 14:06:55

FD Wire
Copyright © 2005 CCBN, Inc. and FDCH e-Media, Inc.

February 9, 2005

# Q4 2004 Norfolk Southern Corp Earnings Conference Call - Final

DAVID GOODE, CHAIRMAN & CEO, NORFOLK SOUTHERN: We've got a fullagenda so we'll move ahead. Good morning. I'm David Goode, Chairmanand Chief Executive Officer of Norfolk Southern and I'm happy towelcome you to our fourth-quarter 2004 analyst meeting. I welcome allof you, including those who are listening by telephone. And as I'malways urged to do, I'll remind everybody to use mikes wherever theycan so that everybody can hear. And as usual, you can get transcriptsfrom our Public Relations department and they'll be posted on ourwebsite. And the slides of the presenters are going to be availablefor everybody's convenience on our website in the Investor section.

Now, the lawyers, as usual, have asked that I remind you to please beadvised that any forward-looking statements made during the course ofthis presentation represent our best good-faith judgment as to whatmay occur in the future. And actual results may differ materiallyfrom those projected and will depend on a number of variables, someof which may be outside the control of the Company. But please referto our annual report or Form 10-Q filed with the SEC for a discussionof those variables.

Having made that formal statement, I'll quickly introduce -- we haveseveral members of our management team here, including Wick Moorman,our President; and our Vice Chairman, Hank Wolf; Steve Tobias and IkePrillaman are here. You'll hear from Wick, Hank, and Ike, and I'll bemaybe a little briefer than unusual. Steve's going to hold off forquestions in this one. Also, we have Jim Hixon, our Executive VicePresident of Finance is here; and Bob Fort, our Vice President ofPublic Relations; Bill Galanko is here somewhere, our Vice Presidentof Taxation. And Marta Stewart, our Vice President and Controller ishere. Where is Marta? Not here -- will be here. Leeanne Marilley,Director of Investor Relations is over in the corner. I hope you allknow Leeanne. And Debbie Malvin, Hank Wolf's assistant, who will helpyou in the back of the room with anything you need.

Now, having made the introductions, let me start with a few commentsabout the tragic accident that occurred earlier this month inGraniteville, South Carolina. As all of you know, nothing takeshigher priority at Norfolk Southern than the safety of our employeesand the communities we serve. I have expressed and want to expressagain the most profound sorrow and apologies for this accident andthe problems it's caused for the people of Graniteville and beyond.We believe that deeds count more than words, and we've been doingeverything we can, applying every resource at our disposal, workingwith all relevant agencies to determine the cause and to remediatethe damage to the town, its businesses and the people involved. A lotof progress has been made, but our efforts will continue as long asneeded. I'm proud of the response of our people in a veryprofessional way to the incidence and its aftermath. Our safety,environmental, operating, and claims groups continue to respond in aprofessional way.

At the same time, we've been cooperating and will continue tocooperate fully with federal agencies, the National TransportationSafety Board (technical difficulty) while they conduct theirinvestigation into the accident and the EPA and state and local onremediation. We appreciate the expertise, cooperation, and patienceof all of those involved, residents and responders alike.

We are still in the process of assessing the financial impact of thistragic incident, but preliminary indications are that we'll have acharge of between 30 and $40 million in the first quarter of thisyear. As you can imagine, we've already had several lawsuits filed asa result of the incidence. And so we are reluctant to say much morethan what I have at this time and what we have issued in the pressrelease that came out a couple of days ago. We will try to provideyou with any further guidance as we can as it becomes appropriate.We'll learn as a Company from this accident and redouble our effortsto ensure the safety of our people at Norfolk Southern and throughoutthe areas we serve. You know our safety record and how much safetymeans to us. After this tragedy, we will as a Company and asindividuals in the Company look anew at what we can do to live up toour objectives to be the safest transportation company.

Now, having said that, now let's turn to our 2004 financial results,which are a good story indeed. Our fourth quarter provided a strongfinish to a strong year and gives a suggestion of what can be donewith higher values, transportation products, and operatingefficiency. Our 2004 financial results show record levels ofperformance throughout our organization. Business and momentum heldstrong as the year finished and continuing into the early part ofthis year. While we certainly don't anticipate the same level ofextraordinary growth experienced in 2004, we do see continued growththrough 2005 and we're planning to handle it. And as you have seen,our Board yesterday increased our quarterly dividend by 1 cent to 11cents, following the previous increase in July.

Our fourth-quarter net income was a record 264 million or 65 cents ashare. And that was on revenues which were up a strong 16 percent. Asyou recall, 2003 included several significant items, both up anddown. I'm going to let Hank Wolf provide you with the full detailsand comparisons, but I do want to emphasize that our operating ratiofor the fourth quarter was 76.3, which is a 4-point improvement overthe fourth quarter of 2003. Now also note that it was not quite aslow as the third quarter was, and Hank will address the components ofthe operating ratio in his presentation. But I want to emphasize thatour efforts in continuous improvement are working, and the consistentimprovement in the operating ratio is a reflection of that.

For the full year, we reported net income of $2.31 a share. That wasup 69 percent compared with our reported net income of $1.37 a sharefor the previous year. The record revenues for the year of 7.3billion were up 13 percent over 2003. And the operating ratio for theyear was 76.7, nearly 7 points better. Now, you will quickly notethat combining these two results achieved our goal of 7 and 7. Thatis, annual revenues beginning with a 7 and an operating ratio thatstarts with a 7. This was widely seen as a very ambitious goal, bothinside the Company and out. Exceeding the goal as we did this yearshows what can be done when business conditions coincide with anoperation network that is fluid and efficient. Significantly, whencustomers gave us an opportunity, as they did this year, we were ableto take advantage by moving the goods and acceptable quality. Whileour metrics have declined somewhat and volumes hit historic highs andwe're going to address that a little with you, we still have beenable to keep the network fluid and hold service levels generallyhigh. We expect to be able to keep that up. While we're careful ofwhat we take on as an organization, we're proud of exceeding our 7and 7 goal, and you can be assured that we'll reach even higher whenI meet shortly with our management team -- there will be some newgoals stated. Anyway you look at it, it was a great quarter capping agreat year. And now I'm going to turn to Wick Moorman for a littlemore detail and then we'll hear from Hank and Ike. Wick?

WICK MOORMAN, PRESIDENT, NORFOLK SOUTHERN: Thank you, David. Thefourth quarter was indeed a very good quarter for us with railwayrevenues up 16 percent and the operating ratio of 76.3, as Davidmentioned; and it obviously punctuated a really great year for us.And to widen the lens on the quarter a little bit and provide somemore perspective, I think our recent results are even moresignificant when you compare them with the fourth quarter 2003, whichwas the strongest quarter of 2003, with revenues and volumes of thatquarter up 6 percent over 2002. So we had a very strong quarter evenin the face of what we thought were some tough comparisons.

The fourth quarter of 2004 and indeed all of the year I think providemore proof, if any is needed, of the two fundamental strengths ofNorfolk Southern. The first great core strength we have is obviouslyour franchise. Ike will give you all the details, but it was a yearin which we saw exceptionally strong growth across almost all of ourportfolio of businesses. Interestingly enough, the one area of ourbusiness that did not grow substantially was automotive, which isusually seen, as you know, as one

of the drivers of ourprofitability. And clearly part of our overall growth is attributableto the strong U.S. industrial economy. However, we believe that theshifting international trade patterns in terms of both domesticconsumer goods, imports, and global energy sourcing, along with theincreasing concerns and issues around domestic highway capacity, arealso key structural drivers of that growth. And to the extent thatthese trends continue and we do not see anything right now that willstop them in the short-term, they bode well for the continuingstrength of our franchise.

The second core strength of **Norfolk Southern** that was very evident in2004 is our people. None of us foresaw the volume growth of 9 percentin 2004 -- more than 600,000 units handled. And the fact that we wereable to handle that volume growth as efficiently and effectively aswe did is testimony to the skills and dedication of a lot of membersof the thoroughbred team.

As David mentioned, our service metrics weren't as good as we wouldhave liked them to have been in the fourth quarter. However, none ofthem were statistically inconsistent with the service metrics wetypically see in a fourth quarter, particularly considering all theadditional volume that we handled. And we look for our metrics toimprove, particularly as we move past the bad weather of January andFebruary. While we clearly need to continue to analyze our systemcapacity and augment it when needed, we're still confident that wecan do this incrementally and that we can efficiently handle all ofthe business that's coming our way.

The real story of the fourth quarter and of the whole year was thework that we've already done in terms of building and refining thethoroughbred operating plan, and adding capacity already at criticalpinch points, be they in infrastructure, locomotives, or train crews,and the work we've done in maintaining our infrastructure (technicaldifficulty) traffic safely and effectively. All of these factors,along with perhaps most importantly the (technical difficulty) toexecute the plan, allowed us to handle the traffic in the fourthquarter without serious delays or disruptions to our customers. Itwas a great effort by a great team.

And I also want to point out that there were some positives in thefourth quarter in terms of performance and productivity improvement.A good example, carloads per crew start -- something we've talkedabout before -- it's an important productivity measure -- it was up5.7 percent year-over-year. And that's what allowed us to handle the10 percent increase in volume with only 3.9 percent additional crewstarts, and that's very powerful leverage for us.

For 2005, we continue to be optimistic about the strength of theindustrial economy. Although we do obviously see some challenges. ForJanuary, our overall car loadings are up 6 percent year-over-year.And as in 2004, that continues to be led by Intermodal metals andcoal. Stockpiles of utility coal remain low by historical standardsand export coal certainly seems to -- continues to be in demand. Fuelproduction remains high as well. And Ike will give you some furtherinsights on the Intermodal story in a few minutes.

As we move forward, we continue our commitment to pricing thatreflects the current market value of our rail service and itsassociated costs, particularly in today's market, which ischaracterized by the challenges to trucking and high fuel costs. Andwe continue to believe that our better service gives us a verycompetitive and valuable product.

2005 holds some challenges for us as well. Hank will tell you moreabout it, but we clearly had some pressure on the cost side in thequarter. As a percentage of our fuel that was hedged declined, ourtotal fuel costs obviously increased. And in addition, we wereaggressively hiring and training for both train and engine serviceemployees and mechanical department employees. In addition, we tookadvantage of the mild weather across much of the railroad for part ofthe quarter to press ahead with some additional track maintenance.

As in 2004, 2005 will continue to have some cost headwinds. Still, weremain steadfast in our commitment to find cost-effective ways ofdoing business while always improving safety and service. I haveevery confidence that we'll continue to move ahead and gain businessand generate margin improvement as we do, but I want to reiteratesomething I've said before and I'll say again. Our first commitmentis always to operating the railroad as safely as we can whileproviding the very highest service levels

that we can to all of ourcustomers. And I think our 2004 results show that if we do that, thenincreased traffic and improved margins will clearly result.

Steve Tobias often says, quite correctly, that we can't build thechurch for Easter Sunday. However, in 2004, the pews at **NorfolkSouthern** were full on a lot of days, and we occasionally had to put afew chairs in the aisles. Fortunately, if you'll permit me tocontinue this analogy a little further, we continue to have theability to add pews without having to build a new church. And ourgoal is to continue to have enough seats for all of our customers andto have them recognize the value that we have provided for them whenthe collection plate gets passed.

It's now my pleasure to turn it over to Hank with the financialdetails.

HANK WOLF, VICE CHAIRMAN & CFO, **NORFOLK SOUTHERN**: Thank you, Wick.Let me begin by making a disclaimer that I'm not an expert in termsof church pews and collection plates.

Our 2004 financial results reflect significant improvement that wasdriven by record operating revenues in the fourth quarter and theyear. We were able to generate record earnings and earnings per sharefor the year as we handled increased volumes carloads that set newrecords and at the same time, controlled our operating expenses.

Before giving you the details of our results, I need to remind youthat we recorded a $53 million gain from the Conrail corporatereorganization in the third quarter of 2004. In addition, there wereseveral significant items that impacted our 2003 financial results.In the fourth quarter of 2003, we had charges for a voluntaryseparation program, which reduced net income by $66 million or 17cents per share and an impairment in the value of TTTTelecommunications assets that reduced net income by $53 million or13 cents per share.

In the first quarter of 2003, our results included a $114 million or29-cent per share after tax benefit from the cumulative effect of tworequired accounting changes, and a $10 million or 3-cent per shareafter tax gain from the discontinued operations related to our 1998sale of North American Van Lines. In order to provide you with themost meaningful comparisons for both the quarter and the full year, Iwill initially exclude all of these items from my presentation thismorning and then reconcile the totals to our reported results at theend of my remarks.

Now let me turn to our results for the fourth quarter. Railwayoperating revenues were 1.95 billion, up 273 million or 16 percentand were record high revenues for any quarter. Intermodal revenuesincreased by (technical difficulty) million; merchandise revenuesrose 93 million; and coal revenues were up 74 million. For the year,railway operating revenues were a record 7.3 billion, an increase of844 million or 13 percent. General merchandise revenues were up 318million. Intermodal revenues increased by 298 million. And coalrevenues rose 228 million. Fourth-quarter volume increased by nearly172,000 carloads or 9.8 percent compared with the prior year, drivenby a 123,000 or 19 percent gain in Intermodal units, which resultedin our highest quarter ever for Intermodal volume. In addition,revenue per unit increased by 5.9 percent, resulting in a totalincrease in railway operating revenues of 16.3 percent.

For the year, carloads were up approximately 603,000 units or 8.8percent, largely driven by a 425,000 unit or 17 percent increase inIntermodal volume. Revenue per unit was up 3.9 percent, and totalrailway operating revenues improved by 13 percent. And Ike is goingto provide (ph) you with the details on our railway operatingrevenues in just a few minutes.

Railway operating expenses for the 1.5 billion, up 142 million or 11percent. For the year, railway operating expenses were 5.6 billion,an increase of 313 million or 6 percent over '03. As you can see, thelargest increase in railway operating expenses for the fourth quarterwas in material services and rents, which rose 92 million or 27percent. This increase was primarily driven by the increased volumesthat were handled during the quarter.

Within this category, purchase services increased by 59 million,primarily due to higher volume related Intermodal costs, such asterminal lifts and drayage, as well as increased maintenance costs.The $18 million rise in equipment rents was also largely a result ofthe increased Intermodal traffic volume.

Materials costs were 15 million higher, reflecting more maintenancework on locomotives and freight cars. The next largest increase infourth quarter operating expenses was in depreciation, up 60 millionor 47 percent. As you can see by the offsetting decline in Conrailrents and services, this increase was primarily the result of theConrail reorganization.

Diesel fuel expense was up 41 million or 42 percent compared withlast year as a result of higher prices. The hedges that we put inplace helped to constrain our diesel fuel expense as we saw fuelprices surge to record levels. Consumption of approximately 129gallons was 6 percent higher on the 10 percent increase in trafficvolume. As you can see, our average price per gallon, even with thehedge benefits, increased from 79 cents in the fourth quarter lastyear to $1.07 in the fourth quarter of '04.

In the fourth quarter, approximately 60 percent of our diesel fuelrequirements were hedged. We had 78 million gallons of fuel hedged inthe fourth quarter at an average price of 84 cents per gallon. Andthese hedges produced a savings of $50 million in diesel fuelexpense. We advised earlier that we had suspended entering into newhedges midyear. And our hedge position remained unchanged in thefourth quarter. As you can see, our hedge position for diesel fuelwill be lower in '05 than '04 in the absence of new hedgetransactions. As a consequence, our diesel fuel expense in '05 willbe significantly higher unless we experience a dramatic decline indiesel fuel prices.

The next largest increase in railway operating expenses for thefourth quarter was in compensation of benefits, which rose $16million to 3 percent. This increase was driven by increased hours fortrain and engine employees that were $16 million higher and increasedmaintenance activities that added 7 million. During the second halfof the year, we increased our employment by more than 700 agreementemployees. As one would expect, these employees are initially intraining for a number of months. And in some measure, the increase incompensation and benefits reflects this training cost. The increasein our stock price resulted in a $5 million increase in stock-basedcompensation expense; higher wage rates added another 4 million toexpense. These items were partially offset by favorable variances of$7 million for management compensation and $4 million in bonuses forlocomotive engineers. As you may recall, the fourth quarter of '03reflected an increase in the accrual for these two items that wasdriven by improved fourth quarter performance that year.

Casualties and other claims rose 3 percent or 8 percent, primarilydue to higher accruals for loss and damage claims; and other expensesdeclined 2 million or 4 percent. Railway operating expenses for theyear were 5.6 billion, up 313 million or 6 percent. As was the casefor the fourth quarter, the largest increase for the year was inmaterial services and rent.

Purchase services rose 100 million. Materials were up 41 million andequipment rents were $33 million higher. As in the quarterlycomparison, these increases were primarily related to increasedtraffic volume and additional maintenance activities.

Compensation and benefits was the second-largest expense increase forthe year, up 104 million or 5 percent. This increase was principallythe result of an increase in T&E employee hours of $39 million.Higher wage rates that added another 27 million; increasedstock-based compensation, as our stock price rose, of 24 million; 11million more in bonus for locomotive engineers; and 9 millionincrease in incentive compensation for non-agreement employees; 9million less in pension income; and other miscellaneous items thatadded $9 million. These increases were offset in part by a reducednon-agreement workforce that saved $24 million.

Depreciation expense rose 85 million. The Conrail rents and servicesdeclined 100 million, largely reflecting the effect of the Conrailcorporate reorganization. Diesel fuel expense was up 69 million or 18percent, reflecting a 6 percent rise in consumption, combined with anincrease in the average price per gallon from 81 cents in '03 to 91cents in '04. Our average price per gallon in '04 would have been$1.17 per gallon absent the benefit of our fuel hedges. Our fuelhedges produced $140 million in diesel fuel expense savings for theyear. Other expenses were up $11 million or 5 percent, reflectinghigher property and sales and use

 © 2013 Thomson Reuters. No claim to original U.S. Government Works. 

taxes. And finally, casualties andother claims were 30 million lower for the year. You'll probablyrecall that expenses in '03 for casualties and other claims wereburdened with unfavorable claims development.

The railway operating ratio for the fourth quarter was 76.3 percent,a 4 percentage point improvement compared with '03. The railwayoperating ratio for the full year was 76.7 percent, a 5.2 percentagepoint improvement compared with the prior year. While thefourth-quarter railway operating ratio showed significantyear-over-year improvement, I should note that it was slightly higherthan the 74.7 percent O/R seen in the third quarter. Having saidthat, the fourth-quarter operating ratio has historically beenslightly higher than the third quarter. In the fourth quarter, wefaced a significant surge in diesel fuel costs, that added $41million more in expense as our hedge position declined. In addition,we saw casualty and other claims that were 11 million higher than thethird quarter as the result of a derailment. Finally, we hadincreased costs for maintenance to help us prepare for the growth intraffic volumes that we're seeing.

Income from railway operations in the fourth quarter was 462 million,up 131 million or 40 percent. For the year, income from railwayoperations was a record 1.7 billion, an increase of 531 million or 45percent.

Turning to our non-operating items, total other income and expensefor the fourth quarter was an expense of 87 million compared with anexpense of 78 million in '03. Gains from sales of properties andinvestments were 31 million compared with 29 million in the prioryear, an increase of 2 million. Coal royalties of 11 million were up1 million over '03. All other was an expense of 3 million comparedwith income of 7 million last year, primarily due to the expensesassociated with the synthetic fuel investments that we made mid-year'04. As you'll recall, the benefits related to these investments arereflected in a reduction of income taxes.

Interest expense on debt was 126 million, which was 2 million higher,but includes the interest on the Conrail debt assumed in the Conrailreorganization as of September 30. For the year, total other incomeand expense was an expense of 453 million compared with an expense of394 million in '03. Gains from sales of property and investmentsincreased by 1 million, while coal royalties increased by 3 million.

All other was an expense of 52 million compared with income of 19million in '03. Again, primarily due to the synthetic fuelinvestments that reduced returns on corporate and reduced returns oncorporate-owned life insurance.

Interest expense on debt for the year was 489 million, 8 millionlower than '03, principally due to less debt outstanding. Ourfourth-quarter income before income taxes was 375 million comparedwith 253 million the prior year, a 48 percent increase. For the year,income before income taxes was 1.2 billion, an increase of 472million or 61 percent compared with '03. The provision for incometaxes for the fourth quarter was $111 million compared with $82million for the fourth quarter of '03.

The effective tax rate for the fourth quarter was 29.6 percentcompared with 32.4 percent in the prior year. For the year, theprovision for income taxes was $379 million compared with $247million in '03. And the effective tax rate was 30.3 percent comparedwith 31.8 percent in '03. The lower effective tax rates for thequarter and the year were largely attributable to the effect of thesynthetic fuel investments that we made about midyear.

Fourth-quarter net income was 264 million, which is 93 million or 54percent higher than the 171 million earned in the prior year. For theyear, net income was a record 870 million compared with 530 millionin '03, an increase of 340 million or 64 percent. This slidehighlights the components of the changes in net income for thefourth-quarter railway operating results. Railway operating revenuesincreased 273 million, while railway operating expenses rose 142million.

Other income net decreased 7 million. Interest expense on debtincreased by 2 million. And income taxes were $29 million higher,yielding a $93 million increase in net income for the fourth quarter.For the year, an $844 million increase in revenues was offset by $313million more in expenses. Other income net was 67 million lower.Interest expense on debt was 8 million lower. And the provision forincome taxes was $132 million higher. Combined, these items generated$340 million more in net income.

Diluted earnings per share for the fourth quarter were 65 centscompared with 43 cents in '03, a 51 percent increase. For the year,diluted earnings per share were a record high $2.18, which was 61percent above the $1.35 per share earned a year ago. This slidereconciles 2004 net income and earnings per share amounts, excludingthe gain from the Conrail reorganization to our reported net incomeof $923 million, and earnings per share of $2.31.

And this slide reconciles our 2003 net income and earnings per shareamounts, excluding the four significant items that I noted earlierprior to our reported earnings. Both of these reconciliations, aswell as reconciliations of all affected income statement line items,are posted on our website for your reference.

Reported net income for the fourth quarter was $264 million or 65cents per share compared with 52 million or 13 cents per dilutedshare in '03. For the year, reported net income was 923 million or$2.31 per diluted share compared with 535 million or $1.37 perdiluted share. Thank you for your attention and now I'll turn theprogram over to Ike Prillaman, who is going to give you an in-depthreport on our revenues.

IKE PRILLAMAN, VICE CHAIRMAN & CMO, NORFOLK SOUTHERN: Good morning.My plan this morning is to outline the key factors that drove ourmarket results in 2004 and what those markets and key factors looklike going into 2005. And after your several meetings this week, I'msure all of you know there was a dramatic increase in demand fortransportation in 2004, and the base reason for that was that theU.S. economy grew an estimated 4.4 percent while the manufacturingsector consistently expanded throughout the year. And as an example,domestic steel production increased over 6 percent in 2004, and wesaw where U.S. coals became the choice for the production of coke bythe domestic and European steel makers. And while also being thechoice for increased electricity generation.

Another key factor was fuel prices increased 25 percent for the year.And at the same time, our improved service levels were enabling us tooffer truck-like services and the ability to price to a highermarket. Accordingly, putting all that together and as Wick pointedout, our Intermodal metals and coal markets accounted for 95 percentof the volume increase, which was up 603,000 loads in 2004 or 9percent.

Reviewing quarterly comparisons, the rate of volume increasesremained consistent throughout the year except for the productioncutbacks in the automotive industry and the softening ag traffic inthe fourth quarter. And both our coal and paper markets experiencedstronger year-over-year numbers in the fourth quarter. For the lasthalf of the year, our monthly volume increases ranged from 7 percentto 13 percent, while November and December's volumes reached levelsthat we had only previously seen during the months of October andAugust.

Those before me have recapped our record results for both the quarterand the year. And even though I wouldn't mind hearing it over andover again, I will avoid being repetitive, and I thought we would gostraight to looking at the specific markets. Coal carload volume forthe fourth quarter totaled 429,000. And although this wasn't ourhighest carload quarter, it was our highest tonnage quarter ever,which reflects improved loading efficiencies. Utility coal volumeincreased 6 percent for the quarter and 3 percent year-to-date. Andas the expanding economy increased demand for electricity generationin our area of service by 1.7 percent. And going forward, I thinkWick mentioned this, stockpiles do remain relatively low and thepricing is high. Always dependent on the weather, the utility coalmarket continues to look strong. Gas prices do remain high and alsovolatile. Coal stockpiles need to be replenished, and it is projectedthat spring refueling outages will result in the lowest nucleargeneration in the East since 2001.

Production in the third and fourth quarters for both Central App andNorthern App coals increased, but it appears availability willcontinue to be a challenge. Net export volume increased 45 percentfor the quarter and 35 percent for the year, as volume through bothBaltimore and Norfolk increased dramatically.

Looking ahead, strong international demand for met (ph) coal and thedecline of the U.S. dollar, as well as higher shipping costs, havemade U.S. met coals more competitive and certainly in demand. Pricesfor 2005 will generally exceed $110 per ton, and that may beconservative. We also have announced price increases for LambertsPoint, for traffic going through there.

Recent projections indicate that the parity between global supply anddemand will again exist during 2005, and this should result in thecontinuing demand for U.S. met coals in Europe, South America, andeven Asia. Higher prices have driven some resource development andmultiple (ph) multi-year contracts between coal producers andEuropean steel makers have become a reality. The availability of U.S.met coals are limited and in turn, this demand will continue to putpressure on the availability of thermal or steam coal.

As I mentioned, there was a significant change in the U.S. steel anddomestic met coal market in 2004. I personally believe this may bestructural going forward. It's certainly a positive for both the U.S.steel industry as it will be for the rail industry. Volume increased32 percent for the quarter and 12 percent for the year. This isresulting from the 6.4 percent increase in the domestic steelproduction, along with the high demand for met coal used to producecoke.

Looking forward, blast furnaces are expected to run near capacity, asdomestic demand for met coal continues to grow. And even thoughfuture steel production will be affected by global events as well asthe business cycles, the domestic vertical integrated producers havetaken action to ensure they have adequate supplies of iron ore andcoking coals, as new investments and raw material sourcing continues.And in fact, a new heat recovery coke plant and steam generationfacility will come online at the end of first quarter 2005, and thereare certainly more in planning as well as under construction.

Coal revenue per car increased 9 percent or $87 for the quarter,reaching $1068 and was up $93 or 10 percent for the year. Greatincreases, since 2003 increased export coal and a large decline ofshort-haul river business are the principal drivers of the increasedrevenue per car. I also would add, I always talk about the mixrevenue -- ton miles were up 12.2 percent while carloads were up only9.4 percent, which means longer haul business, including coal fromWestern origins as well as longer-distance sourcing for domesticcoking and utility coal did occur.

Looking at the merchandise industrial sector, metals/construction,lead merchandise for both revenue and volume gains throughout 2004.Revenue was up 19 percent for the quarter and 17 percent for theyear-to-date, as this group benefited from the increased domesticsteel production, as well as marketing and industrial developmentefforts. IPSCO and Newcor, who both began new operations on NS in2003, had significant increased production while other new businessescan be attributed to a lack of truck availability.

Scrap metal revenue grew 42 percent for the quarter and 32 percentfor the year as a result of expanded alliances with some key scrapmetal shippers, as well as access to new scrap processors and theability to price to a higher market.

Looking forward, we see steel pricing and prospects for the U.S.metals market in 2005, as I mentioned before, will depend on domesticand global demand. But I would quickly add that most believe at thispoint that the current market will be sustainable in 2005.

Chemicals revenue grew 14 percent compared to the fourth quarter 2003and 12 percent for the year. The decline of the U.S. dollar and theincreased worldwide price of oil have actually preempted and enabledthe U.S. chemical industry to remain competitive and despite ofhigher natural gas prices, which everyone knows is their feedstock.

On the forest products side, revenue from wood and paper productsincreased 14 percent for the quarter and 8 percent for the year, andthat was in spite of small volume gains and revenue growth cameprimarily from price increases. And as with the chemicals and themarket declining dollar, the paper market has been positivelyaffected by imports that lost their competitive edge, as well as withthe domestic paper producers regaining some market share. And webelieve this trend will continue into 2005.

Our ag revenue increased 7 percent for the quarter but volume fell 1percent below last year. Increased ethanol revenue --which is reallyramping up here in the Northeast and is scheduled to ramp up nextyear and this year in the Southeast -- but increased ethanol revenuecould not offset the decline in corn shipments. And for the year, agrevenue was up 6 percent while volume was up only 2 percent.

For 2005 and forward, we see the ethanol market will continue, as Imentioned, to ramp up, as will the feed mill business, and neitherare seasonal. We have located nine feed mills in the Southeast in thepast five years. And additionally, the 2004 grain crop, which is thelargest ever, will begin to move.

Automotive revenue increased 2 percent for the year while volumedeclined 2 percent. Fourth-quarter automotive revenue fell 1 percent,and volume was 6 percent below last year. As a result of slow salesduring the fourth quarter, both Ford and GM announced productioncutbacks. And Ford began the closing of their Edison, New Jerseyassembly plant, all of which obviously prevented positivecomparisons. These declines, however, were offset with pricingimprovements to meet market conditions, as well as increasedproduction at NS-served Toyota and Honda plants.

Looking at 2005, Ford and GM cutbacks will continue, even thoughlight vehicle production is forecasted to be 2 percent above 2004.And this will occur principally with increased production attransplant manufactures as well as DaimlerChrysler. I should add thatthe continued ramp up of the two new Honda Lincoln Alabama assemblyplants will continue in 2005.

Merchandise revenue per car rose $106 for the quarter and $63 or 5percent for the year. Metals and construction lead increases, growing7 percent over last year, while paper and chemicals revenue per unitgrew 6 percent. Great increases, fuel surcharges, pricing up newbusiness, as well as a longer length of haul were major contributorsto the gains, as merchandise revenue ton miles grew 5.5 percent over2003, as compared with a 4 percent volume increase.

This is my favorite slide, with a lot of green numbers. Intermodalexperienced strong volume growth throughout the year, driven by anexpanding economy, including growth in international trade, as wellas ongoing constraints in truck capacity. International steamshipvolume was up 19 percent for the quarter, and 15 percent for the yearwhile domestic volume grew 21 percent for both time periods.

Truckload business grew 28 percent for both the quarter and the year,as increasingly, close working relationships with the truckloadcarriers are driving Intermodal growth for both them and ourselves.Our premium business was up 12 percent for the quarter and 15 percentfor the year. And Triple Crown continues to grow, as they opened anew terminal in Minneapolis and a second terminal in Detroit.

For 2005, international trade will continue to increase and many ofour international shipline customers are projecting a 10 to 12percent increase in exports to the U.S. this year -- or our imports.All water service to the East Coast is projected to continue to grow.And our truckload and domestic customers project anothercapacity-constrained year with increasing cost. They believe thedriver shortage will continue and that most of the planned increaseequipment production and purchases that we're seeing occur representreplacements, and that the costs for increased driver pay willincrease perhaps as much as 6 to 10 percent. Accordingly, thecontinuing demand for service and improved market pricing appearsfavorable for 2005.

And I should add in turn we will manage growth and control capacitythrough pricing and productivity gains at our terminals. As anexample, efforts are underway to decrease dwell and gate time. Inaddition, we plan to expand our terminals where it will strategicallyimprove our network.

Intermodal also recorded its best quarterly and annual revenue perunit, which increased 11 percent for the quarter and 6 percent forthe year. Gains were driven by great increases taken during the yearon domestic business and pricing to market on new business. And fuelsurcharges also added to the revenue per unit. International premiumrevenue declined slightly, as both were

impacted by a change in mixas volume did significantly increase in shorter-haul lanes, and thisis a result of the continuing increase -- and it's no small increaseanymore -- in the all-water service to the East Coast ports.

Once a year, we always provide an update on real estate sales andgains. Our recognized gains for 2004 is very similar to 2003, and $10million higher than 2002. We still have an attractive portfolio ofproperties that are for sale at the appropriate price and our saleslevel has been consistent for the past few years and we believe itwill continue.

To summarize, we did not anticipate the magnitude of revenue growththat occurred in 2004 and we passed on a commercial plan to ourtransportation group that in reality nearly doubled. And I think Wickcommented on this. It is fairly obvious that both our marketing andoperating groups, as well as all support groups, did the seize theopportunity that the economy, the markets and unmet demand gave us.We believe we have a very balanced portfolio of business, includingan automotive franchise that did not participate in market growth for2004. The opportunities and the growth potential for Intermodalremain huge. As I mentioned, we will manage capacity, which will behandled through productivity improvements and pricing, and we do haveterminals in development.

To summarize, merchandise will be shaped by the manufacturingeconomy, which appears to be more competitive with the changeddollar, the restructured steel industry, and we also see continuedgrowth in our ag markets and ultimately, an improving automotivemarket. And finally, the coal market for the U.S. producers lookspositive and with I think a coming energy bill, it certainly becomesmore certain for both coal-fired generation, as well as domestic cokemaking. To summarize where we have been and where we are, the marketsdo appear to be positive. Thank you.

DAVID GOODE: Thank you, Ike and all. That's a lot of information, butit's a year we're happy to talk about. Questions?

Yes, Jennifer?

JENNIFER RITTER, ANALYST, LEHMAN BROTHERS: Thanks. Good morning.Jennifer Ritter from Lehman. In some ways, it feels like you're avictim of your own success. Things have gone so well; you got your 7and 7. And I'm guessing you're not going to tell us the goal todaythat you're going to get to your management team next week or in thenext few weeks. But are there still some obvious projects that youcan tackle to continue to grow your margin? Or is it going to take alot of sitting down and thinking through things to find the nextplace to get more efficiency out of your business?

DAVID GOODE: Well indeed, I think it's been taking sitting down andcarefully analyzing and working on it to make the improvements thatwe have made. If we're a victim of our own success, this is thehappiest victim that you've seen in awhile. But I think that webelieve that we have room for improvement. I think I might call onSteve, for example. Steve, make a comment or two about how we'readdressing the capacity in our system. Because we recognize that ourcontinued success does depend upon our ability to continue to do whatwe were successful in doing last year, and that is, take on the veryhigh and in some ways unexpected volumes of business and operate themefficiently, both in terms of service levels and producing goodbottom-line improvements. And we're certainly managing aggressivelyinternally to continue our ability to do that. Do you want to sayjust a (multiple speakers)?

STEVE TOBIAS, VICE CHAIRMAN & COO, **NORFOLK SOUTHERN**: Jennifer, if Ican be reflective for a moment, you've heard me -- most of you whohave been here in the past have heard me stand before you and tellyou that as a result of our top planning and our proactive approachto building our design and our system, that we in fact had morecapacity than we had business. And I think the growth in 2004 clearlypoints out that that was an accurate position. I now stand before youand tell you that we still have capacity in our system. Top program,top system, essentially addresses the merchandise business; and thereis more up to go there. We have continuing enhancements to the systemthat are going to allow us to reduce handlings and terminals. Andessentially what this design produces for us is the ability tomaximize the facilities that we have in place. We're not facilityconstrained in the merchandise segment. We do have the opportunity toproactively design additional physical

plant to our process, both inthe merchandise side, the Intermodal side, and clearly, we do havecapacity left in the coal portion of our business.

We are in a unique position, I believe, as a Company, that we havethe opportunity to add what I would describe as flexible resource toput against our potential increases in volume. And as our planningprocesses carry us through projections into the future, we will workvery diligently to stay ahead of planning those flexible resources,that I would on a service give you an example, being manpower andlocomotive. We have a plant that will sustain more growth.

DAVID GOODE: We also, Jennifer, I might say, have, in addition tocontinuing to work on our technology and improving our operatingplan, we also are constantly looking at the expense side of theledger. We've refreshed NS21 a couple of times. I think one challengethis year will be to rename our expense initiatives as we go into it.But you're quite right. There's no low-hanging fruit. There hasn'tbeen any low-hanging fruit for quite some time, but we've got prettylong arms.

THOMAS WADEWITZ, ANALYST, BEAR STEARNS: Thanks. I've got twoquestions for you. One, on the Intermodal side, you've just seenfantastic growth in 2004 in the volume side as well as a very strongyield. I believe that your margins in Intermodal have been verystrong and certainly overall margins have improved dramatically. Canyou give us a thought on where you're at with Intermodal marginsversus the portfolio? And if we look at 2005, and let's say thatIntermodal is more of the growth, can you still improve the marginsoverall?

DAVID GOODE: As you well know, I'm not going to address what ourmargins are on any particular line of business. But I would justpoint out that if you look at last year, kind of quarter by quarter,you see that we were able to make improvements in our overall marginsat a time of really explosive growth in the Intermodal business,which obviously tells you that we have both some pricing power andability to improve our handling of the Intermodal business as volumesincrease. So we are constantly focusing on making sure that themargins are good in the areas of business that we're growing. Andthat's what Ike signals to you when he talks about carefully managingour capacity and our growth in the Intermodal business; we're goingto do that in such a way. And, obviously, we're fortunate to be in atime when the factors, some of which are outside our control, makeour services very desirable from a lot of our partners, including ourtrucking partners. So we're pretty optimistic about our ability tocontinue to grow that business and do it at very acceptable margins.

THOMAS WADEWITZ: Can you give any further directional thoughts? Wasthere significant margin improvement in Intermodal in '04? And(multiple speakers) --

DAVID GOODE: The answer to that is yes. But Ike, unless you want toexpand it, I think we probably don't want to be any more specificabout margins in Intermodal or coal or metals or any of our otherparticular lines of business.

THOMAS WADEWITZ: Okay. And then a second one on pricing, are youoptimistic that you can see some of the similar level of yield growthcontinuing through the first couple quarters of '05? Fourth quarterwas particularly impressive that way.

DAVID GOODE: Yes, we think -- as we're successful in continuing tomaintain high-quality service, you've heard me talk lots of timesabout value pricing. And that's the approach we're taking. We thinkright now our business has a lot of value and our challenge is tomake sure that our service levels continue to support that kind ofhigh-value product. And as it is, we're going to continue to pricethat way. And we expect to be able to succeed in 2005 as we did in2004 in those efforts.

THOMAS WADEWITZ: Thank you.

DAVID GOODE: Yes, Tony?

UNIDENTIFIED AUDIENCE MEMBER: Thanks, David. I just wanted twoquestions. One is a follow-up a little bit in a different way whatThomas was talking about. Can you tell us where you are in closingthe gaps of the cost of capital and the

returns versus the cost ofhow you did this year? If you're willing to talk about '05 or beyond.And then my second question is, there was just reference to an energybill or energy policy change that would be good for coal. And I wouldjust like it if you could address what you see coming out ofWashington in the next few years; this year starting, in terms of anenergy bill and what that might mean. But also if you see atransportation bill or any kind of attack on -- a re-reg attack viasafety also, coming out of some (indiscernible) say The New YorkTimes series of articles and that kind of thing.

DAVID GOODE: Well, I, as always, I'm reluctant to predict what'sgoing to come out of Washington, either in an energy bill ortransportation bill, certainly. We think both of those could be veryfavorable for our business. We're hopeful and optimistic. I don'tknow, Jim Hixon, would you be hopeful and optimistic? Or go beyondthat?

JIM HIXON, CHIEF LEGAL OFFICER, **NORFOLK SOUTHERN**: (inaudible).

DAVID GOODE: I think it's hard to predict what's going to move. Andwhen it will move in Washington, Tony, as you know probably betterthan I do, but we are interested in seeing both of those bills movedbecause we think that they'll help the business in meaningful ways.We certainly are mindful that events of the past year and recentevents have put a focus on safety from a national standpoint andtransportation security and questions like that. And we're sorry thatwe're in the forefront of that focus. But certainly, we continue todo internally what I've said. And that is, we're focusing on what wecan do to handle things more safely and address that ourselves as wedo it with the industry. And I think there will be a lot of industryefforts going on to improve safety and to improve the security of thetransportation handling of rails are still -- as I'm quick to remindpeople -- the safest form of transportation. And we think that's acore advantage for the industry. But certainly, we've got room to dobetter and we obviously need to do so.

UNIDENTIFIED AUDIENCE MEMBER: (Inaudible question - microphoneinaccessible)

DAVID GOODE: Cost of capital -- I think you can assume that we didbetter last year. If you look at the numbers, we're not there yet.We're not earning our cost of capital. But that is clearly one of mygoals and one of our goals. And it will probably be Wick Moorman'sgoal after I'm retired. And we're getting closer, but we're not thereyet. You can be assured we're focusing on it, though. Yes?

KEN HOEXTER, ANALYST, MERRILL LYNCH: Hi. It's Ken Hoexter fromMerrill Lynch. Dave, I just want to follow up on Jim's questionearlier. It sounded like that was more from the capacity side. I wantto talk about the expense side as it looks at margin going forward.It sounded like you were a little surprised maybe so by some of thevolume strength, especially at the end of the year. And then I thinkHank said some of the expenses, like fuel kind of raced up. Is there-- it still seems like volumes are running ahead of what you would'veexpected based on a normal economy even now, quarter to date. Arethere moves that you can make again to bring that operating ratiodown even further? Obviously, incremental revenue didn't add anyadditional margin to the business in this quarter compared to thirdquarter. So is this as good as it gets on the margin side? Or can youstill improve?

DAVID GOODE: No, no, I think, Ken, clearly, we can improve margins.You know me. You've watched me for years and you've seen meconsistently talk about making incremental improvements in theoperating ratio and therefore in the margins. And we absolutely thinkthat there's room for improvement in that.

And we would love to do that quarter after quarter after quarter.Fourth quarter is always harder to -- if you look historically, thefourth quarter is always a little harder on margins than -- and ourgoal was certainly to improve that for the fourth quarter, which wedidn't do. We did have a couple of things, as Hank pointed out, inthe fourth quarter, principally, we sort of called your attention tothe fact that we are, once again, in a training mode. We're addingpeople and there is a time effect on that.

And we are conveying to you that we were adding both train and enginepersonnel and in our case, mechanical personnel. You'll recall whenwe announced our capital budget, one of things we announced was thatwe had a much more aggressive program of rebuilding locomotives anddoing that work. And we do that, obviously, because that's a good wayfor us to address the need for

additional capacity and an efficientway for us to address it. We have ramped that up very aggressivelybecause as the business remained very strong throughout the fourthquarter, I mean really right up to the end of the year, which I don'tthink I have ever seen the last two weeks of the year anything likethe last couple of weeks that we saw in terms of business; it justdidn't let up. And the early part of January is looking very strongas well. So our business is to handle the goods, and what that tellsus is that we need to be prepared for the economy doing that. And weare preparing to handle that and that puts some pressure on margins.But it also, as you saw last year, if you go back and reflect on it,it also can pay real dividends when the business is there. Meanwhile,we're good business people, so we understand that we've got to focuscontinually on the expense side in the areas that we can attack. Andthat's why we have an NS21 like program that has gone in to gomethodically through there and address areas of cost in the businessthat we can.

And I've been doing this for a lot of years and there is always roomto work on the expense side. And you can be assured we're going to doit.

KEN HOEXTER: Two real quick short answer questions -- follow-upquestions. One, the recent force majeur, based on the weather thatwe've seen recently, is there any impact that we should be aware offor the first quarter, or is that normal seasonality?

DAVID GOODE: Of course, weather has been an issue for the firstquarter. I don't know that I would anticipate any major -- I meanit's early in the quarter yet. So you don't know what's going tocome. But I think we're being able to handle the business. Certainlythe disruption that you've seen in some areas, fortunately not --that's certainly including our areas, but railroading is a highlyinterconnected business. So if anybody in the business is havingpain, we feel it as well. And that's certainly true. But I don'tthink we see any systemic disruptions on a long-term basis. Steve,would you agree with that operationally?

KEN HOEXTER: It's worth a try as always. Any chance you'll break outpricing versus surcharge mix and pure pricing?

DAVID GOODE: I'd be surprised if we would do that. Any otherquestions? You're a very patient group here.

Okay. Well thank you very much. I hope to see you again in anotherquarter with equally good or even better results. Thank you.

[CCBN reserves the right to make changes to documents, content, orother information on this web site without obligation to notify anyperson of such changes.

In the conference calls upon which Event Transcripts are based,companies may make projections or other forward-looking statementsregarding a variety of items. Such forward-looking statements arebased upon current expectations and involve risks and uncertainties.Actual results may differ materially from those stated in anyforward-looking statement based on a number of important factors andrisks, which are more specifically identified in the companies' mostrecent SEC filings. Although the companies may indicate and believethat the assumptions underlying the forward-looking statements arereasonable, any of the assumptions could prove inaccurate orincorrect and, therefore, there can be no assurance that the resultscontemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUALREPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILEEFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BEMATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THESUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES CCBN ASSUME ANYRESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPONTHE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT.USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALLITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANYINVESTMENT OR OTHER DECISIONS. Copyright 2005, CCBN, Inc. All RightsReserved.]

[Copyright: Content copyright 2005 CCBN, Inc. ALL RIGHTS RESERVED.Electronic format, layout and metadata, copyright 2005 FDCH e-Media,Inc. (f/k/a Federal Document Clearing House, Inc.) ALL RIGHTSRESERVED. No license is granted to the user of this material otherthan for research. User may not reproduce or redistribute thematerial except for user's personal or internal use and, in suchcase, only one copy may be printed, nor shall user use any materialfor commercial purposes or in any fashion that may infringe uponCCBN's or FDCH e-Media's copyright or other proprietary rights orinterests in the material; provided, however, that members of thenews media may redistribute limited portions (less than 250 words) ofthis material without a specific license from CCBN and FDCH e-Mediaso long as they provide conspicuous attribution to CCBN and FDCHe-Media as the originators and copyright holders of such material.This is not a legal transcript for purposes of litigation.]

**---- Index References ----**

Company: SIRVA INC; BEAR STEARNS COMPANIES INC; IPSCO INC; CMO; **NORFOLK SOUTHERN** CORP; CONRAIL INC; DAIMLERCHRYSLER AG

News Subject: (Corporate Financial Data (1XO59); Corporate & Business Law (1XO58); Legal (1LE33); Productivity (1PR67); Finance Management (1FI66); World Trade (1WO85); Corporate Legal Management (1XO33); Technology Law (1TE30); Economic Indicators (1EC19); Economics & Trade (1EC26))

Industry: (Railroads (1RA98); Regional Web Presences (1RE47); Transportation (1TR48); Traffic (1TR52); Internet Regulatory (1IN49); Land Transportation (1LA43); Railroad Equipment (1RA68); Internet (1IN27); Pulp & Paper (1PU96); Forest Products (1FO02); Automotive (1AU29); Natural Resources (1NA60))

Region: (North America (1NO39); Americas (1AM92); USA (1US73))

Language: EN

Other Indexing: (BEAR STEARNS; CCBN; CCBN INC; CFO; CMO; CONRAIL; COO; DAIMLERCHRYSLER; EPA; FEDERAL DOCUMENT CLEARING HOUSE; FINANCE; GM; HONDA LINCOLN ALABAMA; IPSCO; MERRILL LYNCH; NATIONAL TRANSPORTATION SAFETY BOARD; **NORFOLK SOUTHERN**; **NORFOLK SOUTHERN** CORP; NORTH AMERICAN VAN LINES; NS; SEC; SITE; TAXATION; TRANSCRIPTION; TRANSCRIPTS; TRANSPORTATION; TTT; UNIDENTIFIED; USERS) (Bill Galanko; Bob Fort; Dave; David; David Goode; Debbie Malvin; FDCH e-Media; Ford; Hank; Hank Wolf; Honda; Ike; Ike Prillaman; Intermodal; Jennifer; Jennifer Ritter; JIM; Jim Hixon; Ken; Leeanne Marilley; Marta; Marta Stewart; Newcor; Prillaman; Reviewing; Steve; Steve Tobias; Thomas; Tony; Triple Crown; Wick; Wick Moorman)

Word Count: 11458

**End of Document**

© 2013 Thomson Reuters. No claim to original U.S. Government Works.

NewsRoom

# EXHIBIT PX0689

NewsRoom

2/8/06 Fin. Disclosure Wire 14:08:21

FD Wire
Copyright © 2006 CCBN, Inc. and FDCH e-Media, Inc.

February 8, 2006

Q4 2005 **Norfolk Southern** Corp **Earnings Conference Call** - Final

DAVID GOODE, CHAIRMAN, **NORFOLK SOUTHERN** CORPORATION: I'm David Goode,Chairman of **Norfolk Southern** Corporation, at least for a few moredays. And it's my privilege to welcome all of you to our fourthquarter 2005 analyst meeting.

As most of you know, I will be retiring soon, so let me make onepersonal note, which is to express my appreciation for the courtesiesand fairness that you and your colleagues have shown to me and to**Norfolk Southern** over my tenure as CEO. I haven't always agreed witheverything the people in this room and some listening said, but Ihave to say I've always been impressed with the professionalism anddedication of the people that covered us. So thank you for yourpatience, and for your consistent interest in our company through avariety of interesting times. I appreciate the professionalism andfairness that you've shown us, so thank you.

Those of you who have followed our company for a while know howoptimistic I am, and that I rarely skip an opportunity to report goodnews. So this is a particularly good quarter, and I asked Wick to letme make a brief report about our recent results before I hand overthe podium to Wick and his team for the heavy lifting.

And by any standard, **Norfolk Southern** posted a strong performance in2005, and it was capped by a remarkable fourth quarter that set anumber of financial records.

For the year, we reported record revenues of 8.5 billion. We reportedtotal record earnings of $3.11 per diluted share, with the fourthquarter showing $0.87 a share. The railway operating ratio improved1.5 percentage points to 75.2% for the year. That's clearly ourlowest since the Conrail integration. And the fourth quarter was 2.6points better than a year ago, and also showed a continuing improvingtrend throughout the year. And you know how pleased that makes me.

Naturally, I'm pleased to report these results, but moresignificantly, I'm proud because the challenges we faced in 2005showcase the strengths of our people and this organization. Wehandled powerful business demands throughout the year and,particularly in the last quarter, did so in the face of considerablechallenge, and we did it safely and efficiently.

Although service metrics were not and are not what they should be, inthe fourth quarter our people produced for our shippers. And whilethere were costs to handle the heavy volumes, we producedhistorically good results that benefit customers and investors alike,and that was illustrated by the Board's decision yesterday toincrease our dividend.

So in short, I think my final year was a good indication of theelements that differentiate **Norfolk Southern**, and I leave you with alot of pride in our people and in the powerful culture that combinedto make a great organization not only endure for 175 years, but alsogrow and prosper.

So thank you for indulging me in a few comments, and I will now turnthe podium over to Wick Moorman, our President and Chief ExecutiveOfficer, and soon-to-be Chairman, to talk specifics.

WICK MOORMAN, PRESIDENT AND CEO, **NORFOLK SOUTHERN** CORPORATION: Thankyou, David. Good morning to everyone, and I first of all want to sayon behalf of all of us at **Norfolk Southern**, thank you, David, for allof your leadership and guidance at the head of the Company over thepast 14 years. David, as all of you know, is leaving a great legacy.He has raised the bar for us; in fact, this quarter he has raised thebar to the point where I look up at it and my heart beats a littlefaster. But in all seriousness, I can think of no greater privilegethen to assume the role, David, which you have played so well forthese years.

Before we proceed, I can tell that part of transition is that I willnow go through two pages of material that you've all heard before.Before we proceed I would like to take a moment to welcome those whoare listening by telephone conference call, and I encourage those whoare here today when speaking to please take the microphone and pleaseidentify yourself, so that the listeners on the telephone can hereand identify you. I would remind our listeners and our Internetparticipants that the slides of the presenters are available for yourconvenience on our Website in the investors section. And as usual,transcripts of the meeting will be posted on the Website andavailable upon request in a few weeks from our CorporateCommunications department.

Please be advised that any forward-looking statements made during thecourse of this presentation represent our best good-faith judgment asto what may occur in the future. The actual results may differmaterially from those projected and will depend on a number ofvariables, some of which may be outside the control of our company.Please refer to our annual report or our Form 10-Q filed with the SECfor a discussion of those variables.

Additionally, keep in mind that all references to reported results,including certain adjustments, i.e. non-GAAP numbers, have beenreconciled on our Website.

We do have with us today several members of our senior managementteam, including our Vice Chairmen Hank Wolf, Ike Prillaman and SteveTobias, whom you all know well. We're also joined by Bob Fort, ourVice President of Corporate Occasions, sitting somewhere; BillGalanko, our Vice President of Financial Planning; Rob Kesler, VicePresident, Taxation; Marta Stewart, Vice President and Controller,who will answer all of the difficult questions; Fred Ehlers, theAssistant to the Chairman; Leanne Marilley, Director, InvestorRelations; and [Debbie Malden], who is Hank Wolf's assistant and runs**Norfolk Southern**.

As David said, 2005 was an extraordinary year for **Norfolk Southern**,capped by a fourth quarter that reflects the strength of ourhigher-value transportation products and our strategic focus. Demandfor rail transportation remained strong throughout the year, and our2005 financial results reflect record levels of performancethroughout the organization.

Our railway operating revenues were the highest of any year in**Norfolk Southern's** history, reflecting continued growth and,importantly, maintaining momentum as the year closed. We posted ourbest-ever income from railway operations, net income and earnings pershare, we set new carloading records, and we significantly improvedthe operating ratio.

And I will start with that, because I think it's important. Ourfourth-quarter operating ratio of 73.7% was an improvement of 2.6percentage points compared with the fourth quarter of 2004. And asDavid also mentioned, for 2005 the operating ratio improved a full1.5 percentage points to 75.2%. As all of you know, lowering theoperating ratio on a consistent basis has always been and continuesto be a primary goal for us, and we are very clearly focused onmaking that happen.

For the fourth quarter, net income was $362 million, or $0.87 pershare, an increase of 37% compared with $264 million, or $0.65 pershare for the same period of last year. For the year, reported netincome was $1.3 billion, or $3.11 per share, an increase of 35%compared with reported net income of 923 million, or $2.31 per sharefor 2004.

Let me remind you that our 2005 results included a $96 millionbenefit from the effects of Ohio tax legislation, and our 2004results include a gain -- a $53 million gain on the Conrail corporatereorganization. Excluding both of those items, 2005 net income wouldhave been 1.2 billion, or $2.88 per share, an increase of 36%compared with net income of $870 million, or $2.18 per share in 2004.

As I mentioned, railway operating revenues set records for thequarter and the year. Fourth-quarter railway operating revenues of2.3 billion were up 16%, and for the year railway operating revenuesincreased 17% to 8.5 billion compared with 2004.

You'll hear all the details about our financial results and ourrevenues in a moment from Hank and Ike, but clearly, the value of ourexpanded thoroughbred operating plan was reflected in the fourthquarter as we continued to adjust to changing business conditions.

As we have already discussed, 2005 had a number of operatingchallenges for us, and the fourth quarter was no exception. In thecontext of record volumes, the effects of the hurricanes lingeredlonger than we had anticipated. And later in the year there wereseveral significant weather and accident-related disruptions on bothour property, as well as the properties of some of our connectingcarriers.

The results were that, as David also said, our fourth-quarter metricsweren't everything that we would hope they would have been; theydeclined somewhat from earlier levels. But it's important to notethat even with all of these disruptions, our overall operationsremain fluid and the service impacts to our customers were limited.We are continuing to work aggressively to add resiliency and capacityto the network, and our metrics coming out of the holidays areimproved over the fourth quarter.

We also remain optimistic about the health of the industrial economy.For January, overall carloadings are up year-over-year, led primarilyby intermodal, coal, and metals and construction. There are, however,some downward pressures being exerted on the automotive and chemicalsectors. As we move forward, we will continue our commitment to[value-based] pricing, and we strongly believed that our serviceefficiency gives us a very competitive and valuable product goingforward.

2006 will pose some challenges for us similar to those we tackledlast year, including cost pressures in the form of increased wagesand health and welfare benefits for our employees, and a rise indiesel fuel prices. In addition, we plan to continue the moreaggressive locomotive and car overhaul programs we initiated in 2005,to ensure that we can continue to respond to customers' demand.Still, we remain steadfast in our concentration on signing morecost-effective ways of doing business while always improving oursafety and our service. I have every confidence that **Norfolk Southern**will continue to successfully push ahead, and that we will gain newbusiness and margin expansion as we do so.

I will now turn it over to Hank to review our numbers, and then Ikewill talk to you about the specifics in the market, and then Davidand I -- David doesn't get off the hook yet -- will return to answeryour questions. Thank you.

HANK WOLF, VICE CHAIRMAN AND CFO, **NORFOLK SOUTHERN** CORPORATION: Thankyou, Wick, and good morning. As David and Wick indicated, recordrailway operating revenues and income from railway operationsproduced very strong financial results for the fourth quarter and thefull year. Our net income and earnings per share for the yearestablished new records in **Norfolk Southern**.

I should point out that the second, third and fourth quarters of 2005represent the three highest quarters in operating income in ourhistory. In fact, the last three quarters of '05 produced more incomefrom railway operations then all four quarters of 2004 combined.

Railway operating revenues for the fourth quarter were 2.3 billion,up 308 million, or 16%, and were the highest quarterly revenues inour history. This quarter was the ninth consecutive quarter ofsequential revenue growth. For the year, railway operating revenueswere a record 8.5 billion, an increase of 1.2 billion, or 17%.

Fourth-quarter volumes were up 3%, largely driven by an 8% gain inintermodal units. Revenue per unit rose 13%, reflecting increasedfuel surcharges and higher rates. For the year, volume increased 4%,a result of intermodal growth of 9%, and a 3% rise in coal shipments.Revenue per unit was up 13%, again reflecting higher rates in fuelsurcharges, and Ike Prillaman will provide you with the details ofour revenues in just a moment.

Railway operating expenses for the fourth quarter were 1.7 billion,up 176 million, or 12%, compared with 2004. For the year, railwayoperating expenses were 6.4 billion, 800 million, or 14% higher than'04.

The largest increase in railway operating expenses for the fourthquarter was in diesel fuel costs, which rose $88 million, or 64%, andaccounted for one half of the year-over-year operating expenseincrease. This rise was almost entirely due to higher prices as theaverage price per gallon increased from $1.07 in the fourth quarterof '04 to $1.76 this year. Consumption decreased modestlyyear-over-year from 129.4 million gallons to 128.6 million gallons,despite the 3% increase in traffic volume. The average price pergallon would have been $1.98 absent the benefit from our fuel hedges.

As you will recall, the third quarter was an inflection point for ourhedge benefit; that is, the hedge benefit in the fourth quarterreflects a decline when compared to the same period in the prioryear. For the next two quarters, the gallons hedged will continue todrop until our hedges are fully settled in May of '06.

The second largest increase in operating expenses was in compensationand benefits which rose 44 million, or 7%, compared with last year.The increase in compensation and benefits expense was due to higherbenefits cost and lower pension income which totaled 14 million,increased wage rates of 11 million, increased T&E and mechanicalhours that added 7 million, and higher stock-based compensation,increased salaries, and other miscellaneous items, each of whichadded $4 million.

Materials, services and rents rose 29 million, or 7% in the fourthquarter. Within this category, volume-related purchased servicesincreased 22 million, or one half, which was attributable toadditional traffic that we handled for FEMA as they responded to theneeds of the hurricane-ravaged areas of the Gulf Coast. Maintenanceactivities added 15 million and included 6 million in material costsfor locomotive overhauls and freight car repairs.

Other operating expenses were 12 million, or 23% higher than '04,principally due to higher sales and use taxes and increased propertytaxes. Casualties and other claims rose by 5 million, or 12%, as aresult of increased insurance costs. Depreciation saw a modestincrease, reflecting our continued investment in plant and equipment,and these items were partially offset by a $5 million reduction inConrail rents and services.

For the year, railway operating expenses were up $800 million, or14%. As in the case of the fourth quarter, the largest increase forthe year was in diesel fuel expense, which rose 278 million, or 62%.The average price per gallon rose to $1.42 for the year, comparedwith $0.91 last year. Our fuel hedges reduced our diesel fuel expenseby $148 million for the year, and without the benefit of thosehedges, our average price per gallon for the year would have been$1.71.

The remaining fuel hedges that we have in place in 2006 would producea benefit of approximately $20 million, assuming the current price ofNYMEX heating oil. Therefore, I would remind you that as we move into2006, we will be facing $128 million diesel fuel expense headwind.

The next largest increase was in consumption -- in compensation andbenefits, which increased 221 million, or 10%. The increase was aresult of more T&E and mechanical hours that added 70 million,higher wage rates that added 46 million, increased benefit costs andlower pension income which totaled 43 million, increased stock-basedcompensation of 22 million, increased salaries and salaried headcountthat totaled 20 million, higher payroll taxes of 12 million, andother miscellaneous items that collectively totaled 8 million.

I would like to take a moment to discuss with you the effect of thenew stock-based compensation accounting standard which we will adoptin the first quarter of '06. As you are aware, Statement of FinancialAccounting Standards Number 123R, Share-based Payment, requirescompanies to expense equity-based awards. It also includes a newrequirement that awards granted to retirement-eligible employees mustbe expensed immediately.

Under the previous accounting standard, such awards were amortizedover the stated service period. And accordingly, that is how thiselement of compensation was reflected in our pro forma disclosures.As a result of the implementation of FAS 123R, the expenserecognition of grants made to retirement-eligible employees isaccelerated, and this acceleration will result in approximately 20 to$25 million of additional compensation expense in the first quarterof '06.

Returning to our expense variance for the year, material services andrents increased 208 million, or 13%. The same costs that drove thequarterly increase contributed to the rise for the year, mainlyhigher volume-related purchase services of 82 million, and 74 millionmore in maintenance activities. In addition, equipment rents rose 28million, largely because of the increased traffic volume and leasecosts that are reflected in this line following the Conrailreorganization.

Depreciation expense increased by 176 million, or 29% over last year.But as you will recall, this is principally due to the effect of the(indiscernible) reorganization of Conrail in the third quarter of'04, and you will note that there was a reduction in Conrail rentsand services that more than offset the increase in depreciation.

Casualties and other claims expense was 73 million, or 48% higher in'05. This increase was principally attributable to three factors --costs associated with the Graniteville accident in the first quarter,the unfavorable personal injury jury verdict in the third quarter,and increased casualty insurance costs.

Other expenses were up 34 million, or 15%, again reflecting higherproperty taxes and sales and use taxes. The railway operating ratiofor the fourth quarter was 73.7%, compared with 76.3% last year, a2.6 percentage point improvement. For the year, the operating ratiowas 75.2%, compared with 76.7% in '04, and this represents animprovement of 1.5 percentage points over the prior year.

Fourth-quarter income from railway operations was a record 594million, up 132 million, or 29% compared with '04. For the year,income from railway operations was also a record at more than 2.1billion, up 415 million, or 24%. Total other income and expense forthe fourth quarter was an expense of 90 million, compared with anexpense of 87 million in '04.

Interest income rose 10 million due to higher cash balances, as wellas higher interest rates. Gain on sale of property and investmentswas 7 million below '04, expenses related to tax credit investmentswere 3 million higher this quarter, and coal royalties were up 2million. All other was a decrease in income of 10 million,principally due to lower earnings and corporate-owned life insurance.Interest expense on debt was 5 million lower than last year on lessoutstanding debt.

For the year, total other income and expense was an expense of 420million, compared with an expense of 400 million in '04. As you willrecall, the Conrail corporate reorganization occurred during thethird quarter of '04 and resulted in a gain which contributed $53million to other income net that year. Expenses related to the taxcredit investments were 39 million higher than '04, which includedonly seven months of the expenses associated with a synthetic fuelinvestment that we made in May of '04.

Interest income was 28 million higher as our cash balances grew overthe course of the year. Equity earnings in Conrail, which arereported in other income, net after the reorganization were $26million higher because they included a full year. Coal royalties were12 million more than last year, and gain on sale of property andinvestments were 5 million higher.

All other increased by 6 million, reflecting a favorable adjustmentfor deficiency interest from the resolution of taxable years 2000 to2001, which you will recall we recorded in the third quarter of '05.

Interest expense on debt for the year was 5 million higher,principally due to the addition of interest on Conrail debt that wasassumed as part of the Conrail reorganization. We experienced verylittle increase in interest expense on debt, even as we saw marketrates rise, because most of our outstanding debt is at fixed rates.

Fourth-quarter income before income taxes was 504 million comparedwith 375 million last year, a 34% increase. For the year, incomebefore income taxes was 1.7 billion, up 36% compared with the 1.2billion last year, excluding the $53 million gain on the Conrailreorganization. Net income for the fourth quarter -- excuse me --income taxes for the fourth quarter were 142 million compared with111 million last year. The effective rate for this quarter was 28.2%compared with 29.6% last year. For the year, the provision for incometaxes was 512 million, excluding the $96 million reduction for thechanges in the Ohio income tax laws. The effective rate was 30.2%compared with 30.3% in '04.

Fourth-quarter net income was 362 million, which is 98 million, or37%, higher than the 264 million earned last year. Excluding the $96million, or $0.23 per share increase in income from the change in theOhio tax law in the second quarter, this would have been ourrecord-high net income for any quarter. For the year, net income wasa record 1.2 billion, excluding the second-quarter change in the Ohiotax laws, compared with 870 million in '04, excluding the $53 milliongain on the Conrail reorganization. This is an increase of 315million, or 36%, and is record net income for any year.

Diluted earnings per share for the fourth quarter were $0.87 comparedwith $0.65 per share in '04, a 34% increase. Diluted earnings pershare for the year, excluding the change in the Ohio tax laws and theConrail reorganization gain, were $2.88, which was 32% higher thanthe 2.18 per share earned in 2004.

This slide that you see reconciles our net income and earnings pershare, without the effect of the Conrail corporate reorganization in'04 and the Ohio tax legislation in '05, to our reported net incomeand earnings per share. These reconciliations are posted on theWebsite. Reported net income for the year was 1.3 billion, or $3.11per diluted share, compared with 923 million, or $2.31 per -- that wereported in '04.

I want to thank you for your attention, and now I will turn theprogram over to Ike Prillaman, who is going to give you an in-depthreport on our revenues.

IKE PRILLAMAN, VICE CHAIRMAN AND CHIEF MARKETING OFFICER, **NORFOLKSOUTHERN** CORPORATION: Thank you, Hank, and good morning. As everyonebefore me has indicated, revenues were the highest ever for both thequarter and the year. Revenue growth was constant throughout the yearand increased 308 million, or 16% for the quarter. This was our ninthconsecutive quarter of record revenues. And also as indicated for theyear, they were up 1.2 billion, or 17%, and reached 8.5 billion.Merchandise and intermodal revenue reached an all-time high for boththe quarter and the year. And since 2002, revenues have increased2.26 billion, or 36%.

The growth for 2005 is a result of large increases in revenue perunit from pricing, fuel surcharges and change in traffic mix for allof our markets, as well as increased volume for intermodal, coal, agand metals and construction.

More specifically, revenue per unit for 2005 was an all-time high forall of our business groups, increasing 12% over 2004. For the year,55% of the merchandise revenue per unit increases were attributableto rate and traffic mix, while 68% of the $197 increase in coalrevenue per unit was the result of repricing of key contracts,longer-haul business, and also includes a settlement of the ratecases in the second quarter.

Intermodal also had increased pricing, along with an unfavorable mixchange that resulted in a 43% net increase in revenue per unit. Andalso, information you'd like to know is approximately 50% of ourtotal book of business will be up for renewal or renegotiation during2006.

Looking at our markets for trends, volume was up 3% for the quarterand 4% for the year. Our intermodal coal, metals, construction and agmarkets reached record volumes for the year, and fourth-quartervolumes for ag and intermodal were all-time highs as well.

Overall, volume for the first half of 2005 increased 5% over 2004,which offset the variability that was incurred during the second halfof the year. Specifically, there was year-over-year growth formerchandise in the first half, which was followed by second-halfvolumes which moderated, and also had to go against the strongcomparisons of 2004.

The largest decline during the second half was that of our chemicalssector, where first-half volume gains were more than offset bysecond-half declines due to the infrastructure damage from the GulfCoast storms. There was consistency. On the upside, intermodal wasthe only market sector with year-over-year gains in all fourquarters, whereas the automotive business incurred year-over-yeardeclines throughout 2005. Although there was a fourth quarterdecline, our coal business had a record year for tonnage. And as Wickindicated, as an encouraging footnote for the new year, our volumesare up 9% for the first 20 days of January.

Looking at our merchandise sector, ag revenue was up 31%, or 59million for the quarter and 118 million for the year. Ag's ethanolmarket grew 34%, and overall volume gains should continue into 2006.Our feed mill market also continues to expand, and we are continuingto enjoy growth in the (indiscernible) of that market, and we arealso seeing growth in an emerging market, which is the biodiesel.

Metals and construction revenues were up 22% for the quarter and 20%for the year, and have increased 40% since 2003. Demand is projectedto continue into 2006 from both the capital goods and constructionmarkets, coming from both the integrated and electric arc furnaceproduction. Construction markets should remain favorable during 2006,with the reconstruction of the Gulf Coast, the new highway bill, aswell as higher capital spending that is forecast.

Our paper and wood products business completed its third consecutiveyear of growth in both revenue and volume. Revenue growth of 16%resulted primarily from increased revenue per unit, while our servicedid attract additional volume in a paper market that was mixedoverall.

Chemicals revenue reached 244 million for the quarter and 973 millionfor the year, with volume declines of 4% in the quarter and a slightdecline for the year, and we do expect volumes to recover asproduction is being brought back online.

And our automotive sector achieved quarterly revenue of 254 millionand record annual revenue of 997 million. And that's despite a 3%reduction in volume for both periods. We are all aware of the plightof the domestic automakers. The 2000 vehicle production of 15.7million vehicles was flat compared to that of 2004. A 13% increase ininternational vehicle production in the U.S., which included expandedproduction at Honda and Mercedes Alabama plants, as well as increasedproduction at Toyota's two plants -- which we serve all of them --did offset the 11% decline at Ford and the 9% decline at GeneralMotors.

For 2006, light vehicle production in North America is projected tobe 3% above 2005, led by continued increase in production at thesetransplant manufacturers, as well as DaimlerChrysler. GM hasannounced plans to close several plants, as well as removing shiftsfrom others. And on Monday, Ford announced similar plans forrestructuring capacity. And of the five plants specifically announcedfor closure, we directly serve the St. Louis and Atlanta assemblyplants and the Batavia transmission plant. And we estimate that thenumber impacting us next year will approach 40 million -- somewherebetween 35 and 40 million could be the impact, if all as describedoccurs.

I would add as the news -- one news analyst put it, that the news --the announcement by Ford was actually about taking 1 million vehiclesout of their capacity, not out of their production. So a lot of thesedeclines that have led to this overcapacity has occurred over thelast few years. And it's certainly not prospective.

Our intermodal franchise continued with strong volume growththroughout 2005. And since 2001, our intermodal business has grown43%. The 9% volume increase in 2005 followed a 17% gain that occurredin 2004.

Looking at our international markets, volume grew 18% for the quarterand 16% for the year. During the fourth quarter, East Coast railvolumes continued to increase, especially at Norfolk Savannah and NewYork, as more containers are routed via the so-called all-waterroutes.

Domestic IMC business continued to encounter unfavorable comparisonsas volume was down 8% for the quarter and 3% for the year. Volumesmoderated due to the continued reduction in translating the WestCoast international freight into domestic containers and, in somecases, the ability to find cheaper pricing.

The remaining lines of business had strong gains during the year.Truckload volume was up 5% for the quarter and 10% for the year, andintermodal's premium business, which includes UPS or parcel and LTLcarriers, was up 15% in the fourth quarter and 6% for the year. AndTriple Crown services volume was flat in the fourth quarter, but grew6% for the year through an expanded trailer fleet and growth in itsgeographic coverage. Revenues were a record-high for Triple Crown for2005.

Looking at 2006, the factors for continued intermodal growth remainin good standing, as it is projected that driver shortages and higheroil prices will continue, and driver pay is being increased.Additionally, the international ship lines are projecting a 10 to 11%growth in 2006 of their container business.

Infrastructure improvements will also add to volume as well. We willopen a new terminal -- open new terminals in Kentucky andPennsylvania, as well as expand existing terminals in Georgia andOhio, which should improve service as well as increasing capacity.

Our coal markets of nearly 424,000 carloads fell 1% below the fourthquarter of 2004. And for the year, these markets reached a recordvolume of over 1.7 million carloads, up 3% over 2004. Our car-onlymarket was essentially flat in the fourth quarter and up 4% for theyear. Utility volume remains strong, as there was a 4% increase inelectricity demand in our service area.

Looking ahead, we are bullish about our utility business. There iscontinued growth in demand for electricity. In addition, natural gasavailability and pricing are expected to remain uncertain and morevolatile than that of coal. In the near-term, the weather, obviously,will drive any demand variability.

Despite a decline in coke and iron ore, there was a sustained demandfor domestic metallurgical coal throughout the year, as volume grew3% for the quarter and 8% for the year. This market should remainstrong in 2006 due to blast furnaces coming back online, as well as aplanned higher production of coke, and on our part, recent successfulcontract renegotiations.

Several factors drove the decline of our export business. Increaseddemand from the Asian market was temporary, as expected, whichimpacted our 2005 business through Baltimore. In addition, during thesecond half of 2005, the European steelmakers were not buying coal inresponse to an inventory buildup, as well as waiting for possiblelower prices in 2006. Also, the problems that plagued Consol'sBuchanan mine during the year affected low-vol availability by 2.8million tons, and I would footnote that that's a big number for thismarket. Looking ahead, the world is still short of high-quality hardcoke and coal, and availability remains the issue for U.S. coals,even with full production at Buchanan.

And finally, I would like to make our annual comment about our realestate efforts. As indicated, 2005's 48.7 million gain on the sale ofreal estate was comparable to gains realized in prior years,especially 2004, '03, and '01. Our portfolio of real estate and thecurrent commercial real estate market would suggest results of recentyears should continue.

And in summary, economic projections are that the economy willcontinue to grow into 2006; the only debate is how much. I previouslyhave commented about the positive indicators for the coal andintermodal markets, while capital spending is forecasted

to be theprincipal strength of the economy for 2006. And as we all know, thisdoes drive the merchandise and the industrial products business. Oneindication of this is the increased number of industrial developmentprojects that are being reported and progressed. And looking -- itreally supports that point. Our efforts will continue to provide areliable and visible service product which can be priced to themarket, and we are fully aware that economic growth and a strongproduct are a great combination for market success. Thank you.

WICK MOORMAN: Thank you, Ike. At this time, we'd be happy to take anyquestions you have.

DAVID GOODE: I'll back him up for a few minutes.

UNIDENTIFIED AUDIENCE MEMBER: First, congratulations on a greatquarter; very, very strong and impressive. I wanted to ask you aboutcapacity. I had the sense that in '05 you were reloading a bit oncapacity, if you will. I think in prior quarters you had said youwere spending more on locomotive rebuilds, finance and track projectsand so forth. And I think there was a little bit of expense pressure.Headcount was up, and so forth. Can we think about '06 as being ayear where you maybe reloaded a bit, and you could actually seestronger operating leverage, a little better capacity position andless incremental expense as you add volumes? Is that a fair way tothink about things in '06?

WICK MOORMAN: Let me ask Steve Tobias to come up and also comment fora minute on capacity. I think that my comment would be is that whilewe did a lot of work, as you've pointed out, on capacity, I think we,as I mentioned in my remarks, are going to continue to push aheadthis year to add both capacity and what I like to call resiliency tothe system, in terms of our overhaul programs for locomotives, whichwill remain strong. Our hiring this year will remain strong, probablynot quite at the level as last year. We are -- we have, I think, agood budget again this year on the capital side for capacity.

One of the things that we have found as we look at capacity and lookat our system and look at our operating metrics is that -- and thisshould come as no surprise -- is that our growth is not equal acrossthe network. And as we analyze where growth is occurring, the ratesof growth are different for different parts of the network, and wehave to respond accordingly. So we're in the process of doing that.But I think where we're looking for operating leverage this year interms of what we did last year is in our service metrics and in theproduct that we deliver to our customers. Steve, do you want to say alittle bit about metrics, too?

STEVE TOBIAS, VICE CHAIRMAN AND COO, **NORFOLK SOUTHERN** CORPORATION:Thank you, Wick. Following Wick is a little bit like leaving me aneck and a wing. I think I would put it in this characterization. Wehave worked very diligently in the previous 10 years to put operatingsystems in place and planning systems in place, and we've talked anumber of times about our Thoroughbred operating plan to you. Thoseenvironments give us the ability to adjust our plan on the go, if youwill. And it certainly puts us in a unique position to be able torespond to our customers' needs and to the operating plan in responseto the nonstandard events of weather, seasonal changes, unscheduledevents. And I think the response that we have made as a result of asignificant event like Katrina is evidence of that.

To that end, we make adjustments in the system that may impact ourmetrics, but the overall benefit to the customer and to the networkas a whole is much greater and much higher than it would have beenhad we not had the ability and made the investments in those systemsin order to generate capacity in other places. And whether it's aKatrina or something else, we'll always be faced with those kinds ofevents. We will methodically weigh, as Wick has touched on, theadditions of capital infusion in order to enhance the system in avery judicious and practical way. The long and short, as you've heardme say before, there is still capacity in our system.

UNIDENTIFIED AUDIENCE MEMBER: I have a second question and I'll passit along. On the pricing side, Ike, you provided a helpful comment interms of 50% of the book available to reprice in '06. Can you tell uswhat that '05 number was, how much you repriced? And give us a sense-- is it possible to see pricing gains or (indiscernible) yieldsurcharge as strong in '06 as it's been in '05?

IKE PRILLAMAN: Well, taking the second question first, we certainlyhope so. And we continue to think we have a valued product that wecan price to the market. The percentage for 2005 was also 50%. Now,as you recall, a lot of our business -- we have estimated as much asone-third -- is rolling each year, or is new business to be replacedto begin with. So in effect, you don't need but about 22% more ofbusiness to be turning to give you that 50%. So it was essentially50% for 2005 and 50% for 2006.

UNIDENTIFIED AUDIENCE MEMBER: Any thoughts on outlook, though, for'06 pricing gains versus what '05 was?

IKE PRILLAMAN: I have no number.

DAVID GOODE: It's not a bad environment though, Tom.

KEN HOEXTER, ANALYST, MERRILL LYNCH: Ken Hoexter from Merrill Lynch.Again, a great, great job on the quarter. And not something we'resupposed to or usually say, but nice job. On the -- back to Ike. Onthe contracts, what is left to renew? What contracts haven't hit thispricing renaissance yet? If you can give us a clue of over the pastyear and a half, two years -- what contracts haven't been touchedyet?

IKE PRILLAMAN: That's difficult to answer without saying publicly whowe're negotiating with. I would suggest that repricing of the coalcontracts will be less this coming year than they were in the past.Intermodal is -- a lot of that runs on a -- as well as merchandise.So the best I can help you with that is coal is a less proportion ofthe 50% in 2006 than it was in 2005.

DAVID GOODE: Jim, one thing I would say is that Ike and his team havedone a -- have clearly concentrated while we have had a good pricingenvironment on getting as much leverage as they can. You've followedus long enough to know that that's been a real priority, and a lot ofprogress has been made on that. And they've done a good job ofgetting the duration of that so that they have pricing flexibility,so we can respond to markets when they give us the opportunity. And Ithink that's what you're seeing. And so I think you're going to see,as long as we have this favorable pricing environment, and peoplewant and really need our services, that Ike and his guys willcontinue to take advantage of it. But I think it's both prudent andnormal of them not to want to talk too many specifics.

KEN HOEXTER: If I could just throw my follow-up question on the autoside, again, probably for Ike again, would be -- I just wanted toclarify -- when you were talking about that $35 million impact,you're saying -- is that a worst-case kind of number? Is that whatthe actual impact will be, or is that what the theoretical impact butthey've already pulled out that capacity anyway over time, and itshouldn't be that harmful?

IKE PRILLAMAN: It's with some degree of certainty, and I would alsosay it is the worst-case -- certainly hopeful of that.

KEN HOEXTER: Is that just because of the closings and you'll make itup with the transplants, or is that just (multiple speakers)

IKE PRILLAMAN: That is direct -- business directly attributable tothe Ford announcement as well as the GM announcement. And it relatesto their business. (multiple speakers). That's right.

WICK MOORMAN: Which we hope and expect will continue to grow.

KEN HOEXTER: So you would take the auto number, take out the 35million, and that's your growth from there, including whatever youget from GM, Ford and transplants growing this year?

IKE PRILLAMAN: That's correct.

DONALD BROUGHTON, ANALYST, A.G. EDWARDS: Donald Broughton, A.G.Edwards. I'm just trying to get a better sense on the operatingmetrics. I know that you had a coal train derailment in Illinois thathampered your intermodal speeds at one

of your intermodal arteries inIllinois in December. You added the operating metrics haddeteriorated slightly; you characterized them as not what you wantthem to be. Do you see it as being event-driven or volume-driven?

WICK MOORMAN: Let me answer that this way. All of everything thathappens to us is happening to us in the context of higher volumes,which means that we're running more trains out there, and areabsorbing some of the resiliency in the system. Some of thefourth-quarter metrics and incidents which Steve alluded to wereevent-driven.

Now, let me say this. In the wintertime they're always cold weatherevents. In this case we had some abnormally-cold temperatures andsome snow up on the northern side of the railroad. And that problemwas compounded by a particular derailment, which was unusual for usin the sense that we usually get out and clear these things up. Butthis thing marked up a lot of rail, which we then had to take a railgang up and re-lay, and we ran slow orders for a week, and that hurtsour intermodal network on that side of the railroad. And at the sametime, I think, two days after that derailment, we had an ice storm onthe Piedmont side of the railroad, and froze that thing up for awhile. So that stuff compounds. We manage our way out of that, butthat takes a little while to do it, and that's when you see themetrics reflected.

We are managing the Company to have the capacity and resiliency tohandle the volume that comes at us, and to be able to respond tothese events, which are inevitable in our business. So it was -- Iwould say it's a combination. Does that make sense?

DONALD BROUGHTON: [I can see the way] adjusted, you're still seeingsome deterioration. I understand Steve has been very kind to pointout that every summer you have hurricanes and every winter you havesnow, and you manage it through that. But still, year-over-year,you're off a little bit.

WICK MOORMAN: I think year-over-year right now, we are pretty closeto where we were coming out of January -- coming out in January, andwe expect, barring the Siberian express coming down and hitting us orsomething like that, that we will continue to see that improvement.Steve, why don't you comment on that, too?

STEVE TOBIAS: I think you have to put in context with all the otherevents that take place when you do a year-over-year comparison, andthat's very difficult to do, particularly when you're trying tobalance climate, weather, nonstandard events. Small incrementalimprovement and small incremental degradation to me is notnecessarily significant. What I think you're hearing us say is we'renot happy with where we are, but there are going to be variations inthis. The metrics per se, because of the way they are applied anddeveloped, and what you're working against, year-over-yearcomparisons, is not an exact science, not incrementally.

WICK MOORMAN: We also, I will say, look at a lot of internal metricsbeyond the metrics that you see and, I think, have a pretty goodhandle on the ultimate level of service delivery. And while we trackthose, we see those improving certainly. And we feel comfortable andconfident that we are going to continue to improve the service thatwe deliver to our customers. And listen, that's why we are inbusiness.

DAVID GOODE: If you get the sense that this team worries a lot aboutits service metrics, you would be right.

WICK MOORMAN: Mr. Hatch.

TONY HATCH, ANALYST: Thank you, Wick. I just want to say, first ofall, David, if you have to go, it's a great quarter to leave on.Great job. I have a couple of -- and I wish you wouldn't, but if youdo, this is a good one. A couple of revenue questions. The papergrowth that was pretty solid in the quarter -- I was just wonderingwhether that was a rail competitive issue. And then also, withinintermodal, the truckload numbers were still pretty solid, but theywere coming down versus the year-over-year growth. And I waswondering if that reflected anything in the capacity issues out therein the truckload market. And also, Ike, while you're up there, justsome overall color on what you thought intermodal would do next year,given the growth rates of the

past few years. Do you think it cancontinue a kind of high single-digit blended growth rate in '06? Iknow you don't like to give numbers, but if you could give us somecolor behind that. Thanks.

IKE PRILLAMAN: Starting with the last first again. Tony, I thinkthere has been some moderation on the domestic side, but that seemsto -- countervailing wins again. Their driver shortage still remains,as well as increased pay, as well as continued increased energyprices. So I really have heard over and over again, and morerecently, there is no capacity, added capacity coming back into thetruckload carrier side. I think a lot of what happened with themoderation in that number was the transloading from the internationalside of business. So one could say our international business was upmore than -- was down more than it showed. But anyway. What was yourfirst question?

TONY HATCH: (inaudible)

IKE PRILLAMAN: Paper -- as I mentioned, it was the third year in arow. Most of the increases in revenue was from a revenue per carside, which part of that was mixed, obviously, but also includedprice increasing -- increases as well as fuel surcharges. But we didsee the pulp side up, as well as getting some conversions, continuingto get some conversions from the truck side on finished paper. Soit's -- I don't know that we -- we're certainly not chasing anycompetitors' business. We're just pricing to the market, and seewhere we go from there.

WICK MOORMAN: Following up a little bit to emphasize one of thepoints that Ike made about the paper business, the paper business forus, particularly the paper business out of the Southeast, is really atruck-competitive market. And to the extent -- and we have made gainsin that market, that's really a conversion issue much more than arail competitive issue, and just another place where we see oureconomics versus the economics of the trucking industry improving.

The other thing I would mention in terms of color is that Don Sealeand I were just recently visiting with one of our major truckloadpartners, and talking about all of the factors that are influencingtheir business. And all they did the entire meeting is affirm all ofthe things that we continue to hear about things like driver shortageand the problems congestion is creating for them. So we're hearing itvery strongly from the people we know in the trucking business that,as Ike said, there's not a lot of capacity coming on. And they havethings that they need -- serious things they need to manage around.Rick?

RICK PATERSON, ANALYST, UBS: Rick Paterson, UBS. Another one oncapacity. I think everybody expects a strong coal year in 2006, andthey're pretty bullish on intermodal as well. If those are both up,say, 7, 8%, do you guys have the capacity to handle that amount ofvolume this year?

WICK MOORMAN: On coal and intermodal?

RICK PATERSON: Right.

WICK MOORMAN: Yes, I think we feel confident about that. Our primaryintermodal corridors are for the most part high-capacity routes, andthey're also places where we are spending infrastructure money to addcapacity where we need it. Clearly, most of our coal network ishigh-capacity. It was built to handle a lot of capacity, and itcontinues to. So I think those -- I think we are confident that wecan handle the growth in those markets and not strain our system.

But we are continuing to invest. And I think one of the points thatI've made before to this group that I want to continue to make isthat as we look at the Company, and all of us try and think aboutmanaging the Company, we want to do it in the same way that David hasdone it, and that is try not just to look ahead three or six monthsat what's going to happen -- that's important -- but try and figureout where the business is going long-term, and make the appropriateinvestments to handle the long-term growth.

DAVID GOODE: I was just going to say, Wick, that if you look back atwhere we have made investments and continue to make investments, it'scentered around the conviction that we're going to see continuedstrong coal markets and continued growth in

the intermodal markets.At the same time, we handle what is one of the country's greatgeneral merchandise franchises. And if you look back over time,including the capital investments that we have planned for this yearand are making right now, what you see is our long-range planning tobe able to respond to growth in the markets that we believed in overa long period of time and continue to believe in, like coal, like theenergy market, and the continued growth of the intermodal market.

RICK PATERSON: One more quick one for Ike. Ike, you mentioned thatthe IMC business was weak in the quarter. Can you give us some morecolor on why that was and your outlook going forward?

IKE PRILLAMAN: The IMC business did moderate in the fourth quarter,and I think it was generally an overall market condition. But myunderstanding, it relates back to two of our larger customers in thatarena not having the conversions on the West Coast from the containeroff -- that comes off the ship usually have been transloaded to them,an actual load to them, and then they would ship by rail. What hashappened or happened the last half of '05 was that the internationalcontainer came off the ship, went directly on the rail car, and cameeast. And that -- my understanding from our largest IMC customer,that was the reason. But as I had in my prepared comments, pricingcould have been a reason for some of the conversions, too. The IMCs-- they follow the price.

WICK MOORMAN: I think the way we look at it is either way, we handledthe business that came in. And I guess to the extent, Ike, that wehandled more of it in 40-foot boxes than in the 53-foot boxes, itwould have been transloaded into it, may have even from a volumestandpoint been a slight positive for us.

DAVID GOODE: And we're not running fire sales right now.

WICK MOORMAN: No, that's right.

Any other questions this morning? Thank you for your patience. It'sgood, as always, to see all of you, and we look forward to talking toyou again in three months.

[Thomson Financial reserves the right to make changes to documents,content, or other information on this web site without obligation tonotify any person of such changes.

In the conference calls upon which Event Transcripts are based,companies may make projections or other forward-looking statementsregarding a variety of items. Such forward-looking statements arebased upon current expectations and involve risks and uncertainties.Actual results may differ materially from those stated in anyforward-looking statement based on a number of important factors andrisks, which are more specifically identified in the companies' mostrecent SEC filings. Although the companies may indicate and believethat the assumptions underlying the forward-looking statements arereasonable, any of the assumptions could prove inaccurate orincorrect and, therefore, there can be no assurance that the resultscontemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUALREPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILEEFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BEMATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THESUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIALOR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANYRESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPONTHE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT.USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALLITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANYINVESTMENT OR OTHER DECISIONS.]

[Copyright: Content copyright 2006 Thomson Financial. ALL RIGHTSRESERVED. Electronic format, layout and metadata, copyright 2006Voxant, Inc. (www.voxant.com) ALL RIGHTS RESERVED. No license isgranted to the user of this material other than for research. Usermay not reproduce or redistribute the material except for user'spersonal or internal use and, in such case, only one copy may beprinted, nor shall user use any material for commercial purposes orin any fashion that may infringe upon Thomson Financial's or Voxant'scopyright or other proprietary rights or interests in the material;provided, however, that members of the news media may redistributelimited portions (less than 250 words) of this material without aspecific license from Thomson Financial and Voxant so long as theyprovide conspicuous attribution to Thomson Financial and Voxant asthe originators and copyright holders of such material. This is not alegal transcript for purposes of litigation.]

**---- Index References ----**

Company: GENERAL MOTORS CORP; **NORFOLK SOUTHERN** CORP; CONRAIL INC; DAIMLERCHRYSLER AG; HONDA MOTOR CO LTD

News Subject: (Corporate Performance (1XO12); Corporate Financial Data (1XO59); Business Management (1BU42); Major Corporations (1MA93); Management Tools & Methods (1MA50); Economics & Trade (1EC26); Economic Indicators (1EC19))

Industry: (Enterprise Performance Management (1EN49); Theoretical Analysis (1TH79); Railroads (1RA98); Business Metrics (1BU72); Manufacturing (1MA74); Transportation (1TR48); Land Transportation (1LA43); Railroad Equipment (1RA68); Automotive Models (1AU61); Passenger Transportation (1PA35); Science & Engineering (1SC33); Automobiles (1AU45); Automotive (1AU29); Business Theory (1BU14); Real Estate (1RE57))

Region: (North America (1NO39); Georgia (1GE15); Americas (1AM92); USA (1US73); Ohio (1OH35); Illinois (1IL01))

Language: EN

Other Indexing: (BATAVIA; CONRAIL; CONSOL; CORPORATE OCCASIONS; DAIMLERCHRYSLER; DONALD; FAS; FINANCIAL; FORD; GENERAL MOTORS; GM; HONDA; IMC; IMCS; KATRINA; MARKETING; MERRILL LYNCH; **NORFOLK SOUTHERN**; **NORFOLK SOUTHERN** CORP; NYMEX; OHIO; SEC; SIBERIAN; SITE; TONY; TRANSCRIPTION; TRANSCRIPTS; UNIDENTIFIED; USERS; VOXANT; WICK) (A.G. Edwards; Bill Galanko; Bob Fort; Crown; David; David Goode; Debbie Malden; Fred Ehlers; Hank; Hank Wolf; Hatch; Ike; Ike Prillaman; Leanne Marilley; Marta Stewart; Mercedes Alabama; Prillaman; Rob Kesler; Standards Number; Steve; Steve Tobias; Tom; Tony; Triple; Triple Crown)

Word Count: 10576

**End of Document** © 2013 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT PX0690

NewsRoom

2/7/06 Fin. Disclosure Wire 16:09:14

FD Wire
Copyright © 2006 CCBN, Inc. and FDCH e-Media, Inc.

February 7, 2006

Q4 2005 **CSXEarningsConferenceCall** - Final

OPERATOR: Good morning, ladies and gentlemen, and welcome to **CSX**Corporation's fourth quarter 2005 earnings call. Today's call isbeing recorded. During this presentation, all participants will be ina listen-only mode. Afterward, a question-and-answer session will beconducted. For opening remarks and introductions, I would like toturn the call over to Mr. David Baggs, Assistant Vice President,Investor Relations for **CSX** Corporation. Please go ahead, sir.

DAVID BAGGS, ASSISTANT VP - IR, **CSX**: Thank you, and good morning. Andwelcome to our fourth quarter presentation this morning. Earliertoday, **CSX** released on its website presentation materials, itsquarterly flash, and the quarterly safety and service measurements.And they available under www.csx.com on the Investor's Landing page.In addition, following the presentation this morning, a webcast andpodcast replay will be available. Here representing **CSX** this morning,are Michael Ward, our Chairman; Tony Ingram, Chief Operating Officer;Clarence Gooden, Chief Commercial Officer; and Oscar Munoz, ChiefFinancial Officer.

Now before we begin the formal part of our presentation this morning,let me remind everyone that the presentation and other statementsmade by the Company contain forward-looking statements. And actualperformance could differ materially from the results anticipated bythese forward-looking statements. And with that, let me turn thepresentation over to **CSX** Corporation's Chairman, President, and ChiefExecutive Officer, Michael Ward. Michael.

MICHAEL WARD, CHAIRMAN, CEO & PRESIDENT, **CSX**: Thank you, David, andHappy New Year, everyone. Today, we have good news on many fronts,including a strong fourth quarter, the restoration of our New Orleansline, and our first steps toward bringing our expansion plans tolife. I would like to start by thanking the hundreds of men and womenwho worked through the holidays under fairly extreme conditions, torestore the New Orleans line ahead of schedule. We're already runninglocal trains in the Gulf, and expect to restore through-train serviceby February 1st. We have also started construction on the sidings andother capacity improvements along our Southeast Corridor betweenChicago and Jacksonville, Florida, and Chicago to New York Corridors.And we have announced our intention to build a new IntermodalLogistics Center in Central Florida. These expansion projects areconsistent with the capital plans we announced last August.

Turning to our financial results, I'm pleased to say this morningthat **CSX** reported fourth quarter earnings per share of $1.03, a 45%increase from the same period last year. This improvement was drivenprimarily by the eighth consecutive quarter of consistent, continuousimprovement in our core Surface Transportation businesses. Withoperating income reaching a fourth quarter record of $415 million. AsClarence will review in more detail, revenue reached a record $2.2billion representing the 15th consecutive quarter of growth.Transportation demand and pricing remains strong across nearly allour markets and we expect it to continue in the foreseeable future.At the same time, as Tony will discuss, we believe the ONE Plan isgaining traction, particularly when you view our performance againstof the backdrop of Katrina's impact on a major artery of our network.

From a fourth quarter and a total year perspective, the story is thesame: stable to improving performance in nearly all key operatingmeasures. From the beginning, we knew it would take time to realizethe benefits of the ONE Plan, and while we still have works ahead ofus, the signs of improvement are evident, both in our measurementsand in our culture. In short, we like what we see at our SurfaceTransportation businesses. The economic environment is strong, andour performance is improving. Now, I will let Tony share with you theoperating results. Tony.

TONY INGRAM, COO, CSX: Thank you, Michael, and good morning,everyone. Today, I'm going to cover 4 key areas. First, I have toldyou my belief that leadership begins with safety, and we continue tomake great progress in this area. Second, our team is starting to runthe ONE Plan with more discipline, and we are starting to get betterresults. Third, as Michael said, we're back up and running on theGulf Coast. With the hard work of many good people, we restored localservice in December and through-service will be back February 1. Thisis a great execution by the team. And, finally, we're moving forwardwith the expansions we told you about last August.

On the next slide, can you see the results of our focus on safety. Ona rolling 12 months, injuries are down 25%, train accidents are down17% from the fourth quarter of 2004. We like these results for theobvious reasons: our people are safe and that's good business. But italso proves to our people that leadership drives results. Gains insafety leads to improvements in other areas.

This brings me to my Slide 8. On-time performance is a majoroperating driver. Last, like safety, gains here drives improvement inother areas. On-time performance is key to running a disciplinednetwork, and we are gaining traction. On-time originations tell ushow well we are running the ONE Plan, and arrivals trackoriginations. This chart shows we're beginning to execute better. Ona rolling 12 months, originations improved to 51%, and arrivals to40%. Of course, there is a lot of work to be done, but w are headedin the right direction. More important, service to our customer isimproving.

On the next slide, you will see our dwell time is stabilized, andcars online have improved. On a rolling 12 months, the dwell time isstable, around 30 hours, and cars online have improved to just over233,000. Overall, this means our network was fluid, in spite of theimpact from Katrina. As we continue to improve on-time performance,these numbers will also continue to improve. Next is velocity. Wewere down some in velocity, mostly in the second half. While ournetwork remains fluid, can you see a lower velocity on this map,between Nashville and Florida. These are related to the reroutes fromKatrina. As we restore the through -service on our Gulf Coast and seeprogress in the rest of the operation, velocity will improve. In thefuture, we will keep using these slides we have just reviewed to helpyou track our progress on a consistent basis.

Now, let's move to the next slide. Last August, we announced plans toexpand our network in places where we can grow and improve service.The investments are in 2 key corridors: the Southeastern Corridor,which is a growing market, and the I-90 Corridor, which connectsChicago to the Northeast. Over the next 2 years, we'll completearound 60 projects. I'm pleased to tell you that we have alreadystarted construction on the first 20. And we're right on schedule tocomplete them by the third and fourth quarter of this year. There are20 additional projects that will begin later this year, and will becompleted in 2007. The last 20 will be started in 2007, and will becompleted at the end of that year.

Looking ahead, we have strong momentum in safety. And that willcontinue. We're beginning to get traction on the ONE Plan. I meetwith the managers every day, and their confidence is growing. We alsocontinue to hire new people. You can see in the flash that we hiredover 500 new people to run the railroad and we stay ahead ofattrition. And our capacity plans are on schedule. In summary, aturnaround of this size happens through discipline, repetition, andsteady progress over time. That is happening on our railroad now, andI am very encouraged. And with that, I'll turn it over to ClarenceGooden, our Chief Commercial Officer.

CLARENCE GOODEN, CHIEF COMMERCIAL OFFICER & EVP, CSX: Thank you,Tony, and good morning, everyone. Before getting to our results, letme discuss the broader economic and business outlook. The latestforecast for 2006 GDP is 3.4%, while industrial production isforecasted at around 3.5%. Manufacturing activity is still strong, asthe Institute of Supply Management Index was 54.2% for December, the31st consecutive month of expansion. Export volume growth is expectedto continue high-single digits, and both import and export volumesare expected to stay stronger than 2005 levels. And finally,

theTransportation Services Index for freight was 111.3 in October, thelatest month reported, with demand for transportation still near therecord levels achieved over the last 2 years. So we see a growingeconomy and strong demand for rail traffic in 2006.

Now, let's look at our results. During the fourth quarter, revenuesof 2.2 billion exceeded prior year by 156 million on a 13-week basis.You will recall that **CSX** had an extra week during the fourth quarterof 2004, which accounted for $117 million. This chart, and theremainder of my presentation, will reflect comparisons that excludethe extra week in 2004. Fourth quarter, 2005, was the fifteenthconsecutive quarter of year-over-year revenue improvement, and itrepresents a new quarterly record for total surface transportationrevenue at **CSX**. As you can see from the chart, revenue growth duringthe quarter was led by the merchandise and coal markets, though allmajor markets were experiencing revenue growth. Revenue, lost toHurricane Katrina, amounted to approximately $20 million. Revenuegrowth was again driven by a continued emphasis on yield, a strongfuel surcharge program, and strong demand.

Overall, volume was down 3.1% from a year ago, primarily as a resultof hurricane impacts, the shedding of low-margin business with someweaknesses in merchandise and automotive. I will talk about that morein detail in a moment. This reported number also differs fromindustry-reported data, the CS-54 Reports, due to the differences inthe handling of the fifty-third accounting week. For 2006, wecontinue to expect increasing volume growth as our service deliveryand asset utilizations improve, and as our New Orleans gatewayreturns to normal.

Now, turning to Slide 16, and our revenue per unit growth. In thefourth quarter of 2005, we continued to achieve revenue yieldimprovement. Revenue per unit grew more than 11%, driven by ourcontinued focus on yield, and our fuel surcharge program. Thisrepresents our highest percentage revenue per unit improvement duringany quarter. As we have shared with you during prior quarters, thecomponents of revenue per unit, increases in the fourth quarter wereapproximately half from price, half from fuel surcharge, with anominal mix impact. Our revenue per unit continues to be susceptibleto fuel price fluctuations. Yet, as I will address in a moment, ourfuel surcharge program and coverage is instrumental in helping tooffset the high cost of fuel. The environment continues to befavorable for increasing price, with strong transportation demand,tight transportation supply, and the growing economy.

As for our fuel surcharge program, turning to slide 17, in order tooffset higher fuel prices, we continue to focus on increasingcoverage with fuel surcharge mechanisms. Currently, fuel pricefluctuations are covered by both our fuel surcharge program, withabout 55% of our traffic, as well as our RCAF indexes, with 25% ofour traffic. In 2006, we are requiring all new and renewed contractsto include the fuel surcharge program. Along with this policy focus,we expect that we will increase our overall coverage by about 6%.

And now turning to Slide 18. Quarterly merchandise revenue of 1.1billion increased nearly 7% on a volume decrease of 39,000 car loads.Revenue per unit of $1,558 increased nearly 13%. These revenue andrevenue per unit results represent record results for our merchandiseunit. This is also represented in the fact that this is our fifteenthconsecutive quarter of year-over-year merchandise revenue growth.Volumes in the merchandise market decreased 5.3% due to severalfactors. Hurricane-related plant closures and plant curtailmentsimpacted volumes in our phosphates and fertilizers, in our chemicals,and in our cement markets. Reduced demand for transportation impacteda few markets, including our military shipments, forest and paper,and our auto shredder residue. Food and consumer volume wasunfavorable due to a cycling in shipments of building products whencompared to the strong hurricane recovery levels that we experiencedin Florida in 2004. And finally, our focus on yield improvement, insome cases, has resulted in the shedding of low-margin traffic.

Looking forward, our outlook for merchandise is generally favorable.We continue to expect increasing volume growth as service deliveryimproves, and as our New Orleans gateway operations returns tonormal. In addition, we expect our momentum and continued focus onyield improvement will lead to favorable revenue results.

Let's turn the page, and look a little closer at the revenue perunit. Merchandise markets recorded stronger yields in nearly allmarkets. As can you see on this chart, results in the phosphates andfertilizers market led the way, with an increase in revenue

per unitof nearly 22%. Close behind that market was metals at 19%, and foodand consumer at 18%. In addition, forest and agricultural products,along with chemicals, experienced increases in revenue per unit ofover 11%. Price improvements were also achieved in our emergingmarket sector, yet mix impacts more than offset these gains in termsof overall revenue per unit. Moving forward in merchandise, we willcontinue our momentum in improving our revenue per unit.

And now, let's turn to Slide 20 and look at the strong results incoal, coke and [iron]. Quarterly coal revenue of $521 millionincreased over 14% on a volume increase of 14,000 carloads. Revenueper car of $1,158 increased by nearly 11%. We believe the favorableenvironment for pricing will continue in coal. Strong demand existsacross all of our coal markets. Growth was strongest in the utility,integrated steel and industrial markets. In addition, electricalgeneration was up 4% in **CSX** served markets. Western coal volumes alsocontinued to grow versus the prior year. The 2006 outlook remainsfavorable. Producer intent is expected to be slightly higher thanlast year, as electrical generation demand remains strong. Utilityinventories remain below target levels, and alternative fuels areexpected to remain expensive. In addition, 2 new destinations on **CSX**recently began receiving coal, and in late 2006, we expect to beginshipping coal to another new plant.

Turning to Slide 21 and the automotive market results, quarterlyautomotive revenue of 225 million increased over 3% on a volumedecrease of 5,000 carloads. Continued efforts to improve yield inthis market resulted in revenue per unit of $1,800, which increased7.3%. While overall North American light vehicle production wasfavorable year-over-year in the fourth quarter, production for thebig 3 domestic automotive producers was down 2.5%. In addition,volume continues to be negatively impacted by plant closures thatoccurred earlier in 2005, and by diversion to truck. At the end ofthe fourth quarter, filled inventory levels were 65 days, down 2 daysyear-over-year, and near target levels. The 2006 outlook is neutral,as the decline in the Big-Three production is expected to be mostlyoffset by the new domestics, like Hyundai, while rail shipments atthe **CSX** plant continued to grow.

Turning now to our Intermodal results, quarterly intermodal revenueof $366 million increased 1.7% on a volume decrease of 28,000 units.Domestic revenue per unit increased over 5%, and overall revenue perunit increased 6.7%, largely due to increased fuel surcharge andprice increases, that more than offset mix related impacts from theloss of core traffic. Volume decline was driven by reductions intranscontinental and off port traffic, as well as the shedding oflow-margin traffic. Yet, moving forward, demand for intermodaltransportation remains strong. China is expected to continue tohaving a strong impact on international traffic. Our on-timeperformance in our Intermodal network remains near 90% in our majorcorridors, which we feel is competitive to truck. The outlook forIntermodal is generally favorable as I will discuss in more detail,along with the intermodal profitability on the next slide.

**CSX** Intermodal's operating income increased 63% to $248 million forthe full-year 2005. In addition, the operating ratio improved 690basis points year-over-year, finishing at 81.8% for the full year. Asyou will recall in 2005, we set out on a conscious strategy toimprove the bottom-line profitability of **CSX** Intermodal, whichfocused on the shedding of low-margin traffic. We are extremelypleased with these positive bottom-line results and we'll focus --and we'll continue to focus on this through the first half of 2006.In the second half of 2006, we expect to see volume growth, alongwith our continued yield management efforts. And finally in summary,demand and growth remains strong for all rail transportation. Thefavorable pricing environment continues, due to the strong growth indemand, and high fuel prices and tight transportation supply. We'reincreasing our emphasis on our fuel surcharge programs coverage, andwe believe that the service improvements will drive our volumegrowth. Thank you very much, and let me introduce to you Oscar Munoz,our Chief Financial Officer.

OSCAR MUNOZ, CFO & EVP, **CSX**: Thank you, Clarence. As Michaelmentioned, our fourth quarter results marked the eight consecutivequarter in which we produced core earnings improvement. Driving theseresults was surface transportation operating income, which increased100 million, or 32% from the prior year, reflecting strong revenuegains and continued cost control. Looking below the line, otherincome increased by 24 million, primarily driven by higher realestate activity. Next, as can you see, our interest expense was lowerby 13 million for the quarter. This reflects the debt repurchaseexecuted in the second quarter, partially offset by higher intereston our floating rate debt.

Moving to income taxes, our improved results drove the $54 millionvariance from the prior year. And going forward, you can expect aneffective tax rate of approximately 38%. I would also think of that38% as predominantly current, rather than deferred. Overall, on thisfirst chart, our consolidated debt earnings were 237 million or $1.03per share, an increase of 45% over 2004.

Moving to the next slide, let me go through some of the highlightsfor Surface Transportation on the quarter. Our results, as you haveseen and heard, were led by solid revenue growth, reflecting thestrong yield emphasis, increased fuel surcharge coverage, and wereoffset partially by slightly lower volumes. On the cost side, wecontain expenses to 3% for the quarter. Primary drivers wereincreased labor costs from additional hiring, higher performancebased compensation and general wage inflation. In addition, highernet fuel costs were partially offset by increased productivity, lowervolume-related expenses, and a net favorable benefit in casualty andother related reserves.

Next, let me update you on the financial aspects of HurricaneKatrina. In the fourth quarter, we estimated an impact of $20million, which is $5 million higher than we forecasted in our thirdquarter call. This makes the full-year P&L impact approximately40 million. Now, as Tony told you, we are nearly complete on all ourmajor reconstruction projects, and therefore, have revised our totalestimated impact related to the hurricane from 250 million, to a costof at least 300 million. Now let me remind you that amounts above 25million, our self-insured retention, d are expected to be covered byinsurance.

Now, let's move on to the next slide and look at our SurfaceTransportation P&L in more detail Now, as Clarence mentionedearlier, we have adjusted the fourth quarter of 2004 to be on acomparable 13-week period. On this basis, revenue was up 8% andexpenses were up 3%, resulting in a 35% increase in operating incomeand a corresponding 380 basis point improvement in our operatingratio from the prior year. Let's take a detailed look at our cost.Turning to labor and benefits, these expenses increased 55 million,primarily driven by a higher incentive compensation of 20 million,general inflation of 15 million. In addition, we saw 14 million inhigher labor costs due to our year-over-year head count increase ofover 500 field employees, as we have continued to higher ahead ofattrition and prepare for our increased capital activity in 2006.

Our MS&O expenses were lower than last year by 38 million. Theprimary driver was a net favorable adjustment of 22 million in ourcasualty and other related reserves. This reflects our recent safetyrecord, the results from our litigation efforts, and a favorabletrend in occupational claims. The balance of the variance in thisline items was largely related to lower freight loss and damageexpenses, reflecting our improved trend in train accidents. Next,fuel increased 59 million due to higher prices, partially offset byour hedge position. I will get into more details on our hedgeposition in a minute. But first, let me finish my expense review forthe quarter. Depreciation was higher due to our increased capitalactivity, and the remaining expense line items on the chart werefavorable, primarily due to our lower volumes and increasedproductivity.

Now, moving to the next slide, let me detail our hedge position for2006. On Slide 29, you can see that our hedge position has declinedfrom 54% in the fourth quarter of 2004, to 39% in the fourth quarterof 2005, the lowest hedge position we have had all year. On ago-forward bases, our hedge position declines to 25% in the firstquarter of 2006, 11% in the second quarter, and finally expires bythe end of the third quarter. This declining hedge position will bepartially offset by increasing fuel surcharge coverage, as Clarencespoke of earlier. And as a result, we expect to face an estimated 100million headwind from fuel for 2006. That finishes our fourth quarterreview.

Now, let me turn to Slide 30 and talk about the full-year results.Consolidated operating income increased 550 million, to over 1.5billion, driven by the strong increase in our Surface Transportationoperating income. Looking below the line, the change in other incomewas primarily driven by higher real estate activity. The next lineitem is related to the debt repurchase, which we completed in thesecond quarter. This repurchase was also the primary driver of ourlower interest expense for the year. Income taxes were up due tohigher income, partially offset by the impact of a state legislativechange in the second quarter. Net earnings from continuing operationsincreased 302 million, to 720 million.

Let's move on to the next slide to discuss earnings per share. Youwill recall that in our third quarter earnings presentation, weincreased our full-year earnings guidance to a range of 320 to 330per share. This guidance reflected the strong earnings

growththroughout the first 3 quarters and adjusted for 2 unique items thatoccurred back in the second quarter. First, we saw an after-taxexpense of 123 million, or $0.54, relating to our debt repurchase.And second, a change in state tax legislation which, reduced incometaxes by 71 million, benefiting EPS by $0.31. The net impact of these2 items was a negative $0.23 for the year. Adjusting for these 2items, we produced a full-year EPS of $3.40. Now, one quick note. Inthe calculation of the $3.40 EPS, as you know, is based on a fullydiluted share calculation of 228 million shares. This is an increaseof approximately 3 million shares for the year, primarily due to ourhigher-share price and its impact on previously-issued stock options.

Now, let's move on to the full year Surface Transportation operatingresults on Slide 32. 2005 operating income was 1.5 billion, a newrecord for the Company. This was an increase of 485 million, or 46%,after adjusting 2004 results for the $71 million restructuringcharge. On this same basis, the operating ratio improved by 480 basispoints. In addition, with these higher earnings, I'm also pleased toreport we exceeded our original free cash flow target of 450 million,which I will summarize on the next slide. As can you see, the Companygenerated over $1 billion in total free cash flow. In the table onthe right, you can see that total free cash flow included 2 uniqueitems. First, 640 million of after-tax proceeds from selling ourWorld Terminals subsidiary, and 123 million of after-taxes, excuseme, of after-tax expenses associated with our debt repurchase.Adjusting for those 2 items, the Company produced core free cash flowof 513 million in 2005.

Now, let's discuss the progress we have made in reducing **CSX's** debtratio on the next slide. As we said in our second quarterpresentation, we have achieved a debt ratio well below our target of50%. With the World Terminals proceeds and our strong core free cashflow, we reduced debt, and our total leverage now stands at 46%. Aswe continue to generate cash, we will be spending more on our networkto enable future growth and improve service reliability.

So let's talk about our capital spending plans for '06 on Slide 35.As we announced at our August investor conference, we expect the 2006and 2007 capital spending to increase to 1.3 to 1.4 billion per year.Consistent with our philosophy of earning the right to spend, and asa result of the Company's strong earnings and cash performance in'05, we have a target capital of 1.4 billion in 2006. On this slide,we're providing some additional detail in where this investment willbe made. Of particular note is the 18% of total capital that isfocused on new capacity. Primarily for new sidings along thesoutheastern portion of our network, and on our line running fromAlbany to New York City. In addition, we will continue to addlocomotives to our fleet, which also support future growth andimprove our network fluidity.

Now, as we move on to the next slide, you can see, even with thisincrease in capital spending, core free cash flow is expected to beover 300 million in 2006. This reflects not only the continuedimprovement in core earnings, but also an approximate 100 million ofnet insurance recovery related to Hurricane Katrina. Let me summarizefor the quarter and year. The fourth quarter provided a very, verystrong finish for 2005. And '05 was a year in which we saw recordSurface Transportation results, significant free cash flows, and animproved capital structure. As we look forward to 2006, we expect togenerate solid free cash flows, while increasing investment in thebusiness, and absorbing the headwind from fuel. Overall, we aregaining momentum and are confident that we will achieve our 5 yeartargets of double-digit growth in EPS, operating income, and cashflow, that we outlined at our August 11th investor conference. Nowwith that, I would like to turn it back to our Chairman for hisclosing remarks.

MICHAEL WARD: Thank you, Oscar. As we begin another year, **CSX** is astronger company. We have a healthy balance sheet, we have a teamfocused on results, and we have momentum behind our key strategiesthat we shared with you last August. The ONE Plan is beginning togain traction. The economic environment favors rail transportation,and demand continues to drive yields. And more importantly, we see noend to the opportunities available to **CSX** with this tremendous marketreach into the Northeast and Southeast populations centers. As wecontinue to build a more reliable railroad, volume growth willaccompany the pricing and productivity improvements we areexperiencing today.

At the same time, we're expanding our network capability to leveragethe changes in the transportation marketplace, and further drivevalue for our shareholders. In short, we're on track to deliverstrong results for 2006, and we look forward to sharing our progresswith you over the coming quarters. At this time, we would like toentertain your questions. I will ask you, if you would

pleaseidentify yourself and your company affiliation for the benefit of allthe listeners on the call. So with that, we're ready for questions.

OPERATOR: [OPERATOR INSTRUCTIONS] Ed Wolfe, Bear, Stearns.

ED WOLFE, ANALYST, BEAR, STEARNS & CO.: Good morning, everybody. Justa couple of things. First of all, I thought I heard you say thatbeginning in February, when the Gulf track is back on line, we shouldsee some velocity improvement. Can you talk about the magnitude ofwhat we should expect to see there?

MICHAEL WARD: Well, that's a little -- this is Michael -- it's alittle tough to calibrate. As you know, you saw from that one chart,there were some fairly sizeable impacts on our velocity, as we lookat that Southeast corner between Nashville and Jacksonville. And Iguess we would expect to see somewhere between a half a mile an hour,a mile an hour. And one half and one mile an hour impact as we workthrough getting Katrina fully up. Now, to remind you, we will startrunning trains in February, but they will gradually phase in over themonth. Because we basically put a new track structure in place there,you have to run some trains over before can you get to full capacitythere.

ED WOLFE: Okay, and then the same question on the volume side. Thevolumes, give or take, are down 3%, apples-to-apples. What should weexpect in '06 for volume growth, assuming an economy that deceleratesmodestly, but remains strong. What is the right volume number? Howmuch of this is intentional, and how much of this was related to theGulf?

CLARENCE GOODEN: well, there was -- Ed, this is Clarence Gooden.There was about 17,000 loads in the fourth quarter, that was directlyrelated to the Gulf. Some of that business will come back as thefactories down there come back on line, particularly around the NewOrleans area, going forward on the merchandise side. We expect to seestrong coal growth, as we told you, going forward. Our automotiveforecast is essentially flat. But we expect to see our Intermodalbusiness start growing in the second quarter, and then pick upmomentum in the second half. And we expect to have a good year on ourmerchandise business.

ED WOLFE: So, when you add it all together, what is kind of a fairvolume estimate overall for the year for '06? 1to 3%, is that kind ofthe range?

CLARENCE GOODEN: Yes, I think you could expect 1 to 3%.

ED WOLFE: Okay, just, for a second. Oscar, just to understand acouple of things in the quarter. Can you talk about the gains onsales, and also you mentioned about a reversing of some reserves, Ithought I heard you say. What did those 2 equal in the quarter versusa year ago?

OSCAR MUNOZ: Let me talk about both of them. The gain on sales, justour normal real estate activity. And I think that's fairly welloutlined. As far as -- not so much reversal of reserves, it is basedon our improvements and our favorable occupational claim trends, aswell as safety improvements that Tony talked about, in both personalinjury and train accidents. And as you know, we use outside parties,actuaries, that help us with those numbers and taking the trends acouple of times a year. We make those reversals.

ED WOLFE: And where do we see those in the income statement?

OSCAR MUNOZ: It is in the MS&O. The net amount of that was around20 million.

ED WOLFE: And is that ongoing?

OSCAR MUNOZ: No. No, the favorable trends we're seeing will help ouroverall financials, but the impact that happened this particularquarter, we can't forecast as to whether or not it will be. But wehave had a good year in injury, and that's been helpful.

MICHAEL WARD: But if we continue to see the improving safety trendthat we saw this year, and we certainly anticipate will happen, asthe actuaries look at that performance, Ed, we could, again, as theytrue that up for the run rate we're seeing, could expect topotentially see something again next year, as we continue to improveboth our personal injuries and our train accident performance.

OSCAR MUNOZ: Yes, and Ed, as you look kind of on a run-rate basis,there was many items in the quarter that helped us. We had someadditional expenses as well between the additional hiring, theadditional hurricane cost above what we expected, and so on, soforth. So, as a general rule, the 415 is a very solid number for us.

ED WOLFE: Okay. I asked a question about some kind of guidance onvolumes. The same thing on the yields. What is your expectation goingforward for yields? Obviously they can't stay at 11% forever. But weare getting a sense -- what percent of contracts are coming up in thenext couple of years that you can reprice? And what is yourexpectation, both for fuel and for pricing?

MICHAEL WARD: Ed, I'm going to ask Clarence to answer that. But Ithink at that point, we might need to let some others ask questionsas well.

ED WOLFE: Fair enough. Thank you.

CLARENCE GOODEN: Well, about two-thirds of our merchandise business,Ed, will be up for repricing this year. About 10% of our Intermodalbusiness will be up. Very little of our automotive business will beup for repricing. And about 20% of our coal business will be up forrepricing, although that is weighted in the coal part of thebusiness, more toward the fourth quarter. Having said all that, weexpect to have a very strong pricing environment going forward in2006. I would not at all be surprised if you didn't see a verysimilar performance in 2006 to what we had in 2005.

ED WOLFE: A similar performance in terms of yield or in terms ofpricing? And then I'll let someone else ask.

CLARENCE GOODEN: In terms of yield.

MICHAEL WARD: In terms of of yield. But the pricing aspect of it, Ed.Obviously, the fuel surcharge component is going to be driven by whatfuel prices are doing.

ED WOLFE: Okay, thank you.

OPERATOR: Scott Flower.

SCOTT FLOWER, ANALYST, SMITH BARNEY CITIGROUP: Just a couple of quickones. I know that Tony showed the slides that showed someimprovement, obviously, in some of the originations and terminationson time, and those are rolling numbers. Could you give us some senseof what the marginal on-time, or originating on-time data are forlet's say, the last month or 2? In other words, the rolling aspectmay hide some of the improvement. I'm just trying to get a sense ofwhat the more current month-to-month figures might be, versus arolling average.

TONY INGRAM: Well, Scott, that is a good question here. We, actuallysince the first of the year, we have been able to improve our on-timeoriginations up above 70, and on arrivals, above 60. But you've gotto take in mind here, this is sort of the beginning of the year. Yougot to reset during the holidays. You've got the cars on line down,and things are extremely good right now as far as volume. But we'reable to sort of, what we call, reset the railroads. And what we seeis extremely good at this point.

SCOTT FLOWER: Okay. And just want to come back to volume for amoment. And I know that Clarence gave us some sense of the comingyear. But I guess I'm just trying to get a sense of , if you stripout Katrina and some of your conscious repricing actions on business,that was not necessarily meeting your thresholds, would your volumeson merchandise and Intermodals still have been down?

CLARENCE GOODEN: Scott, this is Clarence. The Intermodal volumeswould have been down because lost some third party internationalbusiness by design, that was -- never operates on the CSX railroad.It operates in the west. On the merchandise side of our business,there were 4 principal factors. Katrina was 1 that I had mentionedthere. We had the loss of some of our aggregate business there forextended period of time in South Florida, when Hurricane Wilma wentacross. We had a large phosphate customer cease operations in theBone Valley that had lots of volume to the port, not the highrevenues. And then we had the year-over-year negative comparisonswith our military shipments. And those were the principle drivers onthe merchandise side.

SCOTT FLOWER: I mean, you still feel pretty good as you look out, interms of seeing volume growth as you get through Katrina's effects,and through some of your conscious repricing actions on lower-marginbusiness?

CLARENCE GOODEN: Absolutely. Without question.

SCOTT FLOWER: Okay, and then just the last question, and I'll letsomeone else have at it. I just want to clarify Ed's question on thereserves. This is a trueing up for the year. In other words, the 20million relates to the prior quarters in 2005, is that correct? I'mjust trying to make sure I understand the impact. It's on-going.

OSCAR MUNOZ: Yes, Scott. We do the actuarial work twice a year, inour second quarter and our fourth quarter. And so, yes. Thisparticular number would have some benefit. Again, it's a full-yearcalculation on a trend-rate basis, but the last time we did it wasmid-year.

SCOTT FLOWER: All right, thank you.

OPERATOR: James Valentine, Morgan Stanley.

JAMES VALENTINE, ANALYST, MORGAN STANLEY: Great, thanks. First, sorryto keep going back to this materials and other line, but I'm tryingto understand how you did, relative to my expectations. And Oscar,you mentioned something. Obviously, we know the reserve, now, you'veaddressed that. But you mentioned something about Katrina in thequarter. Is this like above and beyond just the expectation we wouldhave all had going into the quarter, knowing that it was still there? Meaning was there like a one-time hit, or like where the insurancewasn't going to cover it, so you guys wound up paying out of your ownpocket, you weren't thinking? Can you give us some feel for when youtalk about the offset to the benefit being done negative Katrina.

OSCAR MUNOZ: Really, I think what we said in the third quarter, is weestimated a number of about 15 for the quarter, and then the actualnumbers came in about 20. That was just slightly a higher impact onvolumes, and some of the other business interruption expenses that wesaw.

JAMES VALENTINE: Okay, but it was not like you paid 20 millionthrough the materials line, that you thought the insurance was goingto cover, and you had to pay out of your own pocket?

OSCAR MUNOZ: No.

JAMES VALENTINE: I thought that's what you were implying. Okay. Iguess the real question I want to ask you guys -- ?

OSCAR MUNOZ: Just to be clear, it's on the revenue side,predominantly.

JAMES VALENTINE: Okay, good. The real topic I want to just hit on,and I think you addressed this back in August. But now that we'recloser to these expansion projects, can you talk about how we mightwant to be modeling any cost result from potential disruptions? Imean, Burlington Northern, obviously, has had problems in the PowderRiver Basin as they expanded, not just this past year, but there'sbeen a number of times over the last 10, 15 years during heavymaintenance, we've seen cost go up. We saw CP with Western Canadaexpansion. Is it realistic that we're sitting in the third and fourth-- second and third quarters, that you guys would be talking aboutheadwinds from this construction slowing down maybe some of yourvelocity?

MICHAEL WARD: I guess 2 points on that, Jim. You may recall from ourAugust conference. We said a lot of these investments were really tosupport future growth that we anticipate. So some of this build isabout where we see the growth occurring between Albany and New YorkCity, and then in between Chicago and Jacksonville. So, some of thiswe're putting in is to support the further growth. In addition, itwill help us on the fluidity of the railroad. And I don't think we'regoing have major impacts. There will be some impact as we put it inplace, but I don't think it will be real big, Jim. Because a lot ofthe work we're doing here is extending existing sidings, putting newsidings in, improving the signalling, and then the speed of turn inand turnouts. You can do a lot of that work parallel to the existingtrack. And the only real disruption to your normal traffic flow iswhen you tie it in.

JAMES VALENTINE: Okay.

MICHAEL WARD: So we don't see big impacts from this construction. Buta lot of future benefits.

JAMES VALENTINE: Okay, great. Let me ask one last question, and thatis we talked about the inflation that you're going to see incontracts -- long-term contracts that have signed over, been signedup -- in terms -- what I'm trying to get at is, the inflationescalator historically, we have seen in railroad contracts, can beanywhere from negative, to only up 1%. And I guess I'm trying tounderstand going forward, maybe Clarence can address this. When yousign a long-term contract, are you looking for something abovehistorical rates, like maybe as much as 3% or even better, as theinflation escalator going forward?

CLARENCE GOODEN: Yes, is the short answer. I'm not aware that we haveany contracts left that have any negative escalators in them at all.We went through that with a fine tooth comb. We had 1, and that wentaway 2 years ago. In all of the contracts that we have got goingforward with escalators, at a minimum, they would have the RCAF-U.But more than likely, they will have the RCAF without fuel, plus fuelsurcharge.

JAMES VALENTINE: Great, so you're going to basically -- you'll atleast cover your cost inflation then?

CLARENCE GOODEN: Yes.

JAMES VALENTINE: Excellent. Thanks, guys.

OPERATOR: John Barnes, BB&T Capital.

JOHN BARNES, ANALYST, BB&T CAPITAL MARKETS: One, can you give us anidea on your insurance recoveries thus far from Katrina, how muchcash you have actually received in?

OSCAR MUNOZ: We have received about 120 million to date.

JOHN BARNES: And how much is outstanding?

OSCAR MUNOZ: Again, our total costs are 300 plus, and less thedeductible. So I would say just do the math on that.

JOHN BARNES: Okay.

OSCAR MUNOZ: We don't have the full-end number yet, so -- .

JOHN BARNES: Okay and then -- ?

MICHAEL WARD: So, roughly, then we have about 280 million plus, afterthe deductible. And we have gotten about 120 of it thus far. Andwe'll probably receive a lot of that during the course of 2006.

JOHN BARNES: Okay. Very good. As you look at your Intermodalbusiness, you talked about intentionally losing a little bit ofbusiness I guess on that international traffic. Are you done there?Do you feel like you're done calling out the unprofitable orintermodal traffic, or the traffic that doesn't necessarily mesh upwith your system well? Or is there more of that to go in 2006?

CLARENCE GOODEN: John, this is Clarence Gooden. On the core, the **CSX**lines themselves, I think we're about finished. In the West, we stillhave some third-party international business, that some of thosecontracts expire in 2006, and some of those contracts expire in 2007,that will continue to go. But it's -- the impact to the IntermodalCompany's bottom line is a very negligible number.

JOHN BARNES: Okay.

CLARENCE GOODEN: So, you could -- .

MICHAEL WARD: You said you expect actually, that the profitabilitywill continue to increase in the first half, with the volumes notreally increasing that much. And they'll grow in the second half.

CLARENCE GOODEN: That is correct.

JOHN BARNES: All right, very good. And then, Clarence, also, thanksfor the color on the book of business to be repriced in '06. Do youhave a similar feel for what is up in '07?

CLARENCE GOODEN: I don't have it with me.

JOHN BARNES: Okay.

CLARENCE GOODEN: But, the patterns will run roughly the same in '07.

JOHN BARNES: All right. Very good. And then lastly, Oscar, on theother line item, the other income line item, can you give us an ideahow 2006 is going to progress? I mean, what are you lookingfull-year? And can you give us an idea of, at least should we divideit up kind of seasonally, evenly throughout the quarter? Or is itmore front-end loaded, rear-end loaded? Can you give us some clue asto where that line item is going?

OSCAR MUNOZ: It's predominantly, as you know, real estate activity.And those deals close as those deals close. And I think if you lookat a couple of years back, and you look at that general average, Ithink, is how we project it, going forward. And seasonality-wise, Ithink we spread it accordingly. So, no, there is no real science tothat. We know of 2 or 3 major issues that are going to hopefullyclose over the course of the year. But it's difficult to give you anyspecific -- any more specific guidance than that.

JOHN BARNES: Okay, good deal. All right, guys. Thanks for your time.

OPERATOR: Ken Hoexter, Merrill Lynch.

KEN HOEXTER, ANALYST, MERRILL LYNCH: Great, good morning. Just aquestion on the Intermodal operating ratio. It looks to have actuallyincreased a bit sequentially, while last year's fourth quarter wasjust a massive improvement. Just wondering, I know you're focused oneliminating some of the unprofitable revenues. What would cause thatprogress to go a bit awry there?

CLARENCE GOODEN: Well, the operating ratio in the third quarter was79, and I think it was 80 here in the fourth quarter and -- .

KEN HOEXTER: Right.

CLARENCE GOODEN: -- I am not sure, off the top of my head, what hascaused that to change. I will say that the earnings in the fourthquarter this year for the Intermodal company were better than thefourth quarter earnings were last year. And if you will recall lastyear was where we made the step function, if you will, Ken, in theprofitability at the Intermodal.

KEN HOEXTER: Yes, in other words, a significant jump down in thefourth quarter last year. Agreed.

OSCAR MUNOZ: Hey, Ken, it's Oscar. Usually, the slight operatingratio movements have something to do with the math, slightly higherrevenues -- that issue between revenue and expense. So, fuelsurcharge increases might have increased revenue a little bit, andthat might do some of the math. There's nothing fundamentallydifferent in Intermodal, with regards to strategy or philosophy orvision. And so, it's probably more a blip in the math than anythingelse.

KEN HOEXTER: Great. And then just last thing. You gave some greatdetail on the cash and your returns coming forward on the year. Canyou talk a bit about Cap Ex, where you're spending it, what you'refocused on, when you're going to bring in the locomotives? And Iguess those other locomotives ended up coming all in at the end ofthe third and fourth quarter that we were targeting for the secondkind of ship this year. Is anything big on the horizon coming throughin early '06?

MICHAEL WARD: Yes. Ken, this is Michael. We have 100 additionallocomotives coming on toward the end of the first quarter and thebeginning of the second quarter. So, that will, I think, give usadditional help as we move into the -- be prepared for the fall peakof next year. So, yes, we're acquiring 100 new. And as we continue torun that ONE Plan better, we think that also is going to improve ourlocomotive utilization, create some further capacity for growth, andwe will continue to add locomotives to support the long-term growthwe expect. But to your specific question, we have 100 coming on latefirst, early second quarter.

KEN HOEXTER: Great, and that leads right into my last question. Wouldjust be, I guess, more a Tony-related question on the ONE Plan is,and I think it's a follow-up, that I think Scott mentioned it before.But on the on-time performance, what gets that to jump significantly?I know you said a bit of congestion here from the New Orleans line.Bit is there something we should look for to get that moving a bitquicker?

TONY INGRAM: Well what improves your on-time originations, is gettingthe trains across the railroad and getting it in the terminal, so canyou have the power to get it turned around. So as long as you don'tspend too much time out on the line [inaudible] with your trains andget them over the line quicker and in the terminals. And that makespower available and gets your on-time performance up. And the ONEPlan helps us design that. As we got more fluid here, we're able toredesign the locomotive plan and either 1, take some time out of thedwell on the locomotives, or remove some of the locomotives and putthem in some other type service.

KEN HOEXTER: So should we see that jump up at the end of the firstquarter, when those other locos come on?

TONY INGRAM: Well, I think -- yes. You should see some improvementwith the locomotives that's coming on. I mean, we're invested in the[hundred] day. They need to show up somewhere in improvements.

MICHAEL WARD: And you will see some improvements, I think, as Tonyalluded to. The first 3 weeks of this year, we have had very goodoriginations and arrivals, and we expect that to continue, and as weadd the additional locomotives, it'll take it to another level.

KEN HOEXTER: Great. Thanks a lot for your time.

OPERATOR: Tom Wadewitz, J.P. Morgan.

TOM WADEWITZ, ANALYST, JPMORGAN: I have got 2 different questions foryou. I think it's a follow-on to some of the other questions thathave been asked about operating improvement. But it seems that youare going to have this Gulf Coast coming back on line for the throughtraffic in February. You've got probably more locomotives than youwould normally expect in a first quarter. And I am wondering how muchconfidence that you have that you really see a pretty significantimprovement in velocity and fluidity, and so forth that in secondquarter, let's say. I guess the other aspect of that would be, do youstill think that there is a lot of work to be done from the culturalaspect and really getting the operational discipline involved thatmight hold you back from just a kind of a capacity-driven move up invelocity?

TONY INGRAM: Tom, we're excited about a couple of things here. Oneis, we have improved our velocity and some terms when we have beenhaving to reroute about 12, 1,300 trains a month in different areas.And we have had to depend on our other Class Ones to work throughinterchanges. They normally don't take high volume. So getting ourrailroads back, getting our velocity back up after the slow ordersare worked through, we're pretty excited at what we see there. Now,we have some other issues that we're working on. The ONE Plan, I'mreal excited about the ONE Plan. The guys are working through theculture issues. We're raising the bar constantly. That's showing someimprovements. I think some of the improvements you're seeing is notonly on our improvement in our leadership. And our drive to raise thebar is also getting our railroad back, and the locomotives coming onwill help, too. So, we're pretty excited at what we see so far. Wehave got good traction going. The attitudes are great, and we arebuilding a good team.

TOM WADEWITZ: Okay. Great, and 1 follow-up, I think probably forClarence, maybe for Michael. You're talking about pretty optimisticend demand, and potential to improve that volume growth. And I amwondering, is it really dependent on seeing that velocity improvefirst, or is there enough customer interest, enough, I guess, renewedvolume from the Gulf Coast area, that even if you don't see thatvelocity improve, and for a second quarter, you could still see thevolume growth improve meaningfully?

CLARENCE GOODEN: I think we're going to see the volume growthimprove, particularly in our Intermodal business, because Tom, as Imentioned in our presentation, our on-time performance in our keyintermodal lanes now, for more than 6 months has been at the 90thpercentile, which we think is competitive in the marketplace toregain the intermodal business back. On the merchandise side of ourbusiness, as you have seen, our metrics that are published now withthe AAR, our velocity has been improving. That's creating car supplythat is enabling us to have higher order fulfillment on ourmerchandise side of the business. So we again feel very positiveabout what has happened there. And as you have watched the CS-54 carloadings that has come out so far this year, we have picked up a lotof automobiles that were left on the ground during the Christmasholidays from the auto makers. And we have been able to clean up allof that backlog. And our coal numbers have remained very strong. So Ifeel very positive going forward.

TOM WADEWITZ: That's great. I guess I am tempted to ask 1 last onehere, and I will pass it along. Michael, any thoughts on potential toreach below 80 OR in 2006. It seems like you have a lot of thingsthat could work in the right direction. I know you don't want toforecast that necessarily. But is that possible in '06?

MICHAEL WARD: You're absolutely right that we don't want to forecastthat, Tom. And I'll just leave it at that.

TOM WADEWITZ: Okay, thanks for the time.

OPERATOR: John Larkin, Stifel Nicolaus.

JOHN LARKIN, ANALYST, STIFEL NICOLAUS: Good morning, everyone. It'sactually Stifel Nicolaus. It will take awhile to get that right. ButI had a question on the $100 million fuel headwind that Oscar talkedabout. What is the embedded cost of fuel that is assumed in thatassessment?

OSCAR MUNOZ: Roughly 60.

JOHN LARKIN: Okay. $60 a barrel. So, if that were to declinesignificantly, that headwind would decline along with it, I guess.

OSCAR MUNOZ: Clearly. And then our fuel surcharge recovery method iswhat's impacting that as well. So, many moving parts to it. But Ithink our forward look is around 60.

JOHN LARKIN: Okay, thanks. And then, Mike, in his opening commentsmentioned a new Florida Intermodal Logistics Center. Could you talk alittle bit about what that entails, how much it will cost, and whenit might be open, and what the impact on traffic in the future mightbe?

CLARENCE GOODEN: John, this is Clarence Gooden. That will involveboth an intermodal facility there in Central Florida, as well as anautomotive facility in central Florida. And then Transflowcapabilities there to move product from traditional rail cars intotrucks, as well as warehousing, and things of that nature in andaround that facility. We're in the developmental stages of that, soit will be sometime in 2007 when you see the facilities start to comeon line there.

MICHAEL WARD: As you would expect, John, there is a lot of issueswhen you build a center like this, but we're working with the citythat this is located in. We have very good cooperation with the citycouncil. But there is a lot of details to be worked out through yet,with the citizenry to make sure they're comfortable with the jobcreation this will entail. As we get some of those more details inline, we'll probably be able to talk a little bit more about what thecost of it is. But it would be contained within the outlook we gaveyou in our August presentation about the capital we would be spendingto improve capacity. So this not add-on. It is part of thelonger-range plan we talked about, of increasing our ability to servethe markets.

JOHN LARKIN: Okay, and then 1 maybe question on the new utilitiesthat may be coming on line over the next few years. Clarencementioned that there were 2 new coal destinations that came on linerecently. There is another 1***o***ne is slated for late '06. I canremember you telling me that there was going to be a doubling of thecoal fire plants over the next 6 or 7 years in the state of Florida.Could you just give us a little more detail on that outlook?

CLARENCE GOODEN: Well, those new plants that came on line for us wereconvert -- the first 2 were conversions. TVA's Paradise KentuckyPlant was converted from barge to rail. Dynegy's Vermillion,Illinois, plant was converted from truck to rail. And then SanteeCooper 's Cross South Carolina plant will come on line in Septemberof this year. Those 3 account for about 3.5 million annual tons ofcoal.

MICHAEL WARD: And the outlook for Florida's continues, as youexpressed at our August conference, isn't it, Clarence?

CLARENCE GOODEN: That's right. There's plants that have beenannounced in Perry, Florida, by JEA. Seminole Electric has announcedcoal-fired generation at their Bostwick, Florida, locations. OrlandoUtilities has announced expansions and a coal gasification facilityat their Orlando plant. Florida Power and Light has announcedcoal-fired generation in South Florida. And then GainesvilleUtilities is looking at developing additional coal-fired capacity.

JOHN LARKIN: Are all those new plants strictly served by **CSX**? Or dosome of them have access to water served deliveries?

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works. 

CLARENCE GOODEN: The one in Perry, Florida, is joint with -- willmore likely be joint with **CSX** and NS. And the others are at inlandpoints.

JOHN LARKIN: Thank you very much.

OPERATOR: Jason Seidl, Credit Suisse.

JASON SEIDL, ANALYST, CREDIT SUISSE FIRST BOSTON: 1 quick follow-upquestion here on coal. You mentioned that your Western coal volumeswere up. Can you give us a little more color as to how much and whatis the feeder for it? Which rail line?

CLARENCE GOODEN: Our Western coal volumes are up almost 60% on ayear-over-year basis. Most of that is coming off of the UP. It'scoming mainly out of Wyoming, as well as some growth out of Colorado.

JASON SEIDL: Do you anticipate sort of strong double-digit growthagain? I mean, it seems like the Western guys are seeing more of ademand to push the PRB coal out East.

CLARENCE GOODEN: Right. Most of our coal is primarily going to TVA.And most of it, not all of it, has been conversion from barge.

MICHAEL WARD: And then, you probably need to talk a little bit, and Iknow you do, to the Western roads. I know there is some issues as tohow much PRB coal they can get out there in the short term. So, butwe will continue to work aggressively with them where there are spotsthat make sense for our customers.

JASON SEIDL: Thank you, gentlemen.

OPERATOR: Jordan Alliger, Deutsche Banc.

JORDAN ALLIGER, ANALYST, DEUTSCHE BANC: You mentioned that even afterthe CapEx, I think, that your cash flow would be 300 million plus.I'm wondering what, if anything, that would be earmarked to.

MICHAEL WARD: Well, I guess as you think about that, Jason -- Jordan.As Oscar told you, we reached our targeted debt levels. So we thinkwe're pretty comfortable with where we are on our debt. You know weincreased our dividends 30% in the third quarter this year,reflecting the improvement we've made in our core earnings, and ourconfidence in the ability to continue to deliver this double-digitearning growth that we talked about in August. I think as theearnings continue to increase and our cash flow increases, we'regoing to look and evaluate what the best course of action to buildthat shareholder value, and we really haven't made any decision yethow we will deploy that cash, Jordan.

JORDAN ALLIGER: Okay. And then just -- I just want to make sure -- Iknow you touched on fuel in terms of the impact of the fuel surchargein the fourth quarter. I think you indicate about half of the yieldimprovement came from the fuel surcharge -- fuel surcharge revenue.Is that safe -- I mean, if you sort of assume it's about 5.5% of theincrease, about $120 million or so against the fuel expense increaseof about 50. Is that how you look at sort of the differential betweenthe 2, and how much the fuel and the impact of the hedges before theyroll off, have an effect on the quarter?

MICHAEL WARD: Well, you have to be a little careful of it, because asyou know, our fuel surcharge mechanism we have in place now, reallydon't fully recover what the cost of the fuel increases are yet.Clarence and his team are going to continue to work to increase thatfuel surcharge coverage, so that we get to the point where we arecovering the increases. You're quite right. We had the hedges thathelped us mitigate some of that gap this year. So I think as I thinkabout it going forward, our goal is the

hedges roll off here veryquickly at the beginning of the year, is to position ourselves wherethe recovery mechanisms we have in fuel surcharge and RCF, capturethat variance in fuel price to make us neutral. So, that's wherewe're trying to take it, overall.

JORDAN ALLIGER: Okay. So, basically over time, it's the goal of thefuel mechanism.

MICHAEL WARD: For neutrality.

JORDAN ALLIGER: As opposed to -- . Okay. Fine. All right, thank you.

OPERATOR: And we have no further questions at this time. Gentlemen,I'll turn things back over to you for any additional or closingremarks.

MICHAEL WARD: Well, thank you. I want to thank everybody for joiningus this morning, and appreciate your attention. Thank you.

OPERATOR: And that does conclude today's conference. Thank you,everyone, for your participation.

[Thomson Financial reserves the right to make changes to documents,content, or other information on this web site without obligation tonotify any person of such changes.

In the conference calls upon which Event Transcripts are based,companies may make projections or other forward-looking statementsregarding a variety of items. Such forward-looking statements arebased upon current expectations and involve risks and uncertainties.Actual results may differ materially from those stated in anyforward-looking statement based on a number of important factors andrisks, which are more specifically identified in the companies' mostrecent SEC filings. Although the companies may indicate and believethat the assumptions underlying the forward-looking statements arereasonable, any of the assumptions could prove inaccurate orincorrect and, therefore, there can be no assurance that the resultscontemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUALREPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILEEFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BEMATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THESUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIALOR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANYRESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPONTHE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT.USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALLITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANYINVESTMENT OR OTHER DECISIONS.]

[Copyright: Content copyright 2006 Thomson Financial. ALL RIGHTSRESERVED. Electronic format, layout and metadata, copyright 2006Voxant, Inc. (www.voxant.com) ALL RIGHTS RESERVED. No license isgranted to the user of this material other than for research. Usermay not reproduce or redistribute the material except for user'spersonal or internal use and, in such case, only one copy may beprinted, nor shall user use any material for commercial purposes orin any fashion that may infringe upon Thomson Financial's or Voxant'scopyright or other proprietary rights or interests in the material;provided, however, that members of the news media may redistributelimited portions (less than 250 words) of this material without aspecific license from Thomson Financial and Voxant so long as theyprovide conspicuous attribution to Thomson Financial and Voxant asthe originators and copyright holders of such material. This is not alegal transcript for purposes of litigation.]

**---- Index References ----**

Company: DYNEGY INC; BEAR STEARNS COMPANIES INC; CSX CORP; MORGAN STANLEY

News Subject: (Corporate Performance (1XO12); Corporate Financial Data (1XO59); Business Management (1BU42); Accidents & Injuries (1AC02); Natural Disasters (1NA67); Health & Family (1HE30); Economic Statistics (1EC52); Economics & Trade (1EC26); Economic Indicators (1EC19))

Industry: (Enterprise Performance Management (1EN49); Theoretical Analysis (1TH79); Freight Transportation (1FR88); Railroads (1RA98); Online & Electronic Publishing (1ON84); Transportation (1TR48); Freight Railroads (1FR84); Traffic (1TR52); Publishing (1PU26); Construction Financing (1CO12); Construction (1CO11); Entertainment (1EN08); Land Transportation (1LA43); Railroad Equipment (1RA68); Internet (1IN27); Passenger Transportation (1PA35); Science & Engineering (1SC33); Passenger Railroads (1PA89); Yield Management (1YI26); Business Theory (1BU14))

Region: (North America (1NO39); Louisiana (1LO72); New York (1NE72); Americas (1AM92); USA (1US73); Illinois (1IL01); Florida (1FL79))

Language: EN

Other Indexing: (AAR; BANC; BB; BEAR STEARNS; BEAR STEARNS CO; CAP; CAPEX; CLARENCE; CSX; CSX CORP; CSX EARNINGS CONFERENCE; CSX INTERMODAL; DYNEGY; EPS; FINANCIAL; FLORIDA; FLORIDA INTERMODAL LOGISTICS CENTER; GAINESVILLE UTILITIES; HURRICANE KATRINA; INSTITUTE OF SUPPLY MANAGEMENT INDEX; INTERMODAL; INTERMODAL LOGISTICS CENTER; INVESTOR; JASON; JEA; JORDAN; JORDAN ALLIGER DEUTSCHE BANC; KATRINA; MERRILL LYNCH; MORGAN STANLEY; NS; OPERATOR; OPERATOR: AND; OPERATOR: SCOTT; PARADISE KENTUCKY PLANT; PRB; RCAF; RCAF U; SCOTT; SITE; SOUTHEASTERN CORRIDOR; SURFACE TRANSPORTATION; TRANSCRIPTION; TRANSCRIPTS; TRANSPORTATION SERVICES; TVA; USERS; VOXANT) (Burlington Northern; Clarence; Clarence Gooden; Credit Suisse; David; David Baggs; Depreciation; Ed; Intermodals; J.P. Morgan; James Valentine; John; John Barnes; John Larkin; Ken; Manufacturing; Michael; Michael Ward; Michael Ward.; Mike; Oscar; Oscar Munoz; Santee Cooper; Scott; SEC FILINGS; Seminole Electric; Southeast; Stifel Nicolaus; Tony; Tony Ingram)

Word Count: 12535

**End of Document**

© 2013 Thomson Reuters. No claim to original U.S. Government Works.

NewsRoom

# EXHIBIT PX0691

7/18/07 Fin. Disclosure Wire 12:30:00

FD Wire
Copyright © 2007 CCBN, Inc. and FDCH e-Media, Inc.

July 18, 2007

Q2 2007 **CSX Earnings Conference Call** - Final

OPERATOR: Good morning, ladies and gentlemen, and welcome to the **CSX**Corporation's second quarter 2007 earnings conference call.

As a reminder, today's call is being recorded. During this call, allparticipants will be in a listen-only mode.

For opening remarks and introductions, I would like to turn the callover to Mr. David Baggs, Assistant Vice President Investor Relationsfor **CSX** Corporation. Sir, you may begin.

DAVID BAGGS, ASSISTANT VP INVESTOR RELATIONS, **CSX** CORPORATION: Thankyou and good morning, everyone, and welcome to **CSX** Corporation secondquarter 2007 earnings presentation.

The presentation material this morning that we'll be reviewing alongwith our **CSX** quarterly finance report and our quarterly safety andservice measurements are available on our Web site at csx.com underthe Investor section. In addition, following the presentation awebcast and podcast replay will be available.

Here representing **CSX** this morning are Michael Ward, the Company'sChairman, President, and Chief Executive Officer; Clarence Gooden,Chief Sales and Marketing Officer, Tony Ingram, Chief OperatingOfficer, and Oscar Munoz, Chief Financial Officer.

Now before we begin the formal part of our program, let me remindeveryone that the presentation and other statements made by theCompany contain forward-looking statements and actual performancecould differ materially from the results anticipated by theseforward-looking statements.

With that, let me turn the presentation over to Michael Ward, **CSX**Corporation's Chairman, President, and Chief Executive Officer.Michael?

MICHAEL WARD, CHAIRMAN, PRESIDENT, CEO, **CSX** CORPORATION: Thank you,David, and good morning, everyone.

The second quarter results announced yesterday demonstrate once again**CSX's** earning power and momentum. Earnings per share were up 22% on acomparable basis to last year when you back out insurance recoveriesand tax settlements from the prior period.

Our transportation businesses generated record second quarterrevenues of $2.5 billion, a nearly 5% increase over 2006 andoperating income of $603 million. Our operations are clearly in arhythm and delivering great results in both safety and service. Weexpect continued improvement in both these areas and our people arenot letting up.

Our safety focus and success are first and foremost about protectingour employees and the communities we serve. At the same time,financial benefits are also very real. As a direct result of oursafety improvements over the past three years, we were able to take asecond quarter $30 million reduction in reserves related to lowerpersonal injury claims.

On the service side, not only are we seeing continued gains in ouroperating performance, but those gains are translating into higherand higher levels of customer satisfaction. Our improvements incustomer satisfaction and service support strong pricing, withapproximately 7% improvement in revenue per unit in the quarter.

And when you combine the underlying strength of our safety, service,and price performance with the ongoing productivity efforts in ouroperations, we continue to drive our operating ratio lower.

Our employees understand that we are establishing new milestones evenas we achieve others. The second quarter demonstrates that our focusis clear and we are on the right path to achieve our goal of anoperating ratio in the mid to low 70s by 2010.

Now let's look at our results, beginning with Tony who will discussour focus on operational excellence. Tony?

TONY INGRAM, COO, CSX CORPORATION: Thank you, Michael, and goodmorning, everyone.

I'm pleased to report the team delivered strong results for thesecond quarter. First, safety results are outstanding and thepositive trend continues. We're running the plan and key servicemeasures continues to improve across the board.

Our customer sees these improvements and they gave us our highestever rating in customer satisfaction. Productivity is also improvingand working against inflation.

Let's look at safety in more detail. Slide 7 shows the excellenttrend in safety continued in the second quarter. In the yellow boxyou see personal injuries at 1.04 for the quarter. This is the bestperformance ever achieved at CSX and it helped drive the improvementsfor the rolling 12 months.

Train accidents were 2.85 for the quarter. On a rolling 12 monthsthey were down 22% to 3.09. The improvements in safety areoutstanding, but we will not stop here. Our employees are committedto safety and reaching higher level of performance.

Let's turn to the area our customer sees, on-time performance.On-time in originations increased to 80% in the quarter, anotherall-time high for CSX, and for the rolling 12 months performanceimproved to 77%. On-time arrivals were 69% for the quarter and alsoimproved for the rolling 12 months.

The train network is running well and our focus on plan execution isproducing results. This trend will continue as we build on oursuccess.

Looking at Slide 9, our asset turns also continues to improve. Onaverage, the dwell was 24 hours in the quarter and 25 hours for therolling 12 months.

Our terminals remain fluid and they're running the plan every day.Cars on line remained at a good level, 223,000 cars for the quarter.

Now let's look at another measure of network performance, velocity.Velocity improved to 20.4 miles per hour in the second quarter and a20.1 for the rolling 12 months period.

The improvements in average velocity is a positive sign, but stablevelocity performance is also important. Stable velocity shows thenetwork is fluid and reliable and can recover quickly from servicedisruptions. In the end, stable velocity leads to more consistentservice for our customers.

This brings me to Slide 11, which shows customer satisfaction. Eachyear we ask more than 2,000 customers to grade our performance on 15aspects of service. For the most recent six months, our scores arehigher than they've ever been.

It's very rewarding to have our customers recognize the operatingimprovements we work hard to deliver. Improved service to ourcustomers is critical to long-term profitable growth for **CSX**. Justlike safety, the work here is not complete. We target continuousimprovements.

Turning to Slide 12, we're making real progress in productivity. Thenetwork is more efficient when we execute the plan. This is mostevident in car hire, the time-based cost of using real equipment notowned by **CSX**.

In addition, through the ONE Plan, we continuously size our trainplan and assets to meet current business conditions. Our processimprovement teams are also manage a pipeline of projects to deliverproductivity gains to help offset the cost of inflation.

Finally, we recently launched a new initiative called Total ServiceIntegration, or TSI, to further improve customer service andproductivity. We'll discuss TSI in more detail at the Septemberinvestor conference.

Wrapping up on Slide 13, our plan is working and we'll continue tobuild on the solid foundation with leadership, discipline, andexecution. The great momentum in safety and network performance willcontinue. We can achieve even better results.

We continue to raise the bar on productivity and the use of keyassets. Finally, our customer will enjoy continuous improvement andservice reliability.

Now let me turn the presentation over to Clarence to review the salesand marketing results.

CLARENCE GOODEN, CHIEF SALES AND MARKETING OFFICER, **CSX** CORPORATION:Thank you, Tony, and good morning, everyone.

This morning I'd like to highlight our second quarter results, theprimary drivers, and offer insights on what we see ahead for theremainder of 2007. **CSX** achieved another successful quarter of revenuegrowth in spite of the continued weakness in the housing andautomotive sectors of the economy.

Revenues increased nearly 5% to a quarterly record of $2.5 billion,exceeding the prior year by $109 million, primarily on the strengthof our pricing actions. Yield improvements of $164 million more thanoffset the impact of lower volumes. This continues our success indelivering uninterrupted quarterly revenue growth for more than fiveyears.

As you can see on the next slide, the pricing environment continuesto be strong. The line on this chart reflects the year-over-yearchange in total revenue per unit, which includes the impact of price,fuel, and mix.

During the second quarter, overall revenue per unit increased 6.9%.This increase is less than the rate we saw in the first quarter dueto the impacts of fuel and mix.

The bars on the chart reflect the increase in price on a same-storesales basis, which excludes the impact from fuel and mix. Same-storesales are defined as shipments with the same customers, samecommodities and car types shipped between the same origin anddestinations. These shipments represent approximately 75% of ourtotal base.

On this basis we achieved average overall price increases of 6.5% inline with the price increases we have achieved over the last sevenquarters. Also let me remind you that in any given period, not alltraffic is up for renewal.

These results reflect our continued focus on pursuing the highestyields on existing and future traffic, despite some temporalweaknesses in volume. Moving forward in 2007, we absolutely expect tocontinue our momentum in improving yield.

Now let's look at the factors driving volume change. Quarterlymerchandise revenue of over $1.2 billion increased 5%. This, too,represents a new quarterly record.

This growth was driven by stronger yields in all markets as revenueper unit increased 9%, more than offsetting volume softness inseveral markets. Growth in agricultural shipments was favorable dueto continued rapid growth in the northeast ethanol market.

We saw the most significant volume declines in our forest products,food and consumer, and emerging markets where the softness in housingreduced shipments of lumber, building products, roofing granules, andaggregates.

Let's turn to the next slide and review the results from coal. Strongpricing actions also drove quarterly coal revenues to a record $638million, an increase of nearly 8%.

Continued strong demand for export coal during the quarter was offsetby declines in shipments to utilities as eastern coal utilitystockpiles have reached target levels. Although carloads were downnearly 1%, total tons shipped were favorable as we continue to shipmore coal per carload.

Revenue per unit increased 9%, significantly offsetting themoderating volume. This reflects our continued focus on yields and webelieve the favorable pricing environment in coal will continue.

Now turning to the automotive market's results. Quarterly automotiverevenue of $223 million remained flat as revenue per unit gainsoffset volume declines.

North American light vehicle production for the big three continue todecline in the second quarter by 7%, as auto industry restructuringresulted in additional plant closures during the second quarter. Thistrend continues to more than offset the growth from current newdomestics located on **CSX**.

Pricing actions resulted in a revenue per unit increase of 4% and thepricing outlook remains favorable going forward. Long-term, we feelwell positioned with the big three and for continued growth in thenew domestics.

Turning to our intermodal results. Quarterly intermodal revenue of$343 million declined 4% driven by mix and lower volume as declinesin international traffic more than offset the increases in domestictraffic. International traffic is down 8% due to losses across a fewaccounts and the closing of our Kingsport, Tennessee, intermodalfacility.

In addition, there were losses due to select steamship carrierswithdrawing from certain markets. However, new shorter haul trainservice into and out of Atlanta, as well as other new dedicated trainservices, drove growth in domestic traffic by more than 8%. These newservices will continue to be a catalyst for growth as the yearprogresses.

Price on a same-store sales basis increased over 4% across theintermodal portfolio, yet overall revenue per unit decreased due tothe mix impacts from the shorter haul yet profitable traffic.

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.

And taking a look at intermodal profitability, intermodal operatingincome was up 16% for the second quarter despite less volume andrevenue as a result of pricing gains, the new profitable shorter haulservice, and greater operating efficiencies. This resulted in asecond quarter operating ratio of 79.3%, a 3.6 point improvementversus 2006 on a comparable basis.

And now let's take a look at the revenue for the third quarter.Overall, our third quarter revenue outlook is positive. Pricingstrength will continue to be the key driver across all markets.

As you can see, in the near-term, revenue is expected to be favorablein six of our ten markets, neutral in two, and unfavorable in two.Coal, coke, and iron ore revenue growth will remain strong due tocontinued pricing strength despite volume challenges from toughyear-over-year comparisons and high utility stockpiles in the east.

In contrast to the second quarter, the outlook for revenue and volumein automotive is favorable as vehicle production forecasts haveimproved and as we have moved beyond some of the initial unfavorableyear-over-year comparisons from 2006. The revenue outlook formerchandise is generally favorable, although continued softness inthe housing sector will impact volume and revenue in metals, food andconsumer, and forest products.

The outlook for intermodal is neutral. Although we see continuingbenefits from improved operations, our new services and strengtheningin international traffic as we move beyond the third quarter of 2007.

Let me close by looking at the overall business environment. Theeconomy is forecasted to improve in the second half resulting ingrowth for 2007 and 2008 in the range of 2 to 3%.

More importantly, we expect strong revenue growth to continue drivenprimarily by our ongoing pricing success. While near-term volumeswill be soft, our overall volume outlook is improving.

We are committed to providing excellent service and value for ourcustomers and let me again reiterate, we will not sacrifice price forshort-term volume gains. This focus reflects our long-term vision ofpricing to the market to support higher yields on existing and futuretraffic.

Thank you very much and let me turn the presentation over to Oscar toreview our financial results.

OSCAR MUNOZ, CFO, **CSX** CORPORATION: Thank you, Clarence, and goodmorning, everyone.

On Slide 25, which represents our reported numbers, we recordedearnings per share of $0.71 for the second quarter, a decrease of$0.12 from the prior year. Going back to the top of the slide, in thequarter we saw Surface Transportation operating income of $603million, reflecting improving operating performance and strong costcontrol. As a reminder, last year's results benefited from insurancerecoveries.

Moving below the line, other income and interest expense are bothrelatively flat with last year while taxes are $21 million higher,primarily due to a benefit seen in the prior year related to theresolution of certain tax matters.

Turning to the next slide, let's look at our results on a morecomparable basis. After removing the prior-year gain on insurancerecoveries and income tax benefits, earnings per share on acomparable basis increased $0.13, or 22%.

Looking at operating income after removing the gain on insurancerecoveries, our Surface Transportation business increased earnings$84 million, or 16%. Now looking at this result from a broaderperspective on Slide 27, you can see that there are two key itemsaffecting the year-over-year comparison of our operating income.

The first is the cycling of our now-expired fuel hedge position,which increased last year's second quarter results by $19 million.The second is a favorable adjustment to our personal injury reserves,which reduced expense by $30 million in this year's quarter.

Now as a reminder, we evaluate our personal injury reserves twice ayear based on independent actuarial assessments analyzing historicaland recent trends in claims and settlements. This reduction reflectsthe significant improvement in our safety record over the pastseveral years.

Absent these two items, our core earnings power increased $73million, or 14%, setting an all-time high in comparable operatingincome despite the softer economic environment.

Now let's walk through the details of our Surface Transportationresults on the next slide. As Clarence discussed, we have seen morethan five years of uninterrupted top line growth. In total, continuedstrength in yields more than offset our decline in volume, resultingin nearly 5% growth for the quarter.

On the cost side, reflecting the impact from lower volumes, strongeroperations, and the favorable adjustment to our personal injuryreserves, total expenses increased 1%, or $25 million for thequarter, the details of which I'll review over the next few slides.The net result was a second quarter operating income of $603 millionand an operating ratio of 76.2.

Let me start our expense review with labor costs. On Slide 29, laborand fringe, which is our largest expense category, increased $26million, or 4% over last year. The increase was primarily driven bywage and benefit inflation of $26 million, as well as costsassociated with the ratification of a labor agreement in the quarter.

However, as a short-term increase in expense associated with thisagreement, we expect long-term benefits as compensation for ourlocomotive engineers is now more directly linked to our corporateobjectives.

These cost increases in labor were partially offset by a reduction intrain crew head count due to lower volume and our continued focus onproductivity and cost control. Looking forward and on a full-yearbasis, we continue to expect our labor and fringe expenses toincrease less than inflation as we achieve our productivityobjectives.

Moving to the next slide. On MS&O, these expenses increased by$18 million, or 4% over last year. This was driven by continuedhigher inflation, an increase in the allowance for non-freightrelated receivables and various other items.

As I previously discussed, these increases were partially offset bythe $30 million reduction in our personal injury reserves, reflectingthe significant progress in our operations team has achieved inmaking safety a way of life.

As we've stated in the past, only about 20 or 30% of our MS&Oexpenses are directly tied to volume. The remaining costs are moreindirect in nature, such as contracted services, cost of risk andinfrastructure and equipment maintenance. So in the near-term, youcan expect the quarterly run rate on this line to continue growing at6 to 8% on a year-over-year basis.

Let's move fuel on the next slide. Overall, fuel increased only $1million versus last year.

The cycling of a $19 million hedge benefit from '06 was mostly offsetby a reduction in average fuel price of $12 million, a decline involume of ton miles, and a continued improvement in fuel efficiency.This improvement in efficiency directly reduced fuel consumption byover 2 million gallons for the quarter.

In further reflecting our commitment to the environment and toimproving fuel efficiency, in locomotive process improvement team, apit team was recently awarded a bronze medal from the AmericanSociety for Quality for significant improvements resulting from acompany-wide fuel conservation initiative.

Now let's go to the next slide and talk about rent. Equipment rentdeclined 17%, or $23 million driven by a reduction in car hireexpense. Primarily driving this reduction were lower volumes in ourmerchandising intermodal markets and the continued improvement inoperational fluidity and asset utilization.

Additionally, we experienced a favorable impact of $7 million relatedto the settlement of car hire expenses with other railroads. If youexclude the favorable impact of these settlements, on a go-forwardbasis, you should expect our rent expense to move with our businessvolumes and to continue to benefit from improvements in assetutilization.

Let me review the remaining expenses on the next slide. All otherexpenses increased $3 million versus prior year. The driver of thisincrease is depreciation, which was higher due to a net increase inour capital asset base.

Partially offsetting this increase are lower depreciation rates as aresult of an equipment life study completed in the quarter. As areminder, railroads are required by the Surface Transportation Boardto complete a periodic review of their assets.

Equipment is reviewed every three years while track and other assetsare reviewed every six years. Our depreciation rates are being drivenlower, reflecting longer lives and higher salvage values for our railcars and locomotives.

With that, let me update you on how we're managing costs for thelong-term. On Slide 34, as our operations have significantlyimproved, our time horizon for identifying and achieving productivityinitiatives is lengthening.

We have established both near-term and long-term productivity andeffectiveness targets, utilizing cross-functional process improvementteams. These teams evaluate processes from end to end and areresponsible for developing a pipeline of projects looking out severalyears into the future.

Core to our approach in managing costs, we are constantlybenchmarking ourselves against the best in class. Our focus on costmanagement will be a key enabler in achieving an operating ratio inthe low to mid 70s by 2010.

Now on the next slide, let me update you on how we continue to returnvalue to shareowners. Our repurchase program is consistent with ourbalanced approach of investing in the business and returning value toshareowners through share repurchases and dividends.

In addition to representing approximately 15% of current market cap,this is the most aggressive share repurchase program in the industry.We are on track for completing the program by year-end 2008.

To date we have already completed over 20% of the program, includingthe repurchase of approximately 12.3 million shares for nearly $550million in the second quarter. As we've said before, we will continueto have a bias for early repurchases.

In addition to the share buyback program and consistent with ourbalanced approach, we recently announced a 25% increase in ourquarterly dividend to $0.15 per share, effective with the thirdquarter payments.

Let me wrap up on the next slide. The actions we have recently takento increase capital investments, share repurchases, and dividendsreinforce our view of the Company's long-term growth prospects.

As a reminder, we have updated our long-term financial targetsexpecting to deliver double-digit growth in operating income andearnings per share through 2010, growing off a record 2007 base. Overthis time frame, we also expect to improve margins to record levelsand continue delivering returns on capital that exceed our cost ofcapital.

So with that let me turn it back to Michael for his remarks.

MICHAEL WARD: Thank you, Oscar.

It's my privilege every quarter to talk to you about the renaissancein our industry and the excellent value **CSX** employees are deliveringto our shareholders, to our customers, to our communities, and to ourcountry.

In the three years ending June 30th, **CSX** investors have seen thevalue of their stock nearly triple and have made more money thaninvestors in 95% of the S&P 500 companies. We're proud of that.

Companies create value when they have something compelling to sell.For some companies, that means changing the flavor of the soft drink,for others it means delivering a cell phone that plays music andsurfs the Internet.

For railroads, as you know, the value proposition is quite different.We meet the needs of the entire nation every day, not just desires orpreferences, but real needs.

**CSX** owns an immense 21,000-mile system. Every day we maintain it, weexpand it to meet new demands and we make it safer. Along our 21,000miles we transport coal to light American homes, grain to feedlivestock and poultry, military equipment to protect our homeland,and even soft drinks.

We're also there for the safe movement of passengers and commuterswho ride on our tracks across the country and through cities likeBoston and Washington, D.C. What many people don't know yet is thatrailroads, which are funded by private industry, are becoming agreater and greater force in bringing solutions to even more publicneeds.

As environmental protection becomes more important and the highwaysmore crowded, America is turning to railroads. We are three to fourtimes more fuel efficient than trucks, which dramatically reducesemissions. Railroads also take traffic off the nation's highways anddeliver the safest form of ground transportation available.

We meet needs. We create value for many constituencies and thattranslates into values for our shareholders.

Large freight railroads spend more than four times as much on capitalfor every dollar of revenue than all U.S. manufacturing companies onaverage. Let me repeat that, four times the average.

To invest at this significantly higher level, it's critical that wehave ready access to capital supported by an investment grade creditprofile. In order for that to be possible, **CSX** must also sustain adisciplined and balance approach to managing our capital structure.

So what does that mean? First it means continuing our excellentfinancial performance. To that end we anticipate double-digit gainsin our key financial measures between now and 2010.

Second, it means repurchasing shares when it makes sense. Wecurrently have the most aggressive repurchase program in ourindustry.

Third, it means paying excellent dividends to our shareholders. Ourannounced increase, effective in September, will triple our dividendin just two years.

And finally, a balanced approach means investing consistently andresponsibly in the **CSX** transportation network to meet growing demand.Our balanced approach provides generous rewards to our investors inboth the short and the long run.

So before I turn it over to questions, I'd like to thank ourshareholders who are attracted to a company with a balanced,long-term strategy and a focused, accountable, and highly motivatedteam. So with that, we'll take your questions. If you would pleaseidentify yourself and your affiliation for the benefit of ouraudience.

OPERATOR: Thank you. (OPERATOR INSTRUCTIONS) Our first question comesfrom Ken Hoexter with Merrill Lynch.

KEN HOEXTER, ANALYST, MERRILL LYNCH: Hi, good morning.

Great, great results and good to see that things are really on trackon the turnaround. And Mike, before I get to some of the earningsquestions, I just have a question on the big picture.

There's an article up in Canada today talking about a potential bidfor CP and that potential for them dividing the network up into anetwork operating company and a physical asset and then the railoperating entity. Can you talk about, as you talk about how lookingat the Company and ability to get certain leverage, can you talkabout whether something like that makes sense in ability to get moreleverage on top of the Company to get the returns that you desireversus operating as a full entity? Because I know we're getting a lotof questions on that this morning.

MICHAEL WARD: Well, Ken, as I think you know, as a matter oflong-standing policy, we usually don't discuss long-term strategicassessments. But having said that, I think that our current businessmodel is the right business model for **CSX**.

This company and it's committed employees have brought excellentresults and value by just about any measure you can think of. I meantripling in the last three years is, I think, pretty darn good, andas I said, we're proud of it. And I think you can really look forwardfor us that we're going to continue that and we're going to continuethat at a strong pace.

KEN HOEXTER: Okay. Great.

Then on the quarter, Clarence, you noted that yields were up 7% or6.5% in line with the same-store level. What level do you target asthe annual increase level in some of the long-term contracts? Is itin that 6.5% range, is it a little bit lower? Kind of on anannualized inflationary level, growth level.

CLARENCE GOODEN: Well I think, Ken, what we've said in the past isthat we expect in 2007 that our same-store sales price increase isgoing to be in the range of 6 to 7% and next year in the range of 5to 6%.

KEN HOEXTER: Okay.

And then on the coal, you mentioned that with some of the newer carsyou're getting more, and that's why you saw some of the levels ofvolumes decrease a bit. Do you bill buy the tonnage or by the car? SoI'm just trying to understand who benefits from the increase capacityof the cars?

CLARENCE GOODEN: We bill by the ton.

KEN HOEXTER: Okay.

And then lastly on the intermodal side, you said you decreasedinternational traffic, you closed the Kingsport, Tennessee, terminal.When do you annualize that? Was there a large customer that moved offyour network?

Can you talk a little bit about the international side? Because Iunderstand it some of the eastern ports are actually seeing somebenefit from the tightness or capacity going on on the west coast,they're moving more to the east. I just want to understand if youcould see some of that improved volume flow on the east coast.

CLARENCE GOODEN: We closed the Kingsport, Tennessee, terminal onApril 1st. It was a mutually agreed closure by us and our customer.It was relatively short hauled international freight moving to theport of Charleston and it's right in the middle of our coal field, sowe had a higher and better use, if you will, for that -- for thosetrain slots that were moving down that Irwin, Tennessee gateway.

KEN HOEXTER: Great. Thanks for the time.

OPERATOR: Thank you. Our next question comes from Ed Wolfe with BearStearns.

ED WOLFE, ANALYST, BEAR, STEARNS & COMPANY: Good morning, guys.

MICHAEL WARD: Good morning, Ed.

ED WOLFE: Can you give a little bit more detail around the labor? Youtalked about there were some costs related to the ratification ofsome contracts. Can you talk about what those costs were and how wethink about those same costs in third quarter and fourth quarterversus second quarter?

OSCAR MUNOZ: Ed, this is Oscar.

The engineer ratification cost in the quarter was approximately $12million. That is by and large a one-time ratification cost and don'tnecessarily see increases in the further quarters. But we do see,obviously, I think it's a great win for both teams, as we have moreand more of our work force tied along with management to theCompany's objectives.

ED WOLFE: What other contracts are ratified and do you expect asimilar kind of drag from those as they get signed or have youaccrued for some and we could even see benefits?

OSCAR MUNOZ: I think it's a combination of all of that. There isalways several things that are out there working, the timing, whichwe can't forecast. We do tend to accrue on a general basis what weexpect and then the ratification costs and such all of that areincluded as part of that. So as they happen we'll let you know andwork through them.

ED WOLFE: So average comp being up 4.5 in the quarter, we should lookat that as there's about $12 million in there that's unusual?

OSCAR MUNOZ: Yes.

ED WOLFE: You also talked about the asset life study on thedepreciation side. Can you give us some more details of what'schanged in terms of how you're looking at depreciating the assetsgoing forward?

OSCAR MUNOZ: I think the way to look at it financially, it'llslightly decrease the rate of increase that you're seeing because ofthe increased Cap Ex. It's about 4 or $5 million a quarter goingforward, offsetting, again, the higher cost of Cap Ex.

ED WOLFE: Right. So that goes forward and then that will grandfatherin second quarter of next year kind of thing?

OSCAR MUNOZ: Exactly. If you mean we will cycle it.

ED WOLFE: Yes. You'll cycle it. That's what I meant by that.

Also, the $30 million insurance reserves that you talked about inMS&O. How do we think about that next quarter? Is that somethingthat we'll see third quarter or not again?

OSCAR MUNOZ: Yes, I think because it's a long-term actuarialadjustment, it does have some ongoing benefit. It's about $1 millionor so per month, so 3 to $4 million a quarter.

ED WOLFE: Okay. That's on top of the 30 this quarter or the 30 wasone-time this quarter and then 3 a quarter going forward?

OSCAR MUNOZ: Exactly. It's 30 one-time and then a small improvementon a go-forward basis.

ED WOLFE: Okay.

Can you talk a little bit, Clarence, about the contracts and what'sbeen repriced? If you look year-to-date, what percent of yourcontracts have repriced that had not repriced early '04 at this time?

CLARENCE GOODEN: Ed, we've got about 15% of our outstanding contractsright now, in terms of revenue, that have not been repriced since2004. Everything else has been touched a minimum one-time and in somecases three and four times.

ED WOLFE: So that's left as of now, but can you talk about fromJanuary until now what was repriced, give or take?

CLARENCE GOODEN: I don't have that number with me.

ED WOLFE: Okay.

Directionally, where truck pricing is down, how should we think aboutyou going forward when you compete with truck? If truck pricing staysdown for a while, are you willing to live with negative volume for awhile to keep the pricing up, or should we think at some point you'vegot to manage the volume yield on that domestic piece a little bit?

CLARENCE GOODEN: No. We're planning on keeping our focus on ourpricing and in the short-term we'll just have to ride the volume out.

ED WOLFE: Okay. Thanks, guys, for the time.

OPERATOR: Thank you. Our next question comes from Tom Wadewitz withJPMorgan.

TOM WADEWITZ, ANALYST, JPMORGAN CHASE & COMPANY: Yes, good morning.

MICHAEL WARD: Good morning, Tom.

TOM WADEWITZ: I wanted to touch on the pricing and then also a littlebit on intermodal. Can, Ed asked you about the truck pricing. Whatabout competition in the spot market with Norfolk Southern? Have youseen any change in that dynamic as a result of some slow volumes fora few quarters?

CLARENCE GOODEN: We have not. We see good, strong pricing all throughthe rail system.

TOM WADEWITZ: Okay.

On the intermodal side, can you talk, I guess, a little bit about themedium-term outlook for growth on that and perhaps touch on the newservice with the southeast service with Burlington Northern, how manytrains a day are running now and kind of the outlook for furthergrowth from that service?

CLARENCE GOODEN: Tom, we're running two a day. They are full in bothdirections. We may well have to add a second train here in the fallpeak, if the fall peak does what we hope it does, hope it will andexpect that it will do.

And as you saw in our numbers there, our domestic volume in generalis up about 7, 8% in the quarter so we feel good about the domesticgrowth, you know, in the third quarter.

TOM WADEWITZ: Okay.

So that service is meeting your expectations, it's coming in as youwould have expected. And what about the international? You talkedabout closing that terminal in Kingsport, which seems to make sense.

Is that, I mean should we look at the run rate for international insecond quarter and expect that to continue for a couple quarters as aresult of the closure, or are you optimistic that that internationalvolume growth would pick up a bit in third and fourth quarter andperhaps be positive looking out a few quarters?

CLARENCE GOODEN: You can expect that volume growth in internationalfor three more quarters to reflect the loss of that Kingsport,Tennessee, business which was about 25% of the total internationalvolume that was down. As we move into the fall peak and into thestrong seasonal shipping business in international traffic, we expectthat will grow some.

TOM WADEWITZ: Is there anything else going on in internationaldriving that softness or is it just kind of a weaker market inaddition to the closure?

CLARENCE GOODEN: Well, some of the steamship lines, as you're aware,pulled out of certain points. You would know that as the IPI, theInland Point Intermodal traffic. And that traffic in turn moves asdomestic traffic.

TOM WADEWITZ: Right. Okay. Great. Thank you for the time.

OPERATOR: Thank you. Our next question comes from John Barnes withBB&T Capital Markets.

JOHN BARNES, ANALYST, BB&T CAPITAL MARKETS: Good morning, guys.Congratulations on a nice number. A couple things on kind ofproductivity.

Tony, can you talk a little bit about your trends in terms of, haveyou been able to, you know, with the safety improvement and some ofthe improvement in on-time originations and arrivals, have you beenable to do anything in terms of train size? Are you seeing asignificant increase in cars per train, train starts, anything likethat? And where do you think those numbers can go?

TONY INGRAM: Well, John, yes, we've seen some improvement in ourtrain size, 2 or 3%, primarily because we've taken out a number oftrains and shrunk some of the network trains that we operate on adaily basis. Also, with the automotive being a little weak, we'vetaken some trains out in that line which has added cars to othertrains.

JOHN BARNES: Okay.

And how much more do you think you have on that front or do you thinkyou've really exhausted your ability to continue to improve that?

TONY INGRAM: Tom, we're raising the bar every day. We're notsatisfied where we are, we're looking for a few more every time werun a train.

JOHN BARNES: Okay. All right. Very good.

Oscar, can you give us an idea, average price per share on yourrepurchase during the quarter?

OSCAR MUNOZ: About $44.55ish.

JOHN BARNES: Okay.

OSCAR MUNOZ: I think if you just do the math on the 550 and 12.3million shares that should be $44.50.

JOHN BARNES: I wanted to make sure it wasn't skewed by a move oranything in the stock.

The other question on that front, do you know, I'm just trying to geta sense, do you know how many shares a day you're allowed topurchase? I know it's a rolling kind of thing, but right off the topof your head, I mean do you know what the maximum number per day youcan buy is?

OSCAR MUNOZ: I don't.

MICHAEL WARD: John, my recollection is no more than 25% of the lasttwo-week average.

JOHN BARNES: All right. Very good.

And then Clarence, lastly, just some of the follow-up on pricing. Ofthat 15% of your outstanding contracts that haven't been repricedsince '04, do you have a feel for how many of those contracts -- whatpercentage of the remaining business that hasn't been touched, howmuch of that are we talking about that hasn't been repriced in tenyears?

Is it some of that that's more in shorter duration since it's beentouched, or is it half of it that hasn't been touched in ten or 15years? I'm just trying to get a sense for, you know, of the remainingpiece, what's the magnitude of increase we may see.

CLARENCE GOODEN: Well, I really don't know how much of it hasn't beentouched in ten years because I don't look at it that way. I look atit, when am I going to touch it. The principal and preponderance ofthat will be repriced in 2008 and 2009.

JOHN BARNES: All right. Very good. Again, guys, nice quarter. Thanksfor your time.

MICHAEL WARD: Thank you.

OPERATOR: Thank you. Our next question comes from Scott Flower withBanc of America Securities.

SCOTT FLOWER, ANALYST, BANC OF AMERICA SECURITIES: Good morning, all.

MICHAEL WARD: Good morning, Scott.

SCOTT FLOWER: Wondered if I could get a little color. Clarence, Iknow that in addition to the charts you show that in the past you'vebeen able to break up RPU as a percentage basis between mix and priceand fuel surcharge. I'm wondering if I could get that sense from younow for this quarter?

CLARENCE GOODEN: Well, as you know, we transitioned, Scott, to a newmileage-based program that's got a slightly different trigger point.So we're focusing on that same store sales perspective, which we'veshown you now for the last several quarters. So the same-store salesis up 6.5% and the RPU is up 6.9 and the difference in the two is dueto fuel and mix.

SCOTT FLOWER: Okay. All right. And then what is your coverage on fuelsurcharge between fuel surcharge and RCAP currently?

CLARENCE GOODEN: 85%.

SCOTT FLOWER: Okay.

And then I'm wondering, and you may have answered, I just wantclarification, but you've mentioned, obviously, the Kingsportfacility and then you also, I think, in your comments talked aboutinternational account losses. Was that the Kingsport facility you'retalking about, or were there other contracts that moved away?

CLARENCE GOODEN: There was a couple certain lanes that shifted away.

SCOTT FLOWER: And that was what you were talked about in terms of theIPI changes?

CLARENCE GOODEN: That was part of it.

SCOTT FLOWER: Was some of the other business did it walk away justbased on price or did it move just in terms of where it embarked intothe country in terms of broader changes by the steamship company?

CLARENCE GOODEN: It moved by where the steamship lines actuallyrouted the freight.

SCOTT FLOWER: Okay. All right.

And then, I guess the last thing I had, maybe this is for you,Michael, is just obviously, there have been some other industrysettlements. I'm just wondering where does that leave the industryrelative to the remaining employee groups that are still outstandingin terms of labor contracts?

MICHAEL WARD: As you probably know, Scott, we've reached with theLRBC, the Rail Labor Bargaining Coalition, which is a combination ofseven unions, six of those ratified, the seventh is out for a revote,it's very close and they think it will pass and that will be back inAugust. That will take care of about 50% of the industry's employees.

We're currently in discussion with a TCU, or clerical-led coalitionfor another five unions. Those discussions are occurring at thispoint and we're hopeful that they will follow the pattern set by thebeginning 50% and then finally we'll have the UTU, which would be thelast to come this round.

SCOTT FLOWER: Okay. Thank you.

OPERATOR: Thank you. Our next question comes from Jason Seidl withCredit Suisse.

JASON SEIDL, ANALYST, CREDIT SUISSE SECURITIES: Good morning,gentleman.

A quick question about the personal injury reserve adjustment. Yousaid that you do a review two times a year. If the trends continue onyour safety record, should we expect another adjustment the next timethat you guys look at this?

OSCAR MUNOZ: It's difficult, this is Oscar, to forecast that. Thereare many issues that go into that adjustment, but clearly, our bestdriver of that that we control is continuing that great safetyrecord. And so that's what we focus on and then as the third partyactuarials do their work, the resulting number is what we workthrough.

JASON SEIDL: Okay. Thanks, Oscar.

Also, second question here. You talked about some of the long-termproductivity targets. Can you give us a little bit more color behindthat in terms of what they specifically are?

OSCAR MUNOZ: I think that the focus that we're trying to articulateis moving from kind of within year, within quarter kind ofinitiatives to a longer-term time frame as Tony and his team get someof the (inaudible) they've been getting, the decisions for movinglonger-term are important that we look at our investments, our toolsand resources and training of our much longer-term horizon. So it'sthe same basic issues, running the railroad and efficiency andproductivity, but just on a longer-term basis.

JASON SEIDL: So there's nothing, Oscar, that you guys specificallyhave in terms of, you know, here's our goals for train speeds, here'sour goal for producing recrew rates, terminal dwell?

OSCAR MUNOZ: Every initiative has both an efficiency and aproductivity measurement that we monitor and work through. We don'tnecessarily talk about those publicly, they're more internaldocuments. But, yes, every initiative has a very specific objectivethat's measured and monitored by the executive team.

JASON SEIDL: Okay.

OSCAR MUNOZ: And clearly a key to getting to that operating ratio tothe low 70s.

JASON SEIDL: My last question here, guys.

Just related to the economy, everyone's talking about a second halfturnaround, but have you guys started to see anything that wouldcause you to believe that we're starting to see it move in the rightdirection in terms of your customers and your traffic?

CLARENCE GOODEN: Jason, this is Clarence Gooden.

JASON SEIDL: Hey, Clarence.

CLARENCE GOODEN: We're seeing, you know, in certain segments of theeconomy, as I mentioned in our agricultural business, in our ethanolbusiness is strong, our chemical business continues to be strong. Weput our intermodal business in a neutral sort of category.

Our coal business is sort of flat, moving there, and we still seeissues in the housing sector. But overall, it looks to us like it'sslightly trending up as we move into this second half.

JASON SEIDL: Okay. That's good color. Thanks a lot, guys.

OPERATOR: Thank you. Our next question comes from William Greene withMorgan Stanley.

WILLIAM GREENE, ANALYST, MORGAN STANLEY: Hi.

I'm wondering if you guys have a sense for how much of your volumechange is due to the economy and how much might be due to yieldmanagement efforts, the whole pricing story?

CLARENCE GOODEN: I would say the preponderance of our volume changewas in the -- was due to the housing and automotive sectors, mainly.And we had some decline in our metals business because of theinventories building up as a result of the automotive sectors, but ingeneral, if you saw our other markets were fairly good as we movedin.

WILLIAM GREENE: Okay. So it doesn't seem like the pricing is chasingvolume off the rails is what you're saying?

CLARENCE GOODEN: No, I don't think so.

WILLIAM GREENE: Okay.

And then if we look at the ROIC target that you talked about, Oscar,how do you compute that cost of capital? Do you use regulatorydefinition or you use Cap M or some other metric?

OSCAR MUNOZ: Cap M.

WILLIAM GREENE: Okay.

And then just lastly in terms of a productivity metric, we often lookat carloads per employee and that's been falling for, I don't know,six, seven, eight quarters, something like that. How should we thinkabout that going forward?

Are you going to be able to start to drive that higher? Do you gothrough attrition or is this a number that just has to wait forvolumes to recover?

OSCAR MUNOZ: I think as the volume comes back, I think that willimprove that metric.

WILLIAM GREENE: Okay. So we still will kind of hold on to what we'vegot here just because of the regular attrition.

OSCAR MUNOZ: They'll move with volume.

WILLIAM GREENE: Okay. Thanks.

OPERATOR: Thank you. Our next question comes from John Larkin withStifel Nicolaus.

JOHN LARKIN, ANALYST, STIFEL NICOLAUS & COMPANY: Good morning,gentleman.

MICHAEL WARD: Good morning, John.

JOHN LARKIN: Just had a question.

I'm thinking back to the session that you held at the New York StockExchange, I guess, coming up on a couple years ago where you laid outa very coherent plan that envisioned, I think it was 2 to 3% volumegrowth over a five-plus year period. And since that time, the economyhas softened and volumes have turned negative.

As you look forward here in your plans through 2010, can you give usa sense for how you see volumes trending? When do you think theyear-over-year comparisons will turn positive? Will they tend togravitate back to that 2 to 3% level or do you think they'll maybeinitially ramp back a little faster than that so that the long-termfive-year average might be more like 2 to 3%?

And then as a follow-on to that, will that return to tonnage growthmake Tony's job a lot easier in terms -- or a lot more difficult, Ishould say, in terms of continuing to show such dramatic improvementin the operating metrics?

And then lastly, will there be additional capital projects that willbe needed to accommodate that growth beyond the Hudson River corridorand the [L&N] improvement that I would gather are nearingcompletion?

CLARENCE GOODEN: John, I hope you didn't think all those questions upby yourself. On the volume going forward, if the housing hadn't ofhit us as hard as it did as an industry and the automotive downturns,we could have had much better volume here.

I expect that as the housing starts to come back sometime in late2008 and all, you'll see the volume start to ramp back up. If we havea hot summer like we're having and hot nights and get a good electricburn on our coal, you'll see our coal business do good.

With the dollar staying as weak as it is right now, you'll see ourexport coal volumes stay strong and I wouldn't be surprised if youdidn't see some of the soybeans and ag products being exported as aresult of the weaker dollar. So moving forward into the out years andout through 2010, I think we're on target to see our 2 to 3% annualgrowth as we've outlined.

JOHN LARKIN: Will there be a catch-up do you think initially, or arewe just going to gravitate back off the lower base to a 2 to 3%growth once we return to normal?

CLARENCE GOODEN: Unless we have just some quantum jump in theeconomy, it'll be a glide.

JOHN LARKIN: Okay.

MICHAEL WARD: Tony, do you want to address the operations questionJohn had?

TONY INGRAM: Yes. John, addressing the capital, as we indicated therein I think it was 2005, we had a two-year program to build somecapacity between Chicago and Jacksonville and we're on target tocomplete that this year. We're seeing some improvements and we'lllook at that as we go forward.

We are planning long-term to look at different capital improvementsbased on the outlook of business to come. And the assistance with ournew program, our total service integration that we'll share with youguys a little later in the year will be a great tool on looking athow we lay out our capital program going forward.

JOHN LARKIN: Thank you very much.

OPERATOR: Thank you. Our next question comes from John Kartsonas withCitigroup Investment Research.

JOHN KARTSONAS, ANALYST, CITIGROUP INVESTMENT RESEARCH: Hi. Just aquick question for Oscar.

As you look at your $3 billion share buyback program, probably youwill need (inaudible) debt markets in the next year and a half here.Any thoughts on whether that's going to be a gradual process? Like acertain amount per quarter, or is it going to be a one-off like thesecond quarter?

OSCAR MUNOZ: John, are you talking about the debt?

JOHN KARTSONAS: Yes.

OSCAR MUNOZ: Usually we tend to do that in relatively large tranchesas opposed to scatter them over time. That's been our historicaltrend anyway.

JOHN KARTSONAS: Okay. And any thought on your cash balances, usingsome of that maybe?

OSCAR MUNOZ: We continue to use a balance of, obviously, cash on handand other methods, but a lot of it will be fueled by debt.

JOHN KARTSONAS: So you'd expect like (inaudible) million to stayrelatively flat?

OSCAR MUNOZ: I'm sorry. Say that again?

JOHN KARTSONAS: Do you expect the $800 million you have on thebalance sheet to stay relatively flat?

OSCAR MUNOZ: I think it will go down a little bit.

JOHN KARTSONAS: Okay. Thanks.

OPERATOR: Thank you. Our next question comes from Salvatore Vitalewith Calyon Securities.

AMY YOUNG, ANALYST, CALYON SECURITIES: Hi. This is Amy Young fromCalyon Securities in for Sal Vitale. Most of my questions have beenasked, but just a couple of questions on some safety costs.

As we think about modeling out safety improvements, what level ofcash costs should we expect to model out in the second half of '07and 2008? Any color you can add on that?

OSCAR MUNOZ: Amy, safety costs are a very broad swath of costs acrossour entire P&L. We really -- it's really difficult to forecastthat on an independent basis. So what we try to give you is sort ofbroad coverage on each of the individual line items, which we didtoday, it's the labor, MS&O, rent and such and that's probablythe best guidance we can provide you at this time.

AMY YOUNG: Okay. Thank you.

And back on to the yield of 7%. Is there any way you could quantifyhow much of that was mix? I'm not sure if that was --

CLARENCE GOODEN: No, Amy, as I mentioned earlier there to thatquestion, we had transitioned over to a mileage-based program that'sgot a fuel surcharge that's got a little bit different trigger point,and our focus has tried to stay on a same-store sales perspective,which you may have seen for the last two or three quarters. So oursame-store sales were up 6.5% and that RPU was up 6.9. So thedifference in those two is both fuel and mix.

MICHAEL WARD: So the true price increase was 6.5

CLARENCE GOODEN: True price was 6.5.

OPERATOR: Thank you. Our final question comes from Donald Broughtonwith A.G. Edwards.

MICHAEL WARD: Good morning, Donald.

OPERATOR: One moment, please. Mr. Broughton, go ahead.

DONALD BROUGHTON, ANALYST, A.G. EDWARDS & SONS: Thanks.

Can you give us some insight into how the April 26th transition tothe mileage-based fuel surcharge program went, and really any insightinto how it went on a commodity-by-commodity basis?

CLARENCE GOODEN: Donald, it went very well. We had essentially noproblems. As our contracts have renewed, we have taken the customersto the newer mileage-based fuel surcharge. I'm not aware of anyissues that we've had in any of our commodities.

MICHAEL WARD: And it doesn't necessarily affect the deregulatedcommodities, right? They continue to operate on the old program?

CLARENCE GOODEN: That is correct.

DONALD BROUGHTON: Of course, of course. But obviously it does affecta number of them.

And can you give us a quick update on the FRA investigation, a statusupdate and how, if any, it has changed your Cap Ex allocation plans?

MICHAEL WARD: Yes. We've been working very closely with the FRA overthe last three, four months and I think they're very pleased with theprograms we're putting in place. A lot of it has to do with one,behaviors and making sure that we're doing things in a safe manner.We've engaged in a number of programs with them.

The spending side of it is not real big, Donald. It's deploying sometechnology over the next couple of years, detection technology, whichare not overly expensive. So I think it's more around putting goodprocesses, good programs in place more than huge capital infusionsrequired.

And I think the FRA is very pleased with the program we have in placeand the progress we're making, and as Tony alluded to, this is, lastquarter was one of our safest quarters ever.

DONALD BROUGHTON: Fair enough. Thank you, gentleman.

MICHAEL WARD: Thank you.

Thank you, everybody, for joining us today. I think that concludesour call.

OPERATOR: Thank you. This concludes today's teleconference. Thank youfor your participation. You may disconnect at this time. Thank you.

[Thomson Financial reserves the right to make changes to documents,content, or other information on this web site without obligation tonotify any person of such changes.

In the conference calls upon which Event Transcripts are based,companies may make projections or other forward-looking statementsregarding a variety of items. Such forward-looking statements arebased upon current expectations and involve risks and uncertainties.Actual results may differ materially from those stated in anyforward-looking statement based on a number of important factors andrisks, which are more specifically identified in the companies' mostrecent SEC filings. Although the companies may indicate and believethat the assumptions underlying the forward-looking statements arereasonable, any of the assumptions could prove inaccurate orincorrect and, therefore, there can be no assurance that the resultscontemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUALREPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILEEFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BEMATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THESUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIALOR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANYRESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPONTHE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT.USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALLITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANYINVESTMENT OR OTHER DECISIONS.]

[Copyright: Content copyright 2007 Thomson Financial. ALL RIGHTSRESERVED. Electronic format, layout and metadata, copyright 2007Voxant, Inc. (www.voxant.com) ALL RIGHTS RESERVED. No license isgranted to the user of this material other than for research. Usermay not reproduce or redistribute the material except for user'spersonal or internal use and, in such case, only one copy may beprinted, nor shall user use any material for commercial purposes orin any fashion that may infringe upon Thomson Financial's or Voxant'scopyright or other proprietary rights or interests in the material;provided, however, that members of the news media may redistributelimited portions (less than 250 words) of this material without aspecific license from Thomson Financial and Voxant so long as theyprovide conspicuous attribution to Thomson Financial and Voxant asthe originators and copyright holders of such material. This is not alegal transcript for purposes of litigation.]

**---- Index References ----**

Company: BEAR STEARNS; BEAR STEARNS COMPANIES INC; MERRILL LYNCH; NORFOLK SOUTHERN CORP; TELE SERVICING INNOVATIONS INC; MORGAN STANLEY; NEW YORK STOCK EXCHANGE INC; SOCIÉTÉ FINANCIAL SA; SITE (NETHERLANDS); TSI; TSI INC; FINANCIAL; BARRA INC; **CSX** CORP; JJF ACQUISITION INC; TSI POWER CORP; TOTAL LOGISTIC CONTROL LLC

News Subject: (Business Management (1BU42); Sales & Marketing (1MA51); Prices (1PR65); Customer Service Management (1CU78); Customer Service Effectiveness (1CU08); Economics & Trade (1EC26); Economic Indicators (1EC19))

Industry: (I.T. (1IT96); Land Transportation (1LA43); Railroads (1RA98); Networking Administration (1NE06); Network Benchmarking & Measurement (1NE97); Passenger Transportation (1PA35); Travel & Tourism (1TR07); Passenger Railroads (1PA89); Transportation (1TR48); Networking (1NE45); Yield Management (1YI26); Freight Railroads (1FR84); I.T. in Transportation (1IT48))

Language: EN

Other Indexing: (AMERICAN SOCIETY; BEAR; BEAR STEARNS; CALYON SECURITIES; CHARLESTON; CITIGROUP; CITIGROUP INVESTMENT RESEARCH; COMPANY; **CSX**; **CSX** CORP; **CSX** EARNINGS CONFERENCE; FINANCIAL; FRA; INLAND POINT INTERMODAL; IPI; LRBC; MERRILL LYNCH; MORGAN STANLEY; MORGAN STANLEY: HI; NEW YORK STOCK EXCHANGE; NORFOLK SOUTHERN; RAIL LABOR BARGAINING COALITION; ROIC; RPU; SITE; STEARNS CO; SURFACE TRANSPORTATION; SURFACE TRANSPORTATION BOARD; TCU; TRANSCRIPTION; TRANSCRIPTS; TSI; USERS; UTU; VOXANT) (A.G. Edwards; Absent; Amy; Amy Young; Broughton; Burlington Northern; Cap; Cap M . WILLIAM GREENE; Clarence; Clarence Gooden; David; David Baggs; Everything; JOHN BARNES; JOHN KARTSONAS; JOHN LARKIN; Michael; Michael Ward; Mike; Oscar; Oscar Munoz; SEC FILINGS; Sir; Tony; Tony Ingram; WILLIAM; WILLIAM GREENE)

Word Count: 11404

**End of Document** © 2013 Thomson Reuters. No claim to original U.S. Government Works.

NewsRoom

# EXHIBIT PX0692

NewsRoom

10/17/07 Fin. Disclosure Wire 12:30:00

FD Wire
Copyright © 2007 CCBN, Inc. and FDCH e-Media, Inc.

October 17, 2007

Q3 2007 **CSX** Corporation **EarningsConferenceCall** - Final

OPERATOR: Good morning, ladies and gentlemen, and welcome to the **CSX**Corporation third quarter 2007 earnings call. As a reminder, today'scall is being recorded. During this call, all participants will be ina listen-only mode.

For opening remarks and introductions, I would like to turn the callover to Mr. David Baggs, Assistant Vice President of InvestorRelations for **CSX** Corporation.

DAVID BAGGS, ASSISTANT VP, IR, **CSX** CORPORATION: Thank you, and goodmorning, everyone. Again, welcome to **CSX** Corporation's third quarter2007 earnings presentation. The presentation material that we'llreview this morning, along with our quarterly financial report andour safety and service measurements, are available on our Web site atCSX.com under the investor section. In addition, following thepresentation this morning, a Webcast and podcast replay will beavailable. Here representing **CSX** this morning are Michael Ward, thecompany's Chairman, President, and Chief Executive Officer; TonyIngram, Chief Operating Officer; Clarence Gooden; Sales and MarketingOfficer; and Oscar Munoz, Chief Financial Officer.

Before we begin the formal part of our program, let me remindeveryone that the presentation and other statements made by thecompany contain forward-looking statements, and actual performancecould differ materially from the results anticipated by theseforward-looking statements. With that let me return the presentationover to **CSX** Corporation's Chairman, President, and Chief ExecutiveOfficer, Michael Ward. Michael?

MICHAEL WARD, CHAIRMAN, PRESIDENT, CEO, **CSX** CORPORATION: Thank you,David, and good morning, everyone. The third quarter results weannounced yesterday show the continued leadership ability of our teamto help solve America's pressing transportation problems whiledriving better safety and service for our customers, and higherproductivity and value for the shareholders.

If I could just take a moment here, I realize that many of you areinterested in the letter we received yesterday from the Children'sInvestment Fund. I can assure you that the board values the opinionof all its shareholders and is reviewing the letter. In the meantime,we remain focused on being safer, providing better service, and beingmore productive. Our focus on these and every other aspect ofoperating the railroad is the reason we were able to continuedelivering strong results in spite of some weakness in parts of theeconomy. We think this says a great deal about the sustainability ofour businesses and the relentless drive of our team.

The company continues to increase its core earning power. Earningsper share from continuing operations were up 24% from last year, whenyou factor out insurance recoveries and tax settlements. The higherservice levels and the clear advantage of riding our rails versusother modes of transportation are supporting continued strength inpricing as we provide value to our customers. Our servicetransportation businesses generated record third quarter revenue of$2.5 billion, a 3% increase over 2006, and record

third quarteroperating income. Higher revenue per unit and productivity gainsenabled us to deliver a 78% operating ratio for the quarter. Andwe're going to build on our service improvements and furtherstrengthen our focus on cost as we drive towards a mid to low 70soperating ratio by 2010.

Safety and service levels are at historical highs for our company.Safety, as we've told you before, is the bedrock of our operations,and it's a core value of our company. As we continue to getsignificantly better in an industry that is among the best in safety,we will learn from incidents like the one last week in Painesville,Ohio. We're thankful that no one was injured, and we are grateful tothe citizens for their patience as we work through with localofficials to mitigate this situation as quickly as possible.

As I mentioned earlier, the economic challenges we are facing inseveral markets are simply a reality that we are dealing with. Webelieve the issues are temporal and see strong evidence of a robusttransportation environment long-term. Our board and management teamrecognize the need to invest for the future, even as we continue toreturn capital to our shareholders through our dividend and sharerepurchase programs. Our disciplined strategy of investing to meetAmerica's growing transportation needs is consistent with ourindustry peers, who as a group invested nearly $7 billion last yearin infrastructure capital. We're proud that our financial results,total shareholder returns, and our commitment to returning capital tothe shareholders lead the industry.

**CSX** continues to perform well versus its peers and the transportationindustry in general. Over the past three years, our shareholders haveseen returns in the top 10% of all S&P 500 companies. We believethat **CSX** has delivered superior performance and the company hasdemonstrated a commitment to meaningful enhancement of shareholdervalue in the future. Now, let me turn the presentation over to Tony,who will discuss how we are making our operations increase to thenext level.

TONY INGRAM, COO, **CSX** CORPORATION: Thank you, Michael. Good morning,everyone.

Our consistent model of leadership, discipline, and execution isproducing great results. First, safety remains at all-time highs.Most recent FRA data shows that **CSX** ranked in the top two and thepositive trends will continue. Productivity is also improving,working to help offset inflation and drive the operating ratio lower.We're running the plan and key service measures improved across theboard. Customers rated **CSX** number one in overall satisfaction in arecent third-party survey.

Now, let's look at the results in more detail. Slide 7 shows theexcellent trends in safety continued in the third quarter. In theyellow box, you see personal injuries at 1.24 for the quarter, animprovement of 17% versus 2006. Average frequency for the rolling 12months increased to 1.24. Train accidents were 2.79 for the quarterand improved 14% compared to the prior year. For the rolling 12months, they improved 19% to 2.98. These results reflect our strongcommitment to safety and reaching even higher levels of performance.

Now let's look to on-time train performance, a key driver of servicereliability. On-time originations increased to 83% in the quarter,another all-time high for **CSX**. For the rolling 12 months, performanceimproved to 78%. On-time arrivals were 76% for the quarter andimproved to 69% for the rolling 12 months. The train network isrunning well, and our focus on planned execution is producingresults. The positive trend will continue as we build on thissuccess.

Looking at slide 9, our asset productivity continues to improve. Onaverage, dwell was 22 hours in the quarter, about 10% improvementversus 2006. The positive trend continues on a rolling 12 months. Ourterminals are running to plan every day and remain fluid. Cars onlineremain at good levels, averaging 221,000 cars for the quarter. Lowervolume combined with improved car turns pushed the car counts down.

Now, let's look at another measure of network performance velocity.Velocity improved to 21.4 miles per hour in the third quarter and20.4 for the rolling 12 months. Improvement in average velocity isvery positive, but stable velocity performance is also important. Inthe end, this leads to more consistent service for our customer.Better planned execution combined with focused capacity investmentsis producing this steady improvement.

Turning to slide 11, we are driving productivity gains and helped topush the operating ratio lower. First, better is cheaper, the networkis more efficient, and the most evidence is in car hire. Oscar willdiscuss the details later. Second, in this period of lower volume, weare adjusting the operating plan. This drives reduction in resourcesand manpower levels. In addition, structured teams are delivering apipeline of productivity projects. For an example, we're using GPStechnology to improve asset utilization, train handling, and fuelefficiency. Finally, as we discussed at the investor conference, ourTSI initiative will improve both customer service and networkproductivity.

Wrapping up on slide 12, our plan is working and we will continue tobuild on the solid foundation with leadership, discipline, andexecution. The great momentum you see in safety, service, andreliability will continue. We can achieve even better results.Finally, we're driving productivity with a structured and disciplinedapproach to push the operating ratio even lower. Now, let me turn thepresentation over to Clarence to review the sales and marketingresults.

CLARENCE GOODEN, EVP, CHIEF COMMERCIAL OFFICER, **CSX** CORPORATION:Thank you, Tony, and good morning, everyone.

The third quarter again proved that working with our customers in afree market environment is the best way to sustain a vibrant railindustry and global competitive advantage for our customers. Thismorning, I will highlight our results, the primary driver of thoseresults, and offer insights on what we see ahead for the remainder of2007. **CSX** achieved another successful quarter of revenue growthdespite the continued volume weakness. Revenues increased over 3% toa third quarter record of $2.5 billion, exceeding the prior year by$83 million, as yield improvements more than offset the impacts oflower volumes. These yield improvements continue to reflect thesuperior value we are providing our customers through improvedservice. This builds on our success in delivering uninterruptedquarterly revenue growth for more than five years.

Now let's look at pricing on the next slide. Price continues todriver revenue per unit growth. The line on this chart reflects theyear-over-year change in total revenue per unit, which includes theimpact of price, fuel, and mix. During the third quarter, overallrevenue per unit increased 8%. The bars on the chart reflect theincrease in price on a same-store sales basis, which excludes theimpact from fuel and mix. Same-store sales are defined as shipmentswith the same customers, same commodities, and car types, shippedbetween the same origin and destination. These shipments representapproximately 75% of our total traffic base.

Same-store sales price increases were 6.5% for the quarter, and isconsistent with our 6 to 7% target for 2007. Based on the value thatwe are providing to our customers through improved service, we expectthe momentum to continue. In 2008, we expect to deliver 5 to 6% insame-store sale price increases, which is consistent with previousguidance. Future pricing gains are critical for **CSX** and the entireindustry, for us to continue to invest in our networks and to meetthe long-term demand for rail transportation.

Now let's look at the markets. Quarterly merchandise revenue ofnearly $1.3 billion increased by over 3%. This growth was driven bystronger yields in all markets as revenue per unit increased almost9%, more than offsetting the weakness in volumes. We saw the mostsignificant volume declines in our forest products and food andconsumer markets, where the softness in the housing sector reducedshipments of lumber, building products, and roofing granules. We hadthe most significant revenue gains in phosphates, agriculturalproducts, and chemicals. The volume declines were more than offset byyield improvements, again reflecting our strong service product.

Reviewing the results in coal, quarterly coal revenues improved to$650 million, an increase of nearly 8%. Continued strong demand forexport coal during the quarter nearly offset declines in shipments toutilities as eastern coal utility stockpiles remained at targetlevels. Revenue per unit increased 10% in the quarter and we expectthe favorable pricing environment to continue as we reprice long-termcontracts to current market levels.

Now turning to the automotive results, quarterly automotive revenueof nearly $200 million increased 8%. The increase in production oflight vehicles more than offset the decline in SUV volumes. Pricingactions resulted in an increase in revenue

per unit of 6%, and thepricing outlook remains favorable going forward. Long-term, we arewell-positioned within our diverse portfolio of business with the BigThree and will continue to be supplemented with additional growthfrom the new domestics.

Turning to our intermodal results, quarterly intermodal revenue of$337 million declined 7%, driven by a mix in lower volume as declinesin international traffic more than offset the increases in domestictraffic. Overall, revenue per unit decreased 1% due to the miximpacts from shorter haul but profitable traffic. However, thesame-store sales price for intermodal increased more than 3% for thequarter. From a volume perspective, international traffic was down17% due to losses across a few accounts and slower import growth fromAsian markets. New shorter haul train services into and out ofAtlanta and Chambersburg, Pennsylvania, as well as other newdedicated train services drove growth in domestic traffic by morethan 10%. These new services will continue to be a catalyst forgrowth going forward.

Now let's take a look at the revenue outlook for the fourth quarter.Overall, our fourth quarter revenue outlook is positive. Pricingstrength will continue to be the key driver across all markets. Weremain committed to providing excellent service and value for ourcustomers and we will not sacrifice price for short-term volumegains. As you can see in the near-term, revenue is expected to befavorable in six of our ten markets, neutral in one, and unfavorablein three.

Coal, coke, and iron ore revenues are expected to remain strong dueto the strength in the export market and the favorable pricingenvironment. While the outlook for the auto market is neutral, therevenue outlook for merchandise is generally favorable, althoughcontinued softness in the housing sector will impact volume andrevenue in the forest products and the food and consumer markets. Thefourth quarter outlook for intermodal is unfavorable, although we seecontinuing benefits from improved operations and our new services.Thank you very much and let me turn the presentation over to Oscar toreview our financial results.

OSCAR MUNOZ, CFO, **CSX** CORPORATION: Thank you, Clarence, and goodmorning, everyone. Yesterday, **CSX** reported earnings per share of$0.91, included $0.24 from discontinued operations. Michael mentionedthis morning, and as you can see on slide 22, we recorded $0.67 fromcontinuing operations, which represents a decrease of $0.04 from theprior year. Start at the top of the slide and work our way down, inthis quarter we saw Surface Transportation operating income of $552million, reflecting the improved operating performance and thisteam's focus on delivering consistent financial results. Below theline, other income decreased $8 million reflecting lower real estateand resort income. Next, interest expense increased $5 million as weissued $1 billion of incremental debt in early September. Finally,our income taxes are a $84 million higher, primarily due to a prioryear benefit.

Turn to the next slide, and let's look at our results on a morecomparable basis. After removing the prior-year insurance gain thatincome tax benefits, EPS from continuing operations increased $0.13***o***r 24% on a comparable basis. Looking at operating income afterremoving the gain on insurance recoveries for both years, our surfacetransportation businesses increased earnings $77 million or 16%. Nowlet's walk through the details of our results on the next slide. AsClarence just discussed, we have seen more than five years ofuninterrupted topline growth. In total, continued strength in yieldsmore than offset our decline in volume, resulting in over 3% or $83million in revenue growth for the quarter.

This topline growth, combined with our stronger operations and ourimproved productivity and lower volumes resulted in a $77 million or16% improvement in operating income. Same drivers improved thecompany's operating ratio of 240 basis points to 78%. Thisperformance continues our industry-leading momentum that we'veestablished over the last three years, and as we've improved ouroperating ratio nearly 1,000 basis points, it positions us for ourdriver towards a mid- to low 70s OR by 2010.

Now let me review our expenses in more detail, starting with laborand fringe. As you can see on slide 25, our labor costs increasedonly 1% or $10 million, primarily driven by inflation of $24 million.Partially offsetting this increase was a reduction in train crew headcount, reflecting our continued focus on productivity and costcontrol. On a full-year basis, we continue to expect our labor andfringe benefits to increase less than inflation as we achieve ourproductivity objectives.

Moving to the next slide, MS&O which increased 1% or only $6million over the last year, as we talked about before, this is a lineitem that fluctuates from quarter to quarter. Our safety performance,volume, collection activities, and other items can all have an impacton these results. In this particular quarter, inflation was mostlyoffset by a decrease in costs associated with our reduction in trainaccidents, which was a 14% reductions. This reflects the continuedimprovement in our safety performance and all associated costs.

Let's talk about fuel on the next slide. Overall, fuel increased 2%or $5 million versus last year. The $0.16 increase in the averagefuel price per gallon resulted in $22 million of additional cost.This was partially offset by a decline in volume and ton miles and bythe continued focus on fuel efficiencies. In the third quarter alone,improvements in fuel efficiency reduced fuel costs by $10 millioncompared to the prior year.

Now let me talk about rent on the next slide. As Tony mentionedearlier, the continued improvement in operational fluidity hassignificantly increased our asset utilization. This, combined withlower volumes in our merchandise and intermodal markets resulted in a14% or $19 million decline in rents. On a go-forward basis, youshould expect our rent expense to move with our business volumes andcontinue to benefit from the improvements in asset utilization. Onthe next slide, let me review the remaining expenses. All otherexpenses increased 1% versus prior year. The main driver wasdepreciation, which is higher due to our net increase and our capitalasset base and was partially offset by lower Surface Transportationservices.

Now if I can, let me update you on where we stand on our sharerepurchase program. In slide 30, during the third quarter werepurchased $882 million, or just over 20 million shares of ourcommon stock. To date we have completed slightly over half of ourcurrent $3 billion program and remain on track to finish the programby the end of 2008. In total, our share repurchase program representsapproximately 15% of the company's current market cap, and isconsistent with our balanced approach of investing in the business,returning value to share owners through share repurchases anddividends.

Wrapping up, these results represent a record third quarter operatingincome and were driven by solid revenue growth and improvedoperational productivity, reinforcing our view of the company'slong-term prospects. As a reminder, our long-term financial targetsare to deliver double digit growth in operating income and earningsper share through 2010, growing off a record 2007 base. Thisfinancial growth is supported by nearly $5 billion of investment overthe next three years as we continue to capitalize on the long-termsecular trends in the industry.

With that let me turn it back over to Michael for his closingremarks.

MICHAEL WARD: Thank you, Oscar. Well, we've come a long way, both asan industry and as a company. You're seeing us make the transitionfrom a cyclical company, largely at the mercy of economic swings to acompany that can manage through periods of softness and still deliverexceptional results for shareholders. America needs railroads morethan ever, and railroads are stepping up to the challenge.

It's no secret to any of you that just as the industry is beginningto turn the corner financially, there are those who would like toturn the clock back to the days of regulation. In 1980, one out ofevery four rail miles in this country was owned by a company inbankruptcy. Today, railroads are paying their own way, investingheavily in the future of our essential service and rewardingshareholders. In September I told you I was optimistic that goodpolicy would prevail. After the recent hearings in Washington, Iremain optimistic. I believe policymakers are going to recognize therisk that reregulation would pose, particularly with respect toinvestment in America's rail system. At the same time, the federalagencies that regulate railroads are becoming increasingly active inaddressing concerns of our industry, and I believe that there's agrowing sentiment that the railroad should be allowed to continueworking without re-regulation legislation.

Because we believe that what comes out of Washington will bebalanced, and because we believe in ourselves and the long-termtransportation environment, we are investing nearly $5 billion in ournetwork over the next three years. These investments will help keepAmerica's rail system strong and safe while ensuring that shareholdervalue is sustained over the long haul. That's

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works. 

how the free marketsystem works in this and every other industry. Our investments turninto value when we create better service for our customers. That ishappening. It's happening because of the investment we make andbecause of our employees who meet the needs of our customers everyday. So we have a vibrant enterprise, investments are being made,customers are being served, employees and communities are safer thanever.

And shareholders are benefiting too. In the past three years, you'vebenefited in a big way. Your investment has grown because of theperformance of our company has caused the share price to increasesignificantly, and you've been rewarded because of our balancedapproach to creating value. This includes long-term investments Ijust described, along with our repurchase and dividend strategies. Weknow we're creating value, real and lasting value.

It's telling that a 180-year-old U.S. rail system, the best railfreight system in the world, holds the key to so many modern problemsfacing our country. Our employees and our investments are making thesolutions possible. And those solutions will continue to rewardshareholders for many years to come. With that, we'll take yourquestions.

DAVID BAGGS: We'll turn it back over to Verizon to go ahead and haveeveryone queue up for Q&A.

OPERATOR: Thank you. (OPERATOR INSTRUCTIONS) Thank you. Our firstquestion comes from Edward Wolfe from Bear Stearns.

ED WOLFE, ANALYST, BEAR STEARNS: Yes. This is a question, I guess,for Tony. Can you talk a little bit about where you are on thespectrum of improving on all these service metrics? Clearly, withweaker volumes, that's got to help, I would think, velocity and dwelland recrews and some other things, and yet you've been steadilyimproving for a while now. So can you talk to how much theenvironment is helping and how much further and how much longer youcan continue to have these kind of improvements?

TONY INGRAM: Ed, you've noted the issues that we've tried to addresswith the volume. The volume is, as we put it in our model, our ONEPlan is able to readjust the trains, we try to maintain a certain carlength for our trains. We'll continue that. Our people are improving,our supervisors are improving, our training efforts are improving. Ithink 50 to 60% of the improvements you see will be on an ongoingbasis because that's through our discipline and leadership programalong with some of the capital investments we've made will continueto help us improve our operations. So there's some upside as wecontinue here. Of course, volume affects it. We're always moreefficient with bigger trains and more volume, but we think we've gotthe technology with our ONE Plan to adjust and stay as close to thisas we go forward.

ED WOLFE: Am I wrong, then, in assuming that less volume is sometimeshelpful as you try -- I mean, it seems like your metrics have donebetter when your volume has actually been a little bit less.

TONY INGRAM: Well, less volume is never good, but we tried to adjustto it, but it does create some capacity at times when there's lessvolume and you're able to reduce trains and slots instead of thesizes of trains, yes, it will help you on your --

MICHAEL WARD: Ed, this is Michael. As we look back to 2004, it was asimilar period where we had similar amounts of gross ton miles, whichis the key work characteristic there. And if you look at the twoperiods, a significant improvement in all of the key operatingmeasures. So while the volume does increase a little bitsequentially, if you look at the base operations of now versus 2004,there's a marked difference with the leadership that Tony's beenbringing to the operating team.

ED WOLFE: I'm not denying there's not a big improvement, I'm justtrying to understand in terms of degree, how we should think aboutthat as volume comes back I'm guessing, a little bit less on some ofthose.

MICHAEL WARD: There'll be a little bit less, but I think most of ithas been driven by the cultural change and the discipline around theONE Plan.

ED WOLFE: Okay. Clarence, I think you noted 3% pricing for intermodalsame-store. Can you break that down between domestic andinternational in (inaudible) ?

CLARENCE GOODEN: I don't have it broken down, Ed, between domesticand international, here in front of me. I can get those numbers foryou.

ED WOLFE: Directionally, I'm guessing domestic is a bit stronger thaninternational; is that fair?

CLARENCE GOODEN: That's fair.

ED WOLFE: Just bigger picture, Michael, you talked a little bit aboutthe rail rereg and that you're confident that cooler heads willreprevail. It looks like the safety bill is going to make its way onthe to the house floor this week possibly. What's your sense that theimpact from a bill like that might have on **CSX** and the otherrailroads?

MICHAEL WARD: As you know, there's two very different versions, theHouse version and the Senate version. I think obviously they'll haveto go into reconciliation here and it'll be a little easier to judgethat once we know that reconciliation is. I think we believe that theSenate version is a probably more appropriate for our industry. Wesee most of the things in there that we can probably live with thoseand will help improve the safety and most of the other railroads feelthe same way.

ED WOLFE: Thank you for the time. I appreciate it.

OPERATOR: Thank you. Our next question comes from Mr. Tom Wadewitzfrom JPMorgan.

TOM WADEWITZ, ANALYST, JPMORGAN: Yes, good morning. I wanted to ask abit about productivity in terms of where are you on head countreduction with respect to where the volume level is on the railroad?Is there a bit of a lag where we might see an acceleration in headcount reduction looking forward, or is it kind of 1.5% reduction inhead count and that's reasonable to expect for the next couple ofquarters if volume remains soft?

OSCAR MUNOZ: Hey, Tom, it's Oscar. I think the process that we gothrough -- that Tony goes through, primarily, with his organizationis to look forward with volumes and adjust both the hiring and thefurlough aspect of our future business. So depending on how volumeswill work, we'll continue to pull that lever. I don't want to give aspecific fact or figure, because again it will depend on volumes andwe're trying to stay relatively flexible on that, but what you didsee this quarter is a pretty significant reduction and we should seethat holding through the end of the year, certainly.

TOM WADEWITZ: So you wouldn't say that there's a lag in how thatcomes in? You kind of had nice productivity on head count and thatkind of continues?

OSCAR MUNOZ: No, I don't think there's a lag. I think we get thebenefit as we do it.

TOM WADEWITZ: Right, okay. One kind of a broader strategic question,when one of the points that your favorite shareholder highlighted, Iguess TCI highlighted yesterday. From an operational perspective,there may be room for longer-term to conversion with the other railsand you had very significant improvement to this point, but is therean opportunity for kind of a step change action, whether it'schanging some of the terminal network or whether it's kind of broadlyrevisiting a ONE Plan where you look at the train schedule andblocking and so forth. Is there potentially a big step change driverof improvement, or is that not realistic? You have shown very goodcontinued process improvement, but I'm just trying to get a sense ifyou think there's a big step out there further in the future.

MICHAEL WARD: Tom, this is Michael. As you know, we did have a prettybig step change there about a year ago and since then you've sawstrong, continued improvement. I think that's what we could expect tocontinue to see. Tony and his team continuing to drive the strongimprovements as we get better around our discipline around the ONEPlan, was I don't see any big step function change that's out thereon the horizon.

TOM WADEWITZ: And just in terms of the terminal network, you thinkthat's pretty much where it needs to be? You're comfortable with whatit looks like?

MICHAEL WARD: Yes.

TOM WADEWITZ: Okay. Thanks for the time.

OPERATOR: Thank you. Our next question comes from Mr. John Barnesfrom BB&T Capital Markets.

JOHN BARNES, ANALYST, BB&T CAPITAL MARKETS: Good morning, guys. Twoquestions. One, as you look at this persistent industry-wide volumeweakness and hearing from all modes of transport, things obviouslylook a little bit weaker right now. Have you guys given any furtherthought to your CapEx budget? I know you laid it out at your analystmeeting, but how quickly can you modify it if this volume kind ofstays at these levels and we don't see any marked improvement incarloads going forward? How quickly can you make adjustments to thatCapEx and what would end up happening with those dollars if youweren't spending them on expansion CapEx?

MICHAEL WARD: John, as you know, a lot of those investments we'remaking are one to sustain the current safety and infrastructure wehave, but secondly to prepare for future growth. We don't think thatthese short-term issues really portend long-term issues. And we aremaking these investments really for the long-term. So as you saw inthis quarter, even in this weaker environment, we had very goodresults. We anticipate we will continue to do so and generate thecash flow to be able to make the capital investments for the future,obviously continue to pay our dividend, and our share repurchaseprogram. Our three legs of our balanced approach and we anticipatewe'll be able to continue to do that and build long-term value.

JOHN BARNES: Okay. The other thing was -- my other question was, youguys are ahead of where I projected you would be on the share buybackat this point. I think you're to be applauded for that. What's yourthinking as you get into '08 and you begin to exhaust the currentauthorization? I'm just kind of curious as to what your thinking ison a go-forward basis. Do you do something more methodical on a sharerepurchase authorization on a go-forward basis, or do you thinkyou're coming back out with another $3 billion type of authorizationat the end of this one?

MICHAEL WARD: John, I think we take one step at a time. We have acurrent $3 billion program out there that we're working on, and whenthat program is finished we will once again look at all the factorsand decide what actions we take. It's really not appropriate todiscuss that at this point.

JOHN BARNES: All right, guys. Thanks for your time.

OPERATOR: Thank you. Our next question comes from Scott Flower fromBanc of America Securities.

SCOTT FLOWER, ANALYST, BANC OF AMERICA: Yeah. Good morning, all.

MICHAEL WARD: Good morning.

SCOTT FLOWER: Actually a couple questions for Clarence. First andsecond quarter, Clarence, did mix have a more favorable or lessfavorable impact on revenue per unit for you?

CLARENCE GOODEN: It had a more favorable.

SCOTT FLOWER: More favorable? Demonstrably or just a little bit?

CLARENCE GOODEN: Just a little bit.

SCOTT FLOWER: Okay. And then on your fuel surcharge, have you beenable to -- maybe I need to step back. Where are you in terms ofcoverage of your fuel surcharge and has that been moving up thisyear? Can you give me some sense of where that stands?

CLARENCE GOODEN: Yes, it's been moving up this year. We're now atabout 85% coverage with either fuel surcharge or RCAFU. We renew nocontracts without fuel surcharge.

SCOTT FLOWER: And how much is that year over year, 5 or 10 percentagepoints roughly, or less than that?

CLARENCE GOODEN: Somewhere in that range.

SCOTT FLOWER: Okay, all right. Thanks very much.

CLARENCE GOODEN: Thanks, Scott.

OPERATOR: Thank you. Our next question comes from Chris Weatherbyfrom Merrill Lynch.

CHRIS WEATHERBY, ANALYST, MERRILL LYNCH: Hey, good morning. It'sChris Weatherby in for Ken Hoexter. Just touching back on theintermodal side for a minute, just curious if you could comment onthe bit of the backslide we saw on the OR for intermodal. Obviouslyvolumes were a bit weak and pricing non mix-adjusted was a bit weakeras we saw international go negative. Was wondering if you couldcomment a bit on how we see the run rate going forward. You had a bigimprovement last quarter, a bit of a decline this quarter. Where dowe see that going?

CLARENCE GOODEN: Our revenue declined reflects some of the lowerinternational volumes and the change in mix, for example where we hadthree now new shorter haul services, one to Chambersburg,Pennsylvania, two to Marion, Ohio, and three with the BNSF intoAtlanta. We do expect intermodal to begin to grow again in 2008 as welap some of these losses. That increase up to an 81.3 operatingratio, which is a slight increase. We do operate, as you're aware, afixed impact of trains that will be impacted by the cost side to someextent by the amount of volume that we can put on it, but we didn'tsee the rise as a dramatic rise and we are very cognizant of whatthose cost of operating that fixed network are and we're working veryclosely with Tony's team to take out the cost, not only from thestandpoint of crew costs and train start costs, but from thestandpoint of equipment costs.

CHRIS WEATHERBY: Okay. As far as -- you had mentioned a customerloss. Anything you can share with us on that that's not toosensitive? Was it a redeployment of assets to different lanes orsomething competitive?

CLARENCE GOODEN: It was some competitive moves and they were notservice related and I don't want to get into the specifics of thecustomers, because the customers themselves like to keep those thingsconfidential.

CHRIS WEATHERBY: Of course. Fair enough. Then switching gears a bitto the buyback. As you guys had mentioned, you got a decent amountdone in the quarter. Debt increased a bit more than we were lookingfor, your debt to cap around 46, debt to EBITDA around 2.25 times.Where do you think you can stay -- what's the target level keeping inmind you guys have mentioned you want to stay investment grade? Alittle over 2 times debt to EBITDA a good level for you guys or canyou increase that a bit?

OSCAR MUNOZ: It's Oscar. I think what we've said pretty consistentlyon the leverage is about a 50% target level and I think we're stillstaying with that.

CHRIS WEATHERBY: Okay. And then I guess just real quick. The way youguys look at ROIC. Just thinking about it on a replacement costbasis, obviously ROIC are coming up and looking pretty solid. Wheredo you think you stand on a replacement cost basis? I'm sure you guyshave done the analysis. I'm just kind of curious, is it half thatlevel, somewhere in between, higher, lower?

OSCAR MUNOZ: What industry looks at their ROIC on a replacement costbasis? I don't know of any industry that does that and I think we'llprobably continue to follow the normal traditions of the way peoplecalculate ROIC. As we continue to improve our profitability, theoverall return is going to continue to increase.

CHRIS WEATHERBY: Okay. All right. Fair enough. Thank you very much.

OPERATOR: Thank you. Our next question comes from Mr. William Greenefrom Morgan Stanley.

WILLIAM GREENE, ANALYST, MORGAN STANLEY: Oscar, I'm wondering if youcan talk about the free cash flow projection you talked about at theinvestor day in 2007. Has that changed in all given the volumetrends, or how you did in the third quarter?

OSCAR MUNOZ: No, not at all. I think we said the [100] plus a whileago and that's still our target for this year.

WILLIAM GREENE: Okay. And then for Clarence, can you talk a littlebit about coal? How long do you think it will be before maybe theutility stockpiles reach a point where we can start to see moremeaningful growth in that category?

CLARENCE GOODEN: Obviously it's weather-dependent andgeneration-dependent and generation and the numbers that came outyesterday for industrial production were actually down. So I'm hopingfor a cold winter. I just don't know how to answer you other thanthat, William.

WILLIAM GREENE: Okay. So basically not a lot of visibility until wesee some colder weather there. And then on intermodal, can we justtalk a little bit about the short haul move. Can you give us a sensefor how much of the growth in the volume there is due to the shorthaul move and then we can get a sense of what the RPU is, or how tothink about this going forward?

CLARENCE GOODEN: I can't on the RPU, but I can tell you a significantamount of volume, specifically in the domestic side was in the shorthaul moves in the Birmingham to Atlanta lane, in the St. Louis toMarion, Ohio, lane, and then in a lesser extent from the Chicago toChambersburg lane.

WILLIAM GREENE: Thanks for your help.

OPERATOR: Our next question comes from Gary Chase from LehmanBrothers.

GARY CHASE, ANALYST, LEHMAN BROTHERS: Good morning, guys. Just aquick one for Clarence. Or maybe Michael. When you look at that 2008goal that you've got out there, the 5 to 6% in same-store sales, isthere any way to give us some flavor for what falls into thefollowing buckets? You've got escalation on existing contracts,you've got the rollover of contracts that are rolling to currentmarket rates, and then is there -- I guess, is there a third bucket?Is there an assumption that the market continues to grow in terms ofthe overall base line? I guess, how important is that last componentto the 5 to 6?

CLARENCE GOODEN: Well, I would tell you that in the rollover area,there's about 25 to 35% is rollover. I would tell you that there is afairly significant amount that is already renegotiated that willstart and kick in on January 1. And I would tell you that theescalation factor would make up the rest.

GARY CHASE: Okay. So there's not much expectation for the marketreality changing. It's really kind of here today. It's just a matterof it playing out on the P&L; is that fair?

CLARENCE GOODEN: I think that's fair.

GARY CHASE: And could I just ask a question of Tony as well, just afollow-up to one of the earlier questions. Obviously understandyou've had some beneficial impact from some of the operatinginitiatives that you've put in place and volume has been helpfulalso. Can we think about volume growth of 2 to 3% with continuedimprovement, understanding you'll keep driving the operationalimprovements, but there'll be some offset with volume challenge. Isthat a reasonable goal?

CLARENCE GOODEN: I think that's reasonable. We still have somecapacity on our trains to absorb something like that.

MICHAEL WARD: And continue to improve.

CLARENCE GOODEN: And continue to improve at the same time.

GARY CHASE: But you think you could do low single digit growth andsee those service metrics keep moving in the right direction?

CLARENCE GOODEN: As far as the service metrics, yes. Yes, we couldsee them continuously improve with that kind of growth.

GARY CHASE: Okay. Thanks, guys.

OPERATOR: Thank you. Next question, John Larkin from Stifel Nicolaus.

JOHN LARKIN, ANALYST, STIFEL NICOLAUS: It's actually Stifel Nicolaus,but thank you anyway. Good morning, everybody.

MICHAEL WARD: Good morning, John.

JOHN LARKIN: I thought I heard Clarence mention that you had done asurvey or some independent party had done a survey that indicatedthat **CSX** showed up as number one in service. Could you give us alittle bit more detail on that, what parameters were measured and whowere you compared against, and who did the analysis?

CLARENCE GOODEN: This is Clarence. Actually, Tony mentioned that, butthe survey was done by J.D. Power and Associates and we have beendoing that since 2002. We started out of in 2002 in not as good asshape as we would have liked to have been. For this year, for twoconsecutive quarters, we've been ranked in that survey by ourcustomers in the top position. We surveyed more than 10,000customers, there's 15 different parameters from order fulfillment toservice to contract negotiations to customer service to sales rep toconsistency of transit that are measured in that.

JOHN LARKIN: Are you compared just to your geographic competitor ormore broadly to the whole industry?

CLARENCE GOODEN: More broadly, to the whole industry, includingtrucking.

MICHAEL WARD: John, the other thing I would add to that, this is nota completely scientific thing. It's polling our customers and askingif they use the other roads and if so what's they're experience tothe other roads.

JOHN LARKIN: So there might be some bias towards giving you higherratings?

MICHAEL WARD: No, I think most of the big customers use most of thebig railroads.

JOHN LARKIN: Okay.

MICHAEL WARD: But I want to let you know this is not some nationwidesurvey, although it's a very broad one as Clarence indicated.

JOHN LARKIN: Would it be possible to maybe make a summary availablethat to the sell side or wall Street in general?

MICHAEL WARD: Actually, John, we've kept that internally here so thatwe can use it to better ourselves, to try to improve as we goforward.

JOHN LARKIN: Okay. Well, congratulations on the big improvementthere. Secondly, the state of Florida is one of the two reasons, Iguess in the country, along with southern California, that has beenmost hard hit by overbuilding in the housing market. Given that youare the primary railroad in thestate of Florida, how much of thevolume softness can be traced to the state of Florida and will thatmake your volume recovery a little more difficult going forward sinceit may take a little more longer to absorb all the excess housinginventory there?

CLARENCE GOODEN: John, obviously we've looked at the housing marketin Florida and California to your point very closely. 25% of theforeclosures in this country have occurred in Florida, 25% inCalifornia, 32% of the homes bought in Florida in the last threeyears were not -- were primary residences, meaning two-thirds werenot. There's a glut of houses on the market. It impacts our aggregatematerials, it impacts our consumer goods, refrigerators, washers,dryers. We've been trying to quantify what that number is for someperiod of time. It's difficult to quantify it not only from thestandpoint of the basic raw building materials of building the house,but it also starts to impact imports with furnitures, appliances fromoverseas. But I would tell you that it is not a pretty picture and itdoes have an impact on what our volume growth is.

JOHN LARKIN: Okay. Thank you. Then on the regulatory front, I thinkyou made your viewpoint pretty clear on the prospects forreregulation. You talked a little bit about your thoughts on how costof capital ought to be calculated and that sort of thing. There'sanother issue out there, and that's the streamlined process forsmaller shippers to contest rate cases. I think if I'm not mistaken,DuPont is kind of working their way through that process now as kindof almost a test case. Any thoughts on whether that process will haveany negative impact going forward?

MICHAEL WARD: As you know, John, that's a pretty new process andyou're right that DuPont is going to be sort of a test case on that.These are just part of the business. The challenges that DuPont hasgiven is only on seven moves out of the hundreds of moves they havewith us and probably only represents about 5% of our revenues withhim. They're a good customer, we like DuPont, but we think our pricesare fair and competitive and we're going to go through that STBprocess with them. As you know, the front end of that is a mediationprocess, which we will engage with them and perhaps it gets solvedthen, perhaps it doesn't, but we think it's a process we'll have tosee how it works going forward and there's really not enoughknowledge yet about it to tell how it works.

JOHN LARKIN: Would you anticipate a lot of additional customers maybeavailing themselves of this new process over the next couple ofyears?

MICHAEL WARD: Well, we have not seen a lot. We have these DuPontcases. I don't think there's any other small shippers cases filedagainst any class 1 railroad. So it doesn't appear at this point tobe a flood of cases coming through the door.

JOHN LARKIN: One final one for Clarence. I know that J.B. Hunt, whosome might say would be the leader in intermodal in the U.S.currently have been deriving a lot of its growth in the east in lanesthat heretofore were thought to be too short to support qualitycompetitive intermodal operations. But that's where their focus isand I know that they have been chatting with you a little bit, atleast. Any thought about whether there might be an opportunity tocapture some of that business, perhaps into the New England area orFlorida or other areas where you might have an advantage over brandX?

CLARENCE GOODEN: Well, we're talking to customers everyday about anyopportunity we can get, John, and we never, never say no. It's alwaysyes if.

JOHN LARKIN: But there's no reason -- you have no exclusive agreementwith Schneider or anything that would preclude you from doingbusiness with J.B. Hunt?

CLARENCE GOODEN: No, sir.

JOHN LARKIN: All righty. Thanks very much.

OPERATOR: Thank you. Next question comes from Jason Seidl from CreditSuisse.

JASON SEIDL, ANALYST, CREDIT SUISSE: Thank you. Morning, gentleman. Acouple quick questions. Clarence, you mentioned, obviously, thatinternational intermodal is much weaker than the domestic side. Whenshould we look for comps start getting easier for the internationalside?

CLARENCE GOODEN: Second half of 2008, Jason.

JASON SEIDL: Second half? Okay. And when we look at the pricing, andI know you don't have it there, but if you break it down, is pricingon the domestic side X some of your new product offerings, is thatstill up? Are you still seeing pricing gains X the new productofferings?

CLARENCE GOODEN: No. The new product offerings, we wouldn't be ableto compare on a year-over-year basis because they weren't there lastyear. So we're pricing to the market, and as you know that market hasgot a lot of capacity in it right now, so it's a very difficultpricing environment in those new intermodal markets.

JASON SEIDL: But despite that, on the existing moves, you saw about a3% move overall. 3% even in domestic?

CLARENCE GOODEN: Even in domestic.

JASON SEIDL: Okay. Fair enough. Fair enough. That's good. Lastquestion, obviously you brought up the TCI letter. Obviously, you hadanother letter there from the UTU when seemed to be -- continued tobe a bit disgruntled, and it's not only with you guys, it's with therest of the railroads out there. Do you see the situation with theUTU improving, or do you think this is something that's going to beongoing?

MICHAEL WARD: They've been on a campaign against the entire industryfor more than a year now as part of their negotiating strategiesaround the current round of negotiations. We've reached agreementwith all other major unions at this point and we would like tocontinue the dialogue with the UTU, we think there's a clear patternout there and we hope we'll be able to engage them at some point inthe near future. We think it's pretty clear we've reached agreementwith most other unions and we should

be able to do the same with UTU.Obviously they have a harsh rhetoric around this entire issue thathopefully they'll be able to get over.

JASON SEIDL: Okay. Thank you. Clarence, if I can just come back for aminute, just so I can clarify something you said before to answer aquestion. You said that 25 to 35% of the business is rollover andthen you said a significant amount is locked up that starts January1. When you say significant amount, are you talking about over 50%?

OSCAR MUNOZ: No. I would be talking in the 25 to 30% category there.

JASON SEIDL: 25 to 30% category. Okay, then -- okay, perfect. Thankyou so much.

OPERATOR: Our next question comes from Mr. Jason Steinberg fromGoldman Sachs.

JASON STEINBERG, ANALYST, GOLDMAN SACHS: Two questions. On theintermodal, on the international customer that you lost, want to knowif that customer is still a customer of **CSX**, and as a second part, ifany other customers you had an indication were making similardecisions or looking at a similar decision process that led to thatcustomer loss, otherwise are there potential for future customerlosses in the future?

CLARENCE GOODEN: We haven't -- we don't know of any that we havepotential losses in the future. Yes, the customer is still a customerof **CSX**, a very good one, I might add, and we expect to do morebusiness with that customer in the future.

JASON STEINBERG: So maybe you can provide us a little bit more detailthere in terms of the decision that customer made. Was it not toserve certain ports or was it to stop in certain lanes, if they arestill a customer, or did they just not ship with you in a givenquarter?

CLARENCE GOODEN: They shifted some lanes over to a competitive modeof transportation.

JASON STEINBERG: Thank you very much. And then one question in termsof your fourth quarter outlook that the slide you put up with yourexpectations for the different end markets, can you give a littlecolor in terms of how much -- those markets where you're favorable ornot favorable, what impact pricing has versus your volume of fourthquarter?

CLARENCE GOODEN: Well, we think that the intermodal volumes will bedown for the fourth quarter, as a result of some of the lowerinternational volume and it's due to some of those customer losses wementioned earlier as well as a continued slowing of the Asian importgrowth. We expect the automotive volumes will be down for the fourthquarter. Chrysler, for example, closing some plants on a temporarybasis just this week. Overall, on our merchandise side, we expect thevolume to be down. We expect volume gains in some of our commodities,phosphates would be an example, fertilizers, medicals, and chemicals,but they'll be more than offset by the losses in the housing area.And we talk about coal earlier, but just to reiterate, we expect thefourth quarter volumes will be flat due to the weather issues andbeing offset a little bit by the export demand growth and our steamcoal and we expect in all of those areas that our pricing in thefourth quarter will continue to be very strong and very robust.

JASON STEINBERG: It sounds like to summarize more of the same in thefourth quarter that we saw in 3Q?

CLARENCE GOODEN: Yes.

JASON STEINBERG: Thank you very much.

OPERATOR: Thank you. Our last question for today comes from Mr.Edward Wolfe from Bear Stearns.

ED WOLFE: Yep. Just two quick follow-ups.

MICHAEL WARD: Welcome back, Ed.

ED WOLFE: Is this a new conference call or is it the same day?Clarence, could you -- the volume comps get a bit easier as we goback this quarter quarter and certainly into first quarter. Whenwould you expect right now that we would expect to see positivevolume comps, if you don't want to talk about **CSX**, for the groupgenerally?

CLARENCE GOODEN: I think in **CSX's** case, I think the second half of2008. It's based on a lot of factors, it's the unknown in thehousing, it's the unknown impact on the economy of the fourthquarter's results, higher oil prices, it's the unknown for the coalbusiness of what the weather is going to do over the next couple ofquarters. I don't think the bottom's going to fall out of it, but Idon't think you're going to see the type growth that you and I wantto see.

ED WOLFE: I'm guessing you see the same for the industry, **CSX** aren'tdoing something different or comps aren't different for somebodyelse?

CLARENCE GOODEN: I don't want to speak for the industry, because assoon as I do that, I will have said something that I'm not qualifiedto say.

ED WOLFE: Okay. But do you see something specific to **CSX** that's goingto get you positive in the second half of '08, or is it just yoursense that at that point, visibility's got to get better at somepoint?

CLARENCE GOODEN: It's just a sense.

ED WOLFE: Okay. Second question, Oscar, real quick, any thoughts yetto CapEx in '08? Is there a little bit of extra pressure on you guysright now with the regulators watching so closely the continue tospend the money and invest at this point?

OSCAR MUNOZ: I'll take the numeric part of the question. I think whatwe've talked about is about a 1.6 level of spending in 2008.

MICHAEL WARD: Ed, this is Michael. I think there is no measure on theregulatory side, but there's pressure we're putting on ourselves tocontinue to improve our infrastructure and prepare for the futurethat's going to make us want to continue spending at the levels thatOscar mentioned.

ED WOLFE: Okay. Thanks, guys.

MICHAEL WARD: Well, thank you for your attendance at our call today.

OPERATOR: Thank you, ladies and gentlemen, this concludes thisconference call. We thank you for participation in today's conferencecall and ask that you please disconnect your line at this time. Thankyou.

[Thomson Financial reserves the right to make changes to documents,content, or other information on this web site without obligation tonotify any person of such changes.

In the conference calls upon which Event Transcripts are based,companies may make projections or other forward-looking statementsregarding a variety of items. Such forward-looking statements arebased upon current expectations and involve risks and uncertainties.Actual results may differ materially from those stated in anyforward-looking statement based on a number of important factors andrisks, which are more specifically identified in the companies' mostrecent SEC filings. Although the companies may indicate and believethat the assumptions underlying the forward-looking statements arereasonable, any of the

assumptions could prove inaccurate orincorrect and, therefore, there can be no assurance that the resultscontemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUALREPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILEEFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BEMATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THESUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIALOR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANYRESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPONTHE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT.USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALLITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANYINVESTMENT OR OTHER DECISIONS.]

[Copyright: Content copyright 2007 Thomson Financial. ALL RIGHTSRESERVED. Electronic format, layout and metadata, copyright 2007Voxant, Inc. (www.voxant.com) ALL RIGHTS RESERVED. No license isgranted to the user of this material other than for research. Usermay not reproduce or redistribute the material except for user'spersonal or internal use and, in such case, only one copy may beprinted, nor shall user use any material for commercial purposes orin any fashion that may infringe upon Thomson Financial's or Voxant'scopyright or other proprietary rights or interests in the material;provided, however, that members of the news media may redistributelimited portions (less than 250 words) of this material without aspecific license from Thomson Financial and Voxant so long as theyprovide conspicuous attribution to Thomson Financial and Voxant asthe originators and copyright holders of such material. This is not alegal transcript for purposes of litigation.]

**---- Index References ----**

Company: TOGOLAISE DES BOISSONS; BEAR STEARNS COMPANIES INC; FINANCIAL AND PROFESSIONAL RISK SOLUTIONS INSURANCE AGENCY INC; STIFEL FINANCIAL CORP; TELE SERVICING INNOVATIONS INC; SOCIÉTÉ FINANCIAL SA; MORGAN STANLEY; GOLDMAN SACHS AND CO; TELECOMMUNICATIONS COOPERATIVE NETWORK INC; LEHMAN BROTHERS HOLDINGS INC; MERRILL LYNCH AND CO INC; BNSF; BARRA INC; FINANCIAL AND INVESTMENT MANAGEMENT GROUP LTD; JJF ACQUISITION INC; TSI POWER CORP; TOTAL LOGISTIC CONTROL LLC; LEHMAN BROTHERS (ISRAEL); LEHMAN BROTHERS INC; MERRILL LYNCH; VERIZON LABORATORIES; FINANCIAL AND INVESTMENT MANAGEMENT GROUP LTD/MI; BEAR STEARNS AND CO; BNSF RAILWAY CO; FINANCIAL AND PROFESSIONAL RISK SOLUTIONS INC; BEAR STEARNS AND CO INC; SITE (NETHERLANDS); TSI; MERRILL LYNCH AND CO CANADA LTD; TSI INC; MORGAN STANLEY AND CO INC; CSX CORP; GOLDMAN SACHS; GOLDMAN SACHS GROUP INC (THE); CELLCO PARTNERSHIP

News Subject: (Corporate Financial Data (1XO59); Economic Statistics (1EC52); Economics & Trade (1EC26); Economic Indicators (1EC19))

Industry: (Construction (1CO11); Land Transportation (1LA43); Railroads (1RA98); Financial Services Products (1FI16); Passenger Transportation (1PA35); Passenger Railroads (1PA89); Financial Services Convergence (1FI45); Transportation (1TR48); Freight Railroads (1FR84); Financial Services (1FI37); Construction Financing (1CO12))

Region: (Americas (1AM92); North America (1NO39); USA (1US73))

Language: EN

Other Indexing: (BEAR STEARNS; BNSF; CHRYSLER; CSX; CSX CORP; CSX CORPORATION EARNINGS CONFERENCE; DUPONT; EBITDA; FINANCIAL; GOLDMAN SACHS; INVESTOR; KEN HOEXTER; LEHMAN BROTHERS; MERRILL LYNCH; MORGAN STANLEY; OPERATOR; ROIC; RPU; SENATE; SITE; STB; STIFEL

NICOLAUS; SURFACE TRANSPORTATION SERVICES; SUV; TCI; TRANSCRIPTION; TRANSCRIPTS; TSI; USERS; UTU; VERIZON; VOXANT) (CapEx; CHRIS; Chris Weatherby; Clarence; David; David Baggs; Edward Wolfe; J.B. Hunt; J.D. Power; Jason; John; John Barnes; John Larkin; Michael; Michael Ward; Michael Ward.; Oscar; Oscar Munoz; Q .OPERATOR: Thank; SEC FILINGS; Thank; Thanks; Tom; Tom Wadewitz; Tony; Tony Ingram; WILLIAM; William Greene)

Word Count: 11292

**End of Document**

© 2013 Thomson Reuters. No claim to original U.S. Government Works.

NewsRoom

# EXHIBIT PX0693

NewsRoom

4/27/04 Fin. Disclosure Wire 08:45:00

FD Wire
Copyright © 2004 CCBN, Inc. and FDCH e-Media, Inc.

April 27, 2004

# Q1 2004 **Burlington Northern Santa Fe** Corporation **Earnings Conference Call** - Final

OPERATOR: Ladies and gentlemen. Thank you for standing by. Welcome tothe BNSF Railway conference call hosted by Matt Rose. At the requestof your host, all lines are in a listen-only mode.

Later we will conduct a question and answer session. If you have aquestion, please press star then one on your touch-tone phone. Youmay remove yourself from queue at any time by pressing the pound key.If you are using a speakerphone, please pick up your handset beforepressing the number. If you should require assistance during the callplease press star, then zero. As a reminder this conference is beingrecorded.

I would now like to turn the conference over to the BNSF Chairman,President, and Chief Executive Officer, Mr. Matt Rose. Please goahead, sir.

MATT ROSE, CHAIRMAN, PRESIDENT, AND CEO, **BURLINGTON NORTHERN SANTA FE**CORPORATION: Thank you, Bill. Good morning, everybody and welcome toour first quarter financial presentation. With me here in Fort Worthare Tom Hund, Executive Vice President, Chief Financial Officer; CarlIce, Executive Vice President and Chief Operations Officer; and JohnLanigan, Executive Vice President, Chief Marketing Officer.

As Bill mentioned our presentation this morning is available bywebcast. So, I'll start by directing everyone's attention to ourfirst slide regarding forward-looking statements. This type ofstatement basically cautions everyone that any forward-lookinginformation presented here today could be affected by a number offactors, including economic conditions, fuel prices, and, of course,my favorite, weather, which could cause actual results to differmaterially from any of the forecast information that we'll providehere today.

Let's take a look at the results for the first quarter. We're very,very pleased to report earnings per share of 52 cents, which is anincrease of about 30% over first quarter results last year. Freightrevenue increased a record 11%, with about 1% of that coming fromfuel surcharges. And that's compared to our guidance in January ofabout a 7% increase in freight revenue.

The primary drivers of the revenue growth were agriculture productsbeing up 22%, industrial products which was up 10%, and consumerproducts with an increase of 9%. Coal revenue was also up 7%. Wecontinue to increase the value of our franchise, and this quarterrealized a 2% increase in price excluding the fuel surcharges.

John's going to give you an update on how we're doing in volumepricing and fuel surcharges across all the lines of business. Ouroperating ratio improved a full point compared to last year, andwould have been significantly better without several unusual itemsthat Tom's going to described when he covers the expense component indetail.

So with that, I'm going to turn it over to Tom.

TOM HUND, CFO AND EVP, **BURLINGTON NORTHERN SANTA FE** CORPORATION:Thanks, Matt.

We experienced 30% growth in earnings per share in the first quarter,as earnings per share was 52 cents compared to 40 cents last yearbefore the accumulative effect of an accounting change. And thissignificant growth in EPS is after two large derailments, oneinvolving high-value automobiles and one which was a chemical trainand included environmental clean up cost that combined impacted us byabout three cents per share. Fortunately, there were no significantinjuries associated with these derailments. Additionally, environmentcost, primarily related to one site, hurt us by about two cents pershare. These costs were offset by a one cent per share gain due to asettlement of tax-related interest income, which is reported in otherexpense.

Operating income in the first quarter was 410 million, 64 millionhigher than 2003. This is an increase in operating incoming of 19%.The first quarter operating ratio of 83.3% decreased one percentagepoint from last year and would have been even lower except for theunusual cost I mentioned earlier.

Here's the composition of our expenses which is generally in linewith what you've seen before. Expenses were up 10% versus last year,primarily driven by the strong volume we saw in the first quarter, asgross ton miles and unit miles increased 9% each. The derailment costand additional environmental expense I previously discussed accountedfor about 2% of this increase in expenses.

Compensation of benefits expense was 787 million for the firstquarter, up 69 million from the same period in 2003. Compensation ofbenefits per employee was up 8%, primarily due to higher utilizationof crews driven by the 9% higher unit miles; 8 million higher crewtraining costs, which will help us handle the volumes anticipatedlater in the year; wage inflation; higher pension expense of 5million; and 17 million higher incentive expense for our salaried andscheduled employees, including a new schedule plan in 2004 in lieu ofhigher wages. Now this new plan increases the number of employeescovered under incentive agreements by approximately 40%, to around12,000 employees, which is about a third of our work force.Productivity, as measured by gross ton miles per employee, improvedby 8% in the first quarter versus last year, as we saw a 9% increasein gross ton miles where our employee count increased 1%.

Looking to the second quarter of 2004, we expect compensation ofbenefits to be up about 14% higher than the same period last year.Now, first incentive expense for our salaried and scheduled employeeswill be significantly higher due to know incentive accruals duringthe second quarter of 2003, which was in line with our performance atthat time. Additionally we will experience higher crew cost due to12% higher unit miles, about 9 million higher crew training costs,and higher pension expense of about 5 million.

Purchase service expense was 340 million, up 39 million from the sameperiod in 2003, and in line with prior guidance. The increase isprimarily due to higher volume-related cost for locomotive contractmaintenance expense, intermodal ramp cost, 7 million of purchasedtransportation cost for BNSF logistics, which is offset by increasesin other revenue, higher legal fees of 5 million, primarily relatedto the coal litigation cases are also included.

In the second quarter of 2004 we expect purchase services to be about12% higher than the second quarter of 2003, due to similar expensefactors. Depreciation expense was 249 million, and in line withguidance we gave you last quarter. As we discussed with you inJanuary, the 23 million increase over the prior year is comprised ofthe expiration of a favorable purchase accounting adjustment from theBNSF merger, with a quarterly impact of about 10 million, as well asour normal capital expenditure program. We expect future quarters'depreciation expense to be slightly higher due to our normal capitalprogram beginning our annual depreciation expense to about 1 billion,25 million.

Equipment rents expense in the first quarter was 187 million, 18million higher than the same period in 2003 and in line with priorguidance. The increase is due to continued strong volumes in thefirst quarter and reduced short term lease incentive which

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.

increasedour rates on intermodal equipment. In the second quarter of 2004, weexpect equipment rents to be about 10% higher due to increased leasedequipment cost to cover our higher business levels.

First quarter [inaudible] and other expense was 242 million, anincrease of 44 million from the prior year. As I said earlier we hada couple of one time cost increases, the two derailments, eachcosting us about $9 million, and the environmental costs I referredto earlier. Additionally we experienced higher utility expenses as aresult of colder weather and utility rate increases, and also higherrelocation costs due to consolidating our locomotive repair facility.In the second quarter of 2004, we expect [inaudible] and otherexpense to be more in line with our normal run rate and about flatwith the second quarter of 2003.

Now, last quarter I told you fuel expense would be about 15 millionlower than the prior year. However, due to significantly highertraffic volumes, fuel expense was 275 million, or 1 million higherthan the first quarter of 2003. At current prices we expect secondquarter fuel expense to be about 310 million, 47 million higher thanthe second quarter of 2003 due to anticipated higher prices andvolumes. At present, on an unhedged basis, fuel is running at about$1.07 per gallon.

In summary we expect second quarter operating expenses to be about12% higher than the second quarter of 2003, driven primarily byhigher volumes; fuel prices, which as you know are extremelyvolatile; inflation and the depreciation adjustment I mentionedearlier.

Here's a look at our fuel price over the last several quarters. Inthe first quarter average fuel price per gallon was $1.02 beforehedge and 85 cents after hedge. In the second quarter of 2004, we arehedged at about 65% level, primarily using swaps. The remainder of2004 is currently hedged about 56 percent, again primarily usingswaps. 2005 is currently hedged about 47% and we're hedged about 19%in 2006.

First quarter other income of 3 million includes the 8 milliontax-related interest settlement I mentioned earlier. We expect secondquarter 2004 to be an expense in the normal range of 3 to 5 million.The first quarter tax rate was even with the prior year at 38% and weexpect the second quarter tax rate to be in line with the firstquarter. As a reminder we received a tax settlement in the secondquarter of 2003 which lowered our rate four that period to 34% andcontributed about three cents per share. Debt to capitalization ratiofor the first quarter was 44.9%.

As we look to full year 2004, our estimate of free cash flow hasimproved based upon increased earnings. However, the estimate isstill uncertain as we have not yet made a final decision on leasingversus buying about $500 million worth of locomotives. If we purchaseall the locomotives, we anticipate free cash flow to be slightlypositive, however it could be significantly positive if we lease someor all of the locomotives.

Turning to share repurchases, we bought back about 2.6 million sharesin the first quarter, for a total of $82 million. Program-to-daterepurchases as of March 31, '04, were 126 million shares at anaverage price slightly above $26, and a total of 3.3 billion.Outstanding shares are more than 20% lower since the share repurchaseprogram began in 1998.

Now to John for revenues.

JOHN LANIGAN, EVP AND CHIEF MARKETING OFFICER, **BURLINGTON NORTHERNSANTA FE** CORPORATION: Thanks, Tom.

As Matt mentioned this was a record first quarter as three of ourbusiness groups showed double-digit growth. Both ag and industrialproducts had their best quarters ever, while consumer products had arecord first quarter.

This slide shows our 42 commodity groupings across our four businessunits. As you can see we broke several all-time and first quarterrevenue records in our 3 business groups, ag products, industrialproducts, and consumer products. In fact, 8 of our 42

commoditygroups had an all-time record quarter and nine groups had recordfirst quarters, and in coal, although it isn't shown here, we brokethe first quarter record for tons.

The analysis of our year-over-year revenue changes begins with threeimportant positive factors. First, strong quarterly volumes driven byeconomic recovery in the manufacturing sector as well as strongcontainer imports and grain shipments and market share gains drivenlargely by two new accounts in coal and our modal partneringinitiative. Secondly, ongoing success with price increases reflectinggreater value for services to our customers. Our price levels were upby about 2% overall. And third, fuel price recovery. We billed $27million more of fuel surcharge revenue from a year earlier, despiteslightly lower highway diesel fuel prices.

Revenue grew over 11% from a year ago, led by double-digit recordgrowth in ag, consumer, and industrial products. Coal revenuesincreased over 7% driven by our two new customers, which representedalmost half of the growth and which offset the business we lost thatwe discussed with you last year. The remaining growth was organicwith existing customers.

Agriculture revenues were up over 22 percent, grains were up 30% dueto strength in corn and wheat exports. Two commodities groups, bulkfoods and feeds, had their best quarters ever. Industrial productscontinues to benefits from strong price increases in the economicrecovery. Several sectors in this business group broke first quarterrecords. In consumer products, revenues grew over 11% led bydouble-digit increases in international and truckload. Internationalset an all-time record for any quarter.

Our 8%, or over 164,000 increase in units, reflects our balancedportfolio with strong increases across the board. We beat our firstquarter plan by 75,000 units, or over 3%. And this is a reflection ofthe tremendous job by our operations team in handling this increasedvolume. Consumer products grew over 8%, led by truckload andinternational. Truckload's 16% volume growth was primarily driven byour modal partnering initiative, and international grew by 9% allfrom organic growth with existing customers. Last year we had somesignificant market share gains, which have all lapped on ayear-over-year comparison. And most importantly, the growth in unitswas surpassed by growth in revenue by three percentage points.

Overall our revenue per ton mile improved slightly from a year ago.This reflects first quarter price increases of about 2% and just over1% from fuel cost recovery. These price increases offset favorablelitigation reversals and revenue adjustments from a year ago, as wellas a mix change in coal. Although coal price were up slightly, asyou'll see on the next slide, length of haul increased almost 4.5%,driven primarily by the new business with Georgia Power and Dynegy.

In ag products, strong world markets drove ag commodity pricesupward, resulting in greater value for our services. In industrialproducts revenue per RTM yields were up 3.6%, driven by strong priceincreases. And in consumer, revenue per RTM was up over 3%,reflecting price increases of about 2%, and fuel surcharges of about1%. n automotive, revenue per RTM was up 4% reflecting priceincreases and favorable mix due to increased short haul traffic invehicle parts for Chrysler and Ford.

Overall price levels were up 2% versus a year ago on a same storebasis. In ag products, world market demand and favorable oceanfreight spreads resulted in strong revenue performance. And consumerand industrial price levels rose by 2% each. Our focus on realizingvalue for our services should continue to benefit us as a recoverycontinues throughout 2004.

Fuel surcharges for the first quarter showed a year-over-yearincrease of $27 million. This increase in fuel surcharge revenuedespite lower prices from a year ago is a reflection of highervolumes and increased participation in our fuel surcharge programs.Tom showed you what's happening with fuel, and we are very focused onthis issue. Currently 77% of our customers are covered by someaspects of our fuel cost recovery program. Our coverage from anexpense stands point for the first quarter was about 43%.

Moving on to the individual market units, in our coal business, wemoved 60 million tons this period, which is a first quarter recordfor coal. Again half of the growth came from our two new customers,and the other half from organic growth. We also

moved some coal toexport for the first time in quite some time, which will continueinto the second quarter. And as I mentioned before, same store priceswere up slightly.

In our ag business unit, growth in wheat was extremely strong. P andW exports were up 90%, and Gulf exports were up 105% due to reducedforeign competition and the weaker dollar. Chinese purchases of wheatcontributed to P and W growth. Exports also drove growth in corn asU.S. corn sales into world markets benefit from a reduction inChinese exports. Wide ocean freight spreads are driving exports tothe P and W.

Soy bean exports were down due to heavy exports in fourth quarter2003 an a poor crop yield. Soy bean stocks are at their lowest levelssince 1989. And in bulk foods, we experienced continuing strength inethanol shipments to California and a large sugar beat crop in theRed River Valley contributed to a growth in sugar. The increase inother was driven by feeds, flower and oil seeds.

Our industrial products team was up over 10% driven by strength inall business units. Construction products, revenues were up due torecord revenues in steel and taconite, petroleum products revenueswere up due to strong asphalt, LPG, and fuel by rail traffic.Building products revenues were up due to record revenues in lumberand panel products, and chemicals and plastics revenues were up dueto stronger economic demand and some new business.

With a record first quarter, consumer products realized growth ofover 9%, which was led by double-digit increases in international andtruckload. International grew 16% on the strength of pure organicgrowth with our existing customers and favorable mix. In addition theweaker dollar has driven an increase in west-bound exports, and ourprices are more accurately reflecting higher value in themarketplace.

Truckload grew nearly 22%. The increased truckload shipments were aresult of the success of our modal partnering initiatives as truckingcompanies look for ways to reduce costs with the new hours of servicerules and driver shortages. Our IMC segment grew to general increaseddemand for intermodal services. And perishables growth was driven bythe intermodal segment where new equipment acquisitions by customersenabled us to capture additional over-the-road business.

We are currently on track to meet our modal partnering initiativesthis year. We anticipate that we will be able to increase our revenuein this area by nearly 60%. Trucking companies continue to faceissues such as driver shortages rising insurance costs andfluctuating fuel prices. And when you combine these existing issueswith the new hours of service rules, we have seen added interest inintermodal service as a way to mitigate the economic impact of thesechanges. We offer an expedited truckload service that is designedspecifically to meet the operational needs of motor carriers. We havehad great response to this service, and our customers are starting torealize the benefits of our partnership initiatives.

In summary, we expect continued economic recovery during the secondquarter. Coal demands is improving, and our outlook for the secondquarter remains positive. We expect continued strength in the wheatand corn exports due to Chinese market behavior. We also expect oceanfreight spreads to continue to favor our P and W franchise.Industrial products will continue to see strong demand across allsectors, and in consumer products we will continue to experiencesolid gains driven by strong demand for intermodal services.

Now, for just a moment, I'd like to talk about what customers aresaying about our service. Our coal service is excellent. You may haveseen information questioning our ability to handle the strong demand.We're doing an outstanding job of handling the increase. In fact,during the first quarter we handled 97% of the NCTA forecast, and atthis point in April we're at about 98.5% of the NCTA forecast.

In ag, we had a record quarter with huge volumes, and as a result wehad significant pent-up orders from the fall moving into the first ofthe year, but we've worked through this nicely. Our customersappreciate that we've handled this growth with few service problems.We've had no real operational issues, and we are ready for the nextharvest. Industrial products has experienced some

minor delays, butservice is very good overall, and in consumer products, service isdown just a bit but overall the network is very fluid and we have nosystemic congestion. So overall we expect another positive quarterwith revenue growth around 12 to 15%.

And I'll now pass it over to Carl to talk about operations.

CARL ICE, COO AND EVP, **BURLINGTON NORTHERN SANTA FE** CORPORATION:Thanks, John. Good morning, everyone.

Of course in this segment you expect to here about how the railroad'sdoing, and how well we're doing with our productivity initiative. Tohelp put that in context, we once again want to point to what'shappened with our levels of work. This is just a slightly differentway to show that. You can see the numbers Tom quoted both in GTMs andin unit miles we are up about 9%, and you can see they'resignificantly higher than any time over the last four years. So, weare pleased to say that we've delivered the goods associated withthis volume that our customers have entrusted to us.

Whenever we look at the strengths of the BNSF organization, we alwaysview the two of our long-established and bedrock strengths are use ofmetrics and driving for results. So given that, when we look at ouron-time performance numbers, we can't say we're performing as well aswe'd like. On the other hand, as John's already talked about, ameasure of the health of a railroad network has to do with itsfluidity and it's throughput. And in those fronts, we think we haveturned in good performance. If you look on this chart at the segmentsthat are up very much about turn times, coal and the portion of agthat are unit trains, we showed turn times that are at the 90%levels. So we are again happy and pleased with how that has gone.

Now as to the other segments, we continue to work to shape our trainnetwork to make sure that it appropriately matches the levels ofvolume we have, and as John told you as we went through this section,we've been over planned in the volume we've had, so that's made usmuch reach even higher than we expected, but we think the changeswe've made will continue to help us drive improvement.

And then lastly, Tom mentioned a couple of the service interruptionswe've had. Those underscore how important our reliability efforts arein infrastructure and equipment, and those will also help driveimprovement in these metrics.

To move further on the discussion about velocity. You all see -- ofcourse, see the train and terminal velocity numbers so we won'trepeat those. You know that we saw some drop off in the first quarterand lately we've about matched last year. We think to go one stepfurther, car velocity tells an even better story, or more importantstory, and you can see in this case we've shown improvementyear-over-year, and actually, we're also at a four-year higher inthis area as well.

Another way to demonstrate that is to look at the inventory on therailroad. We, as you know, we have about 8% increase in unitshandled, yet we've only seen our inventory go up about 2%, so thatshows a network that's moving cars effectively through it and againis very healthy. In terms of our train network, and this starts tospeak a little bit towards capacity which we know you're allinterested in, over the last four years, we've made changes to ournetwork that have had us be slightly more productive than we werewhen we started. We've seen train starts grow at a little slower ratethan our volume grew.

Over the last two years, we made improvement in '03, so that had uscoming into this year with a tighter capacity train network, whichis, of course, exactly what we want, and so when we consider whathappened in the first quarter, our train starts grew about the sameas volume grew, up slightly, not quite as much if you compared tounit miles, which probably a little better measure here. That doestell us that we think we've got some room to make some improvement inthis area. That's one of the initiatives we'll focus on in the secondquarter. We think that'll help both in terms of our cost control, butalso will help us with our capacity with the number of crews we haveas we get a little more mileage out of our train network, and again,we have some changes we put in place that we're seeing fruits of sofar in this quarter.

And that really leads to productivity overall. You can see from this,we continue our long-running trend of good performance andproductivity. We saw big improvements quarter-over-quarter --year-over-year, rather, and once again showing record performance.

We do expect that our number of people will grow this year, so we'regetting there a little different way this time. We're not reducingpeople. We have more people, but we're not adding nearly as manypeople as we're adding the amount of work with gross ton miles.

Now, lastly, again, we know that you're somewhat interested incapacity, and we really need to speak to that on a couple fronts. Oneis our train network. We talked about that already. Our view of atrain network is it's always supposed to be right at capacity, so weadjust it as we forecast demand and that's where we were throughoutlast year, throughout the first quarter, and we expect to make somechanges, but we'll still be tight capacity there. But that can changejust by planning extra starts, as long as you have the crewsavailable for those starts and you can see from this -- I'm not surewhat happened there, I'll back up. No, I won't.

Okay. Well, we have a slide here that shows that we'll hire about1700 conductors this year, and we hired about 1200 last year. So weexpect we will have the crews available. The 1200 last year actuallywe back-end loaded, so we have more effective use of those people nowand the 1700 is front-end loaded this year, so, again, we get helpfrom them from those people early on, and we made an adjustment herefor the rest of the year. The last time we talked about this, it wasseveral hundred lower as we looked at what our volume forecasts werefor the rest of the year.

Then as we turn to locomotives, the locomotive capital plan we hadthis year, as you know about 414 locomotives to be exact, have uswell-positioned to handle this business. We're glad at this point --very glad we accelerated things into '04, and we also did putourselves in a position to take on some short-term leases late lastyear as we looked at how things were evolving, and those are in placeon the system, but we'll be able to shed those as we go forward, andadjust for whatever volume we have later this year and into next.

Okay. Thanks.

So in summary, we have a value that continues improvement at BNSF andpart of that is that we're -- that we would always expect to bebetter than we used to be, and not nearly as good as we're going tobe. If we look at the amount of volume we've handled we think thatdescribes where we are. We made improvements, and we expect to keepmaking improvements as we go forward.

MATT ROSE: Okay. Thanks, Carl.

Well, we're having a little technological glitch here, so if youdon't see it coming up on the webcast, I'm going to turn to thesecond quarter outlook, and we expect to see revenue growth of 12 to15 percent.

John provided you with the primary drivers for this growth. But toput it in a little context, when I think back over my 20 plus yearsin transportation, and trucking and railroading, I, quite frankly,have never seen a time when all the various commodities, all thevarious business units have come to the table like they're startingto. Tom also provided you with a detailed look on what we expect onthe expense slide. This should result in improvement in the operatingratio in the range of about 100 to 150 basis points. This will resultin an increase in earnings per share in the 15 to 20% range. If weadjust for the favorable tax element of 3 cents last year that Tommentioned, we would be expecting growth in the 20 to 25% range.

While we're very pleased with the level and quality of our revenuegrowth, we're clearly not satisfied with our current ability toleverage this growth. As we have some unusual items, which Tomdiscussed in his expense outlook, such as higher pension, crewtraining, depreciation and higher incentive expenses due to theaddition of more scheduled employees to our incentive programs,compounded by the fact last year that we in had no incentive accrualsfor the second quarter last year.

In addition, we've changed the composition of our cost structure. Tomhighlighted the recent change in our incentive compensation systemthat added 40% to the number of our employees covered by theseprograms. This is just one of the initiatives that has shifted moreof our cost from fixed to variable, which is really a double-edgedsword in that it creates a head wind in today's growing economy. Thatsaid, we know we can drive better operating leverage from our systemand having a strong economy will certainly make that much easier todo.

We'll continue to concentrate on improving productivity, increasingthe use of our technology, and maintaining our capital discipline.And we'll combine these cost controls with our ongoing focus onproviding a superior value for our customers that commands a greaterlevel of compensation.

Looking at the 2004 outlook for the full year, this is similar to theslide that we showed you in both November and January, but we've madetwo significant changes. We've changed the revenue growth range,which was 4 to 7% to a current range of 8 to 10%. This is below theexpected run rate for the first half of the year, reflecting thetougher year-over-year comparisons in the back half of the year whenthe economy started to rebound.

We'll continue to be more optimistic about both the economy and theoutlook for ag exports, as well as the goal of increasing the valueof our service we're providing for our customers. We'll continue tohave a goal of offsetting inflation and some of the volume increaseswith productivity initiatives to realize better leverage, whichreally brings me to the seconds change in our outlook. If everythingcontinues on the current course, we expect to see 15 to 20% growth inearnings per share in contrast to our previous guidance of ten to 15%growth.

Turning to free cash flow. The picture has improved since January,but as Tom indicated, we have not yet made the decision onlocomotives which will drive the end result. We're going to continueto focus on returning value to our shareholders through our sharerepurchase program.

Finally, our longer-term outlook hasn't changed. I believe all thefundamentals are turning more positive for us, and again, I thinkthis is somewhat of a see [ph] change going on in surfacetransportation in general. In November, I talked about the positiveoutlook for each of our four businesses. Everything from our bullishoutlook on the export market for U.S. grain, to the growing demandfor intermodal service based on issues in the truck market, andstrong trans-Pacific trade, are really coming to fruition.

So at this point, we're much more confident about our ability torealize double-digit growth in earnings per share. We'll continue tofocus on generating free cash flow and using our cash to improvereturns to our shareholders for both the dividends and sharerepurchases.

And to the last point on the slide which you can't see which saysimproving return on invested capital. We know we have to manage thecompany continuously improve our return on invested capital. At ourBoard meeting last week, we established the new restricted stockgrant with the performance piece tied to improving ROIC over athree-year horizon. I'm pleased to report that our current forecastshows that we're making progress on this extremely important goal.

So, Bill, I think with that, it's now time to open it up toquestions.

OPERATOR: Thank you. Once again, ladies and gentlemen, if you have aquestion or a comment please press star then one on your touch-tonephone.

The first line we'll open is the line of Ken Hoexter at MerrillLynch. Please go ahead.

KEN HOEXTER, ANALYST, MERRILL LYNCH: Hi. Great, thank you. Goodmorning. Just, Matt, can you talk a bit about the pricing continuesto, the capability of keeping that strong pricing growth goingforward. Going up 3 percent, I guess that

2% real price increases, isany of that related to the UP struggles, or is this just the hardfocus that you've had on going out and taking advantage of the strongmarket right now?

MATT ROSE: Ken, I do't really think it's having to do with the UP.Really I think we're seeing it across all surface transportationmodes, and quite frankly even in ocean. If you look at ocean spreadsand ocean rates and while they've come down recently, they werereally moving up quite nicely as well, and I think what you're seeingis that for years the U.S. economy has been in a cost reduction modeand as the manufacturing and IPI started turning back, and as thegeneral economy started turning back for demand of goods andservices, you have not seen a lot of capacity put in all of thesemodes, and so you're seeing higher value realized across the board.

If you kind of think of it again on a continuum, and our truckingpartners are on one side of us, know that they have not added a lotof new class A trucks, more for replacement than anything else, andyou see the types of values that they've been realizing, quitefrankly, over a couple year period, and we're starting to finally seethat in our own businesses as well.

KEN HOEXTER: Just if I could stick on that coal pricing just for aquick second -- I mean, I'm sorry, on pricing and blending it over tothe coal side. Is this something that, I mean, obviously you hadflattish kind of pricing on the coal side, which, I think, was a bitbetter than we expected based on some of the new contracts. Are therenew contracts coming in in '05, or losses that we should expect tosee a volume shift, or is this kind of growth going to continue into'05?

MATT ROSE: Is your question specifically on coal contracts, Ken, orjust general?

KEN HOEXTER: Just on coal.

MATT ROSE: Yeah. John?

JOHN LANIGAN: Ken, this is John. We do have some contracts coming in'05, but where our heads are at right now is we are really workinghard with our customers to prove the value and to retain thosecustomers, the customer retention strategy that we talked about lastyear. And that's where we're clearly focused on, and we believe thatwith the value that we're bringing to the coal marketplace and to themarketplace in general that we will continue to make progress both onthe pricing side, and also on the customer retention side as well.

KEN HOEXTER: Great. Thanks a lot, John. Thanks, Matt.

OPERATOR: Thank you. The next line we'll open is the line of ThomasWadewitz with Bear Stearns. Please go ahead.

THOMAS WADEWITZ, ANALYST, BEAR STEARNS: Good morning, everybody. I'vegot two different questions for you here.

First one is on the -- to continue on the coal side, you had lastyear tried to do some things with public pricing and with, I guessit'd be -- well, without the success you were looking for there, yourbig competitor has put something out about a month and a half agowith a new coal pricing, more of a public pricing approach. I want toget your sense of whether that enables you to really focus on thepublic pricing again going forward? Just, if you can give us anycomments on that and what your response is to that.

MATT ROSE: Yeah, John?

JOHN LANIGAN: Tom, we still have our public pricing mechanism inplace, and we're moving coal under our public pricing mechanism. Sowe did not abandon it last year, even though we did have a couple ofdisappointing results early in the year. So again as I just mentionedin the previous question, we're very focused on customer retentionand driving the right value for our services, and we believe that thepublic pricing that we have is a part of our future as well.

THOMAS WADEWITZ: So maybe if I can drill down a little bit further,on good sized coal contracts that you have coming due, would youexpect to pursue those retaining those through the public pricingmechanism, or would you pursue that through the confidential ratecontract approach?

JOHN LANIGAN: We will continued to both and that is dictated by themarket and by customers, and we clearly would like to move forwardwith our public pricing on a broader basis, and we're going tocontinue to emphasize that where we can. But there are certainsituations where the more traditional contracts are appropriate aswell.

MATT ROSE: Tom, I think the thing that people are missing, and thisis really what we're trying to drive at, traditionally, contracts goalong with the word "long-term" and this -- really staggershas been the way the coal business has been priced in long-termcontracts. And, you know, long-term contracts are fine in anenvironment where there is a long runway of potential efficienciescoming out of a network, like when we went from five people on a crewto two people on a crew, and all the efficiencies we experienced inthe 80s and the 90s.

As those things change and as the market dynamics change, we don'twant to be in long-term contracts. So we want our services to moreaccurately reflect what the market conditions are. And the marketconditions aren't just the railroad price against another railroadprice, it's really what the value of the overall product is. In thiscase, as coal becomes inherently more valuable as a resource, whichwe think it will in a big way because of the systemic issue with gas,we want to be able to realize that that potential value, and youcan't do that in long-terming contracts especially when you insertinflation and the issue of fuel prices.

So our real focus is shorter-term market mechanisms, and whetherthat's a public tariff or a confidential tariff or a contract, itreally doesn't matter. The issue is, we want shorter term marketmechanisms that reflect the value as the markets change both up anddown, and we just think there's more upside than down side.

THOMAS WADEWITZ: Okay. Great. One more question on pricing.

Let's set aside coal and just talk broader pricing. Matt, yourcomments, you indicated it's pretty much an ideal environment forraising prices, capacity's tight not only with rails, but with trucksas well. And I'm wondering, are you asking for significantly more interms of price increases this year than you did last year, and canyou give us a sense of rough terms how much of the portfolio actuallyrolls over this year that you could take advantage of the strongenvironment?

MATT ROSE: Let me give a couple of comments, and I'll ask John togive some specifics. I think if you look at our statement that webelieve we saw 2% net price increase, and that's not including thefuel surcharge, again I can't tell you that I have ever seen a 2% netacross the base of business in price. And again, just a couple yearsago, we would still tell you that we were on a long-term trend ofdecreasing prices across our product line.

So as trucking supply has gotten chronically short, and they've notadded capacity, and as the demand has heated up, we've been able to,I think, more accurately reflect the real value of what thisfranchise is. We're seeing, Tom, the big change here's, we're seeingcustomers asking a different set of questions now. And the questionsthey're asking are, How can I assure myself that I'm going to havethe capacity to move my products, my company's products in goods andservices? Instead of this relentless issue of, Can you lower my priceby another penny a mile? John, you want to give some specifics?

JOHN LANIGAN: Yeah, Tom, back to Matt's point about trying to driveour ability to price on a more opportunistic basis and reflectingmarket conditions, currently we only have 20 to 25% of our businesscome open for pricing on an annualized basis. So, it's going to be aseveral year journey to kind of cycle through those long-termcontracts and get to a shorter-term horizon. But right now, about 20to 25% come due, will come due this year across our entire book ofbusiness.

THOMAS WADEWITZ: Okay. Great. Thanks for the time and congratulationson your quarter.

MATT ROSE: Thanks, Tom.

OPERATOR: Thank you. The next line we'll open is James Valentine ofMorgan Stanley. Please go ahead.

JAMES VALENTINE, ANALYST, MORGAN STANLEY: Good morning and once againcongratulations as well on a great quarter, and also wan to thank youfor the presentation material where you break out the pricing versusmix by commodity type. We don't see that often enough in the industryand it's really helpful.

Given that we're at the high -- I think we're the high [inaudible]for this year and next, I want to drill down a little bit more onguidance if I can. In that, if we factor in the upside surprise forthe first quarter, including these what appear to be some one-timeevents, it appears that your full-year guidance doesn't have muchmore room for upside, maybe a little bit in the second quarter here,you're guiding for 12 to 15% revenue growth here in the secondquarter, so I presume the numbers go up a little bit.

What I am trying to get my hands around is that it implies that thesecond half of the year doesn't have that much upside in terms ofmanagement's guidance. And I'm trying to figure out, is that becauseyou believe that the comps start to get much tougher, or you seesomething else out there on the revenue front, or even expenses, oris it just a bit of conservatism?

TOM HUND: Jim, I think the biggest thing is the comps getconsiderably tougher, especially in the fourth quarter. If we goback, we had a good, strong fourth quarter.

JAMES VALENTINE: Okay. So, I mean -- I don't want to take anythingaway for the guidance. I think it's still very good numbers for theyear, but just wanted to make sure that I wasn't reading it wrong.The question I wanted to get into for a minute here is talking aboutUnion Pacific's problems, in the sense that back in the '97-'98 meltdown, UP saw about a billion of their revenue go away from theirnetwork, and about half of that went to Burlington Northern, and Ithink at the time, many of us all thought, including management, thatthat was here to stay, and only to find out a few years later that alot of that, in fact I think almost all of it, went back to UnionPacific.

And so, what I'm trying to understand is when we look at this, what'sgoing on here in the first quarter, the 12 to 15% revenue guidancefor the second quarter, how much of this euphoria do we want toreally temper here and think about when, assuming UP gets better inthe next year or two, how much do we want to temper this businesswill potentially go back, and to the extent, what can management doto try to avoid that, meaning to really try to hold on to this marketshare?

MATT ROSE: Jim, I hate to be accused of defending my competitor, butlet me try a shot at that. When you see their numbers, which ispublic information on the AAR, you're going to see they're handlingsignificant volumes.

So that's the big difference between this and '97. Their volumes wentdown because of the market share shift, not only to us but to otherrailroads and truck and water and airplane and everything else.

That's a different issue today where their volumes are upsignificantly. And I quite frankly I don't see any real share shiftof business, with some limited exceptions and one of them is we'vetaken back some UPS business that we had lost, and we didn't takeback everything because we quite frankly had replaced enough demandon our network that we didn't want it all, but that was quite franklyafter it was fairly well explained by the UP. They asked to put itback on the highway. They communicated obviously with UPS of whatwould work in their network and what didn't. UPS asked us to put somebusiness back on to our railroad that could fit in existing trainservice, and so we did, and with that issue, and quite frankly, it'snot that big of a revenue issue for us. There is not any share shiftthat I see.

Now I think that there's one thing that might be happening to somedegree is I think that perhaps our customers may be growing at afaster clip perhaps than some of their customers, specifically in theintermodal segments and some of that business. But there really isnot any big share shift. We are not, we're approaching it muchdifferently this time.

We would have done things differently the last time, and what we'retelling the market today is we're handling record volumes of --business is up, units are up tremendously, and what we wanted to dois to stay with our customers that have been there for us, and wewant to be able to handle their additional business, and we'll takeeverything else on a one-off basis. But we are not, we do not want tocause service issues on to our network, and we're pretty comfortablewith how we're approaching this from our own customer standpoint.

JAMES VALENTINE: So, you're pretty confident that this is not -- Imean, I'm just looking at the last four weeks, and you guys are doingfantastic, you're growing your volumes 9%, UP is growing 2.5%.

I guess I'm just trying to brace myself to make sure that next year,we're not going to be here, or year after where we're talking aboutsome of this business went back. It sounds like you're saying, youdon't think you're getting it from UP customers unless it's just thegeneral market share shift taking place, that really the congestionisn't resulting in a big in a big windfall for you.

JOHN BURNS (ph), ANALYST, CSFB: I don't think so. I really don't. AndI think if you look at a couple week period, you'll find theseaberrations, but I think if you look at the quarter numbers in termsof their volumes and ours, while we outgrew them, some of it was fornatural reasons, and again, they're handling big volumes, we'rehandling bigger volumes, and I think that's really the fundamentaldifferences of this versus '97. I'm not expecting, so to answer yourquestion clearly, I'm not expecting any share shifts when this wholething unwinds.

JAMES VALENTINE: Great. Thanks. Once again, great quarter.

MATT ROSE: Thank you.

OPERATOR: Thank you. The next line we'll open is the line of GregBurns at JP Morgan. Please go ahead.

JOHN BURNS (ph): Hello. Good quarter. Just a couple of quickquestions. John, on the intermodal side, it sounds like everything'sgoing well in price, but at least from a mix in the quarter, it lookslike and maybe I am interpreting this wrong, but my understanding wasinternational is somewhat of a lower margin segment. You seem to begrowing that faster, and the direct business was down, and myimpression was you make probably the most money there. Can you speakto whether that's accurate and whether that trend's going tocontinue, and whether you're concerned about that?

JOHN LANIGAN: Well, it's been a long time trend from a standpoint ofthe growth in the international business. It's solely, for ourfranchise, driven by the trade with Asia, and specifically withChina, and that just continues to improve or increase almost on aunabated basis.

We are clearly taking advantage of that market opportunity and theLPL industry, with their consolidations and downsizings and all thosesorts of issues that they've been facing, has not been a growthindustry overall in comparison to other modes of transportation.We're really merely a reflection of the general economy and what'sgone on, both with imports and with the domestic LPL business. Andthere's no big indicators that would indicate that there's going tobe any big flip-flop or major change in those directions in the nearand medium term.

CARL ICE: Greg, I'd like to add, if I could, as well, we do notaccept either that we can't continue to drive productivityimprovements with train size in particular. We see bigger trains inthose segments that helps drive some of the density, and we wouldexpect that we'll continue to do that, because it helps us both incapacity and in cost. So we have this business, we'll do our best tomake leverage improve on that as well.

JOHN LANIGAN: Greg, as you saw we had significant price improvementin the consumer products business which obviously includes theinternational as well. And I did make a comment on the improvement inwestbound shipments because of the weakening dollar, which willoverall is tied directly into, for the most part, that internationalbusiness, either directly or at least on a tangent.

JOHN BURNS (ph): So as your balance improves you're getting bettermargins, is that --

JOHN LANIGAN: Definitely.

JOHN BURNS (ph): Do you need more, this probably leads into my secondquestion for Matt on return on capital targets, but still on this, doyou need more price, would you say, price help over time oninternational than you do in your other segments, or is it a leveragegame and as long as you continue to grow the volume you'll get thereturns you need?

JOHN LANIGAN: I think our focus is clearly on driving the realizationof the value for our services across all of our business units. I'mnot sure it would be fair to say we need more for the internationalbusiness than other business units, but because we're focused on allof them. So over time, to Carls comments around improving train sizeand our efficiencies in handling the international volume, as wecontinue to grow that business, we continue to find opportunities tobe more efficient and more effective, and as that becomes a moreimportant linchpin of the U.S. economy, it will by nature drive morevalue for that service as well over time.

JOHN BURNS (ph): Great. And Matt, can you give us a little more coloron the return on capital targets? It sound like a three-year target.Is it a rate of change? Is there a specific target? Is it related tocost of capital? Can you put some numbers on that for us?

MATT ROSE: Yeah, Tom go ahead.

TOM HUND: Sure. I mean, first of all our target is a three-yeartarget, and it is a change year-over-year.

To put it into perspective, we measure our current return on investedcapital probably in about the 6.5% range. And with the size of ourinvestment, the size of our balance sheet, our target is to maybemove that up four tenths, five tenths a year, something like that,getting us over a three-year period, up more to the 7.5, to maybe7.75 range, and then obviously continuing after that. And we believethat long-term, we need to get up into the 9 to 10% range, because wethink our long-term cost of capital is something probably a littlenorth of 8, probably between 8 and 8.5, depending on what you want toassume for interest rates.

JOHN BURNS (ph): Great. Thanks a lot, guys.

OPERATOR: Thank you. The next line we'll open is the line of JordanAlliger with Lazard. Please go ahead.

JORDAN ALLIGER, ANALYST, LAZARD: Yeah. Question on the operationside. As you head deeper into the second quarter, and volumescontinue to be very robust, how have you found those productivity andservice metrics doing as we progress? Are they holding their own,coming under a little pressure? Thanks.

CARL ICE: They're holding their own. We look good in the fourthquarter and, second quarter, rather, and in fact we think we made alittle improvement from the first as we've avoided some of theinterruptions to our network.

MATT ROSE: Jordan, if you think about it in a broader perspective forthe railroad industry in general, there's several moving parts, firstoff, weather traditionally gets a lot better for the second quarter.Maintenance away becomes more of a challenge. So you've got sometrade-offs pros and cons there. The other piece that will continue tohelp us is our locomotive deliveries as they come in, we will be ableto charge our pipelines up a little bit more.

JORDAN ALLIGER: Great. And then just a quick follow up, any earlyread or sense aside from the agriculture exports, how the harvest mayor may not look, or is it still a little early?

MATT ROSE: It's really too early to tell and next week we start thecorporate rain dances to make sure that we give all the help that wecan to a good harvest.

JORDAN ALLIGER: Thank you very much.

OPERATOR: Thank you. The next line we'll open is the line of DanHemme with Prudential. Please go ahead.

DAN HEMME, ANALYST, PRUDENTIAL: Hi. Good morning. I guess my questionreally may be for Carl. On your commentary for productivity measures,you talked about crew starts being of some concern with the 10%growth from '03 to '04, and an 8% growth in revenue unit. You talkedabout some initiatives. Tell us what initiatives you are working onin the second quarter and how you see those panning out?

CARL ICE: Sure. First, a big piece of them with the growth that we'vealready talked about in international has to do with increasing trainsize from the ports. And we've had that target of that all year. Wemade improvement in the first quarter. We made more improvement inthe second quarter. And as we have enough resources, we're drivingagainst locomotive turns that let us then turn equipment in a waythat we make bigger trains. So we're running close to targets there,but we'll keep stressing those targets. We're using distributivepower on those trains. That gives us more upside we believe as we goforward.

In the rest of the intermodal network, we've adjusted the number ofstarts we have in our premium segment around the amount of businesswe had. Matt mentioned earlier how we filled some of that up. Sowe're stretching that. We've refined some of the OD pairs and some ofwhat we call work events, meaning places that we would stop and setcars out, which has helped us drive density in some of the OD pairs.

And then lastly, in the merchandise network, the carload network, aswe've talked about a couple times, we've had an ongoing reshapingeffort there. We've done better around our discipline with runningsecond sections and so forth. We really think we're position to dolever up on that, and we're right on our targets for the merchandisenetwork as we look at April.

DAN HEMME: Okay. And then maybe as a follow up for John on the fuelsurcharge. I guess with 77% of your customers covered, 43% of yourexpenses covered, are we going to expect these to move up goingforward, or is this low-hanging fruit kind of gone here?

JOHN LANIGAN: Well, the easy low-hanging fruit is largely gonebecause we basically doubled our coverage in the last year. But, eventhough we have 77% of our customers covered, there's are a lot ofcustomers that are covered at rates that are below what we wouldconsider a full-fuel surcharge rate, and it's really going to beabout a three- to five-year journey to right side that again becauseof the expiration of contracts and not being able to get into thosecontracts and change the current relationships.

But even with that, another component of it is the whole RCAF [ph]program that covers our coal and, in limited cases, some of our otherbusinesses as well. And we have actually worked to decouple the fuelaspect of RCAF and with those customers that prefer that kind of anescalator, we're actually going back to those customers with RCAFminus the RCAF fuel factor and then applying a normal or regular fuelsurcharge in addition to that. That program's really just kicking offthis year, and again that will be a multi-year year journey as well.But you won't see as dramatic an increase on a quarter-by-quarterbasis going forward, but over time we expect to increase our coveragesignificantly yet.

DAN HEMME: Great. Great quarter, thanks.

OPERATOR: Next line we'll open is the line Scott Flower with SmithBarney. Please go ahead.

SCOTT FLOWER, ANALYST, SMITH BARNEY: Good morning, all, congrats. Acouple quick questions.

I know you talked a little bit about this, Matt, about some of thevariablization of elements of your cost, and yet you also talkedabout being able to squeeze more leverage out of the system. And Iguess I'm trying to square those two statements. As you get to morevariablization, I would think it would be hard to squeeze leverageout. I mean, obviously that may be a good thing long-term that youavoid the peaks and valleys and you rely on growing the franchise asto where you can create value. But I'm trying to square those twostatements, how you're squeezing leverage out and as some more of thecosts are becoming variable in nature.

MATT ROSE: Yeah, Scott, I think it is -- it's a fair question andI'll start and I'll let Tom add to it if he wants to. In a growingeconomy, quite frankly, more variablization of your cost structureprobably hurts you more than helps you. So here we are, we'recreating more of variable cost space, and we've got a pretty goodhead wind in the economy and that's kind of working in reverse alittle bit.

A couple of other things I think are important. One is the incentivecomp that Tom mentioned and I mentioned that we've increased 40percent of the employees, and we have about a third of our peoplenow, we think that long-term that's really vitally important, andlong-term we'd like to have 100% of our employees on some sort ofvariable compensation that's tied to performance.

Other issues of how you variablize your cost structure are thing likeequipment costs. We have been fairly successful over the last coupleyears in terms of establishing more pay-for-use type of equipmentlines, things like that that. So we think it's the right thing to do.We think we'll get benefits outside of just the financial benefits onsome of these, but I think it's also fair to say that in a strongmarket you might lose some of the leverage on it. Tom, you want toadd anything?

TOM HUND: Yeah, I think that's -- good comments, Matt. I went backand looked at the comments we made last quarter. We got asked aquestion about specifically what kind of leverage can you expect. Ithink I answered that question and said if you took a revenueincrease of X, we think that operating income should improve about2X.. And we're falling a little bit short on that. And some of thatis we're going into the head wind of some so-called accounting issuesof this 40 million of purchase accounting adjustment and about 20 ofpension this year.

So that's one thing, and then you have working off of a low year lastyear of these incentive plans that Matt just talked about. So, Imean, I guess I'd say we're very happy with the results right now,but we also know that we are falling a little bit short on thatbringing the 2X down to the operating income line. And then if youlever that all the way down to the bottom line, given that you don'tincrease your interest expense and all that, you ought to get evenmore pop when you get down to the bottom line. You are neversatisfied I guess with where you are, and we think that we still haveimprovements to make here.

MATT ROSE: The final point, Scott, is as -- if you look at ourfranchise versus maybe some of the other railroads, we have a higherpercent of our franchise in intermodal, and we're proud of that andwe've said that in ten years it's probably going to -- could be closeto 50% of our franchise, and the very nature of intermodalism has amuch higher variable cost structure associated with it between theterminals and the equipment, the ramp costs, things like that.

SCOTT FLOWER: Okay. And then just a couple other questions, obviouslyag and ag exports were important and I know that John Lanigan in hiscomments talked about feeling good about ocean spreads favoring P andW, which we all know is important in terms of how that mix ofbusiness moves.

I'm just trying to get a sense of why you feel good about that, John?I've always found trying to predict ocean spreads is trying topredict the crop by looking at woolie worms, it's just I've neverbeen able to really quite figure out the ocean spread treads

and howto statistically model them. I'm just wondering why you feel goodabout it, other than maybe the fact that it's continued into April,and how you look at ocean spreads.

JOHN LANIGAN: Well, I think it is more of a shorter term focus inview, Scott, and part of it is is that there -- in spite of thepromise of bigger TEU [ph] vessels coming out of Asia there has beena little bit of lull in adding new capacity to those fleets, becausethere's been a lot of shipyard capacity tied up with creating tankersto meet the new EU standards, and although we'll start to see biggerTEU vessels in another year or so, there hasn't been a lot ofcapacity.

And so the focus has been on turning vessels more quickly, whichfavors, obviously, the P and W. So it's really more of a short-tomedium-term look at spreads right now, and although the spreadsbetween the P and W and Gulf have narrowed a little bit in the lastquarter so, there's still a clear spread that favors P and W at thispoint.

SCOTT FLOWER: What are they running now? I'm just curious.

JOHN LANIGAN: I don't have the absolute number in front of me. Theydecreased, or they got closer by about 10 to $15 a ton over the lastquarter or so, but I think there's still a 20 to 25-dollar gap.

SCOTT FLOWER: Okay. And then the last question and this also probablywould be for John. I guess I've always had the perspective that asyou look at your intermodal portfolio, and you look at when theeconomy is giving you tail wind in some of your modal partneringinitiatives, that in general, IMC traffic would be one that wouldn'tnecessarily grow when some of the other sectors are as robust. AndI'm just wondering, did that just fill out existing trains, did youget fairly significant yield increases that made that businessinteresting?

I know you love all of your customers, but obviously you've scarcecapacity and you're trying to maximize the value to yourshareholders. I'm just trying to understand why IMC grew as it did.Traditionally, I guess I would imagine this would be a time at whichthat it might not grow perhaps as quickly as it did.

JOHN LANIGAN: No. I think quite the opposite, Scott. I think theissue is with the trucking industry really settling out after all theissues that they've been dealing wit, and particularly the hours ofservice issue, I think it created an opportunity for the IMC marketto heat up a bit to help fill in some of those gaps because of justthe sheer demand increase by the economy.

So we clearly did not provide any favorable environment for IMCs togrow from a pricing or value perspective. They basically earned theirway into the game and are being very aggressive with customers tohelp fill some of the gaps that the trucking companies areexperiencing.

SCOTT FLOWER: Great. Thanks very much, all.

OPERATOR: Thank you. The next line we'll open is the line of RandyCousins at BMO Nesbitt. Please go ahead.

RANDY COUSINS, ANALYST, BMO NESBITT: Good morning. I have a kind of acombo question for I guess Carl and John. It sort of harks back toyour investor conference. But [inaudible], all business is not goodbusiness and you guys are in the happy position of having huge volumegrowth.

When you look to sort of 2005, I'm just kind of wondering, do yousort of walk away from some of the business that's less profitable,and what impact would that have on margins?

And then secondarily, I guess more for Carl, is that when you get hitwith this much volume, you're just scrambling to sort of deal withit. Let's assume in that '05 the volume levels come down and you geta chance to go back at that network and optimize

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works. 

it, is there a pointor point and a half of operating ratio that we can rip out of thecost structure simply by having a chance to take a breath and gethold of sort of the volume that you're now dealing with?

JOHN LANIGAN: Let me take the first part on the portfolio. One of thecomponents to our focus on gaining value for our services is toclearly look at all the customers that we're serving and all of theneeds that they have and really going after what we believe is theright market value for our services. So over time that has meant thatsome customers have taken price increases to get them up into theright value range.

And other customers have not, and we've worked with themappropriately and over time during an economy that stays strong we'llcontinue to work on improving the overall value of the portfolio, andthat does mean at times that some business will fall out of thebottom because of a mismatch of expectations between what we believewe should get in the market and what the customer is willing to pay.

CARL ICE: Just to add to that for a second. One of the things thatJohn and I feel very good about is the efforts we've made with ourtwo teams working together as we've looked at business opportunitiesin this growth period, and we're working, and our teams are workingtogether well to figure out what fits well in the network and that'scertainly part of what we're doing as we take this on.

Having said that, we would certainly expect to make gains in '05 aswe always do. As Matt mentioned in his comments, we'd expect to coverinflation over a period of time, and part of volume is certainly notwhat we're doing now. And that's hard to do when you're growing at10%. So we'd expect to make some gains towards volume as we move intonext year, but to say that would result in a 1, 1.5% improvementabsent the other things we always do with covering inflation, I thinkthat's probably more than we'd accomplish.

MATT ROSE: Randy, I think these networks are kind of peculiarnetworks. We want volume to be up, because we are still a fixed costbusiness. We want volume to help our operating ratio, to help ourprofitability, our to margin.

When you get to a point where you have too much volume it causes alot of challenges, and certainly, in certain cases we know we can runour network better, more efficiently and you will see some -- andwithout a doubt there are, quote, congestion costs, when you see thetype of volumes we have, and how all that unwinds itself we'll justhave to see when we roll-out those plans when we get here.

RANDY COUSINS: Okay. Thank you.

OPERATOR: Thank you. The next line we'll open is the line of JenniferRitter at Lehman. Please go ahead.

JENNIFER RITTER, ANALYST, LEHMAN BROTHERS: Good morning. I have justone quick question which is talking about agriculture rev per car,which looked like a huge increase this quarter. Is that really justbecause of the mix toward exports, or is there something elsespecific going on in ag?

JOHN LANIGAN: That was really, Jennifer, just a huge increase in theexport market and increase in the commodity prices for ag, and wefollowed along that value chain, so that really drove it.

TOM HUND: When soy beans hit 10 bucks a bushel, we take our railrates up as well.

JENNIFER RITTER: That's good to know, thanks.

OPERATOR: Once again, ladies and gentlemen, [Caller Instructions].We'll open the line of Gary Yablon at Impala. Please go ahead.

GARY YABLON, ANALYST, IMPALA: Hi, folks. How are you?

MATT ROSE: Good, Gary.

GARY YABLON: I have two questions. One is coal-related and one is abigger picture kind of thing for you, Matt. In the coal business, I'mtrying to think about if I'm a utility manager in the east, life'sprobably not a whole lot of fun lately, and eastern prices are goingup.

What I'm driving at is, do you see -- it seems to me that one of thelevers for a utility manager might be to burn more PRB coal, wehaven't really seen the price of PRB coal move to the extent we havein the east. Are you seeing that? Are you hearing more about that?Are you seeing incremental test burns, possibly further market sharegains going further east to the marketplace? I'm not sure what elsethese utility managers are going to do, and I wanted to just get yourthoughts on that.

JOHN LANIGAN: Yeah, Gary. We are doing some test burns in the east ata little higher rate than we did last year, but not at a dramaticallyhigher rate. It's very surgical at this point. We continue to probethat market and look for opportunities. The Georgia Power deal thatkicked in in January, part of that deal was a conversion from easterncoal to PRB coal, so slowly but surely I think that there is arecognition of both long-term supply and then also the environmentalissues as well, but there's no see change going on that we sense atthis point.

GARY YABLON: Do you think that might change, John?

JOHN LANIGAN: Well, we certainly do over time, it's just very hard topredict the timing on it and obviously, you would feel that you'dhave to build some momentum on test burns, and just generate a lotmore interest in test burns as kind of an early indicator. Andalthough we're up modestly on test burns, year-over-year, it's notdramatic yet.

MATT ROSE: Gary, I'll just add to that. I mean I think if you go backtwo years ago, and if anybody would have predicted what eastern coalprices have done because of supply and higher operating expenses ofmining out there, I think you would have had a much differentenvironment in terms of test burns and people wanting to go moveforward with this. I don't hear anybody saying that eastern coalsupply is going to get better.

GARY YABLON: No, it's probably going to get worse.

MATT ROSE: So, I mean I think there's -- all this leads only to --only leads one way.

GARY YABLON: Okay. One other question, bigger-picture, longer-termkind of stuff.

This railroad used to do an operating ratio well below 80%, and whenthe stars were lined up, it would do things in the mid-70s or somesuch number like that. What's changed such that you can't do thatagain? Because we might -- I've followed railroads for longer thanI'm willing to admit on a conference call, and I've never seenrevenue growth like this ever, and to do an operating ratio that'sgot an 8 in front of it, I don't get it.

MATT ROSE: I think a couple things have changed, Gary. One is that ifyou look at fuel prices alone. If you go back to what is a long-term,what we thought was a long-term, normal fuel price in the low 20s,fuel for our railroad alone is probably up 420, $440 million.

Yeah, we're 70% coverage in terms of customer activity and probablyhalf of that, though, in terms of actual coverage, and then withinthat you've got timing delays of when fuel surcharges kick in andeverything else, so without a doubt, fuel is still hurting

us andthat's why we are absolutely committed to getting that issue resolvednot only for our conventional type business but for the R cap [ph]businesses that are covered primarily in coal.

GARY YABLON: Is that the difference as you look at it, versus yourlast peak in operating ratio? Fuel is costing you about 500 basispoints.

MATT ROSE: No, that's one of them. The second issue is that as ourmix continues to increase in terms of intermodal as a percent of thetotal pie, which is going to be our growth engine, I mean, if wehaven't made that thing perfectly clear we always want to. And if youthink about intermodalism in general, and the customer ofintermodalism being a large degree of them being trucking networkswith operating ratios in the low-90s, it's not, I think, in the cardsto have an operating ratio -- a rail operating ratio in the mid-70son that business mix. It's not just going to happen, and nor does itneed to because intermodal can provide a very, very nice growth pieceand it can provide, quite frankly, nice value. And we're always, Ithink improving that value.

And then third major piece is what's happening in our coal rates. Andthere's lots of reasons for that. Part of it is is that we had afranchise that 10 years ago looks a lot different than it does todayin terms of access with other railroads. But more importantly, we'vehad, if you go back prior, not this year or the last year, but if yougo back to prior administrations in terms of the ICC and the STB, wehave gotten case after case where we've had to a numbing down of thevalue of our coal rates. That sends not only very, very specificdegragation [ph] of coal rates to specific contracts, but it alsobleeds across to other contracts that are not even in front of a ratecase.

So you add those three thing up, and those are the three issues thatgive us an operating ratio that starts with an 8 instead of a 7. Andin all that time, obviously then, we've had to deal with theinflation and the various stuff that goes along with that. But Idon't -- I think that we will be back if we can get fuel eithercovered or fuel going down, I do think we'll be back to an operatingratio that starts with a 7. Where that ends up, I'm not going topredict that. But we know that we've still got a lot of value that wecan bring to the bottom line in terms of all the businesses that wehandle and that's what we're going to continue to work on.

GARY YABLON: Fair enough. Okay. Thank you.

OPERATOR: Thank you. The next line we'll open, James Valentine,Morgan Stanley. Please go ahead.

JAMES VALENTINE: Yeah, thank you. Real quick, just two questions.First in terms of -- Union Pacific I guess has had some problemsfinding good qualified candidates out of the West Coast in terms of Tand E employees. Wondering if you're having any problems like that?And well, I'll stop there.

JOHN LANIGAN: I think, Jim, as the economy has heated up, employeesare harder to find. So the first thing we want to do is to hold on tothe employees we have. Hopefully, one of the issues with variablizingthe compensation and creating some opportunities there will do that,and, quite frankly, how we handle employees will go a long way tothat. But I think clearly we still provide excellent jobs, excellentincomes and we have not found a place that we cannot hire employees.

JAMES VALENTINE: Okay. Good.

Second is, the separate -- Matt, I think you've talked about for awhile here about divesting some of your short-line capacity, givennow that things seem to be tightening up. Does that change thephilosophy at all, or are these lines still low-density becausethey've for some time been low-density and just don't go to the rightplaces?

MATT ROSE: Yeah, no, it's still the same. It hasn't really changed.We talked, I think at our analyst conference in November, that wewere expecting to do about a 3,000-mile package. We're not going toget quite that much. We'll get about 2500 miles.

But all the things I outlined there in terms of helping us to reducesome of the overhang, in terms of the capital overhang are stillrelevant and we're still going down that same path. And quite franklywe still like the growth opportunities that the short line brings.And I got to tell you, we still see case after case where short linesare able to get local, State and Federal money to put into those lowdensity branch lines that, quite frankly, in those cases the classones just aren't going to get it.

JAMES VALENTINE: Okay. Great. Thanks.

OPERATOR: Thank you. And our final question will come from the lineof John Burns [ph] with CSFB. Please go ahead.

JOHN BURNS (ph): Good morning, guys. Matt, real quick. Going back toyour comment that the customers are asking a different set ofquestions and are really focused on capacity availability.

Outside of pricing, has there been any change in your response tothese customer questions? I think John highlighted a little bit of itof trying to upgrade the quality of the customer and the portfolio.But can you give us some specifics as to what you're looking forbeyond just pricing?

JOHN LANIGAN: You know, really as we look at the network, part whatwe're looking at is balance, we're looking at those areas of ournetwork that really have, I'll call it more robust capacityopportunities like our northern lines and our P and W area, Chicagoto P and W, which we call the high line. So we're really looking moreopportunistically at how new customers fit into the network to helpbalance the network and help continue to fill out the network in amore balanced way.

So I think that those are some of the things that we look at and inthose areas where customers want to participate in, for example, on atranscon line where we're much busier, then we clearly look at thevalue, we look at what they bring, we look at the scheduling, we lookat the a whole host of things that deal with more fundamentaloperational concerns and issues and see how we can match intoexisting train schedules, make longer trains, et cetera. So dependingon the region, the type of commodity, et cetera, we look at manydifferent factors.

MATT ROSE: John, the other one that's really starting to pay off interms of the longer-term planning customers, like our -- you all sawour logistics park in Chicago and our biggest problem there was wedidn't build it big enough. Which, for those of you who went, it'shard to imagine.

But as we deal with customers and their supply chains, they'restarting to see the value of locating their operations as close tothat railhead, whether it's intermodal or transload -- or carload, toget as close to that rail as they possibly can. And we're just seeinga lot of interest in distribution being tighter, tightly controlledwith rail transportation.

JOHN BURNS (ph): Okay. And I guess that's a good segue into my secondquestion.

I think you picked Memphis now as the location for your nextlogistics park. Can you give us a time frame on when you expect thatfacility to start being developed and come on line.

And then secondly I guess you made the observation that one inChicago you didn't build it large enough. Do you have any plans to goback to Chicago and expand it and has that changed your thoughtprocess on how big you make Memphis initially?

MATT ROSE: Yeah. The nice thing about Chicago is that the footprintreally allows to add to it. We're already in the process of startingthat now.

As far as Memphis, Memphis market won't be near as big as we alwaysconvince ourselves, but it'll start, it actually starts this year.The change into the Memphis facility, and it'll take about threeyears. And we're starting the process of working with variouswarehouse men to understand what types of opportunities they have totie into this intermodal franchise.

JOHN BURNS (ph): Okay. Thanks for your time.

JOHN LANIGAN: I would not think it would change our plans as we goforward for how we design and build facilities. Matt alreadydescribed we do do them in a way that we can scale them and certainlyalways in capacity we only bring as much as we think we need at thevery right at the moment as best we can. That won't change. TheChicago changes are in any of our projections you've seen already.

MATT ROSE: Okay, with that, I think we're done. I appreciate theinterest and we will talk to you in July. Thank you very much.

OPERATOR: Ladies and gentlemen, this conference will be availabilityfor replay beginning today, Tuesday, April 27, at 1:00 p.m. eastern,until Friday, April 30, at midnight, eastern. You may access theAT&T executive play back service by dialing 1(800)475-6701, fordomestic; or (320)365-3844 for international, and entering the accesscode, 725562. That number again is 1(800)475-6701 for domestic;(320)365-3844 international, and entering the access code 725562.That does conclude your teleconference for today. Thank you for yourparticipation and for using the AT&T executive teleconference.You may now disconnect.

[CCBN reserves the right to make changes to documents, content, orother information on this web site without obligation to notify anyperson of such changes.

In the conference calls upon which Event Transcripts are based,companies may make projections or other forward-looking statementsregarding a variety of items. Such forward-looking statements arebased upon current expectations and involve risks and uncertainties.Actual results may differ materially from those stated in anyforward-looking statement based on a number of important factors andrisks, which are more specifically identified in the companies' mostrecent SEC filings. Although the companies may indicate and believethat the assumptions underlying the forward-looking statements arereasonable, any of the assumptions could prove inaccurate orincorrect and, therefore, there can be no assurance that the resultscontemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUALREPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILEEFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BEMATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THESUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES CCBN ASSUME ANYRESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPONTHE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT.USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALLITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANYINVESTMENT OR OTHER DECISIONS. Copyright 2004, CCBN, Inc. All RightsReserved.]

[Copyright: Content copyright 2004 CCBN, Inc. ALL RIGHTS RESERVED.Electronic format, layout and metadata, copyright 2004 FDCH e-Media,Inc. (f/k/a Federal Document Clearing House, Inc.) ALL RIGHTSRESERVED. No license is granted to the user of this material otherthan for research. User may not reproduce or redistribute thematerial except for user's personal or internal use and, in suchcase, only one copy may be printed, nor shall user use any materialfor commercial purposes or in any fashion that may infringe uponCCBN's or FDCH e-Media's copyright or other proprietary rights orinterests in the material; provided, however, that members of thenews media may redistribute limited portions (less than 250 words) ofthis material without a specific license from CCBN and FDCH e-Mediaso long as they provide conspicuous attribution to CCBN and FDCHe-Media as the originators and copyright holders of such material.This is not a legal transcript for purposes of litigation.]

Copyright © 2004 FDCH-eMedia

**---- Index References ----**

Company: UNION PACIFIC CORP; DYNEGY INC; **BURLINGTON NORTHERN SANTA FE** CORP; BEAR STEARNS COMPANIES INC; CREDIT SUISSE FIRST BOSTON (USA) INC; MORGAN STANLEY

News Subject: (Corporate Financial Data (1XO59); Corporate Performance (1XO12); Productivity (1PR67); Business Management (1BU42); Sales (1SA20); Equipment Leasing (1EQ01); Company Profiles (1CO63); Contracts & Orders (1CO29); Market Data (1MA11); Prices (1PR65); Economic Indicators (1EC19); Economics & Trade (1EC26))

Industry: (Enterprise Performance Management (1EN49); Theoretical Analysis (1TH79); Railroads (1RA98); Chemicals (1CH04); Transportation (1TR48); Financial Services (1FI37); Consumer Electronics Standards (1CO37); Traffic (1TR52); Alcohols (1AL99); Commodity Chemicals (1CO31); Land Transportation (1LA43); Consumer Electronics (1CO61); Electronics (1EL16); Leasing & Rental (1LE65); Science & Engineering (1SC33); Passenger Railroads (1PA89); Business Theory (1BU14))

Region: (North America (1NO39); California (1CA98); Americas (1AM92); USA (1US73))

Language: EN

Other Indexing: (AAR; BEAR STEARNS; BMO; BNSF; BNSF RAILWAY; BURLINGTON NORTHERN; CCBN; CCBN INC; CHRYSLER; CORPORATION; CSFB; DYNEGY; EPS; EU; FEDERAL DOCUMENT CLEARING HOUSE; GARY; GARY YABLON; GTMS; ICC; IMC; IPI; JENNIFER; JENNIFER RITTER; JP; LPG; LPL; MERRILL LYNCH; MORGAN STANLEY; NCTA; NORTHERN; OD; PRB; RCAF; ROIC; RTM; SANTA FE CORP; SITE; STB; TEU; TRANSCRIPTION; TRANSCRIPTS; TRANSPORTATION; UNION PACIFIC; USERS) (Bill; Building; Caller Instructions; Carl; Carl Ice; Construction; FDCH e-Media; Fortunately; Good; Great; James Valentine; John; JOHN BURNS; John Lanigan; Jordan; JORDAN ALLIGER; Ken; Matt; Matt Rose; Scott; SEC FILINGS; Tom; Tom Hund)

Word Count: 16210

**End of Document**

© 2013 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT PX0694

1/23/07 Fin. Disclosure Wire 13:45:00

FD Wire
Copyright © 2007 CCBN, Inc. and FDCH e-Media, Inc.

January 23, 2007

Q4 2006 **BurlingtonNorthernSantaFe** Corporation **EarningsConferenceCall** - Final

OPERATOR: Welcome to the BNSF Corporation conference call hosted byMatt Rose.

[OPERATOR INSTRUCTIONS]

I would now like to turn the conference over to BNSF Chairman,President, and Chief Executive Officer, Mr. Matt Rose. Please goahead, sir.

MATT ROSE, CHAIRMAN, PRESIDENT, CEO, **BURLINGTONNORTHERNSANTAFE**CORPORATION: Thank you. Good morning, everybody, and welcome to ourfourth-quarter financial presentation. With me here today in FortWorth are Tom Hund, EVP, Chief Financial Officer; Carl Ice, EVP,Chief Operations Officer; John Lanigan, EVP, Chief Marketing Officer.

Our presentation today is available by webcast. So I'll start bydirecting everybody's attention to our first line regarding firstquarter or forward-looking statements. This statement basicallycautions everyone that any forward-looking information presented heretoday could be affected by a number of factors which could causeactual results to differ materially from any forecast information weprovide. I would also like to mention that we'll be providingnon-GAAP measures today in our commentary and ask that you refer tothe investor relations page on our website for reconciliation toGAAP.

Taking a look at our results for the fourth quarter, we're pleased toreport all-time record quarterly earnings per share of $1.42, anincrease of 26% over fourth-quarter results last year. These resultsinclude a $0.03 benefit from a tax provision adjustment. We also hadseveral one-time items in the fourth quarter last year, and Tom willreview the adjustments required to make the year-over-year numbersmore comparable.

Freight revenues increased 9% to a fourth-quarter record of $3.8billion. We experienced revenue growth in each of our four businessunits against very strong fourth-quarter results last year. Theincrease in Freight revenue was comprised of about 4% unit growth, 6%price, and 1% fuel surcharge, partially offset by negative mix. Johnwill give you a detailed report of the results for each of thebusiness units in his review.

Our operating ratio for the fourth quarter improved to 75% and wouldhave been just under 72% if you exclude the impact of the fuelsurcharge on both revenue and expenses. Tom will provide you with thedetails of fuel as well as the other expense categories in hissection. Carl will review our productivity improvement as well as ourcapital program for 2007.

Turning to a recap of full-year results,earnings per share increased27% to $5.10 from $4.01 on a GAAP basis. Freight revenues increasedabout 15% to a record high of $14.5 billion on double-digit increasesin each of our four business units. Of the 15% increase in Freightrevenue, 6% was unit growth, 6% was attributal to price, and 5% camefrom fuel surcharges partially offset by a negative mix. Free cashflow after dividends increased to $712 million from $669 million lastyear. And for the first time,

free cash flow before dividendsexceeded $1 billion. Finally, I'm pleased to report anothersignificant improvement in our return on invested capital to 11.4%from 10.1% last year and about 7.9 % in 2004.

Now I'm going to turn it over to Tom for a detailed review of ourfourth-quarter results and some specific guidance on the expenselevels going forward. Tom?

TOM HUND, EVP, CFO, **BURLINGTONNORTHERNSANTAFE** CORPORATION: Thanks,Matt.

Earnings per share in the fourth quarter was an all-time quarterlyrecord of $1.42, which is 26% higher than the fourth quarter of 2005.The 2006 earnings per share includes a $0.03 benefit from a state taxprovision adjustment. Also due to a net loss from twocommuter-related transactions that were partially offset by the J.B.Hunt settlement, last year's earnings per share was reduced by about$0.05. So when adjusting for these items, earnings per share for thefourth quarter of 2006 is up 18% over 2005.

Operating income in the fourth quarter was also an all-time quarterlyrecord of $942 million or 18% higher than 2005. And when excludingthe unusual items previously mentioned, operating income would haveincreased 13%. Fourth-quarter operating ratio was 75%, and as Mattsaid, when excluding the impact of fuel surcharge on both revenuesand expenses, the operating ratio would have been just under 72. Asalways, John will cover revenue and then I'll give you the details onexpenses.

Operating expense was $2.940 billion for the quarter, 7% higher thanthe fourth quarter of 2005. The majority of this increase was drivenby higher volume and fuel-related expenses. The composition of ourexpenses is generally in line with historical trends with theexception of fuel, which is still well above historical averages anda few percentage points above last year.

Compensation of benefits expense was $994 million, up 9% from 2005.Employment increased 4% from 2005 to 2006, with the increaseprimarily in Transportation and Engineering, while compensation andbenefits per employee was up 5%. Now about a third of this increaseis driven by higher pension and stock option expenses, and theremainder is due to wages and benefit increases and, to a lesserextent, the timing of certain compensation accruals. In the firstquarter we expect comp and benefit expense and head count to be upabout 3.5%.

Purchase Service expense was $461 million for the quarter, up 5% or$21 million. The increase is due primarily to higher volume-relatedcosts for ramping services and haulage, and in the first quarter of2007, we expect Purchase Services to be up about 6%. Our growing BNSFLogistics Company is driving a third of this increase, and Logisticsexpense increases are offset by increases in other revenue.Depreciation expense was $290 million, and we expect first-quarterdepreciation expense to be about $300 million.

Fourth-quarter equipment rents was $235 million or 1% higher than2005. Equipment rents were nearly flat with 2005 with improvedvelocity and equipment privatization. In the first quarter, we expectequipment rents to be up about 4% over the prior year, drivenprincipally by higher locomotive rents.

Material and other expense of $257 million was down $28 million forthe quarter. However, when excluding the two commuter-relatedtransactions in 2005, material and other was up about $29 million.And this year-over-year variance was driven mostly by highervolume-related costs, material inflation, and increased casualtyexpense. In the first quarter of next year, material and otherexpense are anticipated to be about $275 million.

Fuel expense of $703 million was 16% higher than fourth quarter of2005. This is about $55 million lower than the guidance provided lastquarter, due principally to lower fuel prices. Based on the currentforward curve, we expect first-quarter fuel expense to be about $655million, but, as you know, there's a lot of volatility in fuelprices.

Taking a little closer look at fuel in the fourth quarter, averagefuel price per gallon was a $1.96 before hedge and $1.86 after hedge.In the fourth quarter, with the net impact of higher fuel prices,hedge benefit changes and fuel surcharge resulted in about a $15million headwind. And this is in line with what our prior guidancewas.

Turning to our hedge position, we're about 10% hedged for the firstquarter of 2007, about 7% in the second quarter, and 5% in the thirdand fourth quarters. And for the full-year of 2007, we anticipate aheadwind of about $150 million, with about $60 million of that in thefirst quarter. And the headwind is due to the year-over-yearreduction in hedges, partially offset by increased fuel surchargeparticipation. So in summary, we expect first quarter operatingexpenses to be about 9% higher than the first quarter of 2006, withfuel continuing to be the largest driver of this change.

Interest expense for the fourth quarter was $121 million, and otherexpense for the fourth quarter was $10 million. The fourth quartertax rate dropped by 2% to 36%. As I mentioned earlier, this is aresult of an income tax adjustment from prior periods. We expect thefirst-quarter tax rate to return to a more normal level of 38%. Freecash flow after dividends for the year ended 2006 was an all-timerecord of $712 million, driven by strong free cash from operations.And as Matt said, for the first time, free cash flow before dividendsexceeded $1 billion. We also achieved a return on invested capital of11% in 2006 furthering our improvement in this measure and supportingcontinued investments.

Turning to our share repurchases, we bought back 1.8 million sharesin the quarter under the share repurchase program. And outstandingshares are down almost 25% since the share repurchase program began.

Now I'll turn it over to John for a more detailed review of freightrevenue by business.

JOHN LANIGAN, JR., EVP, CMO, **BURLINGTONNORTHERNSANTAFE**CORPORATION: Thanks, Tom.

The fourth quarter was our 19th consecutive quarter of year-over-yearvolume growth, and we posted fourth-quarter records in both freight,revenue, and units. Coal and Ag achieved all-time freight revenue andunit records, while Industrial and Consumer had fourth-quarterrecords in revenue and units. As a side note, we've reclassified ourperishable and dry foods boxcar traffic, moving it from consumer toindustrial products. And I'll give some more detail later when Icover the individual business units performance.

Overall, we delivered a strong revenue performance driven by volumeand price. Total fuel surcharges billed in the fourth quarter were$440 million, which was $47 million more than -- more in fuelsurcharge than a year ago, driven by record fuel prices during thequarter as well as increased fuel surcharge effectiveness. Theoverall change in mix was primarily driven by the significant growthin Coal and Intermodal. Last year's fourth-quarter results included aone-time gain associated with J. B. Hunt.

Turning to the individual business units, Coal recorded the largestyear-over-year growth of the four business units in the fourthquarter for both units and revenue. Additionally, Coal surpassed ourrecord-setting third quarter, with all-time records in revenue, tons,and units. Loadings per day in the fourth quarter were 56.2system-wide and 50.8 on the Powder River Basin, both all-time highs.

In 2006, BNSF moved a record 287 million tons, nearly 11% growth. Weare forecasting 5% to 8% tonnage growth for 2007 which willsignificantly exceed all previous records. The range will bedetermined by market conditions rather than any operating issues inthe Powder River Basin.

In our Agricultural Products business unit, we produced an all-timerecord quarter for both revenue and units. Although overall PNWexport volumes were down 11%, gulf exports almost completely offsetthe loss. Domestic corn shipments were also very strong, particularlyto the West Texas feedlots. In addition, we saw strong volume growthin barley, bulk foods, fertilizer, and feeds.

In Industrial Products, we have added a new segment called Food andBeverages which is comprised of the perishable and dry foods boxcartraffic formally part of our Consumer Products business unit. Thismove provides better alignment with train service and the field salesteam. The shift represents about $300 million in annual revenue, or2% of our total net revenue, and the units shipped was about 1%.

Industrial Products revenues were up 6%, with an all-time revenuerecord for the fourth quarter, driven by strong improvement in yieldto quality. Building Products revenues continued to decline as demandfor lumber followed the decline in housing starts. However, this wasoffset by strong petroleum, chemicals, plastics, and constructionproducts revenue growth.

In Consumer Products, we now have three segments consisting ofAutomotive, International Intermodal, and Domestic Intermodal.Consumer Products had a solid quarter, with double-digit revenuegrowth in International and Automotive and, excluding last year's J.B. Hunt settlement, modest growth in domestic revenue. Internationaldrove the growth with a record fourth quarter in both revenue andunits. Revenue was up over 13% and units grew over 5%. West CoastImports and Exports continue to experience double-digit growth.However, West-bound empty volume declined significantly in thequarter, driven by international balance contracts. The domesticsegment reported a 2% decline in revenue. However, excluding lastyear's J. B. Hunt settlement, revenue was up slightly. Volumedeclined 2%, reflecting the overall softness in the truckingmarketplace.

Looking forward, we expect to see continued growth during the firstquarter of 2007. Coal demand is very strong, and our outlook remainspositive for the first quarter. In Ag, we expect growth in PNW, corn,and soybean exports due to favorable ocean freight spreads, more thanoffsetting declines in wheat. At the Gulf, corn exports should showcontinued growth, but wheat will drive overall decline due to thepoor crop and high wheat prices. We also expect Grain Products toshow continued growth. Industrial Products should continue to seeimproving yield and volumes reflective of the softer economy. And inConsumer, we should experience growth driven by continued soliddemand for international imports, somewhat offset by flat demand indomestic truck load services. So overall, we expect another positivequarter, with revenue growth of around 5% to 6%.

Now I'll turn it over to Carl for a review of operations.

CARL ICE, EVP, COO, **BURLINGTONNORTHERNSANTAFE** CORPORATION: Thanks,John. Good morning, everyone.

Today we'll be highlighting our successful focus on our capacity,velocity, and volume and productivity initiatives. As Matt, John andTom have indicated, we again handled significant volume increases,with GTMs and unit miles up 4.3% and 4.7% respectively. Theseincreases, coupled with our positive velocity trends, illustrate animproving network.

As you know, in 2006 velocity is one of our key focuses, withinitiatives that included line and terminal throughput, train networkdesign, train size, locomotive distribution, maintenance reliability,and capital improvements. Over the next few slides, you'll see theresult these initiatives have yielded.

First, in locomotive miles per day, we improved velocity compared tothe third quarter and are up over 2% compared to the fourth quarterof 2005. In car velocity, we experienced a 2% improvement over thethird quarter, which marks our fourth consecutive quarter ofincreased car velocity and reflects a nearly 9% increase over thefourth quarter last year. As you would expect with these volume --velocity improvements, you also see improvement in on-timeperformance. As we review our initiatives, we're confident that we'llsee further improvement in both service and velocity in 2007.

Turning to productivity, we continue our long-running trend ofimprovement in employee productivity, and in our key measure ofinventory, we see a favorable relationship, with inventory increasing1% as volume increased 4% or 5%. And finally, train size continues toimprove.

For 2006, total capital commitments were $2.670 billion. Weanticipate our 2007 capital commitments to be in the range of $2.750billion, with continuing strong returns. This program reflects an $80million increase over 2006, primarily driven by a

$300 millionincrease in cash expansion capital offset by a reduction inlocomotive acquisitions. The remainder of our 2007 plan reflects ourongoing maintenance programs, thus ensuring a strong network. Our2007 capital expansion plan includes double-track and sidinginitiatives on the Southern TransCon coal route and Southeast routeas well as our expansion in the Powder River Basin and intermodalterminals.

In summary, we had another good quarter, with steadily improvingproductivity and velocity measures. As you know, over the last month,we've experienced some significant winter weather. And althoughyou've seen some impact in our velocity measures, we've workedthrough those issues and with our continuing improvements in velocityand the capacity we're bringing online, we are well-prepared for2007.

MATT ROSE: All right. Thanks, Carl.

Turning to outlooks for 2007, we expect Freight revenue growth in thefirst quarter of around 5 to 6%, with about one-third of that comingfrom volume. For the quarter to date, volumes are running below thatlevel. Coal volumes in particular have been below our plan, largelydue to weather issues on the coal route. We're watching how quicklyCoal rebounds and just how consumer demand holds up. We'll just haveto see how it all plays out.

We're currently expecting earnings per share on a GAAP basis to becomparable to the $1.09 that we reported in the first quarter of2006. That's in spite of the $60 million headwind from fuel that Tomtalked about which amounts to about $0.10 per share. In addition, wehad a real estate gain in the first quarter last year thatcontributed $0.04 per share. If you adjust for these items, our EPSgrowth would be in the low teens.

Turning to the full year, we expect to see revenue growth in the 7 to8% range. Combining this revenue with our ongoing focus onproductivity, we expect to see earnings per share growth in the lowteens and an operating ratio of around 75% in spite of the fuelheadwind that Tom, again, described. Carl's already reviewed some ofour principal components of our $2.75 billion capital program. It'simportant to note that this level of spending is, again, tied to ourforecast for continuing strong returns. Although we're clearly seeinga softer economy, the long-term secular trends affecting our businessare continuing and should provide growth opportunities going forward.Specifically, we need to continue investing our TransCon lane to beable to handle the increase in trans-Pacific trade, and we're alsofocusing on our coal network to accommodate the anticipated growthand demand for the Powder River Basin coal. Even with this increasein capital commitments, we expect to deliver another year of solidfree cash flow after dividends of around $700 million.

With that, I believe we're ready to take some questions.

OPERATOR: [OPERATOR INSTRUCTIONS]

Our first question is from Ed Wolfe from Bear, Stearns. Please goahead.

ED WOLFE, ANALYST, BEAR, STEARNS & CO.: Hey, good morning guys.

MATT ROSE: Good morning, Ed.

ED WOLFE: Hey Matt, in that guidance you just gave, the 7 to 8%full-year revenue, is that also one-third volume, the way you look atit?

MATT ROSE: Ed, you know, we really don't forecast. We don't give thestreet guidance on volume.

ED WOLFE: Okay. So let's look at it a different way then. Can we talka little bit about yields? And, obviously, yields are strong, butthey've decelerated quite a bit from third quarter to fourth quarter.When I look at the 3.7% of total yield, I'm sorry

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.

-- I'm looking atthe wrong thing. When I look at total yield of 6% verses lastquarter, third quarter when it was 10%, can you talk about how muchof that is just the fuel impact to that and how much of that,particularly in Intermodal where we're seeing yields deceleratequickly, has to do with the competitive market?

MATT ROSE: Ed, we need to take a look at the numbers. We're notfeeling that yields have decelerated to that magnitude. I mean,certainly the -- we're seeing a slow down, that's reflective in thecar loading. Some of it's a little masked by weather. Obviously,we're seeing a slow down in the building products significantly. Butas far as yields, really falling off, we're just we're not seeingthat. We'll spend a few minutes here looking at those same numbers.

ED WOLFE: Sure. And I guess what I'm trying to differentiate withinthe yields is the pricing impact of that. And at Intermodal whereit's flattened out quite a bit and we saw from a competitor where itwas down, I want to try to understand. First of all, there's a bigdifference between Domestic and International, obviously. But whetheryou're seeing some pricing competitiveness from truck or if there'ssomething else there? That's kind of the question I'm trying to getat.

JOHN LANIGAN, JR.: Ed, this is John, we really have not seen ourpricing deteriorate on the intermodal side at all, even on the truckload side to this point. And, in fact, yesterday I met with the CEOof one of our large truck load partners, and they are very committedto the intermodal program and told me that they do not plan tocannibalize their intermodal freight to feed their over-the-roadbusiness, and they'll do that virtually at any cost because theybelieve in the long-term value of the intermodal program. So we'renot seeing that. And our pricing has remained pretty steady throughthe fourth quarter into the beginning of the year.

ED WOLFE: But, John, if you're not seeing it, then in fourth quarteras reported, your total consumer yields are 1.7 verses 6 for thetotal yield of the Company. And in fourth -- third quarter, it was10.6 for a consumer verses 10.4 for the whole Company. So in thirdquarter, intermodal yields were in line with the Company yield andfourth quarter as reported, they're well below. What's thatdifference?

TOM HUND: I'm going to have to look at that Matt -- Ed and -- .

MATT ROSE: Ed, you're referring to average revenue per car, correct?

ED WOLFE: Yes.

MATT ROSE: Yes. And again, we have to neutralize the mix impact tothat when we -- .

ED WOLFE: Is the fuel surcharge bigger on intermodal and, therefore,the year-over-year impact with fuel mitigating have a bigger --obviously, there's a bigger change in the mix. But it feels likethere's other things there. That would be interesting. How should wethink about use of cash flow going forward in terms of repurchase?Should we expect a similar directional share repurchase as we lookout?

TOM HUND: Yes, I think what we've empathized to our shareholders isthat we look at the dividend every year and we want to continue tomaintain a competitive dividend and then we'll use the remaining freecash flow to buy back shares.

ED WOLFE: So something -- directionally as we try to map this, shouldwe think in terms of, if we look at what you did in '06, that's asgood as we can do for '07 as a guess?

TOM HUND: Yes, I think directionally, that's fine, Ed.

ED WOLFE: Okay. And then one last question, on BNI -- on your newmarketing agreement that's going into effect with CSX, can you talk alittle bit about the timing and what that might do for either volumesor yields in intermodal from your perspective?

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works. 

JOHN LANIGAN, JR.: Well, the timing on that, Ed, as the servicestarts up just about a month from now, in the third week of Februarythe actual service will start up. And initially, it'll be a shiftingof current volumes into that region. And as we become operationallyproficient and work out any bugs or kinks that we have in theservice, obviously, we anticipate that the volumes will start to growbased on the economy.

ED WOLFE: But the fact that you're going to hold the volumes longerthan when you formally interchanged with Norfolk, should we expect tosee some benefit? I'm guessing there's a benefit or you wouldn't havedone this.

JOHN LANIGAN, JR.: There will be a modest revenue benefit to usbecause of the difference versus the haulage agreement that we didover the meridian.

ED WOLFE: And when do you think we'll begin to see that? Will it beask quickly as February or it'll take a while until we see that?

TOM HUND: I don't think you'll see it until the end of the firstquarter.

ED WOLFE: Okay.Thanks a lot, I'll follow-up with you on that yieldquestion.

TOM HUND: Ed, this is Tom on the yield question. One of the things --I think we've talked about this on previous calls. With our fuelsurcharge program in the Consumer Business unit, which is obviouslymostly intermodal, that only has a 7-day lag. So as prices fall, thefuel surcharge drops pretty quickly on that. The other businesses allhave a 2-month lag. And so in a period of falling prices, themovement in the rate is substantially muted and, therefore, later.

ED WOLFE: Okay. But the 7-day lag applies to both domestic andintermodal, that's fair to say, right?

TOM HUND: Domestic and international.

ED WOLFE: Yes. And so, we're still seeing a spread between those two,and I'm guessing there's just a little more pressure on the domesticside, is that fair to say?

TOM HUND: Well, we had a volume decline, as we mentioned on the call,on the domestic side. And the domestic revenue is more highly ratedthan the international revenue, so with the acceleration of theinternational revenue versus the domestic, that's part of the mixissue.

ED WOLFE: Okay. And going forward in '07, if fuel were flat fromhere, you're expectation with yields would be positive for bothdomestic and international intermodal?

TOM HUND: Yes. It would be because of the issue of what we're goingto see in year-over-year pricing.

ED WOLFE: Okay. Thank you.

OPERATOR: Our next question is from Ken Hoexter with Merrill Lynch.Please go ahead.

KEN HOEXTER, ANALYST, MERRILL LYNCH: Hi, good morning. If I couldjust follow up on the pricing just for a second. Are you saying thatof the 5.5 on the average revenue per car for the quarter, you cannotbreak out what is pure pricing verses what is surcharge?

TOM HUND: Oh, no.

MATT ROSE: We did for the quarter. What Ed's question was for 2007forecast.

ED WOLFE: Okay. And for the quarter it was two-thirds pricing, soyou're seeing pure pricing go from 5-6% down to 3-ish % now?

MATT ROSE: No.

TOM HUND: No. You've got mix in there on the average revenue per car,where we've got more coal moving in here which moves at aproportionately lower rate. I think what we're going to have to do isgo back to John's comments where he broke down all the parts.

JOHN LANIGAN, JR.: Yeah, if you look at the parts, coal isaccelerating, a bigger piece of the pie, internation intermodal isaccelerating, bigger piece of the pie, domestic intermodal has, as wereported, it was a tough quarter on the trucking side, and it'scontinuing into this year. As you well know, the trucking companiesare reporting very sluggish volumes. So when you look at that wholemix component, that's what drives it, as well. But our pricing hasstayed, historically, very strong through the current point.

TOM HUND: And when we say price, John quoted 6 in his commentsearlier, that's on a, I'll call it a same-store basis. So that'smatching up move-to-move and looking at it that way, which I think isthe best way to look at price.

KEN HOEXTER: Okay. So, really, no change to that same 5-6% level?

JOHN LANIGAN, JR.: No, we still feel very good about price.

KEN HOEXTER: Okay. And then -- ?

JOHN LANIGAN, JR.: And the other piece on that, Ken, is that so muchof our price is in the books because the contracts where negotiated,they play through this year. Obviously, we have some pricing thatcomes through every year, but we feel very strong about the base thatis priced through this year.

KEN HOEXTER: And John, I think you ran through, when you were goingover coal was strong and wheat was a little weak. On the coal side,can you delve into that a little bit? Obviously, Matt threw out thereit started off a little weaker than expected because of the weatherthis quarter. Are you still looking for double-digit growth levels,at least maybe for the quarter because of the easier comps in thefirst quarter? Or are you doing test burns yet? What is your look onsome of the coal?

JOHN LANIGAN, JR.: Well, we got off to -- as Carl mentioned, we hadsome weather issues which have dampened down our goal performance forthe first three weeks of the year, so, obviously, we're looking torebound. Those are starting to get behind us now. And as I mentioned,we're looking at 5-8% unit growth in coal this year, and it's reallygoing to be bounded by the market demand verses our ability todeliver. We're very confident in our ability to deliver the upper endof that range and even then some if the market demand is there. We'rereally waiting to see how market demand shapes up as the year playsout.

KEN HOEXTER: Great. Thanks a lot.

OPERATOR: Our next question is from Jason Seidl with Credit Suisse.Please go ahead.

JASON SEIDL, ANALYST, CREDIT SUISSE: Morning, gentlemen. Can I getback to some of the winter weather in the first quarter? How much ofthe flat comp in the first quarter that you guys are forecasting foris due to the weather, or is that a little bit difficult to tellright now?

MATT ROSE: Well, it's really not. The -- we're early in this year.Everybody has to remember that. This is day 23. So we've got -- we'vegot a lot of quarter still to play out here. But the issue we'rehaving when we're saying comparable EPS growth is, really having toswallow the fuel headwind that's out there of about $60 million forthe first quarter, also with the special, the one-time charge we hadlast year.

We're still expecting -- we are clearly expecting growth in the firstquarter. As far as the winter weather, certainly coal has taken thebrunt of that. We expect that if you look at our coal loading reportsthat you guys see on a weekly basis, you'll see our units are downjust slightly, and we're expecting to reverse that trend, still, forthe first quarter when it's all said and done. So, I don't think that-- we're not saying that the weather is going to have a profoundimpact on the quarter. We're just saying things have gotten off to alittle bit of a slow start.

JASON SEIDL: Okay, fair enough, Matt. And when I go to your 2007***o***utlook, you said EPS for the full year in the low teens, are yougoing off of 510, just to make sure we're on the same page?

TOM HUND: That's GAAP to GAAP.

JASON SEIDL: GAAP to GAAP, perfect. If I could look a little bithere, Carl, at unit trains, units per train trending nicely, 127.Where can that number get? I know you're limited with customersidings, but where can you see that number going to?

CARL ICE: Well, in the near term, we'd just expect to see modestimprovement the way we have over the last few quarters. Longer term,we'll continue to explore if there's a way we can make a quantumleap, things like half-again as large of trains. But for the nearterm, we'll press to make sure all of our trains hit an 8,000 unit --8,000 foot level.

JASON SEIDL: Okay. Thanks a lot, gentlemen.

OPERATOR: Our next question is from John Larkin with Stifel Nicolaus.Please go ahead.

JOHN LARKIN, ANALYST, STIFEL NICOLAUS: Yes, good morning, everybody.

MATT ROSE: Hi, John.

JOHN LARKIN: I think you mentioned that you expected coal volumes togrow at 5-7%.

MATT ROSE: Yes.

JOHN LARKIN: And when you look at the utility inventories being up sodramatically year-over-year, part of that being driven by thewarmer-than-expected winter and maybe the cooler-than-expectedsummer, it just seems awfully aggressive to me. Do you think there'sany chance that perhaps the utilities may scale back as thoseinventories get a little larger here over the next couple of months?

MATT ROSE: Yes, John, first thing I'd point to, I think that all ofthe public information would show you that eastern stockpiles areheavier than western stockpiles or at least eastern coal versus PRBcoal. So that's point one.

Point two is that we're certainly not seeing anybody wanting to turndown their coal burn and, in fact, there are still sets coming in.So, you know, we'll see. It's, I think it's a combination of --certainly the number one driver today is going to be what happenswith the weather the rest of the year, the rest of the quarter,rather. And that's going to be the number-one determinant of how muchmore burn actually handles. But we're really not seeing anybodywanting to stop replenishing their coal stockpile. And as we talkedabout over the last 18 months, our belief is, that as we went tolower stockpiles three and four years ago, that people are going towant to increase back to more normal stockpiles that they used to seebefore.

And then the last thing, we're going to see a little bit of newtonnage for new coal-fired plants in the fourth quarter that will bemodest. And then, the last thing if you put in on the forecast ofabout 2% for electricity generation, we think all that stacks up. ButI think the number one issue will be the burn rate for the remainderof this quarter.

JOHN LARKIN: Okay. Thank you, that's very helpful. Also, on theoperating ratio, it seems to have kind of leveled off here at about a75, which certainly is very admirable. But I would have thought thatsome of the operational improvements that Carl summarized would haveperhaps had a favorable impact on the OR. Do you think we're going tobe able to see some of those improvements translate into expandedmargins here in '07 at some point?

MATT ROSE: Well, you know, again as we describe it. And people say,"Well, it's not fair to put it this way". But the fuel,when you take out the impact and the expense of the fuel surchargeis, you know, is still very significant to us. And we'll work throughthat over time. But we also know that there are still quite a bit ofopportunities that are still out there. And when we look at justrunning the railroad better and getting some of the congestive costout, and we'll do that with a combination of just better operations,better process operations, as well as putting these capital programsto help the overall efficiency, which will help the operating ratio.

So, John, we're -- as you know we're not fixated on operating ratio,we're fixated on EPS and free cash flow and growing our business.Operating ratio is one of the two or three data points that we willlook at. A little bit of it depends, of course, on the mix ofbusiness that you have, and ours is what it is, but we expect tocontinue to have improvements in our operating expense package.

TOM HUND: Yeah, John, this is Tom. I think as we look out over thiscoming year, we will still see some modest improvement in operatingratio, both adjusting and not adjusting for fuel surcharges, despitethe significant fuel headwind that we've got this year. Which, to me,says taking the fuel headwind which is mostly driven by theexpiration of hedges off the table, still, in spite of that showingsome modest improvement, I think shows that we're really driving alot more to efficiency than perhaps the numbers indicate.

JOHN LARKIN: That's very helpful. And then just one final question onhead count. I think you indicated that that was going to be up about4% in the first quarter, which strikes me as, perhaps, being up everybit as much as car loadings or tonnage, or, perhaps, even a littlebit faster. I'm wondering at what point, perhaps, we begin to seesome economies of network density where, perhaps, the tonnage startsgrowing faster than head count?

MATT ROSE: Carl, you want to take that and I'll clean it up?

CARL ICE: Presuming my answer, then?

MATT ROSE: Right.

CARL ICE: The first quarter we always see a little less favorablerelationship with head count and units because we do hire ahead,somewhat, so we're ready for the higher volumes that come in thespring than rolling into our vacation periods. So I think that that'spart of the impact. You'll see those relationships improve as theyear goes on. We also are ever mindful that with the attrition we'llsee across the year, that being a little ahead is something we canadjust for as the quarter unfolds. And right now we're doing some ofthose adjustments, as well.

JOHN LARKIN: Perfect.

CARL ICE: Thank you.

MATT ROSE: Next question.

OPERATOR: And we have a question from the line of Kevin Maczka withBB&T Capital Markets. Please go ahead.

KEVIN MACZKA, ANALYST, BB&T CAPITAL MARKETS: Good morning.

MATT ROSE: Good morning, Kevin.

KEVIN MACZKA: I just have one question, and it relates to volumes andwhat kind of visibility you have into your volumes as you look out aquarter or two. It seems like from mid '06 to the first quarter wesaw a deceleration there in the growth rate. And even though youdidn't say it, it sounds like your guidance is for flattish volumesas you look out to the first quarter. I'm just wondering if 6 monthsago, if you were able to forecast that, and just in general how muchvisibility you have into those volumes?

MATT ROSE: It's just so different for each business. We're notguiding, we're not guiding here at all to flat volumes. The point is,we know industrial is going to be softer this year. All we have to dois look at our -- at our housing starts and look at our lumberbusiness and look at the housing products on our railroad, we knowthat that market's in a steep decline right now. And we know that ourindustrial business will be reflective of this slower GDP.

The rest of the business we expect to grow. And we're still, when welook at TransPac trade, you look at what's going on with globalinsights projections, they're still in the mid to high single-digittype growth. We expect to grow coal quite significantly this year.And Ag is the one, Kevin, that is harder to forecast. So, if -- whenwe look through our crystal ball, that's the one that's the mostdifficult, but when you look at what's happening with the domesticside of Ag, with ethanol, with domestic feedlots as well as oceanspreads, we're expecting to have a decent year in Ag, as well. So,clearly, as -- if you replay this thing 6 months ago and we start tosee the GDP numbers come down, the industrial business is going to bemost reflective of that decline.

KEVIN MACZKA: Okay. That's all I had, thanks for the time.

MATT ROSE: Thank you.

OPERATOR: Next we go to the line of Randy Cousins with BMO CapitalMarkets. Please go ahead.

RANDY COUSINS, ANALYST, BMO CAPITAL MARKETS: Morning, guys.

MATT ROSE: Hi, Randy.

RANDY COUSINS: I wonder if you guys could comment on real estatetransactions that occurred in '06 and what the outlook is for realestate transactions or sale of assets in '07.

MATT ROSE: Tom?

TOM HUND: Yes. Obviously in '06 we had in -- we had the Lakeview saleand we had that -- I think a 4-cent gain in the first quarter. And Ithink that probably was the most significant one. Other than that, Ithink we gave in other income, we think that's probably 10million-ish of expense. And probably is kind of where we stay. Idon't think we have anything this year that's at the present time.And who knows what happens as deals come up? But at the present timethere is nothing. Like last year we had announced New Mexico. If youremember, we had the commuter transaction in New Mexico took a, Ithink it was a $70 million loss on a writedown in the fourth quarter,and that was a $0.04 gain in the first quarter. I said Lakeview, itwas actually New Mexico. In the first quarter this year, there'snothing like that that we think is significant. So, nothing that wethink is worth announcing or anything like that right now.

MATT ROSE: We intend to make it, Randy, the old fashioned way,hauling freight on the railroad.

TOM HUND: That's the gist of the question of the earnings improvementon the teams that Matt talked about. None of that is anticipated tobe something that's highly unusual. As a matter of fact, it's a bitof a headwind because of the New Mexico sale in the first quarter.

RANDY COUSINS: Okay. Second question, which again is anotherfinancial. On your cash flow statement, there in the fourth quarterin other net, it's a minus 171. Anything in particular going onthere?

TOM HUND: Biggest thing is we had a payment to our pension plan thatwent on there just as well as some normal working capital items, notlooking at a separate line. So that probably was the biggest thing.

RANDY COUSINS: Okay. And with reference to, you guys got approval touse ETMS, or you seem to be rolling out the ETMS. I wonder if youcould talk about the benefits, if any, that you see coming in '07 asa consequence of this, or is this really -- does it have a quick payback or does it really -- the leverage is going to come when you getto single-man crews.

MATT ROSE: There's really no benefit in 2007. It's going to be a longtransition. Of course, we had one of the, one of the accelerated waysthat we were going to tie it was within crew constants, but we'restill intending to roll it out and begin to roll out in 2007. Andwe're working internally on those plans. But you will not see anymeaningful benefit in 2007.

RANDY COUSINS: Okay. And then with reference to this surcharge andwith fuel prices having come down, at some point, presumably, thesurcharges start to come off. I'm wondering if you could give us anyhelp in terms of figuring how to model that? Because, again, on theflip side of the coin, you probably still got some contracts whereyou don't have a surcharge in it at this point in time.

TOM HUND: Well, I think from just an overall coverage standpoint, youcan handicap it based on fuel prices. Our fuel surcharge program willstay in effect, it will just be at lower coverage rates, justdepending upon fuel prices, provided fuel prices stay down. We've gotabout 80% of all of our fuel coverage, the majority that's notcovered is in the coal business where we have longer term contracts.So it really is just a function of what's going on with fuel prices.

RANDY COUSINS: So when we look at, your slide number 17, which hasgot the components of growth, and we saw the 440 as sort of asurcharge recovery, when we think about Q1 if prices stay where theyare, I presume that number is going to come down quite dramatically?

CARL ICE: No, not necessarily because of the lag that Tom talkedabout with fuel surcharge in 3 of our 4 business units. It won't comedown as dramatically. If fuel stays down in the 50 range, you'll seemore, more impact in the second quarter as those lags start to catchup.

RANDY COUSINS: Okay. Thank you.

MATT ROSE: Thank you.

OPERATOR: Our next question is from the line of Tom Wadewitz withJ.P. Morgan. Please go ahead.

TOM WADEWITZ, ANALYST, JP MORGAN CHASE & CO: Yeah, good morning.Let's see. Just a short follow-up on the fuel that you werediscussing. I think, John, you said 80% coverage. If that's an '06number, what do you think the '07 number is? Does it go up to 85% or90? Where do you end up in '07 in terms of coverage?

JOHN LANIGAN, JR.: It will be closer to 85, Tom.

TOM WADEWITZ: Okay. And, let's see. When we look at the repricing ofcontracts and where you see the remaining opportunity, I think coal,obviously is one, but are there other areas of the portfolio wherethere's still a big contract repricing opportunity in '07? Or are youpretty much through the big steps at repricing those other areas, andit's more market price gradually moving up?

MATT ROSE: Tom, as we've talked about before, we sort of don't lookat it as the big opportunity to reprice anymore. Most of our businessover the last three years during -- during the big run up in raildemand over the last three years has come due other than coal. Sowe've been through pricing activities on most of our business atleast once, if not twice, over the last three or four years. So, wereally look at it as a market-based situation, and we'll continue tomove forward based on market conditions.

TOM WADEWITZ: Okay. And the 10.6% increase in revenue per car infourth quarter in coal was pretty strong. Is that -- is therepotential for that pace to continue in '07? Or do some of theescalators perhaps come in as fuel prices have come in and that'smaybe not representative of what you might see for coal yields in'07?

MATT ROSE: Hey, Tom, again, when you look at average revenue per car,it's just not -- there's a lot of stuff going on in there to includethings like mix and RCap and everything else. I think we would saythat as we've said in the past, we've got a plethora of coalcontracts in different stages of age, if you will. Certainly as coaldemand has risen, the value of what we're getting to haul coal on anew contract today is higher than it was say 7-8 years ago. And so,that's kind of all we're going to say, is that we still see thatthere's opportunities to increase yields as well as volumes that wethink both of those things go hand in hand in our coal business.

TOM WADEWITZ: You don't want to comment on whether the fourth quarterwas representative for what you might see for yields, for coalyields?

MATT ROSE: No, because that's on an average revenue per car basis,and a lot of it has to do with what, in terms of mix, of whichutilities are taking more coal, and revenue per cars within coal canvary greatly.

TOM WADEWITZ: Okay, fair enough. And one last question for you. Youinvested a lot of money in the railroad. I think maybe a year, twoyears ago, if we knew how much volume growth invested a lot of moneyin the railroad. I think a year or two years ago you would have saidif we knew how much volume growth we had, we might have invested alittle quicker. As volumes are slowing and you had a few good yearsof investment, is there a point where the capacity position reallyenables you to see some strong operating improvements? I knowvelocity has improve somewhat, but is that to come in '07 or perhaps'08 where the network performance improves a lot and we see some costside benefit from that, as well?

MATT ROSE: I would tell you we've seen tremendous performance, 10.1,5.6, 6.1% unit growth over the last 3 years. No railroad has donewhat we've been able to do. And in the midst of all that, we'veraised our ROIC from 7 to 10 to 11.3 or 11.4. So, I feel very, veryconfident and very proud, quite frankly, of the accomplishment thatwe've seen so far. And these investments are going to be for thefuture. So, we feel like that we have -- our capital has paid off forus, it has set us up for the future to be able to handle this volume.If volume slows down, we will obviously alter that capital. But we'vesaid all along that we will only invest in this railroad if we seereturns that will substantiate that capital program, and we're seeingthat now.

TOM WADEWITZ: Yeah, that's fair enough and I wasn't questioning --the growth has been very impressive. I was just trying to get more ofa sense of the capital you put in that enables you to handle futuregrowth as opposed to necessarily driving a lot of further velocityexpansion and cost reduction.

MATT ROSE: Well, it's just all those things. Our velocity has gottenbetter from it, our margins have gotten better from it, our growthhas gotten better from it. All this thing works together.

TOM WADEWITZ: Okay. Fair enough. Thank you for the time.

OPERATOR: Next, we go to Scott Flower with Bank of AmericaSecurities. Please go ahead.

SCOTT FLOWER, ANALYST, BANK OF AMERICA SECURITIES: Yeah, good morningall.

MATT ROSE: Scott.

SCOTT FLOWER: Yes, Hi. Just wanted to, in looking at your guidance,and I know that you talked about the headwind for fuel in firstquarter, and I understand that's a sizable component. But even if Iadjust for that, and know that on a GAAP basis you'll be flatter, doyou expect some acceleration or greater acceleration in the secondhalf of year? Obviously, if you're going to get to a low teens-typeof yearly number and you're flat in first quarter, just themathematics suggest that second half or the last three quarters haveto be better growth rates. And I'm just trying to understand as youlook at the year, are you anticipating that volumes get better? Helpme understand exactly how you're thinking about things in thatregard.

TOM HUND: Scott, hey, this is Tom. Let's talk fuel headwind for aminute, we said that the headwinds, which, again, is the principallyexpiring of hedges offset by some increase in fuel surcharges, forthe year is about $150 million but about 60 of that is in the firstquarter. So, as you can see from that, you've got a $0.10 hit in thefirst quarter and, on average, a much smaller one as you go over thelast three quarters. So roughly half of that number, although it'snot exactly even across the quarter. So that's the biggest thing.

And secondly as we've talked both in my comments and in the Q&Ahere, we had the New Mexico land sale, the gain on New Mexicotransaction, that was 4 cents that quite frankly that the financialcommunity didn't include in our year-over-year improvements in 2006.So we're just saying on a GAAP basis, carve that guy out too, thesame way you guys did last year, that's $0.04 a share. So those twothings combined in the first quarter are $0.14 a share. We don't havethe bad comp on the transaction, the New Mexico transaction, as youlook at second, third, and fourth quarter, and then fuel headwindmoderates.

SCOTT FLOWER: Okay. But if I adjust for those items first quarter,and again, you talked about, it, you'd be up 12-13%, which is aboutprobably where you're talking about for the year, which if I thenkind of normalize for first quarter versus your guidance for theyear, you'd still be stronger than that on average in the remainingthree quarters. So, I'm trying to look through the fuel and realestate comparison. It would still seem like the latter threequarters, or certainly the fourth quarter, would have to berelatively stronger than the average to bring you up. Maybe I'll moveon. I'll catch you offline or Marsha offline on that.

I guess the other questions I had were probably on, predominantly onthe revenue side. I know that you talked about, John, that the gulfexports picked up, and on a volume basis, I'm assuming, offset whathappened to the PNW. I guess two questions off of that. Was thatpredominantly spread-driven as to what happened or was that justproduct driven? And the secondly, if it's a volume offset, a revenueoffset, was it still maybe a mixed negative from a contributionstandpoint?

JOHN LANIGAN, JR.: Possibly, slightly. It was a product-driven morethan anything. Right now, actually, ocean freight spreads areimproving. They've been fluctuating a bit recently between $15 and$18, but last quarter we reported they were at about $10, so there'sbeen a 50 to 80% improvement in the spreads just in the last quarter,which will influence towards the PNW. But there were weather issuesalso in the PNW in the fourth quarter that affected corn and soybeanexports, and we offset it with very strong corn and soybean exportshipments out of the gulf.

So, there was a product mix, there were some weather issues. A lot ofthings moving around, but we feel good as we come into this year. Andeven some of the issues that we had last year with the very poorsouthern plains wheat crop, we've had a lot more moisture this winterthan we had last winter, so that is shaping up to be better on ayear-over-year basis than we had last spring.

SCOTT FLOWER: Okay, and I know that you've been fairly firm andconsistent saying you feel good about price, and yet you talked abouta little bit in the domestic intermodal side that things are perhapsnot as robust. Are you finding that it's just that the shippers arejust not giving you as many volumes or that you're choosing to staydisciplined on price and willing to let those shippers that arewilling to play with the trucker, being a bit more aggressive onprice to let the volumes go? I'm just trying to get a sense of, is itthat you're just staying disciplined on price because that's alonger-term strategy and you're actually seeing some volumes go away?Or that, really, more what you're seeing is just shippers are makingthat decision for you and you're not modulating price at all on thedomestic side of intermodal?

JOHN LANIGAN, JR.: You have to look at who our shipper is on thedomestic side of intermodal, and those are the trucking companies. Ifyou look at our performance in the fourth quarter on domesticintermodal versus the trucking companies in general, I would say thatour performance is actually better from a volume perspective than thegeneral indexes of, particularly, truck load carriers.

What we're seeing, Scott, is a tremendous amount of discipline on thepart of our customers to maintain their intermodal programs. Becausethey are looking at it for the long-term as well, both from a processand a capital perspective. Because as you well understand, if acustomer has 20 or 30% of their business in intermodal, trying toshift a significant portion of that is tough in an environment wherethey're still not finding truck drivers and the truck driver marketis very very tight, and then they'd have to make the capitalexpenditures on additional tractors as well to handle it. So, I don'tthink anybody is going to make that kind of decision in theshort-term in the current market environment.

SCOTT FLOWER: Are you seeing any impact on your car load businessesrelative to over-the-road competition or just not effective in thatregard?

JOHN LANIGAN, JR.: Boy, that's really on the margin. If you look atmost of our car load businesses, it's bulk-type products or speciallyhandled-type products, and there might be a little bit on the margin,but it's not significant.

SCOTT FLOWER: Okay. And then just one clarification. I know youtalked about participation being roughly about 80%. What was that upyear-over-year in the fourth quarter?

JOHN LANIGAN, JR.: Well, I think on a full-year basis, we were up 5%or so last year.

SCOTT FLOWER: Okay. And then the last quick question. I know Tomspoke to it, but on cost per employee, and I know you talked aboutpension and some accruals and timing, and yet I think that when youtalked about first quarter, the rate of change of that was going toslow again. Is that just purely a function of incentive comp or bonusaccruals or pension and option expenses that only hit at certaintimes of the year? I'm just trying to understand better. Because therate of change in cost per employee was the highest it had been forthe year in the different quarters, and I'm just trying to understandwhat's going on in there and how I should look at that going forward.

TOM HUND: It's all of those, Scott. You're right, as we go to thefirst quarter, we expect it to be flat. And the first thing is,remember that stock option expensing occurred for the first time forus in '06. So when we get to the first quarter of '07, we've nowlapsed that. So you get to, instead of comparing to a zero, you'recomparing to something that's pretty comparable, so that kind ofcomes off the table. Pension expense, we had changed some of ourassumptions that caused more expense last year. Again, you kind ofbegin to lap those. And then there was some timing of our incentivecompensation accruals between quarters that's just a matter of whichquarter you record things in, and that hit us a little harder in thefourth quarter that we don't think is there in the first.

SCOTT FLOWER: Okay. Great. Thanks very much, all.

MATT ROSE: Thanks, Scott.

OPERATOR: We next go to Donald Broughton with A.G. Edwards. Please goahead.

DONALD BROUGHTON, ANALYST, A.G. EDWARDS & SONS, INC: Good morning,gentlemen. We've been watching the disparity between total railindustry intermodal volume in the small single digits and the majorintermodal port volumes still running in the high single digits oreven low double digits. And we've been hypothesizing that domesticintermodal had to be negative industry-wide. Was your domesticintermodal volume decline concentrated in a particular customer,customer group, or industry? Or was it more broadly based?

JOHN LANIGAN, JR.: Well, Don, we don't talk about individual customerresults. But as I mentioned --

DONALD BROUGHTON: Doesn't stop me from fishing.

JOHN LANIGAN, JR.: Pardon me?

DONALD BROUGHTON: Doesn't stop me from fishing.

JOHN LANIGAN, JR.: Well, you came up dry, you didn't get anything. AsI mentioned in my earlier remarks, we were down a bit on domesticintermodal, and it was fairly broad based. If you really look at thetruck load in LTL markets and what they're reporting, those are thegreat indicators on what's going on.

DONALD BROUGHTON: All right. Your confidence in pricing overall isbased on, that's outlook on base yields, you're not including fuel inthat perspective, correct?

TOM HUND: That's correct.

DONALD BROUGHTON: On the car loading side, what percentage of thevolume or revenue or however you'd like to characterize it, isrepresented by contracts that have been renegotiated in the last twoquarters that extend through '07?

JOHN LANIGAN, JR.: Well, the vast majority of our car load -- you'retalking about our industrial-type businesses?

DONALD BROUGHTON: Outside of intermodal.

JOHN LANIGAN, JR.: So you're, you mean Ag, coal, and industrial alltogether?

DONALD BROUGHTON: Yes.

JOHN LANIGAN, JR.: Because it's different by the different businessunits.

DONALD BROUGHTON: Obviously, we're analysts, the more granularityyou'd like to give us, the better.

JOHN LANIGAN, JR.: Yes, well, it's a tale of many cities. Most of ourAg business is on [CARIF] which can be adjusted on as little as 30days.

DONALD BROUGHTON: Okay.

JOHN LANIGAN, JR.: All of our coal business, virtually, is undercontract, and those have a lot of different terms, as we've talkedabout many times. And in any given year, we have anywhere from 5 to15% of that business that comes due.

DONALD BROUGHTON: Sure.

JOHN LANIGAN, JR.: And our general industrial car load, those are onmuch -- about 30% of that business is on [CARIF] which means it canbe adjusted relatively rapidly and 70% is under contract. Thosecontracts are in the three-year range, with some as long as five,some as little as two. So most of that business has pricing that'sgood through 2007.

DONALD BROUGHTON: So it sounded like you've gotten -- your confidenceis based upon contract renewals that have happened recently thatextend through '07?

JOHN LANIGAN, JR.: Right, and a lot of those contracts, when you talkabout the business that is under contract, is under contract formultiple years. So, business that has been signed over the lastcouple of years that will continue to run through '07.

DONALD BROUGHTON: So you're saying that you have contracts that haveescalation clauses then that get you that pricing through '07, thatthey essentially translate into the confidence you're expressing?

JOHN LANIGAN, JR.: Yes.

DONALD BROUGHTON: Okay. Tom, with the realignment of the businessunits, I'm kind of bouncing around here on your website, I don't seeit yet. How many quarters back are you going to give us, restate thatdata, for us to be able to revamp our models here? Hello?

TOM HUND: '03, '04, okay, we were looking beyond, Tom, for the folksthat are -- Marsha is here, so '04.

DONALD BROUGHTON: So from '04 on?

TOM HUND: Correct.

DONALD BROUGHTON: Oh, that'd be great. And we can expect that, Iguess, maybe later today?

TOM HUND: Yes.

DONALD BROUGHTON: Fantastic. Thanks, gentlemen. I'll let someone elseask a question.

OPERATOR: We'll go to Jordan Alliger with Deutsche Bank. Please goahead.

JORDON ALLIGER, ANALYST, DEUTSCHE BANK: Hi. I apologize for thisquestion, but I just want to make sure I understand again in terms ofthinking about the first quarter. In 2006, the GAAP earnings were$1.09, so when you're saying, I think you had said flattish growth,although then I think it said expecting some growth, are we lookingat a $1.09 as the comparable for the first quarter of '07?

TOM HUND: Correct.

JORDON ALLIGER: Okay. Second question is, is there a way to gaugewhat the capacity utilization is right now on your network or somemeasure or indication as to how full or not full it may be?

MATT ROSE: Jordan, it's just such a diverse network and thatquestion, if you go to the Powder River Basin versus theTranscontinental Main Line versus Northern Route versus the variousparts of the network, you get a different answer for each one.Typically we would tell -- we will always say that we will try andrun the network at a level that we can always handle an additional 10to 15%. But there are certain places that are on our network that areextremely full right now, and there are

other places that have a lotof capacity. It's 32,000 miles of railroad that we operate, and it'sjust literally an impossible question to answer.

JORDON ALLIGER: Okay.

TOM HUND: But Jordan, from a market perspective, we are wide open forbusiness from a standpoint of new opportunities and what-have-you. Wedon't look at it from a constraint perspective as we look at newopportunities.

JORDON ALLIGER: And then just a final question sort of on price. AndI understand all the points you made. I guess my question is sort ofgenerically, why wouldn't we see shippers push back on price ifthings stay softer in the economy, particularly in some of thedomestic intermodal areas where the truckers are seeing quite a bitof pressure from their own customers? I'm just sort of curious how,why wouldn't there be some push back?

JOHN LANIGAN, JR.: Well, for the most part, the business is undercontract. So I wouldn't tell you for a second that a customerwouldn't have a discussion with us about how tough the environmentis. But a lot of trucking business tends to move within the truckingworld on either much shorter contracts or spot pricing ofwhat-have-you, and we don't have that environment in the railindustry. So we're typically under multi-year contracts with thesecustomers, and that's the way the business lines up.

MATT ROSE: Hey Jordon, the other thing, I think just listening to thetone of the questions from everybody on the call. I think thedisconnect that I see that everybody has here is that we areexpecting a record volume year on this railroad. We're expectingrecord tons, record units to handle across this network. Even given adown-throttled economy, it's still going to be a very, very busyplace. And so we're not seeing that we're going to have any declineat all in volume. In fact, it's going to be just the opposite.

And yes, we know that building products will -- housing starts willbe down, thus building will be down. But in order of magnitude,that's 3% of our business. We're still expecting to operate recordtonnage out of the Powder River Basin. We're going to have recordtonnage off the international business, and we will have recordtonnage out of our domestic intermodal. And we believe we'll haverecord Ag volumes. So we're -- this is a -- this is still a very,very great environment in terms of what we're going to see on therailroad. And we don't see any major changes from a decline in thosevolumes at all.

JORDON ALLIGER: Okay. Thank you.

OPERATOR: Our final question will be from Ed Wolfe with Bear,Stearns. Please go ahead.

ED WOLFE: Thanks, asked and answered. Have a good day, guys.

MATT ROSE: Thanks, Ed. All right. I think with that we're done. Wewill look forward to talking to you after the results of the firstquarter. Thank you all very much.

OPERATOR: Ladies and gentlemen, that does conclude your conferencefor today. Thank you for your participation. You may now disconnect.

[Thomson Financial reserves the right to make changes to documents,content, or other information on this web site without obligation tonotify any person of such changes.

In the conference calls upon which Event Transcripts are based,companies may make projections or other forward-looking statementsregarding a variety of items. Such forward-looking statements arebased upon current expectations and involve risks and uncertainties.Actual results may differ materially from those stated in anyforward-looking statement based on a number of important factors andrisks, which are more specifically identified in the companies' mostrecent SEC filings. Although the

companies may indicate and believethat the assumptions underlying the forward-looking statements arereasonable, any of the assumptions could prove inaccurate orincorrect and, therefore, there can be no assurance that the resultscontemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUALREPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILEEFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BEMATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THESUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIALOR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANYRESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPONTHE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT.USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALLITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANYINVESTMENT OR OTHER DECISIONS.]

[Copyright: Content copyright 2007 Thomson Financial. ALL RIGHTSRESERVED. Electronic format, layout and metadata, copyright 2007Voxant, Inc. (www.voxant.com) ALL RIGHTS RESERVED. No license isgranted to the user of this material other than for research. Usermay not reproduce or redistribute the material except for user'spersonal or internal use and, in such case, only one copy may beprinted, nor shall user use any material for commercial purposes orin any fashion that may infringe upon Thomson Financial's or Voxant'scopyright or other proprietary rights or interests in the material;provided, however, that members of the news media may redistributelimited portions (less than 250 words) of this material without aspecific license from Thomson Financial and Voxant so long as theyprovide conspicuous attribution to Thomson Financial and Voxant asthe originators and copyright holders of such material. This is not alegal transcript for purposes of litigation.]

**---- Index References ----**

Company: BNSF CORP; MERRILL LYNCH; **BURLINGTONNORTHERNSANTAFE** CORP; DEUTSCHE BANK AG; BURLINGTON NORTHERN AND SANTA FE RAILWY CO; CSX CORP; BUKSER OG BERGING AS; STIFEL FINANCIAL CORP; BNSF RAILWAY CO; SOCIÉTÉ FINANCIAL SA; SITE (NETHERLANDS)

News Subject: (Corporate Financial Data (1XO59); Major Corporations (1MA93); Employment (1EM26); Prices (1PR65); Privatization (1PR92); Economic Indicators (1EC19); Economics & Trade (1EC26))

Industry: (Railroads (1RA98); Trucking (1TR88); Cereals, Breads & Grains (1CE39); Building Materials (1BU25); Transportation (1TR48); Banking (1BA20); Corn Farming (1CO87); Freight Railroads (1FR84); Financial Services (1FI37); Construction (1CO11); Land Transportation (1LA43); Agriculture (1AG63); Real Estate (1RE57); Agriculture, Food & Beverage (1AG53); Ocean Shipping (1OC22))

Region: (New Mexico (1NE26); North America (1NO39); Americas (1AM92); USA (1US73))

Language: EN

Other Indexing: (ADDITIONALLY; AUTOMOTIVE; BB; BEAR; BMO; BNSF; BNSF CORP; BURLINGTON NORTHERN; CARIF; CORPORATION; CSX; DEUTSCHE BANK; EPS; ETMS; EVP; FINANCIAL; GAAP; GDP; INTERMODAL; INTERNATIONAL; INTERNATIONAL INTERMODAL; JR; JR : YEAH; MATT ROSE; MERRILL LYNCH; NORTHERN; OPERATOR; PNW; PRB; ROSE; ROSE: YES; SANTA FE CORP; SITE; SOUTHERN TRANSCON; STEARNS; STEARNS CO; STIFEL NICOLAUS; TRANSCRIPTION; TRANSCRIPTS; USERS; VOXANT; YEAH) (A.G. Edwards; Beverages; Building Products; Carl; Carl Ice; Consumer; Consumer Products; Donald Broughton; Engineering; Grain Products; Hey Jordon; J .B. Hunt; J. B. Hunt; J.B .Hunt; J.P. Morgan; John; John Lanigan; JOHN

LANIGAN, JR.; John Larkin; JR.; Lakeview; Matt; Matt Rose; Products; Purchase Service; Randy; Scott; SEC FILINGS; Tom; Tom Hund)

Word Count: 12952

**End of Document**

© 2013 Thomson Reuters. No claim to original U.S. Government Works.

NewsRoom

# EXHIBIT PX0695

NewsRoom

10/23/07 Fin. Disclosure Wire 13:45:00

FD Wire
Copyright © 2007 CCBN, Inc. and FDCH e-Media, Inc.

October 23, 2007

Q3 2007 **Burlington Northern Santa Fe** Corporation **Earnings Conference Call** - Final

OPERATOR: Ladies and gentlemen, thank you for standing by. Welcome tothe BNSF Corporation Conference Call hosted by Matt Rose. At therequest of your host, all lines are in a listen-only mode. Later wewill conduct a question and answer session. (OPERATOR INSTRUCTIONS)As a reminder this conference is being recorded. I would now like toturn the conference over to BNSF Chairman, President, and ChiefExecutive Officer, Mr. Matt Rose. Please go ahead, sir.

MATTHEW ROSE, PRESIDENT - CHAIRMAN - CEO, **BURLINGTON NORTHERN SANTAFE** CORPORATION: All right. Thank you, Karen. Good morning, everybody.Welcome to our third quarter financial presentation. With me here inFort Worth today are Tom Hund, EVP, Chief Financial Officer, CarlIce, EVP, Chief Operations Officer, and John Lanigan, EVP and ChiefMarketing Officer.

Our presentation today is available by webcast, so I will start bydirecting everybody's attention to our first slide which is ourforward-looking statements. The statement basically cautions everyonethat any forward-looking information presented here today could beaffected by a number of factors which cause actual results to differmaterially from other forecast information that we provide. I wouldalso like to mention that we will be providing non-GAAP measurestoday in our commentary and ask that you refer to the InvestorRelations web page on our website for reconciliation to GAAP. Takinga look at our results for the third quarter, we're pleased to reportearnings per share of $1.48. That represents all-time recordquarterly earnings in an increase of 11% from third quarter earningsper share last year of $1.33. While we had benefit in the quarter ofapproximately $0.02 from recent developments in coal rate cases,these results were achieved in spite of a net $45 million head fuelhead wind due to our expiring hedge position.

Freight revenue was up 4%, $3.9 billion, due to continued strongpricing of about 6% which was partially offset by mix. John will giveyou detailed report of the results for each of our business units inhis review. Finally, we reported an operating ratio of 74.6% whichrepresented an improvement of more than 100 basis points versus lastyear which was the result of very effective cost control and ongoingimprovement in yields. As always, Tom will provide you with detailsof fuel and the other expense categories, and Carl will provide anoperational update. Now I will turn it it over to Tom.

TOM HUND, EVP - CFO, **BURLINGTON NORTHERN SANTA FE** CORPORATION: Thankyou, Matt, and good morning. Earnings per share in the third quarterwas an all-time quarterly record of $1.48 which is 11% higher thanthe third quarter of 2006. Quarterly operating income exceeded $1billion for the first time, increasing by $80 million or 9% over2006, and the increase in operating income was driven by freightrevenue growth of 4% and strong cost control, especially in ourlargest expense category, compensation and benefits. Third quarteroperating ratio improved to 74.6% and decreased more than 100 basispoints over last year.

As always, John will cover the details of revenue, and I will coverexpenses. Operating expense was $3.68 billion for the quarter, $50million or 2% higher than the third quarter 2006. A 4% decrease incompensation benefits was more than offset by higher

fuel,depreciation and material and other expenses. Compensation andbenefit expense was $937 million, down $38 million or 4% from 2006.Compensation and benefits expense for employee was down 3% onslightly lower head count. Wages and benefit increases were offset bylower variable compensation costs and other cost controls.

Purchase service expense was $501 million for the third quarter andflat to 2006. Depreciation expense was $324 million, up about 9% fromlast year as a result of our continuing capital investment. Equipmentrent expense was $235 million for the third quarter,. Equipment rentswere about flat with 2006 as higher locomotive rents were partiallyoffset by reduced freight car costs. Material and other expense of$257 million was up $34 million over the third quarter of 2006. Thisincrease was partially the result of a $16 million higher than normalenvironmental a accrual. Additionally, a favorable settlement in2006, higher material expenses and increased crew support costs werepartially offset by lower personal injury costs in the quarter.

Finally, fuel expense of $814 million was about 3% higher than thethird quarter of 2006. The $22 million increase was driven by areduction in hedge benefit of $75 million partly offset by improvedfuel efficiency of more than 3%. Looking a little closer at fuel inthe third quarter average fuel price per gallon was $2.31. Fuelexpense reflected a $45 million head wind for the third quarter. Thehead wind was the net impact of hedge benefit changes partiallyoffset by increased fuel surcharge participation and slightly lowerfuel prices. For the fourth quarter of 2007 we anticipate a net headwind of about $100 million, and this increase over last quarter'sguidance was principally due to significantly higher fuel prices. Weexpect fourth quarter total operating expenses to be about $260million or 9% higher than the fourth quarter of 2006 with fuelexpense accounting for about $220 million of this change. Interestexpense for the third quarter was $132 million, and other expense forthe third quarter was $6 million. The tax rate was 38.6%. Now, westill anticipate capital commitments of about $2.550 billion and freecash flow after dividends of around $700 million for 2007.

Turning to share repurchases, we bought back 3.1 million shares inthe quarter under our share repurchase program. Outstanding sharesare down about 25% since the share repurchase program began. Now Iwill turn it over to John for a detailed review of revenue bybusiness.

JOHN LANIGAN, JR., EVP - CMO, BURLINGTON NORTHERN SANTA FECORPORATION: Thanks, Tom. We posted an all-time revenue recorddespite continued economic softness leading to declining units andflat revenue ton miles. Three of our four business units, Coal, Agand Industrial products achieved all-time revenue records thisquarter. In addition, Ag had an all-time units record and coal hadall-time record tonnage.

Overall we delivered an improved revenue performance driven by yieldquality despite the slowdown in the U.S. economy. Fuel surchargerevenue was down 2% due to the decline in units. The overall changein mix was primarily driven by international revenue and fees whichwas partially offset by favorable coal rate case adjustments.

Turning to the individual business units, while the quarter startedoff with flooding and washout's in the Midwest, we rebounded quicklyenabling coal to set an all-time revenue record and third quartertons record. Loadings per day in the third quarter were 55.6 systemwide and 50.6 on the Powder River Basin. Our continued focus onefficiency resulted in an all-time high of 118.4 tons per unit drivenby steel to aluminum conversions. September recorded an all-timetrains per day record for the joint line.

We expect PRB coal tonnage in 2007 to exceed 290 million tons whichwould beat all previous records. Even as we move record amounts ofcoal, utility forecasts continue to indicate higher demand than whatthe mines are producing. During the quarter two-thirds of the missedloading opportunities were mine related. In our Agricultural productsbusiness unit we produced an all-time record quarter for revenue andunits led by volume growth in wheat, fertilizers and ethanol. OverallGulf exports were up 26% during the quarter driven by wheat exports.Due to a combination of mix and PNW elevator maintenance outages, PNWexport volumes were down 10% with wheat partially offsetting soybeansand corn. Ethanol volume grew significantly and also drove increasedshipments of DDGs for feed usage.

Portions of our industrial products business continued to feel theimpact of the economic slowdown in terms of unit volume but stillsustained an all-time revenue record in the third quarter driven byimprovement in yield quality. Building products revenues were down10% compared to a decline 6% in the second quarter as we saw thecontinued impact of the housing decline. However, we saw strongdemand in petroleum driven by fuel by rail.

Chemicals and plastics benefited from strong demand in industrialchemicals with volume up 5%. Construction products produced 6%revenue growth. However, volume was negatively affected as a resultof weather-related issues.

Consumer products revenue was down 3% on a 10% decline in units.International posted 3% lower revenue on a 14% decline in volumedriven by the following three factors-- First, on the import frontthe decline in Eastbound loads was driven by the slowing U.S. economywhich has resulted in a decline in Eastbound containers handled atWest Coast ports versus the third quarter of 2006. We have not lostany major contracts this year.

Second, we saw the reduced TransPacific Service of a majorinternational customer as we discussed last year. Finally, whileempty volumes continued to decline, similar to what we discussed inthe previous quarters, this decline was partially offset by thegrowth of Westbound loads on strong demand for U.S. exports. Similarto last quarter the domestic segment reported a 4% decline in volumereflecting the overall softness in the trucking market. Due to thesoft economy, we are continuing to see slower volumes and lookingforward we expect to see this trend continue during the fourthquarter of 2007. However, we anticipate positive revenue growth basedon continued yield management. In coal, PRB burn is up 5%year-to-date versus last year. The mines are off to a great start inthe fourth quarter, and we are on pace to set all-time records.

In Ag we expect to see continued strong wheat exports and a recordcorn crop combined with strong corn exports. Ethanol will continueits growth as new plants come online in fourth quarter. Industrialproducts will continue to feel the impact of the economic slowdown inthe building products sector offset by yield and revenue growth inthe other sectors. In consumer, we expect flat revenue growth drivenby yield improvement offset by softness in volume. So overall, weexpect revenue growth in the mid single-digits. Now I will turn itover to Carl for a review of operations.

CARL ICE, EVP - COO, **BURLINGTON NORTHERN SANTA FE** CORPORATION:Thanks, John. Good morning. Everyone. Over the next few minutes we'llbe highlighting our familiar focus areas. Beginning with velocity,locomotive miles per day were down slightly compared to the sameperiod last year but as you can see on the right we improved eachmonth throughout the year and you'll recall we began the quarter withsignificant flooding issues. In car velocity, we were down about 7%-- 7/10s of a percent over last year. There were two basic issues,first, the flooding that I already mentioned which I will not bringup again because we're well recovered from that and working throughweather events is a basic part of railroading, and secondly we've hadcongestion in our Gulf operation primarily resulting from the grainvolume that John mentioned earlier which exceeded the elevatorcapacity as well as IP growth. Those two together have taxed ourfacilities in the Gulf, but we've been a aggressive about moving carsin the area because we wanted to capture the volume. With ourefficient on velocity as you could expect we've seen ongoingimprovement in our on-time performance highlighted particularly bycoal.

Turning to productivity our workforce was down about 1% in the thirdquarter, and we were down slightly in gross ton miles per employee.In the fourth quarter we expect to return to our long-runningimprovement trend with about a 2% drop in employees. In our inventorycomparison you can see that our inventory is up with a drop in thevolume. There are two basic issues here. First, as I believe you allknow, we've had more coal sets available throughout the year than wasnecessary to move the volume that we're handling, so despite the factthat we stored those sets, they show up in our inventory, andsecondly, private cars are up.

Beyond the measures we thought it would be helpful to comment on theoverall operation of the railroad. The railroad is a large and busyplace. To do that well we really need to break it into oursegments. First in terms of coal, John's already mentioned that wemoved a lot of coal, with that we've seen solid improvement in ourcycle time throughout the quarter with several weekly cycles beingthe best we've seen in three years. On the IP front, overall velocityflattish, but the train velocities improved and improved throughoutthe quarter, and in our premium segment we've shown improvement ingood customer feedback as well as

improvement in some of our keylines. In Ag, despite the issues I mentioned, we adjusted forstaging, we're basically flat year-over-year, and over a several-yearperiod we've shown good improvement in Ag, and our unit growth haswell out paced our inventory growth, and finally in IndustrialProducts, each month of the year we showed improvement in velocityover last year until September and in October we're makingimprovements in that area as well.

So finally, we thought it would be interesting to show you our fuelefficiency. As you can see in the third quarter we had an all timerecord for gross ton miles per gallon of 803. So in summary we wecontinue to believe we have the right initiatives in place to driveimprovement in our key focus areas.

MATTHEW ROSE: Thanks, Carl. Turning to our outlook for the fourthquarter, we anticipate freight revenue growth in the midsingle-digits due to ongoing effective yield management combined withan increase in fuel surcharges partially offset by mix. With unitrevenues expected to remain soft, we will continue to focus oncontrolling costs through productivity initiatives and leveraging thevariable components of our cost structure. We expect fourth quarterearnings per share to be about flat with last year in spite of the$0.17 per share fuel head wind Tom described. So based on our currentoutlook we will report an increase in earnings per share for the fullyear over adjusted earnings of $5 per share last year. Of coursethat's in spite of an economic slowdown that continues to affect bothour industrial and our consumer products segments, and what we nowpredict to be a net fuel head wind for the year of about $0.50 pershare. We discussed the variability we've intentionally built intoour cost structure and the advantages of our diverse revenue basemany times in the past, and both of these elements of our franchiseare working to our advantage in this current environment. With that,Karen, I think we're ready to take some questions.

OPERATOR: (OPERATOR INSTRUCTIONS) Our first question does come fromthe line of Mr. Ken Hoexter from Merrill Lynch. Go ahead.

CHRIS WEATHERBY, ANALYST, MERRILL LYNCH: It is actually ChrisWeatherby in for Ken. Just wanted to touch on head count briefly.Obviously you guys have been making decent progress there. Justwanted to get an idea of where do you think you could see that going?I think you mentioned down 2% in the fourth quarter year-over-year.What should we be thinking about for '08, assuming kind of volumesmaybe ramp up in the back half but potentially stay weak for anotherquarter or two?

MATTHEW ROSE: Carl, do you want to?

CARL ICE: Sure. We're finalizing our '08 plans right now. I can'tcomment on it in detail, but generally as we develop those plans, ifvolume comes back, we'll be able to add people, we'll continue tomanage our head count towards volume, and we've got several levers topull using attrition, using our workforce retention boards are inplace.

CHRIS WEATHERBY: Okay. I guess sticking on the cost side, if thinkingabout materials and other, I know you guys mentioned I think anenvironmental accrual there? I was just wondering if you could breakthat out, and I guess think about how we should be thinking aboutthat line item as a stand alone going forward?

TOM HUND: It is Tom, Chris. We said that we had a $16 million higherthan normal environmental accrual related to really just a handful ofsites, so a little bit unusual there. I would call that just anabnormal amount, so we would expect that this number should comedown, that the overall level of spending in that line item shouldcome down next quarter.

CHRIS WEATHERBY: And about that amount or something percentage ofthat 16 million?

TOM HUND: Well, we don't give guidance by line item, but certainly bythat amount if not maybe a little more.

CHRIS WEATHERBY: Okay. And I guess just quickly, two quick otherpoints. Just on the guidance, the fourth quarter number, that's basedon your GAAP 142 , reported in the fourth quarter of '06, is that

TOM HUND: That's correct.

CHRIS WEATHERBY: Okay. And then just finally, as far as legacycontracts kind of rolling over, particularly on the coal side, canyou comment on what you have left? Anything that's being repriced inthe fourth quarter and just kind of what's left after '07?

MATTHEW ROSE: Tom?

TOM HUND: We still have coal contracts, Chris, that have not come upfor renewal out until 2011, so we still have quite a runway left onlegacy contracts.

OPERATOR: Thank you. Our next question does come from Randy Cousinswith BMO Nessbitt Burns. Please go ahead.

RANDY COUSINS, ANALYST, BMO NESBITT BURNS: Good morning, guys.

MATTHEW ROSE: Good morning, Randy.

RANDY COUSINS: John, I wondered if you could comment or give us moreclarity what's happening in your intermodal business. Obviously it isthe largest chunk of your business. You mentioned that a majorcustomer had been losing market share. Have you steen a stabilizationand do you see a situation where the customer gains back market shareand are we continuing to look at relative deterioration?

JOHN LANIGAN, JR.: It wasn't a case of losing market share. It was acase of them withdrawing from the market, withdrawing their serviceto the market, so that has continued out throughout the year, andfrom a standpoint of when we should lap that, that will be aboutmid-year next year, and it is really up to them to determine whetheror not they want to come back into the market.

OPERATOR: Thank you. Our next question does come from the line of EdWolfe with Bear Stearns. Please go ahead.

ED WOLFE, ANALYST, BEAR STEARNS: Good morning.

MATTHEW ROSE: Good morning, Ed.

ED WOLFE: A couple things. J.B. Hunt reported volumes up 23%, andintermodal volumes obviously are down a lot for you guys right now.How do we look at that discrepancy? How should we think about thatsince 83% of their volumes are on your line? How do we think aboutthat?

MATTHEW ROSE: I think, Ed, they certainly have been very aggressivein getting share this year from their competitors. That would I thinkbe the inference.

OPERATOR: Thank you. Our next question does come from the the line ofTom Wadewitz with his with JPMorgan. Please go ahead.

MICHEL WIENZ, ANALYST, JPMORGAN: Good morning this Michael Wienzactually in for Tom right now. How much farther can you go onpricing? What does the spot market look like right now?

MATTHEW ROSE: We move very, very little business on the spot market.Most of our business is under contract, and even the tariff businesswe move for for example in Ag doesn't change on a daily basis, sowithin the railroad industry the spot market really doesn't have anyimpact on our pricing.

MICHEL WIENZ: I mean, volumes are weak right now, they've been weakfor quite a long period of time. Looking forward, if volumes don'timprove, how much farther can you go with price before price startsto impact how much volume you have as opposed to just weak demand?

MATTHEW ROSE: I think it depends on how long and sustained theeconomic slowdown is, and that's difficult to predict if as a lot ofpeople are saying it starts to ramp back up in the second half of theyear, then I think we'll be able to maintain decent pricing goingforward. If it becomes a very long and sustained downturn, then we'llprobably have different discussions toward the end of next year.

MICHEL WIENZ: Okay. So you're kind of expecting the same kind ofthing second half, possible time for a pickup?

MATTHEW ROSE: Well, it is hard to predict at this point. There is alot of mixed signals in the economy.

MICHEL WIENZ: My last question is how much farther can you go onproductivity improvements given the weak environment?

MATTHEW ROSE: Carl?

CARL ICE: We'll continue to make productivity improvements. We wouldexpect to have a coverage of half to two-thirds of inflation as wealways do, and we continue -- we'll continue to drive productivity.

MICHEL WIENZ: Any specific areas you can target on the cost side? Itlooks like you were able to reduce head count this time so thatimpacted costs and benefits, but are there any other or mostlyinitially be on the comp and benefit side?

CARL ICE: We'll impact all areas. It will be across the board, butthere is not one or two specific things I would like to highlight. Itis work in all the the areas.

MATTHEW ROSE: And at this time I would certainly also add that it ismass matched because of the head wind and the price, but we madesignificant improvement in what I would call fuel efficiency which isgross ton miles per gallon this past quarter, and it is an area wealways push out.

MICHEL WIENZ: Thanks for the time, guys.

OPERATOR: Thank you. We have a follow-up question from Mr. EdwardWolfe, Bear Stearns. Please go ahead.

ED WOLFE: Hi, guys, I am sorry. I got cut off by the operator before.I started to ask about Hunt's growth and you talked about them takingsome share, but those volumes tend to find their way onto yourrailroad. What I was trying to understand, is there anything to dowith a change of import versus export? Were seeing obviously terrificexport and weak import growth right now. Does that impact as you seeit your use of IMC or the use of IMCs on your line?

MATTHEW ROSE: Not dramatically, certainly not at this point, Ed. Thewest bound business is making it's primarily into internationalcontainers and all the international steamship lines have rampedtheir marketing efforts in the U.S as well and in many cases don'trely as much on the use if IMCs as they might have 5 or 10 years,ago. Some of the IMCs are doing well particularly with smallershippers but the larger shippers have large programs in place.

ED WOLFE: Okay, Hunt talked about their retail customers feeling someweakness recently in the quarter are you seeing that with retailgenerally and what's your sense of the retail season coming in?

MATTHEW ROSE: Well, they have been pretty well chronical themselvescoming out and predicting relative weak holiday seasons. A lot of theretailers have come out publicly and downgraded their growth numbersfor the next quarter. It feels to us

like that's playing out. Itfeels really like they are playing the inventory game much tighterthan maybe they have in the past. And one of the big influencer Ed,is this whole use of gift cards, we've talked about it before but theretail trade is anticipating an increase of gift card usage of 25%this year and they also indicate that those gift cards don't getspent until the following year. People don't rush out the day afterChristmas and spend all their gift cards. In fact a lot of them areare delayed untill the first or second quarter waiting for theSpring, Easter-type season. The Spring clothing, the summer clothingcoming out. So there has been some changes from that stand point aswell. In fact, they think gift card sales could be as much $15billion this year. When do you expect intermodal volumes to start totrack up you. Do we have grandfather the [Merist] situation or couldthat happen earlier, do you think? Well, the [merist] situation waspretty significant to us so we really have to get through thatlapping situation midyear next year.

CARL ICE: I think, Ed, also, I think we've got to understand wherethe housing sector is going. I think that while we traditionallytonight break out within intermodal what really drives it, I thinkthere is a lot of spill over effect into the general truckloadintermodal of housing and housing related type products.

MATTHEW ROSE: One of the revelations the last few years is the numberone imported item from China the last couple of years has beenfurniture, and obviously with lower housing starts and the like,that's going to impact that particular commodity.

ED WOLFE: That makes sense. On the cost side, you did a phenomenaljob, and I apologize if somebody asked this already, but salary andbenefits down 4%, they were more flat last quarter year-over-year. Isthat sustainable? How should we look at that going forward?

TOM HUND: This is Tom, Ed. I think certainly next quarter we wouldexpect that trend to continue, and then as we move into next year, Ithink it kind of really depends upon what happens with volumes and asCarl said we would expect to offset part of inflation, obviously wageincreases we'll expect it offset a substantial portion of that withefficiency, so I think to next year it really depends on what we seevolume wise.

ED WOLFE: This is a good run rate for fourth quarter, and then nextyear we'll reassess when we get a better sense of demand kind ofthing?

TOM HUND: I think that's fair.

ED WOLFE: What was the fuel impact you said for next quarter there isa $0.17 head wind I think. What was the head wind in third quarter?

TOM HUND: I believe we said 40 -- was it 40 or 45? I think it was 45the number we quoted.

ED WOLFE: Million?

TOM HUND: 45 million, yes.

ED WOLFE: Thanks a lot, guys. Appreciate that.

OPERATOR: Tho our next question is from Adam Lawson with MorganStanley. Please go ahead.

ADAM LAWSON, ANALYST, MORGAN STANLEY: I was wondering, Tom, could yougive more clarity to follow up on the last question on the reductionin variable comp in the salary line? How much was that and was thatmore than last quarter?

TOM HUND: I don't have last quarters in front of me, so I don't knowthe number to that. The year-over-year was probably worth at least acouple of cents per share.

ADAM LAWSON: Okay. Was there any change in the mix of capitalemployees at all that might have impacted that number?

TOM HUND: No, not materially.

ADAM LAWSON: Okay. Okay. The other question I had was you mentionedthe congestion and the PNW. Do you have a sense for how much of theupside that might have taken away, especially with ocean spreadswhere they are and some of the Gulf congestion that you said kind ofresulted out of that?

TOM HUND: We didn't mention -- I don't think we ment to saycongestion in the PNW. What we said was that the elevators werebasically shut down for an extended period of time, almost 30 days.

ADAM LAWSON: Okay.

CARL ICE: The congestion that we saw on the railroad was really inthe Gulf coast area.

ADAM LAWSON: Okay. And how long was the elevator down, I am sorry?

CARL ICE: Down about 30 days.

ADAM LAWSON: About 30 days. Okay.

CARL ICE: Yes.

ADAM LAWSON: And then just the last question, on the intermodal side,a lot of people have mentioned here about pricing pressurespotentially on the domestic side from the trucking companies, and onthe international side there has been a lot of talk in the industryabout the Mayor's contract obviously and some volumes may be shiftingover to lower price legacy contracts on other carriers. Does thatmake you rethink your pricing strategy near-term at all?

MATTHEW ROSE: We're always trying to call brit our pricing strategywith what's going on in the market both short and medium-term, sothat's a continual process for us, and we'll continue to look at thatas we move forward.

ADAM LAWSON: Okay. Great. Thanks a lot, guys.

MATTHEW ROSE: I think from a longer standpoint it is a greatquestion. At the end of the day if intermodal we believe willcontinue to grow, there is going to have to be capacity put in, andquite frankly the market rates that we are charging today simplyreflect that, that cost to put that additional capacity in. We'veliterally have spent hundreds and hundreds of millions of dollars ofexpanding intermodal franchise, so there is really few choices. Wecould have chosen not to make expansions and not to include that inthe base rates, but at the end of the day we know the marketplacewants us to continue to be able to handle these volumes over thelong-term.

ADAM LAWSON: Okay. Great. Thanks a lot.

MATTHEW ROSE: You bet.

OPERATOR: Thank you. Our next question does come from the line ofScott flower with Banc of America Securities. Please go ahead.

SCOTT FLOWER, ANALYST, BANC OF AMERICA SECURITIES: Good morning all.

MATTHEW ROSE: Good morning, Scott.

SCOTT FLOWER: A couple of questions. One is, and forgive me I came ona little late if this is addressed. Can you give a sense of how yousee things playing in Washington there is lots of moving parts andpieces and I understand the economics of the business, but thepolitical side, economics may not totally played to the audiences, soI am trying to get a sense of there is so many moving parts andpieces in Congress as well as the STB. How do you see the politicalenvironment in Washington affecting how you see the business in '08?

MATTHEW ROSE: Scott, I think we can all agree there is more activityin Washington on railroad regulatory policy than we've seen in quitea while, and in terms of the ability for a bill to come out of acommittee or come out of one of the two Houses in Congress, I thinkthere is a much higher chance, but at the end of the day we thinkthat the question will be asked regardless of who is in power of theWhite House or the two bodies. The question that will be asked iswhether or not these actions will result in more rail capacity. Ithink clearly that is the issue that's not come forth today. What iscoming forth today is primarily reduction of rents from the railroadindustry to the customers, but it really comes down to fundamentalquestion of whose going to pay for the renewal of the railroadindustry and whose going to pay for the expansion of the railroadindustry? You probably saw that the industry just came out with astudy looking at the next 30 odd years and basically came out --Cambridge did a third party constituted and I came out with about$150 billion that's going to have to be invested in the industry.That's not renewal. That's simply expansion to be able to handle a 3%type CAGR growth. And these are tremendous amount of resources aregoing to have to go into the industry, and whatever regulatory policyis adopted is going to have to be a policy that in-cents thatinvestment.

I think when you're seeing now is a lot of frustration from shipperswho over the last 20, 25 years have seen ever-reducing rates, and nowas we've reached this kill equilibrium of demand and supply arestarting to see rates go up because of the renewal process that therail roads are going through as well as the capacity of having thembe expanded, and there is a lot of frustration, so it really comesdown to the fundamental question of how this infrastructure will bepaid for, so I think you have to kind of keep in perspective of thehearings and the bill that is are out there. There is a hearing todayin the Senate, and you'll hear a lot of frustration, but at the endof the day, the question will have to be raised of what regulatorypolicy will in-sent these investments to come into this industry.

SCOTT FLOWER: Just a couple other quick ones. Maybe directionally,because I know given the sort of cycle of budgetary considerationsthis may not be done yet, but given that you've all tweaked yourCapEx budget down modestly a little bit this year based on what'sgone on with the economy, how should we directionally, and I stressdirectionally because I know you don't have precision, but how shouldwe directionally think about CapEx for next year?

MATTHEW ROSE: We haven't finalized anything, and it will depend onour volumes, but CapEx you'll have to look at over a couple of years,Scott, because we already have some projects started this year thatwe're going to do next year, kind of regardless of what we think theeconomy is going to do because these are long-lived projects. I thinkso if you look at it over a couple of years, if volumes are expectedto be soft for a couple of years, you'll see the capital come down.There may be a short-term timing issue of six months or a yearbecause of projects that are started this year and that we choose notto stop but generally what we've said is as long as we seeever-increasing returns which will in part be by ever-increasesvolumes, we'll continue to invest in the railroad. If we see one ofthese two issues, either ever-increasing returns or ever-increasingvolumes start to diminish over the longer term, you will see ourcapital come down, and I think that's only logical and makes sensefor everybody.

SCOTT FLOWER: Last question and again forgive me if this is addressedbut obviously Tom answered a question about the run rate and overalllabor costs, but when I look at a cost per employee, it was offsomething to the tune of about 3% this quarter which was demonsterlybetter than past quarters. Is that something per an employee basis,it was a mix driven? Was it obviously incentive comp accruals, all ofthe above, and above, and should that rate per employee also staydown at about that same kind of rate or how should I think aboutlabor? I think there is moving parts and pieces there, and I amtrying to get a better handle on it.

MATTHEW ROSE: This was clearly our -- I guess I will say our bestquarter from a comp standpoint. You're right. It was a lot of stuffin a 90-day period that can impact it. This type of run rate I don'tthink is sustainable, but I think we probably look at maybe on a peremployee basis more flat to down very slightly.

SCOTT FLOWER: Okay. Great. Thanks very much, all.

MATTHEW ROSE: Thanks, Scott.

OPERATOR: Thank you. Our next question is from Randy Cousins with BMOcapital markets. Please go ahead.

RANDY COUSINS: Nice to get a second chance. Just with reference toagain coming back to the intermodal, John, I wonder if you can giveus some greater sense in terms of granularity in terms of I amlooking at the average revenue per unit in intermodal, so obviouslythe international is up quite dramatically, and the domestic is soft.Can you give us a sense as to sort of what's triggering the therelative changes and how much is the loss and the revenue emptybusiness impacting the rates that we're seeing on your consolidatednumbers?

TOM HUND: On the international side as Matt talked about a couple ofminutes ago, we worked very hard to get that business up to areinvestable level because of the long-term growth prospects for thatbusiness, and so those are obviously the results of contracts we'vebeen able to achieve over the last few years, and they play their waythrough the contract cycle. On the domestic side, there is some mixchanges going on in the background, the expedited truckload part ofour business is down somewhat more than other parts of the business.That's reflective of what's going on in the overall trailermarketplace, and what's going on with trailer based carriers. Part ofit is a mix issue. We do have modest price increase on the domesticside on a same-store basis, but the mix within the domesticintermodal hides that a bit.

RANDY COUSINS: When I look at the 12.6 year-over-year, the vastmajority is baseline price increases, not a mix issue, or revenueempties that aren't there.

TOM HUND: The revenue empties aren't there, and that has an impactbecause revenue empties move at a far lower rate than loads do, sothat tends to make that yield or the RPU somewhat artificially highbased on historical perspective.

RANDY COUSINS: But so again it is still the majority of that increaseis base increase is rather than mix issues?

TOM HUND: Well, there is a lot of mix with the revenue emptysituation, and so that's part of the mix story as well. You can'tnegate that.

RANDY COUSINS: Okay. One last question. With reference to the Gulfexports, is that going to have -- if the business comes back into theGulf, does that have a more favorable impact on profitability thansay stuff -- excuse excuse me, comes back to the Pacific Northwest,does that have a more impact on profitability than business going outthrough the Gulf?

TOM HUND: That really depends on the timing and what's going on inWorld Markets. The the Gulf has been so busy because of the rest ofthe world having a very poor wheat crop, so the Gulf has been drawinga lot more wheat than it normally does, and the commodity prices aseverybody has followed have been going through the roof overall inAg. The world supply and demand situation has really played out thisyear in a way that it normally has not played out in the past.

MATTHEW ROSE: Randy, let me give you the short version. We wouldrather go to the PNW for infrastructure reasons as well asprofitability.

RANDY COUSINS: I guess, Matt, what's the real question? What are thechance of getting that PNW business back or is it a case where we'veseen a shift and it is going to keep ongoing throughout the Gulf?

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works. 

MATTHEW ROSE: It is back, it is screaming back today. It is alive andwell as we speak. We're having I shouldn't say record. We're havingtremendous X-PNW export flow right now, so it is back, and as Johnsaid, we don't drive these things. It is really around world marketsand what's the ocean spreads are doing and everything else, but wehave a lot more unencumbered assets in the PNW, and we have a lotbetter flow. Our operating costs are more controlled there, and welove the environment we're in right now which is a heavy PNW flow.

RANDY COUSINS: Great. Thank you.

TOM HUND: The Gulf is still busy.

MATTHEW ROSE: The Gulf is still busy. The grain markets are justplain busy, but there has been a lot of infrastructure investment inthe PNW over the last number of years and not as much in the Gulf,and that sort of exacerbated the issue this year.

OPERATOR: Thank you. Our next question does come from the line ofJason Seidl with Credit Suisse. Please go ahead.

JASON SEIDL, ANALYST, CREDIT SUISSE: Gentlemen, sorry, I jump odd alittle late so if any of these are repeats, I apologize. Matt, do youhave any comments in relation to the new safety bill that just passedthrough the House?

MATTHEW ROSE: Jason, there is a bill that will go through the Senate,and until that gets in conference, we'll just see where it goes.There is not a lot of things helpful in the House Bill, and quitefrankly, we don't think there is a lot of things that will add a lotof value overall to our shippers or to our companies, so it is a longways from passage, and these things typically will work themselvesout.

JASON SEIDL: Okay. Fair enough, and as a follow-up to that, on thecall CN talked about being close to obtaining second shipper forPrince Rupert. Do you anticipate any problems in terms of themstealing some business away from the ports you serve along the WestCoast?

MATTHEW ROSE: We don't know. It is certainly -- we know that thatfacility is up there, but again we think that long-term there will beenough international growth that all of those ports are going to bequite frankly fully taxed, and Rupert has got a narrow swath of whatwill work to certain markets, but it is not just the nature of the CNfranchise, it does not offer the breadth of diversity in terms ofdestinations that the shippers are going to need long-term foreverything.

JASON SEIDL: Matt, as always, I appreciate the time.

MATTHEW ROSE: You bet.

OPERATOR: Thank you. Our next question is from David Feinberg withGoldman Sachs. Please go ahead.

DAVID FEINBERG, ANALYST, GOLDMAN SACHS: Good morning, gentlemen.

MATTHEW ROSE: Good morning.

DAVID FEINBERG: With regard to the compensation declines you'veexperienced year-over-year want to make sure I understand what'sgoing on with head count. Is that a higher rate of attrition allowingyou to scale down or workforce or are you actually having to buyindividuals out of contracts?

MATTHEW ROSE: We're not buying anybody out. It is not a higher rateof attrition. It is that we flex are workforce up and down withvolumes and volume have been soft, so we haven't added and we'veallowed the workforce to attrit out.

DAVID FEINBERG: What is the current rate of attrition?

MATTHEW ROSE: It is about 2%.

DAVID FEINBERG: Okay. And then with regard to the share buybacks, inthe second quarter it looked like the pace of share buybacks hadaccelerated. You've come whack a little bit here in 3Q. How should wethink about the pace of share buybacks as we look forward as itrelate to say your program?

TOM HUND: Sure. What we said is our debt to cash flow, call thatEBITDA or EBITDA minus maintenance, it really doesn't matter thatmuch because they move somewhat in exactly the same pattern or ourinterest coverage, those are the kind of ratios we're looking at.We're looking at holding those reasonably constant where where wewere at the end of the year and you have to look at that and saywhat's the borrowing capacity, and then you'll come up with a number,but there was in intention to say that second versus third should bematerially different. That's just timing I guess within the quarters,and sometimes certain windows when we can't buy and things like that,so that's just a little timing.

DAVID FEINBERG: Can we just confirm what's left on the program andwhen it he can piers?

TOM HUND: There is no expiration on it, and we have probably roughly30 million shares left on it. We have plenty of runway here.

DAVID FEINBERG: Great. Thank you.

OPERATOR: Thank you. Our last question is from Tom Wadewitz withJPMorgan, please go ahead.

MICHEL WIENZ: Good morning. Just one question or two questions on theyield side. I think you talked a little bit about what boosted coalyields in third quarter. Is there a dollar amount you can attributeto the rate case impact, and also when we look at forecasting coalyields going forward, does that continue or do we go become to morekind of 9, 10% growth if we look at fourth quarter?

MATTHEW ROSE: We said on the coal rate cases that it was a couplecents per share on the coal rate cases. Tom, do you want to answer?

TOM HUND: I think with that obviously that's a one-time deal, so wego back to basically what we've been doing the last few quarters.

MICHEL WIENZ: Okay. On Ag yields, would you expect some accelerationin fourth quarter as you got some of these favorable mix with morePNW? Would you expect stronger Ag yield growth in fourth quarter?

TOM HUND: It is very, very strong now, and it has been for the lastcouple of quarters based on all the world dynamics, so it would betough to predict depending on how the quarter actually plays out.There is still a lot of moving parts, but historically it should bevery strong.

MICHEL WIENZ: Okay. Thanks for the time.

OPERATOR: Thank you. There are no further questions. Please continue,Mr. Rose.

MATTHEW ROSE: Thanks, everybody, for your interest, and we will talkto you again next quarter. Have a good and safe day.

OPERATOR: That does conclude our conference for today. Thank you foryour participation and for using AT&T executive teleconferenceservice. You may now disconnect.

[Thomson Financial reserves the right to make changes to documents,content, or other information on this web site without obligation tonotify any person of such changes.

In the conference calls upon which Event Transcripts are based,companies may make projections or other forward-looking statementsregarding a variety of items. Such forward-looking statements arebased upon current expectations and involve risks and uncertainties.Actual results may differ materially from those stated in anyforward-looking statement based on a number of important factors andrisks, which are more specifically identified in the companies' mostrecent SEC filings. Although the companies may indicate and believethat the assumptions underlying the forward-looking statements arereasonable, any of the assumptions could prove inaccurate orincorrect and, therefore, there can be no assurance that the resultscontemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUALREPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILEEFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BEMATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THESUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIALOR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANYRESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPONTHE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT.USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALLITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANYINVESTMENT OR OTHER DECISIONS.]

[Copyright: Content copyright 2007 Thomson Financial. ALL RIGHTSRESERVED. Electronic format, layout and metadata, copyright 2007Voxant, Inc. (www.voxant.com) ALL RIGHTS RESERVED. No license isgranted to the user of this material other than for research. Usermay not reproduce or redistribute the material except for user'spersonal or internal use and, in such case, only one copy may beprinted, nor shall user use any material for commercial purposes orin any fashion that may infringe upon Thomson Financial's or Voxant'scopyright or other proprietary rights or interests in the material;provided, however, that members of the news media may redistributelimited portions (less than 250 words) of this material without aspecific license from Thomson Financial and Voxant so long as theyprovide conspicuous attribution to Thomson Financial and Voxant asthe originators and copyright holders of such material. This is not alegal transcript for purposes of litigation.]

**---- Index References ----**

Company: TOGOLAISE DES BOISSONS; INFORMATION MANAGEMENT CORP; BEAR STEARNS COMPANIES INC; INTERNATIONAL MILLENNIUM CONSULTANTS INC; FINANCIAL AND PROFESSIONAL RISK SOLUTIONS INSURANCE AGENCY INC; MORGAN STANLEY; SOCIÉTÉ FINANCIAL SA; GOLDMAN SACHS AND CO; MERRILL LYNCH AND CO INC; **BURLINGTON NORTHERN SANTA FE** CORP; BNSF; BARRA INC; FINANCIAL AND INVESTMENT MANAGEMENT GROUP LTD; INSTITUTO DE PROSPECTIVA; AMERICAN V SHIPS MARINE; WIHLBORGS FASTIGHETER AB NEW; MERRILL LYNCH; INTERNATIONAL MICROWAVE CORP; FINANCIAL AND INVESTMENT MANAGEMENT GROUP LTD/MI; BEAR STEARNS AND CO; BNSF RAILWAY CO; FINANCIAL AND PROFESSIONAL RISK SOLUTIONS INC; BEAR STEARNS AND CO INC; SITE (NETHERLANDS); MERRILL LYNCH AND CO CANADA LTD; BNSF CORP; MORGAN STANLEY AND CO INC; GOLDMAN SACHS; GOLDMAN SACHS GROUP INC (THE); WHITE HOUSE; INTERAMERICAN MOTOR CORP

News Subject: (Corporate Financial Data (1XO59); Business Management (1BU42); Sales & Marketing (1MA51); Major Corporations (1MA93); Government (1GO80); Market Share (1MA91); Investment Banking (1IN86))

Industry: (Housing (1HO38); Railroads (1RA98); Trucking (1TR88); Building Materials (1BU25); Transportation (1TR48); Banking (1BA20); Oil & Gas Prices (1OI34); Freight Railroads (1FR84); Financial Services (1FI37); Construction (1CO11); Land Transportation (1LA43); Downstream Oil (1DO72); Oil & Gas (1OI76); Travel & Tourism (1TR07); Oil & Gas Retail Marketing & Sales (1OI88); Yield Management (1YI26); Oil & Gas Market (1OI62); Freight Transportation Regulatory (1FR22); Real Estate (1RE57))

Region: (North America (1NO39); Americas (1AM92); USA (1US73))

Language: EN

Other Indexing: (BEAR STEARNS; BMO; BNSF; BNSF CORP; BURLINGTON NORTHERN; CAGR; CAPEX; CN; CONGRESS; CORPORATION; EBITDA; EVP; FINANCIAL; GAAP; GOLDMAN SACHS; HOUSE BILL; IMC; IMCS; IP; JR; MERRILL LYNCH; MORGAN STANLEY; NORTHERN; OPERATOR; PNW; PRB; RPU; SANTA FE CORP; SENATE; SITE; STB; TOM; TRANSCRIPTION; TRANSCRIPTS; USERS; VOXANT; WESTBOUND; WHITE HOUSE) (Ag; Building; Cambridge; Carl; Carl Ice; CHRIS; Chris Weatherby; Construction; Ed; Edward Wolfe; Hunt; J.B. Hunt; John; John Lanigan; JPMorgan; Ken; Matt; Matt Rose; Michael Wienz; Outstanding; Rose; Rupert; Scott; SEC FILINGS; Tom; Tom Hund; Tom Wadewitz)

Word Count: 9155

**End of Document**

© 2013 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT PX0696



# Burlington Northern Santa Fe Corporation

2003 Annual Report and Form 10-K

NYSE : BNI

When you hear our whistle you know we're working. Moving raw materials to manufacturers and manufactured goods to consumers. Carrying on a tradition of commerce as one of America's largest railroad networks. Contributing to the economies of the country, the world and the communities we serve. This is BNSF.




You're taking the train whether you know it or not. We hauled

## 4 million intermodal containers and trailers

in 2003—as well as 236 million tons of coal, 47 million tons of grain, 30 million tons of building products and thousands of other products we use every day.




When you wonder about
employees pulling their weight,
consider the record efficiency of
our 36,500-member team—we handled

## 25 million gross ton-miles

of freight and equipment per person.


You may think of trains as "old technology," but in 2003 our
customers used our electronic tools
to submit 94 percent of our shipping instructions and three-quarters of our freight revenues.




There's something to be said for the steady momentum and strength of a train. Our freight
revenues grew by 5 percent in 2003.

Any improvement in safety is wonderful.
The fact that our highway-rail grade-crossing
accident rate has gone
down by 43 percent
since 1995 is cause for celebration—
and continued commitment.








There are still kids who get excited every time they see a train. And some of those kids have been with us for 35 years. Our people

## have a lifelong passion for railroading.

# Consolidated Financial Highlights

Dollars in millions, except per share data

| DECEMBER 31, | 2003 | 2002 | 2001 | 2000 | 1999 |
|---|---|---|---|---|---|
| **For the year ended:** | | | | | |
| Revenues | $ 9,413 | $ 8,979 | $ 9,208 | $ 9,207 | $ 9,195 |
| Operating income | $ 1,665 | $ 1,656 | $ 1,750 | $ 2,113 | $ 2,209 |
| Income before cumulative effect of accounting change | $ 777[a] | $ 760 | $ 731 | $ 980 | $ 1,137 |
| Diluted earnings per share (before cumulative effect of accounting change) | $ 2.09[a] | $ 2.00 | $ 1.87 | $ 2.36 | $ 2.44 |
| Average diluted shares (in millions) | 372.3 | 380.8 | 390.7 | 415.2 | 466.8 |
| Dividends declared per common share | $ 0.54 | $ 0.48 | $ 0.48 | $ 0.48 | $ 0.48 |
| **At year end:** | | | | | |
| Total assets | $26,939 | $25,767 | $24,721 | $24,375 | $23,700 |
| Long-term debt and commercial paper, including current portion | $ 6,684 | $ 6,814 | $ 6,651 | $ 6,846 | $ 5,813 |
| Stockholders' equity | $ 8,495 | $ 7,932 | $ 7,849 | $ 7,480 | $ 8,172 |
| Net debt to total capitalization[b] | 44.0% | 46.1% | 45.8% | 47.7% | 41.5% |
| **For the year ended:** | | | | | |
| Total capital expenditures | $ 1,726 | $ 1,358 | $ 1,459 | $ 1,399 | $ 1,788 |
| Depreciation and amortization | $ 910 | $ 931 | $ 909 | $ 895 | $ 897 |

[a] 2003 income before cumulative effect of accounting change excludes the favorable cumulative effect of an accounting change of $39 million, net of tax, or $0.10 per diluted share, as described in Note 2 to the Consolidated Financial Statements.

[b] Net debt is calculated as total debt less cash and cash equivalents, and total capitalization is calculated as the sum of net debt and total stockholders' equity.

**TO OUR SHAREHOLDERS, CUSTOMERS AND COLLEAGUES** For all members of BNSF, 2003 was a year of hard work and great accomplishment. As we look back, there is much to be proud of, especially in safety and revenue growth. For the first time since 1998, we showed strong year-over-year revenue growth, posting a gain of 5 percent. Our customers responded to our service offerings by rewarding us with more of their business. As a result of our strong growth during the second half of the year, our earnings per share (before the cumulative effect of an accounting change) increased to $2.09.

Our safety performance in 2003 also ranks at the top of our list of achievements. BNSF people have done a superb job at reducing reportable injuries, as well as the severity of injuries. On these combined measures, we tracked at the lowest levels in our history!

We're not proud of our on-time performance statistics for 2003, which averaged 88 percent. However, we ended the year handling record volumes with much stronger performance, and that momentum has continued into 2004.

Our efficiency also continued to improve. We showed a 6 percent improvement in the key measure of gross ton-miles (GTMs) per employee. This achievement deserves a "thank you" to each and every member of BNSF for their commitment to getting the job done safely and efficiently in the face of unique volume and service challenges.

**FOCUSING ON PROFITABLE GROWTH** We continue to build on our brand identity as the global leader in intermodal rail transportation. With the success of new service products and a targeted marketing strategy, our international intermodal business grew 26 percent, passing the $1.3 billion level and producing the largest growth rate we've seen in any area in recent memory. Our international intermodal business now represents about 14 percent of our total freight revenues. Given our strong presence in the growing global marketplace, we expect this international business to continue its significant growth.

**2003 freight revenues reflect BNSF's balanced commodity portfolio**




BNSF's domestic truckload intermodal business grew 19 percent in 2003. This growth is driven, in part, by our truck-competitive service. Many trucking firms are also turning to rail partnerships as they cope with their own economic challenges—including new federal hours-of-service rules, stricter emissions regulations, driver availability issues and rising insurance costs. Modal partnering makes more sense than ever for us and for our trucking partners, with rail efficiently handling the long haul and truckers handling the dray on either end.

Investments in new and expanded facilities are crucial in handling our intermodal growth. Since opening in October 2002, our Logistics Park-Chicago (LPC), a facility strategically positioned in one of the fastest growing markets in North America, has attracted the operations of major retailers, distribution centers, ocean carriers and motor carriers. This facility complements our earlier investments to expand intermodal facilities in Southern California.

Though intermodal is our "growth engine," one of our greatest strengths is BNSF's balanced commodity portfolio. About 60 percent of our revenues come from coal, grain and carload traffic, and these commodities play a core role in our long-term strategy.

Our Agricultural Products revenues grew by about 4 percent in 2003, due primarily to a strong export wheat market and an extraordinarily large grain harvest. Our 156-station shuttle network helps us handle these peak volumes, allowing quick loading and unloading of 110-car unit trains. This efficiency helps create a more fluid grain network and improves equipment availability and predictability for customers.

More than half of our grain business now moves in shuttles. Although we expect more grain traffic to move in these efficient shuttle networks, we maintain our service commitment to those customers whose operations do not translate well to shuttle

5% year-over-year revenue growth in 2003

service. In addition, we are increasing our ethanol and fertilizer transportation, commodities less affected by seasonal and global cyclical fluctuations than the grain areas of our agricultural business.

In Industrial Products, our carload business, we saw more than 5 percent growth in building and construction products, while chemicals, plastics and petroleum revenues were modestly lower. For the long term, our strategy is to grow revenue and improve service consistency for our carload customers as we develop a better balance between the value of our service and its price.

Coal volumes and revenues were down slightly in 2003, due mostly to milder weather, plant shutdowns and reduced coal stockpiles at utilities. However, we see significant upside in coal for 2004. Several new large coal contracts took effect at the beginning of this year, including a long-term contract where we're handling an additional 13 million tons per year—three additional loaded unit trains per day. Another new long-term coal contract will result in more than 10 million additional tons in 2004. We're also seeing more utilities, including those in central and eastern regions, taking advantage of Powder River Basin coal using our efficient network.

**BUILDING A CULTURE OF EFFICIENCY AND SAFETY** Increased fuel prices presented our biggest challenge as we worked to manage costs in 2003. In total, fuel cost us about $240 million more than in 2002. Our hedging program helped mitigate price increases, saving us an average of 5.4 cents per gallon on about 65 percent of fuel purchased. A fuel surcharge also helped us recover about 40 percent of our costs due to price increases. Despite these efforts, fuel costs had a significant impact on our 2003 bottom line.

**6% increase in gross ton-miles per employee**

In 2004, we will continue our ambitious fuel conservation program. BNSF employees are committed to fuel-saving operating practices, including adjusting train handling, shutting down idling locomotives, and maintaining track and equipment in optimal condition to prevent excess fuel use.

Our work to improve efficiency in Engineering and Mechanical goes beyond just reducing costs—we are looking at more creative and efficient ways to get our work done. For instance, in locomotive maintenance, we use predictive technologies, including ultrasonic wheel testing and infrared scanning, to replace just those parts that need it as part of our condition-based maintenance. In Engineering, we are achieving similar results with our track and signal maintenance, as we redesign the work to eliminate waste.

BNSF people have always been committed to a work environment focused on safe production, and we had many safety successes in 2003. Our employee injury frequency of 1.75 injuries per 200,000 hours worked was a 16 percent improvement over 2002's safety performance. The severity of injuries was down, as well, with an 18 percent reduction in lost days due to injuries compared with 2002. These combined ratios represent the best safety performance in our history. However, we did have some severe injuries and fatalities in 2003, which makes it clear that we still have work to do to attain our goal of an injury-free workplace.

In highway-rail grade-crossing safety, we continued as an industry leader, with a 13 percent reduction in grade-crossing collisions compared with 2002. Our grade-crossing closure program, started in the year 2000, celebrated its 2,000th crossing closure in December 2003. Working with communities and landowners to identify crossings that are unnecessary or redundant, we have closed more than 6 percent of our grade crossings since the start of the program. The result has been reduced risk, reduced maintenance costs and improved safety for our employees, our trains and the communities we serve.

Best combined safety ratios in our history

GATHERING MOMENTUM In 2004, we will continue to work on our key strategic initiatives that include growth, service, ease of doing business, efficiency, and recognizing and developing our people. We also have several specific strategies to continue to increase shareholder value and revenue growth:

- Under Chief Marketing Officer John Lanigan's leadership, we are increasing the effectiveness of our sales organization to focus on delivering consistent revenue growth and improved returns. Increased sales staff in the field and commission-based compensation are two important components of a strategy designed to capture new business and increase volume across all commodities.
- To handle the explosive growth of intermodal, we are managing and selectively expanding network capacity, while increasing revenue per unit to ensure we have returns necessary to invest in service and capacity improvements.
- On the carload side, we are working diligently at reshaping the carload network to focus on fewer, more cost-efficient routes and to develop gathering and distribution networks modeled after current concepts in intermodal transportation. We are also developing a network of multi-commodity transload facilities to support this. By 2008, you should see a significantly different carload network than you see today.
- In all business areas, we are focusing on market-based pricing. We are working to selectively increase rates to reflect service levels and the true cost of providing those services.
- Under the direction of Chief Operations Officer Carl Ice, we will continue to look for ways to improve service, manage capacity and control costs while taking on significant volume growth. We know that quality service and responsiveness to customer needs are two accepted hallmarks of BNSF, and they are the keys to our continued growth and success.

In closing, let me say that what we accomplished together this year truly reflects a great team—one in which every member of our organization really makes a difference.

For our shareholders in 2003, we increased our dividend by 25 percent to 60 cents per share on an annualized basis. Looking ahead, continued growth in earnings per share should enable us to further improve shareholder returns and dividend payouts, while also enhancing our return on invested capital.

As a final note, a valued board member, John J. Burns, Jr., has reached mandatory retirement age and will not stand for re-election in April at our Annual Meeting. We deeply appreciate all the wisdom and insight John has offered us as a member of our board since 1995, and we wish him and his family well in the future.

Thank you all for your support of this company, its leaders, its board and its dedicated team of employees. Every year, we become a stronger company, and that's why I face the future with optimism.

February 12, 2004

Matthew K. Rose

**Matthew K. Rose**
Chairman, President and
Chief Executive Officer





# 2003 Form 10-K

[redacted]

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# Form 10-K

[✓] ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

FOR THE FISCAL YEAR ENDED DECEMBER 31, 2003

OR

[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

FOR THE TRANSITION PERIOD FROM ____________________TO ______________________

COMMISSION FILE NUMBER: 1-11535

---

Burlington Northern Santa Fe Corporation
(EXACT NAME OF REGISTRANT AS SPECIFIED IN ITS CHARTER)

| | |
|---|---|
| **Delaware** | **41-1804964** |
| (STATE OF INCORPORATION) | (I.R.S. EMPLOYER IDENTIFICATION NO.) |

**2650 Lou Menk Drive**
**Fort Worth, Texas 76131-2830**
(ADDRESS OF PRINCIPAL EXECUTIVE OFFICES, INCLUDING ZIP CODE)

**(800) 795-2673**
(REGISTRANT'S TELEPHONE NUMBER, INCLUDING AREA CODE)

**Securities registered pursuant to Section 12(b) of the Act:**

| TITLE OF EACH CLASS | NAME OF EACH EXCHANGE ON WHICH REGISTERED |
|---|---|
| Common Stock, $0.01 par value | New York Stock Exchange |
| | Chicago Stock Exchange |
| | Pacific Exchange |

---

**Securities registered pursuant to Section 12(g) of the Act:** None

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirement for the past 90 days. Yes [✓] No [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [ ]

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Act). Yes [✓] No [ ]

The aggregate market value of the voting stock held by non-affiliates of the registrant was approximately $10.520 billion on June 30, 2003. For purposes of this calculation only, the registrant has excluded stock beneficially owned by directors and officers. By doing so, the registrant does not admit that such persons are affiliates within the meaning of Rule 405 under the Securities Act of 1933 or for any other purpose.

Indicate the number of shares outstanding of each of the registrant's classes of common stock, as of the latest practicable date:

Common Stock, $0.01 par value, 372,258,486 shares outstanding as of February 2, 2004.

**DOCUMENTS INCORPORATED BY REFERENCE**

LIST HEREUNDER THE DOCUMENTS FROM WHICH PARTS THEREOF HAVE BEEN INCORPORATED BY REFERENCE AND THE PART OF THE FORM 10-K INTO WHICH SUCH INFORMATION IS INCORPORATED:

Burlington Northern Santa Fe Corporation's definitive Proxy Statement, to be filed not later than 120 days after the end of the fiscal year covered by this report........PART III

# Table of Contents

PAGE

**_PART I_**

Items 1 and 2. Business and Properties ........ 1
Item 3. Legal Proceedings ........ 7
Item 4. Submission of Matters to a Vote of Security Holders ........ 8

**_PART II_**

Item 5. Market for Registrant's Common Equity and Related Stockholder Matters ........ 10
Item 6. Selected Financial Data ........ 10
Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations ........ 10
Item 7A. Quantitative and Qualitative Disclosures About Market Risk ........ 26
Item 8. Financial Statements and Supplementary Data ........ 28
Item 9. Changes in and Disagreements With Accountants on Accounting and Financial Disclosure ........ 60
Item 9A. Controls and Procedures ........ 60

**_PART III_**

Item 10. Directors and Executive Officers of the Registrant ........ 61
Item 11. Executive Compensation ........ 61
Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters ........ 61
Item 13. Certain Relationships and Related Transactions ........ 61
Item 14. Principal Accountant Fees and Services ........ 62

**_PART IV_**

Item 15. Exhibits, Financial Statement Schedules, and Reports on Form 8-K ........ 63
Signatures ........ S-1
Exhibits ........ E-1

# Part I

## ITEMS 1 AND 2. BUSINESS AND PROPERTIES

Burlington Northern Santa Fe Corporation (BNSF or Company) was incorporated in the State of Delaware on December 16, 1994. On September 22, 1995, the stockholders of Burlington Northern, Inc. (BNI) and Santa Fe Pacific Corporation (SFP) became the stockholders of BNSF pursuant to a business combination of the two companies.

On December 30, 1996, BNI merged with and into SFP. On December 31, 1996, The Atchison, Topeka and Santa Fe Railway Company (ATSF) merged with and into Burlington Northern Railroad Company (BNRR), and BNRR changed its name to The Burlington Northern and Santa Fe Railway Company (BNSF Railway). On January 2, 1998, SFP merged with and into BNSF Railway.

Through its subsidiaries, BNSF is engaged primarily in the rail transportation business. At December 31, 2003, BNSF and its subsidiaries had approximately 36,500 employees. The rail operations of BNSF Railway, BNSF's principal operating subsidiary, comprise one of the largest railroad systems in North America. BNSF Railway's business and operations are described below.

BNSF's Internet address is www.bnsf.com. Through this internet website (under the "Investors" link), BNSF makes available, free of charge, its Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, and Current Reports on Form 8-K, and all amendments to those reports, as soon as reasonably practicable after these reports are electronically filed with or furnished to the Securities and Exchange Commission. The following documents are also made available on the Company's website and a copy will be mailed, without charge, upon request to Investor Relations:

- Code of Business Conduct and Ethics for Directors
- Code of Ethics for the Chief Executive Officer and Senior Financial Officers
- Code of Conduct
- Corporate Governance Guidelines
- Charters of the Audit, Compensation and Development, and Directors and Corporate Governance Committees

### *TRACK CONFIGURATION*

As of December 31, 2003, BNSF Railway operates over a railroad system consisting of approximately 32,500 route miles of track (excluding second, third and fourth main tracks, yard tracks, and sidings), approximately 24,500 miles of which are owned route miles, including easements, through 28 states and two Canadian provinces. Approximately 8,000 route miles of BNSF Railway's system consist of trackage rights that permit BNSF Railway to operate its trains with its crews over another railroad's tracks. BNSF Railway operates over other trackage through lease or other contractual arrangements.

As of December 31, 2003, the total BNSF Railway system, including first, second, third and fourth main tracks, yard tracks, and sidings, consists of approximately 50,000 operated miles of track, all of which are owned by or held under easement by BNSF Railway except for approximately 8,500 route miles operated under trackage rights. At December 31, 2003, approximately 26,500 miles of BNSF Railway's track consists of 112-pound per yard or heavier rail, including approximately 19,500 track miles of 131-pound per yard or heavier rail.

***EQUIPMENT CONFIGURATION***

BNSF Railway owned or had under non-cancelable leases exceeding one year the following units of railroad rolling stock as of the dates shown below:

| AT DECEMBER 31, | **2003** | 2002 | 2001 |
|---|---|---|---|
| Locomotives | **5,377** | 5,226 | 5,357 |
| Freight cars: | | | |
| Covered hopper | **36,255** | 37,609 | 38,007 |
| Gondola | **15,327** | 14,942 | 15,075 |
| Box-specially equipped | **10,021** | 9,612 | 9,641 |
| Open hopper | **10,866** | 10,848 | 11,094 |
| Flat | **7,854** | 7,946 | 7,844 |
| Refrigerator | **5,427** | 5,588 | 5,554 |
| Autorack | **827** | 843 | 877 |
| Tank | **639** | 501 | 506 |
| Box-general purpose | **31** | 559 | 581 |
| Other | **302** | 319 | 343 |
| Total freight cars | **87,549** | 88,767 | 89,522 |
| Domestic containers | **10,627** | 8,197 | 8,259 |
| Domestic chassis | **9,864** | 8,180 | 8,205 |
| Company service cars | **4,028** | 4,035 | 4,132 |
| Trailers | **2,152** | 2,163 | 2,200 |
| Commuter passenger cars | **163** | 160 | 160 |

The average age from date of manufacture of the locomotive fleet at December 31, 2003, was 15 years; the average age from date of manufacture or remanufacture of the freight car fleet at December 31, 2003, was 16 years. These averages are not weighted to reflect the greater capacities of the newer equipment.

***CAPITAL EXPENDITURES AND MAINTENANCE***

CAPITAL EXPENDITURES

A breakdown of the Company's cash capital expenditures for the three years ended December 31, 2003, is incorporated by reference from a table in Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations under the headings "Liquidity and Capital Resources, Investing Activities."

BNSF's planned 2004 cash capital expenditures are incorporated by reference from a table in Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations under the heading "Introduction."

MAINTENANCE

As of December 31, 2003, General Electric Company, Alstom Transportation Inc., OmniTRAX Locomotive Services, LLC and the Electro-Motive Division of General Motors Corporation performed locomotive maintenance and overhauls for BNSF Railway at its facilities under various maintenance agreements that covered approximately 3,200 locomotives.

The extent of the BNSF Railway's track maintenance program is outlined in the following table:

| YEAR ENDED DECEMBER 31, | **2003** | 2002 | 2001 |
|---|---|---|---|
| Track miles of rail laid [(a)] | **749** | 685 | 891 |
| Cross ties inserted (thousands) [(a)] | **2,353** | 2,248 | 2,704 |
| Track resurfaced (miles) | **12,399** | 12,499 | 11,011 |

[(a)] *Includes expenditures for both maintenance of existing route system and expansion projects. These expenditures are primarily capitalized.*

BNSF Railway's planned 2004 track maintenance of way program will result in the installation of approximately 570 track miles of rail, the replacement of about 2.4 million ties, and the resurfacing of approximately 12,000 miles of track.

### *PROPERTY AND FACILITIES*

BNSF Railway operates various facilities and equipment to support its transportation system, including its infrastructure and locomotives and freight cars as previously described. It also owns or leases other equipment to support rail operations, including highway trailers, containers and vehicles. Support facilities for rail operations include yards and terminals throughout its rail network, system locomotive shops to perform locomotive servicing and maintenance, a centralized network operations center for train dispatching and network operations monitoring and management in Fort Worth, Texas, regional dispatching centers, computers, telecommunications equipment, signal systems, and other support systems. Transfer facilities are maintained for rail-to-rail as well as intermodal transfer of containers, trailers and other freight traffic. These facilities include 36 major intermodal hubs located across the system as well as 1 intermodal hub center located off-line used in connection with haulage agreements with other railroads. BNSF Railway's largest intermodal facilities in terms of 2003 volume were:

| INTERMODAL FACILITIES | LIFTS |
|---|---|
| Hobart Yard (Los Angeles, California) | 1,217,000 |
| Corwith Yard (Chicago, Illinois) | 697,000 |
| Willow Springs (Illinois) | 658,000 |
| San Bernardino (California) | 497,000 |
| Alliance (Fort Worth, Texas) | 476,000 |
| Cicero (Illinois) | 454,000 |
| Argentine (Kansas City, Kansas) | 273,000 |

BNSF Railway owns 25 automotive distribution facilities where automobiles are loaded or unloaded from multi-level rail cars and serves eight port facilities in the United States and Canada.

BNSF Railway's largest freight car classification yards based on the average daily number of cars processed (excluding cars that do not change trains at the terminal and intermodal and coal cars) are shown below:

| CLASSIFICATION YARD | DAILY AVERAGE CARS PROCESSED |
|---|---|
| Argentine (Kansas City, Kansas) | 1,814 |
| Galesburg (Illinois) | 1,590 |
| Barstow (California) | 1,323 |
| Pasco (Washington) | 1,210 |
| Memphis (Tennessee) | 938 |

As of December 31, 2003, certain BNSF Railway properties and other assets are subject to liens securing $391 million of mortgage debt. Certain locomotives and rolling stock of BNSF Railway are subject to equipment obligations and leases, as referred to in Notes 9 and 10 to the Consolidated Financial Statements.

***PRODUCTIVITY***

Productivity, as measured by thousand gross ton miles per employee, has risen steadily in the last three years as shown in the table below.

| YEAR ENDED DECEMBER 31, | 2003 | 2002 | 2001 |
|---|---|---|---|
| Thousand gross ton miles divided by average number of employees | **24,875** | 23,368 | 22,862 |

A discussion of Employees and Labor Relations is incorporated by reference from Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations, under the headings "Other Matters; Employee and Labor Relations."

***BUSINESS MIX***

In serving the Midwest, Pacific Northwest and the Western, Southwestern, and Southeastern regions and ports of the country, BNSF Railway transports, through one operating transportation services segment, a range of products and commodities derived from manufacturing, agricultural, and natural resource industries. Accordingly, its financial performance is influenced by, among other things, general and industry economic conditions at the international, national, and regional levels. The map below illustrates the Company's primary routes, including trackage rights, which allow BNSF Railway to access major cities and ports in the western United States as well as Canadian and Mexican traffic. In addition to major cities and ports, BNSF Railway efficiently serves many smaller markets by working closely with the Company's more than 200 shortline partners. BNSF has also entered into marketing agreements with Canadian National Railway Company and Kansas City Southern Railway Company expanding the marketing reach for the organizations.



CONSUMER PRODUCTS:

The Consumer Products' freight business provided approximately 39 percent of freight revenues in 2003 and consisted of the following business sectors:

- INTERNATIONAL. International business consists primarily of container traffic from steamship companies and accounted for approximately 37 percent of total Consumer Products revenues.
- DIRECT MARKETING. Direct marketing generated approximately 20 percent of total Consumer Products revenues. This business centers around intermodal traffic contracted from parcel shippers such as United Parcel Service and service for nationwide and regional LTL (less-than-truckload) carriers such as Yellow-Roadway Corporation.
- TRUCKLOAD. Truckload traffic represented approximately 17 percent of total Consumer Products revenues. This traffic is comprised of business through a joint service arrangement with J.B. Hunt, as well as business from Schneider National and other truckload carriers.
- INTERMODAL MARKETING COMPANIES. Approximately 10 percent of total Consumer Products revenues was generated through intermodal marketing companies, primarily shipper agents and consolidators.
- AUTOMOTIVE. The transportation of both assembled motor vehicles and shipments of vehicle parts to numerous destinations throughout the Midwest, Southwest, West and Pacific Northwest provided about 8 percent of 2003 total Consumer Products revenue.
- PERISHABLES AND DRY BOXCAR. Perishables and Dry Boxcar represented approximately 8 percent of total Consumer Products revenue. This group consists of beverages, canned goods and perishable food items. Other consumer goods handled include cotton, salt, rubber and tires, and miscellaneous boxcar shipments.

INDUSTRIAL PRODUCTS:

Industrial Products' freight business provided approximately 23 percent of BNSF's freight revenues in 2003 and consisted of the following four business areas:

- CONSTRUCTION PRODUCTS. The construction products sector represented approximately 36 percent of total Industrial Products revenue in 2003. This sector serves virtually all of the commodities included in or resulting from the production of steel along with mineral commodities such as clays, sands, cements, aggregates, sodium compounds and other industrial minerals. Industrial taconite, an iron ore derivative produced in northern Minnesota, scrap steel and coal coke are BNSF Railway's primary input products transported. Finished steel products range from structural beams and steel coils to wire and nails. BNSF Railway links the integrated steel mills in the East with fabricators in the West and Southwest. Service is also provided to various mini-mills in the Southwest that produce rebar, beams and coiled rod for the construction industry. Industrial minerals include various mined and processed commodities such as cement and aggregates (construction sand, gravel and crushed stone) that generally move to domestic markets for use in general construction and public work projects, including highways. Borates and clays move to domestic points as well as to export markets primarily through West Coast ports. Sodium compounds, primarily soda ash, are moved to domestic markets for use in the manufacturing of glass and other industrial products. Sand is utilized in the manufacturing of glass and in foundry and oil drilling applications.
- BUILDING PRODUCTS. This sector generated approximately 35 percent of total 2003 Industrial Products revenues and includes primary forest product commodities such as lumber, plywood, oriented strand board, particleboard, paper products, pulpmill feedstocks, wood pulp and sawlogs. Also included in this sector are government, machinery and waste traffic. Commodities from this diverse group primarily originate from the Pacific Northwest, Western Canada, upper Midwest, and the Southeast for shipment mainly into domestic markets. Industries served include construction, furniture, photography, publishing, newspaper and industrial packaging. Shipments of waste, ranging from municipal waste to contaminated soil, are transported to landfills and reclamation centers across the country. The government and machinery business includes aircraft parts, agricultural and construction machinery, military equipment and large industrial machinery.
- CHEMICALS AND PLASTICS. The chemicals and plastics sector represents approximately 16 percent of total 2003 Industrial Products revenues. This group is composed of industrial chemicals and plastics commodities. These commodities include caustic soda, chlorine, industrial gases, acids, polyethylene, polypropylene and polyvinyl chloride. Industrial chemicals and plastics resins are used by the automotive, housing, and packaging industries, as well as for feedstocks, to produce other chemical and plastic products. These commodities originate primarily in the Gulf Coast region for shipment mainly into domestic markets.

- PETROLEUM. Commodities included in the petroleum sector are liquefied petroleum gas (LPG), diesel fuels, asphalt, alcohol, solvents, petroleum coke, lubes, oils, waxes and carbon black, which made up 13 percent of total Industrial Products revenues for 2003. Product use varies based on commodity, and includes the use of LPG for heating purposes, diesel fuel and lubes to run heavy machinery, and asphalt for road projects and roofing. Products within this group originate and terminate throughout the BNSF network, with the largest areas of activities being the Texas Gulf, Pacific Northwest, California, Montana and Illinois.

COAL:

As one of the largest transporters of low-sulfur coal in the United States, BNSF Railway hauls enough coal to generate about ten percent of the electricity produced in this country. In 2003, the transportation of coal contributed about 22 percent of freight revenues. BNSF Railway is the largest transporter of low-sulfur coal originating from the Powder River Basin of Wyoming and Montana, which accounted for approximately 90 percent of all BNSF Railway's coal tons during the three years ending in December 31, 2003. These coal shipments were destined for coal-fired electric generating stations located primarily in the North Central, South Central, Southeast and Mountain regions of the United States. BNSF Railway also transports coal from the Powder River Basin to markets in the eastern United States. Demand for Powder River Basin coal has increased substantially over the past 20 years due to environmental compliance issues, abundant reserves, relatively inexpensive mine production and competitive delivered cost to power plants. Continued deregulation within the electric utility industry may positively impact future demand for Powder River Basin coal.

Other BNSF coal shipments originate principally in Colorado, Illinois, New Mexico and North Dakota. These shipments move to electrical generating stations and industrial plants in the Mountain and North Central regions of the United States and Mexico.

AGRICULTURAL PRODUCTS:

The transportation of Agricultural Products provided approximately 16 percent of 2003 total freight revenues and includes wheat, corn, bulk foods, soybeans, oil seeds and meals, feeds, barley, oats and rye, flour and mill products, milo, oils, specialty grains, malt, ethanol and fertilizer. The BNSF Railway system is strategically located to serve the grain-producing regions of the Midwest and Great Plains. The Company is developing and operating a shuttle network for grain, grain products and fertilizer, which allows more efficient use of equipment and improved cycle times as a result of the shuttle process. In addition to serving most grain-producing areas, BNSF Railway serves most major terminal, storage, feeding and food-processing locations. Furthermore, BNSF Railway has access to major export markets in the Pacific Northwest, western Great Lakes, Texas Gulf and Mexico.

FREIGHT STATISTICS:

The following table sets forth certain freight statistics relating to rail operations for the periods indicated:

| YEAR ENDED DECEMBER 31, | **2003** | 2002 | 2001 |
|---|---|---|---|
| Revenue ton miles (millions) | **508,200** | 490,234 | 501,829 |
| Freight revenue per thousand revenue ton miles | $ **18.27** | $ 18.10 | $ 18.11 |
| Average length of haul (miles) | **1,014** | 992 | 992 |

Revenue, cars/units and average revenue per car/unit information for the three years ended December 31, 2003, is incorporated by reference from a table in Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations, under the headings "Results of Operations; Revenue Table."

### *GOVERNMENT REGULATION AND LEGISLATION*

Rail operations are subject to the regulatory jurisdiction of the Surface Transportation Board (STB) of the United States Department of Transportation (DOT), the Federal Railroad Administration of DOT, the Occupational Safety and Health Administration (OSHA) as well as state regulatory agencies. The STB has jurisdiction over disputes and complaints involving certain rates, routes and services, the sale or abandonment of rail lines, applications for line extensions and construction, and consolidation or merger with, or acquisition of control of, rail common carriers. The outcome of STB proceedings can affect the costs and profitability of BNSF's business.

DOT and OSHA have jurisdiction under several federal statutes over a number of safety and health aspects of rail operations. State agencies regulate some aspects of rail operations with respect to health and safety in areas not otherwise preempted by federal law.

BNSF Railway's rail operations, as well as those of its competitors, are subject to extensive federal, state and local environmental regulation. These laws cover discharges to water, air emissions, toxic substances, and the generation, handling, storage, transportation and disposal of waste and hazardous materials. This regulation has the effect of increasing the cost and liabilities associated with rail operations. Environmental risks are also inherent in rail operations, which frequently involve transporting chemicals and other hazardous materials.

Many of BNSF Railway's land holdings are and have been used for industrial or transportation-related purposes or leased to commercial or industrial companies whose activities may have resulted in discharges onto the property. As a result, BNSF Railway is now subject and will from time to time continue to be subject to environmental cleanup and enforcement actions. In particular, the federal Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), also known as the Superfund law, generally imposes joint and several liability for cleanup and enforcement costs, without regard to fault or the legality of the original conduct, on current and former owners and operators of a site. Accordingly, BNSF Railway may be responsible under CERCLA and other federal and state statutes for all or part of the costs to cleanup sites at which certain substances may have been released by BNSF Railway, its current lessees, former owners or lessees of properties, or other third parties. Further discussion is incorporated by reference from Note 10 to the Consolidated Financial Statements.

### *COMPETITION*

The business environment in which BNSF Railway operates remains highly competitive. Depending on the specific market, deregulated motor carriers, other railroads and river barges may exert pressure on price and service levels. The presence of advanced, high service truck lines with expedited delivery, subsidized infrastructure and minimal empty mileage continues to affect the market for non-bulk, time sensitive freight. The potential expansion of longer combination vehicles could further encroach upon markets traditionally served by railroads. In order to remain competitive, BNSF Railway and other railroads continue to develop and implement operating efficiencies to improve productivity.

As railroads streamline, rationalize and otherwise enhance their franchises, competition among rail carriers intensifies. BNSF Railway's primary rail competitor in the western region of the United States is the Union Pacific Railroad Company (UP). Other Class I railroads and numerous regional railroads and motor carriers also operate in parts of the same territories served by BNSF Railway.

Based on weekly reporting to the Association of American Railroads, in 2003, BNSF's share of the western United States rail traffic was approximately 45 percent.

## ITEM 3. LEGAL PROCEEDINGS

*Ray Ridgeway, et al. v. Burlington Northern Santa Fe Corporation and The Burlington Northern and Santa Fe Railway Company*, No. 48-185170-00 (District Court of Tarrant County, Texas, 48th Judicial District) is a state court action filed on October 27, 2000. The plaintiffs' causes of action include alleged breach of contract, negligence, and breach of fiduciary duties with respect to a special dividend that was paid in 1988 by a Burlington Northern Santa Fe Corporation (BNSF) predecessor, Santa Fe Southern Pacific Corporation (SFSP). The complaint alleges that SFSP erroneously informed shareholders as to the tax treatment of the dividend--specifically, the apportionment of the dividend as either a distribution of earnings and profits or a return of capital--which allegedly caused some shareholders to overpay their income taxes. The plaintiffs assert through their expert's report, that SFSP had essentially no accumulated earnings and profits and that the entire dividend distribution should have been treated as a return of capital, rather than the approximately 34 percent that SFSP determined was a return of capital. BNSF believes these claims lack merit and that it has substantial defenses on both the merits of these claims and the attempted class action, and it is defending these claims vigorously.

In 2002, BNSF Railway was sued by the North Dakota Department of Health (DOH), and a number of private intervenors, including the City of Mandan, regarding the scope of BNSF's obligation to remediate all or part of a diesel plume or plumes in Mandan, North Dakota. Proceedings were brought in state court, *North Dakota Department of Health, et al. v. The Burlington Northern and Santa Fe Railway Company*; District Court, State of North Dakota, County of Morton, South Central Judicial District Civil No. 02-C-1174, and in an administrative proceeding (Case No. 84-400 WPC). In both proceedings, DOH is seeking injunctive relief and compensatory damages as well as unspecified penalties that could exceed $100,000 due to alleged, historic spills of fuel. The intervenors are seeking injunctive relief and personal injury and property damages. In August 2002, the administrative law judge recommended granting the plaintiffs' Motion for Partial Summary Judgment but that penalties were inappropriate against BNSF Railway. The subsequent administrative order issued on February 5, 2003, granted Partial Summary Judgment on liability and denied BNSF's Motion to Stay the Administrative Proceeding but did not include the administrative law judge's recommendation regarding penalties. BNSF appealed the order in May 2003. On October 21, 2003, the state court reversed the order and the administrative proceeding was stayed pending outcome of the state court lawsuit.

BNSF and its subsidiaries are parties to a number of legal actions and claims, various governmental proceedings and private civil suits arising in the ordinary course of business, including those related to environmental matters, Federal Employers' Liability Act claims by BNSF Railway employees, other personal injury claims, and disputes and complaints involving certain transportation rates and charges (including complaints seeking refunds of prior charges paid for coal transportation and the prescription of future rates for such movements). Some of the legal proceedings include claims for punitive as well as compensatory damages, and a few proceedings purport to be class actions. While the final outcome of these matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded along with applicable insurance, it is the opinion of BNSF's management that none of these items will have a material adverse effect on the results of operations, financial position or liquidity of BNSF. However, an unexpected adverse resolution of one or more of these items could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

Reference is made to Note 5 to the Consolidated Financial Statements for information concerning certain pending tax related administrative or adjudicative state proceedings or appeals.

## ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

No matters were submitted by BNSF to a vote of its securities holders during the fourth quarter of 2003.

### *EXECUTIVE OFFICERS OF THE REGISTRANT*

Listed below are the names, ages, and positions of all executive officers of BNSF and their business experience during the past five years. Executive officers hold office until their successors are elected or appointed, or until their earlier death, retirement, resignation, or removal.

MATTHEW K. ROSE, 44

Chairman, President and Chief Executive Officer of BNSF since March 2002. Previously President and Chief Executive Officer of BNSF from December 2000. Also, Chairman, President and Chief Executive Officer of BNSF Railway from December 2000. Previously, President and Chief Operating Officer of BNSF from June 1999 to December 2000, Senior Vice President and Chief Operations Officer from August 1997 to June 1999.

THOMAS N. HUND, 50

Executive Vice President and Chief Financial Officer since January 2001. Prior to that, Senior Vice President and Chief Financial Officer and Treasurer from August 1999, and Vice President and Controller from January 1996.

CARL R. ICE, 47

Executive Vice President and Chief Operations Officer since January 2001. Prior to that, Senior Vice President-Operations from June 1999, Vice President-Operations North from January 1999, and Vice President-Chief Mechanical Officer from December 1996.

DENNIS R. JOHNSON, 42

Vice President and Controller since August 1999. Prior to that, Assistant Vice President and Assistant Controller from January 1996.

JOHN P. LANIGAN, JR., 48

Executive Vice President and Chief Marketing Officer since January 2003. Prior to that, President and Chief Executive Officer of Logistics.com, Inc. (provider of ASP-based transportation procurement services to shippers and carriers) from May 2000, and President and Chief Operating Officer from March 2000; Chief Operating Officer of Schneider National, Inc. (truckload freight hauler) from 1999 to 2000, and President, Transportation Sector from 1995 to 1999.

JEFFREY R. MORELAND, 59

Executive Vice President Law & Government Affairs and Secretary since December 2001. Prior to that, Executive Vice President-Law and Chief of Staff since January 2001, and Senior Vice President-Law and Chief of Staff since February 1998.

PETER J. RICKERSHAUSER, 55

Vice President-Network Development since May 1999. Prior to that, Vice President-Business Development, Merchandise Marketing from December 1998.

### ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY AND RELATED STOCKHOLDER MATTERS

BNSF's common stock is listed on the New York Stock Exchange under the symbol "BNI." The common stock is also listed on the Chicago Stock Exchange and Pacific Exchange. Information as to the high and low sales prices of such stock for the two years ending December 31, 2003, and the frequency and amount of dividends declared on such stock during such periods, is set forth in Note 17 to the Consolidated Financial Statements. The approximate number of holders of record of the common stock at February 2, 2004, was 40,000.

### ITEM 6. SELECTED FINANCIAL DATA

The following table presents, as of and for the dates indicated, selected historical financial information for the Company (dollars in millions, except per share data):

| DECEMBER 31, | **2003** | 2002 | 2001 | 2000 | 1999 |
|---|---|---|---|---|---|
| **FOR THE YEAR ENDED:** | | | | | |
| Revenues | **$ 9,413** | $ 8,979 | $ 9,208 | $ 9,207 | $ 9,195 |
| Operating income | **$ 1,665** | $ 1,656 | $ 1,750 | $ 2,113 | $ 2,209 |
| Income before cumulative effect of accounting change | **$ 777**[(a)] | $ 760 | $ 731 | $ 980 | $ 1,137 |
| Basic earnings per share (before cumulative effect of accounting change) | **$ 2.10**[(a)] | $ 2.01 | $ 1.89 | $ 2.38 | $ 2.46 |
| Average basic shares (in millions) | **369.1** | 378.0 | 387.3 | 412.1 | 463.2 |
| Diluted earnings per share (before cumulative effect of accounting change) | **$ 2.09**[(a)] | $ 2.00 | $ 1.87 | $ 2.36 | $ 2.44 |
| Average diluted shares (in millions) | **372.3** | 380.8 | 390.7 | 415.2 | 466.8 |
| Dividends declared per common share | **$ 0.54** | $ 0.48 | $ 0.48 | $ 0.48 | $ 0.48 |
| **AT YEAR END:** | | | | | |
| Total assets | **$26,939** | $25,767 | $24,721 | $24,375 | $23,700 |
| Long-term debt and commercial paper, including current portion | **$ 6,684** | $ 6,814 | $ 6,651 | $ 6,846 | $ 5,813 |
| Stockholders' equity | **$ 8,495** | $ 7,932 | $ 7,849 | $ 7,480 | $ 8,172 |
| Net debt to total capitalization[(b)] | **44.0%** | 46.1% | 45.8% | 47.7% | 41.5% |
| **FOR THE YEAR ENDED:** | | | | | |
| Total capital expenditures | **$ 1,726** | $ 1,358 | $ 1,459 | $ 1,399 | $ 1,788 |
| Depreciation and amortization | **$ 910** | $ 931 | $ 909 | $ 895 | $ 897 |

*(a) 2003 income before cumulative effect of accounting change excludes the favorable cumulative effect of an accounting change of $39 million, net of tax, or $0.11 per basic share and $0.10 per diluted share, as described in Note 2 to the Consolidated Financial Statements.*

*(b) Net debt is calculated as total debt less cash and cash equivalents, and total capitalization is calculated as the sum of net debt and total stockholders' equity.*

### ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

Management's discussion and analysis relates to the financial condition and results of operations of Burlington Northern Santa Fe Corporation and its majority-owned subsidiaries, all of which are separate legal entities (collectively, BNSF or Company). The principal subsidiary of BNSF is The Burlington Northern and Santa Fe Railway Company (BNSF Railway). All earnings per share information is stated on a diluted basis.

## INTRODUCTION

BNSF Railway continues to be one of the primary rail transporters in North America. Based on weekly reporting to the Association of American Railroads, for 2003, BNSF's share of the western United States rail traffic was approximately 45 percent, a 1 point market share gain compared with 2002. The increase in market share was primarily driven by the Company's strong growth in intermodal traffic.

Strong growth in international and truckload business, along with increased export demand for grain and continued heavy demand for construction and building products enabled BNSF to achieve 5-percent revenue growth in 2003 compared with 2002. Three of BNSF's four business groups experienced year-over-year revenue growth; however, coal revenues were down slightly. For 2004, the Company anticipates continued revenue growth as both the global and U.S economies continue to expand.

In 2003, high fuel costs again impacted BNSF's operating income, accounting for half of the 6 percent increase in operating expenses. BNSF mitigated some of the fuel price increases through the Company's fuel hedging program as well as through fuel surcharges added to a majority of BNSF's transportation rates.

Each year capital expenditures are a significant use of cash for BNSF. In 2003, BNSF increased its capital expenditures by approximately $350 million, over the prior year, to approximately $1.7 billion to purchase, instead of lease, locomotives as well as to advance construction of double track on a portion of BNSF Railway's transcontinental route. The Company plans to incur approximately $1.9 billion in capital expenditures in 2004. Approximately $1.2 billion of the total 2004 planned capital expenditures will be for maintenance of business activities, primarily consisting of expenditures to maintain BNSF's track, signals, bridges and tunnels. The Company plans to spend approximately $0.5 billion on the acquisition of locomotives. The remaining $0.2 billion is planned for terminal and line expansions, as well as other strategic projects.

## RESULTS OF OPERATIONS

### *REVENUE TABLE*

The following table presents BNSF's revenue information by commodity for the years ended December 31, 2003, 2002 and 2001:

| | REVENUES IN MILLIONS | | | CARS / UNITS IN THOUSANDS | | | AVERAGE REVENUE PER CAR / UNIT | | |
|---|---|---|---|---|---|---|---|---|---|
| YEAR ENDED DECEMBER 31, | **2003** | 2002 | 2001 | **2003** | 2002 | 2001 | **2003** | 2002 | 2001 |
| Consumer Products | **$3,657** | $3,353 | $3,356 | **4,336** | 3,880 | 3,752 | **$843** | $864 | $894 |
| Industrial Products | **2,138** | 2,041 | 2,080 | **1,428** | 1,415 | 1,442 | **1,497** | 1,442 | 1,442 |
| Coal | **2,025** | 2,071 | 2,123 | **2,048** | 2,097 | 2,133 | **989** | 988 | 995 |
| Agricultural Products | **1,465** | 1,408 | 1,531 | **834** | 794 | 828 | **1,757** | 1,773 | 1,849 |
| Total Freight Revenues | **9,285** | 8,873 | 9,090 | **8,646** | 8,186 | 8,155 | **$1,074** | $1,084 | $1,115 |
| Other Revenues | **128** | 106 | 118 | | | | | | |
| Total Operating Revenues | **$9,413** | $8,979 | $9,208 | | | | | | |

***EXPENSE TABLE***

The following table presents BNSF's expense information for the years ended December 31, 2003, 2002, and 2001 (in millions):

| YEAR ENDED DECEMBER 31, | **2003** | 2002 | 2001 |
|---|---|---|---|
| Compensation and benefits | **$2,964** | $2,894 | $2,861 |
| Purchased services | **1,253** | 1,146 | 1,090 |
| Depreciation and amortization | **910** | 931 | 909 |
| Equipment rents | **705** | 698 | 736 |
| Fuel | **1,073** | 833 | 973 |
| Materials and other | **843** | 821 | 889 |
| Total operating expenses | **$7,748** | $7,323 | $7,458 |
| Interest expense | **$420** | $428 | $463 |
| Other expense, net | **$14** | $12 | $114 |
| Income tax expense | **$454** | $456 | $442 |

***YEAR ENDED DECEMBER 31, 2003 COMPARED WITH YEAR ENDED DECEMBER 31, 2002***

BNSF recorded net income for 2003 of $816 million, or $2.19 per share, which includes the favorable cumulative effect of an accounting change of $39 million, net of tax, or $0.10 per share, (See Note 2 to the Consolidated Financial Statements) compared with net income for 2002 of $760 million, or $2.00 per share. Operating income of $1,665 million in 2003 was $9 million higher than 2002.

REVENUES

Freight revenues of $9,285 million for 2003 were $412 million, or 5 percent, higher than 2002. Freight revenues in 2003 included fuel surcharges of $110 million compared with $26 million in the prior year. Average revenue per car/unit decreased 1 percent in 2003 to $1,074 from $1,084 in 2002.

Consumer Products revenues of $3,657 million for 2003 were $304 million, or 9 percent, greater than 2002. The increase in Consumer Products revenue is primarily due to increased volumes in the international, truckload and perishable sectors. The reduction in average revenue per unit of 2 percent is primarily related to the strong growth in the international sector, which has lower average revenue per unit.

Industrial Products revenues increased $97 million, or 5 percent, to $2,138 million for 2003. The revenue increase is primarily due to increased business in steel, taconite, clay and minerals in the construction products sector and increased military, lumber, plywood, particle board and paper traffic in the building products sector, which were somewhat offset by lower plastics traffic. Rate increases along with increased fuel surcharges contributed to a 4 percent increase in average revenue per car.

Coal revenues of $2,025 million for 2003 decreased $46 million, or 2 percent, versus a year ago. The decrease is primarily a result of lower volumes from the first quarter draw-down of utility stockpiles, weaker demand due to milder weather, utility plant shutdowns and the conversion of a utility plant from coal to natural gas. The average revenue per car grew slightly.

Agricultural Products revenues of $1,465 million for 2003 were $57 million, or 4 percent, higher than revenues for 2002. This increase is primarily due to more ethanol shipments from plants in the Midwest to California and higher shipments of ethanol by-products. Increased export shipments of soybeans also contributed to growth. The average revenue per car was down slightly due to a change in traffic mix partially offset by increased fuel surcharges.

EXPENSES

Total operating expenses for 2003 were $7,748 million, an increase of $425 million, or 6 percent, over 2002 primarily due to higher fuel expenses and greater volumes handled.

Fuel expenses of $1,073 million for 2003 were $240 million, or 29 percent, higher than 2002. The increase in fuel expense was primarily the result of a 16-cent, or $194 million, increase in the average all-in cost per gallon of diesel fuel. The increase in the average all-in cost per gallon of diesel fuel is comprised of a 17-cent, or $212 million, increase in the average purchase price which is partially offset by an increase in the hedge benefit of 1-cent, or $18 million (2003 benefit of $68 million less 2002 benefit of $50 million). Consumption in 2003 was 1,213 million gallons compared with 1,149 million gallons in 2002.

Compensation and benefits expenses of $2,964 million were $70 million, or 2 percent, higher than 2002 primarily due to higher volumes and the implementation of Statement of Financial Accounting Standards (SFAS) No. 143, *Accounting for Asset Retirement Obligations,* as described in Note 2 to the Consolidated Financial Statements, as well as wage inflation, higher pension costs and new hire crew training, partially offset by lower head counts and the favorable impact of railroad retirement reform (See further discussion under the headings “Other Matters; Railroad Retirement Reform”).

Purchased services expenses of $1,253 million for 2003 were $107 million, or 9 percent, higher than 2002 primarily due to volume-related intermodal ramp and drayage costs and increased locomotive maintenance costs associated with maintaining more locomotives as well as higher service contracts expense related to an agreement to outsource the management of a large portion of BNSF’s information technology infrastructure entered into during the third quarter of 2002 and the implementation of SFAS No. 143.

Depreciation and amortization expenses of $910 million for 2003 were $21 million, or 2 percent, lower than 2002 primarily due to the implementation of SFAS No. 143, as well as new lower depreciation rates for locomotives partially offset by normal increases for capital expenditures. Additionally, at the time of the merger of Burlington Northern Railroad Company and The Atchison, Topeka and Santa Fe Railway Company (ATSF), the Company recorded a decrease in the fair market value of former ATSF locomotives. The decrease was amortized over the remaining useful life of the locomotives and resulted in an annual decrease to depreciation expense. The amortization period expired at the end of 2003; accordingly, this will cause 2004 and future years’ depreciation expense to increase by approximately $40 million. In addition, 2004 depreciation expense will increase from capital expenditure activity.

Equipment rents expenses for 2003 of $705 million were $7 million, or 1 percent, higher than 2002 primarily due to volume growth partially offset by decreases in intermodal and carload equipment rent expenses. Decreases in intermodal and carload equipment rent expenses are a result of greater use of private trailers and containers, as well as favorable lease renegotiations and short term lease rate incentives.

Materials and other expenses of $843 million for 2003 were $22 million, or 3 percent, higher than 2002 principally due to the implementation of SFAS No. 143, employee severance costs and lower gains from property sales substantially offset by decreased material costs and bad debt expense.

Interest expense of $420 million for 2003 was $8 million, or 2 percent, lower than 2002. This decrease was primarily the result of lower average interest rates and an increased benefit from interest rate hedges, partially offset by higher average debt outstanding.

Other expense of $14 million for 2003 was $2 million higher than in 2002.

The effective tax rate in 2003 was 36.9 percent compared with 37.5 percent for the prior-year period. The decrease in the effective tax rate primarily reflects a tax settlement attributable to prior years that was settled favorably in the second quarter of 2003.

***YEAR ENDED DECEMBER 31, 2002 COMPARED WITH YEAR ENDED DECEMBER 31, 2001***

BNSF recorded net income for 2002 of $760 million, or $2.00 per share, compared with net income for 2001 of $731 million, or $1.87 per share. Operating income of $1,656 million in 2002 was $94 million lower than 2001.

REVENUES

Freight revenues of $8,873 million for 2002 were $217 million, or 2 percent, lower than 2001. In 2002, the combined effect of the soft economy, a mild winter, reduced foreign demand for agricultural products and the loss of an automotive contact in the third quarter of 2001 contributed to a decrease in BNSF's revenues.

Consumer Products revenues of $3,353 million for 2002 were essentially flat compared with 2001. Decreased automotive revenues related to an automobile contract loss in 2001 offset increased intermodal volumes in the international and truckload businesses. Additionally, 2001 Consumer Products revenues includes an automotive revenue contract settlement gain of $32 million. International increases were driven by favorable trans-Pacific trade and new contracts. Truckload revenues were up due to strong growth from the Company's primary accounts and modal conversion of highway traffic from new and existing shippers. The reduction in revenue per car/unit is related to a decrease in automotive traffic and an increase in international traffic, which primarily moves in containers and unit trains, and due to the lower cost structure, moves at lower rates per unit.

Industrial Products revenues of $2,041 million for 2002 were $39 million, or 2 percent, lower than 2001. An increase in the chemicals and plastics sector tied to strength in automotive and home construction along with a new contract was more than offset by general softness in the petroleum, building and construction product sectors. Petroleum was down due to higher heating fuel inventories as a result of the mild winter. Building and construction product sectors were down primarily due to weak paper and steel markets.

Coal revenues of $2,071 million for 2002 decreased $52 million, or 2 percent, versus 2001. Volume was lower than 2001 primarily as a result of reduced demand in the first half of 2002 caused by mild winter weather. Revenue per car/unit decreased as a result of modest price decreases related to the renewal of some contracts and rate adjustment factors in existing contracts that were negative in the first half of the year.

Agricultural Products revenues of $1,408 million for 2002 were $123 million, or 8 percent, lower than revenues for 2001 primarily due to decreased soybean, wheat and corn exports due to global market conditions. The decrease in export traffic resulted in lower revenue per unit because of a shorter length of haul. Domestic corn shipments to feedlots were also down from 2001 as a result of reduced feedlot demand, high inventory levels remaining from 2001 shipments and crop production conditions.

EXPENSES

Total operating expenses for 2002 were $7,323 million, a decrease of $135 million, or 2 percent, over 2001 primarily due to a lower total cost per gallon of diesel fuel, lower equipment rents expense driven by an initiative to use less foreign equipment and increased gains on property dispositions.

Compensation and benefits expenses of $2,894 million were $33 million, or 1 percent, higher than 2001 primarily due to increases in health and welfare costs, principally as a result of an increase in rates, incentive compensation, and pension expense primarily reflecting a decrease in the long-term rate of return assumption for pension assets. These increases were partially offset by reduced labor expenses as a result of lower employment levels.

Purchased services of $1,146 million for 2002 were $56 million, or 5 percent, higher than 2001 because of a one-time flood related recovery and higher other recoveries in 2001, higher insurance expense in 2002, as well as higher service contracts expense related to an agreement to outsource the management of a large portion of BNSF's information technology infrastructure entered into during the third quarter of 2002.

Depreciation and amortization expenses of $931 million for 2002 were $22 million, or 2 percent, higher than 2001 primarily due to a higher capital base.

Equipment rents expenses for 2002 of $698 million were $38 million, or 5 percent, lower than 2001. The decrease is primarily related to lower carload equipment expense driven by an initiative to use less foreign equipment, short-term lease incentives and lower auto equipment expense as a result of the loss of an automotive contract in the third quarter of 2001.

Fuel expenses of $833 million for 2002 were $140 million, or 14 percent, lower than 2001. The decrease in fuel expense was primarily the result of a 10-cent, or $117 million, decrease in the average all-in cost per gallon of diesel fuel. The decrease in the average all-in cost per gallon of diesel fuel is comprised of the combination of a 10-cent, or $115 million, decrease in the average purchase price and a slight increase in the hedge benefit of less than 1-cent, or $2 million (2002 benefit of $50 million less 2001 benefit of $48 million). Consumption in 2002 was 1,149 million gallons compared with 1,177 million gallons in 2001.

Materials and other expenses of $821 million for 2002 were $68 million, or 8 percent, lower than 2001 principally due to a $66-million charge for workforce reduction related costs in 2001, and increased gains on property dispositions and lower costs on leased locomotives partially offset by higher personal injury expense in 2002.

Interest expense of $428 million for 2002 was $35 million, or 8 percent, lower than 2001. This decrease was primarily the result of a higher net interest rate hedge benefit and lower average interest rates. The net interest rate hedge benefit in 2002 was $24 million. There was no interest rate hedge benefit or loss in 2001.

Other expense was $12 million or $102 million lower compared with 2001 primarily due to $75 million of losses recognized in 2001 related to non-rail investments. The non-rail investments consisted of FreightWise, Inc., an Internet transportation exchange; Pathnet Telecommunications, Inc., a telecommunications venture; a portfolio of other non-core investments; and a decline in the cash surrender value of company owned life insurance policies. In addition, there was a decrease in accounts receivable sale fees in 2002 compared with 2001.

## LIQUIDITY AND CAPITAL RESOURCES

Cash generated from operations is BNSF's principal source of liquidity. BNSF generally funds any additional liquidity requirements through debt issuance including commercial paper, the leasing of assets and the sale of a portion of its accounts receivable.

### *OPERATING ACTIVITIES*

Net cash provided by operating activities was $2,285 million during 2003 compared with $2,106 million during 2002. The increase was primarily the result of changes in working capital and the Seattle Sound Transit transaction (See further discussion under the headings "Other Matters; Seattle Sound Transit").

### *INVESTING ACTIVITIES*

Net cash used for investing activities was $1,806 million during 2003 compared with $1,517 million during 2002. The increase in cash capital expenditures primarily relates to the purchase, instead of lease, of locomotives as well as the advance construction of double track on a portion of BNSF Railway's transcontinental route. The decrease in cash used for other investing activities primarily reflects a classification change resulting from the implementation of SFAS No. 143, which reduced expenditures capitalized for retired track structure removal.

A breakdown of cash capital expenditures during 2003, 2002 and 2001 is set forth in the following table (in millions):

| YEAR ENDED DECEMBER 31, | **2003** | 2002 | 2001 |
|---|---|---|---|
| Maintenance of way: | | | |
| Rail | **$ 202** | $ 193 | $ 233 |
| Ties | **227** | 222 | 254 |
| Surfacing | **160** | 161 | 146 |
| Other | **337** | 325 | 335 |
| Total maintenance of way | **$ 926** | $ 901 | $ 968 |
| Mechanical | **133** | 168 | 183 |
| Information services | **63** | 79 | 69 |
| Other | **116** | 107 | 113 |
| Total maintenance of business | **$ 1,238** | $ 1,255 | $ 1,333 |
| New locomotive acquisitions | **270** | - | - |
| Terminal and line expansion | **218** | 103 | 126 |
| Total | **$ 1,726** | $ 1,358 | $ 1,459 |

BNSF has agreed to acquire 915 locomotives by 2008. Through December 31, 2003, BNSF has taken delivery of 281 of the 915 locomotives. Most of the locomotives were financed through a combination of cash from operations and operating leases. The remaining locomotives under these agreements will be financed from one or a combination of sources including, but not limited to, cash from operations, capital or operating leases and debt issuances. The decision on the method used for a particular acquisition financing will depend on market conditions and other factors at the time.

***FINANCING ACTIVITIES***

Net cash used for financing activities during 2003 was $489 million primarily related to common stock repurchases of $217 million, dividend payments of $191 million and net repayments of $151 million partially offset by proceeds from stock options exercised of $68 million.

Aggregate debt to mature in 2004 is $244 million. BNSF's ratio of net debt to total capitalization (net debt is calculated as total debt less cash and cash equivalents, and total capitalization is calculated as the sum of net debt and total stockholders' equity) was 44.0 percent at December 31, 2003, compared with 46.1 percent at December 31, 2002, and 45.8 percent at December 31, 2001.

2003

The Company exercised an option to call $150 million of 7.50 percent bonds due July 2023. The bonds were called at a price of 103.02 percent of par and commercial paper was used to fund the call.

BNSF issued $250 million of 4.30 percent notes due July 1, 2013. The net proceeds of the debt issuance were used for general corporate purposes including the repayment of outstanding commercial paper.

The Company exercised an option to call $29 million of 2.63 percent mortgage bonds issued by a predecessor company and due January 1, 2010. Cash generated from operations was used to fund the call.

BNSF had $750 million of debt capacity available under its shelf registration at December 31, 2003.

2002

The Company financed the construction of an intermodal facility by a third party and entered into an agreement to lease the intermodal facility for 20 years. This lease transaction is accounted for as a financing and has a purchase option. The Company recorded an asset in property and equipment, net and a liability in long-term debt and commercial paper of $138 million which represents the fair market value at lease inception.

BNSF issued $300 million of 5.90 percent notes due July 1, 2012. The net proceeds of the debt issuance were used for general corporate purposes including the repayment of outstanding commercial paper.

### *DIVIDENDS*

Common stock dividends declared were $0.54 per share annually for 2003 and $0.48 per share annually for 2002 and 2001. Dividends paid on common stock were $191 million, $183 million and $190 million during 2003, 2002 and 2001, respectively.

### *COMMON STOCK REPURCHASE PROGRAM*

In July 1997, the Board authorized the repurchase of up to 30 million shares of the Company's common stock from time to time in the open market. In December 1999, April 2000, September 2000 and January 2003, the Board authorized extensions of the BNSF share repurchase program, adding 30 million shares at each date to the total shares previously authorized bringing BNSF's share repurchase program to 150 million shares. During 2003, 2002 and 2001, the Company repurchased approximately 8 million, 13 million, and 11 million shares, respectively, of its common stock at average prices of $27.25 per share, $27.85 per share, and $27.76 per share, respectively. Total repurchases through December 31, 2003, were 124 million shares at a total average cost of $26.05 per share, leaving 26 million shares available for repurchase out of the 150 million shares presently authorized.

### *LONG-TERM DEBT AND OTHER OBLIGATIONS*

The Company's business is capital intensive. BNSF has historically generated a significant amount of cash from operating activities which it uses to fund capital additions, service debt, repurchase shares and pay dividends. Additionally, the Company relies on access to the debt and leasing markets to finance a portion of capital additions on a long-term basis.

The Company utilizes a commercial paper program backed by bank revolving credit agreements to manage liquidity needs. The information below summarizes the more significant obligations of the Company at December 31, 2003. For 2004 and the foreseeable future, the Company expects that cash from operating activities, access to capital markets and bank revolving credit agreements will be sufficient to enable the Company to meet its obligations when due. The Company believes these sources of funds will also be sufficient to fund capital additions that are necessary to maintain its competitiveness and position the Company for future revenue growth.

The Company's ratio of earnings to fixed charges was 3.00 and 2.93 times for the years ended December 31, 2003 and 2002, respectively. Additionally, the Company's ratio of net cash provided by operating activities divided by total average debt was 33 percent and 31 percent for the years ended December 31, 2003 and 2002, respectively.

The following table summarizes the Company's obligations under long-term debt and other contractual commitments at December 31, 2003 (in millions):

| | | PAYMENTS DUE BY PERIOD | | | |
|---|---|---|---|---|---|
| CONTRACTUAL OBLIGATIONS | TOTAL | LESS THAN 1 YEAR | 1–3 YEARS | 3–5 YEARS | MORE THAN 5 YEARS |
| Long-term debt [(a)] | $ 6,072 | $ 167 | $ 728 | $ 679 | $ 4,498 |
| Capital lease obligations | 612 | 77 | 166 | 155 | 214 |
| Operating lease [(b)] | 5,346 | 437 | 851 | 732 | 3,326 |
| Purchase obligations [(c)] | 6,321 | 1,054 | 843 | 837 | 3,587 |
| Other long-term liabilities reflected on the balance sheet under GAAP [(d)] | 221 | 77 | 53 | 34 | 57 |
| Total contractual obligations | $ 18,572 | $ 1,812 | $ 2,641 | $ 2,437 | $ 11,682 |

*(a) Excludes capital lease obligations.*

*(b) Gross payments due which include an interest component.*

*(c) Includes short-line minimum usage commitments, asset maintenance and other purchase commitments.*

*(d) Consists of employee merger and separation payments as discussed in Note 11 to the Consolidated Financial Statements, required pension plan contributions as discussed under the heading "Pension Funding" and actuarially estimated payments expected to be made for other post-retirement benefit plans as discussed in Note 13 to the Consolidated Financial Statements.*

In the normal course of business, the Company enters into long-term contractual requirements for future goods and services needed for the operations of the business. Such commitments are not in excess of expected requirements and are not reasonably likely to result in performance penalties or payments that would have a material adverse effect on the Company's liquidity.

### *CREDIT AGREEMENTS*

Commercial paper and the revolving credit agreements are discussed in Note 9 to the Consolidated Financial Statements. The revolving credit agreements include covenants and events of default typical for this type of facility, including a minimum consolidated tangible net worth test, a maximum debt-to-capital test, and a $75 million cross-default provision. At December 31, 2003, the Company was in compliance with its debt covenants. BNSF's tangible net worth is $2.9 billion greater than the minimum consolidated tangible net worth required under the agreement, and the maximum debt-to-capital test provides approximately $5.4 billion of debt capacity above BNSF's outstanding debt as of December 31, 2003, before an event of default would occur under these covenants. With the exception of a voluntary bankruptcy or insolvency, any event of default has either or both a cure period or notice requirement before termination of the agreements. A voluntary bankruptcy or insolvency would be considered an immediate termination event.

### *OFF-BALANCE SHEET ARRANGEMENTS*

#### SALE OF ACCOUNTS RECEIVABLE

The accounts receivable sales program of Santa Fe Receivables Corporation (SFRC), as described in Note 6 of the Consolidated Financial Statements, includes various provisions that, if triggered, would allow the investors participating in this program, at their option, to cancel the program. These provisions include a minimum consolidated tangible net worth test and a maximum debt-to-capital test which are the same as in the BNSF revolving credit agreements. At December 31, 2003, investor interests of $625 million, were outstanding under the $700 million accounts receivable facility. SFRC renewed $350 million of the $700 million accounts receivables facility, effective in June 2003, for an additional 364 days. In addition, SFRC entered into a separate $350 million accounts receivables facility, effective June 2003, with a five-year term. The commitment of the investors to purchase undivided interests under the accounts receivable sales program is currently scheduled to expire in June 2004 and June 2008, respectively. Management expects to be able to either extend the commitment of the current investors under the accounts receivable sales program past June 2004 or to find additional investors in the accounts receivable sales program who will be committed to purchase undivided interests after June 2004.

The accounts receivable sales program provides efficient financing at a competitive interest rate to traditional borrowing arrangements. Since the funding is collateralized by BNSF receivables, the risk of exposure is only as great as the risk of default on these receivables. See Note 6 to the Consolidated Financial Statements.

#### GUARANTEES

BNSF agreed to guarantee approximately $85 million of debt, of which $50 million was outstanding as of December 31, 2003. The proceeds from the debt are being used to construct and operate a 13-mile railroad, which will service several chemical and plastics manufacturing facilities in the Houston, Texas area. Due to evolving circumstances, the timeline of completion for this railroad line is uncertain. As discussed in Note 16 to the Consolidated Financial Statements, the San Jacinto Partnership will likely be consolidated on March 31, 2004.

The Company acts as guarantor for certain other debt and lease obligations of others. During the year ended December 31, 2003, the Company has primarily utilized guarantees to allow third-party entities to obtain favorable terms to finance the construction of assets that will benefit the Company. Additionally, in the ordinary course of business, BNSF enters into agreements with third parties that include indemnification clauses. The Company does not expect performance under these guarantees or indemnities to have a material adverse effect on the Company's liquidity in the foreseeable future. See Note 9 of the Consolidated Financial Statements.

### *PENSION FUNDING*

The Company will make required contributions of approximately $20 million to the qualified BNSF Retirement Plan in 2004.

### *INFLATION*

Due to the capital-intensive nature of BNSF's business, the full effect of inflation is not reflected in operating expenses because depreciation is based on historical cost. An assumption that all operating assets were depreciated at current price levels would result in substantially greater expense than historically reported amounts.

## OTHER MATTERS

### *HEDGING ACTIVITIES*

The Company uses derivatives to hedge against increases in diesel fuel prices and interest rates as well as to convert a portion of its fixed-rate long-term debt to floating-rate debt. The Company formally documents the relationship between the hedging instrument and the hedged item, as well as the risk management objective and strategy for the use of the hedging instrument. This documentation includes linking the derivatives that are designated as fair value or cash flow hedges to specific assets or liabilities on the balance sheet, commitments or forecasted transactions. The Company assesses at the time a derivative contract is entered into, and at least quarterly, whether the derivative item is effective in offsetting the changes in fair value or cash flows. Any change in fair value resulting from ineffectiveness, as defined by SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities,* as amended, is recognized in current period earnings. For derivative instruments that are designated and qualify as cash flow hedges, the effective portion of the gain or loss on the derivative instrument is recorded in Accumulated Other Comprehensive Income (AOCI) as a separate component of stockholders' equity and reclassified into earnings in the period during which the hedge transaction affects earnings.

#### FUEL

BNSF measures the fair value of fuel hedges from data provided by various external counterparties. To value a swap, the Company uses the forward commodity price for the period hedged. The fair values of costless collars are calculated and provided by the corresponding counterparties. BNSF monitors its hedging positions and credit ratings of its counterparties and does not anticipate losses due to counterparty nonperformance. See Note 3 to the Consolidated Financial Statements.

#### INTEREST RATE

From time to time, the Company enters into various interest rate hedging transactions for the purpose of managing exposure to fluctuations in interest rates and establishing rates in anticipation of future debt issuances as well as to convert a portion of its fixed-rate long-term debt to floating-rate debt. The Company uses interest rate swaps and treasury locks as part of its interest rate risk management strategy. BNSF's measurement of the fair value of interest rate swaps and treasury locks is based on estimates of the mid-market values for the transactions provided by the counterparties to these agreements. See Note 3 to the Consolidated Financial Statements.

### *EMPLOYEE AND LABOR RELATIONS*

Approximately 87 percent of BNSF Railway's employees are union-represented. BNSF Railway's union employees work under collective bargaining agreements with various different labor organizations. The negotiating process for new, major collective bargaining agreements covering all of BNSF Railway's union employees has been underway since the bargaining round was initiated November 1, 1999. Wages, health and welfare benefits, work rules, and other issues have traditionally been addressed through industry-wide negotiations. These negotiations have generally taken place over a number of months and have previously not resulted in any extended work stoppages. The existing agreements have remained in effect and will continue to remain in effect until new agreements are reached or the Railway Labor Act's procedures (which include mediation, cooling-off periods, and the possibility of Presidential intervention) are exhausted. The current agreements provide for periodic wage increases until new agreements are reached.

#### BROTHERHOOD OF LOCOMOTIVE ENGINEERS

In October 2003, the NCCC and Brotherhood of Locomotive Engineers (BLE) settled wage, work rule and benefit issues through 2004, subject to union membership ratification. That process was concluded successfully in December 2003. The "national" agreement covers approximately 20 percent of BNSF's unionized workforce. BNSF and BLE concurrently finalized a separate "local" agreement substituting a new profit sharing bonus arrangement for a portion of the wage increases otherwise provided for by the "national" agreement.

### BROTHERHOOD OF RAILROAD SIGNALMEN

In September 2003, the NCCC reached an agreement with the Brotherhood of Railroad Signalmen (BRS) settling wage, work rule and benefit issues through 2004. The agreement was ratified by the union's members in September 2003. BRS represents BNSF's signal system maintenance employees, who comprise approximately 5 percent of the unionized workforce.

### TRANSPORTATION COMMUNICATIONS UNION

In late 2002, the NCCC reached a final agreement with the Transportation Communications Union (TCU) providing for final and binding arbitration of wage and benefit issues through 2004. This agreement averted the possibility of self help by the parties over bargaining round issues. The arbitration decision was issued in January 2003 and settled all wage, work rule and medical benefit issues between the parties through 2004. TCU represents BNSF's clerks, carmen and patrolmen, who make up about 15 percent of BNSF's unionized workforce.

### UNITED TRANSPORTATION UNION

The NCCC reached a "national" agreement in August 2002, with the United Transportation Union (UTU) covering wage, work rule, and locomotive remote control issues through the year 2004 for conductors, brakemen, yardmen, yardmasters and firemen. The "national" agreement also created a final and binding process for resolving health and welfare issues, mainly involving employees sharing in rising benefit costs. The "national" agreement committed each side to participate in a study and negotiation period, during which the parties were to examine alternate ways to control rising healthcare costs. The parties met extensively on this issue though the third quarter of 2003, and reached a tentative contract resolving the health and welfare related issues. The contract was ratified by the UTU's members in November 2003.

When the bargaining round began in 1999, two of the nine BNSF UTU general chairmen contested what BNSF has believed from the outset was their obligation to address wage, work rule and benefits issues in industry-wide bargaining. This matter became the subject of litigation in federal court in the District of Columbia. The court of appeals there sustained BNSF's position on the key legal principle, remanding the matter to a lower court for application of the law to the particular facts presented in the case. While the litigation was pending, BNSF did not effectuate the "national" agreement's terms in connection with employees represented by the two general chairmen involved. The lower court issued its decision in November 2003, in BNSF's favor. As the Company requested, the court ordered application of the "national" agreement in the case of all employees represented by the two general chairmen above, as a full and final settlement of the bargaining round. No appeal was made, and, thus, the litigation has brought the bargaining round to a formal close with all of BNSF's UTU-represented employees, who represent approximately 25 percent of the Company's unionized workforce.

### OTHER UNIONS

The Brotherhood of Maintenance of Way Employees (representing approximately 20 percent of BNSF's unionized workforce) reached an agreement with BNSF in the spring of 2001.

Through the NCCC, BNSF is continuing efforts to settle the bargaining with the International Brotherhood of Electrical Workers, International Association of Machinists, Sheet Metal Workers' International Association, National Conference of Firemen and Oilers, and American Train Dispatchers Association, which together represent approximately 15 percent of the Company's unionized workforce.

### *RAILROAD RETIREMENT REFORM*

Railroad industry personnel are covered by the Railroad Retirement System instead of Social Security. BNSF Railway's contributions under the Railroad Retirement System have been approximately triple those in industries covered by Social Security. The Railroad Retirement System, funded primarily by payroll taxes on covered employers and employees, includes a benefit roughly equivalent to Social Security (Tier I), an additional benefit similar to that allowed in some private defined-benefit plans (Tier II), and other benefits. Investment of Tier II Railroad Retirement assets had, until 2001, been limited to special interest-bearing U. S. Treasury securities. The Railroad Retirement and Survivors' Improvement Act of 2001 (Act) creates a new National Railroad Retirement Investment Trust to hold Tier II Railroad Retirement assets and empowers the trustees to invest these assets in the same types of investments available to private sector retirement plans. In addition to liberalizing certain retirement benefit requirements for rail employees, the Act reduced Tier II Railroad Retirement tax rates on rail employers beginning in 2002 and eliminated a supplemental annuity tax. In 2002, the Company realized savings of approximately $20 million. Additionally, the Company realized incremental savings of approximately $30 million in 2003. The Company expects to realize further savings in 2004 of approximately $20 million for a total ongoing savings of approximately $70 million. Future adjustments in the Tier II Railroad Retirement tax rates assessed will depend on Railroad Retirement fund levels.

### *SEATTLE SOUND TRANSIT*

In December 2003, the Company entered into several agreements with Central Puget Sound Regional Transit Authority (Sound Transit), a government authority, established by King, Pierce and Snohomish counties within the state of Washington. BNSF has agreed to sell to Sound Transit under the threat of condemnation a combination of (a) four easements enabling Sound Transit to offer commuter rail service over the existing BNSF track from Seattle to Everett and (b) 18 miles of railroad line from south of Tacoma to Nisqually, Washington.

Sound Transit will pay BNSF approximately $260 million for four commuter easements to operate trains on the segment between Seattle and Everett, and entered into agreements for service on the commuter easements, and joint use of track for commuter and freight purposes. The Company received approximately $80 million of cash in 2003 upon the closing of the first easement, which will be recognized in income over the use of the associated track structure (approximately 30 years). Over the next four years, upon the subsequent closings subject to conditions in the sale agreement, BNSF will receive an additional $180 million for the remaining three easements, including approximately $80 million expected to be paid in 2004.

Sound Transit will also pay BNSF to convey the 18 miles of railroad line and associated real estate from south of Tacoma to Nisqually in three separate sell transactions. The Company received approximately $8 million of cash in 2003 and reported a gain in income of approximately $2 million, net of tax, as a result of the real estate sale for station related parcels to Sound Transit. Additionally, the Company expects to receive approximately $24 million for the remaining railroad line and real estate sales associated with these agreements over the next four years, including approximately $6 million expected to be paid in 2004. The Company expects total related gains of about $25 million to be recognized in future periods, the majority of which is currently anticipated to be recognized in the next two years.

## CRITICAL ACCOUNTING ESTIMATES

In the ordinary course of business, the Company makes a number of estimates and assumptions related to the reporting of results of operations and financial position in the preparation of its financial statements in conformity with accounting principles generally accepted in the United States of America. Actual results could differ significantly from those estimates under different assumptions and conditions. The following discussion addresses the Company's most critical accounting estimates.

Management has discussed the development and selection of the critical accounting estimates described below with the Audit Committee of the Board of Directors and the Audit Committee has reviewed the Company's disclosure relating to it in this Management's Discussion and Analysis of Financial Condition and Results of Operations.

***LEGAL***

BNSF and its subsidiaries are parties to a number of legal actions and claims, various governmental proceedings and private civil suits arising in the ordinary course of business, including those related to environmental matters, Federal Employers' Liability Act claims by BNSF Railway employees, other personal injury claims, and disputes and complaints involving certain transportation rates and charges (including complaints seeking refunds of prior charges paid for coal transportation and the prescription of future rates for such movements). Some of the legal proceedings include claims for punitive as well as compensatory damages, and a few proceedings purport to be class actions. While the final outcome of these matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded along with applicable insurance, it is the opinion of BNSF's management that none of these items will have a material adverse effect on the results of operations, financial position or liquidity of BNSF. However, an unexpected adverse resolution of one or more of these items could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

BNSF's most significant claims relate to personal injury and environmental matters. These claims are discussed in more detail below.

PERSONAL INJURY

Personal injury claims, including work-related injuries to employees, are a significant expense for the railroad industry. Employees of BNSF are compensated for work-related injuries according to the provisions of the Federal Employers' Liability Act (FELA). FELA's system of requiring the finding of fault, coupled with unscheduled awards and reliance on the jury system, contributed to significant increases in expense in past years. BNSF has implemented a number of safety programs to reduce the number of personal injuries as well as the associated claims and personal injury expense. The Company recognized personal injury expenses of approximately $215 million, $228 million and $195 million in 2003, 2002 and 2001, respectively. BNSF made payments for personal injuries of approximately $198 million, $190 million and $173 million in 2003, 2002 and 2001, respectively. At December 31, 2003 and 2002, the Company had recorded liabilities of $513 million and $496 million, respectively, related to personal injury claims. Of these amounts, $200 million and $197 million are included in current liabilities in 2003 and 2002, respectively. BNSF's liabilities for personal injury claims are undiscounted.

*CRITICAL ESTIMATE*

The Company uses a third party actuarial firm that performs actuarial reviews to assist the Company in estimating its personal injury claims. These estimates are based on the covered population, activity levels and trends in the frequency, and the costs of covered injuries. Personal injury liability and ultimate expense projections are estimated using standard actuarial methodologies. These actuarial method procedures include unasserted claims, except for certain occupational illnesses, which, due to their unpredictability, are accrued on an as reported basis.

The Company has not materially changed its methodology for calculating personal injury liabilities in the three years presented. There are currently no known trends, demands, commitments, events or uncertainties that are reasonably likely to occur and materially affect the methodology or assumptions described above.

ENVIRONMENTAL

The Company's operations, as well as those of its competitors, are subject to extensive federal, state and local environmental regulation. BNSF's operating procedures include practices to protect the environment from the risks inherent in railroad operations, which frequently involve transporting chemicals and other hazardous materials. Additionally, many of BNSF's land holdings are and have been used for industrial or transportation-related purposes or leased to commercial or industrial companies whose activities may have resulted in discharges onto the property. As a result, BNSF is subject to environmental cleanup and enforcement actions. In particular, the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), also known as the Superfund law, as well as similar state laws generally impose joint and several liability for cleanup and enforcement costs on current and former owners and operators of a site without regard to fault or the legality of the original conduct. BNSF has been notified that it is a potentially responsible party (PRP) for study and cleanup costs at approximately 20 Superfund sites for which investigation and remediation payments are or will be made or are yet to be determined (the Superfund sites) and, in many instances, is one of several PRPs. In addition, BNSF may be considered a PRP under certain other laws. Accordingly, under CERCLA and other federal and state statutes, BNSF may be held jointly and severally liable for all environmental costs associated with a particular site. If there are other PRPs, BNSF generally participates in the cleanup of these sites through cost-sharing agreements with terms that vary from site to site. Costs are typically allocated based on relative volumetric contribution of material, the amount of time the site was owned or operated, and/or the portion of the total site owned or operated by each PRP.

Environmental costs include initial site surveys and environmental studies of potentially contaminated sites as well as costs for remediation and restoration of sites determined to be contaminated. Liabilities for environmental cleanup costs are initially recorded when BNSF's liability for environmental cleanup is both probable and a reasonable estimate of associated costs can be made. Adjustments to initial estimates are recorded as necessary based upon additional information developed in subsequent periods. BNSF conducts an ongoing environmental contingency analysis, which considers a combination of factors including independent consulting reports, site visits, legal reviews, analysis of the likelihood of participation in and the ability of other PRPs to pay for cleanup, and historical trend analyses.

Environmental related expenses are a significant expense for BNSF and the railroad industry. BNSF is involved in a number of administrative and judicial proceedings and other mandatory cleanup efforts at approximately 430 sites, including the Superfund sites, at which it is participating in the study or cleanup, or both, of alleged environmental contamination. The Company recognized environmental expenses of approximately $59 million, $43 million and $51 million during 2003, 2002 and 2001, respectively. BNSF paid approximately $56 million, $49 million and $72 million during 2003, 2002 and 2001, respectively, for mandatory and unasserted claims cleanup efforts, including amounts expended under federal and state voluntary cleanup programs. BNSF has recorded liabilities for remediation and restoration of all known sites of $199 million at December 31, 2003, compared with $196 million at December 31, 2002. Of these amounts, $50 million and $51 million, respectively, are included in current liabilities. BNSF's environmental liabilities are not discounted. BNSF anticipates that the majority of the accrued costs at December 31, 2003, will be paid over the next five years and no individual site is considered to be material.

*CRITICAL ESTIMATE*

Liabilities recorded for environmental costs represent BNSF's best estimates for remediation and restoration of these sites and include both asserted and unasserted claims. Unasserted claims are not considered to be a material component of the liability. Although recorded liabilities include BNSF's best estimates of all costs, without reduction for anticipated recoveries from third parties, BNSF's total cleanup costs at these sites cannot be predicted with certainty due to various factors such as the extent of corrective actions that may be required, evolving environmental laws and regulations, advances in environmental technology, the extent of other parties' participation in cleanup efforts, developments in ongoing environmental analyses related to sites determined to be contaminated, and developments in environmental surveys and studies of potentially contaminated sites. As a result, future charges to income for environmental liabilities could have a significant effect on results of operations in a particular quarter or fiscal year as individual site studies and remediation and restoration efforts proceed or as new sites arise. However, the Company believes it is unlikely any identified matters, either individually or in the aggregate, will have a material adverse effect on BNSF's results of operations, financial position or liquidity.

The Company has not materially changed its methodology for identifying and calculating environmental liabilities in the three years presented. There are currently no known trends, demands, commitments, events or uncertainties that are reasonably likely to occur and materially affect the methodology or assumptions described above.

***INCOME TAXES***

BNSF is subject to various federal, state and local income taxes in the taxing jurisdictions where the Company operates. BNSF accounts for income taxes by providing for taxes payable or refundable in the current year and for deferred tax assets and liabilities for future tax consequences of events that have been recognized in financial statements or tax returns.

BNSF recorded total income tax expense, including federal, state and other income taxes, of $454 million, $456 million, and $442 million for the years ended December 31, 2003, 2002 and 2001, respectively. BNSF's Consolidated Balance Sheets reflect $292 million and $314 million of net current deferred tax assets at December 31, 2003 and 2002, respectively. Also included in BNSF's Consolidated Balance Sheets are $7,481 million and $6,975 million of net non-current deferred tax liabilities at December 31, 2003 and 2002, respectively. Classification of deferred tax assets and liabilities as current or non-current is determined by the financial statement classification of the asset or liability to which the temporary difference is related. If a temporary difference is not related to an asset or liability for financial reporting, it is classified according to the expected reversal date of the temporary difference.

Valuation allowances are established to reduce deferred tax assets if it is more likely than not that some or all of the deferred tax asset will not be realized. BNSF has not recorded a valuation allowance, as it believes that the deferred tax assets will be fully realized in the future.

The federal income tax returns of BNSF's predecessor companies, Burlington Northern, Inc. and Santa Fe Pacific Corporation are closed through 1994 and the business combination date of September 1995, respectively. BNSF is currently under Internal Revenue Service examination for years 1995 through 1999. In addition, BNSF and its subsidiaries have various state income tax returns in the process of examination, administrative appeal or litigation. The Company believes that adequate provision has been made for any adjustments that might be assessed for open years through 2003.

*CRITICAL ESTIMATE*

BNSF makes estimates of the potential liability based on its assessment of all potential tax exposures. In addition, the Company uses factors such as applicable law, current information, and past experience with similar issues to make these judgements.

Deferred tax assets and liabilities are measured using the tax rates that apply to taxable income in the period in which the deferred tax asset or liability is expected to be realized or paid. Changes in the Company's estimates regarding the statutory tax rate to be applied to the reversal of deferred tax assets and liabilities could materially affect the effective tax rate.

The Company has not materially changed its methodology for calculating income tax expense for the years presented and there are currently no known trends, demands, commitments, events or uncertainties that are reasonably likely to occur and materially affect the methodology or assumptions described above.

***PENSIONS AND OTHER POST-EMPLOYMENT BENEFITS***

BNSF sponsors a noncontributory qualified BNSF Retirement Plan, which covers substantially all non-union employees and a nonqualified BNSF Supplemental Retirement Plan, which covers certain officers and other employees. The benefits under these plans are based on years of credited service and the highest five-year average compensation levels. BNSF's funding policy is to contribute annually not less than the regulatory minimum and not more than the maximum amount deductible for income tax purposes with respect to the funded plan.

Certain salaried employees of BNSF that have met age and years of service requirements are eligible for medical benefits and life insurance coverage during retirement. The retiree medical plan is contributory and provides benefits to retirees, their covered dependents and beneficiaries. Retiree contributions are adjusted annually. The plan also contains fixed deductibles, coinsurance and out-of-pocket limitations. The basic life insurance plan is noncontributory and covers retirees only. Optional life insurance coverage is available for some retirees; however, the retiree is responsible for the full cost. BNSF's policy is to fund benefits payable under the medical and life insurance plans as they come due. Employees beginning salaried employment with BNSF subsequent to September 22, 1995, are not eligible for medical benefits during retirement.

The Company expects to record a net pension cost of approximately $15 million in 2004 as opposed to net pension benefits of $3 million and $7 million recorded in 2003 and 2002, respectively. In addition, the Company recorded a net pension cost of $10 million in 2001. At December 31, 2003 and 2002, the Company reported pension benefit obligations of $1,678 million and $1,611 million, respectively. The Company recorded a net other post-employment benefits (OPEB) cost of $32 million, $30 million and $25 million for the years ended December 31, 2003, 2002 and 2001, respectively. At December 31, 2003 and 2002 the Company reported OPEB obligations of $366 million and $363 million, respectively.

*CRITICAL ESTIMATE*

Annual pension and OPEB expenses are calculated by third party actuaries using standard actuarial methodologies. The actuaries assist the Company in making estimates based on historical information, current information and estimates about future events and circumstances. Significant assumptions used in the valuation of pension and OPEB include expected return on plan assets, discount rate, rate of increase in compensation levels and the health care cost trend rate. These assumptions are critical to the Company's estimate of expenses and liabilities, and changes to these estimates could have a material impact on the Company's results of operations and financial position.

The discount rate is a component estimate of both pensions and OPEB. The expected return on plan assets is a factor that only influences the funded pension plans. Health care cost trend rates only affect OPEB costs. BNSF uses a discount rate that reflects the current bond market and an expected rate of return on assets that reflects the expected long-term rates of return on plan assets.

From time to time, the Company will change pension and OPEB assumptions to better approximate current conditions and expected future experience. General softness in the economy and the decline in the investment markets during 2001 and 2000 prompted BNSF to decrease the rate of return on plan assets used in the net cost calculation from 9.5 percent in 2001 to 8.5 percent for 2002 and 2003. The discount rate has also been changed within the past three years. Discount rates of 6.5 percent, 7.0 percent and 7.0 percent were used to calculate net benefit costs for years ending December 31, 2003, 2002 and 2001, respectively. The associated discount rate was lowered to 6.0 percent for the 2004 calculation of net benefit cost. Unforeseen changes in the investment markets or other external factors could prompt changes in these estimates in future years. A fifty basis point change in the rate of return on plan assets assumption would effect future annual pension expense by approximately $7 million.

***DEPRECIATION***

Due to the capital-intensive nature of the railroad industry, depreciation expense is a significant component of the Company's operating expense. The Company recorded depreciation and amortization expense of $910 million, $931 million and $909 million for the years ended December 31, 2003, 2002 and 2001, respectively. At December 31, 2003 and 2002, the Company had Property and equipment, net balances of $25,068 million and $24,022 million, which include $6,006 million and $4,883 million, respectively, of accumulated depreciation.

*CRITICAL ESTIMATE*

The Company uses the group method of depreciation under which a single depreciation rate is applied to the gross investment in a particular class of property, despite differences in the service life or salvage value of individual property units within the same class. As required by the Federal Surface Transportation Board (STB), the Company conducts studies of depreciation rates and the required accumulated depreciation balance at least every three years for equipment property and at least every six years for track structure and other roadway property. The Company uses external consultants to conduct these studies. The consultants rely on statistical analysis, historical retirement data, industry knowledge and discussions with management to assess the impact of new technologies and maintenance practices. Changes in the estimated service lives of the assets and their related depreciation rates are implemented prospectively and the difference between the calculated accumulated depreciation and the amount recorded is amortized over the average service lives of the assets.

A study conducted in 2003 resulted in the Company adopting new depreciation rates for hardware and software, other road assets and locomotives that resulted in a net decrease in annual depreciation expense of $9 million.

**ACCOUNTING PRONOUNCEMENTS**

See Note 16 to the Consolidated Financial Statements for information about recent accounting pronouncements.

## FORWARD-LOOKING INFORMATION

To the extent that statements made by the Company relate to the Company's future economic performance or business outlook, projections or expectations of financial or operational results, or refer to matters that are not historical facts, such statements are "forward-looking" statements within the meaning of the federal securities laws. Forward-looking statements involve a number of risks and uncertainties, and actual results may differ materially. Important factors that could cause actual results to differ materially include, but are not limited to, *economic and industry conditions*: material adverse changes in economic or industry conditions, both in the United States and globally, customer demand, effects of adverse economic conditions affecting shippers, adverse economic conditions in the industries and geographic areas that produce and consume freight, competition and consolidation within the transportation industry, the extent to which BNSF is successful in gaining new long-term relationships with customers or retaining existing ones, changes in fuel prices, changes in the securities and capital markets, and changes in labor costs and labor difficulties, including stoppages affecting either BNSF's operations or our customers' abilities to deliver goods to BNSF for shipment; *legal and regulatory factors*: developments and changes in laws and regulations and the ultimate outcome of shipper and rate claims subject to adjudication, environmental investigations or proceedings and other types of claims and litigation; and *operating factors*: technical difficulties, changes in operating conditions and costs, competition, and commodity concentrations, the Company's ability to achieve its operational and financial initiatives and to contain costs, as well as natural events such as severe weather, floods and earthquakes or other disruptions of BNSF Railway's operating systems, structures, or equipment.

The Company cautions against placing undue reliance on forward-looking statements, which reflect its current beliefs and are based on information currently available to it as of the date a forward-looking statement is made. The Company undertakes no obligation to revise forward-looking statements to reflect future events, changes in circumstances, or changes in beliefs. In the event the Company does update any forward-looking statement, no inference should be made that the Company will make additional updates with respect to that statement, related matters, or any other forward-looking statements. Any corrections or revisions may appear in the Company's public filings with the Securities and Exchange Commission, which are accessible at www.sec.gov and on the Company's website at www.bnsf.com, and which investors are advised to consult.

## ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

In the ordinary course of business, BNSF utilizes various financial instruments that inherently have some degree of market risk. The information presented in the Management's Discussion and Analysis of Financial Condition and Results of Operations section and Notes 3 and 9 of the Consolidated Financial Statements describe significant aspects of BNSF's financial instrument programs which have a material market risk.

### COMMODITY PRICE SENSITIVITY

BNSF has a program to hedge against fluctuations in the price of its diesel fuel purchases. Existing hedge transactions as of December 31, 2003, are based on the front month settlement prices of NYMEX #2 heating oil (HO), West Texas Intermediate crude oil (WTI), or the HO refining spread (HO-WTI) which is defined as the difference between HO and WTI. A WTI hedge combined with a HO-WTI hedge will result in the equivalent of a HO hedge. For swaps, BNSF either pays or receives the difference between the hedge price and the actual average price of the hedge commodity during a specified determination period for a specified number of gallons. For costless collars, if the average hedge commodity price for a specified determination period is greater than the cap price, BNSF receives the difference for a specified number of gallons. If the average commodity price is less than the floor price, BNSF pays the difference for a specified number of gallons. If the commodity price is between the floor price and the cap price, BNSF neither makes nor receives a payment. Hedge transactions are generally settled with the counterparty in cash. Based on historical information, BNSF believes there is a significant correlation between the market prices for diesel fuel, WTI, and HO. Further information on fuel hedges is incorporated by reference from Note 3 to the Consolidated Financial Statements.

At December 31, 2003, BNSF maintained fuel inventories for use in normal operations which were not material to BNSF's overall financial position and, therefore, represent no significant market exposure.

## INTEREST RATE SENSITIVITY

From time to time, BNSF enters into various interest rate hedging transactions for purposes of managing exposure to fluctuations in interest rates and establishing rates in anticipation of future debt issuances as well as to convert a portion of its fixed-rate long-term debt to floating-rate debt. These interest rate hedges are accounted for either as cash flow or fair value hedges. BNSF's measurement of fair value of these hedges are based on estimates of the mid-market values for the transactions provided by the counterparties to these agreements. Further information on interest rate hedges is incorporated by reference from Note 3 to the Consolidated Financial Statements.

Information on the Company's debt which may be sensitive to interest rate fluctuations is incorporated by reference from Note 9 to the Consolidated Financial Statements.

## ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

The Consolidated Financial Statements of BNSF and subsidiary companies, together with the report of independent auditors, are included as part of this filing.

The following documents are filed as a part of this report:


| CONSOLIDATED FINANCIAL STATEMENTS | PAGE |
|---|---|
| Report of Independent Auditors | 29 |
| Consolidated Statements of Income for the three years ended December 31, 2003 | 30 |
| Consolidated Balance Sheets as of December 31, 2003 and 2002 | 31 |
| Consolidated Statements of Cash Flows for the three years ended December 31, 2003 | 32 |
| Consolidated Statements of Changes in Stockholders' Equity for the three years ended December 31, 2003 | 33 |
| Notes to Consolidated Financial Statements | 34-59 |

# Report of Independent Auditors

TO THE SHAREHOLDERS AND BOARD OF DIRECTORS OF
BURLINGTON NORTHERN SANTA FE CORPORATION AND SUBSIDIARIES

In our opinion, the consolidated financial statements listed in the accompanying index present fairly, in all material respects, the financial position of Burlington Northern Santa Fe Corporation and subsidiary companies at December 31, 2003 and 2002, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2003 in conformity with accounting principles generally accepted in the United States of America. These financial statements are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

As discussed in Note 2 to the consolidated financial statements, effective January 1, 2003, the Company changed the manner in which it accounts for asset retirement costs that are not legal obligations.

PricewaterhouseCoopers LLP

FORT WORTH, TEXAS
FEBRUARY 11, 2004

## CONSOLIDATED STATEMENTS OF INCOME

*(Dollars in millions, except per share data)*

| YEAR ENDED DECEMBER 31, | **2003** | 2002 | 2001 |
|---|---|---|---|
| Revenues | **$9,413** | $8,979 | $9,208 |
| Operating expenses: | | | |
| Compensation and benefits | **2,964** | 2,894 | 2,861 |
| Purchased services | **1,253** | 1,146 | 1,090 |
| Depreciation and amortization | **910** | 931 | 909 |
| Equipment rents | **705** | 698 | 736 |
| Fuel | **1,073** | 833 | 973 |
| Materials and other | **843** | 821 | 889 |
| Total operating expenses | **7,748** | 7,323 | 7,458 |
| Operating income | **1,665** | 1,656 | 1,750 |
| Interest expense | **420** | 428 | 463 |
| Other expense, net | **14** | 12 | 114 |
| Income before income taxes and cumulative effect of accounting change | **1,231** | 1,216 | 1,173 |
| Income tax expense | **454** | 456 | 442 |
| Income before cumulative effect of accounting change | **$ 777** | $ 760 | $ 731 |
| Cumulative effect of accounting change, net of tax | **39** | - | - |
| Net income | **$ 816** | $ 760 | $ 731 |
| Earnings per share: | | | |
| Basic earnings per share (before cumulative effect of accounting change) | **$ 2.10** | $ 2.01 | $ 1.89 |
| Basic earnings per share (after cumulative effect of accounting change) | **$ 2.21** | $ 2.01 | $ 1.89 |
| Diluted earnings per share (before cumulative effect of accounting change) | **$ 2.09** | $ 2.00 | $ 1.87 |
| Diluted earnings per share (after cumulative effect of accounting change) | **$ 2.19** | $ 2.00 | $ 1.87 |
| Average shares (in millions): | | | |
| Basic | **369.1** | 378.0 | 387.3 |
| Dilutive effect of stock awards | **3.2** | 2.8 | 3.4 |
| Diluted | **372.3** | 380.8 | 390.7 |

*See accompanying Notes to Consolidated Financial Statements.*

## CONSOLIDATED BALANCE SHEETS

*(Dollars in millions, shares in thousands)*

| DECEMBER 31, | 2003 | 2002 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | **$ 18** | $ 28 |
| Accounts receivable, net | **129** | 141 |
| Materials and supplies | **266** | 226 |
| Current portion of deferred income taxes | **292** | 314 |
| Other current assets | **157** | 82 |
| Total current assets | **862** | 791 |
| Property and equipment, net | **25,068** | 24,022 |
| Other assets | **1,009** | 954 |
| Total assets | **$ 26,939** | $ 25,767 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable and other current liabilities | **$ 2,102** | $ 1,918 |
| Long-term debt due within one year | **244** | 173 |
| Total current liabilities | **2,346** | 2,091 |
| Long-term debt and commercial paper | **6,440** | 6,641 |
| Deferred income taxes | **7,481** | 6,975 |
| Casualty and environmental liabilities | **462** | 444 |
| Minimum pension liability | **359** | 368 |
| Employee merger and separation costs | **144** | 170 |
| Other liabilities | **1,212** | 1,146 |
| Total liabilities | **18,444** | 17,835 |
| Commitments and contingencies (see Notes 3, 9 and 10) | | |
| Stockholders' equity: | | |
| Common stock, $0.01 par value 600,000 shares authorized; 500,685 shares and 496,683 shares issued, respectively | **5** | 5 |
| Additional paid-in-capital | **5,766** | 5,664 |
| Retained earnings | **6,240** | 5,625 |
| Treasury stock, at cost, 129,225 shares and 120,905 shares, respectively | **(3,340)** | (3,114) |
| Unearned compensation | **(36)** | (39) |
| Accumulated other comprehensive loss | **(140)** | (209) |
| Total stockholders' equity | **8,495** | 7,932 |
| Total liabilities and stockholders' equity | **$ 26,939** | $ 25,767 |

*See accompanying Notes to Consolidated Financial Statements.*

## CONSOLIDATED STATEMENTS OF CASH FLOWS

*(Dollars in millions)*

| YEAR ENDED DECEMBER 31, | 2003 | 2002 | 2001 |
|---|---|---|---|
| **OPERATING ACTIVITIES** | | | |
| Net income | **$ 816** | $ 760 | $ 731 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation and amortization | **910** | 931 | 909 |
| Deferred income taxes | **460** | 432 | 302 |
| Employee merger and separation costs paid | **(43)** | (55) | (55) |
| Cumulative effect of accounting change, net of tax | **(39)** | - | - |
| Other, net | **48** | (9) | 91 |
| Changes in current assets and liabilities: | | | |
| Accounts receivable, net | **12** | 31 | 142 |
| Materials and supplies | **(39)** | (25) | 29 |
| Other current assets | **5** | (28) | 103 |
| Accounts payable and other current liabilities | **155** | 69 | (55) |
| Net cash provided by operating activities | **2,285** | 2,106 | 2,197 |
| **INVESTING ACTIVITIES** | | | |
| Capital expenditures | **(1,726)** | (1,358) | (1,459) |
| Other, net | **(80)** | (159) | (105) |
| Net cash used for investing activities | **(1,806)** | (1,517) | (1,564) |
| **FINANCING ACTIVITIES** | | | |
| Net decrease in commercial paper and bank borrowings | **(77)** | (96) | (226) |
| Proceeds from issuance of long-term debt | **265** | 300 | 400 |
| Payments on long-term debt | **(339)** | (294) | (380) |
| Dividends paid | **(191)** | (183) | (190) |
| Proceeds from stock options exercised | **68** | 40 | 113 |
| Purchase of BNSF common stock | **(217)** | (353) | (317) |
| Other, net | **2** | (1) | (18) |
| Net cash used for financing activities | **(489)** | (587) | (618) |
| (Decrease) increase in cash and cash equivalents | **(10)** | 2 | 15 |
| Cash and cash equivalents: | | | |
| Beginning of year | **28** | 26 | 11 |
| End of year | **$ 18** | $ 28 | $ 26 |
| **SUPPLEMENTAL CASH FLOW INFORMATION** | | | |
| Interest paid, net of amounts capitalized | **$ 458** | $ 463 | $ 494 |
| Income taxes paid, net of refunds | **$ 26** | $ 55 | $ 102 |
| Non-cash facilities financing | **$ -** | $ 138 | $ - |

*See accompanying Notes to Consolidated Financial Statements.*

## CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY

*(Shares in thousands, dollars in millions, except per share data)*

| | COMMON SHARES | TREASURY SHARES | COMMON STOCK AND PAID-IN CAPITAL | RETAINED EARNINGS | TREASURY STOCK | UNEARNED COMPEN-SATION | ACCUMULATED OTHER COM-PREHENSIVE INCOME (LOSS) | TOTAL STOCK-HOLDERS' EQUITY |
|---|---|---|---|---|---|---|---|---|
| Balance at December 31, 2000 | 486,637 | (95,045) | $5,433 | $4,505 | $(2,413) | $(35) | $(10) | $7,480 |
| Comprehensive income: | | | | | | | | |
| Net income | | | - | 731 | - | - | - | 731 |
| Minimum pension liability adjustment, net of tax expense of $1 | | | - | - | - | - | 2 | 2 |
| Cumulative effect of adoption of SFAS No. 133, net of tax expense of $36 | | | - | - | - | - | 58 | 58 |
| Other, net of tax benefit of $36 | | | - | - | - | - | (59) | (59) |
| Total comprehensive income | | | - | 731 | - | - | 1 | 732 |
| Common stock dividends, $0.48 per share | - | - | - | (188) | - | - | - | (188) |
| Adjustments associated with unearned compensation, restricted stock | 899 | (86) | 15 | - | - | 1 | - | 16 |
| Exercise of stock options and related tax benefit of $17 | 5,282 | (478) | 141 | - | (15) | - | - | 126 |
| Purchase of BNSF common stock | - | (11,432) | - | - | (317) | - | - | (317) |
| Balance at December 31, 2001 | 492,818 | (107,041) | $5,589 | $5,048 | $(2,745) | $(34) | $(9) | $7,849 |
| Comprehensive income: | | | | | | | | |
| Net income | | | - | 760 | - | - | - | 760 |
| Minimum pension liability adjustment, net of tax benefit of $136 | | | - | - | - | - | (220) | (220) |
| Other, net of tax expense of $12 | | | - | - | - | - | 20 | 20 |
| Total comprehensive income | | | - | 760 | - | - | (200) | 560 |
| Common stock dividends, $0.48 per share | - | - | - | (183) | - | - | - | (183) |
| Adjustments associated with unearned compensation, restricted stock | 1,527 | (634) | 25 | - | - | (5) | - | 20 |
| Exercise of stock options and related tax benefit of $6 | 2,338 | (555) | 55 | - | (16) | - | - | 39 |
| Purchase of BNSF common stock | - | (12,675) | - | - | (353) | - | - | (353) |
| Balance at December 31, 2002 | 496,683 | (120,905) | $5,669 | $5,625 | $(3,114) | $(39) | $(209) | $7,932 |
| Comprehensive income: | | | | | | | | |
| Net income | | | - | 816 | - | - | - | 816 |
| Minimum pension liability adjustment, net of tax expense of $3 | | | - | - | - | - | 6 | 6 |
| Other, net of tax expense of $38 | | | - | - | - | - | 63 | 63 |
| Total comprehensive income | | | - | 816 | - | - | 69 | 885 |
| Common stock dividends, $0.54 per share | - | - | - | (201) | - | - | - | (201) |
| Adjustments associated with unearned compensation, restricted stock | 781 | (54) | 22 | - | - | 3 | - | 25 |
| Exercise of stock options and related tax benefit of $7 | 3,221 | (316) | 80 | - | (9) | - | - | 71 |
| Purchase of BNSF common stock | - | (7,950) | - | - | (217) | - | - | (217) |
| Balance at December 31, 2003 | 500,685 | (129,225) | $5,771 | $6,240 | $(3,340) | $(36) | $(140) | $8,495 |

*See accompanying Notes to Consolidated Financial Statements*

# Notes to Consolidated Financial Statements

## 1. THE COMPANY

Burlington Northern Santa Fe Corporation and its majority-owned subsidiaries, (collectively, BNSF or the Company), is engaged primarily in management of its investment in its principal and wholly-owned subsidiary, The Burlington Northern and Santa Fe Railway Company (BNSF Railway), which operates one of the largest railroad networks in North America with approximately 32,500 route miles covering 28 states and two Canadian provinces. Through one operating transportation services segment, BNSF Railway transports a wide range of products and commodities including the transportation of Consumer Products, Industrial Products, Coal and Agricultural Products, derived from manufacturing, agricultural and natural resource industries, which constituted 39 percent, 23 percent, 22 percent and 16 percent, respectively, of total freight revenues for the year ended December 31, 2003.

## 2. SIGNIFICANT ACCOUNTING POLICIES

### PRINCIPLES OF CONSOLIDATION

The Consolidated Financial Statements include the accounts of BNSF, including its principal subsidiary BNSF Railway. All significant intercompany accounts and transactions have been eliminated.

### CUMULATIVE EFFECT OF ACCOUNTING CHANGE, NET OF TAX

The Company adopted Statement of Financial Accounting Standards (SFAS) No. 143, *Accounting for Asset Retirement Obligations*, on January 1, 2003. This statement requires BNSF to recognize a liability for legally obligated asset retirement costs associated with tangible long-lived assets. SFAS No. 143 also disallows the accrual of retirement costs that are not legal obligations. As a result, BNSF and other railroads were required to change their accounting policies for certain track structure assets to exclude removal costs as a component of depreciation expense where the inclusion of such costs would result in accumulated depreciation balances exceeding the historical basis of the assets. This change results in lower depreciation and amortization expense primarily offset by higher compensation and benefits, purchased services and materials and other expenses in the period in which removal costs are incurred.

The following table presents the pro forma net income and earnings per share if SFAS No. 143 would have been applied retroactively (in millions, except per share data):

| YEAR ENDED DECEMBER 31, | **2003** | 2002 | 2001 |
|---|---|---|---|
| Net income as reported | **$816** | $760 | $731 |
| Pro forma net income | **$777** | $749 | $713 |
| Earnings per share | | | |
| Basic – as reported | **$2.21** | $2.01 | $1.89 |
| Basic – pro forma | **$2.10** | $1.98 | $1.84 |
| Diluted – as reported | **$2.19** | $2.00 | $1.87 |
| Diluted – pro forma | **$2.09** | $1.97 | $1.82 |

### USE OF ESTIMATES

The preparation of financial statements in accordance with generally accepted accounting principles (GAAP) requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the periods presented. Actual results could differ from those estimates.

### REVENUE RECOGNITION

Transportation revenues are recognized based upon the proportion of service provided as of the balance sheet date. Revenues from ancillary services are recognized when performed.

### CASH AND CASH EQUIVALENTS

All short-term investments with original maturities of less than 90 days are considered cash equivalents. Cash equivalents are stated at cost, which approximates market value because of the short maturity of these instruments.

### MATERIALS AND SUPPLIES

Materials and supplies, which consist mainly of rail, ties and other items for construction and maintenance of property and equipment, as well as diesel fuel, are valued at the lower of average cost or market.

### PROPERTY AND EQUIPMENT, NET

Property and equipment are depreciated and amortized on a straight-line basis over their estimated useful lives. The Company uses the group method of depreciation in which a single depreciation rate is applied to the gross investment in a particular class of property, despite differences in the service life or salvage value of individual property units within the same class. Upon normal sale or retirement of depreciable railroad property, cost less net salvage value is charged to accumulated depreciation and no gain or loss is recognized. Significant premature retirements and the disposal of land and non-rail property are recorded as gains or losses at the time of their occurrence.

The Company self-constructs portions of its track structure and rebuilds certain classes of rolling stock. In addition to direct labor and material, certain indirect costs are capitalized. Expenditures which significantly increase asset values or extend useful lives are capitalized. Repair and maintenance expenditures are charged to operating expense when the work is performed. Property and equipment are stated at cost.

The Company incurs certain direct labor, contract service and other costs associated with the development and installation of internal-use computer software. Costs for newly developed software or significant enhancements to existing software are typically capitalized. Research, preliminary project, operations, maintenance and training costs are charged to operating expense when the work is performed.

Long-lived assets are reviewed for impairment when events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. If impairment indicators are present and the estimated future undiscounted cash flows are less than the carrying value of the long-lived assets, the carrying value is reduced to the estimated fair value as measured by the discounted cash flows.

### ENVIRONMENTAL LIABILITIES

Liabilities for environmental cleanup costs are initially recorded when BNSF's liability for environmental cleanup is both probable and a reasonable estimate of associated costs can be made. Adjustments to initial estimates are recorded as necessary based upon additional information developed in subsequent periods. Estimates for these liabilities are undiscounted.

### PERSONAL INJURY CLAIMS

Personal injury liability and ultimate expense projections are estimated using standard actuarial methodologies. These actuarial method procedures include unasserted claims, except for certain occupational illnesses, which, due to their unpredictability, are accrued on an as reported basis. BNSF's liabilities for personal injury claims are undiscounted.

### INCOME TAXES

Deferred tax assets and liabilities are measured using the tax rates that apply to taxable income in the period in which the deferred tax asset or liability is expected to be realized or paid. Valuation allowances are established to reduce deferred tax assets if it is more likely than not that some or all of the deferred tax asset will not be realized.

STOCK-BASED COMPENSATION

At December 31, 2003, the Company had stock-based employee compensation plans. The Company applies Accounting Principles Board (APB) Opinion 25, *Accounting for Stock Issued to Employees*, and related interpretations in accounting for its stock based plans. In accordance with APB Opinion 25, the Company records the intrinsic value of stock based compensation as expense. Accordingly, no compensation expense has been recognized for its fixed stock option plans as the exercise price equals the stock price on the date of grant. Stock-based compensation expense related to restricted stock has been recognized as compensation expense. The table below illustrates the effect on net income and earnings per share if the Company had applied the fair value recognition provisions of SFAS No. 123, *Accounting for Stock-Based Compensation*, to stock-based employee compensation (in millions, except per share data):

| YEAR ENDED DECEMBER 31, | **2003** | 2002 | 2001 |
|---|---|---|---|
| Net income, as reported | **$816** | $760 | $731 |
| Stock-based employee compensation expense included in reported net income, net of related tax effects | **11** | 10 | 8 |
| Total stock-based compensation expense determined under fair value method for all awards, net of related tax effects | **(36)** | (32) | (23) |
| Pro forma net income | **$791** | $738 | $716 |
| Earnings per share: | | | |
| Basic – as reported | **$2.21** | $2.01 | $1.89 |
| Basic – pro forma | **$2.14** | $1.95 | $1.85 |
| Diluted – as reported | **$2.19** | $2.00 | $1.87 |
| Diluted – pro forma | **$2.13** | $1.94 | $1.83 |

The pro forma amounts were estimated using the Black-Scholes option-pricing model with the following assumptions:

| YEAR ENDED DECEMBER 31, | **2003** | 2002 | 2001 |
|---|---|---|---|
| Weighted average expected life (years) | **4.0** | 4.0 | 4.0 |
| Weighted average expected volatility | **35.0%** | 35.0% | 35.0% |
| Weighted average dividend per share | **$0.49** | $0.48 | $0.48 |
| Weighted average risk free interest rate | **2.17%** | 3.89% | 4.21% |
| Weighted average fair value of options granted per share | **$7.20** | $7.84 | $8.44 |

PENSION AND OTHER POST-EMPLOYMENT BENEFITS

Annual pension and other post-employment benefits (OPEB) expenses are calculated by third party actuaries using standard actuarial methodologies. The actuaries assist the Company in making estimates based on historical information, current information and estimates about future events and circumstances. Significant assumptions used in the valuation of pension and OPEB include expected return on plan assets, discount rate, rate of increase in compensation levels and the health care cost trend rate.

RECLASSIFICATIONS

Certain comparative prior year amounts in the Consolidated Financial Statements and accompanying notes have been reclassified to conform to the current year presentation. These reclassifications had no effect on previously reported operating income and net income.

**3. HEDGING ACTIVITIES**

The Company uses derivatives to hedge against increases in diesel fuel prices and interest rates as well as to convert a portion of its fixed-rate long-term debt to floating-rate debt. The Company formally documents the relationship between the hedging instrument and the hedged item, as well as the risk management objective and strategy for the use of the hedging instrument. This documentation includes linking the derivatives that are designated as fair value or cash flow hedges to specific assets or liabilities on the balance sheet, commitments or forecasted transactions. The Company assesses at the time a derivative contract is entered into, and at least quarterly, whether the derivative item is effective in offsetting the changes in fair value or cash flows. Any change in fair value resulting from ineffectiveness, as defined by SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities*, as amended, is recognized in current period earnings. For derivative instruments that are designated and qualify as cash flow hedges, the effective portion of the gain or loss on the derivative instrument is recorded in Accumulated Other Comprehensive Income (AOCI) as a separate component of stockholders' equity and reclassified into earnings in the period during which the hedge transaction affects earnings.

BNSF monitors its hedging positions and credit ratings of its counterparties and does not anticipate losses due to counterparty nonperformance.

FUEL

Fuel costs represented 14, 11 and 13 percent of total operating expenses during 2003, 2002 and 2001, respectively. Due to the significance of diesel fuel expenses to the operations of BNSF and the historical volatility of fuel prices, the Company maintains a program to hedge against fluctuations in the price of its diesel fuel purchases. The fuel-hedging program includes the use of derivatives that are accounted for as cash flow hedges. The intent of the program is to protect the Company's operating margins and overall profitability from adverse fuel price changes by entering into fuel-hedge instruments based on management's evaluation of current and expected diesel fuel price trends. However, to the extent the Company hedges portions of its fuel purchases, it may not realize the impact of decreases in fuel prices. Conversely, to the extent the Company does not hedge portions of its fuel purchases, it may be adversely affected by increases in fuel prices. Based on fuel consumption during 2003 and excluding the impact of the hedging program, each one-cent increase in the price of fuel would result in approximately $12 million of additional fuel expense on an annual basis.

*TOTAL FUEL HEDGING PROGRAM*

As of December 31, 2003, BNSF's total fuel hedging program covered approximately 67 percent, 46 percent and 14 percent of estimated fuel purchases for 2004, 2005 and 2006, respectively. Hedge positions are closely monitored to ensure that they will not exceed actual fuel requirements in any period.

The amounts recorded in the Consolidated Statements of Income for fuel hedge transactions were as follows (in millions):

| YEAR ENDED DECEMBER 31, | **2003** | 2002 | 2001 |
|---|---|---|---|
| Hedge benefit | **$65** | $50 | $48 |
| Ineffective portion of unexpired hedges | **3** | - | - |
| Tax effect | **26** | 19 | 18 |
| Hedge benefit, net of tax | **$42** | $31 | $30 |

The amounts recorded in the Consolidated Balance Sheets for fuel hedge transactions were as follows (in millions):

| DECEMBER 31, | **2003** | 2002 |
|---|---|---|
| Fuel hedging asset | **$145** | $31 |
| Ineffective portion of unexpired hedges | **3** | - |
| Tax effect | **55** | 12 |
| Amount included in AOCI, net of tax | **$87** | $19 |
| Settled fuel hedging contracts receivable | **$21** | $29 |

Amounts recorded in AOCI represent the fair value less the ineffective portion of unexpired hedges.

BNSF measures the fair value of hedges from data provided by various external counterparties. To value a swap, the Company uses the forward commodity price for the period hedged. The fair values of costless collars are calculated and provided by the corresponding counterparties.

*NYMEX #2 HEATING OIL HEDGES*

As of December 31, 2003, BNSF had entered into fuel swap and costless collar agreements utilizing NYMEX #2 heating oil (HO). The hedge prices do not include taxes, transportation costs, certain other fuel handling costs and any differences which may occur between the prices of HO and the purchase price of BNSF's diesel fuel. The sum of all such costs typically ranges between 7 and 17 cents per gallon.

During 2003, the Company entered into fuel swap agreements utilizing HO to hedge the equivalent of 233 million gallons of fuel at an average price of approximately $0.74 per gallon, and costless collar agreements utilizing HO to hedge the equivalent of approximately 284 million gallons of fuel with an average cap price of $0.87 per gallon and an average floor price of $0.76 per gallon. In addition, the Company converted approximately 44 million gallons of West Texas Intermediate crude oil (WTI) collars into HO collars. These HO collars had an average cap price of $0.74 per gallon and an average floor price of $0.67 per gallon. The Company also converted approximately 413 million gallons of WTI collars and 50 million gallons of HO collars into HO swaps. These HO swaps had an average price of $0.70 per gallon. The Company also terminated 25 million gallons of HO collars for a gain of less than $1 million. As of December 31, 2003, there are no HO collars outstanding. The following table provides fuel hedge data based upon the quarter being hedged for all HO fuel hedges outstanding at December 31, 2003.

| | QUARTER ENDING | | | | |
|---|---|---|---|---|---|
| **2004** | MARCH 31, | JUNE 30, | SEPTEMBER 30, | DECEMBER 31, | ANNUAL |
| **HO SWAPS** | | | | | |
| Gallons hedged (in millions) | 226.80 | 179.55 | 151.20 | 138.60 | 696.15 |
| Average swap price (per gallon) | $0.75 | $0.69 | $0.69 | $0.70 | $0.71 |
| Fair value (in millions) | $33 | $19 | $14 | $13 | $79 |

*WEST TEXAS INTERMEDIATE CRUDE OIL HEDGES*

In addition, BNSF had entered into fuel swap and costless collar agreements utilizing WTI. The hedge prices do not include taxes, transportation costs, certain other fuel handling costs, and any differences which may occur between the prices of WTI and the purchase price of BNSF's diesel fuel, including refining costs. The sum of all such costs typically ranges between 12 and 30 cents per gallon.

During 2003, the Company entered into fuel swap agreements utilizing WTI to hedge the equivalent of approximately 265 million gallons of fuel at an average price of approximately $24.63 per barrel. Also, during 2003, the Company entered into costless collar agreements utilizing WTI to hedge the equivalent of approximately 684 million gallons of fuel with an average cap price of $27.10 per barrel and an average floor price of $22.49 per barrel. The following tables provide fuel hedge data based upon the quarter being hedged for all WTI fuel hedges outstanding at December 31, 2003.

| 2004 | QUARTER ENDING MARCH 31, | JUNE 30, | SEPTEMBER 30, | DECEMBER 31, | ANNUAL |
|---|---|---|---|---|---|
| **WTI SWAPS** | | | | | |
| Barrels hedged (in thousands) | 525 | 525 | 525 | 675 | 2,250 |
| Equivalent gallons hedged (in millions) | 22.05 | 22.05 | 22.05 | 28.35 | 94.50 |
| Average swap price (per barrel) | $20.68 | $20.64 | $20.61 | $21.34 | $20.85 |
| Fair value (in millions) | $6 | $5 | $5 | $5 | $21 |
| **WTI COLLARS** | | | | | |
| Barrels hedged (in thousands) | - | 300 | 300 | 375 | 975 |
| Equivalent gallons hedged (in millions) | - | 12.60 | 12.60 | 15.75 | 40.95 |
| Average cap price (per barrel) | $- | $29.40 | $28.60 | $27.76 | $28.52 |
| Average floor price (per barrel) | $- | $25.00 | $24.20 | $23.30 | $24.10 |
| Fair value (in millions) | $- | $1 | $- | $1 | $2 |

| 2005 | QUARTER ENDING MARCH 31, | JUNE 30, | SEPTEMBER 30, | DECEMBER 31, | ANNUAL |
|---|---|---|---|---|---|
| **WTI SWAPS** | | | | | |
| Barrels hedged (in thousands) | 600 | 675 | 1,125 | 1,350 | 3,750 |
| Equivalent gallons hedged (in millions) | 25.20 | 28.35 | 47.25 | 56.70 | 157.50 |
| Average swap price (per barrel) | $24.26 | $24.67 | $24.55 | $24.54 | $24.52 |
| Fair value (in millions) | $2 | $2 | $3 | $3 | $10 |
| **WTI COLLARS** | | | | | |
| Barrels hedged (in thousands) | 3,600 | 3,000 | 2,025 | 1,275 | 9,900 |
| Equivalent gallons hedged (in millions) | 151.20 | 126.00 | 85.05 | 53.55 | 415.80 |
| Average cap price (per barrel) | $26.45 | $25.98 | $25.79 | $25.61 | $26.06 |
| Average floor price (per barrel) | $21.82 | $21.39 | $21.19 | $21.05 | $21.46 |
| Fair value (in millions) | $10 | $8 | $5 | $4 | $27 |

| 2006 | QUARTER ENDING MARCH 31, | JUNE 30, | SEPTEMBER 30, | DECEMBER 31, | ANNUAL |
|---|---|---|---|---|---|
| **WTI SWAPS** | | | | | |
| Barrels hedged (in thousands) | 1,350 | 675 | 375 | - | 2,400 |
| Equivalent gallons hedged (in millions) | 56.70 | 28.35 | 15.75 | - | 100.80 |
| Average swap price (per barrel) | $24.43 | $25.16 | $25.69 | $- | $24.83 |
| Fair value (in millions) | $3 | $1 | $- | $- | $4 |
| **WTI COLLARS** | | | | | |
| Barrels hedged (in thousands) | 825 | 750 | 300 | - | 1,875 |
| Equivalent gallons hedged (in millions) | 34.65 | 31.50 | 12.60 | - | 78.75 |
| Average cap price (per barrel) | $27.45 | $27.66 | $28.44 | $- | $27.69 |
| Average floor price (per barrel) | $22.85 | $23.05 | $23.70 | $- | $23.06 |
| Fair value (in millions) | $1 | $1 | $- | $- | $2 |

*NYMEX #2 HEATING OIL REFINING SPREAD HEDGES*

In addition, during 2003 the Company entered into fuel swap agreements utilizing the HO refining spread (HO-WTI) to hedge the equivalent of approximately 95 million gallons of fuel with an average swap price of $4.16 per barrel. HO-WTI is the difference in price between HO and WTI; therefore a HO-WTI swap in combination with a WTI swap is equivalent to a HO swap. The following tables provide fuel hedge data based upon the quarter being hedged for all HO-WTI fuel hedges outstanding at December 31, 2003.

| | QUARTER ENDING | | | | |
|---|---|---|---|---|---|
| **2004** | MARCH 31, | JUNE 30, | SEPTEMBER 30, | DECEMBER 31, | ANNUAL |
| **HO-WTI SWAPS** | | | | | |
| Barrels hedged (in thousands) | 525 | 525 | 525 | 675 | 2,250 |
| Equivalent gallons hedged (in millions) | 22.05 | 22.05 | 22.05 | 28.35 | 94.50 |
| Average swap price (per barrel) | $4.55 | $3.17 | $3.81 | $4.90 | $4.16 |
| Fair value (in millions) | $- | $- | $- | $- | $- |

*SUMMARIZED COMPARATIVE PRIOR YEAR INFORMATION*

The following table provides summarized comparative information for hedge transactions as of December 31, 2002.

| | DECEMBER 31, 2002 | | |
|---|---|---|---|
| YEAR ENDING | 2003 | 2004 | 2005 |
| **WTI SWAPS** | | | |
| Barrels hedged (in thousands) | 2,400 | 2,100 | - |
| Equivalent gallons hedged (in millions) | 100.80 | 88.20 | - |
| Weighted average swap price | $20.55 | $20.63 | $- |
| Fair value (in millions) | $11 | $6 | $- |
| **WTI COLLARS** | | | |
| Barrels hedged (in thousands) | 11,100 | 3,600 | 3,000 |
| Equivalent gallons hedged (in millions) | 466.20 | 151.20 | 126.00 |
| Weighted average cap price | $27.70 | $24.96 | $24.88 |
| Weighted average floor price | $23.35 | $20.48 | $20.38 |
| Fair value (in millions) | $13 | $1 | $- |

INTEREST RATE

From time to time, the Company enters into various interest rate hedging transactions for the purpose of managing exposure to fluctuations in interest rates and establishing rates in anticipation of future debt issuances as well as to convert a portion of its fixed-rate long-term debt to floating-rate debt. The Company uses interest rate swaps and treasury locks as part of its interest rate risk management strategy.

*TOTAL INTEREST RATE HEDGING PROGRAM*

All swap and treasury lock transactions outstanding with an interest rate component are reflected in the tables below.

| | DECEMBER 31, 2003 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | MATURITY DATE | | | | | | | |
| | 2004 | 2005 | 2006 | 2007 | 2008 | THEREAFTER | TOTAL | FAIR VALUE |
| **FAIR VALUE HEDGES** | | | | | | | | |
| Fixed to variable swaps (in millions) | $100 | $300 | -- | $300 | -- | $200 | $900 | $65 |
| Average fixed rate | 8.63% | 6.38% | -- | 7.88% | -- | 6.13% | 7.07% | |
| Average floating rate | 5.44% | 2.63% | -- | 3.75% | -- | 1.65% | 3.10% | |

BNSF's measurement of the fair value of interest rate swaps and treasury locks is based on estimates of the mid-market values for the transactions provided by the counterparties to these agreements.

*SUMMARIZED COMPARATIVE PRIOR YEAR INFORMATION*

| | DECEMBER 31, 2002 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | MATURITY DATE | | | | | | | |
| | 2003 | 2004 | 2005 | 2006 | 2007 | THEREAFTER | TOTAL | FAIR VALUE |
| **FAIR VALUE HEDGES** | | | | | | | | |
| Fixed to variable swaps (in millions) | -- | $100 | $300 | -- | $300 | $200 | $900 | $82 |
| Average fixed rate | -- | 8.63% | 6.38% | -- | 7.88% | 6.13% | 7.07% | |
| Average floating rate | -- | 5.98% | 2.87% | -- | 4.38% | 1.89% | 3.50% | |
| **CASH FLOW HEDGES** | | | | | | | | |
| Variable to fixed LIBOR swaps (in millions) | $100 | -- | -- | -- | -- | -- | $100 | $ – |
| Average fixed rate | 3.14% | -- | -- | -- | -- | -- | 3.14% | |
| Average floating rate | 1.43% | -- | -- | -- | -- | -- | 1.43% | |
| Treasury locks (in millions) | $150 | -- | -- | -- | -- | -- | $150 | $(3) |
| Average locked-in rate | 4.38% | -- | -- | -- | -- | -- | 4.38% | |

*FAIR VALUE INTEREST RATE HEDGES*

The Company enters into interest rate swaps to convert fixed-rate debt to floating-rate debt. These swaps are accounted for as fair value hedges under SFAS No. 133. These fair value hedges qualify for the short cut method of recognition; therefore, no portion of these swaps is treated as ineffective. As of December 31, 2003 and 2002, BNSF had entered into nine separate swaps on a notional amount of $900 million in which it pays an average floating rate, which fluctuates quarterly, based on LIBOR. The average floating rate to be paid by BNSF as of December 31, 2003, was 3.10 percent and the average fixed rate BNSF is to receive is 7.07 percent. These swaps will expire between 2004 and 2009.

The amounts recorded in the Consolidated Statements of Income for interest rate fair value hedge transactions were as follows (in millions):

| YEAR ENDED DECEMBER 31, | **2003** | 2002 | 2001 |
|---|---|---|---|
| Hedge benefit | **$35** | $26 | $- |
| Tax effect | **13** | 10 | - |
| Hedge benefit, net of tax | **$22** | $16 | $- |

The amounts recorded on the Consolidated Balance Sheets for interest rate fair value hedge transactions, which represent the fair value of unexpired hedges, were as follows (in millions):

| DECEMBER 31, | **2003** | 2002 |
|---|---|---|
| Short-term interest rate hedging asset | **$9** | $5 |
| Long-term interest rate hedging asset | **$56** | $77 |

*CASH FLOW INTEREST RATE HEDGES*

The Company occasionally uses interest rate swaps to fix the LIBOR component of commercial paper. These swaps are accounted for as cash flow hedges under SFAS No. 133 and qualify for the short cut method of recognition and, therefore, no portion of these swaps is treated as ineffective. As of December 31, 2003, BNSF had no interest rate swaps outstanding to fix the LIBOR component of commercial paper but had $100 million outstanding at December 31, 2002. These swaps expired in 2003.

In anticipation of future debt issuances, BNSF entered into three treasury lock transactions in 2002 totaling $150 million to fix the treasury component on a future 10-year debt issuance. The average locked-in rate was 4.38 percent. These treasury locks were closed in May 2003 in connection with the issuance of $250 million of 4.30 percent notes due July 1, 2013. BNSF paid the counterparties $10 million on the closing date and this payment will be amortized over the life of the related notes.

The amounts recorded in the Consolidated Statements of Income for interest rate cash flow hedge transactions were as follows (in millions):

| YEAR ENDED DECEMBER 31, | **2003** | 2002 | 2001 |
|---|---|---|---|
| Hedge loss | **$-** | $(2) | $- |
| Tax effect | **-** | (1) | - |
| Hedge loss, net of tax | **$-** | $(1) | $- |

The amounts recorded in the Consolidated Balance Sheets for interest rate cash flow hedge transactions, which represent the fair value of unexpired cash flow hedges, were as follows (in millions):

| DECEMBER 31, | **2003** | 2002 |
|---|---|---|
| Interest rate hedging liability | **$-** | $(3) |
| Tax effect | **-** | (1) |
| Interest rate hedging liability included in AOCI, net of tax | **$-** | $(2) |

**4. OTHER EXPENSE, NET**

Other expense, net includes the following (in millions):

| YEAR ENDED DECEMBER 31, | 2003 | 2002 | 2001 |
|---|---|---|---|
| Accounts receivable sale fees | **$9** | $12 | $30 |
| Write-down of non-rail investments | **-** | - | 75 |
| Miscellaneous, net | **5** | - | 9 |
| Total | **$14** | $12 | $114 |

Losses recognized in 2001 related to non-rail investments consisted primarily of FreightWise, Inc., an Internet transportation exchange; Pathnet Telecommunications, Inc., a telecommunications venture; a decline in the cash surrender value of company owned life insurance policies; and a portfolio of other non-core investments.

**5. INCOME TAXES**

Income tax expense (benefit) was as follows (in millions):

| YEAR ENDED DECEMBER 31, | 2003 | 2002 | 2001 |
|---|---|---|---|
| Current: | | | |
| Federal | **$(12)** | $21 | $129 |
| State | **6** | 3 | 11 |
| Total current | **(6)** | 24 | 140 |
| Deferred: | | | |
| Federal | **408** | 378 | 258 |
| State | **52** | 54 | 44 |
| Total deferred | **460** | 432 | 302 |
| Total | **$454** | $456 | $442 |

Reconciliation of the federal statutory income tax rate to the effective tax rate was as follows:

| YEAR ENDED DECEMBER 31, | 2003 | 2002 | 2001 |
|---|---|---|---|
| Federal statutory income tax rate | **35.0%** | 35.0% | 35.0% |
| State income taxes, net of federal tax benefit | **3.0** | 3.1 | 3.0 |
| Tax settlement | **(1.0)** | - | - |
| Other, net | **(0.1)** | (0.6) | (0.3) |
| Effective tax rate | **36.9%** | 37.5% | 37.7% |

The components of deferred tax assets and liabilities were as follows (in millions):

| DECEMBER 31, | 2003 | 2002 |
|---|---|---|
| Deferred tax liabilities: | | |
| Depreciation and amortization | **$(7,596)** | $(7,148) |
| Other | **(537)** | (445) |
| Total deferred tax liabilities | **(8,133)** | (7,593) |
| Deferred tax assets: | | |
| Casualty and environmental | **273** | 265 |
| Employee merger and separation costs | **69** | 80 |
| Pension and post-retirement benefits | **238** | 237 |
| Other | **364** | 350 |
| Total deferred tax assets | **944** | 932 |
| Net deferred tax liability | **$(7,189)** | $(6,661) |
| Non-current deferred income tax liability | **$(7,481)** | $(6,975) |
| Current deferred income tax asset | **292** | 314 |
| Net deferred tax liability | **$(7,189)** | $(6,661) |

All federal income tax returns of BNSF's predecessor companies, Burlington Northern Inc. and Santa Fe Pacific Corporation are closed through 1994 and the business combination date of September 1995, respectively. BNSF is currently under Internal Revenue Service examination for years 1995 through 1999. In addition, BNSF and its subsidiaries have various state income tax returns in the process of examination, administrative appeal or litigation. The Company believes that adequate provision has been made for any adjustment that might be assessed for open years through 2003.

## 6. ACCOUNTS RECEIVABLE, NET

BNSF Railway transfers most of its accounts receivable to Santa Fe Receivables Corporation (SFRC), a special purpose subsidiary. SFRC transfers an undivided interest in such receivables, with limited exceptions, to a master trust, and causes the trust to issue an undivided interest in the receivables to investors (the A/R sales program). The undivided interests in the master trust may be in the form of certificates or purchased interests.

SFRC renewed $350 million of its $700 million accounts receivable facility, effective June 2003, for an additional 364 days. In addition, SFRC entered into a separate $350 million accounts receivable facility with a five year term in June 2003. The Company's total capacity to sell undivided interests to investors under the A/R sales program was $700 million at December 31, 2003. Outstanding undivided interests held by investors under the A/R sales program were $625 million at December 31, 2003, and $594 million, net of $8 million of excess cash held in the trust, at December 31, 2002. These receivables were derecognized by BNSF Railway in connection with the sale of undivided interests under the A/R sales program. The undivided interests were supported by $808 million and $771 million of receivables transferred by SFRC to the master trust at December 31, 2003 and December 31, 2002, respectively. When SFRC transfers these receivables to the master trust, it retains an undivided interest in the receivables sold. This retained interest is included in accounts receivable in the Company's financial statements. SFRC's retained interest in these receivables of $183 million and $177 million at December 31, 2003 and 2002, respectively, less an allowance for uncollectible accounts, reflected the total accounts receivables transferred by SFRC to the master trust less $625 million and $594 million, at December 31, 2003 and 2002, respectively, of outstanding undivided interests held by investors. Due to a relatively short collection cycle, the fair value of the undivided interest transferred to investors in the A/R sales program approximated book value and there was no gain or loss from the transaction.

The Company retains the collection responsibility with respect to the accounts receivable. Proceeds from collections reinvested in the A/R sales program were approximately $9.8 billion in 2003 and $9.5 billion in 2002. No servicing asset or liability has been recorded since the fees the Company receives for servicing the receivables approximate the related costs. SFRC's costs of the sale of receivables are included in other expense, net and were $9 million and $12 million for the year ended December 31, 2003 and 2002, respectively. These costs fluctuate monthly with changes in prevailing interest rates, and were based on weighted average interest rates of 1.1 percent and 2.0 percent for the years ended December 31, 2003 and 2002, respectively. These costs include interest, discounts associated with transferring the receivables under the A/R sales program to SFRC, program fees paid to banks, incidental commercial paper issuing costs, and fees for unused commitment availability.

The amount of accounts receivable transferred by BNSF Railway to SFRC fluctuates based upon the availability of receivables and is directly affected by changing business volumes and credit risks, including dilution and delinquencies. BNSF Railway has historically experienced very low levels of default or dilution. If dilution or delinquency percentages were to increase by one percentage point, the value of BNSF Railway's retained interest would increase by approximately $8 million.

Receivables funded under the A/R sales program may not include amounts over 90 days past due or concentrations over certain limits with any one customer. At December 31, 2003 and December 31, 2002, $78 million and $77 million, respectively, of accounts receivable were greater than 90 days old. The Company maintains an allowance for bill adjustments and uncollectible accounts based upon the expected collectibility of accounts receivable, including receivables transferred to the master trust. Credit losses are based on specific identification of uncollectible accounts and application of historical collection percentages by aging category. At December 31, 2003 and December 31, 2002, $85 million and $82 million, respectively, of such allowances had been recorded. During the year ended December 31, 2003, 2002 and 2001, $7 million, $7 million and $8 million, respectively, of accounts receivable were written off.

The investors in the master trust have no recourse to BNSF Railway's other assets except for customary warranty and indemnity claims. Creditors of BNSF Railway have no recourse to the assets of the master trust or SFRC unless and until all claims of their respective creditors have been paid. The A/R sales program includes provisions that, if triggered, allow the investors participating in this program, at their option, to cancel the program. At December 31, 2003, BNSF Railway was in compliance with these provisions.

**7. PROPERTY AND EQUIPMENT, NET**

Property and equipment, net (in millions), and the weighted average annual depreciation rate (%) were as follows:

| DECEMBER 31, | **2003** | 2002 | 2003 DEPRECIATION RATE |
|---|---|---|---|
| Land | **$ 1,519** | $ 1,495 | - % |
| Track structure | **13,818** | 13,024 | 3.6 |
| Other roadway | **10,199** | 9,733 | 2.5 |
| Locomotives | **3,468** | 2,721 | 3.7 |
| Freight cars and other equipment | **1,757** | 1,678 | 4.6 |
| Computer hardware and software | **313** | 254 | 11.1 |
| Total cost | **31,074** | 28,905 | |
| Less accumulated depreciation and amortization | **(6,006)** | (4,883) | |
| Property and equipment, net | **$25,068** | $24,022 | |

The Consolidated Balance Sheets at December 31, 2003 and 2002, included $940 million, net of $281 million of amortization, and $972 million, net of $249 million of amortization, respectively, for property and equipment under capital leases, primarily for locomotives.

**8. ACCOUNTS PAYABLE AND OTHER CURRENT LIABILITIES**

Accounts payable and other current liabilities consisted of the following (in millions):

| DECEMBER 31, | 2003 | 2002 |
|---|---|---|
| Compensation and benefits payable | $ 418 | $ 410 |
| Casualty and environmental liabilities | 250 | 248 |
| Accounts payable | 214 | 177 |
| Tax liabilities | 174 | 175 |
| Contract allowances | 129 | 124 |
| Rents and leases | 121 | 150 |
| Equipment purchases | 114 | - |
| Accrued interest | 111 | 118 |
| Employee merger and separation costs | 35 | 40 |
| Other | 536 | 476 |
| Total | $2,102 | $1,918 |

**9. DEBT**

Debt outstanding was as follows (in millions):

| DECEMBER 31, | 2003 | 2002 |
|---|---|---|
| Notes and debentures, weighted average rate of 6.2 percent, due 2004 to 2097 | $4,790 | $4,719 |
| Equipment obligations, weighted average rate of 7.1 percent, due 2004 to 2016 | 537 | 611 |
| Capitalized lease obligations, weighted average rate of 6.4 percent, due 2004 to 2023 | 612 | 646 |
| Mortgage bonds, weighted average rate of 8.3 percent, due 2004 to 2047 | 391 | 422 |
| Financing obligations, weighted average rate of 6.3 percent, due 2012 to 2028 | 153 | 138 |
| Commercial paper, 1.2 percent, variable | 242 | 320 |
| Unamortized discount and other, net | (41) | (42) |
| Total | 6,684 | 6,814 |
| Less current portion of long-term debt | (244) | (173) |
| Long-term debt | $6,440 | $6,641 |

Notes and debentures include increases related to fair value adjustments for hedges of $59 million and $77 million at December 31, 2003 and 2002, respectively.

Certain BNSF Railway properties and other assets are subject to liens securing $391 million of mortgage debt. Certain locomotives and rolling stock of BNSF Railway are subject to equipment obligations and capital leases.

The following tables provide fair value information for the Company's debt obligations including principal cash flows and related weighted average interest rates by contractual maturity dates. Weighted average variable rates are based on implied forward rates in the yield curve at December 31, 2003.

The fair values presented in the following table do not include the fair value of the swaps and treasury locks.

| | DECEMBER 31, 2003 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | MATURITY DATE | | | | | | | |
| | 2004 | 2005 | 2006 | 2007 | 2008 | THEREAFTER | TOTAL | FAIR VALUE |
| Fixed-rate debt (in millions) | $142 | $146 | $432 | $135 | $135 | $4,493 | $5,483 | $5,839 |
| Average interest rate | 7.1% | 7.1% | 8.4% | 6.9% | 6.9% | 6.8% | 7.0% | |
| Variable-rate debt (in millions) | $102 | $316 | - | $322 | $242 | $219 | $1,201 | $1,276 |
| Average interest rate | 5.6% | 3.6% | - | 5.5% | 3.5% | 4.3% | 4.4% | |

Maturities in 2008 in the 2003 table above exclude $200 million of 7.29 percent debentures which mature in 2036 but are redeemable in 2008 at the option of the debt holders. In addition, BNSF has included in 2008 maturities $242 million of commercial paper in the 2003 table above. A one-half percent change in interest rates would cause interest expense related to commercial paper to fluctuate by approximately $1 million.

| | DECEMBER 31, 2002 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | MATURITY DATE | | | | | | | |
| | 2003 | 2004 | 2005 | 2006 | 2007 | THEREAFTER | TOTAL | FAIR VALUE |
| Fixed-rate debt (in millions) | $173 | $149 | $146 | $433 | $136 | $4,480 | $5,517 | $6,028 |
| Average interest rate | 6.4% | 7.0% | 7.1% | 8.4% | 6.9% | 7.0% | 7.1% | |
| Variable-rate debt (in millions) | - | $104 | $641 | - | $328 | $224 | $1,297 | $1,343 |
| Average interest rate | - | 6.1% | 3.1% | - | 5.5% | 4.1% | 4.1% | |

BNSF has included in 2005 maturities $320 million of commercial paper in the 2002 table above. In addition, maturities in 2003 included in the 2002 table exclude $175 million of 6.53 percent notes due 2037 which were redeemable in 2003 at the option of the holder.

The fair value of BNSF's long-term debt is primarily based on quoted market prices for the same or similar issues, or on the current rates that would be offered to BNSF for debt of the same remaining maturities. The carrying amount of commercial paper and bank debt approximates fair value because of the short maturity of these instruments.

MORTGAGE BONDS

*2003*

The Company exercised an option to call $29 million of 2.63 percent mortgage bonds issued by a predecessor company and due January 1, 2010. Cash generated from operations was used to fund the call.

NOTES AND DEBENTURES

*2003*

BNSF issued $250 million of 4.30 percent notes due July 1, 2013. The net proceeds of the debt issuance were used for general corporate purposes including the repayment of outstanding commercial paper.

The Company exercised an option to call $150 million of 7.50 percent bonds due July 2023 at a price of 103.02 percent of par. Commercial paper was used to fund the call.

As of December 31, 2003, the Company had $750 million of debt capacity available under its shelf registration.

*2002*

BNSF issued $300 million of 5.90 percent notes due July 1, 2012. The net proceeds of the debt issuance were used for general corporate purposes including the repayment of outstanding commercial paper.

COMMERCIAL PAPER

BNSF issues commercial paper from time to time that is supported by bank revolving credit agreements. At December 31, 2003, there were no bank borrowings against the revolving credit agreements. Outstanding commercial paper balances are considered as reducing the amount of borrowings available under these agreements. In June 2003, the Company reduced its $750 million short-term facility to $700 million and extended its expiration date to June 2004. The Company has the ability to have any amounts then outstanding mature as late as June 2005. Also, in June 2003, the Company reduced its $750 million long-term facility to $500 million and extended its expiration date to June 2008. As of December 31, 2003, as a result of these amendments, the bank revolving credit agreements allow borrowings of up to $1.2 billion. Annual facility fees are currently 0.10 percent and 0.15 percent for the short-term and long-term facilities, respectively. Both rates are subject to change based upon changes in BNSF's senior unsecured debt ratings. Borrowing rates are based upon: i) LIBOR plus a spread determined by BNSF's senior unsecured debt ratings, ii) money market rates offered at the option of the lenders, or iii) an alternate base rate. The Company classifies commercial paper as long-term to the extent of its borrowing capacity under these facilities. BNSF must maintain compliance with certain financial covenants under its revolving credit agreements. At December 31, 2003, the Company was in compliance.

The maturity value of commercial paper outstanding as of December 31, 2003 was $494 million, reducing the total capacity available under the revolving credit agreements to approximately $706 million. Included in the $494 million maturity value of commercial paper is $251 million issued to a consolidated subsidiary of BNSF that is eliminated upon consolidation.

FINANCING OBLIGATIONS

*2002*

The Company financed the construction of an intermodal facility by a third party and entered into an agreement to lease the intermodal facility for 20 years. This lease transaction is accounted for as a financing and has a purchase option. The Company recorded an asset in property and equipment, net and a liability in long-term debt and commercial paper of $138 million which represents the fair market value at lease inception.

GUARANTEES

Debt guaranteed by the Company as of December 31, 2003 is as follows (dollar amounts in millions):

| | GUARANTEES | | | | |
|---|---|---|---|---|---|
| | BNSF OWNERSHIP PERCENTAGE | PRINCIPAL AMOUNT GUARANTEED | MAXIMUM FUTURE PAYMENTS | MAXIMUM RECOURSE AMOUNT (a) | REMAINING TERM (IN YEARS) |
| **COUNTERPARTY** | | | | | |
| Kinder Morgan Energy Partners, L.P. | 0.5% | $190 | $190 | $- | Termination of Ownership |
| Kansas City Terminal Intermodal Transportation Corporation | 0.0% | $68 | $111 | $111 | 15 |
| The Unified Government of Wyandotte County/Kansas City, Kansas | 0.0% | $14 | $23 | $- | 19 |
| Westside Intermodal Transportation Corporation | 0.0% | $45 | $76 | $- | 19 |
| San Jacinto Partnership | 49.0% | $50 | $51 | $- | Less than 1 |
| All other | 0.0% | $11 | $15 | $6 | Various |

*(a) Reflects the maximum amount the Company could recover from a third party other than the counterparty.*

*KINDER MORGAN ENERGY PARTNERS, L.P.*

Santa Fe Pacific Pipelines, Inc (SFPP), an indirect, wholly-owned subsidiary of BNSF, has a guarantee in connection with its remaining special limited partnership interest in SFPP, L.P. All obligations with respect to the guarantee will cease upon termination of ownership rights which would occur upon a put notice issued by BNSF or the exercise of the call rights by the general partners of SFPP, L.P.

*KANSAS CITY TERMINAL INTERMODAL TRANSPORTATION CORPORATION*

BNSF Railway and another major railroad jointly and severally guarantee $68 million of debt of Kansas City Terminal Intermodal Transportation Corporation, the proceeds of which were used to finance construction of a double track grade separation bridge in Kansas City, Missouri, which is operated and used by Kansas City Terminal Railway Company (KCTRC). BNSF has a 25 percent ownership in KCTRC and accounts for its interest using the equity method of accounting.

*THE UNIFIED GOVERNMENT OF WYANDOTTE COUNTY/KANSAS CITY, KANSAS AND WESTSIDE INTERMODAL TRANSPORTATION CORPORATION*

Proceeds of guaranteed debt are being used to finance construction of a bridge that will connect BNSF Railway's Argentine Yard in Kansas City, Kansas, with the KCTRC mainline tracks in Kansas City, Missouri. The bridge will be operated by KCTRC.

*SAN JACINTO PARTNERSHIP*

BNSF agreed to guarantee approximately $85 million of debt, of which $50 million was outstanding as of December 31, 2003. The proceeds from the debt are being used to construct and operate a 13-mile railroad, which will service several chemical and plastics manufacturing facilities in the Houston, Texas area. In addition, the San Jacinto Partnership used $22 million of the proceeds to repay all of the interim construction advances previously made by BNSF. As discussed in Note 16 to the Consolidated Financial Statements, the San Jacinto Partnership will likely be consolidated on March 31, 2004.

*ALL OTHER*

BNSF Railway guarantees $11 million of other debt and leases. BNSF holds a performance bond and has the option to sub-lease property to recover up to $6 million of the $11 million of guarantees. These guarantees expire between 2005 and 2014.

Other than the performance bond discussed above, there is no collateral held by a third party which BNSF could obtain and liquidate to recover any amounts paid under the above guarantees.

Other than amounts recorded for capitalized obligations, none of the guarantees above are recorded in the Consolidated Financial Statements of the Company. BNSF does not expect performance under these guarantees to have a material effect on the Company in the foreseeable future.

INDEMNITIES

In the ordinary course of business, BNSF enters into agreements with third parties that include indemnification clauses. In general, these clauses are customary for the types of agreements in which they are included. At times, these clauses may involve indemnification for the acts of the Company, its employees and/or agents, indemnification for another party's acts, indemnification for future events, indemnification based upon a certain standard of performance, indemnification for liabilities arising out of the Company's use of leased equipment or other property, or other types of indemnification. Due to the uncertainty of whether the events which would trigger the indemnification obligations will ever occur and, if they did, the extent of the liability which would thereby result, the exposure for future indemnification payments cannot be estimated with any amount of certainty. However, the Company does not believe, based on information available, that these indemnity agreements will have a material adverse effect on the Company's results of operation, financial position or liquidity.

## 10. COMMITMENTS AND CONTINGENCIES

### LEASE COMMITMENTS

BNSF has substantial lease commitments for locomotives, freight cars, trailers and containers, office buildings and other property, and many of these leases provide the option to purchase the leased item at fair market value at the end of the lease. However, some provide fixed price purchase options. Future minimum lease payments (which reflect leases having non-cancelable lease terms in excess of one year) as of December 31, 2003, are summarized as follows (in millions):

| DECEMBER 31, | CAPITAL LEASES | OPERATING LEASES |
|---|---|---|
| 2004 | $110 | $437 |
| 2005 | 109 | 442 |
| 2006 | 108 | 409 |
| 2007 | 96 | 366 |
| 2008 | 90 | 366 |
| Thereafter | 234 | 3,326 |
| Total | 747 | $5,346 |
| Less amount representing interest | 135 | |
| Present value of minimum lease payments | $612 | |

Lease rental expense for all operating leases was $462 million, $448 million and $443 million for the years ended December 31, 2003, 2002 and 2001, respectively. Contingent rentals and sublease rentals were not significant.

### OTHER COMMITMENTS

In the normal course of business, the Company enters into long-term contractual requirements for future goods and services needed for the operations of the business. Such commitments are not in excess of expected requirements and are not reasonably likely to result in performance penalties or payments that would have a material adverse effect on the Company's liquidity.

### CASUALTY AND ENVIRONMENTAL

Personal injury claims, including work-related injuries to employees, are a significant expense for the railroad industry. Employees of BNSF are compensated for work-related injuries according to the provisions of the Federal Employers' Liability Act (FELA). FELA's system of requiring the finding of fault, coupled with unscheduled awards and reliance on the jury system, contributed to significant increases in expense in past years. BNSF has implemented a number of safety programs to reduce the number of personal injuries as well as the associated claims and personal injury expense.

The Company formed a consolidated wholly-owned subsidiary, Burlington Northern Santa Fe Insurance Company, Ltd. (BNSF IC), in the second quarter of 2002. BNSF IC provides insurance coverage for certain punitive damage risks incurred after April 1, 1998, FELA claims, railroad protective and force account insurance claims incurred after January 1, 2002, and certain other claims which are subject to reinsurance. At December 31, 2003, BNSF IC had invested in commercial paper issued by BNSF and third party time deposits and money market accounts. The Company's accounting policies related to personal injury, as disclosed in Note 2 to the Consolidated Financial Statements, did not change as a result of the formation of this subsidiary.

The Company recognized personal injury expenses of approximately $215 million, $228 million and $195 million in 2003, 2002 and 2001, respectively. BNSF made payments for personal injuries of approximately $198 million, $190 million and $173 million in 2003, 2002 and 2001, respectively. At December 31, 2003 and 2002, the Company had recorded liabilities of $513 million and $496 million, respectively, related to personal injury claims. Of these amounts, $200 million and $197 million were included in current liabilities in 2003 and 2002, respectively. BNSF's liabilities for personal injury claims are undiscounted.

The Company's operations, as well as those of its competitors, are subject to extensive federal, state and local environmental regulation. BNSF's operating procedures include practices to protect the environment from the risks inherent in railroad operations, which frequently involve transporting chemicals and other hazardous materials. Additionally, many of BNSF's land holdings are and have been used for industrial or transportation-related purposes or leased to commercial or industrial companies whose activities may have resulted in discharges onto the property. As a result, BNSF is subject to environmental cleanup and enforcement actions. In particular, the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), also known as the Superfund law, as well as similar state laws generally impose joint and several liability for cleanup and enforcement costs on current and former owners and operators of a site without regard to fault or the legality of the original conduct. BNSF has been notified that it is a potentially responsible party (PRP) for study and cleanup costs at approximately 20 Superfund sites for which investigation and remediation payments are or will be made or are yet to be determined (the Superfund sites) and, in many instances, is one of several PRPs. In addition, BNSF may be considered a PRP under certain other laws. Accordingly, under CERCLA and other federal and state statutes, BNSF may be held jointly and severally liable for all environmental costs associated with a particular site. If there are other PRPs, BNSF generally participates in the cleanup of these sites through cost-sharing agreements with terms that vary from site to site. Costs are typically allocated based on relative volumetric contribution of material, the amount of time the site was owned or operated, and/or the portion of the total site owned or operated by each PRP.

Environmental costs include initial site surveys and environmental studies of potentially contaminated sites as well as costs for remediation and restoration of sites determined to be contaminated. Liabilities for environmental cleanup costs are initially recorded when BNSF's liability for environmental cleanup is both probable and a reasonable estimate of associated costs can be made. Adjustments to initial estimates are recorded as necessary based upon additional information developed in subsequent periods. BNSF conducts an ongoing environmental contingency analysis, which considers a combination of factors including independent consulting reports, site visits, legal reviews, analysis of the likelihood of participation in and the ability of other PRPs to pay for cleanup, and historical trend analyses.

BNSF is involved in a number of administrative and judicial proceedings and other mandatory cleanup efforts at approximately 430 sites, including the Superfund sites, at which it is participating in the study or cleanup, or both, of alleged environmental contamination. The Company recognized environmental expenses of approximately $59 million, $43 million and $51 million during 2003, 2002 and 2001, respectively. BNSF paid approximately $56 million, $49 million and $72 million during 2003, 2002 and 2001, respectively, for mandatory and unasserted cleanup efforts, including amounts expended under federal and state voluntary cleanup programs. BNSF has recorded liabilities for remediation and restoration of all known sites of $199 million at December 31, 2003, compared with $196 million at December 31, 2002. Of these amounts, $50 million and $51 million, respectively, are included in current liabilities. BNSF's environmental liabilities are not discounted. BNSF anticipates that the majority of the accrued costs at December 31, 2003, will be paid over the next five years and no individual site is considered to be material.

Liabilities recorded for environmental costs represent BNSF's best estimates for remediation and restoration of these sites and include both asserted and unasserted claims. Unasserted claims are not considered to be a material component of the liability. Although recorded liabilities include BNSF's best estimates of all costs, without reduction for anticipated recoveries from third parties, BNSF's total cleanup costs at these sites cannot be predicted with certainty due to various factors such as the extent of corrective actions that may be required, evolving environmental laws and regulations, advances in environmental technology, the extent of other parties' participation in cleanup efforts, developments in ongoing environmental analyses related to sites determined to be contaminated, and developments in environmental surveys and studies of potentially contaminated sites. As a result, future charges to income for environmental liabilities could have a significant effect on results of operations in a particular quarter or fiscal year as individual site studies and remediation and restoration efforts proceed or as new sites arise. However, management believes it is unlikely any identified matters, either individually or in the aggregate, will have a material adverse effect on BNSF's results of operations, financial position or liquidity.

OTHER CLAIMS AND LITIGATION

BNSF and its subsidiaries are parties to a number of legal actions and claims, various governmental proceedings and private civil suits arising in the ordinary course of business, including those related to environmental matters, Federal Employers' Liability Act claims by BNSF Railway employees, other personal injury claims, and disputes and complaints involving certain transportation rates and charges (including complaints seeking refunds of prior charges paid for coal transportation and the prescription of future rates for such movements). Some of the legal proceedings include claims for punitive as well as compensatory damages, and a few proceedings purport to be class actions. While the final outcome of these matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded along with applicable insurance, it is the opinion of BNSF's management that none of these items will have a material adverse effect on the results of operations, financial position or liquidity of BNSF. However, an unexpected adverse resolution of one or more of these items could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

## 11. EMPLOYEE MERGER AND SEPARATION COSTS

Employee merger and separation costs activity was as follows (in millions):

| | 2003 | 2002 | 2001 |
|---|---|---|---|
| Beginning balance at January 1, | **$210** | $274 | $310 |
| Accruals | **15** | 1 | 30 |
| Payments | **(43)** | (55) | (55) |
| Other | **(3)** | (10) | (11) |
| Ending balance at December 31, | **$179** | $210 | $274 |

Employee merger and separation liabilities of $179 million and $210 million are included in the Consolidated Balance Sheets at December 31, 2003 and 2002, respectively, and principally represent: (i) employee-related severance costs for the consolidation of clerical functions, material handlers in mechanical shops and trainmen on reserve boards; (ii) deferred benefits payable upon separation or retirement to certain active conductors, trainmen and locomotive engineers; and (iii) certain non-union employee severance costs. Employee merger and separation expenses are recorded in materials and other in the Consolidated Income Statements. At December 31, 2003, $35 million of the remaining liabilities are included in current liabilities for anticipated costs to be paid in 2004.

CONDUCTORS, TRAINMEN AND LOCOMOTIVE ENGINEERS

Liabilities related to deferred benefits payable upon separation or retirement to certain active conductors, trainmen and locomotive engineers were $144 million and $163 million at December 31, 2003 and 2002, respectively. These costs were primarily incurred in connection with labor agreements reached prior to the consummation of the business combination of BNSF's predecessor companies Burlington Northern, Inc. and Santa Fe Pacific Corporation (the Merger) which, among other things, reduced train crew sizes and allowed for more flexible work rules. In 2003, the Company updated its estimates and accrued $3 million of additional expenses related to deferred benefits. In 2001, the Company recorded a $5 million reversal of certain deferred benefits payable to reflect a change in estimates.

CONSOLIDATION OF CLERICAL FUNCTIONS

Liabilities related to the consolidation of clerical functions were $20 million and $25 million at December 31, 2003 and 2002, respectively, and primarily provide for severance costs associated with the clerical consolidation plan adopted in 1995 upon the Merger and a separation program announced in July 2003. The 1995 consolidation plan resulted in the elimination of approximately 1,500 permanent positions and was substantially completed during 1999. The July 2003 separation program resulted in accrued severance costs of approximately $12 million and will affect approximately 150 employees. Reductions related to the July 2003 separation program were completed in the fourth quarter of 2003. In the fourth quarter of 2001, the Company recorded a charge of $9 million of costs related to the reduction of approximately 40 material handlers and other clerical positions. This liability balance also includes remaining costs related to the reduction of approximately 140 material handlers in 2000.

In 2003, 2002 and 2001, the Company recorded $1 million, $10 million and $6 million, respectively, of reversals for certain liabilities associated with the consolidation of clerical functions. These reversals primarily reflect accrued payments related to workforce reductions for positions under collective bargaining agreements where the Company was able to place affected individuals in alternate positions. The remaining liability balance at December 31, 2003, represents benefits to be paid to employees affected by the clerical consolidation and the separation program for employees being paid up to ten years or in some cases through retirement versus receiving a lump-sum payment.

NON-UNION EMPLOYEE SEVERANCE

Liabilities principally related to certain remaining non-union employee severances resulting from the fourth quarter 2001 workforce reduction and the Merger were $15 million and $22 million at December 31, 2003 and 2002, respectively. These costs will be paid over the next several years based on deferral elections made by the affected employees.

During the fourth quarter of 2001, the Company reduced 400 positions through severance, normal attrition and the elimination of contractors. The Company recorded $21 million of expenses for severance, medical and other benefits associated with the costs of terminating 360 employees and approximately $31 million for benefits to be received under the Company's retirement and medical plans. During the fourth quarter of 2003 and 2002, the Company recorded a $2 million reduction to its liability balance and accrued additional expenses of $1 million, respectively, due to changes in certain estimates. Substantially all of these planned reductions were completed at December 31, 2001.

## 12. EARNINGS PER SHARE

Basic earnings per share is based on the weighted average number of common shares outstanding. Diluted earnings per share is based on basic earnings per share adjusted for the effect of potential common shares outstanding that were dilutive during the period, arising from employee stock awards and incremental shares calculated using the treasury stock method.

Weighted average stock options totaling 23.6 million, 26.3 million and 18.6 million for 2003, 2002 and 2001, respectively, were not included in the computation of diluted earnings per share, because the options' exercise price exceeded the average market price of the Company's stock for those periods.

## 13. RETIREMENT PLANS AND OTHER POST-EMPLOYMENT BENEFIT PLANS

BNSF sponsors a funded, noncontributory qualified BNSF Retirement Plan, which covers substantially all non-union employees and an unfunded, nonqualified BNSF Supplemental Retirement Plan, which covers certain officers and other employees. The benefits under these BNSF plans are based on years of credited service and the highest five-year average compensation levels. BNSF's funding policy is to contribute annually not less than the regulatory minimum and not more than the maximum amount deductible for income tax purposes with respect to the funded plan.

Certain salaried employees of BNSF that have met certain age and years of service requirements are eligible for medical benefits and life insurance coverage during retirement. The retiree medical plan is contributory and provides benefits to retirees, their covered dependents and beneficiaries. Retiree contributions are adjusted annually. The plan also contains fixed deductibles, coinsurance and out-of-pocket limitations. The basic life insurance plan is noncontributory and covers retirees only. Optional life insurance coverage is available for some retirees; however, the retiree is responsible for the full cost. BNSF's policy is to fund benefits payable under the medical and life insurance plans as they come due. Employees beginning salaried employment with BNSF subsequent to September 22, 1995, are not eligible for medical benefits during retirement.

BNSF's accumulated post retirement benefit obligation (APBO) and net cost recognized for other post employment benefits (OPEB) do not reflect the effects of the recent Medicare Prescription Drug, Improvement and Modernization Act of 2003 (Act). The provisions of the Act provide for a federal subsidy for plans that provide prescription drug benefits and meet certain qualifications. Specific authoritative guidance on the accounting for the federal subsidy is pending and when that guidance is issued, it could require BNSF to change information related to its actuarially determined APBO and net cost for OPEB.

Components of the net (benefit) cost for these plans were as follows (in millions):

| YEAR ENDED DECEMBER 31, | PENSION BENEFITS | | | HEALTH AND WELFARE BENEFITS | | |
|---|---|---|---|---|---|---|
| | **2003** | 2002 | 2001 | **2003** | 2002 | 2001 |
| Service cost | **$17** | $15 | $13 | **$4** | $6 | $4 |
| Interest cost | **100** | 100 | 102 | **22** | 21 | 18 |
| Expected return on plan assets | **(123)** | (127) | (136) | **-** | - | - |
| Curtailments/settlements | **-** | - | 10 | **-** | - | 3 |
| Special termination benefits | **-** | 2 | 18 | **-** | - | - |
| Actuarial loss | **3** | 1 | 1 | **8** | 3 | - |
| Net amortization and deferred amounts | **-** | 2 | 2 | **(2)** | - | - |
| Net (benefit) cost recognized | **$(3)** | $(7) | $10 | **$32** | $30 | $25 |

The following table shows the change in benefit obligation based on the September 30 measurement date (in millions):

| CHANGE IN BENEFIT OBLIGATION | PENSION BENEFITS | | HEALTH AND WELFARE BENEFITS | |
|---|---|---|---|---|
| | **2003** | 2002 | **2003** | 2002 |
| Benefit obligation at beginning of period | **$1,611** | $1,507 | **$363** | $314 |
| Service cost | **17** | 15 | **4** | 6 |
| Interest cost | **100** | 100 | **22** | 21 |
| Plan participants' contributions | **-** | - | **6** | 5 |
| Amendments | **-** | 2 | **(9)** | (12) |
| Actuarial loss | **75** | 117 | **7** | 54 |
| Curtailments/settlements | **-** | (13) | **-** | - |
| Special termination benefits | **-** | 2 | **-** | - |
| Benefits paid | **(125)** | (119) | **(27)** | (25) |
| Benefit obligation at end of period | **$1,678** | $1,611 | **$366** | $363 |

The accumulated benefit obligation for all defined benefit pension plans was $1,559 million and $1,503 million at September 30, 2003, and 2002, respectively. Both the BNSF Retirement Plan and the BNSF Supplemental Retirement Plan had an accumulated benefit obligation in excess of plan assets at September 30, 2003 and 2002.

The following table shows the change in plan assets of the plans based on the September 30 measurement date (in millions):

| CHANGE IN PLAN ASSETS | PENSION BENEFITS | | HEALTH AND WELFARE BENEFITS | |
|---|---|---|---|---|
| | **2003** | 2002 | **2003** | 2002 |
| Fair value of plan assets at beginning of period | **$1,151** | $1,345 | **$-** | $- |
| Actual return on plan assets | **193** | (67) | **-** | - |
| Settlements | **-** | (13) | **-** | - |
| Employer contribution | **5** | 5 | **21** | 20 |
| Plan participants' contributions | **-** | - | **6** | 5 |
| Benefits paid | **(125)** | (119) | **(27)** | (25) |
| Fair value of plan assets at end of period | **$1,224** | $1,151 | **$-** | $- |

The following table shows the reconciliation of the funded status of the plans with amounts recorded in the Consolidated Balance Sheets (in millions):

| | PENSION BENEFITS | | HEALTH AND WELFARE BENEFITS | |
|---|---|---|---|---|
| DECEMBER 31, | **2003** | 2002 | **2003** | 2002 |
| Fair value of plan assets as of September 30 | **$1,224** | $1,151 | **$-** | $- |
| Benefit obligations as of September 30 | **1,678** | 1,611 | **366** | 363 |
| Funded status (plan assets less benefit obligations) | **(454)** | (460) | **(366)** | (363) |
| Amounts not recognized: | | | | |
| Unrecognized net loss | **480** | 479 | **111** | 111 |
| Unrecognized prior service cost | **(2)** | (3) | **(20)** | (12) |
| Net amount recognized as of December 31 | **$24** | $16 | **$(275)** | $(264) |

The following table shows the amounts recognized in the Consolidated Balance Sheets (in millions):

| | PENSION BENEFITS | | HEALTH AND WELFARE BENEFITS | |
|---|---|---|---|---|
| DECEMBER 31, | **2003** | 2002 | **2003** | 2002 |
| Prepaid benefit cost | **$-** | $- | **$-** | $- |
| Accrued benefit cost | **(335)** | (352) | **(275)** | (264) |
| Intangible assets | **-** | - | **-** | - |
| Accumulated other comprehensive income | **359** | 368 | **-** | - |
| Net amount recognized | **$24** | $16 | **$(275)** | $(264) |

| | PENSION BENEFITS | | HEALTH AND WELFARE BENEFITS | |
|---|---|---|---|---|
| DECEMBER 31, | **2003** | 2002 | **2003** | 2002 |
| (Decrease) increase in minimum liability included in other comprehensive income | **$(9)** | $356 | **$-** | $- |

The expected long-term rate of return is the return to be earned, net of plan expenses, over the period that benefits are paid. It reflects the rate of return on present investments and on expected contributions. In determining the expected long-term rate of return, BNSF considered: 1) forward looking capital market forecasts, 2) historical returns for individual asset classes and 3) the impact of active portfolio management.

The assumptions used in accounting for the BNSF plans were as follows:

| | PENSION BENEFITS | | HEALTH AND WELFARE BENEFITS | |
|---|---|---|---|---|
| ASSUMPTIONS USED TO DETERMINE NET (BENEFIT) COST FOR FISCAL YEARS ENDED DECEMBER 31, | **2003** | 2002 | **2003** | 2002 |
| Discount rate | **6.5%** | 7.0% | **6.5%** | 7.0% |
| Expected long-term rate of return on plan assets | **8.5%** | 8.5% | **-** | - |
| Rate of compensation increase | **3.9%** | 4.0% | **3.9%** | 4.0% |

| | PENSION BENEFITS | | HEALTH AND WELFARE BENEFITS | |
|---|---|---|---|---|
| ASSUMPTIONS USED TO DETERMINE BENEFIT OBLIGATIONS AT SEPTEMBER 30, | **2003** | 2002 | **2003** | 2002 |
| Discount rate | **6.0%** | 6.5% | **6.0%** | 6.5% |
| Rate of compensation increase | **3.9%** | 3.9% | **3.9%** | 3.9% |

The following table shows the expected health care rate increase and the future rate and time at which it is expected to remain constant.

| DECEMBER 31, | 2003 | 2002 |
|---|---|---|
| Assumed health care cost trend rate | **11%** | 11% |
| Rate to which health care cost trend rate is expected to decline and remain | **5%** | 5% |
| Year that the rate reaches the ultimate trend rate | **2010** | 2009 |

Assumed health care cost trend rates have a significant effect on the amounts reported for the health care plans. A one-percentage-point change in assumed health care cost trend rates would have the following effects:

| | ONE PERCENTAGE-POINT INCREASE | ONE PERCENTAGE-POINT DECREASE |
|---|---|---|
| Effect on total service and interest cost | $3 | $(2) |
| Effect on post retirement benefit obligation | $36 | $(30) |

The qualified BNSF Retirement Plan asset allocation at September 30, 2003, and 2002 and the target allocation for 2004 by asset category are as follows:

| PLAN ASSET ALLOCATION | TARGET ALLOCATION | PERCENTAGE OF PENSION PLAN ASSETS AT SEPTEMBER 30, | |
|---|---|---|---|
| | 2004 | 2003 | 2002 |
| Equity securities | 45-75% | 57% | 51% |
| Debt securities | 25-45 | 33 | 39 |
| Real estate | 0-10 | 10 | 10 |
| Other | 0-5 | - | - |
| Total | 100% | 100% | 100% |

The general investment objective of the BNSF Retirement Plan is to grow the Plan assets in relation to the Plan liabilities while prudently managing the risk of a decrease in the Plan's assets relative to those liabilities. To meet this objective the Employee Benefits Committee has adopted the above asset allocation ranges. The target for each asset class is the mid-point of the range. Ranges allow flexibility to accommodate market changes in the asset class when those changes occur on a temporary basis because of the cost in transitioning assets.

The Company expects to contribute approximately $20 million to its defined benefit pension plans and approximately $20 million to its OPEB plans in 2004.

### DEFINED CONTRIBUTION PLANS

BNSF sponsors 401(k) plans which cover substantially all employees. BNSF matches 50 percent of the first six percent of non-union employees' contributions and matches 25 percent on the first four percent of a limited number of union employees' contributions, which are subject to certain percentage limits of the employees' earnings, at each pay period. Depending on BNSF's performance, non-union employees can receive an additional matching contribution of up to 30 percent of the first six percent at the end of the year. Employer contributions for all non-union employees are subject to a five-year length of service vesting schedule. BNSF's 401(k) matching expense was $16 million, $15 million and $14 million in 2003, 2002 and 2001, respectively.

### OTHER

Under collective bargaining agreements, BNSF participates in multi-employer benefit plans which provide certain post-retirement health care and life insurance benefits for eligible union employees. Insurance premiums paid attributable to retirees, which are generally expensed as incurred, were $31 million, $20 million and $18 million, in 2003, 2002 and 2001, respectively. See Note 11 to the Consolidated Financial Statements for other deferred benefits payable to certain conductors, trainmen and locomotive engineers.

**14. STOCK OPTIONS AND OTHER INCENTIVE PLANS**

On April 15, 1999, BNSF shareholders approved the BNSF 1999 Stock Incentive Plan and authorized 20 million shares of BNSF common stock to be issued in connection with stock options, restricted stock, restricted stock units and performance stock. On April 18, 2001 and April 17, 2002, BNSF shareholders approved the amended BNSF 1999 Stock Incentive Plan, which authorized additional awards not to exceed 29 million and 35 million shares, respectively of BNSF common stock to be issued in connection with stock options, restricted stock, restricted stock units and performance stock. Approximately three million common shares were available for future grant at December 31, 2003.

Additionally, on April 18, 1996, BNSF shareholders approved the non-employee director's stock plan and authorized 900 thousand shares of BNSF common stock to be issued in connection with this plan. Approximately 600 thousand common shares were available for future grant at December 31, 2003.

STOCK OPTIONS

Under BNSF's stock option plans, options may be granted to officers and salaried employees at the fair market value of the Company's common stock on the date of grant. Stock option grants awarded after April 2001 generally vest ratably over three years and expire within ten years after the date of grant. Shares issued upon exercise of options may be issued from treasury shares or from authorized but unissued shares.

The Company applies APB Opinion 25 and related interpretations in accounting for its stock option plans. See Note 2 to the Consolidated Financial Statements for the Company's pro forma net income and earnings per share determined based on the fair value at grant dates consistent with SFAS No. 123.

A summary of the status of the stock option plans as of December 31, 2003, 2002 and 2001, and changes during the years then ended, is presented below (options in thousands):

| YEAR ENDED DECEMBER 31, | **2003** | | 2002 | | 2001 | |
|---|---|---|---|---|---|---|
| | OPTIONS | WEIGHTED AVERAGE EXERCISE PRICES | OPTIONS | WEIGHTED AVERAGE EXERCISE PRICES | OPTIONS | WEIGHTED AVERAGE EXERCISE PRICES |
| Balance at beginning of year | **39,323** | **$28.31** | 39,839 | $28.02 | 38,423 | $27.22 |
| Granted | **2,957** | **$27.88** | 2,867 | $27.76 | 7,424 | $29.02 |
| Exercised | **(3,222)** | **$22.68** | (2,338) | $21.58 | (5,282) | $23.31 |
| Cancelled | **(738)** | **$30.16** | (1,045) | $30.57 | (726) | $30.29 |
| Balance at end of year | **38,320** | **$28.72** | 39,323 | $28.31 | 39,839 | $28.02 |
| Options exercisable at year end | **31,465** | **$28.83** | 32,068 | $28.30 | 32,893 | $27.80 |

The following table summarizes information regarding stock options outstanding at December 31, 2003 (options in thousands):

| | OPTIONS OUTSTANDING | | | OPTIONS EXERCISABLE | |
|---|---|---|---|---|---|
| RANGE OF EXERCISE PRICES | NUMBER OUTSTANDING | WEIGHTED AVERAGE REMAINING LIFE | WEIGHTED AVERAGE EXERCISE PRICES | NUMBER EXERCISABLE | WEIGHTED AVERAGE EXERCISE PRICES |
| $18.04 to $24.83 | 2,625 | 2.6 Years | $22.91 | 2,611 | $22.90 |
| $25.66 to $28.73 | 11,685 | 7.1 Years | $26.65 | 7,212 | $25.99 |
| $28.76 to $30.98 | 16,466 | 5.1 Years | $29.17 | 14,101 | $29.19 |
| $31.00 to $36.74 | 7,544 | 5.0 Years | $32.95 | 7,541 | $32.95 |
| $18.04 to $36.74 | 38,320 | 5.5 Years | $28.72 | 31,465 | $28.83 |

### OTHER INCENTIVE PLANS

BNSF has other long-term incentive programs in addition to stock options as shown in the following table:

| OTHER INCENTIVE PLANS | VESTED | SHARES OUTSTANDING AS OF DECEMBER 31, 2003 | SHARES GRANTED FOR YEAR ENDED DECEMBER 31, 2003 | 2002 | 2001 |
|---|---|---|---|---|---|
| *(in thousands except for vested)* | *(in years)* | | | | |
| Restricted shares | | | | | |
| Time-based | 3-5 | **2,133** | 558 | 999 | 725 |
| Performance-based | 3 | **321** | - | 340 | - |
| BNSF Incentive Bonus Stock Program[(a)] | 3 | **646** | 329 | 176 | 162 |
| BNSF Discounted Stock Purchase Program[(b)] | N/A | **38** | 19 | 12 | 7 |

*(a) Certain eligible employees may defer through the BNSF Incentive Bonus Stock Program (IBSP) the cash payment of their bonus for restricted stock.*

*(b) Salaried employees not eligible to participate in the IBSP may use their bonus to purchase BNSF common stock at a discount from the market price. These shares are restricted for a three-year period.*

Shares awarded under the plans may not be sold or used as collateral, and are generally not transferable, by the holder until the shares awarded become free of restrictions. Compensation expense, net of tax, recorded under the BNSF Stock Incentive Plans in accordance with APB Opinion 25 was $11 million, $10 million and $8 million for the years ended 2003, 2002 and 2001, respectively.

## 15. COMMON STOCK AND PREFERRED CAPITAL STOCK

### COMMON STOCK

BNSF is authorized to issue 600 million shares of common stock, $0.01 par value. At December 31, 2003, there were 371 million shares of common stock outstanding. Each holder of common stock is entitled to one vote per share in the election of directors and on all matters submitted to a vote of stockholders. Subject to the rights and preferences of any future issuances of preferred stock, each share of common stock is entitled to receive dividends as may be declared by the Board of Directors (the Board) out of funds legally available and to share ratably in all assets available for distribution to stockholders upon dissolution or liquidation. No holder of common stock has any preemptive right to subscribe for any securities of BNSF.

### PREFERRED CAPITAL STOCK

At December 31, 2003, BNSF had 50 million shares of Class A Preferred Stock, $0.01 par value and 25 million shares of Preferred Stock, $0.01 par value available for issuance. The Board has the authority to issue such stock in one or more series, to fix the number of shares and to fix the designations and the powers, rights, and qualifications and restrictions of each series.

### SHARE REPURCHASE PROGRAM

In July 1997, the Board authorized the repurchase of up to 30 million shares of the Company's common stock from time to time in the open market. In December 1999, April 2000, September 2000 and January 2003, the Board authorized extensions of the BNSF share repurchase program, adding 30 million shares at each date to the total shares previously authorized bringing BNSF's share repurchase program to 150 million shares. During 2003, 2002 and 2001, the Company repurchased approximately 8 million, 13 million, and 11 million shares, respectively, of its common stock at average prices of $27.25 per share, $27.85 per share, and $27.76 per share, respectively. Total repurchases through December 31, 2003, were 124 million shares at a total average cost of $26.05 per share, leaving 26 million shares available for repurchase out of the 150 million shares presently authorized.

## 16. ACCOUNTING PRONOUNCEMENTS

In 2001, the Company entered into a partnership (the Partnership) with subsidiaries of three chemical manufacturing companies that ship their products on the BNSF Railway to form San Jacinto Rail Limited. The purpose of the Partnership is to construct and operate a 13-mile railroad, which will service several chemical and plastics manufacturing facilities in the Houston, Texas, area. BNSF owns a 48 percent limited partnership interest and a one percent general partnership interest in the Partnership and acts as the general partner and operator of this facility. San Jacinto Rail Limited, an unconsolidated subsidiary, will likely be required to be consolidated by the Company pursuant to Financial Accounting Standards Board (FASB) Interpretation No. 46R (FIN 46), Consolidation of Variable Interest Entities, on March 31, 2004. If consolidation is required, it will have a minimal impact to the Company's financial statements primarily due to the fact that the Company accounted for this investment prior to the adoption of FIN 46 under the equity method of accounting and recorded all losses incurred by the Partnership from inception to date as required by the partnership agreement.

BNSF has agreed to guarantee debt incurred by the Partnership, which is expected to be $85 million in connection with the construction of this rail line, of which $50 million was outstanding as of December 31, 2003. See Note 9 to the Consolidated Financial Statements for information about BNSF's guarantee of the Partnership's debt.

## 17. QUARTERLY FINANCIAL DATA—UNAUDITED

| (DOLLARS IN MILLIONS, EXCEPT PER SHARE DATA) | FOURTH | THIRD | SECOND | FIRST |
|---|---|---|---|---|
| **2003** | | | | |
| Revenues | **$2,492** | **$2,395** | **$2,294** | **$2,232** |
| Operating income | **$477** | **$430** | **$412** | **$346** |
| Income before cumulative effect of accounting change | **$226** | **$203** | **$200** | **$148** |
| Net income | **$226** | **$203** | **$200** | **$187**[(a)] |
| Basic earnings per share (before cumulative effect of accounting change) | **$0.61** | **$0.55** | **$0.54** | **$0.40** |
| Basic earnings per share (after cumulative effect of accounting change) | **$0.61** | **$0.55** | **$0.54** | **$0.50** |
| Diluted earnings per share (before cumulative effect of accounting change) | **$0.61** | **$0.55** | **$0.54** | **$0.40** |
| Diluted earnings per share (after cumulative effect of accounting change) | **$0.61** | **$0.55** | **$0.54** | **$0.50** |
| Dividends declared per share | **$0.15** | **$0.15** | **$0.12** | **$0.12** |
| Common stock price: | | | | |
| High | **$32.31** | **$29.47** | **$29.80** | **$27.05** |
| Low | **$27.65** | **$26.78** | **$24.89** | **$23.48** |
| **2002** | | | | |
| Revenues | $2,301 | $2,308 | $2,207 | $2,163 |
| Operating income | $436 | $419 | $421 | $380 |
| Net income | $202 | $192 | $194 | $172 |
| Basic earnings per share | $0.54 | $0.51 | $0.51 | $0.45 |
| Diluted earnings per share | $0.54 | $0.51 | $0.51 | $0.45 |
| Dividends declared per share | $0.12 | $0.12 | $0.12 | $0.12 |
| Common stock price: | | | | |
| High | $27.07 | $30.48 | $30.44 | $31.48 |
| Low | $24.13 | $23.74 | $27.54 | $26.85 |

*(a) 2003 Net income includes the favorable cumulative effect of an accounting change of $39 million, net of tax, as described in Note 2 to the Consolidated Financial Statements.*

## ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

None.

## ITEM 9A. CONTROLS AND PROCEDURES

Based on their evaluation as of the end of the period covered by this annual report on Form 10-K, BNSF's principal executive officer and principal financial officer have concluded that BNSF's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934) are effective to ensure that information required to be disclosed by BNSF in the reports that it files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized, and reported within the time periods specified in Securities and Exchange Commission's rules and forms and that such information is accumulated and communicated to BNSF's management, including its principal executive and principal financial officers as appropriate to allow timely decisions regarding required disclosure.

# Part III

## ITEM 10. DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT

Information concerning the directors of BNSF will be provided under the heading "Nominees for Directors" in BNSF's proxy statement for its 2004 annual meeting of shareholders which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under that heading is hereby incorporated by reference.

Information under the heading "Audit Committee" in BNSF's proxy statement for its 2004 annual meeting of shareholders, which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, is hereby incorporated by reference into the Form 10-K.

Information concerning the executive officers of BNSF is included in Part I of this Report on Form 10-K.

Information concerning compliance with Section 16(a) of the Securities Exchange Act of 1934 will be under the heading "Section 16(a) Beneficial Ownership Reporting Compliance" in BNSF's proxy statement for its 2004 annual meeting of shareholders which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under that heading is hereby incorporated by reference.

In 2003, the Company adopted a Code of Ethics for the Chief Executive Officer and Senior Financial Officers (Code of Ethics) applicable to the Chief Executive Officer, Chief Financial Officer, and Controller. A copy of the Code of Ethics is available on the Company's website at www.bnsf.com. Any waiver of this Code of Ethics may be granted only by the Directors and Corporate Governance Committee of the Board of Directors or by the full Board. Any such waiver granted will be timely disclosed on the Company's website under the "Investors" link as will amendments to the Code of Ethics.

## ITEM 11. EXECUTIVE COMPENSATION

Information concerning the compensation of directors and executive officers of BNSF will be provided under the heading "Directors' Compensation" and under the headings "Summary Compensation Table," "Stock Option Grants in 2003," "Aggregated 2003 Stock Option Exercises and Year-End Option Values," "Pension Plans," "Employment Contracts and Other Arrangements," and "Trust Agreements," in BNSF's proxy statement for its 2004 annual meeting of shareholders which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under those headings is hereby incorporated by reference.

## ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

Information concerning the ownership of BNSF equity securities by certain beneficial owners and by management will be provided under the headings "Certain Beneficial Owners" and "Ownership of Management" in BNSF's proxy statement for its 2004 annual meeting of shareholders which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under those headings is hereby incorporated by reference.

Certain information about BNSF's equity compensation plans will be provided under the heading "Equity Compensation Plan Information" in BNSF's proxy statement for its 2004 annual meeting of shareholders which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under such heading is hereby incorporated by reference.

## ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

Information concerning certain relationships and related transactions will be provided under the heading "Certain Relationships" of BNSF's proxy statement for its 2004 annual meeting of shareholders which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under that heading is hereby incorporated by reference.

**ITEM 14. PRINCIPAL ACCOUNTANT FEES AND SERVICES**

Information concerning principal accounting fees and services will be provided under the heading "Independent Auditor" of BNSF's proxy statement for its 2004 annual meeting of shareholders which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under that heading is hereby incorporated by reference.

# Part IV

## ITEM 15. EXHIBITS, FINANCIAL STATEMENT SCHEDULES, AND REPORTS ON FORM 8-K

(a) The following documents are filed as part of this report:

1. Consolidated Financial Statements--See Item 8

   Schedules are omitted because they are not required or applicable, or the required information is included in the Consolidated Financial Statements or related notes.

2. Exhibits:

   See Index to Exhibits beginning on page E-1 for a description of the exhibits filed as a part of this Report on Form 10-K.

(b) Reports on Form 8-K

Registrant furnished a report on Form 8-K on October 21, 2003 reporting under Item 12 a press release announcing third-quarter 2003 operating results.

## Signatures

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, Burlington Northern Santa Fe Corporation has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

***BURLINGTON NORTHERN SANTA FE CORPORATION***

Dated: February 12, 2004

By: /s/ Matthew K. Rose
Matthew K. Rose
Chairman, President and Chief Executive Officer

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of Burlington Northern Santa Fe Corporation and in the capacities and on the date indicated.

| ***SIGNATURE*** | ***TITLE*** |
|---|---|
| /s/ Matthew K. Rose<br>Matthew K. Rose | Chairman, President and Chief Executive Officer (Principal Executive Officer), and Director |
| /s/ Thomas N. Hund<br>Thomas N. Hund | Executive Vice President and Chief Financial Officer (Principal Financial Officer) |
| /s/ Dennis R. Johnson<br>Dennis R. Johnson | Vice President and Controller (Principal Accounting Officer) |
| /s/ Alan L. Boeckmann*<br>Alan L. Boeckmann | Director |
| /s/ John J. Burns, Jr.*<br>John J. Burns, Jr. | Director |
| /s/ Vilma S. Martinez*<br>Vilma S. Martinez | Director |
| /s/ Marc F. Racicot*<br>Marc F. Racicot | Director |
| /s/ Roy S. Roberts*<br>Roy S. Roberts | Director |
| /s/ Marc J. Shapiro*<br>Marc J. Shapiro | Director |

/s/ J.C. Watts, Jr.* — Director
J.C. Watts, Jr.

/s/ Robert H. West* — Director
Robert H. West

/s/ J. Steven Whisler* — Director
J. Steven Whisler

/s/ Edward E. Whitacre Jr.* — Director
Edward E. Whitacre, Jr.

/s/ Michael B. Yanney* — Director
Michael B. Yanney

Dated: February 12, 2004

*By: /s/ Jeffrey R. Moreland
Jeffrey R. Moreland

Executive Vice President Law &
Government Affairs and Secretary

***BURLINGTON NORTHERN SANTA FE CORPORATION AND SUBSIDIARIES***

| EXHIBIT NUMBER | DESCRIPTION |
|---|---|
| 3.1 | Amended and Restated Certificate of Incorporation of BNSF (amended as of April 21, 1998). Incorporated by reference to Exhibit 3.1 to BNSF's Report on Form 10-Q for the quarter ended June 30, 1998. Certificate of Elimination of the Designation of the 6-1/4% Cumulative, Convertible Preferred Stock, Series A, $0.02 Par Value. Certificate of Designation, Preferences and Rights of Junior Participating Preferred Stock, Series B, $0.01 Par Value. Incorporated by reference to Exhibit 4.1 of BNSF's Form 8-A 12B filed December 23, 1999. Certificate of Increase in the Number of Authorized Shares of Junior Participating Preferred Stock, Series B, $0.01 Par Value. Incorporated by reference to Exhibit 3.1 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 2001. |
| 3.2 | By-Laws of BNSF as amended September 20, 2001. Incorporated by reference to Exhibit 3.1 of BNSF's Form 10-Q for the period ended September 30, 2001. |
| 4.1 | Indenture, dated as of December 1, 1995, between BNSF and The First National Bank of Chicago, as Trustee. Incorporated by reference to Exhibit 4 to BNSF's Registration Statement on Form S-3 (No. 333-72013). |
| 4.2 | Form of BNSF's 6 1/8% Notes Due 2009. Incorporated by reference to Exhibit 4.2 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1998. |
| 4.3 | Form of BNSF's 6 3/4% Debentures Due 2029. Incorporated by reference to Exhibit 4.3 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1998. |
| 4.4 | Form of BNSF' 6.70% Debenture Due August 1, 2028. Incorporated by reference to Exhibit 4.4 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1998. |
| 4.5 | Form of BNSF's 7.875% Note Due April 15, 2007. Incorporated by reference to Exhibit 4.5 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 2000. |
| 4.6 | Form of BNSF's 8.125% Debenture Due April 15, 2020. Incorporated by reference to Exhibit 4.6 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 2000. |
| 4.7 | Form of BNSF's 7.95% Debenture Due August 15, 2030. Incorporated by reference to Exhibit 4.7 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 2000. |
| 4.8 | Form of BNSF's 6.75% Note due July 15, 2011. Incorporated by reference to Exhibit 4.1 to BNSF's Report on Form 10-Q for the quarter ended June 30, 2001. |
| 4.9 | Form of BNSF's 5.90% Note Due July 1, 2012. Incorporated by reference to Exhibit 4.1 to BNSF's Report on Form 10-Q for the quarter ended June 30, 2002. |
| 4.10 | Certain instruments evidencing long-term indebtedness of BNSF are not being filed as exhibits to this Report because the total amount of securities authorized under any single such instrument does not exceed 10% of BNSF's total assets. BNSF will furnish copies of any material instruments upon request of the Securities and Exchange Commission. |
| 10.1* | Burlington Northern Santa Fe Non-Employee Directors' Stock Plan as amended July 17, 2003. Incorporated by reference to Exhibit 10.1 to BNSF's Report on Form 10-Q for the period ended June 30, 2003. |
| 10.2* | The Burlington Northern and Santa Fe Railway Company Incentive Compensation Plan as amended effective January 1, 2003. |

| EXHIBIT NUMBER | DESCRIPTION |
|---|---|
| 10.3* | Burlington Northern Santa Fe Corporation Deferred Compensation Plan, as amended and restated effective September 16, 1998. Incorporated by reference to Exhibit 10.1 to BNSF's Report on Form 10-Q for the quarter ended September 30, 1998 (formerly, Burlington Northern Inc. Deferred Compensation Plan). |
| 10.4* | Burlington Northern Inc. Senior Executive Survivor Benefit Plan as of April 1, 1986. Incorporated by reference to Amendment No. 1 to BNI's Report on Form 10-K for the fiscal year ended December 31, 1987. |
| 10.5* | Burlington Northern Santa Fe Corporation Senior Management Stock Deferral Plan. Incorporated by reference to Exhibit 10.37 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1999. Amendment of the Burlington Northern Santa Fe Corporation Senior Management Stock Deferral Plan dated November 19, 2001 is incorporated by reference to BNSF's Report on Form 10-K for the fiscal year ended December 31, 2001. |
| 10.6* | Burlington Northern Santa Fe Long Term Incentive Stock Plan. Incorporated by reference to Exhibit 4(c) to BNSF's Registration Statement on Form S-8 (File No. 33-63247). |
| 10.7* | Burlington Northern Santa Fe Corporation 1990 Directors Stock Option Plan. Incorporated by reference to BNSF's Registration Statement on Form S-8 (File No. 33-62825). |
| 10.8* | Burlington Northern Santa Fe Incentive Bonus Stock Program, as amended and restated January 20, 1999. Incorporated by reference to Exhibit 10.11 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1999. |
| 10.9* | Burlington Northern Santa Fe Corporation 1992 Stock Option Incentive Plan. Incorporated by reference to BNSF's Registration Statement on Form S-8 (File No. 33-62839). |
| 10.10* | Burlington Northern Santa Fe 1996 Stock Incentive Plan. Incorporated by reference to Appendix B to BNSF's Proxy Statement dated March 5, 1996. Amendment of Burlington Northern Santa Fe 1996 Stock Incentive Plan dated January 15, 1998 is incorporated by reference to Exhibit 10.13 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1997. Amendment dated December 3, 1998. Incorporated by reference to Exhibit 10.13 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1999. |
| 10.11* | Burlington Northern Santa Fe Supplemental Retirement Plan. Incorporated by reference to Exhibit 10.2 to BNSF's Report on Form 10-Q for the quarter ended September 30, 1996. |
| 10.12* | Burlington Northern Santa Fe Estate Enhancement Program, as amended and restated effective October 1, 1996. Incorporated by reference to Exhibit 10.15 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1996. Amendment to Burlington Northern Santa Fe Estate Enhancement Program is incorporated by reference to Exhibit 10.2 to BNSF's Form 10-Q for the quarter ended June 30, 1999. |
| 10.13* | Form of BNSF Change-in-Control Agreement (applicable to Messrs. Ice, Hund, Moreland, and Lanigan, and two other executive officers). Incorporated by reference to Exhibit 10.17 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1996. Amendment dated December 17, 1998. Incorporated by reference to Exhibit 10.15 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 2001. |
| 10.14* | Burlington Northern Santa Fe Deferred Compensation Plan for Directors as amended and restated January 16, 2003. Incorporated by reference to Exhibit 10.14 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 2002. |

| EXHIBIT NUMBER | DESCRIPTION |
|---|---|
| 10.15* | Burlington Northern Santa Fe Corporation Supplemental Investment and Retirement Plan. Incorporated by reference to Exhibit 10.20 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 2000. |
| 10.16* | Burlington Northern Inc. Form of Severance Agreement and amendments through September 18, 1995 (applicable to Mr. Rose). Incorporated by reference to Exhibit 10.21 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1995. Amendment to Form of Severance Agreement dated December 3, 1997 is incorporated by reference to Exhibit 10.21 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1997. Amendment dated January 6, 1999 is incorporated by reference to BNSF's Report on Form 10-K for the fiscal year ended December 31, 2001. |
| 10.17* | Burlington Northern Inc. Director's Charitable Award Program. Incorporated by reference to Exhibit 10.22 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1995. |
| 10.18* | Burlington Northern Santa Fe Salary Exchange Option Program. Incorporated by reference to Exhibit 10.23 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1999. |
| 10.19* | Santa Fe Pacific Corporation Supplemental Retirement Plan (Supplemental Plan). Incorporated by reference to Exhibit 10(d) to SFP's Report on Form 10-K for the fiscal year ended December 31, 1984. Supplemental Plan as amended October 1, 1989, and Amendment to Supplemental Plan dated February 27, 1990, are incorporated by reference to Exhibit 10(d) to SFP's Report on Form 10-K for the fiscal year ended December 31, 1989. Amendment to Supplemental Plan dated March 22, 1994, and effective January 1, 1994, is incorporated by reference to Exhibit 10.24 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1995. |
| 10.20* | The Burlington Northern and Santa Fe Railway Company Severance Plan as amended and restated October 16, 2001. Incorporated by reference to Exhibit 10.22 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 2001. |
| 10.21* | Burlington Northern Santa Fe 1999 Stock Incentive Plan as amended effective April 18, 2002. Incorporated by reference to Exhibit 10.1 to BNSF's Form 10-Q for the quarter ended June 30, 2002. |
| 10.22* | Amended and Restated Trust Agreement dated as of April 1, 1994 by and between SFP and The Bank of New York. Incorporated by reference to Exhibit 10.30 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1995. |
| 10.23* | Trust Agreement dated as of July 26, 1994 by and between SFP and The Bank of New York. Incorporated by reference to Exhibit 10.31 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1995. |
| 10.24* | Form of indemnification agreement dated as of September 17, 1998 between BNSF and directors. Incorporated by reference to Exhibit 10.37 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1998. |
| 10.25* | Form of indemnification agreement dated as of September 17, 1998 between BNSF and certain officers. Incorporated by reference to Exhibit 10.38 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1998. |
| 10.26* | Amendment to Burlington Northern Santa Fe Supplemental Retirement Plan (Matthew K. Rose) dated April 18, 2002. Incorporated by reference to Exhibit 10.2 to BNSF's Report on Form 10-Q for the period ended June 30, 2002. |
| 10.27* | Retirement Benefit Agreement dated April 19, 2002 between BNSF and Matthew K. Rose. Incorporated by reference to Exhibit 10.3 to BNSF's Report on Form 10-Q for the period ended June 30, 2002. |

| EXHIBIT NUMBER | DESCRIPTION |
|---|---|
| 10.28* | Achievement Award Program of The Burlington Northern and Santa Fe Railway Company as amended and restated April 17, 2003. Incorporated by reference to Exhibit 10.4 to BNSF's Report on Form 10-Q for the period ended June 30, 2003. |
| 10.29* | Retirement Benefit Agreement dated January 16, 2003 between BNSF and John P. Lanigan. |
| 12.1 | Computation of Ratio of Earnings to Fixed Charges. |
| 21.1 | Subsidiaries of BNSF. |
| 23.1 | Consent of PricewaterhouseCoopers LLP. |
| 24.1 | Powers of Attorney. |
| 31.1 | Principal Executive Officer's Certification Pursuant to 18 U.S.C. § 1350 (Section 302 of Sarbanes-Oxley Act of 2002). |
| 31.2 | Principal Financial Officer's Certification Pursuant to 18 U.S.C. § 1350 (Section 302 of Sarbanes-Oxley Act of 2002). |
| 32.1 | Certification Pursuant to 18 U.S.C. § 1350 (Section 906 of Sarbanes-Oxley Act of 2002). |
| * | *Management contract or compensatory plan or arrangement.* |

Exhibit 12.1

**BURLINGTON NORTHERN SANTA FE CORPORATION AND SUBSIDIARIES**
**COMPUTATION OF RATIO OF EARNINGS TO FIXED CHARGES**

*(in millions, except ratio amounts)*

*(Unaudited)*

| | YEAR ENDED DECEMBER 31, | | |
|---|---|---|---|
| | 2003 | 2002 | 2001 |
| Earnings: | | | |
| Income before income taxes and cumulative effect of accounting change | $1,231 | $1,216 | $1,173 |
| Add: | | | |
| Interest and fixed charges, excluding capitalized interest | 420 | 428 | 463 |
| Portion of rent under long-term operating leases representative of an interest factor | 182 | 178 | 173 |
| Distributed income of investees accounted for under the equity method | 3 | 3 | 5 |
| Amortization of capitalized interest | 8 | 8 | 7 |
| Less: Undistributed equity in earnings of investments accounted for under the equity method | 14 | 17 | 23 |
| Total earnings available for fixed charges | 1,830 | $1,816 | $1,798 |
| Fixed charges: | | | |
| Interest and fixed charges | $429 | $441 | $477 |
| Portion of rent under long-term operating leases representative of an interest factor | 182 | 178 | 173 |
| Total fixed charges | 611 | $619 | $650 |
| Ratio of earnings to fixed charges | 3.00x | 2.93x | 2.77x |

Exhibit 31.1

**PRINCIPAL EXECUTIVE OFFICER'S CERTIFICATIONS PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Matthew K. Rose, certify that:

1. I have reviewed this annual report on Form 10-K of Burlington Northern Santa Fe Corporation;
2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;
3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;
4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and we have:
   a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;
   b) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this annual report based on such evaluation; and
   c) disclosed in this annual report any changes in the registrant's internal control over financial reporting that occurred during the registrant's fourth fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;
5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):
   a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
   b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 12, 2004

/s/ Matthew K. Rose
Matthew K. Rose
Chairman, President and
Chief Executive Officer

Exhibit 31.2

**PRINCIPAL FINANCIAL OFFICER'S CERTIFICATIONS PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Thomas N. Hund, certify that:

1. I have reviewed this annual report on Form 10-K of Burlington Northern Santa Fe Corporation;
2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;
3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;
4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and we have:

   a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

   b) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this annual report based on such evaluation; and

   c) disclosed in this annual report any changes in the registrant's internal control over financial reporting that occurred during the registrant's fourth fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;
5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

   a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 12, 2004

/s/ Thomas N. Hund
Thomas N. Hund
Executive Vice President and
Chief Financial Officer

Exhibit 32.1

**CERTIFICATION PURSUANT TO 18 U.S.C. § 1350**

**(SECTION 906 OF SARBANES-OXLEY ACT OF 2002)**

***BURLINGTON NORTHERN SANTA FE CORPORATION***

In connection with the Annual Report of Burlington Northern Santa Fe Corporation (the "Company") on Form 10-K for the year ended December 31, 2003 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), the undersigned, Matthew K. Rose, Chairman, President and Chief Executive Officer of the Company, and Thomas N. Hund, Executive Vice President and Chief Financial Officer of the Company, each hereby certifies that, to his knowledge on the date hereof:

1. The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and
2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: February 12, 2004

| /s/ Matthew K. Rose | /s/ Thomas N. Hund |
|---|---|
| **Matthew K. Rose** | **Thomas N. Hund** |
| **Chairman, President and Chief Executive Officer** | **Executive Vice President and Chief Financial Officer** |

A signed original of this written statement required by Section 906 has been provided to Burlington Northern Santa Fe Corporation and will be retained by Burlington Northern Santa Fe Corporation and furnished to the Securities and Exchange Commission or its staff upon request.

## Burlington Northern Santa Fe Corporation Directors*

***Alan L. Boeckmann*** [3,4]
Chairman and Chief Executive Officer, Fluor Corporation (professional services holding company offering engineering, construction management and other services),
Aliso Viejo, California.
Board member since 2001.

***John J. Burns, Jr.*** [1,2]
President and Chief Executive Officer, Alleghany Corporation (holding company with insurance, investment management, industrial minerals and steel fastener importing and distribution),
New York, New York.
Board member since 1995.

***Vilma S. Martinez*** [4]
Partner, Munger, Tolles & Olson LLP (law firm),
Los Angeles, California.
Board member since 1998.

***Marc F. Racicot*** [1,4]
Partner, Bracewell & Patterson, L.L.P. (law firm), Washington, D.C., and Chairman, Bush-Cheney 04, Inc. (political organization), Washington, D.C.
Former Governor of Montana.
Board member since 2001.

***Roy S. Roberts*** [2,3,4]
Managing Director, Reliant Equity Investors, L.L.C. (private equity firm), Chicago, Illinois, and Retired Group Vice President, North American Vehicle Sales, Service and Marketing, General Motors Corporation (motor vehicle manufacturer), Detroit, Michigan.
Board member since 1993.

***Matthew K. Rose*** [1]
Chairman, President and Chief Executive Officer, Burlington Northern Santa Fe Corporation and The Burlington Northern and Santa Fe Railway Company, Fort Worth, Texas.
Board member since 2000.

***Marc J. Shapiro*** [4]
Chairman, Chase Bank of Texas (banking), Houston, Texas, and Retired Vice Chairman for Finance, Risk Management and Administration, J.P. Morgan Chase & Co. (bank holding company), New York, New York.
Board member since 1995.

***J.C. Watts, Jr.*** [4]
Chairman, J.C. Watts Companies, L.L.C. and J.C. Watts Enterprises, Inc. (communications and public affairs), Norman, Oklahoma. Former Congressman (R-4th Dist., Okla.) and Chairman, House Republican Conference.
Board member since 2003.

***Robert H. West*** [1,2,3]
Retired Chairman of the Board, Butler Manufacturing Company (manufacturer of pre-engineered building systems and specialty components),
Kansas City, Missouri.
Board member since 1980.

***J. Steven Whisler*** [2,3]
Chairman and Chief Executive Officer, Phelps Dodge Corporation (mining and manufacturing), Phoenix, Arizona.
Board member since 1995.

***Edward E. Whitacre, Jr.*** [1,4]
Chairman and Chief Executive Officer, SBC Communications Inc. (communications holding company), San Antonio, Texas.
Board member since 1993.

***Michael B. Yanney*** [1,2]
Chairman, America First Companies L.L.C. (investments), Omaha, Nebraska.
Board member since 1989.

Committee Assignments:
[1] Executive Committee
[2] Compensation and Development Committee
[3] Audit Committee
[4] Directors and Corporate Governance Committee
* Years of Board service includes service on Boards of Burlington Northern Inc., Santa Fe Pacific Corporation and predecessor corporations.

## Corporate Officers [1]

***Matthew K. Rose*** [2]
Chairman, President and Chief Executive Officer

***Thomas N. Hund*** [2]
Executive Vice President and Chief Financial Officer

***Carl R. Ice*** [2]
Executive Vice President and Chief Operations Officer

***John P. Lanigan, Jr.*** [2]
Executive Vice President and Chief Marketing Officer

***Jeffrey R. Moreland*** [2]
Executive Vice President Law & Government Affairs and Secretary

***Jeffrey J. Campbell***
Vice President – Technology Services and Chief Information Officer

***A. P. (Skip) Endres, Jr.***
Vice President – Government Affairs

***James H. Gallegos***
Vice President and Corporate General Counsel

***Paul R. Hoferer***
Vice President and General Counsel

***Linda J. Hurt***
Treasurer

***Dennis R. Johnson*** [2]
Vice President and Controller

***Kenneth J. Kempker***
Vice President – Corporate Audit Services

***Marsha K. Morgan***
Vice President – Investor Relations

***Peter J. Rickershauser*** [2]
Vice President – Network Development

***Richard A. Russack***
Vice President – Corporate Relations

***Shelley J. Venick***
Vice President and General Tax Counsel

***Richard E. Weicher***
Vice President and Senior Regulatory Counsel

***Gloria A. Zamora***
Vice President – Human Resources and Medical

[1] These officers hold similar positions with The Burlington Northern and Santa Fe Railway Company.

[2] Executive Officer of Burlington Northern Santa Fe Corporation.

## Operating Company Officers

***Stevan B. Bobb***
Group Vice President – Agricultural Products

***Stephen G. Branscum***
Group Vice President – Consumer Products

***Rollin D. Bredenberg***
Vice President – Service Design and Performance

***M. David Dealy***
Vice President – Transportation

***Frederick G. (Fritz) Draper***
Vice President – Business Unit Operations and Support

***George T. Duggan***
Vice President – Industrial Products Sales

***John J. Fleps***
Vice President – Labor Relations

***Gregory C. Fox***
Vice President – Engineering

***David L. Garin***
Group Vice President – Industrial Products

***Craig Hill***
Vice President – Mechanical and Value Engineering

***Thomas G. Kraemer***
Group Vice President – Coal

***Mark A. Schulze***
Vice President and Chief Sourcing Officer

***Sami M. Shalah***
Vice President – Coal Marketing

***Denis J. Smith***
Vice President – Industrial Products Marketing

***Gregory W. Stengem***
Vice President – Safety, Training and Operations Support

# Shareholder Information

## Shares Listed

New York Stock Exchange
Chicago Stock Exchange
Pacific Stock Exchange
Ticker Symbol: BNI

## Principal Corporate Office

2650 Lou Menk Drive,
Fort Worth, Texas 76131-2830
(800) 795-2673
www.bnsf.com

## Stock Transfer Agent and Registrar

Via first class/registered mail:
EquiServe Trust Company, N.A.
P.O. Box 43069
Providence, Rhode Island 02940-3069

Via private mail carrier:
EquiServe Trust Company, N.A.
250 Royall Street
Canton, Massachusetts 02021

(800) 526-5678
http://www.equiserve.com

## Shareholders

As of February 2, 2004, there were approximately 40,000 shareholders of record.

## Shareholder Services

You are encouraged to contact our Transfer Agent directly for these shareholder services:

Change in Certificate Registration, Dividend Reinvestment Service, Change of Mailing Address, Lost or Stolen Certificates, Replacement of Dividend Checks, Direct Deposit of Dividends, Consolidation of Multiple Accounts, Elimination of Duplicate Report Mailings, Replacement of Form 1099-DIV.

## Dividend Reinvestment Plan

A dividend reinvestment plan is provided for registered shareholders as a convenient way to purchase more shares through investment of dividends or voluntary cash payments. A booklet describing the plan is available from the Transfer Agent.

## SEC Filings

The Company's Annual Report on Form 10-K filed with the Securities and Exchange Commission (SEC) is posted on the Company's website, www.bnsf.com. A copy of the Annual Report on Form 10-K is also available to shareholders free of charge upon request to the Company's Investor Relations Department at 2500 Lou Menk Drive, Fort Worth, Texas 76131-2828. The Company's filings on Form 10-K, Form 10-Q and Form 8-K are posted on the Company's website as soon as reasonably practicable after the reports are electronically filed with the SEC. Reports on Forms 3, 4 and 5 by directors and Section 16 reporting officers are posted on the Company's website no later than the day following their filing with the SEC.

## Institutional Investors

Inquiries from security analysts and investment professionals should be directed to the Company's investor relations contact:

Ms. Marsha K. Morgan
Vice President – Investor Relations, (817) 352-6452

## Annual Meeting

The Annual Meeting of Shareholders will be held at the City Club of Fort Worth, 301 Commerce Street, Fort Worth, Texas 76102, on Wednesday, April 21, 2004, at 2:00 p.m. CDT.

## Submitting a Complaint or Concern

To report or submit complaints, concerns or any issues regarding accounting, internal controls, auditing matters or other concerns, call the BNSF Hotline at (800) 241-5689. You may report such matters confidentially and anonymously.

© 2004 Burlington Northern Santa Fe Corporation. All rights reserved.
Principal photography: Eric Myer. Matthew Rose photo: Jamie Williams. Design: Methodologie Inc. Printing: Williamson Printing Corporation.

BNSF

We Can Move Your World.™

Burlington Northern Santa Fe Corporation
2650 Lou Menk Drive
Fort Worth, Texas 76131-2830

BURLINGTON NORTHERN SANTA FE CORPORATION 2003 ANNUAL REPORT AND FORM 10-K

# EXHIBIT PX0697

**Burlington Northern Santa Fe Corporation**

2007 Annual Report and Form 10-K

# Our **railroad** connects



**people** and **products**, here
and everywhere.






## Our impact

**BNSF's impact is much broader than America's borders; we are a critical link connecting consumers to the global marketplace.** For more than 150 years, BNSF has played a vital role in building and sustaining this nation's economy: delivering grain for the food we eat, hauling materials to build our homes, transporting products to stock our shelves, and moving the coal that generates more than 10 percent of the country's electricity.


Our **trains** work hard
for our country.

# 10.3M

**Total freight volume (in units)**

**It all starts on our rails.** Last year, our trains handled more than 10 million shipments of coal, industrial, agricultural and consumer products. We continually look for innovative technologies to enhance the efficiency and safety of our operations and expand our capacity to meet increasing market demands.



Our **team** is the most producti
and dedication, our people deli

# 40,000+

**Experienced professionals**



ve in the business. With focus
ver reliable, efficient service.


Our **economy** runs on rail.

# $24B

**Invested in 10 years**

**America gets a return on our investment.** Each year we handle about 10 percent of the nation's freight ton-miles on our BNSF network, across 32,000 route miles in 28 states and two Canadian provinces. To better serve our customers and handle growing volume, we have invested more than $7 billion in locomotives and expansion projects since 1998. As we maintain and expand our "rail highway," our trains serve as a vital link between producers and the marketplace.




Our **world** is the global marketplace.

# 11%

**10-year international compound annual growth rate***

**Our track may serve America, but our impact spans the globe.** As one of the nation's largest railroads, we are a critical part of the global supply chain. We take that responsibility very seriously. At BNSF, we are working to align our business decisions and our environmental, social and economic commitments to create value for customers and all stakeholders today and in the future.

*International intermodal units

**The future is riding on rail.** economy today and will be incr tomorrow. BNSF will always co here and everywhere.

Rail is integral to our nation's
easingly important to the world
nnect people and products,

**Our rail lines helped build this nation starting more than 150 years ago, and today our role is more important than ever. We play an essential role not only in meeting today's freight transportation needs, but in providing and building a transportation network that will meet the needs of future generations.**

**To our shareholders, customers and colleagues,**

The year 2007 was a year of challenges and successes. In a difficult economic environment, the strength of BNSF was evident as our dedicated employees once again delivered reliable service, captured market opportunities and controlled costs.

While we faced many challenges, including a soft economy and record fuel prices, we produced solid returns for our shareholders because of the diverse nature of our business portfolio. We generated record free cash flow in excess of $1 billion before dividends, which allowed us to increase our dividend for the fifth consecutive year; continue our share repurchase program, which began in 1998; and invest in capital to maintain our infrastructure and selectively add capacity for long-term growth.

Despite these successes, however, 2007 was a disappointing year for safety. Sadly, we lost four colleagues to fatal injuries in 2007. And, after about a decade of year-over-year improvement, our employee injury frequency rate increased in 2006 and again in 2007. These results are especially frustrating because we are a leader in most other areas of safety, including highway-rail grade crossing safety. We clearly have more work to do toward our goal of an injury-free and accident-free workplace. We are increasing our focus on safety performance across the railroad with determination to improve. We believe that we have an excellent employee safety framework in place; our challenge is to ensure that these programs are consistently implemented and that we better disseminate best practices within these areas.

As I review the year in more detail, I will outline how the diversity of our business portfolio helped our results and how we adjusted our costs and capital investments in response to the soft business conditions. I will also review our ability to provide reliable service and a strong network to meet customer needs, our focus on capital investment to support long-term growth, and our commitment to corporate citizenship.

**Maintaining a balanced portfolio**

Our 2007 revenues increased approximately $800 million, or 5 percent, to an all-time record of $15.8 billion. Our results were helped by our diverse portfolio of business. The wide variety of commodities we handle gives our company the ability to weather cyclical downturns. Even though consumer products volumes and commodities related to housing were down, we had strong demand in agricultural products. The diversity of our portfolio makes us less vulnerable to changing market demand than many other industries, and our 2007 results underscored that strength.

Our biggest success in 2007 was our agricultural business, which set an all-time revenue record at $2.7 billion. Our volume increased 6 percent in this area, as we handled record levels of wheat, ethanol and bulk foods. A strong domestic harvest, high global demand for wheat, and significant growth in ethanol volume combined for a very successful year for this business segment.

For coal, we also had record volumes and record revenues of $3.3 billion. Although mine production issues during part of the year impacted our volume, we were able to improve service delivery year-over-year. We are optimistic that demand will remain strong for the low-sulfur coal we transport from the Powder River Basin in Wyoming and Montana.



**Matthew K. Rose,** Chairman, President and Chief Executive Officer

Industrial products volumes decreased slightly; however, revenues increased 3 percent to $3.7 billion. Continued strong demand for petroleum products helped to offset the decline in the housing market, which had a negative impact on all of our building products, including lumber, panel products and other building materials.

Our consumer products revenues increased to a record $5.7 billion. Our unit volumes for consumer products, however, decreased due to softening demand for imported consumer goods and a shift in strategy by one of our largest international intermodal customers. We are optimistic that the long-term demand for Asian goods will rebound as the economy improves.

During a year of mixed demand, we worked hard to control costs. With regard to our largest expense category, compensation and benefits, year-over-year expense was down 1 percent on flat employee headcount. Wages and benefits increases were offset by lower variable compensation costs and other cost-control measures.

Our second-largest expense area, fuel, was up 17 percent, due to higher prices and reduced hedge benefits. We were able to recover a portion of the additional expense through our fuel surcharge program. Additionally, we were able to achieve record fuel efficiency with a nearly 3 percent improvement over 2006, avoiding the purchase of more than 38 million gallons of fuel, saving $90 million, and benefiting the environment by burning less fuel per ton-mile.

### Focusing on velocity and service

We recognize that providing reliable service is the best way to ensure our continued growth, especially when the economy begins to recover. We must continue to realize our vision by "providing transportation services that consistently meet our customers' expectations."

In 2007, we continued our companywide focus on velocity. This initiative, which started in 2005, is increasing our on-time performance and asset utilization. Velocity is much more than the speed at which trains travel. It includes the number of times that equipment is handled and how long freight remains stationary. Our people examine every process to eliminate inefficiencies and gain more productive use of our track, equipment, terminals and other assets.

**We were able to achieve record fuel efficiency with a nearly 3 percent improvement over 2006, avoiding the purchase of more than 38 million gallons of fuel, saving $90 million.**

Efforts throughout the company helped us improve our performance for all six of the velocity measures we track. I am proud of our team, who achieved this while coping with severe flooding midyear in the Southeast and Upper Midwest, wildfires in October in Southern California, and record flooding in December in the Puget Sound region. In 2008, our continued focus on velocity will further improve our efficiency and increase the capacity of our existing assets, while helping us better serve new and existing customers.

## Our 2007 revenues increased approximately $800 million, or 5 percent, to an all-time record of $15.8 billion.

I am also proud of our team for achieving a perfect peak season for United Parcel Service (UPS). We handled 34,366 UPS loads with zero service failures between Thanksgiving and December 23 in 2007, and the streak of failure-free service continued for 53 days through mid-January 2008. This was our fourth UPS peak season with perfect performance since 1999.

### Planning for long-term growth

Over the long term, I am very optimistic about the future of rail transportation. My perspective comes, in part, from my work as a member of the National Surface Transportation Policy and Revenue Study Commission. Formed by Congress in 2005, this commission included some of our nation's top transportation experts and leaders in business, government and academics. We were asked to consider the future needs of the nation's surface transportation system and to recommend funding options; the results of our two-year study were released in January 2008.

This independent commission found that a strong freight railroad industry is vital to the future of our country. Today, the U.S. rail industry transports about 40 percent of the nation's goods, in terms of tons handled and distance moved, for only 13 percent of the overall transportation cost. And the value of rail continues to rise. The U.S. Department of Transportation projects that demand for rail freight transportation, measured in tonnage, will increase 88 percent by 2035.

Unlike other modes of transportation, U.S. railroads, including BNSF, own and maintain their transportation rights of way. Simply put, we fund the building, maintenance and repair of a private "rail highway" that delivers tremendous value for our customers and the nation. Our transportation network is critical to the movement of goods and our nation's economic growth, global competitiveness, environmental sustainability, safety and overall quality of life.

In the 10 years that ended in 2007, BNSF spent nearly $24 billion to improve our infrastructure. That includes maintaining a strong infrastructure through strategic investments in expanded track, yards and terminals; track renewal; technology; and acquiring more than 2,700 new, high-efficiency locomotives. All of our investments in infrastructure, equipment, asset utilization, people and technology help ensure we have the capacity to meet current and future freight transportation needs, while also improving our operating reliability and efficiency.

In 2007, we added a total of 183 miles of new track, focusing on expanding capacity of our transcontinental main line linking California to Chicago and our track serving coal territory in Wyoming and Nebraska. These two freight rail corridors are some of the busiest stretches of track in the world. We also acquired another 200 high-horsepower, high-efficiency locomotives. Our newest locomotives are 15 percent more fuel efficient than the units they replaced, which also reduces emissions and benefits the environment. Our investments help ensure that we have the capacity we need to meet our customers' and our nation's transportation needs today and in the future.

But we were also careful to calibrate our capital spending in response to market conditions. In all, our 2007 capital commitments totaled about $2.6 billion. This number was down from 2006, as we reduced our projected spending during the year in response to the softer demand. We are committed to expanding

our capacity to handle growth over the long term, but we always balance those investments with short-term market conditions and demand.

Over the past several years, the public policy debate around economic regulation of the railroad industry has heated up. The outcome of this debate has a direct impact on our ability to continue to invest to meet the projected future demand. Changes in economic regulation have implications for our customers as well as the national highway network.

The Commission found that our nation will require significant increases in rail capacity to encourage economic growth and help meet energy efficiency and environmental goals. Any change to public policy needs to be measured against whether it will expand or shrink rail capacity. Public policy should support the expansion of rail capacity.

### Demonstrating responsible corporate citizenship

We recognize that, as one of our nation's largest railroads, we are a critical part of the global supply chain. We take that responsibility very seriously. We add value by providing freight capacity that, in most cases, is lower cost, more fuel-efficient, more environmentally friendly and safer than other modes of surface transportation. At BNSF, we are working to align our business decisions and our environmental, social and economic commitments to create value for customers and all stakeholders today and in the future.

To raise awareness of the contributions we are making today and what we are working to achieve, we have issued our first Corporate Citizenship Report. You can find this Corporate Citizenship Report on our website at www.bnsf.com. This report provides significant insight into four key areas — our Environmental Leadership, our Safety Commitment, our People and Communities, and our Economic Impact.

### Investing in our people

While our hiring has slowed down to reflect market conditions, we are proud of our efforts to replace retiring workers with military veterans who possess experience and technical knowledge that we need. In 2007, nearly one-third of our new hires were veterans. In recognition of our commitment, *GI Jobs* magazine put us at the top of their 2007 list of America's 50 Most Military Friendly Employers. After ranking high on this list for several years, we are proud of achieving this first-place position in 2007.

Ultimately, our success rests on the quality of our people and our sensitivity to the needs and concerns of our shippers, our investors and our communities. We believe that we made significant progress in 2007, despite a soft economy and other challenges, and we are well-positioned for the future. As always, I credit the dedication, focus and resilience of our people, and I thank all of our stakeholders for their interest and support. Together, we can look forward to the continued growth and strength of our rail franchise in 2008.

Matthew K. Rose

Matthew K. Rose
Chairman, President and Chief Executive Officer
February 14, 2008

# Consolidated Financial Highlights

Dollars in millions, except per share data

| December 31, | 2007 | 2006[a] | 2005[a] | 2004[a] | 2003[a] |
|---|---|---|---|---|---|
| **For the year ended:** | | | | | |
| Revenues | $ 15,802 | $ 14,985 | $ 12,987 | $ 10,946 | $ 9,413 |
| Operating income | $ 3,486 | $ 3,521 | $ 2,927[b] | $ 1,709[c] | $ 1,675 |
| Income before cumulative effect of accounting change | $ 1,829 | $ 1,889 | $ 1,534[b] | $ 805[c] | $ 783[d] |
| Basic earnings per share (before cumulative effect of accounting change) | $ 5.19 | $ 5.23 | $ 4.13[b] | $ 2.18[c] | $ 2.12[d] |
| Average basic shares | 352.5 | 361.0 | 371.8 | 370.0 | 369.1 |
| Diluted earnings per share (before cumulative effect of accounting change) | $ 5.10 | $ 5.11 | $ 4.02[b] | $ 2.14[c] | $ 2.10[d] |
| Average diluted shares | 358.9 | 369.8 | 381.8 | 376.6 | 372.3 |
| Dividends declared per common share | $ 1.14 | $ 0.90 | $ 0.74 | $ 0.64 | $ 0.54 |
| **At year end:** | | | | | |
| Total assets | $ 33,583 | $ 31,797 | $ 30,436 | $ 29,023 | $ 27,050 |
| Long-term debt and commercial paper, including current portion | $ 8,146 | $ 7,385 | $ 7,154 | $ 6,516 | $ 6,684 |
| Stockholders' equity | $ 11,144 | $ 10,528 | $ 9,638 | $ 9,438 | $ 8,608 |
| Net debt to total capitalization[e] | 41.2% | 40.0% | 42.3% | 39.6% | 43.6% |
| **For the year ended:** | | | | | |
| Total capital expenditures | $ 2,248 | $ 2,014 | $ 1,750 | $ 1,527 | $ 1,726 |
| Depreciation and amortization | $ 1,293 | $ 1,176 | $ 1,111 | $ 1,035 | $ 927 |

a Prior year numbers have been adjusted for the retrospective adoption of Financial Accounting Standards Board (FASB) Staff Position (FSP) AUG AIR-1, *Accounting for Planned Major Maintenance Activities.*

b 2005 operating income, income before cumulative effect of accounting change and earnings per share include an impairment charge related to an agreement to sell certain line segments to the State of New Mexico in the future of $71 million pre-tax, $44 million net of tax, or $0.12 per basic and diluted share.

c 2004 operating income, income before cumulative effect of accounting change and earnings per share include a charge for a change in estimate of unasserted asbestos and environmental liabilities of $465 million pre-tax, $288 million net of tax, or $0.78 per basic share and $0.77 per diluted share.

d 2003 income before cumulative effect of accounting change excludes the favorable cumulative effect of an accounting change for asset retirement obligations of $39 million, net of tax, or $0.11 per basic share and $0.10 per diluted share.

e Net debt is calculated as total debt (long-term debt and commercial paper plus long-term debt due within one year) less cash and cash equivalents, and total capitalization is calculated as the sum of net debt and total stockholders' equity.

BNSF's free cash flow, as discussed in the preceding shareholders letter, is a non-GAAP measure and should be considered in addition to, but not as a substitute or preferable to, other information prepared in accordance with GAAP. Below is the calculation of free cash flow before dividends for 2007.

| Free Cash Flow Calculation (in millions) | 2007 |
|---|---|
| Net cash provided by operating activities | $ 3,492 |
| Net cash used for investing activities | (2,415) |
| Proceeds from facility financing obligation | 41 |
| Free cash flow before dividends | $ 1,118 |

# 2007 Form 10-K

**Burlington Northern Santa Fe Corporation**

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

# FORM 10-K

**[x] ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

FOR THE FISCAL YEAR ENDED DECEMBER 31, 2007

OR

**[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

FOR THE TRANSITION PERIOD FROM __________ TO __________

**COMMISSION FILE NUMBER: 1-11535**

---

**Exact name of registrant as specified in its charter**

## Burlington Northern Santa Fe Corporation

| State of Incorporation | I.R.S. Employer Identification No. |
|---|---|
| **Delaware** | **41-1804964** |

Address of principal executive offices, including zip code
**2650 Lou Menk Drive**
**Fort Worth, Texas 76131-2830**

Registrant's telephone number, including area code
**(800) 795-2673**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Name of each exchange on which registered |
|---|---|
| **Common Stock, $0.01 par value** | **New York Stock Exchange** |

**Securities registered pursuant to Section 12(g) of the Act:**
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. **Yes [x] No [ ]**

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. **Yes [ ] No [x]**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirement for the past 90 days. **Yes [x] No [ ]**

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. **[ ]**

Indicate by check mark whether the registrant is a large accelerated filer, accelerated filer, non-accelerated filer, or smaller reporting company (as defined in Rule 12b-2 of the Act).
**Large accelerated filer [x]** **Accelerated filer [ ]** **Non-accelerated filer [ ]** **Smaller reporting company [ ]**

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). **Yes [ ] No [x]**

The aggregate market value of the voting stock held by non-affiliates of the registrant was approximately $29.822 billion on June 30, 2007. For purposes of this calculation only, the registrant has excluded stock beneficially owned by directors and officers. By doing so, the registrant does not admit that such persons are affiliates within the meaning of Rule 405 under the Securities Act of 1933 or for any other purpose.

Indicate the number of shares outstanding of each of the registrant's classes of common stock, as of the latest practicable date: Common Stock, $0.01 par value, 348,201,513 shares outstanding as of February 4, 2008.

### DOCUMENTS INCORPORATED BY REFERENCE

**List hereunder the documents from which parts thereof have been incorporated by reference and the Part of the Form 10-K into which such information is incorporated:**

Burlington Northern Santa Fe Corporation's definitive Proxy Statement, to be filed not later than 120 days after the end of the fiscal year covered by this report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Part III

# Table of Contents


| | | | |
|---|---|---|---|
| **Part I** | Item 1. | Business | 1 |
| | Item 1A. | Risk Factors | 1 |
| | Item 1B. | Unresolved Staff Comments | 4 |
| | Item 2. | Properties | 5 |
| | Item 3. | Legal Proceedings | 10 |
| | Item 4. | Submission of Matters to a Vote of Security Holders | 11 |
| | Executive Officers of the Registrant | | 11 |
| **Part II** | Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 12 |
| | Item 6. | Selected Financial Data | 13 |
| | Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 14 |
| | Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 35 |
| | Item 8. | Financial Statements and Supplementary Data | 37 |
| | Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 74 |
| | Item 9A. | Controls and Procedures | 74 |
| | Item 9B. | Other Information | 74 |
| **Part III** | Item 10. | Directors, Executive Officers and Corporate Governance | 75 |
| | Item 11. | Executive Compensation | 75 |
| | Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 75 |
| | Item 13. | Certain Relationships and Related Transactions, and Director Independence | 76 |
| | Item 14. | Principal Accountant Fees and Services | 76 |
| **Part IV** | Item 15. | Exhibits and Financial Statement Schedules | 77 |
| | Signatures | | S-1 |
| | Exhibit Index | | E-1 |

# Part I

## Item 1. Business

Burlington Northern Santa Fe Corporation (BNSF, Registrant or Company) was incorporated in the State of Delaware on December 16, 1994. On September 22, 1995, the shareholders of Burlington Northern Inc. (BNI) and Santa Fe Pacific Corporation (SFP) became the shareholders of BNSF pursuant to a business combination of the two companies.

On December 30, 1996, BNI merged with and into SFP. On December 31, 1996, The Atchison, Topeka and Santa Fe Railway Company merged with and into Burlington Northern Railroad Company (BNRR), and BNRR changed its name to The Burlington Northern and Santa Fe Railway Company. On January 2, 1998, SFP merged with and into The Burlington Northern and Santa Fe Railway Company. On January 20, 2005, The Burlington Northern and Santa Fe Railway Company changed its name to BNSF Railway Company (BNSF Railway).

Through its subsidiaries, BNSF is engaged primarily in the freight rail transportation business. At December 31, 2007, BNSF and its subsidiaries had approximately 40,000 employees. The rail operations of BNSF Railway, BNSF's principal operating subsidiary, comprise one of the largest railroad systems in North America.

BNSF's internet address is www.bnsf.com. Through this internet website (under the "Investors" link), BNSF makes available, free of charge, its Annual Report on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K, as well as all amendments to those reports, as soon as reasonably practicable after these reports are electronically filed with or furnished to the Securities and Exchange Commission (SEC). Filings on Forms 3, 4 and 5 are also available on this website within one day after filing with the SEC. BNSF's annual CEO certification filed pursuant to the New York Stock Exchange's Corporate Governance Listing Standards is filed as an exhibit to this Form 10-K. BNSF makes available on its website other previously filed SEC reports, registration statements and exhibits via a link to the SEC's website at www.sec.gov. The following documents are also made available on the Company's website:

- Code of Conduct
- Code of Business Conduct and Ethics for Scheduled Employees
- Corporate Governance Guidelines; and
- Charters of the Audit, Compensation and Development and Directors and Corporate Governance Committees

Further discussion of the Company's business, including equipment and business sectors, is incorporated by reference from Item 2, "Properties."

## Item 1A. Risk Factors

**The Company faces intense competition from rail carriers and other transportation providers, and its failure to compete effectively could adversely affect its results of operations, financial condition or liquidity.**

The Company operates in a highly competitive business environment. Depending on the specific market, the Company faces intermodal, intramodal, product and geographic competition. For example, the Company believes that high service truck lines, due to their ability to deliver non-bulk products on an expedited basis, have had and will continue to have an adverse effect on the Company's ability to compete for deliveries of non-bulk, time-sensitive freight. While the Company must build or acquire and maintain its rail system, trucks and barges are able to use public rights-of-way maintained by public entities. Any material increase in the capacity and quality of these alternative methods or the passage of legislation granting greater latitude to motor carriers with respect to size and weight restrictions could have an adverse effect on the Company's results of operations, financial condition or liquidity. In addition, a failure to provide the level of service required by the Company's customers could result in loss of business to competitors.

**A downturn in the economy or change in government policy could negatively impact demand for the Company's services.**

Significant, extended negative changes in economic conditions that impact the producers and consumers of the commodities transported by the Company may have an adverse effect on the Company's operating results, financial condition or liquidity. In addition, changes in United States and foreign government policies could change the economic environment and affect demand for the Company's services. For example, changes in clean air laws or regulation of carbon dioxide emissions could reduce the demand for coal. Also, United States and foreign government agriculture tariffs or subsidies could affect the demand for grain.

**As part of its railroad operations, the Company frequently transports chemicals and other hazardous materials.**

The Company is required to transport these commodities to the extent of its common carrier obligation. An accidental release of these commodities could result in a significant loss of life and extensive property damage as well as environmental remediation obligations. The associated costs could have an adverse effect on the Company's operating results, financial condition or liquidity.

**Future acts of terrorism or war, as well as the threat of war, may cause significant disruptions in the Company's business operations.**

Terrorist attacks, such as those that occurred on September 11, 2001, as well as the more recent attacks on the transportation systems in Madrid, London and in India, and any government response to those types of attacks and war or risk of war may adversely affect the Company's results of operations, financial condition or liquidity. The Company's rail lines and facilities could be direct targets or indirect casualties of an act or acts of terror, which could cause significant business interruption and result in increased costs and liabilities and decreased revenues, which could have an adverse effect on its operating results and financial condition. Such effects could be magnified if releases of hazardous materials are involved. Any act of terror, retaliatory strike, sustained military campaign or war or risk of war may have an adverse impact on the Company's operating results and financial condition by causing or resulting in unpredictable operating or financial conditions, including disruptions of rail lines, volatility or sustained increase of fuel prices, fuel shortages, general economic decline and instability or weakness of financial markets. In addition, insurance premiums charged for some or all of the coverage currently maintained by the Company could increase dramatically or certain coverage may not be available to the Company in the future.

**The Company is subject to stringent environmental laws and regulations, which may impose significant costs on its business operations.**

The Company's operations are subject to extensive federal, state and local environmental laws and regulations concerning, among other things, emissions to the air; discharges to waters; the generation, handling, storage, transportation and disposal of waste and hazardous materials; and the cleanup of hazardous material or petroleum releases. Changes to or limits on carbon dioxide emissions could result in significant capital expenditures to comply with these regulations. Further, local concerns on emissions and other forms of pollution could inhibit the Company's ability to build facilities in strategic locations to facilitate growth and efficient operations. In addition, many of the Company's land holdings are and have been used for industrial or transportation-related purposes or leased to commercial or industrial companies whose activities may have resulted in discharges onto the property. Environmental liability can extend to previously owned or operated properties, leased properties and properties owned by third parties, as well as to properties currently owned and used by the Company. Environmental liabilities have arisen and may continue to arise from claims asserted by adjacent landowners or other third parties in toxic tort litigation. The Company has been and may continue to be subject to allegations or findings to the effect that it has violated, or is strictly liable under, these laws or regulations. The Company's operating results, financial condition or liquidity could be adversely affected as a result of any of the foregoing, and it may be required to incur significant expenses to investigate and remediate environmental contamination. The Company records liabilities for environmental cleanup when the amount of its liability is both probable and reasonably estimable.

**The Company's future success depends on its ability to continue to comply with the significant federal, state and local governmental regulations to which it is subject.**

The Company is subject to a significant amount of governmental regulation with respect to its rates and practices, railroad operations and a variety of health, safety, labor, environmental and other matters. Failure to comply with applicable laws and regulations could have a material adverse effect on the Company. Governments may change the legislative framework within which the Company operates without providing the Company with any recourse for any adverse effects that the change may have on its business. Also, some of the regulations require the Company to obtain and maintain various licenses, permits and other authorizations, and it cannot assure that it will continue to be able to do so. Increased economic regulation of the rail industry could negatively impact the Company's ability to determine prices for rail services and to make capital improvements to its rail network, resulting in an adverse effect on the Company's results of operations, financial condition or liquidity.

**The availability of qualified personnel could adversely affect the Company's operations.**

Changes in demographics, training requirements and the availability of qualified personnel, particularly engineers and trainmen, could negatively impact the Company's ability to meet demand for rail service. Recruiting and retaining qualified personnel, particularly those with expertise in the railroad industry, are vital to operations. Unpredictable increases in demand for rail services may exacerbate such risks, which could have a negative impact on operational efficiency and otherwise have a material adverse effect on the Company's operating results, financial condition or liquidity.

**Most of the Company's employees are represented by unions, and failure to successfully negotiate collective bargaining agreements may result in strikes, work stoppages, or substantially higher ongoing labor costs.**

A significant majority of BNSF Railway's employees are union-represented. BNSF Railway's union employees work under collective bargaining agreements with various labor organizations. Wages, health and welfare benefits, work rules and other issues have traditionally been addressed through industry-wide negotiations. These negotiations have generally taken place over an extended period of time and have previously not resulted in any extended work stoppages. The existing agreements have remained in effect and will continue to remain in effect until new agreements are reached or the Railway Labor Act's procedures (which include mediation, cooling-off periods and the possibility of Presidential intervention) are exhausted. While the negotiations have not yet resulted in any extended work stoppages, if the Company is unable to negotiate acceptable new agreements, it could result in strikes by the affected workers, loss of business and increased operating costs as a result of higher wages or benefits paid to union members, any of which could have an adverse effect on the Company's operating results, financial condition or liquidity.

**Severe weather and natural disasters could disrupt normal business operations, which would result in increased costs and liabilities and decreases in revenues.**

The Company's success is dependent on its ability to operate its railroad system efficiently. Severe weather and natural disasters, such as tornados, flooding and earthquakes, could cause significant business interruptions and result in increased costs and liabilities and decreased revenues. In addition, damages to or loss of use of significant aspects of the Company's infrastructure due to natural or man-made disruptions could have an adverse affect on the Company's operating results, financial condition or liquidity for an extended period of time until repairs or replacements could be made. Additionally, during natural disasters, the Company's workforce may be unavailable, which could result in further delays. Extreme swings in weather could also negatively affect the performance of locomotives and rolling stock.

**Fuel supply availability and fuel prices may adversely affect the Company's results of operations, financial condition or liquidity.**

Fuel supply availability could be impacted as a result of limitations in refining capacity, disruptions to the supply chain, or rising global demand. A significant reduction in fuel availability could impact the Company's ability to provide transportation services at current levels, increase fuel costs and impact the economy. Each of these factors could have an adverse effect on the Company's operating results, financial condition or liquidity. Additionally, the Company is expected to be able to offset a significant portion of the anticipated higher fuel costs through its fuel surcharge program in 2008. However, to the extent that the Company is unable to maintain and expand its existing fuel surcharge program, increases in fuel prices could have an adverse effect on the Company's operating results, financial condition or liquidity.

**The Company depends on the stability and availability of its information technology systems.**

The Company relies on information technology in all aspects of its business. A significant disruption or failure of its information technology systems could result in service interruptions, safety failures, security violations, regulatory compliance failures and the inability to protect corporate information assets against intruders or other operational difficulties. Although the Company has taken steps to mitigate these risks, including Business Continuity Planning, Disaster Recovery Planning and Business Impact Analysis, a significant disruption could adversely affect the Company's results of operations, financial condition or liquidity. Additionally, if the Company is unable to acquire or implement new technology, it may suffer a competitive disadvantage, which could also have an adverse effect on the Company's results of operations, financial condition or liquidity.

**The Company's operational dependencies may adversely affect results of operations, financial condition or liquidity.**

Due to the integrated nature of the United States' freight transportation infrastructure, the Company's operations may be negatively affected by service disruptions of other entities such as ports and other railroads which interchange with the Company. A significant prolonged service disruption of one or more of these entities could have an adverse effect on the Company's results of operations, financial condition or liquidity.

**Personal injury claims constitute a significant expense, and increases in the amount or severity of these claims could adversely affect the Company's operating results.**

The Company is subject to various personal injury claims by third parties and employees, including claims by employees who worked around asbestos until 1985, when its use at BNSF was substantially eliminated. Personal injury claims by BNSF Railway employees are subject to the Federal Employees' Liability Act (FELA), rather than state workers' compensation laws. The Company believes that the FELA system, which includes unscheduled awards and a reliance on the jury system, has contributed to increased expenses in the past. Future events, such as increases in the number of claims that are filed, developments in legislative and judicial standards and the costs of settling claims, could result in an adverse effect on the Company's operating results.

## Item 1B. Unresolved Staff Comments

None.

# Item 2. Properties

## Track Configuration

BNSF Railway operates over a railroad system consisting of approximately 32,000 route miles of track, excluding multiple main tracks, yard tracks and sidings, approximately 23,000 miles of which are owned route miles, including easements, in 28 states and two Canadian provinces as of December 31, 2007. Approximately 9,000 route miles of BNSF Railway's system consist of trackage rights that permit BNSF Railway to operate its trains with its crews over other railroads' tracks.

As of December 31, 2007, the total BNSF Railway system, including single and multiple main tracks, yard tracks and sidings, consisted of approximately 50,000 operated miles of track, all of which are owned by or held under easement by BNSF Railway except for approximately 10,000 route miles operated under trackage rights. At December 31, 2007, approximately 26,000 miles of BNSF Railway's track consisted of 112-pound per yard or heavier rail, including approximately 20,000 track miles of 131-pound per yard or heavier rail.

## Equipment Configuration

BNSF Railway owned or had under non-cancelable leases exceeding one year the following units of railroad rolling stock and other equipment as of the dates shown below.

| At December 31, | 2007 | 2006 | 2005 |
|---|---|---|---|
| Locomotives | **6,400** | 6,330 | 5,790 |
| Freight cars: | | | |
| Covered hopper | **36,439** | 33,488 | 34,631 |
| Gondola | **13,690** | 13,998 | 12,579 |
| Open hopper | **11,428** | 11,277 | 10,973 |
| Flat | **10,470** | 11,382 | 8,537 |
| Box | **7,948** | 8,937 | 8,685 |
| Refrigerator | **4,196** | 4,631 | 4,983 |
| Tank | **427** | 426 | 422 |
| Autorack | **416** | 641 | 748 |
| Other | **324** | 341 | 323 |
| Total freight cars | **85,338** | 85,121 | 81,881 |
| Domestic chassis | **11,714** | 12,849 | 12,649 |
| Company service cars | **4,070** | 3,982 | 4,091 |
| Domestic containers | **3,253** | 3,275 | 10,412 |
| Trailers | **1,200** | 1,209 | 1,916 |
| Commuter passenger cars | **163** | 165 | 179 |
| Average age from date of manufacture–locomotive fleet (years)[a] | **15** | 15 | 15 |
| Average age from date of manufacture–freight car fleet (years)[a] | **14** | 14 | 15 |

a These averages are not weighted to reflect the greater capacities of the newer equipment.

## Capital Expenditures and Maintenance

### Capital Expenditures

The extent of the BNSF Railway's maintenance and capacity program is outlined in the following table:

| Year ended December 31, | 2008 Estimate | 2007 | 2006 | 2005 |
|---|---|---|---|---|
| Track miles of rail laid[a] | **908** | **994** | 854 | 711 |
| Cross ties inserted (thousands)[a] | **3,237** | **3,126** | 2,957 | 3,171 |
| Track resurfaced (miles) | **13,075** | **11,687** | 12,588 | 12,790 |

a Includes both maintenance of existing route system and expansion projects. Expenditures for these maintenance programs are primarily capitalized.

A breakdown of the Company's cash capital expenditures for the three years ended December 31, 2007, is incorporated by reference from a table in Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations under the heading "Liquidity and Capital Resources; Investing Activities."

BNSF's planned 2008 capital commitments are incorporated by reference from Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations under the heading "Executive Summary; Business Outlook for 2008."

**Maintenance**

As of December 31, 2007, General Electric Company, Alstom Transportation, Inc. and Electro-Motive Diesel, Inc. performed locomotive maintenance and overhauls for BNSF Railway at its facilities under various maintenance agreements that covered approximately 4,240 locomotives.

## Property and Facilities

BNSF Railway operates various facilities and equipment to support its transportation system, including its infrastructure and locomotives and freight cars as previously described. It also owns or leases other equipment to support rail operations, including containers, chassis and vehicles. Support facilities for rail operations include yards and terminals throughout its rail network, system locomotive shops to perform locomotive servicing and maintenance, a centralized network operations center for train dispatching and network operations monitoring and management in Fort Worth, Texas, regional dispatching centers, computers, telecommunications equipment, signal systems and other support systems. Transfer facilities are maintained for rail-to-rail as well as intermodal transfer of containers, trailers and other freight traffic. These facilities include 33 major intermodal hubs located across the system. BNSF Railway's largest intermodal facilities in terms of 2007 volume were as follows:

| Intermodal Facilities | Lifts |
|---|---|
| Hobart Yard (Los Angeles, California) | 1,243,000 |
| Logistics Park (Chicago, Illinois) | 755,000 |
| Corwith Yard (Chicago, Illinois) | 739,000 |
| Willow Springs (Illinois) | 636,000 |
| Alliance (Fort Worth, Texas) | 567,000 |
| Cicero (Illinois) | 517,000 |
| San Bernardino (California) | 500,000 |
| Argentine (Kansas City, Kansas) | 369,000 |
| Seattle International Gateway (Seattle, Washington) | 305,000 |
| Memphis (Tennessee) | 284,000 |

BNSF Railway owns 23 automotive distribution facilities and serves eight port facilities where automobiles are loaded on or unloaded from multi-level rail cars in the United States and Canada.

BNSF Railway's largest freight car classification yards based on the average daily number of cars processed (excluding cars that do not change trains at the terminal, intermodal and coal cars) are shown below:

| Classification Yards | Daily Average Cars Processed |
|---|---|
| Argentine (Kansas City, Kansas) | 1,807 |
| Galesburg (Illinois) | 1,642 |
| Barstow (California) | 1,349 |
| Pasco (Washington) | 1,274 |
| Tulsa (Oklahoma) | 1,198 |

As of December 31, 2007, certain BNSF Railway properties and other assets were subject to liens securing $102 million of mortgage debt. Certain locomotives, rolling stock and facilities of BNSF Railway were subject to equipment leases and financing obligations, as referred to in Notes 9 and 10 to the Consolidated Financial Statements.

## Productivity

Productivity, as measured by thousand gross ton miles per employee, is shown in the table below. Gross ton miles is defined as the product of the number of loaded and empty miles traveled and the combined weight of the car and contents. Certain prior period amounts have been adjusted to conform to current year presentation.

| Year ended December 31, | 2007 | 2006 | 2005 |
|---|---|---|---|
| Thousand gross ton miles divided by average number of employees | **27,222** | 27,092 | 26,964 |

A discussion of Employees and Labor Relations is incorporated by reference from Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations, under the heading "Other Matters; Employee and Labor Relations."

## Business Mix

In serving the Midwest, Pacific Northwest and the Western, Southwestern and Southeastern regions and ports of the country, BNSF transports, through one operating transportation services segment, a range of products and commodities derived from manufacturing, agricultural and natural resource industries. Approximately 65 percent of the freight revenues originated by the Company is covered by contractual agreements of varying duration, while the balance is subject to common carrier, published prices or quotations offered by the Company. BNSF's financial performance is influenced by, among other things, general and industry economic conditions at the international, national and regional levels. The following map illustrates the Company's primary routes, including trackage rights, which allow BNSF to access major cities and ports in the western and southern United States as well as Canadian and Mexican traffic. In addition to major cities and ports, BNSF efficiently serves many smaller markets by working closely with approximately 200 shortline partners. BNSF has also entered into marketing agreements with CSX Transportation, Canadian National Railway Company and Kansas City Southern Railway Company, expanding the marketing reach for each railroad and their customers.




**Consumer Products:**
The Consumer Products' freight business provided approximately 37 percent of freight revenues in 2007 and consisted of the following business sectors:

- **International Intermodal** — International business consists primarily of container traffic from steamship companies such as Maersk, Hyundai and Yang Ming. International Intermodal accounted for approximately 46 percent of total Consumer Products revenues.
- **Domestic Intermodal** — Domestic Intermodal generated approximately 45 percent of total Consumer Products revenue. The Domestic Intermodal sector is comprised of the following business areas:
    - **Truckload/Intermodal Marketing Companies** — The Truckload business area is comprised of full truckload carriers such as J.B. Hunt Transportation, Schneider National and Swift Transportation. The Intermodal Marketing Companies business area is comprised of shippers' agents and consolidators such as the Hub Group.

- **Expedited Truckload/Less-than-Truckload** — This business area is comprised of less-than-truckload carriers and parcel carriers such as United Parcel Service and YRC Worldwide. It also includes expedited truckload carriers such as Werner Enterprises, Stevens Transport and U.S. Xpress Enterprises.

- **Automotive** — The transportation of both assembled motor vehicles, primarily those manufactured outside of the United States, and shipments of vehicle parts to numerous destinations throughout the Midwest, Southwest, West and Pacific Northwest provided about 9 percent of total Consumer Products revenues.

**Industrial Products:**
The Industrial Products' freight business provided approximately 24 percent of BNSF's freight revenues in 2007 and consisted of the following five business areas:

- **Construction Products** — The Construction Products sector represented approximately 33 percent of total Industrial Products revenues in 2007. This sector serves virtually all of the commodities included in, or resulting from, the production of steel along with mineral commodities such as clays, sands, cements, aggregates, sodium compounds and other industrial minerals. Industrial taconite, an iron ore derivative produced in northern Minnesota, scrap steel and coal coke are BNSF's primary input products transported. Finished steel products range from structural beams and steel coils to wire and nails. BNSF links the integrated steel mills in the East with fabricators in the West and Southwest. Service is also provided to various mini-mills in the Southwest that produce rebar, beams and coiled rod for the construction industry. Industrial minerals include various mined and processed commodities such as cement and aggregates (construction sand, gravel and crushed stone) that generally move to domestic markets for use in general construction and public work projects, including highways. Borates and clays move to domestic points as well as to export markets primarily through West Coast ports. Sodium compounds, primarily soda ash, are moved to domestic markets for use in the manufacturing of glass and other industrial products. Sand is utilized in the manufacturing of glass and in foundry and oil drilling applications.

- **Building Products** — This sector generated approximately 29 percent of total 2007 Industrial Products revenues and includes primary forest product commodities such as lumber, plywood, oriented strand board, particleboard, paper products, pulpmill feedstocks, wood pulp and sawlogs. Also included in this sector are government, machinery and waste traffic. Commodities from this diverse group primarily originate from the Pacific Northwest, Western Canada, upper Midwest and the Southeast for shipment mainly into domestic markets. Industries served include construction, furniture, photography, publishing, newspaper and industrial packaging. Shipments of waste, ranging from municipal waste to contaminated soil, are transported to landfills and reclamation centers across the country. The government and machinery business includes aircraft parts, agricultural and construction machinery, military equipment and large industrial machinery.

- **Petroleum Products** — Commodities included in the Petroleum Products sector are liquefied petroleum gas (LPG), diesel fuels, asphalt, alcohol, solvents, petroleum coke, lubes, oils, waxes and carbon black. This group made up 16 percent of total Industrial Products revenues for 2007. Product use varies based on commodity and includes the use of LPG for heating purposes, diesel fuel and lubes to run heavy machinery and asphalt for road projects and roofing. Products within this group originate and terminate throughout the BNSF network, with the largest areas of activities being the Texas Gulf, Pacific Northwest, California, Montana and Illinois.

- **Chemicals and Plastic Products** — The Chemicals and Plastic Products sector represented approximately 14 percent of total 2007 Industrial Products revenues. This group is composed of industrial chemicals and plastics commodities. These commodities include caustic soda, chlorine, industrial gases, acids, polyethylene, polypropylene and polyvinyl chloride. Industrial chemicals and plastics resins are used by the automotive, housing and packaging industries, as well as for feedstocks, to produce other chemicals and plastic products. These commodities originate primarily in the Gulf Coast region for shipment mainly into domestic markets.

- **Food and Beverages** — Food and Beverages represented approximately 8 percent of total 2007 Industrial Products revenues. This group consists of beverages, canned goods and perishable food items. Other consumer goods such as cotton, salt, rubber and tires and miscellaneous boxcar shipments are also included in this business area.

**Coal:**

In 2007, the transportation of coal contributed about 21 percent of freight revenues. BNSF is one of the largest transporters of low-sulfur coal in the United States. More than 90 percent of all BNSF's coal tons originated from the Powder River Basin of Wyoming and Montana. These coal shipments were destined for coal-fired electric generating stations located primarily in the North Central, South Central, Southeast, Mountain and Pacific Northwest regions of the United States. BNSF also transports coal from the Powder River Basin to markets in Canada and the eastern United States. Demand for Powder River Basin coal has increased substantially over the past 20 years due to its relatively low sulfur content, abundant reserves, relatively inexpensive mine production and competitive delivered cost to power plants.

Other BNSF coal shipments originate principally in Colorado, Illinois, New Mexico and North Dakota. These shipments move to electrical generating stations and industrial plants in the Mountain and North Central regions of the United States and to Mexico.

**Agricultural Products:**

The transportation of Agricultural Products provided approximately 18 percent of 2007 freight revenues. These products include wheat, corn, bulk foods, soybeans, oil seeds and meals, feeds, barley, oats and rye, flour and mill products, milo, oils, specialty grains, malt, ethanol and fertilizer. The BNSF system is strategically located to serve the grain-producing regions of the Midwest and Great Plains. The Company continues to develop and operate a shuttle network for grain and grain products, which allows more efficient use of equipment and improved cycle times. In addition to serving most grain-producing areas, BNSF serves most major terminal, storage, feeding and food-processing locations. Furthermore, BNSF has access to major export markets in the Pacific Northwest, western Great Lakes, Texas Gulf and Mexico.

## Freight Statistics

The following table sets forth certain freight statistics relating to rail operations for the periods indicated. Certain prior period amounts have been adjusted to conform to current year presentation.

| **Year ended December 31,** | **2007** | **2006** | **2005** |
|---|---|---|---|
| Revenue ton miles (millions)[a] | **657,572** | 647,857 | 604,656 |
| Freight revenue per thousand revenue ton miles | **$ 23.34** | $ 22.45 | $ 20.85 |
| Average length of haul (miles) | **1,079** | 1,067 | 1,068 |

a Revenue ton miles is defined as the product of the number of loaded miles traveled and the weight of the contents.

Revenue, cars/units and average revenue per car/unit information for the three years ended December 31, 2007, is incorporated by reference from a table in Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations, under the heading "Results of Operations; Revenue Table."

## Government Regulation and Legislation

The Company is subject to federal, state and local laws and regulations generally applicable to all businesses. Rail operations are subject to the regulatory jurisdiction of the Surface Transportation Board (STB) of the United States Department of Transportation (DOT), the Federal Railroad Administration of the DOT, the Occupational Safety and Health Administration (OSHA), as well as other federal and state regulatory agencies. The STB has jurisdiction over disputes and complaints involving certain rates, routes and services, the sale or abandonment of rail lines, applications for line extensions and construction and consolidation or merger with, or acquisition of control of, rail common carriers. The outcome of STB proceedings can affect the profitability of BNSF's business.

DOT and OSHA have jurisdiction under several federal statutes over a number of safety and health aspects of rail operations, including the transportation of hazardous materials. State agencies regulate some aspects of rail operations with respect to health and safety in areas not otherwise preempted by federal law.

BNSF Railway's rail operations, as well as those of its competitors, are also subject to extensive federal, state and local environmental regulation. These laws cover discharges to water, air emissions, toxic substances and the generation, handling, storage, transportation and disposal of waste and hazardous materials. This regulation has the effect of increasing the cost and liabilities associated with rail operations. Environmental risks are also inherent in rail operations, which frequently involve transporting chemicals and other hazardous materials.

Many of BNSF Railway's land holdings are and have been used for industrial or transportation-related purposes or leased to commercial or industrial companies whose activities may have resulted in discharges onto the property. As a result, BNSF Railway is now subject to, and will from time to time continue to be subject to, environmental cleanup and enforcement actions. In particular, the federal Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), also known as the Superfund law, generally imposes joint and several liability for cleanup and enforcement costs on current and former owners and operators of a site, without regard to fault or the legality of the original conduct. Accordingly, BNSF Railway may be responsible under CERCLA and other federal and state statutes for all or part of the costs to clean up sites at which certain substances may have been released by BNSF Railway, its current lessees, former owners or lessees of properties, or other third parties. Further discussion is incorporated by reference from Note 10 to the Consolidated Financial Statements.

### Railroad Retirement

Railroad industry personnel are covered by the Railroad Retirement System instead of Social Security. BNSF Railway's contributions under the Railroad Retirement System have been almost triple those in industries covered by Social Security. The Railroad Retirement System, funded primarily by payroll taxes on covered employers and employees, includes a benefit roughly equivalent to Social Security (Tier I), an additional benefit similar to that allowed in some private defined-benefit plans (Tier II) and other benefits. For 2007, the Railroad Retirement System required up to a 19.75 percent contribution by railroad employers on eligible wages, while the Social Security and Medicare Acts only required a 7.65 percent contribution on similar wage bases.

### Competition

The business environment in which BNSF Railway operates is highly competitive. Depending on the specific market, deregulated motor carriers, other railroads and river barges may exert pressure on price and service levels. The presence of advanced, high service truck lines with expedited delivery, subsidized infrastructure and minimal empty mileage continues to affect the market for non-bulk, time-sensitive freight. The potential expansion of longer combination vehicles could further encroach upon markets traditionally served by railroads. In order to remain competitive, BNSF Railway and other railroads continue to develop and implement operating efficiencies to improve productivity.

As railroads streamline, rationalize and otherwise enhance their franchises, competition among rail carriers intensifies. BNSF Railway's primary rail competitor in the Western region of the United States is the Union Pacific Railroad Company. Other Class I railroads and numerous regional railroads and motor carriers also operate in parts of the same territories served by BNSF Railway.

Based on weekly reporting by the Association of American Railroads, BNSF's share of the western United States rail traffic in 2007 was approximately 49 percent.

## Item 3. Legal Proceedings

Beginning May 14, 2007, 27 similar class action complaints were filed in six federal district courts around the country against BNSF and four other Class I railroads (and, in some cases, the Association of American Railroads) alleging that they have conspired to fix fuel surcharges with respect to unregulated freight transportation services in violation of the antitrust laws and seeking injunctive relief and unspecified treble damages. On November 6, 2007, the Judicial Panel on Multidistrict Litigation entered an order to consolidate cases in the federal district court of the District of Columbia for coordinated or consolidated pretrial proceedings. (In re: Rail Freight Fuel Surcharge Antitrust Litigation, MDL No. 1869). The Company believes that these claims are without merit and intends to defend against the allegations vigorously. The Company is also responding to a state grand jury subpoena requesting production of information related to fuel surcharges. The Company does not believe that the outcome of any of these proceedings will have a material effect on its financial condition, results of operations or liquidity.

Information concerning certain pending tax-related administrative or adjudicative state proceedings or appeals is incorporated by reference from Note 5 to the Consolidated Financial Statements, and information concerning other claims and litigation is incorporated by reference from Note 10 to the Consolidated Financial Statements.

## Item 4. Submission of Matters to a Vote of Security Holders

No matters were submitted by BNSF to a vote of its securities holders during the fourth quarter of 2007.

### Executive Officers of the Registrant

Listed below are the names, ages and positions of all executive officers of BNSF and their business experience during the past five years. Executive officers hold office until their successors are elected or appointed, or until their earlier death, retirement, resignation or removal.

**Matthew K. Rose, 48**
Chairman, President and Chief Executive Officer of BNSF since March 2002.

**Thomas N. Hund, 54**
Executive Vice President and Chief Financial Officer since January 2001.

**Carl R. Ice, 51**
Executive Vice President and Chief Operations Officer since January 2001.

**John P. Lanigan, Jr., 52**
Executive Vice President and Chief Marketing Officer since January 2003.

**Roger Nober, 43**
Executive Vice President Law and Secretary since January 2007. Prior to that, partner of Steptoe & Johnson LLP, Washington, DC (law firm) from March 2006 and Chairman of the United States Surface Transportation Board from November 2002 – January 2006.

**Peter J. Rickershauser, 59**
Vice President–Network Development since May 1999.

# Part II

## Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities

BNSF's common stock is listed on the New York Stock Exchange under the symbol "BNI." Information as to the high and low sales prices of such stock for the two years ended December 31, 2007, and the frequency and amount of dividends declared on such stock during such periods, is set forth in Note 16 to the Consolidated Financial Statements. The approximate number of holders of record of the common stock at February 4, 2008, was 32,000.

### Common Stock Repurchases

The following table presents repurchases by the Company of its common stock for each of the three months for the quarter ended December 31, 2007, (shares in thousands):

| Issuer Purchases of Equity Securities | | | | |
|---|---|---|---|---|
| **Period** | **Total Number of Shares Purchased[a]** | **Average Price Paid Per Share** | **Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs[b]** | **Maximum Number of Shares That May Yet be Purchased Under the Plans or Programs[b]** |
| October 1 – 31 | 272 | $ 85.22 | 270 | 32,643 |
| November 1 – 30 | 1,987 | 85.51 | 1,967 | 30,676 |
| December 1 – 31 | 1,262 | 85.23 | 1,175 | 29,501 |
| Total | 3,521 | $ 85.39 | 3,412 | |

a Total number of shares purchased includes approximately 109 thousand shares where employees delivered already owned shares or used an attestation procedure to satisfy the exercise price of stock options or the withholding of tax payments. Total number of shares purchased does not include approximately 117 thousand shares acquired from employees to satisfy tax withholding obligations that arose on the vesting of restricted stock or the exercise of stock options.

b On July 17, 1997, the Board initially authorized and the Company announced the repurchase of up to 30 million shares of the Company's common stock from time to time in the open market. On December 9, 1999, April 20, 2000, September 21, 2000, January 16, 2003, December 8, 2005 and February 14, 2007, the Board authorized and the Company announced extensions of the BNSF share repurchase program, adding 30 million shares at each date for a total of 210 million shares authorized. The share repurchase program does not have an expiration date.

## Item 6. Selected Financial Data

The following table presents, as of and for the dates indicated, selected historical financial information for the Company (in millions, except per share data):

| December 31, | 2007 | 2006[a] | 2005[a] | 2004[a] | 2003[a] |
|---|---|---|---|---|---|
| **For the year ended:** | | | | | |
| Revenues | **$ 15,802** | $ 14,985 | $ 12,987 | $ 10,946 | $ 9,413 |
| Operating income | **$ 3,486** | $ 3,521 | $ 2,927[b] | $ 1,709[c] | $ 1,675 |
| Income before cumulative effect of accounting change | **$ 1,829** | $ 1,889 | $ 1,534[b] | $ 805[c] | $ 783[d] |
| Basic earnings per share (before cumulative effect of accounting change) | **$ 5.19** | $ 5.23 | $ 4.13[b] | $ 2.18[c] | $ 2.12[d] |
| Average basic shares | **352.5** | 361.0 | 371.8 | 370.0 | 369.1 |
| Diluted earnings per share (before cumulative effect of accounting change) | **$ 5.10** | $ 5.11 | $ 4.02[b] | $ 2.14[c] | $ 2.10[d] |
| Average diluted shares | **358.9** | 369.8 | 381.8 | 376.6 | 372.3 |
| Dividends declared per common share | **$ 1.14** | $ 0.90 | $ 0.74 | $ 0.64 | $ 0.54 |
| **At year end:** | | | | | |
| Total assets | **$ 33,583** | $ 31,797 | $ 30,436 | $ 29,023 | $ 27,050 |
| Long-term debt and commercial paper, including current portion | **$ 8,146** | $ 7,385 | $ 7,154 | $ 6,516 | $ 6,684 |
| Stockholders' equity | **$ 11,144** | $ 10,528 | $ 9,638 | $ 9,438 | $ 8,608 |
| Net debt to total capitalization[e] | **41.2%** | 40.0% | 42.3% | 39.6% | 43.6% |
| **For the year ended:** | | | | | |
| Total capital expenditures | **$ 2,248** | $ 2,014 | $ 1,750 | $ 1,527 | $ 1,726 |
| Depreciation and amortization | **$ 1,293** | $ 1,176 | $ 1,111 | $ 1,035 | $ 927 |

a Prior year numbers have been adjusted for the retrospective adoption of Financial Accounting Standards Board (FASB) Staff Position (FSP) AUG AIR-1, *Accounting for Planned Major Maintenance Activities*. See Note 2 to the Consolidated Financial Statements for additional information.

b 2005 operating income, income before cumulative effect of accounting change and earnings per share include an impairment charge related to an agreement to sell certain line segments to the State of New Mexico in the future of $71 million pre-tax, $44 million net of tax, or $0.12 per basic and diluted share. See discussion under Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations, under the heading "New Mexico Department of Transportation."

c 2004 operating income, income before cumulative effect of accounting change and earnings per share include a charge for a change in estimate of unasserted asbestos and environmental liabilities of $465 million pre-tax, $288 million net of tax, or $0.78 per basic share and $0.77 per diluted share.

d 2003 income before cumulative effect of accounting change excludes the favorable cumulative effect of an accounting change for asset retirement obligations of $39 million, net of tax, or $0.11 per basic share and $0.10 per diluted share.

e Net debt is calculated as total debt (long-term debt and commercial paper plus long-term debt due within one year) less cash and cash equivalents, and total capitalization is calculated as the sum of net debt and total stockholders' equity.

# Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations

Management's discussion and analysis relates to the financial condition and results of operations of Burlington Northern Santa Fe Corporation and its majority-owned subsidiaries (collectively BNSF, Registrant or Company). The principal operating subsidiary of BNSF is the BNSF Railway Company (BNSF Railway) through which BNSF derives substantially all of its revenues. All earnings per share information is stated on a diluted basis.

## Company Overview

Through its subsidiaries, BNSF is engaged primarily in the freight rail transportation business. BNSF's primary operating subsidiary, BNSF Railway, operates one of the largest North American rail networks with about 32,000 route miles in 28 states and two Canadian provinces. Through its one operating transportation segment, BNSF Railway transports a wide range of products and commodities including Consumer Products, Industrial Products, Coal and Agricultural Products.

Additional operational information, including weekly intermodal and carload unit reports as submitted to the Association of American Railroads (AAR) and annual reports submitted to the Surface Transportation Board (STB), are available on the Company's website at www.bnsf.com/investors.

## Executive Summary

**Fiscal Year 2007 — Financial Overview**

- The Company achieved earnings of $5.10 per share compared with 2006 earnings of $5.11 per share.
- Freight revenues increased 6 percent to $15.3 billion, which included revenue increases in each of the Company's four business groups.
    - Of the 6-percent increase in freight revenue, 6 percent, 1 percent and 1 percent was attributable to price, unit growth and fuel surcharges, respectively. These were partially offset by a decrease due to changes in business mix.
- Operating expenses for 2007 increased 7 percent compared with 2006, largely driven by a $463 million increase in fuel expense primarily reflecting increased fuel prices and a reduced fuel-hedge benefit.
- Operating income of $3.5 billion for 2007 decreased $35 million from 2006 despite a $310 million reduction in fuel-hedge benefit.
- Each year capital expenditures are a significant use of cash for BNSF. In 2007, BNSF increased its cash capital expenditures to $2.25 billion from $2.01 billion in the prior year primarily due to both maintenance of BNSF's track structure and additional expansion projects undertaken in 2007. Despite the increase in capital expenditures, BNSF's capital commitments, which includes both cash spent for capital and locomotive leases, decreased approximately $80 million to $2.59 billion in 2007 due to fewer locomotive leases entered into in 2007 as compared to 2006.

**Business Outlook for 2008**

- BNSF expects to see revenue growth in the high single digits on about flat unit volumes.
- Combining projected revenue growth with an ongoing focus on productivity, low double-digit growth in earnings per share is achievable.
- The Company's planned capital commitment program for 2008 is approximately $2.45 billion as compared to $2.59 billion in 2007. The decrease in the capital commitment program versus prior year is principally related to lower expansion capital driven by lower anticipated demand.
    - BNSF anticipates leasing 200 locomotives with a cost of about $400 million and investing over $200 million in track and facilities to expand capacity to continue to meet demand for consistent freight rail service. The 2008 capacity expansion program is expected to be approximately $350 million lower than 2007.
    - The Company expects to spend more than $1.8 billion to keep its infrastructure strong by refreshing track, signal systems, structures, freight cars and implementing new technologies.

## Results of Operations

### Revenue Table

The following table presents BNSF's revenue information by business group for the years ended December 31, 2007, 2006 and 2005.

| Year ended December 31, | Revenues (in millions) | | | Cars / Units (in thousands) | | | Average Revenue Per Car / Unit | | |
|---|---|---|---|---|---|---|---|---|---|
| | **2007** | **2006** | **2005** | **2007** | **2006** | **2005** | **2007** | **2006** | **2005** |
| Consumer products | **$ 5,664** | $ 5,613 | $ 4,898 | **5,149** | 5,520 | 5,215 | **$ 1,100** | $ 1,017 | $ 939 |
| Industrial products | **3,684** | 3,589 | 3,128 | **1,664** | 1,686 | 1,655 | **2,214** | 2,129 | 1,890 |
| Coal | **3,279** | 2,916 | 2,448 | **2,472** | 2,458 | 2,238 | **1,326** | 1,186 | 1,094 |
| Agricultural products | **2,722** | 2,427 | 2,132 | **1,033** | 973 | 916 | **2,635** | 2,494 | 2,328 |
| Total freight revenues | **15,349** | 14,545 | 12,606 | **10,318** | 10,637 | 10,024 | **$ 1,488** | $ 1,367 | $ 1,258 |
| Other revenues | **453** | 440 | 381 | | | | | | |
| Total operating revenues | **$ 15,802** | $ 14,985 | $ 12,987 | | | | | | |

### Expense Table

The following table presents BNSF's expense information for the years ended December 31, 2007, 2006 and 2005 (in millions):

| Year ended December 31, | 2007 | 2006[a] | 2005[a] |
|---|---|---|---|
| Compensation and benefits | **$ 3,773** | $ 3,816 | $ 3,515 |
| Fuel | **3,197** | 2,734 | 1,959 |
| Purchased services | **2,023** | 1,906 | 1,713 |
| Depreciation and amortization | **1,293** | 1,176 | 1,111 |
| Equipment rents | **942** | 930 | 886 |
| Materials and other | **1,088** | 902 | 876 |
| Total operating expenses | **$ 12,316** | $ 11,464 | $ 10,060 |
| Interest expense | **$ 511** | $ 485 | $ 437 |
| Other expense, net | **$ 18** | $ 40 | $ 37 |
| Income tax expense | **$ 1,128** | $ 1,107 | $ 919 |

a Prior year numbers have been adjusted for the retrospective adoption of FSP AUG AIR-1, *Accounting for Planned Major Maintenance Activities*. See Note 2 to the Consolidated Financial Statements for additional information.

### Year Ended December 31, 2007, Compared with Year Ended December 31, 2006

BNSF recorded net income for 2007 of $1,829 million, or $5.10 per share. In comparison, net income for 2006 was $1,889 million, or $5.11 per share.

#### Revenues

*Freight*

Freight revenues of $15,349 million for 2007 were $804 million, or 6 percent higher than 2006. Freight revenues reflected a 3-percent decrease in unit volumes. Freight revenues included an increase of approximately $150 million in fuel surcharges compared with the same 2006 period. Growth in prices and fuel surcharges drove average revenue per car/unit up 9 percent in 2007 to $1,488 from $1,367 in 2006.

*Consumer Products*

The Consumer Products' freight business includes a significant intermodal component and consists of the following three business areas: international intermodal, domestic intermodal and automotive.



Consumer Products revenues of $5,664 million for 2007 were $51 million, or 1 percent, higher than 2006. Higher revenue per unit due to improved yields and fuel surcharges was partially offset by lower volumes related to economic softness as well as reduced transpacific service of a large international customer.

*Industrial Products*

Industrial Products' freight business consists of five business areas: construction products, building products, petroleum products, chemicals and plastic products and food and beverages.

Industrial Products revenues increased $95 million, or 3 percent, to $3,684 million for 2007, while unit volumes declined 1 percent. The 4-percent increase in average revenue per car was mainly the result of price increases. Strong demand for petroleum products, chemicals and plastics was offset by a decline in building products as a result of weakness in the housing market.




*Coal*

BNSF is one of the largest transporters of low-sulfur coal in the United States. More than 90 percent of all BNSF's coal tons originate from the Powder River Basin of Wyoming and Montana.

Coal revenues of $3,279 million for 2007 increased $363 million, or 12 percent, versus a year ago due to improved yields, contractual inflation escalators, increased tons per unit and fuel surcharges. Coal unit volumes increased 1 percent despite mine production and weather-related issues.

*Agricultural Products*

The Agricultural Products' freight business transports agricultural products including corn, wheat, soybeans, bulk foods, ethanol, fertilizer and other products.

Agricultural Products revenues of $2,722 million for 2007 were $295 million, or 12 percent higher than revenues for 2006. This increase was primarily due to strong volume growth, favorable mix of business and price increases with the strongest revenue growth in wheat, soybeans, bulk foods, ethanol and fertilizer.




*Other Revenues*

Other revenues increased $13 million, or 3 percent, to $453 million for 2007 compared to 2006. This increase was primarily due to volume growth of BNSF Logistics, an indirect, wholly-owned non-rail subsidiary that specializes in providing third-party logistics and transportation services.

## Expenses

Total operating expenses for 2007 were $12,316 million, an increase of $852 million, or 7 percent over 2006.

*Compensation and Benefits*

Compensation and benefits includes expenses for BNSF employee wages, health and welfare, payroll taxes and other related items. The primary factors influencing the expenses recorded are volume, headcount, utilization, wage rates, incentives earned during the period, benefit plan participation and pension expenses.

Compensation and benefits expenses of $3,773 million were $43 million, or 1 percent lower than 2006, on flat employee headcount. Wages and benefit increases were offset by lower variable compensation costs and other cost controls.

*Fuel*

Fuel expense is driven by market price, the level of locomotive consumption of diesel fuel and the effects of hedging activities.

Fuel expenses of $3,197 million for 2007 were $463 million, or 17 percent, higher than 2006. The increase in fuel expense was due to an increase in the average all-in cost per gallon of diesel fuel, partially offset by a decline in consumption related to improved fuel efficiency. The average all-in cost per gallon of diesel fuel increased by 37 cents to $2.22, or $538 million, which is comprised of an increase in the average purchase price of 16 cents, or $228 million, and a decrease in the hedge benefit of 21 cents, or $310 million (2007 benefit of $31 million less 2006 benefit of $341 million). Consumption in 2007 decreased 36 million gallons to 1,442 million gallons when compared with consumption in the same 2006 period, resulting in a $75 million decrease in fuel expense.

*Purchased Services*

Purchased services expense includes ramping (lifting of containers onto and off of cars); drayage (highway movements to and from railway facilities); maintenance of locomotives, freight cars and equipment; transportation costs over other railroads; technology services outsourcing; professional services; and other contract services provided to BNSF. Purchased services expense also includes purchased transportation costs for BNSF Logistics, an indirect, non-rail subsidiary of BNSF that specializes in providing third-party logistics and transportation services. The expenses are driven by the rates established in the related contracts and the volume of services required.

Purchased services expenses of $2,023 million for 2007 were $117 million, or 6 percent higher than 2006. Beyond general inflation, the largest drivers of this increase were (i) $25 million in haulage payments for transportation over other railroads, principally due to a new southeast intermodal agreement; (ii) $20 million in purchased transportation costs for BNSF Logistics; (iii) $10 million in locomotive maintenance costs; and (iv) $10 million in ramping costs (lifting of containers onto and off of cars).

*Depreciation and Amortization*

Depreciation and amortization expenses for the period are determined by using the group method of depreciation, applying a single rate to the gross investment in a particular class of property. Due to the capital-intensive nature of BNSF's operations, depreciation expense is a significant component of the Company's operating expense. The full effect of inflation is not reflected in operating expenses since depreciation is based on historical cost.

Depreciation and amortization expenses of $1,293 million for 2007 were $117 million, or 10 percent higher than 2006. This increase was primarily due to continuing capital expenditures as well as updated depreciation rates for locomotives (see discussion under the heading "Critical Accounting Estimates; Depreciation").

*Equipment Rents*

Equipment rents expense includes long-term and short-term payments primarily for locomotives, freight cars, containers and trailers. The expense is driven primarily by volume, lease and rental rates, utilization of equipment and changes in business mix resulting in equipment usage variances.

Equipment rents expenses for 2007 of $942 million were $12 million, or 1 percent, higher than 2006, on a 3-percent decline in unit volumes. The variance represents an increase in locomotive lease expense, partially offset by a decrease in freight car equipment expense due to the impact of the Company's privatization efforts, lower volumes and velocity improvements for freight car equipment.

*Materials and Other*

Material expenses consist mainly of the costs involved to purchase mechanical and engineering materials, in addition to other items for construction and maintenance of property and equipment. Other expenses include personal injury claims, environmental remediation and derailments as well as utilities, impairments of long-lived assets, locomotive overhauls, property and miscellaneous taxes and employee separation costs. The total is offset by gains on land sales and insurance recoveries.

Materials and other expenses of $1,088 million for 2007, which consisted of approximately $450 million of materials expense with the remainder consisting of numerous other items, were $186 million, or 21 percent higher than 2006. The increase was primarily due to increases of approximately (i) $65 million and $16 million first quarter environmental and technology charge, respectively (see discussion under the heading "Other Matters; Charge for Environmental Costs and Technology System Write-Off"); (ii) $40 million in environmental remediation developments; (iii) $25 million due largely to rising costs for materials for locomotives, freight cars and track structure; and (iv) $20 million in crew transportation costs principally due to increased fuel and insurance-related costs as well as increased usage due to adverse weather. In addition, a $22 million gain from a line sale to the State of New Mexico was recorded in 2006 (see discussion under the heading "Other Matters; New Mexico Department of Transportation").

*Interest Expense*

Interest expense of $511 million for 2007 was $26 million, or 5 percent higher than 2006. This increase was primarily the result of a higher average debt balance, partially offset by lower average rates.

*Income Taxes*

The effective rate in 2007 was 38.2 percent compared with 36.9 percent for the prior year. The increase in the effective tax rate primarily reflects income tax adjustments that favorably impacted income tax expense in 2006 as compared with 2007.

**Year Ended December 31, 2006, Compared with Year Ended December 31, 2005**

BNSF recorded net income for 2006 of $1,889 million, or $5.11 per share. In comparison, net income for 2005 was $1,534 million, or $4.02 per share, which included a $0.12 per share impairment charge related to an agreement to sell certain line segments to the State of New Mexico (see discussion under heading "Other Matters; New Mexico Department of Transportation").

## Revenues

### *Freight*

Freight revenues of $14,545 million for 2006 were $1,939 million, or 15 percent higher than 2005. Freight revenues reflected a 6-percent increase in volumes. Freight revenues include an increase of approximately $600 million in fuel surcharges compared with the same 2005 period. Growth in prices and fuel surcharges drove average revenue per car/unit up 9 percent in 2006 to $1,367 from $1,258 in 2005.

### *Consumer Products*

Consumer Products revenues of $5,613 million for 2006 were $715 million, or 15 percent greater than 2005. The increase in average revenue per unit of 8 percent was primarily related to price increases and increased fuel surcharges. Additionally, cars/units increased by 6 percent due primarily to growth in international intermodal.




### *Industrial Products*

Industrial Products revenues increased $461 million, or 15 percent, to $3,589 million for 2006. The revenue increase was driven by double-digit growth in four of the five business areas. The 13-percent increase in average revenue per car was the result of price increases and increased fuel surcharges. Units increased 2 percent driven by demand for plastics, petroleum products and steel, partially offset by softness in demand for building products.




### *Coal*

Coal revenues of $2,916 million for 2006 increased $468 million, or 19 percent, versus 2005. The revenue increase was primarily driven by a 10-percent increase in volumes resulting from significant customer demand and greater line throughput due to increased network fluidity. Average revenue per car increased 8 percent driven by contractual price escalations, increased length of haul and fuel surcharges.

### *Agricultural Products*

Agricultural Products revenues of $2,427 million for 2006 were $295 million, or 14 percent higher than revenues for 2005. This increase was primarily due to a 7-percent increase in average revenue per car, which was driven by both price increases and increased fuel surcharges associated with higher fuel prices, and a 6-percent increase in volume driven primarily by an increase in demand for corn.




### *Other Revenues*

Other revenues increased $59 million, or 15 percent, to $440 million for 2006 compared to 2005. This increase was primarily due to increases in demurrage charges and volume growth of BNSF Logistics, an indirect, wholly-owned non-rail subsidiary that specializes in providing third-party logistics and transportation services.

## Expenses

Total operating expenses for 2006 were $11,464 million, an increase of $1,404 million, or 14 percent over 2005. The increase in operating expenses was primarily the result of significant fuel price increases and a 6-percent increase in gross-ton miles handled. Operating expenses for 2005 were impacted by a $71 million pre-tax impairment charge related to an agreement to sell certain line segments to the State of New Mexico.

### *Compensation and Benefits*

Compensation and benefits expenses of $3,816 million were $301 million, or 9 percent higher than 2005. The increase was primarily related to 6 percent higher unit volumes, which resulted in a 5-percent increase in the average headcount. Additionally, increased stock-based compensation expense of approximately $30 million, due largely to the adoption of Statement of Financial Accounting Standards (SFAS) No. 123R, *Share-Based Payment,* and increased pension expense of approximately $30 million contributed to the overall increase in compensation and benefits expense as compared with the prior year.

*Fuel*

Fuel expenses of $2,734 million for 2006 were $775 million, or 40 percent, higher than 2005. The increase in fuel expense is due to an increase in the average all-in cost per gallon of diesel fuel, as well as an increase in consumption driven by higher volumes. The average all-in cost per gallon of diesel fuel increased by 45 cents to $1.85, or $661 million, which is comprised of an increase in the average purchase price of 32 cents, or $471 million, and a decrease in the hedge benefit of 13 cents, or $190 million (2006 benefit of $341 million less 2005 benefit of $531 million). Consumption in 2006 was 1,478 million gallons compared with 1,402 million gallons in 2005, resulting in a $114 million increase in fuel expense.

*Purchased Services*

Purchased services expenses of $1,906 million for 2006 were $193 million, or 11 percent higher than 2005. This increase was primarily due to increases in the following volume-related costs of approximately (i) $50 million in intermodal ramp costs; (ii) $40 million in haulage payments for transportation over other railroads; (iii) $35 million in locomotive, freight car and equipment maintenance expense; and (iv) $25 million in purchased transportation costs for BNSF Logistics.

*Depreciation and Amortization*

Depreciation and amortization expenses of $1,176 million for 2006 were $65 million, or 6 percent higher than 2005. This increase was primarily due to ongoing capital expenditures.

*Equipment Rents*

Equipment rents expenses for 2006 of $930 million were $44 million, or 5 percent higher than 2005 driven by an increase of approximately $45 million in locomotive rents, which was largely the result of an increase in the number of locomotives under operating leases. Freight car equipment was essentially flat year-over-year due to the impact of increasing volumes being offset by the impact of the Company's privatization efforts, velocity improvements and an increase in off-line receipts.

*Materials and Other*

Materials and other expenses of $902 million for 2006, which consisted of approximately $425 million of materials expense with the remainder consisting of numerous other items, were $26 million, or 3 percent higher than 2005. The increase was primarily due to increases of approximately (i) $65 million in materials costs for locomotives, freight cars and track structure; (ii) $35 million in crew transportation and lodging expense; (iii) $20 million in property taxes; and (iv) $20 million in expense related to derailments. These increases were offset by a $22 million gain from a line sale to the State of New Mexico recorded in 2006. Expenses for 2005 were impacted by a $71 million pre-tax impairment charge related to an agreement to sell certain line segments to the State of New Mexico (see discussion under the heading "Other Matters; New Mexico Department of Transportation").

*Interest Expense*

Interest expense of $485 million for 2006 was $48 million, or 11 percent higher than 2005. This increase was primarily the result of a higher average debt balance.

*Income Taxes*

The effective rate in 2006 was 36.9 percent compared with 37.5 percent for the prior year. The decrease in the effective tax rate primarily reflects income tax adjustments that favorably impacted income tax expense in 2006 as compared with 2005.

## Liquidity and Capital Resources

Liquidity is a company's ability to generate cash flows to satisfy current and future obligations. Cash generated from operations is BNSF's principal source of liquidity. BNSF generally funds any additional liquidity requirements through debt issuance, including commercial paper, through leasing of assets and through the sale of a portion of its accounts receivable.

**Operating Activities**

2007

Net cash provided by operating activities was $3,492 million during 2007 compared with $3,189 million during 2006. The increase was primarily the result of an increase in earnings before depreciation and amortization expense, higher environmental accruals in 2007 and higher contributions to the pension plan in 2006.

2006

Net cash provided by operating activities was $3,189 million during 2006 compared with $2,706 million during 2005. The increase was primarily the result of an increase in earnings before depreciation and amortization expense.

**Investing Activities**

2007

Net cash used for investing activities was $2,415 million during 2007 compared with $2,167 million during 2006. Investing activities for the year included $2,248 million of capital expenditures, which were $234 million higher than 2006 primarily due to an increase in capital expenditures for maintenance of BNSF's track structure and for terminal and line expansions as illustrated in the table below.

2006

Net cash used for investing activities was $2,167 million during 2006 compared with $2,120 million during 2005. Investing activities for the year included $2,014 million of capital expenditures, which were $264 million higher than 2005 primarily due to an increase in capital expenditures for maintenance of BNSF's track structure and for terminal and line expansions as illustrated in the table below. The decrease in cash used for other investing activities primarily reflects timing of equipment financing activities, $50 million in consideration received for the third easement sale to Seattle Sound Transit and $45 million in consideration received for the New Mexico line sale as discussed in the "Other Matters" section. Additionally, 2005 included consideration paid to another carrier for trackage rights and alternative access rights and an investment in Pace Synfuels.

A breakdown of cash capital expenditures during 2007, 2006 and 2005 is set forth in the following table (in millions):

| Year ended December 31, | 2007 | 2006 | 2005 |
|---|---|---|---|
| Maintenance of way: | | | |
| Rail | **$ 376** | $ 304 | $ 232 |
| Ties | **316** | 311 | 284 |
| Surfacing | **235** | 214 | 183 |
| Other | **432** | 397 | 354 |
| Total maintenance of way | **1,359** | 1,226 | 1,053 |
| Mechanical | **141** | 152 | 136 |
| Information services | **75** | 65 | 64 |
| Other | **105** | 121 | 108 |
| Total maintenance of business | **1,680** | 1,564 | 1,361 |
| Terminal and line expansion | **568** | 450 | 389 |
| Total | **$ 2,248** | $ 2,014 | $ 1,750 |

The table above does not include expenditures for equipment financed through operating leases (principally related to locomotives).

**Financing Activities**

2007

Net cash used for financing activities during 2007 was $1,122 million, primarily related to common stock repurchases of $1,265 million, including $43 million to satisfy tax withholding obligations for stock option exercises, and dividend payments of $380 million, which were partially offset by net debt borrowings of $234 million, proceeds from stock options exercised of $142 million, excess tax benefits from equity compensation plans of $121 million and proceeds from a facility financing obligation of $41 million.

Aggregate debt to mature in 2008 is $411 million. BNSF's ratio of net debt to total capitalization was 41.2 percent at December 31, 2007, compared with 40.0 percent at December 31, 2006. The Company's adjusted net debt to total capitalization was 51.8 percent at December 31, 2007, compared with 51.7 percent at December 31, 2006. BNSF's adjusted net debt to total capitalization is a non-GAAP measure and should be considered in addition to, but not as a substitute or preferable to, the information prepared in accordance with GAAP. However, management believes that adjusted net debt to total capitalization provides meaningful additional information about the ability of BNSF to service long-term debt and other fixed obligations and to fund future growth.

The following table presents a reconciliation of the calculation of adjusted net debt to total capitalization percentage:

| **December 31,** | **2007** | **2006[a]** |
|---|---|---|
| Net debt to total capitalization[b] | **41.2%** | 40.0% |
| Adjustment for long-term operating leases[c] | **10.5** | 11.2 |
| Adjustment for other debt equivalents[d] | **0.5** | 0.5 |
| Adjustment for unfunded pension and retiree health and welfare liability | **0.7** | 1.1 |
| Adjustment for junior subordinated notes[e] | **(1.1)** | (1.1) |
| Adjusted net debt to total capitalization | **51.8%** | 51.7% |

a Prior year numbers have been adjusted for the retrospective adoption of FSP AUG AIR-1, *Accounting for Planned Major Maintenance Activities*. See Note 2 to the Consolidated Financial Statements for additional information.

b Net debt to total capitalization is calculated as total debt (long-term debt and commercial paper plus long-term debt due within one year) less cash and cash equivalents divided by the sum of net debt and total stockholders' equity.

c Represents the net present value of future operating lease commitments.

d Adjustment for other debt equivalents principally includes accounts receivable financing (see Note 6 to the Consolidated Financial Statements for additional information).

e Junior subordinated notes are included in total debt on the respective Consolidated Balance Sheets; however, as they include certain equity characteristics, they have been assigned 50 percent equity credit for purposes of this calculation.

In February 2007, the Board of Directors (the Board) authorized an additional $1.4 billion of debt securities that may be issued through the Securities and Exchange Commission (SEC) debt shelf registration process, for a total of $2.1 billion authorized to be issued.

In April 2007, BNSF issued $650 million of 5.65 percent debentures and $650 million of 6.15 percent debentures due May 1, 2017 and May 1, 2037, respectively. The net proceeds from the sale of the debentures are being used for general corporate purposes including, but not limited to, working capital, capital expenditures, funding the maturity of debt which matured in 2007, the repayment of commercial paper and the repurchase of common stock. The issuance of these debentures reduced the amount of debt authorized to be issued by the Board through the SEC debt shelf registration process to $800 million.

In 2007, BNSF entered into several capital leases totaling approximately $325 million to finance locomotives and freight cars. The terms of the leases are between 15 and 20 years.

In 2005, the Company commenced the construction of an intermodal facility that it intends to sell to a third party and subsequently lease back. Once construction of the facility is complete and all improvements have been sold to the third party, BNSF will lease the facility from the third party for 20 years. Construction is expected to be completed by early 2009 with an approximate cost of $160 million. As of December 31, 2007, BNSF has sold $41 million of completed improvements. This sale leaseback transaction is being accounted for as a financing obligation due to continuing involvement. The outflows from the construction of the facility are classified as investing activities, and the inflows from the associated financing proceeds are classified as financing activities in the Company's Consolidated Statements of Cash Flows.

## 2006

Net cash used for financing activities during 2006 was $722 million, primarily related to common stock repurchases of $730 million and dividend payments of $310 million, which were partially offset by net debt borrowings of $116 million, proceeds from stock options exercised of $116 million and excess tax benefits from equity compensation plans of $95 million. Upon adoption of SFAS No. 123R, the excess tax benefits from equity compensation plans were classified in financing activities. However, as the Company adopted SFAS No. 123R prospectively, financial statements prior to January 1, 2006, include excess tax benefits as an operating activity.

In August 2006, BNSF issued $300 million of 6.20 percent debentures due August 15, 2036. The net proceeds from the sale of the debentures are being used for general corporate purposes including but not limited to working capital, capital expenditures and the repayment of outstanding commercial paper. See Note 3 to the Consolidated Financial Statements for information related to the hedges unwound as part of this debt issuance.

## 2005

Net cash used for financing activities during 2005 was $833 million primarily related to common stock repurchases of $799 million, prepaid forward share repurchases of $600 million and dividend payments of $267 million, which where partially offset by net debt borrowings of $599 million and proceeds from stock options exercised of $244 million.

In December 2005, BNSF issued $500 million of 6.613 percent junior subordinated notes due December 31, 2055. The junior subordinated notes are callable on or after January 15, 2026, at par plus accrued and unpaid interest. On January 15, 2026, if the junior subordinated notes are not called, the interest rate will change to an annual rate equal to the 3-month London Interbank Offered Rate (LIBOR) plus 2.35 percent, reset quarterly. Interest payments may be deferred, at the option of the Company, on a cumulative basis for a period of up to five consecutive years; however, during this time the Company would not be permitted to declare or pay dividends on its common stock. In the event that certain financial covenants are not maintained, the Company would be required to sell common stock, the proceeds of which would be used to pay any accrued and unpaid interest. At December 31, 2007, the Company was in compliance with these covenants. Because of this structure, certain rating agencies provide a considerable degree of equity treatment for purposes of calculating various ratios and metrics. The majority of the net proceeds of the debt issuance were used to repurchase common stock, with the remainder used for general corporate purposes.

**Dividends**

Common stock dividends declared were $1.14, $0.90 and $0.74 per share annually for 2007, 2006 and 2005, respectively. Dividends paid on common stock were $380 million, $310 million and $267 million during 2007, 2006 and 2005, respectively. On October 18, 2007, the Board declared a quarterly dividend of $0.32 per share on outstanding shares of common stock, payable January 2, 2008 to shareholders of record on December 12, 2007. On February 13, 2008, the Board declared a quarterly dividend of $0.32 per share on outstanding shares of common stock, payable April 1, 2008, to shareholders of record on March 11, 2008.

**Common Stock Repurchase Program**

During 2007, 2006 and 2005, the Company repurchased approximately 15 million, 18 million and 14 million shares, respectively, of its common stock at average prices of $83.96 per share, $73.43 per share and $54.95 per share, respectively. Further information on this repurchase program is incorporated by reference from Note 15 to the Consolidated Financial Statements.

In February 2007, the Board authorized the extension of the current BNSF share repurchase program, adding 30 million shares to the total of 180 million shares previously authorized in equal amounts in July 1997, December 1999, April 2000, September 2000, January 2003 and December 2005.

Since 2001, BNSF has primarily utilized free cash flow to repurchase its shares. In February 2007, BNSF announced it would modify its share repurchase approach based on improved credit statistics over the past few years, including interest coverage, debt-to-cash flow and debt-to-capital ratios. These credit statistics have improved sufficiently that BNSF is now devoting additional financial capacity to share repurchases. This difference in approach is expected to result in a moderately higher level of debt.

**Long-Term Debt and Other Obligations**

The Company's business is capital intensive. BNSF has historically generated a significant amount of cash from operating activities, which it uses to fund capital additions, service debt, repurchase shares and pay dividends. Additionally, the Company relies on access to the debt and leasing markets to finance a portion of capital additions on a long-term basis.

During 2007, BNSF agreed to acquire an additional 1,025 locomotives, bringing its total commitment to acquire 1,505 new locomotives by 2013. As of December 31, 2007, BNSF had taken delivery of 480 of the 1,505 locomotives, including 200 during 2007.

During 2006, BNSF agreed to acquire 4,000 covered hoppers and 1,400 double-stack cars by 2010. As of December 31, 2007, BNSF had taken delivery of 1,998 of the covered hoppers and 350 of the double-stack cars.

The locomotives and freight cars under these agreements have been or are expected to be financed from one or a combination of sources including, but not limited to, cash from operations, capital or operating leases and debt issuances. The decision on the method used for a particular acquisition financing will depend on market conditions and other factors at that time.

The Company also utilizes a commercial paper program backed by a bank revolving credit agreement to manage liquidity needs. For 2008 and the foreseeable future, the Company expects that cash from operating activities, access to capital markets, the accounts receivable sales program and the bank revolving credit agreement will be sufficient to enable the Company to meet its obligations when due. The Company believes these sources of funds will also be sufficient to fund capital additions that are necessary to maintain its competitiveness and position the Company for future revenue growth.

The Company's ratio of earnings to fixed charges was 4.62 and 4.90 times for the years ended December 31, 2007 and 2006, respectively. Additionally, the Company's ratio of net cash provided by operating activities divided by total average debt was 44 percent for the years ended December 31, 2007 and 2006, respectively.

The following table summarizes the Company's obligations under long-term debt and other contractual commitments at December 31, 2007 (in millions):

| | Payments Due by Period | | | | |
|---|---|---|---|---|---|
| **Contractual Obligations** | **Total** | **Less than 1 year** | **1–3 years** | **3–5 years** | **More than 5 years** |
| Long-term debt[a] | $ 7,208 | $ 258 | $ 605 | $ 1,037 | $ 5,308 |
| Capital lease obligations | 938 | 153 | 245 | 132 | 408 |
| Interest payments[b] | 7,751 | 280 | 913 | 800 | 5,758 |
| Operating lease obligations[c] | 7,498 | 699 | 1,310 | 1,107 | 4,382 |
| Purchase obligations[d] | 14,304 | 5,126 | 2,463 | 1,831 | 4,884 |
| Other long-term liabilities reflected on the balance sheet under GAAP[e] | 575 | 98 | 196 | 157 | 124 |
| Total contractual obligations | $ 38,274 | $ 6,614 | $ 5,732 | $ 5,064 | $ 20,864 |

a Excludes capital lease obligations.

b Interest payments relate to fixed-rate long-term debt and capital lease obligations and exclude the impact of any interest-rate hedging activities (see Note 3 to the Consolidated Financial Statements for additional information). Additionally, the Company's only variable-rate debt is commercial paper, which expires within 90 days; therefore, the related interest has been excluded from the table above.

c Gross payments due, which include an interest component.

d Includes short-line minimum usage commitments, asset maintenance and other purchase commitments.

e Consists of employee separation payments as discussed in Note 11 to the Consolidated Financial Statements, actuarially estimated payments from BNSF expected to be made over the next five years for the pension plans and the retiree health and welfare plan as discussed in Note 13 to the Consolidated Financial Statements and estimated future cash flows for income tax liabilities and interest accrued related to unrecognized tax benefits as discussed in Note 5 to the Consolidated Financial Statements.

In the normal course of business, the Company enters into long-term contracts for future goods and services needed for the operations of the business. Such commitments are not in excess of expected requirements and are not reasonably likely to result in performance penalties or payments that would have a material adverse effect on the Company's liquidity.

**Credit Agreement**

Commercial paper and the revolving credit agreement are discussed in Note 9 to the Consolidated Financial Statements. The $1.2 billion revolving credit agreement includes covenants and events of default typical for this type of facility, including a maximum debt-to-capital test and a $75 million cross-default provision. At December 31, 2007, there were no bank borrowings against the revolving credit agreements, and the Company was in compliance with its debt covenants. BNSF's maximum debt-to-capital test provides approximately $8 billion of debt capacity above BNSF's outstanding debt as of December 31, 2007, before an event of default would occur under these covenants. With the exception of a voluntary bankruptcy or insolvency, any event of default has either or both a cure period or notice requirement before termination of the agreement. A voluntary bankruptcy or insolvency would be considered an immediate termination event.

**Market Conditions**

In spite of recent credit market conditions resulting from issues within the sub-prime mortgage market, BNSF has not experienced significant impacts to liquidity or cost of debt. The market conditions have not affected BNSF's ability to issue commercial paper, secure necessary debt financings or obtain funding through its accounts receivable sales program.

## Off-Balance Sheet Arrangements

### Sale of Accounts Receivable

The accounts receivable sales program of Santa Fe Receivables Corporation, as described in Note 6 to the Consolidated Financial Statements, includes various provisions that, if triggered, would allow the investors participating in this program, at their option, to cancel the program. These provisions include a maximum debt-to-capital test, which is the same as in the BNSF revolving credit agreements described above. BNSF's maximum debt-to-capital test provides approximately $8 billion of debt capacity above BNSF's outstanding debt as of December 31, 2007. At December 31, 2007, the Company's capacity to sell undivided interests to investors under the accounts receivable sales program was $700 million, which was comprised of two $175 million, 364-day accounts receivable sales facilities and two $175 million, 3-year accounts receivable sales facilities. The Company amended the two 364-day facilities in November 2007, reducing the committed amounts to $175 million each and modifying their maturities to November 2008. The two 3-year facilities were entered into in November 2007 concurrently with the amendment and extension of the 364-day facilities and will mature in November 2010. Outstanding undivided interests held by investors under the A/R sales program were $300 million at December 31, 2007 and December 31, 2006, respectively. Management expects to be able to either extend the commitment of the current investors under the 364-day facilities past November 2008 or to find additional investors in the accounts receivable sales program who will commit to purchase undivided interests after November 2008.

The accounts receivable sales program provides efficient financing at a competitive interest rate as compared with traditional borrowing arrangements and provides diversification of funding sources. Since the funding is collateralized by BNSF receivables, the risk of exposure is only as great as the risk of default on these receivables (see Note 6 to the Consolidated Financial Statements for additional information).

### Guarantees

The Company acts as guarantor for certain debt and lease obligations of others. During the past few years, the Company has primarily utilized guarantees to allow third-party entities to obtain favorable terms to finance the construction of assets that will benefit the Company. Additionally, in the ordinary course of business, BNSF enters into agreements with third parties that include indemnification clauses. The Company does not expect performance under these guarantees or indemnities to have a material adverse effect on the Company's liquidity in the foreseeable future (see Note 9 to the Consolidated Financial Statements for additional information).

## Inflation

Due to the capital-intensive nature of BNSF's business, the full effect of inflation is not reflected in operating expenses because depreciation is based on historical cost. An assumption that all operating assets were depreciated at current price levels would result in substantially greater expense than historically reported amounts.

## Other Matters

### Charge for Environmental Costs and Technology System Write-Off

In the first quarter of 2007, the Company recorded a pre-tax charge of $81 million, or $0.14 after-tax per share. This charge reflected an approximate $65 million increase in environmental costs primarily related to a final resolution with the State of Washington and its Department of Ecology on clean-up of an existing environmental site at Skykomish and an adverse reversal of a trial court decision on appeal regarding a site at Arvin, California. In addition, the Company recorded a non-cash charge of $16 million to write-off a technology system that has been replaced.

### Planned Major Maintenance Activities

Effective January 1, 2007, the Company transitioned to the deferral method of accounting for leased locomotive overhauls under the Financial Accounting Standards Board (FASB) Staff Position (FSP) AUG AIR-1, *Accounting for Planned Major Maintenance Activities,* issued in September 2006. Additional information concerning the adoption of this accounting principle is incorporated by reference from Note 2 to the Consolidated Financial Statements.

### Uncertain Tax Positions

Effective January 1, 2007, the Company adopted the provisions of FASB Interpretation No. (FIN) 48, *Accounting for Uncertainty in Income Taxes—an interpretation of FASB Statement No. 109, Accounting for Income Taxes*. Additional information concerning the Company's uncertain tax positions is incorporated by reference from Notes 2 and 5 to the Consolidated Financial Statements.

### Commercial

In February 2005, the Company received a Civil Investigative Demand from the Antitrust Division of the Department of Justice requesting information concerning the Company's pricing activities relating to the shipment of coal from the southern Powder River Basin. The Company has responded to all requests for information, and the matter remains pending.

**Hedging Activities**

The Company uses derivatives to hedge against increases in diesel fuel prices and interest rates as well as to convert a portion of its fixed-rate long-term debt to floating-rate debt. The Company does not hold or issue derivative financial instruments for trading or speculative purposes. The Company formally documents the relationship between the hedging instrument and the hedged item, as well as the risk management objective and strategy for the use of the hedging instrument. This documentation includes linking the derivatives that are designated as fair value or cash flow hedges to specific assets or liabilities on the balance sheet, commitments or forecasted transactions. The Company assesses at the time a derivative contract is entered into, and at least quarterly thereafter, whether the derivative item is effective in offsetting the changes in fair value or cash flows. Any change in fair value resulting from ineffectiveness, as defined by SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities, as amended,* is recognized in current period earnings. For derivative instruments that are designated and qualify as cash flow hedges, the effective portion of the gain or loss on the derivative instrument is recorded in accumulated other comprehensive loss (AOCL) as a separate component of stockholders' equity and reclassified into earnings in the period during which the hedge transaction affects earnings. Cash flows related to fuel and interest rate hedges are classified as operating activities in the Consolidated Statements of Cash Flows.

BNSF monitors its hedging positions and credit ratings of its counterparties and does not anticipate losses due to counterparty nonperformance. As of December 31, 2007, BNSF's counterparties have an investment grade credit rating.

Fuel

BNSF measures the fair value of fuel hedges from data provided by various external counterparties. To value a swap, the Company uses the forward commodity price for the period hedged (see Note 3 to the Consolidated Financial Statements for additional information).

Subsequent to December 31, 2007, the Company entered into fuel swap agreements utilizing New York Mercantile Exchange #2 Heating Oil. The following table provides additional fuel-hedge data through February 4, 2008 based on the quarter being hedged.

| | Quarter Ending | | | | |
|---|---|---|---|---|---|
| **2008** | **March 31,** | **June 30,** | **September 30,** | **December 31,** | **Annual** |
| **HO Swaps** | | | | | |
| Gallons hedged (in millions) | – | 6.80 | 6.80 | 6.06 | 19.66 |
| Average swap price (per gallon) | $ – | $ 2.42 | $ 2.43 | $ 2.48 | $ 2.44 |

Interest Rate

From time to time, the Company enters into various interest rate hedging transactions for the purpose of managing exposure to fluctuations in interest rates by establishing rates in anticipation of both future debt issuances and the refinancing of leveraged leases, as well as converting a portion of its fixed-rate long-term debt to floating-rate debt. The Company uses interest rate swaps and treasury locks as part of its interest rate risk management strategy. BNSF's measurement of the fair value of interest rate derivatives is based on estimates of the mid-market values for the transactions provided by the counterparties to these agreements (see Note 3 to the Consolidated Financial Statements for additional information).

In anticipation of a future debt issuance, the Company entered into treasury locks in January 2008, having an aggregate notional amount of $75 million to fix a portion of the rate for a future 10-year unsecured debt issuance. Including the seven treasury locks that were executed in 2007 for the same expected debt issuance, the total amount hedged is $250 million with an average locked-in rate of 4.24 percent. The treasury locks are expected to be unwound during 2008, and any gain or loss on the hedges will be amortized to interest expense over the life of the issued debt. These transactions are accounted for as cash flow hedges.

**Employee and Labor Relations**

A significant majority of BNSF Railway's employees are union-represented. BNSF Railway's union employees work under collective bargaining agreements with various labor organizations. A negotiating process for new, major collective bargaining agreements covering all of BNSF Railway's union employees has been underway since the bargaining round was initiated November 1, 2004. Wages, health and welfare benefits, work rules and other issues have traditionally been addressed through industry-wide negotiations. These negotiations have generally taken place over an extended period of time and have previously not resulted in any extended work stoppages. The existing agreements have remained in effect and will continue to remain in effect until new agreements are reached or the Railway Labor Act's procedures (which include mediation, cooling-off periods and the possibility of U.S. Presidential intervention) are exhausted. Agreements undergoing renegotiation in the current bargaining round provide for periodic wage increases until new agreements are reached.

The current bargaining round for all unions with contracts that came into effect after January 1, 2005, began on and after November 1, 2004, with the serving of Section 6 notices, which are each side's initial proposals. BNSF is participating in a coordinated national handling of these proposals. The current agreements remain in effect until new agreements are reached or until changes to the existing agreements are made.

Final agreements have been reached under the current bargaining round, covering about 65 percent of BNSF's unionized workforce. These agreements resolve all wage, work rule, and benefit issues through December 31, 2009. A tentative agreement (subject to membership ratification—a process which will take from 45 to 90 days) was reached with the United Transportation Union ("UTU") on January 28, 2008. The UTU represents just under 30 percent of BNSF's scheduled employees. BNSF remains in national bargaining with the International Association of Machinists and Aerospace Workers.

**Seattle Sound Transit**

In December 2003, BNSF Railway Company entered into several agreements with Central Puget Sound Regional Transit Authority (Sound Transit), a government authority established by King, Pierce and Snohomish counties within the State of Washington. BNSF has agreed to sell to Sound Transit under the threat of condemnation a combination of (i) four easements enabling Sound Transit to offer commuter rail service over existing BNSF track from Seattle to Everett and (ii) 18 miles of railroad line from south of Tacoma to Nisqually, Washington.

Sound Transit agreed to pay BNSF approximately $260 million for four commuter easements to operate trains on the segment between Seattle and Everett and entered into agreements both for service on the commuter easements and joint use of track for commuter and freight purposes. The Company received approximately $80 million of cash in 2003 upon the closing of the first easement, $80 million of cash in 2004 upon closing of the second easement, $50 million of cash in 2006 upon closing of the third easement and $50 million in cash in 2007 upon closing of the fourth and final easement. The sale proceeds will be recognized in income over the average life of the associated track structure (approximately 37 years).

Additionally, the Company sold 18 miles of railroad line and associated real estate from south of Tacoma to Nisqually in several separate transactions. The Company recognized gains associated with the sale of $9 million and $7 million, net of tax, in 2005 and 2004, respectively.

**New Mexico Department of Transportation**

In the fourth quarter of 2005, BNSF Railway Company entered into agreements with the New Mexico Department of Transportation to sell the Company's rail line and certain adjacent property between Belen, New Mexico and Trinidad, Colorado, through a series of sales agreements, while retaining freight easement rights on the line. The Company recognized an impairment charge in 2005 related to this agreement of $71 million. During the first quarter of 2006, upon closing the sale of the first line segment, the Company recognized a gain of $22 million and received a cash payment of $45 million. During the first quarter of 2007, upon closing the sale of the second line segment, the Company recognized a gain of $2 million and received cash of $18 million. Upon satisfaction of closing conditions, the remaining line sales are expected to close in 2008. BNSF expects to receive a cash payment of $4 million in 2008 related to this transaction and any related gain is immaterial. The impairment charge and the gains were recorded as a component of materials and other expense.

**American Jobs Creation Act of 2004**

In October 2004, the American Jobs Creation Act of 2004 was signed into law. Part of the legislation includes the repeal of a 4.3–cent tax per gallon of diesel fuel. The tax was gradually phased out in 2005 and 2006 and was completely phased out January 1, 2007. Based on actual fuel consumption, the repeal of the tax resulted in $32 million, $8 million and $21 million in incremental savings for the years ended December 31, 2007, 2006 and 2005, respectively.

## Critical Accounting Estimates

In the ordinary course of business, the Company makes a number of estimates and assumptions related to the reporting of results of operations and financial position in the preparation of its financial statements in conformity with accounting principles generally accepted in the United States of America. Actual results could differ significantly from those estimates under different assumptions and conditions. The following discussion addresses the Company's most critical accounting estimates.

Management has discussed the development and selection of the critical accounting estimates described below with the Audit Committee of the Board of Directors, and the Audit Committee has reviewed the Company's disclosure relating to them in this Management's Discussion and Analysis of Financial Condition and Results of Operations.

**Legal**

BNSF's most significant legal claims relate to personal injury claims and environmental matters. These claims are discussed in more detail below.

Personal Injury

Personal injury claims, including asbestos claims and employee work-related injuries and third-party injuries (collectively, other personal injury), are a significant expense for the railroad industry. Personal injury claims by BNSF Railway employees are subject to the provisions of the Federal Employers' Liability Act (FELA) rather than state workers' compensation laws. FELA's system of requiring the finding of fault, coupled with unscheduled awards and reliance on the jury system, contributed to increased expenses in past years. Other proceedings include claims by non-employees for punitive as well as compensatory damages. A few proceedings purport to be class actions. The variability present in settling these claims, including non-employee personal injury and matters in which punitive damages are alleged, could result in increased expenses in future years. BNSF has implemented a number of safety programs designed to reduce the number of personal injuries as well as the associated claims and personal injury expense.

BNSF records a liability for personal injury claims when the expected loss is both probable and reasonably estimable. The liability and ultimate expense projections are estimated using standard actuarial methodologies. Liabilities recorded for unasserted personal injury claims are based on information currently available. Due to the inherent uncertainty involved in projecting future events such as the number of claims filed each year, developments in judicial and legislative standards and the average costs to settle projected claims, actual costs may differ from amounts recorded. Expense accruals and any required adjustments are classified as materials and other in the Consolidated Statements of Income.

*Asbestos*

The Company is party to a number of personal injury claims by employees and non-employees who may have been exposed to asbestos. The heaviest exposure for BNSF employees was due to work conducted in and around the use of steam locomotive engines that were phased out between the years of 1950 and 1967. However, other types of exposures, including exposure from locomotive component parts and building materials, continued after 1967 until they were substantially eliminated at BNSF by 1985.

BNSF assesses its unasserted liability exposure on an annual basis during the third quarter. BNSF determines its asbestos liability by estimating its exposed population, the number of claims likely to be filed, the number of claims that will likely require payment, and the estimated cost per claim. Estimated filing and dismissal rates and average cost per claim are determined utilizing recent claim data and trends.

Key elements of the assessment include:

- Because BNSF did not have detailed employment records in order to compute the population of potentially exposed employees, it computed an estimate using Company employee data from 1970 forward and estimated the BNSF employee base from 1938-1969 using railroad industry historical census data and estimating BNSF's representation in the total railroad population.
- The projected incidence of disease was estimated based on epidemiological studies using employees' age, duration and intensity of exposure while employed.
- An estimate of the future anticipated claims filing rate by type of disease (non-malignant, cancer and mesothelioma) was computed using the Company's average historical claim filing rates for the period 2004-2006.
- An estimate of the future anticipated dismissal rate by type of claim was computed using the Company's historical average dismissal rates observed in 2005-2007.
- An estimate of the future anticipated settlement by type of disease was computed using the Company's historical average of dollars paid per claim for pending and future claims using the average settlement by type of incidence observed during 2005-2007.

From these assumptions, BNSF projected the incidence of each type of disease to the estimated population to arrive at an estimate of the total number of employees that could potentially assert a claim. Historical claim filing rates were applied for each type of disease to the total number of employees that could potentially assert a claim to determine the total number of anticipated claim filings by disease type. Historical dismissal rates, which represent claims that are closed without payment, were then applied to calculate the number of future claims by disease type that would likely require payment by the Company. Finally, the number of such claims was multiplied by the average settlement value to estimate BNSF's future liability for unasserted asbestos claims.

The most sensitive assumptions for this accrual are the estimated future filing rates and estimated average claim values. Asbestos claim filings are typically sporadic and may include large batches of claims solicited by law firms. To reflect these factors, BNSF used a multi-year calibration period (i.e., the average historical filing rate for the period 2004-2006) because it believed it would be most representative of its future claim experience. In addition, for non-malignant claims, the number of future claims to be filed against BNSF declines at a rate consistent with both mortality and age as there is a decreasing propensity to file a claim as the population ages. BNSF believes the average claim values by type of disease from the historical period 2005-2007 are most representative of future claim values. Non-malignant claims, which represent approximately 90 percent of the total number and 75 percent of the cost of estimated future asbestos claims, were priced by age of the projected claimants. Historically, the ultimate settlement value of these types of claims is most sensitive to the age of the claimant. A 10-percent increase or decrease in either the forecasted number of unasserted claims or the average claim values would result in an approximate $25 million increase or decrease in the liability recorded for unasserted asbestos claims.

Further discussion on asbestos is incorporated by reference from Note 10 to the Consolidated Financial Statements.

*Other Personal Injury*

BNSF estimates its other personal injury liability claims and expense quarterly based on the covered population, activity levels and trends in frequency and the costs of covered injuries. Estimates include unasserted claims except for certain repetitive stress and other occupational trauma claims that result from prolonged repeated events or exposure. Such claims are estimated on an as-reported basis because, while the Company has concluded that a probable loss has occurred, it cannot estimate the range of reasonably possible loss due to other contributing causes of such injuries and the fact that continued exposure is required for the potential injury to manifest itself as a claim. The Company believes that the low end of the range of reasonably possible loss, as that term is used in FIN 14, *Reasonable Estimation of the Amount of a Loss*, is immaterial for these repetitive stress and other occupational trauma claims.

Key elements of the actuarial assessment include:

- Size and demographics (employee age and craft) of the workforce.
- Activity levels (manhours by employee craft and carloadings).
- Expected claim frequency rates by type of claim (employee FELA or third-party liability) based on historical claim frequency trends.
- Expected dismissal rates by type of claim based on historical dismissal rates.
- Expected average paid amounts by type of claim for open and incurred but not reported claims that eventually close with payment.

From these assumptions, BNSF estimates the number of open claims by accident year that will likely require payment by the Company. The projected number of open claims by accident year that will require payment is multiplied by the expected average cost per claim by accident year and type to determine BNSF's estimated liability for all asserted claims. Additionally, BNSF estimates the number of its incurred but not reported claims that will likely result in payment based upon historical emergence patterns by type of claim. The estimated number of projected claims by accident year requiring payment is multiplied by the expected average cost per claim by accident year and type to determine BNSF's estimated liability for incurred but not reported claims.

The most sensitive assumptions for this accrual are the expected average cost per claim and the projected frequency rates for the number of claims that will ultimately result in payment. A 10-percent increase or decrease in either the expected average cost per claim or the frequency rate for claims with payment would result in an approximate $45 million increase or decrease in BNSF's recorded other personal injury reserves.

Further discussion on other personal injury is incorporated by reference from Note 10 to the Consolidated Financial Statements.

Environmental

The Company's operations, as well as those of its competitors, are subject to extensive federal, state and local environmental regulation. BNSF's operating procedures include practices to protect the environment from the risks inherent in railroad operations, which frequently involve transporting chemicals and other hazardous materials. Additionally, many of BNSF's land holdings are and have been used for industrial or transportation-related purposes or leased to commercial or industrial companies whose activities may have resulted in discharges onto the property. As a result, BNSF is subject to environmental cleanup and enforcement actions. In particular, the federal Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), also known as the Superfund law, as well as similar state laws, generally impose joint and several liability for cleanup and enforcement costs on current and former owners and operators of a site without regard to fault or the legality of the original conduct. BNSF has been notified that it is a potentially responsible party (PRP) for study and cleanup costs at Superfund sites for which investigation and remediation payments are or will be made or are yet to be determined (the Superfund sites) and, in many instances, is one of several PRPs. In addition, BNSF may be considered a PRP under certain other laws. Accordingly, under CERCLA and other federal and state statutes, BNSF may be held jointly and severally liable for all environmental costs associated with a particular site. If there are other PRPs, BNSF generally participates in the cleanup of these sites through cost-sharing agreements with terms that vary from site to site. Costs are typically allocated based on such factors as relative volumetric contribution of material, the amount of time the site was owned or operated and/or the portion of the total site owned or operated by each PRP.

Liabilities for environmental cleanup costs are recorded when BNSF's liability for environmental cleanup is probable and reasonably estimable. Subsequent adjustments to initial estimates are recorded as necessary based upon additional information developed in subsequent periods. Environmental costs include initial site surveys and environmental studies as well as costs for remediation of sites determined to be contaminated.

BNSF estimates the ultimate cost of cleanup efforts at its known environmental sites on an annual basis during the third quarter. Ultimate cost estimates for environmental sites are based on historical payment patterns, current estimated percentage to closure ratios and benchmark patterns developed from data accumulated from industry and public sources, including the Environmental Protection Agency and other governmental agencies. These factors incorporate experience gained from cleanup efforts at other similar sites into the estimates for which remediation and restoration efforts are still in progress. The most significant assumptions are as follows: (i) historical payment patterns of site development and (ii) variance from benchmark costs. A 10 percent change in any of these individual assumptions could result in an increase or decrease of up to $20 million in BNSF's estimated environmental liability.

Further discussion on environmental is incorporated by reference from Note 10 to the Consolidated Financial Statements.

Other Claims and Litigation

In addition to asbestos, other personal injury and environmental matters discussed above, BNSF and its subsidiaries are also parties to a number of other legal actions and claims, various governmental proceedings and private civil suits arising in the ordinary course of business, including those related to disputes and complaints involving certain transportation rates and charges (including complaints seeking refunds of prior charges paid for coal transportation and the prescription of future rates for such movements and claims relating to service under contract provisions or otherwise). Some of the legal proceedings include claims for punitive as well as compensatory damages, and a few proceedings purport to be class actions. While the final outcome of these matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded along with applicable insurance, it is the opinion of BNSF that none of these items, when finally resolved, will have a material adverse effect on the Company's financial position or liquidity. However, an unexpected adverse resolution of one or more of these items could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

*Income Taxes*

BNSF is subject to various federal, state and local income taxes in the taxing jurisdictions where the Company operates. BNSF accounts for income taxes by providing for taxes payable or refundable in the current year and for deferred tax assets and liabilities for future tax consequences of events that have been recognized in financial statements or tax returns.

BNSF recorded total income tax expense, including federal, state and other income taxes, of $1,128 million, $1,107 million and $919 million for the years ended December 31, 2007, 2006 and 2005, respectively. BNSF's Consolidated Balance Sheets reflect $290 million and $345 million of net current deferred tax assets at December 31, 2007 and 2006, respectively. Also included in BNSF's Consolidated Balance Sheets are $8,484 million and $8,298 million of net non-current deferred tax liabilities at December 31, 2007 and 2006, respectively. Classification of deferred tax assets and liabilities as current or non-current is determined by the financial statement classification of the asset or liability to which the temporary difference is related. If a temporary difference is not related to an asset or liability for financial reporting, it is classified according to the expected reversal date of the temporary difference.

Valuation allowances are established to reduce deferred tax assets if it is more likely than not that some or all of the deferred tax asset will not be realized. BNSF has not recorded a valuation allowance, as it believes that the deferred tax assets will be fully realized in the future.

All federal income tax returns of BNSF's predecessor companies, Burlington Northern Inc. and Santa Fe Pacific Corporation, are closed through 1994 and the business combination date of September 22, 1995, respectively. Internal Revenue Service (IRS) examination of the years 1995 through 1999 for BNSF is completed, and the un-agreed issues are pending before IRS Appeals. It is anticipated that a settlement with the IRS for the years 1995 through 1999 may be reached within the next twelve months. Examination of the years 2000 through 2002 and 2003 through 2005 for BNSF are completed and protests of the un-agreed issues are pending before IRS Appeals. BNSF is currently under examination for year 2006.

BNSF and its subsidiaries have various state income tax returns in the process of examination, administrative appeal or litigation. State income tax returns are generally subject to examination for a period of three to five years after filing of the respective return. The state impact of any federal changes remains subject to examination by various states for a period of up to one year after formal notification to the states.

Due to the capital-intensive nature of BNSF's business, a significant portion of the audit issues with the IRS and other taxing authorities relate to whether expenditures are classified as maintenance or capital and whether certain asset valuations are appropriate. A provision for taxes resulting from ongoing and future federal and state audits is based on an estimation of aggregate adjustments that may be required as a result of the audits. The Company believes that adequate provision has been made for any adjustment that might be assessed for open years through 2007.

BNSF makes estimates of the potential liability based on its assessment of all potential tax exposures. In addition, the Company uses factors such as applicable tax laws and regulations, current information and past experience with similar issues to make these judgments.

Deferred tax assets and liabilities are measured using the tax rates that apply to taxable income in the period in which the deferred tax asset or liability is expected to be realized or paid. Changes in the Company's estimates regarding the statutory tax rate to be applied to the reversal of deferred tax assets and liabilities could materially affect the effective tax rate.

The Company has not significantly changed its methodology for calculating income tax expense for the years presented, and there are currently no known trends, demands, commitments, events or uncertainties that are reasonably likely to occur and materially affect the methodology or assumptions described above. Further information on uncertain tax positions is incorporated by reference from Notes 2 and 5 to the Consolidated Financial Statements.

**Employment Benefit Plans**

BNSF sponsors a funded, noncontributory qualified pension plan, the BNSF Retirement Plan, which covers most non-union employees, and an unfunded non-tax-qualified pension plan, the BNSF Supplemental Retirement Plan, which covers certain officers and other employees. The benefits under these pension plans are based on years of credited service and the highest consecutive sixty months of compensation for the last ten years of salaried employment with BNSF. BNSF's funding policy is to contribute annually not less than the regulatory minimum and not more than the maximum amount deductible for income tax purposes with respect to the funded plan.

Certain salaried employees of BNSF that have met age and years of service requirements are eligible for life insurance coverage and medical benefits, including prescription drug coverage, during retirement. This postretirement benefit plan, referred to as the retiree health and welfare plan, is contributory and provides benefits to retirees, their covered dependents and beneficiaries. Retiree contributions are adjusted annually. The plan also contains fixed deductibles, coinsurance and out-of-pocket limitations. The basic life insurance plan is noncontributory and covers retirees only. Optional life insurance coverage is available for some retirees; however, the retiree is responsible for the full cost. BNSF's policy is to fund benefits payable under the medical and life insurance plans as they come due. Generally, employees beginning salaried employment with BNSF subsequent to September 22, 1995, are not eligible for medical benefits during retirement.

The amounts recorded in the Consolidated Statements of Income for the pension and the retiree health and welfare plans were as follows (in millions):

| Year ended December 31, | 2008 Estimate | 2007 | 2006 | 2005 |
|---|---|---|---|---|
| Net pension cost | **$ 30** | **$ 52** | $ 68 | $ 38 |
| Net retiree health and welfare cost | **$ 17** | **$ 17** | $ 14 | $ 11 |

The decrease in the 2008 net pension cost as compared to 2007 primarily reflects higher than expected returns on plan assets over the past several years as well as a 50 basis point increase in the discount rate.

At December 31, 2007, BNSF had net losses, excluding prior service costs, of $234 million and $67 million related to the pension and retiree health and welfare benefits plans, respectively, which had been recognized as a component of AOCL under SFAS No. 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans–an amendment of FASB Statements No. 87, 88, 106 and 132R*, as described in Note 13 to the Consolidated Financial Statements. These losses were comprised of gains and losses from changes in discount rates, actuarial assumptions and census data as well as market gains and losses and will be recognized as a component of net pension and retiree health and welfare costs over the next 17 and 8 years, respectively, as follows:

| | Deferred Losses to be Recognized (in millions) | |
|---|---|---|
| **Fiscal year** | **Pension** | **Retiree Health and Welfare Benefits** |
| 2008[a] | $ 16 | $ 4 |
| 2009 | 10 | 4 |
| 2010 | 5 | 4 |
| 2011 | 2 | 3 |
| 2012 | 2 | 3 |
| Thereafter | 21 | 21 |

a Excludes a $5 million pre-tax component of the $7 million net of tax decrease to retained earnings recorded in January 2008 related to the change in measurement date under SFAS No. 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans—an amendment of FASB Statements No. 87, 88, 106 and 132R*. See Note 13 to the Consolidated Financial Statements.

The Company estimates liabilities and expenses for the pension and retiree health and welfare plans. Estimated amounts are based on historical information, current information and estimates about future events and circumstances. Significant assumptions used in the valuation of the pension or retiree health and welfare obligations include expected return on plan assets, discount rate, rate of increase in compensation levels and the health care cost trend rate.

From time to time, the Company will change pension and retiree health and welfare assumptions in response to current conditions and expected future experience. Significant assumptions for the past three years are as follows:

| **Assumptions Used to Determine Net Cost for Fiscal Years Ended December 31,** | **Pension Benefits** | | | **Retiree Health and Welfare Benefits** | | |
|---|---|---|---|---|---|---|
| | **2007** | **2006** | **2005** | **2007** | **2006** | **2005** |
| Discount rate | **5.50%** | 5.25% | 5.75% | **5.50%** | 5.25% | 5.75% |
| Expected long-term rate of return on plan assets | **8.00%** | 8.00% | 8.00% | **–%** | –% | –% |
| Assumed health care cost trend rate | **–%** | –% | –% | **10.00%** | 10.50% | 10.00% |
| Rate to which health care cost trend rate is expected to decline and remain | **–%** | –% | –% | **5.00%** | 5.00% | 5.00% |
| Year that the rate reaches the ultimate trend rate | **–** | – | – | **2012** | 2012 | 2010 |
| Rate of compensation increase | **3.90%** | 3.90% | 3.90% | **3.90%** | 3.90% | 3.90% |

| Assumptions Used to Determine Benefit Obligations at September 30[a], | Pension Benefits | | Retiree Health and Welfare Benefits | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| Discount rate | **6.00%** | 5.50% | **6.00%** | 5.50% |
| Assumed health care cost trend rate | **–%** | –% | **10.50%** | 10.00% |
| Rate to which health care cost trend rate is expected to decline and remain | **–%** | –% | **5.00%** | 5.00% |
| Year that the rate reaches the ultimate trend rate | **–** | – | **2016** | 2012 |
| Rate of compensation increase | **3.80%** | 3.90% | **3.80%** | 3.90% |

a The Company's pension and retiree health and welfare plans used a measurement date of September 30 through 2007. However, BNSF is changing its measurement date and has elected to apply the transition option under which a 15-month measurement was determined as of September 30, 2007 that covers the period until the fiscal year-end measurement is required on December 31, 2008. See Note 13 to the Consolidated Financial Statements.

BNSF determined the discount rate by adjusting the Moody's Aa Corporate bond yield to reflect the difference between the duration of the future estimated cash flows of the Company's pension and retiree health and welfare plans and the duration of the Moody's Aa index. The expected return on plan assets reflects the expected long-term rates of return on those assets. The rate of compensation increase is determined based on historical experience. Finally, the health care cost trend rates reflect the expected future increases in health care costs.

The discount rate used for the 2008 calculation of net benefit cost was increased to 6.00 percent to reflect market conditions at the September 30, 2007 measurement date. The expected rate of return on plan assets remained consistent from 2007 to 2008, and the Company does not expect any near-term significant changes to the current investment allocation of assets. However, unforeseen changes in the investment markets or other external factors could prompt changes in these estimates in future years.

The following table is an estimate of the impact on future net benefit cost that could result from hypothetical changes to the most sensitive assumptions, the discount rate and rate of return on plan assets:

**Sensitivity Analysis**

| | Change in Net Benefit Cost | |
|---|---|---|
| **Hypothetical Discount Rate Change** | **Pension** | **Retiree Health and Welfare** |
| 50 basis point decrease | $6 million increase | $1 million increase |
| 50 basis point increase | $6 million decrease | $1 million decrease |
| **Hypothetical Rate of Return on Plan Assets Change** | **Pension** | |
| 50 basis point decrease | $7 million increase | |
| 50 basis point increase | $7 million decrease | |

Based on its current assumptions and funding methodology, the Company is expected to be required to make contributions of $34 million to the BNSF Retirement Plan in 2008. The Company currently determines required funding by amortizing asset gains and losses over a period of five years. If the Company was required to fully fund the unfunded portion of its projected benefit obligation, which was $173 million at December 31, 2007, for these pension plans and $299 million for the retiree health and welfare plan, the Company's management believes that it would have sufficient liquidity, and it could fund the balance without a significant impact to the Company's financial position. Additionally, the Company expects to make benefit payments in 2008 of approximately $7 million and $25 million from its non-qualified defined benefit and retiree health and welfare plans, respectively.

In August of 2006, the President signed the Pension Protection Act of 2006 (PPA) into law. While the Act will have some effect on specific plan provisions in the Company's retirement program, its primary effect will be to change the minimum funding requirements. The Company expects that the Act will accelerate the required funding of future contributions for the Company's pension plans beginning with the 2009 fiscal year. Anticipated payments, including the impact of the PPA, over the next five years are included in the Contractual Obligations table under the heading "Long-Term Debt and Other Obligations" in Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations. The Company does not anticipate that this legislation will significantly impact its results of operations, financial condition or liquidity.

Further information on employee benefits is incorporated by reference from Note 13 to the Consolidated Financial Statements.

**Depreciation**

Due to the capital-intensive nature of the railroad industry, depreciation expense is a significant component of the Company's operating expense. The Company recorded depreciation and amortization expenses of $1,293 million, $1,176 million and $1,111 million for the years ended December 31, 2007, 2006 and 2005, respectively. At December 31, 2007 and 2006, the Company had property and equipment, net balances of $29,567 million and $27,921 million, which included $9,177 million and $8,617 million, respectively, of accumulated depreciation.

The Company uses the group method of depreciation under which a single depreciation rate is applied to the gross investment in a particular class of property, despite differences in the service life or salvage value of individual property units within the same class. The Company conducts studies of depreciation rates and the required accumulated depreciation balance as required by the STB, which is generally every three years for equipment property and every six years for track structure and other roadway property. Changes in the estimated service lives of the assets and their related depreciation rates are implemented prospectively, and the difference between the calculated accumulated depreciation and the amount recorded is amortized over the average remaining service lives of the assets.

See Note 2 to the Consolidated Financial Statements for additional information related to the retrospective adoption of FSP AUG AIR-1, *Accounting for Planned Major Maintenance Activities*.

A study conducted in 2007 resulted in the Company adopting new depreciation rates for locomotives that resulted in a net increase in 2007 depreciation expense of $17 million and approximately $22 million on an ongoing annual basis, as calculated using the asset base at the time of the rate change. In 2006, the Company conducted a depreciation rate study of its equipment (excluding locomotives). The results of this study did not materially impact the Company's current or future results of operations. All other rate studies are current under the STB's requirements.

## Forward-Looking Information

To the extent that statements made by the Company relate to the Company's future economic performance or business outlook, projections or expectations of financial or operational results, or refer to matters that are not historical facts, such statements are "forward-looking" statements within the meaning of the federal securities laws. These forward-looking statements include, but are not limited to, statements regarding:

- Expectations as to operating results, such as revenue growth and earnings per share;
- Expectations as to the effect of claims, litigation, environmental and personal injury costs, commitments, contingent liabilities, and governmental and regulatory investigations and proceedings on the Company's financial condition;
- Plans and goals for future operational improvements and capital commitments; and
- Future market conditions or economic performance.

Forward-looking statements involve a number of risks and uncertainties, and actual performance or results may differ materially. For a discussion of material risks and uncertainties that the Company faces, see the discussion in Item 1A, "Risk Factors," of this Annual Report on Form 10-K. Important factors that could cause actual results to differ materially include, but are not limited to, the following:

- **Economic and industry conditions:** material adverse changes in economic or industry conditions, both in the United States and globally, changes in customer demand, effects of adverse economic conditions affecting shippers or BNSF's supplier base, adverse economic conditions in the industries and geographic areas that produce and consume freight, changes in demand due to more stringent regulatory policies such as the regulation of carbon dioxide emissions that could reduce the demand for coal, governmental tariffs or subsidies that could affect the demand for grain, competition and consolidation within the transportation industry, the extent to which BNSF is successful in gaining new long-term relationships with customers or retaining existing ones, level of service failures that could lead customers to use competitors' services, changes in fuel prices and other key materials and disruptions in supply chains for these materials, changes in the securities and capital markets and changes in crew availability, labor costs and labor difficulties, including stoppages affecting either BNSF's operations or customers' abilities to deliver goods to BNSF for shipment;

- **Legal, legislative and regulatory factors:** developments and changes in laws and regulations, including those affecting train operations or the marketing of services, the ultimate outcome of shipper and rate claims subject to adjudication or claims, investigations or litigation alleging violations of the antitrust laws, increased economic regulation of the rail industry through legislative action and revised rules and standards applied by the U.S. Surface Transportation Board in various areas including rates and services, developments in environmental investigations or proceedings with respect to rail operations or current or past ownership or control of real property, and developments in and losses resulting from other types of claims and litigation, including those relating to personal injuries, asbestos and other occupational diseases, the release of hazardous materials, environmental contamination and damage to property; and

- **Operating factors:** technical difficulties, changes in operating conditions and costs, changes in business mix, the availability of equipment and human resources to meet changes in demand, the extent of the Company's ability to achieve its operational and financial initiatives and to contain costs, the effectiveness of steps taken to maintain and improve operations and velocity and network fluidity, including the management of the amount of traffic on the system to meet demand and the ability to acquire sufficient resources to meet that demand, the ability to expand the capacity of the system, congestion on other railroads and capacity constraints affecting all links in the transportation chain that feed traffic and goods to BNSF's systems, restrictions on development and expansion plans due to environmental concerns, disruptions to BNSF's technology network including computer systems and software, as well as natural events such as severe weather, fires, floods and earthquakes or man-made or other disruptions of BNSF Railway's operating systems, structures, or equipment including the effects of acts of terrorism on the Company's system or other railroads' systems.

The Company cautions against placing undue reliance on forward-looking statements, which reflect its current beliefs and are based on information currently available to it as of the date a forward-looking statement is made. The Company undertakes no obligation to revise forward-looking statements to reflect future events, changes in circumstances, or changes in beliefs. In the event the Company does update any forward-looking statement, no inference should be made that the Company will make additional updates with respect to that statement, related matters, or any other forward-looking statements. Any corrections or revisions and other important assumptions and factors that could cause actual results to differ materially from forward-looking statements made by the Company may appear in the Company's public filings with the SEC, which are accessible at www.sec.gov, and on the Company's website at www.bnsf.com, and which investors are advised to consult.

# Item 7A. Quantitative and Qualitative Disclosures About Market Risk

In the ordinary course of business, BNSF utilizes various financial instruments that inherently have some degree of market risk. The following table summarizes the impact of these hedging activities on the Company's results of operations (in millions):

| Year ended December 31, | 2007 | 2006 |
|---|---|---|
| Fuel-hedge benefit (including ineffective portion of unexpired hedges) | **$ 31** | $ 341 |
| Interest rate hedge loss | **(3)** | (1) |
| Total hedge benefit | **28** | 340 |
| Tax effect | **(11)** | (131) |
| Hedge benefit, net of tax | **$ 17** | $ 209 |

The Company's fuel-hedge benefit is due to increases in fuel prices subsequent to the initiation of various hedges. The information presented in the Management's Discussion and Analysis of Financial Condition and Results of Operations section and Notes 3 and 9 to the Consolidated Financial Statements describe significant aspects of BNSF's financial instrument activities that have a material market risk. Additionally, the Company uses fuel surcharges, which it believes substantially mitigates the risk of fuel price volatility.

## Commodity Price Sensitivity

BNSF engages in hedging activities to partially mitigate the risk of fluctuations in the price of its diesel fuel purchases. Existing hedge transactions as of December 31, 2007, are based on the front month settlement prices of West Texas Intermediate crude oil (WTI). For swaps, BNSF either pays or receives the difference between the hedge price and the actual average price of the hedge commodity during a specified determination period for a specified number of gallons. Hedge transactions are generally settled with the counterparty in cash. Based on historical information, BNSF believes there is a significant correlation between the market prices for diesel fuel and WTI.

At December 31, 2007, BNSF had recorded a net fuel-hedging asset of $39 million for fuel hedges covering 2008 through 2010.

The following table is an estimate of the impact to earnings that could result from hypothetical price changes during the twelve-month period ending December 31, 2008, and the balance sheet impact from the hypothetical price changes, both based on the Company's hedge position at December 31, 2007:

| Sensitivity Analysis | | |
|---|---|---|
| **Hedged Commodity Price Change** | **Fuel-Hedge Annual Pre-Tax Earnings Impact** | **Balance Sheet Impact of Change in Fuel-Hedge Fair Value** |
| 10 percent increase | $9 million increase | $13 million increase |
| 10 percent decrease | $9 million decrease | $13 million decrease |

Based on fuel consumption during the twelve-month period ending December 31, 2007, of 1,442 million gallons and fuel prices during that same period, excluding the impact of the Company's hedging activities, a 10-percent increase or decrease in the commodity price per gallon would result in an approximate $295 million increase or decrease, respectively, in fuel expense (pre-tax) on an annual basis.

At December 31, 2007, BNSF maintained fuel inventories for use in normal operations, which were not material to BNSF's overall financial position and, therefore, represent no significant market exposure. Further information on fuel hedges is incorporated by reference from Note 3 to the Consolidated Financial Statements.

## Interest Rate Sensitivity

From time to time, BNSF enters into various interest rate hedging transactions for purposes of managing exposure to fluctuations in interest rates by establishing rates in anticipation of both future debt issuances and the refinancing of leveraged leases, as well as to convert a portion of its fixed-rate long-term debt to floating-rate debt. These interest rate hedges are accounted for as cash flow or fair value hedges. BNSF's measurement of the fair value of these hedges is based on estimates of the mid-market values for the transactions provided by the counterparties to these agreements.

At December 31, 2007, the fair value of BNSF's debt, excluding capital leases, was $7,475 million, which includes a fair value interest rate hedge benefit of $6 million. Additionally, the Company had recorded an interest rate hedging liability of $5 million for cash flow hedges.

The following table is an estimate of the impact to earnings and the fair value of the total debt, excluding capital leases, and interest rate hedges that could result from hypothetical interest rate changes during the twelve-month period ending December 31, 2008, based on debt levels and outstanding hedges as of December 31, 2007:

**Sensitivity Analysis**

| Hypothetical Change in Interest Rates | Floating Rate Debt - Annual Pre-Tax Earnings Impact | Change in Fair Value | |
|---|---|---|---|
| | | Total Debt[a] | Interest Rate Hedges |
| 1 percent decrease | $7 million increase | $718 million increase | $8 million decrease |
| 1 percent increase | $7 million decrease | $602 million decrease | $5 million increase |

a Excludes impact of interest rate hedges.

Further information on interest rate hedges is incorporated by reference from Note 3 to the Consolidated Financial Statements. Information on the Company's debt, which may be sensitive to interest rate fluctuations, is incorporated by reference from Note 9 to the Consolidated Financial Statements.

# Item 8. Financial Statements and Supplementary Data

The Consolidated Financial Statements and Management's Report on Internal Control Over Financial Reporting of BNSF and subsidiary companies, together with the report of the Company's independent registered public accounting firm, are included as part of this filing.

The following documents are filed as a part of this report:

## Consolidated Financial Statements

Management's Report on Internal Control Over Financial Reporting ....38
Report of Independent Registered Public Accounting Firm....39
Consolidated Statements of Income for each of the three years in the period ended December 31, 2007....40
Consolidated Balance Sheets as of December 31, 2007 and 2006....41
Consolidated Statements of Cash Flows for each of the three years in the period ended December 31, 2007....42
Consolidated Statements of Changes in Stockholders' Equity for each of the three years in the period ended December 31, 2007....43
Notes to Consolidated Financial Statements.... 44–73

# Management's Report on Internal Control Over Financial Reporting

## To the Shareholders of Burlington Northern Santa Fe Corporation and Subsidiaries

The management of Burlington Northern Santa Fe Corporation (the Company) is responsible for establishing and maintaining adequate internal control over financial reporting. The Company's internal control over financial reporting was designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the Company's financial statements for external reporting purposes in accordance with generally accepted accounting principles in the United States of America.

Management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2007. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in *Internal Control – Integrated Framework*. Based on management's assessment, the Company concluded that as of December 31, 2007, the Company's internal control over financial reporting was effective based on those criteria.

The effectiveness of the Company's internal control over financial reporting as of December 31, 2007, has been audited by PricewaterhouseCoopers LLP, the Company's independent registered public accounting firm, as stated in their report, which appears on the following page.

# Report of Independent Registered Public Accounting Firm

## To the Shareholders and Board of Directors of Burlington Northern Santa Fe Corporation

In our opinion, the accompanying consolidated financial statements listed in the accompanying index present fairly, in all material respects, the financial position of Burlington Northern Santa Fe Corporation and its subsidiaries (the Company) at December 31, 2007 and 2006, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2007 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2007, based on criteria established in *Internal Control - Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). The Company's management is responsible for these financial statements, for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control Over Financial Reporting. Our responsibility is to express opinions on these financial statements and on the Company's internal control over financial reporting based on our integrated audits. We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

As discussed in Note 2 to the consolidated financial statements, effective January 1, 2007, the Company changed the manner in which it accounts for planned major maintenance activities and the manner in which it accounts for uncertain tax positions.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

PricewaterhouseCoopers LLP

Fort Worth, Texas
February 12, 2008

## Consolidated Statements of Income

In millions, except per share data

| **Year ended December 31,** | **2007** | **2006** (As Adjusted)[a] | **2005** (As Adjusted)[a] |
|---|---|---|---|
| Revenues | **$ 15,802** | $ 14,985 | $ 12,987 |
| Operating expenses: | | | |
| Compensation and benefits | **3,773** | 3,816 | 3,515 |
| Fuel | **3,197** | 2,734 | 1,959 |
| Purchased services | **2,023** | 1,906 | 1,713 |
| Depreciation and amortization | **1,293** | 1,176 | 1,111 |
| Equipment rents | **942** | 930 | 886 |
| Materials and other | **1,088** | 902 | 876 |
| Total operating expenses | **12,316** | 11,464 | 10,060 |
| Operating income | **3,486** | 3,521 | 2,927 |
| Interest expense | **511** | 485 | 437 |
| Other expense, net | **18** | 40 | 37 |
| Income before income taxes | **2,957** | 2,996 | 2,453 |
| Income tax expense | **1,128** | 1,107 | 919 |
| Net income | **$ 1,829** | $ 1,889 | $ 1,534 |
| Earnings per share: | | | |
| Basic earnings per share | **$ 5.19** | $ 5.23 | $ 4.13 |
| Diluted earnings per share | **$ 5.10** | $ 5.11 | $ 4.02 |
| Average shares: | | | |
| Basic | **352.5** | 361.0 | 371.8 |
| Dilutive effect of stock awards | **6.4** | 8.8 | 10.0 |
| Diluted | **358.9** | 369.8 | 381.8 |

a Prior year numbers have been adjusted for the retrospective adoption of Financial Accounting Standards Board (FASB) Staff Position (FSP) AUG AIR-1, *Accounting for Planned Major Maintenance Activities*. See Note 2 to the Consolidated Financial Statements for additional information.

See accompanying Notes to Consolidated Financial Statements.

**Burlington Northern Santa Fe Corporation and Subsidiaries**

# Consolidated Balance Sheets

Dollars in millions, shares in thousands

| December 31, | 2007 | 2006 (As Adjusted)[a] |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | **$ 330** | $ 375 |
| Accounts receivable, net | **790** | 805 |
| Materials and supplies | **579** | 488 |
| Current portion of deferred income taxes | **290** | 345 |
| Other current assets | **192** | 168 |
| Total current assets | **2,181** | 2,181 |
| Property and equipment, net | **29,567** | 27,921 |
| Other assets | **1,835** | 1,695 |
| Total assets | **$ 33,583** | $ 31,797 |
| **Liabilities and Stockholders' Equity** | | |
| Current liabilities: | | |
| Accounts payable and other current liabilities | **$ 2,824** | $ 2,853 |
| Long-term debt due within one year | **411** | 473 |
| Total current liabilities | **3,235** | 3,326 |
| Long-term debt and commercial paper | **7,735** | 6,912 |
| Deferred income taxes | **8,484** | 8,298 |
| Casualty and environmental liabilities | **843** | 830 |
| Pension and retiree health and welfare liability | **444** | 604 |
| Employee separation costs | **77** | 86 |
| Other liabilities | **1,621** | 1,213 |
| Total liabilities | **22,439** | 21,269 |
| Commitments and contingencies (see Notes 3, 9 and 10) | | |
| Stockholders' equity: | | |
| Common stock, $0.01 par value, 600,000 shares authorized; 537,330 shares and 532,080 shares issued, respectively | **5** | 5 |
| Additional paid-in-capital | **7,348** | 6,990 |
| Retained earnings | **11,152** | 9,739 |
| Treasury stock, at cost, 189,626 shares and 174,205 shares, respectively | **(7,222)** | (5,929) |
| Accumulated other comprehensive loss | **(139)** | (277) |
| Total stockholders' equity | **11,144** | 10,528 |
| Total liabilities and stockholders' equity | **$ 33,583** | $ 31,797 |

a Prior year numbers have been adjusted for the retrospective adoption of FSP AUG AIR-1, *Accounting for Planned Major Maintenance Activities.* See Note 2 to the Consolidated Financial Statements for additional information.

See accompanying Notes to Consolidated Financial Statements.

**Burlington Northern Santa Fe Corporation and Subsidiaries**

# Consolidated Statements of Cash Flows

In millions

| Year ended December 31, | 2007 | 2006 (As Adjusted)[a] | 2005 (As Adjusted)[a] |
|---|---|---|---|
| **Operating Activities** | | | |
| Net income | **$ 1,829** | $ 1,889 | $ 1,534 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation and amortization | **1,293** | 1,176 | 1,111 |
| Deferred income taxes | **280** | 316 | 219 |
| Employee separation costs paid | **(21)** | (27) | (30) |
| Long-term casualty and environmental liabilities, net | **26** | (55) | (71) |
| Other, net | **183** | (43) | 2 |
| Changes in current assets and liabilities: | | | |
| Accounts receivable, net | **20** | (127) | (138) |
| Change in accounts receivable sales program | **–** | – | (350) |
| Materials and supplies | **(91)** | (92) | (57) |
| Other current assets | **12** | 99 | (5) |
| Accounts payable and other current liabilities | **(39)** | 53 | 491 |
| Net cash provided by operating activities | **3,492** | 3,189 | 2,706 |
| **Investing Activities** | | | |
| Capital expenditures | **(2,248)** | (2,014) | (1,750) |
| Construction costs for facility financing obligation | **(37)** | (14) | (4) |
| Other, net | **(130)** | (139) | (366) |
| Net cash used for investing activities | **(2,415)** | (2,167) | (2,120) |
| **Financing Activities** | | | |
| Net (decrease) increase in commercial paper and bank borrowings | **(584)** | 283 | 563 |
| Proceeds from issuance of long-term debt | **1,300** | 300 | 500 |
| Payments on long-term debt | **(482)** | (467) | (464) |
| Dividends paid | **(380)** | (310) | (267) |
| Proceeds from stock options exercised | **142** | 116 | 244 |
| Purchase of BNSF common stock | **(1,265)** | (730) | (799) |
| Prepaid forward repurchase of treasury stock | **–** | – | (600) |
| Excess tax benefits from equity compensation plans | **121** | 95 | – |
| Proceeds from facility financing obligation | **41** | – | – |
| Other, net | **(15)** | (9) | (10) |
| Net cash used for financing activities | **(1,122)** | (722) | (833) |
| (Decrease) increase in cash and cash equivalents | **(45)** | 300 | (247) |
| Cash and cash equivalents: | | | |
| Beginning of year | **375** | 75 | 322 |
| End of year | **$ 330** | $ 375 | $ 75 |
| **Supplemental Cash Flow Information** | | | |
| Interest paid, net of amounts capitalized | **$ 494** | $ 462 | $ 427 |
| Income taxes paid, net of refunds | **$ 680** | $ 779 | $ 545 |
| Non-cash asset financing | **$ 461** | $ 109 | $ 68 |

a Prior year numbers have been adjusted for the retrospective adoption of FSP AUG AIR-1, *Accounting for Planned Major Maintenance Activities.* See Note 2 to the Consolidated Financial Statements for additional information.

See accompanying Notes to Consolidated Financial Statements.

**Burlington Northern Santa Fe Corporation and Subsidiaries**

## Consolidated Statements of Changes in Stockholders' Equity

Dollars in millions, shares in thousands, except per share data

| | Common Shares | Treasury Shares | Common Stock and Paid–in Capital | Retained Earnings[a] | Treasury Stock | Prepaid Forward Repurchase of Treasury Stock | Unearned Compensation | Accumulated Other Comprehensive Loss | Total Stockholders' Equity[a] |
|---|---|---|---|---|---|---|---|---|---|
| Balance at December 31, 2004, as reported | 517,275 | (140,463) | $ 6,304 | $ 6,792 | $ (3,741) | $ – | $ (43) | $ (1) | $ 9,311 |
| Cumulative effect retrospective application, net of tax expense of $78[a] | | | – | 127 | – | – | – | – | 127 |
| Balance at December 31, 2004, as adjusted | | | 6,304 | 6,919 | (3,741) | – | (43) | (1) | 9,438 |
| Comprehensive income: | | | | | | | | | |
| Net income | | | – | 1,534 | – | – | – | – | 1,534 |
| Minimum pension liability adjustment, net of tax benefit of $25 | | | – | – | – | – | – | (39) | (39) |
| Fuel/interest hedge mark-to-market, net of tax benefit of $8 | | | – | – | – | – | – | (13) | (13) |
| Total comprehensive income | | | – | 1,534 | – | – | – | (52) | 1,482 |
| Common stock dividends, $0.74 per share | | | – | (278) | – | – | – | – | (278) |
| Restricted stock expense | | | – | – | – | – | 37 | – | 37 |
| Restricted stock activity and related tax benefit of $10 | 665 | (140) | 46 | – | – | – | (16) | – | 30 |
| Exercise of stock options and related tax benefit of $84 | 9,349 | (540) | 357 | – | (29) | – | – | – | 328 |
| Purchase of BNSF common stock | – | (14,575) | – | – | (799) | – | – | – | (799) |
| Prepaid forward repurchase of treasury stock | – | – | – | – | – | (600) | – | – | (600) |
| Balance at December 31, 2005, as adjusted | 527,289 | (155,718) | 6,707 | 8,175 | (4,569) | (600) | (22) | (53) | 9,638 |
| Comprehensive income: | | | | | | | | | |
| Net income | | | – | 1,889 | – | – | – | – | 1,889 |
| Minimum pension liability adjustment, net of tax expense of $24 | | | – | – | – | – | – | 40 | 40 |
| Fuel/interest hedge mark-to-market, net of tax benefit of $117 | | | – | – | – | – | – | (188) | (188) |
| Total comprehensive income | | | – | 1,889 | – | – | – | (148) | 1,741 |
| Adjustment to initially apply Statement of Financial Accounting Standard (SFAS) No. 158, net of tax benefit of $48 | | | – | – | – | – | – | (76) | (76) |
| Common stock dividends, $0.90 per share | | | – | (325) | – | – | – | – | (325) |
| Restricted stock and stock options expense | | | 72 | – | – | – | – | – | 72 |
| Restricted stock activity and related tax benefit of $15 | 28 | (33) | 16 | – | (1) | – | – | – | 15 |
| Exercise of stock options and related tax benefit of $80 | 4,763 | (376) | 225 | – | (29) | – | – | – | 196 |
| Adjustment upon adoption of SFAS No. 123R | – | – | (25) | – | – | – | 22 | – | (3) |
| Purchase of BNSF common stock | – | (9,860) | – | – | (730) | – | – | – | (730) |
| Prepaid forward repurchase of treasury stock | – | (8,218) | – | – | (600) | 600 | – | – | – |
| Balance at December 31, 2006, as adjusted | 532,080 | (174,205) | 6,995 | 9,739 | (5,929) | – | – | (277) | 10,528 |
| Comprehensive income: | | | | | | | | | |
| Net income | | | – | 1,829 | – | – | – | – | 1,829 |
| Change in unrecognized prior service cost and actuarial losses, net of tax expense of $76 | | | – | – | – | – | – | 122 | 122 |
| Fuel/interest hedge mark-to-market, net of tax expense of $10 | | | – | – | – | – | – | 16 | 16 |
| Total comprehensive income | | | – | 1,829 | – | – | – | 138 | 1,967 |
| Adjustment for the adoption of FASB Interpretation No. (FIN) 48 | | | – | (13) | – | – | – | – | (13) |
| Common stock dividends, $1.14 per share | | | – | (403) | – | – | – | – | (403) |
| Restricted stock and stock options expense | | | 66 | – | – | – | – | – | 66 |
| Restricted stock activity and related tax benefit of $23 | 1 | (48) | 24 | – | – | – | – | – | 24 |
| Exercise of stock options and related tax benefit of $98 | 5,249 | (319) | 268 | – | (28) | – | – | – | 240 |
| Purchase of BNSF common stock | – | (15,054) | – | – | (1,265) | – | – | – | (1,265) |
| Balance at December 31, 2007 | 537,330 | (189,626) | $ 7,353 | $ 11,152 | $ (7,222) | $ – | $ – | $ (139) | $ 11,144 |

a Prior year numbers have been adjusted for the retrospective adoption of FSP AUG AIR-1, *Accounting for Planned Major Maintenance Activities*. See Note 2 to the Consolidated Financial Statements for additional information.

See accompanying Notes to Consolidated Financial Statements.

# Notes to Consolidated Financial Statements

## 1. The Company

Burlington Northern Santa Fe Corporation (BNSF) is a holding company that conducts no operating activities and owns no significant assets other than through its interests in its subsidiaries. BNSF's principal, wholly-owned subsidiary is BNSF Railway Company (BNSF Railway), which operates one of the largest railroad networks in North America with approximately 32,000 route miles in 28 states and two Canadian provinces. Through one operating transportation services segment, BNSF Railway transports a wide range of products and commodities including the transportation of Consumer Products, Industrial Products, Coal and Agricultural Products, derived from manufacturing, agricultural and natural resource industries, which constituted 37 percent, 24 percent, 21 percent and 18 percent, respectively, of total freight revenues for the year ended December 31, 2007. These Consolidated Financial Statements include BNSF, BNSF Railway and other majority-owned subsidiaries, all of which are separate legal entities (collectively, the Company).

## 2. Significant Accounting Policies

### Principles of Consolidation

The Consolidated Financial Statements include the accounts of BNSF, including its principal subsidiary BNSF Railway. All significant intercompany accounts and transactions have been eliminated. The Company evaluates its less than majority-owned investments for consolidation pursuant to FIN 46R, *Consolidation of Variable Interest Entities.*

### Use of Estimates

The preparation of financial statements in accordance with generally accepted accounting principles in the United States of America (GAAP) requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the periods presented. These estimates and assumptions are periodically reviewed by management. Actual results could differ from those estimates.

### Revenue Recognition

Transportation revenues are recognized based upon the proportion of service provided as of the balance sheet date. Revenues from ancillary services are recognized when performed. Customer incentives, which are primarily provided for shipping a specified cumulative volume or shipping to/from specific locations, are recorded as a reduction to revenue on a pro-rata basis based on actual or projected future customer shipments. When using projected shipments, the Company relies on historic trends as well as economic and other indicators to estimate the liability for customer incentives.

### Accounts Receivable, Net

Accounts receivable, net includes accounts receivable reduced by an allowance for bill adjustments and uncollectible accounts. The allowance for bill adjustments and uncollectible accounts is based on historical experience as well as any known trends or uncertainties related to customer billing and account collectibility.

### Cash and Cash Equivalents

All short-term investments with original maturities of 90 days or less are considered cash equivalents. Cash equivalents are stated at cost, which approximates market value because of the short maturity of these instruments.

### Materials and Supplies

Materials and supplies, which consist mainly of rail, ties and other items for construction and maintenance of property and equipment, as well as diesel fuel, are valued at the lower of average cost or market.

## Property and Equipment, Net

Property and equipment are depreciated and amortized on a straight-line basis over their estimated useful lives. The Company uses the group method of depreciation in which a single depreciation rate is applied to the gross investment in a particular class of property, despite differences in the service life or salvage value of individual property units within the same class. Upon normal sale or retirement of certain depreciable railroad property, cost less net salvage value is charged to accumulated depreciation, and no gain or loss is recognized. The disposals of land and non-rail property as well as significant premature retirements are recorded as gains or losses at the time of their occurrence.

The Company self-constructs portions of its track structure and rebuilds certain classes of rolling stock. In addition to direct labor and material, certain indirect costs are capitalized. Expenditures that significantly increase asset values or extend useful lives are capitalized. Repair and maintenance expenditures are charged to operating expense when the work is performed. Property and equipment are stated at cost.

The Company incurs certain direct labor, contract service and other costs associated with the development and installation of internal-use computer software. Costs for newly developed software or significant enhancements to existing software are typically capitalized. Research, preliminary project, operations, maintenance and training costs are charged to operating expense when the work is performed.

Long-lived assets are reviewed for impairment when events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. If impairment indicators are present and the estimated future undiscounted cash flows are less than the carrying value of the long-lived assets, the carrying value is reduced to the estimated fair value as measured by the discounted cash flows.

Leasehold improvements that meet capitalization criteria are capitalized and amortized on a straight-line basis over the lesser of their estimated useful lives or the remaining lease term. Cash flows for capitalized leasehold improvements are reported in the investing activities other, net line of the Consolidated Statements of Cash Flows.

## Planned Major Maintenance Activities

Effective January 1, 2007, the Company transitioned to the deferral method of accounting for leased locomotive overhauls, which includes the refurbishment of the engine and related components. Previously, the Company used the accrue-in-advance method of accounting for these planned major maintenance activities; however, under FSP AUG AIR-1, *Accounting for Planned Major Maintenance Activities*, issued in September 2006, this method is no longer allowed. This change was applied retrospectively for all periods presented. Accordingly, BNSF has eliminated the asset and liability recorded from the accrue-in-advance methodology and established an asset for overhauls that have been performed. This asset of $245 million, which is included in property and equipment, net in the December 31, 2006 Consolidated Balance Sheets, will be amortized to expense using the straight-line method until the next overhaul is performed or the end of the lease, whichever comes first, typically between six and eight years. The effects of these adjustments were as follows (in millions):

### Consolidated Statements of Income

| Year ended December 31, | 2006 | | 2005 | |
|---|---|---|---|---|
| | As Reported | As Adjusted | As Reported | As Adjusted |
| Depreciation and amortization | $ 1,130 | $ 1,176 | $ 1,075 | $ 1,111 |
| Materials and other | 952 | 902 | 917 | 876 |
| Total operating expenses | 11,468 | 11,464 | 10,065 | 10,060 |
| Operating income | 3,517 | 3,521 | 2,922 | 2,927 |
| Income before income taxes | 2,992 | 2,996 | 2,448 | 2,453 |
| Income tax expense | 1,105 | 1,107 | 917 | 919 |
| Net income | $ 1,887 | $ 1,889 | $ 1,531 | $ 1,534 |
| Basic earnings per share | $ 5.23 | $ 5.23 | $ 4.12 | $ 4.13 |
| Diluted earnings per share | $ 5.10 | $ 5.11 | $ 4.01 | $ 4.02 |

**Consolidated Balance Sheets**

| December 31, | 2006 | |
|---|---|---|
| | As Reported | As Adjusted |
| Property and equipment, net | $ 27,676 | $ 27,921 |
| Other assets | 1,786 | 1,695 |
| Total assets | 31,643 | 31,797 |
| Deferred income taxes | 8,216 | 8,298 |
| Other liabilities | 1,273 | 1,213 |
| Total liabilities | 21,247 | 21,269 |
| Retained earnings | 9,607 | 9,739 |
| Total stockholders' equity | 10,396 | 10,528 |
| Total liabilities and stockholders' equity | $ 31,643 | $ 31,797 |

**Consolidated Statements of Cash Flows**

| Year ended December 31, | 2006 | | 2005 | |
|---|---|---|---|---|
| | As Reported | As Adjusted | As Reported | As Adjusted |
| Net income | $ 1,887 | $ 1,889 | $ 1,531 | $ 1,534 |
| Depreciation and amortization | 1,130 | 1,176 | 1,075 | 1,111 |
| Deferred income taxes | 314 | 316 | 217 | 219 |
| Operating activities other, net | (74) | (43) | (54) | 2 |
| Net cash provided by operating activities | 3,108 | 3,189 | 2,609 | 2,706 |
| Investing activities other, net | (58) | (139) | (269) | (366) |
| Net cash used for investing activities | $ (2,086) | $ (2,167) | $ (2,023) | $ (2,120) |

The effects of the adjustments on years prior to fiscal 2005 resulted in an adjustment to increase stockholders' equity as of January 1, 2005 by $127 million.

## Environmental Liabilities

Liabilities for environmental cleanup costs are initially recorded when BNSF's liability for environmental cleanup is both probable and reasonably estimable. Subsequent adjustments to initial estimates are recorded as necessary based upon additional information developed in subsequent periods. Estimates for these liabilities are undiscounted.

## Personal Injury Claims

Liabilities for personal injury claims are initially recorded when the expected loss is both probable and reasonably estimable. Subsequent adjustments to initial estimates are recorded as necessary based upon additional information developed in subsequent periods. Liabilities recorded for unasserted personal injury claims, including those related to asbestos, are based on information currently available. Estimates of liabilities for personal injury claims are undiscounted.

## Income Taxes

Deferred tax assets and liabilities are measured using the tax rates that apply to taxable income in the period in which the deferred tax asset or liability is expected to be realized or paid. Valuation allowances are established to reduce deferred tax assets if it is more likely than not that some or all of the deferred tax asset will not be realized. Investment tax credits are accounted for using the flow-through method.

## Uncertain Tax Positions

In June 2006, the FASB issued FIN 48, *Accounting for Uncertainty in Income Taxes—an interpretation of FASB Statement No. 109, Accounting for Income Taxes.* This interpretation addresses the determination of whether tax benefits claimed or expected to be claimed on a tax return should be recorded in the financial statements. Under FIN 48, the Company may recognize the tax benefit from an uncertain tax position only if it is more likely than not that the tax position will be sustained on examination by the taxing authorities, based on the technical merits of the position. The tax benefits recognized in the financial statements from such a position should be measured based on the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement. FIN 48 also provides guidance on derecognition, classification, interest and penalties on income taxes, accounting in interim periods and requires increased disclosures. The Company adopted the provisions of FIN 48 on January 1, 2007. As a result of the implementation of FIN 48, the Company recorded an $83 million increase in the liability for unrecognized tax benefits, which is offset by a reduction of the deferred tax liability of $70 million, resulting in a decrease to the January 1, 2007, retained earnings balance of $13 million (for additional information see Note 5 to the Consolidated Financial Statements).

## Stock-Based Compensation

The Company adopted SFAS No. 123R, *Share-Based Payment,* on January 1, 2006. This statement requires BNSF to recognize the cost of employee services received in exchange for the Company's equity instruments. Under SFAS No. 123R, BNSF is required to record compensation expense over an award's vesting period based on the award's fair value at the date of grant. BNSF has elected to adopt SFAS No. 123R on a modified prospective basis; accordingly, the financial statements for periods prior to January 1, 2006, do not include compensation cost calculated under the fair value method. Since the adoption of this new guidance, there have been no significant changes in the quantity or types of instruments used in stock-based compensation programs, nor have there been any significant changes in the terms of existing stock-based compensation arrangements. The Company did, however, record a favorable cumulative adjustment for estimated forfeitures of $3 million, which, due to its immateriality, was included as a reduction to compensation expense in the first quarter of 2006.

Prior to January 1, 2006, the Company applied Accounting Principles Board Opinion 25, *Accounting for Stock Issued to Employees,* and, therefore, recorded the intrinsic value of stock-based compensation as expense. The following table illustrates the effect on net income and earnings per share if the Company had applied the fair value recognition provisions of SFAS No. 123, *Accounting for Stock-Based Compensation,* to stock-based employee compensation (in millions, except per share data) prior to January 1, 2006:

| **Year ended December 31,** | **2005[a]** |
|---|---|
| Net income, as reported | $ 1,534 |
| Stock-based employee compensation expense included in reported net income, net of related tax effects | 23 |
| Total stock-based compensation expense determined under fair value method for all awards, net of related tax effects | (42) |
| Pro forma net income | $ 1,515 |
| Earnings per share: | |
| Basic – as reported | $ 4.13 |
| Basic – pro forma | $ 4.07 |
| Diluted – as reported | $ 4.02 |
| Diluted – pro forma | $ 3.97 |

a Prior year numbers have been adjusted for the retrospective adoption of FSP AUG AIR-1, *Accounting for Planned Major Maintenance Activities.* See "Planned Major Maintenance Activities" within this footnote for additional information.

## Employment Benefit Plans

The Company estimates liabilities and expenses for the pension and retiree health and welfare plans. Estimated amounts are based on historical information, current information and estimates regarding future events and circumstances. Significant assumptions used in the valuation of pension and/or retiree health and welfare liabilities include the expected return on plan assets, discount rate, rate of increase in compensation levels and the health care cost trend rate.

## Reclassifications

Certain comparative prior year amounts in the Consolidated Financial Statements and accompanying notes have been reclassified to conform to the current year presentation. These reclassifications had no effect on previously reported operating income or net income.

## 3. Hedging Activities

The Company uses derivative financial instruments to hedge against increases in diesel fuel prices and interest rates as well as to convert a portion of its fixed-rate long-term debt to floating-rate debt. The Company does not hold or issue derivative financial instruments for trading or speculative purposes. The Company formally documents the relationship between the hedging instrument and the hedged item, as well as the risk management objective and strategy for the use of the hedging instrument. This documentation includes linking the derivatives that are designated as fair value or cash flow hedges to specific assets or liabilities on the balance sheet, commitments or forecasted transactions. The Company assesses at the time a derivative contract is entered into, and at least quarterly thereafter, whether the derivative item is effective in offsetting the changes in fair value or cash flows. Any change in fair value resulting from ineffectiveness, as defined by SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities, as amended,* is recognized in current period earnings. For derivative instruments that are designated and qualify as cash flow hedges, the effective portion of the gain or loss on the derivative instrument is recorded in accumulated other comprehensive loss (AOCL) as a separate component of stockholders' equity and reclassified into earnings in the period during which the hedge transaction affects earnings. Cash flows related to fuel and interest rate hedges are classified as operating activities in the Consolidated Statements of Cash Flows.

BNSF monitors its hedging positions and credit ratings of its counterparties and does not anticipate any losses due to counterparty nonperformance.

### Fuel

Fuel costs represented 26 percent, 24 percent and 19 percent of total operating expenses during 2007, 2006 and 2005, respectively. Due to the significance of diesel fuel expenses to the operations of BNSF and the historical volatility of fuel prices, the Company has entered into hedges to partially mitigate the risk of fluctuations in the price of its diesel fuel purchases. The fuel hedges include the use of derivatives that are accounted for as cash flow hedges. The hedging is intended to protect the Company's operating margins and overall profitability from adverse fuel price changes by entering into fuel-hedge instruments based on management's evaluation of current and expected diesel fuel price trends. However, to the extent the Company hedges portions of its fuel purchases, it may not realize the impact of decreases in fuel prices. Conversely, to the extent the Company does not hedge portions of its fuel purchases, it may be adversely affected by increases in fuel prices. Based on fuel consumption during 2007 and excluding the impact of the hedges, each one-cent increase in the price of fuel per gallon would result in approximately $14 million of additional fuel expense on an annual basis. However, BNSF believes any fuel price increase would be substantially offset by the Company's fuel surcharge program.

#### Total Fuel-Hedging Activities

As of December 31, 2007, BNSF's total fuel-hedging positions covered approximately 3 percent, 1 percent and less than 1 percent of estimated fuel purchases for 2008, 2009 and 2010, respectively. Hedge positions are closely monitored to ensure that they will not exceed actual fuel requirements in any period.

The amounts recorded in the Consolidated Statements of Income for fuel-hedge transactions were as follows (in millions):

| Year ended December 31, | 2007 | 2006 | 2005 |
|---|---|---|---|
| Hedge benefit | **$ 30** | $ 342 | $ 535 |
| Ineffective portion of open hedges | **1** | (1) | (4) |
| Tax effect | **(12)** | (131) | (203) |
| Hedge benefit, net of tax | **$ 19** | $ 210 | $ 328 |

The amounts recorded in the Consolidated Balance Sheets for fuel-hedge transactions were as follows (in millions):

| December 31, | 2007 | 2006 |
|---|---|---|
| Short-term fuel-hedging asset | **$ 29** | $ 13 |
| Long-term fuel-hedging asset | **10** | – |
| Short-term fuel-hedging liability | **–** | (2) |
| Ineffective portion of open hedges | **–** | 1 |
| Tax effect | **(15)** | (4) |
| Amount included in AOCL, net of tax | **$ 24** | $ 8 |
| Settled fuel-hedging contracts receivable | **$ 6** | $ 37 |

BNSF measures the fair value of hedges based upon data provided by various external counterparties. To value a swap, the Company uses the forward commodity price for the period hedged.

### New York Mercantile Exchange (NYMEX) #2 Heating Oil (HO) Hedges

As of December 31, 2006, BNSF had outstanding fuel swap agreements utilizing NYMEX #2 HO. No additional HO hedges were entered into during 2007. As of December 31, 2007, there were no HO hedge positions outstanding.

### West Texas Intermediate (WTI) Crude Oil Hedges

At December 31, 2007, BNSF had outstanding fuel swap agreements utilizing WTI crude oil. The hedge prices do not include taxes, transportation costs, certain other fuel handling costs and any differences which may occur between the prices of WTI and the purchase price of BNSF's diesel fuel, including refining costs. Over the twelve months ended December 31, 2007, the sum of all such costs averaged approximately 55 cents per gallon.

During 2007, the Company entered into fuel swap agreements utilizing WTI to hedge the equivalent of approximately 1.5 million barrels of fuel with an average swap price of $64.12 per barrel. The following tables provide fuel-hedge data based on the quarter being hedged for all WTI fuel hedges outstanding as of December 31, 2007.

| | Quarter Ending | | | | |
|---|---|---|---|---|---|
| **2008** | **March 31,** | **June 30,** | **September 30,** | **December 31,** | **Annual** |
| **WTI Swaps** | | | | | |
| Barrels hedged (in thousands) | 290 | 260 | 230 | 230 | 1,010 |
| Equivalent gallons hedged (in millions) | 12.18 | 10.92 | 9.66 | 9.66 | 42.42 |
| Average swap price (per barrel) | $ 63.69 | $ 63.77 | $ 63.70 | $ 63.70 | $ 63.72 |
| Fair value (in millions) | $ 9 | $ 8 | $ 6 | $ 6 | $ 29 |

| | Quarter Ending | | | | |
|---|---|---|---|---|---|
| **2009** | **March 31,** | **June 30,** | **September 30,** | **December 31,** | **Annual** |
| **WTI Swaps** | | | | | |
| Barrels hedged (in thousands) | 100 | 100 | 100 | 70 | 370 |
| Equivalent gallons hedged (in millions) | 4.20 | 4.20 | 4.20 | 2.94 | 15.54 |
| Average swap price (per barrel) | $ 65.10 | $ 65.10 | $ 65.10 | $ 65.00 | $ 65.08 |
| Fair value (in millions) | $ 2 | $ 2 | $ 2 | $ 2 | $ 8 |

| | Quarter Ending | | | | |
|---|---|---|---|---|---|
| **2010** | **March 31,** | **June 30,** | **September 30,** | **December 31,** | **Annual** |
| **WTI Swaps** | | | | | |
| Barrels hedged (in thousands) | 70 | – | – | – | 70 |
| Equivalent gallons hedged (in millions) | 2.94 | – | – | – | 2.94 |
| Average swap price (per barrel) | $ 64.80 | $ – | $ – | $ – | $ 64.80 |
| Fair value (in millions) | $ 2 | $ – | $ – | $ – | $ 2 |

### Summarized Comparative Prior Year Information

The following table provides summarized comparative information for hedge transactions outstanding as of December 31, 2006.

| Year ended December 31, | 2007 |
|---|---|
| **HO Swaps** | |
| Gallons hedged (in millions) | 55.65 |
| Average swap price (per gallon) | $ 2.11 |
| Fair value (in millions) | $ (16) |
| **HO Collars** | |
| Gallons hedged (in millions) | 40.95 |
| Average cap price (per gallon) | $ 1.17 |
| Average floor price (per gallon) | $ 1.07 |
| Fair value (in millions) | $ 23 |
| **WTI Collars** | |
| Barrels hedged (in thousands) | 150 |
| Equivalent gallons hedged (in millions) | 6.30 |
| Average cap price (per barrel) | $ 33.00 |
| Average floor price (per barrel) | $ 29.00 |
| Fair value (in millions) | $ 4 |

## Interest Rate

From time to time, the Company enters into various interest rate hedging transactions for the purpose of managing exposure to fluctuations in interest rates by establishing rates in anticipation of both future debt issuances and the refinancing of leveraged leases, as well as converting a portion of its fixed-rate long-term debt to floating-rate debt. The Company uses interest rate swaps and treasury locks as part of its interest rate risk management strategy.

### Total Interest Rate Hedging Program

All interest rate derivative transactions outstanding are reflected in the following table:

| | December 31, 2007 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Maturity Date | | | | | | | Fair |
| | 2008 | 2009 | 2010 | 2011 | 2012 | Thereafter | Total | Value |
| **Fair Value Hedges** | | | | | | | | |
| Fixed to variable swaps (in millions) | $ – | $ 200 | $ 250 | $ – | $ – | $ – | $ 450 | $ 6 |
| Average fixed rate | –% | 6.13% | 7.13% | –% | –% | –% | 6.68% | |
| Average floating rate | –% | 5.47% | 7.86% | –% | –% | –% | 6.80% | |
| **Cash Flow Hedges** | | | | | | | | |
| Treasury locks (in millions) | $ 175 | $ – | $ – | $ – | $ – | $ – | $ 175 | $ (5) |
| Average rate | 4.41% | –% | –% | –% | –% | –% | 4.41% | |

BNSF's measurement of the fair value of interest rate derivatives is based on estimates of the mid-market values for the transactions provided by the counterparties to these agreements.

## Summarized Comparative Prior Year Information

| | December 31, 2006 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Maturity Date | | | | | | | Fair |
| | 2007 | 2008 | 2009 | 2010 | 2011 | Thereafter | Total | Value |
| **Fair Value Hedges** | | | | | | | | |
| Fixed to variable swaps (in millions) | $ 300 | $ – | $ 200 | $ 250 | $ – | $ – | $ 750 | $ (6) |
| Average fixed rate | 7.88% | –% | 6.13% | 7.13% | –% | –% | 7.16% | |
| Average floating rate | 7.98% | –% | 5.84% | 8.23% | –% | –% | 7.49% | |
| **Cash Flow Hedges** | | | | | | | | |
| Treasury locks (in millions) | $ 130 | $ – | $ – | $ – | $ – | $ – | 130 | $ – |
| Average rate | 4.69% | –% | –% | –% | –% | –% | 4.69% | |

## Fair Value Interest Rate Hedges

The Company enters into interest rate swaps to convert fixed-rate long-term debt to floating-rate debt. These swaps are accounted for as fair value hedges under SFAS No. 133. These fair value hedges qualify for the short-cut method of recognition; therefore, no portion of these swaps is treated as ineffective. As of each of the years ended December 31, 2007 and 2006, BNSF had outstanding seven and ten separate swaps, respectively, with an aggregate notional amount of $450 million and $750 million, respectively, in which it pays an average floating rate, which fluctuates quarterly, based on London Interbank Offered Rate (LIBOR). The average floating rate to be paid by BNSF as of December 31, 2007, was 6.80 percent, and the average fixed rate BNSF is to receive is 6.68 percent.

The amounts recorded in the Consolidated Statements of Income, as an increase to or reduction of interest expense, for interest rate fair value hedge transactions were as follows (in millions):

| Year ended December 31, | 2007 | 2006 | 2005 |
|---|---|---|---|
| Hedge (loss) benefit | **$ (3)** | $ (1) | $ 17 |
| Tax effect | **1** | – | (6) |
| Hedge (loss) benefit, net of tax | **$ (2)** | $ (1) | $ 11 |

The amounts recorded in the Consolidated Balance Sheets for interest rate fair value hedge transactions, which represent the fair value of open hedges, with a corresponding adjustment to debt or accrued interest, were as follows (in millions):

| December 31, | 2007 | 2006 |
|---|---|---|
| Long-term interest rate hedging asset | **$ 6** | $ – |
| Long-term interest rate hedging liability | **$ –** | $ (6) |

## Cash Flow Interest Rate Hedges

In anticipation of a future debt issuance, the Company entered into seven treasury locks in September, October and November 2007, having an aggregate notional amount of $175 million, and an average locked-in rate of 4.41 percent, to fix a portion of the rate for a future 10-year unsecured debt issuance. The treasury locks are expected to be unwound during 2008, and any gain or loss on the hedges will be amortized to interest expense over the life of the issued debt. These transactions are accounted for as cash flow hedges.

In anticipation of a future refinancing of several leveraged leases, the Company had entered into six treasury locks having an aggregate notional amount of $147 million to fix the interest rate inherent in the operating lease payments. The treasury locks were terminated in May 2007 in connection with the refinancing of the leveraged leases, and the resulting $0.5 million gain on these hedges will be amortized to equipment rents over the remaining life of the leases. These transactions are also accounted for as cash flow hedges.

In anticipation of future debt issuances, the Company had entered into fourteen treasury locks having an aggregate notional amount of $450 million to fix a portion of the rate for a future 10-year unsecured debt issuance and a future 30-year unsecured debt issuance. The treasury locks were terminated in April 2007 in connection with the issuance of $650 million 10-year and $650 million 30-year unsecured debt. Upon termination, BNSF received $6 million from the counterparties, which will be amortized to interest expense over the life of the issued debt. These transactions are also accounted for as cash flow hedges.

The amounts recorded in the Consolidated Balance Sheets for interest rate cash flow hedge transactions, which represent the fair value of open and closed hedges, were as follows (in millions):

| December 31, | 2007 | 2006 |
|---|---|---|
| Interest rate hedging liability – open hedges | **$ (5)** | $ – |
| Unrecognized gain on closed hedges | **19** | 15 |
| Tax effect | **(5)** | (6) |
| Unrecognized gain in AOCL, net of tax | **$ 9** | $ 9 |

## 4. Other Expense, Net

Other expense, net includes the following (in millions):

| Year ended December 31, | 2007 | 2006 | 2005 |
|---|---|---|---|
| Accounts receivable sales fees | **$ 19** | $ 23 | $ 15 |
| Loss from participation in synthetic fuel partnership | **5** | 9 | 14 |
| Miscellaneous, net | **(6)** | 8 | 8 |
| Total | **$ 18** | $ 40 | $ 37 |

The decrease in other expense, net was predominantly due to lower accounts receivable sales fees, a decrease in losses on BNSF Railway's participation in a synthetic fuel partnership and an increase in interest income.

During the fourth quarter of 2004, BNSF Railway indirectly purchased a 4.17 percent ownership of a synthetic fuel partnership through a 50 percent interest in a limited liability company with an unrelated entity. The synthetic fuel partnership generates Section 29 synthetic fuel tax credits, which reduce the Company's effective tax rate (see Note 5 to the Consolidated Financial Statements for additional information). In 2007, 2006 and 2005, BNSF Railway received a tax benefit from its participation in the partnership of approximately $7 million, $11 million and $16 million, respectively, related to the fuel tax credits and the deduction of partnership operating losses. In 2007, 2006 and 2005, the Company recorded approximately $5 million, $9 million and $14 million, respectively, of other expense, net related to the Company's share of the partnership's losses under the equity method of accounting. The partnership does not qualify for consolidation under FIN 46R, as BNSF Railway is not the primary beneficiary of the partnership. The partnership's activities terminated on December 31, 2007; therefore, the Company will not have any additional exposure to loss from the synthetic fuel partnership.

## 5. Income Taxes

Income tax expense was as follows (in millions):

| Year ended December 31, | 2007 | 2006[a] | 2005[a] |
|---|---|---|---|
| Current: | | | |
| Federal | **$ 741** | $ 697 | $ 620 |
| State | **107** | 94 | 80 |
| Total current | **848** | 791 | 700 |
| Deferred: | | | |
| Federal | **245** | 300 | 185 |
| State | **35** | 16 | 34 |
| Total deferred | **280** | 316 | 219 |
| Total | **$ 1,128** | $ 1,107 | $ 919 |

a Prior year numbers have been adjusted for the retrospective adoption of FSP AUG AIR-1, *Accounting for Planned Major Maintenance Activities.* See Note 2 to the Consolidated Financial Statements for additional information.

Reconciliation of the federal statutory income tax rate to the effective tax rate was as follows:

| Year ended December 31, | 2007 | 2006 | 2005 |
|---|---|---|---|
| Federal statutory income tax rate | **35.0%** | 35.0% | 35.0% |
| State income taxes, net of federal tax benefit | **3.1** | 2.6 | 3.0 |
| Tax law change | **–** | (0.2) | – |
| Synthetic fuel credits | **(0.2)** | (0.3) | (0.4) |
| Other, net | **0.3** | (0.2) | (0.1) |
| Effective tax rate | **38.2%** | 36.9% | 37.5% |

The components of deferred tax assets and liabilities were as follows (in millions):

| December 31, | 2007 | 2006[a] |
|---|---|---|
| Deferred tax liabilities: | | |
| Depreciation and amortization | **$ (8,977)** | $ (8,738) |
| Hedging | **(26)** | (15) |
| Other | **(170)** | (208) |
| Total deferred tax liabilities | **(9,173)** | (8,961) |
| Deferred tax assets: | | |
| Casualty and environmental | **348** | 332 |
| Pension and retiree health and welfare benefits | **184** | 247 |
| Compensation and benefits | **145** | 158 |
| Employee separation costs | **35** | 39 |
| Other | **267** | 232 |
| Total deferred tax assets | **979** | 1,008 |
| Net deferred tax liability | **$ (8,194)** | $ (7,953) |
| Non-current deferred income tax liability | **$ (8,484)** | $ (8,298) |
| Current portion of deferred income taxes | **290** | 345 |
| Net deferred tax liability | **$ (8,194)** | $ (7,953) |

a Prior year numbers have been adjusted for the retrospective adoption of FSP AUG AIR-1, *Accounting for Planned Major Maintenance Activities.* See Note 2 to the Consolidated Financial Statements for additional information.

All federal income tax returns of BNSF's predecessor companies, Burlington Northern Inc. and Santa Fe Pacific Corporation, are closed through 1994 and the business combination date of September 22, 1995, respectively. Internal Revenue Service (IRS) examination of the years 1995 through 1999 for BNSF is completed, and the un-agreed issues are pending before IRS Appeals. It is anticipated that a settlement with the IRS for the years 1995 through 1999 may be reached within the next twelve months. Examination of the years 2000 through 2002 and 2003 through 2005 for BNSF are completed and protests of the un-agreed issues are pending before IRS Appeals. BNSF is currently under examination for year 2006.

BNSF and its subsidiaries have various state income tax returns in the process of examination, administrative appeal or litigation. State income tax returns are generally subject to examination for a period of three to five years after filing of the respective return. The state impact of any federal changes remains subject to examination by various states for a period of up to one year after formal notification to the states.

Due to the capital-intensive nature of BNSF's business, a significant portion of the audit issues with the IRS and other taxing authorities relate to whether expenditures are classified as maintenance or capital and whether certain asset valuations are appropriate. A provision for taxes resulting from ongoing and future federal and state audits is based on an estimation of aggregate adjustments that may be required as a result of the audits. The Company believes that adequate provision has been made for any adjustment that might be assessed for open years through 2007.

## Uncertain Tax Positions

The Company adopted the provisions of FIN 48 on January 1, 2007. As a result of the implementation of FIN 48, the Company recorded an $83 million increase in the liability for unrecognized tax benefits, which is offset by a reduction of the deferred tax liability of $70 million, resulting in a decrease to the January 1, 2007, retained earnings balance of $13 million. The amount of unrecognized tax benefits at December 31, 2007 was $125 million, of which $91 million would impact the Company's effective tax rate if recognized. A reconciliation of the beginning and ending amount of unrecognized tax benefits is as follows (in millions):

| | |
|---|---|
| Balance at January 1, 2007 | $ 87 |
| Additions for tax positions related to current year | 29 |
| Additions/reductions for tax positions taken in prior years | 12 |
| Reductions for tax positions as a result of: | |
| Settlements | – |
| Lapse of statute of limitations | (3) |
| Balance at December 31, 2007 | $ 125 |

It is expected that the amount of unrecognized tax benefits will change in the next twelve months; however, BNSF does not expect the change to have a significant impact on the results of operations or the financial position of the Company.

The Company recognizes interest accrued related to unrecognized tax benefits in interest expense and penalties in income tax expense in the Consolidated Statements of Income, which is consistent with the recognition of these items in prior reporting periods. The Company had recorded a liability of approximately $41 million and $65 million for the payment of interest and penalties for the years ending December 31, 2007, and 2006, respectively. For the year ended December 31, 2007, the Company recognized a reduction of approximately $7 million in interest and penalty expense. For the years ended December 31, 2006, and 2005, the Company recognized approximately $5 million and $9 million in interest and penalty expense, respectively.

# 6. Accounts Receivable, Net

BNSF Railway transfers a portion of its accounts receivable to Santa Fe Receivables Corporation (SFRC), a special purpose subsidiary. SFRC transfers an undivided interest in such receivables, with limited exceptions, to a master trust and causes the trust to issue an undivided interest in the receivables to investors (the A/R sales program). The undivided interests in the master trust may be in the form of certificates or purchased interests.

BNSF Railway's total capacity to sell undivided interests to investors under the A/R sales program was $700 million at December 31, 2007, which was comprised of two $175 million, 364-day accounts receivable facilities and two $175 million, 3-year accounts receivable facilities. BNSF Railway amended the two 364-day facilities in November 2007, reducing the committed amounts to $175 million each and modifying their maturities to November 2008. The two 3-year facilities were entered into in November 2007 concurrently with the amendment and extension of the two 364-day facilities and will mature in November 2010. Outstanding undivided interests held by investors under the A/R sales program were $300 million at December 31, 2007 and 2006, respectively, with $75 million in each facility. These undivided interests in receivables are excluded from accounts receivable by BNSF Railway in connection with the sale of undivided interests under the A/R sales program. These undivided interests were supported by $1,105 million and $1,030 million of receivables transferred by SFRC to the master trust at December 31, 2007 and 2006, respectively. When SFRC transfers these receivables to the master trust, it retains an undivided interest in the receivables sold, which is included in accounts receivable in the Company's Consolidated Financial Statements. The interest that continues to be held by SFRC of $805 million and $730 million at December 31, 2007 and 2006, respectively, less an allowance for uncollectible accounts, reflected the total accounts receivable transferred by SFRC to the master trust less $300 million at both December 31, 2007 and 2006, of outstanding undivided interests held by investors. Due to a relatively short collection cycle, the fair value of the undivided interest transferred to investors in the A/R sales program approximated book value, and there was no gain or loss from the transaction.

BNSF Railway retains the collection responsibility with respect to the accounts receivable. Proceeds from collections reinvested in the A/R sales program were approximately $16.8 billion, $15.8 billion and $13.6 billion in 2007, 2006 and 2005, respectively. No servicing asset or liability has been recorded because the fees BNSF Railway receives for servicing the receivables approximate the related costs. SFRC's costs of the sale of receivables are included in other expense, net and were $19 million, $23 million and $15 million for the years ended December 31, 2007, 2006 and 2005, respectively. These costs fluctuate monthly with changes in prevailing interest rates and were based on weighted average interest rates of 5.6 percent, 5.3 percent and 3.3 percent for the years ended December 31, 2007, 2006 and 2005, respectively. These costs include interest, discounts associated with transferring the receivables under the A/R sales program to SFRC, program fees paid to banks, incidental commercial paper issuing costs and fees for unused commitment availability.

The amount of accounts receivable transferred by BNSF Railway to SFRC fluctuates based upon the availability of receivables and is directly affected by changing business volumes and credit risks, including dilution and delinquencies. In order for there to be an impact on the amount of receivables BNSF Railway could sell, the combined dilution and delinquency percentages would have to exceed an established threshold for the combined dilution and delinquency percentages. BNSF Railway has historically experienced very low levels of default or dilution and was well below the established rate at December 31, 2007. Based on the current levels, if dilution or delinquency percentages were to increase by one percentage point, there would be no impact to the amount of receivables BNSF Railway could sell.

Receivables funded under the A/R sales program may not include amounts over 90 days past due or concentrations over certain limits with any one customer and certain other receivables. At December 31, 2007 and 2006, $11 million and $26 million, respectively, of accounts receivable were greater than 90 days old.

BNSF Railway maintains an allowance for bill adjustments and uncollectible accounts based upon the expected collectibility of accounts receivable, including receivables transferred to the master trust. Credit losses are based on specific identification of uncollectible accounts and application of historical collection percentages by aging category. At both December 31, 2007 and 2006, $36 million of such allowances had been recorded, of which $34 million had been recorded as a reduction to accounts receivable, net. The remaining $2 million at December 31, 2007 and 2006, respectively, had been recorded in accounts payable and other current liabilities because they relate to the outstanding undivided interests held by investors. During the years ended December 31, 2007 and 2006, $4 million and $8 million, respectively, of accounts receivable were written off.

The investors in the master trust have no recourse to BNSF Railway's other assets except for customary warranty and indemnity claims. Creditors of BNSF Railway have no recourse to the assets of the master trust or SFRC unless and until all claims of their respective creditors have been paid. The A/R sales program includes provisions that, if triggered, allow the investors participating in this program, at their option, to cancel the program. At December 31, 2007, BNSF Railway was in compliance with these provisions.

## 7. Property and Equipment, Net

Property and equipment, net (in millions), and the weighted average annual depreciation rates (%) were as follows:

| **December 31,** | **2007** | **2006[a]** | **2007 Depreciation Rates** |
|---|---|---|---|
| Land | **$ 1,718** | $ 1,693 | –% |
| Track structure | **18,037** | 17,101 | 3.2% |
| Other roadway | **12,370** | 11,608 | 2.4% |
| Locomotives | **4,003** | 3,705 | 6.4% |
| Freight cars and other equipment | **2,034** | 1,939 | 5.2% |
| Computer hardware and software | **582** | 492 | 14.0% |
| Total cost | **38,744** | 36,538 | |
| Less accumulated depreciation and amortization | **(9,177)** | (8,617) | |
| Property and equipment, net | **$ 29,567** | $ 27,921 | |

a Prior year numbers have been adjusted for the retrospective adoption of FSP AUG AIR-1, *Accounting for Planned Major Maintenance Activities.* See Note 2 to the Consolidated Financial Statements for additional information.

The Consolidated Balance Sheets at December 31, 2007 and 2006, included $1,507 million, net of $469 million of amortization and $1,039 million, net of $409 million of amortization, respectively, for property and equipment under capital leases, primarily for locomotives.

The Company capitalized $17 million, $14 million and $13 million of interest for the years ended December 31, 2007, 2006 and 2005, respectively.

## 8. Accounts Payable and Other Current Liabilities

Accounts payable and other current liabilities consisted of the following (in millions):

| December 31, | 2007 | 2006 |
|---|---|---|
| Compensation and benefits payable | **$ 568** | $ 699 |
| Rents and leases | **303** | 350 |
| Accounts payable | **296** | 282 |
| Casualty and environmental liabilities | **246** | 233 |
| Customer incentives | **145** | 163 |
| Property tax liabilities | **141** | 132 |
| Accrued interest | **138** | 127 |
| Dividends payable | **112** | 90 |
| Income tax liabilities | **82** | 68 |
| Other | **793** | 709 |
| Total | **$ 2,824** | $ 2,853 |

## 9. Debt

Debt outstanding was as follows (in millions):

| December 31, | 2007[a] | | 2006[a] | |
|---|---|---|---|---|
| Notes and debentures, due 2008 to 2097 | **$ 6,376** | **6.6%** | $ 5,364 | 6.8% |
| Equipment obligations, due 2008 to 2016 | **297** | **6.6** | 347 | 6.7 |
| Capitalized lease obligations, due 2008 to 2027 | **938** | **6.3** | 609 | 6.9 |
| Mortgage bonds, due 2008 to 2047 | **102** | **5.6** | 106 | 5.7 |
| Financing obligations, due 2008 to 2028 | **211** | **6.3** | 153 | 6.3 |
| Commercial paper | **261** | **5.5** | 846 | 5.4 |
| Unamortized discount and other, net | **(39)** | | (40) | |
| Total | **8,146** | | 7,385 | |
| Less current portion of long-term debt | **(411)** | **7.2%** | (473) | 7.7% |
| Long-term debt | **$ 7,735** | | $ 6,912 | |

a Amounts represent debt outstanding and weighted average interest rates for 2007 and 2006, respectively. Maturities are as of December 31, 2007.

Notes and debentures include a fair value adjustment increase for hedges of $6 million and a decrease of $6 million at December 31, 2007 and 2006, respectively.

As of December 31, 2007, certain BNSF Railway properties and other assets were subject to liens securing $102 million of mortgage debt. Certain locomotives and rolling stock of BNSF Railway were subject to equipment obligations and capital leases.

The following table provides fair value information for the Company's debt obligations including principal cash flows and related weighted average interest rates by contractual maturity dates. Weighted average variable rate for commercial paper is the current rate at December 31, 2007. The remaining weighted average variable rates are based on implied forward rates in the yield curve at December 31, 2007.

| | December 31, 2007 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Maturity Date | | | | | | Total Including Capital Leases | Total Excluding Capital Leases | Fair Value Excluding Capital Leases |
| | 2008 | 2009 | 2010 | 2011 | 2012 | Thereafter | | | |
| Fixed-rate debt (in millions) | $ 411 | $ 188 | $ 206 | $ 515 | $ 393 | $ 5,716 | $ 7,429 | $ 6,491 | $ 6,752 |
| Average interest rate | 7.2% | 6.9% | 6.8% | 6.7% | 6.0% | 6.5 % | 6.5% | | |
| Variable-rate debt (in millions) | $ – | $ 204 | $ 252 | $ – | $ 261 | $ – | $ 717 | $ 717 | $ 723 |
| Average interest rate | –% | 4.4% | 6.7% | –% | 5.5% | – % | 5.6% | | |

BNSF has included maturities of $261 million of commercial paper in the 2012 column above.

The fair value of BNSF's long-term debt is primarily based on quoted market prices for the same or similar issues, or on the current rates that would be offered to BNSF for debt of the same remaining maturities. Capital leases have been excluded from the calculation of fair value for both 2007 and 2006. The carrying amount of commercial paper and bank debt approximates fair value, and the average interest rate equals the current rate because of the short maturity of these instruments.

## Notes and Debentures

**2007**

In February 2007, the Board of Directors (the Board) authorized an additional $1.4 billion of debt securities that may be issued pursuant to a debt shelf registration statement that has been filed with the Securities and Exchange Commission, for a total of $2.1 billion of debt securities authorized to be issued.

In April 2007, BNSF issued $650 million of 5.65 percent debentures and $650 million of 6.15 percent debentures due May 1, 2017 and May 1, 2037, respectively. The net proceeds from the sale of the debentures are being used for general corporate purposes including, but not limited to, working capital, capital expenditures, funding debt which matured in 2007, the repayment of commercial paper and the repurchase of common stock. The issuance of these debentures reduced the amount of debt authorized to be issued by the Board through its registration statement to $800 million.

**2006**

In August 2006, BNSF issued $300 million of 6.20 percent debentures due August 15, 2036. The net proceeds from the sale of the debentures are being used for general corporate purposes including but not limited to working capital, capital expenditures and the repayment of outstanding commercial paper.

**2005**

In December 2005, BNSF issued $500 million of 6.613 percent junior subordinated notes due December 31, 2055. The junior subordinated notes are callable on or after January 15, 2026, at par plus accrued and unpaid interest. On January 15, 2026, if the junior subordinated notes are not called, the interest rate will change to an annual rate equal to the 3-month LIBOR plus 2.35 percent, reset quarterly. Interest payments may be deferred, at the option of the Company, on a cumulative basis for a period of up to five consecutive years; however, during this time the Company would not be permitted to declare or pay dividends on its common stock. In the event that certain financial covenants are not maintained, the Company would be required to sell common stock, the proceeds of which would be used to pay any accrued and unpaid interest. At December 31, 2007, the Company was in compliance with these covenants. Because of this structure, certain rating agencies provide a considerable degree of equity treatment for purposes of calculating various ratios and metrics. The majority of the net proceeds of the debt issuance was used to repurchase common stock, with the remainder used for general corporate purposes.

**Capital Leases**

In 2007, BNSF entered into several capital leases totaling approximately $325 million to finance locomotives and freight cars. The terms of the leases are between 15 and 20 years.

**Financing Obligation**

In 2005, the Company commenced the construction of an intermodal facility that it intends to sell to a third party and subsequently lease back. Once construction of the facility is complete and all improvements have been sold to the third party, BNSF will lease the facility from the third party for 20 years. Construction is expected to be completed by early 2009 with an approximate cost of $160 million. As of December 31, 2007, BNSF has sold $41 million of completed improvements. This sale leaseback transaction is being accounted for as a financing obligation due to continuing involvement. The outflows from the construction of the facility are classified as investing activities, and the inflows from the associated financing proceeds are classified as financing activities in the Company's Consolidated Statements of Cash Flows.

## Revolving Credit Facility and Commercial Paper

In the fourth quarter, the Company extended the expiration date of its $1.2 billion long-term bank credit facility to September 2012. Annual facility fees are currently 0.08 percent for the facility. The rate is subject to change based upon changes in BNSF's senior unsecured debt ratings. Borrowing rates are based upon (i) LIBOR plus a spread determined by BNSF's senior unsecured debt ratings, (ii) money market rates offered at the option of the lenders, or (iii) an alternate base rate. BNSF must maintain compliance with certain financial covenants under its revolving credit agreement. At December 31, 2007, the Company was in compliance with these covenants.

At December 31, 2007, there were no bank borrowings against the revolving credit agreement.

BNSF issues commercial paper from time to time that is supported by the bank revolving credit agreement. Outstanding commercial paper balances reduce the amount of borrowings available under this agreement.

The maturity value of commercial paper as of December 31, 2007, of $391 million reduced the total capacity available under the revolving credit agreements to $809 million. Commercial paper outstanding included $129 million issued to a consolidated subsidiary of BNSF that was eliminated upon consolidation. Consolidated commercial paper outstanding, which had a maturity value of $262 million, was classified as long-term debt in the Company's Consolidated Balance Sheet.

## Guarantees

Debt and other obligations of non-consolidated entities guaranteed by the Company as of December 31, 2007, were as follows (dollars in millions):

| | | Guarantees | | | | |
|---|---|---|---|---|---|---|
| | BNSF Ownership Percentage | Principal Amount Guaranteed | Maximum Future Payments | Maximum Recourse Amount[a] | Remaining Term (in years) | Capitalized Obligations |
| Kinder Morgan Energy Partners, L.P. | 0.5% | $ 190 | $ 190 | $ – | Termination of Ownership | $ – |
| Kansas City Terminal Intermodal Transportation Corporation | 0.0% | $ 56 | $ 81 | $ 81 | 11 | $ 31[b] |
| Westside Intermodal Transportation Corporation | 0.0% | $ 40 | $ 61 | $ – | 16 | $ 34[b] |
| The Unified Government of Wyandotte County/Kansas City, Kansas | 0.0% | $ 13 | $ 19 | $ – | 16 | $ 10[b] |
| Chevron Phillips Chemical Company, LP | 0.0% | N/A[d] | N/A[d] | N/A[d] | 10 | $ 14[c] |
| Various lessors (Residual value guarantees) | 0.0% | N/A | $ 271 | $ 271 | Various | $ 68[c] |
| All other | 0.0% | $ 6 | $ 7 | $ 3 | Various | $ – |

a Reflects the maximum amount the Company could recover from a third party other than the counterparty.

b Reflects capitalized obligations that are recorded on the Company's Consolidated Balance Sheets.

c Reflects the FIN 45, *Guarantor's Accounting and Disclosure Requirements for Guarantees*, asset and corresponding liability for the fair value of these guarantees.

d There is no cap to the liability that can be sought from BNSF for BNSF's negligence or the negligence of the indemnified party. However, BNSF could receive reimbursement from certain insurance policies if the liability exceeds a certain amount.

**Kinder Morgan Energy Partners, L.P.**

Santa Fe Pacific Pipelines, Inc., an indirect, wholly-owned subsidiary of BNSF Railway, has a guarantee in connection with its remaining special limited partnership interest in Santa Fe Pacific Pipelines Partners, L.P. (SFPP), a subsidiary of Kinder Morgan Energy Partners, L.P., to be paid only upon default by the partnership. All obligations with respect to the guarantee will cease upon termination of ownership rights, which would occur upon a put notice issued by BNSF or the exercise of the call rights by the general partners of SFPP.

**Kansas City Terminal Intermodal Transportation Corporation**

BNSF Railway and another major railroad jointly and severally guarantee $56 million of debt of Kansas City Terminal Intermodal Transportation Corporation, the proceeds of which were used to finance construction of a double track grade separation bridge in Kansas City, Missouri, which is operated and used by Kansas City Terminal Railway Company (KCTRC). BNSF Railway has a 25 percent ownership in KCTRC, accounts for its interest using the equity method of accounting and would be required to fund a portion of the remaining obligation upon default by the original debtor.

**Westside Intermodal Transportation Corporation and The Unified Government of Wyandotte County/Kansas City, Kansas**

BNSF Railway has outstanding guarantees of $53 million of debt, the proceeds of which were used to finance construction of a bridge that connects BNSF Railway's Argentine Yard in Kansas City, Kansas, with the KCTRC mainline tracks in Kansas City, Missouri. The bridge is operated by KCTRC, and payments related to BNSF Railway's guarantee of this obligation would only be called for upon default by the original debtor.

**Chevron Phillips Chemical Company, LP**

In the third quarter of 2007, BNSF Railway entered into an indemnity agreement with Chevron Phillips Chemical Company, LP (Chevron Phillips), granting certain rights of indemnity from BNSF Railway, in order to facilitate access to a new storage facility. Under certain circumstances, payment under this obligation may be required in the event Chevron Phillips were to incur certain liabilities or other incremental costs resulting from trackage access.

**Residual Value Guarantees (RVG)**

In the normal course of business, the Company enters into leases in which it guarantees the residual value of certain leased equipment. Some of these leases have renewal or purchase options, or both, that the Company may exercise at the end of the lease term. If the Company elects not to exercise these options, it may be required to pay the lessor an amount not exceeding the RVG. The amount of any payment is contingent upon the actual residual value of the leased equipment. Some of these leases also require the lessor to pay the Company any surplus if the actual residual value of the leased equipment is over the RVG. These guarantees will expire between 2008 and 2011.

The maximum future payments, as disclosed in the Guarantees table above, represent the undiscounted maximum amount that the Company could be required to pay in the event the Company did not exercise its renewal option and the fair market value of the equipment had significantly declined. BNSF does not anticipate such a large reduction in the fair market value of the leased equipment. As of December 31, 2007, the Company had recorded a $68 million asset and corresponding liability for the fair value of the RVG.

**All Other**

As of December 31, 2007, BNSF guaranteed $6 million of other debt and leases. BNSF holds a performance bond and has the option to sub-lease property to recover up to $3 million of the $6 million of guarantees. These guarantees expire between 2008 and 2013.

Other than as discussed above, there is no collateral held by a third party that the Company could obtain and liquidate to recover any amounts paid under the above guarantees.

Other than as discussed above, none of the guarantees are recorded in the Consolidated Financial Statements of the Company. The Company does not expect performance under these guarantees to have a material effect on the Company in the foreseeable future.

**Indemnities**

In the ordinary course of business, BNSF enters into agreements with third parties that include indemnification clauses. In general, these clauses are customary for the types of agreements in which they are included. At times, these clauses may involve indemnification for the acts of the Company, its employees and agents, indemnification for another party's acts, indemnification for future events, indemnification based upon a certain standard of performance, indemnification for liabilities arising out of the Company's use of leased equipment or other property, or other types of indemnification. Due to the uncertainty of whether events which would trigger the indemnification obligations would ever occur, the Company does not believe that these indemnity agreements will have a material adverse effect on the Company's results of operations, financial position or liquidity. Additionally, the Company believes that, due to lack of historical payment experience, the fair value of indemnities cannot be estimated with any amount of certainty and that the fair value of any such amount would be immaterial to the Consolidated Financial Statements. Agreements that contain unique circumstances, particularly agreements that contain guarantees that indemnify another party's acts are disclosed separately if appropriate. Unless separately disclosed above, no fair value liability related to indemnities has been recorded in the Consolidated Financial Statements.

# 10. Commitments and Contingencies

## Lease Commitments

BNSF has substantial lease commitments for locomotives, freight cars, trailers and containers, office buildings, operating facilities and other property, and many of these leases provide the option to purchase the leased item at fair market value at the end of the lease. However, some provide fixed price purchase options. Future minimum lease payments as of December 31, 2007, are summarized as follows (in millions):

| December 31, | Capital Leases | Operating Leases[a] |
|---|---|---|
| 2008 | $ 204 | $ 699 |
| 2009 | 175 | 681 |
| 2010 | 138 | 629 |
| 2011 | 96 | 582 |
| 2012 | 78 | 525 |
| Thereafter | 518 | 4,382 |
| Total | 1,209 | $ 7,498 |
| Less amount representing interest | (271) | |
| Present value of minimum lease payments | $ 938 | |

a Excludes leases having non-cancelable lease terms of less than one year and per diem leases.

Lease rental expense for all operating leases, excluding per diem leases, was $706 million, $665 million and $565 million for the years ended December 31, 2007, 2006 and 2005, respectively. When rental payments are not made on a straight-line basis, the Company recognizes rental expense on a straight-line basis over the lease term. Contingent rentals and sublease rentals were not significant.

## Other Commitments

In the normal course of business, the Company enters into long-term contractual requirements for future goods and services needed for the operations of the business. Such commitments are not in excess of expected requirements and are not reasonably likely to result in performance penalties or payments that would have a material adverse effect on the Company's liquidity.

## Personal Injury and Environmental Costs

### Personal Injury

Personal injury claims, including asbestos claims and employee work-related injuries and third-party injuries (collectively, other personal injury), are a significant expense for the railroad industry. Personal injury claims by BNSF Railway employees are subject to the provisions of the Federal Employers' Liability Act (FELA) rather than state workers' compensation laws. FELA's system of requiring the finding of fault, coupled with unscheduled awards and reliance on the jury system, contributed to increased expenses in past years. Other proceedings include claims by non-employees for punitive as well as compensatory damages. A few proceedings purport to be class actions. The variability present in settling these claims, including non-employee personal injury and matters in which punitive damages are alleged, could result in increased expenses in future years. BNSF has implemented a number of safety programs designed to reduce the number of personal injuries as well as the associated claims and personal injury expense.

BNSF records a liability for personal injury claims when the expected loss is both probable and reasonably estimable. The liability and ultimate expense projections are estimated using standard actuarial methodologies. Liabilities recorded for unasserted personal injury claims are based on information currently available. Due to the inherent uncertainty involved in projecting future events such as the number of claims filed each year, developments in judicial and legislative standards and the average costs to settle projected claims, actual costs may differ from amounts recorded. Expense accruals and any required adjustments are classified as materials and other in the Consolidated Statements of Income.

#### Asbestos

The Company is party to a number of personal injury claims by employees and non-employees who may have been exposed to asbestos. The heaviest exposure for BNSF employees was due to work conducted in and around the use of steam locomotive engines that were phased out between the years of 1950 and 1967. However, other types of exposures, including exposure from locomotive component parts and building materials, continued after 1967 until they were substantially eliminated at BNSF by 1985.

BNSF assesses its unasserted liability exposure on an annual basis during the third quarter. BNSF determines its asbestos liability by estimating its exposed population, the number of claims likely to be filed, the number of claims that will likely require payment, and the estimated cost per claim. Estimated filing and dismissal rates and average cost per claim are determined utilizing recent claim data and trends.

During the third quarters of 2007, 2006 and 2005, the Company analyzed recent filing and payment trends to ensure the assumptions used by BNSF to estimate its future asbestos liability were reasonable. In 2007, management recorded a decrease in expense of $17 million due to a statistically significant reduction in filing rate experience for non-malignant claims. In 2006 and 2005, management recorded no additional expense. The Company plans to update its study again in the third quarter of 2008.

Throughout the year, BNSF monitors actual experience against the number of forecasted claims and expected claim payments and will record adjustments to the Company's estimates as necessary.

The following table summarizes the activity in the Company's accrued obligations for both asserted and unasserted asbestos matters (in millions):

| | 2007 | 2006 | 2005 |
|---|---|---|---|
| Beginning balance | **$ 306** | $ 326 | $ 345 |
| Accruals | **(17)** | – | – |
| Payments | **(19)** | (20) | (19) |
| Ending balance at December 31, | **$ 270** | $ 306 | $ 326 |

Of the obligation at December 31, 2007, $226 million was related to unasserted claims while $44 million was related to asserted claims. At December 31, 2007 and 2006, $17 million and $22 million were included in current liabilities, respectively. The recorded liability was not discounted. In addition, defense and processing costs, which are recorded on an as-reported basis, were not included in the recorded liability. The Company is presently self-insured for asbestos-related claims.

The following table summarizes information regarding the number of asserted asbestos claims filed against BNSF:

| | 2007 | 2006 |
|---|---|---|
| Claims unresolved at January 1, | **1,975** | 2,121 |
| Claims filed | **376** | 530 |
| Claims settled, dismissed or otherwise resolved | **(570)** | (676) |
| Claims unresolved at December 31, | **1,781** | 1,975 |

Based on BNSF's estimate of the potentially exposed employees and related mortality assumptions, it is anticipated that unasserted claims will continue to be filed through the year 2050. The Company recorded an amount for the full estimated filing period through 2050 because it had a relatively finite exposed population (former and current employees hired prior to 1985), which it was able to identify and reasonably estimate and about which it had obtained reliable demographic data (including age, hire date and occupation) derived from industry or BNSF specific data that was the basis for the study. BNSF projects that approximately 55, 70 and 90 percent of the future unasserted asbestos claims will be filed within the next 10, 15 and 25 years, respectively.

Because of the uncertainty surrounding the factors used in the study, it is reasonably possible that future costs to settle asbestos claims may range from approximately $245 million to $295 million. However, BNSF believes that the $270 million recorded at December 31, 2007, is the best estimate of the Company's future obligation for the settlement of asbestos claims.

The amounts recorded by BNSF for the asbestos-related liability were based upon currently known facts. Future events, such as the number of new claims to be filed each year, the average cost of disposing of claims, as well as the numerous uncertainties surrounding asbestos litigation in the United States, could cause the actual costs to be higher or lower than projected.

While the final outcome of asbestos-related matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded, it is the opinion of BNSF that none of these items, when finally resolved, will have a material adverse effect on the Company's financial position or liquidity. However, the occurrence of a number of these items in the same period could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

Other Personal Injury

BNSF estimates its other personal injury liability claims and expense quarterly based on the covered population, activity levels and trends in frequency and the costs of covered injuries. Estimates include unasserted claims except for certain repetitive stress and other occupational trauma claims that result from prolonged repeated events or exposure. Such claims are estimated on an as-reported basis because, while the Company has concluded that a probable loss has occurred, it cannot estimate the range of reasonably possible loss due to other contributing causes of such injuries and the fact that continued exposure is required for the potential injury to manifest itself as a claim. The Company believes that the low end of the range of reasonably possible loss, as that term is used in FIN 14, *Reasonable Estimation of the Amount of a Loss,* is immaterial for these repetitive stress and other occupational trauma claims.

BNSF monitors quarterly actual experience against the number of forecasted claims to be received, the forecasted number of claims closing with payment and expected claims payments. Adjustments to the Company's estimates are recorded quarterly as necessary or more frequently as new events or revised estimates develop.

The following table summarizes the activity in the Company's accrued obligations for other personal injury matters (in millions):

| | 2007 | 2006 | 2005 |
|---|---|---|---|
| Beginning balance | **$ 439** | $ 422 | $ 459 |
| Accruals | **190** | 188 | 181 |
| Payments | **(190)** | (171) | (218) |
| Ending balance at December 31, | **$ 439** | $ 439 | $ 422 |

At December 31, 2007 and 2006, $163 million and $153 million were included in current liabilities, respectively. BNSF's liabilities for other personal injury claims are undiscounted. In addition, defense and processing costs, which are recorded on an as-reported basis, were not included in the recorded liability. The Company is substantially self-insured for other personal injury claims.

The following table summarizes information regarding the number of personal injury claims, other than asbestos, filed against BNSF:

| | 2007 | 2006 |
|---|---|---|
| Claims unresolved at January 1, | **3,130** | 3,617 |
| Claims filed | **3,894** | 3,516 |
| Claims settled, dismissed or otherwise resolved | **(3,702)** | (4,003) |
| Claims unresolved at December 31, | **3,322** | 3,130 |

Because of the uncertainty surrounding the ultimate outcome of other personal injury claims, it is reasonably possible that future costs to settle other personal injury claims may range from approximately $380 million to $530 million. However, BNSF believes that the $439 million recorded at December 31, 2007, is the best estimate of the Company's future obligation for the settlement of other personal injury claims.

The amounts recorded by BNSF for other personal injury claims were based upon currently known facts. Future events, such as the number of new claims to be filed each year, the average cost of disposing of claims, as well as the numerous uncertainties surrounding personal injury litigation in the United States, could cause the actual costs to be higher or lower than projected.

While the final outcome of these other personal injury matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded, it is the opinion of BNSF that none of these items, when finally resolved, will have a material adverse effect on the Company's financial position or liquidity. However, the occurrence of a number of these items in the same period could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

BNSF Insurance Company

The Company has a consolidated, wholly-owned subsidiary, Burlington Northern Santa Fe Insurance Company, Ltd. (BNSF IC) that provides insurance coverage for certain risks incurred after April 1, 1998, FELA claims, railroad protective and force account insurance claims and certain excess general liability coverage incurred after January 1, 2002, and certain other claims which are subject to reinsurance. Beginning in 2004, BNSF IC entered into annual reinsurance pooling agreements with several other companies. The pooling agreements insure workers compensation, general liability, auto liability and FELA risk. In accordance with the agreements, BNSF IC cedes a portion of its FELA exposure to the pool and assumes a proportionate share of the entire pool's risk. Each year BNSF IC reviews the objectives and performance of the pool to determine its continued participation in the pool. At December 31, 2007, BNSF IC had invested in third-party commercial paper, time deposits and money market accounts as well as in commercial paper issued by BNSF. All of the third-party investments are classified as cash and cash equivalents on the Company's Consolidated Balance Sheet. At December 31, 2007, there was approximately $300 million related to these third-party investments, which were classified as cash and cash equivalents on the Company's Consolidated Balance Sheet, as compared with approximately $350 million at December 31, 2006.

**Environmental**

The Company's operations, as well as those of its competitors, are subject to extensive federal, state and local environmental regulation. BNSF's operating procedures include practices to protect the environment from the risks inherent in railroad operations, which frequently involve transporting chemicals and other hazardous materials. Additionally, many of BNSF's land holdings are and have been used for industrial or transportation-related purposes or leased to commercial or industrial companies whose activities may have resulted in discharges onto the property. As a result, BNSF is subject to environmental cleanup and enforcement actions. In particular, the federal Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), also known as the Superfund law, as well as similar state laws, generally impose joint and several liability for cleanup and enforcement costs on current and former owners and operators of a site without regard to fault or the legality of the original conduct. BNSF has been notified that it is a potentially responsible party (PRP) for study and cleanup costs at Superfund sites for which investigation and remediation payments are or will be made or are yet to be determined (the Superfund sites) and, in many instances, is one of several PRPs. In addition, BNSF may be considered a PRP under certain other laws. Accordingly, under CERCLA and other federal and state statutes, BNSF may be held jointly and severally liable for all environmental costs associated with a particular site. If there are other PRPs, BNSF generally participates in the cleanup of these sites through cost-sharing agreements with terms that vary from site to site. Costs are typically allocated based on such factors as relative volumetric contribution of material, the amount of time the site was owned or operated and/or the portion of the total site owned or operated by each PRP.

Liabilities for environmental cleanup costs are recorded when BNSF's liability for environmental cleanup is probable and reasonably estimable. Subsequent adjustments to initial estimates are recorded as necessary based upon additional information developed in subsequent periods. Environmental costs include initial site surveys and environmental studies as well as costs for remediation of sites determined to be contaminated.

BNSF estimates the ultimate cost of cleanup efforts at its known environmental sites on an annual basis during the third quarter. Ultimate cost estimates for environmental sites are based on historical payment patterns, current estimated percentage to closure ratios and benchmark patterns developed from data accumulated from industry and public sources, including the Environmental Protection Agency and other governmental agencies. These factors incorporate experience gained from cleanup efforts at other similar sites into the estimates for which remediation and restoration efforts are still in progress.

During the third quarter of 2007, 2006 and 2005, the Company analyzed recent data and trends to ensure the assumptions used by BNSF to estimate its future environmental liability were reasonable. As a result of this study, in the third quarter of 2007, 2006 and 2005, management recorded additional expense of approximately $20 million, $5 million and $12 million as of the June 30 measurement date, respectively. The Company plans to update its study again in the third quarter of 2008.

On a quarterly basis, BNSF monitors actual experience against the forecasted remediation and related payments made on existing sites and conducts ongoing environmental contingency analyses, which consider a combination of factors including independent consulting reports, site visits, legal reviews and analysis of the likelihood of participation in, and the ability to pay for, cleanup of other PRPs. Adjustments to the Company's estimates will continue to be recorded as necessary based on developments in subsequent periods. Additionally, environmental accruals, which are classified as materials and other in the Consolidated Statements of Income, include amounts for newly identified sites or contaminants, third-party claims and legal fees incurred for defense of third-party claims and recovery efforts.

Annual studies do not include (i) contaminated sites of which the Company is not aware; (ii) additional amounts for third-party claims, which arise out of contaminants allegedly migrating from BNSF property, due to a limited number of sites; or (iii) natural resource damage claims. BNSF continues to estimate third-party claims on a site by site basis when the liability for such claims is probable and reasonably estimable. BNSF's recorded liability for third-party claims as of December 31, 2007, is approximately $21 million.

BNSF is involved in a number of administrative and judicial proceedings and other mandatory cleanup efforts for 346 sites, including Superfund sites, at which it is participating in the study or cleanup, or both, of alleged environmental contamination.

The following table summarizes the activity in the Company's accrued obligations for environmental matters (in millions):

| | 2007 | 2006 | 2005 |
|---|---|---|---|
| Beginning balance | **$ 318** | $ 370 | $ 385 |
| Accruals | **126** | 20 | 33 |
| Payments | **(64)** | (72) | (48) |
| Ending balance at December 31, | **$ 380** | $ 318 | $ 370 |

At December 31, 2007 and 2006, $66 million and $58 million was included in current liabilities, respectively. In the first quarter of 2007, the Company recorded a $65 million pre-tax charge, or $0.11 per share, due to an increase in environmental costs primarily related to a final resolution with the State of Washington and its Department of Ecology on clean-up of an existing environmental site at Skykomish and an adverse reversal of a trial court decision on appeal regarding a site at Arvin, California.

BNSF's environmental liabilities are not discounted. BNSF anticipates that the majority of the accrued costs at December 31, 2007, will be paid over the next ten years, and no individual site is considered to be material.

The following table summarizes the environmental sites:

| | BNSF Sites | | Superfund Sites | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| Number of sites at January 1, | **375** | 369 | **20** | 20 |
| Sites added during the period | **16** | 23 | **–** | – |
| Sites closed during the period | **(45)** | (17) | **–** | – |
| Number of sites at December 31, | **346** | 375 | **20** | 20 |

Liabilities recorded for environmental costs represent BNSF's best estimate of its probable future obligation for the remediation and settlement of these sites and include both asserted and unasserted claims. Unasserted claims are not a material component of the liability. Although recorded liabilities include BNSF's best estimate of all probable costs, without reduction for anticipated recoveries from third parties, BNSF's total cleanup costs at these sites cannot be predicted with certainty due to various factors such as the extent of corrective actions that may be required, evolving environmental laws and regulations, advances in environmental technology, the extent of other parties' participation in cleanup efforts, developments in ongoing environmental analyses related to sites determined to be contaminated and developments in environmental surveys and studies of contaminated sites.

Because of the uncertainty surrounding these factors, it is reasonably possible that future costs for environmental liabilities may range from approximately $300 million to $525 million. However, BNSF believes that the $380 million recorded at December 31, 2007, is the best estimate of the Company's future obligation for environmental costs.

While the final outcome of these environmental matters cannot be predicted with certainty, it is the opinion of BNSF that none of these items, when finally resolved, will have a material adverse effect on the Company's financial position or liquidity. However, the occurrence of a number of these items in the same period could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

**Other Claims and Litigation**

In addition to asbestos, other personal injury and environmental matters discussed above, BNSF and its subsidiaries are also parties to a number of other legal actions and claims, various governmental proceedings and private civil suits arising in the ordinary course of business, including those related to disputes and complaints involving certain transportation rates and charges (including complaints seeking refunds of prior charges paid for coal transportation and the prescription of future rates for such movements and claims relating to service under contract provisions or otherwise). Some of the legal proceedings include claims for punitive as well as compensatory damages, and a few proceedings purport to be class actions. While the final outcome of these matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded along with applicable insurance, it is the opinion of BNSF that none of these items, when finally resolved, will have a material adverse effect on the Company's financial position or liquidity. However, an unexpected adverse resolution of one or more of these items could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

## 11. Employee Separation Costs

Employee separation costs activity was as follows (in millions):

| | 2007 | 2006 | 2005 |
|---|---|---|---|
| Beginning balance at January 1, | **$ 107** | $ 132 | $ 154 |
| Accruals | **5** | 2 | 8 |
| Payments | **(21)** | (27) | (30) |
| Ending balance at December 31, | **$ 91** | $ 107 | $ 132 |

Employee separation liabilities of $91 million were included in the Consolidated Balance Sheet at December 31, 2007, and principally represent the following: (i) $86 million for deferred benefits payable upon separation or retirement to certain active conductors, trainmen and locomotive engineers; (ii) $1 million for employee-related severance costs for the consolidation of clerical functions, material handlers in mechanical shops and trainmen on reserve boards; and (iii) $4 million for certain non-union employee severance costs. Employee separation expenses are recorded in materials and other in the Consolidated Statements of Income. At December 31, 2007, $14 million of the remaining liabilities were included in current liabilities.

The deferred benefits payable upon separation or retirement to certain active conductors, trainmen and locomotive engineers were primarily incurred in connection with labor agreements reached prior to the business combination of BNSF's predecessor companies, Burlington Northern Inc. and Santa Fe Pacific Corporation (the Merger). These agreements, among other things, reduced train crew sizes and allowed for more flexible work rules. The majority of the remaining costs will be paid between 2008 and 2020. As of December 31, 2007, the Company had updated its estimate and recorded an additional liability of $4 million related to deferred benefits (see (i) above) and a liability of $1 million related to non-union severance costs (see (iii) above). The remaining costs for (ii) above are expected to be paid out between 2008 and approximately 2011, and the costs for (iii) above will be paid over the next several years based on deferral elections made by the affected employees.

## 12. Earnings Per Share

Basic earnings per share is based on the weighted average number of common shares outstanding. Diluted earnings per share is based on basic earnings per share adjusted for the effect of potential common shares outstanding that were dilutive during the period, arising from employee stock awards and incremental shares calculated using the treasury stock method.

Weighted average stock options totaling 2.2 million, 1.1 million and 0.1 million for 2007, 2006 and 2005, respectively, were not included in the computation of diluted earnings per share, because the options' exercise price exceeded the average market price of the Company's stock for those periods.

## 13. Employment Benefit Plans

BNSF sponsors a funded, noncontributory qualified pension plan, the BNSF Retirement Plan, which covers most non-union employees, and an unfunded non-tax-qualified pension plan, the BNSF Supplemental Retirement Plan, which covers certain officers and other employees. The benefits under these pension plans are based on years of credited service and the highest consecutive sixty months of compensation for the last ten years of salaried employment with BNSF. BNSF's funding policy is to contribute annually not less than the regulatory minimum and not more than the maximum amount deductible for income tax purposes with respect to the funded plan.

Certain salaried employees of BNSF that have met age and years of service requirements are eligible for life insurance coverage and medical benefits, including prescription drug coverage, during retirement. This postretirement benefit plan, referred to as the retiree health and welfare plan, is contributory and provides benefits to retirees, their covered dependents and beneficiaries. Retiree contributions are adjusted annually. The plan also contains fixed deductibles, coinsurance and out-of-pocket limitations. The basic life insurance plan is noncontributory and covers retirees only. Optional life insurance coverage is available for some retirees; however, the retiree is responsible for the full cost. BNSF's policy is to fund benefits payable under the medical and life insurance plans as they come due. Generally, employees beginning salaried employment with BNSF subsequent to September 22, 1995, are not eligible for medical benefits during retirement.

In September 2006, the FASB issued SFAS No. 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans–an amendment of FASB Statements No. 87, 88, 106 and 132R,* which requires the recognition of the overfunded or underfunded status of a defined benefit postretirement plan in the Company's balance sheet. This portion of the new guidance was adopted by the Company on December 31, 2006. Additionally, the pronouncement eliminates the option for the Company to use a measurement date prior to the Company's fiscal year-end effective December 31, 2008. SFAS No. 158 provides two approaches to transition to a fiscal year-end measurement date, both of which are to be applied prospectively. BNSF has elected to apply the transition option under which a 15-month measurement was determined as of September 30, 2007 that covers the period until the fiscal year-end measurement is required on December 31, 2008. As a result, the Company recorded a $7 million decrease to retained earnings in January 2008.

The following table shows the incremental effect of applying SFAS No. 158 to both the Company's pension and retiree health and welfare plans on individual line items in the Consolidated Balance Sheet as of December 31, 2006 (in millions):

| | Pension and Retiree Health and Welfare Benefits | | | | |
|---|---|---|---|---|---|
| | **Balances Prior to Adoption of SFAS No. 158 and the Minimum Liability Adjustment** | **Minimum Liability Adjustment** | **Balances Prior to Adoption of SFAS No. 158** | **SFAS No. 158 Adoption Adjustments** | **Ending Balances After Adoption of SFAS No. 158** |
| Pension asset | $ 156 | $ – | $ 156 | $ (156) | $ – |
| Total assets | $ 31,953 | $ – | $ 31,953 | $ (156) | $ 31,797 |
| Pension liability | $ 52 | $ – | $ 52 | $ (52) | $ – |
| Additional minimum pension liability | $ 417 | (64) | $ 353 | (353) | $ – |
| Liability for retiree health and welfare benefits | $ 257 | – | $ 257 | (257) | $ – |
| Pension and retiree health and welfare liability | $ – | – | $ – | 630 | $ 630 |
| Deferred income taxes | $ 8,322 | 24 | $ 8,346 | (48) | $ 8,298 |
| Total liabilities | $ 21,389 | $ (40) | $ 21,349 | $ (80) | $ 21,269 |
| AOCL | $ (241) | $ 40 | $ (201) | $ (76) | $ (277) |
| Total stockholders' equity | $ 10,564 | $ 40 | $ 10,604 | $ (76) | $ 10,528 |

Components of the net cost for these plans were as follows (in millions):

| | Pension Benefits | | | Retiree Health and Welfare Benefits | | |
|---|---|---|---|---|---|---|
| **Year ended December 31,** | **2007** | **2006** | **2005** | **2007** | **2006** | **2005** |
| Service cost | **$ 25** | $ 25 | $ 20 | **$ 2** | $ 3 | $ 2 |
| Interest cost | **97** | 94 | 95 | **17** | 15 | 17 |
| Expected return on plan assets | **(105)** | (97) | (102) | **–** | – | – |
| Amortization of net loss | **35** | 46 | 25 | **6** | 3 | – |
| Amortization of prior service cost | **–** | – | – | **(8)** | (7) | (8) |
| Net cost recognized | **$ 52** | $ 68 | $ 38 | **$ 17** | $ 14 | $ 11 |

The projected benefit obligation is the present value of benefit earned to date by plan participants, including the effect of assumed future salary increases and expected healthcare cost trend rate increases. The following table shows the change in projected benefit obligation based on the September 30 measurement date (in millions):

| | Pension Benefits | | Retiree Health and Welfare Benefits | |
|---|---|---|---|---|
| **Change in Benefit Obligation** | **2007** | **2006** | **2007** | **2006** |
| Benefit obligation at beginning of period | **$ 1,830** | $ 1,858 | **$ 311** | $ 295 |
| Service cost | **25** | 25 | **2** | 3 |
| Interest cost | **97** | 94 | **17** | 15 |
| Plan participants' contributions | **–** | – | **8** | 8 |
| Actuarial (gain) loss | **(59)** | (18) | **(3)** | 19 |
| Medicare subsidy | **–** | – | **2** | 1 |
| Benefits paid | **(130)** | (129) | **(33)** | (30) |
| Projected benefit obligation at end of period | **1,763** | 1,830 | **304** | 311 |
| Component representing future salary increases | **(57)** | (76) | **–** | – |
| Accumulated benefit obligation at end of period | **$ 1,706** | $ 1,754 | **$ 304** | $ 311 |

Both the BNSF Retirement Plan and the BNSF Supplemental Retirement Plan had accumulated and projected benefit obligations in excess of plan assets at September 30, 2007 and 2006.

The following table shows the change in plan assets of the plans based on the September 30 measurement date (in millions):

| | Pension Benefits | | Retiree Health and Welfare Benefits | |
|---|---|---|---|---|
| **Change in Plan Assets** | **2007** | **2006** | **2007** | **2006** |
| Fair value of plan assets at beginning of period | **$ 1,394** | $ 1,347 | **$ –** | $ – |
| Actual return on plan assets | **208** | 126 | **–** | – |
| Employer contribution | **116** | 50 | **23** | 21 |
| Plan participants' contributions | **–** | – | **8** | 8 |
| Medicare subsidy | **–** | – | **2** | 1 |
| Benefits paid | **(130)** | (129) | **(33)** | (30) |
| Fair value of plan assets at measurement date | **$ 1,588** | $ 1,394 | **$ –** | $ – |
| Adjustment for fourth quarter contribution | **$ 2** | $ 111 | **$ 5** | $ 6 |

The following table shows the funded status, defined as plan assets less the projected benefit obligation, as of December 31 (in millions):

| | Pension Benefits | | Retiree Health and Welfare Benefits | |
|---|---|---|---|---|
| | **2007** | **2006** | **2007** | **2006** |
| Funded status (plan assets less projected benefit obligations) | **$ (173)** | $ (325) | **$ (299)** | $ (305) |

Of the combined pension and retiree health and welfare benefits liability of $472 million recognized as of December 31, 2007, $28 million was included in other current liabilities.

Prior to December 31, 2006, actuarial gains and losses and prior service costs were not recognized in the Company's Consolidated Balance Sheets, but were only included in the footnote disclosures. Beginning on December 31, 2006, upon adoption of SFAS No. 158, the Company began recognizing these costs in the Consolidated Balance Sheets through an adjustment to AOCL. Beginning in 2007, the Company recognized actuarial gains and losses and prior service costs in AOCL as they arose. The following table shows the pre-tax change in AOCL attributable to the components of the net cost and the change in benefit obligation (in millions):

| | Pension Benefits | | | Retiree Health and Welfare Benefits | | |
|---|---|---|---|---|---|---|
| **Change in AOCL** | **2007** | **2006** | **2005** | **2007** | **2006** | **2005** |
| Balance at January 1, | **$ 429** | $ 417 | $ 353 | **$ 48** | $ – | $ – |
| Increase (decrease) in minimum liability included in other comprehensive loss prior to adoption of SFAS No. 158 | **–** | (64) | 64 | **–** | – | – |
| SFAS No. 158 adoption adjustment | **–** | 76 | – | **–** | 48 | – |
| Amortization of actuarial loss | **(35)** | – | – | **(6)** | – | – |
| Amortization of prior service costs | **–** | – | – | **8** | – | – |
| Actuarial gain | **(161)** | – | – | **(4)** | – | – |
| Balance at December 31, | **$ 233** | $ 429 | $ 417 | **$ 46** | $ 48 | $ – |

The estimated net actuarial loss and prior service credit for these defined benefit pension plans that will be amortized from AOCL into net periodic benefit cost over the next fiscal year is expected to be $16 million and less than $1 million, respectively. The estimated net actuarial loss and prior service credit for the retiree health and welfare benefit plans that will be amortized from AOCL into net periodic benefit cost over the next fiscal year is expected to be $4 million and $8 million, respectively. Pre-tax amounts currently recognized in AOCL consist of the following (in millions):

| | Pension Benefits | | Retiree Health and Welfare Benefits | |
|---|---|---|---|---|
| | **2007** | **2006** | **2007** | **2006** |
| Net actuarial loss | **$ 234** | $ 430 | **$ 67** | $ 77 |
| Prior service cost | **(1)** | (1) | **(21)** | (29) |
| Pre-tax amount recognized in AOCL at December 31, | **233** | 429 | **46** | 48 |
| After-tax amount recognized in AOCL at December 31, | **$ 143** | $ 264 | **$ 28** | $ 29 |

The expected long-term rate of return is the return the Company anticipates earning, net of plan expenses, over the period that benefits are paid. It reflects the rate of return on present investments and on expected contributions. In determining the expected long-term rate of return, BNSF considered the following: (i) forward looking capital market forecasts; (ii) historical returns for individual asset classes; and (iii) the impact of active portfolio management.

The assumptions used in accounting for the BNSF plans were as follows:

| **Assumptions Used to Determine Net Cost for Fiscal Years Ended December 31,** | Pension Benefits | | | Retiree Health and Welfare Benefits | | |
|---|---|---|---|---|---|---|
| | **2007** | **2006** | **2005** | **2007** | **2006** | **2005** |
| Discount rate | **5.50%** | 5.25% | 5.75% | **5.50%** | 5.25% | 5.75% |
| Expected long-term rate of return on plan assets | **8.00%** | 8.00% | 8.00% | **–%** | –% | –% |
| Rate of compensation increase | **3.90%** | 3.90% | 3.90% | **3.90%** | 3.90 % | 3.90% |

| **Assumptions Used to Determine Benefit Obligations at September 30,** | Pension Benefits | | Retiree Health and Welfare Benefits | |
|---|---|---|---|---|
| | **2007** | **2006** | **2007** | **2006** |
| Discount rate | **6.00%** | 5.50% | **6.00%** | 5.50% |
| Rate of compensation increase | **3.80%** | 3.90% | **3.80%** | 3.90% |

The following table presents assumed health care cost trend rates:

| December 31, | 2007 | 2006 | 2005 |
|---|---|---|---|
| Assumed health care cost trend rate for next year | **10.50%** | 10.00% | 10.50% |
| Rate to which health care cost trend rate is expected to decline and remain | **5.00%** | 5.00% | 5.00% |
| Year that the rate reaches the ultimate trend rate | **2016** | 2012 | 2012 |

Assumed health care cost trend rates have a significant effect on the amounts reported for the health care plans. A one percentage point change in assumed health care cost trend rates would have the following effects (in millions):

| | One Percentage-Point Increase | One Percentage-Point Decrease |
|---|---|---|
| Effect on total service and interest cost | $ 2 | $ (2) |
| Effect on postretirement benefit obligation | $ 23 | $ (20) |

The qualified BNSF Retirement Plan asset allocation at September 30, 2007 and 2006 and the target allocation for 2007 by asset category are as follows:

| | Target Allocation | Percentage of Pension Plan Assets at September 30, | |
|---|---|---|---|
| Plan Asset Allocation | 2007 | 2007 | 2006 |
| Equity Securities | **45 – 75%** | **63%** | 63% |
| Fixed Income Securities | **20 – 40%** | **27** | 28 |
| Real Estate | **5 – 15%** | **10** | 9 |
| Total | | **100%** | 100% |

The general investment objective of the BNSF Retirement Plan is to grow the plan assets in relation to the plan liabilities while prudently managing the risk of a decrease in the plan's assets relative to those liabilities. To meet this objective, the Company's management has adopted the above asset allocation ranges. This allows flexibility to accommodate market changes in the asset classes within defined parameters.

Based on its current assumptions and funding methodology, the Company is expected to be required to make contributions of $34 million to the BNSF Retirement Plan in 2008. The Company expects to make benefit payments in 2008 of approximately $7 million and $25 million from its non-qualified defined benefit and retiree health and welfare plans, respectively.

The following table shows expected benefit payments from its defined benefit pension plans and expected claim payments and Medicare Part D subsidy receipts for the retiree health and welfare plan for the next five fiscal years and the aggregate five years thereafter (in millions):

| Fiscal year | Expected Pension Plan Benefit Payments[a] | Expected Retiree Health and Welfare Payments | Expected Medicare Subsidy |
|---|---|---|---|
| 2008 | $ 131 | $ 25 | $ (3) |
| 2009 | 133 | 26 | (3) |
| 2010 | 134 | 27 | (3) |
| 2011 | 135 | 28 | (3) |
| 2012 | 136 | 28 | (3) |
| 2013–2017 | 691 | 144 | (20) |

a Primarily consists of Qualified Defined Benefit Plan payments, which are made from the plan trust and do not represent an immediate cash outflow to the Company.

### Defined Contribution Plans

BNSF sponsors qualified 401(k) plans that cover substantially all employees and a non-qualified defined contribution plan that covers certain officers and other employees. BNSF matches 50 percent of the first six percent of non-union employees' contributions and matches 25 percent on the first four percent of a limited number of union employees' contributions, which are subject to certain percentage limits of the employees' earnings, at each pay period. Non-union employees are eligible to receive an annual discretionary matching contribution of up to 30 percent of the first six percent of their contributions. Employer contributions for all non-union employees are subject to a five-year length of service vesting schedule. BNSF's 401(k) matching expense was $21 million, $28 million and $20 million in 2007, 2006 and 2005, respectively.

### Other

Under collective bargaining agreements, BNSF participates in multi-employer benefit plans that provide certain postretirement health care and life insurance benefits for eligible union employees. Insurance premiums paid attributable to retirees, which are generally expensed as incurred, were $46 million, $44 million and $43 million, in 2007, 2006 and 2005, respectively (see Note 11 to the Consolidated Financial Statements for other deferred benefits payable to certain conductors, trainmen and locomotive engineers).

## 14. Stock-Based Compensation

On April 15, 1999, BNSF shareholders approved the Burlington Northern Santa Fe 1999 Stock Incentive Plan and authorized 20 million shares of BNSF common stock to be issued in connection with stock options, restricted stock, restricted stock units and performance stock. On April 18, 2001, April 17, 2002, April 21, 2004 and April 19, 2006, BNSF shareholders approved the amendments to the Burlington Northern Santa Fe 1999 Stock Incentive Plan, which authorized additional awards of 9 million, 6 million, 7 million and 11 million shares, respectively, of BNSF common stock to be issued in connection with stock options, restricted stock, restricted stock units and performance stock. Approximately 10 million common shares were available for future grant at December 31, 2007.

Additionally, on April 18, 1996, BNSF shareholders approved the non-employee directors' stock plan and authorized 900,000 shares of BNSF common stock to be issued in connection with this plan. Approximately 450,000 common shares were available for future grant at December 31, 2007.

### Stock Options

Under BNSF's stock plans, options may be granted to directors, officers and salaried employees at the fair market value of the Company's common stock on the date of grant. Stock option grants generally vest ratably over three years and expire within ten years after the date of grant. Shares issued upon exercise of options may be issued from treasury shares or from authorized but unissued shares.

The fair value of each option award is estimated on the date of grant using the Black-Scholes option-pricing model. The following assumptions apply to the options granted for the periods presented:

| **Year ended December 31,** | **2007** | **2006** | **2005** |
|---|---|---|---|
| Weighted average expected life (years) | **4.6** | 4.5 | 4.5 |
| Weighted average expected volatility | **24.0%** | 24.0% | 24.0% |
| Weighted average dividend per share | **$ 1.02** | $ 0.81 | $ 0.69 |
| Weighted average risk free interest rate | **4.31%** | 4.76% | 3.75% |
| Weighted average fair value of options granted per share | **$ 21.91** | $ 20.51 | $ 11.33 |

Expected volatilities are based on historical volatility of the Company's stock, implied volatilities from traded options on the Company's stock and other factors. The Company uses historical experience with exercise and post-vesting employment termination behavior to determine the options' expected life. The expected life represents the period of time that options granted are expected to be outstanding. The risk-free rate is based on the U.S. Treasury rate with a maturity date corresponding to the options' expected life.

A summary of the status of stock options as of, and for the year ended December 31, 2007, is presented below (options in thousands, aggregate intrinsic value in millions):

| Year ended December 31, 2007 | Options | Weighted Average Exercise Prices | Weighted Average Remaining Contractual Term (in years) | Aggregate Intrinsic Value |
|---|---|---|---|---|
| Balance at beginning of year | 15,060 | $ 38.37 | | |
| Granted | 1,777 | 88.33 | | |
| Exercised | (5,249) | 32.34 | | |
| Cancelled | (244) | 73.95 | | |
| Balance at end of year | 11,344 | $ 48.22 | 5.32 | $ 407 |
| Options exercisable at year end | 8,459 | $ 38.04 | 4.26 | $ 384 |

The total intrinsic value of options exercised was $281 million, $222 million and $232 million for the years ended December 31, 2007, 2006 and 2005, respectively.

## Other Incentive Programs

BNSF has other long-term incentive programs that utilize restricted shares/units. A summary of the status of restricted shares/units and the weighted average grant date fair values as of, and for the year ended December 31, 2007, is presented below (shares in thousands):

| Year ended December 31, 2007 | Time Based | | Performance Based | | BNSF Incentive Bonus Stock Program | | BNSF Discounted Stock Purchase Program | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| Balance at beginning of year | 1,267 | $ 48.40 | 765 | $ 53.50 | 861 | $ 46.19 | 64 | $ 49.79 | 2,957 | $ 49.10 |
| Granted | 59 | 86.38 | 560 | 88.80 | – | – | 7 | 79.28 | 626 | 88.47 |
| Vested | (557) | 33.96 | (235) | 32.72 | (219) | 32.16 | (20) | 34.62 | (1,031) | 33.31 |
| Cancelled | (51) | 60.73 | (74) | 78.33 | (3) | 50.83 | – | – | (128) | 70.64 |
| Balance at end of year | 718 | $ 61.83 | 1,016 | $ 75.97 | 639 | $ 50.98 | 51 | $ 59.73 | 2,424 | $ 64.85 |

A summary of the weighted average grant date fair market values of the restricted share/units as of, and for the years ended December 31, 2006 and 2005, is presented below:

| Grant Date Fair Market Value of Awards Granted | Time Based | Performance Based | BNSF Incentive Bonus Stock Program | BNSF Discounted Stock Purchase Program |
|---|---|---|---|---|
| Year ended December 31, 2006 | $ 79.88 | $ 80.17 | $ 81.31 | $ 81.31 |
| Year ended December 31, 2005 | $ 49.23 | $ 49.21 | $ 47.58 | $ 46.91 |

A summary of the fair value of the restricted share/units vested during the years ended December 31, 2007, 2006 and 2005 is presented below:

| Total Fair Value of Shares Vested (in millions) | Time Based | Performance Based | BNSF Incentive Bonus Stock Program | BNSF Discounted Stock Purchase Program | Total |
|---|---|---|---|---|---|
| Year ended December 31, 2007 | $ 49 | $ 21 | $ 18 | $ 1 | $ 89 |
| Year ended December 31, 2006 | $ 42 | $ – | $ 25 | $ 1 | $ 68 |
| Year ended December 31, 2005 | $ 44 | $ 11 | $ 8 | $ 1 | $ 64 |

Time-based awards are granted to senior managers within BNSF primarily as a retention tool and to encourage ownership in the Company. They generally vest over three years, although in some cases up to five years, and are contingent on continued salaried employment.

Performance-based awards are granted to senior managers within BNSF to encourage ownership in the Company and to align management's interest with those of its shareholders. Performance-based awards generally vest over three years and are contingent on the achievement of certain predetermined corporate performance goals (e.g., return on invested capital (ROIC)) and continued salaried employment.

Additionally, related to the 2007, 2006 and 2005 performance-based grant, eligible employees may also earn performance stock that will be granted in 2010, 2009 and 2008, respectively, contingent upon achievement of higher ROIC goals and continued salaried employment. The Company has committed to a maximum grant of approximately 279,000, 235,000 and 316,000 shares, respectively.

Certain employees were eligible to exchange through the Burlington Northern Santa Fe Incentive Bonus Stock Program the cash payment of their bonus for grants of restricted stock. In September 2005, the program was amended so that exchanges of cash bonus payments for awards of restricted stock were no longer permitted after February 2006.

Certain other salaried employees may participate in the BNSF Discounted Stock Purchase Program and use their bonus to purchase BNSF common stock at a discount from the market price. These shares immediately vest but are restricted for a three-year period.

Shares awarded under each of the plans may not be sold or used as collateral and are generally not transferable by the holder until the shares awarded become free of restrictions. Compensation cost, net of tax, recorded under the BNSF Stock Incentive Plans is shown in the following table (in millions):

| | 2007 | 2006 | 2005 |
|---|---|---|---|
| Compensation cost | **$ 66** | $ 72 | $ 37 |
| Income tax benefit | **(23)** | (25) | (14) |
| Total | **$ 43** | $ 47 | $ 23 |
| Compensation cost capitalized | **$ 7** | $ 6 | $ 3 |

At December 31, 2007, there was $105 million of total unrecognized compensation cost related to unvested share-based compensation arrangements. That cost is expected to be recognized over a weighted-average period of 1.19 years.

## 15. Common Stock and Preferred Capital Stock

### Common Stock

BNSF is authorized to issue 600 million shares of common stock, $0.01 par value. At December 31, 2007, there were 348 million shares of common stock outstanding. Each holder of common stock is entitled to one vote per share in the election of directors and on all matters submitted to a vote of shareholders. Subject to the rights and preferences of any future issuances of preferred stock, each share of common stock is entitled to receive dividends as may be declared by the Board out of funds legally available and to share ratably in all assets available for distribution to shareholders upon dissolution or liquidation. No holder of common stock has any preemptive right to subscribe for any securities of BNSF.

### Preferred Capital Stock

At December 31, 2007, BNSF had 50 million shares of Class A Preferred Stock, $0.01 par value and 25 million shares of Preferred Stock, $0.01 par value available for issuance. The Board has the authority to issue such stock in one or more series, to fix the number of shares and to fix the designations and the powers, rights and qualifications and restrictions of each series. As of December 31, 2007, no Class A Preferred Stock had been issued.

### Share Repurchase Program

In February 2007, the Board authorized the extension of the current BNSF share repurchase program, adding 30 million shares to the total of 180 million shares previously authorized in equal amounts in July 1997, December 1999, April 2000, September 2000, January 2003 and December 2005. During 2007, 2006 and 2005, the Company repurchased approximately 15 million, 18 million and 14 million, respectively, of its common stock at average prices of $83.96 per share, $73.43 per share and $54.95 per share, respectively. Total repurchases through December 31, 2007, were 180 million shares at a total average cost of $38.20 per share, leaving 30 million shares available for repurchase out of the 210 million shares presently authorized. Additionally, during 2007, the Company repurchased shares from employees at a cost of $43 million to satisfy tax withholding obligations on the vesting of restricted stock or the exercise of stock options.

In December 2005, the Company entered into prepaid forward transactions to purchase $600 million of the Company's common stock whereby a net settlement in shares would occur upon settlement of the transactions. In late February 2006, these transactions were settled, and approximately 8 million shares were delivered. While the transactions had no impact on the shares outstanding at the end of 2005, outstanding shares used in the calculation of 2006 earnings per share were reduced by approximately 8 million shares when the transactions were settled. The Company accounted for the transactions in accordance with Emerging Issues Task Force (EITF) 00-19, *Accounting for Derivative Financial Instruments Indexed to, and Potentially Settled in, a Company's Own Stock,* which required that the $600 million prepayment be recorded as a reduction in equity in 2005. When the final settlement was made in 2006, this reduction in equity was reclassified from prepaid forward repurchase of treasury stock to treasury stock.

## 16. Quarterly Financial Data—Unaudited

| Dollars in millions, except per share data | Fourth | Third | Second | First |
|---|---|---|---|---|
| **2007** | | | | |
| Revenues | $ 4,245 | $ 4,069 | $ 3,843 | $ 3,645 |
| Operating income | $ 950 | $ 1,001 | $ 841 | $ 694 |
| Net income | $ 517 | $ 530 | $ 433 | $ 349 |
| Basic earnings per share | $ 1.48 | $ 1.51 | $ 1.22 | $ 0.98 |
| Diluted earnings per share | $ 1.46 | $ 1.48 | $ 1.20 | $ 0.96 |
| Dividends declared per share | $ 0.32 | $ 0.32 | $ 0.25 | $ 0.25 |
| Common stock price[a]: | | | | |
| High | $ 88.03 | $ 93.04 | $ 94.43 | $ 85.05 |
| Low | $ 81.54 | $ 76.64 | $ 80.41 | $ 72.45 |
| **2006[b]** | | | | |
| Revenues | $ 3,882 | $ 3,939 | $ 3,701 | $ 3,463 |
| Operating income | $ 943 | $ 921 | $ 864 | $ 793 |
| Net income | $ 519 | $ 489 | $ 471 | $ 410 |
| Basic earnings per share | $ 1.45 | $ 1.36 | $ 1.30 | $ 1.12 |
| Diluted earnings per share | $ 1.42 | $ 1.33 | $ 1.27 | $ 1.09 |
| Dividends declared per share | $ 0.25 | $ 0.25 | $ 0.20 | $ 0.20 |
| Common stock price[a]: | | | | |
| High | $ 80.35 | $ 79.20 | $ 86.62 | $ 83.38 |
| Low | $ 72.77 | $ 64.82 | $ 71.96 | $ 68.32 |

a Average of high and low reported daily stock price

b Prior year numbers have been adjusted for the retrospective adoption of FSP AUG AIR-1, *Accounting for Planned Major Maintenance Activities.* See Note 2 to the Consolidated Financial Statements for additional information.

## Item 9. Changes in and Disagreements With Accountants on Accounting and Financial Disclosure

None.

## Item 9A. Controls and Procedures

### Disclosure Controls and Procedures

Based on their evaluation as of the end of the period covered by this annual report on Form 10-K, the Company's principal executive officer and principal financial officer have concluded that BNSF's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934) are effective to ensure that information required to be disclosed by BNSF in the reports that it files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms and that such information is accumulated and communicated to BNSF's management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure.

### Internal Control Over Financial Reporting

The report of management on the Company's internal control over financial reporting (as defined in Rules 13a-15(f) and 15(d)-15(f) of the Securities Exchange Act of 1934) is included in "Management's Report on Internal Control Over Financial Reporting" in Item 8.

PricewaterhouseCoopers LLP, the independent registered public accounting firm that audited the Company's financial statements contained herein, has issued an attestation report on the effectiveness of the Company's internal control over financial reporting as of December 31, 2007. The attestation report is included in Item 8.

### Changes in Internal Control Over Financial Reporting

As of the end of the period covered by this report, the Company has concluded that there have been no changes in BNSF's internal control over financial reporting that occurred during BNSF's fourth fiscal quarter that have materially affected, or are reasonably likely to materially affect, BNSF's internal control over financial reporting.

## Item 9B. Other Information

None.

# Part III

## Item 10. Directors, Executive Officers and Corporate Governance

Information concerning the directors of BNSF will be provided under the heading "Item 1: Election of Directors; Nominees for Director" in BNSF's proxy statement for its 2008 annual meeting of shareholders, which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under that heading is hereby incorporated by reference.

Information concerning the executive officers of BNSF is included in Part 1 of this Report on Form 10-K.

Information concerning compliance with Section 16(a) of the Securities Exchange Act of 1934 will be provided under the heading "Communications and Other Matters; Section 16(a) Beneficial Ownership Reporting Compliance" in BNSF's proxy statement for its 2008 annual meeting of shareholders, which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under that heading is hereby incorporated by reference.

Information concerning the Directors and Governance Committee's policy with regard to consideration of any director candidates recommended by shareholders will be provided under the heading "Communications and Other Matters; Procedures for Recommending Director Candidates" in BNSF's proxy statement for its 2008 annual meeting of shareholders, which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under that heading is hereby incorporated by reference.

Information concerning the Audit Committee and the Audit Committee Financial Expert will be provided under the heading "Governance of the Company; Board Committees; Audit Committee" in BNSF's proxy statement for its 2008 annual meeting of shareholders, which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under that heading is hereby incorporated by reference into the Form 10-K.

The Company has a Code of Conduct that applies to members of the Board of Directors, officers, and all salaried employees of BNSF and its subsidiaries. Only the Board of Directors may waive the application of the Code of Conduct to a director, executive officer, or the principal accounting officer or controller, and any such waiver will be promptly disclosed on the Company's website. A copy of the Code of Conduct is available on the Company's website at www.bnsf.com under the "Investors" link and then "Corporate Governance."

## Item 11. Executive Compensation

Information concerning the compensation of directors and executive officers of BNSF will be provided under the headings "Directors' Compensation," "Compensation Discussion and Analysis" and "Executive Compensation" in BNSF's proxy statement for its 2008 annual meeting of shareholders, which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under those headings is hereby incorporated by reference.

## Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters

Certain information about BNSF's equity compensation plans is set forth in the table below (number of shares in thousands) as of December 31, 2007:

| Plan Category | Number of Shares to Be Issued upon Exercise of Outstanding Options, Warrants and Rights | Weighted Average Exercise Price of Outstanding Options, Warrants and Rights | Number of Shares Available for Future Issuance |
|---|---|---|---|
| Equity compensation plans approved by shareholders | 11,344 | $ 48.22 | 10,190 |
| Equity compensation plans not approved by shareholders | – | – | – |
| Total | 11,344 | $ 48.22 | 10,190 |

Information concerning the ownership of BNSF equity securities by certain beneficial owners and by management will be provided under the headings "Stock Ownership in the Company; Certain Beneficial Owners" and "Stock Ownership in the Company; Ownership of Management" in BNSF's proxy statement for its 2008 annual meeting of shareholders, which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under that heading is hereby incorporated by reference.

## Item 13. Certain Relationships and Related Transactions, and Director Independence

Information concerning certain relationships and related transactions will be provided under the headings "Governance of the Company; Director Independence" and "Governance of the Company; Certain Relationships and Related Person Transactions" in BNSF's proxy statement for its 2008 annual meeting of shareholders, which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under that heading is hereby incorporated by reference.

## Item 14. Principal Accountant Fees and Services

Information concerning principal accounting fees and services will be provided under the heading "Item 2: Appointment of Independent Auditor; Independent Auditor Fees" in BNSF's proxy statement for its 2008 annual meeting of shareholders, which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under that heading is hereby incorporated by reference.

# Part IV

## Item 15. Exhibits and Financial Statement Schedules

(a) The following documents are filed as part of this report:

1. Consolidated Financial Statements—see Item 8.

   Schedules are omitted because they are not required or applicable, or the required information is included in the Consolidated Financial Statements or related notes.

2. Exhibits:

   See Index to Exhibits beginning on page E-1 for a description of the exhibits filed as a part of this Report on Form 10-K.

# Signatures

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, Burlington Northern Santa Fe Corporation has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**Burlington Northern Santa Fe Corporation**

Dated: February 14, 2008

By: /s/ Matthew K. Rose
Matthew K. Rose
Chairman, President and
Chief Executive Officer

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of Burlington Northern Santa Fe Corporation and in the capacities and on the date indicated.

| Signature | Title |
|---|---|
| /s/ Matthew K. Rose<br>Matthew K. Rose | Chairman, President and Chief Executive Officer<br>(Principal Executive Officer), and Director |
| /s/ Thomas N. Hund<br>Thomas N. Hund | Executive Vice President and Chief Financial Officer<br>(Principal Financial Officer) |
| /s/ Paul W. Bischler<br>Paul W. Bischler | Vice President and Controller<br>(Principal Accounting Officer) |
| /s/ Alan L. Boeckmann*<br>Alan L. Boeckmann | Director |
| /s/ Donald G. Cook*<br>Donald G. Cook | Director |
| /s/ Vilma S. Martinez*<br>Vilma S. Martinez | Director |
| /s/ Marc F. Racicot*<br>Marc F. Racicot | Director |
| /s/ Roy S. Roberts*<br>Roy S. Roberts | Director |
| /s/ Marc J. Shapiro*<br>Marc J. Shapiro | Director |
| /s/ J.C. Watts, Jr.*<br>J.C. Watts, Jr. | Director |

| Signature | Title |
|---|---|
| ______________________<br>Robert H. West | Director |
| /s/ J. Steven Whisler*<br>J. Steven Whisler | Director |
| /s/ Edward E. Whitacre, Jr.*<br>Edward E. Whitacre, Jr. | Director |

Dated: February 14, 2008

*By: /s/ Roger Nober
Roger Nober
Executive Vice President Law
and Secretary

# Exhibit Index

| Exhibit Number and Description | | | Incorporated by Reference (if applicable) | | | |
|---|---|---|---|---|---|---|
| | | | Form | File Date | File No. | Exhibit |
| (3) | Articles of Incorporation and Bylaws | | | | | |
| | 3.1 | Amended and Restated Certificate of Incorporation of Burlington Northern Santa Fe Corporation, dated December 21, 1994, as amended. | 10-Q | 8/13/1998 | 1-11535 | 3.1 |
| | 3.2 | By-Laws of Burlington Northern Santa Fe Corporation, as amended and restated, dated December 6, 2007.‡ | | | | |
| (4) | Instruments defining the rights of security holders, including indentures | | | | | |
| | 4.1 | Indenture, dated as of December 1, 1995, between BNSF and The First National Bank of Chicago, as Trustee. | S-3 | 2/8/1999 | 333-72013 | 4 |
| | 4.2 | Form of BNSF's 6 1/8% Notes Due March 15, 2009. | 10-K | 3/31/1999 | 1-11535 | 4.2 |
| | 4.3 | Form of BNSF's 6 3/4% Debentures Due March 15, 2029. | 10-K | 3/31/1999 | 1-11535 | 4.3 |
| | 4.4 | Form of BNSF's 6.70% Debentures Due August 1, 2028. | 10-K | 3/31/1999 | 1-11535 | 4.4 |
| | 4.5 | Form of BNSF's 8.125% Debentures Due April 15, 2020. | 10-K | 2/12/2001 | 1-11535 | 4.5 |
| | 4.6 | Form of BNSF's 7.95% Debentures Due August 15, 2030. | 10-K | 2/12/2001 | 1-11535 | 4.6 |
| | 4.7 | Form of BNSF's 6.75% Notes Due July 15, 2011. | 10-Q | 8/3/2001 | 1-11535 | 4.1 |
| | 4.8 | Form of BNSF's 5.90% Notes Due July 1, 2012. | 10-Q | 8/9/2002 | 1-11535 | 4.1 |
| | 4.9 | Officers' Certificate of Determination as to the terms of BNSF's 4.875% Notes Due January 15, 2015, including Exhibit A thereto, the form of the Notes. | 8-K | 12/9/2004 | 1-11535 | 4.1 |
| | 4.10 | Indenture, dated as of December 8, 2005, between BNSF and U.S. Bank Trust National Association, as Trustee. | S-3 ASR | 12/8/2005 | 333-130214 | 4.1 |
| | 4.11 | Certificate of Trust of BNSF Funding Trust I, executed and filed by U.S. Bank Trust National Association, Linda Hurt and James Gallegos, as Trustees. | S-3 ASR | 12/8/2005 | 333-130214 | 4.3 |
| | 4.12 | Amended and Restated Declaration of Trust of BNSF Funding Trust I, dated as of December 15, 2005. | 8-K | 12/15/2005 | 1-11535 | 4.4 |
| | 4.13 | Guarantee Agreement between BNSF and U.S. Bank Trust National Association, as Guarantee Trustee, dated as of December 15, 2005. | 8-K | 12/15/2005 | 1-11535 | 4.5 |
| | 4.14 | First Supplemental Indenture, dated as of December 15, 2005, between BNSF and U.S. Bank Trust National Association, as Trustee. | 8-K | 12/15/2005 | 1-11535 | 4.6 |

| Exhibit Number and Description | | Incorporated by Reference (if applicable) | | | |
|---|---|---|---|---|---|
| | | Form | File Date | File No. | Exhibit |
| 4.15 | Agreement as to Expenses and Liabilities dated as of December 15, 2005, between BNSF and BNSF Funding Trust I. | 8-K | 12/15/2005 | 1-11535 | 4.4 (Exhibit C) |
| 4.16 | Form of BNSF Funding Trust I's 6.613% Trust Preferred Securities. | 8-K | 12/15/2005 | 1-11535 | 4.4 (Exhibit D) |
| 4.17 | Officer's Certificate of Determination as to the terms of BNSF's 6.20% Debentures Due August 15, 2036, including the form of the Debentures. | 10-Q | 10/24/2006 | 1-11535 | 4.1 |
| 4.18 | First Supplemental Indenture, dated as of April 13, 2007, to Indenture dated as of December 1, 1995, between Burlington Northern Santa Fe Corporation and Bank of New York Trust Company, N.A., as Trustee. | 8-K | 4/13/2007 | 1-11535 | 4.1 |
| 4.19 | Officer's Certificate of Determination as to the terms of BNSF's 5.65% Debentures due May 1, 2017 and 6.15% Debentures Due May 1, 2037, including the forms of the Debentures. | 8-K | 4/13/2007 | 1-11535 | 4.2 |

Certain instruments evidencing long-term indebtedness of BNSF are not being filed as exhibits to this Report because the total amount of securities authorized under any single such instrument does not exceed 10% of BNSF's total assets. BNSF will furnish copies of any material instruments upon request of the Securities and Exchange Commission.

(10) Material Contracts

| | | Form | File Date | File No. | Exhibit |
|---|---|---|---|---|---|
| 10.1 | Burlington Northern Santa Fe Non-Employee Directors' Stock Plan, as amended and restated February 13, 2008.*‡ | | | | |
| 10.2 | Form of Burlington Northern Santa Fe Non-Employee Directors' Stock Plan Director's Restricted Stock Unit Award Agreement.* | 8-K | 5/23/2005 | 1-11535 | 10.1 |
| 10.3 | BNSF Railway Company Incentive Compensation Plan, as amended and restated December 17, 2007.*‡ | | | | |
| 10.4 | Burlington Northern Santa Fe Corporation Deferred Compensation Plan, as amended and restated effective December 9, 2004.* | 10-K | 2/16/2007 | 1-11535 | 10.5 |
| 10.5 | Burlington Northern Santa Fe Corporation Senior Management Stock Deferral Plan, as amended and restated effective January 1, 2008.*‡ | | | | |
| 10.6 | Burlington Northern Santa Fe Incentive Bonus Stock Program, as amended and restated effective September 14, 2005.* | 8-K | 9/19/2005 | 1-11535 | 10.1 |
| 10.7 | Burlington Northern Santa Fe 1996 Stock Incentive Plan, as amended and restated December 6, 2007.*‡ | | | | |
| 10.8 | Burlington Northern Santa Fe Supplemental Retirement Plan, effective October 1, 1996, as amended through July 21, 2005.* | 8-K | 7/27/2005 | 1-11535 | 10.1 |
| 10.9 | Retirement Benefit Agreement between BNSF and Matthew K. Rose, as amended and restated September 21, 2006.* | 10-Q | 10/24/2006 | 1-11535 | 10.5 |
| 10.10 | Retirement Benefit Agreement, dated January 16, 2003, between BNSF and John P. Lanigan.* | 10-K | 2/13/2004 | 1-11535 | 10.29 |

| Exhibit Number and Description | | Incorporated by Reference (if applicable) Form | File Date | File No. | Exhibit |
|---|---|---|---|---|---|
| 10.11 | Burlington Northern Santa Fe Estate Enhancement Program, as amended and restated, effective November 1, 1996.* | 10-K 405 | 3/31/1997 | 1-11535 | 10.15 |
| 10.11.1 | Amendment of Burlington Northern Santa Fe Estate Enhancement Program, dated December 3, 1998.* | 10-Q | 8/11/1999 | 1-11535 | 10.2 |
| 10.11.2 | Termination of Burlington Northern Santa Fe Estate Enhancement Program, dated September 17, 2003.* | 10-K | 2/16/2007 | 1-11535 | 10.12.2 |
| 10.12 | Form of BNSF Change-in-Control Agreement, as amended and restated December 6, 2007 and effective December 31, 2007 (applicable to Messrs. Rose, Hund, Ice, Lanigan, and Nober and one other executive officer).*‡ | | | | |
| 10.13 | Burlington Northern Santa Fe Corporation Supplemental Investment and Retirement Plan, as amended September 12, 2006.* | 10-Q | 10/24/2006 | 1-11535 | 10.6 |
| 10.14 | Burlington Northern Inc. Director's Charitable Award Program.* | 10-K | 4/1/1996 | 1-11535 | 10.22 |
| 10.15 | Burlington Northern Santa Fe Salary Exchange Option Program, as amended and restated October 1, 2004.* | 10-K | 2/15/2005 | 1-11535 | 10.18 |
| 10.16 | Burlington Northern Santa Fe 1999 Stock Incentive Plan, as amended and restated February 13, 2008.*‡ | | | | |
| 10.17 | Form of 1999 Stock Incentive Plan Stock Option Award Agreement.*‡ | | | | |
| 10.18 | Form of 1999 Stock Incentive Plan Restricted Stock Unit Award Agreement.*‡ | | | | |
| 10.19 | Form of 1999 Stock Incentive Plan Reload Stock Option Agreement.*‡ | | | | |
| 10.20 | Form of 1999 Stock Incentive Plan Special Retention Restricted Stock Unit Award Agreement.*‡ | | | | |
| 10.21 | Form of 1999 Stock Incentive Plan Performance-Based Restricted Stock Unit Award Agreement.*‡ | | | | |
| 10.22 | Form of 1999 Stock Incentive Plan Performance Stock Award Agreement.*‡ | | | | |
| 10.23 | Amended and Restated Benefits Protection Trust Agreement by and between Burlington Northern Santa Fe Corporation and Wachovia Bank, dated January 8, 2008.*‡ | | | | |
| 10.24 | Burlington Northern Santa Fe Directors' Retirement Plan.* | 10-K | 4/1/1996 | 1-11535 | 10.27 |
| 10.24.1 | Termination of Burlington Northern Santa Fe Directors' Retirement Plan, dated July 17, 2003.* | 10-K | 2/16/2007 | 1-11535 | 10.31.1 |
| 10.25 | Form of Indemnification Agreement dated as of September 17, 1998, entered into between BNSF and directors.* | 10-K | 3/31/1999 | 1-11535 | 10.37 |
| 10.26 | Form of Indemnification Agreement dated as of September 17, 1998, entered into between BNSF and certain officers, including Messrs. Rose, Hund, Ice, Lanigan, Nober and Rickershauser.* | 10-K | 3/31/1999 | 1-11535 | 10.38 |

| Exhibit Number and Description | | Incorporated by Reference (if applicable) | | | |
|---|---|---|---|---|---|
| | | Form | File Date | File No. | Exhibit |
| 10.27 | Burlington Northern Santa Fe 2005 Deferred Compensation Plan for Non-Employee Directors, amended and restated as of February 13, 2008.*‡ | | | | |
| 10.28 | Burlington Northern Santa Fe Deferred Compensation Plan for Directors, as amended and restated December 9, 2004.* | 10-K | 2/16/2007 | 1-11535 | 10.35 |
| 10.29 | Replacement Capital Covenant, dated as of December 15, 2005, by BNSF in favor of and for the benefit of each Covered Debtholder (as defined therein). | 10-K | 2/17/2006 | 1-11535 | 10.41 |
| (12) | Statements re: Computation of Ratios | | | | |
| 12.1 | Computation of Ratio of Earnings to Fixed Charges.‡ | | | | |
| (21) | Subsidiaries of the registrant | | | | |
| 21.1 | Subsidiaries of BNSF.‡ | | | | |
| (23) | Consents of experts and counsel | | | | |
| 23.1 | Consent of PricewaterhouseCoopers LLP.‡ | | | | |
| (24) | Power of Attorney | | | | |
| 24.1 | Power of Attorney.‡ | | | | |
| (31) | Rule 13a-14(a)/15d-14(a) Certifications | | | | |
| 31.1 | Principal Executive Officer's Certifications Pursuant to Rule 13a-14(a) (Section 302 of the Sarbanes-Oxley Act of 2002).‡ | | | | |
| 31.2 | Principal Financial Officer's Certifications Pursuant to Rule 13a-14(a) (Section 302 of the Sarbanes-Oxley Act of 2002).‡ | | | | |
| (32) | Section 1350 Certifications | | | | |
| 32.1 | Certification Pursuant to Rule 13a-14(b) and 18 U.S.C. § 1350 (Section 906 of the Sarbanes-Oxley Act of 2002).‡ | | | | |
| (99) | Additional Exhibits | | | | |
| 99.1 | Certification Pursuant to Section 303A.12 of the New York Stock Exchange Listed Company Manual.‡ | | | | |

* Management contract or compensatory plan

‡ Filed herewith

# Exhibit 12.1

## Burlington Northern Santa Fe Corporation and Subsidiaries
## Computation of Ratio of Earnings to Fixed Charges

In millions, except ratio amounts
(Unaudited)

| | Year ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2007** | **2006** (As Adjusted)[a] | **2005** (As Adjusted)[a] | **2004** (As Adjusted)[a] | **2003** (As Adjusted)[a] |
| Earnings: | | | | | |
| Income before income taxes and cumulative effect of accounting change[a] | **$ 2,957** | $ 2,996 | $ 2,453 | $ 1,296 | $ 1,241 |
| Add: | | | | | |
| Interest and other fixed charges, excluding capitalized interest | **511** | 485 | 437 | 409 | 420 |
| Reasonable approximation of portion of rent under long-term operating leases representative of an interest factor | **282** | 261 | 221 | 195 | 182 |
| Distributed income of investees accounted for under the equity method | **4** | 3 | 4 | 4 | 3 |
| Amortization of capitalized interest | **4** | 4 | 8 | 8 | 8 |
| Less: | | | | | |
| Equity in earnings of investments accounted for under the equity method | **19** | 27 | 15 | 9 | 14 |
| Total earnings available for fixed charges | **$ 3,739** | $ 3,722 | $ 3,108 | $ 1,903 | $ 1,840 |
| Fixed charges: | | | | | |
| Interest and fixed charges | **$ 528** | $ 499 | $ 450 | $ 419 | $ 429 |
| Reasonable approximation of portion of rent under long-term operating leases representative of an interest factor | **282** | 261 | 221 | 195 | 182 |
| Total fixed charges | **$ 810** | $ 760 | $ 671 | $ 614 | $ 611 |
| Ratio of earnings to fixed charges | **4.62x** | 4.90x | 4.63x | 3.10x | 3.01x |

a Prior year numbers have been adjusted for the retrospective adoption of Financial Accounting Standards Board (FASB) Staff Position (FSP) AUG AIR-1, *Accounting for Planned Major Maintenance Activities*. See Note 2 to the Consolidated Financial Statements for additional information.

# Exhibit 31.1

## Principal Executive Officer's Certifications

**Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Matthew K. Rose, certify that:

1. I have reviewed this annual report on Form 10-K of Burlington Northern Santa Fe Corporation;
2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
   (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's fourth fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/ Matthew K. Rose

Date: February 14, 2008

Matthew K. Rose
Chairman, President and
Chief Executive Officer

# Exhibit 31.2

## Principal Financial Officer's Certifications

**Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Thomas N. Hund, certify that:

1. I have reviewed this annual report on Form 10-K of Burlington Northern Santa Fe Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's fourth fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/ Thomas N. Hund

Date: February 14, 2008

Thomas N. Hund
Executive Vice President and
Chief Financial Officer

# Exhibit 32.1

## Certification Pursuant to 18 U.S.C. § 1350

**(Section 906 of Sarbanes-Oxley Act of 2002)**

### Burlington Northern Santa Fe Corporation

In connection with the Annual Report of Burlington Northern Santa Fe Corporation (the "Company") on Form 10-K for the year ended December 31, 2007, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), the undersigned, Matthew K. Rose, Chairman, President and Chief Executive Officer of the Company, and Thomas N. Hund, Executive Vice President and Chief Financial Officer of the Company, each hereby certifies that, to his knowledge on the date hereof:

1. The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and
2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: February 14, 2008

/s/ Matthew K. Rose
Matthew K. Rose
Chairman, President and
Chief Executive Officer

/s/ Thomas N. Hund
Thomas N. Hund
Executive Vice President and
Chief Financial Officer

A signed original of this written statement required by Section 906 has been provided to Burlington Northern Santa Fe Corporation and will be retained by Burlington Northern Santa Fe Corporation and furnished to the Securities and Exchange Commission or its staff upon request.

# Exhibit 99.1

## Annual CEO Certification

**(Section 303A.12(a) of the New York Stock Exchange Listed Company Manual)**

As the Chief Executive Officer of Burlington Northern Santa Fe Corporation and as required by Section 303A.12(a) of the New York Stock Exchange Listed Company Manual, I hereby certify that as of the date hereof I am not aware of any violation by the Company of NYSE's Corporate Governance listing standards, other than has been notified to the Exchange pursuant to Section 303A.12(b) and disclosed on Exhibit H to the Company's Domestic Company Section 303A Annual Written Affirmation.

/s/ Matthew K. Rose
Matthew K. Rose
Chairman, President and
Chief Executive Officer
May 18, 2007

[This certification is without qualification.]

## Burlington Northern Santa Fe Corporation Directors*

**Alan L. Boeckmann**[3,4]
Chairman and Chief Executive Officer, Fluor Corporation (professional services holding company offering engineering, construction management and other services), Irving, Texas.
Board member since 2001.

**Donald G. Cook**[2]
Retired General, United States Air Force, San Antonio, Texas.
Board member since 2005.

**Vilma S. Martinez**[4]
Partner, Munger, Tolles & Olson LLP (law firm), Los Angeles, California.
Board member since 1998.

**Marc F. Racicot**[4]
President and Chief Executive Officer, American Insurance Association (property-casualty insurance trade organization), Washington, D.C.
Former Governor of Montana.
Board member since 2001.

**Roy S. Roberts**[1,2]
Managing Director of Reliant Equity Investors, L.L.C. (private equity firm), Chicago, Illinois.
Board member since 1993.

**Matthew K. Rose**[1]
Chairman, President and Chief Executive Officer, Burlington Northern Santa Fe Corporation and BNSF Railway Company, Fort Worth, Texas.
Board member since 2000.

**Marc J. Shapiro**[3,4]
Retired Vice Chairman for Finance, Risk Management and Administration, J.P. Morgan Chase & Co. (bank holding company), New York, New York.
Board member since 1995.

**J.C. Watts, Jr.**[2]
Senior Partner of Oakcrest Capital Partners, L.L.C. (private equity firm) and Chairman, J.C. Watts Companies, L.L.C./Watts Consulting Group, Inc. (public affairs and corporate consulting business), Washington, D.C.
Former Congressman (R-4th Dist. Oklahoma) and Chairman, House Republican Conference.
Board member since 2003.

**Robert H. West**[1,3]
Retired Chairman of the Board, Butler Manufacturing Company (manufacturer of pre-engineered building systems and specialty components), Kansas City, Missouri.
Board member since 1980.

**J. Steven Whisler**[3]
Retired Chairman and Chief Executive Officer, Phelps Dodge Corporation (mining and manufacturing company), Phoenix, Arizona.
Board member since 1995.

**Edward E. Whitacre, Jr., Lead Director**[1,2,4]
Chairman Emeritus AT&T Inc. (communications holding company), San Antonio, Texas.
Board member since 1993.

**Committee Assignments:**
1 *Executive Committee*
2 *Compensation and Development Committee*
3 *Audit Committee*
4 *Directors and Corporate Governance Committee*

* Years of Board service includes service on Boards of Burlington Northern Inc., Santa Fe Pacific Corporation and predecessor corporations.

## Corporate Officers[1]

**Matthew K. Rose**[2]
Chairman, President and Chief Executive Officer

**Thomas N. Hund**[2]
Executive Vice President and Chief Financial Officer

**Carl R. Ice**[2]
Executive Vice President and Chief Operations Officer

**John P. Lanigan, Jr.**[2]
Executive Vice President and Chief Marketing Officer

**Roger Nober**[2]
Executive Vice President Law and Secretary

**Paul W. Bischler**
Vice President and Controller

**Jeffrey J. Campbell**
Vice President – Technology Services and Chief Information Officer

**James H. Gallegos**
Vice President and Corporate General Counsel

**Amy C. Hawkins**
Vice President – Government Affairs

**Paul R. Hoferer**
Vice President and General Counsel

**Linda J. Hurt**
Assistant Vice President – Finance and Treasurer through April 2008
Vice President – Investor Relations effective May 2008

**Mary Jo Keating**
Vice President – Corporate Relations

**Linda Longo-Kazanova**
Vice President – Human Resources and Medical

**Marsha K. Morgan**
Vice President – Investor Relations

**Jo-ann M. Olsovsky**
Vice President – Technology Services and Chief Information Officer effective April 2008

**Peter J. Rickershauser**[2]
Vice President – Network Development

**Charles W. Shewmake**
Vice President and General Counsel effective May 2008

**David W. Stropes**
Vice President – Corporate Audit Services

**Shelley J. Venick**
Vice President and General Tax Counsel

**Richard E. Weicher**
Vice President and General Counsel – Regulatory

1 *These officers hold similar positions with BNSF Railway Company.*
2 *Executive Officer of Burlington Northern Santa Fe Corporation.*

## Operating Company Officers

**Paul B. Anderson**
Vice President – Marketing Support

**Stevan B. Bobb**
Group Vice President – Coal

**Stephen G. Branscum**
Group Vice President – Consumer Products

**Rollin D. Bredenberg**
Vice President – Service Design and Performance

**Frederick G. (Fritz) Draper**
Vice President – Business Unit Operations

**George Duggan**
Vice President – Domestic Intermodal Marketing

**Kathryn M. Farmer**
Vice President – Industrial Products Sales

**John J. Fleps**
Vice President – Labor Relations

**Gregory C. Fox**
Vice President – Transportation

**David L. Freeman**
Vice President – Engineering

**David L. Garin**
Group Vice President – Industrial Products

**Craig Hill**
Vice President – Mechanical and Value Engineering

**Dennis R. Johnson**
Vice President and Chief Sourcing Officer

**Kevin Kaufman**
Group Vice President – Agricultural Products

**Mark A. Kotter**
Vice President – Customer Integration

**Robert W. Lease**
Regional Vice President – Operations

**Frederick R. Malesa**
Vice President – International Intermodal Marketing

**Julie A. Piggott**
Vice President – Finance

**Chris A. Roberts**
Regional Vice President – Operations

**Sami M. Shalah**
Vice President – Coal Marketing

**Denis Smith**
Vice President – Industrial Products Marketing

**Mark A. Schulze**
Vice President – Safety, Training and Operations Support

**Jeffrey B. Wright**
Regional Vice President – Operations

## Shareholder Information

**SHARES LISTED**
New York Stock Exchange,
Ticker Symbol: BNI

**PRINCIPAL CORPORATE OFFICE**
2650 Lou Menk Drive
Fort Worth, Texas 76131-2830
(800) 795-2673
www.bnsf.com

**STOCK TRANSFER AGENT AND REGISTRAR**
Stock Transfer Agent
and Registrar
Computershare Trust
Company, N.A.
250 Royall Street
Canton, MA 02021

Telephone: (800) 526-5678

For account information, go to:
www.computershare.com

**SHAREHOLDERS**
As of February 4, 2008, there were approximately 32,000 shareholders of record.

**SHAREHOLDER SERVICES**
*You are encouraged to contact our Transfer Agent directly for the shareholder services listed below:*
Change in Certificate Registration, Dividend Reinvestment Service, Change of Mailing Address, Lost or Stolen Certificates, Replacement of Dividend Checks, Direct Deposit of Dividends, Consolidation of Multiple Accounts, Elimination of Duplicate Report Mailings, Replacement of Form 1099-DIV.

**DIVIDEND REINVESTMENT PLAN**
A dividend reinvestment plan is provided for registered shareholders through the Transfer Agent as a convenient way to purchase more shares through investment of dividends or voluntary cash payments. A booklet describing the plan is available from the Transfer Agent.

**FORM 10-K**
The Company's Annual Report on Form 10-K filed with the Securities and Exchange Commission (SEC) is posted on the Company's website, www.bnsf.com. A copy of the Annual Report on Form 10-K is also available to shareholders free of charge upon request to the Company's Investor Relations Department at 2500 Lou Menk Drive, Fort Worth, Texas 76131-2828. The Company's filings on Form 10-K, Form 10-Q and Form 8-K are posted on the Company's website as soon as reasonably practicable after the reports are electronically filed with the SEC. Reports on Forms 3, 4 and 5 by directors and Section 16 reporting officers are posted on the Company's website no later than the day following their filing with the SEC.

**INSTITUTIONAL INVESTORS**
*Inquiries from security analysts and investment professionals should be directed to the Company's investor relations contact:*
Ms. Marsha K. Morgan
Vice President – Investor Relations
(817) 352-6452

**ANNUAL MEETING**
The Annual Meeting of Shareholders will be held on Thursday, April 24, 2008, at 8:00 a.m. CDT at The Fort Worth Club, 306 W. 7th Street, Fort Worth, Texas 76102.

**PERFORMANCE GRAPH**
The following graph depicts a five-year comparison of cumulative total shareholder returns for the Company, the Standard & Poor's 500 Stock Index (S&P 500), and the Dow Jones U.S. Transportation Average Index (Dow Jones). The Dow Jones index consists of 20 railroad, airline, trucking and marine transport companies. The Company is included within the S&P 500 and Dow Jones indices. The graph assumes an investment of $100 for the five-year period commencing December 31, 2002, and ending December 31, 2007, in the Company's common stock and the S&P 500 and the Dow Jones indices, and the reinvestment of dividends.




© 2008 Burlington Northern Santa Fe Corporation. All rights reserved.
Design: Methodologie; Photography: Tyler Boley, Jeff Corwin, Wyatt McSpadden (CEO portrait); Printing: ColorGraphics

BNSF
2650 Lou Menk Drive
Fort Worth, Texas 76131-2830



# EXHIBIT PX0698




# We know what the future will bring

Burlington Northern Santa Fe Corporation
2008 Annual Report and Form 10-K

By the year 2040, the Earth's population will grow by one-third. That's 9 billion people who will need food, shelter, clothing and more.

(Source: U.S. Census Bureau International Data Base, December 2008)



# *More essentials for more people*



Over the next 20 years, global energy consumption is projected to increase by about 40 percent. As the demand for energy grows, it is crucial for us to continue improving the efficiency and sustainability of the way we transport essential goods.



(Source: U.S. Energy Information Administration International Energy Outlook 2008)



## *More energy*



More goods and more people will need to go more places than ever before. Our nation will need a robust and reliable transportation network to deliver the essentials required by an expanding global population.



# *More transportation*


BNSF is ready

**In the last 160 years we have learned a lot, and we have prepared for the future. We play an integral role in meeting today's freight transportation needs, and we are improving an already strong network to meet the needs of future generations. With a solid commitment to our customers, the environment and the communities we serve, we are naturally positioned to be part of the solution for the challenges that will define the coming decades.**

# Solutions for moving global commerce

**10M**

Loads of freight moved by BNSF in 2008.

Rail already carries more than 40 percent of the nation's freight from shore to shore and beyond, which helps reduce highway congestion and improve air quality. In 2008, BNSF transported more than 1 million carloads of agricultural commodities. But that's not all. We also moved 8 million tons of lumber, 14.5 million tons of steel products and 13 million tons of plastic. The result: efficient and cost-effective solutions for people and businesses across the nation and throughout the world.

BNSF is the nation's largest grain-hauling railroad, and moved more than 23 million tons of wheat in 2008 alone.



# *A robust infrastructure*

**$30B**

From 1997 to 2008, we spent $30 billion to improve our infrastructure and expand our locomotive fleet.

The way we move products is more cost-effective, more fuel-efficient, more environmentally friendly and safer than other modes of surface transportation. We are constantly striving to maintain and improve our infrastructure — expanding capacity as needed and investing in our fleet of locomotives to ensure that we safely and efficiently meet long-term demand. These investments also help create jobs and promote healthy economic development in communities throughout our network.

In 2008, BNSF completed nearly 16 miles of a third main track through Cajon Pass in Southern California, increasing capacity on our transcontinental main route between Chicago and Los Angeles from 100 to 150 trains per day.



# Efficient energy use

**470**

Average miles BNSF can move one ton of freight on a single gallon of diesel fuel.

Over the long term, our nation's demand for transportation is destined to grow. As the most environmentally friendly form of surface transportation, rail is more fuel-efficient for moving freight than using the nation's crowded highways. If just 10 percent of the freight that currently moves by truck were diverted to rail, fuel savings would exceed 1 billion gallons per year and annual greenhouse gas emissions would fall by more than 12 million tons.

BNSF was the first U.S. railroad to install wide-span cranes. These cranes, located at BNSF's Seattle International Gateway, produce zero emissions on site while generating power each time they lower a load.



# *Our future is riding on rail*

## 2.6%

Railroads account for only 2.6 percent of all transportation-related greenhouse gas emissions but move more than 40 percent of our nation's freight.

Today, BNSF provides significant value to our economy and society in a variety of ways. And as our nation's demand for transportation continues to increase, rail is an obvious solution to meet this challenge.

We are working to improve fuel efficiency, lower emissions throughout our operations and, in conjunction with trucking companies, move more long-haul freight over the rails. All of these efforts help minimize our impact on the planet, while enabling U.S. and global economies to thrive.

BNSF is the answer to the challenges that face us today and the solution for tomorrow.



## → *To our shareholders, customers and employees:*

We are in a time of great change and uncertainty, and despite substantial economic and weather challenges, 2008 was a very good year for BNSF. The diversity and strength of BNSF's franchise and resourcefulness of our people allowed us success in the face of a declining economy. That success is necessary to ensure we achieve the returns our business requires for strong and continued investment in our physical plant.

Safety has always been the highest priority at BNSF, regardless of the economic or operating environment in which we find ourselves. Sadly, last year, we lost two of our co-workers in separate incidents. These losses are unacceptable and underscore our need to drive safety improvement. Despite these tragedies, we reduced our other most severe incidents and rail equipment and crossing accidents. By focusing on safety action plans and encouraging all employees to be their "brother's keeper," I believe we will make progress toward our vision of an injury-free work environment.

Reviewing our 2008 financial results, our earnings per share increased 19 percent to $6.08. This was achieved as a result of record revenues of $18 billion, a 14 percent increase over 2007.

All four of our business units performed well. All-time records in revenue and volume were set for Agricultural Products. At year end, revenues hit $3.4 billion, and volume grew 2.8 percent. Growth in Agricultural Products units was attributed to higher demand for ethanol, corn and soybeans.

We also experienced record revenues in our coal business segment at $4 billion for the year. Coal unit volume was up 1.8 percent over 2007. BNSF loaded an annual record 274.7 million tons of coal in the Powder River Basin, including Wyoming and Montana mines, breaking the previous record set in 2007 by 5.9 million tons, or 2.2 percent.

Although Industrial Products volumes for the year decreased 4 percent due to soft economic conditions and continued weakness in the housing market, improved yields and fuel surcharges allowed us to reach a revenue record of $4 billion.

Consumer Products revenues increased to $6.1 billion, also as a result of improved yields and fuel surcharges; however, lower consumer demand resulted in a 6.4 percent decline in units.

From a service standpoint, we had our best on-time performance in more than five years despite significant weather disruptions. We ended the year with 85 percent on-time performance and increased on-time

"From a service standpoint, we had our best on-time performance in more than five years despite significant weather disruptions. I attribute the increase in on-time performance to companywide focus on velocity."




MATTHEW K. ROSE
Chairman, President and Chief Executive Officer

performance in three of our four business segments compared to last year, and on-time performance for the fourth segment was already very high.

I attribute the increase in on-time performance to companywide focus on velocity. This initiative, which began in 2005, focuses on the number of times that equipment is handled and the throughput of our assets. We saw year-over-year improvements in all velocity measurements except for the locomotives measurement, which was adversely affected by a drop in intermodal volumes. We will continue to stress this initiative through 2009 to achieve the dual benefits of improved service for our customers and increased efficiency throughout our operations.

I am particularly proud of the way our team responded to serve customers amid the massive flooding on the Mississippi River in the central United States and damage from Hurricane Ike. Last summer, the impacts of the Midwest flooding closed parts of six different BNSF Subdivisions. At one point, approximately 166 miles of our track was under water. Just a few months later, Hurricane Ike devastated the Galveston area causing heavy damage to our Galveston Island causeway, which was out of service for 14 days. Despite challenging conditions, our team responded quickly and effectively, and was able to restore operations before many of our customers in the affected areas were even able to reopen for business.

We ended the year at 10.7 percent return on invested capital, up from the previous year's 10 percent. The improved yields we have secured over the past several years are important in ensuring an attractive return on investment for you, our shareholders.

In 2008, we continued to ensure our infrastructure remained strong and improved the efficiency of our operations, investing $2.85 billion back into our network. The majority of capital expenditures were dedicated to our robust maintenance program, which is necessary to refresh operations. We also increased capacity by completing quadruple tracks in the Powder River Basin to better respond to the growing coal market, completed expansion at Cajon Pass in California and began expansion work at Abo Canyon in New Mexico. Following completion of the Abo Canyon project scheduled in 2011, our 2,200-mile Transcontinental Corridor between Southern California and Chicago will have only about 30 miles of single track.

We continue to invest in more fuel-efficient locomotives, both for their operating-cost advantages and to solidify our position as the environmentally preferred mode of freight transportation. In 2008, we acquired another

**19%**

Earnings per share increased 19 percent to $6.08

**$18B**

Record revenues of $18 billion, a 14 percent increase over 2007

352 high-horsepower, high-efficiency locomotives, which are approximately 15 percent more fuel efficient than the units they replaced.

Our nation has faced a tough year, including wide swings in energy costs and unprecedented high fuel prices. The volatility of fuel prices affected virtually all segments of the economy. Year over year, our total fuel expense increased by $1.3 billion, to a total of $4.6 billion. However, we were able to achieve record fuel efficiency with a nearly 2 percent improvement over 2007. We have been able to mitigate most of the rise in fuel costs through our fuel surcharges.

The political landscape changed dramatically with the 2008 election and brings policy opportunity, and some risk. As the new Administration begins to work with Congress on transportation policy, freight rail is well positioned. Freight rail can help reduce our dependence on foreign oil, because trains transport on average a ton of freight nearly three times as far as a truck on the same amount of fuel. Freight rail can also provide tremendous value in reducing the country's transportation carbon footprint, given its reduced emissions versus truck-only freight transportation.

Our ongoing investments provide tremendous benefits to the overall efficiency of the supply chain. Public policy and regulatory decisions should place a premium on ensuring that freight railroads are willing and able to reinvest. Appropriate policy also can leverage that private investment by providing incentives for additional private investment and bringing public partnership to rail projects to maximize the public's benefit. These public benefits go beyond fuel efficiency and sustainability. They mean a more competitive U.S. workforce and economy as our goods reach all across the globe as efficiently as possible.

As we move into 2009, the year has begun where the last several months of 2008 ended. I can't think of a single customer that hasn't been impacted by the change in credit markets and overall loss of consumer confidence, resulting in lower GDP and generally lower shipment volumes. Although we are better positioned than many due to the diversity of our franchise, we have taken and will continue to take numerous actions throughout the year to match our assets with the current demand outlook. We have successfully added variability into our cost structure over the years, which benefits us in times of economic downturn.

Compensation and benefits expenses are typically the largest cost category in running a railroad. Consequently, we will take full advantage of retirements and other normal attrition. We have also taken a number of difficult but prudent actions, such as the furlough of

> "Over the long term, I am very optimistic about the future of rail transportation in general and BNSF in particular. We provide an extremely reliable, fuel-efficient means of transporting products and resources that drive the American economy."

employees and suspending merit increases in 2009 for most salaried employees. These actions were taken in combination with other significant expense-reduction measures, such as returning leased railcars and locomotives and storing less-efficient locomotives.

We believe that our approach to executive compensation is aligned with shareholder interests and responsible practices. Improvement in the long-term value of this company will be the benchmark for delivery of the majority of our senior executives' compensation. Compensation philosophy, goal setting and all other program details are explained in our proxy statement.

We will balance our capital programs to maintain a strong and safe railroad but also to reduce expansion capital on certain routes, again due to the decline in the overall level of our business. However, as the economy recovers, we will be well positioned to take advantage of new opportunities.

We have been investing in the railroad over the years and ensuring that we adjust to the changing transportation and logistics landscape. We also continue to seek opportunities to diversify our financing sources to manage risk and cost. In short, we are keeping costs in line with business needs, while preparing to fulfill our customers' needs when the economy improves.

Over the long term, I am very optimistic about the future of rail transportation in general and BNSF in particular. We provide an extremely reliable, fuel-efficient means of transporting products and resources that drive the American economy.

As I write this letter, the oldest man in America is a former BNSF employee. His name is Walter Breuning, and he is 112 years old. He dedicated a half century of his life to working for predecessors of BNSF. We are grateful for his years of service. Remarkably, BNSF companies were operating nearly a half century before he was born, and we have continued to operate another half century after his retirement. His story highlights the rich history of BNSF and the United States, as well as the enormous obligation that all of us feel toward protecting the strength, character and continued success of the company.

Thank you to our shareholders, customers and employees for your support of BNSF.

**Matthew K. Rose**
Chairman, President and Chief Executive Officer
February 13, 2009

# Consolidated Financial Highlights

In millions, except per share data

| December 31, | 2008 | 2007 | 2006 | 2005 | 2004 |
|---|---|---|---|---|---|
| **For the year ended:** | | | | | |
| Revenues | $ 18,018 | $ 15,802 | $ 14,985 | $ 12,987 | $ 10,946 |
| Operating income | $ 3,912 | $ 3,486 | $ 3,521 | $ 2,927 | $ 1,709 |
| Net income | $ 2,115 | $ 1,829 | $ 1,889 | $ 1,534 | $ 805 |
| Basic earnings per share | $ 6.15 | $ 5.19 | $ 5.23 | $ 4.13 | $ 2.18 |
| Average basic shares | 343.8 | 352.5 | 361.0 | 371.8 | 370.0 |
| Diluted earnings per share | $ 6.08 | $ 5.10 | $ 5.11 | $ 4.02 | $ 2.14 |
| Average diluted shares | 347.8 | 358.9 | 369.8 | 381.8 | 376.6 |
| Dividends declared per common share | $ 1.44 | $ 1.14 | $ 0.90 | $ 0.74 | $ 0.64 |
| **At year end:** | | | | | |
| Total assets | $ 36,403 | $ 33,583 | $ 31,797 | $ 30,436 | $ 29,023 |
| Long-term debt and commercial paper, including current portion | $ 9,555 | $ 8,146 | $ 7,385 | $ 7,154 | $ 6,516 |
| Stockholders' equity | $ 11,131 | $ 11,144 | $ 10,528 | $ 9,638 | $ 9,438 |
| Net debt to total capitalization[a] | 44.5% | 41.2% | 40.0% | 42.3% | 39.6% |
| **For the year ended:** | | | | | |
| Total capital expenditures | $ 2,175 | $ 2,248 | $ 2,014 | $ 1,750 | $ 1,527 |
| Depreciation and amortization | $ 1,397 | $ 1,293 | $ 1,176 | $ 1,111 | $ 1,035 |

a Net debt is calculated as total debt (long-term debt and commercial paper plus long-term debt due within one year) less cash and cash equivalents, and total capitalization is calculated as the sum of net debt and total stockholders' equity.

BNSF's return on invested capital (ROIC), as discussed in the preceding shareholders letter, is a non-GAAP measure and should be considered in addition to, but not as a substitute or preferable to, other information prepared in accordance with GAAP. Below is the calculation of ROIC for the years ended December 31, 2008 and 2007 (dollars in millions).

| December 31, | 2008 | 2007* |
|---|---|---|
| **For the year ended:** | | |
| Average capitalization[a] | $ 24,705 | $ 23,618 |
| Operating income | $ 3,912 | $ 3,486 |
| Other expense | (11) | (18) |
| Financing charges[b] | 335 | 354 |
| Taxes[c] | (1,586) | (1,459) |
| After-tax income excluding financing charges | $ 2,650 | $ 2,363 |
| Return on invested capital[d] | 10.7% | 10.0% |

a Average capitalization is calculated as the average of the sum of stockholders' equity, net debt (long-term debt and commercial paper plus long-term debt due within one year less cash and cash equivalents), the net present value of future long-term operating lease commitments and the receivables sold under the accounts receivable sales program for the most recent preceding 13 month ends.

b Financing charges represent the estimated interest expense included in operating lease payments and accounts receivable sales fees.

c Taxes are calculated as the sum of monthly operating income, other expense and financing charges, multiplied by an effective tax rate.

d Return on invested capital is calculated as the total after-tax income excluding financing charges divided by average capitalization.

* Certain comparative prior period amounts have been adjusted to conform to the current period presentation.

# *2008 Form 10-K*

**Burlington Northern Santa Fe Corporation**

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

# FORM 10-K

**[x] ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

FOR THE FISCAL YEAR ENDED DECEMBER 31, 2008

OR

**[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

FOR THE TRANSITION PERIOD FROM __________ TO __________

**COMMISSION FILE NUMBER: 1-11535**

---

**Exact name of registrant as specified in its charter**

## Burlington Northern Santa Fe Corporation

| State of Incorporation | I.R.S. Employer Identification No. |
|---|---|
| **Delaware** | **41-1804964** |

Address of principal executive offices, including zip code
**2650 Lou Menk Drive, Fort Worth, Texas 76131-2830**
Registrant's telephone number, including area code
**(800) 795-2673**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Name of each exchange on which registered |
|---|---|
| **Common Stock, $0.01 par value** | **New York Stock Exchange** |

**Securities registered pursuant to Section 12(g) of the Act:**
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. **Yes [x] No [ ]**

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. **Yes [ ] No [x]**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirement for the past 90 days. **Yes [x] No [ ]**

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. **[ ]**

Indicate by check mark whether the registrant is a large accelerated filer, accelerated filer, non-accelerated filer, or smaller reporting company (as defined in Rule 12b-2 of the Act).

**Large accelerated filer [x]** **Accelerated filer [ ]** **Non-accelerated filer [ ]** **Smaller reporting company [ ]**

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). **Yes [ ] No [x]**

The aggregate market value of the voting stock held by non-affiliates of the registrant was approximately $34.135 billion on June 30, 2008. For purposes of this calculation only, the registrant has excluded stock beneficially owned by directors and officers. By doing so, the registrant does not admit that such persons are affiliates within the meaning of Rule 405 under the Securities Act of 1933 or for any other purpose.

Indicate the number of shares outstanding of each of the registrant's classes of common stock, as of the latest practicable date: Common Stock, $0.01 par value, 339,394,803 shares outstanding as of February 3, 2009.

**DOCUMENTS INCORPORATED BY REFERENCE**

**List hereunder the documents from which parts thereof have been incorporated by reference and the Part of the Form 10-K into which such information is incorporated:**

Burlington Northern Santa Fe Corporation's definitive Proxy Statement, to be filed not later than 120 days after the end of the fiscal year covered by this report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Part III

# Table of Contents


| | | | |
|---|---|---|---|
| **Part I** | Item 1. | Business | 1 |
| | Item 1A. | Risk Factors | 1 |
| | Item 1B. | Unresolved Staff Comments | 5 |
| | Item 2. | Properties | 6 |
| | Item 3. | Legal Proceedings | 11 |
| | Item 4. | Submission of Matters to a Vote of Security Holders | 12 |
| | Executive Officers of the Registrant | | 12 |
| **Part II** | Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 13 |
| | Item 6. | Selected Financial Data | 14 |
| | Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 15 |
| | Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 34 |
| | Item 8. | Financial Statements and Supplementary Data | 36 |
| | Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 73 |
| | Item 9A. | Controls and Procedures | 73 |
| | Item 9B. | Other Information | 73 |
| **Part III** | Item 10. | Directors, Executive Officers and Corporate Governance | 74 |
| | Item 11. | Executive Compensation | 74 |
| | Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 74 |
| | Item 13. | Certain Relationships and Related Transactions, and Director Independence | 75 |
| | Item 14. | Principal Accountant Fees and Services | 75 |
| **Part IV** | Item 15. | Exhibits and Financial Statement Schedules | 76 |
| | Signatures | | S-1 |
| | Exhibit Index | | E-1 |

# Part I

## Item 1. Business

Burlington Northern Santa Fe Corporation (BNSF, Registrant or Company) was incorporated in the State of Delaware on December 16, 1994. On September 22, 1995, the shareholders of Burlington Northern Inc. (BNI) and Santa Fe Pacific Corporation (SFP) became the shareholders of BNSF pursuant to a business combination of the two companies.

On December 30, 1996, BNI merged with and into SFP. On December 31, 1996, The Atchison, Topeka and Santa Fe Railway Company merged with and into Burlington Northern Railroad Company (BNRR), and BNRR changed its name to The Burlington Northern and Santa Fe Railway Company. On January 2, 1998, SFP merged with and into The Burlington Northern and Santa Fe Railway Company. On January 20, 2005, The Burlington Northern and Santa Fe Railway Company changed its name to BNSF Railway Company (BNSF Railway).

BNSF is a holding company that conducts no operating activities and owns no significant assets other than through its interests in its subsidiaries. Through its subsidiaries, BNSF is engaged primarily in the freight rail transportation business. At December 31, 2008, BNSF and its subsidiaries had approximately 40,000 employees. The rail operations of BNSF Railway, BNSF's principal operating subsidiary, comprise one of the largest railroad systems in North America.

BNSF's internet address is www.bnsf.com. Through this internet Web site (under the "Investors" link), BNSF makes available, free of charge, its Annual Report on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K, as well as all amendments to those reports, as soon as reasonably practicable after these reports are electronically filed with or furnished to the Securities and Exchange Commission (SEC). Filings on Forms 3, 4 and 5 are also available on this Web site as is BNSF's annual proxy statement. BNSF's annual CEO certification filed pursuant to the New York Stock Exchange's corporate governance listing standards is filed as an exhibit to this Form 10-K. BNSF makes available on its Web site other previously filed SEC reports, registration statements and exhibits via a link to the SEC's Web site at www.sec.gov. The following documents are also made available on the Company's Web site:

- Code of Conduct for Directors, Officers and Salaried Employees
- Code of Business Conduct and Ethics for Scheduled Employees
- Corporate Governance Guidelines; and
- Charters of the Audit, Compensation and Development and Directors and Corporate Governance Committees

Further discussion of the Company's business, including equipment and business sectors, is incorporated by reference from Item 2, "Properties."

## Item 1A. Risk Factors

**The Company faces intense competition from rail carriers and other transportation providers, and its failure to compete effectively could adversely affect its results of operations, financial condition or liquidity.**

The Company operates in a highly competitive business environment. Depending on the specific market, the Company faces intermodal, intramodal, product and geographic competition. This competition from other railroads and motor carriers, as well as barges, ships and pipelines in certain markets, may be reflected in pricing, market share, level of services, reliability and other factors. For example, the Company believes that high service truck lines, due to their ability to deliver non-bulk products on an expedited basis, have had and will continue to have an adverse effect on the Company's ability to compete for deliveries of non-bulk, time-sensitive freight. While the Company must build or acquire and maintain its rail system, trucks and barges are able to use public rights-of-way maintained by public entities. Any material increase in the capacity and quality of these alternative methods or the passage of legislation granting greater latitude to motor carriers with respect to size and weight restrictions could have an adverse effect on the Company's results of operations, financial condition or liquidity. In addition, a failure to provide the level of service required by the Company's customers could result in loss of business to competitors. Changes in the ports used by ocean carriers or the use of all-water routes from the Pacific Rim to the East Coast or other changes in the supply chain could also have an adverse affect on the Company's volumes and revenues.

**Downturns in the economy could adversely affect demand for the Company's services.**

Significant, extended negative changes in domestic and global economic conditions that impact the producers and consumers of the commodities transported by the Company may have an adverse effect on the Company's operating results, financial condition or liquidity. Declines in or muted manufacturing activity, economic growth and international trade all could result in reduced revenues in one or more business units.

**Negative changes in general economic conditions could lead to disruptions in the credit markets, increase credit risks and could adversely affect the Company's financial condition, liquidity or stock price.**

Challenging economic conditions may not only affect revenues due to reduced demand for many goods and commodities, but could result in payment delays, increased credit risk and possible bankruptcies of customers. Railroads are capital-intensive and must finance a portion of the building and maintenance of infrastructure as well as locomotives and other rail equipment. Economic slowdowns and related credit market disruptions may adversely affect the Company's cost structure, its timely access to capital to meet financing needs and costs of its financings. The Company could also face increased counterparty risk for its cash investments and its hedge arrangements. Adverse economic conditions could also affect the Company's costs for insurance or its ability to acquire and maintain adequate insurance coverage for risks associated with the railroad business if insurance companies experience credit downgrades or bankruptcies. Declines in the securities and credit markets could also affect the Company's pension fund, which in turn could increase funding requirements.

**As part of its railroad operations, the Company frequently transports chemicals and other hazardous materials, which could expose it to the risk of significant claims, losses and penalties.**

BNSF Railway is required to transport these commodities to the extent of its common carrier obligation. An accidental release of these commodities could result in a significant loss of life and extensive property damage as well as environmental remediation obligations. The associated costs could have an adverse effect on the Company's operating results, financial condition or liquidity as the Company is not insured above a certain threshold. Further, the rates BNSF Railway receives for transporting these commodities do not adequately compensate it should there be some type of accident. In addition, insurance premiums charged for some or all of the coverage currently maintained by the Company could increase dramatically or certain coverage may not be available to the Company in the future if there is a catastrophic event related to rail transportation of these commodities.

**Acts of terrorism or war, as well as the threat of war, may cause significant disruptions in the Company's business operations.**

Terrorist attacks and any government response to those types of attacks and war or risk of war may adversely affect the Company's results of operations, financial condition or liquidity. The Company's rail lines and facilities could be direct targets or indirect casualties of an act or acts of terror, which could cause significant business interruption and result in increased costs and liabilities and decreased revenues, which could have an adverse effect on operating results and financial condition. Such effects could be magnified if releases of hazardous materials are involved. Any act of terror, retaliatory strike, sustained military campaign or war or risk of war may have an adverse impact on the Company's operating results and financial condition by causing unpredictable operating or financial conditions, including disruptions of BNSF Railway or connecting rail lines, loss of critical customers or partners, volatility or sustained increase of fuel prices, fuel shortages, general economic decline and instability or weakness of financial markets. In addition, insurance premiums charged for some or all of the coverage currently maintained by the Company could increase dramatically, the coverage available may not adequately compensate it for certain types of incidents and certain coverage may not be available to the Company in the future.

**The Company is subject to stringent environmental laws and regulations, which may impose significant costs on its business operations.**

The Company's operations are subject to extensive federal, state and local environmental laws and regulations concerning, among other things, emissions to the air; discharges to waters; the generation, handling, storage, transportation and disposal of waste and hazardous materials; and the cleanup of hazardous material or petroleum releases. Changes to or limits on carbon dioxide emissions could result in significant capital expenditures to comply with these regulations with respect to BNSF Railway's diesel locomotives, equipment, vehicles and machinery and its yards and intermodal facilities and the cranes and trucks serving those facilities. Emission regulations could also adversely affect fuel efficiency and increase operating costs. Further, local concerns on emissions and other forms of pollution could inhibit the Company's ability to build facilities in strategic locations to facilitate growth and efficient operations. In addition, many land holdings are and have been used for industrial or transportation-related purposes or leased to commercial or industrial companies whose activities may have resulted in discharges onto the property. Environmental liability can extend to previously owned or operated properties, leased properties and properties owned by third parties, as well as to properties currently owned and used by the Company's subsidiaries. Environmental liabilities have arisen and may continue to arise from claims asserted by adjacent landowners or other third parties in toxic tort litigation. The Company's subsidiaries have been and may continue to be subject to allegations or findings to the effect that they have violated, or are strictly liable under, these laws or regulations. The Company's operating results, financial condition or liquidity could be adversely affected as a result of any of the foregoing, and it may be required to incur significant expenses to investigate and remediate environmental contamination. The Company records liabilities for environmental cleanup when the amount of its liability is both probable and reasonably estimable.

**The Company's success depends on its ability to continue to comply with the significant federal, state and local governmental regulations to which it is subject.**

The Company is subject to a significant amount of governmental regulation with respect to its rates and practices, railroad operations and a variety of health, safety, labor, environmental and other matters. Failure to comply with applicable laws and regulations could have a material adverse effect on the Company. Governments may change the legislative framework within which the Company operates without providing the Company with any recourse for any adverse effects that the change may have on its business. New federal legislation mandates the implementation of positive train control technology by December 31, 2015, on all mainline track where intercity and commuter passenger railroads operate and where toxic-by-inhalation hazardous materials are transported. This type of technology is new and deploying it across BNSF Railway's system and other railroads may pose significant operating and implementation risks and will require significant capital expenditures. Also, some government regulations require the Company to obtain and maintain various licenses, permits and other authorizations, and it cannot assure that it will continue to be able to do so.

**Changes in government policy could negatively impact demand for the Company's services, impair its ability to price its services or increase its costs or liability exposure.**

Changes in United States and foreign government policies could change the economic environment and affect demand for the Company's services. For example, changes in clean air laws or regulation of carbon dioxide emissions could reduce the demand for coal and revenues from the coal transportation services provided by BNSF Railway. Also, United States and foreign government agriculture tariffs or subsidies could affect the demand for grain. Developments and changes in laws and regulations as well as increased economic regulation of the rail industry through legislative action and revised rules and standards applied by the U.S. Surface Transportation Board in various areas, including rates and services, could adversely impact the Company's ability to determine prices for rail services and significantly affect the revenues, costs and profitability of the Company's business. Additionally, because of the significant costs to maintain its rail network, a reduction in profitability could hinder the Company's ability to maintain, improve or expand its rail network, facilities and equipment. Federal or state spending on infrastructure improvements or incentives that favor other modes of transportation could also adversely affect the Company's revenues.

**The availability of qualified personnel could adversely affect the Company's operations.**

Changes in demographics, training requirements and the availability of qualified personnel, particularly engineers and trainmen, could negatively impact the Company's ability to meet demand for rail service. Recruiting and retaining qualified personnel, particularly those with expertise in the railroad industry, are vital to operations. Although the Company has adequate personnel for the current business environment, unpredictable increases in demand for rail services may exacerbate the risk of not having sufficient numbers of trained personnel, which could have a negative impact on operational efficiency and otherwise have a material adverse effect on the Company's operating results, financial condition or liquidity.

**Most of the Company's employees are represented by unions, and failure to successfully negotiate collective bargaining agreements may result in strikes, work stoppages or substantially higher ongoing labor costs.**

A significant majority of BNSF Railway's employees are union-represented. BNSF Railway's union employees work under collective bargaining agreements with various labor organizations. Wages, health and welfare benefits, work rules and other issues have traditionally been addressed through industry-wide negotiations. These negotiations have generally taken place over an extended period of time and have previously not resulted in any extended work stoppages. The existing agreements have remained in effect and will continue to remain in effect until new agreements are reached or the Railway Labor Act's procedures (which include mediation, cooling-off periods and the possibility of Presidential intervention) are exhausted. While the negotiations have not yet resulted in any extended work stoppages, if BNSF Railway is unable to negotiate acceptable new agreements, it could result in strikes by the affected workers, loss of business and increased operating costs as a result of higher wages or benefits paid to union members, any of which could have an adverse effect on the Company's operating results, financial condition or liquidity.

**Severe weather and natural disasters could disrupt normal business operations, which would result in increased costs and liabilities and decreases in revenues.**

The Company's success is dependent on its ability to operate its railroad system efficiently. Severe weather and natural disasters, such as tornados, flooding and earthquakes, could cause significant business interruptions and result in increased costs and liabilities and decreased revenues. In addition, damages to or loss of use of significant aspects of the Company's infrastructure due to natural or man-made disruptions could have an adverse affect on the Company's operating results, financial condition or liquidity for an extended period of time until repairs or replacements could be made. Additionally, during natural disasters, the Company's workforce may be unavailable, which could result in further delays. Extreme swings in weather could also negatively affect the performance of locomotives and rolling stock.

**Fuel supply availability and fuel prices may adversely affect the Company's results of operations, financial condition or liquidity.**

Fuel supply availability could be impacted as a result of limitations in refining capacity, disruptions to the supply chain, rising global demand and international political and economic factors. A significant reduction in fuel availability could impact the Company's ability to provide transportation services at current levels, increase fuel costs and impact the economy. Each of these factors could have an adverse effect on the Company's operating results, financial condition or liquidity. If the price of fuel increases substantially, the Company expects to be able to offset a significant portion of these higher fuel costs through its fuel surcharge program. However, to the extent that the Company is unable to maintain and expand its existing fuel surcharge program, increases in fuel prices could have an adverse effect on the Company's operating results, financial condition or liquidity.

**The Company depends on the stability and availability of its information technology systems.**

The Company relies on information technology in all aspects of its business. A significant disruption or failure of its information technology systems could result in service interruptions, safety failures, security violations, regulatory compliance failures and the inability to protect corporate information assets against intruders or other operational difficulties. Although the Company has taken steps to mitigate these risks, including Business Continuity Planning, Disaster Recovery Planning and Business Impact Analysis, a significant disruption could adversely affect the Company's results of operations, financial condition or liquidity. Additionally, if the Company is unable to acquire or implement new technology, it may suffer a competitive disadvantage, which could also have an adverse effect on the Company's results of operations, financial condition or liquidity.

**The Company's operational dependencies may adversely affect results of operations, financial condition or liquidity.**

Due to the integrated nature of the United States' freight transportation infrastructure, the Company's operations may be negatively affected by service disruptions of other entities such as ports and other railroads which interchange with the Company. A significant prolonged service disruption of one or more of these entities could have an adverse effect on the Company's results of operations, financial condition or liquidity.

**Personal injury claims constitute a significant expense, and increases in the amount or severity of these claims could adversely affect the Company's operating results, financial condition and liquidity.**

The Company is subject to various personal injury claims by third parties and employees, including claims by employees who worked around asbestos until 1985, when its use at BNSF was substantially eliminated. Personal injury claims by BNSF Railway employees are subject to the Federal Employees' Liability Act (FELA), rather than state workers' compensation laws. The Company believes that the FELA system, which includes unscheduled awards and a reliance on the jury system, has contributed to increased expenses in the past. Future events, such as increases in the number of claims that are filed, developments in legislative and judicial standards and the costs of settling claims, could result in an adverse effect on the Company's operating results, financial condition and liquidity.

## *Item 1B. Unresolved Staff Comments*

None.

# *Item 2. Properties*

## Track Configuration

BNSF Railway operates one of the largest railroad networks in North America with approximately 32,000 route miles of track, excluding multiple main tracks, yard tracks and sidings, approximately 23,000 miles of which are owned route miles, including easements, in 28 states and two Canadian provinces as of December 31, 2008. Approximately 9,000 route miles of BNSF Railway's system consist of trackage rights that permit BNSF Railway to operate its trains with its crews over other railroads' tracks.

As of December 31, 2008, the total BNSF Railway system, including single and multiple main tracks, yard tracks and sidings, consisted of approximately 50,000 operated miles of track, all of which are owned by or held under easement by BNSF Railway except for approximately 10,000 route miles operated under trackage rights. At December 31, 2008, approximately 26,000 miles of BNSF Railway's track consisted of 112-pound per yard or heavier rail, including approximately 20,000 track miles of 131-pound per yard or heavier rail.

## Equipment Configuration

BNSF Railway owned or had under non-cancelable leases exceeding one year the following units of railroad rolling stock and other equipment as of the dates shown below.

| At December 31, | 2008 | 2007 | 2006 |
|---|---|---|---|
| Locomotives | **6,510** | 6,400 | 6,330 |
| Freight cars: | | | |
| Covered hopper | **35,381** | 36,439 | 33,488 |
| Gondola | **14,062** | 13,690 | 13,998 |
| Open hopper | **11,046** | 11,428 | 11,277 |
| Flat | **10,627** | 10,470 | 11,382 |
| Box | **6,146** | 7,948 | 8,937 |
| Refrigerator | **3,945** | 4,196 | 4,631 |
| Autorack | **657** | 416 | 641 |
| Tank | **447** | 427 | 426 |
| Other | **244** | 324 | 341 |
| Total freight cars | **82,555** | 85,338 | 85,121 |
| Domestic chassis | **11,336** | 11,714 | 12,849 |
| Domestic containers | **3,246** | 3,253 | 3,275 |
| Trailers | **1,195** | 1,200 | 1,209 |
| Maintenance of way and other | **4,401** | 4,232 | 3,874 |
| Commuter passenger cars | **163** | 163 | 165 |
| Average age from date of manufacture–locomotive fleet (years)[a] | **15** | 15 | 15 |
| Average age from date of manufacture–freight car fleet (years)[a] | **14** | 14 | 14 |

a These averages are not weighted to reflect the greater capacities of the newer equipment.

## Capital Expenditures and Maintenance

### Capital Expenditures

The extent of BNSF Railway's replacement and capacity program is outlined in the following table:

| Year ended December 31, | 2009 Estimate | 2008 | 2007 | 2006 |
|---|---|---|---|---|
| Track miles of rail laid[a] | **889** | **972** | 994 | 854 |
| Cross ties inserted (thousands)[a] | **3,350** | **3,167** | 3,126 | 2,957 |
| Track resurfaced (miles) | **14,571** | **13,005** | 11,687 | 12,588 |

a Includes both replacement capital and expansion projects, which are primarily capitalized.

A breakdown of the Company's cash capital expenditures for the three years ended December 31, 2008, is incorporated by reference from a table in Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations under the heading "Liquidity and Capital Resources; Investing Activities."

BNSF's planned 2009 capital commitments are incorporated by reference from Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations under the heading "Executive Summary; Capital Commitment Outlook for 2009."

**Locomotive Maintenance**

As of December 31, 2008, General Electric Company, Alstom Transportation, Inc. and Electro-Motive Diesel, Inc. performed locomotive maintenance and overhauls for BNSF Railway at its facilities under various maintenance agreements that covered approximately 4,550 locomotives.

## Property and Facilities

BNSF Railway operates various facilities and equipment to support its transportation system, including its infrastructure and locomotives and freight cars as previously described. It also owns or leases other equipment to support rail operations, including containers, chassis and vehicles. Support facilities for rail operations include yards and terminals throughout its rail network, system locomotive shops to perform locomotive servicing and maintenance, a centralized network operations center for train dispatching and network operations monitoring and management in Fort Worth, Texas, regional dispatching centers, computers, telecommunications equipment, signal systems and other support systems. Transfer facilities are maintained for rail-to-rail as well as intermodal transfer of containers, trailers and other freight traffic. These facilities include 32 major intermodal hubs located across the system. BNSF Railway's largest intermodal facilities in terms of 2008 volume were as follows:

| Intermodal Facilities | Lifts |
|---|---|
| Hobart Yard (Los Angeles, California) | 1,244,000 |
| Logistics Park (Chicago, Illinois) | 809,000 |
| Corwith Yard (Chicago, Illinois) | 681,000 |
| Willow Springs (Illinois) | 618,000 |
| Alliance (Fort Worth, Texas) | 540,000 |
| Cicero (Illinois) | 488,000 |
| San Bernardino (California) | 488,000 |
| Argentine (Kansas City, Kansas) | 332,000 |
| Stockton (California) | 300,000 |
| Memphis (Tennessee) | 277,000 |

BNSF Railway owns 22 automotive distribution facilities and serves eight port facilities where automobiles are loaded on or unloaded from multi-level rail cars in the United States and Canada.

BNSF Railway's largest freight car classification yards based on the average daily number of cars processed (excluding cars that do not change trains at the terminal, intermodal and coal cars) are shown below:

| Classification Yards | Daily Average Cars Processed |
|---|---|
| Argentine (Kansas City, Kansas) | 1,772 |
| Galesburg (Illinois) | 1,603 |
| Barstow (California) | 1,292 |
| Tulsa (Oklahoma) | 1,206 |
| Pasco (Washington) | 1,142 |

As of December 31, 2008, certain BNSF Railway properties and other assets were subject to liens securing $97 million of mortgage debt. Certain locomotives, rolling stock and facilities of BNSF Railway were subject to equipment leases and financing obligations, as referred to in Notes 9 and 10 to the Consolidated Financial Statements.

## Productivity

Productivity, as measured by thousand gross ton miles per employee, is shown in the table below. Gross ton miles is defined as the product of the number of loaded and empty miles traveled and the combined weight of the car and contents. Certain prior period amounts have been adjusted to conform to current year presentation.

| Year ended December 31, | 2008 | 2007 | 2006 |
|---|---|---|---|
| Thousand gross ton miles divided by average number of employees | **27,360** | 27,058 | 26,965 |

A discussion of Employees and Labor Relations is incorporated by reference from Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations, under the heading "Other Matters; Employee and Labor Relations."

## Business Mix

In serving the Midwest, Pacific Northwest and the Western, Southwestern and Southeastern regions and ports of the country, BNSF transports, through one operating transportation services segment, a range of products and commodities derived from manufacturing, agricultural and natural resource industries. Slightly less than two-thirds of the freight revenues of the Company are covered by contractual agreements of varying durations, while the balance is subject to common carrier, published prices or quotations offered by the Company. BNSF's financial performance is influenced by, among other things, general and industry economic conditions at the international, national and regional levels. The following map illustrates the Company's primary routes, including trackage rights, which allow BNSF to access major cities and ports in the western and southern United States as well as Canadian and Mexican traffic. In addition to major cities and ports, BNSF efficiently serves many smaller markets by working closely with approximately 200 shortline partners. BNSF has also entered into marketing agreements with CSX Transportation, Canadian National Railway Company and Kansas City Southern Railway Company, expanding the marketing reach for each railroad and their customers.



**Consumer Products:**

The Consumer Products' freight business provided approximately 34 percent of freight revenues in 2008 and consisted of the following business sectors:

- **International Intermodal** — International business consists primarily of container traffic from steamship companies such as Hyundai Merchant Marine Co., Ltd., Yang Ming Group and Orient Overseas Container Line (OOCL). International Intermodal accounted for approximately 45 percent of total Consumer Products revenues.
- **Domestic Intermodal** — Domestic Intermodal generated approximately 47 percent of total Consumer Products revenues. The Domestic Intermodal sector is comprised of the following business areas:
  - **Truckload/Intermodal Marketing Companies** — The Truckload business area is comprised of full truckload carriers such as J.B. Hunt Transportation, Schneider National and Swift Transportation. The Intermodal Marketing Companies business area is comprised of shippers' agents and consolidators such as the Hub Group.
  - **Expedited Truckload/Less-than-Truckload** — This business area is comprised of less-than-truckload carriers and parcel carriers such as United Parcel Service and YRC Worldwide. It also includes expedited truckload carriers such as Werner Enterprises, Stevens Transport and U.S. Xpress Enterprises.
- **Automotive** — The transportation of both assembled motor vehicles and shipments of vehicle parts to numerous destinations throughout the Midwest, Southwest, West and Pacific Northwest provided about 8 percent of total Consumer Products revenues. Asian and European auto companies account for approximately 80 percent of Automotive revenue.

**Industrial Products:**

The Industrial Products' freight business provided approximately 23 percent of BNSF's freight revenues in 2008 and consisted of the following five business areas:

- **Construction Products** — The Construction Products sector represented approximately 36 percent of total Industrial Products revenues in 2008. This sector serves virtually all of the commodities included in, or resulting from, the production of steel along with mineral commodities such as clays, sands, cements, aggregates, sodium compounds and other industrial minerals. Industrial taconite, an iron ore derivative produced in northern Minnesota, scrap steel and coal coke are BNSF's primary input products transported. Finished steel products range from structural beams and steel coils to wire and nails. BNSF links the integrated steel mills in the East with fabricators in the West and Southwest. Service is also provided to various mini-mills in the Southwest that produce rebar, beams and coiled rod for the construction industry. Industrial minerals include mined and processed commodities such as cement and aggregates (construction sand, gravel and crushed stone) that generally move to domestic markets for use in general construction and public work projects, including highways. Borates and clays move to domestic points as well as to export markets primarily through West Coast ports. Sodium compounds, primarily soda ash, are moved to domestic markets for use in the manufacturing of glass and other industrial products. Sand is utilized in oil and natural gas drilling, the manufacturing of glass and in foundry applications.
- **Building Products** — This sector generated approximately 26 percent of total 2008 Industrial Products revenues and includes primary forest product commodities such as lumber, plywood, oriented strand board, particleboard, paper products, pulpmill feedstocks, wood pulp and sawlogs. Also included in this sector are government, machinery and waste traffic. Commodities from this diverse group primarily originate from the Pacific Northwest, Western Canada, upper Midwest and the Southeast for shipment mainly into domestic markets. Industries served include construction, furniture, photography, publishing, newspaper and industrial packaging. Shipments of waste, ranging from municipal waste to contaminated soil, are transported to landfills and reclamation centers across the country. The government and machinery business includes aircraft parts, agricultural and construction machinery, military equipment and large industrial machinery.
- **Petroleum Products** — Commodities included in the Petroleum Products sector are liquefied petroleum gas (LPG), diesel fuels, asphalt, alcohol, solvents, petroleum coke, lubes, oils, waxes and carbon black. This group made up 17 percent of total Industrial Products revenues for 2008. Product use varies based on commodity and includes the use of LPG for heating purposes, diesel fuel and lubes to run heavy machinery and asphalt for road projects and roofing. Products within this group originate and terminate throughout the BNSF network, with the largest areas of activities being the Texas Gulf, Pacific Northwest, California, Montana and Illinois.

- **Chemicals and Plastic Products** — The Chemicals and Plastic Products sector represented approximately 13 percent of total 2008 Industrial Products revenues. This group is composed of industrial chemicals and plastics commodities. These commodities include caustic soda, chlorine, industrial gases, acids, polyethylene, polypropylene and polyvinyl chloride. Industrial chemicals and plastics resins are used by the automotive, housing and packaging industries, as well as for feedstocks, to produce other chemicals and plastic products. These commodities originate primarily in the Gulf Coast region for shipment mainly into domestic markets.

- **Food and Beverages** — Food and Beverages represented approximately 8 percent of total 2008 Industrial Products revenues. This group consists of beverages, canned goods and perishable food items. Other consumer goods such as cotton, salt, rubber and tires and miscellaneous boxcar shipments are also included in this business area.

**Coal:**

In 2008, the transportation of coal contributed about 23 percent of freight revenues. BNSF is one of the largest transporters of low-sulfur coal in the United States. More than 90 percent of all BNSF's coal tons originated from the Powder River Basin of Wyoming and Montana. These coal shipments were destined for coal-fired electric generating stations located primarily in the North Central, South Central, Southeast, Mountain and Pacific Northwest regions of the United States. BNSF also transports coal from the Powder River Basin to markets in Canada, the eastern United States and Asian markets. Demand for Powder River Basin coal has increased substantially over time due to its relatively low sulfur content, abundant reserves, relatively inexpensive mine production and competitive delivered cost to power plants.

Other BNSF coal shipments originate principally in Colorado, New Mexico and North Dakota. These shipments move to electrical generating stations and industrial plants in the Mountain and North Central regions of the United States and to Mexico.

**Agricultural Products:**

The transportation of Agricultural Products provided approximately 20 percent of 2008 freight revenues. These products include wheat, corn, bulk foods, soybeans, oil seeds and meals, feeds, barley, oats and rye, flour and mill products, milo, oils, specialty grains, malt, ethanol and fertilizer. The BNSF system is strategically located to serve the grain-producing regions of the Midwest and Great Plains. The Company continues to develop and operate a shuttle network for grain and grain products, which allows more efficient use of equipment and improved cycle times. In addition to serving most grain-producing areas, BNSF serves most major terminal, storage, feeding and food-processing locations. Furthermore, BNSF has access to major export markets in the Pacific Northwest, western Great Lakes, Texas Gulf and Mexico.

## Freight Statistics

The following table sets forth certain freight statistics relating to rail operations for the periods indicated. Certain prior period amounts have been adjusted to conform to current year presentation.

| Year ended December 31, | 2008 | 2007 | 2006 |
|---|---|---|---|
| Revenue ton miles (millions)[a] | **664,384** | 657,572 | 647,857 |
| Freight revenue per thousand revenue ton miles | **$ 26.34** | $ 23.34 | $ 22.45 |
| Average length of haul (miles) | **1,090** | 1,079 | 1,071 |

a Revenue ton miles is defined as the product of the number of loaded miles traveled and the weight of the contents.

Revenues, cars/units and average revenue per car/unit information for the three years ended December 31, 2008, is incorporated by reference from a table in Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations, under the heading "Results of Operations; Revenue Table."

## Government Regulation and Legislation

The Company is subject to federal, state and local laws and regulations generally applicable to all businesses. Rail operations are subject to the regulatory jurisdiction of the Surface Transportation Board (STB) of the United States Department of Transportation (DOT), the Federal Railroad Administration of the DOT, the Occupational Safety and Health Administration (OSHA), as well as other federal and state regulatory agencies and Canadian regulatory agencies for operations in Canada. The STB has jurisdiction over disputes and complaints involving certain rates, routes and services, the sale or abandonment of rail lines, applications for line extensions and construction and consolidation or merger with, or acquisition of control of, rail common carriers. The outcome of STB proceedings can affect the profitability of BNSF's business.

DOT and OSHA have jurisdiction under several federal statutes over a number of safety and health aspects of rail operations, including the transportation of hazardous materials. State agencies regulate some aspects of rail operations with respect to health and safety in areas not otherwise preempted by federal law.

BNSF Railway's rail operations, as well as those of its competitors, are also subject to extensive federal, state and local environmental regulation. These laws cover discharges to water, air emissions, toxic substances and the generation, handling, storage, transportation and disposal of waste and hazardous materials. This regulation has the effect of increasing the cost and liabilities associated with rail operations. Environmental risks are also inherent in rail operations, which frequently involve transporting chemicals and other hazardous materials.

Many of BNSF Railway's land holdings are and have been used for industrial or transportation-related purposes or leased to commercial or industrial companies whose activities may have resulted in discharges onto the property. As a result, BNSF Railway is now subject to, and will from time to time continue to be subject to, environmental cleanup and enforcement actions. In particular, the federal Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), also known as the Superfund law, generally imposes joint and several liability for cleanup and enforcement costs on current and former owners and operators of a site, without regard to fault or the legality of the original conduct. Accordingly, BNSF Railway may be responsible under CERCLA and other federal and state statutes for all or part of the costs to clean up sites at which certain substances may have been released by BNSF Railway, its current lessees, former owners or lessees of properties, or other third parties. BNSF Railway may also be subject to claims by third parties for investigation, cleanup, restoration or other environmental costs under environmental statutes or common law with respect to properties they own that have been impacted by BNSF Railway operations. Further discussion is incorporated by reference from Note 10 to the Consolidated Financial Statements.

## Railroad Retirement

Railroad industry personnel are covered by the Railroad Retirement System instead of Social Security. BNSF Railway's contributions under the Railroad Retirement System have been higher than those in industries covered by Social Security. The Railroad Retirement System, funded primarily by payroll taxes on covered employers and employees, includes a benefit roughly equivalent to Social Security (Tier I), an additional benefit similar to that allowed in some private defined-benefit plans (Tier II) and other benefits. For 2008, the Railroad Retirement System required up to a 19.75 percent contribution by railroad employers on eligible wages, while the Social Security and Medicare Acts only required a 7.65 percent contribution on similar wage bases.

## Competition

The business environment in which BNSF Railway operates is highly competitive. Depending on the specific market, deregulated motor carriers and other railroads, as well as river barges, ships and pipelines in certain markets, may exert pressure on price and service levels. The presence of advanced, high service truck lines with expedited delivery, subsidized infrastructure and minimal empty mileage continues to affect the market for non-bulk, time-sensitive freight. The potential expansion of longer combination vehicles could further encroach upon markets traditionally served by railroads. In order to remain competitive, BNSF Railway and other railroads continue to develop and implement operating efficiencies to improve productivity.

As railroads streamline, rationalize and otherwise enhance their franchises, competition among rail carriers intensifies. BNSF Railway's primary rail competitor in the Western region of the United States is the Union Pacific Railroad Company. Other Class I railroads and numerous regional railroads and motor carriers also operate in parts of the same territories served by BNSF Railway.

Based on weekly reporting by the Association of American Railroads, BNSF's share of the western United States rail traffic in 2008 was approximately 49 percent.

# *Item 3. Legal Proceedings*

Beginning May 14, 2007, some 30 similar class action complaints were filed in six federal district courts around the country by rail shippers against BNSF Railway and other Class I railroads alleging that they have conspired to fix fuel surcharges with respect to unregulated freight transportation services in violation of the antitrust laws and seeking injunctive relief and unspecified treble damages. These cases have been consolidated and are currently pending in the federal district court of the District of Columbia for coordinated or consolidated pretrial proceedings. (In re: Rail Freight Fuel Surcharge Antitrust Litigation, MDL No. 1869). Consolidated amended class action complaints were filed against BNSF Railway and three other Class I railroads in April 2008. The Company believes that these claims are without merit and continues to defend against the allegations vigorously. The Company does not believe that the outcome of these proceedings will have a material effect on its financial condition, results of operations or liquidity.

Information concerning certain pending tax-related administrative or adjudicative state proceedings or appeals is incorporated by reference from Note 5 to the Consolidated Financial Statements, and information concerning other claims and litigation is incorporated by reference from Note 10 to the Consolidated Financial Statements.

## *Item 4. Submission of Matters to a Vote of Security Holders*

No matters were submitted by BNSF to a vote of its securities holders during the fourth quarter of 2008.

### Executive Officers of the Registrant

Listed below are the names, ages and positions of all executive officers of BNSF and their business experience during the past five years. Executive officers hold office until their successors are elected or appointed, or until their earlier death, retirement, resignation or removal.

**Matthew K. Rose, 49**
Chairman, President and Chief Executive Officer of BNSF since March 2002.

**Thomas N. Hund, 55**
Executive Vice President and Chief Financial Officer since January 2001.

**Carl R. Ice, 52**
Executive Vice President and Chief Operations Officer since January 2001.

**John P. Lanigan, Jr., 53**
Executive Vice President and Chief Marketing Officer since January 2003.

**Linda Longo-Kazanova, 56**
Vice President–Human Resources and Medical since May 2007. Prior to that, Senior Vice President, Human Resources and Business Optimization for Bell & Howell Company, later named ProQuest Company, from 2000.

**Roger Nober, 44**
Executive Vice President Law and Secretary since January 2007. Prior to that, partner of Steptoe & Johnson LLP, Washington, DC (law firm) from March 2006 and Chairman of the United States Surface Transportation Board from November 2002 – January 2006.

**Peter J. Rickershauser, 60**
Vice President–Network Development since May 1999.

# Part II

## *Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities*

BNSF's common stock is listed on the New York Stock Exchange under the symbol "BNI." Information as to the high and low sales prices of such stock for the two years ended December 31, 2008, and the frequency and amount of dividends declared on such stock during such periods, is set forth in Note 16 to the Consolidated Financial Statements. The approximate number of holders of record of the common stock at February 3, 2009, was 31,000.

### Common Stock Repurchases

The following table presents repurchases by the Company of its common stock for each of the three months for the quarter ended December 31, 2008, (shares in thousands):

**Issuer Purchases of Equity Securities**

| Period | Total Number of Shares Purchased[a] | Average Price Paid Per Share | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs[b] | Maximum Number of Shares That May Yet be Purchased Under the Plans or Programs[b] |
|---|---|---|---|---|
| October 1 – 31 | 601 | $ 80.00 | 600 | 20,471 |
| November 1 – 30 | 2,661 | 83.17 | 2,655 | 17,816 |
| December 1 – 31 | 8 | 74.14 | – | 17,816 |
| Total | 3,270 | $ 82.57 | 3,255 | |

a Total number of shares purchased includes approximately 15 thousand shares where employees delivered already owned shares or used an attestation procedure to satisfy the exercise price of stock options or the withholding of tax payments. Total number of shares purchased does not include approximately 2 thousand shares acquired from employees to satisfy tax withholding obligations that arose on the vesting of restricted stock or the exercise of stock options.

b On July 17, 1997, the Board initially authorized and the Company announced the repurchase of up to 30 million shares of the Company's common stock from time to time in the open market. On December 9, 1999, April 20, 2000, September 21, 2000, January 16, 2003, December 8, 2005 and February 14, 2007, the Board authorized and the Company announced extensions of the BNSF share repurchase program, adding 30 million shares at each date for a total of 210 million shares authorized. The share repurchase program does not have an expiration date.

## *Item 6. Selected Financial Data*

The following financial data should be read in conjunction with Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations" and Item 8, "Financial Statements and Supplementary Data." The table below presents, as of and for the dates indicated, selected historical financial information for the Company (in millions, except per share data).

| December 31, | 2008 | 2007 | 2006 | 2005 | 2004 |
|---|---|---|---|---|---|
| **For the year ended:** | | | | | |
| Revenues | **$ 18,018** | $ 15,802 | $ 14,985 | $ 12,987 | $ 10,946 |
| Operating income | **$ 3,912** | $ 3,486 | $ 3,521 | $ 2,927[a] | $ 1,709[b] |
| Net income | **$ 2,115** | $ 1,829 | $ 1,889 | $ 1,534[a] | $ 805[b] |
| Basic earnings per share | **$ 6.15** | $ 5.19 | $ 5.23 | $ 4.13[a] | $ 2.18[b] |
| Average basic shares | **343.8** | 352.5 | 361.0 | 371.8 | 370.0 |
| Diluted earnings per share | **$ 6.08** | $ 5.10 | $ 5.11 | $ 4.02[a] | $ 2.14[b] |
| Average diluted shares | **347.8** | 358.9 | 369.8 | 381.8 | 376.6 |
| Dividends declared per common share | **$ 1.44** | $ 1.14 | $ 0.90 | $ 0.74 | $ 0.64 |
| **At year end:** | | | | | |
| Total assets | **$ 36,403** | $ 33,583 | $ 31,797 | $ 30,436 | $ 29,023 |
| Long-term debt and commercial paper, including current portion | **$ 9,555** | $ 8,146 | $ 7,385 | $ 7,154 | $ 6,516 |
| Stockholders' equity | **$ 11,131** | $ 11,144 | $ 10,528 | $ 9,638 | $ 9,438 |
| Net debt to total capitalization[c] | **44.5%** | 41.2% | 40.0% | 42.3% | 39.6% |
| **For the year ended:** | | | | | |
| Total capital expenditures | **$ 2,175** | $ 2,248 | $ 2,014 | $ 1,750 | $ 1,527 |
| Depreciation and amortization | **$ 1,397** | $ 1,293 | $ 1,176 | $ 1,111 | $ 1,035 |

a 2005 operating income, net income and earnings per share include an impairment charge related to an agreement to sell certain line segments to the State of New Mexico in the future of $71 million pre-tax, $44 million net of tax, or $0.12 per basic and diluted share. See discussion under Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations, under the heading "New Mexico Department of Transportation."

b 2004 operating income, net income and earnings per share include a charge for a change in estimate of unasserted asbestos and environmental liabilities of $465 million pre-tax, $288 million net of tax, or $0.78 per basic share and $0.77 per diluted share.

c Net debt is calculated as total debt (long-term debt and commercial paper plus long-term debt due within one year) less cash and cash equivalents, and total capitalization is calculated as the sum of net debt and total stockholders' equity.

# *Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations*

Management's discussion and analysis relates to the financial condition and results of operations of Burlington Northern Santa Fe Corporation and its majority-owned subsidiaries (collectively BNSF, Registrant or Company). The principal operating subsidiary of BNSF is the BNSF Railway Company (BNSF Railway) through which BNSF derives substantially all of its revenues. All earnings per share information is stated on a diluted basis. Certain prior period amounts have been adjusted to conform to current year presentation.

## Company Overview

Through its subsidiaries, BNSF is engaged primarily in the freight rail transportation business. BNSF's primary operating subsidiary, BNSF Railway, operates one of the largest North American rail networks with about 32,000 route miles in 28 states and two Canadian provinces. Through its one operating transportation segment, BNSF Railway transports a wide range of products and commodities including Consumer Products, Industrial Products, Coal and Agricultural Products.

Additional operational information, including weekly intermodal and carload unit reports as submitted to the Association of American Railroads (AAR) and annual reports submitted to the Surface Transportation Board (STB), are available on the Company's Web site at www.bnsf.com/investors.

## Executive Summary

### Fiscal Year 2008 — Financial Overview

- The Company achieved earnings of $6.08 per share compared with 2007 earnings of $5.10 per share.
- Freight revenues increased 14 percent to $17.5 billion, which included revenue increases in each of the Company's four business groups.
  - The 14-percent increase in freight revenue includes 10-percent and 6-percent increases attributable to fuel surcharges and prices, respectively, partially offset by a decrease due to lower unit volumes.
- Operating expenses of $14.1 billion for 2008 increased 15 percent compared with 2007, primarily driven by a $1.3 billion, or 39 percent, increase in fuel expenses principally as a result of higher fuel prices.
- Operating income of $3.9 billion for 2008 increased 12 percent or $426 million from 2007.
- Each year capital expenditures are a significant use of cash for BNSF. In 2008, BNSF decreased its cash capital expenditures to $2.18 billion from $2.25 billion in the prior year. BNSF's capital commitments, which include both cash spent for capital and locomotive leases, increased approximately $260 million to $2.85 billion in 2008 due to the following: (i) the acquisition of additional new locomotives, which will enable the Company to take advantage of the significant fuel efficiency, other environmental benefits and the Economic Stimulus Act of 2008, and (ii) capital expenditures associated with significant flooding costs in the Midwest.

### Capital Commitment Outlook for 2009

- The Company's planned capital commitment program for 2009 is approximately $2.7 billion, or about $150 million lower than 2008.
  - BNSF expects to spend $1.9 billion to refresh track, signal systems, structures and freight cars and to upgrade technologies.
  - The Company anticipates acquiring approximately 350 locomotives at a cost of about $675 million.
  - Because of the significant volume declines associated with the economy, the expansion portion of the 2009 capital program is minimal and consists of ongoing work on projects already started.

## Results of Operations

### Revenue Table

The following table presents BNSF's revenue information by business group for the years ended December 31, 2008, 2007 and 2006.

| Year ended December 31, | Revenues (in millions) | | | Cars / Units (in thousands) | | | Average Revenue Per Car / Unit | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2007 | 2006 | 2008 | 2007 | 2006 | 2008 | 2007 | 2006 |
| Consumer products | **$ 6,064** | $ 5,664 | $ 5,613 | **4,818** | 5,149 | 5,520 | **$ 1,259** | $ 1,100 | $ 1,017 |
| Industrial products | **4,028** | 3,684 | 3,589 | **1,598** | 1,664 | 1,686 | **2,521** | 2,214 | 2,129 |
| Coal | **3,970** | 3,279 | 2,916 | **2,516** | 2,472 | 2,458 | **1,578** | 1,326 | 1,186 |
| Agricultural products | **3,441** | 2,722 | 2,427 | **1,062** | 1,033 | 973 | **3,240** | 2,635 | 2,494 |
| Total freight revenues | **17,503** | 15,349 | 14,545 | **9,994** | 10,318 | 10,637 | **$ 1,751** | $ 1,488 | $ 1,367 |
| Other revenues | **515** | 453 | 440 | | | | | | |
| Total operating revenues | **$ 18,018** | $ 15,802 | $ 14,985 | | | | | | |

### Expense Table

The following table presents BNSF's expense information for the years ended December 31, 2008, 2007 and 2006 (in millions):

| Year ended December 31, | 2008 | 2007 | 2006 |
|---|---|---|---|
| Fuel | **$ 4,640** | $ 3,327 | $ 2,856 |
| Compensation and benefits | **3,884** | 3,773 | 3,816 |
| Purchased services | **2,136** | 2,023 | 1,906 |
| Depreciation and amortization | **1,397** | 1,293 | 1,176 |
| Equipment rents | **901** | 942 | 930 |
| Materials and other | **1,148** | 958 | 780 |
| Total operating expenses | **$ 14,106** | $ 12,316 | $ 11,464 |
| Interest expense | **$ 533** | $ 511 | $ 485 |
| Other expense, net | **$ 11** | $ 18 | $ 40 |
| Income tax expense | **$ 1,253** | $ 1,128 | $ 1,107 |

### Year Ended December 31, 2008, Compared with Year Ended December 31, 2007

BNSF recorded net income for 2008 of $2,115 million, or $6.08 per share. In comparison, net income for 2007 was $1,829 million, or $5.10 per share.

Revenues

*Freight*

Freight revenues of $17,503 million for 2008 were $2,154 million, or 14 percent higher than 2007. Freight revenues reflected a 3-percent decrease in unit volumes. Freight revenues included an increase of approximately $1,460 million in fuel surcharges compared with the same 2007 period. Growth in prices and fuel surcharges drove average revenue per car/unit up 18 percent in 2008 to $1,751 from $1,488 in 2007.

*Consumer Products*

The Consumer Products' freight business includes a significant intermodal component and consists of the following three business areas: international intermodal, domestic intermodal and automotive.

Consumer Products revenues of $6,064 million for 2008 were $400 million, or 7 percent greater than 2007. Revenue gains were driven by higher revenue per unit due to increased fuel surcharges and improved yields along with slightly higher domestic traffic, partially offset by lower international and automotive volumes caused by economic softness.



*Industrial Products*

Industrial Products' freight business consists of the following five business areas: construction products, building products, petroleum products, chemicals and plastic products and food and beverages.




Industrial Products revenues increased $344 million, or 9 percent, to $4,028 million for 2008. The 14-percent increase in average revenue per car was mainly the result of higher fuel surcharges and improved yields. Units decreased 4 percent primarily due to a decline in building products resulting from weakness in the housing market, partially offset by increased construction product volumes.

*Coal*

BNSF Railway is one of the largest transporters of low-sulfur coal in the United States. More than 90 percent of all BNSF's coal tons originate from the Powder River Basin of Wyoming and Montana.

Coal revenues of $3,970 million for 2008 rose $691 million, or 21 percent, versus a year ago, due to improved yields, contractual economic escalators, increased fuel surcharges and higher unit volumes. Despite the flooding impact in the Powder River Basin and Midwest during May and June, 2008 was a record year for coal as volumes grew 2 percent. This was driven by continued strong demand for Powder River Basin coal, leading to organic growth of existing customers and new eastern U.S. conversions of power plants to burn Powder River Basin coal.

*Agricultural Products*

The Agricultural Products' freight business transports agricultural products including corn, wheat, soybeans, bulk foods, ethanol, fertilizer and other products.




Agricultural Products revenues of $3,441 million for 2008 were $719 million, or 26 percent higher than revenues for 2007. This increase was primarily due to improved yields, higher fuel surcharges and strong unit volume growth in ethanol, corn and soybeans.

*Other Revenues*

Other revenues increased $62 million, or 14 percent, to $515 million for 2008 compared to 2007. This increase was primarily due to an increase of $40 million, or 21 percent, to $230 million in BNSF Logistics revenues and an increase in demurrage charges. The increase in BNSF Logistics revenues was primarily driven by acquisition activities. BNSF Logistics is a wholly-owned, third-party logistics company.

## Expenses

Total operating expenses for 2008 were $14,106 million, an increase of $1,790 million, or 15 percent over 2007.

*Fuel*

Fuel expense is driven by market price, the level of locomotive consumption of diesel fuel and the effects of hedging activities. Substantially all fuel expense consists of fuel used in locomotives for transportation services. Fuel expense also includes non-locomotive fuel-related costs such as fuel used in vehicles (maintenance of way and other vehicles/equipment), fuel used in refrigerated cars, intermodal facilities' fuel and fuel-based products used in servicing locomotives.

Fuel expenses of $4,640 million for 2008 were $1,313 million, or 39 percent higher than 2007. The increase in fuel expense was primarily due to an increase in the average all-in cost per gallon of locomotive diesel fuel, partially offset by a decline in consumption related to improved fuel efficiency and lower volumes. The average all-in cost per gallon of locomotive diesel fuel increased by 94 cents to $3.16, or $1,330 million, which is comprised of an increase in the average purchase price of 91 cents, or $1,294 million, and a decrease in the hedge benefit of 3 cents, or $36 million (2008 loss of $5 million less 2007 benefit of $31 million). Locomotive fuel consumption in 2008 decreased 27 million gallons to 1,415 million gallons when compared with consumption in 2007, resulting in a $60 million decrease in fuel expense. The remainder of the increase was primarily due to higher non-locomotive fuel prices.

*Compensation and Benefits*

Compensation and benefits includes expenses for BNSF employee wages, health and welfare, payroll taxes and other related items. The primary factors influencing the expenses recorded are volume, headcount, utilization, wage rates, incentives earned during the period, benefit plan participation and pension expenses.

Compensation and benefits expenses of $3,884 million, were $111 million, or 3 percent higher than 2007. Wage inflation and increased incentive compensation costs, which cover all non-union and about one quarter of union employees, were partially offset by improved productivity and lower pension costs. The average number of employees decreased 1 percent compared with 2007.

*Purchased Services*

Purchased services expense includes the following: ramping (lifting of containers onto and off of rail cars); drayage (highway movements to and from railway facilities); maintenance of locomotives, freight cars and equipment; transportation costs over other railroads; technology services outsourcing; professional services; and other contract services provided to BNSF. Purchased services expense also includes purchased transportation costs for BNSF Logistics. The expenses are driven by the rates established in the related contracts and the volume of services required.

Purchased services expenses of $2,136 million for 2008 were $113 million, or 6 percent higher than 2007. Approximately 30 percent of the increase was due to purchased transportation costs for BNSF Logistics, which increased about $30 million to $185 million for 2008. An increase of approximately $30 million in freight car and locomotive contract maintenance expense as well as an increase of approximately $15 million in haulage payments for transportation over other railroads also contributed to the increase.

*Depreciation and Amortization*

Depreciation and amortization expenses for the period are determined by using the group method of depreciation, which applies a single rate to the gross investment in a particular class of property. Due to the capital-intensive nature of BNSF's operations, depreciation expense is a significant component of the Company's operating expenses. The full effect of inflation is not reflected in operating expenses because depreciation is based on historical cost.

Depreciation and amortization expenses of $1,397 million for 2008 were $104 million, or 8 percent higher than 2007. This increase was due to capital expenditures and updated depreciation studies (see discussion under the heading "Critical Accounting Estimates; Depreciation").

*Equipment Rents*

Equipment rents expense includes long-term and short-term payments primarily for locomotives, freight cars, containers and trailers. The expense is driven primarily by volume, lease and rental rates, utilization of equipment and changes in business mix resulting in equipment usage variances.

Equipment rents expenses for 2008 of $901 million were $41 million, or 4 percent lower than 2007, due to lower volumes and improved car velocity.

*Materials and Other*

Material expenses consist mainly of the costs involved to purchase mechanical and engineering materials, in addition to other items for maintenance of property and equipment. Other expenses principally include personal injury claims, environmental remediation and derailments as well as utilities, impairments of long-lived assets, locomotive overhauls, property and miscellaneous taxes and employee separation costs. The total is offset by gains on land sales and insurance recoveries.

Materials and other expenses of $1,148 million for 2008, which consisted of approximately $340 million of materials expense with the remainder consisting of numerous other items, were $190 million, or 20 percent higher than 2007. The increase was primarily due to (i) $125 million in higher environmental costs; (ii) a reduction in gains on land sales of about $20 million; (iii) higher derailment costs of about $20 million; and (iv) about $20 million higher property and other miscellaneous taxes.

*Interest Expense*

Interest expense of $533 million for 2008 was $22 million, or 4 percent higher than 2007. This increase was primarily the result of a higher average debt balance, partially offset by the interest associated with a favorable tax settlement.

*Income Taxes*

The effective rate in 2008 was 37.2 percent compared with 38.2 percent for the prior year. The decrease in the effective tax rate primarily reflects a favorable tax settlement.

**Year Ended December 31, 2007, Compared with Year Ended December 31, 2006**

BNSF recorded net income for 2007 of $1,829 million, or $5.10 per share. In comparison, net income for 2006 was $1,889 million, or $5.11 per share.

## Revenues

### *Freight*

Freight revenues of $15,349 million for 2007 were $804 million, or 6 percent higher than 2006. Freight revenues reflected a 3-percent decrease in unit volumes. Freight revenues included an increase of approximately $150 million in fuel surcharges compared with the same 2006 period. Growth in prices and fuel surcharges drove average revenue per car/unit up 9 percent in 2007 to $1,488 from $1,367 in 2006.

### *Consumer Products*

Consumer Products revenues of $5,664 million for 2007 were $51 million, or 1 percent higher than 2006. Higher revenue per unit due to improved yields and fuel surcharges was partially offset by lower volumes related to economic softness as well as reduced trans-pacific service of a large international customer.




### *Industrial Products*

Industrial Products revenues increased $95 million, or 3 percent, to $3,684 million for 2007, while unit volumes declined 1 percent. The 4-percent increase in average revenue per car was mainly the result of price increases. Units decreased 1 percent primarily due to a decline in building products as a result of weakness in the housing market, partially offset by increased petroleum products and chemicals and plastics volumes.




### *Coal*

Coal revenues of $3,279 million for 2007 increased $363 million, or 12 percent, versus a year ago due to improved yields, contractual inflation escalators, increased tons per unit and fuel surcharges. Coal unit volumes increased 1 percent despite mine production and weather-related issues.

### *Agricultural Products*

Agricultural Products revenues of $2,722 million for 2007 were $295 million, or 12 percent higher than revenues for 2006. This increase was primarily due to strong volume growth, favorable mix of business and price increases with the strongest revenue growth in wheat, soybeans, bulk foods, ethanol and fertilizer.




### *Other Revenues*

Other revenues increased $13 million, or 3 percent, to $453 million for 2007 compared to 2006. This increase was primarily due to volume growth of BNSF Logistics, an indirect, wholly-owned non-rail subsidiary that specializes in providing third-party logistics and transportation services.

## Expenses

Total operating expenses for 2007 were $12,316 million, an increase of $852 million, or 7 percent over 2006.

### *Fuel*

Fuel expenses of $3,327 million for 2007 were $471 million, or 16 percent higher than 2006. The increase in fuel expense was primarily due to an increase in the average all-in cost per gallon of locomotive diesel fuel, partially offset by a decline in consumption related to improved fuel efficiency. The average all-in cost per gallon of locomotive diesel fuel increased by 37 cents to $2.22, or $538 million, which is comprised of an increase in the average purchase price of 16 cents, or $228 million, and a decrease in the hedge benefit of 21 cents, or $310 million (2007 benefit of $31 million less 2006 benefit of $341 million). Locomotive fuel consumption in 2007 decreased 36 million gallons to 1,442 million gallons when compared with consumption in the same 2006 period, resulting in a $75 million decrease in fuel expense. The remainder of the increase was primarily due to higher non-locomotive fuel prices.

### *Compensation and Benefits*

Compensation and benefits expenses of $3,773 million were $43 million, or 1 percent lower than 2006, on flat employee headcount. Wages and benefit increases were offset by lower incentive compensation costs and other cost controls.

*Purchased Services*

Purchased services expenses of $2,023 million for 2007 were $117 million, or 6 percent higher than 2006. Beyond general inflation, the largest drivers of this increase were (i) $25 million in haulage payments for transportation over other railroads, principally due to a new southeast intermodal agreement; (ii) $20 million in purchased transportation costs for BNSF Logistics; (iii) $10 million in locomotive maintenance costs; and (iv) $10 million in ramping costs (lifting of containers onto and off of cars).

*Depreciation and Amortization*

Depreciation and amortization expenses of $1,293 million for 2007 were $117 million, or 10 percent higher than 2006. This increase was primarily due to continuing capital expenditures as well as updated depreciation rates for locomotives (see discussion under the heading "Critical Accounting Estimates; Depreciation").

*Equipment Rents*

Equipment rents expenses for 2007 of $942 million were $12 million, or 1 percent higher than 2006, on a 3-percent decline in unit volumes. The variance represents an increase in locomotive lease expense, partially offset by a decrease in freight car equipment expense due to the impact of the Company's privatization efforts, lower volumes and velocity improvements for freight car equipment.

*Materials and Other*

Materials and other expenses of $958 million for 2007, which consisted of approximately $320 million of materials expense with the remainder consisting of numerous other items, were $178 million, or 23 percent higher than 2006. The increase was primarily due to increases of approximately (i) $65 million and $16 million first quarter environmental and technology charge, respectively; (ii) $40 million in environmental remediation developments; (iii) $18 million due largely to rising costs for materials for locomotives, freight cars and track structure; and (iv) about $20 million in crew transportation costs principally due to increased fuel and insurance-related costs as well as increased usage due to adverse weather. In addition, a $22 million gain from a line sale to the State of New Mexico was recorded in 2006 (see discussion under the heading "Other Matters; New Mexico Department of Transportation").

*Interest Expense*

Interest expense of $511 million for 2007 was $26 million, or 5 percent higher than 2006. This increase was primarily the result of a higher average debt balance, partially offset by lower average rates.

*Income Taxes*

The effective rate in 2007 was 38.2 percent compared with 36.9 percent for the prior year. The increase in the effective tax rate primarily reflects income tax adjustments that favorably impacted income tax expense in 2006 as compared with 2007.

## Liquidity and Capital Resources

Liquidity is a company's ability to generate cash flows to satisfy current and future obligations. Cash generated from operations is BNSF's principal source of liquidity. BNSF generally funds any additional liquidity requirements through debt issuance, including commercial paper, through leasing of assets and through the sale of a portion of its accounts receivable.

**Operating Activities**

2008

Net cash provided by operating activities was $3,977 million during 2008 compared with $3,492 million during 2007. The increase was primarily the result of an increase in earnings before depreciation and amortization expense.

2007

Net cash provided by operating activities was $3,492 million during 2007 compared with $3,189 million during 2006. The increase was primarily the result of an increase in earnings before depreciation and amortization expense, higher environmental accruals in 2007 and higher contributions to the pension plan in 2006.

**Investing Activities**

2008

Net cash used for investing activities was $3,073 million during 2008 compared with $2,415 million during 2007. The increase in cash used for investing activities primarily reflects an increase in equipment acquired in 2008 that was not sold and leased back in the same year as it was acquired, as was the case in the prior year. This was partially offset by a decrease in cash capital expenditures. Investing activities for the year included $2,175 million of capital expenditures, which were $73 million lower than 2007.

2007

Net cash used for investing activities was $2,415 million during 2007 compared with $2,167 million during 2006. Investing activities for the year included $2,248 million of capital expenditures, which were $234 million higher than 2006 primarily due to an increase in replacement capital expenditures related to track structure and terminal and line expansions.

A breakdown of cash capital expenditures during 2008, 2007 and 2006 is set forth in the following table (in millions):

| Year ended December 31, | 2008 | 2007 | 2006 |
|---|---|---|---|
| Engineering: | | | |
| Rail | **$ 429** | $ 376 | $ 304 |
| Ties | **358** | 316 | 311 |
| Surfacing | **230** | 235 | 214 |
| Other[a] | **544** | 432 | 397 |
| Total engineering | **1,561** | 1,359 | 1,226 |
| Mechanical | **168** | 141 | 152 |
| Other | **133** | 105 | 121 |
| Total replacement capital | **1,862** | 1,605 | 1,499 |
| Information services | **83** | 75 | 65 |
| New locomotive and freight car acquisitions | **8** | – | – |
| Terminal and line expansion | **222** | 568 | 450 |
| Total | **$ 2,175** | $ 2,248 | $ 2,014 |

a Other primarily includes signals, bridges, structures and other right of way improvements.

The table above does not include expenditures for equipment financed through operating or capital leases (principally related to rolling stock).

**Financing Activities**

2008

Net cash used for financing activities during 2008 was $601 million, primarily related to common stock repurchases of $1,147 million, including $60 million to satisfy tax withholding obligations for stock option exercises, and dividend payments of $471 million, which were partially offset by net debt borrowings of $772 million, excess tax benefits from equity compensation plans of $96 million, proceeds from stock options exercised of $91 million and proceeds from a facility financing obligation of $68 million.

Aggregate debt to mature in 2009, excluding commercial paper, is $456 million. BNSF's ratio of net debt to total capitalization was 44.5 percent at December 31, 2008, compared with 41.2 percent at December 31, 2007. The Company's adjusted net debt to total capitalization was 54.7 percent at December 31, 2008, compared with 53.4 percent at December 31, 2007. BNSF's adjusted net debt to total capitalization is a non-GAAP measure and should be considered in addition to, but not as a substitute or preferable to, the information prepared in accordance with GAAP. However, management believes that adjusted net debt to total capitalization provides meaningful additional information about the ability of BNSF to service long-term debt and other fixed obligations and to fund future growth.

The following table presents a reconciliation of the calculation of adjusted net debt to total capitalization percentage:

| December 31, | 2008 | 2007 |
|---|---|---|
| Net debt to total capitalization[a] | **44.5%** | 41.2% |
| Adjustment for long-term operating leases and other debt equivalents[b] | **9.7** | 12.6 |
| Adjustment for unfunded pension and retiree health and welfare liability | **1.5** | 0.7 |
| Adjustment for junior subordinated notes[c] | **(1.0)** | (1.1) |
| Adjusted net debt to total capitalization | **54.7%** | 53.4% |

a Net debt to total capitalization is calculated as total debt (long-term debt and commercial paper plus long-term debt due within one year) less cash and cash equivalents divided by the sum of net debt and total stockholders' equity.

b Primarily represents an adjustment for the net present value of future operating lease commitments.

c Junior subordinated notes are included in total debt on the respective Consolidated Balance Sheets; however, as they include certain equity characteristics, they have been assigned 50 percent equity credit for purposes of this calculation.

In November 2008, BNSF issued $500 million of 7.00 percent notes due February 1, 2014. The net proceeds from the sale of the notes are being used for general corporate purposes which may include, but are not limited to, working capital, capital expenditures, repurchase of common stock pursuant to the share repurchase program and repayment of short-term borrowings.

In March 2008, BNSF issued $650 million of 5.75 percent notes due March 15, 2018. The net proceeds from the sale of the notes are being used for general corporate purposes including, but not limited to, working capital, capital expenditures, funding debt which matured in 2008, repurchase of common stock pursuant to the share repurchase program and repayment of short-term borrowings.

At December 31, 2008, $500 million remained authorized to be issued by the Board of Directors through the Securities and Exchange Commission (SEC) debt shelf registration process. In February 2009, the Board of Directors authorized an additional $1.0 billion of debt securities that may be issued through the SEC debt shelf registration process, for a total of $1.5 billion authorized to be issued.

In 2008, BNSF entered into a capital lease for approximately $158 million to finance locomotives and freight cars. The term of the lease is 20 years. Additionally, BNSF entered into capital leases totaling $100 million to finance maintenance of way and other vehicles/equipment with lease terms of three to seven years.

In 2005, the Company commenced the construction of an intermodal facility that it intends to sell to a third party and subsequently lease back. Once construction of the facility is complete and all improvements have been sold to the third party, BNSF will lease the facility from the third party for 20 years. Construction is expected to be completed by mid-2009 with an approximate cost of $160 million. As of December 31, 2008, BNSF has sold $109 million of completed improvements. This sale leaseback transaction is being accounted for as a financing obligation due to continuing involvement. The outflows from the construction of the facility are classified as investing activities, and the inflows from the associated financing proceeds are classified as financing activities in the Company's Consolidated Statements of Cash Flows.

2007

Net cash used for financing activities during 2007 was $1,122 million, primarily related to common stock repurchases of $1,265 million, including $43 million to satisfy tax withholding obligations for stock option exercises, and dividend payments of $380 million, which were partially offset by net debt borrowings of $234 million, proceeds from stock options exercised of $142 million, excess tax benefits from equity compensation plans of $121 million and proceeds from a facility financing obligation of $41 million.

In April 2007, BNSF issued $650 million of 5.65 percent debentures and $650 million of 6.15 percent debentures due May 1, 2017 and May 1, 2037, respectively. The net proceeds from the sale of the debentures are being used for general corporate purposes including, but not limited to, working capital, capital expenditures, funding the maturity of debt which matured in 2007, the repayment of commercial paper and the repurchase of common stock.

In 2007, BNSF entered into several capital leases totaling approximately $325 million to finance locomotives and freight cars. The terms of the leases are between 15 and 20 years. Additionally, BNSF entered into capital leases totaling $119 million to finance maintenance of way and other vehicles/equipment with lease terms of three to seven years.

2006

Net cash used for financing activities during 2006 was $722 million, primarily related to common stock repurchases of $730 million and dividend payments of $310 million, which were partially offset by net debt borrowings of $116 million, proceeds from stock options exercised of $116 million and excess tax benefits from equity compensation plans of $95 million. Upon adoption of Statement of Financial Accounting Standards (SFAS) No. 123R, the excess tax benefits from equity compensation plans were classified in financing activities. However, as the Company adopted SFAS No. 123R prospectively, financial statements prior to January 1, 2006, include excess tax benefits as an operating activity.

In August 2006, BNSF issued $300 million of 6.20 percent debentures due August 15, 2036. The net proceeds from the sale of the debentures are being used for general corporate purposes including but not limited to working capital, capital expenditures and the repayment of outstanding commercial paper. See Note 3 to the Consolidated Financial Statements for information related to the hedges unwound as part of this debt issuance.

In 2006, BNSF entered into several capital leases totaling $108 million to finance maintenance of way and other vehicles/equipment with lease terms of three to seven years.

**Dividends**

Common stock dividends declared were $1.44, $1.14 and $0.90 per share annually for 2008, 2007 and 2006, respectively. Dividends paid on common stock were $471 million, $380 million and $310 million during 2008, 2007 and 2006, respectively. On October 23, 2008, the Board declared a quarterly dividend of $0.40 per share on outstanding shares of common stock, payable January 2, 2009, to shareholders of record on December 12, 2008. On February 13, 2009, the Board declared a quarterly dividend of $0.40 per share on outstanding shares of common stock, payable April 1, 2009, to shareholders of record on March 11, 2009.

**Share Repurchase Program**

During 2008, 2007 and 2006, the Company repurchased approximately 12 million, 15 million and 18 million shares, respectively, of its common stock at average prices of $92.96 per share, $83.96 per share and $73.43 per share, respectively. Further information on this repurchase program is incorporated by reference from Note 15 to the Consolidated Financial Statements.

In February 2007, the Board authorized the extension of the current BNSF share repurchase program, adding 30 million shares to the total of 180 million shares previously authorized in equal amounts in July 1997, December 1999, April 2000, September 2000, January 2003 and December 2005.

**Long-Term Debt and Other Obligations**

The Company's business is capital intensive. BNSF has historically generated a significant amount of cash from operating activities, which it uses to fund capital additions, service debt, repurchase shares and pay dividends. Additionally, the Company relies on access to the debt and leasing markets to finance a portion of capital additions on a long-term basis.

During 2008, BNSF agreed to acquire an additional 220 locomotives, bringing its total commitment to 1,245 new locomotives to be acquired by 2013. As of December 31, 2008, BNSF had taken delivery of 377 of the 1,245 locomotives, all of which were delivered in 2008.

Under an agreement entered into in 2006, as amended, BNSF has remaining railcar purchase obligations for 253 double-stack cars, 381 covered hopper cars, and 152 autorack cars through 2010.

The locomotives and freight cars under these agreements have been or are expected to be financed from one or a combination of sources including, but not limited to, cash from operations, capital or operating leases and debt issuances. The decision on the method used for a particular acquisition financing will depend on market conditions and other factors at that time.

The Company's ratio of earnings to fixed charges was 5.04 and 4.62 times for the years ended December 31, 2008 and 2007, respectively. Additionally, the Company's ratio of net cash provided by operating activities divided by total average debt was 46 percent and 44 percent for the years ended December 31, 2008 and 2007, respectively. The increase in the ratio of net cash provided by operating activities divided by total average debt was primarily due to increased earnings.

The following table summarizes the Company's obligations under long-term debt and other contractual commitments at December 31, 2008 (in millions):

| | Payments Due by Period | | | | |
|---|---|---|---|---|---|
| **Contractual Obligations** | **Total** | **Less than 1 year** | **1–3 years** | **3–5 years** | **More than 5 years** |
| Long-term debt[a] | $ 8,312 | $ 256 | $ 812 | $ 763 | $ 6,481 |
| Capital lease obligations | 1,281 | 200 | 427 | 181 | 473 |
| Interest payments[b] | 8,590 | 544 | 1,075 | 953 | 6,018 |
| Operating lease obligations[c] | 6,980 | 620 | 1,247 | 1,062 | 4,051 |
| Purchase obligations[d] | 12,147 | 3,141 | 2,648 | 1,800 | 4,558 |
| Other long-term liabilities reflected on the balance sheet under GAAP[e] | 989 | 130 | 314 | 416 | 129 |
| Total contractual obligations | $ 38,299 | $ 4,891 | $ 6,523 | $ 5,175 | $ 21,710 |

a Excludes capital lease obligations. BNSF has included maturities of $100 million of commercial paper in the 3-5 years column above. Also includes a net fair value interest rate hedge benefit of $73 million. See Note 9 to the Consolidated Financial Statements.

b Interest payments relate to fixed-rate long-term debt and capital lease obligations and exclude the impact of any interest-rate hedging activities (see Note 3 to the Consolidated Financial Statements for additional information). Additionally, the Company's only variable-rate debt is commercial paper, which expires within 90 days; therefore, the related interest has been excluded from the table above.

c Gross payments due, which includes an interest component.

d Includes short-line minimum usage commitments, asset maintenance and other purchase commitments.

e Consists of employee separation payments as discussed in Note 11 to the Consolidated Financial Statements, actuarially estimated required payments from BNSF expected to be made over the next five years for the pension plans and the retiree health and welfare plan and estimated future cash flows for income tax liabilities and interest accrued related to unrecognized tax benefits as discussed in Note 5 to the Consolidated Financial Statements.

In the normal course of business, the Company enters into long-term contracts for future goods and services needed for the operations of the business. Such commitments are not in excess of expected requirements and are not reasonably likely to result in performance penalties or payments that would have a material adverse effect on the Company's liquidity.

**Credit Agreement**

Commercial paper and the revolving credit agreement are discussed in Note 9 to the Consolidated Financial Statements. The $1.2 billion revolving credit agreement includes covenants and events of default typical for this type of facility, including a maximum debt-to-capital test and a $75 million cross-default provision. At December 31, 2008, there were no bank borrowings against the revolving credit agreements, and the Company was in compliance with its debt covenants. BNSF's maximum debt-to-capital test provides approximately $6 billion of debt capacity above BNSF's outstanding debt as of December 31, 2008, before an event of default would occur under these covenants. With the exception of a voluntary bankruptcy or insolvency, any event of default has either or both a cure period or notice requirement before termination of the agreement. A voluntary bankruptcy or insolvency would be considered an immediate termination event.

**Market Conditions**

In spite of the current volatility, the Company believes it will have access to the capital markets and external sources of funds through debt issuance, including secured and unsecured markets, commercial paper, leasing of assets and the sale of a portion of its accounts receivable, as required to maintain liquidity. Additionally, while the Company has seen a reduction in volumes in its economically sensitive business sectors such as housing and consumer, it has a diverse customer base. The Company has not seen a material increase in aging or defaults but is monitoring several significant customers due to adverse credit-ratings. See further discussion of funding sources throughout Management's Discussion and Analysis of Financial Condition and Results of Operations.

BNSF's fuel and interest rate hedging programs, revolving credit facility and accounts receivable sales program involve relationships with high-quality counterparties with credit ratings of A or higher as of December 31, 2008. As a requirement of certain leasing arrangements, BNSF has approximately $359 million in deposits with various high-quality banks that will be used to make future capital lease payments. These banks had a credit rating of A or higher as of December 31, 2008. On an ongoing basis, BNSF monitors the credit ratings of its various counterparties.

Recently, BNSF's pension plan has suffered losses associated with the general market downturn which may ultimately impact the timing and/or increase the amount of BNSF's future cash contributions. BNSF's plan investments are broadly diversified, and despite the recent downturn, BNSF does not anticipate this will have a significant impact on its ability to fund its future pension plan obligations.

## Off-Balance Sheet Arrangements

**Sale of Accounts Receivable**

The accounts receivable sales program of Santa Fe Receivables Corporation, as described in Note 6 to the Consolidated Financial Statements, includes thresholds for dilution, delinquency and write-off ratios that, if exceeded, allow the investors participating in this program, at their option, to cancel the program. These provisions include a maximum debt-to-capital test, which is the same as in the BNSF revolving credit agreements described above. BNSF's maximum debt-to-capital test provides approximately $6 billion of debt capacity above BNSF's outstanding debt as of December 31, 2008. At December 31, 2008, the Company's capacity to sell undivided interests to investors under the accounts receivable sales program was $700 million, which was comprised of two $175 million, 364-day accounts receivable sales facilities and two $175 million, 3-year accounts receivable sales facilities. BNSF Railway extended the maturity date of one 364-day facility to November 2009 and extended the maturity date of the other 364-day facility to March 2009, at which time the Company expects to extend it to November 2009. The two 3-year facilities were entered into in November 2007 and will mature in November 2010. Outstanding undivided interests held by investors under the accounts receivable sales program were $50 million and $300 million at December 31, 2008 and December 31, 2007, respectively. Management expects to be able to either extend the commitment of the current investors under the 364-day facilities past November 2009 or to find additional investors in the accounts receivable sales program who will commit to purchase undivided interests after November 2009.

The accounts receivable sales program provides efficient financing at a competitive interest rate as compared with traditional borrowing arrangements and provides diversification of funding sources. Since the funding is collateralized by BNSF receivables, the risk of exposure is only as great as the risk of default on these receivables (see Note 6 to the Consolidated Financial Statements for additional information).

**Guarantees**

The Company acts as guarantor for certain debt and lease obligations. During the past several years, the Company has primarily utilized guarantees to allow third-party entities to obtain favorable terms to finance the construction of assets that will benefit the Company. Additionally, in the ordinary course of business, BNSF enters into agreements with third parties that include indemnification clauses. The Company does not expect performance under these guarantees or indemnities to have a material adverse effect on the Company's liquidity in the foreseeable future (see Note 9 to the Consolidated Financial Statements for additional information).

## Inflation

Due to the capital-intensive nature of BNSF's business, the full effect of inflation is not reflected in operating expenses because depreciation is based on historical cost. An assumption that all operating assets were depreciated at current price levels would result in substantially greater expense than historically reported amounts.

## Other Matters

### Hedging Activities

The Company uses derivatives to hedge against increases in diesel fuel prices and interest rates as well as to convert a portion of its fixed-rate long-term debt to floating-rate debt. The Company does not hold or issue derivative financial instruments for trading or speculative purposes. The Company formally documents the relationship between the hedging instrument and the hedged item, as well as the risk management objective and strategy for the use of the hedging instrument. This documentation includes linking the derivatives that are designated as fair value or cash flow hedges to specific assets or liabilities on the balance sheet, commitments or forecasted transactions. The Company assesses at the time a derivative contract is entered into, and at least quarterly thereafter, whether the derivative item is effective in offsetting the changes in fair value or cash flows. Any change in fair value resulting from ineffectiveness, as defined by SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities, as amended,* is recognized in current period earnings. For derivative instruments that are designated and qualify as cash flow hedges, the effective portion of the gain or loss on the derivative instrument is recorded in accumulated other comprehensive loss (AOCL) as a separate component of stockholders' equity and reclassified into earnings in the period during which the hedge transaction affects earnings. Cash flows related to fuel and interest rate hedges are classified as operating activities in the Consolidated Statements of Cash Flows.

BNSF monitors its hedging positions and credit ratings of its counterparties and does not anticipate losses due to counterparty nonperformance. As of December 31, 2008, BNSF's counterparties have credit ratings of A or higher.

#### Fuel

BNSF measures the fair value of fuel hedges from data provided by various external counterparties. The Company uses the forward commodity price for the periods hedged to value its fuel-hedge swaps and costless collars. This methodology is a market approach, which under SFAS No. 157, *Fair Value Measurements*, utilizes Level 2 inputs as it uses market data for similar instruments in active markets. Certain of the Company's fuel-hedge instruments are covered by an agreement which includes a provision such that the Company either receives or posts collateral if the position of the instruments exceeds a certain net asset or net liability threshold, respectively. Further information on BNSF's fuel hedging program is incorporated by reference from Note 3 to the Consolidated Financial Statements.

#### Interest Rate

From time to time, the Company enters into various interest rate hedging transactions for the purpose of managing exposure to fluctuations in interest rates by establishing rates in anticipation of both future debt issuances and the refinancing of leveraged leases, as well as converting a portion of its fixed-rate long-term debt to floating-rate debt. The Company uses interest rate swaps and treasury locks as part of its interest rate risk management strategy.

BNSF's measurement of the fair value of interest rate derivatives is based on estimates of the mid-market values for the transactions provided by the counterparties to these agreements. This methodology is a market approach, which under SFAS No. 157 utilizes Level 2 inputs as it uses market data for similar instruments in active markets. Further information on BNSF's interest hedging program is incorporated by reference from Note 3 to the Consolidated Financial Statements.

### Employee and Labor Relations

A significant majority of BNSF Railway's employees are union-represented. Final agreements have been reached in the most recent bargaining round covering 100 percent of BNSF's unionized workforce. These agreements resolve all wage, work rule and benefit issues through December 31, 2009, and will remain in effect until new agreements are reached or the Railway Labor Act's procedures (which include mediation, cooling-off periods and the possibility of U.S. Presidential intervention) are exhausted.

### Seattle Sound Transit

In December 2003, BNSF Railway Company entered into several agreements with Central Puget Sound Regional Transit Authority (Sound Transit), a government authority established by King, Pierce and Snohomish counties within the State of Washington. BNSF has agreed to sell to Sound Transit, under the threat of condemnation, four easements enabling Sound Transit to offer commuter rail service over existing BNSF track from Seattle to Everett.

Sound Transit agreed to pay BNSF approximately $260 million for four commuter easements to operate trains on the segment between Seattle and Everett and entered into agreements both for service on the commuter easements and joint use of track for commuter and freight purposes. The sale proceeds were received between 2003 and 2007 and will be recognized in income over the average life of the associated track structure (approximately 37 years).

**New Mexico Department of Transportation**

In the fourth quarter of 2005, BNSF Railway Company entered into agreements with the New Mexico Department of Transportation to sell the Company's rail line and certain adjacent property between Belen, New Mexico and Trinidad, Colorado for $75 million, through a series of sales agreements, while retaining freight easement rights on the line. The Company recognized an impairment charge in 2005 related to this agreement of $71 million. To date, the Company has closed on two of the four line segments and recognized gains of $22 million. The third and fourth line segments are expected to close in 2009 and any related gain will be immaterial. The impairment charge and the gains were recorded as a component of materials and other expense.

**American Jobs Creation Act of 2004**

In October 2004, the American Jobs Creation Act of 2004 was signed into law. Part of the legislation includes the repeal of a 4.3–cent tax per gallon of diesel fuel. The tax was gradually phased out in 2005 and 2006 and was completely phased out January 1, 2007. Based on actual fuel consumption, the repeal of the tax resulted in $32 million and $8 million in incremental savings for the years ended December 31, 2007 and 2006, respectively, with no impact to the year ended December 31, 2008.

## Critical Accounting Estimates

In the ordinary course of business, the Company makes a number of estimates and assumptions related to the reporting of results of operations and financial position in the preparation of its financial statements in conformity with accounting principles generally accepted in the United States of America. Actual results could differ significantly from those estimates under different assumptions and conditions. The following discussion addresses the Company's most critical accounting estimates.

Management has discussed the development and selection of the critical accounting estimates described below with the Audit Committee of the Board of Directors, and the Audit Committee has reviewed the Company's disclosure relating to them in this Management's Discussion and Analysis of Financial Condition and Results of Operations.

**Legal**

The most significant estimates using management's judgment for legal claims are made with respect to personal injury claims and environmental matters. These matters are discussed in more detail below.

### Personal Injury

Personal injury claims, including asbestos claims and employee work-related injuries and third-party injuries (collectively, other personal injury), are a significant expense for the railroad industry. Personal injury claims by BNSF Railway employees are subject to the provisions of the Federal Employers' Liability Act (FELA) rather than state workers' compensation laws. FELA's system of requiring the finding of fault, coupled with unscheduled awards and reliance on the jury system, contributed to increased expenses in past years. Other proceedings include claims by non-employees for punitive as well as compensatory damages. A few proceedings purport to be class actions. The variability present in settling these claims, including non-employee personal injury and matters in which punitive damages are alleged, could result in increased expenses in future years. BNSF has implemented a number of safety programs designed to reduce the number of personal injuries as well as the associated claims and personal injury expense.

BNSF records a liability for personal injury claims when the expected loss is both probable and reasonably estimable. The liability and ultimate expense projections are estimated using standard actuarial methodologies. Liabilities recorded for unasserted personal injury claims are based on information currently available. Due to the inherent uncertainty involved in projecting future events such as the number of claims filed each year, developments in judicial and legislative standards and the average costs to settle projected claims, actual costs may differ from amounts recorded. Expense accruals and any required adjustments are classified as materials and other in the Consolidated Statements of Income.

*Asbestos*

The Company is party to a number of personal injury claims by employees and non-employees who may have been exposed to asbestos. The heaviest exposure for BNSF employees was due to work conducted in and around the use of steam locomotive engines that were phased out between the years of 1950 and 1967. However, other types of exposures, including exposure from locomotive component parts and building materials, continued after 1967 until they were substantially eliminated at BNSF by 1985.

BNSF assesses its unasserted liability exposure on an annual basis during the third quarter. BNSF determines its asbestos liability by estimating its exposed population, the number of claims likely to be filed, the number of claims that will likely require payment and the estimated cost per claim. Estimated filing and dismissal rates and average cost per claim are determined utilizing recent claim data and trends.

Key elements of the assessment include:

- Because BNSF did not have detailed employment records in order to compute the population of potentially exposed employees, it computed an estimate using Company employee data from 1970 forward and estimated the BNSF employee base from 1938-1969 using railroad industry historical census data and estimating BNSF's representation in the total railroad population.
- The projected incidence of disease was estimated based on epidemiological studies using employees' age, duration and intensity of exposure while employed.
- An estimate of the future anticipated claims filing rate by type of disease (non-malignant, cancer and mesothelioma) was computed using the Company's average historical claim filing rates for the period 2004-2006.
- An estimate of the future anticipated dismissal rate by type of claim was computed using the Company's historical average dismissal rates observed in 2005-2007.
- An estimate of the future anticipated settlement by type of disease was computed using the Company's historical average of dollars paid per claim for pending and future claims using the average settlement by type of incidence observed during 2005-2007.

From these assumptions, BNSF projected the incidence of each type of disease to the estimated population to arrive at an estimate of the total number of employees that could potentially assert a claim. Historical claim filing rates were applied for each type of disease to the total number of employees that could potentially assert a claim to determine the total number of anticipated claim filings by disease type. Historical dismissal rates, which represent claims that are closed without payment, were then applied to calculate the number of future claims by disease type that would likely require payment by the Company. Finally, the number of such claims was multiplied by the average settlement value to estimate BNSF's future liability for unasserted asbestos claims.

The most sensitive assumptions for this accrual are the estimated future filing rates and estimated average claim values. Asbestos claim filings are typically sporadic and may include large batches of claims solicited by law firms. To reflect these factors, BNSF used a multi-year calibration period (i.e., the average historical filing rate for the period 2004-2006) because it believed it would be most representative of its future claim experience. In addition, for non-malignant claims, the number of future claims to be filed against BNSF declines at a rate consistent with both mortality and age as there is a decreasing propensity to file a claim as the population ages. BNSF believes the average claim values by type of disease from the historical period 2005-2007 are most representative of future claim values. Non-malignant claims, which represent approximately 90 percent of the total number and 75 percent of the cost of estimated future asbestos claims, were priced by age of the projected claimants. Historically, the ultimate settlement value of these types of claims is most sensitive to the age of the claimant. A 10-percent increase or decrease in either the forecasted number of unasserted claims or the average claim values would result in an approximate $20 million increase or decrease in the liability recorded for unasserted asbestos claims.

Further discussion on asbestos is incorporated by reference from Note 10 to the Consolidated Financial Statements.

*Other Personal Injury*

BNSF estimates its other personal injury liability claims and expense quarterly based on the covered population, activity levels and trends in frequency and the costs of covered injuries. Estimates include unasserted claims except for certain repetitive stress and other occupational trauma claims that allegedly result from prolonged repeated events or exposure. Such claims are estimated on an as-reported basis because the Company cannot estimate the range of reasonably possible loss due to other non-work related contributing causes of such injuries and the fact that continued exposure is required for the potential injury to manifest itself as a claim. BNSF has not experienced any significant adverse trends related to these types of claims in recent years.

Key elements of the actuarial assessment include:

- Size and demographics (employee age and craft) of the workforce.
- Activity levels (manhours by employee craft and carloadings).
- Expected claim frequency rates by type of claim (employee FELA or third-party liability) based on historical claim frequency trends.
- Expected dismissal rates by type of claim based on historical dismissal rates.
- Expected average paid amounts by type of claim for open and incurred but not reported claims that eventually close with payment.

From these assumptions, BNSF estimates the number of open claims by accident year that will likely require payment by the Company. The projected number of open claims by accident year that will require payment is multiplied by the expected average cost per claim by accident year and type to determine BNSF's estimated liability for all asserted claims. Additionally, BNSF estimates the number of its incurred but not reported claims that will likely result in payment based upon historical emergence patterns by type of claim. The estimated number of projected claims by accident year requiring payment is multiplied by the expected average cost per claim by accident year and type to determine BNSF's estimated liability for incurred but not reported claims.

The most sensitive assumptions for this accrual are the expected average cost per claim and the projected frequency rates for the number of claims that will ultimately result in payment. A 10-percent increase or decrease in either the expected average cost per claim or the frequency rate for claims with payment would result in an approximate $45 million increase or decrease in BNSF's recorded other personal injury reserves.

Further discussion on other personal injury is incorporated by reference from Note 10 to the Consolidated Financial Statements.

## Environmental

The Company's operations, as well as those of its competitors, are subject to extensive federal, state and local environmental regulation. BNSF's operating procedures include practices to protect the environment from the risks inherent in railroad operations, which frequently involve transporting chemicals and other hazardous materials. Additionally, many of BNSF's land holdings are and have been used for industrial or transportation-related purposes or leased to commercial or industrial companies whose activities may have resulted in discharges onto the property. As a result, BNSF is subject to environmental cleanup and enforcement actions. In particular, the federal Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), also known as the Superfund law, as well as similar state laws, generally impose joint and several liability for cleanup and enforcement costs on current and former owners and operators of a site without regard to fault or the legality of the original conduct. BNSF has been notified that it is a potentially responsible party (PRP) for study and cleanup costs at Superfund sites for which investigation and remediation payments are or will be made or are yet to be determined (the Superfund sites) and, in many instances, is one of several PRPs. In addition, BNSF may be considered a PRP under certain other laws. Accordingly, under CERCLA and other federal and state statutes, BNSF may be held jointly and severally liable for all environmental costs associated with a particular site. If there are other PRPs, BNSF generally participates in the cleanup of these sites through cost-sharing agreements with terms that vary from site to site. Costs are typically allocated based on such factors as relative volumetric contribution of material, the amount of time the site was owned or operated and/or the portion of the total site owned or operated by each PRP.

Liabilities for environmental cleanup costs are recorded when BNSF's liability for environmental cleanup is probable and reasonably estimable. Subsequent adjustments to initial estimates are recorded as necessary based upon additional information developed in subsequent periods. Environmental costs include initial site surveys and environmental studies as well as costs for remediation of sites determined to be contaminated.

BNSF estimates the ultimate cost of cleanup efforts at its known environmental sites on an annual basis during the third quarter. Ultimate cost estimates for environmental sites are based on historical payment patterns, current estimated percentage to closure ratios and benchmark patterns developed from data accumulated from industry and public sources, including the Environmental Protection Agency and other governmental agencies. These factors incorporate experience gained from cleanup efforts at other similar sites into the estimates for which remediation and restoration efforts are still in progress. The most significant assumptions are as follows: (i) historical payment patterns of site development and (ii) variance from benchmark costs. A 10 percent change in any of these individual assumptions could result in an approximate increase or decrease of $20 million in BNSF's estimated environmental liability.

Further discussion on environmental is incorporated by reference from Note 10 to the Consolidated Financial Statements.

## Other Claims and Litigation

In addition to asbestos, other personal injury and environmental matters discussed above, BNSF and its subsidiaries are also parties to a number of other legal actions and claims, governmental proceedings and private civil lawsuits arising in the ordinary course of business, including those related to disputes and complaints involving certain transportation rates and charges (including complaints seeking refunds of prior charges paid for coal transportation and the prescription of future rates for such movements and claims relating to service under contract provisions or otherwise). Some of the legal proceedings include claims for punitive as well as compensatory damages, and a few proceedings purport to be class actions. Although the final outcome of these matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded along with applicable insurance, it is the opinion of BNSF that none of these items, when finally resolved, will have a material adverse effect on the Company's financial position or liquidity. However, an unexpected adverse resolution of one or more of these items could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

*Income Taxes*

BNSF is subject to various federal, state and local income taxes in the taxing jurisdictions where the Company operates. BNSF accounts for income taxes by providing for taxes payable or refundable in the current year and for deferred tax assets and liabilities for future tax consequences of events that have been recognized in financial statements or tax returns.

BNSF recorded total income tax expense, including federal, state and other income taxes, of $1,253 million, $1,128 million and $1,107 million for the years ended December 31, 2008, 2007 and 2006, respectively. BNSF's Consolidated Balance Sheets reflect $442 million and $290 million of net current deferred tax assets at December 31, 2008 and 2007, respectively. Also included in BNSF's Consolidated Balance Sheets are $8,590 million and $8,484 million of net non-current deferred tax liabilities at December 31, 2008 and 2007, respectively. Classification of deferred tax assets and liabilities as current or non-current is determined by the financial statement classification of the asset or liability to which the temporary difference is related. If a temporary difference is not related to an asset or liability for financial reporting, it is classified according to the expected reversal date of the temporary difference.

Valuation allowances are established to reduce deferred tax assets if it is more likely than not that some or all of the deferred tax asset will not be realized. BNSF has not recorded a valuation allowance, as it believes that the deferred tax assets will be fully realized in the future.

All federal income tax returns of BNSF are closed through 1999. Internal Revenue Service (IRS) examination of the years 2000 through 2005 for BNSF is completed, and the un-agreed issues are pending before IRS Appeals. It is anticipated that a settlement with the IRS for the years 2000 through 2005 may be reached within the next twelve months. BNSF is currently under examination for years 2006 and 2007.

BNSF and its subsidiaries have various state income tax returns in the process of examination, administrative appeal or litigation. State income tax returns are generally subject to examination for a period of three to five years after filing of the respective return. The state impact of any federal changes remains subject to examination by various states for a period of up to one year after formal notification to the states.

A significant portion of the audit issues relate to state income tax issues with various taxing authorities and with the IRS related to whether certain asset valuations of donated property are appropriate. A provision for taxes resulting from ongoing and future federal and state audits is based on an estimation of aggregate adjustments that may be required as a result of the audits. The Company believes that adequate provision has been made for any adjustment that might be assessed for open years through 2008.

BNSF makes estimates of the potential liability based on its assessment of all potential tax exposures. In addition, the Company uses factors such as applicable tax laws and regulations, current information and past experience with similar issues to make these judgments.

Deferred tax assets and liabilities are measured using the tax rates that apply to taxable income in the period in which the deferred tax asset or liability is expected to be realized or paid. Changes in the Company's estimates regarding the statutory tax rate to be applied to the reversal of deferred tax assets and liabilities could materially affect the effective tax rate.

The Company has not significantly changed its methodology for calculating income tax expense for the years presented, and there are currently no known trends, demands, commitments, events or uncertainties that are reasonably likely to occur and materially affect the methodology or assumptions described above. Further information on federal and state income taxes and uncertain tax positions is incorporated by reference from Notes 2 and 5 to the Consolidated Financial Statements.

**Employment Benefit Plans**

BNSF sponsors a funded, noncontributory qualified pension plan, the BNSF Retirement Plan, which covers most non-union employees, and an unfunded non-tax-qualified pension plan, the BNSF Supplemental Retirement Plan, which covers certain officers and other employees. The benefits under these pension plans are based on years of credited service and the highest consecutive sixty months of compensation for the last ten years of salaried employment with BNSF. BNSF's funding policy is to contribute annually not less than the regulatory minimum and not more than the maximum amount deductible for income tax purposes with respect to the funded plan.

Certain salaried employees of BNSF that have met age and years of service requirements are eligible for life insurance coverage and medical benefits, including prescription drug coverage, during retirement. This postretirement benefit plan, referred to as the retiree health and welfare plan, is contributory and provides benefits to retirees, their covered dependents and beneficiaries. Retiree contributions are adjusted annually. The plan also contains fixed deductibles, coinsurance and out-of-pocket limitations. The basic life insurance plan is noncontributory and covers retirees only. Optional life insurance coverage is available for some retirees; however, the retiree is responsible for the full cost. BNSF's policy is to fund benefits payable under the medical and life insurance plans as they come due. Generally, employees beginning salaried employment with BNSF subsequent to September 22, 1995, are not eligible for medical benefits during retirement.

The amounts recorded in the Consolidated Statements of Income for the pension and the retiree health and welfare plans were as follows (in millions):

| **Year ended December 31,** | **2009 Estimate** | **2008** | **2007** | **2006** |
|---|---|---|---|---|
| Net pension cost | **$ 47** | **$ 31** | $ 52 | $ 68 |
| Net retiree health and welfare cost | **$ 12** | **$ 17** | $ 17 | $ 14 |

The increase in the 2009 net pension cost as compared to 2008 primarily reflects market losses on plan assets in 2008 and a 25 basis point decrease in the discount rate.

At December 31, 2008, BNSF had net losses, excluding prior service costs, of $834 million and $26 million related to the pension and retiree health and welfare benefits plans, respectively, which had been recognized as a component of AOCL under SFAS No. 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans–an amendment of FASB Statements No. 87, 88, 106 and 132R*, as described in Note 13 to the Consolidated Financial Statements. These losses were comprised of gains and losses from changes in discount rates, actuarial assumptions and census data as well as market gains and losses and will be recognized as a component of net pension and retiree health and welfare costs over the next 17 and 14 years, respectively. The expected amortization of deferred losses is as follows:

| | **Deferred Losses to be Recognized (in millions)** | |
|---|---|---|
| **Fiscal year** | **Pension** | **Retiree Health and Welfare Benefits** |
| 2009 | $ 25 | $ 1 |
| 2010 | 32 | 1 |
| 2011 | 40 | 1 |
| 2012 | 46 | 1 |
| 2013 | 52 | 1 |
| Thereafter | 597 | 10 |

The Company estimates liabilities and expenses for the pension and retiree health and welfare plans. Estimated amounts are based on historical information, current information and estimates about future events and circumstances. Significant assumptions used in the valuation of the pension or retiree health and welfare obligations include expected return on plan assets, discount rate, rate of increase in compensation levels and the health care cost trend rate.

From time to time, the Company will change pension and retiree health and welfare assumptions in response to current conditions and expected future experience. Significant assumptions for the past three years are as follows:

| **Assumptions Used to Determine Net Cost for Fiscal Years Ended December 31,** | **Pension Benefits** | | | **Retiree Health and Welfare Benefits** | | |
|---|---|---|---|---|---|---|
| | **2008** | **2007** | **2006** | **2008** | **2007** | **2006** |
| Discount rate | **6.00%** | 5.50% | 5.25% | **6.00%** | 5.50% | 5.25% |
| Expected long-term rate of return on plan assets | **8.00%** | 8.00% | 8.00% | **–%** | –% | –% |
| Assumed health care cost trend rate | **–%** | –% | –% | **10.50%** | 10.00% | 10.50% |
| Rate to which health care cost trend rate is expected to decline and remain | **–%** | –% | –% | **5.00%** | 5.00% | 5.00% |
| Year that the rate reaches the ultimate trend rate | **–** | – | – | **2016** | 2012 | 2012 |
| Rate of compensation increase | **3.80%** | 3.90% | 3.90% | **3.80%** | 3.90% | 3.90% |

| Assumptions Used to Determine Benefit Obligations | Pension Benefits | | Retiree Health and Welfare Benefits | |
|---|---|---|---|---|
| | December 31, 2008[a] | September 30, 2007 | December 31, 2008[a] | September 30, 2007 |
| Discount rate | **5.75%** | 6.00% | **5.75%** | 6.00% |
| Assumed health care cost trend rate | **–%** | –% | **9.75%** | 10.50% |
| Rate to which health care cost trend rate is expected to decline and remain | **–%** | –% | **5.00%** | 5.00% |
| Year that the rate reaches the ultimate trend rate | **–** | – | **2016** | 2016 |
| Rate of compensation increase | **3.80%** | 3.80% | **3.80%** | 3.80% |

a In September 2006, the FASB issued SFAS No. 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans–an amendment of FASB Statements No. 87, 88, 106 and 132R*, which prospectively eliminated the option for the Company to use a measurement date prior to the Company's fiscal year-end effective December 31, 2008. See Note 13 to the Consolidated Financial Statements.

The expected return on plan assets reflects the expected long-term rates of return on those assets. The rate of compensation increase is determined based on historical experience. The health care cost trend rates reflect the expected future increases in health care costs.

At December 31, 2008, BNSF determined the discount rate by averaging the Mercer Yield Curve and the Moody's Aa Corporate bond yield, with both measures adjusted to reflect the future estimated cash flows of the Company's pension and retiree health and welfare plans. For all prior periods presented, BNSF determined the discount rate by adjusting the Moody's Aa Corporate bond yield to reflect the difference between the duration of the future estimated cash flows of the Company's pension and retiree health and welfare plans and the duration of the Moody's Aa index. BNSF believes the Mercer Yield Curve is, in general, a better model to determine discount rates as it utilizes a much larger and more diverse population of highly rated bonds than the Moody's Aa Corporate bond yield. However, given the volatility experienced in late 2008, the Company was concerned that some of the bonds included in the Mercer Yield Curve, such as financial institutions, may have higher yields because their market risk has not yet fully been reflected in their credit rating. Therefore, BNSF decided it most appropriate to average the Mercer Yield Curve with the Moody's Aa Corporate bond yield, which has no financial institutions in its population.

The discount rate used for the 2009 calculation of net benefit cost decreased to 5.75 percent to reflect market conditions at the December 31, 2008, measurement date. The expected rate of return on plan assets remained consistent from 2008 to 2009, and the Company does not expect any near-term significant changes to the current investment allocation of assets. However, unforeseen changes in the investment markets or other external factors could prompt changes in these estimates in future years.

The following table is an estimate of the impact on future net benefit cost that could result from hypothetical changes to the most sensitive assumptions, the discount rate and rate of return on plan assets:

**Sensitivity Analysis**

| | Change in Net Benefit Cost | |
|---|---|---|
| Hypothetical Discount Rate Change | Pension | Retiree Health and Welfare |
| 50 basis point decrease | $5 million increase | $200 thousand decrease |
| 50 basis point increase | $5 million decrease | $200 thousand increase |

| Hypothetical Rate of Return on Plan Assets Change | Pension |
|---|---|
| 50 basis point decrease | $7 million increase |
| 50 basis point increase | $7 million decrease |

Based on its current assumptions and funding methodology, the Company is not required to make contributions to the BNSF Retirement Plan in 2009. However, the Company may elect to make voluntary contributions in 2009. The amount of any contribution will be influenced by many factors, including, but not limited to, market return on plan assets, funding assumptions, legislative funding relief, etc. The Company currently determines required funding by amortizing asset gains and losses over a period of two years. If the Company was required to fully fund the unfunded portion of its accumulated benefit obligation, which was $724 million at December 31, 2008, for these pension plans and $269 million for the retiree health and welfare plan, the Company's management believes that it would have sufficient liquidity, and it could fund the balance without a significant impact to the Company's financial position. Additionally, the Company expects to make benefit payments in 2009 of approximately $8 million and $24 million from its non-qualified defined benefit and retiree health and welfare plans, respectively.

In August of 2006, the President signed the Pension Protection Act of 2006 (PPA) into law. While the Act will have some effect on specific plan provisions in the Company's retirement program, its primary effect will be to change the minimum funding requirements. The Company expects that the Act will accelerate the required funding of future contributions for the Company's pension plans beginning with the 2010 fiscal year. Additionally, in December of 2008, the President signed the Worker, Retiree, and Employer Act of 2008 (WRE) into law. This Act, among other things, will delay some of the funding that would have otherwise been required over the next few years. Anticipated payments, including the impact of PPA and WRE, over the next five years are included in the Contractual Obligations table under the heading "Long-Term Debt and Other Obligations" in Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations. The Company does not anticipate that this legislation will significantly impact its results of operations, financial condition or liquidity.

Further information on employee benefits is incorporated by reference from Note 13 to the Consolidated Financial Statements.

**Depreciation**

Due to the capital-intensive nature of the railroad industry, depreciation expense is a significant component of the Company's operating expense. The Company recorded depreciation and amortization expenses of $1,397 million, $1,293 million and $1,176 million for the years ended December 31, 2008, 2007 and 2006, respectively. At December 31, 2008 and 2007, the Company had property and equipment, net balances of $30,847 million and $29,567 million, which included $9,912 million and $9,177 million, respectively, of accumulated depreciation.

The Company uses the group method of depreciation under which a single depreciation rate is applied to the gross investment in a particular class of property, despite differences in the service life or salvage value of individual property units within the same class. The Company conducts studies of depreciation rates and the required accumulated depreciation balance as required by the Surface Transportation Board (STB), which is generally every three years for equipment property and every six years for track structure and other roadway property. Changes in the estimated service lives of the assets and their related depreciation rates are implemented prospectively, and the difference between the calculated accumulated depreciation and the amount recorded is amortized over the average remaining service lives of the assets.

A study completed and implemented in April 2008 resulted in the Company adopting new depreciation rates for other roadway property, which includes items such as bridges, office buildings and facilities, telecommunication and information technology systems and machinery, that resulted in a net increase in 2008 depreciation expense of approximately $13 million and approximately $17 million on an ongoing annual basis. A study conducted in 2007 resulted in the Company adopting new depreciation rates for locomotives that resulted in a net increase in 2007 depreciation expense of $17 million and approximately $22 million on an ongoing annual basis, as calculated using the asset base at the time of the rate change. In 2006, the Company conducted a depreciation rate study of its equipment (excluding locomotives); the results of which did not materially impact the Company's current or future results of operations. All rate studies are current under the STB's requirements.

## Forward-Looking Information

To the extent that statements made by the Company relate to the Company's future economic performance or business outlook, projections or expectations of financial or operational results, or refer to matters that are not historical facts, such statements are "forward-looking" statements within the meaning of the federal securities laws. These forward-looking statements include, but are not limited to, statements regarding:

- Expectations as to operating results, such as revenue growth and earnings per share;
- Expectations as to the effect on the Company's financial condition of claims, litigation, environmental and personal injury costs, commitments, contingent liabilities, and governmental and regulatory investigations and proceedings;
- Plans and goals for future operational improvements and capital commitments; and
- Current or future volatility in the credit market and future market conditions or economic performance.

Forward-looking statements involve a number of risks and uncertainties, and actual performance or results may differ materially. For a discussion of material risks and uncertainties that the Company faces, see the discussion in Item 1A, "Risk Factors," of this Annual Report on Form 10-K. Important factors that could cause actual results to differ materially include, but are not limited to, the following:

- **Economic and industry conditions:** material adverse changes in economic or industry conditions, both in the United States and globally, continuing volatility in the capital or credit markets and other changes in the securities and capital markets, changes in customer demand, effects of adverse economic conditions affecting shippers or BNSF's supplier base and in the industries and geographic areas that produce and consume freight, changes in demand due to more stringent regulatory policies such as the regulation of carbon dioxide emissions that could reduce the demand for coal or governmental tariffs or subsidies that could affect the demand for grain, competition and consolidation within the transportation industry, the extent to which BNSF is successful in gaining new long-term relationships with customers or retaining existing ones, level of service failures that could lead customers to use competitors' services, changes in fuel prices and other key materials and disruptions in supply chains for these materials, increased customer bankruptcies, closures or slowdowns and changes in crew availability, labor costs and labor difficulties, including stoppages affecting either BNSF's operations or customers' abilities to deliver goods to BNSF for shipment;

- **Legal, legislative and regulatory factors:** developments and changes in laws and regulations, including those affecting train operations or the marketing of services, the ultimate outcome of shipper and rate claims subject to adjudication or claims, investigations or litigation alleging violations of the antitrust laws, increased economic regulation of the rail industry through legislative action and revised rules and standards applied by the U.S. Surface Transportation Board in various areas including rates and services, developments in environmental investigations or proceedings with respect to rail operations or current or past ownership or control of real property or properties owned by others impacted by BNSF Railway operations, and developments in and losses resulting from other types of claims and litigation, including those relating to personal injuries, asbestos and other occupational diseases, the release of hazardous materials, environmental contamination and damage to property; the availability of adequate insurance to cover the risks associated with operations; and

- **Operating factors:** technical difficulties, changes in operating conditions and costs, changes in business mix, the availability of equipment and human resources to meet changes in demand, the extent of the Company's ability to achieve its operational and financial initiatives and to contain costs in response to changes in demand and other factors, the effectiveness of steps taken to maintain and improve operations and velocity and network fluidity, including the management of the amount of traffic on the system to meet demand and the ability to acquire sufficient resources to meet that demand, the ability to expand the capacity of the system, congestion on other railroads and capacity constraints affecting all links in the transportation chain that feed traffic and goods to BNSF's systems, restrictions on development and expansion plans due to environmental concerns, constraints due to the nation's aging infrastructure, disruptions to BNSF's technology network including computer systems and software, as well as natural events such as severe weather, fires, floods and earthquakes or man-made or other disruptions of BNSF Railway's operating systems, structures, or equipment including the effects of acts of terrorism on the Company's system or other railroads' systems or other links in the transportation chain.

The Company cautions against placing undue reliance on forward-looking statements, which reflect its current beliefs and are based on information currently available to it as of the date a forward-looking statement is made. The Company undertakes no obligation to revise forward-looking statements to reflect future events, changes in circumstances or changes in beliefs. In the event the Company does update any forward-looking statement, no inference should be made that the Company will make additional updates with respect to that statement, related matters, or any other forward-looking statements. Any corrections or revisions and other important assumptions and factors that could cause actual results to differ materially from forward-looking statements made by the Company may appear in the Company's public filings with the SEC, which are accessible at www.sec.gov, and on the Company's Web site at www.bnsf.com, and which investors are advised to consult.

## *Item 7A. Quantitative and Qualitative Disclosures About Market Risk*

In the ordinary course of business, BNSF utilizes various financial instruments that inherently have some degree of market risk. The following table summarizes the impact of these hedging activities on the Company's results of operations (in millions):

| Year ended December 31, | 2008 | 2007 |
|---|---|---|
| Fuel-hedge (loss) benefit (including ineffective portion of unexpired hedges) | **$ (5)** | $ 31 |
| Interest rate hedge benefit (loss) | **12** | (3) |
| Total hedge benefit | **7** | 28 |
| Tax effect | **(3)** | (11) |
| Hedge benefit, net of tax | **$ 4** | $ 17 |

The Company's fuel-hedge loss is due to decreases in average fuel prices subsequent to the initiation of various hedges and through their termination. The interest rate hedge benefit is the result of lower interest rates. The information presented in the Management's Discussion and Analysis of Financial Condition and Results of Operations section and Notes 3 and 9 to the Consolidated Financial Statements describe significant aspects of BNSF's financial instrument activities that have a material market risk. Additionally, the Company uses fuel surcharges, which it believes substantially mitigates the risk of fuel price volatility.

### Commodity Price Sensitivity

BNSF engages in hedging activities to partially mitigate the risk of fluctuations in the price of its diesel fuel purchases. Existing hedge transactions as of December 31, 2008, are based on the front month settlement prices of West Texas Intermediate (WTI) crude oil. For swaps, BNSF either pays or receives the difference between the hedge price and the actual average price of the hedge commodity during a specified determination period for a specified number of gallons. For costless collars, if the average hedge commodity price for a specified determination period is greater than the cap price, BNSF receives the difference for a specified number of gallons. If the average commodity price is less than the floor price, BNSF pays the difference for a specified number of gallons. If the commodity price is between the floor price and the cap price, BNSF neither makes nor receives a payment. Hedge transactions are generally settled with the counterparty in cash. Based on historical information, BNSF believes there is a significant correlation between the market prices for diesel fuel and WTI.

At December 31, 2008, BNSF had recorded a fuel-hedging liability of $472 million for fuel hedges covering 2009 through 2011.

The following table is an estimate of the impact to earnings that could result from hypothetical price changes during the twelve-month period ending December 31, 2009, and the balance sheet impact from the hypothetical price changes on all open hedges, both based on the Company's hedge position at December 31, 2008:

| Sensitivity Analysis | | |
|---|---|---|
| **Hedged Commodity Price Change** | **Fuel-Hedge Annual Pre-Tax Earnings Impact** | **Balance Sheet Impact of Change in Fuel-Hedge Fair Value** |
| 10-percent increase | $42 million increase | $108 million increase |
| 10-percent decrease | $42 million decrease | $107 million decrease |

Based on locomotive fuel consumption during the twelve-month period ended December 31, 2008, of 1,415 million gallons and fuel prices during that same period, excluding the impact of the Company's hedging activities, a 10-percent increase or decrease in the commodity price per gallon would result in an approximate $404 million increase or decrease, respectively, in fuel expense (pre-tax) on an annual basis. Additionally, the Company uses fuel surcharges, which it believes substantially mitigates the risk of fuel price volatility.

At December 31, 2008, BNSF maintained fuel inventories for use in normal operations, which were not material to BNSF's overall financial position and, therefore, represent no significant market exposure. The frequency of BNSF's fuel inventory turnover also reduces market exposure, should fuel inventories become material to BNSF's overall financial position. Further information on fuel hedges is incorporated by reference from Note 3 to the Consolidated Financial Statements.

## Interest Rate Sensitivity

From time to time, BNSF enters into various interest rate hedging transactions for purposes of managing exposure to fluctuations in interest rates by establishing rates in anticipation of both future debt issuances and the refinancing of leveraged leases, as well as to convert a portion of its fixed-rate long-term debt to floating-rate debt. These interest rate hedges are accounted for as cash flow or fair value hedges. BNSF's measurement of the fair value of these hedges is based on estimates of the mid-market values for the transactions provided by the counterparties to these agreements.

At December 31, 2008, the fair value of BNSF's debt, excluding capital leases and a net fair value interest rate hedge benefit of $73 million, was $8,323 million. Additionally, the Company had recorded an interest rate hedging liability of $108 million for cash flow hedges.

The following table is an estimate of the impact to earnings and the fair value of the total debt, excluding capital leases, and interest rate hedges that could result from hypothetical interest rate changes during the twelve-month period ending December 31, 2009, based on debt levels and outstanding hedges as of December 31, 2008:

**Sensitivity Analysis**

| Hypothetical Change in Interest Rates | Floating Rate Debt – Annual Pre-Tax Earnings Impact | Change in Fair Value | |
|---|---|---|---|
| | | Total Debt[a] | Interest Rate Hedges |
| 1-percent decrease | $10 million increase | $768 million increase | $35 million decrease |
| 1-percent increase | $10 million decrease | $646 million decrease | $37 million increase |

a Excludes impact of interest rate hedges.

Further information on interest rate hedges is incorporated by reference from Note 3 to the Consolidated Financial Statements. Information on the Company's debt, which may be sensitive to interest rate fluctuations, is incorporated by reference from Note 9 to the Consolidated Financial Statements.

## Item 8. Financial Statements and Supplementary Data

The Consolidated Financial Statements and Management's Report on Internal Control Over Financial Reporting of BNSF and subsidiary companies, together with the report of the Company's independent registered public accounting firm, are included as part of this filing.

The following documents are filed as a part of this report:

## Consolidated Financial Statements

Management's Report on Internal Control Over Financial Reporting ........ 37

Report of Independent Registered Public Accounting Firm........ 38

Consolidated Statements of Income for each of the three years in the period ended December 31, 2008........ 39

Consolidated Balance Sheets as of December 31, 2008 and 2007........ 40

Consolidated Statements of Cash Flows for each of the three years in the period ended December 31, 2008 ........ 41

Consolidated Statements of Changes in Stockholders' Equity for each of the three years in the period ended December 31, 2008........ 42

Notes to Consolidated Financial Statements........ 43–72

# Management's Report on Internal Control Over Financial Reporting

## *To the Shareholders of Burlington Northern Santa Fe Corporation and Subsidiaries*

The management of Burlington Northern Santa Fe Corporation (the Company) is responsible for establishing and maintaining adequate internal control over financial reporting. The Company's internal control over financial reporting was designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the Company's financial statements for external reporting purposes in accordance with generally accepted accounting principles in the United States of America.

Management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2008. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in *Internal Control – Integrated Framework*. Based on management's assessment, Management concluded that as of December 31, 2008, the Company's internal control over financial reporting was effective based on those criteria.

The effectiveness of the Company's internal control over financial reporting as of December 31, 2008, has been audited by PricewaterhouseCoopers LLP, the Company's independent registered public accounting firm, as stated in their report, which appears on the following page.

# Report of Independent Registered Public Accounting Firm

## *To the Shareholders and Board of Directors of Burlington Northern Santa Fe Corporation*

In our opinion, the consolidated financial statements listed in the accompanying index present fairly, in all material respects, the financial position of Burlington Northern Santa Fe Corporation and its subsidiaries (the Company) at December 31, 2008 and 2007, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2008 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2008, based on criteria established in *Internal Control - Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). The Company's management is responsible for these financial statements, for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control Over Financial Reporting. Our responsibility is to express opinions on these financial statements and on the Company's internal control over financial reporting based on our integrated audits. We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

As discussed in Note 2 to the consolidated financial statements, effective January 1, 2007, the Company changed the manner in which it accounts for uncertain tax positions.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

PricewaterhouseCoopers LLP

Fort Worth, Texas
February 12, 2009

**Burlington Northern Santa Fe Corporation and Subsidiaries**

## *Consolidated Statements of Income*

In millions, except per share data

| Year ended December 31, | 2008 | 2007 | 2006 |
|---|---|---|---|
| Revenues | **$ 18,018** | $ 15,802 | $ 14,985 |
| Operating expenses: | | | |
| Fuel | **4,640** | 3,327 | 2,856 |
| Compensation and benefits | **3,884** | 3,773 | 3,816 |
| Purchased services | **2,136** | 2,023 | 1,906 |
| Depreciation and amortization | **1,397** | 1,293 | 1,176 |
| Equipment rents | **901** | 942 | 930 |
| Materials and other | **1,148** | 958 | 780 |
| Total operating expenses | **14,106** | 12,316 | 11,464 |
| Operating income | **3,912** | 3,486 | 3,521 |
| Interest expense | **533** | 511 | 485 |
| Other expense, net | **11** | 18 | 40 |
| Income before income taxes | **3,368** | 2,957 | 2,996 |
| Income tax expense | **1,253** | 1,128 | 1,107 |
| Net income | **$ 2,115** | $ 1,829 | $ 1,889 |
| Earnings per share: | | | |
| Basic earnings per share | **$ 6.15** | $ 5.19 | $ 5.23 |
| Diluted earnings per share | **$ 6.08** | $ 5.10 | $ 5.11 |
| Average shares: | | | |
| Basic | **343.8** | 352.5 | 361.0 |
| Dilutive effect of stock awards | **4.0** | 6.4 | 8.8 |
| Diluted | **347.8** | 358.9 | 369.8 |

See accompanying Notes to Consolidated Financial Statements.

# *Consolidated Balance Sheets*

Dollars in millions, shares in thousands

| December 31, | 2008 | 2007 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | **$ 633** | $ 330 |
| Accounts receivable, net | **847** | 790 |
| Materials and supplies | **525** | 579 |
| Current portion of deferred income taxes | **442** | 290 |
| Other current assets | **218** | 192 |
| Total current assets | **2,665** | 2,181 |
| Property and equipment, net | **30,847** | 29,567 |
| Other assets | **2,891** | 1,835 |
| Total assets | **$ 36,403** | $ 33,583 |
| **Liabilities and Stockholders' Equity** | | |
| Current liabilities: | | |
| Accounts payable and other current liabilities | **$ 3,190** | $ 2,824 |
| Long-term debt due within one year | **456** | 411 |
| Total current liabilities | **3,646** | 3,235 |
| Long-term debt and commercial paper | **9,099** | 7,735 |
| Deferred income taxes | **8,590** | 8,484 |
| Pension and retiree health and welfare liability | **1,047** | 444 |
| Casualty and environmental liabilities | **959** | 843 |
| Employee separation costs | **57** | 77 |
| Other liabilities | **1,874** | 1,621 |
| Total liabilities | **25,272** | 22,439 |
| Commitments and contingencies (see Notes 3, 9 and 10) | | |
| Stockholders' equity: | | |
| Common stock, $0.01 par value, 600,000 shares authorized; 541,346 shares and 537,330 shares issued, respectively | **5** | 5 |
| Additional paid-in-capital | **7,631** | 7,348 |
| Retained earnings | **12,764** | 11,152 |
| Treasury stock, at cost, 202,165 shares and 189,626 shares, respectively | **(8,395)** | (7,222) |
| Accumulated other comprehensive loss | **(874)** | (139) |
| Total stockholders' equity | **11,131** | 11,144 |
| Total liabilities and stockholders' equity | **$ 36,403** | $ 33,583 |

See accompanying Notes to Consolidated Financial Statements.

**Burlington Northern Santa Fe Corporation and Subsidiaries**

# *Consolidated Statements of Cash Flows*

In millions

| **Year ended December 31,** | **2008** | **2007** | **2006** |
|---|---|---|---|
| **Operating Activities** | | | |
| Net income | **$ 2,115** | $ 1,829 | $ 1,889 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation and amortization | **1,397** | 1,293 | 1,176 |
| Deferred income taxes | **417** | 280 | 316 |
| Employee separation costs paid | **(15)** | (21) | (27) |
| Long-term casualty and environmental liabilities, net | **150** | 26 | (55) |
| Other, net | **81** | 183 | (43) |
| Changes in current assets and liabilities: | | | |
| Accounts receivable, net | **191** | 20 | (127) |
| Change in accounts receivable sales program | **(250)** | – | – |
| Materials and supplies | **54** | (91) | (92) |
| Other current assets | **(31)** | 12 | 99 |
| Accounts payable and other current liabilities | **(132)** | (39) | 53 |
| Net cash provided by operating activities | **3,977** | 3,492 | 3,189 |
| **Investing Activities** | | | |
| Capital expenditures | **(2,175)** | (2,248) | (2,014) |
| Construction costs for facility financing obligation | **(64)** | (37) | (14) |
| Acquisition of equipment pending financing | **(941)** | (745) | (1,223) |
| Proceeds from sale of assets financed | **348** | 778 | 1,244 |
| Other, net | **(241)** | (163) | (160) |
| Net cash used for investing activities | **(3,073)** | (2,415) | (2,167) |
| **Financing Activities** | | | |
| Net (decrease) increase in commercial paper and bank borrowings | **(161)** | (584) | 283 |
| Proceeds from issuance of long-term debt | **1,150** | 1,300 | 300 |
| Payments on long-term debt | **(217)** | (482) | (467) |
| Dividends paid | **(471)** | (380) | (310) |
| Proceeds from stock options exercised | **91** | 142 | 116 |
| Purchase of BNSF common stock | **(1,147)** | (1,265) | (730) |
| Excess tax benefits from equity compensation plans | **96** | 121 | 95 |
| Proceeds from facility financing obligation | **68** | 41 | – |
| Other, net | **(10)** | (15) | (9) |
| Net cash used for financing activities | **(601)** | (1,122) | (722) |
| Increase (decrease) in cash and cash equivalents | **303** | (45) | 300 |
| Cash and cash equivalents: | | | |
| Beginning of year | **330** | 375 | 75 |
| End of year | **$ 633** | $ 330 | $ 375 |
| **Supplemental Cash Flow Information** | | | |
| Interest paid, net of amounts capitalized | **$ 538** | $ 494 | $ 462 |
| Income taxes paid, net of refunds | **$ 820** | $ 680 | $ 779 |
| Non-cash asset financing | **$ 258** | $ 461 | $ 109 |

See accompanying Notes to Consolidated Financial Statements.

## *Consolidated Statements of Changes in Stockholders' Equity*

Dollars in millions, shares in thousands, except per share data

| | Common Shares | Treasury Shares | Common Stock and Paid–in Capital | Retained Earnings | Treasury Stock | Prepaid Forward Repurchase of Treasury Stock | Unearned Compen-sation | Accumulated Other Compre-hensive Loss | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|---|
| Balance at December 31, 2005 | 527,289 | (155,718) | $ 6,707 | $ 8,175 | $ (4,569) | $ (600) | $ (22) | $ (53) | $ 9,638 |
| Comprehensive income: | | | | | | | | | |
| Net income | | | – | 1,889 | – | – | – | – | 1,889 |
| Minimum pension liability adjustment, net of tax expense of $24 | | | – | – | – | – | – | 40 | 40 |
| Fuel/interest hedge mark-to-market, net of tax benefit of $117 | | | – | – | – | – | – | (188) | (188) |
| Total comprehensive income | | | – | 1,889 | – | – | – | (148) | 1,741 |
| Adjustment to initially apply Statement of Financial Accounting Standards (SFAS) No. 158, net of tax benefit of $48 | | | – | – | – | – | – | (76) | (76) |
| Common stock dividends, $0.90 per share | | | – | (325) | – | – | – | – | (325) |
| Restricted stock and stock options expense | | | 72 | – | – | – | – | – | 72 |
| Restricted stock activity and related tax benefit of $15 | 28 | (33) | 16 | – | (1) | – | – | – | 15 |
| Exercise of stock options and related tax benefit of $80 | 4,763 | (376) | 225 | – | (29) | – | – | – | 196 |
| Adjustment upon adoption of SFAS No. 123R | – | – | (25) | – | – | – | 22 | – | (3) |
| Purchase of BNSF common stock | – | (9,860) | – | – | (730) | – | – | – | (730) |
| Prepaid forward repurchase of treasury stock | – | (8,218) | – | – | (600) | 600 | – | – | – |
| Balance at December 31, 2006 | 532,080 | (174,205) | 6,995 | 9,739 | (5,929) | – | – | (277) | 10,528 |
| Comprehensive income: | | | | | | | | | |
| Net income | | | – | 1,829 | – | – | – | – | 1,829 |
| Change in unrecognized prior service credit and actuarial losses, net of tax expense of $76 | | | – | – | – | – | – | 122 | 122 |
| Fuel/interest hedge mark-to-market, net of tax expense of $10 | | | – | – | – | – | – | 16 | 16 |
| Total comprehensive income | | | – | 1,829 | – | – | – | 138 | 1,967 |
| Adjustment for the adoption of FASB Interpretation No. (FIN) 48 | | | – | (13) | – | – | – | – | (13) |
| Common stock dividends, $1.14 per share | | | – | (403) | – | – | – | – | (403) |
| Restricted stock and stock options expense | | | 66 | – | – | – | – | – | 66 |
| Restricted stock activity and related tax benefit of $23 | 1 | (48) | 24 | – | – | – | – | – | 24 |
| Exercise of stock options and related tax benefit of $98 | 5,249 | (319) | 268 | – | (28) | – | – | – | 240 |
| Purchase of BNSF common stock | – | (15,054) | – | – | (1,265) | – | – | – | (1,265) |
| Balance at December 31, 2007 | 537,330 | (189,626) | 7,353 | 11,152 | (7,222) | – | – | (139) | 11,144 |
| Comprehensive income: | | | | | | | | | |
| Net income | | | – | 2,115 | – | – | – | – | 2,115 |
| Change in unrecognized prior service credit and actuarial losses, net of tax benefit of $219 | | | – | – | – | – | – | (353) | (353) |
| Fuel/interest hedge mark-to-market, net of tax benefit of $233 | | | – | – | – | – | – | (377) | (377) |
| Unrealized loss on securities held by equity method investees, net of tax benefit of $3 | | | – | – | – | – | – | (5) | (5) |
| Total comprehensive income | | | – | 2,115 | – | – | – | (735) | 1,380 |
| Adjustment to change the measurement date pursuant to SFAS No. 158, net of tax benefit of $3 | | | – | (7) | – | – | – | 2 | (5) |
| Adjustment to initially apply SFAS No. 158 to equity method investees, net of tax benefit of $1 | | | – | – | – | – | – | (2) | (2) |
| Common stock dividends, $1.44 per share | | | – | (496) | – | – | – | – | (496) |
| Restricted stock and stock options expense | | | 69 | – | – | – | – | – | 69 |
| Restricted stock activity and related tax benefit of $25 | 697 | 1 | 26 | – | – | – | – | – | 26 |
| Exercise of stock options and related tax benefit of $71 | 3,319 | (255) | 188 | – | (26) | – | – | – | 162 |
| Purchase of BNSF common stock | – | (12,285) | – | – | (1,147) | – | – | – | (1,147) |
| Balance at December 31, 2008 | 541,346 | (202,165) | $ 7,636 | $ 12,764 | $ (8,395) | $ – | $ – | $ (874) | $ 11,131 |

See accompanying Notes to Consolidated Financial Statements.

Burlington Northern Santa Fe Corporation and Subsidiaries

# Notes to Consolidated Financial Statements

## 1. The Company

Burlington Northern Santa Fe Corporation (BNSF) is a holding company that conducts no operating activities and owns no significant assets other than through its interests in its subsidiaries. BNSF's principal, wholly-owned subsidiary is BNSF Railway Company (BNSF Railway), which operates one of the largest railroad networks in North America with approximately 32,000 route miles in 28 states and two Canadian provinces. Through one operating transportation services segment, BNSF Railway transports a wide range of products and commodities including the transportation of Consumer Products, Industrial Products, Coal and Agricultural Products, derived from manufacturing, agricultural and natural resource industries, which constituted 34 percent, 23 percent, 23 percent and 20 percent, respectively, of total freight revenues for the year ended December 31, 2008. These Consolidated Financial Statements include BNSF, BNSF Railway and other majority-owned subsidiaries, all of which are separate legal entities (collectively, the Company).

## 2. Significant Accounting Policies

### Principles of Consolidation

The Consolidated Financial Statements include the accounts of BNSF, including its principal subsidiary BNSF Railway. All significant intercompany accounts and transactions have been eliminated. The Company evaluates its less than majority-owned investments for consolidation pursuant to FIN 46R, *Consolidation of Variable Interest Entities.*

### Use of Estimates

The preparation of financial statements in accordance with generally accepted accounting principles in the United States of America (GAAP) requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the periods presented. These estimates and assumptions are periodically reviewed by management. Actual results could differ from those estimates.

### Revenue Recognition

Transportation revenues are recognized based upon the proportion of service provided as of the balance sheet date. Revenues from ancillary services are recognized when performed. Customer incentives, which are primarily provided for shipping a specified cumulative volume or shipping to/from specific locations, are recorded as a reduction to revenue on a pro-rata basis based on actual or projected future customer shipments. When using projected shipments, the Company relies on historic trends as well as economic and other indicators to estimate the liability for customer incentives.

### Accounts Receivable, Net

Accounts receivable, net includes accounts receivable reduced by an allowance for bill adjustments and uncollectible accounts. The allowance for bill adjustments and uncollectible accounts is based on historical experience as well as any known trends or uncertainties related to customer billing and account collectibility. Additionally, accounts receivable, net is reduced by receivables sold under the Accounts Receivable sales program (see Note 6 to the Consolidated Financial Statements).

### Cash and Cash Equivalents

All short-term investments with original maturities of 90 days or less are considered cash equivalents. Cash equivalents are stated at cost, which approximates market value because of the short maturity of these instruments.

### Materials and Supplies

Materials and supplies, which consist mainly of rail, ties and other items for construction and maintenance of property and equipment, as well as diesel fuel, are valued at the lower of average cost or market.

## Property and Equipment, Net

Property and equipment are stated at cost and are depreciated and amortized on a straight-line basis over their estimated useful lives. The Company uses the group method of depreciation in which a single depreciation rate is applied to the gross investment in a particular class of property, despite differences in the service life or salvage value of individual property units within the same class. The Company conducts studies of depreciation rates and the required accumulated depreciation balance as required by the STB, which is generally every three years for equipment property and every six years for track structure and other roadway property. Changes in the estimated service lives of the assets and their related depreciation rates are implemented prospectively, and the difference between the calculated accumulated depreciation and the amount recorded is amortized over the average remaining service lives of the assets. Upon normal sale or retirement of certain depreciable railroad property, cost less net salvage value is charged to accumulated depreciation, and no gain or loss is recognized. The disposals of land and non-rail property as well as significant premature retirements are recorded as gains or losses at the time of their occurrence.

The Company self-constructs portions of its track structure and rebuilds certain classes of rolling stock. Expenditures that significantly increase asset values or extend useful lives are capitalized. In addition to direct labor and material, certain indirect costs, which relate to supportive functions, are capitalized. Repair and maintenance expenditures are charged to operating expense when the work is performed.

The Company incurs certain direct labor, contract service and other costs associated with the development and installation of internal-use computer software. Costs for newly developed software or significant enhancements to existing software are typically capitalized. Research, preliminary project, operations, maintenance and training costs are charged to operating expense when the work is performed.

Long-lived assets are reviewed for impairment when events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. If impairment indicators are present and the estimated future undiscounted cash flows are less than the carrying value of the long-lived assets, the carrying value is reduced to the estimated fair value as measured by the discounted cash flows.

Leasehold improvements that meet capitalization criteria are capitalized and amortized on a straight-line basis over the lesser of their estimated useful lives or the remaining lease term. Cash flows for capitalized leasehold improvements are reported in the investing activities other, net line of the Consolidated Statements of Cash Flows.

## Planned Major Maintenance Activities

The Company utilizes the deferral method of accounting for leased locomotive overhauls, which includes the refurbishment of the engine and related components. Accordingly, BNSF has established an asset for overhauls that have been performed. This asset, which is included in property and equipment, net in the Consolidated Balance Sheets, will be amortized to expense using the straight-line method until the next overhaul is performed or the end of the lease, whichever comes first, typically between six and eight years.

## Environmental Liabilities

Liabilities for environmental cleanup costs are initially recorded when BNSF's liability for environmental cleanup is both probable and reasonably estimable. Subsequent adjustments to initial estimates are recorded as necessary based upon additional information developed in subsequent periods. Estimates for these liabilities are undiscounted.

## Personal Injury Claims

Liabilities for personal injury claims are initially recorded when the expected loss is both probable and reasonably estimable. Subsequent adjustments to initial estimates are recorded as necessary based upon additional information developed in subsequent periods. Liabilities recorded for unasserted personal injury claims, including those related to asbestos, are based on information currently available. Estimates of liabilities for personal injury claims are undiscounted.

## Income Taxes

Deferred tax assets and liabilities are measured using the tax rates that apply to taxable income in the period in which the deferred tax asset or liability is expected to be realized or paid. Valuation allowances are established to reduce deferred tax assets if it is more likely than not that some or all of the deferred tax asset will not be realized. Investment tax credits are accounted for using the flow-through method.

## Uncertain Tax Positions

In June 2006, the Financial Accounting Standards Board (FASB) issued FIN 48, *Accounting for Uncertainty in Income Taxes—an interpretation of FASB Statement No. 109, Accounting for Income Taxes.* This interpretation addresses the determination of whether tax benefits claimed or expected to be claimed on a tax return should be recorded in the financial statements. Under FIN 48, the Company may recognize the tax benefit from an uncertain tax position only if it is more likely than not that the tax position will be sustained on examination by the taxing authorities, based on the technical merits of the position. The tax benefits recognized in the financial statements from such a position should be measured based on the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement. FIN 48 also provides guidance on derecognition, classification, interest and penalties on income taxes, accounting in interim periods and requires increased disclosures. The Company adopted the provisions of FIN 48 on January 1, 2007. As a result of the implementation of FIN 48, the Company recorded an $83 million increase in the liability for unrecognized tax benefits, which is offset by a reduction of the deferred tax liability of $70 million, resulting in a decrease to the January 1, 2007, retained earnings balance of $13 million (for additional information see Note 5 to the Consolidated Financial Statements).

## Stock-Based Compensation

The Company adopted SFAS No. 123R, *Share-Based Payment,* on January 1, 2006. This statement requires BNSF to recognize the cost of employee services received in exchange for the Company's equity instruments. Under SFAS No. 123R, BNSF is required to record compensation expense over an award's vesting period based on the award's fair value at the date of grant. BNSF has elected to adopt SFAS No. 123R on a modified prospective basis. Since the adoption of this new guidance, there have been no significant changes in the quantity or types of instruments used in stock-based compensation programs, nor have there been any significant changes in the terms of existing stock-based compensation arrangements. The Company did, however, record a favorable cumulative adjustment for estimated forfeitures of $3 million, which, due to immateriality, was included as a reduction to compensation expense in the first quarter of 2006.

## Employment Benefit Plans

The Company estimates liabilities and expenses for the pension and retiree health and welfare plans. Estimated amounts are based on historical information, current information and estimates regarding future events and circumstances. Significant assumptions used in the valuation of pension and/or retiree health and welfare liabilities include the expected return on plan assets, discount rate, rate of increase in compensation levels and the health care cost trend rate.

## Fair Value Measurements

In September 2006, the FASB issued SFAS No. 157, *Fair Value Measurements*. SFAS No. 157 defines fair value, establishes a framework for measuring fair value and expands disclosure requirements around fair value measurements.

SFAS No. 157 specifies a three-level hierarchy of valuation inputs which was established to increase consistency, clarity and comparability in fair value measurements and related disclosures.

- Level 1–Quoted prices for identical assets or liabilities in active markets that the Company has the ability to access at the measurement date.
- Level 2–Quoted prices for similar assets or liabilities in active markets; quoted prices for identical or similar assets or liabilities in markets that are not active; and model-derived valuations in which all significant inputs are observable market data.
- Level 3–Valuations derived from valuation techniques in which one or more significant inputs are unobservable.

SFAS No. 157 requires companies to maximize the use of observable inputs (Level 1 and Level 2), when available, and to minimize the use of unobservable inputs (Level 3) when determining fair value.

The Company adopted SFAS No. 157 on January 1, 2008, and recorded no financial statement adjustments as a result of adoption. The Company has applied the provisions of the standard to its fuel and interest rate hedges (see Note 3 to the Consolidated Financial Statements).

However, the Company had not applied the provisions of the standard to its property and equipment, goodwill and certain other assets, which are measured at fair value for impairment assessment, nor to any business combinations or asset retirement obligations as of December 31, 2008. The Company has applied the provisions of the standard to these assets and liabilities, beginning January 1, 2009, as required by FASB Staff Position (FSP) SFAS No. 157-2, *Effective Date of FASB Statement No. 157.* This adoption did not have a material impact on the Company's results of operations, financial condition or liquidity.

## Reclassifications

Certain comparative prior year amounts in the Consolidated Financial Statements and accompanying notes have been reclassified to conform to the current year presentation. These reclassifications had no effect on previously reported operating income or net income.

# 3. Hedging Activities

The Company uses derivative financial instruments to hedge against increases in diesel fuel prices and interest rates as well as to convert a portion of its fixed-rate, long-term debt to floating-rate debt. The Company does not hold or issue derivative financial instruments for trading or speculative purposes. The Company formally documents the relationship between the hedging instrument and the hedged item, as well as the risk management objective and strategy for the use of the hedging instrument. This documentation includes linking the derivatives that are designated as fair value or cash flow hedges to specific assets or liabilities on the balance sheet, commitments or forecasted transactions. The Company assesses at the time a derivative contract is entered into, and at least quarterly thereafter, whether the derivative item is effective in offsetting the changes in fair value or cash flows. Any change in fair value resulting from ineffectiveness, as defined by SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities, as amended,* is recognized in current period earnings. For derivative instruments that are designated and qualify as cash flow hedges, the effective portion of the gain or loss on the derivative instrument is recorded in accumulated other comprehensive loss (AOCL) as a separate component of stockholders' equity and reclassified into earnings in the period during which the hedge transaction affects earnings. Cash flows related to fuel and interest rate hedges are classified as operating activities in the Consolidated Statements of Cash Flows.

BNSF monitors its hedging positions and credit ratings of its counterparties and does not anticipate any losses due to counterparty nonperformance.

## Fuel

Fuel costs represented 33 percent, 27 percent and 25 percent of total operating expenses during 2008, 2007 and 2006, respectively. Due to the significance of diesel fuel expenses to the operations of BNSF and the historical volatility of fuel prices, the Company has entered into hedges to partially mitigate the risk of fluctuations in the price of its diesel fuel purchases. The fuel hedges include the use of derivatives that are accounted for as cash flow hedges. The hedging is intended to protect the Company's operating margins and overall profitability from adverse fuel price changes by entering into fuel-hedge instruments based on management's evaluation of current and expected diesel fuel price trends. However, to the extent the Company hedges portions of its fuel purchases, it may not realize the impact of decreases in fuel prices. Conversely, to the extent the Company does not hedge portions of its fuel purchases, it may be adversely affected by increases in fuel prices. Based on locomotive fuel consumption (which represents substantially all fuel consumption) during 2008 and excluding the impact of the hedges, each one-cent increase in the price of fuel per gallon would result in approximately $14 million of additional fuel expense on an annual basis. However, BNSF believes any fuel price increase would be substantially offset by the Company's fuel surcharge program.

### Total Fuel-Hedging Activities

As of December 31, 2008, BNSF's total fuel-hedging positions for 2009, 2010 and 2011 represent 22 percent, 18 percent and 13 percent, respectively, of the average annual locomotive fuel consumption over the past three years. Hedge positions are closely monitored to ensure that they will not exceed actual fuel requirements in any period.

The amounts recorded in the Consolidated Statements of Income for fuel-hedge transactions were as follows (in millions):

| Year ended December 31, | 2008 | 2007 | 2006 |
|---|---|---|---|
| Hedge benefit | **$ 12** | $ 30 | $ 342 |
| Ineffective portion of open hedges | **(17)** | 1 | (1) |
| Tax effect | **2** | (12) | (131) |
| Hedge (loss) benefit, net of tax | **$ (3)** | $ 19 | $ 210 |

The ineffective portion of unrealized gains and losses of open hedges are recorded in the Consolidated Statements of Income as a component of fuel expense.

The amounts recorded in the Consolidated Balance Sheets for fuel-hedge transactions were as follows (in millions):

| December 31, | 2008 | 2007 |
|---|---|---|
| Short-term fuel-hedging asset | **$ –** | $ 29 |
| Long-term fuel-hedging asset | **–** | 10 |
| Short-term fuel-hedging liability | **(279)** | – |
| Long-term fuel-hedging liability | **(193)** | – |
| Ineffective portion of open hedges | **17** | – |
| Tax effect | **174** | (15) |
| Amount included in AOCL, net of tax | **$ (281)** | $ 24 |
| Settled fuel-hedging contracts receivable | **$ –** | $ 6 |
| Settled fuel-hedging contracts payable | **$ (38)** | $ – |

Certain of the Company's fuel-hedge instruments are covered by an agreement which includes a provision such that the Company either receives or posts cash collateral if the position of the instruments exceeds a certain net asset or net liability threshold, respectively. The aggregate fair value of all fuel-hedge instruments under these provisions were in a net liability position on December 31, 2008, of $131 million, for which the Company has posted collateral of $106 million. Additionally, the Company has posted collateral of $20 million as of December 31, 2008, related to fuel-hedging contracts payable, to be settled during the first quarter of 2009. The collateral is reflected as a reduction to either accounts payable and other current liabilities or other liabilities in the Consolidated Balance Sheets, depending on the expiration date of the related fuel hedges. The fuel-hedging liabilities presented in the table above do not reflect a reduction for the posted collateral.

The Company uses the forward commodity price for the periods hedged to value its fuel-hedge swaps and costless collars. This methodology is a market approach, which under SFAS No. 157 utilizes Level 2 inputs as it uses market data for similar instruments in active markets.

New York Mercantile Exchange (NYMEX) #2 Heating Oil (HO) Hedges

During 2008, the Company entered into fuel swap agreements utilizing HO to hedge the equivalent of approximately 24.02 million gallons of fuel with an average swap price of $2.44 per gallon, all of which expired during the year. As of December 31, 2008, there were no HO hedge positions outstanding.

West Texas Intermediate (WTI) Crude Oil Hedges

In addition, BNSF enters into fuel swap and costless collar agreements utilizing WTI crude oil. The hedge prices do not include taxes, transportation costs, certain other fuel handling costs and any differences which may occur between the prices of WTI and the purchase price of BNSF's diesel fuel, including refining costs. Over the twelve months ended December 31, 2008, the sum of all such costs averaged approximately 74 cents per gallon.

During 2008, the Company entered into fuel swap agreements utilizing WTI to hedge the equivalent of approximately 12.82 million barrels of fuel with an average swap price of $82.81 per barrel and costless collar agreements utilizing WTI to hedge the equivalent of approximately 5.89 million barrels of fuel with an average cap price of $112.52 per barrel and an average floor price of $103.81 per barrel. The following tables provide fuel-hedge data based on the quarter being hedged for all WTI fuel hedges outstanding as of December 31, 2008.

| 2009 | Quarter Ending March 31, | June 30, | September 30, | December 31, | Annual |
|---|---|---|---|---|---|
| **WTI Swaps** | | | | | |
| Barrels hedged (in thousands) | 1,125 | 1,215 | 1,240 | 1,425 | 5,005 |
| Equivalent gallons hedged (in millions) | 47.25 | 51.03 | 52.08 | 59.85 | 210.21 |
| Average swap price (per barrel) | $ 74.22 | $ 73.59 | $ 75.09 | $ 75.72 | $ 74.71 |
| Fair value (in millions) | $ (28) | $ (24) | $ (23) | $ (23) | $ (98) |
| **WTI Costless Collars** | | | | | |
| Barrels hedged (in thousands) | 975 | 755 | 520 | 475 | 2,725 |
| Equivalent gallons hedged (in millions) | 40.95 | 31.71 | 21.84 | 19.95 | 114.45 |
| Average cap price (per barrel) | $ 126.40 | $ 127.01 | $ 135.82 | $ 135.46 | $ 129.95 |
| Average floor price (per barrel) | $ 116.20 | $ 117.05 | $ 125.55 | $ 125.38 | $ 119.82 |
| Fair value (in millions) | $ (66) | $ (48) | $ (36) | $ (31) | $ (181) |

| 2010 | Quarter Ending March 31, | June 30, | September 30, | December 31, | Annual |
|---|---|---|---|---|---|
| **WTI Swaps** | | | | | |
| Barrels hedged (in thousands) | 1,210 | 1,110 | 1,125 | 1,235 | 4,680 |
| Equivalent gallons hedged (in millions) | 50.82 | 46.62 | 47.25 | 51.87 | 196.56 |
| Average swap price (per barrel) | $ 85.05 | $ 87.89 | $ 87.82 | $ 86.27 | $ 86.71 |
| Fair value (in millions) | $ (28) | $ (27) | $ (25) | $ (24) | $ (104) |
| **WTI Costless Collars** | | | | | |
| Barrels hedged (in thousands) | 400 | 400 | 400 | 300 | 1,500 |
| Equivalent gallons hedged (in millions) | 16.80 | 16.80 | 16.80 | 12.60 | 63.00 |
| Average cap price (per barrel) | $ 78.22 | $ 79.80 | $ 81.37 | $ 82.95 | $ 80.43 |
| Average floor price (per barrel) | $ 72.55 | $ 74.05 | $ 75.38 | $ 76.87 | $ 74.57 |
| Fair value (in millions) | $ (5) | $ (5) | $ (5) | $ (4) | $ (19) |

| 2011 | Quarter Ending March 31, | June 30, | September 30, | December 31, | Annual |
|---|---|---|---|---|---|
| **WTI Swaps** | | | | | |
| Barrels hedged (in thousands) | 870 | 880 | 885 | 935 | 3,570 |
| Equivalent gallons hedged (in millions) | 36.54 | 36.96 | 37.17 | 39.27 | 149.94 |
| Average swap price (per barrel) | $ 87.12 | $ 86.52 | $ 86.80 | $ 87.07 | $ 86.88 |
| Fair value (in millions) | $ (17) | $ (15) | $ (15) | $ (15) | $ (62) |
| **WTI Costless Collars** | | | | | |
| Barrels hedged (in thousands) | 200 | 200 | 200 | 200 | 800 |
| Equivalent gallons hedged (in millions) | 8.40 | 8.40 | 8.40 | 8.40 | 33.60 |
| Average cap price (per barrel) | $ 84.00 | $ 84.70 | $ 85.39 | $ 86.10 | $ 85.05 |
| Average floor price (per barrel) | $ 77.75 | $ 78.40 | $ 79.05 | $ 79.70 | $ 78.73 |
| Fair value (in millions) | $ (2) | $ (2) | $ (2) | $ (2) | $ (8) |

### Summarized Comparative Prior Year Information

The following table provides summarized comparative information for fuel-hedge transactions outstanding as of December 31, 2007.

| Year ending December 31, | 2008 | 2009 | 2010 |
|---|---|---|---|
| **WTI Swaps** | | | |
| Barrels hedged (in thousands) | 1,010 | 370 | 70 |
| Equivalent gallons hedged (in millions) | 42.42 | 15.54 | 2.94 |
| Average swap price (per barrel) | $ 63.72 | $ 65.08 | $ 64.80 |
| Fair value (in millions) | $ 29 | $ 8 | $ 2 |

## Interest Rate

From time to time, the Company enters into various interest rate hedging transactions for the purpose of managing exposure to fluctuations in interest rates by establishing rates in anticipation of both future debt issuances and the refinancing of leveraged leases, as well as converting a portion of its fixed-rate, long-term debt to floating-rate debt. The Company uses interest rate swaps and treasury locks as part of its interest rate risk management strategy.

### Total Interest Rate Hedging Program

All interest rate derivative transactions outstanding are reflected in the following table:

| | December 31, 2008 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Maturity Date | | | | | | | |
| | 2009 | 2010 | 2011 | 2012 | 2013 | Thereafter | Total | Fair Value |
| **Fair Value Hedges** | | | | | | | | |
| Fixed to variable swaps (in millions) | $ 200 | $ 250 | $ – | $ – | $ – | $ 400 | $ 850 | $ 77[a] |
| Average fixed rate | 6.13% | 7.13% | –% | –% | –% | 5.75% | 6.24% | |
| Average floating rate | 2.47% | 4.87% | –% | –% | –% | 3.40% | 3.61% | |
| **Cash Flow Hedges** | | | | | | | | |
| Treasury locks (in millions) | $ 400 | $ – | $ – | $ – | $ – | $ – | $ 400 | $ (108) |
| Average rate | 4.04% | –% | –% | –% | –% | –% | 4.04% | |

a Fair value includes $4 million of accrued interest.

BNSF's measurement of the fair value of interest rate derivatives is based on estimates of the mid-market values for the transactions provided by the counterparties to these agreements. This methodology is a market approach, which under SFAS No. 157 utilizes Level 2 inputs as it uses market data for similar instruments in active markets. Unrealized mark to market gains and losses are not recorded in the Consolidated Statements of Income.

### Summarized Comparative Prior Year Information

| | December 31, 2007 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Maturity Date | | | | | | | |
| | 2008 | 2009 | 2010 | 2011 | 2012 | Thereafter | Total | Fair Value |
| **Fair Value Hedges** | | | | | | | | |
| Fixed to variable swaps (in millions) | $ – | $ 200 | $ 250 | $ – | $ – | $ – | $ 450 | $ 6 |
| Average fixed rate | –% | 6.13% | 7.13% | –% | –% | –% | 6.68% | |
| Average floating rate | –% | 5.47% | 7.86% | –% | –% | –% | 6.80% | |
| **Cash Flow Hedges** | | | | | | | | |
| Treasury locks (in millions) | $ 175 | $ – | $ – | $ – | $ – | $ – | $ 175 | $ (5) |
| Average rate | 4.41% | –% | –% | –% | –% | –% | 4.41% | |

Fair Value Interest Rate Hedges

The Company enters into interest rate swaps to convert fixed-rate, long-term debt to floating-rate debt. These swaps are accounted for as fair value hedges under SFAS No. 133. These fair value hedges qualify for the short-cut method of recognition; therefore, no portion of these swaps is treated as ineffective.

In March of 2008, the Company entered into four additional interest rate swaps having an aggregate notional amount of $400 million to convert fixed-rate, long-term debt to floating-rate debt. These swaps were entered into at the inception of new 10-year notes (see Note 9 to the Consolidated Financial Statements).

As of each of the years ended December 31, 2008 and 2007, BNSF had outstanding eleven and seven separate swaps, respectively, including the swaps described above, with an aggregate notional amount of $850 million and $450 million, respectively, in which it pays an average floating rate, which fluctuates quarterly, based on London Interbank Offered Rate (LIBOR). The average floating rate to be paid by BNSF as of December 31, 2008, was 3.61 percent, and the average fixed rate BNSF is to receive is 6.24 percent.

The amounts recorded in the Consolidated Statements of Income, as an increase to or reduction of interest expense, for interest rate fair value hedge transactions were as follows (in millions):

| **Year ended December 31,** | **2008** | **2007** | **2006** |
|---|---|---|---|
| Hedge benefit (loss) | **$ 12** | $ (3) | $ (1) |
| Tax effect | **(5)** | 1 | – |
| Hedge benefit (loss), net of tax | **$ 7** | $ (2) | $ (1) |

The amounts recorded in the Consolidated Balance Sheets for interest rate fair value hedge transactions, which represent the fair value of open hedges, with a corresponding adjustment to debt or accrued interest, were as follows (in millions):

| **December 31,** | **2008** | **2007** |
|---|---|---|
| Short-term interest rate hedging asset | **$ 5** | $ – |
| Long-term interest rate hedging asset | **$ 72** | $ 6 |

Cash Flow Interest Rate Hedges

In anticipation of a future debt issuance, the Company entered into five treasury locks during 2008 having an aggregate notional amount of $250 million, and an average locked-in rate of 4.18 percent, to fix a portion of the rate for a future 30-year unsecured debt issuance. The treasury locks are expected to be unwound during the second quarter of 2009 in conjunction with a debt issuance, and any gain or loss on the hedges will be amortized to interest expense over the life of the issued debt. These transactions are accounted for as cash flow hedges.

In anticipation of a future debt issuance, the Company entered into six treasury locks during 2008 having an aggregate notional amount of $150 million, and an average locked-in rate of 3.80 percent, to fix a portion of the rate for a future 10-year unsecured debt issuance. The treasury locks are expected to be unwound during the second quarter of 2009 in conjunction with a debt issuance, and any gain or loss on the hedges will be amortized to interest expense over the life of the issued debt. These transactions are accounted for as cash flow hedges.

In anticipation of a future debt issuance, the Company entered into nine treasury locks during 2008 and 2007, having an aggregate notional amount of $250 million, and an average locked-in rate of 4.24 percent, to fix a portion of the rate for a future 10-year unsecured debt issuance. The treasury locks were terminated in March 2008 in connection with the issuance of $650 million 10-year notes (see Note 9 to the Consolidated Financial Statements). Upon termination, BNSF paid $13 million to the counterparties, which will be amortized to interest expense over the life of the issued debt. These transactions are accounted for as cash flow hedges.

In anticipation of a future refinancing of several leveraged leases, the Company had entered into six treasury locks having an aggregate notional amount of $147 million to fix the interest rate inherent in the operating lease payments. The treasury locks were terminated in May 2007 in connection with the refinancing of the leveraged leases, and the resulting $0.5 million gain on these hedges will be amortized to equipment rents over the remaining life of the leases. These transactions are also accounted for as cash flow hedges.

In anticipation of future debt issuances, the Company had entered into fourteen treasury locks having an aggregate notional amount of $450 million to fix a portion of the rate for a future 10-year unsecured debt issuance and a future 30-year unsecured debt issuance. The treasury locks were terminated in April 2007 in connection with the issuance of $650 million 10-year and $650 million 30-year unsecured debt. Upon termination, BNSF received $6 million from the counterparties, which will be amortized to interest expense over the life of the issued debt. These transactions are also accounted for as cash flow hedges.

The amounts recorded in the Consolidated Balance Sheets for interest rate cash flow hedge transactions, which represent the fair value of open and closed hedges, were as follows (in millions):

| December 31, | 2008 | 2007 |
|---|---|---|
| Interest rate hedging liability – open hedges | **$ (108)** | $ (5) |
| Unrecognized gain on closed hedges | **6** | 19 |
| Tax effect | **39** | (5) |
| Unrecognized (loss) gain in AOCL, net of tax | **$ (63)** | $ 9 |

## 4. Other Expense, Net

Other expense, net includes the following (in millions):

| Year ended December 31, | 2008 | 2007 | 2006 |
|---|---|---|---|
| Accounts receivable sales fees | **$ 12** | $ 19 | $ 23 |
| Loss from participation in synthetic fuel partnership | **–** | 5 | 9 |
| Miscellaneous, net | **(1)** | (6) | 8 |
| Total | **$ 11** | $ 18 | $ 40 |

The decrease in other expense, net was predominantly due to lower accounts receivable sales fees (see Note 6 to the Consolidated Financial Statements for additional information).

During the fourth quarter of 2004, BNSF Railway indirectly purchased a 4.17 percent ownership of a synthetic fuel partnership through a 50 percent interest in a limited liability company with an unrelated entity. The synthetic fuel partnership generated Section 29 synthetic fuel tax credits, which reduced the Company's effective tax rate (see Note 5 to the Consolidated Financial Statements for additional information). In 2007 and 2006, BNSF Railway received a tax benefit from its participation in the partnership of approximately $7 million and $11 million, respectively, related to the fuel tax credits and the deduction of partnership operating losses. In 2007 and 2006, the Company recorded approximately $5 million and $9 million, respectively, of other expense, net related to the Company's share of the partnership's losses under the equity method of accounting. The partnership did not qualify for consolidation under FIN 46R, as BNSF Railway was not the primary beneficiary of the partnership. Under the tax law, the Section 29 synthetic fuel tax credits terminated on December 31, 2007; under the BNSF Railway's purchase agreement, it did not have any additional exposure to loss from the synthetic fuel partnership after that date.

## 5. Income Taxes

Income tax expense was as follows (in millions):

| Year ended December 31, | 2008 | 2007 | 2006 |
|---|---|---|---|
| Current: | | | |
| Federal | **$ 735** | $ 741 | $ 697 |
| State | **101** | 107 | 94 |
| Total current | **836** | 848 | 791 |
| Deferred: | | | |
| Federal | **383** | 245 | 300 |
| State | **34** | 35 | 16 |
| Total deferred | **417** | 280 | 316 |
| Total | **$ 1,253** | $ 1,128 | $ 1,107 |

Reconciliation of the federal statutory income tax rate to the effective tax rate was as follows:

| Year ended December 31, | 2008 | 2007 | 2006 |
|---|---|---|---|
| Federal statutory income tax rate | **35.0%** | 35.0% | 35.0% |
| State income taxes, net of federal tax benefit | **2.6** | 3.1 | 2.6 |
| Tax law change | **–** | – | (0.2) |
| Synthetic fuel credits | **–** | (0.2) | (0.3) |
| Other, net | **(0.4)** | 0.3 | (0.2) |
| Effective tax rate | **37.2%** | 38.2% | 36.9% |

The components of deferred tax assets and liabilities were as follows (in millions):

| December 31, | 2008 | 2007 |
|---|---|---|
| Deferred tax liabilities: | | |
| Depreciation and amortization | **$ (9,522)** | $ (8,977) |
| Hedging | **–** | (26) |
| Other | **(167)** | (170) |
| Total deferred tax liabilities | **(9,689)** | (9,173) |
| Deferred tax assets: | | |
| Pension and retiree health and welfare benefits | **431** | 184 |
| Casualty and environmental | **428** | 348 |
| Hedging | **207** | – |
| Compensation and benefits | **178** | 145 |
| Employee separation costs | **31** | 35 |
| Other | **266** | 267 |
| Total deferred tax assets | **1,541** | 979 |
| Net deferred tax liability | **$ (8,148)** | $ (8,194) |
| Non-current deferred income tax liability | **$ (8,590)** | $ (8,484) |
| Current portion of deferred income taxes | **442** | 290 |
| Net deferred tax liability | **$ (8,148)** | $ (8,194) |

All federal income tax returns of BNSF are closed through 1999. Internal Revenue Service (IRS) examination of the years 2000 through 2005 for BNSF is completed, and the un-agreed issues are pending before IRS Appeals. It is anticipated that a settlement with the IRS for the years 2000 through 2005 may be reached within the next twelve months. BNSF is currently under examination for years 2006 and 2007.

BNSF and its subsidiaries have various state income tax returns in the process of examination, administrative appeal or litigation. State income tax returns are generally subject to examination for a period of three to five years after filing of the respective return. The state impact of any federal changes remains subject to examination by various states for a period of up to one year after formal notification to the states.

A significant portion of the audit issues relate to state income tax issues with various taxing authorities and with the IRS related to whether certain asset valuations of donated property are appropriate. A provision for taxes resulting from ongoing and future federal and state audits is based on an estimation of aggregate adjustments that may be required as a result of the audits. The Company believes that adequate provision has been made for any adjustment that might be assessed for open years through 2008.

### Uncertain Tax Positions

The Company adopted the provisions of FIN 48 on January 1, 2007. As a result of the implementation of FIN 48, the Company recorded an $83 million increase in the liability for unrecognized tax benefits, which is offset by a reduction of the deferred tax liability of $70 million, resulting in a decrease to the January 1, 2007, retained earnings balance of $13 million. The amount of unrecognized tax benefits at December 31, 2008, was $150 million, of which $73 million would impact the Company's effective tax rate if recognized. A reconciliation of the beginning and ending amount of unrecognized tax benefits is as follows (in millions):

| | 2008 | 2007 |
|---|---|---|
| Beginning balance | **$ 125** | $ 87 |
| Additions for tax positions related to current year | **19** | 29 |
| Additions for tax positions taken in prior years | **9** | 12 |
| Additions (reductions) for tax positions as a result of: | | |
| Settlements | **2** | – |
| Lapse of statute of limitations | **(5)** | (3) |
| Ending balance | **$ 150** | $ 125 |

It is expected that the amount of unrecognized tax benefits will change in the next twelve months; however, BNSF does not expect the change to have a significant impact on the results of operations or the financial position of the Company.

The Company recognizes interest accrued related to unrecognized tax benefits in interest expense and penalties in income tax expense in the Consolidated Statements of Income, which is consistent with the recognition of these items in prior reporting periods. The Company had recorded a liability of approximately $33 million and $41 million for the payment of interest and penalties for the years ended December 31, 2008 and 2007, respectively. For the years ended December 31, 2008 and 2007, the Company recognized a reduction of approximately $18 million and $7 million in interest and penalty expense, respectively. For the year ended December 31, 2006, the Company recognized approximately $5 million in interest and penalty expense.

## *6. Accounts Receivable, Net*

BNSF Railway transfers a portion of its accounts receivable to Santa Fe Receivables Corporation (SFRC), a special purpose subsidiary. The sole purpose and activity of SFRC is to purchase receivables from BNSF Railway. SFRC transfers an undivided interest in such receivables, with limited exceptions, to a master trust and causes the trust to issue an undivided interest in the receivables to investors (the A/R sales program). The undivided interests in the master trust may be in the form of certificates or purchased interests and are isolated from BNSF Railway which eliminates all of BNSF Railway's control over the undivided interest. SFRC periodically incurs minor legal fees that are paid by BNSF Railway and are financed through short-term intercompany payables.

BNSF Railway's total capacity to sell undivided interests to investors under the A/R sales program was $700 million at December 31, 2008, which was comprised of two $175 million, 364-day accounts receivable facilities and two $175 million, 3-year accounts receivable facilities. BNSF Railway extended the maturity date of one 364-day facility to November 2009 and extended the maturity date of the other 364-day facility to March 2009, at which time the Company expects to extend it to November 2009. The two 3-year facilities were entered into in November 2007 and will mature in November 2010. The ratings of the financial institutions providing the credit under the facilities are each rated Aa2/A+ or higher. Outstanding undivided interests held by investors under the A/R sales program were $50 million and $300 million at December 31, 2008 and 2007, respectively, with $12.5 million and $75 million in each facility, respectively. These undivided interests in receivables are excluded from accounts receivable by BNSF Railway in connection with the sale of undivided interests under the A/R sales program. These undivided interests were supported by $889 million and $1,105 million of receivables transferred by SFRC to the master trust at December 31, 2008 and 2007, respectively. When SFRC transfers these receivables to the master trust, it retains an undivided interest in the receivables sold, which is included in accounts receivable in the Company's Consolidated Balance Sheets. The interest that continues to be held by SFRC of $839 million and $805 million at December 31, 2008 and 2007, respectively, less an allowance for uncollectible accounts, reflected the total accounts receivable transferred by SFRC to the master trust less $50 million and $300 million at December 31, 2008 and 2007, respectively, of outstanding undivided interests held by investors. Due to a relatively short collection cycle, the fair value of the undivided interest transferred to investors in the A/R sales program approximated book value, and there was no gain or loss from the transaction.

BNSF Railway retains the collection responsibility with respect to the accounts receivable. Proceeds from collections reinvested in the A/R sales program were approximately $19.5 billion, $16.8 billion and $15.8 billion in 2008, 2007 and 2006, respectively. No servicing asset or liability has been recorded because the fees BNSF Railway receives for servicing the receivables approximate the related costs. SFRC's costs of the sale of receivables are included in other expense, net and were $12 million, $19 million and $23 million for the years ended December 31, 2008, 2007 and 2006, respectively. These costs fluctuate monthly with changes in prevailing interest rates as well as unused available commitments and were based on weighted average interest rates of 3.4 percent, 5.7 percent and 5.4 percent for the years ended December 31, 2008, 2007 and 2006, respectively. These costs include interest, discounts associated with transferring the receivables under the A/R sales program to SFRC, program fees paid to banks, incidental commercial paper issuing costs and fees for unused commitment availability.

The amount of accounts receivable transferred by BNSF Railway to SFRC fluctuates based upon the availability of receivables and is directly affected by changing business volumes and credit risks, including dilution and delinquencies. In order for there to be an impact on the amount of receivables BNSF Railway could sell, the combined dilution and delinquency percentages would have to exceed an established threshold. BNSF Railway has historically experienced very low levels of dilution or delinquency and was well below the established threshold rates at December 31, 2008. Based on the current levels, if dilution or delinquency percentages were to increase by one percentage point, there would be no impact to the amount of receivables BNSF Railway could sell.

Receivables funded under the A/R sales program may not include amounts over 90 days past due or concentrations over certain limits with any one customer and certain other receivables. At December 31, 2008 and 2007, $13 million and $11 million, respectively, of accounts receivable were greater than 90 days old.

BNSF Railway maintains an allowance for bill adjustments and uncollectible accounts based upon the expected collectibility of accounts receivable, including receivables transferred to the master trust. At December 31, 2008 and 2007, $55 million and $36 million, respectively of such allowances had been recorded, of which $54 million and $34 million, respectively, had been recorded as a reduction to accounts receivable, net. The remaining $1 million and $2 million at December 31, 2008 and 2007, respectively, had been recorded in accounts payable and other current liabilities because they relate to the outstanding undivided interests held by investors. During the years ended December 31, 2008 and 2007, $6 million and $4 million, respectively, of accounts receivable were written off. Credit losses are based on specific identification of uncollectible accounts and application of historical collection percentages by aging category.

The investors in the master trust have no recourse to BNSF Railway's other assets except for customary warranty and indemnity claims. Creditors of BNSF Railway have no recourse to the assets of the master trust or SFRC unless and until all claims of their respective creditors have been paid. The A/R sales program includes thresholds for dilution, delinquency and write-off ratios that, if exceeded, allow the investors participating in this program, at their option, to cancel the program. At December 31, 2008, BNSF Railway was in compliance with these provisions.

## *7. Property and Equipment, Net*

Property and equipment, net (in millions), and the weighted average annual depreciation rates (%) were as follows:

| **December 31,** | **2008** | **2007** | **2008 Depreciation Rates** |
|---|---|---|---|
| Land | **$ 1,751** | $ 1,718 | –% |
| Track structure | **19,108** | 18,037 | 3.3% |
| Other roadway | **12,924** | 12,370 | 2.6% |
| Locomotives | **4,210** | 4,003 | 6.9% |
| Freight cars and other equipment | **2,140** | 2,034 | 5.3% |
| Computer hardware, software and other | **626** | 582 | 13.2% |
| Total cost | **40,759** | 38,744 | |
| Less accumulated depreciation and amortization | **(9,912)** | (9,177) | |
| Property and equipment, net | **$ 30,847** | $ 29,567 | |

The Consolidated Balance Sheets at December 31, 2008 and 2007, included $1,648 million, net of $572 million of amortization and $1,507 million, net of $469 million of amortization, respectively, for property and equipment under capital leases, primarily for rolling stock.

The Company capitalized $17 million, $17 million and $14 million of interest for the years ended December 31, 2008, 2007 and 2006, respectively.

## 8. Accounts Payable and Other Current Liabilities

Accounts payable and other current liabilities consisted of the following (in millions):

| December 31, | 2008 | 2007 |
|---|---|---|
| Compensation and benefits payable | **$ 610** | $ 568 |
| Hedge liabilities[a] | **333** | 5 |
| Accounts payable | **290** | 296 |
| Casualty and environmental liabilities | **280** | 246 |
| Rents and leases | **276** | 303 |
| Property tax liabilities | **157** | 141 |
| Customer incentives | **141** | 145 |
| Dividends payable | **136** | 112 |
| Accrued interest | **135** | 138 |
| Other | **832** | 870 |
| Total | **$ 3,190** | $ 2,824 |

a 2008 hedge liabilities include a reduction of $92 million for collateral paid (see Note 3 to the Consolidated Financial Statements for additional information).

## 9. Debt

Debt outstanding was as follows (in millions):

| December 31, | 2008[a] | | 2007[a] | |
|---|---|---|---|---|
| Notes and debentures, due 2009 to 2097 | **$ 7,593** | **6.3%** | $ 6,376 | 6.6% |
| Equipment obligations, due 2009 to 2016 | **244** | **6.7** | 297 | 6.7 |
| Capitalized lease obligations, due 2009 to 2028 | **1,281** | **5.3** | 938 | 6.3 |
| Mortgage bonds, due 2009 to 2047 | **97** | **6.0** | 102 | 6.1 |
| Financing obligations, due 2009 to 2028 | **278** | **6.2** | 211 | 6.3 |
| Commercial paper | **100** | **4.7** | 261 | 5.5 |
| Unamortized discount and other, net | **(38)** | | (39) | |
| Total | **9,555** | | 8,146 | |
| Less current portion of long-term debt | **(456)** | **4.8%** | (411) | 7.2% |
| Long-term debt | **$ 9,099** | | $ 7,735 | |

a Amounts represent debt outstanding and weighted average effective interest rates for 2008 and 2007, respectively. Maturities are as of December 31, 2008.

Notes and debentures include a fair value adjustment increase for hedges of $73 million and an increase of $6 million at December 31, 2008 and 2007, respectively.

As of December 31, 2008, certain BNSF Railway properties and other assets were subject to liens securing $97 million of mortgage debt. Certain locomotives and rolling stock of BNSF Railway were subject to equipment obligations and capital leases.

The following table provides fair value information for the Company's debt obligations including principal cash flows and related weighted average interest rates by contractual maturity dates. Weighted average variable rate for commercial paper is the current rate at December 31, 2008. The remaining weighted average variable rates are based on implied forward rates in the yield curve at December 31, 2008.

| | December 31, 2008 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Maturity Date | | | | | | Total Including Capital Leases | Total Excluding Capital Leases | Fair Value Excluding Capital Leases |
| | 2009 | 2010 | 2011 | 2012 | 2013 | Thereafter | | | |
| Fixed-rate debt (in millions) | $ 254 | $ 345 | $ 631 | $ 451 | $ 393 | $ 6,458 | $ 8,532 | $ 7,251 | $ 7,300 |
| Average interest rate | 6.7% | 6.6% | 6.6% | 6.0% | 5.0% | 6.6% | 6.5% | | |
| Variable-rate debt (in millions) | $ 202 | $ 263 | $ – | $ 100 | $ – | $ 458 | $ 1,023 | $ 1,023 | $ 1,023 |
| Average interest rate | 2.5% | 4.3% | –% | 4.7% | –% | 4.1% | 3.9% | | |

BNSF has included maturities of $100 million of commercial paper in the 2012 column above.

The fair value of BNSF's long-term debt is primarily based on quoted market prices for the same or similar issues, or on the current rates that would be offered to BNSF for debt of the same remaining maturities. Capital leases have been excluded from the calculation of fair value for both 2008 and 2007. The carrying amount of commercial paper approximates fair value, and the average interest rate equals the current rate because of the short maturity of these instruments.

## Notes and Debentures

**2008**

In November 2008, BNSF issued $500 million of 7.00 percent notes due February 1, 2014. The net proceeds from the sale of the notes are being used for general corporate purposes which may include, but are not limited to, working capital, capital expenditures, repurchase of common stock pursuant to the share repurchase program and repayment of short-term borrowings.

In March 2008, BNSF issued $650 million of 5.75 percent notes due March 15, 2018. The net proceeds from the sale of the notes are being used for general corporate purposes including, but not limited to, working capital, capital expenditures, funding debt which matured in 2008, repurchase of common stock pursuant to the share repurchase program and repayment of short-term borrowings.

At December 31, 2008, $500 million remained authorized to be issued by the Board of Directors through the Securities and Exchange Commission (SEC) debt shelf registration process.

**2007**

In April 2007, BNSF issued $650 million of 5.65 percent debentures and $650 million of 6.15 percent debentures due May 1, 2017 and May 1, 2037, respectively. The net proceeds from the sale of the debentures are being used for general corporate purposes including, but not limited to, working capital, capital expenditures, funding debt which matured in 2007, the repayment of commercial paper and the repurchase of common stock.

**2006**

In August 2006, BNSF issued $300 million of 6.20 percent debentures due August 15, 2036. The net proceeds from the sale of the debentures are being used for general corporate purposes including but not limited to working capital, capital expenditures and the repayment of outstanding commercial paper.

## Capital Leases

**2008**

In 2008, BNSF entered into a capital lease for approximately $158 million to finance locomotives and freight cars. The term of the lease is 20 years. Additionally, BNSF entered into capital leases totaling $100 million to finance maintenance of way and other vehicles/equipment with lease terms of three to seven years.

**2007**

In 2007, BNSF entered into several capital leases totaling approximately $325 million to finance locomotives and freight cars. The terms of the leases are between 15 and 20 years. Additionally, BNSF entered into capital leases totaling $119 million to finance maintenance of way and other vehicles/equipment with lease terms of three to seven years.

**2006**

In 2006, BNSF entered into several capital leases totaling $108 million to finance maintenance of way and other vehicles/equipment with lease terms of three to seven years.

## Financing Obligation

In 2005, the Company commenced the construction of an intermodal facility that it intends to sell to a third party and subsequently lease back. Once construction of the facility is complete and all improvements have been sold to the third party, BNSF will lease the facility from the third party for 20 years. Construction is expected to be completed by mid-2009 with an approximate cost of $160 million. As of December 31, 2008, BNSF has sold $109 million of completed improvements. This sale leaseback transaction is being accounted for as a financing obligation due to continuing involvement. The outflows from the construction of the facility are classified as investing activities, and the inflows from the associated financing proceeds are classified as financing activities in the Company's Consolidated Statements of Cash Flows.

## Revolving Credit Facility and Commercial Paper

As of December 31, 2008, the Company had borrowing capacity of up to $1.2 billion under its long-term revolving bank credit facility, which expires September 2012. Annual facility fees are currently 0.08 percent for the facility. The rate is subject to change based upon changes in BNSF's senior unsecured debt ratings. Borrowing rates are based upon (i) LIBOR plus a spread determined by BNSF's senior unsecured debt ratings, (ii) money market rates offered at the option of the lenders, or (iii) an alternate base rate. BNSF must maintain compliance with certain financial covenants under its revolving bank credit facility. At December 31, 2008, the Company was in compliance with these covenants.

At December 31, 2008, there were no bank borrowings against the revolving credit agreement.

BNSF issues commercial paper from time to time that is supported by the revolving bank credit facility. Outstanding commercial paper balances reduce the amount of borrowings available under this agreement and are classified as long-term to the extent of its borrowing capacity under this facility.

The maturity value of commercial paper as of December 31, 2008, of approximately $150 million reduced the total capacity available under the revolving credit agreements to $1.05 billion. Commercial paper outstanding consisted of $50 million issued to a consolidated subsidiary of BNSF that was eliminated upon consolidation. Consolidated commercial paper outstanding, which had a maturity value of approximately $100 million, was classified as long-term debt in the Company's Consolidated Balance Sheet.

## Guarantees

As of December 31, 2008, BNSF Railway has not been called upon to perform under the guarantees specifically disclosed in this footnote and does not anticipate a significant performance risk in the foreseeable future.

Debt and other obligations of non-consolidated entities guaranteed by the Company as of December 31, 2008, were as follows (dollars in millions):

| | Guarantees | | | | | |
|---|---|---|---|---|---|---|
| | BNSF Ownership Percentage | Principal Amount Guaranteed | Maximum Future Payments | Maximum Recourse Amount[a] | Remaining Term (in years) | Capitalized Obligations |
| Kinder Morgan Energy Partners, L.P. | 0.5% | $ 190 | $ 190 | $ – | Termination of Ownership | $ – |
| Kansas City Terminal Intermodal Transportation Corporation | 0.0% | $ 52 | $ 74 | $ 74 | 10 | $ 29[b] |
| Westside Intermodal Transportation Corporation | 0.0% | $ 39 | $ 58 | $ – | 15 | $ 30[b] |
| The Unified Government of Wyandotte County/Kansas City, Kansas | 0.0% | $ 12 | $ 18 | $ – | 15 | $ 9[b] |
| Chevron Phillips Chemical Company, LP | 0.0% | N/A[d] | N/A[d] | N/A[d] | 9 | $ 12[c] |
| Various lessors (Residual value guarantees) | 0.0% | N/A | $ 271 | $ 271 | Various | $ 68[c] |
| All other | 0.0% | $ 5 | $ 5 | $ 2 | Various | $ – |

a Reflects the maximum amount the Company could recover from a third party other than the counterparty.

b Reflects capitalized obligations that are recorded on the Company's Consolidated Balance Sheets.

c Reflects FIN 45, *Guarantor's Accounting and Disclosure Requirements for Guarantees,* asset and corresponding liability for the fair value of these guarantees.

d There is no cap to the liability that can be sought from BNSF for BNSF's negligence or the negligence of the indemnified party. However, BNSF could receive reimbursement from certain insurance policies if the liability exceeds a certain amount.

### Kinder Morgan Energy Partners, L.P.

Santa Fe Pacific Pipelines, Inc., an indirect, wholly-owned subsidiary of BNSF Railway, has a guarantee in connection with its remaining special limited partnership interest in Santa Fe Pacific Pipelines Partners, L.P. (SFPP), a subsidiary of Kinder Morgan Energy Partners, L.P., to be paid only upon default by the partnership. All obligations with respect to the guarantee will cease upon termination of ownership rights, which would occur upon a put notice issued by BNSF or the exercise of the call rights by the general partners of SFPP.

**Kansas City Terminal Intermodal Transportation Corporation**

BNSF Railway and another major railroad jointly and severally guarantee $52 million of debt of Kansas City Terminal Intermodal Transportation Corporation, the proceeds of which were used to finance construction of a double track grade separation bridge in Kansas City, Missouri, which is operated and used by Kansas City Terminal Railway Company (KCTRC). BNSF Railway has a 25 percent ownership in KCTRC, accounts for its interest using the equity method of accounting and would be required to fund a portion of the remaining obligation upon default by the original debtor.

**Westside Intermodal Transportation Corporation and The Unified Government of Wyandotte County/Kansas City, Kansas**

BNSF Railway has outstanding guarantees of $51 million of debt, the proceeds of which were used to finance construction of a bridge that connects BNSF Railway's Argentine Yard in Kansas City, Kansas, with the KCTRC mainline tracks in Kansas City, Missouri. The bridge is operated by KCTRC, and payments related to BNSF Railway's guarantee of this obligation would only be called for upon default by the original debtor.

**Chevron Phillips Chemical Company, LP**

In the third quarter of 2007, BNSF Railway entered into an indemnity agreement with Chevron Phillips Chemical Company, LP (Chevron Phillips), granting certain rights of indemnity from BNSF Railway, in order to facilitate access to a new storage facility. Under certain circumstances, payment under this obligation may be required in the event Chevron Phillips were to incur certain liabilities or other incremental costs resulting from trackage access.

**Residual Value Guarantees (RVG)**

In the normal course of business, the Company enters into leases in which it guarantees the residual value of certain leased equipment. Some of these leases have renewal or purchase options, or both, that the Company may exercise at the end of the lease term. If the Company elects not to exercise these options, it may be required to pay the lessor an amount not exceeding the RVG. The amount of any payment is contingent upon the actual residual value of the leased equipment. Some of these leases also require the lessor to pay the Company any surplus if the actual residual value of the leased equipment is over the RVG. These guarantees will expire between 2009 and 2011.

The maximum future payments, as disclosed in the Guarantees table above, represent the undiscounted maximum amount that the Company could be required to pay in the event the Company did not exercise its renewal option and the fair market value of the equipment had significantly declined. As of December 31, 2008, BNSF does not anticipate such a large reduction in the fair market value of the leased equipment. As of December 31, 2008, the Company had recorded a $68 million asset and corresponding liability for the fair value of RVGs.

**All Other**

As of December 31, 2008, BNSF guaranteed $5 million of other debt and leases. BNSF holds a performance bond and has the option to sub-lease property to recover up to $2 million of the $5 million of guarantees. These guarantees expire between 2011 and 2013.

Other than as discussed above, there is no collateral held by a third party that the Company could obtain and liquidate to recover any amounts paid under the above guarantees.

Other than as discussed above, none of the guarantees are recorded in the Consolidated Financial Statements of the Company. The Company does not expect performance under these guarantees to have a material effect on the Company in the foreseeable future.

**Indemnities**

In the ordinary course of business, BNSF enters into agreements with third parties that include indemnification clauses. In general, these clauses are customary for the types of agreements in which they are included. At times, these clauses may involve indemnification for the acts of the Company, its employees and agents, indemnification for another party's acts, indemnification for future events, indemnification based upon a certain standard of performance, indemnification for liabilities arising out of the Company's use of leased equipment or other property, or other types of indemnification. Due to the uncertainty of whether events which would trigger the indemnification obligations would ever occur, the Company does not believe that these indemnity agreements will have a material adverse effect on the Company's results of operations, financial position or liquidity. Additionally, the Company believes that, due to lack of historical payment experience, the fair value of indemnities cannot be estimated with any amount of certainty and that the fair value of any such amount would be immaterial to the Consolidated Financial Statements. Agreements that contain unique circumstances, particularly agreements that contain guarantees that indemnify another party's acts are disclosed separately if appropriate. Unless separately disclosed above, no fair value liability related to indemnities has been recorded in the Consolidated Financial Statements.

## 10. Commitments and Contingencies

### Lease Commitments

BNSF has substantial lease commitments for locomotives, freight cars, trailers and containers, office buildings, operating facilities and other property, and many of these leases provide the option to purchase the leased item at fair market value at the end of the lease. However, some provide fixed price purchase options. Future minimum lease payments as of December 31, 2008, are summarized as follows (in millions):

| December 31, | Capital Leases | Operating Leases[a] |
|---|---|---|
| 2009 | $ 250 | $ 620 |
| 2010 | 282 | 645 |
| 2011 | 219 | 602 |
| 2012 | 137 | 543 |
| 2013 | 98 | 519 |
| Thereafter | 614 | 4,051 |
| Total | 1,600 | $ 6,980 |
| Less amount representing interest | (319) | |
| Present value of minimum lease payments | $ 1,281 | |

a Excludes leases having non-cancelable lease terms of less than one year and per diem leases.

Lease rental expense for all operating leases, excluding per diem leases, was $686 million, $706 million and $665 million for the years ended December 31, 2008, 2007 and 2006, respectively. When rental payments are not made on a straight-line basis, the Company recognizes rental expense on a straight-line basis over the lease term. Contingent rentals and sublease rentals were not significant.

### Other Commitments

In the normal course of business, the Company enters into long-term contractual requirements for future goods and services needed for the operations of the business. Such commitments are not in excess of expected requirements and are not reasonably likely to result in performance penalties or payments that would have a material adverse effect on the Company's liquidity.

### Personal Injury and Environmental Costs

#### Personal Injury

Personal injury claims, including asbestos claims and employee work-related injuries and third-party injuries (collectively, other personal injury), are a significant expense for the railroad industry. Personal injury claims by BNSF Railway employees are subject to the provisions of the Federal Employers' Liability Act (FELA) rather than state workers' compensation laws. FELA's system of requiring the finding of fault, coupled with unscheduled awards and reliance on the jury system, contributed to increased expenses in past years. Other proceedings include claims by non-employees for punitive as well as compensatory damages. A few proceedings purport to be class actions. The variability present in settling these claims, including non-employee personal injury and matters in which punitive damages are alleged, could result in increased expenses in future years. BNSF has implemented a number of safety programs designed to reduce the number of personal injuries as well as the associated claims and personal injury expense.

BNSF records a liability for personal injury claims when the expected loss is both probable and reasonably estimable. The liability and ultimate expense projections are estimated using standard actuarial methodologies. Liabilities recorded for unasserted personal injury claims are based on information currently available. Due to the inherent uncertainty involved in projecting future events such as the number of claims filed each year, developments in judicial and legislative standards and the average costs to settle projected claims, actual costs may differ from amounts recorded. Expense accruals and any required adjustments are classified as materials and other in the Consolidated Statements of Income.

#### Asbestos

The Company is party to a number of personal injury claims by employees and non-employees who may have been exposed to asbestos. The heaviest exposure for BNSF employees was due to work conducted in and around the use of steam locomotive engines that were phased out between the years of 1950 and 1967. However, other types of exposures, including exposure from locomotive component parts and building materials, continued after 1967 until they were substantially eliminated at BNSF by 1985.

BNSF assesses its unasserted liability exposure on an annual basis during the third quarter. BNSF determines its asbestos liability by estimating its exposed population, the number of claims likely to be filed, the number of claims that will likely require payment and the estimated cost per claim. Estimated filing and dismissal rates and average cost per claim are determined utilizing recent claim data and trends.

During the third quarters of 2008, 2007 and 2006, the Company analyzed recent filing and payment trends to ensure the assumptions used by BNSF to estimate its future asbestos liability were reasonable. In 2007, management recorded a decrease in expense of $17 million due to a statistically significant reduction in filing rate experience for non-malignant claims. In 2008 and 2006, management determined that the liability remained appropriate and no change was recorded. The Company plans to update its study again in the third quarter of 2009.

Throughout the year, BNSF monitors actual experience against the number of forecasted claims and expected claim payments and will record adjustments to the Company's estimates as necessary.

The following table summarizes the activity in the Company's accrued obligations for both asserted and unasserted asbestos matters (in millions):

| | 2008 | 2007 | 2006 |
|---|---|---|---|
| Beginning balance | **$ 270** | $ 306 | $ 326 |
| Accruals | **–** | (17) | – |
| Payments | **(19)** | (19) | (20) |
| Ending balance at December 31, | **$ 251** | $ 270 | $ 306 |

Of the obligation at December 31, 2008, $208 million was related to unasserted claims while $43 million was related to asserted claims. At both December 31, 2008 and 2007, $17 million was included in current liabilities, respectively. The recorded liability was not discounted. In addition, defense and processing costs, which are recorded on an as-reported basis, were not included in the recorded liability. The Company is primarily self-insured for asbestos-related claims.

The following table summarizes information regarding the number of asserted asbestos claims filed against BNSF:

| | 2008 | 2007 |
|---|---|---|
| Claims unresolved at January 1, | **1,781** | 1,975 |
| Claims filed | **494** | 376 |
| Claims settled, dismissed or otherwise resolved | **(442)** | (570) |
| Claims unresolved at December 31, | **1,833** | 1,781 |

Based on BNSF's estimate of the potentially exposed employees and related mortality assumptions, it is anticipated that unasserted claims will continue to be filed through the year 2050. The Company recorded an amount for the full estimated filing period through 2050 because it had a relatively finite exposed population (former and current employees hired prior to 1985), which it was able to identify and reasonably estimate and about which it had obtained reliable demographic data (including age, hire date and occupation) derived from industry or BNSF specific data that was the basis for the study. BNSF projects that approximately 55, 75 and 95 percent of the future unasserted asbestos claims will be filed within the next 10, 15 and 25 years, respectively.

Because of the uncertainty surrounding the factors used in the study, it is reasonably possible that future costs to settle asbestos claims may range from approximately $230 million to $275 million. However, BNSF believes that the $251 million recorded at December 31, 2008, is the best estimate of the Company's future obligation for the settlement of asbestos claims.

The amounts recorded by BNSF for the asbestos-related liability were based upon currently known facts. Future events, such as the number of new claims to be filed each year, the average cost of disposing of claims, as well as the numerous uncertainties surrounding asbestos litigation in the United States, could cause the actual costs to be higher or lower than projected.

While the final outcome of asbestos-related matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded, it is the opinion of BNSF that none of these items, when finally resolved, will have a material adverse effect on the Company's financial position or liquidity. However, the occurrence of a number of these items in the same period could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

Other Personal Injury

BNSF estimates its other personal injury liability claims and expense quarterly based on the covered population, activity levels and trends in frequency and the costs of covered injuries. Estimates include unasserted claims except for certain repetitive stress and other occupational trauma claims that allegedly result from prolonged repeated events or exposure. Such claims are estimated on an as-reported basis because the Company cannot estimate the range of reasonably possible loss due to other non-work related contributing causes of such injuries and the fact that continued exposure is required for the potential injury to manifest itself as a claim. BNSF has not experienced any significant adverse trends related to these types of claims in recent years.

BNSF monitors quarterly actual experience against the number of forecasted claims to be received, the forecasted number of claims closing with payment and expected claims payments. Adjustments to the Company's estimates are recorded quarterly as necessary or more frequently as new events or revised estimates develop.

The following table summarizes the activity in the Company's accrued obligations for other personal injury matters (in millions):

| | 2008 | 2007 | 2006 |
|---|---|---|---|
| Beginning balance | **$ 439** | $ 439 | $ 422 |
| Accruals | **159** | 190 | 188 |
| Payments | **(156)** | (190) | (171) |
| Ending balance at December 31, | **$ 442** | $ 439 | $ 439 |

At December 31, 2008 and 2007, $183 million and $163 million were included in current liabilities, respectively. BNSF's liabilities for other personal injury claims are undiscounted. In addition, defense and processing costs, which are recorded on an as-reported basis, were not included in the recorded liability. The Company is substantially self-insured for other personal injury claims.

The following table summarizes information regarding the number of personal injury claims, other than asbestos, filed against BNSF:

| | 2008 | 2007 |
|---|---|---|
| Claims unresolved at January 1, | **3,322** | 3,130 |
| Claims filed | **4,313** | 3,894 |
| Claims settled, dismissed or otherwise resolved | **(4,286)** | (3,702) |
| Claims unresolved at December 31, | **3,349** | 3,322 |

Because of the uncertainty surrounding the ultimate outcome of other personal injury claims, it is reasonably possible that future costs to settle other personal injury claims may range from approximately $375 million to $555 million. However, BNSF believes that the $442 million recorded at December 31, 2008, is the best estimate of the Company's future obligation for the settlement of other personal injury claims.

The amounts recorded by BNSF for other personal injury claims were based upon currently known facts. Future events, such as the number of new claims to be filed each year, the average cost of disposing of claims, as well as the numerous uncertainties surrounding personal injury litigation in the United States, could cause the actual costs to be higher or lower than projected.

While the final outcome of these other personal injury matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded, it is the opinion of BNSF that none of these items, when finally resolved, will have a material adverse effect on the Company's financial position or liquidity. However, the occurrence of a number of these items in the same period could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

BNSF Insurance Company

The Company has a consolidated, wholly-owned subsidiary, Burlington Northern Santa Fe Insurance Company, Ltd. (BNSF IC) that provides insurance coverage for certain risks incurred after April 1, 1998, FELA claims, railroad protective and force account insurance claims and certain excess general liability coverage incurred after January 1, 2002, and certain other claims which are subject to reinsurance. Beginning in 2004, BNSF IC entered into annual reinsurance pooling agreements with several other companies. The pooling agreements insure workers compensation, general liability, auto liability and FELA risk. In accordance with the agreements, BNSF IC cedes a portion of its FELA exposure to the pool and assumes a proportionate share of the entire pool's risk. Each year BNSF IC reviews the objectives and performance of the pool to determine its continued participation in the pool. The pooling agreements provide for certain protections against the risk of pool participants' non-performance. On an on-going basis, BNSF and/or the pool manager reviews the credit-worthiness of each of the participants and does not believe its exposure to pool participants' non-performance is material at this time. BNSF IC typically invests in third-party commercial paper, time deposits and money market accounts as well as in commercial paper issued by BNSF. At December 31, 2008, there was approximately $425 million related to these third-party investments, which were classified as cash and cash equivalents on the Company's Consolidated Balance Sheet, as compared with approximately $300 million at December 31, 2007.

**Environmental**

The Company's operations, as well as those of its competitors, are subject to extensive federal, state and local environmental regulation. BNSF's operating procedures include practices to protect the environment from the risks inherent in railroad operations, which frequently involve transporting chemicals and other hazardous materials. Additionally, many of BNSF's land holdings are and have been used for industrial or transportation-related purposes or leased to commercial or industrial companies whose activities may have resulted in discharges onto the property. As a result, BNSF is subject to environmental cleanup and enforcement actions. In particular, the federal Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), also known as the Superfund law, as well as similar state laws, generally impose joint and several liability for cleanup and enforcement costs on current and former owners and operators of a site without regard to fault or the legality of the original conduct. BNSF has been notified that it is a potentially responsible party (PRP) for study and cleanup costs at Superfund sites for which investigation and remediation payments are or will be made or are yet to be determined (the Superfund sites) and, in many instances, is one of several PRPs. In addition, BNSF may be considered a PRP under certain other laws. Accordingly, under CERCLA and other federal and state statutes, BNSF may be held jointly and severally liable for all environmental costs associated with a particular site. If there are other PRPs, BNSF generally participates in the cleanup of these sites through cost-sharing agreements with terms that vary from site to site. Costs are typically allocated based on such factors as relative volumetric contribution of material, the amount of time the site was owned or operated and/or the portion of the total site owned or operated by each PRP.

Liabilities for environmental cleanup costs are recorded when BNSF's liability for environmental cleanup is probable and reasonably estimable. Subsequent adjustments to initial estimates are recorded as necessary based upon additional information developed in subsequent periods. Environmental costs include initial site surveys and environmental studies as well as costs for remediation of sites determined to be contaminated.

BNSF estimates the ultimate cost of cleanup efforts at its known environmental sites on an annual basis during the third quarter. Ultimate cost estimates for environmental sites are based on historical payment patterns, current estimated percentage to closure ratios and benchmark patterns developed from data accumulated from industry and public sources, including the Environmental Protection Agency and other governmental agencies. These factors incorporate experience gained from cleanup efforts at other similar sites into the estimates for which remediation and restoration efforts are still in progress.

On a quarterly basis, BNSF monitors actual experience against the forecasted remediation and related payments made on existing sites and conducts ongoing environmental contingency analyses, which consider a combination of factors including independent consulting reports, site visits, legal reviews and analysis of the likelihood of participation in, and the ability to pay for, cleanup of other PRPs. Adjustments to the Company's estimates will continue to be recorded as necessary based on developments in subsequent periods. Additionally, environmental accruals, which are classified as materials and other in the Consolidated Statements of Income, include amounts for newly identified sites or contaminants, third-party claims and legal fees incurred for defense of third-party claims and recovery efforts.

During the third quarter of 2008, 2007 and 2006, the Company analyzed recent data and trends to ensure the assumptions used by BNSF to estimate its future environmental liability were reasonable. As a result of this study, in the third quarter of 2008, 2007 and 2006, management recorded additional expense of approximately $13 million, $20 million and $5 million as of the June 30 measurement date, respectively. The Company plans to update its study again in the third quarter of 2009.

Annual studies do not include (i) contaminated sites of which the Company is not aware; (ii) additional amounts for third-party tort claims, which arise out of contaminants allegedly migrating from BNSF property, due to a limited number of sites; or (iii) natural resource damage claims. BNSF continues to estimate third-party tort claims on a site by site basis when the liability for such claims is probable and reasonably estimable. BNSF's recorded liability for third-party tort claims as of December 31, 2008, is approximately $17 million.

BNSF is involved in a number of administrative and judicial proceedings and other mandatory cleanup efforts for 336 sites, including 21 Superfund sites, at which it is participating in the study or cleanup, or both, of alleged environmental contamination.

The following table summarizes the activity in the Company's accrued obligations for environmental matters (in millions):

| | 2008 | 2007 | 2006 |
|---|---|---|---|
| Beginning balance | **$ 380** | $ 318 | $ 370 |
| Accruals | **251** | 126 | 20 |
| Payments | **(85)** | (64) | (72) |
| Ending balance at December 31, | **$ 546** | $ 380 | $ 318 |

At December 31, 2008 and 2007, $80 million and $66 million were included in current liabilities, respectively.

In the second quarter of 2008, the Company completed an analysis of its Montana sites to determine its legal exposure related to the potential effect of a Montana Supreme Court decision. The decision, which did not involve BNSF, held that restoration damages (damages equating to clean-up costs which are intended to return property to its original condition) may be awarded under certain circumstances even where such damages may exceed the property's actual value. The legal situation in Montana, the recent increase in the number of claims against BNSF and others resulting from this decision, and the completion of the analysis caused BNSF to record additional pre-tax environmental expenses of $175 million, or $0.31 per diluted share in the second quarter of 2008 for environmental liabilities primarily related to the effect of the aforementioned Montana Supreme Court decision on certain of BNSF's Montana sites.

In the first quarter of 2007, the Company recorded additional pre-tax environmental expenses of $65 million, or $0.11 per share, due to an increase in environmental costs primarily related to a final resolution with the State of Washington and its Department of Ecology on clean-up of an existing environmental site at Skykomish and an adverse reversal of a trial court decision on appeal regarding a site at Arvin, California.

BNSF's environmental liabilities are not discounted. BNSF anticipates that the majority of the accrued costs at December 31, 2008, will be paid over the next ten years, and no individual site is considered to be material.

The following table summarizes the environmental sites:

| | BNSF Sites | |
|---|---|---|
| | 2008 | 2007 |
| Number of sites at January 1, | **346** | 375 |
| Sites added during the period | **19** | 16 |
| Sites closed during the period | **(29)** | (45) |
| Number of sites at December 31, | **336** | 346 |

Liabilities recorded for environmental costs represent BNSF's best estimate of its probable future obligation for the remediation and settlement of these sites and include both asserted and unasserted claims. Although recorded liabilities include BNSF's best estimate of all probable costs, without reduction for anticipated recoveries from third parties, BNSF's total cleanup costs at these sites cannot be predicted with certainty due to various factors such as the extent of corrective actions that may be required, evolving environmental laws and regulations, advances in environmental technology, the extent of other parties' participation in cleanup efforts, developments in ongoing environmental analyses related to sites determined to be contaminated and developments in environmental surveys and studies of contaminated sites.

Because of the uncertainty surrounding these factors, it is reasonably possible that future costs for environmental liabilities may range from approximately $395 million to $860 million. However, BNSF believes that the $546 million recorded at December 31, 2008, is the best estimate of the Company's future obligation for environmental costs.

While the final outcome of these environmental matters cannot be predicted with certainty, it is the opinion of BNSF that none of these items, when finally resolved, will have a material adverse effect on the Company's financial position or liquidity. However, the occurrence of a number of these items in the same period could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

**Other Claims and Litigation**

In addition to asbestos, other personal injury and environmental matters discussed above, BNSF and its subsidiaries are also parties to a number of other legal actions and claims, governmental proceedings and private civil suits arising in the ordinary course of business, including those related to disputes and complaints involving certain transportation rates and charges (including complaints seeking refunds of prior charges paid for coal transportation and the prescription of future rates for such movements and claims relating to service under contract provisions or otherwise). Some of the legal proceedings include claims for punitive as well as compensatory damages, and a few proceedings purport to be class actions. While the final outcome of these matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded along with applicable insurance, it is the opinion of BNSF that none of these items, when finally resolved, will have a material adverse effect on the Company's financial position or liquidity. However, an unexpected adverse resolution of one or more of these items could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

## *11. Employee Separation Costs*

Employee separation costs activity was as follows (in millions):

| | 2008 | 2007 | 2006 |
|---|---|---|---|
| Beginning balance at January 1, | **$ 91** | $ 107 | $ 132 |
| Accruals | **3** | 5 | 2 |
| Payments | **(15)** | (21) | (27) |
| Ending balance at December 31, | **$ 79** | $ 91 | $ 107 |

Employee separation liabilities of $79 million were included in the Consolidated Balance Sheet at December 31, 2008, and principally represent the following: (i) $76 million for deferred benefits payable upon separation or retirement to certain active conductors, trainmen and locomotive engineers; (ii) less than $1 million for employee-related severance costs for the consolidation of clerical functions, material handlers in mechanical shops and trainmen on reserve boards; and (iii) $3 million for certain non-union employee severance costs. Employee separation expenses are recorded in materials and other in the Consolidated Statements of Income. At December 31, 2008, $22 million of the remaining liabilities were included in current liabilities.

The deferred benefits payable upon separation or retirement to certain active conductors, trainmen and locomotive engineers were primarily incurred in connection with labor agreements reached prior to the business combination of BNSF's predecessor companies, Burlington Northern Inc. and Santa Fe Pacific Corporation (the Merger). These agreements, among other things, reduced train crew sizes and allowed for more flexible work rules. The majority of the remaining costs will be paid between 2009 and 2021. As of December 31, 2008, the Company had updated its estimate and recorded an additional liability of $3 million related to deferred benefits (see (i) above). The remaining costs for (ii) above are expected to be paid out between 2009 and approximately 2011, and the costs for (iii) are expected to be paid out between 2009 and approximately 2021 based on deferral elections made by the affected employees.

## *12. Earnings Per Share*

Basic earnings per share is based on the weighted average number of common shares outstanding. Diluted earnings per share is based on basic earnings per share adjusted for the effect of potential common shares outstanding that were dilutive during the period, arising from employee stock awards and incremental shares calculated using the treasury stock method.

Weighted average stock options totaling 2.4 million, 2.2 million and 1.1 million for 2008, 2007 and 2006, respectively, were not included in the computation of diluted earnings per share, because the options' exercise price exceeded the average market price of the Company's stock for those periods.

## *13. Employment Benefit Plans*

BNSF sponsors a funded, noncontributory qualified pension plan, the BNSF Retirement Plan, which covers most non-union employees, and an unfunded non-tax-qualified pension plan, the BNSF Supplemental Retirement Plan, which covers certain officers and other employees. The benefits under these pension plans are based on years of credited service and the highest consecutive sixty months of compensation for the last ten years of salaried employment with BNSF. BNSF's funding policy is to contribute annually not less than the regulatory minimum and not more than the maximum amount deductible for income tax purposes with respect to the funded plan.

Certain salaried employees of BNSF that have met age and years of service requirements are eligible for life insurance coverage and medical benefits, including prescription drug coverage, during retirement. This postretirement benefit plan, referred to as the retiree health and welfare plan, is contributory and provides benefits to retirees, their covered dependents and beneficiaries. Retiree contributions are adjusted annually. The plan also contains fixed deductibles, coinsurance and out-of-pocket limitations. The basic life insurance plan is noncontributory and covers retirees only. Optional life insurance coverage is available for some retirees; however, the retiree is responsible for the full cost. BNSF's policy is to fund benefits payable under the medical and life insurance plans as they come due. Generally, employees beginning salaried employment with BNSF subsequent to September 22, 1995, are not eligible for medical benefits during retirement.

In September 2006, the FASB issued SFAS No. 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans–an amendment of FASB Statements No. 87, 88, 106 and 132R,* which requires the recognition of the overfunded or underfunded status of a defined benefit postretirement plan in the Company's Consolidated Balance Sheets. This portion of the new guidance was adopted by the Company on December 31, 2006. Additionally, the pronouncement eliminates the option for the Company to use a measurement date prior to the Company's fiscal year-end effective December 31, 2008. SFAS No. 158 provides two approaches to transition to a fiscal year-end measurement date, both of which are to be applied prospectively. BNSF elected to apply the transition option under which a 15-month measurement was determined as of September 30, 2007 that covered the period until the fiscal year-end measurement was required on December 31, 2008. As a result, the Company recorded a $7 million decrease to retained earnings in January 2008.

Components of the net cost for these plans were as follows (in millions):

| | Pension Benefits | | | Retiree Health and Welfare Benefits | | |
|---|---|---|---|---|---|---|
| **Year ended December 31,** | **2008** | **2007** | **2006** | **2008** | **2007** | **2006** |
| Service cost | **$ 25** | $ 25 | $ 25 | **$ 2** | $ 2 | $ 3 |
| Interest cost | **102** | 97 | 94 | **18** | 17 | 15 |
| Expected return on plan assets | **(112)** | (105) | (97) | **–** | – | – |
| Amortization of net loss | **16** | 35 | 46 | **5** | 6 | 3 |
| Amortization of prior service credit | **–** | – | – | **(8)** | (8) | (7) |
| Net cost recognized | **$ 31** | $ 52 | $ 68 | **$ 17** | $ 17 | $ 14 |

The projected benefit obligation is the present value of benefit earned to date by plan participants, including the effect of assumed future salary increases and expected healthcare cost trend rate increases. The following table shows the change in projected benefit obligation based on the respective measurement dates (in millions):

| | Pension Benefits | | Retiree Health and Welfare Benefits | |
|---|---|---|---|---|
| **Change in Benefit Obligation** | **December 31, 2008[a]** | **September 30, 2007** | **December 31, 2008[a]** | **September 30, 2007** |
| Benefit obligation at beginning of period | **$ 1,763** | $ 1,830 | **$ 304** | $ 311 |
| Service cost | **32** | 25 | **3** | 2 |
| Interest cost | **127** | 97 | **22** | 17 |
| Plan participants' contributions | **–** | – | **11** | 8 |
| Actuarial loss (gain) | **86** | (59) | **(36)** | (3) |
| Medicare subsidy | **–** | – | **2** | 2 |
| Benefits paid | **(168)** | (130) | **(37)** | (33) |
| Projected benefit obligation at end of period | **1,840** | 1,763 | **269** | 304 |
| Component representing future salary increases | **(82)** | (57) | **–** | – |
| Accumulated benefit obligation at end of period | **$ 1,758** | $ 1,706 | **$ 269** | $ 304 |

a In September 2006, the FASB issued SFAS No. 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans- an amendment of FASB Statements No. 87, 88, 106 and 132R,* which prospectively eliminated the option for the Company to use a measurement date prior to the Company's fiscal year-end effective December 31, 2008. The measurement date for 2008 and 2007 is December 31, and September 30, respectively. As a result, 2008 includes 15 months worth of activity.

Both the BNSF Retirement Plan and the BNSF Supplemental Retirement Plan had accumulated and projected benefit obligations in excess of plan assets at December 31, 2008, and September 30, 2007.

The following table shows the change in plan assets of the plans based on the respective measurement dates (in millions):

| Change in Plan Assets | Pension Benefits | | Retiree Health and Welfare Benefits | |
|---|---|---|---|---|
| | December 31, 2008[a] | September 30, 2007 | December 31, 2008[a] | September 30, 2007 |
| Fair value of plan assets at beginning of period | **$ 1,588** | $ 1,394 | **$ –** | $ – |
| Actual return on plan assets | **(395)** | 208 | **–** | – |
| Employer contribution | **9** | 116 | **24** | 23 |
| Plan participants' contributions | **–** | – | **11** | 8 |
| Medicare subsidy | **–** | – | **2** | 2 |
| Benefits paid | **(168)** | (130) | **(37)** | (33) |
| Fair value of plan assets at measurement date | **$ 1,034** | $ 1,588 | **$ –** | $ – |
| Adjustment for fourth quarter contribution | **n/a** | $ 2 | **n/a** | $ 5 |

a In September 2006, the FASB issued SFAS No. 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans–an amendment of FASB Statements No. 87, 88, 106 and 132R*, which prospectively eliminated the option for the Company to use a measurement date prior to the Company's fiscal year-end effective December 31, 2008. The measurement date for 2008 and 2007 is December 31, and September 30, respectively. As a result, 2008 includes 15 months worth of activity.

The following table shows the funded status, defined as plan assets less the projected benefit obligation, as of December 31 (in millions):

| | Pension Benefits | | Retiree Health and Welfare Benefits | |
|---|---|---|---|---|
| | 2008 | 2007 | 2008 | 2007 |
| Funded status (plan assets less projected benefit obligations) | **$ (806)** | $ (173) | **$ (269)** | $ (299) |

Of the combined pension and retiree health and welfare benefits liability of $1,075 million and $472 million recognized as of December 31, 2008 and 2007, respectively, $28 million was included in other current liabilities as of both dates.

Actuarial gains and losses and prior service costs are recognized in the Consolidated Balance Sheets through an adjustment to AOCL. Beginning in 2007, the Company recognized actuarial gains and losses and prior service costs in AOCL as they arose. The following table shows the pre-tax change in AOCL attributable to the components of the net cost and the change in benefit obligation (in millions):

| Change in AOCL | Pension Benefits | | | Retiree Health and Welfare Benefits | | |
|---|---|---|---|---|---|---|
| | 2008 | 2007 | 2006 | 2008 | 2007 | 2006 |
| Balance at January 1, | **$ 233** | $ 429 | $ 417 | **$ 46** | $ 48 | $ – |
| Decrease in minimum liability included in other comprehensive loss prior to adoption of SFAS No. 158 | **–** | – | (64) | **–** | – | – |
| SFAS No. 158 adoption adjustment | **–** | – | 76 | **–** | – | 48 |
| SFAS No. 158 measurement date adjustment | **(4)** | – | – | **1** | – | – |
| Amortization of actuarial loss | **(16)** | (35) | – | **(5)** | (6) | – |
| Amortization of prior service credit | **–** | – | – | **8** | 8 | – |
| Actuarial loss (gain) | **621** | (161) | – | **(36)** | (4) | – |
| Balance at December 31, | **$ 834** | $ 233 | $ 429 | **$ 14** | $ 46 | $ 48 |

The estimated net actuarial loss and prior service credit for these defined benefit pension plans that will be amortized from AOCL into net periodic benefit cost over the next fiscal year is expected to be $25 million and less than $1 million, respectively. The estimated net actuarial loss and prior service credit for the retiree health and welfare benefit plans that will be amortized from AOCL into net periodic benefit cost over the next fiscal year is expected to be $1 million and $6 million, respectively. Pre-tax amounts currently recognized in AOCL consist of the following (in millions):

| | Pension Benefits | | Retiree Health and Welfare Benefits | |
|---|---|---|---|---|
| | **2008** | **2007** | **2008** | **2007** |
| Net actuarial loss | **$ 834** | $ 234 | **$ 26** | $ 67 |
| Prior service credit | **–** | (1) | **(12)** | (21) |
| Pre-tax amount recognized in AOCL at December 31, | **834** | 233 | **14** | 46 |
| After-tax amount recognized in AOCL at December 31, | **$ 515** | $ 143 | **$ 9** | $ 28 |

The expected long-term rate of return is the return the Company anticipates earning, net of plan expenses, over the period that benefits are paid. It reflects the rate of return on present investments and on expected contributions. In determining the expected long-term rate of return, BNSF considered the following: (i) forward looking capital market forecasts; (ii) historical returns for individual asset classes; and (iii) the impact of active portfolio management.

The assumptions used in accounting for the BNSF plans were as follows:

| Assumptions Used to Determine Net Cost for Fiscal Years Ended December 31, | Pension Benefits | | | Retiree Health and Welfare Benefits | | |
|---|---|---|---|---|---|---|
| | **2008** | **2007** | **2006** | **2008** | **2007** | **2006** |
| Discount rate | **6.00%** | 5.50% | 5.25% | **6.00%** | 5.50% | 5.25% |
| Expected long-term rate of return on plan assets | **8.00%** | 8.00% | 8.00% | **–%** | –% | –% |
| Rate of compensation increase | **3.80%** | 3.90% | 3.90% | **3.80%** | 3.90% | 3.90% |

| Assumptions Used to Determine Benefit Obligations at the Measurement Date | Pension Benefits | | Retiree Health and Welfare Benefits | |
|---|---|---|---|---|
| | **December 31, 2008** | **September 30, 2007** | **December 31, 2008** | **September 30, 2007** |
| Discount rate | **5.75%** | 6.00% | **5.75%** | 6.00% |
| Rate of compensation increase | **3.80%** | 3.80% | **3.80%** | 3.80% |

The following table presents assumed health care cost trend rates:

| December 31, | 2008 | 2007 | 2006 |
|---|---|---|---|
| Assumed health care cost trend rate for next year | **9.75%** | 10.50% | 10.00% |
| Rate to which health care cost trend rate is expected to decline and remain | **5.00%** | 5.00% | 5.00% |
| Year that the rate reaches the ultimate trend rate | **2016** | 2016 | 2012 |

Assumed health care cost trend rates have a significant effect on the amounts reported for the health care plans. A one percentage point change in assumed health care cost trend rates would have the following effects (in millions):

| | One Percentage-Point Increase | One Percentage-Point Decrease |
|---|---|---|
| Effect on total service and interest cost | $ 2 | $ (1) |
| Effect on postretirement benefit obligation | $ 20 | $ (17) |

The BNSF Retirement Plan asset allocation at December 31, 2008, and September 30, 2007, and the target allocation for 2008 by asset category are as follows:

| Plan Asset Allocation | Target Allocation 2008 | Percentage of Pension Plan Assets December 31, 2008 | Percentage of Pension Plan Assets September 30, 2007 |
|---|---|---|---|
| Equity Securities | **45 – 75%** | **55%** | 63% |
| Fixed Income Securities | **20 – 40%** | **30** | 27 |
| Real Estate | **5 – 15%** | **15** | 10 |
| Total | | **100%** | 100% |

The general investment objective of the BNSF Retirement Plan is to grow the plan assets in relation to the plan liabilities while prudently managing the risk of a decrease in the plan's assets relative to those liabilities. To meet this objective, the Company's management has adopted the above asset allocation ranges. This allows flexibility to accommodate market changes in the asset classes within defined parameters.

Based on its current assumptions and funding methodology, the Company is not required to make contributions to the BNSF Retirement Plan in 2009. However, the Company may elect to make voluntary contributions in 2009. The amount of any contribution will be influenced by many factors, including, but not limited to, market return on plan assets, funding assumptions, legislative funding relief, etc. The Company expects to make benefit payments in 2009 of approximately $8 million and $24 million from its non-qualified defined benefit and retiree health and welfare plans, respectively.

The following table shows expected benefit payments from its defined benefit pension plans and expected claim payments and Medicare Part D subsidy receipts for the retiree health and welfare plan for the next five fiscal years and the aggregate five years thereafter (in millions):

| Fiscal year | Expected Pension Plan Benefit Payments[a] | Expected Retiree Health and Welfare Payments | Expected Medicare Subsidy |
|---|---|---|---|
| 2009 | $ 135 | $ 24 | $ (3) |
| 2010 | 135 | 25 | (3) |
| 2011 | 135 | 26 | (3) |
| 2012 | 135 | 26 | (4) |
| 2013 | 136 | 26 | (4) |
| 2014–2018 | 679 | 127 | (22) |

a Primarily consists of the BNSF Retirement Plan payments, which are made from the plan trust and do not represent an immediate cash outflow to the Company.

## Defined Contribution Plans

BNSF sponsors qualified 401(k) plans that cover substantially all employees and a non-qualified defined contribution plan that covers certain officers and other employees. BNSF matches 50 percent of the first six percent of non-union employees' contributions and matches 25 percent on the first four percent of a limited number of union employees' contributions, which are subject to certain percentage limits of the employees' earnings, at each pay period. Non-union employees are eligible to receive an annual discretionary matching contribution of up to 30 percent of the first six percent of their contributions. Employer contributions for all non-union employees are subject to a five-year length of service vesting schedule. BNSF's 401(k) matching expense was $29 million, $21 million and $28 million in 2008, 2007 and 2006, respectively.

## Other

Under collective bargaining agreements, BNSF participates in multi-employer benefit plans that provide certain postretirement health care and life insurance benefits for eligible union employees. Insurance premiums paid attributable to retirees, which are generally expensed as incurred, were $54 million, $46 million and $44 million, in 2008, 2007 and 2006, respectively (see Note 11 to the Consolidated Financial Statements for other deferred benefits payable to certain conductors, trainmen and locomotive engineers).

## 14. Stock-Based Compensation

On April 15, 1999, BNSF shareholders approved the Burlington Northern Santa Fe 1999 Stock Incentive Plan and authorized 20 million shares of BNSF common stock to be issued in connection with stock options, restricted stock, restricted stock units and performance stock. On April 18, 2001, April 17, 2002, April 21, 2004 and April 19, 2006, BNSF shareholders approved the amendments to the Burlington Northern Santa Fe 1999 Stock Incentive Plan, which authorized additional awards of 9 million, 6 million, 7 million and 11 million shares, respectively, of BNSF common stock to be issued in connection with stock options, restricted stock, restricted stock units and performance stock. Approximately 8 million common shares were available for future grant at December 31, 2008.

Additionally, on April 18, 1996, BNSF shareholders approved the non-employee directors' stock plan and authorized 900,000 shares of BNSF common stock to be issued in connection with this plan. Approximately 430,000 common shares were available for future grant at December 31, 2008.

### Stock Options

Under BNSF's stock plans, options may be granted to directors, officers and salaried employees at the fair market value of the Company's common stock on the date of grant. Stock option grants generally vest ratably over three years and expire within ten years after the date of grant. Shares issued upon exercise of options may be issued from treasury shares or from authorized but unissued shares.

The fair value of each option award is estimated on the date of grant using the Black-Scholes option-pricing model. The following assumptions apply to the options granted for the periods presented:

| Year ended December 31, | 2008 | 2007 | 2006 |
|---|---|---|---|
| Weighted average expected life (years) | **4.7** | 4.6 | 4.5 |
| Weighted average expected volatility | **24.0%** | 24.0% | 24.0% |
| Weighted average expected dividend yield | **1.50%** | 1.15% | 1.01% |
| Weighted average risk free interest rate | **3.09%** | 4.31% | 4.76% |
| Weighted average fair value per share at date of grant | **$ 22.92** | $ 21.91 | $ 20.51 |

Expected volatilities are based on historical volatility of the Company's stock, implied volatilities from traded options on the Company's stock and other factors. The Company uses historical experience with exercise and post-vesting employment termination behavior to determine the options' expected life. The expected life represents the period of time that options granted are expected to be outstanding. The risk-free rate is based on the U.S. Treasury rate with a maturity date corresponding to the options' expected life.

A summary of the status of stock options as of, and for the year ended December 31, 2008, is presented below (options in thousands, aggregate intrinsic value in millions):

| Year ended December 31, 2008 | Options | Weighted Average Exercise Prices | Weighted Average Remaining Contractual Term (in years) | Aggregate Intrinsic Value |
|---|---|---|---|---|
| Balance at beginning of year | 11,344 | $ 48.22 | | |
| Granted | 1,795 | 105.06 | | |
| Exercised | (3,319) | 35.34 | | |
| Cancelled | (152) | 64.17 | | |
| Balance at end of year | 9,668 | $ 62.95 | 5.63 | $ 201 |
| Options exercisable at year end | 6,880 | $ 49.30 | 4.38 | $ 201 |

The total intrinsic value of options exercised was $207 million, $281 million and $222 million for the years ended December 31, 2008, 2007 and 2006, respectively.

## Other Incentive Programs

BNSF has other long-term incentive programs that utilize restricted shares/units. A summary of the status of restricted shares/units and the weighted average grant date fair values as of, and for the year ended December 31, 2008, is presented below (shares in thousands):

| Year ended December 31, 2008 | Time Based | | Performance Based Units | | Performance Stock | | BNSF Incentive Bonus Stock Program | | BNSF Discounted Stock Purchase Program | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Balance at beginning of year | 718 | $ 61.83 | 1,016 | $ 75.97 | 723 | $ 72.25 | 639 | $ 50.98 | 51 | $ 59.73 | 3,147 | $ 66.55 |
| Granted | 59 | 102.06 | 355 | 105.23 | 178 | 100.13 | – | – | 2 | 86.56 | 594 | 103.31 |
| Vested | (307) | 47.02 | (282) | 49.21 | (143) | 49.21 | (575) | 47.58 | (33) | 48.26 | (1,340) | 47.98 |
| Forfeited | (13) | 78.24 | (33) | 92.02 | (146) | 57.53 | – | – | – | – | (192) | 64.90 |
| Balance at end of year | 457 | $ 76.49 | 1,056 | $ 92.48 | 612 | $ 89.24 | 64 | $ 81.31 | 20 | $ 81.34 | 2,209 | $ 87.84 |

A summary of the weighted average grant date fair market values of the restricted share/units as of, and for the years ended December 31, 2007 and 2006, is presented below:

| Grant Date Fair Market Value of Awards Granted | Time Based | Performance Based Units | Performance Stock | BNSF Incentive Bonus Stock Program | BNSF Discounted Stock Purchase Program |
|---|---|---|---|---|---|
| Year ended December 31, 2007 | $ 86.38 | $ 88.80 | $ 88.77 | $ – | $ 79.28 |
| Year ended December 31, 2006 | $ 79.88 | $ 80.17 | $ 80.17 | $ 81.31 | $ 81.31 |

A summary of the fair value of the restricted share/units vested during the years ended December 31, 2008, 2007 and 2006 is presented below:

| Total Fair Value of Shares Vested (in millions) | Time Based | Performance Based Units | Performance Stock | BNSF Incentive Bonus Stock Program | BNSF Discounted Stock Purchase Program | Total |
|---|---|---|---|---|---|---|
| Year ended December 31, 2008 | $ 31 | $ 30 | $ 15 | $ 51 | $ 1 | $ 128 |
| Year ended December 31, 2007 | $ 49 | $ 21 | $ – | $ 18 | $ 1 | $ 89 |
| Year ended December 31, 2006 | $ 42 | $ – | $ – | $ 25 | $ 1 | $ 68 |

Time-based awards are granted to senior managers within BNSF primarily as a retention tool and to encourage ownership in the Company. They generally vest over three years, although in some cases up to five years, and are contingent on continued salaried employment.

Performance-based units are granted to senior managers within BNSF to encourage ownership in the Company and to align management's interest with those of its shareholders. Performance-based units generally vest over three years and are contingent on the achievement of certain predetermined corporate performance goals (e.g., return on invested capital (ROIC)) and continued salaried employment.

Additionally, eligible employees may also earn performance stock contingent upon achievement of higher ROIC goals and continued salaried employment.

Certain employees were eligible to exchange through the Burlington Northern Santa Fe Incentive Bonus Stock Program the cash payment of their bonus for grants of restricted stock. In September 2005, the program was amended so that exchanges of cash bonus payments for awards of restricted stock were no longer permitted after February 2006.

Certain other salaried employees may participate in the BNSF Discounted Stock Purchase Program and use their bonus to purchase BNSF common stock at a discount from the market price. These shares immediately vest but are restricted for a three-year period.

Shares awarded under each of the plans may not be sold or used as collateral and are generally not transferable by the holder until the shares awarded become free of restrictions. Compensation cost, net of tax, recorded under the BNSF Stock Incentive Plans is shown in the following table (in millions):

| | **2008** | **2007** | **2006** |
|---|---|---|---|
| Compensation cost | **$ 69** | $ 66 | $ 72 |
| Income tax benefit | **(25)** | (23) | (25) |
| Total | **$ 44** | $ 43 | $ 47 |
| Compensation cost capitalized | **$ 6** | $ 7 | $ 6 |

At December 31, 2008, there was $101 million of total unrecognized compensation cost related to unvested share-based compensation arrangements. That cost is expected to be recognized over a weighted-average period of 1.37 years.

## *15. Common Stock and Preferred Capital Stock*

### Common Stock

BNSF is authorized to issue 600 million shares of common stock, $0.01 par value. At December 31, 2008, there were 339 million shares of common stock outstanding. Each holder of common stock is entitled to one vote per share in the election of directors and on all matters submitted to a vote of shareholders. Subject to the rights and preferences of any future issuances of preferred stock, each share of common stock is entitled to receive dividends as may be declared by the Board out of funds legally available and to share ratably in all assets available for distribution to shareholders upon dissolution or liquidation. No holder of common stock has any preemptive right to subscribe for any securities of BNSF.

### Preferred Capital Stock

At December 31, 2008, BNSF had 50 million shares of Class A Preferred Stock, $0.01 par value and 25 million shares of Preferred Stock, $0.01 par value available for issuance. The Board has the authority to issue such stock in one or more series, to fix the number of shares and to fix the designations and the powers, rights and qualifications and restrictions of each series. As of December 31, 2008, no Class A Preferred Stock had been issued.

### Share Repurchase Program

In February 2007, the Board authorized the extension of the current BNSF share repurchase program, adding 30 million shares to the total of 180 million shares previously authorized in equal amounts in July 1997, December 1999, April 2000, September 2000, January 2003 and December 2005. During 2008, 2007 and 2006, the Company repurchased approximately 12 million, 15 million and 18 million, respectively, of its common stock at average prices of $92.96 per share, $83.96 per share and $73.43 per share, respectively. Total repurchases through December 31, 2008, were 192 million shares at a total average cost of $41.53 per share, leaving 18 million shares available for repurchase out of the 210 million shares presently authorized. Additionally, during 2008, the Company repurchased shares from employees at a cost of $60 million to satisfy tax withholding obligations on the vesting of restricted stock or the exercise of stock options.

In December 2005, the Company entered into prepaid forward transactions to purchase $600 million of the Company's common stock whereby a net settlement in shares would occur upon settlement of the transactions. In late February 2006, these transactions were settled, and approximately 8 million shares were delivered. While the transactions had no impact on the shares outstanding at the end of 2005, outstanding shares used in the calculation of 2006 earnings per share were reduced by approximately 8 million shares when the transactions were settled. The Company accounted for the transactions in accordance with Emerging Issues Task Force (EITF) 00-19, *Accounting for Derivative Financial Instruments Indexed to, and Potentially Settled in, a Company's Own Stock,* which required that the $600 million prepayment be recorded as a reduction in equity in 2005. When the final settlement was made in 2006, this reduction in equity was reclassified from prepaid forward repurchase of treasury stock to treasury stock.

## *16. Quarterly Financial Data—Unaudited*

| Dollars in millions, except per share data | Fourth | Third | Second | First |
|---|---|---|---|---|
| **2008** | | | | |
| Revenues | $ 4,373 | $ 4,906 | $ 4,478 | $ 4,261 |
| Operating income | $ 1,116 | $ 1,207 | $ 714 | $ 875 |
| Net income | $ 615 | $ 695 | $ 350 | $ 455 |
| Basic earnings per share | $ 1.81 | $ 2.02 | $ 1.01 | $ 1.31 |
| Diluted earnings per share | $ 1.79 | $ 2.00 | $ 1.00 | $ 1.30 |
| Dividends declared per share | $ 0.40 | $ 0.40 | $ 0.32 | $ 0.32 |
| Common stock price[a]: | | | | |
| High | $ 90.71 | $ 107.36 | $ 112.96 | $ 94.53 |
| Low | $ 70.91 | $ 92.32 | $ 92.79 | $ 76.02 |
| **2007** | | | | |
| Revenues | $ 4,245 | $ 4,069 | $ 3,843 | $ 3,645 |
| Operating income | $ 950 | $ 1,001 | $ 841 | $ 694 |
| Net income | $ 517 | $ 530 | $ 433 | $ 349 |
| Basic earnings per share | $ 1.48 | $ 1.51 | $ 1.22 | $ 0.98 |
| Diluted earnings per share | $ 1.46 | $ 1.48 | $ 1.20 | $ 0.96 |
| Dividends declared per share | $ 0.32 | $ 0.32 | $ 0.25 | $ 0.25 |
| Common stock price[a]: | | | | |
| High | $ 88.03 | $ 93.04 | $ 94.43 | $ 85.05 |
| Low | $ 81.54 | $ 76.64 | $ 80.41 | $ 72.45 |

a Average of high and low reported daily stock price.

## *Item 9. Changes in and Disagreements With Accountants on Accounting and Financial Disclosure*

None.

## *Item 9A. Controls and Procedures*

### Disclosure Controls and Procedures

Based on their evaluation as of the end of the period covered by this annual report on Form 10-K, the Company's principal executive officer and principal financial officer have concluded that BNSF's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934) are effective to ensure that information required to be disclosed by BNSF in the reports that it files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms and that such information is accumulated and communicated to BNSF's management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure.

### Internal Control Over Financial Reporting

The report of management on the Company's internal control over financial reporting (as defined in Rules 13a-15(f) and 15(d)-15(f) of the Securities Exchange Act of 1934) is included in "Management's Report on Internal Control Over Financial Reporting" in Item 8.

The effectiveness of the Company's internal control over financial reporting as of December 31, 2008, has been audited by PricewaterhouseCoopers LLP, the Company's independent registered public accounting firm, as stated in their report, which is included in Item 8.

### Changes in Internal Control Over Financial Reporting

As of the end of the period covered by this report, the Company has concluded that there have been no changes in BNSF's internal control over financial reporting that occurred during BNSF's fourth fiscal quarter that have materially affected, or are reasonably likely to materially affect, BNSF's internal control over financial reporting.

## *Item 9B. Other Information*

None.

# Part III

## Item 10. Directors, Executive Officers and Corporate Governance

Information concerning the directors of BNSF will be provided under the heading "Item 1: Election of Directors; Nominees for Director" in BNSF's proxy statement for its 2009 annual meeting of shareholders, which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under that heading is hereby incorporated by reference.

Information concerning the executive officers of BNSF is included in Part I of this Report on Form 10-K.

Information concerning compliance with Section 16(a) of the Securities Exchange Act of 1934 will be provided under the heading "Communications and Other Matters; Section 16(a) Beneficial Ownership Reporting Compliance" in BNSF's proxy statement for its 2009 annual meeting of shareholders, which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under that heading is hereby incorporated by reference.

Information concerning the Directors and Governance Committee's policy with regard to consideration of any director candidates recommended by shareholders will be provided under the heading "Communications and Other Matters; Procedures for Recommending Director Candidates" in BNSF's proxy statement for its 2009 annual meeting of shareholders, which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under that heading is hereby incorporated by reference.

Information concerning the Audit Committee and the Audit Committee Financial Expert will be provided under the heading "Governance of the Company; Board Committees; Audit Committee" in BNSF's proxy statement for its 2009 annual meeting of shareholders, which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under that heading is hereby incorporated by reference.

The Company has a Code of Conduct that applies to members of the Board of Directors, officers, and all salaried employees of BNSF and its wholly-owned subsidiaries. Only the Board of Directors may waive the application of the Code of Conduct to a director, executive officer, or the principal accounting officer or controller, and any such waiver will be promptly disclosed on the Company's Web site. A copy of the Code of Conduct is available on the Company's Web site at www.bnsf.com under the "Investors" link and then "Corporate Governance."

## Item 11. Executive Compensation

Information concerning the compensation of directors and executive officers of BNSF will be provided under the headings "Directors' Compensation," "Compensation Discussion and Analysis" and "Executive Compensation" in BNSF's proxy statement for its 2009 annual meeting of shareholders, which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under those headings is hereby incorporated by reference.

## Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters

Certain information about BNSF's equity compensation plans is set forth in the table below (number of shares in thousands) as of December 31, 2008:

| Plan Category | Number of Shares to Be Issued upon Exercise of Outstanding Options, Warrants and Rights | Weighted Average Exercise Price of Outstanding Options, Warrants and Rights | Number of Shares Available for Future Issuance |
|---|---|---|---|
| Equity compensation plans approved by shareholders | 9,668 | $ 62.95 | 8,123 |
| Equity compensation plans not approved by shareholders | – | – | – |
| Total | 9,668 | $ 62.95 | 8,123 |

Information concerning the ownership of BNSF equity securities by certain beneficial owners and by management will be provided under the headings "Stock Ownership in the Company; Certain Beneficial Owners" and "Stock Ownership in the Company; Ownership of Management" in BNSF's proxy statement for its 2009 annual meeting of shareholders, which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under those headings is hereby incorporated by reference.

## *Item 13. Certain Relationships and Related Transactions, and Director Independence*

Information concerning certain relationships and related transactions and director independence will be provided under the headings "Governance of the Company; Director Independence" and "Governance of the Company; Certain Relationships and Related Person Transactions" in BNSF's proxy statement for its 2009 annual meeting of shareholders, which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under those headings is hereby incorporated by reference.

## *Item 14. Principal Accountant Fees and Services*

Information concerning principal accountant fees and services will be provided under the heading "Item 2: Appointment of Independent Auditor; Independent Auditor Fees" in BNSF's proxy statement for its 2009 annual meeting of shareholders, which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under that heading is hereby incorporated by reference.

# Part IV

## *Item 15. Exhibits and Financial Statement Schedules*

(a) The following documents are filed as part of this report:

1. Consolidated Financial Statements—see Item 8.

   Schedules are omitted because they are not required or applicable, or the required information is included in the Consolidated Financial Statements or related notes.

2. Exhibits:

   See Index to Exhibits beginning on page E-1 for a description of the exhibits filed as a part of this Report on Form 10-K.

# Signatures

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, Burlington Northern Santa Fe Corporation has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**Burlington Northern Santa Fe Corporation**

By: /s/ Matthew K. Rose

Dated: February 13, 2009

Matthew K. Rose
Chairman, President and
Chief Executive Officer

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of Burlington Northern Santa Fe Corporation and in the capacities and on the date indicated.

| Signature | Title |
| --- | --- |
| /s/ Matthew K. Rose<br>Matthew K. Rose | Chairman, President and Chief Executive Officer<br>(Principal Executive Officer), and Director |
| /s/ Thomas N. Hund<br>Thomas N. Hund | Executive Vice President and Chief Financial Officer<br>(Principal Financial Officer) |
| /s/ Paul W. Bischler<br>Paul W. Bischler | Vice President and Controller<br>(Principal Accounting Officer) |
| /s/ Alan L. Boeckmann*<br>Alan L. Boeckmann | Director |
| /s/ Donald G. Cook*<br>Donald G. Cook | Director |
| /s/ Vilma S. Martinez*<br>Vilma S. Martinez | Director |
| /s/ Marc F. Racicot*<br>Marc F. Racicot | Director |
| /s/ Roy S. Roberts*<br>Roy S. Roberts | Director |
| /s/ Marc J. Shapiro*<br>Marc J. Shapiro | Director |
| /s/ J.C. Watts, Jr.*<br>J.C. Watts, Jr. | Director |

| Signature | Title |
|---|---|
| /s/ Robert H. West*<br>Robert H. West | Director |
| /s/ J. Steven Whisler*<br>J. Steven Whisler | Director |
| /s/ Edward E. Whitacre, Jr.*<br>Edward E. Whitacre, Jr. | Director |

*By: /s/ Roger Nober
Roger Nober
Executive Vice President Law
and Secretary

Dated: February 13, 2009

**Burlington Northern Santa Fe Corporation and Subsidiaries**

# Exhibit Index

| Exhibit Number and Description | | Incorporated by Reference (if applicable) | | | |
|---|---|---|---|---|---|
| | | Form | File Date | File No. | Exhibit |
| (3) | Articles of Incorporation and Bylaws | | | | |
| 3.1 | Amended and Restated Certificate of Incorporation of Burlington Northern Santa Fe Corporation, dated December 21, 1994, as amended. | 10-Q | 8/13/1998 | 1-11535 | 3.1 |
| 3.2 | By-Laws of Burlington Northern Santa Fe Corporation, as amended and restated, dated December 11, 2008. | 8-K | 12/12/2008 | 1-11535 | 3.1 |
| (4) | Instruments defining the rights of security holders, including indentures | | | | |
| 4.1 | Indenture, dated as of December 1, 1995, between BNSF and The First National Bank of Chicago, as Trustee. | S-3 | 2/8/1999 | 333-72013 | 4 |
| 4.2 | Form of BNSF's 6 1/8% Notes Due March 15, 2009. | 10-K | 3/31/1999 | 1-11535 | 4.2 |
| 4.3 | Form of BNSF's 6 3/4% Debentures Due March 15, 2029. | 10-K | 3/31/1999 | 1-11535 | 4.3 |
| 4.4 | Form of BNSF's 6.70% Debentures Due August 1, 2028. | 10-K | 3/31/1999 | 1-11535 | 4.4 |
| 4.5 | Form of BNSF's 8.125% Debentures Due April 15, 2020. | 10-K | 2/12/2001 | 1-11535 | 4.5 |
| 4.6 | Form of BNSF's 7.95% Debentures Due August 15, 2030. | 10-K | 2/12/2001 | 1-11535 | 4.6 |
| 4.7 | Form of BNSF's 6.75% Notes Due July 15, 2011. | 10-Q | 8/3/2001 | 1-11535 | 4.1 |
| 4.8 | Form of BNSF's 5.90% Notes Due July 1, 2012. | 10-Q | 8/9/2002 | 1-11535 | 4.1 |
| 4.9 | Officers' Certificate of Determination as to the terms of BNSF's 4.875% Notes Due January 15, 2015, including Exhibit A thereto, the form of the Notes. | 8-K | 12/9/2004 | 1-11535 | 4.1 |
| 4.10 | Indenture, dated as of December 8, 2005, between BNSF and U.S. Bank Trust National Association, as Trustee. | S-3 ASR | 12/8/2005 | 333-130214 | 4.1 |
| 4.11 | Certificate of Trust of BNSF Funding Trust I, executed and filed by U.S. Bank Trust National Association, Linda Hurt and James Gallegos, as Trustees. | S-3 ASR | 12/8/2005 | 333-130214 | 4.3 |
| 4.12 | Amended and Restated Declaration of Trust of BNSF Funding Trust I, dated as of December 15, 2005. | 8-K | 12/15/2005 | 1-11535 | 4.4 |
| 4.13 | Guarantee Agreement between BNSF and U.S. Bank Trust National Association, as Guarantee Trustee, dated as of December 15, 2005. | 8-K | 12/15/2005 | 1-11535 | 4.5 |
| 4.14 | First Supplemental Indenture, dated as of December 15, 2005, between BNSF and U.S. Bank Trust National Association, as Trustee. | 8-K | 12/15/2005 | 1-11535 | 4.6 |
| 4.15 | Agreement as to Expenses and Liabilities dated as of December 15, 2005, between BNSF and BNSF Funding Trust I. | 8-K | 12/15/2005 | 1-11535 | 4.4 (Exhibit C) |

| Exhibit Number and Description | | Incorporated by Reference (if applicable) | | | |
|---|---|---|---|---|---|
| | | Form | File Date | File No. | Exhibit |
| 4.16 | Form of BNSF Funding Trust I's 6.613% Trust Preferred Securities. | 8-K | 12/15/2005 | 1-11535 | 4.4 (Exhibit D) |
| 4.17 | Officer's Certificate of Determination as to the terms of BNSF's 6.20% Debentures Due August 15, 2036, including the form of the Debentures. | 10-Q | 10/24/2006 | 1-11535 | 4.1 |
| 4.18 | First Supplemental Indenture, dated as of April 13, 2007, to Indenture dated as of December 1, 1995, between Burlington Northern Santa Fe Corporation and Bank of New York Trust Company, N.A., as Trustee. | 8-K | 4/13/2007 | 1-11535 | 4.1 |
| 4.19 | Officer's Certificate of Determination as to the terms of BNSF's 5.65% Debentures due May 1, 2017 and 6.15% Debentures Due May 1, 2037, including the forms of the Debentures. | 8-K | 4/13/2007 | 1-11535 | 4.2 |
| 4.20 | Second Supplemental Indenture, dated as of March 14, 2008, to Indenture dated as of December 1, 1995, between Burlington Northern Santa Fe Corporation and Bank of New York Mellon Trust Company, N.A., as Trustee. | 8-K | 3/14/2008 | 1-11535 | 4.1 |
| 4.21 | Officer's Certificate of Determination as to the terms of BNSF's 5.75% Notes due March 18, 2018, including the form of the Notes. | 8-K | 3/14/2008 | 1-11535 | 4.2 |
| 4.22 | Third Supplemental Indenture, dated as of December 3, 2008, to Indenture dated as of December 1, 1995, between Burlington Northern Santa Fe Corporation and Bank of New York Mellon Trust Company, N.A., as Trustee. | 8-K | 12/3/2008 | 1-11535 | 4.1 |
| 4.23 | Officer's Certificate of Determination as to the terms of BNSF's 7.00% Debentures due February 1, 2014. | 8-K | 12/3/2008 | 1-11535 | 4.2 |

Certain instruments evidencing long-term indebtedness of BNSF are not being filed as exhibits to this Report because the total amount of securities authorized under any single such instrument does not exceed 10% of BNSF's total assets. BNSF will furnish copies of any material instruments upon request of the Securities and Exchange Commission.

(10) Material Contracts

| | | Form | File Date | File No. | Exhibit |
|---|---|---|---|---|---|
| 10.1 | Burlington Northern Santa Fe Non-Employee Directors' Stock Plan, as amended and restated February 13, 2008.* | 10-K | 2/15/2008 | 1-11535 | 10.1 |
| 10.2 | Form of Burlington Northern Santa Fe Non-Employee Directors' Stock Plan Director's Restricted Stock Unit Award Agreement.* | 8-K | 5/23/2005 | 1-11535 | 10.1 |
| 10.3 | BNSF Railway Company Incentive Compensation Plan, as amended and restated February 12, 2009.* ‡ | | | | |
| 10.4 | Burlington Northern Santa Fe Corporation Deferred Compensation Plan, as amended and restated effective December 9, 2004.* | 10-K | 2/16/2007 | 1-11535 | 10.5 |
| 10.5 | Burlington Northern Santa Fe Corporation Senior Management Stock Deferral Plan, as amended and restated effective January 1, 2008.* | 10-K | 2/15/2008 | 1-11535 | 10.5 |

| Exhibit Number and Description | | Incorporated by Reference (if applicable) | | | |
|---|---|---|---|---|---|
| | | Form | File Date | File No. | Exhibit |
| 10.6 | Burlington Northern Santa Fe Incentive Bonus Stock Program, as amended and restated effective September 14, 2005.* | 8-K | 9/19/2005 | 1-11535 | 10.1 |
| 10.7 | Burlington Northern Santa Fe 1996 Stock Incentive Plan, as amended and restated December 11, 2008.* ‡ | | | | |
| 10.8 | The Burlington Northern Santa Fe Supplemental Retirement Plan, as amended and restated effective January 1, 2005 and further amended through October 20, 2008.* ‡ | | | | |
| 10.9 | Retirement Benefit Agreement between BNSF and Matthew K. Rose, as amended and restated September 21, 2006.* | 10-Q | 10/24/2006 | 1-11535 | 10.5 |
| 10.10 | Retirement Benefit Agreement, dated January 16, 2003, between BNSF and John P. Lanigan.* | 10-K | 2/13/2004 | 1-11535 | 10.29 |
| 10.11 | Special Cash Award Retention Agreement, dated October 9, 2008, between BNSF Railway Company and Peter J. Rickershauser.* | 10-Q | 10/24/2008 | 1-11535 | 10.1 |
| 10.12 | Form of BNSF Change-in-Control Agreement, as amended and restated December 6, 2007 and effective December 31, 2007 (applicable to Messrs. Rose, Hund, Ice, Lanigan, and Nober and two other executive officers).* | 10-K | 2/15/2008 | 1-11535 | 10.12 |
| 10.13 | Burlington Northern Santa Fe Corporation Supplemental Investment and Retirement Plan, as amended and restated effective January 1, 2005 as further amended November 4, 2008.* ‡ | | | | |
| 10.14 | Burlington Northern Inc. Director's Charitable Award Program as amended and restated, effective January 1, 2009.* ‡ | | | | |
| 10.15 | Burlington Northern Santa Fe Salary Exchange Option Program, as amended and restated October 1, 2004.* | 10-K | 2/15/2005 | 1-11535 | 10.18 |
| 10.16 | Burlington Northern Santa Fe 1999 Stock Incentive Plan, as amended and restated December 11, 2008.* ‡ | | | | |
| 10.17 | Form of 1999 Stock Incentive Plan Stock Option Award Agreement.* | 10-K | 2/15/2008 | 1-11535 | 10.17 |
| 10.18 | Form of 1999 Stock Incentive Plan Restricted Stock Unit Award Agreement.* | 10-K | 2/15/2008 | 1-11535 | 10.18 |
| 10.19 | Form of 1999 Stock Incentive Plan Reload Stock Option Agreement.* | 10-K | 2/15/2008 | 1-11535 | 10.19 |
| 10.20 | Form of 1999 Stock Incentive Plan Special Retention Restricted Stock Unit Award Agreement.* | 10-K | 2/15/2008 | 1-11535 | 10.20 |
| 10.21 | Form of 1999 Stock Incentive Plan Performance-Based Restricted Stock Unit Award Agreement.* | 10-K | 2/15/2008 | 1-11535 | 10.21 |
| 10.22 | Form of 1999 Stock Incentive Plan Performance Stock Award Agreement.* | 10-K | 2/15/2008 | 1-11535 | 10.22 |

| Exhibit Number and Description | | Incorporated by Reference (if applicable) | | | |
|---|---|---|---|---|---|
| | | Form | File Date | File No. | Exhibit |
| 10.23 | Amended and Restated Benefits Protection Trust Agreement by and between Burlington Northern Santa Fe Corporation and Wachovia Bank, dated January 8, 2008.* | 10-K | 2/15/2008 | 1-11535 | 10.23 |
| 10.24 | Burlington Northern Santa Fe Directors' Retirement Plan.* | 10-K | 4/1/1996 | 1-11535 | 10.27 |
| 10.24.1 | Termination of Burlington Northern Santa Fe Directors' Retirement Plan, dated July 17, 2003.* | 10-K | 2/16/2007 | 1-11535 | 10.31.1 |
| 10.25 | Form of Indemnification Agreement dated as of September 17, 1998, entered into between BNSF and directors.* | 10-K | 3/31/1999 | 1-11535 | 10.37 |
| 10.26 | Form of Indemnification Agreement dated as of September 17, 1998, entered into between BNSF and certain officers, including Messrs. Rose, Hund, Ice, Lanigan, Nober and two other executive officers.* | 10-K | 3/31/1999 | 1-11535 | 10.38 |
| 10.27 | Burlington Northern Santa Fe 2005 Deferred Compensation Plan for Non-Employee Directors, as amended and restated December 11, 2008.* ‡ | | | | |
| 10.28 | Burlington Northern Santa Fe Deferred Compensation Plan for Directors, as amended and restated December 9, 2004.* | 10-K | 2/16/2007 | 1-11535 | 10.35 |
| 10.29 | Replacement Capital Covenant, dated as of December 15, 2005, by BNSF in favor of and for the benefit of each Covered Debtholder (as defined therein). | 10-K | 2/17/2006 | 1-11535 | 10.41 |
| (12) | Statements re: Computation of Ratios | | | | |
| 12.1 | Computation of Ratio of Earnings to Fixed Charges. ‡ | | | | |
| (21) | Subsidiaries of the registrant | | | | |
| 21.1 | Subsidiaries of BNSF. ‡ | | | | |
| (23) | Consents of experts and counsel | | | | |
| 23.1 | Consent of PricewaterhouseCoopers LLP. ‡ | | | | |
| (24) | Power of Attorney | | | | |
| 24.1 | Power of Attorney. ‡ | | | | |
| (31) | Rule 13a-14(a)/15d-14(a) Certifications | | | | |
| 31.1 | Principal Executive Officer's Certifications Pursuant to Rule 13a-14(a) (Section 302 of the Sarbanes-Oxley Act of 2002). ‡ | | | | |
| 31.2 | Principal Financial Officer's Certifications Pursuant to Rule 13a-14(a) (Section 302 of the Sarbanes-Oxley Act of 2002). ‡ | | | | |
| (32) | Section 1350 Certifications | | | | |
| 32.1 | Certification Pursuant to Rule 13a-14(b) and 18 U.S.C. § 1350 (Section 906 of the Sarbanes-Oxley Act of 2002). ‡ | | | | |
| (99) | Additional Exhibits | | | | |
| 99.1 | Certification Pursuant to Section 303A.12 of the New York Stock Exchange Listed Company Manual. ‡ | | | | |

* Management contract or compensatory plan

‡ Filed herewith

# Exhibit 12.1

## *Burlington Northern Santa Fe Corporation and Subsidiaries*
## *Computation of Ratio of Earnings to Fixed Charges*

In millions, except ratio amounts
(Unaudited)

| | Year ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2008** | **2007** | **2006** | **2005** | **2004** |
| Earnings: | | | | | |
| Income before income taxes | **$ 3,368** | $ 2,957 | $ 2,996 | $ 2,453 | $ 1,296 |
| Add: | | | | | |
| Interest and other fixed charges, excluding capitalized interest | **533** | 511 | 485 | 437 | 409 |
| Reasonable approximation of portion of rent under long-term operating leases representative of an interest factor | **278** | 282 | 261 | 221 | 195 |
| Distributed income of investees accounted for under the equity method | **5** | 4 | 3 | 4 | 4 |
| Amortization of capitalized interest | **5** | 4 | 4 | 8 | 8 |
| Less: | | | | | |
| Equity in earnings of investments accounted for under the equity method | **13** | 19 | 27 | 15 | 9 |
| Total earnings available for fixed charges | **$ 4,176** | $ 3,739 | $ 3,722 | $ 3,108 | $ 1,903 |
| Fixed charges: | | | | | |
| Interest and fixed charges | **$ 550** | $ 528 | $ 499 | $ 450 | $ 419 |
| Reasonable approximation of portion of rent under long-term operating leases representative of an interest factor | **278** | 282 | 261 | 221 | 195 |
| Total fixed charges | **$ 828** | $ 810 | $ 760 | $ 671 | $ 614 |
| Ratio of earnings to fixed charges | **5.04x** | 4.62x | 4.90x | 4.63x | 3.10x |

# Exhibit 31.1

## *Principal Executive Officer's Certifications*

**Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Matthew K. Rose, certify that:

1. I have reviewed this annual report on Form 10-K of Burlington Northern Santa Fe Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/ Matthew K. Rose

Date: February 13, 2009

Matthew K. Rose
Chairman, President and
Chief Executive Officer

# Exhibit 31.2

## *Principal Financial Officer's Certifications*

**Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Thomas N. Hund, certify that:

1. I have reviewed this annual report on Form 10-K of Burlington Northern Santa Fe Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/ Thomas N. Hund

Date: February 13, 2009

Thomas N. Hund
Executive Vice President and
Chief Financial Officer

# Exhibit 32.1

## *Certification Pursuant to 18 U.S.C. § 1350*

**(Section 906 of Sarbanes-Oxley Act of 2002)**

**Burlington Northern Santa Fe Corporation**

In connection with the Annual Report of Burlington Northern Santa Fe Corporation (the "Company") on Form 10-K for the year ended December 31, 2008, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), the undersigned, Matthew K. Rose, Chairman, President and Chief Executive Officer of the Company, and Thomas N. Hund, Executive Vice President and Chief Financial Officer of the Company, each hereby certifies that, to his knowledge on the date hereof:

1. The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and
2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: February 13, 2009

| | |
|---|---|
| /s/ Matthew K. Rose | /s/ Thomas N. Hund |
| Matthew K. Rose | Thomas N. Hund |
| Chairman, President and | Executive Vice President and |
| Chief Executive Officer | Chief Financial Officer |

A signed original of this written statement required by Section 906 has been provided to Burlington Northern Santa Fe Corporation and will be retained by Burlington Northern Santa Fe Corporation and furnished to the Securities and Exchange Commission or its staff upon request.

# Exhibit 99.1

## *Annual CEO Certification*

**(Section 303A.12(a) of the New York Stock Exchange Listed Company Manual)**

As the Chief Executive Officer of Burlington Northern Santa Fe Corporation (BNI) and as required by Section 303A.12(a) of the New York Stock Exchange Listed Company Manual, I hereby certify that as of the date hereof I am not aware of any violation by the Company of NYSE's Corporate Governance listing standards, other than has been notified to the Exchange pursuant to Section 303A.12(b) and disclosed on Exhibit H to the Company's Domestic Company Section 303A Annual Written Affirmation.

/s/ Matthew K. Rose
Matthew K. Rose
Chairman, President and Chief Executive Officer
May 23, 2008

[This certification is without qualification.]

## *Burlington Northern Santa Fe Corporation Directors*[*]

**Alan L. Boeckmann**[3,4]
Chairman and Chief Executive Officer, Fluor Corporation (professional services holding company offering engineering, construction management and other services), Irving, Texas.
***Board member since 2001.***

**Donald G. Cook**[2]
Retired General, United States Air Force, San Antonio, Texas.
***Board member since 2005.***

**Vilma S. Martinez**[3,4]
Partner, Munger, Tolles & Olson LLP (law firm), Los Angeles, California.
***Board member since 1998.***

**Marc F. Racicot**[4]
Former President and Chief Executive Officer, American Insurance Association (property-casualty insurance trade organization), Washington, D.C. Former Governor of Montana.
***Board member since 2001.***

**Roy S. Roberts**[1,2]
Managing Director of Reliant Equity Investors, L.L.C. (private equity firm), Chicago, Illinois.
***Board member since 1993.***

**Matthew K. Rose**[1]
Chairman, President and Chief Executive Officer, Burlington Northern Santa Fe Corporation and BNSF Railway Company, Fort Worth, Texas.
***Board member since 2000.***

**Marc J. Shapiro**[3,4]
Retired Vice Chairman for Finance, Risk Management and Administration, J.P. Morgan Chase & Co. (bank holding company), New York, New York.
***Board member since 1995.***

**J.C. Watts, Jr.**[2]
Senior Partner of Oakcrest Capital Partners, LLC (private equity firm), and Chairman, J.C. Watts Companies, L.L.C./Watts Partners (public affairs and corporate consulting business), Washington, D.C. Former Congressman (R-4th Dist. Oklahoma) and Chairman, House Republican Conference.
***Board member since 2003.***

**Robert H. West**[1,3]
Retired Chairman of the Board, Butler Manufacturing Company (manufacturer of pre-engineered building systems and specialty components), Kansas City, Missouri.
***Board member since 1980.***

**J. Steven Whisler**[3]
Retired Chairman and Chief Executive Officer, Phelps Dodge Corporation (mining and manufacturing company), Phoenix, Arizona.
***Board member since 1995.***

**Edward E. Whitacre, Jr., Lead Director**[1,2,4]
Chairman Emeritus, AT&T Inc. (communications holding company), Dallas, Texas.
***Board member since 1993.***

**Committee Assignments:**

1 *Executive Committee*
2 *Compensation and Development Committee*
3 *Audit Committee*
4 *Directors and Corporate Governance Committee*

** Years of Board service includes service on Boards of Burlington Northern Inc., Santa Fe Pacific Corporation and predecessor corporations.*

## *Corporate Officers*[1]

**Matthew K. Rose**[2]
Chairman, President and Chief Executive Officer

**Thomas N. Hund**[2]
Executive Vice President and Chief Financial Officer

**Carl R. Ice**[2]
Executive Vice President and Chief Operations Officer

**John P. Lanigan, Jr.**[2]
Executive Vice President and Chief Marketing Officer

**Roger Nober**[2]
Executive Vice President Law and Secretary

**John O. Ambler**
Vice President – Corporate Relations

**Paul W. Bischler**
Vice President and Controller

**James H. Gallegos**
Vice President and Corporate General Counsel

**Amy C. Hawkins**
Vice President – Government Affairs

**Linda J. Hurt**
Vice President – Investor Relations

**Linda Longo-Kazanova**[2]
Vice President – Human Resources and Medical

**Jo-ann M. Olsovsky**
Vice President – Technology Services and Chief Information Officer

**Julie A. Piggott**
Vice President – Finance and Treasurer

**Peter J. Rickershauser**[2]
Vice President – Network Development

**Charles W. Shewmake**
Vice President and General Counsel

**David W. Stropes**
Vice President – Corporate Audit Services

**Shelley J. Venick**
Vice President and General Tax Counsel

**Richard E. Weicher**
Vice President and General Counsel – Regulatory

1 *These officers hold similar positions with BNSF Railway Company.*
2 *Executive Officer of Burlington Northern Santa Fe Corporation.*

## *Operating Company Officers*

**Paul B. Anderson**
Vice President – Marketing Support

**Stevan B. Bobb**
Group Vice President – Coal

**Stephen G. Branscum**
Group Vice President – Consumer Products

**Rollin D. Bredenberg**
Vice President – Service Design and Performance

**Frederick G. (Fritz) Draper**
Vice President – Business Unit Operations and Support

**George Duggan**
Vice President – Domestic Intermodal Marketing

**Kathryn M. Farmer**
Vice President – Industrial Products Sales

**John J. Fleps**
Vice President – Labor Relations

**Gregory C. Fox**
Vice President – Transportation

**David L. Freeman**
Vice President – Engineering

**David L. Garin**
Group Vice President – Industrial Products

**Dennis R. Johnson**
Vice President and Chief Sourcing Officer

**Kevin Kaufman**
Group Vice President – Agricultural Products

**Robert W. Lease**
Regional Vice President – Operations

**Frederick R. Malesa**
Vice President – International Intermodal Marketing

**Chris A. Roberts**
Vice President – Mechanical and Value Engineering

**Sami M. Shalah**
Vice President – Coal Marketing

**Denis Smith**
Vice President – Industrial Products Marketing

**Mark A. Schulze**
Vice President – Safety, Training and Operations Support

**Sanford C. Sexhus**
Regional Vice President – Operations

**Jeffrey B. Wright**
Regional Vice President – Operations

# *Shareholder Information*

**Shares Listed**
New York Stock Exchange,
Ticker Symbol: BNI

**Principal Corporate Office**
2650 Lou Menk Drive
Fort Worth, Texas 76131-2830
(800) 795-2673
www.bnsf.com

**Stock Transfer Agent and Registrar**
Stock Transfer Agent and Registrar
Computershare
Trust Company, N.A.
250 Royall Street
Canton, MA 02021

Telephone: (800) 526-5678

For account information, go to:
www.computershare.com/investor

Shareholders
As of February 3, 2009, there were approximately 31,000 shareholders of record.

**Shareholder Services**
*You are encouraged to contact our Transfer Agent directly for the shareholder services listed below:*
Change in Certificate Registration, Dividend Reinvestment Service, Change of Mailing Address, Lost or Stolen Certificates, Replacement of Dividend Checks, Direct Deposit of Dividends, Consolidation of Multiple Accounts, Elimination of Duplicate Report Mailings, Replacement of Form 1099-DIV.

**Dividend Reinvestment Plan**
A dividend reinvestment plan is provided for registered shareholders through the Transfer Agent as a convenient way to purchase more shares through investment of dividends or voluntary cash payments.
A booklet describing the plan is available from the Transfer Agent.

**Form 10-K**
The Company's Annual Report on Form 10-K filed with the Securities and Exchange Commission (SEC) is posted on the Company's Web site, www.bnsf.com. A copy of the Annual Report on Form 10-K is also available to shareholders free of charge upon request to the Company's Investor Relations Department at 2500 Lou Menk Drive, Fort Worth, Texas 76131-2828. The Company's filings on Form 10-K, Form 10-Q and Form 8-K are posted on the Company's Web site when the reports are electronically filed with the SEC. Reports on Forms 3, 4 and 5 by directors and Section 16 reporting officers are posted on the Company's Web site no later than the day following their filing with the SEC.

**Institutional Investors**
Inquiries from security analysts and investment professionals should be directed to the Company's investor relations contact:
Ms. Linda J. Hurt
Vice President –
Investor Relations
(817) 352-6452

**Annual Meeting**
The Annual Meeting of Shareholders will be held at The Fort Worth Club, 306 W. 7th Street, Fort Worth, Texas 76102, on Thursday, April 23, 2009, at 8:00 a.m. CDT.

**Performance Graph**
The following graph depicts a five-year comparison of cumulative total shareholder returns for the Company, the Standard & Poor's 500 Stock Index (S&P 500) and the Dow Jones U.S. Transportation Average Index (Dow Jones). The Dow Jones index consists of 20 railroad, airline, trucking and marine transport companies. The Company is included within the S&P 500 and Dow Jones indices. The graph assumes an investment of $100 for the five-year period commencing December 31, 2003, and ending December 31, 2008, in the Company's common stock and the S&P 500 and the Dow Jones indices, and the reinvestment of dividends.




© 2009 Burlington Northern Santa Fe Corporation. All rights reserved.
Design: Methodologie; Photography: Steve Crise, Wyatt McSpadden (CEO portrait); Printing: ColorGraphics

BNSF

2650 Lou Menk Drive
Fort Worth, Texas 76131-2830



# EXHIBIT PX0699

Morningstar® Document Research℠

# FORM 10-K

## CSX CORP - csx

**Filed: March 08, 2005 (period: December 31, 2004)**

Annual report which provides a comprehensive overview of the company for the past year

Powered by Morningstar® Document Research℠

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# Form 10-K

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2004**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from to**

**Commission File Number 1-8022**

# CSX Corporation
*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Virginia**<br>*(State or other jurisdiction of incorporation or organization)* | **62-1051971**<br>*(I.R.S. Employer Identification No.)* |
| **500 Water Street, 15th Floor, Jacksonville, FL**<br>*(Address of principal executive offices)* | **32202**<br>*(Zip Code)* |

**(904) 359-3200**
**(Registrant's telephone number, including area code)**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Name of Exchange on Which Registered |
|---|---|
| Common Stock, $1 Par Value | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act:**
**None**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☑

Indicate by check mark whether the registrant is an accelerated filer (as defined in Exchange Act Rule 12b-2). Yes ☑ No ☐

On June 25, 2004, the aggregate market value of the Registrant's voting stock held by non-affiliates was approximately $7.0 billion (based on the New York Stock Exchange closing price on such date).

On February 28, 2005, there were 215,619,764 shares of Common Stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the Registrant's Definitive Proxy Statement ("the Proxy Statement") to be filed with respect to its annual meeting of shareholders scheduled to be held on May 4, 2005.

**CSX CORPORATION**


Powered by Morningstar® Document Research℠

**FORM 10-K**

**TABLE OF CONTENTS**


| Item No. | | Page |
|---|---|---|
| | **PART I** | |
| 1. | Business | 3 |
| 2. | Properties | 5 |
| 3. | Legal Proceedings | 5 |
| 4. | Submission of Matters to a Vote of Security Holders | 5 |
| | **PART II** | |
| 5. | Market for Registrant's Common Equity, Related Stockholder Matters, and Issuer Purchases of Equity Securities | 7 |
| 6. | Selected Financial Data | 9 |
| 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 11 |
| | • 2004 Executive Summary | 11 |
| | • 2004 Surface Transportation Highlights and Challenges | 11 |
| | • 2005 Expectations | 16 |
| | • Risk Factors | 17 |
| | • Forward Looking Statements | 19 |
| | • Financial Results of Operations | 21 |
| | • Liquidity and Capital Resources | 30 |
| | • Schedule of Contractual Obligations and Commercial Commitments | 33 |
| | • Off-Balance Sheet Arrangements | 33 |
| | • Critical Accounting Estimates | 34 |
| 7A. | Quantitative and Qualitative Disclosures about Market Risk | 42 |
| 8. | Financial Statements and Supplementary Data | 43 |
| 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 105 |
| 9A. | Controls and Procedures | 105 |
| 9B. | Other Information | 105 |
| | **PART III** | |
| 10. | Directors and Executive Officers of the Registrant | 105 |
| 11. | Executive Compensation | 106 |
| 12. | Security Ownership of Certain Beneficial Owners and Management | 106 |
| 13. | Certain Relationships and Related Transactions | 106 |
| 14. | Principal Accounting Fees and Services | 106 |
| | **PART IV** | |
| 15. | Exhibits and Financial Statement Schedules | 106 |
| Signatures | | 111 |
| Computation of Ratio of Earnings to Fixed Charges | | |
| Subsidiaries of the Registrant | | |
| Consent of Ernst & Young LLP | | |
| Power of Attorney | | |
| Section 302 Certification - Principal Executive Officer | | |
| Section 302 Certification - Principal Financial Officer | | |
| Section 906 Certification - Principal Executive Officer | | |
| Section 906 Certification - Principal Financial Officer | | |

# PART I

## Item 1. *Business*

CSX Corporation ("CSX" or the "Company") operates one of the largest rail networks in the United States and also arranges for and provides integrated rail and truck ("intermodal") transportation services across the United States and key markets in Canada and Mexico. Its marine operations, described below under the caption "Discontinued Operations," included an international terminal services company, which operated and developed container terminals, distribution facilities and related terminal activities. CSX also owns and operates the Greenbrier, a AAA Five-Diamond resort located in White Sulphur Springs, West Virginia.

## Surface Transportation

### *CSX Transportation, Inc.*

Headquartered in Jacksonville, Florida, CSX Transportation Inc. ("CSXT") is the largest rail network in the eastern United States, providing rail freight transportation over a network of more than 22,000 route miles in 23 states, the District of Columbia and two Canadian provinces.

### *CSX Intermodal, Inc.*

CSX Intermodal Inc. ("CSXI") is one of the nation's largest transcontinental intermodal transportation service providers, operating a network of dedicated intermodal facilities across North America. Headquartered in Jacksonville, Florida, the CSXI network handles approximately 500 dedicated trains among its 44 terminals weekly.

The rail and intermodal segments are viewed on a combined basis as Surface Transportation operations.

## Discontinued Operations

### *International Terminals*

CSX World Terminals, LLC ("CSXWT") operates container-freight terminal facilities in Asia, Europe, Australia, Latin America and the United States. CSXWT is headquartered in Charlotte, North Carolina.

On February 22, 2005 CSX sold its International Terminals business through the sale of all of the issued and outstanding shares of capital stock of SL Service, Inc. ("SLSI"), and all of its interest in Orange Blossom Investment Company, Ltd. to Dubai Ports International FZE ("DPI") for closing cash consideration of $1.142 billion, subject to final working capital and long-term debt adjustments. As a result of the sale CSX will recognize a pretax gain in the first quarter of 2005 and expects to tender substantial tax payments triggered by the transaction beginning in the second quarter of 2005. Of the gross proceeds, approximately $115 million is allocated for the purchase of a minority interest in an International Terminals' subsidiary, acquired in the first quarter of 2005 and divested as part of the sale to DPI. Approximately $100 million was paid for this interest subsequent to December 31, 2004, with the final payment expected in the first quarter of 2005. The Company is considering options regarding the use of net cash proceeds including reduction of debt and other corporate purposes.

SLSI also holds certain residual assets and liabilities as a result of prior divestitures and discontinuances. A wholly-owned subsidiary of CSX retains the rights to those assets and indemnifies DPI, SLSI and related entities against those liabilities pursuant to a separate agreement. CSX guarantees the obligations of its subsidiary under this separate agreement.

Consequently, the results of operations and financial position of the Company's International Terminals business are reported as Discontinued Operations for all periods presented.



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

### Divestitures

***CSX Lines LLC***

In February 2003, CSX conveyed most of its interest in its domestic container-shipping subsidiary, CSX Lines LLC ("CSX Lines"), to a new venture formed with The Carlyle Group for approximately $300 million (gross cash proceeds of approximately $240 million, $214 million net of transaction costs, and $60 million of securities). CSX Lines was subsequently renamed Horizon Lines LLC ("Horizon"). Horizon subleased vessels and equipment from certain affiliates of CSX covering the primary financial obligations related to $265 million of leases under which CSX or one of its affiliates will remain a lessee/ sublessor or guarantor. A deferred pretax gain of approximately $127 million as a result of the transaction is being recognized over the 12-year sub-lease term. The securities contained a term of 7 years and a preferred return feature. During the third quarter of 2003, CSX received a $15 million payment from Horizon Lines, which included $3 million of interest, in return of a portion of its investment in Horizon. The investing section of the 2003 Consolidated Statement of Cash Flows includes proceeds from divestiture of $226 million and $3 million of interest on investment is included in net earnings.

In July 2004, Horizon was acquired by an unrelated third party, and CSX received $59 million, which included $48 million for the purchase of its ownership interest in Horizon, $4 million of interest, and a performance payment of $7 million, which will also be recognized over the 12-year sub-lease term. The investing section of the 2004 Consolidated Statement of Cash Flows includes proceeds from divestiture of $55 million and $4 million of interest on investment is included in net earnings. However, CSX and one of its affiliates will continue to remain a lessee/ sublessor or guarantor on certain vessels and equipment as long as the subleases remain in effect. (See Note 19, Commitments and Contingencies.)

### Financial Information about Operating Segments

See Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations for operating revenue, operating income and total assets by segment for each of the last three fiscal years.

### General

The Company makes available free of charge through its website at www.csx.com, its annual reports on Form 10-K, quarterly reports on Form 10-Q and current reports on Form 8-K, and all amendments thereto, as soon as reasonably practicable after such reports are filed with or furnished to the Securities and Exchange Commission.

CSX has included the CEO and CFO certifications regarding the Company's public disclosure required by Section 302 of the Sarbanes-Oxley Act of 2002 as Exhibits 31(a) and (b) to this report. Additionally, CSX filed with the NYSE the CEO's certification regarding the Company's compliance with the NYSE's Corporate Governance Listing Standards (Listing Standards) pursuant to Section 303A.12(a) of the Listing Standards, which was dated June 2, 2004, and indicated that the CEO was not aware of any violations of the Listing Standards by the Corporation.

For additional information concerning business conducted by CSX during 2004, see Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations and Item 8. Financial Statements and Supplementary Data — Note 20, Business Segments.



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

**Employees**

The information set forth in Item 6. Selected Financial Data is incorporated herein by reference.

**Item 2. *Properties***

The information set forth in the following sections is incorporated herein by reference:

- Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations under the caption "Depreciation Policies Under the Group Life Method,"
- Item 8. Financial Statements and Supplementary Data
  - Note 1 Nature of Operations and Significant Accounting Policies under the caption "Properties", and
  - Note 10 Properties.

**Item 3. *Legal Proceedings***

CSX is involved in routine litigation incidental to its business and is a party to a number of legal actions and claims, various governmental proceedings and private civil lawsuits, including those related to environmental matters, Federal Employers' Liability Act claims by employees, other personal injury claims, and disputes and complaints involving certain transportation rates and charges. Some of the legal proceedings include claims for compensatory as well as punitive damages, and others purport to be class actions. While the final outcome of these matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded along with applicable insurance, it is the opinion of CSX management that none of these items will have a material adverse effect on the results of operations, financial position or liquidity of CSX. However, an unexpected adverse resolution of one or more of these items could have a material adverse effect on the results of operations in a particular quarter or fiscal year. The Company is also party to a number of actions, the resolution of which could result in gain realization in amounts that could be material to results of operations in the quarters received.

See Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations under the caption "Critical Accounting Estimates, Casualty, Environmental and Legal Reserves."

**Item 4. *Submission of Matters to a Vote of Security Holders***

There were no matters submitted to a vote of security holders in the fourth quarter of 2004.

**Executive Officers of the Registrant**

Executive officers of CSX are elected by the CSX Board of Directors and generally hold office until the next annual election of officers. Officers of CSX business units are elected annually by the respective Boards of Directors of the business units. There are no family relationships or any



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

arrangement or understanding between any officer and any other person pursuant to which such officer was selected. Effective March 1, 2005, the executive officers will be as follows:

| Name and Age | Business Experience During Past 5 Years |
|---|---|
| Michael J. Ward, 54 | Chairman of the Board, President and Chief Executive Officer of CSX, having been elected as Chairman and Chief Executive Officer in January 2003 and as President in July 2002. He has also served CSX Transportation, Inc., the Company's rail subsidiary, as President since November 2000 and as President and Chief Executive Officer since October 2002. Previously, Mr. Ward served CSX Transportation as Executive Vice President — Operations from April through November 2000, and as Executive Vice President — Coal Service Group from August 1999 to April 2000. |
| Ellen M. Fitzsimmons, 44 | Senior Vice President — Law and Public Affairs of CSX and CSX Transportation, Inc. since December 2003. Before December 2003, Ms. Fitzsimmons served as Senior Vice President — Law and Corporate Secretary since May 2003 and as Senior Vice President — Law from February 2001 to May 2003. Prior thereto, she served as General Counsel — Corporate at CSX. |
| Clarence W. Gooden, 53 | Executive Vice President and Chief Commercial Officer of CSX and CSX Transportation, Inc. since April 2004. Before April 2004, Mr. Gooden served as Senior Vice President — Merchandise Service Group, CSX Transportation, Inc. since 2002. Prior to 2002, Mr. Gooden served as President of CSX Intermodal from 2001 to 2002; Senior Vice President — Coal Service Group from 2000 to 2001; and Vice President — System Transportation from 1999 to 2000. |
| Robert J. Haulter, 51 | Senior Vice President — Human Resources and Labor Relations of CSX and CSX Transportation, Inc. since December 2003. Before December 2003, Mr. Haulter served as CSX Senior Vice President — Human Resources since July 2002. Before July 2002, he served CSX Transportation, Inc. as Senior Vice President — Human Resources from May 2002 to July 2002; as Vice President — Human Resources from December 2000 to May 2002; as Assistant Vice President of Operations Support from September 2000 to December 2000; and as Assistant Vice President — Strategic Development from November 1999 to September 2000. |



Source: CSX CORP, 10-K, March 08, 2005
Powered by Morningstar® Document Research℠

| Name and Age | Business Experience During Past 5 Years |
|---|---|
| Oscar Munoz, 46 | Executive Vice President and Chief Financial Officer of CSX and CSX Transportation, Inc. since May 2003. Before May 2003, Mr. Munoz served as Chief Financial Officer and Vice President, Consumer Services, AT&T Corporation, from January 2001 to May 2003; as Senior Vice President — Finance & Administration, Qwest Communications International, Inc. from June to December 2000; and as Chief Financial Officer & Vice President, U.S. West Retail Markets from April 1999 to May 2000. |
| Tony L. Ingram, 58 | Executive Vice President and Chief Operating Officer of CSX Transportation, Inc. since March 2004. Before March 2004, Mr. Ingram served as Senior Vice President — Transportation, Network and Mechanical, Norfolk Southern Corporation, from February 2003 to March 2004; and Vice President, Transportation — Operations from March 2000 to February 2003. |
| Carolyn T. Sizemore, 42 | Vice President and Controller of CSX and CSX Transportation, Inc. since April 2002. Prior to April 2002, Ms. Sizemore served CSX as Assistant Vice President and Assistant Controller from July 2001 to April 2002, and as Assistant Vice President, Financial Planning from June 1999 to July 2001. |

# PART II

## Item 5. *Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities*

### Market Information

CSX's common stock is listed on the New York and Swiss stock exchanges and trades with unlisted privileges on the Midwest, Boston, Cincinnati, Pacific and Philadelphia stock exchanges. The official trading symbol is "CSX." In 2004, the Company decided to delist its common stock from the London Stock Exchange, effective December 31, 2004, due to low trading volume and costs associated with listing maintenance.

### Description of Common and Preferred Stocks

A total of 300 million shares of common stock is authorized, of which 215,528,753 shares were outstanding as of December 31, 2004. Each share is entitled to one vote in all matters requiring a vote of shareholders. There are no pre-emptive rights. At February 28, 2005, there were 70,398 common stock shareholders of record.

A total of 25 million shares of preferred stock is authorized, none of which is currently outstanding.



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

**Equity Compensation Plan Information**

The following table summarizes the equity compensation plans under which CSX common stock may be issued as of December 31, 2004.

| | (1) Number of Securities to be Issued upon Exercise of Outstanding Options, Warrants and Rights (000's) | (2) Weighted-Average Exercise Price of Outstanding Options, Warrants and Rights | (3)(a)(b) Number of Securities Remaining Available for Future Issuance under Equity Compensation Plans (Excluding Securities Reflected in Column(1) (000's) |
|---|---|---|---|
| Equity compensation plans approved by security holders | 19,969 | $ 39.67 | 7,179 |
| Equity compensation plans not approved by security holders | 625 | $ 44.86 | — |
| Total | 20,594 | | 7,179 |

(a) The number of shares remaining available for future issuance under plans approved by shareholders includes 601,530 shares available for stock option grants, payment of director compensation, and stock grants pursuant to the CSX Stock Plan for Directors; and 6,577,519 shares available for grant in the form of stock options, performance units, restricted stock, stock appreciation rights, and stock awards pursuant to the CSX Omnibus Incentive Plan.

(b) The 1990 Stock Award Plan ("1990 Plan") is the only CSX equity compensation plan that has not been approved by shareholders. Effective September 12, 1990, the purpose of the 1990 Plan was to further the long term stability and financial success of CSX by rewarding selected meritorious employees by the award of Company stock. Each stock award and grant of options shall be approved or ratified by the Board.

Upon approval of the CSX Omnibus Incentive Plan by shareholders in 2000, the plan was closed to further grants. No options have been granted under the 1990 Plan since 1999.

The following table sets forth, for the quarters indicated, the dividends declared and the high and low sales prices of the Company's common stock.

| | Quarter 1st | 2nd | 3rd | 4th |
|---|---|---|---|---|
| **2004** | | | | |
| Dividends | $ 0.10 | $ 0.10 | $ 0.10 | $ 0.10 |
| Common Stock Price | | | | |
| High | $ 36.26 | $ 33.04 | $ 34.28 | $ 40.46 |
| Low | $ 28.80 | $ 29.28 | $ 29.96 | $ 33.09 |
| **2003** | | | | |
| Dividends | $ 0.10 | $ 0.10 | $ 0.10 | $ 0.10 |
| Common Stock Price | | | | |
| High | $ 30.85 | $ 33.16 | $ 32.99 | $ 36.29 |
| Low | $ 25.50 | $ 28.20 | $ 28.92 | $ 29.07 |



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

**Item 6.** ***Selected Financial Data***

| | 2004 | 2003 | 2002 | 2001 | 2000 |
|---|---|---|---|---|---|
| | (Dollars in millions, except per share amounts) | | | | |
| **Earnings from Continuing Operations** | | | | | |
| Operating Revenue | $ 8,020 | $ 7,566 | $ 7,916 | $ 7,853 | $ 7,887 |
| Operating Expense | 7,020 | 7,046 | 6,897 | 7,003 | 7,195 |
| Operating Income | $ 1,000 | $ 520 | $ 1,019 | $ 850 | $ 692 |
| Net Earnings from Continuing Operations | $ 418 | $ 137 | $ 410 | $ 243 | $ 129 |
| Earnings Per Share: | | | | | |
| From Continuing Operations | $ 1.95 | $ 0.64 | $ 1.93 | $ 1.15 | $ 0.61 |
| From Continuing Operations, Assuming Dilution | $ 1.87 | $ 0.63 | $ 1.85 | $ 1.13 | $ 0.61 |
| From Cumulative Effect of Accounting Change | $ — | $ 0.26 | $ (0.20) | $ — | $ — |
| From Cumulative Effect of Accounting Change, Assuming Dilution | $ — | $ 0.25 | $ (0.19) | $ — | $ — |
| **Financial Position** | | | | | |
| Cash, Cash Equivalents and Short-term Investments | $ 859 | $ 368 | $ 264 | $ 618 | $ 686 |
| Total Assets | 24,581 | 21,760 | 20,951 | 20,801 | 20,548 |
| Long-term Debt | 6,234 | 6,886 | 6,519 | 5,839 | 5,896 |
| Shareholders' Equity | 6,811 | 6,448 | 6,241 | 6,120 | 6,017 |
| **Other Data Per Common Share** | | | | | |
| Cash Dividends | $ 0.40 | $ 0.40 | $ 0.40 | $ 0.80 | $ 1.20 |
| Market Price | | | | | |
| High | $ 40.46 | $ 36.29 | $ 41.40 | $ 41.30 | $ 33.44 |
| Low | $ 28.80 | $ 25.50 | $ 25.09 | $ 24.81 | $ 19.50 |
| **Employees — Annual Averages** | | | | | |
| Rail | 32,074 | 32,892 | 33,468 | 35,014 | 35,496 |
| Other | 3,773 | 4,624 | 6,471 | 6,446 | 9,955 |
| Total | 35,847 | 37,516 | 39,939 | 41,460 | 45,451 |

See accompanying Consolidated Financial Statements



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

Significant events include the following:

2004 — A charge of $71 million pretax, $44 million after tax, was recognized for separation expenses related to the management restructuring announced in November 2003 at Surface Transportation.

— Revenues, operating expenses and after-tax income include approximately $63 million, $35 million and $6 million, respectively, representing consolidation of Four Rivers Transportation ("FRT"), a short-line railroad previously accounted for under the equity method, in conjunction with adoption of FASB Interpretation No. 46, "Consolidation of Variable Interest Entities." Net equity earnings of FRT of approximately $4 million were included in other income in 2003.

— CSX completed a corporate reorganization of Conrail that resulted in the direct ownership of certain Conrail assets by CSXT. This transaction was accounted for at fair value and resulted in a net gain of $16 million after tax, which is included in other income. (See Note 2. Investment In and Integrated Rail Operations with Conrail.)

— In December 2004, CSX entered into a definitive agreement to sell its international terminals business for $1.142 billion in cash and other consideration. As a result, amounts related to this business are reported as discontinued operations for all periods presented.

2003 — Income of $93 million pretax, $57 million after tax, was recognized as a cumulative effect of accounting change, representing the reversal of the accrued liability for crosstie removal costs in conjunction with the adoption of SFAS 143, "Accounting for Asset Retirement Obligations." (See Note 1, Nature of Operations and Significant Accounting Policies.)

— In February 2003, CSX conveyed most of its interest in its domestic container-shipping subsidiary, CSX Lines, to a new venture formed with the Carlyle Group for approximately $300 million. CSX Lines was subsequently renamed Horizon. A deferred pretax gain of approximately $127 million as a result of the transaction is being recognized over the 12-year sub-lease term. In the third quarter of 2004, Horizon was acquired by an unrelated third party, and CSX received $59 million, which included $48 million for the purchase of its ownership interest in Horizon, $4 million of interest and a performance payment of $7 million.

— A charge of $232 million pretax, $145 million after tax, was recognized in conjunction with the change in estimate of casualty reserves to include an estimate of incurred but not reported claims for asbestos and other occupational injuries to be received over the next seven years. (See Note 11, Casualty, Environmental, and Other Reserves.)

— A charge of $108 million pretax, $67 after tax, was recognized to account for the Company entering into two settlement agreements with Maersk that resolved all material disputes pending between the companies arising out of the 1999 sale of the international container-shipping assets. (See Note 19, Commitments and Contingencies.)

— A charge of $34 million pretax, $21 million after tax, was recognized as the initial charge for separation expenses related to the management restructuring announced in November 2003. In addition, the Company recorded a credit of $22 million pretax, $13 million after tax related to revised estimates for railroad retirement taxes and the amount of benefits that will be paid to individuals under the $1.3 billion charges for separation plans initially recorded in 1991 and 1992. For the year, the Company recorded a net restructuring charge of $22 million, $13 million after tax that includes these items and additional separation charges that were included in the third quarter results. (See Note 5, Management Restructuring.)

2002 — A charge was recognized to write down indefinite lived intangible assets as a cumulative effect of an accounting change, which reduced earnings $83 million pretax, $43 million after



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

tax, and consideration of minority interest. (See Note 1, Nature of Operations and Significant Accounting Policies.)

2001 — A charge of $60 million pretax, $37 million after tax, was recognized to account for the settlement of the 1987 New Orleans tank car fire litigation.

**Item 7. *Management's Discussion and Analysis of Financial Condition and Results of Operations***

The following discussion should be read in conjunction with Item 8. Financial Statements and Supplementary Data and other information included in this report. CSX follows a 52/53 week fiscal reporting calendar. Fiscal year 2004 consisted of a 53-week year ending on December 31, 2004. Fiscal year 2003 consisted of 52 weeks ending on December 26, 2003.

## EXECUTIVE SUMMARY

### 2004 SURFACE TRANSPORTATION HIGHLIGHTS AND CHALLENGES

**Revenue**

Revenue increased by 8% or $581 million year-over-year, a portion of which is due to 53 weeks instead of 52 weeks in the fiscal year ended December 31, 2004. The fourth quarter of 2004 marked the 11th consecutive quarter of year-over-year revenue growth. Increased demand for coal was a primary driver of the revenue growth due to both increased electricity generation and rebuilding utility stockpile inventory. In addition, demand created from a generally strong industrial economy propelled all merchandise markets and CSXI to record revenue levels. All major markets showed year-over-year improvement in revenue-per-car due to continued yield management strategies and the Company's fuel surcharge program.

**Volume**

Volume growth during 2004 lagged others in the rail industry due to service related constraints at CSXT and the Network Simplification Initiative ("NSI") at CSXI. Several markets exhibited potential for additional volume especially within the coal and metals markets, if the Company's car fleet utilization had improved. Furthermore, some customers diverted traffic to other rail carriers or other modes of transportation due to service challenges.

In July, CSXI implemented NSI, which eliminated 26 weekly train starts, in an effort to improve overall contributions by consolidating volumes on fewer trains. The annualized impact from NSI is estimated to be increase CSXI's operating income by $8 million or approximately 5%.

**Fuel Costs and Fuel Surcharge Program**

Fuel expenses increased 16% to $656 million in 2004, net of $63 million of fuel hedging benefits, from $566 million in 2003 due principally to the rising price per gallon of diesel fuel. Fuel hedging activity had no impact on fuel expense for the fiscal year ended December 26, 2003. The average price per gallon of diesel fuel, including benefits from CSX's fuel hedging program, was $1.0950 in 2004 versus $0.9564 in 2003. In addition, the fuel surcharge programs within the Surface Transportation business segment and contractual cost escalation clauses used in most multi-year customer contracts partially offset fuel cost increases.

**Operations**

Fiscal year 2004 proved to be operationally challenging. As illustrated in the table below, key measures of network performance declined versus prior year and had an adverse impact on service



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

consistency, expenses and CSX's ability to fully capture growth opportunities during a period of high demand for transportation services.

**RAIL OPERATING STATISTICS(a)**

| | | Year 2004 | 2003 | % Change |
|---|---|---|---|---|
| **Service Measurements** | Average Velocity, All Trains (Miles Per Hour) | 20.3 | 21.1 | (4)% |
| | Average System Dwell Time (Hours) | 28.7 | 25.3 | (13) |
| | Average Total Cars-On-Line | 233,271 | 229,926 | (1) |
| | On-Time Originations | 49.0% | 62.0% | (21) |
| | On-Time Arrivals | 40.9% | 56.9% | (28) |
| | Average Recrews (Per Day) | 62.6 | 49.7 | (26)% |

(a) Amounts for 2004 are estimated.

**Implementation of the ONE Plan**

The ONE Plan was a major initiative launched across the CSX network in the third quarter of 2004 aimed at improving network performance. The first phase of the ONE Plan included a complete redesign of the operating plan for automotive and merchandise shipments to improve service consistency and efficiency by reducing terminal handlings and routing miles. With the new operating plan in place, management focused on consistent execution and refining the plan in response to changing shipment volumes and flows. Early results were promising, with key measures improving sequentially from the third to the fourth quarter of 2004.

**Expenses**

CSX follows a 52/53 week fiscal reporting calendar. Fiscal year 2004 consisted of a 53-week year ending on December 31, 2004. Fiscal year 2003 consisted of 52 weeks ending on December 26, 2003.

| | Surface Transportation December 31, 2004 | December 26, 2003 | $ Change | % Change |
|---|---|---|---|---|
| | (Dollars in millions) | | | |
| **Operating Revenue** | $ 8,020 | $ 7,439 | $ 581 | 8% |
| **Operating Expense** | | | | |
| Labor and Fringe | 2,776 | 2,628 | 148 | 6 |
| Materials, Supplies and Other | 1,707 | 1,530 | 177 | 12 |
| Conrail Rents, Fees and Services | 256 | 342 | (86) | (25) |
| Building and Equipment Rent | 566 | 562 | 4 | 1 |
| Inland Transportation | 293 | 298 | (5) | (2) |
| Depreciation | 702 | 611 | 91 | 15 |
| Fuel | 656 | 566 | 90 | 16 |
| Provision for Casualty Claims | — | 229 | (229) | (100) |
| Restructuring Charge — Net | 71 | 22 | 49 | 223 |
| **Total Operating Expense** | 7,027 | 6,788 | 239 | 4 |
| **Operating Income (Loss)** | $ 993 | $ 651 | $ 342 | 53% |
| **Operating Ratio** | 87.6% | 91.2% | | |



Source: CSX CORP, 10-K, March 08, 2005
Powered by Morningstar® Document Research℠

**Safety**

Efforts by the Company to reduce the frequency of personal injuries and train accidents produced modest improvements on a year-over-year comparison. The Company's personal injury frequency index for 2004 remained unchanged from 2003 levels, while its FRA train accident frequency improved 4% on a year-over-year basis. The Company's safety performance improved sequentially in the third and fourth quarters.

**RAIL OPERATING STATISTICS(a)**

| | | Year | | |
|---|---|---|---|---|
| | | **2004** | **2003** | **% Change** |
| **Service Measurements** | Personal Injury Frequency Index (Per 100 Employees) | 2.29 | 2.30 | 0% |
| | FRA Train Accidents Frequency (Per Million Train Miles) | 4.48 | 4.66 | 4% |

(a) Amounts for 2004 are estimated.

**Organizational Effectiveness Initiative**

As of April 2004, CSX concluded the Management Restructuring program announced in November 2003 to improve the speed of decision-making by reducing management layers and increasing the span of control for managers, as well as realigning certain functions. As a result of this initiative, CSX reduced the non-union Surface Transportation workforce by 863 positions. The Company incurred expense associated with this program through the third quarter of 2004 as final settlement costs were determined.



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

**Selected Earnings Data**

| | | Years Ended December 31, 2004 | Years Ended December 26, 2003 | $ Change | % Change |
|---|---|---|---|---|---|
| | | (Dollars in millions, except per share amounts) | | | |
| **Revenue and Expense** | **Surface Transportation Revenue** | $ 8,020 | $ 7,439 | $ 581 | 8% |
| | **Surface Transportation Expense** | 7,027 | 6,788 | 239 | 4 |
| | **Surface Transportation Operating Income** | 993 | 651 | 342 | 53 |
| **Earnings** | **Earnings From Continuing Operations** | 418 | 137 | 281 | 205 |
| | Discontinued Operations — Net of Tax | (79) | 52 | (131) | (252) |
| | Cumulative Effect of Accounting Change — Net of Tax (Note f) | — | 57 | (57) | (100) |
| | **Net Earnings** | $ 339 | $ 246 | $ 93 | 38 |
| **Per Common Share** | ***Earnings Per Share, Assuming Dilution:*** | | | | |
| | **Earnings From Continuing Operations** | 1.87 | 0.63 | 1.24 | 197 |
| | Discontinued Operations | (0.35) | 0.23 | (0.58) | (252) |
| | Cumulative Effect of Accounting Change | — | 0.25 | (0.25) | (100) |
| | **Net Earnings** | $ 1.52 | $ 1.11 | $ 0.41 | 37% |
| | **Average Diluted Common Shares Outstanding** (Thousands) | 225,030 | 224,328 | | |



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

**Free Cash Flow**

Free cash flow is considered a non-GAAP financial measure under SEC Regulation G. Management believes, however, that free cash flow is important in evaluating its financial performance and measures an ability to generate cash without incurring additional external financings. Free cash flow should be considered in addition to, rather than a substitute for, cash provided by operating activities. The following table reconciles cash provided by operating activities (GAAP measure) to free cash flow (non-GAAP measure):

| | December 31, 2004 | December 26, 2003 |
|---|---|---|
| | (Dollars in millions) | |
| Net Increase in Cash and Cash Equivalents | $ 226 | $ 169 |
| Add (Deduct): | | |
| Short-term Investments — Net | 247 | (68) |
| 42% of Conrail Free Cash Flow | 115 | 164 |
| Redemption of Accounts Receivable | — | 380 |
| Other Financing Activities | (127) | (282) |
| Total Free Cash Flow | $ 461 | $ 363 |

Surface Transportation capital expenditures totaled $960 million and $983 million for fiscal years 2004 and 2003, respectively.

**International Terminals Divestiture**

On February 22, 2005, CSX sold its International Terminals business through the sale of all of the issued and outstanding shares of capital stock of SLSI, and all of its interest in Orange Blossom Investment Company, Ltd. to DPI for closing cash consideration of $1.142 billion, subject to final working capital and long-term debt adjustments. As a result of the sale, CSX will recognize a significant gain in the first quarter of 2005 and expects to tender substantial tax payments triggered by the transaction beginning in the second quarter of 2005. As a result, amounts related to this business are reported as Discontinued Operations for all periods presented. On the Consolidated Income Statement, Discontinued Operations includes International Terminals' net earnings of $18 million as well as additional tax expense of $97 million related to undistributed foreign earnings. On the Consolidated Balance Sheet, the amounts related to this business are shown as International Terminals Assets/Liabilities Held for Sale.

**Conrail Spin-off**

In the third quarter of 2004, CSX, Norfolk Southern Corporation and Conrail, Inc. completed a corporate reorganization of Conrail that resulted in the direct ownership and control by CSXT of routes and assets that had previously been operated by CSXT under operating and lease agreements with a Conrail subsidiary. As a part of the reorganization, CSXT issued new unsecured debt obligations, which were exchanged for unsecured debt obligations of Consolidated Rail Corporation ("CRC"), a Conrail subsidiary. In addition, CSXT entered into new lease and sublease arrangements with CRC to support CRC's secured debt and lease obligations, and a long-term note due from CSX to Conrail was eliminated. The reorganization did not affect the Shared Assets Areas, which continue to be owned and operated by CRC and are reflected in CSX's Investment in Conrail as shown in the Consolidated Balance Sheets.

The distribution was accounted for at fair value, resulting in a net gain of $16 million after tax, which is included in Other Income in the Consolidated Income Statement.



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

Case 1:07-mc-00489-BAH Document 1229-7 Filed 11/22/24 Page 685 of 3766

The assets and liabilities acquired at the time of the Conrail spin-off transaction, as of September 2004, are as follows:

| | (Dollars in millions) | |
|---|---|---|
| Current Assets | $ | 7 |
| Properties — Net | | 6,018 |
| Investment in Conrail | | (4,130) |
| Other Long-term Assets | | 136 |
| **Total Assets** | $ | 2,031 |
| Current Liabilities | $ | 7 |
| Long-term Liabilities | | 15 |
| Long-term Debt | | (93) |
| Deferred Taxes | | 2,086 |
| Retained Earnings | | 16 |
| **Total Liabilities and Retained Earnings** | $ | 2,031 |

### Horizon Lines

In July 2004, CSX received $59 million, which included $48 million for the purchase of its ownership interest in Horizon, $4 million of interest, and a performance payment of $7 million, which will be recognized over 12 years. However, CSX and one of its affiliates will continue to remain a lessee/ sublessor or guarantor on $265 million of leases on certain vessels and equipment as long as the subleases remain in effect.

## 2005 EXPECTATIONS

### Revenue

Revenue is expected to continue to outpace volume in 2005 due to a continued emphasis on price. Lower contributory traffic is either being re-priced or replaced by longer haul, more profitable business. The amount of any revenue and volume increase depends on several factors:

**Economy:** Favorable economic conditions are expected based on the forecasts for key economic indicators such as the gross domestic product, industrial and automotive production as well as overall import levels. Generally, CSX's revenue is fairly diversified and a large portion is relatively insensitive to significant fluctuations in the general economy. However, changes in the macro economic environment do impact overall revenue growth.

**Operational Performance:** Service is expected to improve as management consistently executes the ONE Plan and average velocity increases. Consequently, additional volume may be captured as freight car availability increases due to improved asset utilization and reduced transit times. If service does not improve, volume growth could be flat to slightly negative.

**Fuel Prices:** Because of the fuel surcharge program and cost escalation clauses in long-term contracts, which include a fuel element, a portion of CSX's revenue varies with the price of fuel, but these mechanisms only partially offset the inflation in fuel prices.

### Operations

Improvement in key operating measurements is expected in 2005. Several factors can affect overall service levels:

**Availability of Resources:** Locomotive and train and engine employee availability are key resources to execute the operating plan. Management believes current resource plans, which



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

include hiring additional train and engine employees and the acquisition of 100 new locomotives, will be sufficient to manage anticipated volume while improving service levels.

**Volume:** If volume growth significantly exceeds management's expectations, additional train crew hiring and locomotive resources may be required, depending on the type and location of the volume growth. Deployment of additional resources could lag a sudden surge in demand by several months due to the time required to hire and train employees and to secure additional leased locomotives, subject to availability, which could negatively impact overall service levels during that period.

### Capital Investments

Total capital investments in rail infrastructure, locomotives, and freight cars are estimated to be $1.1 billion in 2005. Capital expenditures could increase if the industrial economy remains strong, additional volume materializes and profitability targets, including free cash flow, are met.

### Free Cash Flow

CSX will continue to focus on free cash flow in 2005, with a target of approximately $450 million.

## RISK FACTORS

### Competition

The Company experiences competition from other transportation providers including railroads and motor carriers that operate similar routes across its service area, and to a less significant extent barges, ships, and pipelines. Transportation providers such as motor carriers and barges utilize public rights-of-way that are built and maintained by governmental entities while CSX and other railroads must build and maintain its network through the utilization of internal resources. If the scope and quality of these alternative methods of transportation are materially increased, or if legislation is passed providing materially greater opportunity for motor carriers with respect to size or weight restrictions, there could be a material adverse effect on the Company's results of operations, financial condition, and liquidity.

### Employees and Labor Union Relationships

The Company considers employee relations with most of its unions generally to be good. Most of CSXT's employees are represented by labor unions and are covered by collective bargaining agreements. The bargaining agreements contain a moratorium clause that precludes serving new bargaining demands until a certain date. These agreements, which usually are bargained nationally by the National Railway Labor Conference ("NRLC"), normally contain the same moratorium date so all bargaining on agreement changes generally begins at approximately the same time. A round of bargaining started in 2000 when the moratorium provisions expired. Agreements have been reached with all but one of the unions. Two of those agreements are out for ratifications. Negotiations with the union representing the machinists are in mediation. The machinists have asked the National Mediation Board to be released from mediation and the railroads have opposed that request. A new round of bargaining commenced in 2004.

Also, the agreements which were concluded in the 2000 bargaining round are now open for renegotiation. The process of renegotiating these agreements commenced in early November 2004 when the parties were free to serve their bargaining demands. The outcome of the 2004 round of negotiations is uncertain at this time.

In the rail industry, negotiations have generally taken place over a number of years and previously have not resulted in any extended work stoppages. The existing agreements continue to remain in effect until new agreements are reached. The parties are not permitted to either strike or lockout until the Railway Labor Act's lengthy procedures (which include mediation, cooling-off periods, and the possibility of Presidential intervention) are exhausted.



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

**Environmental Laws and Regulation**

The Company's operations are subject to wide-ranging federal, state and local environmental laws and regulations concerning, among other things, emissions to the air, discharges to waters and the handling, storage, transportation and disposal of waste and other materials and cleanup of hazardous material or petroleum releases. The Company generates and transports hazardous and non-hazardous waste and materials in its current operations, and it has done so in its former operations. In certain circumstances, environmental liability can extend to formerly owned or operated properties, leased properties and properties owned by third parties, as well as to properties currently owned and used by the Company. Environmental liabilities have arisen and may also arise from claims asserted by adjacent landowners or other third parties in toxic tort litigation. The Company has been and may be subject to allegations or findings to the effect that it has violated, or is strictly liable under, environmental laws or regulations, and such violations can result in the Company's incurring fines, penalties or costs relating to the cleanup of environmental contamination. Although the Company has appropriately recorded current and long-term liabilities for known future environmental costs, it could incur significant costs as a result of any of the foregoing, and may be required to incur significant expenses to investigate and remediate known, unknown or future environmental contamination, which could have a material adverse effect on results of operations, financial condition and liquidity.

**Fuel Costs**

Fuel costs represent a significant expense of CSX Surface Transportation operations. Fuel prices can vary significantly from period to period and significant increases may have a material adverse effect on the Company's operating results. Furthermore, fuel prices and supply are influenced considerably by international political and economic circumstances. If a fuel supply shortage arose from OPEC production restrictions, a disruption of oil imports or otherwise, fuel shortages, higher fuel prices and any subsequent price increases could, despite the Company's fuel surcharge programs, materially adversely affect our operating results, financial condition and liquidity.

**Future Acts of Terrorism or War**

Terrorist attacks, such as those that occurred on September 11, 2001, or in Madrid, Spain on March 11, 2004, any government response thereto and war may adversely affect results of operations, financial condition and liquidity. The Company's rail lines and physical plant may be direct targets or indirect casualties of acts of terror, which could cause significant business interruption and result in increased costs and liabilities and decreased revenues and have a material adverse effect on operating results, financial condition or liquidity. In addition, insurance premiums charged for some or all of the coverage currently maintained by the Company could increase dramatically or the coverage may no longer be available.

**Regulation and Legislation**

The Company is subject to the regulatory jurisdiction of the Surface Transportation Board ("STB") of the United States Department of Transportation ("DOT"), the Federal Railroad Administration of DOT and other state and federal regulatory agencies as to rail operations and for a variety of health, safety, labor, environmental, and other matters. Legislation passed by Congress or regulations issued by these organizations can significantly affect the costs and profitability of the Company's business. In addition, the failure to comply with applicable laws and regulations could have a material adverse effect on the Company.

In response to the heightened threat of terrorism in the wake of the September 2001 attacks on the World Trade Center, Pentagon and airline infrastructure, federal, state and local regulatory agencies are evaluating various proposals with respect to the transportation industry. Some of these proposals relate to the transport of hazardous material. Certain metropolitan areas considered a security risk have been and may continue to be the subjects of regulation. The ultimate

legislation passed by federal, state and local regulators related to issues of security has the potential to materially adversely affect CSX's operations and costs.

**Safety**

The Company faces inherent business risk of exposure to property damage and personal injury claims in the event of train accidents, including derailments. The Company is also subject to exposure to occupational injury claims. While CSX is working diligently to enhance its safety programs and to continue to raise the awareness levels of its employees concerning safety, the Company cannot ensure that it will not experience any material property damage, personal or occupational claims in the future or that it will not incur significant costs to defend such claims. Additionally, the Company cannot ensure that existing claims will not suffer adverse development not currently reflected in reserve estimates, as the ultimate outcome of existing claims is subject to numerous factors that are outside of CSX's control. CSX engages outside parties to assist with the evaluation of certain of the occupational and personal injury claims, and believes that it is adequately reserved to cover all potential claims. However, final amounts determined to be due on any outstanding matters may differ materially from the recorded reserves.

**Severe Weather**

The Company may face severe weather conditions and other natural occurrences, including floods, fires, hurricanes and earthquakes which may cause significant disruptions of the Company's operations, and result in increased costs and liabilities and decreased revenues which could have a material adverse effect on operating results, financial condition and liquidity.

## FORWARD LOOKING STATEMENTS

Certain statements in this report and in other materials filed with the Securities and Exchange Commission, as well as information included in oral statements or other written statements made by the Company, are forward-looking statements within the meaning of the Securities Act of 1933 and the Securities Exchange Act of 1934. These forward-looking statements include, among others, statements regarding:

- Expectations as to operating results and operational improvements;
- Expectations as to the effect of claims, lawsuits, environmental costs, commitments, contingent liabilities, labor negotiations or agreements on our financial condition;
- Management's plans, goals, strategies and objectives for future operations and other similar expressions concerning matters that are not historical facts, and management's expectations as to future performance and operations and the time by which objectives will be achieved; and
- Future economic, industry or market conditions or performance.

Forward-looking statements are typically identified by words or phrases such as "believe", "expect", "anticipate", "project", and similar expressions. The Company cautions against placing undue reliance on forward-looking statements, which reflect its good faith beliefs with respect to future events and are based on information currently available to it as of the date the forward-looking statement is made. Forward-looking statements should not be read as a guarantee of future performance or results, and will not necessarily be accurate indications of the times that, or by which, such performance or results will be achieved.

Forward-looking statements are subject to a number of risks and uncertainties and actual performance or results could differ materially from that anticipated by these forward-looking statements. The Company undertakes no obligation to update or revise any forward-looking statement. If the Company does update any forward-looking statement, no inference should be drawn that the Company will make additional updates with respect to that statement or any other forward-looking statements. The following important factors, in addition to those discussed else-



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

Case 1:07-mc-00489-BAH Document 1229-7 Filed 11/22/24 Page 689 of 3766

where herein, may cause actual results to differ materially from those contemplated by these forward-looking statements:

- The Company's success in implementing its operational objectives and improving Surface Transportation operating efficiency;
- Changes in operating conditions and costs or commodity concentrations;
- Material changes in domestic or international economic or business conditions, including those affecting the rail industry such as customer demand, effects of adverse economic conditions affecting shippers, and adverse economic conditions in the industries and geographic areas that consume and produce freight;
- Labor costs and labor difficulties, including stoppages affecting either the Company's operations or the customers' ability to deliver goods to the Company for shipment;
- The inherent risks associated with safety and security, including adverse economic or operational effects from terrorist activities and any governmental response;
- Changes in fuel prices;
- Legislative, regulatory, or legal developments involving taxation, including the outcome of tax claims and litigation; the potential enactment of initiatives to re-regulate the rail industry and the ultimate outcome of shipper and rate claims subject to adjudication;
- Competition from other modes of freight transportation such as trucking and competition and consolidation within the transportation industry generally;
- Natural events such as extreme weather conditions, fire, floods, earthquakes, or other unforeseen disruptions of the Company's operations, systems, property, or equipment; and
- The outcome of litigation and claims, including those related to environmental contamination, personal injuries and occupational illnesses.

Other important assumptions and factors that could cause actual results to differ materially from those in the forward-looking statements are specified elsewhere in this report and in the Company's other SEC reports, accessible on the SEC's website at www.sec.gov and the Company's website at www.csx.com.



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

## FINANCIAL RESULTS OF OPERATIONS

***Consolidated Results***

CSX follows a 52/53 week fiscal reporting calendar. Fiscal year 2004 consisted of a 53-week year ending on December 31, 2004. Fiscal year 2003 consisted of 52 weeks ending on December 26, 2003. The results of operations of the Company's International Terminals business are reported as Discontinued Operations for all periods presented.

| | Consolidated | | | | |
|---|---|---|---|---|---|
| | 53 Weeks December 31, 2004 | | 52 Weeks December 26, 2003 | | 52 Weeks December 27, 2002 |
| | (Dollars in millions)(Unaudited)(a) | | | | |
| **Operating Revenue** | $ 8,020 | 6% | $ 7,566 | (4)% | $ 7,916 |
| **Operating Expense** | | | | | |
| Labor and Fringe | 2,779 | 3 | 2,689 | (5) | 2,829 |
| Materials, Supplies and Other | 1,709 | 8 | 1,586 | (4) | 1,647 |
| Conrail Rents, Fees & Services | 256 | (25) | 342 | 6 | 322 |
| Building and Equipment Rent | 553 | (1) | 558 | (6) | 592 |
| Inland Transportation | 293 | (7) | 314 | (13) | 363 |
| Depreciation | 711 | 15 | 620 | (1) | 629 |
| Fuel | 656 | 13 | 581 | 13 | 515 |
| Miscellaneous | (8) | 33 | (6) | — | — |
| Provision for Casualty Claims | — | (100) | 232 | — | — |
| Additional Loss on Sale | — | (100) | 108 | — | — |
| Restructuring Charge — Net | 71 | 223 | 22 | — | — |
| **Total Operating Expense** | 7,020 | (0) | 7,046 | 2 | 6,897 |
| **Operating Income** | $ 1,000 | 92% | $ 520 | (49)% | $ 1,019 |

(a) Prior periods have been reclassified to conform to the current presentation.

***2004 vs. 2003***

*Operating Revenue*

Operating revenue increased $454 million for the year ended December 31, 2004 to $8.0 billion, compared to $7.6 billion for the prior year primarily due to continued yield management strategies as all major markets showed year-over-year improvement in revenue-per-car coupled with the Company's fuel surcharge program.

*Operating Income*

Operating income for the year ended December 31, 2004 increased $480 million to $1.0 billion, compared to $520 million in the prior year. Operating expenses decreased $26 million to $7 billion for the fiscal year ended December 31, 2004, principally due to the absence of charges totaling $340 million taken in 2003 for (1) the provision for casualty claims, and (2) the additional loss on sale.

*Other Income*

Other income decreased $21 million to $72 million for the year ended December 31, 2004, compared to $93 million for the prior year primarily due to a decline in income from real estate and resort operations. This decrease was partially offset by the net gain of $16 million, after tax, related to the Conrail spin-off transaction.



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

*Interest Expense*

Interest expense increased $17 million for the year ended December 31, 2004 compared to the prior year comparable period due to decreased benefits from interest rate swaps and the exchange of Conrail debt, as a result of the Conrail spin-off transaction.

*Net Earnings*

Earnings from Continuing Operations were $418 million, or $1.87 per diluted share, for the year ended December 31, 2004 compared to $137 million, or 63 cents per diluted share for the prior year.

Losses from Discontinued Operations, net of tax, were $79 million, or 35 cents per diluted share, for the year ended December 31, 2004 compared to earnings of $52 million, or 23 cents per diluted share for the prior year. Discontinued Operations for the period ended December 31, 2004, includes International Terminals' net earnings as well as additional tax expense of $97 million related to undistributed foreign earnings.

The year ended December 26, 2003 included an after-tax cumulative effect of accounting change benefit of $57 million, related to the adoption of Statement of Financial Accounting Standard ("SFAS") 143, "Accounting for Asset Retirement Obligations."

Net earnings were $339 million, or $1.52 per diluted share, for the year ended December 31, 2004, compared to $246 million or $1.11 per share for the prior year.

The increase in the 2004 effective income tax rate compared to the prior year is primarily attributable to a larger percentage of total pretax earnings in 2004 than in 2003. Additionally, 2003 income tax expense was favorably impacted by the cumulative impact of changes in the Company's deferred effective state income tax rates.

In 2004, CSX is required to include approximately 10 million shares underlying its convertible debt instrument using the "if-converted" method in the computation of earnings per share, assuming dilution. The dilutive impact for all periods is approximately 2%-5%. Earnings per share, assuming dilution, has been restated for all periods presented.

***2003 vs. 2002***

*Operating Revenue*

Operating revenue decreased $350 million for the year ended December 26, 2003 to $7.6 billion, compared to $7.9 billion for the prior year. A $627 million decline in consolidated revenue resulted from a reduction of revenue in the domestic container-shipping segment as a majority of CSX's interest in CSX Lines was conveyed during the first quarter of 2003 (See Note 3, Divestitures.) Excluding revenue from this subsidiary, revenue increased $277 million primarily due to an increase in Surface Transportation revenue.

*Operating Income*

Operating income for the year ended December 26, 2003 was down $499 million to $520 million, compared to $1.0 billion in the prior year. The prior year included $38 million of operating income of CSX Lines, which was conveyed to a new venture formed with the Carlyle Group in the first quarter of 2003. Excluding operating income from this subsidiary, 2003 operating income decreased $461 million.

The decrease in operating income is primarily the result of two charges taken during 2003 totaling $340 million. The Company recorded a $232 million charge in conjunction with the change in estimate for casualty reserves, which is reflected in operating expense as "Provision for Casualty Claims" (See Note 11, Casualty, Environmental and Other Reserves.) Also, CSX entered into two settlement agreements, which together resolved all material outstanding disputes with Maersk. This decreased the Company's operating income by $108 million, and is reflected in operating expense



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

as the additional loss on sale of international container-shipping assets. (See Note 19, Commitments and Contingencies.)

The Company also recorded $34 million pretax as the initial charge for separation expenses related to the management restructuring announced in November 2003. In addition, the Company recorded a credit of $22 million pretax related to revised estimates for railroad retirement taxes and the amount of benefits that will ultimately be paid to individuals under the $1.3 billion charges for separation plans initially recorded in 1991 and 1992. For the year, the Company recorded a net restructuring charge of $22 million. (See Note 5, Management Restructuring.)

In February 2003, CSX conveyed most of its interest in its domestic container-shipping subsidiary, CSX Lines LLC. The Consolidated Income Statement includes operating income of $1 million for the fiscal year ended December 26, 2003, derived from CSX Lines.

*Other Income*

Other income increased $15 million to $93 million for the year ended December 26, 2003, compared to $78 million for the prior year. A decrease in discounts on sales of accounts receivable due to the discontinuance of the receivable sale program and a loss on sale in 2002 that did not recur in 2003 had a favorable impact, but were partially offset by lower interest income and reduced real estate gains.

*Interest Expense*

Interest expense decreased $27 million for the year ended December 26, 2003 as compared to the prior year. Lower interest rates on floating rate debt and the favorable impact of interest rate swaps (see Note 13, Derivative Financial Instruments) continued to benefit the Company.

*Net Earnings*

Earnings from Continuing Operations were $137 million, or 63 cents per diluted share, for the year ended December 26, 2003 compared to $410 million, or $1.85 per diluted share for the prior year. The $273 million year-over-year decrease in Earnings from Continuing Operations primarily results from a $145 million after-tax charge to increase the Company's provision for casualty reserves, a $67 million after-tax charge to record the loss on sale of international container-shipping assets and a $21 million after-tax charge to record amounts associated with the management restructuring.

Earnings from Discontinued Operations, net of tax, were $52 million, or 23 cents per diluted share, for the year ended December 26, 2003 compared to earnings of $57 million, or 25 cents per diluted share for the prior year.

The year ended December 26, 2003 included an after-tax cumulative effect of accounting change benefit of $57 million, related to the adoption of SFAS 143, while the year ended December 27, 2002, included an after-tax cumulative effect of accounting change charge of $43 million, related to the adoption of SFAS 142, "Goodwill and Other Intangible Assets."

Net earnings were $246 million, or $1.11 per diluted share, for the year ended December 26, 2003, compared to $424 million or $1.91 per diluted share for the prior year.

The 2003 effective income tax rate was lower than the 2002 effective income tax rate because equity in Conrail earnings represented a larger percentage of pretax earnings in 2003 than 2002. Also, 2003 included a favorable state income tax benefit attributable to changes in the Company's deferred effective state income tax rate.

Earnings per share, assuming dilution, have been restated for all periods presented.



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

The following tables provide detail of operating revenue and expense by segment:

| | Rail | | | | |
|---|---|---|---|---|---|
| | 53 Weeks December 31, 2004 | | 52 Weeks December 26, 2003 | | 52 Weeks December 27, 2002 |
| | (Dollars in millions)(Unaudited) | | | | |
| **Operating Revenue** | $ 6,694 | 8% | $ 6,182 | 3% | $ 6,003 |
| **Operating Expense** | | | | | |
| Labor and Fringe | 2,698 | 6 | 2,555 | 1 | 2,530 |
| Materials, Supplies and Other | 1,508 | 13 | 1,329 | 10 | 1,212 |
| Conrail Rents, Fees & Services | 256 | (25) | 342 | 6 | 322 |
| Building and Equipment Rent | 425 | 2 | 418 | (2) | 425 |
| Inland Transportation | (421) | 6 | (399) | 9 | (365) |
| Depreciation | 664 | 15 | 579 | 1 | 576 |
| Fuel | 656 | 16 | 566 | 26 | 449 |
| Provision for Casualty Claims | — | (100) | 229 | — | — |
| Restructuring Charge — Net | 67 | 205 | 22 | — | — |
| **Total Operating Expense** | 5,853 | 4 | 5,641 | 10 | 5,149 |
| **Operating Income** | $ 841 | 55% | $ 541 | (37)% | $ 854 |
| **Operating Ratio** | 87.4% | | 91.2% | | 85.8% |
| **Total Assets** | 20,045 | | 12,923 | | 12,738 |

| | Intermodal | | | | |
|---|---|---|---|---|---|
| | 53 Weeks December 31, 2004 | | 52 Weeks December 26, 2003 | | 52 Weeks December 27, 2002 |
| | (Dollars in millions)(Unaudited) | | | | |
| **Operating Revenue** | $ 1,326 | 5% | $ 1,257 | 7% | $ 1,180 |
| **Operating Expense** | | | | | |
| Labor and Fringe | 78 | 7 | 73 | 9 | 67 |
| Materials, Supplies and Other | 199 | (1) | 201 | 12 | 179 |
| Building and Equipment Rent | 141 | (2) | 144 | 10 | 131 |
| Inland Transportation | 714 | 2 | 697 | 10 | 633 |
| Depreciation | 38 | 19 | 32 | 10 | 29 |
| Restructuring Charge — Net | 4 | 100 | — | — | — |
| **Total Operating Expense** | 1,174 | 2 | 1,147 | 10 | 1,039 |
| **Operating Income** | $ 152 | 38% | $ 110 | (22)% | $ 141 |
| **Operating Ratio** | 88.5% | | 91.2% | | 88.1% |
| **Total Assets** | 698 | | 611 | | 537 |



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

The following tables provide carload and revenue data by business segment, service group and commodity:

***Fiscal Years Ended December 31, 2004, December 26, 2003 and December 27, 2002***

| | Carloads (Thousands) | | | Revenue (Dollars in millions) | | |
|---|---|---|---|---|---|---|
| | 53 Weeks 2004 | 52 Weeks 2003 | 52 Weeks 2002 | 53 Weeks 2004 | 52 Weeks 2003 | 52 Weeks 2002 |
| **Merchandise** | | | | | | |
| Phosphates and Fertilizers | 471 | 460 | 463 | $ 341 | $ 329 | $ 324 |
| Metals | 380 | 348 | 319 | 511 | 435 | 401 |
| Forest Products | 465 | 459 | 449 | 681 | 622 | 600 |
| Food and Consumer | 245 | 242 | 235 | 377 | 351 | 330 |
| Agricultural Products | 356 | 363 | 361 | 512 | 497 | 494 |
| Chemicals | 564 | 541 | 539 | 1,069 | 989 | 959 |
| Emerging Markets | 506 | 476 | 424 | 504 | 471 | 398 |
| **Total Merchandise** | 2,987 | 2,889 | 2,790 | 3,995 | 3,694 | 3,506 |
| **Automotive** | 507 | 529 | 538 | 835 | 853 | 845 |
| **Coal, Coke and Iron Ore** | | | | | | |
| Coal | 1,659 | 1,570 | 1,574 | 1,714 | 1,543 | 1,529 |
| Coke and Iron Ore | 71 | 65 | 70 | 66 | 57 | 69 |
| **Total Coal, Coke and Iron Ore** | 1,730 | 1,635 | 1,644 | 1,780 | 1,600 | 1,598 |
| **Other** | — | — | — | 84 | 35 | 54 |
| **Total Rail** | 5,224 | 5,053 | 4,972 | 6,694 | 6,182 | 6,003 |
| **Intermodal** | | | | | | |
| Domestic | 1,028 | 1,060 | 982 | 795 | 784 | 696 |
| International | 1,278 | 1,170 | 1,137 | 507 | 469 | 476 |
| Other | — | — | — | 24 | 4 | 8 |
| **Total Intermodal** | 2,306 | 2,230 | 2,119 | 1,326 | 1,257 | 1,180 |
| **Total Surface Transportation** | 7,530 | 7,283 | 7,091 | $ 8,020 | $ 7,439 | 7,183 |

(a) Prior periods have been reclassified to conform to the current presentation.

## *Rail*

### *2004 vs. 2003*

CSX follows a 52/53 week fiscal reporting calendar. Fiscal year 2004 consisted of a 53-week year ending on December 31, 2004. Fiscal year 2003 consisted of 52 weeks ending on December 26, 2003.

*Operating Revenue*

CSX categorizes revenues in three main areas: merchandise, automotive and coal, coke and iron ore. Overall revenues were up $512 million to $6.7 billion in 2004 from $6.2 billion in 2003.



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

*Merchandise Revenue*

Merchandise showed strength during 2004 with revenue up 8% on 3% volume growth. All markets showed year-over-year revenue improvement due to pricing, yield management strategies and the Company's fuel surcharge program. All markets, except agricultural products, experienced increased volumes. Metals realized the most improvement, with 17% revenue growth on 9% volume growth. Strong demand existed across all steel commodity lines as steel production and mill utilization rates were at high levels. Forest products revenue grew 9% on 1% volume growth as a result of strength in panel and lumber markets driven by strong residential construction. Food and consumer revenues grew 7% on 1% volume growth. Food and consumer and forest products volumes were favorable year-over-year primarily due to the 53 week fiscal reporting calendar in 2004. Chemicals revenue grew 8% on 4% volume growth driven by strong customer demand and a rebound in U.S. chemical exports. Emerging markets revenues grew 7% on 6% volume growth, largely driven by strength in aggregates, cement, lime and fly ash. New industrial development is helping serve off–rail markets. Phosphate and fertilizer revenues grew 4% on 2% volume growth. Fertilizer production levels were mixed as high fertilizer prices and hurricane disruptions caused curtailments in production. Although ethanol shipments contributed to growth in agricultural products, revenue increased 3% on declining volume due to a decline in export and bean markets.

*Automotive Revenue*

Volumes declined largely due to a 100,000 unit year-over-year decrease in North American light vehicle production. Downtime at CSXT-served plants also contributed to volume weakness. Price increases drove improvements in revenue-per-car.

*Coal, Coke and Iron Ore Revenue*

Coal, coke and iron ore revenue increased 11% on 6% volume growth. All lines of business reflect year-over-year revenue-per-car improvements. Volume growth was driven by gains in export, metallurgical and utility markets. Strength in exports was due to high demand primarily related to Asia steel market needs.

*Other*

Other revenue for the fiscal year 2004 includes $63 million for FRT, a short-line railroad consolidated in 2004 pursuant to Financial Accounting Standards Board ("FASB") Interpretation No. 46, "Consolidation of Variable Interest Entities". Prior to 2004, FRT was accounted for under the equity method.

*Operating Expense*

Total rail operating expenses increased $212 million, or 4% for the year ended December 31, 2004, compared to 2003.

Labor and fringe expense increased $143 million or 6% compared to the prior year primarily attributable to the effects of inflation, consolidation of FRT and increases in the Company's incentive compensation plan and pension costs. These costs were partially offset by benefits realized from reduced staffing levels.

Materials, supplies and other expenses increased $179 million, or 13%, year-over-year primarily due to increased maintenance and crew travel costs, property and sales taxes, coupled with higher track, locomotive, car repair and other costs. Additionally, due to the adoption of SFAS 143, "Accounting for Asset Retirement Obligations," as discussed below, depreciation expense has been decreased and materials, supplies and other expense increased to account for the discontinuation of the accrual of cross-tie removal as a component of depreciation expense.



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

Conrail rents, fees & services expense decreased $86 million or 25% in 2004, compared to the prior year, as a result of the Conrail spin-off transaction, which decreased rents paid to Conrail as assets previously leased from Conrail are now owned directly by CSXT. (See Note 2, Investment In and Integrated Rail Operations with Conrail.)

Building and equipment rent remained relatively consistent year-over-year with the slight increase in 2004 resulting from unfavorable asset utilization.

Inland transportation, which represents CSXI's use of the CSXT rail network, increased $22 million or 6% year-over-year. The offsetting expense associated with this amount is reflected in CSXI's operating expense, and thus eliminates at the consolidated level.

Depreciation expense increased $85 million or 15% compared to the prior year primarily attributable to the Conrail spin-off transaction. The rail segment had property additions of approximately $1 billion, but the additional depreciation was offset by the reduction in depreciation associated with the adoption of SFAS 143, "Accounting for Asset Retirement Obligations." In conjunction with the group-life method of accounting for asset costs, the Company historically accrued crosstie removal costs as a component of depreciation, which is not permitted under SFAS 143. The effect is to decrease depreciation expense and increase material, supplies and other expense.

Fuel expense increased $90 million or 16% in 2004, net of $63 million of fuel hedging benefits, compared to the prior year primarily due to fuel price increases, while increased volumes were also a factor. The average price per gallon of diesel fuel, including benefits from CSX's fuel hedging program, was $1.0950 in 2004 versus $0.9564 in 2003. In addition, the fuel surcharge programs and contractual cost escalation clauses used in most multi-year customer contracts partially offset fuel cost increases.

For the fiscal year ended December 31, 2004, the rail business segment recorded expense of $67 million for separation expense, pension and post-retirement benefit curtailment charges, stock compensation expense and other related expenses. (See Note 5, Management Restructuring.)

Rail operating expense for the fiscal year ended December 26, 2003, included a charge of $229 million recorded in conjunction with the Company's change in estimate for its casualty reserves to include an estimate of incurred but not reported claims for asbestos and other occupational injuries that could be received over the next seven years. This charge is reflected as "Provision for Casualty Claims" in the operating expense detail above. (See Note 11, Casualty, Environmental and Other Reserves.)

*Operating Income*

Operating income increased $300 million to $841 million in 2004, compared to $541 million in 2003 primarily due to an 8% increase in revenue coupled with the absence of $229 million provision for casualty claims, offset by $67 million of management restructuring charges and other expense increases as previously discussed.

***2003 vs. 2002***

*Operating Revenue*

Overall rail revenues increased $179 million to $6.2 billion in 2003, with increases in merchandise and automotive revenues.

*Merchandise Revenue*

Merchandise showed strength during 2003 with revenue up 5% on 4% volume growth. All markets showed year-over-year revenue improvement, and all except phosphates and fertilizers experienced increased volumes. Emerging markets realized the most improvement, with 18%



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

Case 1:07-mc-00489-BAH Document 1229-7 Filed 11/22/24 Page 697 of 3766

revenue growth on 12% volume growth. Aggregates and cement traffic grew faster than average industry growth rates due to new industrial development and increased conversion of truck traffic to rail. Ammunition volumes increased throughout the year and strength continued in waste markets. The metals sector also showed strength in 2003. Revenue improved 8% on 9% volume growth, driven by strong global steel demand, particularly for scrap and sheet steel. Other factors contributing to improvement include strength in semi-finish metals and continued increases in modal conversions. Demand for building products, lumber and paper products resulted in an increase in forest and industrial revenue of 5% on 2% volume growth. The agricultural and food and chemical sectors also realized revenue increases, while volumes remained consistent with 2002. Phosphates and fertilizers revenues increased slightly year-over-year despite decreased volume, due to domestic phosphates and ammonia strength.

*Automotive Revenue*

Volume declined largely due to a 200,000 unit year-over-year decrease in North American light vehicle production. Haul extensions and price increases drove improvements in revenue-per-car.

*Coal, Coke and Iron Ore Revenue*

Coal, coke and iron ore volumes and revenue remained consistent with results in the prior year. Export moves were strong due to high European steam coal demand for electricity generation. Steel related traffic was weak throughout the year, but showed renewed strength during the fourth quarter due to consolidation in the steel industry and shifts in scrap metal demands that resulted in increased traffic and revenue for CSX. Utility revenue was favorable due to pricing initiatives and higher average length of haul. Improvements in these areas were offset by abnormally harsh winter weather during the first quarter which adversely affected lake loadings, as lakes were frozen.

*Operating Expense*

Total rail operating expenses increased $492 million, or 10% in 2003 as compared to 2002. Increases in most expense categories were somewhat offset by decreases in building and equipment rent.

The primary component of the expense increase was a charge of $229 million recorded in conjunction with the Company’s change in estimate for its casualty reserves to include an estimate of incurred but not reported claims for asbestos and other occupational injuries that could be received over the next seven years. This charge is reflected as “Provision for Casualty Claims” in the operating expense detail above. (See Note 11, Casualty, Environmental and Other Reserves.)

Labor and fringe expense remained relatively consistent year-over-year. The cost of labor inflation was offset by December-over-December reductions in staff of approximately 1,200 and the favorable impact of the absence of a management bonus in 2003, as approximately $45 million of such expense was recorded in 2002.

Materials, supplies and other expense increased $117 million, or 10%, year-over-year. One of the primary drivers was approximately $80 million of increased cost for personal injury and related safety issues. An additional $20 million of the expense deterioration is due to increased cost of derailments. Additionally, due to the adoption of SFAS 143, “Accounting for Asset Retirement Obligations,” as discussed below, depreciation expense has been decreased and materials, supplies and other expense increased to account for the discontinuation of the accrual of cross-tie removal as a component of depreciation expense. The remaining increase results from volume increases, inflationary effects and general operational inefficiencies.

Conrail rents, fees & services expense increased $20 million in 2003, as compared to the prior year, as a result of increased usage of Shared Assets Areas, a contractual increase in the rental fee



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

for Shared Area facilities, and a favorable tax adjustment in the prior year. (See Note 2, Investment In and Integrated Rail Operations with Conrail.)

Building and equipment rent decreased $7 million in 2003 compared to the prior year principally as a result of reduced car rentals from other railroads.

Inland transportation, which represents CSXI's use of the CSXT rail network, remained relatively consistent year-over-year. The offsetting expense associated with this amount is reflected in CSXI's operating expense, and thus eliminates on a Surface Transportation level.

Depreciation remained consistent year-over-year. The rail segment had capital additions of approximately $1 billion, but the additional depreciation was offset by the reduction in depreciation associated with the adoption of SFAS 143, "Accounting for Asset Retirement Obligations." In conjunction with the group-life method of accounting for asset costs, the Company historically accrued crosstie removal costs as a component of depreciation, which is not permitted under SFAS 143. The effect is to decrease depreciation expense and increase materials, supplies and other expense.

Fuel expense increased $117 million in 2003, as compared to the prior year. The expense increase is primarily due to $102 million in fuel price increases, while increased volumes were also a factor. The average price per gallon of fuel was 96 cents per gallon for 2003 compared to 78 cents per gallon for 2002. In order to minimize future exposure to fuel price fluctuation risk, during 2003 the Company entered into a series of swaps in order to fix the price of a portion of its estimated future fuel purchases. As of December 26, 2003, 18% and 21% of 2004 and 2005, respectively, estimated fuel purchases were hedged. Fuel swaps did not have an effect on fuel expense for the year ended December 26, 2003.

The net $22 million restructuring charge in 2003 represents the cost of CSX's reorganization charges offset by reductions in 1991/1992 separation reserves. (See Note 5, Management Restructuring.)

*Operating Income*

Operating income decreased $313 million to $541 million in 2003, compared to $854 million in 2002 primarily due to the $229 million provision for casualty claims, the $22 million net restructuring charge and other expense increases as previously discussed. Excluding the provision for casualty claims and net restructuring charge, operating income would have been $792 million.

### *Intermodal*

CSX follows a 52/53 week fiscal reporting calendar. Fiscal year 2004 consisted of a 53-week year ending on December 31, 2004. Fiscal year 2003 consisted of 52 weeks ending on December 26, 2003.

***2004 vs. 2003***

CSXI revenue improved 5% on a 3% volume increase due to strength in most business commodities. Strong gains in truck brokerage continued with the implementation of deal space technology, which is incorporated into the broader Pegasus system. Deal space technology is designed as a pricing, scheduling and capacity reservation system and provides CSX Trucking Solicitors real-time information on costs, competitive prices, preferred routes and service. The parcel and international sectors also continued to show year-over-year strength. The parcel group showed improvement in most markets while international volume gains were based on general import growth. The domestic channel did not experience year-over-year growth due to CSXI's Network Simplification Initiative which led to overall service improvements across the network, limited some terminals to containers only and improved the profitability of the traffic.



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

CSXI operating expense increased $27 million compared to the prior year due primarily to increases in volume and inflationary factors. Operating income increased to $152 million in 2004, compared to $110 million in the prior year, for a 38% improvement.

***2003 vs. 2002***

CSXI domestic revenue improved 13% on 8% volume increase due to increased unloading and loading ("transloading") of international containers into domestic containers and new programs. Strength in truck brokerage continued due to the rollout of the new Pegasus information management system, which provides real-time information regarding driver availability and location, service quality tracking and financial performance. The parcel sector also showed year-over-year strength. International strength in general import growth was partially offset by continued international import/export diversions of freight carried entirely via water routes from west coast ports to east coast ports. These diversions have resulted in volume declines, shorter hauls and lower per-unit revenue.

CSXI operating expense increased $108 million compared to the prior year. The increase is due primarily to traffic mix and inflationary factors. Additionally, the Company recognized a $15 million positive contract settlement in 2002. Operating income decreased to $110 million in 2003, compared to $141 million in the prior year.

## LIQUIDITY AND CAPITAL RESOURCES

***Operating Activities***

Cash provided by operations in 2004 was $1.4 billion, compared to $804 million for 2003. In 2003, CSX discontinued the receivable sale program decreasing cash provided by operating activities by $380 million as the Company repurchased those receivables. Federal income tax payments were significantly lower in 2004 compared to the prior year resulting in additional cash from operating activities of $99 million. Finally, 2003 cash flows from operations includes payment of 2002 management incentive compensation, whereas the Company did not make such a payment in 2004.

***Investing Activities***

Net cash used by investing activities was $1.2 billion in 2004 compared to $807 million in 2003. Property additions totaled $1.0 billion in 2003 and 2004.

***Financing Activities***

Financing activities provided cash of $20 million during 2004 compared to $172 million in 2003.

The weighted average interest rate on outstanding short-term borrowings of $101 million was 1.1% as of December 31, 2004. The Company had $2 million of short-term borrowings outstanding with a weighted average interest rate of 1.21% as of December 26, 2003.

***Debt Issuances***

In February 2004, the Company executed a $100 million bank financing that matures February 25, 2005, which bore interest at a rate that varied with LIBOR plus an applicable spread. As of December 31, 2004, the Company had $100 million in aggregate principal amount outstanding under this agreement. The Company settled this obligation with cash at maturity.

In June 2004, the Company executed a $300 million bank financing with a maturity date of December 29, 2004, which bore interest at a rate that varied with LIBOR plus an applicable spread.



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

As of December 31, 2004, the Company had repaid the entire aggregate principal amount outstanding under this agreement and terminated this agreement.

In August 2004, the Company issued $300 million of floating rate notes with a maturity date of August 3, 2006. The notes bear interest at a rate that varies with LIBOR plus an applicable spread. These notes are not redeemable prior to maturity.

In August 2003, the Company issued $300 million aggregate principal amount of the Company's Notes due 2013. These Notes bear interest at the rate of 5.50% and mature on August 1, 2013. The Notes may be redeemed by the Company at any time.

In November 2003, CSX issued $200 million aggregate principal amount of the Company's Notes due 2014 and $200 million aggregate principal amount of the Company's Notes due 2006. The 2014 Notes bear interest at the rate of 5.30% per year and mature on February 15, 2014. The 2006 Notes bear interest at the rate of 2.75% per year and mature on February 15, 2006. The Company may redeem the 2014 Notes at any time, but the 2006 Notes cannot be redeemed before maturity.

In December 2003, CSX executed a $75 million revolving loan facility with a maturity date in 2005. Borrowings under the facility bore interest at a rate that fluctuated with LIBOR. In addition, the Company paid an annual commitment fee of 0.15% for the period the facility was not drawn. This debt was redeemable at any time after May 2004, with additional borrowings allowed through the maturity of the facility. As of December 31, 2004, the Company had $75 million in aggregate principal amount outstanding under this borrowing. In January 2005, the Company paid this obligation in full with cash.

***Debt Repayments***

CSX repaid long-term debt of $434 million in 2004 compared to $500 million in 2003, including outstanding debt obligations of $300 million that matured in August 2004. The primary sources of 2004 debt repayments were the issuance of new debt combined with cash on hand.

The Company also paid a net $141 million in short-term debt during 2003. The primary sources of 2003 repayments were the $214 million of proceeds from the conveyance of CSX Lines (see Note 3, Divestitures) and the issuance of new debt.

Long-term and short-term debt at December 31, 2004 and December 26, 2003, totaled $7.2 billion and $7.3 billion, respectively. The ratio of debt to total capitalization was 48% and 51% at December 31, 2004 and December 26, 2003, respectively.

***Convertible Debentures***

See Item 8. Financial Statements and Supplementary Data — Note 12, Debt and Credit Agreements, Convertible Debentures.

***Dividends***

Dividends paid in 2004, 2003 and 2002 were as follows:

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| Dividend Per Share | $ 0.40 | $ 0.40 | $ 0.40 |
| Total Cash Paid for Dividends (In Millions) | $ 86 | $ 86 | $ 86 |

***Working Capital***

The Company's working capital deficit at December 31, 2004, was $330 million, as compared to $77 million at December 26, 2003. A working capital deficit is not unusual for the Company and other companies in the industry and does not indicate a lack of liquidity. The Company continues to maintain adequate current assets to satisfy current liabilities and maturing obligations when they



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

come due and has sufficient financial capacity to manage its day-to-day cash requirements and any obligations arising from legal, tax and other regulatory rulings.

***Credit Facilities***

The Company has a $1.2 billion five-year unsecured revolving credit facility expiring in May 2009 and a $400 million 364-day unsecured revolving credit facility expiring in May 2005. The facilities were entered into in May 2004 on terms substantially similar to the facilities they replaced: a $345 million unsecured revolving credit facility that expired in May 2004 and a $1.0 billion unsecured revolving credit facility that would have expired in May 2006. Generally, these facilities may be used for general corporate purposes, to support the Company's commercial paper, and for working capital. Neither of the credit facilities was drawn on as of December 31, 2004. Commitment fees and interest rates payable under the facilities are similar to fees and rates available to comparably rated investment-grade borrowers. Similar to the credit facilities they replaced, these credit facilities allow for borrowings at floating (LIBOR-based) rates, plus a spread, depending upon our senior unsecured debt ratings. At December 31, 2004, the Company was in compliance with all covenant requirements under the facilities.

***Credit Ratings***

As of December 31, 2004, CSX's long-term unsecured debt obligations were rated BBB and Baa2 by Standard and Poor's and Moody's Investor Service, respectively. On March 30, 2004, Standard and Poor's lowered the Company's short-term rating from A-2 to A-3 and revised the outlook from stable to negative. On July 6, 2004, Moody's Investor Service reaffirmed the Company's short and long-term unsecured debt ratings, but adjusted the outlook from stable to negative. The Company's short-term commercial paper program is rated A-3 and P-2 by Standard and Poor's and Moody's Investor Service, respectively. This increases the Company's borrowing costs in the commercial paper market and reduces the Company's access to these funds because of the limited demand for A-3 commercial paper. If CSX's long-term unsecured bond ratings were reduced to BBB- and Baa3, the Company's undrawn borrowing costs under the $1.2 billion and $400 million revolving credit facilities would not materially increase.

***Shelf Registration Statements***

CSX currently has $900 million of capacity under an effective shelf registration that may be used, subject to market conditions and board authorization, to issue debt or equity securities at the Company's discretion. The Company presently intends to use the proceeds from the sale of any securities issued under its shelf registration statement to finance cash requirements, including refinancing existing debt as it matures. While the Company seeks to give itself flexibility with respect to meeting such needs, there can be no assurance that market conditions would permit the Company to sell such securities on acceptable terms at any given time, or at all.



Source: CSX CORP, 10-K, March 08, 2005
Powered by Morningstar® Document Research℠

**SCHEDULE OF CONTRACTUAL OBLIGATIONS AND COMMERCIAL COMMITMENTS**

The following table sets forth maturities of the Company's contractual obligations:

| Type of Obligation | 2005 | 2006 | 2007 | 2008 | 2009 | Thereafter | Total |
|---|---|---|---|---|---|---|---|
| | | | | Dollars in millions | | | |
| Long-term Debt (See Note 12)(a) | $ 983 | $ 925 | $ 599 | $ 615 | $ 280 | $ 3,704 | $ 7,106 |
| Operating Leases — Net (See Note 19)(b) | 180 | 148 | 138 | 115 | 88 | 440 | 1,109 |
| Agreements with Conrail (See Note 2) | 21 | 19 | 19 | 16 | 13 | 26 | 114 |
| Purchase Obligations (See Note 19)(c) | 167 | 216 | 224 | 232 | 218 | 4,733 | 5,790 |
| Total Contractual Obligations | $ 1,351 | $ 1,308 | $ 980 | $ 978 | $ 599 | $ 8,903 | $ 14,119 |

The following table sets forth maturities of the Company's other commitments:

| Type of Obligation | 2005 | 2006 | 2007 | 2008 | 2009 | Thereafter | Total |
|---|---|---|---|---|---|---|---|
| | | | | Dollars in millions | | | |
| Unused Lines of Credit (See Note 12) | $ 400 | $ — | $ — | $ — | $ 1,200 | $ — | $ 1,600 |
| Guarantees (See Note 19)(d) | 133 | 101 | 130 | 103 | 50 | 184 | 701 |
| Other | 137 | 14 | — | — | 1 | 3 | 155 |
| Total Other Commitments | $ 670 | $ 115 | $ 130 | $ 103 | $ 1,251 | $ 187 | $ 2,456 |

(a) The fair market value of the interest rate swap agreements of $26 million, which is included in long-term debt on the Consolidated Balance Sheet, is not included on the debt maturity schedule. The unamortized discount of the convertible bonds of $85 million, which is included in long-term debt on the Consolidated Balance Sheet, is not included on the debt maturity schedule. See Footnote 12, Debt and Credit Agreements for additional discussion. Capital leases of $145 million are included in long-term debt.

(b) CSX has entered into various operating lease agreements primarily for rail transportation equipment.

(c) Purchase Obligations consists of a $5.8 billion maintenance program which expires in 2026 relating to CSX's fleet of locomotives. This program replaced an internal maintenance program.

(d) Approximately $364 million of these guarantees relate to certain lease obligations assumed by Maersk, but for which CSX remains contingently liable. Accordingly, CSX has collateral liens on the assets relating to these leases and indemnities provided by Maersk to fulfill the lease commitments. CSX believes that Maersk will fulfill its contractual commitments with respect to such leases and that CSX will have no further liabilities relating to these obligations. Approximately $70 million relates to construction and cash deficiency support guarantees at one of the Company's equity investments. CSX guarantees approximately $265 million relating to leases assumed as part of CSX's conveyance of its interest in CSX Lines.

**OFF-BALANCE SHEET ARRANGEMENTS**

There are no off-balance sheet arrangements that are reasonably likely to have an effect on the Company's financial condition or results of operations.

**Investment In and Integrated Rail Operations with Conrail**

See background, accounting and financial reporting effects and summary financial information in Note 2, Investment In and Integrated Rail Operations with Conrail.



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

## CRITICAL ACCOUNTING ESTIMATES

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires that management make estimates in reporting the amounts of certain assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amount of certain revenues and expenses during the reporting period. Actual results may differ from those estimates. Significant estimates using management judgment are made for the following areas:

- Casualty, Environmental and Legal Reserves
- Pension and Postretirement Medical Plan Accounting
- Depreciation Policies for Assets Under the Group-Life Method
- Income Taxes

These estimates and assumptions are discussed with the Audit Committee of the Board of Directors on a regular basis.

### Casualty, Environmental, and Legal Reserves

**Casualty Reserves**

Casualty reserves represent accruals for the uninsured portion of personal injury and occupational injury claims.

*Personal Injury*

In 2003, CSX retained an independent actuarial firm to assist management in assessing the value of CSX's personal injury portfolio. An analysis is performed by the independent actuarial firm semi-annually. The methodology used by the actuary includes a development factor to reflect growth in the value of the Company's personal injury claims. This methodology is based largely on CSX's historical claims and settlement activity. Actual results may vary from estimates due to the type and severity of the injury, costs of medical treatments, and uncertainties surrounding the litigation process. In conjunction with the change in estimate during the third quarter of 2003, the Company recorded a charge of $26 million for personal injury liabilities. Reserves for personal injury claims are $383 million and $355 million at December 31, 2004 and December 26, 2003, respectively.

While the final outcome of casualty-related matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded, it is the opinion of CSX management that none of these items, when finally resolved, will have a material adverse effect on the Company's financial position or liquidity. However, should a number of these items occur in the same period, it could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

*Occupational*

Occupational claims include allegations of exposure to certain materials in the work place, such as asbestos, solvents, and diesel fuel, or alleged physical injuries, such as carpal tunnel syndrome or hearing loss.

*Asbestos*

The Company is party to a number of occupational claims by employees exposed to asbestos in the workplace. The heaviest exposure for CSX employees was due to work conducted in and around the use of steam locomotive engines that were phased out between the early 1950's and late 1960's. However, other types of exposures, including exposure from locomotive component parts and building materials, continued after 1967, until it was substantially eliminated by 1985.



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

Asbestos claim filings against the Company have been inconsistent. Accordingly, while the Company had concluded that a probable loss had occurred, it did not believe it could estimate the range of reasonably possible loss because of the lack of experience with such claims and the lack of detailed employment records for the population of exposed employees. Claim filings increased and when they continued into 2003, the Company concluded that an estimate for incurred but not reported asbestos exposure liability needed to be recorded.

In 2003, CSX engaged a third party, who has extensive experience in performing asbestos and other occupational studies, to assist in assessing the unasserted liability exposure. The objective of the assessment was to determine the number of estimated incurred but not reported asbestos claims and the estimated average cost per claim to be received over the next seven years. Seven years was determined by management to be the time period in which claim filings and claim values could be estimated with more certainty.

The Company, with the assistance of the third party, first determined its exposed population from which it was able to derive the estimated number of incurred but not reported claims. The estimated average cost per claim was then determined utilizing recent actual average cost per claim data. Based on the assessment, in September 2003 the Company recorded an undiscounted $141 million pre-tax charge for unasserted asbestos claims. Key elements of the assessment included the following:

- Because CSX did not have detailed employment records in order to compute the population of potentially exposed employees, it computed an estimate using a ratio of Company employee data to national employment for select years during the period 1938-2001 using railroad industry historical census data.
- The projected incidence of disease was estimated based on epidemiological studies using employees' age, and the duration and intensity of exposure while employed.
- An estimate of the future anticipated claims filing rate by type of disease, non-malignant, cancer and mesothelioma, was computed using the Company's average historical claim filing rates for the 2001-2002 calibration period. (i.e. the years management felt were representative of future filing rates).
- An estimate of the future anticipated dismissal rate by type of claim was computed using the Company's historical average dismissal rates observed in 2001-2003.
- An estimate of the future anticipated settlement by type of disease was computed using the Company's historical average of dollars paid per claim for pending and future claims using the average settlement by type of incidence observed during 2001-2003.

From these assumptions CSX projected the incidence of each type of disease to the estimated population to arrive at an estimate of the total number of employees that could potentially assert a claim. Historical claim filing rates were applied for each type of disease to the total number of employees that could potentially assert a claim to determine the total number of anticipated claim filings by disease type. Historical dismissal rates, which represent claims that are closed without payment, were deducted to calculate the number of future claims by disease type that would likely require payment by the Company. Finally, the number of such claims was multiplied by the average settlement value to estimate CSX's future liability for incurred but not reported asbestos claims.

The estimated future filing rates and estimated average claim values are the most sensitive assumptions for this reserve. Asbestos claim filings are typically sporadic and may include large batches of claims solicited by law firms. To reflect these factors, CSX used a two-year calibration period during its initial assessment because the Company believed it would be most representative of its future claim experience. In addition, for non-malignant claims, the number of future claims to be filed against CSX declines at a rate consistent with both mortality and age as there is a decreasing probability of filing claims as the population ages. CSX believes the average claim values



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

by type of disease from the historical period 2001-2002 are most representative of future claim values. Non-malignant claims, which represent approximately 90% of the total number and 91% of the cost of estimated future asbestos claims, were valued by age of the projected claimants. Historically, the ultimate settlement value of these types of claims is most sensitive to the age of the claimant. A 10% increase or decrease in either the forecasted number of incurred but not reported claims or the average claim values would result in an approximate $14 million increase or decrease in the liability recorded for unasserted asbestos claims.

In the fourth quarter of 2004, management updated their assessment of the unasserted liability exposure with the assistance of the third party specialists. In 2004, individual asbestos claims continued to be sporadic and proved to be submitted at a low rate for the year. In further review of the data, the bulk claims filed by the law firms appear to be filed against the Company every other year. As a result, management reassessed the calibration period to a 4-year average (2000-2004) to capture the most recent filing experience within the context of the bulk law firm filings.

CSX will obtain semi-annual updates of the study. On a quarterly basis, CSX will monitor actual experience against the number of forecasted claims to be received and expected claim payments. Adjustments to our estimates will be recorded quarterly if necessary. More periodic updates to the study will occur if trends necessitate a change. At December 31, 2004, the Company had recorded undiscounted liabilities of $212 million for asbestos-related claims. Of the amount recorded, $132 million is related to incurred but not reported claims while $80 million is related to asserted claims. As of December 26, 2003, the Company had recorded undiscounted liabilities of $246 for asbestos-related claims. Current liabilities include $37 million and $20 million of asbestos-related claims as of December 31, 2004 and December 26, 2003, respectively. Defense and processing costs, which historically have been and are anticipated in the future to be insignificant, are not included in the recorded liability. The Company is presently self-insured for asbestos-related claims.

*Other Occupational*

In the third quarter of 2003, the Company changed its estimate of occupational reserves to include an estimate of incurred but not reported claims for other occupational injuries as well as asbestos as noted above. The Company engaged a third party specialist to assist in projecting the number of other occupational injury claims to be received over the next seven years and the related costs. Based on this analysis, the Company established reserves for the probable and reasonably estimable other occupational injury liabilities. In the third quarter of 2003, the Company recorded an undiscounted $65 million pre-tax charge for incurred but not reported other occupational claims for similar reasons as asbestos discussed above. Similar to the asbestos liability estimation process, the key elements of the assessment included the following:

- An estimate of the potentially exposed population for other occupational diseases was calculated by projecting active versus retired work force from 2002 to 2010 using a growth rate projection for overall railroad employment made by the Railroad Retirement Board in its June 2003 report.
- An estimate of the future anticipated claims filing rate by type of injury, employee type, and active versus retired employee was computed using the Company's average historical claim filing rates for the calibration period 2002-2003 for all diseases except hearing loss. Because the filing rate for hearing loss claims has been decreasing since 1998, the latest year filing of 2003 was used. These calibration periods are the time periods which management felt were representative of future filing rates. An estimate was made to forecast future claims by using the filing rates by disease and the active and retired CSX population each year.
- An estimate of the future anticipated settlement by type of injury was computed using the Company's historical average of dollars paid per claim for pending and future claims using the average settlement by type of injury observed during 2001-2003.



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

At December 31, 2004, the Company had recorded undiscounted liabilities of $110 million for other occupational-related claims. Of the amount recorded, $56 million is related to incurred but not reported claims while $54 million is related to asserted claims. As of December 26, 2003, the Company had recorded undiscounted liabilities of $111 million for other occupational-related claims. Current liabilities include $18 million and $4 million at December 31, 2004 and December 26, 2003, respectively. Defense and processing costs, which historically have been and are anticipated in the future to be insignificant, are not included in the recorded liability. The Company is presently self-insured for other occupational-related claims.

The amounts recorded by CSX for the occupational liability were based upon currently known facts. Projecting future events, such as the number of new claims to be filed each year, the average cost of disposing of claims, as well as the numerous uncertainties surrounding asbestos and other occupational litigation in the United States, could cause the actual costs to be higher or lower than projected.

**Environmental Reserves**

CSXT is a party to various proceedings, including administrative and judicial proceedings, involving private parties and regulatory agencies related to environmental issues. CSXT has been identified as a potentially responsible party ("PRP") at approximately 252 environmentally impaired sites, many of which are, or may be, subject to remedial action under the Federal Superfund statute ("Superfund") or similar state statutes. A number of these proceedings are based on allegations that CSXT, or its railroad predecessors, sent hazardous substances to the facilities in question for disposal. Some of the proceedings involve property formerly or currently owned by CSXT or its railroad predecessors. Proceedings arising under Superfund or similar state statutes can involve numerous other companies who generated the waste or owned or operated the property and involve the allocation of liability for costs associated with site investigation and cleanup, which could be substantial.

At least once each quarter, CSXT reviews its role with respect to each such location, giving consideration to a number of factors, including:

- the type of cleanup required,
- the nature of CSXT's alleged connection to the location (e.g., generator of waste sent to the site, or owner or operator of the site),
- the extent of CSXT's alleged connection (e.g., volume of waste sent to the location and other relevant factors),
- the accuracy and strength of evidence connecting CSXT to the location, and
- the number, connection, and financial viability of other named and unnamed PRP's at the location.

CSXT management estimates its environmental liabilities using guidance from *Statement of Position 96-1, Environmental Remediation Liabilities.* Each site is periodically evaluated and the liability is adjusted to the most recent estimates made by management. Based on this review process, CSXT has recorded reserves to cover estimated contingent future environmental costs with respect to such sites. These liabilities, which are undiscounted, include amounts representing CSXT's estimate of unasserted claims, which CSXT believes to be immaterial. The liability includes future costs for all sites where the Company's obligation is (1) deemed probable, and (2) can be reasonably estimated. The liability includes future costs for remediation and restoration of sites as well as any significant ongoing monitoring costs, but excludes any anticipated insurance recoveries.

The Company does not currently possess sufficient information to reasonably estimate the amounts of additional liabilities, if any, on some sites until completion of future environmental studies. Also, changes in federal and state laws and regulations may impact, favorably or unfavora-



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

bly, the effort required to remediate sites. In addition, latent conditions at any given location could result in exposure, the amount and materiality of which cannot presently be reliably estimated. Based upon information currently available, however, the Company believes its environmental reserves are adequate to accomplish remedial actions to comply with present laws and regulations, and that the ultimate liability for these matters, if any, will not materially affect its overall results of operations and financial condition.

**Legal Reserves**

In accordance with SFAS 5, "Accounting for Contingencies," an accrual for a loss contingency is established if information available prior to issuance of the financial statements indicates that it is (1) probable that an asset has been impaired or a liability has been incurred at the date of the financial statements, and (2) the amount of loss can be reasonably estimated. If no accrual is made for a loss contingency because one or both of these conditions are not met, or if an exposure to loss exists in excess of the amount accrued, disclosure of the contingency is made when there is at least a reasonable possibility that a loss or an additional loss may have been incurred.

The Company evaluates all exposures relating to legal liabilities twice quarterly and records and adjusts reserves when appropriate under the guidance noted above. The amount of a particular reserve may be influenced by factors that include official rulings, newly discovered or developed evidence, or changes in laws, regulations, and evidentiary standards.

**Pension and Postretirement Medical Plan Accounting**

The Company sponsors defined benefit pension plans, principally for salaried, non-contract personnel. The plans provide eligible employees with retirement benefits based predominantly on years of service and compensation rates near retirement. In addition to the defined benefit pension plans, the Company sponsors one medical plan and one life insurance plan that provide benefits to full-time, salaried, non-contract employees hired prior to January 1, 2003, upon their retirement if certain eligibility requirements are met. The postretirement medical plans are contributory (partially funded by retirees), with retiree contributions adjusted annually. The life insurance plan is non-contributory.

The accounting for these plans is subject to the guidance provided in SFAS No. 87, "Employers Accounting for Pensions," and SFAS No. 106, "Employers' Accounting for Postretirement Benefits Other than Pensions." Both of these statements require that management make certain assumptions relating to the following:

- Long-term rate of return of plan assets;
- Discount rates used to measure future obligations and interest expense;
- Salary scale inflation rates;
- Health care cost trend rates; and
- Other assumptions.

These assumptions are determined as of the beginning of the year. As permitted by SFAS 87, the Company has elected to use a plan fiscal year of October 1 through September 30 to actuarially value its pension and postretirement plans as it provides for more timely analysis. The Company engages independent, external actuaries to compute the amounts of liabilities and expenses relating to these plans subject to the assumptions that the Company selects as of the beginning of the plan year. The Company reviews the discount, salary scale inflation, and health care cost trend rates on an annual basis and makes modifications to the assumptions based on current rates and trends as appropriate. Since the Company negatively adjusted its expected long-term rate of return on assets in both 2004 and 2005, management does not anticipate revisiting this rate for the next 3 to 5 years to maintain consistency with market cycles.



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

*Long-term Rate of Return on Plan Assets*

The expected long-term rate of return on plan assets reflects the average rate of earnings expected on the funds invested or to be invested to provide for benefits included in the projected benefit obligation. In estimating that rate, the Company gives appropriate consideration to the returns being earned by the plan assets in the fund and the rates of return expected to be available for reinvestment. The expected long-term rate of return on plan assets is used in conjunction with the market-related value of assets to compute the expected return on assets.

The Company's expected long-term average rate of return on assets considers the current and projected asset mix of the funds. Management balances market expectations obtained from various investment managers and economists with both market and actual plan historical returns to develop a reasonable estimate of the expected long-term rate of return on assets. As this assumption is long-term, it is adjusted less frequently than other assumptions used in pension accounting. However, recent overall market returns have caused CSX to reevaluate and reduce the rate used in calculating its liability at September 30, 2004, consequently increasing the amount of pension expense reported in future periods.

*Discount Rates*

Discount rates affect the amount of liability recorded and the interest expense component of pension and postretirement expense. Assumed discount rates reflect the rates at which the pension benefits could be effectively settled. It is appropriate in estimating those rates to look to available information about rates implicit in current prices of annuity contracts that could be used to effect settlement of the obligation. In making those estimates, employers may also look to rates of return on high-quality fixed-income investments currently available and expected to be available during the period to maturity of the pension benefits. Each year those rates are reevaluated to determine whether they reflect the best estimate of the current effective settlement rates. If interest rates generally decline or rise, the assumed discount rates will change.

The Company derives its discount rates from composite yields of AA-rated bonds adjusted for estimated durations. The difference between the discount rate used for pension and that used for postretirement is due to the different time horizon of future payments. Consequently, management has minimal discretion with respect to the discount rates selected.

*Salary Scale Inflation*

Salary scale inflation rates are based on current trends and historical data accumulated by the Company. The Company reviews recent merit increases and management incentive compensation payments over the past five years in assessment of salary scale inflation rates.

*Health Care Cost Trend Rates*

Health care cost trend rates are based on recent plan experience and industry trends. The Company uses actuarial data to substantiate the inflation assumption for health care costs, representing increases in total plan costs, which include claims and administrative fee cost components. The current assumed health care cost trend rate is 11% and is expected to increase slightly before decreasing gradually until reaching 4.5% in 2013. No changes were deemed necessary to the health care costs trend rate for the years 2003 or 2004. Due to the increasing costs of providing health benefits, the Company expects to increase the inflation assumption for health care costs for 2005.



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

*Other Assumptions*

The calculations made by the actuaries also include assumptions relating to mortality rates, turnover, and retirement age. These assumptions are based on historical data and are approved by management.

*2005 Estimated Pension and Postretirement Expense*

As a result of changes in assumptions for fiscal year 2005, net periodic pension benefit cost and postretirement benefit costs for 2005 are expected to be approximately $47 million and $40 million, respectively. It is not likely that an event will occur in 2005 to cause the Company to adjust the discount rate or salary scale inflation rate in excess of 0.25%.

| | Sensitivity Analysis Increase/ (Decrease) in 2005 Estimated Expense | |
|---|---|---|
| | Pension | OPEB |
| | (Millions of dollars) | |
| Discount Rate: | | |
| 0.25% increase | $ (4) | $ — |
| 0.25% decrease | 4 | — |
| Salary Increase: | | |
| 0.25% increase | 2 | — |
| 0.25% decrease | (2) | — |
| Health Care Cost Trend Rate: | | |
| 1% increase | N/A | 3 |
| 1% decrease | N/A | (5) |

*Medicare Prescription Drug, Improvement and Modernization Act of 2003*

The Company is required to estimate and record the effects of the Medicare Prescription Drug, Improvement and Modernization Act of 2003 (“Act”). The Company believes that a portion of its medical plan’s prescription drug benefit will qualify as actuarially equivalent to Medicare Part D based upon a review by the plan’s health and welfare actuary of the plan’s prescription drug benefit compared with the prescription drug benefit that would be paid under Medicare Part D beginning in 2006. The reduction in the postretirement benefit obligation as a result of the Act was approximately $25 million. There was no immediate impact on net earnings as an unrecognized gain will be recorded. The effects of the Act are reflected in net postretirement benefit costs as the unrecognized gain is amortized, which began in the second quarter of 2004. Postretirement benefit costs were reduced by approximately $3 million in 2004 due to the Act. (See Note 18, Employee Benefit Plans.)

**Depreciation Policies for Assets Under the Group-Life Method**

The Company accounts for its rail assets, including main-line track, locomotives and freight cars, using the group-life method. The group-life method pools similar assets by type and then depreciates each group as a whole. Under the group-life method, the service lives for each group of rail assets are determined by the performance of periodic life studies and management’s assumptions concerning the service lives of its properties. These studies are conducted by a third party expert, analyzed by the Company’s management and approved by the STB.

Changes in asset lives due to the results of the life studies could significantly impact future periods’ depreciation expense and thus the Company’s results of operations. Events that could cause the Company to change its estimates relating to the lives of its asset groups could be



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

Case 1:07-mc-00489-BAH Document 1229-7 Filed 11/22/24 Page 710 of 3766

changes in historical results, technological improvements, maintenance plans and changes in specific assets. The life studies may also indicate that the recorded amount of accumulated depreciation is deficient (or in excess) of the amount indicated by the study. Any such deficiency (or excess) is amortized as a component of depreciation expense over the remaining useful life of the asset group until the next required life study.

Although recent experience with life studies has resulted in depreciation rate changes, these modifications have not significantly affected the Company's annual depreciation expense. In 2003, the Company completed life studies for all of its rail, equipment and track assets, resulting in an increase in the average useful lives of equipment and track assets, while decreasing the average useful lives of many roadway assets. The combination of these adjustments increased depreciation expense by $1 million in 2003 with a decrease of approximately $13 million in 2004. Life studies for equipment assets are completed every three years, whereas road and track life studies are completed every six years as required by the STB.

Assets depreciated under the group-life method comprise 95% of the Company's total fixed assets and amounted to $19.3 billion on a net basis at December 31, 2004. The Company's depreciation expense for the year ended December 31, 2004 amounted to $711 million. A one-percentage point increase (or decrease) in the average life of all group-life assets would result in a $7 million increase (or decrease) to the Company's annual depreciation expense.

**Income Taxes**

Management uses factors such as applicable law, current information and past experience with similar issues in computing its income tax expense. The Company has not materially changed its methodology for calculating income tax expense for the years presented. The Company does not anticipate any material change in the methodology or assumptions used in determining the Company's income tax expense.

The Company files a consolidated federal income tax return, which includes its principal domestic subsidiaries. Examinations of the federal income tax returns of CSX have been completed through 1993. Federal income tax returns for 1994 through 2003 currently are under examination. Management believes adequate provision has been made for any adjustments that might be assessed. While the final outcome of these matters cannot be predicted with certainty, it is the opinion of CSX management that none of these items will have a material adverse effect on the results of operations, financial position or liquidity of CSX. However, an unexpected adverse resolution of one or more of these items could have a material adverse effect on the results of operations in a particular fiscal quarter or fiscal year. The Company is party to a number of legal and administrative proceedings, the resolution of which could result in gain realization in amounts that could be material to results of operations in a particular fiscal quarter or fiscal year.

**New Accounting Pronouncements and Change in Accounting Policy**

See Item 8. Financial Statements and Supplementary Data — Note 1 Nature of Operations and Significant Accounting Policies under the caption "New Accounting Pronouncements and Change in Accounting Policy."

**Other Matters**

***Matters Arising out of Sale of International Container-Shipping Assets***

See Item 8. Financial Statements and Supplementary Data — Note 19, Commitments and Contingencies, under the caption "Matters Arising out of Sale of International Container-Shipping Assets."



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

***Management Restructuring***

See Item 8. Financial Statements and Supplementary Data — Note 5, Management Restructuring.

**Item 7A.** ***Quantitative and Qualitative Disclosures about Market Risk***

CSX addresses market risk exposure to fluctuations in interest rates and the risk of volatility in its fuel costs through the use of derivative financial instruments. The Company does not hold or issue derivative financial instruments for trading purposes.

The Company addresses its exposure to interest rate market risk through a controlled program of risk management that includes the use of interest rate swap agreements. As of December 31, 2004, the Company had various interest rate swap agreements on $950 million of its fixed rate outstanding notes payable. In the event of a 1% increase or decrease in the LIBOR interest rate, the interest expense related to these agreements would increase or decrease approximately $10 million on an annual basis.

During 2003, the Company began a program to hedge its exposure to fuel price volatility through swap transactions. As of December 31, 2004, CSX had hedged approximately 48% and 9% of fuel purchases for 2005 and 2006, respectively. At December 31, 2004, a 1% change in fuel prices would result in an increase or decrease in the asset related to the swaps of approximately $4 million. The Company's rail unit average annual fuel consumption is approximately 615 million gallons. A one-cent change in the price per gallon of fuel would affect fuel expense by approximately $5 million annually.

The Company is exposed to loss in the event of non-performance by any counter-party to the interest rate swap or fuel hedging agreements. The Company does not anticipate non-performance by such counter-parties, and no material loss would be expected from non-performance.

Exclusive of derivative contracts that swap fixed interest rate notes to floating interest rates, CSX had approximately $604 million of floating rate debt outstanding at December 31, 2004. A 1% variance in interest rates would on average affect annual interest expense by approximately $6 million.



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

Table of Contents

**Item 8.** ***Financial Statements and Supplementary Data***

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**


| | Page |
|---|---|
| Reports of Independent Registered Public Accounting Firm | 44 |
| **CSX Corporation** | |
| Consolidated Financial Statements and Notes to Consolidated Financial Statements Submitted Herewith: | |
| Consolidated Income Statements for Fiscal Years Ended: | 46 |
| • December 31, 2004 | |
| • December 26, 2003 | |
| • December 27, 2002 | |
| Consolidated Balance Sheets as of: | 47 |
| • December 31, 2004 | |
| • December 26, 2003 | |
| Consolidated Cash Flow Statements for Fiscal Years Ended: | 48 |
| • December 31, 2004 | |
| • December 26, 2003 | |
| • December 27, 2002 | |
| Consolidated Statements of Changes in Shareholders' Equity for Fiscal Years Ended: | 49 |
| • December 31, 2004 | |
| • December 26, 2003 | |
| • December 27, 2002 | |
| Notes to Consolidated Financial Statements | 50 |




Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Shareholders and Board of Directors of CSX Corporation

We have audited the accompanying consolidated balance sheets of CSX Corporation and subsidiaries as of December 31, 2004 and December 26, 2003, and the related consolidated statements of income, cash flows, and changes in shareholders' equity for each of the three fiscal years in the period ended December 31, 2004. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of CSX Corporation and subsidiaries at December 31, 2004 and December 26, 2003, and the consolidated results of their operations and their cash flows for each of the three fiscal years in the period ended December 31, 2004, in conformity with U.S. generally accepted accounting principles.

As discussed in Note 1 to the consolidated financial statements, in 2004 the Company changed its method of calculating earnings per share, in 2003 the Company changed its method of accounting for railroad tie removal costs and stock-based compensation, and in 2002 the Company changed its method of accounting for indefinite lived intangible assets.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of CSX Corporation's internal control over financial reporting as of December 31, 2004, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated March 2, 2005, expressed an unqualified opinion thereon.

/s/ Ernst & Young LLP
Independent Certified Public Accountants

Jacksonville, Florida
March 2, 2005



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

The Shareholders and Board of Directors of CSX Corporation

We have audited management's assessment, included in the accompanying Report of Management on CSX Corporation's Internal Control Over Financial Reporting appearing under Item 9A, that CSX Corporation maintained effective internal control over financial reporting as of December 31, 2004, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO criteria). CSX Corporation's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express an opinion on management's assessment and an opinion on the effectiveness of the company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, management's assessment that CSX Corporation maintained effective internal control over financial reporting as of December 31, 2004, is fairly stated, in all material respects, based on the COSO criteria. Also, in our opinion, CSX Corporation maintained, in all material respects, effective internal control over financial reporting as of December 31, 2004, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the 2004 consolidated financial statements of CSX Corporation and our report dated March 2, 2005, expressed an unqualified opinion thereon.

/s/ Ernst & Young LLP
Independent Certified Public Accountants

Jacksonville, Florida
March 2, 2005



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

Table of Contents

## CSX CORPORATION

## CONSOLIDATED INCOME STATEMENTS

| | For Fiscal Years Ended | | |
|---|---|---|---|
| | Dec. 31, 2004 | Dec. 26, 2003 | Dec. 27, 2002 |
| | (Dollars in millions, except per share amounts) | | |
| **Operating Income** | | | |
| Operating Revenue | $ 8,020 | $ 7,566 | $ 7,916 |
| Operating Expense | 7,020 | 7,046 | 6,897 |
| Operating Income | 1,000 | 520 | 1,019 |
| **Other Income and Expense** | | | |
| Other Income | 72 | 93 | 78 |
| Interest Expense | 435 | 418 | 445 |
| **Earnings** | | | |
| Earnings before Income Taxes | 637 | 195 | 652 |
| Income Tax Expense | 219 | 58 | 242 |
| Earnings from Continuing Operations | 418 | 137 | 410 |
| Discontinued Operations — Net of Tax | (79) | 52 | 57 |
| Cumulative Effect of Accounting Change — Net of Tax | — | 57 | (43) |
| Net Earnings | $ 339 | $ 246 | $ 424 |
| **Per Common Share** | | | |
| Earnings Per Share: | | | |
| From Continuing Operations | $ 1.95 | $ 0.64 | $ 1.93 |
| Discontinued Operations | (0.37) | 0.24 | 0.27 |
| Cumulative Effect of Accounting Change | — | 0.26 | (0.20) |
| Net Earnings | $ 1.58 | $ 1.14 | $ 2.00 |
| Earnings Per Share, Assuming Dilution: | | | |
| From Continuing Operations | $ 1.87 | $ 0.63 | $ 1.85 |
| Discontinued Operations | (0.35) | 0.23 | 0.25 |
| Cumulative Effect of Accounting Change | — | 0.25 | (0.19) |
| Net Earnings | $ 1.52 | $ 1.11 | $ 1.91 |
| Average Common Shares Outstanding (Thousands) | 214,796 | 213,964 | 212,729 |
| Average Common Shares Outstanding, Assuming Dilution (Thousands) | 225,030 | 224,328 | 223,511 |
| Cash Dividends Paid Per Common Share | $ 0.40 | $ 0.40 | $ 0.40 |

See accompanying Notes to Consolidated Financial Statements.



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**CONSOLIDATED BALANCE SHEETS**

| | Dec. 31, 2004 | Dec. 26, 2003 |
|---|---|---|
| | (Dollars in millions) | |
| **ASSETS** | | |
| Current Assets: | | |
| Cash, Cash Equivalents and Short-term Investments | $ 859 | $ 368 |
| Accounts Receivable — Net | 1,143 | 1,115 |
| Materials and Supplies | 165 | 168 |
| Deferred Income Taxes | 20 | 136 |
| Other Current Assets | 157 | 64 |
| International Terminals Assets Held for Sale | 643 | 446 |
| Total Current Assets | 2,987 | 2,297 |
| Properties | 25,852 | 19,087 |
| Accumulated Depreciation | (5,907) | (5,453) |
| Properties — Net | 19,945 | 13,634 |
| Investment in Conrail | 574 | 4,678 |
| Affiliates and Other Companies | 296 | 225 |
| Other Long-term Assets | 779 | 926 |
| Total Assets | $ 24,581 | $ 21,760 |
| **LIABILITIES** | | |
| Current Liabilities: | | |
| Accounts Payable | $ 879 | $ 821 |
| Labor and Fringe Benefits Payable | 371 | 388 |
| Casualty, Environmental and Other Reserves | 312 | 280 |
| Current Maturities of Long-term Debt | 983 | 426 |
| Short-term Debt | 101 | 2 |
| Income and Other Taxes Payable | 170 | 114 |
| Other Current Liabilities | 115 | 144 |
| International Terminals Liabilities Held for Sale | 386 | 199 |
| Total Current Liabilities | 3,317 | 2,374 |
| Casualty, Environmental and Other Reserves | 735 | 836 |
| Long-term Debt | 6,234 | 6,886 |
| Deferred Income Taxes | 5,979 | 3,707 |
| Other Long-term Liabilities | 1,505 | 1,509 |
| Total Liabilities | 17,770 | 15,312 |
| **Shareholders' Equity:** | | |
| Common Stock, $1 Par Value | 216 | 215 |
| Other Capital | 1,605 | 1,579 |
| Retained Earnings | 5,210 | 4,957 |
| Accumulated Other Comprehensive Loss | (220) | (303) |
| Total Shareholders' Equity | 6,811 | 6,448 |
| Total Liabilities and Shareholders' Equity | $ 24,581 | $ 21,760 |

See accompanying Notes to Consolidated Financial Statements.



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**CONSOLIDATED CASH FLOW STATEMENTS**

| | Fiscal Years Ended | | |
|---|---|---|---|
| | Dec. 31, 2004 | Dec. 26, 2003 | Dec. 27, 2002 |
| | (Dollars in millions) | | |
| **Operating Activities** | | | |
| Net Earnings | $ 339 | $ 246 | $ 424 |
| Adjustments to Reconcile Net Earnings to Net Cash Provided: | | | |
| Depreciation | 730 | 643 | 649 |
| Deferred Income Taxes | 240 | 119 | 172 |
| Cumulative Effect of Accounting Change — Net of Tax | — | (57) | 43 |
| Additional Loss on Sale | — | 108 | — |
| Provision for Casualty Reserves | — | 232 | — |
| Restructuring Charge | 77 | 22 | — |
| Net Gain on Conrail spin-off — after tax | (16) | — | — |
| Other Operating Activities | (97) | (108) | (108) |
| Changes in Operating Assets and Liabilities: | | | |
| Termination of Sale of Accounts Receivable | — | (380) | — |
| Accounts Receivable | (3) | 19 | 30 |
| Other Current Assets | 29 | 40 | 23 |
| Accounts Payable | (2) | 49 | (83) |
| Other Current Liabilities | 149 | (129) | (23) |
| Net Cash Provided by Operating Activities | 1,446 | 804 | 1,127 |
| **Investing Activities** | | | |
| Property Additions | (1,030) | (1,059) | (1,080) |
| Net Proceeds from Divestitures | 55 | 226 | — |
| Short-term Investments — Net | (247) | 69 | 350 |
| Other Investing Activities | (18) | (43) | (45) |
| Net Cash Used in Investing Activities | (1,240) | (807) | (775) |
| **Financing Activities** | | | |
| Short-term Debt — Net | 99 | (141) | 140 |
| Long-term Debt Issued | 401 | 919 | 748 |
| Long-term Debt Repaid | (434) | (500) | (1,159) |
| Dividends Paid | (86) | (86) | (86) |
| Other Financing Activities | 40 | (20) | (5) |
| Net Cash Provided by (Used In) Financing Activities | 20 | 172 | (362) |
| Net Increase (Decrease) in Cash and Cash Equivalents | 226 | 169 | (10) |
| **Cash, Cash Equivalents and Short-term Investments** | | | |
| Cash and Cash Equivalents at Beginning of Period | 296 | 127 | 137 |
| Cash and Cash Equivalents at End of Period | 522 | 296 | 127 |
| Short-term Investments at End of Period | 337 | 72 | 137 |
| Cash, Cash Equivalents and Short-term Investments at End of Period | $ 859 | $ 368 | $ 264 |
| **Supplemental Cash Flow Information** | | | |
| Interest Paid — Net of Amounts Capitalized | $ 425 | $ 415 | $ 448 |
| Income Taxes Paid | $ 35 | $ 134 | $ 44 |

See accompanying Notes to Consolidated Financial Statements.



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

## CSX CORPORATION

## CONSOLIDATED STATEMENTS OF CHANGES IN SHAREHOLDERS' EQUITY

| | Common Shares Outstanding (Thousands) | Common Stock | Other Capital | Retained Earnings | Accumulated Other Comprehensive Loss | Total |
|---|---|---|---|---|---|---|
| | | | (Dollars in millions) | | | |
| **Balance December 28, 2001** | 213,688 | $ 214 | $ 1,492 | $ 4,459 | $ (45) | $ 6,120 |
| Comprehensive Earnings: | | | | | | |
| Net Earnings | — | — | — | 424 | — | 424 |
| Other Comprehensive Income (See Note 14) | — | — | — | — | (273) | (273) |
| Comprehensive Earnings | | | | | | 151 |
| Dividends | — | — | — | (86) | — | (86) |
| Common Stock Issued — Net | 999 | 1 | 55 | — | — | 56 |
| **Balance December 27, 2002** | 214,687 | 215 | 1,547 | 4,797 | (318) | 6,241 |
| Comprehensive Earnings: | | | | | | |
| Net Earnings | — | — | — | 246 | — | 246 |
| Other Comprehensive Income (See Note 14) | — | — | — | — | 15 | 15 |
| Comprehensive Earnings | | | | | | 261 |
| Dividends | — | — | — | (86) | — | (86) |
| Common Stock Issued — Net | 384 | — | 32 | — | — | 32 |
| **Balance December 26, 2003** | 215,071 | 215 | 1,579 | 4,957 | (303) | 6,448 |
| Comprehensive Earnings: | | | | | | |
| Net Earnings | — | — | — | 339 | — | 339 |
| Other Comprehensive Income (See Note 14) | — | — | — | — | 83 | 83 |
| Comprehensive Earnings | | | | | | 422 |
| Dividends | — | — | — | (86) | — | (86) |
| Common Stock Issued — Net | 458 | 1 | 26 | — | — | 27 |
| **Balance December 31, 2004** | 215,529 | $ 216 | $ 1,605 | $ 5,210 | $ (220) | $ 6,811 |

See accompanying Notes to Consolidated Financial Statements.



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## NOTE 1. Nature of Operations and Significant Accounting Policies

### *Basis of Presentation*

In the opinion of management, the accompanying consolidated financial statements contain all adjustments necessary to fairly present the financial position of CSX and subsidiaries at December 31, 2004 and December 26, 2003, the Consolidated Income Statements, Cash Flows and Changes in Shareholders' Equity for the fiscal years ended December 31, 2004, December 26, 2003 and December 27, 2002, such adjustments being of a normal recurring nature. Certain prior-year data have been reclassified to conform to the 2004 presentation.

### *Nature of Operations*

CSX is a freight transportation company with principal business units providing rail transportation and intermodal services. The Company's international terminals business is reported as Discontinued Operations for all periods presented.

- Rail transportation services are provided principally throughout the Eastern United States and accounted for 83% of the Company's 2004 operating revenue.
- Intermodal services are provided through a dedicated network of terminals and facilities across North America and accounted for 17% of operating revenue in 2004.

Rail shipments include merchandise, automotive products and coal, coke and iron ore. Service groups as a percent of rail revenue are as follows:

| | Fiscal Years Ended | |
|---|---|---|
| | 2004 | 2003 |
| Merchandise | 60% | 60% |
| Automotive | 12% | 14% |
| Coal, Coke and Iron Ore | 27% | 26% |
| Other | 1% | 0% |
| Total | 100% | 100% |

Merchandise traffic includes the following markets:

- Phosphates and Fertilizer
- Metals
- Forest Products
- Food and Consumer
- Agricultural Products
- Chemicals
- Emerging Markets

Coal shipments originate mainly from mining locations in the Eastern United States and primarily supply domestic utility and export markets.



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

***Principles of Consolidation***

The consolidated financial statements include CSX and its majority-owned subsidiaries. All significant intercompany accounts and transactions have been eliminated. Investments in companies that are not majority-owned are carried at cost (if less than 20% owned and the Company has no significant influence) or equity (if the Company has significant influence).

***Fiscal Year***

CSX follows a 52/53 week fiscal reporting calendar. Fiscal year 2004 consisted of 53 weeks. Fiscal years 2003 and 2002 consisted of 52 weeks. Fiscal years 2004, 2003 and 2002 ended on:

- December 31, 2004
- December 26, 2003
- December 27, 2002

***Cash, Cash Equivalents and Short-term Investments***

On a daily basis, cash in excess of current operating requirements is invested in various highly liquid investments having a maturity of three months or less at the date of acquisition. These investments are carried at cost, which approximates market value. Investments which the Company considers to be highly liquid are classified as Cash Equivalents. Investments in instruments with maturities less than one year are classified as Short Term Investments.

***Materials and Supplies***

Materials and supplies consist primarily of fuel and items for replacement and maintenance of track and equipment, and are carried at average cost.

***Properties***

All properties are stated at cost less an allowance for accumulated depreciation. Rail assets, including main-line track, locomotives and freight cars are depreciated using the group-life method, which pools similar assets by road and equipment type and then depreciates each group as a whole. The majority of non-rail property is depreciated using the straight-line method on a per asset basis.

Regulations enforced by the STB of the U.S. Department of Transportation require periodic formal studies of ultimate service lives for all railroad assets. Factors taken into account during the life study include:

- Statistical analysis of historical retirements for each group of property;
- Evaluation of current operations;
- Evaluation of technological advances and maintenance schedules;
- Previous assessment of the condition of the assets and outlook for their continued use;
- Expected net salvage expected to be received upon retirement; and
- Comparison of assets to the same asset groups with other companies.

The results of the life study process determine the service lives for each asset group under the group-life method. These studies are conducted by a third party expert and analyzed by the Company's management. Resulting service life estimates are subject to review and approval by the



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

STB. Road assets, including main-line track, have estimated service lives ranging from 5 years for system roadway machinery to 80 years for grading. Equipment assets, including locomotives and freight cars, have estimated service lives ranging from 6 years for vehicles to 35 years for work equipment.

Changes in asset lives due to the results of the life studies are applied at the completion of the life study and continue until the next required life study. The life studies may also indicate that the recorded amount of accumulated depreciation is deficient (or in excess) of the amount indicated by the study. Any such deficiency (or excess) is amortized as a component of depreciation expense over the remaining useful life of the asset group until the next required life study.

For retirements or disposals of depreciable rail assets that occur in the ordinary course of business, the asset cost (net of salvage value or sales proceeds) is charged to accumulated depreciation and no gain or loss is recognized. For retirements or disposals of non-rail depreciable assets, infrequent disposal of rail assets outside the normal course of business and all dispositions of land, the resulting gains or losses are recognized at the time of disposal. Expenditures that significantly increase asset values or extend useful lives are capitalized. Repair and maintenance expenditures are charged to operating expense when the work is performed.

Properties and other long-lived assets are reviewed for impairment whenever events or business conditions indicate the carrying amount of such assets may not be fully recoverable. Initial assessments of recoverability are based on estimates of undiscounted future net cash flows associated with an asset or a group of assets in accordance with SFAS 144. Where impairment is indicated, the assets are evaluated, and their carrying amount is reduced to fair value based on undiscounted net cash flows or other estimates of fair value.

***Revenue and Expense Recognition***

The Company recognizes revenue using Free-On-Board ("FOB") Origin pursuant to Emerging Issues Task Force ("EITF") 1991-9 *Revenue and Expense Recognition for Freight Services in Process.* The Company uses method (5) in the EITF, which provides for the allocation of revenue between reporting periods based on relative transit time in each reporting period. Expenses are recognized as incurred.

Four key estimates are included in the recognition and measurement of revenue and related accounts receivable under the policies described above:

(1) unbilled revenue on shipments that have been delivered;

(2) revenue associated with shipments in transit;

(3) future adjustments to revenue or accounts receivable for billing corrections and bad debts; and

(4) future adjustments to revenue for overcharge claims filed by customers.

The Company regularly updates the estimates described above based on historical experience.

Prior to the conveyance of CSX Lines in 2003, container-shipping revenue, and a corresponding accrual for the estimated cost to complete delivery, was recorded when cargo first sailed from its port of origin. International Terminals revenue and expense are recognized when vessels depart from the terminal.

All other revenue is recorded upon completion of service.



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

***Stock-Based Compensation***

The Company adopted the fair-value-based method of accounting for share-based payments effective fiscal year 2003 using the prospective method described in FASB Statement No. 148, "Accounting for Stock-Based Compensation — Transition and Disclosure" and accordingly, expense of $11 million and $5 million was recognized in fiscal years ended December 31, 2004, and December 26, 2003, respectively, for stock options granted in May 2003. Stock compensation expense for the fiscal year ended December 31, 2004 includes $5 million recorded in conjunction with the Company's management restructuring (see Note 5, Management Restructuring), related to recognition of unamortized expense for 2003 stock option awards retained by terminated employees. In addition to stock option expense, stock-based employee compensation expense included in reported net income consists of restricted stock awards and stock issued to directors for all period presented.

The following table illustrates the pro forma effect on net earnings and earnings per share as if the fair value based method had been applied to all outstanding and unvested awards in each period:

| | December 31, 2004 | December 26, 2003 | December 27, 2002 |
|---|---|---|---|
| | (Dollars in millions, except per share amounts) | | |
| Net Earnings — As Reported | $ 339 | $ 246 | $ 424 |
| Add: Stock-Based Employee Compensation Expense Included in Reported Net Income — Net of Tax | 9 | 3 | 4 |
| Deduct: Total Stock-Based Employee Compensation Expense Determined under the Fair Value Based Method for all Awards — Net of Tax | (31) | (34) | (29) |
| Pro Forma Net Earnings | $ 317 | $ 215 | $ 399 |
| Interest Expense on Convertible Debt — Net of Tax | 4 | 4 | 3 |
| Pro Forma Net Earnings, If-Converted | $ 321 | $ 219 | $ 402 |
| **Earnings Per Share:** | | | |
| Basic — As Reported | $ 1.58 | $ 1.14 | $ 2.00 |
| Basic — Pro Forma | $ 1.48 | $ 1.00 | $ 1.88 |
| Diluted — As Reported | $ 1.52 | $ 1.11 | $ 1.91 |
| Diluted — Pro Forma | $ 1.42 | $ 0.98 | $ 1.80 |

As discussed in "New Accounting Pronouncements and Change in Accounting Policy" below, the Company will comply with SFAS 123®, "Share-Based Payment", effective July 1, 2005.

***Comprehensive Earnings***

CSX reports comprehensive earnings (loss) in accordance with SFAS 130, "Reporting Comprehensive Income," in the Consolidated Statement of Changes in Shareholders' Equity. Comprehensive earnings are defined as all changes in shareholders' equity during a period, other than those resulting from investments by and distributions to shareholders (i.e. issuance of equity securities and dividends). Accumulated Other Comprehensive Loss at December 31, 2004 and



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

December 26, 2003 consists primarily of minimum pension liabilities and the fair value of fuel hedging contracts. (See Note 14, Shareholders Equity.)

***Derivative Financial Instruments***

The Company recognizes all derivatives as either assets or liabilities in the Consolidated Balance Sheet and measures those instruments at fair value. (See Note 13, Derivative Financial Instruments.)

***New Accounting Pronouncements and Change in Accounting Policy***

In September 2004, the EITF reached a consensus on Issue No. 04-8, The Effect of Contingently Convertible Debt on Diluted Earnings Per Share. The EITF states that contingently convertible debt instruments are subject to the "if-converted" method under SFAS 128, Earnings Per Share, regardless of fulfillment of any of the contingent features included in the instrument. This consensus is effective for periods ending after December 15, 2004 and the consensus must be applied by restating all periods during which the instrument was outstanding.

Effective for the fourth quarter of 2004, CSX is required to include approximately 10 million shares underlying its convertible debt instrument using the "if-converted" method in the computation of earnings per share, assuming dilution. The dilutive impact for all periods is approximately 2%-5%.

SFAS 143, "Accounting for Asset Retirement Obligations" was issued in 2001. This statement addresses financial accounting and reporting for legal obligations associated with the retirement of tangible long-lived assets and the associated retirement costs. In conjunction with the group-life method of accounting for asset costs, the Company historically accrued crosstie removal costs as a component of depreciation, which is not permitted under SFAS 143. As noted above, with the adoption of SFAS 143 in fiscal year 2003, CSX recorded pretax income of $93 million, $57 million after tax, as a cumulative effect of an accounting change, representing the reversal of the accrued liability for crosstie removal costs. The adoption of SFAS 143 did not have a material effect on prior reporting periods, and the Company does not believe it will have a material effect on future earnings. On an ongoing basis, depreciation expense will be reduced, while labor and fringe and materials, supplies and other expense will be increased by approximately $12 million as a result of the adoption of SFAS 143.

SFAS 148, "Accounting for Stock-Based Compensation — Transition and Disclosure" was issued in December 2002. SFAS 148 amends SFAS 123, "Accounting for Stock-Based Compensation," to provide alternative methods of transition to Statement 123's fair value method of accounting for stock-based employee compensation and require disclosure of the effects of an entity's accounting policy with respect to stock-based employee compensation. Effective beginning with fiscal year 2003, CSX has voluntarily adopted the fair value recognition provisions of SFAS 123, "Accounting for Stock-Based Compensation," and adopted the disclosure requirements of SFAS 148, "Accounting for Stock-Based Compensation — Transition and Disclosure — an amendment of SFAS 123." In accordance with the prospective method of adoption permitted under SFAS 148, stock-based awards issued subsequent to fiscal year 2002 are accounted for under the fair value recognition provisions of SFAS 123 utilizing the Black-Scholes-Merton valuation method and, accordingly, are expensed. (See Note 16, Stock Plans.)

On December 16, 2004, the FASB issued SFAS 123®, "Share-Based Payment", which is a revision of SFAS 123, "Accounting for Stock-Based Compensation". Currently, the Company uses the Black-Scholes-Merton formula to estimate the value of stock options granted to employees and



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

expects to continue to use this acceptable option valuation model upon the required adoption of SFAS 123® on July 1, 2005. Because SFAS 123® must be applied not only to new awards but to previously granted awards that are not fully vested on the effective date, and because the Company adopted SFAS 123 using the prospective transition method (which applied only to awards granted, modified or settled after the adoption date), compensation cost for some previously granted awards that were not recognized under SFAS 123 will be recognized under SFAS 123®. However, had CSX adopted SFAS 123® in prior periods, the impact of that standard would have approximated the impact of SFAS 123 as described in the disclosure of pro forma net income and earnings per share above. SFAS 123® also requires the benefits of tax deductions in excess of recognized compensation cost to be reported as a financing cash flow, rather than as an operating cash flow as required under current literature. This requirement will reduce net operating cash flows and increase net financing cash flows in periods after adoption. The Company is currently evaluating the impact of SFAS 123® on its consolidated financial statements, but is not yet in a position to determine the impact of the revised standard. However, the effect could be material.

In 2003, the FASB issued Interpretation No. 46, "Consolidation of Variable Interest Entities," which requires a variable interest entity ("VIE") to be consolidated by a company that is subject to a majority of the risk of loss from the VIE's activities or is entitled to receive a majority of the entity's residual returns, or both. Interpretation No. 46 also requires disclosures about VIEs that a company is not required to consolidate but in which it has a significant variable interest. Also in 2003, Interpretation 46 ("46R"), a revision to FASB Interpretation No. 46 was issued, to clarify some of the provisions of, and to exempt certain entities from, Interpretation 46 requirements. Under the rules of the new guidance, CSX consolidated FRT, a shortline railroad, into its financial statements at the beginning of fiscal year 2004. The adoption of Interpretation No. 46 will not have a material impact on results of operations in future reporting periods. Previously, FRT was accounted for under the equity method of accounting. Other income includes net equity earnings for FRT for the year ended December 26, 2003. The following table indicates the impact of consolidating FRT in 2004 compared to equity method accounting in 2003.

| | Years Ended | |
|---|---|---|
| | December 31, 2004 | December 26, 2003 |
| | (Dollars in millions) | |
| Revenues | $ 63 | $ — |
| Operating Expense | 35 | — |
| Net Equity Earnings | — | 4 |
| Net Income | 6 | — |
| Current Assets | 32 | — |
| Long-term Assets | 146 | 44 |
| Current Liabilities | 26 | — |
| Long-term Liabilities | $ 101 | $ — |

In 2002, the FASB issued Financial Accounting Standard Interpretation ("FASI") No. 45, "Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others." This statement requires that certain guarantees be recorded at fair value on the Consolidated Balance Sheet and additional disclosures be made about guarantees. CSX did not realize a financial statement impact with the adoption of the accounting provisions of this statement in fiscal year 2003 and does not anticipate a future impact. (See Note 19, Commitments and Contingencies.)



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

In 2001, SFAS 142, "Goodwill and Other Intangible Assets", was issued. Under the provisions of SFAS 142, goodwill and other indefinite lived intangible assets are no longer amortized, but are reviewed for impairment on a periodic basis. The Company adopted this standard for fiscal 2002, and incurred a pretax charge of $83 million, $43 million after tax, and minority interest as a cumulative effect of an accounting change, which represents the difference between book value and the fair value of indefinite lived intangible assets. These indefinite lived intangible assets are permits and licenses that the Company holds relating to a proposed pipeline to transfer natural gas from Alaska's North Slope to the port in Valdez, Alaska. The fair value was determined using a discount method of projected future cash flows relating to these assets. The carrying value of these assets is now approximately $3 million. The adoption of SFAS 142 did not have a material effect on prior reporting periods, and the Company does not believe it will have a material effect on future earnings. The Company does not have any other significant indefinite lived intangible assets.

In 2002, SFAS 144, "Accounting for the Impairment or Disposal of Long-Lived Assets," was issued. This statement requires that long-lived assets to be disposed of by sale are no longer measured on a net realizable value basis, and future operating losses are no longer recognized before they occur. In addition, this statement modifies the reporting requirements for discontinued operations. Long-lived assets, whether to be held for disposition or held and used, should be measured at the lower of its carrying amount or fair value less cost to dispose. The Company applied the provisions of this statement relating to the accounting for the conveyance of its wholly-owned subsidiary, CSX Lines, to a third party in 2003 (See Note 3, Divestitures.)

***Use of Estimates***

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires that management make estimates in reporting the amounts of certain assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amount of certain revenues and expenses during the reporting period. Actual results may differ from those estimates. Critical accounting estimates using management judgment are made for the following areas:

1. Casualty, legal and environmental reserves;
2. Pension and postretirement medical plan accounting;
3. Depreciation polices for its assets under the group-life method; and
4. Income taxes.

**NOTE 2. Investment In and Integrated Rail Operations with Conrail**

As previously reported, in June 2003 CSX, Norfolk Southern Corporation ("NS"), and Conrail Inc. ("Conrail") jointly filed a petition with the STB to establish direct ownership and control by CSX's and NS' respective subsidiaries, CSXT and Norfolk Southern Railway Company ("NSR"), of CSX's and NS' portions of the Conrail system already operated by them separately and independently under various agreements. These portions of the Conrail system were owned by Conrail's subsidiaries, New York Central Lines, LLC ("NYC") and Pennsylvania Lines, LLC ("PRR"). In August 2004, the following events occurred: (i) the ownership of NYC and PRR was transferred ("spun off") to CSXT and NSR, respectively, and (ii) the parties consummated an exchange offer of new unsecured securities of subsidiaries of CSXT and NSR for unsecured securities of Conrail. The exchange offer was the final stage in the restructuring of Conrail's unsecured indebtedness as described in the parties' joint petition filed with the STB.



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

CSXT and NSR offered unsecured debt securities of newly formed subsidiaries in an approximate 42%/58% ratio in exchange for Conrail's unsecured debentures. The debt securities issued by each respective subsidiary were fully and unconditionally guaranteed by CSXT and NSR. Upon completion of the transaction, the subsidiaries merged into CSXT and NSR, respectively, and the new debt securities thus became direct unsecured obligations of CSXT and NSR. Conrail's secured debt and lease obligations are supported by new leases and subleases which became the direct lease and sublease obligations, also in an approximate 42%/58% ratio, of CSXT and NSR.

Prior to the transaction, CSX's and NS' indirect ownership interest in NYC and PRR mirrored their ownership interest in Conrail (42% for CSX and 58% for NS). As a result of the transaction, CSX obtained direct ownership of NYC and NS obtained direct ownership PRR. Thus, CSX in effect received NS' 58% indirect ownership in NYC and NS in effect received CSX's 42% indirect ownership of PRR. The receipt of the interest not already indirectly owned by CSX was accounted for at fair value. The receipt of the NYC interest already indirectly owned by CSX was accounted for using CSX's basis in amounts already included within CSX's investment in Conrail. At the conclusion of the transaction, NYC was merged into CSXT and PRR was merged into NSR.

As a result of the transaction, the Company recognized a net gain of $16 million, after tax, which is included in other income.

The Company recorded this transaction at fair value based on the results of an independent valuation. The following table summarizes the estimated fair value of the acquired assets and liabilities assumed at the date of the spin-off and at the end of the prior year and its effects on the Company's Consolidated Balance Sheets as of September 24, 2004. Fair value adjustments are non-cash transactions and, accordingly, have no cash impact on the Consolidated Cash Flow Statements:

| | Dollars in millions |
|---|---|
| Current Assets | $ 7 |
| Properties — Net | 6,018 |
| Investment in Conrail | (4,130) |
| Other Long-term Assets | 136 |
| **Total Assets** | $ 2,031 |
| Current Liabilities | $ 7 |
| Long-term Liabilities | 15 |
| Long-term Debt | (93) |
| Deferred Taxes | 2,086 |
| Retained Earnings | 16 |
| **Total Liabilities and Retained Earnings** | $ 2,031 |



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

Table of Contents

**CSX CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

The following table summarizes the estimated fair value of the acquired assets and liabilities assumed at the date of the spin-off and at the end of the prior year and its effects on the Company's Consolidated Balance Sheets as of December 26, 2003.

| | Reported December 26, 2003 | Effects of Spin-Off | Pro Forma Spin-Off Effects December 26, 2003 (Unaudited) |
|---|---|---|---|
| | | (Dollars in millions) | |
| **ASSETS** | | | |
| Current Assets: | | | |
| Cash, Cash Equivalents and Short-term Investments | $ 368 | $ — | $ 368 |
| Accounts Receivable — Net | 1,115 | — | 1,115 |
| Materials and Supplies | 168 | — | 168 |
| Deferred Income Taxes | 136 | — | 136 |
| Other Current Assets | 64 | 7 | 71 |
| International Terminals Assets Held for Sale | 446 | — | 446 |
| Total Current Assets | 2,297 | 7 | 2,304 |
| Properties — Net | 13,634 | 6,151 | 19,785 |
| Investment in Conrail | 4,678 | (4,185) | 493 |
| Affiliates and Other Companies | 225 | — | 225 |
| Other Long-term Assets | 926 | 136 | 1,062 |
| Total Assets | $ 21,760 | $ 2,109 | $ 23,869 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | |
| Current Liabilities: | | | |
| Accounts Payable | $ 821 | — | 821 |
| Labor and Fringe Benefits Payable | 388 | — | 388 |
| Casualty, Environmental and Other Reserves | 280 | — | 280 |
| Current Maturities of Long-term Debt | 426 | — | 426 |
| Short-term Debt | 2 | — | 2 |
| Income and Other Taxes Payable | 114 | — | 114 |
| Other Current Liabilities | 144 | 7 | 151 |
| International Terminals Liabilities Held for Sale | 199 | — | 199 |
| Total Current Liabilities | 2,374 | 7 | 2,381 |
| Casualty, Environmental and Other Reserves | 836 | 6 | 842 |
| Long-term Debt | 6,886 | (55) | 6,831 |
| Deferred Income Taxes | 3,707 | 2,142 | 5,849 |
| Other Long-term Liabilities | 1,509 | 9 | 1,518 |
| Total Liabilities | 15,312 | 2,109 | 17,421 |
| Shareholders' Equity: | | | |
| Common Stock, $1 Par Value | 215 | — | 215 |
| Authorized 300,000,000 Shares | | | |
| Issued and Outstanding 214,829,471 Shares | | | |
| Other Capital | 1,579 | — | 1,579 |
| Retained Earnings | 4,957 | — | 4,957 |
| Accumulated Other Comprehensive Loss | (303) | — | (303) |
| Total Shareholders' Equity | 6,448 | — | 6,448 |
| Total Liabilities and Shareholders' Equity | $ 21,760 | $ 2,109 | $ 23,869 |



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

The following table illustrates the pro forma effect on the Consolidated Income Statements as if the spin-off transaction had been completed as of the beginning of the periods.

| | Year Ended December 31, 2004 | | | Year Ended December 26, 2003 | | |
|---|---|---|---|---|---|---|
| | As Reported | Effect of Spin-Off | Unaudited Pro Forma | As Reported | Effect of Spin-Off | Unaudited Pro Forma |
| | (Dollars in millions, except per share amounts) | | | | | |
| Operating Revenue | $ 8,020 | $ — | $ 8,020 | $ 7,566 | $ — | $ 7,566 |
| Earnings from Continuing Operations | 418 | 21 | 439 | 137 | 24 | 161 |
| Discontinued Operations | (79) | — | (79) | 52 | — | 52 |
| Cumulative Effect of Accounting Change — Net of Tax | — | — | — | 57 | — | 57 |
| Net Earnings | 339 | 21 | 360 | 246 | 24 | 270 |
| Earnings Per Share, Assuming Dilution: | | | | | | |
| From Continuing Operations | 1.87 | 0.09 | 1.96 | 0.63 | 0.11 | 0.74 |
| Discontinued Operations | (0.35) | — | (0.35) | 0.23 | — | 0.23 |
| Cumulative Effect of Accounting Change | — | — | — | 0.25 | — | 0.25 |
| Net Earnings | $ 1.52 | $ 0.09 | $ 1.61 | $ 1.11 | 0.11 | $ 1.22 |

Since September of 2004, the impact of the transaction has been included in the Company's Consolidated Income Statement.

As a result of the spin-off transaction, CSX's investment in Conrail no longer includes the amounts related to NYC and PRR. Instead the assets and liabilities of NYC are reflected in their respective line items in CSX's Consolidated Balance Sheet. As previously reported, Conrail will continue to own, manage, and operate the Shared Assets Areas. However, this transaction effectively decreased rents paid to Conrail after the transaction date, as some assets previously leased from Conrail are now owned by CSXT.

**Accounting and Financial Reporting Effects**

Prior to the spin-off transaction, CSX's rail and intermodal operating revenue includes revenue from traffic moving on Conrail property. Operating expenses include costs incurred to handle such traffic and operate the Conrail lines. Rail operating expense includes an expense category, "Conrail Rents, Fees and Services," which reflects:

1. Right-of-way usage fees to Conrail through August 2004.
2. Equipment rental payments to Conrail through August 2004.
3. Transportation, switching, and terminal service charges provided by Conrail in the Shared Assets Areas that Conrail operates for the joint benefit of CSX and NS.
4. Amortization of the fair value write-up arising from the acquisition of Conrail and certain other adjustments.



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

5. CSX's 42% share of Conrail's income before the cumulative effect of accounting change recognized under the equity method of accounting.

***Detail of Conrail Rents, Fees and Services***

| | Fiscal Year Ended | | |
|---|---|---|---|
| | December 31, 2004 | December 26, 2003 | December 27, 2002 |
| | (Dollars in millions) | | |
| Rents, Fees and Services | $ 280 | $ 357 | $ 346 |
| Purchase Price Amortization and Other | 35 | 54 | 52 |
| Equity in Income of Conrail | (59) | (69) | (76) |
| Total Conrail | $ 256 | $ 342 | $ 322 |

***Conrail Financial Information***

Summary financial information for Conrail is as follows:

| | Fiscal Years Ended | | |
|---|---|---|---|
| | December 31, 2004 | December 31, 2003 | December 31, 2002 |
| | (Dollars in millions) | | |
| Income Statement Information: | | | |
| Revenues | $ 352 | $ 316 | $ 305 |
| Expenses | 370 | 352 | 321 |
| Operating Income | $ (18) | $ (36) | $ (16) |
| Income from Continuing Operations | 22 | 10 | 34 |
| Income from Discontinued Operations, Net of tax | 119 | 191 | 146 |
| Cumulative Effect of Accounting Change, Net of tax | (1) | 2 | — |
| Net Income | $ 140 | $ 203 | $ 180 |



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Discontinued Operations include the results of operations of NYC and PRR prior to the spin-off transaction.

| | Fiscal Years Ended | |
|---|---|---|
| | December 31, 2004 | December 31, 2003 |
| | (Dollars in millions) | |
| Balance Sheet Information: | | |
| Current Assets | $ 340 | $ 186 |
| Assets of Discontinued Operations | — | 7,176 |
| Property and Equipment and Other Assets | 1,080 | 952 |
| Total Assets | $ 1,420 | $ 8,314 |
| Current Liabilities | $ 247 | $ 260 |
| Long-term Debt | 266 | 288 |
| Liabilities of Discontinued Operations | — | 2,751 |
| Other Long-term Liabilities | 545 | 561 |
| Total Liabilities | 1,058 | 3,860 |
| Stockholders' Equity | 362 | 4,454 |
| Total Liabilities and Stockholders' Equity | $ 1,420 | $ 8,314 |

The decrease in Conrail's Total Assets, Total Liabilities and Stockholders' Equity was the result of the spin-off transaction.

**Transactions with Conrail**

As listed below, CSX has amounts payable to Conrail representing expenses incurred under the operating, equipment and shared area agreements with Conrail.

| | Fiscal Years Ended | |
|---|---|---|
| | December 31, 2004 | December 26, 2003 |
| | (Dollars in millions) | |
| CSX Payable to Conrail | $ 59 | $ 71 |
| Conrail Advances to CSX | $ — | $ 515 |
| Interest Rates on Conrail Advances to CSX | N/A | 1.66% |

| | Fiscal Years Ended | | |
|---|---|---|---|
| | December 31, 2004 | December 26, 2003 | December 27, 2002 |
| | (Dollars in millions) | | |
| Interest Expense Related to Conrail Advances | $ 17 | $ 7 | $ 8 |

The agreement under which CSXT operated its allocated portion of the Conrail route system was terminated upon consummation of the spin-off transaction as CSXT then became the direct owner of its allocated portion of the Conrail system. Agreements for subleasing Conrail equipment operated by CSXT cover varying terms. CSXT is responsible for all costs of operating, maintaining, and improving the equipment under these agreements.



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

On December 31, 2004, future minimum payments to Conrail under the operating, equipment and shared area agreements were as follows:

| | Future Minimum Payments (Dollars in millions) |
|---|---|
| 2005 | $ 21 |
| 2006 | 19 |
| 2007 | 19 |
| 2008 | 16 |
| 2009 | 13 |
| Thereafter | 26 |
| Total | $ 114 |

**NOTE 3. Divestitures**

In February 2003, CSX conveyed most of its interest in its domestic container-shipping subsidiary, CSX Lines, to a new venture formed with The Carlyle Group for approximately $300 million (gross cash proceeds of approximately $240 million, $214 million net of transaction costs, and $60 million of securities). CSX Lines was subsequently renamed Horizon. Horizon subleased vessels and equipment from certain affiliates of CSX covering the primary financial obligations related to $265 million of leases under which CSX or one of its affiliates will remain a lessee/ sublessor or guarantor. A deferred pretax gain of approximately $127 million as a result of the transaction is being recognized over the 12-year sub-lease term. The securities contained a term of 7 years and a preferred return feature. During the third quarter of 2003, CSX received a $15 million payment from Horizon Lines, which included $3 million of interest, in return of a portion of its investment in Horizon. The investing section of the Consolidated Statement of Cash Flows includes proceeds from divestiture of $226 million and $3 million of interest on investment is included in net earnings.

In July 2004, Horizon was acquired by an unrelated third party, and CSX received $59 million, which included $48 million for the purchase of its ownership interest in Horizon, $4 million of interest, and a performance payment of $7 million, which will also be recognized over the 12-year sub-lease term. The investing section of the Consolidated Statement of Cash Flows includes proceeds from divestiture of $55 million and $4 million of interest on investment is included in net earnings. However, CSX and one of its affiliates will continue to remain a lessee/ sublessor or guarantor on certain vessels and equipment as long as the subleases remain in effect. (See Note 19. Commitments and Contingencies.)

**NOTE 4. Discontinued Operations**

On February 22, 2005 CSX sold its International Terminals business through the sale of all of the issued and outstanding shares of capital stock of SL Service, Inc. (“SLSI”), and all of its interest in Orange Blossom Investment Company, Ltd. to Dubai Ports International FZE (“DPI”) for closing cash consideration of $1.142 billion, subject to final working capital and long-term debt adjustments. As a result of the sale CSX will recognize a pretax gain in the first quarter of 2005 and expects to tender substantial tax payments triggered by the transaction beginning in the second quarter of 2005. Of the gross proceeds, approximately $115 million is allocated for the purchase of a minority interest in an International Terminals’ subsidiary, acquired in the first quarter of 2005 and divested as part of the sale to DPI. Approximately $100 million was paid for this interest subsequent to December 31, 2004, with the final payment expected in the first quarter of 2005. The Company is



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

CSX CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

considering options regarding the use of net cash proceeds including reduction of debt and other corporate purposes.

SLSI also holds certain residual assets and liabilities as a result of prior divestitures and discontinuances. A wholly-owned subsidiary of CSX retains the rights to those assets and indemnifies DPI, SLSI and related entities against those liabilities pursuant to a separate agreement. CSX guarantees the obligations of its subsidiary under this separate agreement.

Consequently, the results of operations and financial position of the Company's International Terminals business are reported as Discontinued Operations for all periods presented.

| | Fiscal Years Ended | |
|---|---|---|
| | December 31, 2004 | December 26, 2003 |
| | (Dollars in millions) | |
| Balance Sheet Information: | | |
| Accounts Receivable — Net | $ 25 | $ 48 |
| Other Current Assets | 3 | 4 |
| Properties — Net | 87 | 96 |
| Affiliates and Other Companies | 523 | 290 |
| Other Long-term Assets | 5 | 8 |
| International Terminals Assets Held for Sale | $ 643 | $ 446 |
| Current Liabilities | $ 26 | $ 35 |
| Short-term Debt | 203 | — |
| Long-term Deferred Income Taxes | 16 | 45 |
| Other Long-term Liabilities | 141 | 119 |
| International Terminals Liabilities Held for Sale | $ 386 | $ 199 |

| | Fiscal Years Ended | | |
|---|---|---|---|
| | December 31, 2004 | December 26, 2003 | December 27, 2002 |
| | | (Dollars in millions) | |
| Income Statement Information: | | | |
| Revenues | $ 167 | $ 227 | $ 236 |
| Expenses | 122 | 121 | 128 |
| Operating Income | $ 45 | $ 106 | $ 108 |
| Other Income (Expense) | (20) | (36) | (37) |
| Earnings Before Income Taxes | 25 | 70 | 71 |
| Income Tax Expense | 7 | 18 | 14 |
| Net Income | $ 18 | $ 52 | $ 57 |

In 2004, Discontinued Operations on the Consolidated Income Statement includes International Terminals' net earnings of $18 million as well as additional tax expense of $97 million related to undistributed foreign earnings.

Discontinued Operations includes International Terminals restructuring initiatives of $6 million for the fiscal year ended December 31, 2004, in an effort to maintain and improve productivity standards in light of current business conditions. International Terminals recorded no such charges in 2003. The restructuring initiatives have reduced the international terminals workforce by 183 positions, as of December 31, 2004.



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

In December 2004, prior to the completion of this transaction, International Terminals raised its stake in Asia Container Terminals Ltd, funded by a loan from DPI of $203 million, which is included in International Terminals Liabilities Held for Sale in the Consolidated Balance Sheet.

**NOTE 5. Management Restructuring**

Surface Transportation incurred restructuring charges related to the November 2003 management restructuring plan to streamline the structure, eliminate organizational layers and realign certain functions. For the fiscal year ended December 31, 2004, the Company recorded expense of $71 million for separation expense, pension and post-retirement benefit curtailment charges, stock compensation expense and other related expenses. Surface Transportation recorded an initial pretax charge related to this reduction of $34 million in 2003. The restructuring initiatives have reduced the non-contract Surface Transportation workforce by 863 positions, as of December 31, 2004.

The total cost of the program through the fiscal year December 31, 2004 is $105 million for Surface Transportation. The majority of separation benefits will be paid from CSX's qualified pension plan, with the remainder being paid from general corporate funds. See the table below for a rollforward of significant components of the restructuring charge.

| | Balance December 26, 2003 | 2004 Expense | Payments(a) | Balance December 31, 2004 |
|---|---|---|---|---|
| | | (Dollars in millions) | | |
| Pension and Postretirement Separation Expense | $ 30 | $ 35 | $ (64) | $ 1 |
| Other Related Costs | 4 | 7 | (11) | — |
| Restructuring Total | $ 34 | $ 42 | $ (75) | $ 1 |
| Pension and Postretirement Curtailment Charges | | 24 | | |
| Stock Compensation Expense(b) | | 5 | | |
| Total 2004 Expense | | $ 71 | | |

(a) Includes payments from the qualified pension plan and general corporate funds.

(b) Related to recognition of unamortized expense for 2003 stock option awards retained by terminated employees.

In 2003, the Company recorded a $22 million pretax credit related to a favorable change in estimate related to railroad retirement taxes and other benefits included in the 1991 and 1992 separation plans. These plans provided for workforce reductions, improvements in productivity and other cost reductions.

Also in 2003, the Company recorded a $10 million restructuring charge related to another workforce reduction program, substantially all of which had been paid out at December 26, 2003.

A net $22 million restructuring charge was recorded representing the cost of the restructuring initiatives offset by reductions in 1991/1992 separation reserves. The associated expense is included in operating expense as "Restructuring Charge — Net." (See Note 6, Operating Expense.)



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

Table of Contents



## NOTE 6. Operating Expense

Operating expense consists of the following:

| | Fiscal Years Ended | | |
|---|---|---|---|
| | December 31, 2004 | December 26, 2003 | December 27, 2002 |
| | (Dollars in millions) | | |
| Labor and Fringe | $ 2,779 | $ 2,689 | $ 2,829 |
| Materials, Supplies and Other | 1,709 | 1,586 | 1,647 |
| Conrail Rents, Fees and Services | 256 | 342 | 322 |
| Building and Equipment Rent | 553 | 558 | 592 |
| Inland Transportation | 293 | 314 | 363 |
| Depreciation | 711 | 620 | 629 |
| Fuel | 656 | 581 | 515 |
| Miscellaneous | (8) | (6) | — |
| Provision for Casualty Claims | — | 232 | — |
| Additional Loss on Sale | — | 108 | — |
| Restructuring Charge — Net | 71 | 22 | — |
| Total | $ 7,020 | $ 7,046 | $ 6,897 |
| S, G & A Expenses Included in Above Categories | 557 | 549 | 525 |

Operating expenses include amounts from the Company's domestic container-shipping subsidiary, CSX Lines, through February of 2003, when most of CSX's interest in the entity was conveyed to a new venture. (See Note 3. Divestitures.)

## NOTE 7. Other Income

Other income consists of the following:

| | Fiscal Years Ended | | |
|---|---|---|---|
| | December 31, 2004 | December 26, 2003 | December 27, 2002 |
| | (Dollars in millions) | | |
| Interest Income | $ 21 | $ 21 | $ 27 |
| Income from Real Estate and Resort Operations | 47 | 95 | 108 |
| Discounts on Sales of Accounts Receivable | — | (10) | (26) |
| Net Gain on Conrail Spin-off, after tax | 16 | — | — |
| Minority Interest | (16) | (6) | (3) |
| Miscellaneous | 4 | (7) | (28) |
| Total | $ 72 | $ 93 | $ 78 |
| Gross Revenue from Real Estate and Resort Operations Included in Other Income | $ 217 | $ 274 | $ 261 |



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

**NOTE 8. Income Taxes**

Earnings from Continuing Operations before Income Taxes of $637 million, $195 million, and $652 million for fiscal years 2004, 2003, and 2002, respectively represent earnings from domestic operations.

The significant components of deferred tax assets and liabilities include:

| | December 31, 2004 | | December 26, 2003 | |
|---|---|---|---|---|
| | Assets | Liabilities | Assets | Liabilities |
| | (Dollars in millions) | | | |
| Productivity/ Restructuring Charges | $ 73 | | $ 79 | — |
| Employee Benefit Plans | 358 | | 336 | — |
| Accelerated Depreciation | — | 6,505 | — | 4,047 |
| Other | 1,011 | 948 | 917 | 901 |
| Total | $ 1,442 | $ 7,453 | $ 1,332 | $ 4,948 |
| Net Deferred Tax Liabilities | | $ 6,011 | | $ 3,616 |

The primary factors in the change in year-end net deferred income tax liability balances include:

- Annual provision for deferred income tax expense;
- Consolidation of FRT (See Note 1. Nature of Operations and Significant Accounting Policies.);
- Conrail Spin-off transaction (See Note 2. Investment In and Integrated Rail Operations with Conrail.);
- Minimum pension liability
- Fuel hedging adjustments to Accumulated Other Comprehensive Loss

In conjunction with the sale of all the issued and outstanding stock of SL Service, Inc., the Company accrued $97 million of deferred U.S. income tax liability related to undistributed foreign earnings of its foreign subsidiaries that are no longer considered indefinitely invested in offshore operations. This U.S. income tax expense is reflected as a component of Discontinued Operations — Net of Tax on the 2004 Consolidated Income Statement.

Included in the net deferred tax liabilities above are $16 million and $45 million of deferred taxes included in International Terminals Liabilities Held for Sale in the Consolidated Balance Sheets as of December 31, 2004 and December 26, 2003. (See Note 4. Discontinued Operations.)

At December 26, 2003 and December 27, 2002, the Company had not recorded domestic deferred or additional foreign income taxes related to undistributed earnings of foreign subsidiaries that were considered, at the time, to be indefinitely reinvested in offshore operations. These earnings amounted to $387 million and $341 million at December 26, 2003 and December 27, 2002, respectively.

The Company files a consolidated federal income tax return, which includes its principal domestic subsidiaries. Examinations of the federal income tax returns of CSX have been completed through 1993. Federal income tax returns for 1994 through 2003 currently are under examination. Management believes adequate provision has been made for any adjustments that might be assessed.



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

The breakdown of income tax expense (benefit) between current and deferred is as follows:

| | Fiscal Years Ended December 31, 2004 | Fiscal Years Ended December 26, 2003 (Dollars in millions) | Fiscal Years Ended December 27, 2002 |
|---|---|---|---|
| Current: | | | |
| Federal | $ 66 | $ (66) | $ 60 |
| State | 14 | 7 | 17 |
| Total Current | $ 80 | $ (59) | $ 77 |
| Deferred: | | | |
| Federal | $ 139 | $ 125 | $ 146 |
| State | — | (8) | 19 |
| Total Deferred | $ 139 | $ 117 | $ 165 |
| Total | $ 219 | $ 58 | $ 242 |

Income tax expense reconciled to the tax computed at statutory rates is as follows:

| | Fiscal Years Ended December 31, 2004 | | Fiscal Years Ended December 26, 2003 (Dollars in millions) | | Fiscal Years Ended December 27, 2002 | |
|---|---|---|---|---|---|---|
| Tax at Statutory Rates | $ 223 | 35% | $ 68 | 35% | $ 228 | 35% |
| State Income Taxes | 9 | 1% | — | 0% | 23 | 4% |
| Equity in Conrail Earnings | (16) | (3)% | (9) | (5)% | (12) | (2)% |
| Other Items | 3 | 1% | (1) | 0% | 3 | 0% |
| Income Tax Expense/ Rate | $ 219 | 34% | $ 58 | 30% | $ 242 | 37% |

The increase in the 2004 effective income tax rate compared to the prior year is primarily attributable to a larger percentage of total pretax earnings in 2004 than in 2003. Additionally, 2003 income tax expense was favorably impacted by the cumulative impact of changes in the Company's deferred effective state income tax rates. The 2003 effective income tax rate was lower than the 2002 effective income tax rate because equity in Conrail earnings represented a larger percentage of pretax earnings in 2003 than 2002. Also, 2003 included a favorable state income tax benefit attributable to changes in the Company's deferred effective state income tax rate.

## NOTE 9. Accounts Receivable

***Sale of Accounts Receivable***

As of June 2003, CSXT discontinued its accounts receivable securitization program. Prior to that, CSXT sold, without recourse, a revolving pool of accounts receivable to CSX Trade Receivables Corporation ("CTRC"), a bankruptcy-remote entity wholly owned by CSX. CTRC transferred the accounts receivable to a master trust and caused the trust to issue multiple series of certificates representing undivided interests in the receivables. The certificates issued by the master trust were sold to investors, and the proceeds from those sales were paid to CSXT. Net losses associated with the sale of receivables were $10 million and $26 million for the fiscal years ended December 26, 2003 and December 27, 2002, respectively.



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

***Allowance for Doubtful Accounts***

The Company maintains an allowance for doubtful accounts based on the expected collectibility of all accounts receivable. The allowance for doubtful accounts is included in the Consolidated Balance Sheet as follows:

| | Fiscal Years Ended | |
|---|---|---|
| | December 31, 2004 | December 26, 2003 |
| | (Dollars in millions) | |
| Allowance for Doubtful Accounts | $ 95 | $ 99 |

## NOTE 10. Properties

| | December 31, 2004 | | | December 26, 2003 | | |
|---|---|---|---|---|---|---|
| | Cost | Accumulated Depreciation | Net | Cost | Accumulated Depreciation | Net |
| | (Dollars in millions) | | | | | |
| Rail: | | | | | | |
| Road | $ 18,367 | $ 2,923 | $ 15,444 | $ 12,147 | $ 2,683 | $ 9,464 |
| Equipment | 6,181 | 2,363 | 3,818 | 5,686 | 2,225 | 3,461 |
| Total Rail | 24,548 | 5,286 | 19,262 | 17,833 | 4,908 | 12,925 |
| Intermodal | 506 | 247 | 259 | 488 | 209 | 279 |
| Total Surface Transportation | 25,054 | 5,533 | 19,521 | 18,321 | 5,117 | 13,204 |
| Other | 798 | 374 | 424 | 766 | 336 | 430 |
| Total Properties | $ 25,852 | $ 5,907 | $ 19,945 | $ 19,087 | $ 5,453 | $ 13,634 |

## NOTE 11. Casualty, Environmental and Other Reserves

Activity related to casualty, environmental and other reserves is as follows:

| | Casualty and Other Reserves | Separation Liabilities | Environmental Reserves | Total |
|---|---|---|---|---|
| | (Dollars in millions) | | | |
| Balance December 28, 2001 | $ 661 | $ 242 | $ 32 | $ 935 |
| Charged to Expense | 231 | — | 17 | 248 |
| Payments | (287) | (32) | (14) | (333) |
| Balance December 27, 2002 | 605 | 210 | 35 | 850 |
| Charged to Expense | 307 | 44 | 23 | 374 |
| Changes in Estimate | 232 | (22) | — | 210 |
| Payments | (281) | (24) | (13) | (318) |
| Balance December 26, 2003 | 863 | 208 | 45 | 1,116 |
| Charged to Expense | 301 | 16 | 29 | 346 |
| Conrail Spin-off | — | — | 6 | 6 |
| Payments/ Adjustments | (331) | (69) | (21) | (421) |
| Balance December 31, 2004 | $ 833 | $ 155 | $ 59 | $ 1,047 |



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Casualty, environmental and other reserves are provided for in the Consolidated Balance Sheet as follows:

| | December 31, 2004 | | | December 26, 2003 | | |
|---|---|---|---|---|---|---|
| | Current | Long-Term | Total | Current | Long-Term | Total |
| | | | (Dollars in millions) | | | |
| Casualty and Other | $ 272 | $ 561 | $ 833 | $ 198 | $ 665 | $ 863 |
| Separation | 20 | 135 | 155 | 52 | 156 | 208 |
| Environmental | 20 | 39 | 59 | 30 | 15 | 45 |
| Total | $ 312 | $ 735 | $ 1,047 | $ 280 | $ 836 | $ 1,116 |

**Casualty Reserves**

Casualty reserves represent accruals for the uninsured portion of personal injury and occupational injury claims.

***Personal Injury***

In 2003, CSX retained an independent actuarial firm to assist management in assessing the value of CSX's personal injury portfolio. An analysis is performed by the independent actuarial firm semi-annually. The methodology used by the actuary includes a development factor to reflect growth in the value of the Company's personal injury claims. This methodology is based largely on CSX's historical claims and settlement activity. Actual results may vary from estimates due to the type and severity of the injury, costs of medical treatments, and uncertainties surrounding the litigation process. In conjunction with the change in estimate during the third quarter of 2003, the Company recorded a charge of $26 million for personal injury liabilities. Reserves for personal injury claims are $383 million and $355 million at December 31, 2004 and December 26, 2003, respectively.

While the final outcome of casualty-related matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded, it is the opinion of CSX management that none of these items, when finally resolved, will have a material adverse effect on the Company's financial position or liquidity. However, should a number of these items occur in the same period, it could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

***Occupational***

Occupational claims include allegations of exposure to certain materials in the work place, such as asbestos, solvents, and diesel fuel, or alleged physical injuries, such as carpal tunnel syndrome or hearing loss.

***Asbestos***

The Company is party to a number of occupational claims by employees exposed to asbestos in the workplace. The heaviest exposure for CSX employees was due to work conducted in and around the use of steam locomotive engines that were phased out between the early 1950's and late 1960's. However, other types of exposures, including exposure from locomotive component parts and building materials, continued after 1967, until it was substantially eliminated by 1985.

Asbestos claim filings against the Company have been inconsistent. Accordingly, while the Company had concluded that a probable loss had occurred, it did not believe it could estimate the range of reasonably possible loss because of the lack of experience with such claims and the lack of



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

detailed employment records for the population of exposed employees. Claim filings increased and when they continued into 2003, the Company concluded that an estimate for incurred but not reported asbestos exposure liability needed to be recorded.

In 2003, CSX engaged a third party, who has extensive experience in performing asbestos and other occupational studies, to assist in assessing the unasserted liability exposure. The objective of the assessment was to determine the number of estimated incurred but not reported asbestos claims and the estimated average cost per claim to be received over the next seven years. Seven years was determined by management to be the time period in which claim filings and claim values could be estimated with more certainty.

The Company, with the assistance of the third party, first determined its exposed population from which it was able to derive the estimated number of incurred but not reported claims. The estimated average cost per claim was then determined utilizing recent actual average cost per claim data. Based on the assessment, in September 2003 the Company recorded an undiscounted $141 million pre-tax charge for unasserted asbestos claims. Key elements of the assessment included the following:

- Because CSX did not have detailed employment records in order to compute the population of potentially exposed employees, it computed an estimate using a ratio of Company employee data to national employment for select years during the period 1938-2001 using railroad industry historical census data.

- The projected incidence of disease was estimated based on epidemiological studies using employees' age, and the duration and intensity of exposure while employed.

- An estimate of the future anticipated claims filing rate by type of disease, non-malignant, cancer and mesothelioma, was computed using the Company's average historical claim filing rates for the 2001-2002 calibration period. (i.e. the years management felt were representative of future filing rates).

- An estimate of the future anticipated dismissal rate by type of claim was computed using the Company's historical average dismissal rates observed in 2001-2003.

- An estimate of the future anticipated settlement by type of disease was computed using the Company's historical average of dollars paid per claim for pending and future claims using the average settlement by type of incidence observed during 2001-2003.

From these assumptions CSX projected the incidence of each type of disease to the estimated population to arrive at an estimate of the total number of employees that could potentially assert a claim. Historical claim filing rates were applied for each type of disease to the total number of employees that could potentially assert a claim to determine the total number of anticipated claim filings by disease type. Historical dismissal rates, which represent claims that are closed without payment, were deducted to calculate the number of future claims by disease type that would likely require payment by the Company. Finally, the number of such claims was multiplied by the average settlement value to estimate CSX's future liability for incurred but not reported asbestos claims.

The estimated future filing rates and estimated average claim values are the most sensitive assumptions for this reserve. Asbestos claim filings are typically sporadic and may include large batches of claims solicited by law firms. To reflect these factors, CSX used a two-year calibration period during its initial assessment because the Company believed it would be most representative of its future claim experience. In addition, for non-malignant claims, the number of future claims to be filed against CSX declines at a rate consistent with both mortality and age as there is a decreasing probability of filing claims as the population ages. CSX believes the average claim values



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

by type of disease from the historical period 2001-2002 are most representative of future claim values. Non-malignant claims, which represent approximately 90% of the total number and 91% of the cost of estimated future asbestos claims, were valued by age of the projected claimants. Historically, the ultimate settlement value of these types of claims is most sensitive to the age of the claimant. A 10% increase or decrease in either the forecasted number of incurred but not reported claims or the average claim values would result in an approximate $14 million increase or decrease in the liability recorded for unasserted asbestos claims.

In the fourth quarter of 2004, management updated their assessment of the unasserted liability exposure with the assistance of the third party specialists. In 2004, individual asbestos claims continued to be sporadic and proved to be submitted at a low rate for the year. In further review of the data, the bulk claims filed by the law firms appear to be filed against the Company every other year. As a result, management reassessed the calibration period to a 4-year average (2000-2004) to capture the most recent filing experience within the context of the bulk law firm filings.

CSX will obtain semi-annual updates of the study. On a quarterly basis, CSX will monitor actual experience against the number of forecasted claims to be received and expected claim payments. Adjustments to our estimates will be recorded quarterly if necessary. More periodic updates to the study will occur if trends necessitate a change. At December 31, 2004, the Company had recorded undiscounted liabilities of $212 million for asbestos-related claims. Of the amount recorded, $132 million is related to incurred but not reported claims while $80 million is related to asserted claims. As of December 26, 2003, the Company had recorded undiscounted liabilities of $246 for asbestos-related claims. Current liabilities include $37 million and $20 million of asbestos-related claims as of December 31, 2004 and December 26, 2003, respectively. Defense and processing costs, which historically have been and are anticipated in the future to be insignificant, are not included in the recorded liability. The Company is presently self-insured for asbestos-related claims.

***Other Occupational***

In the third quarter of 2003, the Company changed its estimate of occupational reserves to include an estimate of incurred but not reported claims for other occupational injuries as well as asbestos as noted above. The Company engaged a third party specialist to assist in projecting the number of other occupational injury claims to be received over the next seven years and the related costs. Based on this analysis, the Company established reserves for the probable and reasonably estimable other occupational injury liabilities. In the third quarter of 2003, the Company recorded an undiscounted $65 million pre-tax charge for incurred but not reported other occupational claims for similar reasons as asbestos discussed above. Similar to the asbestos liability estimation process, the key elements of the assessment included the following:

- An estimate of the potentially exposed population for other occupational diseases was calculated by projecting active versus retired work force from 2002 to 2010 using a growth rate projection for overall railroad employment made by the Railroad Retirement Board in its June 2003 report.
- An estimate of the future anticipated claims filing rate by type of injury, employee type, and active versus retired employee was computed using the Company's average historical claim filing rates for the calibration period 2002-2003 for all diseases except hearing loss. Because the filing rate for hearing loss claims has been decreasing since 1998, the latest year filing of 2003 was used. These calibration periods are the time periods which management felt were representative of future filing rates. An estimate was made to forecast future claims by using the filing rates by disease and the active and retired CSX population each year.



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

- An estimate of the future anticipated settlement by type of injury was computed using the Company's historical average of dollars paid per claim for pending and future claims using the average settlement by type of injury observed during 2001-2003.

At December 31, 2004, the Company had recorded undiscounted liabilities of $110 million for other occupational-related claims. Of the amount recorded, $56 million is related to incurred but not reported claims while $54 million is related to asserted claims. As of December 26, 2003, the Company had recorded undiscounted liabilities of $111 million for other occupational-related claims. Current liabilities include $18 million and $4 million at December 31, 2004 and December 26, 2003, respectively. Defense and processing costs, which historically have been and are anticipated in the future to be insignificant, are not included in the recorded liability. The Company is presently self-insured for other occupational-related claims.

A summary of existing asbestos and other occupational claims activity is as follows:

| | Fiscal Year Ended December 31, 2004 | Fiscal Year Ended December 26, 2003 |
|---|---|---|
| Asserted Claims: | | |
| Open Claims — Beginning of Period | 13,332 | 14,706 |
| New Claims Filed | 984 | 2,368 |
| Claims Settled | (2,680) | (3,382) |
| Claims Dismissed | (304) | (360) |
| Open Claims — End of Period | 11,332 | 13,332 |

Approximately 6,000 of the open claims at December 31, 2004 are asbestos claims against the Company's previously owned international container-shipping business, Sea-Land. Because the Sea-Land claims are against multiple vessel owners, the Company's reserves reflect its portion of those claims. The remaining open claims have been asserted against CSXT. The Company had approximately $13 million reserved for the Sea-Land claims at December 31, 2004 and December 26, 2003.

The amounts recorded by CSX for the occupational liability were based upon currently known facts. Projecting future events, such as the number of new claims to be filed each year, the average cost of disposing of claims, as well as the numerous uncertainties surrounding asbestos and other occupational litigation in the United States, could cause the actual costs to be higher or lower than projected.

**Environmental Reserves**

CSXT is a party to various proceedings, including administrative and judicial proceedings, involving private parties and regulatory agencies related to environmental issues. CSXT has been identified as a PRP at approximately 252 environmentally impaired sites, many of which are, or may be, subject to remedial action under the Superfund or similar state statutes. A number of these proceedings are based on allegations that CSXT, or its railroad predecessors, sent hazardous substances to the facilities in question for disposal.

In addition, some of CSXT's land holdings are and have been used for industrial or transportation-related purposes or leased to commercial or industrial companies whose activities may have resulted in releases onto the property. Therefore, CSXT is subject to environmental cleanup and enforcement actions including under the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), also known as the Superfund law, as well as similar



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

state laws that may impose joint and several liability for cleanup and enforcement costs on current and former owners and operators of a site without regard to fault or the legality of the original conduct, which could be substantial. In the fourth quarter of 2004, CSX added $6 million of Conrail environmental claims, due to the Conrail spin-off transaction.

At least once a quarter, CSXT reviews its role with respect to each site identified. Based on the review process, CSXT has recorded reserves to cover estimated contingent future environmental costs with respect to such sites. Environmental costs are charged to expense when they relate to an existing condition caused by past operations and do not contribute to current or future revenue generation. The recorded liabilities for estimated future environmental costs at December 31, 2004 and December 26, 2003 were $59 million and $45 million, respectively. These liabilities, which are undiscounted, include amounts representing CSXT's estimate of unasserted claims, which CSXT believes to be immaterial. The liability includes future costs for all sites where the Company's obligation is (1) deemed probable and (2) where such costs can be reasonably estimated. The liability includes future costs for remediation and restoration of sites as well as any significant ongoing monitoring costs, but excludes any anticipated insurance recoveries.

The Company does not currently possess sufficient information to reasonably estimate the amounts of additional liabilities, if any, on some sites until completion of future environmental studies. In addition, latent conditions at any given location could result in exposure, the amount and materiality of which cannot presently be reliably estimated. Based upon information currently available, however, the Company believes its environmental reserves are adequate to accomplish remedial actions to comply with present laws and regulations, and that the ultimate liability for these matters, if any, will not materially affect its overall results of operations and financial condition.

## Separation Liability

Separation liabilities at December 31, 2004 and December 26, 2003 include productivity charges recorded in 1991, 1992, 1995, 2003 and 2004 to provide for the estimated costs of implementing workforce reductions, improvements in productivity and other cost reductions at the Company's major transportation units. The remaining separation liabilities are expected to be paid out over the next 15 to 20 years. Separation liabilities also include amounts payable through general corporate funds under the Company's management restructuring programs. (See Note 5, Management Restructuring.)



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**NOTE 12. Debt and Credit Agreements**

Debt is as follows:

| | Maturity | Average Interest Rates at December 31, 2004 | December 31, 2004 | December 26, 2003 |
|---|---|---|---|---|
| | | (Dollars in millions) | | |
| Notes | 2005-2032 | 6.8% | $ 5,856 | $ 5,956 |
| Convertible Debentures, net of $85 and $91 discount, respectively | 2021 | 1.0% | 463 | 447 |
| Equipment Obligations | 2005-2015 | 7.0% | 651 | 703 |
| Other Obligations, Including Capital Leases | 2005-2015 | 4.8% | 247 | 206 |
| Total Current Maturities and Long-term Debt | | | 7,217 | 7,312 |
| Less Debt Due within One Year | | | (983) | (426) |
| Total Long Term Debt | | | $ 6,234 | $ 6,886 |

***Debt Issuances***

In February 2004, the Company executed a $100 million bank financing that matures February 25, 2005, which bore interest at a rate that varied with LIBOR plus an applicable spread. As of December 31, 2004, the Company had $100 million in aggregate principal amount outstanding under this agreement. The Company settled this obligation with cash at maturity.

In June 2004, the Company executed a $300 million bank financing with a maturity date of December 29, 2004, which bore interest at a rate that varied with LIBOR plus an applicable spread. As of December 31, 2004, the Company had repaid the entire aggregate principal amount outstanding under this agreement and terminated this agreement.

In August 2004, the Company issued $300 million of floating rate notes with a maturity date of August 3, 2006. The notes bear interest at a rate that varies with LIBOR plus an applicable spread. These notes are not redeemable prior to maturity.

In August 2003, the Company issued $300 million aggregate principal amount of the Company's Notes due 2013. These Notes bear interest at the rate of 5.50% and mature on August 1, 2013. The Notes may be redeemed by the Company at any time.

In November 2003, CSX issued $200 million aggregate principal amount of the Company's Notes due 2014 and $200 million aggregate principal amount of the Company's Notes due 2006. The 2014 Notes bear interest at the rate of 5.30% per year and mature on February 15, 2014. The 2006 Notes bear interest at the rate of 2.75% per year and mature on February 15, 2006. The Company may redeem the 2014 Notes at any time, but the 2006 Notes cannot be redeemed before maturity.

In December 2003, CSX executed a $75 million revolving loan facility with a maturity date in 2005. Borrowings under the facility bore interest at a rate that fluctuated with LIBOR. In addition, the Company paid an annual commitment fee of 0.15% for the period the facility was not drawn. This debt was redeemable at any time after May 2004, with additional borrowings allowed through the maturity of the facility. As of December 31, 2004, the Company had $75 million in aggregate principal



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

amount outstanding under this borrowing. In January 2005, the Company paid this obligation in full with cash.

During 2002, CSX issued $200 million of 4.88% notes due in 2009 and $400 million of 6.30% notes due in 2012.

***Debt Repayments***

CSX repaid long-term debt of $434 million in 2004 compared to $500 million in 2003, including outstanding debt obligations of $300 million that matured in August 2004. The primary sources of 2004 debt repayments were the issuance of new debt combined with cash on hand.

The Company also paid a net $141 million in short-term debt during 2003. The primary sources of 2003 repayments were the $214 million of proceeds from the conveyance of CSX Lines (see Note 3, Divestitures) and the issuance of new debt.

Long-term and short-term debt at December 31, 2004 and December 26, 2003, totaled $7.2 billion and $7.3 billion, respectively. The ratio of debt to total capitalization was 48% and 51% at December 31, 2004 and December 26, 2003, respectively.

***Convertible Debentures***

In October 2001, CSX issued $564 million aggregate principal amount at maturity in unsubordinated zero coupon convertible debentures (the "debentures") due October 30, 2021 for an initial offering price of approximately $462 million. At December 31, 2004 and December 26, 2003, outstanding debentures are included in long-term debt, at a carrying value of $463 million and $447 million, respectively. These debentures accrete (increase) in value at a yield to maturity of 1% per year. The accretion rate may be reset on October 30, 2007, October 30, 2011, and October 30, 2016 to a rate based on five-year United States Treasury Notes minus 2.8%. In no event, however, will the yield to maturity be reset below 1% or above 3% per annum. Accretion in value on the debentures is recorded for each period, but will not be paid prior to maturity.

Under the terms of the debentures, holders had the option to require the Company to purchase their debentures at a purchase price equal to the accreted value of the debentures in October 2003. CSX purchased $15 million aggregate principal amount at maturity of the debentures at an aggregate cost of $13 million. In November 2003, the Company made a one-time cash payment of $23.00 per $1,000 aggregate principal amount at maturity to holders who did not require the Company to purchase their debentures. This resulted in a $13 million cash payment, which will be amortized over the remaining term of the debentures. In addition, the terms of the debentures were amended to permit holders to cause the Company to purchase the debentures on October 30, 2005, at their accreted value of $852.48 per $1,000 principal amount at maturity, in addition to the purchase dates provided under the terms of the debentures. As a result, the debentures are classified in Current Maturities of Long-term Debt in the Consolidated Balance Sheet. Similarly, the debentures allow holders to require the Company to purchase their debentures in October 2006, October 2008, October 2011, and October 2016, at a purchase price equal to the accreted value of the debentures. CSX may redeem the debentures for cash at any time on or after October 30, 2008, at a redemption price equal to the accreted value of the debentures.

CSX amended the terms of these debentures during the third quarter of 2004 to surrender its right to pay the purchase price, in whole or in part, in shares of CSX's common stock for debentures tendered to CSX at the option of holders on certain specified purchase dates. As a result, CSX will be required to pay the purchase price for such debentures on such specified purchase dates in cash.



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

Holders may in addition convert their debentures into shares of the Company's common stock at a conversion rate of 17.75 common shares per debenture, subject to customary anti-dilution adjustments, if any of the following conditions are satisfied:

- If the closing sale price of the Company's common stock for at least 20 trading days in the 30 trading day period ending on the trading day before the conversion date is more than 120% (which percentage will decline over the life of the debentures to 110% in accordance with the terms of the debentures) of the accreted conversion price per share of the Company's common stock at that preceding trading day;
- If the Company's senior unsecured credit ratings are downgraded by Moody's Investors Service, Inc. to below Ba1 and by Standard & Poor's Rating Services to below BB+;
- If the Company has called the debentures for redemption (which may occur no sooner than October 30, 2008); or
- Upon the occurrence of specified corporate transactions.

The accreted conversion price of the debentures at December 31, 2004 was $47.64 and the threshold price to be met in order to convert the debentures into common stock was $56.46 per common share.

***Credit Facilities***

The Company has a $1.2 billion five-year unsecured revolving credit facility expiring in May 2009 and a $400 million 364-day unsecured revolving credit facility expiring in May 2005. The facilities were entered into in May 2004 on terms substantially similar to the facilities they replaced: a $345 million unsecured revolving credit facility that expired in May 2004 and a $1.0 billion unsecured revolving credit facility that would have expired in May 2006. Generally, these facilities may be used for general corporate purposes, to support the Company's commercial paper, and for working capital. Neither of the credit facilities were drawn on as of December 31, 2004. Commitment fees and interest rates payable under the facilities are similar to fees and rates available to comparably rated investment-grade borrowers. Similar to the credit facilities they replaced, these credit facilities allow for borrowings at floating (LIBOR-based) rates, plus a spread, depending upon our senior unsecured debt ratings. At December 31, 2004, the Company was in compliance with all covenant requirements under the facilities.

***Shelf Registration Statements***

CSX currently has $900 million of capacity under an effective shelf registration that may be used, subject to market conditions and board authorization, to issue debt or equity securities at the Company's discretion. The Company presently intends to use the proceeds from the sale of any securities issued under its shelf registration statement to finance cash requirements, including refinancing existing debt as it matures. While the Company seeks to give itself flexibility with respect to meeting such needs, there can be no assurance that market conditions would permit the Company to sell such securities on acceptable terms at any given time, or at all.

**CSX CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

***Short-term Debt Balances and Rates***

| | December 31, 2004 | December 26, 2003 |
|---|---|---|
| | (Dollars in millions) | |
| Short-term Debt | $ 101 | $ 2 |
| Weighted Average Interest Rates | 1.10% | 1.21% |

***Long-term Debt Maturities***

| | (Dollars in millions) |
|---|---|
| 2005 | $ 983 |
| 2006 | 925 |
| 2007 | 599 |
| 2008 | 615 |
| 2009 | 280 |
| 2010 and Thereafter | 3,704 |
| Total | $ 7,106(a)(b) |

(a) The fair market value of the interest rate swap agreements of $26 million, which is included in long-term debt on the Consolidated Balance Sheet, is not included on the debt maturity schedule.
(b) The unamortized discount on the convertible bonds of $85 million, which is included in long-term debt on the Consolidated Balance Sheet, is not included on the debt maturity schedule.

Certain of CSX's rail unit properties are pledged as security for various rail-related long-term debt issues. In addition, the Company has approximately $90 million in assets, which are specifically designated to fund an equal amount of long-term debt.

**NOTE 13. Derivative Financial Instruments**

CSX uses derivative financial instruments to manage its overall exposure to fluctuations in interest rates and fuel costs.

***Interest Rate Swaps***

CSX has entered into various interest rate swap agreements on the following fixed rate notes:

| Maturity Date | Notional Amount | Fixed Interest Rate | Variable Rate at December 31, 2004 | Variable Rate at December 26, 2003 |
|---|---|---|---|---|
| | (Millions) | | | |
| June 22, 2005 | $ 50 | 6.46% | 3.45% | 2.66% |
| August 15, 2006 | 300 | 9.00% | 6.83% | 6.09% |
| May 1, 2007 | 450 | 7.45% | 5.50% | 4.42% |
| May 1, 2032 | 150 | 8.30% | 3.75% | 2.76% |
| Total/ Average | $ 950 | 8.02% | | |

Under these agreements, the Company will pay variable interest based on LIBOR in exchange for a fixed rate, effectively transforming the notes to floating rate obligations. The interest rate swap agreements are designated and qualify as fair value hedges and the gain or loss on the derivative



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

instrument, as well as the offsetting gain or loss on the fixed rate note attributable to the hedged risk, are recognized in current earnings during the period of change in fair values. Hedge effectiveness is measured at least quarterly based on the relative change in fair value of the derivative contract in comparison with changes over time in the fair value of the fixed rate notes. Any change in fair value resulting from ineffectiveness, as defined by SFAS 133, "Accounting For Derivative Instruments and Hedging Activities," is recognized immediately in earnings. The Company's interest rate swaps qualify as perfectly effective fair value hedges, as defined by SFAS 133. As such, there was no ineffective portion to the hedge recognized in earnings during the current or prior year periods. Long-term debt has been increased by $26 million and $56 million for the fair market value of the interest rate swap agreements at December 31, 2004 and December 26, 2003, respectively.

The differential to be paid or received under these agreements is accrued based on the terms of the agreements and is recognized in interest expense over the term of the related debt. The related amounts payable to or receivable from counterparties are included in other current liabilities or assets. Cash flows related to interest rate swap agreements are classified as Operating Activities in the Consolidated Cash Flow Statements. For the fiscal years ended December 31, 2004 and December 26, 2003, the Company reduced interest expense by approximately $32 million and $45 million, respectively, as a result of the interest rate swap agreements that were in place during each period. Fair value adjustments are non-cash transactions and, accordingly, have no cash impact on the Consolidated Cash Flow Statements.

The counterparties to the interest rate swap agreements expose the Company to credit loss in the event of non-performance. The Company does not anticipate non-performance by the counterparties.

## Fuel Hedging

In the third quarter of 2003, CSX began a program to hedge a portion of its future locomotive fuel purchases. This program was established to manage exposure to fuel price fluctuations. In order to minimize this risk, CSX has entered into a series of swaps in order to fix the price of a portion of its estimated future fuel purchases.

Following is a summary of outstanding fuel swaps:

| | December 31, 2004 |
|---|---|
| Approximate Gallons Hedged (Millions) | 359 |
| Average Price Per Gallon | $0.81 |
| Swap Maturities | January 2005-July 2006 |

| | 2005 | 2006 |
|---|---|---|
| Estimated % of Future Fuel Purchases | | |
| Hedged at December 31, 2004 | 48% | 9% |

The program limits fuel hedges to a 24-month duration and a maximum of 80% of CSX's average monthly fuel purchased for any month within the 24-month period, and places the hedges among selected counterparties. Fuel hedging activity favorably impacted fuel expense for the fiscal year ended December 31, 2004 by $63 million. Fuel hedging activity had no impact on fuel expense for the fiscal year ended December 26, 2003. Ineffectiveness, or the extent to which changes in the fair values of the fuel swaps did not offset changes in the fair values of the expected fuel purchases, was immaterial.



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

These instruments qualify, and are designated by management, as cash-flow hedges of variability in expected future cash flows attributable to fluctuations in fuel prices. The fair values of fuel derivative instruments are determined based upon current fair market values as quoted by third party dealers and are recorded on the Consolidated Balance Sheet with offsetting adjustments to Accumulated Other Comprehensive Loss, a component of Shareholders' Equity. Accumulated Other Comprehensive Loss included a gain, net of tax of approximately $66 million and $6 million as of December 31, 2004 and December 26, 2003, respectively, related to fuel derivative instruments. Amounts are reclassed from Accumulated Other Comprehensive Loss as the underlying fuel that was hedged is consumed by rail operations. Fair value adjustments are non-cash transactions and, accordingly, have no cash impact on the Consolidated Cash Flow Statements.

The Company has temporarily suspended entering into new swaps in its fuel hedge program since the third quarter of 2004. The Company will continue to monitor and assess the current issues facing the global fuel market place to decide when to resume hedging under the program.

The counterparties to the fuel hedge agreements expose the Company to credit loss in the event of non-performance. The Company does not anticipate non-performance by the counterparties.

## NOTE 14. Shareholders Equity

### *Common and Preferred Stocks*

Common and Preferred Stock consists of (in thousands):

| Common Stock, 1$ Par Value | December 31, 2004 |
|---|---|
| Common Shares Authorized | 300,000 |
| Common Shares Issued and Outstanding | 215,529 |
| Additional Potential Shares: | |
| Stock Options | 20,594 |
| Convertible Debt | 9,728 |

| Preferred Stock | December 31, 2004 |
|---|---|
| Preferred Shares Authorized | 25,000 |
| Preferred Shares Outstanding | — |

Holders of Common Stock are entitled to one vote on all matters requiring a vote for each share held. Preferred Stock is senior to common stock with respect to dividends and upon liquidation of the Company.

Prior to October 2003, 3,000,000 shares had been designated as Series B Preferred Stock in conjunction with the Company's Shareholder Rights Plan. In October 2003, the expiration date of the shareholder rights under the Shareholder Rights Plan was accelerated, resulting in the effective termination of the Plan, and the Company's Articles of Incorporation were amended to eliminate the designation of shares for Series B Preferred.



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

CSX CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

***Accumulated Other Comprehensive Loss***

Accumulated Other Comprehensive Loss in the Consolidated Statement of Changes in Shareholders' Equity consists of the following:

| | Balance December 26, 2003 | Net Gain (Loss) | Balance December 31, 2004 |
|---|---|---|---|
| | | (Dollars in millions) | |
| Minimum Pension Liability (net of $153 and $161 of taxes as of December 26, 2003 and December 31, 2004, respectively | $ (310) | $ 18 | $ (292) |
| Fair Value of Fuel Derivatives (net of $45 taxes) | 6 | 66 | 72 |
| Other | 1 | (1) | — |
| Total | $ (303) | $ 83 | $ (220) |

Other comprehensive income in 2002 represented adjustments to the minimum pension liability, net of taxes, of $152 million.

**NOTE 15. Earnings Per Share**

The following table sets forth the computation of basic earnings per share and earnings per share, assuming dilution:

| | Fiscal Years Ended | | |
|---|---|---|---|
| | December 31, 2004 | December 26, 2003 | December 27, 2002 |
| Numerator (Millions): | | | |
| Net Earnings from Continuing Operations | $ 418 | $ 137 | $ 410 |
| Interest Expense on Convertible Debt — Net of Tax | 4 | 4 | 3 |
| Net Earnings from Continuing Operations, If-Converted | 422 | 141 | 413 |
| Discontinued Operations — Net of Tax | (79) | 52 | 57 |
| Cumulative Effect of Accounting Change — Net of Tax | — | 57 | (43) |
| Net Earnings, If-Converted | 343 | 250 | 427 |
| Interest Expense on Convertible Debt — Net of Tax | (4) | (4) | (3) |
| Net Earnings | $ 339 | $ 246 | $ 424 |
| Denominator (Thousands): | | | |
| Average Common Shares Outstanding | 214,796 | 213,964 | 212,729 |
| Convertible Debt | 9,728 | 9,932 | 10,000 |
| Effect of Potentially Dilutive Common Shares | 506 | 432 | 782 |
| Average Common Shares Outstanding, Assuming Dilution | 225,030 | 224,328 | 223,511 |



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

| | Fiscal Years Ended | | |
|---|---|---|---|
| | December 31, 2004 | December 26, 2003 | December 27, 2002 |
| Earnings Per Share: | | | |
| Net Earnings from Continuing Operations | $ 1.95 | $ 0.64 | $ 1.93 |
| Discontinued Operations | (0.37) | 0.24 | 0.27 |
| Cumulative Effect of Accounting Change | — | 0.26 | (0.20) |
| Net Earnings | $ 1.58 | $ 1.14 | $ 2.00 |
| Earnings Per Share, Assuming Dilution: | | | |
| Net Earnings from Continuing Operations | $ 1.87 | $ 0.63 | $ 1.85 |
| Discontinued Operations | (0.35) | 0.23 | 0.25 |
| Cumulative Effect of Accounting Change | — | 0.25 | (0.19) |
| Net Earnings | $ 1.52 | $ 1.11 | $ 1.91 |

Basic earnings per share is based on the weighted-average number of common shares outstanding. Earnings per share, assuming dilution, is based on the weighted-average number of common shares outstanding adjusted for the effect of potentially dilutive common shares, arising from convertible debt and employee stock options and awards. During the fiscal years ended December 31, 2004 and December 26, 2003, 517,027 and 291,908 options were exercised, respectively.

Certain potentially dilutive common shares at December 31, 2004 and December 26, 2003 were excluded from the computation of earnings per share, assuming dilution, since their related option exercise prices were greater than the average market price of the common shares during the period. The following table indicates information about potentially dilutive common shares excluded from the computation of earnings per share:

| | Fiscal Years Ended | | |
|---|---|---|---|
| | December 31, 2004 | December 26, 2003 | December 27, 2002 |
| Number of Shares (Thousands) | 19,689 | 18,497 | 23,776 |
| Average Exercise/ Conversion Price | $ 41.07 | $ 42.41 | $ 42.49 |

In September 2004, the EITF reached a consensus on Issue No. 04-8, The Effect of Contingently Convertible Debt on Diluted Earnings Per Share. The EITF states that contingently convertible debt instruments are subject to the “if-converted” method under SFAS 128, Earnings Per Share, regardless of fulfillment of any of the contingent features included in the instrument. This consensus is effective for periods ending after December 15, 2004 and the consensus must be applied by restating all periods during which the instrument was outstanding.

Effective for the fourth quarter of 2004, CSX is required to include approximately 10 million shares underlying its convertible debt instrument using the “if-converted” method in the computation of earnings per share, assuming dilution. The dilutive impact for all periods is approximately 2%-5%.

A substantial increase in the fair market value of the Company’s stock price could trigger contingent conditions for conversion and allow holders to convert their debentures into CSX common stock and thus negatively impact basic earnings per share.



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

CSX CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

## NOTE 16. Stock Plans

The Company adopted the fair-value-based method of accounting for share-based payments effective fiscal year 2003 using the prospective method described in FASB Statement No. 148, “Accounting for Stock-Based Compensation — Transition and Disclosure”. (See Note 1, Nature of Operations and Significant Accounting Policies under the caption “Stock-Based Compensation”.)

Total compensation expense associated with stock-based compensation was as follows:

| | Fiscal Years Ended | | |
|---|---|---|---|
| | December 31, 2004 | December 26, 2003 | December 27, 2002 |
| | | (Dollars in millions) | |
| Stock Based Compensation Expense | $ 15 | $ 5 | $ 6 |

***Stock Options and Awards***

CSX stock option and award plans provide primarily (1) stock options, and (2) restricted stock awards (“RSAs”) to eligible officers and employees. Awards granted under the various plans are determined by the board of directors.

At December 31, 2004, there were 3,441 current or former employees with grants outstanding under the various plans. A total of approximately 39 million shares were reserved for issuance under the plans of which 7 million were available for new grants. The remaining shares are assigned to outstanding stock options and stock awards.

The fair value of stock options granted in 2003 and 2002 was estimated as of the dates of grant using the Black-Scholes-Merton option model. No stock options were granted in 2004.

| | Fiscal Years Ended | |
|---|---|---|
| | 2003 | 2002 |
| Black-Scholes Assumptions: | | |
| Expected Dividend Yield | 1.10% | 1.10% |
| Risk-free Interest Rate | 2.53% | 4.30% |
| Expected Stock Volatility | 28% | 27% |
| Expected Term Until Exercise | 6 years | 6 years |
| Average Fair Value of Stock Options Granted | $8.93 | $11.76 |



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

*Stock Options*

The majority of stock options have been granted with 10-year terms. Options outstanding at December 31, 2004, are generally exercisable three to ten years after date of grant. The exercise price for options granted equals the market price of the underlying stock on the date of grant. A summary of the Company's stock option activity and related information for the fiscal years ended December 31, 2004, December 26, 2003 and December 27, 2002 follows:

| | December 31, 2004 | | December 26, 2003 | | December 27, 2002 | |
|---|---|---|---|---|---|---|
| | Weighted-Average Shares (000s) | Average Exercise Price | Weighted-Average Shares (000s) | Average Exercise Price | Weighted-Average Shares (000s) | Average Exercise Price |
| Outstanding at Beginning of Year | 23,297 | $ 39.27 | 26,022 | $ 40.45 | 23,650 | $ 39.49 |
| Granted | — | $ — | 3,477 | $ 38.14 | 3,438 | $ 38.14 |
| Expired or Canceled | (2,186) | $ 37.83 | (5,909) | $ 39.91 | (46) | $ 44.89 |
| Exercised | (517) | $ 23.29 | (293) | $ 22.42 | (1,020) | $ 31.45 |
| Outstanding at End of Year | 20,594 | $ 39.83 | 23,297 | $ 39.27 | 26,022 | $ 40.45 |
| Exercisable at End of Year | 7,758 | $ 41.18 | 7,104 | $ 41.13 | 8,513 | $ 41.58 |

The following table summarizes information about stock options outstanding at December 31, 2004:

| | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|
| Exercise Price | Number Outstanding (000's) | Weighted-Average Remaining Contractual Life (Years) | Weighted-Average Exercise Price | Number Outstanding (000's) | Weighted-Average Exercise Price |
| $20 to $29 | 1,413 | 5.1 | $ 23.94 | 831 | $ 24.17 |
| $30 to $39 | 10,406 | 7.2 | $ 36.77 | 1,304 | $ 39.58 |
| $40 to $49 | 6,546 | 2.8 | $ 43.59 | 5,163 | $ 43.41 |
| $50 to $59 | 2,229 | 1.8 | $ 53.09 | 460 | $ 51.43 |
| Total | 20,594 | 5.05 | $ 39.83 | 7,758 | $ 41.18 |

*Restricted Stock Awards*

Restricted stock awards outstanding at December 31, 2004, vest over a three- to five-year employment period. Approximately $2 million, $2 million and $6 million was expensed in 2004, 2003 and 2002, respectively, in connection with restricted stock awards.

| | Fiscal Years Ended | |
|---|---|---|
| | December 31, 2004 | December 26, 2003 |
| Number of Restricted Stock Awards Outstanding | 258,910 | 248,500 |
| Weighted Average Fair Value at Grant Date | $ 31.21 | $ 30.97 |



Source: CSX CORP, 10-K, March 08, 2005
Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

***Long Term Incentive Program***

The CSX Long Term Incentive Program is designed to reward participants for the attainment of CSX financial and customer service improvement results leading to share price appreciation for shareholders and employees. The objective of the plan is to motivate and reward senior executives for achieving and exceeding a two-year modified free cash flow goal, at which time the award is payable in cash and CSX common stock. Assuming the Company achieves target performance levels, approximately 0.6 million shares could be issued under the plan as of December 31, 2004. The Company recognized $10 million in expense associated with this program for the fiscal year ended December 31, 2004.

***Employee Stock Purchase Plan***

The 2001 Employee Stock Purchase Plan ("ESPP") allowed eligible employees to purchase CSX common stock at a discount. Specifically, participating employees were able to purchase CSX stock at the lower of 85% of fair market value on December 1 (beginning of the annual offering period) or 85% of fair market value on November 30 of the following year (end of the annual offering period). In effect, employees received a 12-month stock option to purchase Company stock. Once purchased, the shares were unrestricted and could generally be sold or transferred at any time. Employees purchased approximately 540,000 shares and 570,000 shares under this plan during 2003 and 2002, respectively. This plan was not extended for 2004.

***Shareholder Dividend Reinvestment Plans***

The Company maintains the Shareholder Dividend Reinvestment Plan under which shareholders may purchase additional shares of stock. At December 31, 2004, there were 4,946,856 shares available for issuance under this plan.

***Stock Plan for Directors***

The Stock Plan for Directors, approved by the shareholders in 1992, governs in part the manner in which directors' fees and retainers are paid. A minimum of 40% of the retainers must be paid in common stock of the Company. In 2004, the minimum retainer to be paid in stock increased to 50%. In addition, each director may elect to receive up to 100% of the remaining retainer and fees in the form of common stock of the Company. In 1997, shareholders approved amendments to the Plan that would permit additional awards of stock or stock options.

| | Fiscal Years Ended | | |
|---|---|---|---|
| | December 31, 2004 | December 26, 2003 | December 27, 2002 |
| Shares Issued to Directors | 40,662 | 36,219 | 45,195 |
| Expense | $ 1 | $ 1 | $ 1 |

The Plan permits each director to elect to transfer stock into a trust that will hold the shares until the participant's death, disability, retirement as a director, other cessation of services as a director, or change in control of the Company. At December 31, 2004, there were 0.6 million shares of common stock reserved for issuance under this Plan.

## NOTE 17. Fair Value of Financial Instruments

Fair values of the Company's financial instruments are estimated by reference to quoted prices from market sources and financial institutions, as well as other valuation techniques. Long-term debt is the only financial instrument of the Company with fair values significantly different from their



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

carrying amounts. At December 31, 2004, the fair value of long-term debt, including current maturities, was $7.7 billion, compared with a carrying amount of $7.2 billion. At December 31, 2003, the fair value of long-term debt, including current maturities, was $7.8 billion, compared with a carrying amount of $7.3 billion. The fair value of long-term debt has been estimated using discounted cash flow analysis based upon the Company's current incremental borrowing rates for similar types of financing arrangements. The Company's interest rate swap agreements at December 31, 2004 and December 26, 2003 had a fair value of $26 million and $56 million, respectively. The Company's fuel hedging agreements at December 31, 2004 and December 26, 2003 had a fair value of $117 million and $9 million, respectively.

## NOTE 18. Employee Benefit Plans

The Company sponsors defined benefit pension plans, principally for salaried, non-contract personnel. The plans provide eligible employees with retirement benefits based predominantly on years of service and compensation rates near retirement.

In addition to the defined benefit pension plans, the Company sponsors one medical plan and one life insurance plan that provide benefits to full-time, salaried, non-contract employees hired prior to January 1, 2003, upon their retirement if certain eligibility requirements are met. The postretirement medical plans are contributory (partially funded by retirees), with retiree contributions adjusted annually. The life insurance plan is non-contributory.

| | Summary of Participants as of January 1, 2004(a) | |
|---|---|---|
| | Pension Plans | Postretirement Plan |
| Active Employees | 7,910 | 5,372 |
| Retirees and Beneficiaries | 10,744 | 10,699 |
| Other | 5,742 | 287 |
| Total | 24,396 | 16,358 |

(a) Active Employees includes participants terminated under the management restructuring program.

As permitted by SFAS 87, the Company has elected to use a plan fiscal year of October 1 through September 30 to actuarially value its pension and postretirement plans as it provides for more timely analysis. The Company engages independent, external actuaries to compute the amounts of liabilities and expenses relating to these plans subject to the assumptions that the Company selects as of the beginning of the plan year.

The benefit obligation for these plans represents the liability of the Company for current and retired employees and is affected primarily by the following:

- Service cost (benefits attributed to employee service during the period)
- Interest cost (interest on the liability due to the passage of time)
- Actuarial gains/losses (experience during the year different from that assumed and changes in plan assumptions)
- Benefits paid to participants

Plan assets are amounts that have been segregated and restricted to provide benefits, and include amounts contributed by the Company and amounts earned from investing contributions, less



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

CSX CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

benefits paid. The Company funds the cost of the postretirement medical and life insurance benefits on a pay-as-you go basis. CSX expects to make cash contributions of $2 million to its pension plans in 2005.

The benefits as of December 31, 2004 expected to be paid in each of the next five fiscal years, and in the aggregate for the five fiscal years thereafter are as follows:

| | Expected Cashflows | |
|---|---|---|
| | Pension Benefits | Postretirement Benefits |
| | (Dollars in millions) | |
| 2005 | $ 148 | $ 47 |
| 2006 | 140 | 48 |
| 2007 | 140 | 48 |
| 2008 | 141 | 47 |
| 2009 | 142 | 46 |
| Thereafter | 722 | 203 |
| Total | $ 1,433 | $ 439 |

Asset management for the pension fund is founded upon an asset allocation strategy that was developed using asset return simulation in conjunction with projected plan liabilities. The allocation seeks maximization of returns within the constraints of acceptable risks considering the long-term investment horizon. CSX has established a target allocation of 60% equity and 40% fixed income investments. The goal is to maintain assets at or above benefit obligations (long-term liabilities) without corporate contributions.

The distribution of pension plan assets as of the measurement date is as follows:

| | September 30, 2004 | | September 30, 2003 | |
|---|---|---|---|---|
| | Amount | Percent of Total Assets | Amount | Percent of Total Assets |
| | (Dollars in millions) | | | |
| Common Stocks | $ 865 | 59% | $ 863 | 60% |
| Fixed Income | 581 | 40% | 557 | 38% |
| Cash and Cash Equivalents | 12 | 1% | 31 | 2% |
| Total | $ 1,458 | 100% | $ 1,451 | 100% |

The Company provides investment guidelines to both the plan's fixed income and equity fund managers. Within the broad asset classes that comprise the plan's investments, common stocks are diversified based on allocations to domestic and foreign stocks as mandated by the Company. Allocations are maintained at within 3% of targets. The U.S. stock segment includes style diversification among managers of large capitalization stocks and small capitalization stocks. The Company limits industry sectors, outlines individual stock issuer concentration and monitors the use or prohibition of derivatives and CSX securities.

Fixed income securities are diversified across fund managers and investment style and are benchmarked to a long duration index. The Company specifies the types of allowable investments such as government, corporate and asset backed bonds, and limits diversification between domestic and foreign investments and the use of derivatives. Additionally, the Company stipulates minimum credit quality constraints and any prohibited securities.



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Individual investments or fund managers are selected in accordance with standards of prudence as it applies to asset diversification and investment suitability. Monitoring fund investment performance is ongoing. Acceptable performance is determined in the context of the long-term return objectives of the fund and appropriate asset class benchmarks.

Benefit obligation and plan asset information is as follows:

| | Pension Benefits | | Postretirement Benefits | |
|---|---|---|---|---|
| | December 31, 2004 | December 26, 2003 | December 31, 2004 | December 26, 2003 |
| | (Dollars in millions) | | | |
| **Actuarial Present Value of Benefit Obligation** | | | | |
| Accumulated Benefit Obligation | $ 1,825 | $ 1,785 | N/A | N/A |
| Projected Benefit Obligation | $ 1,941 | $ 1,916 | $ 509 | $ 513 |
| **Change in Projected Benefit Obligation:** | | | | |
| Projected Benefit Obligation at Beginning of Plan Year | $ 1,916 | $ 1,806 | $ 513 | $ 499 |
| Service Cost | 37 | 38 | 9 | 11 |
| Interest Cost | 111 | 113 | 25 | 25 |
| Impact of Plan Changes/ Special Termination Benefits | 51 | (7) | 20 | (32) |
| Plan Participants' Contributions | — | — | 12 | 12 |
| Actuarial (Gain)/ Loss | 12 | 135 | (20) | 46 |
| Benefits Paid | (186) | (169) | (50) | (48) |
| Benefit Obligation at End of Plan Year | $ 1,941 | $ 1,916 | $ 509 | $ 513 |

| | Pension Benefits | | Postretirement Benefits | |
|---|---|---|---|---|
| | December 31, 2004 | December 26, 2003 | December 31, 2004 | December 26, 2003 |
| | (Dollars in millions) | | | |
| **Change in Plan Assets:** | | | | |
| Fair Value of Plan Assets at Beginning of Plan Year | $ 1,451 | $ 1,324 | N/A | N/A |
| Actual Return on Plan Assets | 165 | 241 | N/A | N/A |
| Employer Contributions | 28 | 55 | 38 | 36 |
| Plan Participants' Contributions | — | — | 12 | 12 |
| Benefits Paid | (186) | (169) | (50) | (48) |
| Fair Value of Plan Assets at End of Plan Year | $ 1,458 | $ 1,451 | $ — | $ — |
| **Funded Status** | $ (483) | $ (465) | $ (509) | $ (513) |



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

Table of Contents



The funded status, or amount by which the benefit obligation exceeds the fair value of plan assets, represents a liability. At December 31, 2004, the status of CSX plans is as follows:

| | Aggregate Projected Benefit Obligation | Aggregate Fair Value of Plan Assets |
|---|---|---|
| For plans with a projected benefit obligation in excess of plan assets | $ 1.9 billion | $ 1.5 billion |
| For plans with an accumulated benefit obligation in excess of plan assets | $ 1.8 billion | $ 1.5 billion |

The following table shows the reconciliation of the funded status of the plan with the amount recorded in the Consolidated Balance Sheet:

| | Pension Benefits | | Postretirement Benefits | |
|---|---|---|---|---|
| | December 31, 2004 | December 26, 2003 | December 31, 2004 | December 26, 2003 |
| | (Dollars in millions) | | | |
| Funded Status | $ (483) | $ (465) | $ (509) | $ (513) |
| Unrecognized Actuarial Loss | 448 | 487 | 184 | 222 |
| Unrecognized Prior Service Cost | 27 | 34 | (19) | (27) |
| Fourth Quarter Activity: | | | | |
| Employer Contributions to Pension Plans | 3 | 3 | — | — |
| Net Postretirement Benefits Paid | — | — | 10 | 10 |
| Net Amount Recognized in Consolidated Balance Sheet | $ (5) | $ 59 | $ (334) | $ (308) |

A liability is recognized if net periodic pension cost (cost of a pension plan for a period, including service cost, interest cost, actual return on plan assets, gain or loss, amortization of unrecognized prior service cost) recognized exceeds amounts the employer has contributed to the plan. An asset is recognized if net periodic pension cost is less than amounts the employer has contributed to the plan.

| | Pension Benefits | | Postretirement Benefits | |
|---|---|---|---|---|
| | December 31, 2004 | December 26, 2003 | December 31, 2004 | December 26, 2003 |
| | (Dollars in millions) | | | |
| Accrued Benefit Liability | $ (422) | $ (393) | $ (334) | $ (308) |
| Intangible Asset | 26 | 34 | N/A | N/A |
| Accumulated Other Comprehensive Loss | 391 | 418 | N/A | N/A |
| Net Amount Recognized in Consolidated Balance Sheet | $ (5) | $ 59 | $ (334) | $ (308) |



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

The following table presents components of net periodic benefit expense:

| | Pension Benefits | | | Postretirement Benefits | | |
|---|---|---|---|---|---|---|
| | Dec. 31, 2004 | Dec. 26, 2003 | Dec. 27, 2002 | Dec. 31, 2004 | Dec. 26, 2003 | Dec. 27, 2002 |
| | (Dollars in millions) | | | | | |
| Service Cost | $ 37 | $ 38 | $ 40 | $ 9 | $ 11 | $ 11 |
| Interest Cost | 111 | 113 | 119 | 25 | 25 | 29 |
| Expected Return on Plan Assets | (130) | (137) | (152) | — | — | — |
| Amortization of Prior Service Cost | 4 | 4 | 5 | (6) | (5) | — |
| Amortization of Net Loss | 14 | — | (9) | 15 | 14 | 8 |
| Net Periodic Benefit Cost | $ 36 | $ 18 | $ 3 | $ 43 | $ 45 | $ 48 |
| Special Termination Benefits — Workforce Reduction Program/ Curtailments | 6 | 13 | — | 18 | — | — |
| Net Periodic Benefit Expense Including Termination Benefits | $ 42 | $ 31 | $ 3 | $ 61 | $ 45 | $ 48 |

Due to the termination of employees under the management restructuring plan (see Note 5, Management Restructuring), a curtailment occurred in the Company's defined benefit pension plans and postretirement medical plan. The estimated cost of the curtailments of $24 million was included in the management restructuring charge for the fiscal year ended December 31, 2004. Due to the curtailments, the Company was required to update its measurement of the assets and obligations of these plans, which affected the net periodic benefit costs beginning in the second quarter of 2004. A substantial portion of benefits provided under the management restructuring initiatives will be paid from assets of the Company's defined benefit pension plans.

The $13 million termination charge in 2003 represents a curtailment charge associated with the retirement of the Company's former Chairman and Chief Executive Officer.

During 2004 and 2003, CSX recorded changes in its minimum pension liability. These changes did not affect net earnings, but are a component of Accumulated Other Comprehensive Loss on an after-tax basis. In 2004, the minimum pension liability decreased by $26 million, reducing Accumulated Other Comprehensive Loss by $18 million after tax. In 2003, the minimum pension liability increased by $6 million, increasing Accumulated Other Comprehensive Loss by $3 million after tax. The Company also recorded $1 million and $10 million after tax effect of Accumulated Other Comprehensive Income, relating to Conrail's minimum pension liability for December 31, 2004 and December 26, 2003, respectively.



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Weighted-average assumptions used in accounting for the plans are as follows:

| | Pension Benefits | | Postretirement Benefits | |
|---|---|---|---|---|
| | December 31, 2004 | December 26, 2003 | December 31, 2004 | December 26, 2003 |
| Expected Long-term Return on Plan Assets: | | | | |
| Benefit Cost for Plan Year | 8.90% | 8.90% | N/A | N/A |
| Benefit Obligation at End of Plan Year | 8.50% | 8.90% | N/A | N/A |
| Discount Rates: | | | | |
| Benefit Cost for Plan Year | 6.00% | 6.50% | 5.00% | 5.50% |
| Benefit Obligation at End of Plan Year | 5.75% | 6.00% | 5.00% | 5.00% |
| Salary Scale Inflation | 3.20% | 3.30% | 3.20% | 3.30% |

The net postretirement benefit obligation was determined using the following assumptions for health care cost trend rate for medical plans

| | Postretirement Benefits | |
|---|---|---|
| | December 31, 2004 | December 26, 2003 |
| Health Care Cost Trend Rate | | |
| Components of benefit cost: Pre-65 | 11% decreasing to 4.5% | 11% decreasing to 5% |
| Components of benefit cost: Post-65 | 11% decreasing to 4.5% | 11% decreasing to 5% |
| Benefit Obligations: Pre-65 | 12% decreasing to 4.5% | 11% decreasing to 4.5% |
| Benefit Obligations: Post-65 | 13% decreasing to 4.5% | 11% decreasing to 4.5% |

A 1% change in the assumed health care cost trend rate would have the following effects:

| | 1% Increase | 1% Decrease |
|---|---|---|
| | (Dollars in millions) | |
| Effect on postretirement benefits service and interest cost | $ 1 | $ (2) |
| Effect on postretirement benefit obligation | $ 24 | $ (35) |

In connection with recognition of the curtailments, the Company is required to estimate and record the effects of the Medicare Prescription Drug, Improvement and Modernization Act of 2003 ("Act"). The Company believes that a portion of its medical plan's prescription drug benefit will qualify as actuarially equivalent to Medicare Part D based upon a review by the plan's health and welfare actuary of the plan's prescription drug benefit compared with the prescription drug benefit that would be paid under Medicare Part D beginning in 2006. The reduction in the postretirement benefit obligation as a result of the Act was approximately $25 million. There was no immediate impact on net earnings as an unrecognized gain will be recorded. The effects of the Act are reflected in net postretirement benefit costs as the unrecognized gain is amortized, which began in the second quarter of 2004. Postretirement benefit costs were reduced by approximately $3 million in 2004 due to the Act.



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

***Other Plans***

The Company maintains savings plans for virtually all full-time salaried employees and certain employees covered by collective bargaining agreements. Expense associated with these plans was $15 million, $16 million and $15 million for 2004, 2003 and 2002, respectively.

Under collective bargaining agreements, the Company participates in a number of union-sponsored, multi-employer benefit plans. Payments to these plans are made as part of aggregate assessments generally based on number of employees covered, hours worked, tonnage moved or a combination thereof. Total contributions of $368 million, $360 million and $315 million were made to these plans in 2004, 2003 and 2002, respectively.

## NOTE 19. Commitments and Contingencies

***Lease Commitments***

The Company has various lease agreements with other parties with terms up to 42 years. Non-cancelable, long-term leases generally include provisions for maintenance, options to purchase and options to extend the terms.

At December 31, 2004, minimum building and equipment rentals under these operating leases are as follows:

| | Operating Leases | Sublease Income | Net Lease Commitments |
|---|---|---|---|
| | | (Dollars in millions) | |
| 2005 | $ 218 | $ 38 | $ 180 |
| 2006 | 184 | 36 | 148 |
| 2007 | 166 | 28 | 138 |
| 2008 | 139 | 24 | 115 |
| 2009 | 102 | 14 | 88 |
| Thereafter | 456 | 16 | 440 |
| Total | $ 1,265 | $ 156 | $ 1,109 |

Upon consummation of the sale of the International Terminals business, operating leases will decrease by $123 million. (See Note 4, Discontinued Operations.)

Rent expense on operating leases totaled $567 million in 2004, $556 million in 2003 and $597 million in 2002. These amounts include net daily rental charges on railroad operating equipment aggregating $304 million, $296 million and $294 million in 2004, 2003 and 2002, respectively, which are not long-term commitments. In addition to these commitments, the Company also has agreements covering equipment leased from Conrail. See Note 2, Investment In and Integrated Rail Operations with Conrail, for a description of these commitments.

***Matters Arising Out of Sale of International Container-Shipping Assets***

In 2003, CSX finalized a settlement agreement with Maersk resolving all remaining material disputes pending directly between the two companies, consisting predominantly of two major disputes. The first dispute involved a post-closing working capital adjustment to the sale price for which the Company had recorded a receivable of approximately $70 million. The second dispute involved a claim of 425 million Dutch Guilders (approximately $180 million at then prevailing



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

currency exchange rates) plus interest by European Container Terminals ("ECT") alleging breaches of contract by the Company at the Rotterdam container terminal facility owned by ECT.

Also in 2003, CSX entered into a final settlement agreement with Maersk allocating responsibility between the two companies for third party claims and litigation relating to the assets acquired by Maersk. The two settlements reduced the Company's 2003 earnings by $108 million pretax, $67 million after tax. This charge is reflected in Operating Expense as an Additional Loss on the Sale of the international container-shipping assets. Neither settlement has a material impact on cash flows. (See Note 6, Operating Expense.)

***Purchase Commitments***

The Company has a commitment under a long-term maintenance program for approximately 40% of CSXT's fleet of locomotives. The agreement expires in 2026 and approximates $5.8 billion. The long-term maintenance program is intended to provide CSX access to efficient, high-quality locomotive maintenance services at fixed price levels through the term of the program. Under the program, CSX paid $151 million, $130 million and $124 million during the fiscal years ended 2004, 2003 and 2002, respectively. Minimum payments are as follows:

| | Minimum Payments (Dollars in millions) |
|---|---|
| 2005 | $ 167 |
| 2006 | 216 |
| 2007 | 224 |
| 2008 | 232 |
| 2009 | 218 |
| Thereafter | 4,733 |
| Total | $ 5,790 |

The Company has various commitments to purchase technology and communications services. The terms for the various agreements call for CSX to pay $36 million, $29 million and $26 million for the fiscal years ending 2005, 2006 and 2007, respectively. The largest obligation is for purchased communications services of $24 million per year for the years 2005 through 2007.

***STB Proceeding***

In 2001 Duke Energy Corporation ("Duke") filed a complaint before the STB alleging that certain CSXT common carrier coal rates were unreasonably high. In February 2004, the STB issued a decision finding that the CSXT common carrier rates were reasonable. While approving the rate levels, the STB also invited Duke to request a phase-in of rate increases over some time period. The nature and amount of any such phase-in is uncertain, and would only apply to billings subsequent to December 2001. In October 2004, the STB issued a decision denying Duke's petition for reconsideration of its February 2004 ruling. In November 2004, Duke advised the STB that it would request phase-in relief, and filed a Petition for Review of the STB's decisions in the United States Court of Appeals for the District of Columbia Circuit. CSXT will continue to consider and pursue all available legal defenses in this matter. Administrative proceedings and legal appeals could take several years to resolve. An unfavorable outcome to this complaint would not have a material effect on the Company's financial position.



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

***Self-Insurance***

The Company uses a combination of third-party and self-insurance, obtaining substantial amounts of commercial insurance for potential losses for third-party liability and property damages. Specified levels of risk (up to $35 million for property and $25 million for liability per occurrence) are retained on a self-insurance basis.

***Guarantees***

The Company and its subsidiaries are contingently liable individually and jointly with others as guarantors of obligations principally relating to leased equipment, joint ventures and joint facilities used by the Company in its business operations. Utilizing the Company's guarantee for these obligations allows the obligor to take advantage of lower interest rates and obtain other favorable terms. Guarantees are contingent commitments issued by the Company that could require CSX or one of its affiliates to make payment or to perform certain actions for the guaranteed party based on another entity's failure to perform. As of December 31, 2004, the Company's guarantees can be segregated into three main categories:

1. Guarantees of approximately $364 million of lease commitments assumed by A.P. Moller-Maersk ("Maersk") for which the Company is contingently liable. CSX believes Maersk will fulfill its contractual commitments with respect to such leases, and CSX will have no further liabilities for those obligations.

2. Guarantees of approximately $70 million, of which $11 million may be recovered from other shareholders, relating to construction and cash deficiency support guarantees at several of the Company's international terminal locations under development. The non-performance of one of its partners, cost overruns or non-compliance with financing loan covenants could cause the Company to have to perform under these guarantees. The Company has made equity contributions of $5 million under these guarantees and estimates it will be required to make additional equity contributions of $1 million in 2005. Upon consummation of the sale of the International Terminals business, these guarantees are expected to decrease. (See Note 4, Discontinued Operations.)

3. Guarantees of approximately $265 million relating to leases assumed as part of CSX's conveyance of its interest in CSX Lines in February 2003, as discussed in Note 3, Divestitures.

The maximum amount of future payments the Company could be required to make under these guarantees is the amount of the guarantees themselves.

***Contract Settlement***

In 2002, the Company received $44 million as the first of two payments to settle a contract dispute. During 2002, the Company recognized approximately $7 million of the first payment in other income as this amount related to prior periods. The remaining $37 million will be recognized over the contract period, which ends in 2020. The second payment of $23 million was received in 2003 and will be recognized over the contract period, which ends in 2020. The results of this settlement will provide an average of approximately $3 million in annual pretax earnings through 2020.

***Other Legal Proceedings***

CSX is involved in routine litigation incidental to its business and is a party to a number of legal actions and claims, various governmental proceedings and private civil lawsuits, including those related to environmental matters, Federal Employers' Liability Act claims by employees, other



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

personal injury claims, and disputes and complaints involving certain transportation rates and charges. Some of the legal proceedings include claims for compensatory as well as punitive damages, and others purport to be class actions. While the final outcome of these matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded along with applicable insurance, it is the opinion of CSX management that none of these items will have a material adverse effect on the results of operations, financial position or liquidity of CSX. However, an unexpected adverse resolution of one or more of these items could have a material adverse effect on the results of operations in a particular quarter or fiscal year. The Company is also party to a number of actions, the resolution of which could result in gain realization in amounts that could be material to results of operations in the quarters received.

### NOTE 20. Business Segments

The Company operates in two business segments: rail and intermodal. The rail segment provides rail freight transportation over a network of more than 22,000 route miles in 23 states, the District of Columbia and two Canadian provinces. The intermodal segment provides integrated rail and truck transportation services and operates a network of dedicated intermodal facilities across North America. The Company's segments are strategic business units that offer different services and are managed separately. The rail and intermodal segments are also viewed on a combined basis as Surface Transportation operations.

The Company evaluates performance and allocates resources based on several factors, of which the primary financial measure is business segment operating income. The accounting policies of the segments are the same as those described in the summary of significant accounting policies (see Note 1, Nature of Operations and Significant Accounting Policies). Intersegment sales and transfers are generally accounted for as if the sales or transfers were to third parties, at current market prices.

The International Terminals business segment has been reclassified to Discontinued Operations. (See Note 4. Discontinued Operations.)



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

Table of Contents

**CSX CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Business segment information for the fiscal years ended December 31, 2004 and December 26, 2003 is as follows:

| | Surface Transportation | | | | |
|---|---|---|---|---|---|
| | Rail | Intermodal | Total | Other(a) | Total |
| | | | (Dollars in millions) | | |
| **2004** | | | | | |
| Revenues from External Customers | $ 6,694 | $ 1,326 | 8,020 | $ — | $ 8,020 |
| Intersegment Revenues | — | — | — | — | — |
| Segment Operating Income | 841 | 152 | 993 | 7 | 1,000 |
| Assets | 20,045 | 698 | 20,743 | 1,016 | 21,759 |
| Depreciation Expense | 664 | 38 | 702 | 9 | 711 |
| Property Additions | 973 | 22 | 995 | 8 | 1,003 |
| **2003** | | | | | |
| Revenues from External Customers | $ 6,182 | $ 1,257 | $ 7,439 | $ 127 | $ 7,566 |
| Intersegment Revenues | — | 4 | 4 | — | 4 |
| Segment Operating Income | 541 | 110 | 651 | — | 651 |
| Assets | 12,923 | 611 | 13,534 | 1,020 | 14,554 |
| Depreciation Expense | 579 | 32 | 611 | — | 611 |
| Property Additions | 974 | 47 | 1,021 | 12 | 1,033 |
| **2002** | | | | | |
| Revenues from External Customers | $ 6,003 | $ 1,156 | $ 7,159 | $ 757 | $ 7,916 |
| Intersegment Revenues | — | 24 | 24 | — | 24 |
| Segment Operating Income | 854 | 141 | 995 | 38 | 1,033 |
| Assets | 12,738 | 537 | 13,275 | 1,268 | 14,543 |
| Depreciation Expense | 576 | 29 | 605 | 17 | 622 |
| Property Additions | 981 | 29 | 1,010 | 19 | 1,029 |

(a) Other includes the results of operations of CSX Lines, which was conveyed to a new venture formed by the Carlyle Group in February, 2003.



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

Table of Contents

CSX CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

A reconciliation of the totals reported for the business segments to the applicable line items in the consolidated financial statements is as follows:

| | Fiscal Years Ended December 31, 2004 | December 26, 2003 | December 27, 2002 |
|---|---|---|---|
| | | (Dollars in millions) | |
| **Revenues:** | | | |
| Total External Revenues for Business Segments | $ 8,020 | $ 7,566 | $ 7,916 |
| Intersegment Revenues for Business Segments | — | 4 | 24 |
| Elimination of Intersegment Revenues | — | (4) | (24) |
| Other | — | — | — |
| **Total Consolidated Revenues** | $ 8,020 | $ 7,566 | $ 7,916 |
| **Operating Income:** | | | |
| Total Operating Income for Business Segments | $ 1,000 | $ 651 | $ 1,033 |
| Unallocated Corporate Expenses | — | (23) | (14) |
| Additional Loss on Sale | — | (108) | — |
| **Total Consolidated Operating Income** | $ 1,000 | $ 520 | $ 1,019 |

| | Fiscal Years Ended December 31, 2004 | December 26, 2003 | December 27, 2002 |
|---|---|---|---|
| | | (Dollars in millions) | |
| **Assets:** | | | |
| Assets for Business Segments | $ 21,759 | $ 14,554 | $ 14,543 |
| Investment in Conrail | 574 | 4,678 | 4,653 |
| Elimination of Intersegment Payables (Receivables) | (560) | (17) | (128) |
| Non-segment Assets | 2,808 | 2,545 | 1,883 |
| **Total Consolidated Assets** | $ 24,581 | $ 21,760 | $ 20,951 |
| **Depreciation Expense** | | | |
| Depreciation for Business Segments | 711 | 611 | 622 |
| Non-Segment Depreciation | — | 9 | 18 |
| **Total Consolidated Depreciation Expense** | $ 711 | $ 620 | $ 640 |
| **Property Additions** | | | |
| Property Additions for Business Segments | 1,003 | 1,033 | 1,029 |
| Non-segment Property Additions | 27 | 17 | 40 |
| **Total Consolidated Property Additions** | $ 1,030 | $ 1,050 | $ 1,069 |

**NOTE 21. Summarized Consolidating Financial Data**

During 1987, Sea-Land, a former consolidated subsidiary of the Company, entered into agreements to sell and lease back, by charter, three new U.S. built, U.S.–flag, D-7 class container ships. The ships were not included in the sale of international liner assets to Maersk in December 1999 and the related debt remains an obligation of CSX Lines. CSX has guaranteed the obligations of CSX Lines pursuant to the related charters, which, along with the container ships, serve as



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

collateral for debt securities registered with the SEC. As noted in Note 3, Divestitures, of the CSX 2003 Annual Report on Form 10-K, CSX agreed to convey certain assets of CSX Lines to Horizon. These obligations are not part of this transaction and another CSX entity, CSX Vessel Leasing, became the obligor in 2003. In accordance with SEC disclosure requirements, consolidating summarized financial information for the parent and obligor are as follows (certain prior year amounts have been reclassified to conform to the 2004 presentation):

**Consolidating Income Statement**

| Fiscal Year Ended December 31, 2004 | CSX Corporation | CSX Vessel Leasing | Other | Eliminations | Consolidated |
|---|---|---|---|---|---|
| | | | (Dollars in millions) | | |
| Operating Revenue | $ — | $ — | $ 8,020 | $ — | $ 8,020 |
| Operating Expense | (138) | — | 7,158 | — | 7,020 |
| Operating Income (Loss) | 138 | — | 862 | — | 1,000 |
| Equity in Earnings of Subsidiaries | 657 | — | — | (657) | — |
| Other Income (Expense) | (158) | 5 | 232 | (7) | 72 |
| Interest Expense | 381 | — | 87 | (33) | 435 |
| Earnings from Continuing Operations before Income Taxes | 256 | 5 | 1,007 | (631) | $ 637 |
| Income Tax Expense (Benefit) | (83) | — | 302 | — | 219 |
| Earnings from Continuing Operations | 339 | 5 | 705 | (631) | 418 |
| Discontinued Operations — Net of Tax | — | — | (53) | (26) | (79) |
| Net Earnings | $ 339 | $ 5 | $ 652 | $ (657) | $ 339 |

| Fiscal Year Ended December 26, 2003 | CSX Corporation | CSX Vessel Leasing | Other | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Operating Revenue | $ — | $ — | $ 7,570 | $ (4) | $ 7,566 |
| Operating Expense | (152) | — | 7,202 | (4) | 7,046 |
| Operating Income (Loss) | 152 | — | 368 | — | 520 |
| Equity in Earnings of Subsidiaries | 414 | — | — | (414) | — |
| Other Income (Expense) | (23) | 4 | 114 | (2) | 93 |
| Interest Expense | 373 | — | 78 | (33) | 418 |
| Earnings from Continuing Operations before Income Taxes | 170 | 4 | 404 | (383) | 195 |
| Income Tax Expense (Benefit) | (76) | — | 134 | — | 58 |
| Earnings from Continuing Operations | 246 | 4 | 270 | (383) | 137 |
| Discontinued Operations | — | — | 83 | (31) | 52 |
| Cumulative Effect of Accounting Change — Net of Tax | — | — | 57 | — | 57 |
| **Net Earnings** | $ 246 | $ 4 | $ 410 | $ (414) | $ 246 |



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

| Fiscal Year Ended December 27, 2002 | CSX Corporation | CSX Lines | Other | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Operating Revenue | $ — | $ 758 | $ 7,183 | $ (25) | $ 7,916 |
| Operating Expense | (241) | 720 | 6,443 | (25) | 6,897 |
| Operating Income (Loss) | 241 | 38 | 740 | — | 1,019 |
| Equity in Earnings of Subsidiaries | 549 | — | — | (549) | — |
| Other Income (Expense) | (24) | 5 | 119 | (22) | 78 |
| Interest Expense | 394 | 7 | 96 | (52) | 445 |
| Earnings from Continuing Operations before Income Taxes | 372 | 36 | 763 | (519) | 652 |
| Income Tax Expense (Benefit) | (52) | 14 | 280 | — | 242 |
| Earnings from Continuing Operations | 424 | 22 | 483 | (519) | 410 |
| Discontinued Operations — Net of Tax | — | — | 87 | (30) | 57 |
| Cumulative Effect of Accounting Change — Net of Tax | — | — | (43) | — | (43) |
| **Net Earnings** | $ 424 | $ 22 | $ 527 | $ (549) | $ 424 |



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

Table of Contents

**CSX CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**Consolidating Balance Sheet**

| December 31, 2004 | CSX Corporation | CSX Vessel Leasing | Other | Eliminations | Consolidated |
|---|---|---|---|---|---|
| | | | (Dollars in millions) | | |
| **ASSETS** | | | | | |
| Current Assets: | | | | | |
| Cash, Cash Equivalents and Short-term Investments | $ 1,110 | $ 46 | $ (297) | $ — | $ 859 |
| Accounts Receivable — Net | (482) | 19 | 1,631 | (25) | 1,143 |
| Materials and Supplies | — | — | 165 | — | 165 |
| Deferred Income Taxes | 9 | — | 11 | — | 20 |
| Other Current Assets | — | — | 283 | (126) | 157 |
| International Terminals Assets Held for Sale | — | — | 787 | (144) | 643 |
| Total Current Assets | 637 | 65 | 2,580 | (295) | 2,987 |
| Properties | 25 | — | 25,827 | — | 25,852 |
| Accumulated Depreciation | (24) | — | (5,883) | — | (5,907) |
| Properties — Net | 1 | — | 19,944 | — | 19,945 |
| Investment in Conrail | — | — | 574 | — | 574 |
| Affiliates and Other Companies | — | — | 306 | (10) | 296 |
| Investment in Consolidated Subsidiaries | 13,078 | — | — | (13,078) | — |
| Other Long-term Assets | 1,345 | — | (352) | (214) | 779 |
| Total Assets | $ 15,061 | $ 65 | $ 23,052 | $ (13,597) | $ 24,581 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | | | |
| Current Liabilities: | | | | | |
| Accounts Payable | $ 88 | $ 19 | $ 796 | $ (24) | $ 879 |
| Labor and Fringe Benefits Payable | 23 | — | 348 | — | 371 |
| Payable to Affiliates | — | — | 126 | (126) | — |
| Casualty, Environmental and Other Reserves | — | — | 312 | — | 312 |
| Current Maturities of Long-term Debt | 839 | — | 144 | — | 983 |
| Short-term Debt | 100 | — | 1 | — | 101 |
| Income and Other Taxes Payable | 1,487 | — | (1,317) | — | 170 |
| Other Current Liabilities | 18 | — | 98 | (1) | 115 |
| International Terminals Assets Held for Sale | — | — | 395 | (9) | 386 |
| Total Current Liabilities | 2,555 | 19 | 903 | (160) | 3,317 |
| Casualty, Environmental and Other reserves | — | — | 735 | — | 735 |
| Long-term Debt | 5,021 | — | 1,213 | — | 6,234 |
| Deferred Income Taxes | — | — | 5,979 | — | 5,979 |
| Long-term Payable to Affiliates | 107 | — | 108 | (215) | — |
| Other Long-term Liabilities | 567 | 37 | 933 | (32) | 1,505 |
| Total Liabilities | $ 8,250 | $ 56 | $ 9,871 | $ (407) | $ 17,770 |
| Shareholders' Equity: | | | | | |
| Preferred Stock | — | — | 107 | (107) | — |
| Common Stock | 216 | — | 189 | (189) | 216 |
| Other Capital | 1,605 | 1 | 8,107 | (8,108) | 1,605 |
| Retained Earnings | 5,210 | 8 | 4,706 | (4,714) | 5,210 |
| Accumulated Other Comprehensive Loss | (220) | — | 72 | (72) | (220) |
| Total Shareholders' Equity | 6,811 | 9 | 13,181 | (13,190) | 6,811 |
| Total Liabilities and Shareholders' Equity | $ 15,061 | $ 65 | $ 23,052 | $ (13,597) | $ 24,581 |



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

## CSX CORPORATION

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

### Consolidating Balance Sheet

| December 26, 2003 | CSX Corporation | CSX Vessel Leasing | Other | Eliminations | Consolidated |
|---|---|---|---|---|---|
| | | | (Dollars in millions) | | |
| **ASSETS** | | | | | |
| Current Assets: | | | | | |
| Cash, Cash Equivalents and Short-term Investments | $ 1,210 | $ 45 | $ (887) | $ — | $ 368 |
| Accounts Receivable — Net | 45 | 15 | 1,078 | (23) | 1,115 |
| Materials and Supplies | — | — | 168 | — | 168 |
| Deferred Income Taxes | 12 | — | 124 | — | 136 |
| Other Current Assets | 6 | — | 195 | (137) | 64 |
| International Terminals Assets Held for Sale | — | | 952 | (506) | 446 |
| Total Current Assets | 1,273 | 60 | 1,630 | (666) | 2,297 |
| Properties | 25 | — | 19,062 | — | 19,087 |
| Accumulated Depreciation | (24) | — | (5,429) | — | (5,453) |
| Properties — Net | 1 | — | 13,633 | — | 13,634 |
| Investment in Conrail | 331 | — | 4,347 | — | 4,678 |
| Affiliates and Other Companies | — | — | 263 | (38) | 225 |
| Investment in Consolidated Subsidiaries | 12,633 | — | — | (12,633) | — |
| Other Long-term Assets | 1,112 | — | 338 | (524) | 926 |
| Total Assets | $ 15,350 | $ 60 | $ 20,211 | $ (13,861) | $ 21,760 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | | | |
| Current Liabilities: | | | | | |
| Accounts Payable | $ 88 | $ — | $ 755 | $ (22) | $ 821 |
| Labor and Fringe Benefits Payable | 6 | — | 382 | — | 388 |
| Payable to Affiliates | — | — | 137 | (137) | — |
| Casualty, Environmental and Other Reserves | 5 | — | 275 | — | 280 |
| Current Maturities of Long-term Debt | 300 | — | 126 | — | 426 |
| Short-term Debt | — | — | 2 | — | 2 |
| Income and Other Taxes Payable | 1,464 | — | (1,349) | (1) | 114 |
| Other Current Liabilities | 21 | 8 | 115 | — | 144 |
| International Terminals Assets Held for Sale | — | — | 232 | (33) | 199 |
| Total Current Liabilities | 1,884 | 8 | 675 | (193) | 2,374 |
| Casualty, Environmental and Other reserves | — | — | 836 | — | 836 |
| Long-term Debt | 6,085 | — | 801 | — | 6,886 |
| Deferred Income Taxes | (39) | — | 3,746 | — | 3,707 |
| Long-term Payable to Affiliates | 396 | — | 128 | (524) | — |
| Other Long-term Liabilities | 576 | 48 | 970 | (85) | 1,509 |
| Total Liabilities | $ 8,902 | $ 56 | $ 7,156 | $ (802) | $ 15,312 |
| Shareholders' Equity: | | | | | |
| Preferred Stock | — | — | 396 | (396) | — |
| Common Stock | 215 | — | 209 | (209) | 215 |
| Other Capital | 1,579 | 1 | 8,052 | (8,053) | 1,579 |
| Retained Earnings | 4,957 | 3 | 4,398 | (4,401) | 4,957 |
| Accumulated Other Comprehensive Loss | (303) | — | — | — | (303) |
| Total Shareholders' Equity | 6,448 | 4 | 13,055 | (13,059) | 6,448 |
| Total Liabilities and Shareholders' Equity | $ 15,350 | $ 60 | $ 20,211 | $ (13,861) | $ 21,760 |



Source: CSX CORP, 10-K, March 08, 2005
Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**Consolidating Cash Flow Statements**
**Fiscal Year Ended December 31, 2004**

| | CSX Corporation | CSX Vessel Leasing | Other | Eliminations | Consolidated |
|---|---|---|---|---|---|
| | | | (Dollars in millions) | | |
| **Operating Activities** | | | | | |
| *Net Cash Provided (Used) by Operating Activities* | $ (93) | $ 1 | $ 1,668 | $ (130) | $ 1,446 |
| **Investing Activities** | | | | | |
| Property Additions | — | — | (1,030) | — | (1,030) |
| Net Proceeds from Divestitures | — | — | 55 | — | 55 |
| Short-term Investments — Net | (247) | — | — | — | (247) |
| Other Investing Activities | 84 | — | 719 | (821) | (18) |
| *Net Cash Provided (Used) by Investing Activities* | (163) | — | (256) | (821) | (1,240) |
| **Financing Activities** | | | | | |
| Short-term Debt — Net | 100 | — | (1) | — | 99 |
| Long-term Debt Issued | 406 | — | (5) | — | 401 |
| Long-term Debt Repaid | (303) | — | (131) | — | (434) |
| Dividends Paid | (88) | — | (197) | 199 | (86) |
| Other Financing Activities | (206) | — | (506) | 752 | 40 |
| *Net Cash Provided (Used) by Financing Activities* | (91) | — | (840) | 951 | 20 |
| **Net Increase (Decrease) in Cash and Cash Equivalents** | (347) | 1 | 572 | — | 226 |
| **Cash and Cash Equivalents at Beginning of Period** | 1,163 | 45 | (912) | — | 296 |
| **Cash and Cash Equivalents at End of Period** | $ 816 | $ 46 | $ (340) | $ — | $ 522 |



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

CSX CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

**Consolidating Cash Flow Statements**
**Fiscal Year Ended December 26, 2003**

| | CSX Corporation | CSX Vessel Leasing | Other | Eliminations | Consolidated |
|---|---|---|---|---|---|
| | | | (Dollars in millions) | | |
| **Operating Activities** | | | | | |
| *Net Cash Provided (Used) by Operating Activities* | $ 41 | $ — | $ 1,004 | $ (241) | $ 804 |
| **Investing Activities** | | | | | |
| Property Additions | — | — | (1,059) | — | (1,059) |
| Net Proceeds from Divestitures | 214 | — | 12 | — | 226 |
| Short-term Investments — Net | 69 | — | — | — | 69 |
| Other Investing Activities | 29 | — | 207 | (279) | (43) |
| *Net Cash Provided (Used) by Investing Activities* | 312 | — | (840) | (279) | (807) |
| **Financing Activities** | | | | | |
| Short-term Debt — Net | (140) | — | (1) | — | (141) |
| Long-term Debt Issued | 919 | — | — | — | 919 |
| Long-term Debt Repaid | (175) | — | (325) | — | (500) |
| Dividends Paid | (86) | — | (239) | 239 | (86) |
| Other Financing Activities | 29 | 61 | (391) | 281 | (20) |
| *Net Cash Provided (Used) by Financing Activities* | 547 | 61 | (956) | 520 | 172 |
| **Net Increase (Decrease) in Cash and Cash Equivalents** | 900 | 61 | (792) | — | 169 |
| **Cash and Cash Equivalents at Beginning of Period** | 263 | (16) | (120) | — | 127 |
| **Cash and Cash Equivalents at End of Period** | $ 1,163 | $ 45 | $ (912) | $ — | $ 296 |



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

**Consolidating Cash Flow Statements**
**Fiscal Year Ended December 27, 2002**

| | CSX Corporation | CSX Vessel Leasing | Other | Eliminations | Consolidated |
|---|---|---|---|---|---|
| | | | (Dollars in millions) | | |
| **Operating Activities** | | | | | |
| *Net Cash Provided (Used) by Operating Activities* | $ 288 | $ 15 | $ 1,041 | $ (217) | $ 1,127 |
| **Investing Activities** | | | | | |
| Property Additions | (4) | (19) | (1,057) | — | (1,080) |
| Net Proceeds from Divestitures | — | — | — | — | — |
| Short-term Investments — Net | 135 | (26) | 241 | — | 350 |
| Other Investing Activities | (10) | 14 | (29) | (20) | (45) |
| *Net Cash Provided (Used) by Investing Activities* | 121 | (31) | (845) | (20) | (775) |
| **Financing Activities** | | | | | |
| Short-term Debt — Net | 140 | — | — | — | 140 |
| Long-term Debt Issued | 746 | — | 2 | — | 748 |
| Long-term Debt Repaid | (950) | — | (209) | — | (1,159) |
| Dividends Paid | (86) | — | (209) | 209 | (86) |
| Other Financing Activities | 29 | — | (62) | 28 | (5) |
| *Net Cash Provided (Used) by Financing Activities* | (121) | — | (478) | 237 | (362) |
| **Net Increase (Decrease) in Cash and Cash Equivalents** | 288 | (16) | (282) | — | (10) |
| **Cash and Cash Equivalents at Beginning of Period** | (25) | — | 162 | — | 137 |
| **Cash and Cash Equivalents at End of Period** | $ 263 | $ (16) | $ (120) | $ — | $ 127 |




Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

## NOTE 22. Quarterly Financial Data (Unaudited)(a)(b)

| Quarter | 2004 1st | 2004 2nd | 2004 3rd | 2004 4th | 2003 1st | 2003 2nd | 2003 3rd | 2003 4th |
|---|---|---|---|---|---|---|---|---|
| | (Dollars in millions, except per share amounts) | | | | | | | |
| Operating Revenue | $ 1,915 | $ 1,995 | $ 1,938 | $ 2,172 | $ 1,960 | $ 1,887 | $ 1,823 | $ 1,896 |
| Operating Expense | 1,763 | 1,714 | 1,688 | 1,855 | 1,808 | 1,628 | 1,951 | 1,659 |
| Operating Income | 152 | 281 | 250 | 317 | 152 | 259 | (128) | 237 |
| Other Income (Expense) | (4) | 6 | 32 | 38 | — | 28 | 30 | 35 |
| Interest Expense | 108 | 109 | 106 | 112 | 103 | 105 | 103 | 107 |
| Earnings from Continuing Operations before Income Taxes | 40 | 178 | 176 | 243 | 49 | 182 | (201) | 165 |
| Income Tax Expense | 13 | 60 | 62 | 84 | 17 | 68 | (80) | 53 |
| Earnings from Continuing Operations | 27 | 118 | 114 | 159 | 32 | 114 | (121) | 112 |
| Discontinued Operations — Net of Tax | 4 | 1 | 9 | (93) | 10 | 13 | 18 | 11 |
| Cumulative Effect of Accounting Change — Net of Tax | — | — | — | — | 57 | — | — | — |
| Net Earnings | $ 31 | $ 119 | $ 123 | $ 66 | $ 99 | $ 127 | $ (103) | $ 123 |
| Earnings Per Share: | | | | | | | | |
| From Continuing Operations | $ 0.12 | $ 0.55 | $ 0.53 | $ 0.74 | $ 0.15 | $ 0.53 | $ (0.56) | $ 0.52 |
| Discontinued Operations | 0.02 | — | 0.04 | (0.43) | 0.05 | 0.06 | 0.08 | 0.05 |
| Cumulative Effect of Accounting Change | — | — | — | — | 0.26 | — | — | — |
| Net Earnings | $ 0.14 | $ 0.55 | $ 0.57 | $ 0.31 | $ 0.46 | $ 0.59 | $ (0.48) | $ 0.57 |
| Earnings Per Share Assuming Dilution: | | | | | | | | |
| From Continuing Operations | $ 0.12 | $ 0.53 | $ 0.51 | $ 0.71 | $ 0.15 | $ 0.51 | $ (0.56) | $ 0.50 |
| Discontinued Operations | 0.02 | — | 0.04 | (0.41) | 0.05 | 0.06 | $ 0.08 | 0.05 |
| Cumulative Effect of Accounting Change | — | — | — | — | 0.25 | — | — | — |
| Net Earnings | $ 0.14 | $ 0.53 | $ 0.55 | $ 0.30 | $ 0.45 | $ 0.57 | $ (0.48) | $ 0.55 |
| Dividend Per Share | $ 0.10 | $ 0.10 | $ 0.10 | $ 0.10 | $ 0.10 | $ 0.10 | $ 0.10 | $ 0.10 |
| Market Price | | | | | | | | |
| High | $ 36.26 | $ 33.04 | $ 34.28 | $ 40.46 | $ 30.85 | $ 33.16 | $ 32.99 | $ 36.29 |
| Low | $ 28.80 | $ 29.28 | $ 29.96 | $ 33.09 | $ 25.50 | $ 28.20 | $ 28.92 | $ 29.07 |

(a) Periods presented are 13 week quarters, except for the fourth quarter of 2004, which was 14 weeks.

(b) All periods presented have been restated for Discontinued Operations.



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

Table of Contents

**Item 9.** ***Changes in and Disagreements with Accountants on Accounting and Financial Disclosure***

None.

**Item 9A.** ***Controls and Procedures***

**Evaluation of Disclosure Controls and Procedures**

As of the end of the period covered by this report, CSX carried out an evaluation, under the supervision and with the participation of management, including the Company's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of the Company's disclosure controls and procedures.

As of December 31, 2004, under the supervision and with the participation of the Company's Chief Executive Officer (CEO) and the Chief Financial Officer (CFO), management has evaluated the effectiveness of the design and operation of the Company's disclosure controls and procedures. Based on that evaluation, the CEO and CFO concluded that the Company's disclosure controls and procedures were effective as of December 31, 2004. There were no changes in the Company's internal controls over financial reporting during the fourth quarter of 2004 that have materially affected or are reasonably likely to materially affect the Company's internal control over financial reporting.

**Management's Report on Internal Control over Financial Reporting**

CSX's management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rules 13a-15(f) and 15d-15(f). Under the supervision and with the participation of the management of CSX, including the Company's Chief Executive Officer and Chief Financial Officer, CSX conducted an evaluation of the effectiveness of the Company's internal control over financial reporting as of December 31, 2004 based on the framework in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on that evaluation, management of CSX concluded that the Company's internal control over financial reporting was effective as of December 31, 2004.

Management's assessment of the effectiveness of the Company's internal control over financial reporting as of December 31, 2004 has been audited by Ernst & Young LLP, an independent registered public accounting firm, as stated in their report which is included elsewhere herein.

**Changes in Internal Control over Financial Reporting**

There were no changes in the Company's internal control over financial reporting

**Item 9B.** ***Other Information***

None.

**PART III**

**Item 10.** ***Directors and Executive Officers of the Registrant***

In accordance with Instruction G(3) of Form 10-K, the information required by this Item is incorporated herein by reference to the Proxy Statement, except for the information regarding the executive officers of the Registrant which is included in Part I of this report under the caption "Executive Officers of the Registrant."



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

**Item 11.** ***Executive Compensation***

In accordance with Instruction G(3) of Form 10-K, the information required by this Item is incorporated herein by reference to the Proxy Statement.

**Item 12.** ***Security Ownership of Certain Beneficial Owners and Management***

In accordance with Instruction G(3) of Form 10-K, the information required by this Item is incorporated herein by reference to the Proxy Statement.

**Item 13.** ***Certain Relationships and Related Transactions***

In accordance with Instruction G(3) of Form 10-K, the information required by this Item is incorporated herein by reference to the Proxy Statement.

**Item 14.** ***Principal Accounting Fees and Services***

In accordance with Instruction G(3) of Form 10-K, the information required by this Item is incorporated herein by reference to the Proxy Statement.

## PART IV

**Item 15.** ***Exhibits and Financial Statement Schedules***

*(a)(1) Financial Statements*

See Index to Consolidated Financial Statements on page 43.

*(2) Financial Statement Schedules*

The information required by Rule 3-09 is included in Note 2 to the Consolidated Financial Statements, "Investment in and Integrated Rail Operations with Conrail." The information required by Schedule II is included in Note 9 to the Consolidated Financial Statements, "Casualty, Environmental and Other Reserves." All other financial statement schedules are not applicable.

*(3) Exhibits*

| | |
|---|---|
| 2.1 | Distribution Agreement, dated as of July 26, 2004, by and among CSX Corporation, CSX Transportation, Inc., CSX Rail Holding Corporation, CSX Northeast Holding Corporation, Norfolk Southern Corporation, Norfolk Southern Railway Company, CRR Holdings LLC, Green Acquisition Corp., Conrail Inc., Consolidated Rail Corporation, New York Central Lines LLC, Pennsylvania Lines LLC, NYC Newco, Inc. and PRR Newco, Inc. (incorporated herein by reference to Exhibit 2.1 to the Registrant's Current Report on Form 8-K filed with the Commission on September 2, 2004) |
| 3.1 | Amended and Restated Articles of Incorporation of the Registrant (incorporated herein by reference to Exhibit 3.1 to the Registrant's Current Report on Form 8-K filed with the Commission on December 14, 2004) |
| 3.2 | Bylaws of the Registrant, amended as of May 7, 2003 (incorporated herein by reference to Exhibit 3.2 of the Registrant's Current Report on Form 8-K filed with the Commission on December 14, 2004) |
| 4.1(a) | Indenture, dated August 1, 1990, between the Registrant and The Chase Manhattan Bank, as Trustee (incorporated herein by reference to the Registrant's Form SE, dated September 7, 1990, filed with the Commission) |
| 4.1(b) | First Supplemental Indenture, dated as of June 15, 1991, between the Registrant and The Chase Manhattan Bank, as Trustee (incorporated herein by reference to Exhibit 4(c) to the Registrant's Form SE, dated May 28, 1992, filed with the Commission) |



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

| | |
|---|---|
| 4.1(c) | Second Supplemental Indenture, dated as of May 6, 1997, between the Registrant and The Chase Manhattan Bank, as Trustee (incorporated herein by reference to Exhibit 4.3 to the Registrant's Registration Statement on Form S-4 (Registration No. 333-28523) filed with the Commission on June 5, 1997) |
| 4.1(d) | Third Supplemental Indenture, dated as of April 22, 1998, between the Registrant and The Chase Manhattan Bank, as Trustee (incorporated herein by reference to Exhibit 4.2 to the Registrant's Current Report on Form 8-K filed with the Commission on May 12, 1998) |
| 4.1(e) | Fourth Supplemental Indenture, dated as of October 30, 2001, between the Registrant and The Chase Manhattan Bank, as Trustee (incorporated herein by reference to Exhibit 4.1 to the Registrant's Report on Form 10-Q filed with the Commission on November 7, 2001) |
| 4.1(f) | Fifth Supplemental Indenture, dated as of October 27, 2003 between the Registrant and The Chase Manhattan Bank, as Trustee (incorporated herein by reference to Exhibit 4.1 to the Registrant's Report on Form 8-K filed with the Commission on October 27, 2003) |
| 4.1(g) | Sixth Supplemental Indenture, dated as of September 23, 2004 between the Registrant and JP Morgan Chase Bank, formerly The Chase Manhattan Bank, as Trustee (incorporated herein by reference to Exhibit 4.1 to the Registrant's Report on Form 10-Q filed with the Commission on November 3, 2004) |

Pursuant to Regulation S-K, Item 601(b)(4)(iii), instruments that define the rights of holders of the Registrant's long-term debt securities, where the long-term debt securities authorized under each such instrument do not exceed 10% of the Registrant's total assets, have been omitted and will be furnished to the Commission upon request.

| | |
|---|---|
| 10.1 | CSX Stock Plan for Directors (as amended through January 1, 2004) (incorporated herein by reference to Exhibit 10.1 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 10, 2004)** |
| 10.2 | Corporate Director Deferred Compensation Plan (as amended through January 1, 2004) (incorporated herein by reference to Exhibit 10.2 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 10, 2004)** |
| 10.3 | CSX Corporation 2002 Corporate Director Deferred Compensation Plan (as amended through January 1, 2004) (incorporated herein by reference to Exhibit 10.3 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 10, 2004)** |
| 10.4 | CSX Directors' Charitable Gift Plan, as amended (incorporated herein by reference to Exhibit 10.4 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 4, 1994)** |
| 10.5 | CSX Directors' Matching Gift Plan (as amended through December 31, 2003) (incorporated herein by reference to Exhibit 10.5 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 10, 2004)** |
| 10.6 | Special Employment Agreement with M. J. Ward (incorporated herein by reference to Exhibit 10.6 to the Registrant's Report on Form 10-Q filed with the Commission on November 7, 2001)** |
| 10.7 | Restricted Stock Award Agreement with M. J. Ward (incorporated herein by reference to Exhibit 10.7 to the Registrant's Report on Form 10-Q filed with the Commission on November 7, 2001)** |
| 10.8 | Railroad Retirement Benefits Agreement with M. J. Ward (incorporated herein by reference to Exhibit 10.13 to the Registrant's Report on Form 10-K filed with the Commission on February 26, 2003)** |
| 10.9 | Employment Agreement with O. Munoz (incorporated herein by reference to Exhibit 10.1 to the Registrant's Report on Form 10-Q filed with the Commission on July 30, 2003)** |
| 10.10 | Restricted Stock Award Agreement with O. Munoz (incorporated herein by reference to Exhibit 10.2 to the Registrant's Report on Form 10-Q filed with the Commission on July 30, 2003)** |



Source: CSX CORP, 10-K, March 08, 2005
Powered by Morningstar® Document Research℠

| | |
|---|---|
| 10.11 | Form of Employment Agreement with executive officers (incorporated herein by reference to Exhibit 10.1 of the Registrant's Current Report on Form 8-K filed with the Commission on January 6, 2005)** |
| 10.12 | Form of Stock Option Agreement (incorporated herein by reference to Exhibit 10.17 of the Registrant's Report on Form 10-K filed with the Commission on March 4, 2002)** |
| 10.13 | 1987 Long-Term Performance Stock Plan, as Amended and Restated effective April 25, 1996 (as amended through February 7, 2003) (incorporated herein by reference to Exhibit 10.24 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 10, 2004)** |
| 10.14 | Deferred Compensation Program for Executives of CSX Corporation and Affiliated Companies (as amended through January 1, 1998) (incorporated herein by reference to Exhibit 10.25 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 10, 2004)** |
| 10.15 | 2002 Deferred Compensation Plan of CSX Corporation and Affiliated Corporations (as amended through February 7, 2003) (incorporated herein by reference to Exhibit 10.26 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 10, 2004)** |
| 10.16 | Supplementary Savings Plan and Incentive Award Deferral Plan for Eligible Executives of CSX Corporation and Affiliated Companies (as Amended through February 7, 2003) (incorporated herein by reference to Exhibit 10.27 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 10, 2004)** |
| 10.17 | Special Retirement Plan of CSX Corporation and Affiliated Companies (as amended through February 14, 2001) (incorporated herein by reference to Exhibit 10.23 to the Registrant's Report on Form 10-K filed with the Commission on March 4, 2002)** |
| 10.18 | Supplemental Retirement Benefit Plan of CSX Corporation and Affiliated Companies (as amended through February 14, 2001) (incorporated herein by reference to Exhibit 10.24 of the Registrant's Report on Form 10-K filed with the Commission on March 4, 2002)** |
| 10.19 | Senior Executive Incentive Compensation Plan (incorporated herein by reference to Appendix B to the Registrant's Definitive Proxy Statement filed with the Commission on March 17, 2000)** |
| 10.20 | CSX Omnibus Incentive Plan (as Amended through February 14, 2001) (incorporated herein by reference to Exhibit 10.26 to the Registrant's Report on Form 10-K filed with the Commission on March 4, 2002)** |
| 10.21 | 1990 Stock Award Plan as Amended and Restated Effective February 14, 1996 (as amended through September 8, 1999) (incorporated herein by reference to Exhibit 10.24 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 7, 2000)** |
| 10.22 | Transaction Agreement, dated as of June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation, and CRR Holdings LLC, with certain schedules thereto (incorporated herein by reference to Exhibit 10 to the Registrant's Current Report on Form 8-K filed with the Commission on July 8, 1997) |
| 10.23 | Amendment No. 1, dated as of August 22, 1998, to the Transaction Agreement, dated as of June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation, and CRR Holdings LLC (incorporated herein by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed with the Commission on June 11, 1999) |
| 10.24 | Amendment No. 2, dated as of June 1, 1999, to the Transaction Agreement, dated as of June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation, and CRR Holdings, LLC (incorporated herein by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed with the Commission on June 11, 1999) |



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

| | |
|---|---|
| 10.25 | Amendment No. 3, dated as of August 1, 2000, to the Transaction Agreement, dated as of June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation, and CRR Holdings LLC (incorporated herein by reference to Exhibit 10.34 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 1, 2001) |
| 10.26 | Amendment, dated and effective as of June 1, 1999, and executed in April 2004, to the Transaction Agreement, dated as of June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation, and CRR Holdings LLC (incorporated herein by reference to Exhibit 99.1 to the Registrant's Current Report on Form 8-K filed with the Commission on August 6, 2004) |
| 10.27 | Amendment No. 5, dated as of August 27, 2004, to the Transaction Agreement, dated as of June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation and CRR Holdings LLC (incorporated herein by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed with the Commission on September 2, 2004) |
| 10.28 | Operating Agreement Termination Agreement, dated as of August 27, 2004, between New York Central Lines LLC and CSX Transportation, Inc. (incorporated herein by reference to Exhibit 10.3 to the Registrant's Current Report on Form 8-K filed with the Commission on September 2, 2004) |
| 10.29 | Shared Assets Area Operating Agreement for North Jersey, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibit thereto (incorporated herein by reference to Exhibit 10.4 to the Registrant's Current Report on Form 8-K filed with the Commission on June 11, 1999) |
| 10.30 | Shared Assets Area Operating Agreement for Southern Jersey/ Philadelphia, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibit thereto (incorporated herein by reference to Exhibit 10.5 to the Registrant's Current Report on Form 8-K filed with the Commission on June 11, 1999) |
| 10.31 | Shared Assets Area Operating Agreement for Detroit, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Corporation, with exhibit thereto (incorporated herein by reference to Exhibit 10.6 to the Registrant's Current Report on Form 8-K filed with the Commission on June 11, 1999) |
| 10.32 | Monongahela Usage Agreement, dated as of June 1, 1999, by and among CSX Transportation, Inc., Norfolk Southern Railway Company, Pennsylvania Lines LLC and New York Central Lines LLC, with exhibit thereto (incorporated herein by reference to Exhibit 10.7 to the Registrant's Current Report on Form 8-K filed with the Commission on June 11, 1999) |
| 10.33 | Tax Allocation Agreement, dated as of August 27, 2004, by and among CSX Corporation, Norfolk Southern Corporation, Green Acquisition Corp., Conrail Inc., Consolidated Rail Corporation, New York Central Lines LLC and Pennsylvania Lines LLC (incorporated herein by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed with the Commission on September 2, 2004) |
| 10.34 | Employment Agreement with T. L. Ingram, dated as of March 15, 2004 (incorporated herein by reference to Exhibit 10.1 to the Registrant's Report on Form 10-Q filed with the Commission on April 30, 2004)** |
| 10.35 | Restricted Stock Award Agreement with T. L. Ingram (incorporated herein by reference to Exhibit 10.1 to the Registrant's Report on Form 10-Q filed with the Commission on July 29, 2004)** |
| 10.36 | Stock Purchase Agreement, dated as of December 8, 2004, by and between CSX Corporation and Dubai Ports International FZE (incorporated herein by reference to Exhibit 2.1 to the Registrant's Current Report on Form 8-K filed with the Commission on December 13, 2004) |



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

| | |
|---|---|
| 10.37 | Special Employment Agreement with A.B. Fogarty, dated as of December 13, 2004 (incorporated herein by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed with the Commission on December 14, 2004)** |
| 10.38 | Amendment No. 1, dated as of December 13, 2004, to Employment Agreement with T. L. Ingram, dated as of March 15, 2004 (incorporated herein by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed with the Commission on December 14, 2004)** |
| 10.39 | Omnibus Closing Agreement, by and between CSX Corporation and Dubai Ports International FZE dated February 22, 2005 (incorporated herein by reference to Exhibit 2.1 to the Registrant's Current Report on Form 8-K filed with the Commission on February 25, 2005) |
| 12* | Computation of Ratio of Earnings to Fixed Charges |
| 14 | Code of Ethics (incorporated herein by reference to Exhibit 14 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 10, 2004) |
| 21* | Subsidiaries of the Registrant |
| 23.1* | Consent of Ernst & Young LLP |
| 24* | Powers of Attorney |
| 31.1* | Principal Executive Officer Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 31.2* | Principal Financial Officer Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32.1* | Principal Executive Officer Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 32.2* | Principal Financial Officer Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |

* Filed herewith
** Management Contract or Compensatory Plan or Arrangement



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

CSX CORPORATION
(Registrant)

By: /s/ CAROLYN T. SIZEMORE

Carolyn T. Sizemore
Vice President and Controller
(Principal Accounting Officer)

Dated: March 8, 2005

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities indicated on March 8, 2005.

| Signature | Title |
|---|---|
| * <br> Michael J. Ward | Chairman of the Board, President, Chief Executive Officer and Director (Principal Executive Officer) |
| * <br> Oscar Munoz | Executive Vice President and Chief Financial Officer (Principal Financial Officer) |
| /s/ CAROLYN T. SIZEMORE <br> Carolyn T. Sizemore | Vice President and Controller (Principal Accounting Officer) |
| *By: /s/ ELLEN M. FITZSIMMONS <br> Ellen M. Fitzsimmons | Senior Vice President — Law and Public Affairs Attorney-in-Fact |
| /s/ ELIZABETH E. BAILEY <br> Elizabeth E. Bailey | Director |
| /s/ ROBERT L. BURRUS JR. <br> Robert L. Burrus Jr. | Director |
| /s/ EDWARD J. KELLY III <br> Edward J. Kelly III | Director |
| /s/ ROBERT D. KUNISCH <br> Robert D. Kunisch | Director |
| /s/ SOUTHWOOD J. MORCOTT <br> Southwood J. Morcott | Director |



Source: CSX CORP, 10-K, March 08, 2005 Powered by Morningstar® Document Research℠

Table of Contents

| Signature | Title |
| --- | --- |
| /s/ DAVID M. RATCLIFFE<br>David M. Ratcliffe | Director |
| /s/ CHARLES E. RICE<br>Charles E. Rice | Director |
| /s/ WILLIAM C. RICHARDSON<br>William C. Richardson | Director |
| /s/ FRANK S. ROYAL M.D.<br>Frank S. Royal M.D. | Director |
| /s/ DONALD J. SHEPARD<br>Donald J. Shepard | Director |



Source: CSX CORP, 10-K, March 08, 2005
Powered by Morningstar® Document Research℠

Powered by Morningstar® Document Research℠

Exhibit 12

Computation of Earnings to Fixed Charges
CSX Corporation
Ratio of Earnings to Fixed Charges
(Millions of Dollars)

| | FOR THE FISCAL YEARS ENDED | | | | |
|---|---|---|---|---|---|
| | Dec. 31, 2004 | Dec. 26, 2003 | DEC. 27, 2002 | DEC. 28, 2001 | DEC. 29, 2000 |
| Earnings: | | | | | |
| Earnings before Income Taxes | $ 637 | $ 195 | $ 652 | $ 374 | $ 194 |
| Interest Expense | 435 | 418 | 445 | 518 | 543 |
| Amortization of debt discount | 9 | 4 | 4 | — | — |
| Interest Portion of Fixed Rent | 46 | 62 | 77 | 88 | 109 |
| Undistributed earnings of unconsolidated subsidiaries | (139) | (32) | (38) | (8) | (26) |
| Earnings, as Adjusted | $ 988 | $ 647 | $ 1,140 | $ 972 | $ 820 |
| Fixed Charges: | | | | | |
| Interest Expense | $ 435 | $ 418 | $ 445 | $ 518 | $ 543 |
| Capitalized Interest | 3 | 3 | 3 | 7 | 6 |
| Amortization of Debt Discount | 9 | 4 | 4 | — | — |
| Interest Portion of Fixed Rent | 46 | 62 | 77 | 88 | 109 |
| Fixed Charges | $ 493 | $ 487 | $ 529 | $ 613 | $ 658 |
| Ratio of Earnings to Fixed Charges | 2.0 x | 1.3 x | 2.2 x | 1.6 x | 1.2 x |


Powered by Morningstar® Document Research℠

Powered by Morningstar® Document Research℠

**Exhibit 21**

**Subsidiaries of the Registrant**

As of December 31, 2004, the Registrant was the beneficial owner of 100% of the common stock of the following significant subsidiaries:

CSX Transportation, Inc. (a Virginia corporation)
CSX Intermodal, Inc. (a Delaware corporation)

As of December 31, 2004, none of the other subsidiaries included in the Registrant's consolidated financial statements constitute a significant subsidiary.


Powered by Morningstar® Document Research℠

Powered by Morningstar® Document Research℠

EXHIBIT 23.1

Consent of Independent Registered Public Accounting Firm

We consent to the incorporation by reference in the following Registration Statements:

- Registration Statement (Form S-3 No. 33-2084)
- Registration Statement (Form S-3 No. 333-113637)
- Registration Statement (Form S-8 No. 33-16230)
- Registration Statement (Form S-8 No. 33-25537)
- Registration Statement (Form S-8 No. 33-29136)
- Registration Statement (Form S-8 No. 33-33853)
- Registration Statement (Form S-8 No. 33-33854)
- Registration Statement (Form S-8 No. 33-37449)
- Registration Statement (Form S-8 No. 33-41498)
- Registration Statement (Form S-8 No. 33-41499)
- Registration Statement (Form S-8 No. 33-41735)
- Registration Statement (Form S-8 No. 33-47655)
- Registration Statement (Form S-8 No. 33-57029)
- Registration Statement (Form S-8 No. 333-09213)
- Registration Statement (Form S-8 No. 333-73429)
- Registration Statement (Form S-8 No. 333-32008)
- Registration Statement (Form S-8 No. 333-43382)
- Registration Statement (Form S-8 No. 333-48896)
- Registration Statement (Form S-8 No. 333-66604)
- Registration Statement (Form S-8 No. 333-110589)

of our report dated March 2, 2005, with respect to the consolidated financial statements of CSX Corporation, included herein, and our report dated March 2, 2005 with respect to CSX Corporation's management's assessment of the effectiveness of internal control over financial reporting and the effectiveness of internal control over financial reporting of CSX Corporation included in this Annual Report (Form 10-K) for CSX Corporation.

/s/ Ernst & Young LLP

Jacksonville, Florida
March 2, 2005


Powered by Morningstar® Document Research℠

Exhibit 24

POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS that each of the undersigned officers and directors of CSX CORPORATION, a Virginia Corporation, which is to file with the Securities and Exchange Commission, Washington, D. C., a Form 10-K (Annual Report), hereby constitutes and appoints Carolyn T. Sizemore and Ellen M. Fitzsimmons his true and lawful attorneys-in-fact and agents, for him and in his name, place and stead to sign said Form 10-K, and any and all amendments thereto, with power where appropriate to affix the corporate seal of CSX Corporation thereto and to attest said seal, and to file said Form 10-K, and any and all other documents in connection therewith, with the Securities and Exchange Commission, hereby granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform any and all acts and things requisite and necessary to be done in and about the premises as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or either of them, may lawfully do or cause to be done by virtue hereof.

IN WITNESS WHEREOF, the undersigned have hereunto set their hands this 7th day of March 2005.

/s/ Elizabeth E. Bailey
Elizabeth E. Bailey

/s/ Robert L. Burrus, Jr.
Robert L. Burrus, Jr.

/s/ Edward J. Kelly, III
Edward J. Kelly, III

/s/ Robert D. Kunisch
Robert D. Kunisch

/s/ Southwood J. Morcott
Southwood J. Morcott

/s/ David M. Ratcliffe
David M. Ratcliffe

/s/ Charles E. Rice
Charles E. Rice

/s/ William C. Richardson
William C. Richardson

/s/ Frank S. Royal
Frank S. Royal

/s/ Donald J. Shepard
Donald J. Shepard

/s/ Michael J. Ward
Michael J. Ward

/s/ Oscar Munoz
Oscar Munoz


Powered by Morningstar® Document Research℠

Powered by Morningstar® Document Research℠

Exhibit 31.1

**CERTIFICATE OF CHIEF EXECUTIVE OFFICER**

I, Michael J. Ward, certify that:

1. I have reviewed this annual report on Form 10-K of CSX Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined by Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 8, 2005

/s/ MICHAEL J. WARD
Michael J. Ward

Chairman, President and Chief Executive Officer


Powered by Morningstar® Document Research℠

Exhibit 31.2

**CERTIFICATE OF CHIEF FINANCIAL OFFICER**

I, Oscar Munoz, certify that:

1. I have reviewed this annual report on Form 10-K of CSX Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined by Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 8, 2005

/s/ OSCAR MUNOZ
Oscar Munoz

Executive Vice President and Chief Financial Officer


Powered by Morningstar® Document Research℠

Powered by Morningstar® Document Research℠

Exhibit 32.1

CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Annual Report of CSX Transportation, Inc. on Form 10-K for the period ending December 31, 2004 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Michael J. Ward, Chief Executive Officer of the registrant, certify, pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to my knowledge, that:

1. The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the registrant.

Date: March 8, 2005

/s/ MICHAEL J. WARD
Michael J. Ward
Chairman and Chief Executive Officer


Powered by Morningstar® Document Research℠

Powered by Morningstar® Document Research℠

Exhibit 32.2

CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Annual Report of CSX Transportation, Inc. on Form 10-K for the period ending December 31, 2004 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Oscar Munoz, Chief Financial Officer of the registrant, certify, pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to my knowledge, that:

1. The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the registrant.

Date: March 8, 2005

/s/ OSCAR MUNOZ
Oscar Munoz
Executive Vice President and Chief Financial Officer

Created by Morningstar® Document Research℠
http://documentresearch.morningstar.com

# EXHIBIT PX0700

Morningstar® Document Research℠

# FORM 10-K

## CSX CORP - csx

**Filed: February 24, 2006 (period: December 30, 2005)**

Annual report which provides a comprehensive overview of the company for the past year

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-K

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 30, 2005**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from to**

**Commission File Number 1-8022**

# CSX CORPORATION
*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Virginia**<br>*(State or other jurisdiction of incorporation or organization)* | **62-1051971**<br>*(I.R.S. Employer Identification No.)* |
| **500 Water Street, 15th Floor, Jacksonville, FL**<br>*(Address of principal executive offices)* | **32202**<br>*(Zip Code)* |

**(904) 359-3200**
**(Telephone number, including area code)**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Name of exchange on which registered |
|---|---|
| Common Stock, $1 Par Value | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act:**
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer (as defined in Rule 405 of the Securities Act). Yes ☑ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer or a non-accelerated filer (as defined in Exchange Act Rule 12b-2).

Large Accelerated Filer ☑ Accelerated Filer ☐ Non-accelerated Filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Exchange Act Rule 12b-2). Yes ☐ No ☑

On July 1, 2005 (which is the last day of the second quarter and the required date to use), the aggregate market value of the Registrant's voting stock held by non-affiliates was approximately $7.5 billion (based on the New York Stock Exchange closing price on such date).

On January 27, 2006, there were 219,431,371 shares of Common Stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the Registrant's Definitive Proxy Statement (the "Proxy Statement") to be filed with respect to its annual meeting of shareholders scheduled to be held on May 3, 2006.


Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**FORM 10-K**

**TABLE OF CONTENTS**


| Item No. | | Page |
|---|---|---|
| | **PART I** | |
| 1. | Business | 3 |
| 1A. | Risk Factors | 4 |
| 1B. | Unresolved Staff Comments | 4 |
| 2. | Properties | 5 |
| 3. | Legal Proceedings | 7 |
| 4. | Submission of Matters to a Vote of Security Holders | 7 |
| | **PART II** | |
| 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 10 |
| 6. | Selected Financial Data | 12 |
| 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 14 |
| | • Executive Summary | 14 |
| | • 2005 Surface Transportation Highlights and Challenges | 14 |
| | • 2006 Expectations | 18 |
| | • Risk Factors | 20 |
| | • Forward-Looking Statements | 23 |
| | • Financial Results of Operations | 24 |
| | • Liquidity and Capital Resources | 36 |
| | • Schedule of Contractual Obligations and Commercial Commitments | 38 |
| | • Off-Balance Sheet Arrangements | 38 |
| | • Critical Accounting Estimates | 38 |
| 7A. | Quantitative and Qualitative Disclosures about Market Risk | 47 |
| 8. | Financial Statements and Supplementary Data | 48 |
| 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 101 |
| 9A. | Controls and Procedures | 101 |
| 9B. | Other Information | 101 |
| | **PART III** | |
| 10. | Directors and Executive Officers of the Registrant | 102 |
| 11. | Executive Compensation | 102 |
| 12. | Security Ownership of Certain Beneficial Owners and Management | 102 |
| 13. | Certain Relationships and Related Transactions | 102 |
| 14. | Principal Accounting Fees and Services | 102 |
| | **PART IV** | |
| 15. | Exhibits and Financial Statement Schedules | 103 |

Signatures 107
Omnibus Incentive Plan as amended
Restricted Stock Award Certificate
Restricted Stock Award Agreement
Subsidiaries
Consent of Ernst & Young LLP
Consent of Ernst & Young LLP and KPMG LLP
Powers of Attorney
Section 302 Certification of PEO
Section 302 Certification of PFO
Section 906 Certification of PEO
Section 906 Certification of PFO
Unaudited Consolidated Financial Statements






Powered by Morningstar® Document Research℠

CSX CORPORATION

PART I

**Item 1.** ***Business***

CSX Corporation ("CSX" and, together with its subsidiaries, the "Company"), based in Jacksonville, FL, owns companies providing rail, intermodal and rail-to-truck transload services that combine to form one of the nation's leading transportation companies, connecting more than 70 ocean, river and lake ports.

**Surface Transportation**

***CSX Transportation Inc.***

CSX's principal operating company, CSX Transportation Inc. ("CSXT"), operates the largest railroad in the eastern United States with approximately 21,000-mile rail network linking commercial markets in 23 states, the District of Columbia, and the Canadian provinces of Ontario and Quebec.

***CSX Intermodal Inc.***

CSX Intermodal Inc. ("Intermodal"), one of the nation's largest coast-to-coast intermodal transportation providers, is a stand-alone, integrated intermodal company serving customers from origin to destination with its own truck and terminal operations, plus a dedicated domestic container fleet. Containers and trailers are loaded and unloaded from trains, with trucks providing the link between intermodal terminals and the customer.

***Surface Transportation Businesses***

The rail and intermodal companies are viewed by the Company on a combined basis as Surface Transportation businesses. Together, they serve four primary lines of business:

- Merchandise generated approximately 49% of the Company's total revenue in 2005 with 2.9 million carloads. The Company's merchandise business is made up of seven market segments: phosphates and fertilizers; metals; forest products; food and consumer; agricultural products; chemicals; and emerging markets. Emerging markets target high-growth business opportunities in specialized markets such as aggregates, processed materials (for example, cement), waste, military cargo, and machinery.
- Coal, which delivered more than 1.8 million carloads of coal, coke and iron ore to electric utilities and manufacturers in 2005, accounted for approximately 24% of the Company's total 2005 revenue. The Company serves more than 130 coal mines in nine states, including three of the nation's top four coal-producing states.
- Intermodal, as described above, offers a cost advantage over long-haul trucking by combining the better economics of longer hauls provided by rail with the short-haul flexibility of trucks through a network of dedicated terminals across North America. Intermodal accounted for approximately 2.2 million units and 16% of the Company's total revenue in 2005.
- Automotive, which serves plants in eight states and delivers both finished vehicles and auto parts, transported 488,000 carloads generating 10% of the Company's total revenue in 2005.
- Other revenue, such as demurrage, switching, and other incidental charges, accounted for 1% of the Company's total 2005 revenue. Demurrage represents charges assessed by railroads for the retention of cars by shippers or receivers of freight beyond a specified period of time. Switching revenue is generated when CSX switches cars between trains for a customer or other railroad.



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

**Divestitures**

***International Terminals***

In February 2005, CSX sold its International Terminals business. CSX recognized a gain of $683 million pretax, $428 million after tax, in the fiscal year ended December 30, 2005. These amounts are reported as Discontinued Operations in the Company's Consolidated Income Statements. All prior activities for this business are presented as Discontinued Operations. (See Note 4. Discontinued Operations.)

***Domestic Container Shipping***

In February 2003, CSX conveyed its interest in the Domestic Container-Shipping business. CSX continues to sublease vessels and equipment to this former business through 2014. Due to these continuing obligations, CSX deferred the gain of $127 million pretax and is amortizing it over the 12-year sub-lease term. (See Note 3. Divestitures.)

**Financial Information about Operating Segments**

See Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations for operating revenue, operating income and total assets by segment for each of the last three fiscal years.

**General**

The Company makes available, free of charge through its website at www.csx.com, its annual reports on Form 10-K, quarterly reports on Form 10-Q and current reports on Form 8-K, and all amendments thereto, as soon as reasonably practicable after such reports are filed with or furnished to the Securities and Exchange Commission. Additionally, the Company has posted its code of ethics on its website.

The Company has included the CEO and CFO certifications regarding the Company's public disclosure required by Section 302 of the Sarbanes-Oxley Act of 2002 as Exhibits 31.1 and 31.2 to this report. Additionally, CSX filed with the NYSE the CEO's certification regarding the Company's compliance with the NYSE's Corporate Governance Listing Standards ("Listing Standards") pursuant to Section 303A.12(a) of the Listing Standards, which was dated May 26, 2005 and indicated that the CEO was not aware of any violations of the Listing Standards by the Company.

For additional information concerning business conducted by the Company during 2005, see Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations and Item 8. Financial Statements and Supplementary Data — Note 20. Business Segments.

**Employees**

The Company's annual average of employees was approximately 35,000 people in 2005 primarily working to provide transportation services.

The information set forth in Item 6. Selected Financial Data is incorporated herein by reference.

**Item 1A.** ***Risk Factors***

The information set forth in Item 7. Management Discussion and Analysis of Financial Condition and Results of Operations under the caption "Risk Factors" is incorporated by reference.

**Item 1B.** ***Unresolved Staff Comments***

Not applicable.



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

**Item 2.** ***Properties***

CSX's properties primarily consist of track and its related infrastructure, locomotives and freight cars and each category is described below.

***Track and Infrastructure***

Serving 23 states, the District of Columbia, Ontario and Quebec, the CSXT rail network extends from New York, Philadelphia and Boston to the Southeast markets of Atlanta, Miami and New Orleans and to the Midwestern cities of East St. Louis, Memphis and Chicago.

The Company's track structure includes main thoroughfares connecting terminals and yards (referred to as mainline track); track within terminals and switching yards; track adjacent to the mainlines used for passing trains; and track connecting the mainline track to customer locations. As of December 30, 2005, the breakdown of these track miles is as follows:

| | Track Miles |
|---|---|
| Mainline Track | 26,865 |
| Terminals and Switching Yards | 9,774 |
| Passing Sidings and Turnouts | 1,031 |
| Total | 37,670 |

In addition to its physical track structure, CSXT operates 36 major yards and terminals, plus a number of smaller facilities. These sites serve as the links between the Company and its local customers and as sorting facilities where shipments are classified and routed to other areas around the nation. CSXT's train operations are focused around four major transportation networks: the Coal Network, the Southeastern Corridor, the Interstate 90 Corridor, and the Interstate 95 Corridor.

**Coal Network**

Coal is used to generate more than half of the electricity in the United States. The CSX coal network connects mining operations in nine states with industrial areas in the Northeast as well as many river, lake and seaport facilities. These routes also support CSXT's strong and growing utility market in the Southeast.

**Southeastern Corridor**

This section of the network runs on the western side of CSXT's system from Chicago and the Western gateways, through the cities of Atlanta, Nashville and Birmingham to markets throughout the Southeast. The Southeastern Corridor is a vital route for CSXT's merchandise and Intermodal's traffic as well as automotive services.

**Interstate 90 (I-90) Corridor**

Chicago and metropolitan areas in New York and New England are linked by CSX's I-90 corridor. Much of this route has two lanes of track side by side (referred to as double mainline track) supporting high-speed intermodal and automotive services. The I-90 corridor is also a primary route for import traffic moving across the country, through Chicago and into the population centers in the Northeast.

**Interstate 95 (I-95) Corridor**

Charleston, Jacksonville, Miami and many other cities throughout the growing Southeast are connected to the heavily populated northeastern cities of Baltimore, Philadelphia and New York



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

along CSXT's I-95 corridor. This route is used for certain CSX merchandise business, which primarily includes food and consumer products along with metals and chemicals.

***Locomotives***

CSXT operates more than 3,700 locomotives, of which approximately 500 are under short-term lease arrangements. Freight locomotives are the power used primarily to pull trains. Switching locomotives are used in yards to sort rail cars so that the right rail car gets attached to the right train in order to get it to its final destination. Auxiliary units are typically used to provide extra traction for heavy trains in hilly terrain.

| | December 30, 2005 | | | |
|---|---|---|---|---|
| | **Owned** | **Leased** | **Total** | **%** |
| Locomotives | | | | |
| Freight | 2,922 | 462 | 3,384 | 89% |
| Switching | 217 | — | 217 | 6% |
| Auxiliary Units | 189 | — | 189 | 5% |
| Total | 3,328 | 462 | 3,790 | 100% |

***Freight Car Fleet***

CSXT provides specialized equipment to safely deliver freight from the source to distributors or end users:

- Gondolas support CSXT's coal and metals markets and provide transport for woodchips and other bulk commodities.
- Open-top hoppers handle heavy dry bulk commodities that are impervious to weather conditions such as coal, coke, stone, sand, ores and gravel.
- Flat Cars for shipping intermodal containers and trailers.
- Box Cars transport commodities that must be protected from the weather, such as paper products, appliances and building materials. Insulated boxcars deliver food products, canned goods, and certain beverages.
- Covered hoppers have a permanent roof. Lighter bulk commodities such as grain, fertilizer, flour, salt, sugar, clay and lime are shipped in large cars called jumbo covered hoppers. Heavier commodities like cement, ground limestone and glass sand are shipped in small cube-covered hoppers.
- Other cars on the network include but are not limited to center beam cars for transporting lumber and building products.

| | December 30, 2005 | | | |
|---|---|---|---|---|
| | **Owned** | **Leased** | **Total** | **%** |
| Freight Cars | | | | |
| Gondolas | 22,174 | 8,070 | 30,244 | 29% |
| Open-top Hoppers | 16,354 | 3,299 | 19,653 | 19% |
| Flat Cars | 1,053 | 18,439 | 19,492 | 19% |
| Box Cars | 13,240 | 2,737 | 15,977 | 16% |
| Covered Hoppers | 13,199 | 3,301 | 16,500 | 16% |
| Other Cars | 431 | 1,017 | 1,448 | 1% |
| Total | 66,451 | 36,863 | 103,314 | 100% |



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

At any point in time, over half of the railcars on the CSXT system are not owned buy CSXT. Examples of these are railcars owned by other railroads, which are interchanged to CSXT; shipper-furnished ("private") cars, which are generally used only in that shipper's services; and multi-level railcars. These multi-level railcars are used to transport finished motor vehicles, such as sport utility vehicles and light trucks in bi-level cars, while sedans and smaller automobiles are shipped in try-level cars. Multi-level railcars are used jointly by participating railroads, and the fleet is managed as a nationwide pool to serve the automobile industry. As noted, in certain markets, CSXT uses railcars supplied by railroad customers. For example, chemical shippers typically supply tank cars for the transportation of hazardous and non-hazardous material.

The information set forth in Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations under the caption "Depreciation Policies Under the Group Life Method", is incorporated herein by reference.

The information set forth in Item 8. Financial Statements and Supplementary Data, Note 1. Nature of Operations and Significant Accounting Policies under the caption "Properties", and Note 10. Properties, is incorporated herein by reference.

**Item 3.** ***Legal Proceedings***

The Company is involved in routine litigation incidental to its business and is a party to a number of legal actions and claims, various governmental proceedings and private civil lawsuits, including those related to environmental matters, Federal Employers' Liability Act claims by employees, other personal injury claims, and disputes and complaints involving certain transportation rates and charges. Some of the legal proceedings include claims for compensatory as well as punitive damages, and others purport to be class actions. While the final outcome of these matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded along with applicable insurance, it is the opinion of CSX management that none of these items will have a material adverse effect on the results of operations, financial position or liquidity of the Company. An unexpected adverse resolution of one or more of these items, however, could have a material adverse effect on the results of operations, financial position or liquidity of the Company in a particular quarter or fiscal year.

See Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations under the caption "Critical Accounting Estimates, Casualty, Environmental and Legal Reserves."

**Item 4.** ***Submission of Matters to a Vote of Security Holders***

There were no matters submitted to a vote of security holders in the fourth quarter of 2005.

**Executive Officers of the Registrant**

Executive officers of CSX are elected by the CSX Board of Directors and generally hold office until the next annual election of officers. There are no family relationships or any arrangement or



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

Table of Contents

understanding between any officer and any other person pursuant to which such officer was selected. Effective February 23, 2006, the executive officers are as follows:

| Name and Age | Business Experience During Past 5 Years |
|---|---|
| Michael J. Ward, 55 | Chairman of the Board, President and Chief Executive Officer of CSX, having been elected as Chairman and Chief Executive Officer in January 2003 and as President in July 2002. He has also served CSX Transportation, Inc., the Company's rail subsidiary, as President since November 2000 and as President and Chief Executive Officer since October 2002. Previously, Mr. Ward served CSX Transportation as Executive Vice President — Operations from April through November 2000, and as Executive Vice President — Coal Service Group from August 1999 to April 2000. |
| Ellen M. Fitzsimmons, 45 | Senior Vice President — Law and Public Affairs of CSX and CSX Transportation, Inc. since December 2003. Before December 2003, Ms. Fitzsimmons served as Senior Vice President — Law and Corporate Secretary from May 2003 and as Senior Vice President — Law from February 2001 to May 2003. Prior thereto, she served as General Counsel — Corporate at CSX. |
| Clarence W. Gooden, 54 | Executive Vice President and Chief Commercial Officer of CSX and CSX Transportation, Inc. since April 2004. Before April 2004, Mr. Gooden served as Senior Vice President — Merchandise Service Group, CSX Transportation, Inc. from 2002. Prior to 2002, Mr. Gooden served as President of CSX Intermodal from 2001 to 2002; Senior Vice President — Coal Service Group from 2000 to 2001; and Vice President — System Transportation from 1999 to 2000. |
| Robert J. Haulter, 52 | Senior Vice President — Human Resources and Labor Relations of CSX and CSX Transportation, Inc. since December 2003. Before December 2003, Mr. Haulter served as CSX Senior Vice President — Human Resources from July 2002. Before July 2002, he served CSX Transportation, Inc. as Senior Vice President — Human Resources from May 2002 to July 2002; as Vice President — Human Resources from December 2000 to May 2002; as Assistant Vice President of Operations Support from September 2000 to December 2000; and as Assistant Vice President — Strategic Development from November 1999 to September 2000. |



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

Table of Contents

| Name and Age | Business Experience During Past 5 Years |
|---|---|
| Tony L. Ingram, 57 | Executive Vice President and Chief Operating Officer of CSX Transportation, Inc. since March 2004. Before March 2004, Mr. Ingram served as Senior Vice President — Transportation, Network and Mechanical, Norfolk Southern Corporation, from February 2003 to March 2004; and Vice President, Transportation — Operations from March 2000 to February 2003. |
| Oscar Munoz, 47 | Executive Vice President and Chief Financial Officer of CSX and CSX Transportation, Inc. since May 2003. Before May 2003, Mr. Munoz served as Chief Financial Officer and Vice President, Consumer Services, AT&T Corporation, from January 2001 to May 2003; as Senior Vice President — Finance & Administration, Qwest Communications International, Inc. from June to December 2000; and as Chief Financial Officer & Vice President, U.S. West Retail Markets from April 1999 to May 2000. |
| Carolyn T. Sizemore, 43 | Vice President and Controller of CSX and CSX Transportation, Inc. since April 2002. Prior to April 2002, Ms. Sizemore served CSX as Assistant Vice President and Assistant Controller from July 2001 to April 2002, and as Assistant Vice President, Financial Planning from June 1999 to July 2001. |



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**PART II**

**Item 5.** ***Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities***

**Market Information**

CSX's common stock is listed on the New York stock exchange and trades with unlisted privileges on the Midwest, Boston, Cincinnati, Pacific and Philadelphia stock exchanges. The official trading symbol is "CSX."

**Description of Common and Preferred Stocks**

A total of 300 million shares of common stock is authorized, of which 218,202,519 shares were outstanding as of December 30, 2005. Each share is entitled to one vote in all matters requiring a vote of shareholders. There are no pre-emptive rights. At January 27, 2006, there were 49,859 common stock shareholders of record. Weighted average common shares outstanding used in the calculation of diluted earnings per share was approximately 228 million as of December 30, 2005, and is expected to increase in 2006 due to anticipated stock option exercises and other incentive programs. (See Note 15. Earnings Per Share.)

A total of 25 million shares of preferred stock is authorized, none of which is currently outstanding.

The following table sets forth, for the quarters indicated, the dividends declared and the high and low share prices of the Company's common stock. In 2005, the Company increased dividends by 30% from 10 cents to 13 cents per common share.

| | Quarter | | | | |
|---|---|---|---|---|---|
| | **1st** | **2nd** | **3rd** | **4th** | **Year** |
| **2005** | | | | | |
| Dividends | $ 0.10 | $ 0.10 | $ 0.10 | $ 0.13 | $ 0.43 |
| Common Stock Price | | | | | |
| High | $ 43.54 | $ 44.10 | $ 46.89 | $ 51.60 | $ 51.60 |
| Low | $ 36.90 | $ 38.01 | $ 42.48 | $ 42.70 | $ 36.90 |
| **2004** | | | | | |
| Dividends | $ 0.10 | $ 0.10 | $ 0.10 | $ 0.10 | $ 0.40 |
| Common Stock Price | | | | | |
| High | $ 36.26 | $ 33.04 | $ 34.28 | $ 40.46 | $ 40.46 |
| Low | $ 28.80 | $ 29.28 | $ 29.96 | $ 33.09 | $ 28.80 |

**Issuer Purchases of Equity Securities Information**

As required by SEC Regulation S-K for the quarter ended December 30, 2005, the following table summarizes common shares withheld by CSX on behalf of current and retired employees to

Case 1:07-mc-00489-BAH Document 1229-7 Filed 11/22/24 Page 812 of 3766

settle the employee's minimum statutory tax obligation on the distribution of shares that were formerly deferred and any restricted stock that has vested.

**Issuer Purchases of Equity Securities**

| Period | (a) Total Number of Shares Purchased | (b) Average Price Paid per Share | (c) Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs | (d) Maximum Number of Shares that May Yet Be Purchased Under the Plan or Programs |
|---|---|---|---|---|
| October (October 1, 2005 – October 28, 2005) | 6,318 | $ 42.07 | — | — |
| November (October 29, 2005 – November 27, 2005) | 3,219 | 45.78 | — | — |
| December (November 28, 2005 December 30, 2005) | 1,363 | 50.44 | — | — |
| Total | 10,900 | $ 44.21 | — | — |



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

**Item 6.** ***Selected Financial Data***

| | Fiscal Years Ended | | | | |
|---|---|---|---|---|---|
| | 2005 | 2004 | 2003 | 2002 | 2001 |
| | (Dollars in millions, except per share amounts) (Unaudited) | | | | |
| **Earnings from Continuing Operations** | | | | | |
| Operating Revenue | $ 8,618 | $ 8,040 | $ 7,573 | $ 7,916 | $ 7,853 |
| Operating Expense | 7,068 | 7,040 | 7,053 | 6,897 | 7,003 |
| Operating Income | $ 1,550 | $ 1,000 | $ 520 | $ 1,019 | $ 850 |
| Net Earnings from Continuing Operations | $ 720 | $ 418 | $ 137 | $ 410 | $ 243 |
| Earnings Per Share: | | | | | |
| From Continuing Operations | $ 3.33 | $ 1.95 | $ 0.64 | $ 1.93 | $ 1.15 |
| From Continuing Operations, Assuming Dilution | $ 3.17 | $ 1.87 | $ 0.63 | $ 1.85 | $ 1.13 |
| From Cumulative Effect of Accounting Change | $ — | $ — | $ 0.26 | $ (0.20) | $ — |
| From Cumulative Effect of Accounting Change, Assuming Dilution | $ — | $ — | $ 0.25 | $ (0.19) | $ — |
| **Financial Position** | | | | | |
| Cash, Cash Equivalents and Short-term Investments | $ 602 | $ 859 | $ 368 | $ 264 | $ 618 |
| Total Assets | 24,232 | 24,605 | 21,760 | 20,951 | 20,801 |
| Long-term Debt | 5,093 | 6,248 | 6,886 | 6,519 | 5,839 |
| Shareholders' Equity | 7,954 | 6,811 | 6,448 | 6,241 | 6,120 |
| **Other Data Per Common Share** | | | | | |
| Cash Dividends | $ 0.43 | $ 0.40 | $ 0.40 | $ 0.40 | $ 0.80 |
| **Employees — Annual Averages** | | | | | |
| Rail | 32,033 | 32,074 | 32,892 | 33,468 | 35,014 |
| Other | 3,076 | 3,833 | 4,624 | 6,471 | 6,446 |
| Total | 35,109 | 35,907 | 37,516 | 39,939 | 41,460 |

See accompanying Consolidated Financial Statements



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

Table of Contents

Significant events included in Earnings from Continuing Operations are as follows:

2005 — CSX repurchased $1.0 billion of outstanding debt. CSX recognized a charge of $192 million pretax, $123 million after tax, to repurchase the debt, which primarily reflects the increase in current market value above original issue value. (See Note 12. Debt and Credit Agreements.)

— Ohio enacted legislation to gradually eliminate its corporate franchise tax. This legislative change resulted in an income tax benefit of $71 million. (See Note 8. Income Taxes.)

— CSX updated its assessment of the unasserted liability exposure for asbestos and other claims, which resulted in recognition of a $38 million pretax, $23 million after tax, favorable change in estimate. (See Note 11. Casualty, Environmental, and Other Reserves.)

2004 — A charge of $71 million pretax, $44 million after tax, was recognized for separation expenses related to the management restructuring at Surface Transportation. (See Note 5. Management Restructuring.)

— Revenues, operating expenses and after tax income include approximately $63 million, $35 million and $6 million, respectively, representing consolidation of Four Rivers Transportation ("FRT"), a short-line railroad previously accounted for under the equity method, in conjunction with adoption of FASB Interpretation 46, *Consolidation of Variable Interest Entities.* Net equity earnings of FRT of approximately $4 million were included in other income in 2003.

— CSX completed a corporate reorganization of Conrail that resulted in the direct ownership of certain Conrail assets by CSXT. This transaction was accounted for at fair value and resulted in a net gain of $16 million after tax, which is included in other income. (See Note 2. Investment In and Integrated Rail Operations with Conrail.)

2003 — Income of $93 million pretax, $57 million after tax, was recognized as a cumulative effect of accounting change, representing the reversal of the accrued liability for crosstie removal costs in conjunction with the adoption of SFAS 143 *Accounting for Asset Retirement Obligations.* (See Note 1. Nature of Operations and Significant Accounting Policies.)

— CSX conveyed most of its interest in its domestic container-shipping subsidiary, CSX Lines, to a new venture formed with the Carlyle Group for approximately $300 million in cash and securities. CSX Lines was subsequently renamed Horizon. A deferred pretax gain of approximately $127 million resulting from the transaction is being recognized over the 12-year sub-lease term during which the Company continues to sublease vessels and equipment to Horizon. (See Note 3. Divestitures.)

— A charge of $232 million pretax, $145 million after tax, was recognized in conjunction with the change in estimate of casualty reserves to include an estimate of incurred but not reported claims for asbestos and other occupational injuries to be received over the next seven years. (See Note 11. Casualty, Environmental, and Other Reserves.)

— A charge of $108 million pretax, $67 million after tax, was recognized to account for CSX's entering into two settlement agreements with Maersk that resolved all material disputes pending between the companies arising out of the 1999 sale of the international container-shipping assets. (See Note 19. Commitments and Contingencies.)



Source: CSX CORP, 10-K, February 24, 2006
Powered by Morningstar® Document Research℠

— A charge of $34 million pretax, $21 million after tax, was recognized as the initial charge for separation expenses related to the management restructuring announced in 2003. In addition, the Company recorded a credit of $22 million pretax, $13 million after tax related to revised estimates for railroad retirement taxes and the amount of benefits that will be paid to individuals under the 1991 and 1992 separation plans. The net restructuring charge of $22 million, $13 million after tax includes these items. (See Note 5. Management Restructuring.)

2002 — A charge of $83 million pretax, $43 million after tax, was recognized to write down indefinite lived intangible assets as a cumulative effect of an accounting change and consideration of minority interest.

2001 — A charge of $60 million pretax, $37 million after tax, was recognized to account for the settlement of the 1987 New Orleans tank car fire litigation.

**Item 7.** ***Management's Discussion and Analysis of Financial Condition and Results of Operations***

## EXECUTIVE SUMMARY

### 2005 SURFACE TRANSPORTATION HIGHLIGHTS AND CHALLENGES

**Operating Results**

CSX follows a 52/53 week fiscal reporting calendar. This fiscal calendar allows every quarter to consistently end on a Friday and to be of equal duration (13 weeks). However, in order to maintain this type of reporting calendar, every sixth or seventh year (depending on the Gregorian calendar and when leap year falls), an extra week will be included in one quarter (a 14 week quarter) and, therefore, the full year will have 53 weeks. Fiscal 2004 included 53 weeks while fiscal year 2005 had 52 weeks. All comparisons below utilize these respective years' reported results.

**Revenue**

Surface Transportation's revenue in 2005 increased by 7% or $578 million to a record $8.6 billion while volume decreased by 2%, or 180,000 units. A portion of this volume decrease was due to the additional week included in fiscal year 2004. Revenue per unit increased by 10%, or $105, of which approximately 50% was due to continued pricing efforts and 50% was due to the Company's fuel surcharge program and traffic mix.

Revenue increased across all commodities. A strong industrial economy, coupled with a shortage of rail, truck and barge capacity allowed for substantial price increases within all merchandise groups. While North American automotive production was relatively flat compared to the prior year, automotive revenue and revenue-per-unit benefited from contractual price escalations and higher fuel surcharges recoveries. Coal volumes and revenue improved significantly due to both increased electrical generation by CSXT-served utilities and price increases. The overall competitive position of Intermodal improved compared to the trucking industry due to shortage of truck capacity and higher fuel prices creating a stronger pricing environment for Intermodal services.



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

A detailed discussion of significant factors driving changes in volume and revenue is provided under the caption, "Results of Operations".

| | Years Ended 52 Weeks 2005 | Years Ended 53 Weeks 2004 | $ Change | % Change |
|---|---|---|---|---|
| | (Dollars in millions, except per share amounts) | | | |
| **Revenue and Expense** | | | | |
| Surface Transportation Revenue | $ 8,618 | $ 8,040 | $ 578 | 7% |
| **Operating Expense** | | | | |
| Labor and Fringe | 2,856 | 2,741 | 115 | 4 |
| Materials, Supplies and Other | 1,784 | 1,759 | 25 | 1 |
| Depreciation | 818 | 702 | 116 | 17 |
| Fuel | 783 | 656 | 127 | 19 |
| Building and Equipment Rent | 533 | 582 | (49) | (8) |
| Inland Transportation | 230 | 280 | (50) | (18) |
| Conrail Rents, Fees and Services | 65 | 256 | (191) | (75) |
| Restructuring Charge — Net | — | 71 | (71) | NM |
| Provision for Casualty Claims | (38) | — | (38) | NM |
| **Surface Transportation Expense** | 7,031 | 7,047 | (16) | — |
| **Surface Transportation Operating Income** | $ 1,587 | $ 993 | $ 594 | 60% |
| **Operating Ratio** | 81.6% | 87.6% | | |

Prior periods have been reclassified to conform to the current presentation.

NM — not meaningful

**Fuel Costs and Fuel Surcharge Program**

Fuel expenses increased 19% to $783 million in 2005, net of $249 million of fuel hedging benefits, due principally to the rising price per gallon of diesel fuel. Fuel hedging activity had a $63 million favorable impact on fuel expense for the fiscal year ended December 31, 2004. The average price per gallon of diesel fuel, including benefits from CSX's fuel hedging program, was $1.31 in 2005 versus $1.10 in 2004.

Fuel cost recovery programs are commonly used within the transportation industry. When the cost of fuel exceeds certain thresholds, CSX shares a portion of the increase with its customers through its fuel surcharge program. In 2005, approximately 50% and 31% of CSX's revenue was subject to fuel surcharges and cost escalation clauses (which include a fuel element), respectively. As existing contracts are renewed or new contracts are executed, CSX is increasing the number of contracts which include fuel surcharge mechanisms.

**Operations**

As illustrated in the table below, key service measures show mixed results in 2005. Average train velocity, system dwell and recrew performance declined, while on-time train originations improved compared to the prior year. Cars on line remained essentially flat, indicating that CSXT's network remained relatively fluid through 2005.

The Company's Surface Transportation businesses remained focused on producing continuous improvement through several key initiatives. In 2004, CSXT instituted a new network operating plan called the ONE Plan, which defines CSXT's scheduled train network and is designed to improve service reliability and efficiency. Although anticipated benefits have not been realized on a sustained



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

basis, CSXT believes the ONE Plan benefits will be attained and remains committed to this initiative. Efforts are ongoing to improve plan execution and to refine the operating plan to reflect changing traffic volumes, operating capabilities, and service requirements.

CSXT is investing to ensure that adequate resources are in place to achieve higher levels of plan execution. CSXT acquired 100 additional locomotives and started implementing a new locomotive plan in late 2005. Locomotive availability and reliability are critical to plan execution. CSXT also hired and trained approximately 2,000 train and engine employees to keep pace with high attrition rates, particularly conductors and engineers. Finally, a two-year program to expand capacity in key corridors commenced in 2005. This expanded capacity will accommodate future growth, improve service reliability and improve efficiency on the targeted corridors.

Hurricane Katrina, which struck the Gulf Coast in late August, had a significant impact on operations in the latter part of 2005. Approximately 100 miles of CSXT's infrastructure was destroyed by the storm, effectively severing CSXT's route to and from the New Orleans gateway. CSXT continued service to customers outside of the storm-affected area by rerouting rail traffic through alternative western gateways, including East St. Louis, IL, Memphis, TN, Birmingham, AL, Mobile, AL, and Montgomery, AL. Rerouted traffic added volume to busy corridors and resulted in additional network congestion, which adversely affected overall train velocity and system dwell. Service to local businesses on the Gulf Coast has been restored and previously rerouted Merchandise trains have returned to the New Orleans gateway. Operations should be normalized to pre-hurricane conditions by the end of the first quarter of 2006. A description of the corresponding financial statement implications is presented below under the caption "Hurricane Katrina".

**RAIL OPERATING STATISTICS(a)**

| | | Fiscal Years Ended | | |
|---|---|---|---|---|
| | | **2005** | **2004** | **% Change** |
| **Service Measurements** | Average Velocity, All Trains (Miles Per Hour) | 19.2 | 20.3 | (5)% |
| | Average System Dwell Time (Hours)(b) | 29.7 | 28.7 | (3) |
| | Average Total Cars-On-Line | 233,118 | 233,271 | — |
| | On-Time Originations | 51.1% | 49.0% | 4 |
| | On-Time Arrivals | 40.1% | 40.9% | (2) |
| | Average Recrews (Per Day) | 68 | 63 | (8)% |

(a) Amounts for 2005 are estimated.

(b) Beginning in October 2005, the American Association of Railroads adopted a new dwell calculation in an effort to standardize reporting across U.S. railroads. Beginning in 2006 and forward, CSX will adopt this new method.

**Safety**

CSXT's continued efforts to reduce the frequency of personal injuries and train accidents produced significant positive results in 2005. Continued focus on CSXT's safety leadership and train accident prevention processes produced improvements in both its FRA personal injury frequency index and FRA train accident frequency compared to 2004 results. Both processes use training, awareness, compliance measurement and root cause analysis to prevent incidents and create a safer work environment.



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

Table of Contents

**RAIL OPERATING STATISTICS(a)**

| | | Fiscal Years Ended | | |
|---|---|---|---|---|
| | | 2005 | 2004 | % Change |
| Service Measurements | FRA Personal Injury Frequency Index (Per 200,000 Man Hours) | 1.71 | 2.29 | 25% |
| | FRA Train Accidents Frequency (Per Million Train Miles) | 3.99 | 4.79 | 17% |

(a) Amounts for 2005 are estimated.

**Hurricane Katrina**

The following table summarizes the financial impact of Hurricane Katrina during 2005: (See Note 6. Hurricane Katrina.)

| | Income Statement Impact | | | |
|---|---|---|---|---|
| | Losses | Deductible Recognized | Insurance Recoveries Recognized(a) | Net Income Statement Impact |
| | (Dollars in millions) | | | |
| Capital | | | | |
| Fixed assets damages | $ (41) | $ — | $ 41 | $ — |
| Business Interruption | | | | |
| Incremental expenses | (80) | (8) | 72 | (8) |
| Lost profits | (30) | — | — | (30) |
| Total | $ (151) | $ (8) | $ 113 | $ (38) |

(a) Amounts recorded as receivables from insurance companies. See tables in Note 6. Hurricane Katrina

As of December 30, 2005, The Company has collected insurance payments of $70 million. Through February 2006, the Company has collected an additional $50 million in insurance recoveries for a total of $120 million.

**Capital Investments**

Surface Transportation capital expenditures totaled $1.1 billion and $960 million for fiscal years 2005 and 2004, respectively.

**2005 CSX CORPORATION OTHER ITEMS**

**International Terminals Disposal**

In February 2005, CSX sold its International Terminals business for net cash proceeds of $1,108 billion. CSX recognized a gain of $683 million pretax, $428 million after tax, for the fiscal year ended December 30, 2005. (See Note 4. Discontinued Operations.)

**Debt Repurchase**

In June 2005, CSX repurchased $1.0 billion of its publicly-traded notes. The consideration paid for these notes totaled $1.2 billion, including a pretax charge of $192 million for costs to repurchase the debt which primarily reflected the market value above original issue value. CSX used cash on hand to finance this repurchase. During 2005, CSX improved its overall financial position by reducing debt balances from $7.2 billion at December 31, 2004 to $6.0 billion as of December 30,



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

2005. Corresponding interest expense benefits associated with lower outstanding debt helped offset rising variable interest rates. See Note 12. Debt and Credit Agreements.

### Free Cash Flow

Free cash flow is considered a non-GAAP financial measure under SEC Regulation G. Management believes, however, that free cash flow is important in evaluating its financial performance and measures an ability to generate cash without incurring additional external financings. Free cash flow is calculated by taking cash provided by operating activities less property additions, other investing activities, and dividends paid plus Conrail free cash flow and proceeds from sale of businesses. Free cash flow should be considered in addition to, rather than a substitute for, cash provided by operating activities. The following table reconciles free cash flow (non-GAAP measure) to cash provided by operating activities (GAAP measure):

| | Fiscal Years Ended | |
|---|---|---|
| | December 30, 2005 | December 31, 2004 |
| | (Dollars in millions) | |
| Free Cash Flow(a) | $ 1,030 | $ 461 |
| Add (Deduct) Items from Consolidated Cash Flow Statements: | | |
| Short-term Investments — Net(b) | 33 | (247) |
| Dividends Paid | 93 | 86 |
| Net Cash Used in Investing Activities(c) | 36 | 1,240 |
| Add (Deduct) Items Not Included in Consolidated Free Cash Flow: | | |
| Conrail Free Cash Flow(d) | (103) | (115) |
| Other Deposits(e) | 21 | 21 |
| Net Cash Provided by Operating Activities | $ 1,110 | $ 1,446 |

(a) Free cash flow as of December 30, 2005 includes net cash proceeds (net of taxes paid) from the International Terminals' disposition of $640 million and net debt repurchase costs of $123 million.

(b) Short-term Investments — Net represents the net source or (use) of cash resulting from sales and purchases of short-term investments included in the investing section of the Consolidated Cash Flow Statements.

(c) Net Cash Used in Investing Activities includes property additions offset by net cash proceeds (before taxes paid) from the International Terminals' disposition of $998 million and other investing items.

(d) Conrail Free Cash Flow represents CSX's 42% economic interest which is not consolidated in the CSX amounts.

(e) Other Deposits are not included in the Company's Free Cash Flow as these deposits represent assets that are set aside for certain future debt payments.

## 2006 EXPECTATIONS

### Revenue

During 2006, CSX expects revenue growth, based in part on continuance of the robust pricing environment experienced in 2005. In addition, the Company expects volume increases of 2-3%. Longer-term, CSX expects average annual revenue growth of 4-6% over the next five years due to



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

continued strong transportation demand, the Company's emphasis on price, and volume growth. Lower contributory traffic will continue to be re-priced or replaced by longer haul, more profitable business. The amount of any revenue and volume increase will depend on several factors:

**Economy:** Favorable economic conditions are expected to continue based on the forecasts for key economic indicators such as the gross domestic product, industrial production and overall import levels. Generally, the Company's revenue is fairly diversified and a large portion is relatively insensitive to significant fluctuations in the general economy. Changes, however, in the macroeconomic environment can impact overall revenue growth.

**Operational Performance:** Service is expected to improve with more consistent execution of the network operating plan, which should result in improved average velocity and more reliable service. Consequently, additional volume may be captured as freight car availability increases due to improved asset utilization and reduced transit times.

**Fuel Prices:** Because of the fuel surcharge program and cost escalation clauses in long-term contracts, which include a fuel element, a portion of the Company's revenue varies with the price of fuel. In 2004, CSX suspended entering into new swaps in its fuel hedge program and fuel surcharges became the primary vehicle through which CSX manages fuel price volatility. Consequently, CSX anticipates increases in estimated fuel expenses to approach $100 million in 2006, depending on fluctuations in fuel prices.

**Operations**

CSXT expects key operating measurements to improve in 2006 versus the prior year as the initiatives mentioned previously gain momentum, and the emphasis on plan execution continues. Management believes current resource plans are adequate to handle anticipated business levels and to keep the network fluid. CSXT plans to hire approximately 1,860 new train and engine employees, which include locomotive engineers and conductors, to offset anticipated attrition. In addition, CSXT will acquire 100 new high-horsepower locomotives in 2006. Planned capacity and infrastructure investments will also support improved service reliability and volume growth as they are completed throughout the year.

**Capital Investments**

The Company continues to invest in its rail infrastructure, locomotives, freight cars and technology to accommodate safe, efficient and reliable train operations. In anticipation of future volume growth in key corridors, the Company plans to make strategic infrastructure investments as profitability targets are met. Investments include locomotives mentioned previously, track and terminal infrastructure expansion such as the Southeastern corridor between Chicago and Florida and the River Line from Albany to New York City. Investments in the Southeastern corridor are intended, among other things, to support Western coal sourcing from the Colorado, Illinois and Powder River basins, consumer goods shipments from West Coast ports and merchandise and automobile shipments. Investments in the River Line are designed to increase long-term capacity for the I-90 corridor between Chicago and New York.

As a result of these investments and the ongoing needs of the business, the Company expects capital spending of approximately $1.4 billion in 2006 and between $1.3 billion and $1.4 billion in 2007, excluding the impact of Hurricane Katrina.

**Free Cash Flow**

CSX will continue to focus on free cash flow in 2006, with a target of approximately $300 million, including approximately $100 million in anticipated insurance recoveries related to Hurricane Katrina.



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

## RISK FACTORS

### Enterprise Risk Management

In the provision of transportation services, the Company must identify, manage and mitigate the inherent business risks that are an integral component of the Company's business activities. Financial risk, legal, regulatory, and compliance issues, operational risk, and workforce planning are primary risks to the Company's business. In 2005, the Company began implementation of a formal Enterprise Risk Management ("ERM") program in order to identify, quantify, monitor, and potentially mitigate these risks. ERM is a systematic and ongoing process used to help recognize and manage the critical risks that could impact the Company. ERM assists management's allocation of financial resources and mitigation efforts and enhances risk oversight by the Board of Directors with oversight by the Board or Board Committees, management is responsible for the development and implementation of risk mitigation policies and directing day-to-day risk management.

The following important risk factors could have a material adverse effect on the Company's results of operations, financial condition and liquidity, and could cause those results to differ materially from those expressed or implied in the Company's forward-looking statements.

### Competition

The Company experiences competition in the form of pricing, service, reliability and other factors from other transportation providers including railroads and motor carriers that operate similar routes across its service area, and to a less significant extent, barges, ships and pipelines. Transportation providers such as motor carriers and barges utilize public rights-of-way that are built and maintained by governmental entities while CSXT and other railroads must build and maintain rail networks using largely internal resources. The Company could be negatively impacted if the scope and quality of these alternative methods of transportation materially increase, or if legislation is passed providing materially greater opportunities for motor carriers with respect to size or weight restrictions.

### Operations and Workforce Planning

In an environment of continued high demand for rail services, CSXT has experienced some network difficulties, including congestion and reduced velocity on its rail system. In addition, changes in demographics, training requirements and the availability of qualified personnel, could each have a negative impact on CSXT's ability to meet demand for rail service. To meet these challenges, CSXT started implementation of the new network operating plan referred to as the ONE Plan, acquired additional locomotives, started implementing a new locomotive plan, and is hiring and training significant numbers of employees to keep pace with high attrition rates. In 2005, the Company also commenced a two-year program to expand capacity in key corridors. Though these steps have been taken, CSXT cannot be sure that these measures will fully or adequately address the operational issues. The Company also cannot be sure that it will not experience other difficulties related to network capacity, dramatic and unplanned increases in demand for rail service in one or more of our commodity groups, or other events that could have a negative impact on our operational efficiency, any one of which could have a material adverse effect on our results of operations, financial condition, and liquidity.

### Employees and Labor Union Relationships

CSXT considers relations with its unions and union employees generally to be good. Most of CSXT's employees are represented by labor unions and are covered by collective bargaining agreements. The bargaining agreements contain a moratorium clause that precludes serving new bargaining demands until a certain date. Generally speaking, these agreements are bargained nationally by the National Railway Labor Conference, so all bargaining on agreement changes



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

Case 1:07-mc-00489-BAH Document 1229-7 Filed 11/22/24 Page 822 of 3766

begins at the same time. The round of bargaining that started in 2000 was recently concluded when agreements were reached with all of the unions.

Most of the moratoriums negotiated in the 2000 round have expired and in November 2004 the parties were free under the collective bargaining agreements to serve new bargaining demands and start a new round of national bargaining. The current status of 2004 negotiations is that CSXT and the other railroads participating in national bargaining are in mediation with eight unions, are bargaining with four other unions and have not started bargaining with one union. The railroads had asked the National Mediation Board for a release from mediation with respect to seven of the eight unions in mediation, but now have informed the National Mediation Board that they are voluntarily withdrawing that request pending a decision in the lawsuit brought by the United Transportation Union which challenges certain aspects of the railroads' bargaining demands. The outcome of the 2004 round of negotiations is uncertain at this time.

In the rail industry, negotiations have generally taken place over a number of years and previously have not resulted in any extended work stoppages. The agreements reached in the 2000 round of bargaining will continue to remain in effect until new agreements are reached. The parties are not permitted to either strike or lockout until the Railway Labor Act's lengthy procedures (which include mediation, cooling-off periods, and the possibility of Presidential intervention) are exhausted.

**Environmental Laws and Regulation**

The Company's operations are subject to wide-ranging federal, state and local environmental laws and regulations concerning, among other things, emissions to the air, discharges to water, the handling, storage, transportation and disposal of waste and other materials, and cleanup of hazardous material or petroleum releases. The Company generates and transports hazardous and non-hazardous waste and materials in its current operations, and it has done so in its former operations. In certain circumstances, environmental liability can extend to formerly owned or operated properties, leased properties and properties owned by third parties or Company predecessors, as well as to properties currently owned and used by the Company. Environmental liabilities have arisen and may also arise from claims asserted by adjacent landowners or other third parties in toxic tort litigation. The Company has been and may be subject to allegations or findings to the effect that it has violated, or is strictly liable under, environmental laws or regulations, and such violations can result in the Company's incurring fines, penalties or costs relating to the cleanup of environmental contamination. Although the Company believes it has appropriately recorded current and long-term liabilities for known future environmental costs, it could incur significant costs as a result of any of the foregoing, and may be required to incur significant expenses to investigate and remediate known, unknown or future environmental contamination.

**Fuel Costs**

Fuel costs represent a significant expense of the Company's Surface Transportation operations. Fuel prices can vary significantly from period to period and significant increases may have a material adverse effect on results of operations. Furthermore, fuel prices and supply are influenced considerably by international political and economic circumstances. A fuel surcharge recovery program is in place with a considerable number of customers. This program has historically permitted the Company's Surface Transportation businesses to recover a significant portion of increased fuel costs. Despite the fuel surcharge program, the Company could be negatively impacted if a fuel supply shortage were to arise, whether due to OPEC or other production restrictions, lower refinery outputs, a disruption of oil imports or otherwise, and any subsequent price increases could further increase the potential impact.



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

**Future Acts of Terrorism or War**

Terrorist attacks, such as those that occurred in the United States in September 2001, in Spain in March 2004, or in England in July 2005, and any government response thereto or war may adversely affect results of operations, financial condition and liquidity. The Company's rail lines and physical plant may be direct targets or indirect casualties of acts of terror or war, which could cause significant business interruption and result in increased costs and liabilities and decreased revenues and have a material adverse effect on results of operations, financial condition or liquidity. In addition, insurance premiums charged for some or all of the coverage currently maintained by the Company could increase dramatically or the coverage may no longer be available.

**Regulation and Legislation**

The Company is subject to various regulatory jurisdictions, including the Surface Transportation Board ("STB") of the United States Department of Transportation ("DOT"), the Federal Railroad Administration of DOT and other state and federal regulatory agencies for a variety of economic, health, safety, labor, environmental, tax, legal and other matters. Legislation passed by Congress or regulations issued by these agencies can significantly affect the revenues, costs and profitability of the Company's business. Moreover, the Company could be negatively affected by failure to comply with applicable laws and regulations. In addition, Congressional efforts to reduce or eliminate funding for Amtrak, if successful, could result in significant costs to CSXT, including, but not limited to: loss of revenue from trackage rights; uncertainty relating to operating agreements; loss of other contractual rights, such as indemnification; adverse network implications, such as potential coordination with numerous state commuter rail agencies; and increased payments into the Railroad Retirement system to supplement lost contributions from Amtrak and its employees.

In response to the heightened threat of terrorism in the wake of the September 11, 2001 attacks, federal, state and local governmental bodies are proposing and beginning to adopt various legislation and regulations relating to security issues that impact the transportation industry, including rules and regulations that affect the transportation of hazardous materials. For instance, the District of Columbia enacted legislation that prohibits rail carriers, including CSXT, from transporting certain hazardous materials through the District. CSXT, supported by the United States, is currently challenging the validity of this legislation in the federal courts. Although CSXT and the Federal Government have secured favorable rulings from the US Court of Appeals for the District of Columbia Circuit and the STB, legal proceedings continue, and the ultimate outcome is uncertain. The extent to which other governmental bodies will ultimately take similar or related steps is also uncertain. The Company could be negatively impacted by any legislation, regulations, or rules enacted by federal, state or local governmental bodies relating to security issues that affect rail and intermodal transportation.

**Safety**

The Company faces inherent business risk from exposure to property damage and personal injury claims resulting from train accidents, including derailments. The Company is also subject to exposure to occupational injury claims. While the Company is working diligently to enhance its safety programs and to continue to raise the awareness levels of its employees concerning safety, the Company cannot ensure that it will not experience any material property damage or personal injury or occupational claims in the future or that it will not incur significant costs to defend such claims. Additionally, the Company cannot ensure that existing claims will not suffer adverse development not currently reflected in reserve estimates, as the ultimate outcome of existing claims is subject to numerous factors outside of the Company's control. The Company engages outside parties to assist with the evaluation of certain of the occupational and personal injury claims, and believes that it is adequately reserved to cover all potential claims. Final amounts determined to be due, however, on any outstanding matters may differ materially from the recorded reserves.



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

**Severe Weather**

The Company may face severe weather conditions and other natural occurrences, including floods, fires, hurricanes and earthquakes which may cause significant disruptions to the Company's operations, and result in increased costs and liabilities and decreased revenues. For information on insurance issues resulting from the effects of Hurricane Katrina on the Company's results of operations, financial position or liquidity, see Note 6. Hurricane Katrina.

## FORWARD-LOOKING STATEMENTS

Certain statements in this report and in other materials filed with the SEC, as well as information included in oral statements or other written statements made by the Company, are forward-looking statements within the meaning of the Securities Act of 1933 and the Securities Exchange Act of 1934. These forward-looking statements include, among others, statements regarding:

- Expectations as to results of operations and operational improvements;
- Expectations as to the effect of claims, lawsuits, environmental costs, commitments, contingent liabilities, labor negotiations or agreements on the Company's financial condition;
- Management's plans, goals, strategies and objectives for future operations and other similar expressions concerning matters that are not historical facts, and management's expectations as to future performance and operations and the time by which objectives will be achieved; and
- Future economic, industry or market conditions or performance.

Forward-looking statements are typically identified by words or phrases such as "believe", "expect", "anticipate", "project", and similar expressions. The Company cautions against placing undue reliance on forward-looking statements, which reflect its good faith beliefs with respect to future events and are based on information currently available to it as of the date the forward-looking statement is made. Forward-looking statements should not be read as a guarantee of future performance or results, and will not necessarily be accurate indications of the times that, or by which, such performance or results will be achieved.

Forward-looking statements are subject to a number of risks and uncertainties and actual performance or results could differ materially from those anticipated by these forward-looking statements. The Company undertakes no obligation to update or revise any forward-looking statement. If the Company does update any forward-looking statement, no inference should be drawn that the Company will make additional updates with respect to that statement or any other forward-looking statements. The following important factors, in addition to those discussed elsewhere, may cause actual results to differ materially from those contemplated by these forward-looking statements:

- The Company's success in implementing its operational objectives and improving Surface Transportation operating efficiency;
- Changes in operating conditions and costs or commodity concentrations;
- Material changes in domestic or international economic or business conditions, including those affecting the rail industry such as customer demand, effects of adverse economic conditions affecting shippers, and adverse economic conditions in the industries and geographic areas that consume and produce freight;
- Labor costs and labor difficulties, including stoppages affecting either the Company's operations or the customers' ability to deliver goods to the Company for shipment;
- The inherent risks associated with safety and security, including adverse economic or operational effects from terrorist activities and any governmental response;



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

- Changes in fuel prices;
- Legislative, regulatory, or legal developments involving taxation, including the outcome of tax claims and litigation; the potential enactment of initiatives to re-regulate the rail industry and the ultimate outcome of shipper and rate claims subject to adjudication;
- Competition from other modes of freight transportation such as trucking and competition and consolidation within the transportation industry generally;
- Natural events such as severe weather conditions, including floods, fire, hurricanes and earthquakes, or other unforeseen disruptions of the Company's operations, systems, property or equipment; and
- The outcome of litigation and claims, including those related to environmental contamination, personal injuries and occupational illnesses.

Additionally, important factors resulting from Hurricane Katrina that may cause actual results to differ materially from those contemplated by these forward-looking statements include: the ability to fully restore service in affected areas of CSXT's rail network; further assessments of the extent of storm-related losses; the price and availability of continued supplies of fuel; the effect of inefficiencies in Company operations and increased operating expenses resulting from storm-related disruptions; loss of customers to competitors that have not been affected by the storm to the same degree in the same locales; and the extent of insurance coverage for the Company's losses. Other important assumptions and factors that could cause actual results to differ materially from those in the forward-looking statements are specified elsewhere in this report and in the Company's other SEC reports, accessible on the SEC's website at www.sec.gov and the Company's website at www.csx.com.

## FINANCIAL RESULTS OF OPERATIONS

### *2005 vs. 2004 Consolidated Results of Operations*

CSX follows a 52/53 week fiscal reporting calendar. Fiscal year 2005 consisted of 52 weeks ending on December 30, 2005. Fiscal year 2004 consisted of 53 weeks ending on December 31, 2004.

| | Consolidated | | | |
|---|---|---|---|---|
| | 52 Weeks 2005 | 53 Weeks 2004 | $ Change | % Change |
| | (Dollars in millions) | | | |
| **Operating Revenue** | $ 8,618 | $ 8,040 | $ 578 | 7% |
| **Operating Expense** | | | | |
| Labor and Fringe | 2,864 | 2,744 | 120 | 4 |
| Materials, Supplies and Other | 1,828 | 1,753 | 75 | 4 |
| Depreciation | 826 | 711 | 115 | 16 |
| Fuel | 783 | 656 | 127 | 19 |
| Building and Equipment Rent | 510 | 569 | (59) | (10) |
| Inland Transportation | 230 | 280 | (50) | (18) |
| Conrail Rents, Fees & Services | 65 | 256 | (191) | (75) |
| Restructuring Charge — Net | — | 71 | (71) | NM |
| Provision for Casualty Claims | (38) | — | (38) | NM |
| **Total Operating Expense** | 7,068 | 7,040 | 28 | — |
| **Operating Income** | $ 1,550 | $ 1,000 | $ 550 | 55% |

Prior periods have been reclassified to conform to the current presentation.

NM — not meaningful



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

Table of Contents

*Operating Revenue*

Operating Revenue increased $578 million for the year ended December 30, 2005 to $8.6 billion, compared to $8.0 billion for the prior year as continued yield management efforts coupled with the Company's fuel surcharge program drove revenue-per-unit improvements across all major markets.

*Operating Income*

Operating Income for the year ended December 30, 2005 increased $550 million to $1.6 billion as a result of increased operating revenue. Operating expenses remained relatively flat compared to the prior year.

*Other Income*

Despite the absence of the $16 million net gain after tax related to the Conrail spin-off transaction, Other Income increased $29 million to $101 million for the year ended December 30, 2005, primarily as a result of gains from real estate sales.

*Interest Expense*

Interest Expense decreased $12 million to $423 million for the year ended December 30, 2005 compared to the prior year comparable period. In June 2005, CSX repurchased $1.0 billion of its publicly-traded notes. As a result of the debt repurchase, interest expense was reduced. The savings (from June through December) were mostly offset by rising variable interest rates.

*Net Earnings*

Earnings from Continuing Operations were $720 million, or $3.17 per diluted share, for the year ended December 30, 2005 compared to $418 million, or $1.87 per diluted share for the prior year.

Income tax expense increased $97 million to $316 million for the year ended December 30, 2005 as a result of higher Earnings from Continuing Operations. Additionally, the effective income tax rate decreased from 34% in 2004 to 30% in 2005 primarily attributable to legislative changes in Ohio that will gradually eliminate the Ohio corporate franchise tax.

Income from Discontinued Operations, net of tax, was $425 million, or $1.87 per diluted share, for the year ended December 30, 2005 compared to a loss of $79 million, or 35 cents per diluted share, for the prior year. CSX recognized income of $683 million pretax, $428 million after tax, for the fiscal year ended December 30, 2005 as a result of the sale of its International Terminals' business. Discontinued Operations for the period ended December 31, 2004, includes International Terminals' net earnings as well as additional income tax expense of $97 million related to undistributed foreign earnings.

Net Earnings were $1.1 billion, or $5.04 per diluted share, for the year ended December 30, 2005, compared to $339 million, or $1.52 per diluted share, for the prior year.



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

Table of Contents

***2004 vs. 2003 Consolidated Results of Operations***

CSX follows a 52/53 week fiscal reporting calendar. Fiscal year 2004 consisted of 53 weeks ending on December 31, 2004. Fiscal year 2003 consisted of 52 weeks ending on December 26, 2003.

| | Consolidated | | | |
|---|---|---|---|---|
| | 53 Weeks 2004 | 52 weeks 2003 | $ Change | % Change |
| | (Dollars in millions) | | | |
| **Operating Revenue** | $ 8,040 | $ 7,573 | $ 467 | 6% |
| **Operating Expense** | | | | |
| Labor and Fringe | 2,744 | 2,656 | 88 | 3 |
| Materials, Supplies and Other | 1,753 | 1,622 | 131 | 8 |
| Depreciation | 711 | 620 | 91 | 15 |
| Fuel | 656 | 581 | 75 | 13 |
| Building and Equipment Rent | 569 | 565 | 4 | 1 |
| Inland Transportation | 280 | 305 | (25) | (8) |
| Conrail Rents, Fees & Services | 256 | 342 | (86) | (25) |
| Restructuring Charge — Net | 71 | 22 | 49 | 223 |
| Provision for Casualty Claims | — | 232 | (232) | NM |
| Additional Loss on Sale | — | 108 | (108) | NM |
| **Total Operating Expense** | 7,040 | 7,053 | (13) | — |
| **Operating Income** | $ 1,000 | $ 520 | $ 480 | 92% |

Prior periods have been reclassified to conform to the current presentation.

NM — not meaningful

*Operating Revenue*

Operating Revenue increased $467 million for the year ended December 31, 2004 to $8.0 billion, compared to $7.6 billion for the prior year primarily due to continued yield management strategies as all major markets showed year-over-year improvement in revenue-per-unit coupled with the Company's fuel surcharge program.

*Operating Income*

Operating Income for the year ended December 31, 2004 increased $480 million to $1.0 billion, compared to $520 million in the prior year. Operating expenses decreased principally due to the absence of charges totaling $340 million taken in 2003 for (1) the Provision for Casualty Claims, and (2) the Additional Loss on Sale.

*Other Income*

Other Income decreased $21 million to $72 million for the year ended December 31, 2004, compared to $93 million for the prior year primarily due to a decline in income from real estate and resort operations. This decrease was partially offset by the net gain of $16 million, after tax, related to the Conrail spin-off transaction.



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

*Interest Expense*

Interest Expense increased $17 million for the year ended December 31, 2004 compared to the prior year comparable period due to decreased benefits from interest rate swaps and the exchange of Conrail debt as a result of the Conrail spin-off transaction.

*Net Earnings*

Earnings from Continuing Operations were $418 million, or $1.87 per diluted share, for the year ended December 31, 2004 compared to $137 million, or 63 cents per diluted share, for the prior year.

Losses from Discontinued Operations, net of tax, were $79 million, or 35 cents per diluted share, for the year ended December 31, 2004 compared to earnings of $52 million, or 23 cents per diluted share, for the prior year. Discontinued Operations for the period ended December 31, 2004, include International Terminals' net earnings as well as additional tax expense of $97 million related to undistributed foreign earnings.

The year ended December 26, 2003 includes an after-tax cumulative effect of accounting change benefit of $57 million, related to the adoption of Statement of Financial Accounting Standard ("SFAS") 143, *Accounting for Asset Retirement Obligations* ("SFAS 143").

Net Earnings were $339 million, or $1.52 per diluted share, for the year ended December 31, 2004, compared to $246 million, or $1.11 per diluted share, for the prior year.

The increase in the 2004 effective income tax rate compared to the prior year is primarily attributable to a larger percentage of total pretax earnings being attributable to Conrail equity earnings in 2004 than in 2003. Additionally, 2003 income tax expense was favorably impacted by the cumulative effect of changes in the Company's deferred effective state income tax rates.

***2005 vs. 2004 Rail Results of Operations***

CSX follows a 52/53 week fiscal reporting calendar. Fiscal year 2005 consisted of 52 weeks ending on December 30, 2005. Fiscal year 2004 consisted of 53 weeks ending on December 31, 2004.

| | Rail | | | |
|---|---|---|---|---|
| | 52 Weeks 2005 | 53 weeks 2004 | $ Change | % Change |
| | (Dollars in millions) | | | |
| **Operating Revenue** | $ 7,256 | $ 6,694 | $ 562 | 8% |
| **Operating Expense** | | | | |
| Labor and Fringe | 2,777 | 2,663 | 114 | 4 |
| Materials, Supplies and Other | 1,622 | 1,540 | 82 | 5 |
| Depreciation | 779 | 664 | 115 | 17 |
| Fuel | 783 | 656 | 127 | 19 |
| Building and Equipment Rent | 400 | 428 | (28) | (7) |
| Inland Transportation | (433) | (421) | (12) | 3 |
| Conrail Rents, Fees & Services | 65 | 256 | (191) | (75) |
| Restructuring Charge — Net | — | 67 | (67) | NM |
| Provision for Casualty Claims | (38) | — | (38) | NM |
| **Total Operating Expense** | 5,955 | 5,853 | 102 | 2 |
| **Operating Income** | $ 1,301 | $ 841 | $ 460 | 55% |
| **Operating Ratio** | 82.1% | 87.4% | | |
| **Total Assets** | $ 23,177 | $ 22,927 | | |

Prior periods have been reclassified to conform to the current presentation.

NM — not meaningful

| | Rail Traffic, Revenue and Revenue per Unit | | | | | |
|---|---|---|---|---|---|---|
| | Volume | | Revenue | | Revenue Per Unit | |
| | 52 Weeks 2005 | 53 Weeks 2004 | 52 Weeks 2005 | 53 Weeks 2004 | 52 Weeks 2005 | 53 Weeks 2004 |
| | Volume (thousands); Revenue (dollars in millions), Revenue Per Unit (dollars) | | | | | |
| **Merchandise** | | | | | | |
| Phosphates and Fertilizers | 444 | 471 | $ 351 | $ 341 | $ 791 | $ 724 |
| Metals | 361 | 380 | 570 | 511 | 1,579 | 1,345 |
| Forest Products | 439 | 465 | 717 | 681 | 1,633 | 1,465 |
| Food and Consumer | 249 | 245 | 438 | 377 | 1,759 | 1,539 |
| Agricultural Products | 357 | 356 | 550 | 512 | 1,541 | 1,438 |
| Chemicals | 533 | 564 | 1,089 | 1,069 | 2,043 | 1,895 |
| Emerging Markets | 505 | 506 | 513 | 504 | 1,016 | 996 |
| **Total Merchandise** | 2,888 | 2,987 | 4,228 | 3,995 | 1,464 | 1,337 |
| **Automotive** | 488 | 507 | 844 | 835 | 1,730 | 1,647 |
| **Coal, Coke and Iron Ore** | | | | | | |
| Coal | 1,726 | 1,659 | 1,992 | 1,714 | 1,154 | 1,033 |
| Coke and Iron Ore | 83 | 71 | 88 | 66 | 1,060 | 930 |
| Total Coal, Coke and Iron Ore | 1,809 | 1,730 | 2,080 | 1,780 | 1,150 | 1,029 |
| Other | — | — | 104 | 84 | — | — |
| **Total Rail** | 5,185 | 5,224 | $ 7,256 | $ 6,694 | $ 1,399 | $ 1,281 |

Prior periods have been reclassified to conform to the current presentation.

*Operating Revenue*

CSX categorizes rail revenue in three main lines of business: merchandise, automotive and coal, coke and iron ore. Overall revenue increased $562 million, or 8%, to $7.3 billion in 2005 from $6.7 billion in 2004.

***Merchandise***

All merchandise markets experienced revenue growth primarily driven by yield improvement efforts and the Company's fuel surcharge program. Overall merchandise revenue grew 6% to a record $4.2 billion while revenue-per-unit also achieved record levels increasing 9%. Volume declined 3% due to several factors including an additional week included in the fiscal year ended December 31, 2004, impacts of Hurricane Katrina and shedding of low margin traffic. Food and consumer experienced volume growth due to a continued shift of traffic previously handled by trucks to rail and the acquisition of newly finished railcars to other shippers. Despite strong soybean and corn harvests and increased export demand for grain, volume in agricultural products was flat due to declines in processed products such as flour, sweeteners, and vegetable oils. Emerging markets volumes and revenue were negatively impacted by a significant reduction in shipments of high revenue per unit military traffic. While metals volumes decreased by 5%, the pricing environment remained very favorable and resulted in the highest revenue per unit growth within merchandise at 17%.

Forest products also experienced high revenue per unit increases because of both a favorable pricing environment and a favorable mix shift from short haul low margin traffic towards longer haul more profitable traffic. In addition to production disruption from both Hurricanes Katrina and Rita, chemical volumes were negatively impacted by high natural gas prices and generally high raw materials inventories. Phosphate and fertilizer volumes were down due to high international inventories of phosphates during the first half of the year and several CSX-served plant curtailments



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

Case 1:07-mc-00489-BAH Document 1229-7 Filed 11/22/24 Page 830 of 3766

or closures during 2005. Both the chemicals and phosphate and fertilizer groups experienced high revenue per unit increases of 8% and 9%, respectively.

***Automotive***

Overall volume was down 4% as North American light vehicle production was flat compared to the prior year. However, vehicle production for the Big 3 was unfavorable 6%, including permanent closures of three General Motors plants served by the Company. Growth in new shipments from the newly-opened Hyundai plant in Montgomery, AL continued to partially offset these declines. Revenue-per-unit grew 5% on strong yield management and increases in fuel surcharge rates and coverage resulting in record revenue-per-unit levels. Revenue-per-unit gains more than offset volume weakness and drove overall revenue growth of 1% compared to the prior year.

***Coal, Coke & Iron Ore***

Revenues increased by 17% to a record $2.1 billion due to both strong volume growth of 5%, and revenue per unit improvements of 12% driven by a favorable pricing environment and the Company's fuel surcharge program. Most markets experienced strong demand as utility inventory levels remained below target levels. CSXT also reached a settlement agreement in a rate case that resulted in an additional $17 million of revenue in 2005.

*Operating Expense*

Total rail operating expenses increased $102 million, or 2% for the year ended December 30, 2005, compared to 2004.

Labor and Fringe Expense increased $114 million or 4% compared to the prior year primarily attributable to increases in incentive compensation and the effects of inflation.

Materials, Supplies and Other expenses increased $82 million, or 5%, primarily due to the effects of inflation, higher reserve requirements for uncollectible accounts, and increased legal fees resulting from the litigation and resolution of certain matters.

Depreciation expense increased $115 million or 17% compared to the prior year primarily attributable to additional assets received as a result of the Conrail spin-off transaction. The rail segment had property additions of approximately $1.1 billion.

Fuel expense increased $127 million or 19% in 2005, net of $249 million of fuel hedging benefits, compared to the prior year primarily due to fuel price increases. Fuel hedging activity had a $63 million favorable impact on fuel expense for the fiscal year ended December 31, 2004. The average price per gallon of diesel fuel, including benefits from CSX's fuel hedging program, was $1.31 in 2005 versus $1.10 in 2004. In addition, the fuel surcharge programs and contractual cost escalation clauses used in most multi-year customer contracts partially offset fuel cost increases.

Building and Equipment Rent decreased $28 million or 7% in 2005, compared to the prior year, as a result of decreased overall volume and lower locomotive lease expense.

Inland transportation, which represents Intermodal's use of the CSXT rail network, decreased $12 million compared to the prior year. The offsetting expense associated with this amount is reflected in Intermodal's operating expense, and is thus eliminated at the consolidated level.

Conrail Rents, Fees & Services expense decreased $191 million or 75% in 2005, compared to the prior year, as a result of the Conrail spin-off transaction, which decreased rents paid to Conrail as assets previously leased from Conrail are now owned directly by CSXT. Additionally, Conrail received a tax benefit from the resolution of various federal income tax audit adjustments during 2005, which increases CSX's equity earnings and offsets Conrail Rents, Fees & Services. (See Note 2. Investment In and Integrated Rail Operations with Conrail.)



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

Table of Contents

Rail operating expense for the fiscal year ended December 30, 2005, included net favorable reserve adjustments of $38 million related to decreasing claim trends. This adjustment is reflected as "Provision for Casualty Claims" in the operating expense detail above. (See Note 11. Casualty, Environmental and Other Reserves.)

For the fiscal year ended December 31, 2004, the rail business segment recorded expense of $67 million for separation expense, pension and postretirement benefit curtailment charges, stock compensation expense and other related expenses. (See Note 5. Management Restructuring.)

*Operating Income*

Operating income increased $460 million to $1.3 billion in 2005, compared to $841 million in 2004 primarily due to an 8% increase in revenue.

***2004 vs. 2003 Rail Results of Operations***

CSX follows a 52/53 week fiscal reporting calendar. Fiscal year 2004 consisted of 53 weeks ending on December 31, 2004. Fiscal year 2003 consisted of 52 weeks ending on December 26, 2003.

| | Rail | | | |
|---|---|---|---|---|
| | 53 weeks 2004 | 52 weeks 2003 | $ Change | % Change |
| | (Dollars in millions) | | | |
| **Operating Revenue** | $ 6,694 | $ 6,182 | $ 512 | 8% |
| **Operating Expense** | | | | |
| Labor and Fringe | 2,663 | 2,522 | 141 | 6 |
| Materials, Supplies and Other | 1,540 | 1,358 | 182 | 13 |
| Depreciation | 664 | 579 | 85 | 15 |
| Fuel | 656 | 566 | 90 | 16 |
| Building and Equipment Rent | 428 | 422 | 6 | 1 |
| Inland Transportation | (421) | (399) | (22) | 6 |
| Conrail Rents, Fees & Services | 256 | 342 | (86) | (25) |
| Provision for Casualty Claims | — | 229 | (229) | NM |
| Restructuring Charge — Net | 67 | 22 | 45 | NM |
| **Total Operating Expense** | 5,853 | 5,641 | 212 | 4 |
| **Operating Income** | $ 841 | $ 541 | $ 300 | 55% |
| **Operating Ratio** | 87.4% | 91.2% | | |
| **Total Assets** | $ 22,927 | $ 16,333 | | |

Prior periods have been reclassified to conform to the current presentation.

NM — not meaningful



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

| | Rail Traffic, Revenue and Revenue per Unit | | | | | |
|---|---|---|---|---|---|---|
| | Volume | | Revenue | | Revenue Per Unit | |
| | 53 Weeks 2004 | 52 Weeks 2003 | 53 Weeks 2004 | 52 Weeks 2003 | 53 Weeks 2004 | 52 Weeks 2003 |
| | Volume (thousands); Revenue (dollars in millions), Revenue Per Unit (dollars) | | | | | |
| **Merchandise** | | | | | | |
| Phosphates and Fertilizers | 471 | 460 | $ 341 | $ 329 | $ 724 | $ 715 |
| Metals | 380 | 348 | 511 | 435 | 1,345 | 1,250 |
| Forest Products | 465 | 459 | 681 | 622 | 1,465 | 1,355 |
| Food and Consumer | 245 | 242 | 377 | 351 | 1,539 | 1,450 |
| Agricultural Products | 356 | 363 | 512 | 497 | 1,438 | 1,369 |
| Chemicals | 564 | 541 | 1,069 | 989 | 1,895 | 1,828 |
| Emerging Markets | 506 | 476 | 504 | 471 | 996 | 989 |
| **Total Merchandise** | 2,987 | 2,889 | 3,995 | 3,694 | 1,337 | 1,279 |
| **Automotive** | 507 | 529 | 835 | 853 | 1,647 | 1,612 |
| **Coal, Coke and Iron Ore** | | | | | | |
| Coal | 1,659 | 1,570 | 1,714 | 1,543 | 1,033 | 983 |
| Coke and Iron Ore | 71 | 65 | 66 | 57 | 930 | 877 |
| **Total Coal, Coke and Iron Ore** | 1,730 | 1,635 | 1,780 | 1,600 | 1,029 | 979 |
| **Other** | — | — | 84 | 35 | — | — |
| **Total Rail** | 5,224 | 5,053 | $ 6,694 | $ 6,182 | $ 1,281 | $ 1,223 |

*Prior periods have been reclassified to conform to the current presentation.*

*Operating Revenue*

CSXT categorizes revenues in three main areas: merchandise, automotive and coal, coke and iron ore. Overall revenues were up $512 million to $6.7 billion in 2004 from $6.2 billion in 2003.

***Merchandise***

Merchandise showed strength during 2004 with revenue up 8% on 3% volume growth. All markets showed year-over-year revenue improvement due to pricing, yield management strategies and the Company's fuel surcharge program. All markets, except agricultural products, experienced increased volumes. Metals realized the most improvement, with 17% revenue growth on 9% volume growth. Strong demand existed across all steel commodity lines as steel production and mill utilization rates were at high levels. Forest products revenue grew 9% on 1% volume growth as a result of strength in panel and lumber markets driven by strong residential construction. Food and consumer revenues grew 7% on 1% volume growth. Food and consumer and forest products volumes were favorable year-over-year primarily due to the 53 week fiscal reporting calendar in 2004. Chemicals revenue grew 8% on 4% volume growth driven by strong customer demand and a rebound in U.S. chemical exports. Emerging markets revenues grew 7% on 6% volume growth, largely driven by strength in aggregates, cement, lime and fly ash. New industrial development is helping serve off — rail markets. Phosphate and fertilizer revenues grew 4% on 2% volume growth. Fertilizer production levels were mixed as high fertilizer prices and hurricane disruptions caused curtailments in production. Although ethanol shipments contributed to growth in agricultural products, revenue increased 3% on declining volume due to a decline in export and bean markets.



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

***Automotive***

Volumes declined largely due to a 100,000 unit year-over-year decrease in North American light vehicle production. Downtime at CSXT-served plants also contributed to volume weakness. Price increases drove improvements in revenue-per-unit.

***Coal, Coke and Iron Ore***

Coal, coke and iron ore revenue increased 11% on 6% volume growth. All lines of business reflect year-over-year revenue-per-unit improvements. Volume growth was driven by gains in export, metallurgical and utility markets. Strength in exports was due to high demand primarily related to Asian steel market needs.

***Other***

Other revenue for the fiscal year 2004 includes $63 million for FRT, a short-line railroad consolidated in 2004 pursuant to Financial Accounting Standards Board (“FASB”) Interpretation 46 *Consolidation of Variable Interest Entities.* Prior to 2004, FRT was accounted for under the equity method.

*Operating Expense*

Total rail operating expenses increased $212 million, or 4% for the year ended December 31, 2004, compared to 2003.

Labor and Fringe Expense increased $141 million or 6% compared to the prior year primarily attributable to the effects of inflation, consolidation of FRT and increases in incentive compensation plan and pension costs. These costs were partially offset by benefits realized from reduced staffing levels.

Materials, Supplies and Other expenses increased $182 million, or 13%, year-over-year primarily due to increased maintenance and crew travel costs, property and sales taxes, coupled with higher track, locomotive, car repair and other costs. Additionally, due to the adoption of SFAS 143 as discussed below, depreciation expense has been decreased and materials, supplies and other expense increased to account for the discontinuance of the accrual of cross-tie removal as a component of depreciation expense.

Depreciation expense increased $85 million or 15% compared to the prior year primarily attributable to assets received as a result of the Conrail spin-off transaction. The rail segment had property additions of approximately $1 billion, but the additional depreciation was offset by the reduction in depreciation associated with the adoption of SFAS 143. In conjunction with the group-life method of accounting for asset costs, CSXT historically accrued crosstie removal costs as a component of depreciation, which is not permitted under SFAS 143. The effect is to decrease depreciation expense and increase Materials, Supplies and Other expense.

Fuel expense increased $90 million or 16% in 2004, net of $63 million of fuel hedging benefits, compared to the prior year primarily due to fuel price increases, while increased volumes were also a factor. The average price per gallon of diesel fuel, including benefits from CSX’s fuel hedging program, was $1.10 in 2004 versus $0.96 in 2003. In addition, the fuel surcharge programs and contractual cost escalation clauses used in most multi-year customer contracts partially offset fuel cost increases.

Building and Equipment Rent remained relatively consistent year-over-year with the slight increase in 2004 resulting from unfavorable asset utilization.

Inland transportation, which represents Intermodal’s use of the CSXT rail network, reduced operating expense by $22 million or 6% year-over-year. The offsetting expense associated with this amount is reflected in Intermodal’s operating expense, and thus eliminates at the consolidated level.



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

Conrail Rents, Fees & Services expense decreased $86 million or 25% in 2004, compared to the prior year, as a result of the Conrail spin-off transaction, which decreased rents paid to Conrail as assets previously leased from Conrail are now owned directly by CSXT. (See Note 2. Investment In and Integrated Rail Operations with Conrail.)

For the fiscal year ended December 31, 2004, the rail business segment recorded expense of $67 million for separation expense, pension and postretirement benefit curtailment charges, stock compensation expense and other related expenses. (See Note 5. Management Restructuring.)

Rail operating expense for the fiscal year ended December 26, 2003, included a charge of $229 million recorded in conjunction with CSXT's change in estimate for its casualty reserves to include an estimate of incurred but not reported claims for asbestos and other occupational injuries that could be received over the next seven years. This charge is reflected as "Provision for Casualty Claims" in the operating expense detail above. (See Note 11. Casualty, Environmental and Other Reserves.)

*Operating Income*

Operating income increased $300 million to $841 million in 2004, compared to $541 million in 2003 primarily due to an 8% increase in revenue coupled with the absence of $229 million provision for casualty claims, offset by $67 million of management restructuring charges and other expense increases as previously discussed.

***2005 vs. 2004 Intermodal Results of Operations***

CSX follows a 52/53 week fiscal reporting calendar. Fiscal year 2005 consisted of 52 weeks ending on December 30, 2005. Fiscal year 2004 consisted of 53 weeks ending on December 31, 2004.

| | Intermodal | | | |
|---|---|---|---|---|
| | 52 Weeks 2005 | 53 Weeks 2004 | $ Change | % Change |
| | (Dollars in millions) | | | |
| **Operating Revenue** | $ 1,362 | $ 1,346 | $ 16 | 1% |
| **Operating Expense** | | | | |
| Labor and Fringe | 79 | 78 | 1 | 1 |
| Materials, Supplies and Other | 200 | 219 | (19) | (9) |
| Depreciation | 39 | 38 | 1 | 3 |
| Building and Equipment Rent | 133 | 154 | (21) | (14) |
| Inland Transportation | 663 | 701 | (38) | (5) |
| Restructuring Charge — Net | — | 4 | (4) | NM |
| **Total Operating Expense** | 1,114 | 1,194 | (80) | (7) |
| **Operating Income** | $ 248 | $ 152 | $ 96 | 63% |
| **Operating Ratio** | 81.8% | 88.7% | | |
| **Total Assets** | $ 305 | $ 313 | | |

Prior periods have been reclassified to conform to the current presentation.

NM — not meaningful



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

**Intermodal Traffic, Revenue and Revenue-per-Unit**

| | Volume | | Revenue | | Revenue Per Unit | |
|---|---|---|---|---|---|---|
| | 52 Weeks 2005 | 53 Weeks 2004 | 52 Weeks 2005 | 53 Weeks 2004 | 52 Weeks 2005 | 53 Weeks 2004 |
| | Volume (thousands); Revenue (dollars in millions), Revenue per unit (dollars) | | | | | |
| **Intermodal** | | | | | | |
| Domestic | 891 | 1,028 | $ 738 | $ 795 | $ 828 | $ 773 |
| International | 1,274 | 1,278 | 499 | 501 | 392 | 392 |
| Other | — | — | 125 | 50 | — | — |
| **Total Intermodal** | 2,165 | 2,306 | $ 1,362 | $ 1,346 | $ 629 | $ 584 |

Prior periods have been reclassified to conform to the current presentation.

*Operating Revenue*

Intermodal revenue improved 1% due to higher fuel surcharge rates, customer coverage and continued emphasis on multiple ancillary charges, including premise use and per diem charges related to asset utilization. In the domestic market, continued focus on longer hauls in higher density lanes coupled with sustained strength in pricing increased revenue per unit by 7%. Overall, domestic volumes were down compared to the prior year due to ongoing yield management efforts. Strong demand from the parcel sector partially offset volume declines and increased revenue. International volumes and revenue remained flat compared to the prior year. Pricing initiatives were offset by a reduction in long-haul shipments from the west coast. The shift of traffic to east coast ports caused an increase in shorter-haul moves, which negatively impacted revenue per unit.

*Operating Expense*

Intermodal expenses decreased 7% compared to the prior year due to continued service improvements, an emphasis on equipment utilization, and decrease in volume as discussed above. A decline in trucking expenses associated with line-haul moves led to a significant decrease in operating costs associated with a reduction in services. Several productivity initiatives within terminal operations generated efficiencies driving per-unit cost reductions compared to the prior year.



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

***2004 vs. 2003 Intermodal Results of Operations***

CSX follows a 52/53 week fiscal reporting calendar. Fiscal year 2004 consisted of 53 weeks ending on December 31, 2004. Fiscal year 2003 consisted of 52 weeks ending on December 26, 2003.

| | Intermodal | | | |
|---|---|---|---|---|
| | 53 Weeks 2004 | 52 Weeks 2003 | $ Change | % Change |
| | (Dollars in millions) | | | |
| **Operating Revenue** | $ 1,346 | $ 1,264 | $ 82 | 6% |
| **Operating Expense** | | | | |
| Labor and Fringe | 78 | 73 | 5 | 7 |
| Materials, Supplies and Other | 219 | 214 | 5 | 2 |
| Depreciation | 38 | 32 | 6 | 19 |
| Building and Equipment Rent | 154 | 147 | 7 | 5 |
| Inland Transportation | 701 | 688 | 13 | 2 |
| Restructuring Charge — Net | 4 | — | 4 | NM |
| **Total Operating Expense** | 1,194 | 1,154 | 40 | 3 |
| **Operating Income** | $ 152 | $ 110 | $ 42 | 38% |
| **Operating Ratio** | 88.7% | 91.3% | | |
| **Total Assets** | $ 313 | $ 400 | | |

Prior periods have been reclassified to conform to the current presentation.

NM — not meaningful

| | Intermodal Traffic, Revenue and Revenue Per Unit | | | | | |
|---|---|---|---|---|---|---|
| | Volume | | Revenue | | Revenue Per Unit | |
| | 53 Weeks 2004 | 52 Weeks 2003 | 53 Weeks 2004 | 52 Weeks 2003 | 53 Weeks 2004 | 52 Weeks 2003 |
| | Volume (thousands); Revenue (dollars in millions), Revenue Per Unit (dollars) | | | | | |
| **Intermodal** | | | | | | |
| Domestic | 1,028 | 1,060 | $ 795 | $ 784 | $ 773 | $ 740 |
| International | 1,278 | 1,170 | 501 | 469 | 392 | 401 |
| Other | — | — | 50 | 11 | — | — |
| **Total Intermodal** | 2,306 | 2,230 | $ 1,346 | $ 1,264 | $ 584 | $ 567 |

Prior periods have been reclassified to conform to the current presentation.

*Operating Revenue*

Intermodal revenue improved 6% on a 3% volume increase due to strength in most business commodities. Strong gains in truck brokerage continued with the implementation of deal space technology, which is incorporated into the broader Pegasus system. Deal space technology is designed as a pricing, scheduling and capacity reservation system and provides CSX Trucking solicitors real-time information on costs, competitive prices, preferred routes and service. The parcel and international sectors also continued to show year-over-year strength. The parcel group showed improvement in most markets while international volume gains were based on general import growth. The domestic channel did not experience year-over-year growth due to Intermodal's Network Simplification Initiative which led to overall service improvements across the network, limited some terminals to containers only and improved the profitability of the traffic.



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

*Operating Expense*

Intermodal operating expense increased $40 million compared to the prior year due primarily to increases in volume and inflationary factors. Operating income increased to $152 million in 2004, compared to $110 million in the prior year, a 38% improvement.

**LIQUIDITY AND CAPITAL RESOURCES**

***Cash and Cash Equivalents***

Cash and cash equivalents decreased $213 million to $309 million at December 30, 2005, from $522 million at December 31, 2004. The decrease in cash is primarily due to the net effect of total consolidated debt repaid of $1.3 billion (see Debt Repurchase below) offset by the net cash proceeds from the sale of CSX's International Terminals business of $1.1 billion.

***Debt Repurchase***

In June 2005, CSX repurchased $1.0 billion of its publicly-traded notes. The total consideration paid for these notes totaled $1.2 billion, which includes a pretax charge of $192 million for costs to repurchase the debt which primarily reflects the market value above original issue value. CSX used cash proceeds from the disposition of CSX's International Terminals business to finance this repurchase. During 2005, CSX improved its overall financial position by reducing debt balances from $7.2 billion at December 31, 2004 to $6.0 billion as of December 30, 2005. As a result of the debt repurchase, CSX expects interest expense savings of approximately $68 million per year. However, these savings will be offset by rising short-term interest rates associated with $1.1 billion of variable rate debt which terms are based on LIBOR. (See Note 12. Debt and Credit Agreements.)

***Convertible Debentures***

In October 2005, holders had the option to require CSX to purchase their debentures at a purchase price equal to the accreted value of $852.48 per $1,000 principal amount at maturity. As a result, CSX purchased an immaterial aggregate principal amount at maturity of the debentures with cash on hand. The debentures allow holders to require CSX to purchase their debentures in October 2006, October 2008, October 2011, and October 2016, at a purchase price equal to the accreted value of the debentures at the time. The debentures are classified in Current Maturities of Long-term Debt in the Consolidated Balance Sheets.

***Debt Issuances***

In August 2004, CSX issued $300 million of floating rate notes with a maturity date of August 3, 2006. The notes bear interest at a rate that varies with LIBOR plus an applicable spread. These notes are not redeemable prior to maturity.

***Operating Activities***

Cash provided by operations in 2005 was $1.1 billion, compared to $1.4 billion for 2004. Earnings from Continuing Operations were substantially higher than the previous year. However, the Company made significant tax payments attributable to these higher earnings as well as related taxes paid on the sale of CSX's International Terminals business in 2005.

***Investing Activities***

Net cash used by investing activities was $36 million in 2005 compared to $1.2 billion in 2004. Included in investing activities is cash spent for capital additions of $1.1 billion and $1.0 billion in 2005 and 2004 respectively. Offsetting the cash spent in 2005, are the net cash proceeds from the disposition of CSX's International Terminals business.



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

***Financing Activities***

Financing activities used cash of $1.3 billion during 2005 compared to providing cash of $20 million during 2004 primarily as a result of the debt repurchase completed in June 2005, and an increase in dividends paid, which was partially offset by the proceeds from the exercise of stock options.

***Dividends***

CSX paid $93 million, $86 million, and $86 million in dividends in fiscal years 2005, 2004 and 2003, respectively. The increase in 2005 is a result of the Company increasing dividends by 30%, in the fourth quarter, from 10 cents to 13 cents per share.

***Working Capital***

The Company's working capital at December 30, 2005 was a deficit of $607 million, compared to a deficit of $314 million at December 31, 2004, primarily driven by reductions in cash and cash equivalents and short-term investments combined with the absence of net assets from CSX's former International Terminals business. A working capital deficit is not unusual for the Company and other railroads and does not indicate a lack of liquidity. The Company continues to maintain adequate current assets to satisfy current liabilities and maturing obligations when they come due and has sufficient financial capacity to manage its day-to-day cash requirements and any anticipated obligations arising from legal, tax and other regulatory rulings.

***Credit Facilities***

CSX has a $1.2 billion five-year unsecured revolving credit facility expiring in May 2009 and a $400 million 364-day unsecured revolving credit facility expiring in May 2006. The facilities were entered into in May 2004 and May 2005, respectively, on terms substantially similar to the facilities they replaced. Generally, these facilities may be used for general corporate purposes, to support CSX's commercial paper, and for working capital. Neither of the credit facilities was drawn on as of December 30, 2005. Commitment fees and interest rates payable under the facilities are similar to fees and rates available to comparably rated investment-grade borrowers. In 2005, CSX paid approximately $2 million for total fees associated with the undrawn facility. These credit facilities allow for borrowings at floating (LIBOR-based) rates, plus a spread, depending upon CSX's senior unsecured debt ratings. At December 30, 2005, CSX was in compliance with all covenant requirements under the facilities.

***Stock Repurchases***

The Board of Directors has authorized CSX to purchase shares of its common stock from time to time in an amount up to approximately $150 million in any fiscal year. Pursuant to this authority, CSX intends to purchase shares of CSX common stock in the open market or in privately negotiated transactions.

***Credit Ratings***

As of December 30, 2005, CSX's long-term unsecured debt obligations were rated BBB and Baa2 by Standard and Poor's and Moody's Investor Service, respectively. In May 2005, Standard and Poor's raised CSX's short-term rating from A-3 to A-2 and revised the outlook from negative to stable. In July 2004, Moody's Investor Service reaffirmed CSX's short and long-term unsecured debt ratings, but adjusted the outlook from stable to negative. CSX's short-term commercial paper program is rated A-2 and P-2 by Standard and Poor's and Moody's Investor Service, respectively. If CSX's long-term unsecured bond ratings were reduced to BBB- and Baa3, its undrawn borrowing costs under the $1.2 billion and $400 million revolving credit facilities would not materially increase. If CSX's short-term commercial paper ratings were reduced to A-3 and P-3, it would increase CSX's



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

borrowing costs in the commercial paper market and reduce its access to this source of funds because of the more limited demand for lower rated commercial paper. CSX had no commercial paper outstanding at December 30, 2005 or December 31, 2004.

***Shelf Registration Statements***

CSX currently has $900 million of capacity under an effective shelf registration that may be used, subject to market conditions and board authorization, to issue debt or equity securities at CSX's discretion. CSX presently intends to use the proceeds from the sale of any securities issued under its shelf registration statement to finance cash requirements, including refinancing existing debt as it matures. While CSX seeks to give itself flexibility with respect to meeting such needs, there can be no assurance that market conditions would permit CSX to sell such securities on acceptable terms at any given time, or at all.

## SCHEDULE OF CONTRACTUAL OBLIGATIONS AND COMMERCIAL COMMITMENTS

The following table sets forth maturities of the Company's contractual obligations:

| Type of Obligation | 2006 | 2007 | 2008 | 2009 | 2010 | Thereafter | Total |
|---|---|---|---|---|---|---|---|
| | | | (Dollars in millions)(Unaudited) | | | | |
| Long-term Debt (See Note 12) | $ 1,016 | $ 595 | $ 633 | $ 296 | $ 94 | $ 3,474 | $ 6,108 |
| Operating Leases — Net (See Note 19) | 176 | 165 | 120 | 87 | 75 | 264 | 956 |
| Agreements with Conrail (See Note 2) | 18 | 18 | 16 | 13 | 9 | 17 | 91 |
| Purchase Obligations (See Note 19) | 397 | 423 | 342 | 338 | 353 | 5,855 | 7,708 |
| Total Contractual Obligations | $ 1,607 | $ 1,201 | $ 1,111 | $ 734 | $ 531 | $ 9,610 | $ 14,863 |

The following table sets forth maturities of the Company's other commitments:

| Type of Obligation | 2006 | 2007 | 2008 | 2009 | 2010 | Thereafter | Total |
|---|---|---|---|---|---|---|---|
| | | | (Dollars in millions)(Unaudited) | | | | |
| Unused Lines of Credit (See Note 12) | $ 400 | $ — | $ — | $ 1,200 | $ — | $ — | $ 1,600 |
| Guarantees (See Note 19) | 21 | 22 | 16 | 16 | 16 | 26 | 117 |
| Other | 43 | 15 | — | 1 | — | 1 | 60 |
| Total Other Commitments | $ 464 | $ 37 | $ 16 | $ 1,217 | $ 16 | $ 27 | $ 1,777 |

## OFF-BALANCE SHEET ARRANGEMENTS

There are no off-balance sheet arrangements that are reasonably likely to have a material effect on the Company's financial condition, results of operations or liquidity.

### Investment In and Integrated Rail Operations with Conrail

See background, accounting and financial reporting effects and summary financial information in Note 2. Investment In and Integrated Rail Operations with Conrail.

## CRITICAL ACCOUNTING ESTIMATES

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires that management make estimates in reporting the amounts of certain assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amount of certain revenues and expenses during the reporting



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

Case 1:07-mc-00489-BAH Document 1229-7 Filed 11/22/24 Page 840 of 3766

period. Actual results may differ from those estimates. Consistent with the prior year, significant estimates using management judgment are made for the following areas:

- Casualty, Environmental and Legal Reserves
- Pension and Postretirement Medical Plan Accounting
- Depreciation Policies for Assets Under the Group-Life Method
- Income Taxes

These estimates and assumptions are discussed with the Audit Committee of the Board of Directors on a regular basis.

**Casualty, Environmental and Legal Reserves**

**Casualty**

Casualty reserves represent accruals for personal injury and occupational injury claims. Currently, none of these claims are covered by insurance since no individual claim value is expected to exceed the Company's self-insured retention amount. Personal injury and occupational claims are presented on a gross basis in accordance with SFAS 5, *Accounting for Contingencies* ("SFAS 5"). To the extent the value of an individual claim were to exceed the self-insured retention amount, CSX would present the liability on a gross basis with a corresponding receivable for insurance recoveries. Most of the claims are related to CSXT unless otherwise noted.

*Personal Injury*

CSXT retains an independent actuarial firm to assist management in assessing the value of CSXT's claims and cases. An analysis is performed by the independent actuarial firm semi-annually and is reviewed by management. The methodology used by the actuary includes a development factor to reflect growth or reduction in the value of CSXT's personal injury claims. This methodology is based largely on CSXT's historical claims and settlement activity. Actual results may vary from estimates due to the type and severity of the injury, costs of medical treatments, and uncertainties in litigation.

While the final outcome of casualty-related matters cannot be predicted with certainty, considering among other things, the meritorious legal defenses available and liabilities that have been recorded, it is the opinion of CSX management that none of these items, when finally resolved, will have a material adverse effect on the Company's results of operations, financial condition, or liquidity. However, should a number of these items occur in the same period, they could have a material adverse effect on the results of operations, financial condition or liquidity in a particular quarter or fiscal year.

*Occupational*

Occupational claims include allegations of exposure to certain materials in the work place, such as asbestos, solvents, and diesel fuel, or alleged physical injuries, such as repetitive stress injuries, carpal tunnel syndrome or hearing loss.

*Occupational — Asbestos*

The Company is party to a number of occupational claims by employees alleging exposure to asbestos in the workplace. The heaviest possible exposure for employees was due to work conducted in and around steam locomotive engines that were phased out in the 1950's, according to rail industry statistics. However, other types of exposures, including exposure from locomotive component parts and building materials, continued until it was substantially eliminated by 1985.



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

Asbestos claim filings against the Company have been inconsistent. Accordingly, while the Company had concluded that a probable loss had occurred, prior to 2003 it did not believe it could estimate the range of reasonably possible loss because of the lack of experience with such claims and the lack of detailed employment records for the population of exposed employees. Claim filings increased and when they continued into 2003, the Company concluded that an estimate for incurred but not reported ("IBNR") asbestos exposure liability needed to be recorded. Currently, there is recurring pending legislation regarding the establishment of an asbestos liability trust fund. The impact to the Company of this pending legislation is unknown at this time.

***2003 Provision for Asbestos Change in Estimate***

In 2003, the Company changed its estimate of asbestos reserves to include an estimate of IBNR claims and retained a third party specialist who has extensive experience in performing asbestos and other occupational studies to assist in this estimate. The analysis is performed by the specialist semi-annually and is reviewed by management. The objective of the analysis is to determine the number of estimated IBNR claims and the estimated average cost per claim to be received over the next seven years. Seven years was determined by management to be the time period in which probable claim filings and claim values could be estimated with more certainty.

The Company, with the assistance of the third party specialist, first determined its potentially exposed population from which it was able to derive the estimated number of IBNR claims. The estimated average cost per claim was then determined utilizing recent actual average cost per claim data and national industry data. Based on the assessment, in September 2003 the Company recorded an undiscounted $141 million pre-tax charge for unasserted asbestos claims. Key elements of the assessment included the following:

- An estimate was computed using a ratio of Company employee data to national employment for select years during the period 1938-2001. The Company used railroad industry historical census data because it did not have detailed employment records in order to compute the population of potentially exposed employees.
- The projected incidence of disease was estimated based on epidemiological studies using employees' age and the duration and intensity of potential exposure while employed.
- An estimate of the future anticipated claims filing rate by type of disease (non-malignant, cancer and mesothelioma) was computed using the Company's average historical claim filing rates for a 2-year calibration period (i.e. the years management felt were representative of future filing rates).
- An estimate of the future anticipated dismissal rate by type of claim was computed using the Company's historical average dismissal rates observed for two years.
- An estimate of the future anticipated settlement by type of disease was computed using the Company's historical average of dollars paid per claim for pending and future claims using the average settlement by type of incident observed during a 3-year time period.

From these assumptions, the Company projected the incidence of each type of disease to the estimated population to determine the total estimated number of employees that could potentially assert a claim. Historical claim filing rates were applied for each type of disease to the total number of employees that could potentially assert a claim to determine the total number of anticipated claim filings by disease type. Historical dismissal rates, which represent claims that are closed without payment, were deducted to calculate the number of future claims by disease type that would likely require payment by the Company. Finally, the number of such claims was multiplied by the average settlement value to estimate the Company's future liability for IBNR asbestos claims.

Asbestos claim filings are typically sporadic and may include large batches of claims solicited by law firms. To reflect these factors, CSX used a 2-year calibration period during its initial assessment



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

because the Company believed it would be most representative of its future claim experience. In addition, for non-malignant claims, the number of future claims to be filed against CSX declines at a rate consistent with both mortality and age as there is a decreasing probability of filing claims as the population ages. CSX believes the average claim values by type of disease from the historical 2-year period were most representative of future claim values.

***2005 Provision for Asbestos Change in Estimate***

In 2004, management had no changes in estimate for asbestos liabilities. In 2005, management updated their assessment of the unasserted liability exposure with the assistance of the third party specialists, which resulted in recognition of a $48 million favorable change in estimate associated with asbestos liabilities. During 2004 and 2005, asbestos related disease claims filed against CSX dropped substantially, particularly bulk claims filed by certain law firms. In 2003, the Company received a significant number of filings. The Company believes the number was attributable to an attempt to file before a new, more restrictive venue law took effect in West Virginia in mid-2003. As a result, management reassessed the calibration period to a 3-year average, excluding the surge in claims originating in West Virginia. Management believes this calibration period provides the best estimate of future filing rates.

The estimated future filing rates and estimated average claim values are the most sensitive assumptions for this reserve. A 10% increase or decrease in either the forecasted number of IBNR claims or the average claim values would result in an approximate $7 million increase or decrease in the liability recorded for unasserted asbestos claims.

The Company, with the assistance of the third party specialist, obtains semi-annual updates of the study. The Company will monitor actual experience against the number of forecasted claims to be received and expected claim payments. More periodic updates to the study will occur if trends necessitate a change.

*Other Occupational*

***2003 Provision for Other Occupational Change in Estimate***

In 2003, the Company changed its estimate of occupational reserves to include an estimate of IBNR claims for other occupational injuries as well as asbestos as noted above. The Company engaged a third party specialist to assist in projecting the number of other occupational injury claims to be received over the next seven years. Based on this analysis, the Company established reserves for the probable and reasonably estimable other occupational injury liabilities. In 2003, the Company recorded an undiscounted $65 million pre-tax charge for IBNR other occupational claims for similar reasons as asbestos discussed above.

Similar to the asbestos liability estimation process, the key elements of the assessment included the following:

- An estimate of the potentially exposed population for other occupational diseases was calculated by projecting active versus retired work force from 2002 to 2010 using a growth rate projection for overall railroad employment made by the Railroad Retirement Board in its June 2003 report.
- An estimate of the future anticipated claims filing rate by type of injury, employee type, and active versus retired employee was computed using the Company's average historical claim filing rates for the 2-year calibration period for all diseases except hearing loss. Because the filing rate for hearing loss claims has been decreasing since 1998, the latest year filing rate was viewed as representative. These calibration periods are the time periods which management felt were representative of future filing rates. An estimate was made to forecast future claims by using the filing rates by disease and the active and retired CSX population each year.



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

- An estimate of the future anticipated settlement by type of injury was computed using the Company's historical average of dollars paid per claim for pending and future claims using the average settlement by type of injury observed during a 3-year time period.

***2005 Provision for Other Occupational Change in Estimate***

In 2004, management had no changes in estimate for other occupational liabilities. During 2005, CSX experienced an unfavorable trend in settlement values for repetitive stress and other injuries, which resulted in the recognition of a $10 million unfavorable change in estimate associated with these liabilities. In connection with the semi-annual updates of the study, the Company will monitor actual experience against the number of forecasted claims to be received and expected claim payments. More periodic updates to the study will occur if trends necessitate a change.

The estimated future filing rates and estimated average claim values are the most sensitive assumptions for this reserve. A 10% increase or decrease in either the forecasted number of IBNR claims or the average claim values would result in an approximate $7 million increase or decrease in the liability recorded for unasserted other occupational claims.

***Summary***

The amounts recorded by the Company for asbestos and other occupational liabilities are based upon currently known information and judgments based upon that information. Projecting future events, such as the number of new claims to be filed each year, the average cost of disposing of claims, as well as the numerous uncertainties surrounding asbestos and other occupational litigation or legislation in the United States, could cause the actual costs to be higher or lower than projected.

While the final outcome of casualty-related matters cannot be predicted with certainty, considering among other items the meritorious legal defenses available and the liabilities that have been recorded, it is the opinion of management that none of these items, when finally resolved, will have a material effect on the Company's results of operations, financial position or liquidity. However, should a number of these items occur in the same period, they could have a material effect on the results of operations, financial condition or liquidity in a particular quarter or fiscal year.

**Environmental**

The Company is a party to various proceedings, including administrative and judicial proceedings, involving private parties and regulatory agencies related to environmental issues. The Company has been identified as a potentially responsible party ("PRP") at approximately 259 environmentally impaired sites, many of which are, or may be, subject to remedial action under the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), also known as the Superfund Law, or similar state statutes. A number of these proceedings are based on allegations that CSX, or its predecessors, sent hazardous substances to the facilities in question for disposal.

In addition, some of the Company's land holdings are and have been used for industrial or transportation-related purposes or leased to commercial or industrial companies whose activities may have resulted in releases of various regulated materials onto the property. Therefore, the Company is subject to environmental cleanup and enforcement actions under the Superfund law, as well as similar state laws that may impose joint and several liability for cleanup and enforcement costs on current and former owners and operators of a site without regard to fault or the legality of the original conduct, which could be substantial. In 2004, the Company assumed $6 million of Conrail environmental liabilities, due to the Conrail spin-off transaction.

At least once each quarter, CSXT reviews its role with respect to each such location, giving consideration to a number of factors, including:

- Type of cleanup required;
- Nature of CSXT's alleged connection to the location (e.g., generator of waste sent to the site, or owner or operator of the site);
- Extent of CSXT's alleged connection (e.g., volume of waste sent to the location and other relevant factors);
- Accuracy and strength of evidence connecting CSXT to the location; and
- Number, connection, and financial viability of other named and unnamed PRP's at the location.

CSXT management estimates its environmental liabilities using guidance from Statement of Position ("SOP") 96-1, *Environmental Remediation Liabilities.* Each site is periodically evaluated and the liability is adjusted to the most recent estimates made by management. Based on the review process, the Company has recorded reserves to cover estimated contingent future environmental costs with respect to such sites. Environmental costs are charged to expense when they relate to an existing condition caused by past operations and do not contribute to current or future revenue generation. The recorded liabilities for estimated future environmental costs are undiscounted and include amounts representing the Company's estimate of unasserted claims, which the Company believes to be immaterial. The liability includes future costs for all sites where the Company's obligation is (1) deemed probable, and (2) where such costs can be reasonably estimated. The liability includes future costs for remediation and restoration of sites as well as any significant ongoing monitoring costs, but excludes any anticipated insurance recoveries.

Currently, the Company does not possess sufficient information to reasonably estimate the amounts of additional liabilities, if any, on some sites until completion of future environmental studies. In addition, latent conditions at any given location could result in exposure, the amount and materiality of which cannot presently be reliably estimated. Based upon information currently available, however, the Company believes its environmental reserves are adequate to accomplish remedial actions to comply with present laws and regulations, and that the ultimate liability for these matters, if any, will not materially affect its overall results of operations, financial condition and liquidity.

**Legal**

In accordance with SFAS 5, an accrual for a loss contingency is established if information available prior to issuance of the financial statements indicates that it is (1) probable that an asset has been impaired or a liability has been incurred at the date of the financial statements, and (2) the amount of loss can be reasonably estimated. If no accrual is made for a loss contingency because one or both of these conditions are not met, or if an exposure to loss exists in excess of the amount accrued, disclosure of the contingency is made when there is at least a reasonable possibility that a loss or an additional loss may have been incurred.

The Company evaluates all exposures relating to legal liabilities twice quarterly and adjusts reserves when appropriate under the guidance noted above. The amount of a particular reserve may be influenced by factors that include official rulings, newly discovered or developed evidence, or changes in laws, regulations, and evidentiary standards.

**Pension and Postretirement Medical Plan Accounting**

The Company sponsors defined benefit pension plans, principally for salaried, management personnel. The plans provide eligible employees with retirement benefits based predominantly on years of service and compensation rates near retirement. In addition to the defined benefit pension



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

plans, the Company sponsors one medical plan and one life insurance plan that provide benefits to full-time, salaried, management employees hired prior to January 1, 2003, upon their retirement if certain eligibility requirements are met. The postretirement medical plans are contributory (partially funded by retirees), with retiree contributions adjusted annually. The life insurance plan is non-contributory.

The accounting for these plans is subject to the guidance provided in SFAS 87, *Employers Accounting for Pensions* ("SFAS 87"), and SFAS 106, *Employers' Accounting for Postretirement Benefits Other than Pensions* ("SFAS 106"). Both of these statements require that management make certain assumptions relating to the following:

- Long-term rate of return of plan assets;
- Discount rates used to measure future obligations and interest expense;
- Salary scale inflation rates;
- Health care cost trend rates; and
- Other assumptions.

These assumptions are determined as of the beginning of the year. As permitted by SFAS 87, the Company has elected to use a plan measurement date of September 30 to actuarially value its pension and postretirement plans as it provides for more timely analysis. The Company engages independent, external actuaries to compute the amounts of liabilities and expenses relating to these plans subject to the assumptions that the Company selects as of the beginning of the plan year. The Company reviews the discount, salary scale inflation, and health care cost trend rates on an annual basis and makes modifications to the assumptions based on current rates and trends as appropriate. Because the Company reduced its expected long-term rate of return on assets in 2004, management does not anticipate revising this assumption for the next several years to maintain consistency with market cycles.

*Long-term Rate of Return on Plan Assets*

The expected long-term rate of return on plan assets reflects the average rate of earnings expected on the funds invested or to be invested to provide for benefits included in the projected benefit obligation. In estimating that rate, the Company gives appropriate consideration to the returns being earned by the plan assets in the funds and the rates of return expected to be available for reinvestment. The expected long-term rate of return on plan assets is used in conjunction with the market-related value of assets to compute the expected return on assets.

The Company's expected long-term average rate of return on assets considers the current and projected asset mix of the funds. Management balances market expectations obtained from various investment managers and economists with both market and actual plan historical returns to develop a reasonable estimate of the expected long-term rate of return on assets. As this assumption is long-term, it is adjusted less frequently than other assumptions used in pension accounting.

*Discount Rates*

Discount rates affect the amount of liability recorded and the interest expense component of pension and postretirement expense. Assumed discount rates reflect the rates at which the pension and postretirement benefits could be effectively settled. It is appropriate in estimating those rates to look to available information about rates implicit in current prices of annuity contracts that could be used to effect settlement of the obligation. In making those estimates, employers may also look to rates of return on high-quality fixed-income investments currently available and expected to be available during the period to maturity of the pension benefits. The Company determines the discount rate based on a hypothetical portfolio of high quality bonds with cash flows matching the



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

Table of Contents

plans' expected benefit payments. CSX uses a different discount rate for pension and postretirement benefits due to the different time horizons of future payments for each of the plans.

Each year these discount rates are reevaluated and adjusted to reflect the best estimate of the current effective settlement rates. If interest rates generally decline or rise, the assumed discount rates will change.

*Salary Scale Inflation Rates*

Salary scale inflation rates are based on current trends and historical data accumulated by the Company. The Company reviews recent merit increases and management incentive compensation payments over the past five years in assessment of salary scale inflation rates.

*Health Care Cost Trend Rates*

Health care cost trend rates are based on recent plan experience and industry trends. The Company uses actuarial data to substantiate the inflation assumption for health care costs, representing increases in total plan costs, which include claims and administrative fee cost components. The current assumed health care cost trend rate is 11% for Medicare eligible participants and 12% for non-Medicare eligible participants and is expected to increase slightly before decreasing gradually until reaching 4.5% in 2013 based upon current actuarial projections.

*Other Assumptions*

The calculations made by the actuaries also include assumptions relating to mortality rates, turnover, and retirement age. These assumptions are based on historical data and are approved by management.

*2006 Estimated Pension and Postretirement Expense*

As a result of changes in assumptions for fiscal year 2006, net periodic pension benefit cost and postretirement benefit costs for 2006 are expected to be approximately $62 million and $30 million, respectively, compared to $46 million and $40 million, respectively in 2005. Currently, there is proposed legislation regarding pension plan funding requirements. If the proposed legislation is passed, pension plan funding requirements will be increased. The impact to the Company of this proposed legislation is unknown at this time.

| | Increase/ (Decrease) in 2006 Estimated Expense | |
|---|---|---|
| | **Pension** | **OPEB** |
| | **(Millions of dollars)** | |
| Discount Rate: | | |
| 0.25% increase | $ (4) | $ — |
| 0.25% decrease | 5 | — |
| Salary Scale Inflation Rate: | | |
| 0.25% increase | 3 | — |
| 0.25% decrease | (3) | — |
| Health Care Cost Trend Rate: | | |
| 1% increase | N/A | 3 |
| 1% decrease | N/A | (3) |

*Medicare Prescription Drug, Improvement and Modernization Act of 2003*

The Company is required to estimate and record the effects of the Medicare Prescription Drug, Improvement and Modernization Act of 2003 ("Act"). The Company determined that its medical



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

plan's prescription drug benefit will qualify as actuarially equivalent to Medicare Part D based upon a review by the plan's health and welfare actuary of the plan's benefit compared with the benefit that would be paid under Medicare Part D. The reduction in the postretirement benefit obligation as a result of the Act was approximately $56 million as of December 31, 2005. (See Note 18. Employee Benefit Plans.)

The Company has applied for the tax free 28% federal reimbursement of total prescription drug claims from $250 to $5,000 paid after January 1, 2006. Combining the financial implications of both cash receipts and lower tax deductible business expenses resulting from the subsidy, the Company expects after tax cash flow savings of approximately $5 million for fiscal year 2006. Additionally, projected postretirement benefit expenses for fiscal year 2006 were reduced by approximately $7 million due to the Act.

**Depreciation Policies for Assets Under the Group-Life Method**

CSXT accounts for its rail assets, including main-line track, locomotives and freight cars, using the group-life method. The group-life method pools similar assets by type and then depreciates each group as a whole. Under the group-life method, the service lives for each group of rail assets are determined by the performance of periodic life studies and management's assumptions concerning the service lives of its properties. These studies, called life studies, are conducted by a third party expert, analyzed by the Company's management and approved by the Surface Transportation Board ("STB") of the U.S. Department of Transportation. Life studies for equipment assets are completed every three years, whereas road and track life studies are completed every six years as required by the STB.

Changes in asset lives due to the results of the life studies could significantly impact future periods' depreciation expense and thus the Company's results of operations. Factors taken into account during the life study include:

- Statistical analysis of historical retirements for each group of property;
- Evaluation of current operations;
- Evaluation of technological advances and maintenance schedules;
- Previous assessment of the condition of the assets and outlook for their continued use;
- Expected net salvage expected to be received upon retirement; and
- Comparison of assets to the same asset groups with other companies.

The life studies may also indicate that the recorded amount of accumulated depreciation is deficient (or in excess) of the appropriate amount indicated by the study. Any such deficiency (or excess) is amortized as a component of depreciation expense over the remaining useful life of the asset group until the next required life study.

Although recent experience with life studies has resulted in depreciation rate changes, these modifications have not significantly affected the Company's annual depreciation expense. In 2003, the Company completed life studies for all of its rail, equipment and track assets, resulting in an increase in the average useful lives of equipment and track assets, while decreasing the average useful lives of many roadway assets. The combination of these adjustments increased depreciation expense by $1 million in 2003 with a decrease of approximately $13 million in 2004. No life studies were required or completed during 2005.

Assets depreciated under the group-life method comprise 95% of the Company's total fixed assets of $19.5 billion on a net basis at December 30, 2005. The Company's depreciation expense for the year ended December 30, 2005 amounted to $826 million. A one-percentage point increase (or decrease) in the average life of all group-life assets would result in an $8 million increase (or decrease) to the Company's annual depreciation expense.



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

**Income Taxes**

Management uses factors such as applicable law, current information and past experience with similar issues in computing its income tax expense. The Company has not materially changed its methodology for calculating income tax expense for the years presented. The Company does not anticipate any material change in the methodology or assumptions used in determining the Company's income tax expense.

The Company files a consolidated federal income tax return, which includes its principal domestic subsidiaries. Examinations of the federal income tax returns of CSX have been completed through 1993. Federal income tax returns for 1994 through 2003 currently are under examination. Management believes adequate provision has been made for any adjustments that might be assessed. While the final outcome of these matters cannot be predicted with certainty, it is the opinion of CSX management that none of these items will have a material adverse effect on the results of operations, financial position or liquidity of CSX. An unexpected adverse resolution of one or more of these items, however, could have a material adverse effect on the results of operations, financial condition or liquidity in a particular fiscal quarter or fiscal year. Also, the Company is party to a number of legal and administrative proceedings, the resolution of which could result in gain realization in amounts that could be material to results of operations, financial condition or liquidity in a particular fiscal quarter or fiscal year.

**New Accounting Pronouncements and Change in Accounting Policy**

See Note 1. Nature of Operations and Significant Accounting Policies under the caption "New Accounting Pronouncements and Change in Accounting Policy."

**Item 7A.** ***Quantitative and Qualitative Disclosures about Market Risk***

CSX addresses market risk exposure to fluctuations in interest rates and the risk of volatility in its fuel costs through the use of derivative financial instruments. CSX does not hold or issue derivative financial instruments for trading purposes.

CSX addresses its exposure to interest rate market risk through a controlled program of risk management that includes the use of interest rate swap agreements. The table below illustrates CSX's long-term interest rate swap sensitivity.

| | December 30, 2005 (Dollars in millions) |
|---|---|
| Interest Rate Swap Agreements | $ 600 |
| Effect of 1% Increase or Decrease in LIBOR Interest Rate | 6 |

During 2003, CSX began a program to hedge its exposure to fuel price volatility through swap transactions. As of December 30, 2005, CSX had hedged approximately 9% of fuel purchases for 2006. At December 30, 2005, a 1% change in fuel prices would result in an increase or decrease in the asset related to the swaps of approximately $1 million. CSX's rail unit average annual fuel consumption is approximately 603 million gallons. A one-cent change in the price per gallon, excluding gallons hedged, of fuel would affect fuel expense by approximately $5 million annually.

CSX is exposed to loss in the event of non-performance by any counter-party to the interest rate swap or fuel hedging agreements. CSX does not anticipate non-performance by such counter-parties, and no material loss would be expected from non-performance.

The following table highlights CSX's floating rate debt outstanding exclusive of derivative contracts that essentially convert fixed interest rate notes to floating interest rates.

| | December 30, 2005 (Dollars in millions) |
|---|---|
| Floating Rate Debt Outstanding | $ 378 |
| Effect of 1% Variance in Interest Rates | 4 |



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

Table of Contents

**Item 8.** ***Financial Statements and Supplementary Data***

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**


| | Page |
|---|---|
| Reports of Independent Registered Public Accounting Firm | 49 |
| **CSX Corporation** | |
| Consolidated Financial Statements and Notes to Consolidated Financial Statements Submitted Herewith: | |
| Consolidated Income Statements for Fiscal Years Ended: | 51 |
| • December 30, 2005 | |
| • December 31, 2004 | |
| • December 26, 2003 | |
| Consolidated Balance Sheets as of: | 52 |
| • December 30, 2005 | |
| • December 31, 2004 | |
| Consolidated Cash Flow Statements for Fiscal Years Ended: | 53 |
| • December 30, 2005 | |
| • December 31, 2004 | |
| • December 26, 2003 | |
| Consolidated Statements of Changes in Shareholders' Equity: | 54 |
| • December 30, 2005 | |
| • December 31, 2004 | |
| • December 26, 2003 | |
| Notes to Consolidated Financial Statements | 55 |




Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Shareholders and Board of Directors of CSX Corporation

We have audited the accompanying consolidated balance sheets of CSX Corporation and subsidiaries as of December 30, 2005 and December 31, 2004, and the related consolidated statements of income, cash flows, and changes in shareholders' equity for each of the three fiscal years in the period ended December 30, 2005. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of CSX Corporation and subsidiaries at December 30, 2005 and December 31, 2004, and the consolidated results of their operations and their cash flows for each of the three fiscal years in the period ended December 30, 2005, in conformity with U.S. generally accepted accounting principles.

As discussed in Note 1 to the consolidated financial statements, in 2004 the Company changed its method of calculating earnings per share, and in 2003 the Company changed its method of accounting for railroad tie removal costs and stock-based compensation.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of CSX Corporation's internal control over financial reporting as of December 30, 2005, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 13, 2006, expressed an unqualified opinion thereon.

/s/ Ernst & Young LLP
Independent Certified Public Accountants

Jacksonville, Florida
February 13, 2006



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

Case 1:07-mc-00489-BAH Document 1229-7 Filed 11/22/24 Page 851 of 3766

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

The Shareholders and Board of Directors of CSX Corporation

We have audited management's assessment, included in the accompanying CSX Corporation Management's Report on Internal Control Over Financial Reporting appearing under Item 9A, that CSX Corporation maintained effective internal control over financial reporting as of December 30, 2005, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO criteria). CSX Corporation's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express an opinion on management's assessment and an opinion on the effectiveness of the company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, management's assessment that CSX Corporation maintained effective internal control over financial reporting as of December 30, 2005, is fairly stated, in all material respects, based on the COSO criteria. Also, in our opinion, CSX Corporation maintained, in all material respects, effective internal control over financial reporting as of December 30, 2005, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the 2005 consolidated financial statements of CSX Corporation and our report dated February 13, 2006, expressed an unqualified opinion thereon.

/s/ Ernst & Young LLP
Independent Certified Public Accountants

Jacksonville, Florida
February 13, 2006



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**CONSOLIDATED INCOME STATEMENTS**

| | Fiscal Years Ended | | |
|---|---|---|---|
| | December 30, 2005 | December 31, 2004 | December 26, 2003 |
| | (Dollars in millions, except per share amounts) | | |
| **Operating Revenue** | $ 8,618 | $ 8,040 | $ 7,573 |
| **Operating Expense** | | | |
| Labor and Fringe | 2,864 | 2,744 | 2,656 |
| Materials, Supplies and Other | 1,828 | 1,753 | 1,622 |
| Depreciation | 826 | 711 | 620 |
| Fuel | 783 | 656 | 581 |
| Building and Equipment Rent | 510 | 569 | 565 |
| Inland Transportation | 230 | 280 | 305 |
| Conrail Rents, Fees and Services | 65 | 256 | 342 |
| Restructuring Charge — Net | — | 71 | 22 |
| Provision for Casualty Claims | (38) | — | 232 |
| Additional Loss on Sale | — | — | 108 |
| **Total Operating Expenses** | 7,068 | 7,040 | 7,053 |
| **Operating Income** | 1,550 | 1,000 | 520 |
| **Other Income and Expense** | | | |
| Other Income (Note 7) | 101 | 72 | 93 |
| Debt Repurchase Expense (Note 12) | (192) | — | — |
| Interest Expense | (423) | (435) | (418) |
| **Earnings** | | | |
| Earnings before Income Taxes | 1,036 | 637 | 195 |
| Income Tax Expense (Note 8) | (316) | (219) | (58) |
| Earnings from Continuing Operations | 720 | 418 | 137 |
| Discontinued Operations — Net of Tax (Note 4) | 425 | (79) | 52 |
| Cumulative Effect of Accounting Change — Net of Tax | — | — | 57 |
| Net Earnings | $ 1,145 | $ 339 | $ 246 |
| **Per Common Share** (Note 15) | | | |
| Earnings Per Share: | | | |
| From Continuing Operations | $ 3.33 | $ 1.95 | $ 0.64 |
| Discontinued Operations | 1.96 | (0.37) | 0.24 |
| Cumulative Effect of Accounting Change | — | — | 0.26 |
| Net Earnings | $ 5.29 | $ 1.58 | $ 1.14 |
| Earnings Per Share, Assuming Dilution: | | | |
| From Continuing Operations | $ 3.17 | $ 1.87 | $ 0.63 |
| Discontinued Operations | 1.87 | (0.35) | 0.23 |
| Cumulative Effect of Accounting Change | — | — | 0.25 |
| Net Earnings | $ 5.04 | $ 1.52 | $ 1.11 |
| Average Common Shares Outstanding (Thousands) | 216,425 | 214,796 | 213,964 |
| Average Common Shares Outstanding, Assuming Dilution (Thousands) | 228,024 | 225,030 | 224,328 |
| Cash Dividends Paid Per Common Share | $ 0.43 | $ 0.40 | $ 0.40 |

See accompanying Notes to Consolidated Financial Statements.





Powered by Morningstar® Document Research℠

## CSX CORPORATION

## CONSOLIDATED BALANCE SHEETS

| | December 30, 2005 | December 31, 2004 |
|---|---|---|
| | (Dollars in millions) | |
| **ASSETS** | | |
| **Current Assets:** | | |
| Cash and Cash Equivalents (Note 1) | $ 309 | $ 522 |
| Short-term Investments | 293 | 337 |
| Accounts Receivable — Net (Note 9) | 1,202 | 1,159 |
| Materials and Supplies | 199 | 165 |
| Deferred Income Taxes | 225 | 20 |
| Other Current Assets | 144 | 157 |
| International Terminals Assets Held for Sale (Note 4) | — | 643 |
| Total Current Assets | 2,372 | 3,003 |
| Properties | 26,538 | 25,852 |
| Accumulated Depreciation | (6,375) | (5,907) |
| Properties — Net (Note 10) | 20,163 | 19,945 |
| Investment in Conrail (Note 2) | 603 | 574 |
| Affiliates and Other Companies | 304 | 281 |
| Other Long-term Assets (Note 21) | 790 | 802 |
| Total Assets | $ 24,232 | $ 24,605 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| **Current Liabilities:** | | |
| Accounts Payable | $ 954 | $ 870 |
| Labor and Fringe Benefits Payable | 565 | 380 |
| Casualty, Environmental and Other Reserves (Note 11) | 311 | 312 |
| Current Maturities of Long-term Debt (Note 12) | 936 | 983 |
| Short-term Debt (Note 12) | 1 | 101 |
| Income and Other Taxes Payable | 102 | 170 |
| Other Current Liabilities | 110 | 115 |
| International Terminals Liabilities Held for Sale (Note 4) | — | 386 |
| Total Current Liabilities | 2,979 | 3,317 |
| Casualty, Environmental and Other Reserves (Note 11) | 653 | 735 |
| Long-term Debt (Note 12) | 5,093 | 6,248 |
| Deferred Income Taxes | 6,082 | 5,979 |
| Other Long-term Liabilities (Note 21) | 1,471 | 1,515 |
| Total Liabilities | 16,278 | 17,794 |
| **Shareholders' Equity:** | | |
| Common Stock, $1 Par Value (Note 14) | 218 | 216 |
| Other Capital | 1,751 | 1,605 |
| Retained Earnings | 6,262 | 5,210 |
| Accumulated Other Comprehensive Loss | (277) | (220) |
| Total Shareholders' Equity | 7,954 | 6,811 |
| Total Liabilities and Shareholders' Equity | $ 24,232 | $ 24,605 |

See accompanying Notes to Consolidated Financial Statements.



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**CONSOLIDATED CASH FLOW STATEMENTS**

| | Fiscal Years Ended | | |
|---|---|---|---|
| | December 30, 2005 | December 31, 2004 | December 26, 2003 |
| | (Dollars in millions) | | |
| **Operating Activities** | | | |
| Net Earnings | $ 1,145 | $ 339 | $ 246 |
| Adjustments to Reconcile Net Earnings to Net Cash Provided: | | | |
| Depreciation | 833 | 730 | 643 |
| Deferred Income Taxes | (46) | 240 | 119 |
| Gain on Sale of International Terminals — Net of Tax (Note 4) | (428) | — | — |
| Provision for Casualty Reserves (Note 11) | (38) | — | 232 |
| Additional Loss on Sale | — | — | 108 |
| Cumulative Effect of Accounting Change — Net of Tax | — | — | (57) |
| Insurance Proceeds (Note 6) | 29 | — | — |
| Restructuring Charge (Note 5) | — | 71 | 22 |
| Net Gain on Conrail spin-off — after tax (Note 2) | — | (16) | — |
| Other Operating Activities | (103) | (91) | (108) |
| Changes in Operating Assets and Liabilities: | | | |
| Termination of Sale of Accounts Receivable (Note 9) | — | — | (380) |
| Accounts Receivable (Note 9) | (44) | (3) | 19 |
| Other Current Assets | (29) | 29 | 40 |
| Accounts Payable | 54 | (2) | 49 |
| Income and Other Taxes Payable | (402) | 38 | (23) |
| Other Current Liabilities | 139 | 111 | (106) |
| Net Cash Provided by Operating Activities | 1,110 | 1,446 | 804 |
| **Investing Activities** | | | |
| Property Additions | (1,136) | (1,030) | (1,059) |
| Insurance Proceeds (Note 6) | 41 | — | — |
| Net Proceeds from Sale of International Terminals (Note 4) | 1,108 | — | — |
| Purchase of Minority Interest in an International Terminals' Subsidiary (Note 4) | (110) | — | — |
| Proceeds from Divestitures (Note 3) | — | 55 | 226 |
| Purchases of Short-term Investments | (2,601) | (1,583) | (2,128) |
| Proceeds from Sale of Short-term Investments | 2,634 | 1,336 | 2,197 |
| Other Investing Activities | 28 | (18) | (43) |
| Net Cash Used in Investing Activities | (36) | (1,240) | (807) |
| **Financing Activities** | | | |
| Short-term Debt — Net | (99) | 99 | (141) |
| Long-term Debt Issued | 105 | 401 | 919 |
| Long-term Debt Repaid | (1,283) | (434) | (500) |
| Dividends Paid | (93) | (86) | (86) |
| Other Financing Activities | 83 | 40 | (20) |
| Net Cash (Used In) Provided by Financing Activities | (1,287) | 20 | 172 |
| Net (Decrease) Increase in Cash and Cash Equivalents | (213) | 226 | 169 |
| **Cash and Cash Equivalents** | | | |
| Cash and Cash Equivalents at Beginning of Period | 522 | 296 | 127 |
| Cash and Cash Equivalents at End of Period | $ 309 | $ 522 | $ 296 |
| **Supplemental Cash Flow Information** | | | |
| Interest Paid — Net of Amounts Capitalized | $ 440 | $ 414 | $ 406 |
| Income Taxes Paid | $ 798 | $ 35 | $ 134 |

See accompanying Notes to Consolidated Financial Statements.



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

Powered by Morningstar® Document Research℠

# CSX CORPORATION

## CONSOLIDATED STATEMENTS OF CHANGES IN SHAREHOLDERS' EQUITY

| | Common Shares Outstanding (Thousands) | Common Stock | Other Capital | Retained Earnings | Accumulated Other Comprehensive Income (Loss): Minimum Pension Liability(a) | Accumulated Other Comprehensive Income (Loss): Fuel Derivative(b) | Accumulated Other Comprehensive Income (Loss): Other | Total |
|---|---|---|---|---|---|---|---|---|
| | | (Dollars in millions) | | | | | | |
| **Balance December 27, 2002** | 214,687 | $ 215 | $ 1,547 | $ 4,797 | $ (318) | $ — | $ — | $ 6,241 |
| Comprehensive Earnings: | | | | | | | | |
| Net Earnings | — | — | — | 246 | — | — | — | 246 |
| Other Comprehensive Income | — | — | — | — | 8 | 6 | 1 | 15 |
| Comprehensive Earnings | | | | | | | | 261 |
| Dividends | — | — | — | (86) | — | — | — | (86) |
| Stock Option Exercises and Other | 384 | — | 32 | — | — | — | — | 32 |
| **Balance December 26, 2003** | 215,071 | 215 | 1,579 | 4,957 | (310) | 6 | 1 | 6,448 |
| Comprehensive Earnings: | | | | | | | | |
| Net Earnings | — | — | — | 339 | — | — | — | 339 |
| Other Comprehensive Income (Loss) | — | — | — | — | 18 | 66 | (1) | 83 |
| Comprehensive Earnings | | | | | | | | 422 |
| Dividends | — | — | — | (86) | — | — | — | (86) |
| Stock Option Exercises and Other | 458 | 1 | 26 | — | — | — | — | 27 |
| **Balance December 31, 2004** | 215,529 | 216 | 1,605 | 5,210 | (292) | 72 | — | 6,811 |
| Comprehensive Earnings: | | | | | | | | |
| Net Earnings | — | — | — | 1,145 | — | — | — | 1,145 |
| Other Comprehensive (Loss) | — | — | — | — | (15) | (42) | — | (57) |
| Comprehensive Earnings | | | | | | | | 1,088 |
| Dividends | — | — | — | (93) | — | — | — | (93) |
| Stock Option Exercises and Other | 2,674 | 2 | 146 | — | — | — | — | 148 |
| **Balance December 30, 2005** | 218,203 | $ 218 | $ 1,751 | $ 6,262 | $ (307) | $ 30 | $ — | $ 7,954 |

(a) Net of taxes of $146 million, $161 million, and $153 million for 2005, 2004, and 2003, respectively.

(b) Net of taxes of $20 million, $45 million, and $3 million for 2005, 2004, and 2003, respectively.

See accompanying Notes to Consolidated Financial Statements.



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## NOTE 1. Nature of Operations and Significant Accounting Policies

***Nature of Operations***

CSX Corporation ("CSX" and, together with its subsidiaries, the "Company"), based in Jacksonville, FL, owns companies providing rail, intermodal and rail-to-truck transload services that combine to form one of the nation's leading transportation companies, connecting more than 70 ocean, river and lake ports.

*Surface Transportation*

***CSX Transportation Inc.***

CSX's principal operating company, CSX Transportation Inc. ("CSXT"), operates the largest railroad in the eastern United States with approximately 21,000-mile rail network linking commercial markets in 23 states, the District of Columbia, and the Canadian provinces of Ontario and Quebec.

***CSX Intermodal Inc.***

CSX Intermodal Inc. ("Intermodal"), one of the nation's largest coast-to-coast intermodal transportation providers, is a stand-alone, integrated intermodal company serving customers from origin to destination with its own truck and terminal operations, plus a dedicated domestic container fleet. Containers and trailers are loaded and unloaded from trains, with trucks providing the link between intermodal terminals and the customer.

***Surface Transportation Businesses***

The rail and intermodal companies are viewed by the Company on a combined basis as Surface Transportation businesses. Together, they serve four primary lines of business:

- Merchandise generated approximately 49% of the Company's total revenue in 2005 with 2.9 million carloads. The Company's merchandise business is made up of seven market segments: phosphates and fertilizers; metals; forest products; food and consumer; agricultural products; chemicals; and emerging markets. Emerging markets target high-growth business opportunities in specialized markets such as aggregates, processed materials (for example, cement), waste, military cargo, and machinery.
- Coal, which delivered more than 1.8 million carloads of coal, coke and iron ore to electric utilities and manufacturers in 2005, accounted for approximately 24% of the Company's total 2005 revenue. The Company serves more than 130 coal mines in nine states, including three of the nation's top four coal-producing states.
- Intermodal, as described above, offers a cost advantage over long-haul trucking by combining the better economics of longer hauls provided by rail with the short-haul flexibility of trucks through a network of dedicated terminals across North America. Intermodal accounted for approximately 2.2 million units and 16% of the Company's total revenue in 2005.
- Automotive, which serves plants in eight states and delivers both finished vehicles and auto parts, transported 488,000 carloads generating 10% of the Company's total revenue in 2005.
- Other revenue, such as demurrage, switching, and other incidental charges, accounted for 1% of the Company's total 2005 revenue. Demurrage represents charges assessed by railroads for the retention of cars by shippers or receivers of freight beyond a specified period of time. Switching revenue is generated when CSX switches cars between trains for a customer or other railroad.

***Basis of Presentation***

In the opinion of management, the accompanying consolidated financial statements contain all adjustments necessary to fairly present the financial position of CSX and its subsidiaries at December 30, 2005 and December 31, 2004, the Consolidated Income and Cash Flow Statements and Changes in Shareholders' Equity for the fiscal years ended December 30, 2005, December 31,



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

2004 and December 26, 2003, such adjustments being of a normal, recurring nature. Certain prior-year data have been reclassified to conform to the 2005 presentation.

***Fiscal Year***

CSX follows a 52/53 week fiscal reporting calendar. This fiscal calendar allows every quarter to consistently end on a Friday and to be of equal duration (13 weeks). However, in order to maintain this type of reporting calendar, every sixth or seventh year (depending on the Gregorian calendar and when leap year falls), an extra week will be included in one quarter (a 14 week quarter) and, therefore, the full year will have 53 weeks.

- Fiscal year 2005 consisted of 52 weeks ending on December 30, 2005
- Fiscal year 2004 consisted of 53 weeks ending on December 31, 2004
- Fiscal year 2003 consisted of 52 weeks ending on December 26, 2003

***Principles of Consolidation***

The consolidated financial statements include CSX and its majority-owned subsidiaries. All significant intercompany accounts and transactions have been eliminated. Investments in companies that are not majority-owned are carried at cost (if less than 20% owned and the Company has no significant influence) or equity (if the Company has significant influence).

***Cash, Cash Equivalents and Short-term Investments***

On a daily basis, cash in excess of current operating requirements is invested in various highly liquid investments having a typical maturity date of three months or less at the date of acquisition. These investments are carried at cost, which approximates market value, and are classified as Cash Equivalents. Investments in instruments with maturities less than one year are classified as Short-term Investments.

CSX holds $268 million and $273 million of auction rate securities and classifies these investments as available for sale as of December 30, 2005, and December 31, 2004, respectively. Accordingly, these investments are included in current assets as Short-term Investments on the Consolidated Balance Sheets. On the Consolidated Cash Flow Statements, purchases and sales of these assets are classified within investing activities.

***Materials and Supplies***

Materials and supplies consist primarily of fuel and parts used in the repair and maintenance of CSXT's freight car and locomotive fleets, equipment, and track structure, which are carried at average cost.

***Properties***

All properties are stated at cost less an allowance for accumulated depreciation. Rail assets, including main-line track, locomotives and freight cars are depreciated using the group-life method, which pools similar assets by road and equipment type and then depreciates each group as a whole. The majority of non-rail property is depreciated using the straight-line method on a per asset basis. Amortization expense recorded under capital leases is included in depreciation expense on the Consolidated Income Statements.

Regulations enforced by the Surface Transportation Board ("STB") of the U.S. Department of Transportation require periodic formal studies of ultimate service lives for all railroad assets. Factors taken into account during the life study include:

- Statistical analysis of historical retirements for each group of property;
- Evaluation of current operations;
- Evaluation of technological advances and maintenance schedules;
- Previous assessment of the condition of the assets and outlook for their continued use;



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

- Expected net salvage expected to be received upon retirement; and
- Comparison of assets to the same asset groups with other companies.

The results of the life study process determine the service lives for each asset group under the group-life method. These studies are conducted by a third party expert and analyzed by the Company's management. Resulting service life estimates are subject to review and approval by the STB. Road assets, including main-line track, have estimated service lives ranging from 5 years for system roadway machinery to 80 years for grading. Equipment assets, including locomotives and freight cars, have estimated service lives ranging from 6 years for vehicles to 35 years for work equipment.

Changes in asset lives due to the results of the life studies are applied at the completion of the life study and continue until the next required life study. The life studies may also indicate that the recorded amount of accumulated depreciation is deficient (or in excess) of the amount indicated by the study. Any such deficiency (or excess) amount is amortized as a component of depreciation expense over the remaining useful life of the asset group until the next required life study.

For retirements or disposals of depreciable rail assets that occur in the ordinary course of business, the asset cost (net of salvage value or sales proceeds) is charged to accumulated depreciation and no gain or loss is recognized. For retirements or disposals of non-rail depreciable assets, infrequent disposal of rail assets outside the normal course of business and all dispositions of land, the resulting gains or losses are recognized at the time of disposal. Expenditures that significantly increase asset values or extend useful lives are capitalized. Repair and maintenance expenditures are charged to operating expense when the work is performed.

Properties and other long-lived assets are reviewed for impairment whenever events or business conditions indicate the carrying amount of such assets may not be fully recoverable. Initial assessments of recoverability are based on estimates of undiscounted future net cash flows associated with an asset or a group of assets in accordance with SFAS 144, *Accounting for the Impairment or Disposal of Long-Lived Assets* ("SFAS 144"). Where impairment is indicated, the assets are evaluated, and their carrying amount is reduced to fair value based on undiscounted net cash flows or other estimates of fair value.

***Revenue and Expense Recognition***

The Company recognizes freight revenue using Free-On-Board ("FOB") Origin pursuant to Emerging Issues Task Force ("EITF") 91-9, *Revenue and Expense Recognition for Freight Services in Process.* The Company uses method (5) in the EITF, which provides for the allocation of revenue between reporting periods based on relative transit time in each reporting period. Expenses are recognized as incurred.

Certain key estimates are included in the recognition and measurement of revenue and related accounts receivable under the policies described above:

- unbilled revenue on shipments that have been delivered;
- revenue associated with shipments in transit;
- future adjustments to revenue or accounts receivable for billing corrections and bad debts;
- future adjustments to revenue for overcharge claims filed by customers; and
- incentive-based refunds to customers.

The Company regularly updates the estimates described above based on historical experience.

All other revenue, such as demurrage, switching and other incidental charges are recorded upon completion of the service. Demurrage represents charges assessed by railroads for the retention of cars by shippers or receivers of freight beyond a specified period of time. Switching revenue is generated when CSX switches cars between trains for a customer or other railroad.



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

Table of Contents



***Share-Based Compensation***

As permitted under SFAS 148, *Accounting for Stock-Based Compensation — Transition and Disclosure* ("SFAS 148"), CSX has adopted the fair value recognition provisions on a prospective basis and, accordingly, recognized expense for stock options granted in May 2003. No stock options were granted in 2004 or 2005. In addition to stock option expense, stock-based employee compensation expense included in net income consists of restricted stock awards, stock issued to CSX directors and the Company's Long-term Incentive Program for all periods presented.

The following table illustrates the pro forma effect on net earnings and earnings per share as if the fair value based method had been applied to all outstanding and unvested awards in each period:

| | December 30, 2005 | December 31, 2004 | December 26, 2003 |
|---|---|---|---|
| | (Dollars in millions, except per share amounts) | | |
| Net Earnings — As Reported | $ 1,145 | $ 339 | $ 246 |
| Add: Stock-Based Employee Compensation Expense Included in Reported Net Income — Net of Tax | 25 | 13 | 3 |
| Deduct: Total Stock-Based Employee Compensation Expense Determined under the Fair Value Based Method for all Awards — Net of Tax | (29) | (29) | (34) |
| Pro Forma Net Earnings | $ 1,141 | $ 323 | $ 215 |
| Interest Expense on Convertible Debt — Net of Tax | 4 | 4 | 4 |
| Pro Forma Net Earnings, If-Converted | $ 1,145 | $ 327 | $ 219 |
| **Earnings Per Share:** | | | |
| Basic — As Reported | $ 5.29 | $ 1.58 | $ 1.14 |
| Basic — Pro Forma | $ 5.27 | $ 1.50 | $ 1.00 |
| Diluted — As Reported | $ 5.04 | $ 1.52 | $ 1.11 |
| Diluted — Pro Forma | $ 5.02 | $ 1.45 | $ 0.98 |

As discussed in "New Accounting Pronouncements and Change in Accounting Policy" below, the Company will comply with SFAS 123(R), *Share-Based Payment* ("SFAS 123(R)"), effective January 1, 2006.

***Comprehensive Earnings***

CSX reports comprehensive earnings (loss) in accordance with SFAS 130, *Reporting Comprehensive Income* ("SFAS 130"), in the Consolidated Statement of Changes in Shareholders' Equity. Comprehensive earnings are defined as all changes in shareholders' equity during a period, other than those resulting from investments by and distributions to shareholders (i.e. issuance of equity securities and dividends). Accumulated Other Comprehensive Loss at December 30, 2005 and December 31, 2004 consists primarily of minimum pension liabilities partially offset by the fair value of fuel hedging contracts.

***Derivative Financial Instruments***

The Company recognizes all derivatives as either assets or liabilities in the Consolidated Balance Sheets and measures those instruments at fair value. (See Note 13. Derivative Financial Instruments.)



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

***New Accounting Pronouncements and Change in Accounting Policy***

SFAS 148 was issued in December 2002. SFAS 148 amends SFAS 123, *Accounting for Stock-Based Compensation* ("SFAS 123"), to provide alternative methods of transition to SFAS 123's fair value method of accounting for stock-based employee compensation and require disclosure of the effects of an entity's accounting policy with respect to stock-based employee compensation. Effective beginning with fiscal year 2003, CSX has voluntarily adopted the fair value recognition provisions of SFAS 123 and adopted the disclosure requirements of SFAS 148. In accordance with the prospective method of adoption permitted under SFAS 148, stock-based awards issued subsequent to fiscal year 2002 are accounted for under the fair value recognition provisions of SFAS 123 utilizing the Black-Scholes-Merton valuation method and, accordingly, are expensed. (See Note 16. Stock Plans.)

In December 2004, the Financial Accounting Standards Board ("FASB") issued SFAS 123(R), which is a revision of SFAS 123. Currently, CSX uses the Black-Scholes-Merton formula to estimate the fair value of stock options granted to employees and expects to continue to use this acceptable option valuation model upon the required adoption of SFAS 123(R) on January 1, 2006. Compensation cost for unvested awards that were not recognized under SFAS 123 will be recognized under SFAS 123(R). The new rules must be applied to new and existing unvested awards on the effective date. CSX adopted SFAS 123 using the prospective transition method (which applied only to awards granted, modified or settled after the adoption date). Had CSX adopted SFAS 123(R) in prior periods, the impact of SFAS 123 would have been estimated as described in the disclosure of pro forma net income and earnings per share above. SFAS 123(R) also requires the benefits of tax deductions in excess of recognized compensation cost to be reported as a financing cash flow, rather than as operating cash flow as required under current literature. This requirement will reduce net operating cash flows and increase net financing cash flows in periods after adoption. The Company is currently evaluating the impact of SFAS 123(R) on its consolidated financial statements, but does not expect the impact to be material.

Currently, CSX's stock-based employee compensation expense is recognized over the amortization period which could continue beyond the date an employee is eligible for retirement. Upon adoption of SFAS 123(R), CSX will no longer allow automatic vesting when an employee becomes retirement eligible.

In 2001, SFAS 143, *Accounting for Asset Retirement Obligations* ("SFAS 143") was issued. This statement addresses financial accounting and reporting for legal obligations associated with the retirement of tangible long-lived assets and the associated retirement costs. In conjunction with the group-life method of accounting for asset costs, the Company historically accrued crosstie removal costs as a component of depreciation, which is not permitted under SFAS 143. With the adoption of SFAS 143 in fiscal year 2003, the Company recorded pretax income of $93 million, $57 million after tax, as a cumulative effect of an accounting change, representing the reversal of the accrued liability for crosstie removal costs. The adoption of SFAS 143 did not have a material effect on prior reporting periods, and the Company does not believe it will have a material effect on future earnings. On an ongoing basis, depreciation expense will be reduced, while labor and fringe and materials, supplies and other expense will be increased by approximately $12 million as a result of the adoption of SFAS 143.

In 2002, the FASB issued Financial Accounting Standard Interpretation ("FASI") 45, *Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others.* This statement requires that certain guarantees be recorded at fair value on the Consolidated Balance Sheets and additional disclosures be made about guarantees. CSX did not realize a financial statement impact with the adoption of the accounting provisions of this



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

statement in fiscal year 2003 and does not anticipate a future impact. (See Note 19. Commitments and Contingencies.)

In 2002, SFAS 144 was issued. This statement requires that long-lived assets to be disposed of by sale are no longer measured on a net realizable value basis, and future operating losses are no longer recognized before they occur. In addition, this statement modifies the reporting requirements for discontinued operations. Long-lived assets, whether to be held for disposition or held and used, should be measured at the lower of its carrying amount or fair value less cost to dispose. CSX applied the provisions of this statement relating to the accounting for the conveyance of its wholly-owned subsidiary, CSX Lines, to a third party in 2003 (See Note 3. Divestitures.)

***Use of Estimates***

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires that management make estimates in reporting the amounts of certain assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amount of certain revenues and expenses during the reporting period. Actual results may differ from those estimates. Critical accounting estimates using management judgment are made for the following areas:

1. Casualty, legal and environmental reserves (See Note 11. Casualty, Environmental and Other Reserves)

2. Pension and postretirement medical plan accounting (See Note 18. Employee Benefit Plans)

3. Depreciation policies for its assets under the group-life method (See Note 1. Nature of Operations and Significant Accounting Policies)

4. Income taxes (See Note 8. Income Taxes)

**NOTE 2. Investment In and Integrated Rail Operations with Conrail**

Through a limited liability company, CSX and Norfolk Southern Corporation (“NS”) jointly own Conrail Inc. (“Conrail”), whose primary subsidiary is Consolidated Rail Corporation (“CRC”). CSX has a 42% economic interest and 50% voting interest in the jointly owned entity, and NS has the remainder of the economic and voting interests. CSX applies the equity method of accounting to its investment in Conrail.

In August 2004, CSX, NS and Conrail completed a reorganization of Conrail (“Conrail spin-off transaction”), which established direct ownership and control by CSXT and Norfolk Southern Railway (“NSR”) of two former CRC subsidiaries, New York Central Lines LLC (“NYC”) and Pennsylvania Lines LLC (“PRR”), respectively. Prior to the Conrail spin-off transaction, CSXT operated the routes and used the assets of NYC, and NSR operated the routes and used the assets of PRR, each in accordance with separate operating and lease agreements. Pursuant to the Conrail spin-off transaction, the operating and lease agreements were terminated and NYC and PRR were merged into CSXT and NSR, respectively.

As a part of the Conrail spin-off transaction, the assets and liabilities of NYC and PRR were distributed to CSXT and NSR, respectively. In order to facilitate this distribution, Conrail restructured its existing unsecured and secured public indebtedness, with the consent of Conrail’s debt holders. As a result of the transaction, CSXT and NSR issued new unsecured debt securities in exchange for Conrail debentures and entered into leases and subleases with Conrail to support its secured debt obligations in proportion to their economic ownership percentages.

In 2004, as a result of the transaction, the Company recognized a net gain of $16 million, after tax, which is included in Other Income. This net gain represents the fair value write-up of the assets and liabilities (“net assets”) received in excess of the book value of the net assets surrendered.



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

The Company concluded that it was appropriate to use the fair value of the net assets received as they were more clearly evident than the fair value of the assets surrendered in accordance with EITF 01-2, *Interpretation of APB Opinion 29,* paragraph 1. The fair value was based on an independent appraisal of the distribution.

After the transaction, CSX's investment in Conrail no longer includes the amounts related to NYC and PRR. Instead the assets and liabilities of NYC are reflected in their respective line items in CSX's Consolidated Balance Sheet.

The following table illustrates the pro forma effect on the Consolidated Income Statements as if the spin-off transaction had been completed as of the beginning of the periods.

| | Fiscal Years Ended | | | | | |
|---|---|---|---|---|---|---|
| | December 31, 2004 | | | December 26, 2003 | | |
| | As Reported | Effect of Spin-Off | Unaudited Pro Forma | As Reported | Effect of Spin-Off | Unaudited Pro Forma |
| | (Dollars in millions, except per share amounts) | | | | | |
| Operating Revenue | $ 8,040 | $ — | $ 8,040 | $ 7,573 | $ — | $ 7,573 |
| Earnings from Continuing Operations | 418 | 21 | 439 | 137 | 24 | 161 |
| Discontinued Operations | (79) | — | (79) | 52 | — | 52 |
| Cumulative Effect of Accounting Change — Net of Tax | — | — | — | 57 | — | 57 |
| Net Earnings | 339 | 21 | 360 | 246 | 24 | 270 |
| Earnings Per Share, Assuming Dilution: | | | | | | |
| From Continuing Operations | 1.87 | 0.09 | 1.96 | 0.63 | 0.11 | 0.74 |
| Discontinued Operations | (0.35) | — | (0.35) | 0.23 | — | 0.23 |
| Cumulative Effect of Accounting Change | — | — | — | 0.25 | — | 0.25 |
| Net Earnings | $ 1.52 | $ 0.09 | $ 1.61 | $ 1.11 | $ 0.11 | $ 1.22 |

The Company recorded this spin-off transaction at fair value based on the results of an independent appraisal. Since September 2004, the assets, liabilities, results of operations and cash flows of NYC have been included in CSX's Consolidated Balance Sheets and Consolidated Income and Cash Flow Statements.

**Accounting and Financial Reporting Effects**

For periods prior to the spin-off transaction, the Company's rail and intermodal operating revenue included revenue from traffic moving on the Conrail property. Operating expenses included costs incurred to handle such traffic and to operate the Conrail lines. Rail operating expense included an expense category, "Conrail Rents, Fees and Services," which reflected:

1. Right-of-way usage fees to Conrail through August 2004.
2. Equipment rental payments to Conrail through August 2004.
3. Transportation, switching and terminal service charges levied by Conrail in the Shared Assets Areas, which Conrail operates for the joint benefit of CSXT and NSR.
4. Amortization of the fair value write-up arising from the acquisition of Conrail and certain other adjustments. The amortization primarily represents the additional after tax depreciation expense related to the write up of Conrail's fixed assets when the original purchase price, from the 1997 transaction, was allocated based on fair value.



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

5. CSX's 42% share of Conrail's income before the cumulative effect of accounting change recognized under the equity method of accounting.

Conrail will continue to own, manage and operate the Shared Assets Areas for the joint benefit of CSXT and NSR. The spin-off transaction, however, effectively decreased rents paid to Conrail after the transaction date, as some assets previously leased from Conrail are now owned by CSXT and NSR.

***Detail of Conrail Rents, Fees and Services***

| | Fiscal Years Ended | | |
|---|---|---|---|
| | December 30, 2005 | December 31, 2004 | December 26, 2003 |
| | | (Dollars in millions) | |
| Rents, Fees and Services | $ 97 | $ 280 | $ 357 |
| Purchase Price Amortization and Other | 4 | 35 | 54 |
| Equity in Income of Conrail | (36) | (59) | (69) |
| Total Conrail Rents, Fees and Services | $ 65 | $ 256 | $ 342 |

***Conrail Financial Information***

Summary financial information for Conrail is as follows:

| | Fiscal Years Ended | | |
|---|---|---|---|
| | December 31, 2005 | December 31, 2004 | December 31, 2003 |
| | | (Dollars in millions) | |
| Income Statement Information: | | | |
| Revenues | $ 378 | $ 352 | $ 316 |
| Expenses | 346 | 370 | 352 |
| Operating Income | $ 32 | $ (18) | $ (36) |
| Income from Continuing Operations | 85 | 22 | 10 |
| Income from Discontinued Operations, Net of Tax | — | 119 | 191 |
| Cumulative Effect of Accounting Change, Net of Tax | — | (1) | 2 |
| Net Income | $ 85 | $ 140 | $ 203 |

Discontinued Operations included in the summary income statement information for Conrail above reflect the results of operations of NYC and PRR prior to the spin-off transaction.

| | December 31, 2005 | December 31, 2004 |
|---|---|---|
| | (Dollars in millions) | |
| Balance Sheet Information: | | |
| Current Assets | $ 233 | $ 334 |
| Property and Equipment and Other Assets | 1,242 | 1,080 |
| Total Assets | $ 1,475 | $ 1,414 |
| Current Liabilities | $ 233 | $ 242 |
| Long-term Debt | 215 | 266 |
| Other Long-term Liabilities | 592 | 545 |
| Total Liabilities | 1,040 | 1,053 |
| Stockholders' Equity | 435 | 361 |
| Total Liabilities and Stockholders' Equity | $ 1,475 | $ 1,414 |



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

CSX CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

**Transactions with Conrail**

As listed below, the Company has amounts payable to Conrail representing expenses incurred under the operating, equipment and shared area agreements with Conrail. In exchange for the Conrail advance, the Company has executed two promissory notes with a subsidiary of Conrail which are included in Long-term Debt on the Consolidated Balance Sheets.

| | December 30, 2005 | December 31, 2004 |
|---|---|---|
| | (Dollars in millions) | |
| Balance Sheet Information: | | |
| CSX Payable to Conrail | $ 40 | $ 59 |
| Promissory Notes Payable to Conrail Subsidiary | | |
| 4.40% CSX Promissory Note due October 2035 | $ 73 | $ — |
| 4.52% CSXT Promissory Note due March 2035 | $ 23 | $ — |

| | Fiscal Years Ended | | |
|---|---|---|---|
| | December 30, 2005 | December 31, 2004 | December 26, 2003 |
| | | (Dollars in millions) | |
| Income Statement Information: | | | |
| Interest Expense Related to Conrail Advances | $ 1 | $ 7 | $ 7 |

**NOTE 3. Divestitures**

In February 2003, CSX conveyed its interest in its domestic container-shipping subsidiary, CSX Lines. In consideration of its interest in CSX Lines, CSX received $300 million of proceeds consisting of cash and senior preferred securities. As a result, CSX had a voting interest of approximately 16% of a new venture called Horizon Lines (“Horizon”). The majority interest was held by a unit of The Carlyle Group. Horizon is a shipping and logistics company that operates 16 vessels and approximately 22,100 cargo containers while servicing routes that include Alaska, Hawaii, Puerto Rico and Guam.

The $300 million of gross proceeds from the conveyance was comprised of approximately $240 million of gross cash ($214 million net of transaction costs) and $60 million of senior preferred securities. After the transaction, CSX accounted for its investment in Horizon using the cost method of accounting in accordance with APB 18, *The Equity Method for Accounting for Investments in Common Stock.*

CSX continues to sublease vessels and equipment to Horizon. Through 2014, the Company remains the primary obligor on 4 lease agreements (3 vessel leases and 1 container lease). The obligation under these lease agreements totals approximately $268 million, $248 million and $229 million as of December 26, 2003, December 31, 2004 and December 30, 2005, respectively. CSX believes Horizon will fulfill its contractual commitments with respect to such leases, and CSX will have no further liabilities for those obligations after 2014.

In accordance with SAB Topic 5U, *Gain Recognition on the Sale of a Business or Operating Assets to a Highly Leveraged Entity,* CSX has deferred the gain associated with the conveyance of CSX Lines. In early 2003 a pretax gain of approximately $127 million was deferred and is being amortized over the 12-year sub-lease term.

In August 2003, CSX received $15 million in cash from Horizon. This payment represented $3 million of accrued interest and $12 million for the partial redemption of senior preferred securities. After receipt of that payment, CSX’s voting interest was approximately 12%.

In July 2004, CSX received $59 million cash from Horizon. This payment represented $4 million of accrued interest, $48 million for the final redemption of senior preferred securities and $7 million related to a performance payment. At this time, CSX was fully divested of its interest in Horizon.



Source: CSX CORP, 10-K, February 24, 2006
Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

However, CSX and its affiliates will continue to remain the primary obligor on vessel and equipment leases and will continue to amortize the deferred gain over the sub-lease term that expires in 2014. (See Note 19. Commitments and Contingencies.)

**NOTE 4. Discontinued Operations**

In February 2005, CSX sold its International Terminals business, which included the capital stock of SL Service, Inc. ("SLSI") to Dubai Ports International FZE ("DPI") for gross cash consideration of $1,142 billion. Of the gross proceeds, approximately $110 million was paid for the purchase of a minority interest in an International Terminals' subsidiary, which the Company acquired during the first quarter of 2005 and divested as part of the sale to DPI. Other related cash transaction costs amounted to approximately $34 million, including resolution of working capital and long-term debt adjustments.

CSX recognized a gain of $683 million pretax, $428 million after tax, for the fiscal year ended December 30, 2005 as a result of the sale. Consequently, amounts related to this business are reported as Discontinued Operations on the Consolidated Income Statement for all periods presented. On the 2004 Consolidated Balance Sheet, the amounts related to this business are shown as International Terminals Assets/Liabilities Held for Sale.

SLSI also holds certain residual assets and liabilities as a result of prior divestitures and discontinuances. A wholly-owned subsidiary of CSX retains the rights to those assets and indemnifies DPI, SLSI and related entities against those liabilities pursuant to a separate agreement. CSX guarantees the obligations of its subsidiary under this separate agreement.

Consequently, the results of operations and financial position of the Company's International Terminals business are reported as Discontinued Operations for all periods presented.

| | December 31, 2004 |
|---|---|
| | (Dollars in millions) |
| Balance Sheet Information: | |
| Accounts Receivable — Net | $ 25 |
| Other Current Assets | 3 |
| Properties — Net | 87 |
| Affiliates and Other Companies | 523 |
| Other Long-term Assets | 5 |
| International Terminals Assets Held for Sale | $ 643 |
| Current Liabilities | $ 26 |
| Short-term Debt | 203 |
| Long-term Deferred Income Taxes | 16 |
| Other Long-term Liabilities | 141 |
| International Terminals Liabilities Held for Sale | $ 386 |



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

| | Fiscal Years Ended | | |
|---|---|---|---|
| | December 30, 2005 | December 31, 2004 | December 26, 2003 |
| | | (Dollars in millions) | |
| Income Statement Information: | | | |
| Revenues | $ 14 | $ 167 | $ 227 |
| Expenses | 21 | 122 | 121 |
| Operating Income (Loss) | $ (7) | $ 45 | $ 106 |
| Other Income (Expense) | — | (20) | (36) |
| Earnings Before Income Taxes | (7) | 25 | 70 |
| Income Tax Expense | (4) | 7 | 18 |
| Net Income | $ (3) | $ 18 | $ 52 |

In 2004, Discontinued Operations on the Consolidated Income Statements includes International Terminals' net earnings of $18 million as well as additional income tax expense of $97 million related to undistributed foreign earnings.

Discontinued Operations includes International Terminals restructuring initiatives of $6 million for the fiscal year ended December 31, 2004, designed to maintain and improve productivity standards in light of business conditions at the time. International Terminals recorded no such charges in 2003. The restructuring initiatives reduced the International Terminals' workforce by 183 positions, as of December 31, 2004.

In December 2004, prior to the completion of this transaction, International Terminals increased its ownership in Asia Container Terminals Ltd, funded by a loan from DPI of $203 million, which is included in International Terminals Liabilities Held for Sale in the Consolidated Balance Sheets.

**NOTE 5. Management Restructuring**

Surface Transportation incurred restructuring charges related to the November 2003 restructuring plan designed to streamline the management structure, eliminate organizational layers and realign certain functions. For the fiscal year ended December 31, 2004, the Company recorded expense of $71 million for separation expense, pension and postretirement benefit curtailment charges, stock compensation expense and other related expenses. Surface Transportation recorded an initial pretax charge related to this reduction of $34 million in 2003. The restructuring initiatives reduced the management Surface Transportation workforce by 863 positions as of December 31, 2004.

The total cost of the program through the fiscal year December 31, 2004 was $105 million for Surface Transportation. The majority of separation benefits were paid from CSX's qualified pension plan, with the remainder being paid from general corporate funds.

In 2003, the Company recorded a $22 million pretax credit related to a favorable change in estimate for railroad retirement taxes and other benefits included in the 1991 and 1992 separation plans. These plans provided for improvements in productivity, workforce reductions in train crews from three persons to two persons, and other cost reductions. Originally the Company recorded a $1.3 billion charge related to these obligations in 1991 and 1992. As part of the labor agreements entered into to facilitate the reduction of train crews, two payments are due to employees that were either conductors/foremen or trainmen/switchmen. These agreements required lump sum payments that were to be distributed (1) within 30 days of implementation of the 1991 and 1992 labor agreements, and (2) at retirement, death or resignation. Regardless of the employees' continued service, such employees are entitled to receive the second payment at the time when the employee/employer relationship is severed.



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

Also in 2003, the Company recorded a $10 million restructuring charge related to another workforce reduction program, substantially all of which was paid as of December 26, 2003.

A net $22 million restructuring charge was recorded in fiscal year 2003 representing the cost of the restructuring initiatives offset by reductions in 1991 and 1992 separation reserves. The associated expense is included in operating expense as "Restructuring Charge — Net" on the Consolidated Income Statements.

| | Fiscal Year Ended December 31, 2004 | Fiscal Year Ended December 26, 2003 |
|---|---|---|
| | (Dollars in millions) | |
| Management Restructuring: | | |
| November 2003 management restructuring plan | $ 71 | $ 34 |
| Other workforce reductions | — | 10 |
| Change in estimate for 1991/1992 charge | — | (22) |
| Restructuring Charge — Net | $ 71 | $ 22 |

The Company did not record any restructuring charges during the fiscal year ended December 30, 2005.

## NOTE 6. Hurricane Katrina

In August 2005, Hurricane Katrina caused extensive damage to Company assets on the Gulf Coast. The most significant damage was concentrated on CSXT's approximately 100-mile route starting in New Orleans, LA and going east to Pascagoula, MS and includes damage to track infrastructure and bridges. Service to local businesses on the Gulf Coast has been restored and previously rerouted Merchandise trains have returned to the New Orleans gateway. Operations should be normalized to pre-hurricane conditions by the end of the first quarter of 2006.

In order to determine the proper accounting treatment for the damage, the Company reviewed EITF 01-10, *Accounting for the Impact of the Terrorist Attacks of September 11, 2001* ("EITF 01-10"), specifically Issue 3, of that consensus, in which the Task Force concluded that insurance recoveries in connection with property and casualty losses should be recognized when realization of the claim for recovery of a loss recognized in the financial statements is deemed probable. Information regarding the Company's insurance coverage, damage estimates and the allocation of the insurance deductible is as follows:

***Insurance coverage***

The Company has insurance coverage of $535 million, after a $25 million deductible (per occurrence), for the following types of losses:

*Fixed assets*

1. *Replacement value of fixed asset damages* — CSX is entitled to the current replacement cost of the damaged assets. If the Company does not replace the damaged assets, then it is entitled to cash, at a discounted rate. The Company replaced the damaged assets in like kind. The Company's bridges and track damaged by Hurricane Katrina comprised the majority of these types of losses.

*Business interruption*

2. *Recovery of incremental expenses* — The Company is entitled to recover the increased costs incurred to allow the Company to continue operations and to minimize the overall business impact to the Company during the period of indemnity. These increased costs include off-line (third party) rerouting costs, on-line (internal) rerouting costs, and other costs.



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

3. *Recovery of lost profits* — The Company is entitled to recover lost profits, net of associated expenses during the period of indemnity. The period of indemnity extends through the date which the railroad network is restored to its original operations.

The Company's insurance policies do not prioritize coverage based on types of losses. As claims are submitted to the insurance companies, they are reviewed and preliminary payments made until all losses are incurred and documented. A final payment will be made once the Company and its insurers agree on the total measurement value of the claim. As of December 30, 2005, the Company has collected insurance payments of $70 million. Through February 2006, the Company has collected an additional $50 million in insurance recoveries for a total of $120 million.

***Damage estimates***

The Company estimated damages as follows:

1. *Fixed asset damages*

Through air and underwater inspections, along with discussions with construction and salvage contractors, the Company's engineers estimated amounts to replace damaged assets. The cost estimate along the Company's 100-mile impacted route is based on the replacement value of approximately 39 miles of continuous track, six major bridges, numerous small bridges, signal and communication damage, locomotive repair and facilities damaged throughout the region.

2. *Incremental expenses*

The Company's incremental expenses relate primarily to three main areas of anticipated loss; (1) off-line (third party) rerouting costs, (2) on-line (internal) rerouting costs and (3) other costs.

Off-line rerouting costs were estimated based on projections made using historical volumes moved on other railroad lines. The Company is billed by the other railroads at an agreed upon rate based on the volume of trains or railcars routed to alternative locations.

On-line rerouting costs were determined by comparing estimates of incremental activity, including railcar miles, railcar days, gross ton-miles and crew starts incurred on the Company's network to route volume, before and after Hurricane Katrina, through alternative locations. The incremental activity was then used to calculate incremental operating expenses including train crew labor, railcar rentals, railcar maintenance, locomotive maintenance and fuel.

Other costs include debris removal, maintenance on equipment damaged by water, supplies, environmental expenses, maintenance labor and other various items.

3. *Lost profits*

The Company's sales representatives have estimated the impact on revenue at a location and customer-specific level. In order to estimate lost profits, for each shipment lost, the associated expenses for fuel, railcar rentals, locomotive and railcar maintenance that would have been incurred were estimated and netted against the lost revenue.

***Allocation of deductible***

The Company's insurance policies require its participation in the first $25 million of each loss event, without regard to the category of the covered losses. Although the Company's insurance policies do not specifically apply the deductible by the types of losses covered, CSX believes it is inconsistent with the form and economic substance of the Company's policies to attribute the entire deductible to a single component of covered losses. Therefore, the Company allocated the $25 million self-insured retention among the three categories of losses in proportion to the best estimate of the total ultimate losses eligible for recovery under the Company's insurance policies.



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

CSX CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

This estimate includes losses incurred at the balance sheet date, including all three categories and expected future losses attributable to incremental expenses and lost profits.

As the Company receives additional information regarding costs and lost revenues, it will continue to refine the estimate for insurance recoveries. As the estimate changes, the Company will reallocate and apply the deductible as appropriate. The Company does not foresee any possible scenario that would result in anything other than a net gain on insurance recoveries.

Management's estimate of the losses and recoveries by category is as follows:

| | Total Expected Losses Eligible for Recovery | % of Recoveries | Allocation of Deductible |
|---|---|---|---|
| | | (Dollars in millions) | |
| Capital | | | |
| Fixed asset damages | $ 222 | 60% | $ (15) |
| Business Interruption | | | |
| Incremental expenses | 118 | 32% | (8) |
| Lost profits | 30 | 8% | (2) |
| Total | $ 370 | 100% | $ (25) |

***Fixed Asset Damages***

Due to the significant difference between the carrying amount of property damage (net book value of $41 million immediately prior to Hurricane Katrina) and the estimated replacement cost of the property ($222 million), the Company estimates that it will ultimately realize a net gain after an estimated, allocated deductible of $15 million. Because replacement value of damaged fixed assets is significantly greater than the net book value, in 2005 a portion of the gain on the replacement value, to the extent of the loss, was recognized in the period in which the loss was recognized. CSX believes the loss attributable to the allocable deductible will be offset by the recovery of the replacement value of the property. The remaining net gain will be recognized when all contingencies related to the gain are resolved.

***Incremental expenses***

Because incremental expenses incurred to date have been easily quantified shortly after incurrence and CSX's insurance policies explicitly cover such costs, the Company believes this coverage is more analogous to property damage coverage. As such, the Company has concluded recoveries attributable to incremental costs should be recognized when it is probable the insurance providers will settle the claim for at least the amount of recognized losses.

***Lost profits***

Currently, the financial statements of the Company have been impacted by lost profits, as the Company did not earn revenues associated with covered losses. No amounts have been reflected for estimated insurance recoveries in the Company's financial statements. The Company believes lost profits are recoverable based on the insurance policy terms. However, because the insurance coverage associated with the recovery of lost profits is similar to a contingent gain due to the subjective nature of the coverage and longer time periods utilized to measure the lost profits as compared to other types of coverage, all contingencies related to the timing and amount of recovery must be resolved prior to recognition in earnings or at the time cash is received. At this time, CSX does not yet believe these amounts meet the probable recovery criterion in EITF 01-10 due to uncertainties associated with the ultimate measurement of the lost profits and expected negotiations with the Company's insurers. The Company estimates 2005 operating income was impacted by an estimated $30 million of lost profit.



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

***Summary***

Gain contingencies subject to FIN 30, *Accounting for Involuntary Conversions of Nonmonetary Assets to Monetary Assets* and SFAS 5, *Accounting for Contingencies* ("SFAS 5"), are not recognized until the period in which all contingencies are resolved. The probable insurance recovery of the replacement cost of fixed assets in excess of book value and the recovery of lost profits are considered to be gain contingencies. The Company believes it is appropriate to defer the net gain (after consideration of the insurance deductible) until all contingencies related to the gain are resolved. Therefore, in measuring the losses incurred at December 30, 2005, attributable to Hurricane Katrina, the Company considered the actual losses reflected in the financial statements, the allocable deductible (based on expected total recoveries from insured losses), and recorded a receivable for the difference based on probable insurance recoveries. The insurance receivable, after insurance proceeds, amounted to $43 million at December 30, 2005 and is included in Accounts Receivable — Net in the Company's Consolidated Balance Sheet.

The Company believes insurance recoveries, which are included in Materials, Supplies and Other and Labor expense in the Company's consolidated income statement, are probable and it does not believe there are solvency issues with the Company's insurers. In accordance with SFAS 95, *Statement of Cash Flows* ("SFAS 95"), cash proceeds received from insurers will be presented as "Insurance Proceeds", in either cash flows from operating activities or cash flows from investing activities based on the type of cost to which the proceeds relate.

The following table summarizes the financial impact of Hurricane Katrina during 2005:

| | Income Statement Impact | | | |
|---|---|---|---|---|
| | Losses | Deductible Recognized | Insurance Recoveries Recognized(a) | Net Income Statement Impact |
| | (Dollars in millions) | | | |
| Capital | | | | |
| Fixed assets damages | $ (41) | $ — | $ 41 | $ — |
| Business Interruption | | | | |
| Incremental expenses | (80) | (8) | 72 | (8) |
| Estimated Lost profits | (30) | — | — | (30) |
| Total | $ (151) | $ (8) | $ 113 | $ (38) |

(a) Amounts recorded as receivables from insurance companies. (See table below)

| | Balance Sheet Impact | | |
|---|---|---|---|
| | Insurance Recoveries Receivables | Insurance Proceeds Received | Net Insurance Receivable |
| | (Dollars in millions) | | |
| Capital | | | |
| Fixed assets damages | $ 41 | $ 41 | $ — |
| Business Interruption | | | |
| Incremental expenses | 72 | 29 | 43 |
| Lost profits | — | — | — |
| Total | $ 113 | $ 70 | $ 43 |



Source: CSX CORP, 10-K, February 24, 2006
Powered by Morningstar® Document Research℠

Table of Contents



## NOTE 7. Other Income and Supplemental Data

Other Income and Supplemental Data consists of the following:

| | Fiscal Years Ended | | |
|---|---|---|---|
| | December 30, 2005 | December 31, 2004 | December 26, 2003 |
| | | (Dollars in millions) | |
| Interest Income | $ 38 | $ 21 | $ 21 |
| Income from Real Estate and Resort Operations | 85 | 47 | 95 |
| Discounts on Sales of Accounts Receivable | — | — | (10) |
| Net Gain on Conrail Spin-off, after tax | — | 16 | — |
| Minority Interest | (19) | (16) | (6) |
| Miscellaneous | (3) | 4 | (7) |
| Total Other Income | $ 101 | $ 72 | $ 93 |
| Gross Revenue from Real Estate and Resort Operations Included in Other Income above | $ 262 | $ 217 | $ 274 |

Operating Expense included Selling, General & Administrative Expenses of $524 million, $557 million and $549 million for fiscal years 2005, 2004, and 2003, respectively.

## NOTE 8. Income Taxes

Earnings from Continuing Operations before Income Taxes of $1.0 billion, $637 million, and $195 million for fiscal years 2005, 2004, and 2003, respectively represent earnings from domestic operations.

The significant components of deferred tax assets and liabilities include:

| | December 30, 2005 | | December 31, 2004 | |
|---|---|---|---|---|
| | Assets | Liabilities | Assets | Liabilities |
| | | (Dollars in millions) | | |
| Productivity/ Restructuring Charges | $ 48 | $ — | $ 73 | $ — |
| Employee Benefit Plans | 429 | — | 358 | — |
| Accelerated Depreciation | — | 6,324 | — | 6,665 |
| Other | 482 | 493 | 832 | 609 |
| Total | $ 959 | $ 6,817 | $ 1,263 | $ 7,274 |
| Net Deferred Tax Liabilities | | $ 5,858 | | $ 6,011 |

The primary factors in the change in year-end net deferred income tax liability balances include:

- Annual provision for deferred income tax expense;
- Deferred income taxes attributable to Discontinued Operations; and
- Adjustments to Accumulated Other Comprehensive Loss.

In conjunction with the sale of all the issued and outstanding stock of SL Service, Inc., the Company accrued $97 million of deferred U.S. income tax liability related to undistributed foreign earnings of its foreign subsidiaries that are no longer considered indefinitely invested in offshore operations. This U.S. income tax expense is reflected as a component of Discontinued Operations — Net of Tax on the 2004 Consolidated Income Statements.

Included in the net deferred tax liabilities above are $16 million of deferred taxes included in International Terminals Liabilities Held for Sale in the Consolidated Balance Sheets as of December 31, 2004. (See Note 4. Discontinued Operations.)

The Company files a consolidated federal income tax return, which includes its principal domestic subsidiaries. Examinations of the federal income tax returns of CSX have been completed



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

through 1993. Federal income tax returns for 1994 through 2003 currently are under examination. Management believes adequate provision has been made for any adjustments that might be assessed.

The breakdown of income tax expense (benefit) between current and deferred is as follows:

| | Fiscal Years Ended | | |
|---|---|---|---|
| | December 30, 2005 | December 31, 2004 | December 26, 2003 |
| | | (Dollars in millions) | |
| Current: | | | |
| Federal | $ 350 | $ 66 | $ (66) |
| State | 12 | 14 | 7 |
| Total Current | $ 362 | $ 80 | $ (59) |
| Deferred: | | | |
| Federal | $ 33 | $ 139 | $ 125 |
| State | (79) | — | (8) |
| Total Deferred | $ (46) | $ 139 | $ 117 |
| Total | $ 316 | $ 219 | $ 58 |

Income tax expense reconciled to the tax computed at statutory rates is as follows:

| | Fiscal Years Ended | | | | | |
|---|---|---|---|---|---|---|
| | December 30, 2005 | | December 31, 2004 | | December 26, 2003 | |
| | | | (Dollars in millions) | | | |
| Tax at Statutory Rates | $ 362 | 35% | $ 223 | 35% | $ 68 | 35% |
| State Income Taxes | (44) | -4% | 9 | 1% | — | 0% |
| Equity in Conrail Earnings | (9) | -1% | (16) | -3% | (9) | -5% |
| Other Items | 7 | 0% | 3 | 1% | (1) | 0% |
| Income Tax Expense/ Rate | $ 316 | 30% | $ 219 | 34% | $ 58 | 30% |

The decrease in the 2005 effective income tax rate compared to the prior year is primarily attributable to legislative changes in Ohio that will gradually eliminate the Ohio corporate franchise tax. The 2004 effective income tax rate was higher than the 2003 effective income tax rate because equity in Conrail earnings represented a larger percentage of pretax earnings in 2003 than 2004. Also, 2003 included a favorable state income tax benefit attributable to changes in the Company's deferred effective state income tax rate.

## NOTE 9. Accounts Receivable

### *Allowance for Doubtful Accounts*

The Company maintains an allowance for doubtful accounts for the estimated probable losses on uncollectible accounts and other receivables. The allowance is based upon the creditworthiness of customers, historical experience, the age of the receivable and current market and economic conditions. Uncollectible amounts are charged against the allowance account. The allowance for doubtful accounts is maintained against current accounts receivable. Allowances for doubtful accounts of $108 million and $95 million are included in the Consolidated Balance Sheets as of December 30, 2005 and December 31, 2004.

### *Sale of Accounts Receivable*

As of June 2003, CSXT discontinued its accounts receivable securitization program. Prior to that, CSXT sold, without recourse, a revolving pool of accounts receivable to CSX Trade Receivables Corporation ("CTRC"), a wholly-owned, bankruptcy-remote subsidiary. CTRC transferred the accounts receivable to a master trust and caused the trust to issue multiple series of certificates representing undivided interests in the receivables. The certificates issued by the master trust were



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

Table of Contents



sold to investors, and the proceeds from those sales were paid to CSXT. Net losses associated with the sale of receivables were $10 million for the fiscal year ended December 26, 2003 and was included in Other Income.

**NOTE 10. Properties**

| | December 30, 2005 | | | December 31, 2004 | | |
|---|---|---|---|---|---|---|
| | Cost | Accumulated Depreciation | Net | Cost | Accumulated Depreciation | Net |
| | (Dollars in millions) | | | | | |
| Rail: | | | | | | |
| Road | $ 18,861 | $ 3,208 | $ 15,653 | $ 18,367 | $ 2,923 | $ 15,444 |
| Equipment | 6,357 | 2,482 | 3,875 | 6,181 | 2,363 | 3,818 |
| Total Rail | 25,218 | 5,690 | 19,528 | 24,548 | 5,286 | 19,262 |
| Intermodal | 528 | 284 | 244 | 506 | 247 | 259 |
| Total Surface Transportation | 25,746 | 5,974 | 19,772 | 25,054 | 5,533 | 19,521 |
| Other | 792 | 401 | 391 | 798 | 374 | 424 |
| Total Properties | $ 26,538 | $ 6,375 | $ 20,163 | $ 25,852 | $ 5,907 | $ 19,945 |

**NOTE 11. Casualty, Environmental and Other Reserves**

Activity related to casualty, environmental and other reserves is as follows:

| | Casualty Reserves | Separation Liabilities | Environmental Reserves | Other Reserves | Total |
|---|---|---|---|---|---|
| | | | (Dollars in millions) | | |
| Balance December 27, 2002 | $ 463 | $ 216 | $ 35 | $ 136 | $ 850 |
| Charged to Expense | 226 | 38 | 23 | 87 | 374 |
| Change in Estimate | 232 | (22) | — | — | 210 |
| Payments | (209) | (24) | (13) | (72) | (318) |
| Balance December 26, 2003 | 712 | 208 | 45 | 151 | 1,116 |
| Charged to Expense | 217 | 16 | 29 | 84 | 346 |
| Payments | (214) | (20) | (21) | (107) | (362) |
| Conrail Spin-off(a) | — | — | 6 | — | 6 |
| Reclassifications(b) | (10) | (49) | — | — | (59) |
| Balance December 31, 2004 | 705 | 155 | 59 | 128 | 1,047 |
| Charged to Expense | 181 | — | 32 | 47 | 260 |
| Change in Estimate | (38) | — | — | — | (38) |
| Payments | (173) | (34) | (20) | (78) | (305) |
| Balance December 30, 2005 | $ 675 | $ 121 | $ 71 | $ 97 | $ 964 |

(a) In 2004, the Company assumed $6 million of Conrail environmental liabilities, due to the Conrail Spin-off transaction.

(b) The majority of this line represents obligations arising from the management restructuring program. Most of this liability was paid from CSX's qualified pension plan and therefore was reclassified to pension liabilities which are included in Other Long-term Liabilities.



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Casualty, environmental and other reserves are provided for in the Consolidated Balance Sheets as follows:

| | December 30, 2005 | | | December 31, 2004 | | |
|---|---|---|---|---|---|---|
| | Current | Long-term | Total | Current | Long-term | Total |
| | | | (Dollars in millions) | | | |
| Casualty | $ 227 | $ 448 | $ 675 | $ 230 | $ 475 | $ 705 |
| Separation | 20 | 101 | 121 | 20 | 135 | 155 |
| Environmental | 20 | 51 | 71 | 20 | 39 | 59 |
| Other | 44 | 53 | 97 | 42 | 86 | 128 |
| Total | $ 311 | $ 653 | $ 964 | $ 312 | $ 735 | $ 1,047 |

**Casualty**

Casualty reserves represent accruals for personal injury and occupational injury claims. Currently, none of these claims are covered by insurance since no individual claim value is expected to exceed the Company's self-insured retention amount. Personal injury and occupational claims are presented on a gross basis in accordance with SFAS 5. To the extent the value of an individual claim were to exceed the self-insured retention amount, CSX would present the liability on a gross basis with a corresponding receivable for insurance recoveries. Most of the claims are related to CSXT unless otherwise noted.

***Personal Injury***

CSXT retains an independent actuarial firm to assist management in assessing the value of CSXT's claims and cases. An analysis is performed by the independent actuarial firm semi-annually and is reviewed by management. The methodology used by the actuary includes a development factor to reflect growth or reduction in the value of CSXT's personal injury claims. This methodology is based largely on CSXT's historical claims and settlement activity. Actual results may vary from estimates due to the type and severity of the injury, costs of medical treatments, and uncertainties in litigation. In conjunction with the change in estimate during 2003, the Company recorded a charge of $26 million for personal injury liabilities. Reserves for personal injury claims are $421 million and $383 million at December 30, 2005 and December 31, 2004, respectively.

While the final outcome of casualty-related matters cannot be predicted with certainty, considering among other things, the meritorious legal defenses available and liabilities that have been recorded, it is the opinion of CSX management that none of these items, when finally resolved, will have a material adverse effect on the Company's results of operations, financial condition, or liquidity. However, should a number of these items occur in the same period, they could have a material adverse effect on the results of operations, financial condition or liquidity in a particular quarter or fiscal year.

***Occupational***

Occupational claims include allegations of exposure to certain materials in the work place, such as asbestos, solvents, and diesel fuel, or alleged physical injuries, such as repetitive stress injuries, carpal tunnel syndrome or hearing loss.

Reserves for asbestos related claims are $141 million and $212 million at December 30, 2005 and December 31, 2004, respectively. Reserves for other occupational claims are $113 million and $110 million at December 30, 2005 and December 31, 2004, respectively.

***Occupational — Asbestos***

The Company is party to a number of occupational claims by employees alleging exposure to asbestos in the workplace. The heaviest possible exposure for employees was due to work conducted in and around steam locomotive engines that were phased out in the 1950's, according to



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

rail industry statistics. However, other types of exposures, including exposure from locomotive component parts and building materials, continued until it was substantially eliminated by 1985.

Asbestos claim filings against the Company have been inconsistent. Accordingly, while the Company had concluded that a probable loss had occurred, prior to 2003 it did not believe it could estimate the range of reasonably possible loss because of the lack of experience with such claims and the lack of detailed employment records for the population of exposed employees. Claim filings increased and when they continued into 2003, the Company concluded that an estimate for incurred but not reported ("IBNR") asbestos exposure liability needed to be recorded. Currently, there is recurring pending legislation regarding the establishment of an asbestos liability trust fund. The impact to the Company of this pending legislation is unknown at this time.

***2003 Provision for Asbestos Change in Estimate***

In 2003, the Company changed its estimate of asbestos reserves to include an estimate of IBNR claims and retained a third party specialist who has extensive experience in performing asbestos and other occupational studies to assist in this estimate. The analysis is performed by the specialist semi-annually and is reviewed by management. The objective of the analysis is to determine the number of estimated IBNR claims and the estimated average cost per claim to be received over the next seven years. Seven years was determined by management to be the time period in which probable claim filings and claim values could be estimated with more certainty.

The Company, with the assistance of the third party specialist, first determined its potentially exposed population from which it was able to derive the estimated number of IBNR claims. The estimated average cost per claim was then determined utilizing recent actual average cost per claim data and national industry data. Based on the assessment, in September 2003 the Company recorded an undiscounted $141 million pre-tax charge for unasserted asbestos claims. Key elements of the assessment included the following:

- An estimate was computed using a ratio of Company employee data to national employment for select years during the period 1938-2001. The Company used railroad industry historical census data because it did not have detailed employment records in order to compute the population of potentially exposed employees.
- The projected incidence of disease was estimated based on epidemiological studies using employees' age and the duration and intensity of potential exposure while employed.
- An estimate of the future anticipated claims filing rate by type of disease (non-malignant, cancer and mesothelioma) was computed using the Company's average historical claim filing rates for a 2-year calibration period (i.e. the years management felt were representative of future filing rates).
- An estimate of the future anticipated dismissal rate by type of claim was computed using the Company's historical average dismissal rates observed for two years.
- An estimate of the future anticipated settlement by type of disease was computed using the Company's historical average of dollars paid per claim for pending and future claims using the average settlement by type of incident observed during a 3-year time period.

From these assumptions, the Company projected the incidence of each type of disease to the estimated population to determine the total estimated number of employees that could potentially assert a claim. Historical claim filing rates were applied for each type of disease to the total number of employees that could potentially assert a claim to determine the total number of anticipated claim filings by disease type. Historical dismissal rates, which represent claims that are closed without payment, were deducted to calculate the number of future claims by disease type that would likely require payment by the Company. Finally, the number of such claims was multiplied by the average settlement value to estimate the Company's future liability for IBNR asbestos claims.



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

Asbestos claim filings are typically sporadic and may include large batches of claims solicited by law firms. To reflect these factors, CSX used a 2-year calibration period during its initial assessment because the Company believed it would be most representative of its future claim experience. In addition, for non-malignant claims, the number of future claims to be filed against CSX declines at a rate consistent with both mortality and age as there is a decreasing probability of filing claims as the population ages. CSX believes the average claim values by type of disease from the historical 2-year period were most representative of future claim values.

***2005 Provision for Asbestos Change in Estimate***

In 2004, management had no changes in estimate for asbestos liabilities. In 2005, management updated their assessment of the unasserted liability exposure with the assistance of the third party specialists, which resulted in recognition of a $48 million favorable change in estimate associated with asbestos liabilities. During 2004 and 2005, asbestos related disease claims filed against CSX dropped substantially, particularly bulk claims filed by certain law firms. In 2003, the Company received a significant number of filings. The Company believes the number was attributable to an attempt to file before a new, more restrictive venue law took effect in West Virginia in mid-2003. As a result, management reassessed the calibration period to a 3-year average, excluding the surge in claims originating in West Virginia. Management believes this calibration period provides the best estimate of future filing rates.

The estimated future filing rates and estimated average claim values are the most sensitive assumptions for this reserve. A 10% increase or decrease in either the forecasted number of IBNR claims or the average claim values would result in an approximate $7 million increase or decrease in the liability recorded for unasserted asbestos claims.

The Company, with the assistance of the third party specialist, obtains semi-annual updates of the study. The Company will monitor actual experience against the number of forecasted claims to be received and expected claim payments. More periodic updates to the study will occur if trends necessitate a change.

Undiscounted liabilities recorded related to asbestos claims are as follows:

| | December 30, 2005 | December 31, 2004 |
|---|---|---|
| | (Dollars in millions) | |
| **Asbestos** | | |
| Incurred but not reported claims | $ 54 | $ 132 |
| Asserted claims | 87 | 80 |
| Total liability | $ 141 | $ 212 |
| Current liability | $ 37 | $ 37 |

Defense and processing costs, which historically have been and are anticipated in the future to be insignificant, are not included in the recorded liability. The Company is presently self-insured for asbestos-related claims.

***Other Occupational***

*2003 Provision for Other Occupational Change in Estimate*

In 2003, the Company changed its estimate of occupational reserves to include an estimate of IBNR claims for other occupational injuries as well as asbestos as noted above. The Company engaged a third party specialist to assist in projecting the number of other occupational injury claims to be received over the next seven years. Based on this analysis, the Company established reserves for the probable and reasonably estimable other occupational injury liabilities. In 2003, the Company recorded an undiscounted $65 million pre-tax charge for IBNR other occupational claims for similar reasons as asbestos discussed above.



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Similar to the asbestos liability estimation process, the key elements of the assessment included the following:

- An estimate of the potentially exposed population for other occupational diseases was calculated by projecting active versus retired work force from 2002 to 2010 using a growth rate projection for overall railroad employment made by the Railroad Retirement Board in its June 2003 report.
- An estimate of the future anticipated claims filing rate by type of injury, employee type, and active versus retired employee was computed using the Company's average historical claim filing rates for the 2-year calibration period for all diseases except hearing loss. Because the filing rate for hearing loss claims has been decreasing since 1998, the latest year filing rate was viewed as representative. These calibration periods are the time periods which management felt were representative of future filing rates. An estimate was made to forecast future claims by using the filing rates by disease and the active and retired CSX population each year.
- An estimate of the future anticipated settlement by type of injury was computed using the Company's historical average of dollars paid per claim for pending and future claims using the average settlement by type of injury observed during a 3-year time period.

*2005 Provision for Other Occupational Change in Estimate*

In 2004, management had no changes in estimate for other occupational liabilities. During 2005, CSX experienced an unfavorable trend in settlement values for repetitive stress and other injuries, which resulted in the recognition of a $10 million unfavorable change in estimate associated with these liabilities. In connection with the semi-annual updates of the study, the Company will monitor actual experience against the number of forecasted claims to be received and expected claim payments. More periodic updates to the study will occur if trends necessitate a change.

The estimated future filing rates and estimated average claim values are the most sensitive assumptions for this reserve. A 10% increase or decrease in either the forecasted number of IBNR claims or the average claim values would result in an approximate $7 million increase or decrease in the liability recorded for unasserted other occupational claims.

Undiscounted recorded liabilities related to occupational claims are as follows:

| | December 30, 2005 | December 31, 2004 |
|---|---|---|
| | (Dollars in millions) | |
| **Other Occupational** | | |
| Incurred But Not Reported Claims | $ 63 | $ 56 |
| Asserted Claims | 50 | 54 |
| Total Liability | $ 113 | $ 110 |
| Current Liability | $ 18 | $ 18 |

Defense and processing costs, which historically have been and are anticipated in the future to be insignificant, are not included in the recorded liability. The Company is presently self-insured for other occupational-related claims.



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

A summary of asbestos and other occupational claims activity is as follows:

| | Fiscal Years Ended | |
|---|---|---|
| | December 30, 2005 | December 31, 2004 |
| **Asserted Claims** | | |
| Open Claims — Beginning of Period | 11,461 | 13,479 |
| New Claims Filed | 765 | 1,178 |
| Claims Settled | (1,206) | (2,758) |
| Claims Dismissed | (381) | (438) |
| Open Claims — End of Period | 10,639 | 11,461 |

Approximately 6,000 of the open claims at December 30, 2005 are asbestos claims against the Company's previously owned international container-shipping business. Because these claims are against multiple vessel owners, the Company's reserves reflect its portion of those claims. The Company had approximately $11 million and $13 million reserved for those shipping business claims at December 30, 2005 and December 31, 2004, respectively. The remaining open claims have been asserted against CSXT.

***Summary***

The amounts recorded by the Company for asbestos and other occupational liabilities are based upon currently known information and judgments based upon that information. Projecting future events, such as the number of new claims to be filed each year, the average cost of disposing of claims, as well as the numerous uncertainties surrounding asbestos and other occupational litigation or legislation in the United States, could cause the actual costs to be higher or lower than projected.

While the final outcome of casualty-related matters cannot be predicted with certainty, considering among other items the meritorious legal defenses available and the liabilities that have been recorded, it is the opinion of management that none of these items, when finally resolved, will have a material effect on the Company's results of operations, financial position or liquidity. However, should a number of these items occur in the same period, they could have a material effect on the results of operations, financial condition or liquidity in a particular quarter or fiscal year.

**Separation**

Separation liabilities at December 30, 2005 and December 31, 2004 provide for the estimated costs of implementing workforce reductions, improvements in productivity and other cost reductions at the Company's major transportation units since 1991. These liabilities are expected to be paid out over the next 15 to 20 years from general corporate funds.

**Environmental**

The Company is a party to various proceedings, including administrative and judicial proceedings, involving private parties and regulatory agencies related to environmental issues. The Company has been identified as a potentially responsible party ("PRP") at approximately 259 environmentally impaired sites, many of which are, or may be, subject to remedial action under the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), also known as the Superfund Law, or similar state statutes. A number of these proceedings are based on allegations that CSX, or its predecessors, sent hazardous substances to the facilities in question for disposal.

In addition, some of the Company's land holdings are and have been used for industrial or transportation-related purposes or leased to commercial or industrial companies whose activities may have resulted in releases of various regulated materials onto the property. Therefore, the Company is subject to environmental cleanup and enforcement actions under the Superfund law, as



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

well as similar state laws that may impose joint and several liability for cleanup and enforcement costs on current and former owners and operators of a site without regard to fault or the legality of the original conduct, which could be substantial. In 2004, the Company assumed $6 million of Conrail environmental liabilities, due to the Conrail spin-off transaction.

At least once a quarter, the Company reviews its role with respect to each site identified. Based on the review process, the Company has recorded reserves to cover estimated contingent future environmental costs with respect to such sites. Environmental costs are charged to expense when they relate to an existing condition caused by past operations and do not contribute to current or future revenue generation. The recorded liabilities for estimated future environmental costs are undiscounted and include amounts representing the Company's estimate of unasserted claims, which the Company believes to be immaterial. The liability includes future costs for all sites where the Company's obligation is (1) deemed probable, and (2) where such costs can be reasonably estimated. The liability includes future costs for remediation and restoration of sites as well as any significant ongoing monitoring costs, but excludes any anticipated insurance recoveries.

Currently, the Company does not possess sufficient information to reasonably estimate the amounts of additional liabilities, if any, on some sites until completion of future environmental studies. In addition, latent conditions at any given location could result in exposure, the amount and materiality of which cannot presently be reliably estimated. Based upon information currently available, however, the Company believes its environmental reserves are adequate to accomplish remedial actions to comply with present laws and regulations, and that the ultimate liability for these matters, if any, will not materially affect its overall results of operations, financial condition and liquidity.

**Other**

Other reserves of $97 million include liabilities for various claims, such as longshoremen disability claims, freight claims, and claims for property, automobile and general liability. As liabilities become known, the Company accrues the estimable and probable amount, in accordance with SFAS 5.

Longshoremen disability reserves represent liability for assessments under Section 8f of the United States Longshore and Harbor Workers' Compensation Act. These reserves have amounts accrued for second injury fund liabilities, which represent the non-medical portion of employee claims which are paid by the United States Department of Labor and are attributable to an earlier injury to the same employee.

Freight claims represent claims for both freight loss and damage and freight rate disputes. Freight loss and damage claims are liabilities that resulted in lost or damaged customer freight while being handled by the Company's transportation services. Freight rate disputes represent liabilities for customer claims regarding the rate charged by the Company for its transportation services. Liabilities for freight rate disputes are recorded as a reduction of revenue.

The Company accrues for losses related to property, automobile and general liability. Property and automobile claims represent primary liability and state mandated coverages required satisfying financial responsibility requirements for company property and vehicle fleets. General liability is coverage for liability arising from operations of non-rail CSX subsidiaries.



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

CSX CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

## NOTE 12. Debt and Credit Agreements

Debt is as follows:

| | Maturity | Average Interest Rates at December 30, 2005 | December 30, 2005 | December 31, 2004 |
|---|---|---|---|---|
| | | (Dollars in millions) | | |
| Notes | 2006-2043 | 6.9% | $ 4,891 | $ 5,870 |
| Convertible Debentures, net of $80 and $85 discount, respectively | 2021 | 1.0% | 468 | 463 |
| Equipment Obligations | 2006-2015 | 6.6% | 549 | 651 |
| Other Obligations, Including Capital Leases | 2006-2015 | 7.3% | 121 | 247 |
| Total Current Maturities and Long- term Debt | | | 6,029 | 7,231 |
| Less Debt Due within One Year | | | (936) | (983) |
| Total Long Term Debt | | | $ 5,093 | $ 6,248 |

***Debt Repurchased***

In June 2005, CSX repurchased $1.0 billion of its publicly-traded notes listed below.

| Notes | Principal Amount Outstanding | Aggregate Principal Amount of Tendered Notes Accepted for Purchase |
|---|---|---|
| | (Dollars in millions) | |
| CSX 2.75% Notes due 2006 | $ 200 | $ 186 |
| CSX 9% Notes due 2006 | 300 | 206 |
| CSX Floating Rate Notes due 2006 | 300 | 58 |
| CSX 8.625% Notes due 2022 | 200 | 84 |
| CSX 7.95% Notes due 2027 | 500 | 227 |
| CSX 8.10% Notes due 2022 | 150 | 57 |
| CSX 7.25% Notes due 2027 | 250 | 167 |
| CSX 7.90% Notes due 2017 | 400 | 15 |
| | $ 2,300 | $ 1,000 |

The consideration paid for these notes totaled $1.2 billion, including a pretax charge of $192 million for costs to repurchase the debt which primarily reflects the market value above original issue value. CSX used net cash proceeds from the disposition of CSX's International Terminals business, along with cash on hand, to finance this repurchase.

***Debt Issuances***

In February 2004, CSX executed a $100 million bank financing that matured on February 25, 2005, which bore interest at a rate that varied with LIBOR plus an applicable spread. As of December 31, 2004, CSX had $100 million in aggregate principal amount outstanding under this agreement. CSX settled this obligation with cash at maturity.

In June 2004, CSX executed a $300 million bank financing with a maturity date of December 29, 2004, which bore interest at a rate that varied with LIBOR plus an applicable spread. As of December 31, 2004, CSX repaid the entire aggregate principal amount outstanding under this agreement and terminated this agreement.



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

In August 2004, CSX issued $300 million of floating rate notes with a maturity date of August 3, 2006. The notes bear interest at a rate that varies with LIBOR plus an applicable spread. These notes are not redeemable prior to maturity.

***Convertible Debentures***

In October 2001, CSX issued $564 million aggregate principal amount at maturity in unsubordinated zero coupon convertible debentures (the "debentures") due October 30, 2021 for an initial offering price of approximately $462 million. The carrying value of outstanding debentures was $468 million and $463 million, at December 30, 2005 and December 31, 2004, respectively. These debentures accrete (increase) in value at a yield to maturity of 1% per year. The accretion rate may be reset on October 30, 2007, October 30, 2011, and October 30, 2016 to a rate based on five-year United States Treasury Notes minus 2.8%. In no event, however, will the yield to maturity be reset below 1% or above 3% per annum. Accretion in value on the debentures is recorded for each period, but will not be paid prior to maturity.

In October 2005, holders had the option to require CSX to purchase their debentures at a purchase price equal to the accreted value of $852.48 per $1,000 principal amount at maturity. As a result, CSX purchased an immaterial aggregate principal amount at maturity of the debentures with cash on hand. Similarly, the debentures allow holders to require CSX to purchase their debentures in October 2006, October 2008, October 2011, and October 2016, at a purchase price equal to the accreted value of the debentures at the time. The debentures are classified in Current Maturities of Long-term Debt in the Consolidated Balance Sheets. CSX may redeem the debentures for cash at any time on or after October 30, 2008, at a redemption price equal to the accreted value of the debentures.

CSX amended the terms of these debentures during the third quarter of 2004 to surrender its right to pay the purchase price, in whole or in part, in shares of CSX's common stock for debentures tendered to CSX at the option of holders on certain specified purchase dates. As a result, if CSX is required to purchase any of the debentures on any of such dates, CSX will be required to pay the purchase price for such debentures on such specified purchase dates in cash.

Holders may in addition convert their debentures into shares of CSX's common stock at a conversion rate of 17.75 common shares per debenture, subject to customary anti-dilution adjustments, if any of the following conditions are satisfied:

- If the closing sale price of CSX's common stock for at least 20 trading days in the 30 trading day period ending on the trading day before the conversion date is more than 120% (which percentage will decline over the life of the debentures to 110% in accordance with the terms of the debentures) of the accreted conversion price per share of CSX's common stock at that preceding trading day;
- If CSX's senior unsecured credit ratings are downgraded by Moody's Investors Service, Inc. to below Ba1 and by Standard & Poor's Rating Services to below BB+;
- If CSX has called the debentures for redemption (which may occur no sooner than October 30, 2008); or
- Upon the occurrence of specified corporate transactions.

The accreted conversion price of the debentures at December 30, 2005 was $853.98 and the threshold price to be met in order to convert the debentures into common stock was $56.79 per common share.



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

***Short-term Debt Balances and Rates***

| | December 30, 2005 | December 31, 2004 |
|---|---|---|
| | (Dollars in millions) | |
| Short-term Debt | $ 1 | $ 101 |
| Weighted Average Interest Rates | 4.47% | 1.10% |

***Long-term Debt Maturities***

| Fiscal Years Ending | (Dollars in millions) |
|---|---|
| 2006 | $ 1,016 |
| 2007 | 595 |
| 2008 | 633 |
| 2009 | 296 |
| 2010 | 94 |
| 2011 and Thereafter | 3,474 |
| Total Long-term Debt Maturities | 6,108 |
| Unamortized discount on convertible bonds included in Current Maturities of Long-term Debt | (80) |
| Fair market value of interest rate swap included in Long-term Debt | 1 |
| Total Current Maturities and Long-term Debt | $ 6,029 |

Certain of CSX's rail unit properties are pledged as security for various rail-related long-term debt issues. In addition, the Company has approximately $68 million in assets, which are specifically designated to fund an equal amount of long-term debt.

***Credit Facilities***

CSX has a $1.2 billion five-year unsecured revolving credit facility expiring in May 2009 and a $400 million 364-day unsecured revolving credit facility expiring in May 2006. The facilities were entered into in May 2004 and May 2005, respectively, on terms substantially similar to the facilities they replaced. Generally, these facilities may be used for general corporate purposes, to support CSX's commercial paper, and for working capital. Neither of the credit facilities was drawn on as of December 30, 2005. Commitment fees and interest rates payable under the facilities are similar to fees and rates available to comparably rated investment-grade borrowers. In 2005, CSX paid approximately $2 million for total fees associated with the undrawn facility. These credit facilities allow for borrowings at floating (LIBOR-based) rates, plus a spread, depending upon CSX's senior unsecured debt ratings. At December 30, 2005, CSX was in compliance with all covenant requirements under the facilities.

**NOTE 13. Derivative Financial Instruments**

CSX uses derivative financial instruments to manage its overall exposure to fluctuations in interest rates and fuel costs.

***Interest Rate Swaps***

CSX has entered into various interest rate swap agreements on the following fixed rate notes:

| Maturity Date | Notional Amount | Fixed Interest Rate | Variable Rate at December 30, 2005 | Variable Rate at December 31, 2004 |
|---|---|---|---|---|
| | (Dollars in millions) | | | |
| May 1, 2007 | $ 450 | 7.45% | 7.65% | 5.50% |
| May 1, 2032 | 150 | 8.30% | 5.84% | 3.75% |
| Total/ Average | $ 600 | 7.66% | | |



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Under these agreements, CSX will pay variable interest based on LIBOR in exchange for a fixed rate, effectively transforming the notes to floating rate obligations. The interest rate swap agreements are designated and qualify as fair value hedges and the gain or loss on the derivative instrument, as well as the offsetting gain or loss on the fixed rate note attributable to the hedged risk, are recognized in current earnings during the period of change in fair values. Hedge effectiveness is measured at least quarterly based on the relative change in fair value of the derivative contract in comparison with changes over time in the fair value of the fixed rate notes. Any change in fair value resulting from ineffectiveness, as defined by SFAS 133, *Accounting For Derivative Instruments and Hedging Activities* ("SFAS 133"), is recognized immediately in earnings. CSX's interest rate swaps qualify as perfectly effective fair value hedges, as defined by SFAS 133. As such, there was no ineffective portion to the hedge recognized in earnings during the current or prior year periods. Long-term debt has been increased by $1 million and $26 million for the fair market value of the interest rate swap agreements based upon quoted market prices at December 30, 2005 and December 31, 2004, respectively. Fair value adjustments are non-cash transactions and, accordingly, have no cash impact on the Consolidated Cash Flow Statements.

The differential to be paid or received under these agreements is accrued based on the terms of the agreements and is recognized in interest expense over the term of the related debt. The related amounts payable to or receivable from counterparties are included in other current liabilities or assets. Cash flows related to interest rate swap agreements are classified as Operating Activities in the Consolidated Cash Flow Statements. For the fiscal years ended December 30, 2005 and December 31, 2004, CSX reduced interest expense by approximately $12 million and $32 million, respectively, as a result of the interest rate swap agreements that were in place during each period.

The counterparties to the interest rate swap agreements expose CSX to credit loss in the event of non-performance. CSX does not anticipate non-performance by the counterparties.

**Fuel Hedging**

In 2003, CSX began a program to hedge a portion of CSXT's future diesel fuel purchases. This program was established to manage exposure to fuel price fluctuations. In order to minimize this risk, CSX has entered into a series of swaps in order to fix the price of a portion of CSXT's estimated future fuel purchases.

Following is a summary of outstanding fuel swaps:

| | December 30, 2005 |
|---|---|
| Approximate Gallons Hedged (Millions) | 57 |
| Average Price Per Gallon | $0.84 |
| Swap Maturities | January 2006-July 2006 |

| | 2006 | | |
|---|---|---|---|
| | Q1 | Q2 | Q3 |
| Estimated % of Future Fuel Purchases Hedged at December 30, 2005 | 25% | 11% | 1% |

The program limits fuel hedges to a 24-month duration and a maximum of 80% of CSXT's average monthly fuel purchased for any month within the 24-month period, and places the hedges among selected counterparties. Fuel hedging activity favorably impacted fuel expense for the fiscal year ended December 30, 2005 and December 31, 2004 by $249 million and $63 million, respectively. Fuel hedging activity had no impact on fuel expense for the fiscal year ended December 26, 2003. Ineffectiveness, or the extent to which changes in the fair values of the fuel swaps did not offset changes in the fair values of the expected fuel purchases, was immaterial.

These instruments qualify, and are designated by management, as cash-flow hedges of variability in expected future cash flows attributable to fluctuations in fuel prices. The fair values of



 Powered by Morningstar® Document Research℠

fuel derivative instruments are determined based upon current fair market values as quoted by third party dealers and are recorded on the Consolidated Balance Sheets with offsetting adjustments to Accumulated Other Comprehensive Loss, a component of Shareholders' Equity. Amounts are reclassed from Accumulated Other Comprehensive Loss as the underlying fuel that was hedged is consumed by rail operations. The fair value of fuel derivative instruments based upon quoted market prices was $51 million and $118 million as of December 30, 2005 and December 31, 2004. Fair value adjustments are non-cash transactions and, accordingly, have no cash impact on the Consolidated Cash Flow Statements.

CSX suspended entering into new swaps in its fuel hedge program since the third quarter of 2004. CSX will continue to monitor and assess the global fuel marketplace to decide if and when to resume hedging under the program.

The counterparties to the fuel hedge agreements expose CSX to credit loss in the event of non-performance. CSX does not anticipate non-performance by the counterparties.

## NOTE 14. Shareholders' Equity

***Common and Preferred Stocks***

Common and Preferred Stock consists of:

| Common Stock, $1 Par Value | December 30, 2005 |
|---|---|
| | (In thousands) |
| Common Shares Authorized | 300,000 |
| Common Shares Issued and Outstanding | 218,203 |

| Preferred Stock | December 30, 2005 |
|---|---|
| | (In thousands) |
| Preferred Shares Authorized | 25,000 |
| Preferred Shares Outstanding | — |

Holders of Common Stock are entitled to one vote on all matters requiring a vote for each share held. Preferred Stock is senior to common stock with respect to dividends and upon liquidation of CSX.

Prior to October 2003, 3,000,000 shares had been designated as Series B Preferred Stock in conjunction with CSX's Shareholder Rights Plan. In October 2003, the expiration date of the shareholder rights under the Shareholder Rights Plan was accelerated, resulting in the effective termination of the Plan, and CSX's Articles of Incorporation were amended to eliminate the designation of shares for Series B Preferred.

Table of Contents

CSX CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

## NOTE 15. Earnings Per Share

The following table sets forth the computation of basic earnings per share and earnings per share, assuming dilution:

| | Fiscal Years Ended | | |
|---|---|---|---|
| | December 30, 2005 | December 31, 2004 | December 26, 2003 |
| Numerator (Millions): | | | |
| Earnings from Continuing Operations | $ 720 | $ 418 | $ 137 |
| Interest Expense on Convertible Debt — Net of Tax | 4 | 4 | 4 |
| Net Earnings from Continuing Operations, If-Converted | 724 | 422 | 141 |
| Discontinued Operations — Net of Tax | 425 | (79) | 52 |
| Cumulative Effect of Accounting Change — Net of Tax | — | — | 57 |
| Net Earnings, If-Converted | 1,149 | 343 | 250 |
| Interest Expense on Convertible Debt — Net of Tax | (4) | (4) | (4) |
| Net Earnings | $ 1,145 | $ 339 | $ 246 |
| Denominator (Thousands): | | | |
| Average Common Shares Outstanding | 216,425 | 214,796 | 213,964 |
| Convertible Debt | 9,728 | 9,728 | 9,932 |
| Stock Options | 1,406 | 360 | 328 |
| Other Potentially Dilutive Common Shares | 465 | 146 | 104 |
| Average Common Shares Outstanding, Assuming Dilution | 228,024 | 225,030 | 224,328 |
| Earnings Per Share: | | | |
| Income from Continuing Operations | $ 3.33 | $ 1.95 | $ 0.64 |
| Discontinued Operations | 1.96 | (0.37) | 0.24 |
| Cumulative Effect of Accounting Change | — | — | 0.26 |
| Net Earnings | $ 5.29 | $ 1.58 | $ 1.14 |
| Earnings Per Share, Assuming Dilution: | | | |
| Income from Continuing Operations | $ 3.17 | $ 1.87 | $ 0.63 |
| Discontinued Operations | 1.87 | (0.35) | 0.23 |
| Cumulative Effect of Accounting Change | — | — | 0.25 |
| Net Earnings | $ 5.04 | $ 1.52 | $ 1.11 |

Basic earnings per share are based on the weighted-average number of common shares outstanding. Earnings per share, assuming dilution, is based on the weighted-average number of common shares outstanding adjusted for the effect of potentially dilutive common shares from convertible debt and employee stock options and awards. The following table provides information about stock options exercised.

| | Fiscal Years Ended | | |
|---|---|---|---|
| | December 30, 2005 | December 31, 2004 | December 26, 2003 |
| | | (Thousands) | |
| Number of Stock Options Exercised | 2,764 | 517 | 293 |



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

Certain potentially dilutive stock options as of the fiscal years ended 2005, 2004 and 2003 were excluded from the computation of earnings per share, assuming dilution, since their related option exercise prices were greater than the average market price of the common shares during the period. The following table provides information about potentially dilutive stock options excluded from the computation of earnings per share:

| | Fiscal Years Ended | | |
|---|---|---|---|
| | December 30, 2005 | December 31, 2004 | December 26, 2003 |
| Number of Shares (Thousands) | 2,213 | 16,374 | 18,497 |
| Average Exercise Price | $ 53.11 | $ 42.88 | $ 42.41 |

A substantial increase in the fair market value of CSX's stock price could trigger contingent conditions for conversion allowing holders to convert their debentures into CSX common stock, as well as causing an increase in the exercise of stock options. Thus, both could negatively impact basic earnings per share.

**NOTE 16. Stock Plans**

The Company adopted the fair value based method of accounting for share-based payments effective fiscal year 2003 using the prospective method described in SFAS 148. (See Note 1. Nature of Operations and Significant Accounting Policies under the caption "Share-Based Compensation".)

Total compensation expense associated with share-based compensation was as follows:

| | Fiscal Years Ended | | |
|---|---|---|---|
| | December 30, 2005 | December 31, 2004 | December 26, 2003 |
| | | (Dollars in millions) | |
| Stock Based Compensation Expense | $ 39 | $ 20 | $ 5 |

***Stock Options and Awards***

CSX stock option and award plans provide primarily (1) stock options, (2) restricted stock awards to eligible officers and employees, (3) Long-term incentive plans, (4) stock plans for directors, and (5) other plans. Awards granted under the various plans are determined by the Board of Directors.

At December 30, 2005, there were 3,334 current or former employees with grants outstanding under the various plans. A total of approximately 39 million shares were reserved for issuance under the plans of which 6 million were available for new grants. The remaining shares are assigned to outstanding stock options and stock awards.

***Stock Options***

The fair value of $8.93 for stock options granted in 2003 was estimated as of the date of grant using the Black-Scholes-Merton option model and incorporating assumptions as listed below. No stock options were granted in 2004 or 2005.

| | December 26, 2003 |
|---|---|
| Black-Scholes Assumptions: | |
| Expected Dividend Yield | 1.10% |
| Risk-free Interest Rate | 2.53% |
| Expected Stock Volatility | 28% |
| Expected Term Until Exercise | 6 years |

Stock options have been granted with 10-year terms. Options outstanding at December 30, 2005, are generally exercisable three to ten years after date of grant. The exercise price for options granted equals the market price of the underlying stock on the date of grant. A summary of CSX's

Table of Contents



stock option activity and related information for the fiscal years ended December 30, 2005, December 31, 2004 and December 26, 2003 is as follows:

| | December 30, 2005 | | December 31, 2004 | | December 26, 2003 | |
|---|---|---|---|---|---|---|
| | Weighted-Average Shares (000s) | Average Exercise Price | Weighted-Average Shares (000s) | 2004 Average Exercise Price | Weighted-Average Shares (000s) | Average Exercise Price |
| Outstanding at Beginning of Year | 20,594 | $ 39.83 | 23,297 | $ 39.27 | 26,022 | $ 40.45 |
| Granted | — | $ — | — | $ — | 3,477 | $ 38.14 |
| Expired or Canceled | (883) | $ 39.97 | (2,186) | $ 37.83 | (5,909) | $ 39.91 |
| Exercised | (2,764) | $ 35.56 | (517) | $ 23.29 | (293) | $ 22.42 |
| Outstanding at End of Year | 16,947 | $ 40.30 | 20,594 | $ 39.83 | 23,297 | $ 39.27 |
| Exercisable at End of Year | 8,497 | $ 42.15 | 7,758 | $ 41.18 | 7,104 | $ 41.13 |

The following table summarizes information about stock options outstanding at December 30, 2005:

| | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|
| Exercise Price | Number Outstanding (000's) | Weighted-Average Remaining Contractual Life (Years) | Weighted-Average Exercise Price | Number Outstanding (000's) | Weighted-Average Exercise Price |
| $20 to $29 | 713 | 4.20 | $ 24.02 | 713 | $ 24.02 |
| $30 to $39 | 9,523 | 6.28 | $ 36.58 | 2,838 | $ 39.15 |
| $40 to $49 | 4,509 | 2.47 | $ 44.48 | 3,571 | $ 44.58 |
| $50 to $59 | 2,202 | 0.89 | $ 53.12 | 1,375 | $ 51.43 |
| Total | 16,947 | 4.48 | $ 40.30 | 8,497 | $ 42.15 |

***Restricted Stock Awards***

Restricted stock awards vest over a three to five-year employment period. The following table provides information about outstanding restricted stock awards.

| | Fiscal Years Ended | | |
|---|---|---|---|
| | December 30, 2005 | December 31, 2004 | December 26, 2003 |
| Number of Restricted Stock Awards Outstanding (Thousands) | 275 | 259 | 249 |
| Weighted Average Fair Value at Grant Date | $ 32.72 | $ 31.21 | $ 30.97 |
| Restricted Stock Award Expense (Millions) | $ 2 | $ 2 | $ 2 |

***Long-term Incentive Programs***

The CSX Long-term Incentive Program, introduced in 2004, is designed to reward participants for the attainment of certain CSX financial and strategic initiatives designed to align shareholder and employee interests. The objective of the plan is to motivate and reward key members of management and executives for achieving and exceeding a two-year modified free cash flow goal. The award is payable in cash and CSX common stock. The current plan expired on December 30, 2005, and CSX issued 756 thousand shares in 2006 as a result of the achievement of performance targets for the two preceding fiscal years. Additionally, CSX recognized $75 million and $10 million in expense associated with this program for the fiscal years ended December 30, 2005 and December 31, 2004, respectively.



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

The Company intends to continue to motivate and reward key members of management and executive officers for achieving certain performance criteria through the use of long-term incentive compensation plans at least partially payable in CSX common stock.

***Stock Plan for Directors***

The Stock Plan for Directors, approved by the shareholders in 1992, governs in part the manner in which directors' fees and retainers are paid. In 2004, the minimum retainer to be paid in CSX common stock increased from 40% to 50%. In addition, each director may elect to receive up to 100% of the remaining retainer and fees in the form of common stock of CSX. In 1997, shareholders approved amendments to the Plan that would permit additional awards of stock or stock options. The following table provides information about shares issued to directors.

| | Fiscal Years Ended | | |
|---|---|---|---|
| | December 30, 2005 | December 31, 2004 | December 26, 2003 |
| Shares Issued to Directors (Thousands) | 37 | 41 | 36 |
| Expense (Millions) | $ 2 | $ 1 | $ 1 |

For 2005, the Plan permits each director, in accordance with Internal Revenue Code Section 409A, to defer receipt of fees. Deferred fee amounts are credited to an unfunded account and may be invested in eight investment choices, including a CSX common stock equivalent fund. Distributions are made in accordance with elections made by the directors consistent with the terms of the Plan. At December 30, 2005, there were 593 thousand shares of common stock reserved for issuance under this plan.

***Employee Stock Purchase Plan***

The 2001 Employee Stock Purchase Plan ("ESPP") allowed eligible employees to purchase CSX common stock at a discount. Specifically, participating employees were able to purchase CSX stock at the lower of 85% of fair market value on December 1 (beginning of the annual offering period) or 85% of fair market value on November 30 of the following year (end of the annual offering period). In effect, employees received a 12-month stock option to purchase CSX stock. Once purchased, the shares were unrestricted and could generally be sold or transferred at any time. Employees purchased approximately 540,000 shares under this plan during 2003. This plan was not extended beyond 2003.

***Shareholder Dividend Reinvestment Plan***

CSX maintains the Shareholder Dividend Reinvestment Plan under which shareholders may purchase additional shares of stock. The following table provides information about shares available for issuance under this plan as of December 30, 2005, December 31, 2004 and December 26, 2003.

| | December 30, 2005 | December 31, 2004 | December 26, 2003 |
|---|---|---|---|
| | | (Thousands) | |
| Number of Shares Available for Issuance | 4,734 | 4,947 | 4,626 |

***Stock Repurchases***

The Board of Directors has authorized CSX to purchase shares of its common stock from time to time in an amount up to approximately $150 million in any fiscal year. Pursuant to this authority, CSX intends to purchase shares of CSX common stock in the open market or in privately negotiated transactions.

## NOTE 17. Fair Value of Financial Instruments

Fair values of the Company's financial instruments are estimated by reference to quoted prices from market sources and financial institutions, as well as other valuation techniques. Long-term debt is the only financial instrument of the Company with fair values significantly different from their



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

carrying amounts. The fair value of long-term debt has been estimated using discounted cash flow analysis based upon the Company's current incremental borrowing rates for similar types of financing arrangements

| | December 30, 2005 | December 31, 2004 |
|---|---|---|
| | (Dollars in billions) | |
| Long Term Debt Including Current Maturities: | | |
| Fair Value | $ 6.7 | $ 7.7 |
| Carrying Value | $ 6.0 | $ 7.2 |

## NOTE 18. Employee Benefit Plans

### *General*

The Company sponsors defined benefit pension plans principally for salaried, management personnel. The plans provide eligible employees with retirement benefits based predominantly on years of service and compensation rates near retirement. Under the CSX pension plan, employees hired after December 31, 2002 are covered by a cash formula. The cash balance formula provides benefits by utilizing interest and pay credits based upon age, service and compensation.

In addition to the defined benefit pension plans, CSX sponsors one postretirement medical plan and one life insurance plan that provide benefits to full-time, salaried, management employees hired prior to January 1, 2003, upon their retirement if certain eligibility requirements are met. The postretirement medical plan is contributory (partially funded by retirees), with retiree contributions adjusted annually. The life insurance plan is non-contributory.

| | Summary of Participants as of January 1, 2005 | |
|---|---|---|
| | Pension Plans | Postretirement Plan |
| Active Employees | 6,654 | 4,325 |
| Retirees and Beneficiaries | 11,079 | 11,295 |
| Other | 5,980 | 265 |
| Total | 23,713 | 15,885 |

As permitted by SFAS 87, *Employers Accounting for Pensions* ("SFAS 87"), the Company has elected to use a plan measurement date of September 30 to actuarially value its pension and postretirement plans as it provides for more timely analysis. The Company engages independent, external actuaries to compute the amounts of liabilities and expenses relating to these plans subject to the assumptions that the Company selects as of the beginning of the plan year.

The benefit obligation for these plans represents the liability of the Company for current and retired employees and is affected primarily by the following:

- Service cost (benefits attributed to employee service during the period)
- Interest cost (interest on the liability due to the passage of time)
- Actuarial gains/losses (experience during the year different from that assumed and changes in plan assumptions)
- Benefits paid to participants

Currently, there is proposed legislation regarding pension plan funding requirements. If the proposed legislation is passed, pension plan funding requirements will be increased. The impact to the Company of this proposed legislation is unknown at this time.

### *Cashflows*

Plan assets are amounts that have been segregated and restricted to provide benefits, and include amounts contributed by the Company and amounts earned from investing contributions, less



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

CSX CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

benefits paid. The Company funds the cost of the postretirement medical and life insurance benefits on a pay-as-you go basis. CSX expects to make cash contributions of approximately $9 million to its pension plans in 2006. The benefits as of December 30, 2005 expected to be paid in each of the next five fiscal years, and in the aggregate for the five fiscal years thereafter are as follows:

| | Expected Cashflows | |
|---|---|---|
| | Pension Benefits | Postretirement Benefits |
| | (Dollars in millions) | |
| 2006 | $ 147 | $ 47 |
| 2007 | 143 | 46 |
| 2008 | 143 | 45 |
| 2009 | 144 | 43 |
| 2010 | 142 | 42 |
| Thereafter | 738 | 177 |
| Total | $ 1,457 | $ 400 |

***Plan Assets***

Asset management for the pension fund is founded upon an asset allocation strategy that was developed using asset return simulation in conjunction with projected plan liabilities. The allocation seeks maximization of returns within the constraints of acceptable risks considering the long-term investment horizon. CSX has established a target allocation of 60% equity and 40% fixed income investments. The goal is to maintain assets at or above benefit obligations (long-term liabilities) without corporate contributions.

The distribution of pension plan assets as of the measurement date is as follows:

| | September 30, 2005 | | September 30, 2004 | |
|---|---|---|---|---|
| | Amount | Percent of Total Assets | Amount | Percent of Total Assets |
| | (Dollars in millions) | | | |
| Common Stocks | $ 928 | 60% | $ 865 | 59% |
| Fixed Income | 591 | 39% | 581 | 40% |
| Cash and Cash Equivalents | 17 | 1% | 12 | 1% |
| Total | $ 1,536 | 100% | $ 1,458 | 100% |

The Company provides investment guidelines to both the plan's fixed income and equity fund managers. Within the broad asset classes that comprise the plan's investments, common stocks are diversified based on allocations to domestic and foreign stocks as mandated by the Company. Allocations are maintained at within 3% of targets. The U.S. stock segment includes style diversification among managers of large capitalization stocks and small capitalization stocks. The Company limits industry sectors, outlines individual stock issuer concentration and monitors the use or prohibition of derivatives and CSX securities.

Fixed income securities are diversified across fund managers and investment style and are benchmarked to a long duration index. The Company specifies the types of allowable investments such as government, corporate and asset-backed bonds, and limits diversification between domestic and foreign investments and the use of derivatives. Additionally, the Company stipulates minimum credit quality constraints and any prohibited securities.

Individual investments or fund managers are selected in accordance with standards of prudence as it applies to asset diversification and investment suitability. Monitoring fund investment performance is ongoing. Acceptable performance is determined in the context of the long-term return objectives of the fund and appropriate asset class benchmarks.



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

Table of Contents

CSX CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

***Benefit Obligation and Plan Asset Information***

| | Pension Benefits | | Postretirement Benefits | |
|---|---|---|---|---|
| | December 30, 2005 | December 31, 2004 | December 30, 2005 | December 31, 2004 |
| | (Dollars in millions) | | | |
| **Actuarial Present Value of Benefit Obligation** | | | | |
| Accumulated Benefit Obligation | $ 1,947 | $ 1,825 | N/A | N/A |
| Projected Benefit Obligation | 2,078 | 1,941 | $ 444 | $ 509 |
| **Change in Projected Benefit Obligation:** | | | | |
| Projected Benefit Obligation at Beginning of Plan Year | $ 1,941 | $ 1,916 | $ 509 | $ 513 |
| Service Cost | 34 | 37 | 8 | 9 |
| Interest Cost | 107 | 111 | 24 | 25 |
| Impact of Plan Changes/ Special Termination Benefits | 2 | 51 | — | 20 |
| Plan Participants' Contributions | — | — | 14 | 12 |
| Actuarial (Gain)/ Loss | 141 | 12 | (58) | (20) |
| Benefits Paid | (147) | (186) | (53) | (50) |
| Benefit Obligation at End of Plan Year | $ 2,078 | $ 1,941 | $ 444 | $ 509 |

| | Pension Benefits | | Postretirement Benefits | |
|---|---|---|---|---|
| | December 30, 2005 | December 31, 2004 | December 30, 2005 | December 31, 2004 |
| | (Dollars in millions) | | | |
| **Change in Plan Assets:** | | | | |
| Fair Value of Plan Assets at Beginning of Plan Year | $ 1,458 | $ 1,451 | N/A | N/A |
| Actual Return on Plan Assets | 210 | 165 | N/A | N/A |
| Employer Contributions | 15 | 28 | $ 39 | $ 38 |
| Plan Participants' Contributions | — | — | 14 | 12 |
| Benefits Paid | (147) | (186) | (53) | (50) |
| Fair Value of Plan Assets at End of Plan Year | $ 1,536 | $ 1,458 | $ — | $ — |
| **Funded Status** | $ (542) | $ (483) | $ (444) | $ (509) |

***Funded Status and Amounts Recognized in Consolidated Balance Sheets***

The funded status, or amount by which the benefit obligation exceeds the fair value of plan assets, represents a liability. At December 30, 2005, the status of CSX plans is as follows:

| | Aggregate Projected Benefit Obligation | Aggregate Fair Value of Plan Assets |
|---|---|---|
| For plans with a projected benefit obligation in excess of plan assets | $ 2.1 billion | $ 1.5 billion |
| For plans with an accumulated benefit obligation in excess of plan assets | $ 1.9 billion | $ 1.5 billion |



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

Table of Contents



The following table shows the reconciliation of the funded status of the plans with the amount recorded in the Consolidated Balance Sheets:

| | Pension Benefits | | Postretirement Benefits | |
|---|---|---|---|---|
| | December 30, 2005 | December 31, 2004 | December 30, 2005 | December 31, 2004 |
| | (Dollars in millions) | | | |
| Funded Status | $ (542) | $ (483) | $ (444) | $ (509) |
| Unrecognized Actuarial Loss | 477 | 448 | 114 | 184 |
| Unrecognized Prior Service Cost | 23 | 27 | (14) | (19) |
| Fourth Quarter Activity: | | | | |
| Employer Contributions to Pension Plans | 4 | 3 | — | — |
| Net Postretirement Benefits Paid | — | — | 11 | 10 |
| Net Amount Recognized in Consolidated Balance Sheet | $ (38) | $ (5) | $ (333) | $ (334) |

A liability is recognized if net periodic pension cost (cost of a pension plan for a period, including service cost, interest cost, actual return on plan assets, gain or loss, amortization of unrecognized prior service cost) recognized exceeds amounts the employer has contributed to the plan. An asset is recognized if net periodic pension cost is less than amounts the employer has contributed to the plan.

| | Pension Benefits | | Postretirement Benefits | |
|---|---|---|---|---|
| | December 30, 2005 | December 31, 2004 | December 30, 2005 | December 31, 2004 |
| | (Dollars in millions) | | | |
| Accrued Benefit Liability | $ (462) | $ (422) | $ (333) | $ (334) |
| Intangible Asset | 23 | 26 | N/A | N/A |
| Accumulated Other Comprehensive Loss | 401 | 391 | N/A | N/A |
| Net Amount Recognized in Consolidated Balance Sheet | $ (38) | $ (5) | $ (333) | $ (334) |

***Net Periodic Benefit Expense***

| | Pension Benefits | | | Postretirement Benefits | | |
|---|---|---|---|---|---|---|
| | Fiscal Years Ended | | | Fiscal Years Ended | | |
| | 2005 | 2004 | 2003 | 2005 | 2004 | 2003 |
| | (Dollars in millions) | | | | | |
| Service Cost | $ 34 | $ 37 | $ 38 | $ 8 | $ 9 | $ 11 |
| Interest Cost | 107 | 111 | 113 | 24 | 25 | 25 |
| Expected Return on Plan Assets | (120) | (130) | (137) | — | — | — |
| Amortization of Prior Service Cost | 4 | 4 | 4 | (5) | (6) | (5) |
| Amortization of Net Loss | 21 | 14 | — | 13 | 15 | 14 |
| Net Periodic Benefit Cost | $ 46 | $ 36 | $ 18 | $ 40 | $ 43 | $ 45 |
| Special Termination Benefits — Workforce Reduction Program/ Curtailments | — | 6 | 13 | — | 18 | — |
| Net Periodic Benefit Expense Including Termination Benefits | $ 46 | $ 42 | $ 31 | $ 40 | $ 61 | $ 45 |



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

***Curtailments***

Due to the termination of employees under the management restructuring plan (see Note 5. Management Restructuring), a curtailment occurred in CSX's pension plan and postretirement medical plan. The estimated cost of the curtailments of $24 million was included in the management restructuring charge for the fiscal year ended December 31, 2004. Due to the curtailments, the Company was required to update its measurement of the assets and obligations of these plans, which affected the net periodic benefit costs beginning in the second quarter of 2004. A substantial portion of benefits provided under the management restructuring initiatives was paid from assets of the Company's defined benefit pension plans.

The $13 million termination charge in 2003 represents a curtailment charge associated with the retirement of the Company's former Chairman and Chief Executive Officer.

***Additional Minimum Liability***

During 2005 and 2004, CSX recorded changes in its minimum pension liability and its shares of changes in Conrail's minimum pension liability. These changes did not affect net earnings, but are a component of Accumulated Other Comprehensive Loss on an after tax basis.

| **Components of Accumulated Other Comprehensive Loss** | **December 30, 2005 Increase (Decrease)** | **December 31, 2004 Increase (Decrease)** |
|---|---|---|
| | **(Dollars in millions)** | |
| Minimum Pension Liability | $ (10) | $ (26) |
| Accumulated Effect Net of Taxes | (6) | 19 |
| Conrail Effect Net of Taxes | (9) | (1) |

***Assumptions***

Weighted-average assumptions used in accounting for the plans are as follows:

| | **Pension Benefits** | | **Postretirement Benefits** | |
|---|---|---|---|---|
| | **December 30, 2005** | **December 31, 2004** | **December 30, 2005** | **December 31, 2004** |
| Expected Long-term Return on Plan Assets: | | | | |
| Benefit Cost for Plan Year | 8.50% | 8.90% | N/A | N/A |
| Benefit Obligation at End of Plan Year | 8.50% | 8.50% | N/A | N/A |
| Discount Rates: | | | | |
| Benefit Cost for Plan Year | 5.75% | 6.00% | 5.00% | 5.00% |
| Benefit Obligation at End of Plan Year | 5.25% | 5.75% | 5.00% | 5.00% |
| Salary Scale Inflation | 3.60% | 3.20% | 3.60% | 3.20% |

The net postretirement benefit obligation was determined using the following assumptions for health care cost trend rate for medical plans.

| | **Postretirement Benefits** | |
|---|---|---|
| | **December 30, 2005** | **December 31, 2004** |
| Health Care Cost Trend Rate | | |
| Components of Benefit Cost: Pre-65 | 12% decreasing to 4.5% | 11% decreasing to 4.5% |
| Components of Benefit Cost: Post-65 | 13% decreasing to 4.5% | 11% decreasing to 4.5% |
| Benefit Obligations: Pre-65 | 11% decreasing to 4.5% | 12% decreasing to 4.5% |
| Benefit Obligations: Post-65 | 12% decreasing to 4.5% | 13% decreasing to 4.5% |



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

CSX CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

A 1% change in the assumed health care cost trend rate would have the following effects:

| | 1% Increase | 1% Decrease |
|---|---|---|
| | (Dollars in millions) | |
| Effect on postretirement benefits service and interest cost | $ 1 | $ (2) |
| Effect on postretirement benefit obligation | $ 18 | $ (16) |

***Medicare Prescription Drug, Improvement and Modernization Act of 2003***

The Company is required to estimate and record the effects of the Medicare Prescription Drug, Improvement and Modernization Act of 2003 ("Act"). The Company determined that its medical plan's prescription drug benefit will qualify as actuarially equivalent to Medicare Part D based upon a review by the plan's health and welfare actuary of the plan's benefit compared with the benefit that would be paid under Medicare Part D. The reduction in the postretirement benefit obligation as a result of the Act was approximately $56 million as of December 30, 2005.

CSX has applied for the tax free 28% federal reimbursement of total prescription drug claims from $250 to $5,000 paid after January 1, 2006.

***Other Plans***

The Company maintains savings plans for virtually all full-time salaried employees and certain employees covered by collective bargaining agreements. Expense associated with these plans was $19 million, $15 million and $16 million for 2005, 2004 and 2003, respectively.

Under collective bargaining agreements, the Company participates in a number of multiemployer medical insurance plans providing health insurance coverage to its contract employees. The participating employers make contributions on a pay-as-you-go basis generally based upon the number of its employees participating in the plan. Total contributions of $376 million, $368 million and $360 million were made to these plans in 2005, 2004 and 2003, respectively.

## NOTE 19. Commitments and Contingencies

***Lease Commitments***

The Company has various lease agreements with other parties with terms up to 27 years. Non-cancelable, long-term leases generally include provisions for maintenance, options to purchase and options to extend the terms.

At December 30, 2005, minimum building and equipment rentals and commitments for vessels under these operating leases are as follows:

| Years | Operating Leases | Sublease Income | Net Lease Commitments |
|---|---|---|---|
| | | (Dollars in millions) | |
| 2006 | $ 232 | $ 56 | $ 176 |
| 2007 | 236 | 71 | 165 |
| 2008 | 170 | 50 | 120 |
| 2009 | 124 | 37 | 87 |
| 2010 | 106 | 31 | 75 |
| Thereafter | 375 | 111 | 264 |
| Total | $ 1,243 | $ 356 | $ 887 |

Operating leases and an equal portion of sublease income include approximately $229 million relating to ongoing operating lease commitments for vessels and equipment, which have been subleased to Horizon. CSX believes Horizon will fulfill its contractual commitments with respect to such leases, and CSX will have no further liabilities for those obligations.



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

In addition to the commitments in the following table, the Company also has agreements covering equipment leased from Conrail. (See Note 2. Investment In and Integrated Rail Operations with Conrail, for a description of these commitments.)

| | For Years Ended | | |
|---|---|---|---|
| | December 30, 2005 | December 31, 2004 | December 26, 2003 |
| | | (Dollars in millions) | |
| Rent Expense on Operating Leases | $ 523 | $ 567 | $ 556 |

The majority of rent expense on operating leases relates to net daily rental charges on railroad operating equipment which are not long-term commitments.

The Company recognizes rent expense associated with operating leases that include escalations over their term using the straight-line method.

***Matters Arising Out of Sale of International Container-Shipping Assets***

In 2003, CSX finalized a settlement agreement with Maersk resolving all remaining material disputes pending directly between the two companies, consisting predominantly of two major disputes. The first dispute involved a post-closing working capital adjustment to the sale price for which the Company had recorded a receivable of approximately $70 million. The second dispute involved a claim of 425 million Dutch Guilders (approximately $180 million at then prevailing currency exchange rates) plus interest by European Container Terminals (“ECT”) alleging breaches of contract by the Company at the Rotterdam container terminal facility owned by ECT.

Also in 2003, CSX entered into a final settlement agreement with Maersk allocating responsibility between the two companies for third party claims and litigation relating to the assets acquired by Maersk. The two settlements reduced the Company’s 2003 earnings by $108 million pretax, $67 million after tax. This charge is reflected in Operating Expense as an Additional Loss on the Sale of the international container-shipping assets. Neither settlement had a material impact on cash flows.

***Purchase Commitments***

CSXT has a commitment under a long-term maintenance program that currently covers 43% of CSXT’s fleet of locomotives. The agreement is based on the maintenance cycle for each locomotive and is currently predicted to expire no earlier than 2026 and as late as 2031, depending upon when additional locomotives are placed in service. The costs expected to be incurred through the duration of the agreement fluctuate as locomotives are placed into or removed from service or as required maintenance is adjusted. CSXT may terminate the agreement at its option after 2012 though such action will trigger certain liquidated damages provisions. Under the program, CSXT paid $170 million, $151 million and $130 million during the fiscal years ended 2005, 2004 and 2003, respectively.

As a result of agreements executed in August 2005 and February 2006, CSXT has purchase obligations supporting a multi-year plan to acquire additional locomotives between 2006 and 2011. The amount of the ultimate purchase commitment depends upon the model of locomotive acquired and the timing of delivery.



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Annual payments under the long-term maintenance program and locomotive purchase obligations are estimated as follows:

| Years | Payments (Dollars in millions) |
|---|---|
| 2006 | $ 361 |
| 2007 | 392 |
| 2008 | 340 |
| 2009 | 338 |
| 2010 | 353 |
| 2011-2031 | 5,855 |
| Total | $ 7,639 |

Additionally, the Company has various commitments to purchase technology and communications services. The terms for the various agreements call for the Company to pay $36 million, $31 million and $2 million for the fiscal years ending 2006, 2007 and 2008, respectively. The largest purchase obligation is for communications services of $24 million per year for the years 2006 through 2007.

***STB Proceeding***

In 2001 Duke Energy Corporation (“Duke”) filed a complaint before the STB alleging that certain CSXT common carrier coal rates were unreasonably high. CSXT and Duke reached a settlement agreement pursuant to which Duke dismissed the STB proceedings with prejudice. Consequently, the Company reversed a $17 million reserve which increased coal, coke and iron ore revenue. Resolution of this matter in 2005 did not have a material impact on the Company’s financial condition, results of operations or liquidity for any period presented. Duke and CSXT have entered into a transportation contract establishing commercial terms for the future transportation of coal to Duke power plants served by CSXT.

***Insurance***

The Company maintains numerous insurance programs, most notably for third-party casualty liability and for Company property damage and business interruption with substantial limits. A specific amount of risk ($25 million per occurrence) is retained by the Company on the casualty program and noncatastrophic property damage. The Company retains $50 million of risk per occurrence for its catastrophic property coverage. For information on insurance issues resulting from the effects of Hurricane Katrina on the Company’s operations and assets, see Note 6 Hurricane Katrina.

***Guarantees***

CSX and its subsidiaries are contingently liable individually and jointly with others as guarantors of approximately $117 million in obligations principally relating to leased equipment, vessels and joint facilities used by the Company in its business operations. Utilizing the Company’s guarantee for these obligations allows the obligor to take advantage of lower interest rates and obtain other favorable terms. Guarantees are contingent commitments issued by the Company that could require CSX or one of its affiliates to make payment to or to perform certain actions for the beneficiary of the guarantee based on another entity’s failure to perform.

1. Guarantee of approximately $85 million of obligations of a former subsidiary, CSX Energy, in connection with a sale-leaseback transaction. CSX is, in turn, indemnified by several subsequent owners of the subsidiary against payments made with respect to this guarantee. CSX management does not expect that CSX will be required to make any payments under this guarantee for which CSX will not be reimbursed.



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

2. Guarantee of approximately $16 million relating to leases assumed as part of the conveyance of its interest in a former subsidiary, CSX Lines, subsequently renamed Horizon Lines LLC ("Horizon"). CSX believes Horizon will fulfill its contractual commitments with respect to such leases, and CSX will have no further liabilities for those obligations.

3. Guarantee of approximately $13 million of lease commitments assumed by A.P. Moller-Maersk ("Maersk") for which CSX is contingently liable. CSX believes Maersk will fulfill its contractual commitments with respect to such lease commitments, and CSX will have no further liabilities for those obligations.

As of December 30, 2005, the Company has not recognized any liabilities in its financial statements in connection with any guarantees arrangements. The maximum amount of future payments CSX could be required to make under these guarantees is the amount of the guarantees themselves.

***Other Legal Proceedings***

The Company is involved in routine litigation incidental to its business and is a party to a number of legal actions and claims, various governmental proceedings and private civil lawsuits, including those related to environmental matters, Federal Employers' Liability Act claims by employees, other personal injury claims, and disputes and complaints involving certain transportation rates and charges. Some of the legal proceedings include claims for compensatory as well as punitive damages, and others purport to be class actions. While the final outcome of these matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded along with applicable insurance, it is the opinion of CSX management that none of these items will have a material adverse effect on the results of operations, financial position or liquidity of the Company. An unexpected adverse resolution of one or more of these items, however, could have a material adverse effect on the results of operations, financial position or liquidity of the Company in a particular quarter or fiscal year.

## NOTE 20. Business Segments

The Company operates primarily in two business segments: rail and intermodal. The rail segment provides rail freight transportation over a network of approximately 21,000 route miles in 23 states, the District of Columbia and two Canadian provinces. The intermodal segment provides integrated rail and truck transportation services and operates a network of dedicated intermodal facilities across North America. The Company's segments are strategic business units that offer different services and are managed separately. The rail and intermodal segments are also viewed on a combined basis as Surface Transportation operations.

The Company evaluates performance and allocates resources based on several factors, of which the primary financial measure is business segment operating income. The accounting policies of the segments are the same as those described in Nature of Operations and Significant Accounting Policies (See Note 1. Nature of Operations and Significant Accounting Policies.)

Consolidated operating income includes the results of operations of Surface Transportation and other operating income. Other operating income includes the gain amortization on the CSX Lines conveyance, net sublease income from assets formerly included in the Company's Marine Services segment, and other items.

The International Terminals business segment has been reclassified to Discontinued Operations. (See Note 4. Discontinued Operations.)



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Business segment information for the fiscal years ended December 30, 2005, December 31, 2004 and December 26, 2003 is as follows:

| | Surface Transportation | | | | |
|---|---|---|---|---|---|
| | Rail | Intermodal | Total | Other | Total |
| | (Dollars in millions) | | | | |
| **2005** | | | | | |
| Revenues from External Customers | $ 7,256 | $ 1,362 | $ 8,618 | $ — | $ 8,618 |
| Segment Operating Income | 1,301 | 248 | 1,549 | 1 | 1,550 |
| Assets | 23,177 | 305 | 23,482 | — | 23,482 |
| Depreciation Expense | 779 | 39 | 818 | — | 818 |
| Property Additions | 1,091 | 25 | 1,116 | 1 | 1,117 |
| **2004** | | | | | |
| Revenues from External Customers | $ 6,694 | $ 1,346 | $ 8,040 | $ — | $ 8,040 |
| Segment Operating Income | 841 | 152 | 993 | 7 | 1,000 |
| Assets | 22,927 | 313 | 23,240 | 552 | 23,792 |
| Depreciation Expense | 664 | 38 | 702 | — | 702 |
| Property Additions | 973 | 22 | 995 | 8 | 1,003 |
| **2003** | | | | | |
| Revenues from External Customers | $ 6,182 | $ 1,264 | $ 7,446 | $ 127 | $ 7,573 |
| Intersegment Revenues | — | 4 | 4 | — | 4 |
| Segment Operating Income | 541 | 110 | 651 | — | 651 |
| Assets | 16,333 | 400 | 16,733 | 614 | 17,347 |
| Depreciation Expense | 579 | 32 | 611 | — | 611 |
| Property Additions | 974 | 47 | 1,021 | 21 | 1,042 |

A reconciliation of the totals reported for the business segments to the applicable line items in the consolidated financial statements is as follows:

| | Fiscal Years Ended | | |
|---|---|---|---|
| | December 30, 2005 | December 31, 2004 | December 26, 2003 |
| | (Dollars in millions) | | |
| **Revenues:** | | | |
| Total External Revenues for Business Segments | $ 8,618 | $ 8,040 | $ 7,573 |
| Intersegment Revenues for Business Segments | — | — | 4 |
| Elimination of Intersegment Revenues | — | — | (4) |
| Other | — | — | — |
| **Total Consolidated Revenues** | $ 8,618 | $ 8,040 | $ 7,573 |
| **Operating Income:** | | | |
| Total Operating Income for Business Segments | $ 1,550 | $ 1,000 | $ 651 |
| Unallocated Corporate Expenses | — | — | (23) |
| Additional Loss on Sale | — | — | (108) |
| **Total Consolidated Operating Income** | $ 1,550 | $ 1,000 | $ 520 |



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

| | Fiscal Years Ended | | |
|---|---|---|---|
| | December 30, 2005 | December 31, 2004 | December 26, 2003 |
| | (Dollars in millions) | | |
| **Assets:** | | | |
| Assets for Business Segments | $ 23,482 | $ 23,792 | $ 17,347 |
| Investment in Conrail | 603 | 574 | 4,678 |
| Elimination of Intersegment Payables (Receivables) | (83) | (61) | (44) |
| Non-segment Assets (Liabilities) | 230 | 300 | (221) |
| **Total Consolidated Assets** | $ 24,232 | $ 24,605 | $ 21,760 |
| **Depreciation Expense** | | | |
| Depreciation for Business Segments | $ 818 | $ 702 | $ 611 |
| Non-Segment Depreciation | 8 | 9 | 9 |
| **Total Consolidated Depreciation Expense** | $ 826 | $ 711 | $ 620 |
| **Property Additions** | | | |
| Property Additions for Business Segments | $ 1,117 | $ 1,003 | $ 1,042 |
| Non-segment Property Additions | 19 | 27 | 17 |
| **Total Consolidated Property Additions** | $ 1,136 | $ 1,030 | $ 1,059 |

## NOTE 21. Other Long-term Assets and Other Long-term Liabilities

***Other Long-term Assets***

Other Long-term Assets at December 30, 2005 and December 31, 2004 consisted of the following:

| | Fiscal Years Ended | |
|---|---|---|
| | December 30, 2005 | December 31, 2004 |
| | (Dollars in millions) | |
| Pension Plan Assets | $ 127 | $ 162 |
| Long Term Deposits | 77 | 68 |
| Other Long-term Assets | 69 | 146 |
| Available for Sale Securities | 65 | 50 |
| Goodwill | 64 | 64 |
| Real Estate Development Costs | 37 | 37 |
| Debt Issuance Costs | 31 | 42 |
| Long-term Income Taxes Receivable | 320 | 233 |
| Total Other Long-term Assets | $ 790 | $ 802 |



Source: CSX CORP, 10-K, February 24, 2006
Powered by Morningstar® Document Research℠

Table of Contents



***Other Long-term Liabilities***

Other Long-term Liabilities at December 30, 2005 and December 31, 2004 consisted of the following:

| | Fiscal Years Ended | |
|---|---|---|
| | December 30, 2005 | December 31, 2004 |
| | (Dollars in millions) | |
| Long-term Pension Plan Liability | $ 554 | $ 547 |
| Postretirement Benefit Liability | 287 | 289 |
| Long-term Deferred Gains | 203 | 226 |
| Other Long-term Liabilities | 132 | 148 |
| Accrued Deferred Compensation | 84 | 105 |
| Minority Interest | 68 | 54 |
| Deferred Lease Payments | 35 | 37 |
| Accrued Sick Leave | 23 | 28 |
| Long-term Income Taxes Payable | 85 | 81 |
| Total Other Long-term Liabilities | $ 1,471 | $ 1,515 |



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

CSX CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

## NOTE 22. Quarterly Financial Data (Unaudited)(a)(b)

| Quarter | 2005 1st | 2005 2nd(f) | 2005 3rd | 2005 4th(g) | 2004 1st(c) | 2004 2nd(d) | 2004 3rd(e) | 2004 4th |
|---|---|---|---|---|---|---|---|---|
| | (Dollars in millions, except per share amounts) | | | | | | | |
| Operating Revenue | $ 2,108 | $ 2,166 | $ 2,125 | $ 2,219 | $ 1,920 | $ 1,997 | $ 1,943 | $ 2,180 |
| Operating Expense | 1,754 | 1,735 | 1,772 | 1,807 | 1,768 | 1,715 | 1,693 | 1,863 |
| Operating Income | 354 | 431 | 353 | 412 | 152 | 282 | 250 | 317 |
| Other Income (Expense) | (2) | 30 | 11 | 62 | (4) | 5 | 32 | 38 |
| Debt Repurchase Expense | — | (192) | — | — | — | — | — | — |
| Interest Expense | (114) | (110) | (100) | (99) | (108) | (109) | (106) | (112) |
| Earnings from Continuing Operations before Income Taxes | 238 | 159 | 264 | 375 | 40 | 178 | 176 | 243 |
| Income Tax (Expense) Benefit | (84) | 6 | (100) | (138) | (13) | (60) | (62) | (84) |
| Earnings from Continuing Operations | 154 | 165 | 164 | 237 | 27 | 118 | 114 | 159 |
| Discontinued Operations — Net of Tax | 425 | — | — | — | 3 | 1 | 9 | (93) |
| Net Earnings | $ 579 | $ 165 | $ 164 | $ 237 | $ 30 | $ 119 | $ 123 | $ 66 |
| Earnings Per Share: | | | | | | | | |
| From Continuing Operations | $ 0.72 | $ 0.76 | $ 0.75 | $ 1.09 | $ 0.13 | $ 0.55 | $ 0.53 | $ 0.74 |
| Discontinued Operations | 1.97 | — | — | — | 0.01 | — | 0.04 | (0.43) |
| Net Earnings | $ 2.69 | $ 0.76 | $ 0.75 | $ 1.09 | $ 0.14 | $ 0.55 | $ 0.57 | $ 0.31 |
| Earnings Per Share Assuming Dilution: | | | | | | | | |
| From Continuing Operations | $ 0.68 | $ 0.73 | $ 0.72 | $ 1.03 | $ 0.13 | $ 0.53 | $ 0.51 | $ 0.71 |
| Discontinued Operations | 1.88 | — | — | — | 0.01 | — | 0.04 | (0.41) |
| Net Earnings | $ 2.56 | $ 0.73 | $ 0.72 | $ 1.03 | $ 0.14 | $ 0.53 | $ 0.55 | $ 0.30 |
| Dividend Per Share | $ 0.10 | $ 0.10 | $ 0.10 | $ 0.13 | $ 0.10 | $ 0.10 | $ 0.10 | $ 0.10 |
| Market Price | | | | | | | | |
| High | $ 43.54 | $ 44.10 | $ 46.89 | $ 51.60 | $ 36.26 | $ 33.04 | $ 34.28 | $ 40.46 |
| Low | $ 36.90 | $ 38.01 | $ 42.48 | $ 42.70 | $ 28.80 | $ 29.28 | $ 29.96 | $ 33.09 |

(a) Periods presented are 13-week quarters, except for the fourth quarter of 2004, which was 14 weeks.

(b) All periods presented have been restated for Discontinued Operations.

(c) A charge of $53 million pretax for separation expenses related to the management restructuring announced in November 2003 at the Company's Surface Transportation units. (See Note 5. Management Restructuring.)

(d) A charge of $15 million pretax for separation expenses related to the management restructuring announced in November 2003 at the Company's Surface Transportation units. (See Note 5. Management Restructuring.)

(e) CSX completed a corporate reorganization of Conrail that resulted in the direct ownership of certain Conrail assets by CSXT. This transaction was accounted for at fair value and resulted in a net gain of $16 million after tax, which is included in other income. (See Note 2. Investment In and Integrated Rail Operations with Conrail.)

(f) Ohio enacted legislation to gradually eliminate its corporate franchise tax. This legislative change resulted in an income tax benefit of $71 million. (See Note 8. Income Taxes.)

(g) CSX updated its assessment of the unasserted liability exposure, which resulted in recognition of a $38 million pretax, favorable change in estimate. (See Note 11. Casualty, Environmental, and Other Reserves.)



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

Case 1:07-mc-00489-BAH Document 1229-7 Filed 11/22/24 Page 903 of 3766

**Item 9.** ***Changes in and Disagreements with Accountants on Accounting and Financial Disclosure***

None.

**Item 9A.** ***Controls and Procedures***

**Evaluation of Disclosure Controls and Procedures**

As of December 30, 2005, under the supervision and with the participation of CSX's Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), management has evaluated the effectiveness of the design and operation of the Company's disclosure controls and procedures, as such term is defined in Exchange Act Rules 13a-15(e) and 15d-15(e). Based on that evaluation, the CEO and CFO concluded that the Company's disclosure controls and procedures were effective as of December 30, 2005. There were no changes in the Company's internal controls over financial reporting during the fourth quarter of 2005 that have materially affected or are reasonably likely to materially affect the Company's internal control over financial reporting.

**Management's Report on Internal Control over Financial Reporting**

CSX's management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rules 13a-15(f) and 15d-15(f). Under the supervision and with the participation of the management of CSX, including CSX's CEO and CFO, CSX conducted an evaluation of the effectiveness of the Company's internal control over financial reporting as of December 30, 2005 based on the framework in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). Based on that evaluation, management of CSX concluded that the Company's internal control over financial reporting was effective as of December 30, 2005.

Management's assessment of the effectiveness of the Company's internal control over financial reporting as of December 30, 2005 has been audited by Ernst & Young LLP, an independent registered public accounting firm, as stated in their report which is included elsewhere herein.

**Changes in Internal Control over Financial Reporting**

There were no material changes in the Company's internal control over financial reporting.

**Item 9B.** ***Other Information***

None.



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

Table of Contents

## CSX CORPORATION

## PART III

**Item 10.** ***Directors and Executive Officers of the Registrant***

In accordance with Instruction G(3) of Form 10-K, the information required by this Item is incorporated herein by reference to the Proxy Statement, except for the information regarding the executive officers of the Registrant which is included in Part I of this report under the caption "Executive Officers of the Registrant."

**Item 11.** ***Executive Compensation***

In accordance with Instruction G(3) of Form 10-K, the information required by this Item is incorporated herein by reference to the Proxy Statement.

**Item 12.** ***Security Ownership of Certain Beneficial Owners and Management***

In accordance with Instruction G(3) of Form 10-K, the information required by this Item is incorporated herein by reference to the Proxy Statement.

**Item 13.** ***Certain Relationships and Related Transactions***

In accordance with Instruction G(3) of Form 10-K, the information required by this Item is incorporated herein by reference to the Proxy Statement.

**Item 14.** ***Principal Accounting Fees and Services***

In accordance with Instruction G(3) of Form 10-K, the information required by this Item is incorporated herein by reference to the Proxy Statement.



Source: CSX CORP, 10-K, February 24, 2006
Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**PART IV**

**Item 15.** ***Exhibits and Financial Statement Schedules***

*(a)(1) Financial Statements*

See Index to Consolidated Financial Statements on page 56.

*(2) Financial Statement Schedules*

The information required by Rule 3-09 is included in Note 2 to the Consolidated Financial Statements, Investment In and Integrated Rail Operations with Conrail and the Unaudited and Audited Consolidated Financial Statements of Conrail, Inc., filed herewith as Exhibit 99.3*. The information required by Schedule II is included in Note 11 to the Consolidated Financial Statements, Casualty, Environmental and Other Reserves. All other financial statement schedules are not applicable.

*(3) Exhibits*

| | |
|---|---|
| 2.1 | Distribution Agreement, dated as of July 26, 2004, by and among CSX Corporation, CSX Transportation, Inc., CSX Rail Holding Corporation, CSX Northeast Holding Corporation, Norfolk Southern Corporation, Norfolk Southern Railway Company, CRR Holdings LLC, Green Acquisition Corp., Conrail Inc., Consolidated Rail Corporation, New York Central Lines LLC, Pennsylvania Lines LLC, NYC Newco, Inc. and PRR Newco, Inc. (incorporated herein by reference to Exhibit 2.1 to the Registrant's Current Report on Form 8-K filed with the Commission on September 2, 2004) |
| 3.1 | Amended and Restated Articles of Incorporation of the Registrant (incorporated herein by reference to Exhibit 3.1 to the Registrant's Current Report on Form 8-K filed with the Commission on December 14, 2004) |
| 3.2 | Bylaws of the Registrant, amended effective as of May 3, 2006 (incorporated herein by reference to Exhibit 3.2 of the Registrant's Current Report on Form 8-K filed with the Commission on February 13, 2006) |
| 4.1(a) | Indenture, dated August 1, 1990, between the Registrant and The Chase Manhattan Bank, as Trustee (incorporated herein by reference to the Registrant's Form SE, dated September 7, 1990, filed with the Commission) |
| 4.1(b) | First Supplemental Indenture, dated as of June 15, 1991, between the Registrant and The Chase Manhattan Bank, as Trustee (incorporated herein by reference to Exhibit 4(c) to the Registrant's Form SE, dated May 28, 1992, filed with the Commission) |
| 4.1(c) | Second Supplemental Indenture, dated as of May 6, 1997, between the Registrant and The Chase Manhattan Bank, as Trustee (incorporated herein by reference to Exhibit 4.3 to the Registrant's Registration Statement on Form S-4 (Registration No. 333-28523) filed with the Commission on June 5, 1997) |
| 4.1(d) | Third Supplemental Indenture, dated as of April 22, 1998, between the Registrant and The Chase Manhattan Bank, as Trustee (incorporated herein by reference to Exhibit 4.2 to the Registrant's Current Report on Form 8-K filed with the Commission on May 12, 1998) |
| 4.1(e) | Fourth Supplemental Indenture, dated as of October 30, 2001, between the Registrant and The Chase Manhattan Bank, as Trustee (incorporated herein by reference to Exhibit 4.1 to the Registrant's Report on Form 10-Q filed with the Commission on November 7, 2001) |
| 4.1(f) | Fifth Supplemental Indenture, dated as of October 27, 2003 between the Registrant and The Chase Manhattan Bank, as Trustee (incorporated herein by reference to Exhibit 4.1 to the Registrant's Report on Form 8-K filed with the Commission on October 27, 2003) |
| 4.1(g) | Sixth Supplemental Indenture, dated as of September 23, 2004 between the Registrant and JP Morgan Chase Bank, formerly The Chase Manhattan Bank, as Trustee (incorporated herein by reference to Exhibit 4.1 to the Registrant's Report on Form 10-Q filed with the Commission on November 3, 2004) |

Pursuant to Regulation S-K, Item 601(b)(4)(iii), instruments that define the rights of holders of the Registrant's long-term debt securities, where the long-term debt securities authorized under



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

Powered by Morningstar® Document Research℠

each such instrument do not exceed 10% of the Registrant's total assets, have been omitted and will be furnished to the Commission upon request.

| | |
|---|---|
| 10.1** | CSX Stock Plan for Directors (as amended through January 1, 2004) (incorporated herein by reference to Exhibit 10.1 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 10, 2004) |
| 10.2** | Corporate Director Deferred Compensation Plan (as amended through January 1, 2004) (incorporated herein by reference to Exhibit 10.2 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 10, 2004) |
| 10.3** | CSX Corporation 2002 Corporate Director Deferred Compensation Plan (as amended through January 1, 2004) (incorporated herein by reference to Exhibit 10.3 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 10, 2004) |
| 10.4** | CSX Directors' Charitable Gift Plan, as amended (incorporated herein by reference to Exhibit 10.4 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 4, 1994) |
| 10.5** | CSX Directors' Matching Gift Plan (as amended through December 31, 2003) (incorporated herein by reference to Exhibit 10.5 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 10, 2004) |
| 10.6** | Special Employment Agreement with M. J. Ward (incorporated herein by reference to Exhibit 10.6 to the Registrant's Report on Form 10-Q filed with the Commission on November 7, 2001) |
| 10.7** | Restricted Stock Award Agreement with M. J. Ward (incorporated herein by reference to Exhibit 10.7 to the Registrant's Report on Form 10-Q filed with the Commission on November 7, 2001) |
| 10.8** | Railroad Retirement Benefits Agreement with M. J. Ward (incorporated herein by reference to Exhibit 10.13 to the Registrant's Report on Form 10-K filed with the Commission on February 26, 2003) |
| 10.9** | Employment Agreement with O. Munoz (incorporated herein by reference to Exhibit 10.1 to the Registrant's Report on Form 10-Q filed with the Commission on July 30, 2003) |
| 10.10** | Restricted Stock Award Agreement with O. Munoz (incorporated herein by reference to Exhibit 10.2 to the Registrant's Report on Form 10-Q filed with the Commission on July 30, 2003) |
| 10.11** | Form of Employment Agreement with executive officers (incorporated herein by reference to Exhibit 10.1 of the Registrant's Current Report on Form 8-K filed with the Commission on January 6, 2005) |
| 10.12** | Form of Stock Option Agreement (incorporated herein by reference to Exhibit 10.17 of the Registrant's Report on Form 10-K filed with the Commission on March 4, 2002) |
| 10.13** | 1987 Long-term Performance Stock Plan, as Amended and Restated effective April 25, 1996 (as amended through February 7, 2003) (incorporated herein by reference to Exhibit 10.24 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 10, 2004) |
| 10.14** | Deferred Compensation Program for Executives of CSX Corporation and Affiliated Companies (as amended through January 1, 1998) (incorporated herein by reference to Exhibit 10.25 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 10, 2004) |
| 10.15** | 2002 Deferred Compensation Plan of CSX Corporation and Affiliated Corporations (as amended through February 7, 2003) (incorporated herein by reference to Exhibit 10.26 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 10, 2004) |
| 10.16** | Supplementary Savings Plan and Incentive Award Deferral Plan for Eligible Executives of CSX Corporation and Affiliated Companies (as Amended through February 7, 2003) (incorporated herein by reference to Exhibit 10.27 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 10, 2004) |
| 10.17** | Special Retirement Plan of CSX Corporation and Affiliated Companies (as amended through February 14, 2001) (incorporated herein by reference to Exhibit 10.23 to the Registrant's Report on Form 10-K filed with the Commission on March 4, 2002) |

 Powered by Morningstar® Document Research℠

Powered by Morningstar® Document Research℠

| | |
|---|---|
| 10.18** | Supplemental Retirement Benefit Plan of CSX Corporation and Affiliated Companies (as amended through February 14, 2001) (incorporated herein by reference to Exhibit 10.24 of the Registrant's Report on Form 10-K filed with the Commission on March 4, 2002) |
| 10.19** | Senior Executive Incentive Compensation Plan (incorporated herein by reference to Appendix B to the Registrant's Definitive Proxy Statement filed with the Commission on March 17, 2000) |
| 10.20* | CSX Omnibus Incentive Plan (as Amended through December 8, 2004) (incorporated herein by reference to Exhibit 10.26 to the Registrant's Report on Form 10-K filed with the Commission on March 4, 2002) |
| 10.21** | 1990 Stock Award Plan as Amended and Restated Effective February 14, 1996 (as amended through September 8, 1999) (incorporated herein by reference to Exhibit 10.24 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 7, 2000) |
| 10.22 | Transaction Agreement, dated as of June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation, and CRR Holdings LLC, with certain schedules thereto (incorporated herein by reference to Exhibit 10 to the Registrant's Current Report on Form 8-K filed with the Commission on July 8, 1997) |
| 10.23 | Amendment No. 1, dated as of August 22, 1998, to the Transaction Agreement, dated as of June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation, and CRR Holdings LLC (incorporated herein by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed with the Commission on June 11, 1999) |
| 10.24 | Amendment No. 2, dated as of June 1, 1999, to the Transaction Agreement, dated as of June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation, and CRR Holdings, LLC (incorporated herein by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed with the Commission on June 11, 1999) |
| 10.25 | Amendment No. 3, dated as of August 1, 2000, to the Transaction Agreement, dated as of June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation, and CRR Holdings LLC (incorporated herein by reference to Exhibit 10.34 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 1, 2001) |
| 10.26 | Amendment, dated and effective as of June 1, 1999, and executed in April 2004, to the Transaction Agreement, dated as of June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation, and CRR Holdings LLC (incorporated herein by reference to Exhibit 99.1 to the Registrant's Current Report on Form 8-K filed with the Commission on August 6, 2004) |
| 10.27 | Amendment No. 5, dated as of August 27, 2004, to the Transaction Agreement, dated as of June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation and CRR Holdings LLC (incorporated herein by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed with the Commission on September 2, 2004) |
| 10.28 | Operating Agreement Termination Agreement, dated as of August 27, 2004, between New York Central Lines LLC and CSX Transportation, Inc. (incorporated herein by reference to Exhibit 10.3 to the Registrant's Current Report on Form 8-K filed with the Commission on September 2, 2004) |
| 10.29 | Shared Assets Area Operating Agreement for North Jersey, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibit thereto (incorporated herein by reference to Exhibit 10.4 to the Registrant's Current Report on Form 8-K filed with the Commission on June 11, 1999) |
| 10.30 | Shared Assets Area Operating Agreement for Southern Jersey/Philadelphia, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibit thereto (incorporated herein by reference to Exhibit 10.5 to the Registrant's Current Report on Form 8-K filed with the Commission on June 11, 1999) |


Powered by Morningstar® Document Research℠

| | |
|---|---|
| 10.31 | Shared Assets Area Operating Agreement for Detroit, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Corporation, with exhibit thereto (incorporated herein by reference to Exhibit 10.6 to the Registrant's Current Report on Form 8-K filed with the Commission on June 11, 1999) |
| 10.32 | Monongahela Usage Agreement, dated as of June 1, 1999, by and among CSX Transportation, Inc., Norfolk Southern Railway Company, Pennsylvania Lines LLC and New York Central Lines LLC, with exhibit thereto (incorporated herein by reference to Exhibit 10.7 to the Registrant's Current Report on Form 8-K filed with the Commission on June 11, 1999) |
| 10.33 | Tax Allocation Agreement, dated as of August 27, 2004, by and among CSX Corporation, Norfolk Southern Corporation, Green Acquisition Corp., Conrail Inc., Consolidated Rail Corporation, New York Central Lines LLC and Pennsylvania Lines LLC (incorporated herein by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed with the Commission on September 2, 2004) |
| 10.34** | Employment Agreement with T. L. Ingram, dated as of March 15, 2004 (incorporated herein by reference to Exhibit 10.1 to the Registrant's Report on Form 10-Q filed with the Commission on April 30, 2004) |
| 10.35** | Restricted Stock Award Agreement with T. L. Ingram (incorporated herein by reference to Exhibit 10.1 to the Registrant's Report on Form 10-Q filed with the Commission on July 29, 2004) |
| 10.36 | Stock Purchase Agreement, dated as of December 8, 2004, by and between CSX Corporation and Dubai Ports International FZE. (incorporated herein by reference to Exhibit 2.1 to the Registrant's Current Report on Form 8-K filed with the Commission on December 13, 2004) |
| 10.37** | Special Employment Agreement with A.B. Fogarty, dated as of December 13, 2004 (incorporated herein by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed with the Commission on December 14, 2004) |
| 10.38** | Amendment No. 1, dated as of December 13, 2004, to Employment Agreement with T. L. Ingram, dated as of March 15, 2004 (incorporated herein by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed with the Commission on December 14, 2004) |
| 10.39 | Omnibus Closing Agreement, by and between CSX Corporation and Dubai Ports International FZE dated February 22, 2005 (incorporated herein by reference to Exhibit 2.1 to the Registrant's Current Report on Form 8-K filed with the Commission on February 25, 2005) |
| 10.40* | Restricted Stock Award Agreement with Clarence W. Gooden |
| 10.41* | Restricted Stock Award Agreement with Ellen M. Fitzsimmons |
| 14 | Code of Ethics (incorporated herein by reference to Exhibit 14 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 10, 2004) |
| 21* | Subsidiaries of the Registrant |
| 23.1* | Consent of Ernst & Young LLP |
| 23.2* | Consent of Ernst & Young LLP and KPMG LLP |
| 24* | Powers of Attorney |
| 31.1* | Rule 13a-14(a) Certification of Principal Executive Officer |
| 31.2* | Rule 13a-14(a) Certification of Principal Financial Officer |
| 32.1* | Rule 13a-14(b) Certification of Principal Executive Officer |
| 32.2* | Rule 13a-14(b) Certification of Principal Financial Officer |
| 99.3* | Unaudited Consolidated Financial Statements of Conrail Inc. for the Years Ended December 31, 2004 and December 31, 2005 and Audited Consolidated Financial Statements of Conrail Inc. for the Year |

Ended December 31, 2003

* Filed herewith

** Management Contract or Compensatory Plan or Arrangement



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

CSX CORPORATION
(Registrant)

By: /s/ CAROLYN T. SIZEMORE
Carolyn T. Sizemore
Vice President and Controller
(Principal Accounting Officer)

Dated: February 21, 2006

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities indicated on February 21, 2006.

| Signature | Title |
|---|---|
| * Michael J. Ward | Chairman of the Board, President, Chief Executive Officer and Director (Principal Executive Officer) |
| * Oscar Munoz | Executive Vice President and Chief Financial Officer (Principal Financial Officer) |
| /s/ CAROLYN T. SIZEMORE Carolyn T. Sizemore | Vice President and Controller (Principal Accounting Officer) |
| *By: /s/ ELLEN M. FITZSIMMONS Ellen M. Fitzsimmons | Senior Vice President — Law and Public Affairs Attorney-in-Fact |
| * Elizabeth E. Bailey | Director |
| * John B. Breaux | Director |
| * Edward J. Kelly III | Director |
| * Robert D. Kunisch | Director |
| * Southwood J. Morcott | Director |
| * David M. Ratcliffe | Director |

| | |
|---|---|
| * | Director |
| Charles E. Rice | |



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

| Signature | Title |
|---|---|
| * William C. Richardson | Director |
| * Frank S. Royal M.D. | Director |
| * Donald J. Shepard | Director |



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

Powered by Morningstar® Document Research℠

**Exhibit 10.20**

CSX Omnibus Incentive Plan

Effective April 27, 2000

(As Amended through December 8, 2004)

1. Purpose. The purpose of this CSX Omnibus Incentive Plan (the "Plan") is to further the long term stability and financial success of CSX, its Subsidiaries, Foreign Affiliates and Affiliates by rewarding selected meritorious employees. The Board of Directors believes that such awards will provide incentives for employees to remain with CSX, will encourage continued work of superior quality and will further the identification of those employees' interests with those of CSX's shareholders.

2. Definitions. As used in the Plan, the following terms have the meanings indicated:

   (a) "Affiliate" means a corporation, partnership or other entity other than a Subsidiary or Foreign Affiliate in which CSX or a Subsidiary owns, directly or indirectly, a substantial interest. The employees of an Affiliate shall be eligible to participate in the Plan only if the Board or the Committee approves the participation of the Affiliate in the Plan.

   (b) "Applicable Withholding Taxes" means the aggregate minimum amount of federal, state, local and foreign income, payroll and other taxes that an Employer is required to withhold in connection with any Incentive Award.

   (c) "Beneficiary" means the person or entity designated by the Participant, in a form approved by CSX, to exercise the Participant's rights with respect to an Incentive Award after the Participant's death.

   (d) Benefits Trust Committee" means the committee established pursuant to the CSX Corporation and Affiliated Companies Benefits Assurance Trust.

   (e) "Board" means the Board of Directors of CSX Corporation.

   (f) "Cause" means: (i) an act or acts of personal dishonesty of a Participant intended to result in substantial personal enrichment of the Participant at the expense of the Company or any of its Subsidiaries, Foreign Affiliates or Affiliates; (ii) a violation of the management responsibilities by the Participant which is demonstrably willful and deliberate on the Participant's part and which is not remedied in a reasonable period of time after receipt of written notice from the Employer; or, (iii) the conviction of the Participant of a felony involving moral turpitude.

   (g) "Change in Control" means the occurrence of any of the following events:

      (i) Stock Acquisition. The acquisition by any individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) (a "Person") of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 20 percent or more of either (A) the then outstanding shares of common stock of CSX (the "Outstanding Company Common Stock"), or (B) the

combined voting power of the then outstanding voting securities of CSX entitled to vote generally in the election of directors (the "Outstanding Company Voting Securities"); provided, however, that for purposes of this subsection (i), the following acquisitions shall not constitute a change in control: (A) any acquisition directly from CSX; (B) any acquisition by CSX; (C) any acquisition by any employee benefit plan (or related trust) sponsored or maintained by CSX or any corporation controlled by CSX; or (D) any acquisition by any corporation pursuant to a transaction which complies with clauses (A), (B) and (C) of subsection (iii) of this Section 2(c); or

(ii) Board Composition Individuals who, as of the date hereof, constitute the Board (the "Incumbent Board") cease for any reason to constitute at least a majority of the Board; provided, however, that any individual becoming a director subsequent to the date hereof whose election or nomination for election by CSX's shareholders was approved by a vote of at least a majority of the directors then comprising the Incumbent Board shall be considered as though such individual were a member of the Incumbent Board, but excluding, for this purpose, any such individuals whose initial assumption of office occurs as a result of an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board; or

(iii) Business Combination Approval by the shareholders of CSX of a reorganization, merger, consolidation, or sale or other disposition of all or substantially all of the assets of CSX or its principal Subsidiary that is not subject, as a matter of law or contract, to approval by the Surface Transportation Board or any successor agency or regulatory body having jurisdiction over such transactions (the "STB") (a "Business Combination"), in each case, unless, following such Business Combination:

(A) all or substantially all of the individuals and entities who were the beneficial owners, respectively, of the Outstanding Company Common Stock and Outstanding Company Voting Securities immediately prior to such Business Combination beneficially own, directly or indirectly, more than 50 percent of, respectively, the then outstanding shares of common stock and the combined voting power of the then outstanding voting securities entitled to vote generally in the election of directors, as the case may be, of the corporation resulting from such Business Combination (including, without limitation, a corporation which as a result of such transaction owns CSX or its principal Subsidiary or all or substantially all of the assets of CSX or its principal Subsidiary either directly or


Powered by Morningstar® Document Research℠

through one or more subsidiaries) in substantially the same proportions as their ownership immediately prior to such Business Combination of the Outstanding Company Common Stock and Outstanding Company Voting Securities, as the case may be;

(B) no Person (excluding any corporation resulting from such Business Combination or any employee benefit plan (or related trust) of CSX or such corporation resulting from such Business Combination) beneficially owns, directly or indirectly, 20 percent or more of, respectively, the then outstanding shares of common stock of the corporation resulting from such Business Combination or the combined voting power of the then outstanding voting securities of such corporation except to the extent that such ownership existed prior to the Business Combination; and

(C) at least a majority of the members of the board of directors resulting from such Business Combination were members of the Incumbent Board at the time of the execution of the initial agreement, or of the action of the Board providing for such Business Combination; or

(iv) Regulated Business Combination. Approval by the shareholders of CSX of a Business Combination that is subject, as a matter of law or contract, to approval by the STB (a "Regulated Business Combination") unless such Business Combination complies with clauses (A), (B) and (C) of subsection (iii) of this Section 2(g); or

(v) Liquidation or Dissolution. Approval by the shareholders of CSX of a complete liquidation or dissolution of CSX or its principal Subsidiary.

(h) "Code" means the Internal Revenue Code of 1986, as amended.

(i) "Committee" means the Compensation Committee of the Board or its successor, provided that, if any member of the Compensation Committee does not qualify as both an outside director for purposes of Code Section 162(m) and a non-employee director for purposes of Rule 16b-3, the remaining members of the Compensation Committee (but not less than two members) shall be constituted as a subcommittee of the Compensation Committee to act as the Committee for purposes of the Plan.

(j) "Company Stock" means common stock, $1.00 par value, of CSX. In the event of a change in the capital structure of CSX affecting the common stock (as provided in Section 18), the shares resulting from such a change in the common stock shall be deemed to be Company Stock within the meaning of the Plan.

 Powered by Morningstar® Document Research℠

(k) "Covered Employee" means a Participant who the Committee determines is or may become a covered employee within the meaning of Code Section 162(m) during the performance period for a Performance Grant.

(l) "CSX" means CSX Corporation.

(m) "Date of Grant" means the date on which the Committee grants an Incentive Award.

(n) "Disability" or "Disabled" means, as to an Incentive Stock Option, a Disability within the meaning of Code Section 22(e)(3). As to all other Incentive Awards, a Disability shall occur when the Participant is eligible for benefits under the CSX Salary Continuance and Long-Term Disability Plan or another long-term disability plan of CSX applicable to the Participant.

(o) "Divisive Transaction" means a transaction in which the Participant's Employer ceases to be a Subsidiary, Foreign Affiliate or Affiliate or a sale of substantially all of the assets of a Subsidiary, Foreign Affiliate or Affiliate.

(p) "Employer" means CSX and each Subsidiary, Foreign Affiliate or Affiliate that employs one or more Participants.

(q) "Fair Market Value" means the mean between the highest and lowest registered sales prices of a share of Company Stock on the New York Stock Exchange, as reported in the Wall Street Journal (or other authoritative source approved by the Committee) on the day of reference.

(r) "Foreign Affiliate" means an entity that is not organized under the laws of the United States, or any state thereof or any political subdivision of any state, and in which CSX has, directly or indirectly, a substantial interest.

(s) "Good Reason," as to any Participant, means (i) the Participant's compensation or employment related benefits are reduced (other than across-the reductions that affect management employees generally); (ii) the Participant's status, title(s), office(s), working conditions, or management responsibilities are diminished (other than changes in reporting or management responsibilities required by applicable federal or state law); or (iii) the location of Participant's place of employment is changed by more than 30 miles without the Participant's consent.

(t) "Incentive Award" means, collectively, a Performance Grant or the award of Restricted Stock, an Option, a Restricted Stock Unit, a Stock Appreciation Right, or a Dividend Right under the Plan,

(u) "Incentive Stock Option" means an Option that qualifies for favorable federal income tax treatment under Code Section 422.

(v) "Mature Shares" means shares of Company Stock for which the holder has good title, free and clear of all liens and encumbrances and which the holder either (i) has held for at least six months or (ii) has purchased on the open market.


Powered by Morningstar® Document Research℠

(w) "Nonqualified Stock Option" means an Option that is not an Incentive Stock Option.

(x) "Option" means a right to purchase Company Stock granted under the Plan, at a price determined in accordance with the Plan.

(y) "Participant" means any employee of CSX, a Subsidiary, a Foreign Affiliate or an Affiliate who receives an Incentive Award under the Plan.

(z) "Performance Criteria" means any of the following areas of performance of CSX, any Subsidiary, any Foreign Affiliate, or any Affiliate:

return on invested capital (ROIC); free cash flow; value added (ROIC) less cost of capital multiplied by capital); total shareholder return; economic value added (net operating profit after tax less cost of capital); operating ratio; cost reduction (or limits on cost increases); debt to capitalization; debt to equity; earnings; earnings before interest and taxes; earnings before interest, taxes, depreciation and amortization; earnings per share (including or excluding nonrecurring items); earnings per share before extraordinary items; income from operations (including or excluding nonrecurring items); income from operations compared to capital spending; net income (including or excluding nonrecurring items, extraordinary items and/or the accumulative effect of accounting changes); net sales; price per share of Company Stock; return on assets; return on capital employed; return on equity; return on investment; return on sales; and sales volume.

Any Performance Criteria may be used to measure the performance of CSX as a whole or any Subsidiary, Foreign Affiliate, Affiliate or business unit of CSX. As determined by the Committee, Performance Criteria shall be derived from the financial statements of CSX, its Subsidiaries or affiliated entities prepared in accordance with generally accepted accounting principles applied on a consistent basis, or, for Performance Criteria that cannot be so derived, under a methodology established by the Committee prior to the issuance of a Performance Grant that is consistently applied.

(aa) "Performance Goal" means an objectively determinable performance goal established by the Committee with respect to a given Performance Grant that relates to one or more Performance Criteria.

(bb) "Performance Grant" means an Incentive Award payable in Company Stock, cash, or a combination of Company Stock and cash that is made pursuant to Section 8.

(cc) "Restricted Stock" means Company Stock awarded under Section 6.

(dd) "Restricted Stock Unit" means a right granted to a Participant to receive Company Stock or cash awarded under Section 7.

(ee) "Retirement" means a Participant's termination of employment after age 55 with eligibility to begin immediately receiving retirement benefits under an Employer's defined benefit pension plan.

(ff) "Rule l6b-3" means Rule 16b-3 of the Securities and Exchange Commission promulgated under the Securities Exchange Act of 1934, as amended. A reference in the Plan to Rule 16b-3 shall include a reference to any corresponding rule (or number redesignation) of any amendments to Rule I 6b-3 enacted after the effective date of the Plan adoption.

(gg) "Senior Executive Incentive Award" means an award made to a Participant under the terms of the Senior Executive Incentive Plan.

(hh) "Senior Executive Incentive Plan" means the CSX Senior Executive incentive Plan.

(ii) "Stock Appreciation Right" means a right to receive amounts awarded under Section 10.

(jj) "Subsidiary" means any corporation in which CSX owns stock possessing more than 50 percent of the combined voting power of all classes of stock or which is in a chain of corporations with CSX in which stock possessing more than 50 percent of the combined voting power of all classes of stock is owned by one or more other corporations in the chain.

(kk) "Vesting Event" means the occurrence of any of the events listed in Section 2(g), with the following modification: the words, "Approval by the shareholders of CSX of," in the first line of Sections 2(g)(iii) and 2(g)(iv) are replaced for purposes of this Section 2(kk) with the words, "Consummation of, i.e., actual change in ownership of Outstanding Corporation Common Stock, Outstanding Corporation Voting Stock, and/or assets of CSX or its principal Subsidiary by reason of,".

3. Stock.

(a) Subject to Section 18 of the Plan, there shall be reserved for issuance under the Plan an aggregate of 6 million (6,000,000) shares of Company Stock, which shall be authorized, but unissued shares, plus any shares of Company Stock that are represented by awards granted under any prior plan of the Company, which are forfeited, expire or are cancelled without the delivery of shares or which result in the forfeiture of shares back to CSX. Shares allocable to Incentive Awards granted under the Plan that expire, are forfeited, otherwise terminate unexercised, or are settled in cash may again be subjected to an Incentive Award under the Plan. For purposes of determining the number of shares that are available for Incentive Awards under the Plan, the number shall include the number of shares surrendered by a Participant actually or by attestation or retained by CSX in payment of Applicable Withholding Taxes and any Mature Shares surrendered by a Participant upon exercise of an Option or in payment of Applicable Withholding Taxes. Shares issued under the Plan through the settlement, assumption of substitution of outstanding awards or

obligations to grant future awards as a condition of an Employer acquiring another entity shall not reduce the maximum number of shares available for delivery under the Plan. Shares issued under the Senior Executive Incentive Plan shall reduce the maximum number of shares available for delivery under the Plan.

(b) No more than 1,200,000 shares may be allocated to the Incentive Awards, including the maximum amounts payable under a Performance Grant, that are granted to any individual Participant during any 36-month period. The maximum number of shares that may be issued as Restricted Stock, Restricted Stock Units, Dividend Equivalents and under Performance Grants, Stock Awards or Senior Executive Incentive Plan Grants shall be 1,200,000 shares, provided that any shares of Restricted Stock, Restricted Stock Units, Dividend Equivalents, Performance Grants or Stock Awards that are forfeited shall not count against this limit. The maximum cash payment that can be made for all Incentive Awards granted to any one individual shall be $3,000,000 times the number of 12-month periods in any performance cycle for any single or combined performance goals. Any amount that is deferred by a Participant shall be subject to the previous limit on the maximum cash payment in the year in which the deferral is made and not in any later year in which payment is made.

4. Eligibility.

(a) All present and future employees of CSX, a Subsidiary, or a Foreign Affiliate at the time of grant shall be eligible to receive Incentive Awards under the Plan, If an Affiliate is approved to participate in the Plan, all present and future employees of an Affiliate at the time of grant shall be eligible to receive Incentive Awards under the Plan. The Committee shall have the power and complete discretion, as provided in Section 19, to select eligible employees to receive Incentive Awards and to determine for each employee the nature of the award and the terms and conditions of each Incentive Award.

(b) The grant of an Incentive Award shall not obligate an Employer to pay an employee any particular amount of remuneration, to continue the employment of the employee after the grant or to make further grants to the employee at any time thereafter.

5. Stock Options.

(a) The Committee may make grants of Options to Participants. The Committee shall determine the number of shares for which Options are granted, the Option exercise price per share, whether the Options are Incentive Stock Options or Nonqualified Stock Options, and any other terms and conditions to which the Options are subject.

(b) The exercise price of shares of Company Stock covered by an Option shall be not less than 100 percent of the Fair Market Value of the Company Stock on the Date of Grant. Except as provided in Section 18, the exercise


Powered by Morningstar® Document Research℠

price of an Option may not be decreased after the Date of Grant. Except as provided in Section 18, a Participant may not surrender an Option in consideration for the grant of a new Option with a lower exercise price. If a Participant's Option is cancelled before its termination date, the Participant may not receive another Option within 6 months of the cancellation unless the exercise price of such Option is no less than the exercise price of the cancelled Option.

(c) An Option shall not be exercisable more than 10 years after the Date of Grant. The aggregate Fair Market Value, determined at the Date of Grant, of shares for which Incentive Stock Options become exercisable by a Participant during any calendar year shall not exceed $100,000.

6. Restricted Stock Awards.

(a) The Committee may make grants of Restricted Stock to Participants. The Committee shall establish as to each award of Restricted Stock the terms and conditions to which the Restricted Stock is subject, including the period of time before which all restrictions shall lapse and the Participant shall have full ownership of the Company Stock (the "Restriction Period"). The Committee in its discretion may award Restricted Stock without cash consideration.

(b) Except as provided below in Section 6(c), the minimum Restriction Period applicable to any award of Restricted Stock that is not subject to performance standards restricting transfer shall be three years from the Date of Grant. Except as provided below in Section 6(c), the minimum Restriction Period applicable to any award of Restricted Stock that is subject to performance standards shall be one year from the Date of Grant.

(c) Restriction Periods of shorter duration than provided in Section 6(b) and Section 7(b) may be approved for awards of Restricted Stock or Restricted Stock Units combined with respect to up to 600,000 shares of Company Stock under the Plan.

(d) Restricted Stock may not be sold, assigned, transferred, pledged, hypothecated, or otherwise encumbered or disposed of until the restrictions have lapsed or been removed. Certificates representing Restricted Stock shall be held by CSX until the restrictions lapse and the Participant shall provide CSX with appropriate stock powers endorsed in blank.

7. Restricted Stock Units.

(a) The Committee may make grants of Restricted Stock Units to Participants. The Committee shall establish as to each award of Restricted Stock Units the terms and conditions to which the Restricted Stock Units are subject. Upon lapse of the restrictions, a Restricted Stock Unit shall entitle the Participant to receive from CSX a share of Company Stock or a cash amount equal to the Fair Market Value of the Company Stock on the date that the restrictions lapse.


Powered by Morningstar® Document Research℠

(b) Except as provided in Section 6 the minimum Restriction Period applicable to any award of Restricted Stock Units that is not subject to performance standards restricting transfer shall be three years from the Date of Grant. Except as provided in Section 6(c) the minimum Restriction Period applicable to any award of Restricted Stock Units that is subject to performance standards shall be one year from the Date of Grant.

8. Performance Grants.

(a) The Committee may make Performance Grants to any Participant. Each Performance Grant shall contain the Performance Goals for the award, including the Performance Criteria, the target and maximum amounts payable and such other terms and conditions of the Performance Grant. As to each Covered Employee, each Performance Grant shall be granted and administered to comply with the requirements of Code Section 162(m).

(b) The Committee shall establish the Performance Goals for Performance Grants. The Committee shall determine the extent to which any Performance Criteria shall be used and weighted in determining Performance Grants. The Committee may increase, but not decrease, any Performance Goal during a performance period for a Covered Employee. The Performance Goals for any Performance Grant for a Covered Employee shall be made not later than 90 days after the start of the period for which the Performance Grant relates and shall be made prior to the completion of 25 percent of such period.

(c) The Committee shall establish for each Performance Grant the amount of Company Stock or cash payable at specified levels of performance, based on the Performance Goal for each Performance Criteria. The Committee shall make all determinations regarding the achievement of any Performance Goals. The Committee may not increase the amount of cash or Common Stock that would otherwise be payable upon achievement of the Performance Goal or Goals but may reduce or eliminate the payments except as provided in a Performance Grant.

(d) The actual payments to a Participant under a Performance Grant will be calculated by applying the achievement of Performance Criteria to the Performance Goal. The Committee shall make all calculations of actual payments and shall certify in writing the extent, if any, to which the Performance Goals have been met.

9. Stock Awards. The Committee may make Stock Awards to any Participant. The Committee shall establish the number of shares of Common Stock to be awarded and the terms and conditions applicable to each Stock Award. The Committee will make all determinations regarding the achievement of any performance restrictions on a Stock Award. The Common Stock under a Stock Award shall be issued by CSX upon the satisfaction of the terms and conditions of a Stock Award. No more than 1,200,000 shares of Company Stock (reduced by shares issued under Restricted Stock or Restricted Stock Units subject to Section 6(c)) may be granted under Stock Awards without performance restrictions.

10. Stock Appreciation Rights. The Committee may make grants of Stock Appreciation Rights to Participants. The Committee shall establish as to each award of Stock Appreciation Rights the terms and conditions to which the Stock Appreciation Rights are subject. The following provisions apply to all Stock Appreciation Rights:

    (a) A Stock Appreciation Right shall entitle the Participant, upon exercise of the Stock Appreciation Right, to receive in exchange an amount equal to the excess of (x) the Fair Market Value on the date of exercise of the Company Stock covered by the surrendered Stock Appreciation Right over (y) an amount not less than 100 percent of the Fair Market Value of the Company Stock on the Date of Grant of the Stock Appreciation Right. The Committee may limit the amount that the Participant will be entitled to receive upon exercise of Stock Appreciation Rights.

    (b) A Stock Appreciation Right may not be exercisable more than 10 years after the Date of Grant. A Stock Appreciation Right may only be exercised at a time when the Fair Market Value of the Company Stock covered by the Stock Appreciation Right exceeds the Fair Market Value of the Company Stock on the Date of Grant of the Stock Appreciation Right. The Stock Appreciation Right may provide for payment in Company Stock or cash, or a fixed combination of Company Stock or cash, or the Committee may reserve the right to determine the manner of payment at the time the Stock Appreciation Right is exercised.

11. Dividend Equivalents. The Committee may make grants of Dividend Equivalents to any Participant. The Committee shall establish the terms and conditions to which the Dividend Equivalents are subject. Dividend Equivalents may be granted in connection with any other Incentive Award or separately. Under a Dividend Equivalent, a Participant shall be entitled to receive currently or in the future payments equivalent to the amount of dividends paid by CSX to holders of Company Stock with respect to the number of Dividend Equivalents held by the Participant. The Dividend Equivalent may provide for payment in Company Stock or cash, or a fixed combination of Company Stock or cash, or the Committee may reserve the right to determine the manner of payment at the time the Dividend Equivalent is payable.

12. Method of Exercise of Options. Options may be exercised by the Participant (or his guardian or personal representative) giving notice to the Corporate Secretary of CSX or his delegate pursuant to procedures established by CSX of the exercise stating the number of shares the Participant has elected to purchase under the Option. The exercise price may be paid in cash; or if the terms of an Option permit, (i) delivery or attestation of Mature Shares (valued at their Fair Market Value) in satisfaction of all or any part of the exercise price, (ii) delivery of a properly executed exercise notice with irrevocable instructions to a broker to deliver to CSX the amount necessary to pay the exercise price from the sale or proceeds of a loan from the broker with respect to the sale of Company Stock or a broker Joan secured by Company Stock, or (iii) a combination of(i) and (ii).

13. Tax Withholding. Whenever payment under an Incentive Award is made in cash, the Employer will withhold an amount sufficient to satisfy any Applicable Withholding Taxes. Each Participant shall agree as a condition of receiving an Incentive Award


Powered by Morningstar® Document Research℠

payable in the form of Company Stock, to pay to the Employer, or make arrangements satisfactory to the Employer regarding the payment to the Employer of, Applicable Withholding Taxes. To satisfy Applicable Withholding Taxes and under procedures established by the Committee or its delegate, a Participant may elect to (i) make a cash payment or authorize additional withholding from cash compensation, (ii) deliver Mature Shares (valued at their Fair Market Value) or (iii) have CSX retain that number of shares of Company Stock (valued at their Fair Market Value) that would satisfy all or a specified portion of the Applicable Withholding Taxes.

14. Transferability of Incentive Awards. Incentive Awards other than Incentive Stock Options shall not be transferable by a Participant and exercisable by a person other than the Participant, except as expressly provided in the Incentive Award. Incentive Stock Options, by their terms, shall not be transferable except by will or by the laws of descent and distribution and shall be exercisable, during the Participant's lifetime, only by the Participant.

15 Deferral Elections. The Committee may permit Participants to elect to defer the issuance of Company Stock or the settlement of awards in cash under the 2002 Deferred Compensation Plan of CSX Corporation or its successor.

16. Effective Date of the Plan. The effective date of the Plan is April 27, 2000. The Plan shall be submitted to the shareholders of CSX for approval. Until (i) the Plan has been approved by CSX's shareholders, and (ii) the requirements of any applicable federal or state securities laws have been met, no Restricted Stock shall be awarded that is not contingent on these events and no Option granted shall be exercisable.

17. Termination, Modification. Change. If not sooner terminated by the Board, this Plan shall terminate at the close of business on April 26. 2010. No Incentive Awards shall be made under the Plan after its termination. Prior to a Change in Control, the Board may amend or terminate the Plan as it shall deem advisable; provided that no change shall be made that increases the total number of shares of Company Stock reserved for issuance pursuant to Incentive Awards granted under the Plan (except pursuant to Section 18), or reduces the minimum exercise price for Options unless such change is authorized by the shareholders of CSX. A termination or amendment of the Plan shall not, without the consent of the Participant, adversely affect a Participant's rights under an Incentive Award previously granted to him or her. After a Change in Control, all amendments to the Plan are subject to the approval of the Benefits Trust Committee.

18. Change in Capital Structure.

(a) In the event of a stock dividend, stock split or combination of shares, share exchange, recapitalization or merger in which CSX is the surviving corporation or other change in CSX capital stock (including, but not limited to, the created or issuance to shareholders generally of rights, options or warrants for the purchase of common stock or preferred stock of CSX), the number and kind of shares of stock or securities of CSX to be subject to the Plan and to Incentive Awards then outstanding or to be granted, the maximum number of shares or securities which may be delivered under the Plan under Sections 3(a), 3(b), 6(b) or 9, the exercise price, the terms of incentive Awards and other relevant provisions shall be

adjusted by the Committee in its discretion, whose determination shall be binding on all persons. If the adjustment would produce fractional shares with respect to any unexercised Option, the Committee may adjust appropriately the number of shares covered by the Option so as to eliminate the fractional shares.

(b) If CSX is a party to a consolidation or a merger in which CSX is not the surviving corporation, a transaction that results in the acquisition of substantially all of CSR's outstanding stock by a single person or entity, or a sale or transfer of substantially all of CSX's assets, the Committee may take such actions with respect to outstanding Incentive Awards as the Committee deems appropriate.

(c) Notwithstanding anything in the Plan to the contrary, the Committee may take the foregoing actions without the consent of any Participant, and the Committee's determination shall be conclusive and binding on all persons for all purposes.

19. Administration of the Plan.

(a) Prior to a Change in Control, the Committee shall administer the Plan. The Committee shall have general authority to impose any term, limitation or condition upon an Incentive Award that the Committee deems appropriate to achieve the objectives of the Incentive Award. The Committee may adopt rules and regulations for carrying out the Plan with respect to Participants. The interpretation and construction of any provision of the Plan by the Committee shall be final and conclusive as to any Participant.

(b) Except as provided in Section 5(b), the Committee shall have the power to amend the terms of previously granted Incentive Awards that were granted by that Committee as long as the terms as amended are consistent with the terms of the Plan and provided that the consent of the Participant is obtained with respect to any amendment that would be detrimental to him or her, except that such consent will not be required if such amendment is for the purpose of complying with Rule 16b-3 or any requirement of the Code applicable to the Incentive Award.

(c) The Committee shall have the power and complete discretion (i) to delegate to any individual, or to any group of individuals employed by the Company or any Subsidiary, the authority to grant Stock Awards under the Plan and (ii) to determine the terms and limitations of any delegation of authority; provided that no individual Stock Award granted under a delegation by the Committee may exceed a Fair Market Value of $100,000 on the Date of Grant.

(d) Following a Change in Control, the Benefits Trust Committee, at its discretion, may assume any or all of the duties and responsibilities of the


Powered by Morningstar® Document Research℠

Committee as to the Plan. All actions by the Benefits Trust Committee shall be consistent with the provisions of the CSX Corporation and Affiliated Companies Benefits Assurance Trust.

(e) If the Participant's Employer is involved in a Divisive Transaction, the Committee may take such actions with respect to outstanding Incentive Awards as the Committee deems appropriate.

(f) If a Participant or former Participant (1) becomes associated with, recruits or solicits customers or other employees of an Employer, is employed by, renders services to, or owns any interest in (other than any nonsubstantial interest, as determined by the Committee) any business that is in competition with CSX, its Subsidiaries, Foreign Affiliates or Affiliates, (2) has his employment terminated by his Employer on account of actions by the Participant which are detrimental to the interests of CSX, its Subsidiaries, Foreign Affiliates or Affiliates, or (3) engages in, or has engaged in, conduct which the Committee determines to be detrimental to the interests of CSX. the Committee may, in its sole discretion, cancel all outstanding Incentive Awards, including immediately terminating any options held by the Participant, regardless of whether then exercisable.

(g) In the event of the death of a Participant, any outstanding Incentive Awards that are otherwise exercisable may be exercised by the Participant's Beneficiary or, if no Beneficiary is designated, by the personal representative of the Participant's estate or by the person to whom rights under the Incentive Award shall pass by will or the laws of descent and distribution.

20. Change in Control.

(a) Notwithstanding any provision of the Plan or any Incentive Award to the contrary:

(i) upon the occurrence of the date of a Change in Control, (i) all Options and Stock Appreciation Rights granted before February 13, 2001 shall become fully exercisable, (ii) all terms and conditions on Restricted Stock and Restricted Stock Units granted before February 13, 2001 shall be deemed satisfied, and (iii) all Performance Grants, Stock Awards and Dividend Equivalents granted before February 13, 2001 shall be deemed to be fully earned and to be immediately payable in cash;

(ii) upon the occurrence of the date of a Vesting Event, (i) all Options and Stock Appreciation Rights granted on or after February 13, 2001 shall become fully exercisable, (ii) all terms and conditions on Restricted Stock and Restricted Stock Units granted on or after February 13, 2001 shall be deemed satisfied, and (iii) all Performance Grants, Stock Awards and Dividend Equivalents

granted on or after February 13, 2001 shall be deemed to be fully earned and to be immediately payable in cash;

(iii) all Options and Stock Appreciation Rights held by a Participant (A) who resigns within three months after an event constituting Good Reason or (B) whose employment is terminated without Cause by the Company or an Affiliate, in either case upon or after an event described in Section 2(g)(iii) or 2(g)(iv) and prior to the earlier of (x) the consummation of such event, i.e., actual change in ownership of Outstanding Corporation Common Stock, Outstanding Corporation Voting Stock, and/or assets of CSX or its principal Subsidiary and (y) the determination by the Board of Directors that such event has been unwound or reversed or is no longer expected to be consummated, which Options and Stock Appreciation Rights were not fully exercisable at the time of such termination of employment, shall become fully exercisable upon the consummation of the event described in Section 2(g)(iii) or 2(g)(iv), as applicable. Such Options and Stock Appreciation Rights shall be exercisable following the consummation of such event for the period specified in the Incentive Award for exercise following termination of employment other than due to death or Disability or until the expiration of the original option term, if sooner; provided, that prior to consummation of such event or a Board of Directors determination, as referenced above, such Options and Stock Appreciation Rights shall remain outstanding and be exercisable only at the time and to the extent set forth in the Incentive Award;

(iv) any terms and conditions of all Restricted Stock and Restricted Stock Units held by a Participant (A) who resigns within three months if an event constituting Good Reason or (B) whose employment is terminated without Cause by the Company or an Affiliate, in either case upon or after an event described in Section 2(g)(iii) or 2(g)(iv) and prior to the earlier of (x) the consummation of such event, i.e., actual change in ownership of Outstanding Corporation Common Stock, Outstanding Corporation Voting Stock, and/or assets of CSX or its principal Subsidiary and (y) the determination by the Board of Directors that such event has been unwound or reversed or is no longer expected to be consummated, which terms and conditions had not been satisfied at the time of such termination of employment, shall be deemed satisfied upon the consummation of the event described in Section 2(g)(iii) or 2(g)(iv), as applicable; provided, that prior to the consummation of such event or a Board of Directors determination, as referenced above, such Restricted Stock and Restricted Stock Units shall remain outstanding and be subject to the terms and conditions set forth in the Incentive Award; and


Powered by Morningstar® Document Research℠

(v) all Performance Grants, Stock Awards and Dividend Equivalents held by a Participant (A) who resigns within three months of an event constituting Good Reason or (B) whose employment is terminated without Cause by the Company or an Affiliate, in either case upon or after an event described in Section 2(g)(iii) or 2(g)(iv) and prior to a the earlier of(x) the consummation of such event, i.e., actual change in ownership of Outstanding Corporation Common Stock, Outstanding Corporation Voting Stock, and/or assets of CSX or its principal Subsidiary and (y) the determination by the Board of Directors that such event has been unwound, reversed, or is no longer expected to be consummated, which had not been fully earned at the time of such termination of employment, shall be deemed to be fully earned and immediately payable in cash upon the consummation of the event described in Section 2(g)(iii) or 2(g)(iv), as applicable; provided, that prior to the consummation of such event or a Board of Directors determination, as referenced above, such Performance Grants, Stock Awards and Dividend Equivalents shall remain outstanding and be subject to the terms and conditions set forth in the Incentive Award.

(b) Upon a Change in Control, CSX or the Employer of the Participant shall, as soon as possible, but in no event more than seven days following a Change in Control, make an irrevocable contribution to the Benefits Trust in an amount that is sufficient to pay each Participant or Beneficiary of this Plan the unfunded portion of the benefits (i) to which Participants of this Plan or their Beneficiaries are entitled and for which the Company is liable pursuant to the terms of this Plan as of the date on which the Change in Control occurred and (ii) if the Change in Control is not also a Vesting Event, to which Participant or their Beneficiaries would be entitled and for which the Company would be liable if the Change of Control had been a Vesting Event. The amount of the Company's irrevocable contribution shall be based on the accounting for the most recent calendar year or more recent period for the Plan, as approved by an independent actuary or accountant engaged by the Company prior to the Change in Control and approved by the Benefits Trust Committee, if selected or changed following a Change in Control (the "Actuary"), and shall include an amount deemed necessary to pay estimated administrative expenses for the following five years. The Benefits Trust Committee shall cause such accounting to be updated, using participant data supplied to the Actuary by the Company, through a date no earlier than the date of the initial contribution and notify the Company of the amount of additional contributions required as soon as possible. The Benefits Trust is the CSX Corporation and Affiliated Companies Executives' Trust or other similar trusts sponsored by CSX or another Employer.

21. Interpretation. The terms of this Plan shall be governed by the laws of the Commonwealth of Virginia without regard to its conflict of laws rules.

 Powered by Morningstar® Document Research℠

Powered by Morningstar® Document Research℠

**Exhibit 10.40**

RESTRICTED STOCK AWARD AGREEMENT

THIS AGREEMENT is made and entered into as of October 4, 2002, by and between CSX CORPORATION ("CSX"), a Virginia corporation, and Clarence W. Gooden (the "Recipient").

WHEREAS, CSX wishes to create a further incentive for Recipient to remain as an employee of CSX.

NOW, THEREFORE, in consideration of their mutual promises and undertakings, CSX and Recipient mutually agree as follows:

1. In consideration for Recipient's agreement to remain an active employ of CSX or an Affiliate, continuously, through October 4, 2007 (the "Employment Period"), the Recipient shall, as of October 4, 2002 (the "Grant Date"), receive a grant of 17,000 shares of restricted CSX Corporation common stock, $1 par value (the "Restricted Stock") under CSX' s Omnibus Incentive Plan (the "Plan"), the provisions of which are hereby incorporated by reference. (In the event of any conflict between this Agreement and the Plan, this Agreement shall control.) All or a portion of the Restricted Stock shall vest, and the restrictions applicable to such shares of Restricted Stock hereunder shall be lifted, on the date that is the "Vesting Date," as provided below in this Agreement. Except as provided otherwise below, the Vesting Date for all of the Restricted Stock shall be October 4, 2007. CSX shall pay to Recipient an amount equal to dividends declared and payable on each of the shares of Restricted Stock from October 4, 2002, through the Vesting Date for such shares or the date on which it is forfeited, as applicable, net of applicable withholding taxes, as and when such dividends are paid to CSX shareholders generally.

2. (a) Except as set forth below in this Section 2, if Recipient's employment with CSX terminates for any reason before the end of the Employment Period ("Date of Termination?'), Recipient shall forfeit the Restricted Stock, this Agreement shall become null and void, and CSX shall have no obligation as to vesting of any of the Restricted Stock and payment of any further monies pursuant to Paragraph 1 of this Agreement.

(b) In the event of a termination of Recipient's employment before the end of the Employment Period by reason of Recipient's death or Disability, by CSX without Cause or by Recipient for Good Reason, the Date of Termination shall be the Vesting Date with respect to a number of shares of Restricted Stock determined by the following formula:

(number of completed months from the Grant Date through the Date of
Termination / 60) x 17,000

For purposes of this Agreement, "Disability" shall mean the Recipient's becoming disabled within the meaning of the long-term disability plan of the Company covering the Recipient. "Cause" means (i) the willful and continued failure of the Recipient substantially to perform the Recipient's duties under this Agreement (other than as a result of physical or mental illness or injury), after the Board of Directors of the Company (the "Board") or the Chief Executive Officer or other senior executive of the


Powered by Morningstar® Document Research℠

Company delivers to the Recipient a written demand for substantial performance that specifically identifies the manner in which the Board, the Chief Executive Officer or such other executive believes that the Recipient has not substantially performed the Recipient's duties, or (ii) illegal conduct or gross misconduct by the Recipient. "Good Reason" means termination by the Recipient within 60 days after, and as a result of:

i. Any action by the Company that results in a material diminution in the Recipient's position, authority, duties or responsibilities; provided, however, that minor changes in Recipient's job title or responsibilities will not constitute grounds for a Good Reason termination under this Section 4(c)(i)(A).

ii. any requirement by the Company that the Recipient's services be rendered primarily at a location or locations other than Jacksonville Florida. unless such requested relocation is made under the terms of the CSX executive relocation policy.

The remainder of the Restricted Stock shall be forfeited as of the Date of Termination and CSX shall have no obligation as to vesting of such forfeited Restricted Stock, nor any obligation to pay further monies pursuant to Paragraph 1 of this Agreement with respect to any of the Restricted Stock.

(c) Recipient shall be solely responsible for any and all federal, state, and local taxes which may be imposed on him as a result of his receipt of the Restricted Stock, the vesting thereof and his receipt of dividends pursuant to Section 1.

3. In the event of any change (such as recapitalization, merger, consolidation, stock dividend, or otherwise) in the character or amount of CSX Corporation common stock, $1 par value, prior to vesting of the Restricted Stock pursuant to Paragraph I of this Agreement, (a) the number of shares of Restricted Stock to which Recipient shall be entitled shall be the same as if he had actually owned the Restricted Stock without restriction at the time of such change, and (b) the amount of the cash to be paid to Recipient shall be the amount of dividends paid on the Restricted Stock following such change in the number of shares of Restricted Stock.

4. Upon The occurrence of the date of a Vesting Event as defined in the Plan. the Vesting Date will be deemed to have occurred.

5. Nothing in this Agreement shall be interpreted or construed to create a contract of employment between the Company and the Recipient. This Agreement is intended solely to provide Recipient an incentive to continue his existing employment.


Powered by Morningstar® Document Research℠

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of October 4, 2002.

RECIPIENT:

/s/ Clarence W. Gooden

Social Security No.: ________________________

CSX CORPORATION

By: /s/ Jeffrey McCutcheon

Title: SVP, Human Resources


Powered by Morningstar® Document Research℠

**Exhibit 10.41**

RESTRICTED STOCK AWARD AGREEMENT

THIS AGREEMENT is made and entered into as of December 22, 2005, by and between CSX CORPORATION ("CSX"), a Virginia corporation, and Ellen M. Fitzsimmons (the "Recipient").

WHEREAS, CSX wishes to create a further incentive for Recipient to remain as an employee of CSX.

NOW, THEREFORE, in consideration of their mutual promises and undertakings, CSX and Recipient mutually agree as follows:

1. In consideration for Recipient's agreement to remain an active employee of CSX or an Affiliate, continuously and without interruption from the period December 22, 2005 through December 21, 2008 (the "Employment Period"), the Recipient shall, as of December 22, 2005, receive a grant of 20,620 shares of restricted CSX Corporation common stock, $1 par value (the "Restricted Stock") under CSX's Omnibus Incentive Plan (the "Plan"), the provisions of which are hereby incorporated by reference. (In the event of any conflict between this Agreement and the Plan, this Agreement shall control.) During the Employment Period, CSX will pay to Recipient an amount equal to dividends declared and payable on the Restricted Stock from December 22, 2005, through the Employment Period, net of applicable withholding taxes. Except as otherwise provided herein, the Restricted Stock shall vest and the restrictions will be lifted as follows:

| Vesting Date | Shares Vested |
|---|---|
| December 22, 2005 | 5,155 |
| December 22, 2006 | 5,155 |
| December 22, 2007 | 5,155 |
| December 22, 2008 | 5,155 |

2. (a) Except as set forth in subsection 2, if Recipient's employment by CSX or an Affiliate terminates before the "Vesting Date," this Agreement shall become null and void and CSX shall have no obligation as to vesting of any of the Restricted Stock and payment of any further monies pursuant to Paragraph 1 of this Agreement.

(b) In the event of a termination of Recipient's employment before the end of the Employment Period by reason of Recipient's death or Disability, by CSX without Cause or by Recipient for Good Reason, the Date of Termination shall be the Vesting Date with respect to a number of shares of Restricted Stock determined by the following formula:

(number of completed months from the Grant Date through the Date of Termination / 48) x 20,620)

For purposes of this Agreement, "Disability" shall mean the Recipient's becoming disabled within the meaning of the long-term disability plan of the Company covering the Recipient. "Cause" means (i) the willful and continued failure of the Recipient substantially to perform the Recipient's duties under this Agreement (other

than as a result of physical or mental illness or injury), after the Board of Directors of the Company (the "Board") or the Chief Executive Officer or other senior executive of the Company delivers to the Recipient a written demand for substantial performance that specifically identifies the manner in which the Board, the Chief Executive Officer or such other executive believes that the Recipient has not substantially performed the Recipient's duties, or (ii) illegal conduct or gross misconduct by the Recipient. "Good Reason" means termination by the Recipient within 60 days after, and as a result of:

i. Any action by the Company that results in a material diminution in the Recipient's position, authority, duties or responsibilities; provided, however, that minor changes in Recipient's job title or responsibilities will not constitute grounds for a Good Reason termination under this Section 4(c)(i)(A).

ii. any requirement by the Company that the Recipient's services be rendered primarily at a location or locations other than Jacksonville, Florida, unless such requested relocation is made under the terms of the CSX executive relocation policy.

The remainder of the Restricted Stock shall be forfeited as of the Date of Termination and CSX shall have no obligation as to vesting of such forfeited Restricted Stock, nor any obligation to pay further monies pursuant to Paragraph 1 of this Agreement with respect to any of the Restricted Stock.

(c) Recipient shall be solely responsible for any and all federal, state, and local taxes which may be imposed on her as a result of her receipt of the Restricted Stock, the vesting thereof and her receipt of dividends pursuant to Section 1.

3. In the event of any change (such as recapitalization, merger, consolidation, stock dividend, or otherwise) in the character or amount of CSX Corporation common stock, $1 par value, prior to vesting of the Restricted Stock pursuant to Paragraph 1 of this Agreement, (a) the number of shares of Restricted Stock to which Recipient shall be entitled shall be the same as if she had actually owned the Restricted Stock without restriction at the time of such change, and (b) the amount of the cash to be paid to Recipient shall be the amount of dividends paid on the Restricted Stock following such change in the number of shares of Restricted Stock.

4. Upon the occurrence of the date of a Vesting Event as defined in the Plan, the Vesting Date will be deemed to have occurred.

5. Nothing in this Agreement shall be interpreted or construed to create a contract of employment between the Company and the Recipient. This Agreement is intended sole to provide Recipient an incentive to continue her existing employment.


Powered by Morningstar® Document Research℠

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of December 22, 2005.

| RECIPIENT: | CSX CORPORATION |
|---|---|
| /s/ Ellen M. Fitzsimmons | /s/ Michael Ward |
| Ellen M. Fitzsimmons | Title: Chairman, President & CEO |


Powered by Morningstar® Document Research℠

Powered by Morningstar® Document Research℠

**Exhibit 21**

**Subsidiaries of the Registrant**

As of December 30, 2005, the Registrant was the beneficial owner of 100% of the common stock of the following significant subsidiaries:

CSX Transportation, Inc. (a Virginia corporation)
CSX Intermodal, Inc. (a Delaware corporation)

As of December 30, 2005, none of the other subsidiaries included in the Registrant's consolidated financial statements constitute a significant subsidiary.


Powered by Morningstar® Document Research℠

**EXHIBIT 23.1**

# Consent of Independent Registered Public Accounting Firm

We consent to the incorporation by reference in the following Registration Statements:

- Registration Statement (Form S-3 No. 33-2084)
- Registration Statement (Form S-3 No. 333-113637)
- Registration Statement (Form S-8 No. 33-16230)
- Registration Statement (Form S-8 No. 33-25537)
- Registration Statement (Form S-8 No. 33-29136)
- Registration Statement (Form S-8 No. 33-33853)
- Registration Statement (Form S-8 No. 33-33854)
- Registration Statement (Form S-8 No. 33-37449)
- Registration Statement (Form S-8 No. 33-41498)
- Registration Statement (Form S-8 No. 33-41499)
- Registration Statement (Form S-8 No. 33-41735)
- Registration Statement (Form S-8 No. 33-47655)
- Registration Statement (Form S-8 No. 33-57029)
- Registration Statement (Form S-8 No. 333-09213)
- Registration Statement (Form S-8 No. 333-73429)
- Registration Statement (Form S-8 No. 333-32008)
- Registration Statement (Form S-8 No. 333-43382)
- Registration Statement (Form S-8 No. 333-48896)
- Registration Statement (Form S-8 No. 333-66604)
- Registration Statement (Form S-8 No. 333-110589)

of our report dated February 13, 2006, with respect to the consolidated financial statements of CSX Corporation, included herein, and our report dated February 13, 2006 with respect to CSX Corporation's management's assessment of the effectiveness of internal control over financial reporting and the effectiveness of internal control over financial reporting of CSX Corporation included in this Annual Report (Form 10-K) for CSX Corporation.

/s/ Ernst & Young LLP
Jacksonville, Florida
February 21, 2006


Powered by Morningstar® Document Research℠

Powered by Morningstar® Document Research℠

EXHIBIT 23.2

Consent of Independent Registered Public Accounting Firms

We consent to the use of our report dated January 27, 2004, except for Note 2, as to which the date is January 21, 2005, with respect to the consolidated statements of income, stockholders' equity, and cash flows of Conrail Inc. and subsidiaries for the year ended December 31, 2003 in this Annual Report (Form 10-K) of CSX Corporation and subsidiaries (CSX).

We also consent to the incorporation by reference in each CSX Form S-3 Registration Statement (Registration Nos. 33-2084 and 333-113637) and in each CSX Form S-8 Registration Statement (Registration Nos. 33-16230, 33-25537, 33-29136, 33-37449, 33-41498, 33-41499, 33-41735, 33-41655, 33-57029, 333-09213, 33-33853, 33-33854, 333-73427, 333-73429, 333-32008, 333-43382, 333-48896, 333-66604, and 333-110589) of our report dated January 27, 2004, except for Note 2, as to which the date is January 21, 2005, with respect to the consolidated statements of income, stockholders' equity, and cash flows of Conrail Inc. and subsidiaries for the year ended December 31, 2003 included in this Annual Report (Form 10-K) of CSX for the fiscal year ended December 30, 2005.

/s/ Ernst & Young LLP
Jacksonville, Florida
February 21, 2006

/s/ KPMG LLP
Norfolk, Virginia
February 21, 2006


Powered by Morningstar® Document Research℠

Powered by Morningstar® Document Research℠

Exhibit 24

POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS that each of the undersigned officers and directors of CSX CORPORATION, a Virginia Corporation, which is to file with the Securities and Exchange Commission, Washington, D. C., a Form 10-K (Annual Report), hereby constitutes and appoints Carolyn T. Sizemore and Ellen M. Fitzsimmons his true and lawful attorneys-in-fact and agents, for him and in his name, place and stead to sign said Form 10-K, and any and all amendments thereto, with power where appropriate to affix the corporate seal of CSX Corporation thereto and to attest said seal, and to file said Form 10-K, and any and all other documents in connection therewith, with the Securities and Exchange Commission, hereby granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform any and all acts and things requisite and necessary to be done in and about the premises as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or either of them, may lawfully do or cause to be done by virtue hereof.

IN WITNESS WHEREOF, the undersigned have hereunto set their hands this 8th day of February 2006.

/s/ Elizabeth E. Bailey
Elizabeth E. Bailey

/s/ John B. Breaux
John B. Breaux

/s/ Edward J. Kelly, III
Edward J. Kelly, III

/s/ Robert D. Kunisch
Robert D. Kunisch

/s/ Southwood J. Morcott
Southwood J. Morcott

/s/ David M. Ratcliffe
David M. Ratcliffe

/s/ Charles E. Rice
Charles E. Rice

/s/ William C. Richardson
William C. Richardson

/s/ Frank S. Royal
Frank S. Royal

/s/ Donald J. Shepard
Donald J. Shepard

/s/ Michael J. Ward
Michael J. Ward

/s/ Oscar Munoz
Oscar Munoz


Powered by Morningstar® Document Research℠

Powered by Morningstar® Document Research℠

Exhibit 31.1

**CERTIFICATE OF CHIEF EXECUTIVE OFFICER**

I, Michael J. Ward, certify that:

1. I have reviewed this Annual Report on Form 10-K of CSX Corporation;
2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined by Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 21, 2006

/s/ MICHAEL J. WARD
Michael J. Ward
Chairman, President and Chief Executive Officer


Powered by Morningstar® Document Research℠

Powered by Morningstar® Document Research℠

Exhibit 31.2

**CERTIFICATE OF CHIEF FINANCIAL OFFICER**

I, Oscar Munoz, certify that:

1. I have reviewed this Annual Report on Form 10-K of CSX Corporation;
2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined by Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 21, 2006

/s/ OSCAR MUNOZ
Oscar Munoz
Executive Vice President and Chief Financial Officer


Powered by Morningstar® Document Research℠

Powered by Morningstar® Document Research℠

Exhibit 32.1

CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Annual Report of CSX Corporation on Form 10-K for the fiscal year ended December 30, 2005 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Michael J. Ward, Chief Executive Officer of the registrant, certify, pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to my knowledge, that:

1. The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the registrant.

Date: February 21, 2006

/s/ MICHAEL J. WARD
Michael J. Ward
Chairman, President and Chief Executive Officer


Powered by Morningstar® Document Research℠

Powered by Morningstar® Document Research℠

Exhibit 32.2

CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Annual Report of CSX Corporation on Form 10-K for the fiscal year ended December 30, 2005 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Oscar Munoz, Chief Financial Officer of the registrant, certify, pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to my knowledge, that:

1. The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the registrant.

Date: February 21, 2006

/s/ OSCAR MUNOZ
Oscar Munoz
Executive Vice President and Chief Financial Officer


Powered by Morningstar® Document Research℠

Powered by Morningstar® Document Research℠

Exhibit 99.3

**Report of Independent Registered Public Accounting Firms**

**The Stockholders and Board of Directors**
**Conrail Inc.:**

We have audited the accompanying consolidated statements of income, stockholders' equity and cash flows of Conrail Inc. and subsidiaries for the year ended December 31, 2003. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audit.

We conducted our audit in accordance with the Standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. We were not engaged to perform an audit of the Company's internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the consolidated financial statements of Conrail Inc. and subsidiaries referred to above present fairly, in all material respects, the results of their operations and their cash flows for the year ended December 31, 2003, in conformity with U.S. generally accepted accounting principles.

As discussed in Note 1 to the consolidated financial statements, effective January 1, 2003 the Company adopted Financial Accounting Standards Board Statement No. 143, *Accounting for Asset Retirement Obligations*.

The accompanying financial statements for 2005 and 2004 were not audited by us and, accordingly we do not express an opinion on them.

KPMG LLP
Norfolk, Virginia

Ernst & Young LLP
Jacksonville, Florida

January 27, 2004,
except for Note 2, as to which
the date is January 21, 2005



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

**CONRAIL INC.**
**CONSOLIDATED STATEMENTS OF INCOME**

| ($ In Millions) | Years ended December 31, (Unaudited) 2005 | (Unaudited) 2004 | 2003 |
|---|---|---|---|
| **Revenues — NSC/CSX** | **$ 276** | $ 255 | $ 235 |
| **Revenues — Third parties** | **102** | 97 | 81 |
| Total operating revenues | **378** | 352 | 316 |
| **Operating expenses** | | | |
| Compensation and benefits | **187** | 189 | 168 |
| Material, services and rents | **103** | 121 | 118 |
| Depreciation and amortization | **27** | 29 | 30 |
| Casualties and insurance | **9** | 11 | 16 |
| Fuel | **10** | 7 | 6 |
| Other | **10** | 13 | 14 |
| Total operating expenses | **346** | 370 | 352 |
| Income (loss) from operations | **32** | (18) | (36) |
| Interest expense | **(7)** | (8) | (9) |
| Other income, net (Note 11) | **88** | 61 | 58 |
| Income from continuing operations before income taxes and accounting changes | **113** | 35 | 13 |
| Provision for income taxes (Note 8) | **28** | 13 | 3 |
| Income from continuing operations before accounting changes | **85** | 22 | 10 |
| Income from discontinued operations, net of tax (Note 2) | **—** | 119 | 191 |
| Cumulative effect of changes in accounting principles, net of tax (Note 1) | **—** | (1) | 2 |
| **Net Income** | **$ 85** | $ 140 | $ 203 |

*See accompanying notes to the consolidated financial statements.*



 Powered by Morningstar® Document Research℠

**CONRAIL INC.**
**CONSOLIDATED BALANCE SHEETS**

| ($ In Millions) | December 31, (Unaudited) 2005 | December 31, (Unaudited) 2004 |
|---|---|---|
| **ASSETS** | | |
| **Current assets** | | |
| Cash and cash equivalents | **$ 20** | $ 20 |
| Accounts receivable, net | **24** | 25 |
| Income taxes receivable (Note 8) | **5** | 73 |
| Due from NSR/CSXT (Note 3) | **134** | 165 |
| Material and supplies | **9** | 8 |
| Deferred income taxes (Note 8) | **38** | 40 |
| Other current assets | **3** | 3 |
| Total current assets | **233** | 334 |
| **Property and equipment, net (Note 5)** | **560** | 560 |
| **Due from NSR/CSXT (Note 3)** | **308** | 225 |
| **Due from NSC/CSX (Note 3)** | **105** | — |
| **Other assets (Note 6)** | **269** | 295 |
| Total assets | **$ 1,475** | $ 1,414 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| **Current liabilities** | | |
| Accounts payable | **$ 30** | $ 18 |
| Current maturities of long-term debt (Note 7) | **44** | 50 |
| Due to NSC/CSX (Note 3) | **6** | 4 |
| Wages and employee benefits | **35** | 33 |
| Casualty reserves | **32** | 32 |
| Accrued and other current liabilities (Note 6) | **86** | 105 |
| Total current liabilities | **233** | 242 |
| **Long-term debt (Note 7)** | **215** | 266 |
| **Casualty reserves** | **87** | 109 |
| **Deferred income taxes (Note 8)** | **66** | 17 |
| **Other liabilities (Note 6)** | **439** | 419 |
| Total liabilities | **1,040** | 1,053 |
| **Commitments and contingencies (Note 12)** | | |
| **Stockholders' equity (Notes 2 and 10)** | | |
| Common stock ($1 par value; 100 shares authorized, issued and outstanding) | **—** | — |
| Additional paid-in capital | **456** | 445 |
| Retained earnings | **102** | 17 |
| Accumulated other comprehensive loss | **(123)** | (101) |
| Total stockholders' equity | **435** | 361 |
| Total liabilities and stockholders' equity | **$ 1,475** | $ 1,414 |

*See accompanying notes to the consolidated financial statements.*



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

# CONRAIL INC.
## CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY

($ in Millions)

| | Additional Paid-In Capital | Retained Earnings | Accumulated Other Comprehensive Loss | Total |
|---|---|---|---|---|
| **Balance , January 1, 2003** | $ 2,221 | $ 2,134 | $ (129) | $ 4,226 |
| Comprehensive income - 2003 | | | | |
| Net Income | — | 203 | — | 203 |
| Minimum pension liability, net (Note 9) | — | — | 25 | 25 |
| Total comprehensive income | | | | 228 |
| **Balance , December 31, 2003** | 2,221 | 2,337 | (104) | 4,454 |
| Comprehensive income — 2004 (Unaudited) | | | | |
| Net Income (Unaudited) | — | 140 | — | 140 |
| Minimum pension liability, net (Unaudited) (Note 9) | — | — | 3 | 3 |
| Total comprehensive income (Unaudited) | | | | 143 |
| Conrail Corporate Reorganization (Unaudited)(Note 2) | (1,776) | (2,460) | | (4,236) |
| **Balance , December 31, 2004 (Unaudited)** | 445 | 17 | (101) | 361 |
| Comprehensive income — 2005 (Unaudited) | | | | |
| Net Income (Unaudited) | — | 85 | — | 85 |
| Minimum pension liability, net (Unaudited) (Note 9) | — | — | (22) | (22) |
| Total comprehensive income (Unaudited) | | | | 63 |
| Tax refund allocation to spun-off subsidiaries (Unaudited) (Note 8) | 11 | | | 11 |
| **Balance, December 31, 2005 (Unaudited)** | **$ 456** | **$ 102** | **$ (123)** | **$ 435** |

*See accompanying notes to the consolidated financial statements.*



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

**CONRAIL INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| ($In Millions) | Years ended December 31, (Unaudited) 2005 | (Unaudited) Revised See Note 1 2004 | Revised See Note 1 2003 |
|---|---|---|---|
| **Cash flows from operating activities** | | | |
| Net income | **$ 85** | $ 140 | $ 203 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Net cumulative effect of changes in accounting principles | — | 1 | (40) |
| Depreciation and amortization | **27** | 219 | 329 |
| Deferred income taxes | **48** | (26) | (12) |
| Gains from sales of property | **(9)** | (3) | (7) |
| Pension cost (benefit) | **12** | 10 | (4) |
| Changes in: | | | |
| Accounts receivable, net | **1** | 1 | 1 |
| Income taxes receivable | **68** | — | — |
| Accounts and wages payable | **14** | (14) | 4 |
| Due to NSC/CSX | **2** | (1) | (4) |
| Other, net | **9** | (30) | (58) |
| Net cash provided by operating activities | **257** | 297 | 412 |
| **Cash flows from investing activities** | | | |
| Notes receivable from NSR/CSXT | **(124)** | — | — |
| Notes receivable from NSC/CSX | **(105)** | (213) | (339) |
| Property and equipment acquisitions | **(26)** | (31) | (35) |
| Other | 14 | 3 | 14 |
| Net cash used in investing activities | **(241)** | (241) | (360) |
| **Cash flows from financing activities** | | | |
| Payment of long-term debt, net | **(16)** | (54) | (57) |
| Net cash used in financing activities | **(16)** | (54) | (57) |
| **Net change in cash and cash equivalents** | — | 2 | (5) |
| **Cash and cash equivalents** | | | |
| At beginning of year | **20** | 18 | 23 |
| At end of year | **$ 20** | $ 20 | $ 18 |
| **Supplemental cash flow information** | | | |
| **Cash paid during the year for:** | | | |
| Interest | **$ 24** | $ 80 | $ 100 |
| Income taxes | **$ 25** | $ 73 | $ 129 |

*See accompanying notes to the consolidated financial statements.*



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

**CONRAIL INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Information pertaining to December 31, 2005 and December 31, 2004 and the years then ended is unaudited except for Note 2)**

## 1. Summary of Significant Accounting Policies

***Description of Business***

Conrail Inc. ("Conrail" or the "Company") is a holding company whose principal subsidiary is Consolidated Rail Corporation ("CRC"), a principal switching and terminal railroad operating in Pennsylvania, New Jersey and Michigan. Norfolk Southern Corporation ("NSC") and CSX Corporation ("CSX"), two of the major railroad holding companies in the United States, jointly control Conrail through their ownership interests in CRR Holdings LLC ("CRR"), whose major subsidiary is Green Acquisition Corporation ("Green Acquisition"), which owns Conrail. NSC and CSX have equity interests in CRR of 58% and 42%, respectively, and voting interests of 50% each. Through its subsidiary, CRC, Conrail owns, manages and operates certain rail properties ("Shared Assets Area") for the joint and exclusive benefit of the railroad subsidiaries of NSC and CSX, Norfolk Southern Railway Company ("NSR")and CSX Transportation, Inc. ("CSXT"), respectively.

On August 27, 2004, Conrail, NSC and CSX completed a reorganization of Conrail ("Conrail Reorganization"), which resulted in the spin-off of two former CRC subsidiaries, Pennsylvania Lines LLC ("PRR") and New York Central Lines LLC ("NYC"), respectively. Prior to the Conrail Reorganization, PRR and NYC owned a substantial share of Conrail's assets and leased these assets through separate but identical operating agreements to NSR and CSXT, respectively. As a result of the Conrail Reorganization, the operating and lease agreements were terminated and PRR and NYC were merged into NSR and CSXT, respectively. Consequently, the results of operations, and assets and liabilities for PRR and NYC have been classified as discontinued operations in the consolidated financial statements for all periods presented. In addition, as part of the Conrail Reorganization, the Company restructured its existing unsecured and secured indebtedness, with the consent of CRC's debtholders (see Note 2 to the Consolidated Financial Statements).

The Conrail Reorganization did not involve the Shared Assets Area. Accordingly, subsequent to the Conrail reorganization the major source of the Company's revenues is from CSXT and NSR, related to fees paid for their joint access and reimbursable cost incurred by
CRC in operating the Shared Assets Area. Also, effective with the Conrail Reorganization and the restructuring of its existing unsecured and secured debt, Conrail has entered into various sublease arrangements with NSR and CSXT.



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

**CONRAIL INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**
**(Information pertaining to December 31, 2005 and December 31, 2004 and the years then ended is unaudited except for Note 2)**

***Principles of Consolidation***

The consolidated financial statements include the Company and its majority-owned subsidiaries. As of January 1, 2004, the financial statements also include the consolidated results for a variable interest entity for which the Company is the primary beneficiary (See Note 1 New Accounting Pronouncements). Investments in 20% to 50% owned companies are accounted for by the equity method. All significant intercompany accounts and transactions have been eliminated. Effective with the Conrail Reorganization, the Company no longer has any equity investees.

***Cash Equivalents***

Cash equivalents consist of highly liquid securities purchased with a maturity of three months or less, and are stated at cost which approximates market value.

For 2004 and 2003, the Company has revised the consolidated statements of cash flows by combining cash flows from discontinued operations with cash flows from continuing operations within each category. Previously, cash flows from discontinued operations were reported as a single amount within operating cash flows.

***Material and Supplies***

Material and supplies consist of maintenance material valued at the lower of cost or market.

***Property and Equipment***

Property and equipment are recorded at cost. Depreciation is provided using the group method over estimated service lives. Expenditures, including those on leased assets that extend an asset's useful life or increase its utility, are capitalized. Maintenance expense is recognized when repairs are performed. The cost (net of salvage) of depreciable property retired or replaced in the ordinary course of business is charged to accumulated depreciation and no gain or loss is recognized. Gains and losses on disposal of land and all other property are included in Other Income, net (See Note 11). In 2005, the overall depreciation rate averaged 2.9% for all roadway and equipment.

During 2003, the Company completed a study to update the estimated useful lives of its roadway and track property and the associated accumulated depreciation reserves. This review did not have a material impact on the Company's consolidated financial statements.

***Asset Impairment***

Long-lived assets are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Expected future cash flows from the use and disposition of long-lived assets are compared to the current carrying amounts to determine the potential impairment loss.



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

**CONRAIL INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**
**(Information pertaining to December 31, 2005 and December 31, 2004 and the years then ended is unaudited except for Note 2)**

***New Accounting Pronouncements***

Conrail adopted Financial Accounting Standards Board ("FASB") Interpretation No. 46R, "Consolidation of Variable Interest Entities" ("FIN 46R") which requires that a variable interest entity be consolidated by the company that is subject to a majority of the economic risks and/or rewards of that entity. Pursuant to FIN 46R, on January 1, 2004, the Company consolidated a locomotive leasing entity, Locomotive Management Services ("LMS") and recorded a $1 million net adjustment for the cumulative effect of this accounting change. The consolidation of LMS will not have an impact on net income in future periods as the Company previously accounted for its investment in LMS under the equity method of accounting.

Conrail also adopted FASB Statement of Financial Accounting Standards ("SFAS") No. 143, "Accounting for Asset Retirement Obligations", effective January 1, 2003. Pursuant to SFAS 143, companies are precluded from accruing removal cost expenses that are not legal obligations. Previously, Conrail and most other railroads had accrued removal costs as a component of depreciation expense. In the first quarter of 2003, Conrail recorded income of $40 million ($65 million before taxes) for the cumulative effect of this change. Of this amount, $38 million ($62 million before taxes) is related to the discontinued operations of PRR and NYC. Effective with this pronouncement, removal costs are expensed as incurred. This change did not have a material impact on the Company's consolidated financial statements.

***Revenue Recognition***

The Company's major sources of revenues are from NSC and CSX, primarily in the form of rental revenues and operating fees, which are recognized when earned. Conrail also has third party revenues, which are recognized when earned, related to the operations of Indiana Harbor Belt Railroad Company, a 51% owned terminal railroad subsidiary.

***Use of Estimates***

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenues and expenses during the reporting period. Management reviews its estimates, including those related to the recoverability and useful lives of assets as well as liabilities for litigation, environmental remediation, casualty claims, income taxes and pension and postretirement benefits. Changes in facts and circumstances may result in revised estimates.



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

***Reclassifications***

Certain amounts in the consolidated financial statements and notes thereto have been reclassified to conform to the 2005 presentation.

**2. Conrail Reorganization**

On August 27, 2004, Conrail, together with NSC and CSX, completed the Conrail Reorganization. Prior to the Conrail Reorganization, CRC's former subsidiaries, PRR and NYC owned a substantial share of Conrail's assets and leased these assets through separate but identical operating agreements to NSR and CSXT, respectively. Pursuant to the Conrail Reorganization, these agreements were terminated and the direct ownership of PRR and NYC was transferred to NSR and CSXT, respectively. The Conrail Reorganization has been approved by the Surface Transportation Board ("STB") and has received favorable rulings from the Internal Revenue Service ("IRS") regarding certain tax matters.

As a part of the Conrail Reorganization, the Company restructured its existing unsecured and secured public indebtedness, with the consent of CRC's debt holders. NSR and CSXT offered substantially similar unsecured debt securities in a 58%/42% ratio in exchange of CRC's unsecured debentures. Of the $800 million total unsecured debentures, $779 million were accepted for exchange and became direct unsecured obligations of NSR and CSXT. The Company's secured debt and lease obligations remained obligations of CRC and are supported by new leases and subleases which became the direct lease and sublease obligations, also in a 58%/42% ratio of NSR and CSXT, respectively. In accordance with EITF 87-24, "Allocation of Interest to Discontinued Operations," interest expense related to the exchanged debt and the direct lease and sublease obligations assumed by NSR and CSXT has been allocated to discontinued operations for all periods presented.

At August 27, 2004, the Company charged $4.2 billion, principally the net assets of the discontinued operations of PRR and NYC against stockholders' equity to reflect the Conrail Reorganization. In addition, Conrail recorded net operating loss carrybacks and carryforwards of approximately $73 million and $27 million, respectively, related to the Conrail Reorganization (See Note 8).



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

**CONRAIL INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**
**(Information pertaining to December 31, 2005 and December 31, 2004 and the years then ended is unaudited except for Note 2)**

The following table summarizes the reporting of the discontinued operations on the Consolidated Statements of Income:

Condensed Statement of Operations
$ in Millions

| | Year to Date Period Ended | |
|---|---|---|
| | Aug. 27, 2004 | Dec. 31, 2003 |
| Total operating revenues | $ 406 | $ 602 |
| Total operating expenses | 196 | 307 |
| Income from operations | 210 | 295 |
| Interest expense | (59) | (90) |
| Other income, net | 37 | 38 |
| Income before income taxes and accounting change | 188 | 243 |
| Provision for income taxes | 69 | 90 |
| Income before accounting change | 119 | 153 |
| Accounting change, net of tax | — | 38 |
| **Income from discontinued operations** | **$ 119** | **$ 191** |

## 3. Related Parties Transactions

***Shared Assets Area***

NSR and CSXT pay Conrail a fee for joint and exclusive access to the Shared Assets Area. In addition, NSR and CSXT pay, based on usage, the costs incurred by Conrail to operate the Shared Assets Area plus a profit factor.

Payments made by NSR to Conrail under the Shared Assets agreements were $149 million, $109 million and $135 million during 2005, 2004 and 2003, respectively, of which $30 million, $27 million and $31 million, were minimum rents. Payments made by CSXT to Conrail under the Shared Assets agreements were $112 million, $91 million and $124 million during 2005, 2004 and 2003, respectively, of which $21 million, $19 million and $24 million, were minimum rents.



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

**CONRAIL INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**
**(Information pertaining to December 31, 2005 and December 31, 2004 and the years then ended is unaudited except for Note 2)**

Future minimum lease payments to be received from NSR/CSXT for the Shared Assets Area are as follows:

| $ in Millions<br>Year Ending December 31, | From NSR | From CSXT | Total |
|---|---|---|---|
| 2006 | $ 25 | $ 18 | $ 43 |
| 2007 | 25 | 18 | 43 |
| 2008 | 25 | 18 | 43 |
| 2009 | 25 | 18 | 43 |
| 2010 | 25 | 18 | 43 |
| 2011 and Beyond | 331 | 240 | 571 |
| **Total** | $ 456 | $ 330 | $ 786 |

***Equipment Financing Agreements***

As part of the Conrail Reorganization, CRC obtained consents from debtholders and other related parties regarding amendments to certain of the Company's existing equipment financing obligations. Under the amended agreements, CRC's existing secured debt and lease obligations related to these equipment financings remain in effect but are supported by new leases and subleases which became the direct lease and sublease obligations in an approximate 58%/42% ratio of NSR and CSXT, respectively. In general, payments received by Conrail from NSR and CSXT under the direct lease and sublease agreements equal the Company's existing lease obligations and in 2005 totaled $62 million and $44 million from NSR and CSXT, respectively. Payments received in 2004 under these agreements totaled $16 million and $11 million from NSR and CSXT, respectively.

Future minimum lease payments to be received from NSR/CSXT under the Equipment Financing agreements are as follows:

| $ in Millions<br>Year Ending December 31, | From NSR | From CSXT | Total |
|---|---|---|---|
| 2006 | $ 52 | $ 38 | $ 90 |
| 2007 | 64 | 47 | 111 |
| 2008 | 41 | 29 | 70 |
| 2009 | 34 | 24 | 58 |
| 2010 | 19 | 13 | 32 |
| 2011 and Beyond | 41 | 28 | 69 |
| **Total** | $ 251 | $ 179 | $ 430 |




Powered by Morningstar® Document Research℠

**CONRAIL INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**
**(Information pertaining to December 31, 2005 and December 31, 2004 and the years then ended is unaudited except for Note 2)**

***Related Party Balances and Other Transactions***

"Due from NSR/CSXT" at December 31, 2005 and 2004, is comprised of amounts due for the Shared Assets Area operations and the Equipment Financing Agreements. Also at December 31, 2005, "Due from NSR/CSXT" includes 30 year interest-bearing notes receivable issued in 2005 totaling $101 million at 4.40% from NSR and $23 million at 4.52% from CSXT. Interest income related to the notes receivables "Due from NSR/CSXT" was approximately $1 million in 2005.

"Due from NSC/CSX" at December 31, 2005 is comprised of 30 year interest-bearing notes receivable issued in 2005 totaling $32 million at 4.52% from NSC and $73 million at 4.40% from CSX. Interest income related to the notes receivables "Due from NSC/CSX" was approximately $2 million in 2005.

"Due to NSC/CSX" includes amounts payable for property and equipment rentals, as well as amounts related to service provider agreements with both NSC and CSX to provide certain general and administrative support to CRC.

A summary of the "Due to NSC/CSX" activity for the services described above follows:

| **$ in Millions** | **Payments to NSC** | | **Payments to CSX** | |
|---|---|---|---|---|
| | 2005 | 2004 | 2005 | 2004 |
| Service Provider Agreements | **$ 7** | $ 6 | **$ 3** | $ 3 |
| Material purchases | **11** | 8 | **—** | — |
| Rental of locomotives, equipment and facilities | **4** | 6 | **3** | 4 |
| Capital Project activities | **—** | 2 | **—** | 3 |
| **Total payments** | **$ 22** | $ 22 | **$ 6** | $ 10 |
| | **2005** | 2004 | 2005 | 2004 |
| "Due to NSC/CSX" at December 31 | **$ 5** | $ 3 | **$ 1** | $ 1 |

From time to time, NSC and CSX, as the indirect owners of Conrail, may need to provide some of the Company's cash requirements through capital contributions, loans or advances. Through December 31, 2005 there have been no transactions under these arrangements.



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

**CONRAIL INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**
**(Information pertaining to December 31, 2005 and December 31, 2004 and the years then ended is unaudited except for Note 2)**

**4. Other Items**

In November 2004, a settlement was reached among Conrail and other parties relating to insurance recoveries for environmental remediation costs. Under the terms of the settlement, Conrail received approximately $9 million in the first quarter of 2005. In the fourth quarter of 2004, the Company recognized a pretax gain of $9 million resulting from the settlement, which is included in the "Other income, net" line item of the income statement.

In 2004, Conrail made payments totaling approximately $15 million, relating to obtaining consents from debtholders and other related parties regarding amendments to certain of the Company's existing equipment financing obligations. The amounts are included as operating activities in the cash flow statement.

**5. Property and Equipment**

| | December 31, 2005 | December 31, 2004 |
|---|---|---|
| | ($ In Millions) | |
| Roadway | **$ 727** | $ 709 |
| Equipment | **141** | 145 |
| Accumulated depreciation | **(315)** | (304) |
| | **553** | 550 |
| | | |
| Capital leases (primarily equipment) | **49** | 52 |
| Accumulated amortization | **(42)** | (42) |
| | **7** | 10 |
| | $ **560** | $ 560 |

6. **Composition of Certain Balance Sheet Amounts**

The components of certain balance sheet accounts were as follows:

**Other Assets**

| | December 31, 2005 | December 31, 2004 |
|---|---|---|
| | ($ In Millions) | |
| Prepaid Pension cost | **$ 111** | $ 121 |
| Employee Benefit Trust | **106** | 105 |
| Yen denominated deposits | **22** | 33 |
| Other | **30** | 36 |
| | **$ 269** | $ 295 |



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

**CONRAIL INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**
**(Information pertaining to December 31, 2005 and December 31, 2004 and the years then ended is unaudited except for Note 2)**

**Accrued and Other Current Liabilities**

| | December 31, 2005 | December 31, 2004 |
|---|---|---|
| | ($ In Millions) | |
| Operating leases | **$ 22** | $ 37 |
| Income and other taxes | **30** | 32 |
| Other | **34** | 36 |
| | **$ 86** | $ 105 |

**Other Liabilities**

| | December 31, 2005 | December 31, 2004 |
|---|---|---|
| | ($ In Millions) | |
| Pension and other postretirement benefits | **$ 266** | $ 235 |
| Environmental reserves | **48** | 57 |
| Unearned revenues | **46** | 48 |
| Minority interest | **35** | 32 |
| Other | **44** | 47 |
| | **$ 439** | $ 419 |

**7. Long-term Debt and Leases**

As part of the Conrail Reorganization, CRC obtained consents from debtholders and other related parties regarding amendments to certain of the Company's existing equipment financing obligations. Under the amended agreements, CRC's existing secured debt and lease obligations related to these equipment financings remain in effect but are supported by new leases and subleases which became the direct lease and sublease obligations in an approximate 58%/42% ratio of NSR and CSX, respectively. In general, payments received by Conrail from NSR and CSX under the direct lease and sublease agreements equal the Company's existing lease obligations.

***Long-term debt***

Long-term debt outstanding, including the weighted average interest rates at December 31, 2005, is composed of the following:

| | December 31, 2005 | December 31, 2004 |
|---|---|---|
| | ($ In Millions) | |
| Capital leases | **$ 87** | $ 118 |
| Debentures payable, 7.88%, due 2043 | **12** | 12 |
| Debentures payable, 9.75%, due 2020 | **9** | 9 |
| Equipment and other obligations, 7.21% | **151** | 177 |
| **Total Long-term debt** | **259** | 316 |
| **Current portion** | **(44)** | (50) |
| | | |
| **Long-term debt excluding current portion** | **$ 215** | $ 266 |



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

**CONRAIL INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**
**(Information pertaining to December 31, 2005 and December 31, 2004 and the years then ended is unaudited except for Note 2)**

Equipment and other obligations mature in 2006 through 2043 and are collateralized by a net lease receivable of $123 million at December 31, 2005. Maturities of long-term debt other than capital leases net of the lease receivable amounts due under the equipment financing agreements are as follows:

Debentures, Equipment and Other Obligations

**$ in Millions**

| Year Ending December 31, | Gross Commitments | Lease Receivable | Net |
|---|---|---|---|
| 2006 | $ 25 | $ 20 | $ 5 |
| 2007 | 47 | 43 | 4 |
| 2008 | 21 | 17 | 4 |
| 2009 | 15 | 11 | 4 |
| 2010 | 12 | 8 | 4 |
| 2011 and Beyond | 52 | 24 | 28 |
| **Total** | $ 172 | $ 123 | $ 49 |

***Leases***

The Company's noncancelable long-term leases generally include options to purchase at fair value and to extend the terms. Certain lease obligations are payable in Japanese yen, which require the maintenance of yen-denominated deposits sufficient to satisfy the yen-denominated obligation. These deposits are included in the "Other assets" line item of the balance sheet and totaled $22 million and $33 million at December 31, 2005 and December 31, 2004, respectively. Capital leases have been discounted at rates ranging from 3.09% to 14.26% and are collateralized by net lease receivables of $49 million at December 31, 2005.

The future minimum lease payments for the capital and operating leases net of the lease receivable amounts due under the equipment financing agreements are as follows:



Source: CSX CORP, 10-K, February 24, 2006

Powered by Morningstar® Document Research℠

**CONRAIL INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**
**(Information pertaining to December 31, 2005 and December 31, 2004 and the years then ended is unaudited except for Note 2)**

**Capital Leases**

**$ In Millions**

| Year Ending December 31, | Gross Lease Commitments | Lease Receivable | Net |
|---|---|---|---|
| 2006 | $ 24 | $ 17 | $ 7 |
| 2007 | 28 | 19 | 9 |
| 2008 | 15 | 11 | 4 |
| 2009 | 23 | 12 | 11 |
| 2010 | 12 | 1 | 11 |
| 2011 and Beyond | — | — | — |
| **Total** | **102** | **60** | **42** |
| **Amount representing interest** | **(15)** | **(11)** | **(4)** |
| | **$ 87** | **$ 49** | **$ 38** |

**Operating Leases**

**$ In Millions**

| Year Ending December 31, | Gross Lease Commitments | Sublease Rentals | Net |
|---|---|---|---|
| 2006 | $ 48 | $ 44 | $ 4 |
| 2007 | 54 | 43 | 11 |
| 2008 | 51 | 38 | 13 |
| 2009 | 44 | 31 | 13 |
| 2010 | 33 | 21 | 12 |
| 2011 and Beyond | 184 | 41 | 143 |
| **Total** | **$ 414** | **$ 218** | **$ 196** |

Operating lease rent expense was $54 million in 2005 and $60 million in both 2004 and 2003. Sublease rental income commencing in August 2004 with the Conrail Reorganization totaled $50 million in 2005 and $17 million in 2004.




Powered by Morningstar® Document Research℠

**CONRAIL INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**
**(Information pertaining to December 31, 2005 and December 31, 2004 and the years then ended is unaudited except for Note 2)**

**8. Income Taxes**

Conrail is included in the consolidated federal income tax return of Green Acquisition Corporation and Subsidiaries (“Green”).

Total income taxes for the years ended December 31, were allocated as follows:

| | 2005 | 2004 | 2003 |
|---|---|---|---|
| | | ($ In Millions) | |
| Income from continuing operations | **$ 28** | $ 13 | $ 3 |
| Discontinued operations (includes $24 million in 2003 for accounting change) | **—** | 69 | 114 |
| Cumulative effect of changes in accounting principles | **—** | — | 1 |
| Stockholders’ equity, for Accumulated Other Comprehensive Loss recognized for minimum pension liability | **(12)** | 9 | 16 |
| | **$ 16** | $ 91 | $ 134 |

The amount related to Accumulated Other Comprehensive Loss for 2004 includes $4 million tax expense related to a change in the effective tax rate in connection with the Conrail reorganization.

The provisions for income taxes for continuing operations are composed of the following:

| | 2005 | 2004 | 2003 |
|---|---|---|---|
| | | ($ In Millions) | |
| Current | | | |
| Federal | **$ (18)** | $ (6) | $ (8) |
| State | **(2)** | 1 | (1) |
| | **(20)** | (5) | (9) |
| Deferred | | | |
| Federal | **44** | 8 | 11 |
| State | **4** | 10 | 1 |
| | **48** | 18 | 12 |
| | **$ 28** | $ 13 | $ 3 |



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

**CONRAIL INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**
**(Information pertaining to December 31, 2005 and December 31, 2004 and the years then ended is unaudited except for Note 2)**

Reconciliation of the U.S. statutory tax rates with the effective tax rates is as follows:

| | 2005 | 2004 | 2003 |
|---|---|---|---|
| Statutory tax rate | **35.0%** | 35.0% | 35.0% |
| State income taxes, net of federal benefit | **1.1** | 1.5 | 1.3 |
| Settlement of tax audit | **(11.3)** | — | - |
| Corporate-owned life insurance | **(.1)** | (1.1) | (10.0) |
| Other | **.3** | .4 | 1.3 |
| Effective tax rate | **25.0%** | **35.8%** | **27.6%** |

During the third quarter of 2005, the Internal Revenue Service (IRS) advised Green that the Congressional Joint Committee on Taxation had completed its consideration of the IRS special report (made to satisfy the requirements of section 6405 of the Internal Revenue Code of 1986) for Green's federal income tax returns for the short tax period beginning May 24, 1997 and ending December 1997, and calendar years ending December 1998 through December 2001, and have taken no exception to the conclusions reached by the IRS and approved a refund of approximately $120 million (this included interest of approximately $19 million). Conrail has recognized the interest portion of the refund in the "Other income, net" line item of the income statement.

In conjunction with the tax refund, the Company also recognized income tax benefits of approximately $13 million, which is reflected in the "Provision for income taxes" line item of the income statement. The income tax benefit adjustment is net of the impact of additional tax liabilities required for reversing temporary differences and an increase in the Company's effective tax rate. Also in accounting for the tax refund, the Company under the provisions of a tax allocation agreement, distributed a share of the refund proceeds and other tax items to the former CRC subsidiaries PRR and NYC which were spun-off as part of the Conrail Reorganization. The net effect of the tax allocation transactions, approximately $11 million, has been recognized in stockholders' equity.

As part of the Conrail Reorganization in 2004, a $267 million bond redemption premium deduction was taken on the Green tax return for the period ended December 31, 2004 which contributed to Green having a consolidated federal taxable loss for 2004. The taxable loss resulted in the Company filing for refunds ($66 million federal and $7 million state) of the 2004 estimated tax payments. The $73 million income tax refund receivable is reflected in the "Income taxes receivable" line item of the Balance Sheet as of December 31, 2004.



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

**CONRAIL INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**
**(Information pertaining to December 31, 2005 and December 31, 2004 and the years then ended is unaudited except for Note 2)**

During 2005, $55 million of the federal income tax refund was received and the remaining $11 million was applied and credited towards the 2005 federal income tax estimate. Also in 2005, $5 million of the state income tax refund was received and $1 million has been applied and credited towards the 2005 state income tax estimate.

Significant components of the Company's deferred income tax assets (liabilities) are as follows:

| | December 31, 2005 | December 31, 2004 |
|---|---|---|
| | ($ In Millions) | |
| Current assets | **$ —** | $ — |
| Current liabilities | **38** | 40 |
| **Current deferred tax asset, net** | **$ 38** | $ 40 |
| Non-current liabilities: | | |
| Property and equipment | **(155)** | (97) |
| Other | **(65)** | (98) |
| | **(220)** | (195) |
| Non-current assets: | | |
| Non-deductible reserves and other liabilities | **154** | 178 |
| **Non-current deferred income tax asset (liability), net** | **$ (66)** | $ (17) |
| **Net deferred income tax asset (liability)** | **$ (28)** | $ 23 |

As of December 31, 2005 , the Company had state net operating loss carryforwards of approximately $37 million that are anticipated to be utilized through 2023.

The Company has not recorded a valuation allowance, as management believes that it is more likely than not that the results of future operations will generate sufficient taxable income to realize the deferred tax assets.

**9. Pension and Other Postretirement Benefits**

The Company and certain subsidiaries sponsor defined benefit qualified and nonqualified pension plans, covering principally non-union employees. The Company and certain subsidiaries also sponsor plans that provide for medical benefits and life insurance coverage to eligible retirees.



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

**CONRAIL INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**
**(Information pertaining to December 31, 2005 and December 31, 2004 and the years then ended is unaudited except for Note 2)**

***Pension Plan Asset Management***

Six investment firms manage the Company's defined benefit pension plans' assets under investment guidelines approved by a pension fund investment committee. Investments are allocated among domestic fixed income investments, and domestic and international equity investments. Limitations restrict investment concentration and use of certain derivative instruments. Fixed income investments must have an average rating of 'AA' or better. Equity investments must be in liquid securities listed on national exchanges. However no direct investment is permitted in the securities of either NSC or CSX. Equity investment managers have specific equity strategies and their returns are expected to exceed selected market indices by prescribed margins.

The target asset allocation range is for equity allocations to be between 44% and 56% of the fund's assets with approximately 10% of the assets allocated to international equity investments. The asset allocation on December 31, 2005, was 47% in fixed income investments and 53% in equity investments including 11% in international equities. This compared to 46% fixed income and 54% equity including 12% international equity as of December 31, 2004.

The plans' assumed future returns are based principally on the asset allocation and the historic returns for the plans' asset classes determined from both the actual plan returns and, over longer time periods, the market returns for those asset classes.



 Powered by Morningstar® Document Research℠

**CONRAIL INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**
**(Information pertaining to December 31, 2005 and December 31, 2004 and the years then ended is unaudited except for Note 2)**

***Obligations and Funded Status***

The following tables provide a reconciliation of the changes in the plans' benefit obligations and fair value of assets over the two-year period ended December 31, 2005, and a statement of the funded status as of December 31 of both years:

| | Pension Benefits | | Other Postretirement Benefits | |
|---|---|---|---|---|
| **($ In Millions)** | **2005** | **2004** | **2005** | **2004** |
| **Change in benefit obligation** | | | | |
| Net benefit obligation at beginning of year | **$ 670** | $ 655 | **$ 38** | $ 37 |
| Service cost | **2** | 2 | **—** | — |
| Interest cost | **37** | 40 | **2** | 2 |
| Plan participants' contributions | — | — | **7** | 9 |
| Actuarial losses | **31** | 34 | **2** | 2 |
| Benefits paid | **(58)** | (61) | **(12)** | (12) |
| Net benefit obligation at end of year | **$ 682** | $ 670 | **$ 37** | $ 38 |
| | | | | |
| **Change in plan assets** | | | | |
| Fair value of plan assets at beginning of year | **$ 588** | $ 576 | **$ 5** | $ 6 |
| Actual return on plan assets | **24** | 71 | **—** | - |
| Employer contributions | **2** | 2 | **4** | 2 |
| Plan participants' contributions | **—** | — | **7** | 9 |
| Benefits paid | **(58)** | (61) | **(12)** | (12) |
| Fair value of plan assets at end of year | **$ 556** | $ 588 | **$ 4** | $ 5 |
| Funded status at end of year | **$ (126)** | $ (82) | **$ (33)** | $ (33) |
| Unrecognized prior service cost | **6** | 6 | **(1)** | (1) |
| Unrecognized actuarial (gains)losses | **198** | 164 | **—** | (2) |
| Net amount recognized at year end | **$ 78** | $ 88 | **$ (34)** | $ (36) |



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

**CONRAIL INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**
**(Information pertaining to December 31, 2005 and December 31, 2004 and the years then ended is unaudited except for Note 2)**

***Accumulated Benefit Obligation***

The accumulated benefit obligation is the actuarial present value of pension benefits based on current or past salary levels. The accumulated benefit obligation for all defined benefit plans was $671 million and $656 million as of December 31, 2005 and 2004, respectively.

The projected benefit obligation, accumulated benefit obligation and fair value of plan assets for the pension plans with accumulated benefit obligations in excess of plan assets are as follows:

| | December 31, 2005 | December 31, 2004 |
|---|---|---|
| | ($ In Millions) | |
| Projected benefit obligation | **$ (671)** | $ (661) |
| Accumulated benefit obligation | **(662)** | (649) |
| Fair value plan assets | **545** | 576 |
| Unfunded accumulated benefit obligation | **(117)** | (73) |

***Minimum Pension Liability***

During 2005 and 2004, the Company recorded changes to its minimum pension liability, which is required due to the Company's unfunded accumulated benefit obligation and recognized prepaid paid pension asset.

The changes do not impact net income but are recognized as adjustments to an intangible asset and accumulated other comprehensive income, net of tax. In 2005, the minimum pension liability increased $33 million, decreasing accumulated other comprehensive income $22 million, net of tax. In 2004, the minimum pension liability decreased $13 million, increasing accumulated other comprehensive income $3 million, net of tax. The intangible asset decreased $1 million in both 2005 and 2004.



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

**CONRAIL INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**
**(Information pertaining to December 31, 2005 and December 31, 2004 and the years then ended is unaudited except for Note 2)**

***Amounts Recognized in Consolidated Balance Sheets***

The following amounts have been recognized in the balance sheets as of December 31:

| ($ In Millions) | Pension Benefits 2005 | Pension Benefits 2004 | Other Postretirement Benefits 2005 | Other Postretirement Benefits 2004 |
|---|---|---|---|---|
| Prepaid pension cost | **$ 111** | $ 121 | $ — | $ — |
| Accrued benefit cost | **(232)** | (199) | **(34)** | (36) |
| Intangible asset | **5** | 6 | **—** | - |
| Accumulated other comprehensive loss | **194** | 160 | **—** | - |
| | **$ 78** | $ 88 | **$ (34)** | $ (36) |

The postretirement life insurance plan had plan assets totaling $4 million and $5 million at December 31, 2005 and December 31, 2004, respectively. There are no plan assets for the postretirement medical plans.

***Actuarial Assumptions***

The assumptions used in the measurement of the Company's benefit obligations and benefit cost for the year ended December 31 are as follows:

| ($ In Millions) | Pension Benefits 2005 | Pension Benefits 2004 | Other Postretirement Benefits 2005 | Other Postretirement Benefits 2004 |
|---|---|---|---|---|
| **Funded Status:** | | | | |
| Discount rate | **5.50%** | 5.75% | **5.50%** | 5.75% |
| Rate of compensation increase | **5.00%** | 5.00% | **5.00%** | 5.00% |
| **Benefit Cost:** | | | | |
| Discount rate | **5.75%** | 6.25% | **5.75%** | 6.25% |
| Expected return on plan assets | **9.00%** | 9.00% | **8.00%** | 8.00% |
| Rate of compensation increase | **5.00%** | 5.00% | **5.00%** | 5.00% |

A 10% annual rate of increase in the per capita cost of covered health care benefits was assumed for 2005, gradually decreasing to 5% by the year 2010.

Assumed health care cost trend rates affect amounts reported for the health care plans. The effect of a one percentage point increase and (decrease) in the assumed health care cost trend rate on the accumulated postretirement benefit obligation is approximately $1 million and $(1) million, respectively.



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

**CONRAIL INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**
**(Information pertaining to December 31, 2005 and December 31, 2004 and the years then ended is unaudited except for Note 2)**

***Net Periodic Benefit Cost***

The components of the Company's net periodic benefit cost (benefit) for the plans are as follows:

| | Year Ending December 31, | | | | | |
|---|---|---|---|---|---|---|
| | Pension Benefits | | | Other Postretirement Benefits | | |
| ($ In Millions) | 2005 | 2004 | 2003 | 2005 | 2004 | 2003 |
| Service cost | **$ 2** | $ 2 | $ 1 | **$ —** | $ — | $ — |
| Interest cost | **37** | 40 | 41 | **2** | 2 | 2 |
| Expected return on assets | **(45)** | (47) | (52) | **—** | (1) | — |
| Amortization of: | | | | | | |
| Prior service cost | **—** | 1 | 1 | — | — | — |
| Actuarial loss | **18** | 14 | 5 | — | — | — |
| | **$ 12** | $ 10 | $ (4) | **$ 2** | $ 1 | $ 2 |

***Contributions and Estimated Future Benefit Payments***

The Company is not required to make cash contributions to its defined benefit qualified plan in 2006, but may elect to make discretionary contributions depending upon the plan's investment performance and the Company's operating cash flows. The Company expects to contribute approximately $2 million to the non-qualified pension plan and $3 million to the other postretirement benefit plans in 2006.

The estimated future benefits to be paid for pensions and other postretirement benefits (OPEB) are:

| Year Ending December 31, | Pensions | OPEB |
|---|---|---|
| | ($ In Millions) | |
| 2006 | $ 57 | $ 3 |
| 2007 | 55 | 3 |
| 2008 | 54 | 3 |
| 2009 | 53 | 3 |
| 2010 | 52 | 3 |
| 2011 - 2015 | 247 | 15 |

***Savings Plans***

The Company and certain subsidiaries provide 401(k) savings plans for union and non-union employees. For the non-union savings plan, the Company matches a portion of employee contributions, subject to the applicable limitations. Savings plan expense related to the non-union savings plan was approximately $1 million in each of the years 2005, 2004 and 2003. There is no Company match provision under the union employee plan except for certain unions, which negotiated a Company match as part of their contract provisions.



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

***Incentive Compensation Plans***

The Company has an incentive compensation plan for all non-union employees in which employees receive targeted cash awards upon attainment of certain performance criteria established by the Company's Board of Directors. Compensation expense under this plan was approximately $3 million in each of the years 2005, 2004 and 2003.

The Company also has a long-term incentive plan under which phantom stock options are granted to officers and other key non-union employees. The option price for the phantom shares is equal to the blended fair market value of NSC and CSX common stock at the date of grant. Options will vest one year after grant date and the option term may not exceed ten years. Upon exercise, eligible participants will receive cash payments equal to the appreciation on the composite NSC and CSX common stock fair values. Compensation expense for this plan was $5 million in 2005, $6 million in 2004, and $2 million in 2003.

***Change in Control payments***

The Company has a long-term liability in connection with employment "change in control" agreements with certain former executives, which became operative as a result of the joint acquisition of Conrail. There were no payments in 2005, and payments were $1 million in 2004 and $4 million in 2003 made primarily from the Company's pension plan. The remaining amount, approximately $27 million at December 31, 2005, will be paid out at the discretion of the participants in the program.

**10. Stockholders' equity**

In conjunction with the tax refund received in 2005, the Company under the provisions of a tax allocation agreement, distributed a share of the refund proceeds and other tax items to the former CRC subsidiaries PRR and NYC which were spun-off as part of the Conrail Reorganization. The net effect of the tax allocation transactions; approximately $11 million, has been recognized in stockholders' equity (Note 8).

As a result of the Conrail Reorganization in 2004, the Company charged $4.2 billion, principally the net assets of the discontinued operations of PRR and NYC, against stockholders' equity (Note 2).



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

**CONRAIL INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**
**(Information pertaining to December 31, 2005 and December 31, 2004 and the years then ended is unaudited except for Note 2)**

**11. Other income, net**

| | 2005 | 2004 | 2003 |
|---|---|---|---|
| | | ($ In Millions) | |
| Rental income | **$ 48** | $ 49 | $ 46 |
| Property sales | **9** | 2 | 5 |
| Interest income | **28** | 3 | 3 |
| Insurance settlements | **3** | 10 | 1 |
| Other, net | **—** | (3) | 3 |
| | **$ 88** | $ 61 | $ 58 |

The increase in interest income in 2005 is primarily attributable to $19 million received in conjunction with the settlement of the tax audit (Note 8) and $3 million related to interest from the issuance of long-term notes to NSR/CSXT and NSC/CSX (Note 3).

**12. Commitments and Contingencies**

***Environmental***

The Company is subject to various federal, state and local laws and regulations regarding environmental matters. Conrail is a party to various proceedings brought by both regulatory agencies and private parties under federal, state and local laws, including Superfund laws, and has also received inquiries from governmental agencies with respect to other potential environmental issues. At December 31, 2005, Conrail has received, together with other companies, notices of its involvement as a potentially responsible party or requests for information under the Superfund laws with respect to cleanup and/or removal costs due to its status as an alleged transporter, generator or property owner at 25 locations. Due to the number of parties involved at many of these sites, the wide range of costs of possible remediation alternatives, the changing technology and the length of time over which these matters develop, it is often not possible to estimate Conrail's liability for the costs associated with the assessment and remediation of contaminated sites.

At December 31, 2005 and 2004, the Company had accrued $48 million and $57 million respectively, related to future environmental costs at Superfund sites and other sites based on known information and using various estimating techniques. The Company anticipates that much of this liability will be paid out over five years; however some costs will be paid out over a longer period. The Company believes the ultimate liability for these matters will not materially affect its consolidated financial condition.

The Company spent $2 million in 2005, $6 million in 2004 and $5 million in 2003 for environmental remediation and related costs.



Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

**CONRAIL INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**
**(Information pertaining to December 31, 2005 and December 31, 2004 and the years then ended is unaudited except for Note 2)**

***Casualty***

The Company is involved in various legal actions, principally relating to occupational health claims, personal injuries, casualties and property damage. The casualty claim liability is determined using the aid of an independent actuarial firm based upon claims filed and an estimate of claims incurred but not yet reported. The Company is generally self-insured for casualty claims. Claims in excess of self-insurance levels are insured up to excess coverage limits. While the ultimate amounts of claims incurred are dependent upon future developments, in management's opinion, the recorded liability is adequate to cover expected probable payments.

***Labor***

CRC had 1,217 employees at December 31, 2005; approximately 89% of whom are represented by 12 different labor organizations and are covered by 16 separate collective bargaining agreements. These agreements remain in effect until changed pursuant to the Railway Labor Act. The Company was engaged in collective bargaining at December 31, 2005 with labor organizations representing approximately 87% of its labor force.

***Guarantees***

The Company is contingently liable under indemnification provisions related to the sale of tax benefits. This liability is recorded in the "Other liabilities" line item of the balance sheet and totaled $1 million at both December 31, 2005 and December 31, 2004.

**13. Fair Values of Financial Instruments**

The fair values of "Cash and cash equivalents," "Accounts receivable, net" and "Accounts payable" approximate the carrying values of these financial instruments at December 31, 2005 and 2004.

Using current market prices when available, or a valuation based on the yield to maturity of comparable debt instruments having similar characteristics, credit rating and maturity, the total fair value of the Company's long-term debt, including the current portion, but excluding capital leases, is $188 million and $222 million at December 31, 2005 and 2004, respectively, compared with carrying values of $172 million and $198 million at December 31, 2005 and 2004, respectively.



Created by Morningstar® Document Research℠
http://documentresearch.morningstar.com

Source: CSX CORP, 10-K, February 24, 2006 Powered by Morningstar® Document Research℠

# EXHIBIT PX0701

Morningstar® Document Research℠

# FORM 10-K

## CSX CORP - csx

**Filed: February 15, 2007 (period: December 29, 2006)**

Annual report which provides a comprehensive overview of the company for the past year

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

FORM 10-K

(X) ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 29, 2006

OR

( ) TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from to

Commission file number 1-8022

*(Exact name of registrant as specified in its charter)*

| **Virginia** | | **62-1051971** |
|---|---|---|
| *(State or other jurisdiction of incorporation or organization)* | | *(I.R.S. Employer Identification No.)* |
| **500 Water Street, 15th Floor, Jacksonville, FL** | **32202** | **(904) 359-3200** |
| *(Address of principal executive offices)* | *(Zip Code)* | *Telephone number, including area code* |

**Securities registered pursuant to Section 12(b) of the Act:**

| **Title of each class** | **Name of exchange on which registered** |
|---|---|
| Common Stock, $1 Par Value | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer (as defined in Rule 405 of the Securities Act).
Yes (X) No ( )

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ( ) No (X)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.
Yes (X) No ( )

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. (X)

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer or a non-accelerated filer (as defined in Exchange Act Rule 12b-2).

Large Accelerated Filer (X) Accelerated Filer ( ) Non-accelerated Filer ( )

Indicate by check mark whether the registrant is a shell company (as defined in Exchange Act Rule 12b-2).
Yes ( ) No (X)

On June 30, 2006 (which is the last day of the second quarter and the required date to use), the aggregate market value of the Registrant's voting stock held by non-affiliates was approximately $15.6 billion (based on the New York Stock Exchange closing price on such date).

There were 436,792,841 shares of Common Stock outstanding on January 31, 2007 (the latest practicable date that is closest to the filing date).

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the Registrant's Definitive Proxy Statement (the "Proxy Statement") to be filed with respect to its annual meeting of shareholders scheduled to be held on May 2, 2007.

Table of Contents

**CSX CORPORATION**
**FORM 10-K**
**TABLE OF CONTENTS**


| Item No. | Page |
|---|---|
| **PART I** | |
| 1. Business | 3 |
| 1A. Risk Factors | 6 |
| 1B. Unresolved Staff Comments | 8 |
| 2. Properties | 8 |
| 3. Legal Proceedings | 13 |
| 4. Submission of Matters to a Vote of Security Holders | 13 |
| **PART II** | |
| 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 15 |
| 6. Selected Financial Data | 18 |
| 7. Management's Discussion and Analysis of Financial Condition and Results of Operations | 20 |
| • Company Overview | 20 |
| • 2006 CSX Highlights | 20 |
| • 2007 Expectations | 22 |
| • Forward-Looking Statements | 24 |
| • Financial Results of Operations | 25 |
| • Liquidity and Capital Resources | 36 |
| • Schedule of Contractual Obligations and Commercial Commitments | 38 |
| • Off-Balance Sheet Arrangements | 38 |
| • Critical Accounting Estimates | 38 |
| 7A. Quantitative and Qualitative Disclosures about Market Risk | 47 |
| 8. Financial Statements and Supplementary Data | 49 |
| 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 106 |
| 9A. Controls and Procedures | 106 |
| 9B. Other Information | 108 |
| **PART III** | |
| 10. Directors and Executive Officers of the Registrant | 108 |
| 11. Executive Compensation | 108 |
| 12. Security Ownership of Certain Beneficial Owners and Management | 108 |
| 13. Certain Relationships and Related Transactions | 108 |
| 14. Principal Accounting Fees and Services | 108 |
| **PART IV** | |
| 15. Exhibits and Financial Statement Schedules | 109 |
| Signatures | 114 |




Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents



**Item 1. Business by Segment**

CSX Corporation ("CSX" and, together with its subsidiaries, the "Company"), based in Jacksonville, Florida, is one of the nation's leading transportation companies. Surface Transportation, which includes the Company's rail and intermodal businesses, provides rail-based transportation services including traditional rail service and the transport of intermodal containers and trailers.

**Rail**

CSX's principal operating company, CSX Transportation Inc. ("CSXT"), operates the largest railroad in the eastern United States with a rail network of approximately 21,000 route miles, linking markets in 23 states, the District of Columbia, and the Canadian provinces of Ontario and Quebec.

In addition to CSXT, the rail segment includes Total Distribution Services, Inc. ("TDSI"), Transflo Terminal Services, Inc. (Transflo), CSX Technology, and other subsidiaries. TDSI provides a network of vehicle distribution centers, while Transflo provides access to bulk transloading sites. Technology and other support services are provided by the other subsidiaries.

**Intermodal**

CSX Intermodal Inc. ("Intermodal"), one of the nation's largest coast-to-coast intermodal transportation providers, is a stand-alone, integrated intermodal company linking customers to railroads via trucks and terminals. Containers and trailers are loaded and unloaded from trains, and trucks provide the link between intermodal terminals and the customer.

**Surface Transportation Businesses**

The rail and intermodal segments are designated by the Company on a combined basis as Surface Transportation businesses. Together, they serve four primary lines of business, which are as follows:

- The merchandise business includes the following seven groups: chemicals, emerging markets, forest products, agriculture products, metals, phosphates and fertilizers, and food and consumer. The emerging markets group includes aggregates, processed materials, waste, military cargo, and machinery. The merchandise business line generated approximately 49% of the Company's total revenue in 2006 and 38% of the Company's volume.

- Coal, which delivered approximately 1.9 million carloads of coal, coke and iron ore to electric utilities and manufacturers in 2006, accounted for approximately 25% of the Company's total 2006 revenue and 26% of the Company's volume. The Company serves more than 130 coal-loading locations in nine states, including three of the nation's top four coal-producing states.

- Automotive, which serves plants in eight states and delivers both finished vehicles and auto parts, generated 9% of the Company's total revenue in 2006 and 6% of the Company's volume. Consistent with the overall automotive market, CSXT's volumes continued to shift from the Big 3 to foreign brands produced domestically.



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents



- Intermodal offers a competitive cost advantage over long-haul trucking by combining the superior economics of rail transportation coupled with the short-haul flexibility of trucks. This service is provided through a network of dedicated terminals across North America. Intermodal shipments, which consist primarily of imported and domestic finished consumer products sold at major retailers, are moved in containers and trailers. For 2006, Intermodal accounted for approximately 15% of the Company's total revenue and 30% of the Company's volume.

Other revenue, which includes short-line railroads owned by CSX and demurrage, switching, and other incidental charges, accounted for 2% of the Company's total 2006 revenue. Demurrage represents charges assessed by railroads when shippers or receivers of freight hold railcars beyond a specified period of time. Switching revenue is generated when CSX switches cars between trains for a customer or another railroad.

**Other Businesses**

The Company also has certain residual activities from the formerly owned companies that made up the Marine Services segment. These activities include leasing of equipment and vessels. These results are included in consolidated operating income.

CSX's other holdings include CSX Hotels, Inc., a resort doing business as The Greenbrier, located in White Sulphur Springs, West Virginia, and CSX Real Property, Inc., an organization responsible for the management, sale, lease, acquisition and development of Company properties. The results from these activities are classified as a component of other income as they are not considered by the Company to be operating activities.

**Financial Information about Operating Segments**

See Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations for operating revenue, operating income and total assets by segment for each of the last three fiscal years.

**Competition**

CSX competes within the broader transportation services marketplace. The Company competes directly with truck, barge and other rail transportation providers. Although transportation modes and specific providers are in direct competition, they often work cooperatively to offer services that combine modes. For example, railroads work with truckload carriers to offer door-to-door container and trailer services to shippers.

As global trade continues to grow and supply chains lengthen, ports play an increasingly vital role. This is most evident in the intermodal business, where links to ports and container terminals can be a distinct competitive advantage. As demand for transportation grows, and potentially outpaces the expansion of supply, capacity in key markets will become a competitive advantage.

Shippers typically select transportation providers that offer the most compelling combination of service and price. Service requirements, both in terms of transit time and reliability, vary by shipper and commodity. As a result, the Company's primary competition varies by commodity and geographic location. The Company's main rail competitor is Norfolk Southern, which also operates in the eastern United States.



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents

**CSX CORPORATION**
**PART I**

### Company History

A leader in freight rail transportation for almost 180 years, CSX's roots date back to the early nineteenth century when the Baltimore and Ohio Railroad (B&O)—the nation's first common carrier—was chartered in 1827.

CSX was incorporated in November 1978, under the laws of the Commonwealth of Virginia. In November 1980, the Company completed the merger of the Chessie System ("Chessie") and Seaboard Coast Line Industries ("Seaboard") into CSX. In July 1986, Chessie and Seaboard operating entities were transferred to the rail entity, CSXT, which was created through the merger. Intermodal was originally formed in 1986.

In May 1997, CSX acquired a 42% economic and 50% voting interest in Conrail, Inc. ("Conrail"). Conrail owned and operated certain properties in the metropolitan New York, Philadelphia and Detroit areas. See Note 17, Related Party Transactions, for additional information.

### Other Information

CSX makes available on its website www.csx.com, free of charge, its annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and all amendments to those reports as soon as reasonably practicable after such reports are filed with or furnished to the Securities and Exchange Commission ("SEC"). Additionally, the Company has posted its code of ethics on its website, which is also available to any shareholder who requests it. This Form 10-K and other SEC filings are also accessible through the SEC's website at www.sec.gov.

The Company has included the certifications of the Chief Executive Officer ("CEO") and the Chief Financial Officer ("CFO") regarding the Company's public disclosure required by Section 302 of the Sarbanes-Oxley Act of 2002 as Exhibits 31.1 and 31.2, as well as Section 906 of the Act as Exhibits 32.1 and 32.2 to this Form 10-K report. Additionally, CSX filed with the New York Stock Exchange the CEO's certification regarding the Company's compliance with their Corporate Governance Listing Standards. These standards are pursuant to Section 303A.12(a), which was dated May 5, 2006. The CEO was not aware of any violations of these standards by the Company as of January 31, 2007 (the latest practicable date that is closest to the filing).

The Company's annual average number of employees was approximately 36,000 people in 2006. Most of these employees provide transportation services. The information set forth in Item 6. Selected Financial data is incorporated herein by reference.

For additional information concerning business conducted by the Company during 2006, see Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations and Item 8. Financial Statements and Supplementary Data—Note 16, Business Segments.



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents



**Item 1A. Risk Factors**

The following important risk factors could have a materially adverse effect on the Company's results of operations, financial condition and liquidity, and could cause those results to differ materially from those expressed or implied in the Company's forward-looking statements. Although the risks described below are those that management believes are the most significant, these are not the only risks facing our company. Additional risks and uncertainties not currently known to us or that we currently do not deem to be material also may materially affect our business, financial condition or future results of operations.

***New legislation or regulatory changes could increase the Company's cost of operations.***

The Company is subject to various regulatory jurisdictions, including the Surface Transportation Board ("STB") of the United States Department of Transportation ("DOT"), the Federal Railroad Administration of the DOT and other state and federal regulatory agencies for a variety of economic, health, safety, labor, environmental, tax, legal and other matters. Legislation passed by Congress or regulations issued by these agencies can significantly affect the revenues, costs and profitability of the Company's business. For example, additional regulations related to carbon dioxide could result in reduced coal production and higher expenses related to locomotive emissions, which would adversely affect the Company's income from operations. Moreover, the Company could be negatively affected by the cost to comply with applicable laws and regulations.

In response to the heightened risk of terrorism, federal, state and local governmental bodies are proposing and beginning to adopt various legislation and regulations relating to security issues that impact the transportation industry, such as the Customs-Trade Partnership Against Terrorism. This voluntary initiative was designed to strengthen a portion of the supply chain for international shipments by requiring minimum security thresholds. Legislation, regulations, or rules enacted by federal, state or local governmental bodies relating to security issues that affect rail and intermodal transportation could negatively impact the Company.

***CSXT, as a common carrier by rail, is required to transport hazardous materials, which could expose the Company to significant costs and claims.***

Under Federal regulations, CSXT is required to transport hazardous materials under its common carrier obligation. A rail accident involving the transport of hazardous materials could result in significant claims arising from personal injury, property damage, and environmental penalties and remediation.

***General economic and geo-political risks may affect the Company's operations.***

Inflation or other changes in general economic conditions that affect demand for rail or intermodal services could adversely affect our results of operations. Abrupt political change or terrorist activity pose a risk of general economic disruption and could require changes in our operations and security arrangements, thus increasing our operating costs. These conditions may lend additional uncertainty to the timing and purchasing decisions by our customers.

Furthermore, fuel prices and supply are influenced by international political and economic circumstances. Although a fuel surcharge recovery program is in place with a considerable number of customers, the Company could be negatively impacted if a fuel supply shortage were to arise, whether due to OPEC or other production restrictions, lower refinery outputs, a disruption of oil imports or otherwise.



 Powered by Morningstar® Document Research℠

Table of Contents



***The Company is subject to environmental laws and regulations that may result in significant costs.***

The Company's operations are subject to wide-ranging federal, state and local environmental laws and regulations concerning, among other things, emissions into the air, discharges into water, the handling, storage, transportation and disposal of waste and other materials, and clean-up of hazardous material or petroleum releases. In certain circumstances, environmental liability can extend to formerly owned or operated properties, leased properties, adjacent properties and properties owned by third parties or Company predecessors, as well as to properties currently owned and used by the Company.

The Company has been, and may be subject to, allegations or findings to the effect that it has violated, or is strictly liable under, environmental laws or regulations, and such violations can result in the Company's incurring fines, penalties or costs relating to the clean-up of environmental contamination. Although the Company believes it has appropriately recorded current and long-term liabilities for known future environmental costs, it could incur significant costs as a result of any of the foregoing, and may be required to incur significant expenses to investigate and remediate known, unknown or future environmental contamination.

***Future acts of terrorism or war may cause significant disruptions in the Company's operations.***

Terrorist attacks, such as those that occurred in the United States in September 2001, in Spain in March 2004, in England in July 2005, and in India in July 2006, along with any government response to those attacks may adversely affect results of operations. CSXT's rail lines or other key infrastructure may be direct targets or indirect casualties of acts of terror or war. This could cause significant business interruption and result in increased costs and liabilities and decreased revenues. In addition, insurance premiums charged for some or all of the coverage currently maintained by the Company could increase dramatically or the coverage may no longer be available.

***Increases in the number and magnitude of property damage and personal injury claims could adversely affect the Company's operating results.***

The Company faces inherent business risk from exposure to property damage, occupational injury claims, and personal injury claims resulting from train accidents, worker injury claims under FELA, and claims from outside parties resulting from the Company's operations. Although the Company is working diligently to enhance its safety programs and to continue to raise the awareness levels of its employees concerning safety, the Company could experience material property damage or personal injury or occupational claims in the future and it may incur significant costs to defend such claims.

Existing claims may suffer adverse developments not currently reflected in reserve estimates, as the ultimate outcome of existing claims is subject to numerous factors outside of the Company's control. The Company establishes reserves to cover all claims. However, final amounts determined to be due on any outstanding matters may differ materially from the recorded reserves.

***Network difficulties could have a negative impact on the Company's rail and intermodal operational efficiency.***

CSXT cannot be sure that it will not experience rail network difficulties related to network capacity, dramatic and unplanned increases in demand for rail service, or increased passenger activities in capacity-constrained areas that could have a negative impact on the Company's operational fluidity.



 Powered by Morningstar® Document Research℠

Table of Contents



Also, the Company may face external factors such as severe weather conditions and other natural occurrences, including floods, fires, hurricanes and earthquakes, which may disrupt the Company's operations. For information about the effects of Hurricane Katrina on the Company's results of operations, financial condition and liquidity, see Note 5, Hurricane Katrina.

***The Company may be subject to various claims and lawsuits that could result in significant expenditures.***

The Company is subject to various existing lawsuits and potential, future, unknown litigation. The Company may experience material judgments or incur significant costs to defend any such lawsuits. Additionally, existing litigation may suffer adverse development not currently reflected in its reserve estimates as the ultimate outcome of existing litigation is subject to numerous factors outside of the Company's control. While the Company uses its best efforts to evaluate existing litigation, the final judgments may differ materially from the recorded reserves.

***The limited availability of qualified personnel could adversely affect the Company's operations.***

Changes in demographics, training requirements and the availability of qualified personnel, could each have a negative impact on CSXT's ability to meet demand for rail service. In addition, approximately 27% of the Company's workforce will be eligible for retirement within the next five years. Increases in demand for qualified personnel and unexpected increases in demand for rail services may aggravate these risks.

***Failure to complete negotiations on collective bargaining agreements could result in strikes, work stoppages.***

Most of CSXT's employees are represented by labor unions and are covered by collective bargaining agreements. Generally speaking, these agreements are bargained nationally by the National Carriers Committee. In the rail industry, negotiations have generally taken place over a number of years and previously have not resulted in any extended work stoppages. Over the last 30 years, there were only six days of work stoppage related to labor disputes over national handling. A negotiating process for new collective bargaining agreements started with the issuance of bargaining notices in November 2004 and the outcome of the current round of negotiations is uncertain at this time. The existing agreements will continue to remain in effect until new agreements are reached. Under the Railway Labor Act's procedures (which include mediation, cooling-off periods, and the possibility of Presidential intervention), neither party may exercise self-help until the procedures are exhausted.

## Item 1B. Unresolved Staff Comments

None.

## Item 2. Properties by Segment

### Rail Property

CSXT's properties primarily consist of track and its related infrastructure, locomotives and freight cars. These categories and the geography of the network are described below.

***Track and Infrastructure***

Serving 23 states, the District of Columbia, and the Canadian provinces of Ontario and Quebec, the CSXT rail network serves, among other markets, New York, Philadelphia and Boston in the northeast and mid-Atlantic, the southeast markets of Atlanta, Miami and New Orleans, and the Midwestern cities of St. Louis, Memphis and Chicago.



 Powered by Morningstar® Document Research℠

Table of Contents



CSXT's track structure includes main thoroughfares connecting terminals and yards (known as mainline track); track within terminals and switching yards; track adjacent to the mainlines used for passing trains; track connecting the mainline track to customer locations; and track that diverts trains from one track to another known as turnouts. Track miles are greater than the Company's 21,000 route miles, which reflect the size of CSX's rail network that connects markets, customers, and western railroads. At December 2006, the breakdown of track miles was as follows:

| | Track Miles |
|---|---|
| Mainline track | 26,629 |
| Terminals and switching yards | 9,550 |
| Passing sidings and turnouts | 1,018 |
| Total | 37,197 |

In addition to its physical track structure, CSXT operates numerous yards and terminals. These serve as the hubs between the company and its local customers and as sorting facilities where rail cars often are received, re-sorted, and placed onto new outbound trains. The following thirty-six yards are identified as key to the CSXT system:

| Rail Yards or Terminals | |
|---|---|
| Birmingham, AL | Detroit, MI |
| Mobile, AL | Hamlet, NC |
| Montgomery, AL | Rocky Mount, NC |
| Baldwin, FL | Buffalo, NY |
| Moncrief (Jacksonville), FL | Selkirk, NY |
| Tampa, FL | Syracuse, NY |
| Atlanta, GA | Cincinnati, OH |
| East Savannah, GA | Cleveland, OH |
| Waycross, GA | Columbus, OH |
| Avon (Indianapolis), IN | Stanley (Toledo), OH |
| Chicago, IL | Walbridge (Toledo), OH |
| Evansville, IN | Willard, OH |
| Louisville, KY | Greenwich (Philadelphia), PA |
| Russell, KY | Charleston, SC |
| New Orleans, LA | Florence, SC |
| Cumberland, MD | Erwin, TN |
| Curtis Bay (Baltimore), MD | Nashville, TN |
| Locust Point (Baltimore), MD | Richmond, VA |

For a list of Intermodal's terminals, see page 12.



 Powered by Morningstar® Document Research℠

Table of Contents



***Network Geography***

CSXT's train operations primarily are focused around the following four major transportation networks, which are defined geographically or by line of business and are described below.

Coal Network – Coal is used to generate more than half of the electricity in the United States. The CSXT coal network connects mining operations in nine states with industrial areas in the northeast and mid-Atlantic as well as many river, lake and seaport facilities. These routes also support CSXT's strong and growing utility market in the southeast.

Southeastern Corridor – This section of the network runs on the western side of CSXT's system between Chicago and central Florida through the cities of Nashville, Birmingham, and Atlanta. This corridor also connects the vital gateways of Chicago, St. Louis and Memphis with the major markets of the southeast. CSXT's capacity investment in this corridor clearly strengthens this route and makes it the premier rail route connecting these key cities and gateways with the growing southeast. The corridor extends through the coal reserves of the southern Illinois basin and provides direct rail service between these coal sources and the increasing demand for coal in the southeast. The increase in capacity on this corridor positions CSXT well to handle the projected traffic volumes of intermodal, coal, automotive, and general merchandise traffic.

Interstate 90 (I-90) Corridor – Chicago and metropolitan areas in New York and New England are linked by CSXT's I-90 Corridor. Much of this route has two lanes of track side-by-side (referred to as double mainline track) supporting high-speed intermodal and automotive services. The I-90 Corridor is also a primary route for import traffic moving across the country, through Chicago and into the population centers in the northeast.

Interstate 95 (I-95) Corridor – Charleston, Jacksonville, Miami and many other cities throughout the growing southeast are connected to the heavily populated northeastern cities of Baltimore, Philadelphia and New York along CSXT's I-95 Corridor. This route is used for certain portions of CSXT's merchandise business, which primarily includes food and consumer products along with metals and chemicals.

***Locomotives***

CSXT operates more than 3,800 locomotives. Freight locomotives are the power source used primarily to pull rail cars. Switching locomotives are used in yards to sort railcars so that the right railcar gets attached to the right train in order to get it to its final destination. Auxiliary units are typically used to provide extra traction for heavy trains in hilly terrain. At December 2006, CSXT's owned and long-term leased locomotives consisted of the following:

| | Locomotives | % |
|---|---|---|
| Freight | 3,335 | 87% |
| Switching | 327 | 8% |
| Auxiliary Units | 189 | 5% |
| Total | 3,851 | 100% |



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents



***Freight Car Fleet***

CSXT's freight car fleet consists of five main types of cars. Gondolas support CSXT's coal and metals markets and provide transport for woodchips and other bulk commodities. Flat cars are used for shipping intermodal containers and trailers, while box cars transport commodities that must be protected from the weather, such as paper products, appliances and building materials. Insulated boxcars deliver food products, canned goods, and certain beverages.

Additionally, CSXT has open-top hoppers, which handle heavy dry bulk commodities such as coal, coke, stone, sand, ores and gravel that are resistant to weather conditions, and covered hoppers, which have a permanent roof. Lighter bulk commodities such as grain, fertilizer, flour, salt, sugar, clay and lime are shipped in large cars called jumbo covered hoppers. Heavier commodities like cement, ground limestone and glass sand are shipped in small cube-covered hoppers. Finally, other cars owned or leased on the network include, but are not limited to, center beam cars for transporting lumber and building products.

At December 2006, CSXT's owned and long-term leased freight car fleet consisted of the following:

| | Freight Cars | % |
|---|---|---|
| Gondolas | 29,010 | 29% |
| Open-top hoppers | 20,447 | 20 |
| Flat cars | 19,830 | 20 |
| Box cars | 15,748 | 15 |
| Covered hoppers | 15,256 | 15 |
| Other cars | 1,311 | 1 |
| Total | 101,602 | 100% |

At any point in time, over half of the railcars on the CSXT system are not owned or leased by CSXT. Examples of these are railcars owned by other railroads (which are interchanged to CSXT), shipper-furnished or private cars (which are generally used only in that shipper's service) and multi-level railcars.

Multi-level railcars are used to transport finished motor vehicles, such as sport utility vehicles and light trucks in bi-level cars, while sedans and smaller automobiles are shipped in tri-level cars. Multi-level railcars are owned jointly by participating railroads, and the fleet is managed as a nationwide pool to serve the automobile industry. As noted, in certain markets, CSXT uses railcars supplied by railroad customers. For example, chemical shippers typically supply tank cars for the transportation of hazardous and non-hazardous materials.



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents



**Intermodal Property**

***Infrastructure***

Intermodal serves 47 terminals in 21 states. These terminals serve as a transfer point between rail and trucks. If the city has more than one terminal, it is indicated by the number next to it.

**Intermodal Terminals**

| | |
|---|---|
| Mobile, AL | East St. Louis, MO |
| Lathrop, CA | Kansas City, MO |
| Los Angeles/Long Beach, CA (3) | Charlotte, NC |
| Oakland, CA | North Bergen, NJ |
| San Diego, CA | Buffalo, NY |
| Jacksonville, FL | New York, NY/NJ (3) |
| Orlando, FL | Syracuse, NY |
| Tampa, FL | Cincinnati, OH |
| Atlanta, GA (2) | Cleveland, OH |
| Savannah, GA | Columbus, OH (2) |
| Chicago, IL (2) | Portland, OR |
| Evansville, IN | Philadelphia, PA |
| Indianapolis, IN | Charleston, SC |
| New Orleans, LA | Kingsport, TN |
| Baltimore, MD | Memphis, TN (2) |
| Boston, MA | Nashville, TN |
| Springfield, MA | Portsmouth, VA |
| Worcester, MA (3) | Seattle, WA |
| Detroit, MI | |

***Equipment***

Intermodal equipment consists primarily of containers, trailers, and chassis. Containers are weather-proof designed boxes used for bulk shipment of freight, and chassis are the wheeled support framework for a container that allows it to be attached to a tractor. All of CSX's chassis are leased. CSX also has other types of equipment such as doublestack railcars, which are railcars that allow for two containers to be mounted one above the other.

At December 29, 2006, Intermodal owned or long-term leased equipment consisted of the following:

| | Equipment | 0% |
|---|---|---|
| Containers | 13,705 | 30% |
| Chassis | 30,826 | 69% |
| Other | 433 | 1% |
| **Total** | 44,964 | 100% |



 Powered by Morningstar® Document Research℠

Table of Contents



**Item 3. Legal Proceedings**

The Company is subject to various legal proceedings and claims that arise in the ordinary course of business. For more information on these legal proceedings including environmental remediation matters, see Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations under the caption "Critical Accounting Estimates—Casualty, Environmental and Legal Reserves" and Item 8. Financial Statements and Supplementary Data—Note 7, Commitments and Contingencies under the caption "Other Legal Proceedings."

**Item 4. Submission of Matters to a Vote of Security Holders**

There were no matters submitted to a vote of security holders in the fourth quarter of 2006.

**Executive Officers of the Registrant**

Executive officers of CSX are elected by the CSX Board of Directors and generally hold office until the next annual election of officers. There are no family relationships or any arrangement or understanding between any officer and any other person pursuant to which such officer was elected. As of December 29, 2006, the executive officers are:

| Name and Age | Business Experience During Past 5 Years |
| --- | --- |
| Michael J. Ward, 56 | Mr. Ward was elected as Chairman of the Board, President and CEO of CSX, in January 2003 and as President in July 2002. He began his career with one of CSX's predecessor railroads in 1977. He has served CSX Transportation, Inc., the Company's rail subsidiary, as President since November 2000 and as President and Chief Executive Officer since October 2002. Previously, Mr. Ward served CSXT as Executive Vice President—Operations from April through November 2000. Mr. Ward has a long tenure with CSXT's railroad business, where he headed up CSXT's coal business unit, managed the planning of the Conrail merger, and was the railroad's Chief Financial Officer. |
| Oscar Munoz, 47 | Mr. Munoz has served as Executive Vice President and CFO of CSX and CSXT since May 2003. Before May 2003, Mr. Munoz served as CFO and Vice President, Consumer Services, AT&T Corporation, from January 2001 to May 2003. He brings significant experience from industries outside of transportation, having served as Senior Vice President—Finance & Administration, Qwest Communications International, Inc.; and as CFO & Vice President, U.S. West Retail Markets as well as leadership assignments at PepsiCo and Coca-Cola. |
| Tony L. Ingram, 60 | Mr. Ingram has served as Executive Vice President and Chief Operating Officer of CSXT since March 2004. He has been intimately involved in the railroad business for 36 years both at CSX and at another railroad. Before March 2004, Mr. Ingram served as Senior Vice President—Transportation, Network and Mechanical, Norfolk Southern Corporation, from February 2003 to March 2004; and Vice President, Transportation—Operations from March 2000 to February 2003. |



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents

**CSX CORPORATION**
**PART I**

| Name and Age | Business Experience During Past 5 Years |
|---|---|
| Clarence W. Gooden, 55 | Mr. Gooden has been the Executive Vice President and Chief Commercial Officer of CSX and CSXT since April 2004. Mr. Gooden has also served as Senior Vice President—Merchandise Service Group, CSXT from 2002 to 2004. Mr. Gooden's strategic acumen can be attributed to his cross functional roles in both operations and sales and marketing side of the business. Prior to 2002, Mr. Gooden served as President of Intermodal. Previously he served as Senior Vice President—Coal Service Group, in several Vice President roles in System Transportation, Network Operations and Transportation Field Operations and Northern Region General Manager for CSXT. |
| Ellen M. Fitzsimmons, 46 | Ms. Fitzsimmons has been the Senior Vice President—Law and Public Affairs of CSX and CSXT since December 2003. She also serves as the Corporate Secretary. Ms. Fitzsimmons' broad responsibilities over her long career at CSX have included key roles in major risk and governance-related areas. Ms. Fitzsimmons served as Senior Vice President—Law and Corporate Secretary from May to December 2003 and as Senior Vice President—Law from February 2001 to May 2003. Prior to joining CSX as Senior Counsel in 1991, Ms. Fitzsimmons was an associate with the Hunton & Williams law firm. |
| Robert J. Haulter, 53 | Mr. Haulter has served as Senior Vice President—Human Resources and Labor Relations of CSX and CSXT since December 2003. Mr. Haulter has served in several leadership positions with CSX and CSXT over his many years at CSX. Before December 2003, he was Senior Vice President—Human Resources at CSX and Vice President—Human Resources—CSXT. He also served as Assistant Vice President at CSXT from 1994 to 2000 in: Performance Improvement, Integration Planning, Strategic Development and Operations Support. |
| Carolyn T. Sizemore, 43 | Mrs. Sizemore has served as Vice President and Controller of CSX and CSXT since April 2002. Prior to April 2002, Ms. Sizemore served CSX as Assistant Vice President and Assistant Controller from July 2001 to April 2002. Mrs. Sizemore has a long history in the finance and audit-related areas of CSX. She joined the Company in 1989 and served in a variety of roles including Manager—Corporate Accounting, Director—Budgets and Performance Analysis, and Senior Director—Financial and Strategic Measures. |



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents

CSX CORPORATION
PART II

**Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities**

**Market Information**

CSX's common stock is listed on the New York Stock Exchange and trades with unlisted privileges on the Midwest, Boston, Cincinnati, Pacific and Philadelphia stock exchanges. The official trading symbol is "CSX."

**Description of Common and Preferred Stock**

A total of 600 million shares of common stock is authorized, of which 437,763,589 shares were outstanding as of December 29, 2006. Each share is entitled to one vote in all matters requiring a vote of shareholders. There are no pre-emptive rights. At January 31, 2007, the latest practicable date, there were 48,098 common stock shareholders of record. Weighted average common shares outstanding used in the calculation of diluted earnings per share was approximately 466 million as of December 29, 2006, and is expected to increase in 2007 due to anticipated stock option exercises and other incentive programs, offset by share repurchases to the extent authorized and completed. (See Note 2, Earnings Per Share.)

A total of 25 million shares of preferred stock is authorized, none of which is currently outstanding.

The following table sets forth, for the quarters indicated, the dividends declared and the high and low share prices of CSX common stock as required by SEC Regulation S-K. All dividends and common stock prices were adjusted to reflect CSX's two-for-one stock split in August 2006.

| | Quarter | | | | |
|---|---|---|---|---|---|
| | 1st | 2nd | 3rd | 4th | Year |
| **2006** | | | | | |
| Dividends | $0.065 | $ 0.065 | $0.100 | $0.100 | $ 0.330 |
| Common Stock Price | | | | | |
| High | $30.20 | $ 37.33 | $35.58 | $38.30 | $ 38.30 |
| Low | $24.29 | $ 30.05 | $28.60 | $32.51 | $ 24.29 |
| **2005** | | | | | |
| Dividends | $0.050 | $ 0.050 | $0.050 | $0.065 | $ 0.215 |
| Common Stock Price | | | | | |
| High | $21.77 | $ 22.05 | $23.45 | $25.80 | $ 25.80 |
| Low | $18.45 | $ 19.01 | $21.24 | $21.35 | $ 18.45 |



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents

**CSX CORPORATION**
**PART II**

**Stock Performance Graph**

The cumulative shareholder returns, assuming reinvestment of dividends, on $100 invested at December 31, 2001 is illustrated on the graph below. The Company references the Standard & Poor 500 Stock Index and the Dow Jones U.S. Transportation Average Index, which provide comparisons to a broad-based market index and other companies in the transportation industry.




| | Dec-01 | Dec-02 | Dec-03 | Dec-04 | Dec-05 | Dec-06 |
|---|---|---|---|---|---|---|
| CSX CORPORATION | $100.00 | $81.75 | $105.15 | $118.72 | $151.85 | $208.11 |
| S & P 500 | $100.00 | $77.90 | $100.25 | $111.15 | $116.61 | $135.03 |
| DJ US TRANSPORTATION AVG | $100.00 | $88.52 | $116.71 | $149.08 | $166.45 | $182.78 |



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents

**CSX CORPORATION**
**PART II**

**CSX Purchases of Equity Securities**

The Company is required to disclose any purchases of its own common stock for the most recent quarter. CSX purchases its own shares for three primary reasons: as part of a share repurchase program; to fund the company contribution required to be paid in CSX common stock under 401(k) plans which cover certain union employees; or to meet employees' minimum statutory tax obligation on the distribution of shares that were formerly deferred or the vesting of restricted stock.

During the fourth quarter, CSX bought back shares as part of the share repurchase program and to meet minimum statutory tax obligations. In July 2006, the Board of Directors granted new authority of up to $500 million so that CSX could purchase additional shares of its common stock and terminated the previously completed $150 million share repurchase authority. In 2006 for the full year, $465 million, or 14.5 million shares, were repurchased under these two programs.

On February 14, 2007, the Board of Directors: (i) terminated the unused portion under the $500 million share repurchase authority; and (ii) granted new authority of up to $2.0 billion so that CSX may purchase additional shares of its common stock. CSX intends to complete the purchase of shares from time to time by the end of 2008.

Share repurchase activity for the fourth quarter of 2006 was as follows:

| | CSX Purchases of Equity Securities for the quarter | | | |
|---|---|---|---|---|
| **Fourth Quarter** | **Total Number of Shares Purchased** | **Average Price Paid per Share** | **Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs *(a)*** | **Approximate Dollar Value of Shares that May Yet Be Purchased Under the Plans or Programs *(b)*** |
| Beginning fourth quarter balance | | | | $ 227,506,743 |
| October (September 30, 2006 – October 27, 2006) | 340,300 | $ 32.74 | 340,300 | $ 216,365,242 |
| November (October 28, 2006 – November 24, 2006) | 23,600 | $ 35.40 | 23,600 | $ 215,529,823 |
| December (November 25, 2006 – December 29, 2006) | 918,284 | $ 34.67 | 912,100 | $ 183,902,865 |
| Total/Ending Balance | 1,282,184 | $ 34.17 | 1,276,000 | $ 183,902,865 |

*(a) The difference in total shares purchased as part of publicly announced plans and the total number of shares purchased for the quarter is due to 6,184 shares being purchased to meet minimum statutory tax obligations.*

*(b) The beginning balance for the fourth quarter of $228 million represents the $500 million authority level (as granted in July 2006) less the third quarter repurchases of $272 million.*



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents

**CSX CORPORATION**
**PART II**

### Item 6. Selected Financial Data

Selected financial data and significant events related to the Company's financial results for the last five fiscal years are listed below. All periods have been retroactively restated to reflect the stock split.

| | Fiscal Years | | | | |
|---|---|---|---|---|---|
| *(Dollars in Millions, Except Per Share Amounts)* | **2006** | 2005 | 2004 | 2003 | 2002 |
| **Earnings From Continuing Operations** | | | | | |
| Operating Revenue | **$ 9,566** | $ 8,618 | $ 8,040 | $ 7,573 | $ 7,916 |
| Operating Expense | **7,428** | 7,068 | 7,040 | 7,053 | 6,897 |
| Operating Income | **$ 2,138** | $ 1,550 | $ 1,000 | $ 520 | $ 1,019 |
| Earnings from Continuing Operations | **$ 1,310** | $ 720 | $ 418 | $ 137 | $ 410 |
| Earnings Per Share: | | | | | |
| From Continuing Operations | **$ 2.98** | $ 1.67 | $ 0.97 | $ 0.32 | $ 0.96 |
| From Continuing Operations, Assuming Dilution | **2.82** | 1.59 | 0.94 | 0.31 | 0.92 |
| From Cumulative Effect of Accounting Change | **—** | — | — | 0.13 | (0.10) |
| From Cumulative Effect of Accounting Change, Assuming Dilution | **—** | — | — | 0.13 | (0.10) |
| **Financial Position** | | | | | |
| Cash, Cash Equivalents and Short-term Investments | **$ 900** | $ 602 | $ 859 | $ 368 | $ 264 |
| Total Assets | **25,129** | 24,232 | 24,605 | 21,760 | 20,951 |
| Long-term Debt | **5,362** | 5,093 | 6,248 | 6,886 | 6,519 |
| Shareholders' Equity | **8,942** | 7,954 | 6,811 | 6,448 | 6,241 |
| **Other Data Per Common Share** | | | | | |
| Dividend Per Share | **$ 0.330** | $ 0.215 | $ 0.200 | $ 0.200 | $ 0.200 |
| **Employees — Annual Averages** | | | | | |
| Rail | **32,987** | 32,033 | 32,074 | 32,892 | 33,468 |
| Other | **3,018** | 3,076 | 3,833 | 4,624 | 6,471 |
| Total | **36,005** | 35,109 | 35,907 | 37,516 | 39,939 |

Significant Events

2006 — Two-for-one split of the Company's common stock effective August 2006. An increase in the quarterly post-split dividend to $.10. (See Note 2, Earnings Per Share.)

— Recognized gains of $168 million before tax, or $104 million after tax, on insurance recoveries from claims related to Hurricane Katrina. (See Note 5, Hurricane Katrina.)

— Recognized an income tax benefit of $151 million primarily related to the resolution of certain tax matters, including resolution of ordinary course federal audits for 1994 –1998. (See Note 13, Income Taxes.)

2005 — Recognized a charge of $192 million pretax, $123 million after tax, to repurchase $1.0 billion of outstanding debt, for costs of the increase in current market value above original issue value. (See Note 9, Debt and Credit Agreements.)

— Recognized an income tax benefit of $71 million for the Ohio legislative change to gradually eliminate its corporate franchise tax. (See Note 13, Income Taxes.)



 Powered by Morningstar® Document Research℠

Table of Contents

**CSX CORPORATION**
**PART II**

Significant events, continued:

| | | |
|---|---|---|
| | — | Recognized a benefit of $38 million pretax, $23 million after tax, due to a change in estimate related to unasserted liability exposure for asbestos and other occupational claims. (See Note 6, Casualty, Environmental, and Other Reserves.) |
| 2004 | — | Recognized a charge of $71 million pretax, $44 million after tax, for separation expenses related to the management restructuring. (See Note 15, Management Restructuring.) |
| | — | Revenues, operating expenses and after-tax income included approximately $63 million, $35 million and $6 million, respectively, representing consolidation of a short-line railroad previously accounted for under the equity method, in conjunction with adoption of FASB Interpretation 46, *Consolidation of Variable Interest Entities*. Net equity earnings of approximately $4 million were included in other income in 2003. |
| | — | Completed a corporate reorganization of Conrail that resulted in the direct ownership of certain Conrail assets by CSXT. (See Note 17, Related Party Transactions.) |
| 2003 | — | Recognized income of $93 million pretax, $57 million after tax, as a cumulative effect of accounting change, for the reversal of the accrued liability for crosstie removal costs in conjunction with the adoption of SFAS 143, *Accounting for Asset Retirement Obligations*. |
| | — | Conveyed most of its interest in its domestic container-shipping subsidiary, CSX Lines, for approximately $300 million in cash and securities. A deferred gain of approximately $127 million pretax resulting from the transaction is being recognized over the 12-year sub-lease term through 2014 during which the Company continues to sublease vessels and equipment to Horizon. |
| | — | Recognized a charge of $232 million pretax, $145 million after tax, in conjunction with the change in estimate of casualty reserves to include an estimate of incurred but not reported claims for asbestos and other occupational injuries to be received over the next seven years. |
| | — | Recognized a charge of $108 million pretax, $67 million after tax, for two settlement agreements with Maersk that resolved all material disputes pending between the companies arising out of the 1999 sale of the international container-shipping assets. |
| | — | Recognized a charge of $34 million pretax, $21 million after tax, as the initial charge for separation expenses related to the management restructuring announced in 2003. In addition, the Company recorded a credit of $22 million pretax, $13 million after tax, related to revised estimates for railroad retirement taxes and the amount of benefits that will be paid to individuals under the 1991 and 1992 separation plans. The net restructuring charge of $22 million, $13 million after tax, includes these items. |
| 2002 | — | Recognized a charge of $83 million pretax, $43 million after tax, to write down indefinite lived intangible assets as a cumulative effect of an accounting change including consideration of minority interest with the adoption of SFAS 142, *Goodwill and Other Intangible Assets*. |



 Powered by Morningstar® Document Research℠

Table of Contents

CSX CORPORATION
PART II

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations**

COMPANY OVERVIEW

CSX, which is based in Jacksonville, Florida, is one of the nation's leading transportation companies. Surface Transportation, which includes the Company's rail and intermodal businesses, provides rail-based transportation services including traditional rail service and the transport of intermodal containers and trailers. CSX's principal operating company, CSXT, operates the largest railroad in the eastern United States with a rail network of approximately 21,000 route miles, linking markets in 23 states, the District of Columbia, and the Canadian provinces of Ontario and Quebec. Intermodal, one of the nation's largest coast-to-coast intermodal transportation providers, is a stand-alone, integrated intermodal company linking customers to railroads via trucks and terminals.

CSX's other holdings include CSX Hotels, Inc., a resort doing business as The Greenbrier, located in White Sulphur Springs, West Virginia, and CSX Real Property, Inc., an organization responsible for the management, sale, lease, acquisition and development of company properties.

**2006 CSX HIGHLIGHTS**

**SURFACE TRANSPORTATION**

- Revenue grew 11%, or $948 million, to $9.6 billion.
- Expenses increased $371 million, net of a $168 million gain on insurance recoveries.
- Operating income increased $577 million to $2.1 billion.
- Service and safety measurements improved in all categories.

Revenue increased 11% from a year ago driven by strong yield management initiatives on flat volumes. Continued pricing efforts, fuel surcharge increases and favorable traffic mix contributed approximately 50%, 30% and 20%, respectively, of the increase in revenue per unit of 11%. The Company was able to achieve the substantial pricing gains due to a strong industrial economy coupled with a shortage of rail, truck and barge capacity. Approximately 85% of CSX's revenue was subject to fuel surcharges or cost escalation clauses, which include a fuel element.

Certain revenue markets had strong volume increases, while others were flat or down causing overall volume to be flat compared to last year. Coal, agricultural products, and emerging markets volumes were higher than a year ago. These gains were offset by volume declines in the automotive, phosphates and fertilizers, and forest products markets.

Expenses increased primarily due to higher fuel costs. This was driven by a $194 million decrease in fuel hedge benefits, which directly reduce fuel expense. In addition, there was a 13% increase in the average price per gallon of diesel fuel in 2006. Other expense increases were mostly offset by a $168 million gain on insurance recoveries from Hurricane Katrina.

For additional detailed information, refer to Rail and Intermodal Results of Operations discussions on pages 30 and 32, respectively.



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents

**CSX CORPORATION**
**PART II**

The Company's continued focus on safety initiatives and operating plan execution helped all service measurements improve compared to last year. Within the service measures, the key safety measures (personal injury and train accident frequency) improved by more than 20% each in 2006. These improvements were driven by continued focus on safety leadership and train accident prevention processes. Both use training, awareness, compliance measurement and root cause analysis to prevent incidents and create a safer work environment.

Additionally, CSX produced improvement in train operations and asset utilization which drove improvements of about 50% in both on-time originations and on-time arrivals. Another measure of network fluidity is velocity, which increased 3% for 2006. More important was the consistent week to week velocity, which indicates the network delivered more reliable service to its customers. The table below shows these key measurements and resources.

**RAIL OPERATING STATISTICS**

| | | Fiscal Years | | |
|---|---|---|---|---|
| | | **2006*(a)*** | 2005 | ***Improvement %*** |
| **Service Measurements** | Personal Injury Frequency Index (Per 200,000 man hours) | **1.39** | 1.77 | *21%* |
| | FRA Train Accidents Frequency (Per million train miles) | **3.35** | 4.41 | *24* |
| | On-Time Originations | **76.0%** | 51.1% | *49* |
| | On-Time Arrivals | **62.7%** | 40.1% | *56* |
| | *Average System Dwell Time (hours)[(b)]* | **25.6** | 29.7 | *14* |
| | Average Total Cars-On-Line | **224,680** | 233,118 | *4* |
| | Average Velocity, All Trains (miles per hour) | **19.8** | 19.2 | *3* |
| | Average Recrews (per day) | **59** | 68 | *13%* |
| | | | | ***Increase/ (Decrease)*** |
| **Resources** | Route Miles | **21,114** | 21,357 | *(1)%* |
| | Locomotives (owned and long-term leased) | **3,851** | 3,788 | *2* |
| | Freight Cars (owned and long-term leased) | **101,602** | 103,544 | *(2)%* |

*(a) Amounts for 2006 are estimated.*

*(b) In October 2005, the Association of American Railroads adopted a new dwell calculation in an effort to standardize reporting across U.S. railroads. Beginning in 2007 and going forward, CSXT will adopt this new method. If CSXT had used this new method in 2006, average system dwell time would have been 25.1 hours vs 25.6 hours reported above.*

**OTHER ITEMS**

Free cash flow for 2006 was $361 million which was a decrease of $669 million from a year ago. Last year's amount included $1.0 billion from the disposition of the International Terminals business. Excluding that one time item, free cash flow compared to a year ago was higher from better earnings net of higher capital investments. Cash provided by operating activities (GAAP measure) is reconciled to free cash flow (non-GAAP measure) on page 23.

Consolidated capital expenditures increased $503 million to $1.6 billion in 2006 compared to the prior year. Surface Transportation core capital expenditures of $1.4 billion were the largest components of the total and of the increase. This increase was primarily due to capital expansion projects. These additions were primarily for track and infrastructure with the remainder spent on locomotives, freight cars and other items, which include technology and facilities for growth. Also included in the year-over-year increase was the replacement of property damaged by Hurricane Katrina.



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents



The Company also announced 3 major events in 2006. A two-for-one split of its common stock was approved by the CSX Board of Directors. The Company also increased its quarterly post-split dividend to $0.10, which represented an increase of 54% on a per share basis. Last, CSX announced a $500 million share repurchase program to be completed within the first six months of 2007, at such times as CSX deems appropriate.

## 2007 Expectations

The Company bases its performance expectations on external forecasts for economic indicators such as gross domestic product, industrial production and overall import levels. The indicators that influence CSX's businesses are expected to be favorable in 2007, but at lower growth rates than the last two years. Considering these and other factors, the Company believes that its business environment remains strong and will support consistent, continuous financial improvements for the next several years.

While changes in the macro economy can impact CSX's financial results, the Company's revenues are derived from fairly diversified sources, and this provides stability as specific economic sectors fluctuate.

The nation's increasing need to transport a substantially greater number of imported products across North America, combined with the significant cost and environmental advantages of rail versus truck transportation, should support continued pricing strength in the Company's Surface Transportation businesses. In addition, recent and continued improvements in the Company's operations and infrastructure are expected to result in volume growth and higher margins over time.

Considering the Company's solid overall business environment, along with momentum in its underlying business performance, CSX expects that its financial performance in 2007 will be consistent with its long-term financial targets, which include compounded annual growth rates ("CAGR") as shown below:

| Long-term Financial Targets | 2006-2010 CAGR |
|---|---|
| • Revenue Growth | 4% - 6% |
| • Surface Transportation Operating Income Growth | 10% - 12% |
| • Earnings Per Share Growth | 12% - 14% |
| • Free Cash Flow Growth | 10% - 12% |

To reinforce its long-term vision, the Company's capital budget is expected to be $1.4 billion in 2007. Approximately 76% is being allocated to maintaining existing rail infrastructure and expanding capacity in key corridors. The remaining 24% is being invested in locomotives and freight cars, along with certain technology improvements. The Company anticipates using cash from operations to fund these projects. Additionally, CSX anticipates free cash flow of approximately $500 million in 2007. See page 23 for how free cash flow is calculated.



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents



In January 2007, the Surface Transportation Board ("STB") announced its new policy on railroad fuel surcharges that will govern shipments regulated by the STB, commonly referred to as tariff movements. The STB determined that in the future, fuel surcharges should be based on movement-specific factors, such as distance and/or weight, rather than as a percentage of revenue. Most of CSXT's shipments are not regulated by the STB ruling; however the Company is analyzing the application of a movement-specific fuel surcharge to both its regulated and non-regulated shipments. At this time, CSX does not believe this will result in a significant change to future revenue, but is still evaluating the overall impact.

On February 14, 2007, CSX announced a $2.0 billion share repurchase program and an increased quarterly dividend on the Company's common stock of 20% to $0.12 per share. The Company intends to complete the repurchase program by the end of 2008. This new authority also terminated the unused portion under the previously announced $500 million program.

### Free Cash Flow

Free cash flow is considered a non-GAAP financial measure under SEC Regulation G, *Disclosure of Non-GAAP Measures.* Management believes, however, that free cash flow is important in evaluating the Company's financial performance and measures an ability to generate cash without incurring additional external financing. Free cash flow should be considered in addition to, rather than a substitute for, cash provided by operating activities.

Free cash flow is calculated by generally taking cash from operations and subtracting property additions, dividends paid and certain other investing activities. These other investing activities include proceeds from sale of businesses, insurance proceeds and other items. Also, added to free cash flow is CSX's 42% economic interest in Conrail's free cash flow which is not consolidated in CSX amounts. Other deposits, which are included in cash provided by operating activities, are not included in the Company's free cash flow because these deposits represent assets that are set aside for certain future debt payments.

The following table reconciles cash provided by operating activities (GAAP measure) to free cash flow (non-GAAP measure).

| | Fiscal Years | | |
|---|---|---|---|
| *(Dollars in Millions)* | **2006** | 2005 | *Change* |
| Net cash provided by operating activities | **$ 2,058** | $ 1,110 | *$ 948* |
| Property additions *(a)* | **(1,639)** | (1,136) | *(503)* |
| Other investing activities | **151** | 69 | *82* |
| Proceeds from sale *(b)* | **—** | 998 | *(998)* |
| Dividends | **(145)** | (93) | *(52)* |
| Other deposits | **(68)** | (21) | *(47)* |
| Conrail free cash flow | **4** | 103 | *(99)* |
| Free Cash Flow | **$ 361** | $ 1,030 | *$ (669)* |

*(a) Property additions have increased since prior year due to capital expansion projects and the replacement of property damaged by Hurricane Katrina.*

*(b) Proceeds from sale in 2005 are for the International Terminals' disposition.*



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents

**CSX CORPORATION**
**PART II**

**Forward-Looking Statements**

Certain statements in this report and in other materials filed with the Securities and Exchange Commission ("SEC"), as well as information included in oral statements or other written statements made by the Company, are forward-looking statements within the meaning of the Securities Act of 1933 and the Securities Exchange Act of 1934. These forward-looking statements include, among others, statements regarding:

- Expectations as to results of operations and operational improvements;
- Expectations as to the effect of claims, lawsuits, environmental costs, commitments, contingent liabilities, labor negotiations or agreements on the Company's financial condition;
- Management's plans, goals, strategies and objectives for future operations and other similar expressions concerning matters that are not historical facts, and management's expectations as to future performance and operations and the time by which objectives will be achieved; and
- Future economic, industry or market conditions or performance.

Forward-looking statements are typically identified by words or phrases such as "believe," "expect," "anticipate," "project," and similar expressions. The Company cautions against placing undue reliance on forward-looking statements, which reflect its good faith beliefs with respect to future events and are based on information currently available to it as of the date the forward-looking statement is made. Forward-looking statements should not be read as a guarantee of future performance or results, and will not necessarily be accurate indications of the times that, or by which, such performance or results will be achieved.

Forward-looking statements are subject to a number of risks and uncertainties and actual performance or results could differ materially from those anticipated by these forward-looking statements. The Company undertakes no obligation to update or revise any forward-looking statement. If the Company does update any forward-looking statement, no inference should be drawn that the Company will make additional updates with respect to that statement or any other forward-looking statements. The following important factors, in addition to those discussed elsewhere, may cause actual results to differ materially from those contemplated by these forward-looking statements:

- Legislative, regulatory or legal developments involving transportation, including rail or intermodal transportation, the environment, hazardous materials or taxation, including the outcome of tax claims and litigation, the potential enactment of initiatives to re-regulate the rail industry and the ultimate outcome of shipper and rate claims subject to adjudication;
- The Company's success in implementing its operational objectives and improving Surface Transportation operating efficiency;
- Natural events such as severe weather conditions, including floods, fire, hurricanes and earthquakes, a pandemic affecting the health of the Company's employees, its shippers or the consumers of goods such as may result from avian flu, or other unforeseen disruptions of the Company's operations, systems, property or equipment;
- Labor costs and labor difficulties, including stoppages affecting either the Company's operations or the customers' ability to deliver goods to the Company for shipment;
- The outcome of litigation and claims, including those related to environmental contamination, personal injuries and occupational illnesses;



 Powered by Morningstar® Document Research℠

Table of Contents



- The inherent risks associated with safety and security, including the availability and cost of insurance, the availability and vulnerability of information technology, adverse economic or operational effects from actual or threatened war or terrorist activities and any governmental response;
- Changes in operating conditions and costs or commodity concentrations;
- Material changes in domestic or international economic or business conditions, including those affecting the transportation industry such as access to capital markets, ability to revise debt arrangements as contemplated, customer demand, customer acceptance of price increases, effects of adverse economic conditions affecting shippers, and adverse economic conditions in the industries and geographic areas that consume and produce freight;
- Changes in fuel prices, surcharges for fuel and the availability of fuel; and
- Competition from other modes of freight transportation, such as trucking and competition and consolidation within the transportation industry generally.

Other important assumptions and factors that could cause actual results to differ materially from those in the forward-looking statements are specified elsewhere in this report and in CSX's other SEC reports, accessible on the SEC's website at www.sec.gov and the Company's website at www.csx.com.

## Financial Results of Operations

***2006 vs. 2005 Consolidated Results of Operations***

*Both fiscal years 2006 and 2005 consisted of 52 weeks ending on December 29, 2006 and December 30, 2005, respectively.*

| | CONSOLIDATED | | | |
|---|---|---|---|---|
| *(Dollars in Millions)* | **2006** | 2005 | $ Change | % Change |
| Operating Revenue | **$ 9,566** | $ 8,618 | *$ 948* | *11%* |
| Operating Expense | **7,428** | 7,068 | *360* | *5* |
| **Operating Income** | **2,138** | 1,550 | *588* | *38* |
| Other Income | **95** | 101 | *(6)* | *(6)* |
| Debt Repurchase | **—** | (192) | *192* | *(100)* |
| Interest Expense | **(392)** | (423) | *31* | *(7)* |
| Income Tax Expense | **(531)** | (316) | *(215)* | *68* |
| Discontinued Operations - Net of Tax | **—** | 425 | *(425)* | *(100)* |
| **Net Earnings** | **$ 1,310** | $ 1,145 | *$ 165* | *14%* |

*Prior periods have been reclassified to conform to the current presentation.*

*Operating Revenue*

Operating Revenue increased $948 million in 2006 to $9.6 billion, compared to $8.6 billion for the prior year. The primary components of the revenue gain were continued yield management and the Company's fuel surcharge program, which drove revenue per unit across all major markets.



 Powered by Morningstar® Document Research℠

Table of Contents



*Operating Income*

Operating Income increased $588 million to $2.1 billion in 2006, which was driven by increased operating revenues. These revenue gains and gains on insurance proceeds from Hurricane Katrina were partially offset by increases in fuel expense caused by higher fuel prices and lower hedge benefits.

*Other Income*

Other Income decreased $6 million to $95 million in 2006. This change was driven primarily by lower real estate sales, which was partially offset by a non-cash gain on additional Conrail property value received in connection with the 2004 Conrail spin-off transaction.

*Interest Expense*

Interest Expense decreased $31 million to $392 million in 2006 compared to the prior year. There was lower interest expense from lower average debt balances for 2006 (due to a $1.0 billion debt repurchase in mid-2005). However, this savings was partially offset by higher variable interest rates.

*Income Tax Expense*

Income Tax Expense increased $215 million to $531 million in 2006 as a result of higher earnings. This increase was partially offset by the net impact of favorable resolutions of certain tax matters in 2006 that were higher than benefits last year.

*Net Earnings*

Net Earnings for 2006 increased $165 million to $1.3 billion, with Earnings Per Share up $.30 to $2.82 per diluted share for the prior year. This increase was primarily due to the following factors:

- Driven by Surface Transportation results, Earnings from Continuing Operations were up $590 million, or $1.23 per diluted share;

- Offsetting this increase was Income from Discontinued Operations, net of tax, of $425 million, or $.93 per diluted share, as a result of the sale of CSX's International Terminals business in 2005.



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents

**CSX CORPORATION**
**PART II**

***2005 vs. 2004 Consolidated Results of Operations***

*CSX follows a 52/53 week fiscal reporting calendar.*
*Fiscal year 2005 consisted of 52 weeks ending on December 30, 2005.*
*Fiscal year 2004 consisted of 53 weeks ending on December 31, 2004.*

| *(Dollars in Millions)* | CONSOLIDATED 52 Weeks 2005 | 53 Weeks 2004 | *$ Change* | *% Change* |
|---|---|---|---|---|
| Operating Revenue | $ 8,618 | $ 8,040 | *$ 578* | *7%* |
| Operating Expense | 7,068 | 7,040 | *28* | *—* |
| **Operating Income** | 1,550 | 1,000 | *550* | *55* |
| Other Income | 101 | 72 | *29* | *40* |
| Debt Repurchase | (192) | — | *(192)* | *NM* |
| Interest Expense | (423) | (435) | *12* | *(3)* |
| Income Tax Expense | (316) | (219) | *(97)* | *44* |
| Discontinued Operations–Net of Tax | 425 | (79) | *504* | *(638)* |
| **Net Earnings** | $ 1,145 | $ 339 | *$ 806* | *238%* |

*Prior periods have been reclassified to conform to the current presentation.*
*NM—not meaningful*

*Operating Revenue*

Operating Revenue increased $578 million in 2005 to $8.6 billion, compared to $8.0 billion for the prior year as continued yield management efforts coupled with the Company's fuel surcharge program drove revenue per unit improvements across all major markets.

*Operating Income*

Operating Income increased $550 million to $1.6 billion in 2005, as a result of increased operating revenue. Operating expenses remained relatively flat compared to the prior year.

*Other Income*

Despite the absence of the $16 million net non-cash gain (after tax) related to the Conrail spin-off transaction, Other Income increased $29 million to $101 million in 2005, primarily as a result of gains from real estate sales.

*Interest Expense*

Interest Expense decreased $12 million to $423 million in 2005 compared to the prior year. In June 2005, CSX repurchased $1.0 billion of its publicly-traded notes. As a result of the debt repurchase, interest expense was reduced. The savings (from June through December) were mostly offset by rising variable interest rates.

*Income Tax Expense*

Income Tax Expense increased $97 million to $316 million in 2005, as a result of higher Earnings from Continuing Operations. Additionally, the effective income tax rate decreased from 34% in 2004 to 30% in 2005 primarily due to legislative changes in Ohio that will gradually eliminate the Ohio corporate franchise tax.



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents



*Net Earnings*

Net Earnings for 2005 increased $806 million to $1.1 billion, with Earnings Per Share also up significantly by $1.76 per diluted share to $2.52 per diluted share compared to prior year. The increase was primarily due to the following factors:

- Driven by Surface Transportation results, Earnings from Continuing Operations were up $302 million, or $0.65 per diluted share;

- Also, Income from Discontinued Operations, net of tax, was up $504 million, or $1.11 per diluted share compared to the prior year. In 2005, CSX recognized $428 million after tax as a result of the sale of its International Terminals business. Discontinued Operations for 2004 was a net loss of $79 million, which included International Terminals' net earnings as well as additional income tax expense of $97 million related to undistributed foreign earnings.



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents

**CSX CORPORATION**
**PART II**

***2006 vs. 2005 Surface Transportation Results of Operations***

*Both fiscal years 2006 and 2005 consisted of 52 weeks ending on December 29, 2006 and December 30, 2005, respectively.*

**SURFACE TRANSPORTATION DETAIL** *(Unaudited)*
*(Dollars in Millions)*
*Fiscal Year*

| | Rail | | Intermodal | | Surface Transportation | | *Increase/ (Decrease)* |
|---|---|---|---|---|---|---|---|
| | **2006** | 2005 | **2006** | 2005 | **2006** | 2005 | |
| **Revenue** | **$ 8,154** | $ 7,256 | **$1,412** | $ 1,362 | **$9,566** | $ 8,618 | *$948* |
| **Operating Expense:** | | | | | | | |
| Labor and Fringe | **2,840** | 2,777 | **82** | 79 | **2,922** | 2,856 | *66* |
| Materials, Supplies and Other | **1,697** | 1,584 | **192** | 200 | **1,889** | 1,784 | *105* |
| Depreciation | **818** | 779 | **38** | 39 | **856** | 818 | *38* |
| Fuel | **1,112** | 783 | **—** | — | **1,112** | 783 | *329* |
| Equipment and Other Rents | **382** | 400 | **130** | 133 | **512** | 533 | *(21)* |
| Inland Transportation | **(462)** | (433) | **704** | 663 | **242** | 230 | *12* |
| Conrail Rents, Fees and Services | **75** | 65 | **—** | — | **75** | 65 | *10* |
| Gain on Insurance Recoveries | **(166)** | — | **(2)** | — | **(168)** | — | *(168)* |
| **Total Expense** | **6,296** | 5,955 | **1,144** | 1,114 | **7,440** | 7,069 | *371* |
| **Operating Income** | **$ 1,858** | $ 1,301 | **$ 268** | $ 248 | **$2,126** | $ 1,549 | *$577* |
| **Operating Ratio** | **77.2%** | 82.1% | **81.0%** | 81.8% | **77.8%** | 82.0% | |
| **Total Assets** | **$24,077** | $23,182 | **$ 276** | $ 305 | | | |

**SURFACE TRANSPORTATION VOLUME AND REVENUE**
*Volume (Thousands); Revenue (Dollars in Millions); Revenue Per Unit (Dollars)*
*Fiscal Year*

| | Volume | | | Revenue | | | Revenue Per Unit | | |
|---|---|---|---|---|---|---|---|---|---|
| | **2006** | 2005 | *% Change* | **2006** | 2005 | *% Change* | **2006** | 2005 | *% Change* |
| Chemicals | **528** | 533 | *(1)%* | **$ 1,210** | $ 1,089 | *11%* | **$ 2,292** | $ 2,043 | *12%* |
| Emerging Markets | **524** | 505 | *4* | **580** | 513 | *13* | **1,107** | 1,016 | *9* |
| Forest Products | **404** | 439 | *(8)* | **773** | 717 | *8* | **1,913** | 1,633 | *17* |
| Agricultural Products | **397** | 357 | *11* | **681** | 550 | *24* | **1,715** | 1,541 | *11* |
| Metals | **364** | 361 | *1* | **673** | 570 | *18* | **1,849** | 1,579 | *17* |
| Phosphates and Fertilizers | **362** | 444 | *(18)* | **354** | 351 | *1* | **978** | 791 | *24* |
| Food and Consumer | **245** | 249 | *(2)* | **477** | 438 | *9* | **1,947** | 1,759 | *11* |
| **Total Merchandise** | **2,824** | 2,888 | *(2)* | **4,748** | 4,228 | *12* | **1,681** | 1,464 | *15* |
| Coal | **1,798** | 1,726 | *4* | **2,259** | 1,992 | *13* | **1,256** | 1,154 | *9* |
| Coke and Iron Ore | **94** | 83 | *13* | **119** | 88 | *35* | **1,266** | 1,060 | *19* |
| **Total Coal** | **1,892** | 1,809 | *5* | **2,378** | 2,080 | *14* | **1,257** | 1,150 | *9* |
| **Automotive** | **463** | 488 | *(5)* | **847** | 844 | *—* | **1,829** | 1,730 | *6* |
| **Other** | **—** | — | *—* | **181** | 104 | *74* | **—** | — | *—* |
| **Total Rail** | **5,179** | 5,185 | *—* | **8,154** | 7,256 | *12* | **1,574** | 1,399 | *13* |
| International | **1,281** | 1,274 | *1* | **580** | 545 | *6* | **453** | 428 | *6* |
| Domestic | **898** | 891 | *1* | **786** | 766 | *3* | **875** | 860 | *2* |
| Other | **—** | — | *—* | **46** | 51 | *(10)* | **—** | — | *—* |
| **Total Intermodal** | **2,179** | 2,165 | *1* | **1,412** | 1,362 | *4* | **648** | 629 | *3* |
| **Total Surface Transportation** | **7,358** | 7,350 | *—%* | **$ 9,566** | $ 8,618 | *11%* | **$ 1,300** | $ 1,173 | *11%* |

*For both tables, prior periods have been reclassified to conform to the current presentation.*



 Powered by Morningstar® Document Research℠

Table of Contents



***2006 vs. 2005 Rail Results of Operations***

Rail Operating Revenue

CSXT categorizes rail revenue in three main lines of business: merchandise, coal, and automotive. Revenue for CSXT increased $898 million, or 12%, to $8.2 billion in 2006 from a year ago. Continued yield management and fuel surcharge were the primary drivers of revenue per unit gains.

*Merchandise*

Chemicals – Revenue and revenue per unit improved by capitalizing on a continued strong pricing environment. Overall volume was down slightly because high raw material costs continued to negatively affect the U.S. chemical industry's competitiveness and in turn, CSX volumes.

Emerging Markets – Growth was driven by increased shipments of municipal waste, military, and aggregate products (which include rocks and sand). Revenue per unit also improved due to strong pricing actions.

Forest Products – Shipment of building products and printing paper slowed due to the decline in residential housing starts and electronic media conversion. However, revenue and revenue per unit improved due to a favorable pricing environment.

Agriculture Products – Strong domestic demand in feed grain, soybean, ethanol, and export shipments supported volume and revenue per unit. In addition, strong export demand for grain and increased shipments of beans helped volume growth.

Metals – Revenue and revenue per unit increased due to continued pricing gains and fuel surcharge coverage. Volume increased slightly driven by strong steel demand in the energy and non-residential construction end-markets. These gains were partially offset by lower demand for steel in the automotive sector.

Phosphates and Fertilizers – Volume declined from lower export shipments due to increased international phosphate production which caused several domestic phosphate plants to close. Favorable mix coupled with price increases resulted in significantly improved revenue per unit.

Food and Consumer – Volume growth in alcoholic beverages, canned goods, and rice and beans was offset by softness in building products, perishables, and the appliance markets. Strong pricing actions, and a focus on longer, more profitable shipments increased revenue and revenue per unit.

*Coal*

Revenue and volume improvements were due to increased shipments of utility and export coal. Utility companies built up their inventories which was a major contributor to CSX's volume growth. Revenue per unit increased due to the continued favorable pricing environment and increased fuel surcharge coverage.

*Automotive*

Volume declined due to a reduction in North American light vehicle production. Consistent with the overall automotive market, CSX's volumes continued to shift from the Big 3 to foreign brands produced domestically. Revenue per unit was favorable due to prices increases and fuel surcharge.



 Powered by Morningstar® Document Research℠

Table of Contents



Rail Operating Expense

Total rail operating expenses for 2006 increased $341 million, or 6%, to $6.3 billion compared to the prior year. The description of what is included in each category as well as significant year over year changes are described below.

Labor and Fringe expenses include employee compensation and benefit programs. These expenses are primarily affected by inflation, headcount, wage rates, incentives earned, healthcare plan costs and inflation, and pension and other post-retirement plan expenses. These expenses increased $63 million, primarily due to wage and benefit inflation and increased staffing in rail operations.

Materials, Supplies and Other expenses consist primarily of materials and contracted services to maintain infrastructure and equipment and for terminal services at intermodal and automotive facilities. This category also includes costs related to personal injury claims, environmental remediation, derailments, utilities, non-locomotive fuel, property and sales taxes and professional services. These costs increased by $113 million in 2006 primarily due to materials inflation, along with prior year casualty favorable adjustments and supplier reimbursements that were not repeated. These costs were partially offset by productivity gains from improved operations, such as efficient use of locomotives.

Depreciation expense primarily relates to capital costs for locomotives, railcars, and track structure, which includes rail, ties, and other track material. This expense is impacted primarily by the capital expenditures made each year. This expense increased $39 million due to a larger asset base related to higher capital spending.

Fuel expense includes locomotive diesel fuel. This expense is driven by the market price and locomotive consumption of diesel fuel offset by the effects of any hedging activities. This expense increased $329 million primarily due to reduced hedge benefit from the expiration of the fuel hedge program as well as higher fuel prices.

Equipment and Other Rents primarily includes rent paid for freight cars owned by other railroads or private companies, net of rents received by CSXT for use of CSXT equipment. This category of expenses also includes lease expenses primarily for locomotives, railcars, containers and trailers, office and other rentals. These expenses decreased $18 million due mainly to improvement in operational fluidity, which drove improvements in asset utilization.

Inland Transportation expense included in the rail segment amounts paid to CSXT from Intermodal for shipments on CSXT's network. These intercompany charges are eliminated in consolidated results.

Conrail Rents, Fees and Services include transportation, switching and terminal service charges paid to Conrail for the shared area, purchase price amortization relating to the Conrail purchase, and CSX's 42% share of Conrail's income. The $10 million increase in expense was primarily due to prior year federal income tax benefits that were recognized by Conrail but not repeated in 2006.

Gain on Insurance Recoveries includes gains on insurance recoveries related to Hurricane Katrina. The $166 million for 2006 represented cash received for lost profits and higher replacement value of property compared to the value of the property that was damaged, after consideration of the Company's insurance deductible.



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents



***2006 vs. 2005 Intermodal Results of Operations***

Intermodal operating income increased 8% or $20 million versus last year driven by revenue gains of $50 million along with expense containment. The increase in revenue and revenue per unit was driven by the continued yield management emphasis which was partially offset by mix of traffic. Volume increased slightly due to continued growth of imported consumer goods from Asia as well as the strength in the truckload market offset by weaker demand in services sold to transportation brokers (known as wholesale markets).

Intermodal operating expense increased $30 million primarily driven by an increase in fuel costs that are reflected in inland transportation expense. Fuel costs were higher due to rising market prices. Partially offsetting the increase in fuel were efficiency gains related to equipment utilization.



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents

**CSX CORPORATION**
**PART II**

***2005 vs. 2004 Surface Transportation Results of Operations***

*CSX follows a 52/53 week fiscal reporting calendar.*
*Fiscal year 2005 consisted of 52 weeks ending on December 30, 2005.*
*Fiscal year 2004 consisted of 53 weeks ending on December 31, 2004.*

**SURFACE TRANSPORTATION DETAIL** *(Unaudited)*
*(Dollars in Millions)*
*Fiscal Year*

| | Rail | | Intermodal | | Surface Transportation | | *Increase/ (Decrease)* |
|---|---|---|---|---|---|---|---|
| | 2005 | 2004 | 2005 | 2004 | 2005 | 2004 | |
| **Revenue** | $ 7,256 | $ 6,694 | $ 1,362 | $ 1,346 | $ 8,618 | $ 8,040 | *$ 578* |
| **Operating Expense:** | | | | | | | |
| Labor and Fringe | 2,777 | 2,663 | 79 | 78 | 2,856 | 2,741 | *115* |
| Materials, Supplies and Other | 1,584 | 1,540 | 200 | 219 | 1,784 | 1,759 | *25* |
| Depreciation | 779 | 664 | 39 | 38 | 818 | 702 | *116* |
| Fuel | 783 | 656 | — | — | 783 | 656 | *127* |
| Equipment and Other Rents | 400 | 428 | 133 | 154 | 533 | 582 | *(49)* |
| Inland Transportation | (433) | (421) | 663 | 701 | 230 | 280 | *(50)* |
| Conrail Rents, Fees and Services | 65 | 256 | — | — | 65 | 256 | *(191)* |
| Restructuring Charge - net | — | 67 | — | 4 | — | 71 | *(71)* |
| **Total Expense** | 5,955 | 5,853 | 1,114 | 1,194 | 7,069 | 7,047 | *22* |
| **Operating Income** | $ 1,301 | $ 841 | $ 248 | $ 152 | $ 1,549 | $ 993 | *$ 556* |
| **Operating Ratio** | 82.1% | 87.4% | 81.8% | 88.7% | 82.0% | 87.6% | |
| **Total Assets** | $ 23,182 | $ 22,932 | $ 305 | $ 313 | | | |

**SURFACE TRANSPORTATION VOLUME AND REVENUE**
*Volume (Thousands); Revenue (Dollars in Millions); Revenue Per Unit (Dollars)*
*Fiscal Year*

| | Volume | | | Revenue | | | Revenue Per Unit | | |
|---|---|---|---|---|---|---|---|---|---|
| | **2005** | **2004** | *% Change* | **2005** | **2004** | *% Change* | **2005** | **2004** | *% Change* |
| Chemicals | **533** | 564 | *(5)%* | **$ 1,089** | $ 1,069 | *2%* | **$ 2,043** | $ 1,895 | *8%* |
| Emerging Markets | **505** | 506 | *—* | **513** | 504 | *2* | **1,016** | 996 | *2* |
| Forest Products | **439** | 465 | *(6)* | **717** | 681 | *5* | **1,633** | 1,465 | *12* |
| Agricultural Products | **357** | 356 | *—* | **550** | 512 | *7* | **1,541** | 1,438 | *7* |
| Metals | **361** | 380 | *(5)* | **570** | 511 | *12* | **1,579** | 1,345 | *17* |
| Phosphates and Fertilizers | **444** | 471 | *(6)* | **351** | 341 | *3* | **791** | 724 | *9* |
| Food and Consumer | **249** | 245 | *2* | **438** | 377 | *16* | **1,759** | 1,539 | *14* |
| **Total Merchandise** | **2,888** | 2,987 | *(3)* | **4,228** | 3,995 | *6* | **1,464** | 1,337 | *9* |
| Coal | **1,726** | 1,659 | *4* | **1,992** | 1,714 | *16* | **1,154** | 1,033 | *12* |
| Coke and Iron Ore | **83** | 71 | *17* | **88** | 66 | *33* | **1,060** | 930 | *14* |
| **Total Coal** | **1,809** | 1,730 | *5* | **2,080** | 1,780 | *17* | **1,150** | 1,029 | *12* |
| **Automotive** | **488** | 507 | *(4)* | **844** | 835 | *1* | **1,730** | 1,647 | *5* |
| **Other** | **—** | — | *—* | **104** | 84 | *24* | **—** | — | *—* |
| **Total Rail** | **5,185** | 5,224 | *(1)* | **7,256** | 6,694 | *8* | **1,399** | 1,281 | *9* |
| International | **1,274** | 1,278 | *—* | **499** | 501 | *—* | **392** | 392 | *—* |
| Domestic | **891** | 1,028 | *(13)* | **738** | 795 | *(7)* | **828** | 773 | *7* |
| Other | **—** | — | *—* | **125** | 50 | *150* | **—** | — | *—* |
| **Total Intermodal** | **2,165** | 2,306 | *(6)* | **1,362** | 1,346 | *1* | **629** | 584 | *8* |
| **Total Surface Transportation** | **7,350** | 7,530 | *(2)%* | **$ 8,618** | $ 8,040 | *7%* | **$ 1,173** | $ 1,068 | *10%* |

*For both tables, prior periods have been reclassified to conform to the current presentation.*



 Powered by Morningstar® Document Research℠

Table of Contents



***2005 vs. 2004 Rail Results of Operations***

Rail Operating Revenue

CSXT categorizes rail revenue in three main lines of business: merchandise, coal, coke and iron ore, and automotive. Overall revenue increased $562 million, or 8%, to $7.3 billion in 2005 from $6.7 billion in 2004.

*Merchandise*

All merchandise markets experienced revenue growth primarily driven by yield improvement efforts and the Company's fuel surcharge program. Overall merchandise revenue grew 6% to a record $4.2 billion while revenue per unit also achieved record levels increasing 9%. Volume declined 3% due to several factors including an additional week in 2004, impacts of Hurricane Katrina and shedding of low-margin traffic. Individual market results are as follows:

Chemicals – In addition to production disruption from Hurricanes Katrina and Rita, chemicals volumes were negatively impacted by high natural gas prices and generally high raw materials inventories.

Emerging Markets – Emerging markets volumes and revenue were negatively impacted by a significant reduction in shipments of high revenue per unit military traffic.

Forest Products – Forest products also experienced high revenue per unit increases because of both a favorable pricing environment and a favorable mix shift from short haul, low-margin traffic towards longer haul, more profitable traffic.

Agricultural Products – Despite strong soybean and corn harvests and increased export demand for grain, volume in agricultural products was flat due to declines in processed products such as flour, sweeteners, and vegetable oils.

Metals – Metals volumes decreased by 5%; however, the pricing environment remained very favorable and resulted in the highest revenue per unit growth within merchandise at 17%.

Phosphate and Fertilizers – Phosphate and fertilizer volumes were down due to high international inventories of phosphates during the first half of the year and several CSXT-served plant curtailments or closures during 2005. Both the chemicals and phosphate and fertilizer groups experienced high revenue per unit increases of 8% and 9%, respectively.

Food and Consumer – Food and consumer experienced volume growth due to a continued shift of traffic previously handled by trucks to rail and the acquisition of newly finished railcars to other shippers.

*Coal*

Revenues increased by 17% to a record $2.1 billion due to both strong volume growth of 5% and revenue per unit improvements of 12%, driven by a favorable pricing environment and CSXT's fuel surcharge program. Most markets experienced strong demand as utility inventory levels remained below target levels. CSXT also reached a settlement agreement in a rate case that resulted in an additional $17 million of revenue in 2005.



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents



*Automotive*

Overall volume was down 4% as North American light vehicle production was flat compared to the prior year. However, vehicle production for the Big 3 was unfavorable 6%, including permanent closures of three General Motors plants served by CSXT. Growth in new shipments from the newly-opened Hyundai plant in Montgomery, AL continued to partially offset these declines. Revenue per unit grew 5% on strong yield management and increases in fuel surcharge rates and coverage resulting in record revenue per unit levels. Revenue per unit gains more than offset volume weakness and drove overall revenue growth of 1% compared to the prior year.

Rail Operating Expense

Total rail operating expenses increased $102 million, or 2% in 2005, compared to the prior year. A brief description of what is included in each category is described in the 2006 vs. 2005 results.

Labor and Fringe expense increased $114 million compared to the prior year primarily due to increases in incentive compensation and the effects of inflation.

Materials, Supplies and Other expenses increased $44 million primarily due to the effects of inflation, higher reserve requirements for uncollectible accounts, and increased legal fees resulting from the litigation and resolution of certain matters.

Depreciation expense increased $115 million primarily due to additional assets received as a result of the Conrail spin-off transaction. The rail segment had property additions of approximately $1.1 billion.

Fuel expense increased $127 million in 2005, net of $249 million of fuel hedging benefits, compared to the prior year primarily due to fuel price increases. Fuel hedging activity had a $63 million favorable impact on fuel expense for the fiscal year ended December 31, 2004. The average price per gallon of diesel fuel, including benefits from CSX's fuel hedging program, was $1.31 in 2005 versus $1.10 in 2004. In addition, the fuel surcharge programs and contractual cost escalation clauses used in most multi-year customer contracts partially offset fuel cost increases.

Equipment and Other Rents decreased $28 million in 2005 as a result of decreased overall volume and lower locomotive lease expense.

Inland Transportation decreased $12 million compared to the prior year. The offsetting expense associated with this amount is reflected in Intermodal's operating expense, and is thus eliminated at the consolidated level.

Conrail Rents, Fees and Services expense decreased $191 million in 2005 as a result of the Conrail spin-off transaction, which decreased rents paid to Conrail as assets previously leased from Conrail are now owned directly by CSXT. Additionally, Conrail received a tax benefit from the resolution of various federal income tax audit adjustments during 2005, which increases CSX's equity earnings and offsets Conrail Rents, Fees & Services.

***2005 vs. 2004 Intermodal Results of Operations***

Operating income increased 63% or $96 million in 2006. Continued focus on longer hauls in higher density lanes coupled with sustained strength in pricing increased revenue per unit. Volume was down primarily due to ongoing yield management efforts and a continued focus on network operations designed to increase efficiencies and reduce indirect routing.



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents



Expenses decreased 7% compared to the prior year due to continued service improvements, an emphasis on equipment utilization, and a decrease in volume as discussed above. A decline in trucking expenses associated with line-haul moves led to a significant decrease in operating costs associated with a reduction in services. Several productivity initiatives within terminal operations generated efficiencies driving per-unit cost reductions compared to the prior year.

## Liquidity and Capital Resources

Liquidity is a company's ability to generate adequate amounts of cash to meet both current and future needs for obligations as they mature and to provide for planned operational growth. In order to have a complete picture of a company's liquidity, its balance sheet, sources and uses of cash flow and external factors should be reviewed.

### *Material Changes in the Consolidated Balance Sheets*

CSX's balance sheet continues to reflect a strong liquidity position and capital base. In 2006, cash (which includes cash and cash equivalents) and short-term investments increased $298 million to $900 million. This increase was primarily due to higher cash from operations, offset by higher capital spending.

Current maturities of long-term debt decreased by $344 million versus last year principally related to the reclassification of the Company's convertible debt. In October 2006, debt holders had the option to require CSX to purchase their debentures; however, no significant balances were presented for payment. Because the next option date is in 2008, the debentures are reflected as long-term debt in the consolidated balance sheets. This reclassification increased the Company's working capital as discussed below. See Note 9, Debt and Credit Agreements, for additional details.

Working capital can be considered a measure of a company's ability to meet its short-term needs. CSX's working capital at December 2006 was $150 million compared to a deficit of $607 million last year. This increase of $757 million year over year was driven by better earnings that produced higher cash and short-term investments at year end. Also, current liabilities were lower by $457 million primarily due to the convertible debentures being reclassified into long-term debt as described above. The Company believes that in future periods working capital may return to a deficit. A working capital deficit is not unusual for CSX or other companies in the industry and does not indicate a lack of liquidity. The Company continues to maintain adequate current assets to satisfy current liabilities and maturing obligations when they come due. CSX has sufficient financial capacity, including the revolving line of credit and shelf registration, to manage its day-to-day cash requirements and any anticipated obligations.

### *Sources and Uses of Cash*

CSX has multiple sources of and required uses of its cash. CSX generates substantial cash balances from its operations. Its financing sources of cash include strong access to the capital markets as well as a significant long-term credit facility. Uses of cash include significant, annual reinvestment in infrastructure and equipment, as well as scheduled payments of debt, and leases with manageable near-term maturities. The company's cash requirements also include any declared dividends to shareholders.

Cash provided by operations in 2006 was $2.1 billion, which was $1.0 billion higher than a year ago. This change was driven mostly by higher earnings from operations. Additionally, the Company made lower cash income tax payments in 2006 primarily due to large cash income tax payments made in 2005 related to the sale of the International Terminals business.



 Powered by Morningstar® Document Research℠

Table of Contents



Credit facilities are an untapped source of funding available to CSX. CSX has a $1.25 billion five-year unsecured revolving credit facility that expires in May, 2011. See Note 9 Debt and Credit Agreements for more information.

CSX also has a $900 million shelf registration. It may be used, subject to market conditions and CSX board authorization, to issue debt or equity securities at CSX's discretion. CSX presently intends to use the proceeds to finance cash requirements, including refinancing existing debt as it matures. While CSX seeks to give itself flexibility with respect to meeting such needs, there can be no assurance that market conditions would permit CSX to sell such securities on acceptable terms at any given time, or at all.

During 2006, the primary use of cash was to fund property additions and capital expansion projects. Net cash used by investing activities was $1.6 billion in 2006 compared to $36 million last year. This change was attributable primarily to the utilization of $1.0 billion of cash proceeds received from the disposition of CSX's International Terminals business in 2005. Additionally, the Company spent approximately $500 million more for capital additions in 2006. This included additions for property damaged by Hurricane Katrina.

The Company completed a debt repurchase of $1.0 billion last year which drove the change in financing activities between 2006 and 2005. Financing activities used cash of $296 million during 2006 compared to cash used of $1.3 billion during 2005. Additionally, in 2006, there was cash used for the share repurchase program partially offset by an increase in cash from proceeds of stock option exercises. The Company anticipates moderately increased use of debt in funding its future cash requirements.

Dividend payments are another use of cash. The Company paid dividends of $145 million in 2006, $52 million more than last year. The increase in 2006 was primarily due to the Company increasing post-stock-split dividends by 54% on a per share basis to $0.10 per share.

On February 14, 2007, CSX announced a $2.0 billion share repurchase program and an increased quarterly dividend on the Company's common stock of 20% to $0.12 per share. The Company intends to complete the repurchase program by the end of 2008. The timing and amount of repurchase transactions will be determined by the Company's management based on their evaluation of market conditions, share price and other factors. The program may be suspended or discontinued at any time. CSX will use cash on hand and cash from operations to fund the share repurchase and the dividend increase.

***External Factors***

Credit ratings can also be considered an indicator of a company's liquidity and access to capital. The ratings ranked on a spectrum ranging between highest credit quality on one end and "junk" on the other. Long-term credit ratings are denoted with a letter: AAA is the highest credit quality, and C or D (depending on the rating agency) is the lowest or junk quality. Any rating of BBB or higher is considered to be investment grade. CSX's ratings, along with other large U.S. Class I freight railroads fall within the investment grade category.

CSX's long-term unsecured debt obligations were rated BBB and Baa2 by Standard & Poor's and Moody's Investors Services, respectively, both with a "Stable" outlook as of December 29, 2006. CSX's short-term commercial paper program was rated A-2 and P-2 by these agencies, respectively.

If CSX's long-term unsecured bond ratings were reduced to BBB- and Baa3, its undrawn borrowing costs under the $1.25 billion revolving credit facility would not materially increase. If CSX's



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

short-term commercial paper ratings were reduced to A-3 and P-3, it would increase borrowing costs in the commercial paper market and reduce access to this source of funds because of the more limited demand for lower rated commercial paper. CSX had no commercial paper outstanding at December 29, 2006 or December 30, 2005.

## Schedule of Contractual Obligations and Commercial Commitments

The following tables sets forth maturities of the Company's contractual obligations and other commitments:

| Type of Obligation | 2007 | 2008 | 2009 | 2010 | 2011 | Thereafter | Total |
|---|---|---|---|---|---|---|---|
| *(Dollars in Millions) (Unaudited)* | | | | | | | |
| Contractual Obligations | | | | | | | |
| Long-term Debt (See Note 9) | $ 592 | $ 1,092 | $ 291 | $ 77 | $ 575 | $ 3,327 | $ 5,954 |
| Operating Leases – Net (See Note 7) | 165 | 110 | 85 | 68 | 54 | 196 | 678 |
| Agreements with Conrail (See Note 17) | 18 | 16 | 13 | 9 | 4 | 13 | 73 |
| Purchase Obligations (See Note 7) | 469 | 526 | 451 | 283 | 273 | 5,247 | 7,249 |
| Total Contractual Obligations | $ 1,244 | $ 1,744 | $ 840 | $ 437 | $ 906 | $ 8,783 | $ 13,954 |
| Other Commitments | | | | | | | |
| Guarantees (See Note 7) | 22 | 15 | 16 | 16 | 12 | 14 | 95 |
| Other | 28 | 3 | 1 | — | — | 40 | 72 |
| Total Other Commitments | $ 50 | $ 18 | $ 17 | $ 16 | $ 12 | $ 54 | $ 167 |

## Off-Balance Sheet Arrangements

For detailed information about the Company's guarantees, operating leases and purchase obligations, see Note 7, Commitments and Contingencies.

There are no off-balance sheet arrangements that are reasonably likely to have a material effect on the Company's results of operations, financial condition or liquidity.

## Critical Accounting Estimates

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires that management make estimates in reporting the amounts of certain assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements and certain revenues and expenses during the reporting period. Actual results may differ from those estimates. These estimates and assumptions are discussed with the Audit Committee of the Board of Directors on a regular basis. Consistent with the prior year, significant estimates using management judgment are made for the following areas:

- Casualty, environmental and legal reserves
- Pension and post-retirement medical plan accounting
- Depreciation policies for assets under the group-life method
- Income taxes

Table of Contents



**Casualty, Environmental and Legal Reserves**

***Casualty***

Casualty reserves represent accruals for personal injury and occupational injury claims. Occupational injury claims are broken down into two main categories: asbestos and other. Currently, no individual claim value is expected to exceed the Company's self-insurance retention amount. If an individual claim did exceed the amount, insurance is available as more specifically detailed in Note 7, Commitments and Contingencies. Personal injury and occupational claims are recorded on a gross basis and in accordance with SFAS 5, *Accounting for Contingencies* ("SFAS 5"). To the extent the value of an individual claim were to exceed the self-insured retention amount, the Company would record the liability on a gross basis with a corresponding receivable for insurance recoveries. These reserves fluctuate with estimates provided by independent third parties reviewed by management, and are offset by the timing of payments. Most of the claims are related to CSXT unless otherwise noted.

The amounts recorded by the Company for casualty-related liabilities are based upon currently known information, and judgments based upon that information. Projecting future events, such as the number of new claims to be filed each year, the average cost of disposing of claims, as well as the numerous uncertainties surrounding asbestos and other occupational litigation or legislation in the United States, could cause the actual costs to be higher or lower than projected.

While the final outcome of casualty-related matters cannot be predicted with certainty, considering among other items the meritorious legal defenses available and the liabilities that have been recorded, it is the opinion of management that none of these items, when finally resolved, will have a material effect on the Company's results of operations, financial condition or liquidity. However, should a number of these items occur in the same period, they could have a material effect on the results of operations, financial condition or liquidity in a particular quarter or fiscal year.

*Personal Injury*

Personal injury represents liabilities for employee work-related and third-party injuries. Work-related injuries for CSXT employees are primarily subject to the Federal Employers' Liability Act ("FELA"). In addition to the FELA liabilities, employees of other CSX subsidiaries are covered by various state workers' compensation laws, the Federal Longshore and Harbor Worker's Compensation Program and/or the Maritime Jones Act.

CSXT retains an independent actuarial firm to assist management in assessing the value of personal injury claims and cases. An analysis is performed by the independent actuarial firm semi-annually and is reviewed by management. The Company will monitor actual experience against the number of forecasted claims to be received and expected claim payments. The methodology used by the actuary included a development factor to reflect growth or reduction in the value of these personal injury claims which was based largely on CSXT's historical claims and settlement experience. Actual results may vary from estimates due to the type and severity of the injury, costs of medical treatments and uncertainties in litigation.

*Occupational*

Occupational claims include allegations of exposure to certain materials in the work place, such as asbestos, solvents (which include soaps and chemicals) and diesel fuel, and alleged chronic physical injuries, such as repetitive stress injuries, carpal tunnel syndrome or hearing loss.



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents



*Asbestos*

The Company is party to a number of occupational claims by employees alleging exposure to asbestos in the workplace. The heaviest possible exposure for employees was due to work conducted in and around steam locomotive engines that were largely phased out beginning around the 1950's. However, other types of exposures, including exposure from locomotive component parts and building materials, continued until it was substantially eliminated by 1985.

CSXT retains a third-party specialist who has extensive experience in performing asbestos and other occupational studies to assist in this estimate. The analysis is performed by the specialist semi-annually and is reviewed by management. The Company will monitor actual experience against the number of forecasted claims to be received and expected claim payments. The objective of the analysis is to determine the number of estimated incurred but not reported ("IBNR") claims and the estimated average cost per claim to be received over the next seven years. Seven years was determined by management to be the time period in which probable claim filings and claim values could be estimated with more certainty.

The Company, with the assistance of the third party specialist, determines its potentially exposed population from which it is able to derive the estimated number of IBNR claims. The estimated average cost per claim is then determined utilizing recent actual average cost per claim data and national industry data. Key elements of the assessment include the following:

- An estimate is computed using a ratio of Company employee data to national employment for select years during the period 1938-2001. The Company uses railroad industry historical census data in order to compute the population of potentially exposed employees.

- The projected incidence of disease is estimated based on epidemiological studies using employees' age and the duration and intensity of potential exposure while employed. Epidemiology is the medical science that deals with the incidence, distribution and control of diseases in a population.

- An estimate of the future anticipated claims filing rate by type of disease (non-malignant, cancer and mesothelioma) is computed using the Company's average historical claim filing rates for a three year calibration period, excluding a surge in claims originating in West Virginia. In 2006, the Company received 766 asbestos claims in West Virginia in which the claimants were neither exposed in West Virginia nor residents of the state. CSX believes these claims will not have standing in West Virginia and therefore are excluded from the calibration period. Management feels this calibration period represents the best estimate of future filing rates.

- An estimate of the future anticipated dismissal rate by type of claim is computed using the Company's historical average dismissal rates observed during the current calibration period noted above.

- An estimate of the future anticipated settlement by type of disease is computed using the Company's historical average of dollars paid per claim for pending and future claims using the average settlement by type of incident observed during the current calibration period noted above.



 Powered by Morningstar® Document Research℠

Table of Contents



From these assumptions, the Company projects the incidence of each type of disease to the estimated population to determine the total estimated number of employees that could potentially assert a claim. Historical claim filing rates are applied for each type of disease to the total number of employees that could potentially assert a claim to determine the total number of anticipated claim filings by disease type. Historical dismissal rates, which represent claims that are closed without payment, are deducted to calculate the number of future claims by disease type that would likely require payment by the Company. Finally, the number of such claims is multiplied by the average settlement value to estimate the Company's future liability for IBNR asbestos claims.

In 2005, management updated their estimate of the unasserted liability exposure with the assistance of the third party specialists, which resulted in recognition of a $48 million favorable change associated with asbestos liabilities (net $38 million favorable change for all occupational liabilities). During 2004 and 2005, asbestos-related disease claims filed against CSX dropped substantially, particularly bulk claims filed by certain law firms. In 2003, the Company received a significant number of filings. The Company believes the number was attributable to an attempt to file before a new, more restrictive venue law took effect in West Virginia in mid-2003. As a result, management reassessed the calibration period from a four-year average to a three-year average, excluding the surge in claims originating in West Virginia. As mentioned before, management believes this calibration period represents the best estimate of future filing rates. There have been no significant changes in 2006.

The estimated future filing rates and estimated average claim values are the most sensitive assumptions for this reserve. A 1% increase or decrease in either the forecasted number of IBNR claims or the average claim values would result in an approximate $1 million increase or decrease in the liability recorded for unasserted asbestos claims.

The Company, with the assistance of the third party specialist, obtains semi-annual updates of the study.

*Other Occupational*

The Company engages a third party specialist to assist in projecting the number of other occupational injury claims to be received over the next seven years. Based on this analysis, the Company establishes reserves for the probable and reasonably estimable other occupational injury liabilities.

Similar to the asbestos liability estimation process, the key elements of the assessment include the following:

- An estimate of the potentially exposed population for other occupational diseases is calculated by projecting the total active versus retired employees in the work force from 2002 to 2010 using a growth rate projection for overall railroad employment made by the Railroad Retirement Board in its June 2003 report.

- An estimate of the future anticipated claims filing rate by type of injury, employee type, and active versus retired employee is computed using the Company's average historical claim filing rates for the calibration periods which management felt are representative of future filing rates. For carpal tunnel and repetitive stress injuries, the current calibration period is a one-year average of claim filings. Hearing loss uses a three-year calibration period, and all other diseases or injuries use a two-year calibration period. An estimate is made to forecast future claims by using the filing rates by disease and the active and retired CSX employee population each year.



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents



- An estimate of the future anticipated settlement by type of injury is computed using the Company's historical average of dollars paid per claim for pending and future claims using the average settlement by type of injury observed during a period that management feels is representative of future settlement amounts.

During 2005, CSXT experienced an unfavorable trend in settlement values for repetitive stress and other injuries, which resulted in the recognition of a $10 million unfavorable change in estimate associated with these liabilities. There have been no significant changes in 2006.

The estimated future filing rates and estimated average claim values are the most sensitive assumptions for this reserve. A 1% increase or decrease in either the forecasted number of IBNR claims or the average claim values would result in an approximate $1 million increase or decrease in the liability recorded for unasserted other occupational claims.

***Environmental***

The Company is a party to various proceedings related to environmental issues, including administrative and judicial proceedings, involving private parties and regulatory agencies. The Company has been identified as a potentially responsible party ("PRP") at approximately 254 environmentally impaired sites, many of which are, or may be, subject to remedial action under the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERLA"), also known as the Superfund Law, or similar state statutes. The majority of these proceedings arise from environmental conditions on properties used for ongoing or discontinued railroad operations. However, a number of these proceedings are based on allegations to the effect that the Company, or its predecessors, sent hazardous substances for disposal to facilities owned or operated by others.

In addition, some of the Company's land holdings are, and have been, leased to others for commercial or industrial operations that may have resulted in releases of hazardous substances or other regulated materials onto the property and could give rise to proceedings against the Company.

In any such proceedings, the Company is potentially subject to environmental clean-up obligations and enforcement actions under CERLA or similar state laws, which may impose joint and several liability for clean-up and enforcement costs. These costs could be substantial, on current and former owners and operators of a site without regard to fault or the legality of the original conduct. In 2004, the Company assumed $6 million of Conrail environmental liabilities, due to the Conrail transaction.

At least once each quarter, CSXT reviews its role with respect to each such location, giving consideration to a number of factors, including:

- Type of clean-up required;

- Nature of the Company's alleged connection to the location (e.g., generator of waste sent to the site, or owner or operator of the site);

- Extent of the Company's alleged connection (e.g., volume of waste sent to the location and other relevant factors); and

- Number, connection, and financial viability of other named and unnamed PRP's at the location.

In accordance with Statement of Position 96-1, *Environmental Remediation Liabilities*, at least once a quarter, the Company reviews its role and plans for remediation with respect to each site



 Powered by Morningstar® Document Research℠

identified. Based on this review, the Company records amounts to cover anticipated contingent future environmental remediation costs with respect to each site to the extent such costs are estimable and probable. The recorded liabilities are undiscounted and include amounts representing the Company's estimate of unasserted claims, which the Company believes to be immaterial. The liability includes future costs for remediation and restoration of sites as well as any significant ongoing monitoring costs, but excludes any anticipated insurance recoveries.

Currently, the Company does not possess sufficient information to reasonably estimate the amount of additional liabilities, if any, on some sites until completion of future environmental studies. In addition, latent conditions at any given location could result in exposure, the amount and materiality of which cannot presently be reliably estimated. Based upon information currently available, however, the Company believes its environmental reserves are adequate to accomplish remedial actions to comply with present laws and regulations, and that the ultimate liability for these matters, if any, will not materially affect its overall results of operations, financial condition and liquidity.

***Legal***

In accordance with SFAS 5, an accrual for a loss contingency is established if information available prior to issuance of the financial statements indicates that it is probable that an asset has been impaired or a liability has been incurred at the date of the financial statements, and the amount of loss can be reasonably estimated. If no accrual is made for a loss contingency because one or both of these conditions are not met, or if an exposure to loss exists in excess of the amount accrued, disclosure of the contingency is made when there is at least a reasonable possibility that a loss or an additional loss may have been incurred.

The Company evaluates all exposures relating to legal liabilities at least quarterly and adjusts reserves when appropriate under the guidance noted above. The amount of a particular reserve may be influenced by factors that include official rulings, newly discovered or developed evidence, or changes in laws, regulations, and evidentiary standards.

**Pension and Post-retirement Medical Plan Accounting**

The Company sponsors defined benefit pension plans principally for salaried, management personnel. The plans provide eligible employees with retirement benefits based predominantly on years of service and compensation rates near retirement. Employees hired after December 31, 2002 are covered by a cash balance plan, which provides benefits by utilizing interest and pay credits based upon age, service, and compensation.

In addition to these plans, CSX sponsors one post-retirement medical plan and one life insurance plan that provide benefits to full-time, salaried, management employees hired prior to January 1, 2003, upon their retirement if certain eligibility requirements are met. The post-retirement medical plan is contributory (partially funded by retirees), with retiree contributions adjusted annually. The life insurance plan is non-contributory.

The accounting for these plans is subject to the guidance provided in SFAS 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans, an amendment of FASB Statements No. 87, 88, 106, and 132 (R)* ("SFAS 158"), SFAS 87, *Employers Accounting for Pensions*



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents



(“SFAS 87”), and SFAS 106, *Employers’ Accounting for Postretirement Benefits Other than Pension* (“SFAS 106”).

SFAS 87 requires that management make certain assumptions relating to the following:

- Long-term rate of return on plan assets;
- Discount rates used to measure future obligations and interest expense;
- Salary scale inflation rates;
- Health care cost trend rates; and
- Other assumptions.

These assumptions are determined as of the beginning of the year. As permitted by SFAS 87, the Company has elected to use a plan measurement date of September 30 to actuarially value its pension and post-retirement plans. As required by SFAS 158, CSX will change its measurement date to the fiscal year end in 2008. The Company engages independent, external actuaries to compute the amounts of liabilities and expenses relating to these plans subject to the assumptions that the Company selects as of the beginning of the plan year. The Company reviews the long-term rate of return, discount, salary scale inflation, and health care cost trend rates on an annual basis and makes modifications to the assumptions based on current rates and trends as appropriate.

In September 2006, FASB issued SFAS 158, which changed the accounting rules for reporting and disclosures related to pension and other post-retirement benefit plans. Companies are now required to include on the balance sheet an additional asset or liability to reflect the funded status of retirement and other post-retirement benefit plans, and a corresponding after-tax adjustment to equity. Retroactive application of this accounting rule is prohibited; therefore, 2006 is presented as required by SFAS 158 and 2005 is presented as required under the accounting rules prior to SFAS 158. The adoption in 2006 had no effect on the computation of net periodic benefit expense for pensions and post-retirement benefits. See Note 8, Employee Benefit Plans, for the impact on the consolidated balance sheet. Effective 2008, CSX will be required to change the measurement date for post-retirement benefit plans from September 30 to the last day of the fiscal year.

*Long-term Rate of Return on Plan Assets*

The expected long-term rate of return on plan assets reflects the average rate of earnings expected on the funds invested, or to be invested, to provide for benefits included in the projected benefit obligation. In estimating that rate, the Company gives appropriate consideration to the returns being earned by the plan assets in the funds and the rates of return expected to be available for reinvestment.

The Company’s expected long-term average rate of return on assets considers the current and projected asset mix of the funds. Management balances market expectations obtained from various investment managers and economists with both market and actual plan historical returns to develop a reasonable estimate of the expected long-term rate of return on assets. As this assumption is long-term, it is adjusted less frequently than other assumptions used in pension accounting. The long-term rate of return on plan assets used by the Company to value its 2006 pension obligation was 8.5%.

*Discount Rates*

Discount rates affect the amount of liability recorded and the interest expense component of pension and post-retirement expense. Assumed discount rates reflect the rates at which both of these



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents



benefits could be effectively settled. It is appropriate in estimating those rates to look to available information about rates implicit in current prices of annuity contracts that could be used to settle these obligations. In making those estimates, employers may also look to rates of return on high quality fixed-income investments currently available and expected to be available, during the period to maturity of the pension benefits. The Company determines the discount rate based on a hypothetical portfolio of high quality bonds with cash flows matching the plans' expected benefit payments. The discount rates used by the Company to value its 2006 pension and post-retirement obligations are 5.75% and 5.5%, respectively. The Company uses a different discount rate for pension and post-retirement benefits due to the different time horizons of future payments for each of the plans. For pensions, the time horizon is approximately 12 years, while for post-retirement, the time horizon is approximately 8 years.

Each year these discount rates are reevaluated and adjusted to reflect the best estimate of the current effective settlement rates. If interest rates generally decline or rise, the assumed discount rates will change.

*Salary Scale Inflation Rates*

Salary scale inflation rates are based on current trends and historical data accumulated by the Company. The Company reviews recent wage increases and management incentive compensation payments over the past five years in its assessment of salary scale inflation rates. The Company used a salary scale rate of 4.1% to value its 2006 pension obligation.

*Health Care Cost Trend Rates*

Health care cost trend rates are based on recent plan experience and industry trends. The Company uses actuarial data to substantiate the inflation assumption for health care costs, representing increases in total plan costs (which include claims and administrative fee cost components). The current assumed health care cost trend rate is 10% for Medicare-eligible participants and 11% for non-Medicare-eligible participants, and is expected to decrease gradually until reaching 4.5% in 2014, based upon current actuarial projections.

*Other Assumptions*

The calculations made by the actuaries also include assumptions relating to mortality rates, turnover and retirement age. These assumptions are based upon historical data and are approved by management.

*2007 Estimated Pension and Post-retirement Expense*

Net periodic pension and post-retirement benefits expense for 2007 is expected to be approximately $54 million and $25 million, respectively, compared to $62 million and $30 million, respectively in 2006.

The following sensitivity analysis illustrates the effect of changes in certain assumptions like discount rates, salaries, and health care costs on the 2007 estimated pension and post-retirement expense:

| *(Dollars in Millions)* | Pension | OPEB |
|---|---|---|
| Discount Rate 0.25% change | $ 4 | $ 2 |
| Salary Inflation 0.25% change | 3 | — |
| Health Care Cost 1% change | N/A | 2 |



 Powered by Morningstar® Document Research℠

The discount rate for pension and post-retirement plans has an inverse relationship with the expense calculation, meaning that as the discount rate increases, expense decreases and vice versa. The other assumptions above have a direct relationship with expense.

*Pension Protection Act*

In August 2006, the President of the United States signed the Pension Protection Act of 2006 into law. Included in this legislation are changes to the method of valuing pension plan assets and liabilities for funding purposes, as well as the minimum funding levels required by 2008. CSX is determining what impact the new requirements will have on the Company's cash flow; however, initial estimates forecast a 2008 unfunded liability of approximately $185 million after tax. This estimate will be affected by future contributions, investment returns on plan assets and interest rates. Under the transition rules provided, CSX must begin the funding of this 2008 shortfall no later than 2009, and must complete the funding by 2014. The Company anticipates funding pension contributions with cash from operations.

**Depreciation Policies for Assets Under the Group-Life Method**

CSXT accounts for its rail assets, including main-line track, locomotives and freight cars, using the group-life method. The group-life method pools similar assets by type and then depreciates each group as a whole. Under the group-life method, the service lives for each group of rail assets are determined by completing periodic life studies and applying management's assumptions concerning the service lives of its properties. These life studies are conducted by a third party expert, analyzed by the Company's management and approved by the STB. Life studies for equipment assets are required every three years, whereas road and track life studies are required every six years by the STB.

Changes in asset lives due to the results of the life studies could significantly impact future periods' depreciation expense, and thus, the Company's results of operations. Factors taken into account during the life study include:

- Statistical analysis of historical retirements for each group of property;
- Evaluation of current operations;
- Evaluation of technological advances and maintenance schedules;
- Previous assessment of the condition of the assets and outlook for their continued use;
- Expected net salvage to be received upon retirement; and
- Comparison of assets to the same asset groups with other companies.

The life studies may also indicate that the recorded amount of accumulated depreciation is deficient (or in excess) of the appropriate amount indicated by the study. Any such deficiency (or excess) is amortized as a component of depreciation expense over the remaining useful life of the asset group until the next required life study.

Recent experience with life studies has resulted in depreciation rate changes, which did not significantly affect the Company's annual depreciation expense. In 2006, CSXT initiated a life study for its equipment assets with approval and adoption expected in early 2007. CSXT does not expect the life study to have a material effect on the Company's results of operations, financial condition, or liquidity in a particular quarter or fiscal year.

Assets depreciated under the group-life method comprise 95% of CSXT's total fixed assets of $20.3 billion on a net basis at December 29, 2006. The Company's depreciation expense for the year



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents



ended December 29, 2006 amounted to $867 million. A one percent change in the average life of all group-life assets would result in an $8 million change to the Company's annual depreciation expense.

**Income Taxes**

Management uses factors such as applicable law, current information and past experience with similar issues in computing its income tax expense. The Company has not materially changed its methodology for calculating income tax expense for the years presented.

In July 2006, the Financial Accounting Standards Board ("FASB") issued Interpretation 48, *Accounting for Uncertainty in Income Taxes*, ("FIN 48"), which will be effective for CSX beginning in 2007. FIN 48 provides guidance on measurement, classification, interest and penalties, and disclosures of uncertain tax positions. Differences between the amounts recognized in the financial statements prior to the adoption of FIN 48 and the amounts recognized after adoption will be accounted for as a cumulative-effect adjustment. The Company is currently evaluating the impact of FIN 48 on its consolidated financial statements, but is not yet in a position to make this determination.

CSX files a consolidated federal income tax return, which includes its principal domestic subsidiaries. Examinations of the federal income tax returns of CSX have been completed through 1998. Federal income tax returns for 1997 through 2005 currently are under examination. Management believes adequate provision has been made for any adjustments that might be assessed. While the final outcome of these matters cannot be predicted with certainty, it is the opinion of CSX management that none of these items will have a materially adverse effect on the results of operations, financial condition or liquidity of CSX. An unexpected adverse resolution of one or more of these items, however, could have a materially adverse effect on the results of operations, financial condition or liquidity in a particular fiscal quarter or fiscal year. Also, the Company is party to a number of legal and administrative proceedings, the resolution of which could result in gain realization in amounts that could be material to results of operations, financial condition or liquidity in a particular fiscal quarter or fiscal year.

**New Accounting Pronouncements and Change in Accounting Policy**

See Note 1, Nature of Operations and Significant Accounting Policies under the caption, "New Accounting Pronouncements and Change in Accounting Policy."

**Item 7A. Quantitative and Qualitative Disclosures about Market Risk**

CSX addresses market risk exposure to fluctuations in interest rates and the risk of volatility in its fuel costs through the use of derivative financial instruments. CSX does not hold or issue derivative financial instruments for trading purposes.

CSX addresses its exposure to interest rate market risk through a controlled program of risk management that includes the use of interest rate swap agreements. The table below illustrates CSX's long-term interest rate swap sensitivity.

| *(Dollars in Millions)* | December 29, 2006 |
|---|---|
| Interest rate swap agreements | $ 600 |
| Effect of 1% change in LIBOR interest rate | 6 |



 Powered by Morningstar® Document Research℠

Table of Contents



During 2003, CSX began a program to hedge its exposure to fuel price volatility through swap transactions. In the third quarter of 2004, CSX suspended entering into new swaps in its fuel hedge program. The remainder of the fuel hedge contracts expired in July 2006.

CSX is exposed to loss in the event of non-performance by any counter-party to the interest rate swap agreements. CSX does not anticipate non-performance by such counter-parties, and no material loss would be expected from non-performance.

The following table highlights CSX's floating rate debt outstanding (exclusive of derivative contracts) that essentially converts fixed interest rate notes to floating interest rates.

| *(Dollars in Millions)* | December 29, 2006 |
|---|---|
| Floating rate debt outstanding | $ 118 |
| Effect of 1% change in interest rates | 1 |



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents

**CSX CORPORATION**
**PART II**
**Item 8. Financial Statements and Supplementary Data**

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**


| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | 50 |
| **CSX Corporation** | |
| Consolidated Financial Statements and Notes to Consolidated Financial Statements Submitted Herewith: | |
| Consolidated Income Statement for the Fiscal Years Ended:<br>• December 29, 2006<br>• December 30, 2005<br>• December 31, 2004 | 51 |
| Consolidated Balance Sheets as of:<br>• December 29, 2006<br>• December 30, 2005 | 52 |
| Consolidated Cash Flow Statements for Fiscal Years Ended:<br>• December 29, 2006<br>• December 30, 2005<br>• December 31, 2004 | 53 |
| Consolidated Statements of Changes in Shareholders' Equity:<br>• December 29, 2006<br>• December 30, 2005<br>• December 31, 2004 | 54 |
| Notes to Consolidated Financial Statements | 55 |




Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents

CSX CORPORATION
PART II
Item 8. Financial Statements and Supplementary Data

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Shareholders and Board of Directors of CSX Corporation

We have audited the accompanying consolidated balance sheets of CSX Corporation and subsidiaries as of December 29, 2006 and December 30, 2005, and the related consolidated statements of income, cash flows, and changes in shareholders' equity for each of the three fiscal years in the period ended December 29, 2006. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of CSX Corporation and subsidiaries at December 29, 2006 and December 30, 2005, and the consolidated results of their operations and their cash flows for each of the three fiscal years in the period ended December 29, 2006, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of CSX Corporation's internal control over financial reporting as of December 29, 2006, based on criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 13, 2007, included in Item 9A expressed an unqualified opinion thereon.

/s/ Ernst & Young LLP
Independent Certified Public
Accountants

Jacksonville, Florida
February 13, 2007



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents

CSX CORPORATION
PART II
Item 8. Financial Statements and Supplementary Data

## CONSOLIDATED INCOME STATEMENTS

*(Dollars in Millions, Except Per Share Amounts)*

| | Fiscal Years 2006 | 2005 | 2004 |
|---|---|---|---|
| **Operating Revenue** | **$ 9,566** | $ 8,618 | $ 8,040 |
| **Operating Expense** | | | |
| Labor and Fringe | **2,930** | 2,864 | 2,744 |
| Materials, Supplies and Other | **1,873** | 1,790 | 1,753 |
| Depreciation | **857** | 826 | 711 |
| Fuel | **1,112** | 783 | 656 |
| Building and Equipment Rent | **507** | 510 | 569 |
| Inland Transportation | **242** | 230 | 280 |
| Conrail Rents, Fees and Services | **75** | 65 | 256 |
| Restructuring Charge—Net | **—** | — | 71 |
| Gain on Insurance Recoveries (Note 5) | **(168)** | — | — |
| **Total Operating Expenses** | **7,428** | 7,068 | 7,040 |
| **Operating Income** | **2,138** | 1,550 | 1,000 |
| **Other Income and Expense** | | | |
| Other Income (Note10) | **95** | 101 | 72 |
| Debt Repurchase Expense (Note 9) | **—** | (192) | — |
| Interest Expense | **(392)** | (423) | (435) |
| **Earnings** | | | |
| Earnings before Income Taxes | **1,841** | 1,036 | 637 |
| Income Tax Expense (Note 13) | **(531)** | (316) | (219) |
| Earnings from Continuing Operations | **1,310** | 720 | 418 |
| Discontinued Operations—Net of Tax (Note 18) | **—** | 425 | (79) |
| Net Earnings | **$ 1,310** | $ 1,145 | $ 339 |
| **Per Common Share** (Note 2) | | | |
| Earnings Per Share: | | | |
| From Continuing Operations | **$ 2.98** | $ 1.67 | $ 0.97 |
| Discontinued Operations | **—** | 0.98 | (0.18) |
| Net Earnings | **$ 2.98** | $ 2.65 | $ 0.79 |
| Earnings Per Share, Assuming Dilution: | | | |
| From Continuing Operations | **$ 2.82** | $ 1.59 | $ 0.94 |
| Discontinued Operations | **—** | 0.93 | (0.18) |
| Net Earnings | **$ 2.82** | $ 2.52 | $ 0.76 |
| Average Common Shares Outstanding (Thousands) | **440,084** | 432,851 | 429,592 |
| Average Common Shares Outstanding, Assuming Dilution (Thousands) | **465,934** | 456,047 | 450,060 |
| Cash Dividends Paid Per Common Share | **$ 0.330** | $ 0.215 | $ 0.200 |

All share and per share data were retroactively restated to reflect the stock split.

See accompanying Notes to Consolidated Financial Statements.



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents

CSX CORPORATION
PART II
Item 8. Financial Statements and Supplementary Data

## CONSOLIDATED BALANCE SHEETS
*(Dollars in Millions)*

| | December 29, 2006 | December 30, 2005 |
|---|---|---|
| **ASSETS** | | |
| Current Assets: | | |
| Cash and Cash Equivalents (Note 1) | **$ 461** | $ 309 |
| Short-term Investments | **439** | 293 |
| Accounts Receivable, net of allowance for doubtful accounts of $82 and $108, respectively | **1,174** | 1,202 |
| Materials and Supplies | **204** | 199 |
| Deferred Income Taxes | **251** | 225 |
| Other Current Assets | **143** | 144 |
| Total Current Assets | **2,672** | 2,372 |
| Properties | **27,715** | 26,538 |
| Accumulated Depreciation | **(6,792)** | (6,375) |
| Properties—Net (Note 11) | **20,923** | 20,163 |
| Investment in Conrail (Note 17) | **607** | 603 |
| Affiliates and Other Companies | **336** | 304 |
| Other Long-term Assets (Note 12) | **591** | 790 |
| Total Assets | **$ 25,129** | $ 24,232 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| Current Liabilities: | | |
| Accounts Payable | **$ 974** | $ 954 |
| Labor and Fringe Benefits Payable | **495** | 565 |
| Casualty, Environmental and Other Reserves (Note 6) | **253** | 311 |
| Current Maturities of Long-term Debt (Note 9) | **592** | 936 |
| Short-term Debt (Note 9) | **8** | 1 |
| Income and Other Taxes Payable | **114** | 102 |
| Other Current Liabilities | **86** | 110 |
| Total Current Liabilities | **2,522** | 2,979 |
| Casualty, Environmental and Other Reserves (Note 6) | **668** | 653 |
| Long-term Debt (Note 9) | **5,362** | 5,093 |
| Deferred Income Taxes | **6,110** | 6,082 |
| Other Long-term Liabilities (Note 12) | **1,525** | 1,471 |
| Total Liabilities | **16,187** | 16,278 |
| Shareholders' Equity: | | |
| Common Stock, $1 Par Value (Note 3) | **438** | 436 |
| Other Capital | **1,469** | 1,533 |
| Retained Earnings | **7,427** | 6,262 |
| Accumulated Other Comprehensive Loss | **(392)** | (277) |
| Total Shareholders' Equity | **8,942** | 7,954 |
| Total Liabilities and Shareholders' Equity | **$ 25,129** | $ 24,232 |

Common Stock and Other Capital were retroactively restated to reflect the stock split.

See accompanying Notes to Consolidated Financial Statements.



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents

CSX CORPORATION
PART II
Item 8. Financial Statements and Supplementary Data

## CONSOLIDATED CASH FLOW STATEMENTS

*(Dollars in Millions)*

| | Fiscal Years | | |
|---|---|---|---|
| | **2006** | 2005 | 2004 |
| **Operating Activities** | | | |
| Net Earnings | **$ 1,310** | $ 1,145 | $ 339 |
| Adjustments to Reconcile Net Earnings to Net Cash Provided: | | | |
| Depreciation | **867** | 833 | 730 |
| Deferred Income Taxes | **42** | (46) | 240 |
| Gain on Sale of International Terminals—Net of Tax (Note 18) | **—** | (428) | — |
| Gain on Insurance Recoveries | **(168)** | — | — |
| Insurance Proceeds (Note 5) | **121** | 29 | — |
| Restructuring Charge (Note 15) | **—** | — | 71 |
| Net Gain on Conrail spin-off—after tax (Note 17) | **(26)** | — | (16) |
| Other Operating Activities | **5** | (141) | (91) |
| Changes in Operating Assets and Liabilities: | | | |
| Accounts Receivable | **(33)** | (44) | (3) |
| Other Current Assets | **96** | (29) | 29 |
| Accounts Payable | **51** | 54 | (2) |
| Income and Other Taxes Payable | **(103)** | (402) | 38 |
| Other Current Liabilities | **(104)** | 139 | 111 |
| Net Cash Provided by Operating Activities | **2,058** | 1,110 | 1,446 |
| **Investing Activities** | | | |
| Property Additions | **(1,639)** | (1,136) | (1,030) |
| Insurance Proceeds (Note 5) | **147** | 41 | — |
| Net Proceeds from Sale of International Terminals (Note 18) | **—** | 1,108 | — |
| Purchase of Minority Interest in an International Terminals' Subsidiary (Note 18) | **—** | (110) | — |
| Proceeds from Divestitures (Note 19) | **—** | — | 55 |
| Purchases of Short-term Investments | **(1,412)** | (2,601) | (1,583) |
| Proceeds from Sale of Short-term Investments | **1,290** | 2,634 | 1,336 |
| Other Investing Activities | **4** | 28 | (18) |
| Net Cash Used in Investing Activities | **(1,610)** | (36) | (1,240) |
| **Financing Activities** | | | |
| Short-term Debt—Net | **7** | (99) | 99 |
| Long-term Debt Issued | **471** | 105 | 401 |
| Long-term Debt Repaid | **(546)** | (1,283) | (434) |
| Dividends Paid | **(145)** | (93) | (86) |
| Stock Options Exercised (Note 4) | **319** | 98 | 12 |
| Shares Repurchased (Note 4) | **(465)** | — | — |
| Other Financing Activities | **63** | (15) | 28 |
| Net Cash (Used In) Provided by Financing Activities | **(296)** | (1,287) | 20 |
| Net (Decrease) Increase in Cash and Cash Equivalents | **152** | (213) | 226 |
| **Cash and Cash Equivalents** | | | |
| Cash and Cash Equivalents at Beginning of Period | **309** | 522 | 296 |
| Cash and Cash Equivalents at End of Period | **$ 461** | $ 309 | $ 522 |
| **Supplemental Cash Flow Information** | | | |
| Interest Paid—Net of Amounts Capitalized | **$ 387** | $ 444 | $ 414 |
| Income Taxes Paid | **$ 531** | $ 798 | $ 35 |

See accompanying Notes to Consolidated Financial Statements.



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents

CSX CORPORATION
PART II
Item 8. Financial Statements and Supplementary Data

## CONSOLIDATED STATEMENTS OF CHANGES IN SHAREHOLDERS' EQUITY

*(Dollars in Millions)*

| | Common Shares Outstanding (Thousands) | Common Stock | Other Capital | Retained Earnings | Accumulated Other Comprehensive Income (Loss): Pension and OPEB Adjustments*(a)* | Accumulated Other Comprehensive Income (Loss): Fuel Hedge*(b)* | Accumulated Other Comprehensive Income (Loss): Other | Total |
|---|---|---|---|---|---|---|---|---|
| **Balance December 26, 2003** | 430,142 | $ 430 | $ 1,364 | $ 4,957 | $ (310) | $ 6 | $ 1 | $ 6,448 |
| Comprehensive Earnings: | | | | | | | | |
| Net Earnings | — | — | — | 339 | — | — | — | 339 |
| Other Comprehensive Income (Loss) (Note 8) | — | — | — | — | 18 | 66 | (1) | 83 |
| Comprehensive Earnings | | | | | | | | 422 |
| Dividends | — | — | — | (86) | — | — | — | (86) |
| Stock Option Exercises and Other | 916 | 1 | 26 | — | — | — | — | 27 |
| **Balance December 31, 2004** | 431,058 | 431 | 1,390 | 5,210 | (292) | 72 | — | 6,811 |
| Comprehensive Earnings: | | | | | | | | |
| Net Earnings | — | — | — | 1,145 | — | — | — | 1,145 |
| Other Comprehensive (Loss) (Note 8) | — | — | — | — | (15) | (42) | — | (57) |
| Comprehensive Earnings | | | | | | | | 1,088 |
| Dividends | — | — | — | (93) | — | — | — | (93) |
| Stock Option Exercises and Other | 5,348 | 5 | 143 | — | — | — | — | 148 |
| **Balance December 30, 2005** | 436,406 | 436 | 1,533 | 6,262 | (307) | 30 | — | 7,954 |
| Comprehensive Earnings: | | | | | | | | |
| Net Earnings | — | — | — | 1,310 | — | — | — | 1,310 |
| Other Comprehensive (Loss) (Note 8) | — | — | — | — | (2) | (30) | — | (32) |
| Comprehensive Earnings | | | | | | | | 1,278 |
| Adjustment for Initial Application of SFAS 158, net of tax (Note 8) | — | — | — | — | (83) | — | — | (83) |
| Dividends | — | — | — | (145) | — | — | — | (145) |
| Share Repurchases | (14,533) | (14) | (451) | — | — | — | — | (465) |
| Stock Option Exercises and Other | 15,891 | 16 | 387 | — | — | — | — | 403 |
| **Balance December 29, 2006** | 437,764 | $ 438 | $ 1,469 | $ 7,427 | $ (392) | $ — | $ — | $ 8,942 |

*(a) Pension and OPEB adjustments are net of taxes of $161 million, $146 million and $197 million for 2004, 2005 and 2006, respectively.*
*(b) Fuel hedge activity is net of taxes of $46 million, $21 million, and $21 million for 2004, 2005, and 2006, respectively.*

Common Shares Outstanding, Common Stock and Other Capital were retroactively restated to reflect the stock split.

See accompanying Notes to Consolidated Financial Statements.



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents



## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### NOTE 1. Nature of Operations and Significant Accounting Policies

***Nature of Operations***

CSX Corporation ("CSX" and, together with its subsidiaries, the "Company"), based in Jacksonville, Florida, owns companies providing rail, intermodal and rail-to-truck transload services that combine to form one of the nation's leading transportation companies, connecting more than 70 ocean, river and lake ports.

**Rail**

CSX's principal operating company, CSX Transportation Inc. ("CSXT"), operates the largest railroad in the eastern United States with a rail network of approximately 21,000 route miles, linking markets in 23 states, the District of Columbia, and the Canadian provinces of Ontario and Quebec.

In addition to CSXT, the rail segment includes Total Distribution Services, Inc. ("TDSI"), Transflo Terminal Services, Inc. (Transflo), CSX Technology, and other subsidiaries. TDSI provides a network of vehicle distribution centers, while Transflo provides access to bulk transloading sites. Technology and other support services are provided by the other subsidiaries.

**Intermodal**

CSX Intermodal Inc. ("Intermodal"), one of the nation's largest coast-to-coast intermodal transportation providers, is a stand-alone, integrated intermodal company linking customers to railroads via trucks and terminals. Containers and trailers are loaded and unloaded from trains, and trucks provide the link between intermodal terminals and the customer.

**Surface Transportation Businesses**

The rail and intermodal segments are designated by the Company on a combined basis as Surface Transportation businesses. Together, they serve four primary lines of business, which are as follows:

- The merchandise business includes the following seven groups: chemicals, emerging markets, forest products, agriculture products, metals, phosphates and fertilizers, and food and consumer. The emerging markets group includes aggregates, processed materials, waste, military cargo, and machinery. The merchandise business line generated approximately 49% of the Company's total revenue in 2006 and 38% of the Company's volume.

- Coal, which delivered approximately 1.9 million carloads of coal, coke and iron ore to electric utilities and manufacturers in 2006, accounted for approximately 25% of the Company's total 2006 revenue and 26% of the Company's volume. The Company serves more than 130 coal loading locations in nine states, including three of the nation's top four coal-producing states.

- Automotive, which serves plants in eight states and delivers both finished vehicles and auto parts, generated 9% of the Company's total revenue in 2006 and 6% of the Company's volume. Consistent with the overall automotive market, CSXT's volumes continued to shift from the Big 3 to foreign brands produced domestically.



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents



**NOTE 1. Nature of Operations and Significant Accounting Policies, continued**

- Intermodal offers a competitive cost advantage over long-haul trucking by combining the superior economics of rail transportation coupled with the short-haul flexibility of trucks. This service is provided through a network of dedicated terminals across North America. Intermodal shipments, which consist primarily of imported and domestic finished consumer products sold at major retailers, are moved in containers and trailers. For 2006, Intermodal accounted for approximately 15% of the Company's total revenue and 30% of the Company's volume.

Other revenue, which includes short-line railroads owned by CSX and demurrage, switching, and other incidental charges, accounted for 2% of the Company's total 2006 revenue. Demurrage represents charges assessed by railroads when shippers or receivers of freight hold railcars beyond a specified period of time. Switching revenue is generated when CSX switches cars between trains for a customer or another railroad.

**Other Businesses**

The Company also has certain residual activities from the formerly owned companies that made up the Marine Services Segment. These activities include leasing of equipment and vessels. These results are included in consolidated operating income.

CSX's other holdings include CSX Hotels, Inc. a resort doing business as The Greenbrier, located in White Sulphur Springs, West Virginia, and CSX Real Property, Inc., an organization responsible for the management, sale, lease, acquisition and development of Company properties. The results from these activities are classified as a component of other income as they are not considered by the Company to be operating activities.

***Basis of Presentation***

In the opinion of management, the accompanying consolidated financial statements contain all adjustments necessary to fairly present the financial position of CSX and its subsidiaries at December 29, 2006 and December 30, 2005, the Consolidated Income and Cash Flow Statements and Changes in Shareholders' Equity for fiscal years 2006, 2005 and 2004, such adjustments being of a normal, recurring nature. Certain prior-year data have been reclassified to conform to the 2006 presentation.

***Fiscal Year***

CSX follows a 52/53 week fiscal reporting calendar. This fiscal calendar allows every quarter to consistently end on a Friday and to be of equal duration (13 weeks). However, to maintain this type of reporting calendar, every sixth or seventh year (depending on the Gregorian calendar and when leap year falls), an extra week will be included in one quarter (a 14-week fiscal quarter) and, therefore, the full fiscal year will have 53 weeks.

- Fiscal year 2006 consisted of 52 weeks, ending on December 29, 2006
- Fiscal year 2005 consisted of 52 weeks, ending on December 30, 2005
- Fiscal year 2004 consisted of 53 weeks, ending on December 31, 2004



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents



**NOTE 1. Nature of Operations and Significant Accounting Policies, continued**

Except as otherwise specified, references to full year indicate CSX's fiscal periods ended on the dates noted above.

***Principles of Consolidation***

The consolidated financial statements include results of operations of CSX and its majority-owned subsidiaries. All significant intercompany accounts and transactions have been eliminated. Most investments in companies that were not majority-owned were carried at cost (if less than 20% owned and the Company has no significant influence) or equity (if the Company has significant influence).

***Cash, Cash Equivalents and Short-term Investments***

On a daily basis, cash in excess of current operating requirements is invested in various highly liquid investments having a typical maturity date of three months or less at the date of acquisition. These investments were carried at cost, which approximated market value, and were classified as Cash Equivalents. Investments in instruments with maturities less than one year were classified as Short-term Investments.

CSX holds $391 million and $268 million of auction rate securities and classifies these investments as available for sale as of December 29, 2006, and December 30, 2005, respectively. Accordingly, these investments were included in current assets as Short-term Investments on the Consolidated Balance Sheets. On the Consolidated Cash Flow Statements, purchases and sales of these assets were classified within investing activities.

***Allowance for Doubtful Accounts***

The Company maintains an allowance for doubtful accounts for the estimated probable losses on uncollectible accounts and other receivables. The allowance is based upon the credit worthiness of customers, historical experience, the age of the receivable, current market and economic conditions, as well as any known trends or uncertainties related to customer billing and account collectibility. Uncollectible amounts were charged against the allowance account. The allowance for doubtful accounts is netted against current accounts receivable.

***Materials and Supplies***

Materials and supplies in the Consolidated Balance Sheets consist primarily of fuel and parts used in the repair and maintenance of CSXT's freight car and locomotive fleets, equipment, and track structure, which were carried at average cost.

***Properties***

All properties were stated at cost less an allowance for accumulated depreciation. Rail assets, including main-line track, locomotives and freight cars were depreciated using the group-life method as discussed below. Under this method, the Company pools similar assets by road and equipment type and then depreciates each group as a whole. The majority of non-rail property is depreciated using the straight-line method on a per asset basis. Amortization expense recorded under capital leases is included in depreciation expense on the Consolidated Income Statements.



 Powered by Morningstar® Document Research℠

Table of Contents

CSX CORPORATION
PART II
Item 8. Financial Statements and Supplementary Data

**NOTE 1. Nature of Operations and Significant Accounting Policies, continued**

Regulations enforced by the Surface Transportation Board ("STB") of the U.S. Department of Transportation require periodic formal studies of ultimate service lives ("life studies") for all railroad assets. Factors taken into account during the life study include:

- Statistical analysis of historical retirements for each group of property;
- Evaluation of current operations;
- Evaluation of technological advances and maintenance schedules;
- Previous assessment of the condition of the assets and outlook for their continued use;
- Expected net salvage expected to be received upon retirement; and
- Comparison of assets to the same asset groups with other companies.

The results of the life study process determine the service lives for each asset group under the group-life method. These studies are conducted by a third party expert and are analyzed by the Company's management. Resulting changes in service life estimates are subject to review and approval by the STB. Road assets, including main-line track, have estimated service lives ranging from five years for system roadway machinery to 80 years for grading. Equipment assets, including locomotives and freight cars, have estimated service lives ranging from six years for motor vehicles to 35 years for work equipment.

Changes in asset lives due to the results of the life studies are applied at the completion of the life study and continue until the next required life study. The life studies may also indicate that the recorded amount of accumulated depreciation is deficient (or in excess) of the amount indicated by the study. Any such deficiency (or excess) amount is amortized as a component of depreciation expense over the remaining useful life of the asset group until the next required life study.

For retirements or disposals of depreciable rail assets that occur in the ordinary course of business, the asset cost (net of salvage value or sales proceeds) was charged to accumulated depreciation and no gain or loss is recognized. For retirements or disposals of non-rail depreciable assets, infrequent disposal of rail assets outside the normal course of business and all dispositions of land, the resulting gains or losses were recognized at the time of disposal. Expenditures that significantly increased asset values or extended useful lives were capitalized. Repair and maintenance expenditures were charged to operating expense when the work was performed.

Properties and other long-lived assets are reviewed for impairment whenever events or business conditions indicate the carrying amount of such assets may not be fully recoverable. Initial assessments of recoverability are based on estimates of undiscounted future net cash flows associated with an asset or a group of assets in accordance with Statement of Financial Accounting Standards ("SFAS") 144, *Accounting for the Impairment or Disposal of Long-Lived Assets*. Where impairment is indicated, the assets are evaluated, and their carrying amount is reduced to fair value based on undiscounted net cash flows or other estimates of fair value.



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents



**NOTE 1. Nature of Operations and Significant Accounting Policies, continued**

***Revenue and Expense Recognition***

The Company recognizes freight revenue using Free-On-Board ("FOB") Origin pursuant to Emerging Issues Task Force ("EITF") 91-9, *Revenue and Expense Recognition for Freight Services in Process*. The Company uses method (5) in the EITF, which provides for the allocation of revenue between reporting periods based on relative transit time in each reporting period. Expenses are recognized as incurred.

Certain key estimates are included in the recognition and measurement of revenue and related accounts receivable under the policies described above:

- unbilled revenue on shipments that have been delivered;
- revenue associated with shipments in transit;
- future adjustments to revenue or accounts receivable for billing corrections, billing discounts and bad debts;
- future adjustments to revenue for overcharge claims filed by customers; and
- incentive-based refunds to customers.

The Company regularly updates the estimates described above based on historical experience.

All other revenue, such as demurrage, switching and other incidental charges are recorded upon completion of the service. Demurrage represents charges assessed by railroads for the retention of cars by shippers or receivers of freight beyond a specified period of time. Switching revenue is generated when CSXT switches cars between trains for a customer or other railroad.

***Comprehensive Earnings***

CSX reports comprehensive earnings (loss) in accordance with SFAS 130, *Reporting Comprehensive Income*, in the Consolidated Statement of Changes in Shareholders' Equity. Comprehensive earnings is defined as all changes in shareholders' equity during a period, other than those resulting from investments by, and distributions to, shareholders (i.e. issuance of equity securities and dividends). At December 30, 2005, Accumulated Other Comprehensive Loss consisted primarily of pension liabilities partially offset by the fair value of fuel hedge contracts. At December 29, 2006, Accumulated Other Comprehensive Loss consisted primarily of adjustments for pension and other post-retirement liabilities.

***Derivative Financial Instruments***

The Company recognizes all derivatives as either assets or liabilities in the Consolidated Balance Sheets and measures those instruments at fair value. (See Note 14, Derivative Financial Instruments.)



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents



**NOTE 1. Nature of Operations and Significant Accounting Policies, continued**

***New Accounting Pronouncements and Change in Accounting Policy***

In September 2006, the Financial Accounting Standards Board issued SFAS 158, which changed the accounting rules for reporting and disclosures related to pensions and other post-retirement benefit plans. Companies were required to reflect the funded status of retirement and other post-retirement benefit plans on the balance sheet. This change was effective for the Company for this fiscal year end. See Note 8, Employee Benefit Plans, for the impact on the Consolidated Balance Sheet. The decrease in equity did not have any significant impact on the Company's credit ratios or financing covenants. Pursuant to SFAS 158, the Company will be required to change its September measurement date for the plan's assets and obligations to its fiscal year end effective in 2008.

In July 2006, FASB issued Interpretation 48, *Accounting for Uncertainty in Income Taxes*, ("FIN 48"), which will be effective for CSX beginning in 2007. FIN 48 provides guidance on measurement, classification, and disclosures of uncertain tax positions including treatment of related interest and penalties. Differences between the amounts recognized in the financial statements prior to the adoption of FIN 48 and the amounts recognized after adoption will be accounted for as a cumulative-effect adjustment. The Company is currently evaluating the impact of FIN 48 on its consolidated financial statements, but is not yet in a position to make this determination. (See Note 13, Income Taxes.)

Effective fiscal year 2006, the Company adopted the fair value recognition provisions of SFAS 123(R), *Share-Based Payment* ("SFAS 123(R)") using the modified-prospective-transition method. Under this method, compensation costs recognized in 2006 include all unvested share-based payments as of the beginning of 2006. Share-based compensation at CSX may include stock options, restricted stock awards, stock issued to CSX directors and CSX's Long-term Incentive Plans. The amount of compensation costs recognized is based upon the estimated grant date fair value method under the Black-Scholes-Merton formula and resulted in the recognition of additional compensation cost from the unvested portion of stock options granted prior to 2003.

Prior to the adoption of SFAS 123(R), in 2003 CSX adopted the fair value recognition provision on a prospective basis as permitted under SFAS 148, *Accounting for Stock-Based Compensation — Transition and Disclosure*. Results for prior periods have not been restated, as such prior period restatement is not required. The adoption of SFAS 123(R) did not result in a material impact to the Company's Consolidated Income Statement or earnings per share. The Company recorded $3 million in 2006 of additional compensation expense for unvested stock options granted prior to 2003. Compensation costs for all other types of share-based payments were consistently reported for all periods presented.

***Use of Estimates***

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires that management make estimates in reporting the amounts of certain assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amount of certain revenues and expenses during the reporting period. Actual results may differ from those estimates. Critical accounting estimates using management judgment are made for the following areas:

- Casualty, environmental and legal reserves (see Note 6, Casualty, Environmental and Other Reserves);



 Powered by Morningstar® Document Research℠

Table of Contents



**NOTE 1. Nature of Operations and Significant Accounting Policies, continued**

- Pension and post-retirement medical plan accounting (see Note 8, Employee Benefit Plans);
- Depreciation policies for assets under the group-life method (see "Properties" in this note); and
- Income taxes (see Note 13, Income Taxes).

**NOTE 2. Earnings Per Share**

CSX announced a two-for-one split of its common stock and a $0.10 per share quarterly post-split dividend in July 2006. The stock split was effective August 15, 2006. Pursuant to SFAS 128, *Earnings Per Share*, all share and per share disclosures have been retroactively restated to reflect the stock split.

The following table sets forth the computation of basic earnings per share and earnings per share, assuming dilution:

| | Fiscal Years | | |
|---|---|---|---|
| | **2006** | 2005 | 2004 |
| Numerator (Millions): | | | |
| Earnings from Continuing Operations | **$ 1,310** | $ 720 | $ 418 |
| Interest Expense on Convertible Debt—Net of Tax | **4** | 4 | 4 |
| Net Earnings from Continuing Operations, If-Converted | **1,314** | 724 | 422 |
| Discontinued Operations—Net of Tax | **—** | 425 | (79) |
| Net Earnings, If-Converted | **1,314** | 1,149 | 343 |
| Interest Expense on Convertible Debt—Net of Tax | **(4)** | (4) | (4) |
| Net Earnings | **$ 1,310** | $ 1,145 | $ 339 |
| Denominator (Thousands): | | | |
| Average Common Shares Outstanding | **440,084** | 432,851 | 429,592 |
| Convertible Debt | **19,456** | 19,456 | 19,456 |
| Stock Options | **6,057** | 2,811 | 720 |
| Other Potentially Dilutive Common Shares | **337** | 929 | 292 |
| Average Common Shares Outstanding, Assuming Dilution | **465,934** | 456,047 | 450,060 |
| Earnings Per Share: | | | |
| Income from Continuing Operations | **$ 2.98** | $ 1.67 | $ 0.97 |
| Discontinued Operations | **—** | 0.98 | (0.18) |
| Net Earnings | **$ 2.98** | $ 2.65 | $ 0.79 |
| Earnings Per Share, Assuming Dilution: | | | |
| Income from Continuing Operations | **$ 2.82** | $ 1.59 | $ 0.94 |
| Discontinued Operations | **—** | 0.93 | (0.18) |
| Net Earnings | **$ 2.82** | $ 2.52 | $ 0.76 |



 Powered by Morningstar® Document Research℠

Table of Contents



**NOTE 2. Earnings Per Share, continued**

Basic earnings per share was based on the weighted-average number of common shares outstanding. Earnings per share, assuming dilution, was based on the weighted-average number of common shares outstanding adjusted for the effect of the following types of potentially dilutive common shares:

- convertible debt,
- employee stock options, and
- other equity awards, which include unvested restricted stock and long-term incentive awards.

EITF 04-8, *The Effect of Contingently Convertible Debt on Diluted Earnings Per Share*, required CSX to include approximately 19 million shares in the computation of earnings per share, assuming dilution. The amount included in diluted earnings per share represents the number of shares that would be issued if all the Company's convertible debentures were converted. Debentures converted into CSX common stock were reflected in the basic earnings per share calculation.

Certain stock options were excluded from the computation of earnings per share, assuming dilution, since their related option exercise prices were greater than the average market price of the common shares during the period. The following table provides information about potentially dilutive stock options excluded from the computation of earnings per share:

| | Fiscal Years | | |
|---|---|---|---|
| | **2006(a)** | 2005 | 2004 |
| Number of Shares *(Thousands)* | — | 4,426 | 32,748 |
| Average Exercise Price | $ — | $ 26.55 | $ 21.44 |

*(a) In 2006, all stock options were dilutive. Therefore, the potentially dilutive impact is zero.*

**NOTE 3. Shareholders' Equity**

Common and Preferred Stock consists of:

| **Common Stock, 1$ Par Value** | **December 29, 2006** *(in Thousands)* |
|---|---|
| Common shares authorized | 600,000 |
| Common shares issued and outstanding | 437,764 |
| **Preferred Stock** | |
| Preferred shares authorized | 25,000 |
| Preferred shares outstanding | — |

Holders of common stock are entitled to one vote on all matters requiring a vote for each share held. Preferred stock is senior to common stock with respect to dividends and upon liquidation of CSX.

**NOTE 4. Stock Plans and Share-Based Compensation**

CSX share-based compensation plans primarily include stock options, restricted stock awards, long-term incentive plans, and stock plans for directors. CSX has not granted stock options since 2003. Awards granted under the various plans were determined and approved by the Compensation Committee of the Board of Directors.



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents

**CSX CORPORATION**
**PART II**
**Item 8. Financial Statements and Supplementary Data**
**NOTE 4. Stock Plans and Share-Based Compensation, continued**

At December 29, 2006, there were 2,868 current or former employees with stock option grants outstanding under the various plans. Most new stock awards were granted under the authorization provided in the CSX Omnibus Incentive Plan. As of December 29, 2006, an additional 12 million shares of stock could be issued under this plan.

SFAS 123(R) requires the cash flows resulting from income tax deductions in excess of compensation costs to be classified as financing cash flows. This requirement resulted in reduced net operating cash flows and increased net financing cash flows of approximately $59 million for fiscal year 2006. Prior to the adoption of SFAS 123(R), CSX presented all income tax benefits from deductions resulting from compensation costs as operating cash flows in the Consolidated Cash Flow Statements.

Total pre-tax expense associated with share-based compensation and its related income tax benefit is as follows:

| | Fiscal Years | | |
|---|---|---|---|
| *(Dollars in Millions)* | **2006** | 2005 | 2004 |
| Share-Based Compensation Expense | **$ 45** | $ 39 | $ 20 |
| Income Tax Benefit | **17** | 14 | 7 |

The following table illustrates the pro forma effect on net earnings and earnings per share prior to the adoption of SFAS 123(R). This table only shows 2004 and 2005 pro forma amounts since the Company adopted the fair value recognition provisions of SFAS 123(R) in the first quarter of 2006. Therefore, expenses were recognized in the Consolidated Income Statement for all unvested share-based compensation in 2006. The table below only shows 2005 and 2004 as it is not applicable for pro forma amounts for 2006 and forward.

| *(Dollars in Millions, Except Per Share Amounts)* | 2005 | 2004 |
|---|---|---|
| Net Earnings—As Reported | $ 1,145 | $ 339 |
| Add: Stock-Based Employee Compensation Expense Included in Reported Net Income—Net of Tax | 25 | 13 |
| Deduct: Total Stock-Based Employee Compensation | | |
| Expense Determined under the Fair Value Based Method for all Awards—Net of Tax | (29) | (29) |
| Pro Forma Net Earnings | $ 1,141 | $ 323 |
| Interest Expense on Convertible Debt—Net of Tax | 4 | 4 |
| Pro Forma Net Earnings, If-Converted | $ 1,145 | $ 327 |
| Earnings Per Share: | | |
| Basic—As Reported | $ 2.65 | $ 0.79 |
| Basic—Pro Forma | $ 2.64 | $ 0.75 |
| Diluted—As Reported | $ 2.52 | $ 0.76 |
| Diluted—Pro Forma | $ 2.51 | $ 0.73 |



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents

**CSX CORPORATION**
**PART II**
**Item 8. Financial Statements and Supplementary Data**

**NOTE 4. Stock Plans and Share-Based Compensation, continued**

***Stock Options***

Stock options were granted with 10-year terms. Options outstanding at December 29, 2006, are generally exercisable three to ten years after date of grant. The exercise price for options granted equals the market price of the underlying stock on the date of grant. A summary of CSX's stock option activity and related information for the fiscal years 2006, 2005 and 2004 is as follows:

| | Fiscal Years | | | | | |
|---|---|---|---|---|---|---|
| | **2006** | | 2005 | | 2004 | |
| | **Options Outstanding (000s)** | **Weighted-Average Exercise Price** | Options Outstanding (000s) | Weighted-Average Exercise Price | Options Outstanding (000s) | Weighted-Average Exercise Price |
| Outstanding at Beginning of Year | **34,151** | **$ 20.13** | 41,445 | $ 19.81 | 46,851 | $ 19.55 |
| Granted | **—** | **$ —** | — | $ — | — | $ — |
| Expired or Canceled | **(101)** | **$ 21.71** | (1,766) | $ 19.99 | (4,372) | $ 18.92 |
| Exercised | **(14,630)** | **$ 21.76** | (5,528) | $ 17.78 | (1,034) | $ 11.65 |
| Outstanding at End of Year | **19,420** | **$ 18.96** | 34,151 | $ 20.13 | 41,445 | $ 19.81 |
| Exercisable at End of Year | **12,670** | **$ 19.78** | 15,746 | $ 21.00 | 14,438 | $ 20.52 |

The following table summarizes information about stock options outstanding at December 29, 2006:

| **Exercise Price** | **Number Outstanding (000's)** | **Weighted-Average Remaining Contractual Life (Years)** | **Weighted-Average Exercise Price** | **Aggregate Intrinsic Value (Millions)** |
|---|---|---|---|---|
| **Options Outstanding:** | | | | |
| $10 to $15 | 822 | 3.29 | $ 12.25 | $ 19 |
| $15 to $20 | 14,155 | 5.38 | $ 18.08 | $ 248 |
| $20 to $25 | 3,695 | 1.85 | $ 22.13 | $ 50 |
| $25 to $30 | 748 | 1.01 | $ 27.42 | $ 6 |
| Total | 19,420 | 4.45 | $ 18.96 | $ 323 |
| **Options Exercisable:** | | | | |
| $10 to $15 | 822 | 3.29 | $ 12.25 | $ 19 |
| $15 to $20 | 7,687 | 4.91 | $ 18.95 | $ 128 |
| $20 to $25 | 3,695 | 1.85 | $ 22.13 | $ 50 |
| $25 to $30 | 466 | 0.81 | $ 28.08 | $ 3 |
| Total | 12,670 | 3.76 | $ 19.78 | $ 200 |

The total intrinsic value of options exercised, which represents the value paid to current and former employees that exercised options for fiscal year ended 2006, 2005, and 2004 were $147 million, $24 million, and $6 million, respectively.



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents



**NOTE 4. Stock Plans and Share-Based Compensation, continued**

***Restricted Stock Awards***

Restricted stock awards vest over an employment period of up to five years. The following table provides information about outstanding restricted stock awards.

| | Fiscal Years | | |
|---|---|---|---|
| | **2006** | 2005 | 2004 |
| Number of Restricted Stock Awards Outstanding *(Thousands)* | **220** | 550 | 518 |
| Weighted Average Fair Value at Grant Date | **$ 19.44** | $ 16.36 | $ 15.60 |
| Restricted Stock Award Expense *(Millions)* | **$ 2** | $ 2 | $ 2 |

***Long-term Incentive Plans***

The CSX Long-term Incentive Plans were adopted under the CSX Omnibus Incentive Plans. The objective of the 2004/2005 plan was to motivate and reward key members of management and executives for achieving and exceeding a two-year modified free cash flow goal, and the award was payable in cash and CSX common stock.

The plan expired on December 30, 2005, and CSX issued 1.5 million shares in 2006 as a result of the achievement of performance targets for the two preceding fiscal years. Additionally, CSX recognized $75 million and $10 million in expense associated with this program for the fiscal years 2005 and 2004, respectively.

Grants under two new Long-term Incentive Plans were made in 2006 in the form of performance units. One of the plans provides for a two-year cycle ending in fiscal year 2007 and the other plan provides for a three-year cycle ending in fiscal year 2008. For these plans, the key financial target is operating ratio for Surface Transportation, which is defined as annual operating expenses divided by revenue of CSX's rail and intermodal businesses and is calculated excluding non-recurring items. All units awarded are payable in CSX common stock. The payout range for the majority of participants will be between 0% and 200%, with each unit being equivalent to one share of CSX stock. The payout for certain senior executive officers is subject to a 20% increase if certain additional pre-established financial targets are achieved, which could result in a maximum payout of 240%. However, any payout to certain senior executive officers is also subject to a 30% reduction at the discretion of the Compensation Committee of the Board of Directors. Units in both plans have a weighted average grant date fair value of $36.79, which includes the value of both the initial grant and subsequent, smaller grants at different prices to new or promoted employees not previously included.



 Powered by Morningstar® Document Research℠

Table of Contents



**NOTE 4. Stock Plans and Share-Based Compensation, continued**

The Company began recording expense for these plans when the grants were made in May 2006, which resulted in compensation expense of $35 million for fiscal year 2006. As of December 29, 2006, there was $41 million of total unrecognized compensation cost related to these plans that is expected to be recognized over a weighted-average period of approximately 1.3 years. The activity related to each of these plans is summarized as follows:

| | 2006 - 2007 Plan Units Outstanding (000s) | 2006 - 2008 Plan Units Outstanding (000s) |
|---|---|---|
| Unvested at December 30, 2005 | — | — |
| Granted | 1,393 | 697 |
| Forfeited | (14) | (7) |
| Unvested at December 29, 2006 | 1,379 | 690 |

***Stock Plan for Directors***

The Stock Plan for Directors, approved by the shareholders in 1992, governs in part the manner in which directors' fees and retainers were paid. At the end of 2006, the minimum retainer to be paid in CSX common stock was 50% but each director may elect to receive the entire retainer and fees in CSX common stock. In addition, each director receives an annual payment made entirely in CSX common stock. The following table provides information about shares issued to directors.

| | Fiscal Years | | |
|---|---|---|---|
| | **2006** | 2005 | 2004 |
| Shares Issued to Directors *(Thousands)* | **70** | 74 | 82 |
| Expense *(Millions)* | **$ 3** | $ 2 | $ 1 |

For 2006, the Plan permitted each director, in accordance with Internal Revenue Code Section 409A, to defer receipt of fees. Deferred cash amounts were credited to an unfunded account and were invested in a choice of eight investment selections, including a CSX common stock equivalent fund. Distributions were made in accordance with elections made by the directors consistent with the terms of the Plan. At December 29, 2006, there were 1.1 million shares of common stock reserved for issuance under this Plan.

***Shareholder Dividend Reinvestment Plan***

CSX maintains the Shareholder Dividend Reinvestment Plan under which shareholders may use dividends paid on CSX common stock held in the plan to purchase additional shares of stock. The following table provides information about shares available for issuance under this plan at the end of fiscal years 2006, 2005 and 2004.

| | Fiscal Years | | |
|---|---|---|---|
| | **2006** | 2005 | 2004 |
| Number of Shares Available for Issuance *(Thousands)* | **10,642** | 10,295 | 9,894 |



 Powered by Morningstar® Document Research℠

Table of Contents



**NOTE 5. Hurricane Katrina**

In August 2005, Hurricane Katrina caused extensive damage to Company assets on the Gulf Coast, including damage to track infrastructure and bridges. Operations were returned to pre-hurricane conditions by the end of the first quarter of 2006.

In order to determine the proper accounting treatment for the damage, the Company reviewed EITF 01-10, *Accounting for the Impact of the Terrorist Attacks of September 11, 2001*, specifically Issue 3, of that consensus, in which the Task Force concluded that insurance recoveries in connection with property and casualty losses should be recognized when realization of the claim for recovery of a loss recognized in the financial statements is deemed probable. Information regarding the Company's insurance coverage, damage estimates and the allocation of the insurance deductible is as follows:

***Insurance Coverage***

In 2005, the Company had insurance coverage of $535 million, after a $25 million deductible (per occurrence), for the following types of losses:

1. Fixed Assets Damages—CSX is entitled to the current replacement cost of the damaged assets. The Company's bridges and track damaged by Hurricane Katrina comprised the majority of these types of losses.

2. Business Interruption—The Company is entitled to recover the increased costs incurred to allow the Company to continue operations and to minimize the overall business impact to the Company during the period of indemnity. These increased costs include rerouting costs and other costs.

3. Lost Profit—The Company is entitled to recover lost profits, net of associated expenses during the period of indemnity. The period of indemnity extends through the date which the railroad network was restored to its original operations.

The Company's insurance policies do not prioritize coverage based on types of losses. As claims were submitted to the insurance companies, they were reviewed and preliminary payments were received until all losses were incurred and documented. A final payment will be received once the Company and its insurers agree on the total value of the claim.



 Powered by Morningstar® Document Research℠

Table of Contents



**NOTE 5. Hurricane Katrina, continued**

***Damage Estimates***

Management's current loss estimate is approximately $450 million. Damages are categorized as follows:

1. Fixed Asset Damages—The cost estimate is based on the replacement value of approximately 39 miles of continuous track, six major bridges, numerous small bridges, signal and communication damage, locomotive repair and facilities damaged throughout the region.

2. Incremental Expenses—The Company's incremental expenses relate primarily to rerouting costs and other costs. Rerouting costs are costs to move traffic either through alternative locations on the Company's network or on other railroad lines. Other costs include debris removal, maintenance on equipment damaged by water, supplies, environmental expenses, maintenance labor and other various items.

3. Lost Profit—The Company estimated the impact on revenue at a location and customer-specific level.

***Allocation of Deductible***

The Company's insurance policies required its participation in the first $25 million of each loss event, without regard to the category of the covered losses. Although the Company's insurance policies do not specifically apply the deductible by the types of losses covered, CSX believes it is inconsistent with the form and economic substance of the Company's policies to attribute the entire deductible to a single component of covered losses. Therefore, the Company allocated the $25 million self-insured deductible among the three categories of losses in proportion to the best estimate of the total ultimate losses eligible for recovery under the Company's insurance policies. This estimate includes losses incurred in all three categories through the balance sheet date, as well as expected future losses attributable to incremental expenses and lost profits.

***Fixed Asset Damages***

Due to the significant difference between the carrying amount of property damaged and the estimated replacement cost of the property, the Company realized a net gain during 2006. This net gain resulted after applying the deductible of $15 million that was allocated to fixed asset damage. See also "Gain on Insurance Recoveries" below for further information.

***Incremental Expenses***

Because incremental expenses incurred to date were easily quantified shortly after incurrence and CSX's insurance policies explicitly cover such costs, the Company has concluded that recoveries attributed to incremental costs should be recognized when it is probable the insurance providers will settle the claim for the amount of recognized losses or as cash is received. No gain was recognized associated with incremental expenses, as recoveries were for the amounts of incurred expenses.



 Powered by Morningstar® Document Research℠

Table of Contents



**NOTE 5. Hurricane Katrina, continued**

***Lost Profits***

The financial statements of the Company were impacted by lost profits, as the Company did not earn revenues associated with covered losses. The Company believes lost profits are recoverable based on the insurance policy terms. However, because the insurance coverage associated with the recovery of lost profits is similar to a gain contingency, gains on lost profits are recognized only when cash is received. These lost profits are considered contingent gain due to the subjective nature of the coverage and longer time periods used to measure the lost profits as compared to other types of coverage.

Gains from lost profits were recognized during 2006. See "Gain on Insurance Recoveries" below for further information. The Company estimates that the 2005 operating income was impacted by $30 million due to lost profits.

***Gain on Insurance Recoveries***

In 2006, CSX recognized gains of $168 million pre-tax, on insurance recoveries from claims related to Hurricane Katrina. No gains were recognized in 2005. The gains are attributable to recovering amounts in excess of the net book value of fixed asset damages and to recording recoveries related to lost profits. Additional gains are expected in future periods as more cash is collected.

Gain contingencies subject to FIN 30, *Accounting for Involuntary Conversions of Nonmonetary Assets to Monetary Assets* and SFAS 5, *Accounting for Contingencies* ("SFAS 5"), were not recognized until the period in which all contingencies were resolved or cash proceeds were received. The probable insurance recovery of the replacement cost of property damage in excess of book value and the recovery of lost profits were considered to be gain contingencies. The Company believes it is appropriate to defer the net gain (after applying the insurance deductible) until all contingencies related to the gain were resolved or cash proceeds were received. Therefore, in measuring the losses incurred in 2005, attributed to Hurricane Katrina, the Company considered the actual losses reflected in the financial statements, the allocable deductible (based on expected total recoveries from insured losses), and recorded a receivable for the difference based on probable insurance recoveries at December 30, 2005.

This insurance receivable, net of $43 million cash insurance proceeds, was included in Accounts Receivable – Net at December 30, 2005. No receivables related to insurance recoveries existed at December 29, 2006. As of December 29, 2006, the Company has collected insurance payments of $338 million.

***Cash Flows***

In accordance with SFAS *95*, *Statement of Cash Flows*, CSX reported cash proceeds received from insurers as "Insurance Proceeds", in either cash flows from operating activities or cash flows from investing activities based on the type of cost to which the proceeds relate.



 Powered by Morningstar® Document Research℠

Table of Contents



**NOTE 6. Casualty, Environmental and Other Reserves**

Activity related to casualty, environmental and other reserves is as follows:

| *(Dollars in Millions)* | Casualty Reserves | Separation Liabilities | Environmental Reserves | Other Reserves | Total |
|---|---|---|---|---|---|
| Balance December 26, 2003 | $ 712 | $ 208 | $ 45 | $ 151 | $ 1,116 |
| Charged to Expense | 217 | 16 | 29 | 84 | 346 |
| Payments | (214) | (20) | (21) | (107) | (362) |
| Conrail Spin-off [(a)] | — | — | 6 | — | 6 |
| Reclassifications [(b)] | (10) | (49) | — | — | (59) |
| Balance December 31, 2004 | $ 705 | $ 155 | $ 59 | $ 128 | $ 1,047 |
| Charged to Expense | 181 | — | 32 | 47 | 260 |
| Change in Estimate | (38) | — | — | — | (38) |
| Payments | (173) | (34) | (20) | (78) | (305) |
| Balance December 30, 2005 | $ 675 | $ 121 | $ 71 | $ 97 | $ 964 |
| Charged to Expense | 143 | — | 20 | 48 | 211 |
| Payments | (181) | (16) | (20) | (52) | (269) |
| Reclassifications[(c)] | — | 15 | — | — | 15 |
| Balance December 29, 2006 | $ 637 | $ 120 | $ 71 | $ 93 | $ 921 |

*(a) Conrail spin-off in 2004 represents the Company assuming responsibility to reimburse Conrail $6 million for certain environmental liabilities retained by Conrail for facilities now owned by CSXT.*

*(b) The reclassifications in 2004 of $59 million represent obligations arising from the management restructuring program. Most of this liability was paid from CSX's qualified pension plan and therefore was reclassified to pension liabilities. Both items were reclassified to other long-term liabilities.*

*(c) The reclassifications in 2006 were reclassified from labor and fringe benefit payable.*

Casualty, environmental and other reserves were determined to be critical accounting estimates due to the need for significant management judgments. They are provided for in the Consolidated Balance Sheets as follows:

| | **December 29, 2006** | | | December 30, 2005 | | |
|---|---|---|---|---|---|---|
| *(Dollars in Millions)* | **Current** | **Long-term** | **Total** | Current | Long-term | Total |
| Casualty | **$ 172** | **$ 465** | **$ 637** | $ 227 | $ 448 | $ 675 |
| Separation | **20** | **100** | **120** | 20 | 101 | 121 |
| Environmental | **26** | **45** | **71** | 20 | 51 | 71 |
| Other | **35** | **58** | **93** | 44 | 53 | 97 |
| Total | **$ 253** | **$ 668** | **$ 921** | $ 311 | $ 653 | $ 964 |

***Casualty***

Casualty reserves represent accruals for personal injury and occupational injury claims. Currently, no individual claim is expected to exceed the Company's self-insured retention amount. To the extent the value of an individual claim exceeds the self-insured retention amount, CSX would present the liability on a gross basis with a corresponding receivable for insurance recoveries. Personal injury and occupational claims were presented on a gross basis and in accordance with SFAS 5, *Accounting for*



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents



**NOTE 6. Casualty, Environmental and Other Reserves, continued**

*Contingencies* ("SFAS 5"). These reserves fluctuate with estimates provided by independent third parties reviewed by management, offset by the timing of payments. Most of the claims were related to CSXT unless otherwise noted.

The amounts recorded by the Company for asbestos and other occupational liabilities were based upon currently known information and judgments based upon that information. Projecting future events, such as the number of new claims to be filed each year, the average cost of disposing of claims, as well as the numerous uncertainties surrounding asbestos and other occupational litigation or legislation in the United States, could cause the actual costs to be higher or lower than projected.

While the final outcome of casualty-related matters cannot be predicted with certainty, considering among other items the meritorious legal defenses available and the liabilities that have been recorded, it is the opinion of management that none of these items, when finally resolved, will have a material effect on the Company's results of operations, financial condition or liquidity. However, should a number of these items occur in the same period, they could have a material effect on the results of operations, financial condition or liquidity in a particular quarter or fiscal year.

*Personal Injury*

Personal injury represents liabilities for employee work-related and third-party injuries. Work-related injuries for CSXT employees were primarily subject to the Federal Employers' Liability Act ("FELA"). In addition to the FELA liabilities, employees of other CSX subsidiaries were covered by various state workers' compensation laws, the Federal Longshore and Harbor Worker's Compensation Program or the Maritime Jones Act.

CSXT retains an independent actuarial firm to assist management in assessing the value of personal injury claims and cases. An analysis is performed by the independent actuarial firm semi-annually and is reviewed by management. The methodology used by the actuary includes a development factor to reflect growth or reduction in the value of these personal injury claims. It is based largely on CSXT's historical claims and settlement experience. Actual results may vary from estimates due to the type and severity of the injury, costs of medical treatments, and uncertainties in litigation. Reserves for personal injury claims were $424 million and $421 million at December 29, 2006 and December 30, 2005, respectively.

*Occupational*

Occupational claims arise from allegations of exposure to certain materials in the work place. Examples of exposures would be asbestos, solvents (which include soaps and chemicals) diesel fuel, and alleged chronic physical injuries resulting from work conditions. Examples of claims arising from work conditions would be repetitive stress injuries, carpal tunnel syndrome or hearing loss.

Reserves for asbestos related claims were $121 million and $141 million at December 29, 2006 and December 30, 2005, respectively. Reserves for all other occupational claims were $92 million and $113 million at December 29, 2006 and December 30, 2005, respectively.



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents



**NOTE 6. Casualty, Environmental and Other Reserves, continued**

*Asbestos*

The Company is party to a number of occupational claims by employees alleging exposure to asbestos in the workplace. The heaviest possible exposure for employees was due to work conducted in and around steam locomotive engines that were largely phased out beginning around the 1950's. However, other types of exposures, including exposure from locomotive component parts and building materials, continued until it was substantially eliminated by 1985. Additionally, the Company has retained liability for asbestos claims filed against the previously owned international container shipping business.

The Company retains a third party specialist with extensive experience in performing asbestos and other occupational studies to assist management in assessing the value of the Company's claims and cases. The analysis is performed by the specialist semi-annually and is reviewed by management. The objective of the analysis is to determine the number of estimated incurred but not reported ("IBNR") claims and the estimated average cost per claim to be received over the next seven years. Seven years was determined by management to be the time period in which probable claim filings and claim values could be estimated with more certainty.

The Company, with the assistance of the third party specialist, determines its potentially exposed population from which it is able to derive the estimated number of IBNR claims. The estimated average cost per claim is then determined utilizing recent actual average cost per claim data and national industry data. Key elements of the assessment include the following:

- An estimate is computed using a ratio of Company employee data to national employment for select years during the period 1938-2001. The Company uses railroad industry historical census data because it does not have detailed employment records in order to compute the population of potentially exposed employees.

- The projected incidence of disease is estimated based on epidemiological studies using employees' age and the duration and intensity of potential exposure while employed. Epidemiology is the medical science that deals with the incidence, distribution and control of diseases in a population.

- An estimate of the future anticipated claims filing rate by type of disease (non-malignant, cancer and mesothelioma) is computed using the Company's average historical claim filing rates for a three-year calibration period, excluding a surge in claims originating in West Virginia. In 2006, the Company received 766 asbestos claims in West Virginia in which the claimants were neither exposed in West Virginia nor residents of the state. CSX believes these claims will not have standing in West Virginia and therefore are excluded from the calibration period. Management feels this calibration period represents the best estimate of future filing rates.

- An estimate of the future anticipated dismissal rate by type of claim is computed using the Company's historical average dismissal rates observed during the current calibration period noted above.

- An estimate of the future anticipated settlement by type of disease is computed using the Company's historical average of dollars paid per claim for pending and future claims using the average settlement by type of incident observed during the current calibration period noted above.

Table of Contents



**NOTE 6. Casualty, Environmental and Other Reserves, continued**

From these assumptions, the Company projects the incidence of each type of disease to the estimated population to determine the total estimated number of employees that could potentially assert a claim. Historical claim filing rates were applied for each type of disease to the total number of employees that could potentially assert a claim to determine the total number of anticipated claim filings by disease type. Historical dismissal rates, which represented claims that were closed without payment, were deducted to calculate the number of future claims by disease type that would likely require payment by the Company. Finally, the number of such claims was multiplied by the average settlement value to estimate the Company's future liability for IBNR asbestos claims.

The estimated future filing rates and estimated average claim values were the most sensitive assumptions for this reserve. A 1% increase or decrease in either the forecasted number of IBNR claims or the average claim values would result in an approximate $1 million increase or decrease in the liability recorded for unasserted asbestos claims.

Undiscounted liabilities recorded related to asbestos claims were as follows:

| *(Dollars in Millions)* | **December 29, 2006** | December 30, 2005 |
|---|---|---|
| **Asbestos** | | |
| Incurred but not reported claims | **$ 52** | $ 54 |
| Asserted claims | **69** | 87 |
| Total liability | **$ 121** | $ 141 |
| Current liability | **$ 30** | $ 37 |

Defense and processing costs, which historically have been insignificant and are anticipated to be insignificant in the future, were not included in the recorded liability. The Company is presently self-insured for asbestos-related claims.

In 2005, management updated its estimate of the unasserted liability exposure with the assistance of the third party specialists, which resulted in recognition of a $48 million favorable change associated with asbestos liabilities (net $38 million favorable change for all occupational liabilities). During 2004 and 2005, asbestos related disease claims filed against the Company dropped substantially, particularly bulk claims filed by certain law firms. In 2003, the Company received a significant number of filings. The Company believes the number was attributable to an attempt to file before a new, more restrictive venue law took effect in West Virginia in mid-2003. As a result, management reassessed the calibration period from a four-year average as mentioned before to a three-year average, excluding the surge in claims originating in West Virginia. Management believes this calibration period represents the best estimate of future filing rates. There have been no significant changes in 2006.



 Powered by Morningstar® Document Research℠

Table of Contents



**NOTE 6. Casualty, Environmental and Other Reserves, continued**

*Other Occupational*

The Company retains a third party specialist with extensive experience in performing other occupational studies to assist management in assessing the value of the Company's claims and cases. The analysis is performed by the specialist semi-annually and is reviewed by management. Similar to the asbestos liability estimation process, the key elements of the assessment include the following:

- An estimate of the potentially exposed population for other occupational diseases is calculated by projecting active versus retired work force from 2002 to 2010 using a growth rate projection for overall railroad employment made by the Railroad Retirement Board in its June 2003 report.

- An estimate of the future anticipated claims filing rate by type of injury, employee type, and active versus retired employee is computed using the Company's average historical claim filing rates for the calibration periods management felt were representative of future filing rates. For carpal tunnel and repetitive stress injuries, the current calibration period is a 1-year average of claim filings. Hearing loss uses a 3-year calibration period, and all other diseases or injuries use a 2-year calibration period. An estimate is made to forecast future claims by using the filing rates by disease and the active and retired CSX population each year.

- An estimate of the future anticipated settlement by type of injury is computed using the Company's historical average of dollars paid per claim for pending and future claims using the average settlement by type of injury observed during a period that management feels is representative of future settlement amounts.

The estimated future filing rates and estimated average claim values were the most sensitive assumptions for this reserve. A 1% increase or decrease in either the forecasted number of IBNR claims or the average claim values would result in an approximate $1 million increase or decrease in the liability recorded for unasserted other occupational claims.

Undiscounted recorded liabilities related to other occupational claims were as follows:

| *(Dollars in Millions)* | **December 29, 2006** | December 30, 2005 |
|---|---|---|
| **Other Occupational** | | |
| Incurred But Not Reported Claims | **$ 53** | $ 63 |
| Asserted Claims | **39** | 50 |
| Total Liability | **$ 92** | $ 113 |
| Current Liability | **$ 30** | $ 18 |

Defense and processing costs, which historically have been insignificant and were anticipated to be insignificant in the future, were not included in the recorded liability. The Company is presently self-insured for other occupational-related claims.

During 2005, the Company experienced an unfavorable trend in settlement values for repetitive stress and other injuries, which resulted in the recognition of a $10 million unfavorable change in estimate associated with these liabilities. There have been no significant changes in 2006.



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents



**NOTE 6. Casualty, Environmental and Other Reserves, continued**

*Summary*

A summary of asbestos and other occupational claims activity is as follows:

| | Fiscal Years | |
|---|---|---|
| | **2006** | 2005 |
| **Asserted Claims** | | |
| Open Claims—Beginning of Year | **10,639** | 11,461 |
| New Claims Filed | **1,504** | 765 |
| Claims Settled | **(767)** | (1,206) |
| Claims Dismissed | **(260)** | (381) |
| Open Claims—End of Year | **11,116** | 10,639 |

Approximately 6,000 of the open claims at December 29, 2006 were asbestos claims against the Company's previously owned international container-shipping business. Because these claims were against multiple vessel owners, the Company's reserves reflected its portion of those claims. The Company had approximately $9 million and $11 million reserved for those shipping business claims at December 29, 2006 and December 30, 2005, respectively. The remaining open claims were asserted against CSXT.

***Separation***

Separation liabilities provide for the estimated costs of implementing workforce reductions, improvements in productivity and other cost reductions at the Company's major transportation units since 1991. These liabilities are expected to be paid out over the next 15 to 20 years from general corporate funds and may fluctuate depending on the timing of payments and associated taxes.

***Environmental***

The Company is a party to various proceedings, including administrative and judicial proceedings, involving private parties and regulatory agencies related to environmental issues. The Company was identified as a potentially responsible party at approximately 254 environmentally impaired sites, many of which were, or may be, subject to remedial action under the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, or CERCLA, also known as the Superfund Law, or similar state statutes. The majority of these proceedings arose from environmental conditions on properties used for ongoing or discontinued railroad operations. However, a number of these proceedings were based on allegations that the Company, or its predecessors, sent hazardous substances for disposal to facilities owned or operated by others. In addition, some of the Company's land holdings were leased to others for commercial or industrial operations that may have resulted in releases of hazardous substances or other regulated materials onto the property and could give rise to proceedings against the Company.

In any such proceedings, the Company is subject to environmental clean-up and enforcement actions under the Superfund Law, as well as similar state laws that may impose joint and several liability for clean-up and enforcement costs on current and former owners and operators of a site without regard to fault or the legality of the original conduct. These costs could be substantial.



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents



**NOTE 6. Casualty, Environmental and Other Reserves, continued**

At least once a quarter, the Company reviews its role with respect to each site identified. Based on the review process, the Company has recorded amounts to cover anticipated contingent future environmental remediation costs with respect to each site to the extent such costs are estimable and probable. The recorded liabilities for estimated future environmental costs are undiscounted and include amounts representing the Company's estimate of unasserted claims, which the Company believes to be immaterial. The liability includes future costs for remediation and restoration of sites as well as any significant ongoing monitoring costs, but excludes any anticipated insurance recoveries.

Currently, the Company does not possess sufficient information to reasonably estimate the amounts of additional liabilities, if any, on some sites until completion of future environmental studies. In addition, conditions that are currently unknown could, at any given location, result in exposure, the amount and materiality of which cannot presently be reliably estimated. Based upon information currently available, however, the Company believes its environmental reserves are adequate to accomplish remedial actions to comply with present laws and regulations, and that the ultimate liability for these matters, if any, will not materially affect its overall results of operations, financial condition and liquidity.

**Other**

Other reserves of $93 million include liabilities for various claims, such as longshoremen disability claims, freight claims, and claims for property, automobile and general liability. These liabilities are accrued at the estimable and probable amount, in accordance with SFAS 5.

Longshoremen disability claims represent liability for assessments under Section 8f of the United States Longshore and Harbor Workers' Compensation Act. These reserves have amounts accrued for second injury fund liabilities, which represent the non-medical portion of employee claims which are paid by the United States Department of Labor and are attributed to an earlier injury to the same employee.

Freight claims represent claims for both freight loss and damage and freight rate disputes. Freight loss and damage claims are liabilities that resulted in lost or damaged customer freight while being handled by the Company's transportation services. Freight rate disputes represent liabilities for customer claims regarding the rate charged by the Company for its transportation services. Liabilities for freight rate disputes are recorded as a reduction of revenue.

The Company accrues for claims related to property, automobile and general liability. The Company is also required to maintain primary and state mandated coverage for company property and vehicle fleets. General liability is coverage for liability arising from operations of non-rail CSX subsidiaries.



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents



**NOTE 7. Commitments and Contingencies**

***Lease Commitments***

The Company has various lease agreements with other parties with terms up to 30 years. Non-cancelable, long-term leases generally include provisions for maintenance, options to purchase and options to extend the terms.

At December 29, 2006, minimum building and equipment rentals and commitments for vessels under these operating leases were as follows:

*(Dollars in millions)*

| Years | Operating Leases | Sublease Income | Net Lease Commitments |
|---|---|---|---|
| 2007 | $ 252 | $ 69 | $ 183 |
| 2008 | 174 | 48 | 126 |
| 2009 | 135 | 37 | 98 |
| 2010 | 108 | 31 | 77 |
| 2011 | 75 | 17 | 58 |
| Thereafter | 305 | 96 | 209 |
| Total | $ 1,049 | $ 298 | $ 751 |

Operating leases and an equal portion of sublease income include approximately $216 million relating to ongoing operating lease commitments for vessels and equipment, which have been subleased to Horizon Lines LLC ("Horizon"), a former subsidiary previously named CSX Lines. CSX believes Horizon will fulfill its contractual commitments with respect to such leases, and CSX will have no further liabilities for those obligations.

In addition to the commitments in the following table, the Company also has agreements covering equipment leased from Conrail. (See Note 17, Related Party Transactions, for a description of these commitments.)

| | Fiscal Years | | |
|---|---|---|---|
| *(Dollars in Millions)* | **2006** | 2005 | 2004 |
| Rent Expense on Operating Leases | **$ 514** | $ 523 | $ 567 |

The majority of rent expense on operating leases relates to net daily rental charges on railroad operating equipment, which are not long-term commitments. The Company recognizes rent expense associated with operating leases that include escalations over their term using the straight-line method.

***Purchase Commitments***

CSXT has a commitment under a long-term maintenance program that currently covers 40% of CSXT's fleet of locomotives. The agreement is based on the maintenance cycle for each locomotive and is currently predicted to expire no earlier than 2026 and as late as 2031, depending upon when additional locomotives are placed in service. The costs expected to be incurred through the duration of the agreement fluctuate as locomotives are placed into or removed from service or as required maintenance is adjusted. CSXT may terminate the agreement at its option after 2012, although such action would trigger certain liquidated damages provisions. Under the program, CSXT paid $183 million, $170 million and $151 million during the fiscal years ended 2006, 2005 and 2004, respectively.



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents



**NOTE 7. Commitments and Contingencies, continued**

As a result of agreements executed in August 2005 and February 2006, CSXT has purchase obligations supporting a multi-year plan to acquire additional locomotives between 2006 and 2011. The amount of the ultimate purchase commitment depends upon the model of locomotive acquired and the timing of delivery. Annual payments under the long-term maintenance program and locomotive purchase obligations were estimated as follows:

| (Dollars in Millions) | Payments |
|---|---|
| 2007 | $ 380 |
| 2008 | 441 |
| 2009 | 411 |
| 2010 | 252 |
| 2011 | 268 |
| 2012-2031 | 5,241 |
| Total | $ 6,993 |

Additionally, the Company has various other commitments to purchase technology, communications, railcar maintenance and other services from various suppliers. The largest purchase obligation is for railcar maintenance of $79 million over the next two years. Annual payments under these additional purchase commitments were estimated as follows:

| (Dollars in Millions) | Payments |
|---|---|
| 2007 | $ 89 |
| 2008 | 85 |
| 2009 | 40 |
| 2010 | 31 |
| 2011 | 5 |
| 2012-2031 | 6 |
| Total | $ 256 |

***Insurance***

The Company maintains numerous insurance programs, most notably for third-party casualty liability and for Company property damage and business interruption with substantial limits. A specific amount of risk ($25 million per occurrence) is retained by the Company on the casualty program and non-catastrophic property damage. The Company retains $50 million of risk per occurrence for its catastrophic property coverage. For information on insurance issues resulting from the effects of Hurricane Katrina on the Company's operations and assets, see Note 5, Hurricane Katrina.



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents



**NOTE 7. Commitments and Contingencies, continued**

***Guarantees***

CSX and its subsidiaries are contingently liable individually and jointly with others as guarantors of approximately $95 million in obligations principally relating to leased equipment, vessels and joint facilities used by the Company in its business operations. Utilizing the Company's guarantee for these obligations allows the obligor to take advantage of lower interest rates and obtain other favorable terms. Guarantees are contingent commitments issued by the Company that could require CSX or one of its affiliates to make payment to or to perform certain actions for the beneficiary of the guarantee based on another entity's failure to perform.

At December, 2006, the Company's guarantees primarily related to the following:

1. Guarantee of approximately $73 million of obligations of a former subsidiary, CSX Energy, in connection with a sale-leaseback transaction. CSX is, in turn, indemnified by several subsequent owners of the subsidiary against payments made with respect to this guarantee. Management does not expect that the Company will be required to make any payments under this guarantee for which CSX will not be reimbursed.

2. Guarantee of approximately $8 million relating to leases assumed as part of the conveyance of its interest in Horizon. The Company believes Horizon will fulfill its contractual commitments with respect to such leases, and the Company will have no further liabilities for those obligations.

3. Guarantee of approximately $13 million of lease commitments assumed by A.P. Moller-Maersk ("Maersk") for which CSX is contingently liable. CSX believes Maersk will fulfill its contractual commitments with respect to such lease commitments, and CSX will have no further liabilities for those obligations.

As of December 29, 2006, the Company has not recognized any liabilities in its financial statements in connection with any guarantee arrangements. The maximum amount of future payments the Company could be required to make under these guarantees is the amount of the guarantees themselves.

***Other Legal Proceedings***

The Company is involved in routine litigation incidental to its business and is a party to a number of legal actions and claims, various governmental proceedings and private civil lawsuits, including, but not limited to, those related to environmental matters, FELA claims by employees, other personal injury claims, and disputes and complaints involving certain transportation rates and charges. Some of the legal proceedings include claims for compensatory as well as punitive damages, and others purported to be class actions. While the final outcome of these matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded along with applicable insurance, it is currently the opinion of CSX management that none of these items will have a material adverse effect on the results of operations, financial condition or liquidity of the Company. An unexpected adverse resolution of one or more of these items, however, could have a material adverse effect on the results of operations, financial condition or liquidity of the Company in a particular quarter or fiscal year.



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents



## NOTE 8. Employee Benefit Plans

***General***

The Company sponsors defined benefit pension plans principally for salaried, management personnel. The plans provide eligible employees with retirement benefits based predominantly on years of service and compensation rates near retirement. Employees hired after December 31, 2002 are covered by a cash balance plan, which provides benefits by utilizing interest and pay credits based upon age, service, and compensation.

In addition to these plans, CSX sponsors one post-retirement medical plan and one life insurance plan that provide benefits to full-time, salaried, management employees hired prior to January 1, 2003, upon their retirement if certain eligibility requirements are met. The post-retirement medical plan is contributory (partially funded by retirees), with retiree contributions adjusted annually. The life insurance plan is non-contributory.

| | Summary of Participants as of January 1, 2006 | |
|---|---|---|
| | Pension Plans | Post-retirement Medical Plan |
| Active Employees | 6,433 | 4,199 |
| Retirees and Beneficiaries | 10,834 | 10,987 |
| Other (a) | 6,031 | 264 |
| Total | 23,298 | 15,450 |

(a) *For pension plans, the other category consists of terminated but vested former employees. For post-retirement plans, the other category consists of employees on long-term disability that have not yet retired.*

In September 2006, FASB issued SFAS 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans, an amendment of FASB Statements No. 87, 88, 106, and 132 (R) ("SFAS 158")*, which changed the accounting rules for reporting and disclosures related to pension and other post-retirement benefit plans. Companies are now required to include on the balance sheet an additional asset or liability to reflect the funded status of retirement and other post-retirement benefit plans, and a corresponding after-tax adjustment to equity. Retroactive application of this accounting rule is prohibited; therefore, 2006 is presented as required by SFAS 158 and 2005 is presented as required under the accounting rules prior to SFAS 158. The adoption in 2006 had no effect on the computation of net periodic benefit expense for pensions and post-retirement benefits. Effective 2008, CSX will be required to change the measurement date for pension and post-retirement benefit plans from September 30 to the last day of the fiscal year.

As currently permitted by SFAS 87, *Employers Accounting for Pensions* ("SFAS 87"), the Company has elected to use a plan measurement date of September 30 to actuarially value its pension and post-retirement plans.

The Company engages independent, external actuaries to compute the amounts of liabilities and expenses relating to these plans subject to the assumptions that the Company selects.

The benefit obligation for these plans represents the liability of the Company for current and retired employees and is affected primarily by the following:

- Service cost (benefits attributed to employee service during the period)
- Interest cost (interest on the liability due to the passage of time)



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents



**NOTE 8. Employee Benefit Plans, continued**

- Actuarial gains/losses (experience during the year different from that assumed and changes in plan assumptions)
- Benefits paid to participants

***Pension Protection Act of 2006***

In August 2006, the President of the United States signed the Pension Protection Act of 2006 into law. Included in this legislation were changes to the method of valuing pension plan assets and liabilities for funding purposes, as well as the minimum funding levels required by 2008. CSX is determining what impact the new requirements will have on the Company's future cash flow; however, initial estimates forecast a 2008 unfunded liability of approximately $185 million after tax. This estimate will be affected by future contributions, investment returns on plan assets, and interest rates. Under the transition rules provided, CSX must begin funding of this shortfall no later than 2009, and must complete the funding by 2014. The Company anticipates funding pension contributions with cash from operations.

***Medicare Prescription Drug, Improvement and Modernization Act of 2003***

As required by the Medicare Prescription Drug, Improvement and Modernization Act of 2003 ("The Act"), the Company has determined that its medical plan's prescription drug benefit qualifies as actuarially equivalent to the benefit that would be paid under the Act.

The Company has applied for the tax free 28% federal reimbursement of total prescription drug claims from $250 to $5,000 paid after December 31, 2005, and received $4 million in reimbursement in 2006.

***Cashflows***

Plan assets are amounts that had been segregated and restricted to provide benefits, and include amounts contributed by the Company and amounts earned from investing contributions, less benefits paid. The Company funds the cost of the post-retirement medical and life insurance benefits on a pay-as-you go basis. CSX expects to make cash contributions of approximately $8 million to its pension plans in 2007.

The benefits as of December 29, 2006, expected to be paid in each of the next five fiscal years, and in the aggregate for the five fiscal years thereafter were as follows:

| | Expected Cash Flows | |
|---|---|---|
| *(Dollars in Millions)* | Pension Benefits | Post-retirement Benefits |
| 2007 | $ 129 | $ 44 |
| 2008 | 130 | 43 |
| 2009 | 132 | 42 |
| 2010 | 132 | 40 |
| 2011 | 132 | 39 |
| Thereafter | 653 | 162 |
| Total | $ 1,308 | $ 370 |



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents



**NOTE 8. Employee Benefit Plans, continued**

***Plan Assets***

Asset management for the pension fund is founded on an asset allocation strategy that was developed using asset return simulation in conjunction with projected plan liabilities. The allocation seeks maximization of returns within the constraints of acceptable risks considering the long-term investment horizon. CSX has established a target allocation of 60% equity and 40% fixed income investments.

The distribution of pension plan assets as of the measurement date is as follows:

| | September 30, 2006 | | September 30, 2005 | |
|---|---|---|---|---|
| *(Dollars in Millions)* | Amount | Percent of Total Assets | Amount | Percent of Total Assets |
| Common Stocks | $ 900 | 60% | $ 928 | 60% |
| Fixed Income | 598 | 39% | 591 | 39% |
| Cash and Cash Equivalents | 13 | 1% | 17 | 1% |
| Total | $ 1,511 | 100% | $ 1,536 | 100% |

The Company provides investment guidelines to both the plan's fixed income and equity fund managers. Within the broad asset classes that comprise the plan's investments, common stocks were diversified based on allocations to domestic and foreign stocks as mandated by the Company. Allocations were maintained within 3% of targets. The U.S. stock segment includes style diversification among managers of large capitalization stocks and small capitalization stocks. The Company limits industry sectors, outlines individual stock issuer concentration and monitors the use of derivatives and CSX securities.

Fixed income securities were diversified across fund managers and investment style and were benchmarked to a long duration index. The Company specifies the types of allowable investments such as government, corporate and asset-backed bonds, and limits diversification between domestic and foreign investments and the use of derivatives. Additionally, the Company stipulates minimum credit quality constraints and any prohibited securities.

Individual investments or fund managers were selected carefully in accordance with standards of prudence as it applies to asset diversification and investment suitability. Monitoring fund investment performance is ongoing. Acceptable performance is determined in the context of the long-term return objectives of the fund and appropriate asset class benchmarks.



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents



**NOTE 8. Employee Benefit Plans, continued**

***Benefit Obligation and Plan Asset Information***

The following is a reconciliation of the beginning and ending balances of the benefit obligation and the fair value of plan assets as of year end:

| *(Dollars in Millions)* | Pension Benefits | | Post-retirement Benefits | |
|---|---|---|---|---|
| | **December 29, 2006** | December 30, 2005 | **December 29, 2006** | December 30, 2005 |
| **Actuarial Present Value of Benefit Obligation** | | | | |
| Accumulated Benefit Obligation | **$ 1,942** | $ 1,947 | **N/A** | N/A |
| Projected Benefit Obligation | **2,075** | 2,078 | **$ 398** | $ 444 |
| **Change in Projected Benefit Obligation:** | | | | |
| Projected Benefit Obligation at Beginning of Plan Year | **$ 2,078** | $ 1,941 | **$ 444** | $ 509 |
| Service Cost | **36** | 34 | **7** | 8 |
| Interest Cost | **105** | 107 | **21** | 24 |
| Impact of Plan Changes/Special Termination Benefits | **—** | 2 | **—** | — |
| Plan Participants’ Contributions | **—** | — | **16** | 14 |
| Actuarial (Gain)/Loss | **2** | 141 | **(35)** | (58) |
| Benefits Paid | **(146)** | (147) | **(55)** | (53) |
| Benefit Obligation at End of Plan Year | **$ 2,075** | $ 2,078 | **$ 398** | $ 444 |
| **Change in Plan Assets:** | | | | |
| Fair Value of Plan Assets at Beginning of Plan Year | **$ 1,536** | $ 1,458 | **N/A** | N/A |
| Actual Return on Plan Assets | **99** | 210 | **N/A** | N/A |
| Employer Contributions | **22** | 15 | **$ 39** | $ 39 |
| Plan Participants’ Contributions | **—** | — | **16** | 14 |
| Benefits Paid | **(146)** | (147) | **(55)** | (53) |
| Fair Value of Plan Assets at End of Plan Year | **$ 1,511** | $ 1,536 | **$ —** | $ — |
| **Funded Status at end of Plan Year** | **$ (564)** | $ (542) | **$ (398)** | $ (444) |



 Powered by Morningstar® Document Research℠

Table of Contents



**NOTE 8. Employee Benefit Plans, continued**

***Funded Status and Amounts Recognized in Consolidated Balance Sheets***

The funded status, or amount by which the benefit obligation exceeds the fair value of plan assets, represents a liability. At December 29, 2006, the status of CSX plans was as follows:

| | Aggregate Projected Benefit Obligation | Aggregate Fair Value of Plan Assets |
|---|---|---|
| For plans with a projected benefit obligation in excess of plan assets | 2.3 billion | 1.5 billion |
| For plans with an accumulated benefit obligation in excess of plan assets | 2.2 billion | 1.5 billion |

Effective 2006, SFAS 158 required that companies recognize a balance sheet asset or liability for each of their pension and other post-retirement benefit plans equal to the funded status of the plan, as shown above.

For 2005, a liability was recognized if net periodic pension cost recognized exceeds amounts the employer had contributed to the plan. An asset was recognized if net periodic pension cost was less than amounts the employer had contributed to the plan. 2006 pension liability was equal to the funded status of the plans, to reflect the change in presentation from applying SFAS 158.

The following table shows the reconciliation of the funded status of the Company's plans with the amount recorded in the Consolidated Balance Sheets:

| | Pension Benefits | | Post-retirement Benefits | |
|---|---|---|---|---|
| *(Dollars in Millions)* | **December 29, 2006** | December 30, 2005 | **December 29, 2006** | December 30, 2005 |
| Funded Status | $ (564) | $ (542) | $ (398) | $ (444) |
| Unrecognized Actuarial Loss | — | 477 | — | 114 |
| Unrecognized Prior Service Cost | — | 23 | — | (14) |
| Fourth Quarter Activity: | | | | |
| Employer Contributions to Pension Plans | 24 | 4 | — | — |
| Net Post-retirement Benefits Paid | — | — | 10 | 11 |
| Net Amount Recognized in Consolidated Balance Sheet | $ (540) | $ (38) | $ (388) | $ (333) |



 Powered by Morningstar® Document Research℠

Table of Contents



**NOTE 8. Employee Benefit Plans, continued**

***Net Periodic Benefit Expense***

The following table describes the components of net periodic benefit expense.

| | Pension Benefits | | | Post-retirement Benefits | | |
|---|---|---|---|---|---|---|
| | Fiscal Years | | | Fiscal Years | | |
| *(Dollars in Millions)* | **2006** | 2005 | 2004 | **2006** | 2005 | 2004 |
| Service Cost | **$ 36** | $ 34 | $ 37 | **$ 7** | $ 8 | $ 9 |
| Interest Cost | **105** | 107 | 111 | **21** | 24 | 25 |
| Expected Return on Plan Assets | **(117)** | (120) | (130) | **—** | — | — |
| Amortization of Prior Service Cost | **4** | 4 | 4 | **(5)** | (5) | (6) |
| Amortization of Net Loss | **34** | 21 | 14 | **7** | 13 | 15 |
| Net Periodic Benefit Cost | **$ 62** | $ 46 | $ 36 | **$ 30** | $ 40 | $ 43 |
| Special Termination Benefits—Workforce Reduction Program /Curtailments | **—** | — | 6 | **—** | — | 18 |
| Net Periodic Benefit Expense Including Termination Benefits | **$ 62** | $ 46 | $ 42 | **$ 30** | $ 40 | $ 61 |

Due to the termination of employees under the management restructuring plan (see Note 15, Management Restructuring), a curtailment occurred in CSX's pension plan and post-retirement medical plan. The estimated cost of the curtailments of $24 million was included in the management restructuring charge for the fiscal year 2004. Due to the curtailments, the Company was required to update its measurement of the assets and obligations of these plans, which affected the net periodic benefit costs beginning in 2004. A substantial portion of benefits provided under the management restructuring initiatives was paid from assets of the Company's defined benefit pension plans.



 Powered by Morningstar® Document Research℠

Table of Contents

CSX CORPORATION
PART II
Item 8. Financial Statements and Supplementary Data

**NOTE 8. Employee Benefit Plans, continued**

***Pension and OPEB Adjustments***

During 2006 and 2005, CSX recorded changes in its pension liabilities, which included 42% of the change in the pension liability for Conrail, its equity investee. The following table shows the pre-tax change in other comprehensive income (loss) attributable to the components of net expense and the change in benefit obligation.

| Components of Other 2006 Comprehensive Income (loss) | Pension Benefits December 2006 Income (Loss) | Pension Benefits December 2005 Income (Loss) | Post-retirement Benefits December 2006 Income (Loss) | Post-retirement Benefits December 2005 Income (Loss) |
|---|---|---|---|---|
| *(Dollars in Millions)* | | | | |
| Gains (Losses) | | | | |
| Recognized During the Period | **$ 62** | $ 9 | **$ 71** | — |
| Recognized as a Component of Net Periodic Benefit Cost [(a)] | **34** | 21 | **7** | 13 |
| Prior Service Cost | | | | |
| Recognized During the Period | **19** | — | **(8)** | — |
| Recognized as a Component of Net Periodic Benefit Cost [(b)] | **4** | 4 | **(5)** | (5) |
| Increase in Pension Liability Included in Other Comprehensive Income Prior to Adoption of SFAS 158 | **2** | 6 | **—** | — |
| Effect of Adoption of SFAS 158 (after tax) | **44** | N/A | **39** | N/A |

*(a) The estimated amount to be expensed for 2007 is $30 million for pension benefits and $4 million for post-retirement benefits.*

*(b) The estimated amount to be expensed for 2007 is $4 million for pension benefits and a $5 million expense reduction for post-retirement benefits.*

The balance as of December 2006 of pre-tax amounts to be amortized in the future that are included in Accumulated Other Comprehensive Income (a component of Stockholders' Equity) are listed below:

| | Pension Benefits | Post-retirement Benefits |
|---|---|---|
| (Gains)/Losses | $ 463 | $ 71 |
| Prior Service Costs | 19 | (8) |
| Total | $ 482 | $ 63 |



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents



**NOTE 8. Employee Benefit Plans, continued**

***Incremental Effect to the Balance Sheet***

The following table illustrates the incremental effect of applying SFAS 158 on individual items on the Company's Consolidated Balance Sheet at December 29, 2006:

| *(Dollars in Millions)* | Balance prior to adoption of SFAS 158 and the minimum pension liability adjustment | Increase (Decrease) Minimum liability adjustment | Balance prior to adoption of SFAS 158 | Increase (Decrease) SFAS 158 adoption adjustments | Ending balance after adoption of SFAS 158 |
|---|---|---|---|---|---|
| Intangible Assets | $ 23 | $ (4) | $ 19 | $ (19) | $ — |
| Pension Assets | 105 | (31) | 74 | (74) | — |
| Investment in Conrail | 599 | — | 599 | 8 | 607 |
| **Total Assets** | **25,249** | (35) | **25,214** | (85) | **25,129** |
| Post-retirement Benefits Liability | 322 | 3 | 325 | 63 | 388 |
| Pension Benefits Liability | 587 | (34) | 553 | (13) | 540 |
| Deferred Income Taxes | 6,161 | 1 | 6,162 | (52) | 6,110 |
| **Total Liabilities** | **16,219** | (30) | **16,189** | (2) | **16,187** |
| Retained Earnings | 7,430 | (3) | 7,427 | — | 7,427 |
| Accumulated Other Comprehensive Income | (307) | (2) | (309) | (83) | (392) |
| Total Stockholder Equity | 9,030 | (5) | 9,025 | (83) | 8,942 |
| **Total Liabilities and Equity** | **$ 25,249** | $ (35) | **$ 25,214** | $ (85) | **$ 25,129** |

***Assumptions***

Weighted-average assumptions used in accounting for the plans were as follows:

| | Pension Benefits | | Post-retirement Benefits | |
|---|---|---|---|---|
| | **2006** | **2005** | **2006** | **2005** |
| Expected Long-term Return on Plan Assets: | | | | |
| Benefit Cost for Plan Year | **8.50%** | 8.50% | **N/A** | N/A |
| Benefit Obligation at End of Plan Year | **8.50%** | 8.50% | **N/A** | N/A |
| Discount Rates: | | | | |
| Benefit Cost for Plan Year | **5.25%** | 5.75% | **5.00%** | 5.00% |
| Benefit Obligation at End of Plan Year | **5.75%** | 5.25% | **5.50%** | 5.00% |
| Salary Scale Inflation | **4.10%** | 3.60% | **4.10%** | 3.60% |



 Powered by Morningstar® Document Research℠

Table of Contents



**NOTE 8. Employee Benefit Plans, continued**

The net post-retirement benefit obligation was determined using the following assumptions for health care cost trend rate for medical plans. The rate is assumed to gradually decrease to 4.5% by 2014. Additionally, there are cost differentials between Medicare and Non-Medicare eligible individuals which is reflected below.

| | Post-retirement Benefits | |
|---|---|---|
| | **2006** | 2005 |
| Health Care Cost Trend Rate | | |
| Components of Benefit Cost: Non-Medicare Eligible | **11%** | 12% |
| Components of Benefit Cost: Medicare Eligible | **12%** | 13% |
| Benefit Obligations: Non-Medicare Eligible | **10%** | 11% |
| Benefit Obligations: Medicare Eligible | **11%** | 12% |

For every 1% change in the assumed health care cost trend rate, service and interest cost will change $1 million (Income Statement impact) and the Company's benefit obligation will change $13 million (Balance Sheet impact).

***Other Plans***

The Company maintains savings plans for virtually all full-time salaried employees and certain employees covered by collective bargaining agreements. Expense associated with these plans was $18 million, $19 million and $15 million for 2006, 2005 and 2004, respectively.

Under collective bargaining agreements, the Company participates in a multi-employer benefit plan, which provides certain postretirement health care and life insurance benefits to eligible contract employees. Premiums under this plan are expensed as incurred and amounted to $30 million in 2006, $30 million in 2005 and $24 million in 2004.

**NOTE 9. Debt and Credit Agreements**

Debt was as follows:

| *(Dollars in Millions)* | **Maturity** | **Average Interest Rates at December 29, 2006** | **December 29, 2006** | December 30, 2005 |
|---|---|---|---|---|
| Notes | 2007-2043 | 6.9% | **$ 4,924** | $ 4,891 |
| Convertible Debentures, net of $75 and $80 discount, respectively | 2021 | 1.0% | **473** | 468 |
| Equipment Obligations | 2007-2015 | 6.9% | **446** | 549 |
| Other Obligations, Including Capital Leases | 2007-2015 | 6.5% | **111** | 121 |
| Total Long-term Debt (including current portion) | | | **5,954** | 6,029 |
| Less Debt Due within One Year | | | **(592)** | (936) |
| Total Long Term Debt (excluding current portion) | | | **$ 5,362** | $ 5,093 |



 Powered by Morningstar® Document Research℠

Table of Contents



**NOTE 9. Debt and Credit Agreements, continued**

***Debt Repurchased***

In June 2005, CSX repurchased $1.0 billion of its publicly-traded notes listed below.

| Notes | Principal Amount Outstanding | Aggregate Principal Amount of Tendered Notes Accepted for Purchase |
|---|---|---|
| *(Dollars in Millions)* | | |
| CSX 2.75% Notes due 2006 | $ 200 | $ 186 |
| CSX 9% Notes due 2006 | 300 | 206 |
| CSX Floating Rate Notes due 2006 | 300 | 58 |
| CSX 8.625% Notes due 2022 | 200 | 84 |
| CSX 7.95% Notes due 2027 | 500 | 227 |
| CSX 8.10% Notes due 2022 | 150 | 57 |
| CSX 7.25% Notes due 2027 | 250 | 167 |
| CSX 7.90% Notes due 2017 | 400 | 15 |
| | $ 2,300 | $ 1,000 |

The consideration paid for these notes totaled $1.2 billion, including a pre-tax charge of $192 million for costs to repurchase the debt which primarily reflects the market value above original issue value. CSX used net cash proceeds from the disposition of CSX's International Terminals business in 2005, along with cash on hand, to finance this repurchase.

***Debt Issuance***

In September 2006, CSX issued $400 million of notes, which bear interest at 6% and mature on October 1, 2036. These notes were included in the Consolidated Balance Sheets under Long-term Debt and may be redeemed by CSX at any time. CSX does not have any intention to redeem the notes within the next 12 months.

***Convertible Debentures***

In October 2001, CSX issued $564 million aggregate principal amount at maturity in unsubordinated zero coupon convertible debentures (the "debentures") due October 30, 2021 for an initial offering price of approximately $462 million. The carrying value of outstanding debentures was $473 million and $468 million, at December 29, 2006 and December 30, 2005, respectively. These debentures accrete (increase) in value at a yield to maturity of 1% per year. The accretion rate may be reset on October 30, 2007, October 30, 2011, and October 30, 2016 to a rate based on five-year United States Treasury Notes minus 2.8%. In no event, however, will the yield to maturity be reset below 1% or above 3% per annum. Accretion in value on the debentures is recorded for each period, but will not be paid prior to maturity.



 Powered by Morningstar® Document Research℠

Table of Contents

CSX CORPORATION
PART II
Item 8. Financial Statements and Supplementary Data

**NOTE 9. Debt and Credit Agreements, continued**

In October 2006 and 2005, holders had the option to require CSX to purchase their debentures at a purchase price equal to the accreted value of $861.03 and $852.48 per $1,000 principal amount, respectively, at maturity. As a result, CSX purchased an immaterial aggregate principal amount at maturity of the debentures with cash on hand. Similarly, the debentures allow holders to require CSX to purchase their debentures in October 2008, October 2011, and October 2016, at a purchase price equal to the accreted value of the debentures at the time. At December 29, 2006, the debentures were classified in Long-term Debt in the Consolidated Balance Sheets. CSX may redeem the debentures for cash at any time on or after October 30, 2008, at a redemption price equal to the accreted value of the debentures.

Holders may, in addition, convert their debentures into shares of CSX's common stock at a conversion rate of 35.49 common shares per $1,000 principal amount of debentures, subject to customary anti-dilution adjustments, if any of the following conditions were satisfied:

- If the closing sale price of CSX's common stock, for at least 20 trading days in the 30 trading day period ending on the trading day before the conversion date, is more than 120% (which percentage will decline over the life of the debentures to 110% in accordance with the terms of the debentures) of the accreted conversion price per share of CSX's common stock at that preceding trading day;

- If CSX's senior unsecured credit ratings are downgraded by Moody's Investors Service, Inc. to below Ba1 and by Standard & Poor's Rating Services to below BB+;

- If CSX has called the debentures for redemption (which may occur no sooner than October 30, 2008); or

- Upon the occurrence of specified corporate transactions.

The accreted conversion price of the debentures at December 29, 2006 was $862.44 and the threshold price to be met in order to convert the debentures into common stock was $28.55 per common share.

***Short-term Debt Balances and Rates***

| *(Dollars in Millions)* | **December 29, 2006** | December 30, 2005 |
|---|---|---|
| Short-term Debt | **$ 8** | $ 1 |
| Weighted Average Interest Rates | **6.07%** | 4.47% |



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents



**NOTE 9. Debt and Credit Agreements, continued**

***Long-term Debt Maturities***

| *(Dollars in Millions)* **Fiscal Years Ending** | **Maturities as of December 2006** |
|---|---|
| 2007 | $ 595 |
| 2008 | 1,092 |
| 2009 | 291 |
| 2010 | 77 |
| 2011 | 575 |
| 2012 and Thereafter | 3,323 |
| Total Long-term Debt Maturities | 5,953 |
| Fair market value of interest rate swap included in Current Maturities of Long-term Debt | (3) |
| Fair market value of interest rate swap included in Long-term Debt | 4 |
| Total Long-term Debt (including current portion) | $ 5,954 |

***Credit Facilities***

CSX has a $1.25 billion five-year unsecured revolving credit facility expiring in May 2011, a $15 million secured revolving credit facility expiring in May 2011, and a $16.9 million 364-day unsecured revolving credit facility expiring in August 2007. The $1.25 billion and $15 million facilities were entered into in May 2006, and the $16.9 million facility was entered into in August 2006, on terms substantially similar to the facilities they replaced. The $1.25 billion facility expires in May 2011, but CSX may, with the consent of the lenders, in each of May 2007 and 2008, extend the maturity date of the facility by an additional year. Generally, these facilities may be used for general corporate purposes, to support CSX's commercial paper, and for working capital.

Additionally, with the approval of the lending banks, CSX may increase its total borrowing capacity by $500 million, from $1.25 billion to up to $1.75 billion. The amount of the credit facilities drawn on as of December 29, 2006 was $8.3 million. Commitment fees and interest rates payable under the facility were similar to fees and rates available to comparably rated investment-grade borrowers.

In 2006, CSX paid approximately $3 million for total fees associated with the undrawn facilities. These credit facilities allow for borrowings at floating (LIBOR-based) interest rates, plus a spread, depending upon CSX's senior unsecured debt ratings. LIBOR is the London Interbank Offered Rate which is a daily reference rate based on the interest rates at which banks offer to lend unsecured funds. At December 29, 2006, CSX was in compliance with all covenant requirements under the facility.

Table of Contents



**NOTE 9. Debt and Credit Agreements, continued**

***Fair Value of Financial Instruments***

Fair values of the Company's financial instruments were estimated by reference to quoted prices from market sources and financial institutions, as well as other valuation techniques. Long-term debt is the only financial instrument of the Company with fair values significantly different from their carrying amounts. The fair value of long-term debt has been estimated using discounted cash flow analysis based upon the Company's current incremental borrowing rates for similar types of financing arrangements.

| *(Dollars in Billions)* | **December 29, 2006** | December 30, 2005 |
|---|---|---|
| Long Term Debt Including Current Maturities: | | |
| Fair Value | **$ 6.6** | $ 6.7 |
| Carrying Value | **$ 6.0** | $ 6.0 |

**NOTE 10. Other Income and Supplemental Data**

Other Income consists of the following:

| | Fiscal Years | | |
|---|---|---|---|
| *(Dollars in Millions)* | **2006** | 2005 | 2004 |
| Interest Income | **$ 41** | $ 38 | $ 21 |
| Income from Real Estate and Resort Operations [(a)] | **24** | 85 | 47 |
| Gain on Conrail Property (After Tax) [(b)] | **26** | — | 16 |
| Minority Interest | **(21)** | (19) | (16) |
| Miscellaneous [(c)] | **25** | (3) | 4 |
| Total Other Income | **$ 95** | $ 101 | $ 72 |
| Gross Revenue from Real Estate and Resort Operations Included in Other Income above | **$ 193** | $ 262 | $ 217 |

*(a) Income from Real Estate and Resort Operations includes the results of operations from CSX Hotels, Inc., a resort doing business as The Greenbrier, located in White Sulphur Springs, West Virginia, as well as the results of the company's real estate sales, leasing, acquisition, and management and development activities.*

*(b) This item represents a non-cash gain on additional Conrail property value received.*

*(c) Miscellaneous income includes the income from several CSX owned or partially owned companies and other items.*

Supplemental data consists of the following:

Operating Expense of $7.4 billion, $7.1 billion and $7.0 billion included Selling, General & Administrative Expenses of $487 million, $492 million and $434 million for fiscal years 2006, 2005 and 2004, respectively.



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents



**NOTE 11. Properties**

The Company's properties were as follows:

| | December 29, 2006 | | | December 30, 2005 | | |
|---|---|---|---|---|---|---|
| *(Dollars in Millions)* | **Cost** | **Accumulated Depreciation** | **Net** | Cost | Accumulated Depreciation | Net |
| Rail: | | | | | | |
| Road | **$19,741** | **$3,342** | **$16,399** | $18,861 | $3,208 | $15,653 |
| Equipment | **6,567** | **2,666** | **3,901** | 6,357 | 2,482 | 3,875 |
| Total Rail | **26,308** | **6,008** | **20,300** | 25,218 | 5,690 | 19,528 |
| Intermodal | **559** | **321** | **238** | 528 | 284 | 244 |
| Total Surface Transportation | **26,867** | **6,329** | **20,538** | 25,746 | 5,974 | 19,772 |
| Other | **848** | **463** | **385** | 792 | 401 | 391 |
| Total Properties | **$27,715** | **$6,792** | **$20,923** | $26,538 | $6,375 | $20,163 |

**NOTE 12. Other Long-term Assets and Other Long-term Liabilities**

***Other Long-term Assets***

Other Long-term Assets consisted of the following:

| *(Dollars in Millions)* | **December 29, 2006** | **December 30, 2005** |
|---|---|---|
| Long-term Income Taxes Receivable (a) | **$348** | $320 |
| Goodwill (b) | **73** | 64 |
| Other Long-term Assets | **54** | 69 |
| Available for Sale Securities (c) | **44** | 65 |
| Real Estate Development Costs | **39** | 37 |
| Debt Issuance Costs | **30** | 31 |
| Long Term Deposits | **3** | 77 |
| Pension Plan Assets (d) | **—** | 127 |
| Total Other Long-term Assets | **$591** | $790 |

*(a) Long-term income tax receivable includes amounts on deposit with the internal revenue service, bonds and other unpaid claims of income taxes.*

*(b) Goodwill represents the purchase price in excess of the fair value of identifiable tangible and intangible assets.*

*(c) Available for sale securities include investments in marketable securities that mature in greater than one year.*

*(d) See Note 8, Employee Benefit Plans, for a discussion on changes in pension assets.*



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents

CSX CORPORATION
PART II
Item 8. Financial Statements and Supplementary Data

**NOTE 12. Other Long-term Assets and Other Long-term Liabilities, continued**

**Other Long-term Liabilities**

Other Long-term Liabilities consisted of the following:

| *(Dollars in Millions)* | **December 29, 2006** | December 30, 2005 |
|---|---|---|
| Long-term Pension Plan Liability [(a)] | **$ 529** | $ 554 |
| Post-retirement Benefit Liability [(a)] | **345** | 287 |
| Long-term Deferred Gains | **200** | 203 |
| Long-term Income Taxes Payable | **105** | 85 |
| Other Long-term Liabilities | **95** | 132 |
| Accrued Deferred Compensation | **90** | 84 |
| Minority Interest | **89** | 68 |
| Deferred Lease Payments | **53** | 35 |
| Accrued Sick Leave | **19** | 23 |
| Total Other Long-term Liabilities | **$ 1,525** | $ 1,471 |

*(a) See Note 8, Employee Benefit Plans for a discussion on pension and post-retirement benefit liability.*

**NOTE 13. Income Taxes**

Earnings from Continuing Operations before Income Taxes of $1.8 billion, $1.0 billion and $637 million for fiscal years 2006, 2005, and 2004, respectively represent earnings from domestic operations.

The significant components of deferred tax assets and liabilities include:

| | **December 29, 2006** | | December 30, 2005 | |
|---|---|---|---|---|
| *(Dollars in Millions)* | **Assets** | **Liabilities** | Assets | Liabilities |
| Employee Benefit Plans | **$ 498** | **$ —** | $ 429 | $ — |
| Accelerated Depreciation | **—** | **6,464** | — | 6,324 |
| Other | **580** | **473** | 530 | 493 |
| Total | **$ 1,078** | **$ 6,937** | $ 959 | $ 6,817 |
| Net Deferred Tax Liabilities | | **$ 5,859** | | $ 5,858 |

The primary factors in the change in year-end net deferred income tax liability balances include:

- Annual provision for deferred income tax expense;
- Adjustments to Accumulated Other Comprehensive Loss; and
- Deferred income taxes attributable to additional gains recognized on Conrail property received.

Table of Contents

**CSX CORPORATION**
**PART II**
**Item 8. Financial Statements and Supplementary Data**

**NOTE 13. Income Taxes, continued**

The Company files a consolidated federal income tax return, which includes its principal domestic subsidiaries. Examinations of the federal income tax returns of CSX have been completed through 1998. Federal income tax returns for 1999 through 2005 currently are under examination. Management believes adequate provision has been made for any adjustments that might be assessed.

The breakdown of income tax expense (benefit) between current and deferred is as follows:

| | Fiscal Years | | |
|---|---|---|---|
| *(Dollars in Millions)* | **2006** | 2005 | 2004 |
| Current: | | | |
| Federal | **$ 458** | $ 350 | $ 66 |
| State | **31** | 12 | 14 |
| Total Current | **489** | 362 | 80 |
| Deferred: | | | |
| Federal | **15** | 33 | 139 |
| State | **27** | (79) | — |
| Total Deferred | **42** | (46) | 139 |
| Total | **$ 531** | $ 316 | $ 219 |

Income tax expense reconciled to the tax computed at statutory rates is as follows:

| | Fiscal Years | | | | | |
|---|---|---|---|---|---|---|
| *(Dollars in Millions)* | **2006** | | 2005 | | 2004 | |
| Tax at Statutory Rates | **$ 644** | **35%** | $362 | 35% | $223 | 35% |
| State Income Taxes | **37** | **2%** | (44) | -4% | 9 | 1% |
| Equity in Conrail Earnings | **(14)** | **-1%** | (9) | -1% | (16) | -3% |
| Prior Year Resolutions | **(132)** | **-7%** | (1) | 0% | — | 0% |
| Other Items | **(4)** | **0%** | 8 | 0% | 3 | 1% |
| Income Tax Expense/Rate | **$ 531** | **29%** | $316 | 30% | $219 | 34% |

The change in the 2006 effective income tax rate compared to the prior year is primarily attributed to the resolution of prior year items including the resolution of federal income tax audits. The net state tax impact of these resolutions of $15 million is included on the state income taxes line above. The 2005 effective rate decreased from 2004 as a result of the Ohio legislative change that gradually eliminates the Ohio corporate franchise tax.



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents



**NOTE 14. Derivative Financial Instruments**

CSX used derivative financial instruments to manage its overall exposure to fluctuations in interest rates and fuel costs.

***Interest Rate Swaps***

CSX entered into various interest rate swap agreements on the following fixed and variable rate notes:

| Maturity Date | Notional Amount (Millions) | Fixed Interest Rate | Variable Rate at December 29, 2006 | Variable Rate at December 30, 2005 |
|---|---|---|---|---|
| **Fixed Rate Notes** | | | | |
| May 1, 2007 | $ 450 | 7.45% | 8.59% | 7.65% |
| May 1, 2032 | 150 | 8.30% | 6.96% | 5.84% |
| Total/Average | $ 600 | 7.66% | | |
| **Variable Rate Note** | | | | |
| June 30, 2011 | 40 | 5.43% | 5.37% | |

Under the fixed rate agreements, CSX will pay variable interest based on LIBOR in exchange for a fixed rate, effectively transforming the notes to floating rate obligations. In contrast, under the variable rate agreement, CSX will pay a fixed interest in exchange for a variable rate based on LIBOR. The interest rate swap agreements were designated and qualified as fair value hedges, and the gain or loss on the derivative instrument, as well as the offsetting gain or loss on the fixed rate note attributed to the hedged risk, were recognized in current earnings during the period of change in fair values. Hedge effectiveness was measured at least quarterly based on the relative change in fair value of the derivative contract, in comparison with changes over time in the fair value of the fixed rate notes. Any change in fair value resulting from ineffectiveness, as defined by SFAS 133, *Accounting For Derivative Instruments and Hedging Activities* (“SFAS 133”), was recognized immediately in earnings.

CSX’s interest rate swaps qualified as perfectly effective fair value hedges, as defined by SFAS 133. As such, there was no ineffective portion to the hedge recognized in earnings during the current or prior year periods. Total debt was increased by $1 million for the fair market value of the interest rate swap agreements based upon quoted market prices at December 29, 2006 and December 30, 2005, respectively. Fair value adjustments are non-cash transactions and, accordingly, had no cash impact on the Consolidated Cash Flow Statements.

The differential to be paid or received under these agreements is accrued based on the terms of the agreements and is recognized in interest expense over the term of the related debt. The related amounts payable to or receivable from counterparties were included in other current liabilities or assets. Cash flows related to interest rate swap agreements were classified as Operating Activities in the Consolidated Cash Flow Statements. CSX increased interest expense by approximately $2 million for the fiscal year ended December 29, 2006, and reduced interest expense by approximately $12 million for the fiscal year ended December 20, 2005, as a result of the interest rate swap agreements that were in place during each period.



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents



**NOTE 14. Derivative Financial Instruments, continued**

The counterparties to the interest rate swap agreements expose CSX to credit loss in the event of non-performance. CSX does not anticipate non-performance by the counterparties.

***Fuel Hedging***

In 2003, CSX began a program to hedge its exposure to fuel price volatility through swap transactions. In the third quarter of 2004, CSX suspended entering into new swaps in its fuel hedge program. All outstanding fuel hedge contracts expired in July 2006. The fuel hedge program was gradually replaced with a fuel surcharge program that allows CSX to recover some of its increased fuel costs through programmatic changes to its transportation charges as the price of fuel rises and falls. The fuel surcharge program has up to this point provided the Company with financial protection for fluctuations in fuel costs in lieu of fuel hedging. CSX will continue to monitor and assess the global fuel marketplace to decide if and when to resume hedging under the program.

The fuel hedge program was established to manage exposure to fuel price fluctuations. The program limited fuel hedges to a 24-month duration and a maximum of 80% of CSXT's average monthly fuel purchased for any month within the 24-month period, and placed the hedges among selected counterparties. Fuel hedging activity favorably impacted fuel expense for the fiscal years 2006, 2005, and 2004 by $55 million, $249 million, and $63 million, respectively. Ineffectiveness, or the extent to which changes in the fair values of the fuel swaps did not offset changes in the fair values of the expected fuel purchases, was immaterial.

These instruments qualified, and were designated by management, as cash-flow hedges of variability in expected future cash flows attributed to fluctuations in fuel prices. The fair values of fuel derivative instruments were determined based upon current fair market values as quoted by third party dealers and were recorded on the Consolidated Balance Sheets with offsetting adjustments to Accumulated Other Comprehensive Loss, a component of Shareholders' Equity. Amounts were reclassified from Accumulated Other Comprehensive Loss to fuel expense as the underlying fuel that was hedged was consumed by rail operations. The fair value of fuel derivative instruments based upon quoted market prices was $51 million as of December 30, 2005. There were no fuel hedge contracts outstanding at December 29, 2006. Fair value adjustments are non-cash transactions and, accordingly, had no cash impact on the Consolidated Cash Flow Statements.

**NOTE 15. Management Restructuring**

CSX incurred restructuring charges related to the November 2003 restructuring plan designed to streamline the management structure, eliminate organizational layers and realign certain functions. For the fiscal year 2004, the Company recorded expense of $71 million for separation expense, pension and post-retirement benefit curtailment charges, stock compensation expense and other related expenses. The restructuring initiatives reduced the management workforce by 863 positions as of December 31, 2004. The Company did not record any restructuring charges during the fiscal years 2005 and 2006.

The total cost of the program was $105 million. The majority of separation benefits were paid from CSX's qualified pension plan, with the remainder paid from general corporate funds.



 Powered by Morningstar® Document Research℠

Table of Contents



**NOTE 16. Business Segments**

The Company operates primarily in two business segments: rail and intermodal. The rail segment provides rail freight transportation over a network of approximately 21,000 route miles in 23 states, the District of Columbia and the Canadian provinces of Ontario and Quebec. The intermodal segment provides integrated rail and truck transportation services and operates a network of dedicated intermodal facilities across North America. The Company's segments are strategic business units that offer different services and are managed separately. The rail and intermodal segments are also viewed on a combined basis as Surface Transportation operations.

The Company evaluates performance and allocates resources based on several factors, of which the primary financial measures are business segment operating income and operating ratio. The accounting policies of the segments are the same as those described in Nature of Operations and Significant Accounting Policies (see Note 1, Nature of Operations and Significant Accounting Policies).



 Powered by Morningstar® Document Research℠

Table of Contents



**NOTE 16. Business Segments, continued**

Consolidated operating income includes the results of operations of Surface Transportation and other operating income. Other operating income includes the gain amortization on the CSX Lines conveyance, net sublease income from assets formerly included in the Company's Marine Services segment, and other items.

Business segment information for the fiscal years 2006, 2005 and 2004 was as follows:

| | Fiscal Years | | |
|---|---|---|---|
| *(Dollars in Millions)* | **2006** | 2005 | 2004 |
| **Revenue from External Customers:** | | | |
| Rail | **$ 8,154** | $ 7,256 | $ 6,694 |
| Intermodal | **1,412** | 1,362 | 1,346 |
| **Consolidated** | **$ 9,566** | $ 8,618 | $ 8,040 |
| **Operating Income:** | | | |
| Rail | **$ 1,858** | $ 1,301 | $ 841 |
| Intermodal | **268** | 248 | 152 |
| Other | **12** | 1 | 7 |
| **Consolidated** | **$ 2,138** | $ 1,550 | $ 1,000 |
| **Assets:** | | | |
| Rail | **$ 24,077** | $ 23,182 | $ 22,932 |
| Intermodal | **276** | 305 | 313 |
| Other | **43** | 123 | 717 |
| Investment in Conrail | **607** | 603 | 574 |
| Elimination of Intersegment Payables (Receivables) | **(78)** | (77) | (57) |
| Non-segment Assets | **204** | 96 | 126 |
| **Consolidated** | **$ 25,129** | $ 24,232 | $ 24,605 |
| **Depreciation Expense:** | | | |
| Rail | **$ 818** | $ 779 | $ 664 |
| Intermodal | **38** | 39 | 38 |
| Other | **1** | 8 | 9 |
| **Consolidated** | **$ 857** | $ 826 | $ 711 |
| **Property Additions:** | | | |
| Rail | **$ 1,592** | $ 1,091 | $ 973 |
| Intermodal | **28** | 25 | 22 |
| Other | **—** | 5 | 8 |
| Non-Segment | **19** | 15 | 27 |
| **Consolidated** | **$ 1,639** | $ 1,136 | $ 1,030 |



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents



**NOTE 17. Related Party Transactions**

Through a limited liability company, CSX and Norfolk Southern Corporation ("NS") jointly own Conrail Inc. ("Conrail"), whose primary subsidiary is Consolidated Rail Corporation ("CRC"). CSX has a 42% economic interest and 50% voting interest in the jointly owned entity, and NS has the remainder of the economic and voting interests. Pursuant to the Accounting Principle Board ("APB") Opinion 18, *The Equity Method of Accounting for Investments in Common Stock,* CSX applies the equity method of accounting to its investment in Conrail.

In August 2004, CSX, NS and Conrail completed a reorganization of Conrail referred to as the Conrail spin-off transaction, which established direct ownership and control by CSXT and Norfolk Southern Railway ("NSR") of two former CRC subsidiaries, New York Central Lines LLC ("NYC") and Pennsylvania Lines LLC ("PRR"), respectively. Prior to the Conrail spin-off transaction, CSXT operated the routes and used the assets of NYC, and NSR operated the routes and used the assets of PRR, each in accordance with separate operating and lease agreements. Pursuant to the Conrail spin-off transaction, the operating and lease agreements were terminated and NYC and PRR were merged into CSXT and NSR, respectively. The rail infrastructure that Conrail continues to own and operate for the joint benefit of CSXT and NSR is known as the shared asset area ("Shared Asset Areas").

In 2004, as a result of the transaction, the Company recognized a net gain of $16 million, after tax, which was included in Other Income. This net gain represented the fair value write-up of the assets and liabilities ("net assets") received in excess of the book value of the net assets surrendered. Likewise, in 2006, the Company recognized, in Other Income, a net gain of $26 million, after tax, related to additional property value received from Conrail in connection with the 2004 transaction. This also increased properties by $75 million, increased deferred income taxes by $29 million and decreased the investment in Conrail by $20 million in the Consolidated Balance Sheet.

In accordance with EITF 01-2, *Interpretation of APB Opinion 29*, which provides guidance on how to account for non-monetary transactions, the Company concluded that it was appropriate to use the fair value of the net assets received as that was more clearly evident than the fair value of the assets surrendered. The fair-value was based on an independent appraisal of the distribution.

After the transaction, CSX's investment in Conrail no longer includes the amounts related to NYC and PRR. Instead the assets and liabilities of NYC were reflected in their respective line items in CSX's Consolidated Balance Sheet.



 Powered by Morningstar® Document Research℠

Table of Contents



**NOTE 17. Related Party Transactions, continued**

***Accounting and Financial Reporting Effects***

The following table illustrates the pro forma effect on the Consolidated Income Statements as if the spin-off transaction had been completed as of the beginning of 2004:

| *(Dollars in Millions, Except Per Share Amounts)* | As reported | Effect of Spin-off | Unaudited Pro Forma |
|---|---|---|---|
| Operating Revenue | $ 8,040 | $ — | $ 8,040 |
| Earnings from Continuing Operations | 418 | 21 | 439 |
| Discontinued Operations | (79) | — | (79) |
| Net Earnings | 339 | 21 | 360 |
| Earnings Per Share, Assuming Dilution: | | | |
| From Continuing Operations | 0.94 | 0.05 | 0.99 |
| Discontinued Operations | (0.18) | — | (0.18) |
| Net Earnings | $ 0.76 | $ 0.05 | $ 0.81 |

Through August 2004 (prior to the spin-off transaction), the Company's rail and intermodal operating revenue included revenue from traffic moving on the Conrail property. Operating expenses included costs incurred to handle such traffic and to operate the Conrail lines. Rail operating expense included an expense category, "Conrail Rents, Fees and Services," which reflected:

- Right-of-way usage fees to Conrail;
- Equipment rental payments to Conrail;
- Transportation, switching and terminal service charges in the Shared Assets Areas;
- Amortization of the fair value write-up arising from the acquisition of Conrail and certain other adjustments. The amortization primarily represents the additional after tax depreciation expense related to the write-up of Conrail's fixed assets when the original purchase price, from the 1997 acquisition, was allocated based on fair value; and
- CSX's 42% share of Conrail's income.

Conrail will continue to own, manage and operate the Shared Assets Areas for the joint benefit of CSXT and NSR. The spin-off transaction, however, effectively decreased rents paid to Conrail after the transaction date, as some assets previously leased from Conrail are now owned by CSXT and NSR.

The following table details the amounts included in the Company's Consolidated Income Statements under Conrail Rents, Fees and Services:

| | Fiscal Years | | |
|---|---|---|---|
| *(Dollars in Millions)* | **2006** | 2005 | 2004 |
| Rents, Fees and Services | **$ 91** | $ 97 | $ 280 |
| Purchase Price Amortization and Other | **4** | 4 | 35 |
| Equity in Income of Conrail | **(20)** | (36) | (59) |
| Total Conrail Rents, Fees and Services | **$ 75** | $ 65 | $ 256 |



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents

CSX CORPORATION
PART II
Item 8. Financial Statements and Supplementary Data

**NOTE 17. Related Party Transactions, continued**

As required by Article 4-08 of the Securities and Exchange Commission's ("SEC") Regulation S-X, summary financial information for the stand alone company Conrail, Inc., is as follows (all fiscal year ends below are December 31):

| *(Dollars in Millions)* | Fiscal Years 2006 | 2005 | 2004 |
|---|---|---|---|
| **Income Statement Information:** | | | |
| Revenues | **$ 373** | $ 378 | $ 352 |
| Expenses | **357** | 346 | 370 |
| Operating Income | **$ 16** | $ 32 | $ (18) |
| Income from Continuing Operations | **47** | 85 | 22 |
| Income from Discontinued Operations, Net of Tax (a) | **—** | — | 119 |
| Cumulative Effect of Accounting Change, Net of Tax | **—** | — | (1) |
| Net Income | **$ 47** | $ 85 | $ 140 |

*(a) Discontinued Operations included above reflect the results of operations of NYC and PRR prior to the spin-off transaction.*

| *(Dollars in Millions)* | December 31 2006 | December 31, 2005 |
|---|---|---|
| **Balance Sheet Information:** | | |
| Current Assets | $ 280 | $ 233 |
| Property and Equipment and Other Assets | 1,043 | 1,242 |
| Total Assets | $ 1,323 | $ 1,475 |
| Current Liabilities | $ 263 | $ 233 |
| Long-term Debt | 134 | 215 |
| Other Long-term Liabilities | 421 | 592 |
| Total Liabilities | 818 | 1,040 |
| Stockholders' Equity | 505 | 435 |
| Total Liabilities and Stockholders' Equity | $ 1,323 | $ 1,475 |

*Transactions with Conrail*

As required by SFAS 57, *Related Party Disclosures,* the Company has identified below amounts owed to Conrail or its affiliates representing expenses incurred under the operating, equipment and shared area agreements with Conrail. The Company also executed two promissory notes with a subsidiary of Conrail which were included in Long-term Debt on the Consolidated Balance Sheets.

| *(Dollars in Millions)* | December 29, 2006 | December 30, 2005 |
|---|---|---|
| **Balance Sheet Information:** | | |
| CSX Payable to Conrail | **$ 48** | $ 40 |
| Promissory Notes Payable to Conrail Subsidiary | | |
| 4.40% CSX Promissory Note due October 2035 | **$ 73** | $ 73 |
| 4.52% CSXT Promissory Note due March 2035 | **$ 23** | $ 23 |



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents



**NOTE 17. Related Party Transactions, continued**

| *(Dollars in Millions)* | Fiscal Years **2006** | 2005 | 2004 |
|---|---|---|---|
| **Income Statement Information:** | | | |
| Interest Expense Related to Conrail | **$ 4** | $ 1 | $ 7 |

**NOTE 18. Discontinued Operations**

In February 2005, CSX sold its International Terminals business, which included the capital stock of SL Services, Inc. (“SLSI”) to Dubai Ports International FZE (“DPI”) for gross cash consideration of $1.142 billion. Of the gross proceeds, approximately $110 million was paid for the purchase of a minority interest in an International Terminals’ subsidiary, which the Company acquired during the first quarter of 2005 and divested as part of the sale to DPI. Other related cash transaction costs amounted to approximately $34 million, including resolution of working capital and long-term debt adjustments.

CSX recognized a gain of $683 million pre-tax, $428 million after tax, in fiscal year 2005 as a result of the sale. Consequently, amounts related to this business were reported as Discontinued Operations on the Consolidated Income Statement for all years presented.

SLSI also holds certain residual assets and liabilities as a result of prior divestitures and discontinuances. A wholly-owned subsidiary of CSX retains the rights to those assets and indemnifies DPI, SLSI and related entities against those liabilities pursuant to a separate agreement. CSX guarantees the obligations of its subsidiary under this separate agreement.

The following table represents the results of operations of the Company’s International Terminals Business.

| *(Dollars in Millions)* | Fiscal Years 2005 | 2004 |
|---|---|---|
| **Income Statement Information:** | | |
| Revenues | $ 14 | $ 167 |
| Expenses | 21 | 122 |
| Operating Income (Loss) | $ (7) | $ 45 |
| Other Income (Expense) | — | (20) |
| Earnings Before Income Taxes | (7) | 25 |
| Income Tax Expense | (4) | 7 |
| Net Income | $ (3) | $ 18 |

The Consolidated Income Statement presented for 2004 included International Terminals’ net earnings of $18 million as described above as well as additional income tax expense of $97 million related to undistributed foreign earnings.



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents



**NOTE 19. Divestitures**

In February 2003, CSX conveyed its interest in its domestic container-shipping subsidiary, CSX Lines, subsequently renamed Horizon. In consideration of its interest in CSX Lines, CSX received $300 million of proceeds consisting of cash and senior preferred securities. In July 2004, CSX received the final redemption payment for the senior preferred securities and this is reflected in the Consolidated Cash Flow Statements as Proceeds from Divestitures. CSX has been fully divested of its interest in Horizon. However, CSX and its affiliates will continue to remain the primary obligor on vessel and equipment leases that expire in 2014. (See Note 7, Commitments and Contingencies.)

**NOTE 20. Quarterly Financial Data (Unaudited) (a)(b)**

Pursuant to Article 3 of the SEC's Regulation S-X, the following are selected quarterly financial data:

| | **2006** | | | | |
|---|---|---|---|---|---|
| | **Quarters** | | | | |
| *(Dollars in Millions, Except Per Share Amounts)* | **1st** | **2nd(c)** | **3rd(d)** | **4th(e)** | **Full Year** |
| Operating Revenue | **$2,331** | **$ 2,421** | **$2,418** | **$2,396** | **$ 9,566** |
| Operating Income | **496** | **646** | **489** | **507** | **2,138** |
| Net Earnings | **$ 245** | **$ 390** | **$ 328** | **$ 347** | **$ 1,310** |
| Earnings Per Share: | | | | | |
| Net Earnings | **$ 0.56** | **$ 0.88** | **$ 0.75** | **$ 0.79** | **$ 2.98** |
| Earnings Per Share Assuming Dilution: | | | | | |
| Net Earnings | **$ 0.53** | **$ 0.83** | **$ 0.71** | **$ 0.75** | **$ 2.82** |
| Dividend Per Share | **$0.065** | **$ 0.065** | **$0.100** | **$0.100** | **$ 0.330** |

| | 2005 | | | | |
|---|---|---|---|---|---|
| | Quarters | | | | |
| *(Dollars in Millions, Except Per Share Amounts)* | 1st | 2nd (f) | 3rd | 4th (g) | Full Year |
| Operating Revenue | $2,108 | $ 2,166 | $2,125 | $2,219 | $ 8,618 |
| Operating Income | 354 | 431 | 353 | 412 | 1,550 |
| Earnings from Continuing Operations | 154 | 165 | 164 | 237 | 720 |
| Discontinued Operations—Net of Tax | 425 | — | — | — | 425 |
| Net Earnings | $ 579 | $ 165 | $ 164 | $ 237 | $ 1,145 |
| Earnings Per Share: | | | | | |
| From Continuing Operations | $ 0.36 | $ 0.38 | $ 0.38 | $ 0.55 | $ 1.67 |
| Discontinued Operations | 0.98 | — | — | — | 0.98 |
| Net Earnings | $ 1.34 | $ 0.38 | $ 0.38 | $ 0.55 | $ 2.65 |
| Earnings Per Share Assuming Dilution: | | | | | |
| From Continuing Operations | $ 0.35 | $ 0.36 | $ 0.36 | $ 0.52 | $ 1.59 |
| Discontinued Operations | 0.93 | — | — | — | 0.93 |
| Net Earnings | $ 1.28 | $ 0.36 | $ 0.36 | $ 0.52 | $ 2.52 |
| Dividend Per Share | $0.050 | $ 0.050 | $0.050 | $0.065 | $ 0.215 |

*(a) Periods presented were 13-week quarters.*

*(b) All periods presented were restated to reflect the stock split.*

Table of Contents



**NOTE 20. Quarterly Financial Data (Unaudited), continued**

*(c) CSX recognized an income tax benefit of $41 million principally related to the resolution of certain tax matters. Additionally, CSX recognized a $126 million pre-tax benefit on insurance recoveries from gains related to Hurricane Katrina.*

*(d) CSX recognized an income tax benefit of $69 million, principally related to the resolution of federal course audits for 1994 – 1996. Additionally, CSX recognized a $15 million pre-tax benefit on insurance recoveries from gains related to Hurricane Katrina.*

*(e) CSX recognized an income tax benefit of $41 million, principally related to the resolution of federal course audits for 1997—1998. Additionally, CSX recognized a $27 million pre-tax benefit on insurance recoveries from gains related to Hurricane Katrina.*

*(f) Ohio enacted legislation to gradually eliminate its corporate franchise tax. This legislative change resulted in an income tax benefit of $71 million. (See Note 13, Income Taxes.)*

*(g) CSX updated its estimate for unasserted liability exposure, which resulted in a $38 million pre-tax benefit, primarily related to a reduction in asbestos-related disease claims filed against the Company. (See Note 6, Casualty, Environmental, and Other Reserves.)*



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents



**Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

None.

**Item 9A. Controls and Procedures**

***Evaluation of Disclosure Controls and Procedures***

As of December 29, 2006, under the supervision and with the participation of CSX's Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), management has evaluated the effectiveness of the design and operation of the Company's disclosure controls and procedures. Based on that evaluation, the CEO and CFO concluded that, as of December 29, 2006, the Company's disclosure controls and procedures were effective at the reasonable assurance level in timely alerting them to material information required to be included in CSX's periodic SEC reports. There were no changes in the Company's internal controls over financial reporting during the fourth quarter of 2006 that have materially affected or are reasonably likely to materially affect the Company's internal control over financial reporting.

***Management's Report on Internal Control over Financial Reporting***

CSX's management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rules 13a-15(f) and 15d-15(f). Under the supervision and with the participation of the management of CSX, including CSX's CEO and CFO, CSX conducted an evaluation of the effectiveness of the Company's internal control over financial reporting as of December 29, 2006 based on the framework in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission which is also referred to as COSO. Based on that evaluation, management of CSX concluded that the Company's internal control over financial reporting was effective as of December 29, 2006. Management's assessment of the effectiveness of internal control over financial reporting is expressed at the level of reasonable assurance because a control system, no matter how well designed and operated, can provide only reasonable, but not absolute, assurance that the control system's objectives will be met.

Management's assessment of the effectiveness of the Company's internal control over financial reporting as of December 29, 2006 has been audited by Ernst & Young LLP, an independent registered public accounting firm, as stated in their report which is included elsewhere herein.



 Powered by Morningstar® Document Research℠

Table of Contents



***Report of Independent Registered Public Accounting Firm***

The Shareholders and Board of Directors of CSX Corporation

We have audited management's assessment, included in the accompanying Management's Report on Internal Control Over Financial Reporting, that CSX Corporation maintained effective internal control over financial reporting as of December 29, 2006, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO criteria). CSX Corporation's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express an opinion on management's assessment and an opinion on the effectiveness of the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, management's assessment that CSX Corporation maintained effective internal control over financial reporting as of December 29, 2006, is fairly stated, in all material respects, based on the COSO criteria. Also, in our opinion, CSX Corporation maintained, in all material respects, effective internal control over financial reporting as of December 29, 2006, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the 2006 consolidated financial statements of CSX Corporation and our report dated February 13, 2007, expressed an unqualified opinion thereon.

/s/ Ernst & Young LLP
Independent Certified Public Accountants

Jacksonville, Florida
February 13, 2007



 Powered by Morningstar® Document Research℠

Table of Contents



***Changes in Internal Control over Financial Reporting***

There are no material changes in the Company's internal control over financial reporting.

**Item 9B. Other Information**

None

**Item 10. Directors and Executive Officers of the Registrant**

In accordance with Instruction G(3) of Form 10-K, the information required by this item is incorporated herein by reference to the Proxy Statement. The Proxy Statement will be filed prior the Company's annual shareholders' meeting scheduled to be held on May 2, 2007, except for the information regarding the executive officers of the Company. Information regarding executive officers is included in Part I of this report under the caption "Executive Officers of the Registrant."

**Item 11. Executive Compensation**

In accordance with Instruction G(3) of Form 10-K, the information required by this Item is incorporated herein by reference to the Proxy Statement (see Item 10 above).

**Item 12. Security Ownership of Certain Beneficial Owners and Management**

In accordance with Instruction G(3) of Form 10-K, the information required by this Item is incorporated herein by reference to the Proxy Statement (see Item 10 above).

**Item 13. Certain Relationships and Related Transactions**

In accordance with Instruction G(3) of Form 10-K, the information required by this Item is incorporated herein by reference to the Proxy Statement (see Item 10 above).

**Item 14. Principal Accounting Fees and Services**

In accordance with Instruction G(3) of Form 10-K, the information required by this Item is incorporated herein by reference to the Proxy Statement (see Item 10 above).



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents

**CSX CORPORATION**
**PART IV**

**Item 15. Exhibits and Financial Statement Schedules**

*(a)(1) Financial Statements*

See Index to Consolidated Financial Statements on page 49.

*(2) Financial Statement Schedules*

The information required by Schedule II, *Valuation and Qualifying Accounts*, is included in Note 6 to the Consolidated Financial Statements, Casualty, Environmental and Other Reserves. All other financial statement schedules are not applicable.

*(3) Exhibits*

| | |
|---|---|
| 2.1 | Distribution Agreement, dated as of July 26, 2004, by and among CSX Corporation, CSX Transportation, Inc., CSX Rail Holding Corporation, CSX Northeast Holding Corporation, Norfolk Southern Corporation, Norfolk Southern Railway Company, CRR Holdings LLC, Green Acquisition Corp., Conrail Inc., Consolidated Rail Corporation, New York Central Lines LLC, Pennsylvania Lines LLC, NYC Newco, Inc. and PRR Newco, Inc. (incorporated herein by reference to Exhibit 2.1 to the Registrant's Current Report on Form 8-K filed with the Commission on September 2, 2004) |
| 3.1 | Amended and Restated Articles of Incorporation of the Registrant (incorporated herein by reference to Exhibit 3.1 to the Registrant's Current Report on Form 8-K filed with the Commission on December 14, 2004) |
| 3.2 | Bylaws of the Registrant, amended effective as of May 3, 2006 (incorporated herein by reference to Exhibit 3.2 of the Registrant's Current Report on Form 8-K filed with the Commission on February 13, 2006) |
| 4.1(a) | Indenture, dated August 1, 1990, between the Registrant and The Chase Manhattan Bank, as Trustee (incorporated herein by reference to the Registrant's Form SE, dated September 7, 1990, filed with the Commission) |
| 4.1(b) | First Supplemental Indenture, dated as of June 15, 1991, between the Registrant and The Chase Manhattan Bank, as Trustee (incorporated herein by reference to Exhibit 4(c) to the Registrant's Form SE, dated May 28, 1992, filed with the Commission) |
| 4.1(c) | Second Supplemental Indenture, dated as of May 6, 1997, between the Registrant and The Chase Manhattan Bank, as Trustee (incorporated herein by reference to Exhibit 4.3 to the Registrant's Registration Statement on Form S-4 (Registration No. 333-28523) filed with the Commission on June 5, 1997) |
| 4.1(d) | Third Supplemental Indenture, dated as of April 22, 1998, between the Registrant and The Chase Manhattan Bank, as Trustee (incorporated herein by reference to Exhibit 4.2 to the Registrant's Current Report on Form 8-K filed with the Commission on May 12, 1998) |
| 4.1(e) | Fourth Supplemental Indenture, dated as of October 30, 2001, between the Registrant and The Chase Manhattan Bank, as Trustee (incorporated herein by reference to Exhibit 4.1 to the Registrant's Report on Form 10-Q filed with the Commission on November 7, 2001) |
| 4.1(f) | Fifth Supplemental Indenture, dated as of October 27, 2003 between the Registrant and The Chase Manhattan Bank, as Trustee (incorporated herein by reference to Exhibit 4.1 to the Registrant's Report on Form 8-K filed with the Commission on October 27, 2003) |



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents



| | |
|---|---|
| 4.1(g) | Sixth Supplemental Indenture, dated as of September 23, 2004 between the Registrant and JP Morgan Chase Bank, formerly The Chase Manhattan Bank, as Trustee (incorporated herein by reference to Exhibit 4.1 to the Registrant's Report on Form 10-Q filed with the Commission on November 3, 2004) |

Pursuant to Regulation S-K, Item 601(b)(4)(iii), instruments that define the rights of holders of the Registrant's long-term debt securities, where the long-term debt securities authorized under each such instrument do not exceed 10% of the Registrant's total assets, have been omitted and will be furnished to the Commission upon request.

| | |
|---|---|
| 10.1** | CSX Stock Plan for Directors (as amended through January 1, 2004) (incorporated herein by reference to Exhibit 10.1 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 10, 2004) |
| 10.2** | Corporate Director Deferred Compensation Plan (as amended through January 1, 2004) (incorporated herein by reference to Exhibit 10.2 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 10, 2004) |
| 10.3** | CSX Corporation 2002 Corporate Director Deferred Compensation Plan (as amended through January 1, 2004) (incorporated herein by reference to Exhibit 10.3 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 10, 2004) |
| 10.4** | CSX Directors' Charitable Gift Plan, as amended (incorporated herein by reference to Exhibit 10.4 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 4, 1994) |
| 10.5** | CSX Directors' Matching Gift Plan (as amended through December 31, 2003) (incorporated herein by reference to Exhibit 10.5 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 10, 2004) |
| 10.6** | Special Employment Agreement with M. J. Ward (incorporated herein by reference to Exhibit 10.6 to the Registrant's Report on Form 10-Q filed with the Commission on November 7, 2001) |
| 10.7** | Restricted Stock Award Agreement with M. J. Ward (incorporated herein by reference to Exhibit 10.7 to the Registrant's Report on Form 10-Q filed with the Commission on November 7, 2001) |
| 10.8** | Railroad Retirement Benefits Agreement with M. J. Ward (incorporated herein by reference to Exhibit 10.13 to the Registrant's Report on Form 10-K filed with the Commission on February 26, 2003) |
| 10.9** | Employment Agreement with O. Munoz (incorporated herein by reference to Exhibit 10.1 to the Registrant's Report on Form 10-Q filed with the Commission on July 30, 2003) |
| 10.10** | Restricted Stock Award Agreement with O. Munoz (incorporated herein by reference to Exhibit 10.2 to the Registrant's Report on Form 10-Q filed with the Commission on July 30, 2003) |
| 10.11** | Form of Employment Agreement with executive officers (incorporated herein by reference to Exhibit 10.1 of the Registrant's Current Report on Form 8-K filed with the Commission on January 6, 2005) |
| 10.12** | Form of Stock Option Agreement (incorporated herein by reference to Exhibit 10.17 of the Registrant's Report on Form 10-K filed with the Commission on March 4, 2002) |



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents

**CSX CORPORATION**
**PART IV**

| | |
|---|---|
| 10.13** | 1987 Long-term Performance Stock Plan, as Amended and Restated effective April 25, 1996 (as amended through February 7, 2003) (incorporated herein by reference to Exhibit 10.24 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 10, 2004) |
| 10.14** | Deferred Compensation Program for Executives of CSX Corporation and Affiliated Companies (as amended through January 1, 1998) (incorporated herein by reference to Exhibit 10.25 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 10, 2004) |
| 10.15** | 2002 Deferred Compensation Plan of CSX Corporation and Affiliated Corporations (as amended through February 7, 2003) (incorporated herein by reference to Exhibit 10.26 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 10, 2004) |
| 10.16** | Supplementary Savings Plan and Incentive Award Deferral Plan for Eligible Executives of CSX Corporation and Affiliated Companies (as Amended through February 7, 2003) (incorporated herein by reference to Exhibit 10.27 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 10, 2004) |
| 10.17** | Special Retirement Plan of CSX Corporation and Affiliated Companies (as amended through February 14, 2001) (incorporated herein by reference to Exhibit 10.23 to the Registrant's Report on Form 10-K filed with the Commission on March 4, 2002) |
| 10.18** | Supplemental Retirement Benefit Plan of CSX Corporation and Affiliated Companies (as amended through February 14, 2001) (incorporated herein by reference to Exhibit 10.24 of the Registrant's Report on Form 10-K filed with the Commission on March 4, 2002) |
| 10.19** | Senior Executive Incentive Compensation Plan (incorporated herein by reference to Appendix B to the Registrant's Definitive Proxy Statement filed with the Commission on March 17, 2000) |
| 10.20** | CSX Omnibus Incentive Plan (as Amended through December 8, 2004) (incorporated herein by reference to Exhibit 10.20 to the Registrant's Annual Report on Form 10-K filed with the Commission on February 24, 2006) |
| 10.21** | 1990 Stock Award Plan as Amended and Restated Effective February 14, 1996 (as amended through September 8, 1999) (incorporated herein by reference to Exhibit 10.24 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 7, 2000) |
| 10.22 | Transaction Agreement, dated as of June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation, and CRR Holdings LLC, with certain schedules thereto (incorporated herein by reference to Exhibit 10 to the Registrant's Current Report on Form 8-K filed with the Commission on July 8, 1997) |
| 10.23 | Amendment No. 1, dated as of August 22, 1998, to the Transaction Agreement, dated as of June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation, and CRR Holdings LLC (incorporated herein by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed with the Commission on June 11, 1999) |
| 10.24 | Amendment No. 2, dated as of June 1, 1999, to the Transaction Agreement, dated as of June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation, and CRR Holdings, LLC (incorporated herein by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed with the Commission on June 11, 1999) |



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents



| | |
|---|---|
| 10.25 | Amendment No. 3, dated as of August 1, 2000, to the Transaction Agreement, dated as of June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation, and CRR Holdings LLC (incorporated herein by reference to Exhibit 10.34 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 1, 2001) |
| 10.26 | Amendment, dated and effective as of June 1, 1999, and executed in April 2004, to the Transaction Agreement, dated as of June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation, and CRR Holdings LLC (incorporated herein by reference to Exhibit 99.1 to the Registrant's Current Report on Form 8-K filed with the Commission on August 6, 2004) |
| 10.27 | Amendment No. 5, dated as of August 27, 2004, to the Transaction Agreement, dated as of June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation and CRR Holdings LLC (incorporated herein by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed with the Commission on September 2, 2004) |
| 10.28 | Operating Agreement Termination Agreement, dated as of August 27, 2004, between New York Central Lines LLC and CSX Transportation, Inc. (incorporated herein by reference to Exhibit 10.3 to the Registrant's Current Report on Form 8-K filed with the Commission on September 2, 2004) |
| 10.29 | Shared Assets Area Operating Agreement for North Jersey, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibit thereto (incorporated herein by reference to Exhibit 10.4 to the Registrant's Current Report on Form 8-K filed with the Commission on June 11, 1999) |
| 10.30 | Shared Assets Area Operating Agreement for Southern Jersey/Philadelphia, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibit thereto (incorporated herein by reference to Exhibit 10.5 to the Registrant's Current Report on Form 8-K filed with the Commission on June 11, 1999) |
| 10.31 | Shared Assets Area Operating Agreement for Detroit, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Corporation, with exhibit thereto (incorporated herein by reference to Exhibit 10.6 to the Registrant's Current Report on Form 8-K filed with the Commission on June 11, 1999) |
| 10.32 | Monongahela Usage Agreement, dated as of June 1, 1999, by and among CSX Transportation, Inc., Norfolk Southern Railway Company, Pennsylvania Lines LLC and New York Central Lines LLC, with exhibit thereto (incorporated herein by reference to Exhibit 10.7 to the Registrant's Current Report on Form 8-K filed with the Commission on June 11, 1999) |
| 10.33 | Tax Allocation Agreement, dated as of August 27, 2004, by and among CSX Corporation, Norfolk Southern Corporation, Green Acquisition Corp., Conrail Inc., Consolidated Rail Corporation, New York Central Lines LLC and Pennsylvania Lines LLC (incorporated herein by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed with the Commission on September 2, 2004) |
| 10.34** | Employment Agreement with T. L. Ingram, dated as of March 15, 2004 (incorporated herein by reference to Exhibit 10.1 to the Registrant's Report on Form 10-Q filed with the Commission on April 30, 2004) |



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents

**CSX CORPORATION**
**PART IV**

| | |
|---|---|
| 10.35** | Restricted Stock Award Agreement with T. L. Ingram (incorporated herein by reference to Exhibit 10.1 to the Registrant's Report on Form 10-Q filed with the Commission on July 29, 2004) |
| 10.36 | Stock Purchase Agreement, dated as of December 8, 2004, by and between CSX Corporation and Dubai Ports International FZE. (incorporated herein by reference to Exhibit 2.1 to the Registrant's Current Report on Form 8-K filed with the Commission on December 13, 2004) |
| 10.37** | Amendment No. 1, dated as of December 13, 2004, to Employment Agreement with T. L. Ingram, dated as of March 15, 2004 (incorporated herein by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed with the Commission on December 14, 2004) |
| 10.38 | Omnibus Closing Agreement, by and between CSX Corporation and Dubai Ports International FZE dated February 22, 2005 (incorporated herein by reference to Exhibit 2.1 to the Registrant's Current Report on Form 8-K filed with the Commission on February 25, 2005) |
| 10.39** | Restricted Stock Award Agreement with Clarence W. Gooden (incorporated herein by reference to Exhibit 10.40 of the Registrant's Annual Report on Form 10-K filed with the Commission on February 24, 2006) |
| 10.40** | Restricted Stock Award Agreement with Ellen M. Fitzsimmons (incorporated herein by reference to Exhibit 10.41 of the Registrant's Annual Report on Form 10-K filed with the Commission on February 24, 2006) |
| 10.41 | Revolving Credit Agreement, dated May 4, 2006 (incorporated herein by reference to Exhibit 99.1 to the Registrant's Current Report on Form 8-K filed with the Commission on May 9, 2006) |
| 14 | Code of Ethics (incorporated herein by reference to Exhibit 14 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 10, 2004) |
| 21* | Subsidiaries of the Registrant |
| 23* | Consent of Ernst & Young LLP |
| 24* | Powers of Attorney |
| 31.1* | Rule 13a-14(a) Certification of Principal Executive Officer |
| 31.2* | Rule 13a-14(a) Certification of Principal Financial Officer |
| 32.1* | Rule 13a-14(b) Certification of Principal Executive Officer |
| 32.2* | Rule 13a-14(b) Certification of Principal Financial Officer |

* *Filed herewith*

*** Management Contract or Compensatory Plan or Arrangement*



Source: CSX CORP, 10-K, February 15, 2007 Powered by Morningstar® Document Research℠

Table of Contents

**CSX CORPORATION**
**PART IV**

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

CSX CORPORATION
(Registrant)

By: /s/ CAROLYN T. SIZEMORE
Carolyn T. Sizemore
Vice President and Controller
(Principal Accounting Officer)

Dated: February 13, 2007

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities indicated on February 14, 2007.

| Signature | Title |
|---|---|
| * <br> Michael J. Ward | Chairman of the Board, President, Chief Executive Officer and Director (Principal Executive Officer) |
| /s/ OSCAR MUNOZ <br> Oscar Munoz | Executive Vice President and Chief Financial Officer (Principal Financial Officer) |
| /s/ CAROLYN T. SIZEMORE <br> Carolyn T. Sizemore | Vice President and Controller (Principal Accounting Officer) |
| * By: /s/ ELLEN M. FITZSIMMONS <br> Ellen M. Fitzsimmons | Senior Vice President – Law and Public Affairs *Attorney-in-Fact |



 Powered by Morningstar® Document Research℠

Table of Contents

**CSX CORPORATION**
**PART IV**

| Signature | Title |
| --- | --- |
| * <br> Donna M. Alvarado | Director |
| * <br> Elizabeth E. Bailey | Director |
| * <br> John B. Breaux | Director |
| * <br> Steven T. Halverson | Director |
| * <br> Edward J. Kelly III | Director |
| * <br> Robert D. Kunisch | Director |
| * <br> Southwood J. Morcott | Director |
| * <br> David M. Ratcliffe | Director |
| * <br> William C. Richardson | Director |
| * <br> Frank S. Royal M.D. | Director |
| * <br> Donald J. Shepard | Director |



 Powered by Morningstar® Document Research℠

 Exhibit 21

**Subsidiaries of the Registrant**

As of December 29, 2006, the Registrant was the beneficial owner of 100% of the common stock of the following significant subsidiaries:

CSX Transportation, Inc. (a Virginia corporation)
CSX Intermodal, Inc. (a Delaware corporation)

As of December 29, 2006, none of the other subsidiaries included in the Registrant's consolidated financial statements constitute a significant subsidiary.


Powered by Morningstar® Document Research℠

 Exhibit 23

Consent of Independent Registered Public Accounting Firm

We consent to the incorporation by reference in the following Registration Statements:

- Registration Statement (Form S-3 No. 33-2084)
- Registration Statement (Form S-3 No. 333-113637)
- Registration Statement (Form S-3ASR. 333-132051)
- Registration Statement (Form S-8 No. 33-16230)
- Registration Statement (Form S-8 No. 33-25537)
- Registration Statement (Form S-8 No. 33-29136)
- Registration Statement (Form S-8 No. 33-33853)
- Registration Statement (Form S-8 No. 33-33854)
- Registration Statement (Form S-8 No. 33-37449)
- Registration Statement (Form S-8 No. 33-41498)
- Registration Statement (Form S-8 No. 33-41499)
- Registration Statement (Form S-8 No. 33-41735)
- Registration Statement (Form S-8 No. 33-47655)
- Registration Statement (Form S-8 No. 33-57029)
- Registration Statement (Form S-8 No. 333-09213)
- Registration Statement (Form S-8 No. 333-73429)
- Registration Statement (Form S-8 No. 333-32008)
- Registration Statement (Form S-8 No. 333-43382)
- Registration Statement (Form S-8 No. 333-48896)
- Registration Statement (Form S-8 No. 333-66604)
- Registration Statement (Form S-8 No. 333-110589)

of our report dated February 13, 2007, with respect to the consolidated financial statements of CSX Corporation, included herein, and our report dated February 13, 2007 with respect to CSX Corporation's management's assessment of the effectiveness of internal control over financial reporting and the effectiveness of internal control over financial reporting of CSX Corporation included in this Annual Report (Form 10-K) for CSX Corporation.

/s/ Ernst & Young LLP
Jacksonville, Florida
February 13, 2007

 Powered by Morningstar® Document Research℠

 Exhibit 24

POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS that each of the undersigned officers and directors of CSX CORPORATION, a Virginia Corporation, which is to file with the Securities and Exchange Commission, Washington, D. C., a Form 10-K (Annual Report), hereby constitutes and appoints Carolyn T. Sizemore and Ellen M. Fitzsimmons his true and lawful attorneys-in-fact and agents, for him and in his name, place and stead to sign said Form 10-K, and any and all amendments thereto, with power where appropriate to affix the corporate seal of CSX Corporation thereto and to attest said seal, and to file said Form 10-K, and any and all other documents in connection therewith, with the Securities and Exchange Commission, hereby granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform any and all acts and things requisite and necessary to be done in and about the premises as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or either of them, may lawfully do or cause to be done by virtue hereof.

IN WITNESS WHEREOF, the undersigned have hereunto set their hands this 14 day of February 2007.

/s/ Donna M. Alvarado
Donna M. Alvarado

/s/ Elizabeth E. Bailey
Elizabeth E. Bailey

/s/ John B. Breaux
John B. Breaux

/s/ Steven T. Halverson
Steven T. Halverson

/s/ Edward J. Kelly, III
Edward J. Kelly, III

/s/ Robert D. Kunisch
Robert D. Kunisch

/s/ Southwood J. Morcott
Southwood J. Morcott

/s/ David M. Ratcliffe
David M. Ratcliffe

/s/ William C. Richardson
William C. Richardson

/s/ Frank S. Royal
Frank S. Royal

/s/ Donald J. Shepard
Donald J. Shepard

/s/ Michael J. Ward
Michael J. Ward

/s/ Oscar Munoz
Oscar Munoz


Powered by Morningstar® Document Research℠

**CERTIFICATE OF CHIEF EXECUTIVE OFFICER**

I, Michael J. Ward, certify that:

1. I have reviewed this Annual Report on Form 10-K of CSX Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined by Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 9, 2007

/s/ MICHAEL J. WARD
Michael J. Ward
Chairman, President and Chief Executive Officer


Powered by Morningstar® Document Research℠

Exhibit 31.2

**CERTIFICATE OF CHIEF FINANCIAL OFFICER**

I, Oscar Munoz, certify that:

1. I have reviewed this Annual Report on Form 10-K of CSX Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined by Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 9, 2007

/s/ OSCAR MUNOZ

Oscar Munoz
Executive Vice President and Chief Financial Officer


Powered by Morningstar® Document Research℠

Exhibit 32.1

CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Annual Report of CSX Corporation on Form 10-K for the fiscal year ended December 29, 2006 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Michael J. Ward, Chief Executive Officer of the registrant, certify, pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to my knowledge, that:

1. The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the registrant.

Date: February 9, 2007

/s/ MICHAEL J. WARD

Michael J. Ward
Chairman, President and Chief Executive Officer


Powered by Morningstar® Document Research℠

Exhibit 32.2

CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Annual Report of CSX Corporation on Form 10-K for the fiscal year ended December 29, 2006 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Oscar Munoz, Chief Financial Officer of the registrant, certify, pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to my knowledge, that:

1. The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the registrant.

Date: February 9, 2007

/s/ OSCAR MUNOZ
Oscar Munoz
Executive Vice President and Chief Financial Officer

Created by Morningstar® Document Research℠
http://documentresearch.morningstar.com

# EXHIBIT PX0702

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-K

(X) ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 For the fiscal year ended **DEC. 31, 2004**

( ) TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 For the transition period from _________ to _________

Commission file number 1-8339

NORFOLK SOUTHERN

**NORFOLK SOUTHERN CORPORATION**
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Virginia**<br>(State or other jurisdiction of incorporation) | **52-1188014**<br>(IRS Employer Identification No.) |
| **Three Commercial Place**<br>**Norfolk, Virginia**<br>(Address of principal executive offices) | **23510-2191**<br>Zip Code |
| Registrant's telephone number, including area code | **(757) 629-2680** |

**No Change**
(Former name, former address and former fiscal year, if changed since last report.)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each Class | Name of each exchange on which registered |
|---|---|
| **Norfolk Southern Corporation Common Stock (Par Value $1.00)** | **New York Stock Exchange** |

Securities registered pursuant to Section 12(g) of the Act: NONE

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days. Yes (X) No ( )

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ( )

The number of shares outstanding of each of the registrant's classes of common stock, as of Jan. 31, 2005: 400,276,939 excluding 20,907,125 shares held by registrant's consolidated subsidiaries).

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Act). Yes (X) No ( )

The aggregate market value of the voting common equity held by nonaffiliates as of June 30, 2004 was $10,440,582,263 (based on the closing price as quoted on the New York Stock Exchange on that date).

**DOCUMENTS INCORPORATED BY REFERENCE:**

Portions of the Registrant's definitive proxy statement to be filed electronically pursuant to Regulation 14A not later than 120 days after the end of the fiscal year, are incorporated by reference in Part III.

**TABLE OF CONTENTS**

**NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES (NS)**


| | | | Page |
|---|---|---|---|
| Part I. | 1. | Business | K3 |
| | 2. | Properties | K3 |
| | 3. | Legal Proceedings | K11 |
| | 4. | Submission of Matters to a Vote of Security Holders | K11 |
| | | Executive Officers of the Registrant | |
| Part II. | 5. | Market for Registrant's Common Equity and Related Stockholders Matters | K14 |
| | 6. | Selected Financial Data | K15 |
| | 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | K17 |
| | 7A. | Quantitative and Qualitative Disclosures About Market Risk | K36 |
| | 8. | Financial Statements and Supplementary Data | K37 |
| | 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | K77 |
| | 9A. | Controls and Procedures | K77 |
| Part III. | 10. | Directors and Executive Officers of the Registrant | K78 |
| | 11. | Executive Compensation | K78 |
| | 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | K78 |
| | 13. | Certain Relationships and Related Transactions | K81 |
| | 14. | Principal Accountant Fees and Services | K81 |
| Part IV. | 15. | Exhibits, Financial Statement Schedule and Reports on Form 8-K | K82 |
| | | Index to Consolidated Financial Statement Schedule | |
| | | Power of Attorney | K90 |
| | | Signatures | K90 |
| | | Exhibit Index | K93 |

# PART I

## Norfolk Southern Corporation and Subsidiaries (NS)

**Item 1. Business. and Item 2. Properties.**

**GENERAL -** Norfolk Southern Corporation (Norfolk Southern) was incorporated on July 23, 1980, under the laws of the Commonwealth of Virginia. On June l, 1982, Norfolk Southern acquired control of two major operating railroads, Norfolk and Western Railway Company (NW) and Southern Railway Company (Southern) in accordance with an Agreement of Merger and Reorganization dated as of July 31, 1980, and with the approval of the transaction by the Interstate Commerce Commission (ICC) (now the Surface Transportation Board [STB]).

Effective Dec. 31, 1990, Norfolk Southern transferred all the common stock of NW to Southern, and Southern's name was changed to Norfolk Southern Railway Company (Norfolk Southern Railway or NSR). Effective Sept. 1, 1998, NW was merged with and into Norfolk Southern Railway. As of Dec. 31, 2004, all the common stock of Norfolk Southern Railway was owned directly by Norfolk Southern.

Through a limited liability company, Norfolk Southern and CSX Corporation (CSX) jointly own Conrail Inc. (Conrail), whose primary subsidiary is Consolidated Rail Corporation (CRC). Norfolk Southern has a 58% economic and 50% voting interest in the jointly owned entity, and CSX has the remainder of the economic and voting interests. CRC owns and operates certain properties (the Shared Assets Areas) for the joint and exclusive benefit of NSR and CSX Transportation Inc. (CSXT). On June 1, 1999, NSR and CSXT, began operating separate portions of Conrail's rail routes and assets. As described below, on August 27, 2004, NS, CSX and Conrail completed a reorganization of Conrail.

Norfolk Southern makes available free of charge through its website, www.nscorp.com, its annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and all amendments to those reports as soon as reasonably practicable after such material is electronically filed with or furnished to the Securities and Exchange Commission (SEC). Additionally, Norfolk Southern's corporate governance guidelines, board committee charters, code of ethics and code of ethical conduct for senior financial officers are available on the company's website and in print to any shareholder who requests them.

Unless otherwise indicated, Norfolk Southern and its subsidiaries are referred to collectively as NS.

**CONRAIL CORPORATE REORGANIZATION –** On August 27, 2004, NS, CSX and Conrail completed a reorganization of Conrail (Conrail Corporate Reorganization), which established direct ownership and control by NSR and CSX Transportation, Inc. (CSXT) of two former CRC subsidiaries, Pennsylvania Lines LLC (PRR) and New York Central Lines LLC (NYC), respectively. Prior to the Conrail Corporate Reorganization, NSR operated the routes and assets of PRR and CSXT operated the routes and assets of NYC, each in accordance with operating and lease agreements. Pursuant to the Conrail Corporate Reorganization, the operating and lease agreements were terminated and PRR and NYC were merged into NSR and CSXT, respectively. The reorganization did not involve the Shared Assets Areas and did not affect the competitive rail service provided in the Shared Assets Areas. Conrail continues to own, manage and operate the Shared Assets Areas as previously approved by the STB. In connection with the Conrail Corporate Reorganization, NS, CSX and Conrail obtained a ruling from the Internal Revenue Service (IRS) regarding certain tax matters, and the STB approved the transaction. As a part of the Conrail Corporate Reorganization, Conrail restructured its existing

unsecured and secured public indebtedness, with the consent of Conrail's debtholders. See Note 2 to the Consolidated Financial Statements.

**RAILROAD OPERATIONS –** As of Dec. 31, 2004, NS' railroads operated approximately 21,300 miles of road. The miles operated, which includes leased lines between Cincinnati, Ohio, and Chattanooga, Tennessee, and trackage rights over property owned by North Carolina Railway Company, were as follows:

**Mileage Operated as of Dec. 31, 2004**

| | Miles of Road | Second and Other Main Track | Passing Track, Crossovers and Turnouts | Way and Yard Switching | Total |
|---|---|---|---|---|---|
| Owned | 16,389 | 2,808 | 2,095 | 8,632 | 29,924 |
| Operated under lease, contract or trackage rights | 4,947 | 1,978 | 417 | 969 | 8,311 |
| Total | 21,336 | 4,786 | 2,512 | 9,601 | 38,235 |

NS' railroads carry raw materials, intermediate products and finished goods primarily in the Southeast, East and Midwest and via interchange with other rail carriers, to and from the rest of the United States and parts of Canada. They also transport overseas freight through several Atlantic and Gulf Coast ports. Atlantic ports served by NS include: the Ports of New York/New Jersey; Philadelphia, Pennsylvania/ Camden, New Jersey; Baltimore, Maryland; Wilmington, Delaware; Norfolk, Virginia; Morehead City, North Carolina; Charleston, South Carolina; Savannah and Brunswick, Georgia; and Jacksonville, Florida. Gulf Coast ports served include Mobile, Alabama and New Orleans, Louisiana.

The lines of NS' railroads reach most of the larger industrial and trading centers of the Southeast, Northeast, Mid-Atlantic region and Midwest. Chicago, Norfolk, Detroit, Atlanta, Metropolitan New York City, Jacksonville, Kansas City (Missouri), Baltimore, Buffalo, Charleston, Cleveland, Columbus, Philadelphia, Pittsburgh, Toledo, Greensboro, Charlotte and Savannah are among the leading centers originating and terminating freight traffic on the system. In addition, haulage arrangements with connecting carriers allow NS' railroads to provide single-line service to and from additional markets, including haulage provided by Florida East Coast Railway Company to serve southern and eastern Florida, including the port cities of Miami, West Palm Beach and Fort Lauderdale; and haulage provided by The Kansas City Southern Railway Company to provide transcontinental intermodal service via a connection in Dallas, Texas with the Burlington Northern and Santa Fe Railway Company. Service is provided to New England, including the Port of Boston, via haulage, trackage rights and interline arrangements with Canadian Pacific Railway Company and Guilford Transportation Industries. The system's lines also reach many individual industries, electric generating facilities, mines (in western Virginia, eastern Kentucky, southern and northern West Virginia and western Pennsylvania), distribution centers, transload facilities and other businesses located in smaller communities in its service area. The traffic corridors carrying the heaviest volumes of freight include those from the New York City area to Chicago (via Allentown and Pittsburgh); Chicago to Jacksonville (via Cincinnati, Chattanooga and Atlanta); Appalachian coal fields of Virginia, West Virginia and Kentucky to Norfolk, Virginia and Sandusky, Ohio; Cleveland to Kansas City; and Knoxville to Chattanooga. Chicago, Memphis, Sidney/Salem, Illinois, New Orleans, Kansas City, Buffalo, St. Louis and Meridian, MS, are major gateways for interterritorial system traffic.

**Triple Crown Operations** – Triple Crown Services Company (TCSC), NS' intermodal subsidiary, offers door-to-door intermodal service using RoadRailer® equipment and domestic containers. RoadRailer® units are enclosed vans that can be pulled over highways in tractor-trailer configuration and over the rails by locomotives. TCSC provides intermodal service in major traffic corridors, including those between the Midwest and the Northeast, the Midwest and the Southeast, and the Midwest and Texas.

The following table sets forth certain statistics relating to NS railroads' operations for the past 5 years:

**Rail Operating Statistics**

| | Year Ended Dec. 31, | | | | |
|---|---|---|---|---|---|
| | **2004** | **2003** | **2002** | **2001** | **2000** |
| Revenue ton miles (billions) | 198 | 183 | 179 | 182 | 197 |
| Freight train miles traveled (millions) | 77.7 | 73.9 | 72.6 | 70.0 | 74.4 |
| Revenue per ton mile | $0.0369 | $0.0353 | $0.0350 | $0.0339 | $0.0312 |
| Revenue ton miles per man-hour worked | 3,347 | 3,111 | 3,067 | 3,023 | 2,888 |
| Percentage ratio of railway operating expenses to railway operating revenues | 76.7% | 83.5%[1] | 81.5% | 83.7% | 89.7%[2] |

[1]Includes $107 million of costs for a voluntary separation program, which added 1.6 percentage points to the ratio.

[2]Includes $165 million of costs for early retirement and separation programs, which added 2.7 percentage points to the ratio.

**RAILWAY OPERATING REVENUES --** NS' total railway operating revenues were $7.3 billion in 2004. See the financial information by traffic segment in Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**COAL TRAFFIC --** Coal, coke and iron ore -- most of which is bituminous coal -- is NS' railroads' largest commodity group as measured by revenues. The railroads handled a total of 181 million tons in 2004, most of which originated on NS' lines in West Virginia, Virginia, Pennsylvania and Kentucky. Revenues from coal, coke and iron ore accounted for about 24% of NS' total railway operating revenues in 2004.

Total coal handled through all system ports in 2004 was 38 million tons. Of this total, 13 million tons (including coastwise traffic) moved through Norfolk, Virginia, 4 million tons moved through the Baltimore Terminal, 14 million tons moved to various docks on the Ohio River, and 7 million tons moved to various Lake Erie ports. Other than coal for export, virtually all coal handled by NS' railroads was terminated in states east of the Mississippi River.

See the discussion of coal traffic, by type of coal, in Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**GENERAL MERCHANDISE TRAFFIC -** General merchandise traffic is composed of five major commodity groupings: automotive; chemicals; metals and construction; agriculture, consumer products and government; and paper, clay and forest products. The automotive group includes finished vehicles for BMW, DaimlerChrysler, Ford Motor Company, General Motors, Honda, Isuzu, Jaguar, Land Rover, Mazda, Mercedes-Benz, Mitsubishi, Nissan, Saab, Subaru, Suzuki, Toyota and Volkswagen, and auto

parts for Ford Motor Company, General Motors, Mercedes-Benz and Toyota. The chemicals group includes sulfur and related chemicals, petroleum products, chlorine and bleaching compounds, plastics, rubber, industrial chemicals, chemical wastes and municipal wastes. The metals and construction group includes steel, aluminum products, machinery, scrap metals, cement, aggregates, bricks and minerals. The agriculture, consumer products and government group includes soybeans, wheat, corn, fertilizer, animal and poultry feed, food oils, flour, beverages, canned goods, sweeteners, consumer products, ethanol and items for the military. The paper, clay and forest products group includes lumber and wood products, pulp board and paper products, wood fibers, wood pulp, scrap paper and clay.

In 2004, 141 million tons of general merchandise freight, or approximately 67% of total general merchandise tonnage handled by NS, originated online. The balance of general merchandise traffic was received from connecting carriers at interterritorial gateways. The principal interchange points for NS-received traffic included Chicago, Memphis, New Orleans, Cincinnati, Kansas City, Detroit, Hagerstown, St. Louis/East St. Louis and Louisville. General merchandise carloads handled in 2004 were 2.9 million, the revenue from which accounted for 55% of NS' total railway operating revenues in 2004.

See the discussion of general merchandise rail traffic by commodity group in Part II, Item 7, "Management's Discussion and Analysis."

**INTERMODAL TRAFFIC -** The intermodal market consists of shipments moving in trailers, domestic and international containers, and Roadrailer® equipment. These shipments are handled on behalf of intermodal marketing companies, international steamship lines, truckers and other shippers. Intermodal units handled in 2004 were 2.9 million, the revenues from which accounted for 21% of NS' total railway operating revenues for the year.

See the discussion of intermodal traffic in Part II, Item 7, "Management's Discussion and Analysis of Financial Conditions and Results of Operations."

**FREIGHT RATES -** In 2004, NS' railroads continued their reliance on private contracts and exempt price quotes as their predominant pricing mechanisms. Thus, a major portion of NS' railroads' freight business is not currently economically regulated by the government. In general, market forces have been substituted for government regulation and now are the primary determinant of rail service prices. However, in 2004 there were significant coal movements moving under common carrier (tariff) rates that had previously moved under rates contained in transportation contracts. Beginning Jan. 1, 2002, coal moving to Duke Energy's (Duke) Belew's Creek, Allen, Buck and Dan River generating stations moved under common carrier rates and beginning April 1, 2002, coal moving to Carolina Power and Light's (CP&L) Hyco and Mayo plants moved under common carrier rates. In 2002, Duke and CP&L filed rate reasonableness complaints at the STB alleging that NS' tariff rates for the transportation of coal were unreasonable. On October 20, 2004, in a consolidated decision the STB found NS' rates to be reasonable in both cases. At the STB's invitation, Duke and CP&L have each initiated proceedings to determine whether phasing constraints should apply. Although management has made an estimate of the ultimate resolution of these cases, the uncertainty of future developments in the Duke case and(or) the CP&L case may result in adjustments that could have a favorable or unfavorable material impact on results of operations in a particular quarter or year. See the discussion of the rate cases in Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations."

In 2004, NS' railroads were found by the STB not to be "revenue adequate" based on results for the year 2003. A railroad is "revenue adequate" under the applicable law when its return on net investment exceeds the rail industry's composite cost of capital. This determination is made pursuant to a statutory requirement and does not adversely impact NS' liquidity or capital resources.

**PASSENGER OPERATIONS -** Regularly scheduled passenger trains are operated by Amtrak on NS' lines between Alexandria and New Orleans, between Greensboro and Selma, North Carolina, between Chicago, Illinois, and Detroit, Michigan, and between Chicago and Harrisburg, Pennsylvania. Commuter trains are operated on the NS line between Manassas and Alexandria in accordance with contracts with two transportation commissions of the Commonwealth of Virginia. NS also leases the Chicago to Manhattan, Illinois, line to the Commuter Rail Division of the Regional Transportation Authority of Northeast Illinois. NS operates lines on which Amtrak conducts regularly scheduled passenger operations. In addition, NS provides freight service over lines with significant ongoing Amtrak and commuter passenger operations, and is conducting freight operations over some trackage owned by Amtrak or by New Jersey Transit, the Southeastern Pennsylvania Transportation Authority, Metro-North Commuter Railroad Company and Maryland DOT. Finally, passenger operations are conducted either by Amtrak or by the commuter agencies over trackage owned by Conrail in the Shared Assets Areas.

**NONCARRIER OPERATIONS -** NS' noncarrier subsidiaries engage principally in the acquisition, leasing and management of coal, oil, gas and minerals; the development of commercial real estate; telecommunications; and the leasing or sale of rail property and equipment. In 2004, no such noncarrier subsidiary or industry segment grouping of noncarrier subsidiaries met the requirements for a reportable business segment set forth in Statement of Financial Accounting Standards No. 131.

**RAILWAY PROPERTY**

The NS railroad system extends across 22 states, the District of Columbia and portions of Canada. The railroad infrastructure makes the company capital intensive with total property of approximately $21 billion.

**Capital Expenditures -** Capital expenditures for road, equipment and other property for the past five years were as follows (including capitalized leases):

| | Capital Expenditures | | | | |
|---|---|---|---|---|---|
| | **2004** | **2003** | **2002** | **2001** | **2000** |
| | | | *($ in millions)* | | |
| Road | $ 607 | $ 495 | $ 519 | $ 505 | $ 557 |
| Equipment | 429 | 218 | 174 | 233 | 146 |
| Other property | 5 | 7 | 2 | 8 | 28 |
| Total | $ 1,041 | $ 720 | $ 695 | $ 746 | $ 731 |

Capital spending and maintenance programs are and have been designed to assure the ability to provide safe, efficient and reliable transportation services. For 2005, NS has budgeted $938 million of capital spending. See the discussion following “Cash used for investing activities,” in Part II, Item 7, “Management's Discussion and Analysis of Financial Condition and Results of Operations.”

**Equipment -** As of Dec. 31, 2004, NS owned or leased the following units of equipment:

| | Owned* | Number of Units Leased** | Total | Capacity of Equipment |
|---|---|---|---|---|
| Locomotives: | | | | (Horsepower) |
| Multiple purpose | 3,323 | 151 | 3,474 | 11,902,650 |
| Switching | 207 | -- | 207 | 303,700 |
| Auxiliary units | 74 | -- | 74 | -- |
| Total locomotives | 3,604 | 151 | 3,755 | 12,206,350 |
| Freight cars: | | | | (Tons) |
| Hopper | 19,911 | 822 | 20,733 | 2,183,236 |
| Box | 18,712 | 2,175 | 20,887 | 1,641,530 |
| Covered hopper | 9,399 | 2,678 | 12,077 | 1,316,489 |
| Gondola | 30,300 | 8,010 | 38,310 | 4,093,691 |
| Flat | 2,928 | 1,342 | 4,270 | 328,376 |
| Caboose | 251 | -- | 251 | -- |
| Other | 3,701 | -- | 3,701 | 184,599 |
| Total freight cars | 85,202 | 15,027 | 100,229 | 9,747,921 |
| Other: | | | | |
| Work equipment | 5,612 | 3 | 5,615 | |
| Vehicles | 4,761 | -- | 4,761 | |
| Highway trailers and containers | 877 | 9,987 | 10,864 | |
| RoadRailer® | 6,498 | -- | 6,498 | |
| Miscellaneous | 1,546 | 16,256 | 17,802 | |
| Total other | 19,294 | 26,246 | 45,540 | |

* Includes equipment leased to outside parties and equipment subject to equipment trusts, conditional sale agreements and capitalized leases.
** Includes 18 locomotives and 6,813 freight cars leased from CRC.

The following table indicates the number and year built for locomotives and freight cars owned at Dec. 31, 2004.

| | Year Built | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2004 | 2003 | 2002 | 2001 | 2000 | 1993-1999 | 1988-1992 | 1987 & Before | Total |
| Locomotives: | | | | | | | | | |
| No. of units | 207 | 100 | --* | 160 | 200 | 920 | 344 | 1,673 | 3,604 |
| % of fleet | 6% | 3% | --% | 4% | 6% | 25% | 10% | 46% | 100% |
| Freight cars: | | | | | | | | | |
| No. of units | -- | -- | -- | 44 | 112 | 10,741 | 6,310 | 67,995 | 85,202 |
| % of fleet | --% | --% | --% | --% | --% | 13% | 7% | 80% | 100% |

*Fifty of the locomotives built in 2001 were purchased in 2002.

As of Dec. 31, 2004, the average age of the locomotive fleet was 16.8 years. During 2004, 50 locomotives, the average age of which was 22.9 years, were retired. The average age of the freight car fleet at Dec. 31, 2004, was 27.6 years. Between 1988 and 2000, about 29,000 coal cars were rebodied. As a result, the remaining servicibility of the freight car fleet is greater than may be inferred from the high percentage of freight cars built in earlier years. During 2004, 1,829 freight cars were retired.

| | Annual Average Bad Order Ratio | | | | |
|---|---|---|---|---|---|
| | **2004** | **2003** | **2002** | **2001** | **2000** |
| Freight cars: | | | | | |
| NS Rail | 7.4% | 7.4% | 8.1% | 6.9% | 5.7% |
| Locomotives: | | | | | |
| NS Rail | 6.3% | 6.2% | 6.3% | 5.8% | 5.5% |

Ongoing freight car and locomotive maintenance programs are intended to ensure the highest standards of safety, reliability, customer satisfaction and equipment marketability. The freight car bad order ratio rose in 2000, 2001 and 2002 as a result of decreased maintenance activity. The decline in 2003 reflected an increase in maintenance activity as well as the retirement of unserviceable units. The locomotive bad order ratio includes units out of service for required inspections every 92 days and program work such as overhauls. The elevated ratio through 2004 reflected units out of service related to the resumption of maintenance and modification activities.

**Encumbrances -** Certain railroad equipment is subject to the prior lien of equipment financing obligations amounting to approximately $930 million as of Dec. 31, 2004, and $910 million at Dec. 31, 2003.

**Track Maintenance -** Of the approximately 38,200 total miles of track operated, NS had responsibility for maintaining about 31,000 miles of track with the remainder being operated under trackage rights. Over 75% of the main line trackage (including first, second, third and branch main tracks, all excluding trackage rights) has rail ranging from 131 to 155 pounds per yard with the standard installation currently at 141 pounds per yard. Approximately 40% of NS lines carried 20 million or more gross tons per track mile.

The following table summarizes several measurements regarding NS' track roadway additions and replacements during the past five years:

| | **2004** | **2003** | **2002** | **2001** | **2000** |
|---|---|---|---|---|---|
| Track miles of rail installed | 246 | 233 | 235 | 254 | 390 |
| Miles of track surfaced | 5,055 | 5,105 | 5,270 | 3,836 | 3,687 |
| New crossties installed (millions) | 2.5 | 2.8 | 2.8 | 1.5 | 1.5 |

**Microwave System -** The NS microwave system, consisting of approximately 7,400 radio route miles, 423 core stations, 14 secondary stations and 5 passive repeater stations, provides communications between most operating locations. The microwave system is used primarily for voice communications, VHF radio control circuits, data and facsimile transmissions, traffic control operations and AEI data transmissions.

**Traffic Control -** Of the approximately 16,400 route miles owned by NS, 11,052 miles are signalized, including 8,030 miles of centralized traffic control (CTC) and 3,022 miles of automatic block signals.

Of the 8,030 miles of CTC, 2,565 miles are controlled by data radio originating at 197 base station radio sites.

**Computers -** A computer network consisting of a centralized data center in Atlanta, Georgia, and various distributed computers throughout the company connects the yards, terminals, transportation offices, rolling stock repair points, sales offices and other key system locations. Operating and traffic data are processed and stored to provide customers with information on their shipments throughout the system. Computer systems provide current information on the location of every train and each car on line, as well as related waybill and other train and car movement data. In addition, the computer systems are utilized to assist management in the performance of a variety of functions and services including payroll, car and revenue accounting, billing, material management activities and controls, and special studies.

**ENVIRONMENTAL MATTERS -** Compliance with federal, state and local laws and regulations relating to the protection of the environment is a principal NS goal. To date, such compliance has not affected materially NS' capital additions, earnings, liquidity or competitive position. See the discussion of "Environmental Matters" in Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations," and in Note 18 to the Consolidated Financial Statements.

**EMPLOYEES -** NS employed an average of 28,475 employees in 2004, compared with an average of 28,753 employees in 2003. The approximate average cost per employee during 2004 was $59,000 in wages and $28,000 in employee benefits.

Approximately 85% of NS' railroad employees are covered by collective bargaining agreements with 14 different labor unions. See the discussion of "Labor Agreements" in Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**GOVERNMENT REGULATION -** In addition to environmental, safety, securities and other regulations generally applicable to all businesses, NS' railroads are subject to regulation by the STB. The STB has jurisdiction over some rates, routes, conditions of service and the extension or abandonment of rail lines. The STB also has jurisdiction over the consolidation, merger or acquisition of control of and by rail common carriers. The Department of Transportation regulates certain track and mechanical equipment standards.

The relaxation of economic regulation of railroads, begun over two decades ago under the Staggers Rail Act of 1980, has continued. Significant exemptions are TOFC/COFC (i.e., "piggyback") business, rail boxcar traffic, lumber, manufactured steel, automobiles and certain bulk commodities such as sand, gravel, pulpwood and wood chips for paper manufacturing. Transportation contracts on regulated shipments effectively remove those shipments from regulation as well. About 75% of NS' freight revenues come from either exempt traffic or traffic moving under transportation contracts.

Efforts may be made in 2005 to re-subject the rail industry to unwarranted federal economic regulation. The Staggers Rail Act of 1980, which substantially reduced such regulation, encouraged and enabled rail carriers to innovate and to compete for business, thereby contributing to the economic health of the nation and to the revitalization of the industry. Accordingly, NS will oppose efforts to reimpose unwarranted economic regulation.

**COMPETITION -** There is continuing strong competition among rail, water and highway carriers. Price is usually only one factor of importance as shippers and receivers choose a transport mode and specific hauling company. Inventory carrying costs, service reliability, ease of handling and the desire to avoid loss and damage during transit are also important considerations, especially for higher-valued finished goods, machinery and consumer products. Even for raw materials, semifinished goods and work-in-

process, users are increasingly sensitive to transport arrangements that minimize problems at successive production stages.

NS' primary rail competitor is the CSX system; both operate throughout much of the same territory. Other railroads also operate in parts of the territory. NS also competes with motor carriers, water carriers and with shippers who have the additional option of handling their own goods in private carriage.

Certain marketing strategies among railroads and between railroads and motor carriers enable carriers to compete more effectively in specific markets.

**Item 3. Legal Proceedings.**

None.

**Item 4. Submission of Matters to a Vote of Security Holders.**

There were no matters submitted to a vote of security holders during the fourth quarter of 2004.

**Executive Officers of the Registrant.**

Norfolk Southern's executive officers generally are elected and designated annually by the Board of Directors at its first meeting held after the annual meeting of stockholders, and they hold office until their successors are elected. Executive officers also may be elected and designated throughout the year as the Board of Directors considers appropriate. There are no family relationships among the officers, nor any arrangement or understanding between any officer and any other person pursuant to which the officer was selected. The following table sets forth certain information, as of February 1, 2005, relating to the executive officers.

| **Name, Age, Present Position** | **Business Experience During Past Five Years** |
| --- | --- |
| David R. Goode, 64, Chairman and Chief Executive Officer | Present position since October 1, 2004. Served as Chairman, President and Chief Executive Officer since 1992. |
| Charles W. Moorman, 52, President | Present position since October 1, 2004. Served as Senior Vice President – Corporate Planning and Services from December 1, 2003 to October 1, 2004; Senior Vice President, Corporate Services from February 1, 2003 to December 1, 2003; also served as President Thoroughbred Technology and Telecommunications, Inc. since October 1999 and prior thereto was Vice President Information Technology. |
| L. I. Prillaman, 61, Vice Chairman and Chief Marketing Officer | Present position since August 1998. |
| Stephen C. Tobias, 60, Vice Chairman and Chief Operating Officer | Present position since August 1998. |
| Henry C. Wolf, 62, Vice Chairman and Chief Financial Officer | Present position since August 1998. |
| James A. Hixon, 51, Executive Vice President Finance and Public Affairs | Present position since October 1, 2004. Served as Senior Vice President Legal and Government Affairs from December 1, 2003 to October 1, 2004; Senior Vice Administration from February 2001 to December 1, 2003; Senior Vice President Employee Relations from November 1999 to February 2001 and prior thereto was Vice President Taxation. |
| Mark D. Manion, 52, Executive Vice President Operations | Present position since October 1, 2004. Served as Senior Vice President Transportation Operations from December 1, 2003 to October 1, 2004; Vice President Transportation Services and Mechanical from February 2001 to December 1, 2003 and prior thereto was Vice President Mechanical. |

| | |
|---|---|
| Kathryn B. McQuade, 48,<br>Executive Vice President Planning and Chief Information Officer | Present position since October 1, 2004.<br>Served as Senior Vice President Finance from December 1, 2003 to October 1, 2004; Senior Vice President Financial Planning from April 2000 to December 1, 2003 and prior thereto was Vice President Financial Planning. |
| John P. Rathbone, 53,<br>Executive Vice President Administration | Present position since October 1, 2004.<br>Served as Senior Vice President Administration from December 1, 2003 to October 1, 2004; Senior Vice President and Controller from April 2000 to December 1, 2003 and prior thereto was Vice President and Controller. |
| Donald W. Seale, 52,<br>Executive Vice President Sales and Marketing | Present position since October 1, 2004.<br>Served as Senior Vice President Marketing Services from December 1, 2003 to October 1, 2004 and prior thereto was Senior Vice President Merchandise Marketing. |
| Henry D. Light, 64,<br>Senior Vice President Law | Present position since January 2002.<br>Served as Vice President Law from April 2000 to January 2002, and prior thereto was General Counsel Operations. |
| Daniel D. Smith, 52,<br>Senior Vice President Energy and Properties | Present position since December 1, 2003.<br>Served as President NS Development from February 2001 to December 1, 2003 and prior thereto was President Pocahontas Land Corporation. |
| James A. Squires, 43,<br>Senior Vice President Law | Present position since October 1, 2004.<br>Served as Vice President Law from December 1, 2003 to October 1, 2004; Senior General Counsel from February 2002 to December 1, 2003 and prior thereto was General Counsel. |
| Marta R. Stewart, 47,<br>Vice President and Controller | Present position since December 1, 2003.<br>Prior thereto was Assistant Vice President Corporate Accounting. |

## PART II

**Item 5. Market for Registrant's Common Stock and Related Stockholder Matters.**

### NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES
### STOCK PRICE AND DIVIDEND INFORMATION

The Common Stock of Norfolk Southern Corporation, owned by 51,032 stockholders of record as of Dec. 31, 2004, is traded on the New York Stock Exchange with the symbol NSC. The following table shows the high and low sales prices as reported by Bloomberg L.P. on its internet-based service and dividends per share, by quarter, for 2004 and 2003.

| | Quarter | | | |
|---|---|---|---|---|
| **2004** | 1st | 2nd | 3rd | 4th |
| Market price | | | | |
| High | $ 24.06 | $ 26.60 | $ 29.79 | $ 36.69 |
| Low | 20.38 | 21.54 | 24.77 | 29.88 |
| Dividends per share | $ 0.08 | $ 0.08 | $ 0.10 | $ 0.10 |
| **2003** | | | | |
| Market price | | | | |
| High | $ 20.89 | $ 22.39 | $ 20.20 | $ 24.62 |
| Low | 17.35 | 18.31 | 18.00 | 18.32 |
| Dividends per share | $ 0.07 | $ 0.07 | $ 0.08 | $ 0.08 |

### ISSUER REPURCHASES OF EQUITY SECURITIES

| Period | (a) Total Number of Shares (or Units) Purchased | (b) Average Price Paid per Share (or Unit) | (c) Total Number of Shares (or Units) Purchased as Part of Publicly Announced Plans or Programs | (d) Maximum Number (or Approximate Dollar Value) of Shares (or Units) that may yet be Purchased Under the Plans or Programs |
|---|---|---|---|---|
| Oct. 1-31, 2004 | -- | -- | -- | -- |
| Nov. 1-30, 2004 | 3,503(1) | $34.86 | -- | -- |
| Dec. 1-31, 2004 | 4,732(1) | $35.23 | -- | -- |
| Total | 8,235 | $35.07 | | |

(1) Shares tendered by employees in connection with the exercise of stock options under the Long-Term Incentive Plan.

**Item 6. Selected Financial Data.**

**NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES**
**FIVE-YEAR FINANCIAL REVIEW 2000-2004**

| | 2004[1] | 2003[2] | 2002 | 2001 | 2000[6] |
|---|---|---|---|---|---|
| | ($ in millions, except per share amounts) | | | | |
| **RESULTS OF OPERATIONS** | | | | | |
| Railway operating revenues | $ 7,312 | $ 6,468 | $ 6,270 | $ 6,170 | $ 6,159 |
| Railway operating expenses | 5,610 | 5,404 | 5,112 | 5,163 | 5,526 |
| Income from railway operations | 1,702 | 1,064 | 1,158 | 1,007 | 633 |
| Other income – net | 89 | 19 | 66 | 99 | 168 |
| Interest expense on debt | 489 | 497 | 518 | 553 | 551 |
| Income from continuing operations before income taxes and accounting changes | 1,302 | 586 | 706 | 553 | 250 |
| Provision for income taxes | 379 | 175 | 246 | 191 | 78 |
| Income from continuing operations before accounting changes | 923 | 411 | 460 | 362 | 172 |
| Discontinued operations[3] | -- | 10 | -- | 13 | -- |
| Cumulative effect of changes in accounting principles, net of taxes[4] | -- | 114 | -- | -- | -- |
| Net income | $ 923 | $ 535 | $ 460 | $ 375 | $ 172 |
| **PER SHARE DATA** | | | | | |
| Income from continuing operations before accounting changes – basic | $ 2.34 | $ 1.05 | $ 1.18 | $ 0.94 | $ 0.45 |
| – diluted | $ 2.31 | $ 1.05 | $ 1.18 | $ 0.94 | $ 0.45 |
| Net income – basic | $ 2.34 | $ 1.37 | $ 1.18 | $ 0.97 | $ 0.45 |
| – diluted | $ 2.31 | $ 1.37 | $ 1.18 | $ 0.97 | $ 0.45 |
| Dividends | $ 0.36 | $ 0.30 | $ 0.26 | $ 0.24 | $ 0.80 |
| Stockholders' equity at year end | $ 19.95 | $ 17.83 | $ 16.71 | $ 15.78 | $ 15.16 |
| **FINANCIAL POSITION** | | | | | |
| Total assets | $ 24,750 | $ 20,596 | $ 19,956 | $ 19,418 | $ 18,976 |
| Total long-term debt, including current maturities[5] | $ 7,525 | $ 7,160 | $ 7,364 | $ 7,632 | $ 7,636 |
| Stockholders' equity | $ 7,990 | $ 6,976 | $ 6,500 | $ 6,090 | $ 5,824 |
| **OTHER** | | | | | |
| Capital expenditures | $ 1,041 | $ 720 | $ 695 | $ 746 | $ 731 |
| Average number of shares outstanding (thousands) | 394,201 | 389,788 | 388,213 | 385,158 | 383,358 |
| Number of stockholders at year end | 51,032 | 52,091 | 51,418 | 53,042 | 53,194 |
| Average number of employees: | | | | | |
| Rail | 28,057 | 28,363 | 28,587 | 30,510 | 33,344 |
| Nonrail | 418 | 390 | 383 | 384 | 394 |
| Total | 28,475 | 28,753 | 28,970 | 30,894 | 33,738 |

[1] 2004 other income – net includes a $53 million net gain from the Conrail Corporate Reorganization. This gain increased net income by $53 million or 13 cents per diluted share.

[2] 2003 operating expenses include a $107 million charge for a voluntary separation program. Other income – net includes an $84 million charge to recognize the impaired value of certain telecommunications assets. These charges reduced net income by $119 million, or 30 cents per diluted share.

[3] In 1998, NS sold all the common stock of its motor carrier subsidiary, North American Van Lines, Inc. (NAVL). Accordingly, NAVL's results of operations, financial position and cash flows are presented as "Discontinued operations." Results in 2001 include an additional after-tax gain of $13 million, or 3 cents per diluted share, that resulted from the expiration of certain indemnity obligations contained in the sales agreement. Results in 2003 include an additional after-tax gain of $10 million, or 3 cents per diluted share, resulting from resolution of tax issues related to the transaction.

[4] Net income in 2003 reflects two accounting changes, the cumulative effect of which increased net income by $114 million, or 29 cents per diluted share: a change in accounting for the cost to remove railroad crossties, which increased net income by $110 million, and a change in accounting related to a special-purpose entity that leases certain locomotives to NS, which increased net income by $4 million. This entity's assets and liabilities, principally the locomotives and debt related to their purchase, are now reflected in NS' Consolidated Balance Sheet.

[5] Excludes notes payable to Conrail of $716 million in 2003, $513 million in 2002, $301 million in 2001, and $51 million in 2000.

[6] 2000 operating expenses include $165 million in work force reduction costs for early retirement and separation programs. These costs reduced net income by $101 million or 26 cents per diluted share.

See accompanying Consolidated Financial Statements and notes thereto.

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations.**

**Norfolk Southern Corporation and Subsidiaries**
**Management's Discussion and Analysis of**
**Financial Condition and Results of Operations**

The following discussion and analysis should be read in conjunction with the Consolidated Financial Statements and Notes and the Selected Financial Data.

## OVERVIEW

NS' results in 2004 reflect substantial increases in traffic volumes as the U.S. economy recovered and demand for transportation grew. The U.S. economy grew an estimated 4.4%, and the manufacturing sector expanded throughout the year. The higher demand, coupled with the combination of trucking capacity constraints and the continuing fluidity of the NS network resulted in a substantial increase in volume and revenues. Carloadings were up 603,000 units, or 9%, in 2004 driven by intermodal, metals and construction, and coal, which together accounted for 95% of this increase, and revenues increased $844 million, or 13%. Improved performance and service levels allowed NS to meet increased demand and led to the ability to raise rates in response to market demand. The fluidity and efficiency of NS' system enabled it to handle the record levels of traffic volume and control expenses. Operating expenses grew less than the 9% increase in carloadings, and the operating ratio, a measure of the amount of operating revenues consumed by operating expenses, improved to 76.7% in 2004.

Looking ahead NS expects business levels to continue to grow in 2005 but at a more modest pace than seen in 2004.

## SUMMARIZED RESULTS OF OPERATIONS

### 2004 Compared with 2003

Net income was $923 million, or $2.31 per diluted share, in 2004, up $388 million, or 73%, compared with net income of $535 million, or $1.37 per diluted share, in 2003. Results in 2003 included a $10 million, or 3 cents per share, gain from discontinued operations (see Note 17) and a $114 million, or 29 cents per share, benefit related to the cumulative effect of changes in accounting principles (see Note 1). Income from continuing operations before accounting changes was $923 million, or $2.31 per diluted share, in 2004, compared with $411 million, or $1.05 per diluted share, in 2003. The increase in 2004 was the result of higher income from railway operations and also included a $53 million net noncash gain from the Conrail Corporate Reorganization reported in "Other income – net" (see Notes 2 and 3). In addition, the comparisons were affected by the costs of a voluntary separation program (see Note 11) and the impairment of certain telecommunications assets (see Note 6), which combined to reduce income by $119 million, or 30 cents per diluted share, in 2003.

### 2003 Compared with 2002

Net income was $535 million, or $1.37 per diluted share, in 2003, up $75 million, or 16%. Income from continuing operations before accounting changes was $411 million, or $1.05 per diluted share, down $49 million, or 11%, compared with 2002, reflecting higher compensation and benefits costs, which included the costs of the voluntary separation program, and lower nonoperating income that reflected the impairment of the telecommunications assets.

## DETAILED RESULTS OF OPERATIONS

### Railway Operating Revenues

Railway operating revenues were $7.3 billion in 2004, $6.5 billion in 2003 and $6.3 billion in 2002. The following table presents a three-year comparison of revenues, volume and average revenue per unit by market group.

| | Revenues | | | Units | | | Revenue per Unit | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2004 | 2003 | 2002 | 2004 | 2003 | 2002 | 2004 | 2003 | 2002 |
| | | *($ in millions)* | | | *(in thousands)* | | | *($ per unit)* | |
| Coal | $ 1,728 | $ 1,500 | $ 1,441 | 1,691 | 1,615 | 1,610 | $ 1,022 | $ 929 | $ 895 |
| General merchandise: | | | | | | | | | |
| Automotive | 954 | 936 | 961 | 635 | 645 | 662 | 1,503 | 1,450 | 1,450 |
| Chemicals | 864 | 772 | 755 | 448 | 426 | 423 | 1,927 | 1,815 | 1,783 |
| Metals/construction | 818 | 699 | 692 | 781 | 710 | 716 | 1,048 | 984 | 966 |
| Agr./cons. prod./govt. | 727 | 688 | 637 | 569 | 556 | 518 | 1,278 | 1,238 | 1,231 |
| Paper/clay/forest | 684 | 634 | 603 | 449 | 443 | 438 | 1,524 | 1,431 | 1,378 |
| General merchandise | 4,047 | 3,729 | 3,648 | 2,882 | 2,780 | 2,757 | 1,404 | 1,341 | 1,323 |
| Intermodal | 1,537 | 1,239 | 1,181 | 2,891 | 2,466 | 2,354 | 531 | 502 | 502 |
| Total | $ 7,312 | $ 6,468 | $ 6,270 | 7,464 | 6,861 | 6,721 | $ 980 | $ 943 | $ 933 |

In 2004, revenues increased $844 million, or 13%, reflecting a $318 million, or 9%, rise in general merchandise revenues, a $298 million, or 24%, increase in intermodal revenues and a $228 million, or 15%, improvement in coal revenues. All general merchandise market groups except automotive posted volume increases over 2003. As shown in the following table, the revenue improvement was the result of higher traffic volumes and increased average revenues. The favorable revenue per unit/mix variance was driven by higher average revenue per unit that reflected higher rates and increased fuel surcharges, offset in part by the effects of a 17% increase in lower-priced intermodal traffic volume.

**Revenue Variance Analysis**
Increases (Decreases)

| | 2004 vs. 2003 | 2003 vs. 2002 |
|---|---|---|
| | *($ in millions)* | |
| Volume | $ 569 | $ 131 |
| Revenue per unit/mix | 275 | 67 |
| Total | $ 844 | $ 198 |

In 2003, revenues increased 3%, reflecting a 2% rise in general merchandise revenues, a 4% improvement in coal revenues, and a 5% increase in intermodal revenues. All but automotive within the general merchandise market group posted revenue increases over 2002. Most of the revenue improvement was the result of higher traffic volumes. The favorable revenue per unit/mix variance was driven by higher average revenue per unit, offset in part by the effects of unfavorable changes in the mix of traffic, particularly a 5% increase in intermodal traffic volume.

Beginning March 1, 2004, NS modified its fuel surcharge program for its merchandise and coal traffic. The fuel surcharge program in effect until that time applied a 2% fuel surcharge to line haul freight charges when the West Texas Intermediate (WTI) crude oil price, as published in the Wall Street Journal, exceeded $28.00 per barrel for 30 consecutive business days. For each $5.00 per barrel increase, an

additional 2% fuel surcharge applied. The revised fuel surcharge is based on the monthly average price of WTI crude oil. Line haul freight charges are adjusted by 0.4% for every dollar the average price exceeds $23 per barrel in the second calendar month prior to the month in which the fuel surcharge is applied. The modification in the fuel surcharge program causes the amount charged to more closely reflect fuel price fluctuations in today's volatile market. Higher average WTI crude oil prices resulted in an increase in fuel surcharges in 2004; however, this was offset by the effect of higher prices for diesel fuel (excluding hedge benefits).

**COAL** revenues increased $228 million, or 15%, versus 2003. Traffic volume (carloads) increased 5% primarily due to higher export, utility and metallurgical coal volumes, which offset declines in coke and iron ore. Revenue per unit increased 10%, reflecting higher rates, fuel surcharges, a favorable change in the mix of traffic (the rate of increase in longer haul traffic exceeded that of short haul traffic) and improved loading productivity (increased tons per car). Coal, coke and iron ore revenues represented 24% of total railway operating revenues in 2004, and 83% of NS' coal shipments originated on lines it operates.

NS is involved in rate cases with two of its utility customers, Duke Energy (Duke) and Carolina Power & Light (CP&L). In 2002, Duke and CP&L filed rate reasonableness complaints at the STB alleging that NS' tariff rates for the transportation of coal were unreasonable. On Oct. 20, 2004, in a consolidated decision, the STB found NS' rates to be reasonable in both cases. At the STB's invitation, Duke and CP&L each initiated proceedings to determine whether phasing constraints should apply. As the STB has explained, the phasing constraint is an independent constraint relating not to the reasonableness of a rate, but to the reasonableness of collecting it immediately. The Interstate Commerce Commission (the predecessor to the STB) had previously issued guidelines for phasing. These guidelines indicate that phasing of a rate increase will only be required where the party seeking such relief demonstrates the need for it with specificity. In balancing the equities of the particular phasing request, the STB will consider factors including the requirements of the railroads, the magnitude of the proposed increase, the magnitude of past increases, the dependence of the utility on coal, the economic conditions in the final destination market and the economic conditions in the coal supply area.

The phasing constraint has never been invoked by a complainant utility in a rate case, and the STB has never applied it. Therefore, it is unknown how the STB would balance the above factors, whether it would find the phasing constraint applicable, and if it did, whether phasing would be ordered retroactively or prospectively or both. Additionally, Duke and CP&L have appealed the October 2004 STB decision on reconsideration to the D.C. Circuit Court of Appeals. Although management has made an estimate of the ultimate resolution of these cases, due to these uncertainties, future developments in the Duke case and(or) the CP&L case may result in adjustments that could have a favorable or unfavorable material impact on results of operations in a particular quarter or year. Over the long term, management believes the STB decisions in the Duke and CP&L proceedings will help support improved pricing for coal transportation services.

Coal carloads were flat in 2003 while revenues increased 4% versus 2002. Revenue per unit increased 4%, reflecting favorable developments in 2003 of the coal rate reasonableness proceedings before the STB, as well as increases resulting from more longer haul business and loading productivity improvements that led to more tons per car. Coal, coke and iron ore revenues represented 23% of total railway operating revenues in 2003, and 86% of NS' coal shipments originated on lines it operates.

**Total Coal, Coke and Iron Ore Carloads**

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| | | *(Cars in thousands)* | |
| Utility | 1,222.4 | 1,188.5 | 1,175.0 |
| Export | 157.0 | 116.5 | 108.8 |
| Domestic metallurgical | 214.0 | 213.8 | 228.1 |
| Industrial | 97.4 | 95.8 | 97.7 |
| Total | 1,690.8 | 1,614.6 | 1,609.6 |

**Utility coal** volume increased 3%, compared to 2003, as electricity production was up almost 2% in NS' service region responding to higher demand driven by a rebounding U.S. economy. Utilities increased burn to meet the heavier electricity demand and a new rail unloading facility began operating in April 2004 at a northern utility. Utility coal stockpiles were below target levels across NS' service area due in part to the increased demand for coal-fired electric generation. Increased demand for Eastern U.S. coal prompted some customers to ship coals from non-traditional coal fields in Wyoming and Colorado in addition to more imported coal. In response, Appalachian coal production increased slightly in 2004 following declines in 2003 and 2002.

For 2003, utility coal volume increased 1%, compared to 2002, primarily due to a 6% gain in tonnage moving to the Northeast. These gains were led by a full year's operation of two projects completed in 2002 that captured traffic from truck and barge. In the first quarter of 2003, higher natural gas prices and colder temperatures caused coal-fired generating stations to run near capacity in the Northeast, reducing the high stockpiles that were carried forward from 2002. However, the mild temperatures through the remainder of the year diminished seasonal demand for coal. Volumes to utilities in the South decreased 4% due to milder weather and extended power plant outages for the installation of environmental emission-control technology.

The outlook for utility coal remains positive. The continued growth in demand for electricity and lower-than-targeted coal stockpiles at the utilities should support increased coal carloads in 2005. Domestic western origin and imported coals are expected to continue to be an important source of additional coal supply to overcome the supply imbalance created by increased utility demand and the supply constraints of traditional coal sources. Natural gas prices are expected to remain higher and more volatile than coal energy prices. As always, demand will be influenced by the weather.

A number of evolving environmental issues remain that have the potential to affect the utility coal market, depending upon their outcome. These include a national energy policy, proposed multi-emissions legislation, mercury emissions standards, new source review and ongoing efforts at addressing climate change. Certain utilities have chosen to add emissions control technologies to their electric generating units in advance of governmental requirements and are advancing their plans to more fully utilize their existing coal-fired power plants.

**Export coal** volume increased 35% in 2004, compared to 2003, due to sustained strong global demand for high quality metallurgical coal and China's continued growing consumption of coal for steel production and electricity generation. The devaluation of the dollar resulted in lower U.S. coal prices relative to Australian and Canadian coal prices which made U.S. coals more economical in traditional European markets. In addition, ocean vessel rates continued to favor U.S. coals. Volume through Baltimore and Norfolk increased dramatically. Baltimore was up approximately 24,000 carloads, or

159%, and Norfolk was up approximately 16,000 carloads, or 16%. However, U.S. exports in 2004 were constrained by the tight coal supply from Eastern coal mines.

Export coal volume increased 7% in 2003, compared to 2002. Export coal through Norfolk, primarily metallurgical coal, increased by 24% in 2003, benefiting from a decline in exports from China. Strong steel production in China shifted Chinese exports of metallurgical coal to its own domestic consumption. Also, ocean freight rates were at an all time high. Spot vessel rates from Australia to Europe more than tripled, while transatlantic rates increased less dramatically. The combination of the gap in ocean freight rates and the shorter sailing times gave the U.S. a competitive advantage in European markets. Lastly, the decline in the value of the dollar against the Euro and Australian Dollar also increased demand for U.S. metallurgical coal abroad. Coal exported through Baltimore, primarily steam coal, declined 41% due to strong domestic demand for utility coal.

Export coal volume for 2005 is expected to continue to show improvement with strong international demand for metallurgical coal, in addition to a weaker dollar and higher shipping costs making U.S. coal more competitive.

**Domestic metallurgical** coal, coke and iron ore volume was flat in 2004, when compared with 2003. Metallurgical coal volume was up 12%. However, this was offset by declines in domestic coke and iron ore volumes, principally due to reduced production at an NS-served producer.

Domestic metallurgical coal, coke and iron ore volumes decreased 6% in 2003, when compared to 2002, due to the temporary closing of a large mine that produced low-volatile coal, the continuing consolidation of the steel industry, and fewer blast furnaces operating than in the past.

Demand for domestic metallurgical coal, coke and iron ore is expected to improve in 2005. Blast furnaces are expected to run near capacity as domestic demand for metallurgical coal continues to grow.

**Other coal** volumes increased 2% versus 2003, primarily due to new business and the recovery of the U.S. economy. In 2003, steam coal shipped to manufacturing plants finished the year down 2% when compared to 2002.

**GENERAL MERCHANDISE** traffic volume increased 4% in 2004 compared to 2003, and revenues increased 9%, principally due to improved volumes in all but the automotive business group, higher average revenues across all business groups and increased fuel surcharges. In 2003, general merchandise traffic volume increased 1% compared to 2002, and revenues increased 2%, principally due to higher average revenues in most business groups and higher agriculture traffic volume.

**Automotive** traffic volume decreased 2% in 2004 compared to 2003, primarily due to reduced automotive production at Ford and GM, partially offset by increased production at Toyota and Honda. In contrast, revenues increased 2%, reflecting pricing improvements and fuel surcharge increases.

In 2003, automotive traffic volume and revenues decreased 3% compared to 2002, principally due to reduced vehicle production.

For 2005, automotive revenues are expected to increase, supported by a projected 2% rise in light vehicle production and volume from two plants that opened late in 2004.

**Chemicals** traffic volume increased 5% and revenues increased 12% in 2004, compared with 2003, reflecting manufacturers' increased demand across all chemical business groups. Feedstocks and plastic shipments were up as inventories were restocked in anticipation of higher product prices related to

increased natural gas costs and new propane and asphalt terminals in the Southeast added carloads. Revenue per unit reflected higher prices to meet market conditions and fuel surcharges.

Chemicals traffic volume increased 1% and revenue increased 2% in 2003 compared to 2002. Traffic volume benefited from higher shipments of industrial intermediates, petroleum and environmental products, and plastics. Also contributing to 2003 growth, approximately 2,000 annual carloads of new traffic were diverted from the waterways and highways. Revenue per unit reflected improved pricing to meet market conditions, as well as favorable changes in mix.

Chemical volume is expected to grow in 2005, with several propane and plastic plant expansions planned and the continued strengthening of the economy. However, volume could be adversely affected by the price of natural gas and crude oil, which accounts for more than 50% of the cost of most chemical products and presents a significant competitive challenge that could cause domestic chemical producers to move production overseas.

**Metals and construction** traffic volume increased 10% and revenue increased 17% in 2004 compared with 2003. The improvement was primarily due to increased production at NS-served integrated mills and mini-mills, the conversion of truck business to rail resulting from a shortage of flatbed trucks as well as higher scrap metal volumes resulting from expanded alliances with key scrap metal shippers and access to new scrap processors and steel mills. Construction traffic volume benefited from increased residential, commercial and highway construction.

In 2003, metals and construction traffic volume decreased 1%, but revenues increased 1% compared with 2002. The decline in volume resulted from reduced metals volume (mostly iron and steel), offset in part by higher construction traffic. Revenue per unit improved 2%, reflecting favorable pricing and traffic mix changes.

The outlook for 2005 remains strong for iron and steel markets with new import slab business and growth in plate, structural, bar/rod and steel rail for both integrated mills and mini-mills. Construction traffic volume is expected to reflect continued strength in residential and commercial construction.

**Agriculture, consumer products and government** traffic volume increased 2% and revenue increased 6% in 2004 compared with 2003, driven by ethanol and fertilizer shipments. Ethanol traffic increased 59% primarily due to the opening of the Northeast market to ethanol as a gasoline additive. Fertilizer was up 7% year-over-year, reflecting higher domestic shipments to industrial customers and increased exports of phosphates, principally to China. Revenue per unit improved 3% as a result of changes in traffic mix such as increased ethanol traffic and more long haul feed shipments as well as higher prices.

In 2003, agriculture, consumer products and government traffic volume increased 7% and revenues increased 8% compared with 2002. Commodities contributing most to these increases were corn, fertilizer, military, sweeteners and wheat. Only feed, food products and beverages showed a slight decrease. Corn shipments increased 4% in 2003 and revenue was up 8%. Due to the drought of 2002, which caused a depletion of inventories, there was a significant increase in demand for corn to Southeast feed mill customers and poultry producers in eastern Pennsylvania, Maryland, and Delaware, resulting in long haul rail movements from Midwest suppliers to these areas. Higher fertilizer traffic resulted from the re-opening of a large phosphate fertilizer plant. Shipments of military vehicles and military equipment increased 36% over 2002 levels due to the war in Iraq.

Agriculture, consumer products and government volume is expected to be higher in 2005, benefiting from the record grain crop in 2004, expanding markets for ethanol and improving feed mill business.

**Paper, clay and forest products** traffic volume increased 1% and revenue increased 8% in 2004 compared with 2003, reflecting yield improvements in all segments except newsprint, together with higher printing paper, newsprint, pulp board and kaolin shipments as U.S. paper production and demand for paper products strengthened in 2004. Revenue per unit improved 6% principally as a result of price increases but also aided by increased fuel surcharges.

In 2003, paper, clay and forest products traffic increased 1% and revenues increased 5% compared to 2002, principally due to improved domestic demand for paper products. Paper traffic benefited from increased domestic orders for consumer products packaging and from the advertising sector, as well as new business. Newsprint shipments continued to remain soft, largely due to a prolonged decline in demand. Woodchip volume increased significantly as NS-served paper mills experienced shortages and were forced to source wood fiber from more distant suppliers due to wet weather in the Southeast. NS clay revenue was up compared to 2002 due to a strong increase in revenue per carload and a more positive mix as NS handled more long-haul domestic traffic. Lumber business was soft in early 2003 despite strong demand due in part to wet weather and several mill closures. Lumber business was up in the fourth quarter as weather in the Southeast and commodity prices improved.

In 2005, paper, clay and forest product revenues are expected to grow modestly with the addition of several new lumber distribution centers on NS lines.

**INTERMODAL** volume increased 17% and revenue increased 24% in 2004 compared with 2003. Strong demand was driven by an expanding economy led by higher consumer spending, industrial production and international trade, in addition to constraints in truck and other railroads' capacity. International steamship volume was up 15%, tied to the growth in U.S. trade volumes through east and west coast ports. Truckload volume increased 28% as a result of new business with traditional truckload companies. Premium business, which includes parcel and LTL carriers, grew 15% principally due to new parcel service between Chicago and New Jersey. Triple Crown Services Company increased volume by 8% through an expanded trailer fleet and growth in its geographic coverage. Revenue per unit improved 6%, reflecting value-based pricing and fuel surcharges.

In 2003, intermodal volume increased 5% and revenues increased 5% compared to 2002. Volume growth was driven by improved service performance that enabled the conversion of truck business to rail. Shipments for asset-based truckload carriers increased 14% as these trucking companies used intermodal to reduce their exposure to driver shortages and the need for larger fleets. International volume, which represents 45% of intermodal's volume, grew 9%, primarily a result of strong import trade and new business driven by enhanced service. Triple Crown Services Company's growth was limited to 1% in 2003, hampered by a fleet at full capacity.

In 2005, intermodal revenues are expected to grow with higher levels of truck to rail conversions as prices for motor carrier services continue to increase as a result of continuing driver and equipment shortages and high fuel prices. NS expects to build new terminals in Ohio, Kentucky, Virginia and Pennsylvania in addition to expanding existing intermodal terminals. Strong international trade is expected to create growth opportunities in NS' international business segment and available capacity should help grow NS' domestic and premium segments. Future growth may, however, be tempered by operating improvements at other railroads, as well as constraints in the drayage market.

**Railway Operating Expenses**

Railway operating expenses increased 4% in 2004 compared to 2003 and 6% in 2003 compared to 2002. Expenses in 2003 included $107 million of costs related to a voluntary separation program to reduce the size of the work force, while there was no such program in either 2004 or 2002. Accordingly, the absence

of the voluntary separation program in 2004 and 2002 resulted in a 2% reduction in the 2004 to 2003 year-over-year comparison and a 2% increase in the 2003 to 2002 year-over-year comparison. Carloads rose 9% in 2004 compared to 2003 and 2% in 2003 compared to 2002.

The railway operating ratio, which measures the percentage of railway operating revenues consumed by railway operating expenses, was 76.7% in 2004, compared with 83.5% in 2003 and 81.5% in 2002. The voluntary separation costs added 1.6 percentage points to the 2003 ratio.

The following table shows the changes in railway operating expenses summarized by major classifications.

**Operating Expense Variances**
Increases (Decreases)

| | 2004 vs. 2003 | 2003 vs. 2002 |
|---|---|---|
| | *($ in millions)* | |
| Compensation and benefits* | $ (3) | $ 253 |
| Materials, services and rents | 174 | (30) |
| Conrail rents and services | (100) | 7 |
| Depreciation | 85 | (2) |
| Diesel fuel | 69 | 38 |
| Casualties and other claims | (30) | 10 |
| Other | 11 | 16 |
| Total | $ 206 | $ 292 |

* Includes $107 million of voluntary separation costs in 2003.

**Compensation and benefits** represented 40% of total railway operating expenses and was flat in 2004 compared to 2003, but increased 13% in 2003 compared to 2002. Both comparisons reflect the $107 million costs of the voluntary separation program in 2003. Expenses in 2004 reflected higher volume-related train and engine payroll expenses, up $39 million; higher wage rates, which added $37 million; increased stock-based compensation, up $24 million; and higher management and locomotive engineer performance-based incentive compensation, which was up $20 million. These increases were offset by lower nonagreement workforce levels, saving $24 million, as well as the absence of the $107 million expense of the 2003 voluntary separation program.

In the third quarter of 2005, NS will adopt Statement of Financial Accounting Standards No. 123 (revised), which requires expensing of stock options. See New Accounting Pronouncements (below) and Note 1.

Almost half of the increase in 2003 was the result of the voluntary separation program. The remainder was principally due to higher wage rates (including the BLE bonus in lieu of wage increases), which added $45 million, increased health and welfare benefits costs, which were up $44 million, and reduced pension income, down $34 million (see Note 11). Approximately $25 million of the increase in health and welfare benefit costs was attributable to retirees, reflecting a higher estimated medical inflation rate.

The Railroad Retirement and Survivors' Improvement Act, which took effect Jan. 1, 2002, allows for investment of Tier II assets in a diversified portfolio through the National Railroad Retirement Investment Trust. The law also provides a mechanism for automatic adjustment of Tier II payroll taxes should the trust assets fall below a four-year reserve or exceed a six-year reserve. As a result, the employers' portion

of Tier II retirement payroll taxes have been reduced from 14.2% in 2003 to 13.1% in 2004 and 12.6% in 2005 and thereafter. However, these savings are expected to continue to be substantially offset by higher payroll taxes on increased wages and a higher wage base.

**Materials, services and rents** includes items used for the maintenance of railroad lines, structures and equipment; the costs of services purchased from outside contractors, including the net costs of operating joint (or leased) facilities with other railroads; and the net cost of equipment rentals. This category of expenses increased 12% in 2004 compared to 2003 and decreased 2% in 2003 compared to 2002.

The 2004 increase was the result of higher purchased services, up $100 million, including higher costs for volume-related intermodal services such as loading of containers and trailers and drayage. In addition, locomotive and freight car maintenance expenses rose $23 million, and equipment rents increased $33 million. The 2003 decline reflected lower equipment rents, down $26 million, and reduced purchased services, down $20 million, including lower expenses for intermodal, automotive and bulk transfer services, and professional and legal fees.

Equipment rents, which includes the cost to NS of using equipment (mostly freight cars) owned by other railroads or private owners, less the rent paid to NS for the use of its equipment, increased 9% in 2004 and decreased 7% in 2003 compared to 2002. The increase in 2004 was principally due to increased volume-related intermodal shipments and the absence of favorable settlements that benefited 2003. The decline in 2003 was principally the result of lower automotive traffic volume in addition to adjustments relating to periodic studies of equipment rents and favorable settlements of recent bills. In addition, the change in accounting related to certain leased locomotives (see Note 1) also reduced equipment rents.

Locomotive repair costs increased in 2004 and 2003, due to more maintenance activity related to the increase in business coupled with the age of the fleet. Locomotive and freight car maintenance costs are expected to increase further in 2005.

**Conrail rents and services** decreased 24% in 2004 compared to 2003 and increased 2% in 2003 compared to 2002. This item includes amounts due to CRC for operation of the Shared Assets Areas (see Note 2). Prior to the Conrail Corporate Reorganization, this category also included amounts due to PRR for use of its operating properties and equipment as well as NS' equity in Conrail's net earnings, and the additional amortization related to the difference between NS' investment in Conrail and its underlying equity (see Note 2). The decline was primarily driven by the Conrail Corporate Reorganization, which resulted in the consolidated reporting of individual components of Conrail equity earnings, principally depreciation, equipment rents and interest expense (see Note 2). NS' share of equity earnings post-Conrail Corporate Reorganization is now shown within "Other income-net." The increase in 2003 reflects lower Conrail earnings and higher expenses in the Shared Assets Areas.

**Depreciation** expense increased 17% in 2004 compared to 2003 and decreased slightly in 2003 compared to 2002. The increase in 2004 was primarily a result of the Conrail Corporate Reorganization (see Note 2). In addition, substantial levels of capital spending affected all years; however, depreciation expense in 2003 benefited from a change in accounting for the cost to remove crossties (see Note 1, "Properties," for NS' depreciation policy).

In 2004, NS received the results of a depreciation study from an independent firm of engineers. The results of the study, which were implemented in September 2004, prospectively reduced depreciation expense by approximately $17 million annually.

**Diesel fuel** expenses increased 18% in 2004 compared with 2003 and 11% in 2003 compared to 2002. The increase in 2004 reflects a 13% increase in the average price per gallon (which includes hedge benefits) and a 6% increase in consumption. The increase in 2003 reflects an 11% rise in the average price per gallon including hedge benefits and essentially flat consumption. Expenses in 2004 included a benefit of $140 million compared with benefits of $59 million in 2003 and $10 million in 2002 from the diesel fuel hedging program (see "Market Risks and Hedging Activities," below and Note 16). NS has hedged approximately 36% of expected 2005 diesel fuel requirements as of December 31, 2004, at an average price of 83 cents per gallon. No new hedges have been entered into since May 2004. Accordingly, if diesel fuel prices remain at their current levels, or increase further, diesel fuel expense will be higher going forward.

Recently enacted legislation will repeal the 4.3 cents per gallon excise tax on railroad diesel fuel and inland waterway fuel by 2007, with the following phased reductions in 2005 and 2006: by 1 cent per gallon from Jan. 1, 2005 through June 30, 2005; 2 cents per gallon from July 1, 2005 through Dec. 31, 2006; and by the full 4.3 cents thereafter. NS consumes approximately 500 million gallons of diesel fuel per year.

**Casualties and other claims** expenses (including the estimates of costs related to personal injury, property damage and environmental matters) decreased 17% in 2004 compared to 2003 and increased 6% in 2003 compared to 2002. The decline reflected favorable personal injury and freight claims development and higher insurance settlements, partially offset by increased derailment expenses. The higher expense in 2003 was due to adverse personal injury claims development and derailments expense as well as higher insurance costs.

On Jan. 6, 2005, a derailment occurred in Graniteville, SC. NS expects the first quarter of 2005 to reflect operating expenses related to this incident of between $30 million and $40 million (pretax). The amount includes NS' self-insured retention under its insurance policies, as well as other uninsured costs. Although potential losses may exceed self-insured retention amounts, NS expects at this time that insurance coverage is adequate to cover such potential claims or settlements. This amount does not include any fines or penalties that could be imposed.

The largest component of casualties and other claims expense is personal injury costs. In 2004, cases involving occupational injuries comprised about one-third of total employee injury cases resolved and 24% of the total payments made. With its long-established commitment to safety, NS continues to work actively to eliminate all employee injuries and to reduce the associated costs. With respect to occupational injuries, which are not caused by a specific accident or event, but result from a claimed exposure over time, the benefits of any existing safety initiatives may not be realized immediately. These types of claims are being asserted by former or retired employees, some of which have not been actively employed in the rail industry for decades.

The rail industry remains uniquely susceptible to litigation involving job-related accidental injury and occupational claims because of the Federal Employers' Liability Act (FELA), which is applicable only to railroads. FELA's fault-based system, which covers employee claims for job-related injuries, produces results that are unpredictable and inconsistent as compared with a no-fault workers' compensation system.

NS maintains substantial amounts of commercial insurance for potential third-party liability and property damage claims. It also retains reasonable levels of risk through self-insurance (see Note 18). NS expects insurance costs to be higher in 2005.

**Other expenses** increased 5% in 2004 compared to 2003 and 8% in 2003 compared to 2002. The increase in 2004 reflected higher property and sales and use taxes. The increase in 2003 was primarily

attributable to higher state franchise and sales and use taxes, the absence of a favorable bad debt settlement that benefited 2002 and higher union employee travel expenses.

**Other income – net** was $89 million in 2004, $19 million in 2003 and $66 million in 2002 (see Note 3). The increase in 2004 reflected the absence of the $84 million telecommunications assets impairment charge that burdened 2003 (see Note 6) and the gain in 2004 recognized on the Conrail Corporate Reorganization (see Note 2) that combined to more than offset losses generated by an investment in a limited liability company that owns and operates facilities that produce synthetic fuel from coal (see the discussion of tax credit investments below). The decline in 2003 was primarily due to the $84 million charge that offset increased gains from the sale of properties, higher corporate-owned life insurance returns and lower interest accruals related to tax liabilities.

In June 2004, NS purchased a membership interest in a limited liability company that owns and operates facilities that produce synthetic fuel from coal. The production of synthetic fuel results in expenses related to the investments as well as tax credits. The expenses are recorded as a component of "Other income – net," and the tax credits, as well as tax benefits related to the expenses, are reflected in the provision for income taxes. The synthetic fuel tax credits are subject to reduction if the average price of oil for a year exceeds a certain amount under the tax laws. Given current market conditions, it is possible that these tax credits could be reduced in 2005. Such a reduction in tax credits would be accompanied by a reduction in the expense related to the investment, although the net effect would be to reduce the projected return on the investment.

**Income Taxes**

Income tax expense in 2004 was $379 million for an effective rate of 29%, compared with effective rates of 30% in 2003 and 35% in 2002. Excluding NS' equity in Conrail's after-tax earnings and the gain on the Conrail Corporate Reorganization, the effective rate was 31% in 2004, 33% in 2003 and 38% in 2002.

In 2004, the effective rate was reduced by tax credits from synthetic fuel related investments and the favorable resolution of an IRS audit of a synthetic fuel related investment (see Note 4). In 2003, the effective rate was reduced by the favorable resolution of prior years' tax audits. The effective rates in all three years benefited from favorable adjustments upon filing the prior year tax returns and favorable adjustments to state tax liabilities.

For the last four years, 30% and 50% bonus depreciation has been allowed for federal income tax purposes. After 2004, bonus depreciation will not be available. In addition, the Conrail Corporate Reorganization resulted in NS receiving assets with less future tax depreciation than book depreciation. As a result, current taxes have been lower in prior years than might be expected in future years.

NS has interests in synthetic fuel related investments that result in tax credits. These synthetic fuel tax credits expire at the end of 2007. In addition, synthetic fuel tax credits are subject to reduction if the average price of oil for a year exceeds a certain amount under the tax laws. Given current market conditions, it is possible that these tax credits could be reduced in 2005.

**Discontinued Operations**

In 2003, income from discontinued operations consisted of a $10 million after-tax gain related to the resolution of tax issues arising from the sale of NS' motor carrier subsidiary.

**FINANCIAL CONDITION, LIQUIDITY AND CAPITAL RESOURCES**

**Cash provided by operating activities,** NS' principal source of liquidity, was $1,661 million in 2004, compared with $1,054 million in 2003 and $803 million in 2002. The improvement in 2004 was primarily due to increased railway operating income. In 2003, the increase reflected a smaller change in the amount of accounts receivables sold; declines in receivables sold amounted to $30 million in 2003 and $270 million in 2002 (see Note 5).

Prior to the Conrail Corporate Reorganization, a significant portion of payments made to PRR (which were included in "Conrail Rents and Services" and, therefore, were a use of cash in "Cash provided by operating activities") was borrowed back from a PRR subsidiary under a note due in 2032, and, therefore, was a source of cash in "Proceeds from borrowings." Amounts outstanding under this note comprised the long-term balance of "Due to Conrail", and this note was effectively extinguished by the Conrail Corporate Reorganization. Subsequent to the Conrail Corporate Reorganization, payments under "Conrail rents and services" have declined, depreciation charges have increased, and the net borrowings have been terminated. Accordingly, NS' cash provided by operating activities after the Conrail Corporate Reorganization has increased. NS' net cash flow from these borrowings amounted to $118 million in 2004, $203 million in 2003 and $212 million in 2002.

NS' working capital deficit was $234 million at Dec. 31, 2004, compared with $376 million at Dec. 31, 2003. The improvement was principally due to an increase in cash flow from operations.

NS expects that cash on hand combined with cash flow from operations will be sufficient to meet its ongoing obligations including the higher level of debt maturing in 2005. This expectation is based on a view that the economy will continue at a moderate growth rate through 2005.

**Contractual obligations** at Dec. 31, 2004, related to NS' long-term debt (including capital leases) (see Note 8), operating leases (see Note 9), agreements with CRC (see Note 2), unconditional purchase obligations (see Note 18) and other long-term obligations (see Note 18), are as follows:

| | | Payments Due By Period | | | |
|---|---|---|---|---|---|
| | Total | 2005 | 2006-2007 | 2008-2009 | 2010 and Subsequent |
| | | | ($ in millions) | | |
| Long-term debt and capital leases | $ 7,525 | $ 662 | $ 809 | $ 851 | $ 5,203 |
| Operating leases | 1,025 | 154 | 227 | 160 | 484 |
| Agreements with CRC | 686 | 33 | 68 | 68 | 517 |
| Unconditional purchase Obligations | 121 | 121 | -- | -- | -- |
| Other long-term obligations | 26 | 11 | 15 | -- | -- |
| Total | $ 9,383 | $ 981 | $ 1,119 | $ 1,079 | $ 6,204 |

**Off balance sheet arrangements** consist of an accounts receivable sale program (see Note 5). While there were some sales during 2004, there were no accounts receivable sold under this arrangement as of Dec. 31, 2004. NS does not expect to sell any accounts receivable in 2005.

**Cash used for investing activities** increased 77% in 2004 and decreased 5% in 2003. Property additions, which account for most of the recurring spending in this category, were up 45% in 2004 and up 4% in 2003. In addition, investing activities reflect NS' new investment in a membership interest in a limited

liability company that owns and operates facilities that produce synthetic fuel from coal. The following tables show capital spending (including capital leases) and track and equipment statistics for the past five years.

**Capital Expenditures**

| | 2004 | 2003 | 2002 | 2001 | 2000 |
|---|---|---|---|---|---|
| | | | *($ in millions)* | | |
| Road | $ 607 | $ 495 | $ 519 | $ 505 | $ 557 |
| Equipment | 429 | 218 | 174 | 233 | 146 |
| Other property | 5 | 7 | 2 | 8 | 28 |
| Total | $ 1,041 | $ 720 | $ 695 | $ 746 | $ 731 |

Higher capital expenditures in 2004 were primarily due to increased locomotive purchases and investment in roadway projects in addition to Triple Crown Services Company equipment and freight cars. The increase in 2003 reflects higher locomotive purchases offset, in part, by lower spending on signal and electrical projects and computers.

NS and six other railroads (five Class I railroads and a commuter railroad) have agreed to participate in the Chicago Region Environmental and Transportation Efficiency (CREATE) project in Chicago. The intent of the proposed public-private partnership is to reduce rail and highway congestion and add freight and passenger capacity in the metropolitan Chicago area. The project is estimated to cost $1.5 billion with city, state and federal support. The railroads' financial contribution to the project is contingent upon a binding commitment that establishes the availability, on terms and conditions satisfactory to the railroads, of all required public funding and of third-party properties necessary to complete the entire project. If public funding is secured, the railroads will contribute a total of $232 million towards the project with NS' share slated to be $34 million over an estimated six-year period.

**Track Structure Statistics (Capital and Maintenance)**

| | 2004 | 2003 | 2002 | 2001 | 2000 |
|---|---|---|---|---|---|
| Track miles of rail installed | 246 | 233 | 235 | 254 | 390 |
| Miles of track surfaced | 5,055 | 5,105 | 5,270 | 3,836 | 3,687 |
| New crossties installed (millions) | 2.5 | 2.8 | 2.8 | 1.5 | 1.5 |

**Average Age of Owned Railway Equipment**

| | 2004 | 2003 | 2002 | 2001 | 2000 |
|---|---|---|---|---|---|
| | | | *(years)* | | |
| Freight cars | 27.6 | 26.6 | 25.9 | 25.4 | 24.6 |
| Locomotives | 16.8 | 15.3 | 16.1 | 15.7 | 16.1 |
| Retired locomotives | 22.9 | 28.7 | 28.2 | 22.4 | 24.5 |

Through its coal car rebody program, which was suspended in 2000, NS converted about 29,000 hopper cars into high-capacity steel gondolas or hoppers. As a result, the remaining service life of the freight-car fleet is greater than may be inferred from the increasing average age shown in the table above.

For 2005, NS has budgeted $938 million for capital expenditures. The anticipated spending includes $671 million for roadway projects, of which $438 million is for track and bridge program work. Also included are projects for communications, signal and electrical systems, as well as projects for environmental and public improvements such as grade crossing separations and signal upgrades. Other roadway projects include marketing and industrial development initiatives, including increasing track capacity and access to coal receivers and vehicle production and distribution facilities, and continuing investments in intermodal infrastructure. Equipment spending of $225 million includes the purchase of 52 locomotives and upgrades to existing units, improvements to multilevel automobile racks, and projects related to computers and information technology, including additional security and backup systems.

**Cash used for financing activities** was $233 million in 2004, $314 million in 2003 and $150 million in 2002. The change in 2004 reflected more proceeds from common stock issued in connection with employee option exercises as well as the elimination of PRR borrowings that resulted from the Conrail Corporate Reorganization. The increase in 2003 primarily resulted from a higher net reduction in debt and the $43 million redemption in 2003 of all publicly held shares of Norfolk Southern Railway's preferred stock. Prior to the Conrail Corporate Reorganization financing activities included loan transactions with a subsidiary of PRR that were net borrowings of $118 million in 2004, $203 million in 2003 and $212 million in 2002 (see Note 2). Debt was reduced $371 million in 2004, compared with a decrease of $370 million in 2003 and $303 million in 2002. NS' debt-to-total capitalization ratio at year end was 48.5% in 2004 and 50.7% (excluding notes payable to the PRR subsidiary) in 2003.

NS currently has in place and available a $1 billion, five-year credit agreement, which provides for borrowings at prevailing rates and includes financial covenants. Additionally, NS has the ability to issue up to $1 billion of registered debt or equity securities under its shelf registration statement on Form S-3, which was filed in September 2004 (see Note 8).

## APPLICATION OF CRITICAL ACCOUNTING ESTIMATES

The preparation of financial statements in accordance with U.S. generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. These estimates and assumptions may require significant judgment about matters that are inherently uncertain, and future events are likely to occur that may require management to change them. Accordingly, management regularly reviews these estimates and assumptions based on historical experience, changes in the business environment and other factors that management believes to be reasonable under the circumstances. Management discusses the development, selection and disclosures concerning critical accounting estimates with the Audit Committee of its Board of Directors.

### Pensions and Other Postretirement Benefits

Accounting for pensions and other postretirement benefit plans requires management to make several estimates and assumptions (see Note 11). These include the expected rate of return from investment of the plans' assets, projected increases in medical costs and the expected retirement age of employees as well as their projected earnings and mortality. In addition, the amounts recorded are affected by changes in the interest rate environment because the associated liabilities are discounted to their present value. Management makes these estimates based on the company's historical experience and other information that it deems pertinent under the circumstances (for example, expectations of future stock market

performance). Management engages an independent consulting actuarial firm to aid it in selecting appropriate assumptions and valuing its related liabilities.

NS' net pension benefit, which is included in "Compensation and benefits" on its Consolidated Income Statement, was $36 million for the year ended Dec. 31, 2004. In recording this amount, NS assumed a long-term investment rate of return of 9%. Investment experience of the pension fund over the past 10-, 15- and 20-year periods has been in excess of 10%. A one percentage point change to this rate of return assumption would result in a $18 million change to the pension credit and, as a result, an equal change in "Compensation and benefits" expense. Changes that are reasonably likely to occur in assumptions concerning retirement age, projected earnings and mortality would not be expected to have a material effect on NS' net pension benefit or net pension asset in the future. The net pension asset is recorded at its net present value using a discount rate that is based on the current interest rate environment; therefore, management has little discretion in this assumption.

NS' net cost for other postretirement benefits, which is also included in "Compensation and benefits," was $49 million for the year ended Dec. 31, 2004. In recording this expense and valuing the net liability for other postretirement benefits, which is included in "Other benefits" as disclosed in Note 11, management estimated future increases in health-care costs. These assumptions, along with the effect of a one percentage point change in them, are described in Note 11.

**Properties and Depreciation**

Most of NS' total assets are comprised of long-lived railway properties (see Note 6). As disclosed in Note 1, NS' properties are depreciated using group depreciation. Rail is depreciated primarily on the basis of use measured by gross-ton miles. Other properties are depreciated generally using the straight-line method over the lesser of estimated service or lease lives. NS reviews the carrying amount of properties whenever events or changes in circumstances indicate that such carrying amount may not be recoverable based on future undiscounted cash flows. Assets that are deemed impaired as a result of such review are recorded at the lesser of carrying amount or fair value.

NS' depreciation expense is based on management's assumptions concerning service lives of its properties as well as the expected net salvage that will be received upon their retirement. These assumptions are the product of periodic depreciation studies that are performed by a firm of consulting engineers. These studies analyze NS' historical patterns of asset use and retirement and take into account any expected change in operation or maintenance practices. NS' recent experience with these studies has been that while they do result in changes in the rates used to depreciate its properties, these changes have not caused a significant effect to its annual depreciation expense. The studies may also indicate that the recorded amount of accumulated depreciation is deficient (or in excess) of the amount indicated by the study. Any such deficiency (or excess) is amortized as a component of depreciation expense over the remaining service lives of the affected class of property. NS' "Depreciation expense" for the year ended Dec. 31, 2004, amounted to $598 million. NS' weighted-average depreciation rates for 2004 are disclosed in Note 6; a one-tenth percentage point increase (or decrease) in these rates would have resulted in a $27 million increase (or decrease) to NS' depreciation expense.

**Personal Injury, Environmental and Legal Liabilities**

NS' expense for "Casualties and other claims" amounted to $151 million for the year ended Dec. 31, 2004. Most of this expense was composed of NS' accrual related to personal injury liabilities (see discussion of FELA in the discussion captioned "Casualties and other claims" above). Job-related personal injury and occupational claims are subject to FELA, which is applicable only to railroads. FELA's fault-based tort system produces results that are unpredictable and inconsistent as compared with

a no-fault worker's compensation system. The variability inherent in this system could result in actual costs being very different from the liability recorded. In all cases, NS records a liability when the expected loss for the claim is both probable and estimable.

NS engages an independent consulting actuarial firm to aid in valuing its personal injury liability and determining the amount to accrue during the year. For employee personal injury cases, the actuarial firm studies NS' historical patterns of reserving for claims and subsequent settlements, taking into account relevant outside influences. An estimate of the ultimate amount of the liability, which includes amounts for incurred but unasserted claims, is based on the results of this analysis. For occupational injury claims, the actuarial firm studies NS' history of claim filings, severity, payments and other relevant facts. Additionally, the estimate of the ultimate loss for occupational injuries includes a provision for those claims that have been incurred but not reported by projecting NS' experience into the future as far as can be reasonably determined. NS has recorded this actuarially determined liability. The liability is dependent upon many individual judgments made as to the specific case reserves as well as the judgments of the consulting actuary and management in the periodic studies. Accordingly, there could be significant changes in the liability, which NS would recognize when such a change became known. The most recent actuarial study was performed as of Sept. 30, 2004, and resulted in a slight decrease to NS' personal injury liability during the fourth quarter. While the liability recorded is supported by the most recent study, it is reasonably possible that the liability could be higher or lower.

NS is subject to various jurisdictions' environmental laws and regulations. It is NS' policy to record a liability where such liability or loss is probable and its amount can be estimated reasonably (see Note 18). Environmental engineers regularly participate in ongoing evaluations of all known sites and in determining any necessary adjustments to liability estimates. NS also has established an Environmental Policy Council, composed of senior managers, to oversee and interpret its environmental policy.

Operating expenses for environmental matters totaled approximately $11 million in 2004, $9 million in 2003 and $15 million in 2002, and capital expenditures totaled approximately $9 million in 2004 and in 2003, and $10 million in 2002. Capital expenditures in 2005 are expected to be comparable to those in 2004.

NS' balance sheets included liabilities for environmental exposures in the amount of $64 million at Dec. 31, 2004, and $25 million at Dec. 31, 2003 (of which $12 million was accounted for as a current liability at Dec. 31, 2004, and $8 million at Dec. 31, 2003). The increase in the liability was the result of the Conrail Corporate Reorganization and relates to sites on the former PRR properties. At Dec. 31, 2004, the liability represented NS' estimate of the probable cleanup and remediation costs based on available information at 210 identified locations. On that date, 15 sites accounted for $32 million of the liability, and no individual site was considered to be material. NS anticipates that much of this liability will be paid out over five years; however, some costs will be paid out over a longer period.

At some of the 210 locations, certain NS subsidiaries, usually in conjunction with a number of other parties, have been identified as potentially responsible parties by the Environmental Protection Agency (EPA) or similar state authorities under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, or comparable state statutes, which often impose joint and several liability for cleanup costs.

With respect to known environmental sites (whether identified by NS or by the EPA or comparable state authorities), estimates of NS' ultimate potential financial exposure for a given site or in the aggregate for all such sites are necessarily imprecise because of the widely varying costs of currently available cleanup techniques, the likely development of new cleanup technologies, the difficulty of determining in advance the nature and full extent of contamination and each potential participant's share of any estimated loss

(and that participant's ability to bear it), and evolving statutory and regulatory standards governing liability. NS estimates its environmental remediation liability on a site-by-site basis, using assumptions and judgments that management deems appropriate for each site. As a result, it is not practical to quantitatively describe the effects of changes in these many assumptions and judgments. NS has consistently applied its methodology of estimating its environmental liabilities.

The risk of incurring environmental liability is inherent in the railroad business. Some of the commodities in NS' traffic mix, particularly those classified as hazardous materials, can pose special risks that NS and its subsidiaries work diligently to minimize. In addition, several NS subsidiaries own, or have owned, land used as operating property, or which is leased and operated by others, or held for sale. Because environmental problems may exist on these properties that are latent or undisclosed, there can be no assurance that NS will not incur environmentally related liabilities or costs with respect to one or more of them, the amount and materiality of which cannot be estimated reliably at this time. Moreover, lawsuits and claims involving these and potentially other unidentified environmental sites and matters are likely to arise from time to time. The resulting liabilities could have a significant effect on financial condition, results of operations or liquidity in a particular year or quarter.

However, based on its assessment of the facts and circumstances now known, management believes that it has recorded the probable costs for dealing with those environmental matters of which the Corporation is aware. Further, management believes that it is unlikely that any known matters, either individually or in the aggregate, will have a material adverse effect on NS' financial position, results of operations or liquidity.

Norfolk Southern and certain subsidiaries are defendants in numerous lawsuits and other claims relating principally to railroad operations. When management concludes that it is probable that a liability has been incurred and the amount of the liability can be reasonably estimated, it is accrued through a charge to expenses. While the ultimate amount of liability incurred in any of these lawsuits and claims is dependent on future developments, in management's opinion the recorded liability, if any, is adequate to cover the future payment of such liability and claims. However, the final outcome of any of these lawsuits and claims cannot be predicted with certainty, and unfavorable or unexpected outcomes could result in additional accruals that could be significant to results of operations in a particular year or quarter. Any adjustments to recorded liabilities will be reflected in expenses in the periods in which such adjustments are known.

**Income Taxes**

NS' net long-term deferred tax liability totaled $6,550 million at Dec. 31, 2004 (see Note 4). This liability is estimated based on the expected future tax consequences of items recognized in the financial statements. After application of the federal statutory tax rate to book income, judgment is required with respect to the timing and deductibility of expenses in the corporate income tax returns. For state income and other taxes, judgment is also required with respect to the apportionment among the various jurisdictions. A valuation allowance is recorded if management expects that it is more likely than not that its deferred tax assets will not be realized. NS has a $21 million valuation allowance on $668 million of deferred tax assets as of Dec. 31, 2004, reflecting the expectation that most of these assets will be realized. In addition, NS has a recorded liability for its estimate of potential income tax exposures. Management believes this liability for potential exposure to be adequate. Income tax expense is adjusted to the extent the final outcome of these matters differs from the amounts recorded. For every one half percent change in the 2004 effective rate net income would have changed by $7 million.

## OTHER MATTERS

### Labor Agreements

Approximately 24,000 of NS' railroad employees are covered by collective bargaining agreements with various labor unions. These agreements remain in effect until changed pursuant to the Railway Labor Act. NS largely bargains in concert with other major railroads. Moratorium provisions in the labor agreements govern when the railroads and the unions may propose labor agreement changes. Such proposals were made in late 1999 and, since that time, NS has reached agreements with most of the major rail labor organizations to settle that round of bargaining. These agreements cover approximately 93% of NS contract employees. Tentative agreements subject to ratification have also been reached with the National Conference of Firemen and Oilers and the Sheet Metal Workers International Association. A 1999 bargaining round agreement has not yet been reached with the International Association of Machinists. On or after November 1, 2004, the railroads and the rail labor unions served new proposals to begin the next bargaining round. The outcome of the negotiations cannot be determined at this point.

### Market Risks and Hedging Activities

NS uses derivative financial instruments to reduce the risk of volatility in its diesel fuel costs and to manage its overall exposure to fluctuations in interest rates.

In 2001, NS began a program to hedge a portion of its diesel fuel consumption. The intent of the program is to assist in the management of NS' aggregate risk exposure to fuel price fluctuations, which can significantly affect NS' operating margins and profitability, through the use of one or more types of derivative instruments.

Diesel fuel costs represented 8% of NS' operating expenses for 2004. The program provides that NS will not enter into any fuel hedges with a duration of more than 36 months, and that no more than 80% of NS' average monthly fuel consumption will be hedged for any month within any 36-month period.

As of Dec. 31, 2004, through swap transactions, NS has hedged approximately 36% of expected 2005 diesel fuel requirements. The effect of these hedges is to yield an average cost of 83 cents per hedged gallon, including federal taxes and transportation. A 10% decrease in diesel fuel prices would reduce NS' asset related to the swaps by approximately $24 million as of Dec. 31, 2004.

However, with fuel prices near historic highs and fuel surcharges being collected under certain tariffs and contracts, NS has not entered into additional hedges since May 2004. Consequently, the past pattern of entering into regular monthly swaps may not be indicative of future hedging activity. If diesel fuel prices remain at their current levels, or increase further, diesel fuel expense will be higher going forward.

NS manages its overall exposure to fluctuations in interest rates by issuing both fixed- and floating-rate debt instruments and by entering into interest-rate hedging transactions to achieve an appropriate mix within its debt portfolio.

At Dec. 31, 2004, NS' debt subject to interest rate fluctuations totaled $576 million. A 1% increase in interest rates would increase NS' total annual interest expense related to all its variable debt by approximately $6 million. Management considers it unlikely that interest rate fluctuations applicable to these instruments will result in a material adverse effect on NS' financial position, results of operations or liquidity.

Some of NS' capital leases, which carry an average fixed rate of 7%, were effectively converted to variable rate obligations using interest rate swap agreements. On Dec. 31, 2004, the average pay rate under these agreements was 3%, and the average receive rate was 7%. During 2004, the effect of the swaps was to reduce interest expense by $6 million. A portion of the lease obligations is payable in Japanese yen. NS eliminated the associated exchange rate risk at the inception of each lease with a yen deposit sufficient to fund the yen-denominated obligation. Most of these deposits are held by foreign banks, primarily Japanese. As a result, NS is exposed to financial market risk relative to Japan. Counterparties to the interest rate swaps and Japanese banks holding yen deposits are major financial institutions believed by management to be creditworthy.

**New Accounting Pronouncements**

In December 2004, the Financial Accounting Standards Board issued Statement of Financial Accounting Standards No. 123 (revised), Share-Based Payment. This statement, effective for interim or annual reporting periods beginning after June 15, 2005, establishes standards for accounting for transactions in which an entity exchanges its equity instruments for goods or services, such as stock-based compensation plans. The statement applies to all awards granted after the effective date and to awards modified, repurchased, or cancelled after that date. As the amount of expense to be recognized in future periods will depend on the levels of future grants, the effect of adoption of this statement cannot be predicted with certainty. However, had NS adopted this statement in prior periods, the effect of adoption on net income and earnings per share would have approximated the amounts shown in the pro forma information included in Note 1.

**Proposed Legislation and Regulations on Safety and Transportation of Hazardous Materials**

Legislation introduced in Congress in early 2005 would give federal regulators increased authority to conduct investigations and levy substantial fines and penalties in connection with railroad accidents. Federal regulators would also be required to prescribe new regulations governing railroads' transportation of hazardous materials. If enacted, such legislation and regulations could impose significant additional costs on railroads including NS. In addition, certain local governments have sought to enact ordinances banning, or requiring disclosures with respect to, hazardous materials moving by rail within their borders. If promulgated and upheld, such ordinances could require the re-routing of hazardous materials shipments, with the potential for significant additional costs and network inefficiencies. Accordingly, NS will oppose efforts to impose unwarranted regulation in this area.

**Inflation**

In preparing financial statements, U.S. generally accepted accounting principles require the use of historical cost that disregards the effects of inflation on the replacement cost of property. NS, a capital-intensive company, has most of its capital invested in such assets. The replacement cost of these assets, as well as the related depreciation expense, would be substantially greater than the amounts reported on the basis of historical cost.

**FORWARD-LOOKING STATEMENTS**

This Management's Discussion and Analysis of Financial Condition and Results of Operations contains forward-looking statements that may be identified by the use of words like “believe,” “expect,” “anticipate” and “project.” Forward-looking statements reflect management's good-faith evaluation of information currently available. However, such statements are dependent on and, therefore, can be influenced by, a number of external variables over which management has little or no control, including:

domestic and international economic conditions; the business environment in industries that produce and consume rail freight; competition and consolidation within the transportation industry; fluctuation in prices of key materials, in particular diesel fuel; labor difficulties, including strikes and work stoppages; legislative and regulatory developments; changes in securities and capital markets; and natural events such as severe weather, floods and earthquakes. Forward-looking statements are not, and should not be relied upon as, a guaranty of future performance or results. Nor will they necessarily prove to be accurate indications of the times at or by which any such performance or results will be achieved. As a result, actual outcomes and results may differ materially from those expressed in forward-looking statements. NS undertakes no obligation to update or revise forward-looking statements.

**Item 7A. Quantitative and Qualitative Disclosures about Market Risk.**

The information required by this item is included in Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations" under the heading "Market Risks and Hedging Activities."

**Item 8. Financial Statements and Supplementary Data.**

## INDEX TO FINANCIAL STATEMENTS


| | Page |
|---|---|
| Report of Management | K38 |
| Reports of Independent Registered Public Accounting Firm | K39 |
| Consolidated Statements of Income<br>Years ended December 31, 2004, 2003 and 2002 | K42 |
| Consolidated Balance Sheets<br>As of December 31, 2004 and 2003 | K43 |
| Consolidated Statements of Cash Flows<br>Years ended December 31, 2004, 2003 and 2002 | K44 |
| Consolidated Statements of Changes in Stockholders' Equity<br>Years ended December 31, 2004, 2003 and 2002 | K45 |
| Notes to Consolidated Financial Statements | K46 |
| The Index to Consolidated Financial Statement Schedule in Item 15 | K82 |

**Report of Management**

February 28, 2005

To the Stockholders
Norfolk Southern Corporation

Management is responsible for establishing and maintaining adequate internal control over financial reporting. In order to ensure that the Corporation's internal control over financial reporting is effective, management regularly assesses such controls and did so most recently for its financial reporting as of December 31, 2004. This assessment was based on criteria for effective internal control over financial reporting described in *Internal Control-Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this assessment, management has concluded that the Corporation maintained effective internal control over financial reporting as of December 31, 2004.

KPMG LLP, independent registered public accounting firm, has audited the Corporation's financial statements and has reported on management's assessment of the effectiveness of the Corporation's internal control over financial reporting as of December 31, 2004.

| | | |
|---|---|---|
| /s/ David R. Goode | /s/ Henry C. Wolf | /s/ Marta R. Stewart |
| David R. Goode | Henry C. Wolf | Marta R. Stewart |
| Chairman and | Vice Chairman and | Vice President and |
| Chief Executive Officer | Chief Financial Officer | Controller |

## Report of Independent Registered Public Accounting Firm

The Stockholders and Board of Directors
Norfolk Southern Corporation:

We have audited the accompanying consolidated balance sheets of Norfolk Southern Corporation and subsidiaries as of December 31, 2004 and 2003, and the related consolidated statements of income, changes in stockholders' equity and cash flows for each of the years in the three-year period ended December 31, 2004. In connection with our audits of the consolidated financial statements, we have also audited the financial statement schedule as listed in Item 15(A)2. These consolidated financial statements and financial statement schedule are the responsibility of Norfolk Southern Corporation's management. Our responsibility is to express an opinion on these consolidated financial statements and financial statement schedule based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Norfolk Southern Corporation and subsidiaries as of December 31, 2004 and 2003, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 2004, in conformity with U.S. generally accepted accounting principles. Also, in our opinion, the related financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

As discussed in note 1 to the consolidated financial statements, effective January 1, 2003, Norfolk Southern Corporation adopted Financial Accounting Standards Board Statement No. 143, *Accounting for Asset Retirement Obligations*, and Financial Accounting Standards Board Interpretation No. 46, *Consolidation of Variable Interest Entities*.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of Norfolk Southern Corporation's internal control over financial reporting as of December 31, 2004, based on criteria established in *Internal Control – Integrated Framework,* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated February 28, 2005, expressed an unqualified opinion on management's assessment of, and the effective operation of, internal control over financial reporting.

/s/ KPMG LLP
Norfolk, Virginia
February 28, 2005

**Report of Independent Registered Public Accounting Firm**

The Stockholders and Board of Directors
Norfolk Southern Corporation:

We have audited management's assessment, included in the accompanying Report of Management, that Norfolk Southern Corporation maintained effective internal control over financial reporting as of December 31, 2004, based on criteria established in *Internal Control—Integrated Framework,* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Norfolk Southern Corporation's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express an opinion on management's assessment and an opinion on the effectiveness of Norfolk Southern Corporation's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with U.S. generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, management's assessment that Norfolk Southern Corporation maintained effective internal control over financial reporting as of December 31, 2004, is fairly stated, in all material respects, based on criteria established in *Internal Control—Integrated Framework,* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Also, in our opinion, Norfolk Southern Corporation maintained, in all material respects, effective internal control over financial reporting as of December 31, 2004, based on criteria established in *Internal Control—Integrated Framework,* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Norfolk Southern Corporation and subsidiaries as of December 31, 2004 and 2003, and the related consolidated statements of income, changes in stockholders' equity and cash flows for each of the years in the three-year period ended December 31, 2004. In connection with our audits of the consolidated financial statements, we have also audited the financial statement schedule as listed in Item 15(A)2. Our report dated February 28, 2005, expressed an unqualified opinion on the consolidated financial statements and financial statement schedule.

/s/ KPMG LLP
Norfolk, Virginia
February 28, 2005

**Norfolk Southern Corporation and Subsidiaries**
**Consolidated Statements of Income**

| | Years ended Dec. 31, 2004 | 2003 | 2002 |
|---|---|---|---|
| | *($ in millions, except earnings per share)* | | |
| **Railway operating revenues** | $ 7,312 | $ 6,468 | $ 6,270 |
| **Railway operating expenses** | | | |
| Compensation and benefits (Note 11) | 2,272 | 2,275 | 2,022 |
| Materials, services and rents | 1,601 | 1,427 | 1,457 |
| Conrail rents and services (Note 2) | 319 | 419 | 412 |
| Depreciation (Note 2) | 598 | 513 | 515 |
| Diesel fuel | 449 | 380 | 342 |
| Casualties and other claims | 151 | 181 | 171 |
| Other | 220 | 209 | 193 |
| Total railway operating expenses | 5,610 | 5,404 | 5,112 |
| **Income from railway operations** | 1,702 | 1,064 | 1,158 |
| Other income – net (Note 3) | 89 | 19 | 66 |
| Interest expense on debt (Note 6) | (489) | (497) | (518) |
| Income from continuing operations before income taxes and accounting changes | 1,302 | 586 | 706 |
| Provision for income taxes (Note 4) | 379 | 175 | 246 |
| Income from continuing operations before accounting changes | 923 | 411 | 460 |
| Discontinued operations – gain on sale of motor carrier, net of taxes (Note 17) | -- | 10 | -- |
| Cumulative effect of changes in accounting principles, net of taxes (Note 1) | -- | 114 | -- |
| **Net income** | $ 923 | $ 535 | $ 460 |
| Per share amounts (Note 14): | | | |
| Income from continuing operations before accounting changes | | | |
| Basic | $ 2.34 | $ 1.05 | $ 1.18 |
| Diluted | $ 2.31 | $ 1.05 | $ 1.18 |
| Net income | | | |
| Basic | $ 2.34 | $ 1.37 | $ 1.18 |
| Diluted | $ 2.31 | $ 1.37 | $ 1.18 |

*See accompanying notes to consolidated financial statements.*

**Norfolk Southern Corporation and Subsidiaries**
**Consolidated Balance Sheets**

| | As of Dec. 31, 2004 | 2003 |
|---|---|---|
| | ($ in millions) | |
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 579 | $ 284 |
| Short-term investments | 90 | 2 |
| Accounts receivable-net (Note 5) | 767 | 695 |
| Materials and supplies | 104 | 92 |
| Deferred income taxes (Note 4) | 187 | 189 |
| Other current assets | 240 | 163 |
| Total current assets | 1,967 | 1,425 |
| Investment in Conrail (Note 2) | 805 | 6,259 |
| Properties less accumulated depreciation (Notes 2 and 6) | 20,526 | 11,779 |
| Other assets | 1,452 | 1,133 |
| **Total assets** | $ 24,750 | $ 20,596 |
| **Liabilities and stockholders' equity** | | |
| Current liabilities: | | |
| Accounts payable (Note 7) | $ 1,012 | $ 948 |
| Income and other taxes | 210 | 199 |
| Due to Conrail (Note 2) | 78 | 81 |
| Other current liabilities (Note 7) | 239 | 213 |
| Current maturities of long-term debt (Note 8) | 662 | 360 |
| Total current liabilities | 2,201 | 1,801 |
| Long-term debt (Notes 2 and 8) | 6,863 | 6,800 |
| Other liabilities (Note 10) | 1,146 | 1,080 |
| Due to Conrail (Note 2) | -- | 716 |
| Deferred income taxes (Notes 2 and 4) | 6,550 | 3,223 |
| **Total liabilities** | 16,760 | 13,620 |
| Stockholders' equity: | | |
| Common stock $1.00 per share par value, 1,350,000,000 shares authorized; issued 421,346,107 and 412,168,988 shares, respectively | 421 | 412 |
| Additional paid-in capital | 728 | 521 |
| Unearned restricted stock (Note 12) | (8) | (5) |
| Accumulated other comprehensive loss (Note 13) | (24) | (44) |
| Retained income | 6,893 | 6,112 |
| Less treasury stock at cost, 20,907,125 and 21,016,125 shares, respectively | (20) | (20) |
| **Total stockholders' equity** | 7,990 | 6,976 |
| **Total liabilities and stockholders' equity** | $ 24,750 | $ 20,596 |

*See accompanying notes to consolidated financial statements.*

**Norfolk Southern Corporation and Subsidiaries**
**Consolidated Statements of Cash Flows**

| | Years Ended Dec. 31, 2004 | 2003 | 2002 |
|---|---|---|---|
| | | ($ in millions) | |
| **Cash flows from operating activities** | | | |
| Net income | $ 923 | $ 535 | $ 460 |
| Reconciliation of net income to net cash provided by operating activities: | | | |
| Net cumulative effects of changes in accounting principles | -- | (114) | -- |
| Depreciation | 609 | 528 | 529 |
| Deferred income taxes | 200 | 132 | 178 |
| Equity in earnings of Conrail (Note 2) | (54) | (58) | (54) |
| Gain on Conrail Corporate Reorganization (Note 2) | (53) | -- | -- |
| Gains and losses on properties and investments | (46) | (45) | (47) |
| Income from discontinued operations | -- | (10) | -- |
| Changes in assets and liabilities affecting operations: | | | |
| Accounts receivable (Note 5) | (71) | (12) | (208) |
| Materials and supplies | (12) | 5 | (7) |
| Other current assets | (18) | (4) | 1 |
| Current liabilities other than debt | 126 | (25) | 35 |
| Other – net (Notes 6 and 11) | 57 | 122 | (84) |
| Net cash provided by operating activities | 1,661 | 1,054 | 803 |
| **Cash flows from investing activities** | | | |
| Property additions | (1,041) | (720) | (689) |
| Property sales and other transactions | 75 | 78 | 31 |
| Investments, including short-term | (228) | (106) | (78) |
| Investment sales and other transactions | 61 | 108 | 63 |
| Net cash used for investing activities | (1,133) | (640) | (673) |
| **Cash flows from financing activities** | | | |
| Dividends | (142) | (117) | (101) |
| Common stock issued – net | 162 | 13 | 42 |
| Redemption of minority interest | -- | (43) | -- |
| Proceeds from borrowings | 202 | 261 | 672 |
| Debt repayments | (455) | (428) | (763) |
| Net cash used for financing activities | (233) | (314) | (150) |
| Net increase (decrease) in cash and cash equivalents | 295 | 100 | (20) |
| **Cash and cash equivalents** | | | |
| At beginning of year | 284 | 184 | 204 |
| At end of year | $ 579 | $ 284 | $ 184 |
| **Supplemental disclosure of cash flow information** | | | |
| Cash paid during the year for: | | | |
| Interest (net of amounts capitalized) | $ 483 | $ 510 | $ 525 |
| Income taxes | $ 146 | $ 93 | $ 54 |

*See accompanying notes to consolidated financial statements.*

**Norfolk Southern Corporation and Subsidiaries**
**Consolidated Statements of Changes in Stockholders' Equity**

| | Common Stock | Additional Paid-in Capital | Unearned Restricted Stock | Accum. Other Compre-hensive Income (Loss) | Retained Income | Treasury Stock | Total |
|---|---|---|---|---|---|---|---|
| | *($ in millions, except per share amounts)* | | | | | | |
| **Balance Dec. 31, 2001** | $ 407 | $ 423 | $ -- | $ (55) | $ 5,335 | $ (20) | $ 6,090 |
| Comprehensive income | | | | | | | |
| Net income | | | | | 460 | | 460 |
| Other comprehensive loss (Note 13) | | | | (10) | | | (10) |
| Total comprehensive income | | | | | | | 450 |
| Dividends on Common Stock, $0.26 per share | | | | | (101) | | (101) |
| Other (Notes 11 and 12) | 3 | 58 | | | | | 61 |
| **Balance Dec. 31, 2002** | 410 | 481 | -- | (65) | 5,694 | (20) | 6,500 |
| Comprehensive income | | | | | | | |
| Net income | | | | | 535 | | 535 |
| Other comprehensive income (Note 13) | | | | 21 | | | 21 |
| Total comprehensive income | | | | | | | 556 |
| Dividends on Common Stock, $0.30 per share | | | | | (117) | | (117) |
| Other (Notes 11 and 12) | 2 | 40 | (5) | | | | 37 |
| **Balance Dec. 31, 2003** | 412 | 521 | (5) | (44) | 6,112 | (20) | 6,976 |
| Comprehensive income | | | | | | | |
| Net income | | | | | 923 | | 923 |
| Other comprehensive income (Note 13) | | | | 20 | | | 20 |
| Total comprehensive income | | | | | | | 943 |
| Dividends on Common Stock, $0.36 per share | | | | | (142) | | (142) |
| Other (Notes 11 and 12) | 9 | 207 | (3) | | | | 213 |
| **Balance Dec. 31, 2004** | $ 421 | $ 728 | $ (8) | $ (24) | $ 6,893 | $ (20) | $ 7,990 |

*See accompanying notes to consolidated financial statements.*

**Norfolk Southern Corporation and Subsidiaries**
**Notes to Consolidated Financial Statements**

The following Notes are an integral part of the Consolidated Financial Statements.

## 1. Summary of Significant Accounting Policies

### Description of Business

Norfolk Southern Corporation is a Virginia-based holding company engaged principally in the rail transportation business, operating approximately 21,300 route miles primarily in the East and Midwest. These consolidated financial statements include Norfolk Southern Corporation (Norfolk Southern) and its majority-owned and controlled subsidiaries (collectively, NS). Norfolk Southern's major subsidiary is Norfolk Southern Railway Company (NSR). All significant intercompany balances and transactions have been eliminated in consolidation.

The railroad transports raw materials, intermediate products and finished goods classified in the following market groups (percent of total railway operating revenues in 2004): coal (24%); intermodal (21%); automotive (13%); chemicals (12%); metals/construction (11%); agriculture/consumer products/government (10%); and paper/clay/forest products (9%). Ultimate points of origination or destination for some of the freight (particularly coal bound for export and intermodal containers) are outside the United States. Approximately 85% of NS' railroad employees are covered by collective bargaining agreements with 14 different labor unions.

### Use of Estimates

The preparation of financial statements in accordance with U.S. generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Management reviews its estimates, including those related to the recoverability and useful lives of assets, as well as liabilities for litigation, environmental remediation, casualty claims, income taxes, and pension and postretirement benefits. Changes in facts and circumstances may result in revised estimates.

### Cash Equivalents

"Cash equivalents" are highly liquid investments purchased three months or less from maturity.

### Investments

Marketable equity and debt securities are reported at amortized cost or fair value, depending upon their classification as securities "held-to-maturity," "trading" or "available-for-sale." Unrealized gains and losses for investments designated as "available-for-sale," net of taxes, are recognized in "Accumulated other comprehensive loss."

Investments where NS has the ability to exercise significant influence over but does not control the entity are accounted for using the equity method in accordance with APB Opinion No. 18, "The Equity Method of Accounting for Investments in Common Stock."

**Materials and Supplies**

"Materials and supplies," consisting mainly of fuel oil and items for maintenance of property and equipment, are stated at the lower of average cost or market. The cost of materials and supplies expected to be used in capital additions or improvements is included in "Properties."

**Properties**

"Properties" are stated principally at cost and are depreciated using group depreciation. Rail is depreciated primarily on the basis of use measured by gross ton-miles. Other properties are depreciated generally using the straight-line method over the lesser of estimated service or lease lives. NS capitalizes interest on major capital projects during the period of their construction. Expenditures, including those on leased assets that extend an asset's useful life or increase its utility, are capitalized. Maintenance expense is recognized when repairs are performed. When properties other than land and nonrail assets are sold or retired in the ordinary course of business, the cost of the assets, net of sale proceeds or salvage, is charged to accumulated depreciation, and no gain or loss is recognized through income. Gains and losses on disposal of land and nonrail assets are included in "Other income - net" (see Note 3).

NS reviews the carrying amount of properties whenever events or changes in circumstances indicate that such carrying amount may not be recoverable based on future undiscounted cash flows. Assets that are deemed impaired as a result of such review are recorded at the lower of carrying amount or fair value (see Note 6).

**Revenue Recognition**

Transportation revenue is recognized proportionally as a shipment moves from origin to destination. Refunds are recorded as a reduction to revenues based on management's best estimate of projected liability. Switching, demurrage and other incidental service revenue is recognized when the services are performed.

**Derivatives**

NS does not engage in the trading of derivatives. NS uses derivative financial instruments to reduce the risk of volatility in its diesel fuel costs and in the management of its mix of fixed and floating-rate debt. Management has determined that these derivative instruments qualify as either fair-value or cash-flow hedges, having values that highly correlate with the underlying hedged exposures and have designated such instruments as hedging transactions. Income and expense related to the derivative financial instruments are recorded in the same category as generated by the underlying asset or liability. Credit risk related to the derivative financial instruments is considered to be minimal and is managed by requiring high credit standards for counterparties and periodic settlements (see Note 16).

**Stock-Based Compensation**

NS has stock-based employee compensation plans, which are more fully described in Note 12. NS applies the intrinsic value recognition and measurement principles of APB Opinion No. 25, "Accounting for Stock Issued to Employees" (APB Opinion No. 25), and related interpretations in accounting for these plans.

The following table illustrates the effect on net income and earnings per share if NS had applied the fair value recognition provisions of Statement of Financial Accounting Standards No. 123, "Accounting for Stock-Based Compensation" (SFAS No. 123), to stock-based employee compensation:

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| | *($ in millions except per share)* | | |
| Net income, as reported | $ 923 | $ 535 | $ 460 |
| Add: Stock-based employee compensation expense included in reported net income, net of related tax effects | 32 | 18 | 14 |
| Deduct: Stock-based employee compensation expense determined under fair value method, net of related tax effects | (44) | (35) | (45) |
| Pro forma net income | $ 911 | $ 518 | $ 429 |
| Earnings per share: | | | |
| As reported | | | |
| Basic | $ 2.34 | $ 1.37 | $ 1.18 |
| Diluted | $ 2.31 | $ 1.37 | $ 1.18 |
| Pro forma | | | |
| Basic | $ 2.31 | $ 1.33 | $ 1.10 |
| Diluted | $ 2.28 | $ 1.33 | $ 1.10 |

**Required Accounting Changes in 2003**

NS adopted Financial Accounting Standards Board (FASB) Statement No. 143, "Accounting for Asset Retirement Obligations," (SFAS No. 143) effective Jan. 1, 2003, and recorded a $110 million net adjustment ($182 million before taxes) for the cumulative effect of this change in accounting on years prior to 2003. Pursuant to SFAS No. 143, the cost to remove crossties must be recorded as an expense when incurred; previously these removal costs were accrued as a component of depreciation. This change in accounting lowered depreciation expense (because the depreciation rate for crossties no longer reflects cost to remove) and increased compensation and benefits and other expenses (for the costs to remove retired assets). The net effect to total railway operating expenses and net income was not material.

NS also adopted FASB Interpretation No. 46, "Consolidation of Variable Interest Entities," (FIN No. 46) effective Jan. 1, 2003, and recorded a $4 million net adjustment ($6 million before taxes) for the cumulative effect of this change in accounting on years prior to 2003. Pursuant to FIN No. 46, NS has consolidated a special-purpose entity that leases certain locomotives to NS (see Note 9). This entity's assets and liabilities at Jan. 1, 2003, included $169 million of locomotives and $157 million of debt related to their purchase as well as a $6 million minority interest liability. This change in accounting increased depreciation and interest expense (to reflect the locomotives as owned assets) and lowered lease expense. The net effect to total railway operating expenses and net income was not material.

The cumulative effect of these changes amounted to $114 million, or 29 cents per share.

**Reclassifications**

Certain amounts in the consolidated financial statements and notes thereto have been reclassified to conform to the 2004 presentation.

**2. Investment in Conrail and Operations Over Its Lines**

**Overview**

Through a limited liability company, Norfolk Southern and CSX Corporation (CSX) jointly own Conrail Inc. (Conrail), whose primary subsidiary is Consolidated Rail Corporation (CRC). NS has a 58% economic and 50% voting interest in the jointly owned entity, and CSX has the remainder of the economic and voting interests. CRC owns and operates certain properties (the Shared Assets Areas) for the joint and exclusive benefit of Norfolk Southern Railway Company (NSR) and CSX Transportation Inc. (CSXT). The costs of operating the Shared Assets Areas are borne by NSR and CSXT based on usage. In addition, NSR and CSXT pay CRC a fee for access to the Shared Assets Areas.

**Conrail Corporate Reorganization**

On August 27, 2004, NS, CSX and Conrail completed a reorganization of Conrail (Conrail Corporate Reorganization), which established direct ownership and control by NSR and CSXT of two former CRC subsidiaries, Pennsylvania Lines LLC (PRR) and New York Central Lines LLC (NYC), respectively. Prior to the Conrail Corporate Reorganization, NSR operated the routes and assets of PRR and CSXT operated the routes and assets of NYC, each in accordance with operating and lease agreements. Pursuant to the Conrail Corporate Reorganization, the operating and lease agreements were terminated and PRR and NYC were merged into NSR and CSXT, respectively. The reorganization did not involve the Shared Assets Areas and did not affect the competitive rail service provided in the Shared Assets Areas. Conrail continues to own, manage and operate the Shared Assets Areas as previously approved by the Surface Transportation Board (STB). In connection with the Conrail Corporate Reorganization, NS, CSX and Conrail obtained a ruling from the Internal Revenue Service (IRS) regarding certain tax matters, and the STB approved the transaction.

As a part of the Conrail Corporate Reorganization, Conrail restructured its existing unsecured and secured public indebtedness, with the consent of Conrail's debtholders. Prior to the restructuring, there were two series of unsecured public debentures with an outstanding principal amount of approximately $800 million and 13 series of secured debt with an outstanding principal amount of approximately $300 million. Guaranteed debt securities were offered in an approximate 58%/42% ratio in exchange for Conrail's unsecured debentures. Of the $800 million unsecured public debentures, $779 million were tendered and accepted for exchange. Upon completion of the transaction as described in various SEC filings, the new debt securities became direct unsecured obligations of NSR and CSXT, respectively, and rank equally with all existing and future senior unsecured debt obligations, if any, of NSR and CSXT. Except for interest payments made in relation to the consummation of the exchange, these new debt securities have maturity dates, interest rates and principal and interest payment dates identical to those of the respective series of Conrail's unsecured debentures. In addition, these new debt securities have covenants substantially similar to those of the publicly traded debt securities of NS and CSX, respectively.

Conrail's secured debt and lease obligations remain obligations of Conrail and are supported by leases and subleases which are the direct lease and sublease obligations of NSR or CSXT.

NS accounted for the transaction at fair value, which resulted in the recognition of a $53 million net gain (reported in "Other income – net") from the tax-free distribution to NS of a portion of its investment in Conrail. As a result of the transaction, NS' investment in Conrail no longer includes amounts related to PRR and NYC. Instead the assets and liabilities of PRR are reflected in their respective line items in NS' Consolidated Balance Sheet and amounts due to PRR were extinguished.

The following summarizes the effect of the transaction on NS' Consolidated Balance Sheet ($ in millions):

| | | |
|---|---|---|
| Properties | $ | 8,368 |
| Extinguishment of amounts due to PRR | | 870 |
| Other assets and liabilities, net | | 177 |
| Deferred income taxes | | (3,113) |
| Long-term debt, including current maturities | | (734) |
| Net assets received | | 5,568 |
| Investment in Conrail | | (5,515) |
| Gain from Conrail Corporate Reorganization | $ | 53 |

The amounts shown above for the net assets received reflect the fair value of such assets. Properties have been valued based on information received from an independent valuation consultant. Debt has been recorded at fair value based on interest rates at the time of the reorganization.

On the Consolidated Income Statement, "Conrail rents and services" is reduced as a result of the transaction. After the Conrail Corporate Reorganization, "Conrail rents and services" reflects only the expenses associated with the Shared Assets Areas, and other expenses (primarily the depreciation related to the PRR assets) are reflected in their respective line items. The transaction's impact on net income was the $53 million gain discussed above. Prospectively, the transaction will not have a significant ongoing effect on net income.

**Investment in Conrail**

NS is continuing to apply the equity method of accounting to its remaining investment in Conrail in accordance with APB Opinion No. 18, "The Equity Method of Accounting for Investments in Common Stock." NS is amortizing the excess of the purchase price over Conrail's net equity using the principles of purchase accounting, based primarily on the estimated remaining useful lives of Conrail's depreciable property and equipment, including the related deferred tax effect of the differences in tax and accounting bases for certain assets. At Dec. 31, 2004, the difference between NS' investment in Conrail and its share of Conrail's underlying net equity was $595 million.

NS' Consolidated Balance Sheet at Dec. 31, 2004, includes $17 million of liabilities related to the original Conrail transaction, principally for contractual obligations to Conrail employees imposed by the STB when it approved the transaction. Through Dec. 31, 2004, NS has paid $186 million of such costs.

**Related-Party Transactions**

NS provides certain general and administrative support functions to Conrail, the fees for which are billed in accordance with several service-provider arrangements and amount to approximately $7 million annually.

"Conrail rents and services" includes: (1) expenses for amounts due to PRR for use by NSR of operating properties and equipment prior to the Conrail Corporate Reorganization, (2) NS' equity in the earnings of Conrail, net of amortization, prior to the Conrail Corporate Reorganization, and (3) expenses for amounts due to CRC for operation of the Shared Assets Areas. After the Conrail Corporate Reorganization, "Conrail rents and services" includes only expenses for amounts due to CRC for operation of the Shared Assets Areas. NS' equity in the earnings of Conrail, net of amortization, after the reorganization is included in "Other income – net."

Prior to the Conrail Corporate Reorganization, a significant portion of the payments made to PRR was borrowed back from a subsidiary of PRR under a note due in 2032. Amounts outstanding under this note comprised the long-term balance of "Due to Conrail," and this note was effectively extinguished by the reorganization. "Due to Conrail" included in current liabilities is composed principally of amounts related to expenses included in "Conrail rents and services," as discussed above.

**Summary Financial Information - Conrail**

As a result of the Conrail Corporate Reorganization discussed above, two CRC subsidiaries, PRR and NYC, were distributed to NS and CSX, respectively, and CRC's public indebtedness was restructured. The results of the operations of these subsidiaries and their net assets are presented in the following financial information as "Discontinued Operations."

**Summarized Consolidated Statements of Income - Conrail**

| | Years Ended Dec. 31, | | |
|---|---|---|---|
| | **2004** | **2003** | **2002** |
| | | *($ in millions)* | |
| Operating revenues | $ 352 | $ 316 | $ 305 |
| Operating loss | $ (18) | $ (36) | $ (16) |
| Income from continuing operations | $ 22 | $ 10 | $ 34 |
| Discontinued operations (PRR and NYC) | $ 119 | $ 191 | $ 146 |
| Net income | $ 140 | $ 203 | $ 180 |

Note: Conrail adopted FIN No. 46 "Consolidation of Variable Interest Entities," effective Jan. 1, 2004, and recorded a $1 million net adjustment for the cumulative effect of this change in accounting on years prior to 2004. Conrail adopted SFAS No. 143, effective Jan. 1, 2003, and recorded a $40 million net adjustment for the cumulative effect of this change in accounting on years prior to 2003 (including $38 million related to discontinued operations). NS excluded this amount from its determination of equity in earnings of Conrail because an amount related to Conrail is included in NS' cumulative effect adjustment for SFAS No. 143.

**Summarized Consolidated Balance Sheets - Conrail**

| | As of Dec. 31, 2004 | As of Dec. 31, 2003 |
|---|---|---|
| | *($ in millions)* | |
| Assets: | | |
| Current assets | $ 334 | $ 186 |
| Noncurrent assets | 1,080 | 952 |
| Assets of discontinued operations (PRR and NYC) | -- | 7,176 |
| Total assets | $ 1,414 | $ 8,314 |
| Liabilities and stockholders' equity: | | |
| Current liabilities | $ 241 | $ 260 |
| Noncurrent liabilities | 811 | 849 |
| Liabilities of discontinued operations (PRR and NYC) | -- | 2,751 |
| Stockholders' equity | 362 | 4,454 |
| Total liabilities and stockholders' equity | $ 1,414 | $ 8,314 |

Note: Current assets include amounts due from NS and CSX totaling $165 million at Dec. 31, 2004, and $136 million at Dec. 31, 2003. Noncurrent assets include amounts due from NS and CSX totaling $225 million at Dec. 31, 2004, and $1,231 million at Dec. 31, 2003. Current liabilities include amounts payable to NS and CSX totaling $4 million at Dec. 31, 2004, and $5 million at Dec. 31, 2003.

**Shared Assets Areas**

CRC owns and operates certain properties (the Shared Assets Areas) for the joint and exclusive benefit of NSR and CSXT. NSR and CSXT pay CRC a fee for joint and exclusive access to the Shared Assets Areas. In addition, NSR and CSXT pay, based on usage, the costs incurred by CRC to operate the Shared Assets Areas. Future minimum lease payments due to CRC under the Shared Assets Areas agreements are as follows ($ in millions):

| | |
|---|---|
| 2005 | $ 33 |
| 2006 | 34 |
| 2007 | 34 |
| 2008 | 34 |
| 2009 | 34 |
| 2010 and subsequent years | 517 |
| Total | $ 686 |

Operating lease expense related to the Shared Assets Areas as well as the agreements in place before the Conrail Corporate Reorganization related to operation of the PRR routes and assets, all of which is included in “Conrail rents and services,” amounted to $363 million in 2004, $478 million in 2003 and $468 million in 2002.

### 3. Other Income - Net

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| | | ($ in millions) | |
| Income from natural resources: | | | |
| Royalties from coal | $ 42 | $ 39 | $ 48 |
| Nonoperating depletion and depreciation | (11) | (15) | (14) |
| Subtotal | 31 | 24 | 34 |
| Gain from Conrail Corporate Reorganization (Note 2) | 53 | -- | -- |
| Gains from sale of properties and investments | 46 | 45 | 47 |
| Rental income | 40 | 38 | 36 |
| Interest income | 13 | 10 | 12 |
| Equity in earnings of Conrail (Note 2) | 11 | -- | -- |
| Corporate-owned life insurance – net | 8 | 21 | (1) |
| Equity in losses of partnerships | (61) | -- | (1) |
| Other interest expense | (17) | (4) | (31) |
| Taxes on nonoperating property | (8) | (8) | (7) |
| Charitable contributions | (4) | (4) | -- |
| Discount on sales of accounts receivable (Note 5) | (1) | -- | (4) |
| Impairment of telecommunications assets (Note 6) | -- | (84) | -- |
| Other | (22) | (19) | (19) |
| Total | $ 89 | $ 19 | $ 66 |

"Other income - net" includes the income generated by the activities of NS' noncarrier subsidiaries as well as the costs incurred by those subsidiaries in their operations. NS has a 40.5% interest in a limited liability company that owns and operates facilities that produce synthetic fuel from coal. The production of synthetic fuel results in tax credits as well as expenses related to the investments. The expenses are recorded as a component of "Other income – net."

"Other current assets" in the Consolidated Balance Sheets includes prepaid interest of $48 million at Dec. 31, 2004, and $50 million at Dec. 31, 2003, arising from corporate-owned life insurance borrowings.

## 4. Income Taxes

### Provision for Income Taxes

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| | | ($ in millions) | |
| Current: | | | |
| Federal | $ 133 | $ 32 | $ 61 |
| State | 46 | 11 | 7 |
| Total current taxes | 179 | 43 | 68 |
| Deferred: | | | |
| Federal | 181 | 97 | 145 |
| State | 19 | 35 | 33 |
| Total deferred taxes | 200 | 132 | 178 |
| Provision for income taxes | $ 379 | $ 175 | $ 246 |

### Reconciliation of Statutory Rate to Effective Rate

Total income taxes as reflected in the Consolidated Statements of Income differ from the amounts computed by applying the statutory federal corporate tax rate as follows:

| | 2004 | | 2003 | | 2002 | |
|---|---|---|---|---|---|---|
| | Amount | % | Amount | % | Amount | % |
| | | | ($ in millions) | | | |
| Federal income tax at statutory rate | $ 456 | 35 | $ 205 | 35 | $ 247 | 35 |
| State income taxes, net of federal tax benefit | 42 | 3 | 30 | 5 | 26 | 4 |
| Gain from Conrail Corporate Reorganization | (19) | (1) | -- | -- | -- | -- |
| Equity in earnings of Conrail | (18) | (1) | (20) | (3) | (19) | (3) |
| Tax credits | (80) | (7) | -- | -- | -- | -- |
| Other – net | (2) | -- | (40) | (7) | (8) | (1) |
| Provision for income taxes | $ 379 | 29 | $ 175 | 30 | $ 246 | 35 |

### Deferred Tax Assets and Liabilities

Certain items are reported in different periods for financial reporting and income tax purposes. Deferred tax assets and liabilities are recorded in recognition of these differences.

The tax effects of temporary differences that give rise to significant portions of the deferred tax assets and deferred tax liabilities are as follows:

| | Dec. 31, 2004 | Dec. 31, 2003 |
|---|---|---|
| | ($ in millions) | |
| Deferred tax assets: | | |
| Reserves, including casualty and other claims | $ 181 | $ 194 |
| Retiree health and death benefit obligations | 180 | 157 |
| Taxes, including state and property | 263 | 240 |
| Other | 44 | 55 |
| Total gross deferred tax assets | 668 | 646 |
| Less valuation allowance | (21) | (22) |
| Net deferred tax asset | 647 | 624 |
| Deferred tax liabilities: | | |
| Property | (6,857) | (3,466) |
| Other | (153) | (192) |
| Total gross deferred tax liabilities | (7,010) | (3,658) |
| Net deferred tax liability | (6,363) | (3,034) |
| Net current deferred tax asset | 187 | 189 |
| Net long-term deferred tax liability | $ (6,550) | $ (3,223) |

Net deferred income tax liabilities increased by $3,113 million in 2004 as a result of the Conrail Corporate Reorganization (see Note 2). Except for amounts for which a valuation allowance has been provided, management believes that it is more likely than not that the results of future operations will generate sufficient taxable income to realize the deferred tax assets. The valuation allowance at the end of each year relates to subsidiary net operating losses that may not be utilized prior to their expiration. The total valuation allowance decreased $1 million in 2004, $2 million in 2003 and increased $6 million in 2002.

**Internal Revenue Service (IRS) Reviews**

Consolidated federal income tax returns have been examined and Revenue Agent Reports have been received for all years up to and including 1999. In 2004, the favorable resolution of the IRS audit of a synthetic fuel-related investment is reflected in the "Tax credits" line of the reconciliation of statutory rate to the effective rate. In 2003, the favorable resolution of prior years' audits is reflected in the "Other – net" line of the reconciliation of statutory rate to the effective rate, as shown above, and comprised most of that line item. The consolidated federal income tax returns for 2000 through 2003 are being audited by the IRS. The IRS examination for 2000 and 2001 is expected to be completed in the first half of 2005. Management believes that adequate provision has been made for any additional taxes and interest thereon that might arise as a result of IRS examinations.

**5. Accounts Receivable**

NS has in place an accounts receivable sales program. Under this program a bankruptcy-remote special purpose subsidiary of NS sells without recourse undivided ownership interests in a pool of accounts receivable. The buyers have a priority collection interest in the entire pool of receivables and, as a result, NS has retained credit risk to the extent the pool of receivables exceeds the amount sold. NS services and collects the receivables on behalf of the buyers and payments collected from sold receivables can be

reinvested in new accounts receivable on behalf of the buyers. Should NS' credit rating drop below investment grade, the buyers have the right to discontinue this reinvestment.

While there were some sales during 2004 and 2003, there were no accounts receivable sold under this arrangement as of Dec. 31, 2004 and 2003. The change in "Accounts receivable" included on the Consolidated Statements of Cash Flows related to receivable sales was zero for 2004, compared with a decrease of $30 million in 2003 and a decrease of $270 million in 2002. The fees associated with sales, which are based on the buyers' financing costs, are included in "Other income – net" (see Note 3).

NS' allowance for doubtful accounts was $9 million at Dec. 31, 2004, and $7 million at Dec. 31, 2003. To determine its allowance for doubtful accounts NS evaluates historical loss experience, which has not been significant, the characteristics of current accounts, as well as general economic conditions and trends.

**6. Properties**

| | Dec. 31, 2004 | Dec. 31, 2003 | Depreciation Rate for 2004 |
|---|---|---|---|
| | *($ in millions)* | | |
| Railway property: | | | |
| Road | $ 19,530 | $ 11,243 | 3.0% |
| Equipment | 6,661 | 5,779 | 4.2% |
| Other property | 574 | 569 | 2.9% |
| | 26,765 | 17,591 | |
| Less accumulated depreciation | (6,239) | (5,812) | |
| Net properties | $ 20,526 | $ 11,779 | |

Properties increased $8,368 million in 2004 as a result of the Conrail Corporate Reorganization (see Note 2). Railway property includes $618 million at Dec. 31, 2004, and $477 million at Dec. 31, 2003, of assets recorded pursuant to capital leases. Other property includes the costs of obtaining rights to natural resources of $341 million at Dec. 31, 2004 and 2003.

**Impairment of Telecommunications Assets in 2003**

In 2003, NS recorded an $84 million non-cash reduction in the carrying value of certain telecommunications assets to recognize their impaired value in accordance with the provisions of SFAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets." NS' subsidiary, Thoroughbred Technology and Telecommunications (T-Cubed), developed fiber optic infrastructure with companies in the telecommunications industry. This industry has been in a severe downturn and, accordingly, T-Cubed monitored the carrying amount of these assets through independent fair market value appraisals. As a result of a deterioration in the long-term prospects for these assets, an updated appraisal obtained in the fourth quarter of 2003 indicated a significant decline in their value. T-Cubed continues to monitor the carrying value of these assets.

**Capitalized Interest**

Total interest cost incurred on debt in 2004, 2003 and 2002 was $499 million, $509 million and $529 million, respectively, of which $10 million, $12 million and $11 million was capitalized.

**7. Current Liabilities**

| | Dec. 31, 2004 | Dec. 31, 2003 |
|---|---|---|
| | ($ in millions) | |
| Accounts payable: | | |
| Accounts and wages payable | $ 544 | $ 491 |
| Casualty and other claims (Note 18) | 222 | 218 |
| Vacation liability | 115 | 113 |
| Equipment rents payable – net | 106 | 103 |
| Other | 25 | 23 |
| Total | $ 1,012 | $ 948 |
| Other current liabilities: | | |
| Interest payable | $ 117 | $ 104 |
| Liabilities for forwarded traffic | 46 | 37 |
| Retiree health and death benefit obligations (Note 11) | 45 | 38 |
| Accrued Conrail-related costs (Note 2) | 17 | 21 |
| Other | 14 | 13 |
| Total | $ 239 | $ 213 |

**8. Long-term Debt**

| | Dec. 31, 2004 | Dec. 31, 2003 |
|---|---|---|
| | ($ in millions) | |
| Notes and debentures at average rates and maturities as follows: | | |
| 6.78%, maturing to 2009 | $ 1,540 | $ 2,190 |
| 6.71%, maturing 2010 to 2014 | 1,041 | 600 |
| 8.67%, maturing 2017 to 2021 | 1,114 | 800 |
| 7.54%, maturing 2027 to 2031 | 1,500 | 1,500 |
| 7.21%, maturing 2037 and 2043 | 855 | 717 |
| 7.90%, maturing 2097 | 350 | 350 |
| Equipment obligations at an average rate of 4.32%, maturing to 2014 | 563 | 636 |
| Capitalized leases at an average rate of 3.51%, maturing to 2024 | 370 | 274 |
| Other debt at an average rate of 6.51%, maturing to 2019 | 113 | 118 |
| Discounts and premiums, net | 79 | (25) |
| Total long-term debt | 7,525 | 7,160 |
| Less current maturities | (662) | (360) |
| Long-term debt excluding current maturities | $ 6,863 | $ 6,800 |

| | |
|---|---|
| Long-term debt maturities subsequent to 2005 are as follows: | |
| 2006 | $ 316 |
| 2007 | 493 |
| 2008 | 370 |
| 2009 | 481 |
| 2010 and subsequent years | 5,203 |
| Total | $ 6,863 |

Pursuant to the Conrail Corporate Reorganization, NSR issued unsecured public debentures with a total principal of $452 million and fair value of $595 million that mature in 2020 and 2043 (see Note 2). The fair value write-up is included in "Discounts and premiums, net" and reflects interest rates at the time of the reorganization. This write-up is being amortized as a reduction to interest expense over the life of the instruments with a resulting average effective interest rate of 6.2%. The new debt securities have covenants substantially similar to other NS publicly traded debt securities. In addition, "Capitalized leases" includes $135 million at Dec. 31, 2004, related to the fair value of equipment sublease obligations for equipment that remain secured debt and lease obligations of Conrail (see Note 2).

In September 2004, NS exchanged $400 million of its 7.35% notes maturing May 2007 for $442 million of 5.257% notes maturing September 2014. The $42 million difference is being recognized as additional interest expense over the life of the new notes and is included in "Discounts and premiums, net."

The railroad equipment obligations and the capitalized leases are secured by liens on the underlying equipment.

Certain lease obligations require the maintenance of yen-denominated deposits, which are pledged to the lessor to satisfy yen-denominated lease payments. These deposits are included in "Other assets" on the balance sheet and totaled $100 million at Dec. 31, 2004, and $96 million at Dec. 31, 2003.

**Shelf Registration**

In September 2004, NS filed on Form S-3 a shelf registration statement with the Securities and Exchange Commission covering the issuance of up to $550 million of securities. This, together with the $450 million of securities authorized but unissued from a prior $1 billion shelf registration, allows the company to issue up to $1 billion of registered debt or equity securities. As of Dec. 31, 2004, NS had not issued any securities under this shelf registration.

**Credit Agreement, Debt Covenants and Commercial Paper**

In August 2004, NS renewed its $1 billion credit facility under substantially the same terms and conditions as the previous facility for a five-year term expiring in 2009. Any borrowings under the credit agreement are contingent on the continuing effectiveness of the representations and warranties made at the inception of the agreement. NS is subject to various financial covenants with respect to its debt and under its credit agreement, including a minimum net worth requirement, a maximum leverage ratio restriction, certain restrictions on the issuance of further debt by NS or its subsidiaries and the consolidation, merger or sale of substantially all of NS' assets. At Dec. 31, 2004, NS was in compliance with all financial covenants.

NS has the ability to issue commercial paper supported by its $1 billion credit agreement. At Dec. 31, 2004 and Dec. 31, 2003, NS had no commercial paper outstanding.

## 9. Lease Commitments

NS is committed under long-term lease agreements, which expire on various dates through 2067, for equipment, lines of road and other property. The following amounts do not include payments to CRC under the Shared Assets Areas agreements (see Note 2). Future minimum lease payments and operating lease expense are as follows:

| | Operating Leases | Capital Leases |
|---|---|---|
| | *($ in millions)* | |
| 2005 | $ 154 | $ 75 |
| 2006 | 120 | 70 |
| 2007 | 107 | 80 |
| 2008 | 87 | 48 |
| 2009 | 73 | 64 |
| 2010 and subsequent years | 484 | 74 |
| Total | $ 1,025 | $ 411 |
| Less imputed interest on capital leases at an average rate of 5.5% | | (41) |
| Present value of minimum lease payments included in debt | | $ 370 |

**Operating Lease Expense**

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| | | *($ in millions)* | |
| Minimum rents | $ 151 | $ 130 | $ 140 |
| Contingent rents | 65 | 63 | 60 |
| Total | $ 216 | $ 193 | $ 200 |

During 2000, NS entered into an operating lease for 140 locomotives, which is renewable annually at NS' option, has a maximum term of eight years and includes purchase options. The lessor is a variable interest entity whose activities are limited to those incident to this particular transaction. As discussed in Note 1 under the heading "Required Accounting Changes in 2003," NS has consolidated this entity for reporting purposes as of Jan. 1, 2003. The table above includes operating lease expense related to this lease of $13 million in 2002. During December 2004, NS provided an irrevocable notice of election to exercise the purchase option and pay for the locomotives on June 30, 2005. Accordingly, the $141 million of debt of the variable interest entity is included in "Current maturities of long-term debt" as of Dec. 31, 2004.

**10. Other Liabilities**

| | | Dec. 31, 2004 | | 2003 |
|---|---|---|---|---|
| | | ($ in millions) | | |
| Retiree health and death benefit obligations (Note 11) | $ | 354 | $ | 321 |
| Casualty and other claims (Note 18) | | 315 | | 270 |
| Deferred compensation | | 143 | | 143 |
| Net pension obligations (Note 11) | | 94 | | 89 |
| Accrued Conrail-related costs (Note 2) | | -- | | 14 |
| Other | | 240 | | 243 |
| Total | $ | 1,146 | $ | 1,080 |

**11. Pensions and Other Postretirement Benefits**

Norfolk Southern and certain subsidiaries have both funded and unfunded defined benefit pension plans covering principally salaried employees. Norfolk Southern and certain subsidiaries also provide specified health care and death benefits to eligible retired employees and their dependents. Under the present plans, which may be amended or terminated at NS' option, a defined percentage of health care expenses is covered, reduced by any deductibles, copayments, Medicare payments and, in some cases, coverage provided under other group insurance policies.

**Asset Management**

Eleven investment firms manage the Company's defined benefit pension plan's assets under investment guidelines approved by the Board of Directors. Investments are restricted to domestic fixed income securities, international fixed income securities, domestic and international equity investments and unleveraged exchange-traded options and financial futures. Limitations restrict investment concentration and use of certain derivative instruments. The target asset allocation for equity is 75% of the pension plan's assets. Fixed income investments must have an average rating of "AA" or better and all fixed income securities must be rated "A" or better except bond index funds. Equity investments must be in liquid securities listed on national exchanges. No investment is permitted in the securities of Norfolk Southern Corporation or its subsidiaries (except through commingled pension trust funds). Investment managers' returns are expected to exceed selected market indices by prescribed margins.

NS' pension plan weighted-average asset allocations at Dec. 31, 2004 and 2003, by asset category, are as follows:

| Asset Category | Plan assets at Dec. 31, 2004 | 2003 |
|---|---|---|
| Equity securities | 76% | 75% |
| Debt securities | 24 | 25 |
| Total | 100% | 100% |
| International equity securities included in equity securities above | 10% | 9% |

The postretirement benefit plan assets consist primarily of trust-owned variable life insurance policies with an asset allocation at Dec. 31, 2004, of 67% in equity securities and 33% in debt securities compared

with 55% in equity securities and 45% in debt securities at Dec. 31, 2003. The target asset allocation for equity is between 50% and 75% of the plan's assets.

The plans' assumed future returns are based principally on the asset allocation and on the historic returns for the plans' asset classes determined from both actual plan returns and, over longer time periods, market returns for those asset classes.

**Voluntary Separation Program in 2003**

Compensation and benefits expense in 2003 includes $107 million of costs related to a voluntary separation program undertaken in the fourth quarter. Through the program, 553 nonagreement employees were separated from service, of which 314 retired under Norfolk Southern's retirement plan. The costs include $66 million for separation payments and other benefits of the program and $41 million of costs related to the pension and other benefit plans.

**Medicare Changes**

The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (the Act) was signed into law in December 2003. The Act introduces a new prescription drug benefit under Medicare (Medicare Part D) as well as a federal subsidy to sponsors of retiree health care benefit plans that provide a benefit that is at least actuarially equivalent to Medicare Part D. Norfolk Southern believes that its medical plan's prescription drug benefit will qualify as actuarially equivalent to Medicare Part D based on a review by the plan's external prescription drug administrator of the plan's prescription drug benefit compared with the prescription drug benefit that would be paid under Medicare Part D beginning in 2006. In 2003, NS elected to take into account these legislative changes in the measurement of its postretirement benefit obligations in accordance with Financial Accounting Standards Board Staff Position No. 106-1. This resulted in a $45 million decrease in the end-of-year benefit obligation with a corresponding decline in the unrecognized actuarial loss for 2003. There was no effect on the net benefit cost in 2003; however, the effects of the Act are reflected as a reduction of $9 million in the net benefit cost in 2004.

**Pension and Other Postretirement Benefit Obligations and Plan Assets**

| | Pension Benefits 2004 | Pension Benefits 2003 | Other Benefits 2004 | Other Benefits 2003 |
|---|---|---|---|---|
| | ($ in millions) | | | |
| ***Change in benefit obligations*** | | | | |
| Benefit obligation at beginning of year | $ 1,488 | $ 1,370 | $ 608 | $ 592 |
| Service cost | 18 | 20 | 15 | 18 |
| Interest cost | 89 | 89 | 39 | 40 |
| Amendment | -- | -- | -- | (51) |
| Legislative changes | -- | -- | -- | (45) |
| Curtailment loss | -- | 17 | -- | 10 |
| Special termination benefits | -- | -- | -- | 17 |
| Actuarial losses | 96 | 105 | 83 | 65 |
| Benefits paid | (117) | (113) | (44) | (38) |
| Benefit obligation at end of year | 1,574 | 1,488 | 701 | 608 |
| ***Change in plan assets*** | | | | |
| Fair value of plan assets at beginning of year | 1,720 | 1,469 | 130 | 106 |
| Actual return on plan assets | 197 | 358 | 10 | 24 |
| Employer contribution | 6 | 6 | 9 | 38 |
| Benefits paid | (117) | (113) | (44) | (38) |
| Fair value of plan assets at end of year | 1,806 | 1,720 | 105 | 130 |
| **Funded status** | 232 | 232 | (596) | (478) |
| Unrecognized actuarial loss | 253 | 208 | 232 | 163 |
| Unrecognized prior service cost (benefit) | 18 | 21 | (35) | (44) |
| Net amount recognized | $ 503 | $ 461 | $ (399) | $ (359) |
| Amounts recognized in the Consolidated Balance Sheets consist of: | | | | |
| Prepaid benefit cost | $ 577 | $ 532 | $ -- | $ -- |
| Accrued benefit liability | (94) | (89) | (399) | (359) |
| Accumulated other comprehensive income | 20 | 18 | -- | -- |
| **Net amount recognized** | $ 503 | $ 461 | $ (399) | $ (359) |

Following is information for NS' unfunded pension plans which in all cases have no assets and therefore have an accumulated benefit obligation in excess of plan assets:

| | Dec. 31, 2004 | Dec. 31, 2003 |
|---|---|---|
| | ($ in millions) | |
| Projected benefit obligation | $ 120 | $ 103 |
| Accumulated benefit obligation | 94 | 89 |

During 2003, NS amended its retiree medical plan to require participants retiring after Dec. 31, 2003 to share in any increased medical costs. Contributions will be determined annually and will increase at a

rate similar to that of active nonagreement employees. The amendment decreased the retiree medical benefit obligation by $51 million.

**Pension and Other Postretirement Benefit Costs Components**

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| | | ($ in millions) | |
| ***Pension benefits*** | | | |
| Service cost | $ 18 | $ 20 | $ 17 |
| Interest cost | 89 | 89 | 91 |
| Curtailment loss | -- | 17 | -- |
| Expected return on plan assets | (149) | (158) | (179) |
| Amortization of prior service cost | 3 | 5 | 4 |
| Recognized net actuarial (gains) losses | 3 | 2 | (13) |
| Net benefit | $ (36) | $ (25) | $ (80) |
| ***Other postretirement benefits*** | | | |
| Service cost | $ 15 | $ 18 | $ 13 |
| Interest cost | 39 | 40 | 33 |
| Curtailment loss | -- | 10 | -- |
| Special termination benefits | -- | 17 | -- |
| Expected return on plan assets | (12) | (12) | (13) |
| Amortization of prior service cost (benefit) | (9) | (7) | -- |
| Amortization of unrecognized losses | 16 | 14 | -- |
| Net cost | $ 49 | $ 80 | $ 33 |

**Pension Assumptions**

Pension and other postretirement benefit costs are determined based on actuarial valuations that reflect appropriate assumptions as of the measurement date, ordinarily the beginning of each year. The funded status of the plans is determined using appropriate assumptions as of each year end. A summary of the major assumptions follows:

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| ***Funded status:*** | | | |
| Discount rate | 5.75% | 6.25% | 6.75% |
| Future salary increases | 4.5% | 4.5% | 4.5% |
| ***Pension cost:*** | | | |
| Discount rate | 6.25% | 6.75% | 7.25% |
| Return on assets in plans | 9% | 9% | 9% |
| Future salary increases | 4.5% | 4.5% | 5% |

**Health Care Cost Trend Assumptions**

For measurement purposes at Dec. 31, 2004, increases in the per capita cost of covered health care benefits were assumed to be 9% for 2004 and 8% for 2005. It is assumed the rate will decrease gradually to an ultimate rate of 5% for 2008 and remain at that level thereafter.

Assumed health care cost trend rates have a significant effect on the amounts reported in the financial statements. To illustrate, a one-percentage-point change in the assumed health care cost trend would have the following effects:

| | One percentage point Increase | One percentage point Decrease |
|---|---|---|
| | *($ in millions)* | |
| Increase (decrease) in: | | |
| Total service and interest cost components | $ 8 | $ (6) |
| Postretirement benefit obligation | $ 82 | $ (69) |

**Contributions and Estimated Future Benefit Payments**

In 2005, NS expects to contribute approximately $7 million to its unfunded pension plans for payments to pensioners and $44 million to its other postretirement benefit plans for retiree health benefits.

Benefit payments, which reflect expected future service, as appropriate, are expected to be paid as follows:

| | Pension Benefits | Other Benefits |
|---|---|---|
| | *($ in millions)* | |
| 2005 | $ 111 | $ 44 |
| 2006 | 110 | 43 |
| 2007 | 107 | 44 |
| 2008 | 106 | 45 |
| 2009 | 106 | 46 |
| Years 2010-2014 | 564 | 249 |

Beginning in 2006, the other benefit payments include an estimated annual $3 million reduction due to the Medicare Part D Subsidy.

**Other Postretirement Coverage**

Under collective bargaining agreements, NS and certain subsidiaries participate in a multi-employer benefit plan, which provides certain postretirement health care and life insurance benefits to eligible union employees. Premiums under this plan are expensed as incurred and amounted to $20 million in 2004, $18 million in 2003 and $11 million in 2002.

**Section 401(k) Plans**

Norfolk Southern and certain subsidiaries provide Section 401(k) savings plans for employees. Under the plans, NS matches a portion of employee contributions, subject to applicable limitations. NS' expenses under these plans were $12 million in each of 2004, 2003 and 2002.

**12. Stock-Based Compensation**

Under the stockholder-approved Long-Term Incentive Plan (LTIP), a committee of nonemployee directors of the Board may grant stock options, stock appreciation rights (SARs), restricted shares and performance share units (PSUs), up to a maximum of 88,025,000 shares of Norfolk Southern Common

Stock (Common Stock). Of these shares, 5,000,000 were approved by the Board for issuance to non-officer participants; as a broadly based issuance, stockholder approval was not required. Under the Board-approved Thoroughbred Stock Option Plan (TSOP), the committee may grant stock options up to a maximum of 6,000,000 shares of Common Stock. Options may be granted for a term not to exceed 10 years, but may not be exercised prior to the first anniversary of the date of grant. Options are exercisable at the fair market value of Common Stock on the date of grant.

The LTIP also permits the payment – on a current or a deferred basis and in cash or in stock – of dividend equivalents on shares of Common Stock covered by options or PSUs in an amount commensurate with dividends paid on Common Stock. Tax absorption payments also are authorized in amounts estimated to equal the federal and state income taxes applicable to shares of Common Stock issued subject to a share retention agreement.

**Accounting Method**

As disclosed in Note 1, NS applies APB Opinion 25 and related interpretations in accounting for awards made under the plans. Accordingly, grants of PSUs, restricted shares, dividend equivalents, tax absorption payments and SARs result in charges to net income, while grants of stock options have no effect on net income. Related compensation costs were $53 million in 2004, $29 million in 2003 and $23 million in 2002. NS recognized additional paid-in capital of $30 million in 2004, $2 million in 2003 and $6 million in 2002 related to the tax benefit generated by stock option exercises.

Note 1 includes a table that illustrates the effect on net income and earnings per share had NS applied the fair value recognition provisions of SFAS No. 123 to stock-based employee compensation. The pro forma amounts include compensation costs calculated using the Black-Scholes option-pricing model, with average expected option lives of five years; average risk-free interest rates of 3.2% in 2004, 2.8% in 2003 and 4.6% in 2002; average stock-price volatilities of 35% in 2004, 33% in 2003 and 32% in 2002; and dividend yields of zero. These assumptions produced per-share grant-date fair values of $7.95 in 2004, $6.60 in 2003 and $8.26 in 2002.

**Stock Option Activity**

| | Option Shares | Weighted Average Exercise Price |
|---|---|---|
| Balance Dec. 31, 2001 | 33,413,523 | $ 23.21 |
| | | |
| Granted | 7,384,000 | 22.49 |
| Exercised | (2,851,538) | 17.48 |
| Expired | (287,341) | 26.73 |
| Balance Dec. 31, 2002 | 37,658,644 | $ 23.47 |
| | | |
| Granted | 5,700,000 | 19.63 |
| Exercised | (781,610) | 16.13 |
| Expired | (863,219) | 24.37 |
| Balance Dec. 31, 2003 | 41,713,815 | $ 23.07 |
| | | |
| Granted | 4,580,500 | 22.02 |
| Exercised | (8,203,589) | 19.60 |
| Expired | (1,233,859) | 24.53 |
| Balance Dec. 31, 2004 | 36,856,867 | $ 23.66 |

Of the total options outstanding at Dec. 31, 2004, 32 million were vested and have a weighted-average exercise price of $23.89.

**Stock Options Outstanding**

| Range | Exercise Price Weighted Average | Number Outstanding at Dec. 31, 2004 | Weighted Average Remaining Contractual Life |
|---|---|---|---|
| $ 15.48 - $ 16.94 | $ 16.22 | 7,493,546 | 5.6 years |
| 19.63 - 22.49 | 21.51 | 15,752,409 | 7.9 years |
| 24.31 - 27.69 | 27.44 | 5,495,162 | 3.7 years |
| 29.46 - 33.25 | 32.14 | 8,115,750 | 3.5 years |
| $ 15.48 - $ 33.25 | $ 23.66 | 36,856,867 | 5.8 years |

**Performance Share Units**

PSUs provide for awards based on achievement of certain predetermined corporate performance goals at the end of a three-year cycle. PSU grants and average grant-date fair market values were 831,000 and $22.02 in 2004; 946,000 and $19.63 in 2003; and 815,000 and $22.49 in 2002. PSUs may be paid in the form of shares of Common Stock, cash or any combination thereof. Shares earned and issued may be subject to share retention agreements and held by NS for up to five years.

**Restricted Shares**

Restricted share grants were 359,040 in 2004, with a grant-date fair market value of $22.02 and a three-year restriction period, and were 420,000 in 2003, with a grant date fair market value of $19.63 and a three-year restriction period. At Dec. 31, 2004 and 2003, the balance of unearned compensation was $8 million and $5 million, relating to 726,540 restricted shares, and 391,800 shares, respectively.

**Shares Available and Issued**

Shares of stock available for future grants and issued in connection with all features of the LTIP and TSOP are as follows:

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| Available for future grants Dec. 31: | | | |
| LTIP | 14,033,053 | 17,994,726 | 23,645,146 |
| TSOP | 2,773,300 | 2,737,200 | 2,568,200 |
| Shares of Common Stock issued: | | | |
| LTIP | 8,764,021 | 1,412,749 | 2,917,898 |
| TSOP | 8,700 | -- | -- |

## 13. Stockholders' Equity

### Accumulated Other Comprehensive Loss

"Accumulated other comprehensive income (loss)" reported in the Consolidated Statements of Changes in Stockholders' Equity consisted of the following:

| | Balance at Beginning of Year | Net Gain (Loss) | Reclassification Adjustments | Balance at End of Year |
|---|---|---|---|---|
| | | *($ in millions)* | | |
| Dec. 31, 2004 | | | | |
| Unrealized gains on securities | $ -- | $ 1 | $ -- | $ 1 |
| Cash flow hedges | 28 | 104 | (85) | 47 |
| Minimum pension liability | (72) | -- | -- | (72) |
| Accumulated other comprehensive loss | $ (44) | $ 105 | $ (85) | $ (24) |
| Dec. 31, 2003 | | | | |
| Unrealized gains on securities | $ 1 | $ (1) | $ -- | $ -- |
| Cash flow hedges | 18 | 46 | (36) | 28 |
| Minimum pension liability | (84) | 12 | -- | (72) |
| Accumulated other comprehensive loss | $ (65) | $ 57 | $ (36) | $ (44) |

"Other comprehensive income (loss)" reported in the Consolidated Statements of Changes in Stockholders' Equity consisted of the following:

| | Pretax Amount | Tax (Expense) Benefit | Net-of-Tax Amount |
|---|---|---|---|
| | | *($ in millions)* | |
| ***Year ended Dec. 31, 2004*** | | | |
| Net gain (loss) arising during the year: | | | |
| Cash flow hedges | $ 171 | $ (67) | $ 104 |
| Reclassification adjustments for gains included in net income | (140) | 55 | (85) |
| Subtotal | 31 | (12) | 19 |
| Unrealized gains (losses) on securities | 1 | -- | 1 |
| Other comprehensive income (loss) | $ 32 | $ (12) | $ 20 |
| ***Year ended Dec. 31, 2003*** | | | |
| Net gain (loss) arising during the year: | | | |
| Cash flow hedges | $ 75 | $ (29) | $ 46 |
| Reclassification adjustments for gains included in net income | (59) | 23 | (36) |
| Subtotal | 16 | (6) | 10 |
| Unrealized gains (losses) on securities | (1) | -- | (1) |
| Minimum pension liability | 11 | 1 | 12 |
| Other comprehensive income (loss) | $ 26 | $ (5) | $ 21 |
| ***Year ended Dec. 31, 2002*** | | | |
| Net gain (loss) arising during the year: | | | |
| Cash flow hedges | $ 58 | $ (23) | $ 35 |
| Reclassification adjustments for gains included in net income | (10) | 4 | (6) |
| Subtotal | 48 | (19) | 29 |
| Reclassification adjustments for realized gains on securities included in net income | (9) | 4 | (5) |
| Minimum pension liability | (34) | -- | (34) |
| Other comprehensive income (loss) | $ 5 | $ (15) | $ (10) |

In 2004, 2003 and 2002, Conrail recorded a $3 million gain, a $25 million gain and a $59 million loss, respectively, in other comprehensive income (loss) related to its minimum pension liability. NS' "Other comprehensive income (loss)" includes a $2 million gain for 2004, a $14 million gain for 2003 and a $34 million loss for 2002, arising from the Conrail adjustments.

**Undistributed Earnings of Equity Investees**

"Retained income" includes undistributed earnings of equity investees, principally attributable to NS' equity in the earnings of Conrail, of $19 million at Dec. 31, 2004; $455 million at Dec. 31, 2003; and $375 million at Dec. 31, 2002.

**14. Earnings Per Share**

The following table sets forth the calculation of basic and diluted earnings per share:

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| | *($ in millions except per share, shares in millions)* | | |
| Income available to common stockholders for basic and diluted computations | $ 923 | $ 535 | $ 460 |
| Basic earnings per share: | | | |
| Weighted-average shares outstanding | 394.2 | 389.8 | 388.2 |
| Basic earnings per share | $ 2.34 | $ 1.37 | $ 1.18 |
| Diluted earnings per share: | | | |
| Weighted-average shares outstanding per above | 394.2 | 389.8 | 388.2 |
| Dilutive effect of outstanding options, PSUs and restricted shares (as determined by the application of the treasury stock method) | 5.1 | 1.9 | 2.3 |
| Adjusted weighted-average shares outstanding | 399.3 | 391.7 | 390.5 |
| Diluted earnings per share | $ 2.31 | $ 1.37 | $ 1.18 |

These calculations exclude options whose exercise price exceeded the average market price of Common Stock as follows: 13 million in 2004, 28 million in 2003 and 24 million in 2002.

There are no adjustments to "Net income" or "Income from continuing operations" for the diluted earnings per share computations.

**15. Fair Values of Financial Instruments**

The fair values of "Cash and cash equivalents," "Short-term investments," "Accounts receivable" and "Accounts payable" approximate carrying values because of the short maturity of these financial instruments. The fair value of corporate-owned life insurance approximates carrying value. The carrying amounts and estimated fair values for the remaining financial instruments, excluding derivatives (see Note 16) and investments accounted for under the equity method in accordance with APB Opinion No. 18, consisted of the following at Dec. 31:

| | 2004 | | 2003 | |
|---|---|---|---|---|
| | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
| | | *($ in millions)* | | |
| Investments | $ 125 | $ 134 | $ 32 | $ 40 |
| Notes receivable | 93 | 107 | 93 | 105 |
| Long-term debt | (7,525) | (8,577) | (7,160) | (8,101) |

Quoted market prices were used to determine the fair value of marketable securities; underlying net assets were used to estimate the fair value of other investments. The fair values of notes receivable are based on future discounted cash flows. The fair values of debt were estimated based on quoted market prices or discounted cash flows using current interest rates for debt with similar terms, company rating and remaining maturity.

Carrying amounts of marketable securities reflect unrealized holding gains of $1 million on Dec. 31, 2004 and 2003. Sales of "available-for-sale" securities were immaterial for the years ended Dec. 31, 2004, 2003 and 2002.

**16. Derivative Financial Instruments**

On Jan. 1, 2001, NS adopted Statement of Financial Accounting Standards No. 133, "Accounting for Derivative Instruments and Hedging Activities" (SFAS No. 133), as amended by Statement of Financial Accounting Standards No. 138, "Accounting for Certain Derivative Instruments and Certain Hedging Activities" (SFAS No. 138). The Statements establish accounting and reporting standards for derivative instruments and hedging activities, requiring that all derivatives be recognized in the financial statements as either assets or liabilities and that they be measured at fair value. Changes in fair value are recorded as adjustments to the assets or liabilities being hedged in "Other comprehensive income," or in current earnings, depending on whether the derivative is designated and qualifies for hedge accounting, the type of hedge transaction represented and the effectiveness of the hedge. The settlements of the hedges will result in the reclassification into diesel fuel expense of the related gains or losses recorded as a component of "Other comprehensive income."

NS uses derivative financial instruments to reduce the risk of volatility in its diesel fuel costs and to manage its overall exposure to fluctuations in interest rates. NS does not engage in the trading of derivatives. Management has determined that its derivative financial instruments qualify as either fair-value or cash-flow hedges, having values that highly correlate with the underlying hedged exposures, and has designated such instruments as hedging transactions. Credit risk related to the derivative financial instruments is considered to be minimal and is managed by requiring high credit standards for counterparties and periodic settlements.

**Diesel Fuel Hedging**

NS has hedged a significant portion of its diesel fuel consumption. The intent of the hedges is to assist in the management of NS' aggregate risk exposure to fuel price fluctuations, which can significantly affect NS' operating margins and profitability. In order to minimize this risk, NS has entered into a series of swaps in order to lock in the purchase prices of some of its diesel fuel. Management has designated these derivative instruments as cash-flow hedges of the exposure to variability in expected future cash flows attributable to fluctuations in diesel fuel prices.

Following is a summary of NS' diesel fuel swaps:

| | 2004 | 2003 |
|---|---|---|
| Number of swaps entered into during the year | 120 | 286 |
| Approximate number of gallons hedged (millions) | 157 | 374 |
| Approximate average price per gallon of Nymex No. 2 heating oil | $0.86 | $0.76 |

| | 2005 | 2006 | 2007 |
|---|---|---|---|
| Percent of estimated future diesel fuel consumption covered as of Dec. 31, 2004 | 36% | 4% | -- |

Hedges are entered into periodically by competitive bid among selected counterparties; however, no hedges have been placed since May 2004. The goal of this hedging strategy is to reduce the variability of fuel costs over an extended period of time while minimizing the incremental cost of hedging. The program provides that NS will not enter into any fuel hedges with a duration of more than 36 months, and that no more than 80% of NS' average monthly fuel consumption will be hedged for each month within any 36-month period. After taking into account the effect of the hedging, diesel fuel costs represented 8% of NS' operating expenses for the year ended Dec. 31, 2004, and 7% for each of the years ended Dec. 31, 2003 and 2002.

NS' fuel hedging activity resulted in decreases in diesel fuel expenses of $140 million, $59 million and $10 million for 2004, 2003 and 2002, respectively. Ineffectiveness, or the extent to which changes in the fair value of the heating oil contracts do not offset changes in the fair values of the expected diesel fuel transactions, was approximately $5 million in 2004 and less than $1 million in both 2003 and 2002.

**Interest Rate Hedging**

NS manages its overall exposure to fluctuations in interest rates by issuing both fixed and floating-rate debt instruments, and by entering into interest rate hedging transactions. NS had $151 million, or 2.2%, and $186 million, or 2.8%, of its fixed rate debt portfolio hedged as of Dec. 31, 2004, and Dec. 31, 2003, respectively, using interest rate swaps that qualify for and are designated as fair-value hedge transactions. NS’ interest rate hedging activity resulted in decreases in interest expenses of $6 million, $10 million and $9 million for 2004, 2003 and 2002, respectively. These swaps have been effective in hedging the changes in fair value of the related debt arising from changes in interest rates and, accordingly, there has been no impact on earnings resulting from ineffectiveness associated with these derivative transactions.

**Fair Values**

The fair values of NS' diesel fuel derivative instruments as of Dec. 31, 2004 and 2003, were determined based upon current fair market values as quoted by an independent third party. Fair values of interest rate swaps were determined based upon the present value of expected future cash flows discounted at the appropriate implied spot rate from the spot rate yield curve. Fair value adjustments are noncash

transactions and, accordingly, are excluded from the Consolidated Statement of Cash Flows. "Accumulated other comprehensive income (loss)," a component of "Stockholders' equity," included unrealized gains of $75 million (pretax) as of Dec. 31, 2004, and $40 million (pretax) as of Dec. 31, 2003, related to the fair value of derivative fuel hedging transactions that will terminate within twelve months of the respective dates. Any future gain or loss actually realized will be based on the fair value of the derivative fuel hedges at the time of termination.

The asset and liability positions of NS' outstanding derivative financial instruments were as follows:

| | Dec. 31, 2004 | Dec. 31, 2003 |
|---|---|---|
| | *($ in millions)* | |
| ***Interest rate hedges:*** | | |
| Gross fair market asset position | $ 9 | $ 16 |
| Gross fair market (liability) position | -- | -- |
| ***Fuel hedges:*** | | |
| Gross fair market asset position | 81 | 45 |
| Gross fair market (liability) position | -- | -- |
| Total net asset (liability) position | $ 90 | $ 61 |

## 17. Discontinued Operations - Motor Carrier

On March 28, 1998, NS sold all the common stock of North American Van Lines, Inc. (NAVL), its motor carrier subsidiary. Results in 2003 include an additional after-tax gain of $10 million, or 3 cents per share (basic and diluted), that resulted from resolution of tax issues related to the transaction.

## 18. Commitments and Contingencies

### Lawsuits

Norfolk Southern and certain subsidiaries are defendants in numerous lawsuits and other claims relating principally to railroad operations. When management concludes that it is probable that a liability has been incurred and the amount of the liability can be reasonably estimated, it is accrued through a charge to earnings. While the ultimate amount of liability incurred in any of these lawsuits and claims is dependent on future developments, in management's opinion, the recorded liability is adequate to cover the future payment of such liability and claims. However, the final outcome of any of these lawsuits and claims cannot be predicted with certainty, and unfavorable or unexpected outcomes could result in additional accruals that could be significant to results of operations in a particular year or quarter. Any adjustments to the recorded liability will be reflected in earnings in the periods in which such adjustments are known.

### Casualty Claims

Casualty claims include employee personal injury and occupational claims as well as third-party claims. NS engages an independent consulting actuarial firm to aid in valuing its liability for personal injury, occupational and third-party claims. Job-related accidental injury and occupational claims are subject to the Federal Employers' Liability Act (FELA), which is applicable only to railroads. FELA's fault-based system produces results that are unpredictable and inconsistent as compared with a no-fault workers' compensation system. The variability inherent in this system could result in actual costs being very

different from the liability recorded. While the ultimate amount of claims incurred is dependent on future developments, in management's opinion, the recorded liability after considering applicable insurance coverage is adequate to cover the future payments of claims and is supported by the most recent actuarial study. In all cases, NS records a liability when the expected loss for the claim is both probable and estimable.

**Employee personal injury claims** – The largest component of casualties and other claims expense is employee personal injury costs. The actuarial firm engaged by NS provides quarterly studies to aid in valuing its employee personal injury liability and estimating its employee personal injury expense. The actuarial firm studies NS' historical patterns of reserving for claims and subsequent settlements, taking into account relevant outside influences. The actuary uses the results of these analyses to estimate the ultimate amount of the liability, which includes amounts for incurred but unasserted claims. NS adjusts its liability to the actuarially determined amount on a quarterly basis. The estimate of loss liabilities is subject to inherent limitation given the difficulty of predicting future events such as jury decisions, court interpretations or legislative changes and as such the actual emergence of loss may vary from the actuarial estimate.

**Occupational claims** – Occupational claims (including asbestosis and other respiratory diseases, as well as repetitive motion) are often not caused by a specific accident or event but rather result from a claimed exposure over time. Many such claims are being asserted by former or retired employees, some of whom have not been actively employed in the rail industry for decades. The actuarial firm provides an estimate of the occupational claims liability based upon NS' history of claim filings, severity, payments and other pertinent facts. The liability is dependent upon management's judgments made as to the specific case reserves as well as judgments of the consulting actuarial firm in the periodic studies. The actuarial firm's estimate of ultimate loss includes a provision for those claims that have been incurred but not reported by analyzing industry data and projecting NS' experience into the future as far as can be reasonably determined. NS adjusts its liability to the actuarially determined amount on a quarterly basis. However, it is possible that the recorded liability may not be adequate to cover the future payment of claims. Adjustments to the recorded liability are reflected in operating expenses in the periods in which such adjustments become known.

**Third-party claims** – NS records a liability for third-party claims including those for highway crossing accidents, trespasser and other injuries, automobile liability, property damage and lading damage. The actuarial firm assists with the calculation of potential liability for third-party claims, except lading damage, based upon NS' experience including number and timing of incidents, amount of payments, settlement rates, number of open claims and legal defenses. The actuarial estimate includes a provision for claims that have been incurred but have not yet been reported. Each quarter NS adjusts its liability to the actuarially determined amount. Given the inherent uncertainty in the ultimate outcome of third-party claims, it is possible that future settlement costs may differ from the estimated liability recorded.

**Environmental Matters**

NS is subject to various jurisdictions' environmental laws and regulations. It is NS' policy to record a liability where such liability or loss is probable and its amount can be estimated reasonably. Claims, if any, against third parties for recovery of cleanup costs incurred by NS are reflected as receivables (when collection is probable) on the balance sheet and are not netted against the associated NS liability. Environmental engineers regularly participate in ongoing evaluations of all known sites and in determining any necessary adjustments to liability estimates. NS also has established an Environmental Policy Council, composed of senior managers, to oversee and interpret its environmental policy.

NS' Consolidated Balance Sheets included liabilities for environmental exposures in the amount of $64 million at Dec. 31, 2004, and $25 million at Dec. 31, 2003 (of which $12 million was accounted for as a current liability at Dec. 31, 2004, and $8 million at Dec. 31, 2003). The increase in the liability was the result of the Conrail Corporate Reorganization and relates to sites on the former PRR properties. At Dec. 31, 2004, the liability represented NS' estimate of the probable cleanup and remediation costs based on available information at 210 known locations. On that date, 15 sites accounted for $32 million of the liability, and no individual site was considered to be material. NS anticipates that much of this liability will be paid out over five years; however, some costs will be paid out over a longer period.

At some of the 210 locations, certain NS subsidiaries, usually in conjunction with a number of other parties, have been identified as potentially responsible parties by the Environmental Protection Agency (EPA) or similar state authorities under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, or comparable state statutes, which often impose joint and several liability for cleanup costs.

With respect to known environmental sites (whether identified by NS or by the EPA or comparable state authorities), estimates of NS' ultimate potential financial exposure for a given site or in the aggregate for all such sites are necessarily imprecise because of the widely varying costs of currently available cleanup techniques, the likely development of new cleanup technologies, the difficulty of determining in advance the nature and full extent of contamination and each potential participant's share of any estimated loss (and that participant's ability to bear it), and evolving statutory and regulatory standards governing liability.

The risk of incurring environmental liability – for acts and omissions, past, present and future - is inherent in the railroad business. Some of the commodities in NS' traffic mix, particularly those classified as hazardous materials, can pose special risks that NS and its subsidiaries work diligently to minimize. In addition, several NS subsidiaries own, or have owned, land used as operating property, or which is leased and operated by others, or held for sale. Because environmental problems may exist on these properties that are latent or undisclosed, there can be no assurance that NS will not incur environmental liabilities or costs with respect to one or more of them, the amount and materiality of which cannot be estimated reliably at this time. Moreover, lawsuits and claims involving these and potentially other unidentified environmental sites and matters are likely to arise from time to time. The resulting liabilities could have a significant effect on financial condition, results of operations or liquidity in a particular year or quarter.

However, based on its assessment of the facts and circumstances now known, management believes that it has recorded the probable costs for dealing with those environmental matters of which the Corporation is aware. Further, management believes that it is unlikely that any known matters, either individually or in the aggregate, will have a material adverse effect on NS' financial position, results of operations or liquidity.

**Insurance**

NS obtains on behalf of itself and its subsidiaries commercial insurance for potential losses for third-party liability and first-party property damages. Specified levels of risk are retained on a self-insurance basis (up to $25 million per occurrence for bodily injury and property damage to third parties and $12.5 million per occurrence for property owned by NS or in NS' care, custody or control).

**Purchase Commitments**

NSR had outstanding purchase commitments of approximately $121 million in connection with its 2005 capital program. In addition, Norfolk Southern has committed to purchase telecommunications services totaling $26 million through 2007.

**Change-In-Control Arrangements**

Norfolk Southern has compensation agreements with officers and certain key employees that become operative only upon a change in control of the Corporation, as defined in those agreements. The agreements provide generally for payments based on compensation at the time of a covered individual's involuntary or other specified termination and for certain other benefits.

**Guarantees**

In a number of instances, NS and its subsidiaries have agreed to indemnify lenders for additional costs they may bear as a result of certain changes in laws or regulations applicable to their loans. Such changes may include impositions or modifications with respect to taxes, duties, reserves, liquidity, capital adequacy, special deposits, and similar requirements relating to extensions of credit by, deposits with, or the assets or liabilities of such lenders. Similar provisions exist in NS' accounts receivable sales program. The nature and timing of changes in laws or regulations applicable to NS' financings are inherently unpredictable, and therefore NS' exposure in connection with the foregoing indemnifications cannot be quantified. No liability has been recorded related to these indemnifications. In the case of one type of equipment financing, NSR's Japanese leveraged leases, NSR may terminate the leases and ancillary agreements if such a change-in-law indemnity is triggered. Such a termination would require NSR to make early termination payments that would not be expected to have a material adverse effect on NS' financial condition, results of operations or liquidity.

NS has indemnified parties in a number of transactions for U.S. income tax withholding imposed as a result of changes in U.S. tax law. In all cases, NS has the right to unwind the related transaction if the withholding cannot be avoided in the future. Because these indemnities would be triggered and are dependent upon a change in the tax law, the maximum exposure is not quantifiable. Management does not believe that it is likely that it will be required to make any payments under these indemnities.

NS has outstanding warranty liabilities primarily related to work performed at its locomotive facilities. NS has recorded a reserve of less than $1 million as of Dec. 31, 2004 and $1 million as of Dec. 31, 2003, for these warranties.

As of Dec. 31, 2004, certain Norfolk Southern subsidiaries are contingently liable as guarantors with respect to $8 million of indebtedness of an entity in which they have an ownership interest, the Terminal Railroad Association of St. Louis, due in 2019. Six other railroads are also jointly and severally liable as guarantors for this indebtedness. No liability has been recorded related to this guaranty.

**Subsequent Event**

On Jan. 6, 2005, a derailment occurred in Graniteville, SC. NS expects the first quarter of 2005 to reflect operating expenses related to this incident of between $30 million and $40 million (pretax). The amount includes NS' self-insured retention under its insurance policies, as well as other uninsured costs. Although potential losses may exceed self-insured retention amounts NS expects at this time, that insurance coverage is adequate to cover such potential claims or settlements. This amount does not include any fines or penalties that could be imposed.

**NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES**
**QUARTERLY FINANCIAL DATA**

| | Three Months Ended | | | |
|---|---|---|---|---|
| | **March 31** | **June 30** | **Sept. 30** | **Dec. 31** |
| | *(In millions of dollars, except per share amounts)* | | | |
| **2004** | | | | |
| Railway operating revenues | $ 1,693 | $ 1,813 | $ 1,857 | $ 1,949 |
| Income from railway operations | 346 | 425 | 469 | 462 |
| Net income | 158 | 213 | 288[1] | 264 |
| Earnings per share: | | | | |
| Basic | $ 0.40 | $ 0.55 | $ 0.73[1] | $ 0.66 |
| Diluted | $ 0.40 | $ 0.54 | $ 0.72[1] | $ 0.65 |
| **2003** | | | | |
| Railway operating revenues | $ 1,561 | $ 1,633 | $ 1,598 | $ 1,676 |
| Income from railway operations | 231 | 298 | 311 | 224[3] |
| Income from continuing operations before accounting changes | 85 | 137 | 137 | 52[3] |
| Net income | 209[2] | 137 | 137 | 52[3] |
| Earnings per share – basic and diluted: | | | | |
| Income from continuing operations before accounting changes | $ 0.22 | $ 0.35 | $ 0.35 | $ 0.13[3] |
| Net income | $ 0.54[2] | $ 0.35 | $ 0.35 | $ 0.13[3] |

[1] Includes a $53 million or 13 cents per share gain from the Conrail Corporate Reorganization (see Note 2 to the Consolidated Financial Statements).

[2] Includes a $114 million, or 29 cents per share, increase related to required accounting changes (see Note 1 to the Consolidated Financial Statements), and a $10 million, or 3 cents per share, gain from discontinued operations (see Note 17 to the Consolidated Financial Statements).

[3] Includes a $107 million pretax charge for a voluntary separation program (see Note 11 to the Consolidated Financial Statements), which reduced net income by $66 million or 17 cents per share. Also includes an $84 million impairment charge (see Note 6 to the Consolidated Financial Statements), which reduced net income by $53 million or 13 cents per share.

**Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure.**

None.

**Item 9A. Controls and Procedures.**

**Evaluation of Disclosure Controls and Procedures**

Norfolk Southern's Chief Executive Officer and Chief Financial Officer have evaluated the effectiveness of NS' disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of December 31, 2004. Based on such evaluation, such officers have concluded that, as of December 31, 2004, NS' disclosure controls and procedures are effective in alerting them on a timely basis to material information relating to NS (including its consolidated subsidiaries) required to be included in NS' periodic filings under the Exchange Act.

**Internal Control Over Financial Reporting**

The management of Norfolk Southern is responsible for establishing and maintaining adequate internal control over financial reporting. The Corporation's internal control over financial reporting includes those policies and procedures that pertain to the Corporation's ability to record, process, summarize and report reliable financial data. Management recognizes that there are inherent limitations in the effectiveness of any internal control over financial reporting, including the possibility of human error and the circumvention or overriding of internal control. Accordingly, even effective internal control over financial reporting can provide only reasonable assurance with respect to financial statement preparation. Further, because of changes in conditions, the effectiveness of internal control over financial reporting may vary over time.

In order to ensure that the Corporation's internal control over financial reporting is effective, management regularly assesses such controls and did so most recently for its financial reporting as of December 31, 2004. This assessment was based on criteria for effective internal control over financial reporting set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in *Internal Control-Integrated Framework*. Based on our assessment, management has concluded that the Corporation maintained effective internal control over financial reporting as of December 31, 2004.

The Board of Directors, acting through its Audit Committee, is responsible for the oversight of the Corporation's accounting policies, financial reporting and internal control. The Audit Committee of the Board of Directors is comprised entirely of outside directors who are independent of management. The independent registered public accounting firm and the internal auditors have full and unlimited access to the Audit Committee, with or without management, to discuss the adequacy of internal control over financial reporting, and any other matters which they believe should be brought to the attention of the Audit Committee.

Norfolk Southern's management has issued a report of its assessment of internal control over financial reporting, and Norfolk Southern's independent registered public accounting firm has issued a report on this assessment. These reports appear in Item II, Part 8 of this report on Form 10-K.

During the fourth quarter of 2004, management has not identified any changes in NS' internal controls over financial reporting that have materially affected, or are reasonably likely to materially affect, NS' internal controls over financial reporting.

# PART III

## NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES (NS)

### Item 10. Directors and Executive Officers of the Registrant.

In accordance with General Instruction G(3), information called for by Item 10, Part III, is incorporated herein by reference from the information appearing under the caption "Election of Directors," under the subcaptions "Committees" (including the information appearing under "Audit Committee") and "Corporate Governance" under the caption "Board of Directors;" and under the caption "Section 16(a) Beneficial Ownership Reporting Compliance" in Norfolk Southern's definitive Proxy Statement, for the Norfolk Southern Annual Meeting of Stockholders to be held on May 12, 2005, which definitive Proxy Statement will be filed electronically with the Commission pursuant to Regulation 14A. The information regarding executive officers called for by Item 401 of Regulation S-K is included in Part I hereof beginning under "Executive Officers of the Registrant."

### Item 11. Executive Compensation.

In accordance with General Instruction G(3), information called for by Item 11, Part III, is incorporated herein by reference from the information appearing under the subcaption "Compensation" under the caption "Board of Directors" for directors and under the caption "Executive Compensation" for executives, including the information appearing in the "Summary Compensation Table" and under the subcaptions "Long-Term Incentive Plan" (including the three tables therein), "Pension Plans" (including the table therein), and "Change in Control Arrangements" in Norfolk Southern's definitive Proxy Statement, for the Norfolk Southern Annual Meeting of Stockholders to be held on May 12, 2005, which definitive Proxy Statement will be filed electronically with the Commission pursuant to Regulation 14A.

### Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters.

In accordance with General Instruction G(3), information called for by Item 12, Part III, is incorporated herein by reference from the information appearing under the caption "Beneficial Ownership of Stock" in Norfolk Southern's definitive Proxy Statement, for the Norfolk Southern Annual Meeting of Stockholders to be held on May 12, 2005, which definitive Proxy Statement will be filed electronically with the Commission pursuant to Regulation 14A.

**Equity Compensation Plan Information (as of Dec. 31, 2004)**

| Plan category | Number of securities to be issued upon exercise of outstanding options, warrants and rights (a) | Weighted-average exercise price of outstanding options, warrants and rights (b) | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) (c) |
|---|---|---|---|
| Equity compensation Plans approved by security holders[1] | 34,325,304 | 23.14 [4] | 13,854,425 [5] |
| Equity compensation Plans not approved by security holders[2] | 5,123,563 [3] | 26.91 [3] | 2,990,928 [6] |
| Total | 39,448,867 | 23.66 | 16,845,353 |

1 The Long-Term Incentive Plan, excluding five million shares for broad-based issuance to non-officers.
2 The Long-Term Incentive Plan's five million shares for broad-based issuance to non-officers, the Thoroughbred Stock Option Plan and the Directors' Restricted Stock Plan.
3 Includes options and performance share units granted under the Long-Term Incentive Plan on 1,896,863 shares for non-officers and options granted under the Thoroughbred Stock Option Plan.
4 Calculated without regard to 2,592,000 outstanding performance share units.
5 Of the shares remaining available for grant under plans approved by stockholders, 2,638,378 are available for grant as restricted shares or performance shares under the Long-Term Incentive Plan.
6 Of the shares remaining available for grant under plans not approved by stockholders, 39,000 are available for grant as restricted stock under the Directors' Restricted Stock Plan.

**Norfolk Southern Corporation Long-Term Incentive Plan ("LTIP")**

Established on June 28, 1983, and approved by the stockholders at their Annual Meeting most recently on May 10, 2001, LTIP was adopted to promote the success of Norfolk Southern by providing an opportunity for officers and other key employees to acquire a proprietary interest in the Corporation. On January 23, 2001, the Board of Directors approved the issuance of an additional 5,000,000 shares of authorized but unissued Common Stock under LTIP to participants who are not officers of Norfolk Southern. The issuance of these shares was broadly-based, and stockholder approval of these shares was not required. Accordingly, this portion of LTIP is included in the number of securities available for future issuance for plans not approved by stockholders. Also on that date, the Board adopted an amended plan which included the reservation for issuance of an additional 30,000,000 shares of authorized but unissued Norfolk Southern Common Stock, with no more than 6 million of such additional shares to be awarded as restricted shares or performance shares (including performance share units earned as performance shares). This amended plan was approved by stockholders on May 10, 2001.

Non-employee directors, officers and other key employees residing in the United States or Canada are eligible for selection to receive LTIP awards. Under LTIP, the Compensation Committee (Committee) may grant incentive stock options, nonqualified stock options, stock appreciation rights, restricted shares and performance share units (in addition, dividend equivalents may be awarded for options and

performance share units). The Committee may establish such terms and conditions for the awards as provided in the plan.

For options, the option price per share will not be less than 100% of the fair market value of Norfolk Southern's Common Stock on the effective date the option is granted. All options are subject to a vesting period of at least one year, and the term of the option will not exceed ten years. LTIP specifically prohibits option repricing without stockholder approval, except for capital adjustments.

Performance share units are performance-based awards which are earned upon achievement of goals the Committee establishes at the time of the grant for three equally weighted performance criteria approved by the stockholders -- return on average invested capital, operating ratio, and total return to NS stockholders as compared with the total return on all stocks comprising the S&P 500 Composite Stock Price Index -- and the units may be payable as shares of Norfolk Southern Common Stock or in cash.

**Norfolk Southern Corporation Thoroughbred Stock Option Plan**

The Board adopted the Norfolk Southern Corporation Thoroughbred Stock Option Plan ("TSOP") on January 26, 1999, to promote the success of Norfolk Southern by providing an opportunity for nonagreement employees to acquire a proprietary interest in Norfolk Southern and thereby to provide an additional incentive to nonagreement employees to devote their maximum efforts and skills to the advancement, betterment, and prosperity of Norfolk Southern and its stockholders. The plan has not been approved by stockholders. Six million shares of authorized but unissued Common Stock were reserved for issuance under TSOP.

Active full-time nonagreement employees residing in the United States or Canada are eligible for selection to receive TSOP awards. Under TSOP, the Compensation Committee of the Board of Directors may grant nonqualified stock options and may establish such terms and conditions as provided in the plan.

The option price per share will not be less than 100% of the fair market value of Norfolk Southern's Common Stock on the effective date the option is granted. All options are subject to a vesting period of at least one year, and the term of the option will not exceed ten years. TSOP specifically prohibits option repricing without stockholder approval, except for capital adjustments.

**Norfolk Southern Corporation Directors' Restricted Stock Plan**

The Norfolk Southern Corporation Directors' Restricted Stock Plan ("Plan") was adopted on January 1, 1994, and is designed to increase ownership of Norfolk Southern's Common Stock by its non-employee directors so as to further align their ownership interest in Norfolk Southern with that of stockholders. The Plan has not been approved by stockholders. Currently, a maximum of 66,000 shares of Corporation Common Stock may be granted under the Plan. To make the grants to eligible directors, Norfolk Southern purchases, through one or more subsidiary companies, the number of shares required in open-market transactions at prevailing market prices, or makes such grants from Common Stock already owned by one or more of Norfolk Southern's subsidiary companies.

Only non-employee directors, who are not and never have been employees of Norfolk Southern, are eligible to participate in the Plan. Upon becoming a director, each eligible director receives a one-time grant of 3,000 restricted shares of Norfolk Southern Common Stock. No individual member of the Board exercises discretion concerning the eligibility of any director or the number of shares granted.

The restriction period begins on the date of the grant and ends on the earlier of death or six months after the eligible director ceases to be a director by reason of disability or retirement. Directors will forfeit the right to receive the restricted shares if they cease to serve as a director of Norfolk Southern for reasons other than their disability, retirement or death.

**Item 13. Certain Relationships and Related Transactions.**

In accordance with General Instruction G(3), information called for by Item 13, Part III, is incorporated herein by reference from the information appearing under the caption "Certain Relationships and Related Transactions" in Norfolk Southern's definitive Proxy Statement, for the Norfolk Southern Annual Meeting of Stockholders to be held on May 12, 2005, which definitive Proxy Statement will be filed electronically with the Commission pursuant to Regulation 14A.

**Item 14. Principal Accountant Fees and Services.**

In accordance with General Instruction G(3), information called for by Item 14, Part III is incorporated herein by reference from the information appearing under the caption "Ratification of Appointment of Independent Registered Public Accounting Firm" in Norfolk Southern's definitive Proxy Statement, for the Norfolk Southern Annual Meeting of Stockholders to be held on May 12, 2005, which definitive proxy statement will be filed electronically with the Commission pursuant to Regulation 14A.

# PART IV

## NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES (NS)

**Item 15. Exhibits, Financial Statement Schedule and Reports on Form 8-K.**

Page

(A) The following documents are filed as part of this report:

1. Index to Consolidated Financial Statements


| | |
|---|---|
| Report of Management | K38 |
| Reports of Independent Registered Public Accounting Firm | K39 |
| Consolidated Statements of Income, Years ended Dec. 31, 2004, 2003 and 2002 | K42 |
| Consolidated Balance Sheets As of Dec. 31, 2004 and 2003 | K43 |
| Consolidated Statements of Cash Flows, Years ended Dec. 31, 2004, 2003 and 2002 | K44 |
| Consolidated Statements of Changes in Stockholders' Equity, Years ended Dec. 31, 2004, 2003 and 2002 | K45 |
| Notes to Consolidated Financial Statements | K46 |


2. Financial Statement Schedule:

The following consolidated financial statement schedule should be read in connection with the consolidated financial statements:


| Index to Consolidated Financial Statement Schedule | Page |
|---|---|
| Schedule II - Valuation and Qualifying Accounts | K92 |


Schedules other than the one listed above are omitted either because they are not required or are inapplicable, or because the information is included in the consolidated financial statements or related notes.

3. Exhibits

| Exhibit Number | Description |
|---|---|
| 3 | Articles of Incorporation and Bylaws - |
| 3(i) | The Restated Articles of Incorporation of Norfolk Southern Corporation are incorporated By reference to Exhibit 3(i) to Norfolk Southern Corporation's 10-K filed on March 5, 2001. |
| 3(ii) | The Bylaws of Norfolk Southern Corporation, as amended Jan. 25, 2005, are incorporated by reference to Exhibit 99 to Norfolk Southern Corporation’s Form 8-K filed on Jan. 25, 2005. |

4 Instruments Defining the Rights of Security Holders, Including Indentures:

(a) Indenture, dated as of January 15, 1991, from Norfolk Southern Corporation to First Trust of New York, National Association, as Trustee, incorporated by reference to Exhibit 4.1 to Norfolk Southern Corporation's Registration Statement on Form S-3 (No. 33-38595).

(b) First Supplemental Indenture, dated May 19, 1997, between Norfolk Southern Corporation and First Trust of New York, National Association, as Trustee, related to the issuance of notes in the principal amount of $4.3 billion, is incorporated herein by reference to Exhibit 1.1(d) to Norfolk Southern Corporation’s Form 8-K filed on May 21, 1997.

(c) Second Supplemental Indenture, dated April 26, 1999, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, related to the issuance of notes in the principal amount of $400 million, is incorporated herein by reference to Exhibit 1.1(c) to Norfolk Southern Corporation’s Form 8-K filed on April 30, 1999.

(d) Third Supplemental Indenture, dated May 23, 2000, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, related to the issuance of notes in the principal amount of $600 million, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on May 25, 2000.

(e) Fourth Supplemental Indenture, dated as of February 6, 2001, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, related to the issuance of notes in the principal amount of $1 billion, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on February 7, 2001.

(f) Fifth Supplemental Indenture, dated as of July 5, 2001, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, related to the issuance of notes in the principal amount of $250 million, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on July 5, 2001.

(g) Rights Agreement, dated as of September 26, 2000, between Norfolk Southern Corporation and The Bank of New York, with exhibits thereto, is incorporated herein by reference to Exhibit 4 to Norfolk Southern Corporation's Form 8-K filed on September 26, 2000.

(h) Sixth Supplemental Indenture, dated as of April 30, 2002, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, relating to the issuance of notes in the principal amount of $200 million, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on May 1, 2002.

(i) Seventh Supplemental Indenture, dated as of April 30, 2002, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, relating to the issuance of notes in the principal amount of $100 million, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on May 1, 2002.

(j) Amendment to Rights Agreement, dated as of November 26, 2002, between Norfolk Southern Corporation and The Bank of New York, with exhibits thereto, is incorporated by reference to Exhibit 4 to Norfolk Southern Corporation's Form 8-K filed on November 26, 2002.

(k) Eighth Supplemental Indenture, dated as of September 17, 2004, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, relating to the issuance of 5.257% Notes due 2014 ("Securities") in the aggregate principal amount of $441.5 million in connection with Norfolk Southern Corporation's offer to exchange the Securities and cash for up to $400 million of its outstanding 7.350% Notes due 2007, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on September 23, 2004.

(l) The Indenture, dated August 27, 2004, among PRR Newco, Inc., as Issuer, and Norfolk Southern Railway Company, as Guarantor, and The Bank of New York, as Trustee, is incorporated herein by reference to Exhibit 4(l) to Norfolk Southern Corporation's Form 10-Q filed on October 28, 2004.

(m) The First Supplemental Indenture, dated August 27, 2004, among PRR Newco, Inc., as Issuer, and Norfolk Southern Railway Company, as Guarantor, and The Bank of New York, as Trustee, related to the issuance of notes in the principal amount of approximately $451.8 million, is incorporated herein by reference to Exhibit 4(m) to Norfolk Southern Corporation's Form 10-Q filed on October 28, 2004.

In accordance with Item 601(b)(4)(iii) of Regulation S-K, copies of other instruments of Norfolk Southern Corporation and its subsidiaries with respect to the rights of holders of long-term debt are not filed herewith, or incorporated by reference, but will be furnished to the Commission upon request.

10 Material Contracts -

(a) The Transaction Agreement, dated as of June 10, 1997, by and among CSX, CSX Transportation, Inc., Registrant, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation and CRR Holdings LLC, with certain schedules thereto, previously filed, is incorporated herein by reference to Exhibit 10(a) to Norfolk Southern Corporation's Form 10-K filed on February 24, 2003.

(b) Amendment No. 1, dated as of August 22, 1998, to the Transaction Agreement, dated as of June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation and CRR Holdings LLC is incorporated herein by reference from Exhibit 10.1 to Norfolk Southern Corporation's Form 10-Q filed on August 11, 1999.

(c) Amendment No. 2, dated as of June 1, 1999, to the Transaction Agreement, dated June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation and CRR Holdings LLC is incorporated herein by reference from Exhibit 10.2 to Norfolk Southern Corporation's Form 10-Q filed on August 11, 1999.

(d) Shared Assets Area Operating Agreement for North Jersey, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibit thereto, is incorporated herein by reference from Exhibit 10.4 to Norfolk Southern Corporation's Form 10-Q filed on August 11, 1999.

(e) Shared Assets Area Operating Agreement for South Jersey/ Philadelphia, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibit thereto, is incorporated herein by reference from Exhibit 10.5 to Norfolk Southern Corporation's Form 10-Q filed on August 11, 1999.

(f) Shared Assets Area Operating Agreement for Detroit, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibit thereto, is incorporated herein by reference from Exhibit 10.6 to Norfolk Southern Corporation's Form 10-Q filed on August 11, 1999.

(g) Amendment No. 1, dated as of June 1, 2000, to the Shared Assets Areas Operating Agreement for North Jersey, South Jersey/Philadelphia and Detroit, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibit thereto, is incorporated herein by reference to Exhibit 10(h) to Norfolk Southern Corporation's 10-K filed on March 5, 2001.

(h) Amendment No. 2, dated as January 1, 2001, to the Shared Assets Area Operating Agreements for North Jersey, South Jersey/Philadelphia and Detroit, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibit thereto, is incorporated herein by reference to Exhibit 10(j) to Norfolk Southern Corporation's Form 10-K filed on February 21, 2002.

(i) Amendment No. 3, dated as of June 1, 2001, and executed in May of 2002, to the Shared Assets Area Operating Agreement for North Jersey, South Jersey/Philadelphia and Detroit, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibit thereto, is incorporated herein by reference to Exhibit 10(k) to Norfolk Southern Corporation’s Form 10-K filed on February 24, 2003.

(j) Monongahela Usage Agreement, dated as of June 1, 1999, by and among CSX Transportation, Inc., Norfolk Southern Railway Company, Pennsylvania Lines LLC and New York Central Lines LLC, with exhibit thereto, is incorporated herein by reference from Exhibit 10.7 to Norfolk Southern Corporation's Form 10-Q filed on August 11, 1999.

(k) The Agreement, entered into as of July 27, 1999, between North Carolina Railroad Company and Norfolk Southern Railway Company, is incorporated herein by reference from Exhibit 10(i) to Norfolk Southern Corporation's Form 10-K filed on March 6, 2000.

(l) The Supplementary Agreement, entered into as of January 1, 1987, between the Trustees of the Cincinnati Southern Railway and The Cincinnati, New Orleans and Texas Pacific Railway Company (the latter a wholly owned subsidiary of Norfolk Southern Railway Company) - extending and amending a Lease, dated as of October 11, 1881 - is incorporated by reference to Exhibit 10(k) to Norfolk Southern Corporation's Form 10-K filed on March 5, 2001.

(m) The Norfolk Southern Corporation Executive Management Incentive Plan, effective January 25, 2000, is incorporated by reference herein from Exhibit 10(1) to Norfolk Southern Corporation's Form 10-K filed on March 6, 2000.

(n) The Norfolk Southern Corporation Long-Term Incentive Plan, as amended effective January 28, 2003, is incorporated herein by reference to Exhibit 10(p) to Norfolk Southern Corporation’s Form 10-K filed on February 24, 2003.

(o) The Norfolk Southern Corporation Officers' Deferred Compensation Plan, as amended effective September 26, 2000, is incorporated herein by reference to Exhibit 10(n) to Norfolk Southern Corporation's Form 10-K filed on March 5, 2001.

(p) The Norfolk Southern Corporation Executives' Deferred Compensation Plan, as amended effective January 20, 2001, is incorporated herein by reference to Exhibit 10(o) to Norfolk Southern Corporation's Form 10-K filed on March 5, 2001.

(q) The Directors' Deferred Fee Plan of Norfolk Southern Corporation, as amended effective January 23, 2001, is incorporated herein by reference to Exhibit 10(p) to Norfolk Southern Corporation's Form 10-K filed on March 5, 2001.

(r) The Norfolk Southern Corporation Directors' Restricted Stock Plan, effective January 1, 1994, as restated November 24, 1998, is incorporated herein by reference from Exhibit 10(h) to Norfolk Southern Corporation's Form 10-K filed on March 24, 1999.

(s) Form of Severance Agreement, dated as of June 1, 1996, between Norfolk Southern Corporation and certain executive officers (including those defined as “named executive officers” and identified in the Corporation's Proxy Statement for the 1997 through 2001 Annual Meetings of Stockholders) is incorporated herein by reference from Exhibit 10(t) to Norfolk Southern Corporation's Form 10-K filed on February 21, 2002.

(t) Norfolk Southern Corporation Supplemental (formerly, Excess) Benefit Plan, effective as of August 22, 1999, is incorporated herein by reference from Exhibit 10(r) to Norfolk Southern Corporation's Form 10-K filed on March 6, 2000.

(u) The Norfolk Southern Corporation Directors' Charitable Award Program, effective February 1, 1996, is incorporated herein by reference from Exhibit 10(v) to Norfolk Southern Corporation's Form 10-K filed on February 21, 2002.

(v) The Norfolk Southern Corporation Outside Directors' Deferred Stock Unit Program, as amended effective January 28, 2003, is incorporated herein by reference to Exhibit 10(x) to Norfolk Southern Corporation's Form 10-K filed on February 24, 2003.

(w) Agreement, dated as of October 1, 2001, providing enhanced pension benefits to three officers in exchange for their continued employment with Norfolk Southern Corporation for two years, is incorporated herein by reference to Exhibit 10(w) to Norfolk Southern Corporation's Form 10-Q filed on November 9, 2001. The agreement was entered into with L. Ike Prillaman, Vice Chairman and Chief Marketing Officer; Stephen C. Tobias, Vice Chairman and Chief Operating Officer; and Henry C. Wolf, Vice Chairman and Chief Financial Officer.

(x) The Norfolk Southern Corporation Thoroughbred Stock Option Plan, as amended effective January 28, 2003, is incorporated herein by reference to Exhibit 10(z) to Norfolk Southern Corporation's Form 10-K filed on February 24, 2003.

(y) The Norfolk Southern Corporation Restricted Stock Unit Plan, effective January 28, 2003, is incorporated herein by reference to Exhibit 10(bb) to Norfolk Southern Corporation's Form 10-K filed on February 24, 2003.

(z) The Norfolk Southern Corporation Executive Life Insurance Plan, as amended, effective October 1, 2003, is incorporated herein by reference to Exhibit 10 to Norfolk Southern Corporation's Form 10-Q filed on October 31, 2003.

(aa) Amendment No. 3, dated as of June 1, 1999, and executed in April 2004, to the Transaction Agreement, dated June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation and CRR Holdings LLC, is incorporated herein by reference to Exhibit 10(dd) to Norfolk Southern Corporation's Form 10-Q filed on July 30, 2004.

(bb) Distribution Agreement, dated as of July 26, 2004, by and among CSX Corporation, CSX Transportation, Inc., CSX Rail Holding Corporation, CSX Northeast Holdings Corporation, Norfolk Southern Corporation, Norfolk Southern Railway Company, CRR Holdings LLC, Green Acquisition Corp., Conrail Inc., Consolidated Rail Corporation, New York Central Lines LLC, Pennsylvania Lines LLC, NYC Newco, Inc. and PRR Newco, Inc., is incorporated herein by reference to Exhibit 2.1 to Norfolk Southern Corporation's Form 8-K filed on September 2, 2004.

(cc) Amendment No. 5 to the Transaction Agreement, dated as of August 27, 2004, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation and CRR Holdings LLC, is incorporated herein by reference to Exhibit 10.1 to Norfolk Southern Corporation's Form 8-K filed on September 2, 2004.

(dd) Tax Allocation Agreement, dated as of August 27, 2004, by and among Green Acquisition Corp., Conrail Inc., Consolidated Rail Corporation, New York Central Lines LLC and Pennsylvania Lines LLC, is incorporated herein by reference to Exhibit 10.2 to Norfolk Southern Corporation's Form 8-K filed on September 2, 2004.

(ee) Credit Agreement dated as of August 31, 2004, between Norfolk Southern Corporation and various lenders, is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K/A filed on September 7, 2004.

(ff) Form of 2005 Incentive Stock Option and Non-Qualified Stock Option Agreement, as amended, under the Norfolk Southern Long-Term Incentive Plan is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K filed on January 7, 2005.

(gg) Form of 2005 Restricted Share Agreement, as amended, under the Norfolk Southern Corporation Long-Term Incentive Plan is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K filed on January 7, 2005.

(hh) Form of 2005 Performance Share Unit Award, as amended, under the Norfolk Southern Corporation Long-Term Incentive Plan is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K filed on January 7, 2005.

(ii) Form of 2005 Restricted Stock Unit Agreement, as amended, under the Norfolk Southern Corporation Restricted Stock Unit Plan is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K filed on January 7, 2005.

12 Statement re: Computation of Ratio of Earnings to Fixed Charges.

21 Subsidiaries of the Registrant.

23 Consent of Independent Registered Public Accounting Firm.

31 Rule 13a-14(a)/15d-14(a) Certifications.

32 Section 1350 Certifications.

99 Annual CEO Certification pursuant to NYSE Rule 303A.12(a).

(B) Reports on Form 8-K.

A report on Form 8-K was filed on November 23, 2004, advising that Performance-Based Compensation Committee of the Norfolk Southern Corporation Board of Directors approved the Form of 2005 Incentive Stock Option and Non-Qualified Stock Option Agreement, the Form of 2005 Restricted Share Agreement and Form of 2005 Performance Share Unit Award under the Norfolk Southern Corporation Long-Term Incentive Plan and the Form of 2005 restricted Stock Unit Agreement under the Norfolk Southern Corporation Restricted Stock Unit Plan, and attaching each as exhibits.

A report on Form 8-K/A was filed on November 12, 2004, amending the Corporation's Form 8-K previously filed on September 2, 2004, and describing the pro forma effects of the Conrail Corporate Reorganization on the Corporation's financial statements and attaching as an exhibit the following financial statements for Pennsylvania Lines LLC and its subsidiaries: Consolidated Statements of Income for the years ended December 31, 2003, 2002 and 2001; Consolidated Balance Sheets for the years ended December 31, 2003 and 2002; and Consolidated Statements of Cash Flows for the years ended December 31, 2003, 2002 and 2001; Report of Independent Registered Public Accounting Firm.

A report on Form 8-K was filed on October 22, 2004, advising of the Corporation's review of the Surface Transportation Board's decision in two pending rate cases brought by Duke Energy Corp. and Carolina Power & Light Company and attaching as an exhibit the related press release.

A report on Form 8-K was furnished on October 20, 2004, advising of the Corporation's third-quarter 2004 results and attaching as an exhibit the related press release, which included the following financial statements for the Corporation and its subsidiaries: Consolidated Statements of Income (Unaudited) for the three and nine months ended September 30, 2004 and 2003; Consolidated Balance Sheets (Unaudited) for September 30, 2004, and December 31, 2003; and Consolidated Statements of Cash Flows (Unaudited) for the nine months ended September 30, 2004 and 2003.

A report on Form 8-K was filed October 1, 2004, advising that the Corporation had announced a series of senior-level executive and organizational changes approved by its Board of Directors, including the election of a President, and attaching as an exhibit the related press release.

(C) Exhibits.

The Exhibits required by Item 601 of Regulation S-K as listed in Item 15(A)3 are filed herewith or incorporated herein by references.

(D) Financial Statement Schedules.

Financial statement schedules and separate financial statements specified by this Item are included in Item 15(A)2 or are otherwise not required or are not applicable.

## POWER OF ATTORNEY

Each person whose signature appears below under "SIGNATURES" hereby authorizes Henry C. Wolf, James A. Hixon and James A. Squires or any one of them, to execute in the name of each such person, and to file, any amendment to this report and hereby appoints Henry C. Wolf, James A. Hixon and James A. Squires or any one of them, as attorneys-in-fact to sign on his or her behalf, individually and in each capacity stated below, and to file, any and all amendments to this report.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, Norfolk Southern Corporation has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, on this 28th day of February, 2005.

**NORFOLK SOUTHERN CORPORATION**

By: /s/ David R. Goode
(David R. Goode,
Chairman and Chief Executive Officer)

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below on this 28th day of February, 2005, by the following persons on behalf of Norfolk Southern Corporation and in the capacities indicated.

| Signature | Title |
|---|---|
| /s/ David R. Goode<br>(David R. Goode) | Chairman and Chief Executive Officer and Director<br>(Principal Executive Officer) |
| /s/ Charles W. Moorman<br>(Charles W. Moorman) | President and Director |
| /s/ Henry C. Wolf<br>(Henry C. Wolf) | Vice Chairman and Chief Financial Officer<br>(Principal Financial Officer) |
| /s/ Marta R. Stewart<br>(Marta R. Stewart) | Vice President and Controller<br>(Principal Accounting Officer) |
| /s/ Gerald L. Baliles<br>(Gerald L. Baliles) | Director |

| | |
|---|---|
| /s/ Gene R. Carter<br>(Gene R. Carter) | Director |
| /s/ Alston D. Correll<br>(Alston D. Correll) | Director |
| /s/ Landon Hilliard<br>(Landon Hilliard) | Director |
| /s/ Burton M. Joyce<br>(Burton M. Joyce) | Director |
| /s/ Steven F. Leer<br>(Steven F. Leer) | Director |
| /s/ Jane Margaret O'Brien<br>(Jane Margaret O'Brien) | Director |
| /s/ Harold W. Pote<br>(Harold W. Pote) | Director |
| /s/ J. Paul Reason<br>(J. Paul Reason) | Director |

Schedule II

**Norfolk Southern Corporation and Subsidiaries**
**Valuation and Qualifying Accounts**
**Years Ended December 31, 2002, 2003 and 2004**
**(In millions of dollars)**

| | Beginning Balance | Additions charged to: Expenses | Additions charged to: Other Accounts | Deductions | Ending Balance |
|---|---|---|---|---|---|
| ***Year ended December 31, 2002*** | | | | | |
| Valuation allowance (included net in deferred tax liability) for deferred tax assets | $ 18 | $ 6 | $ -- | $ -- | $ 24 |
| Casualty and other claims included in other liabilities | $ 265 | $ 119 | $ 9[1] | $ 139[3] | $ 254 |
| Current portion of casualty and other claims included in accounts payable | $ 192 | $ 32 | $ 124[1] | $ 141[4] | $ 207 |
| ***Year ended December 31, 2003*** | | | | | |
| Valuation allowance (included net in deferred tax liability) for deferred tax assets | $ 24 | $ -- | $ -- | $ 2[2] | $ 22 |
| Casualty and other claims included in other liabilities | $ 254 | $ 134 | $ 6[1] | $ 124[3] | $ 270 |
| Current portion of casualty and other claims included in accounts payable | $ 207 | $ 34 | $ 125[1] | $ 148[4] | $ 218 |
| ***Year ended December 31, 2004*** | | | | | |
| Valuation allowance (included net in deferred tax liability) for deferred tax assets | $ 22 | $ -- | $ -- | $ 1[2] | $ 21 |
| Casualty and other claims included in other liabilities | $ 270 | $ 112 | $ 48[1] | $ 115[3] | $ 315 |
| Current portion of casualty and other claims included in accounts payable | $ 218 | $ 23 | $ 124[1] | $ 143[4] | $ 222 |

[1]Includes revenue refunds and overcharges provided through deductions from operating revenues and transfers from other accounts.

[2]Reclassifications to/from other assets.

[3]Payments and reclassifications to/from accounts payable.

[4]Payments and reclassifications to/from other liabilities.

## EXHIBIT INDEX

**NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES (NS)**

| Electronic Submission Exhibit Number | Description |
|---|---|
| 12 | Statement re: Computation of Ratio of Earnings to Fixed Charges. |
| 21 | Subsidiaries of Norfolk Southern Corporation. |
| 23 | Consent of Independent Registered Public Accounting Firm. |
| 31 | Rule 13a-14(a)/15d-14(a) Certifications. |
| 32 | Section 1350 Certifications. |
| 99 | Annual CEO Certification pursuant to NYSE Rule 303A.12(a). |

Exhibits 23, 31, 32 and 99 are included; remaining exhibits are not included in copies assembled for public dissemination. These exhibits are included in the 2004 Form 10-K posted on our website at www.nscorp.com under "Investors" and "SEC Filings" or you may request copies by writing to:

**Office of Corporate Secretary**
**Norfolk Southern Corporation**
**Three Commercial Place**
**Norfolk, Virginia 23510-9219**

# EXHIBIT PX0703

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549
**FORM 10-K**

(X) ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 For the fiscal year ended **DEC. 31, 2006**

( ) TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 For the transition period from _________ to _________

Commission file number 1-8339

**NORFOLK SOUTHERN CORPORATION**
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Virginia**<br>(State or other jurisdiction of incorporation) | **52-1188014**<br>(IRS Employer Identification No.) |
| **Three Commercial Place**<br>**Norfolk, Virginia**<br>(Address of principal executive offices) | **23510-2191**<br>Zip Code |
| Registrant's telephone number, including area code | **(757) 629-2680** |

**No Change**
(Former name, former address and former fiscal year, if changed since last report.)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each Class | Name of each exchange on which registered |
|---|---|
| **Norfolk Southern Corporation Common Stock (Par Value $1.00)** | **New York Stock Exchange** |

Securities registered pursuant to Section 12(g) of the Act: NONE

Indicate by checkmark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes (X) No ( )

Indicate by checkmark if the registrant is not required to file such reports pursuant to Section 13 or 15(d) of the Act. Yes ( ) No (X)

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or Section 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes (X) No ( )

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ( )

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act.
Large accelerated filer (X) Accelerated filer ( ) Non-accelerated filer ( )

Indicate by checkmark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ( ) No (X)

The aggregate market value of the voting common equity held by nonaffiliates as of June 30, 2006 was $22,023,555,376 (based on the closing price as quoted on the New York Stock Exchange on that date).

The number of shares outstanding of each of the registrant's classes of common stock, as of Jan. 31, 2007: 396,986,263(excluding 20,760,284 shares held by the registrant's consolidated subsidiaries).

**DOCUMENTS INCORPORATED BY REFERENCE:**

Portions of the Registrant's definitive proxy statement to be filed electronically pursuant to Regulation 14A not later than 120 days after the end of the fiscal year, are incorporated by reference in Part III.

## TABLE OF CONTENTS

## NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES (NS)


| | | | Page |
|---|---|---|---|
| Part I. | Items 1 and 2. | Business and Properties | K3 |
| | Item 1A. | Risk Factors | K11 |
| | Item 1B. | Unresolved Staff Comments | K14 |
| | Item 3. | Legal Proceedings | K14 |
| | Item 4. | Submission of Matters to a Vote of Security Holders | K14 |
| | | Executive Officers of the Registrant | K15 |
| Part II. | Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | K17 |
| | Item 6. | Selected Financial Data | K18 |
| | Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | K20 |
| | Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | K38 |
| | Item 8. | Financial Statements and Supplementary Data | K39 |
| | Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | K78 |
| | Item 9A. | Controls and Procedures | K78 |
| | Item 9B. | Other Information | K78 |
| Part III. | Item 10. | Directors, Executive Officers and Corporate Governance | K79 |
| | Item 11. | Executive Compensation | K79 |
| | Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | K79 |
| | Item 13. | Certain Relationships and Related Transactions, and Director Independence | K82 |
| | Item 14. | Principal Accountant Fees and Services | K82 |
| Part IV. | Item 15. | Exhibits and Financial Statement Schedules | K83 |
| | | Power of Attorney | K91 |
| | | Signatures | K91 |

# PART I

## NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES (NS)

**Item 1. Business. and Item 2. Properties.**

**GENERAL -** Norfolk Southern Corporation (Norfolk Southern) is a Norfolk, Virginia based company that controls a major freight railroad, Norfolk Southern Railway Company. Norfolk Southern Railway Company is primarily engaged in the rail transportation of raw materials, intermediate products and finished goods primarily in the Southeast, East and Midwest and, via interchange with rail carriers, to and from the rest of the United States and parts of Canada. Norfolk Southern also transports overseas freight through several Atlantic and Gulf Coast ports. Norfolk Southern provides comprehensive logistics services and offers the most extensive intermodal network in the eastern half of the United States. The common stock of Norfolk Southern is listed on the New York Stock Exchange (NYSE) under the symbol “NSC.”

Norfolk Southern was incorporated on July 23, 1980, under the laws of the Commonwealth of Virginia. On June l, 1982, Norfolk Southern acquired control of two major operating railroads, Norfolk and Western Railway Company (NW) and Southern Railway Company (Southern) in accordance with an Agreement of Merger and Reorganization dated as of July 31, 1980, and with the approval of the transaction by the Interstate Commerce Commission (now the Surface Transportation Board [STB]). Effective Dec. 31, 1990, Norfolk Southern transferred all the common stock of NW to Southern, and Southern's name was changed to Norfolk Southern Railway Company (Norfolk Southern Railway or NSR). Effective Sept. 1, 1998, NW was merged with and into Norfolk Southern Railway. As of Dec. 31, 2006, all the common stock of Norfolk Southern Railway was owned directly by Norfolk Southern.

Through a limited liability company, Norfolk Southern and CSX Corporation (CSX) jointly own Conrail Inc. (Conrail), whose primary subsidiary is Consolidated Rail Corporation (CRC). Norfolk Southern has a 58% economic and 50% voting interest in the jointly owned entity, and CSX has the remainder of the economic and voting interests. CRC owns and operates certain properties (the Shared Assets Areas) for the joint and exclusive benefit of NSR and CSX Transportation Inc. (CSXT). On June 1, 1999, NSR and CSXT began operating separate portions of Conrail’s rail routes and assets. On August 27, 2004, NS, CSX and Conrail completed a corporate reorganization of Conrail (Conrail Corporate Reorganization), which established direct ownership and control by NSR and CSXT of two former CRC subsidiaries, Pennsylvania Lines LLC and New York Central Lines LLC, respectively (see Note 4 to the Consolidated Financial Statements).

Norfolk Southern makes available free of charge through its website, www.nscorp.com, its annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and all amendments to those reports as soon as reasonably practicable after such material is electronically filed with or furnished to the Securities and Exchange Commission (SEC). In addition, the following documents are available on the company’s website and in print to any shareholder who requests them:

- Corporate Governance Guidelines
- Charters of the Committees of the Board of Directors
- Code of Ethics for employees
- Code of Ethical Conduct for Senior Financial Officers
- Categorical Independence Standards for Directors

Unless otherwise indicated, Norfolk Southern and its subsidiaries are referred to collectively as NS.

**RAILROAD OPERATIONS –** As of Dec. 31, 2006, NS' railroads operated approximately 21,000 miles of road in 22 eastern states, the District of Columbia and Ontario, Canada.

The system's lines reach many individual industries, electric generating facilities, mines (in western Virginia, eastern Kentucky, southern and northern West Virginia and western Pennsylvania), distribution centers, transload facilities and other businesses located in smaller communities in its service area.




Corridors with heaviest freight volume:

- New York City area to Chicago (via Allentown and Pittsburgh)
- Chicago to Macon (via Cincinnati, Chattanooga and Atlanta)
- Appalachian coal fields of Virginia, West Virginia and Kentucky to Norfolk and Sandusky, OH
- Cleveland to Kansas City
- Birmingham to Meridian
- Memphis to Chattanooga

The miles operated, which includes leased lines between Cincinnati, Ohio, and Chattanooga, Tennessee, and trackage rights over property owned by North Carolina Railway Company, were as follows:

**Mileage Operated as of Dec. 31, 2006**

| | Miles of Road | Second and Other Main Track | Passing Track, Crossovers and Turnouts | Way and Yard Switching | Total |
|---|---|---|---|---|---|
| Owned | 16,194 | 2,808 | 2,084 | 8,569 | 29,655 |
| Operated under lease, contract or trackage rights | 4,947 | 1,978 | 417 | 969 | 8,311 |
| Total | 21,141 | 4,786 | 2,501 | 9,538 | 37,966 |

**Triple Crown Operations** – Triple Crown Services Company (TCSC), NS' subsidiary, offers door-to-door intermodal service using RoadRailer® equipment and domestic containers. RoadRailer® units are enclosed vans that can be pulled over highways in tractor-trailer configuration and over the rails by locomotives. TCSC provides intermodal service in major traffic corridors, including those between the Midwest and the Northeast, the Midwest and the Southeast, and the Midwest and Texas.

The following table sets forth certain statistics relating to NS railroads' operations for the past 5 years:

**Rail Operating Statistics**

| | Years Ended Dec. 31, | | | | |
|---|---|---|---|---|---|
| | 2006 | 2005 | 2004 | 2003 | 2002 |
| Revenue ton miles (billions) | 204 | 203 | 198 | 183 | 179 |
| Freight train miles traveled (millions) | 84.2 | 81.2 | 77.7 | 73.9 | 72.6 |
| Revenue per ton mile | $0.0462 | $0.0421 | $0.0369 | $0.0353 | $0.0350 |
| Revenue ton miles per man-hour worked | 3,196 | 3,146 | 3,347 | 3,111 | 3,067 |
| Percentage ratio of railway operating expenses to railway operating revenues | 72.8% | 75.2% | 76.7% | 83.5%[1] | 81.5% |

[1]Includes $107 million of costs for a voluntary separation program, which added 1.6 percentage points to the ratio.

**RAILWAY OPERATING REVENUES** -- NS' total railway operating revenues were $9.4 billion in 2006. See the financial information by traffic segment in Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**COAL TRAFFIC** -- Coal, coke and iron ore -- most of which is bituminous coal -- is NS' railroads' largest commodity group as measured by revenues. The railroads handled a total of 190.6 million tons in 2006, most of which originated on NS' lines in West Virginia, Virginia, Pennsylvania and Kentucky. Revenues from coal, coke and iron ore accounted for about 25% of NS' total railway operating revenues in 2006.

Total coal handled through all system ports in 2006 was 33.8 million tons. Of this total, 10.8 million tons (including coastwise traffic) moved through Norfolk, Virginia, 2.4 million tons moved through the Baltimore Terminal, 13.0 million tons moved to various docks on the Ohio River, and 7.6 million tons moved to various

Lake Erie ports. Other than coal for export, virtually all coal handled by NS' railroads was terminated in states east of the Mississippi River.

See the discussion of coal traffic, by type of coal, in Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**GENERAL MERCHANDISE TRAFFIC -** General merchandise traffic is composed of five major commodity groupings: automotive; chemicals; metals and construction; agriculture, consumer products and government; and paper, clay and forest products. The automotive group includes finished vehicles for BMW, DaimlerChrysler, Ford Motor Company, General Motors, Honda, Isuzu, Jaguar, Land Rover, Mazda, Mercedes-Benz, Mitsubishi, Nissan, Saab, Subaru, Suzuki, Toyota and Volkswagen, and auto parts for Ford Motor Company, General Motors, Mercedes-Benz and Toyota. The chemicals group includes sulfur and related chemicals, petroleum products, chlorine and bleaching compounds, plastics, rubber, industrial chemicals, chemical wastes and municipal wastes. The metals and construction group includes steel, aluminum products, machinery, scrap metals, cement, aggregates, bricks and minerals. The agriculture, consumer products and government group includes soybeans, wheat, corn, fertilizer, animal and poultry feed, food oils, flour, beverages, canned goods, sweeteners, consumer products, ethanol and items for the military. The paper, clay and forest products group includes lumber and wood products, pulp board and paper products, wood fibers, wood pulp, scrap paper and clay.

In 2006, 147 million tons of general merchandise freight, or approximately 66% of total general merchandise tonnage handled by NS, originated online. The balance of general merchandise traffic was received from connecting carriers at interterritorial gateways. The principal interchange points for NS-received traffic included Chicago, Memphis, New Orleans, Cincinnati, Kansas City, Detroit, Hagerstown, St. Louis/East St. Louis and Louisville. General merchandise carloads handled in 2006 were 2.9 million, the revenue from which accounted for 54% of NS' total railway operating revenues in 2006.

See the discussion of general merchandise rail traffic by commodity group in Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**INTERMODAL TRAFFIC -** The intermodal market consists of shipments moving in trailers, domestic and international containers, and Roadrailer® equipment. These shipments are handled on behalf of intermodal marketing companies, international steamship lines, truckers and other shippers. Intermodal units handled in 2006 were 3.3 million, the revenues from which accounted for 21% of NS' total railway operating revenues for the year.

See the discussion of intermodal traffic in Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**FREIGHT RATES -** In 2006, NS' railroads continued their reliance on private contracts and exempt price quotes as their predominant pricing mechanisms. Thus, a major portion of NS' railroads' freight business is not currently economically regulated by the government. In general, market forces have been substituted for government regulation and now are the primary determinant of rail service prices.

In 2006, NS' railroads were found by the STB to be "revenue adequate" based on results for the year 2005. A railroad is "revenue adequate" under the applicable law when its return on net investment exceeds the rail industry's composite cost of capital. This determination is made pursuant to a statutory requirement.

**PASSENGER OPERATIONS**

- Regularly scheduled passenger trains are operated by Amtrak on NS' lines between the following locations:
  - Alexandria and New Orleans
  - Greensboro and Selma, North Carolina
  - Chicago, Illinois, and Detroit, Michigan
  - Chicago and Harrisburg, Pennsylvania
- Commuter trains are operated on the NS line between Manassas and Alexandria in accordance with contracts with two transportation commissions of the Commonwealth of Virginia
- NS leases the Chicago to Manhattan, Illinois, line to the Commuter Rail Division of the Regional Transportation Authority of Northeast Illinois
- NS provides freight service over lines with significant ongoing Amtrak and commuter passenger operations, and is conducting freight operations over some trackage owned by:
  - Amtrak
  - New Jersey Transit
  - Southeastern Pennsylvania Transportation Authority
  - Metro-North Commuter Railroad Company
  - Maryland DOT
- Passenger operations are conducted either by Amtrak or by the commuter agencies over trackage owned by Conrail in the Shared Assets Areas.

**NONCARRIER OPERATIONS -** NS' noncarrier subsidiaries engage principally in the acquisition, leasing and management of coal, oil, gas and minerals; the development of commercial real estate; telecommunications; and the leasing or sale of rail property and equipment. In 2006, no such noncarrier subsidiary or industry segment grouping of noncarrier subsidiaries met the requirements for a reportable business segment set forth in Statement of Financial Accounting Standards No. 131.

**RAILWAY PROPERTY**

The NS railroad system extends across 22 states, the District of Columbia and portions of Canada. The railroad infrastructure makes the company capital intensive with total property of approximately $21 billion.

**Capital Expenditures -** Capital expenditures for road, equipment and other property for the past five years were as follows (including capitalized leases):

**Capital Expenditures**

| | 2006 | 2005 | 2004 | 2003 | 2002 |
|---|---|---|---|---|---|
| | | | *($ in millions)* | | |
| Road | $ 756 | $ 741 | $ 612 | $ 502 | $ 521 |
| Equipment | 422 | 284 | 429 | 218 | 174 |
| Total | $ 1,178 | $ 1,025 | $ 1,041 | $ 720 | $ 695 |

Capital spending and maintenance programs are and have been designed to assure the ability to provide safe, efficient and reliable transportation services. For 2007, NS has budgeted $1.34 billion of capital spending. On May 1, 2006, NS and Kansas City Southern (KCS) formed a joint venture (MSLLC) pursuant to which NS intends to contribute $300 million in cash, substantially all of which will be used for capital improvements over a period of approximately three years, in exchange for a 30% interest in the joint venture. See the discussion following "Cash used for investing activities," in Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**Equipment -** As of Dec. 31, 2006, NS owned or leased the following units of equipment:

| | Number of Units | | | Capacity |
|---|---|---|---|---|
| | **Owned*** | **Leased**** | **Total** | **of Equipment** |
| Locomotives: | | | | (Horsepower) |
| Multiple purpose | 3,505 | 132 | 3,637 | 12,563,600 |
| Switching | 207 | -- | 207 | 303,700 |
| Auxiliary units | 74 | -- | 74 | -- |
| Total locomotives | 3,786 | 132 | 3,918 | 12,867,300 |
| Freight cars: | | | | (Tons) |
| Hopper | 18,839 | 808 | 19,647 | 2,086,249 |
| Box | 17,555 | 2,346 | 19,901 | 1,590,557 |
| Covered hopper | 9,042 | 3,019 | 12,061 | 1,317,822 |
| Gondola | 29,806 | 8,283 | 38,089 | 4,093,356 |
| Flat | 2,708 | 1,336 | 4,044 | 316,712 |
| Caboose | 191 | -- | 191 | -- |
| Other | 4,028 | 20 | 4,048 | 303,650 |
| Total freight cars | 82,169 | 15,812 | 97,981 | 9,708,346 |
| Other: | | | | |
| Work equipment | 5,337 | 3 | 5,340 | |
| Vehicles | 3,547 | -- | 3,547 | |
| Highway trailers and containers | 184 | 11,496 | 11,680 | |
| RoadRailer® | 6,828 | 192 | 7,020 | |
| Miscellaneous | 1,356 | 18,686 | 20,042 | |
| Total other | 17,252 | 30,377 | 47,629 | |

* Includes equipment leased to outside parties and equipment subject to equipment trusts, conditional sale agreements and capitalized leases.
** Includes 6,437 freight cars leased from CRC.

The following table indicates the number and year built for locomotives and freight cars owned at Dec. 31, 2006.

| | Year Built | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **2006** | **2005** | **2004** | **2003** | **2002** | **1995-2001** | **1990-1994** | **1989 & Before** | **Total** |
| Locomotives: | | | | | | | | | |
| No. of units | 143 | 89 | 207 | 100 | --* | 1,073 | 395 | 1,779 | 3,786 |
| % of fleet | 4% | 2% | 5% | 3% | --% | 28% | 11% | 47% | 100% |
| Freight cars: | | | | | | | | | |
| No. of units | 404 | 89 | -- | -- | -- | 6,536 | 5,065 | 70,075 | 82,169 |
| % of fleet | 1% | --% | --% | --% | --% | 8% | 6% | 85% | 100% |

*Fifty of the locomotives built in 2001 were purchased in 2002.

The following table shows the average age of NS' locomotive and freight car fleets at Dec. 31, 2006, and the number of retirements in 2006:

| | Locomotives | Freight Cars |
|---|---|---|
| Average age – in service | 17.7 years | 30.0 years |
| Retirements | 2 units | 2,520 units |
| Average age – retired | 35.0 years | 38.7 years |

Between 1988 and 2000, about 29,000 coal cars were rebodied. As a result, the remaining serviceability of the freight car fleet is greater than may be inferred from the high percentage of freight cars built in earlier years.

**Annual Average Bad Order Ratio**

| | 2006 | 2005 | 2004 | 2003 | 2002 |
|---|---|---|---|---|---|
| Freight cars | 6.4% | 6.3% | 7.4% | 7.4% | 8.1% |
| Locomotives | 5.7% | 6.2% | 6.3% | 6.2% | 6.3% |

Ongoing freight car and locomotive maintenance programs are intended to ensure the highest standards of safety, reliability, customer satisfaction and equipment marketability. The declines in 2006, 2005 and 2003 reflected an increase in maintenance activity as well as the retirement of unserviceable units. The locomotive bad order ratio includes units out of service for required inspections every 92 days and program work such as overhauls.

**Encumbrances -** Certain railroad equipment is subject to the prior lien of equipment financing obligations amounting to approximately $534 million as of Dec. 31, 2006, and $650 million as of Dec. 31, 2005.

**Track Maintenance -** Of the approximately 38,000 total miles of track operated, NS had responsibility for maintaining about 30,000 miles of track with the remainder being operated under trackage rights.

Over 75% of the main line trackage (including first, second, third and branch main tracks, all excluding trackage rights) has rail ranging from 131 to 155 pounds per yard with the standard installation currently at 136 pounds per yard. Approximately 45% of NS lines carried 20 million or more gross tons per track mile during 2006.

The following table summarizes several measurements regarding NS' track roadway additions and replacements during the past five years:

| | 2006 | 2005 | 2004 | 2003 | 2002 |
|---|---|---|---|---|---|
| Track miles of rail installed | 327 | 302 | 246 | 233 | 235 |
| Miles of track surfaced | 4,871 | 4,663 | 5,055 | 5,105 | 5,270 |
| New crossties installed (millions) | 2.7 | 2.5 | 2.5 | 2.8 | 2.8 |

**Microwave System -** The NS microwave system, consisting of approximately 7,400 radio route miles, 424 core stations, 14 secondary stations and 5 passive repeater stations, provides communications between most operating locations. The microwave system is used primarily for voice communications, VHF radio control circuits, data and facsimile transmissions, traffic control operations and AEI data transmissions.

**Traffic Control -** Of the approximately 16,200 route miles owned by NS, about 11,000 miles are signalized, including 8,000 miles of centralized traffic control (CTC) and 3,000 miles of automatic block signals. Of the 8,000 miles of CTC, approximately 3,000 miles are controlled by data radio originating at 244 base station radio sites.

**Computers -** A computer network consisting of a centralized data center in Atlanta, Georgia, and various distributed computers throughout the company connects the yards, terminals, transportation offices, rolling stock repair points, sales offices and other key system locations. Operating and traffic data are processed and stored to provide customers with information on their shipments throughout the system. Computer systems provide current information on the location of every train and each car on line, as well as related waybill and other train and car movement data. In addition, the computer systems are utilized to assist management in the performance of a variety of functions and services including payroll, car and revenue accounting, billing, material management activities and controls, and special studies.

**ENVIRONMENTAL MATTERS -** Compliance with federal, state and local laws and regulations relating to the protection of the environment is a principal NS goal. To date, such compliance has not affected materially NS' capital additions, earnings, liquidity or competitive position. See "Legal Proceedings," Part I, Item 3; "Personal Injury, Environmental and Legal Liabilities" in Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations;" and Note 17 to the Consolidated Financial Statements.

**EMPLOYEES –** The following table shows the average number of employees and the average cost per employee for wages and benefits:

| | 2006 | 2005 | 2004 | 2003 | 2002 |
|---|---|---|---|---|---|
| Average number of employees | 30,541 | 30,294 | 28,475 | 28,753 | 28,970 |
| Average wage cost per employee | $62,000 | $61,000 | $59,000 | $58,000 | $54,000 |
| Average benefit cost per employee | $32,000 | $29,000 | $28,000 | $28,000 | $24,000 |

Approximately 85% of NS' railroad employees are covered by collective bargaining agreements with various labor unions. See the discussion of "Labor Agreements" in Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**GOVERNMENT REGULATION -** In addition to environmental, safety, securities and other regulations generally applicable to all businesses, NS' railroads are subject to regulation by the STB. The STB has jurisdiction over some rates, routes, conditions of service and the extension or abandonment of rail lines. The STB also has jurisdiction over the consolidation, merger or acquisition of control of and by rail common carriers. The Federal Railroad Administration regulates certain track and mechanical equipment standards.

The relaxation of economic regulation of railroads, begun over two decades ago under the Staggers Rail Act of 1980, has continued. Significant exemptions are TOFC/COFC (i.e., "piggyback") business, rail boxcar traffic, lumber, manufactured steel, automobiles and certain bulk commodities such as sand, gravel, pulpwood and wood chips for paper manufacturing. Transportation contracts on regulated shipments effectively remove those shipments from regulation as well for the duration of the contract. About 84% of NS' freight revenues come from either exempt traffic or traffic moving under transportation contracts.

Efforts may be made in 2007 to re-subject the rail industry to unwarranted federal economic regulation. The Staggers Rail Act of 1980, which substantially reduced such regulation, encouraged and enabled rail carriers to innovate and to compete for business, thereby contributing to the economic health of the nation and to the revitalization of the industry. Accordingly, NS will oppose efforts to reimpose unwarranted economic regulation.

**COMPETITION -** There is continuing strong competition among rail, water and highway carriers. Price is usually only one factor of importance as shippers and receivers choose a transport mode and specific hauling company. Inventory carrying costs, service reliability, ease of handling and the desire to avoid loss and damage

during transit are also important considerations, especially for higher-valued finished goods, machinery and consumer products. Even for raw materials, semifinished goods and work-in-process, users are increasingly sensitive to transport arrangements that minimize problems at successive production stages.

NS' primary rail competitor is the CSX system; both operate throughout much of the same territory. Other railroads also operate in parts of the territory. NS also competes with motor carriers, water carriers and with shippers who have the additional option of handling their own goods in private carriage.

Certain marketing strategies among railroads and between railroads and motor carriers enable carriers to compete more effectively in specific markets.

**Item 1A. Risk Factors.**

**NS is subject to significant governmental regulation and legislation over commercial, environmental and operating matters.** Railroads are subject to commercial regulation by the Surface Transportation Board, which has jurisdiction over some rates, routes, fuel surcharges, conditions of service and the extension or abandonment of rail lines. The STB also has jurisdiction over the consolidation, merger or acquisition of control of and by rail common carriers. Occasional efforts are made to re-subject the rail industry to unwarranted federal economic regulation. In addition, Congress could enact re-regulation legislation. Economic re-regulation of the rail industry could have a significant negative impact on NS' ability to determine prices for rail services, reduce capital spending on its rail network, and result in a material adverse effect on NS' financial position, results of operations or liquidity in a particular year or quarter.

NS' operations are subject to extensive federal, state, and local environmental laws and regulations concerning, among other things, emissions to the air; discharges to water ways or ground water supplies; handling, storage, transportation, and disposal of waste and other materials; and the cleanup of hazardous material or petroleum releases. The risk of incurring environmental liability – for acts and omissions, past, present and future – is inherent in the railroad business. Several of NS' subsidiaries own, or have owned, land used as operating property or held for sale, or which is leased or may have been leased and operated by others. Environmental problems that are latent or undisclosed may exist on these properties, and NS could incur environmental liabilities or costs, the amount and materiality of which cannot be estimated reliably at this time, with respect to one or more of these properties. Moreover, lawsuits and claims involving other unidentified environmental sites and matters are likely to arise from time to time, and the resulting liabilities could have a significant effect on financial position, results of operations or liquidity in a particular year or quarter.

The Federal Railroad Administration regulates a host of operations matters including track and mechanical equipment standards; signaling systems; testing and inspection of grade crossing warning devices, hours of service of operating employees; drug and alcohol testing; locomotive engineer certification; and reporting of employee injuries, among other areas. NS' unintentional failure to comply with applicable laws and regulations could have a material adverse effect on NS, and changes in the legislative or regulatory frameworks within which NS operates could adversely affect its business.

**NS, as a common carrier by rail, must offer to transport hazardous materials, regardless of risk.** Transportation of certain hazardous materials could create catastrophic losses in terms of personal injury and property damage costs, and compromise critical parts of our rail network. Legislation introduced in Congress in early 2005 would give federal regulators increased authority to conduct investigations and levy substantial fines and penalties in connection with railroad accidents. Federal regulators also would be required to prescribe new regulations governing railroads' transportation of hazardous materials. Legislation proposed in 2006 would require the Department of Homeland Security (DHS) to develop rail security plans and the railroads to submit vulnerability assessments, security plans and employee training programs to DHS for approval. If enacted, such legislation and regulations could impose significant additional costs on railroads. Regulations proposed in late 2006 by DHS mandating chain of custody and security measures likely will cause service degradation and higher

costs for the transportation of toxic inhalation hazard materials. Further, certain local governments have sought to enact ordinances banning hazardous materials moving by rail within their borders. Some legislators have contemplated pre-notification requirements for hazardous materials shipments. If promulgated such ordinances could require the re-routing of hazardous materials shipments, with the potential for significant additional costs and network inefficiencies.

**NS may be affected by terrorism or war.** Any terrorist attack, or other similar event, any government response thereto, and war or risk of war could cause significant business interruption and may adversely affect NS' results of operations, financial position, and liquidity. Because NS plays a critical role in the nation's transportation system, it could become the target of such an attack or have a significant role in the government's preemptive approach or response to an attack or war.

Although NS currently maintains insurance coverage for third-party liability arising out of war and acts of terrorism, it maintains only limited insurance coverage for first-party property damage and damage to property in NS' care, custody or control caused by certain acts of terrorism. In addition, premiums for some or all of NS' current insurance programs covering these losses could increase dramatically, or insurance coverage for certain losses may not be available to NS in the future.

**NS may be affected by general economic conditions.** Prolonged negative changes in domestic and global economic conditions affecting the producers and consumers of the commodities NS carries may have an adverse effect on its operating results, financial position, and liquidity. Economic conditions resulting in bankruptcies of one or more large customers could have a significant impact on NS' financial position, results of operations or liquidity in a particular year or quarter.

**NS faces competition from other transportation providers.** NS is subject to competition from motor carriers, railroads, and to a lesser extent, ships, barges, and pipelines, on the basis of transit time, pricing, and the quality and reliability of service. While NS has used primarily internal resources to build or acquire and maintain its rail system, trucks and barges have been able to use public rights-of-way maintained by public entities. Any future improvements or expenditures materially increasing the quality or reducing the cost of alternative modes of transportation in the regions in which NS operates, or legislation granting materially greater latitude for motor carriers with respect to size or weight limitations, could have a material adverse effect on its financial position, results of operations or liquidity in a particular year or quarter.

**The operations of carriers with which NS interchanges may adversely affect its operations.** NS' ability to provide rail service to customers in the U.S. and Canada depends in large part upon its ability to maintain cooperative relationships with connecting carriers with respect to, among other matters, freight rates, revenue divisions, car supply, reciprocal switching, interchange, trackage rights and locomotive availability. Deterioration in the operations of, or service provided by connecting carriers, or in our relationship with those connecting carriers, could result in NS' inability to meet its customers' demands or require NS to use alternate train routes, which could result in significant additional costs and network inefficiencies.

**NS relies on technology and technology improvements in its business operations.** If NS experiences significant disruption or failure of one or more of its information technology systems, including computer hardware, software, and communications equipment, NS could experience a service interruption, security breach, or other operational difficulties, which could have a material adverse impact on its results of operations, financial condition, and liquidity. Additionally, if NS does not have sufficient capital to acquire new technology or if it is unable to implement new technology, NS may suffer a competitive disadvantage within the rail industry and with companies providing other modes of transportation service, which could have a material adverse effect on its financial position, results of operations or liquidity in a particular year or quarter.

**The vast majority of NS employees belong to labor unions, and labor agreements, strikes, or work stoppages could adversely affect its operations.** Approximately 26,000, or about 85%, of NS railroad

employees are covered by collective bargaining agreements with various labor unions. If unionized workers were to engage in a strike, work stoppage, or other slowdown, NS could experience a significant disruption of its operations. Additionally, future national labor agreements, or renegotiation of labor agreements or provisions of labor agreements, could significantly increase NS' costs for healthcare, wages, and other benefits. Any of these factors could have a material adverse impact on NS' financial position, results of operations or liquidity in a particular year or quarter.

**NS may be subject to various claims and lawsuits that could result in significant expenditures.** The nature of NS' business exposes it to the potential for various claims and litigation related to labor and employment, personal injury, freight loss and other property damage, and other matters. Job-related personal injury and occupational claims are subject to the Federal Employers' Liability Act (FELA), which is applicable only to railroads. FELA's fault-based tort system produces results that are unpredictable and inconsistent as compared with a no-fault worker's compensation system. The variability inherent in this system could result in actual costs being very different from the liability recorded.

Any material changes to current litigation trends or a catastrophic rail accident involving any or all of freight loss or property damage, personal injury, and environmental liability could have a material adverse effect on NS' operating results, financial condition, and liquidity to the extent not covered by insurance. NS has obtained insurance for potential losses for third-party liability and first-party property damages. Specified levels of risk are retained on a self-insurance basis (currently up to $25 million per occurrence for bodily injury and property damage to third parties and $25 million per occurrence for property owned by NS or in its care, custody or control). Insurance is available from a limited number of insurers and may not continue to be available or, if available, may not be obtainable on terms acceptable to NS.

**Severe weather could result in significant business interruptions and expenditures.** Severe weather conditions and other natural phenomena, including hurricanes and floods, may cause significant business interruptions and result in increased costs, increased liabilities, and decreased revenues, which could have an adverse effect on NS' financial position, results of operations or liquidity in a particular year or quarter.

**Unpredictability of demand for rail services resulting in the unavailability of qualified personnel could adversely affect NS' operational efficiency and ability to meet demand.** Workforce demographics, training requirements, and the availability of qualified personnel, particularly engineers and trainmen, could each have a negative impact on NS' ability to meet demand for rail service. Unpredictable increases in demand for rail services may exacerbate such risks, which could have a negative impact on NS' operational efficiency and otherwise have a material adverse effect on its financial position, results of operations or liquidity in a particular year or quarter.

**NS may be affected by supply constraints resulting from disruptions in the fuel markets or the nature of some of its supplier markets.** NS consumes over 500 million gallons of diesel fuel each year. Fuel availability could be affected by any limitation in the fuel supply or by any imposition of mandatory allocation or rationing regulations. If a severe fuel supply shortage arose from production curtailments, disruption of oil imports, disruption of domestic refinery production, damage to refinery or pipeline infrastructure, political unrest, war or otherwise, NS' financial position, results of operations or liquidity in a particular year or quarter could be affected. Also, such an event would impact NS as well as its customers and other transportation companies.

Due to the capital intensive nature and industry-specific requirements of the rail industry, there are high barriers of entry for potential new suppliers of core railroad items, such as locomotives and rolling stock equipment. Additionally, NS competes with other industries for available capacity and raw materials used in the production of certain track materials, such as rail and ties. Changes in the competitive landscapes of these limited-supplier markets could result in increased prices or material shortages that could materially affect NS' financial position, results of operations or liquidity in a particular year or quarter.

**Item 1B. Unresolved Staff Comments.**

NS has no unresolved SEC staff comments.

**Item 3. Legal Proceedings.**

On Oct. 19, 2006, the Pennsylvania Department of Environmental Protection (PDEP) issued an assessment of civil penalties against NS and filed a complaint for civil penalties with the Pennsylvania Environmental Hearing Board (EHB) requesting that the EHB impose civil penalties upon NS for alleged violations of state environmental laws and regulations resulting from a discharge of sodium hydroxide which occurred as a result of the derailment of a NS train in Norwich Township, Pennsylvania, on June 30, 2006. The PDEP's actions seek to impose combined penalties of $8,890,000 for alleged past violations and $46,420 per day for alleged ongoing violations of state environmental laws and regulations. NS believes that the monetary penalties sought by the PDEP are excessive. Accordingly, NS intends to vigorously defend the action and has appealed the fines to the EHB. In addition, NS expects the Pennsylvania Fish and Boat Commission to impose a monetary penalty on NS for damages alleged to have been caused by this accident. NS does not believe that the outcome of these proceedings will have a material effect on its financial position, results of operations, or liquidity.

**Item 4. Submission of Matters to a Vote of Security Holders.**

There were no matters submitted to a vote of security holders during the fourth quarter of 2006.

**Executive Officers of the Registrant.**

Norfolk Southern's executive officers generally are elected and designated annually by the Board of Directors at its first meeting held after the annual meeting of stockholders, and they hold office until their successors are elected. Executive officers also may be elected and designated throughout the year as the Board of Directors considers appropriate. There are no family relationships among the officers, nor any arrangement or understanding between any officer and any other person pursuant to which the officer was selected. The following table sets forth certain information, as of January 31, 2007, relating to the executive officers.

| Name, Age, Present Position | Business Experience During Past Five Years |
|---|---|
| Charles W. Moorman, 54, Chairman, President and Chief Executive Officer | Present position since February 1, 2006. Served as President and Chief Executive Officer from November 1, 2005 to February 1, 2006; as President from October 1, 2004 to November 1, 2005; as Senior Vice President – Corporate Planning and Services from December 1, 2003 to October 1, 2004; Senior Vice President – Corporate Services from February 1, 2003 to December 1, 2003; also served as President – Thoroughbred Technology and Telecommunications, Inc. since October 1999 and prior thereto was Vice President – Information Technology. |
| Stephen C. Tobias, 62, Vice Chairman and Chief Operating Officer | Present position since August 1998. |
| Henry C. Wolf, 64, Vice Chairman and Chief Financial Officer | Present position since August 1998. |
| James A. Hixon, 53, Executive Vice President – Law and Corporate Relations | Present position since October 1, 2005. Served as Executive Vice President – Finance and Public Affairs From October 1, 2004, to October 1, 2005; Senior Vice President – Legal and Government Affairs from December 1, 2003 to October 1, 2004; Senior Vice President – Administration from February 1, 2001 to December 1, 2003; and prior thereto was Senior Vice President – Employee Relations. |
| Mark D. Manion, 54, Executive Vice President – Operations | Present position since October 1, 2004. Served as Senior Vice President – Transportation Operations from December 1, 2003 to October 1, 2004; Vice President – Transportation Services and Mechanical from February 1, 2001 to December 1, 2003; and prior thereto was Vice President – Mechanical. |
| Kathryn B. McQuade, 50, Executive Vice President – Planning and Chief Information Officer | Present position since October 1, 2004. Served as Senior Vice President – Finance from December 1, 2003 to October 1, 2004; and prior thereto was Senior Vice President – Financial Planning. |

| | |
|---|---|
| John P. Rathbone, 54,<br>Executive Vice President –<br>Administration | Present position since October 1, 2004.<br>Served as Senior Vice President – Administration from December 1, 2003 to October 1, 2004; Senior Vice President and Controller from April 2000 to December 1, 2003 and prior thereto was Vice President and Controller. |
| Donald W. Seale, 54,<br>Executive Vice President<br>and Chief Marketing Officer | Present position since April 1, 2006.<br>Served as Executive Vice President – Sales and Marketing from October 1, 2004 to April 1, 2006; as Senior Vice President - Marketing Services from December 1, 2003 to October 1, 2004; and prior thereto was Senior Vice President – Merchandise Marketing. |
| Daniel D. Smith, 54,<br>Senior Vice President –<br>Energy and Properties | Present position since December 1, 2003.<br>Served as President- NS Development from February 1, 2001 to December 1, 2003. |
| James A. Squires, 45,<br>Senior Vice President –<br>Financial Planning | Present position since April 1, 2006.<br>Served as Senior Vice President – Law from October 1, 2004 to April 1, 2006; as Vice President – Law from December 1, 2003 to October 1, 2004; Senior General Counsel from February 1, 2002 to December 1, 2003; and prior thereto was General Counsel. |
| Marta R. Stewart, 49,<br>Vice President and Controller | Present position since December 1, 2003.<br>Prior thereto was Assistant Vice President Corporate Accounting. |

## PART II

## NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES (NS)

## Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities.

### NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES
### STOCK PRICE AND DIVIDEND INFORMATION

The Common Stock of Norfolk Southern Corporation, owned by 38,900 stockholders of record as of Dec. 31, 2006, is traded on the New York Stock Exchange with the symbol NSC. The following table shows the high and low sales prices as reported by Bloomberg L.P. on its internet-based service and dividends per share, by quarter, for 2006 and 2005.

| | Quarter | | | |
|---|---|---|---|---|
| **2006** | **1st** | **2nd** | **3rd** | **4th** |
| Market price | | | | |
| High | $ 54.93 | $ 57.71 | $ 54.00 | $ 55.07 |
| Low | 41.22 | 46.17 | 39.10 | 42.80 |
| Dividends per share | $ 0.16 | $ 0.16 | $ 0.18 | $ 0.18 |
| **2005** | **1st** | **2nd** | **3rd** | **4th** |
| Market price | | | | |
| High | $ 38.99 | $ 37.78 | $ 40.93 | $ 45.81 |
| Low | 33.21 | 29.60 | 30.70 | 38.01 |
| Dividends per share | $ 0.11 | $ 0.11 | $ 0.13 | $ 0.13 |

### ISSUER PURCHASES OF EQUITY SECURITIES

| Period | (a) Total Number of Shares (or Units) Purchased | (b) Average Price Paid per Share (or Unit) | (c) Total Number of Shares (or Units) Purchased as Part of Publicly Announced Plans or Programs(2) | (d) Maximum Number (or Approximate Dollar Value) of Shares (or Units) that may yet be Purchased Under the Plans or Programs(2) |
|---|---|---|---|---|
| Oct. 1-31, 2006 | 985,889 | $46.09 | 983,995 | 28,279,067 |
| Nov. 1-30, 2006 | 1,889 | $52.96 | -- | 28,279,067 |
| Dec. 1-31, 2006 | 53,239 | $49.56 | 51,500 | 28,227,567 |
| Total | 1,041,017(1) | $46.28 | | |

(1) Of this amount 5,522 represent shares tendered by employees in connection with the exercise of stock options under the Long-Term Incentive Plan.

(2) On Nov. 22, 2005, the Board of Directors authorized a share repurchase program, pursuant to which up to 50 million of the NS' common stock may be purchased through Dec. 31, 2015.

**Item 6. Selected Financial Data.**

**NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES**
**FIVE-YEAR FINANCIAL REVIEW 2002-2006**

| | 2006 | 2005[1] | 2004[2] | 2003[3] | 2002 |
|---|---|---|---|---|---|
| | | *($ in millions, except per share amounts)* | | | |
| **RESULTS OF OPERATIONS** | | | | | |
| Railway operating revenues | $ 9,407 | $ 8,527 | $ 7,312 | $ 6,468 | $ 6,270 |
| Railway operating expenses | 6,850 | 6,410 | 5,610 | 5,404 | 5,112 |
| Income from railway operations | 2,557 | 2,117 | 1,702 | 1,064 | 1,158 |
| Other income – net | 149 | 74 | 76 | 19 | 66 |
| Interest expense on debt | 476 | 494 | 489 | 497 | 518 |
| Income from continuing operations before income taxes and accounting changes | 2,230 | 1,697 | 1,289 | 586 | 706 |
| Provision for income taxes | 749 | 416 | 379 | 175 | 246 |
| Income from continuing operations before accounting changes | 1,481 | 1,281 | 910 | 411 | 460 |
| Discontinued operations[4] | -- | -- | -- | 10 | -- |
| Cumulative effect of changes in accounting principles, net of taxes[5] | -- | -- | -- | 114 | -- |
| Net income | $ 1,481 | $ 1,281 | $ 910 | $ 535 | $ 460 |
| **PER SHARE DATA** | | | | | |
| Income from continuing operations before accounting changes – basic | $ 3.63 | $ 3.17 | $ 2.31 | $ 1.05 | $ 1.18 |
| – diluted | $ 3.57 | $ 3.11 | $ 2.28 | $ 1.05 | $ 1.18 |
| Net income – basic | $ 3.63 | $ 3.17 | $ 2.31 | $ 1.37 | $ 1.18 |
| – diluted | $ 3.57 | $ 3.11 | $ 2.28 | $ 1.37 | $ 1.18 |
| Dividends | $ 0.68 | $ 0.48 | $ 0.36 | $ 0.30 | $ 0.26 |
| Stockholders' equity at year end | $ 24.19 | $ 22.63 | $ 19.92 | $ 17.83 | $ 16.71 |
| **FINANCIAL POSITION** | | | | | |
| Total assets | $ 26,028 | $ 25,859 | $ 24,748 | $ 20,596 | $ 19,956 |
| Total long-term debt, including current maturities[6] | $ 6,600 | $ 6,930 | $ 7,525 | $ 7,160 | $ 7,364 |
| Stockholders' equity | $ 9,615 | $ 9,276 | $ 7,977 | $ 6,976 | $ 6,500 |
| **OTHER** | | | | | |
| Capital expenditures | $ 1,178 | $ 1,025 | $ 1,041 | $ 720 | $ 695 |
| Average number of shares outstanding (thousands) | 405,988 | 404,170 | 394,201 | 389,788 | 388,213 |
| Number of stockholders at year end | 38,900 | 48,180 | 51,032 | 52,091 | 51,418 |
| Average number of employees: | | | | | |
| Rail | 30,079 | 29,851 | 28,057 | 28,363 | 28,587 |
| Nonrail | 462 | 443 | 418 | 390 | 383 |
| Total | 30,541 | 30,294 | 28,475 | 28,753 | 28,970 |

[1] 2005 provision for income taxes includes a $96 million benefit related to the reduction of NS' deferred income tax liabilities resulting from tax legislation enacted by Ohio. This benefit increased net income by $96 million, or 23 cents per diluted share.

[2] 2004 other income – net includes a $40 million net gain from the Conrail Corporate Reorganization. This gain increased net income by $40 million or 10 cents per diluted share.

[3] 2003 operating expenses include a $107 million charge for a voluntary separation program. Other income – net includes an $84 million charge to recognize the impaired value of certain telecommunications assets. These charges reduced net income by $119 million, or 30 cents per diluted share.

[4] NS sold all the common stock of its motor carrier subsidiary, North American Van Lines, Inc. in 1998. Results in 2003 include an additional after-tax gain of $10 million, or 3 cents per diluted share, resulting from resolution of tax issues related to the transaction.

[5] Net income in 2003 reflects two accounting changes, the cumulative effect of which increased net income by $114 million, or 29 cents per diluted share: a change in accounting for the cost to remove railroad crossties, which increased net income by $110 million, and a change in accounting related to a special-purpose entity that leases certain locomotives to NS, which increased net income by $4 million.

[6] Excludes notes payable to Conrail of $716 million in 2003 and $513 million in 2002.

See accompanying Consolidated Financial Statements and notes thereto.

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations.**

**Norfolk Southern Corporation and Subsidiaries**
**Management's Discussion and Analysis of**
**Financial Condition and Results of Operations**

The following discussion and analysis should be read in conjunction with the Consolidated Financial Statements and Notes and the Selected Financial Data.

## OVERVIEW

NS' 2006 results reflect substantial increases in revenues (up $880 million, or 10%) resulting primarily from higher pricing, including increased fuel surcharges. Traffic volume in 2006 rose modestly as increases in the first half of the year were largely offset by declines in the second half, particularly during the fourth quarter. Operating expenses rose 7%, resulting in a 21% improvement in income from railway operations and a lower operating ratio (a measure of the amount of operating revenues consumed by operation expenses) of 72.8% compared with 75.2% in 2005.

Higher operating income for the year translated into increased cash flows, which, combined with substantial proceeds from employee stock option exercises, were used to fund increased capital expenditures, purchase and retire common stock, increase dividends and pay maturing debt. At Dec. 31, 2006, the cash and short-term investment balance was $918 million. Looking ahead, NS expects revenue increases to continue but at a more moderate pace, reflecting lower volume growth and comparison with a strong 2006. NS plans to continue its focus on improving service levels and maintaining a market-based approach to pricing. Approximately one-half of NS' revenue base is subject to renegotiation or repricing in 2007.

During 2006, NS purchased and retired 21.8 million shares of common stock at a total cost of $964 million under the share repurchase program approved by the Board of Directors on Nov. 22, 2005. Under the program, the Board has authorized the repurchase of up to 50 million shares of NS common stock through Dec. 31, 2015.

## SUMMARIZED RESULTS OF OPERATIONS

### 2006 Compared with 2005

Net income in 2006 was $1.5 billion, or $3.57 per diluted share, up $200 million, or 16%, compared with $1.3 billion, or $3.11 per diluted share, in 2005. The increase in net income was primarily due to higher income from railway operations, offset in part by the absence of the $96 million income tax benefit recorded in 2005 because of Ohio tax law changes (see Note 3). Railway operating revenues increased $880 million, reflecting higher rates, including fuel surcharges that accounted for about 40% of the increase and modestly higher traffic volume. Railway operating expenses rose $440 million, or 7%, principally due to higher diesel fuel prices and increased compensation and benefit costs.

### 2005 Compared with 2004

Net income in 2005 was $1.3 billion, or $3.11 per diluted share, up $371 million, or 41%, compared with $910 million, or $2.28 per diluted share, in 2004. Results in 2005 reflected a $96 million second quarter income tax benefit related to Ohio tax law changes (see Note 3), while results in 2004 included a $40 million net gain related to the Conrail Corporate Reorganization (see Note 4). The remaining $315 million increase in net income was primarily due to higher income from railway operations. Railway operating revenues increased $1.2 billion, reflecting higher rates (including the favorable effects of the coal rate cases settled in the second quarter – see

below), fuel surcharges and increased traffic volume. Railway operating expenses rose $800 million, or 14%, principally due to higher diesel fuel prices, increased volume-related expenses and casualty claims costs.

## DETAILED RESULTS OF OPERATIONS

### Railway Operating Revenues

Railway operating revenues were $9.4 billion in 2006, $8.5 billion in 2005 and $7.3 billion in 2004. The following table presents a three-year comparison of revenues, volume and average revenue per unit by market group (prior period amounts for the chemicals, agriculture/consumer products/government and paper/clay/forest groups have been reclassified to conform to the current year presentation).

| | Revenues | | | Units | | | Revenue per Unit | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2006 | 2005 | 2004 | 2006 | 2005 | 2004 | 2006 | 2005 | 2004 |
| | | *($ in millions)* | | | *(in thousands)* | | | *($ per unit)* | |
| Coal | $ 2,330 | $ 2,115 | $ 1,728 | 1,760.0 | 1,735.4 | 1,690.8 | $ 1,324 | $ 1,219 | $ 1,022 |
| General merchandise: | | | | | | | | | |
| Metals/construction | 1,168 | 978 | 818 | 835.3 | 794.2 | 781.1 | 1,398 | 1,231 | 1,048 |
| Chemicals | 1,079 | 978 | 868 | 426.4 | 442.1 | 444.7 | 2,530 | 2,212 | 1,953 |
| Agr./cons. prod./govt. | 994 | 832 | 716 | 594.1 | 571.8 | 559.8 | 1,673 | 1,454 | 1,279 |
| Automotive | 974 | 997 | 954 | 561.9 | 615.9 | 634.6 | 1,734 | 1,620 | 1,503 |
| Paper/clay/forest | 891 | 801 | 691 | 466.7 | 472.2 | 461.7 | 1,909 | 1,697 | 1,496 |
| General merchandise | 5,106 | 4,586 | 4,047 | 2,884.4 | 2,896.2 | 2,881.9 | 1,770 | 1,583 | 1,404 |
| Intermodal | 1,971 | 1,826 | 1,537 | 3,256.5 | 3,154.9 | 2,891.5 | 605 | 579 | 531 |
| Total | $ 9,407 | $ 8,527 | $ 7,312 | 7,900.9 | 7,786.5 | 7,464.2 | $ 1,191 | $ 1,095 | $ 980 |

Revenues increased $880 million, or 10%, in 2006 and $1.2 billion, or 17%, in 2005. As shown in the following table, both revenue improvements were the result of increased average revenues per unit, including fuel surcharges, and, to a lesser extent in 2006 than for 2005, higher traffic volumes.

**Revenue Variance Analysis**
Increases

| | 2006 vs. 2005 | 2005 vs. 2004 |
|---|---|---|
| | *($ in millions)* | |
| Revenue per unit/mix | $ 755 | $ 899 |
| Traffic volume (units) | 125 | 316 |
| Total | $ 880 | $ 1,215 |

Both comparisons reflect large increases in average revenue per unit, a result of higher rates and increased fuel surcharges. All market groups collected significant fuel surcharges, which accounted for approximately 40% of the 2006 increase in revenues and about one-third of the 2005 increase. At year-end 2006, fuel surcharge provisions covered approximately 91% of total revenues compared with about 85% at the end of 2005. Traffic volume increased 1% in 2006, principally due to higher intermodal and metals/construction shipments. In 2005, traffic volume rose 4%, reflecting a 9% increase in intermodal shipments. The favorable revenue per unit/mix variance in 2005 included an unfavorable mix component reflecting the 9% rise in intermodal traffic, which has a lower average revenue per unit.

On April 24, 2006, NS announced that it was revising its fuel surcharge program for non-intermodal traffic originating and moving on NS-issued tariffs and public quotes issued on or after July 1, 2006. While the mechanics of the new fuel surcharge are generally the same as the previous fuel surcharge, the trigger price was

raised from $23 to $64 per barrel of West Texas Intermediate (WTI) Crude Oil and the percentage by which the line haul rate is increased when oil exceeds the trigger price was decreased from 0.4% to 0.3% for each dollar or portion thereof in excess of the trigger price. Tariff prices and public quotes have been adjusted to reflect this change. The fuel surcharge is based on the monthly average price of WTI in the second calendar month prior to the month in which the fuel surcharge is applied. Application of the new fuel surcharge across tariff and public quotes as well as contracts now approximates 15% of NS' total revenue base.

On January 26, 2007, the Surface Transportation Board (STB) issued a decision that the type of fuel surcharge imposed by NS and most other large railroads – a fuel surcharge based on a percentage of line haul revenue – would no longer be permitted for regulated traffic that moves under public (tariff) rates. The STB gave the railroads a 90-day transition period to adjust their fuel surcharge programs. NS does not expect that compliance with these new regulations will have a material effect on its financial condition, results of operations or liquidity.

**COAL** revenues increased $215 million, or 10%, compared with 2005, which reflected higher average revenue per unit and slightly higher traffic volume. Coal average revenue per unit was up 9% compared with 2005, reflecting increased fuel surcharges and higher rates, tempered by the absence of the $55 million benefit from the coal rate settlements in the second quarter of 2005 (see below). Coal represented 25% of NS' revenues in 2006, and 79% of shipments handled originated on NS' lines. Traffic volumes rose 1% primarily because of increased shipments of utility coal, domestic metallurgical coal and coke that offset lower export and iron ore shipments.

NS is currently involved in litigation with Virginia Electric and Power Company/Old Dominion Electric Cooperative (Virginia Power) regarding rate adjustment provisions in a transportation contract between them. During the third quarter of 2006, a court order was entered in favor of NS, and in the fourth quarter Virginia Power filed a petition with the Virginia Supreme Court appealing this order. Future developments and the ultimate resolution of this matter could result in NS recognizing additional revenues related to this dispute, which could have a favorable impact on results of operations in a particular year or quarter.

In 2005, coal revenues increased $387 million, or 22%, compared with 2004, reflecting higher average revenue per unit and increased traffic volume. Coal average revenue per unit was up 19% compared with 2004, reflecting higher rates, the favorable effects of fuel surcharges, longer-haul business and the rate cases settled in the second quarter (see below). Coal represented 25% of NS' revenues in 2005, and 83% of shipments handled originated on NS' lines. Traffic volumes rose 3% primarily because of increased shipments of utility coal that offset lower export and domestic metallurgical coal, coke and iron ore shipments.

During the second quarter of 2005, NS entered into settlement agreements with two utility customers that resolved their rail transportation rate cases before the STB. In 2002, these customers each filed rate reasonableness complaints with the STB. In October 2004, the STB found NS' rates to be reasonable in both cases. As a result of the settlement of these cases, NS recognized $55 million of additional coal revenue in 2005 related to the period in dispute.

**Total Coal, Coke and Iron Ore Tonnage**

| | **2006** | **2005** | **2004** |
|---|---|---|---|
| | | *(Tons in thousands)* | |
| Utility | 148,078 | 142,522 | 134,085 |
| Domestic metallurgical | 20,878 | 20,076 | 20,686 |
| Export | 12,409 | 14,531 | 16,583 |
| Industrial | 9,202 | 9,524 | 9,799 |
| Total | 190,567 | 186,653 | 181,153 |

**Utility coal** tonnage increased 4%, compared with 2005, reflecting the rebuilding of stockpiles by customers, more shipments from the Powder River Basin in the West and higher shipments of import coal through Charleston, SC.

In 2005, utility coal tonnage increased 6% compared to 2004, in response to increased coal-fired generation to meet the heavier electricity demand of a strong economy, limited nuclear power generation capacity, higher natural gas prices and utility coal stockpiles which were below target levels across NS' service area. Supply constraints dampened shipments while the increased demand for Eastern U.S. coal prompted some customers to shift to coal from non-traditional sources in Wyoming and Colorado and imported coal. Appalachian coal production increased modestly and Western coal production was up 2% in 2005.

While natural gas prices are expected to remain higher in 2007, demand for utility coal could be tempered by persistent mild winter weather in the East and above average stockpiles. Additionally, in November 2006, Virginia Power announced it intends to switch from domestic coal to imported coal for its Chesapeake, Virginia, Energy Center. Since NS would not transport the imported coal, this change would result in the loss of approximately 1.6 million tons annually.

A number of evolving environmental issues could affect the utility coal market. These include potential regional programs aimed at capping and reducing power plant $CO_2$ emissions, and ongoing efforts at addressing climate change. In response to changes in environmental regulations, certain utilities have begun adding or are planning to add emissions control technologies to their electric generating units, allowing them to utilize their existing coal-fired power plants.

**Domestic metallurgical** coal, coke and iron ore tonnage increased 4% in 2006 compared with 2005. The increase was driven by higher domestic metallurgical coal and coke shipments in the first half of the year in response to steel-making demand, which more than offset a decline in iron ore volume caused by the shutdown of a blast furnace at a major customer location.

For 2005, domestic metallurgical coal, coke and iron ore tonnage was down 3%, compared with 2004. Declines in domestic coke and iron ore volumes, principally due to the idling of a major steel blast furnace, were partially offset by an 8% increase in metallurgical coal.

Demand for domestic metallurgical coal and coke is expected to decline slightly with a softening in the steel industry in 2007, whereas new business is expected to modestly increase iron ore shipments.

**Export coal** tonnage decreased 15% in 2006 compared to 2005, reflecting weaker demand for U.S. coal as Europe and Asia continued to increase purchases from other countries. Baltimore volume was down approximately 13,500 cars, or 37%, and Norfolk volume declined by approximately 3,000 cars, or 3%.

In 2005, export coal tonnage decreased 12% compared to 2004, due to both coal supply constraints and a weak European steel market. Volume through Norfolk and Baltimore decreased. Norfolk was down approximately 16,000 carloads, or 14%, and Baltimore was down approximately 2,000 carloads, or 6%. U.S. exports in 2005 were constrained by several factors: (1) the tight coal supply from Eastern coal mines caused primarily by the sporadic closure of a major coal mine, (2) the idling of production by European steel manufacturers in order to manage finished goods inventory, and (3) the abundant supply of Chinese coke on the world market lowering the price and making it more economical to buy coke rather than import metallurgical coal from the U.S. and convert it.

Export coal tonnage for 2007 is expected to weaken as higher mining costs offset potential gains from favorable ocean freight rates from the U.S. versus Australia.

**Other coal** tonnage (principally steam coal shipped to industrial plants) decreased 3% versus 2005, primarily due to plant closures and mine production problems. In 2005, other coal tonnage decreased 3% versus 2004, primarily due to the diversion of coal to the utility market.

**GENERAL MERCHANDISE** revenues increased $520 million, or 11%, in 2006 compared with 2005, as all market groups posted higher average revenue per unit driven by increased rates and fuel surcharges. Traffic volume declined slightly as improved metals and construction and agriculture volumes were offset by declines in the other business groups. In 2005, general merchandise revenues increased 13% due to higher average rates and fuel surcharges. Traffic volume was up modestly in 2005 compared with 2004 as decreases in automotive and chemicals traffic partially offset increases in other business groups.

**Metals and construction** revenue increased 19% and traffic volume increased 5% in 2006 compared with 2005 as declines in the fourth quarter were offset by higher volumes through the rest of the year. Revenue per unit rose 14% because of increased rates and fuel surcharges. The increase in traffic volume was driven primarily by higher import slab business to NS-served steel mills, more scrap metal shipments and higher sand, gravel and cement traffic for commercial and highway construction projects.

In 2005, metals and construction revenue increased 20% and traffic volume increased 2% compared with 2004. Revenue per unit rose 17% because of higher rates and fuel surcharges. The volume improvements were due primarily to continued strength at NS-served integrated and electric arc mills and higher aluminum product shipments, which were partially offset by lower scrap metal carloads. Construction traffic volume benefited from increased residential, commercial and highway construction.

Metals and construction volume is expected to be tempered in the first quarter of 2007, reflecting a softening in domestic steel production affecting iron and steel shipments, with improving conditions expected in the second half of the year. Aggregate and cement shipments are expected to increase driven by highway projects and new stone terminals locating on NS' lines.

**Chemicals** revenue increased 10%, despite a 4% drop in traffic volume, reflecting increased rates and fuel surcharges. Petroleum, industrial and plastics traffic volumes were down as a result of lower inventories arising from post-Katrina conditions, the closure of several plants on NS lines and the weaker housing and automotive markets.

In 2005, chemicals revenues increased 13%, reflecting higher prices and fuel surcharges, while traffic volume was down slightly as a result of production curtailment in the Gulf Coast region and as compared with a strong 2004. Volume increases for plastic and petroleum products were offset by decreases in industrial and miscellaneous chemicals.

Chemical volume is expected to improve in 2007, supported by new and expanded business as the year progresses. However, volume could be adversely affected by the price of natural gas and crude oil, which accounts for more than 50% of the cost of many chemical products and presents a significant competitive challenge that could cause domestic chemical producers to move production overseas.

**Agriculture, consumer products and government** revenue increased 19% and traffic volume increased 4% in 2006 compared with 2005. Average revenue per unit rose 15%, a result of higher rates and fuel surcharges. Traffic volume growth resulted from increased ethanol, military and corn shipments. Military traffic growth was primarily due to the continued support of military operations in Iraq.

In 2005, agriculture, consumer products and government revenue increased 16% and traffic volume increased 2% compared with 2004. Average revenue per unit rose 14%, a result of higher rates and fuel surcharges. Traffic growth resulted from sweeteners, government traffic and fertilizer. Government traffic growth was primarily due to the support of military operations in Iraq as well as shipments of temporary housing to hurricane-damaged

areas. Ethanol traffic increased 38% due to higher shipments from current customers in addition to new business in Georgia and South Carolina.

Agriculture volume is expected to continue to grow in 2007, benefiting from increasing demand for ethanol as a replacement for MTBE which was banned by the Federal Government as a fuel additive. However, declines in consumer products and government volumes are expected to offset this growth.

**Automotive** revenues declined 2% in 2006 compared with 2005 as lower volumes offset increased average revenues per unit, including fuel surcharges. Volume decreased 9% primarily due to substantial production cuts at Ford, General Motors and Daimler-Chrysler assembly plants, including two NS-served plant closures at Ford and one at General Motors during 2006. Ford and General Motors combined operate 15 of 29 assembly plants served by NS. Reduced production at Honda and BMW also contributed to the volume decrease.

In 2005, automotive revenues rose 5%, compared with 2004, the result of an 8% increase in average revenue per unit that reflected pricing improvements and higher fuel surcharges. In contrast, traffic volume decreased 3% primarily due to reduced production at Ford and General Motors, with General Motors closing NS-served assembly plants in Michigan, Maryland and New Jersey. These reductions were partially offset by increased production at Honda, Mercedes-Benz and Toyota.

For 2007, NS expects automotive revenues to continue to decline as a result of automotive production cutbacks. Decreases by U.S. automotive manufacturers are expected to be partially offset by higher domestic production by foreign manufacturers.

**Paper, clay and forest products** revenue increased 11% in 2006 compared with 2005 due to higher average revenues per unit, including fuel surcharges, despite a 1% decrease in traffic volume. Higher solid waste and debris traffic, and growth in traffic from the import of printing paper, partially offset reduced pulp and pulp board shipments.

In 2005, paper, clay and forest products revenue increased 16% and traffic volume increased 2% compared with 2004. Average revenue per unit rose 13% due to higher rates and fuel surcharges. Pulp board, printing paper, newsprint and woodchip produced volume gains despite consolidations within the industry and mill shutdowns.

In 2007, paper, clay and forest product revenues are expected to be up slightly and benefit from continued growth in waste and debris transportation.

**INTERMODAL** revenues increased $145 million, or 8%, compared with 2005, largely because of higher fuel surcharges, increased rates and improved traffic volume. Traffic volume for the year rose 3% notwithstanding a 3% decline in the fourth quarter. International traffic volume rose 9% reflecting growth in imported goods from Asia and exported goods through NS-served East Coast ports, as well as West Coast ports. Truckload volume increased 8% reflecting continued expansion of business with traditional truckload companies. Triple Crown Services Company, a service with rail-to-highway trailers, had flat volume compared with 2005 as higher consumer product shipments were offset by weaker automotive-related shipments. Domestic intermodal marketing companies (IMC) volume declined 9% reflecting declines in the housing, construction and automotive markets. Premium business, which includes parcel and LTL (less-than-truckload) carriers, was down 3% reflecting lower LTL shipper traffic that offset modest gains in parcel shipments. Intermodal revenue per unit increased 4%, principally a result of higher fuel surcharges as well as increased rates and longer-haul international traffic, which was offset in part by the ongoing shift of shipments from higher revenue per unit, rail-provided assets (trailers and containers) to lower revenue per unit shipments in shipper-provided equipment.

In 2005, intermodal revenues increased $289 million, or 19% compared with 2004, reflecting improved traffic volume, higher fuel surcharges, and increased rates. Despite moderated growth in domestic business, traffic volume increased 9% reflecting strength in the international, truckload and Triple Crown Services lines of

business. International traffic volume grew by 16% reflecting strength in U.S. consumer markets and growth in the movement of import and export goods through NS-served East Coast ports, as well as West Coast ports. Truckload volume increased 10% compared with 2004, reflecting additional business with traditional truckload companies. Premium business grew 6% due primarily to new business in the Northern region. Triple Crown Services volume grew 6% reflecting expanded geographic coverage and increased trailer fleet size to meet higher demand. Domestic volume decreased 3% compared with 2004, principally due to the continued reduction in transloading of West Coast international freight into domestic containers. Intermodal revenue per unit increased 9%, a result of fuel surcharges and rate increases.

In 2007, NS expects moderate growth in its intermodal markets, with continued strength in the international markets. Future growth may, however, be tempered by economic conditions in the U.S.

**Railway Operating Expenses**

Railway operating expenses in 2006 were $6.9 billion, up $440 million, or 7%, compared to 2005, which were up $800 million compared to 2004. The 2006 increase was principally due to higher diesel fuel prices and increased compensation and benefits. The increase in 2005 was principally due to a sharp rise in the price of diesel fuel, volume-related expense increases, more maintenance activities and higher casualty costs. Carloads rose 1% in 2006 compared to 2005 and 4% in 2005 compared to 2004.

The railway operating ratio, which measures the percentage of railway operating revenues consumed by railway operating expenses, improved to 72.8% in 2006, compared with 75.2% in 2005 and 76.7% in 2004.

The following table shows the changes in railway operating expenses summarized by major classifications.

**Operating Expense Variances**
Increases (Decreases)

| | 2006 vs. 2005 | 2005 vs. 2004 |
|---|---|---|
| | *($ in millions)* | |
| Compensation and benefits | $ 144 | $ 221 |
| Materials, services and rents | 86 | 208 |
| Conrail rents and services | (3) | (190) |
| Depreciation | (36) | 176 |
| Diesel fuel | 250 | 278 |
| Casualties and other claims | (4) | 73 |
| Other | 3 | 34 |
| Total | $ 440 | $ 800 |

**Compensation and benefits**, which represents nearly 40% of total railway operating expenses, increased $144 million, or 6%, compared with 2005, and increased $221 million in 2005, or 10%, compared with 2004. Expenses in 2006 included the effect of the implementation of Statement of Accounting Standards No. 123(R) "Share-Based Payment," which increased stock-based compensation expense by $27 million. Most of the increase was reflected in the first quarter which included the effect of accelerated recognition of costs related to grants to retirement-eligible employees. This up front recognition of costs will occur in the first quarter of 2007 and is expected to be somewhat higher reflecting a higher proportion of retirement eligible grantees. The remaining increase was attributable to increased salaries and wages (up $44 million), higher health and welfare benefit costs (up $29 million), higher payroll taxes (up $17 million), retirement and waiver agreements entered into in the first quarter (up $13 million) and the cost of the regular stock-based grant to the former chief executive officer who retired in the first quarter ($11 million).

NS employment averaged 30,541 in 2006 compared with 30,294 in 2005 and 28,475 in 2004. The increased number of employees has come almost exclusively in operating department personnel to meet the increased volume and service needs, as well as expected retirements. NS continues to hire and train additional workers in order to meet the requirements of forecasted volumes in light of the demographics of its work force.

The increase in compensation and benefits for 2005 reflected increased hours for train operations, including trainees, and equipment maintenance (up $70 million); increased wage rates (up $46 million); increased pension, postretirement and health and welfare benefit costs (up $43 million); higher stock-based compensation (up $22 million); and higher payroll taxes (up $12 million).

The Railroad Retirement and Survivors' Improvement Act, which took effect Jan. 1, 2002, allows for investment of Tier II assets in a diversified portfolio through the National Railroad Retirement Investment Trust. The law also provides a mechanism for automatic adjustment of Tier II payroll taxes should the trust assets fall below a four-year reserve or exceed a six-year reserve. As a result, the employers' portion of Tier II retirement payroll taxes has been reduced from 13.1% in 2004 to 12.6% in 2005 and 2006, and to 12.1% for 2007. However, these savings are expected to continue to be substantially offset by higher payroll taxes on increased wages and a higher wage base.

**Materials, services and rents** includes costs related to items used for the maintenance of railroad lines, structures and equipment; the costs of services purchased from outside contractors, including the net costs of operating joint (or leased) facilities with other railroads; and the net cost of equipment rentals. This category of expenses increased $86 million, or 5%, in 2006 compared to 2005, and increased 13% in 2005 compared to 2004. For 2006, materials expense was up $39 million due to increased maintenance activities, purchased services was up $39 million reflecting increased intermodal traffic volume and equipment rents rose $8 million.

The increase in 2005 reflected higher volume-related purchased services (up $82 million) and higher maintenance expense (up $74 million). Equipment rents rose $28 million, reflecting higher traffic volume as well as leases from the Conrail Corporate Reorganization (see Note 4).

Locomotive and freight car repair costs increased in 2006 and in 2005, due to more maintenance activity related to higher usage from increased traffic volumes coupled with the age of the fleet. This level of expense is expected to continue and may increase depending on traffic volumes.

Equipment rents, which includes the cost to NS of using equipment (mostly freight cars) owned by other railroads or private owners less the rent paid to NS for the use of its equipment, rose 2% in 2006 and increased 11% in 2005. The increase in 2006 was principally due to a reduction in rents received on automotive equipment as a result of decreased shipments. The increase in 2005 was principally due to additional lease expense for a full year from the Conrail Corporate Reorganization and increased volume-related intermodal shipments.

**Conrail rents and services** decreased $3 million, or 2%, in 2006 compared to 2005, and decreased 60% in 2005 compared to 2004. For 2006 and 2005 this item includes amounts due to Conrail for operation of the Shared Assets Areas. Before the Conrail Corporate Reorganization in 2004 this item included amounts due to PRR for use of its operating properties and equipment, NS' equity in Conrail's net earnings and the additional amortization related to the difference between NS' investment in Conrail and its underlying equity (see Note 4). The decline in 2005 was primarily driven by the Conrail Corporate Reorganization, which resulted in the consolidated reporting of individual components of Conrail equity earnings, principally depreciation, equipment rents and interest expense (see Note 4). NS' share of equity earnings after the Conrail Corporate Reorganization is a component of "Other income-net" (see Note 2).

**Depreciation** expense decreased $36 million, or 5%, in 2006 compared with 2005, reflecting the results of an equipment depreciation study from an independent firm of engineers and an analysis of the assets received in the Conrail Corporation Reorganization completed in 2006. Depreciation expense increased 29% in 2005

compared to 2004 primarily a result of the Conrail Corporate Reorganization (see Note 4). In addition, substantial capital investments and improvements resulted in higher depreciation expense.

**Diesel fuel** expense increased $250 million, or 34%, in 2006 compared with 2005 and increased 62% in 2005 compared with 2004. Diesel fuel expense is recorded net of hedge benefits, although there have been no such benefits since May 2006 when the program wound down (see "Market Risks and Hedging Activities," below and Note 16). Expense in 2006 included hedge benefits of $20 million compared with benefits of $148 million in 2005, and $140 million in 2004, and reflected a 13% rise in the average price per gallon with a 1% increase in consumption. The increase in 2005 reflected a 43% rise in the average price per gallon and a 2% increase in consumption.

Legislation enacted in the first quarter of 2005 repealed the 4.3 cents per gallon excise tax on railroad diesel fuel for 2007, with the following phased reductions in 2005 and 2006: 1 cent per gallon from Jan. 1, 2005 through June 30, 2005; 2 cents per gallon from July 1, 2005 through Dec. 31, 2006; and by the full 4.3 cents thereafter. NS consumes about 520 million gallons of diesel fuel per year.

**Casualties and other claims** expenses (including the estimates of costs related to personal injury, property damage and environmental matters) decreased $4 million, or 2%, in 2006 compared to 2005 and increased 48% in 2005 compared to 2004. The decrease in 2006 reflected the absence of $38 million of costs associated with a derailment in Graniteville, South Carolina (see discussion below), and an unfavorable jury verdict in an employee injury case, partially offset by higher expenses arising from derailments and insurance costs. The increase in 2005 was attributable to the costs associated with the Graniteville derailment, $16 million for an unfavorable jury verdict rendered in an employee injury case, $9 million of higher insurance costs, and $4 million for the portion of the $12.5 million self-insured retention related to Hurricane Katrina expenses.

On Jan. 6, 2005, a collision in Graniteville, South Carolina, between two NS trains caused the release of chlorine gas from a ruptured tank car. NS' liability related to this accident includes a current and long-term portion which represents NS' best estimate based on current facts and circumstances. The estimate includes amounts related to business property damage and other economic losses, personal injury and individual property damage claims as well as third-party response costs. NS' commercial insurance policies are expected to cover substantially all expenses related to this derailment above NS' self-insured retention, including NS' response costs and legal fees. Accordingly, the Consolidated Balance Sheets reflect a current and long-term receivable for estimated recoveries from NS' insurance carriers. The expense recorded in 2005 represents NS' retention under its insurance policies and other uninsured costs. While it is reasonable to expect that the liability for covered losses could differ from the amount recorded, such a change would be offset by a corresponding change in the insurance receivable. As a result, NS does not believe that it is reasonably likely that its net loss (the difference between the liability and future recoveries) will be materially different than the loss recorded in 2005. NS expects at this time that insurance coverage is adequate to cover potential claims and settlements above its self-insurance retention.

During the third quarter of 2005, NS' operations were adversely affected by Hurricane Katrina, and to a lesser extent, Hurricane Rita, both of which struck the Gulf Coast. NS sustained damage to its facilities in the region as a result of Hurricane Katrina but restored rail freight service into and around New Orleans in a relatively short period of time. The damage sustained to NS facilities as a result of Hurricane Katrina did not materially impact NS' financial condition or results of operations and is covered by insurance above the self-insurance retention limit.

The largest component of casualties and other claims expense is personal injury costs. Cases involving occupational injuries comprised about two-thirds of total employee injury cases resolved and about one-third of total payments made. With its long-established commitment to safety, NS continues to work actively to eliminate all employee injuries and to reduce the associated costs. With respect to occupational injuries, which are not caused by a specific accident or event, but result from a claimed exposure over time, the benefits of any existing safety initiatives may not be realized immediately. These types of claims are being asserted by former or retired employees, some of whom have not been actively employed in the rail industry for decades.

The rail industry remains uniquely susceptible to litigation involving job-related accidental injury and occupational claims because of the Federal Employers' Liability Act (FELA), which is applicable only to railroads. FELA's fault-based system, which covers employee claims for job-related injuries, produces results that are unpredictable and inconsistent as compared with a no-fault workers' compensation system.

NS maintains substantial amounts of insurance for potential third-party liability and property damage claims. It also retains reasonable levels of risk through self-insurance (see Note 17). NS expects insurance costs to be slightly higher in 2007.

**Other expenses** increased $3 million, or 1%, in 2006 compared to 2005, and increased $34 million, or 15%, in 2005 compared to 2004. The increase in 2006 was primarily due to higher employee travel and relocation costs offset in part by lower property taxes. The increase in 2005 reflected higher property and sales and use taxes.

**Other Income – Net**

Other income – net was $149 million in 2006 and $74 million in 2005 (see Note 2). Results in 2006 reflected lower expense associated with tax credit investments primarily due to synthetic fuel related investments (see discussion under heading "Income Taxes"), greater interest income, and higher returns from corporate-owned life insurance, that were partially offset by lower equity in Conrail earnings.

In 2005, other income – net decreased by $2 million which reflected the absence of the $40 million gain recognized in 2004 for the Conrail Corporate Reorganization. The results in 2005 also reflected: (1) higher interest income, (2) equity in earnings of Conrail subsequent to the Conrail Corporate Reorganization, (3) additional coal royalties (up $12 million), and (4) lower interest accruals related to tax liabilities (down $9 million). These income improvements were partially offset by more expense associated with tax credit investments.

**Income Taxes**

Income tax expense in 2006 was $749 million for an effective rate of 34%, compared with effective rates of 25% in 2005 and 29% in 2004. The increase in the rate for 2006 was largely the result of the absence of an Ohio tax law change which lowered the effective rate in 2005 as well as fewer tax credits from synthetic fuel related investments (see below). The 2005 effective rate benefited from a $96 million reduction in deferred taxes resulting from the Ohio tax legislation, which lowered the rate by six percentage points (see Note 3).

NS' consolidated federal income tax returns for 2004 and 2005 are being audited by the Internal Revenue Service (IRS). The IRS completed its examination of the 2002 and 2003 consolidated federal income tax returns during the third quarter of 2006 and NS has appealed certain adjustments proposed by the IRS. The results of the examination had a negligible effect on the effective tax rate.

NS' synthetic fuel tax credits are subject to reduction if the Reference Price of a barrel of oil for the year falls within an inflation-adjusted phase-out range specified by the tax code. The Reference Price for a year is the annual average wellhead price per barrel of unregulated domestic crude oil as determined by the Secretary of the Treasury by April 1 of the following year. In 2005, the phase-out range was $53.20 to $66.79, and the phase-out range is adjusted annually for inflation. While NS cannot predict with certainty the Reference Price for the year, NS estimated a 35% phase-out of synthetic fuel credits in 2006 based on actual oil prices during the year.

Net income in 2006 reflects $18 million less in net benefits from these credits, as compared with the same period of 2005, as shown below:

| | 2006 | 2005 | 2004 |
|---|---|---|---|
| | | ($ in millions) | |
| Effect in "Other income – net:" | | | |
| Expenses on synthetic fuel related investments | $ 62 | $ 102 | $ 58 |
| Effect in "Provision for income taxes:" | | | |
| Tax credits | 56 | 98 | 60 |
| Tax benefit of expenses on synthetic fuel related investments | 24 | 40 | 21 |
| Total reduction of income tax expense | 80 | 138 | 81 |
| Effect in "Net income:" | | | |
| Net benefit from synthetic fuel related investments | $ 18 | $ 36 | $ 23 |

Subject to the uncertainty associated with these tax credits, the effective tax rate in 2007 is expected to be comparable to that of 2006. The tax credits generated by NS' synthetic fuel related investments expire at the end of 2007 and, accordingly, the effective tax rate may increase thereafter.

**FINANCIAL CONDITION, LIQUIDITY AND CAPITAL RESOURCES**

**Cash provided by operating activities,** NS' principal source of liquidity, was $2.2 billion in 2006, compared with $2.1 billion in 2005 and $1.7 billion in 2004. The improvement in 2006 reflected the $440 million increase in income from railway operations offset in part by higher income tax payments. The increase in 2005 reflected the $415 million increase in income from railway operations as well as the effects of the Conrail Corporate Reorganization (see below), offset in part by higher income tax payments, including a payment made upon settlement of a federal audit cycle.

Prior to the August 2004 Conrail Corporate Reorganization (see Note 4), a significant portion of the payments made to PRR under the operating and lease agreements (which were included in "Conrail rents and services" and, therefore, were a use of cash in "Net cash provided by operating activities"), was borrowed back from a subsidiary of PRR under a note due in 2032 and, therefore, was a source of cash in "Proceeds from borrowings." NS' net cash flow from these borrowings amounted to $118 million in 2004. This note was effectively extinguished by the reorganization in 2004. Subsequent to the Conrail Corporate Reorganization, 2005 payments under "Conrail rents and services" declined, depreciation charges increased and those net borrowings were terminated. Accordingly, NS' cash provided by operating activities after the Conrail Corporate Reorganization has increased.

NS had working capital of $307 million at Dec. 31, 2006, compared with working capital of $729 million at Dec. 31, 2005. The reduction was largely due to share repurchases made in 2006 (see Note 13) and higher current maturities of long-term debt. NS' cash, cash equivalents and short-term investment balances totaled $918 million and $1.3 billion at Dec. 31, 2006 and 2005, respectively.

**Contractual obligations** at Dec. 31, 2006, comprised of NS' long-term debt (including capital leases) (see Note 7), operating leases (see Note 8), agreements with CRC (see Note 4), unconditional purchase obligations (see Note 17) and long-term advances from Conrail (see Note 4) were as follows:

| | Payments Due By Period | | | | |
|---|---|---|---|---|---|
| | **Total** | **2007** | **2008-2009** | **2010-2011** | **2012 and Subsequent** |
| | | | *($ in millions)* | | |
| Long-term debt and capital lease principal | $ 6,600 | $ 491 | $ 843 | $ 676 | $ 4,590 |
| Operating leases | 1,087 | 166 | 274 | 189 | 458 |
| Agreements with CRC | 448 | 26 | 52 | 52 | 318 |
| Unconditional purchase obligations | 276 | 238 | 33 | 5 | -- |
| Long-term advances from Conrail | 133 | -- | -- | -- | 133 |
| Total | $ 8,544 | $ 921 | $ 1,202 | $ 922 | $ 5,499 |

**Off balance sheet arrangements** consist of obligations related to operating leases, which are included in the table of contractual obligations above and disclosed in Note 8. NS did not renew its accounts receivable securitization program which expired in May 2005.

**Cash used for investing activities** was $684 million in 2006, compared with $1.8 billion in 2005 and $1.2 billion in 2004. The decrease in 2006 reflected higher proceeds from short-term investment sales, principally to fund share repurchases reflected in financing activities, offset in part by the $100 million investment in Meridian Speedway LLC (MSLLC) (see discussion below) and increased property additions. The increase in 2005 was principally the result of larger purchases of short-term investments.

Property additions account for most of the recurring spending in this category. The following tables show capital spending (including capital leases) and track and equipment statistics for the past five years.

**Capital Expenditures**

| | **2006** | **2005** | **2004** | **2003** | **2002** |
|---|---|---|---|---|---|
| | | | *($ in millions)* | | |
| Road and other property | $ 756 | $ 741 | $ 612 | $ 502 | $ 521 |
| Equipment | 422 | 284 | 429 | 218 | 174 |
| Total | $ 1,178 | $ 1,025 | $ 1,041 | $ 720 | $ 695 |

**Track Structure Statistics (Capital and Maintenance)**

| | **2006** | **2005** | **2004** | **2003** | **2002** |
|---|---|---|---|---|---|
| Track miles of rail installed | 327 | 302 | 246 | 233 | 235 |
| Miles of track surfaced | 4,871 | 4,663 | 5,055 | 5,105 | 5,270 |
| New crossties installed (millions) | 2.7 | 2.5 | 2.5 | 2.8 | 2.8 |

**Average Age of Owned Railway Equipment**

| | 2006 | 2005 | 2004 | 2003 | 2002 |
|---|---|---|---|---|---|
| | | | *(years)* | | |
| Freight cars | 30.0 | 29.4 | 28.6 | 27.8 | 27.0 |
| Locomotives | 17.7 | 17.4 | 16.9 | 15.3 | 16.1 |
| Retired locomotives | 35.0 | 27.4 | 22.9 | 28.7 | 28.2 |

The higher average age of locomotives in 2006 reflects the retirement of two locomotives compared with 52 retired in 2005.

For 2007, NS has budgeted $1.34 billion for capital expenditures. The anticipated spending includes $884 million for roadway projects, $401 million for equipment and $55 million for small projects and real estate. In roadway projects, $610 million is for track and bridge program work, including $73 million in infrastructure investments for increased main line and terminal capacity. Also included are projects for communications, signal and electrical systems, as well as projects for environmental and public improvements such as grade crossing separations and signal upgrades. Other roadway projects include marketing and industrial development initiatives, including increasing track capacity and access to coal receivers and vehicle production and distribution facilities, and continuing investments in intermodal infrastructure. Planned equipment spending of $401 million includes the purchase of 53 locomotives and upgrades to existing units, the purchase of 1,300 new higher capacity coal cars as part of a multi-year program to replace the existing coal car fleet, the purchase of 739 freight cars as their lease expires, improvements to multilevel automobile racks, and projects related to computers and information technology, including additional security and backup systems. NS expects to make all of its capital expenditures with internally generated funds.

On May 1, 2006, NS and Kansas City Southern (KCS) formed a joint venture (MSLLC) pursuant to which NS intends to contribute $300 million in cash, substantially all of which will be used for capital improvements over a period of approximately three years, in exchange for a 30% interest in the joint venture. At the formation of MSLLC, NS contributed $100 million and KCS contributed its 320 mile rail line between Meridian, Mississippi and Shreveport, Louisiana (the Meridian Speedway). NS is recognizing its pro rata share of the joint venture's earnings or loss as required under the equity method of accounting. NS' total investment in MSLLC is supported by the fair value of the rail line as well as intangible assets obtained through the transaction. The transaction is expected to be modestly dilutive in the early years of the venture due to lost interest income on the cash contributed to the joint venture. However, NS expects that the dilution from the lost interest income will be offset from additional traffic as the investment is made and improvements are completed. The joint venture is expected to increase capacity and improve service over the Meridian Speedway into the Southeast.

During the third quarter of 2006, NS and the states of Ohio, West Virginia and Virginia each entered into a Memorandum of Agreement with the Federal Highway Administration that governs the release of up to $95 million in federal funding and up to $11 million in state funding for the Heartland Corridor rail double-stack clearance project. NS expects to spend about $60 million over a five-year period in connection with this project. The Heartland Corridor is a package of proposed clearance improvements and other facilities that will create a seamless high-capacity intermodal route across Virginia and West Virginia to Midwest markets.

NS and other railroads have agreed to participate in the Chicago Region Environmental and Transportation Efficiency (CREATE) project in Chicago. The intent of the proposed public-private partnership is to reduce rail and highway congestion and add freight and passenger capacity in the metropolitan Chicago area. A portion of the public funding has been approved and the parties are working to develop a list of projects to be included in Phase I of the project. Funding requirements will be determined by the selection of Phase I projects. The railroads expect to complete Phase I over the next four years.

**Cash used for financing activities** was $1.3 billion in 2006, compared with $456 million in 2005 and $233 million in 2004. Financing activity in 2006 included $964 million for the purchase and retirement of common stock as part of NS' ongoing share repurchase program (see discussion below). Financing activities for 2006 also included $212 million of proceeds and $85 million of tax benefits from employee exercises of stock options (see Note 11).

In 2005, financing activity included: (1) the issuance of $300 million aggregate principal amount of 6% unsecured notes due March 2105, and (2) the issuance of $717 million of unsecured notes ($350 million at 5.64% due 2029 and $367 million at 5.59% due 2025) and payment of $218 million of premium in exchange for $717 million of previously issued unsecured notes ($350 million at 7.8% due 2027, $200 million at 7.25% due 2031, and $167 million at 9.0% due 2021) (see Note 7). The $218 million cash premium payment is reflected as a reduction of debt in the Consolidated Balance Sheets and Statement of Cash Flows and will be amortized as additional interest expense over the terms of the new debt. Financing activities in 2005 included $194 million in proceeds relating to employee exercises of stock options. NS' debt-to-total capitalization ratio was 40.7% at Dec. 31, 2006, and 42.8% at Dec. 31, 2005.

In November 2005, NS' Board of Directors authorized the repurchase of up to 50 million shares of NS common stock through Dec. 31, 2015. The timing and volume of any purchases will be guided by management's assessment of market conditions and other factors. Near-term purchases under the program are expected to be made with internally generated cash; however, future funding sources could include proceeds from the sale of commercial paper notes or the issuance of long-term debt.

NS currently has in place and available a $1 billion, five-year credit agreement that expires in 2009, which provides for borrowings at prevailing rates and includes financial covenants. There were no amounts outstanding under this facility at Dec. 31, 2006, and NS is in compliance with all of the financial covenants. NS also has in place a shelf registration statement on Form S-3 filed with the SEC in September 2004 with $700 million of available capacity (see Note 7). On July 18, 2005, Standard & Poor's (S&P) upgraded its ratings on NS' unsecured debt from BBB to BBB+. Moody's rating remains at Baa1, comparable to S&P's.

## APPLICATION OF CRITICAL ACCOUNTING ESTIMATES

The preparation of financial statements in accordance with U.S. generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. These estimates and assumptions may require significant judgment about matters that are inherently uncertain, and future events are likely to occur that may require management to change them. Accordingly, management regularly reviews these estimates and assumptions based on historical experience, changes in the business environment and other factors that management believes to be reasonable under the circumstances. Management discusses the development, selection and disclosures concerning critical accounting estimates with the Audit Committee of its Board of Directors.

### Pensions and Other Postretirement Benefits

Accounting for pensions and other postretirement benefit plans requires management to make several estimates and assumptions (see Note 10). These include the expected rate of return from investment of the plans' assets, projected increases in medical costs and the expected retirement age of employees as well as their projected earnings and mortality. In addition, the amounts recorded are affected by changes in the interest rate environment because the associated liabilities are discounted to their present value. Management makes these estimates based on the company's historical experience and other information that it deems pertinent under the circumstances (for example, expectations of future stock market performance). Management engages an

independent consulting actuarial firm to assist it in selecting appropriate assumptions and valuing its related liabilities.

NS' net pension benefit, which is included in "Compensation and benefits" on its Consolidated Statements of Income, was $29 million for the year ended Dec. 31, 2006. In recording this amount, NS assumed a long-term investment rate of return of 9%. Investment experience of the pension fund over the past 10-, 15- and 20-year periods has been a rate of return in excess of 10% and supports the current rate of return assumption. A one percentage point change to this rate of return assumption would result in a $19 million change to the pension credit and, as a result, an equal change in "Compensation and benefits" expense. Changes that are reasonably likely to occur in assumptions concerning retirement age, projected earnings and mortality would not be expected to have a material effect on NS' net pension benefit or net pension asset in the future. The net pension asset is recorded at its net present value using a discount rate that is based on the current interest rate environment in light of the timing of expected benefit payments. Specifically, NS refers to Moody's seasoned Aa corporate bond yields and the changes in such yields; therefore, management has little discretion in this assumption.

NS' net cost for other postretirement benefits, which is also included in "Compensation and benefits," was $70 million for the year ended Dec. 31, 2006. In recording this expense and valuing the net liability for other postretirement benefits, which is included in "Other postretirement benefits" as disclosed in Note 10, management estimated future increases in health-care costs. These assumptions, along with the effect of a one percentage point change in them, are described in Note 10.

**Properties and Depreciation**

Most of NS' total assets are comprised of long-lived railway properties (see Note 5). As disclosed in Note 1, NS' properties are depreciated using group depreciation. Rail is depreciated primarily on the basis of use measured by gross-ton miles. Other properties are depreciated generally using the straight-line method over the lesser of estimated service or lease lives. NS reviews the carrying amount of properties whenever events or changes in circumstances indicate that such carrying amount may not be recoverable based on future undiscounted cash flows. Assets that are deemed impaired as a result of such review are recorded at the lesser of carrying amount or fair value.

NS' depreciation expense is based on management's assumptions concerning service lives of its properties as well as the expected net salvage that will be received upon their retirement. These assumptions are the product of periodic depreciation studies that are performed by an outside firm of consulting engineers. These studies analyze NS' historical patterns of asset use and retirement and take into account any expected change in operation or maintenance practices. NS' recent experience with these studies has been that while they do result in changes in the rates used to depreciate its properties, these changes have not caused a significant effect to its annual depreciation expense. The studies may also indicate that the recorded amount of accumulated depreciation is deficient (or in excess) of the amount indicated by the study. Any such deficiency (or excess) is amortized as a component of depreciation expense over the remaining service lives of the affected class of property. NS' depreciation expense for the year ended Dec. 31, 2006, amounted to $738 million. NS' weighted-average depreciation rates for 2006 are disclosed in Note 5; a one-tenth percentage point increase (or decrease) in these rates would have resulted in a $26 million increase (or decrease) to NS' depreciation expense.

**Personal Injury, Environmental and Legal Liabilities**

NS' expense for "Casualties and other claims" amounted to $220 million for the year ended Dec. 31, 2006. Most of this expense was composed of NS' accrual related to personal injury liabilities. Job-related personal injury and occupational claims are subject to FELA, which is applicable only to railroads. FELA's fault-based tort system produces results that are unpredictable and inconsistent as compared with a no-fault worker's compensation system. The variability inherent in this system could result in actual costs being very different from the liability recorded. In all cases, NS records a liability when the expected loss for the claim is both probable and estimable.

NS engages an independent consulting actuarial firm to aid in valuing its personal injury liability and determining the amount to accrue during the year. For employee personal injury cases, the actuarial firm studies NS' historical patterns of reserving for claims and subsequent settlements, taking into account relevant outside influences. An estimate of the ultimate amount of the liability, which includes amounts for incurred but unasserted claims, is based on the results of this analysis. For occupational injury claims, the actuarial firm studies NS' history of claim filings, severity, payments and other relevant facts. Additionally, the estimate of the ultimate loss for occupational injuries includes a provision for those claims that have been incurred but not reported by projecting NS' experience into the future as far as can be reasonably determined. NS has recorded this actuarially determined liability. The liability is dependent upon many individual judgments made as to the specific case reserves as well as the judgments of the consulting actuary and management in the periodic studies. Accordingly, there could be significant changes in the liability, which NS would recognize when such a change became known. The most recent actuarial study, completed in the fourth quarter of 2006, resulted in a slight increase to NS' personal injury liability during the fourth quarter. While the liability recorded is supported by the most recent study, it is reasonably possible that the liability could be higher or lower.

NS is subject to various jurisdictions' environmental laws and regulations. It is NS' policy to record a liability where such liability or loss is probable and its amount can be estimated reasonably (see Note 17). Claims, if any, against third parties for recovery of cleanup costs incurred by NS, are reflected as receivables (when collection is probable) in the Consolidated Balance Sheets and are not netted against the associated NS liability. Environmental engineers regularly participate in ongoing evaluations of all known sites and in determining any necessary adjustments to liability estimates. NS also has established an Environmental Policy Council, composed of senior managers, to oversee and interpret its environmental policy.

Operating expenses for environmental matters totaled approximately $19 million in 2006, $16 million in 2005 and $11 million in 2004, and capital expenditures totaled approximately $6 million in 2006, and $9 million in each of 2005 and 2004. Capital expenditures in 2007 are expected to be comparable to those in 2006.

NS' Consolidated Balance Sheets included liabilities for environmental exposures in the amount of $54 million at Dec. 31, 2006, and $58 million at Dec. 31, 2005 (of which $12 million was accounted for as a current liability at Dec. 31, 2006, and 2005). At Dec. 31, 2006, the liability represented NS' estimate of the probable cleanup and remediation costs based on available information at 172 identified locations. On that date, 15 sites accounted for $29 million of the liability, and no individual site was considered to be material. NS anticipates that much of this liability will be paid out over five years; however, some costs will be paid out over a longer period.

At some of the 172 locations, certain NS subsidiaries, usually in conjunction with a number of other parties, have been identified as potentially responsible parties by the Environmental Protection Agency (EPA) or similar state authorities under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, or comparable state statutes, which often impose joint and several liability for cleanup costs.

With respect to known environmental sites (whether identified by NS or by the EPA or comparable state authorities), estimates of NS' ultimate potential financial exposure for a given site or in the aggregate for all such sites are necessarily imprecise because of the widely varying costs of currently available cleanup techniques, the likely development of new cleanup technologies, the difficulty of determining in advance the nature and full extent of contamination and each potential participant's share of any estimated loss (and that participant's ability to bear it), and evolving statutory and regulatory standards governing liability. NS estimates its environmental remediation liability on a site-by-site basis, using assumptions and judgments that management deems appropriate for each site. As a result, it is not practical to quantitatively describe the effects of changes in these many assumptions and judgments. NS has consistently applied its methodology of estimating its environmental liabilities.

Based on its assessment of the facts and circumstances now known, management believes that it has recorded the probable costs for dealing with those environmental matters of which NS is aware. Further, management believes

that it is unlikely that any known matters, either individually or in the aggregate, will have a material adverse effect on NS' financial position, results of operations or liquidity.

Norfolk Southern and certain subsidiaries are defendants in numerous lawsuits and other claims relating principally to railroad operations. When management concludes that it is probable that a liability has been incurred and the amount of the liability can be reasonably estimated, it is accrued through a charge to expenses. While the ultimate amount of liability incurred in any of these lawsuits and claims is dependent on future developments, in management's opinion the recorded liability, if any, is adequate to cover the future payment of such liability and claims. However, the final outcome of any of these lawsuits and claims cannot be predicted with certainty, and unfavorable or unexpected outcomes could result in additional accruals that could be significant to results of operations in a particular year or quarter. Any adjustments to recorded liabilities will be reflected in expenses in the periods in which such adjustments are known.

On Oct. 19, 2006, the Pennsylvania Department of Environmental Protection (PDEP) issued an assessment of civil penalties against NS and filed a complaint for civil penalties with the Pennsylvania Environmental Hearing Board (EHB) requesting that the EHB impose civil penalties upon NS for alleged violations of state environmental laws and regulations resulting from a discharge of sodium hydroxide which occurred as a result of the derailment of a NS train in Norwich Township, Pennsylvania, on June 30, 2006. The PDEP's actions seek to impose combined penalties of $8,890,000 for alleged past violations and $46,420 per day for alleged ongoing violations of state environmental laws and regulations. NS believes that the monetary penalties sought by the PDEP are excessive. Accordingly, NS intends to vigorously defend the action and has appealed the fines to the EHB. In addition, NS expects the Pennsylvania Fish and Boat Commission to impose a monetary penalty on NS for damages alleged to have been caused by this accident. NS does not believe that the outcome of these proceedings will have a material effect on its financial position, results of operations, or liquidity.

### Income Taxes

NS' net long-term deferred tax liability totaled $6.4 billion at Dec. 31, 2006 (see Note 3). This liability is estimated based on the expected future tax consequences of items recognized in the financial statements. After application of the federal statutory tax rate to book income, judgment is required with respect to the timing and deductibility of expenses in the corporate income tax returns. For state income and other taxes, judgment is also required with respect to the apportionment among the various jurisdictions. A valuation allowance is recorded if management expects that it is more likely than not that its deferred tax assets will not be realized. NS had a $9 million valuation allowance on $637 million of deferred tax assets as of Dec. 31, 2006, reflecting the expectation that most of these assets will be realized. In addition, NS has a recorded liability for its estimate of potential income tax exposures. Management believes this liability for potential exposure to be adequate. Income tax expense is adjusted to the extent the final outcome of these matters differs from the amounts recorded. For every one half percent change in the 2006 effective rate net income would have changed by $11 million.

## OTHER MATTERS

### Labor Agreements

Approximately 26,000, or about 85%, of NS' railroad employees are covered by collective bargaining agreements with various labor unions. These agreements remain in effect until changed pursuant to the Railway Labor Act (RLA). NS largely bargains in concert with other major railroads. Moratorium provisions in the labor agreements govern when the railroads and the unions may propose labor agreement changes. The current bargaining round began in late 2004. Industry issues include contracting out of certain work and employee contributions for medical and other benefits.

After a period of direct negotiations, either party may file for mediation if it believes insufficient progress is being made. The status quo is preserved during mediation while a federal mediator assists the parties in their efforts to reach agreement. The railroads are currently in mediation with all of the involved labor unions. If the National Mediation Board, a federal agency, were to terminate mediation, it would, at that time, propose that the parties arbitrate their differences. A strike could occur 30 days thereafter if the parties did not accept arbitration. However, if arbitration is rejected by either party the President of the United States of America could then appoint an Emergency Board which would delay any strike for a further 60 days while the Board made recommendations and the parties engaged in further negotiations. The outcome of the negotiations cannot be determined at this point.

**Market Risks and Hedging Activities**

NS has used derivative financial instruments to reduce the risk of volatility in its diesel fuel costs and to manage its overall exposure to fluctuations in interest rates.

In 2001, NS began a program to hedge a portion of its diesel fuel consumption. The intent of the program was to assist in the management of NS' aggregate risk exposure to fuel price fluctuations, which can significantly affect NS' operating margins and profitability, through the use of one or more types of derivative instruments. No new hedges have been entered into since May of 2004, and the last remaining contracts were settled in the second quarter of 2006, bringing an end to the benefits from the program. Diesel fuel costs represented 14% of NS' operating expenses for 2006, 11% for 2005 and 8% for 2004.

NS manages its overall exposure to fluctuations in interest rates by issuing both fixed- and floating-rate debt instruments and by entering into interest-rate hedging transactions to achieve an appropriate mix within its debt portfolio.

At Dec. 31, 2006, NS' debt subject to interest rate fluctuations totaled $237 million. A 1% point increase in interest rates would increase NS' total annual interest expense related to all its variable debt by approximately $2 million. Management considers it unlikely that interest rate fluctuations applicable to these instruments will result in a material adverse effect on NS' financial position, results of operations or liquidity.

Some of NS' capital leases, which carry an average fixed rate of 7%, were effectively converted to variable rate obligations using interest rate swap agreements. On Dec. 31, 2006, the average pay rate under these agreements was 6%, and the average receive rate was 7%. During 2006 and 2005, the effect of the swaps was to reduce interest expense by $1 million and $2 million, respectively. A portion of the lease obligations is payable in Japanese yen. NS eliminated the associated exchange rate risk at the inception of each lease with a yen deposit sufficient to fund the yen-denominated obligation. Most of these deposits are held by foreign banks, primarily Japanese. As a result, NS is exposed to financial market risk relative to Japan. Counterparties to the interest rate swaps and Japanese banks holding yen deposits are major financial institutions believed by management to be creditworthy.

**New Accounting Pronouncements**

In June 2006, the FASB issued Interpretation No. (FIN) 48, “Accounting for Uncertainty in Income Taxes.” This Interpretation clarifies accounting for uncertainty in income taxes recognized in an enterprise’s financial statements in accordance with SFAS No. 109, “Accounting for Income Taxes.” FIN 48 prescribes a recognition threshold and measurement attribute for a tax position taken or expected to be taken in a tax return. Under the guidelines of FIN 48, an entity should recognize the financial statement benefit of a tax position if it determines that it is more likely than not that the position will be sustained on examination. NS will adopt this Interpretation in the first quarter of 2007 and expects it will not have a material effect on NS’ consolidated financial statements.

In September 2006, the Financial Accounting Standards Board (FASB) issued Statement of Financial Accounting Standards (SFAS) No. 158, “Employers’ Accounting for Defined Benefit Pension and Other Postretirement Plans.” This statement requires an employer to recognize in its statement of financial position the overfunded or

underfunded status of defined benefit pension and postretirement plans measured as the difference between the fair value of plan assets and the benefit obligation. Employers must also recognize as a component of other comprehensive income, net of tax, the actuarial gains and losses and the prior service costs, credits and transition costs that arise during the period. NS adopted this statement in the fourth quarter of 2006 (see Note 10).

In December 2004, the FASB issued SFAS No. 123(R), "Share-Based Payment." This statement establishes standards for accounting for transactions in which an entity exchanges its equity instruments for goods or services, such as stock-based compensation plans. NS adopted this standard in the first quarter of 2006 (see Note 1).

**Inflation**

In preparing financial statements, U.S. generally accepted accounting principles require the use of historical cost that disregards the effects of inflation on the replacement cost of property. NS, a capital-intensive company, has most of its capital invested in such assets. The replacement cost of these assets, as well as the related depreciation expense, would be substantially greater than the amounts reported on the basis of historical cost.

**Proposed Legislation and Regulations on Safety and Transportation of Hazardous Materials**

Regulations proposed by the Department of Homeland Security in late 2006 would mandate that railroads adopt chain of custody and security measures. If enacted, such regulations could cause service degradation and higher costs for the transportation of toxic inhalation hazard materials. In addition, certain local governments have sought to enact ordinances banning hazardous materials moving by rail within their borders. Some legislators have contemplated pre-notification requirements for hazardous material shipments. If promulgated, such ordinances could require the re-routing of hazardous materials shipments, with the potential for significant additional costs and network inefficiencies. Accordingly, NS will oppose efforts to impose unwarranted regulation in this area.

**FORWARD-LOOKING STATEMENTS**

This Management's Discussion and Analysis of Financial Condition and Results of Operations contains forward-looking statements that may be identified by the use of words like "believe," "expect," "anticipate" and "project." Forward-looking statements reflect management's good-faith evaluation of information currently available. However, such statements are dependent on and, therefore, can be influenced by, a number of external variables over which management has little or no control, including: domestic and international economic conditions; interest rates; the business environment in industries that produce and consume rail freight; competition and consolidation within the transportation industry; the operations of carriers with which NS interchanges; acts of terrorism or war; fluctuation in prices of key materials, in particular diesel fuel; labor difficulties, including strikes and work stoppages; legislative and regulatory developments; changes in securities and capital markets; disruptions to NS' technology infrastructure including computer systems; and natural events such as severe weather, hurricanes and floods. For more discussion about each risk factor, see Part I, Item 1A "Risk Factors." Forward-looking statements are not, and should not be relied upon as a guarantee of future performance or results, nor will they necessarily prove to be accurate indications of the times at or by which any such performance or results will be achieved. As a result, actual outcomes and results may differ materially from those expressed in forward-looking statements. NS undertakes no obligation to update or revise forward-looking statements.

**Item 7A. Quantitative and Qualitative Disclosures about Market Risk.**

The information required by this item is included in Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations" under the heading "Market Risks and Hedging Activities."

**Item 8. Financial Statements and Supplementary Data.**

**INDEX TO FINANCIAL STATEMENTS**


| | Page |
|---|---|
| Report of Management | K40 |
| Reports of Independent Registered Public Accounting Firm | K41 |
| Consolidated Statements of Income<br>Years ended Dec. 31, 2006, 2005 and 2004 | K44 |
| Consolidated Balance Sheets<br>As of Dec. 31, 2006 and 2005 | K45 |
| Consolidated Statements of Cash Flows<br>Years ended Dec. 31, 2006, 2005 and 2004 | K46 |
| Consolidated Statements of Changes in Stockholders' Equity<br>Years ended Dec. 31, 2006, 2005 and 2004 | K47 |
| Notes to Consolidated Financial Statements | K48 |
| The Index to Consolidated Financial Statement Schedule in Item 15 | K83 |

**Report of Management**

February 20, 2007

To the Stockholders
Norfolk Southern Corporation

Management is responsible for establishing and maintaining adequate internal control over financial reporting. In order to ensure that the Corporation's internal control over financial reporting is effective, management regularly assesses such controls and did so most recently for its financial reporting as of December 31, 2006. This assessment was based on criteria for effective internal control over financial reporting described in *Internal Control-Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this assessment, management has concluded that the Corporation maintained effective internal control over financial reporting as of December 31, 2006.

KPMG LLP, independent registered public accounting firm, has audited the Corporation's financial statements and has reported on management's assessment of the effectiveness of the Corporation's internal control over financial reporting as of December 31, 2006.

/s/ Charles W. Moorman
Charles W. Moorman
Chairman, President and
Chief Executive Officer

/s/ Henry C. Wolf
Henry C. Wolf
Vice Chairman and
Chief Financial Officer

/s/ Marta R. Stewart
Marta R. Stewart
Vice President and
Controller

**Report of Independent Registered Public Accounting Firm**

The Board of Directors and Stockholders
Norfolk Southern Corporation:

We have audited management's assessment, included in the accompanying Report of Management, that Norfolk Southern Corporation maintained effective internal control over financial reporting as of December 31, 2006, based on criteria established in *Internal Control – Integrated Framework*, issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Norfolk Southern Corporation's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express an opinion on management's assessment and an opinion on the effectiveness of Norfolk Southern Corporation's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with U.S. generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, management's assessment that Norfolk Southern Corporation maintained effective internal control over financial reporting as of December 31, 2006, is fairly stated, in all material respects, based on criteria established in *Internal Control – Integrated Framework*, issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Also in our opinion, Norfolk Southern Corporation maintained, in all material respects, effective internal control over financial reporting as of December 31, 2006, based on criteria established in *Internal Control – Integrated Framework,* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Norfolk Southern Corporation and subsidiaries as of December 31, 2006 and 2005, and the related consolidated statements of income, changes in stockholders' equity and cash flows for each of the years in the three-year period ended December 31, 2006. In connection with our audits of the consolidated financial statements, we have also audited the financial statement schedule as listed in Item 15(A)2. Our report dated February 20, 2007, expressed an unqualified opinion on the consolidated financial statements and financial statement schedule.

/s/ KPMG LLP
Norfolk, Virginia
February 20, 2007

## Report of Independent Registered Public Accounting Firm

The Board of Directors and Stockholders
Norfolk Southern Corporation:

We have audited the accompanying consolidated balance sheets of Norfolk Southern Corporation and subsidiaries as of December 31, 2006 and 2005, and the related consolidated statements of income, changes in stockholders' equity and cash flows for each of the years in the three-year period ended December 31, 2006. In connection with our audits of the consolidated financial statements, we have also audited the financial statement schedule as listed in Item 15(A)2. These consolidated financial statements and financial statement schedule are the responsibility of Norfolk Southern Corporation's management. Our responsibility is to express an opinion on these consolidated financial statements and financial statement schedule based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Norfolk Southern Corporation and subsidiaries as of December 31, 2006 and 2005, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 2006, in conformity with U.S. generally accepted accounting principles. Also in our opinion, the related financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

As discussed in note 1 to the consolidated financial statements, Norfolk Southern Corporation adopted Statement of Financial Accounting Standards No. 123 (revised 2004), *Share-Based Payment,* effective January 1, 2006, and Statement of Financial Accounting Standards No. 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans,* effective December 31, 2006.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of Norfolk Southern Corporation's internal control over financial reporting as of December 31, 2006, based on criteria established in *Internal Control – Integrated Framework*, issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated February 20, 2007, expressed an unqualified opinion on management's assessment of, and the effective operation of, internal control over financial reporting.

/s/ KPMG LLP
Norfolk, Virginia
February 20, 2007

**Norfolk Southern Corporation and Subsidiaries**
**Consolidated Statements of Income**

| | Years ended Dec. 31, 2006 | 2005 | 2004 |
|---|---|---|---|
| | *($ in millions, except earnings per share)* | | |
| **Railway operating revenues** | $ 9,407 | $ 8,527 | $ 7,312 |
| **Railway operating expenses:** | | | |
| Compensation and benefits | 2,637 | 2,493 | 2,272 |
| Materials, services and rents | 1,895 | 1,809 | 1,601 |
| Conrail rents and services | 126 | 129 | 319 |
| Depreciation | 738 | 774 | 598 |
| Diesel fuel | 977 | 727 | 449 |
| Casualties and other claims | 220 | 224 | 151 |
| Other | 257 | 254 | 220 |
| Total railway operating expenses | 6,850 | 6,410 | 5,610 |
| **Income from railway operations** | 2,557 | 2,117 | 1,702 |
| Other income – net | 149 | 74 | 76 |
| Interest expense on debt | 476 | 494 | 489 |
| Income before income taxes | 2,230 | 1,697 | 1,289 |
| Provision for income taxes | 749 | 416 | 379 |
| **Net income** | $ 1,481 | $ 1,281 | $ 910 |
| **Per share amounts:** | | | |
| Net income | | | |
| Basic | $ 3.63 | $ 3.17 | $ 2.31 |
| Diluted | $ 3.57 | $ 3.11 | $ 2.28 |

*See accompanying notes to consolidated financial statements.*

**Norfolk Southern Corporation and Subsidiaries**
**Consolidated Balance Sheets**

| | As of Dec. 31, 2006 | As of Dec. 31, 2005 |
|---|---|---|
| | *($ in millions)* | |
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 527 | $ 289 |
| Short-term investments | 391 | 968 |
| Accounts receivable – net | 992 | 931 |
| Materials and supplies | 151 | 132 |
| Deferred income taxes | 186 | 167 |
| Other current assets | 153 | 163 |
| Total current assets | 2,400 | 2,650 |
| Investments | 1,755 | 1,558 |
| Properties less accumulated depreciation | 21,098 | 20,735 |
| Other assets | 775 | 916 |
| **Total assets** | $ 26,028 | $ 25,859 |
| **Liabilities and stockholders' equity** | | |
| Current liabilities: | | |
| Accounts payable | $ 1,181 | $ 1,163 |
| Income and other taxes | 205 | 231 |
| Other current liabilities | 216 | 213 |
| Current maturities of long-term debt | 491 | 314 |
| Total current liabilities | 2,093 | 1,921 |
| Long-term debt | 6,109 | 6,616 |
| Other liabilities | 1,767 | 1,415 |
| Deferred income taxes | 6,444 | 6,631 |
| **Total liabilities** | 16,413 | 16,583 |
| Stockholders' equity: | | |
| Common stock $1.00 per share par value, 1,350,000,000 shares authorized; issued 418,200,239 and 430,718,913 shares, Respectively | 418 | 431 |
| Additional paid-in capital | 1,303 | 992 |
| Unearned restricted stock | -- | (17) |
| Accumulated other comprehensive loss | (369) | (77) |
| Retained income | 8,283 | 7,967 |
| Less treasury stock at cost, 20,780,638 and 20,833,125 shares, Respectively | (20) | (20) |
| **Total stockholders' equity** | 9,615 | 9,276 |
| **Total liabilities and stockholders' equity** | $ 26,028 | $ 25,859 |

*See accompanying notes to consolidated financial statements.*

**Norfolk Southern Corporation and Subsidiaries**
**Consolidated Statements of Cash Flows**

| | Years Ended Dec. 31, 2006 | 2005 | 2004 |
|---|---|---|---|
| | ($ in millions) | | |
| **Cash flows from operating activities** | | | |
| Net income | $ 1,481 | $ 1,281 | $ 910 |
| Reconciliation of net income to net cash provided by operating activities: | | | |
| Depreciation | 750 | 787 | 609 |
| Deferred income taxes | (8) | 80 | 200 |
| Equity in earnings of Conrail | (25) | (37) | (54) |
| Gain on Conrail Corporate Reorganization | -- | -- | (40) |
| Gains and losses on properties and investments | (54) | (51) | (46) |
| Changes in assets and liabilities affecting operations: | | | |
| Accounts receivable | (60) | (94) | (71) |
| Materials and supplies | (19) | (28) | (12) |
| Other current assets | (11) | 20 | (18) |
| Current liabilities other than debt | 38 | 55 | 126 |
| Other – net | 114 | 92 | 57 |
| Net cash provided by operating activities | 2,206 | 2,105 | 1,661 |
| **Cash flows from investing activities** | | | |
| Property additions | (1,178) | (1,025) | (1,041) |
| Property sales and other transactions | 119 | 110 | 75 |
| Investments, including short-term | (1,804) | (1,822) | (396) |
| Investment sales and other transactions | 2,179 | 910 | 117 |
| Net cash used for investing activities | (684) | (1,827) | (1,245) |
| **Cash flows from financing activities** | | | |
| Dividends | (278) | (194) | (142) |
| Common stock issued – net | 297 | 194 | 162 |
| Purchase and retirement of common stock | (964) | -- | -- |
| Proceeds from borrowings | -- | 433 | 202 |
| Debt repayments | (339) | (889) | (455) |
| Net cash used for financing activities | (1,284) | (456) | (233) |
| Net increase (decrease) in cash and cash equivalents | 238 | (178) | 183 |
| **Cash and cash equivalents** | | | |
| At beginning of year | 289 | 467 | 284 |
| At end of year | $ 527 | $ 289 | $ 467 |
| **Supplemental disclosure of cash flow information** | | | |
| Cash paid during the year for: | | | |
| Interest (net of amounts capitalized) | $ 473 | $ 485 | $ 483 |
| Income taxes (net of refunds) | $ 692 | $ 271 | $ 146 |

*See accompanying notes to consolidated financial statements.*

**Norfolk Southern Corporation and Subsidiaries**
**Consolidated Statements of Changes in Stockholders' Equity**

| | Common Stock | Additional Paid-in Capital | Unearned Restricted Stock | Accum. Other Compre-hensive Loss | Retained Income | Treasury Stock | Total |
|---|---|---|---|---|---|---|---|
| | | | *($ in millions, except per share amounts)* | | | | |
| **Balance Dec. 31, 2003** | $ 412 | $ 521 | $ (5) | $ (44) | $ 6,112 | $ (20) | $ 6,976 |
| Comprehensive income | | | | | | | |
| Net income | | | | | 910 | | 910 |
| Other comprehensive income | | | | 20 | | | 20 |
| Total comprehensive income | | | | | | | 930 |
| Dividends on Common Stock, $0.36 per share | | | | | (142) | | (142) |
| Stock-based compensation, including tax benefit of $30 | 9 | 204 | (3) | | | | 210 |
| Other | | 3 | | | | | 3 |
| **Balance Dec. 31, 2004** | 421 | 728 | (8) | (24) | 6,880 | (20) | 7,977 |
| Comprehensive income | | | | | | | |
| Net income | | | | | 1,281 | | 1,281 |
| Other comprehensive loss | | | | (53) | | | (53) |
| Total comprehensive income | | | | | | | 1,228 |
| Dividends on Common Stock, $0.48 per share | | | | | (194) | | (194) |
| Stock-based compensation, including tax benefit of $47 | 10 | 260 | (9) | | | | 261 |
| Other | | 4 | | | | | 4 |
| **Balance Dec. 31, 2005** | 431 | 992 | (17) | (77) | 7,967 | (20) | 9,276 |
| Comprehensive income | | | | | | | |
| Net income | | | | | 1,481 | | 1,481 |
| Other comprehensive income | | | | 2 | | | 2 |
| Total comprehensive income | | | | | | | 1,483 |
| Adoption of SFAS 158, net of tax | | | | (294) | | | (294) |
| Dividends on Common Stock, $0.68 per share | | | | | (278) | | (278) |
| Share repurchases | (22) | (63) | | | (879) | | (964) |
| Stock-based compensation, including tax benefit of $85 | 9 | 372 | 17 | | (8) | | 390 |
| Other | | 2 | | | | | 2 |
| **Balance Dec. 31, 2006** | $ 418 | $ 1,303 | $ - | $ (369) | $ 8,283 | $ (20) | $ 9,615 |

*See accompanying notes to consolidated financial statements.*

**Norfolk Southern Corporation and Subsidiaries**
**Notes to Consolidated Financial Statements**

The following Notes are an integral part of the Consolidated Financial Statements.

## 1. Summary of Significant Accounting Policies

### Description of Business

Norfolk Southern Corporation is a Virginia-based holding company engaged principally in the rail transportation business, operating approximately 21,000 route miles primarily in the East and Midwest. These consolidated financial statements include Norfolk Southern Corporation (Norfolk Southern) and its majority-owned and controlled subsidiaries (collectively, NS). Norfolk Southern's major subsidiary is Norfolk Southern Railway Company (NSR). All significant intercompany balances and transactions have been eliminated in consolidation.

The railroad transports raw materials, intermediate products and finished goods classified in the following market groups (percent of total railway operating revenues in 2006): coal (25%); intermodal (21%); metals/construction (12%); chemicals (12%); agriculture/consumer products/government (11%); automotive (10%); and paper/clay/forest products (9%). Although most of NS' customers are domestic, ultimate points of origination or destination for some of the products transported (particularly coal bound for export and some intermodal containers) may be outside the United States. Approximately 85% of NS' railroad employees are covered by collective bargaining agreements with various labor unions.

### Use of Estimates

The preparation of financial statements in accordance with U.S. generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Management reviews its estimates, including those related to the recoverability and useful lives of assets, as well as liabilities for litigation, environmental remediation, casualty claims, income taxes, and pension and other postretirement benefits. Changes in facts and circumstances may result in revised estimates.

### Revenue Recognition

Transportation revenue is recognized proportionally as a shipment moves from origin to destination and related expenses are recognized as incurred. Refunds (which are primarily volume-based incentives) are recorded as a reduction to revenues on the basis of management's best estimate of projected liability, which is based on historical activity, current traffic counts and the expectation of future activity. NS regularly monitors its contract refund liability, and historically, the estimates have not differed significantly from the amounts ultimately refunded. Switching, demurrage and other incidental service revenues are recognized when the services are performed.

### Derivatives

NS does not engage in the trading of derivatives. NS uses derivative financial instruments to reduce the risk of volatility in its diesel fuel costs and in the management of its mix of fixed and floating-rate debt. Management has determined that these derivative instruments qualify as either fair-value or cash-flow hedges, having values that highly correlate with the underlying hedged exposures, and has designated such instruments as hedging transactions. Income and expense related to the derivative financial instruments are recorded in the same category as generated by the underlying asset or liability. Credit risk related to the derivative financial instruments is

considered to be minimal and is managed by requiring high credit standards for counterparties and periodic settlements (see Note 16).

**Stock-Based Compensation**

NS has stock-based employee compensation plans, which are more fully described in Note 11. Through Dec. 31, 2005, NS applied the intrinsic value recognition and measurement principles of APB Opinion No. 25, "Accounting for Stock Issued to Employees" (APB Opinion 25), and related interpretations in accounting for these plans (See "Required Accounting Changes in 2006," below).

The following table illustrates the effect on net income and earnings per share if NS had applied the fair value recognition provisions of Statement of Financial Accounting Standards No. 123, "Accounting for Stock-Based Compensation" (SFAS 123), to stock-based employee compensation:

| | 2005 | 2004 |
|---|---|---|
| | *($ in millions except per share)* | |
| Net income, as reported | $ 1,281 | $ 910 |
| Add: Stock-based employee compensation expense as reported | 46 | 32 |
| Deduct: Stock-based employee compensation expense determined under fair value method | (45) | (44) |
| Pro forma net income | $ 1,282 | $ 898 |
| Earnings per share: | | |
| As reported | | |
| Basic | $ 3.17 | $ 2.31 |
| Diluted | $ 3.11 | $ 2.28 |
| Pro forma | | |
| Basic | $ 3.17 | $ 2.28 |
| Diluted | $ 3.10 | $ 2.25 |

**Required Accounting Changes in 2006**

Effective January 1, 2006, NS adopted Statement of Financial Accounting Standards, No. 123(R), "Share-Based Payment," [SFAS 123(R)]. This statement applies to awards granted, modified, repurchased or cancelled after the effective date as well as awards that are unvested at the effective date and includes, among other things, the requirement to expense the fair value of stock options. The standard also requires that awards to be settled in cash be measured at fair value at each reporting date until ultimate settlement. NS adopted SFAS 123(R) using the modified prospective method, which requires application of the standard to all awards granted, modified, repurchased or cancelled on or after January 1, 2006, and to all awards for which the requisite service has not been rendered as of such date. In accordance with the modified prospective approach, prior period financial statements have not been restated to reflect the impact of SFAS 123(R). As compared to amounts that would have been recognized under APB Opinion 25, the adoption of SFAS 123(R) resulted in $27 million of additional compensation expense for 2006, including the immediate expensing of 2006 grants made to retirement-eligible employees, which reduced net income by $20 million, or 5 cents per basic and diluted share. Under SFAS 123(R), all new awards granted to retirement eligible employees must be expensed immediately. Under APB Opinion No. 25 and related interpretations, such awards were amortized over the stated service period. Such awards were treated similarly under SFAS 123 in the pro forma amounts disclosed in the preceding table.

Effective Dec. 31, 2006, NS adopted Statement of Financial Accounting Standards (SFAS) No. 158, "Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans" (see Note 10).

**Cash Equivalents**

"Cash equivalents" are highly liquid investments purchased three months or less from maturity.

**Allowance for Doubtful Accounts**

NS' allowance for doubtful accounts was $5 million at Dec. 31, 2006, and $6 million at Dec. 31, 2005. To determine its allowance for doubtful accounts, NS evaluates historical loss experience (which has not been significant), the characteristics of current accounts, as well as general economic conditions and trends.

**Materials and Supplies**

"Materials and supplies," consisting mainly of fuel oil and items for maintenance of property and equipment, are stated at the lower of average cost or market. The cost of materials and supplies expected to be used in capital additions or improvements is included in "Properties."

**Investments**

Debt securities classified as "held-to-maturity" are reported at amortized cost and marketable equity and debt securities classified as "trading" or "available-for-sale" are recorded at fair value. Unrealized after-tax gains and losses for investments designated as "available-for-sale," are recognized in "Accumulated other comprehensive loss."

Investments where NS has the ability to exercise significant influence over but does not control the entity are accounted for using the equity method in accordance with APB Opinion No. 18, "The Equity Method of Accounting for Investments in Common Stock."

**Properties**

"Properties" are stated principally at cost and are depreciated using group depreciation. Rail is depreciated primarily on the basis of use measured by gross ton-miles. Other properties are depreciated generally using the straight-line method over the lesser of estimated service or lease lives. Depletion of natural resources (see Note 2) is based on units of production. Depreciation in the Consolidated Statements of Cash Flows includes depreciation and depletion. NS capitalizes interest on major capital projects during the period of their construction. Expenditures, including those on leased assets that extend an asset's useful life or increase its utility, are capitalized. Costs related to repairs and maintenance activities that do not extend an asset's useful life or increase its utility are expensed when such repairs are performed. When properties other than land and nonrail assets are sold or retired in the ordinary course of business, the cost of the assets, net of sale proceeds or salvage, is charged to accumulated depreciation, and no gain or loss is recognized through income. Gains and losses on disposal of land and nonrail assets are included in "Other income - net" (see Note 2) since such income is not a product of NS' railroad operations.

NS reviews the carrying amount of properties whenever events or changes in circumstances indicate that such carrying amount may not be recoverable based on future undiscounted cash flows. Assets that are deemed impaired as a result of such review are recorded at the lower of carrying amount or fair value.

**Reclassifications**

Certain comparative prior year amounts have been reclassified to conform to the current year presentation.

## 2. Other Income - Net

| | 2006 | 2005 | 2004 |
|---|---|---|---|
| | | *($ in millions)* | |
| Income from natural resources: | | | |
| Royalties from coal | $ 55 | $ 54 | $ 42 |
| Nonoperating depletion and depreciation | (12) | (13) | (11) |
| Subtotal | 43 | 41 | 31 |
| Interest income | 76 | 41 | 13 |
| Gains and losses from sale of properties and investments | 54 | 49 | 46 |
| Rental income | 45 | 42 | 40 |
| Equity in earnings of Conrail (Note 4) | 25 | 37 | 11 |
| Corporate-owned life insurance – net | 24 | 4 | 8 |
| Gain from Conrail Corporate Reorganization (Note 4) | -- | -- | 40 |
| Equity in losses of partnerships | (68) | (108) | (61) |
| Other interest expense | (17) | (6) | (17) |
| Taxes on nonoperating property | (9) | (9) | (8) |
| Charitable contributions | (4) | (4) | (4) |
| Other | (20) | (13) | (23) |
| Total | $ 149 | $ 74 | $ 76 |

"Other income - net" includes income and costs not part of rail operations and the income generated by the activities of NS' noncarrier subsidiaries as well as the costs incurred by those subsidiaries in their operations. NS has a 40.5% interest in a limited liability company that owns and operates facilities that produce synthetic fuel from coal. The production of synthetic fuel results in tax credits as well as expenses related to the investments. The expenses are included in "Equity in losses of partnerships" above.

"Other current assets" in the Consolidated Balance Sheets includes prepaid interest of $50 million at Dec. 31, 2006, and $47 million at Dec. 31, 2005, arising from corporate-owned life insurance borrowings.

## 3. Income Taxes

### Provision for Income Taxes

| | 2006 | 2005 | 2004 |
|---|---|---|---|
| | | *($ in millions)* | |
| Current: | | | |
| Federal | $ 666 | $ 283 | $ 133 |
| State | 91 | 53 | 46 |
| Total current taxes | 757 | 336 | 179 |
| Deferred: | | | |
| Federal | 3 | 220 | 181 |
| State | (11) | (140) | 19 |
| Total deferred taxes | (8) | 80 | 200 |
| Provision for income taxes | $ 749 | $ 416 | $ 379 |

**Reconciliation of Statutory Rate to Effective Rate**

The "Provision for income taxes" in the Consolidated Statements of Income differs from the amounts computed by applying the statutory federal corporate tax rate as follows:

| | 2006 Amount | 2006 % | 2005 Amount | 2005 % | 2004 Amount | 2004 % |
|---|---|---|---|---|---|---|
| | | | ($ in millions) | | | |
| Federal income tax at statutory rate | $ 780 | 35 | $ 594 | 35 | $ 451 | 35 |
| State income taxes, net of federal tax effect | 52 | 2 | 40 | 2 | 42 | 3 |
| Tax credits | (62) | (3) | (104) | (6) | (80) | (7) |
| Ohio rate change, net of federal tax effect | -- | -- | (96) | (6) | -- | -- |
| Equity in earnings of Conrail | (7) | -- | (10) | -- | (18) | (1) |
| Gain from Conrail Corporate Reorganization | -- | -- | -- | -- | (14) | (1) |
| Other – net | (14) | -- | (8) | -- | (2) | -- |
| Provision for income taxes | $ 749 | 34 | $ 416 | 25 | $ 379 | 29 |

In June 2005, Ohio enacted tax legislation that phases out its Corporate Franchise Tax, which was generally based on federal taxable income, and phases in a new gross receipts tax called the Commercial Activity Tax, which is based on current year sales and rentals. The phased elimination of the Corporate Franchise Tax resulted in a reduction in NS' deferred income tax liability, as required by Statement of Financial Accounting Standards No. 109, "Accounting for Income Taxes," which, as noted above, decreased deferred tax expense by $96 million.

**Deferred Tax Assets and Liabilities**

Certain items are reported in different periods for financial reporting and income tax purposes. Deferred tax assets and liabilities are recorded in recognition of these differences. The tax effects of temporary differences that give rise to significant portions of the deferred tax assets and deferred tax liabilities are as follows:

| | Dec. 31, 2006 | Dec. 31, 2005 |
|---|---|---|
| | ($ in millions) | |
| Deferred tax assets: | | |
| Compensation and benefits, including post-retirement | $ 382 | $ 160 |
| Accruals, including casualty and other claims | 211 | 207 |
| Other | 44 | 49 |
| Total gross deferred tax assets | 637 | 416 |
| Less valuation allowance | (9) | (10) |
| Net deferred tax asset | 628 | 406 |
| Deferred tax liabilities: | | |
| Property | (6,659) | (6,632) |
| Other | (227) | (238) |
| Total gross deferred tax liabilities | (6,886) | (6,870) |
| Net deferred tax liability | (6,258) | (6,464) |
| Net current deferred tax asset | 186 | 167 |
| Net long-term deferred tax liability | $ (6,444) | $ (6,631) |

Except for amounts for which a valuation allowance has been provided, management believes that it is more likely than not that future taxable income will be sufficient to realize the deferred tax assets. The valuation allowance at the end of each year relates to subsidiary state income tax net operating losses that may not be utilized prior to their expiration. The total valuation allowance decreased $1 million in 2006, $3 million in 2005 and $1 million in 2004.

**Internal Revenue Service (IRS) Reviews**

Consolidated federal income tax returns have been examined and Revenue Agent Reports have been received for all years up to and including 2003. In 2004, the favorable resolution of the IRS audit of a synthetic fuel-related investment is reflected in the "Tax credits" line of the reconciliation of statutory rate to the effective rate. The consolidated federal income tax returns for 2004 and 2005 are being audited by the IRS. Management believes that adequate provision has been made for any additional taxes and interest thereon that might arise as a result of IRS examinations.

**4. Investments**

| | Dec. 31, 2006 | Dec. 31, 2005 |
|---|---|---|
| | *($ in millions)* | |
| Short-term investments with average maturities at Dec. 31, 2006: | | |
| Federal government notes, 5 months | $ 124 | $ 348 |
| Corporate notes, 4 months | 117 | 290 |
| Commercial paper, 2 months | 74 | 251 |
| Municipal debt, 1 month | 22 | 43 |
| Other short-term investments, less than one month | 54 | 36 |
| Total short-term investments | $ 391 | $ 968 |
| Long-term investments: | | |
| Investment in Conrail Inc. | $ 849 | $ 812 |
| Other equity method investments | 451 | 331 |
| Company-owned life insurance at net cash surrender value | 310 | 276 |
| Other investments | 145 | 139 |
| Total long-term investments | $ 1,755 | $ 1,558 |

The $391 million in "Short-term investments" is classified as available-for-sale, of which approximately three-quarters mature within six months. Unrealized gains from short-term investments were approximately $1 million at Dec. 31, 2006, and unrealized losses from short-term investments were approximately $1 million at Dec. 31, 2005.

Other equity method investments, shown above, includes NS' $100 million investment in MSLLC, a joint venture formed with Kansas City Southern, made in 2006.

**Investment in Conrail and Operations Over Its Lines**

**Overview**

Through a limited liability company, Norfolk Southern and CSX Corporation (CSX) jointly own Conrail Inc. (Conrail), whose primary subsidiary is Consolidated Rail Corporation (CRC). NS has a 58% economic and 50% voting interest in the jointly owned entity, and CSX has the remainder of the economic and voting interests. CRC owns and operates certain properties (the Shared Assets Areas) for the joint and exclusive

benefit of NSR and CSX Transportation Inc. (CSXT). The costs of operating the Shared Assets Areas are borne by NSR and CSXT based on usage. In addition, NSR and CSXT pay CRC a fee for access to the Shared Assets Areas.

**Conrail Corporate Reorganization**

On August 27, 2004, NS, CSX and Conrail completed a reorganization of Conrail (Conrail Corporate Reorganization), which established direct ownership and control by NSR and CSXT of two former CRC subsidiaries, Pennsylvania Lines LLC (PRR) and New York Central Lines LLC (NYC), respectively. Prior to the Conrail Corporate Reorganization, NSR operated the routes and assets of PRR and CSXT operated the routes and assets of NYC, each in accordance with operating and lease agreements. Pursuant to the Conrail Corporate Reorganization, the operating and lease agreements were terminated and PRR and NYC were merged into NSR and CSXT, respectively. The reorganization did not involve the Shared Assets Areas and did not affect the competitive rail service provided in the Shared Assets Areas. Conrail continues to own, manage and operate the Shared Assets Areas as previously approved by the Surface Transportation Board (STB).

As a part of the Conrail Corporate Reorganization, Conrail restructured its existing unsecured and secured public indebtedness, with the consent of Conrail's debtholders. Prior to the restructuring, there were two series of unsecured public debentures with an outstanding principal amount of approximately $800 million and 13 series of secured debt with an outstanding principal amount of approximately $300 million. Guaranteed debt securities were offered in an approximate 58%/42% ratio in exchange for Conrail's unsecured debentures. Of the $800 million unsecured public debentures, $779 million were tendered and accepted for exchange, and NSR issued unsecured public debentures with a total principal of $452 million and an issue-date fair value of $595 million. Conrail's secured debt and lease obligations remain obligations of Conrail and are supported by leases and subleases which are the direct lease and sublease obligations of NSR or CSXT. Substantially all of these NSR obligations are capital leases and, accordingly, are a component of NS' capital lease obligations (see Note 7).

NS accounted for the transaction at fair value, which resulted in the recognition of a $40 million net gain (reported in "Other income – net") in 2004 from the tax-free distribution to NS of a portion of its investment in Conrail. Originally in 2004, the gain was calculated and reported as $53 million. However, in December 2006, CSX determined that the value for a portion of a rail yard transferred from Conrail to CSX had been omitted. Accordingly, the gain was adjusted in the accompanying Consolidated Statement of Income for 2004 to reflect an immaterial correction of $13 million. In addition, the Consolidated Balance Sheet as of December 31, 2005 reflects corresponding adjustments to the amounts previously reported for Investments (reduction of $32 million), Properties (increase of $30 million), Deferred income tax liabilities (increase of $11 million) and Retained income (decrease of $13 million).

NS concluded that fair value was the appropriate measurement for 42% of PRR because the transaction resulted in the complete ownership and control of PRR. The remaining 58% of PRR was recorded at NS' carryover basis. As a result of the transaction, NS' investment in Conrail does not include amounts related to PRR and NYC beginning in 2005. Instead the assets and liabilities of PRR are reflected in their respective line items in NS' Consolidated Balance Sheet and amounts due to PRR were extinguished.

The following summarizes the effect of this 2004 transaction, as adjusted for the immaterial correction described above ($ in millions):

| | | |
|---|---|---|
| Properties | $ | 8,398 |
| Extinguishment of amounts due to PRR | | 870 |
| Other assets and liabilities, net | | 177 |
| Deferred income taxes | | (3,124) |
| Long-term debt, including current maturities | | (734) |
| Net assets received | | 5,587 |
| Investment in Conrail | | (5,547) |
| Gain from Conrail Corporate Reorganization | $ | 40 |

The amounts shown above for the net assets received reflect the fair value of such assets. Properties were valued based on information received from an independent valuation consultant. The assets of PRR included the note due from NSR discussed below under the heading "Related Party Transactions," which resulted in its effectively being extinguished. Debt was recorded at fair value based on interest rates at the time of the reorganization. The reduction to NS' investment in Conrail represented the removal of amounts related to NS' equity interests in PRR and NYC as well as amounts related to the Conrail debt that was exchanged or effectively assumed by the leases and subleases entered into to support those obligations.

On the Consolidated Statements of Income, "Conrail rents and services" was reduced as a result of the 2004 transaction. After the Conrail Corporate Reorganization, "Conrail rents and services" reflects only the expenses associated with the Shared Assets Areas, and other expenses (primarily the depreciation related to the PRR assets) are reflected in their respective line items in the Consolidated Statements of Income. The transaction's impact on 2004 net income was the $40 million gain discussed above. Prospectively, the transaction will have no effect on revenues and will not have a significant ongoing effect on net income. Had the transaction been consummated before the periods presented, there would have been no change in revenues and no significant change to net income.

NS is continuing to apply the equity method of accounting to its remaining investment in Conrail in accordance with APB Opinion No. 18, "The Equity Method of Accounting for Investments in Common Stock." NS is amortizing the excess of the purchase price over Conrail's net equity using the principles of purchase accounting, based primarily on the estimated remaining useful lives of Conrail's depreciable property and equipment, including the related deferred tax effect of the differences in tax and accounting bases for certain assets, as all of the purchase price at acquisition was allocable to Conrail's tangible assets and liabilities. At Dec. 31, 2006, the difference between NS' investment in Conrail and its share of Conrail's underlying net equity was $556 million.

**Related-Party Transactions**

CRC owns and operates the Shared Assets Areas for the joint and exclusive benefit of NSR and CSXT. NSR and CSXT pay CRC a fee for joint and exclusive access to the Shared Assets Areas. In addition, NSR and CSXT pay, based on usage, the costs incurred by CRC to operate the Shared Assets Areas. Future minimum lease payments due to CRC under the Shared Assets Areas agreements are as follows: $26 million in each of 2007 through 2011 and $318 million thereafter.

The components of "Conrail rents and services" are as follows:

| | Years Ended Dec. 31, 2006 | 2005 | 2004 |
|---|---|---|---|
| | ($ in millions) | | |
| Expenses for amounts due to CRC for operation of the Shared Assets Areas | $ 126 | $ 129 | $ 129 |
| Amounts due to PRR for use by NSR of operating properties and equipment (prior to the Conrail Corporate Reorganization) | -- | -- | 233 |
| NS' equity in the earnings of Conrail, net of amortization (prior to the Conrail Corporate Reorganization)* | -- | -- | (43) |
| Conrail rents and services | $ 126 | $ 129 | $ 319 |

*After the reorganization, NS' equity in the earnings of Conrail, net of amortization, is included in "Other income – net," (see Note 2).

Prior to the Conrail Corporate Reorganization, a significant portion of the payments made to PRR was borrowed back from a subsidiary of PRR under a note due in 2032. Amounts outstanding under this note comprised the long-term balance of "Due to Conrail," and this note was effectively extinguished by the reorganization. "Due to Conrail" included in "Accounts payable" (see Note 6) is composed principally of amounts related to expenses included in "Conrail rents and services," as discussed above. "Long-term advances from Conrail," included in "Other liabilities" (see Note 9), bear interest at an average rate of 4.4% and are due in 2035.

NS provides certain general and administrative support functions to Conrail, the fees for which are billed in accordance with several service-provider arrangements and amount to approximately $7 million annually.

**Summary Financial Information – Conrail**

As a result of the Conrail Corporate Reorganization discussed above, two CRC subsidiaries, PRR and NYC, were distributed to NS and CSX, respectively, and CRC's public indebtedness was restructured. The results of the operations of these subsidiaries are presented in the following 2004 financial information as "Discontinued Operations." The 2006, 2005 and 2004 summarized information was derived from unaudited financial statements.

**Summarized Income Statement Information - Conrail**

| | Years Ended Dec. 31, 2006 | 2005 | 2004 |
|---|---|---|---|
| | ($ in millions) | | |
| Operating revenues | $ 373 | $ 378 | $ 352 |
| Operating income (loss) | $ 16 | $ 32 | $ (18) |
| Income from continuing operations | $ 47 | $ 85 | $ 22 |
| Discontinued operations (PRR and NYC) | $ -- | $ -- | $ 119 |
| Net income | $ 47 | $ 85 | $ 140 |

Note: Conrail adopted FIN No. 46 "Consolidation of Variable Interest Entities," effective Jan. 1, 2004, and recorded a $1 million net adjustment for the cumulative effect of this change in accounting on years prior to 2004.

**Summarized Balance Sheet Information - Conrail**

| | As of Dec. 31, 2006 | As of Dec. 31, 2005 |
|---|---|---|
| | *($ in millions)* | |
| Assets: | | |
| Current assets | $ 280 | $ 233 |
| Noncurrent assets | 1,043 | 1,242 |
| Total assets | $ 1,323 | $ 1,475 |
| Liabilities and stockholders' equity: | | |
| Current liabilities | $ 263 | $ 233 |
| Noncurrent liabilities | 555 | 807 |
| Stockholders' equity | 505 | 435 |
| Total liabilities and stockholders' equity | $ 1,323 | $ 1,475 |

Note: Current assets include amounts due from NS and CSX totaling $173 million at Dec. 31, 2006, and $134 million at Dec. 31, 2005. Noncurrent assets include amounts due from NS and CSX totaling $351 million at Dec. 31, 2006, and $413 million at Dec. 31, 2005. Current liabilities include amounts payable to NS and CSX totaling $4 million at Dec. 31, 2006, and $6 million at Dec. 31, 2005.

**5. Properties**

| | Dec. 31, 2006 | Dec. 31, 2005 | Depreciation Rate for 2006 |
|---|---|---|---|
| | *($ in millions)* | | |
| Land | $ 2,082 | $ 2,088 | |
| Railway property: | | | |
| Road | 18,725 | 18,161 | 2.6% |
| Equipment | 7,085 | 6,838 | 3.7% |
| Other property | 471 | 469 | 2.6% |
| | 28,363 | 27,556 | |
| Less accumulated depreciation | (7,265) | (6,821) | |
| Net properties | $ 21,098 | $ 20,735 | |

Railway property includes $602 million at Dec. 31, 2006 and 2005, of assets recorded pursuant to capital leases with accumulated amortization of $192 million and $170 million at Dec. 31, 2006 and 2005, respectively. Other property includes the costs of obtaining rights to natural resources of $337 million at Dec. 31, 2006 and 2005, with accumulated depletion of $165 million and $157 million at Dec. 31, 2006 and 2005, respectively.

**Capitalized Interest**

Total interest cost incurred on debt in 2006, 2005 and 2004 was $489 million, $505 million and $499 million, respectively, of which $13 million, $11 million and $10 million was capitalized.

**6. Current Liabilities**

| | Dec. 31, 2006 | Dec. 31, 2005 |
|---|---|---|
| | ($ in millions) | |
| Accounts payable: | | |
| Accounts and wages payable | $ 569 | $ 571 |
| Casualty and other claims | 301 | 291 |
| Vacation liability | 120 | 119 |
| Equipment rents payable – net | 96 | 101 |
| Due to Conrail | 68 | 56 |
| Other | 27 | 25 |
| Total | $ 1,181 | $ 1,163 |
| Other current liabilities: | | |
| Interest payable | $ 88 | $ 100 |
| Retiree benefit obligations (Note 10) | 53 | 45 |
| Liabilities for forwarded traffic | 50 | 47 |
| Other | 25 | 21 |
| Total | $ 216 | $ 213 |

**7. Long-term Debt**

| | Dec. 31, 2006 | Dec. 31, 2005 |
|---|---|---|
| | ($ in millions) | |
| Notes and debentures at average rates and maturities as follows: | | |
| 7.01%, maturing to 2011 | $ 1,540 | $ 1,740 |
| 6.67%, maturing 2014 and 2017 | 981 | 991 |
| 8.25%, maturing 2020 to 2025 | 764 | 764 |
| 7.12%, maturing 2027 to 2031 | 1,290 | 1,300 |
| 7.21%, maturing 2037 and 2043 | 855 | 855 |
| 7.02%, maturing 2097 and 2105 | 650 | 650 |
| Equipment obligations at an average rate of 6.02%, maturing to 2014 | 306 | 363 |
| Capitalized leases at an average rate of 4.87%, maturing to 2024 | 231 | 290 |
| Other debt at an average rate of 7.31%, maturing to 2019 | 113 | 113 |
| Discounts and premiums, net | (130) | (136) |
| Total long-term debt | 6,600 | 6,930 |
| Less current maturities | (491) | (314) |
| Long-term debt excluding current maturities | $ 6,109 | $ 6,616 |

| Long-term debt maturities subsequent to 2007 are as follows: | |
|---|---|
| 2008 | $ 368 |
| 2009 | 475 |
| 2010 | 339 |
| 2011 | 337 |
| 2012 and subsequent years | 4,590 |
| Total | $ 6,109 |

In May 2005, NS issued $717 million of unsecured notes ($350 million at 5.64% due 2029 and $367 million at 5.59% due 2025) and paid $218 million of premium in exchange for $717 million of its previously issued unsecured notes ($350 million at 7.8% due 2027, $200 million at 7.25% due 2031, and $167 million at 9.0% due

2021). The $218 million cash premium payment is reflected as a reduction of debt in the Consolidated Balance Sheet and Statement of Cash Flows and is included in "Discounts and premiums, net." The premium is being amortized as additional interest expense over the terms of the new debt, resulting in effective interest rates of 8.7% for the 2029 notes and 9.0% for the 2025 notes.

In August 2004, pursuant to the Conrail Corporate Reorganization (see Note 4), NSR issued unsecured public debentures with a total principal of $452 million ($314 million at 9.75% due 2020 and $138 million at 7.875% due 2043) and fair value of $595 million. This difference is included in "Discounts and premiums, net" and is being amortized as a reduction of interest expense over the terms of the notes, resulting in effective interest rates of 6.0% for the 2020 notes and 6.2% for the 2043 notes.

The railroad equipment obligations and the capitalized leases are secured by liens on the underlying equipment. Certain lease obligations require the maintenance of yen-denominated deposits, which are pledged to the lessor to satisfy yen-denominated lease payments. These deposits are included in "Other assets" on the balance sheet and totaled $85 million at Dec. 31, 2006, and $87 million at Dec. 31, 2005.

**Shelf Registration**

NS has on file with the Securities and Exchange Commission a Form S-3 shelf registration statement, covering the issuance of registered debt or equity securities, with $700 million of available capacity. In 2005, NS issued $300 million of 6% senior notes due March 2105 under this shelf registration statement.

**Credit Agreement, Debt Covenants and Commercial Paper**

NS has in place a five-year $1 billion credit facility expiring in 2009. Any borrowings under the credit agreement are contingent on the continuing effectiveness of the representations and warranties made at the inception of the agreement. NS is subject to various financial covenants with respect to its debt and under its credit agreement, including a minimum net worth requirement, a maximum leverage ratio restriction, certain restrictions on the issuance of further debt by NS or its subsidiaries and the consolidation, merger or sale of substantially all of NS' assets. At Dec. 31, 2006, NS was in compliance with all financial covenants.

NS has the ability to issue commercial paper supported by its $1 billion credit agreement. At Dec. 31, 2006, and Dec. 31, 2005, NS had no outstanding commercial paper or borrowings under the credit agreement.

## 8. Lease Commitments

NS is committed under long-term lease agreements, which expire on various dates through 2067, for equipment, lines of road and other property. The following amounts do not include payments to CRC under the Shared Assets Areas agreements (see Note 4). Future minimum lease payments and operating lease expense are as follows:

| | Operating Leases | Capital Leases |
|---|---|---|
| | *($ in millions)* | |
| 2007 | $ 166 | $ 77 |
| 2008 | 146 | 46 |
| 2009 | 128 | 58 |
| 2010 | 110 | 24 |
| 2011 | 79 | 21 |
| 2012 and subsequent years | 458 | 23 |
| Total | $ 1,087 | $ 249 |
| Less imputed interest on capital leases at an average rate of 5.2% | | (18) |
| Present value of minimum lease payments included in debt | | $ 231 |

**Operating Lease Expense**

| | 2006 | 2005 | 2004 |
|---|---|---|---|
| | | ($ in millions) | |
| Minimum rents | $ 197 | $ 190 | $ 151 |
| Contingent rents | 79 | 75 | 65 |
| Total | $ 276 | $ 265 | $ 216 |

Contingent rents is primarily comprised of rent paid to other railroads for joint facility operations and are based on usage.

**9. Other Liabilities**

| | Dec. 31, 2006 | Dec. 31, 2005 |
|---|---|---|
| | ($ in millions) | |
| Retiree health and death benefit obligations (Note 10) | $ 621 | $ 364 |
| Casualty and other claims (Note 17) | 471 | 421 |
| Deferred compensation | 149 | 143 |
| Net pension obligations (Note 10) | 144 | 106 |
| Long-term advances from Conrail (Note 4) | 133 | 133 |
| Other | 249 | 248 |
| Total | $ 1,767 | $ 1,415 |

**10. Pensions and Other Postretirement Benefits**

Norfolk Southern and certain subsidiaries have both funded and unfunded defined benefit pension plans covering principally salaried employees. Norfolk Southern and certain subsidiaries also provide specified health care and death benefits to eligible retired employees and their dependents. Under the present plans, which may be amended or terminated at NS' option, a defined percentage of health care expenses is covered, reduced by any deductibles, copayments, Medicare payments and, in some cases, coverage provided under other group insurance policies.

**Required Accounting Change**

As of Dec. 31, 2006, NS adopted SFAS No. 158, “Employers’ Accounting for Defined Benefit Pension and Other Postretirement Plans” (SFAS 158). This statement requires an employer to recognize in its statement of financial position the overfunded or underfunded status of defined benefit pension and postretirement plans measured as the difference between the fair value of plan assets and the benefit obligation. Employers must also recognize as a component of other comprehensive income, net of tax, the actuarial gains and losses and the prior service costs, credits and transition costs that arise during the period. As a result of adopting this standard, NS reduced its pension asset by $217 million and increased its pension and postretirement liabilities by $258 million in its Consolidated Balance Sheet, with a corresponding reduction to stockholders’ equity of $292 million (net of tax) reflected as an increase to accumulated other comprehensive loss. The adoption of SFAS 158 has no impact on years prior to 2006 and has no effect on the calculation of expenses for pensions and post-retirement benefits.

The following table illustrates the incremental effect of applying SFAS 158 to NS' pension and postretirement plans on individual line items in NS' Consolidated Balance Sheet at Dec. 31, 2006.

| | Before application of SFAS 158 at Dec. 31, 2006 | Adjustments | After application of SFAS 158 at Dec. 31, 2006 |
|---|---|---|---|
| | | *($ in millions)* | |
| Noncurrent pension asset | $ 658 | $ (217) | $ 441 |
| Total assets | 26,245 | (217) | 26,028 |
| Current liabilities: | | | |
| Postretirement benefits liability | 45 | -- | 45 |
| Pension liability | -- | 8 | 8 |
| Noncurrent liabilities: | | | |
| Post-retirement benefits liability | 390 | 231 | 621 |
| Pension liability | 125 | 19 | 144 |
| Deferred income taxes | 6,627 | (183) | 6,444 |
| Total liabilities | 16,338 | 75 | 16,413 |
| Accumulated other comprehensive loss | 23 | 292 | 315 |
| Total stockholders' equity | $ 9,907 | $ (292) | $ 9,615 |

NS' adoption of SFAS 158 in 2006, as reflected in the Consolidated Statements of Changes in Stockholders' Equity, includes a $2 million loss related to NS' proportionate share of Conrail's adoption of SFAS 158.

**Pension and Other Postretirement Benefit Obligations and Plan Assets**

| | Pension Benefits | | Other Postretirement Benefits | |
|---|---|---|---|---|
| | 2006 | 2005 | 2006 | 2005 |
| | ($ in millions) | | | |
| ***Change in benefit obligations*** | | | | |
| Benefit obligation at beginning of year | $ 1,642 | $ 1,574 | $ 754 | $ 701 |
| Service cost | 27 | 23 | 19 | 17 |
| Interest cost | 88 | 87 | 42 | 40 |
| Settlement | -- | -- | -- | (12) |
| Actuarial losses | 6 | 72 | 14 | 60 |
| Benefits paid | (113) | (114) | (44) | (52) |
| Benefit obligation at end of year | 1,650 | 1,642 | 785 | 754 |
| ***Change in plan assets*** | | | | |
| Fair value of plan assets at beginning of year | 1,824 | 1,806 | 108 | 105 |
| Actual return on plan assets | 220 | 126 | 11 | 3 |
| Employer contribution | 8 | 6 | 44 | 52 |
| Benefits paid | (113) | (114) | (44) | (52) |
| Fair value of plan assets at end of year | 1,939 | 1,824 | 119 | 108 |
| **Funded status at end of year** | $ 289 | $ 182 | $ (666) | $ (646) |
| Amounts recognized in the Consolidated Balance Sheets consist of: | | | | |
| Noncurrent assets | $ 441 | $ 612 | $ -- | $ -- |
| Current liabilities | (8) | -- | (45) | (45) |
| Noncurrent liabilities | (144) | (106) | (621) | (364) |
| Accumulated other comprehensive loss | -- | 26 | -- | -- |
| **Net amount recognized** | $ 289 | $ 532 | $ (666) | $ (409) |
| Amounts recognized in accumulated other comprehensive loss (pretax) consist of: | | | | |
| Impact of implementation of SFAS 158 | $ 244 | $ -- | $ 231 | $ -- |
| Minimum pension liability | -- | 26 | -- | -- |

During 2005, NS distributed split dollar life insurance policies to eligible retired employees, which resulted in a $12 million reduction of the postretirement benefit obligation.

NS' unfunded pension plans, included above, which in all cases have no assets and therefore have an accumulated benefit obligation in excess of plan assets, had projected benefit obligations of $152 million at Dec. 31, 2006, and $134 million at Dec. 31, 2005, and had accumulated benefit obligations of $125 million at Dec. 31, 2006, and $106 million at Dec. 31, 2005.

**Pension and Other Postretirement Benefit Cost Components**

| | 2006 | 2005 | 2004 |
|---|---|---|---|
| | | *($ in millions)* | |
| ***Pension benefits*** | | | |
| Service cost | $ 27 | $ 23 | $ 18 |
| Interest cost | 88 | 87 | 89 |
| Expected return on plan assets | (159) | (149) | (149) |
| Amortization of prior service cost | 2 | 2 | 3 |
| Amortization of net losses | 13 | 14 | 3 |
| Net benefit | $ (29) | $ (23) | $ (36) |
| ***Other postretirement benefits*** | | | |
| Service cost | $ 19 | $ 17 | $ 15 |
| Interest cost | 42 | 40 | 39 |
| Expected return on plan assets | (10) | (9) | (12) |
| Amortization of prior service benefit | (8) | (8) | (9) |
| Amortization of net losses | 27 | 22 | 16 |
| Net cost | $ 70 | $ 62 | $ 49 |

The estimated net loss and prior service cost for the defined benefit pension plans that will be amortized from accumulated other comprehensive loss into net periodic benefit cost over the next year are $9 million and $2 million, respectively. The estimated net loss and prior service benefit for the other defined benefit postretirement plans that will be amortized from accumulated other comprehensive loss into net periodic benefit cost over the next year are $23 million and $8 million, respectively.

**Pension Assumptions**

Pension and other postretirement benefit costs are determined based on actuarial valuations that reflect appropriate assumptions as of the measurement date, ordinarily the beginning of each year. The funded status of the plans is determined using appropriate assumptions as of each year end. A summary of the major assumptions follows:

| | 2006 | 2005 | 2004 |
|---|---|---|---|
| ***Funded status:*** | | | |
| Discount rate | 5.75% | 5.50% | 5.75% |
| Future salary increases | 4.5% | 4.5% | 4.5% |
| ***Pension cost:*** | | | |
| Discount rate | 5.50% | 5.75% | 6.25% |
| Return on assets in plans | 9% | 9% | 9% |
| Future salary increases | 4.5% | 4.5% | 4.5% |

**Health Care Cost Trend Assumptions**

For measurement purposes at Dec. 31, 2006 increases in the per capita cost of covered health care benefits were assumed to be 10% for 2006 and 9% for 2007. It is assumed the rate will decrease gradually to an ultimate rate of 5% for 2011 and remain at that level thereafter.

Assumed health care cost trend rates have a significant effect on the amounts reported in the financial statements. To illustrate, a one-percentage-point change in the assumed health care cost trend would have the following effects:

| | One percentage point Increase | One percentage point Decrease |
|---|---|---|
| | ($ in millions) | |
| Increase (decrease) in: | | |
| Total service and interest cost components | $ 8 | $ (7) |
| Postretirement benefit obligation | $ 89 | $ (75) |

**Asset Management**

Eleven investment firms manage NS' defined benefit pension plan's assets under investment guidelines approved by the Board of Directors. Investments are restricted to domestic fixed income securities, international fixed income securities, domestic and international equity investments and unleveraged exchange-traded options and financial futures. Limitations restrict investment concentration and use of certain derivative instruments. The target asset allocation for equity is 75% of the pension plan's assets. Fixed income investments must have an average rating of "AA" or better and all fixed income securities must be rated "A" or better except bond index funds. Equity investments must be in liquid securities listed on national exchanges. No investment is permitted in the securities of Norfolk Southern Corporation or its subsidiaries (except through commingled pension trust funds). Investment managers' returns are expected to meet or exceed selected market indices by prescribed margins.

NS' pension plan weighted-average asset allocations at Dec. 31, 2006 and 2005, by asset category, were as follows:

| Asset Category | Percentage of plan assets at Dec. 31, 2006 | 2005 |
|---|---|---|
| Equity securities | 77% | 76% |
| Debt securities | 23% | 24% |
| Total | 100% | 100% |
| International equity securities included in equity securities above | 10% | 11% |

The postretirement benefit plan assets consist primarily of trust-owned variable life insurance policies with an asset allocation at Dec. 31, 2006, of 67% in equity securities and 33% in debt securities compared with 66% in equity securities and 34% in debt securities at Dec. 31, 2005. The target asset allocation for equity is between 50% and 75% of the plan's assets.

The plans' assumed future returns are based principally on the asset allocation and on the historic returns for the plans' asset classes determined from both actual plan returns and, over longer time periods, market returns for those asset classes.

**Contributions and Estimated Future Benefit Payments**

In 2007, NS expects to contribute approximately $8 million to its unfunded pension plans for payments to pensioners and $45 million to its other postretirement benefit plans for retiree health benefits.

Benefit payments, which reflect expected future service, as appropriate, are expected to be paid as follows:

| | Pension Benefits | Other Postretirement Benefits |
|---|---|---|
| | *($ in millions)* | |
| 2007 | $ 113 | $ 45 |
| 2008 | 112 | 48 |
| 2009 | 113 | 50 |
| 2010 | 114 | 53 |
| 2011 | 116 | 54 |
| Years 2012-2016 | 620 | 290 |

The other benefit payments include an estimated annual reduction due to the Medicare Part D Subsidy of about $5 million.

**Other Postretirement Coverage**

Under collective bargaining agreements, NS and certain subsidiaries participate in a multi-employer benefit plan, which provides certain postretirement health care and life insurance benefits to eligible union employees. Premiums under this plan are expensed as incurred and amounted to $26 million in 2006 and 2005, and $20 million in 2004.

**Section 401(k) Plans**

Norfolk Southern and certain subsidiaries provide Section 401(k) savings plans for employees. Under the plans, NS matches a portion of employee contributions, subject to applicable limitations. NS' expenses under these plans were $14 million in 2006, $13 million in 2005 and $12 million in 2004.

**11. Stock-Based Compensation**

Under the stockholder-approved Long-Term Incentive Plan (LTIP), a committee of nonemployee directors of the Board or the chief executive officer (if delegated such authority by the committee) may grant stock options, stock appreciation rights (SARs), restricted shares, restricted stock units, performance shares and performance share units (PSUs), up to a maximum of 88,025,000 shares of Norfolk Southern Common Stock (Common Stock). Of these shares, 5,000,000 were approved by the Board for issuance to non-officer participants; as a broad-based issuance, stockholder approval was not required. In May 2005, the stockholders approved an amended LTIP which provided that 8,500,000 shares of stock previously approved for issuance under LTIP could be granted as restricted shares, restricted stock unit shares or performance shares. Under the Board-approved Thoroughbred Stock Option Plan (TSOP), the committee may grant stock options up to a maximum of 6,000,000 shares of Common Stock. Options may be granted for a term not to exceed 10 years and are subject to a vesting period of at least one year. Option exercise prices are at not less than the fair market value of Common Stock on the effective date of the grant.

The LTIP also permits the payment – on a current or a deferred basis and in cash or in stock – of dividend equivalents on shares of Common Stock covered by options, PSUs or restricted stock units in an amount commensurate with dividends paid on Common Stock. Tax absorption payments also are authorized for any awards under LTIP in amounts estimated to equal the federal and state income taxes applicable to shares of Common Stock issued subject to a share retention agreement.

During the first quarter of 2006, a committee of nonemployee directors of NS' Board granted stock options, restricted shares, restricted stock units and PSUs pursuant to the LTIP and granted stock options pursuant to the TSOP.

**Accounting Method**

As disclosed in Note 1, prior to the adoption of SFAS 123(R), NS applied APB Opinion 25 and related interpretations in accounting for awards made under the plans. Accordingly, grants of PSUs, restricted shares, restricted share units, dividend equivalents, tax absorption payments and SARs resulted in charges to net income, while grants of stock options had no effect on net income. Under SFAS 123(R), all awards will result in charges to net income while dividend equivalents are charged to retained earnings. Related compensation costs were $129 million in 2006, $75 million in 2005 and $53 million in 2004. The total tax effect recognized in income in relation to stock-based compensation was a benefit of $44 million in 2006, $27 million in 2005 and $19 million in 2004.

**Stock Options**

In the first quarter of 2006, 1,188,700 options were granted under the LTIP and 238,000 options were granted under the TSOP. In each case, the grant price was $49.425, which was the fair market value of Common Stock on the date of grant, and the options have a term of ten years but may not be exercised prior to the first anniversary of the date of grant. Holders of the options granted under LTIP receive cash dividend equivalent payments for five years commensurate with dividends paid on Common Stock.

The fair value of each option award in 2006 was measured on the date of grant using a lattice-based option valuation model. Expected volatilities are based on implied volatilities from traded options on Common Stock and historical volatility of Common Stock. NS uses historical data to estimate option exercises and employee terminations within the valuation model. The average expected option life is derived from the output of the valuation model and represents the period of time that options granted are expected to be outstanding. The average risk-free interest rate is based on the U.S. Treasury yield curve in effect at the time of grant. For options granted that include dividend equivalent payments, a dividend yield of zero was used. For purposes of pro forma information required under SFAS 123, the fair value of the option awards in 2005 and 2004 was determined using the Black-Scholes option-pricing model. The assumptions for 2006, 2005 and 2004 are shown in the following table:

| | 2006 | 2005 | 2004 |
|---|---|---|---|
| Expected volatility range | 23.5% - 34.5% | n/a | n/a |
| Average expected volatility | 27% | 33% | 35% |
| Average expected option life | 3.7 years | 5 years | 5 years |
| Average risk-free interest rate | 4.5% | 3.7% | 3.2% |
| Per-share grant-date fair value | $13.47 | $12.19 | $7.95 |
| Options granted | 1,427,400 | 1,353,600 | 4,580,500 |

A summary of options outstanding as of Dec. 31, 2006 and changes during the twelve months then ended is presented below:

| | Option Shares | | Weighted Avg. Exercise Price |
|---|---|---|---|
| Outstanding at Dec. 31, 2005 | 29,545,680 | $ | 24.35 |
| Granted | 1,427,400 | | 49.43 |
| Exercised | (8,677,254) | | 25.02 |
| Forfeited | (19,300) | | 41.00 |
| Outstanding at Dec. 31, 2006 | 22,276,526 | $ | 25.68 |
| Exercisable at Dec. 31, 2006 | 20,858,826 | $ | 24.07 |

The aggregate intrinsic value of options outstanding at Dec. 31, 2006, was $548 million and had a weighted-average remaining life of 4.9 years. Of these options outstanding, 20,858,826 were exercisable and had an aggregate intrinsic value of $547 million with a weighted average remaining contractual life of 4.7 years.

The following table provides information related to options exercised as of Dec. 31 for the respective years:

| | 2006 | 2005 | 2004 |
|---|---|---|---|
| | | *($ in millions)* | |
| Total intrinsic value | $ 226 | $ 139 | $ 85 |
| Cash received upon exercise of options | $ 212 | $ 194 | $ 162 |
| Related tax benefit realized | $ 79 | $ 47 | $ 30 |

Prior to the adoption of SFAS 123(R), NS presented tax benefits generated from tax deductions in excess of compensation costs recognized for share-based awards (excess tax benefits) as operating cash flows in the Consolidated Statement of Cash Flows. Beginning in 2006, SFAS 123(R) requires excess tax benefits to be classified as financing cash flows. Accordingly, “Common stock issued – net” in the Consolidated Statement of Cash Flows for the year ended Dec. 31, 2006, included $85 million of such tax benefits.

In November of 2005, the Board of Directors of NS changed the vesting periods on options granted in January 2005 from three years to one year in order to reduce future compensation expense. At the time, each of these options had an intrinsic value of approximately $9 and the modification resulted in less than $1 million of compensation expense.

**Restricted Shares and Restricted Stock Units**

Restricted share and restricted stock unit grants were 332,150 and 332,150, respectively, in 2006, with a grant-date fair value of $49.60 and a three-year restriction period, and were 576,240 and 384,160, respectively, in 2005, with a grant-date fair value of $34.10 and a five-year restriction period (that may, for restricted shares, be accelerated to a three-year restriction period upon achievement of specified performance measures), and were 359,040 and 239,360, respectively, in 2004 with a grant-date fair value of $22.02 and a three-year restriction period.

A summary of the status of restricted shares and restricted stock units as of Dec. 31, 2006, and changes during the twelve months then ended is presented below:

| | Shares | Units | Weighted - Average Grant-Date Fair Value |
|---|---|---|---|
| Nonvested at Dec. 31, 2005 | 1,262,776 | 841,852 | $ 26.80 |
| Granted | 332,150 | 332,150 | 49.60 |
| Vested | (473,294) | (319,696) | 21.03 |
| Forfeited | (2,950) | (2,350) | 40.75 |
| Nonvested at Dec. 31, 2006 | 1,118,682 | 851,956 | $ 36.78 |

At Dec. 31, 2006, there was $11 million of total unrecognized compensation related to restricted shares and restricted stock units. That cost is expected to be recognized over a weighted-average period of approximately 1.7 years. The total fair value of the restricted shares vested and restricted stock units paid in cash during the twelve months ended Dec. 31, 2006, 2005 and 2004 was $40 million, $2 million and zero, respectively. The total related tax benefit realized was $6 million in 2006.

**Performance Share Units**

PSUs provide for awards based on achievement of certain predetermined corporate performance goals (total shareholder return, return on average invested capital and operating ratio) at the end of a three-year cycle. PSU grants and average grant-date fair values were 1,163,600 and $49.425 in 2006; 1,344,400 and $34.10 in 2005; and 831,000 and $22.02 in 2004. One-half of any PSUs earned will be paid in the form of shares of Common Stock with the other half to be paid in cash.

A summary of the status of PSUs as of Dec. 31, 2006, and changes during the twelve months then ended is presented below:

| | Performance Share Units | Weighted - Average Grant-Date Fair Value |
|---|---|---|
| Balance Dec. 31, 2005 | 3,118,400 | $ 26.49 |
| Granted | 1,163,600 | 49.43 |
| Earned | (345,290) | 19.63 |
| Paid in cash | (345,290) | 19.63 |
| Unearned | (255,420) | 19.63 |
| Forfeited | (34,200) | 34.38 |
| Balance Dec. 31, 2006 | 3,301,800 | $ 36.46 |

As of Dec. 31, 2006, there was $30 million of total unrecognized compensation related to PSUs granted under the LTIP which is expected to be recognized over a weighted-average period of 1.2 years. The total fair value of PSUs earned and paid in cash during the twelve months ended Dec. 31, 2006, 2005 and 2004 was $34 million, $18 million and $10 million, respectively.

**Shares Available and Issued**

Shares of stock available for future grants and issued in connection with all features of the LTIP and TSOP as of Dec. 31, were as follows:

| | 2006 | 2005 | 2004 |
|---|---|---|---|
| Available for future grants: | | | |
| LTIP | 9,288,283 | 11,321,573 | 14,033,053 |
| TSOP | 2,538,700 | 2,771,400 | 2,773,300 |
| Shares of Common Stock issued: | | | |
| LTIP | 8,517,911 | 9,078,717 | 8,764,021 |
| TSOP | 836,783 | 410,750 | 8,700 |

**12. Stockholders' Equity**

**Other Comprehensive Income (Loss)**

"Other comprehensive income (loss)" reported in the Consolidated Statements of Changes in Stockholders' Equity consisted of the following:

| | Pretax Amount | Tax (Expense) Benefit | Net-of-Tax Amount |
|---|---|---|---|
| | | ($ in millions) | |
| ***Year ended Dec. 31, 2006*** | | | |
| Net gain (loss) arising during the year: | | | |
| Cash flow hedges | $ (1) | $ 1 | $ -- |
| Reclassification adjustments for gains included in net income | (20) | 8 | (12) |
| Subtotal | (21) | 9 | (12) |
| Unrealized gains on securities | 1 | -- | 1 |
| Minimum pension liability | (10) | 4 | (6) |
| Other comprehensive income of equity investees | 15 | 4 | 19 |
| Other comprehensive income (loss) | $ (15) | $ 17 | $ 2 |
| ***Year ended Dec. 31, 2005*** | | | |
| Net gain (loss) arising during the year: | | | |
| Cash flow hedges | $ 92 | $ (37) | $ 55 |
| Reclassification adjustments for gains included in net income | (148) | 58 | (90) |
| Subtotal | (56) | 21 | (35) |
| Unrealized losses on securities | (1) | -- | (1) |
| Minimum pension liability | (6) | 2 | (4) |
| Other comprehensive loss of equity investees | (13) | -- | (13) |
| Other comprehensive income (loss) | $ (76) | $ 23 | $ (53) |
| ***Year ended Dec. 31, 2004*** | | | |
| Net gain (loss) arising during the year: | | | |
| Cash flow hedges | $ 171 | $ (67) | $ 104 |
| Reclassification adjustments for gains included in net income | (140) | 55 | (85) |
| Subtotal | 31 | (12) | 19 |
| Unrealized gains on securities | 1 | -- | 1 |
| Other comprehensive income (loss) | $ 32 | $ (12) | $ 20 |

**Accumulated Other Comprehensive Loss**

"Accumulated other comprehensive loss" reported in the Consolidated Statements of Changes in Stockholders' Equity consisted of the following:

| | Balance at Beginning of Year | Net Gain (Loss) | Reclassification Adjustments | Balance at End of Year |
|---|---|---|---|---|
| | *($ in millions)* | | | |
| Dec. 31, 2006 | | | | |
| Unrealized gains on securities | $ -- | $ 1 | $ -- | $ 1 |
| Cash flow hedges | 12 | -- | (12) | -- |
| Minimum pension liability | (17) | 17 | -- | -- |
| Pension and other postretirement liabilities | -- | (315) | -- | (315) |
| Other comprehensive loss of equity investees | (72) | 17 | -- | (55) |
| Accumulated other comprehensive loss | $ (77) | $ (280) | $ (12) | $ (369) |
| Dec. 31, 2005 | | | | |
| Unrealized gains (losses) on securities | $ 1 | $ (1) | $ -- | $ -- |
| Cash flow hedges | 47 | 55 | (90) | 12 |
| Minimum pension liability | (13) | (4) | -- | (17) |
| Other comprehensive loss of equity investees | (59) | (13) | -- | (72) |
| Accumulated other comprehensive loss | $ (24) | $ 37 | $ (90) | $ (77) |

**13. Stock Purchase Program**

In November 2005, NS' Board of Directors authorized the repurchase of up to 50 million shares of Common Stock through the end of 2015. The timing and volume of purchases is guided by management's assessment of market conditions and other pertinent facts. Near-term purchases under the program are expected to be made with internally generated cash; however, future funding sources could include proceeds from the sale of commercial paper notes or the increase of long-term debt. NS purchased and retired 21.8 million shares of its common stock under this program in 2006 at a cost of $964 million.

**14. Earnings Per Share**

The following tables set forth the calculation of basic and diluted earnings per share:

| | 2006 | 2005 | 2004 |
|---|---|---|---|
| | *($ in millions except per share, shares in millions)* | | |
| Basic earnings per share: | | | |
| Income available to common stockholders | $ 1,475 | $ 1,281 | $ 910 |
| Weighted-average shares outstanding | 406.0 | 404.2 | 394.2 |
| Basic earnings per share | $ 3.63 | $ 3.17 | $ 2.31 |

Income available to common stockholders for 2006 reflects a $6 million reduction for the after-tax effect of dividend equivalent payments made to holders of vested stock options.

| | | 2006 | | 2005 | | 2004 |
|---|---|---|---|---|---|---|
| | *($ in millions except per share, shares in millions)* | | | | | |
| Diluted earnings per share: | | | | | | |
| Income available to common stockholders | $ | 1,481 | $ | 1,281 | $ | 910 |
| Weighted-average shares outstanding per above | | 406.0 | | 404.2 | | 394.2 |
| Dilutive effect of outstanding options, PSUs and restricted shares (as determined by the application of the treasury stock method) | | 8.7 | | 8.1 | | 5.1 |
| Adjusted weighted-average shares outstanding | | 414.7 | | 412.3 | | 399.3 |
| Diluted earnings per share | $ | 3.57 | $ | 3.11 | $ | 2.28 |

The diluted calculations exclude options whose exercise price exceeded the average market price of Common Stock as follows: 1 million in 2006, 1 million in 2005 and 13 million in 2004.

**15. Fair Values of Financial Instruments**

The fair values of "Cash and cash equivalents," "Short-term investments," "Accounts receivable" and "Accounts payable" approximate carrying values because of the short maturity of these financial instruments. The fair value of corporate-owned life insurance approximates carrying value. The carrying amounts and estimated fair values for the remaining financial instruments, excluding derivatives (see Note 16) and investments accounted for under the equity method in accordance with APB Opinion No. 18, consisted of the following at Dec. 31:

| | 2006 | | 2005 | |
|---|---|---|---|---|
| | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
| | *($ in millions)* | | | |
| Investments | $ 145 | $ 166 | $ 139 | $ 160 |
| Long-term debt | $ (6,600) | $ (7,370) | $ (6,930) | $ (7,934) |

Quoted market prices were used to determine the fair value of marketable securities; underlying net assets were used to estimate the fair value of other investments. The fair values of notes receivable are based on future discounted cash flows. The fair values of debt were estimated based on quoted market prices or discounted cash flows using current interest rates for debt with similar terms, company rating and remaining maturity.

Carrying amounts of marketable securities reflect unrealized holding gains of $1 million on Dec. 31, 2006, and less than $1 million on Dec. 31, 2005. Sales of "available-for-sale" securities were immaterial for the years ended Dec. 31, 2006, 2005 and 2004; most short-term investments were redeemed at maturity.

**16. Derivative Financial Instruments**

All derivatives are recognized in the financial statements as either assets or liabilities and are measured at fair value. Changes in fair value are recorded as adjustments to the assets or liabilities being hedged in "Other comprehensive loss," or in current earnings, depending on whether the derivative is designated and qualifies for hedge accounting, the type of hedge transaction represented and the effectiveness of the hedge. The settlements of the hedges will result in the reclassification into diesel fuel expense of the related gains or losses recorded as a component of "Other comprehensive loss."

NS has used derivative financial instruments to reduce the risk of volatility in its diesel fuel costs and to manage its overall exposure to fluctuations in interest rates. NS does not engage in the trading of derivatives. Management has determined that its derivative financial instruments qualify as either fair-value or cash-flow hedges, having values that highly correlate with the underlying hedged exposures, and has designated such

instruments as hedging transactions. Credit risk related to the derivative financial instruments is considered to be minimal and is managed by requiring high credit standards for counterparties and periodic settlements.

**Diesel Fuel Hedging**

In 2001, NS began a program to hedge a portion of its diesel fuel consumption. The intent of the program was to assist in the management of NS' aggregate risk exposure to fuel price fluctuations, which can significantly affect NS' operating margins and profitability, through the use of one or more types of derivative instruments. No new hedges have been entered into since May 2004, and the last remaining contracts were settled in the second quarter of this year, bringing an end to this program.

The goal of this hedging strategy was to reduce the variability of fuel costs over an extended period of time while minimizing the incremental cost of hedging. The program provided that NS would not enter into any fuel hedges with a duration of more than 36 months, and that no more than 80% of NS' average monthly fuel consumption would be hedged for any month within any 36-month period. After taking into account the effect of the hedging, diesel fuel costs represented 14% of NS' operating expenses for the year ended Dec. 31, 2006, 11% for the year ended Dec. 31, 2005 and 8% for the year ended Dec. 31, 2004.

NS' fuel hedging activity resulted in decreases in diesel fuel expenses of $20 million, $148 million and $140 million for 2006, 2005 and 2004, respectively. Ineffectiveness, or the extent to which changes in the fair value of the heating oil contracts do not offset changes in the fair values of the expected diesel fuel transactions, was a $1 million expense in 2006, a $5 million expense in 2005 and a $5 million benefit in 2004.

**Interest Rate Hedging**

NS manages its overall exposure to fluctuations in interest rates by issuing both fixed and floating-rate debt instruments, and by entering into interest rate hedging transactions to achieve an appropriate mix within its debt portfolio. NS had $83 million and $116 million, or less than 2%, of its fixed rate debt portfolio hedged as of Dec. 31, 2006, and Dec. 31, 2005, respectively, using interest rate swaps that qualify for and are designated as fair-value hedge transactions. NS' interest rate hedging activity resulted in decreases in interest expenses of $1 million, $2 million and $6 million for 2006, 2005 and 2004, respectively. These swaps have been effective in hedging the changes in fair value of the related debt arising from changes in interest rates and there has been no impact on earnings resulting from ineffectiveness associated with these derivative transactions.

**Fair Values**

There were no diesel fuel derivative instruments outstanding at Dec. 31, 2006. The fair value of NS' diesel fuel derivative instruments at Dec. 31, 2005, was determined based upon current market values as quoted by independent third party dealers. Fair values of interest rate swaps were determined based upon the present value of expected future cash flows discounted at the appropriate implied spot rate from the spot rate yield curve. Fair value adjustments are noncash transactions and, accordingly, are excluded from the Consolidated Statements of Cash Flows. "Accumulated other comprehensive loss," a component of "Stockholders' equity," included unrealized gains of zero at Dec. 31, 2006, and $20 million (pretax) at Dec. 31, 2005, related to the fair value of derivative fuel hedging transactions that will terminate within twelve months of the respective dates. Gains or losses actually realized were based on the fair value of the derivative fuel hedges at the time of termination.

The asset and liability positions of NS' outstanding derivative financial instruments were as follows:

| | Dec. 31, 2006 | Dec. 31, 2005 |
|---|---|---|
| | ($ in millions) | |
| ***Interest rate hedges:*** | | |
| Gross fair value asset position | $ 1 | $ 3 |
| Gross fair value (liability) position | -- | -- |
| ***Fuel hedges:*** | | |
| Gross fair value asset position | -- | 20 |
| Gross fair value (liability) position | -- | -- |
| Total net asset (liability) position | $ 1 | $ 23 |

**17. Commitments and Contingencies**

**Lawsuits**

Norfolk Southern and certain subsidiaries are defendants in numerous lawsuits and other claims relating principally to railroad operations. When management concludes that it is probable that a liability has been incurred and the amount of the liability can be reasonably estimated, it is accrued through a charge to earnings. While the ultimate amount of liability incurred in any of these lawsuits and claims is dependent on future developments, in management's opinion, the recorded liability is adequate to cover the future payment of such liability and claims. However, the final outcome of any of these lawsuits and claims cannot be predicted with certainty, and unfavorable or unexpected outcomes could result in additional accruals that could be significant to results of operations in a particular year or quarter. Any adjustments to the recorded liability will be reflected in earnings in the periods in which such adjustments are known.

NS was involved in mass tort litigation proceedings arising out of historic flooding events that occurred in West Virginia in 2001. In 2005, one of NS' subsidiaries was identified as the target defendant for claims related to a specific sub-watershed. During the first quarter of 2006, the parties reached a settlement with respect to NS' liability in this matter. The settlement did not have a material effect on the results of operations in the first quarter or for the year.

**Casualty Claims**

Casualty claims include employee personal injury and occupational claims as well as third-party claims, all exclusive of legal costs. NS engages an independent consulting actuarial firm to aid in valuing its liability for these claims. Job-related accidental injury and occupational claims are subject to the Federal Employers' Liability Act (FELA), which is applicable only to railroads. FELA's fault-based system produces results that are unpredictable and inconsistent as compared with a no-fault workers' compensation system. The variability inherent in this system could result in actual costs being very different from the liability recorded. While the ultimate amount of claims incurred is dependent on future developments, in management's opinion, the recorded liability is adequate to cover the future payments of claims and is supported by the most recent actuarial study. In all cases, NS records a liability when the expected loss for the claim is both probable and estimable.

In 2005, NS recorded a liability related to the Jan. 6, 2005 derailment in Graniteville, SC. The liability, which includes a current and long-term portion, represents NS' best estimate based on current facts and circumstances. The estimate includes amounts related to business property damage and other economic losses, personal injury and individual property damage claims as well as third-party response costs. NS' commercial insurance policies are expected to cover substantially all expenses related to this derailment above NS' self-insured retention, including NS' response costs and legal fees. Accordingly, the Consolidated Balance Sheets reflect a current and long-term receivable for estimated recoveries from NS' insurance carriers. Expenses in 2005 included

$41 million related to this incident, representing NS' retention under its insurance policies and other uninsured costs. While it is reasonable to expect that the liability for covered losses could differ from the amount recorded, such a change would be offset by a corresponding change in the insurance receivable. As a result, NS does not believe that it is reasonably likely that its net loss (the difference between the liability and future recoveries) will be materially different than the loss recorded in 2005. NS expects at this time that insurance coverage is adequate to cover potential claims and settlements above its self-insurance retention.

**Employee personal injury claims** – The largest component of casualties and other claims expense is employee personal injury costs. The actuarial firm engaged by NS provides quarterly studies to aid in valuing its employee personal injury liability and estimating its employee personal injury expense. The actuarial firm studies NS' historical patterns of reserving for claims and subsequent settlements, taking into account relevant outside influences. The actuary uses the results of these analyses to estimate the ultimate amount of the liability, which includes amounts for incurred but unasserted claims. NS adjusts its liability to the actuarially determined amount on a quarterly basis. The estimate of loss liabilities is subject to inherent limitation given the difficulty of predicting future events such as jury decisions, court interpretations or legislative changes and as such the actual loss may vary from the actuarial estimate.

**Occupational claims** – Occupational claims (including asbestosis and other respiratory diseases, as well as repetitive motion) are often not caused by a specific accident or event but rather result from a claimed exposure over time. Many such claims are being asserted by former or retired employees, some of whom have not been employed in the rail industry for decades. The actuarial firm provides an estimate of the occupational claims liability based upon NS' history of claim filings, severity, payments and other pertinent facts. The liability is dependent upon management's judgments made as to the specific case reserves as well as judgments of the consulting actuarial firm in the periodic studies. The actuarial firm's estimate of ultimate loss includes a provision for those claims that have been incurred but not reported. This provision is derived by analyzing industry data and projecting NS' experience into the future as far as can be reasonably determined. NS adjusts its liability to the actuarially determined amount on a quarterly basis. However, it is possible that the recorded liability may not be adequate to cover the future payment of claims. Adjustments to the recorded liability are reflected in operating expenses in the periods in which such adjustments become known.

**Third-party claims** – NS records a liability for third-party claims including those for highway crossing accidents, trespasser and other injuries, automobile liability, property damage and lading damage. The actuarial firm assists with the calculation of potential liability for third-party claims, except lading damage, based upon NS' experience including number and timing of incidents, amount of payments, settlement rates, number of open claims and legal defenses. The actuarial estimate includes a provision for claims that have been incurred but have not yet been reported. Each quarter NS adjusts its liability to the actuarially determined amount. Given the inherent uncertainty in regard to the ultimate outcome of third-party claims, it is possible that future settlement costs may differ from the estimated liability recorded.

**Environmental Matters**

NS is subject to various jurisdictions' environmental laws and regulations. It is NS' policy to record a liability where such liability or loss is probable and its amount can be estimated reasonably. Claims, if any, against third parties for recovery of cleanup costs incurred by NS are reflected as receivables (when collection is probable) on the balance sheet and are not netted against the associated NS liability. Environmental engineers regularly participate in ongoing evaluations of all known sites and in determining any necessary adjustments to liability estimates. NS also has an Environmental Policy Council, composed of senior managers, to oversee and interpret its environmental policy.

NS' Consolidated Balance Sheets included liabilities for environmental exposures in the amount of $54 million at Dec. 31, 2006, and $58 million at Dec. 31, 2005 (of which $12 million was accounted for as a current liability at Dec. 31, 2006 and 2005). At Dec. 31, 2006, the liability represented NS' estimate of the probable cleanup and

remediation costs based on available information at 172 known locations compared with 189 locations at Dec. 31, 2005. On that date, 15 sites accounted for $29 million of the liability, and no individual site was considered to be material. NS anticipates that much of this liability will be paid out over five years; however, some costs will be paid out over a longer period.

At some of the 172 locations, certain NS subsidiaries, usually in conjunction with a number of other parties, have been identified as potentially responsible parties by the Environmental Protection Agency (EPA) or similar state authorities under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, or comparable state statutes, which often impose joint and several liability for cleanup costs.

With respect to known environmental sites (whether identified by NS or by the EPA or comparable state authorities), estimates of NS' ultimate potential financial exposure for a given site or in the aggregate for all such sites are necessarily imprecise because of the widely varying costs of currently available cleanup techniques, the likely development of new cleanup technologies, the difficulty of determining in advance the nature and full extent of contamination and each potential participant's share of any estimated loss (and that participant's ability to bear it), and evolving statutory and regulatory standards governing liability.

The risk of incurring environmental liability – for acts and omissions, past, present and future - is inherent in the railroad business. Some of the commodities in NS' traffic mix, particularly those classified as hazardous materials, can pose special risks that NS and its subsidiaries work diligently to minimize. In addition, several NS subsidiaries own, or have owned, land used as operating property, or which is leased and operated by others, or held for sale. Because environmental problems may exist on these properties that are latent or undisclosed, there can be no assurance that NS will not incur environmental liabilities or costs with respect to one or more of them, the amount and materiality of which cannot be estimated reliably at this time. Moreover, lawsuits and claims involving these and potentially other unidentified environmental sites and matters are likely to arise from time to time. The resulting liabilities could have a significant effect on financial position, results of operations or liquidity in a particular year or quarter.

However, based on its assessment of the facts and circumstances now known, management believes that it has recorded the probable costs for dealing with those environmental matters of which NS is aware. Further, management believes that it is unlikely that any known matters, either individually or in the aggregate, will have a material adverse effect on NS' financial position, results of operations or liquidity.

On Oct. 19, 2006, the Pennsylvania Department of Environmental Protection (PDEP) issued an assessment of civil penalties against NS and filed a complaint for civil penalties with the Pennsylvania Environmental Hearing Board (EHB) requesting that the EHB impose civil penalties upon NS for alleged violations of state environmental laws and regulations resulting from a discharge of sodium hydroxide that occurred as a result of the derailment of a NS train in Norwich Township, Pennsylvania, on June 30, 2006. The PDEP's actions seek to impose combined penalties of $8,890,000 for alleged past violations and $46,420 per day for alleged ongoing violations of state environmental laws and regulations. NS believes that the monetary penalties sought by the PDEP are excessive. Accordingly, NS intends to vigorously defend the action and has appealed the fines to the EHB. In addition, NS expects the Pennsylvania Fish and Boat Commission to impose a monetary penalty on NS for damages alleged to have been caused by this accident. NS does not believe that the outcome of these proceedings will have a material effect on its financial position, results of operations, or liquidity.

**Insurance**

NS obtains on behalf of itself and its subsidiaries insurance for potential losses for third-party liability and first-party property damages. Specified levels of risk are retained on a self-insurance basis (up to $25 million per occurrence for bodily injury and property damage to third parties and $25 million per occurrence for property owned by NS or in NS' care, custody or control).

**Purchase Commitments**

NSR had outstanding purchase commitments of approximately $276 million primarily in connection with its capital programs through 2010, including 53 locomotives in 2007.

**Change-In-Control Arrangements**

Norfolk Southern has compensation agreements with officers and certain key employees that become operative only upon a change in control of the Corporation, as defined in those agreements. The agreements provide generally for payments based on compensation at the time of a covered individual's involuntary or other specified termination and for certain other benefits.

**Guarantees**

In a number of instances, NS and its subsidiaries have agreed to indemnify lenders for additional costs they may bear as a result of certain changes in laws or regulations applicable to their loans. Such changes may include impositions or modifications with respect to taxes, duties, reserves, liquidity, capital adequacy, special deposits, and similar requirements relating to extensions of credit by, deposits with, or the assets or liabilities of such lenders. The nature and timing of changes in laws or regulations applicable to NS' financings are inherently unpredictable, and therefore NS' exposure in connection with the foregoing indemnifications cannot be quantified. No liability has been recorded related to these indemnifications. In the case of one type of equipment financing, NSR's Japanese leveraged leases, NSR may terminate the leases and ancillary agreements if such a change-in-law indemnity is triggered. Such a termination would require NSR to make early termination payments that would not be expected to have a material adverse effect on NS' financial position, results of operations or liquidity.

NS has indemnified parties in a number of transactions for U.S. income tax withholding imposed as a result of changes in U.S. tax law. In all cases, NS has the right to unwind the related transaction if the withholding cannot be avoided in the future. Because these indemnities would be triggered and are dependent upon a change in the tax law, the maximum exposure is not quantifiable. Management does not believe that it is likely that it will be required to make any payments under these indemnities.

As of Dec. 31, 2006, certain Norfolk Southern subsidiaries are contingently liable as guarantors with respect to $8 million of indebtedness of an entity in which they have an ownership interest, the Terminal Railroad Association of St. Louis, due in 2019. Four other railroads are also jointly and severally liable as guarantors for this indebtedness. No liability has been recorded related to this guaranty.

*** * * * ***

**NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES**
**QUARTERLY FINANCIAL DATA**
**(Unaudited)**

| | Three Months Ended | | | |
|---|---|---|---|---|
| | March 31 | June 30 | Sept. 30 | Dec. 31 |
| | *($ in millions, except per share amounts)* | | | |
| **2006** | | | | |
| Railway operating revenues | $ 2,303 | $ 2,392 | $ 2,393 | $ 2,319 |
| Income from railway operations | 551 | 677 | 715 | 614 |
| Net income | 305 | 375 | 416 | 385 |
| Earnings per share: | | | | |
| Basic | $ 0.74 | $ 0.91 | $ 1.04 | $ 0.97 |
| Diluted | $ 0.72 | $ 0.89 | $ 1.02 | $ 0.95 |
| **2005** | | | | |
| Railway operating revenues | $ 1,961 | $ 2,154 | $ 2,155 | $ 2,257 |
| Income from railway operations | 403 | 592 | 528 | 594 |
| Net income | 194 | 424[1] | 301 | 362 |
| Earnings per share: | | | | |
| Basic | $ 0.48 | $ 1.05[1] | $ 0.74 | $ 0.89 |
| Diluted | $ 0.47 | $ 1.04[1] | $ 0.73 | $ 0.87 |

[1] Includes a $96 million, or 23 cents per diluted share, benefit related to a reduction of deferred income tax liabilities resulting from tax legislation enacted by Ohio.

## Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure.

None.

## Item 9A. Controls and Procedures.

### Evaluation of Disclosure Controls and Procedures

Norfolk Southern's Chief Executive Officer and Chief Financial Officer, with the assistance of management, evaluated the effectiveness of NS' disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of Dec. 31, 2006. Based on such evaluation, such officers have concluded that, as of Dec. 31, 2006, NS' disclosure controls and procedures were effective to ensure that information required to be disclosed in NS' reports under the Exchange Act is recorded, processed, summarized and reported, within time period specified in the SEC's rules and forms, and that such information is accumulated and communicated to management, including the Chief Executive Officer and the Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

### Internal Control over Financial Reporting

The management of Norfolk Southern is responsible for establishing and maintaining adequate internal control over financial reporting. The Corporation's internal control over financial reporting includes those policies and procedures that pertain to its ability to record, process, summarize and report reliable financial data. Management recognizes that there are inherent limitations in the effectiveness of any internal control over financial reporting, including the possibility of human error and the circumvention or overriding of internal control. Accordingly, even effective internal control over financial reporting can provide only reasonable assurance with respect to financial statement preparation. Further, because of changes in conditions, the effectiveness of internal control over financial reporting may vary over time.

In order to ensure that the Corporation's internal control over financial reporting is effective, management regularly assesses such controls and did so most recently for its financial reporting as of Dec. 31, 2006. This assessment was based on criteria for effective internal control over financial reporting set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in *Internal Control-Integrated Framework*. Based on our assessment, management has concluded that the Corporation maintained effective internal control over financial reporting as of Dec. 31, 2006.

The Board of Directors, acting through its Audit Committee, is responsible for the oversight of the Corporation's accounting policies, financial reporting and internal control. The Audit Committee of the Board of Directors is comprised entirely of outside directors who are independent of management. The independent registered public accounting firm and the internal auditors have full and unlimited access to the Audit Committee, with or without management, to discuss the adequacy of internal control over financial reporting, and any other matters which they believe should be brought to the attention of the Audit Committee.

Norfolk Southern's management has issued a report of its assessment of internal control over financial reporting, and Norfolk Southern's independent registered public accounting firm has issued a report on this assessment. These reports appear in Part II, Item 8 of this report on Form 10-K.

During the fourth quarter of 2006, management has not identified any changes in NS' internal controls over financial reporting that have materially affected, or are reasonably likely to materially affect, NS' internal control over financial reporting.

## Item 9B. Other Information.

None.

# PART III

## NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES (NS)

**Item 10. Directors, Executive Officers and Corporate Governance.**

In accordance with General Instruction G(3), information called for by Item 10, Part III, is incorporated herein by reference from the information appearing under the caption "Election of Directors," under the caption "Section 16(a) Beneficial Ownership Reporting Compliance," under the caption "Corporate Governance," and under the caption "Committees" in Norfolk Southern's definitive Proxy Statement for the Annual Meeting of Stockholders to be held on May 10, 2007, which definitive Proxy Statement will be filed electronically with the Securities and Exchange Commission (Commission) pursuant to Regulation 14A no later than May 1, 2007. The information regarding executive officers called for by Item 401 of Regulation S-K is included in Part I hereof beginning under "Executive Officers of the Registrant."

**Item 11. Executive Compensation.**

In accordance with General Instruction G(3), information called for by Item 11, Part III, is incorporated herein by reference from the information:

- appearing under the subcaption "Compensation" under the caption "Board of Directors" for directors, including the "2006 Non-Employee Director Compensation Table" and the "Narrative to Non-Employee Director Compensation Table;"
- appearing under the caption "Executive Compensation" for executives, including the "Compensation Discussion and Analysis," the information appearing in the "Summary Compensation Table" and the "Grants of Plan-Based Awards" table including the narrative to such tables, the "Outstanding Equity Awards at Fiscal Year-End" table and the "Option Exercises and Stock Vested" table, and the information appearing under the subcaptions "Retirement Benefits," "Deferred Compensation," and Potential Payments Upon a Change in Control or Other Termination of Employment;" and
- appearing under the captions "Compensation Committee Interlocks and Insider Participation" and "Compensation Committee Report,"

in each case included in Norfolk Southern's definitive Proxy Statement for the Annual Meeting of Stockholders to be held on May 10, 2007, which definitive Proxy Statement will be filed electronically with the Commission pursuant to Regulation 14A no later than May 1, 2007.

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters.**

In accordance with General Instruction G(3), information on security ownership of certain beneficial owners and management called for by Item 12, Part III, Item 403 of Regulation S-K, is incorporated herein by reference from the information appearing under the caption "Beneficial Ownership of Stock" in Norfolk Southern's definitive Proxy Statement for the Annual Meeting of Stockholders to be held on May 10, 2007, which definitive Proxy Statement will be filed electronically with the Commission pursuant to Regulation 14A no later than May 1, 2007.

**Equity Compensation Plan Information (as of Dec. 31, 2006)**

| Plan Category | Number of securities to be issued upon exercise of outstanding options, warrants and rights (a) | | Weighted-average exercise price of outstanding options, warrants and rights (b) | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) (c) |
|---|---|---|---|---|
| Equity compensation plans approved by security holders[1] | 23,160,692 | $ | 24.68[(4)] | 9,288,283[(5)] |
| Equity compensation plans not approved by security holders[2] | 2,417,634[(3)] | $ | 33.87[(3)] | 2,574,700[(6)] |
| Total | 25,578,326 | | | 11,862,983 |

1 The Long-Term Incentive Plan, excluding five million shares for broad-based issuance to non-officers.
2 The Long-Term Incentive Plan's five million shares for broad-based issuance to non-officers, the Thoroughbred Stock Option Plan and the Directors' Restricted Stock Plan.
3 Includes options and performance share units granted under the Long-Term Incentive Plan on 212,567 shares for non-officers and options granted under the Thoroughbred Stock Option Plan.
4 Calculated without regard to 3,301,800 outstanding performance share units at Dec. 31, 2006.
5 Of the shares remaining available for grant under plans approved by stockholders, 7,642,110 are available for grant as restricted shares, performance shares or restricted stock unit shares under the Long-Term Incentive Plan.
6 Of the shares remaining available for grant under plans not approved by stockholders, 36,000 are available for grant as restricted stock under the Directors' Restricted Stock Plan.

**Norfolk Southern Corporation Long-Term Incentive Plan ("LTIP")**

Established on June 28, 1983, and approved by stockholders at their Annual Meeting held on May 10, 1984, LTIP was adopted to promote the success of Norfolk Southern by providing an opportunity for non-employee directors, officers and other key employees to acquire a proprietary interest in the Corporation. On Jan. 23, 2001, the Board of Directors further amended LTIP and approved the issuance of an additional 5,000,000 shares of authorized but unissued Common Stock under LTIP to participants who are not officers of Norfolk Southern. The issuance of these shares was broadly-based, and stockholder approval of these shares was not required. Accordingly, this portion of LTIP is included in the number of securities available for future issuance for plans not approved by stockholders. Also on Jan. 23, 2001, the Board amended LTIP, which amendment was approved by shareholders on May 10, 2001, that included the reservation for issuance of an additional 30,000,000 shares of authorized but unissued Norfolk Southern Common Stock.

Pursuant to another amendment approved by stockholders on May 12, 2005, not more than 8.5 million of the shares remaining available for issuance under LTIP may be awarded as restricted shares, performance shares or restricted stock unit shares. Cash payments of restricted stock units, stock appreciation rights and performance share units will not be applied against the maximum number of shares issuable under LTIP. Any shares of Common Stock subject to options, performance share units or restricted stock units which are not issued as Common Stock will again be available for award under LTIP after the expiration or forfeiture of an award.

Non-employee directors, officers and other key employees residing in the United States or Canada are eligible for selection to receive LTIP awards. Under LTIP, the Compensation Committee (Committee) may grant incentive stock options, nonqualified stock options, stock appreciation rights, restricted shares, restricted stock units and performance share units. In addition, dividend equivalents may be awarded for options, restricted stock units and performance share units. The Committee may establish such terms and conditions for the awards as provided in LTIP.

For options, the option price per share will not be less than 100% of the fair market value of Norfolk Southern's Common Stock on the effective date the option is granted. All options are subject to a vesting period of at least one year, and the term of the option will not exceed ten years. LTIP specifically prohibits option repricing without stockholder approval, except for capital adjustments.

Performance share units entitle a recipient to receive performance-based compensation at the end of a three-year performance cycle based on Norfolk Southern's performance during that three-year period. For the 2006 performance share unit awards, corporate performance will be measured using three equally weighted standards established by the committee: (1) three-year average return on average capital invested, (2) three-year average operating ratio and (3) three-year total return to stockholders. Performance share units may be payable in either shares of Norfolk Southern Common Stock or cash.

Restricted stock units are payable in cash or in shares of Norfolk Southern Common Stock at the end of a restriction period of not less than 36 months and not more than 60 months. During the restriction period, the holder of the restricted stock units has no beneficial ownership interest in the Norfolk Southern Common Stock represented by the restricted stock units and has no right to vote the shares represented by the units or to receive dividends (except for dividend equivalent rights that may be awarded with respect to the restricted stock units). Restricted stock units will be forfeited immediately if the holder leaves the continuous employment of Norfolk Southern before the end of the restriction period, unless such employment is terminated by reason of retirement, disability or death or unless the restrictions are waived by Norfolk Southern.

**Norfolk Southern Corporation Thoroughbred Stock Option Plan**

The Board adopted the Norfolk Southern Corporation Thoroughbred Stock Option Plan ("TSOP") on Jan. 26, 1999, to promote the success of Norfolk Southern by providing an opportunity for nonagreement employees to acquire a proprietary interest in Norfolk Southern and thereby to provide an additional incentive to nonagreement employees to devote their maximum efforts and skills to the advancement, betterment, and prosperity of Norfolk Southern and its stockholders. TSOP has not been and is not required to have been approved by stockholders. Six million shares of authorized but unissued Common Stock were reserved for issuance under TSOP.

Active full-time nonagreement employees residing in the United States or Canada are eligible for selection to receive TSOP awards. Under TSOP, the Compensation Committee of the Board of Directors may grant nonqualified stock options subject to such terms and conditions as provided in TSOP.

The option price will not be less than 100% of the fair market value of Norfolk Southern's Common Stock on the effective date the options are granted. All options are subject to a vesting period of at least one year, and the term of the option will not exceed ten years. TSOP specifically prohibits option repricing without stockholder approval, except for capital adjustments.

**Norfolk Southern Corporation Directors' Restricted Stock Plan**

The Norfolk Southern Corporation Directors' Restricted Stock Plan ("Plan") was adopted on Jan. 1, 1994, and is designed to increase ownership of Norfolk Southern Common Stock by its non-employee directors so as to further align their ownership interest in Norfolk Southern with that of stockholders. The Plan has not been and is not required to have been approved by stockholders. Currently, a maximum of 66,000 shares of Corporation Common Stock may be granted under the Plan. To make grants to eligible directors, Norfolk Southern purchases, through one or more subsidiary companies, the number of shares required in open-market transactions at prevailing market prices, or makes such grants from Norfolk Southern Common Stock already owned by one or more of Norfolk Southern's subsidiary companies.

Only non-employee directors who are not and never have been employees of Norfolk Southern are eligible to participate in the Plan. Upon becoming a director, each eligible director receives a one-time grant of 3,000 restricted shares of Norfolk Southern Common Stock. No individual member of the Board exercises discretion concerning the eligibility of any director or the number of shares granted.

The restriction period applicable to restricted shares granted under the Plan begins on the date of the grant and ends on the earlier of the recipient's death or six months after the recipient ceases to be a director by reason of disability or retirement. During the restriction period shares may not be sold, pledged or otherwise encumbered. Directors will forfeit the restricted shares if they cease to serve as a director of Norfolk Southern for reasons other than their disability, retirement or death.

**Item 13. Certain Relationships and Related Transactions, and Director Independence.**

In accordance with General Instruction G(3), information called for by Item 13, Part III, is incorporated herein by reference from the information appearing under the caption "Transactions with Related Persons" and under the caption "Director Independence" in Norfolk Southern's definitive Proxy Statement for the Annual Meeting of Stockholders to be held on May 10, 2007, which definitive Proxy Statement will be filed electronically with the Commission pursuant to Regulation 14A no later than May 1, 2007.

**Item 14. Principal Accountant Fees and Services.**

In accordance with General Instruction G(3), information called for by Item 14, Part III is incorporated herein by reference from the information appearing under the caption "Ratification of Appointment of Independent Registered Public Accounting Firm" in Norfolk Southern's definitive Proxy Statement for the Annual Meeting of Stockholders to be held on May 10, 2007, which definitive proxy statement will be filed electronically with the Commission pursuant to Regulation 14A no later than May 1, 2007.

# PART IV

## NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES (NS)

**Item 15. Exhibits and Financial Statement Schedules.**

Page

(A) The following documents are filed as part of this report:

1. Index to Consolidated Financial Statements



| | |
|---|---|
| Report of Management | K40 |
| Reports of Independent Registered Public Accounting Firm | K41 |
| Consolidated Statements of Income, Years ended Dec. 31, 2006, 2005 and 2004 | K44 |
| Consolidated Balance Sheets As of Dec. 31, 2006 and 2005 | K45 |
| Consolidated Statements of Cash Flows, Years ended Dec. 31, 2006, 2005 and 2004 | K46 |
| Consolidated Statements of Changes in Stockholders' Equity, Years ended Dec. 31, 2006, 2005 and 2004 | K47 |
| Notes to Consolidated Financial Statements | K48 |



2. Financial Statement Schedule:

The following consolidated financial statement schedule should be read in connection with the consolidated financial statements:



| Index to Consolidated Financial Statement Schedule | Page |
|---|---|
| Schedule II - Valuation and Qualifying Accounts | K93 |



Schedules other than the one listed above are omitted either because they are not required or are inapplicable, or because the information is included in the consolidated financial statements or related notes.

3. Exhibits

| Exhibit Number | Description |
|---|---|
| 3 | Articles of Incorporation and Bylaws - |
| 3(i) | The Restated Articles of Incorporation of Norfolk Southern Corporation are incorporated By reference to Exhibit 3(i) to Norfolk Southern Corporation's 10-K filed on March 5, 2001. |
| 3(ii) | The Bylaws of Norfolk Southern Corporation, as amended Jan. 23, 2006, are incorporated by reference to Exhibit 3(ii) to Norfolk Southern Corporation's Form 8-K filed on Jan. 27, 2006. |

4 Instruments Defining the Rights of Security Holders, Including Indentures:

(a) Indenture, dated as of Jan. 15, 1991, from Norfolk Southern Corporation to First Trust of New York, National Association, as Trustee, is incorporated by reference to Exhibit 4.1 to Norfolk Southern Corporation's Registration Statement on Form S-3 (No. 33-38595).

(b) First Supplemental Indenture, dated May 19, 1997, between Norfolk Southern Corporation and First Trust of New York, National Association, as Trustee, related to the issuance of notes in the principal amount of $4.3 billion, is incorporated herein by reference to Exhibit 1.1(d) to Norfolk Southern Corporation's Form 8-K filed on May 21, 1997.

(c) Second Supplemental Indenture, dated April 26, 1999, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, related to the issuance of notes in the principal amount of $400 million, is incorporated herein by reference to Exhibit 1.1(c) to Norfolk Southern Corporation's Form 8-K filed on April 30, 1999.

(d) Third Supplemental Indenture, dated May 23, 2000, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, related to the issuance of notes in the principal amount of $600 million, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on May 25, 2000.

(e) Fourth Supplemental Indenture, dated as of Feb. 6, 2001, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, related to the issuance of notes in the principal amount of $1 billion, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on Feb. 7, 2001.

(f) Fifth Supplemental Indenture, dated as of July 5, 2001, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, related to the issuance of notes in the principal amount of $250 million, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on July 5, 2001.

(g) Sixth Supplemental Indenture, dated as of April 30, 2002, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, relating to the issuance of notes in the principal amount of $200 million, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on May 1, 2002.

(h) Seventh Supplemental Indenture, dated as of April 30, 2002, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, relating to the issuance of notes in the principal amount of $100 million, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on May 1, 2002.

(i) Eighth Supplemental Indenture, dated as of Sept. 17, 2004, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, relating to the issuance of 5.257% Notes due 2014 ("Securities") in the aggregate principal amount of $441.5 million in connection with Norfolk Southern Corporation's offer to exchange the Securities and cash for up to $400 million of its outstanding 7.350% Notes due 2007, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on Sept. 23, 2004.

(j) Indenture, dated Aug. 27, 2004, among PRR Newco, Inc., as Issuer, and Norfolk Southern Railway Company, as Guarantor, and The Bank of New York, as Trustee, is incorporated herein by reference to Exhibit 4(l) to Norfolk Southern Corporation's Form 10-Q filed on Oct. 28, 2004.

(k) First Supplemental Indenture, dated Aug. 27, 2004, among PRR Newco, Inc., as Issuer, and Norfolk Southern Railway Company, as Guarantor, and The Bank of New York, as Trustee, related to the issuance of notes in the principal amount of approximately $451.8 million, is incorporated herein by reference to Exhibit 4(m) to Norfolk Southern Corporation's Form 10-Q filed on Oct. 28, 2004.

(l) Ninth Supplemental Indenture, dated as of March 11, 2005, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, relating to the issuance of notes in the principal amount of $300 million, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on March 15, 2005.

(m) Tenth Supplemental Indenture, dated as of May 17, 2005, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, relating to the issuance of notes in the principal amount of $366.6 million, is incorporated herein by reference to Exhibit 99.1 to Norfolk Southern Corporation's Form 8-K filed on May 18, 2005.

(n) Eleventh Supplemental Indenture, dated as of May 17, 2005, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, relating to the issuance of notes in the principal amount of $350 million, is incorporated herein by reference to Exhibit 99.2 to Norfolk Southern Corporation's Form 8-K filed on May 18, 2005.

In accordance with Item 601(b)(4)(iii) of Regulation S-K, copies of other instruments of Norfolk Southern Corporation and its subsidiaries with respect to the rights of holders of long-term debt are not filed herewith, or incorporated by reference, but will be furnished to the Commission upon request.

10 Material Contracts -

(a) The Transaction Agreement, dated as of June 10, 1997, by and among CSX, CSX Transportation, Inc., Registrant, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation and CRR Holdings LLC, with certain schedules thereto, previously filed, is incorporated herein by reference to Exhibit 10(a) to Norfolk Southern Corporation's Form 10-K filed on Feb. 24, 2003.

(b) Amendment No. 1, dated as of Aug. 22, 1998, to the Transaction Agreement, dated as of June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation and CRR Holdings LLC, is incorporated herein by reference from Exhibit 10.1 to Norfolk Southern Corporation's Form 10-Q filed on Aug. 11, 1999.

(c) Amendment No. 2, dated as of June 1, 1999, to the Transaction Agreement, dated June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation and CRR Holdings LLC, is incorporated herein by reference from Exhibit 10.2 to Norfolk Southern Corporation's Form 10-Q filed on Aug. 11, 1999.

(d) Shared Assets Area Operating Agreement for North Jersey, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibit thereto, is incorporated herein by reference from Exhibit 10.4 to Norfolk Southern Corporation's Form 10-Q filed on Aug. 11, 1999.

(e) Shared Assets Area Operating Agreement for South Jersey/ Philadelphia, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibit thereto, is incorporated herein by reference from Exhibit 10.5 to Norfolk Southern Corporation's Form 10-Q filed on Aug. 11, 1999.

(f) Shared Assets Area Operating Agreement for Detroit, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibit thereto, is incorporated herein by reference from Exhibit 10.6 to Norfolk Southern Corporation's Form 10-Q filed on Aug. 11, 1999.

(g) Amendment No. 1, dated as of June 1, 2000, to the Shared Assets Areas Operating Agreement for North Jersey, South Jersey/Philadelphia and Detroit, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibit thereto, is incorporated herein by reference to Exhibit 10(h) to Norfolk Southern Corporation's 10-K filed on March 5, 2001.

(h) Amendment No. 2, dated as Jan. 1, 2001, to the Shared Assets Area Operating Agreements for North Jersey, South Jersey/Philadelphia and Detroit, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibit thereto, is incorporated herein by reference to Exhibit 10(j) to Norfolk Southern Corporation's Form 10-K filed on Feb. 21, 2002.

(i) Amendment No. 3, dated as of June 1, 2001, and executed in May of 2002, to the Shared Assets Area Operating Agreement for North Jersey, South Jersey/Philadelphia and Detroit, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibit thereto, is incorporated herein by reference to Exhibit 10(k) to Norfolk Southern Corporation’s Form 10-K filed on Feb. 24, 2003.

(j) Monongahela Usage Agreement, dated as of June 1, 1999, by and among CSX Transportation, Inc., Norfolk Southern Railway Company, Pennsylvania Lines LLC and New York Central Lines LLC, with exhibit thereto, is incorporated herein by reference from Exhibit 10.7 to Norfolk Southern Corporation's Form 10-Q filed on Aug. 11, 1999.

(k) The Agreement, entered into as of July 27, 1999, between North Carolina Railroad Company and Norfolk Southern Railway Company, is incorporated herein by reference from Exhibit 10(i) to Norfolk Southern Corporation's Form 10-K filed on March 6, 2000.

(l) The Supplementary Agreement, entered into as of Jan. 1, 1987, between the Trustees of the Cincinnati Southern Railway and The Cincinnati, New Orleans and Texas Pacific Railway Company (the latter a wholly owned subsidiary of Norfolk Southern Railway Company) - extending and amending a Lease, dated as of Oct. 11, 1881 - is incorporated by reference to Exhibit 10(k) to Norfolk Southern Corporation's Form 10-K filed on March 5, 2001.

*(m) The Norfolk Southern Corporation Executive Management Incentive Plan, effective Jan. 25, 2005, is incorporated by reference herein from Exhibit 99 to Norfolk Southern Corporation's Form 8-K filed on May 13, 2005.

*(n) The Norfolk Southern Corporation Long-Term Incentive Plan, as amended effective Jan. 25, 2005, is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K filed on May 13, 2005.

*(o) The Norfolk Southern Corporation Officers' Deferred Compensation Plan, as amended effective September 26, 2000, is incorporated herein by reference to Exhibit 10(n) to Norfolk Southern Corporation's Form 10-K filed on March 5, 2001.

*(p) The Norfolk Southern Corporation Executives' Deferred Compensation Plan, as amended effective Jan. 20, 2001, is incorporated herein by reference to Exhibit 10(o) to Norfolk Southern Corporation's Form 10-K filed on March 5, 2001.

*(q) The Directors' Deferred Fee Plan of Norfolk Southern Corporation, as amended effective Jan. 23, 2001, is incorporated herein by reference to Exhibit 10(p) to Norfolk Southern Corporation's Form 10-K filed on March 5, 2001.

*(r) The Norfolk Southern Corporation Directors' Restricted Stock Plan, effective Jan. 1, 1994, as restated Nov. 24, 1998, is incorporated herein by reference from Exhibit 10(h) to Norfolk Southern Corporation's Form 10-K filed on March 24, 1999.

*(s) Form of Severance Agreement, dated as of June 1, 1996, between Norfolk Southern Corporation and certain executive officers (including those defined as "named executive officers" and identified in the Corporation's Proxy Statement for the 1997 through 2001 Annual Meetings of Stockholders), is incorporated herein by reference to Exhibit 10(t) to Norfolk Southern Corporation's Form 10-K filed on Feb. 21, 2002.

*(t) Norfolk Southern Corporation Supplemental (formerly, Excess) Benefit Plan, effective as of Aug. 22, 1999, is incorporated herein by reference to Exhibit 10(r) to Norfolk Southern Corporation's Form 10-K filed on March 6, 2000.

*(u) The Norfolk Southern Corporation Directors' Charitable Award Program, effective Feb. 1, 1996, is incorporated herein by reference to Exhibit 10(v) to Norfolk Southern Corporation's Form 10-K filed on Feb. 21, 2002.

*(v) The Norfolk Southern Corporation Outside Directors' Deferred Stock Unit Program, as amended effective Jan. 28, 2003, is incorporated herein by reference to Exhibit 10(x) to Norfolk Southern Corporation's Form 10-K filed on Feb. 24, 2003.

*(w) Form of Agreement, dated as of Oct. 1, 2001, providing enhanced pension benefits to three officers in exchange for their continued employment with Norfolk Southern Corporation for two years, is incorporated herein by reference to Exhibit 10(w) to Norfolk Southern Corporation's Form 10-Q filed on Nov. 9, 2001. The agreement was entered into with L. Ike Prillaman, Vice Chairman and Chief Marketing Officer; Stephen C. Tobias, Vice Chairman and Chief Operating Officer; and Henry C. Wolf, Vice Chairman and Chief Financial Officer.

(x) The Norfolk Southern Corporation Thoroughbred Stock Option Plan, as amended effective Jan. 28, 2003, is incorporated herein by reference to Exhibit 10(z) to Norfolk Southern Corporation's Form 10-K filed on Feb. 24, 2003.

*(y) The Norfolk Southern Corporation Restricted Stock Unit Plan, effective Jan. 28, 2003, is incorporated herein by reference to Exhibit 10(bb) to Norfolk Southern Corporation's Form 10-K filed on Feb. 24, 2003.

*(z) The Norfolk Southern Corporation Executive Life Insurance Plan, as amended, effective Oct. 1, 2003, is incorporated herein by reference to Exhibit 10 to Norfolk Southern Corporation's Form 10-Q filed on Oct. 31, 2003.

(aa) Amendment No. 3, dated as of June 1, 1999, and executed in April 2004, to the Transaction Agreement, dated June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation and CRR Holdings LLC, is incorporated herein by reference to Exhibit 10(dd) to Norfolk Southern Corporation's Form 10-Q filed on July 30, 2004.

(bb) Distribution Agreement, dated as of July 26, 2004, by and among CSX Corporation, CSX Transportation, Inc., CSX Rail Holding Corporation, CSX Northeast Holdings Corporation, Norfolk Southern Corporation, Norfolk Southern Railway Company, CRR Holdings LLC, Green Acquisition Corp., Conrail Inc., Consolidated Rail Corporation, New York Central Lines LLC, Pennsylvania Lines LLC, NYC Newco, Inc. and PRR Newco, Inc., is incorporated herein by reference to Exhibit 2.1 to Norfolk Southern Corporation's Form 8-K filed on Sept. 2, 2004.

(cc) Amendment No. 5 to the Transaction Agreement, dated as of Aug. 27, 2004, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation and CRR Holdings LLC, is incorporated herein by reference to Exhibit 10.1 to Norfolk Southern Corporation's Form 8-K filed on Sept. 2, 2004.

(dd) Tax Allocation Agreement, dated as of Aug. 27, 2004, by and among Green Acquisition Corp., Conrail Inc., Consolidated Rail Corporation, New York Central Lines LLC and Pennsylvania Lines LLC, is incorporated herein by reference to Exhibit 10.2 to Norfolk Southern Corporation's Form 8-K filed on Sept. 2, 2004.

(ee) Credit Agreement dated as of Aug. 31, 2004, between Norfolk Southern Corporation and various lenders, is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K/A filed on Sept. 7, 2004.

(ff) Amendment No. 4, dated as of June 1, 2005, and executed in late June 2005, to the Shared Assets Area Operating Agreement for North Jersey, South Jersey/Philadelphia and Detroit, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibits thereto, is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K filed on July 1, 2005.

*(gg) The description of Norfolk Southern Corporation's executive physical reimbursement for non-employee directors and certain executives is incorporated herein by reference to Norfolk Southern Corporation's Form 8-K filed on July 28, 2005.

*(hh) Form of 2006 Incentive Stock Option and Non-Qualified Stock Option Agreement under the Norfolk Southern Long-Term Incentive Plan, is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K/A filed on Dec. 7, 2005.

*(ii) Form of 2006 Restricted Share and Restricted Stock Unit Agreement under the Norfolk Southern Corporation Long-Term Incentive Plan, is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K/A filed on Dec. 7, 2005.

*(jj) Form of 2005 Performance Share Unit Award under the Norfolk Southern Corporation Long-Term Incentive Plan, is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K/A filed on Dec. 7, 2005.

*(kk) Revised annual salaries for certain named executive officers are incorporated herein by reference to Norfolk Southern Corporation's Form 8-K/A filed on Dec. 7, 2005.

(ll) The Transaction Agreement, dated as of Dec. 1, 2005, by and among Norfolk Southern Corporation, The Alabama Great Southern Railroad Company, Kansas City Southern and The Kansas City Southern Railway Company (Exhibits, annexes and schedules omitted. The Registrant will furnish supplementary copies of such materials to the SEC upon request).

(mm) Amendment No. 1, dated as of Jan. 17, 2006, by and among Norfolk Southern Corporation, The Alabama Great Southern Railroad Company, Kansas City Southern and the Kansas City Southern Railroad.

*(nn) The retirement agreement, dated Jan. 27, 2006, between Norfolk Southern Corporation and David R. Goode, is incorporated herein by reference to Exhibit 10.1 to Norfolk Southern Corporation's Form 8-K filed on Jan. 27, 2006.

*(oo) The waiver agreement, dated Jan. 27, 2006, between Norfolk Southern Corporation and David R. Goode, providing for the waiver of forfeiture provisions otherwise applicable to certain restricted shares and restricted stock units upon retirement, is incorporated herein by reference to Exhibit 10.2 to Norfolk Southern Corporation's Form 8-K filed on Jan. 27, 2006.

*(pp) Revised fees for outside directors are incorporated herein by reference to Norfolk Southern Corporation's Form 8-K filed on Jan. 27, 2006.

*(qq) The retirement agreement, dated Mar. 28, 2006, between Norfolk Southern Corporation and L. Ike Prillaman, is incorporated herein by reference to Exhibit 10.1 to Norfolk Southern Corporation's Form 8-K filed on Mar. 31, 2006.

*(rr) The waiver agreement, dated Mar. 28, 2006, between Norfolk Southern Corporation and L. Ike Prillaman, providing for the waiver of forfeiture provisions otherwise applicable to certain restricted shares and restricted stock units upon retirement, is incorporated herein by reference to Exhibit 10.2 to Norfolk Southern Corporation's Form 8-K filed on Mar. 31, 2006.

(ss) Amendment No. 2, dated as of May 1, 2006, to the Transaction Agreement, dated as of Dec. 1, 2005, by and among Norfolk Southern Corporation, The Alabama Great Southern Railroad Company, Kansas City Southern and The Kansas City Southern Railway Company is incorporated herein by reference to Exhibit 10.1 to Norfolk Southern Corporation's Form 8-K filed on May 4, 2006.

(tt) Limited Liability Company Agreement of Meridian Speedway, LLC, dated as of May 1, 2006, by and among The Alabama Great Southern Railroad Company and Kansas City Southern is incorporated herein by reference to Exhibit 10.2 to Norfolk Southern Corporation's Form 8-K filed on May 4, 2006.

*(uu) The Norfolk Southern Corporation Long-Term Incentive Plan, as amended effective July 25, 2006, is incorporated herein by reference to Exhibit 10.3 to Norfolk Southern Corporation's Form 10-Q filed on July 28, 2006.

*(vv) Form of Norfolk Southern Corporation Long-Term Incentive Plan, 2007 Award Agreement is incorporated herein by reference to Exhibit 10.1 to Norfolk Southern Corporation's Form 8-K filed on Jan. 11, 2007.

*, **(ww) Retirement Plan of Norfolk Southern Corporation and Participating Subsidiary Companies Effective June 1, 1982, amended to and including Dec. 1, 2006.

**12 Statement re: Computation of Ratio of Earnings to Fixed Charges.

**21 Subsidiaries of the Registrant.

**23 Consent of Independent Registered Public Accounting Firm.

**31 Rule 13a-14(a)/15d-14(a) Certifications.

**32 Section 1350 Certifications.

**99 Annual CEO Certification pursuant to NYSE Rule 303A.12(a).

* *Management contract or compensatory arrangement.*
** *Filed herewith.*

(B) Exhibits.

The Exhibits required by Item 601 of Regulation S-K as listed in Item 15(A)3 are filed herewith or incorporated herein by references.

(C) Financial Statement Schedules.

Financial statement schedules and separate financial statements specified by this Item are included in Item 15(A)2 or are otherwise not required or are not applicable.

Exhibits 23, 31, 32 and 99 are included in copies assembled for public dissemination. All exhibits are included in the 2006 Form 10-K posted on our website at www.nscorp.com under "Investors" and "SEC Filings" or you may request copies by writing to:

**Office of Corporate Secretary**
**Norfolk Southern Corporation**
**Three Commercial Place**
**Norfolk, Virginia 23510-9219**

## POWER OF ATTORNEY

Each person whose signature appears below under "SIGNATURES" hereby authorizes Henry C. Wolf, James A. Hixon and James A. Squires or any one of them, to execute in the name of each such person, and to file, any amendment to this report and hereby appoints Henry C. Wolf, James A. Hixon and James A. Squires or any one of them, as attorneys-in-fact to sign on his or her behalf, individually and in each capacity stated below, and to file, any and all amendments to this report.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, Norfolk Southern Corporation has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, on this 20th day of February 2007.

**NORFOLK SOUTHERN CORPORATION**

By: /s/ Charles W. Moorman
Charles W. Moorman
(Chairman, President and Chief Executive Officer)

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below on this 20th day of February 2007, by the following persons on behalf of Norfolk Southern Corporation and in the capacities indicated.

| Signature | Title |
| --- | --- |
| /s/ Charles W. Moorman<br>(Charles W. Moorman) | Chairman, President and Chief Executive Officer and Director<br>(Principal Executive Officer) |
| /s/ Henry C. Wolf<br>(Henry C. Wolf) | Vice Chairman and Chief Financial Officer<br>(Principal Financial Officer) |
| /s/ Marta R. Stewart<br>(Marta R. Stewart) | Vice President and Controller<br>(Principal Accounting Officer) |
| /s/ Gerald L. Baliles<br>(Gerald L. Baliles) | Director |
| /s/ Daniel A. Carp<br>(Daniel A. Carp) | Director |
| /s/ Gene R. Carter<br>(Gene R. Carter) | Director |

| | |
|---|---|
| /s/ Alston D. Correll<br>(Alston D. Correll) | Director |
| /s/ Landon Hilliard<br>(Landon Hilliard) | Director |
| /s/ Burton M. Joyce<br>(Burton M. Joyce) | Director |
| /s/ Steven F. Leer<br>(Steven F. Leer) | Director |
| /s/ Jane Margaret O'Brien<br>(Jane Margaret O'Brien) | Director |
| /s/ J. Paul Reason<br>(J. Paul Reason) | Director |

Schedule II

**Norfolk Southern Corporation and Subsidiaries**
**Valuation and Qualifying Accounts**
**Years Ended December 31, 2004, 2005 and 2006**
**($ in millions)**

| | | Additions charged to: | | | |
|---|---|---|---|---|---|
| | Beginning Balance | Expenses | Other Accounts | Deductions | Ending Balance |
| ***Year ended December 31, 2004*** | | | | | |
| Valuation allowance (included net in deferred tax liability) for deferred tax assets | $ 14 | $ -- | $ -- | $ 1[2] | $ 13 |
| Casualty and other claims included in other liabilities | $ 270 | $ 112 | $ 48[1] | $ 115[3] | $ 315 |
| Current portion of casualty and other claims included in accounts payable | $ 218 | $ 23 | $ 124[1] | $ 143[4] | $ 222 |
| ***Year ended December 31, 2005*** | | | | | |
| Valuation allowance (included net in deferred tax liability) for deferred tax assets | $ 13 | $ -- | $ -- | $ 3[2] | $ 10 |
| Casualty and other claims included in other liabilities | $ 315 | $ 311 | $ -- | $ 205[3] | $ 421 |
| Current portion of casualty and other claims included in accounts payable | $ 222 | $ 92 | $ 114[1] | $ 137[4] | $ 291 |
| ***Year ended December 31, 2006*** | | | | | |
| Valuation allowance (included net in deferred tax liability) for deferred tax assets | $ 10 | $ -- | $ -- | $ 1[2] | $ 9 |
| Casualty and other claims included in other liabilities | $ 421 | $ 217 | $ -- | $ 167[3] | $ 471 |
| Current portion of casualty and other claims included in accounts payable | $ 291 | $ 40 | $ 124[1] | $ 154[4] | $ 301 |

Certain comparative prior year amounts have been reclassified to conform to the current year presentation.

[1]Includes revenue refunds and overcharges provided through deductions from operating revenues and transfers from other accounts.

[2]Reclassifications to/from other assets.

[3]Payments and reclassifications to/from accounts payable.

[4]Payments and reclassifications to/from other liabilities.

# EXHIBIT PX0704

# UNION PACIFIC CORPORATION 2004 ANNUAL REPORT

UNION PACIFIC

BUILDING AMERICA®



## FINANCIAL HIGHLIGHTS

| *Millions of Dollars, Except Per Share Amounts and Ratios* | *2004* | *2003* | *2002* | *2001* | *2000* |
|---|---|---|---|---|---|
| **FOR THE YEAR** | | | | | |
| Operating Revenues | $12,215 | $11,551 | $11,159 | $10,830 | $10,765 |
| Operating Income | 1,295 | 2,133 | 2,253 | 2,018 | 1,850 |
| Income from Continuing Operations | 604 | 1,056 | 1,265 | 934 | 810 |
| Income from Discontinued Operations (a) | - | 255 | 76 | 32 | 32 |
| Cumulative Effect of Accounting Change, Net of Taxes | - | 274 | - | - | - |
| Net Income | 604 | 1,585 | 1,341 | 966 | 842 |
| Per Share—Basic: | | | | | |
| Income from Continuing Operations | 2.33 | 4.15 | 5.02 | 3.77 | 3.29 |
| Income from Discontinued Operations | - | 1.00 | 0.30 | 0.13 | 0.13 |
| Cumulative Effect of Accounting Change | - | 1.08 | - | - | - |
| Net Income | 2.33 | 6.23 | 5.32 | 3.90 | 3.42 |
| Per Share—Diluted: | | | | | |
| Income from Continuing Operations | 2.30 | 4.07 | 4.78 | 3.65 | 3.22 |
| Income from Discontinued Operations | - | 0.95 | 0.27 | 0.12 | 0.12 |
| Cumulative Effect of Accounting Change | - | 1.02 | - | - | - |
| Net Income | 2.30 | 6.04 | 5.05 | 3.77 | 3.34 |
| Dividends Per Share | 1.20 | 0.99 | 0.83 | 0.80 | 0.80 |
| Capital Expenditures (b) | 1,876 | 1,940 | 1,820 | 1,696 | 1,750 |
| Operating Cash Flow | 2,237 | 2,422 | 2,199 | 1,865 | 2,021 |
| Free Cash Flow (c) | 215 | 524 | 536 | 241 | 214 |
| **AT YEAR-END** | | | | | |
| Total Assets | $34,589 | $33,494 | $32,771 | $31,551 | $30,917 |
| Total Debt | 8,131 | 7,989 | 7,703 | 8,078 | 8,351 |
| Common Shareholders' Equity | 12,655 | 12,354 | 10,651 | 9,575 | 8,662 |
| Equity Per Common Share (d) | 48.58 | 47.85 | 41.99 | 38.26 | 35.09 |
| **FINANCIAL RATIOS (%)** | | | | | |
| Operating Margin | 10.6 | 18.5 | 20.2 | 18.6 | 17.2 |
| Operating Ratio | 89.4 | 81.5 | 79.8 | 81.4 | 82.8 |
| Lease-Adjusted Debt to Capital (e) | 45.1 | 44.8 | 51.7 | 55.0 | 58.2 |
| Return on Average Common Shareholders' Equity | 4.8 | 13.8 | 13.3 | 10.6 | 10.1 |

*(a) The Corporation's trucking segment is presented as discontinued operations. 2003 results include a $211 million gain on sale, which includes an income tax benefit of $126 million.*
*(b) Capital expenditures include non-cash capital lease financings of $188 million, $126 million, $124 million, and $201 million in 2003, 2002, 2001, and 2000, respectively. There were no non-cash capital lease financings in 2004.*
*(c) Free cash flow is defined as cash provided by operating activities less cash used in investing activities, dividends paid, and non-cash capital lease financings plus non-cash acquisitions. 2003 results exclude proceeds from Overnite IPO of $620 million. See reconciliation in Item 7 of Form 10-K.*
*(d) Equity per common share is based on average common shareholders' equity.*
*(e) Lease-adjusted debt to capital is computed as follows: total debt plus convertible preferred securities plus net present value of leases divided by total debt plus equity plus convertible preferred securities plus net present value of leases.*

**OPERATING REVENUES**
*In millions of dollars*




**FREE CASH FLOW**
*In millions of dollars*




**Excludes proceeds from Overnite IPO of $620 million*

**DEBT TO CAPITAL****
*Percentage*




***Lease-Adjusted*

**Dear Fellow Shareholders:**

2004 likely will be remembered as a year of booming economic growth, record oil prices, global struggles for democracy and a devastating tsunami in Asia. For Union Pacific, we will remember 2004 as a time of unprecedented demand for rail transportation. Unfortunately, we did not fully meet this demand as we experienced considerable operating difficulties. Our commitment to the future is that we are learning from these challenges and will emerge a stronger and better Railroad.

**Financial Recap**

As a result of record demand in our business, commodity revenue was the bright spot in the year, hitting a record $11.7 billion and topping last year's record by more than $650 million. Commodity volume growth was one driver of the revenue gain as we set monthly records for 7-day carloadings every month in 2004, peaking in November with an all-time weekly record of more than 194,000 carloads.

Union Pacific faced two significant financial challenges in 2004—the increased costs associated with our operational inefficiencies and record high fuel prices. Service issues, coupled with our increased hiring and training efforts, added roughly $300 million in operating expenses to the year. Our average fuel price rose from $1.02 per gallon in the first quarter of the year to $1.46 per gallon in the fourth quarter, resulting in an additional $200 million year-over-year expense increase net of our fuel surcharge recovery.

**Changing Business Environment**

Unprecedented levels of demand have created a very strong pricing environment that we are working diligently to convert into higher returns on investment. Across all business groups, we are obtaining solid price increases in the marketplace. At the same time, we are working to reduce the complexity and inflexibility of long-term contracts so that we can respond more quickly to changing market conditions.

One clear example is in our coal business where we have instituted new coal pricing mechanisms for all shipments from the Southern Powder River Basin (SPRB) in Wyoming, as well as spot movements out of Colorado and Utah. We have simplified the way we do business with our customers by clearly communicating the revenue we need in order to reinvest in our coal business, while sharply reducing the administrative burden of dozens of separate contracts. In total, 322 million tons of coal moved out of the SPRB in 2004, and that is expected to grow to over 500 million tons by 2013. Our goal is to participate in meeting that growing demand, but only if the financial returns are sufficient to justify the necessary investment.

**Operating Recap**

Surging freight demand in the latter part of 2003 strained our network resources and slowed our system velocity, leaving us short of train crew personnel and locomotive power. Tactical plans were initiated to add resources. We graduated nearly 5,000 new conductors into service and acquired almost 400 new locomotives during 2004, but record volumes continued to overwhelm our system even as we added these resources.

In some of the most constrained parts of our network, we took additional steps during the year to manage network flows and volumes. For example, on our Sunset Corridor between Los Angeles and El Paso, where demand was particularly strong, we reduced the number of trains to improve fluidity. Another example is in our South Texas rock network where velocity improved 16 percent after we reduced the number of rail cars assigned to rock service to ease congestion. The 20 percent reduction in cars, combined with the velocity gain, allowed us to increase rock loadings by 26 percent during the peak construction months of August, September and October. We appreciate the tremendous level of support and cooperation that our customers provided in helping alleviate some of the congestion, and we look forward to continuing these efforts in the future.

We're also approaching our operational issues strategically through several network management initiatives. One of these is our Unified Plan, which takes a "clean sheet" approach to redesigning our transportation plan. Using quality tools, including an industrial engineering process known as Lean management to aid us in this process, we will work to simplify operations and balance the demands on our network, enabling Union Pacific to operate more

efficiently. When combined with efforts to manage the flow of business onto our Railroad, we believe these initiatives can improve the reliability and consistency of our service offerings.

As we entered 2005, we were looking forward to gaining momentum with our network efforts and increasing velocity. Instead, Mother Nature delivered a major storm to the Los Angeles Basin, Nevada and Utah, severely limiting our operations in that region for several weeks. Thanks to the heroic efforts of the men and women of Union Pacific, we were able to quickly restore vital rail service in the affected areas. We also saw our 7-day average train speed increase by 2.3 miles per hour from the last week in December to the last week in January. Continued improvement in network fluidity is our focus and is vital to achieving our 2005 goals.

**Safety—Always a Priority**

Regardless of the demands on our network or what Mother Nature has to offer, our first priority is to operate safely. We believe all accidents and injuries can be prevented, and it is the responsibility of everyone at Union Pacific to work toward that goal. During a year when we added thousands of new train crew personnel and moved record volumes, the number of claims for lost work day cases fell by 9 percent. Quality processes, designed to ensure we hire the right people and provide world-class training, and an overall culture of safety are essential to achieving continuous improvement in our safety record.

**Corporate Changes**

Ike Evans, our Vice Chairman and a member of our Board, is retiring at the end of February 2005, after more than six years of dedicated service. Ike's leadership, determination and enthusiasm will certainly be missed. We wish him well and sincerely thank him for all he has contributed.

Another Board of Directors change occurred last June when we were pleased to welcome Erroll B. Davis, Jr., Chairman and CEO of Alliant Energy Corporation, to our Board. Erroll brings extensive management expertise and a customer perspective to our Board.

For the first time since 1910, Union Pacific Railroad changed its home address when we relocated our headquarters to the Union Pacific Center at 1400 Douglas Street. Working in partnership with the State of Nebraska, we consolidated personnel from 10 office buildings in Omaha and St. Louis into one new, bright, functional home. The new building greatly enhances work force efficiency, is a source of pride for Union Pacific employees and will serve as the central point of our operations for years to come.

**Planning for the Future**

As 2004 demonstrated, a shift has occurred in the supply and demand fundamentals of rail transportation. For the first time in decades, demand exceeds supply and, given transportation infrastructure constraints and truck driver shortages, this situation is not likely to change in the near term. We must, therefore, work to find the point of equilibrium between supply and demand. As a Company, we must also embrace the changes that will be necessary to operate successfully in this new environment.

- *We will strive to eliminate unnecessary work events and reduce capacity constraints through process improvements.*
- *We will optimize network capacity to improve our yields.*
- *We will allocate capital resources based on the expected returns and the incremental capacity enhancement gained per dollar spent. For example, in 2004, a $34 million investment increased our Denver coal train processing capacity by 25 percent and reduced our customers' inventory carrying costs. In addition, we'll save $15 million annually in failure costs from this "Denver Beltline Connection."*

We also will continue to cultivate our vital employee assets. Over the next 10 years, we are projecting significant work force attrition and retirements, making it essential that we continue to work to attract high quality, energetic and diverse employees. We've been very pleased with the quality of people we've hired into train service over the last year, and we are equally excited about the new operating management associates who are just starting their careers. These men and women are the future of Union Pacific and, judging by what we are seeing so far, that future looks bright.

Our efforts to be an "employer of choice" have gained national recognition. *G.I. Jobs* magazine named Union Pacific as one of the Top 25 "military friendly" employers for our military recruiting efforts, percentage of new hires with military experience and policies toward National Guard and reserve service. We also were honored as a top employer for the third time by *Working Mother* magazine and for the second year in a row by *LATINA Style* magazine. In addition, the National Association of Secondary School Principals awarded Union Pacific its highest honor, the Distinguished Service Award, for creating The Principals' Partnership program supporting public high school principals as they seek to educate America's future work force.

**2005 — Challenges and Opportunities**

Looking at 2005, our customers are indicating another year of strong demand. This environment should provide tremendous opportunities for our industry and our Company. Every year has its challenges, however, with external factors, such as the potential for rising interest rates or devaluation of the U.S. dollar, presenting a risk to economic growth. High fuel prices will likely remain an obstacle, but we will continue to push for greater fuel surcharge recoveries to offset this added cost. We'll remain watchful of these external developments, working to minimize cost pressures on our business as we take advantage of the growing opportunities in the marketplace.

Union Pacific's success in 2005 will be defined by how we operate our network. Through our various network management initiatives we must increase our velocity and, at the same time, work to restore efficiency using the Quality principles. By achieving these objectives, we will restore trust and confidence in Union Pacific as we increase the value of our Company for our customers, our employees and our shareholders.

Dick Davidson
Chairman and Chief Executive Officer

# DIRECTORS AND EXECUTIVE OFFICERS

## BOARD OF DIRECTORS

*Philip F. Anschutz* *1 Chair, 4, 5*
Chairman
Anschutz Company

*Richard K. Davidson* *1*
Chairman, President and
Chief Executive Officer
Union Pacific Corporation

Chairman and Chief Executive Officer
Union Pacific Railroad Company

*Erroll B. Davis, Jr.* *4*
Chairman and CEO
Alliant Energy Corporation

*Thomas J. Donohue* *1, 2 Chair, 5*
President and
Chief Executive Officer
U.S. Chamber of Commerce

*Archie W. Dunham* *1, 4 Chair, 5*
Retired Chairman
ConocoPhillips

*Spencer F. Eccles* *2, 3*
Chairman
Wells Fargo Intermountain
Banking Region

*Ivor J. Evans**
Vice Chairman
Union Pacific Corporation and
Union Pacific Railroad Company

*Judith Richards Hope* *1, 3 Chair, 4*
Adjunct Professor of Law
Georgetown University Law Center

*Michael W. McConnell* *2, 3*
Managing Partner
Brown Brothers Harriman & Co.

*Steven R. Rogel* *1, 2, 5 Chair*
Chairman, President and
Chief Executive Officer
Weyerhaeuser Company

*Ernesto Zedillo Ponce de Leon* *3, 4*
Director
Yale Center for the Study
of Globalization

## BOARD COMMITTEES

1. Executive 2. Compensation and Benefits 3. Audit 4. Finance 5. Corporate Governance and Nominating

## EXECUTIVE OFFICERS

*Richard K. Davidson*
Chairman, President and
Chief Executive Officer
Union Pacific Corporation

Chairman and Chief Executive Officer
Union Pacific Railroad Company

*Ivor J. Evans**
Vice Chairman
Union Pacific Corporation and
Union Pacific Railroad Company

*James R. Young*
President and Chief Operating Officer
Union Pacific Railroad Company

*L. Merill Bryan, Jr.***
Senior Vice President and
Chief Information Officer
Union Pacific Corporation

*Dennis J. Duffy*
Executive Vice President–Operations
Union Pacific Railroad Company

*Charles R. Eisele*
Senior Vice President–Strategic Planning
Union Pacific Corporation

*Bernard R. Gutschewski*
Vice President–Taxes
Union Pacific Corporation

*J. Michael Hemmer*
Senior Vice President–Law
and General Counsel
Union Pacific Corporation

*Mary Sanders Jones*
Vice President and Treasurer
Union Pacific Corporation

*Robert M. Knight, Jr.*
Executive Vice President–Finance
and Chief Financial Officer
Union Pacific Corporation

*John J. Koraleski*
Executive Vice President–
Marketing and Sales
Union Pacific Railroad Company

*Mary E. McAuliffe*
Vice President–External Relations
Union Pacific Corporation

*Richard J. Putz*
Vice President and Controller
Union Pacific Corporation

*Barbara W. Schaefer*
Senior Vice President–Human Resources
and Secretary
Union Pacific Corporation

*Robert W. Turner*
Senior Vice President–Corporate Relations
Union Pacific Corporation

**Mr. Evans has announced his intention to retire effective February 28, 2005.*
***Mr. Bryan has announced his intention to retire effective February 28, 2005.*

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

# FORM 10-K

*(Mark One)*

[X] **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2004

**OR**

[ ] **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from ____________ to ____________

***Commission File Number 1-6075***

# UNION PACIFIC CORPORATION
(Exact name of registrant as specified in its charter)

| **UTAH** | **13-2626465** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**1400 DOUGLAS STREET, OMAHA, NEBRASKA**
(Address of principal executive offices)
**68179**
(Zip Code)
**(402) 544-5000**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each Class | Name of each exchange on which registered |
|---|---|
| **Common Stock (Par Value $2.50 per share)** | **New York Stock Exchange, Inc.** |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Yes X No ___

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [X].

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Act).

Yes X No ___

As of June 30, 2004, the aggregate market value of the registrant's Common Stock held by non-affiliates (using the New York Stock Exchange closing price) was $15,116,771,158.

The number of shares outstanding of the registrant's Common Stock as of January 31, 2005, was 260,998,036.

Documents Incorporated by Reference – Portions of the registrant's definitive Proxy Statement for the Annual Meeting of Shareholders to be held on May 5, 2005, have been incorporated by reference into Part III of this report. The registrant's Proxy Statement will be filed with the Securities and Exchange Commission pursuant to Regulation 14A.

## TABLE OF CONTENTS
## UNION PACIFIC CORPORATION


**PART I**

| | | |
|---|---|---|
| Item 1. | Business | 3 |
| Item 2. | Properties | 6 |
| Item 3. | Legal Proceedings | 7 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 9 |
| | Executive Officers of the Registrant and Principal Executive Officers of Subsidiaries | 9 |

**PART II**

| | | |
|---|---|---|
| Item 5. | Market for the Registrant's Common Equity, Related Shareholder Matters, and Issuer Purchases of Equity Securities | 11 |
| Item 6. | Selected Financial Data | 12 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 13 |
| | Critical Accounting Policies | 29 |
| | Risk Factors | 32 |
| | Cautionary Information | 34 |
| Item 7A. | Quantitative and Qualitative Disclosures about Market Risk | 35 |
| Item 8. | Financial Statements and Supplementary Data | 36 |
| | Report of Independent Registered Public Accounting Firm | 37 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 65 |
| Item 9A. | Controls and Procedures | 65 |
| | Management's Annual Report on Internal Control Over Financial Reporting | 66 |
| | Report of Independent Registered Public Accounting Firm on Internal Control Over Financial Reporting | 67 |
| Item 9B. | Other Information | 68 |

**PART III**

| | | |
|---|---|---|
| Item 10. | Directors and Executive Officers of the Registrant | 69 |
| Item 11. | Executive Compensation | 69 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management | 69 |
| Item 13. | Certain Relationships and Related Transactions | 70 |
| Item 14. | Principal Accounting Fees and Services | 70 |

**PART IV**

| | | |
|---|---|---|
| Item 15. | Exhibits and Financial Statement Schedules | 71 |
| | Signatures | 72 |
| | Certifications | 81 |

# PART I

## Item 1. Business

## GENERAL

Union Pacific Corporation operates primarily as a rail transportation provider through Union Pacific Railroad Company, its principal operating company, which is the largest railroad in North America, covering 23 states across the western two-thirds of the United States. Union Pacific Corporation was incorporated in Utah in 1969 and maintains its principal executive offices at 1400 Douglas Street, Omaha, NE 68179. The telephone number at that address is (402) 544-5000. The common stock of Union Pacific Corporation is listed on the New York Stock Exchange (NYSE) under the symbol "UNP".

For purposes of this report, unless the context otherwise requires, all references herein to "UPC", "Corporation", "we", "us", and "our" shall mean Union Pacific Corporation and its subsidiaries, including Union Pacific Railroad Company, which will be separately referred to as "UPRR" or the "Railroad".

Our operating results include Southern Pacific Rail Corporation, which we acquired in October 1996. During 1997, the Railroad acquired an ownership interest in a consortium that was granted a 50-year concession to operate the Pacific-North and Chihuahua Pacific lines in Mexico. The Railroad made an additional investment in the consortium in 1999 and currently holds a 26% ownership interest. In November 2003, we completed the sale of our entire trucking interest through an underwritten initial public offering of all the common stock of Overnite Corporation, leaving the Railroad as our only operating segment and the principal source of our revenues.

**Available Information** – Our Internet website is www.up.com. We make available free of charge on our website (under the "Investors" caption link) our annual reports on Form 10-K, our quarterly reports on Form 10-Q, our current reports on Form 8-K, our proxy statements, Forms 3, 4, and 5, filed on behalf of directors and executive officers, and amendments to such reports filed or furnished pursuant to the Securities Exchange Act of 1934, as amended (the Exchange Act), as soon as reasonably practicable after such material is electronically filed with, or furnished to, the Securities and Exchange Commission (SEC). We also make available on our website previously filed SEC reports and exhibits via a link to EDGAR on the SEC's Internet site at www.sec.gov. Additionally, our corporate governance materials, including Board Committee charters, governance guidelines and policies, and codes of conduct and ethics for directors, officers, and employees may be found on our website at www.up.com/investors. From time to time, the corporate governance materials on our website may be updated as necessary to comply with rules issued by the SEC and NYSE or as desirable to promote the effective and efficient governance of our company. Any security holder wishing to receive, without charge, a copy of any of our SEC filings or corporate governance materials should send a written request to: Secretary, Union Pacific Corporation, 1400 Douglas Street, Omaha, NE 68179.

We have included the CEO and CFO certifications regarding our public disclosure required by Section 302 of the Sarbanes-Oxley Act of 2002 as Exhibits 31(a) and (b) to this report. Additionally, we filed with the NYSE the CEO's certification regarding our compliance with the NYSE's Corporate Governance Listing Standards (Listing Standards) pursuant to Section 303A.12(a) of the Listing Standards, which was dated April 30, 2004, and indicated that the CEO was not aware of any violations of the Listing Standards by the Corporation.

References to our website address and any other references to the website contained in this report, including references in Management's Discussion and Analysis of Financial Condition and Results of Operations, Item 7, are provided as a convenience and do not constitute, and should not be deemed, an incorporation by reference of the information contained on the website. Therefore, such information should not be considered part of this report.

## OPERATIONS

The Railroad, along with its subsidiaries and rail affiliates, is our one reportable business segment. The Consolidated Financial Statements also include our discontinued trucking operations, consisting of Overnite Transportation Company (OTC) and Motor Cargo Industries, Inc. (Motor Cargo). Our trucking segment was reclassified as a discontinued operation in 2003. Additional information regarding our operations is presented within Selected Financial Data, Item 6; Management's Discussion and Analysis of Financial Condition and Results of Operations, Item 7; and the Consolidated Financial Statements, Item 8.

**Continuing Operations** – UPRR is a Class I railroad that operates in the United States. We have approximately 33,000 route miles, linking Pacific Coast and Gulf Coast ports with the Midwest and eastern United States gateways and providing several north/south corridors to key Mexican gateways. We serve the western two-thirds of the country and maintain coordinated schedules with other rail carriers for the handling of freight to and from the Atlantic Coast, the Pacific Coast, the Southeast, the Southwest, Canada, and Mexico. Export and import traffic is moved through Gulf Coast and Pacific Coast ports and across the Mexican and Canadian borders. Railroad commodity revenue totaled $11.7 billion in 2004 and is comprised of the following six commodity groups:

*Agricultural* – The transportation of agricultural products, including whole grains (for animal and human consumption) and commodities produced from these grains, food and beverage products, and sweeteners, provided 14% of the Railroad's 2004 commodity revenue. With access to most major grain markets, the Railroad provides a critical link between the Midwest and western producing areas and the primary Pacific Northwest (PNW) and Gulf ports, as well as Mexico. UPRR also serves significant domestic markets, including grain processors and feeders and ethanol producers in the Midwest, West, South, and Rocky Mountain states. Unit trains of grain efficiently shuttle between producers and export terminals or domestic markets. Primary food commodities consist of a variety of fresh and frozen fruits and vegetables, dairy products, and beverages that are moved to major U.S. population centers for consumption. Express Lane, our premium and perishables service that moves fruits and vegetables from the PNW and California to destinations in the East, continues to focus on drawing market share from the trucking industry. Frozen meat and poultry are also transported to the West Coast ports for export, while beverages are imported into the U.S. from Mexico. Sweeteners are primarily short-haul sugar beet movements from the fields to the refineries, both of which are located in Idaho.

*Automotive* – UPRR is the largest automotive carrier west of the Mississippi River, serving seven vehicle assembly plants and distributing imported vehicles from six West Coast ports and Houston. The Railroad serves 42 vehicle distribution centers that deliver vehicles to all major western U.S. cities. These centers serve as rail car-to-truck haul away operations for major domestic and international automotive manufacturers. In addition to transporting finished vehicles, UPRR currently provides expedited handling of automobile materials in both boxcars and containers to several assembly plants. Mexico continues to be an integral part of our automotive business. The Railroad carries automobile materials bound for assembly plants in Mexico, the U.S., and Canada to and from Mexican interchanges and transports finished vehicles from manufacturing facilities in Mexico. In 2004, transportation of finished vehicles and automobile materials accounted for 11% of the Railroad's total commodity revenue.

*Chemicals* – The transportation of chemicals provided 15% of UPRR's 2004 commodity revenue. The Railroad's franchise enables it to serve the large chemical producing areas along the Gulf Coast, as well as the Rocky Mountain region. More than two-thirds of the chemicals business consists of liquid and dry chemicals, plastics, and liquid petroleum products. In addition to transporting plastics, customers also leverage UPRR's industry leading storage-in-transit yards for intermediate storage of plastic resins. Soda ash shipments originate in southwestern Wyoming and California and are consumed primarily in glass producing markets in the East, the West, and abroad. Fertilizer movements originate primarily in the Gulf Coast region, as well as the West and Canada, bound for major agricultural end-users in the Midwest and the western U.S.

*Energy* – Coal transportation accounted for 20% of UPRR's 2004 commodity revenue. The Railroad's geographic footprint positions it to transport coal destined for utilities and industrial facilities in 27 states, as well as to the Gulf and rail/barge/ship facilities on the Mississippi and Ohio Rivers and the Great Lakes. UPRR serves mines located in the Southern Powder River Basin of Wyoming, in addition to Colorado, Utah, southern Wyoming, and southern Illinois. Southern Powder River Basin coal represents the largest growth segment of the market, as utilities continue to favor its low cost and low-sulfur content. In addition, UPRR continues to penetrate markets in the East as electricity generation continues to grow in the face of declining eastern coal production. High-BTU, low-sulfur coal from Colorado and Utah is also transported for export to Mexico.

*Industrial Products* – The industrial products group includes a broad range of commodities, from bulk products like stone, cement, minerals, waste, and scrap to higher-value shipments like lumber, paper, government, and consumer goods. Bulk commodities often move in unit train service from origin to a distribution facility in major metropolitan areas. Other commodities move in manifest trains and rely on the Railroad's extensive network to move between thousands of shippers and customers across North America. In 2004, the transportation of industrial products provided 21% of the Railroad's total commodity revenue.

*Intermodal* – UPRR's intermodal business, which represents 19% of the Railroad's 2004 commodity revenues, is classified as international, domestic, or premium shipments. International business consists of international container traffic for steamship customers. It arrives at West Coast ports for destinations throughout the United States. Domestic business includes domestic container and trailer traffic handled by intermodal marketing companies (primarily shipper agents and consolidators) and truckload carriers. Less-than-truckload and package carriers with time-sensitive business requirements account for the majority of our premium service. Service performance and reliability are important in driving intermodal business growth.

**Working Capital** – We currently have, and historically have had, a working capital deficit, which is not uncommon in our industry and does not indicate a lack of liquidity or financial stability. We maintain adequate resources to meet our daily cash requirements, and we have sufficient financial capacity to satisfy our current liabilities.

**Competition** – We are subject to competition from other railroads, motor carriers, and barge operators. Our main rail competitor is Burlington Northern Santa Fe Corporation. Its rail subsidiary, BNSF Railway Company, operates parallel routes in many of our main traffic corridors. In addition, we operate in corridors served by other competing railroads and by motor carriers. Motor carrier competition is particularly strong with respect to five of our six commodity groups (excluding energy) due to shorter delivery times offered by such carriers. Because of the proximity of our routes to major inland and Gulf Coast waterways, barge competition can be particularly pronounced, especially for grain and bulk commodities. Competition can pressure both transit time requirements and pricing, as well as place a greater emphasis on the quality and reliability of the service provided. While we must build or acquire and maintain our rail system, trucks and barges are able to use public rights-of-way maintained by public entities. Any future improvements or expenditures materially increasing the quality or reducing the costs of these alternative modes of transportation in the locations in which we operate, or legislation granting materially greater latitude for motor carriers with respect to size or weight limitations, could have a material adverse effect on our results of operations, financial condition, and liquidity.

**Equipment Suppliers** – We are dependent on two key domestic suppliers of locomotives. Due to the capital intensive nature and sophistication of this equipment and its production, there are high barriers of entry to potential new suppliers. Therefore, if one of these domestic suppliers discontinues manufacturing locomotives, we could experience a significant cost increase and the potential for reduced availability of the locomotives that are necessary to our operations.

**Employees** – Approximately 87% of our more than 48,000 full-time equivalent employees are represented by 14 major rail unions. Under the collective bargaining round that began on November 1, 1999, 11 of the 14 unions reached new labor agreements with the railroads. We are currently negotiating new agreements with the remaining three unions. Existing agreements remain in effect and will continue to remain in effect until new agreements are reached or the Railway Labor Act's procedures (which include mediation, cooling-off periods, and the possibility of Presidential intervention) are exhausted. The current agreements provide for periodic wage increases until new agreements are reached.

On November 1, 2004, notices for the next round of negotiations were sent to all 14 unions by the National Railway Labor Conference on behalf of UPRR (and other carriers in the conference). These legal notices state our desire to modify the current collective bargaining agreements. Contract negotiations with the various unions usually take place over an extended period of time and generally have not resulted in work stoppages.

**Discontinued Operations** – In November 2003, we completed the sale of our entire trucking interest, and as a result, the operations of OTC and Motor Cargo are included in discontinued operations (see note 13 to the Consolidated Financial Statements, Item 8).

## GOVERNMENTAL AND ENVIRONMENTAL REGULATION

**Governmental Regulation** – Our operations are subject to a variety of federal, state, and local regulations, generally applicable to all businesses (see also the discussion of certain regulatory proceedings in Legal Proceedings, Item 3).

The operations of the Railroad are subject to the regulatory jurisdiction of the Surface Transportation Board (STB) of the United States Department of Transportation (DOT) and other federal and state agencies. The operations of the Railroad are also subject to the regulations of the Federal Railroad Administration (FRA) of the DOT. The STB has jurisdiction over rates charged on certain regulated rail traffic; freight car compensation; transfer, extension or abandonment of rail lines; and acquisition of control of rail common carriers.

The DOT and the Occupational Safety and Health Administration, along with other federal agencies, have jurisdiction over certain aspects of safety, movement of hazardous materials, movement and disposal of hazardous waste, emissions requirements, and equipment standards. Various state and local agencies have jurisdiction over disposal of hazardous waste and seek to regulate movement of hazardous materials in areas not otherwise preempted by federal law.

On February 14, 2005, we received a Civil Investigative Demand (CID) from the Antitrust Division of the Department of Justice (DOJ). The CID seeks information concerning pricing activities for the transportation of coal carried by UPRR from the Southern Powder River Basin. During 2004, several coal shippers' organizations questioned the appropriateness of our pricing practices for Southern Powder River Basin coal transportation. The Railroad initiated a meeting with the DOJ in early December in order to explain those practices and the manner in which price information is distributed to customers. It is not uncommon for the DOJ to issue CIDs to gather additional facts and information to facilitate its investigatory functions. Issuance of a CID does not indicate any conclusion with respect to the legality of our coal pricing activities. We are confident that the DOJ's investigation will confirm that our activities are lawful, and we intend to cooperate with the DOJ's request for information.

**Environmental Regulation** – In addition to the regulations governing the transportation of hazardous materials, we are subject to extensive federal and state environmental statutes and regulations pertaining to public health and the environment. The statutes and regulations are administered and monitored by the Environmental Protection Agency (EPA) and by various state environmental agencies. The laws primarily affecting our operations are the Resource Conservation and Recovery Act of 1976, regulating the management and disposal of solid and hazardous wastes; the Comprehensive Environmental Response, Compensation, and Liability Act of 1976, regulating the cleanup of contaminated properties; the Clean Air Act, regulating air emissions; and the Clean Water Act, regulating waste water discharges.

Information concerning environmental claims and contingencies and estimated remediation costs is set forth in Management's Discussion and Analysis of Financial Condition and Results of Operations – Critical Accounting Policies – Environmental, Item 7.

## Item 2. Properties

Our primary real estate, equipment, and other properties are owned or leased to support our rail operations. We operate facilities and equipment designated for both maintenance and repair, including locomotives, rail cars, and other equipment, and for monitoring such maintenance and repair work. Other facilities include rail yards, intermodal ramps, and maintenance shops throughout the rail system. We spent approximately $1.9 billion in capital during 2004 for, among other things, building and maintaining track, structures and infrastructure, upgrading and augmenting equipment, and implementing new technologies (see the capital expenditures table in Management's Discussion and Analysis of Financial Condition and Results of Operations – Liquidity and Capital Resources – Financial Condition, Item 7).

Certain of our properties are subject to federal, state, and local laws and regulations governing the protection of the environment (see discussion of environmental issues in Business – Governmental and Environmental Regulation, Item 1, and Management's Discussion and Analysis of Financial Condition and Results of Operations – Critical Accounting Policies – Environmental, Item 7).

**Track** – Our rail operations utilize approximately 33,000 main line and branch line route miles in 23 states in the western two-thirds of the United States. We own approximately 27,000 route miles, with the remainder of route miles operated under trackage rights or leases. Route miles operated and track miles installed and replaced as of, and for the year ending, December 31, 2004 are as follows:

| *Miles* | |
|---|---|
| Main line | 27,415 |
| Branch line | 5,201 |
| Yards, sidings, and other main lines | 21,261 |
| Total | 53,877 |
| Track miles of rail installed and replaced: | |
| New | 689 |
| Used | 336 |
| Ties installed and replaced (000) | 4,775 |

**Equipment** – Our primary rail equipment consisted of the following as of, and for the year ending, December 31, 2004:

| *Equipment* | |
|---|---|
| Owned or leased at year end: | |
| Locomotives | 7,682 |
| Freight cars: | |
| Covered hoppers | 37,504 |
| Boxcars | 20,879 |
| Open-top hoppers | 19,431 |
| Gondolas | 15,970 |
| Other | 10,856 |
| Work equipment and other | 7,048 |
| Average age of equipment (years): | |
| Locomotives | 14.7 |
| Freight cars | 23.0 |

## Item 3. Legal Proceedings

### Environmental Matters

As previously reported in our Annual Report on Form 10-K for 2003, the United States Attorney for the Central District of California notified us that the office intended to pursue criminal charges against us for alleged violations of federal environmental laws, including the federal Clean Water Act, in connection with releases of oil and oil contaminated water from our Taylor Yard in 2001 and 2003. In April 2004, we settled the State of California's claims arising from these releases for $45,020.

As previously reported in our Annual Report on Form 10-K for 2003, the California Department of Toxic Substances Control (DTSC) threatened civil prosecution against us in November 2003, after a series of protracted negotiations, relating to our failure to register as a hazardous waste transporter under California law from April 2000 to August 2001. We contend that we are exempt from the registration requirements due to federal preemption. The DTSC has proposed civil penalties of $125,160 for the alleged violation. We continue to vigorously oppose this proposed penalty.

As previously reported in our Annual Report on Form 10-K for 2001, on January 30, 2002, the Louisiana Department of Environmental Quality (LDEQ) issued to the Railroad a notice of a proposed penalty assessment in the amount of $195,700. The LDEQ proposed penalty relates to the derailment of one of our trains carrying hazardous materials near Eunice, Louisiana on May 27, 2000. We met with the LDEQ regarding this matter to present documentation indicating that no penalty should be assessed. We have filed suit against the LDEQ in Louisiana State District Court challenging the penalty.

As previously reported in our Quarterly Report on Form 10-Q for the quarter ended March 31, 2003, the San Joaquin County District Attorney filed an action against us on February 3, 2003, alleging claims under the California Business and Professions Code section 17200 (unfair business practices), Fish and Game Code section 5650 and 5650.1, California Health and Safety Code section 25189(d) and Public Nuisance, California Civil Code

section 3480. The claims arise from a February 16, 2000 derailment in Stockton, California, in which a locomotive struck an object on the tracks, resulting in the puncture of a fuel tank. The District Attorney alleged that diesel fuel from this spill entered waters of the State of California. The complaint also asserted claims under the above referenced statutes for any other diesel spill which may have occurred in the State of California, between 2000 and 2003, in which diesel may have passed into waters of the State of California and seeks injunctive relief, as well as civil penalties of $25,000 for the alleged February 16, 2000 diesel spill and total penalties of not less than $250,000 for all diesel spills which may have occurred since 2000. The District Attorney filed an amended complaint on April 10, 2003, which narrowed the claims to the incident of February 16, 2000. The amended complaint seeks both injunctive relief and daily penalties for each day that fuel was in the affected waterway, which could exceed $100,000.

As previously reported in our Annual Report on Form 10-K for 2003, a criminal case relating to a series of alleged releases of calcium oxide (lime) was filed against the Railroad by the District Attorneys of Merced, Madera, and Stanislaus Counties in California. The criminal case was dismissed in the last quarter of 2003 and was subsequently refiled as a civil action by several counties. The refiled suit sought civil penalties against the Railroad in connection with the release of lime from an unidentified rail car between Chowchilla and Sacramento, California, on December 27, 2001, and another incident in which lime leaked from a rail car between Chowchilla and Stockton, California on February 21, 2002. The suit contended that regulatory violations occurred by virtue of the Railroad's alleged failure to timely report the release of a "hazardous material," its alleged disposal of hazardous waste, and the alleged release of material into the waters of the State of California. On September 20, 2004, the Court dismissed the suit with prejudice. The State appealed this decision and the appeal remains pending.

As previously reported in our Quarterly Report on Form 10-Q for the quarter ended March 31, 2002, on April 26, 2002, we received written notice of a proposed $250,000 penalty from the Illinois Environmental Protection Agency relating to a collision between trains from Conrail and the Railroad. The collision occurred near Momence, Illinois, on March 23, 1999, when an eastbound Conrail train failed to stop at a signal and struck a UPRR train that was properly occupying a crossing. The collision resulted in a release of diesel fuel from the fuel tanks of our locomotive, which was promptly reported and remediated. We received notice in January 2003 that the amount of the proposed penalty, including oversight costs, had been reduced to $127,000. We continue to vigorously oppose this proposed penalty.

As previously reported in our Quarterly Report on Form 10-Q for the quarter ended September 30, 2004, the Attorney General's office of Illinois filed an Agreed Order and Complaint and a Complaint for Injunctive and Other Relief on October 7, 2004, against The Alton & Southern Railway Company, a wholly owned subsidiary of the Railroad, as a result of a collision and derailment on September 21, 2004. The state seeks to enjoin The Alton & Southern from further violations, as well as impose a monetary penalty. The amount of the proposed penalty is uncertain but could exceed $100,000.

In December 2004, we were advised by the District Attorney of Riverside County, California, that the County intends to file either a criminal or civil action against the Railroad as a result of the Railroad's alleged unlawful disposal of hazardous waste. This claim arises out of an April 2004 incident in which a construction crew allegedly discarded hazardous waste into a dumpster that was subsequently taken to a landfill in Cathedral City, California. The District Attorney intends to seek fines or penalties in excess of $100,000.

We have received notices from the EPA and state environmental agencies alleging that we are or may be liable under certain federal or state environmental laws for remediation costs at various sites throughout the United States, including sites that are on the Superfund National Priorities List or state superfund lists. Although specific claims have been made by the EPA and state regulators with respect to some of these sites, the ultimate impact of these proceedings and suits by third parties cannot be predicted at this time because of the number of potentially responsible parties involved, the degree of contamination by various wastes, the scarcity and quality of volumetric data related to many of the sites, and/or the speculative nature of remediation costs.

Information concerning environmental claims and contingencies and estimated remediation costs is set forth in Management's Discussion and Analysis of Financial Condition and Results of Operations – Critical Accounting Policies – Environmental, Item 7.

## Other Matters

As previously reported in our Quarterly Report on Form 10-Q for the quarter ended September 30, 2004, we were notified that a *qui tam,* or private citizen, complaint was filed in the United States District Court for the Central

District of California against, among other parties, the City of Long Beach, City of Long Beach Harbor Department, Port of Long Beach (the Port), Union Pacific Corporation, Union Pacific Railroad Company, and Union Pacific Resources Company, also known as Union Pacific Resources Group Inc. (Resources), a former subsidiary of UPC. A private citizen filed the action because the federal government and the State of California elected not to pursue the claims. The complaint alleges that the defendants violated the Federal Civil False Claims Act and the California False Claims Act by conspiring to use public funds to (1) shift environmental cleanup liability to the Port when Resources sold its Terminal Island oil field property to the Port in 1994, and (2) effect the acquisition by the Port of the Terminal Island property in which the Port (or the State of California) allegedly already held certain incidents of title. The complaint, which has not been served on us, seeks damages of $2.405 billion, unspecified costs for remediating groundwater contamination, and treble damages and civil penalties of $10,000 per day. We dispute the factual and legal bases of the complaint. Also, we have notified Anadarko Petroleum Corporation (Anadarko), as successor to Resources after its acquisition in 2000, that an indemnification agreement between Resources and the Corporation obligates Anadarko to indemnify us for all damages, costs, and expenses related to the complaint.

## Item 4. Submission of Matters to a Vote of Security Holders

No matters were submitted to a vote of security holders during the fourth quarter of the year ended December 31, 2004.

## Executive Officers of the Registrant and Principal Executive Officers of Subsidiaries

Our executive officers generally are elected and designated annually by the Board of Directors at our first meeting held after the Annual Meeting of Shareholders, and they hold office until their successors are elected. Executive officers also may be elected and designated throughout the year, as the Board of Directors considers appropriate. There are no family relationships among the officers, nor any arrangement or understanding between any officer and any other person pursuant to which the officer was selected. The following table sets forth certain information, as of February 7, 2005 relating to the executive officers.

| Name | Position | Age | Business Experience During Past Five Years |
|---|---|---|---|
| Richard K. Davidson | Chairman, President and Chief Executive Officer of UPC and Chairman and Chief Executive Officer of the Railroad | 63 | Current Position |
| Ivor J. Evans | Vice Chairman of UPC and the Railroad | 62 | (1) |
| Robert M. Knight, Jr. | Executive Vice President – Finance and Chief Financial Officer of UPC and the Railroad | 47 | (2) |
| L. Merill Bryan, Jr. | Senior Vice President and Chief Information Officer of UPC and the Railroad | 60 | (3) |
| Charles R. Eisele | Senior Vice President – Strategic Planning of UPC and the Railroad | 55 | (4) |
| J. Michael Hemmer | Senior Vice President – Law and General Counsel of UPC and the Railroad | 55 | (5) |
| Barbara W. Schaefer | Senior Vice President – Human Resources and Secretary of UPC and the Railroad | 51 | (6) |
| Robert W. Turner | Senior Vice President – Corporate Relations of UPC and the Railroad | 55 | (7) |
| Bernard R. Gutschewski | Vice President – Taxes of UPC and Vice President and General Tax Counsel of the Railroad | 54 | Current Position |
| Mary E. McAuliffe | Vice President – External Relations of UPC | 58 | Current Position |
| Richard J. Putz | Vice President and Controller of UPC and Chief Accounting Officer and Controller of the Railroad | 57 | Current Position |
| Mary Sanders Jones | Vice President and Treasurer of UPC and Treasurer of the Railroad | 52 | Current Position |

## Executive Officers of the Registrant and Principal Executive Officers of Subsidiaries

(Continued)

| Name | Position | Age | Business Experience During Past Five Years |
|---|---|---|---|
| James R. Young | President and Chief Operating Officer of the Railroad | 52 | (8) |
| Dennis J. Duffy | Executive Vice President – Operations of the Railroad | 54 | Current Position |
| John J. Koraleski | Executive Vice President – Marketing and Sales of the Railroad | 54 | Current Position |

(1) Mr. Evans has announced his intention to retire effective February 28, 2005. He was elected to his current position effective February 1, 2004. He served as President and Chief Operating Officer of the Railroad prior thereto.

(2) Mr. Knight was elected to his current position effective February 1, 2004. He was elected Senior Vice President – Finance for UPC and the Railroad effective February 1, 2002, Vice President and General Manager Automotive for the Railroad effective June 2000 and served as Vice President and General Manager Energy for the Railroad prior thereto.

(3) Mr. Bryan, who has held his current position for the last five years, has announced his intention to retire effective February 28, 2005.

(4) Mr. Eisele was elected to his current position effective October 1, 2001. He was Vice President – Strategic Planning and Administration prior thereto.

(5) Mr. Hemmer was elected to his current position effective June 1, 2004. Mr. Hemmer was elected Vice President – Law of the Railroad effective September 1, 2002, and prior thereto was a partner at the law firm of Covington & Burling in Washington, DC.

(6) Mrs. Schaefer has held the position of Senior Vice President – Human Resources for the past five years. In addition, she was elected Secretary of UPC and the Railroad effective June 1, 2004.

(7) Mr. Turner was elected to his current position effective August 2000. Prior thereto, he was Vice President – Public Affairs of Champion International Corporation, a paper and forest products company.

(8) Mr. Young was elected to his current position effective February 1, 2004. Prior thereto, he was Executive Vice President – Finance of UPC and Chief Financial Officer of the Railroad.

# PART II

## Item 5. Market for the Registrant's Common Equity, Related Shareholder Matters, and Issuer Purchases of Equity Securities

Our common stock is traded on the NYSE under the symbol "UNP". The following table presents the dividends declared and the high and low sales prices of our common stock for each of the indicated quarters.

| *2004 - Dollars Per Share* | *Mar. 31* | *June 30* | *Sep. 30* | *Dec. 31* |
|---|---|---|---|---|
| Dividends | $ 0.30 | $ 0.30 | $ 0.30 | $ 0.30 |
| Common stock price: | | | | |
| High | 69.56 | 60.47 | 59.58 | 67.68 |
| Low | 59.38 | 55.66 | 54.80 | 58.68 |
| *2003 - Dollars Per Share* | | | | |
| Dividends | $ 0.23 | $ 0.23 | $ 0.23 | $ 0.30 |
| Common stock price: | | | | |
| High | 61.99 | 61.99 | 61.89 | 69.50 |
| Low | 50.90 | 54.18 | 57.15 | 57.80 |

At January 31, 2005, there were 260,998,036 shares of outstanding common stock and 31,130 common shareholders of record. At that date, the closing price of the common stock on the NYSE was $59.60. We have paid dividends to our common shareholders during each of the past 105 years. In the fourth quarter of 2002, we increased our quarterly dividend by 15% to $0.23 per share. In the fourth quarter of 2003, we increased our quarterly dividend by an additional 30% to $0.30 per share. We declared dividends totaling $312 million in 2004 and $252 million in 2003, and we expect to continue paying comparable dividends in 2005. We are subject to certain restrictions related to the payment of cash dividends to our shareholders. The amount of retained earnings available for dividends decreased to $5.2 billion at December 31, 2004, from $6.9 billion at December 31, 2003, due to revisions in minimum net worth requirements under our credit facilities.

### Purchases of Equity Securities

We do not currently have a formal publicly announced plan or program to repurchase shares of our common stock. The purchased shares presented below relate solely to our equity compensation plans described in note 7 to our Consolidated Financial Statements, Item 8. During the first nine months of 2004, 291,383 shares of our common stock were repurchased at an average price per share of $65.97. The following table presents common stock repurchases during each month for the quarter ended December 31, 2004:

| *Period* | *Total Number of Shares Purchased* | *Average Price Paid per Share* | *Total Number of Shares Purchased as Part of a Publicly Announced Plan or Program* | *Maximum Number of Shares That May Yet Be Purchased Under the Plan or Program* |
|---|---|---|---|---|
| Oct. 1 through Oct. 31 | | | | |
| Employee transactions [a] | 56,899 | $62.99 | N/A | N/A |
| Nov. 1 through Nov. 30 | | | | |
| Employee transactions [a] | 92,819 | $64.04 | N/A | N/A |
| Dec. 1 through Dec. 31 | | | | |
| Employee transactions [a] | 234,461 | $66.34 | N/A | N/A |
| Total | 384,179 | $65.29 | N/A | N/A |

*[a] Includes shares delivered or attested to UPC to pay stock option exercise prices or to satisfy tax withholding obligations for stock option exercises or vesting of restricted or retention shares.*

## Item 6. Selected Financial Data

The following table presents as of, and for the years ended, December 31, our selected financial data for each of the last 10 years. The selected financial data should be read in conjunction with Management's Discussion and Analysis of Financial Condition and Results of Operations, Item 7, and with the Consolidated Financial Statements and notes thereto, Item 8. The information below is not necessarily indicative of the results of future operations.

*Millions of Dollars, Except Per Share Amounts, Ratios, and Employee Statistics*

| | *2004[b]* | *2003* | *2002[c]* | *2001* | *2000[d]* | *1999* | *1998[e]* | *1997* | *1996* | *1995* |
|---|---|---|---|---|---|---|---|---|---|---|
| **For the Year Ended December 31[a]** | | | | | | | | | | |
| Operating revenues | 12,215 | 11,551 | 11,159 | 10,830 | 10,765 | 10,175 | 9,480 | 10,133 | 7,825 | 6,510 |
| Operating income | 1,295 | 2,133 | 2,253 | 2,018 | 1,850 | 1,784 | 337 | 1,134 | 1,499 | 1,291 |
| Income (loss) [f] | 604 | 1,056 | 1,265 | 934 | 810 | 765 | (101) | 435 | 782 | 655 |
| Net income (loss) [g] | 604 | 1,585 | 1,341 | 966 | 842 | 810 | (633) | 432 | 904 | 946 |
| Per share – basic: | | | | | | | | | | |
| Income (loss) [f] | 2.33 | 4.15 | 5.02 | 3.77 | 3.29 | 3.10 | (0.41) | 1.77 | 3.61 | 3.20 |
| Net income (loss) [g] | 2.33 | 6.23 | 5.32 | 3.90 | 3.42 | 3.28 | (2.57) | 1.76 | 4.17 | 4.62 |
| Per share – diluted: | | | | | | | | | | |
| Income (loss) [f] | 2.30 | 4.07 | 4.78 | 3.65 | 3.22 | 3.05 | (0.41) | 1.75 | 3.58 | 3.19 |
| Net income (loss) [g] | 2.30 | 6.04 | 5.05 | 3.77 | 3.34 | 3.22 | (2.57) | 1.74 | 4.14 | 4.60 |
| Dividends per share | 1.20 | 0.99 | 0.83 | 0.80 | 0.80 | 0.80 | 0.80 | 1.72 | 1.72 | 1.72 |
| Operating cash flow | 2,237 | 2,422 | 2,199 | 1,865 | 2,021 | 1,823 | 507 | 1,568 | 1,653 | 1,405 |
| **At December 31[a]** | | | | | | | | | | |
| Total assets [g] | 34,589 | 33,494 | 32,771 | 31,551 | 30,917 | 30,192 | 29,590 | 28,860 | 27,990 | 19,500 |
| Total debt | 8,131 | 7,989 | 7,703 | 8,078 | 8,351 | 8,636 | 8,687 | 8,510 | 8,016 | 6,350 |
| Convertible preferred securities | - | - | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | - | - | - |
| Common shareholders' equity | 12,655 | 12,354 | 10,651 | 9,575 | 8,662 | 8,001 | 7,393 | 8,225 | 8,225 | 6,364 |
| Equity per common share | 48.58 | 47.85 | 41.99 | 38.26 | 35.09 | 32.29 | 29.88 | 33.30 | 33.35 | 30.96 |
| **Additional Data[a]** | | | | | | | | | | |
| Commodity revenue | 11,692 | 11,041 | 10,663 | 10,391 | 10,270 | 9,851 | 9,072 | 9,712 | 7,419 | 6,105 |
| Carloads (000) | 9,458 | 9,239 | 9,131 | 8,916 | 8,901 | 8,556 | 7,998 | 8,453 | 6,632 | 5,568 |
| Operating margin (%)[h] | 10.6 | 18.5 | 20.2 | 18.6 | 17.2 | 17.5 | 3.6 | 11.2 | 19.2 | 19.8 |
| Operating ratio (%)[h] | 89.4 | 81.5 | 79.8 | 81.4 | 82.8 | 82.5 | 96.4 | 88.8 | 80.8 | 80.2 |
| Average employees (000) | 48.3 | 46.4 | 47.3 | 48.7 | 50.5 | 52.5 | 53.6 | 54.0 | 41.4 | 35.2 |
| Revenue per employee (000) | 252.9 | 248.9 | 235.9 | 222.4 | 213.2 | 193.8 | 176.9 | 187.6 | 189.0 | 184.9 |
| **Financial Ratios (%)[a]** | | | | | | | | | | |
| Debt to capital employed [i] | 39.1 | 39.3 | 38.8 | 42.2 | 45.1 | 47.6 | 49.4 | 50.9 | 49.4 | 49.9 |
| Return on equity [j] | 4.8 | 13.8 | 13.3 | 10.6 | 10.1 | 10.5 | (8.1) | 5.3 | 12.4 | 16.5 |

*[a] Data includes the effects of the acquisitions of Southern Pacific Rail Corporation as of October 1, 1996 and Chicago and North Western Transportation Company as of May 1, 1995.*

*[b] 2004 operating income and net income includes a $247 million pre-tax ($154 million after-tax) charge for unasserted asbestos-related claims.*
*[c] 2002 net income includes $214 million pre-tax ($133 million after-tax) gains on asset dispositions. In addition, net income includes a reduction of income tax expense of $67 million related to tax adjustments for prior years' income tax examinations.*
*[d] 2000 operating income and net income includes a $115 million pre-tax ($72 million after-tax) work force reduction charge.*
*[e] 1998 net loss includes a $547 million pre-and after-tax charge for the revaluation of OTC goodwill.*
*[f] Based on results from continuing operations.*
*[g] Net income and total assets includes the effects of the acquisitions of Motor Cargo as of November 30, 2002 and Skyway Freight Systems, Inc. as of May 31, 1993, and reflects the disposition of all of our trucking interests in 2003, logistics subsidiary in 1998, natural resources subsidiary in 1996 and waste management subsidiary in 1995.*
*[h] Operating margin is defined as operating income divided by operating revenues. Operating ratio is defined as operating expenses divided by operating revenues.*
*[i] Debt to capital employed is determined as follows: total debt divided by debt plus equity plus convertible preferred securities.*
*[j] Based on average common shareholders' equity.*

## Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations

The following discussion should be read in conjunction with the Consolidated Financial Statements and applicable notes to the Consolidated Financial Statements, Item 8, and other information in this report, including Critical Accounting Policies, Risk Factors, and Cautionary Information set forth at the end of this Item 7.

The Railroad, along with its subsidiaries and rail affiliates, is our one reportable business segment. The Consolidated Financial Statements in 2003 and 2002 also include discontinued trucking operations, consisting of OTC and Motor Cargo, which were subsidiaries of Overnite, Inc., formerly an indirect wholly owned subsidiary of UPC. In 2003, we reclassified our trucking operations as discontinued operations.

## EXECUTIVE SUMMARY

### 2004 Highlights

- **Safety** – During a year when we added many new crew personnel and moved record volumes, the number of new claims for lost work day cases declined by 9%, and incidents reportable to the FRA decreased by over 2%. The number of derailments for the year was flat compared to 2003, trespasser incidents declined 11%, while our grade crossing accidents were up slightly over 2003. As part of our continuing focus on public safety, we worked to reduce grade-crossing incidents by closing numerous crossings, upgrading many others, training law-enforcement officers, and educating the public about the risks associated with crossings. In an effort to reduce derailments, we increased track inspections, employed new technology to identify car defects before failure, and implemented operating practice improvements to accelerate skill development and promote situational awareness with our train crews and yard personnel.

- **Revenue Growth** – We increased operating revenues by 6% year-over-year to $12.2 billion, the highest level in our history, as vigorous economic growth led to unprecedented demand for our services. We achieved record revenue levels in four of our major commodity groups: agricultural, automotive, industrial products, and intermodal. The higher revenue was attributable primarily to additional fuel surcharges, better pricing yields, and increased carloads, and reflects our continued focus on our Yield Strategy. The key components of our Yield Strategy are providing service that meets customer needs at prices that reflect the value of our services and achieving a mix of business that maximizes profitability.

- **Resources** – We made substantial progress during 2004 to increase our train crews and locomotive resources. Through aggressive hiring and training programs, we placed into conductor service nearly 5,000 new trainmen, resulting in a 19% net increase in trainmen, and trained nearly 700 conductors to become engineers, a 3% net increase. In addition to hiring and training crews, we accelerated locomotive acquisitions to improve velocity, with almost 400 new locomotives entering our system during 2004, an increase of 6% in our locomotive road fleet.

- **Free Cash Flow** – We generated free cash flow of $215 million in 2004. Free cash flow is defined as cash provided by operating activities, less cash used in investing activities, dividends paid, and non-cash capital lease financings plus non-cash acquisitions.

Free cash flow is considered a non-GAAP financial measure by SEC Regulation G. We believe free cash flow is important in evaluating our financial performance and measures our ability to generate cash without additional external financings. Free cash flow should be considered in addition to, rather than as a substitute for, cash provided by operating activities. The following table reconciles cash provided by operating activities (GAAP measure) to free cash flow (non-GAAP measure):

| *Millions of Dollars* | *2004* | *2003* | *2002* | *2001* | *2000* |
|---|---|---|---|---|---|
| Cash provided by operating activities | $ 2,237 | $ 2,422 | $ 2,199 | $ 1,865 | $ 2,021 |
| Cash used in investing activities | (1,712) | (856) | (1,336) | (1,382) | (1,407) |
| Dividends paid | (310) | (234) | (201) | (198) | (199) |
| Non-cash capital lease financings | - | (188) | (126) | (124) | (201) |
| Non-cash acquisitions | - | - | - | 80 | - |
| Free cash flow | 215 | 1,144 | 536 | 241 | 214 |
| Proceeds from sale of discontinued operations | - | (620) | - | - | - |
| Net free cash flow | $ 215 | $ 524 | $ 536 | $ 241 | $ 214 |

## 2004 Challenges

- **Energy Prices** – Energy prices were high throughout the year, increasing our operating expenses by $416 million over 2003. However, our fuel surcharges offset over 50% of these higher fuel costs. Our fuel surcharge programs allow us to recover a portion of the increase in fuel expense from customers in the form of higher revenue.

- **Network Performance** – Due to the unprecedented demand for our services and our resource shortages, we experienced operational challenges throughout 2004. Our network performance and operating efficiency were initially affected in the latter part of 2003 by a shortage of trainmen and engineers and fourth quarter record-level volumes. During 2004, we largely addressed our resource shortages by aggressive hiring and training of train crews, along with long- and short-term locomotive and freight car acquisition and leasing programs. However, our record volumes consumed many of the resources we added, preventing us from improving operational efficiency and creating congestion in several key corridors. In addition to adding resources, we also regulated business levels to reduce congestion. Our service issues, including increased hiring and training efforts, added approximately $300 million in operating expenses during 2004.

## 2005 Outlook

- **Safety** – In 2005, operating safety will continue to be our first priority. With our extensive hiring efforts, our approach to safety for our new employees incorporates training, communication, and quality assurance. With respect to public safety, we will continue our efforts to upgrade and close crossings, improve visibility at crossings, install video cameras on locomotives, and educate the public on crossing safety. We will also continue our focus on derailment prevention.

- **Revenue Growth** – Record revenue levels are expected to continue in 2005. We have established a target for year-over-year commodity revenue growth of five to seven percent. We intend to manage total volume growth to one to two percent, and we are projecting yield increases in all of our major commodity groups. We expect the largest percentage increases in revenue from the energy, intermodal, and industrial products groups, and we should see steady but more modest increases in revenue from automotive, chemical, and agricultural shipments.

- **Energy Prices** – We expect that fuel prices will remain volatile throughout the year. To help reduce the impact of fuel price volatility on earnings, we will continue to increase the amount of traffic subject to a fuel surcharge.

- **Capital Plan** – In 2005, we expect our cash capital expenditures to be approximately $2 billion. These expenditures will be used to maintain track and structures, continue capacity expansions on our main lines in constrained corridors, remove bottlenecks, upgrade and augment equipment to better meet customer

needs, build and improve facilities and terminals, and develop and implement new technologies. We expect to fund our 2005 capital expenditures through cash generated from operations, additional debt financings, the sale or lease of various operating and non-operating properties, and cash on hand at December 31, 2004. In addition to cash capital expenditures, we expect to acquire locomotives and certain other equipment through short- and long-term operating leases. This focused capital plan is designed to assist in expanding capacity, improving network velocity, and facilitating revenue growth.

- **Transportation Plan** – In the latter part of 2004, we initiated a comprehensive redesign of our transportation plan. We expect to fully implement this new Unified Plan by the middle of 2005. The new plan is intended to simplify our operations, improve network velocity, and better manage the volume of traffic flowing on our network in the face of continued strong demand. We are also using industrial engineering techniques to increase throughput and improve terminal processing.

- **California Weather Impact** – In early January of 2005, a massive storm hit California and Nevada. Our rail system suffered significant damage, resulting in the temporary shutdown of five of six routes in and out of Los Angeles. Two of those routes required extensive reconstruction. Embargos were instituted to restrict traffic to and from Southern California and the Las Vegas area until service could be restored, while a number of trains were rerouted onto other serviceable tracks. We are still assessing the financial impact of the storm. Although we have insurance coverage and are subject to a $50 million deductible, we will not be able to finalize matters with our insurance carriers for some time.

## RESULTS OF OPERATIONS

| *Millions of Dollars, Except Per Share Amounts and Ratios* | *2004* | *2003* | *2002* |
|---|---|---|---|
| Income from continuing operations | $ 604 | $1,056 | $1,265 |
| Income from discontinued operations | - | 255 | 76 |
| Cumulative effect of accounting change | - | 274 | - |
| Net income | $ 604 | $1,585 | $1,341 |
| Diluted Earnings Per Share: | | | |
| Income from continuing operations | $2.30 | $ 4.07 | $ 4.78 |
| Net income | $2.30 | $ 6.04 | $ 5.05 |
| Income from continuing operations as a percentage of operating revenues | 4.9% | 9.1% | 11.3% |
| Return on average common shareholders' equity | 4.8% | 13.8% | 13.3% |
| Operating margin | 10.6% | 18.5% | 20.2% |

**Income from Continuing Operations** – Income from continuing operations declined in 2004 due to higher fuel prices, a $154 million after-tax asbestos charge, higher operational costs associated with a slower network, volume-related expenses, and wage and benefit inflation. Revenue growth of 6% partially offset the higher expenses.

The decrease in income from continuing operations in 2003 was a result of higher fuel prices, inflation, network costs (including expenses associated with increased volumes), lower gains from real estate sales (2002 asset sales included transactions with the Utah Transit Authority (UTA) for $141 million pre-tax and the Santa Clara Valley Transportation Authority (VTA) for $73 million pre-tax), and debt redemption expenses, which more than offset revenue gains, lower interest expense, and productivity improvements. Productivity is measured by both gross ton-miles per inflation-adjusted expense dollar and gross ton-miles per employee.

**Operating Revenues** – Operating revenue is comprised of commodity revenue and other revenues. Other revenues primarily include subsidiary revenue from various companies that are wholly owned or majority owned by the Railroad, revenue from our commuter rail operations, and accessorial revenue earned due to customer detainment of Railroad owned or controlled equipment. We recognize commodity revenues on a percentage-of-completion basis as freight moves from origin to destination. Other revenue is recognized as service is performed or contractual obligations are met. The allocation of revenue between reporting periods is based on the relative transit time in each reporting period.

Operating revenues increased $664 million (6%) to $12.2 billion in 2004, compared to an increase of $392 million (4%) in 2003. Commodity revenue increased $651 million (6%) in 2004 and $378 million (4%) in 2003. The increase in 2004 was driven by the industrial products, intermodal, and chemical commodity groups, while growth in 2003 was generated by gains in the industrial products, agricultural, intermodal, and energy commodity groups.

Average revenue per car (ARC) improved 3% to $1,236 in 2004 compared to a 2% increase in 2003, while revenue carloads increased 2% and 1% in 2004 and 2003, respectively. The increase in both periods was driven by fuel surcharges, price increases, and index-based contract escalators. We recognized $330 million and $112 million in commodity revenue from our fuel surcharge programs in 2004 and 2003, respectively.

Other revenue increased $13 million (3%) in 2004 driven by increased passenger and subsidiary revenue, partially offset by a decrease in accessorial revenues. In 2003, other revenue improved $14 million (3%) due to higher passenger, subsidiary, and accessorial revenues.

The following tables summarize the year-over-year changes in commodity revenue, revenue carloads, and average revenue per car by commodity type:

| *Commodity Revenue in Millions of Dollars* | *2004* | *2003* | *2002* | *% Change 2004 v 2003* | *% Change 2003 v 2002* |
|---|---|---|---|---|---|
| Agricultural | $ 1,675 | $ 1,578 | $ 1,506 | 6% | 5% |
| Automotive | 1,235 | 1,216 | 1,209 | 2 | 1 |
| Chemicals | 1,719 | 1,589 | 1,575 | 8 | 1 |
| Energy | 2,404 | 2,412 | 2,343 | - | 3 |
| Industrial Products | 2,419 | 2,180 | 2,035 | 11 | 7 |
| Intermodal | 2,240 | 2,066 | 1,995 | 8 | 4 |
| Total | $11,692 | $11,041 | $10,663 | 6% | 4% |

| *Revenue Carloads in Thousands* | *2004* | *2003* | *2002* | *% Change 2004 v 2003* | *% Change 2003 v 2002* |
|---|---|---|---|---|---|
| Agricultural | 883 | 883 | 875 | -% | 1% |
| Automotive | 826 | 820 | 818 | 1 | - |
| Chemicals | 935 | 888 | 904 | 5 | (2) |
| Energy | 2,172 | 2,187 | 2,164 | (1) | 1 |
| Industrial Products | 1,515 | 1,478 | 1,419 | 2 | 4 |
| Intermodal | 3,127 | 2,983 | 2,951 | 5 | 1 |
| Total | 9,458 | 9,239 | 9,131 | 2% | 1% |

| *Average Revenue per Car* | *2004* | *2003* | *2002* | *% Change 2004 v 2003* | *% Change 2003 v 2002* |
|---|---|---|---|---|---|
| Agricultural | $ 1,896 | $ 1,787 | $ 1,722 | 6% | 4% |
| Automotive | 1,496 | 1,484 | 1,477 | 1 | - |
| Chemicals | 1,839 | 1,788 | 1,742 | 3 | 3 |
| Energy | 1,107 | 1,103 | 1,083 | - | 2 |
| Industrial Products | 1,597 | 1,475 | 1,434 | 8 | 3 |
| Intermodal | 716 | 693 | 676 | 3 | 3 |
| Total | $ 1,236 | $ 1,195 | $ 1,168 | 3% | 2% |

*Agricultural* – The 2004 improvement was driven by increased demand for dry feed ingredients and the positive ARC impact of longer average length of haul shipments. Corn and feed grain shipments also posted revenue gains as demand for these shipments to the Pacific Northwest improved. Revenue growth was also achieved through

additional shipments for Gulf export and wheat to Mexico. ARC grew due to the positive mix impact of longer average length of haul shipments, as well as price increases and fuel surcharges.

Revenue growth in 2003 was driven by higher demand for Gulf wheat exports and ethanol shipments. Revenue gains were also achieved through additional shipments of sugar beets due to a favorable crop in 2003 and canned and packaged foods resulting from additional, longer-haul shipments from the west coast. ARC grew due to the positive mix impact of longer average length of haul shipments, as well as price increases and fuel surcharges.

*Automotive* – Revenue growth in 2004 was attributable to increased volume of both finished vehicles, primarily from international shippers, and automotive materials shipments. This was partially offset by a decline in shipments for domestic manufacturers due to lower production levels and weakened sales. ARC was up slightly in 2004 due to fuel surcharges and the favorable impact of longer average length of haul.

Revenue growth in 2003 was driven by additional volume due to market share gains for materials shipments, partially offset by a decline in revenues from domestic manufacturers, as the softening economy weakened demand for finished vehicles and forced production cuts. ARC was up slightly in 2003, as price increases were partially offset by the mix impact of disproportionate growth in materials shipments, which move at a lower revenue per car than finished vehicles.

*Chemicals* – In 2004, liquid and dry chemical shipments were up due to overall economic activity, led by intermediate chemicals and caustic soda. Soda ash, or sodium carbonate, which is an important raw material for manufacturing, moves increased due to strong domestic and export demand. Plastics showed increases in both carloadings and revenue due to an improved economy and a stronger export market. ARC improved due to a mix shift toward longer average length of haul moves, increased shipments of high-ARC soda ash, and the positive effects of price increases and fuel surcharges.

In 2003, reduced plastics volume led the decline in carloads as the soft economy combined with higher input costs caused producers to lower inventories and reduce shipments. Growth of market demand for domestic and export soda ash partially offset the decline. ARC improved due to a mix shift toward longer average length of haul moves, driven by fewer cars in storage-in-transit, in addition to price increases and fuel surcharges.

*Energy* – In 2004, overall volume was slightly down compared to record levels set in 2003. Volume increased 9% for business originating in Colorado due to strong demand for western high-BTU coal. Supply constraints for eastern coal and imports will continue to increase the demand for western coal. Price increases and fuel surcharges drove ARC improvements but were offset by the mix impact of shorter length of haul moves.

In 2003, strong utility demand due to lower inventories in the last three quarters more than offset the absence of export traffic from the Colorado and Utah mining regions (as Japan was sourcing coal from other Far Eastern producers). ARC increased primarily due to index-based contract escalators.

*Industrial Products* – Higher revenue in 2004 was driven by growth in lumber, steel, and non-metallic minerals. Demand for lumber was driven by housing starts and continued low interest rates. Steel increased as strong global market demand limited imports and spurred demand for domestic steel. ARC improved due to price increases, fuel surcharges, and more high-ARC lumber moves.

Revenue improvement in 2003 was attributable to government, steel, and lumber business growth. The increase in government shipments was driven by movement of military equipment and ammunition in support of the war effort. Lumber positively impacted carloads, as housing starts and low interest rates continued to drive demand. Steel and scrap shipments also increased as the weakening dollar created higher domestic and export demand for U.S. produced steel, augmented by market share gains. ARC rose due to price increases, fuel surcharges, and more high-ARC lumber moves, reflecting demand for building materials.

*Intermodal* – Revenue increased in 2004, driven by improved overall economic conditions and an increase in imports from the Far East, as more domestic goods were manufactured or assembled overseas. ARC in 2004 improved due to fuel surcharges and price increases.

In 2003, carloads were up due to strong imports and improved economic conditions, as well as the year over year impact of the labor dispute between the International Longshoreman and Warehouse Union (ILWU) and the

Pacific Maritime Association (PMA), which occurred primarily in the fourth quarter of 2002. ARC in 2003 improved due to fuel surcharges and price increases.

*Mexico Business* – Included in the commodity revenue reported above is revenue from shipments to and from Mexico. This revenue grew 9% to $970 million in 2004 compared to a 2% increase to $893 million for 2003. Business gains in 2004 were led by increased volume in the industrial products, intermodal, chemical, and automotive business groups, particularly cement, newsprint and wood fiber, liquid and dry chemicals, soda ash, and automotive materials. Revenue growth was also driven by an increase in agricultural revenues resulting from both higher wheat exports and beer imports. A decline in export shipments of corn and feed grains, as well as a reduction in energy carloads, partially offset the increases. Growth in 2003 was led by market share gains in automotive materials shipments and increased revenue for agricultural products resulting from higher corn and meal exports, as well as increased beer imports.

**Operating Expenses**

| *Millions of Dollars* | *2004* | *2003* | *2002* | *% Change 2004 v 2003* | *% Change 2003 v 2002* |
|---|---|---|---|---|---|
| Salaries, wages, and employee benefits | $ 4,167 | $3,892 | $3,694 | 7% | 5% |
| Equipment and other rents | 1,374 | 1,221 | 1,240 | 13 | (2) |
| Depreciation | 1,111 | 1,067 | 1,147 | 4 | (7) |
| Fuel and utilities | 1,816 | 1,341 | 1,065 | 35 | 26 |
| Materials and supplies | 488 | 414 | 476 | 18 | (13) |
| Casualty costs | 694 | 416 | 359 | 67 | 16 |
| Purchased services and other costs | 1,270 | 1,067 | 925 | 19 | 15 |
| Total | $10,920 | $9,418 | $8,906 | 16% | 6% |

Operating expenses increased in 2004 due to higher fuel prices, an asbestos charge of $247 million (pre-tax), higher crew and asset utilization costs resulting from slower network velocity, and volume-related costs. Expenses in 2004 were also negatively impacted by wage and benefit inflation, additional training expenses associated with an increase in trainmen employment levels, increased depreciation expense, and higher casualty costs relating to a jury verdict upheld against the Railroad for a 1998 crossing accident and a derailment in San Antonio, Texas in 2004. Our service issues, including increased hiring and training efforts, added approximately $300 million in operating expenses during 2004.

Operating expenses in 2003 were higher due to increased fuel prices, wage and benefit inflation, and volume-related costs as well as higher operational costs resulting from a slower rail network in the third and fourth quarters of the year. These increases were mitigated somewhat by lower depreciation expense, a 2% reduction in employment levels, and cost control efforts. Cost control efforts are defined as focused actions to reduce discretionary spending and failure costs.

*Salaries, Wages, and Employee Benefits* – The increase in 2004 was driven by wages and training expenses associated with an increase in trainmen employment levels, increased crew costs due to slower network velocity, inflation, volume-related expenses, and severance costs associated with the relocation of various support functions to Omaha, Nebraska. Lower protection costs and performance-based compensation expense for management partially offset these increases. Protection cost represents the differential payment when the wage earned for active employment is lower than an employee's "protected" rate of pay. An individual's protected rate is imposed by the STB for employees adversely affected by a merger or is established by collective bargaining agreements. We also benefited from cost savings driven by a smaller non-transportation workforce during the year.

The increase in 2003 resulted from the adoption of FASB Statement No.143, *Accounting for Asset Retirement Obligations* (FAS 143), which accounted for $110 million of the increase. Other drivers included inflation, volume-related costs, protection costs, increased crew utilization costs due to a shortage of available crews in the third and fourth quarters, as well as higher pension expense.

*Equipment and Other Rents* – Equipment and other rents primarily includes rental expense the Railroad pays for freight cars owned by other railroads or private companies; freight car, intermodal, and locomotive leases; other

specialty equipment leases; and office and other rentals. Expenses increased in 2004 due to an increase in carload volumes, which resulted in higher locomotive and car rental expenses, and longer car cycle times resulting from slower network velocity. The higher locomotive expense includes additional costs associated with leasing short-term surge locomotive power, which is more costly than long-term locomotive leases, and the increased leasing of new locomotives, which are being utilized for the higher business volumes and to improve network performance. Car cycle time is defined as the amount of time that a car spends on our system without changing its loaded/ unloaded status or having a new waybill issued.

Conversely, expenses decreased in 2003 due primarily to lower rental prices for private rail cars, partially offset by higher locomotive lease expense and increased car cycle times driven by higher inventory of cars on the system due to slower network velocity in the third and fourth quarters of 2003.

*Depreciation* – The majority of depreciation relates to track structure, including rail, ties, and other track material. Depreciation expense increased in 2004 primarily due to a higher depreciable asset base caused by higher capital spending in recent years.

The 2003 decrease was driven by the adoption of FAS 143, as well as the implementation of depreciation studies approved by the STB, which resulted in lower depreciation rates in 2003 for certain track assets, partially offset by increased rates for locomotives and other assets. The higher depreciable asset base partially offset the favorable impact of FAS 143 and the depreciation studies in 2003.

*Fuel and Utilities* – Fuel and utilities include locomotive fuel, utilities other than telephone, and gasoline and other fuels. The increases in 2004 and 2003 were driven by diesel fuel prices, which averaged $1.22, $0.92, and $0.73 per gallon in 2004, 2003, and 2002, respectively (including taxes and transportation costs), and higher gallons consumed on a year-over-year basis. The higher fuel price in 2004 contributed $416 million to the increase; however, approximately 52% of these costs were recovered through our fuel surcharge programs and are included in operating revenues. The increase in gross ton-miles in 2004 and 2003 drove the higher fuel usage resulting in an additional $24 million and $25 million in fuel expense in each year, respectively. The Railroad hedged approximately 9% and 13% of its fuel consumption for 2004 and 2003, in accordance with its hedging policy, which decreased fuel costs by $14 million in 2004 and $28 million in 2003. Gasoline, utilities, and propane expenses increased $13 million in 2004 and $12 million in 2003 due to higher prices.

*Materials and Supplies* – Materials used for the maintenance of the Railroad's lines, structures, and equipment is the principal component of materials and supplies expense. Office, small tools and other supplies, and the costs of freight services purchased to ship company materials are also included. Expenses increased in 2004 due to increased use of locomotive repair materials associated with maintaining a larger fleet that includes older units not covered by warranties, additional freight car repairs, higher materials costs, and increased freight charges for shipment of company material.

Conversely, expenses decreased in 2003 driven primarily by costs associated with track removal as well as fewer locomotive repairs, cost control measures, and a shift to more contracting of locomotive repairs, which resulted in a corresponding increase to Purchased Services and Other Costs. The 2003 reduction was partially offset by higher costs for locomotive materials.

*Casualty Costs* – Personal injury expense, freight and property damage, insurance, environmental matters, and asbestos expense are included in casualty costs. Costs in 2004 increased due to the asbestos charge of $247 million (pre-tax), higher personal injury expense due to a 2002 jury verdict against the Railroad for a 1998 crossing accident that was upheld on appeal in 2004, and costs related to a 2004 derailment near San Antonio, Texas. These increases were partially offset by reduced personal injury expense driven by lower than anticipated settlement costs and fewer employee injuries in 2004 than previously assumed, in addition to lower expense for our insurance programs.

Expenses in 2003 increased due to higher personal injury expense, insurance costs due to increased premiums, and expenses associated with destruction of foreign equipment. Destruction of foreign equipment expense is incurred when equipment owned by other railroads is destroyed while in our possession.

*Purchased Services and Other Costs* – Purchased services and other costs include the costs of services purchased from outside contractors, state and local taxes, net costs of operating facilities jointly used by UPRR and other

railroads, transportation and lodging for train crew employees, trucking and contracting costs for intermodal containers, leased automobile maintenance expenses, telephone and cellular expense, employee travel expense, and computer and other general expenses. Expenses increased in 2004 as a result of higher locomotive contract maintenance services, state and local taxes, relocation costs associated with moving various support personnel to Omaha, Nebraska, and increased trucking expenses for intermodal carriers and crew transportation costs due to slower network velocity and additional volume.

Similarly, expenses rose in 2003 due to the drivers mentioned above in addition to higher contract-related expenses resulting from the cost of track removal and joint facilities costs, which were up due to reduced haulage receipts and increased expenses associated with a new joint facility contract.

The following table shows operating income and non-operating financial results for periods ended December 31:

| *Millions of Dollars* | *2004* | *2003* | *2002* |
|---|---|---|---|
| Operating income | $1,295 | $2,133 | $2,253 |
| Other income | 88 | 78 | 324 |
| Interest expense | (527) | (574) | (632) |
| Income before income taxes | 856 | 1,637 | 1,945 |
| Income taxes | (252) | (581) | (680) |
| Income from continuing operations | $ 604 | $1,056 | $1,265 |

**Operating Income** – Operating income decreased in 2004 as higher fuel prices, a $247 million pre-tax asbestos charge, resource utilization costs associated with sub-optimal network operations, volume-related expenses, wage and benefit inflation, training expenses, and higher casualty costs more than offset annual revenue growth of 6%. Our service issues, including increased hiring and training efforts, added approximately $300 million in operating expenses during 2004.

Operating income in 2003 declined as productivity gains and lower depreciation expense were more than offset by higher fuel prices, inflation, volume, and resource utilization costs experienced in the third and fourth quarters of 2003.

**Non-Operating Items**

*Other Income* – The 2004 improvement in other income was a result of higher costs in 2003 associated with the early retirement of $1.5 billion of Convertible Preferred Securities (CPS) and income recognized in 2004 from the sale of assets of a technology subsidiary, which were partially offset by lower gains from real estate sales in 2004.

The reduction in 2003 was primarily a result of higher 2002 real estate gains (transactions included sales to the Utah Transit Authority with a pre-tax value of $141 million and the Santa Clara Valley Transit Authority with a pre-tax value of $73 million) and the negative impact of the 2003 CPS redemption costs.

*Interest Expense* – The improvement in interest expense in 2004 and 2003 was primarily due to declining weighted-average debt levels of $8.1 billion, $8.9 billion, and $9.5 billion in 2004, 2003, and 2002, respectively, which included the CPS in 2003 and 2002. Our effective interest rate was 6.5% in 2004, compared to 6.4% and 6.6% in 2003 and 2002, respectively.

*Income Taxes* – Income tax expense decreased in 2004, driven by lower pre-tax income, a reduction in the deferred state income tax liability primarily attributable to relocating support operations to Omaha, Nebraska, state income tax credits earned in connection with the new headquarters building in Omaha, and an increase in foreign tax credits resulting from the passage of the American Jobs Creation Act of 2004.

The decrease in 2003 was driven by lower pre-tax income, which was partially offset by a tax adjustment recognized in 2002 for prior years' income tax examinations. Our effective tax rate decreased to 29.4% in 2004 compared to 35.5% and 35.0% in 2003 and 2002, respectively.

## DISCONTINUED OPERATIONS

On November 5, 2003, we completed the sale of our entire trucking interest. Revenues from discontinued operations were $1.2 billion and $1.3 billion in 2003 and 2002, respectively. Income from discontinued operations was $255 million and $76 million in 2003 and 2002. Income from discontinued operations in 2003 included the net gain from the sale of our trucking interest of $211 million, including an income tax benefit of $126 million.

## OTHER OPERATING AND FINANCIAL STATISTICS

### Railroad Performance Measures

We report key railroad performance measures weekly to the American Association of Railroads, including carloads, average train speed, average daily inventory of rail cars on our system, and average terminal dwell time, which is a measure of the average time a rail car spends (in hours) at our terminals. This operating data is available on our website at www.up.com/investors/reports/index.shtml.

### Other Operating Statistics

| | *2004* | *2003* | *2002* |
|---|---|---|---|
| Gross ton-miles (billions) | 1,037.5 | 1,018.9 | 993.7 |
| Revenue ton-miles (billions) | 546.3 | 532.9 | 518.7 |
| Average full-time equivalent employees | 48,295 | 46,371 | 47,298 |

*Gross and Revenue Ton-Miles* – Gross and revenue ton-miles increased 2% and 3% respectively in 2004 driven by carloading growth of 2% during the same period. Gross and revenue ton-miles both increased 3% in 2003 with carloading growth of 1%. The increase in gross and revenue ton-miles in 2003 was positively impacted by volume growth experienced in the higher density commodity groups of industrial products and chemicals, combined with a minimal increase in automotive carloads, which is a lower density commodity. Gross ton-miles are calculated by multiplying the weight of a loaded or empty freight car by the number of actual miles hauled. Revenue ton-miles are based on tariff miles and do not include the weight of the freight car.

*Average Full-Time Equivalent Employees* – The 2004 increase in the average number of full-time equivalent employees resulted from the addition of train crew personnel, who were hired to handle increased customer demand and improve service. These additions were partially offset by increased productivity in the non-transportation functions, employee attrition, and fewer employees at our technology subsidiaries. In 2003, the number of full-time equivalent employees decreased 2% due to productivity improvements and employee attrition.

### Other Financial Statistics

| | *2004* | *2003* |
|---|---|---|
| Debt to capital | 39.1% | 39.3% |
| Lease adjusted debt to capital | 45.1% | 44.8% |

*Debt to Capital/Lease Adjusted Debt to Capital* – Debt to capital is computed by dividing total debt by total debt plus equity. Lease adjusted debt to capital is derived by dividing total debt plus the net present value of operating leases by total debt plus equity plus the net present value of operating leases. We believe these measures are important in managing our capital structure to allow efficient access to the debt market while minimizing our cost of capital. The improvement in our 2004 debt to capital ratio resulted from an increase in equity due to earnings, partially offset by an increase in our debt levels since year-end 2003. The increase in lease adjusted debt to capital was driven by higher debt levels and valuation of operating leases, which were partially offset by higher equity.

## LIQUIDITY AND CAPITAL RESOURCES

As of December 31, 2004, our principal sources of liquidity included cash, cash equivalents, the sale of receivables, and our revolving credit facilities, as well as issuance of commercial paper and other sources of financing through the capital markets. We had $2.0 billion of credit facilities available, of which there were no borrowings outstanding as of December 31, 2004. The sale of receivables program is subject to certain requirements including the maintenance of an investment grade credit rating. If our credit rating were to deteriorate, it could have an adverse impact on our liquidity. The value of the outstanding undivided interest held by investors under the program was $590 million as of December 31, 2004. Access to commercial paper is dependent on market conditions. Deterioration of our operating results or financial condition due to internal or external factors could negatively impact our ability to utilize commercial paper as a source of liquidity. Liquidity through the capital markets is also dependent on our financial stability.

At December 31, 2004 and 2003, we had a working capital deficit of $226 million and $367 million, respectively. A working capital deficit is not uncommon in our industry and does not indicate a lack of liquidity. We maintain adequate resources to meet our daily cash requirements, and we have sufficient financial capacity to satisfy our current liabilities.

### Financial Condition

| *Cash Flows*<br>*Millions of Dollars* | *2004* | *2003* | *2002* |
|---|---|---|---|
| Cash provided by operating activities | $2,237 | $2,422 | $2,199 |
| Cash used in investing activities | (1,712) | (856) | (1,336) |
| Cash used in financing activities | (75) | (1,406) | (599) |
| Net change in cash and temporary investments | $ 450 | $ 160 | $ 264 |

*Cash Provided by Operating Activities* – The decrease in cash provided by operating activities in 2004 was driven by lower income from continuing operations and cash from discontinued operations recognized in 2003, which was partially offset by working capital performance. The increase from 2002 to 2003 was due to working capital performance and higher cash from the discontinued operations, partially offset by lower income from continuing operations.

*Cash Used in Investing Activities* – The increase in 2004 resulted from $620 million received in 2003 for the sale of our trucking interest, a large dividend from an affiliate in 2003, and reduced asset sales in 2004. The reduction in use of cash in 2003 was primarily driven by proceeds of $620 million from the sale of our trucking interest, which was partially offset by lower proceeds from asset sales and increased 2003 capital spending.

*Cash Used in Financing Activities* – The decrease in 2004 was driven by lower debt repayments of $588 million in 2004 compared to $2.1 billion in 2003 (including $1.5 billion of CPS) partially offset by a decrease in proceeds from stock option exercises ($102 million in 2004 compared to $216 million in 2003) and higher dividend payments ($310 million in 2004 versus $234 million in 2003). The increase in 2003 reflects higher debt repayments of $2.1 billion in 2003 (including $1.5 billion of CPS) compared to $1.2 billion in 2002, and higher dividend payments, partially offset by an increase in proceeds from stock option exercises of $66 million.

The table below details capital expenditures for the years ended December 31, 2004, 2003, and 2002, including non-cash capital lease financings of $188 million and $126 million in 2003 and 2002, respectively. There were no non-cash capital lease financings in 2004.

| *Capital Expenditures*<br>*Millions of Dollars* | *2004* | *2003* | *2002* |
|---|---|---|---|
| Track | $1,328 | $1,224 | $1,200 |
| Locomotives | 114 | 373 | 187 |
| Freight cars | 11 | 13 | 11 |
| Facilities and other | 423 | 330 | 422 |
| Total | $1,876 | $1,940 | $1,820 |

In 2005, we expect our cash capital expenditures to be approximately $2 billion. These expenditures will be used to maintain track and structures, continue capacity expansions on our main lines in constrained corridors, remove bottlenecks, upgrade and augment equipment to better meet customer needs, build and improve facilities and terminals, and develop and implement new technologies. We expect to fund our 2005 capital expenditures through cash generated from operations, additional debt financings, the sale or lease of various operating and non-operating properties, and cash on hand at December 31, 2004. We expect that these sources will continue to provide sufficient funds to meet our expected capital requirements for 2005. In addition to cash capital expenditures, we expect to acquire locomotives and certain other equipment through short- and long-term operating leases.

For the years ended December 31, 2004, 2003, and 2002, our ratio of earnings to fixed charges was 2.1, 3.2, and 3.4, respectively. The ratio of earnings to fixed charges was computed on a consolidated basis. Earnings represent income from continuing operations, less equity earnings net of distributions, plus fixed charges and income taxes. Fixed charges represent interest charges, amortization of debt discount, and the estimated amount representing the interest portion of rental charges. The decline in our ratio was due primarily to lower income from continuing operations.

## Financing Activities

**Credit Facilities** – On December 31, 2004, we had $2.0 billion in revolving credit facilities available, including $1.0 billion under a 364-day revolving facility expiring in March 2005 and $1.0 billion under a 5-year facility expiring in March 2009 (collectively, the “facilities”). The facilities, which were entered into during March 2004, are designated for general corporate purposes and replaced a $925 million 364-day revolving credit facility that expired in March 2004 and a $1.0 billion 5-year revolving credit facility, which was due to expire in March 2005. Neither of the facilities were drawn as of December 31, 2004. Commitment fees and interest rates payable under the facilities are similar to fees and rates available to comparably rated investment-grade borrowers. Like the revolving credit facilities that were replaced, these facilities allow for borrowings at floating (LIBOR-based) rates, plus a spread, depending upon our senior unsecured debt ratings. The facilities do not include any other financial restrictions, credit rating triggers (other than rating-dependent pricing), or any other provision that could require the posting of collateral. The facilities require the maintenance of minimum net worth and debt to net worth coverage ratios. At December 31, 2004, we were in compliance with these covenants.

To the extent we have long-term credit facilities available, we have reclassified certain short-term debt to a long-term basis. At December 31, 2004 and 2003, approximately $440 million and $324 million of short-term borrowings that we intend to refinance were reclassified as long-term debt. This reclassification reflects our intent to refinance these short-term borrowings and current maturities of long-term debt on a long-term basis through the issuance of commercial paper or new long-term financings, or by using the currently available long-term credit facility if alternative financing is not available. We are reviewing rollover options for the 364-day credit facility that expires in March 2005.

**Dividend Restrictions** – Retained earnings available for dividends decreased to $5.2 billion at December 31, 2004, from $6.9 billion at December 31, 2003, due to revisions in minimum net worth requirements under the credit facilities referred to above. We do not expect that these restrictions will have a material adverse effect on our consolidated financial condition, results of operations, or liquidity.

**Shelf Registration Statement and Significant New Borrowings** – On May 4, 2004, we issued the remaining $250 million available under a shelf registration statement filed in 2002. We issued 5.375% fixed rate debt with a maturity of May 1, 2014. Also on May 4, 2004, we issued $250 million of 6.25% fixed rate debt with a maturity of May 1, 2034, under a $1.0 billion shelf registration statement filed in 2003. On November 23, 2004, we issued an additional $250 million of 4.875% fixed rate debt with a maturity of January 15, 2015 under the 2003 shelf registration statement. The proceeds from the issuances were used for the repayment of debt and other general corporate purposes. Under the 2003 shelf registration statement, we may issue, from time to time, any combination of debt securities, preferred stock, common stock, or warrants for debt securities or preferred stock in one or more offerings. At December 31, 2004, we had $500 million remaining for issuance under the 2003 shelf registration statement. We have no immediate plans to issue equity securities; however, we will continue to explore opportunities to replace existing debt or access capital through issuances of debt securities under this shelf registration.

## Operating Lease Activities

As of December 31, 2004, our total aggregate contractual obligations for operating leases were approximately $3.4 billion. During 2004, the Railroad entered into long-term operating lease arrangements covering 376 new locomotives. These new lease arrangements provide for minimum total rental payments of approximately $506 million. The lessors of the locomotives were investors that purchased the locomotives in various transactions for a total equipment cost of approximately $601 million. The Railroad also entered into similar long-term operating lease arrangements for freight cars with a total equipment cost of approximately $53 million and minimum total rent payments of approximately $76 million.

The lessors financed the purchase of the locomotives and freight cars, in part, by the issuance of equipment notes that are non-recourse to us and are secured by an assignment of the underlying leases and a security interest in the equipment. Neither the Railroad nor UPC guarantees payment of the equipment notes. The Railroad's obligations to make operating lease payments under the leases are recourse obligations and are not recorded in the Consolidated Statements of Financial Position.

We have certain renewal and purchase options with respect to the locomotives and freight cars. Additionally, we have flexible return rights with respect to a portion of the locomotives. If we do not exercise any such options or flexible return rights, the equipment will be returned to the lessors at the end of the lease term.

On October 5, 2004, the Railroad completed the refinancing of a new headquarters building in Omaha, Nebraska, with a synthetic lease, which is an off-balance sheet financing arrangement (as discussed below). The lease has a term of 10 years with total scheduled lease payments of approximately $134 million.

## Off-Balance Sheet Arrangements, Contractual Obligations, and Commitments

As described in the notes to the Consolidated Financial Statements, Item 8, and as referenced in the tables below, we have contractual obligations and commercial commitments that may affect our financial condition. However, based on our assessment of the underlying provisions and circumstances of our material contractual obligations and commercial commitments, including material sources of off-balance sheet and structured finance arrangements, there is no known trend, demand, commitment, event, or uncertainty that is reasonably likely to occur which would have a material adverse effect on our consolidated results of operations, financial condition, or liquidity. In addition, the commercial obligations, financings, and commitments made by us are customary transactions that are similar to those of other comparable industrial corporations, particularly within the transportation industry.

The following tables identify material obligations and commitments as of December 31, 2004:

| | | *Payments Due by Period* | | | |
|---|---|---|---|---|---|
| *Contractual Obligations Millions of Dollars* | *Total* | *Less Than 1 Year* | *2-3 Years* | *4-5 Years* | *After 5 Years* |
| Debt [a] | $ 6,818 | $ 487 | $1,245 | $1,024 | $4,062 |
| Operating leases | 3,436 | 491 | 749 | 524 | 1,672 |
| Capital lease obligations [b] | 2,300 | 201 | 377 | 339 | 1,383 |
| Purchase obligations [c] | 3,887 | 1,126 | 490 | 456 | 1,815 |
| Total contractual obligations | $16,441 | $2,305 | $2,861 | $2,343 | $8,932 |

*[a] Excludes capital lease obligations of $1,416 million, unamortized discount of $105 million, and market value adjustments of $2 million for debt with qualifying hedges that are recorded as assets on the Consolidated Statements of Financial Position.*

*[b] Represents total obligations, including interest component.*

*[c] Purchase obligations include locomotive maintenance contracts; purchase commitments for locomotives, ties, ballast, and track; and agreements to purchase other goods and services.*

| *Other Commercial Commitments Millions of Dollars* | *Total Amounts Committed* | *Amount of Commitment Expiration Per Period* | | | |
|---|---|---|---|---|---|
| | | *Less Than 1 Year* | *2-3 Years* | *4-5 Years* | *After 5 Years* |
| Credit facilities [a] | $2,000 | $1,000 | $ - | $1,000 | $ - |
| Sale of receivables [b] | 600 | 600 | - | - | - |
| Guarantees [c] | 485 | 15 | 15 | 30 | 425 |
| Standby letters of credit [d] | 56 | 56 | - | - | - |
| Total commercial commitments | $3,141 | $1,671 | $15 | $1,030 | $425 |

*[a] None of the credit facilities were used as of December 31, 2004.*
*[b] $590 million of the facility was utilized at December 31, 2004.*
*[c] Includes guaranteed obligations of affiliated operations.*
*[d] None of the letters of credit were drawn upon as of December 31, 2004.*

**Sale of Receivables** – The Railroad transfers most of its accounts receivable to Union Pacific Receivables, Inc. (UPRI), a bankruptcy-remote subsidiary, as part of a sale of receivables facility. UPRI sells, without recourse on a 364-day revolving basis, an undivided interest in such accounts receivable to investors. The total capacity to sell undivided interests to investors under the facility was $600 million at December 31, 2004. The value of the outstanding undivided interest held by investors under the facility was $590 million at both December 31, 2004 and December 31, 2003. The value of the outstanding undivided interest held by investors is not included in our Consolidated Financial Statements. The value of the undivided interest held by investors was supported by $1,089 million and $1,048 million of accounts receivable held by UPRI at December 31, 2004 and December 31, 2003, respectively. At December 31, 2004 and December 31, 2003, the value of the interest retained by UPRI was $499 million and $458 million, respectively. This retained interest is included in accounts receivable in our Consolidated Financial Statements. The interest sold to investors is sold at carrying value, which approximates fair value, and there is no gain or loss recognized from the transaction.

The value of the outstanding undivided interest held by investors could fluctuate based upon the availability of eligible receivables and is directly affected by changing business volumes and credit risks, including default and dilution. If default or dilution percentages were to increase one percentage point, the amount of eligible receivables would decrease by $6 million. Should our credit rating fall below investment grade, the value of the outstanding undivided interest held by investors would be reduced, and, in certain cases, the investors would have the right to discontinue the facility.

The Railroad has been designated to service the sold receivables; however, no servicing asset or liability has been recognized as the servicing fees adequately compensate the Railroad for its responsibilities. The Railroad collected approximately $12.2 billion and $11.3 billion during the years ended December 31, 2004 and 2003, respectively. UPRI used such proceeds to purchase new receivables under the facility.

The costs of the sale of receivables program are included in other income and were $11 million, $10 million, and $13 million for the twelve months ended December 31, 2004, 2003, and 2002, respectively. The costs include interest, program fees paid to banks, commercial paper issuing costs, and fees for unused commitment availability.

The investors have no recourse to the Railroad's other assets except for customary warranty and indemnity claims. Creditors of the Railroad have no recourse to the assets of UPRI. On August 5, 2004, the sale of receivables program was renewed for an additional 364-day period without any significant changes in terms.

**Headquarters Building** – On October 5, 2004, the Railroad completed the refinancing of the synthetic lease for the new headquarters building. The Railroad will lease the building pursuant to an operating lease with a term of ten years. Total scheduled lease payments during the term are approximately $134 million. UPC has guaranteed the obligations of the Railroad under the lease and, therefore, has a contingent liability for such obligations. The obligations of the Railroad to make lease payments are not recorded in the Consolidated Financial Statements of

the Railroad or UPC. During the term of the lease, the Railroad may, at its option, purchase the building. Such purchase amount, which was $257.5 million, will represent the cost of constructing the building, including capitalized interest and transaction expenses. Any such payment may also include an additional make-whole amount for early redemption of the outstanding debt, which will vary depending on prevailing interest rates at the time of prepayment.

Upon expiration of the lease term, if the Railroad does not purchase the building or renew the lease, the building will be remarketed. The Railroad has guaranteed that the building will have a residual value equal to at least $206 million in the event that the building is remarketed. Therefore, the guarantee made by UPC with respect to the Railroad's obligations under the lease is expected to represent a contingent obligation of approximately $206 million. At December 31, 2004, the Railroad had a liability of approximately $6 million related to the fair value of this guarantee.

The arrangement is subject to customary default provisions, including, without limitation, those relating to payment defaults under the lease and the operative documents, the acceleration of certain other unrelated debt obligations of the Railroad or UPC, performance defaults, and events of bankruptcy. In the event that such defaults occur and are continuing, the Railroad (or UPC pursuant to its guarantee) may be required to pay all amounts due under the lease through the end of the term of the lease.

## OTHER MATTERS

**Inflation** – The cumulative effect of long periods of inflation has significantly increased asset replacement costs for capital-intensive companies. As a result, assuming that all operating assets are replaced at current price levels, depreciation charges (on an inflation-adjusted basis) would be substantially greater than historically reported amounts.

**Derivative Financial Instruments** – We use derivative financial instruments in limited instances for other than trading purposes to manage risk related to changes in fuel prices and to achieve our interest rate objectives. We are not a party to leveraged derivatives and, by policy, do not use derivative financial instruments for speculative purposes. Financial instruments qualifying for hedge accounting must maintain a specified level of effectiveness between the hedging instrument and the item being hedged, both at inception and throughout the hedged period. We formally document the nature and relationships between the hedging instruments and hedged items, as well as our risk-management objectives, strategies for undertaking the various hedge transactions, and method of assessing hedge effectiveness. We may use swaps, collars, futures, and/or forward contracts to mitigate the downside risk of adverse price movements and to hedge the exposure to variable cash flows. The use of these instruments also limits future benefits from favorable movements. The purpose of these programs is to protect our operating margins and overall profitability from adverse fuel price changes or interest rate fluctuations.

*Market and Credit Risk* – We address market risk related to derivative financial instruments by selecting instruments with value fluctuations that highly correlate with the underlying hedged item. Credit risk related to derivative financial instruments, which is minimal, is managed by requiring high credit standards for counterparties and periodic settlements. At December 31, 2004, we have not been required to provide collateral, nor have we received collateral relating to our hedging activities.

In addition, we enter into secured financings in which the debtor has pledged collateral. The collateral is based upon the nature of the financing and the credit risk of the debtor. We generally are not permitted to sell or repledge the collateral unless the debtor defaults.

*Determination of Fair Value* – The fair values of our derivative financial instrument positions at December 31, 2004 and 2003 were determined based upon current fair values as quoted by recognized dealers or developed based upon the present value of expected future cash flows discounted at the applicable U.S. Treasury rate, London Interbank Offered Rates (LIBOR), or swap spread.

*Sensitivity Analyses* – The sensitivity analyses that follow illustrate the economic effect that hypothetical changes in interest rates or fuel prices could have on our results of operations and financial condition. These hypothetical changes do not consider other factors that could impact actual results.

*Interest Rate Fair Value Hedges* – We manage our overall exposure to fluctuations in interest rates by adjusting the proportion of fixed and floating rate debt instruments within our debt portfolio over a given period. The mix of fixed and floating rate debt is largely managed through the issuance of targeted amounts of each as debt matures or as incremental borrowings are required. Derivatives are used as one of the tools to obtain the targeted mix. In addition, we also obtain flexibility in managing interest costs and the interest rate mix within our debt portfolio by evaluating the issuance of and managing outstanding callable fixed-rate debt securities.

At December 31, 2004 and 2003, we had variable-rate debt representing approximately 9% and 10%, respectively, of our total debt. If variable interest rates average one percentage point higher in 2005 than our December 31, 2004 variable rate, which was approximately 5%, our interest expense would increase by approximately $8 million. If variable interest rates averaged one percentage point higher in 2004 than our December 31, 2003 variable rate, which was approximately 3%, our interest expense would have increased by approximately $7 million. This amount was determined by considering the impact of the hypothetical interest rates on the balances of our variable-rate debt at December 31, 2004 and 2003, respectively.

Swaps allow us to convert debt from fixed rates to variable rates and thereby hedge the risk of changes in the debt's fair value attributable to the changes in the benchmark interest rate (LIBOR). The swaps have been accounted for as fair value hedges using the short-cut method as allowed by FASB Statement No. 133, *Accounting for Derivative Instruments and Hedging Activities;* therefore, no ineffectiveness has been recorded within our Consolidated Financial Statements. In April 2004, we entered into an interest rate swap on $250 million of debt with a maturity of April 15, 2012. As of December 31, 2004 and 2003, we had interest rate swaps hedging debt of approximately $750 million and $818 million, respectively.

Market risk for fixed-rate debt is estimated as the potential increase in fair value resulting from a hypothetical one percentage point decrease in interest rates as of December 31, 2004, and amounts to approximately $599 million at December 31, 2004. Market risk resulting from a hypothetical one percentage point decrease in interest rates as of December 31, 2003, amounted to approximately $573 million at December 31, 2003. The fair values of our fixed-rate debt were estimated by considering the impact of the hypothetical interest rates on quoted market prices and current borrowing rates.

*Interest Rate Cash Flow Hedges* – In May 2004, in anticipation of a future lease transaction, we entered into treasury lock transactions with notional amounts totaling $125 million and an average locked-in rate of 5.08%. The treasury locks are accounted for as cash flow hedges. On September 28, 2004, the treasury locks were settled in connection with a 10-year operating lease, commencing on October 5, 2004, and maturing on September 30, 2014. The settlement of these treasury lock transactions was based on a treasury yield of 4.01% and resulted in a payment of $11 million to our counterparty that is being amortized to rent expense over the life of the 10-year operating lease. As of December 31, 2004 and 2003, we had no interest rate cash flow hedges outstanding.

*Fuel Cash Flow Hedges* – Fuel costs are a significant portion of our total operating expenses. In 2004 and 2003, our primary means of mitigating the impact of adverse fuel price changes was our fuel surcharge program. However, we may use swaps, collars, futures and/or forward contracts to further mitigate the impact of adverse fuel price changes.

We currently have no fuel hedges in place for 2005. As of December 31, 2003, collars were in place for 9% of expected fuel consumption for 2004. The collars had a floor of $0.64, a cap of $0.74, and a ceiling of $0.86 per gallon, excluding taxes, transportation costs, and regional pricing spreads. Based on annualized fuel consumption during 2004, each one-cent increase in the price of fuel would have resulted in approximately $8.5 million of additional fuel expense, after tax. As of December 31, 2002, we hedged approximately 7% of our forecasted 2003 fuel consumption using fuel swaps at $0.58 per gallon, excluding taxes, transportation costs, and regional pricing spreads.

**Accounting Pronouncements** – In December 2004, the FASB issued Statement No. 123 (R), *Share-Based Payment*. This statement, which is effective for the Corporation beginning July 1, 2005, requires that companies recognize compensation expense equal to the fair value of stock options or other share based payments. We anticipate the impact of this pronouncement will not differ materially from what has been disclosed in our pro

forma net income located in our Significant Accounting Policies section of the Consolidated Financial Statements and applicable notes to the Consolidated Financial Statements, Item 8.

**Asbestos** – We are a defendant in a number of lawsuits in which current and former employees allege exposure to asbestos. Additionally, we have received claims for asbestos exposure that have not been litigated. The claims and lawsuits (collectively referred to as "claims") allege occupational illness resulting from exposure to asbestos-containing products. In most cases, the claimants do not have credible medical evidence of physical impairment resulting from the alleged exposures. Additionally, most claims filed against us do not specify an amount of alleged damages.

The greatest potential for asbestos exposure in the railroad industry existed while steam locomotives were used. The railroad industry, including UPRR and its predecessors, phased out steam locomotives in approximately 1955-1960. The use of asbestos-containing products in the railroad industry was substantially reduced after steam locomotives were discontinued, although it was not completely eliminated. Some asbestos-containing products were still manufactured in the building trade industry and were used in isolated component parts on locomotives and railroad cars during the 1960s and 1970s. By the early 1980s, manufacturers of building materials and locomotive component parts developed non-asbestos alternatives for their products and ceased manufacturing asbestos-containing materials.

Prior to 2004, we concluded it was not possible to reasonably estimate the cost of disposing of asbestos-related claims that might be filed against us in the future, due to a lack of sufficient comparable history from which to reasonably estimate unasserted asbestos-related claims. As a result, we recorded a liability for asbestos-related claims only when the claims were asserted.

We believe we can now reasonably estimate a liability for unasserted asbestos-related claims because we have sufficient comparable loss data and there is no immediate legislative solution to asbestos litigation. During 2004 we engaged a third-party expert with extensive experience in estimating resolution costs for asbestos-related claims to assist us in assessing the number and value of these unasserted claims through 2034, based on our average claims experience over a multi-year period. As a result, we increased our liability for asbestos-related claims to $326 million. At December 31, 2004, $17 million was classified as current liabilities, while the remainder was classified as long-term accrued casualty costs. Approximately 14% of the recorded liability related to asserted claims, and approximately 86% related to unasserted claims. These claims are expected to be paid out over the next 30 years. A summary of asbestos-related claims activity in recent years follows:

| | *Year Ended December 31,* | | |
|---|---|---|---|
| *Millions of Dollars* | *2004* | *2003* | *2002* |
| Pending claims, beginning of year | 2,560 | 1,541 | 1,325 |
| New claims filed | 474 | 1,612 | 547 |
| Claims settled/dismissed | 718 | 593 | 331 |
| Pending claims, end of year | 2,316 | 2,560 | 1,541 |
| Payments | $ 14.1 | $ 14.4 | $ 12.4 |
| Aggregate payments to settle asbestos-related claims | $118.3 | $104.2 | $ 89.8 |

We have insurance coverage that reimburses us for a portion of the costs incurred to resolve asbestos-related claims. At December 31, 2004, we have recognized an asset for estimated insurance recoveries.

We believe that our liability for asbestos-related claims and the estimated insurance recoveries reflect reasonable and probable estimates. The amounts recorded for asbestos-related liabilities and related insurance recoveries were based on currently known facts. However, future events, such as the number of new claims to be filed each year, average settlement costs, and insurance coverage issues could cause the actual costs and insurance recoveries to be higher or lower than the projected amounts. Estimates may also vary due to changes in the litigation environment, federal and state law governing compensation of asbestos claimants, and the level of payments made to claimants by other defendants.

**Commitments and Contingencies** – Various claims and lawsuits are pending against us and certain of our subsidiaries. We are also subject to various federal, state and local environmental laws and regulations, pursuant to which we are currently participating in the investigation and remediation of various sites. We do not expect that any known lawsuits, claims, environmental costs, commitments, contingent liabilities, or guarantees will have a material adverse effect on our consolidated financial condition, results of operations, or liquidity after taking into account liabilities previously recorded for these matters.

## CRITICAL ACCOUNTING POLICIES

Our Consolidated Financial Statements have been prepared in accordance with accounting principles generally accepted in the United States of America. The preparation of these financial statements requires estimation and judgment that affect the reported amounts of revenues, expenses, assets, and liabilities. We base our estimates on historical experience and on various other assumptions that are believed to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. The following critical accounting policies are a subset of our significant accounting policies described in the notes to the Consolidated Financial Statements, Item 8. These critical accounting policies affect significant areas of our financial statements and involve judgment and estimates. If these estimates differ significantly from actual results, the impact on our Consolidated Financial Statements may be material.

**Asbestos** – We are a defendant in a number of lawsuits in which current and former employees allege exposure to asbestos. Additionally, we have received claims for asbestos exposure that have not been litigated. A liability for resolving both asserted and unasserted asbestos-related claims through 2034 has been estimated and recorded. A third-party expert with experience in estimating resolution costs for asbestos-related claims assisted us in assessing our potential liability. The liability for resolving both asserted and unasserted claims was based on the following assumptions:

- The number of claims received in 2005 will be consistent with average claims received between 2000 and 2003.
- The number of claims to be filed against us will decline each year after 2005.
- The average settlement values for asserted and unasserted claims will be equivalent to those experienced between 2002 and 2004.
- The percentage of claims dismissed between 2002 and 2004 will continue through 2034.

As a result of the assessment for unasserted asbestos-related claims, we increased our liability for asbestos-related claims to $326 million. At December 31, 2004, $17 million was classified as current liabilities, while the remainder was classified as long-term accrued casualty costs. Approximately 14% of the recorded liability related to asserted claims and approximately 86% related to unasserted claims. These claims are expected to be paid out over the next 30 years. We have insurance coverage for a portion of the costs incurred to resolve asbestos-related claims and we have recognized an asset for estimated insurance recoveries.

We believe that our liability for asbestos-related claims and the estimated insurance recoveries reflect reasonable and probable estimates. The amounts recorded for asbestos-related liabilities and related insurance recoveries were based on currently known facts. However, future events, such as the number of new claims to be filed each year, average settlement costs, and insurance coverage issues could cause the actual costs and insurance recoveries to be higher or lower than the projected amounts. Estimates may also vary due to changes in the litigation environment, federal and state law governing compensation of asbestos claimants, and the level of payments made to claimants by other defendants.

**Environmental** – We are subject to federal, state, and local environmental laws and regulations. We have identified 384 sites at which we are or may be liable for remediation costs associated with alleged contamination or for violations of environmental requirements. This includes 52 sites that are the subject of actions taken by the

U.S. government, 31 of which are currently on the Superfund National Priorities List. Certain federal legislation imposes joint and several liability for the remediation of identified sites; consequently, our ultimate environmental liability may include costs relating to activities of other parties, in addition to costs relating to our own activities at each site.

When an environmental issue has been identified with respect to property owned, leased, or otherwise used in the conduct of our business, we and our consultants perform environmental assessments on the property. We expense the cost of the assessments as incurred. We accrue the cost of remediation where our obligation is probable and such costs can be reasonably estimated. We do not discount our environmental liabilities when the timing of the anticipated cash payments is not fixed or readily determinable.

Environmental expense for the years ended December 31, 2004, 2003, and 2002 were $46 million, $26 million, and $37 million, respectively. As of December 31, 2004 and 2003, we had a liability of $201 million and $187 million, respectively, accrued for future environmental costs, of which $50 million and $57 million, respectively, were recorded in current liabilities as accrued casualty costs. The liability includes future costs for remediation and restoration of sites, as well as ongoing monitoring costs, but excludes any anticipated recoveries from third parties. Cost estimates are based on information available for each site, financial viability of other potentially responsible parties and existing technology, laws, and regulations. The ultimate liability for remediation is difficult to determine because of the number of potentially responsible parties involved, site-specific cost sharing arrangements with other potentially responsible parties, the degree of contamination by various wastes, the scarcity and quality of volumetric data related to many of the sites, and the speculative nature of remediation costs. Current obligations are not expected to have a material adverse effect on our consolidated financial condition, results of operations, or liquidity.

**Personal Injury** – The cost of personal injuries to employees and others related to our activities is charged to expense based on estimates of the ultimate cost and number of incidents each year. We use third-party actuaries to assist us in properly measuring the expense and liability, including unasserted claims. Compensation for work-related accidents is governed by the Federal Employers' Liability Act (FELA). Under FELA, damages are assessed based on a finding of fault through litigation or out-of-court settlements. We offer a comprehensive variety of services and rehabilitation programs for employees who are injured at work. Annual expenses for our personal injury-related events were $288 million in 2004, $250 million in 2003, and $221 million in 2002. As of December 31, 2004 and 2003, we had a liability of $639 million and $617 million accrued for future personal injury costs, respectively, of which $274 million was recorded in current liabilities as accrued casualty costs in both years. Changes in estimates can vary due to evolving trends in litigation related to personal injury cases.

**Depreciation** – The railroad industry is capital intensive. Properties are carried at cost. Provisions for depreciation are computed principally on the straight-line method based on estimated service lives of depreciable property. The lives are calculated using a separate composite annual percentage rate for each depreciable property group, based on the results of a depreciation study. We are required to submit a report on depreciation studies and proposed depreciation rates every three years for equipment property and every six years for road property to the STB for review and approval. The cost (net of salvage) of depreciable rail property retired or replaced in the ordinary course of business is charged to accumulated depreciation, and no gain or loss is recognized. A gain or loss is recognized in other income for all other property upon disposition. The cost of internally developed software is capitalized and amortized over a five-year period. An obsolescence review of capitalized software is performed on a periodic basis.

Capital spending in recent years has increased the total value of our depreciable assets. Cash capital spending totaled $1.9 billion for the year ended December 31, 2004. In 2003, we implemented depreciation studies, approved by the STB, resulting in lower depreciation expense of $50 million for the year ended December 31, 2003, due to a reduction in depreciation rates for certain track assets (effective January 1, 2003), partially offset by increased rates for locomotives and other assets (effective July 1, 2003). For the year ended December 31, 2004, depreciation expense was $1.1 billion. Various methods are used to estimate useful lives for each group of depreciable property. Due to the capital intensive nature of the business and the large base of depreciable assets, variances to those estimates could have a material effect on our Consolidated Financial Statements. If the estimated useful lives of all depreciable assets were increased by one year, annual depreciation expense would

decrease by approximately $37 million. If the estimated useful lives of all assets to be depreciated were decreased by one year, annual depreciation expense would increase by approximately $40 million.

**Income Taxes** – We account for income taxes by recording taxes payable or refundable for the current year and deferred tax assets and liabilities for the future tax consequences of events that have been recognized in our financial statements or tax returns.

As required under Financial Accounting Standards Board (FASB) Statement No. 109, *Accounting for Income Taxes*, these expected future tax consequences are measured based on provisions of tax law as currently enacted; the effects of future changes in tax laws are not anticipated. Future tax law changes, such as a change in the corporate tax rate, could have a material impact on our financial condition or results of operations.

When appropriate, we record a valuation allowance against deferred tax assets to offset future tax benefits that may not be realized. In determining whether a valuation allowance is appropriate, we consider whether it is more likely than not that all or some portion of our deferred tax assets will not be realized, based in part on management's judgments regarding the best available evidence about future events. Based on that analysis, we have recorded a valuation allowance of $11 million against certain deferred tax assets as of December 31, 2004.

**Pension and Other Postretirement Benefits** – We use third-party actuaries to assist us in properly measuring the liabilities and expenses associated with providing pension and defined contribution medical and life insurance benefits (OPEB) to eligible employees. In order to use actuarial methods to value the liabilities and expenses we must make several assumptions. The critical assumptions used to measure pension obligations and expenses are the discount rate and expected rate of return on pension assets. For other postretirement benefits, the critical assumptions are the discount rate and healthcare cost trend rate.

We evaluate our critical assumptions at least annually, and selected assumptions are based on the following factors:

- Discount rate is based on a hypothetical portfolio of high quality bonds with cash flows matching our plans' expected benefit payments.

- Expected return on plan assets is based on our asset allocation mix and our historical return, taking into consideration current and expected market conditions.

- Healthcare cost trend rate is based on our historical rates of inflation and expected market conditions.

The following tables present the key assumptions used to measure pension and OPEB expense for 2004 and the estimated impact on 2004 pension and OPEB expense relative to a change in those assumptions:

| *Assumptions* | *Pension* | *OPEB* |
|---|---|---|
| Discount rate | 6.50% | 6.50% |
| Expected return on assets | 8.00% | N/A |
| Healthcare cost trend rate: | | |
| Current | N/A | 9.00% |
| Level in 2010 | N/A | 5.00% |

| *Sensitivities* | *Increase in Expense* | |
|---|---|---|
| *Millions of Dollars* | *Pension* | *OPEB* |
| 0.25% decrease in discount rate | $1 | $ 1 |
| 0.25% decrease in expected return on plan assets | $4 | N/A |
| 1% increase in healthcare cost trend rate | N/A | $14 |

## RISK FACTORS

*We Face Competition from Other Railroads and Other Transportation Providers* – We are subject to competition from other railroads, which operate parallel routes in many of our traffic corridors, in addition to motor carriers and, to a lesser extent, ships, barges, and pipelines. Competition can pressure both transit time requirements and pricing, as well as place a greater emphasis on the quality and reliability of the service provided. While we must build or acquire and maintain our rail system, trucks and barges are able to use public rights-of-way maintained by public entities. Any future improvements or expenditures materially increasing the quality or reducing the cost of alternative modes of transportation in the regions in which we operate, or legislation granting materially greater latitude for motor carriers with respect to size or weight limitations, could have a material adverse effect on our results of operations, financial condition, and liquidity.

*We Have Experienced Service Difficulties, Which May Continue* – Due to unprecedented demand for rail service, a shortage of train personnel and locomotives, and capacity constraints, we have experienced network difficulties, including congestion and reduced velocity on our system, which have compromised the level of service we provide to our customers in a competitive environment. Although we have taken steps to correct these difficulties, including hiring and training employees for train service, acquiring equipment, and the ongoing redesign of our transportation plan to better manage traffic on our system, we cannot be sure that these measures will fully or adequately address our service difficulties. We also cannot be sure that we will not experience other difficulties related to network capacity, dramatic and unplanned increases of demand for rail service in one or more of our commodity groups, or other events that could have a negative impact on our operational efficiency, any of which could have a material adverse effect on our results of operations, financial condition, and liquidity.

*We Are Subject to Significant Governmental Regulation* – We are subject to governmental regulation by a significant number of federal, state, and local authorities covering a variety of health, safety, labor, environmental (as discussed below), and other matters. Our failure to comply with applicable laws and regulations could have a material adverse effect on us. Governments may change the legislative or regulatory frameworks within which we operate without providing us with any recourse for any adverse effects that the change may have on our business. Economic re-regulation of the rail industry would negatively impact our ability to determine prices for rail services and reduce capital spending on our rail network, resulting in a material adverse effect on our results of operations, financial condition, and liquidity. Also, some laws and regulations require us to obtain and maintain various licenses, permits, and other authorizations, and we cannot provide assurance that we will continue to be able to do so. In addition, one or more consolidations of Class I railroads could lead to future re-regulation of the rail industry.

*Rising Fuel Costs Could Materially and Adversely Affect Our Business* – Fuel costs constitute a significant portion of our transportation expenses. Diesel fuel prices are subject to dramatic fluctuations. Significant price increases may have a material adverse effect on our operating results. Additionally, fuel prices and supplies are affected by international, political, and economic circumstances. If a fuel supply shortage were to arise from OPEC production curtailments, a disruption of oil imports, or otherwise, higher fuel prices could, despite our fuel surcharge programs, materially affect our operating results, financial condition, and liquidity.

*We Are Subject to Significant Environmental Laws and Regulations* – Our operations are subject to extensive federal, state, and local environmental laws and regulations concerning, among other things, emissions to the air; discharges to waters; handling, storage, transportation, and disposal of waste and other materials; and the cleanup of hazardous material or petroleum releases. We generate and transport hazardous and non-hazardous waste in our current operations, and we did so in our former operations. Environmental liability can extend to previously owned or operated properties, leased properties, and properties owned by third parties, as well as to properties currently owned and used by us. Environmental liabilities have arisen and may also arise from claims asserted by adjacent landowners or other third parties in toxic tort litigation. We have been and may be subject to allegations or findings that we have violated, or are strictly liable under, these laws or regulations. Although we have appropriately recorded current and long-term liabilities for known future environmental costs, we could incur significant costs as a result of any of the foregoing, and we may be required to incur significant expenses to investigate and remediate known, unknown, or future environmental contamination, which could have a material adverse effect on our results of operations, financial condition, and liquidity.

*The Majority of Our Employees Belong to Labor Unions, and Labor Agreements, Strikes, or Work Stoppages Could Adversely Affect Our Operations* – We are a party to collective bargaining agreements with various labor unions in the United States. Under the collective bargaining round that began on November 1, 1999, 11 of the 14 major rail unions reached new labor agreements. We are currently negotiating new agreements with the remaining three unions. On November 1, 2004, notices for the next round of negotiations were sent to all 14 unions by the National Railway Labor Conference on behalf of UPRR (and other carriers in the conference). These legal notices state our desire to modify the current collective bargaining agreements. Disputes with regard to the terms of these agreements or our potential inability to negotiate acceptable contracts with these unions could result in, among other things, strikes, work stoppages, or other slowdowns by the affected workers. If unionized workers were to engage in a strike, work stoppage, or other slowdown, or other employees were to become unionized, we could experience a significant disruption of our operations or higher ongoing labor costs, either of which could have a material adverse effect on our results of operations, financial condition, and liquidity. Additionally, future national labor agreements, or renegotiation of labor agreements or provisions of labor agreements, could significantly increase our costs for healthcare, wages, and other benefits, which could have a material adverse impact on our results of operations, financial condition, and liquidity.

*The Availability of Qualified Personnel Could Adversely Affect Our Operations* – Changes in demographics, training requirements, and the availability of qualified personnel, particularly engineers and trainmen, could each have a negative impact on our ability to meet demand for rail service. Unpredictable increases in demand for rail services and a lack of network fluidity may exacerbate such risks, which could have a negative impact on our operational efficiency and otherwise have a material adverse effect on our results of operations, financial condition, and liquidity.

*We May Be Affected by General Economic Conditions* – Prolonged negative changes in domestic and global economic conditions affecting the producers and consumers of the commodities carried by us may have an adverse effect on our operating results, financial condition, and liquidity.

*We Utilize Capital Markets* – We rely on the capital markets to provide some of our capital requirements, including the issuance of commercial paper from time to time and the sale of certain of our receivables. Market instability or deterioration of our financial condition due to internal or external factors could restrict or prohibit our access to commercial paper and reduce our credit ratings below investment grade, which would prohibit us from utilizing our sale of receivables program and significantly increase the cost of issuing debt.

*We Are Dependent on Two Key Domestic Suppliers of Locomotives* – Due to the capital intensive nature and sophistication of locomotive equipment and its production, there are high barriers of entry to potential new suppliers. Therefore, if one of these domestic suppliers discontinues manufacturing locomotives, we could experience a significant cost increase and the potential for reduced availability of the locomotives that are necessary to our operations.

*We Rely on Technology and Technology Improvements in Our Business Operations* – We rely on information technology in all aspects of our business. If we do not have sufficient capital to acquire new technology or if we are unable to implement new technology, we may suffer a competitive disadvantage within the rail industry and with companies providing other modes of transportation service, which could have a material adverse effect on our results of operations, financial position, and liquidity. Additionally, if we experience significant disruption or failure of one or more of our information technology systems, including computer hardware, software, and communications equipment, we could experience a service interruption, safety failure, security breach, or other operational difficulties, which could have a material adverse impact on our results of operations, financial condition, and liquidity.

*Severe Weather Could Result in Significant Business Interruptions and Expenditures* – Severe weather conditions and other natural phenomena, including earthquakes, fires, and floods, may cause significant business interruptions and result in increased costs, increased liabilities, and decreased revenues, which could have an adverse effect on our operating results, financial condition, and liquidity.

*We May Be Subject to Various Claims and Lawsuits That Could Result in Significant Expenditures* – The nature of our business exposes us to the potential for various claims and litigation related to labor and employment,

personal injury, property damage, environmental, and other matters. Any material changes to current litigation trends or a catastrophic rail accident involving any or all of property damage, personal injury, and environmental liability could have a material adverse effect on our operating results, financial condition, and liquidity.

*We May Be Affected by Acts of Terrorism, War, or Risk of War* – Our rail lines, facilities, and equipment, including rail cars carrying hazardous materials, which we are required to transport under federal law, could be direct targets or indirect casualties of terrorist attacks. Any terrorist attack, or other similar event, any government response thereto, and war or risk of war could cause significant business interruption and may adversely affect our results of operations, financial condition, and liquidity. In addition, premiums for some or all of our current insurance programs covering these losses could increase dramatically, or insurance coverage for certain losses may not be available to us in the future.

## CAUTIONARY INFORMATION

Certain statements in this report, and statements in other material filed or to be filed with the Securities and Exchange Commission (as well as information included in oral statements or other written statements made or to be made by us), are, or will be, forward-looking statements as defined by the Securities Act of 1933 and the Securities Exchange Act of 1934. These forward-looking statements include, without limitation, statements regarding: expectations as to operational or service improvements; statements concerning expectations of the effectiveness of steps taken or to be taken to improve operations, service, or to stabilize the rail system, including the hiring and training of train crews, acquisition of additional locomotives, infrastructure improvements, transportation plan modifications, and management of customer traffic on the system to meet demand; expectations as to cost savings, revenue growth, and earnings; the time by which certain objectives will be achieved; statements or information concerning projections, predictions, expectations, estimates, or forecasts as to our business, financial and operational results, future economic performance, and general economic conditions; statements of management's goals and objectives; proposed new products and services; estimates of costs relating to environmental remediation and restoration; expectations that claims, lawsuits, environmental costs, commitments, contingent liabilities, labor negotiations or agreements, or other matters will not have a material adverse effect on our consolidated financial condition, results of operations, or liquidity and any other similar expressions concerning matters that are not historical facts.

Forward-looking statements should not be read as a guarantee of future performance or results, and will not necessarily be accurate indications of the times that, or by which, such performance or results will be achieved, including expectations as to operational, service, and network fluidity improvements. Forward-looking information is subject to risks and uncertainties that could cause actual performance or results to differ materially from those expressed in the statements.

The following important factors, in addition to those discussed in "Risk Factors" in this Item 7, could affect our future results and could cause those results or other outcomes to differ materially from those expressed or implied in the forward-looking statements:

- whether we are successful in implementing our financial and operational initiatives, including gaining new customers, retaining existing ones, and containing operating costs;

- whether we are successful in improving network operations and service by hiring and training additional train crews, acquiring additional locomotives, improving infrastructure, redesigning our transportation plan, and managing network volume;

- material adverse changes in economic and industry conditions, both within the United States and globally;

- the effects of adverse general economic conditions affecting customer demand and the industries and geographic areas that produce and consume commodities we carry;

- transportation industry competition, conditions, performance, and consolidation;

- legislative and regulatory developments, including possible enactment of initiatives to re-regulate the rail industry;
- legislative, regulatory, or legal developments involving taxation, including enactment of new federal or state income tax rates, revisions of controlling authority, and the outcome of tax claims and litigation;
- changes in securities and capital markets;
- natural events such as severe weather, fire, floods, earthquakes, or other disruptions of our operating systems, structures, and equipment;
- any adverse economic or operational repercussions from terrorist activities and any governmental response thereto;
- war or risk of war;
- changes in fuel prices;
- changes in labor costs, including healthcare cost increases, and labor difficulties, including stoppages affecting either our operations or our customers' abilities to deliver goods to us for shipment; and
- the outcome of claims and litigation, including those related to environmental contamination, personal injuries, and occupational illnesses arising from hearing loss, repetitive motion, and exposure to asbestos and diesel fumes.

Forward-looking statements speak only as of the date the statement was made. We assume no obligation to update forward-looking information to reflect actual results, changes in assumptions or changes in other factors affecting forward-looking information. If we do update one or more forward-looking statements, no inference should be drawn that we will make additional updates with respect thereto or with respect to other forward-looking statements.

## Item 7A. Quantitative and Qualitative Disclosures about Market Risk

Information concerning market risk sensitive instruments is set forth under Management's Discussion and Analysis of Financial Condition and Results of Operations – Other Matters, Item 7.

***************************************

## Item 8. Financial Statements and Supplementary Data


| Index to Consolidated Financial Statements | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | 37 |
| Consolidated Statements of Income<br>For the Years Ended December 31, 2004, 2003, and 2002 | 38 |
| Consolidated Statements of Financial Position<br>At December 31, 2004 and 2003 | 39 |
| Consolidated Statements of Cash Flows<br>For the Years Ended December 31, 2004, 2003, and 2002 | 40 |
| Consolidated Statements of Changes in Common Shareholders' Equity<br>For the Years Ended December 31, 2004, 2003, and 2002 | 41 |
| Notes to the Consolidated Financial Statements | 42 |

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

Union Pacific Corporation, its Directors, and Shareholders:

We have audited the accompanying consolidated statements of financial position of Union Pacific Corporation and Subsidiary Companies (the Corporation) as of December 31, 2004 and 2003, and the related consolidated statements of income, changes in common shareholders' equity, and cash flows for each of the three years in the period ended December 31, 2004. Our audits also included the consolidated financial statement schedule listed in the Table of Contents at Part IV, Item 15. These consolidated financial statements and consolidated financial statement schedule are the responsibility of the Corporation's management. Our responsibility is to express an opinion on the consolidated financial statements and consolidated financial statement schedule based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of Union Pacific Corporation and Subsidiary Companies at December 31, 2004 and 2003, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2004, in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, such consolidated financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

As discussed in Note 12 to the consolidated financial statements, the Corporation changed its method of accounting for asset retirement obligations in 2003.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of the Corporation's internal control over financial reporting as of December 31, 2004, based on the criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 7, 2005 expressed an unqualified opinion on management's assessment of the effectiveness of the Corporation's internal control over financial reporting and an unqualified opinion on the effectiveness of the Corporation's internal control over financial reporting.



Omaha, Nebraska
February 7, 2005

## CONSOLIDATED STATEMENTS OF INCOME

*Union Pacific Corporation and Subsidiary Companies*

| *Millions, Except Per Share Amounts, for the Years Ended December 31,* | *2004* | *2003* | *2002* |
|---|---|---|---|
| Operating revenues | $12,215 | $11,551 | $11,159 |
| Operating expenses: | | | |
| Salaries, wages, and employee benefits | 4,167 | 3,892 | 3,694 |
| Equipment and other rents | 1,374 | 1,221 | 1,240 |
| Depreciation | 1,111 | 1,067 | 1,147 |
| Fuel and utilities | 1,816 | 1,341 | 1,065 |
| Materials and supplies | 488 | 414 | 476 |
| Casualty costs | 694 | 416 | 359 |
| Purchased services and other costs | 1,270 | 1,067 | 925 |
| Total operating expenses | 10,920 | 9,418 | 8,906 |
| Operating income | 1,295 | 2,133 | 2,253 |
| Other income | 88 | 78 | 324 |
| Interest expense | (527) | (574) | (632) |
| Income before income taxes | 856 | 1,637 | 1,945 |
| Income taxes | (252) | (581) | (680) |
| Income from continuing operations | 604 | 1,056 | 1,265 |
| Income from discontinued operations, (including gain on sale of $211 in 2003) net of tax benefit of $96 in 2003 and $5 in 2002 | - | 255 | 76 |
| Cumulative effect of accounting change, net of income tax expense of $167 | - | 274 | - |
| Net income | $ 604 | $ 1,585 | $ 1,341 |
| **Share and Per Share** | | | |
| Basic: | | | |
| Income from continuing operations | $ 2.33 | $ 4.15 | $ 5.02 |
| Income from discontinued operations | - | 1.00 | 0.30 |
| Cumulative effect of accounting change | - | 1.08 | - |
| Net income | $ 2.33 | $ 6.23 | $ 5.32 |
| Diluted: | | | |
| Income from continuing operations | $ 2.30 | $ 4.07 | $ 4.78 |
| Income from discontinued operations | - | 0.95 | 0.27 |
| Cumulative effect of accounting change | - | 1.02 | - |
| Net income | $ 2.30 | $ 6.04 | $ 5.05 |
| Weighted average number of shares (Basic) | 259.1 | 254.4 | 252.1 |
| Weighted average number of shares (Diluted) | 262.2 | 268.0 | 276.8 |
| Dividends | $ 1.20 | $ 0.99 | $ 0.83 |

*The accompanying notes are an integral part of these Consolidated Financial Statements.*

## CONSOLIDATED STATEMENTS OF FINANCIAL POSITION

*Union Pacific Corporation and Subsidiary Companies*

| *Millions of Dollars, as of December 31,* | *2004* | *2003* |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and temporary investments | $ 977 | $ 527 |
| Accounts receivable, net | 538 | 498 |
| Materials and supplies | 309 | 267 |
| Current deferred income taxes | 288 | 518 |
| Other current assets | 178 | 279 |
| Total current assets | 2,290 | 2,089 |
| Investments: | | |
| Investments in and advances to affiliated companies | 742 | 688 |
| Other investments | 25 | 38 |
| Total investments | 767 | 726 |
| Properties: | | |
| Road | 31,948 | 30,435 |
| Equipment | 7,733 | 7,648 |
| Other | 226 | 237 |
| Total cost | 39,907 | 38,320 |
| Accumulated depreciation | (8,893) | (8,037) |
| Net properties | 31,014 | 30,283 |
| Other assets | 518 | 396 |
| Total assets | $34,589 | $33,494 |
| **Liabilities and Common Shareholders' Equity** | | |
| Current liabilities: | | |
| Accounts payable | $ 590 | $ 511 |
| Accrued wages and vacation | 384 | 363 |
| Accrued casualty costs | 419 | 394 |
| Income and other taxes | 208 | 219 |
| Dividends and interest | 256 | 252 |
| Debt due within one year | 150 | 167 |
| Equipment rents payable | 130 | 128 |
| Other current liabilities | 379 | 422 |
| Total current liabilities | 2,516 | 2,456 |
| Debt due after one year | 7,981 | 7,822 |
| Deferred income taxes | 9,180 | 9,102 |
| Accrued casualty costs | 884 | 595 |
| Retiree benefits obligation | 893 | 712 |
| Other long-term liabilities | 480 | 453 |
| Commitments and contingencies (Note 9) | | |
| Total liabilities | 21,934 | 21,140 |
| Common shareholders' equity: | | |
| Common shares, 500,000,000 shares authorized; 275,694,761 and 275,692,546 shares issued, respectively | 689 | 689 |
| Paid-in-surplus | 3,917 | 3,936 |
| Retained earnings | 9,222 | 8,930 |
| Treasury stock | (936) | (1,077) |
| Accumulated other comprehensive loss | (237) | (124) |
| Total common shareholders' equity | 12,655 | 12,354 |
| Total liabilities and common shareholders' equity | $34,589 | $33,494 |

*The accompanying notes are an integral part of these Consolidated Financial Statements.*

## CONSOLIDATED STATEMENTS OF CASH FLOWS

*Union Pacific Corporation and Subsidiary Companies*

| *Millions of Dollars, for the Years Ended December 31,* | *2004* | *2003* | *2002* |
|---|---|---|---|
| **Operating Activities** | | | |
| Net income | $ 604 | $1,585 | $1,341 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Income from discontinued operations | - | (255) | (76) |
| Cumulative effect of accounting change | - | (274) | - |
| Depreciation | 1,111 | 1,067 | 1,147 |
| Deferred income taxes | 359 | 494 | 596 |
| Cash paid to fund pension plan | (100) | (100) | (100) |
| Other, net | 167 | (125) | (398) |
| Changes in current assets and liabilities, net | 96 | 30 | (311) |
| Cash provided by operating activities | 2,237 | 2,422 | 2,199 |
| **Investing Activities** | | | |
| Capital investments | (1,876) | (1,752) | (1,694) |
| Proceeds from asset sales | 145 | 150 | 409 |
| Proceeds from sale of discontinued operations | - | 620 | - |
| Other investing activities, net | 19 | 126 | (51) |
| Cash used in investing activities | (1,712) | (856) | (1,336) |
| **Financing Activities** | | | |
| Dividends paid | (310) | (234) | (201) |
| Debt repaid | (588) | (2,117) | (1,196) |
| Cash received from exercise of stock options | 102 | 216 | 150 |
| Financings, net | 721 | 729 | 648 |
| Cash used in financing activities | (75) | (1,406) | (599) |
| Net change in cash and temporary investments | 450 | 160 | 264 |
| Cash and temporary investments at beginning of year | 527 | 367 | 103 |
| Cash and temporary investments at end of year | $ 977 | $ 527 | $ 367 |
| **Changes in Current Assets and Liabilities, Net** | | | |
| Accounts receivable, net | $ (40) | $ 59 | $ (85) |
| Materials and supplies | (42) | 10 | (22) |
| Other current assets | 101 | (80) | (53) |
| Accounts, wages, and vacation payable | 100 | 79 | (81) |
| Other current liabilities | (23) | (38) | (70) |
| Total | $ 96 | $ 30 | $ (311) |
| **Supplemental cash flow information:** | | | |
| Non-cash transactions: | | | |
| Non-cash capital lease financings | $ - | $ 188 | $ 126 |
| Cash (paid) received during the year for: | | | |
| Interest | $(517) | $ (587) | $ (639) |
| Income taxes, net | 187 | (51) | (134) |

*The accompanying notes are an integral part of these Consolidated Financial Statements.*

# CONSOLIDATED STATEMENTS OF CHANGES IN COMMON SHAREHOLDERS' EQUITY

*Union Pacific Corporation and Subsidiary Companies*

| | | | | | | | *Accumulated Other Comprehensive Income/(Loss)* | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| *Millions of Dollars Thousands of Shares* | *Common Shares* | *Treasury Shares* | *Common Shares* | *Paid-in-Surplus* | *Retained Earnings* | *Treasury Stock* | *Minimum Pension Liability Adj.* | *Foreign Currency Trans. Adj.* | *Derivative Adj.* | *Total* |
| Balance at Jan. 1, 2002 | 275,499 | (25,209) | $689 | $3,980 | $6,466 | $(1,549) | $ (7) | $ 3 | $ (7) | $ 9,575 |
| Comprehensive income/(loss): | | | | | | | | | | |
| Net income | | | - | - | 1,341 | - | - | - | - | 1,341 |
| Other comp. income/(loss) from continuing operations [a] | | | - | - | - | - | (141) | (12) | 14 | (139) |
| Other comp. income/(loss) from discontinued operations [b] | | | - | - | - | - | (84) | - | - | (84) |
| Total comprehensive income/(loss) | | | - | - | 1,341 | - | (225) | (12) | 14 | 1,118 |
| Conversion, exercises of stock options, forfeitures, and other | 80 | 3,289 | - | (34) | - | 202 | - | - | - | 168 |
| Dividends declared ($0.83 per share) | - | - | - | - | (210) | - | - | - | - | (210) |
| Balance at Dec. 31, 2002 | 275,579 | (21,920) | $689 | $3,946 | $7,597 | $(1,347) | $(232) | $ (9) | $ 7 | $10,651 |
| Comprehensive income/(loss): | | | | | | | | | | |
| Net income | | | - | - | 1,585 | - | - | - | - | 1,585 |
| Other comp. income/(loss) from continuing operations [a] | | | - | - | - | - | 39 | (9) | (4) | 26 |
| Other comp. income/(loss) from discontinued operations [b] | | | - | - | - | - | 84 | - | - | 84 |
| Total comprehensive income/(loss) | | | - | - | 1,585 | - | 123 | (9) | (4) | 1,695 |
| Conversion, exercises of stock options, forfeitures, and other | 114 | 4,388 | - | (10) | - | 270 | - | - | - | 260 |
| Dividends declared ($0.99 per share) | - | - | - | - | (252) | - | - | - | - | (252) |
| Balance at Dec. 31, 2003 | 275,693 | (17,532) | $689 | $3,936 | $8,930 | $(1,077) | $(109) | $(18) | $ 3 | $12,354 |
| Comprehensive income/(loss): | | | | | | | | | | |
| Net income | | | - | - | 604 | - | - | - | - | 604 |
| Other comp. income/(loss) from continuing operations [a] | | | - | - | - | - | (103) | - | (10) | (113) |
| Total comprehensive income/(loss) | | | - | - | 604 | - | (103) | - | (10) | 491 |
| Conversion, exercises of stock options, forfeitures, and other | 2 | 2,357 | - | (19) | - | 141 | - | - | - | 122 |
| Dividends declared ($1.20 per share) | - | - | - | - | (312) | - | - | - | - | (312) |
| Balance at Dec. 31, 2004 | 275,695 | (15,175) | $689 | $3,917 | $9,222 | $ (936) | $(212) | $(18) | $ (7) | $12,655 |

*[a] Net of tax of $(69), $16, and $(85) in 2004, 2003, and 2002, respectively.*
*[b] Net of tax of $-, $48, and $(48) in 2004, 2003, and 2002, respectively.*

*The accompanying notes are an integral part of these Consolidated Financial Statements.*

## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

*Union Pacific Corporation and Subsidiary Companies*

For purposes of this report, unless the context otherwise requires, all references herein to the "Corporation", "we", "us", and "our" mean Union Pacific Corporation and its subsidiaries, including Union Pacific Railroad Company, which will be separately referred to herein as "UPRR" or the "Railroad".

### Significant Accounting Policies

**Principles of Consolidation** – The Consolidated Financial Statements include the accounts of Union Pacific Corporation and all of its subsidiaries. Investments in affiliated companies (20% to 50% owned) are accounted for using the equity method of accounting. All significant intercompany transactions are eliminated.

**Cash and Temporary Investments** – Temporary investments are stated at cost, which approximates fair value, and consist of investments with original maturities of three months or less.

**Materials and Supplies** – Materials and supplies are carried at the lower of average cost or market.

**Property and Depreciation** – Properties are carried at cost. Provisions for depreciation are computed principally on the straight-line method based on estimated service lives of depreciable property. The cost (net of salvage) of depreciable rail property retired or replaced in the ordinary course of business is charged to accumulated depreciation, and no gain or loss is recognized. A gain or loss is recognized in other income for all other property upon disposition. The cost of internally developed software is capitalized and amortized over a five-year period. An obsolescence review of capitalized software is performed on a periodic basis.

**Impairment of Long-lived Assets** – We review long-lived assets, including identifiable intangibles, for impairment when events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. If impairment indicators are present and the estimated future undiscounted cash flows are less than the carrying value of the long-lived assets, the carrying value is reduced to the estimated fair value as measured by the discounted cash flows.

**Revenue Recognition** – We recognize commodity revenues on a percentage-of-completion basis as freight moves from origin to destination. Other revenue is recognized as service is performed or contractual obligations are met. The allocation of revenue between reporting periods is based on the relative transit time in each reporting period.

**Translation of Foreign Currency** – Our portion of the assets and liabilities related to foreign investments are translated into U.S. dollars at the exchange rates in effect at the balance sheet date. Revenues and expenses are translated at the average rates of exchange prevailing during the year. Unrealized adjustments are reflected within shareholders' equity as accumulated other comprehensive income or loss.

**Financial Instruments** – The carrying value of our non-derivative financial instruments approximates fair value. The fair value of financial instruments is generally determined by reference to market values as quoted by recognized dealers or developed based upon the present value of expected future cash flows discounted at the applicable U.S. Treasury rate, London Interbank Offered Rates (LIBOR), or swap spread.

We periodically use derivative financial instruments, for other than trading purposes, to manage risk related to changes in fuel prices and interest rates.

**Stock-Based Compensation** – At December 31, 2004, we had several stock-based employee compensation plans, which are described more fully in note 7. We account for those plans under the recognition and measurement principles of Accounting Principles Board Opinion No. 25, *Accounting for Stock Issued to Employees,* and related interpretations. No stock-based employee compensation expense related to stock option grants is reflected in net income, as all options granted under those plans had an exercise price equal to the market value of our common stock on the date of grant. Stock-based compensation expense related to retention shares, stock units, and other incentive plans is reflected in net income. The following table illustrates the effect on net income and earnings per

share if we had applied the fair value recognition provisions of Financial Accounting Standards Board (FASB) Statement No. 123, *Accounting for Stock-Based Compensation,* to stock-based employee compensation. See note 11 to the Consolidated Financial Statements for discussion of FASB Statement No. 123 (R), *Share-Based Payment,* related to the treatment of stock options. See note 8 to the Consolidated Financial Statements for reconciliation between basic earnings per share and diluted earnings per share.

| | *Year Ended December 31,* | | |
|---|---|---|---|
| *Millions of Dollars, Except Per Share Amounts* | *2004* | *2003* | *2002* |
| Net income, as reported | $ 604 | $1,585 | $1,341 |
| Stock-based employee compensation expense included in reported net income, net of tax | 13 | 28 | 31 |
| Total stock-based employee compensation expense determined under fair value based method for all awards, net of tax | (35) | (50) | (52) |
| Pro forma net income | $ 582 | $1,563 | $1,320 |
| EPS – basic, as reported | $2.33 | $ 6.23 | $ 5.32 |
| EPS – basic, pro forma | $2.25 | $ 6.14 | $ 5.24 |
| EPS – diluted, as reported | $2.30 | $ 6.04 | $ 5.05 |
| EPS – diluted, pro forma | $2.22 | $ 5.96 | $ 4.98 |

**Earnings Per Share** – Basic earnings per share (EPS) are calculated on the weighted-average number of common shares outstanding during each period. Diluted EPS include shares issuable upon exercise of outstanding stock options, stock-based awards, and the potential conversion of the preferred securities where the conversion of such instruments would be dilutive.

**Use of Estimates** – Our Consolidated Financial Statements include estimates and assumptions regarding certain assets, liabilities, revenues, and expenses and the disclosure of certain contingent assets and liabilities. Actual future results may differ from such estimates.

**Income Taxes** – We account for income taxes in accordance with FASB Statement No. 109, *Accounting for Income Taxes*. The objectives of accounting for income taxes are: (1) to recognize the amount of taxes payable or refundable for the current year; and (2) to recognize the future tax consequences (deferred taxes) associated with items of income or expense that are reported in an entity's financial statements in different time periods than its tax returns. Deferred taxes are measured using current tax law; future changes in tax laws are not anticipated, but such future changes could have a material impact on our financial condition or our results of operations.

**Pension and Postretirement Benefits** – We incur certain employment-related expenses associated with pensions and postretirement health benefits. In order to measure the expense associated with these benefits, we must make various assumptions including discount rates used to value certain liabilities, expected return on plan assets used to fund these expenses, salary increases, employee turnover rates, anticipated mortality rates, and expected future healthcare costs. The assumptions used by us are based on our historical experience as well as current facts and circumstances. We use third-party actuaries to assist us in properly measuring the expense and liability associated with these benefits.

**Personal Injury** – The cost of injuries to employees and others on our property is charged to expense based on estimates of the ultimate cost and number of incidents each year. We use third-party actuaries to assist us in properly measuring the expense and liability.

**Environmental** – When environmental issues have been identified with respect to property currently or formerly owned, leased, or otherwise used in the conduct of our business, we and our consultants perform environmental assessments on such property. We expense the cost of the assessments as incurred. We accrue the cost of remediation where our obligation is probable and such costs can be reasonably estimated. We do not discount our environmental liabilities when the timing of the anticipated cash payments is not fixed or readily determinable.

**Asbestos** – We estimate a liability for asserted and unasserted asbestos-related claims based on an assessment of the number and value of those claims. We use an external consulting firm to assist us in properly measuring the expense and liability.

**Differences in Securities and Exchange Commission (SEC) and Surface Transportation Board (STB) Accounting** – STB accounting rules require that railroads accrue the cost of removing track structure over the expected useful life of these assets. Railroads historically used this prescribed accounting for reports filed with both the STB and SEC. In August 2001, the FASB issued Statement No. 143, *Accounting for Asset Retirement Obligations.* This statement was effective for us beginning January 1, 2003, and prohibits the accrual of removal costs unless there is a legal obligation to remove the track structure at the end of its life. We concluded that we did not have a legal obligation to remove the track structure, and therefore, under generally accepted accounting principles, we could not accrue the cost of removal in advance. As a result, reports filed with the SEC will reflect the expense of removing these assets in the period in which they are removed.

**Change in Presentation** – Certain prior year amounts have been reclassified to conform to the 2004 Consolidated Financial Statement presentation. These reclassifications had no effect on previously reported operating income or net income, with the exception of reclassifications made to reflect the discontinued operations.

## 1. Operations and Segmentation

We have one reportable business segment, operating primarily in the area of rail transportation through our indirect wholly owned subsidiary, Union Pacific Railroad Company, including its subsidiaries and rail affiliates. The Consolidated Financial Statements for 2003 and 2002 also include discontinued trucking operations, consisting of Overnite Transportation Company (OTC) and Motor Cargo Industries, Inc. (Motor Cargo) (see note 13 to the Consolidated Financial Statements regarding the reclassification of our trucking segment as a discontinued operation).

**Continuing Operations** – UPRR is a Class I railroad that operates in the United States. Our operating results have included Southern Pacific Rail Corporation since October 1996. In addition, during 1997, the Railroad acquired an ownership interest in a consortium that was granted a 50-year concession to operate the Pacific-North and Chihuahua Pacific lines in Mexico. The Railroad made an additional investment in the consortium in 1999 and currently holds a 26% ownership interest in the consortium.

We have approximately 33,000 route miles, linking Pacific Coast and Gulf Coast ports with the Midwest and eastern United States gateways and providing several north/south corridors to key Mexican gateways. We serve the western two-thirds of the country and maintain coordinated schedules with other rail carriers for the handling of freight to and from the Atlantic Coast, the Pacific Coast, the Southeast, the Southwest, Canada, and Mexico. Export and import traffic is moved through Gulf Coast and Pacific Coast ports and across the Mexican and Canadian borders. Railroad freight is comprised of six commodity groups (percent of total commodity revenues for the year ended December 31, 2004): agricultural (14%), automotive (11%), chemicals (15%), energy (20%), industrial products (21%), and intermodal (19%).

*Employees* – Approximately 87% of our more than 48,000 full-time equivalent employees are represented by 14 major rail unions. Under the collective bargaining round that began on November 1, 1999, 11 of the 14 unions reached new labor agreements with the railroads. We are currently negotiating new agreements with the remaining three unions. Existing agreements remain in effect and will continue to remain in effect until new agreements are reached or the Railway Labor Act's procedures (which include mediation, cooling-off periods, and the possibility of Presidential intervention) are exhausted. The current agreements provide for periodic wage increases until new agreements are reached.

On November 1, 2004, notices for the next round of negotiations were sent to all 14 unions by the National Railway Labor Conference on behalf of UPRR (and other carriers in the conference). These legal notices state our desire to modify the current collective bargaining agreements. Contract negotiations with the various unions usually take place over an extended period of time and generally have not resulted in work stoppages.

*Competition* – We are subject to competition from other railroads, motor carriers, and barge operators. Our main rail competitor is Burlington Northern Santa Fe Corporation. Its rail subsidiary, BNSF Railway Company, operates parallel routes in many of our main traffic corridors. In addition, we operate in corridors served by other competing railroads and by motor carriers. Motor carrier competition is particularly strong with respect to five of our six commodity groups (excluding energy) due to shorter delivery times offered by such carriers. Because of the proximity of our routes to major inland and Gulf Coast waterways, barge competition can be particularly pronounced, especially for grain and bulk commodities. Competition can pressure both transit time requirements and pricing, as well as place a greater emphasis on the quality and reliability of the service provided. While we must build or acquire and maintain our rail system, trucks and barges are able to use public rights-of-way maintained by public entities. Any future improvements or expenditures materially increasing the quality or reducing the costs of these alternative modes of transportation in the locations in which we operate, or legislation granting materially greater latitude for motor carriers with respect to size or weight limitations, could have a material adverse effect on our results of operations, financial condition, and liquidity.

*Equipment Suppliers* – We are dependent on two key domestic suppliers of locomotives. Due to the capital intensive nature and sophistication of this equipment and its production, there are high barriers of entry to potential new suppliers. Therefore, if one of these domestic suppliers discontinues manufacturing locomotives, we could experience a significant cost increase and the potential for reduced availability of the locomotives that are necessary to our operations.

**Discontinued Operations** – The discontinued operations represent the operations of OTC and Motor Cargo.

## 2. Financial Instruments

**Strategy and Risk** – We use derivative financial instruments in limited instances for other than trading purposes to manage risk related to changes in fuel prices and to achieve our interest rate objectives. We are not a party to leveraged derivatives and, by policy, do not use derivative financial instruments for speculative purposes. Financial instruments qualifying for hedge accounting must maintain a specified level of effectiveness between the hedging instrument and the item being hedged, both at inception and throughout the hedged period. We formally document the nature and relationships between the hedging instruments and hedged items, as well as our risk-management objectives, strategies for undertaking the various hedge transactions, and method of assessing hedge effectiveness. We may use swaps, collars, futures, and/or forward contracts to mitigate the downside risk of adverse price movements and to hedge the exposure to variable cash flows. The use of these instruments also limits future benefits from favorable movements. The purpose of these programs is to protect our operating margins and overall profitability from adverse fuel price changes or interest rate fluctuations.

**Market and Credit Risk** – We address market risk related to derivative financial instruments by selecting instruments with value fluctuations that highly correlate with the underlying hedged item. Credit risk related to derivative financial instruments, which is minimal, is managed by requiring high credit standards for counterparties and periodic settlements. At December 31, 2004, we have not been required to provide collateral, nor have we received collateral, relating to our hedging activities.

In addition, we enter into secured financings in which the debtor has pledged collateral. The collateral is based upon the nature of the financing and the credit risk of the debtor. We generally are not permitted to sell or repledge the collateral unless the debtor defaults.

**Determination of Fair Value** – The fair values of our derivative financial instrument positions at December 31, 2004 and 2003 were determined based upon current fair values as quoted by recognized dealers or developed based upon the present value of expected future cash flows discounted at the applicable U.S. Treasury rate, LIBOR, or swap spread.

**Interest Rate Fair Value Hedges** – We manage our overall exposure to fluctuations in interest rates by adjusting the proportion of fixed and floating rate debt instruments within our debt portfolio over a given period. The mix of fixed and floating rate debt is largely managed through the issuance of targeted amounts of each as debt matures or as incremental borrowings are required. Derivatives are used as one of the tools to obtain the targeted

mix. In addition, we also obtain flexibility in managing interest costs and the interest rate mix within our debt portfolio by evaluating the issuance of and managing outstanding callable fixed-rate debt securities.

Swaps allow us to convert debt from fixed rates to variable rates and thereby hedge the risk of changes in the debt's fair value attributable to the changes in the benchmark interest rate (LIBOR). The swaps have been accounted for using the short-cut method as allowed by FASB Statement No. 133, *Accounting for Derivative Instruments and Hedging Activities*; therefore, no ineffectiveness has been recorded within our Consolidated Financial Statements. In April 2004, we entered into an interest rate swap on $250 million of debt with a maturity of April 15, 2012.

The following is a summary of our interest rate derivatives qualifying as fair value hedges:

| *Millions, Except Percentages* | *2004* | *2003* |
|---|---|---|
| Interest rate fair value hedging: | | |
| Amount of debt hedged | $750 | $818 |
| Percentage of total debt portfolio | 9% | 10% |
| Gross fair value asset position | $ 8 | $ 24 |
| Gross fair value (liability) position | $ (4) | $ (1) |

**Interest Rate Cash Flow Hedges** – Changes in the fair value of cash flow hedges are reported in accumulated other comprehensive income until earnings are affected by the hedged item.

In May 2004, in anticipation of a future lease transaction, we entered into treasury lock transactions with notional amounts totaling $125 million and an average locked-in rate of 5.08%. The treasury locks are accounted for as cash flow hedges. On September 28, 2004, the treasury locks were settled in connection with a 10-year operating lease, commencing on October 5, 2004, and maturing on September 30, 2014. The settlement of these treasury lock transactions was based on a treasury yield of 4.01% and resulted in a payment of $11 million to our counterparty that is being amortized to rent expense over the life of the 10-year operating lease. The unamortized portion of the payment is recorded as a $7 million after-tax reduction to common shareholders' equity as part of accumulated other comprehensive loss at December 31, 2004. As of December 31, 2004 and 2003, we had no interest rate cash flow hedges outstanding.

**Fuel Cash Flow Hedges** – Fuel costs are a significant portion of our total operating expenses. In 2004 and 2003, our primary means of mitigating the impact of adverse fuel price changes was our fuel surcharge program. However, we may use swaps, collars, futures, and/or forward contracts to further mitigate the impact of adverse fuel price changes. We currently have no fuel hedges in place for 2005.

The following is a summary of our fuel derivatives qualifying as cash flow hedges:

| *Millions, Except Average Commodity Prices* | *2004* | *2003* |
|---|---|---|
| Swaps: | | |
| Number of gallons hedged for 2003 | - | 145 |
| Average price of 2003 hedges (per gallon) [a] | $ - | $0.63 |
| Collars: | | |
| Number of gallons hedged for 2004 | 120 | 120 |
| Average cap price for 2004 collars outstanding [a] | $0.74 | $0.74 |
| Average floor price for 2004 collars outstanding[a] | $0.64 | $0.64 |
| Average ceiling price for 2004 collars outstanding [a] | $0.86 | $0.86 |
| Gross fair value asset position | $ - | $ 6 |
| Gross fair value (liability) position | $ - | $ - |

*[a] Excludes taxes, transportation costs, and regional pricing spreads.*

Fuel hedging positions qualifying as cash flow hedges would be reclassified from accumulated other comprehensive income to fuel expense over the life of the hedge as fuel is consumed. At December 31, 2004, no amounts were recorded in accumulated other comprehensive income associated with our fuel hedges because no fuel hedges were outstanding.

**Earnings Impact** – Our use of derivative financial instruments had the following impact on pre-tax income for the years ended December 31:

| *Millions of Dollars* | *2004* | *2003* | *2002* |
|---|---|---|---|
| Decrease in interest expense from interest rate hedging | $24 | $30 | $29 |
| Decrease in fuel expense from fuel hedging | 14 | 28 | 36 |
| Decrease in fuel expense from fuel swaptions | - | - | 19 |
| Decrease in operating expenses | 38 | 58 | 84 |
| Increase in other income, net from fuel swaptions | - | - | 5 |
| Increase in other income from interest rate swap cancellation | - | 5 | - |
| Increase in pre-tax income | $38 | $63 | $89 |

**Fair Value of Debt Instruments** – The fair value of our short- and long-term debt was estimated using quoted market prices, where available, or current borrowing rates. At December 31, 2004 and 2003, the fair value of total debt exceeded the carrying value by approximately $673 million and $727 million, respectively. At December 31, 2004 and 2003, approximately $282 million and $375 million, respectively, of fixed-rate debt securities contained call provisions that allowed us to retire the debt instruments prior to final maturity, with the payment of fixed call premiums, or in certain cases, at par.

**Sale of Receivables** – The Railroad transfers most of its accounts receivable to Union Pacific Receivables, Inc. (UPRI), a bankruptcy-remote subsidiary, as part of a sale of receivables facility. UPRI sells, without recourse on a 364-day revolving basis, an undivided interest in such accounts receivable to investors. The total capacity to sell undivided interests to investors under the facility was $600 million at December 31, 2004. The value of the outstanding undivided interest held by investors under the facility was $590 million at both December 31, 2004 and December 31, 2003. The value of the outstanding undivided interest held by investors is not included in our Consolidated Financial Statements. The value of the undivided interest held by investors was supported by $1,089 million and $1,048 million of accounts receivable held by UPRI at December 31, 2004 and December 31, 2003, respectively. At December 31, 2004 and December 31, 2003, the value of the interest retained by UPRI was $499 million and $458 million, respectively. This retained interest is included in accounts receivable in our Consolidated Financial Statements. The interest sold to investors is sold at carrying value, which approximates fair value, and there is no gain or loss recognized from the transaction.

The value of the outstanding undivided interest held by investors could fluctuate based upon the availability of eligible receivables and is directly affected by changing business volumes and credit risks, including default and dilution. If default or dilution percentages were to increase one percentage point, the amount of eligible receivables would decrease by $6 million. Should our credit rating fall below investment grade, the value of the outstanding undivided interest held by investors would be reduced, and, in certain cases, the investors would have the right to discontinue the facility.

The Railroad has been designated to service the sold receivables; however, no servicing asset or liability has been recognized as the servicing fees adequately compensate the Railroad for its responsibilities. The Railroad collected approximately $12.2 billion and $11.3 billion during the years ended December 31, 2004 and 2003, respectively. UPRI used such proceeds to purchase new receivables under the facility.

The costs of the sale of receivables program are included in other income and were $11 million, $10 million, and $13 million for the twelve months ended December 31, 2004, 2003, and 2002, respectively. The costs include interest, program fees paid to banks, commercial paper issuing costs, and fees for unused commitment availability.

The investors have no recourse to the Railroad's other assets except for customary warranty and indemnity claims. Creditors of the Railroad have no recourse to the assets of UPRI. On August 5, 2004, the sale of receivables program was renewed for an additional 364-day period without any significant changes in terms.

## 3. Income Taxes

Components of income tax expense for continuing operations were as follows for the years ended December 31:

| *Millions of Dollars* | *2004* | *2003* | *2002* |
|---|---|---|---|
| Current: | | | |
| Federal | $ (99) | $ 55 | $ 76 |
| State | (8) | 32 | 8 |
| Total current | (107) | 87 | 84 |
| Deferred: | | | |
| Federal | 407 | 508 | 532 |
| State | (48) | (14) | 64 |
| Total deferred | 359 | 494 | 596 |
| Total | $252 | $581 | $680 |

For the years ending December 31, reconciliation between statutory and effective tax rates for continuing operations is as follows:

| *Percentages* | *2004* | *2003* | *2002* |
|---|---|---|---|
| Federal statutory tax rate | 35.0% | 35.0% | 35.0% |
| State taxes at statutory rates, net | 2.6 | 2.5 | 2.8 |
| Reduction in deferred state tax rate, net | (2.9) | (0.8) | - |
| State tax credits, net | (4.0) | (1.0) | (0.4) |
| Prior years' income tax examinations | - | - | (1.8) |
| Other | (1.3) | (0.2) | (0.6) |
| Effective tax rate | 29.4% | 35.5% | 35.0% |

Deferred income tax liabilities (assets) were comprised of the following at December 31:

| *Millions of Dollars* | *2004* | *2003* |
|---|---|---|
| Net current deferred income tax asset | $ (288) | $ (518) |
| Property | 9,060 | 8,681 |
| State taxes, net | 581 | 606 |
| Other | (461) | (185) |
| Net long-term deferred income tax liability | 9,180 | 9,102 |
| Net deferred income tax liability | $8,892 | $8,584 |

All federal income tax years prior to 1986 are closed. Federal income tax liabilities for 1986 through 1994 have been resolved, with the exception of minor refund claims for non-conventional fuel source credits claimed by Union Pacific Resources Corporation, Inc., a former subsidiary. Resolution of the issues for these years resulted in a decrease in income tax expense for continuing operations of $33 million in 2002. Interest calculations for these years are in process and may take several years to resolve with the Internal Revenue Service (IRS).

The IRS has substantially completed its examination of the Corporation's federal income tax returns for the years 1995 through 1998 and has issued a preliminary Notice of Deficiency. Specifically, the IRS proposes to disallow 100% of the deductions claimed in connection with certain donations of property during those years. The Corporation disputes the proposed adjustments and intends to defend its position through applicable IRS procedures, and, if necessary, litigation.

The federal income tax returns for years 1999 through 2002 are currently under examination by the IRS.

The Corporation believes it has adequately reserved for federal and state income taxes, and does not expect that resolution of these examinations will have a material adverse effect on its operating results, financial condition, or liquidity.

## 4. Debt

Total debt as of December 31, 2004 and 2003, including interest rate swaps designated as hedges, is summarized below:

| *Millions of Dollars* | *2004* | *2003* |
|---|---|---|
| Short-term borrowings, reclassified as long-term debt, average of 7.7% in 2004 and 6.0% in 2003 | $ 440 | $ 324 |
| Notes and debentures, 2.0% to 8.4% due through 2054 [a] | 5,435 | 5,124 |
| Capitalized leases, 4.7% to 11.3% due through 2026 | 1,416 | 1,531 |
| Medium-term notes, 6.8% to 10.0% due through 2020 | 372 | 387 |
| Equipment obligations, 6.5% to 10.2% due through 2019 | 313 | 374 |
| Mortgage bonds, 4.8% due through 2030 | 60 | 152 |
| Tax-exempt financings, 3.3% to 5.7% due through 2026 | 200 | 202 |
| Unamortized discount | (105) | (105) |
| Total debt | 8,131 | 7,989 |
| Less current portion | (150) | (167) |
| Total long-term debt | $7,981 | $7,822 |

*[a] 2004 and 2003 include a collective write-up of $2 million and $19 million, respectively, due to market value adjustments for debt with qualifying hedges that are recorded as assets on the Consolidated Statements of Financial Position.*

**Debt Maturities** – The following table presents aggregate debt maturities as of December 31, 2004, excluding market value adjustments. Short-term borrowings that were reclassified as long-term debt are shown at their stated maturities.

| *Millions of Dollars* | |
|---|---|
| 2005 | $ 590 |
| 2006 | 654 |
| 2007 | 784 |
| 2008 | 681 |
| 2009 | 531 |
| Thereafter | 4,889 |
| Total debt | $8,129 |

In February 2004, we called our 4.25% mortgage bonds, with an outstanding balance of approximately $92 million and maturity date of January 1, 2005, for redemption in April 2004.

**Mortgaged Properties** – Equipment with a carrying value of approximately $3.3 billion and $3.5 billion at December 31, 2004 and 2003, respectively, serves as collateral for capital leases and other types of equipment obligations in accordance with the secured financing arrangements utilized to acquire such railroad equipment.

As a result of the merger of Missouri Pacific Railroad Company (MPRR) with and into UPRR on January 1, 1997, and pursuant to the underlying indentures for the MPRR mortgage bonds, UPRR must maintain the same value of assets after the merger in order to comply with the security requirements of the mortgage bonds. As of the merger date, the value of the MPRR assets that secured the mortgage bonds was approximately $5.8 billion. In accordance with the terms on the indentures, this collateral value must be maintained during the entire term of the mortgage bonds irrespective of the outstanding balance of such bonds.

**Credit Facilities** – On December 31, 2004, we had $2.0 billion in revolving credit facilities available, including $1.0 billion under a 364-day revolving facility expiring in March 2005 and $1.0 billion under a 5-year facility expiring in March 2009 (collectively, the "facilities"). The facilities, which were entered into during March 2004, are designated for general corporate purposes and replaced a $925 million 364-day revolving credit facility that expired in March 2004 and a $1.0 billion 5-year revolving credit facility, which was due to expire in March 2005. Neither of the facilities were drawn as of December 31, 2004. Commitment fees and interest rates payable under the facilities are similar to fees and rates available to comparably rated investment-grade borrowers. Similar to the revolving credit facilities that were replaced, these facilities allow for borrowings at floating (LIBOR-based) rates, plus a spread, depending upon our senior unsecured debt ratings. The facilities do not include any other financial restrictions, credit rating triggers (other than rating-dependent pricing), or any other provision that could require the posting of collateral. The facilities require the maintenance of a minimum net worth and a debt to net worth coverage ratio. At December 31, 2004, we were in compliance with these covenants.

To the extent we have long-term credit facilities available, we have reclassified certain short-term debt to a long-term basis. At December 31, 2004 and 2003, approximately $440 million and $324 million of short-term borrowings that we intend to refinance were reclassified as long-term debt. This reclassification reflects our intent to refinance these short-term borrowings and current maturities of long-term debt on a long-term basis through the issuance of commercial paper or new long-term financings, or by using the currently available long-term credit facility if alternative financing is not available. We are reviewing rollover options for the 364-day credit facility that expires in March 2005.

**Redemption of Convertible Preferred Securities** – During 2003, we exercised our option to redeem the entire $1.5 billion of Convertible Preferred Securities (CPS). The CPS were issued in April 1998 by our wholly owned subsidiary, Union Pacific Capital Trust, at a price of $50 each and paid quarterly cash dividends at an annual rate of 6.25%. The redemption was funded with a combination of cash from operations, the issuance of $500 million of debt in June 2003, and cash proceeds from the initial public offering of Overnite. The $1.5 billion redemption, net of the $500 million debt issuance, reduces interest expense by approximately $71 million, pre-tax, annually and eliminates the dilutive effect of the CPS on earnings per share. Total one-time costs incurred in 2003 associated with the redemption were approximately $45 million and are included in other income.

**Shelf Registration Statement and Significant New Borrowings** – On May 4, 2004, we issued the remaining $250 million available under a shelf registration statement filed in 2002. We issued 5.375% fixed rate debt with a maturity of May 1, 2014. Also on May 4, 2004, we issued $250 million of 6.25% fixed rate debt with a maturity of May 1, 2034, under a $1.0 billion shelf registration statement filed in 2003. On November 23, 2004, we issued an additional $250 million of 4.875% fixed rate debt with a maturity of January 15, 2015 under the 2003 shelf registration statement. The proceeds from the issuances were used for the repayment of debt and other general corporate purposes. Under the 2003 shelf registration statement, we may issue, from time to time, any combination of debt securities, preferred stock, common stock, or warrants for debt securities or preferred stock in one or more offerings. At December 31, 2004, we had $500 million remaining for issuance under the 2003 shelf registration statement. We have no immediate plans to issue equity securities; however, we will continue to explore opportunities to replace existing debt or access capital through issuances of debt securities under this shelf registration.

During May 2003, we entered into a capital lease covering new locomotives. The related capital lease obligation totaled approximately $188 million and is included in the Consolidated Statements of Financial Position as debt.

**Dividend Restrictions** – We are subject to certain restrictions related to the payment of cash dividends to our shareholders. The amount of retained earnings available for dividends decreased to $5.2 billion at December 31, 2004, from $6.9 billion at December 31, 2003, due to revisions in minimum net worth requirements under our

credit facilities. In the fourth quarter of 2003, the Board of Directors voted to increase the quarterly dividend by 30% to 30 cents per share. We declared dividends of $312 million in 2004 and $252 million in 2003.

## 5. Leases

We lease certain locomotives, freight cars, and other property. Future minimum lease payments for operating and capital leases with initial or remaining non-cancelable lease terms in excess of one year as of December 31, 2004 were as follows:

| *Millions of Dollars* | *Operating Leases* | *Capital Leases* |
|---|---|---|
| 2005 | $ 491 | $ 201 |
| 2006 | 405 | 198 |
| 2007 | 344 | 179 |
| 2008 | 284 | 172 |
| 2009 | 240 | 167 |
| Later Years | 1,672 | 1,383 |
| Total minimum lease payments | $3,436 | 2,300 |
| Amount representing interest | | (884) |
| Present value of minimum lease payments | | $1,416 |

Rent expense for operating leases with terms exceeding one month was $651 million in 2004, $586 million in 2003, and $585 million in 2002. Contingent rentals and sub-rentals are not significant.

## 6. Retirement Plans

### Pension and Other Postretirement Benefits

*Pension Plans* – We provide defined benefit retirement income to eligible non-union employees through qualified and non-qualified (supplemental) pension plans. Qualified and non-qualified pension benefits are based on years of service and the highest compensation during the latest years of employment, with specific reductions made for early retirements.

*Other Postretirement Benefits (OPEB)* – We provide defined contribution medical and life insurance benefits for eligible retirees. These benefits are funded as medical claims and life insurance premiums are paid.

### Funded Status

*Projected Benefit Obligation (PBO)* – The PBO of our pension plans is the present value of benefits earned to date by plan participants, including the effect of assumed future salary increases. The PBO of the OPEB plan is equal to the accumulated benefit obligation, as the present value of OPEB liabilities is not affected by salary increases. Changes in our projected benefit obligation are as follows for the years ended December 31:

| | *Pension* | | *OPEB* | |
|---|---|---|---|---|
| *Millions of Dollars* | *2004* | *2003* | *2004* | *2003* |
| Projected benefit obligation at beginning of year | $1,804 | $1,703 | $543 | $551 |
| Service cost | 30 | 27 | 5 | 7 |
| Interest cost | 120 | 113 | 31 | 35 |
| Plan amendments | - | - | (52) | (74) |
| Actuarial loss (gain) | 219 | 76 | (34) | 61 |
| Gross benefits paid | (115) | (115) | (40) | (37) |
| Projected benefit obligation at end of year | $2,058 | $1,804 | $453 | $543 |

*Assets* – Plan assets are measured at fair value. Changes in the fair value of our plan assets are as follows for the years ended December 31:

| | *Pension* | | *OPEB* | |
|---|---|---|---|---|
| *Millions of Dollars* | *2004* | *2003* | *2004* | *2003* |
| Fair value of plan assets at beginning of year | $1,520 | $1,231 | $ - | $ - |
| Actual return on plan assets | 180 | 297 | - | - |
| Voluntary funded pension plan contributions | 100 | 100 | - | - |
| Unfunded plan benefit payments | 8 | 7 | 40 | 37 |
| Gross benefits paid | (115) | (115) | (40) | (37) |
| Fair value of plan assets at end of year | $1,693 | $1,520 | $ - | $ - |

*Funded Status* – The funded status represents the difference between the projected benefit obligation and the fair value of the plan assets. Below is a reconciliation of the funded status of the benefit plans to the net amounts recognized for the years ended December 31:

| | *Pension* | | *OPEB* | |
|---|---|---|---|---|
| *Millions of Dollars* | *2004* | *2003* | *2004* | *2003* |
| Funded status at end of year | $(365) | $(284) | $(453) | $(543) |
| Unrecognized net actuarial loss | 373 | 201 | 133 | 216 |
| Unrecognized prior service cost (credit) | 39 | 46 | (144) | (116) |
| Unrecognized net transition obligation | - | (2) | - | - |
| Net amount recognized at end of year | $ 47 | $ (39) | $(464) | $(443) |

*Amounts Recorded in Consolidated Statement of Financial Position* – The following table presents the amounts recorded in the Consolidated Statements of Financial Position for the years ended December 31:

| | *Pension* | | *OPEB* | |
|---|---|---|---|---|
| *Millions of Dollars* | *2004* | *2003* | *2004* | *2003* |
| Prepaid benefit cost | $ 127 | $ 34 | $ - | $ - |
| Accrued benefit cost | (80) | (73) | (464) | (443) |
| Additional minimum liability | (380) | (221) | - | - |
| Intangible assets | 38 | 46 | - | - |
| Accumulated other comprehensive income | 342 | 175 | - | - |
| Net amount recognized at end of year | $ 47 | $ (39) | $(464) | $(443) |

At both December 31, 2004 and 2003, $35 million of the total pension and other postretirement liabilities were classified as current.

*Unfunded Accumulated Benefit Obligation* – The accumulated benefit obligation is the present value of benefits earned to date, assuming no future salary growth. The unfunded accumulated benefit obligation represents the difference between the accumulated benefit obligation and the fair value of plan assets. The projected benefit obligation, accumulated benefit obligation, and fair value of plan assets for pension plans with accumulated benefit obligations in excess of the fair value of the plan assets were as follows for the years ended December 31:

| *Millions of Dollars* | *2004* | *2003* |
|---|---|---|
| Projected benefit obligation | $(2,042) | $(1,789) |
| Accumulated benefit obligation | $(2,014) | $(1,769) |
| Fair value of plan assets | 1,674 | 1,503 |
| Unfunded accumulated benefit obligation | $ (340) | $ (266) |

The accumulated benefit obligation for all defined benefit pension plans was $2.0 billion and $1.8 billion as of December 31, 2004 and 2003, respectively.

*Assumptions* – The weighted-average actuarial assumptions used to determine benefit obligations at December 31:

| | *Pension* | | | *OPEB* | | |
|---|---|---|---|---|---|---|
| *Percentages* | *2004* | *2003* | *2002* | *2004* | *2003* | *2002* |
| Discount rate | 6.00% | 6.50% | 6.75% | 6.00% | 6.50% | 6.75% |
| Salary increase | 3.00 | 3.50 | 3.75 | N/A | N/A | N/A |
| Healthcare cost trend rate: | | | | | | |
| Current | N/A | N/A | N/A | 11.00 | 9.00 | 10.00 |
| Level in 2010 | N/A | N/A | N/A | 5.00 | 5.00 | 5.00 |

**Expense**

Both pension and OPEB expense are determined based upon the annual service cost of benefits (the actuarial cost of benefits earned during a period) and the interest cost on those liabilities, less the expected return on plan assets. With respect to the value of pension plan assets, the expected long-term rate of return on plan assets is applied to a calculated value of plan assets that recognizes changes in fair value over a five-year period. This practice is intended to reduce year-to-year volatility in pension expense, but it can have the effect of delaying the recognition of differences between actual returns on assets and expected returns based on long-term rate of return assumptions. The expected rate of return on assets was 8% for both 2004 and 2003.

Differences in actual experience in relation to assumptions are not recognized immediately, but are deferred and, if necessary, amortized as pension or OPEB expense.

The components of our net periodic pension and other postretirement costs (income) were as follows for the years ended December 31:

| | *Pension* | | | *OPEB* | | |
|---|---|---|---|---|---|---|
| *Millions of Dollars* | *2004* | *2003* | *2002* | *2004* | *2003* | *2002* |
| Service cost | $ 30 | $ 27 | $ 21 | $ 5 | $ 7 | $ 6 |
| Interest cost | 120 | 113 | 117 | 31 | 35 | 37 |
| Expected return on plan assets | (137) | (133) | (144) | - | - | - |
| Amortization of: | | | | | | |
| Transition obligation | (2) | (2) | (2) | - | - | - |
| Prior service cost (credit) | 8 | 9 | 9 | (24) | (15) | (3) |
| Actuarial loss (gain) | 3 | 1 | (15) | 18 | 16 | 5 |
| Total net periodic benefit cost (income) | $ 22 | $ 15 | $ (14) | $ 30 | $ 43 | $45 |

*Assumptions* – The weighted-average actuarial assumptions used to determine expense were as follows for the years ended December 31:

| | *Pension* | | | *OPEB* | | |
|---|---|---|---|---|---|---|
| *Percentages* | *2004* | *2003* | *2002* | *2004* | *2003* | *2002* |
| Discount rate | 6.50% | 6.75% | 7.25% | 6.50% | 6.75% | 7.25% |
| Expected return on plan assets | 8.00 | 8.00 | 9.00 | N/A | N/A | N/A |
| Salary increase | 3.50 | 3.75 | 4.25 | N/A | N/A | N/A |
| Health care cost trend rate: | | | | | | |
| Current | N/A | N/A | N/A | 9.00 | 10.00 | 7.70 |
| Level in 2008 | N/A | N/A | N/A | 5.00 | 5.00 | 5.50 |

The discount rate is based on a hypothetical portfolio of high quality bonds with cash flows matching our plans' expected benefit payments. The expected return on plan assets is based on our asset allocation mix and our historical return, taking into account current and expected market conditions. The actual return on pension plan assets was approximately 12% in 2004, compared to 25% in 2003. Our historical annualized ten-year rate of return on plan assets is approximately 10%.

Assumed healthcare cost trend rates have a significant effect on the expense and liabilities reported for healthcare plans. The healthcare cost trend rate is based on historical rates and expected market conditions. A one-percentage point change in the expected healthcare cost trend rates would have the following effects on OPEB:

| *Millions of Dollars* | *One % pt. Increase* | *One % pt. Decrease* |
|---|---|---|
| Effect on total service and interest cost components | $ 7 | $ (6) |
| Effect on accumulated benefit obligation | 79 | (66) |

**Equity Adjustment**

An additional minimum pension liability adjustment is required when our accumulated benefit obligation exceeds the fair value of our plan assets, and that difference exceeds the net pension liability recognized in the Consolidated Statements of Financial Position. The liability was recorded as a $212 million and $109 million after-tax reduction to common shareholders' equity as part of accumulated other comprehensive loss in 2004 and 2003, respectively.

The equity reduction may be restored to the balance sheet in future periods if the fair value of plan assets exceeds the accumulated benefit obligations. This reduction to equity does not affect net income or cash flow and has no impact on compliance with debt covenants.

**Cash Contributions**

The following table details our cash contributions for the years ended December 31, 2004 and 2003, and the expected contributions for 2005:

| | *Pension* | | |
|---|---|---|---|
| *Millions of Dollars* | *Funded* | *Unfunded* | *OPEB* |
| 2003 | $100 | $7 | $37 |
| 2004 | 100 | 8 | 40 |
| 2005 (expected) | 50 | 8 | 35 |

Our policy with respect to funding the qualified plans is to fund at least the minimum required by the Employee Retirement Income Security Act of 1974, as amended, and not more than the maximum amount deductible for tax purposes. We do not currently have minimum funding requirements, as set forth in employee benefit and tax laws. All contributions made to the funded pension plans for 2003 and 2004 were voluntary and were made with cash generated from operations.

All benefit payments for other postretirement benefits are voluntary, as the postretirement plans are not funded, and are not subject to any minimum regulatory funding requirements. Benefit payments for each year represent claims paid for medical and life insurance, and we anticipate our 2005 OPEB payments will be made from cash generated from operations.

**Benefit Payments**

The following table details expected benefit payments for the years 2005 though 2014:

| *Millions of Dollars* | *Pension* | *OPEB* |
|---|---|---|
| 2005 | $120 | $ 35 |
| 2006 | 120 | 33 |
| 2007 | 122 | 34 |
| 2008 | 126 | 35 |
| 2009 | 130 | 36 |
| Years 2010 – 2014 | 737 | 189 |

**Medicare Reform Act**

On December 13, 2003, Congress passed the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (Medicare Reform Act). The provisions of the Medicare Reform Act include prescription drug benefits for Medicare eligible individuals. We elected to recognize this legislation in 2003, in accordance with FASB Staff Position No. 106-1, *Accounting and Disclosure Requirements Related to the Medicare Prescription Drug, Improvement and Modernization Act of 2003,* resulting in a $47 million reduction to the accumulated benefit obligation for other postretirement benefits as of December 31, 2003. This reduction was based on the value of the projected federal subsidy, assumes no changes in participation rates, and was recorded as an unrecognized actuarial gain. The estimated reduction in post-65 per capita claim costs was 17%. There was no effect on 2003 expense. For 2004, we experienced a reduction in OPEB expense of $7 million. Future guidance from either Congress or the FASB could result in a change to this recognition.

**Asset Allocation Strategy**

Our pension plan asset allocation at December 31, 2004 and 2003, and target allocation for 2005, are as follows:

| | *Target Allocation* | *Percentage of Plan Assets December 31,* | |
|---|---|---|---|
| *Asset Category* | *2005* | *2004* | *2003* |
| Equity securities | 65% to 75% | 73% | 70% |
| Debt securities | 20% to 30% | 27% | 30% |
| Real estate | 2% to 8% | 0% | 0% |
| Other | 0% | 0% | 0% |
| Total | 100% | 100% | 100% |

The investment strategy for pension plan assets is to maintain a broadly diversified portfolio designed to achieve our target of an average long-term rate of return of 8%. While we believe we can achieve a long-term average rate of return of 8%, we cannot be certain that the portfolio will perform to our expectations. Assets are strategically allocated between equity and debt securities in order to achieve a diversification level that mitigates wide swings in investment returns. To further improve diversification, a target allocation to real estate investments has been established for future time periods. Asset allocation target ranges for equity, debt, and other portfolios are evaluated at least every three years with the assistance of an external consulting firm. Actual asset allocations are monitored monthly, and rebalancing actions are executed at least quarterly, if needed.

The majority of the plan's assets are invested in equity securities, because equity portfolios have historically provided higher returns than debt and other asset classes over extended time horizons and are expected to do so in the future. Correspondingly, equity investments also entail greater risks than other investments. The risk of loss in the plan's equity portfolio is mitigated by investing in a broad range of equity types. Equity diversification includes large-capitalization and small-capitalization companies, growth-oriented and value-oriented investments, and U.S. and non-U.S. securities.

Equity risks are further balanced by investing a significant portion of the plan's assets in high quality debt securities. The average quality rating of the debt portfolio exceeded AA as of December 31, 2004 and 2003. The debt portfolio is also broadly diversified and invested primarily in U.S. Treasury, mortgage, and corporate securities with an intermediate average maturity. The weighted-average maturity of the debt portfolio was 6.3 years at December 31, 2004 and 6.1 years as of December 31, 2003.

The investment of pension plan assets in our securities is specifically prohibited for both the equity and debt portfolios, other than through index fund holdings.

**Other Retirement Programs**

*Thrift Plan* – We provide a defined contribution plan (thrift plan) to eligible non-union employees and make matching contributions to the thrift plan. We match 50 cents for each dollar contributed by employees up to the first six percent of compensation contributed. Our thrift plan contributions were $12 million in both 2004 and 2003 and $10 million in 2002.

*Railroad Retirement System* – All Railroad employees are covered by the Railroad Retirement System (the System). On December 21, 2001, The Railroad Retirement and Survivors' Improvement Act of 2001 (the Act) was signed into law. The Act was a result of historic cooperation between rail management and labor, and provides improved railroad retirement benefits for employees and reduced payroll taxes for employers. Contributions made to the System are expensed as incurred and amounted to approximately $569 million in 2004, $562 million in 2003, and $595 million in 2002.

*Collective Bargaining Agreements* – Under collective bargaining agreements, we participate in multi-employer benefit plans that provide certain postretirement healthcare and life insurance benefits for eligible union employees. Premiums under the plans are expensed as incurred and amounted to $30 million in 2004, $27 million in 2003, and $16 million in 2002.

## 7. Stock Options and Other Stock Plans

We have 6,546,765 options outstanding under the 1993 Stock Option and Retention Stock Plan of Union Pacific Corporation (1993 Plan). There are 5,100 retention stock units (the right to receive shares of common stock) outstanding under the 1993 Plan. There are 7,140 restricted shares outstanding under the 1992 Restricted Stock Plan for Non-Employee Directors of Union Pacific Corporation. We no longer grant options or awards of restricted stock or retention shares and stock units under these plans.

The UP Shares Stock Option Plan of Union Pacific Corporation (UP Shares Plan) was approved by our Board of Directors on April 30, 1998. The UP Shares Plan reserved 12,000,000 shares of our common stock for issuance. The UP Shares Plan was a broad-based option program that granted options to purchase 200 shares of our common stock at $55.00 per share to eligible active employees on April 30, 1998. All options granted were non-qualified options that became exercisable on May 1, 2001, and remain exercisable until April 30, 2008. If an optionee's employment terminates for any reason, the option remains exercisable for a period of one year after the date of termination, but no option is exercisable after April 30, 2008. No further options may be granted under the UP Shares Plan. As of December 31, 2004, there were 4,441,118 options outstanding under the UP Shares Plan.

We adopted the Executive Stock Purchase Incentive Plan (ESPIP), effective October 1, 1999, in order to encourage and facilitate ownership of our common stock by our officers and other key executives. Under the ESPIP, participants purchased a total of 1,008,000 shares of our common stock with the proceeds of 6.02% interest-bearing, full recourse loans from the Corporation. Loans totaled $47 million and have a final maturity date of January 31, 2006. Deferred cash payments were to be awarded to the participants to repay interest and the loan principal if certain performance and retention criteria were met within a 40-month period ending January 31, 2003. Following satisfaction of the various performance criteria during the term of the ESPIP and continued employment with the Corporation through January 31, 2003, participants received a deferred cash payment equal to two-thirds of the outstanding principal balance of their loan plus the net accrued interest on January 31, 2003. Such payments were applied against the participants' outstanding loan balance pursuant to the terms of the ESPIP. The remaining balance of the loan is payable in three equal installments on January 31, 2004, January 31, 2005, and January 31, 2006. At December 31, 2004 and 2003, the total outstanding balance of the remaining loans was $1 million and $8 million, respectively.

In April 2000, the shareholders approved the Union Pacific Corporation 2000 Directors Plan (Directors Plan) whereby 550,000 shares of our common stock were reserved for issuance to our non-employee directors. Under the Directors Plan, each non-employee director, upon his or her initial election to the Board of Directors, receives a grant of 1,000 shares of restricted shares or restricted stock units. Additionally, each non-employee director receives annually an option to purchase at fair value a number of shares of our common stock, not to exceed 5,000 shares during any calendar year, determined by dividing 60,000 by ⅓ of the fair market value of one share of our common stock on the date of such Board of Directors meeting, with the resulting quotient rounded up or down to the nearest 50 shares. As of December 31, 2004, 5,000 restricted shares were outstanding under the Directors Plan and 128,350 options were outstanding under the Directors Plan.

In November 2000, our Board of Directors approved the 2001 Long Term Plan (LTP). Participants were awarded retention shares or stock units and cash awards subject to the attainment of certain performance targets and continued employment through January 31, 2004, or other applicable vesting dates. The LTP performance criteria included three year (for fiscal years 2001, 2002, and 2003) cumulative earnings per share and stock price targets. We met the cumulative earnings per share target at December 31, 2003, which entitled participants to receive a total of 88,140 shares, 371,712 stock units, and $32 million at January 31, 2004, or other applicable vesting dates, totaling 48% of the maximum amount available under the LTP.

The Union Pacific Corporation 2001 Stock Incentive Plan (2001 Plan) was approved by the shareholders in April 2001. The 2001 Plan reserved 12,000,000 shares of our common stock for issuance to eligible employees of

the Corporation and its subsidiaries in the form of non-qualified options, incentive stock options, retention shares, stock units, and incentive bonus awards. Non-employee directors are not eligible for awards under the 2001 Plan. As of December 31, 2004, 6,387,500 options and 1,247,125 retention shares and stock units were outstanding under the 2001 Plan.

The Union Pacific Corporation 2004 Stock Incentive Plan (2004 Plan) was approved by shareholders in April 2004. The 2004 Plan reserved 21,000,000 shares of our common stock for issuance, plus any shares subject to awards made under the 2001 Plan and the 1993 Plan that were outstanding on April 16, 2004, and became available for regrant pursuant to the terms of the 2004 Plan. Under the 2004 Plan, non-qualified options, stock appreciation rights, retention shares, stock units, and incentive bonus awards may be granted to eligible employees of the Corporation and its subsidiaries. Non-employee directors are not eligible for awards under the 2004 Plan. As of December 31, 2004, 18,400 options and 13,050 retention shares and stock units were outstanding under the 2004 Plan.

Pursuant to the above plans, 21,571,309, 6,899,211, and 9,544,569 shares of our common stock were available for grant at December 31, 2004, 2003, and 2002, respectively.

**Options** – Stock options are granted with an exercise price equal to the fair market value of our common stock as of the date of the grant. Options are granted with a 10-year term and are generally exercisable one to two years after the date of the grant. A summary of the stock options issued under the 1993 Plan, the UP Shares Plan, the Directors Plan, the 2001 Plan, and the 2004 Plan, and changes during the years ending December 31 are as follows:

| | *Year Ended December 31,* | | | | | |
|---|---|---|---|---|---|---|
| | *2004* | | *2003* | | *2002* | |
| | *Shares* | *Weighted-Average Exercise Price* | *Shares* | *Weighted-Average Exercise Price* | *Shares* | *Weighted-Average Exercise Price* |
| Outstanding, beginning of year | 18,515,231 | $53.75 | 21,352,105 | $53.00 | 23,189,323 | $51.12 |
| Granted | 2,220,450 | 65.04 | 2,398,300 | 55.98 | 2,107,500 | 61.14 |
| Exercised | (2,942,406) | 47.52 | (4,955,725) | 51.58 | (3,814,625) | 45.99 |
| Forfeited | (271,142) | 57.23 | (279,449) | 54.69 | (130,093) | 54.99 |
| Outstanding, end of year | 17,522,133 | $56.17 | 18,515,231 | $53.75 | 21,352,105 | $53.00 |
| Options exercisable at year end | 14,878,933 | $54.92 | 15,514,331 | $53.27 | 18,897,155 | $52.04 |
| Weighted-average fair value of options granted during the year | | $16.38 | | $14.30 | | $17.78 |

The following table summarizes information about our outstanding stock options as of December 31, 2004:

| | *Options Outstanding* | | | *Options Exercisable* | |
|---|---|---|---|---|---|
| *Range of Exercise Prices* | *Number Outstanding* | *Weighted-Average Remaining Contractual Life* | *Weighted-Average Exercise Price* | *Number Exercisable* | *Weighted-Average Exercise Price* |
| $37.94 – $55.00 | 7,673,345 | 3.96 | $52.16 | 7,621,545 | $52.24 |
| $55.62 – $60.81 | 5,692,488 | 4.49 | 56.44 | 5,254,138 | 56.45 |
| $61.14 – $65.10 | 4,156,300 | 8.12 | 63.19 | 2,003,250 | 61.14 |
| $37.94 – $65.10 | 17,522,133 | 5.12 | $56.17 | 14,878,933 | $54.92 |

The fair value of each option grant was estimated on the date of grant using the Black-Scholes option-pricing model, with the following weighted-average assumptions for options granted in 2004, 2003, and 2002.

| | *2004* | *2003* | *2002* |
|---|---|---|---|
| Risk-free interest rates | 3.3% | 2.9% | 4.4% |
| Dividend yield | 1.7% | 1.5% | 1.3% |
| Expected lives-years | 5.6 | 5.0 | 5.0 |
| Volatility | 25.9% | 28.4% | 28.8% |

**Restricted Stock and Other Incentive Plans** – Our plans provide for awarding retention shares of common stock or stock units to eligible employees. These awards are subject to forfeiture if employment terminates during the prescribed retention period, generally three or four years, or, in some cases, if a certain prescribed stock price or other financial criterion is not met. Restricted stock awards are issued to non-employee directors and are subject to forfeiture if certain service requirements are not met. During the year ended December 31, 2004, 276,575 retention shares, stock units, and restricted shares were issued at a weighted-average fair value of $64.75. During the year ended December 31, 2003, 380,786 retention shares, stock units, and restricted shares were issued at a weighted-average fair value of $55.99. During 2002, 804,956 retention shares, stock units, and restricted shares were issued at a weighted-average fair value of $58.21. The cost of retention and restricted awards is amortized to expense over the retention period.

Under the LTP, 11,900 performance retention stock units were issued at a weighted-average fair value of $60.97 during 2002. The cost of the LTP was marked to market and expensed over the performance period, which ended January 31, 2004.

The cost associated with the ESPIP retention criterion was amortized to expense over the 40-month period. The cost associated with the ESPIP first performance criterion is expensed over the life of the loan, and the cost associated with the second performance criterion was expensed in December 2002.

During the years ended December 31, 2004, 2003, and 2002, we expensed $21 million, $46 million, and $50 million, respectively, related to the other incentive plans described above.

## 8. Earnings Per Share

The following table provides a reconciliation between basic and diluted earnings per share for the years ended December 31:

| *Millions, Except Per Share Amounts* | *2004* | *2003* | *2002* |
|---|---|---|---|
| Income statement data: | | | |
| Income from continuing operations before cumulative effect of accounting change | $ 604 | $1,056 | $1,265 |
| Income from discontinued operations | - | 255 | 76 |
| Cumulative effect of accounting change | - | 274 | - |
| Net income available to common shareholders – basic | $ 604 | $1,585 | $1,341 |
| Dilutive effect of interest associated with the CPS | - | 34 | 58 |
| Net income available to common shareholders – diluted | $ 604 | $1,619 | $1,399 |
| Weighted-average number of shares outstanding: | | | |
| Basic | 259.1 | 254.4 | 252.1 |
| Dilutive effect of stock options | 1.2 | 1.5 | 1.8 |
| Dilutive effect of retention shares, stock units and restricted shares | 1.9 | 1.8 | 1.1 |
| Dilutive effect of CPS | - | 10.3 | 21.8 |
| Diluted | 262.2 | 268.0 | 276.8 |
| Earnings per share – basic: | | | |
| Income from continuing operations before cumulative effect of accounting change | $2.33 | $ 4.15 | $ 5.02 |
| Income from discontinued operations | - | 1.00 | 0.30 |
| Cumulative effect of accounting change | - | 1.08 | - |
| Net income | $2.33 | $ 6.23 | $ 5.32 |
| Earnings per share – diluted: | | | |
| Income from continuing operations before cumulative effect of accounting change | $2.30 | $ 4.07 | $ 4.78 |
| Income from discontinued operations | - | 0.95 | 0.27 |
| Cumulative effect of accounting change | - | 1.02 | - |
| Net income | $2.30 | $ 6.04 | $ 5.05 |

Common stock options totaling 3.3 million and 2.3 million for 2004 and 2002, respectively, were excluded from the computation of diluted earnings per share because the exercise prices of these options exceeded the average market price of our common stock for the respective periods, and the effect of their inclusion would be anti-dilutive. All stock options were dilutive for 2003.

## 9. Commitments and Contingencies

**Unasserted Claims** – Various claims and lawsuits are pending against us and certain of our subsidiaries. It is not possible at this time for us to determine fully the effect of all unasserted claims on our consolidated financial condition, results of operations or liquidity; however, to the extent possible, where unasserted claims can be estimated and where such claims are considered probable, we have recorded a liability. We do not expect that any known lawsuits, claims, environmental costs, commitments, contingent liabilities, or guarantees will have a material adverse effect on our consolidated financial condition, results of operations, or liquidity after taking into account liabilities previously recorded for these matters.

**Personal Injury** – The cost of personal injuries to employees and others related to our activities is charged to expense based on estimates of the ultimate cost and number of incidents each year. We use third-party actuaries to assist us in properly measuring the expense and liability, including unasserted claims. Compensation for work-

related accidents is governed by the Federal Employers' Liability Act (FELA). Under FELA, damages are assessed based on a finding of fault through litigation or out-of-court settlements. We offer a comprehensive variety of services and rehabilitation programs for employees who are injured at work. Annual expenses for our personal injury-related events were $288 million in 2004, $250 million in 2003, and $221 million in 2002. As of December 31, 2004 and 2003, we had a liability of $639 million and $617 million, respectively, accrued for future personal injury costs, of which $274 million was recorded in current liabilities as accrued casualty costs for each year.

**Asbestos** – We are a defendant in a number of lawsuits in which current and former employees allege exposure to asbestos. Additionally, we have received claims for asbestos exposure that have not been litigated. The claims and lawsuits (collectively referred to as "claims") allege occupational illness resulting from exposure to asbestos-containing products. In most cases, the claimants do not have credible medical evidence of physical impairment resulting from the alleged exposures. Additionally, most claims filed against us do not specify an amount of alleged damages.

The greatest potential for asbestos exposure in the railroad industry existed while steam locomotives were used. The railroad industry, including UPRR and its predecessors, phased out steam locomotives in approximately 1955-1960. The use of asbestos-containing products in the railroad industry was substantially reduced after steam locomotives were discontinued, although it was not completely eliminated. Some asbestos-containing products were still manufactured in the building trade industry and were used in isolated component parts on locomotives and railroad cars during the 1960s and 1970s. By the early 1980s, manufacturers of building materials and locomotive component parts developed non-asbestos alternatives for their products and ceased manufacturing asbestos-containing materials.

During 2004, we engaged a third-party expert with extensive experience in estimating resolution costs for asbestos-related claims to assist us in assessing the number and value of these unasserted claims through 2034, based on our average claims experience over a multi-year period. As a result, we increased our liability for asbestos-related claims to $326 million. At December 31, 2004, $17 million was classified as current liabilities, while the remainder was classified as long-term accrued casualty costs. Approximately 14% of the recorded liability related to pending claims, and approximately 86% related to future claims. These claims are expected to be paid out over the next 30 years. Payments for asbestos-related claims were $14.1 million, $14.4 million, and $12.4 million in 2004, 2003, and 2002, respectively. Aggregate payments totaled $118.3 million, $104.2 million, and $89.8 million at December 31, 2004, 2003, and 2002, respectively.

We have insurance coverage that reimburses us for a portion of the costs incurred to resolve asbestos-related claims. At December 31, 2004, we have recognized an asset for estimated insurance recoveries.

We believe that our liability for asbestos-related claims and the estimated insurance recoveries reflect reasonable and probable estimates. The amounts recorded for asbestos-related liabilities and related insurance recoveries were based on currently known facts. However, future events, such as the number of new claims to be filed each year, average settlement costs, and insurance coverage issues could cause the actual costs and insurance recoveries to be higher or lower than the projected amounts. Estimates may also vary due to changes in the litigation environment, federal and state law governing compensation of asbestos claimants, and the level of payments made to claimants by other defendants.

**Environmental Costs** – We are subject to federal, state, and local environmental laws and regulations. We have identified approximately 384 sites at which we are or may be liable for remediation costs associated with alleged contamination or for violations of environmental requirements. This includes 52 sites that are the subject of actions taken by the U.S. government, 31 of which are currently on the Superfund National Priorities List. Certain federal legislation imposes joint and several liability for the remediation of identified sites; consequently, our ultimate environmental liability may include costs relating to activities of other parties, in addition to costs relating to our own activities at each site.

When an environmental issue has been identified with respect to the property owned, leased, or otherwise used in the conduct of our business, we and our consultants perform environmental assessments on the property. We expense the cost of the assessments as incurred. We accrue the cost of remediation where our obligation is

probable and such costs can be reasonably estimated. We do not discount our environmental liabilities when the timing of the anticipated cash payments is not fixed or readily determinable.

As of December 31, 2004 and 2003, we had a liability of $201 million and $187 million, respectively, accrued for future environmental costs, of which $50 million and $57 million were recorded in current liabilities as accrued casualty costs. The liability includes future costs for remediation and restoration of sites, as well as for ongoing monitoring costs, but excludes any anticipated recoveries from third parties. Cost estimates are based on information available for each site, financial viability of other potentially responsible parties, and existing technology, laws, and regulations. We believe that we have adequately accrued for our ultimate share of costs at sites subject to joint and several liability. However, the ultimate liability for remediation is difficult to determine because of the number of potentially responsible parties involved, site-specific cost sharing arrangements with other potentially responsible parties, the degree of contamination by various wastes, the scarcity and quality of volumetric data related to many of the sites, and the speculative nature of remediation costs. Current obligations are not expected to have a material adverse effect on our results of operations or financial condition.

Remediation of identified sites previously used in operations, used by tenants or contaminated by former owners required cash spending of $42 million in 2004, $36 million in 2003, and $68 million in 2002. We also engage in capital spending designed to reduce emissions and prevent spills and releases of hazardous materials. We spent cash of $8 million in both 2004 and 2003 and $6 million in 2002 for these control and prevention measures. In 2005, we anticipate spending $50 million for remediation and $8 million for control and prevention. The impact of current obligations is not expected to have a material adverse effect on our liquidity.

**Purchase Obligations and Guarantees** – We periodically enter into financial and other commitments in connection with our businesses. We do not expect that these commitments or guarantees will have a material adverse effect on our consolidated financial condition, results of operations, or liquidity.

At December 31, 2004, we were contingently liable for $485 million in guarantees and $56 million in letters of credit. These contingent guarantees were entered into in the normal course of business and include guaranteed obligations of affiliated operations. None of the guarantees individually is significant, and a liability of $6 million has been recorded for the fair value of these obligations as of December 31, 2004. The final guarantee expires in 2022. We are not aware of any existing event of default that would require us to satisfy these guarantees.

**Headquarters Building** – On October 5, 2004, the Railroad completed the refinancing of the synthetic lease for the new headquarters building. The Railroad will lease the building pursuant to an operating lease with a term of ten years. Total scheduled lease payments during the term are approximately $134 million. UPC has guaranteed the obligations of the Railroad under the lease and, therefore, has a contingent liability for such obligations. The obligations of the Railroad to make lease payments are not recorded in the Consolidated Financial Statements of the Railroad or UPC. During the term of the lease, the Railroad may, at its option, purchase the building. Such purchase amount will represent the cost of constructing the building, including capitalized interest and transaction expenses, which was $257.5 million. Any such payment may also include an additional make-whole amount for early redemption of the outstanding debt, which will vary depending on prevailing interest rates at the time of prepayment.

Upon expiration of the lease term, if the Railroad does not purchase the building or renew the lease, the building will be remarketed. The Railroad has guaranteed that the building will have a residual value equal to at least $206 million in the event that the building is remarketed. Therefore, the guarantee made by UPC with respect to the Railroad's obligations under the lease is expected to represent a contingent obligation of approximately $206 million. At December 31, 2004, the Railroad had a liability of approximately $6 million related to the fair value of this guarantee.

The arrangement is subject to customary default provisions, including, without limitation, those relating to payment defaults under the lease and the operative documents, the acceleration of certain other unrelated debt obligations of the Railroad or UPC, performance defaults and events of bankruptcy. In the event that such defaults occur and are continuing, the Railroad (or UPC pursuant to its guarantee) may be required to pay all amounts due under the lease through the end of the term of the lease.

## 10. Other Income

Other income included the following:

| *Millions of Dollars* | *2004* | *2003* | *2002* |
|---|---|---|---|
| Net gain on non-operating asset dispositions | $69 | $84 | $287 |
| Rental income | 55 | 57 | 60 |
| Interest income | 10 | 8 | 14 |
| Early retirement of convertible preferred securities | - | (45) | - |
| Other, net | (46) | (26) | (37) |
| Total | $88 | $78 | $324 |

Included in the 2002 gain on non-operating asset dispositions was a pre-tax gain of $141 million related to the sale of land, track, operating rights, and facilities to the Utah Transit Authority for $185 million, which included approximately 175 miles of track that stretches from Brigham City, Utah, through Salt Lake City, Utah, south to Payson, Utah. The transaction contributed $88 million to our earnings on an after-tax basis.

Also included in the 2002 gain on non-operating asset dispositions was a pre-tax gain of $73 million related to the sale of land and track to the Santa Clara Valley Transportation Authority for $80 million, which included approximately 15 miles of track that stretches from William Street in San Jose, California, north to Paseo Padre Parkway in Fremont, California. The transaction contributed $45 million to our earnings on an after-tax basis.

## 11. Accounting Pronouncements

In December 2004, the FASB issued Statement No. 123 (R), *Share-Based Payment.* This statement, which is effective for the Corporation beginning July 1, 2005, requires that companies recognize compensation expense equal to the fair value of stock options or other share-based payments. We anticipate the impact of this pronouncement will not differ materially from what has been disclosed in our pro forma net income located in our Significant Accounting Policies section of this Item 8.

## 12. Cumulative Effect of Accounting Change

STB accounting rules require that railroads accrue the cost of removing track structure over the expected useful life of these assets. Railroads historically used this prescribed accounting for reports filed with both the STB and SEC. In August 2001, the FASB issued Statement No. 143, *Accounting for Asset Retirement Obligations* (FAS 143). This statement was effective for us beginning January 1, 2003, and prohibits the accrual of removal costs unless there is a legal obligation to remove the track structure at the end of its life. We concluded that we did not have a legal obligation to remove the track structure, and therefore, under generally accepted accounting principles, we could not accrue the cost of removal in advance. As a result, reports filed with the SEC will reflect the expense of removing these assets in the period in which they are removed. For STB reporting requirements only, we will continue to follow the historical method of accruing in advance, as prescribed by the STB. FAS 143 also requires us to record a liability for legally obligated asset retirement costs associated with tangible long-lived assets. In the first quarter of 2003, we recorded income from a cumulative effect of accounting change, related to the adoption of FAS 143, of $274 million, net of income tax expense of $167 million. The accounting change had no effect on our liquidity. Had the change been retroactively applied, the change would not have had a material impact on net income and earnings per share.

## 13. Discontinued Operations

On November 5, 2003, we completed the sale of our entire trucking interest through an initial public offering. As part of the offering, we received cash proceeds of $620 million, including a dividend from Overnite of $128 million. As part of the transaction, Overnite forgave our intercompany payable to them of $227 million, and we received a $1 million promissory note. We recorded a gain on the sale of $211 million, including an income tax benefit of $126 million in the fourth quarter of 2003. The tax benefit recognized in 2003 was associated with

Overnite goodwill written off in the fourth quarter of 1998. Revenues from discontinued operations were $1,241 million and $1,332 million for the years ended December 31, 2003 and 2002, respectively. Income before income taxes from discontinued operations was $74 million and $71 million for the years ended December 31, 2003 and 2002, respectively.

## 14. Subsequent Event

In early January 2005, a massive storm hit California and Nevada. Our rail system suffered significant damage, resulting in the temporary shutdown of five of six routes in and out of Los Angeles. Two of those routes required extensive reconstruction. Embargos were instituted to restrict traffic to and from Southern California and the Las Vegas area until service could be restored while a number of trains were rerouted onto other serviceable tracks.

## 15. Selected Quarterly Data (Unaudited)

Selected unaudited quarterly data are as follows:

| *Millions of Dollars, Except Per Share Amounts* | | | | |
|---|---|---|---|---|
| *2004* | *Mar. 31* | *June 30* | *Sep. 30* | *Dec. 31[a]* |
| Operating revenues | $2,893 | $3,029 | $3,076 | $3,217 |
| Operating income | 314 | 359 | 418 | 204 |
| Net income | 165 | 158 | 202 | 79 |
| Net income per share | | | | |
| Basic | 0.64 | 0.61 | 0.78 | 0.30 |
| Diluted | 0.63 | 0.60 | 0.77 | 0.30 |
| *2003* | *Mar. 31* | *June 30* | *Sep. 30* | *Dec. 31[b]* |
| Operating revenues | $2,736 | $2,894 | $2,956 | $2,965 |
| Operating income | 369 | 583 | 592 | 589 |
| Cumulative effect of accounting change [c] | 274 | - | - | - |
| Net income | 429 | 288 | 317 | 551 |
| Cumulative effect of accounting change per share | | | | |
| Basic | 1.08 | - | - | - |
| Diluted | 1.07 | - | - | - |
| Net income per share | | | | |
| Basic | 1.69 | 1.13 | 1.25 | 2.15 |
| Diluted | 1.67 | 1.10 | 1.21 | 2.12 |

*[a] In the fourth quarter of 2004, we recognized a $154 million after-tax charge for unasserted asbestos-related claims.*

*[b] In the fourth quarter of 2003, we completed the sale of our entire trucking interest. We recorded a gain on the sale of $211 million, including an income tax benefit of $126 million.*

*[c] Cumulative effect of accounting change is shown net of income tax expense of $167 million.*

****************************************

## Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure

None.

## Item 9A. Controls and Procedures

As of the end of the period covered by this report, the Corporation carried out an evaluation, under the supervision and with the participation of the Corporation's management, including the Corporation's Chief Executive Officer (CEO) and Executive Vice President – Finance and Chief Financial Officer (CFO), of the effectiveness of the design and operation of the Corporation's disclosure controls and procedures pursuant to Exchange Act Rules 13a-15 and 15d-15. Based upon that evaluation, the CEO and the CFO concluded that, as of the end of the period covered by this report, the Corporation's disclosure controls and procedures are effective in alerting them, in a timely manner, to material information relating to the Corporation (including its consolidated subsidiaries) required to be included in the Corporation's periodic SEC filings.

Additionally, the CEO and CFO determined that there have been no significant changes to the Corporation's internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) during the last fiscal quarter that have materially affected, or are reasonably likely to materially affect, the Corporation's internal control over financial reporting.

## MANAGEMENT'S ANNUAL REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING

The management of Union Pacific Corporation and Subsidiary Companies (the Corporation) is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)). The Corporation's internal control system was designed to provide reasonable assurance to the Corporation's management and Board of Directors regarding the preparation and fair presentation of published financial statements.

All internal control systems, no matter how well designed, have inherent limitations. Therefore, even those systems determined to be effective can provide only reasonable assurance with respect to financial statement preparation and presentation.

The Corporation's management assessed the effectiveness of the Corporation's internal control over financial reporting as of December 31, 2004. In making this assessment, it used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in *Internal Control—Integrated Framework.* Based on our assessment, management believes that, as of December 31, 2004, the Corporation's internal control over financial reporting is effective based on those criteria.

The Corporation's independent auditors have issued an audit report on our assessment of the Corporation's internal control over financial reporting. This report appears on page 67.

January 31, 2005

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

Union Pacific Corporation, its Directors, and Shareholders:

We have audited management's assessment, included in the accompanying Management's Annual Report on Internal Control Over Financial Reporting, that Union Pacific Corporation and Subsidiary Companies (the Corporation) maintained effective internal control over financial reporting as of December 31, 2004, based on criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. The Corporation's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express an opinion on management's assessment and an opinion on the effectiveness of the Corporation's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed by, or under the supervision of, the company's principal executive and principal financial officers, or persons performing similar functions, and effected by the company's board of directors, management, and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of the inherent limitations of internal control over financial reporting, including the possibility of collusion or improper management override of controls, material misstatements due to error or fraud may not be prevented or detected on a timely basis. Also, projections of any evaluation of the effectiveness of the internal control over financial reporting to future periods are subject to the risk that the controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, management's assessment that the Corporation maintained effective internal control over financial reporting as of December 31, 2004, is fairly stated, in all material respects, based on the criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Also in our opinion, the Corporation maintained, in all material respects, effective internal control over financial reporting as of December 31, 2004, based on the criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated financial statements and consolidated financial statement schedule as of and for the year ended December 31, 2004 of the Corporation and our report dated February 7, 2005 expressed an unqualified opinion on those consolidated financial statements and consolidated financial statement schedule.



Omaha, Nebraska
February 7, 2005

**Item 9B. Other Information**

None.

# PART III

## Item 10. Directors and Executive Officers of the Registrant

(a) Directors of Registrant.

Information as to the names, ages, positions and offices with UPC, terms of office, periods of service, business experience during the past five years and certain other directorships held by each director or person nominated to become a director of UPC is set forth in the Election of Directors segment of the Proxy Statement and is incorporated herein by reference.

Information concerning our Audit Committee and the independence of its members, along with information about the audit committee financial expert(s) serving on the Audit Committee, is set forth in the Audit Committee segment of the Proxy Statement and is incorporated herein by reference.

(b) Executive Officers of Registrant.

Information concerning the executive officers of UPC and its subsidiaries is presented in Part I of this report under Executive Officers of the Registrant and Principal Executive Officers of Subsidiaries.

(c) Section 16(a) Compliance.

Information concerning compliance with Section 16(a) of the Securities Exchange Act of 1934 is set forth in the Section 16(a) Beneficial Ownership Reporting Compliance segment of the Proxy Statement and is incorporated herein by reference.

(d) Code of Ethics for Chief Executive Officer and Senior Financial Officers of Registrant.

The Board of Directors of UPC has adopted the UPC Code of Ethics for the Chief Executive Officer and Senior Financial Officers (the "Code"). A copy of the Code may be found on the Internet at our website www.up.com/investors. We intend to disclose any amendments to the Code or any waiver from a provision of the Code on our website.

## Item 11. Executive Compensation

Information concerning compensation received by our directors and certain executive officers is presented in the Compensation of Directors, Report on Executive Compensation, Summary Compensation Table, Security Ownership of Management, Option/SAR Grants Table, Aggregated Option/SAR Exercises in Last Fiscal Year and FY-End Option/SAR Values Table, Defined Benefit Plans and Change in Control Arrangements segments of the Proxy Statement and is incorporated herein by reference. Additional information regarding compensation of directors, including Board committee members, is set forth in the By-Laws of UPC and the Stock Unit Grant and Deferred Compensation Plan for the Board of Directors, both of which are included as exhibits to this report.

## Item 12. Security Ownership of Certain Beneficial Owners and Management

Information as to the number of shares of our equity securities beneficially owned by each of our directors and nominees for director, our five most highly compensated executive officers, our directors and executive officers as a group, and certain beneficial owners is set forth in the Election of Directors and Security Ownership of Management segments of the Proxy Statement and is incorporated herein by reference.

The following table summarizes the equity compensation plans under which Union Pacific Corporation common stock may be issued as of December 31, 2004.

| *Plan Category* | *Number of securities to be issued upon exercise of outstanding options, warrants and rights (a)* | *Weighted-average exercise price of outstanding options, warrants and rights (b)* | *Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) (c)* |
|---|---|---|---|
| Equity compensation plans approved by security holders .................... | 14,122,940[1] | $56.56[2] | 21,987,959 |
| Equity compensation plans not approved by security holders [3] ................ | 4,441,118 | $55.00 | - |
| Total ....................... | 18,564,058 | $56.17 | 21,987,959 |

*[1] Includes 1,041,925 retention units that do not have an exercise price. Does not include 235,490 retention shares that are actually issued and outstanding.*

*[2] Does not include the retention units or retention shares described in footnote [1].*

*[3] The UP Shares Stock Option Plan (UP Shares Plan) is the only equity compensation plan not approved by shareholders. The UP Shares Plan was approved by the Company's Board of Directors on April 30, 1998 and reserved 12,000,000 shares of Common Stock for issuance. The UP Shares Plan was a broad-based option program that granted each active employee on April 30, 1998 non-qualified options to purchase 200 shares of Common Stock at $55.00 per share. Options became exercisable on May 1, 2001 and expire on April 30, 2008. If an optionee's employment terminates for any reason, the option remains exercisable for a period of one year after the date of termination, but no option is exercisable after April 30, 2008. No further options may be granted under the UP Shares Plan.*

## Item 13. Certain Relationships and Related Transactions

Information on related transactions is set forth in the Certain Relationships and Related Transactions and Compensation Committee Interlocks and Insider Participation segments of the Proxy Statement and is incorporated herein by reference. We do not have any relationship with any outside third party which would enable such a party to negotiate terms of a material transaction that may not be available to, or available from, other parties on an arm's-length basis.

## Item 14. Principal Accounting Fees and Services

Information concerning the fees billed by our independent auditor and the nature of services comprising the fees for each of the two most recent fiscal years in each of the following categories: (i) audit fees, (ii) audit – related fees, (iii) tax fees, and (iv) all other fees, is set forth in the Audit Committee Report segment of the Proxy Statement and is incorporated herein by reference.

Information concerning our Audit Committee's policies and procedures pertaining to pre-approval of audit and non-audit services rendered by our independent auditor is set forth in the Audit Committee segment of the Proxy Statement and is incorporated herein by reference.

# PART IV

## Item 15. Exhibits and Financial Statement Schedules

(a) Financial Statements, Financial Statement Schedules, and Exhibits:

(1) Financial Statements

The financial statements filed as part of this filing are listed on the index to Consolidated Financial Statements, Item 8, on page 36.

(2) Financial Statement Schedules
Schedule II – Valuation and Qualifying Accounts

Schedules not listed above have been omitted because they are not applicable or not required or the information required to be set forth therein is included in the Consolidated Financial Statements, Item 8, or notes thereto.

(3) Exhibits

Exhibits are listed in the exhibit index on page 74. The exhibits include management contracts, compensatory plans and arrangements required to be filed as exhibits to the Form 10-K by Item 601 (10) (iii) of Regulation S-K.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, on this 25th day of February, 2005.

UNION PACIFIC CORPORATION

By /s/ Richard K. Davidson

Richard K. Davidson, Chairman,
President, Chief Executive
Officer and Director

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below, on this 25th day of February, 2005, by the following persons on behalf of the registrant and in the capacities indicated.

PRINCIPAL EXECUTIVE OFFICER
AND DIRECTOR:

/s/ Richard K. Davidson

Richard K. Davidson, Chairman,
President, Chief Executive
Officer and Director

PRINCIPAL FINANCIAL OFFICER:

/s/ Robert M. Knight, Jr.

Robert M. Knight, Jr.,
Executive Vice President – Finance and
Chief Financial Officer

PRINCIPAL ACCOUNTING OFFICER:

/s/ Richard J. Putz

Richard J. Putz,
Vice President and Controller

DIRECTORS:

Philip F. Anschutz*
Erroll B. Davis, Jr.*
Thomas J. Donohue*
Archie W. Dunham*
Spencer F. Eccles*
Ivor J. Evans*
Judith Richards Hope*
Michael W. McConnell*
Steven R. Rogel*
Ernesto Zedillo Ponce de Leon*

* By /s/ Thomas E. Whitaker

Thomas E. Whitaker, Attorney-in-fact

## SCHEDULE II – VALUATION AND QUALIFYING ACCOUNTS

*Union Pacific Corporation and Subsidiary Companies*

| *Millions of Dollars, for the Years Ended December 31,* | *2004* | *2003* | *2002* |
|---|---|---|---|
| Allowance for doubtful accounts: | | | |
| Balance, beginning of period | $101 | $108 | $110 |
| Charged to expense | 11 | 13 | 16 |
| Write-offs, net of recoveries | (5) | (20) | (18) |
| Balance, end of period | $107 | $101 | $108 |
| Allowance for doubtful accounts are presented in the Consolidated Statements of Financial Position as follows: | | | |
| Current | $ 19 | $ 17 | $ - |
| Long-term | 88 | 84 | 108 |
| Balance, end of period | $107 | $101 | $108 |

| *Millions of Dollars, for the Years Ended December 31,* | *2004* | *2003* | *2002* |
|---|---|---|---|
| Accrued casualty costs: | | | |
| Balance, beginning of period | $ 989 | $1,077 | $1,094 |
| Charged to expense | 694 | 416 | 359 |
| Cash payments and other reductions | (380) | (504) | (376) |
| Balance, end of period | $1,303 | $ 989 | $1,077 |
| Accrued casualty costs are presented in the Consolidated Statements of Financial Position as follows: | | | |
| Current | $ 419 | $ 394 | $ 419 |
| Long-term | 884 | 595 | 658 |
| Balance, end of period | $1,303 | $ 989 | $1,077 |

## Union Pacific Corporation
## Exhibit Index

| Exhibit No. | Description |
|---|---|
| **Filed with this Statement** | |
| 10(a) | The UPC Stock Unit Grant and Deferred Compensation Plan for the Board of Directors, as amended January 1, 2003. |
| 12 | Ratio of Earnings to Fixed Charges. |
| 21 | List of the Corporation's significant subsidiaries and their respective states of incorporation. |
| 23 | Independent Registered Public Accounting Firm's Consent. |
| 24 | Powers of attorney executed by the directors of UPC. |
| 31(a) | Certifications Pursuant to Rule 13a-14(a), of the Exchange Act, as Adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 – Richard K. Davidson. |
| 31(b) | Certifications Pursuant to Rule 13a-14(a), of the Exchange Act, as Adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 – Robert M. Knight, Jr. |
| 32 | Certifications Pursuant to 18 U.S.C. Section 1350, as Adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 – Richard K. Davidson and Robert M. Knight, Jr. |
| **Incorporated by Reference** | |
| 3(a) | Revised Articles of Incorporation of UPC, as amended through April 25, 1996, are incorporated herein by reference to Exhibit 3 to the Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 1996. |
| 3(b) | By-Laws of UPC, as amended, effective October 15, 2004, are incorporated herein by reference to Exhibit 3(b) of the Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2004. |
| 4(a) | Indenture, dated as of December 20, 1996, between UPC and Citibank, N.A., as Trustee, is incorporated herein by reference to Exhibit 4.1 to UPC's Registration Statement on Form S-3 (No. 333-18345). |
| 4(b) | Indenture, dated as of April 1, 1999, between UPC and JP Morgan Chase Bank, formerly The Chase Manhattan Bank, as Trustee, is incorporated herein by reference to Exhibit 4.2 to UPC's Registration Statement on Form S-3 (No. 333-75989). |
| 4(c) | Form of Debt Security is incorporated herein by reference to Exhibit 4.3 to UPC's Registration Statement on Form S-3 (No. 33-59323). |
| | Certain instruments evidencing long-term indebtedness of UPC are not filed as exhibits because the total amount of securities authorized under any single such instrument does not exceed 10% of the Corporation's total consolidated assets. UPC agrees to furnish the Commission with a copy of any such instrument upon request by the Commission. |

| | |
|---|---|
| 10(b) | Amended and Restated Registration Rights Agreement, dated as of July 12, 1996, among UPC, UP Holding Company, Inc., Union Pacific Merger Co. and Southern Pacific Rail Corporation (SP) is incorporated herein by reference to Annex J to the Joint Proxy Statement/Prospectus included in Post-Effective Amendment No. 2 to UPC's Registration Statement on Form S-4 (No. 33-64707). |
| 10(c) | Agreement, dated September 25, 1995, among UPC, UPRR, Missouri Pacific Railroad Company (MPRR), SP, Southern Pacific Transportation Company (SPT), The Denver & Rio Grande Western Railroad Company (D&RGW), St. Louis Southwestern Railway Company (SLSRC) and SPCSL Corp. (SPCSL), on the one hand, and Burlington Northern Railroad Company (BN) and The Atchison, Topeka and Santa Fe Railway Company (Santa Fe), on the other hand, is incorporated by reference to Exhibit 10.11 to UPC's Registration Statement on Form S-4 (No. 33-64707). |
| 10(d) | Supplemental Agreement, dated November 18, 1995, between UPC, UPRR, MPRR, SP, SPT, D&RGW, SLSRC and SPCSL, on the one hand, and BN and Santa Fe, on the other hand, is incorporated herein by reference to Exhibit 10.12 to UPC's Registration Statement on Form S-4 (No. 33-64707). |
| 10(e) | UPC 2001 Stock Incentive Plan, dated April 20, 2001, is incorporated herein by reference to Exhibit 99 to UPC's Current Report on Form 8-K dated March 8, 2001. |
| 10(f) | UPC 2004 Stock Incentive Plan, effective as of April 16, 2004, is incorporated herein by reference to Exhibit 10 to UPC's Current Report on Form 8-K dated March 10, 2004. |
| 10(g) | UP Shares Stock Option Plan of UPC, effective April 30, 1998, is incorporated herein by reference to Exhibit 4.3 to UPC's Registration Statement on Form S-8 (No. 333-57958). |
| 10(h) | The Executive Incentive Plan of UPC, as amended May 31, 2001, is incorporated herein by reference to Exhibit 10(b) to the Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001. |
| 10(i) | Written Description of Premium Exchange Program Pursuant to 1993 Stock Option and Retention Stock Plan of UPC is incorporated herein by reference to Exhibit 10(b) to the Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 1999. |
| 10(j) | The Supplemental Pension Plan for Officers and Managers of UPC and Affiliates, as amended May 30, 2002, is incorporated herein by reference to Exhibit 10(a) to the Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2002. |
| 10(k) | The 1993 Stock Option and Retention Stock Plan of UPC, as amended May 30, 2002, is incorporated herein by reference to Exhibit 10(b) to the Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2002. |
| 10(l) | UPC 2000 Directors Stock Plan is incorporated herein by reference to Exhibit 99 to UPC's Current Report on Form 8-K filed March 9, 2000. |
| 10(m) | UPC Key Employee Continuity Plan dated November 16, 2000, is incorporated herein by reference to Exhibit 10(o) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 2000. |

| | |
|---|---|
| 10(n) | The Pension Plan for Non-Employee Directors of UPC, as amended January 25, 1996, is incorporated herein by reference to Exhibit 10(w) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 1995. |
| 10(o) | The Executive Life Insurance Plan of UPC, as amended October 1997, is incorporated herein by reference to Exhibit 10(t) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 1997. |
| 10(p) | Charitable Contribution Plan for Non-Employee Directors of Union Pacific Corporation is incorporated herein by reference to Exhibit 10(z) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 1995. |
| 10(q) | Written Description of Other Executive Compensation Arrangements of Union Pacific Corporation is incorporated herein by reference to Exhibit 10(q) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 1998. |
| 10(r) | Form of Non-Qualified Stock Option Agreement for Executives is incorporated herein by reference to Exhibit 10(a) to the Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2004. |
| 10(s) | Form of Stock Unit Agreement for Executives is incorporated herein by reference to Exhibit 10(b) to the Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2004. |
| 10(t) | Form of Stock Unit Agreement for Executive Incentive Premium Exchange Program is incorporated herein by reference to Exhibit 10(c) to the Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2004. |
| 10(u) | Form of Non-Qualified Stock Option Agreement for Directors is incorporated herein by reference to Exhibit 10(d) to the Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2004. |

**Exhibit 12**

## RATIO OF EARNINGS TO FIXED CHARGES

*Union Pacific Corporation and Subsidiary Companies*

| *Millions of Dollars, Except for Ratio* | *2004* | *2003* | *2002* | *2001* | *2000* |
|---|---|---|---|---|---|
| Income from continuing operations | $ 604 | $1,056 | $1,265 | $ 934 | $ 810 |
| Equity earnings net of distributions | (47) | 15 | (34) | (48) | 24 |
| Total earnings | 557 | 1,071 | 1,231 | 886 | 834 |
| Income taxes | 252 | 581 | 680 | 545 | 446 |
| Fixed charges: | | | | | |
| Interest expense including amortization of debt discount | 527 | 574 | 632 | 700 | 722 |
| Portion of rentals representing an interest factor | 206 | 169 | 172 | 177 | 171 |
| Total fixed charges | 733 | 743 | 804 | 877 | 893 |
| Earnings available for fixed charges | $1,542 | $2,395 | $2,715 | $2,308 | $2,173 |
| Ratio of earnings to fixed charges | 2.1 | 3.2 | 3.4 | 2.6 | 2.4 |

**Exhibit 21**

## SIGNIFICANT SUBSIDIARIES OF UNION PACIFIC CORPORATION

| Name of Corporation | State of Incorporation |
|---|---|
| Union Pacific Railroad Company | Delaware |
| Southern Pacific Rail Corporation | Utah |

**Exhibit 23**

## CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We consent to the incorporation by reference in Post-Effective Amendment No. 1 to Registration Statement No. 33-12513, Registration Statement No. 33-53968, Registration Statement No. 33-49785, Registration Statement No. 33-49849, Registration Statement No. 33-51071, Registration Statement No. 33-58563, Registration Statement No. 333-10797, Registration Statement No. 333-13115, Registration Statement No. 333-16563, Registration Statement No. 333-88225, Registration Statement No. 333-88709, Registration Statement No. 333-57958, Registration Statement No. 333-61856, Registration Statement No. 333-42768, Registration Statement No. 333-106707, Registration Statement No. 333-106708, Registration Statement No. 333-105714, Registration Statement No. 333-105715, and Registration Statement No. 333-116003 on Forms S-8 and Registration Statement No. 333-88666, Amendment No. 1 to Registration Statement No. 333-88666, and Registration Statement No. 333-111185 on Forms S-3 of our reports dated February 7, 2005, relating to the consolidated financial statements and consolidated financial statement schedule of Union Pacific Corporation and Subsidiary Companies (which report expressed an unqualified opinion and included an explanatory paragraph relating to the change in method of accounting for asset retirement obligations in 2003) and management's report of the effectiveness of internal control over financial reporting, appearing in this Annual Report on Form 10-K of Union Pacific Corporation and Subsidiary Companies for the year ended December 31, 2004.

Deloitte & Touche LLP

Omaha, Nebraska
February 25, 2005

**Exhibit 24**

## UNION PACIFIC CORPORATION
## Powers of Attorney

Each of the undersigned directors of Union Pacific Corporation, a Utah corporation (the "Company"), do hereby appoint each of James R. Young, Barbara W. Schaefer, and Thomas E. Whitaker his or her true and lawful attorney-in-fact and agent, to sign on his or her behalf the Company's Annual Report on Form 10-K, for the year ended December 31, 2004, and any and all amendments thereto, and to file the same, with all exhibits thereto, with the Securities and Exchange Commission.

IN WITNESS WHEREOF, the undersigned have executed this Power of Attorney as of January 27, 2005.

/s/ Phillip F. Anschutz
Phillip F. Anschutz

/s/ Errol B. Davis, Jr.
Errol B. Davis, Jr.

/s/ Thomas J. Donohue
Thomas J. Donohue

/s/ Archie W. Dunham
Archie W. Dunham

/s/ Spencer F. Eccles
Spencer F. Eccles

/s/ Ivor J. Evans
Ivor J. Evans

/s/ Judith Richards Hope
Judith Richards Hope

/s/ Michael W. McConnell
Michael W. McConnell

/s/ Steven R. Rogel
Steven R. Rogel

/s/ Ernesto Zedillo
Ernesto Zedillo

**Exhibit 31(a)**

## CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER

I, Richard K. Davidson, certify that:

1. I have reviewed this annual report on Form 10-K of Union Pacific Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 25, 2005

/s/ Richard K. Davidson

Richard K. Davidson
Chairman, President and
Chief Executive Officer

**Exhibit 31(b)**

## CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER

I, Robert M. Knight, Jr., certify that:

1. I have reviewed this annual report on Form 10-K of Union Pacific Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f))for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 25, 2005

/s/ Robert M. Knight, Jr.

Robert M. Knight, Jr.
Executive Vice President - Finance and
Chief Financial Officer

**Exhibit 32**

## CERTIFICATION OF CHIEF EXECUTIVE OFFICER PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the accompanying Annual Report of Union Pacific Corporation (the Corporation) on Form 10-K for the period ending December 31, 2004, as filed with the Securities and Exchange Commission on the date hereof (the Report), I, Richard K. Davidson, Chairman, President and Chief Executive Officer of the Corporation, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to the best of my knowledge, that:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Corporation.

By: /s/ Richard K. Davidson

Richard K. Davidson
Chairman, President and
Chief Executive Officer
Union Pacific Corporation

February 25, 2005

A signed original of this written statement required by Section 906 has been provided to the Corporation and will be retained by the Corporation and furnished to the Securities and Exchange Commission or its staff upon request.

## CERTIFICATION OF CHIEF FINANCIAL OFFICER PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the accompanying Annual Report of Union Pacific Corporation (the Corporation) on Form 10-K for the period ending December 31, 2004, as filed with the Securities and Exchange Commission on the date hereof (the Report), I, Robert M. Knight, Jr., Executive Vice President – Finance and Chief Financial Officer of the Corporation, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to the best of my knowledge, that:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Corporation.

By: /s/ Robert M. Knight, Jr.

Robert M. Knight, Jr.
Executive Vice President – Finance and
Chief Financial Officer
Union Pacific Corporation

February 25, 2005

A signed original of this written statement required by Section 906 has been provided to the Corporation and will be retained by the Corporation and furnished to the Securities and Exchange Commission or its staff upon request.

# CORPORATE INFORMATION

## CORPORATE HEADQUARTERS

Union Pacific Corporation
1400 Douglas Street, 19th Floor
Omaha, NE 68179
(402) 544-5000
www.up.com

Union Pacific Railroad Company
1400 Douglas Street
Omaha, NE 68179
www.up.com

## TRANSFER AGENT AND REGISTRAR OF STOCK

Computershare Investor Services, LLC

*For U.S. Mail*
P.O. Box 1689
Chicago, IL 60690

*For Express Service Delivery*
2 North LaSalle Street
Chicago, IL 60602

Most questions regarding your account may be answered by contacting the automated Computershare Investor Services Help Line at (800) 317-2512 from your touch-tone phone, 24 hours a day, 7 days a week. Service representatives are available on the Help Line from 8 a.m. to 5 p.m. Central Time, Monday through Friday. You may also write to Computershare at the appropriate address above, or you may contact Computershare online at www.computershare.com.

## STOCK LISTING

New York Stock Exchange
Ticker Symbol: UNP

## ANNUAL MEETING OF SHAREHOLDERS

May 5, 2005, 8:30 a.m.
Little America Hotel
500 South Main Street
Salt Lake City, UT

## INFORMATION SOURCES

The contact for media and public relations inquiries is Corporate Relations at (402) 544-3475. Institutional investors and financial analysts can contact Investor Relations at (402) 544-4227 or (877) 547-7261. Written inquiries for Corporate or Investor Relations can be directed to Union Pacific Corporation's address listed above.

Individual shareholder questions should be directed to the Corporation's Transfer Agent using the contact information above.

## SEC FILINGS AND OTHER CORPORATE INFORMATION

Union Pacific makes available free of charge on our Internet Web site at www.up.com/investors our annual reports on Form 10-K, our quarterly reports on Form 10-Q, our current reports on Form 8-K, our proxy statements, Forms 3, 4 and 5, filed on behalf of directors and executive officers, and amendments to such reports filed or furnished pursuant to the Securities Exchange Act of 1934, as amended, as soon as reasonably practicable after such material is electronically filed with, or furnished to, the Securities and Exchange Commission (SEC). We also make available on our Web site previously filed SEC reports and exhibits via a link to "EDGAR" on the SEC's Internet site at www.sec.gov. Additionally, our corporate governance materials (including Board Committee charters, governance guidelines and policies, and codes of conduct and ethics for directors, officers and employees), news releases, investor fact books and other general information about Union Pacific are available on our Web site at www.up.com/investors. From time to time, the corporate governance materials on our Web site may be updated as necessary to comply with rules issued by the SEC and NYSE or as desirable to promote the effective and efficient governance of our company.

Copies of Union Pacific's 2004 Annual Report/Form 10-K and other corporate materials also are available, without charge, by writing to:

Secretary
Union Pacific Corporation
1400 Douglas Street, 19th Floor
Omaha, NE 68179

UNION PACIFIC
BUILDING AMERICA®




**UNION PACIFIC**—Headquartered in Omaha, Nebraska, Union Pacific Railroad operates nearly 33,000 route miles in the western two-thirds of the United States, making it North America's largest railroad. Supporting the nation's economy, Union Pacific links 23 states, every major West Coast and Gulf Coast port, and the fastest-growing U.S. population centers. The Railroad has one of the industry's most diversified commodity mixes and serves the East through four major gateways in Chicago, St. Louis, Memphis and New Orleans. Additionally, Union Pacific operates key north/south corridors, interchanging traffic with the Canadian rail systems, and it is the only railroad to serve six major gateways to Mexico. The Company's computer systems provide real-time information about customer shipments moving daily aboard nearly 3,000 trains, many of which are controlled by Omaha's Harriman Dispatching Center. The Railroad operates nearly 7,700 locomotives, most equipped with computerized control systems, and freight cars number more than 104,000. Union Pacific has more than 48,000 employees.

BUILDING AMERICA® UNION PACIFIC



UNION PACIFIC

BUILDING AMERICA®

1400 Douglas Street Omaha, Nebraska 68179 www.up.com

# EXHIBIT PX0705

# UNION PACIFIC CORPORATION 2003 ANNUAL REPORT

UNION PACIFIC

BUILDING AMERICA℠



## FINANCIAL HIGHLIGHTS

| *Millions of Dollars, Except Per Share Amounts and Ratios* | *2003* | *2002* | *2001* |
|---|---|---|---|
| **FOR THE YEAR** | | | |
| Operating Revenues | $11,551 | $11,159 | $10,830 |
| Operating Income | 2,133 | 2,253 | 2,018 |
| Income from Continuing Operations | 1,056 | 1,265 | 934 |
| Income from Discontinued Operations (a) | 255 | 76 | 32 |
| Cumulative Effect of Accounting Change, Net of Taxes | 274 | - | - |
| Net Income | 1,585 | 1,341 | 966 |
| Per Share–Basic: | | | |
| Income from Continuing Operations | 4.15 | 5.02 | 3.77 |
| Income from Discontinued Operations | 1.00 | 0.30 | 0.13 |
| Cumulative Effect of Accounting Change | 1.08 | - | - |
| Net Income | 6.23 | 5.32 | 3.90 |
| Per Share–Diluted: | | | |
| Income from Continuing Operations | 4.07 | 4.78 | 3.65 |
| Income from Discontinued Operations | 0.95 | 0.27 | 0.12 |
| Cumulative Effect of Accounting Change | 1.02 | - | - |
| Net Income | 6.04 | 5.05 | 3.77 |
| Dividends Per Share | 0.99 | 0.83 | 0.80 |
| Capital Expenditures (b) | 1,940 | 1,820 | 1,696 |
| Operating Cash Flow | 2,422 | 2,199 | 1,865 |
| Free Cash Flow (c) | 524 | 536 | 241 |
| **AT YEAR-END** | | | |
| Total Assets | $33,460 | $32,764 | $31,551 |
| Total Debt | 7,989 | 7,703 | 8,078 |
| Common Shareholders' Equity | 12,354 | 10,651 | 9,575 |
| Equity Per Common Share (d) | 47.85 | 41.99 | 38.26 |
| **FINANCIAL RATIOS (%)** | | | |
| Operating Margin | 18.5 | 20.2 | 18.6 |
| Operating Ratio | 81.5 | 79.8 | 81.4 |
| Lease Adjusted Debt to Capital (e) | 44.8 | 51.7 | 55.0 |
| Return on Average Common Shareholders' Equity | 13.8 | 13.3 | 10.6 |

*(a) The Corporation's trucking segment is presented as discontinued operations. 2003 results include a $211 million gain on sale, including an income tax benefit of $126 million.*
*(b) Capital expenditures include non-cash financings of $188 million, $126 million and $124 million in 2003, 2002 and 2001, respectively.*
*(c) Free cash flow is computed as follows: cash from operations less cash from investing less dividends paid less non-cash lease financings plus non-cash acquisitions. 2003 results exclude proceeds from Overnite IPO of $620 million. See reconciliation in Item 7 of Form 10-K.*
*(d) Equity per common share is based on average common shareholders' equity.*
*(e) Lease adjusted debt to capital is computed as follows: total debt plus convertible preferred securities plus net present value of leases divided by total debt plus equity plus convertible preferred securities plus net present value of leases.*

**OPERATING REVENUES**
*In millions of dollars*




**FREE CASH FLOW**
*In millions of dollars*




* *Excludes proceeds from Overnite IPO of $620 million.*

**DEBT TO CAPITAL****
*Percentage*




*** Lease Adjusted*

**3 YEAR TOTAL RETURN**
*Percentage*



**FELLOW SHAREHOLDERS,**

*The beginning of a new year is generally a time to reflect back on the events that have passed and think forward to the possibilities of tomorrow. Looking at 2003, the year began with economic uncertainty and global unrest, but ended with the positive momentum of an improving economy and emerging international stability. Through it all, Union Pacific has stayed the course and posted solid results, leveraging our assets to produce profitable, top-line growth through the consistency of our Yield Strategy and application of our quality processes.*

---

**2003 RECAP**

The two big challenges for Union Pacific in 2003 continued to be the cost of fuel and the uncertain economy. Energy prices remained stubbornly high throughout the year, increasing our 2003 expenses by $255 million and putting cost pressure on many of our customers, especially in the chemical industry. The good news, however, is that we improved our recovery mechanism with an innovative fuel surcharge program. In 2003, our surcharges offset nearly 44 percent of the higher fuel costs, a positive step forward and a vast improvement over historical recovery rates. Our overall commodity pricing improved more than 2 percent through a combination of value-added service offerings, favorable trends in our business mix and the surcharges.

Despite economic headwinds during the first part of the year, Union Pacific's great franchise and execution of our Yield Strategy helped the Company attain a number of volume and revenue records in 2003.

- *Total carloads topped 9.2 million for the first time ever and a single-month mark was set in October, moving nearly 836,000 carloads.*
- *Five of the six business teams recorded their best yearly revenue.*
  - *Energy benefited from a record 33 trains per day out of the Powder River Basin and set a new yearly high moving 177 million tons of coal.*
  - *Intermodal achieved its record year through disciplined price increases and an increased mix of premium business.*
  - *Industrial Products surpassed its 1994 record with revenue gains in 13 of the 16 different business segments within this group.*
  - *Agricultural Products beat a revenue record set in 1995, gaining from a resurgent grain market and continued growth in our premium perishables service known as Express Lane. In fact, for the first time in over 30 years we have invested, and will continue to invest, in new refrigerated boxcars to support the growth opportunities in this area.*
  - *Automotive topped last year's record performance with an 11 percent increase in auto parts revenue, offsetting slower demand for finished vehicle shipments.*

**CUSTOMER FOCUS**

Being a company where customers want to do business is a top priority at Union Pacific. One way of attaining that goal is by anticipating and responding to customer needs. In 2003, we demonstrated how we can help our customers be more competitive in the marketplace with the implementation of a 60-hour transcontinental service for United Parcel Service (UPS). Partnering with CSX and UPS, we are changing the way parcel freight is delivered coast-to-coast. Another creative service, the "de Mex AutoFlyer," is reliably speeding auto parts from Detroit to Mexico.

This new service is winning business from trucks and helping auto manufacturers reduce costs. Best of all, these offerings are an indication of the great potential we have to expand and grow in new markets through innovative product design.

While we can point to some great successes in 2003, we could have performed even better. Shortages of train crews and locomotives limited our growth potential and impacted both operating costs and service as volumes increased in the second half of the year. As we begin 2004 in anticipation of a growing economy, I'm confident that we are properly resourced and rededicated to excellent service through continuous quality improvement.

**THE END OF AN ERA**

Over the last 10 years, Union Pacific has gradually been divesting itself of non-rail assets. In November, we became a "pure" railroad again with the completion of the Overnite initial public offering. Overnite is a great company with a terrific management team, but it shared few synergies with the Railroad. Over the last few years, we explored ways to monetize Overnite, and in 2003, the timing was right. The market for less-than-truckload companies picked up in anticipation of an economic recovery, and the Teamsters were decertified by Overnite employees at every terminal that had previously voted for representation. The cash generated by the sale was used primarily to retire the final $500 million of the $1.5 billion convertible preferred securities issued by the Company in 1998 – further strengthening the Company's balance sheet and giving us great financial flexibility.

**LONG-TERM COMMITMENTS**

Looking back, the weak economy and energy cost pressures of 2003 were an extension of the challenging business cycle that began at the end of 2000. If you review Union Pacific's performance during that period, the Company has clearly produced solid results despite a difficult environment.

- *Rail operating revenues hit record levels each of the last three years – rising 4 percent in 2003 to a new high of $11.6 billion.*
- *Debt to total capitalization, adjusted for leases, decreased from 58.2 percent to 44.8 percent.*
- *Union Pacific's credit ratings were upgraded by both Standard and Poor's and Moody's.*
- *Overnite was sold in 2003, generating more than $600 million of cash.*
- *Free cash flow after dividends, including the Overnite sale, totaled over $1.9 billion.*
- *The Board of Directors increased the quarterly dividend by 50 percent from $0.20 to $0.30 per share.*
- *From December 31, 2000, to December 31, 2003, the total return on Union Pacific's stock rose 43 percent versus a 12 percent decrease in the S&P 500.*

The driving force behind this success has been our Yield Strategy and our quality commitment. Our focus on profitable revenue growth with increased asset utilization has been a winning combination. Best of all, success breeds success, positioning Union Pacific for further growth.

> *"The driving force behind this success has been our Yield Strategy and our quality commitment."*

**KEY STAKEHOLDERS**

The financial success of Union Pacific translates into greater job security for our employees and increased value for shareholders. The face of the Union Pacific worker is changing, so we must also change how we attract and retain top-quality, diverse employees. The U.S. Department of Health and Human Services recognized Union Pacific with the "Healthy Workplace" award for our efforts to promote healthy lifestyles. We were also selected by *Working Mother* magazine as one of the top 100 employers for working mothers and named to the *LATINA Style* 50 for sensitivity to Latinas' needs and goals in the workplace. Union Pacific is taking proactive steps today to ensure a quality workforce tomorrow.

At a time when shareholders are looking for strong corporate governance, I am especially pleased to report that our corporate audit staff was one of eight internal audit departments worldwide to receive the International Institute of Internal Auditors' Commitment to Quality Improvement Award. Additionally, the recent Corporate Governance Quotient issued by Institutional Shareholder Services places Union Pacific in the 98th percentile of S&P 500 companies and first in the transportation sector.

A driving force behind Union Pacific's strong corporate governance ranking has been our Board of Directors. The Board will see some changes in 2004, as two of our valued members step down due to the Board's mandatory retirement age. Ebby Gerry has been on the Board since 1986 and leaves his post as chair of the Finance Committee, having both strengthened the Company's balance sheet and increased the dividend to shareholders. Dick Mahoney joined the Board in 1991 and was instrumental in helping develop Union Pacific's strong reputation for corporate governance as the chair of the Corporate Governance and Nominating Committee. The contributions of both men will be greatly missed. I am pleased to welcome Mike McConnell as our newest board member. Mike is the managing partner at Brown Brothers Harriman & Company and brings a great business perspective to our Board.

*"We are using quality service and productivity to further increase the profitability of our business and enhance shareholder value."*

We also made some changes to our management structure, electing Ike Evans Vice Chairman and Jim Young to succeed Ike as President of the Railroad. They will join me in the newly created "Office of the Chairman," which formalizes our strong working relationship. Ike, Jim and I are a team whose skills complement each other very well. Rob Knight will succeed Jim as Executive Vice President and Chief Financial Officer. This new organization continues our efforts toward operational excellence, financial integrity and strong corporate governance.

**2004: LOOKING FORWARD**

Looking ahead, we see both opportunities and challenges again in 2004. The economic outlook is optimistic, and we're hopeful that the recent economic upswing will sustain itself. That said, energy costs remain a wild card and could dampen expectations. Regardless of the external factors, we will maintain our focus on running a profitable and efficient Railroad.

Union Pacific is positioned for growth. We have the best rail franchise in North America, a solid infrastructure, a talented management team and an unrelenting focus on quality. Our balance sheet is strong – giving us the flexibility to take advantage of the opportunities ahead. We are dedicated to meeting customer commitments and partnering with them to provide innovative services that meet their needs. We are also working to bring new customers to our Railroad. We are using quality service and productivity to further increase the profitability of our business and enhance shareholder value.

Our employees take pride in their work and are committed to converting today's opportunity into tomorrow's reality – making Union Pacific an even better company.



Dick Davidson
Chairman and Chief Executive Officer

# DIRECTORS AND OFFICERS

## BOARD OF DIRECTORS

*Philip F. Anschutz* *1 Chair, 4, 5*
Chairman
Anschutz Company

*Richard K. Davidson* *1*
Chairman, President and
Chief Executive Officer
Union Pacific Corporation

Chairman and
Chief Executive Officer
Union Pacific Railroad Company

*Thomas J. Donohue* *1, 2 Chair, 3*
President and
Chief Executive Officer
U.S. Chamber of Commerce

*Archie W. Dunham* *2, 5*
Chairman
ConocoPhillips

*Spencer F. Eccles* *2, 3*
Chairman
Wells Fargo Intermountain
Banking Region

*Ivor J. Evans*
Vice Chairman
Union Pacific Corporation and
Union Pacific Railroad Company

*Elbridge T. Gerry, Jr.* *1, 4 Chair, 5*
Partner
Brown Brothers Harriman & Co.

*Judith Richards Hope* *1, 3 Chair, 4*
Adjunct Professor of Law
Georgetown University Law Center
Senior Advisor to
Paul, Hastings, Janofsky & Walker

*Richard J. Mahoney* *1, 4, 5 Chair*
Retired Chairman and
Chief Executive Officer
Monsanto Company

*Michael W. McConnell*
Managing Partner
Brown Brothers Harriman & Co.

*Steven R. Rogel* *2, 3*
Chairman, President and
Chief Executive Officer
Weyerhaeuser Company

*Ernesto Zedillo Ponce de Leon* *3, 4*
Director
Yale Center for the Study
of Globalization

## BOARD COMMITTEES

1. Executive 2. Compensation and Benefits 3. Audit 4. Finance 5. Corporate Governance and Nominating

## OFFICERS

*Richard K. Davidson*
Chairman, President and
Chief Executive Officer
Union Pacific Corporation

Chairman and Chief Executive Officer
Union Pacific Railroad Company

*Ivor J. Evans*
Vice Chairman
Union Pacific Corporation and
Union Pacific Railroad Company

*James R. Young*
President and Chief Operating Officer
Union Pacific Railroad Company

*James V. Dolan*
Vice Chairman
Union Pacific Railroad Company

*L. Merill Bryan, Jr.*
Senior Vice President and
Chief Information Officer
Union Pacific Corporation

*Dennis J. Duffy*
Executive Vice President - Operations
Union Pacific Railroad Company

*Charles R. Eisele*
Senior Vice President - Strategic Planning
Union Pacific Corporation

*Bernard R. Gutschewski*
Vice President - Taxes
Union Pacific Corporation

*Mary Sanders Jones*
Vice President and Treasurer
Union Pacific Corporation

*R. Bradley King*
Executive Vice President -
Network Design and Integration
Union Pacific Railroad Company

*Robert M. Knight, Jr.*
Executive Vice President - Finance
and Chief Financial Officer
Union Pacific Corporation

*John J. Koraleski*
Executive Vice President -
Marketing and Sales
Union Pacific Railroad Company

*Mary E. McAuliffe*
Vice President - External Relations
Union Pacific Corporation

*Richard J. Putz*
Vice President and Controller
Union Pacific Corporation

*Barbara W. Schaefer*
Senior Vice President - Human Resources
Union Pacific Corporation

*Robert W. Turner*
Senior Vice President -
Corporate Relations
Union Pacific Corporation

*Carl W. von Bernuth*
Senior Vice President,
General Counsel and Secretary
Union Pacific Corporation

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

# FORM 10-K

*(Mark One)*

[X] **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2003

**OR**

[ ] **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from ___________ to ___________

***Commission File Number 1-6075***

# UNION PACIFIC CORPORATION
(Exact name of registrant as specified in its charter)

| **UTAH** | **13-2626465** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**1416 DODGE STREET, OMAHA, NEBRASKA**
(Address of principal executive offices)
**68179**
(Zip Code)
**(402) 271-5777**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each Class | Name of each exchange on which registered |
|---|---|
| **Common Stock (Par Value $2.50 per share)** | **New York Stock Exchange, Inc.** |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Yes X No ___

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [ ].

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Act).

Yes X No ___

As of June 30, 2003, the aggregate market value of the registrant's Common Stock held by non-affiliates (using the New York Stock Exchange closing price) was $14,439,817,141

The number of shares outstanding of the registrant's Common Stock as of January 31, 2004, was 258,839,901.

Documents Incorporated by Reference – Portions of the registrant's definitive Proxy Statement for the Annual Meeting of Shareholders to be held on April 16, 2004, have been incorporated by reference into Parts II and III of this report. The registrant's Proxy Statement will be filed with the Securities and Exchange Commission pursuant to Regulation 14A.

## TABLE OF CONTENTS
## UNION PACIFIC CORPORATION


PART I

| | | |
|---|---|---|
| Item 1. | Business | 3 |
| Item 2. | Properties | 7 |
| Item 3. | Legal Proceedings | 8 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 11 |
| | Executive Officers of the Registrant and Principal Executive Officers of Subsidiaries | 11 |

PART II

| | | |
|---|---|---|
| Item 5. | Market for the Registrant's Common Equity and Related Shareholder Matters | 13 |
| Item 6. | Selected Financial Data | 13 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 14 |
| | Risk Factors | 17 |
| | Cautionary Information | 34 |
| Item 7A. | Quantitative and Qualitative Disclosures about Market Risk | 35 |
| Item 8. | Financial Statements and Supplementary Data | 36 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 67 |
| Item 9A. | Controls and Procedures | 67 |

PART III

| | | |
|---|---|---|
| Item 10. | Directors and Executive Officers of the Registrant | 68 |
| Item 11. | Executive Compensation | 68 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management | 68 |
| Item 13. | Certain Relationships and Related Transactions | 69 |
| Item 14. | Principal Accounting Fees and Services | 69 |

PART IV

| | | |
|---|---|---|
| Item 15. | Exhibits, Financial Statement Schedules and Reports on Form 8-K | 70 |
| | Signatures | 71 |
| | Certifications | 80 |

# PART I

## Item 1. Business

## GENERAL

Union Pacific Corporation operates primarily as a rail transportation provider through Union Pacific Railroad Company, its principal operating company, which is the largest railroad in North America, covering 23 states across the western two-thirds of the United States. Union Pacific Corporation was incorporated in Utah in 1969 with its principal executive offices located at 1416 Dodge Street, Omaha, NE 68179. The telephone number at that address is (402) 271-5777. The common stock of Union Pacific Corporation is listed on the New York Stock Exchange (NYSE) under the symbol "UNP".

For purposes of this report, unless the context otherwise requires, all references herein to "UPC", "Corporation", "we", "us", and "our" shall mean Union Pacific Corporation and its subsidiaries, including Union Pacific Railroad Company, which will be separately referred to as "UPRR" or the "Railroad".

Our operating results include Southern Pacific Rail Corporation, which we acquired in October 1996. In addition, during 1997, the Railroad acquired an ownership interest in a consortium which was granted a 50-year concession to operate the Pacific-North and Chihuahua Pacific lines in Mexico. The Railroad made an additional investment in the consortium in 1999 and currently holds a 26% ownership interest. In November 2003, we completed the sale of our entire trucking interest through an underwritten initial public offering of all the common stock of Overnite Corporation, leaving the Railroad as our only operating segment and the principal source of our revenues.

**Available Information** – Our Internet website is www.up.com. We make available free of charge on our website (under the "Investors" caption link) our annual report on Form 10-K, our quarterly reports on Form 10-Q, our current reports on Form 8-K, our proxy statement and Forms 3, 4 and 5, filed on behalf of directors and executive officers and amendments to such reports filed or furnished pursuant to the Securities Exchange Act of 1934, as amended (the Exchange Act), as soon as reasonably practicable after such material is electronically filed with, or furnished to, the Securities Exchange Commission (SEC). We also make available on our website previously filed SEC reports and exhibits via a link to EDGAR on the SEC's Internet site at www.sec.gov. Additionally, our corporate governance materials, including Board Committee charters, governance guidelines and policies and codes of conduct and ethics for directors, officers and employees may also be found on our website at www.up.com/investors. From time to time, the corporate governance materials on our website may be updated as necessary to comply with rules issued by the SEC and NYSE or as desirable to promote the effective and efficient governance of our company. Any security holder wishing to receive, without charge, a copy of any of these SEC filings or corporate governance materials should write to Secretary, Union Pacific Corporation, 1416 Dodge Street, Room 1230, Omaha, NE 68179.

The reference to our website address does not constitute incorporation by reference of the information contained on the website and should not be considered part of this report.

## OPERATIONS

The Railroad, along with its subsidiaries and rail affiliates, is our one reportable business segment. The Consolidated Financial Statements also include our discontinued trucking operations, consisting of Overnite Transportation Company (OTC) and Motor Cargo Industries, Inc. (Motor Cargo). Our trucking segment was reclassified as a discontinued operation in 2003. Additional information regarding our operations is presented within Selected Financial Data, Item 6 and the Consolidated Financial Statements, Item 8.

**Continuing Operations** – The Railroad is a Class I railroad that operates in the United States. We have approximately 33,000 route miles linking Pacific Coast and Gulf Coast ports with the Midwest and eastern United

States gateways and providing several north/south corridors to key Mexican gateways. We serve the western two-thirds of the country and maintain coordinated schedules with other rail carriers for the handling of freight to and from the Atlantic Coast, the Pacific Coast, the Southeast, the Southwest, Canada and Mexico. Export and import traffic is moved through Gulf Coast and Pacific Coast ports and across the Mexican and Canadian borders. Railroad commodity revenue totaled $11.0 billion in 2003 and is comprised of the following six commodity groups:

*Agricultural* – The transportation of Agricultural Products, including whole grains (for animal and human consumption) and commodities produced from these grains, food and beverage products and sweeteners, provided 14% of 2003 commodity revenue. With access to most major grain markets, the Railroad provides a critical link between the Midwest and western producing areas and the primary Pacific Northwest (PNW) and Gulf ports, as well as Mexico. UPRR also serves significant domestic markets, including grain processors and feeders, as well as ethanol producers in the Midwest, West, South and Rocky Mountain states. Unit trains of grain efficiently shuttle between producers and export terminals or domestic markets. Primary food commodities consist of a variety of fresh and frozen fruits and vegetables, dairy products and beverages, which are moved to major U.S. population centers for consumption. Express Lane, our premium and perishables service moving fruits and vegetables from the PNW and California to destinations in the East, continues to draw market share from trucks. Frozen meat and poultry are also transported to the West Coast ports for export, while beverages are imported into the U.S. from Mexico. Sweeteners are primarily short haul sugar beet movements from the fields to the refineries, both of which are located in Idaho.

*Automotive* – UPRR is the largest automotive carrier west of the Mississippi River, serving seven vehicle assembly plants and distributing imported vehicles from six West Coast ports and Houston. The Railroad serves 42 vehicle distribution centers, from which vehicles are delivered to all major western U.S. cities. These centers serve as railcar-to-truck haulaway operations for major domestic and international automotive manufacturers. In addition to transporting finished vehicles, UPRR currently provides expedited handling of automobile materials in both boxcars and containers to several assembly plants. Converting automotive material shipments from the highway to rail is a key growth opportunity. Mexico is also an important contributor to the automotive market for the Railroad, as manufacturers continue to locate both vehicle manufacturing and parts facilities at locations throughout the country. Automotive materials flow north and south across the border bound for assembly plants in Mexico, the U.S. and Canada. In 2003, the transportation of finished vehicles and automobile materials accounted for 11% of total commodity revenue.

*Chemicals* – The transportation of Chemicals provided 14% of UPRR's 2003 commodity revenue. The Railroad's franchise enables it to serve the large chemical producing areas along the Gulf Coast, as well as the Rocky Mountain region. More than two-thirds of the chemicals business consists of liquid and dry chemicals, plastics and liquid petroleum products. "Pipeline" service, designed to eliminate unnecessary stops in terminals, reduces delivery times and significantly improves asset utilization for customers and the Railroad. In addition to transporting plastics, customers also leverage UPRR's industry leading storage-in-transit yards for intermediate storage of plastic resins. Soda ash shipments originate in southwestern Wyoming and California and are consumed primarily in glass producing markets in the East, the West and abroad. Fertilizer movements originate on the Gulf Coast, as well as in the West and Canada, bound for major agricultural end-users in the Midwest and the western U.S.

*Energy* – Coal transportation accounted for 22% of UPRR's 2003 commodity revenue. The Railroad's geographic footprint positions it to transport coal destined for utilities and industrial facilities in 27 states, as well as to the Gulf and rail/barge/ship facilities on the Mississippi and Ohio Rivers and the Great Lakes. UPRR serves mines located in the Southern Powder River Basin of Wyoming, in addition to Colorado, Utah, southern Wyoming and southern Illinois. Southern Powder River Basin coal represents the largest and fastest growing segment of the market, as utilities continue to favor its low cost and low-sulfur content. In addition, UPRR continues to penetrate markets in the East as electricity generation continues to grow in the face of declining eastern coal production. High-BTU low-sulfur coal from Colorado and Utah is also transported to domestic utilities and industries, as well as for export to Mexico.

*Industrial Products* – Industrial products includes a broad range of commodities, from bulk products like stone, cement, minerals, waste and scrap to higher-value shipments like lumber, paper and government and consumer goods. Bulk commodities often move in unit train service from origin to a distribution facility in major metropolitan areas. Other commodities move in manifest trains and rely on the Railroad's extensive network to move between thousands of shippers and customers across North America. UPRR continues to focus on capturing share from trucks by providing consistent and reliable service. In 2003, the transportation of industrial products provided 20% of total commodity revenue.

*Intermodal* – UPRR's Intermodal business, which represents 19% of 2003 commodity revenues, is classified as international, domestic or premium shipments. International business consists of international container traffic for steamship customers. It arrives at West Coast ports for destinations throughout the United States. Domestic business includes domestic container and trailer traffic handled by intermodal marketing companies (primarily shipper agents and consolidators) and truckload carriers. Less-than-truckload and package carriers with time sensitive business requirements account for the majority of the premium business. Service performance and reliability drive intermodal business growth, as modeled by the 60-hour transcontinental rail service solution provided by the Railroad and its partnering rail carrier to UPS in 2003.

*Working Capital* – We currently have, and historically have had, a working capital deficit, which is not uncommon in our industry and does not indicate a lack of liquidity or financial stability. We maintain adequate resources to meet our daily cash requirements, and we have sufficient financial capacity to satisfy our current liabilities.

*Competition* – We are subject to competition from other railroads, motor carriers and barge operators. Our main rail competitor is Burlington Northern Santa Fe Corporation. Its rail subsidiary, The Burlington Northern and Santa Fe Railway Company, operates parallel routes in many of our main traffic corridors. In addition, our operations are conducted in corridors served by other competing railroads and by motor carriers. Motor carrier competition is particularly strong with respect to five of our six commodity groups (excluding energy), due to shorter delivery times offered by such carriers. Because of the proximity of our routes to major inland and Gulf Coast waterways, barge competition can be particularly pronounced, especially for grain and bulk commodities. Competition can pressure both transit time requirements and pricing, as well as place a greater emphasis on the quality and reliability of the service provided. While we must build or acquire and maintain our rail system, trucks and barges are able to use public rights-of-way maintained by public entities. Any future improvements or expenditures materially increasing the quality of these alternative modes of transportation in the locations in which we operate, or legislation granting materially greater latitude for motor carriers with respect to size or weight limitations, could have a material adverse effect on our results of operations, financial condition and liquidity.

*Equipment Suppliers* – We are dependent on two key suppliers of locomotives. Due to the capital intensive nature and sophistication of this equipment and its production, there are strong barriers of entry to potential new suppliers. Therefore, if one of these suppliers discontinues manufacturing locomotives, we could realize a significant increase in the cost and the potential for reduced availability of the locomotives that are necessary to our operations.

*Employees* – Approximately 86% of our 46,000 full time equivalent employees are represented by 14 major rail unions. National negotiations under the Railway Labor Act to revise the national labor agreements for all crafts began in late 1999.

In May 2001, the Brotherhood of Maintenance of Way Employees (BMWE) ratified an agreement, which included provisions for wage increases (based on the consumer price index) and progressive employee health and welfare cost sharing rates.

In August 2002, the carriers reached an agreement with the United Transportation Union (UTU) that incorporated wage increases. The agreement also provided for the operation of remote control locomotives

by trainmen that was challenged by the Brotherhood of Locomotive Engineers (BLE). A January 2003 arbitration decision held that the operation of remote control locomotives in terminals does not violate the BLE agreement. In November 2003, agreement was reached with the UTU on employee health and welfare cost sharing rates and plan design changes.

In November 2002, the International Brotherhood of Boilermakers and Blacksmiths (IBB) reached an agreement that incorporated wage increases.

In January 2003, an arbitration award was rendered establishing wage increases and employee health and welfare cost sharing rates for the Transportation Communications International Union (TCU). Health and welfare plan design changes were also part of the TCU agreement.

Other settled agreements that incorporated wage increases and employee health and welfare cost sharing rates combined with plan design changes include the Brotherhood of Railway Signalmen (BRS) in September 2003 and the Brotherhood of Locomotive Engineers (BLE) in December 2003. Contract discussions with the remaining unions are either in negotiation or mediation.

All settlements previously discussed include a five year contract period, expiring December 31, 2004.

Effective January 2004, the Brotherhood of Locomotive Engineers merged with the International Brotherhood of Teamsters (IBT). The BLE has changed its name to the Brotherhood of Locomotive Engineers and Trainmen (BLET).

**Discontinued Operations –** In November 2003, we completed the sale of our entire trucking interest, and as a result, the operations of OTC and Motor Cargo are included in discontinued operations (see note 13 to the Consolidated Financial Statements, Item 8). OTC is a major interstate trucking company specializing in less-than-truckload shipments. OTC serves all 50 states and portions of Canada and Mexico through 170 service centers located throughout the United States providing regional, inter-regional and long haul service. OTC transports a variety of products including machinery, tobacco, textiles, plastics, electronics and paper products. Motor Cargo is a western regional less-than-truckload carrier that provides comprehensive service throughout 10 western states. Motor Cargo transports general commodities, including consumer goods, packaged foodstuffs, industrial and electronic equipment and auto parts.

## GOVERNMENTAL AND ENVIRONMENTAL REGULATION

**Governmental Regulation –** Our operations are subject to a variety of federal, state and local regulations, generally applicable to all businesses (see also the discussion of certain regulatory proceedings in Legal Proceedings, Item 3).

The operations of the Railroad are subject to the regulatory jurisdiction of the Surface Transportation Board (STB) of the United States Department of Transportation (DOT) and other federal and state agencies. The operations of the Railroad are also subject to the regulations of the Federal Railroad Administration of the DOT. The STB has jurisdiction over rates charged on certain regulated rail traffic; freight car compensation; transfer, extension or abandonment of rail lines; and acquisition of control of rail common carriers.

The DOT and the Occupational Safety and Health Administration, along with other federal agencies, have jurisdiction over certain aspects of safety, movement of hazardous materials, movement and disposal of hazardous waste and equipment standards. Various state and local agencies have jurisdiction over disposal of hazardous waste and seek to regulate movement of hazardous materials in areas not otherwise preempted by federal law.

**Environmental Regulation –** In addition to the regulations governing the transportation of hazardous materials, we are subject to extensive federal and state environmental statutes and regulations pertaining to public

health and the environment. The statutes and regulations are administered and monitored by the Environmental Protection Agency (EPA) and by various state environmental agencies. Those laws primarily affecting our operations are the Resource Conservation and Recovery Act of 1976, regulating the management and disposal of solid and hazardous wastes, the Comprehensive Environmental Response, Compensation and Liability Act of 1976, regulating the cleanup of contaminated properties, the Clean Air Act regulating air emissions and the Clean Water Act, regulating waste water discharges.

Information concerning environmental claims and contingencies and estimated remediation costs is set forth in Management's Discussion and Analysis of Financial Condition and Results of Operations – Critical Accounting Policies – Environmental, Item 7.

## Item 2. Properties

Our primary real estate, equipment and other property (properties) are owned or leased to support our rail operations. We believe that our properties are in good condition and are adequate for current operations. We operate facilities and equipment designated for both maintenance and repair, including locomotives, railcars and other equipment, and for monitoring such maintenance and repair work. The facilities include rail yards, intermodal ramps and maintenance shops throughout the rail system. We had approximately $1.9 billion in capital expenditures during 2003, including non-cash financings of $188 million, for, among other things, building and maintaining track, structures and infrastructure, upgrading and augmenting equipment and implementing new technologies (see the capital expenditures table in Management's Discussion and Analysis of Financial Condition and Results of Operations – Liquidity and Capital Resources – Financial Condition, Item 7).

Certain of our properties are subject to federal, state and local provisions involving the protection of the environment (see discussion of environmental issues in Governmental and Environmental Regulation, Item 1, Management's Discussion and Analysis of Financial Condition and Results of Operations – Critical Accounting Policies – Environmental, Item 7).

**Track –** Our rail operations utilize approximately 33,000 main line and branch line route miles in 23 states in the western two-thirds of the United States. We own approximately 27,000 route miles with the remainder of route miles operated under trackage rights or leases. As of and for the years ending December 31, 2003, 2002 and 2001, route miles operated and track miles installed and replaced are as follows:

| *Miles* | *2003* | *2002* | *2001* |
|---|---|---|---|
| Main line | 27,547 | 27,504 | 27,553 |
| Branch line | 5,284 | 5,637 | 6,033 |
| Yards, sidings and other main lines | 21,285 | 21,760 | 21,669 |
| Total | 54,116 | 54,901 | 55,255 |
| Track miles of rail installed and replaced: | | | |
| New | 739 | 783 | 857 |
| Used | 309 | 330 | 388 |
| Ties installed and replaced (000) | 4,855 | 4,531 | 3,648 |

**Equipment –** Our primary rail equipment as of and for the years ending December 31, 2003, 2002 and 2001, consisted of the following:

| *Equipment* | *2003* | *2002* | *2001* |
|---|---|---|---|
| Owned or leased at year-end: | | | |
| Locomotives | 7,251 | 7,094 | 6,886 |
| Freight cars: | | | |
| Covered hoppers | 29,374 | 30,602 | 33,901 |
| Boxcars | 18,691 | 15,040 | 15,561 |
| Open-top hoppers | 13,489 | 15,891 | 17,202 |
| Gondolas | 14,955 | 14,793 | 15,431 |
| Other | 11,296 | 14,551 | 14,681 |
| Work equipment and other | 6,950 | 6,950 | 6,950 |
| Purchased or leased during the year: | | | |
| Locomotives | 265 | 530 | 500 |
| Freight cars | 580 | 3,823 | 793 |
| Average age of equipment (years): | | | |
| Locomotives | 14.3 | 14.4 | 14.9 |
| Freight cars | 24.5 | 21.9 | 22.5 |

## Item 3. Legal Proceedings

### Shareholder Litigation

As previously reported, a purported derivative action was filed by nine individuals, seven of whom are members of the Teamsters, on behalf of the Corporation on June 21, 2001, in the Chancery Court of Shelby County, Tennessee, naming as defendants current and certain former directors of the Corporation and various present and former officers and employees of OTC, as well as OTC, and, as a nominal defendant, the Corporation. The derivative action alleged, among other things, that the named defendants breached their fiduciary duties to the Corporation, wasted its assets and mismanaged OTC by opposing the efforts of the Teamsters to organize the employees of OTC. Plaintiffs claimed that the "anti-union" campaign allegedly waged by the defendants cost millions of dollars and caused a substantial decline in the value of OTC. On July 31, 2001, the defendants filed a motion to dismiss the action on various grounds, and on July 1, 2002, the court granted the defendants' motion and dismissed the derivative action on procedural grounds. The plaintiffs filed an appeal with the Tennessee Court of Appeals, and, on October 7, 2003, the Court of Appeals affirmed the decision of the Chancery Court to dismiss the action on procedural grounds. During the fourth quarter of 2003, the plaintiffs petitioned the Supreme Court of Tennessee to review the decision of the appellate court. The Court has not indicated whether it will hear this appeal.

### Environmental Matters

The United States Attorney for the Central District of California has notified us that the office intends to present criminal charges against us for alleged violations of federal environmental laws, including the federal Clean Water Act, in connection with releases of oil contaminated wastewater from our Taylor Yard in 2001 and 2003. In addition, the State authorities are proposing civil penalties for these same releases in the amount of $125,000.

After a series of protracted negotiations, the California Department of Toxic Substances Control ("DTSC") threatened civil prosecution against us in November 2003, relating to our failure to register as a hazardous waste transporter under California law from April 2000 to August 2001. We contend that we are exempt from the registration requirements due to federal preemption. The DTSC has proposed civil penalties of $125,160 for the alleged violation. We will vigorously oppose this proposed penalty.

As previously reported in our Annual Report on Form 10-K for 2001, on January 30, 2002, the Louisiana Department of Environmental Quality (LDEQ) issued to the Railroad a notice of a proposed penalty assessment in the amount of $195,700. We previously met with the LDEQ regarding this matter to present documentation indicating that no penalty should be assessed. We have filed suit against the LDEQ in Louisiana State District Court challenging the penalty. The LDEQ proposed penalty relates to the derailment of one of our trains carrying hazardous materials near Eunice, Louisiana on May 27, 2000. The derailment caused a fire and explosion that resulted in the evacuation of approximately 3,800 residents of the surrounding area and numerous claims for personal injuries, property damage and business interruption, which was previously reported in our report on Form 10-Q for the period ended June 30, 2000. To date, several class action claims have been filed against the Railroad. The amount of damages have not been specified in these claims; and, therefore, it is not possible to predict the ultimate outcome of these proceedings. Settlement discussions with the class representatives are ongoing. We believe we have substantial defenses and, although losses have exceeded self-insured retention amounts, we believe our insurance coverage is adequate to cover any material damage claims or settlements.

As previously reported in our Quarterly Report on Form 10-Q for the quarter ended June 30, 2002, a criminal case, relating to a series of alleged releases of hazardous materials, was filed against us by the District Attorneys of Merced, Madera and Stanislaus Counties. The criminal case was dismissed in the last quarter of 2003 and was subsequently refiled as a civil action by several counties. The civil suit seeks civil penalties against us in connection with the release of calcium oxide (“lime”), which leaked from an unidentified railcar between Chowchilla and Sacramento, California, on December 27, 2001, and another incident in which lime leaked from a railcar between Chowchilla and Stockton, California on February 21, 2002. The suit contends that regulatory violations occurred by virtue of our alleged failure to timely report the release of a “hazardous material,” our alleged disposal of hazardous waste, and the alleged release of material into the waters of the State of California. The amount of the claim is not specified but could exceed $100,000.

As previously reported in our Quarterly Report on Form 10-Q for the quarter ended March 31, 2003, the San Joaquin County District Attorney filed an action against us on February 3, 2003, alleging claims under the California Business and Professions Code section 17200 (unfair business practices), Fish and Game Code section 5650 and 5650.1, California Health and Safety Code section 25189(d) and Public Nuisance, California Civil Code section 3480. The claims arise from a February 16, 2000 derailment in Stockton, California in which a locomotive struck an object on the tracks, resulting in the puncture of a fuel tank. The District Attorney alleged that diesel fuel from this spill entered waters of the State of California. The complaint also asserted claims under the above referenced statutes for any other diesel spill which may have occurred in the State of California, between 2000 and 2003, in which diesel may have passed into waters of the State of California and seeks injunctive relief, as well as civil penalties of $25,000 for the alleged February 16, 2000 diesel spill and total penalties of not less than $250,000 for all diesel spills which may have occurred since 2000. The District Attorney filed an amended complaint on April 10, 2003, which narrowed the claims to the incident of February 16, 2000. The amended complaint seeks both injunctive relief and daily penalties, which could exceed $100,000, for each day that fuel was in the affected waterway.

As previously reported in our Quarterly Report on Form 10-Q for the quarter ended March 31, 2002, on April 26, 2002, we received written notice of a proposed $250,000 penalty from the Illinois Environmental Protection Agency relating to a collision between trains from Conrail and the Railroad. The collision occurred near Momence, Illinois, on March 23, 1999 when an eastbound Conrail train failed to stop at a signal and struck a UPRR train that was properly occupying a crossing. The collision resulted in a release of diesel fuel from the fuel tanks of our locomotive, which was promptly reported and remediated. We received notice in January 2003 that the amount of the proposed penalty, including oversight costs, has been reduced to $127,000. We will vigorously oppose this proposed penalty.

We have received notices from the EPA and state environmental agencies alleging that we are or may be liable under certain federal or state environmental laws for remediation costs at various sites throughout the United States, including sites which are on the Superfund National Priorities List or state superfund lists.

Although specific claims have been made by the EPA and state regulators with respect to some of these sites, the ultimate impact of these proceedings and suits by third parties cannot be predicted at this time because of the number of potentially responsible parties involved, the degree of contamination by various wastes, the scarcity and quality of volumetric data related to many of the sites, and/or the speculative nature of remediation costs.

Information concerning environmental claims and contingencies and estimated remediation costs is set forth in Management's Discussion and Analysis of Financial Condition and Results of Operations – Critical Accounting Policies – Environmental, Item 7.

## Other Matters

As previously reported, Western Resources, Inc. (Western) filed a complaint on January 24, 2000, in the U.S. District Court for the District of Kansas alleging that UPRR and The Burlington Northern and Santa Fe Railway Company (BNSF) materially breached our service obligations under the transportation contract to deliver coal in a timely manner to Western's Jeffrey Energy Center. On September 12, 2002, the jury returned a verdict finding that the contract had not been breached by the railroads, and the judgment dismissing the case was entered by the court on September 16, 2002. Western filed a motion for a new trial on September 30, 2002, which was denied by the court on March 6, 2003. Western filed notice of its intent to appeal the verdict to the 10th Circuit Court of Appeals on April 4, 2003. On October 22, 2003, Western agreed to have the matter dismissed in exchange for a payment of $50,000 by the railroads, which did not constitute an admission of liability, and, on November 5, 2003, the court dismissed the complaint.

## Item 4. Submission of Matters to a Vote of Security Holders

No matters were submitted to a vote of security holders during the fourth quarter of the year ended December 31, 2003.

## Executive Officers of the Registrant and Principal Executive Officers of Subsidiaries

Our executive officers generally are elected and designated annually by the Board of Directors at our first meeting held after the Annual Meeting of Shareholders, and they hold office until their successors are elected. Executive officers also may be elected and designated throughout the year, as the Board of Directors considers appropriate. There are no family relationships among the officers, nor any arrangement or understanding between any officer and any other person pursuant to which the officer was selected. The following table sets forth certain information, as of February 6, 2004 relating to the executive officers.

| Name | Position | Age | Business Experience During Past Five Years |
|---|---|---|---|
| Richard K. Davidson | Chairman, President and Chief Executive Officer of UPC and Chairman and Chief Executive Officer of the Railroad | 62 | Current Position |
| Ivor J. Evans | Vice Chairman of UPC and the Railroad | 61 | (1) |
| Robert M. Knight, Jr. | Executive Vice President–Finance and Chief Financial Officer of UPC and the Railroad | 46 | (2) |
| L. Merill Bryan, Jr. | Senior Vice President and Chief Information Officer | 59 | Current Position |
| Charles R. Eisele | Senior Vice President–Strategic Planning | 54 | (3) |
| Barbara W. Schaefer | Senior Vice President–Human Resources | 50 | Current Position |
| Robert W. Turner | Senior Vice President–Corporate Relations | 54 | (4) |
| Carl W. von Bernuth | Senior Vice President, General Counsel and Secretary | 60 | Current Position |
| Bernard R. Gutschewski | Vice President–Taxes | 53 | Current Position |
| Mary E. McAuliffe | Vice President–External Relations | 57 | Current Position |
| Richard J. Putz | Vice President and Controller | 56 | (5) |
| Mary Sanders Jones | Vice President and Treasurer | 51 | Current Position |
| James R. Young | President and Chief Operating Officer of the Railroad | 51 | (6) |
| James V. Dolan | Vice Chairman of the Board of the Railroad | 65 | (7) |
| Dennis J. Duffy | Executive Vice President–Operations of the Railroad | 53 | Current Position |
| John J. Koraleski | Executive Vice President–Marketing and Sales of the Railroad | 53 | Current Position |
| R. Bradley King | Executive Vice President–Network Design and Integration of the Railroad | 55 | Current Position |

## Executive Officers of the Registrant and Principal Executive Officers of Subsidiaries
(Continued)

(1) Mr. Evans was elected to his current position effective February 1, 2004. He served as President and Chief Operating Officer of the Railroad prior thereto.

(2) Mr. Knight was elected to his current position effective February 1, 2004. He was elected Senior Vice President-Finance for UPC and the Railroad effective February 1, 2002, Vice President and General Manager Automotive for the Railroad effective June 2000 and served as Vice President and General Manager Energy for the Railroad prior thereto.

(3) Mr. Eisele was elected to his current position effective October 1, 2001. He was Vice President–Strategic Planning and Administration prior thereto.

(4) Mr. Turner was elected to his current position effective August 2000. Prior thereto, he was Vice President–Public Affairs of Champion International Corporation, a paper and forest products company.

(5) Mr. Putz was elected Vice President and Controller of UPC and Chief Accounting Officer and Controller of the Railroad effective December 1, 1999. Prior thereto, he was Assistant Vice President and Controller of the Railroad.

(6) Mr. Young was elected to his current position effective February 1, 2004. He was elected Executive Vice President–Finance of UPC and Chief Financial Officer of the Railroad effective December 1, 1999, Controller of UPC and Senior Vice President–Finance of the Railroad effective March 1999 and served as Senior Vice President–Finance of UPC prior thereto.

(7) Mr. Dolan was elected to his current position effective September 1, 2002. Prior thereto, he was Vice President-Law of the Railroad.

# PART II

## Item 5. Market for the Registrant's Common Equity and Related Shareholder Matters

Our common stock is traded on the New York Stock Exchange under the symbol "UNP". The following table presents, for the quarters indicated, the dividends declared and the high and low sales prices of our common stock.

| *2003 - Dollars Per Share* | *Mar. 31* | *June 30* | *Sep. 30* | *Dec. 31* |
|---|---|---|---|---|
| Dividends | $0.23 | $0.23 | $0.23 | $0.30 |
| Common stock price: | | | | |
| High | 61.99 | 61.99 | 61.89 | 69.50 |
| Low | 50.90 | 54.18 | 57.15 | 57.80 |
| *2002 - Dollars Per Share* | | | | |
| Dividends | $0.20 | $0.20 | $0.20 | $0.23 |
| Common stock price: | | | | |
| High | 65.15 | 64.97 | 64.87 | 62.15 |
| Low | 56.01 | 54.54 | 53.00 | 54.95 |

At January 31, 2004, there were 258,839,901 shares of outstanding common stock and approximately 32,364 common shareholders of record. On January 30, 2004, the closing price of the common stock on the New York Stock Exchange was $64.40. We have paid dividends to our common shareholders during each of the past 104 years. In the fourth quarter of 2002, we increased our quarterly dividend by 15% to $0.23 per share. In the fourth quarter of 2003, we increased our quarterly dividend by an additional 30% to $0.30 per share. We declared dividends totaling $252 million in 2003 and $210 million in 2002. We are subject to certain restrictions related to the payment of cash dividends to our shareholders. The amount of retained earnings available for dividends was $6.9 billion and $5.2 billion at December 31, 2003 and 2002, respectively.

## Item 6. Selected Financial Data

The following table presents, as of and for the years ended December 31, our selected financial data for each of the last 10 years. The selected financial data should be read in conjunction with Management's Discussion and Analysis of Financial Condition and Results of Operations, Item 7, and with the Consolidated Financial Statements and notes thereto, Item 8. The information below is not necessarily indicative of the results of future operations.

| *Millions of Dollars, Except Per Share Amounts, Ratios and Employee Statistics* | *2003* | *2002[b]* | *2001* | *2000[c]* | *1999* | *1998[d]* | *1997* | *1996* | *1995* | *1994[e]* |
|---|---|---|---|---|---|---|---|---|---|---|
| **For the Year Ended December 31[a]** | | | | | | | | | | |
| Operating revenues | 11,551 | 11,159 | 10,830 | 10,765 | 10,175 | 9,480 | 10,133 | 7,825 | 6,510 | 5,455 |
| Operating income | 2,133 | 2,253 | 2,018 | 1,850 | 1,784 | 337 | 1,134 | 1,499 | 1,291 | 1,078 |
| Income (loss) [f] | 1,056 | 1,265 | 934 | 810 | 765 | (101) | 435 | 782 | 655 | 533 |
| Net income (loss) [g] | 1,585 | 1,341 | 966 | 842 | 810 | (633) | 432 | 904 | 946 | 546 |
| Per share – basic: | | | | | | | | | | |
| Income (loss) [f] | 4.15 | 5.02 | 3.77 | 3.29 | 3.10 | (0.41) | 1.77 | 3.61 | 3.20 | 2.60 |
| Net income (loss) [g] | 6.23 | 5.32 | 3.90 | 3.42 | 3.28 | (2.57) | 1.76 | 4.17 | 4.62 | 2.66 |
| Per share – diluted: | | | | | | | | | | |
| Income (loss) [f] | 4.07 | 4.78 | 3.65 | 3.22 | 3.05 | (0.41) | 1.75 | 3.58 | 3.19 | 2.59 |
| Net income (loss) [g] | 6.04 | 5.05 | 3.77 | 3.34 | 3.22 | (2.57) | 1.74 | 4.14 | 4.60 | 2.66 |
| Dividends per share | 0.99 | 0.83 | 0.80 | 0.80 | 0.80 | 0.80 | 1.72 | 1.72 | 1.72 | 1.66 |
| Operating cash flow | 2,422 | 2,199 | 1,865 | 2,021 | 1,823 | 507 | 1,568 | 1,653 | 1,405 | 1,006 |

*Millions of Dollars, Except Per Share Amounts, Ratios and Employee Statistics*

| | *2003* | *2002[b]* | *2001* | *2000[c]* | *1999* | *1998[d]* | *1997* | *1996* | *1995* | *1994[e]* |
|---|---|---|---|---|---|---|---|---|---|---|
| **At December 31[a]** | | | | | | | | | | |
| Total assets [g] | 33,460 | 32,764 | 31,551 | 30,917 | 30,192 | 29,590 | 28,860 | 27,990 | 19,500 | 14,543 |
| Total debt | 7,989 | 7,703 | 8,078 | 8,351 | 8,636 | 8,687 | 8,510 | 8,016 | 6,350 | 4,462 |
| Convertible preferred securities | - | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | - | - | - | - |
| Common shareholders' equity | 12,354 | 10,651 | 9,575 | 8,662 | 8,001 | 7,393 | 8,225 | 8,225 | 6,364 | 5,131 |
| Equity per common share | 47.85 | 41.99 | 38.26 | 35.09 | 32.29 | 29.88 | 33.30 | 33.35 | 30.96 | 24.92 |
| **Additional Data[a]** | | | | | | | | | | |
| Commodity revenue | 11,041 | 10,663 | 10,391 | 10,270 | 9,851 | 9,072 | 9,712 | 7,419 | 6,105 | 5,216 |
| Carloads (000) | 9,239 | 9,131 | 8,916 | 8,901 | 8,556 | 7,998 | 8,453 | 6,632 | 5,568 | 4,991 |
| Operating margin (%)[h] | 18.5 | 20.2 | 18.6 | 17.2 | 17.5 | 3.6 | 11.2 | 19.2 | 19.8 | 19.8 |
| Operating ratio (%)[h] | 81.5 | 79.8 | 81.4 | 82.8 | 82.5 | 96.4 | 88.8 | 80.8 | 80.2 | 80.2 |
| Average employees (000) | 46.4 | 47.3 | 48.7 | 50.5 | 52.5 | 53.6 | 54.0 | 41.4 | 35.2 | 30.8 |
| Revenue per employee (000) | 248.9 | 235.9 | 222.4 | 213.2 | 193.8 | 176.9 | 187.6 | 189.0 | 184.9 | 177.1 |
| **Financial Ratios (%)[a]** | | | | | | | | | | |
| Debt to capital employed[i] | 39.3 | 38.8 | 42.2 | 45.1 | 47.6 | 49.4 | 50.9 | 49.4 | 49.9 | 46.5 |
| Return on equity[j] | 13.8 | 13.3 | 10.6 | 10.1 | 10.5 | (8.1) | 5.3 | 12.4 | 16.5 | 10.9 |

[a] *Data included the effects of the acquisitions of Southern Pacific Rail Corporation as of October 1, 1996 and Chicago and North Western Transportation Company as of May 1, 1995.*

[b] *2002 net income includes $214 million pre-tax ($133 million after-tax) gains on asset dispositions. In addition, net income included a reduction of income tax expense of $67 million related to tax adjustments for prior years' income tax examinations.*

[c] *2000 operating income and net income included $115 million pre-tax ($72 million after-tax) work force reduction charge.*

[d] *1998 net loss included a $547 million pre-and after-tax charge for the revaluation of OTC goodwill.*

[e] *1994 net income included a net after-tax loss of $404 million from the sale of our waste management operations.*

[f] *Based on results from continuing operations.*

[g] *Net income and total assets includes the effects of the acquisitions of Motor Cargo as of November 30, 2001 and Skyway Freight Systems, Inc. as of May 31, 1993, and reflects the disposition of our trucking subsidiary in 2003, logistics subsidiary in 1998, natural resources subsidiary in 1996 and waste management subsidiary in 1995.*

[h] *Operating margin is defined as operating income divided by operating revenues. Operating ratio is defined as operating expenses divided by operating revenues.*

[i] *Debt to capital employed is as follows: total debt divided by debt plus equity plus convertible preferred securities.*

[j] *Based on average common shareholders' equity.*

## Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations

The following discussion should be read in conjunction with the Consolidated Financial Statements and applicable notes to the Consolidated Financial Statements, Item 8, and other information included in this report.

The Railroad, along with its subsidiaries and rail affiliates is our one reportable business segment. The Consolidated Financial Statements also include discontinued trucking operations, consisting of OTC and Motor Cargo, which are subsidiaries of Overnite, Inc., formerly an indirect wholly owned subsidiary of UPC. In 2003, we reclassified our trucking operations as discontinued operations.

## EXECUTIVE SUMMARY

### 2003 Highlights

- **Revenue growth -** We increased operating revenues by 4% year-over-year to $11.6 billion, the highest level in our history, despite a sluggish economy during the first half of the year. Record revenue levels were achieved in five of our major commodity groups: agricultural, automotive, energy, industrial products and intermodal. The higher revenue was primarily attributable to increased carloads of these commodities, improved average revenue per car and fuel surcharges, and reflects the revenue diversity of our rail franchise, as well as continued focus on our Yield Strategy. The key components of our Yield Strategy are providing premium service for a premium price and achieving a mix of business that maximizes profitability.

- **Free cash flow -** We generated net free cash flow of $524 million (excluding proceeds from the Overnite IPO). Free cash flow is defined as cash provided by operating activities less cash used in investing activities, less dividends paid, less non-cash financings plus non-cash acquisitions. Net free cash flow is free cash flow less cash from the sale of discontinued operations.

  Free cash flow is considered a non-GAAP financial measure by SEC Regulation G. We believe free cash flow is important in evaluating our financial performance and measures our ability to generate cash without incurring additional external financings. Free cash flow should be considered in addition to, rather than a substitute for cash provided by operating activities. The following table reconciles cash provided by operating activities (GAAP measure) to free cash flow (non-GAAP measure):

| *Millions of Dollars* | *2003* | *2002* | *2001* |
|---|---|---|---|
| Cash provided by operating activities | $2,422 | $2,199 | $1,865 |
| Cash used in investing activities | (856) | (1,336) | (1,382) |
| Dividends paid | (234) | (201) | (198) |
| Non-cash financings | (188) | (126) | (124) |
| Non-cash acquisitions | - | - | 80 |
| Free cash flow | 1,144 | 536 | 241 |
| Proceeds from sale of discontinued operations | (620) | - | - |
| Net free cash flow | $524 | $536 | $241 |

- **Overnite IPO -** We sold 100% of Overnite through an initial public offering. This resulted in a gain of $211 million (including an income tax benefit of $126 million) in the fourth quarter. We generated $620 million in cash proceeds from the offering.

- **Dividend increase -** Reflecting our increased financial strength and improvement of our balance sheet, the Board of Directors increased the quarterly dividend by 30% to $0.30 per share, following an increase of 15% in 2002.

- **Improved balance sheet -** We significantly improved our balance sheet by redeeming $1.0 billion of Convertible Preferred Securities (CPS) with cash from operations and the proceeds of the Overnite offering. The remaining $500 million of CPS was refinanced with new unsecured debt with comparably favorable terms.

- **Credit rating upgrade -** The Corporation's long-term unsecured credit rating was upgraded by Moody's to Baa2, which followed an upgrade by Standard and Poor's to BBB in 2002. These upgrades reflect our improved balance sheet and will provide us more flexibility with respect to access to capital markets and meeting our financing requirements.

## 2003 Challenges

- **Energy prices -** Energy prices were high throughout the year, increasing our operating expenses by $255 million over 2002. However, our fuel surcharge programs offset about 44% of these higher fuel costs. Our fuel surcharge programs allow us to recover a portion of the increase in fuel expense from customers in the form of higher revenue.

- **Uncertain economy -** Continued weakness in the U.S. economy, created a very difficult business environment during the first half of 2003. U.S. industrial production in the first half of 2003 was flat compared to the first half of 2002. The second half of 2003 was up 0.6% compared to the second half of 2002. The impact of this early weakness can be seen in our carload volumes. Carloads for the first three quarters of 2003 were flat year-over-year, with fourth quarter carloads up 4%.

- **Network performance -** Our network performance and operating efficiency were adversely affected in the third and fourth quarters by a shortage of trainmen and engineers, combined with an expanded summer track maintenance program and fourth quarter record-level volumes. Programs have been put in place, which we believe should remedy the situation, including, among other things, hiring and training additional employees and accelerating certain locomotive acquisitions.

## 2004 Expectations

- **Revenue growth -** We expect to build on the positive momentum generated during the fourth quarter of 2003, targeting year-over-year commodity revenue growth of 4 to 6 percent for the full year 2004. We are projecting increases in all of our major commodity groups with the exception of energy, which may be slightly down. We expect the largest percentage increases in the intermodal, automotive and agricultural groups, and we should see steady but more modest increases in revenue from chemicals and industrial products shipments.

- **Energy prices -** Fuel prices will remain susceptible to price volatility. To help reduce the impact of fuel price volatility on earnings, we will continue to leverage our fuel surcharge programs, and we will continue to adhere to our hedging strategy.

- **Capital spending -** In 2004, we expect to spend approximately $2 billion on capital expenditures, including capital leases. These expenditures will be used to maintain track and structures, continue capacity expansions on our main lines, upgrade and augment equipment to better meet customer needs, build infrastructure and develop and implement new technologies. Our 2004 capital expenditures and debt service requirements are expected to be funded through cash generated from operations, additional debt financings and the sale or lease of various operating and non-operating properties. We expect that these sources will continue to provide sufficient funds to meet our expected cash requirements.

- **Free cash flow -** We will continue to focus on free cash flow in 2004, with a target of $500 million.

- **Key historical measures:**

| *Millions of Dollars (except fuel prices)* | *2003* | *2002* | *2001* |
|---|---|---|---|
| Operating Revenue | $11,551 | $11,159 | $10,830 |
| Operating Income | 2,133 | 2,253 | 2,018 |
| Free Cash Flow (excluding Overnite IPO)[a] | 524 | 536 | 241 |
| Fuel Price Per Gallon[b] | $0.92 | $0.73 | $0.88 |
| Capital Expenditures[c] | $1,940 | $1,820 | $1,696 |

[a] *Free cash flow is defined as cash provided by operating activities less cash used in investing activities, less dividends paid, less non-cash financings plus non-cash acquisitions. See discussion of free cash flow above for a reconciliation of free cash flow to cash provided by operating activities, the most analogous GAAP measurement.*

[b] *Including taxes and transportation costs.*

[c] *Capital expenditures include non-cash financings of $188 million, $126 million and $124 million in 2003, 2002 and 2001, respectively.*

## RISK FACTORS

*We Face Competition from Other Railroads and Other Transportation Providers* - We are subject to competition from other railroads, which operate parallel routes in many of our traffic corridors, in addition to motor carriers and, to a lesser extent, ships, barges and pipelines. Competition can pressure both transit time requirements and pricing, as well as place a greater emphasis on the rate charged and the quality and reliability of the service provided. While we must build or acquire and maintain our rail system, trucks and barges are able to use public rights-of-way maintained by public entities. Any future improvements or expenditures materially increasing the quality of these alternative modes of transportation in the locations in which we operate, or legislation granting materially greater latitude for motor carriers with respect to size or weight limitations, could have a material adverse effect on our results of operations, financial condition and liquidity.

*We Are Subject to Significant Governmental Regulation* - We are subject to governmental regulation by a significant number of federal, state and local authorities with respect to our railroad operations and a variety of health, safety, labor, environmental, as discussed below, and other matters. Our failure to comply with applicable laws and regulations could have a material adverse effect on us. Governments may change the legislative or regulatory framework within which we operate without providing us with any recourse for any adverse effects that the change may have on our business. Also, some of the regulations require us to obtain and maintain various licenses, permits and other authorizations, and we cannot assure you that we will continue to be able to do so.

*We Are Subject to Significant Environmental Laws and Regulations* - Our operations are subject to extensive federal, state and local environmental laws and regulations concerning, among other things, emissions to the air, discharges to waters and the handling, storage, transportation and disposal of waste and other materials and cleanup of hazardous material or petroleum releases. We generate and transport hazardous and non-hazardous waste in our current operations, and we have done so in our former operations. Environmental liability can extend to previously owned or operated properties, leased properties and properties owned by third parties, as well as to properties currently owned and used by us. Environmental liabilities have arisen and may also arise from claims asserted by adjacent landowners or other third parties in toxic tort litigation. We have been and may be subject to allegations or findings to the effect that we have violated, or are strictly liable under, these laws or regulations. Although, we have appropriately recorded current and long-term liabilities for known future environmental costs, we could incur significant costs as a result of any of the foregoing, and we may be required to incur significant expenses to investigate and remediate known, unknown or future environmental contamination, which could have a material adverse effect on our results of operations, financial condition and liquidity.

*Rising Fuel Costs Could Materially and Adversely Affect Our Business* - Fuel costs constitute a significant portion of our transportation expenses. Diesel fuel prices are subject to dramatic fluctuations. Significant price increases may have a material adverse effect on our operating results. Additionally, fuel prices and supplies are influenced significantly by international political and economic circumstances. If a fuel supply shortage were to arise from OPEC production curtailments, a disruption of oil imports or otherwise, higher fuel prices and any subsequent price increases would, despite our fuel surcharge programs, materially affect our operating results, financial condition and liquidity.

*The Majority of Our Employees Belong to Labor Unions, and Strikes or Work Stoppages Could Adversely Affect Our Operations* - We are a party to collective bargaining agreements with various labor unions in the United States. Some of these agreements expire within the next two years. Disputes with regard to the terms of these agreements or our potential inability to negotiate acceptable contracts with these unions could result in, among other things, strikes, work stoppages or other slowdowns by the affected workers. If the unionized workers were to engage in a strike, work stoppage or other slowdown, or other employees were to become unionized or the terms and conditions in future labor agreements were renegotiated, we could experience a significant disruption of our operations and higher ongoing labor costs.

*We May Be Affected by General Economic Conditions* - Several of the commodities we transport come from industries with cyclical business operations. As a result, prolonged negative changes in domestic and global

economic conditions affecting the producers and consumers of the commodities carried by us may have an adverse effect on our operating results, financial condition and liquidity.

*Severe Weather Could Result in Significant Business Interruptions and Expenditures* - Severe weather conditions and other natural phenomena, including earthquakes, fires and floods, may cause significant business interruptions and result in increased costs, increased liabilities and decreased revenues, which could have an adverse effect on our operating results, financial condition and liquidity.

*We Are Dependent on Two Key Suppliers of Locomotives* - Due to the capital intensive nature and sophistication of locomotives, there are strong barriers to entry for new suppliers. Therefore, if one of these suppliers discontinues manufacturing locomotives, we could realize a significant increase in the cost and the potential for reduced availability of the locomotives that are necessary to our operations.

*We May Be Subject to Various Claims and Lawsuits That Could Result in Significant Expenditures* - The nature of our business exposes us to the potential for various claims and litigation related to labor and employment, personal injury and property damage, environmental and other matters. Any material changes to current litigation trends could have a material adverse effect on our operating results, financial condition and liquidity.

*We May Be Affected by Future Acts of Terrorism or War or Risk of War* - Terrorist attacks, such as those that occurred on September 11, 2001, any government response thereto and war or risk of war may adversely affect our results of operations, financial condition, our ability to raise capital or our future growth. Our rail lines and facilities could be direct targets or indirect casualties of an act or acts of terror, which could cause significant business interruption and result in increased costs and liabilities and decreased revenues and have a material adverse effect on our operating results, financial condition or liquidity. Any act of terror, retaliatory strike, sustained military campaign or war or risk of war may have an adverse impact on our operating results, financial condition and liquidity by causing or resulting in unpredictable operating or financial conditions, including disruptions of rail lines, volatility or sustained increase of fuel prices, fuel shortages, general economic decline and instability or weakness of financial markets which could restrict our ability to raise capital. In addition, insurance premiums charged for some or all of the coverages currently maintained by us could increase dramatically, or certain coverages may not be available to us in the future.

## CRITICAL ACCOUNTING POLICIES

Our Consolidated Financial Statements have been prepared in accordance with accounting principles generally accepted in the United States of America. The preparation of these financial statements requires estimation and judgment that affect the reported amounts of revenues, expenses, assets and liabilities. We base our estimates on historical experience and on various other assumptions that are believed to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. The following are our critical accounting policies that affect significant areas of our financial statements and involve judgment and estimates. If these estimates differ significantly from actual results, the impact on our Consolidated Financial Statements may be material.

**Depreciation –** The railroad industry is capital intensive. Properties are carried at cost. Provisions for depreciation are computed principally on the straight-line method based on estimated service lives of depreciable property. The lives are calculated using a separate composite annual percentage rate for each depreciable property group, based on the results of a depreciation study. We are required to submit a report on depreciation studies and proposed depreciation rates every three years for equipment property and every six years for road property, to the Surface Transportation Board for review and approval. The cost (net of salvage) of depreciable rail property retired or replaced in the ordinary course of business is charged to accumulated depreciation, and no gain or loss is recognized. A gain or loss is recognized in other income for all other property upon disposition. The cost of internally developed software is capitalized and amortized over a five-year period. An obsolescence review of capitalized software is performed on a periodic basis.

Capital spending in recent years has increased the total value of our depreciable assets. Capital spending totaled $1.9 billion for the year ended December 31, 2003, including non-cash financings of $188 million. In 2003, we implemented depreciation studies, approved by the Surface Transportation Board, resulting in lower depreciation expense of $50 million for the year ended December 31, 2003, due to a reduction in depreciation rates for certain track assets (effective January 1, 2003), partially offset by increased rates for locomotives and other assets (effective July 1, 2003). For the year ended December 31, 2003, depreciation expense was $1.1 billion. Various methods are used to estimate useful lives for each group of depreciable property. Due to the capital intensive nature of the business and the large base of depreciable assets, variances to those estimates could have a material effect on our Consolidated Financial Statements. If the estimated useful lives of all depreciable assets were increased by one year, annual depreciation expense would decrease by $36 million. If the estimated useful lives of all assets to be depreciated were decreased by one year, annual depreciation expense would increase by $39 million.

**Environmental –** We generate and transport hazardous and non-hazardous waste in our current operations and have done so in our former operations, and we are subject to federal, state and local environmental laws and regulations. We have identified approximately 417 sites at which we are or may be liable for remediation costs associated with alleged contamination or for violations of environmental requirements. This includes 51 sites that are the subject of actions taken by the U.S. government, 29 of which are currently on the Superfund National Priorities List. Certain federal legislation imposes joint and several liability for the remediation of identified sites; consequently, our ultimate environmental liability may include costs relating to activities of other parties, in addition to costs relating to our own activities at each site.

When an environmental issue has been identified with respect to the property owned, leased or otherwise used in the conduct of our business, we and our consultants perform environmental assessments on such property. We expense the cost of the assessments as incurred. We accrue the cost of remediation where our obligation is probable and such costs can be reasonably estimated.

The liability includes future costs for remediation and restoration of sites, as well as for ongoing monitoring costs, but excludes any anticipated recoveries from third parties. Cost estimates are based on information available for each site, financial viability of other potentially responsible parties, and existing technology, laws and regulations. We believe that we have adequately accrued for our ultimate share of costs at sites subject to joint and several liability. However, the ultimate liability for remediation is difficult to determine because of the number of potentially responsible parties involved, site-specific cost sharing arrangements with other potentially responsible parties, the degree of contamination by various wastes, the scarcity and quality of volumetric data related to many of the sites, and/or the speculative nature of remediation costs. For the year ended December 31, 2003 and 2002, we recorded environmental expenses of $26 million and $37 million for continuing operations, respectively. As of December 31, 2003 and 2002, we had a liability of $187 million and $188 million, respectively, of which $57 million and $71 million were classified as current.

**Income Taxes –** We account for income taxes by recording taxes payable or refundable for the current year and deferred tax assets and liabilities for the future tax consequences of events that have been recognized in our financial statements or tax returns.

As required under Financial Accounting Standards Board (FASB) Statement No. 109, "Accounting for Income Taxes", these expected future tax consequences are measured based on provisions of tax law as currently enacted; the effects of future changes in tax laws are not anticipated. Future tax law changes, such as a change in the corporate tax rate, could have a material impact on our financial condition or results of operations.

When appropriate, we record a valuation allowance against deferred tax assets to offset future tax benefits that may not be realized. In determining whether a valuation allowance is appropriate, we consider whether it is more likely than not that all or some portion of our deferred tax assets will not be realized, based in part upon management's judgments regarding future events. Based on that analysis, we have determined that a valuation allowance is not appropriate at December 31, 2003.

**Pension and Other Postretirement Benefits –** We provide defined benefit retirement income to eligible non-union employees through qualified and non-qualified (supplemental) pension plans. Qualified and non-qualified pension benefits are based on years of service and the highest compensation during the latest years of employment with specific reductions made for early retirements. We also provide other postretirement benefits (OPEB). All non-union and certain of our union employees participate in defined contribution medical and life insurance programs for retirees.

We account for our pension plans in accordance with FASB Statement No. 87, "Employers' Accounting for Pensions" (FAS 87) and our postretirement benefits in accordance with FASB Statement No. 106, "Employers' Accounting for Postretirement Benefits Other Than Pensions" (FAS 106). FAS 87 and FAS 106 require us to make various estimates and assumptions, including discount rates used to value liabilities, expected rates of return on plan assets, salary increases, employee turnover rates, anticipated employee mortality rates and expected future healthcare costs. The estimates we used are based on our historical experience, as well as current facts and circumstances and are updated at least annually. We use third-party actuaries to assist us in properly measuring the expense and liability associated with these benefits.

*Funded Status* – The funded status of our pension plans represents the difference between the fair value of pension assets and the present value of pension liabilities (projected benefit obligation, or PBO). The PBO is the present value of benefits earned to date by plan participants, including the effect of assumed future salary increases. The funded status is impacted by actual asset returns and cash funding, as well as a year-end discount rate, which is used to calculate the present value of the projected benefit obligation. The discount rate we use for this purpose is based on a hypothetical portfolio of high quality bonds with cash flows matching our plans' expected benefit payments. The OPEB plan is unfunded and funding occurs as claims are paid. The PBO of the OPEB plan is equal to the accumulated benefit obligation, as the present value of OPEB liabilities is not affected by salary increases. The discount rate used in valuing OPEB obligations is equal to the pension discount rate for both 2003 and 2002.

The following table presents the funded status of our pension and OPEB plans, as well as the key assumptions that impact the funded status as of December 31, 2003:

| *Millions of Dollars* | *Pension Benefits* | *OPEB* |
|---|---|---|
| Funded status: | | |
| Fair Value of Plan Assets | $ 1,520 | $ - |
| Projected Benefit Obligation | (1,804) | (543) |
| Funded status | $ (284) | $(543) |
| Assumptions: | | |
| Discount rate | 6.50% | 6.50% |
| Salary increase | 3.50% | N/A |
| Health care cost trend rate: | | |
| Current | N/A | 9.0% |
| Level in 2008 | N/A | 5.0% |

The following table shows the estimated impact that changes in the assumed discount rate, salary increase and health care cost trend rate would have had on our projected benefit obligation as of December 31, 2003:

| *Millions of Dollars* | *Increase / (Decrease) in Projected Benefit Obligation* | |
|---|---|---|
| | *Pension* | *OPEB* |
| Discount Rate: | | |
| 0.25% increase | $(50) | $(15) |
| 0.25% decrease | 52 | 15 |
| Salary Increase: | | |
| 0.25% increase | 6 | N/A |
| 0.25% decrease | (5) | N/A |
| Health Care Cost Trend Rate: | | |
| 1% increase | N/A | $59 |
| 1% decrease | N/A | (49) |

*Cash Contributions* - We follow FAS 87 rules to record the expense and liability associated with our pension plans. However, actual cash funding is governed by employee benefit and tax laws. No cash funding was required for us in 2003. During 2003, we voluntarily contributed $100 million to our funded pension plan.

Contributions required subsequent to 2003 are dependent on asset returns and future discount rates. We do not anticipate minimum pension funding requirements in 2004. We voluntarily contributed $50 million in January of 2004 to help mitigate any potential required funding in the future. Future contributions are expected to be funded primarily by cash generated from operating activities.

Cash funding for OPEB benefits is based on claims paid. Claims paid, net of retiree contributions, totaled $37 million and $46 million for 2003 and 2002, respectively. Expected claims for 2004 total $35 million, net of employee contributions.

*Expense* - Pension expense for 2003 was $15 million, while we recorded pension income in 2002 of $14 million. OPEB expense for 2003 and 2002 was $43 million and $45 million, respectively. Both pension and OPEB expense is determined based upon the annual service cost of benefits (the actuarial cost of benefits earned during a period) and the interest cost on those liabilities, less the expected return on pension plan assets (for pension only). With respect to the value of pension plan assets, the expected long-term rate of return on plan assets is applied to a calculated value of plan assets that recognizes changes in fair value over a five-year period. This practice is intended to reduce year-to-year volatility in pension expense, but it can have the effect of delaying the recognition of differences between actual returns on assets and expected returns based on long-term rate of return assumptions. The expected rate of return on assets was 8% for 2003 and 9% for 2002.

Differences in actual experience in relation to assumptions are not recognized immediately, but are deferred and, if necessary, amortized as pension or OPEB expense.

The following table illustrates the estimated impact on 2003 pension and OPEB expense relative to a change in the discount rate, expected return on plan assets and health care cost trend rate.

| | *Increase/(Decrease) in Expense* | |
|---|---|---|
| *Millions of Dollars* | *Pension* | *OPEB* |
| Discount Rate: | | |
| 0.25% increase | $(4) | $(2) |
| 0.25% decrease | 1 | 1 |
| Expected Return on Plan Assets: | | |
| 0.25% increase | (4) | N/A |
| 0.25% decrease | 4 | N/A |
| Health Care Cost Trend Rate: | | |
| 1% increase | N/A | 10 |
| 1% decrease | N/A | (9) |

**Personal Injury and Occupational Illness –** The cost of personal injuries to employees and others related to our activities is charged to expense based on estimates of the ultimate cost and number of incidents each year. We use third party actuaries to assist us in properly measuring the expense and liability. Compensation for work-related accidents is governed by the Federal Employers' Liability Act (FELA). Under FELA, damages are assessed based on a finding of fault through litigation or out-of-court settlements. We offer a comprehensive variety of services and rehabilitation programs for employees who are injured at work. Annual expenses for our personal injury-related events were $250 million and $221 million in 2003 and 2002, respectively. As of December 31, 2003 and 2002, we had a liability of $617 million and $671 million accrued for future personal injury costs, respectively, of which $274 million was recorded in current liabilities as accrued casualty costs in both years. We have additional amounts accrued for claims related to certain alleged occupational illnesses. Changes in estimates can vary due to evolving trends in litigation related to personal injury and occupational illness cases based on large jury awards and public pressures associated with certain occupational related injuries.

## RESULTS OF OPERATIONS

| *Millions of Dollars, Except Per Share Amounts and Ratios* | *2003* | *2002* | *2001* |
|---|---|---|---|
| Income from continuing operations | $1,056 | $1,265 | $934 |
| Income from discontinued operations | 255 | 76 | 32 |
| Cumulative effect of accounting change | 274 | - | - |
| Net income | 1,585 | 1,341 | 966 |
| Diluted Earnings Per Share: | | | |
| Income from continuing operations | 4.07 | 4.78 | 3.65 |
| Net income | 6.04 | 5.05 | 3.77 |
| Income from continuing operations as a percentage of operating revenues | 9.1% | 11.3% | 8.6% |
| Return on average common shareholders' equity | 13.8% | 13.3% | 10.6% |
| Operating margin | 18.5% | 20.2% | 18.6% |

**Income from Continuing Operations –** The decrease in income from continuing operations in 2003 compared to 2002 was driven by higher fuel prices, inflation, network costs (including expenses associated with increased volumes), lower gains from real estate sales (2002 asset sales with the Utah Transit Authority (UTA) for $141

million pre-tax and the Santa Clara Valley Transportation Authority (VTA) for $73 million pre-tax) and debt redemption expenses, which more than offset revenue gains, lower interest expense and productivity improvements. Conversely, the increase in income from continuing operations in 2002 compared to 2001 resulted from double digit operating income growth, lower interest costs, the two large asset sale transactions mentioned previously and tax adjustments of $33 million, reflecting the outcome of income tax examinations for prior years. Operating income in 2002 improved as revenue growth, productivity gains and lower fuel prices more than offset inflation, increased depreciation expense and higher rail costs due to increased rail volume. Productivity is measured by both gross ton miles per inflation-adjusted expense dollar and gross ton miles per employee. Gross ton miles are calculated by multiplying the weight of a loaded or empty freight car by the number of miles hauled.

**Operating Revenues –** Operating revenue is comprised of commodity revenue and other revenues. Other revenues primarily include subsidiary revenue from various companies that are wholly owned or majority owned by the Railroad, revenue from the Chicago commuter rail operations and accessorial revenue earned due to customer detainment of Railroad owned or controlled equipment. We recognize commodity revenues on a percentage-of-completion basis as freight moves from origin to destination. Other revenue is recognized as service is performed or contractual obligations are met.

Operating revenues increased $392 million (4%) to $11.6 billion in 2003 over 2002, following an increase of $329 million (3%) in 2002 over 2001. Commodity revenue increased $378 million (4%) in 2003 and $272 million (3%) in 2002. The increase in 2003 was driven by growth in the Industrial Products, Agricultural, Intermodal and Energy commodity groups, including revenue from our fuel surcharge programs, while the increase in 2002 was a result of growth in the Automotive, Intermodal, Agricultural and Industrial Products commodity groups. Revenue carloads increased 1% and 2% in 2003 and 2002, respectively, while average revenue per car (referred to as ARC) increased 2% to $1,195 in 2003 and was $1,168 and $1,165 in 2002 and 2001, respectively. Other revenue increased $14 million (3%) in 2003 and $57 million (13%) in 2002, driven by increased passenger, subsidiary and accessorial revenues in both years.

The following tables summarize the year-over-year changes in commodity revenue, revenue carloads and average revenue per car by commodity type:

| *Commodity Revenue in Millions of Dollars* | *2003* | *2002* | *2001* |
|---|---|---|---|
| Agricultural | $ 1,578 | $ 1,506 | $ 1,454 |
| Automotive | 1,216 | 1,209 | 1,118 |
| Chemicals | 1,589 | 1,575 | 1,545 |
| Energy | 2,412 | 2,343 | 2,399 |
| Industrial Products | 2,180 | 2,035 | 1,970 |
| Intermodal | 2,066 | 1,995 | 1,905 |
| Total | $11,041 | $10,663 | $10,391 |

| *Revenue Carloads in Thousands* | *2003* | *2002* | *2001* |
|---|---|---|---|
| Agricultural | 883 | 875 | 869 |
| Automotive | 820 | 818 | 763 |
| Chemicals | 888 | 904 | 879 |
| Energy | 2,187 | 2,164 | 2,161 |
| Industrial Products | 1,478 | 1,419 | 1,412 |
| Intermodal | 2,983 | 2,951 | 2,832 |
| Total | 9,239 | 9,131 | 8,916 |

| *Average Revenue Per Car* | *2003* | *2002* | *2001* |
|---|---|---|---|
| Agricultural | $1,787 | $1,722 | $1,673 |
| Automotive | 1,484 | 1,477 | 1,465 |
| Chemicals | 1,788 | 1,742 | 1,756 |
| Energy | 1,103 | 1,083 | 1,111 |
| Industrial Products | 1,475 | 1,434 | 1,395 |
| Intermodal | 693 | 676 | 673 |
| Total | $1,195 | $1,168 | $1,165 |

*Agricultural* – Revenue in 2003 rose 5% due to a 4% improvement in ARC and a 1% increase in carloads following revenue growth of 4% in 2002, resulting from a 3% gain in ARC and a 1% growth in carloads. In 2003, the improvement was driven by higher wheat demand for Gulf exports, in addition to added ethanol shipments resulting from heightened demand for the fuel additive. Revenue gains were also achieved through additional shipments of sugar beets due to a favorable crop in 2003 and canned and packaged foods resulting from additional, longer-haul shipments from the west coast. ARC grew due to the positive mix impact of longer average length of haul shipments, as well as price increases and fuel surcharges. In 2002, revenues grew due to strong export demand and more shipments to Mexico. Revenue gains were also achieved through increased shipments of cottonseed, ethanol (used as a fuel additive) and frozen french fries. ARC rose due to higher average length of haul, resulting from fewer short-haul empty storage moves and corn processor shipments, combined with additional long-haul meals and oils and animal feed shipments.

*Automotive* – Revenue increased 1% in 2003 as a result of a slight rise in both carloads and ARC following an 8% increase in 2002, which resulted from a 7% gain in carloads and 1% growth in ARC. 2003 revenue growth was the result of additional volume due to market share gains for materials shipments, partially offset by a decline in revenues from domestic manufacturers, as the softening economy weakened demand for finished vehicles and forced production cuts. ARC was up slightly in 2003, as price increases were partially offset by the mix impact of disproportionate growth in materials shipments, which move at a lower ARC than finished vehicles. In 2002, volume growth resulted from market share gains for finished vehicles, where carloads were up 11% despite a decline in U.S. light vehicle sales. Materials shipments declined 1%, due primarily to reduced production in Mexico. Market share gains partially offset the decline. ARC increased as a result of a shift in mix, resulting from increased higher ARC vehicles shipments and a decline in lower ARC materials shipments. In addition, average length of haul for vehicle shipments increased due to mix of business.

*Chemicals* – Revenue in 2003 grew 1%, as a 2% decline in carloads was offset by a 3% increase in ARC. Revenue in 2002 rose 2% as a result of a 3% increase in carloads offset by a 1% decrease in ARC. In 2003, reduced plastics volume led the decline in carloads as the soft economy combined with higher input costs caused producers to lower inventories and reduce shipments. Growth of market demand for domestic and export soda ash partially offset the decline. ARC improved due to a mix shift toward longer average length of haul moves, driven by fewer cars in storage-in-transit, in addition to price increases and fuel surcharges. Conversely, in 2002, volume rose for liquid and dry chemicals due to relatively higher economic demand from industrial manufacturers. Plastics shipments rose as a result of increased demand for consumer durables. Revenue also grew due to higher domestic demand for fertilizer and demand for domestic and export soda ash shipments. ARC declined during 2002, as a result of changes in customer contract terms.

*Energy* – Revenue climbed 3% in 2003 compared to a 2% decrease in 2002. In 2003, strong utility demand due to lower inventories in the last three quarters more than offset the absence of export traffic from the Colorado and Utah mining regions (which Japan is now sourcing from other Far Eastern producers), resulting in a 1% increase in carloads. Fourth quarter carloads were the highest ever from the Southern Powder River Basin and Colorado and Utah mining regions. During 2003, tonnage moved from the Southern Powder River Basin was also the highest ever for us. ARC increased 2%, primarily due to index-based contract escalators. Conversely, the 2002

revenue decrease was driven by a 3% decrease in ARC. ARC declined due to the impact of contract price negotiations on expiring long-term contracts with certain major customers. Increased carloads and coal trains loaded per day in the Southern Powder River Basin in Wyoming were offset by reduced West Coast export shipments originating from the Colorado and Utah mining regions.

*Industrial Products* – Revenue increased 7% and 3% in 2003 and 2002, respectively. Revenue in 2003 was driven by 3% growth in ARC and a 4% improvement in carloads, which was attributable to government, steel and lumber business growth. The increase in government shipments was driven by movement of military equipment and ammunition in support of the war effort. Lumber positively impacted carloads, as housing starts and low interest rates continue to drive demand. Steel and scrap shipments also increased as the weakening dollar created higher domestic and export demand for U.S. produced steel, augmented by market share gains. ARC rose due to price increases, fuel surcharges and more high-ARC lumber moves. Revenue in 2002 was primarily driven by a 3% increase in ARC, augmented with a slight improvement in carloads. Increased lumber shipments were the primary growth driver, due to strong housing construction and greater production in the Pacific Northwest region. Stone shipments grew due to strong building and road construction activity in the South. Higher general demand for paper and newsprint commodities also positively impacted revenues. Reduced shipments of steel and metallic shipments in the first three quarters partially offset these increases. However, steel shipments rebounded in the fourth quarter as new U.S. tariffs made domestic producers more price-competitive with foreign producers. ARC improved due to price increases and a greater mix of longer average length of haul.

*Intermodal* – Revenue climbed 4% in 2003 driven by a 3% increase in ARC and a 1% gain in carloads, which followed a 5% increase in revenue for 2002 on the strength of a 4% gain in carloads. In 2003, carloads were up due to strong imports and improved economic conditions as well as the year over year impact of the labor dispute between the International Longshoreman and Warehouse Union (ILWU) and the Pacific Maritime Association (PMA) which occurred primarily in the fourth quarter of 2002. ARC in 2003 improved due to fuel surcharges and price increases. Revenue in 2002 increased resulting from strong import demand, truck conversion and price increases. These gains were partially offset by the ILWU/PMA labor dispute, which had a significant impact on intermodal volumes during the fourth quarter, primarily in October. The slight increase in ARC was the result of price increases, offset by the mix impact of a greater number of lower revenue per car international shipments.

*Mexico Business* – Included in the commodity revenue reported above is revenue from shipments to and from Mexico. This revenue grew 2% to $893 million in 2003 compared to a 1% increase to $873 million for 2002. Business growth in 2003 was led by market share gains in auto parts shipments and increased revenue for agricultural products resulting from higher corn and meal exports, as well as increased beer imports. In 2002, shipments increased for agricultural products, chemicals, and industrial products commodity groups. Increased revenue for agricultural products resulted from higher corn and meal exports, as well as increased beer imports. Increased chemicals business consisted of plastics exports, in addition to higher imports and exports of liquid and dry chemicals. Reduced automobile production partially offset these gains resulting in fewer shipments of finished vehicles.

**Operating Expenses -** Operating expenses increased $512 million (6%) to $9.4 billion in 2003 compared to 2002, following an increase of $94 million (1%) to $8.9 billion in 2002 compared to 2001. The increase in 2003 expenses was due primarily to higher fuel prices in addition to wage and benefit inflation and volume-related costs, as gross ton miles increased 3% for the year. A 2% reduction in employment levels, combined with lower depreciation expense and cost control efforts partially offset the increase. Cost control efforts are defined as focused actions to reduce discretionary spending and failure costs. Expenses in the third and fourth quarters were also negatively affected by increased crew and asset utilization costs, associated with a deterioration in network fluidity as discussed under Other Matters in this Item 7. The increase in 2002 expenses reflects wage and benefit inflation, higher equipment rents, depreciation expenses and increased purchased services and other costs. These increases were partially offset by a 3% reduction in employment levels, lower fuel prices and cost control efforts.

*Salaries, Wages and Employee Benefits* – Salaries, wages and employee benefits were $3.9 billion, $3.7 billion and $3.6 billion in 2003, 2002 and 2001, respectively. The increase in 2003 of $198 million (5%) was driven by the

adoption of FASB Statement No. 143, "Accounting for Asset Retirement Obligations" (FAS 143), which accounted for $110 million of the increase. Other drivers included inflation, volume-related costs (driven by a 3% increase in gross ton miles), protection costs, increased crew utilization costs due to a shortage of available crews and pension expense. Protection cost represents the differential payment when the wage earned for active employment is lower than an employee's "protected" rate of pay. An individual's protected rate is imposed by the Surface Transportation Board for employees adversely affected by a merger or is established by collective bargaining agreements in other cases. The increase in 2002 of $108 million (3%) was primarily driven by inflation and volume-related costs associated with a 4% increase in gross ton miles. A 3% reduction in employee force levels in conjunction with worker productivity improvements partially offset the inflation and higher volume-related costs.

*Equipment and Other Rents* – Equipment and other rents primarily includes rental expense the Railroad pays for freight cars owned by other railroads or private companies; freight car, intermodal and locomotive leases; other specialty equipped vehicle leases; and office and other rentals. Expenses decreased $19 million (2%) in 2003 compared to 2002, following an increase of $26 million (2%) in 2002 from 2001. The decrease in 2003 was due primarily to lower rental prices for private railcars, partially offset by higher locomotive lease expense and increased car cycle times driven by higher inventory of cars on the system due to slower network train speed in the third and fourth quarters. Conversely, the increase in expense in 2002 compared to 2001 was driven by higher locomotive leases and volume-related costs, partially offset by savings from lower car cycle times. Car cycle time for equipment and other rents is defined as the average number of accumulated days that loaded and empty cars from other railroads spend on UPRR's system. The higher locomotive lease expense in both years is attributable to the Railroad's increased leasing of new, more reliable and fuel efficient locomotives. These new locomotives replaced older, non-leased models in the fleet, which helped reduce expenses for depreciation, labor, materials and fuel during each year.

*Depreciation* – The majority of depreciation relates to track structure, including rail, ties and other track material. Depreciation expense decreased $80 million (7%) in 2003 from 2002 levels, following an increase of $21 million (2%) in 2002 compared to 2001. The 2003 decrease was driven by the adoption of FAS 143 as well as the implementation of depreciation studies approved by the Surface Transportation Board, which resulted in lower depreciation rates in 2003 for certain track assets, partially offset by increased rates for locomotives and other assets. Conversely, capital spending in recent years has increased the total value of depreciable assets, partially offsetting the favorable impact of FAS 143 and the depreciation studies in 2003. The increase in expenses for 2002 compared to 2001 resulted primarily from a higher depreciable asset base.

*Fuel and Utilities* – Fuel and utilities include locomotive fuel, utilities other than telephone and gasoline and other fuels. Expenses increased $276 million (26%) in 2003 over 2002 compared to a decrease of $184 million (15%) in 2002 versus 2001. The increase in 2003 and decrease in 2002 were driven by fuel prices, which averaged 92, 73 and 88 cents per gallon in 2003, 2002 and 2001, respectively (including taxes and transportation costs). The higher fuel price in 2003 contributed $255 million to the increase; however, approximately 44% of these costs were recovered through our fuel surcharge programs and are included in operating revenues. A 3% and 4% increase in gross ton miles in 2003 and 2002 resulted in an additional $25 million and $43 million in fuel expense. Additionally, the Railroad hedged approximately 13% and 42% of its fuel consumption for 2003 and 2002, in accordance with its policy applicable to hedging, which decreased fuel costs by $28 million in 2003 and $55 million in 2002.

*Materials and Supplies* – Materials used for the maintenance of the Railroad's lines, structures and equipment is the principal component of materials and supplies expense. Office, small tools and other supplies and the costs of freight services purchased to ship company materials are also included. Expenses decreased by $62 million (13%) in 2003 and $11 million (2%) in 2002. The lower expense in 2003 was primarily driven by costs associated with track removal. Additionally, expense in both 2003 and 2002, decreased due to fewer locomotives repaired, cost control measures and a shift to more contracting of locomotive repairs, which resulted in a corresponding increase to Purchased Services and Other Costs. The 2003 reduction was partially offset by higher costs for locomotive materials, while the decrease in 2002 expense was partially offset by higher costs for freight car repairs.

*Casualty Costs* – The largest component of casualty costs is personal injury expense. Freight and property damage, insurance, environmental matters and occupational illness expense are also included in casualty costs. Costs in 2003 increased $57 million (16%) following an increase of $30 million (9%) in 2002. The increase in 2003 was driven by higher personal injury expense, insurance costs due to increased premiums and expenses associated with destruction of foreign equipment. Destruction of foreign equipment expense is incurred when equipment owned by other railroads is damaged while in our possession. Higher personal injury and insurance costs in 2002 were partially offset by lower costs for freight damage and destruction of foreign equipment.

*Purchased Services and Other Costs* – Purchased services and other costs include the costs of services purchased from outside contractors, state and local taxes, net costs of operating facilities jointly used by UPRR and other railroads, transportation and lodging for train crew employees, trucking and contracting costs for intermodal containers, leased automobile maintenance expenses, telephone and cellular expense, employee travel expense and computer and other general expenses. Expenses increased $142 million (15%) in 2003, as a result of higher state and local taxes, increased spending for contract services and joint facility expense. Crew transportation costs and trucking expenses for intermodal containers also increased due to network performance. State and local taxes increased primarily as a result of higher income levels used to assess property taxes. Growth in contract services was primarily driven by higher costs for contracting of locomotive maintenance (referenced in Materials and Supplies) and contract-related expenses resulting from the cost of track removal. Joint facilities costs were up due to reduced haulage receipts and increased expenses associated with a new joint facility contract. Expenses increased $104 million (13%) in 2002, as a result of higher state and local taxes, increased spending for contract services and joint facility expense.

**Operating Income –** Operating income decreased $120 million (5%) to $2.1 billion in 2003 following an increase of $235 million (12%) to $2.3 billion in 2002. In 2003, revenue growth, productivity gains and lower depreciation expense were more than offset by higher fuel prices, inflation, volume and resource utilization costs. In 2002, revenue growth, productivity gains and lower fuel prices more than offset inflation, increased depreciation expense and higher rail costs due to increased rail volume.

**Non-Operating Items –** Interest expense decreased $58 million (9%) and $68 million (10%) in 2003 and 2002, respectively. The improvement in both years was a result of lower weighted-average debt levels, including the Convertible Preferred Securities, of $8,939 million, $9,523 million and $9,979 million in 2003, 2002 and 2001, as well as lower weighted-average interest rates of 6.4% in 2003, 6.6% in 2002 and 7.0% in 2001. Other income fell $246 million in 2003, following an increase of $163 million in 2002. The reduction in 2003 and increase in 2002 were primarily a result of higher 2002 real estate gains (2002 asset sales to the Utah Transit Authority with a pre-tax value of $141 million and the Santa Clara Valley Transit Authority with a pre-tax value of $73 million). Other income for 2003 was also negatively affected by redemption costs associated with the early retirement of $1.5 billion of Convertible Preferred Securities. Income tax expense decreased $99 million (15%) in 2003 versus an increase of $135 million (25%) in 2002 over 2001. The decrease in 2003 was driven by lower pre-tax income, which was partially offset by a tax adjustment recognized in 2002 for prior years' income tax examinations. The increase in income tax expense for 2002 resulted from higher pre-tax income in 2002, which was partially offset by the tax adjustment previously mentioned.

## Discontinued Operations

Revenues from discontinued operations were $1.2 billion, $1.3 billion and $1.1 billion for 2003, 2002 and 2001, respectively. Revenues for 2003 decreased as a result of the loss of November and December revenues due to the sale of our trucking interest on November 5, 2003. The decrease was partially offset by increased volume, yield improvements and price improvements. The increase in revenues for 2002 was due to volume growth, yield improvements and higher revenue for special services, partially offset by lower fuel surcharge revenue as a result of lower fuel prices in 2002. Income from discontinued operations was $255 million, $76 million and $32 million in 2003, 2002 and 2001. Income from discontinued operations in 2003 included the net gain from the sale of our trucking interest of $211 million, including an income tax benefit of $126 million, while 2002 income included a

one-time benefit of $34 million as a result of the resolution of certain tax matters with the Internal Revenue Service, which was accounted for as a reduction of income tax expense during the period.

## LIQUIDITY AND CAPITAL RESOURCES

As of December 31, 2003, our principal sources of liquidity included cash, cash equivalents, the sale of receivables and revolving credit facilities, as well as issuance of commercial paper and other sources of financing through the capital markets. We had $1.925 billion of credit facilities available, of which there were no borrowings outstanding as of December 31, 2003. The sale of receivables program is subject to certain requirements including the maintenance of an investment grade bond rating. If our bond rating were to deteriorate, it could have an adverse impact on our liquidity. Receivables sold as of December 31, 2003 were $590 million. In January 2004, we reduced the outstanding undivided interest held by investors by $30 million to $560 million, due to a decrease in available receivables at December 31, 2003. Access to commercial paper is dependent on market conditions. Deterioration of our operating results or financial condition due to internal or external factors could negatively impact our ability to utilize commercial paper as a source of liquidity. Liquidity through the capital markets is also dependent on our financial stability.

At December 31, 2003 and 2002, we had a working capital deficit of $367 million and $625 million, respectively. A working capital deficit is not uncommon in our industry and does not indicate a lack of liquidity. We maintain adequate resources to meet our daily cash requirements, and we have sufficient financial capacity to satisfy our current liabilities.

### Financial Condition

Cash from operations was $2.4 billion, $2.2 billion and $1.9 billion in 2003, 2002 and 2001, respectively. The increase from 2002 to 2003 is due to working capital performance and cash from the discontinued operations, partially offset by lower income from continuing operations. The increase from 2001 to 2002 was primarily due to higher net income partially offset by pension plan funding.

Cash used in investing activities was $856 million, $1.3 billion and $1.4 billion in 2003, 2002 and 2001. The reduction in 2003 is primarily driven by proceeds of $620 million from the sale of our trucking interest, which was partially offset by lower proceeds from asset sales and increased 2003 capital spending. The amount decreased slightly from 2001 to 2002 as higher real estate sales, a warranty refund from a vendor and a dividend from an affiliate in 2002 were partially offset by higher capital spending.

The table below details capital expenditures for the years ended December 31, 2003, 2002 and 2001 (including non-cash financings of $188 million, $126 million and $124 million, respectively).

| *Capital Expenditures Millions of Dollars* | *2003* | *2002* | *2001* |
|---|---|---|---|
| Track | $1,224 | $1,200 | $1,125 |
| Locomotives | 373 | 187 | 176 |
| Freight cars | 13 | 11 | 27 |
| Facilities and other | 330 | 422 | 368 |
| Total | $1,940 | $1,820 | $1,696 |

Cash used in financing activities was $1.4 billion, $599 million and $484 million in 2003, 2002 and 2001, respectively. The increase from 2002 to 2003 reflects higher debt repayments of $2.1 billion in 2003 (including $1.5 billion of Convertible Preferred Securities) compared to $1.2 billion in 2002, and higher dividend payments, partially offset by an increase in proceeds from stock option exercises of $66 million. The increase from 2001 to 2002 reflects lower financings ($648 million in 2002 versus $881 million in 2001), partially offset by an increase in stock option exercise proceeds of $98 million and slightly lower debt repayments.

We expect to spend approximately $2 billion on capital expenditures in 2004, including capital leases. Our 2004 capital expenditures and debt service requirements are expected to be funded through cash generated from operations, additional debt financings and the sale or lease of various operating and non-operating properties.

Including the Convertible Preferred Securities as an equity instrument, the ratio of debt to total capital employed was 39.3%, 38.8% and 42.2% at December 31, 2003, 2002 and 2001, respectively. The increase in our ratio in 2003 is due to the redemption of the $1.5 billion of Convertible Preferred Securities and higher debt levels, partially offset by higher equity levels. The reduction in 2002 is due to lower debt levels and higher equity balances.

For the years ended December 31, 2003, 2002 and 2001, our ratio of earnings to fixed charges was 3.2, 3.4 and 2.6, respectively. The ratio of earnings to fixed charges is based on continuing operations. Earnings represent income before discontinued operations and cumulative effect of accounting change, less equity in undistributed earnings of unconsolidated affiliates, plus fixed charges and income taxes. Fixed charges represent interest charges, amortization of debt discount and the estimated amount representing the interest portion of rental charges. The change in our ratio is due primarily to the changes in our income from continuing operations.

## Financing Activities

**Credit Facilities -** We had no commercial paper borrowings outstanding as of December 31, 2003. Commercial paper is issued from time to time for working capital needs and is supported by $1.925 billion in credit facilities. Our credit facilities include $925 million of 364-day revolving credit facilities expiring in March 2004, and $1.0 billion of 5-year revolving credit facilities expiring in March 2005. We have the option to hold higher cash balances in addition to or in replacement of the credit facilities to support commercial paper. These credit facilities also allow for borrowings at floating (LIBOR-based) rates, plus a spread, depending upon our senior unsecured debt ratings. The credit facilities require the maintenance of a minimum net worth and a debt to net worth coverage ratio. At December 31, 2003, we were in compliance with these covenants. The credit facilities do not include any other financial restrictions, credit rating triggers (other than rating-dependent pricing) or any provision that could require the posting of collateral. The credit facilities are designated for general corporate purposes, and none of the credit facilities were used as of December 31, 2003. Commitment fees and interest rates payable under the facilities are similar to fees and rates available to comparably rated investment-grade borrowers. We are reviewing rollover options for the credit facilities.

To the extent we have long-term credit facilities available, we have reclassified certain short-term debt on a long-term basis. At December 31, 2003 and 2002, approximately $324 million and $188 million of short-term borrowings that we intend to refinance were reclassified as long-term debt. This reclassification reflects our intent to refinance these short-term borrowings and current maturities of long-term debt on a long-term basis through the issuance of commercial paper or new long-term financings, or by using the currently available long-term credit facility if alternative financing is not available.

**Redemption of Convertible Preferred Securities -** During 2003, we exercised our option to redeem the entire $1.5 billion of the Convertible Preferred Securities (CPS). The CPS were issued in April 1998 by our wholly owned subsidiary, Union Pacific Capital Trust, at a price of $50 each and paid quarterly cash dividends at an annual rate of 6 1⁄4%. The redemption was funded with a combination of cash from operations, the issuance of $500 million of debt in June 2003, and cash proceeds from the initial public offering of Overnite. The $1.5 billion redemption, net of the $500 million debt issuance, will reduce interest expense by approximately $71 million, pre-tax, annually and eliminate the dilutive effect of the CPS on earnings per share. Total one-time costs incurred in 2003, associated with the redemption, were approximately $45 million and are included in other income.

**Shelf Registration Statement and Significant New Borrowings -** Under a current shelf registration statement filed in 2002, we may issue, from time to time, any combination of debt securities, preferred stock, common stock or warrants for debt securities or preferred stock in one or more offerings. During February 2003, under the shelf

registration, we issued $250 million of 3⅞% fixed rate debt with a maturity of February 15, 2009. The proceeds of the issuance were used for repayment of debt and other general corporate purposes. On June 5, 2003, we issued $300 million of 3⅝% fixed rate debt with a maturity of June 1, 2010 and $200 million of 5⅜% fixed rate debt with a maturity of June 1, 2033. The proceeds of the issuance were used to redeem $500 million of CPS on July 7, 2003. In December 2003, we filed a new $1.0 billion shelf registration statement, which became effective December 29, 2003. Under this shelf registration statement, we may issue, from time to time, any combination of debt securities, preferred stock, common stock or warrants for debt securities or preferred stock in one or more offerings. At December 31, 2003, we had $250 million remaining for issuance under the 2002 shelf registration and the full $1.0 billion for issuance under the new 2003 shelf registration. We have no immediate plans to issue equity securities; however, we will continue to explore opportunities in 2004 to replace existing debt and otherwise access capital through issuances of debt securities under these registrations.

During May 2003, we entered into a capital lease covering new locomotives. The related capital lease obligation totaled approximately $188 million and is included in the Consolidated Statements of Financial Position as debt.

## Off-Balance Sheet Arrangements, Contractual Obligations and Commitments

As described in the notes to the Consolidated Financial Statements, Item 8, and as referenced in the tables below, we have contractual obligations and commercial commitments that may affect our financial condition. However, based on our assessment of the underlying provisions and circumstances of our material contractual obligations and commercial commitments, including material sources of off-balance sheet and structured finance arrangements, there is no known trend, demand, commitment, event or uncertainty that is reasonably likely to occur which would have a material adverse effect on our consolidated results of operations, financial condition or liquidity. In addition, the commercial obligations, financings and commitments made by us are customary transactions which are similar to those of other comparable industrial corporations, particularly within the transportation industry.

The following tables identify material obligations and commitments as of December 31, 2003:

| | | *Payments Due by Period* | | | |
|---|---|---|---|---|---|
| *Contractual Obligations Millions of Dollars* | *Total* | *Less Than 1 Year* | *2-3 Years* | *4-5 Years* | *After 5 Years* |
| Debt (note 4)[a] | $6,439 | $373 | $1,151 | $1,281 | $3,634 |
| Operating leases (note 5) | 2,975 | 439 | 733 | 482 | 1,321 |
| Capital lease obligations (note 5)[b] | 2,525 | 223 | 398 | 352 | 1,552 |
| Purchase obligations [c] | 3,456 | 427 | 595 | 462 | 1,972 |
| Total contractual obligations | $15,395 | $1,462 | $2,877 | $2,577 | $8,479 |

[a] *Excludes capital lease obligations of $1,531 million and market value adjustments of $19 million for debt with qualifying hedges that are recorded as assets on the Consolidated Statements of Financial Position.*

[b] *Represents total obligations, including interest component.*

[c] *Purchase obligations include locomotive maintenance contracts, purchase commitments for locomotives, ties, ballast and track and agreements to purchase other goods and services.*

| *Other Commercial Commitments Millions of Dollars* | *Total Amounts Committed* | *Amount of Commitment Expiration Per Period* | | | |
|---|---|---|---|---|---|
| | | *Less Than 1 Year* | *2-3 Years* | *4-5 Years* | *After 5 Years* |
| Credit facilities (note 4)[a] | $1,925 | $ 925 | $1,000 | $ - | $ - |
| Sale of receivables (note 2)[b] | 600 | 600 | - | - | - |
| Guarantees (note 9)[c] | 399 | 16 | 17 | 13 | 353 |
| Standby letters of credit (note 9)[d] | 49 | 39 | 10 | - | - |
| Total commercial commitments | $2,973 | $1,580 | $1,027 | $13 | $353 |

[a] *None of the credit facilities were used as of December 31, 2003.*
[b] *$590 million of the facility was utilized at December 31, 2003.*
[c] *Includes guaranteed obligations of affiliated operations.*
[d] *None of the letters of credit were drawn upon as of December 31, 2003.*

**Sale of Receivables** – The Railroad has sold without recourse on a 364-day revolving basis, an undivided interest in a designated pool of accounts receivable to investors through Union Pacific Receivables, Inc. (UPRI), a bankruptcy-remote subsidiary. At December 31, 2003 and 2002, UPRI had transferred $695 million and $667 million, respectively, of accounts receivable to the investors. UPRI subsequently sells an interest in such pool to the investors and retains an undivided interest in a portion of these receivables. This retained interest is included in accounts receivable in our Consolidated Financial Statements. At December 31, 2003 and 2002, UPRI had a retained interest of $105 million and $67 million, respectively. The outstanding undivided interest held by investors of $590 million and $600 million at December 31, 2003 and 2002, respectively, is sold at carrying value, which approximates fair value, and there is no gain or loss recognized from the transaction. These sold receivables are no longer included in our Consolidated Financial Statements.

On August 7, 2003, the program was renewed for one year with a capacity to sell to the investors an undivided interest in accounts receivable of $600 million. The amount of receivables sold fluctuates based upon the availability of the amount of receivables eligible for sale and is directly affected by changing business volumes and credit risks, including default and dilution. If default or dilution percentages were to increase one percentage point, the amount of receivables available for sale would decrease by $6 million. Should our credit rating fall below investment grade, the amount of receivables sold would be reduced, and, in certain cases, the investors have the right to discontinue this reinvestment.

The investors have designated the Railroad to service the sold receivables; however, no servicing asset or liability has been recognized as the servicing fees adequately compensate the Railroad for its responsibilities. The costs of the sale of receivables program are included in other income and were $10 million, $13 million and $27 million in 2003, 2002 and 2001, respectively. The costs include interest, program fees paid to banks, commercial paper issuing costs, and fees for unused commitment availability. Payments collected from sold receivables can be reinvested in new receivables on behalf of the buyers. Proceeds from collections reinvested in the program were approximately $11 billion in both 2003 and 2002.

In January 2004, UPRI reduced the outstanding undivided interest held by investors by $30 million to $560 million, due to a decrease in available receivables at December 31, 2003.

**Headquarters Building -** The Railroad has a synthetic operating lease arrangement to finance a new headquarters building, which is being constructed in Omaha, Nebraska. The expected completion date of the building is mid-2004. It will total approximately 1.1 million square feet with approximately 3,800 office workspaces. The cost to construct the new headquarters, including capitalized interest, is approximately $260 million. We have guaranteed all of the Railroad's obligation under this lease.

UPRR is the construction agent for the lessor during the construction period. The Railroad has guaranteed, in the event of a loss caused by, or resulting from, our actions or failures to act as construction agent, 89.9% of the building related construction costs incurred up to that point during the construction period. Total building related costs incurred and drawn from the lease funding commitments as of December 31, 2003, were approximately $125 million. Accordingly, the Railroad's guarantee at December 31, 2003, was approximately $113 million. As construction continues and additional costs are incurred, this guarantee will increase accordingly. At December 31, 2003, we had a liability recorded of approximately $7 million related to the fair value of this guarantee.

After construction is complete, UPRR will lease the building under an initial term of five years with provisions for renewal for an extended period subject to agreement between the Railroad and lessor. At any time during the lease, the Railroad may, at its option, purchase the building at approximately the amount expended by the lessor to construct the building. If the Railroad elects not to purchase the building or renew the lease, the building is returned to the lessor for remarketing, and the Railroad has guaranteed a residual value equal to 85% of the total construction related costs. The guarantee will be approximately $220 million.

## OTHER MATTERS

**Inflation –** The cumulative effect of long periods of inflation has significantly increased asset replacement costs for capital-intensive companies. As a result, assuming that all operating assets are replaced at current price levels, depreciation charges (on an inflation-adjusted basis) would be substantially greater than historically reported amounts.

**Derivative Financial Instruments –** We use derivative financial instruments in limited instances for other than trading purposes to manage risk related to changes in fuel prices and to achieve our interest rate objectives. We are not a party to leveraged derivatives and, by policy, do not use derivative financial instruments for speculative purposes. Financial instruments qualifying for hedge accounting must maintain a specified level of effectiveness between the hedging instrument and the item being hedged, both at inception and throughout the hedged period. We formally document the nature and relationships between the hedging instruments and hedged items, as well as our risk-management objectives, strategies for undertaking the various hedge transactions and method of assessing hedge effectiveness. We use swaps, collars, futures and/or forward contracts to mitigate the downside risk of adverse price movements and hedge the exposure to variable cash flows. The use of these instruments also limits future gains from favorable movements. We use interest rate swaps to manage our exposure to interest rate changes. The purpose of these programs is to protect our operating margins and overall profitability from adverse fuel price changes or interest rate fluctuations.

*Market and Credit Risk* – We address market risk related to derivative financial instruments by selecting instruments with value fluctuations that highly correlate with the underlying item being hedged. Credit risk related to derivative financial instruments, which is minimal, is managed by requiring high credit standards for counterparties and periodic settlements. At December 31, 2003 we have not been required to provide collateral, nor have we received collateral relating to our hedging activities.

In addition, we enter into secured financings in which the debtor has pledged collateral. The collateral is based upon the nature of the financing and the credit risk of the debtor. We generally are not permitted to sell or repledge the collateral unless the debtor defaults.

*Determination of Fair Value* – The fair values of our derivative financial instrument positions at December 31, 2003 and 2002 were determined based upon current fair values as quoted by recognized dealers or developed based upon the present value of expected future cash flows discounted at the applicable U.S. Treasury rate, London Interbank Offered Rates (LIBOR) or swap spread.

*Sensitivity Analyses* – The sensitivity analyses that follow illustrate the economic effect that hypothetical changes in interest rates or fuel prices could have on our results of operations and financial condition. These hypothetical changes do not consider other factors that could impact actual results.

*Interest Rates* – We manage our overall exposure to fluctuations in interest rates by adjusting the proportion of fixed and floating rate debt instruments within our debt portfolio over a given period. The mix of fixed and floating rate debt is largely managed through the issuance of targeted amounts of each as debt matures or as incremental borrowings are required. Derivatives are used as one of the tools to obtain the targeted mix. In addition, we also obtain flexibility in managing interest costs and the interest rate mix within our debt portfolio by evaluating the issuance of and managing outstanding callable fixed-rate debt securities.

At December 31, 2003 and 2002, we had variable-rate debt representing approximately 10% and 12%, respectively, of our total debt. If variable interest rates average one percentage point higher in 2004 than our December 31, 2003 variable rate, which was approximately 3%, our interest expense would increase by approximately $7 million. If variable interest rates averaged one percentage point higher in 2003 than our 2002 annual variable rate, which was approximately 3%, our interest expense would have increased by approximately $8 million. This amount was determined by considering the impact of the hypothetical interest rates on the balances of our variable-rate debt at December 31, 2003 and 2002, respectively.

Swaps allow us to convert debt from fixed rates to variable rates and thereby hedge the risk of changes in the debt's fair value attributable to the changes in the benchmark interest rate (LIBOR). The swaps have been accounted for using the short-cut method as allowed by FASB Statement No. 133 (FAS 133); therefore, no ineffectiveness has been recorded within our Consolidated Financial Statements. In March 2003, we entered into an interest rate swap on $250 million of debt with a maturity date of October 2007. In May 2002, we entered into an interest rate swap on $150 million of debt with a maturity date of February 2023. This swap contained a call option that matched the call option of the underlying hedged debt, as allowed by FAS 133. In January 2003, the swap's counterparty exercised its option to cancel the swap, effective February 1, 2003. Similarly, we exercised our option to redeem the underlying debt. As of December 31, 2003 and 2002, we had interest rate swaps hedging debt of approximately $818 million and $898 million, respectively.

Market risk for fixed-rate debt is estimated as the potential increase in fair value resulting from a hypothetical one percentage point decrease in interest rates as of December 31, 2003, and amounts to approximately $573 million at December 31, 2003. Market risk resulting from a hypothetical one percentage point decrease in interest rates as of December 31, 2002, amounted to approximately $561 million at December 31, 2002. The fair values of our fixed-rate debt were estimated by considering the impact of the hypothetical interest rates on quoted market prices and current borrowing rates.

*Fuel* – Fuel costs are a significant portion of our total operating expenses. As a result of the significance of fuel costs and the historical volatility of fuel prices, we periodically use swaps, collars, futures and/or forward contracts, as well as our fuel surcharge programs, to mitigate the impact of adverse fuel price changes.

As of December 31, 2003, collars are in place for 9% of expected fuel consumption for 2004. The collars have a floor of $0.64, a cap of $0.74 and a ceiling of $0.86 per gallon, excluding taxes, transportation costs and regional pricing spreads. As of December 31, 2003, we had no outstanding hedges for 2005. Based on annualized fuel consumption during 2003, and excluding the impact of the hedging program, each one-cent increase in the price of fuel would have resulted in approximately $8 million of additional fuel expense, after tax.

As of December 31, 2002, we hedged approximately 7% of our forecasted 2003 fuel consumption using fuel swaps at $0.58 per gallon, excluding taxes, transportation costs and regional pricing spreads.

**Accounting Pronouncements –** In December 2003, the FASB published a revision to FASB Interpretation No. 46 "Consolidation of Variable Interest Entities" (FIN 46) to clarify some of the provisions and to exempt certain entities from its requirements. Under the new guidance, special effective date provisions apply to enterprises that have fully or partially applied FIN 46 prior to issuance of the revised interpretation. We adopted FIN 46 in June of 2003. The revision did not require us to modify our accounting related to the implementation of FIN 46.

**Network Performance -** Our network performance and operating efficiency were adversely affected in the third and fourth quarters by a shortage of trainmen and engineers, combined with an expanded summer track maintenance program and fourth quarter record-level volumes. Additional operating expenses were incurred as crew utilization costs and car cycle times increased due to slower network train speed. As discussed under Operating Expenses in this Item 7, labor, rent expense and other costs were affected by our network performance. Programs have been put in place, which we believe should remedy the situation, including, among other things, hiring and training additional employees and accelerating certain locomotive acquisitions.

**Commitments and Contingencies –** There are various claims and lawsuits pending against us and certain of our subsidiaries. We are also subject to various federal, state and local environmental laws and regulations, pursuant to which we are currently participating in the investigation and remediation of various sites.

## CAUTIONARY INFORMATION

Certain statements in this report are, and statements in other material filed or to be filed with the Securities and Exchange Commission (as well as information included in oral statements or other written statements made or to be made by us) are, or will be, forward-looking statements as defined by the Securities Act of 1933 and the Securities Exchange Act of 1934. These forward-looking statements include, without limitation, statements regarding: expectations as to operational improvements; expectations as to cost savings, revenue growth and earnings; the time by which certain objectives will be achieved; estimates of costs relating to environmental remediation and restoration; proposed new products and services; expectations that claims, lawsuits, environmental costs, commitments, contingent liabilities, labor negotiations or agreements, or other matters will not have a material adverse effect on our consolidated financial condition, results of operations or liquidity; and statements concerning projections, predictions, expectations, estimates or forecasts as to our business, financial and operational results, and future economic performance, statements of management's goals and objectives and other similar expressions concerning matters that are not historical facts.

Forward-looking statements should not be read as a guarantee of future performance or results, and will not necessarily be accurate indications of the times that, or by which, such performance or results will be achieved. Forward-looking information is based on information available at the time and/or management's good faith belief with respect to future events, and is subject to risks and uncertainties that could cause actual performance or results to differ materially from those expressed in the statements.

The following important factors, in addition to those discussed in "Risk Factors" in Item 7, could affect our future results and could cause those results or other outcomes to differ materially from those expressed or implied in the forward-looking statements:

- whether we are fully successful in implementing our financial and operational initiatives, including gaining new customers and retaining existing ones, along with containment of operating costs;
- material adverse changes in economic and industry conditions, both within the United States and globally;
- the effects of adverse general economic conditions affecting customer demand and the industries and geographic areas that produce and consume commodities carried by us;
- industry competition, conditions, performance and consolidation;
- general legislative and regulatory developments, including possible enactment of initiatives to re-regulate the rail industry;
- legislative, regulatory, or legal developments involving taxation, including enactment of new federal or state income tax rates, revisions of controlling authority, and the outcome of tax claims and litigation;

- changes in securities and capital markets;
- natural events such as severe weather, fire, floods, earthquakes or other disruptions of our operating systems, structures and equipment;
- any adverse economic or operational repercussions from terrorist activities and any governmental response thereto;
- war or risk of war;
- changes in fuel prices;
- changes in labor costs and labor difficulties, including stoppages affecting either our operations or our customers' abilities to deliver goods to us for shipment; and
- the outcome of claims and litigation, including those related to environmental contamination, personal injuries and occupational illnesses arising from hearing loss, repetitive motion and exposure to asbestos and diesel fumes.

Forward-looking statements speak only as of the date the statement was made. We assume no obligation to update forward-looking information to reflect actual results, changes in assumptions or changes in other factors affecting forward-looking information. If we do update one or more forward-looking statements, no inference should be drawn that we will make additional updates with respect thereto or with respect to other forward-looking statements.

## Item 7A. Quantitative and Qualitative Disclosures about Market Risk

Information concerning market risk sensitive instruments is set forth under Management's Discussion and Analysis of Financial Condition and Results of Operations – Other Matters, Item 7.

****************************************

## Item 8. Financial Statements and Supplementary Data

### Index to Consolidated Financial Statements


| Index to Consolidated Financial Statements | Page |
|---|---|
| Independent Auditors' Report | 37 |
| Consolidated Statements of Income For the Years Ended December 31, 2003, 2002 and 2001 | 38 |
| Consolidated Statements of Financial Position At December 31, 2003 and 2002 | 39 |
| Consolidated Statements of Cash Flows For the Years Ended December 31, 2003, 2002 and 2001 | 40 |
| Consolidated Statements of Changes in Common Shareholders' Equity For the Years Ended December 31, 2003, 2002 and 2001 | 41 |
| Notes to the Consolidated Financial Statements | 42 |

## INDEPENDENT AUDITORS' REPORT

Union Pacific Corporation, its Directors and Shareholders:

We have audited the accompanying consolidated statements of financial position of Union Pacific Corporation and Subsidiary Companies (the Corporation) as of December 31, 2003 and 2002, and the related consolidated statements of income, changes in common shareholders' equity and cash flows for each of the three years in the period ended December 31, 2003. Our audits also included the consolidated financial statement schedule listed in the Table of Contents at Part IV, Item 15. These consolidated financial statements and consolidated financial statement schedule are the responsibility of the Corporation's management. Our responsibility is to express an opinion on the consolidated financial statements and consolidated financial statement schedule based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of Union Pacific Corporation and Subsidiary Companies at December 31, 2003 and 2002, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2003, in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, such consolidated financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

As discussed in Note 12 to the consolidated financial statements, the Corporation changed its method of accounting for asset retirement obligations in 2003.

Deloitte & Touche LLP

Omaha, Nebraska
February 6, 2004

## CONSOLIDATED STATEMENTS OF INCOME

*Union Pacific Corporation and Subsidiary Companies*

| *Millions, Except Per Share Amounts, for the Years Ended December 31,* | *2003* | *2002* | *2001* |
|---|---|---|---|
| Operating revenues | $11,551 | $11,159 | $10,830 |
| Operating expenses: | | | |
| Salaries, wages and employee benefits | 3,892 | 3,694 | 3,586 |
| Equipment and other rents | 1,221 | 1,240 | 1,214 |
| Depreciation | 1,067 | 1,147 | 1,126 |
| Fuel and utilities | 1,341 | 1,065 | 1,249 |
| Materials and supplies | 414 | 476 | 487 |
| Casualty costs | 416 | 359 | 329 |
| Purchased services and other costs | 1,067 | 925 | 821 |
| Total operating expenses | 9,418 | 8,906 | 8,812 |
| Operating income | 2,133 | 2,253 | 2,018 |
| Other income | 78 | 324 | 161 |
| Interest expense | (574) | (632) | (700) |
| Income before income taxes | 1,637 | 1,945 | 1,479 |
| Income taxes | (581) | (680) | (545) |
| Income from continuing operations | 1,056 | 1,265 | 934 |
| Income from discontinued operations, (including gain on sale of $211 in 2003) net of tax expense (benefit) of $(96), $(5) and $22 | 255 | 76 | 32 |
| Cumulative effect of accounting change, net of income tax expense of $167 | 274 | - | - |
| Net income | $ 1,585 | $ 1,341 | $ 966 |
| **Share and Per Share** | | | |
| Basic: | | | |
| Income from continuing operations | $ 4.15 | $ 5.02 | $ 3.77 |
| Income from discontinued operations | 1.00 | 0.30 | 0.13 |
| Cumulative effect of accounting change | 1.08 | - | - |
| Net income | $ 6.23 | $ 5.32 | $ 3.90 |
| Diluted: | | | |
| Income from continuing operations | $ 4.07 | $ 4.78 | $ 3.65 |
| Income from discontinued operations | 0.95 | 0.27 | 0.12 |
| Cumulative effect of accounting change | 1.02 | - | - |
| Net income | $ 6.04 | $ 5.05 | $ 3.77 |
| Weighted average number of shares (Basic) | 254.4 | 252.1 | 248.0 |
| Weighted average number of shares (Diluted) | 268.0 | 276.8 | 271.9 |
| Dividends | $ 0.99 | $ 0.83 | $ 0.80 |

*The accompanying notes are an integral part of these Consolidated Financial Statements.*

## CONSOLIDATED STATEMENTS OF FINANCIAL POSITION

*Union Pacific Corporation and Subsidiary Companies*

| *Millions of Dollars, as of December 31,* | *2003* | *2002* |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and temporary investments | $ 527 | $ 367 |
| Accounts receivable, net | 498 | 557 |
| Inventories | 267 | 277 |
| Current deferred income taxes | 518 | 498 |
| Other current assets | 279 | 199 |
| Total current assets | 2,089 | 1,898 |
| Investments: | | |
| Investments in and advances to affiliated companies | 688 | 649 |
| Other investments | 38 | 50 |
| Total investments | 726 | 699 |
| Properties: | | |
| Road | 30,435 | 29,370 |
| Equipment | 7,648 | 7,451 |
| Other | 237 | 39 |
| Total cost | 38,320 | 36,860 |
| Accumulated depreciation | (8,037) | (7,856) |
| Net properties | 30,283 | 29,004 |
| Other assets | 362 | 381 |
| Assets of discontinued operations | - | 782 |
| Total assets | $33,460 | $32,764 |
| **Liabilities and Common Shareholders' Equity** | | |
| Current liabilities: | | |
| Accounts payable | $ 511 | $ 430 |
| Accrued wages and vacation | 363 | 365 |
| Accrued casualty costs | 394 | 419 |
| Income and other taxes | 219 | 227 |
| Dividends and interest | 252 | 253 |
| Debt due within one year | 167 | 275 |
| Other current liabilities | 550 | 554 |
| Total current liabilities | 2,456 | 2,523 |
| Debt due after one year | 7,822 | 7,428 |
| Deferred income taxes | 9,169 | 8,550 |
| Accrued casualty costs | 595 | 658 |
| Retiree benefits obligation | 678 | 762 |
| Other long-term liabilities | 386 | 385 |
| Liabilities of discontinued operations | - | 307 |
| Company-obligated mandatorily redeemable convertible preferred securities | - | 1,500 |
| Commitments and contingencies | | |
| Common shareholders' equity | 12,354 | 10,651 |
| Total liabilities and common shareholders' equity | $33,460 | $32,764 |

*The accompanying notes are an integral part of these Consolidated Financial Statements.*

## CONSOLIDATED STATEMENTS OF CASH FLOWS

*Union Pacific Corporation and Subsidiary Companies*

| *Millions of Dollars, for the Years Ended December 31,* | *2003* | *2002* | *2001* |
|---|---|---|---|
| **Operating Activities** | | | |
| Net income | $1,585 | $1,341 | $ 966 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Income from discontinued operations | (255) | (76) | (32) |
| Cumulative effect of accounting change | (274) | - | - |
| Depreciation | 1,067 | 1,147 | 1,126 |
| Deferred income taxes | 494 | 596 | 419 |
| Cash paid to fund pension plan | (100) | (100) | - |
| Other, net | (125) | (398) | (430) |
| Changes in current assets and liabilities, net | 30 | (311) | (184) |
| Cash provided by operating activities | 2,422 | 2,199 | 1,865 |
| **Investing Activities** | | | |
| Capital investments | (1,752) | (1,694) | (1,572) |
| Proceeds from asset sales | 150 | 409 | 316 |
| Proceeds from sale of discontinued operations | 620 | - | - |
| Other investing activities, net | 126 | (51) | (126) |
| Cash used in investing activities | (856) | (1,336) | (1,382) |
| **Financing Activities** | | | |
| Dividends paid | (234) | (201) | (198) |
| Debt repaid | (2,117) | (1,196) | (1,219) |
| Cash received from exercise of stock options | 216 | 150 | 52 |
| Financings, net | 729 | 648 | 881 |
| Cash used in financing activities | (1,406) | (599) | (484) |
| Net change in cash and temporary investments | 160 | 264 | (1) |
| Cash and temporary investments at beginning of year | 367 | 103 | 104 |
| Cash and temporary investments at end of year | $ 527 | $ 367 | $ 103 |
| **Changes in Current Assets and Liabilities, Net** | | | |
| Accounts receivable, net | $ 59 | $ (85) | $ (24) |
| Inventories | 10 | (22) | 97 |
| Other current assets | (80) | (53) | (28) |
| Accounts, wages and vacation payable | 79 | (81) | (115) |
| Other current liabilities | (38) | (70) | (114) |
| Total | $ 30 | $ (311) | $(184) |
| **Supplemental cash flow information:** | | | |
| Non-cash transactions: | | | |
| Non-cash locomotive lease financings | $ 188 | $ 126 | $ 124 |
| Acquisition of Motor Cargo Industries, Inc. | - | - | 80 |
| Cash paid during the year for: | | | |
| Interest | $ 587 | $ 639 | $ 709 |
| Income taxes, net | 51 | 134 | 51 |

*The accompanying notes are an integral part of these Consolidated Financial Statements.*

# CONSOLIDATED STATEMENTS OF CHANGES IN COMMON SHAREHOLDERS' EQUITY

*Union Pacific Corporation and Subsidiary Companies*

| | | | | | Accumulated Other Comprehensive Income (Loss) | | | | |
|---|---|---|---|---|---|---|---|---|---|
| *Millions of Dollars* | *Common Shares [a]* | *Paid-in-Surplus* | *Retained Earnings* | *Treasury Stock [b]* | *Minimum Pension Liability Adjustments* | *Foreign Currency Translation Adjustments* | *Derivative Adjustments* | *Total* | *Total* |
| Balance at January 1, 2001 | $688 | $4,024 | $5,699 | $(1,749) | $ (2) | $ 2 | $ - | $ - | $ 8,662 |
| Net income | - | - | 966 | - | - | - | - | - | 966 |
| Other comprehensive income (loss) | | | | | | | | | |
| From continuing operations, net of tax of $(6) | - | - | - | - | (5) | 1 | (7) | (11) | (11) |
| Comprehensive income | | | | | | | | | 955 |
| Conversion, exercises of stock options, forfeitures and other - net 265,112 shares in 2001[c] | 1 | (44) | - | 200 | - | - | - | - | 157 |
| Dividends declared ($0.80 per share) | - | - | (199) | - | - | - | - | - | (199) |
| Balance at December 31, 2001 | 689 | 3,980 | 6,466 | (1,549) | (7) | 3 | (7) | (11) | 9,575 |
| Net income | - | - | 1,341 | - | - | - | - | - | 1,341 |
| Other comprehensive income (loss) | | | | | | | | | |
| From continuing operations, net of tax of $(85) | - | - | - | - | (141) | (12) | 14 | (139) | (139) |
| From discontinued operations, net of tax of $(48) | - | - | - | - | (84) | - | - | (84) | (84) |
| Comprehensive income | | | | | | | | | 1,118 |
| Conversion, exercises of stock options, forfeitures and other – net 80,280 shares in 2002 | - | (34) | - | 202 | - | - | - | - | 168 |
| Dividends declared ($0.83 per share) | - | - | (210) | - | - | - | - | - | (210) |
| Balance at December 31, 2002 | 689 | 3,946 | 7,597 | (1,347) | (232) | (9) | 7 | (234) | 10,651 |
| Net income | - | - | 1,585 | - | - | - | - | - | 1,585 |
| Other comprehensive income (loss) | | | | | | | | | |
| From continuing operations, net of tax of $16 | - | - | - | - | 39 | (9) | (4) | 26 | 26 |
| From discontinued operations, net of tax of $48 | - | - | - | - | 84 | - | - | 84 | 84 |
| Comprehensive income | | | | | | | | | 1,695 |
| Conversion, exercises of stock options, forfeitures and other – net 113,179 shares in 2003 | - | (10) | - | 270 | - | - | - | - | 260 |
| Dividends declared ($0.99 per share) | - | - | (252) | - | - | - | - | - | (252) |
| Balance at December 31, 2003 | $689 | $3,936 | $8,930 | $(1,077) | $(109) | $(18) | $3 | $(124) | $12,354 |

[a] *Common stock $2.50 par value; 500,000,000 shares authorized; 275,692,546 shares issued at the end of 2003; 275,579,367 shares issued at the end of 2002; 275,499,087 shares issued at the end of 2001.*

[b] *Balance at end of year, shares at cost 17,532,015 in 2003; 21,920,238 in 2002; 25,208,819 in 2001.*

[c] *We utilized approximately 1.7 million shares of treasury stock in the acquisition of Motor Cargo Industries, Inc.*

*The accompanying notes are an integral part of these Consolidated Financial Statements.*

# NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

*Union Pacific Corporation and Subsidiary Companies*

For purposes of this report, unless the context otherwise requires, all references herein to the "Corporation", "we", "us", and "our" mean Union Pacific Corporation and its subsidiaries, including Union Pacific Railroad Company, which will be separately referred to herein as "UPRR" or the "Railroad".

## Significant Accounting Policies

**Principles of Consolidation –** The Consolidated Financial Statements include the accounts of Union Pacific Corporation and all of its subsidiaries. Investments in affiliated companies (20% to 50% owned) are accounted for using the equity method of accounting. All significant intercompany transactions are eliminated.

**Cash and Temporary Investments –** Temporary investments are stated at cost which approximates fair value and consist of investments with original maturities of three months or less.

**Inventories –** Inventories consist of materials and supplies carried at the lower of average cost or market.

**Property and Depreciation –** Properties are carried at cost. Provisions for depreciation are computed principally on the straight-line method based on estimated service lives of depreciable property. The cost (net of salvage) of depreciable rail property retired or replaced in the ordinary course of business is charged to accumulated depreciation, and no gain or loss is recognized. A gain or loss is recognized in other income for all other property upon disposition. The cost of internally developed software is capitalized and amortized over a five-year period. An obsolescence review of capitalized software is performed on a periodic basis.

**Impairment of Long-lived Assets –** We review long-lived assets, including identifiable intangibles, for impairment when events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. If impairment indicators are present and the estimated future undiscounted cash flows are less than the carrying value of the long-lived assets, the carrying value is reduced to the estimated fair value as measured by the discounted cash flows.

**Revenue Recognition –** We recognize commodity revenues on a percentage-of-completion basis as freight moves from origin to destination. Other revenue is recognized as service is performed or contractual obligations are met.

**Translation of Foreign Currency –** Our portion of the assets and liabilities related to foreign investments are translated into U.S. dollars at the exchange rates in effect at the balance sheet date. Revenues and expenses are translated at the average rates of exchange prevailing during the year. Unrealized adjustments are reflected within shareholders' equity as accumulated other comprehensive income or loss.

**Financial Instruments –** The carrying value of our non-derivative financial instruments approximates fair value. The fair value of financial instruments is generally determined by reference to market values as quoted by recognized dealers or developed based upon the present value of expected future cash flows discounted at the applicable U.S. Treasury rate, London Interbank Offered Rates (LIBOR) or swap spread.

We periodically use derivative financial instruments, for other than trading purposes, to manage risk related to changes in fuel prices and interest rates.

**Stock-Based Compensation –** At December 31, 2003, we had several stock-based employee compensation plans, which are described more fully in note 7. We account for those plans under the recognition and measurement principles of APB Opinion No. 25, "Accounting for Stock Issued to Employees", and related Interpretations. No stock-based employee compensation expense, related to stock option grants, is reflected in net income as all options granted under those plans had an exercise price equal to the market value of the underlying common

stock on the date of grant. Stock-based employee compensation expense related to restricted stock, units and other incentive plans is reflected in net income. The following table illustrates the effect on net income and earnings per share if we had applied the fair value recognition provisions of Financial Accounting Standards Board (FASB) Statement No. 123, "Accounting for Stock-Based Compensation", to stock-based employee compensation.

| | *Year Ended December 31,* | | |
|---|---|---|---|
| *Millions of Dollars, Except Per Share Amounts* | *2003* | *2002* | *2001* |
| Net income, as reported | $1,585 | $1,341 | $ 966 |
| Stock-based employee compensation expense included in reported net income, net of tax | 28 | 31 | 11 |
| Total stock-based employee compensation expense determined under fair value based method for all awards, net of tax | (50) | (52) | (33) |
| Pro forma net income | $1,563 | $1,320 | $ 944 |
| EPS – basic, as reported | $ 6.23 | $ 5.32 | $3.90 |
| EPS – basic, pro forma | $ 6.14 | $ 5.24 | $3.81 |
| EPS – diluted, as reported | $ 6.04 | $ 5.05 | $3.77 |
| EPS – diluted, pro forma | $ 5.96 | $ 4.98 | $3.69 |

**Earnings Per Share –** Basic earnings per share (EPS) are calculated on the weighted-average number of common shares outstanding during each period. Diluted EPS include shares issuable upon exercise of outstanding stock options, stock-based awards and the potential conversion of the preferred securities where the conversion of such instruments would be dilutive.

**Use of Estimates –** Our Consolidated Financial Statements include estimates and assumptions regarding certain assets, liabilities, revenues and expenses and the disclosure of certain contingent assets and liabilities. Actual future results may differ from such estimates.

**Income Taxes –** We account for income taxes in accordance with FASB Statement No. 109, "Accounting for Income Taxes". The objectives of accounting for income taxes are: (1) to recognize the amount of taxes payable or refundable for the current year; and (2) to recognize the future tax consequences (deferred taxes) associated with items of income or expense that are reported in an entity's financial statements in different time periods than its tax returns. Deferred taxes are measured using current tax law; future changes in tax laws are not anticipated, but such future changes could have a material impact on our financial condition or our results of operations.

**Pension and Postretirement Benefits –** We incur certain employment-related expenses associated with pensions and postretirement health benefits. In order to measure the expense associated with these benefits, we must make various estimates including discount rates used to value certain liabilities, expected return on plan assets used to fund these expenses, salary increases, employee turnover rates, anticipated mortality rates and expected future healthcare costs. The estimates used by us are based on our historical experience as well as current facts and circumstances. We use third-party actuaries to assist us in properly measuring the expense and liability associated with these benefits. Actual results that vary from the previously mentioned assumptions could have a material impact on our results of operations, financial condition or liquidity.

**Personal Injury –** The cost of injuries to employees and others on our property is charged to expense based on estimates of the ultimate cost and number of incidents each year. We use third party actuaries to assist us in properly measuring the expense and liability.

**Environmental –** When environmental issues have been identified with respect to the property owned, leased or otherwise used in the conduct of our business, we and our consultants perform environmental assessments on

such property. We expense the cost of the assessments as incurred. We accrue the cost of remediation where our obligation is probable and such costs can be reasonably estimated.

**Differences in Securities and Exchange Commission (SEC) and Surface Transportation Board (STB) Accounting –** STB accounting rules require that railroads accrue the cost of removing track structure over the expected useful life of these assets. Railroads historically used this prescribed accounting for reports filed with both the STB and SEC. In August 2001, the FASB issued Statement No. 143, "Accounting for Asset Retirement Obligations" (FAS 143). This statement was effective for us beginning January 1, 2003, and prohibits the accrual of removal costs unless there is a legal obligation to remove the track structure at the end of its life. We concluded that we did not have a legal obligation to remove the track structure, and therefore, under generally accepted accounting principles, we could not accrue the cost of removal in advance. As a result, reports filed with the SEC will reflect the expense of removing these assets in the period in which they are removed.

**Change in Presentation –** Certain prior year amounts have been reclassified to conform to the 2003 Consolidated Financial Statement presentation. These reclassifications had no effect on previously reported operating income or net income, with the exception of reclassifications made to reflect the discontinued operations.

## 1. Operations and Segmentation

We have one reportable business segment that operates primarily in the area of rail transportation, through our indirect wholly owned subsidiary, Union Pacific Railroad Company and its subsidiaries and rail affiliates. The Consolidated Financial Statements also include discontinued trucking operations, consisting of Overnite Transportation Company (OTC) and Motor Cargo Industries, Inc. (Motor Cargo) (see note 13 to the Consolidated Financial Statements regarding the reclassification of our trucking segment as a discontinued operation).

**Continuing Operations –** The Railroad is a Class I railroad that operates in the United States. Our operating results have included Southern Pacific Rail Corporation since October 1996. In addition, during 1997, the Railroad acquired an ownership interest in a consortium which was granted a 50-year concession to operate the Pacific-North and Chihuahua Pacific lines in Mexico. The Railroad made an additional investment in the consortium in 1999 and currently holds a 26% ownership interest in the consortium.

We have approximately 33,000 route miles linking Pacific Coast and Gulf Coast ports with the Midwest and eastern United States gateways and providing several north/south corridors to key Mexican gateways. We serve the western two-thirds of the country and maintain coordinated schedules with other rail carriers for the handling of freight to and from the Atlantic Coast, the Pacific Coast, the Southeast, the Southwest, Canada and Mexico. Export and import traffic is moved through Gulf Coast and Pacific Coast ports and across the Mexican and Canadian borders. Railroad freight is comprised of six commodity groups (percent of total commodity revenues for the year ended December 31, 2003): agricultural (14%), automotive (11%), chemicals (14%), energy (22%), industrial products (20%) and intermodal (19%).

*Employees* – Approximately 86% of our 46,000 full time equivalent employees are represented by 14 major rail unions. National negotiations under the Railway Labor Act to revise the national labor agreements for all crafts began in late 1999.

In May 2001, the Brotherhood of Maintenance of Way Employees (BMWE) ratified an agreement, which included provisions for wage increases (based on the consumer price index) and progressive employee health and welfare cost sharing rates.

In August 2002, the carriers reached an agreement with the United Transportation Union (UTU) that incorporated wage increases. The agreement also provided for the operation of remote control locomotives by trainmen that was challenged by the Brotherhood of Locomotive Engineers (BLE). A January 2003 arbitration

decision held that the operation of remote control locomotives in terminals does not violate the BLE agreement. In November 2003, agreement was reached with the UTU on employee health and welfare cost sharing rates and plan design changes.

In November 2002, the International Brotherhood of Boilermakers and Blacksmiths (IBB) reached an agreement that incorporated wage increases.

In January 2003, an arbitration award was rendered establishing wage increases and employee health and welfare cost sharing rates for the Transportation Communications International Union (TCU). Health and welfare plan design changes were also part of the TCU agreement.

Other settled agreements that incorporated wage increases and employee health and welfare cost sharing rates combined with plan design changes include the Brotherhood of Railway Signalmen (BRS) in September 2003 and the Brotherhood of Locomotive Engineers (BLE) in December 2003. Contract discussions with the remaining unions are either in negotiation or mediation.

All settlements previously discussed include a five year contract period, expiring December 31, 2004.

Effective January 2004, the Brotherhood of Locomotive Engineers merged with the International Brotherhood of Teamsters (IBT). The BLE has changed its name to the Brotherhood of Locomotive Engineers and Trainmen (BLET).

*Competition* - We are subject to competition from other railroads, motor carriers and barge operators. Our main rail competitor is Burlington Northern Santa Fe Corporation. Its rail subsidiary, The Burlington Northern and Santa Fe Railway Company, operates parallel routes in many of our main traffic corridors. In addition, our operations are conducted in corridors served by other competing railroads and by motor carriers. Motor carrier competition is particularly strong with respect to five of our six commodity groups (excluding energy), due to shorter delivery times offered by such carriers. Because of the proximity of our routes to major inland and Gulf Coast waterways, barge competition can be particularly pronounced, especially for grain and bulk commodities. Competition can pressure both transit time requirements and pricing, as well as place a greater emphasis on the quality and reliability of the service provided. While we must build or acquire and maintain our rail system, trucks and barges are able to use public rights-of-way maintained by public entities. Any future improvements or expenditures materially increasing the quality of these alternative modes of transportation in the locations in which we operate, or legislation granting materially greater latitude for motor carriers with respect to size or weight limitations, could have a material adverse effect on our results of operations, financial condition and liquidity.

*Equipment Suppliers* - We are dependent on two key suppliers of locomotives. Due to the capital intensive nature and sophistication of this equipment and its production, there are strong barriers of entry to potential new suppliers. Therefore, if one of these suppliers discontinues manufacturing locomotives, we could realize a significant increase in the cost and the potential for reduced availability of the locomotives that are necessary to our operations.

**Discontinued Operations –** The discontinued operations represent the operations of OTC and Motor Cargo. OTC is a major interstate trucking company specializing in less-than-truckload shipments. OTC serves all 50 states and portions of Canada and Mexico through 170 service centers located throughout the United States providing regional, inter-regional and long haul service. OTC transports a variety of products including machinery, tobacco, textiles, plastics, electronics and paper products. Motor Cargo is a western regional less-than-truckload carrier that provides comprehensive service throughout 10 western states. Motor Cargo transports general commodities, including consumer goods, packaged foodstuffs, industrial and electronic equipment and auto parts.

## 2. Financial Instruments

**Strategy and Risk –** We use derivative financial instruments in limited instances for other than trading purposes to manage risk related to changes in fuel prices and to achieve our interest rate objectives. We are not a party to leveraged derivatives and, by policy, do not use derivative financial instruments for speculative purposes. Financial instruments qualifying for hedge accounting must maintain a specified level of effectiveness between the hedging instrument and the item being hedged, both at inception and throughout the hedged period. We formally document the nature and relationships between the hedging instruments and hedged items, as well as our risk-management objectives, strategies for undertaking the various hedge transactions and method of assessing hedge effectiveness. We use swaps, collars, futures and/or forward contracts to mitigate the downside risk of adverse price movements and hedge the exposure to variable cash flows. The use of these instruments also limits future benefits from favorable movements. We use interest rate swaps to manage our exposure to interest rate changes. The purpose of these programs is to protect our operating margins and overall profitability from adverse fuel price changes or interest rate fluctuations.

**Market and Credit Risk –** We address market risk related to derivative financial instruments by selecting instruments with value fluctuations that highly correlate with the underlying hedged item. Credit risk related to derivative financial instruments, which is minimal, is managed by requiring high credit standards for counterparties and periodic settlements. At December 31, 2003, we had not been required to provide collateral, nor have we received collateral relating to our hedging activities.

In addition, we enter into secured financings in which the debtor has pledged collateral. The collateral is based upon the nature of the financing and the credit risk of the debtor. We generally are not permitted to sell or repledge the collateral unless the debtor defaults.

**Determination of Fair Value –** The fair values of our derivative financial instrument positions at December 31, 2003 and 2002, were determined based upon current fair values as quoted by recognized dealers or developed based upon the present value of expected future cash flows discounted at the applicable U.S. Treasury rate, London Interbank Offered Rates (LIBOR) or swap spread.

**Interest Rate Strategy –** We manage our overall exposure to fluctuations in interest rates by adjusting the proportion of fixed and floating rate debt instruments within our debt portfolio over a given period. The mix of fixed and floating rate debt is largely managed through the issuance of targeted amounts of each as debt matures or as incremental borrowings are required. Derivatives are used as one of the tools to obtain the targeted mix. In addition, we also obtain flexibility in managing interest costs and the interest rate mix within our debt portfolio by evaluating the issuance of and managing outstanding callable fixed-rate debt securities.

Swaps allow us to convert debt from fixed rates to variable rates and thereby hedge the risk of changes in the debt's fair value attributable to the changes in the benchmark interest rate (LIBOR). The swaps have been accounted for using the short-cut method as allowed by FASB Statement No. 133 (FAS 133); therefore, no ineffectiveness has been recorded within our Consolidated Financial Statements. In March 2003, we entered into an interest rate swap on $250 million of debt with a maturity date of October 2007. In May 2002, we entered into an interest rate swap on $150 million of debt with a maturity date of February 2023. This swap contained a call option that matched the call option of the underlying hedged debt, as allowed by FAS 133. In January 2003, the swap's counterparty exercised their option to cancel the swap, effective February 1, 2003. Similarly, we exercised our option to redeem the underlying debt. As of December 31, 2003 and 2002, we had interest rate swaps hedging debt of approximately $818 million and $898 million, respectively.

**Fuel Strategy –** Fuel costs are a significant portion of our total operating expenses. As a result of the significance of fuel costs and the historical volatility of fuel prices, we periodically use swaps, collars, futures and/or forward contracts, as well as our fuel surcharge programs, to mitigate the impact of adverse fuel price changes.

The following is a summary of our derivative financial instruments for continuing operations at December 31, 2003 and 2002:

| *Millions, Except Percentages and Average Commodity Prices* | *2003* | *2002* |
|---|---|---|
| Interest rate hedging: | | |
| Amount of debt hedged | $ 818 | $ 898 |
| Percentage of total debt portfolio | 10% | 12% |
| Fuel hedging: | | |
| Swaps and swaptions: | | |
| Number of gallons hedged for 2002[a] | - | 552 |
| Average price of 2002 hedges (per gallon) [b] | $ - | $0.56 |
| Number of gallons hedged for 2003[c] | 145 | 88 |
| Average price of 2003 hedges outstanding (per gallon) [b] | $0.63 | $0.58 |
| Collars: | | |
| Number of gallons hedged for 2003 | 22 | - |
| Average cap price for 2003 collars outstanding [b] | $0.77 | $ - |
| Average floor price for 2003 collars outstanding [b] | $0.67 | $ - |
| Average ceiling price for 2003 collars outstanding [b] | $0.88 | $ - |
| Number of gallons hedged for 2004 | 120 | - |
| Average cap price for 2004 collars outstanding [b] | $0.74 | $ - |
| Average floor price for 2004 collars outstanding [b] | $0.64 | $ - |
| Average ceiling price for 2004 collars outstanding [b] | $0.86 | $ - |

[a] *Fuel hedges which were in effect during 2002.*
[b] *Excludes taxes, transportation costs and regional pricing spreads.*
[c] *Fuel hedges which were in effect during 2003. These hedges expired December 31, 2003.*

The fair value asset and liability positions of our outstanding derivative financial instruments at December 31, 2003 and 2002 were as follows:

| *Millions of Dollars* | *2003* | *2002* |
|---|---|---|
| Interest rate hedging: | | |
| Gross fair value asset position | $24 | $52 |
| Gross fair value (liability) position | (1) | - |
| Fuel hedging: | | |
| Gross fair value asset position | 6 | 12 |
| Gross fair value (liability) position | - | - |
| Total fair value asset (liability) position, net | $29 | $64 |

Fuel hedging positions will be reclassified from accumulated other comprehensive income (loss) to fuel expense over the life of the hedge as fuel is consumed.

Our use of derivative financial instruments had the following impact on pre-tax income for the years ended December 31, 2003, 2002 and 2001:

| *Millions of Dollars* | *2003* | *2002* | *2001* |
|---|---|---|---|
| Decrease in interest expense from interest rate hedging | $30 | $29 | $4 |
| Decrease (increase) in fuel expense from fuel hedging | 28 | 36 | (14) |
| Decrease (increase) in fuel expense from fuel swaptions | - | 19 | (6) |
| Decrease (increase) in operating expenses | 58 | 84 | (16) |
| Increase (decrease) in other income, net from fuel swaptions | - | 5 | (18) |
| Increase in other income from interest rate swap cancellation | 5 | - | - |
| Increase (decrease) in pre-tax income | $63 | $89 | $(34) |

**Fair Value of Debt Instruments –** The fair value of our long-term and short-term debt has been estimated using quoted market prices, where available, or current borrowing rates. At December 31, 2003 and 2002, the fair value of total debt exceeded the carrying value by approximately $727 million and $991 million, respectively. At December 31, 2003 and 2002, approximately $375 million and $513 million, respectively, of fixed-rate debt securities contain call provisions that allow us to retire the debt instruments prior to final maturity, with the payment of fixed call premiums, or in certain cases, at par.

**Sale of Receivables –** The Railroad has sold without recourse on a 364-day revolving basis, an undivided interest in a designated pool of accounts receivable to investors through Union Pacific Receivables, Inc. (UPRI), a bankruptcy-remote subsidiary. At December 31, 2003 and 2002, UPRI had transferred $695 million and $667 million, respectively, of accounts receivable to the investors. UPRI subsequently sells an interest in such pool to the investors and retains an undivided interest in a portion of these receivables. This retained interest is included in accounts receivable in our Consolidated Financial Statements. At December 31, 2003 and 2002, UPRI had a retained interest of $105 million and $67 million, respectively. The outstanding undivided interest held by investors of $590 million and $600 million at December 31, 2003 and 2002, respectively, is sold at carrying value, which approximates fair value, and there is no gain or loss recognized from the transaction. These sold receivables are no longer included in our Consolidated Financial Statements.

On August 7, 2003, the program was renewed for one year with a capacity to sell to the investors an undivided interest in accounts receivable of $600 million. The amount of receivables sold fluctuates based upon the availability of the amount of receivables eligible for sale and is directly affected by changing business volumes and credit risks, including default and dilution. If default or dilution percentages were to increase one percentage point, the amount of receivables available for sale would decrease by $6 million. Should our credit rating fall below investment grade, the amount of receivables sold would be reduced, and, in certain cases, the investors have the right to discontinue this reinvestment.

The investors have designated the Railroad to service the sold receivables; however, no servicing asset or liability has been recognized as the servicing fees adequately compensate the Railroad for its responsibilities. The costs of the sale of receivables program are included in other income and were $10 million, $13 million and $27 million in 2003, 2002 and 2001, respectively. The costs include interest, program fees paid to banks, commercial paper issuing costs, and fees for unused commitment availability. Payments collected from sold receivables can be reinvested in new receivables on behalf of the buyers. Proceeds from collections reinvested in the program were approximately $11 billion in both 2003 and 2002.

In January 2004, UPRI reduced the outstanding undivided interest held by investors by $30 million to $560 million, due to a decrease in available receivables at December 31, 2003.

## 3. Income Taxes

Components of income tax expense for continuing operations were as follows for the years ended December 31, 2003, 2002 and 2001:

| *Millions of Dollars* | *2003* | *2002* | *2001* |
|---|---|---|---|
| Current: | | | |
| Federal | $ 55 | $ 76 | $120 |
| State | 32 | 8 | 6 |
| Total current | 87 | 84 | 126 |
| Deferred: | | | |
| Federal | 508 | 532 | 370 |
| State | (14) | 64 | 49 |
| Total deferred | 494 | 596 | 419 |
| Total | $581 | $680 | $545 |

Deferred income tax liabilities (assets) were comprised of the following at December 31, 2003 and 2002:

| *Millions of Dollars* | *2003* | *2002* |
|---|---|---|
| Net current deferred income tax asset | $ (518) | $ (498) |
| Property | 8,526 | 8,170 |
| State taxes, net | 612 | 611 |
| Other | 31 | (231) |
| Net long-term deferred income tax liability | 9,169 | 8,550 |
| Net deferred income tax liability | $8,651 | $8,052 |

For the years ending December 31, 2003, 2002 and 2001, a reconciliation between statutory and effective tax rates for continuing operations is as follows:

| *Percentages* | *2003* | *2002* | *2001* |
|---|---|---|---|
| Statutory tax rate | 35.0% | 35.0% | 35.0% |
| State taxes, net | 0.7 | 2.4 | 2.4 |
| Prior years' income tax examinations | - | (1.8) | (0.2) |
| Other | (0.2) | (0.6) | (0.4) |
| Effective tax rate | 35.5% | 35.0% | 36.8% |

All federal income tax years prior to 1986 are closed. Federal income tax liabilities for 1986 through 1994 have been resolved, pending final resolution of interest calculations, which may take several years. Resolution of these years resulted in a decrease in income tax expense for continuing operations of $33 million in 2002. Years 1995 through 1998 are currently under examination by the IRS.

We believe we have adequately reserved for federal and state income taxes.

## 4. Debt

Total debt as of December 31, 2003 and 2002, including interest rate swaps designated as hedges, is summarized below:

| *Millions of Dollars* | *2003* | *2002* |
|---|---|---|
| Short-term borrowings, reclassified as long-term debt | $ 324 | $ 188 |
| Notes and debentures, 2.0% to 8.4% due through 2054 [a] | 5,158 | 4,788 |
| Capitalized leases, 4.7% to 11.6% due through 2026 | 1,531 | 1,457 |
| Medium-term notes, 6.8% to 10.0% due through 2020 [a] | 387 | 516 |
| Equipment obligations, 6.3% to 10.3% due through 2019 | 374 | 534 |
| Term floating-rate debt | - | - |
| Mortgage bonds, 4.3% to 4.8% due through 2030 | 152 | 153 |
| Tax-exempt financings, 2.6% to 5.7% due through 2026 | 168 | 168 |
| Commercial paper and bid notes, average of 1.6% in 2003 and 2.9% in 2002 | - | - |
| Unamortized discount | (105) | (101) |
| Total debt | 7,989 | 7,703 |
| Less current portion | (167) | (275) |
| Total long-term debt | $7,822 | $7,428 |

[a] *2003 and 2002 include a collective write-up of $19 million and $52 million, respectively, due to market value adjustments for debt with qualifying hedges that are recorded as assets on the Consolidated Statements of Financial Position.*

**Debt Maturities –** The following table presents aggregate debt maturities as of December 31, 2003, excluding market value adjustments. Short-term borrowings that were reclassified as long-term debt are shown at their stated maturities.

| *Millions of Dollars* | |
|---|---|
| 2004 | $ 485 |
| 2005 | 682 |
| 2006 | 659 |
| 2007 | 784 |
| 2008 | 680 |
| Thereafter | 4,680 |
| Total debt | $7,970 |

In February 2004, we called our 4.25% mortgage bonds, with an outstanding balance of approximately $92 million and maturity date of January 1, 2005, for redemption in April 2004.

**Mortgaged Properties –** Equipment with a carrying value of approximately $3.5 billion and $3.7 billion at December 31, 2003 and 2002, respectively, serves as collateral for the capital leases and other types of equipment obligations in accordance with the secured financing arrangements utilized to acquire such railroad equipment.

As a result of the merger of Missouri Pacific Railroad Company (MPRR) with and into UPRR on January 1, 1997, and pursuant to the underlying indentures for the MPRR mortgage bonds, UPRR must maintain the same value of assets after the merger in order to comply with the security requirements of the mortgage bonds. As of the merger date, the value of the MPRR assets which secured the mortgage bonds was approximately $5.8 billion. In accordance with the terms on the indentures, this collateral value must be maintained during the entire term of the mortgage bonds irrespective of the outstanding balance of such bonds.

**Credit Facilities –** We had no commercial paper borrowings outstanding as of December 31, 2003. Commercial paper is issued from time to time for working capital needs and is supported by $1.925 billion in credit facilities. Our credit facilities include $925 million of 364-day revolving credit facilities expiring in March 2004, and $1.0 billion of 5-year revolving credit facilities expiring in March 2005. We have the option to hold higher cash balances in addition to or in replacement of the credit facilities to support commercial paper. These credit facilities also allow for borrowings at floating (LIBOR-based) rates, plus a spread, depending upon our senior unsecured debt ratings. The credit facilities require the maintenance of a minimum net worth and a debt to net worth coverage ratio. At December 31, 2003, we were in compliance with these covenants. The credit facilities do not include any other financial restrictions, credit rating triggers (other than rating-dependent pricing) or any provision that could require the posting of collateral. The credit facilities are designated for general corporate purposes, and none of the credit facilities were used as of December 31, 2003. Commitment fees and interest rates payable under the facilities are similar to fees and rates available to comparably rated investment-grade borrowers. We are reviewing rollover options for the credit facilities.

To the extent we have long-term credit facilities available, we have reclassified certain short-term debt on a long-term basis. At December 31, 2003 and 2002, approximately $324 million and $188 million of short-term borrowings that we intend to refinance were reclassified as long-term debt. This reclassification reflects our intent to refinance these short-term borrowings and current maturities of long-term debt on a long-term basis through the issuance of commercial paper or new long-term financings, or by using the currently available long-term credit facility if alternative financing is not available.

**Redemption of Convertible Preferred Securities –** During 2003, we exercised our option to redeem the entire $1.5 billion of the Convertible Preferred Securities (CPS). The CPS were issued in April 1998 by our wholly owned subsidiary, Union Pacific Capital Trust, at a price of $50 each and paid quarterly cash dividends at an annual rate of 6 1⁄4%. The redemption was funded with a combination of cash from operations, the issuance of $500 million of debt in June 2003, and cash proceeds from the initial public offering of Overnite. The $1.5 billion redemption, net of the $500 million debt issuance, will reduce interest expense by approximately $71 million, pre-tax, annually and eliminate the dilutive effect of the CPS on earnings per share. Total one-time costs incurred in 2003 associated with the redemption were approximately $45 million and are included in other income.

**Shelf Registration Statement and Significant New Borrowings –** Under a current shelf registration statement filed in 2002, we may issue, from time to time, any combination of debt securities, preferred stock, common stock or warrants for debt securities or preferred stock in one or more offerings. During February 2003, under the shelf registration we issued $250 million of 3 7⁄8% fixed rate debt with a maturity of February 15, 2009. The proceeds of the issuance were used for repayment of debt and other general corporate purposes. On June 5, 2003, we issued $300 million of 3 5⁄8% fixed rate debt with a maturity of June 1, 2010 and $200 million of 5 3⁄8% fixed rate debt with a maturity of June 1, 2033. The proceeds of the issuance were used to redeem $500 million of CPS on July 7, 2003. In December 2003, we filed a new $1.0 billion shelf registration statement, which became effective December 29, 2003. Under this shelf registration statement, we may issue, from time to time, any combination of debt securities, preferred stock, common stock or warrants for debt securities or preferred stock in one or more offerings. At December 31, 2003, we had $250 million remaining for issuance under the 2002 shelf registration and the full $1.0 billion for issuance under the new 2003 shelf registration. We have no immediate plans to issue equity securities; however, we will continue to explore opportunities in 2004 to replace existing debt and otherwise access capital through issuances of debt securities under these registrations.

During May 2003, we entered into a capital lease covering new locomotives. The related capital lease obligation totaled approximately $188 million and is included in the Consolidated Statements of Financial Position as debt.

**Dividend Restrictions –** We are subject to certain restrictions related to the payment of cash dividends to our shareholders. The amount of retained earnings available for dividends was $6.9 billion and $5.2 billion at December 31, 2003 and 2002, respectively. In the fourth quarter of 2003, the Board of Directors voted to increase the quarterly dividend by 30% to 30 cents per share. We declared dividends of $252 million in 2003 and $210 million in 2002.

## 5. Leases

We lease certain locomotives, freight cars and other property. Future minimum lease payments for operating and capital leases with initial or remaining non-cancelable lease terms in excess of one year as of December 31, 2003 were as follows:

| *Millions of Dollars* | *Operating Leases* | *Capital Leases* |
|---|---|---|
| 2004 | $ 439 | $ 223 |
| 2005 | 396 | 200 |
| 2006 | 337 | 198 |
| 2007 | 273 | 180 |
| 2008 | 209 | 172 |
| Later Years | 1,321 | 1,552 |
| Total minimum lease payments | $2,975 | 2,525 |
| Amount representing interest | | (994) |
| Present value of minimum lease payments | | $1,531 |

Rent expense for operating leases with terms exceeding one month was $586 million in 2003, $585 million in 2002 and $575 million in 2001. Contingent rentals and sub-rentals are not significant.

## 6. Retirement Plans

### Pension and Other Postretirement Benefits

*Pension Plans* – We provide defined benefit retirement income to eligible non-union employees through qualified and non-qualified (supplemental) pension plans. Qualified and non-qualified pension benefits are based on years of service and the highest compensation during the latest years of employment with specific reductions made for early retirements.

*Other Postretirement Benefits (OPEB)* – All non-union and certain of our union employees participate in defined contribution medical and life insurance programs for retirees. These costs are funded as paid.

### Medicare Reform Act

On December 13, 2003, Congress passed the Medicare Prescription Drug, Improvement and Modernization Act of 2003 (Medicare Reform Act). The provisions of the Medicare Reform Act include prescription drug benefits for Medicare eligible individuals. We have elected to recognize this legislation in 2003, in accordance with FASB Staff Position No. 106-1, "Accounting and Disclosure Requirements Related to the Medicare Prescription Drug, Improvement and Modernization Act of 2003", which results in a $47 million reduction to the accumulated benefit obligation for other postretirement benefits as of December 31, 2003. This reduction is based on the value of the projected federal subsidy, assumes no changes in participation rates and is recorded as an unrecognized actuarial gain. The estimated reduction in post-65 per capita claim costs was 17%. There was no effect on 2003 expense. For 2004, we expect a reduction in OPEB expense of $7 million. Future guidance from either Congress or the FASB could result in a change to this recognition.

### Funded Status

*Projected Benefit Obligation (PBO)* – The projected benefit obligation of our pension plans is the present value of benefits earned to date by plan participants, including the effect of assumed future salary increases. The PBO of

the OPEB plan is equal to the accumulated benefit obligation, as the present value of OPEB liabilities are not affected by salary increases. Changes in our projected benefit obligation are as follows for the years ended December 31:

| | *Pension* | | *OPEB* | |
|---|---|---|---|---|
| *Millions of Dollars* | *2003* | *2002* | *2003* | *2002* |
| Projected benefit obligation at beginning of year | $1,703 | $1,654 | $551 | $497 |
| Service cost | 27 | 21 | 7 | 6 |
| Interest cost | 113 | 117 | 35 | 37 |
| Plan amendments | - | (1) | (74) | (48) |
| Actuarial loss | 76 | 34 | 61 | 105 |
| Gross benefits paid | (115) | (122) | (37) | (46) |
| Projected benefit obligation at end of year | $1,804 | $1,703 | $543 | $551 |

*Assets* – Assets used in calculating the funded status are measured at the fair value at December 31. Changes in the fair value of our plan assets are as follows for the years ended December 31, 2003 and 2002:

| | *Pension* | | *OPEB* | |
|---|---|---|---|---|
| *Millions of Dollars* | *2003* | *2002* | *2003* | *2002* |
| Fair value of plan assets at beginning of year | $1,231 | $1,404 | $ - | $ - |
| Actual return on plan assets | 297 | (159) | - | - |
| Voluntary funded pension plan contributions | 100 | 100 | - | - |
| Unfunded plan benefit payments | 7 | 8 | 37 | 46 |
| Gross benefits paid | (115) | (122) | (37) | (46) |
| Fair value of plan assets at end of year | $1,520 | $1,231 | $ - | $ - |

*Funded Status* – The funded status represents the difference between the projected benefit obligation and the fair value of the plan assets. Below is a reconciliation of the funded status of the benefit plans to the net liability recognized for the years ended December 31, 2003 and 2002:

| | *Pension* | | *OPEB* | |
|---|---|---|---|---|
| *Millions of Dollars* | *2003* | *2002* | *2003* | *2002* |
| Funded status at end of year | $(284) | $(472) | $(543) | $(551) |
| Unrecognized net actuarial loss | 201 | 290 | 216 | 171 |
| Unrecognized prior service cost (credit) | 46 | 55 | (116) | (56) |
| Unrecognized net transition obligation | (2) | (4) | - | - |
| Net liability recognized at end of year | $ (39) | $(131) | $(443) | $(436) |

*Liability Recorded in Consolidated Statement of Financial Position* – The net liability represents the amount previously accrued by us for pension and OPEB costs. The following table presents the components of the benefit plan liabilities in the Consolidated Statements of Financial Position for December 31, 2003 and 2002:

| | *Pension* | | *OPEB* | |
|---|---|---|---|---|
| *Millions of Dollars* | *2003* | *2002* | *2003* | *2002* |
| Prepaid benefit cost | $ 34 | $ 7 | $ - | $ - |
| Accrued benefit cost | (73) | (137) | (443) | (436) |
| Additional minimum liability | (221) | (294) | - | - |
| Intangible assets | 46 | 55 | - | - |
| Accumulated other comprehensive income | 175 | 238 | - | - |
| Net liability recognized at end of year | $(39) | $(131) | $(443) | $(436) |

At December 31, 2003 and 2002, $35 million and $43 million, respectively, of the total pension and other postretirement liability were classified as a current liability.

*Unfunded Accumulated Benefit Obligation* – The accumulated benefit obligation is the present value of benefits earned to date, assuming no future salary growth. The unfunded accumulated benefit obligation represents the difference between the accumulated benefit obligation and the fair value of the plan assets. The projected benefit obligation, accumulated benefit obligation and fair value of plan assets for pension plans with accumulated benefit obligations in excess of the fair value of the plan assets were as follows for the years ended December 31, 2003 and 2002:

| *Millions of Dollars* | *2003* | *2002* |
|---|---|---|
| Projected benefit obligation | $(1,789) | $(1,688) |
| Accumulated benefit obligation | $(1,769) | $(1,646) |
| Fair value of plan assets | 1,503 | 1,216 |
| Unfunded accumulated benefit obligation | $ (266) | $ (430) |

The accumulated benefit obligation for all defined benefit pension plans was $1.8 billion and $1.7 billion as of December 31, 2003 and 2002, respectively.

*Assumptions* – The weighted-average actuarial assumptions used to determine benefit obligations at December 31, 2003, 2002 and 2001 were as follows:

| | *Pension* | | | *OPEB* | | |
|---|---|---|---|---|---|---|
| *Percentages* | *2003* | *2002* | *2001* | *2003* | *2002* | *2001* |
| Discount rate | 6.50% | 6.75% | 7.25% | 6.50% | 6.75% | 7.25% |
| Salary increase | 3.50 | 3.75 | 4.25 | N/A | N/A | N/A |
| Health care cost trend rate: | | | | | | |
| Current | N/A | N/A | N/A | 9.00 | 10.0 | 7.70 |
| Level in 2008 | N/A | N/A | N/A | 5.00 | 5.00 | 5.50 |

**Expense**

Both pension and OPEB expense is determined based upon the annual service cost of benefits (the actuarial cost of benefits earned during a period) and the interest cost on those liabilities, less the expected return on plan assets. With respect to the value of pension plan assets, the expected long-term rate of return on plan assets is applied to a calculated value of plan assets that recognizes changes in fair value over a five-year period. This practice is intended to reduce year-to-year volatility in pension expense, but it can have the effect of delaying the recognition of differences between actual returns on assets and expected returns based on long-term rate of return assumptions. The expected rate of return on assets was 8% for 2003 and 9% for 2002.

Differences in actual experience in relation to assumptions are not recognized immediately, but are deferred and, if necessary, amortized as pension or OPEB expense.

The components of our net periodic pension and other postretirement costs (income) for the years ended December 31, 2003, 2002 and 2001 were as follows:

| | *Pension* | | | *OPEB* | | |
|---|---|---|---|---|---|---|
| *Millions of Dollars* | *2003* | *2002* | *2001* | *2003* | *2002* | *2001* |
| Service cost | $ 27 | $ 21 | $ 22 | $ 7 | $ 6 | $ 6 |
| Interest cost | 113 | 117 | 113 | 35 | 37 | 30 |
| Expected return on plan assets | (133) | (144) | (157) | - | - | - |
| Amortization of: | | | | | | |
| Transition obligation | (2) | (2) | (1) | - | - | - |
| Prior service cost (credit) | 9 | 9 | 12 | (15) | (3) | (2) |
| Actuarial loss (gain) | 1 | (15) | (23) | 16 | 5 | - |
| Total net periodic benefit cost (income) | $ 15 | $ (14) | $ (34) | $ 43 | $45 | $34 |

*Assumptions* – The weighted-average actuarial assumptions used to determine expense for the years ended December 31, 2003, 2002 and 2001 were as follows:

| | *Pension* | | | *OPEB* | | |
|---|---|---|---|---|---|---|
| *Percentages* | *2003* | *2002* | *2001* | *2003* | *2002* | *2001* |
| Discount rate | 6.75% | 7.25% | 7.5% | 6.75% | 7.25% | 7.5% |
| Expected return on plan assets | 8.0 | 9.0 | 10.0 | N/A | N/A | N/A |
| Salary increase | 3.75 | 4.25 | 4.5 | N/A | N/A | N/A |
| Health care cost trend rate: | | | | | | |
| Current | N/A | N/A | N/A | 10.0 | 7.70 | 7.70 |
| Level in 2008 | N/A | N/A | N/A | 5.00 | 5.50 | 5.50 |

The discount rate we used is based on a hypothetical portfolio of high quality bonds with cash flows matching our plans' expected benefit payments at December 31. The expected return on plan assets is based on our asset allocation mix and our historical return, taking into account current and expected market conditions. The actual return on pension plan assets was approximately 25% in 2003, compared to an 11% loss in 2002. Our historical annualized ten-year rate of return on plan assets is approximately 9%. During 2003, we decreased our expected return on plan assets from 9% to 8%. This assumption change resulted in an increase to 2003 pension expense of $17 million.

Assumed health care cost trend rates have a significant effect on the expense and liabilities reported for health care plans. The health care cost trend rate is based on historical rates and expected market conditions. A one-percentage point change in the expected health care cost trend rates would have the following effects on OPEB:

| *Millions of Dollars* | *One % pt. Increase* | *One % pt. Decrease* |
|---|---|---|
| Effect on total service and interest cost components . . . . . . . . . . . . . . . . . | $ 5 | $ (4) |
| Effect on accumulated benefit obligation . . . . . . . . . . . . . . . . . . . . . . . . . . | 59 | (49) |

**Equity Adjustment**

During 2002, actual asset returns for our pension plans were adversely impacted by continued deterioration in the equity markets. Also during 2002, corporate bond yields, which are used in determining the discount rate for future pension obligations, continued to decline. As a result of negative asset returns and lower discount rates, we were required to recognize an additional minimum pension liability. An additional minimum pension liability adjustment is required when our accumulated benefit obligation exceeds the fair value of our plan assets, and that difference exceeds the net pension liability. The liability was recorded as a $141 million after-tax reduction to common shareholders' equity as part of accumulated other comprehensive loss in 2002.

Because the fair value of plan assets improved in 2003, the 2003 adjustment to shareholders' equity was $39 million, after-tax, recorded as an increase to equity in accumulated other comprehensive income.

The remaining equity reduction from 2002 will be restored to the balance sheet in future periods if the fair value of plan assets exceeds the accumulated benefit obligations. Recognition of this reduction to equity did not affect net income or cash flow in 2003 and had no impact on compliance with debt covenants.

**Cash Contributions**

The following table details our cash contributions for the years ended December 31, 2003 and 2002, and the expected contributions for 2004:

| | *Pension* | | |
|---|---|---|---|
| *Millions of Dollars* | *Funded* | *Unfunded* | *OPEB* |
| 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $100 | $8 | $46 |
| 2003 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 100 | 7 | 37 |
| 2004 (expected) . . . . . . . . . . . . . . . . . . . . | 50 | 8 | 35 |

Our policy with respect to funding the qualified plans is to fund at least the minimum required by the Employee Retirement Income Security Act of 1974, as amended, and not more than the maximum amount deductible for tax purposes. We do not currently have minimum funding requirements, as set forth in employee benefit and tax laws. All contributions made to the funded pension plans for 2002 and 2003 were voluntary. The 2004 funded pension plan contribution was voluntary and was made in January 2004 with cash generated from operations.

All benefit payments for other postretirement benefits are voluntary, as the postretirement plans are not funded, and are not subject to any minimum regulatory funding requirements. Benefit payments for each year represent claims paid for medical and life insurance, and we anticipate our 2004 OPEB payments will be made from cash generated from operations.

**Benefit Payments**

The following table details expected benefit payments for the years 2004 though 2013:

| *Millions of Dollars* | *Pension Benefits* | *Other Postretirement Benefits* |
|---|---|---|
| 2004 | $116 | $35 |
| 2005 | 116 | 38 |
| 2006 | 117 | 37 |
| 2007 | 119 | 39 |
| 2008 | 122 | 40 |
| Years 2009 – 2013 | 697 | 215 |

Expected benefit payments for other postretirement benefits are adjusted for estimated reimbursements for prescription drugs beginning in 2006, based on the Medicare Reform Act passed in 2003.

**Asset Allocation Strategy**

Our pension plan asset allocation at December 31, 2003 and 2002 and target allocation for 2004 are as follows:

| | *Target Allocation* | *Percentage of Plan Assets December 31,* | |
|---|---|---|---|
| *Asset Category* | *2004* | *2003* | *2002* |
| Equity securities | 65% to 75% | 70% | 66% |
| Debt securities | 25% to 35% | 30% | 34% |
| Real estate | 0% | 0% | 0% |
| Other | 0% | 0% | 0% |
| Total | | 100% | 100% |

The investment strategy for pension plan assets is to maintain a broadly diversified portfolio designed to achieve our target of an average long-term rate of return of 8%. While we believe we can achieve a long-term average rate of return of 8%, we cannot be certain that the portfolio will perform to our expectations. Assets are strategically allocated between equity and debt securities in order to achieve a diversification level that mitigates wide swings in investment returns. Asset allocation target ranges for equity and debt portfolios are evaluated at least every three years with the assistance of an external consulting firm. Actual asset allocations are monitored monthly and rebalancing actions are executed at least quarterly, if needed.

The majority of the plan's assets are invested in equity securities because equity portfolios have historically provided higher returns than debt portfolios over extended time horizons and are expected to do so in the future. Correspondingly, equity investments also entail greater risks than debt investments. The risk of loss in the plan's equity portfolio is mitigated by investing in a broad range of equity types. Equity diversification includes large-capitalization and small-capitalization companies, growth-oriented and value-oriented investments, and U.S. and non-U.S. securities.

Equity risks are further balanced by investing a significant portion of the plan's assets in high quality debt securities. The average quality rating of the debt portfolio exceeded AA as of December 31, 2003 and 2002. The

debt portfolio is also broadly diversified and primarily invested in U.S. Treasury, mortgage, and corporate securities with an intermediate average maturity. The weighted-average maturity of the debt portfolio was 6.1 years at December 31, 2003 and 7.0 years as of December 31, 2002.

The investment of pension plan assets in Union Pacific securities is specifically prohibited for both the equity and debt portfolios other than through index fund holdings.

**Other Retirement Programs**

*Thrift Plan* – We provide a defined contribution plan (thrift plan) to eligible non-union employees and make matching contributions to the thrift plan. We match 50 cents for each dollar contributed by employees up to the first 6 percent of compensation contributed. Our thrift plan contributions were $12 million, $10 million and $11 million for the years ended December 31, 2003, 2002, and 2001, respectively.

*Railroad Retirement System* – All Railroad employees are covered by the Railroad Retirement System (the System). On December 21, 2001, The Railroad Retirement and Survivors' Improvement Act of 2001 (the Act) was signed into law. The Act was a result of historic cooperation between rail management and labor, and provides improved railroad retirement benefits for employees and reduced payroll taxes for employers. Contributions made to the System are expensed as incurred and amounted to approximately $562 million in 2003, $595 million in 2002 and $607 million in 2001.

*Collective Bargaining Agreements* – Under collective bargaining agreements, we participate in multi-employer benefit plans which provide certain postretirement health care and life insurance benefits for eligible union employees. Premiums under this plan are expensed as incurred and amounted to $27 million in 2003, $16 million in 2002 and $13 million in 2001.

## 7. Stock Options and Other Stock Plans

We have no options outstanding under the 1988 Stock Option and Restricted Stock Plan of Union Pacific Corporation (1988 Plan) and 8,786,213 options outstanding under the 1993 Stock Option and Retention Stock Plan of Union Pacific Corporation (1993 Plan). There are 1,246,819 retention shares and stock units (the right to receive shares of common stock) outstanding under the 1993 Plan. There are 10,710 restricted shares outstanding under the 1992 Restricted Stock Plan for Non-Employee Directors of Union Pacific Corporation (1992 Directors Plan). We no longer grant options or awards of restricted stock or retention shares and units under the 1988 Plan, the 1993 Plan or the 1992 Directors Plan.

The UP Shares Stock Option Plan of Union Pacific Corporation (UP Shares Plan) was approved by our Board of Directors on April 30, 1998. The UP Shares Plan reserved 12,000,000 shares of our common stock for issuance. The UP Shares Plan was a broad-based option program that granted eligible active employees on April 30, 1998 an option to purchase 200 shares of our common stock at $55.00 per share. All options granted were non-qualified options that became exercisable on May 1, 2001 and remain exercisable until April 30, 2008. If an optionee's employment terminates for any reason, the option remains exercisable for a period of one year after the date of termination, but no option is exercisable after April 30, 2008. No further options may be granted under the UP Shares Plan. As of December 31, 2003, there were 5,268,566 options outstanding under the UP Shares Plan.

We adopted the Executive Stock Purchase Incentive Plan (ESPIP) effective October 1, 1999, in order to encourage and facilitate ownership of our common stock by our officers and other key executives. Under the ESPIP, participants purchased a total of 1,008,000 shares of our common stock with the proceeds of 6.02% interest-bearing, full recourse loans from the Corporation. Loans totaled $47 million and have a final maturity date of January 31, 2006. Deferred cash payments were to be awarded to the participants to repay interest and the loan principal if certain performance and retention criteria were met within a 40-month period ending

January 31, 2003. Dividends paid on the purchased shares were originally assigned to the Corporation to offset the accrued interest on the loan balance until March 2001 when the first performance criterion was satisfied and, accordingly thereafter, the dividends on the purchased shares were paid directly to the participants. Satisfaction of the first performance criterion also entitled participants to receive a cash payment equal to the net accrued interest on the outstanding principal balance of the loan. Satisfaction of the second performance criterion, in December 2002, entitled participants to receive a cash payment equal to one-third of the outstanding principal balance of their loan, and satisfaction of the retention criterion of continued employment with the Corporation until January 31, 2003, entitled participants to receive an additional cash payment equal to one-third of the outstanding principal balance of their loan. Such payments have been applied against the participants' outstanding loan balance pursuant to the terms of the ESPIP. The remaining balance of the loan is payable in three equal installments on January 31, 2004, January 31, 2005 and January 31, 2006. At December 31, 2003 and 2002, the outstanding loan balance was $8 million and $45 million, respectively. None of our executive officers subject to Section 16 of the Securities Exchange Act of 1934, as amended, had outstanding loans as of January 31, 2004. The remaining outstanding loans were $1 million at January 31, 2004.

In April 2000, the shareholders approved the Union Pacific Corporation 2000 Directors Plan (Directors Plan) whereby 550,000 shares of our common stock were reserved for issuance to our non-employee directors. Under the Directors Plan, each non-employee director, upon his or her initial election to the Board of Directors, receives a grant of 1,000 shares of restricted shares or restricted stock units. Additionally, each non-employee director receives annually an option to purchase at fair value a number of shares of our common stock, not to exceed 5,000 shares during any calendar year, determined by dividing 60,000 by 1/3 of the fair market value of one share of our common stock on the date of such Board of Directors meeting, with the resulting quotient rounded up or down to the nearest 50 shares. As of December 31, 2003, there were 3,000 restricted shares outstanding under the Directors Plan and there were 100,850 options outstanding under the Directors Plan.

In November 2000, our Board of Directors approved the 2001 Long Term Plan (LTP). Participants were awarded retention shares or stock units and cash awards subject to the attainment of certain performance targets and continued employment through January 31, 2004, or other applicable vesting dates. The LTP performance criteria include three year (for fiscal years 2001, 2002 and 2003) cumulative earnings per share and stock price targets. We met the cumulative earnings per share target at December 31, 2003, which entitled participants to receive 88,140 shares, 371,712 stock units and $32 million at January 31, 2004, or other applicable vesting dates, totaling 48% of the maximum amount available under the LTP.

The Union Pacific Corporation 2001 Stock Incentive Plan (2001 Plan) was approved by the shareholders in April 2001. The 2001 Plan reserved 12,000,000 shares of our common stock for issuance to eligible employees of the Corporation in the form of non-qualified options, incentive stock options, retention shares, stock units and incentive bonus awards. Awards and options under the 2001 Plan may be granted to our employees. Non-employee directors are not eligible. As of December 31, 2003, there were 1,059,088 retention shares and stock units outstanding under the 2001 Plan, and there were 4,347,900 options outstanding under the 2001 Plan.

Pursuant to the above plans, 6,899,211, 9,544,569, and 12,461,025 shares of our common stock were available for grant at December 31, 2003, 2002 and 2001, respectively.

**Options –** Stock options are granted with an exercise price equal to the fair market value of our common stock as of the date of the grant. Options are granted with a 10-year term and are generally exercisable one to two years after the date of the grant. A summary of the stock options issued under the 1988 Plan, the 1993 Plan, the UP Shares Plan, the Directors Plan and the 2001 Plan, and changes during the years ending December 31, 2003, 2002 and 2001 are as follows:

| | *Year Ended December 31,* | | | | | |
|---|---|---|---|---|---|---|
| | *2003* | | *2002* | | *2001* | |
| | *Shares* | *Weighted-Average Exercise Price* | *Shares* | *Weighted-Average Exercise Price* | *Shares* | *Weighted-Average Exercise Price* |
| Outstanding, beginning of year | 21,352,105 | $53.00 | 23,189,323 | $51.12 | 25,342,300 | $50.48 |
| Granted | 2,398,300 | 55.98 | 2,107,500 | 61.14 | 1,798,150 | 49.91 |
| Exercised | (4,955,725) | 51.58 | (3,814,625) | 45.99 | (2,044,997) | 38.63 |
| Forfeited | (279,449) | 54.69 | (130,093) | 54.99 | (1,906,130) | 54.82 |
| Outstanding, end of year | 18,515,231 | $53.75 | 21,352,105 | $53.00 | 23,189,323 | $51.12 |
| Options exercisable at year end | 15,514,331 | $53.27 | 18,897,155 | $52.04 | 21,053,773 | $51.13 |
| Weighted-average fair value of options granted during the year | | $14.30 | | $17.78 | | $13.09 |

The following table summarizes information about our outstanding stock options as of December 31, 2003:

| | *Options Outstanding* | | | *Options Exercisable* | |
|---|---|---|---|---|---|
| *Range of Exercise Prices* | *Number Outstanding* | *Weighted-Average Remaining Contractual Life* | *Weighted-Average Exercise Price* | *Number Exercisable* | *Weighted-Average Exercise Price* |
| $20.60 – $55.00 | 10,006,989 | 4.57 | $50.48 | 9,954,189 | $50.53 |
| $55.98 – $57.54 | 6,172,557 | 5.25 | 56.30 | 3,464,757 | 56.50 |
| $57.68 – $62.40 | 2,335,685 | 7.60 | 60.98 | 2,095,385 | 60.96 |
| $20.60 – $62.40 | 18,515,231 | 5.18 | $53.75 | 15,514,331 | $53.27 |

The fair value of each option grant was estimated on the date of grant using the Black-Scholes option-pricing model, with the following weighted-average assumptions for options granted in 2003, 2002, and 2001.

| | *2003* | *2002* | *2001* |
|---|---|---|---|
| Risk-free interest rates | 2.9% | 4.4% | 4.3% |
| Dividend yield | 1.5% | 1.3% | 1.4% |
| Expected lives-years | 5 | 5 | 4 |
| Volatility | 28.4% | 28.8% | 29.5% |

**Restricted Stock and Other Incentive Plans –** Our plans provide for awarding retention shares of common stock or stock units to eligible employees. These awards are subject to forfeiture if employment terminates during the prescribed retention period, generally three or four years, or, in some cases, if a certain prescribed stock price or other financial criteria is not met. Restricted stock awards are issued to non-employee directors and are subject to forfeiture if certain service requirements are not met. During the year ended December 31, 2003, 380,786 retention shares, stock units, and restricted shares were issued at a weighted-average fair value of $55.99. During the year ended December 31, 2002, 804,956 retention shares, stock units, and restricted shares were issued at a weighted-average fair value of $58.21. During 2001, 387,540 retention shares, stock units, and restricted shares were issued at a weighted-average fair value of $49.95. The cost of retention and restricted awards is amortized to expense over the retention period.

Under the LTP, no performance retention stock units were issued in 2003, 11,900 performance retention stock units were issued at a weighted-average fair value of $60.97 during 2002, and 1,019,500 performance retention stock shares and stock units were issued at a weighted-average fair value of $50.07 during 2001. The cost of the LTP is marked to market and is expensed over the performance period which ended January 31, 2004.

The cost associated with the ESPIP retention criterion was amortized to expense over the 40-month period. The cost associated with the ESPIP first performance criterion is expensed over the life of the loan, and the cost associated with the second performance criterion was expensed in December 2002.

During the years ended December 31, 2003, 2002 and 2001, we expensed $46 million, $50 million and $18 million, respectively, related to the other incentive plans described above.

## 8. Earnings Per Share

The following table provides a reconciliation between basic and diluted earnings per share for the years ended December 31, 2003, 2002 and 2001:

| *Millions, Except Per Share Amounts* | *2003* | *2002* | *2001* |
|---|---|---|---|
| Income statement data: | | | |
| Income from continuing operations before cumulative effect of accounting change | $1,056 | $1,265 | $934 |
| Income from discontinued operations | 255 | 76 | 32 |
| Cumulative effect of accounting change | 274 | - | - |
| Net income available to common shareholders - basic | $1,585 | $1,341 | $966 |
| Dilutive effect of interest associated with the CPS | 34 | 58 | 58 |
| Net income available to common shareholders - diluted | $1,619 | $1,399 | $1,024 |
| Weighted-average number of shares outstanding: | | | |
| Basic | 254.4 | 252.1 | 248.0 |
| Dilutive effect of stock options | 1.5 | 1.8 | 1.3 |
| Dilutive effect of retention shares, stock units and restricted shares | 1.8 | 1.1 | 0.8 |
| Dilutive effect of CPS | 10.3 | 21.8 | 21.8 |
| Diluted | 268.0 | 276.8 | 271.9 |
| Earnings per share – basic | | | |
| Income from continuing operations before cumulative effect of accounting change | $4.15 | $5.02 | $3.77 |
| Income from discontinued operations | 1.00 | 0.30 | 0.13 |
| Cumulative effect of accounting change | 1.08 | - | - |
| Net income | $6.23 | $5.32 | $3.90 |
| Earnings per share – diluted | | | |
| Income from continuing operations before cumulative effect of accounting change | $4.07 | $4.78 | $3.65 |
| Income from discontinued operations | 0.95 | 0.27 | 0.12 |
| Cumulative effect of accounting change | 1.02 | - | - |
| Net income | $6.04 | $5.05 | $3.77 |

Common stock options totaling 2.3 million and 12.8 million shares for 2002 and 2001, respectively were excluded from the computation of diluted earnings per share because the exercise prices of these options exceeded the average market price of our common stock for the respective periods, and the effect of their inclusion would be anti-dilutive. All stock options were dilutive for 2003.

## 9. Commitments and Contingencies

**Unasserted Claims –** There are various claims and lawsuits pending against us and certain of our subsidiaries. It is not possible at this time for us to determine fully the effect of all unasserted claims on our consolidated financial condition, results of operations or liquidity; however, to the extent possible, where unasserted claims can be estimated and where such claims are considered probable, we have recorded a liability. We do not expect that any known lawsuits, claims, environmental costs, commitments, contingent liabilities or guarantees will have a material adverse effect on our consolidated financial condition, results of operations or liquidity.

**Personal Injury and Occupational Illness –** The cost of personal injuries to employees and others related to our activities is charged to expense based on estimates of the ultimate cost and number of incidents each year. We use third party actuaries to assist us in properly measuring the expense and liability. Compensation for work-related accidents is governed by the Federal Employers' Liability Act (FELA). Under FELA, damages are assessed based on a finding of fault through litigation or out-of-court settlements. We offer a comprehensive variety of services and rehabilitation programs for employees who are injured at work. Annual expenses for our personal injury-related events were $250 million in 2003, $221 million in 2002 and $200 million in 2001. As of December 31, 2003 and 2002, we had a liability of $617 million and $671 million, respectively, accrued for future personal injury costs, of which $274 million was recorded in current liabilities as accrued casualty costs for each year. We have additional amounts accrued for claims related to certain alleged occupational illnesses. The impact of current obligations is not expected to have a material adverse effect on our results of operations or financial condition.

**Environmental Costs –** We generate and transport hazardous and non-hazardous waste in our current operations, and have done so in our former operations, and are subject to federal, state and local environmental laws and regulations. We have identified approximately 417 sites at which we are or may be liable for remediation costs associated with alleged contamination or for violations of environmental requirements. This includes 51 sites that are the subject of actions taken by the U.S. government, 29 of which are currently on the Superfund National Priorities List. Certain federal legislation imposes joint and several liability for the remediation of identified sites; consequently, our ultimate environmental liability may include costs relating to activities of other parties, in addition to costs relating to our own activities at each site.

When an environmental issue has been identified with respect to the property owned, leased or otherwise used in the conduct of our business, we and our consultants perform environmental assessments on such property. We expense the cost of the assessments as incurred. We accrue the cost of remediation where our obligation is probable and such costs can be reasonably estimated.

As of December 31, 2003 and 2002, we had a liability of $187 million and $188 million, respectively, accrued for future environmental costs, of which $57 million and $71 million were recorded in current liabilities as accrued casualty costs. The liability includes future costs for remediation and restoration of sites, as well as for ongoing monitoring costs, but excludes any anticipated recoveries from third parties. Cost estimates are based on information available for each site, financial viability of other potentially responsible parties, and existing technology, laws and regulations. We believe that we have adequately accrued for our ultimate share of costs at sites subject to joint and several liability. However, the ultimate liability for remediation is difficult to determine because of the number of potentially responsible parties involved, site-specific cost sharing arrangements with other potentially responsible parties, the degree of contamination by various wastes, the scarcity and quality of volumetric data related to many of the sites, and/or the speculative nature of remediation costs. The impact of current obligations is not expected to have a material adverse effect on our results of operations or financial condition.

Remediation of identified sites previously used in operations, used by tenants or contaminated by former owners required cash spending of $36 million in 2003, $68 million in 2002, and $63 million in 2001. We are also engaged in reducing emissions, spills and migration of hazardous materials, and spent cash of $8 million, $6 million and $5 million in 2003, 2002, and 2001, respectively, for control and prevention. In 2004, we anticipate spending $52 million for remediation and $8 million for control and prevention. The impact of current obligations is not expected to have a material adverse effect on our liquidity.

**Purchase Obligations and Guarantees –** We periodically enter into financial and other commitments in connection with our businesses. We do not expect that these commitments or guarantees will have a material adverse effect on our consolidated financial condition, results of operations or liquidity.

At December 31, 2003, we had unconditional purchase obligations of $100 million for the acquisition of locomotives as part of our multi-year capital asset acquisition plan. In addition, we were contingently liable for $399 million in guarantees and $49 million in letters of credit at December 31, 2003. These contingent guarantees

were entered into in the normal course of business and include guaranteed obligations of affiliated operations. None of the guarantees individually are significant, and a liability of $7 million has been recorded related to these guarantees as of December 31, 2003. The final guarantee expires in 2022. We are not aware of any existing event of default, which would require us to satisfy these guarantees.

**Headquarters Building –** The Railroad has a synthetic operating lease arrangement to finance a new headquarters building, which is being constructed in Omaha, Nebraska. The expected completion date of the building is mid-2004. It will total approximately 1.1 million square feet with approximately 3,800 office workspaces. The cost to construct the new headquarters, including capitalized interest, is approximately $260 million. We have guaranteed all of the Railroad's obligation under this lease.

UPRR is the construction agent for the lessor during the construction period. The Railroad has guaranteed, in the event of a loss caused by, or resulting from, our actions or failures to act as construction agent, 89.9% of the building related construction costs incurred up to that point during the construction period. Total building related costs incurred and drawn from the lease funding commitments as of December 31, 2003, were approximately $125 million. Accordingly, the Railroad's guarantee at December 31, 2003, was approximately $113 million. As construction continues and additional costs are incurred, this guarantee will increase accordingly. At December 31, 2003, we had a liability recorded of approximately $7 million related to the fair value of this guarantee.

After construction is complete, UPRR will lease the building under an initial term of five years with provisions for renewal for an extended period subject to agreement between the Railroad and lessor. At any time during the lease, the Railroad may, at its option, purchase the building at approximately the amount expended by the lessor to construct the building. If the Railroad elects not to purchase the building or renew the lease, the building is returned to the lessor for remarketing, and the Railroad has guaranteed a residual value equal to 85% of the total construction related costs. The guarantee will be approximately $220 million.

## 10. Other Income

Other income included the following:

| *Millions of Dollars* | *2003* | *2002* | *2001* |
|---|---|---|---|
| Net gain on non-operating asset dispositions | $84 | $287 | $133 |
| Rental income | 57 | 60 | 89 |
| Interest income | 8 | 14 | 12 |
| Early retirement of convertible preferred securities | (45) | - | - |
| Fuel swaptions | - | 5 | (18) |
| Other, net | (26) | (42) | (55) |
| Total | $78 | $324 | $161 |

Included in the 2002 gain on non-operating asset dispositions is a pre-tax gain of $141 million related to the sale of land, track, operating rights and facilities to the Utah Transit Authority (UTA) for $185 million, which included approximately 175 miles of track that stretches from Brigham City, Utah, through Salt Lake City, Utah, south to Payson, Utah. The transaction contributed $88 million to our earnings on an after-tax basis.

Also included in the 2002 gain on non-operating asset dispositions is a pre-tax gain of $73 million related to the sale of land and track to the Santa Clara Valley Transportation Authority (VTA) for $80 million, which included approximately 15 miles of track that stretches from William Street in San Jose, California, north to Paseo Padre Parkway in Fremont, California. The transaction contributed $45 million to our earnings on an after-tax basis.

## 11. Accounting Pronouncements

In December 2003, the FASB published a revision to FASB Interpretation No. 46 "Consolidation of Variable Interest Entities" (FIN 46) to clarify some of the provisions and to exempt certain entities from its requirements. Under the new guidance, special effective date provisions apply to enterprises that have fully or partially applied FIN 46 prior to issuance of the revised interpretation. We adopted FIN 46 in June of 2003. The revision did not require us to modify our accounting related to the implementation of FIN 46.

## 12. Cumulative Effect of Accounting Change

Surface Transportation Board (STB) accounting rules require that railroads accrue the cost of removing track structure over the expected useful life of these assets. Railroads historically used this prescribed accounting for reports filed with both the STB and SEC. In August 2001, the FASB issued Statement No. 143, "Accounting for Asset Retirement Obligations" (FAS 143). This statement was effective for us beginning January 1, 2003, and prohibits the accrual of removal costs unless there is a legal obligation to remove the track structure at the end of its life. We concluded that we did not have a legal obligation to remove the track structure, and therefore, under generally accepted accounting principles, we could not accrue the cost of removal in advance. As a result, reports filed with the SEC will reflect the expense of removing these assets in the period in which they are removed. For STB reporting requirements only, we will continue to follow the historical method of accruing in advance, as prescribed by the STB. FAS 143 also requires us to record a liability for legally obligated asset retirement costs associated with tangible long-lived assets. In the first quarter of 2003, we recorded income from a cumulative effect of accounting change, related to the adoption of FAS 143, of $274 million, net of income tax expense of $167 million. The accounting change had no effect on our liquidity. Had the change been retroactively applied, the change would not have had a material impact on net income and earnings per share.

## 13. Discontinued Operations

On November 5, 2003, we completed the sale of our entire trucking interest through an initial public offering. As part of the offering, we received cash proceeds of $620 million, including a dividend from Overnite of $128 million. As part of the transaction, Overnite forgave our intercompany payable to them of $227 million, and we received a $1 million promissory note. We recorded a gain on the sale of $211 million, including an income tax benefit of $126 million in the fourth quarter of 2003. The tax benefit recognized in 2003 is associated with Overnite goodwill written off in the fourth quarter of 1998.

The entire trucking segment was reclassified as a discontinued operation for all periods presented. The following table presents a statement of financial position for the discontinued operations as of December 31, 2002:

| *Millions of Dollars* | *Dec. 31, 2002* |
|---|---|
| Current assets | $254 |
| Properties, net | 501 |
| Other assets | 27 |
| Total assets | 782 |
| Current liabilities | 179 |
| Noncurrent liabilities | 128 |
| Total liabilities | 307 |
| Net assets of discontinued operations | $475 |
| Accumulated other comprehensive income | $84 |

The December 31, 2002 numbers vary from those recorded in the Overnite Corporation final Prospectus dated October 30, 2003, due primarily to the classification of deferred taxes, as well as the elimination of intercompany receivables for consolidated financial statement purposes.

The following table presents the revenues and income before income taxes for the discontinued operations for the years ended December 31, 2003, 2002 and 2001:

| *Millions of Dollars* | *Year Ended December 31,* 2003 | 2002 | 2001 |
|---|---|---|---|
| Revenues | $1,241 | $1,332 | $1,143 |
| Income before income taxes | $ 74 | $ 71 | $ 54 |

## 14. Selected Quarterly Data (Unaudited)

Selected unaudited quarterly data are as follows:

| *Millions of Dollars, Except Per Share Amounts* | | | | |
|---|---|---|---|---|
| *2003* | *Mar. 31* | *June 30* | *Sep. 30* | *Dec. 31[a]* |
| Operating revenues | $2,736 | $2,894 | $2,956 | $2,965 |
| Operating income | 369 | 583 | 592 | 589 |
| Cumulative effect of accounting change [b] | 274 | - | - | - |
| Net income | 429 | 288 | 317 | 551 |
| Cumulative effect of accounting change per share | | | | |
| Basic | 1.08 | - | - | - |
| Diluted | 1.07 | - | - | - |
| Net income per share | | | | |
| Basic | 1.69 | 1.13 | 1.25 | 2.15 |
| Diluted | 1.67 | 1.10 | 1.21 | 2.12 |
| *2002* | *Mar. 31* | *June 30* | *Sep. 30* | *Dec. 31* |
| Operating revenues | $2,662 | $2,822 | $2,850 | $2,825 |
| Operating income | 489 | 583 | 619 | 562 |
| Net income | 222 | 304 | 437 | 378 |
| Net income per share | | | | |
| Basic | 0.89 | 1.21 | 1.73 | 1.49 |
| Diluted | 0.86 | 1.15 | 1.63 | 1.41 |

[a] *In the fourth quarter of 2003, we completed the sale of our entire trucking interest. We recorded a gain on the sale of $211 million, including an income tax benefit of $126 million.*

[b] *Cumulative effect of accounting change is shown net of income tax expense of $167 million.*

****************************************

## Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure

None.

## Item 9A. Controls and Procedures

As of the end of the period covered by this report, the Corporation carried out an evaluation, under the supervision and with the participation of the Corporation's management, including the Corporation's Chief Executive Officer (CEO) and Executive Vice President – Finance and Chief Financial Officer (CFO), of the effectiveness of the design and operation of the Corporation's disclosure controls and procedures pursuant to Exchange Act Rule 13a-15. Based upon that evaluation, the CEO and the CFO concluded that, as of the end of the period covered by this report, the Corporation's disclosure controls and procedures are effective in alerting them, in a timely manner, to material information relating to the Corporation (including its consolidated subsidiaries) required to be included in the Corporation's periodic SEC filings.

Additionally, the CEO and CFO determined that there have been no changes to the Corporation's internal control over financial reporting during the last fiscal quarter that have materially affected, or are reasonably likely to materially affect, the Corporation's internal control over financial reporting.

# PART III

## Item 10. Directors and Executive Officers of the Registrant

(a) Directors of Registrant.

Information as to the names, ages, positions and offices with UPC, terms of office, periods of service, business experience during the past five years and certain other directorships held by each director or person nominated to become a director of UPC is set forth in the Election of Directors segment of the Proxy Statement and is incorporated herein by reference.

Information concerning our Audit Committee and the independence of its members, along with information about the audit committee financial expert(s) serving on the Audit Committee, is set forth in the Audit Committee segment of the Proxy Statement and is incorporated herein by reference.

(b) Executive Officers of Registrant.

Information concerning the executive officers of UPC and its subsidiaries is presented in Part I of this Report under Executive Officers of the Registrant and Principal Executive Officers of Subsidiaries.

(c) Section 16(a) Compliance.

Information concerning compliance with Section 16(a) of the Securities Exchange Act of 1934 is set forth in the Section 16(a) Beneficial Ownership Reporting Compliance segment of the Proxy Statement and is incorporated herein by reference.

(d) Code of Ethics for Chief Executive Officer and Senior Financial Officers of Registrant.

The Board of Directors of UPC has adopted the UPC Code of Ethics for the Chief Executive Officer and Senior Financial Officers (the "Code"). A copy of the Code may be found on the Internet at our website www.up.com/investors. We intend to disclose any amendments to the Code or any waiver from a provision of the Code on our website.

## Item 11. Executive Compensation

Information concerning compensation received by our directors and certain executive officers is presented in the Compensation of Directors, Report on Executive Compensation, Summary Compensation Table, Security Ownership of Management, Option/SAR Grants Table, Aggregated Option/SAR Exercises in Last Fiscal Year and FY-End Option/SAR Values Table, Defined Benefit Plans and Change in Control Arrangements segments of the Proxy Statement and is incorporated herein by reference.

## Item 12. Security Ownership of Certain Beneficial Owners and Management

Information as to the number of shares of our equity securities authorized for issuance under equity compensation plans is set forth in the Equity Compensation Plan Information segment of the Proxy Statement and is incorporated herein, by reference.

Information as to the number of shares of our equity securities beneficially owned as of February 6, 2004, by each of our directors and nominees for director, our five most highly compensated executive officers, our directors and executive officers as a group and certain beneficial owners is set forth in the Election of Directors and Security Ownership of Management segments of the Proxy Statement and is incorporated herein by reference.

## Item 13. Certain Relationships and Related Transactions

Information on related transactions is set forth in the Certain Relationships and Related Transactions and Compensation Committee Interlocks and Insider Participation segments of the Proxy Statement and is incorporated herein by reference. We do not have any relationship with any outside third party which would enable such a party to negotiate terms of a material transaction that may not be available to, or available from, other parties on an arm's-length basis.

## Item 14. Principal Accounting Fees and Services

Information concerning the fees billed by our independent auditor and the nature of services comprising the fees for each of the two most recent fiscal years in each of the following categories: (i) audit fees, (ii) audit – related fees, (iii) tax fees and (iv) all other fees, is set forth in the Audit Committee Report segment of the Proxy Statement and is incorporated herein by reference.

Information concerning our Audit Committee's policies and procedures pertaining to pre-approval of audit and non-audit services rendered by our independent auditor is set forth in the Audit Committee segment of the Proxy Statement and is incorporated herein by reference.

# PART IV

## Item 15. Exhibits, Financial Statement Schedules and Reports on Form 8-K

(a) Financial Statements, Financial Statement Schedules and Exhibits:

(1) Financial Statements

The financial statements filed as part of this filing are listed on the index to Consolidated Financial Statements, Item 8, on page 36.

(2) Financial Statement Schedules

Schedule II – Valuation and Qualifying Accounts

Schedules not listed above have been omitted because they are not applicable or not required or the information required to be set forth therein is included in the Consolidated Financial Statements, Item 8, or notes thereto.

(3) Exhibits

Exhibits are listed in the exhibit index on page 73. The exhibits include management contracts, compensatory plans and arrangements required to be filed as exhibits to the Form 10-K by Item 601 (10) (iii) of Regulation S-K.

(b) Reports on Form 8-K

On January 21, 2004, Union Pacific Corporation furnished a Current Report on Form 8-K announcing UPC's financial results for the fourth quarter of 2003.*

On December 15, 2003, Union Pacific Corporation filed a Current Report on Form 8-K amending certain items in each of its Annual Report on Form 10-K for the fiscal year ended December 31, 2002, and Forms 10-Q for the quarterly periods ended March 31, 2003, and June 30, 2003, to reflect the disposition of Overnite Corporation as a discontinued operation.

On November 19, 2003, Union Pacific Corporation furnished a Current Report on Form 8-K announcing that its Board of Directors voted to increase the quarterly dividend.*

On November 5, 2003, Union Pacific Corporation furnished a Current Report on Form 8-K announcing its intention to redeem the remaining Convertible Preferred Securities issued by the Union Pacific Capital Trust. *

On November 5, 2003, Union Pacific Corporation filed a Current Report on Form 8-K announcing the completion of the sale of its Overnite trucking interest through an initial public offering.*

On October 31, 2003, Union Pacific Corporation filed a Current Report on Form 8-K announcing the pricing of the initial public offering of Overnite.*

On October 23, 2003, Union Pacific Corporation furnished a Current Report on Form 8-K announcing UPC's financial results for the third quarter of 2003.*

* These reports, or certain portions thereof, were furnished under Item 9 or Item 12 of Form 8-K and are referenced herein for informational purposes only. Therefore, such reports or applicable provisions thereof are not, and such contents should not be deemed, incorporated by reference into any registration statements filed by Union Pacific Corporation with the SEC under the Securities Act of 1933, as amended.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, on this 18th day of February, 2004.

UNION PACIFIC CORPORATION

By /s/ Richard K. Davidson

Richard K. Davidson, Chairman,
President, Chief Executive
Officer and Director

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below, on this 18th day of February, 2004, by the following persons on behalf of the registrant and in the capacities indicated.

PRINCIPAL EXECUTIVE OFFICER
AND DIRECTOR:

/s/ Richard K. Davidson

Richard K. Davidson, Chairman,
President, Chief Executive
Officer and Director

PRINCIPAL FINANCIAL OFFICER:

/s/ Robert M. Knight, Jr.

Robert M. Knight, Jr.,
Executive Vice President–Finance
and Chief Financial Officer

PRINCIPAL ACCOUNTING OFFICER:

/s/ Richard J. Putz

Richard J. Putz,
Vice President and Controller

DIRECTORS:

Philip F. Anschutz*
Thomas J. Donohue*
Archie W. Dunham*
Spencer F. Eccles*
Ivor J. Evans*

Elbridge T. Gerry, Jr.*
Judith Richards Hope*
Richard J. Mahoney*
Steven R. Rogel*
Ernesto Zedillo Ponce de Leon*

* By /s/ Thomas E. Whitaker

Thomas E. Whitaker, Attorney-in-fact

## SCHEDULE II – VALUATION AND QUALIFYING ACCOUNTS

*Union Pacific Corporation and Subsidiary Companies*

| *Millions of Dollars, for the Years Ended December 31,* | *2003* | *2002* | *2001* |
|---|---|---|---|
| Allowance for doubtful accounts: | | | |
| Balance, beginning of period | $ 108 | $ 110 | $ 99 |
| Charged to expense | 13 | 16 | 17 |
| Write-offs, net of recoveries | (37) | (18) | (6) |
| Balance, end of period | $ 84 | $ 108 | $ 110 |
| Accrued casualty costs: | | | |
| Balance, beginning of period | $1,077 | $1,094 | $1,190 |
| Charged to expense | 416 | 359 | 329 |
| Cash payments and other reductions | (504) | (376) | (425) |
| Balance, end of period | $ 989 | $1,077 | $1,094 |
| Accrued casualty costs are presented in the Consolidated Statements of Financial Position as follows: | | | |
| Current | $ 394 | $ 419 | $ 421 |
| Long-term | 595 | 658 | 673 |
| Balance, end of period | $ 989 | $1,077 | $1,094 |

## Union Pacific Corporation
## Exhibit Index

| Exhibit No. | Description |
|---|---|
| **Filed with this Statement** | |
| 3(a) | By-laws of UPC, as amended, effective as of February 1, 2004. |
| 12 | Ratio of Earnings to Fixed Charges. |
| 21 | List of the Corporation's significant subsidiaries and their respective states of incorporation. |
| 23 | Independent Auditors' Consent. |
| 24 | Powers of attorney executed by the directors of UPC. |
| 31(a) | Certifications Pursuant to Rule 13a-14(a), of the Exchange Act, as Adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 - Richard K. Davidson. |
| 31(b) | Certifications Pursuant to Rule 13a-14(a), of the Exchange Act, as Adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 - Robert M. Knight, Jr. |
| 32 | Certifications Pursuant to 18 U.S.C. Section 1350, as Adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 - Richard K. Davidson and Robert M. Knight, Jr. |
| **Incorporated by Reference** | |
| 3(b) | Revised Articles of Incorporation of UPC, as amended through April 25, 1996, are incorporated herein by reference to Exhibit 3 to the Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 1996. |
| 4(a) | Indenture, dated as of December 20, 1996, between UPC and Citibank, N.A., as Trustee, is incorporated herein by reference to Exhibit 4.1 to UPC's Registration Statement on Form S-3 (No. 333-18345). |
| 4(b) | Indenture, dated as of April 1, 1999, between UPC and JP Morgan Chase Bank, formerly The Chase Manhattan Bank, as Trustee, is incorporated herein by reference to Exhibit 4.2 to UPC's Registration Statement on Form S-3 (No. 333-75989). |
| 4(c) | Form of Debt Security is incorporated herein by reference to Exhibit 4.3 to UPC's Registration Statement on Form S-3 (No. 33-59323). |
| | Certain instruments evidencing long-term indebtedness of UPC are not filed as exhibits because the total amount of securities authorized under any single such instrument does not exceed 10% of the Corporation's total consolidated assets. UPC agrees to furnish the Commission with a copy of any such instrument upon request by the Commission. |
| 10(b) | Overnite Transportation Company Employee Stock Purchase Plan, as amended, effective as of November 19, 1998, is incorporated by reference to Exhibit 10(b) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 2002. |

| | |
|---|---|
| 10(c) | Amended and Restated Anschutz Shareholders Agreement, dated as of July 12, 1996, among UPC, UPRR, The Anschutz Corporation (TAC), Anschutz Foundation (the Foundation) and Mr. Philip F. Anschutz, is incorporated herein by reference to Annex D to the Joint Proxy Statement/Prospectus included in Post-Effective Amendment No. 2 to UPC's Registration Statement on Form S-4 (No. 33-64707). |
| 10(d) | Amended and Restated Registration Rights Agreement, dated as of July 12, 1996, among UPC, TAC and the Foundation is incorporated herein by reference to Annex H to the Joint Proxy Statement/Prospectus included in Post-Effective Amendment No. 2 to UPC's Registration Statement on Form S-4 (No. 33-64707). |
| 10(e) | Amended and Restated Registration Rights Agreement, dated as of July 12, 1996, among UPC, UP Holding Company, Inc., Union Pacific Merger Co. and Southern Pacific Rail Corporation (SP) is incorporated herein by reference to Annex J to the Joint Proxy Statement/Prospectus included in Post-Effective Amendment No. 2 to UPC's Registration Statement on Form S-4 (No. 33-64707). |
| 10(f) | Agreement, dated September 25, 1995, among UPC, UPRR, Missouri Pacific Railroad Company (MPRR), SP, Southern Pacific Transportation Company (SPT), The Denver & Rio Grande Western Railroad Company (D&RGW), St. Louis Southwestern Railway Company (SLSRC) and SPCSL Corp. (SPCSL), on the one hand, and Burlington Northern Railroad Company (BN) and The Atchison, Topeka and Santa Fe Railway Company (Santa Fe), on the other hand, is incorporated by reference to Exhibit 10.11 to UPC's Registration Statement on Form S-4 (No. 33-64707). |
| 10(g) | Supplemental Agreement, dated November 18, 1995, between UPC, UPRR, MPRR, SP, SPT, D&RGW, SLSRC and SPCSL, on the one hand, and BN and Santa Fe, on the other hand, is incorporated herein by reference to Exhibit 10.12 to UPC's Registration Statement on Form S-4 (No. 33-64707). |
| 10(h) | UPC 2001 Stock Incentive Plan, dated April 20, 2001, is incorporated herein by reference to Exhibit 99 to the UPC's Current Report on Form 8-K dated March 8, 2001. |
| 10(i) | UP Shares Stock Option Plan of UPC, effective April 30, 1998, is incorporated herein by reference to Exhibit 4.3 to UPC's Registration Statement on Form S-8 (No. 333-57958). |
| 10(j) | The Executive Incentive Plan of UPC, as amended May 31, 2001, is incorporated herein by reference to Exhibit 10(b) to the Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001. |
| 10(k) | Written Description of Premium Exchange Program Pursuant to 1993 Stock Option and Retention Stock Plan of UPC is incorporated herein by reference to Exhibit 10(b) to the Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 1999. |
| 10(l) | The Supplemental Pension Plan for Officers and Managers of UPC and Affiliates, as amended May 30, 2002, is incorporated herein by reference to Exhibit 10(a) to the Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2002. |

| | |
|---|---|
| 10(m) | The 1988 Stock Option and Restricted Stock Plan of UPC, as amended November 16, 2000, is incorporated herein by reference to Exhibit 10(l) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 2000. |
| 10(n) | The 1993 Stock Option and Retention Stock Plan of UPC, as amended May 30, 2002, is incorporated herein by reference to Exhibit 10(b) to the Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2002. |
| 10(o) | UPC 2000 Directors Stock Plan is incorporated herein by reference to Exhibit 99 to UPC's Current Report on Form 8-K filed March 9, 2000. |
| 10(p) | UPC Key Employee Continuity Plan dated November 16, 2000, is incorporated herein by reference to Exhibit 10(o) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 2000. |
| 10(q) | The Pension Plan for Non-Employee Directors of UPC, as amended January 25, 1996, is incorporated herein by reference to Exhibit 10(w) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 1995. |
| 10(r) | The Executive Life Insurance Plan of UPC, as amended October 1997, is incorporated herein by reference to Exhibit 10(t) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 1997. |
| 10(s) | The UPC Stock Unit Grant and Deferred Compensation Plan for the Board of Directors, as amended May 27, 2001, is incorporated herein by reference to Exhibit 10(a) to the Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001. |
| 10(t) | Charitable Contribution Plan for Non-Employee Directors of Union Pacific Corporation is incorporated herein by reference to Exhibit 10(z) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 1995. |
| 10(u) | Written Description of Other Executive Compensation Arrangements of Union Pacific Corporation is incorporated herein by reference to Exhibit 10(q) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 1998. |
| 10(v) | Form of 2001 Long Term Plan Stock Unit and Cash Award Agreement dated January 25, 2001, is incorporated herein by reference to Exhibit 10(u) to the Corporation's Annual Report of Form 10-K for the year ended December 31, 2000. |
| 10(w) | Motor Cargo Industries, Inc. Employee Stock Purchase Plan, dated November 21, 2002, is incorporated herein by reference to Exhibit 4 to UPC's Registration Statement on Form S-8 (No. 333-101430). |

**Exhibit 12**

## RATIO OF EARNINGS TO FIXED CHARGES

*Union Pacific Corporation And Subsidiary Companies*

| *Millions of Dollars, Except for Ratio* | *2003* | *2002* | *2001* | *2000* | *1999* |
|---|---|---|---|---|---|
| Earnings from continuing operations | $1,056 | $1,265 | $ 934 | $ 810 | $ 765 |
| Undistributed equity (earnings) loss | 15 | (34) | (48) | 24 | (45) |
| Total earnings | 1,071 | 1,231 | 886 | 834 | 720 |
| Income taxes | 581 | 680 | 545 | 446 | 416 |
| Fixed charges: | | | | | |
| Interest expense including amortization of debt discount | 574 | 632 | 700 | 722 | 732 |
| Portion of rentals representing an interest factor | 169 | 172 | 177 | 171 | 183 |
| Total fixed charges | 743 | 804 | 877 | 893 | 915 |
| Earnings available for fixed charges | $2,395 | $2,715 | $2,308 | $2,173 | $2,051 |
| Ratio of earnings to fixed charges | 3.2 | 3.4 | 2.6 | 2.4 | 2.2 |

**Exhibit 21**

## SIGNIFICANT SUBSIDIARIES OF UNION PACIFIC CORPORATION

| Name of Corporation | State of Incorporation |
|---|---|
| Union Pacific Railroad Company | Delaware |
| Southern Pacific Rail Corporation | Utah |

**Exhibit 23**

## INDEPENDENT AUDITORS' CONSENT

We consent to the incorporation by reference in Post-Effective Amendment No. 1 to Registration Statement No. 2-79663, Post-Effective Amendment No. 1 to Registration Statement No. 33-12513, Registration Statement No. 33-18877, Registration Statement No. 33-22106, Registration Statement No. 33-44236, Registration Statement No. 33-53968, Registration Statement No. 33-49785, Registration Statement No. 33-49849, Registration Statement No. 33-51071, Registration Statement No. 33-51735, Registration Statement No. 33-58563, Registration Statement No. 333-10797, Registration Statement No. 333-13115, Registration Statement No. 333-16563, Registration Statement No. 333-88225, Registration Statement No. 333-88709, Registration Statement No. 333-57958, Registration Statement No. 333-61856, Registration Statement No. 333-42768, Registration Statement No. 333-101430, Registration Statement No. 333-106707, Registration Statement No. 333-106708, Registration Statement No. 333-105714 and Registration Statement No. 333-105715 on Forms S-8 and Post-Effective Amendment No. 1 to Registration Statement No. 333-51617, Registration Statement No. 333-88666, Registration Statement No. 333-111185 and Amendment No. 1 to Registration Statement No. 333-88666 on Forms S-3 of our report dated February 6, 2004 (which report expresses an unqualified opinion and includes an explanatory paragraph relating to change in method of accounting for asset retirement obligations in 2003), appearing in this Annual Report on Form 10-K of Union Pacific Corporation for the year ended December 31, 2003.

/s/ Deloitte & Touche LLP
DELOITTE & TOUCHE LLP

Omaha, Nebraska
February 18, 2004

**Exhibit 24**

## UNION PACIFIC CORPORATION
## Powers of Attorney

Each of the undersigned directors of Union Pacific Corporation, a Utah corporation (the "Company"), do hereby appoint each of James R. Young, Carl W. von Bernuth and Thomas E. Whitaker his or her true and lawful attorney-in-fact and agent, to sign on his or her behalf the Company's Annual Report on Form 10-K, for the year ended December 31, 2003, and any and all amendments thereto, and to file the same, with all exhibits thereto, with the Securities and Exchange Commission.

IN WITNESS WHEREOF, the undersigned have executed this Power of Attorney as of January 29, 2004.

/s/ Phillip F. Anschutz
Phillip F. Anschutz

/s/ Thomas J. Donohue
Thomas J. Donohue

/s/ Archie W. Dunham
Archie W. Dunham

/s/ Spencer F. Eccles
Spencer F. Eccles

/s/ Ivor J. Evans
Ivor J. Evans

/s/ Elbridge T. Gerry, Jr
Elbridge T. Gerry, Jr

/s/ Judith Richards Hope
Judith Richards Hope

/s/ Richard J. Mahoney
Richard J. Mahoney

/s/ Steven R. Rogel
Steven R. Rogel

/s/ Ernesto Zedillo
Ernesto Zedillo

**EXHIBIT 31(a)**

## CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER

I, Richard K. Davidson, certify that:

1. I have reviewed this annual report on Form 10-K of Union Pacific Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
> (b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
> (c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

> (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
>
> (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 18, 2004

/s/ Richard K. Davidson

Richard K. Davidson
Chairman, President and
Chief Executive Officer
Union Pacific Corporation

**EXHIBIT 31(b)**

## CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER

I, Robert M. Knight, Jr., certify that:

1. I have reviewed this annual report on Form 10-K of Union Pacific Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 18, 2004

/s/ Robert M. Knight, Jr.

Robert M. Knight, Jr.
Executive Vice President–Finance
and Chief Financial Officer
Union Pacific Corporation

**EXHIBIT 32**

## CERTIFICATION OF CHIEF EXECUTIVE OFFICER PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the accompanying Annual Report of Union Pacific Corporation (the Corporation) on Form 10-K for the period ending December 31, 2003 as filed with the Securities and Exchange Commission on the date hereof (the Report), I, Richard K. Davidson, Chairman, President and Chief Executive Officer of the Corporation, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to the best of my knowledge, that:

(1) The Report fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Corporation.

By: /s/ Richard K. Davidson

Richard K. Davidson
Chairman, President and
Chief Executive Officer
Union Pacific Corporation

February 18, 2004

A signed original of this written statement required by Section 906 has been provided to the Corporation and will be retained by the Corporation and furnished to the Securities and Exchange Commission or its staff upon request.

## CERTIFICATION OF CHIEF FINANCIAL OFFICER PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the accompanying Annual Report of Union Pacific Corporation (the Corporation) on Form 10-K for the period ending December 31, 2003 as filed with the Securities and Exchange Commission on the date hereof (the Report), I, Robert M. Knight, Jr., Executive Vice President – Finance and Chief Financial Officer of the Corporation, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to the best of my knowledge, that:

(1) The Report fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Corporation.

By: /s/ Robert M. Knight, Jr.

Robert M. Knight, Jr.
Executive Vice President-Finance
and Chief Financial Officer
Union Pacific Corporation

February 18, 2004

A signed original of this written statement required by Section 906 has been provided to the Corporation and will be retained by the Corporation and furnished to the Securities and Exchange Commission or its staff upon request.

THIS PAGE INTENTIONALLY LEFT BLANK

# CORPORATE INFORMATION

**CORPORATE HEADQUARTERS**

Union Pacific Corporation
1416 Dodge Street, Room 1230
Omaha, NE 68179
(402) 271-5777
www.up.com

Union Pacific Railroad Company
1416 Dodge Street
Omaha, NE 68179
www.up.com

**TRANSFER AGENT AND REGISTRAR OF STOCK**

Computershare Investor Services, LLC

*For U.S. Mail*
P.O. Box 1689
Chicago, IL 60690

*For Express Service Delivery*
2 North LaSalle Street
Chicago, IL 60602

Most questions regarding your account may be answered by contacting the automated Computershare Investor Services Help Line at (800) 317-2512 from your touch-tone phone, 24 hours a day, 7 days a week. Service representatives are available on the Help Line from 8 a.m. to 5 p.m. Central Time, Monday through Friday. You may also write to Computershare at the appropriate address above, or you may contact Computershare online at www.computershare.com.

**STOCK LISTING**

New York Stock Exchange
Ticker Symbol: UNP

**ANNUAL MEETING OF SHAREHOLDERS**

April 16, 2004, 8:30 a.m.
Little America Hotel
500 South Main Street
Salt Lake City, UT

**INFORMATION SOURCES**

The contact for media and public relations inquiries is Corporate Relations at (402) 271-3475. Institutional investors and financial analysts can contact Investor Relations at (402) 271-4227 or (877) 547-7261. Written inquiries for Corporate or Investor Relations can be directed to the Corporation's address listed above.

Individual shareholder questions should be directed to the Corporation's Transfer Agent using the contact information above.

**SEC FILINGS AND OTHER CORPORATE INFORMATION**

Union Pacific makes available free of charge on our Internet Web site at www.up.com (under the "Investors" caption link) our annual report on Form 10-K, our quarterly reports on Form 10-Q, our current reports on Form 8-K, our proxy statement and Forms 3, 4 and 5, filed on behalf of directors and executive officers, and amendments to such reports filed or furnished pursuant to the Securities Exchange Act of 1934, as amended, as soon as reasonably practicable after such material is electronically filed with, or furnished to, the Securities and Exchange Commission (SEC). We also make available on our Web site previously filed SEC reports and exhibits via a link to "EDGAR" on the SEC's Internet site at www.sec.gov. Additionally, our corporate governance materials (including Board Committee charters, governance guidelines and policies, and codes of conduct and ethics for directors, officers and employees), news releases, investor fact books and other general information about Union Pacific are all available on our Web site at www.up.com/investors. From time to time, the corporate governance materials on our Web site may be updated as necessary to comply with rules issued by the SEC and NYSE or as desirable to promote the effective and efficient governance of our company.

Copies of Union Pacific's 2003 Annual Report/Form 10-K and other corporate materials are also available, without charge, by writing to:

Secretary
Union Pacific Corporation
1416 Dodge Street, Room 1230
Omaha, NE 68179

UNION PACIFIC
BUILDING AMERICA℠




**UNION PACIFIC** – Headquartered in Omaha, Nebraska, Union Pacific Railroad operates 33,000 route miles in the western two-thirds of the United States, making it North America's largest railroad. Supporting the nation's economy, Union Pacific links 23 states, every major West Coast and Gulf Coast port, and the fastest-growing U.S. population centers. The Railroad has one of the industry's most diversified commodity mixes and serves the East through four major gateways in Chicago, St. Louis, Memphis and New Orleans. Additionally, Union Pacific operates key north/south corridors, interchanging traffic with the Canadian rail systems, and it is the only railroad to serve six major gateways to Mexico. The company's computer systems provide real-time information about customer shipments moving daily aboard 2,500 trains controlled from Omaha's Harriman Dispatching Center. The Railroad operates more than 7,000 locomotives, most equipped with computerized control systems. Freight cars number more than 87,000.

BUILDING AMERICA℠ UNION PACIFIC




MAXIMUM
SPEED
70 MPH
UP 4775


UNION PACIFIC
CHILLED
EXPRESS



# EXHIBIT PX0706

BUILDING AMERICA®

**UNION PACIFIC CORPORATION**
2007 ANNUAL REPORT

Fellow Shareholders:

By nearly every measure, 2007 was one of the best years in our Company's history. We achieved this success by fulfilling our commitments to customers, communities, employees and our shareholders.

- We operated a safer railroad for our customers, employees and communities.
- We overcame the challenges of a weaker economy and record-high diesel fuel prices to set numerous financial records.
- We increased our value to customers through improved service. Customers recognized these efforts, rewarding us with their highest satisfaction survey marks since our merger with the Southern Pacific.
- We contributed to the communities where we operate by offering good jobs and supporting economic development and community organizations.

The progress we made in these areas enabled us to deliver strong shareholder returns. During 2007, Union Pacific's stock price appreciated nearly 37 percent, dividends increased 47 percent, and shareholders received $1.5 billion through share repurchases.

We expect 2008 will be another record year. Although we will be challenged by economic softness and volatile diesel fuel prices, we expect to offset these issues as the long-term initiatives we began a few years ago continue to pay off.

America's transportation infrastructure needs capacity investment. Union Pacific has pledged to do its part by investing for growth as we improve our financial returns. The "proof statement" can be seen in our actions. We invested a record $3.1 billion during 2007, as we earned record profits and improved our return on invested capital. Our plans for 2008 are similar - generate record profits, increase returns and invest an additional $3.1 billion for safety, service, growth and efficiency.

Union Pacific plays a critical role in our nation's pursuit of energy independence and environmental responsibility. Railroads are the most fuel efficient, environmentally friendly mode of ground freight transportation, moving one ton more than 790 miles on a gallon of diesel fuel. In addition, our numerous technology and process innovations are driving even greater conservation, already having saved nearly 21 million gallons of diesel fuel in 2007. One example is a new switch locomotive that reduces emissions as much as 80 percent and is at least 15 percent more fuel efficient.

The men and women of Union Pacific are the driving force behind our success as a company. They are prepared to handle the challenges ahead as we recruit, train and develop one of the nation's most productive workforces. The Union Pacific team is dedicated to continuing the strong tradition built over the past 146 years, and we look forward to a very successful future.

Tim Young

Chairman, President and
Chief Executive Officer

# DIRECTORS AND SENIOR MANAGEMENT

## BOARD OF DIRECTORS

**Andrew H. Card, Jr.**
Former White House Chief of Staff
*Board Committees: Audit, Finance*

**Erroll B. Davis, Jr.**
Chancellor
University System of Georgia
*Board Committees: Compensation and Benefits, Corporate Governance and Nominating*

**Thomas J. Donohue**
President and
Chief Executive Officer
U.S. Chamber of Commerce
*Board Committees: Compensation and Benefits (Chair), Corporate Governance and Nominating*

**Archie W. Dunham**
Retired Chairman
ConocoPhillips
*Board Committees: Finance (Chair), Corporate Governance and Nominating*

**Judith Richards Hope**
Distinguished Visitor from Practice
and Professor of Law
Georgetown University Law Center
*Board Committees: Audit (Chair), Finance*

**Charles C. Krulak**
General, USMC, Ret.
Former Commandant of the
United States Marine Corps
*Board Committees: Audit, Finance*

**Michael W. McConnell**
General Partner
Brown Brothers Harriman & Co.
*Board Committees: Audit, Compensation and Benefits*

**Thomas F. McLarty III**
President
McLarty Associates
*Board Committees: Compensation and Benefits, Corporate Governance and Nominating*

**Steven R. Rogel**
Chairman and
Chief Executive Officer
Weyerhaeuser Company
*Board Committees: Corporate Governance and Nominating (Chair), Compensation and Benefits*

**James R. Young**
Chairman, President and
Chief Executive Officer
Union Pacific Corporation and
Union Pacific Railroad Company

## SENIOR MANAGEMENT

**James R. Young**
Chairman, President and
Chief Executive Officer
Union Pacific Corporation and
Union Pacific Railroad Company

**Dennis J. Duffy**
Executive Vice President–Operations
Union Pacific Railroad Company

**Charles R. Eisele**
Senior Vice President–Strategic Planning
Union Pacific Corporation

**Bernard R. Gutschewski**
Vice President–Taxes
Union Pacific Corporation

**J. Michael Hemmer**
Senior Vice President–Law
and General Counsel
Union Pacific Corporation

**Mary Sanders Jones**
Vice President and Treasurer
Union Pacific Corporation

**Robert M. Knight, Jr.**
Executive Vice President–Finance
and Chief Financial Officer
Union Pacific Corporation

**John J. Koraleski**
Executive Vice President–
Marketing and Sales
Union Pacific Railroad Company

**John J. Marchant**
Vice President–Labor Relations
Union Pacific Railroad Company

**Richard R. McClish**
Vice President–
Continuous Improvement
Union Pacific Railroad Company

**Joseph E. O'Connor, Jr.**
Vice President–Purchasing
Union Pacific Railroad Company

**Michael A. Rock**
Vice President–External Relations
Union Pacific Corporation

**Barbara W. Schaefer**
Senior Vice President–Human
Resources and Secretary
Union Pacific Corporation

**Lynden L. Tennison**
Senior Vice President and
Chief Information Officer
Union Pacific Corporation

**Jeffrey P. Totusek**
Vice President and Controller
Union Pacific Corporation

**Robert W. Turner**
Senior Vice President–
Corporate Relations
Union Pacific Corporation

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

# FORM 10-K

*(Mark One)*

**[X] ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2007

**OR**

**[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from __________ to ____________

***Commission File Number 1-6075***

# UNION PACIFIC CORPORATION
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **UTAH** | **13-2626465** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**1400 DOUGLAS STREET, OMAHA, NEBRASKA**
(Address of principal executive offices)
**68179**
(Zip Code)
**(402) 544-5000**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each Class | Name of each exchange on which registered |
|---|---|
| Common Stock (Par Value $2.50 per share) | New York Stock Exchange, Inc. |

- Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.
☑ Yes ☐ No
- Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.
☐ Yes ☑ No
- Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.
☑ Yes ☐ No
- Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.
☑
- Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer (as defined in Rule 12b-2 of the Act):
Large accelerated filer ☑ Accelerated filer ☐ Non-accelerated filer ☐
- Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).
☐ Yes ☑ No

As of June 29, 2007, the aggregate market value of the registrant's Common Stock held by non-affiliates (using the New York Stock Exchange closing price) was $31.7 billion.

The number of shares outstanding of the registrant's Common Stock as of January 31, 2008 was 260,700,527.

**Documents Incorporated by Reference –** Portions of the registrant's definitive Proxy Statement for the Annual Meeting of Shareholders to be held on May 1, 2008, are incorporated by reference into Part III of this report. The registrant's Proxy Statement will be filed with the Securities and Exchange Commission pursuant to Regulation 14A.

**TABLE OF CONTENTS**
**UNION PACIFIC CORPORATION**


**PART I**

| | | |
|---|---|---|
| Item 1. | Business | 3 |
| Item 1A. | Risk Factors | 7 |
| Item 1B. | Unresolved Staff Comments | 10 |
| Item 2. | Properties | 10 |
| Item 3. | Legal Proceedings | 13 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 15 |
| | Executive Officers of the Registrant and Principal Executive Officers of Subsidiaries | 16 |

**PART II**

| | | |
|---|---|---|
| Item 5. | Market for the Registrant's Common Equity, Related Stockholder Matters, and Issuer Purchases of Equity Securities | 17 |
| Item 6. | Selected Financial Data | 19 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 20 |
| | Critical Accounting Policies | 40 |
| | Cautionary Information | 44 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 45 |
| Item 8. | Financial Statements and Supplementary Data | 46 |
| | Report of Independent Registered Public Accounting Firm | 47 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 78 |
| Item 9A. | Controls and Procedures | 78 |
| Item 9B. | Other Information | 78 |
| | Management's Annual Report on Internal Control Over Financial Reporting | 79 |
| | Report of Independent Registered Public Accounting Firm | 80 |

**PART III**

| | | |
|---|---|---|
| Item 10. | Directors, Executive Officers, and Corporate Governance | 81 |
| Item 11. | Executive Compensation | 81 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 81 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 82 |
| Item 14. | Principal Accountant Fees and Services | 82 |

**PART IV**

| | | |
|---|---|---|
| Item 15. | Exhibits, Financial Statement Schedules | 83 |
| | Signatures | 84 |
| | Certifications | 94 |

# PART I

## Item 1. Business

### GENERAL

Union Pacific Corporation owns one of America's leading transportation companies. Its principal operating company, Union Pacific Railroad Company, links 23 states in the western two-thirds of the country and serves the fastest-growing U.S. population centers. Union Pacific Railroad Company's diversified business mix includes agricultural products, automotive, chemicals, energy, industrial products, and intermodal. It offers competitive long-haul routes from all major West Coast and Gulf Coast ports to eastern gateways. Union Pacific Railroad Company connects with Canada's rail systems and is the only railroad serving all six major gateways to Mexico, making it North America's premier rail franchise.

Union Pacific Corporation was incorporated in Utah in 1969 and maintains its principal executive offices at 1400 Douglas Street, Omaha, NE 68179. The telephone number at that address is (402) 544-5000. The common stock of Union Pacific Corporation is listed on the New York Stock Exchange (NYSE) under the symbol "UNP".

For purposes of this report, unless the context otherwise requires, all references herein to "UPC", "Corporation", "we", "us", and "our" shall mean Union Pacific Corporation and its subsidiaries, including Union Pacific Railroad Company, which we separately refer to as "UPRR" or the "Railroad".

**Available Information –** Our Internet website is www.up.com. We make available free of charge on our website (under the "Investors" caption link) our Annual Reports on Form 10-K; our Quarterly Reports on Form 10-Q; our current reports on Form 8-K; our proxy statements; Forms 3, 4, and 5, filed on behalf of directors and executive officers; and amendments to such reports filed or furnished pursuant to the Securities Exchange Act of 1934, as amended (the Exchange Act), as soon as reasonably practicable after such material is electronically filed with, or furnished to, the Securities and Exchange Commission (SEC). We also make available on our website previously filed SEC reports and exhibits via a link to EDGAR on the SEC's Internet site at www.sec.gov. Additionally, our corporate governance materials, including By-Laws, Board Committee charters, governance guidelines and policies, and codes of conduct and ethics for directors, officers, and employees are available on our website. From time to time, the corporate governance materials on our website may be updated as necessary to comply with rules issued by the SEC and the NYSE or as desirable to promote the effective and efficient governance of our company. Any security holder wishing to receive, without charge, a copy of any of our SEC filings or corporate governance materials should send a written request to: Secretary, Union Pacific Corporation, 1400 Douglas Street, Omaha, NE 68179.

We have included the Chief Executive Officer (CEO) and Chief Financial Officer certifications regarding our public disclosure required by Section 302 of the Sarbanes-Oxley Act of 2002 as Exhibits 31(a) and (b) to this report. Additionally, we filed with the NYSE the CEO's certification regarding our compliance with the NYSE's Corporate Governance Listing Standards (Listing Standards) pursuant to Section 303A.12(a) of the Listing Standards, which was dated May 9, 2007, and indicated that the CEO was not aware of any violations of the Listing Standards by the Corporation.

References to our website address in this report, including references in Management's Discussion and Analysis of Financial Condition and Results of Operations, Item 7, are provided as a convenience and do not constitute, and should not be deemed, an incorporation by reference of the information contained on, or available through, the website. Therefore, such information should not be considered part of this report.

**OPERATIONS**

The Railroad, along with its subsidiaries and rail affiliates, is our one reportable operating segment. Although revenue is analyzed by commodity group, we analyze the net financial results of the Railroad as one segment due to the integrated nature of our rail network. Additional information regarding our business and operations, including revenue and financial information and data and other information regarding environmental matters, is presented in Selected Financial Data, Item 6; Management's Discussion and Analysis of Financial Condition and Results of Operations, Item 7; and the Financial Statements and Supplementary Data, Item 8.




**Operations –** UPRR is a Class I railroad operating in the United States. We have 32,205 route miles, linking Pacific Coast and Gulf Coast ports with the Midwest and eastern United States gateways and providing several corridors to key Mexican gateways. We serve the western two-thirds of the country and maintain coordinated schedules with other rail carriers to move freight to and from the Atlantic Coast, the Pacific Coast, the Southeast, the Southwest, Canada, and Mexico. Export and import traffic moves through Gulf Coast and Pacific Coast ports and across the Mexican and Canadian borders. Our freight traffic consists of bulk, manifest, and premium business. Bulk traffic is primarily coal, grain, rock, or soda ash in unit trains – trains transporting a single commodity from one source to one destination. Manifest traffic is individual carload or less than train-load business, including commodities such as lumber, steel, paper, and food. The transportation of finished vehicles and intermodal containers is part of our premium business. In 2007, we generated commodity revenue totaling $15.5 billion from the following six commodity groups:

*Agricultural* – Transporting agricultural products, including whole grains, commodities produced from these grains, and food and beverage products, provided 17% of our 2007 commodity revenue. With access to most major grain markets, we provide a critical link between the Midwest and western producing areas and export terminals in the Pacific Northwest (PNW) and Gulf ports, as well as Mexico. Unit trains of grain efficiently shuttle between producers and export terminals or domestic markets. We also serve significant domestic markets, including grain processors, animal feeders, and ethanol producers in the Midwest, West, South, and Rocky Mountain states. Primary food commodities consist of a variety of fresh and frozen fruits and vegetables, dairy products, and beverages, which are moved to major U.S. population centers for consumption. Express Lane and our Produce Unit Train, our premium perishables services that move fruits and vegetables from the PNW and California with priority service to destinations in the East, compete with the trucking industry. We transport frozen meat and poultry to the West Coast ports for export, while beverages, primarily beer, enter the U.S. from Mexico.

*Automotive* – We are the largest automotive carrier west of the Mississippi River, serving seven vehicle assembly plants and distributing imported vehicles from six West Coast ports and Houston. We off-load finished vehicles at 38 vehicle distribution centers for delivery by truck to all major western U.S. cities. In addition to transporting finished vehicles, we provide expedited handling of automotive parts in both boxcars and intermodal containers to several assembly plants. We carry automotive materials bound for assembly plants in Mexico, the U.S., and Canada, and we also transport finished vehicles from manufacturing facilities in Mexico. In 2007, transportation of finished vehicles and automotive materials accounted for 9% of our commodity revenue.

*Chemicals* – Transporting chemicals provided 15% of our commodity revenue in 2007. Our franchise enables us to serve the chemical producing areas along the Gulf Coast, as well as the Rocky Mountain region. Two-

thirds of the chemicals business consists of liquid and dry chemicals, plastics, and liquid petroleum products. In addition to transporting plastics, customers also leverage our storage-in-transit yards for intermediate storage of plastic resins. Soda ash shipments originate in southwestern Wyoming and California destined primarily for glass producing markets in the East, the West, and abroad. Fertilizer movements originate primarily in the Gulf Coast region, as well as the West and Canada, bound for major agricultural users in the Midwest and the western U.S.

*Energy* – Coal transportation accounted for 20% of our 2007 commodity revenue. Our geographic network allows us to transport coal destined for utilities and industrial facilities in 27 states, as well as to the Gulf and rail/barge/ship facilities on the Mississippi and Ohio Rivers and the Great Lakes. We serve mines located in the Southern Powder River Basin of Wyoming (SPRB), Colorado, Utah, southern Wyoming, and southern Illinois. SPRB coal represents the largest growth segment of the market, as utilities continue to favor its lower cost and low-sulfur content.

*Industrial Products* – Our extensive network enables our industrial products group to move numerous commodities between thousands of origin and destination points throughout North America. Lumber shipments originate primarily in the PNW and Canada for destinations throughout the United States for new home construction and repair and remodeling. Commercial and highway construction drives shipments of steel and construction products, consisting of rock, cement, and roofing materials. Paper and consumer goods, including furniture and appliances, are shipped to major metropolitan areas for consumers. Nonferrous metals and industrial minerals are moved for industrial manufacturing. In addition, we provide efficient and safe transportation for government entities and waste companies. In 2007, transporting industrial products provided 20% of our commodity revenue.

*Intermodal* – Our intermodal business, which represented 19% of our 2007 commodity revenue, includes international, domestic, and premium shipments. International business consists of imported container traffic that arrives at West Coast ports via steamship for destinations throughout the United States. Domestic business includes domestic container and trailer traffic for intermodal marketing companies (primarily shipper agents and consolidators) and truckload carriers. Less-than-truckload and package carriers with time-sensitive business requirements account for the majority of our premium service.

**Seasonality** – Some of the commodities we carry have peak shipping seasons, reflecting either or both the nature of the commodity, such as certain agricultural and food products that have specific growing and harvesting seasons, and the demand cycle for the commodity, such as intermodal traffic, which generally has a peak shipping season during the third quarter to meet holiday-related demand for consumer goods during the fourth quarter. The peak shipping seasons for these commodities can vary considerably from year to year depending upon various factors, including the strength of domestic and international economies and currencies and the strength of harvests and market prices of agricultural products. In response to an annual request delivered by the Surface Transportation Board (STB) to all of the Class I railroads operating in the U.S., we issue a letter during the third quarter detailing our plans for handling traffic during the third and fourth quarters and providing other information requested by the STB.

**Working Capital** – We currently have, and historically have had, a working capital deficit, which is common in our industry and does not indicate a lack of liquidity or financial stability. We maintain adequate resources to meet our daily cash requirements, and we have sufficient financial capacity to satisfy our current liabilities.

**Competition** – We are subject to competition from other railroads, motor carriers, ship and barge operators, and pipelines. Our main rail competitor is Burlington Northern Santa Fe Corporation. Its rail subsidiary, BNSF Railway Company (BNSF), operates parallel routes in many of our main traffic corridors. In addition, we operate in corridors served by other railroads and motor carriers. Motor carrier competition is particularly strong for five of our six commodity groups (excluding energy). Because of the proximity of our routes to major inland and Gulf Coast waterways, barge competition can be particularly effective, especially for grain and bulk commodities. In addition to price competition, we face competition with respect to transit times and quality and reliability of service. While we must build or acquire and maintain our rail system, trucks and

barges are able to use public rights-of-way maintained by public entities. Any future improvements or expenditures materially increasing the quality or reducing the costs of these alternative modes of transportation, or legislation releasing motor carriers from their size or weight limitations, could have a material adverse effect on our business.

**Equipment Suppliers –** We depend on two key domestic suppliers of locomotives. Due to the capital intensive nature and sophistication of this equipment, potential new suppliers face high barriers to entry with respect to this industry. Therefore, if one of these domestic suppliers discontinues manufacturing locomotives, we could experience a significant cost increase and risk reduced availability of the locomotives that are necessary to our operations.

**Employees –** Approximately 86% of our 50,089 full-time-equivalent employees are represented by 14 major rail unions. In January 2005, the U.S. railroads began the current round of negotiations with the unions. In June 2007, the Brotherhood of Locomotive Engineers and Trainmen, the Brotherhood of Maintenance of Way Employees, the Brotherhood of Railway Signalmen, the National Conference of Firemen and Oilers, the International Brotherhood of Boilermakers and Blacksmiths, and the Sheet Metal Workers ratified a five-year agreement that provides for wage increases and increased employee health and welfare cost sharing. The annual wage increases (including retroactive increases) are as follows: July 2005 2.5%; July 2006 3.0%; July 2007 3.0%; July 2008 4.0%; July 2009 4.5%. A second bargaining group consisting of the Transportation Communications International Union, the Brotherhood of Railway Carman, and the International Brotherhood of Electrical Workers ratified the same agreement in September of 2007. However, the International Association of Machinists (IAM) failed to ratify this agreement in September. We also settled with the American Railway and Airway Supervisors Association in September. We reached a tentative agreement with the United Transportation Union in January of 2008. Therefore, we remain in negotiations with the IAM and United Supervisors Council of America (Yardmasters). Existing agreements with these two unions continue in effect until new agreements are reached or the Railway Labor Act's procedures (which include mediation, cooling-off periods, and the possibility of Presidential intervention) are exhausted. Contract negotiations with the various unions generally take place over an extended period of time, and we rarely experience work stoppages during negotiations. The current agreements provide for periodic cost of living increases until new agreements are reached.

## GOVERNMENTAL AND ENVIRONMENTAL REGULATION

**Governmental Regulation –** Our operations are subject to a variety of federal, state, and local regulations, generally applicable to all businesses (see also the discussion of certain regulatory proceedings in Legal Proceedings, Item 3).

The operations of the Railroad are subject to the regulatory jurisdiction of the STB of the United States Department of Transportation (DOT). The operations of the Railroad are also subject to the regulations of the Federal Railroad Administration of the DOT and other federal and state agencies. The STB has jurisdiction over rates charged on certain regulated rail traffic; freight car compensation; transfer, extension, or abandonment of rail lines; and acquisition of control of rail common carriers. On January 26, 2007, the STB issued a decision limiting the manner in which U.S. railroads can calculate fuel surcharges on traffic regulated by the STB, and we have complied with this regulation. The STB also has adopted new mechanisms for regulating some of our rates, adopted a new methodology for calculating the cost of capital for railroads, and expanded its review of line sales and leases. Various appeals may affect these regulations prior to final implementation.

DOT, the Occupational Safety and Health Administration, and the Department of Homeland Security, along with other federal agencies, have jurisdiction over certain aspects of safety, movement of hazardous materials, movement and disposal of hazardous waste, emissions requirements, and equipment standards. Various state and local agencies have jurisdiction over disposal of hazardous waste and seek to regulate movement of hazardous materials in areas not otherwise preempted by federal law.

**Environmental Regulation** – We are subject to extensive federal and state environmental statutes and regulations pertaining to public health and the environment. The statutes and regulations are administered and monitored by the Environmental Protection Agency (EPA) and by various state environmental agencies. The primary laws affecting our operations are the Resource Conservation and Recovery Act, regulating the management and disposal of solid and hazardous wastes; the Comprehensive Environmental Response, Compensation, and Liability Act, regulating the cleanup of contaminated properties; the Clean Air Act, regulating air emissions; and the Clean Water Act, regulating waste water discharges.

Information concerning environmental claims and contingencies and estimated remediation costs is set forth in Management's Discussion and Analysis of Financial Condition and Results of Operations – Critical Accounting Policies – Environmental, Item 7.

### Item 1A. Risk Factors

The information set forth in this Item 1A should be read in conjunction with the rest of the information included in this report, including Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations, and Item 8, Financial Statements and Supplementary Data.

*We Are Subject to Significant Governmental Regulation* – We are subject to governmental regulation by a significant number of federal, state, and local authorities covering a variety of health, safety, labor, environmental (as discussed below), and other matters. Many laws and regulations require us to obtain and maintain various licenses, permits, and other authorizations, and we cannot guarantee that we will continue to be able to do so. Our failure to comply with applicable laws and regulations could have a material adverse effect on us. Governments may change the legislative or regulatory frameworks within which we operate without providing us any recourse to address any adverse effects on our business, including, without limitation, regulatory determinations or rules regarding dispute resolution, business relationships with other railroads, calculation of our cost of capital or other inputs relevant to determining or estimating our revenue adequacy, and costs and expenses. Increased regulation of the rail industry likely would restrict our ability to determine prices for certain rail services, affect our ability to control traffic volume, and reduce capital spending on our rail network, facilities and equipment, resulting in a material adverse effect on our results of operations, financial condition, and liquidity. Additionally, one or more consolidations of Class I railroads could lead to increased regulation of the rail industry.

*We May Be Affected by General Economic Conditions* – Prolonged negative changes in domestic and global economic conditions affecting the producers and consumers of the commodities we carry may have a material adverse effect on our results of operations, financial condition, and liquidity.

*We May Be Subject to Various Claims and Lawsuits That Could Result in Significant Expenditures* – The nature of our business exposes us to the potential for various claims and litigation related to labor and employment, personal injury, property damage, environmental liability, and other matters. Any material changes to litigation trends or a catastrophic rail accident or series of accidents involving any or all of property damage, personal injury, and environmental liability could have a material adverse effect on our results of operations, financial condition, and liquidity.

*We Are Required to Transport Hazardous Materials* – Federal laws require railroads, including us, to transport hazardous materials regardless of risk or potential exposure of loss. Any rail accident or other incident or accident on our network, at our facilities, or at the facilities of our customers involving the release of hazardous materials, including toxic inhalation hazard (or TIH) materials such as certain chlorine compounds, could involve significant costs and claims for personal injury, property damage, and environmental penalties and remediation, which could have a material adverse effect on our results of operations, financial condition, and liquidity.

*We Must Manage Both Significant Demand for Our Services and Network Capacity* – We may experience network difficulties, including congestion and reduced velocity, which may compromise the level of service we

provide to our customers. This level of demand may compound the impact of weather and weather-related events on our operations and velocity. Although we continue to improve our transportation plan, add capacity, and improve operations at our yards and other facilities, we cannot be sure that these measures will fully or adequately address any service shortcomings. We may experience other difficulties related to network capacity, dramatic and unplanned increases or decreases of demand for rail service with respect to one or more of our commodity groups, or other events that could have a negative impact on our operational efficiency, any of which could have a material adverse effect on our results of operations, financial condition, and liquidity.

*Severe Weather Could Result in Significant Business Interruptions and Expenditures* – Severe weather conditions, events, and other natural phenomena, including earthquakes, hurricanes, fires, floods, mudslides or landslides, extreme temperatures, and significant precipitation may cause business interruptions, including line outages on our rail network that can adversely affect our entire rail network and result in increased costs, increased liabilities, and decreased revenue, which could have a material adverse effect on our results of operations, financial condition, and liquidity.

*Strikes or Work Stoppages Could Adversely Affect Our Operations as the Majority of Our Employees Belong to Labor Unions and Labor Agreements* – We are a party to collective bargaining agreements with various labor unions. Disputes with regard to the terms of these agreements or our potential inability to negotiate acceptable contracts with these unions could result in, among other things, strikes, work stoppages, or other slowdowns by the affected workers. If unionized workers were to engage in a strike, work stoppage, or other slowdown, or other employees were to become unionized, we could experience a significant disruption of our operations or higher ongoing labor costs, either of which could have a material adverse effect on our results of operations, financial condition, and liquidity. Additionally, future national labor agreements, or renegotiation of labor agreements or provisions of labor agreements, could compromise our service reliability and significantly increase our costs for healthcare, wages, and other benefits, which could have a material adverse impact on our results of operations, financial condition, and liquidity.

*The Availability of Qualified Personnel Could Adversely Affect Our Operations* – Changes in demographics, training requirements, and the availability of qualified personnel could negatively affect our ability to meet demand for rail service. Unpredictable increases in demand for rail services and a lack of network fluidity may exacerbate such risks, which could have a negative impact on our operational efficiency and otherwise have a material adverse effect on our results of operations, financial condition, and liquidity.

*We Rely on Technology and Technology Improvements in Our Business Operations* – We rely on information technology in all aspects of our business. If we do not have sufficient capital to acquire new technology or if we are unable to implement new technology, we may suffer a competitive disadvantage within the rail industry and with companies providing other modes of transportation service, which could have a material adverse effect on our results of operations, financial condition, and liquidity. Additionally, if we experience significant disruption or failure of one or more of our information technology systems, including computer hardware, software, and communications equipment, we could experience a service interruption, safety failure, security breach, or other operational difficulties, which could have a material adverse impact on our results of operations, financial condition, and liquidity.

*We Are Subject to Significant Environmental Laws and Regulations* – Our operations are subject to extensive federal, state, and local environmental laws and regulations concerning, among other things, emissions to the air; discharges to waters; handling, storage, transportation, and disposal of waste and other materials; and hazardous material or petroleum releases. We generate and transport hazardous and non-hazardous waste in our operations, and we did so in our former operations. Environmental liability can extend to previously owned or operated properties, leased properties, and properties owned by third parties, as well as to properties we currently own. Environmental liabilities have arisen and may also arise from claims asserted by adjacent landowners or other third parties in toxic tort litigation. We have been and may be subject to allegations or findings that we have violated, or are strictly liable under, these laws or regulations. We could incur significant costs as a result of any of the foregoing, and we may be required to incur significant expenses to investigate

and remediate known, unknown, or future environmental contamination, which could have a material adverse effect on our results of operations, financial condition, and liquidity.

*We May Be Affected by Climate Change and Market or Regulatory Responses to Climate Change* – Climate change, including the impact of global warming, could have a material adverse effect on our results of operations, financial condition, and liquidity. Restrictions, caps, taxes, or other controls on emissions of greenhouse gasses, including diesel exhaust, could significantly increase our operating costs. Restrictions on emissions could also affect our customers that (a) use commodities that we carry to produce energy, (b) use significant amounts of energy in producing or delivering the commodities we carry, or (c) manufacture or produce goods that consume significant amounts of energy or burn fossil fuels, including chemical producers, farmers and food producers, and automakers and other manufacturers. Significant cost increases, government regulation, or changes of consumer preferences for goods or services relating to alternative sources of energy or emissions reductions could materially affect the markets for the commodities we carry, which in turn could have a material adverse effect on our results of operations, financial condition, and liquidity. Government incentives encouraging the use of alternative sources of energy could also affect certain of our customers and the markets for certain of the commodities we carry in an unpredictable manner that could alter our traffic patterns, including, for example, the impacts of ethanol incentives on farming and ethanol producers. Finally, we could face increased costs related to defending and resolving legal claims and other litigation related to climate change and the alleged impact of our operations on climate change. Any of these factors, individually or in operation with one or more of the other factors, or other unforeseen impacts of climate change could reduce the amount of traffic we handle and have a material adverse effect on our results of operations, financial condition, and liquidity.

*Rising or Elevated Fuel Costs and Whether We Are Able to Mitigate These Costs with Fuel Surcharges Could Materially and Adversely Affect Our Business* – Fuel costs constitute a significant portion of our transportation expenses. Diesel fuel prices are subject to dramatic fluctuations, and significant price increases could have a material adverse effect on our operating results. Although we currently are able to recover a significant amount of our increased fuel expenses through revenue from fuel surcharges, we cannot be certain that we will always be able to mitigate rising or elevated fuel costs through surcharges. Future market conditions or legislative or regulatory activities could adversely affect our ability to apply fuel surcharges or adequately recover increased fuel costs through fuel surcharges. International, political, and economic circumstances affect fuel prices and supplies. Weather can also affect fuel supplies and limit domestic refining capacity. If a fuel supply shortage were to arise higher fuel prices could, despite our fuel surcharge programs, have a material adverse effect on our results of operations, financial condition, and liquidity.

*We Face Competition from Other Railroads and Other Transportation Providers* – We face competition from other railroads, motor carriers, ships, barges, and pipelines. In addition to price competition, we face competition with respect to transit times and quality and reliability of service. While we must build or acquire and maintain our rail system, trucks and barges are able to use public rights-of-way maintained by public entities. Any future improvements or expenditures materially increasing the quality or reducing the cost of alternative modes of transportation, or legislation releasing motor carriers from their size or weight limitations, could have a material adverse effect on our results of operations, financial condition, and liquidity. Additionally, any future consolidation of the rail industry could materially affect the competitive environment in which we operate.

*We Are Subject to Legislative, Regulatory, and Legal Developments Involving Taxes* – Taxes are a significant part of our expenses. We are subject to federal and state income, payroll, property, sales and use, fuel, and other types of taxes. Any or all changes in tax rates, enactment of new tax laws, revisions of tax regulations, and claims or litigation with taxing authorities could result in substantially higher taxes and, therefore, could have a material adverse effect on our results of operations, financial condition, and liquidity.

*We Utilize Capital Markets* – We rely on the capital markets to provide some of our capital requirements, including the issuance of long-term debt instruments and commercial paper from time to time, as well as the sale of certain of our receivables. Significant instability of the capital markets or deterioration of our financial condition due to internal or external factors could restrict or prohibit our access to commercial paper and

other financing sources and reduce our credit ratings below investment grade, which would prohibit us from utilizing our sale of receivables program and significantly increase the costs associated with issuing both commercial paper and long-term debt.

*We Are Dependent on Two Key Domestic Suppliers of Locomotives* – Due to the capital intensive nature and sophistication of locomotive equipment, potential new suppliers face high barriers to entry with respect to this industry. Therefore, if one of these domestic suppliers discontinues manufacturing locomotives, we could experience a significant cost increase and risk reduced availability of the locomotives that are necessary to our operations.

*We May Be Affected by Acts of Terrorism, War, or Risk of War* – Our rail lines, facilities, and equipment, including rail cars carrying hazardous materials, could be direct targets or indirect casualties of terrorist attacks. Terrorist attacks, or other similar events, any government response thereto, and war or risk of war may adversely affect our results of operations, financial condition, and liquidity. In addition, insurance premiums for some or all of our current coverages could increase dramatically, or certain coverages may not be available to us in the future.

## Item 1B. Unresolved Staff Comments

None.

## Item 2. Properties

We employ a variety of assets in the management and operation of our rail business.  Our rail network links 23 states in the western two-thirds of the U.S.



**Track –** Our rail network includes 32,205 route miles. We own 26,354 miles and operate on the remainder pursuant to trackage rights or leases. The following table describes track miles at December 31, 2007 and 2006.

| | *2007* | *2006* |
|---|---|---|
| Route miles | **32,205** | 32,339 |
| Other main line | **6,404** | 6,295 |
| Passing lines and turnouts | **3,021** | 2,962 |
| Switching and classification yard lines | **9,270** | 10,000 |
| Total | **50,900** | 51,596 |

**Harriman Dispatching Center –** The Harriman Dispatching Center (HDC), located in Omaha, Nebraska, is our primary dispatching facility. It is linked to regional dispatching and locomotive management facilities at various locations along our network. The HDC moves locomotives and trains, manages traffic on our network, and coordinates interchanges with other railroads. Over 700 employees currently work on-site in the facility.

**Rail Facilities –** In addition to our track structure, we operate numerous facilities, including terminals for intermodal and other freight; rail yards for train-building, switching, storage-in-transit (the temporary storage of customer goods in rail cars prior to shipment) and other activities; offices to administer and manage our operations; dispatch centers to direct traffic on our rail network; crew quarters to house train crews along our network; and shops and other facilities for fueling, maintenance, and repair of locomotives and repair and maintenance of rail cars and other equipment. The following tables include the major yards and terminals on our system:

| | *Avg. Daily Car Volume* | |
|---|---|---|
| *Top 10 Classification Yards* | *2007* | *2006* |
| North Platte, Nebraska | **2,700** | 2,900 |
| North Little Rock, Arkansas | **1,600** | 1,600 |
| Proviso (Chicago), Illinois | **1,600** | 1,700 |
| Roseville, California | **1,400** | 1,400 |
| Englewood (Houston), Texas | **1,300** | 1,400 |
| West Colton, California | **1,300** | 1,300 |
| Livonia, Louisiana | **1,300** | 1,400 |
| Pine Bluff, Arkansas | **1,300** | 1,300 |
| Fort Worth, Texas | **1,200** | 1,300 |
| Neff (Kansas City), Missouri | **1,000** | 1,000 |

| *Top 10 Intermodal Terminals* | *Annual Lifts* ***2007*** | *2006* |
|---|---|---|
| ICTF (Los Angeles), California | **719,000** | 725,000 |
| Marion (Memphis), Tennessee | **414,000** | 406,000 |
| East Los Angeles, California | **360,000** | 329,000 |
| Global II (Chicago), Illinois | **353,000** | 297,000 |
| Global I (Chicago), Illinois | **310,000** | 321,000 |
| Dallas, Texas | **292,000** | 284,000 |
| Seattle, Washington | **250,000** | 238,000 |
| Yard Center (Chicago), Illinois | **238,000** | 248,000 |
| Oakland, California | **236,000** | 268,000 |
| Englewood (Houston), Texas | **214,000** | 206,000 |

**Rail Equipment –** Our equipment includes owned and leased locomotives and rail cars; heavy maintenance equipment and machinery; other equipment and tools in our shops, offices, and facilities; and vehicles for maintenance, transportation of crews, and other activities. As of December 31, 2007, we owned or leased the following units of equipment:

| *Locomotives* | *Owned* | *Leased* | *Total* | *Average Age (yrs.)* |
|---|---|---|---|---|
| Road | 4,330 | 3,704 | 8,034 | 14.8 |
| Switching | 488 | 32 | 520 | 30.5 |
| Other | 112 | 55 | 167 | 20.6 |
| Total locomotives | 4,930 | 3,791 | 8,721 | N/A |

| *Freight cars* | *Owned* | *Leased* | *Total* | *Average Age (yrs.)* |
|---|---|---|---|---|
| Covered hopper | 13,864 | 21,573 | 35,437 | 28.7 |
| Open hoppers | 13,431 | 5,216 | 18,647 | 28.6 |
| Gondolas | 7,639 | 6,141 | 13,780 | 26.6 |
| Boxcars | 8,132 | 4,140 | 12,272 | 27.1 |
| Mechanical refrigerated | 3,309 | 5,291 | 8,600 | 22.3 |
| Flat cars | 3,687 | 1,149 | 4,836 | 30.2 |
| Other | 127 | 585 | 712 | N/A |
| Total freight cars | 50,189 | 44,095 | 94,284 | N/A |

**Capital Expenditures –** Our rail network requires significant annual capital investments for maintenance, improvement, and expansion. These investments maintain and enhance safe operations, support the transportation needs of our customers, and improve our operational efficiency. Additionally, we add new locomotives and freight cars to our fleet to replace older, less efficient equipment, to support growth and customer demand, and to reduce our impact on the environment through the acquisition of more fuel efficient and low emission locomotives, including yard engines that use new hybrid technology.

**2007 Capital Expenditures –** During 2007, we made capital investments totaling $3.1 billion, which included cash spending of $2.5 billion (see the capital expenditures table in Management's Discussion and Analysis of Financial Condition and Results of Operations – Liquidity and Capital Resources – Financial Condition, Item 7). We also acquired 259 locomotives and 150 freight cars under long-term operating leases with an aggregate net present value of $434 million. We procured an additional 56 locomotives and other equipment through capital lease financings valued at $82 million.

**Sunset Corridor Expansion –** One of our critical routes is the Sunset Corridor, a 760-mile route running between Los Angeles and El Paso, Texas. This heavily traveled corridor carries about 20 percent of our traffic, including a significant amount of intermodal traffic. In 2007, we added 33 miles of double track to the corridor, which now includes nearly 410 miles of double track (approximately 54% of the route).

**SPRB Joint-Line Expansion –** An important part of our franchise is our access to the coal-producing SPRB through a joint line, which we own with BNSF (the Joint Line). In addition to the significant annual maintenance required on the Joint Line (due to the volume of trains, the weight of loaded coal cars, and the impact of coal dust on rail beds), a capacity expansion project is underway. During 2007, we completed the installation of additional main line track so the entire Joint Line now has triple track.

**2008 Capital Expenditures –** In 2008, we expect to make capital investments of approximately $3.1 billion (which may be revised if revenue, tax, and business conditions require changing, or new laws or regulations affect our ability to generate sufficient returns on, these investments). See discussion of our 2008 capital plan in Management's Discussion and Analysis of Financial Condition and Results of Operations – 2008 Outlook, Item 7.

**Equipment Encumbrance –** Equipment with a carrying value of approximately $2.8 billion at both December 31, 2007 and 2006 serves as collateral for capital leases and other types of equipment obligations in accordance with the secured financing arrangements utilized to acquire such railroad equipment.

As a result of the merger of Missouri Pacific Railroad Company (MPRR) with and into UPRR on January 1, 1997, and pursuant to the underlying indentures for the MPRR mortgage bonds, UPRR must maintain the same value of assets after the merger in order to comply with the security requirements of the mortgage bonds. As of the merger date, the value of the MPRR assets that secured the mortgage bonds was approximately $6.0 billion. In accordance with the terms of the indentures, this collateral value must be maintained during the entire term of the mortgage bonds irrespective of the outstanding balance of such bonds.

Certain of our properties are subject to federal, state, and local laws and regulations governing the protection of the environment (see discussion of environmental issues in Business – Governmental and Environmental Regulation, Item 1, and Management's Discussion and Analysis of Financial Condition and Results of Operations – Critical Accounting Policies – Environmental, Item 7).

## Item 3. Legal Proceedings

From time to time, we are involved in legal proceedings, claims, and litigation that occur in connection with our business. Management routinely assesses our liabilities and contingencies in connection with these matters based upon the latest available information. Consistent with SEC rules and requirements, we describe below material pending legal proceedings (other than ordinary routine litigation incidental to our business), material proceedings known to be contemplated by governmental authorities, other proceedings arising under federal, state, or local environmental laws and regulations (including governmental proceedings involving potential fines, penalties, or other monetary sanctions in excess of $100,000) and such other pending matters that we may determine to be appropriate.

### Environmental Matters

As we reported in our Quarterly Report on Form 10-Q for the quarter ended September 30, 2007, the Railroad received notice from the Army Corps of Engineers (the Corps) that, during its construction efforts to restore service to the Caliente Subdivision after severe flooding in January 2005, the Railroad may have exceeded its authority under emergency authorizations and permits issued by the Corps. Subsequently, the Corps referred the matter to the EPA, which has demanded that the Railroad repair claimed impacts to the adjacent waterway, perform compensatory mitigation, and pay a civil penalty in connection with this project and related storm water issues. The Railroad and the EPA have discussed the scope of additional work to be performed by the Railroad to address alleged impacts of its construction activities, as well as compensatory

mitigation and potential penalties. To date, we have not reached an agreement with the EPA, and, therefore, the ultimate amount of the civil penalty cannot be determined. However, the penalty component of the settlement will exceed $100,000.

As we reported in our Quarterly Report on Form 10-Q for the quarter ended September 30, 2004, the Illinois Attorney General's office filed an Agreed Order and Complaint and a Complaint for Injunctive and Other Relief on October 7, 2004, in the Circuit Court for the Twentieth Judicial Circuit (St. Clair County) against The Alton & Southern Railway Company, a wholly-owned subsidiary of the Railroad, as a result of a collision and derailment on September 21, 2004. The State of Illinois seeks to enjoin The Alton & Southern Railway Company from further violations, as well as a monetary penalty. The Railroad reached a tentative agreement with the State of Illinois that will require the payment of a penalty in the amount of $48,000. The agreement should be executed in the first quarter of 2008.

As we reported in our Annual Report on Form 10-K for 2005, the EPA considers the Railroad a potentially responsible party for the Omaha Lead Site. The Omaha Lead Site consists of approximately 12,800 acres of residential property in the eastern part of Omaha, Nebraska, allegedly impacted by air emissions from two former lead smelters/refineries. One refinery was operated by ASARCO. The EPA identified the Railroad as a potentially responsible party because more than 60 years ago the Railroad owned land that was leased to ASARCO. The Railroad disputes both the legal and technical basis of the EPA's allegations. It has nonetheless engaged in extensive negotiations with the EPA. These negotiations reached an apparent impasse. The EPA issued a Unilateral Administrative Order with an effective date of December 16, 2005, directing the Railroad to implement an interim remedy at the site at an estimated cost of $50 million. Failure to comply with the order without just cause could subject the Railroad to penalties of up to $32,500 per day and triple the EPA's costs in performing the work. The Railroad believes it has just cause not to comply with the order, but it offered to perform some of the work specified in the order as a compromise. To date, the EPA has rejected all of the Railroad's offers to settle or resolve this matter. The Railroad will vigorously contest liability and the imposition of any penalties.

As we reported in our Annual Report on Form 10-K for 2005, the Illinois Attorney General's office filed a complaint in the Circuit Court for the Twenty-First Judicial Circuit (St. Clair County) seeking injunctive relief and civil penalties against the Railroad relating to a collision between UPRR and Norfolk Southern Railway Company (NS) trains near Momence, Illinois, on November 24, 2005. The collision derailed approximately five locomotives and 30 railcars. Two of the UPRR locomotives and two of the NS locomotives caught fire, and four of the locomotives released approximately 16,000 gallons of diesel fuel. Other cars carrying food products derailed and released an unknown amount of product. The State of Illinois seeks a permanent injunction against the Railroad ordering UPRR to continue remediation. The State of Illinois seeks to enjoin UPRR from further violations and payment of a monetary penalty. Union Pacific reached a tentative agreement with the State of Illinois that will require payment of $60,000, which includes a penalty payment and the amount of the State's response costs. The agreement should be executed in the first quarter of 2008.

As we reported in our Annual Report on Form 10-K for 2005, the Illinois Attorney General's office filed a complaint in the Circuit Court for the Twentieth Judicial Circuit (St. Clair County) for injunctive and other relief on November 28, 2005, against the Railroad, alleging a diesel fuel spill from an above-ground storage tank in a rail yard in Dupo, St. Clair County, Illinois. The State of Illinois seeks to enjoin UPRR from further violations and a monetary penalty. The amount of the proposed penalty is uncertain.

As we reported in our Annual Report on Form 10-K for 2003, the United States Attorney for the Central District of California notified the Railroad that the office intended to pursue criminal charges against the Railroad for alleged violations of federal environmental laws, including the federal Clean Water Act, in connection with releases of oil contaminated wastewater from our Taylor Yard in 2001 and 2003. On July 31, 2006, the United States Attorney filed criminal misdemeanor charges against us for these releases in the United States District Court for the Central District of California, and we received the Summons from the Court on August 8, 2006. We will vigorously defend the charges.

We received notices from the EPA and state environmental agencies alleging that we are or may be liable under federal or state environmental laws for remediation costs at various sites throughout the United States, including sites on the Superfund National Priorities List or state superfund lists. We cannot predict the ultimate impact of these proceedings and suits because of the number of potentially responsible parties involved, the degree of contamination by various wastes, the scarcity and quality of volumetric data related to many of the sites, and the speculative nature of remediation costs.

Information concerning environmental claims and contingencies and estimated remediation costs is set forth in Management's Discussion and Analysis of Financial Condition and Results of Operations – Critical Accounting Policies – Environmental, Item 7.

**Other Matters**

As we reported in our Quarterly Report on Form 10-Q for the quarter ended June 30, 2007, 20 small rail shippers (many of whom are represented by the same law firms) filed virtually identical antitrust lawsuits in various federal district courts against us and four other Class I railroads in the U.S. The original plaintiff filed the first of these claims in the U.S. District Court in New Jersey on May 14, 2007, and the additional plaintiffs filed claims in district courts in various states, including Florida, Illinois, Alabama, Pennsylvania, and the District of Columbia. These suits allege that the railroads engaged in price-fixing by establishing common fuel surcharges for certain rail traffic.

We received additional complaints during the third and fourth quarters of 2007, increasing the total number of complaints to 30. A few of these suits involve plaintiffs alleging that they are or were indirect purchasers of rail transportation and seeking to represent the class of indirect purchasers of rail transportation that paid fuel surcharges. These complaints have added allegations under state antitrust and consumer protection laws. All of these "copycat" lawsuits (whether filed by direct or indirect purchasers of rail transportation) are being filed by various groups of plaintiffs' lawyers seeking to become lead counsel in a nationwide class action against the railroads. Each of the plaintiffs requests certification of its complaint as a class-action. On November 6, 2007, the Judicial Panel on Multidistrict Litigation ordered that all of the rail fuel surcharge cases be transferred to the U.S. District Court in D.C. for coordinated or consolidated pretrial proceedings.

Additionally, the Attorney General of a state outside our service area issued a grand jury subpoena to us requesting documents pertaining to our fuel surcharge program. We met with representatives of this Attorney General's office, and we plan to have additional meetings in the future in an effort to resolve that office's interest in this matter.

We deny the allegations that our fuel surcharge program violates the antitrust laws or any other laws. We believe that these lawsuits are without merit, and we will vigorously defend our actions. Therefore, we currently believe that these matters will not have a material adverse effect on any of our results of operations, financial condition, and liquidity.

## Item 4. Submission of Matters to a Vote of Security Holders

No matters were submitted to a vote of security holders during the fourth quarter of 2007.

## Executive Officers of the Registrant and Principal Executive Officers of Subsidiaries

The Board of Directors typically elects and designates our executive officers on an annual basis at the board meeting held in conjunction with the Annual Meeting of Shareholders, and they hold office until their successors are elected. Executive officers also may be elected and designated throughout the year, as the Board of Directors considers appropriate. There are no family relationships among the officers, nor any arrangement or understanding between any officer and any other person pursuant to which the officer was selected. The following table sets forth certain information, as of February 15, 2008, relating to the executive officers.

| Name | Position | Age | Business Experience During Past Five Years |
|---|---|---|---|
| James R. Young | Chairman, President and Chief Executive Officer of UPC and the Railroad | 55 | (1) |
| Robert M. Knight, Jr. | Executive Vice President – Finance and Chief Financial Officer of UPC and the Railroad | 50 | (2) |
| J. Michael Hemmer | Senior Vice President – Law and General Counsel of UPC and the Railroad | 58 | (3) |
| Barbara W. Schaefer | Senior Vice President – Human Resources and Secretary of UPC and the Railroad | 54 | (4) |
| Jeffrey P. Totusek | Vice President and Controller of UPC and Chief Accounting Officer and Controller of the Railroad | 49 | (5) |
| Dennis J. Duffy | Executive Vice President – Operations of the Railroad | 57 | Current Position |
| John J. Koraleski | Executive Vice President – Marketing and Sales of the Railroad | 57 | Current Position |

*(1) Mr. Young was elected Chief Executive Officer and President of UPC and the Railroad effective January 1, 2006. He was elected to the additional position of Chairman effective February 1, 2007. He was elected President and Chief Operating Officer of the Railroad, effective February 1, 2004, and he previously was Executive Vice President – Finance of UPC and Chief Financial Officer of the Railroad.*

*(2) Mr. Knight was elected to his current position effective February 1, 2004. He previously was Senior Vice President – Finance for UPC and the Railroad.*

*(3) Mr. Hemmer was elected to his current position effective June 1, 2004. Mr. Hemmer previously was Vice President – Law of the Railroad.*

*(4) Mrs. Schaefer has held the position of Senior Vice President – Human Resources for the past five years. In addition, she was elected Secretary of UPC and the Railroad effective June 1, 2004.*

*(5) Mr. Totusek was elected to his current position effective January 1, 2008. He previously was Assistant Vice President – Financial Analysis of the Railroad.*

# PART II

## Item 5. Market for the Registrant's Common Equity, Related Stockholder Matters, and Issuer Purchases of Equity Securities

Our common stock is traded on the NYSE under the symbol "UNP". The following table presents the dividends declared and the high and low closing prices of our common stock for each of the indicated quarters.

| *2007 - Dollars Per Share* | *Q1* | *Q2* | *Q3* | *Q4* |
|---|---|---|---|---|
| Dividends | $ 0.35 | $ 0.35 | $ 0.35 | $ 0.44 |
| Common stock price: | | | | |
| High | 105.84 | 122.79 | 129.36 | 137.56 |
| Low | 89.58 | 100.41 | 99.38 | 110.07 |
| *2006 - Dollars Per Share* | | | | |
| Dividends | $ 0.30 | $ 0.30 | $ 0.30 | $ 0.30 |
| Common stock price: | | | | |
| High | 93.73 | 97.49 | 92.96 | 96.16 |
| Low | 77.62 | 83.83 | 78.65 | 86.27 |

At January 31, 2008, there were 260,700,527 shares of outstanding common stock and 35,295 common shareholders of record. At that date, the closing price of the common stock on the NYSE was $124.76. We have paid dividends to our common shareholders during each of the past 108 years. We declared dividends totaling $396 million in 2007 and $323 million in 2006. On November 15, 2007, we increased the quarterly dividend to $0.44 per share, payable beginning on January 2, 2008, to shareholders of record on November 29, 2007. We are subject to certain restrictions regarding retained earnings with respect to the payment of cash dividends to our shareholders. The amount of retained earnings available for dividends increased to $11.5 billion at December 31, 2007, from $7.8 billion at December 31, 2006. See discussion of this restriction in Management's Discussion and Analysis of Financial Condition and Results of Operations – Liquidity and Capital Resources, Item 7. We do not believe the restriction on retained earnings will affect our ability to pay dividends, and we currently expect to pay dividends in 2008 comparable to 2007.

**Comparison Over One- and Three-Year Periods** – The following table presents the cumulative total shareholder returns, assuming reinvested dividends, over one- and three-year periods for the Corporation, a peer group index (comprised of Burlington Northern Santa Fe Corporation, CSX Corporation, and Norfolk Southern Corporation), the Dow Jones Transportation Index (Dow Jones), and the Standard & Poor's 500 Stock Index (S&P 500).

| *Period* | *UPC* | *Peer Group* | *Dow Jones* | *S&P 500* |
|---|---|---|---|---|
| 1 Year (2007) | 37.9% | 12.6% | 1.4% | 5.5% |
| 3 Year (2005-2007) | 94.6 | 74.7 | 24.2 | 28.2 |

**Five-Year Performance Comparison** – The following graph provides an indicator of cumulative total shareholder returns for the Corporation as compared to the peer group index (described above), the Dow Jones, and the S&P 500. The graph assumes that the value of the investment in the common stock of Union Pacific Corporation and each index was $100 on December 31, 2002, and that all dividends were reinvested.




**Purchases of Equity Securities** – During 2007, we repurchased 13,266,070 shares of our common stock at an average price of $115.66. During the first nine months of 2007, we repurchased 10,639,916 shares of our common stock at an average price per share of $112.68. The following table presents common stock repurchases during each month for the fourth quarter of 2007:

| *Period* | *Total Number of Shares Purchased [a]* | *Average Price Paid per Share* | *Total Number of Shares Purchased as Part of a Publicly Announced Plan or Program* | *Maximum Number of Shares That May Yet Be Purchased Under the Plan or Program [b]* |
|---|---|---|---|---|
| Oct. 1 through Oct. 31 ......... | 99,782 | $128.78 | - | 9,774,279 |
| Nov. 1 through Nov. 30 ....... | 540,294 | 124.70 | 528,000 | 9,246,279 |
| Dec. 1 through Dec. 31 ........ | 1,986,078 | 128.53 | 1,869,800 | 7,376,479 |
| Total..................................... | 2,626,154 | $127.75 | 2,397,800 | N/A |

*[a] Total number of shares purchased during the quarter includes 228,354 shares delivered or attested to UPC by employees to pay stock option exercise prices, satisfy excess tax withholding obligations for stock option exercises or vesting of retention units, and pay withholding obligations for vesting of retention shares.*

*[b] On January 30, 2007, our Board of Directors authorized us to repurchase up to 20 million shares of our common stock through December 31, 2009. We may make these repurchases on the open market or through other transactions. Our management has sole discretion with respect to determining the timing and amount of these transactions.*

## Item 6. Selected Financial Data

The following table presents as of, and for the years ended, December 31, our selected financial data for each of the last five years. The selected financial data should be read in conjunction with Management's Discussion and Analysis of Financial Condition and Results of Operations, Item 7, and with the Financial Statements and Supplementary Data, Item 8. The information below is not necessarily indicative of the results of future operations.

| *Millions of Dollars, Except per Share Amounts, Carloads, Employee Statistics, and Ratios* | ***2007*** | *2006* | *2005 [a]* | *2004 [b]* | *2003 [c]* |
|---|---|---|---|---|---|
| **For the Year Ended December 31** | | | | | |
| Operating revenue [d] | **$16,283** | $15,578 | $13,578 | $12,215 | $11,551 |
| Operating income | **3,375** | 2,884 | 1,795 | 1,295 | 2,133 |
| Income from continuing operations | **1,855** | 1,606 | 1,026 | 604 | 1,056 |
| Net income | **1,855** | 1,606 | 1,026 | 604 | 1,585 |
| Per share – basic: | | | | | |
| Income from continuing operations | **6.97** | 5.96 | 3.89 | 2.33 | 4.15 |
| Net income | **6.97** | 5.96 | 3.89 | 2.33 | 6.23 |
| Per share – diluted: | | | | | |
| Income from continuing operations | **6.91** | 5.91 | 3.85 | 2.30 | 4.07 |
| Net income | **6.91** | 5.91 | 3.85 | 2.30 | 6.04 |
| Dividends declared per share | **1.49** | 1.20 | 1.20 | 1.20 | 0.99 |
| Cash provided by operating activities | **3,277** | 2,880 | 2,595 | 2,257 | 2,443 |
| **At December 31** | | | | | |
| Total assets | **$38,033** | $36,515 | $35,620 | $34,596 | $33,496 |
| Debt due after one year | **7,543** | 6,000 | 6,760 | 7,981 | 7,822 |
| Common shareholders' equity | **15,585** | 15,312 | 13,707 | 12,655 | 12,354 |
| Equity per common share [e] | **59.74** | 56.68 | 51.41 | 48.58 | 47.85 |
| **Additional Data** | | | | | |
| Commodity revenue [d] | **$15,516** | $14,862 | $12,957 | $11,692 | $11,041 |
| Carloads (000) | **9,733** | 9,852 | 9,544 | 9,458 | 9,239 |
| Operating margin (%) [f] | **20.7** | 18.5 | 13.2 | 10.6 | 18.5 |
| Operating ratio (%) [f] | **79.3** | 81.5 | 86.8 | 89.4 | 81.5 |
| Average employees (000) | **50.1** | 50.7 | 49.7 | 48.3 | 46.4 |
| Operating revenue per employee (000) | **$ 325.0** | $ 307.2 | $ 273.2 | $ 252.9 | $ 248.9 |
| **Financial Ratios (%)** | | | | | |
| Debt to capital [g] | **33.0** | 30.7 | 35.1 | 39.1 | 39.3 |
| Return on average common shareholders' equity | **12.0** | 11.1 | 7.8 | 4.8 | 13.8 |

*[a] 2005 net income includes a $118 million tax expense reduction to reflect a reduction in the estimated deferred income tax liability.*

*[b] 2004 operating income and net income includes a $247 million pre-tax ($154 million after-tax) charge for unasserted asbestos-related claims.*

*[c] Net income and total assets include the effects of the disposition of all of our trucking interests in 2003.*

*[d] Includes fuel surcharge revenue of $1,478 million, $1,619 million, $963 million, $292 million, and $93 million for 2007, 2006, 2005, 2004, and 2003, respectively, which partially offsets increased operating expenses for fuel. 2007 fuel surcharge revenue is not comparable to prior periods due to implementation of new mileage-based fuel surcharge programs. See further discussion in Management's Discussion and Analysis of Financial Condition and Results of Operations – Results of Operations – Operating Revenue, Item 7.*

*[e] Equity per common share is calculated as follows: common shareholders' equity divided by common shares issued less treasury shares outstanding.*

*[f] Operating margin is defined as operating income divided by operating revenue. Operating ratio is defined as operating expenses divided by operating revenue.*

*[g] Debt to capital is determined as follows: total debt divided by total debt plus equity.*

## Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations

The following discussion should be read in conjunction with the Consolidated Financial Statements and applicable notes to the Financial Statements and Supplementary Data, Item 8, and other information in this report, including Risk Factors set forth in Item 1A and Critical Accounting Policies and Cautionary Information at the end of this Item 7.

The Railroad, along with its subsidiaries and rail affiliates, is our one reportable operating segment. Although we analyze revenue by commodity group, we analyze the net financial results of the Railroad as one segment due to the integrated nature of our rail network.

### EXECUTIVE SUMMARY

### 2007 Results

- **Safety –** We operated a safer railroad in 2007, improving safety for our employees, customers, and the public. The employee injury incident rate per 200,000 man-hours declined to its lowest level. A continued focus on derailment prevention in 2007 resulted in a 14% reduction in incidents, with associated costs declining 13%. In the area of public safety, we closed 482 grade crossings to reduce our exposure incidents, and we installed additional video cameras in our road locomotives. As a result of this installation work, we now have camera-equipped locomotives in the lead position of over 85% of our road trains. These video cameras allow us to better analyze grade crossing incidents, thereby increasing safety for our employees and the public. The number of grade crossing incidents decreased 9% during the year, despite the combination of increasing highway traffic and urban expansion. Also, through extensive trespass reduction programs, we were able to reduce trespasser incidents by 21%. All of these improvements are the result of comprehensive efforts to enhance employee training, increase public education, make capital investments, and take proactive steps to reduce safety risks.

- **Financial Performance –** In 2007, we generated record operating income of $3.4 billion despite lower volume. Yield increases, network management initiatives, and improved productivity drove the 17% increase in operating income. Our operating ratio was 79.3% for the year, a 2.2 point improvement compared to 2006. Net income of $1.86 billion also exceeded our previous milestone, translating into earnings of $6.91 per diluted share.

- **Commodity Revenue –** Our commodity revenue grew 4% year-over-year to $15.5 billion, the highest level in our history. We achieved record revenue levels in five of our six commodity groups, driven primarily by better pricing and fuel surcharges. Since 2004, we have repriced approximately 75% of our business. Volume decreased 1% in 2007 due to softening markets for some of our commodities and adverse weather conditions.

- **Network Operations –** In 2007, we significantly improved the fluidity and efficiency of our transportation network. Continued focus on increasing velocity, eliminating work events, improving asset utilization, and expanding capacity were key drivers of our operational improvement. We reduced average terminal dwell time by 8%, improved car utilization by 7%, and increased average train speed by 2% with ongoing enhancements to our Unified Plan (an ongoing program that streamlines segments of our transportation plan) and implementation of initiatives to make train processing at our terminals more efficient. We completed implementation of Customer Inventory Management System, an operational productivity initiative that complements the Unified Plan by reducing the number of rail cars in our terminals without adding capacity. We also expanded capacity and continued to use industrial engineering techniques to further improve network fluidity, ease capacity constraints, and improve asset utilization. Our customer satisfaction improved during 2007, an indication that efforts to improve network operations translated into better customer service.

- **Fuel Prices –** Crude oil prices increased at a steady rate in 2007, rising from a low of $56.58 per barrel in January to close at nearly $96.00 per barrel at the end of December. Our 2007 average fuel price increased by 9% and added $242 million of operating expenses compared to 2006. Our fuel surcharge programs are designed to help offset the impact of higher fuel prices. In addition, our fuel conservation efforts allowed us to improve our consumption rate by 2%. Locomotive simulator training, operating practices, and technology all contributed to this improvement, saving approximately 21 million gallons of fuel in 2007.

- **Free Cash Flow –** Cash generated by operating activities totaled a record $3.3 billion, yielding free cash flow of $487 million in 2007. Free cash flow is defined as cash provided by operating activities, less cash used in investing activities and dividends paid.

Free cash flow is not considered a financial measure under accounting principles generally accepted in the United States (GAAP) by SEC Regulation G and Item 10 of SEC Regulation S-K. We believe free cash flow is important in evaluating our financial performance and measures our ability to generate cash without additional external financings. Free cash flow should be considered in addition to, rather than as a substitute for, cash provided by operating activities. The following table reconciles cash provided by operating activities (GAAP measure) to free cash flow (non-GAAP measure):

| *Millions of Dollars* | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| Cash provided by operating activities | **$ 3,277** | $ 2,880 | $ 2,595 |
| Cash used in investing activities | **(2,426)** | (2,042) | (2,047) |
| Dividends paid | **(364)** | (322) | (314) |
| Free cash flow | **$ 487** | $ 516 | $ 234 |

**2008 Outlook**

- **Safety –** Operating a safe railroad benefits our employees, our customers, our shareholders, and the public. We will continue using a multi-faceted approach to safety, utilizing technology, risk assessment, quality control, and training for, and engaging with our employees. We plan to implement Total Safety Culture (TSC) throughout our operations. TSC, an employee-focused initiative that has helped improve safety, is a process designed to establish, maintain, and promote safety among co-workers. With respect to public safety, we will continue our efforts to maintain, upgrade, and close crossings, install video cameras on locomotives, and educate the public about crossing safety through various internal and industry programs, along with other activities.

- **Commodity Revenue –** Despite uncertainty regarding the U.S. economy, we expect record revenue in 2008 based on current economic indicators, forecasted demand, improved customer service, and additional opportunities to reprice certain of our business. Yield increases and fuel surcharges will be the primary drivers of commodity revenue growth in 2008. We expect that overall volume will fall within a range of 1% higher to 1% lower than 2007, with continued softness in some market sectors.

- **Transportation Plan –** In 2008, we will continue to evaluate traffic flows and network logistic patterns to identify additional opportunities to simplify operations and improve network efficiency and asset utilization. We plan to maintain adequate manpower and locomotives, improve productivity using industrial engineering techniques, and improve our operating margins.

- **Fuel Prices –** Fuel prices should remain volatile, with crude oil prices and conversion and regional spreads fluctuating throughout the year. On average, we expect fuel prices to increase 15% to 20% above the average price in 2007. To reduce the impact of fuel price on earnings, we will continue to seek recovery from our customers through our fuel surcharge programs and expand our fuel conservation efforts.

- **Capital Plan –** In 2008, we expect to make capital investments of approximately $3.1 billion (which may be revised if revenue, tax, or business conditions require changing, or new laws or regulations affect our ability to generate sufficient returns on, these investments). Major investment categories include $1.6 billion to maintain and improve track infrastructure; $840 million to increase network and terminal capacity; $490 million to upgrade our locomotive and freight car fleet, including the acquisition of 175 high-horsepower locomotives and new covered hoppers; and $170 million primarily to upgrade information technology systems, including the testing of positive train control, and other capital projects. We expect to fund our 2008 cash capital investments through cash generated from operations, the sale or lease of various operating and non-operating properties, debt issuances, and cash on hand at December 31, 2007. Our annual capital plan is a critical component of our long-term strategic plan, which we designed to enhance the long-term value of the Corporation for our shareholders by providing sufficient resources to (i) maintain and improve our existing track infrastructure to provide safe and fluid operations, (ii) increase network efficiency by adding or improving facilities and track, and (iii) make investments that meet customer demand and take advantage of opportunities for long-term growth.

- **Financial Expectations –** We are cautious about the economic environment; however, we anticipate revenue growth and continued network improvement in 2008, which should produce financial results that exceed 2007. We expect to generate earnings of $7.75 to $8.25 per diluted share and improve our operating ratio and return on invested capital.

## RESULTS OF OPERATIONS

### Operating Revenue

| *Millions of Dollars* | ***2007*** | *2006* | *2005* | ***% Change 2007 v 2006*** | *% Change 2006 v 2005* |
|---|---|---|---|---|---|
| Commodity revenue | **$15,516** | $14,862 | $12,957 | **4%** | 15% |
| Other revenue | **767** | 716 | 621 | **7** | 15 |
| Total | **$16,283** | $15,578 | $13,578 | **5%** | 15% |

Operating revenue includes commodity revenue and other revenue. The primary drivers of commodity revenue are volume (carloads) and average revenue per car (ARC). ARC varies with changes in price, commodity mix, and fuel surcharges. Other revenue consists primarily of revenue earned by our subsidiaries, revenue from our commuter rail operations, and accessorial revenue, which we earn when customers retain equipment owned or controlled by us or when we perform additional services such as switching or storage.

We recognize commodity revenue on a percentage-of-completion basis as freight moves from origin to destination. We allocate revenue between reporting periods based on the relative transit time in each reporting period and recognize expenses as we incur them. We recognize other revenue as service is performed or contractual obligations are met. We provide incentives to our customers for meeting or exceeding specified cumulative volumes or shipping to and from specific locations, which we record as a reduction to revenue based on the actual or projected future shipments.

Revenue from five of our six commodity groups increased during 2007, while revenue generated from industrial products shipments declined. ARC increased 6% during 2007 driven by core price improvement. Lower shipments of industrial and agricultural products drove volume down 1% in 2007, more than offsetting an increase in chemical shipments. Our fuel surcharge programs (excluding index-based contract escalators that contain some provision for fuel) generated $1.5 billion in commodity revenue in 2007. Fuel surcharge revenue is not comparable to prior periods due to implementation of new mileage-based fuel surcharge programs for certain traffic. As previously disclosed in our 2006 Annual Report on Form 10-K, the STB issued a decision limiting the manner in which U.S. railroads can calculate fuel surcharges on traffic regulated by the

STB. Effective April 26, 2007, we implemented new fuel surcharge programs covering this regulated traffic, which represents approximately 19% of our current revenue base. These new programs use mileage (as opposed to percent of revenue) as the basis for calculating fuel surcharges, and they use the On-Highway Diesel Price index – published by the Energy Information Administration – for purposes of determining fuel costs. The new programs affect fuel surcharges assessed for certain shipments of agricultural, chemical, and industrial products, and, to a lesser extent, coal. In addition, we reset the effective base fuel price at which our new mileage-based fuel surcharge programs take effect, resulting in a higher starting point of $2.30 per gallon versus $1.35 per gallon.

All six commodity groups produced double-digit revenue growth in 2006, including over 20% growth of revenue from agricultural commodities. Price increases, fuel surcharges, and index-based contract escalators, which are formulas in our shipping contracts that correlate price adjustments to certain economic indices, all contributed to higher ARC. Our fuel surcharge programs (excluding index-based contract escalators that contain some provision for fuel) generated an additional $656 million in commodity revenue compared to 2005, contributing 5% to commodity revenue growth. Volume increased 3% during the year, led by solid growth of intermodal and energy shipments, which were partially offset by lower shipments of industrial products and chemicals. Lower volume in 2005 due to the January West Coast storm, SPRB Joint Line disruptions, Hurricane Rita and the Kansas washouts also contributed to this year-over-year growth.

The following tables summarize the year-over-year changes in commodity revenue, revenue carloads, and ARC by commodity type:

| ***Commodity Revenue*** *Millions of Dollars* | ***2007*** | *2006* | *2005* | ***% Change 2007 v 2006*** | *% Change 2006 v 2005* |
|---|---|---|---|---|---|
| Agricultural | **$ 2,597** | $ 2,395 | $ 1,971 | **8%** | 22% |
| Automotive | **1,469** | 1,438 | 1,273 | **2** | 13 |
| Chemicals | **2,293** | 2,098 | 1,848 | **9** | 13 |
| Energy | **3,136** | 2,953 | 2,578 | **6** | 15 |
| Industrial Products | **3,110** | 3,168 | 2,814 | **(2)** | 13 |
| Intermodal | **2,911** | 2,810 | 2,473 | **4** | 14 |
| Total | **$15,516** | $14,862 | $12,957 | **4%** | 15% |

| ***Revenue Carloads*** *Thousands* | ***2007*** | *2006* | *2005* | ***% Change 2007 v 2006*** | *% Change 2006 v 2005* |
|---|---|---|---|---|---|
| Agricultural | **902** | 923 | 883 | **(2)%** | 5% |
| Automotive | **826** | 834 | 797 | **(1)** | 5 |
| Chemicals | **928** | 896 | 912 | **4** | (2) |
| Energy | **2,299** | 2,296 | 2,178 | **-** | 5 |
| Industrial Products | **1,325** | 1,446 | 1,503 | **(8)** | (4) |
| Intermodal | **3,453** | 3,457 | 3,271 | **-** | 6 |
| Total | **9,733** | 9,852 | 9,544 | **(1)%** | 3% |

| ***Average Revenue per Car*** | ***2007*** | *2006* | *2005* | ***% Change 2007 v 2006*** | *% Change 2006 v 2005* |
|---|---|---|---|---|---|
| Agricultural | **$ 2,880** | $ 2,595 | $ 2,233 | **11%** | 16% |
| Automotive | **1,779** | 1,724 | 1,598 | **3** | 8 |
| Chemicals | **2,471** | 2,342 | 2,026 | **6** | 16 |
| Energy | **1,364** | 1,286 | 1,184 | **6** | 9 |
| Industrial Products | **2,347** | 2,190 | 1,871 | **7** | 17 |
| Intermodal | **843** | 813 | 756 | **4** | 8 |
| Average | **$ 1,594** | $ 1,509 | $ 1,358 | **6%** | 11% |

*Agricultural* – Price increases were the primary drivers of agricultural commodity revenue in 2007, partially offset by a decline in volume levels. Shipments of whole grains used in feed declined as barge operators captured more shipments destined for export from the Gulf Coast due to both favorable barge rates and improved navigation conditions on the Mississippi River. Conversely, wheat and food grain shipments improved as a strong wheat crop generated record shipments to the Gulf Coast for export. Shipments of ethanol, a grain product used as an alternative fuel and fuel additive, and its co-products (primarily livestock feed) also increased substantially.




Price increases, volume growth, and fuel surcharges increased agricultural commodity revenue in 2006 versus 2005. Whole grains increased as strong gulf exports and higher freight charges for barge traffic shifted feed grain shipments to rails. Shipments of ethanol and its co-products (primarily livestock feed) also experienced strong growth, reflecting continued demand in this growing industry. Conversely, wheat shipments declined due to extremely low crop production levels in 2006 primarily due to drought conditions in wheat producing states. Price and fuel surcharge increases improved ARC in 2006.

*Automotive* – Price increases drove the growth in automotive revenue, partially offset by lower finished vehicle shipments. A decline in vehicle production levels primarily drove the volume decline. Conversely, automotive parts shipments grew due to increased volumes from domestic manufacturers, new business acquired in the middle of 2006, and our new intermodal train service between Mexico and Michigan.




Price increases, volume growth, and fuel surcharges increased automotive commodity revenue in 2006 over 2005. Shipments of finished vehicles grew as higher manufacturer inventories at the end of 2005 translated into record volume growth in 2006. Shipments remained relatively strong through the second quarter due to the production ramp-up of new models at plants served by us. Automotive parts shipments also grew due to conversion of traffic from trucks, new business growth, and production increases at several assembly plants served by us. Fuel surcharges and price increases drove the ARC improvement.

*Chemicals* – Price increases and volume growth drove the increase in revenue in 2007 versus 2006. Strong demand for potash exports through Pacific Northwest ports and a robust planting season for corn to supply ethanol producers increased demand for fertilizer shipments in 2007. New business acquired in June 2007 contributed to more shipments of plastics. Soda ash volume increased as export demand grew in the Gulf area and Mexico. Lower production at Canadian locations during the year boosted shipments of liquid and dry chemicals from U.S. sources.




Price increases, fuel surcharges, and index-based contract escalators drove the increase in revenue and ARC in 2006 versus 2005. Fewer fertilizer shipments largely drove the volume decrease. Wet weather conditions in the Midwest led to weak demand during the fall planting season. In addition, softer export markets for potash, a fertilizer product, also led to reduced volumes. Business interruptions in the third quarter of 2005, primarily attributable to Hurricane Rita, reduced chemicals shipments leading to favorable volume comparisons in 2006.

*Energy* – Price increases during 2007 improved both revenue and ARC over 2006 levels. Volume was flat, however, as severe storms in the first quarter and heavy rains in May flooded coal pits in the SPRB, which closed several rail lines and reduced volume levels. Shipments from the Colorado and Utah mines were down 1% due to lower mine production, predominately in the fourth quarter of 2007.




Price increases, fuel surcharges, and index-based contract escalators primarily drove the increases in revenue and ARC in 2006 over 2005. Volume increases also contributed to revenue growth as coal shipments from the SPRB mines improved 8% during the year. These increases in 2006 partially reflect lower volume levels in 2005, as SPRB Joint Line disruptions, network disruptions resulting from Hurricane Rita, and the October Kansas washouts hampered coal shipments in 2005. Conversely, shipments from the Colorado and Utah mines declined 6% in 2006 due to mine shutdowns during the first quarter of 2006, along with the impact of mining production problems and network maintenance throughout the third quarter of 2006.




*Industrial Products* – Volume declines more than offset price increases, driving industrial products revenue lower in 2007 compared to 2006. Continued softening of the housing construction market, surplus inventories, and general market uncertainty resulted in lower lumber shipments. Delays of rail expansion projects, customer production problems, unfavorable weather, and the ongoing impact of a weak residential construction market reduced stone shipments during the year.

Price increases and fuel surcharges improved revenue and ARC in 2006 over 2005. Volume levels declined due to lower lumber, paper, and newsprint shipments, which were partially offset by higher steel shipments. The softening of the housing construction market, lower production levels, and general market uncertainty drove the reduction in lumber shipments. Conversely, strong domestic markets throughout most of the year drove the increase in construction-related steel material and pipe, particularly those materials used in oil and gas drilling. Hurricane Rita reduced shipment volumes of industrial products in 2005, which favorably affected volume comparisons with 2006.




*Intermodal* – Price increases improved intermodal revenue in 2007 compared to 2006. Volume was flat versus 2006 as increased domestic traffic due to new service offerings and increased business under some of our older, long-term contracts were offset by a decrease of premium shipments. International traffic was flat in 2007 compared to 2006 due to general softening of imports from Asia.

Record volume growth, fuel surcharges, price increases, and index-based contract escalators combined to improve revenue in 2006 over 2005, in addition to the favorable impact from weaker intermodal revenue during 2005 due to the January West Coast storm. Carloadings grew due to strong imports, primarily from Asia, partially offset by decreased domestic traffic. ARC improved due to price increases, fuel surcharges, and contract escalators.

*Mexico Business* – Each of our commodity groups includes revenue from shipments to and from Mexico. Revenue from Mexico business increased 5% to $1.44 billion in 2007 compared to 2006. Price increases and more shipments of automotive parts and intermodal containers drove revenue growth in 2007. Volume declines in cement, some agricultural products, and newsprint shipments partially offset the increases.

Revenue from Mexico business increased 23% to $1.37 billion in 2006 compared to 2005. Price increases, fuel surcharges, and increased shipments of finished vehicles, automotive parts, import beer, dry feed ingredients, and intermodal drove revenue growth in 2006. Volume declines in coal, newsprint, and sulfur shipments partially offset the increases.

**Operating Expenses**

| *Millions of Dollars* | ***2007*** | *2006* | *2005* | ***% Change 2007 v 2006*** | *% Change 2006 v 2005* |
|---|---|---|---|---|---|
| Salaries, wages, and employee benefits.. | **$ 4,591** | $ 4,599 | $ 4,375 | **-%** | 5% |
| Fuel and utilities | **3,164** | 3,012 | 2,562 | **5** | 18 |
| Equipment and other rents | **1,423** | 1,455 | 1,402 | **(2)** | 4 |
| Depreciation | **1,321** | 1,237 | 1,175 | **7** | 5 |
| Materials and supplies | **714** | 691 | 546 | **3** | 27 |
| Casualty costs | **321** | 410 | 411 | **(22)** | - |
| Purchased services and other costs | **1,374** | 1,290 | 1,312 | **7** | (2) |
| Total | **$12,908** | $12,694 | $11,783 | **2%** | 8% |

Operating expenses increased $214 million in 2007. Higher fuel prices, which rose 9% during the period, increased operating expenses by $242 million. Wage, benefit and materials inflation and higher depreciation expense also increased expenses during the year. Productivity improvements, better resource utilization, and a lower fuel consumption rate helped offset these increases.




Operating expenses increased $911 million in 2006. Higher fuel prices, which rose 16% during the period, accounted for $393 million of the increase. Our fuel surcharge programs helped offset these expenses in the form of higher revenue. Wages, benefits, and materials and supplies inflation; a larger workforce; volume-related expenses; and higher locomotive and freight car maintenance and lease expenses accounted for most of the additional increase in 2006. Settlement of all remaining insurance claims related to the January 2005 West Coast storm, an improved fuel consumption rate, and improved car cycle times (which reduced freight car rental expense) partially offset the cost increases. Additional clean-up and restoration costs for the January 2005 West Coast storm favorably affects comparison of 2006 operating expenses with those in 2005.

*Salaries, Wages, and Employee Benefits* – Operational improvements and lower volume levels led to a 1% decline in our workforce, saving $79 million in 2007. A smaller workforce and less need for new train personnel reduced training costs during the year, which contributed to the improvement. General wage and benefit inflation mostly offset the reductions, reflecting higher salaries and wages and the impact of higher healthcare and other benefit costs.

General wage and benefit inflation increased expenses in 2006, reflecting higher salaries and wages and the impact of higher healthcare and other benefit costs. A larger workforce, driven by higher volume levels, and stock option expense required by new accounting rules also contributed to higher expenses. Conversely, reduced protection costs and operational improvements, boosted by network management initiatives and investment in capacity, partially offset these increases. Protection costs represent the differential payment when the wage earned for active employment is lower than an employee's protected rate of pay. An individual's protected rate is imposed by the STB for employees adversely affected by a merger or is established by collective bargaining agreements with our labor unions in certain cases. Additionally, we incurred higher labor expenses in 2005 for clean-up and restoration of property damaged by the January West Coast storm.

*Fuel and Utilities* – Fuel and utilities include locomotive fuel, utilities other than telephone, and gasoline and other fuels. Higher diesel fuel prices, which averaged $2.24 per gallon (including taxes and transportation

costs) in 2007 compared to $2.06 per gallon in 2006, increased expenses by $242 million. A 2% improvement of our fuel consumption rate resulting from the use of newer, more fuel-efficient locomotives and our fuel conservation programs reduced fuel expense by $43 million, and a 2% decrease of gross ton miles reduced fuel expense by an additional $53 million.

Higher diesel fuel prices, which averaged $2.06 per gallon (including taxes and transportation costs) in 2006 compared to $1.77 per gallon in 2005, increased expenses by $393 million during 2006. A 3% increase in gross ton-miles resulted in $63 million of additional expenses, which was partially offset by a 2% improvement in our fuel consumption rate due to the use of newer, more fuel-efficient locomotives and our fuel conservation programs. As noted above (and described in this Item 7), we offset a significant portion of increased locomotive fuel expenses through revenue from fuel surcharges. Gasoline, utilities, and propane and other fuel expenses increased $20 million in 2006 due to higher prices and increased usage.

*Equipment and Other Rents* – Equipment and other rents includes primarily rental expense we pay for freight cars owned by other railroads or private companies; freight car, intermodal, and locomotive leases; other specialty equipment leases; and office and other rentals. Fewer shipments of industrial products, combined with improved car-cycle times, which reflect operational improvement and better asset utilization, reduced our short-term freight car rental expense by $46 million in 2007 compared to 2006. Lower lease expenses for freight cars, intermodal containers, and fleet vehicles and equipment decreased costs by $20 million in 2007. Conversely, higher locomotive lease expense resulted in a $33 million increase in costs during the year.

Lease expense increased in 2006 compared to 2005 as we leased more locomotives and freight cars. Growth in automotive and intermodal shipments also increased our short-term freight car rental expense. Improved car-cycle times driven by network management initiatives partially offset this increase.

*Depreciation* – The majority of depreciation relates to track structure, including rail, ties, and other track material. A higher depreciable asset base, reflecting higher capital spending in recent years, increased depreciation expense in 2007 and 2006.

*Materials and Supplies* – Materials used to maintain our lines, structures, and equipment are the principal components of materials and supplies expense. This expense item also includes small tools, office supplies, other materials, and the costs of freight services to ship supplies and materials. Increased use of higher cost components to repair and maintain our fleet of locomotives (including a growing number of units not covered by warranties) added $32 million to materials and supplies expense during 2007. Conversely, we used fewer parts for freight car repairs due to program maintenance scheduling, which lowered costs by $11 million and partially offset the increase for 2007.

We used more repair materials at higher component costs to repair and maintain freight cars and locomotives in 2006, including a growing number of units not covered by warranties. In addition, we performed more maintenance on locomotives that were maintained internally and not subject to maintenance contracts with third-party contractors compared to 2005.

*Casualty Costs* – Personal injury costs, freight and property damage, insurance, and environmental expense are the primary components of casualty costs. Casualty costs were lower in 2007 compared to 2006 driven primarily by a reduction in personal injury expense. Actuarial studies completed during 2007 resulted in a reduction in personal injury expense of approximately $80 million, which was partially offset by an adverse development with respect to one claim.

Costs were flat in 2006 compared to 2005 as lower bad debt expenses, lower freight damage expenses, and lower expenses for destruction of foreign or leased equipment all offset increased personal injury costs and higher settlement expenses.

*Purchased Services and Other Costs* – Purchased services and other costs include expenses associated with outside contractors, state and local taxes, net costs of operating facilities jointly used with other railroads,

transportation and lodging for train crew employees, trucking and contracting costs for intermodal containers, leased automobile maintenance expenses, telephone and cellular expense, employee travel expense, and computer and other general expenses. Higher consulting fees and higher contract expenses (including equipment maintenance) increased costs by $58 million. In addition, crew transportation and lodging costs increased $17 million in 2007 due to higher gas prices and rate inflation. Conversely, lower drayage expense of $13 million, settlement of insurance claims in 2007 related to Hurricane Rita, and higher equity income partially offset these increases. In addition, the year-over-year comparison was affected by the settlement of insurance claims totaling $23 million in 2006 related to the January 2005 West Coast storm and a $9 million gain in 2006 from the sale of two Company-owned airplanes.

Volume-related expenses, including crew transportation and lodging costs, increased in 2006 driven by 3% growth in carloads. Higher state and local taxes (primarily sales and use taxes related to higher diesel fuel prices) also increased expenses in 2006 compared to 2005. Conversely, lower locomotive contract maintenance costs and lower expenses associated with jointly-owned operating facilities reduced expenses in 2006 compared to 2005. Settlement of all remaining insurance claims related to the January 2005 West Coast storm and the gain from the sale of two airplanes also reduced expenses in 2006. Finally, clean-up and restoration costs related to the January West Coast storm increased expenses in 2005.

**Non-Operating Items**

| *Millions of Dollars* | ***2007*** | *2006* | *2005* | ***% Change 2007 v 2006*** | *% Change 2006 v 2005* |
|---|---|---|---|---|---|
| Other income | **$ 116** | $ 118 | $ 145 | **(2)%** | (19)% |
| Interest expense | **(482)** | (477) | (504) | **1** | (5) |
| Income taxes | **(1,154)** | (919) | (410) | **26** | 124 |

*Other Income* – Lower net gains from non-operating asset sales (primarily real estate) drove the reduction in other income in 2007. Recognition of rental income in 2006 from the settlement of a rent dispute also contributed to the year-over-year decrease in other income. Cash investment returns increased $21 million due to larger cash balances and higher interest rates.

Lower net gains from non-operating asset sales (primarily real estate) and higher expenses due to rising interest rates associated with our sale of receivables program resulted in a reduction in other income in 2006, which was partially offset by higher rental income for the use of our right-of-way (including 2006 settlements of rate disputes from prior years) and cash investment returns due to higher interest rates.

*Interest Expense* – Higher interest expense in 2007 was driven by an increase in the weighted-average debt levels of $7.3 billion, compared to $7.1 billion in 2006. A lower effective interest rate of 6.6% in 2007, compared to 6.7% in 2006, partially offset the effects of the higher debt level.

Lower interest expense in 2006 was due to a decline in the weighted-average debt level from $7.8 billion in 2005 to $7.1 billion in 2006. A higher effective interest rate of 6.7% in 2006, compared to 6.5% in 2005, partially offset the effects of the declining debt level.

*Income Taxes* – Income taxes were $235 million higher in 2007, due primarily to higher pre-tax income and the effect of new tax legislation in the State of Illinois that changed how we determine the amount of our income subject to Illinois tax. The Illinois legislation increased our deferred tax expense by $27 million in 2007. Our effective tax rates were 38.4% and 36.4% in 2007 and 2006, respectively.

Income tax expense was $509 million higher in 2006 than 2005. Higher pre-tax income resulted in additional taxes of $414 million and $118 million of the increase resulted from a reduction of deferred tax expense in 2005. Final settlements of pre-1995 tax years and Internal Revenue Service Examination Reports for 1995

through 2002, among other things, resulted in the $118 million reduction in 2005. Our effective tax rate was 36.4% and 28.6% in 2006 and 2005, respectively.

## OTHER OPERATING/PERFORMANCE AND FINANCIAL STATISTICS

We report key Railroad performance measures weekly to the Association of American Railroads (AAR), including carloads, average daily inventory of rail cars on our system, average train speed, and average terminal dwell time. We provide this data on our website at www.up.com/investors/reports/index.shtml.

### Operating/Performance Statistics

Railroad performance measures reported to the AAR, as well as other performance measures, are included in the table below:

| | ***2007*** | *2006* | *2005* | ***% Change 2007 v 2006*** | *% Change 2006 v 2005* |
|---|---|---|---|---|---|
| Avg. train speed (miles per hour) | **21.8** | 21.4 | 21.1 | **2 %** | 1 % |
| Avg. terminal dwell time (hours) | **25.1** | 27.2 | 28.7 | **(8) %** | (5) % |
| Gross ton-miles (billions) | **1,052.3** | 1,072.5 | 1,043.9 | **(2) %** | 3 % |
| Revenue ton-miles (billions) | **561.8** | 565.2 | 548.8 | **(1) %** | 3 % |
| Operating ratio | **79.3** | 81.5 | 86.8 | **2.2 pt** | 5.3 pt |
| Avg. full-time-equivalent employees | **50,089** | 50,739 | 49,747 | **(1) %** | 2 % |
| Customer satisfaction index | **79** | 72 | 64 | **7 pt** | 8 pt |

*Average Train Speed* – Average train speed is calculated by dividing train miles by hours operated on our main lines between terminals. Ongoing network management initiatives and capacity expansion contributed to 2% and 1% improvements of average train speed during 2007 and 2006, respectively.

*Average Terminal Dwell Time* – Average terminal dwell time is the average time that a rail car spends at our terminals. Lower average terminal dwell time is favorable. Average terminal dwell improved 8% and 5% in 2007 and 2006, respectively, as a result of ongoing management initiatives and directed efforts to more timely deliver rail cars to our interchange partners and customers. Average terminal dwell time was also impacted by 1% lower volume levels in 2007 and a 3% increase in volume levels during 2006.

*Gross and Revenue Ton-Miles* – Gross ton-miles are calculated by multiplying the weight of loaded or empty freight cars by the number of miles hauled. Revenue ton-miles are calculated by multiplying the weight of freight by the number of tariff miles. Revenue ton-miles declined 1% in relation to the 1% reduction in carloadings in 2007 compared to 2006. Gross ton-miles decreased 2% in 2007 driven by a mix shift in freight shipments. In 2006, gross and revenue-ton miles grew 3% in relation to the 3% increase in carloadings as volume was balanced between the higher and lower density commodities.

*Operating Ratio* – Operating ratio is defined as our operating expenses as a percentage of revenue. Our operating ratio improved 2.2 points to 79.3% in 2007 as a result of yield increases, network management initiatives, and improved productivity. In 2006, our operating ratio improved 5.3 points to 81.5% as a result of solid demand, yield increases, and improved operational efficiency.

*Average Full-Time-Equivalent Employees* – Lower employee levels in 2007 versus 2006 resulted from fewer train and engine personnel due to improved network productivity and 1% lower volume levels, partially offset by more employees maintaining our larger locomotive fleet. The larger full-time-equivalent number in 2006, included more people to maintain our larger locomotive and freight car fleet, more employees needed for increased track repair and maintenance programs, more operations management personnel (including an expanded management training program), and more train and engine personnel to meet demand levels.

*Customer Satisfaction Index* – The customer satisfaction survey asks customers to rate how satisfied they are with our performance over the last 12 months on a variety of attributes. A higher score indicates higher customer satisfaction. The improvement in survey results in 2007 and 2006 generally reflects customer recognition of our improving service.

**Return on Average Common Shareholders' Equity**

| *Millions of Dollars, Except Percentages* | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| Net income | **$ 1,855** | $ 1,606 | $ 1,026 |
| Average equity | **$15,448** | $14,510 | $13,181 |
| Return on average common shareholders' equity | **12.0%** | 11.1% | 7.8% |

**Return on Invested Capital as Adjusted (ROIC)**

| *Millions of Dollars, Except Percentages* | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| Net income | **$ 1,855** | $ 1,606 | $ 1,026 |
| Add: Interest expense | **482** | 477 | 504 |
| Add: Sale of receivables fees | **35** | 33 | 23 |
| Add: Interest on present value of operating leases | **292** | 268 | 218 |
| Less: Taxes on interest and fees | **(310)** | (283) | (213) |
| Net operating profit after taxes as adjusted (a) | **$ 2,354** | $ 2,101 | $ 1,558 |
| Average equity | **$15,448** | $14,510 | $13,181 |
| Add: Average debt | **7,232** | 7,098 | 7,774 |
| Add: Average value of sold receivables | **600** | 600 | 595 |
| Add: Average present value of operating leases | **3,648** | 3,349 | 2,729 |
| Average invested capital as adjusted (b) | **$26,928** | $25,557 | $24,279 |
| Return on invested capital as adjusted (a/b) | **8.7%** | 8.2% | 6.4% |

ROIC is considered a non-GAAP financial measure by SEC Regulation G and Item 10 of SEC Regulation S-K. We believe this measure is important in evaluating the efficiency and effectiveness of the Corporation's long-term capital investments, and we currently use ROIC as a performance criteria in determining certain elements of equity compensation for our executives. ROIC should be considered in addition to, rather than as a substitute for, other information provided in accordance with GAAP. A comparable GAAP measure is Return on Average Common Shareholders' Equity. The tables above provide a reconciliation from return on average common shareholders' equity to ROIC.

**Debt to Capital / Adjusted Debt to Capital**

| *Millions of Dollars, Except Percentages* | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| Debt (a) | **$ 7,682** | $ 6,780 | $ 7,416 |
| Equity | **15,585** | 15,312 | 13,707 |
| Capital (b) | **$23,267** | $22,092 | $21,123 |
| Debt to capital (a/b) | **33.0%** | 30.7% | 35.1% |

| *Millions of Dollars, Except Percentages* | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| Debt | **$ 7,682** | $ 6,780 | $ 7,416 |
| Value of sold receivables | **600** | 600 | 600 |
| Net present value of operating leases | **3,783** | 3,513 | 3,185 |
| Adjusted debt (a) | **$12,065** | $10,893 | $11,201 |
| Equity | **15,585** | 15,312 | 13,707 |
| Adjusted capital (b) | **$27,650** | $26,205 | $24,908 |
| Adjusted debt to capital (a/b) | **43.6%** | 41.6% | 45.0% |

Adjusted debt to capital is a non-GAAP financial measure under SEC Regulation G and Item 10 of SEC Regulation S-K. We believe this measure is important to management and investors in evaluating the total amount of leverage in our capital structure, including off-balance sheet lease obligations, which we generally incur in connection with financing the acquisition of locomotives and freight cars and certain facilities. We monitor the ratio of adjusted debt to capital as we manage our capital structure to balance cost-effective and efficient access to the capital markets with the Corporation's overall cost of capital. Adjusted debt to capital should be considered in addition to, rather than as a substitute for, debt to capital. The tables above provide a reconciliation from debt to capital to adjusted debt to capital. Our December 31, 2007, debt to capital ratios increased as a result of a $902 million increase in debt from December 31, 2006, and purchases of our common stock under our share repurchase program, partially offset by an increase in retained earnings due to higher earnings in 2007.

**LIQUIDITY AND CAPITAL RESOURCES**

As of December 31, 2007, our principal sources of liquidity included cash, cash equivalents, the sale of certain receivables, an uncommitted line of credit, and our revolving credit facility, as well as the availability of commercial paper and other sources of financing through the capital markets. We had $1.9 billion of committed credit available under our credit facility, with no borrowings outstanding as of December 31, 2007. We did not make any short-term borrowings under this facility during the year. We also had a $75 million uncommitted line of credit available, which was not used during the year. The value of the outstanding undivided interest held by investors under the sale of receivables program was $600 million as of December 31, 2007. The sale of receivables program is subject to certain requirements, including maintenance of an investment grade bond rating. If our bond rating were to deteriorate, it could have an adverse impact on our liquidity. Access to commercial paper as well as other capital market financings is dependent on market conditions. Deterioration of our operating results or financial condition due to internal or external factors could negatively impact our ability to utilize commercial paper as a source of liquidity. Liquidity through the capital markets is also dependent on our financial stability.

At December 31, 2007, and December 31, 2006, we had working capital deficits of approximately $0.4 billion and $1.1 billion, respectively. A working capital deficit is common in our industry and does not indicate a lack of liquidity. We maintain adequate resources to meet our daily cash requirements, and we have sufficient financial capacity to satisfy our current liabilities.

**Financial Condition**

| ***Cash Flows*** *Millions of Dollars* | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| Cash provided by operating activities | **$ 3,277** | $ 2,880 | $ 2,595 |
| Cash used in investing activities | **(2,426)** | (2,042) | (2,047) |
| Cash used in financing activities | **(800)** | (784) | (752) |
| Net change in cash and cash equivalents | **$ 51** | $ 54 | $ (204) |

*Cash Provided by Operating Activities* – We generated higher income in 2007, which was the primary driver of the increase of cash provided by operating activities. Pension contributions in 2006 totaling $150 million also contributed to the year-over-year increase. These increases were partially offset by cash payments representing prior period wage increases in accordance with recent union contract ratifications and higher income tax payments.

Higher income in 2006 generated the increased cash provided by operating activities, which was partially offset by higher income tax payments, $150 million in voluntary pension contributions, higher material and supply inventories, and higher management incentive payments.

*Cash Used in Investing Activities* – Higher capital investments and work in process balances drove the increase in cash used in investing in 2007. The third quarter of 2006 included insurance settlement proceeds for property damages resulting from the 2005 West Coast storm.

An insurance settlement for the January 2005 West Coast storm and lower balances for work in process decreased the amount of cash used in investing activities in 2006. Higher capital investments and lower proceeds from asset sales partially offset this decrease.

*Cash Used in Financing Activities* – The increase in cash used in financing activities resulted primarily from the use of $1.4 billion to repurchase common shares, payment of higher dividends, and lower net proceeds from equity compensation plans ($71 million in 2007 compared to $160 million in 2006). These increases were mostly offset by debt issuances of $1.6 billion in 2007 compared to no issuances in 2006. The increase in cash used in financing activities in 2006 resulted primarily from lower net proceeds from equity compensation plans ($160 million in 2006 compared to $262 million in 2005).

The table below details cash capital investments for the years ended December 31, 2007, 2006, and 2005.

| *Millions of Dollars* | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| Track | **$1,593** | $1,487 | $1,472 |
| Capacity and commercial facilities | **534** | 510 | 509 |
| Locomotives and freight cars | **263** | 135 | 98 |
| Other | **106** | 110 | 90 |
| Total | **$2,496** | $2,242 | $2,169 |

In 2008, we expect our total capital investments to be approximately $3.1 billion (which may be revised if revenue, tax, or business conditions require changing, or new laws or regulations affect our ability to generate sufficient returns on, these investments). Major investment categories include $1.6 billion to maintain and improve track infrastructure; $840 million to increase network and terminal capacity; $490 million to upgrade our locomotive and freight car fleet, including the acquisition of 175 high-horsepower locomotives and new covered hoppers; and $170 million primarily to upgrade information technology systems, including the testing of positive train control, and other capital projects. We expect to fund our 2008 cash capital investments

through cash generated from operations, the sale or lease of various operating and non-operating properties, debt issuances, and cash on hand at December 31, 2007. Our annual capital plan is a critical component of our long-term strategic plan, which we designed to enhance the long-term value of the Corporation for our shareholders by providing sufficient resources to (i) maintain and improve our existing track infrastructure to provide safe and fluid operations, (ii) increase network efficiency by adding or improving facilities and track, and (iii) make investments that meet customer demand and take advantage of opportunities for long-term growth.

For each of the years ended December 31, 2007, 2006, and 2005, our ratio of earnings to fixed charges was 5.1, 4.4, and 2.9, respectively. The increases in 2007 and 2006 were driven by higher net income. The ratio of earnings to fixed charges was computed on a consolidated basis. Earnings represent income from continuing operations, less equity earnings net of distributions, plus fixed charges and income taxes. Fixed charges represent interest charges, amortization of debt discount, and the estimated amount representing the interest portion of rental charges. See Exhibit 12 for the calculation of the ratio of earnings to fixed charges.

**Financing Activities**

**Credit Facilities –** On December 31, 2007, $1.9 billion of credit was available under our revolving credit facility (the facility), which we entered into on April 20, 2007. The facility is designated for general corporate purposes and supports the issuance of commercial paper. We did not draw on the facility during 2007. Commitment fees and interest rates payable under the facility are similar to fees and rates available to comparably rated, investment-grade borrowers. The facility allows for borrowings at floating rates based on London Interbank Offered Rates, plus a spread, depending upon our senior unsecured debt ratings. The facility requires the maintenance of a debt to net worth coverage ratio. At December 31, 2007, we were in compliance with this covenant. The facility does not include any other financial restrictions, credit rating triggers (other than rating-dependent pricing), or any other provision that could require us to post collateral. The facility, which expires in April 2012, replaced two $1 billion, 5-year facilities with terms ending in March 2009 and March 2010. The facility includes terms that are comparable with those of the prior facilities, although the minimum net worth requirement of $7.5 billion in prior facilities was removed, and the facility includes a change-of-control provision.

In addition to our revolving credit facility, a $75 million uncommitted line of credit was available. The line of credit expires in April 2008, and was not used in 2007. We must have equivalent credit available under our five-year facility to draw on this $75 million line.

At December 31, 2007, we reclassified as long-term debt approximately $550 million of debt due within one year that we intend to refinance. This reclassification reflected our ability and intent to refinance any short-term borrowings and certain current maturities of long-term debt on a long-term basis. At December 31, 2006, we did not reclassify any short-term debt as long-term debt as we did not intend to refinance at that time.

**Dividends –** On November 15, 2007, we increased the quarterly dividend to $0.44 per share, payable beginning on January 2, 2008, to shareholders of record on November 29, 2007. We expect to fund the increase in the quarterly dividend through cash generated from operations, the sale or lease of various operating and non-operating properties, and cash on hand at December 31, 2007.

**Dividend Restrictions –** Our revolving credit facility includes a debt-to-net worth covenant that, under certain circumstances, restricts the payment of cash dividends to our shareholders. The amount of retained earnings available for dividends was $11.5 billion and $7.8 billion at December 31, 2007 and December 31, 2006, respectively. This facility replaced two credit facilities that had minimum net worth covenants that were more restrictive with respect to the amount of retained earnings available for dividends at December 31, 2006.

**Share Repurchase Program –** On January 30, 2007, our Board of Directors authorized the repurchase of up to 20 million shares of Union Pacific Corporation common stock through the end of 2009. Management's

assessments of market conditions and other pertinent facts guide the timing and volume of all repurchases. We expect to fund our common stock repurchases through cash generated from operations, the sale or lease of various operating and non-operating properties, debt issuances, and cash on hand at December 31, 2007.

During 2007, we repurchased approximately 13 million shares under this program at an aggregate purchase price of approximately $1.5 billion. These shares were recorded in treasury stock at cost, which includes any applicable commissions and fees.

**Shelf Registration Statement and Significant New Borrowings** – Our Board of Directors authorized the issuance of up to $3 billion of debt securities pursuant to a new shelf registration statement, which became effective on March 6, 2007, replacing the $500 million of authority remaining under our shelf registration filed in December 2003. Under the current shelf registration, we may issue, from time to time, any combination of debt securities, preferred stock, common stock, or warrants for debt securities or preferred stock in one or more offerings.

We have issued the following unsecured, fixed-rate debt securities under our current shelf registration:

| *Date* | *Description of Securities* |
|---|---|
| Issued during 2007: | |
| April 18, 2007 | $250 million of 5.65% Notes due May 1, 2017 |
| April 18, 2007 | $250 million of 6.15% Debentures due May 1, 2037 |
| August 24, 2007 | $500 million of 5.45% Notes due January 31, 2013 |
| October 30, 2007 | $500 million of 5.75% Notes due November 15, 2017 |
| Issued subsequent to 2007: | |
| February 5, 2008 | $750 million of 5.70% Notes due August 15, 2018 |

The net proceeds from these offerings are for general corporate purposes, including the repurchase of common stock pursuant to our share repurchase program. These debt securities include change-of-control provisions. We have no immediate plans to issue equity securities; however, we will continue to explore opportunities to replace existing debt or access capital through issuances of debt securities under our shelf registration, and, therefore, we may issue additional debt securities at any time.

**Operating Lease Activities**

During 2007, the Railroad, as lessee, entered into long-term operating lease arrangements covering 259 locomotives and 150 rail cars, with a total equipment cost of approximately $538 million. In total, these new lease arrangements will provide for minimum rental payments of approximately $831 million, with a present value of approximately $434 million.

The lessors financed the purchase of the locomotives and freight cars, in part, by issuing equipment notes that are non-recourse to the Railroad and are secured by assignments of the underlying leases and security interests in the equipment. The Corporation and the Railroad do not guaranty payment of the equipment notes. The Railroad's obligations to make operating lease payments under the leases are recourse obligations and are not recorded in the Consolidated Statements of Financial Position.

The Railroad has certain renewal and purchase options with respect to the locomotives and freight cars. If the Railroad does not exercise these options, the equipment will be returned to the lessors at the end of the lease term.

**Contractual Obligations and Commitments**

As described in the notes to the Consolidated Financial Statements and as referenced in the tables below, we have contractual obligations and commercial commitments that may affect our financial condition. However, based on our assessment of the underlying provisions and circumstances of our contractual obligations and commercial commitments, including material sources of off-balance sheet and structured finance arrangements, there is no known trend, demand, commitment, event, or uncertainty that is reasonably likely to occur that would have a material adverse effect on our consolidated results of operations, financial condition, or liquidity. In addition, our commercial obligations, financings, and commitments are customary transactions that are similar to those of other comparable corporations, particularly within the transportation industry.

The following tables identify material obligations and commitments as of December 31, 2007:

| *Contractual Obligations* *Millions of Dollars* | *Total* | *Payments Due by December 31,* *2008* | *2009* | *2010* | *2011* | *2012* | *After 2012* | *Other* |
|---|---|---|---|---|---|---|---|---|
| Debt [a] | $10,747 | $ 974 | $ 789 | $ 701 | $ 750 | $ 944 | $ 6,589 | $ - |
| Operating leases | 6,021 | 639 | 600 | 554 | 522 | 417 | 3,289 | - |
| Capital lease obligations [b] | 1,845 | 181 | 179 | 160 | 165 | 106 | 1,054 | - |
| Purchase obligations [c] | 3,927 | 991 | 649 | 279 | 244 | 223 | 1,541 | - |
| Other post retirement benefits [d] | 396 | 39 | 40 | 41 | 41 | 41 | 194 | - |
| Income tax contingencies [e] | 161 | 140 | - | - | - | - | - | 21 |
| Total contractual obligations | $23,097 | $2,964 | $2,257 | $1,735 | $1,722 | $1,731 | $12,667 | $21 |

*[a] Excludes capital lease obligations of $1,219 million, unamortized discount of $(104) million, and market value adjustments of $2 million for debt with qualifying hedges that are recorded as liabilities on the Consolidated Statements of Financial Position. Includes an interest component of $4,182 million.*
*[b] Represents total obligations, including interest component of $626 million.*
*[c] Purchase obligations include locomotive maintenance contracts; purchase commitments for locomotives, ties, ballast, and track; and agreements to purchase other goods and services.*
*[d] Includes estimated other postretirement, medical, and life insurance payments and payments made under the unfunded pension plan for the next ten years. No amounts are included for funded pension as no contributions are currently required.*
*[e] Future cash flows for income tax contingencies reflect the recorded liability, including interest and penalties, in accordance with FIN 48 as of December 31, 2007. Where we can reasonably estimate the years in which these liabilities may be settled, this is shown in the table. For amounts where we can not reasonably estimate the year of settlement, they are reflected in the Other column.*

| *Other Commercial Commitments* *Millions of Dollars* | *Total* | *Amount of Commitment Expiration per Period* *2008* | *2009* | *2010* | *2011* | *2012* | *After 2012* |
|---|---|---|---|---|---|---|---|
| Credit facilities [a] | $1,975 | $ 75 | $ - | $ - | $ - | $1,900 | $ - |
| Sale of receivables [b] | 600 | 600 | - | - | - | - | - |
| Guarantees [c] | 465 | 15 | 19 | 46 | 76 | 22 | 287 |
| Standby letters of credit [d] | 27 | 10 | 17 | - | - | - | - |
| Total commercial commitments | $3,067 | $700 | $36 | $46 | $76 | $1,922 | $287 |

*[a] The $75 million line of credit requires equivalent credit available under the revolving credit facility. None of the credit facilities were used as of December 31, 2007.*
*[b] $600 million of the sale of receivables program was utilized at December 31, 2007.*
*[c] Includes guaranteed obligations related to our headquarters building, equipment financings, and affiliated operations.*
*[d] None of the letters of credit were drawn upon as of December 31, 2007.*

### Off-Balance Sheet Arrangements

**Sale of Receivables –** The Railroad transfers most of its accounts receivable to Union Pacific Receivables, Inc. (UPRI), a bankruptcy-remote subsidiary, as part of a sale of receivables facility. UPRI sells, without recourse on a 364-day revolving basis, an undivided interest in such accounts receivable to investors. The total capacity to sell undivided interests to investors under the facility was $600 million at both December 31, 2007 and 2006. The value of the outstanding undivided interest held by investors under the facility was $600 million at both December 31, 2007 and 2006, respectively. The value of the outstanding undivided interest held by investors is not included in our Consolidated Financial Statements. The value of the undivided interest held by investors was supported by $1,071 million and $1,158 million of accounts receivable held by UPRI at December 31, 2007 and 2006, respectively. At December 31, 2007 and 2006, the value of the interest retained by UPRI was $471 million and $558 million, respectively. This retained interest is included in accounts receivable in our Consolidated Financial Statements. The interest sold to investors is sold at carrying value, which approximates fair value, and there is no gain or loss recognized from the transaction.

The value of the outstanding undivided interest held by investors could fluctuate based upon the availability of eligible receivables and is directly affected by changing business volumes and credit risks, including default and dilution. If default or dilution percentages were to increase one percentage point, the amount of eligible receivables would decrease by $6 million. Should our credit rating fall below investment grade, the value of the outstanding undivided interest held by investors would be reduced, and, in certain cases, the investors would have the right to discontinue the facility.

The Railroad services the sold receivables; however, the Railroad does not recognize any servicing asset or liability as the servicing fees adequately compensate us for these responsibilities. The Railroad collected approximately $16.1 billion and $15.5 billion during the years ended December 31, 2007 and 2006, respectively. UPRI used certain of these proceeds to purchase new receivables under the facility.

The costs of the sale of receivables program are included in other income and were $35 million, $33 million, and $23 million for 2007, 2006, and 2005, respectively. The costs include interest, program fees paid to banks, commercial paper issuing costs, and fees for unused commitment availability.

The investors have no recourse to the Railroad’s other assets except for customary warranty and indemnity claims. Creditors of the Railroad do not have recourse to the assets of UPRI. In August 2007, the sale of receivables program was renewed for an additional 364-day period without any significant changes in terms.

**Guarantees –** At December 31, 2007, we were contingently liable for $465 million in guarantees. We have recorded a liability of $5 million and $6 million for the fair value of these obligations as of December 31, 2007 and 2006, respectively. We entered into these contingent guarantees in the normal course of business, and they include guaranteed obligations related to our headquarters building, equipment financings, and affiliated operations. The final guarantee expires in 2022. We are not aware of any existing event of default that would require us to satisfy these guarantees. We do not expect that these guarantees will have a material adverse effect on our consolidated financial condition, results of operations, or liquidity.

## OTHER MATTERS

**Inflation –** The cumulative effect of long periods of inflation significantly increases asset replacement costs for capital-intensive companies. As a result, assuming that we replace all operating assets at current price levels, depreciation charges (on an inflation-adjusted basis) would be substantially greater than historically reported amounts.

**Derivative Financial Instruments –** We may use derivative financial instruments in limited instances for other than trading purposes to assist in managing our overall exposure to fluctuations in interest rates and fuel prices. We are not a party to leveraged derivatives and, by policy, do not use derivative financial instruments for speculative purposes. Derivative financial instruments qualifying for hedge accounting must maintain a

specified level of effectiveness between the hedging instrument and the item being hedged, both at inception and throughout the hedged period. We formally document the nature and relationships between the hedging instruments and hedged items at inception, as well as our risk-management objectives, strategies for undertaking the various hedge transactions, and method of assessing hedge effectiveness. Changes in the fair market value of derivative financial instruments that do not qualify for hedge accounting are charged to earnings. We may use swaps, collars, futures, and/or forward contracts to mitigate the risk of adverse movements in interest rates and fuel prices; however, the use of these derivative financial instruments may limit future benefits from favorable price movements.

**Market and Credit Risk –** We address market risk related to derivative financial instruments by selecting instruments with value fluctuations that highly correlate with the underlying hedged item. We manage credit risk related to derivative financial instruments, which is minimal, by requiring high credit standards for counterparties and periodic settlements. At December 31, 2007 and 2006, we were not required to provide collateral, nor had we received collateral, relating to our hedging activities.

**Determination of Fair Value –** We determine the fair values of our derivative financial instrument positions based upon current fair values as quoted by recognized dealers or the present value of expected future cash flows.

**Sensitivity Analyses –** The sensitivity analyses that follow illustrate the economic effect that hypothetical changes in interest rates could have on our results of operations and financial condition. These hypothetical changes do not consider other factors that could impact actual results.

At December 31, 2007, we had variable-rate debt representing approximately 3% of our total debt. If variable interest rates average one percentage point higher in 2008 than our December 31, 2007 variable rate, which was approximately 7%, our interest expense would increase by approximately $3 million. This amount was determined by considering the impact of the hypothetical interest rate on the balances of our variable-rate debt at December 31, 2007.

Market risk for fixed-rate debt is estimated as the potential increase in fair value resulting from a hypothetical one percentage point decrease in interest rates as of December 31, 2007, and amounts to an increase of approximately $524 million to the fair value of our debt at December 31, 2007. We estimated the fair values of our fixed-rate debt by considering the impact of the hypothetical interest rates on quoted market prices and current borrowing rates.

**Interest Rate Fair Value Hedges –** We manage our overall exposure to fluctuations in interest rates by adjusting the proportion of fixed and floating rate debt instruments within our debt portfolio over a given period. We generally manage the mix of fixed and floating rate debt through the issuance of targeted amounts of each as debt matures or as we require incremental borrowings. We employ derivatives, primarily swaps, as one of the tools to obtain the targeted mix. In addition, we also obtain flexibility in managing interest costs and the interest rate mix within our debt portfolio by evaluating the issuance of and managing outstanding callable fixed-rate debt securities.

Swaps allow us to convert debt from fixed rates to variable rates and thereby hedge the risk of changes in the debt's fair value attributable to the changes in interest rates. We account for swaps as fair value hedges using the short-cut method pursuant to Financial Accounting Standards Board (FASB) Statement No. 133, *Accounting for Derivative Instruments and Hedging Activities*; therefore, we do not record any ineffectiveness within our Consolidated Financial Statements.

**Interest Rate Cash Flow Hedges –** We report changes in the fair value of cash flow hedges in accumulated other comprehensive loss until the hedged item affects earnings. At December 31, 2007 and 2006, we had reductions of $4 million and $5 million, respectively, recorded as an accumulated other comprehensive loss that is being amortized on a straight-line basis through September 30, 2014. As of December 31, 2007 and 2006, we had no interest rate cash flow hedges outstanding.

**Fuel Swaps –** Two fuel basis swaps cover a total of 151 million gallons of diesel fuel for the period August 2006 through July 2008. These commodity basis swaps require us to make payments to, or receive payments from, the counterparty based on the difference between certain price indices. Changes in the fair value of these swaps are reflected in fuel expense. We reported a derivative asset of approximately $1 million and $2 million at December 31, 2007 and 2006, respectively, which represents the fair value of the swaps. The swaps increased fuel expense for 2007 by $1 million and reduced fuel expense for 2006 by $3 million. The recognition of the swaps in fuel expense included monthly net settlements with the counterparty and the change in fair value.

**Accounting Pronouncements –** In September 2006, the FASB issued Statement No. 157, *Fair Value Measurements* (FAS 157). FAS 157 defines fair value, establishes a framework for measuring fair value in accordance with generally accepted accounting principles and expands disclosures about fair value measurements. This statement does not require any new fair value measurements; rather, it applies under other accounting pronouncements that require or permit fair value measurements. The provisions of FAS 157 are effective for us beginning in 2008. We expect this new standard will result in increased disclosures but will not have a significant impact on our financial position or results of operations.

In February 2007, the FASB issued Statement No. 159, *The Fair Value Option for Financial Assets and Financial Liabilities* (FAS 159). The fair value option established by FAS 159 permits, but does not require, all entities to choose to measure eligible items at fair value at specified election dates. An entity would report unrealized gains and losses on items for which the fair value option has been elected in earnings at each subsequent reporting date. FAS 159 is effective for us beginning in 2008. We do not currently intend to elect the fair value option for any eligible items and do not expect this standard to have a significant impact on our financial position or results of operations.

In December 2007, the FASB issued Statement No. 141 (Revised 2007), *Business Combinations* (FAS 141R). FAS 141R will change the accounting for business combinations. Under FAS 141R, an acquiring entity will be required to recognize all the assets acquired and liabilities assumed in a transaction at the acquisition-date fair value with limited exceptions. FAS 141R will also change the accounting treatment and disclosures with respect to certain specific items in a business combination. FAS 141R applies to us prospectively for business combinations occurring on or after January 1, 2009. Accordingly, any business combinations we engage in will be recorded and disclosed following existing GAAP until January 1, 2009. We expect FAS 141R will have an impact on accounting for business combinations, but the effect will be dependent upon any potential future acquisitions.

In December 2007, the FASB issued Statement No. 160, *Noncontrolling Interests in Consolidated Financial Statements – An Amendment of ARB No. 51* (FAS 160). FAS 160 establishes new accounting and reporting standards for the noncontrolling interest in a subsidiary and for the deconsolidation of a subsidiary. FAS 160 is effective for us beginning in 2009. We are still assessing the potential impact, if any, of the adoption of FAS 160 on our consolidated financial position, results of operations and cash flows.

In December 2007, the FASB ratified the consensus reached on Emerging Issues Task Force (EITF) Issue No. 07-1, *Collaborative Arrangements* (EITF 07-1), which defines collaborative arrangements and establishes reporting and disclosure requirements for transactions between participants in a collaborative arrangement. The requirements of this EITF will be applied to collaborative arrangements in existence on or after January 1, 2009. We are still assessing the potential impact, if any, of the adoption of EITF 07-1 on our consolidated financial position, results of operations and cash flows.

**Asserted and Unasserted Claims –** Various claims and lawsuits are pending against us and certain of our subsidiaries. We cannot fully determine the effect of all asserted and unasserted claims on our consolidated results of operations, financial condition, or liquidity; however, to the extent possible, where asserted and unasserted claims are considered probable and where such claims can be reasonably estimated, we have recorded a liability. We do not expect that any known lawsuits, claims, environmental costs, commitments, contingent liabilities, or guarantees will have a material adverse effect on our consolidated results of

operations, financial condition, or liquidity after taking into account liabilities previously recorded for these matters.

**Indemnities –** Our maximum potential exposure under indemnification arrangements, including certain tax indemnifications, can range from a specified dollar amount to an unlimited amount, depending on the nature of the transactions and the agreements. Due to uncertainty as to whether claims will be made or how they will be resolved, we cannot reasonably determine the probability of an adverse claim or reasonably estimate any adverse liability or the total maximum exposure under these indemnification arrangements. We do not have any reason to believe that we will be required to make any material payments under these indemnity provisions.

**Climate Change –** Although climate change could have an adverse impact on our operations and financial performance in the future (see Risk Factors under Item 1A), we are currently unable to predict the manner or severity of such impact. However, we continue to take steps and explore opportunities to reduce the impact of our operations on the environment, including investments in new technologies, using training programs to reduce fuel consumption, and changing our operations to increase fuel efficiency.

## CRITICAL ACCOUNTING POLICIES

Our Consolidated Financial Statements have been prepared in accordance with GAAP. The preparation of these financial statements requires estimation and judgment that affect the reported amounts of revenue, expenses, assets, and liabilities. We base our estimates on historical experience and on various other assumptions that are believed to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. The following critical accounting policies are a subset of our significant accounting policies described in note 1 to the Financial Statements and Supplementary Data, Item 8. These critical accounting policies affect significant areas of our financial statements and involve judgment and estimates. If these estimates differ significantly from actual results, the impact on our Consolidated Financial Statements may be material.

**Asbestos –** We are a defendant in a number of lawsuits in which current and former employees and other parties allege exposure to asbestos. During 2004, we engaged a third party with extensive experience in estimating resolution costs for asbestos-related claims to assist us in assessing our potential liability. During 2007, we updated our potential liability to include actual claim experience since 2004. As a result of this reassessment, we decreased our liability by $20 million in 2007 for both asserted and unasserted asbestos-related claims through 2034. This liability excludes future defense and processing costs. The liability for resolving both asserted and unasserted claims was based on the following assumptions:

- The number of future claims received would be consistent with historical averages.
- The number of claims filed against us will decline each year.
- The average settlement values for asserted and unasserted claims will be equivalent to historical averages.
- The percentage of claims dismissed in the future will be equivalent to historical averages.

Our asbestos-related liability activity was as follows:

| *Millions of Dollars* | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| Beginning balance | **$302** | $311 | $324 |
| Accruals/(credits) | **(20)** | - | - |
| Payments | **(17)** | (9) | (13) |
| Ending balance at December 31 | **$265** | $302 | $311 |
| Current portion, ending balance at December 31 | **$ 11** | $ 13 | $ 16 |

Approximately 13% of the recorded liability related to asserted claims and approximately 87% related to unasserted claims. These claims are expected to be paid out over the next 27 years. In conjunction with the liability update performed in 2007, we also reassessed estimated insurance recoveries. We have recognized an asset for estimated insurance recoveries at December 31, 2007 and 2006. We will continue to review actual experience and adjust our estimate as warranted.

Our asbestos-related claims activity was as follows:

| | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| Open claims, beginning balance | **2,277** | 2,435 | 2,316 |
| New claims | **269** | 316 | 741 |
| Settled or dismissed claims | **(460)** | (474) | (622) |
| Open claims, ending balance at December 31 | **2,086** | 2,277 | 2,435 |

We believe that our estimates of liability for asbestos-related claims and insurance recoveries are reasonable and probable. The amounts recorded for asbestos-related liabilities and related insurance recoveries were based on currently known facts. However, future events, such as the number of new claims to be filed each year, average settlement costs, and insurance coverage issues could cause the actual costs and insurance recoveries to be higher or lower than the projected amounts. Estimates also may vary in the future if: strategies, activities, and outcomes of asbestos litigation materially change; federal and state laws governing asbestos litigation increase or decrease the probability or amount of compensation of claimants; and there are material changes with respect to payments made to claimants by other defendants.

**Environmental –** We are subject to federal, state, and local environmental laws and regulations. We identified 339 sites at which we are or may be liable for remediation costs associated with alleged contamination or for violations of environmental requirements. This includes 41 sites that are the subject of actions taken by the U.S. government, 22 of which are currently on the Superfund National Priorities List. Certain federal legislation imposes joint and several liability for the remediation of identified sites; consequently, our ultimate environmental liability may include costs relating to activities of other parties, in addition to costs relating to our own activities at each site. Our environmental liability activity was as follows:

| *Millions of Dollars* | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| Beginning balance | **$210** | $213 | $201 |
| Accruals | **41** | 39 | 45 |
| Payments | **(42)** | (42) | (33) |
| Ending balance at December 31 | **$209** | $210 | $213 |
| Current portion, ending balance at December 31 | **$ 63** | $ 54 | $ 46 |

Our environmental site activity was as follows:

| | *2007* | *2006* | *2005* |
|---|---|---|---|
| Open sites, beginning balance | **367** | 370 | 384 |
| New sites | **72** | 50 | 56 |
| Closed sites | **(100)** | (53) | (70) |
| Open sites, ending balance at December 31 | **339** | 367 | 370 |

When we identify an environmental issue with respect to property owned, leased, or otherwise used in our business, we and our consultants perform environmental assessments on the property. We expense the cost of the assessments as incurred. We accrue the cost of remediation where our obligation is probable and we can reasonably estimate such costs. We do not discount our environmental liabilities when the timing of the anticipated cash payments is not fixed or readily determinable.

The liability includes future costs for remediation and restoration of sites, as well as ongoing monitoring costs, but excludes any anticipated recoveries from third parties. Cost estimates are based on information available for each site, financial viability of other potentially responsible parties, and existing technology, laws, and regulations. The ultimate liability for remediation is difficult to determine because of the number of potentially responsible parties, site-specific cost sharing arrangements with other potentially responsible parties, the degree of contamination by various wastes, the scarcity and quality of volumetric data related to many of the sites, and the speculative nature of remediation costs. Estimates of liability may vary over time due to changes in federal, state, and local laws governing environmental remediation. Current obligations are not expected to have a material adverse effect on our consolidated results of operations, financial condition, or liquidity.

**Personal Injury –** The cost of personal injuries to employees and others related to our activities is charged to expense based on estimates of the ultimate cost and number of incidents each year. We use third-party actuaries to assist us in measuring the expense and liability, including unasserted claims. The Federal Employers' Liability Act (FELA) governs compensation for work-related accidents. Under FELA, damages are assessed based on a finding of fault through litigation or out-of-court settlements. We offer a comprehensive variety of services and rehabilitation programs for employees who are injured at work.

Our personal injury liability is discounted to present value using applicable U.S. Treasury rates. Approximately 89% of the recorded liability related to asserted claims, and approximately 11% related to unasserted claims. Estimates can vary over time due to evolving trends in litigation. Our personal injury liability activity was as follows:

| *Millions of Dollars* | *2007* | *2006* | *2005* |
|---|---|---|---|
| Beginning balance | **$ 631** | $ 619 | $ 639 |
| Accruals | **165** | 240 | 247 |
| Payments | **(203)** | (228) | (267) |
| Ending balance at December 31 | **$ 593** | $ 631 | $ 619 |
| Current portion, ending balance at December 31 | **$ 204** | $ 233 | $ 274 |

Our personal injury claims activity was as follows:

| | *2007* | *2006* | *2005* |
|---|---|---|---|
| Open claims, beginning balance | **4,126** | 4,197 | 4,028 |
| New claims | **4,133** | 4,190 | 4,584 |
| Settled or dismissed claims | **(4,175)** | (4,261) | (4,415) |
| Open claims, ending balance at December 31 | **4,084** | 4,126 | 4,197 |

**Depreciation –** The railroad industry is capital intensive. Properties are carried at cost. Provisions for depreciation are computed principally on the straight-line method based on estimated service lives of depreciable property. The lives are calculated using a separate composite annual percentage rate for each depreciable property group, based on the results of internal depreciation studies. We are required to submit a report on depreciation studies and proposed depreciation rates to the STB for review and approval every three years for equipment property and every six years for road property. The cost (net of salvage) of depreciable railroad property retired or replaced in the ordinary course of business is charged to accumulated depreciation, and no gain or loss is recognized. A gain or loss is recognized in other income for all other property upon disposition because the gain or loss is not part of rail operations. The cost of internally developed software is capitalized and amortized based on estimated service lives of the software.

Significant capital spending in recent years increased the total value of our depreciable assets. Cash capital spending totaled $2.5 billion for the year ended December 31, 2007. For the year ended December 31, 2007, depreciation expense was $1.3 billion. We use various methods to estimate useful lives for each group of depreciable property. Due to the capital intensive nature of the business and the large base of depreciable assets, variances to those estimates could have a material effect on our Consolidated Financial Statements. If the estimated useful lives of all depreciable assets were increased by one year, annual depreciation expense would decrease by approximately $47 million. If the estimated useful lives of all assets to be depreciated were decreased by one year, annual depreciation expense would increase by approximately $50 million.

**Income Taxes –** As required under FASB Statement No. 109, *Accounting for Income Taxes*, we account for income taxes by recording taxes payable or refundable for the current year and deferred tax assets and liabilities for the expected future tax consequences of events that have been recognized in our financial statements or tax returns. These expected future consequences are measured based on provisions of tax law as currently enacted; the effects of future changes in tax law are not anticipated. Future tax law changes, such as a change in the corporate tax rate, could have a material impact on our financial condition or results of operations. For example, a 1% increase in the federal income tax rate would increase our deferred tax liability by approximately $250 million.

When appropriate, we record a valuation allowance against deferred tax assets to offset future tax benefits that may not be realized. In determining whether a valuation allowance is appropriate, we consider whether it is more likely than not that all or some portion of our deferred tax assets will not be realized, based on management's judgments regarding the best available evidence about future events. Based on that analysis, there was no valuation allowance at December 31, 2007 or 2006.

When we have claimed tax benefits that may be challenged by a tax authority, these uncertain tax benefits are accounted for under FASB Interpretation No. 48, *Accounting for Uncertainty in Income Taxes, an Interpretation of FASB Statement No. 109* (FIN 48). We adopted FIN 48 beginning January 1, 2007. Prior to 2007, income tax contingencies were accounted for under FASB Statement No. 5, *Accounting for Contingencies*.

Under FIN 48, we recognize tax benefits only for tax positions that are more likely than not to be sustained upon examination by tax authorities. The amount recognized is measured as the largest amount of benefit that is greater than 50 percent likely to be realized upon settlement. A liability for "unrecognized tax benefits" is recorded for any tax benefits claimed in our tax returns that do not meet these recognition and measurement

standards. For additional information on the adoption of FIN 48, see note 4 to the Consolidated Financial Statements.

**Pension and Other Postretirement Benefits –** We use third-party actuaries to assist us in properly measuring the liabilities and expenses associated with providing pension and defined contribution medical and life insurance benefits (OPEB) to eligible employees. In order to use actuarial methods to value the liabilities and expenses we must make several assumptions. The critical assumptions used to measure pension obligations and expenses are the discount rate and expected rate of return on pension assets. For OPEB, the critical assumptions are the discount rate and healthcare cost trend rate.

We evaluate our critical assumptions at least annually, and selected assumptions are based on the following factors:

- Discount rate is based on a hypothetical portfolio of high quality corporate bonds (rated AA by a recognized rating agency) for which the timing and amount of cash flows matches our plan's expected benefit payments.
- Expected return on plan assets is based on our asset allocation mix and our historical return, taking into consideration current and expected market conditions.
- Healthcare cost trend rate is based on our historical rates of inflation and expected market conditions.

The following tables present the key assumptions used to measure pension and OPEB expense for 2007 and the estimated impact on 2007 pension and OPEB expense relative to a change in those assumptions:

| *Assumptions* | *Pension* | *OPEB* |
|---|---|---|
| Discount rate | 6.00% | 6.00% |
| Salary increase | 3.00% | N/A |
| Expected return on plan assets | 8.00% | N/A |
| Healthcare cost trend rate: | | |
| Pre-65 current | N/A | 9.00% |
| Pre-65 level in 2011 | N/A | 5.00% |
| Post-65 current | N/A | 11.00% |
| Post-65 level in 2013 | N/A | 5.00% |

| *Sensitivities* | *Increase in Expense* | |
|---|---|---|
| *Millions of Dollars* | *Pension* | *OPEB* |
| 0.25% decrease in discount rate | $ 6 | $ 2 |
| 0.25% increase in salary scale | $ 2 | N/A |
| 0.25% decrease in expected return on plan assets | $ 4 | N/A |
| 1% increase in healthcare cost trend rate | N/A | $ 5 |

## CAUTIONARY INFORMATION

Certain statements in this report, and statements in other reports or information filed or to be filed with the SEC (as well as information included in oral statements or other written statements made or to be made by us), are, or will be, forward-looking statements as defined by the Securities Act of 1933 and the Securities Exchange Act of 1934. These forward-looking statements include, without limitation, statements regarding dividends in Item 5 and statements and information set forth under the caption "2008 Outlook" in this Item 7, and any other statements or information in this report (including information incorporated herein by reference) regarding: expectations as to operational or service improvements; expectations regarding the effectiveness of steps taken or to be taken to improve operations, service, infrastructure improvements,

transportation plan modifications, and management of customer traffic on the system to meet demand (including statements set forth in Item 2 regarding expectations related to our capital expenditures); expectations as to cost savings, revenue growth, and earnings; the time by which goals, targets, or objectives will be achieved; projections, predictions, expectations, estimates, or forecasts as to our business, financial and operational results, future economic performance, and general economic conditions; proposed new products and services; estimates of costs relating to environmental remediation and restoration; expectations that claims, litigation, environmental costs, commitments, contingent liabilities, labor negotiations or agreements, or other matters will not have a material adverse effect on our consolidated results of operations, financial condition, or liquidity and any other similar expressions concerning matters that are not historical facts.

Forward-looking statements should not be read as a guarantee of future performance or results, and will not necessarily be accurate indications of the times that, or by which, such performance or results will be achieved. Forward-looking information is subject to risks and uncertainties that could cause actual performance or results to differ materially from those expressed in the statements.

Forward-looking statements and information reflect the good faith consideration by management of currently available information, and may be based on underlying assumptions believed to be reasonable under the circumstances. However, such information and assumptions (and, therefore, such forward-looking statements and information) are or may be subject to variables or unknown or unforeseeable events or circumstances over which management has little or no influence or control. The Risk Factors in Item 1A of this report could affect our future results and could cause those results or other outcomes to differ materially from those expressed or implied in the forward-looking statements.

Forward-looking statements speak only as of the date the statement was made. We assume no obligation to update forward-looking information to reflect actual results, changes in assumptions or changes in other factors affecting forward-looking information. If we do update one or more forward-looking statements, no inference should be drawn that we will make additional updates with respect thereto or with respect to other forward-looking statements.

**Item 7A. Quantitative and Qualitative Disclosures about Market Risk**

Information concerning market risk sensitive instruments is set forth under Management's Discussion and Analysis of Financial Condition and Results of Operations — Other Matters, Item 7.

***************************************

**Item 8.** **Financial Statements and Supplementary Data**

**Index to Consolidated Financial Statements** **Page**

Report of Independent Registered Public Accounting Firm .......... 47

Consolidated Statements of Income
For the Years Ended December 31, 2007, 2006, and 2005 .......... 48

Consolidated Statements of Financial Position
At December 31, 2007 and 2006 .......... 49

Consolidated Statements of Cash Flows
For the Years Ended December 31, 2007, 2006, and 2005 .......... 50

Consolidated Statements of Changes in Common Shareholders' Equity
For the Years Ended December 31, 2007, 2006, and 2005 .......... 51

Notes to the Consolidated Financial Statements .......... 52

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

Union Pacific Corporation, its Directors, and Shareholders:

We have audited the accompanying consolidated statements of financial position of Union Pacific Corporation and Subsidiary Companies (the Corporation) as of December 31, 2007 and 2006, and the related consolidated statements of income, changes in common shareholders' equity, and cash flows for each of the three years in the period ended December 31, 2007. Our audits also included the financial statement schedule listed in the Table of Contents at Part IV, Item 15. These financial statements and financial statement schedule are the responsibility of the Corporation's management. Our responsibility is to express an opinion on the financial statements and financial statement schedule based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of Union Pacific Corporation and Subsidiary Companies as of December 31, 2007 and 2006, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2007, in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, such financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

As discussed in Note 7 to the consolidated financial statements, in 2006 the Corporation adopted Statement of Financial Accounting Standards No. 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans.*

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the Corporation's internal control over financial reporting as of December 31, 2007, based on the criteria established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 15, 2008 expressed an unqualified opinion on the Corporation's internal control over financial reporting.

Deloitte & Touche LLP

Omaha, Nebraska
February 15, 2008

## CONSOLIDATED STATEMENTS OF INCOME

*Union Pacific Corporation and Subsidiary Companies*

| *Millions, Except Per Share Amounts, for the Years Ended December 31,* | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| Operating revenue | **$16,283** | $15,578 | $13,578 |
| Operating expenses: | | | |
| Salaries, wages, and employee benefits | **4,591** | 4,599 | 4,375 |
| Fuel and utilities | **3,164** | 3,012 | 2,562 |
| Equipment and other rents | **1,423** | 1,455 | 1,402 |
| Depreciation | **1,321** | 1,237 | 1,175 |
| Materials and supplies | **714** | 691 | 546 |
| Casualty costs | **321** | 410 | 411 |
| Purchased services and other costs | **1,374** | 1,290 | 1,312 |
| Total operating expenses | **12,908** | 12,694 | 11,783 |
| Operating income | **3,375** | 2,884 | 1,795 |
| Other income | **116** | 118 | 145 |
| Interest expense | **(482)** | (477) | (504) |
| Income before income taxes | **3,009** | 2,525 | 1,436 |
| Income taxes | **(1,154)** | (919) | (410) |
| Net income | **$ 1,855** | $ 1,606 | $ 1,026 |
| Share and Per Share (note 9): | | | |
| Earnings per share – basic | **$ 6.97** | $ 5.96 | $ 3.89 |
| Earnings per share – diluted | **$ 6.91** | $ 5.91 | $ 3.85 |
| Weighted average number of shares – basic | **265.9** | 269.4 | 263.4 |
| Weighted average number of shares – diluted | **268.4** | 272.0 | 266.5 |
| Dividends declared per share | **$ 1.49** | $ 1.20 | $ 1.20 |

*The accompanying notes are an integral part of these Consolidated Financial Statements.*

## CONSOLIDATED STATEMENTS OF FINANCIAL POSITION

*Union Pacific Corporation and Subsidiary Companies*

| *Millions of Dollars, as of December 31,* | *2007* | *2006* |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | **$ 878** | $ 827 |
| Accounts receivable, net | **632** | 679 |
| Materials and supplies | **453** | 395 |
| Current deferred income taxes | **336** | 319 |
| Other current assets | **295** | 191 |
| Total current assets | **2,594** | 2,411 |
| Investments: | | |
| Investments in and advances to affiliated companies | **912** | 865 |
| Other investments | **11** | 12 |
| Total investments | **923** | 877 |
| Properties: | | |
| Road | **37,661** | 35,634 |
| Equipment | **7,818** | 7,637 |
| Other | **175** | 177 |
| Total cost | **45,654** | 43,448 |
| Accumulated depreciation | **(11,496)** | (10,575) |
| Net properties | **34,158** | 32,873 |
| Other assets | **358** | 354 |
| Total assets | **$38,033** | $36,515 |
| **Liabilities and Common Shareholders' Equity** | | |
| Current liabilities: | | |
| Accounts payable | **$ 732** | $ 684 |
| Accrued wages and vacation | **394** | 412 |
| Accrued casualty costs | **371** | 409 |
| Income and other taxes | **343** | 279 |
| Dividends and interest | **284** | 238 |
| Debt due within one year | **139** | 780 |
| Equipment rents payable | **103** | 108 |
| Other current liabilities | **675** | 629 |
| Total current liabilities | **3,041** | 3,539 |
| Debt due after one year | **7,543** | 6,000 |
| Deferred income taxes | **10,050** | 9,696 |
| Accrued casualty costs | **799** | 868 |
| Retiree benefits obligation | **462** | 504 |
| Other long-term liabilities | **553** | 596 |
| Commitments and contingencies (note 10) | | |
| Total liabilities | **22,448** | 21,203 |
| Common shareholders' equity: | | |
| Common shares, $2.50 par value, 500,000,000 authorized; 276,162,141 and 275,962,411 issued; 260,869,647 and 270,172,290 outstanding, respectively | **690** | 690 |
| Paid-in-surplus | **3,926** | 3,943 |
| Retained earnings | **12,667** | 11,215 |
| Treasury stock | **(1,624)** | (394) |
| Accumulated other comprehensive loss | **(74)** | (142) |
| Total common shareholders' equity | **15,585** | 15,312 |
| Total liabilities and common shareholders' equity | **$38,033** | $36,515 |

*The accompanying notes are an integral part of these Consolidated Financial Statements.*

## CONSOLIDATED STATEMENTS OF CASH FLOWS

*Union Pacific Corporation and Subsidiary Companies*

| *Millions of Dollars, for the Years Ended December 31,* | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| **Operating Activities** | | | |
| Net income | **$ 1,855** | $ 1,606 | $ 1,026 |
| Adjustments to reconcile net income to cash provided by operating activities: | | | |
| Depreciation | **1,321** | 1,237 | 1,175 |
| Deferred income taxes and unrecognized tax benefits | **332** | 235 | 320 |
| Stock-based compensation expense | **44** | 35 | 21 |
| Net gain from asset sales | **(52)** | (72) | (135) |
| Other operating activities, net | **(251)** | (175) | 37 |
| Changes in current assets and liabilities, net | **28** | 14 | 151 |
| Cash provided by operating activities | **3,277** | 2,880 | 2,595 |
| **Investing Activities** | | | |
| Capital investments | **(2,496)** | (2,242) | (2,169) |
| Proceeds from asset sales | **122** | 133 | 185 |
| Acquisition of equipment pending financing | **(621)** | (536) | (872) |
| Proceeds from completed equipment financings | **621** | 536 | 872 |
| Other investing activities | **(52)** | 67 | (63) |
| Cash used in investing activities | **(2,426)** | (2,042) | (2,047) |
| **Financing Activities** | | | |
| Common share repurchases (note 12) | **(1,375)** | - | - |
| Dividends paid | **(364)** | (322) | (314) |
| Debt repaid | **(792)** | (657) | (699) |
| Debt issued | **1,581** | - | - |
| Net proceeds from equity compensation plans | **71** | 160 | 262 |
| Excess tax benefits from equity compensation plans | **76** | 29 | - |
| Other financing activities | **3** | 6 | (1) |
| Cash used in financing activities | **(800)** | (784) | (752) |
| Net change in cash and cash equivalents | **51** | 54 | (204) |
| Cash and cash equivalents at beginning of year | **827** | 773 | 977 |
| Cash and cash equivalents at end of year | **$ 878** | $ 827 | $ 773 |
| **Changes in Current Assets and Liabilities, Net of Acquisitions** | | | |
| Accounts receivable, net | **$ 47** | $ 68 | $ (201) |
| Materials and supplies | **(58)** | (64) | (22) |
| Other current assets | **(104)** | (21) | 12 |
| Accounts, wages, and vacation payable | **30** | (102) | 224 |
| Other current liabilities | **113** | 133 | 138 |
| Total | **$ 28** | $ 14 | $ 151 |
| **Supplemental Cash Flow Information** | | | |
| Non-cash activity: | | | |
| Capital investments accrued but not yet paid | **$ 126** | $ 106 | $ 103 |
| Capital lease financings | **82** | 16 | - |
| Common shares repurchased but not yet paid | **82** | - | - |
| Cash dividends declared but not yet paid | **112** | 80 | 78 |
| Cash paid during the year for: | | | |
| Interest, net of amounts capitalized | **$ (467)** | $ (492) | $ (510) |
| Income taxes, net of refunds | **(839)** | (549) | (29) |

*The accompanying notes are an integral part of these Consolidated Financial Statements.*

**CONSOLIDATED STATEMENTS OF CHANGES IN COMMON SHAREHOLDERS' EQUITY**
*Union Pacific Corporation and Subsidiary Companies*

| *Millions of Dollars Thousands of Shares* | *Common Shares* | *Treasury Shares* | *Common Shares* | *Paid-in-Surplus* | *Retained Earnings* | *Treasury Stock* | *Accumulated Other Comprehensive Income/(Loss) (note 13)* | *Total* |
|---|---|---|---|---|---|---|---|---|
| Balance at January 1, 2005 | 275,695 | (15,175) | $689 | $3,917 | $9,222 | $ (936) | $(237) | $12,655 |
| Comprehensive income: | | | | | | | | |
| Net income | | | - | - | 1,026 | - | - | 1,026 |
| Other comp. income | | | - | - | - | - | 7 | 7 |
| Total comp. income (note 13) | | | - | - | 1,026 | - | 7 | 1,033 |
| Conversion, stock option exercises, forfeitures, and other | 104 | 6,011 | - | (2) | - | 337 | - | 335 |
| Dividends declared ($1.20 per share) | - | - | - | - | (316) | - | - | (316) |
| Balance at December 31, 2005 | 275,799 | (9,164) | $689 | $3,915 | $9,932 | $ (599) | $(230) | $13,707 |
| Comprehensive income: | | | | | | | | |
| Net income | | | - | - | 1,606 | - | - | 1,606 |
| Other comp. income | | | - | - | - | - | 167 | 167 |
| Total comp. income (note 13) | | | - | - | 1,606 | - | 167 | 1,773 |
| FAS 158 adoption (note 7) | - | - | - | - | - | - | (79) | (79) |
| Conversion, stock option exercises, forfeitures, and other | 163 | 3,374 | 1 | 28 | - | 205 | - | 234 |
| Dividends declared ($1.20 per share) | - | - | - | - | (323) | - | - | (323) |
| Balance at December 31, 2006 | 275,962 | (5,790) | $690 | $3,943 | $11,215 | $ (394) | $(142) | $15,312 |
| Cumulative effect of adoption of FIN 48 (note 4) | - | - | - | - | (7) | - | - | (7) |
| Balance at January 1, 2007 | 275,962 | (5,790) | $690 | $3,943 | $11,208 | $ (394) | $(142) | $15,305 |
| Comprehensive income: | | | | | | | | |
| Net income | | | - | - | 1,855 | - | - | 1,855 |
| Other comp. income | | | - | - | - | - | 68 | 68 |
| Total comp. income (note 13) | | | - | - | 1,855 | - | 68 | 1,923 |
| Conversion, stock option exercises, forfeitures, and other | 200 | 3,122 | - | (17) | - | 227 | - | 210 |
| Share repurchases (note 12) | - | (12,624) | - | - | - | (1,457) | - | (1,457) |
| Dividends declared ($1.49 per share) | - | - | - | - | (396) | - | - | (396) |
| **Balance at December 31, 2007** | **276,162** | **(15,292)** | **$690** | **$3,926** | **$12,667** | **$(1,624)** | **$ (74)** | **$15,585** |

*The accompanying notes are an integral part of these Consolidated Financial Statements.*

## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

*Union Pacific Corporation and Subsidiary Companies*

For purposes of this report, unless the context otherwise requires, all references herein to the "Corporation", "UPC", "we", "us", and "our" mean Union Pacific Corporation and its subsidiaries, including Union Pacific Railroad Company, which will be separately referred to herein as "UPRR" or the "Railroad".

### 1. Significant Accounting Policies

**Principles of Consolidation –** The Consolidated Financial Statements include the accounts of Union Pacific Corporation and all of its subsidiaries. Investments in affiliated companies (20% to 50% owned) are accounted for using the equity method of accounting. All significant intercompany transactions are eliminated. The Corporation evaluates its less than majority-owned investments for consolidation pursuant to Financial Accounting Standards Board (FASB) Interpretation No. 46 (Revised 2003), *Consolidation of Variable Interest Entities, an Interpretation of Accounting Research Bulletin No. 51* (FIN 46(R)). We currently have no less than majority-owned investments that require consolidation under FIN 46(R).

**Cash and Cash Equivalents –** Cash equivalents consist of investments with original maturities of three months or less.

**Materials and Supplies –** Materials and supplies are carried at the lower of average cost or market.

**Property and Depreciation –** Properties are carried at cost. Provisions for depreciation are computed principally on the straight-line method based on estimated service lives of depreciable property. The cost (net of salvage) of depreciable rail property retired or replaced in the ordinary course of business is charged to accumulated depreciation, and no gain or loss is recognized. A gain or loss is recognized in other income for all other property upon disposition because the gain or loss is not part of rail operations. The cost of purchased and internally developed software is capitalized and amortized based on estimated service lives of the software.

**Impairment of Long-lived Assets –** We review long-lived assets, including identifiable intangibles, for impairment when events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. If impairment indicators are present and the estimated future undiscounted cash flows are less than the carrying value of the long-lived assets, the carrying value is reduced to the estimated fair value as measured by the discounted cash flows.

**Revenue Recognition –** We recognize commodity revenue on a percentage-of-completion basis as freight moves from origin to destination. The allocation of revenue between reporting periods is based on the relative transit time in each reporting period with expenses recognized as incurred. Other revenue is recognized as service is performed or contractual obligations are met. Customer incentives, which are primarily provided for shipping a specified cumulative volume or shipping to/from specific locations, are recorded as a reduction to operating revenue based on actual or projected future customer shipments.

**Translation of Foreign Currency –** Our portion of the assets and liabilities related to foreign investments are translated into U.S. dollars at the exchange rates in effect at the balance sheet date. Revenue and expenses are translated at the average rates of exchange prevailing during the year. Unrealized adjustments are reflected within common shareholders' equity as accumulated other comprehensive income or loss.

**Financial Instruments –** The carrying value of our non-derivative financial instruments approximates fair value. The fair value of financial instruments is generally determined by reference to market values as quoted by recognized dealers or developed based upon the present value of expected future cash flows.

We periodically use derivative financial instruments, for other than trading purposes, to manage risk related to changes in fuel prices and interest rates.

**Stock-Based Compensation –** We have several stock-based compensation plans under which employees and non-employee directors receive stock options, nonvested retention shares, and nonvested stock units. We refer to the nonvested shares and stock units collectively as "retention awards". We issue treasury shares to cover option exercises and stock unit vestings, while new shares are issued when retention shares vest.

We adopted FASB Statement No. 123(R), *Share-Based Payment* (FAS 123(R)), on January 1, 2006. FAS 123(R) requires us to measure and recognize compensation expense for all stock-based awards made to employees and directors, including stock options. Compensation expense is based on the calculated fair value of the awards as measured at the grant date and is expensed ratably over the service period of the awards (generally the vesting period). The fair value of retention awards is the closing stock price on the date of grant, while the fair value of stock options is determined by using the Black-Scholes option pricing model. We elected to use the modified prospective transition method as permitted by FAS 123(R) and did not restate financial results for prior periods. We did not make an adjustment for the cumulative effect of estimated forfeitures, as the impact was not material.

As a result of the adoption of FAS 123(R), we recognized expense for stock options in 2007 and 2006, in addition to retention awards, which were expensed prior to 2006. Information regarding stock-based compensation appears in the table below:

| *Millions of Dollars* | ***2007*** | *2006* |
|---|---|---|
| Stock-based compensation, before tax: | | |
| Stock options | **$21** | $14 |
| Retention awards | **23** | 21 |
| Total stock-based compensation, before tax | **$44** | $35 |
| Total stock-based compensation, after tax | **$27** | $22 |

Prior to the adoption of FAS 123(R), we applied the recognition and measurement principles of Accounting Principles Board Opinion No. 25, *Accounting for Stock Issued to Employees,* and related interpretations. No stock-based employee compensation expense related to stock option grants was reflected in net income, as all options granted under those plans had a grant price equal to the market value of our common stock on the date of grant. Stock-based compensation expense related to retention shares, stock units, and other incentive plans was reflected in net income.

The following table details the effect on net income and earnings per share had compensation expense for all of our stock-based awards, including stock options, been recorded in the year ended December 31, 2005 based on the fair value method under FASB Statement No. 123, *Accounting for Stock-Based Compensation.*

| *Pro Forma Stock-Based Compensation Expense* *Millions of Dollars, Except Per Share Amounts* | *2005* |
|---|---|
| Net income, as reported | $1,026 |
| Stock-based employee compensation expense, reported in net income, net of tax | 13 |
| Total stock-based employee compensation expense determined under fair value–based method for all awards, net of tax [a] | (50) |
| Pro forma net income | $ 989 |
| Earnings per share – basic, as reported | $ 3.89 |
| Earnings per share – basic, pro forma | $ 3.75 |
| Earnings per share – diluted, as reported | $ 3.85 |
| Earnings per share – diluted, pro forma | $ 3.71 |

[a] *Stock options for executives granted in 2003 and 2002 included a reload feature. This reload feature allowed executives to exercise their options using shares of Union Pacific Corporation common stock that they already owned and obtain a new grant of options in the amount of the shares used for exercise plus any shares withheld for tax purposes. The reload feature of these option grants could only be exercised if the price of our common stock increased at least 20% from the price at the time of the reload grant. During the year ended December 31, 2005, reload option grants represented $19 million of the pro forma expense noted above. There were no reload option grants during 2007 and 2006 as stock options exercised after January 1, 2006 are not eligible for the reload feature.*

**Earnings Per Share –** Basic earnings per share are calculated on the weighted-average number of common shares outstanding during each period. Diluted earnings per share include shares issuable upon exercise of outstanding stock options and stock-based awards where the conversion of such instruments would be dilutive.

**Use of Estimates –** Our Consolidated Financial Statements include estimates and assumptions regarding certain assets, liabilities, revenue, and expenses and the disclosure of certain contingent assets and liabilities. Actual future results may differ from such estimates.

**Income Taxes –** As required under FASB Statement No. 109, *Accounting for Income Taxes*, we account for income taxes by recording taxes payable or refundable for the current year and deferred tax assets and liabilities for the expected future tax consequences of events that have been recognized in our financial statements or tax returns. These expected future tax consequences are measured based on provisions of tax law as currently enacted; the effects of future changes in tax laws are not anticipated. Future tax law changes, such as a change in the corporate tax rate, could have a material impact on our financial condition or results of operations.

When appropriate, we record a valuation allowance against deferred tax assets to offset future tax benefits that may not be realized. In determining whether a valuation allowance is appropriate, we consider whether it is more likely than not that all or some portion of our deferred tax assets will not be realized, based on management's judgments regarding the best available evidence about future events.

When we have claimed tax benefits that may be challenged by a tax authority, these uncertain tax positions are accounted for under FASB Interpretation No. 48, *Accounting for Uncertainty in Income Taxes, an Interpretation of FASB Statement No. 109* (FIN 48). We adopted FIN 48 beginning January 1, 2007. Prior to 2007, income tax contingencies were accounted for under FASB Statement No. 5, *Accounting for Contingencies.*

Under FIN 48, we recognize tax benefits only for tax positions that are more likely than not to be sustained upon examination by tax authorities. The amount recognized is measured as the largest amount of benefit that is greater than 50 percent likely to be realized upon settlement. A liability for "unrecognized tax benefits" is

recorded for any tax benefits claimed in our tax returns that do not meet these recognition and measurement criteria. For additional information on the adoption of FIN 48, see note 4 to the Consolidated Financial Statements.

**Pension and Postretirement Benefits** – We incur certain employment-related expenses associated with pensions and postretirement health benefits. In order to measure the expense associated with these benefits, we must make various assumptions including discount rates used to value certain liabilities, expected return on plan assets used to fund these expenses, salary increases, employee turnover rates, anticipated mortality rates, and expected future healthcare costs. The assumptions used by us are based on our historical experience as well as current facts and circumstances. We use third-party actuaries to assist us in properly measuring the expense and liability associated with these benefits.

**Personal Injury** – The cost of injuries to employees and others on our property is charged to expense based on estimates of the ultimate cost and number of incidents each year. We use third-party actuaries to assist us in properly measuring the expense and liability. Our personal injury liability is discounted to present value using applicable U.S. Treasury rates. Legal fees and incidental costs are expensed as incurred.

**Environmental** – When environmental issues have been identified with respect to property currently or formerly owned, leased, or otherwise used in the conduct of our business, we and our consultants perform environmental assessments on such property. We expense the cost of the assessments as incurred. We accrue the cost of remediation where our obligation is probable and such costs can be reasonably estimated. We do not discount our environmental liabilities when the timing of the anticipated cash payments is not fixed or readily determinable. Legal fees and incidental costs are expensed as incurred.

**Asbestos** – We estimate a liability for asserted and unasserted asbestos-related claims based on an assessment of the number and value of those claims. We use an external consulting firm to assist us in properly measuring the expense and liability. Our liability for asbestos-related claims is not discounted to present value due to the uncertainty surrounding the timing of future payments. Legal fees and incidental costs are expensed as incurred.

## 2. Operations and Segmentation

We are a Class I railroad that operates in the United States. We have 32,205 route miles, linking Pacific Coast and Gulf Coast ports with the Midwest and eastern United States gateways and providing several corridors to key Mexican gateways. We serve the western two-thirds of the country and maintain coordinated schedules with other rail carriers for the handling of freight to and from the Atlantic Coast, the Pacific Coast, the Southeast, the Southwest, Canada, and Mexico. Export and import traffic is moved through Gulf Coast and Pacific Coast ports and across the Mexican and Canadian borders.

The Railroad, along with its subsidiaries and rail affiliates, is our one reportable operating segment. Although revenue is analyzed by commodity group, we analyze the net financial results of the Railroad as one segment due to the integrated nature of our rail network. The following table provides revenue by commodity group:

| *Millions of Dollars* | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| Agricultural | **$ 2,597** | $ 2,395 | $ 1,971 |
| Automotive | **1,469** | 1,438 | 1,273 |
| Chemicals | **2,293** | 2,098 | 1,848 |
| Energy | **3,136** | 2,953 | 2,578 |
| Industrial Products | **3,110** | 3,168 | 2,814 |
| Intermodal | **2,911** | 2,810 | 2,473 |
| Total commodity revenue | **$15,516** | $14,862 | $12,957 |
| Other revenue | **767** | 716 | 621 |
| Total operating revenue | **$16,283** | $15,578 | $13,578 |

### 3. Financial Instruments

**Strategy and Risk –** We may use derivative financial instruments in limited instances for other than trading purposes to assist in managing our overall exposure to fluctuations in interest rates and fuel prices. We are not a party to leveraged derivatives and, by policy, do not use derivative financial instruments for speculative purposes. Derivative financial instruments qualifying for hedge accounting must maintain a specified level of effectiveness between the hedging instrument and the item being hedged, both at inception and throughout the hedged period. We formally document the nature and relationships between the hedging instruments and hedged items at inception, as well as our risk-management objectives, strategies for undertaking the various hedge transactions, and method of assessing hedge effectiveness. Changes in the fair market value of derivative financial instruments that do not qualify for hedge accounting are charged to earnings. We may use swaps, collars, futures, and/or forward contracts to mitigate the risk of adverse movements in interest rates and fuel prices; however, the use of these derivative financial instruments may limit future benefits from favorable price movements.

**Market and Credit Risk –** We address market risk related to derivative financial instruments by selecting instruments with value fluctuations that highly correlate with the underlying hedged item. We manage credit risk related to derivative financial instruments, which is minimal, by requiring high credit standards for counterparties and periodic settlements. At December 31, 2007 and 2006, we were not required to provide collateral, nor had we received collateral, relating to our hedging activities.

**Determination of Fair Value –** We determine the fair values of our derivative financial instrument positions based upon current fair values as quoted by recognized dealers or the present value of expected future cash flows.

**Interest Rate Fair Value Hedges –** We manage our overall exposure to fluctuations in interest rates by adjusting the proportion of fixed and floating rate debt instruments within our debt portfolio over a given period. We generally manage the mix of fixed and floating rate debt through the issuance of targeted amounts of each as debt matures or as we require incremental borrowings. We employ derivatives, primarily swaps, as one of the tools to obtain the targeted mix. In addition, we also obtain flexibility in managing interest costs and the interest rate mix within our debt portfolio by evaluating the issuance of and managing outstanding callable fixed-rate debt securities.

Swaps allow us to convert debt from fixed rates to variable rates and thereby hedge the risk of changes in the debt's fair value attributable to the changes in interest rates. We account for swaps as fair value hedges using the short-cut method pursuant to FASB Statement No. 133, *Accounting for Derivative Instruments and Hedging Activities*; therefore, we do not record any ineffectiveness within our Consolidated Financial Statements.

The following is a summary of our interest rate derivatives qualifying as fair value hedges:

| *Millions of Dollars, Except Percentages* | ***2007*** | *2006* |
|---|---|---|
| Amount of debt hedged | **$250** | $500 |
| Percentage of total debt portfolio | **3%** | 7% |
| Gross fair value asset/(liability) position | **$ 2** | $(14) |

**Interest Rate Cash Flow Hedges –** We report changes in the fair value of cash flow hedges in accumulated other comprehensive loss until the hedged item affects earnings. At December 31, 2007 and 2006, we had reductions of $4 million and $5 million, respectively, recorded as an accumulated other comprehensive loss that is being amortized on a straight-line basis through September 30, 2014. As of December 31, 2007 and 2006, we had no interest rate cash flow hedges outstanding.

**Fuel Swaps –** Two fuel basis swaps cover a total of 151 million gallons of diesel fuel for the period August 2006 through July 2008. These commodity basis swaps require us to make payments to, or receive payments from, the counterparty based on the difference between certain price indices. Changes in the fair value of these swaps are reflected in fuel expense. We reported a derivative asset of approximately $1 million and $2 million at December 31, 2007 and 2006, respectively, which represents the fair value of the swaps. The swaps increased fuel expense for 2007 by $1 million and reduced fuel expense for 2006 by $3 million. The recognition of the swaps in fuel expense included monthly net settlements with the counterparty and the change in fair value.

**Earnings Impact –** Our use of derivative financial instruments had the following impact on pre-tax income for the years ended December 31:

| *Millions of Dollars* | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| (Increase)/decrease in interest expense from interest rate hedging | **$(8)** | $(8) | $5 |
| (Increase)/decrease in fuel expense from fuel derivatives | **(1)** | 3 | - |
| Increase/(decrease) in pre-tax income | **$(9)** | $(5) | $5 |

**Fair Value of Debt Instruments –** The fair value of our short- and long-term debt was estimated using quoted market prices, where available, or current borrowing rates. At December 31, 2007 and 2006, the fair value of total debt exceeded the carrying value by approximately $96 million and $273 million, respectively. At December 31, 2007 and 2006, approximately $164 million and $165 million, respectively, of fixed-rate debt securities contained call provisions that allowed us to retire the debt instruments prior to final maturity, with the payment of fixed call premiums, or in certain cases, at par.

**Sale of Receivables –** The Railroad transfers most of its accounts receivable to Union Pacific Receivables, Inc. (UPRI), a bankruptcy-remote subsidiary, as part of a sale of receivables facility. UPRI sells, without recourse on a 364-day revolving basis, an undivided interest in such accounts receivable to investors. The total capacity to sell undivided interests to investors under the facility was $600 million at both December 31, 2007 and 2006. The value of the outstanding undivided interest held by investors under the facility was $600 million at both December 31, 2007 and 2006, respectively. The value of the outstanding undivided interest held by investors is not included in our Consolidated Financial Statements. The value of the undivided interest held by investors was supported by $1,071 million and $1,158 million of accounts receivable held by UPRI at December 31, 2007 and 2006, respectively. At December 31, 2007 and 2006, the value of the interest retained by UPRI was $471 million and $558 million, respectively. This retained interest is included in accounts receivable in our Consolidated Financial Statements. The interest sold to investors is sold at carrying value, which approximates fair value, and there is no gain or loss recognized from the transaction.

The value of the outstanding undivided interest held by investors could fluctuate based upon the availability of eligible receivables and is directly affected by changing business volumes and credit risks, including default and dilution. If default or dilution percentages were to increase one percentage point, the amount of eligible receivables would decrease by $6 million. Should our credit rating fall below investment grade, the value of the outstanding undivided interest held by investors would be reduced, and, in certain cases, the investors would have the right to discontinue the facility.

The Railroad services the sold receivables; however, the Railroad does not recognize any servicing asset or liability as the servicing fees adequately compensate us for these responsibilities. The Railroad collected approximately $16.1 billion and $15.5 billion during the years ended December 31, 2007 and 2006, respectively. UPRI used certain of these proceeds to purchase new receivables under the facility.

The costs of the sale of receivables program are included in other income and were $35 million, $33 million, and $23 million for 2007, 2006, and 2005, respectively. The costs include interest, program fees paid to banks, commercial paper issuing costs, and fees for unused commitment availability.

The investors have no recourse to the Railroad's other assets except for customary warranty and indemnity claims. Creditors of the Railroad do not have recourse to the assets of UPRI. In August 2007, the sale of receivables program was renewed for an additional 364-day period without any significant changes in terms.

**4. Income Taxes**

Components of income tax expense/(benefit) were as follows for the years ended December 31:

| *Millions of Dollars* | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| Current | **$ 822** | $ 684 | $ 90 |
| Deferred | **354** | 235 | 320 |
| Unrecognized tax benefits | **(22)** | N/A | N/A |
| Total income tax expense | **$1,154** | $ 919 | $ 410 |

For the years ended December 31, reconciliation between statutory and effective tax rates is as follows:

| *Tax Rate Percentages* | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| Federal statutory tax rate | **35.0%** | 35.0% | 35.0% |
| State statutory rates, net of federal benefits | **2.9** | 2.9 | 2.9 |
| Deferred tax adjustments | **1.0** | (0.5) | (8.2) |
| Tax credits | **(0.6)** | (1.0) | (1.2) |
| Other | **0.1** | - | 0.1 |
| Effective tax rate | **38.4%** | 36.4% | 28.6% |

As reported in our Forms 10-Q for the quarters ended June 30, 2005 and September 30, 2005, the final settlements of income tax examinations for pre-1995 tax years, along with the Internal Revenue Service (IRS) Examination Reports for tax years 1995 through 2002, among other things, were considered in a re-evaluation of our estimated deferred tax assets and liabilities. This resulted in a reduction of deferred tax liabilities and income tax expense of $118 million in the third quarter of 2005.

Deferred income tax liabilities/(assets) were comprised of the following at December 31:

| *Millions of Dollars* | *2007* | *2006* |
|---|---|---|
| Net current deferred income tax asset | **$ (336)** | $ (319) |
| Property | **$ 9,467** | $9,356 |
| State taxes, net of federal benefits | **691** | 617 |
| Other | **(108)** | (277) |
| Net long-term deferred income tax liability | **$10,050** | $9,696 |
| Net deferred income tax liability | **$ 9,714** | $9,377 |

In June 2006, the FASB issued FIN 48. We adopted FIN 48 on January 1, 2007. Under FIN 48, tax benefits are recognized only for tax positions that are more likely than not to be sustained upon examination by tax authorities. The amount recognized is measured as the largest amount of benefit that is greater than 50 percent likely to be realized upon settlement. Unrecognized tax benefits are tax benefits claimed in our tax returns that do not meet these recognition and measurement standards.

At adoption, our total liabilities for unrecognized tax benefits were $227 million pre-tax, or $173 million after including tax benefits for the deductibility of interest and state taxes. Of this amount, $7 million was recorded as a decrease to beginning retained earnings for the cumulative effect of adopting FIN 48. The remaining $166 million had been previously accrued under either FASB Statement No. 5, *Accounting for Contingencies*, or FASB Statement No. 109, *Accounting for Income Taxes.* The entire $173 million was classified as non-current in the Consolidated Statement of Financial Position.

A reconciliation of changes in pre-tax unrecognized tax benefits liabilities/(assets) from the beginning to the end of the reporting period is as follows:

| *Millions of Dollars* | *2007* |
|---|---|
| Unrecognized Tax Benefits at adoption on January 1, 2007 | **$227** |
| Increases for positions taken in current year | **15** |
| Increases for positions taken in prior years | **7** |
| Decreases for positions taken in prior years | **(45)** |
| Decreases for positions expected to be taken in future years | **(41)** |
| Settlements with taxing authorities | **(1)** |
| Increases (decreases) for interest and penalties | **3** |
| Other increases (decreases) | **(4)** |
| Unrecognized tax benefits at December 31, 2007 | **$161** |

Included in the $161 million balance at December 31, 2007 and the $227 million balance at adoption were $142 million and $182 million, respectively, of unrecognized tax benefits that, if recognized, would reduce our effective tax rate. The remaining unrecognized tax benefits related to tax positions for which ultimate deductibility is highly certain, but for which there is uncertainty about the timing of such deductibility. Recognition of these tax benefits would reduce our effective tax rate only through a reduction of accrued interest and penalties.

We recognize interest and penalties as part of income tax expense. Total accrued pre-tax liabilities for interest and penalties were $78 million ($47 million after-tax) at December 31, 2007 and $75 million ($45 million after-tax) at adoption.

For all federal income tax years prior to 1995, the IRS examinations have been completed and the statute of limitations bars any additional assessments by the IRS. We have filed interest refund claims for years 1986

through 1994, which may be disputed by the IRS. The IRS has completed its examinations and issued notices of deficiency for tax years 1995 through 2004, and we are in different stages of the IRS appeals process for these years. The IRS is examining our tax returns for tax years 2005 and 2006. In the third quarter of 2007, we believe that we reached an agreement in principle with the IRS to resolve all of the issues, except interest, related to tax years 1995 through 1998, including the previously reported dispute over certain donations of property. We anticipate signing a closing agreement in 2008. Once formalized, we anticipate that this agreement will result in an immaterial reduction of income tax expense.

Upon resolution of the federal income tax examinations described above, we will report any changes to our taxable income to state and local taxing authorities in compliance with state and local requirements. Additionally, several state taxing authorities are currently examining our state income tax returns for tax years 2001 through 2005.

In the third quarter of 2007, the State of Illinois enacted new tax legislation that changed how we determine the amount of our income subject to Illinois tax. This legislation caused an increase to our deferred tax expense by $27 million in the third quarter. In addition, because the legislation reduced uncertainty about determining future income subject to Illinois tax, $41 million pre-tax ($26 million after-tax) of deferred taxes are no longer considered part of unrecognized tax benefits. In January of 2008, Illinois enacted technical corrections legislation that made additional changes in how we determine the amount of our income subject to Illinois tax. This technical corrections legislation will result in a reduction of deferred tax expense of approximately $14 million in the first quarter of 2008.

We expect that the amount of unrecognized tax benefits will change significantly during the next 12 months. Of the $161 million balance at December 31, 2007, $140 million is classified as current in the Consolidated Statement of Financial Position, primarily due to the anticipated settlement for tax years 1995 through 1998 described above. It is also reasonably possible that we may resolve the interest claims for 1986 through 1994 described above, which would likely result in an immaterial change to unrecognized tax benefits.

**5. Debt**

Total debt as of December 31, 2007 and 2006, net of interest rate swaps designated as hedges, is summarized below:

| *Millions of Dollars* | ***2007*** | *2006* |
|---|---|---|
| Notes and debentures, 3.0% to 7.4% due through 2054 [a] | **$5,968** | $4,803 |
| Capitalized leases, 4.7% to 9.3% due through 2026 | **1,219** | 1,236 |
| Medium-term notes, 9.2% to 10.0% due through 2020 | **61** | 362 |
| Equipment obligations, 6.2% to 8.1% due through 2031 | **291** | 232 |
| Mortgage bonds, 4.8% due through 2030 | **59** | 59 |
| Tax-exempt financings, 5.0% to 5.7% due through 2026 | **188** | 191 |
| Unamortized discount | **(104)** | (103) |
| Total debt [a] | **$7,682** | $6,780 |
| Less current portion [b] | **(139)** | (780) |
| Total long-term debt | **$7,543** | $6,000 |

*[a] 2007 included a write-up of $2 million while 2006 included a collective write-down of $14 million due to market value adjustments for debt with qualifying hedges that are recorded on the Consolidated Statements of Financial Position.*

*[b] 2006 included a write-down of $4 million due to short-term market value adjustments for debt with qualifying hedges that are recorded on the Consolidated Statements of Financial Position.*

**Debt Maturities –** The following table presents aggregate debt maturities as of December 31, 2007, excluding market value adjustments.

| *Millions of Dollars* | |
|---|---|
| 2008 | $ 689 |
| 2009 | 542 |
| 2010 | 462 |
| 2011 | 550 |
| 2012 | 720 |
| Thereafter | 4,717 |
| Total debt | $7,680 |

At December 31, 2007, we reclassified as long-term debt approximately $550 million of debt due within one year that we intend to refinance. This reclassification reflected our ability and intent to refinance any short-term borrowings and certain current maturities of long-term debt on a long-term basis. At December 31, 2006, we did not reclassify any short-term debt as long-term debt as we did not intend to refinance at that time.

**Mortgaged Properties –** Equipment with a carrying value of approximately $2.8 billion at both December 31, 2007 and 2006 serves as collateral for capital leases and other types of equipment obligations in accordance with the secured financing arrangements utilized to acquire such railroad equipment.

As a result of the merger of Missouri Pacific Railroad Company (MPRR) with and into UPRR on January 1, 1997, and pursuant to the underlying indentures for the MPRR mortgage bonds, UPRR must maintain the same value of assets after the merger in order to comply with the security requirements of the mortgage bonds. As of the merger date, the value of the MPRR assets that secured the mortgage bonds was approximately $6.0 billion. In accordance with the terms of the indentures, this collateral value must be maintained during the entire term of the mortgage bonds irrespective of the outstanding balance of such bonds.

**Credit Facilities –** On December 31, 2007, $1.9 billion of credit was available under our revolving credit facility (the facility), which we entered into on April 20, 2007. The facility is designated for general corporate purposes and supports the issuance of commercial paper. We did not draw on the facility during 2007. Commitment fees and interest rates payable under the facility are similar to fees and rates available to comparably rated, investment-grade borrowers. The facility allows for borrowings at floating rates based on London Interbank Offered Rates, plus a spread, depending upon our senior unsecured debt ratings. The facility requires the maintenance of a debt to net worth coverage ratio. At December 31, 2007, we were in compliance with this covenant. The facility does not include any other financial restrictions, credit rating triggers (other than rating-dependent pricing), or any other provision that could require us to post collateral. The facility, which expires in April 2012, replaced two $1 billion, 5-year facilities with terms ending in March 2009 and March 2010. The facility includes terms that are comparable with those of the prior facilities, although the minimum net worth requirement of $7.5 billion in prior facilities was removed, and the facility includes a change-of-control provision.

In addition to our revolving credit facility, a $75 million uncommitted line of credit was available. The line of credit expires in April 2008, and was not used in 2007. We must have equivalent credit available under our five-year facility to draw on this $75 million line.

**Dividend Restrictions –** Our revolving credit facility includes a debt-to-net worth covenant that, under certain circumstances, would restrict the payment of cash dividends to our shareholders. The amount of retained earnings available for dividends was $11.5 billion and $7.8 billion at December 31, 2007 and December 31, 2006, respectively. This facility replaced two credit facilities that had minimum net worth covenants that were more restrictive with respect to the amount of retained earnings available for dividends at December 31, 2006.

**Shelf Registration Statement and Significant New Borrowings** – Our Board of Directors authorized the issuance of up to $3 billion of debt securities pursuant to a new shelf registration statement, which became effective on March 6, 2007, replacing the $500 million of authority remaining under our shelf registration filed in December 2003. Under the current shelf registration, we may issue, from time to time, any combination of debt securities, preferred stock, common stock, or warrants for debt securities or preferred stock in one or more offerings.

We have issued the following unsecured, fixed-rate debt securities under our current shelf registration:

| *Date* | *Description of Securities* |
|---|---|
| Issued during 2007: | |
| April 18, 2007 | $250 million of 5.65% Notes due May 1, 2017 |
| April 18, 2007 | $250 million of 6.15% Debentures due May 1, 2037 |
| August 24, 2007 | $500 million of 5.45% Notes due January 31, 2013 |
| October 30, 2007 | $500 million of 5.75% Notes due November 15, 2017 |
| Issued subsequent to 2007: | |
| February 5, 2008 | $750 million of 5.70% Notes due August 15, 2018 |

The net proceeds from these offerings are for general corporate purposes, including the repurchase of common stock pursuant to our share repurchase program. These debt securities include change-of-control provisions. We have no immediate plans to issue equity securities; however, we will continue to explore opportunities to replace existing debt or access capital through issuances of debt securities under our shelf registration, and, therefore, we may issue additional debt securities at any time.

## 6. Leases

We lease certain locomotives, freight cars, and other property. The Consolidated Statement of Financial Position as of December 31, 2007 and 2006 included $2,062 million, net of $887 million of amortization, and $1,982 million, net of $800 million of amortization, respectively, for properties under capital leases. A charge to income resulting from the amortization of assets recorded under capital leases is included within depreciation expense in our Consolidated Statements of Income. Future minimum lease payments for operating and capital leases with initial or remaining non-cancelable lease terms in excess of one year as of December 31, 2007 were as follows:

| *Millions of Dollars* | *Operating Leases* | *Capital Leases* |
|---|---|---|
| 2008 | $ 639 | $ 181 |
| 2009 | 600 | 179 |
| 2010 | 554 | 160 |
| 2011 | 522 | 165 |
| 2012 | 417 | 106 |
| Later Years | 3,289 | 1,054 |
| Total minimum lease payments | $6,021 | $1,845 |
| Amount representing interest | N/A | (626) |
| Present value of minimum lease payments | N/A | $1,219 |

Rent expense for operating leases with terms exceeding one month was $810 million in 2007, $798 million in 2006, and $728 million in 2005. When cash rental payments are not made on a straight-line basis, we

recognize variable rental expense on a straight-line basis over the lease term. Contingent rentals and sub-rentals are not significant.

## 7. Retirement Plans

### Pension and Other Postretirement Benefits

*Pension Plans* – We provide defined benefit retirement income to eligible non-union employees through qualified and non-qualified (supplemental) pension plans. Qualified and non-qualified pension benefits are based on years of service and the highest compensation during the latest years of employment, with specific reductions made for early retirements.

*Other Postretirement Benefits (OPEB)* – We provide defined contribution medical and life insurance benefits for eligible retirees. These benefits are funded as medical claims and life insurance premiums are paid.

### Funded Status

We adopted FASB Statement No. 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans* (FAS 158), at the end of 2006, which required us to separately recognize the overfunded or underfunded status of our pension and OPEB plans as an asset or liability. The funded status represents the difference between the projected benefit obligation (PBO) and the fair value of the plan assets. The PBO is the present value of benefits earned to date by plan participants, including the effect of assumed future salary increases. The PBO of the OPEB plan is equal to the accumulated benefit obligation, as the present value of the OPEB liabilities is not affected by salary increases. Plan assets are measured at fair value. We use a December 31 measurement date for plan assets and obligations for all our retirement plans.

Changes in our PBO and plan assets are as follows for the years ended December 31:

| ***Funded Status*** | *Pension* | | *OPEB* | |
|---|---|---|---|---|
| *Millions of Dollars* | ***2007*** | *2006* | ***2007*** | *2006* |
| Projected Benefit Obligation | | | | |
| Projected benefit obligation at beginning of year | **$2,113** | $2,065 | **$ 374** | $ 476 |
| Service cost | **34** | 35 | **3** | 4 |
| Interest cost | **124** | 117 | **20** | 21 |
| Plan amendments | **-** | - | **(10)** | (38) |
| Actuarial loss (gain) | **(33)** | 16 | **(34)** | (58) |
| Gross benefits paid | **(126)** | (120) | **(27)** | (31) |
| Projected benefit obligation at end of year | **$2,112** | $2,113 | **$ 326** | $ 374 |
| Plan Assets | | | | |
| Fair value of plan assets at beginning of year | **$1,989** | $1,707 | **$ -** | $ - |
| Actual return on plan assets | **183** | 243 | **-** | - |
| Voluntary funded pension plan contributions | **-** | 150 | **-** | - |
| Non-qualified plan benefit contributions | **12** | 9 | **27** | 31 |
| Gross benefits paid | **(126)** | (120) | **(27)** | (31) |
| Fair value of plan assets at end of year | **$2,058** | $1,989 | **$ -** | $ - |
| Funded status at end of year | **$ (54)** | $ (124) | **$(326)** | $(374) |

Amounts recognized in the statement of financial position as of December 31, 2007 and 2006 consist of:

| *Millions of Dollars* | *Pension* | | *OPEB* | |
|---|---|---|---|---|
| | **2007** | 2006 | **2007** | 2006 |
| Noncurrent assets | **$ 120** | $ 45 | **$ -** | $ - |
| Current liabilities | **(11)** | (12) | **(27)** | (27) |
| Noncurrent liabilities | **(163)** | (157) | **(299)** | (347) |
| Net amounts recognized at end of year | **$ (54)** | $(124) | **$(326)** | $(374) |

Pre-tax amounts recognized in accumulated other comprehensive income/(loss) as of December 31, 2007 consist of:

| *Millions of Dollars* | *Pension* | *OPEB* | *Total* |
|---|---|---|---|
| Prior service (cost)/credit | $ (18) | $137 | $ 119 |
| Net actuarial loss | (158) | (85) | (243) |
| Total | $(176) | $ 52 | $(124) |

Pre-tax amounts recognized in accumulated other comprehensive income/(loss) as of December 31, 2006 consist of:

| *Millions of Dollars* | *Pension* | *OPEB* | *Total* |
|---|---|---|---|
| Prior service (cost)/credit | $ (24) | $ 161 | $ 137 |
| Net actuarial loss | (249) | (126) | (375) |
| Total | $(273) | $ 35 | $(238) |

Other pre-tax changes recognized in other comprehensive income during 2007 were as follows:

| *Millions of Dollars* | *Pension* | *OPEB* | *Total* |
|---|---|---|---|
| Prior service credit arising during the year | $ - | $(10) | $ (10) |
| Net actuarial (gain)/loss arising during the year | (73) | (32) | (105) |
| Amortization of prior service (cost)/credit | (6) | 33 | 27 |
| Amortization of actuarial gain/(loss) | (18) | (8) | (26) |
| Total | $(97) | $(17) | $(114) |

Amounts included in accumulated other comprehensive income expected to be amortized into net periodic cost (benefit) during 2008:

| *Millions of Dollars* | *Pension* | *OPEB* | *Total* |
|---|---|---|---|
| Prior service cost (credit) | $ 6 | $(33) | $(27) |
| Net actuarial loss | 5 | 6 | 11 |
| Total | $11 | $(27) | $(16) |

*Underfunded Accumulated Benefit Obligation* – The accumulated benefit obligation (ABO) is the present value of benefits earned to date, assuming no future salary growth. The underfunded accumulated benefit obligation represents the difference between the ABO and the fair value of plan assets. At December 31, 2007, the only pension plan that was underfunded was our non-qualified (supplemental) plan, which is not funded by

design. The non-qualified (supplemental) plan is funded with cash from operations as benefits are paid to plan participants. Each of our qualified plans was fully funded at December 31, 2007. The PBO, ABO, and fair value of plan assets for pension plans with accumulated benefit obligations in excess of the fair value of the plan assets were as follows for the years ended December 31:

| ***Underfunded Accumulated Benefit Obligation*** *Millions of Dollars* | ***2007*** | *2006* |
|---|---|---|
| Projected benefit obligation | **$(175)** | $(169) |
| Accumulated benefit obligation | **$(172)** | $(168) |
| Fair value of plan assets | - | - |
| Underfunded accumulated benefit obligation | **$(172)** | $(168) |

The ABO for all defined benefit pension plans was $2.0 billion and $2.1 billion at December 31, 2007 and 2006, respectively.

*Assumptions* – The weighted-average actuarial assumptions used to determine benefit obligations at December 31:

| | *Pension* | | | *OPEB* | | |
|---|---|---|---|---|---|---|
| *Percentages* | ***2007*** | *2006* | *2005* | ***2007*** | *2006* | *2005* |
| Discount rate | **6.50%** | 6.00% | 5.75% | **6.50%** | 6.00% | 5.75% |
| Salary increase | **3.50** | 3.00 | 2.75 | **N/A** | N/A | N/A |

The following table presents assumed health care cost trend rates used to determine benefit obligations and OPEB expense:

| *Percentages* | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| Assumed health care cost trend rate for next year | **9.0%** | 8.0% | 9.0% |
| Rate to which health care cost trend rate is expected to decline and remain | **5.0%** | 5.0% | 5.0% |
| Year that the rate reaches the ultimate trend rate | **2011** | 2010 | 2010 |

**Expense**

Both pension and OPEB expense are determined based upon the annual service cost of benefits (the actuarial cost of benefits earned during a period) and the interest cost on those liabilities, less the expected return on plan assets. The expected long-term rate of return on plan assets is applied to a calculated value of plan assets that recognizes changes in fair value over a five-year period. This practice is intended to reduce year-to-year volatility in pension expense, but it can have the effect of delaying the recognition of differences between actual returns on assets and expected returns based on long-term rate of return assumptions. Differences in actual experience in relation to assumptions are not recognized in net income immediately, but are deferred and, if necessary, amortized as pension or OPEB expense.

The components of our net periodic pension and OPEB cost/(benefit) were as follows for the years ended December 31:

| | *Pension* | | | *OPEB* | | |
|---|---|---|---|---|---|---|
| *Millions of Dollars* | ***2007*** | *2006* | *2005* | ***2007*** | *2006* | *2005* |
| Net Periodic Benefit Cost: | | | | | | |
| Service cost | **$ 34** | $ 35 | $ 28 | **$ 3** | $ 4 | $ 4 |
| Interest cost | **124** | 117 | 115 | **20** | 21 | 25 |
| Expected return on plan assets | **(144)** | (134) | (134) | **-** | - | - |
| Amortization of: | | | | | | |
| Prior service cost/(credit) | **6** | 7 | 7 | **(33)** | (33) | (30) |
| Actuarial loss | **18** | 21 | 5 | **8** | 13 | 14 |
| Net periodic benefit cost/(benefit) | **$ 38** | $ 46 | $ 21 | **$ (2)** | $ 5 | $ 13 |

*Assumptions* – The weighted-average actuarial assumptions used to determine expense were as follows for the years ended December 31:

| | *Pension* | | | *OPEB* | | |
|---|---|---|---|---|---|---|
| *Percentages* | ***2007*** | *2006* | *2005* | ***2007*** | *2006* | *2005* |
| Discount rate | **6.00%** | 5.75% | 6.00% | **6.00%** | 5.75% | 6.00% |
| Expected return on plan assets | **8.00** | 8.00 | 8.00 | **N/A** | N/A | N/A |
| Salary increase | **3.00** | 2.75 | 3.00 | **N/A** | N/A | N/A |

The discount rate is based on a hypothetical portfolio of high quality corporate bonds with cash flows matching our plans' expected benefit payments. The expected return on plan assets is based on our asset allocation mix and our historical return, taking into account current and expected market conditions. The actual return on pension plan assets, net of fees, was approximately 9% in 2007, 14% in 2006, and 7% in 2005. Our historical annualized ten-year rate of return on plan assets is approximately 8%.

Assumed healthcare cost trend rates have a significant effect on the expense and liabilities reported for healthcare plans. The assumed healthcare cost trend rate is based on historical rates and expected market conditions. A one-percentage point change in the assumed healthcare cost trend rates would have the following effects on OPEB:

| *Millions of Dollars* | *One % pt. Increase* | *One % pt. Decrease* |
|---|---|---|
| Effect on total service and interest cost components | $ 2 | $ (2) |
| Effect on accumulated benefit obligation | 25 | (21) |

**Cash Contributions**

The following table details our cash contributions for the years ended December 31, 2007 and 2006, and the expected contributions for 2008:

| | *Pension* | | |
|---|---|---|---|
| *Millions of Dollars* | *Qualified* | *Non-qualified* | *OPEB* |
| 2006 | $150 | $ 9 | $31 |
| 2007 | - | 12 | 27 |
| 2008 | - | 12 | 27 |

Our policy with respect to funding the qualified plans is to fund at least the minimum required by the Pension Protection Act of 2006 and not more than the maximum amount deductible for tax purposes. All contributions made to the qualified pension plans in 2006 were voluntary and were made with cash generated from operations. At December 31, 2007, our qualified pension plans were fully funded. No required contributions are expected in 2008.

The OPEB plans are not funded and are not subject to any minimum regulatory funding requirements. Benefit payments for each year represent claims paid for medical and life insurance, and we anticipate our 2008 OPEB payments will be made from cash generated from operations.

**Benefit Payments**

The following table details expected benefit payments for the years 2008 though 2017:

| *Millions of Dollars* | *Pension* | *OPEB* |
|---|---|---|
| 2008 | $ 125 | $ 27 |
| 2009 | 128 | 28 |
| 2010 | 131 | 29 |
| 2011 | 137 | 29 |
| 2012 | 142 | 29 |
| Years 2013 – 2017 | 795 | 139 |

**Asset Allocation Strategy**

Our pension plan asset allocation at December 31, 2007 and 2006, and target allocation for 2008, are as follows:

| | *Target Allocation* | *Percentage of Plan Assets December 31,* | |
|---|---|---|---|
| | *2008* | ***2007*** | *2006* |
| Equity securities | 60% to 70% | **68%** | 70% |
| Debt securities | 20% to 30% | **23** | 26 |
| Real estate | 2% to 8% | **4** | 2 |
| Commodities | 4% to 6% | **5** | 2 |
| Total | | **100%** | 100% |

The investment strategy for pension plan assets is to maintain a broadly diversified portfolio designed to achieve our target of an average long-term rate of return of 8%. While we believe we can achieve a long-term average rate of return of 8%, we cannot be certain that the portfolio will perform to our expectations. Assets are strategically allocated among equity, debt, and other instruments in order to achieve a diversification level that mitigates wide swings in investment returns. Asset allocation target ranges for equity, debt, and other portfolios are evaluated at least every three years with the assistance of an independent external consulting firm. Actual asset allocations are monitored monthly, and rebalancing actions are executed at least quarterly, if needed.

Plan assets are valued at fair value. Investments in securities traded on national security exchanges are valued at their closing market prices on the valuation date; where no sale was made on the valuation date, the security is valued at its bid price. Securities traded in the over-the-counter market are valued at their last sale or bid price. Investments in mortgage-backed securities are carried at estimated fair value based on the characteristics of the underlying mortgages. Certain short-term investments are carried at cost, which approximates fair

value. Venture capital funds, where no quoted market prices are available, are valued at their estimated fair values as determined by the investment manager. Investments in limited partnerships are valued at estimated fair value based on their proportionate share of the partnerships' fair value. The partnerships invest primarily in readily marketable securities.

The majority of the plan's assets are invested in equity securities, because equity portfolios have historically provided higher returns than debt and other asset classes over extended time horizons, and are expected to do so in the future. Correspondingly, equity investments also entail greater risks than other investments. The risk of loss in the plan's equity portfolio is mitigated by investing in a broad range of equity types. Equity diversification includes large-capitalization and small-capitalization companies, growth-oriented and value-oriented investments, and U.S. and non-U.S. securities.

Equity risks are further balanced by investing a significant portion of the plan's assets in high quality debt securities. The average quality rating of the debt portfolio exceeded AA as of December 31, 2007 and 2006. The debt portfolio is also broadly diversified and invested primarily in U.S. Treasury, mortgage, and corporate securities with an intermediate average maturity. The weighted-average maturity of the debt portfolio was 6.4 years at both December 31, 2007 and 2006, respectively.

The investment of pension plan assets in our securities is specifically prohibited for both the equity and debt portfolios, other than through index fund holdings.

**Other Retirement Programs**

*Thrift Plan* – We provide a defined contribution plan (thrift plan) to eligible non-union employees and make matching contributions to the thrift plan. We match 50 cents for each dollar contributed by employees up to the first six percent of compensation contributed. Our thrift plan contributions were $14 million in 2007, $13 million in 2006, and $12 million in 2005.

*Railroad Retirement System* – All Railroad employees are covered by the Railroad Retirement System (the System). Contributions made to the System are expensed as incurred and amounted to approximately $616 million in 2007, $615 million in 2006, and $595 million in 2005.

*Collective Bargaining Agreements* – Under collective bargaining agreements, we provide certain postretirement healthcare and life insurance benefits for eligible union employees. Premiums under the plans are expensed as incurred and amounted to $40 million in both 2007 and 2006, and $41 million in 2005.

**8. Stock Options and Other Stock Plans**

We have 600,793 options outstanding under the 1993 Stock Option and Retention Stock Plan of Union Pacific Corporation (1993 Plan). There are 3,570 restricted shares outstanding under the 1992 Restricted Stock Plan for Non-Employee Directors of Union Pacific Corporation. We no longer grant options or awards of retention shares and units under these plans.

The UP Shares Stock Option Plan of Union Pacific Corporation (UP Shares Plan) was approved by our Board of Directors on April 30, 1998. The UP Shares Plan reserved 12,000,000 shares of our common stock for issuance. The UP Shares Plan was a broad-based option program that granted options to purchase 200 shares of our common stock at $55.00 per share to eligible active employees on April 30, 1998. All options granted were non-qualified options that became exercisable on May 1, 2001, and remain exercisable until April 30, 2008. If an optionee's employment terminates for any reason, the option remains exercisable for a period of one year after the date of termination, but no option is exercisable after April 30, 2008. No further options may be granted under the UP Shares Plan. As of December 31, 2007, there were 432,689 options outstanding under the UP Shares Plan.

In April 2000, the shareholders approved the Union Pacific Corporation 2000 Directors Plan (Directors Plan) whereby 550,000 shares of our common stock were reserved for issuance to our non-employee directors. Under the Directors Plan, each non-employee director, upon his or her initial election to the Board of Directors, receives a grant of 1,000 shares of retention shares or retention stock units. Additionally, each non-employee director receives annually an option to purchase at fair value a number of shares of our common stock, not to exceed 5,000 shares during any calendar year, determined by dividing 60,000 by 1/3 of the fair market value of one share of our common stock on the date of such Board of Directors meeting, with the resulting quotient rounded up or down to the nearest 50 shares. After December 31, 2007, non-employee directors will not receive these annual options. As of December 31, 2007, 7,000 restricted shares were outstanding under the Directors Plan and 155,500 options were outstanding under the Directors Plan.

The Union Pacific Corporation 2001 Stock Incentive Plan (2001 Plan) was approved by the shareholders in April 2001. The 2001 Plan reserved 12,000,000 shares of our common stock for issuance to eligible employees of the Corporation and its subsidiaries in the form of non-qualified options, incentive stock options, retention shares, stock units, and incentive bonus awards. Non-employee directors were not eligible for awards under the 2001 Plan. As of December 31, 2007, 2,963,203 options and 86,250 retention shares and stock units were outstanding under the 2001 Plan. We no longer grant any stock options or other stock or unit awards under this plan.

The Union Pacific Corporation 2004 Stock Incentive Plan (2004 Plan) was approved by shareholders in April 2004. The 2004 Plan reserved 21,000,000 shares of our common stock for issuance, plus any shares subject to awards made under the 2001 Plan and the 1993 Plan that were outstanding on April 16, 2004, and became available for regrant pursuant to the terms of the 2004 Plan. Under the 2004 Plan, non-qualified options, stock appreciation rights, retention shares, stock units, and incentive bonus awards may be granted to eligible employees of the Corporation and its subsidiaries. Non-employee directors are not eligible for awards under the 2004 Plan. As of December 31, 2007, 3,471,156 options and 1,020,420 retention shares and stock units were outstanding under the 2004 Plan.

Pursuant to the above plans, 19,300,864; 19,544,245; and 20,695,817 shares of our common stock were authorized and available for grant at December 31, 2007, 2006, and 2005, respectively.

**Stock Options –** We estimate the fair value of our stock option awards using the Black-Scholes option pricing model. Groups of employees and non-employee directors that have similar historical and expected exercise behavior are considered separately for valuation purposes. The table below shows the annual weighted-average assumptions used for valuation purposes:

| *Weighted-Average Assumptions* | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| Risk-free interest rate | **4.9%** | 4.5% | 3.8% |
| Dividend yield | **1.4%** | 1.4% | 1.9% |
| Expected life (years) | **4.7** | 6.0 | 4.8 |
| Volatility | **20.9%** | 25.3% | 20.6% |
| Weighted-average grant-date fair value of options granted | **$22.38** | $24.97 | $12.92 |

The risk-free rate is based on the U.S. Treasury yield curve in effect at the time of grant; the dividend yield is calculated as the ratio of dividends paid per share of common stock to the stock price on the date of grant; the expected life is based on historical and expected exercise behavior; and volatility is based on the historical volatility of our stock price over the expected life of the option.

A summary of stock option activity during 2007 is presented below:

| | *Shares (thous.)* | *Weighted-Average Exercise Price* | *Weighted-Average Remaining Contractual Term* | *Aggregate Intrinsic Value (millions)* |
|---|---|---|---|---|
| Outstanding at January 1, 2007 | 10,044 | $64.22 | 6.0 yrs. | $279 |
| Granted | 1,103 | 96.94 | N/A | N/A |
| Exercised | (3,542) | 58.61 | N/A | N/A |
| Forfeited or expired | (42) | 79.18 | N/A | N/A |
| Outstanding at December 31, 2007 | 7,563 | $71.53 | 6.0 yrs. | $409 |
| Vested or expected to vest at December 31, 2007 | 7,501 | $71.36 | 6.0 yrs. | $407 |
| Options exercisable at December 31, 2007 | 5,487 | $63.88 | 5.0 yrs. | $339 |

Stock options are granted at the closing price on the date of grant, have ten-year contractual terms, and vest no later than three years from the date of grant. None of the stock options outstanding at December 31, 2007 are subject to performance or market-based vesting conditions.

At December 31, 2007, there was $26 million of unrecognized compensation expense related to nonvested stock options, which is expected to be recognized over a weighted-average period of 1.3 years. Additional information regarding stock option exercises appears in the table below:

| *Millions of Dollars* | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| Intrinsic value of stock options exercised | **$208** | $124 | $142 |
| Cash received from option exercises | **132** | 177 | 296 |
| Tax benefit realized from option exercises | **78** | 44 | 55 |
| Aggregate grant-date fair value of stock options vested [a] | **11** | 26 | 62 |

*[a] Stock options for executives granted in 2003 and 2002 included a reload feature. This reload feature allowed executives to exercise their options using shares of Union Pacific Corporation common stock that they already owned and obtain a new grant of options with immediate vesting in the amount of the shares used for exercise plus any shares withheld for tax purposes. The reload feature of these option grants could only be exercised if the price of our common stock increased at least 20% from the price at the time of the reload grant. During the year ended December 31, 2005, reload option grants represented $31 million of the aggregate grant-date fair value of stock options vested. There were no reload option grants during 2007 and 2006 as stock options exercised after January 1, 2006 are not eligible for the reload feature.*

**Retention Awards –** The fair value of retention awards is based on the closing price of the stock at the grant date. Dividend equivalents are paid to participants during the vesting periods.

Changes in our retention awards during 2007 were as follows:

| | *Shares (thous.)* | *Weighted-Average Grant-Date Fair Value* |
|---|---|---|
| Nonvested at January 1, 2007 | 778 | $71.72 |
| Granted | 306 | 97.01 |
| Vested | (253) | 61.66 |
| Forfeited | (19) | 81.80 |
| Nonvested at December 31, 2007 | 812 | $84.09 |

Retention awards are granted at no cost to the employee or non-employee director and vest over periods lasting up to four years. At December 31, 2007, there was $38 million of total unrecognized compensation expense related to nonvested retention awards, which is expected to be recognized over a weighted-average period of 2.1 years.

**Performance Retention Awards –** In January 2007, our Board of Directors approved performance stock unit grants. Other than raising the performance targets, the basic terms of these performance stock units are identical to those granted in January 2006, including annual return on invested capital (ROIC) as the performance measure. Stock units awarded to selected employees under these grants are subject to continued employment for 37 months and the attainment of certain levels of ROIC. We will expense the fair value of the units that are probable of being earned based on our forecasted ROIC over the 3-year performance period. We measure the fair value of these performance stock units based upon the closing price of the underlying common stock as of the date of grant, reduced by the present value of estimated future dividends. Dividend equivalents are paid to participants only after the units are earned.

The assumptions used to calculate the present value of estimated future dividends are as follows:

| | *2007* |
|---|---|
| Dividend per share per quarter | $0.35 |
| Risk-free interest rate at date of grant | 4.9% |

Changes in our performance retention awards during 2007 were as follows:

| | *Shares (thous.)* | *Weighted-Average Grant-Date Fair Value* |
|---|---|---|
| Nonvested at January 1, 2007 | 122 | $86.05 |
| Granted | 173 | 93.72 |
| Vested | - | - |
| Forfeited | (1) | 93.72 |
| Nonvested at December 31, 2007 | 294 | $90.53 |

At December 31, 2007, there was $15 million of total unrecognized compensation expense related to nonvested performance retention awards, which is expected to be recognized over a weighted-average period of 1.7 years. A portion of this expense is subject to achievement of the ROIC levels established for the performance stock unit grants.

## 9. Earnings Per Share

The following table provides a reconciliation between basic and diluted earnings per share for the years ended December 31:

| *Millions of Dollars, Except Per Share Amounts* | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| Net income | **$1,855** | $1,606 | $1,026 |
| Weighted-average number of shares outstanding: | | | |
| Basic | **265.9** | 269.4 | 263.4 |
| Dilutive effect of stock options | **2.1** | 2.1 | 1.5 |
| Dilutive effect of retention shares and units | **0.4** | 0.5 | 1.6 |
| Diluted | **268.4** | 272.0 | 266.5 |
| Earnings per share – basic | **$ 6.97** | $ 5.96 | $ 3.89 |
| Earnings per share – diluted | **$ 6.91** | $ 5.91 | $ 3.85 |

Common stock options totaling 0.4 million, 1.4 million, and 1.4 million for 2007, 2006, and 2005, respectively, were excluded from the computation of diluted earnings per share because the exercise prices of these options exceeded the average market price of our common stock for the respective periods, and the effect of their inclusion would be anti-dilutive.

## 10. Commitments and Contingencies

**Asserted and Unasserted Claims –** Various claims and lawsuits are pending against us and certain of our subsidiaries. We cannot fully determine the effect of all asserted and unasserted claims on our consolidated results of operations, financial condition, or liquidity; however, to the extent possible, where asserted and unasserted claims are considered probable and where such claims can be reasonably estimated, we have recorded a liability. We do not expect that any known lawsuits, claims, environmental costs, commitments, contingent liabilities, or guarantees will have a material adverse effect on our consolidated results of operations, financial condition, or liquidity after taking into account liabilities previously recorded for these matters.

**Personal Injury –** The cost of personal injuries to employees and others related to our activities is charged to expense based on estimates of the ultimate cost and number of incidents each year. We use third-party actuaries to assist us in measuring the expense and liability, including unasserted claims, on a semi-annual basis. Compensation for work-related accidents is governed by the Federal Employers' Liability Act (FELA). Under FELA, damages are assessed based on a finding of fault through litigation or out-of-court settlements.

As a result of improvements in our safety experience, lower estimated ultimate settlement costs, and the completion of actuarial studies, we reduced personal injury expense by approximately $80 million in 2007. These adjustments were partially offset by adverse development with respect to one claim. Our personal injury liability activity was as follows:

| *Millions of Dollars* | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| Beginning balance | **$ 631** | $ 619 | $ 639 |
| Accruals | **165** | 240 | 247 |
| Payments | **(203)** | (228) | (267) |
| Ending balance at December 31 | **$ 593** | $ 631 | $ 619 |
| Current portion, ending balance at December 31 | **$ 204** | $ 233 | $ 274 |

Our personal injury liability is discounted to present value using applicable U.S. Treasury rates. Because of the uncertainty surrounding the ultimate outcome of personal injury claims, it is reasonably possible that future costs to settle these claims may range from approximately $593 million to $641 million. We believe that the $593 million liability recorded at December 31, 2007, is the best estimate of the present value of the future settlement costs of personal injury claims.

**Asbestos –** We are a defendant in a number of lawsuits in which current and former employees and other parties allege exposure to asbestos. Additionally, we have received claims for asbestos exposure that have not been litigated. The claims and lawsuits (collectively referred to as "claims") allege occupational illness resulting from exposure to asbestos-containing products. In most cases, the claimants do not have credible medical evidence of physical impairment resulting from the alleged exposures. Additionally, most claims filed against us do not specify an amount of alleged damages.

During 2004, we engaged a third party with extensive experience in estimating resolution costs for asbestos-related claims to assist us in assessing the number and value of these unasserted claims through 2034, based on our average claims experience over a multi-year period. During 2007, we updated our potential liability to include actual claim experience since 2004. As a result, we decreased our liability by $20 million in 2007 for asbestos-related claims. The liability for resolving both asserted and unasserted claims was based on the following assumptions:

- The number of future claims received would be consistent with historical averages.
- The number of claims filed against us will decline each year.
- The average settlement values for asserted and unasserted claims will be equivalent to historical averages.
- The percentage of claims dismissed in the future will be equivalent to historical averages.

Our asbestos-related liability activity was as follows:

| *Millions of Dollars* | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| Beginning balance | **$302** | $311 | $324 |
| Accruals/(credits) | **(20)** | - | - |
| Payments | **(17)** | (9) | (13) |
| Ending balance at December 31 | **$265** | $302 | $311 |
| Current portion, ending balance at December 31 | **$ 11** | $ 13 | $ 16 |

Our liability for asbestos-related claims is not discounted to present value due to the uncertainty surrounding the timing of future payments. Approximately 13% of the recorded liability related to asserted claims, and approximately 87% related to unasserted claims. These claims are expected to be paid out over the next 27 years. We will continue to review actual experience and adjust our estimate as warranted.

We have insurance coverage for a portion of the costs incurred to resolve asbestos-related claims, and, as a result of the 2004 assessment, we increased our receivable for insurance recoveries related to asbestos during 2004. In conjunction with the liability update performed in 2007, we also reassessed estimated insurance recoveries. We have recognized an asset for estimated insurance recoveries at December 31, 2007 and 2006.

We believe that our estimates of liability for asbestos-related claims and insurance recoveries are reasonable and probable. The amounts recorded for asbestos-related liabilities and related insurance recoveries were based on currently known facts. However, future events, such as the number of new claims filed each year, average settlement costs, and insurance coverage issues, could cause the actual costs and insurance recoveries to be higher or lower than the projected amounts. Estimates also may vary in the future if: strategies, activities,

and outcomes of asbestos litigation materially change; federal and state laws governing asbestos litigation increase or decrease the probability or amount of compensation of claimants; and there are material changes with respect to payments made to claimants by other defendants.

**Environmental Costs** – We are subject to federal, state, and local environmental laws and regulations. We have 339 projects with which we are or may be liable for remediation costs associated with alleged contamination or for violations of environmental requirements. This includes 41 projects that are the subject of actions taken by the U.S. government, 22 of which are currently on the Superfund National Priorities List. Certain federal legislation imposes joint and several liability for the remediation of identified projects; consequently, our ultimate environmental liability may include costs relating to activities of other parties, in addition to costs relating to our own activities with each project.

When an environmental issue has been identified with respect to property owned, leased, or otherwise used in our business, we and our consultants perform environmental assessments on the property. We expense the cost of the assessments as incurred. We accrue the cost of remediation where our obligation is probable and such costs can be reasonably estimated. We do not discount our environmental liabilities when the timing of the anticipated cash payments is not fixed or readily determinable. At December 31, 2007, approximately 13% of our environmental liability was discounted at 4.15%, while approximately 14% of our environmental liability was discounted at 5.34% at December 31, 2006.

Our environmental liability activity was as follows:

| *Millions of Dollars* | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| Beginning balance | **$210** | $213 | $201 |
| Accruals | **41** | 39 | 45 |
| Payments | **(42)** | (42) | (33) |
| Ending balance at December 31 | **$209** | $210 | $213 |
| Current portion, ending balance at December 31 | **$ 63** | $ 54 | $ 46 |

The environmental liability includes costs for remediation and restoration of sites, as well as for ongoing monitoring costs, but excludes any anticipated recoveries from third parties. Cost estimates are based on information available for each project, financial viability of other potentially responsible parties, and existing technology, laws, and regulations. We believe that we have adequately accrued for our ultimate share of costs at sites subject to joint and several liability. However, the ultimate liability for remediation is difficult to determine because of the number of potentially responsible parties involved, site-specific cost sharing arrangements with other potentially responsible parties, the degree of contamination by various wastes, the scarcity and quality of volumetric data related to many of the sites, and the speculative nature of remediation costs. Estimates of liability may vary over time due to changes in federal, state, and local laws governing environmental remediation. We do not expect current obligations to have a material adverse effect on our results of operations or financial condition.

**Guarantees** – At December 31, 2007, we were contingently liable for $465 million in guarantees. We have recorded a liability of $5 million and $6 million for the fair value of these obligations as of December 31, 2007 and 2006, respectively. We entered into these contingent guarantees in the normal course of business, and they include guaranteed obligations related to our headquarters building, equipment financings, and affiliated operations. The final guarantee expires in 2022. We are not aware of any existing event of default that would require us to satisfy these guarantees. We do not expect that these guarantees will have a material adverse effect on our consolidated financial condition, results of operations, or liquidity.

**Indemnities** – Our maximum potential exposure under indemnification arrangements, including certain tax indemnifications, can range from a specified dollar amount to an unlimited amount, depending on the nature of the transactions and the agreements. Due to uncertainty as to whether claims will be made or how they will

be resolved, we cannot reasonably determine the probability of an adverse claim or reasonably estimate any adverse liability or the total maximum exposure under these indemnification arrangements. We do not have any reason to believe that we will be required to make any material payments under these indemnity provisions.

**Income Taxes –** As discussed in note 4, the IRS has completed its examinations and issued notices of deficiency for tax years 1995 through 2004, and we are in different stages of the IRS appeals process for these years. The IRS is examining our tax returns for tax years 2005 and 2006. In the third quarter of 2007, we believe that we reached an agreement in principle with the IRS to resolve all of the issues, except interest, related to tax years 1995 through 1998, including the previously reported dispute over certain donations of property. We anticipate signing a closing agreement in 2008. At December 31, 2007, we have recorded a current liability of $140 million for tax payments in 2008 related to federal and state income tax examinations. We do not expect that the ultimate resolution of these examinations will have a material adverse effect on our Consolidated Financial Statements.

### 11. Other Income

Other income included the following for the years ended December 31:

| *Millions of Dollars* | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| Rental income | **$ 68** | $ 83 | $ 59 |
| Net gain on non-operating asset dispositions | **52** | 72 | 135 |
| Interest income | **50** | 29 | 17 |
| Sale of receivables fees | **(35)** | (33) | (23) |
| Non-operating environmental costs and other | **(19)** | (33) | (43) |
| Total | **$116** | $118 | $145 |

### 12. Share Repurchase Program

On January 30, 2007, our Board of Directors authorized the repurchase of up to 20 million shares of Union Pacific Corporation common stock through the end of 2009. Management's assessments of market conditions and other pertinent facts guide the timing and volume of all repurchases. We expect to fund our common stock repurchases through cash generated from operations, the sale or lease of various operating and non-operating properties, debt issuances, and cash on hand at December 31, 2007.

During 2007, we repurchased approximately 13 million shares under this program at an aggregate purchase price of approximately $1.5 billion. These shares were recorded in treasury stock at cost, which includes any applicable commissions and fees.

### 13. Comprehensive Income/(Loss)

Comprehensive income/(loss) was as follows:

| *Millions of Dollars* | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| Net income | **$1,855** | $1,606 | $1,026 |
| Other comprehensive income: | | | |
| Defined benefit plans | **65** | 170 | 1 |
| Foreign currency translation | **2** | (4) | 5 |
| Derivatives | **1** | 1 | 1 |
| Total other comprehensive income/(loss) [a] | **68** | 167 | 7 |
| Total comprehensive income | **$1,923** | $1,773 | $1,033 |

*[a] Net of deferred taxes of $52 million, $102 million, and $5 million during 2007, 2006, and 2005, respectively.*

The after-tax components of accumulated other comprehensive loss were as follows:

| *Millions of Dollars* | ***Dec. 31, 2007*** | *Dec. 31, 2006* |
|---|---|---|
| Defined benefit plans | **$(55)** | $(120) |
| Foreign currency translation | **(15)** | (17) |
| Derivatives | **(4)** | (5) |
| Total | **$(74)** | $(142) |

### 14. Accounting Pronouncements

In September 2006, the FASB issued Statement No. 157, *Fair Value Measurements* (FAS 157). FAS 157 defines fair value, establishes a framework for measuring fair value in accordance with generally accepted accounting principles and expands disclosures about fair value measurements. This statement does not require any new fair value measurements; rather, it applies under other accounting pronouncements that require or permit fair value measurements. The provisions of FAS 157 are effective for us beginning in 2008. We expect this new standard will result in increased disclosures but will not have a significant impact on our financial position or results of operations.

In February 2007, the FASB issued Statement No. 159, *The Fair Value Option for Financial Assets and Financial Liabilities* (FAS 159). The fair value option established by FAS 159 permits, but does not require, all entities to choose to measure eligible items at fair value at specified election dates. An entity would report unrealized gains and losses on items for which the fair value option has been elected in earnings at each subsequent reporting date. FAS 159 is effective for us beginning in 2008. We do not currently intend to elect the fair value option for any eligible items and do not expect this standard to have a significant impact on our financial position or results of operations.

In December 2007, the FASB issued Statement No. 141 (Revised 2007), *Business Combinations* (FAS 141R). FAS 141R will change the accounting for business combinations. Under FAS 141R, an acquiring entity will be required to recognize all the assets acquired and liabilities assumed in a transaction at the acquisition-date fair value with limited exceptions. FAS 141R will also change the accounting treatment and disclosures with respect to certain specific items in a business combination. FAS 141R applies to us prospectively for business combinations occurring on or after January 1, 2009. Accordingly, any business combinations we engage in will be recorded and disclosed following existing GAAP until January 1, 2009. We expect FAS 141R will have an impact on accounting for business combinations, but the effect will be dependent upon any potential future acquisitions.

In December 2007, the FASB issued Statement No. 160, *Noncontrolling Interests in Consolidated Financial Statements – An Amendment of ARB No. 51* (FAS 160). FAS 160 establishes new accounting and reporting standards for the noncontrolling interest in a subsidiary and for the deconsolidation of a subsidiary. FAS 160 is effective for us beginning in 2009. We are still assessing the potential impact, if any, of the adoption of FAS 160 on our consolidated financial position, results of operations and cash flows.

In December 2007, the FASB ratified the consensus reached on Emerging Issues Task Force (EITF) Issue No. 07-1, *Collaborative Arrangements* (EITF 07-1), which defines collaborative arrangements and establishes reporting and disclosure requirements for transactions between participants in a collaborative arrangement. The requirements of this EITF will be applied to collaborative arrangements in existence on or after January 1, 2009. We are still assessing the potential impact, if any, of the adoption of EITF 07-1 on our consolidated financial position, results of operations and cash flows.

**15. Selected Quarterly Data (Unaudited)**

| *Millions of Dollars, Except Per Share Amounts* | | | | |
|---|---|---|---|---|
| *2007* | *Mar. 31* | *June 30* | *Sep. 30* | *Dec. 31* |
| Operating revenue | $3,849 | $4,046 | $4,191 | $4,197 |
| Operating income | 719 | 787 | 1,005 | 864 |
| Net income | 386 | 446 | 532 | 491 |
| Net income per share | | | | |
| Basic | 1.43 | 1.66 | 2.02 | 1.88 |
| Diluted | 1.41 | 1.65 | 2.00 | 1.86 |
| *2006* | *Mar. 31* | *June 30* | *Sep. 30* | *Dec. 31* |
| Operating revenue | $3,710 | $3,923 | $3,983 | $3,962 |
| Operating income | 605 | 717 | 752 | 810 |
| Net income | 311 | 390 | 420 | 485 |
| Net income per share | | | | |
| Basic | 1.16 | 1.45 | 1.56 | 1.79 |
| Diluted | 1.15 | 1.44 | 1.54 | 1.78 |

****************************************

### Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure

None.

### Item 9A. Controls and Procedures

As of the end of the period covered by this report, the Corporation carried out an evaluation, under the supervision and with the participation of the Corporation's management, including the Corporation's Chief Executive Officer (CEO) and Executive Vice President – Finance and Chief Financial Officer (CFO), of the effectiveness of the design and operation of the Corporation's disclosure controls and procedures pursuant to Exchange Act Rules 13a-15 and 15d-15. In designing and evaluating the disclosure controls and procedures, management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. Based upon that evaluation, the CEO and the CFO concluded that, as of the end of the period covered by this report, the Corporation's disclosure controls and procedures were effective to provide reasonable assurance that information required to be disclosed in our Exchange Act reports is recorded, processed, summarized and reported within the time periods specified by the SEC, and that such information is accumulated and communicated to management, including the CEO and CFO, as appropriate, to allow timely decisions regarding required disclosure.

Additionally, the CEO and CFO determined that there have been no changes to the Corporation's internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) during the last fiscal quarter that have materially affected, or are reasonably likely to materially affect, the Corporation's internal control over financial reporting.

### Item 9B. Other Information

None.

## MANAGEMENT'S ANNUAL REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING

The management of Union Pacific Corporation and Subsidiary Companies (the Corporation) is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)). The Corporation's internal control system was designed to provide reasonable assurance to the Corporation's management and Board of Directors regarding the preparation and fair presentation of published financial statements.

All internal control systems, no matter how well designed, have inherent limitations. Therefore, even those systems determined to be effective can provide only reasonable assurance with respect to financial statement preparation and presentation.

The Corporation's management assessed the effectiveness of the Corporation's internal control over financial reporting as of December 31, 2007. In making this assessment, it used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in *Internal Control – Integrated Framework*. Based on our assessment management believes that, as of December 31, 2007, the Corporation's internal control over financial reporting is effective based on those criteria.

The Company's independent registered public accounting firm has issued an attestation report on the effectiveness of the Company's internal control over financial reporting. This report appears on page 80.

February 14, 2008

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

Union Pacific Corporation, its Directors, and Shareholders:

We have audited the internal control over financial reporting of Union Pacific Corporation and Subsidiary Companies (the Corporation) as of December 31, 2007, based on criteria established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. The Corporation's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Annual Report on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on the Corporation's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed by, or under the supervision of, the company's principal executive and principal financial officers, or persons performing similar functions, and effected by the company's board of directors, management, and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of the inherent limitations of internal control over financial reporting, including the possibility of collusion or improper management override of controls, material misstatements due to error or fraud may not be prevented or detected on a timely basis. Also, projections of any evaluation of the effectiveness of the internal control over financial reporting to future periods are subject to the risk that the controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, the Corporation maintained, in all material respects, effective internal control over financial reporting as of December 31, 2007, based on the criteria established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated financial statements and financial statement schedule as of and for the year ended December 31, 2007 of the Corporation and our report dated February 15, 2008 expressed an unqualified opinion on those consolidated financial statements and financial statement schedule and included an explanatory paragraph regarding the Corporation's adoption, in 2006, of Statement of Financial Accounting Standards No. 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans.*

Deloitte & Touche LLP

Omaha, Nebraska
February 15, 2008

# PART III

## Item 10. Directors, Executive Officers, and Corporate Governance

(a) Directors of Registrant.

Information as to the names, ages, positions and offices with UPC, terms of office, periods of service, business experience during the past five years and certain other directorships held by each director or person nominated to become a director of UPC is set forth in the Election of Directors segment of the Proxy Statement and is incorporated herein by reference.

Information concerning our Audit Committee and the independence of its members, along with information about the audit committee financial expert(s) serving on the Audit Committee, is set forth in the Audit Committee segment of the Proxy Statement and is incorporated herein by reference.

(b) Executive Officers of Registrant.

Information concerning the executive officers of UPC and its subsidiaries is presented in Part I of this report under Executive Officers of the Registrant and Principal Executive Officers of Subsidiaries.

(c) Section 16(a) Compliance.

Information concerning compliance with Section 16(a) of the Securities Exchange Act of 1934 is set forth in the Section 16(a) Beneficial Ownership Reporting Compliance segment of the Proxy Statement and is incorporated herein by reference.

(d) Code of Ethics for Chief Executive Officer and Senior Financial Officers of Registrant.

The Board of Directors of UPC has adopted the UPC Code of Ethics for the Chief Executive Officer and Senior Financial Officers (the Code). A copy of the Code may be found on the Internet at our website www.up.com/investors. We intend to disclose any amendments to the Code or any waiver from a provision of the Code on our website.

## Item 11. Executive Compensation

Information concerning compensation received by our directors and our named executive officers is presented in the Compensation Discussion and Analysis, Summary Compensation Table, Grants of Plan-Based Awards in Fiscal Year 2007, Outstanding Equity Awards at 2007 Fiscal Year-End, Option Exercises and Stock Vested in Fiscal Year 2007, Pension Benefits at 2007 Fiscal Year-End, Nonqualified Deferred Compensation at 2007 Fiscal Year-End, Potential Payments Upon Termination or Change in Control and Director Compensation in Fiscal Year 2007 segments of the Proxy Statement and is incorporated herein by reference. Additional information regarding compensation of directors, including Board committee members, is set forth in the By-Laws of UPC and the Stock Unit Grant and Deferred Compensation Plan for the Board of Directors, both of which are included as exhibits to this report. Information regarding the Compensation Committee is set forth in the Compensation Committee Interlocks and Insider Participation and Compensation Committee Report segments of the Proxy Statement and is incorporated herein by reference.

## Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters

Information as to the number of shares of our equity securities beneficially owned by each of our directors and nominees for director, our named executive officers, our directors and executive officers as a group, and

certain beneficial owners is set forth in the Security Ownership of Certain Beneficial Owners and Management segment of the Proxy Statement and is incorporated herein by reference.

The following table summarizes the equity compensation plans under which Union Pacific Corporation common stock may be issued as of December 31, 2007.

| *Plan Category* | *Number of securities to be issued upon exercise of outstanding options, warrants and rights (a)* | *Weighted-average exercise price of outstanding options, warrants and rights (b)* | *Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) (c)* |
|---|---|---|---|
| Equity compensation plans approved by security holders | 7,670,459[1] | $72.54[2] | 19,300,864 |
| Equity compensation plans not approved by security holders [3] | 432,689 | 55.00 | - |
| Total | 8,103,148 | $71.53 | 19,300,864 |

*[1] Includes 539,678 retention units that do not have an exercise price. Does not include 577,562 retention shares that are actually issued and outstanding.*

*[2] Does not include the retention units or retention shares described above in footnote [1].*

*[3] The UP Shares Stock Option Plan (UP Shares Plan) is the only equity compensation plan not approved by shareholders. The UP Shares Plan was approved by our Board of Directors on April 30, 1998 and reserved 12,000,000 shares of common stock for issuance. The UP Shares Plan was a broad-based option program that granted each active employee on April 30, 1998 non-qualified options to purchase 200 shares of common stock at $55.00 per share. Options became exercisable on May 1, 2001 and expire on April 30, 2008. If an optionee's employment terminates for any reason, the option remains exercisable for a period of one year after the date of termination, but no option is exercisable after April 30, 2008. No further options may be granted under the UP Shares Plan.*

### Item 13. Certain Relationships and Related Transactions, and Director Independence

Information on related transactions is set forth in the Certain Relationships and Related Transactions and Compensation Committee Interlocks and Insider Participation segments of the Proxy Statement and is incorporated herein by reference. We do not have any relationship with any outside third party that would enable such a party to negotiate terms of a material transaction that may not be available to, or available from, other parties on an arm's-length basis.

Information regarding the independence of our directors is set forth in the Director Independence segment of the Proxy Statement and is incorporated herein by reference.

### Item 14. Principal Accountant Fees and Services

Information concerning the fees billed by our independent registered public accounting firm and the nature of services comprising the fees for each of the two most recent fiscal years in each of the following categories: (i) audit fees, (ii) audit—related fees, (iii) tax fees, and (iv) all other fees, is set forth in the Independent Registered Public Accounting Firm's Fees and Services segment of the Proxy Statement and is incorporated herein by reference.

Information concerning our Audit Committee's policies and procedures pertaining to pre-approval of audit and non-audit services rendered by our independent registered public accounting firm is set forth in the Audit Committee segment of the Proxy Statement and is incorporated herein by reference.

# PART IV

## Item 15. Exhibits, Financial Statement Schedules

(a) Financial Statements, Financial Statement Schedules, and Exhibits:

(1) Financial Statements

The financial statements filed as part of this filing are listed on the index to the Financial Statements and Supplementary Data, Item 8, on page 46.

(2) Financial Statement Schedules

Schedule II—Valuation and Qualifying Accounts

Schedules not listed above have been omitted because they are not applicable or not required or the information required to be set forth therein is included in the Financial Statements and Supplementary Data, Item 8, or notes thereto.

(3) Exhibits

Exhibits are listed in the exhibit index beginning on page 86. The exhibits include management contracts, compensatory plans and arrangements required to be filed as exhibits to the Form 10-K by Item 601 (10) (iii) of Regulation S-K.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, on this 28th day of February, 2008.

UNION PACIFIC CORPORATION

By /s/ James R. Young
James R. Young,
Chairman, President, Chief
Executive Officer, and Director

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below, on this 28th day of February, 2008, by the following persons on behalf of the registrant and in the capacities indicated.

PRINCIPAL EXECUTIVE OFFICER
AND DIRECTOR:

/s/ James R. Young
James R. Young,
Chairman, President, Chief
Executive Officer, and Director

PRINCIPAL FINANCIAL OFFICER:

/s/ Robert M. Knight, Jr.
Robert M. Knight, Jr.,
Executive Vice President - Finance
and Chief Financial Officer

PRINCIPAL ACCOUNTING OFFICER:

/s/ Jeffrey P. Totusek
Jeffrey P. Totusek,
Vice President and Controller

DIRECTORS:

Andrew H. Card, Jr.*
Erroll B. Davis, Jr.*
Thomas J. Donohue*
Archie W. Dunham*
Judith Richards Hope*

Charles C. Krulak*
Michael W. McConnell*
Thomas F. McLarty III*
Steven R. Rogel*

* By /s/ Thomas E. Whitaker
Thomas E. Whitaker, Attorney-in-fact

## SCHEDULE II – VALUATION AND QUALIFYING ACCOUNTS

*Union Pacific Corporation and Subsidiary Companies*

| *Millions of Dollars, for the Years Ended December 31,* | ***2007*** | *2006* | *2005* |
|---|---|---|---|
| **Allowance for doubtful accounts:** | | | |
| Balance, beginning of period | **$ 99** | $ 126 | $ 107 |
| Charges/(reduction) to expense | **(7)** | (7) | 2 |
| Net recoveries/(write-offs) | **(17)** | (20) | 17 |
| Balance, end of period | **$ 75** | $ 99 | $ 126 |
| Allowance for doubtful accounts are presented in the Consolidated Statements of Financial Position as follows: | | | |
| Current | **$ 3** | $ 6 | $ 16 |
| Long-term | **72** | 93 | 110 |
| Balance, end of period | **$ 75** | $ 99 | $ 126 |
| **Accrued casualty costs:** | | | |
| Balance, beginning of period | **$1,277** | $1,354 | $1,303 |
| Charges to expense | **328** | 417 | 409 |
| Cash payments and other reductions | **(435)** | (494) | (358) |
| Balance, end of period | **$1,170** | $1,277 | $1,354 |
| Accrued casualty costs are presented in the Consolidated Statements of Financial Position as follows: | | | |
| Current | **$ 371** | $ 409 | $ 478 |
| Long-term | **799** | 868 | 876 |
| Balance, end of period | **$1,170** | $1,277 | $1,354 |

**Union Pacific Corporation**
**Exhibit Index**

| Exhibit No. | Description |
|---|---|
| Filed with this Statement | |
| 10(a) | Form of 2008 Long Term Plan Stock Unit Agreement. |
| 10(b) | The UPC Stock Unit Grant and Deferred Compensation Plan for the Board of Directors, as amended January 1, 2008. |
| 12 | Ratio of Earnings to Fixed Charges. |
| 21 | List of the Corporation's significant subsidiaries and their respective states of incorporation. |
| 23 | Independent Registered Public Accounting Firm's Consent. |
| 24 | Powers of attorney executed by the directors of UPC. |
| 31(a) | Certifications Pursuant to Rule 13a-14(a), of the Exchange Act, as Adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 - James R. Young. |
| 31(b) | Certifications Pursuant to Rule 13a-14(a), of the Exchange Act, as Adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 - Robert M. Knight, Jr. |
| 32 | Certifications Pursuant to 18 U.S.C. Section 1350, as Adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 - James R. Young and Robert M. Knight, Jr. |
| Incorporated by Reference | |
| 3(a) | By-Laws of UPC, as amended, effective October 1, 2007, are incorporated herein by reference to Exhibit 3 to the Corporation's Current Report on Form 8-K dated October 2, 2007. |
| 3(b) | Revised Articles of Incorporation of UPC, as amended through April 25, 1996, are incorporated herein by reference to Exhibit 3 to the Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 1996. |
| 4(a) | Indenture, dated as of December 20, 1996, between UPC and Wells Fargo Bank, National Association, as successor to Citibank, N.A., as Trustee, is incorporated herein by reference to Exhibit 4.1 to UPC's Registration Statement on Form S-3 (No. 333-18345). |
| 4(b) | Indenture, dated as of April 1, 1999, between UPC and The Bank of New York, as successor to JP Morgan Chase Bank, formerly The Chase Manhattan Bank, as Trustee, is incorporated herein by reference to Exhibit 4.2 to UPC's Registration Statement on Form S-3 (No. 333-75989). |
| 4(c) | Form of Debt Security is incorporated herein by reference to Exhibit 4.3 to UPC's Registration Statement on Form S-3 (No. 33-59323). |

| | |
|---|---|
| 4(d) | Form of Debt Security (Note) is incorporated by reference to Exhibit 4.1 to UPC's Current Report of Form 8-K, dated April 18, 2007. |
| 4(e) | Form of Debt Security (Debenture) is incorporated by reference to Exhibit 4.2 to the Corporation's Current Report of Form 8-K, dated April 18, 2007. |
| 4(f) | Form of Debt Security (Note) is incorporated by reference to Exhibit 4.1 to the Corporation's Current Report of Form 8-K, dated August 24, 2007. |
| 4(g) | Form of Debt Security (Note) is incorporated by reference to Exhibit 4.1 to the Corporation's Current Report of Form 8-K, dated October 30, 2007. |
| 4(h) | Form of Debt Security (Note) is incorporated by reference to Exhibit 4.1 to the Corporation's Current Report of Form 8-K, dated February 5, 2008. |
| | Certain instruments evidencing long-term indebtedness of UPC are not filed as exhibits because the total amount of securities authorized under any single such instrument does not exceed 10% of the Corporation's total consolidated assets. UPC agrees to furnish the Commission with a copy of any such instrument upon request by the Commission. |
| 10(c) | UPC 2000 Directors Stock Plan, as amended November 16, 2006 and January 30, 2007, is incorporated herein by reference to Exhibit 10(b) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 2006. |
| 10(d) | UP Shares Stock Option Plan of UPC, as amended November 16, 2006, is incorporated herein by reference to Exhibit 10(c) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 2006. |
| 10(e) | The 1993 Stock Option and Retention Stock Plan of UPC, as amended November 16, 2006, is incorporated herein by reference to Exhibit 10 to the Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2007. |
| 10(f) | UPC 2001 Stock Incentive Plan, as amended November 16, 2006, is incorporated herein by reference to Exhibit 10(e) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 2006. |
| 10(g) | UPC 2004 Stock Incentive Plan, as amended November 16, 2006, is incorporated herein by reference to Exhibit 10(f) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 2006. |
| 10(h) | Amended and Restated Registration Rights Agreement, dated as of July 12, 1996, among UPC, UP Holding Company, Inc., Union Pacific Merger Co. and Southern Pacific Rail Corporation (SP) is incorporated herein by reference to Annex J to the Joint Proxy Statement/Prospectus included in Post-Effective Amendment No. 2 to UPC's Registration Statement on Form S-4 (No. 33-64707). |
| 10(i) | Agreement, dated September 25, 1995, among UPC, UPRR, Missouri Pacific Railroad Company (MPRR), SP, Southern Pacific Transportation Company (SPT), The Denver & Rio Grande Western Railroad Company (D&RGW), St. Louis Southwestern Railway Company (SLSRC) and SPCSL Corp. (SPCSL), on the one hand, and Burlington Northern Railroad Company (BN) and The Atchison, Topeka and Santa Fe Railway Company (Santa Fe), on the other hand, is incorporated by |

| | |
|---|---|
| | reference to Exhibit 10.11 to UPC's Registration Statement on Form S-4 (No. 33-64707). |
| 10(j) | Supplemental Agreement, dated November 18, 1995, between UPC, UPRR, MPRR, SP, SPT, D&RGW, SLSRC and SPCSL, on the one hand, and BN and Santa Fe, on the other hand, is incorporated herein by reference to Exhibit 10.12 to UPC's Registration Statement on Form S-4 (No. 33-64707). |
| 10(k) | The Executive Incentive Plan of UPC, as amended May 31, 2001, is incorporated herein by reference to Exhibit 10(b) to the Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001. |
| 10(l) | Written Description of Premium Exchange Program Pursuant to 1993 Stock Option and Retention Stock Plan of UPC is incorporated herein by reference to Exhibit 10(b) to the Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 1999. |
| 10(m) | UPC Key Employee Continuity Plan dated November 16, 2000, is incorporated herein by reference to Exhibit 10(o) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 2000. |
| 10(n) | The Pension Plan for Non-Employee Directors of UPC, as amended January 25, 1996, is incorporated herein by reference to Exhibit 10(w) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 1995. |
| 10(o) | The Executive Life Insurance Plan of UPC, as amended October 1997, is incorporated herein by reference to Exhibit 10(t) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 1997. |
| 10(p) | Charitable Contribution Plan for Non-Employee Directors of Union Pacific Corporation is incorporated herein by reference to Exhibit 10(z) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 1995. |
| 10(q) | Written Description of Other Executive Compensation Arrangements of Union Pacific Corporation is incorporated herein by reference to Exhibit 10(q) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 1998. |
| 10(r) | Form of Non-Qualified Stock Option Agreement for Executives is incorporated herein by reference to Exhibit 10(a) to the Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2004. |
| 10(s) | Form of Stock Unit Agreement for Executives is incorporated herein by reference to Exhibit 10(b) to the Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2004. |
| 10(t) | Form of Stock Unit Agreement for Executive Incentive Premium Exchange Program is incorporated herein by reference to Exhibit 10(c) to the Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2004. |
| 10(u) | Form of Non-Qualified Stock Option Agreement for Directors is incorporated herein by reference to Exhibit 10(d) to the Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2004. |

| | |
|---|---|
| 10(v) | Form of Stock Unit Agreement for Executives, is incorporated herein by reference to Exhibit 10(b) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 2005. |
| 10(w) | Form of Non-Qualified Stock Option Agreement for Executives, is incorporated herein by reference to Exhibit 10(c) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 2005. |
| 10(x) | Form of 2006 Long Term Plan Stock Unit Agreement is incorporated herein by reference to Exhibit 10(a) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 2005. |
| 10(y) | Form of 2007 Long Term Plan Stock Unit Agreement is incorporated herein by reference to Exhibit 10(a) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 2006. |
| 10(z) | UPC Executive Incentive Plan, effective May 5, 2005, is incorporated herein by reference to Exhibit 10(d) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 2005. |
| 10(aa) | Supplemental Thrift Plan of UPC, as amended December 21, 2005, is incorporated herein by reference to Exhibit 10(e) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 2005. |
| 10(bb) | The Supplemental Pension Plan for Officers and Managers of UPC and Affiliates, as amended December 21, 2005, is incorporated herein by reference to Exhibit 10(f) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 2005. |
| 10(cc) | Executive Incentive Plan (2005) – Deferred Compensation Program, dated December 21, 2005, is incorporated herein by reference to Exhibit 10(g) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 2005. |

**Exhibit 12**

## RATIO OF EARNINGS TO FIXED CHARGES

*Union Pacific Corporation and Subsidiary Companies*

| *Millions of Dollars, Except for Ratios* | ***2007*** | *2006* | *2005* | *2004* | *2003* |
|---|---|---|---|---|---|
| Fixed charges: | | | | | |
| Interest expense including amortization of debt discount | **$ 482** | $ 477 | $ 504 | $ 527 | $ 574 |
| Portion of rentals representing an interest factor | **237** | 243 | 220 | 206 | 169 |
| Total fixed charges | **$ 719** | $ 720 | $ 724 | $ 733 | $ 743 |
| Earnings available for fixed charges: | | | | | |
| Net income | **$1,855** | $1,606 | $1,026 | $ 604 | $1,056 |
| Equity earnings net of distributions | **(69)** | (59) | (48) | (47) | 15 |
| Income taxes | **1,154** | 919 | 410 | 252 | 581 |
| Fixed charges | **719** | 720 | 724 | 733 | 743 |
| Earnings available for fixed charges | **$3,659** | $3,186 | $2,112 | $1,542 | $2,395 |
| Ratio of earnings to fixed charges | **5.1** | 4.4 | 2.9 | 2.1 | 3.2 |

**Exhibit 21**

**SIGNIFICANT SUBSIDIARIES OF UNION PACIFIC CORPORATION**

| Name of Corporation | State of Incorporation |
|---|---|
| Union Pacific Railroad Company......................................................................... | Delaware |
| Southern Pacific Rail Corporation ...................................................................... | Utah |

**Exhibit 23**

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

We consent to the incorporation by reference in Post-Effective Amendment No. 1 to Registration Statement No. 33-12513, Registration Statement No. 33-53968, Registration Statement No. 33-49785, Registration Statement No. 33-49849, Registration Statement No. 33-51071, Registration Statement No. 333-10797, Registration Statement No. 333-13115, Registration Statement No. 333-16563, Registration Statement No. 333-88225, Registration Statement No. 333-88709, Registration Statement No. 333-57958, Registration Statement No. 333-61856, Registration Statement No. 333-42768, Registration Statement No. 333-106707, Registration Statement No. 333-106708, Registration Statement No. 333-105714, Registration Statement No. 333-105715, Registration Statement No. 333-116003 and Registration Statement No. 333-132324 on Forms S-8 and Registration Statement No. 333-88666, Amendment No. 1 to Registration Statement No. 333-88666, Registration Statement No. 333-111185, and Registration Statement No. 333-141084 on Forms S-3 of our reports dated February 15, 2008, relating to the consolidated financial statements and financial statement schedule of Union Pacific Corporation and Subsidiary Companies (the Corporation) (which report expressed an unqualified opinion and included an explanatory paragraph relating to the Corporation's adoption, in 2006, of Statement of Financial Accounting Standards No. 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans*) and the effectiveness of the Corporation's internal control over financial reporting, appearing in this Annual Report on Form 10-K of Union Pacific Corporation and Subsidiary Companies for the year ended December 31, 2007.

Deloitte & Touche LLP

Omaha, Nebraska
February 26, 2008

**Exhibit 24**

## UNION PACIFIC CORPORATION
**Powers of Attorney**

Each of the undersigned directors of Union Pacific Corporation, a Utah corporation (the Company), do hereby appoint each of James R. Young, Barbara W. Schaefer, and Thomas E. Whitaker his or her true and lawful attorney-in-fact and agent, to sign on his or her behalf the Company's Annual Report on Form 10-K, for the year ended December 31, 2007, and any and all amendments thereto, and to file the same, with all exhibits thereto, with the Securities and Exchange Commission.

IN WITNESS WHEREOF, the undersigned have executed this Power of Attorney as of February 28, 2008.

/s/ Andrew H. Card, Jr.
Andrew H. Card, Jr.

/s/ Erroll B. Davis, Jr.
Erroll B. Davis, Jr.

/s/ Thomas J. Donohue
Thomas J. Donohue

/s/ Archie W. Dunham
Archie W. Dunham

/s/ Judith Richards Hope
Judith Richards Hope

/s/ Charles C. Krulak
Charles C. Krulak

/s/ Michael W. McConnell
Michael W. McConnell

/s/ Thomas F. McLarty III
Thomas F. McLarty III

/s/ Steven R. Rogel
Steven R. Rogel

**Exhibit 31(a)**

**CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER**

I, James R. Young, certify that:

1. I have reviewed this annual report on Form 10-K of Union Pacific Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 28, 2008

/s/ James R. Young
James R. Young
Chairman, President and
Chief Executive Officer

**Exhibit 31(b)**

## CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER

I, Robert M. Knight, Jr., certify that:

1. I have reviewed this annual report on Form 10-K of Union Pacific Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f))for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 28, 2008

/s/ Robert M. Knight, Jr.
Robert M. Knight, Jr.
Executive Vice President - Finance and
Chief Financial Officer

**Exhibit 32**

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the accompanying Annual Report of Union Pacific Corporation (the Corporation) on Form 10-K for the period ending December 31, 2007, as filed with the Securities and Exchange Commission on the date hereof (the Report), I, James R. Young, Chairman, President and Chief Executive Officer of the Corporation, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to the best of my knowledge, that:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Corporation.

By: /s/ James R. Young
James R. Young
Chairman, President and
Chief Executive Officer
Union Pacific Corporation

February 28, 2008

A signed original of this written statement required by Section 906 has been provided to the Corporation and will be retained by the Corporation and furnished to the Securities and Exchange Commission or its staff upon request.

**CERTIFICATION OF CHIEF FINANCIAL OFFICER PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the accompanying Annual Report of Union Pacific Corporation (the Corporation) on Form 10-K for the period ending December 31, 2007, as filed with the Securities and Exchange Commission on the date hereof (the Report), I, Robert M. Knight, Jr., Executive Vice President - Finance and Chief Financial Officer of the Corporation, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to the best of my knowledge, that:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Corporation.

By: /s/ Robert M. Knight, Jr.
Robert M. Knight, Jr.
Executive Vice President - Finance and
Chief Financial Officer
Union Pacific Corporation

February 28, 2008

A signed original of this written statement required by Section 906 has been provided to the Corporation and will be retained by the Corporation and furnished to the Securities and Exchange Commission or its staff upon request.

# EXHIBIT PX0707

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

# FORM 10-K

*(Mark One)*

**[X] ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2008

**OR**

**[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from __________ to ____________

***Commission File Number 1-6075***

# UNION PACIFIC CORPORATION
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **UTAH** | **13-2626465** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**1400 DOUGLAS STREET, OMAHA, NEBRASKA**
(Address of principal executive offices)

**68179**
(Zip Code)

**(402) 544-5000**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each Class | Name of each exchange on which registered |
|---|---|
| **Common Stock (Par Value $2.50 per share)** | **New York Stock Exchange, Inc.** |

- Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.
  ☑ Yes ☐ No
- Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.
  ☐ Yes ☑ No
- Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.
  ☑ Yes ☐ No
- Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.
  ☐
- Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.
  Large accelerated filer ☑ Accelerated filer ☐ Non-accelerated filer ☐ Smaller reporting company ☐
- Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).
  ☐ Yes ☑ No

As of June 30, 2008, the aggregate market value of the registrant's Common Stock held by non-affiliates (using the New York Stock Exchange closing price) was $41.6 billion.

The number of shares outstanding of the registrant's Common Stock as of January 30, 2009 was 503,193,533.

**Documents Incorporated by Reference** – Portions of the registrant's definitive Proxy Statement for the Annual Meeting of Shareholders to be held on May 14, 2009, are incorporated by reference into Part III of this report. The registrant's Proxy Statement will be filed with the Securities and Exchange Commission pursuant to Regulation 14A.

**UNION PACIFIC CORPORATION**
**TABLE OF CONTENTS**


| | | |
|---|---|---|
| | Chairman's Letter | 3 |
| | Directors and Senior Management | 4 |
| | **PART I** | |
| Item 1. | Business | 5 |
| Item 1A. | Risk Factors | 10 |
| Item 1B. | Unresolved Staff Comments | 14 |
| Item 2. | Properties | 14 |
| Item 3. | Legal Proceedings | 17 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 20 |
| | Executive Officers of the Registrant and Principal Executive Officers of Subsidiaries | 21 |
| | **PART II** | |
| Item 5. | Market for the Registrant's Common Equity, Related Stockholder Matters, and Issuer Purchases of Equity Securities | 22 |
| Item 6. | Selected Financial Data | 24 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 25 |
| | Critical Accounting Policies | 46 |
| | Cautionary Information | 51 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 52 |
| Item 8. | Financial Statements and Supplementary Data | 53 |
| | Report of Independent Registered Public Accounting Firm | 54 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 88 |
| Item 9A. | Controls and Procedures | 88 |
| Item 9B. | Other Information | 88 |
| | Management's Annual Report on Internal Control Over Financial Reporting | 89 |
| | Report of Independent Registered Public Accounting Firm | 90 |
| | **PART III** | |
| Item 10. | Directors, Executive Officers, and Corporate Governance | 91 |
| Item 11. | Executive Compensation | 91 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 92 |
| Item 13. | Certain Relationships and Related Transactions and Director Independence | 92 |
| Item 14. | Principal Accountant Fees and Services | 92 |
| | **PART IV** | |
| Item 15. | Exhibits, Financial Statement Schedules | 93 |
| | Signatures | 94 |
| | Certifications | 104 |

February 6, 2009

Fellow Shareholders:

Union Pacific withstood a very challenging year and delivered record financial results for our shareholders in 2008. We overcame a mudslide that brought down a mountain, flooding, hurricanes, record-high diesel fuel prices and a recessionary economy to produce strong earnings growth and a best-ever profit margin.

Our success stems from a consistent focus on our long-term strategy:

- Although rail is already the safest form of ground freight transportation, we achieved a record safety performance for our employees, our customers and our communities in 2008.
- We achieved the best customer satisfaction ratings in our Company's history as customers realized more value from rail transportation because of our excellent service.
- The efficiency of our Company increased throughout 2008 as we diligently executed our operating plan, increased asset turns and utilized technology to increase productivity.
- Investing capital for future growth supports the strong, long-term demand we see ahead for Union Pacific's transportation services. We will always balance this need with earning a fair return and responding to near-term economic realities.
- Our conservation efforts benefited our nation, our communities and our economy by reducing emissions and fuel consumption. During 2008, UP's fuel consumption rate improved 4 percent, saving 58 million gallons of diesel fuel.
- We also focused on producing solid shareholder returns with a two-for-one stock split, a 23 percent dividend increase and share repurchases totaling more than $1.5 billion.

As we enter 2009, there is a great deal of concern regarding the economy. Some believe the darkest days are still ahead of us, while others expect a more near-term recovery. Whatever the case may be, Union Pacific is up to the challenge.

Throughout the current financial crisis, we maintained a solid balance sheet, a strong cash position and good access to the capital markets. Going forward, we will continue to manage our financial position to ensure flexibility and liquidity in today's challenging environment.

As the new administration in Washington focuses on infrastructure to stimulate economic growth, Union Pacific's role will be critical and our opportunity is great. America and the communities we serve need a strong rail system that is energy efficient, emissions friendly and provides good-paying American jobs. Railroads are also cost effective. For example, we can build five miles of rail for the same amount it costs to construct roughly one urban highway mile.

Since 1862, Union Pacific employees have served the needs of our nation through hard work, innovation and integrity. We are both confident and optimistic about the future of our Company. Although there certainly will be challenges in the coming months, the steps we take today will allow us to emerge from this time as an even more successful railroad tomorrow.

Chairman, President and
Chief Executive Officer

# DIRECTORS AND SENIOR MANAGEMENT

## BOARD OF DIRECTORS

**Andrew H. Card, Jr.**
Consultant and Professional Speaker
*Board Committees: Audit, Finance*

**Erroll B. Davis, Jr.**
Chancellor
University System of Georgia
*Board Committees: Compensation and Benefits, Corporate Governance and Nominating*

**Thomas J. Donohue**
President and
Chief Executive Officer
U.S. Chamber of Commerce
*Board Committees: Compensation and Benefits (Chair), Corporate Governance and Nominating*

**Archie W. Dunham**
Retired Chairman
ConocoPhillips
*Board Committees: Finance (Chair), Corporate Governance and Nominating*

**Judith Richards Hope**
Distinguished Visitor from Practice and Professor of Law
Georgetown University Law Center
*Board Committees: Audit (Chair), Finance*

**Charles C. Krulak**
General, USMC, Ret.
Former Commandant of the United States Marine Corps
*Board Committees: Audit, Finance*

**Michael R. McCarthy**
Chairman
McCarthy Group, LLC
*Board Committees: Audit, Finance*

**Michael W. McConnell**
General Partner
Brown Brothers Harriman & Co.
*Board Committees: Audit, Compensation and Benefits*

**Thomas F. McLarty III**
President
McLarty Associates
*Board Committees: Compensation and Benefits, Corporate Governance and Nominating*

**Steven R. Rogel**
Chairman
Weyerhaeuser Company
*Board Committees: Corporate Governance and Nominating (Chair), Compensation and Benefits*

**Jose H. Villarreal**
Advisor
Akin, Gump, Strauss, Hauer & Feld, LLP
*Board Committees: Corporate Governance and Nominating, Finance*

**James R. Young**
Chairman, President and
Chief Executive Officer
Union Pacific Corporation and
Union Pacific Railroad Company

## SENIOR MANAGEMENT

**James R. Young**
Chairman, President and
Chief Executive Officer
Union Pacific Corporation and
Union Pacific Railroad Company

**Dennis J. Duffy**
Executive Vice President–Operations
Union Pacific Railroad Company

**Charles R. Eisele**
Senior Vice President–Strategic Planning
Union Pacific Corporation

**Lance M. Fritz**
Vice President–Labor Relations
Union Pacific Railroad Company

**Bernard R. Gutschewski**
Vice President–Taxes
Union Pacific Corporation

**J. Michael Hemmer**
Senior Vice President–Law and General Counsel
Union Pacific Corporation

**Mary Sanders Jones**
Vice President and Treasurer
Union Pacific Corporation

**Robert M. Knight, Jr.**
Executive Vice President–Finance and Chief Financial Officer
Union Pacific Corporation

**John J. Koraleski**
Executive Vice President–Marketing and Sales
Union Pacific Railroad Company

**Richard R. McClish**
Vice President–Continuous Improvement
Union Pacific Railroad Company

**Joseph E. O'Connor, Jr.**
Vice President–Purchasing
Union Pacific Railroad Company

**Michael A. Rock**
Vice President–External Relations
Union Pacific Corporation

**Barbara W. Schaefer**
Senior Vice President–Human Resources and Secretary
Union Pacific Corporation

**Lynden L. Tennison**
Senior Vice President and
Chief Information Officer
Union Pacific Corporation

**Jeffrey P. Totusek**
Vice President and Controller
Union Pacific Corporation

**Robert W. Turner**
Senior Vice President–Corporate Relations
Union Pacific Corporation

# PART I

## Item 1. Business

### GENERAL

Union Pacific Corporation owns one of America's leading transportation companies. Its principal operating company, Union Pacific Railroad Company, links 23 states in the western two-thirds of the country and serves the fastest-growing U.S. population centers. Union Pacific's diversified business mix includes agricultural products, automotive, chemicals, energy, industrial products and intermodal. It offers competitive long-haul routes from all major West Coast and Gulf Coast ports to eastern gateways. Union Pacific Railroad Company connects with Canada's rail systems and is the only railroad serving all six major gateways to Mexico, making it North America's premier rail franchise.

Union Pacific Corporation was incorporated in Utah in 1969 and maintains its principal executive offices at 1400 Douglas Street, Omaha, NE 68179. The telephone number at that address is (402) 544-5000. The common stock of Union Pacific Corporation is listed on the New York Stock Exchange (NYSE) under the symbol "UNP".

For purposes of this report, unless the context otherwise requires, all references herein to "UPC", "Corporation", "we", "us", and "our" shall mean Union Pacific Corporation and its subsidiaries, including Union Pacific Railroad Company, which we separately refer to as "UPRR" or the "Railroad".

**Available Information** – Our Internet website is www.up.com. We make available free of charge on our website (under the "Investors" caption link) our Annual Reports on Form 10-K; our Quarterly Reports on Form 10-Q; our current reports on Form 8-K; our proxy statements; Forms 3, 4, and 5, filed on behalf of directors and executive officers; and amendments to such reports filed or furnished pursuant to the Securities Exchange Act of 1934, as amended (the Exchange Act), as soon as reasonably practicable after such material is electronically filed with, or furnished to, the Securities and Exchange Commission (SEC). We also make available on our website previously filed SEC reports and exhibits via a link to EDGAR on the SEC's Internet site at www.sec.gov. Additionally, our corporate governance materials, including By-Laws, Board Committee charters, governance guidelines and policies, and codes of conduct and ethics for directors, officers, and employees are available on our website. From time to time, the corporate governance materials on our website may be updated as necessary to comply with rules issued by the SEC and the NYSE or as desirable to promote the effective and efficient governance of our company. Any security holder wishing to receive, without charge, a copy of any of our SEC filings or corporate governance materials should send a written request to: Secretary, Union Pacific Corporation, 1400 Douglas Street, Omaha, NE 68179.

We have included the Chief Executive Officer (CEO) and Chief Financial Officer certifications regarding our public disclosure required by Section 302 of the Sarbanes-Oxley Act of 2002 as Exhibits 31(a) and (b) to this report. Additionally, we filed with the NYSE the CEO's certification regarding our compliance with the NYSE's Corporate Governance Listing Standards (Listing Standards) pursuant to Section 303A.12(a) of the Listing Standards, which was dated May 12, 2008, and indicated that the CEO was not aware of any violations of the Listing Standards by the Corporation.

References to our website address in this report, including references in Management's Discussion and Analysis of Financial Condition and Results of Operations, Item 7, are provided as a convenience and do not constitute, and should not be deemed, an incorporation by reference of the information contained on, or available through, the website. Therefore, such information should not be considered part of this report.

**OPERATIONS**

The Railroad, along with its subsidiaries and rail affiliates, is our one reportable operating segment. Although revenue is analyzed by commodity group, we analyze the net financial results of the Railroad as one segment due to the integrated nature of our rail network. Additional information regarding our business and operations, including revenue and financial information and data and other information regarding environmental matters, is presented in Legal Proceedings, Item 3; Selected Financial Data, Item 6; Management's Discussion and Analysis of Financial Condition and Results of Operations, Item 7; and the Financial Statements and Supplementary Data, Item 8.

**2008 Freight Revenue**




**Operations** – UPRR is a Class I railroad operating in the United States. We have approximately 32,012 route miles, linking Pacific Coast and Gulf Coast ports with the Midwest and eastern United States gateways and providing several corridors to key Mexican gateways. We serve the western two-thirds of the country and maintain coordinated schedules with other rail carriers to move freight to and from the Atlantic Coast, the Pacific Coast, the Southeast, the Southwest, Canada, and Mexico. Export and import traffic moves through Gulf Coast and Pacific Coast ports and across the Mexican and Canadian borders. Our freight traffic consists of bulk, manifest, and premium business. Bulk traffic is primarily coal, grain, rock, or soda ash in unit trains – trains transporting a single commodity from one source to one destination. Manifest traffic is individual carload or less than train-load business, including commodities such as lumber, steel, paper, and food. The transportation of finished vehicles and intermodal containers is part of our premium business. In 2008, we generated freight revenues totaling $17.1 billion from the following six commodity groups:

*Agricultural* – Transporting agricultural products, including whole grains, commodities produced from these grains, and food and beverage products, provided 18% of our 2008 freight revenues. With access to most major grain markets, we provide a critical link between the Midwest and western producing areas and export terminals in the Pacific Northwest (PNW) and Gulf ports, as well as Mexico. Unit trains of grain efficiently shuttle between producers and export terminals or domestic markets. We also serve significant domestic markets, including grain processors, animal feeders, and ethanol producers in the Midwest, West, South, and Rocky Mountain states. Primary food commodities consist of a variety of fresh and frozen fruits and vegetables, dairy products, and beverages, which are moved to major U.S. population centers for distribution and consumption. Express Lane and our Produce Unit Train, our premium perishables services that move fruits and vegetables from the PNW and California with priority service to destinations in the East, compete with the trucking industry. We transport frozen meat and poultry to the West Coast ports for export, while beverages, primarily beer, enter the U.S. from Mexico.

*Automotive* – We are the largest automotive carrier west of the Mississippi River, serving seven vehicle assembly plants and distributing imported vehicles from six West Coast ports and Houston. We off-load finished vehicles at 38 vehicle distribution centers for delivery by truck to all major western U.S. cities. In addition to transporting finished vehicles, we provide expedited handling of automotive parts in both boxcars and intermodal containers to several assembly plants. We carry automotive materials bound for assembly plants in Mexico, the U.S., and Canada, and we also transport finished vehicles from manufacturing facilities in Mexico. In 2008, transportation of finished vehicles and automotive materials accounted for 8% of our freight revenues.

*Chemicals* – Transporting chemicals provided 15% of our freight revenues in 2008. Our franchise enables us to serve the chemical producing areas along the Gulf Coast, as well as the Rocky Mountain region. Two-thirds of the chemicals business consists of liquid and dry chemicals, plastics, and liquid petroleum products. In addition to transporting plastics, customers also use our storage-in-transit yards for intermediate storage of plastic resins. Soda ash shipments originate in southwestern Wyoming and California destined primarily for glass producing markets in the East, the West, and abroad. Fertilizer movements originate primarily in the Gulf Coast region, as well as the West and Canada, bound for major agricultural users in the Midwest and the western U.S.

*Energy* – Coal transportation accounted for 22% of our 2008 freight revenues. Our transportation network allows us to transport coal and coke to utilities, industrial facilities, interchange points, and water terminals. The water terminals provide access to the West and Gulf Coasts for export, and rail/barge interchange facilities on the Mississippi and Ohio Rivers and the Great Lakes. We serve mines located in the Southern Powder River Basin of Wyoming (SPRB), Colorado, Utah, southern Wyoming, and southern Illinois. SPRB coal represents the largest growth segment of the market, as utilities continue to favor its lower cost and low-sulfur content.

*Industrial Products* – Our extensive network enables our industrial products group to move numerous commodities between thousands of origin and destination points throughout North America. Lumber shipments originate primarily in the PNW and Canada for destinations throughout the United States for new home construction and repair and remodeling. Commercial and highway construction drives shipments of steel and construction products, consisting of rock, cement, and roofing materials. Paper and consumer goods, including furniture and appliances, are shipped to major metropolitan areas for consumers. Nonferrous metals and industrial minerals are moved for industrial manufacturing. In addition, we provide efficient and safe transportation for government entities and waste companies. In 2008, transporting industrial products provided 19% of our freight revenues.

*Intermodal* – Our intermodal business, which represented 18% of our freight revenues in 2008, includes international, domestic, and premium shipments. International business consists of imported or exported container traffic that arrives at, or departs from, West Coast ports via ocean vessel. Domestic business includes domestic container and trailer traffic for major retailers and other U.S. businesses that is sold through intermodal marketing companies (primarily shipper agents and consolidators) and truckload carriers. Less-than-truckload and package carriers with time-sensitive business requirements account for the majority of our premium service.

**Seasonality** – Some of the commodities we carry have peak shipping seasons, reflecting either or both the nature of the commodity, such as certain agricultural and food products that have specific growing and harvesting seasons, and the demand cycle for the commodity, such as intermodal traffic, which generally has a peak shipping season during the third quarter to meet holiday-related demand for consumer goods during the fourth quarter. The peak shipping seasons for these commodities can vary considerably from year to year depending upon various factors, including the strength of domestic and international economies and currencies and the strength of harvests and market prices of agricultural products. In response to an annual request delivered by the Surface Transportation Board (STB) of the United States Department of Transportation (DOT) to all of the Class I railroads operating in the U.S., we issue a letter during the third quarter detailing our plans for handling traffic during the third and fourth quarters and providing other information requested by the STB.

**Working Capital** – We currently have, and historically have had, a working capital deficit, which is common in our industry and does not indicate a lack of liquidity or financial stability. We maintain adequate resources and, when necessary, have access to capital to meet any daily and short-term cash requirements, and we have sufficient financial capacity to satisfy our current liabilities.

**Competition** – We are subject to competition from other railroads, motor carriers, ship and barge operators, and pipelines. Our main rail competitor is Burlington Northern Santa Fe Corporation. Its rail subsidiary, BNSF Railway Company (BNSF), operates parallel routes in many of our main traffic corridors. In addition, we operate in corridors served by other railroads and motor carriers. Motor carrier competition is particularly strong for five of our six commodity groups (excluding energy). Because of the proximity of our routes to major inland and Gulf Coast waterways, barges can be particularly competitive, especially for grain and bulk commodities. In addition to price competition, we face competition with respect to transit times and quality and reliability of service. While we must build or acquire and maintain our rail system, trucks and barges are able to use public rights-of-way maintained by public entities. Any future improvements or expenditures materially increasing the quality or reducing the costs of these alternative modes of transportation, or legislation releasing motor carriers from their size or weight limitations, could have a material adverse effect on our business.

**Equipment Suppliers** – We depend on two key domestic suppliers of locomotives. Due to the capital intensive nature and sophistication of this equipment, potential new suppliers face high barriers to entry with respect to this industry. Therefore, if one of these domestic suppliers discontinues manufacturing locomotives for any reason, including insolvency or bankruptcy, we could experience a significant cost increase and risk reduced availability of the locomotives that are necessary to our operations. Additionally, there are two key suppliers of rail for U.S. railroads (one domestic and one international). Rail is critical for both maintenance of our network and replacement and improvement or expansion of our network and facilities. Rail manufacturing also has high barriers to entry, and, if one of those suppliers discontinues operations for any reason, including insolvency or bankruptcy, we could experience cost increases and difficulty obtaining rail.

**Employees** – Approximately 86% of our 48,242 full-time-equivalent employees are represented by 14 major rail unions. We concluded the most recent round of negotiations with the unions in 2008 when the last three unions (yardmasters, United Transportation Union, and the IAM) ratified new agreements. The 14 unions executed similar multi-year agreements that provide for wage increases and increased employee health and welfare cost sharing. The annual wage increases (including retroactive increases) are as follows: July 2005 2.5%; July 2006 3.0%; July 2007 3.0%; July 2008 4.0%; July 2009 4.5%. The current agreements expire on December 31, 2009, and the next round of negotiations will begin in late 2009.

**Railroad Security** – Operating a safe and secure railroad is first among our critical priorities and is a primary responsibility of all our employees. This emphasis helps us protect the public and our employees, our customers, and our operations and rail network. Our security efforts rely upon a wide variety of measures including employee training, cooperation with our customers, training of emergency responders, and partnerships with numerous federal, state, and local government agencies. While federal law requires us to protect the confidentiality of our security plans designed to safeguard against terrorism and other security incidents, the following provides a general overview of our security initiatives.

*UPRR Security Measures* – We maintain a comprehensive security plan designed to deter and to respond to any potential or actual threats as they arise. The plan includes four levels of alert status, each with its own set of countermeasures. We employ our own police force, consisting of more than 220 commissioned and highly-trained officers. Our employees also undergo recurrent security and preparedness training, as well as federally-mandated hazardous materials and security training. We regularly review the sufficiency of our employee training programs for ways to increase preparedness and to improve security.

We have an emergency response management center, which operates 24 hours a day. The center receives reports of emergencies, dangerous or potentially dangerous conditions, and other safety and security issues from our employees, the public, and law enforcement and other government officials. In cooperation with government officials, we monitor both threats and public events, and as necessary, we

may alter rail traffic flow near high-risk areas to minimize risk to communities we serve and our operations. We comply with the hazardous materials routing rules and other requirements imposed by federal law. We also design our operating plan to expedite the movement of hazardous material shipments to minimize the time rail cars remain idle at yards and terminals located in or near major population centers. Additionally, we are prepared to comply with new Transportation Security Agency (TSA) regulations governing tracking and the chain of custody for Rail Security-Sensitive Material Shipments, including toxic inhalation hazard materials, which will take effect on April 1, 2009.

We also have established a number of our own innovative safety and security-oriented initiatives ranging from various investments in technology to the Officer on the Train program, which provides local law enforcement officers with the opportunity to ride with train crews to enhance their understanding of railroad operations and risks.

*Cooperation with Federal, State, and Local Government Agencies* – We work closely with government agencies ranging from the DOT and the Department of Homeland Security (DHS), to local police departments, fire departments, and other first responders. In conjunction with the DOT, DHS, and other railroads, we sponsor Operation Respond, which provides first responders with secure links to electronic railroad resources, including mapping systems, shipment records, and other essential information required by emergency personnel to respond to accidents and other situations. We also participate in the National Joint Terrorism Task Force, a multi-agency effort established by the Justice Department and the Federal Bureau of Investigation to combat and prevent terrorism.

We work with the Coast Guard, U.S. Customs and Border Protection (CBP, formerly the U.S. Customs Service), and the Military Transport Management Command to monitor shipments entering the UPRR rail network at U.S. border crossings and ports. We were the first railroad in the United States to be named a partner in CBP's Customs-Trade Partnership Against Terrorism (C-TPAT), a partnership designed to develop, enhance, and maintain effective security processes throughout the global supply chain.

*Cooperation with Customers and Trade Associations* – Along with other railroads, we work with the American Chemistry Council to train more than 200,000 emergency responders each year. We work closely with our chemical shippers to establish plant security plans, and continue to take steps to more closely monitor and track hazardous materials shipments. In cooperation with the Federal Railroad Administration (FRA) and other railroads, we are also working to develop an improved tank car design that will further limit the risk of releases of hazardous materials.

**GOVERNMENTAL AND ENVIRONMENTAL REGULATION**

**Governmental Regulation** – Our operations are subject to a variety of federal, state, and local regulations, generally applicable to all businesses (see also the discussion of certain regulatory proceedings in Legal Proceedings, Item 3).

The operations of the Railroad are subject to the regulatory jurisdiction of the STB. The operations of the Railroad are also subject to the regulations of the FRA and other federal and state agencies. The STB has jurisdiction over rates charged on certain regulated rail traffic; common carrier service of regulated traffic; freight car compensation; transfer, extension, or abandonment of rail lines; and acquisition of control of rail common carriers. On January 26, 2007, the STB issued a decision limiting the manner in which U.S. railroads can calculate fuel surcharges on traffic regulated by the STB, and we have complied with this regulation. The STB also has adopted new mechanisms for regulating some of our rates, adopted a new methodology for calculating the cost of capital for railroads, and expanded its review of line sales and leases. Various appeals may affect these regulations prior to final implementation.

DOT, the Occupational Safety and Health Administration, and the DHS, along with other federal agencies, have jurisdiction over certain aspects of safety, movement of hazardous materials, movement

and disposal of hazardous waste, emissions requirements, and equipment standards. On October 16, 2008, the President signed the Rail Safety Improvement Act of 2008 into the law, which, among other things, revises hours of service rules for train and certain other railroad employees, mandates implementation of positive train control (a collision avoidance technology that can override locomotive controls and stop a train before an accident) by the end of 2015, addresses safety at rail crossings, increases the number of safety related employees of the FRA, and increases fines that may be levied against railroads for safety violations. Additionally, various state and local agencies have jurisdiction over disposal of hazardous waste and seek to regulate movement of hazardous materials in areas not otherwise preempted by federal law.

**Environmental Regulation** – We are subject to extensive federal and state environmental statutes and regulations pertaining to public health and the environment. The statutes and regulations are administered and monitored by the Environmental Protection Agency (EPA) and by various state environmental agencies. The primary laws affecting our operations are the Resource Conservation and Recovery Act, regulating the management and disposal of solid and hazardous wastes; the Comprehensive Environmental Response, Compensation, and Liability Act, regulating the cleanup of contaminated properties; the Clean Air Act, regulating air emissions; and the Clean Water Act, regulating waste water discharges.

Information concerning environmental claims and contingencies and estimated remediation costs is set forth in Management's Discussion and Analysis of Financial Condition and Results of Operations – Critical Accounting Policies – Environmental, Item 7.

**Item 1A. Risk Factors**

The information set forth in this Item 1A should be read in conjunction with the rest of the information included in this report, including Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations, and Item 8, Financial Statements and Supplementary Data.

*We May Be Affected by General Economic Conditions* – Either or both of prolonged and severe adverse domestic and global economic conditions or disruptions of either or both of the financial and credit markets, including the availability of short and long-term debt financing, may affect the producers and consumers of the commodities we carry and may have a material adverse effect on our results of operations, financial condition, and liquidity.

*We Are Subject to Significant Governmental Regulation* – We are subject to governmental regulation by a significant number of federal, state, and local authorities covering a variety of health, safety, labor, environmental, economic (as discussed below), and other matters. Many laws and regulations require us to obtain and maintain various licenses, permits, and other authorizations, and we cannot guarantee that we will continue to be able to do so. Our failure to comply with applicable laws and regulations could have a material adverse effect on us. Governments may change the legislative or regulatory frameworks within which we operate without providing us any recourse to address any adverse effects on our business, including, without limitation, regulatory determinations or rules regarding dispute resolution, business relationships with other railroads, calculation of our cost of capital or other inputs relevant to determining or estimating our revenue adequacy, and costs and expenses. In recent years, there has been a significant level of legislative activity involving proposed bills in Congress and state legislatures seeking to re-regulate various aspects of railroad operations. As part of the Rail Safety Improvement Act of 2008, railroad carriers must implement positive train control (a collision avoidance technology that can override locomotive controls and stop a train before an accident) by the end of 2015, which could have a material adverse effect on our results of operations, financial condition, and liquidity. Increased regulation of the rail industry likely would restrict our ability to determine prices for certain rail services, affect our ability to control traffic volume, and reduce capital spending on our rail network, facilities and equipment, resulting in a material adverse effect on our results of operations, financial condition, and liquidity.

Additionally, one or more consolidations of Class I railroads could lead to increased regulation of the rail industry.

*We May Be Subject to Various Claims and Lawsuits That Could Result in Significant Expenditures* – The nature of our business exposes us to the potential for various claims and litigation related to labor and employment, personal injury, property damage, environmental liability, and other matters. Any material changes to litigation trends or a catastrophic rail accident or series of accidents involving any or all of property damage, personal injury, and environmental liability could have a material adverse effect on our results of operations, financial condition, and liquidity.

*We Are Required to Transport Hazardous Materials* – Federal laws require railroads, including us, to transport hazardous materials regardless of risk or potential exposure of loss. Any rail accident or other incident or accident on our network, at our facilities, or at the facilities of our customers involving the release of hazardous materials, including toxic inhalation hazard (or TIH) materials such as certain chlorine compounds, could involve significant costs and claims for personal injury, property damage, and environmental penalties and remediation, which could have a material adverse effect on our results of operations, financial condition, and liquidity.

*Severe Weather Could Result in Significant Business Interruptions and Expenditures* – Severe weather conditions, events, and other natural phenomena, including earthquakes, hurricanes, fires, floods, mudslides or landslides, extreme temperatures, and significant precipitation may cause business interruptions, including line outages on our rail network that can adversely affect our entire rail network and result in increased costs, increased liabilities, and decreased revenue, which could have a material adverse effect on our results of operations, financial condition, and liquidity.

*We Rely on Technology and Technology Improvements in Our Business Operations* – We rely on information technology in all aspects of our business. If we do not have sufficient capital to acquire new technology or if we are unable to implement new technology, we may suffer a competitive disadvantage within the rail industry and with companies providing other modes of transportation service, which could have a material adverse effect on our results of operations, financial condition, and liquidity. Additionally, if we experience significant disruption or failure of one or more of our information technology systems, including computer hardware, software, and communications equipment, we could experience a service interruption, safety failure, security breach, or other operational difficulties, which could have a material adverse impact on our results of operations, financial condition, and liquidity.

*We Face Competition from Other Railroads and Other Transportation Providers* – We face competition from other railroads, motor carriers, ships, barges, and pipelines. In addition to price competition, we face competition with respect to transit times and quality and reliability of service. While we must build or acquire and maintain our rail system, trucks and barges are able to use public rights-of-way maintained by public entities. Any future improvements or expenditures materially increasing the quality or reducing the cost of alternative modes of transportation, or legislation releasing motor carriers from their size or weight limitations, could have a material adverse effect on our results of operations, financial condition, and liquidity. Additionally, any future consolidation of the rail industry could materially affect the competitive environment in which we operate.

*We Must Manage Fluctuating Demand for Our Services and Network Capacity* – If there is significant demand for our services that exceeds the designed capacity of our network, we may experience network difficulties, including congestion and reduced velocity, that could compromise the level of service we provide to our customers. This level of demand may also compound the impact of weather and weather-related events on our operations and velocity. Although we continue to improve our transportation plan, add capacity, and improve operations at our yards and other facilities, we cannot be sure that these measures will fully or adequately address any service shortcomings resulting from demand exceeding our planned capacity. We may experience other operational or service difficulties related to network

capacity, dramatic and unplanned increases or decreases of demand for rail service with respect to one or more of our commodity groups, or other events that could have a negative impact on our operational efficiency, any of which could have a material adverse effect on our results of operations, financial condition, and liquidity. In the event that we experience significant reductions of demand for rail services with respect to one or more of our commodity groups, we may experience increased costs associated with resizing our operations, including higher unit operating costs and costs for the storage of locomotives, rail cars, and other equipment; work-force adjustments; and other related activities, which could have a material adverse effect on our results of operations, financial condition, and liquidity.

*We Utilize Capital Markets* – Due to the significant capital expenditures required to operate a safe and efficient railroad, we rely on the capital markets to provide some of our capital requirements, including the issuance of long-term debt instruments, and commercial paper from time-to-time, as well as the sale of certain of our receivables. Significant instability or disruptions of the capital markets, including the credit markets, or deterioration of our financial condition due to internal or external factors could restrict or prohibit our access to, and significantly increase the cost of, commercial paper and other financing sources, including bank credit facilities and the issuance of long-term debt, including corporate bonds. Any of these factors alone or in combination could also result in a reduction of our credit rating to below investment grade, which could prohibit or restrict us from utilizing our current sale of receivables program or accessing external sources of short and long-term debt financing and significantly increase the costs associated with utilizing a sale of receivables program and issuing both commercial paper and long-term debt.

*Strikes or Work Stoppages Could Adversely Affect Our Operations as the Majority of Our Employees Belong to Labor Unions and Labor Agreements* – We are a party to collective bargaining agreements with various labor unions. Disputes with regard to the terms of these agreements or our potential inability to negotiate acceptable contracts with these unions could result in, among other things, strikes, work stoppages, or other slowdowns by the affected workers. If unionized workers were to engage in a strike, work stoppage, or other slowdown, or other employees were to become unionized, we could experience a significant disruption of our operations or higher ongoing labor costs, either of which could have a material adverse effect on our results of operations, financial condition, and liquidity. Additionally, future national labor agreements, or renegotiation of labor agreements or provisions of labor agreements, could compromise our service reliability and significantly increase our costs for healthcare, wages, and other benefits, which could have a material adverse impact on our results of operations, financial condition, and liquidity.

*We Are Subject to Significant Environmental Laws and Regulations* – Our operations are subject to extensive federal, state, and local environmental laws and regulations concerning, among other things, emissions to the air; discharges to waters; handling, storage, transportation, and disposal of waste and other materials; and hazardous material or petroleum releases. We generate and transport hazardous and non-hazardous waste in our operations, and we did so in our former operations. Environmental liability can extend to previously owned or operated properties, leased properties, and properties owned by third parties, as well as to properties we currently own. Environmental liabilities have arisen and may also arise from claims asserted by adjacent landowners or other third parties in toxic tort litigation. We have been and may be subject to allegations or findings that we have violated, or are strictly liable under, these laws or regulations. We could incur significant costs as a result of any of the foregoing, and we may be required to incur significant expenses to investigate and remediate known, unknown, or future environmental contamination, which could have a material adverse effect on our results of operations, financial condition, and liquidity.

*We May Be Affected by Climate Change and Market or Regulatory Responses to Climate Change* – Climate change, including the impact of global warming, could have a material adverse effect on our results of operations, financial condition, and liquidity. Restrictions, caps, taxes, or other controls on emissions of greenhouse gasses, including diesel exhaust, could significantly increase our operating costs.

Restrictions on emissions could also affect our customers that (a) use commodities that we carry to produce energy, (b) use significant amounts of energy in producing or delivering the commodities we carry, or (c) manufacture or produce goods that consume significant amounts of energy or burn fossil fuels, including chemical producers, farmers and food producers, and automakers and other manufacturers. Significant cost increases, government regulation, or changes of consumer preferences for goods or services relating to alternative sources of energy or emissions reductions could materially affect the markets for the commodities we carry, which in turn could have a material adverse effect on our results of operations, financial condition, and liquidity. Government incentives encouraging the use of alternative sources of energy could also affect certain of our customers and the markets for certain of the commodities we carry in an unpredictable manner that could alter our traffic patterns, including, for example, the impacts of ethanol incentives on farming and ethanol producers. Finally, we could face increased costs related to defending and resolving legal claims and other litigation related to climate change and the alleged impact of our operations on climate change. Any of these factors, individually or in operation with one or more of the other factors, or other unforeseen impacts of climate change could reduce the amount of traffic we handle and have a material adverse effect on our results of operations, financial condition, and liquidity.

*Rising or Elevated Fuel Costs and Whether We Are Able to Mitigate These Costs with Fuel Surcharges Could Materially and Adversely Affect Our Business* – Fuel costs constitute a significant portion of our transportation expenses. Diesel fuel prices are subject to dramatic fluctuations, and significant price increases could have a material adverse effect on our operating results. Although we currently are able to recover a significant amount of our increased fuel expenses through revenue from fuel surcharges, we cannot be certain that we will always be able to mitigate rising or elevated fuel costs through surcharges. Future market conditions or legislative or regulatory activities could adversely affect our ability to apply fuel surcharges or adequately recover increased fuel costs through fuel surcharges. International, political, and economic circumstances affect fuel prices and supplies. Weather can also affect fuel supplies and limit domestic refining capacity. If a fuel supply shortage were to arise, higher fuel prices could, despite our fuel surcharge programs, have a material adverse effect on our results of operations, financial condition, and liquidity.

*The Availability of Qualified Personnel Could Adversely Affect Our Operations* – Changes in demographics, training requirements, and the availability of qualified personnel could negatively affect our ability to meet demand for rail service. Unpredictable increases in demand for rail services and a lack of network fluidity may exacerbate such risks, which could have a negative impact on our operational efficiency and otherwise have a material adverse effect on our results of operations, financial condition, and liquidity.

*We Are Subject to Legislative, Regulatory, and Legal Developments Involving Taxes* – Taxes are a significant part of our expenses. We are subject to federal and state income, payroll, property, sales and use, fuel, and other types of taxes. Changes in tax rates, enactment of new tax laws, revisions of tax regulations, and claims or litigation with taxing authorities could result in substantially higher taxes and, therefore, could have a material adverse effect on our results of operations, financial condition, and liquidity.

*We Are Dependent on Certain Key Suppliers of Locomotives and Rail* – Due to the capital intensive nature and sophistication of locomotive equipment, potential new suppliers face high barriers to entry with respect to locomotive manufacturing. Therefore, if one of these domestic suppliers discontinues manufacturing locomotives for any reason, including bankruptcy or insolvency, we could experience significant cost increases and reduced availability of the locomotives that are necessary to our operations. Additionally, there are two key suppliers of rail, which is critical for rail replacement programs, maintenance, and for adding additional network capacity, new rail and storage yards, and expansions of existing facilities. This industry similarly has high barriers to entry, and if one of these suppliers discontinues operations for any reason, including bankruptcy or insolvency, we could experience both

significant cost increases for rail purchases and difficulty obtaining sufficient rail for maintenance and other projects.

*We May Be Affected by Acts of Terrorism, War, or Risk of War* – Our rail lines, facilities, and equipment, including rail cars carrying hazardous materials, could be direct targets or indirect casualties of terrorist attacks. Terrorist attacks, or other similar events, any government response thereto, and war or risk of war may adversely affect our results of operations, financial condition, and liquidity. In addition, insurance premiums for some or all of our current coverages could increase dramatically, or certain coverages may not be available to us in the future.

**Item 1B. Unresolved Staff Comments**

None.

**Item 2. Properties**

We employ a variety of assets in the management and operation of our rail business. Our rail network covers 23 states in the western two-thirds of the U.S.



**Track** – Our rail network includes 32,012 route miles. We own 26,171 miles and operate on the remainder pursuant to trackage rights or leases. The following table describes track miles at December 31, 2008 and 2007.

| | ***2008*** | *2007* |
|---|---|---|
| Route miles | **32,012** | 32,205 |
| Other main line | **6,510** | 6,404 |
| Passing lines and turnouts | **3,037** | 3,021 |
| Switching and classification yard lines | **9,207** | 9,270 |
| Total | **50,766** | 50,900 |

**Harriman Dispatching Center** – The Harriman Dispatching Center (HDC), located in Omaha, Nebraska, is our primary dispatching facility. It is linked to regional dispatching and locomotive management facilities at various locations along our network. The HDC moves locomotives and trains, manages traffic on our network, and coordinates interchanges with other railroads. Over 1,000 employees currently work on-site in the facility.

**Rail Facilities** – In addition to our track structure, we operate numerous facilities, including terminals for intermodal and other freight; rail yards for train-building (classification yards), switching, storage-in-transit (the temporary storage of customer goods in rail cars prior to shipment) and other activities; offices to administer and manage our operations; dispatch centers to direct traffic on our rail network; crew quarters to house train crews along our network; and shops and other facilities for fueling, maintenance, and repair of locomotives and repair and maintenance of rail cars and other equipment. The following tables include the major yards and terminals on our system:

| | *Avg. Daily Car Volume* | |
|---|---|---|
| *Top 10 Classification Yards* | ***2008*** | *2007* |
| North Platte, Nebraska | **2,500** | 2,700 |
| North Little Rock, Arkansas | **1,600** | 1,600 |
| Proviso (Chicago), Illinois | **1,500** | 1,600 |
| Englewood (Houston), Texas | **1,300** | 1,300 |
| Fort Worth, Texas | **1,300** | 1,200 |
| Roseville, California | **1,300** | 1,400 |
| Livonia, Louisiana | **1,200** | 1,300 |
| West Colton, California | **1,200** | 1,300 |
| Pine Bluff, Arkansas | **1,200** | 1,300 |
| Neff (Kansas City), Missouri | **1,000** | 1,000 |

| *Top 10 Intermodal Terminals* | *Annual Lifts* ***2008*** | *2007* |
|---|---|---|
| ICTF (Los Angeles), California | **619,000** | 719,000 |
| East Los Angeles, California | **383,000** | 360,000 |
| Marion (Memphis), Tennessee | **360,000** | 414,000 |
| Global II (Chicago), Illinois | **299,000** | 353,000 |
| Dallas, Texas | **294,000** | 292,000 |
| Global I (Chicago), Illinois | **291,000** | 310,000 |
| Seattle, Washington | **228,000** | 250,000 |
| Yard Center (Chicago), Illinois | **227,000** | 238,000 |
| Oakland, California | **222,000** | 236,000 |
| Englewood (Houston), Texas | **207,000** | 214,000 |

**Rail Equipment** – Our equipment includes owned and leased locomotives and rail cars; heavy maintenance equipment and machinery; other equipment and tools in our shops, offices, and facilities; and vehicles for transportation of crews and other activities. As of December 31, 2008, we owned or leased the following units of equipment:

| *Locomotives* | *Owned* | *Leased* | *Total* | *Average Age (yrs.)* |
|---|---|---|---|---|
| Road | 4,247 | 3,531 | 7,778 | 14.6 |
| Switching | 475 | 28 | 503 | 30.6 |
| Other | 112 | 55 | 167 | 21.5 |
| Total locomotives | 4,834 | 3,614 | 8,448 | N/A |

| *Freight cars* | *Owned* | *Leased* | *Total* | *Average Age (yrs.)* |
|---|---|---|---|---|
| Covered hoppers | 13,053 | 22,602 | 35,655 | 29.4 |
| Open hoppers | 13,144 | 4,990 | 18,134 | 29.4 |
| Gondolas | 7,197 | 6,726 | 13,923 | 26.9 |
| Boxcars | 6,469 | 3,365 | 9,834 | 27.0 |
| Mechanical refrigerated | 2,696 | 4,722 | 7,418 | 20.8 |
| Flat cars | 3,460 | 865 | 4,325 | 31.2 |
| Other | 112 | 604 | 716 | N/A |
| Total freight cars | 46,131 | 43,874 | 90,005 | N/A |

**Capital Expenditures** – Our rail network requires significant annual capital investments for replacement, improvement, and expansion. These investments enhance safety, support the transportation needs of our customers, and improve our operational efficiency. Additionally, we add new locomotives and freight cars to our fleet to replace older, less efficient equipment, to support growth and customer demand, and to reduce our impact on the environment through the acquisition of more fuel efficient and low-emission locomotives.

**2008 Capital Expenditures** – During 2008, we made capital investments totaling $3.1 billion, which included cash spending of $2.8 billion (see the capital expenditures table in Management's Discussion

and Analysis of Financial Condition and Results of Operations – Liquidity and Capital Resources – Financial Condition, Item 7). Our capital plan included the acquisition of 82 locomotives, 300 freight cars and 2,000 intermodal containers acquired under long-term operating leases with an aggregate net present value of $178 million. We also acquired 83 locomotives through capital lease financings valued at $175 million.

**Infrastructure Expansion** – One of our critical routes is the Sunset Corridor, a 760-mile route running between Los Angeles and El Paso, Texas. This heavily traveled corridor carries about 20 percent of our traffic, including a significant amount of intermodal traffic. In 2008, we added 45 miles of double track to the corridor, which now includes nearly 455 miles of double track (approximately 60% of the route). To support anticipated growth on the Sunset Corridor, as well as our other key routes, we continue to upgrade and add terminal capacity. During 2008, we opened a new intermodal facility at San Antonio, Texas, and acquired property for the construction of a new intermodal facility in Joliet, Illinois.

An important part of our franchise is our access to the coal-producing SPRB through a line that we jointly own with BNSF (the Joint Line). In addition to the significant annual replacement required on the Joint Line (due to the volume of trains, the weight of loaded coal cars, and the impact of coal dust on rail beds), a capacity expansion project is underway. During 2008, we added approximately 20 miles of track on the Joint Line, now making those sections quadruple tracked, as well as approximately 10 miles of triple track on our line into the SPRB.

**2009 Capital Expenditures** – In 2009, we expect to make capital investments of approximately $2.8 billion (which may be revised if business conditions or new laws or regulations affect our ability to generate sufficient returns on these investments). See discussion of our 2009 capital plan in Management's Discussion and Analysis of Financial Condition and Results of Operations – 2009 Outlook, Item 7.

**Equipment Encumbrance** – Equipment with a carrying value of approximately $2.7 billion and $2.8 billion at December 31, 2008 and 2007, respectively, serves as collateral for capital leases and other types of equipment obligations in accordance with the secured financing arrangements utilized to acquire such railroad equipment.

As a result of the merger of Missouri Pacific Railroad Company (MPRR) with and into UPRR on January 1, 1997, and pursuant to the underlying indentures for the MPRR mortgage bonds, UPRR must maintain the same value of assets after the merger in order to comply with the security requirements of the mortgage bonds. As of the merger date, the value of the MPRR assets that secured the mortgage bonds was approximately $6.0 billion. In accordance with the terms of the indentures, this collateral value must be maintained during the entire term of the mortgage bonds irrespective of the outstanding balance of such bonds.

Certain of our properties are subject to federal, state, and local laws and regulations governing the protection of the environment (see discussion of environmental issues in Business – Governmental and Environmental Regulation, Item 1, and Management's Discussion and Analysis of Financial Condition and Results of Operations – Critical Accounting Policies – Environmental, Item 7).

**Item 3. Legal Proceedings**

From time to time, we are involved in legal proceedings, claims, and litigation that occur in connection with our business. We routinely assess our liabilities and contingencies in connection with these matters based upon the latest available information and, when necessary, we seek input from our third-party advisors when making these assessments. Consistent with SEC rules and requirements, we describe below material pending legal proceedings (other than ordinary routine litigation incidental to our business), material proceedings known to be contemplated by governmental authorities, other proceedings arising

under federal, state, or local environmental laws and regulations (including governmental proceedings involving potential fines, penalties, or other monetary sanctions in excess of $100,000) and such other pending matters that we may determine to be appropriate.

**ENVIRONMENTAL MATTERS**

As we reported in our Quarterly Report on Form 10-Q for the quarter ended September 30, 2007, the Railroad received notice from the Army Corps of Engineers (the Corps) that, during its construction efforts to restore service to the Caliente Subdivision after severe flooding in January 2005, the Railroad may have exceeded its authority under emergency authorizations and permits issued by the Corps. Subsequently, the Corps referred the matter to the EPA, which has demanded that the Railroad repair claimed impacts to the adjacent waterway, perform compensatory mitigation, and pay a civil penalty in connection with this project and related storm water issues. The Railroad and the EPA have discussed the scope of additional work to be performed by the Railroad to address alleged impacts of its construction activities, as well as compensatory mitigation and potential penalties. To date, we have not reached a final agreement with the EPA, and, therefore, the ultimate amount of the civil penalty cannot be determined. However, the penalty component of the settlement will exceed $100,000.

As we reported in our Quarterly Report on Form 10-Q for the quarter ended September 30, 2004, the Illinois Attorney General's office filed an Agreed Order and Complaint and a Complaint for Injunctive and Other Relief on October 7, 2004, in the Circuit Court for the Twentieth Judicial Circuit (St. Clair County) against The Alton & Southern Railway Company, a wholly-owned subsidiary of the Railroad, as a result of a collision and derailment on September 21, 2004. The State of Illinois sought to enjoin The Alton & Southern Railway Company from further violations, as well as payment of a monetary penalty. The Railroad executed an agreement to settle this matter with the State of Illinois. Once it is approved by the Court, the agreement will require payment of a penalty in the amount of $48,000.

As we reported in our Annual Report on Form 10-K for 2005, the EPA considers the Railroad a potentially responsible party for the Omaha Lead Site. The Omaha Lead Site consists of approximately 25 square miles of residential property in the eastern part of Omaha, Nebraska, allegedly impacted by air emissions from two former lead smelters/refineries. One refinery was operated by ASARCO. The EPA identified the Railroad as a potentially responsible party because more than 60 years ago the Railroad owned land that was leased to ASARCO. The Railroad disputes both the legal and technical basis of the EPA's allegations. It has nonetheless engaged in extensive negotiations with the EPA. These negotiations reached an apparent impasse. The EPA issued a Unilateral Administrative Order with an effective date of December 16, 2005, directing the Railroad to implement an interim remedy at the site at an estimated cost of $50 million. Failure to comply with the order without just cause could subject the Railroad to penalties of up to $32,500 per day and triple the EPA's costs in performing the work. The Railroad believes it has just cause not to comply with the order, but it offered to perform some of the work specified in the order as a compromise. To date, the EPA has rejected all of the Railroad's offers to settle or resolve this matter. The Railroad will vigorously contest liability and the imposition of any penalties.

As we reported in our Annual Report on Form 10-K for 2005, the Illinois Attorney General's office filed a complaint in the Circuit Court for the Twentieth Judicial Circuit (St. Clair County) for injunctive and other relief on November 28, 2005, against the Railroad, alleging a diesel fuel spill from an above-ground storage tank in a rail yard in Dupo, St. Clair County, Illinois. The State of Illinois seeks to enjoin UPRR from further violations and a monetary penalty. The amount of the proposed penalty, although uncertain, could exceed $100,000.

As we reported in our Quarterly Report on Form 10-Q for the quarter ended June 30, 2008, the Railroad received notice from the United States Department of Justice on May 8, 2008, indicating its intent to file suit for civil penalties in connection with a March 6, 2005 derailment near Kamela, Oregon. The derailment resulted in the release of approximately 900 gallons of diesel fuel from ruptured fuel tanks of

derailed refrigerator cars. Some of this fuel entered Dry Creek, a tributary to the Grande Ronde River. While the amount of the ultimate penalty is uncertain, it could exceed $100,000.

As we reported in our Quarterly Report on Form 10-Q for the quarter ended June 30, 2008, the Railroad has been engaged in discussions with the United States Attorney for the District of Utah and the Utah Attorney General concerning the transfer of certain engineering signal huts to a recycler in Salt Lake City in September 2005. The EPA, the United States Attorney, and the Utah Attorney General contend that the Railroad failed to provide predemolition notification pursuant to the National Emissions Standards for Hazardous Air Pollutants (NESHAPs) prior to removing those huts from their foundations. The Railroad maintains that the predemolition notification requirements of the NESHAPs do not apply to the removal of these signal huts. The Railroad and the government have reached an agreement in principal involving a proposed consent decree under which the Railroad will pay a civil penalty in the amount of $200,000, plus approximately $28,000 in investigative costs.

On April 26, 2007 the Colorado Department of Public Health and Environment issued a Notice of Violation/Cease and Desist Order to the Railroad in connection with certain alleged violations of the Railroad's stormwater permits at its Burnham Shops and North Yard facilities in Denver, Colorado. The Order required the Railroad, among other things, to evaluate the effectiveness of the best management practices (BMPs) that were in place to control stormwater and pollutant discharges from the regulated portions of those facilities, take appropriate remedial actions, implement additional BMPs to control the discharge of pollutants at each of the facilities, and report the results of its evaluation and demonstrate compliance with its stormwater permits to the agency. In October 2008, the State indicated that it would pursue a civil penalty in connection with the alleged permit violations noted in the Order. The amount of any such penalty is uncertain but could exceed $100,000.

We received notices from the EPA and state environmental agencies alleging that we are or may be liable under federal or state environmental laws for remediation costs at various sites throughout the United States, including sites on the Superfund National Priorities List or state superfund lists. We cannot predict the ultimate impact of these proceedings and suits because of the number of potentially responsible parties involved, the degree of contamination by various wastes, the scarcity and quality of volumetric data related to many of the sites, and the speculative nature of remediation costs.

Information concerning environmental claims and contingencies and estimated remediation costs is set forth in Management's Discussion and Analysis of Financial Condition and Results of Operations – Critical Accounting Policies – Environmental, Item 7.

**OTHER MATTERS**

As we reported in our Quarterly Report on Form 10-Q for the quarter ended June 30, 2007, 20 small rail shippers (many of whom are represented by the same law firms) filed virtually identical antitrust lawsuits in various federal district courts against us and four other Class I railroads in the U.S. The original plaintiff filed the first of these claims in the U.S. District Court in New Jersey on May 14, 2007, and the additional plaintiffs filed claims in district courts in various states, including Florida, Illinois, Alabama, Pennsylvania, and the District of Columbia. These suits allege that the named railroads engaged in price-fixing by establishing common fuel surcharges for certain rail traffic.

We received additional complaints following the initial claim, increasing the total number of complaints to 30. In addition to suits filed by direct purchasers of rail transportation, a few of the suits involve plaintiffs alleging that they are or were indirect purchasers of rail transportation and seek to represent a purported class of indirect purchasers of rail transportation that paid fuel surcharges. These complaints have added allegations under state antitrust and consumer protection laws. On November 6, 2007, the Judicial Panel on Multidistrict Litigation ordered that all of the rail fuel surcharge cases be transferred to Judge Paul Friedman of the U.S. District Court in D.C. for coordinated or consolidated pretrial

proceedings. Subsequently, the direct purchaser plaintiffs and the indirect purchaser plaintiffs filed Consolidated Amended Class Action Complaints against UPRR and three other Class I railroads.

One additional shipper filed a separate anti-trust suit during 2008. Subsequently, the shipper voluntarily dismissed the action without prejudice.

On October 10, 2008, Judge Friedman heard oral arguments with respect to the defendant railroads' motions to dismiss. In a ruling delivered on November 7, 2008, Judge Friedman denied the motion with respect to the direct purchasers' complaint, and, therefore, that case will proceed to discovery. On December 31, 2008, Judge Friedman ruled that the allegations of the indirect purchasers based upon state antitrust, consumer protection and unjust enrichment laws must be dismissed. He also ruled, however, that the plaintiffs can proceed with their claim for injunctive relief under the federal antitrust laws, which is identical to a claim by the direct purchaser plaintiffs.

Additionally, the Attorney General of New Jersey issued a grand jury subpoena to us requesting documents pertaining to our fuel surcharge programs. We met with representatives of the Attorney General's office in an effort to resolve their interest in this matter. On July 9, 2008, the Attorney General's office advised us that it is not moving forward with the criminal investigation at this time but is reserving the right to reopen the investigation if circumstances warrant.

We deny the allegations that our fuel surcharge programs violate the antitrust laws or any other laws. We believe that these lawsuits are without merit, and we will vigorously defend our actions. Therefore, we currently believe that these matters will not have a material adverse effect on any of our results of operations, financial condition, and liquidity.

**Item 4. Submission of Matters to a Vote of Security Holders**

No matters were submitted to a vote of security holders during the fourth quarter of 2008.

**Executive Officers of the Registrant and Principal Executive Officers of Subsidiaries**

The Board of Directors typically elects and designates our executive officers on an annual basis at the board meeting held in conjunction with the Annual Meeting of Shareholders, and they hold office until their successors are elected. Executive officers also may be elected and designated throughout the year, as the Board of Directors considers appropriate. There are no family relationships among the officers, nor any arrangement or understanding between any officer and any other person pursuant to which the officer was selected. The following table sets forth certain information, as of February 1, 2009, relating to the executive officers.

| Name | Position | Age | Business Experience During Past Five Years |
|---|---|---|---|
| James R. Young | Chairman, President and Chief Executive Officer of UPC and the Railroad | 56 | [1] |
| Robert M. Knight, Jr. | Executive Vice President – Finance and Chief Financial Officer of UPC and the Railroad | 51 | [2] |
| J. Michael Hemmer | Senior Vice President – Law and General Counsel of UPC and the Railroad | 59 | [3] |
| Barbara W. Schaefer | Senior Vice President – Human Resources and Secretary of UPC and the Railroad | 55 | [4] |
| Jeffrey P. Totusek | Vice President and Controller of UPC and Chief Accounting Officer and Controller of the Railroad | 50 | [5] |
| Dennis J. Duffy | Executive Vice President – Operations of the Railroad | 58 | Current Position |
| John J. Koraleski | Executive Vice President – Marketing and Sales of the Railroad | 58 | Current Position |

*[1] Mr. Young was elected Chief Executive Officer and President of UPC and the Railroad effective January 1, 2006. He was elected to the additional position of Chairman effective February 1, 2007. He was elected President and Chief Operating Officer of the Railroad, effective February 1, 2004, and he previously was Executive Vice President – Finance of UPC and Chief Financial Officer of the Railroad.*

*[2] Mr. Knight was elected to his current position effective February 1, 2004. He previously was Senior Vice President – Finance for UPC and the Railroad.*

*[3] Mr. Hemmer was elected to his current position effective June 1, 2004. Mr. Hemmer previously was Vice President – Law of the Railroad.*

*[4] Mrs. Schaefer has held the position of Senior Vice President – Human Resources for the past five years. In addition, she was elected Secretary of UPC and the Railroad effective June 1, 2004.*

*[5] Mr. Totusek was elected to his current position effective January 1, 2008. He previously was Assistant Vice President – Financial Analysis of the Railroad.*

# PART II

## Item 5. Market for the Registrant's Common Equity, Related Stockholder Matters, and Issuer Purchases of Equity Securities

Our common stock is traded on the NYSE under the symbol "UNP". On May 28, 2008, we completed a two-for-one stock split, effected in the form of a 100% stock dividend. The stock split entitled all shareholders of record at the close of business on May 12, 2008, to receive one additional share of our common stock, par value $2.50 per share, for each share of common stock held on that date. All references to common shares and per share information have been restated to reflect the stock split for all periods presented. The following table presents the dividends declared and the high and low closing prices of our common stock for each of the indicated quarters.

| *2008 - Dollars Per Share* | *Q1* | *Q2* | *Q3* | *Q4* |
|---|---|---|---|---|
| Dividends | $ 0.22 | $ 0.22 | $ 0.27 | $ 0.27 |
| Common stock price: | | | | |
| High | 65.29 | 82.76 | 85.80 | 71.78 |
| Low | 52.66 | 62.98 | 67.34 | 41.84 |
| *2007 - Dollars Per Share* | | | | |
| Dividends | $ 0.175 | $ 0.175 | $ 0.175 | $ 0.220 |
| Common stock price: | | | | |
| High | 52.92 | 61.40 | 64.68 | 68.78 |
| Low | 44.79 | 50.21 | 49.69 | 55.04 |

At January 30, 2009, there were 503,193,533 shares of outstanding common stock and 34,250 common shareholders of record. On that date, the closing price of the common stock on the NYSE was $43.79. We have paid dividends to our common shareholders during each of the past 109 years. We declared dividends totaling $501 million in 2008 and $396 million in 2007. On July 31, 2008, we increased the quarterly dividend to $0.27 per share, payable beginning on October 1, 2008, to shareholders of record on August 29, 2008. We are subject to certain restrictions regarding retained earnings with respect to the payment of cash dividends to our shareholders. The amount of retained earnings available for dividends decreased to $10.5 billion at December 31, 2008, from $11.5 billion at December 31, 2007. See discussion of this restriction in Management's Discussion and Analysis of Financial Condition and Results of Operations – Liquidity and Capital Resources, Item 7. We do not believe the restriction on retained earnings will affect our ability to pay dividends, and we currently expect to pay dividends in 2009 comparable to 2008.

**Comparison Over One- and Three-Year Periods** – The following table presents the cumulative total shareholder returns, assuming reinvested dividends, over one- and three-year periods for the Corporation, a peer group index (comprised of Burlington Northern Santa Fe Corporation, CSX Corporation, and Norfolk Southern Corporation), the Dow Jones Transportation Index (Dow Jones), and the Standard & Poor's 500 Stock Index (S&P 500).

| *Period* | *UPC* | *Peer Group* | *Dow Jones* | *S&P 500* |
|---|---|---|---|---|
| 1 Year (2008) | (22.7)% | (10.3)% | (21.4)% | (37.0)% |
| 3 Year (2006-2008) | 23.4 | 12.8 | (12.6) | (23.0) |

**Five-Year Performance Comparison** – The following graph provides an indicator of cumulative total shareholder returns for the Corporation as compared to the peer group index (described above), the Dow Jones, and the S&P 500. The graph assumes that the value of the investment in the common stock of Union Pacific Corporation and each index was $100 on December 31, 2003, and that all dividends were reinvested.




**Purchases of Equity Securities** – During 2008, we repurchased 23,036,995 shares of our common stock at an average price of $68.91. The following table presents common stock repurchases during each month for the fourth quarter of 2008:

| *Period* | *Total Number of Shares Purchased [a]* | *Average Price Paid Per Share* | *Total Number of Shares Purchased as Part of a Publicly Announced Plan or Program* | *Maximum Number of Shares That May Yet Be Purchased Under the Plan or Program [b]* |
|---|---|---|---|---|
| Oct. 1 through Oct. 31 | 1,126,551 | $ 60.08 | 1,126,366 | 34,834,006 |
| Nov. 1 through Nov. 30 | 1,934,572 | 59.87 | 1,927,272 | 32,906,734 |
| Dec. 1 through Dec. 31 | 329,644 | 47.53 | 329,644 | 32,577,090 |
| Total | 3,390,767 | $ 58.74 | 3,383,282 | N/A |

[a] *Total number of shares purchased during the quarter includes 7,485 shares delivered or attested to UPC by employees to pay stock option exercise prices, satisfy excess tax withholding obligations for stock option exercises or vesting of retention units, and pay withholding obligations for vesting of retention shares.*

[b] *On January 30, 2007, our Board of Directors authorized us to repurchase up to 40 million shares of our common stock through December 31, 2009. These repurchases may be made on the open market or through other transactions. Our management has sole discretion with respect to determining the timing and amount of these transactions. On May 1, 2008, our Board of Directors authorized an additional repurchase of 40 million shares of our common stock through March 31, 2011.*

**Item 6. Selected Financial Data**

The following table presents as of, and for the years ended, December 31, our selected financial data for each of the last five years. The selected financial data should be read in conjunction with Management's Discussion and Analysis of Financial Condition and Results of Operations, Item 7, and with the Financial Statements and Supplementary Data, Item 8. The information below is not necessarily indicative of future financial condition or results of operations.

| *Millions of Dollars, Except per Share Amounts, Carloads, Employee Statistics, and Ratios* | ***2008*** | *2007* | *2006* | *2005 [a]* | *2004 [b]* |
|---|---|---|---|---|---|
| **For the Year Ended December 31** | | | | | |
| Operating revenues [c] | **$ 17,970** | $ 16,283 | $ 15,578 | $ 13,578 | $ 12,215 |
| Operating income | **4,075** | 3,375 | 2,884 | 1,795 | 1,295 |
| Net income | **2,338** | 1,855 | 1,606 | 1,026 | 604 |
| Earnings per share - basic [d] | **4.58** | 3.49 | 2.98 | 1.95 | 1.17 |
| Earnings per share - diluted [d] | **4.54** | 3.46 | 2.95 | 1.92 | 1.15 |
| Dividends declared per share [d] | **0.98** | 0.745 | 0.60 | 0.60 | 0.60 |
| Cash provided by operating activities | **4,070** | 3,277 | 2,880 | 2,595 | 2,257 |
| Cash used for capital investments | **(2,780)** | (2,496) | (2,242) | (2,169) | (1,876) |
| Cash used for common share repurchases | **(1,609)** | (1,375) | - | - | - |
| **At December 31** | | | | | |
| Total assets | **$ 39,722** | $ 38,033 | $ 36,515 | $ 35,620 | $ 34,596 |
| Debt due after one year | **8,607** | 7,543 | 6,000 | 6,760 | 7,981 |
| Common shareholders' equity | **15,447** | 15,585 | 15,312 | 13,707 | 12,655 |
| Equity per common share [e] | **30.70** | 29.87 | 28.34 | 25.70 | 24.29 |
| **Additional Data** | | | | | |
| Freight revenues [c] | **$ 17,118** | $ 15,486 | $ 14,791 | $ 12,856 | $ 11,575 |
| Revenue carloads (units) (000) | **9,261** | 9,733 | 9,852 | 9,544 | 9,458 |
| Operating margin (%) [f] | **22.7** | 20.7 | 18.5 | 13.2 | 10.6 |
| Operating ratio (%) [f] | **77.3** | 79.3 | 81.5 | 86.8 | 89.4 |
| Average employees (000) | **48.2** | 50.1 | 50.7 | 49.7 | 48.3 |
| Operating revenues per employee (000) | **$ 372.8** | $ 325.0 | $ 307.2 | $ 273.2 | $ 252.9 |
| **Financial Ratios (%)** | | | | | |
| Debt to capital [g] | **36.6** | 33.0 | 30.7 | 35.1 | 39.1 |
| Return on average common shareholders' equity [h] | **15.1** | 12.0 | 11.1 | 7.8 | 4.8 |

*[a] 2005 net income includes a $118 million tax expense reduction to reflect a reduction in the estimated deferred income tax liability.*

*[b] 2004 operating income and net income includes a $247 million pre-tax ($154 million after-tax) charge for unasserted asbestos-related claims.*

*[c] Includes fuel surcharge revenue of $2,323 million, $1,478 million, $1,619 million, $963 million, and $292 million for 2008, 2007, 2006, 2005, and 2004, respectively, which partially offsets increased operating expenses for fuel. Fuel surcharge revenue is not comparable to prior periods due to implementation of new mileage-based fuel surcharge programs in each respective year. See further discussion in Management's Discussion and Analysis of Financial Condition and Results of Operations – Results of Operations – Operating Revenue, Item 7.*

*[d] Earnings per shares and dividends have been restated to reflect the May 28, 2008 stock split.*

*[e] Equity per common share is calculated as follows: common shareholders' equity divided by common shares issued less treasury shares outstanding. Shares have been adjusted to reflect the May 28, 2008 stock split.*

*[f] Operating margin is defined as operating income divided by operating revenues. Operating ratio is defined as operating expenses divided by operating revenues.*

*[g] Debt to capital is determined as follows: total debt divided by total debt plus equity.*

*[h] Return on average common shareholders' equity is determined as follows: Net income divided by average common shareholders' equity.*

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations**

The following discussion should be read in conjunction with the Consolidated Financial Statements and applicable notes to the Financial Statements and Supplementary Data, Item 8, and other information in this report, including Risk Factors set forth in Item 1A and Critical Accounting Policies and Cautionary Information at the end of this Item 7.

The Railroad, along with its subsidiaries and rail affiliates, is our one reportable operating segment. Although we analyze revenue by commodity group, we analyze the net financial results of the Railroad as one segment due to the integrated nature of our rail network.

## EXECUTIVE SUMMARY

### 2008 Results

- **Safety** – We operated a safer railroad in 2008, improving safety for all of our employees, customers, and the communities where we operate. The employee injury incident rate per 200,000 man-hours declined 11% from 2007 to its lowest level ever. A continued focus on derailment prevention in 2008 resulted in a 14% reduction in incidents, with associated costs declining 7%. With respect to public safety, we closed 435 grade crossings to reduce our exposure to incidents. We also continued installing video cameras in our road locomotives and now have camera-equipped locomotives in the lead position of over 90% of our road trains. These video cameras allow us to better analyze grade crossing conditions and incidents, increasing safety for our employees and the public. The number of grade crossing incidents decreased 18% during the year, to the lowest number on record. Also, through extensive trespass reduction programs, we were able to reduce trespasser incidents by 9%. All of these improvements are the result of comprehensive efforts to enhance employee training, increase public education, make targeted capital investments, and take proactive steps to eliminate or reduce safety risks.

- **Financial Performance** – In 2008, we generated operating income of $4.1 billion despite the recessionary economy. Yield increases, network management initiatives, and improved productivity drove the 21% increase in operating income, more than offsetting a 5% reduction in volume levels, which reflects deteriorating economic conditions during the year, particularly in the fourth quarter. Our operating ratio was 77.3% for the year, a 2 point improvement compared to 2007. Net income of $2.3 billion also exceeded our previous milestone, translating into earnings of $4.54 per diluted share.

- **Freight Revenues** – Our freight revenues grew 11% year-over-year to $17.1 billion. We achieved record revenue levels in five of our six commodity groups, driven by better pricing and fuel cost recovery. Since 2004, we have repriced approximately 82% of our business. Overall, volume decreased 5% in 2008 due to the weakening economy, driving lower demand in several market sectors, particularly the automotive, domestic housing and construction markets.

- **Network Operations** – In 2008, we significantly improved the fluidity and efficiency of our transportation network. Continued focus on increasing velocity, eliminating work events, improving asset utilization, and expanding capacity were key drivers of our operational improvement. Lower volume levels also contributed to the increased efficiency. We increased average train speed by 8%, reduced average terminal dwell time by 1%, and improved car utilization by 4% with ongoing enhancements to our Unified Plan (an ongoing program that streamlines segments of our transportation plan) and by implementing initiatives to make train processing at our terminals more efficient. We also expanded capacity and continued to use industrial engineering techniques to further improve network fluidity and improve asset utilization. Our customer satisfaction improved to record

levels during 2008, an indication that efforts to improve network operations translated into better customer service.

- **Fuel Prices** – Crude oil prices increased at a steady rate through the first seven months of 2008, closing at a record high of $145.29 a barrel in early July. As the economy worsened during the third and fourth quarters, fuel prices dropped dramatically, hitting $33.87 per barrel in December, a near five-year low. Despite these price declines toward the end of the year, our 2008 average fuel price increased by 39% and added $1.1 billion of operating expenses compared to 2007. Our fuel surcharge programs helped offset the impact of higher fuel prices. In addition, we reduced our consumption rate by 4%, saving approximately 58 million gallons of fuel during the year. The use of newer, more fuel efficient locomotives; our fuel conservation programs; improved network operations; and a shift in commodity mix, primarily due to growth in bulk shipments, contributed to the improvement.

- **Free Cash Flow** – Cash generated by operating activities totaled a record $4.1 billion, yielding free cash flow of $825 million in 2008. Free cash flow is defined as cash provided by operating activities, less cash used in investing activities and dividends paid.

  Free cash flow is not considered a financial measure under accounting principles generally accepted in the United States (GAAP) by SEC Regulation G and Item 10 of SEC Regulation S-K. We believe free cash flow is important in evaluating our financial performance and measures our ability to generate cash without additional external financings. Free cash flow should be considered in addition to, rather than as a substitute for, cash provided by operating activities. The following table reconciles cash provided by operating activities (GAAP measure) to free cash flow (non-GAAP measure):

| *Millions of Dollars* | ***2008*** | *2007* | *2006* |
|---|---|---|---|
| Cash provided by operating activities | **$ 4,070** | $ 3,277 | $ 2,880 |
| Cash used in investing activities | **(2,764)** | (2,426) | (2,042) |
| Dividends paid | **(481)** | (364) | (322) |
| Free cash flow | **$ 825** | $ 487 | $ 516 |

**2009 Outlook**

- **Safety** – Operating a safe railroad benefits our employees, our customers, our shareholders, and the public. We will continue using a multi-faceted approach to safety, utilizing technology, risk assessment, quality control, and training and engaging our employees. We plan to continue implementation of Total Safety Culture (TSC) throughout our operations. TSC, an employee-focused initiative that has helped improve safety, is a process designed to establish, maintain, and promote safety among co-workers. With respect to public safety, we will continue our efforts to maintain, upgrade, and close crossings, install video cameras on locomotives, and educate the public about crossing safety through various Railroad and industry programs, along with other activities.

- **Transportation Plan** – In 2009, we will continue to evaluate traffic flows and network logistic patterns to identify additional opportunities to simplify operations and improve network efficiency and asset utilization. We plan to maintain adequate manpower and locomotives, and improve productivity using industrial engineering techniques.

- **Fuel Prices** – On average, we expect fuel prices to decrease substantially from the average price we paid in 2008. However, due to economic uncertainty, other global pressures, and weather incidents, fuel prices again could be volatile during the year. To reduce the impact of fuel price on earnings, we

will continue to seek recovery from our customers through our fuel surcharge programs and expand our fuel conservation efforts.

- **Capital Plan** – In 2009, we expect our total capital investments to be approximately $2.8 billion (which may be revised if business conditions or new laws or regulations affect our ability to generate sufficient returns on these investments). See further discussion in this Item 7 under Liquidity and Capital Resources – Capital Plan.

- **Financial Expectations** – We are cautious about the economic environment; however, we anticipate continued pricing opportunities, network improvement, and increased productivity in 2009.

**RESULTS OF OPERATIONS**

**Operating Revenues**

| *Millions of Dollars* | ***2008*** | *2007* | *2006* | ***% Change 2008 v 2007*** | *% Change 2007 v 2006* |
|---|---|---|---|---|---|
| Freight revenues | **$ 17,118** | $ 15,486 | $ 14,791 | **11%** | 5% |
| Other revenues | **852** | 797 | 787 | **7** | 1 |
| Total | **$ 17,970** | $ 16,283 | $ 15,578 | **10%** | 5% |

Freight revenues are revenues generated by transporting freight or other materials from our six commodity groups. Freight revenues vary with volume (carloads) and average revenue per car (ARC). ARC is driven by changes in price, traffic mix and fuel surcharges. As a result of contractual obligations with some of our customers, we have provided incentives for meeting or exceeding specified cumulative volumes or shipping to and from specific locations, which we record as a reduction to freight revenues based on the actual or projected future shipments. We recognize freight revenues on a percentage-of-completion basis as freight moves from origin to destination. We allocate freight revenues between reporting periods based on the relative transit time in each reporting period and recognize expenses as we incur them.

Other revenues include revenues earned by our subsidiaries, revenues from our commuter rail operations, and accessorial revenues, which we earn when customers retain equipment owned or controlled by us or when we perform additional services such as switching or storage. We recognize other revenues as we perform services or meet contractual obligations.

Freight revenues from five of the six commodity groups increased during 2008, with particularly strong growth from agricultural and energy shipments. While revenues generated from chemical and industrial products shipments grew in 2008 compared to 2007, Hurricanes Gustav and Ike reduced shipments of these commodities. Revenues generated from automotive shipments declined versus 2007. Greater fuel cost recoveries and core pricing improvement combined to increase ARC during 2008. Fuel cost recoveries include fuel surcharge revenue and the impact of resetting the base fuel price for certain traffic, as described below in more detail. The severe economic downturn during the fourth quarter compounded already declining volumes experienced during the first nine months of 2008 due to ongoing weakness in certain market sectors. As a result, we moved fewer intermodal, automotive, industrial products, and chemical shipments, which more than offset volume growth from agricultural and energy shipments.

Our fuel surcharge programs (excluding index-based contract escalators that contain some provision for fuel) generated $2.3 billion in freight revenues during 2008. Fuel surcharge revenue is not comparable to prior periods due to the implementation of new mileage-based fuel surcharge programs beginning in April 2007 for regulated traffic. As previously disclosed in our 2006 Annual Report on Form 10-K, the STB

issued a decision limiting the manner in which U.S. railroads can calculate fuel surcharges on traffic regulated by the STB. Effective April 26, 2007, we implemented new fuel surcharge programs covering this regulated traffic, which represents approximately 19% of our revenue base. These new programs use mileage (as opposed to percent of revenue) as the basis for calculating fuel surcharges, and they use the On-Highway Diesel Price index – published by the Energy Information Administration – for purposes of determining fuel costs. The new programs affect fuel surcharges assessed for certain shipments of agricultural, chemical, and industrial products, and, to a lesser extent, coal. In addition, we reset the effective base fuel price at which our new mileage-based fuel surcharge programs take effect, resulting in a higher starting point of $2.30 per gallon versus $1.35 per gallon. We also converted a portion of our non-regulated traffic to mileage-based fuel surcharge programs. The resetting of the fuel price at which the fuel surcharge begins, in conjunction with rebasing the affected transportation rates to include a portion of what had been in the fuel surcharge, did not materially change our freight revenues, as higher base rates offset lower fuel surcharge revenue.

Freight revenues from five of our six commodity groups increased during 2007, while revenues generated from industrial products shipments declined. ARC increased 6% during 2007 driven by core price improvement. Lower shipments of industrial and agricultural products drove volume down 1% in 2007, more than offsetting an increase in chemical shipments. Our fuel surcharge programs (excluding index-based contract escalators that contain some provision for fuel) generated $1.5 billion in freight revenues in 2007. Fuel surcharge revenues are not comparable to prior periods due to implementation of new mileage-based fuel surcharge programs for certain traffic, as described above.

Other revenues increased in 2008 versus 2007 driven by higher revenues from both our commuter rail operations and our subsidiary that brokers intermodal services. Accessorial revenues also increased in both periods due to improved collection rates.

The following tables summarize the year-over-year changes in freight revenues, revenue carloads, and ARC by commodity type:

| ***Freight Revenues*** | | | | ***% Change*** | *% Change* |
|---|---|---|---|---|---|
| *Millions of Dollars* | ***2008*** | *2007* | *2006* | ***2008 v 2007*** | *2007 v 2006* |
| Agricultural | **$ 3,174** | $ 2,605 | $ 2,385 | **22 %** | 9 % |
| Automotive | **1,344** | 1,458 | 1,427 | **(8)** | 2 |
| Chemicals | **2,494** | 2,287 | 2,084 | **9** | 10 |
| Energy | **3,810** | 3,134 | 2,949 | **22** | 6 |
| Industrial Products | **3,273** | 3,077 | 3,135 | **6** | (2) |
| Intermodal | **3,023** | 2,925 | 2,811 | **3** | 4 |
| Total | **$ 17,118** | $ 15,486 | $ 14,791 | **11 %** | 5 % |

| ***Revenue Carloads*** | | | | ***% Change*** | *% Change* |
|---|---|---|---|---|---|
| *Thousands* | ***2008*** | *2007* | *2006* | ***2008 v 2007*** | *2007 v 2006* |
| Agricultural | **947** | 902 | 923 | **5 %** | (2)% |
| Automotive | **667** | 826 | 834 | **(19)** | (1) |
| Chemicals | **885** | 928 | 896 | **(5)** | 4 |
| Energy | **2,348** | 2,299 | 2,296 | **2** | - |
| Industrial Products | **1,249** | 1,325 | 1,446 | **(6)** | (8) |
| Intermodal | **3,165** | 3,453 | 3,457 | **(8)** | - |
| Total | **9,261** | 9,733 | 9,852 | **(5)%** | (1)% |

| ***Average Revenue per Car*** | ***2008*** | *2007* | *2006* | ***% Change 2008 v 2007*** | *% Change 2007 v 2006* |
|---|---|---|---|---|---|
| Agricultural | **$ 3,352** | $ 2,888 | $ 2,584 | **16 %** | 12 % |
| Automotive | **2,017** | 1,766 | 1,710 | **14** | 3 |
| Chemicals | **2,818** | 2,464 | 2,326 | **14** | 6 |
| Energy | **1,622** | 1,363 | 1,285 | **19** | 6 |
| Industrial Products | **2,620** | 2,322 | 2,167 | **13** | 7 |
| Intermodal | **955** | 847 | 813 | **13** | 4 |
| Average | **$ 1,848** | $ 1,591 | $ 1,501 | **16 %** | 6 % |

*Agricultural Products* – Price improvements, fuel surcharges, and volume growth generated higher agricultural freight revenue in 2008 versus 2007. Strong global demand for grain and a weak dollar drove higher shipments of corn and feed grains and shipments of wheat and food grains for 2008. Shipments of ethanol, a grain product used as an alternative fuel and fuel additive, and its co-products (primarily livestock feed) also increased.

**2008 Agricultural Revenue**




Price increases were the primary drivers of agricultural freight revenue in 2007 versus 2006, partially offset by a decline in volume levels. Shipments of whole grains used in feed declined as barge operators captured more shipments destined for export from the Gulf Coast due to both favorable barge rates and improved navigation conditions on the Mississippi River. Conversely, wheat and food grain shipments improved as a strong wheat crop generated record shipments to the Gulf Coast for export. Shipments of ethanol and its co-products also increased substantially.

*Automotive* – Double-digit declines in shipments of both finished vehicles and auto parts drove freight revenue lower in 2008 compared to 2007. Price improvements and fuel surcharges partially offset these lower volumes. The manufacturers experienced poor sales and reduced vehicle production during 2008 due to the recessionary economy, which in turn reduced shipments of finished vehicles and parts. In addition, a major parts supplier strike reduced volume levels compared to 2007. Shipments of finished vehicles decreased 23% in 2008 versus 2007.

**2008 Automotive Revenue**




In 2007, price increases drove the growth in automotive revenue, partially offset by lower finished vehicle shipments versus 2006. A decline in vehicle production levels primarily drove the volume decline. Conversely, automotive parts shipments grew due to increased volumes from domestic manufacturers, new business acquired in the middle of 2006, and our new intermodal train service between Mexico and Michigan.

*Chemicals* – Price improvements and increased fuel surcharges drove higher revenue from chemicals shipments during 2008, which were partially offset by a decrease in volume levels compared to 2007. Weak market conditions and business interruptions in chemical producing areas resulting from Hurricanes Gustav and Ike all contributed to lower liquid and dry chemicals shipments. Plastics shipments also declined in part due to the impact of Hurricanes Gustav and Ike.

**2008 Chemicals Revenue**




Price increases and volume growth drove the increase in revenue in 2007 versus 2006. Strong demand for potash exports through Pacific Northwest ports and a robust planting season for corn to supply ethanol producers increased demand for fertilizer shipments in 2007. New business acquired in June 2007 contributed to more shipments of plastics. Soda ash volume increased as export demand grew in the Gulf area and Mexico. Lower production at Canadian locations during the year boosted shipments of liquid and dry chemicals from U.S. sources.

*Energy* – Price increases, fuel surcharges, and higher volume produced revenue growth in 2008 versus 2007. Shipments from the SPRB were up 5% compared to 2007 despite mine flooding and network interruptions caused by extensive flooding in the Midwest in June of 2008. Conversely, shipments from the Colorado and Utah mines were down 4% in 2008 versus 2007, due to mine production problems.

**2008 Energy Revenue**




Price increases during 2007 improved both revenue and ARC over 2006 levels. Volume was flat, however, as severe storms in the first quarter and heavy rains in May flooded coal pits in the SPRB, which closed several rail lines and reduced volume levels. Shipments from the Colorado and Utah mines were down 1% due to lower mine production, predominately in the fourth quarter of 2007.

*Industrial Products* – Price improvements and fuel surcharges contributed to higher freight revenue in 2008 compared to 2007. Lower volume partially offset these increases. Continued softening of the housing market and weak market conditions resulted in lower lumber shipments. In addition, cement and stone shipments declined due to a weak overall residential and commercial construction market. Business interruptions resulting from the hurricanes also reduced various construction-related shipments, primarily stone. Conversely, we shipped more steel in 2008 than in 2007 as the weak dollar increased the cost of steel imports during most of the year, creating a strong demand for domestic steel.

**2008 Industrial Products Revenue**




Volume declines more than offset price increases, driving industrial products revenue lower in 2007 compared to 2006. Continued softening of the housing construction market, surplus inventories, and general market uncertainty resulted in lower lumber shipments. Delays of rail expansion projects, customer production problems, unfavorable weather, and the ongoing impact of a weak residential construction market reduced stone shipments during the year.

*Intermodal* – Price increases and fuel surcharges generated higher revenue in 2008, partially offset by lower volume levels. International traffic declined 11% in 2008, reflecting continued softening of imports from China and the loss of a customer contract. Notably, the peak intermodal shipping season, which usually starts in the third quarter, was particularly weak in 2008. Additionally, continued weakness in domestic housing and automotive sectors translated into weak demand in large sectors of the international intermodal market, which also contributed to lower volumes. Domestic traffic declined 3% in 2008 due to the loss of a customer contract and lower volumes from less-than-truckload shippers. Additionally, the flood-related embargo on traffic in the Midwest during the second quarter hindered intermodal volume levels in 2008.

**2008 Intermodal Revenue**




Price increases improved intermodal revenue in 2007 compared to 2006. Volume was flat versus 2006 as increased domestic traffic due to new service offerings and increased business under some of our older, long-term contracts were offset by a decrease of premium shipments. International traffic was flat in 2007 compared to 2006 due to general softening of imports from Asia.

*Mexico Business* – The results for each commodity group include shipments to and from Mexico. Revenue from Mexico business increased 13% to $1.6 billion in 2008 compared to 2007. Price improvements and fuel surcharges contributed to these increases, partially offset by a 4% decline in volume in 2008 compared to 2007.

Revenue from Mexico business increased 5% to $1.44 billion in 2007 compared to 2006. Price increases and more shipments of automotive parts and intermodal containers drove revenue growth in 2007.

Volume declines in cement, some agricultural products, and newsprint shipments partially offset the increases.

**Operating Expenses**

| *Millions of Dollars* | ***2008*** | *2007* | *2006* | ***% Change 2008 v 2007*** | *% Change 2007 v 2006* |
|---|---|---|---|---|---|
| Compensation and benefits | **$ 4,457** | $ 4,526 | $ 4,535 | **(2)%** | - % |
| Fuel | **3,983** | 3,104 | 2,968 | **28** | 5 |
| Purchased services and materials | **1,902** | 1,856 | 1,756 | **2** | 6 |
| Depreciation | **1,387** | 1,321 | 1,237 | **5** | 7 |
| Equipment and other rents | **1,326** | 1,368 | 1,396 | **(3)** | (2) |
| Other | **840** | 733 | 802 | **15** | (9) |
| Total | **$ 13,895** | $ 12,908 | $ 12,694 | **8 %** | 2 % |

**2008 Operating Expenses**




Operating expenses increased $987 million in 2008. Our fuel price per gallon rose 39% during the year, increasing operating expenses by $1.1 billion compared to 2007. Wage, benefit, and materials inflation, higher depreciation, and costs associated with the January Cascade mudslide and Hurricanes Gustav and Ike also increased expenses during the year. Cost savings from productivity improvements, better resource utilization, and lower volume helped offset these increases.

Operating expenses increased $214 million in 2007 versus 2006. Higher fuel prices, which rose 9% during the period, increased operating expenses by $242 million. Wage, benefit and materials inflation and higher depreciation expense also increased expenses during the year. Productivity improvements, better resource utilization, and a lower fuel consumption rate helped offset these increases.

*Compensation and Benefits* – Compensation and benefits include wages, payroll taxes, health and welfare costs, pension costs, other postretirement benefits, and incentive costs. Productivity initiatives in all areas, combined with lower volume, led to a 4% decline in our workforce for 2008, saving $227 million compared to 2007. Conversely, general wage and benefit inflation and higher pension and postretirement benefits increased expenses in 2008, partially offsetting these reductions.

Operational improvements and lower volume levels in 2007 led to a 1% decline in our workforce, saving $79 million in 2007 compared to 2006. A smaller workforce and less need for new train personnel reduced training costs during the year, which contributed to the improvement. General wage and benefit inflation mostly offset the reductions, reflecting higher salaries and wages and the impact of higher healthcare and other benefit costs.

*Fuel* – Fuel includes locomotive fuel and gasoline for highway and non-highway vehicles and heavy equipment. Diesel fuel prices, which averaged $3.15 per gallon (including taxes and transportation costs) in 2008 compared to $2.27 per gallon in 2007, increased expenses by $1.1 billion. A 4% improvement in our fuel consumption rate resulted in $136 million of cost savings due to the use of newer, more fuel

efficient locomotives; our fuel conservation programs; improved network operations; and a shift in commodity mix, primarily due to growth in bulk shipments. Volume, as measured by gross ton-miles, decreased 3% in the year, lowering expenses by $101 million compared to 2007.

Higher diesel fuel prices, which averaged $2.27 per gallon (including taxes and transportation costs) in 2007 compared to $2.09 per gallon in 2006, increased expenses by $244 million. A 2% improvement of our fuel consumption rate resulting from the use of newer, more fuel-efficient locomotives and our fuel conservation programs reduced fuel expense by $44 million, and a 2% decrease of gross ton miles reduced fuel expense by an additional $54 million.

*Purchased Services and Materials* – Purchased services and materials expense includes the costs of services purchased from outside contractors; materials used to maintain the Railroad's lines, structures, and equipment; costs of operating facilities jointly used by UPRR and other railroads; transportation and lodging for train crew employees; trucking and contracting costs for intermodal containers; leased automobile maintenance expenses; and tools and supplies. In 2008, higher contract costs (including restoration costs related to the January Cascade mudslide, June Midwest flooding, and September hurricanes) increased expenses $40 million compared to 2007. Higher material costs for freight car wheel sets during the year and an increase in the number of wheel sets required to repair flood-damaged freight cars also contributed to higher materials expense in 2008. Conversely, rail scrap proceeds associated with our rail replacement program partially offset these increases for the year.

Higher consulting fees and higher contract expenses (including equipment maintenance) increased costs by $58 million in 2007 compared to 2006. Crew transportation and lodging costs increased $17 million in 2007 due to higher gas prices and rate inflation. Increased use of higher cost components to repair and maintain our fleet of locomotives (including a growing number of units not covered by warranties) added $32 million to materials expense during 2007. Conversely, we used fewer parts for freight car repairs due to program maintenance scheduling, which lowered costs by $11 million in 2007 compared to 2006. We also incurred lower drayage expense in 2007 compared to 2006.

*Depreciation* – The majority of depreciation relates to track structure, including rail, ties, and other track material. A higher depreciable asset base, reflecting higher capital spending in recent years, increased depreciation expense in 2008 versus 2007, and in 2007 versus 2006.

*Equipment and Other Rents* – Equipment and other rents expense primarily includes rental expense that the Railroad pays for freight cars owned by other railroads or private companies; freight car, intermodal, and locomotive leases; other specialty equipment leases; and office and other rentals. Fewer shipments of finished vehicles, industrial products and intermodal containers reduced our short term freight car rental expense by $62 million in 2008 compared to 2007. Lower lease expense for freight cars, intermodal containers, and locomotives also decreased costs. Conversely, lease expense for fleet vehicles increased costs in 2008 compared to 2007.

Fewer shipments of industrial products, combined with improved car-cycle times, which reflect operational improvement and better asset utilization, reduced our short-term freight car rental expense by $46 million in 2007 compared to 2006. Lower lease expenses for freight cars, intermodal containers, and fleet vehicles and equipment decreased costs by $20 million in 2007. Conversely, higher locomotive lease expense resulted in a $33 million increase in costs during the year.

*Other* – Other costs include personal injury costs, freight and property damage, insurance, environmental expense, state and local taxes, utilities, telephone and cellular expenses, employee travel expense, and computer software and other general expenses. Other costs were higher in 2008 compared to 2007 due to an increase in bad debts, state and local taxes, utility costs, and other miscellaneous expenses totaling $110 million. Conversely, casualty expenses including costs for personal injuries, asbestos-related claims, freight and property damage, insurance, and environmental costs were $3 million lower in 2008

compared to 2007. We reduced personal injury expense by $80 million in 2007 as a result of fewer than expected claims and lower than expected average settlement costs. In 2008, we reduced personal injury expense and asbestos-related costs $82 million based on the results of updated personal injury actuarial studies and a reassessment of our potential liability for resolution of current and future asbestos claims. In addition, environmental and toxic tort expenses were $7 million lower in 2008 compared to 2007.

Other costs were lower in 2007 compared to 2006 driven primarily by a reduction in personal injury expense. Actuarial studies completed during 2007 resulted in a reduction in personal injury expense of $80 million, which was partially offset by an adverse development with respect to one claim. Settlement of insurance claims in 2007 related to Hurricane Rita, and higher equity income also drove expenses lower in 2007 versus 2006. Conversely, the year-over-year comparison was affected by the settlement of insurance claims totaling $23 million in 2006 related to the January 2005 West Coast storm and a $9 million gain in 2006 from the sale of two Company-owned airplanes.

**Non-Operating Items**

| *Millions of Dollars* | | ***2008*** | | *2007* | | *2006* | ***% Change 2008 v 2007*** | *% Change 2007 v 2006* |
|---|---|---|---|---|---|---|---|---|
| Other income | **$** | **92** | $ | 116 | $ | 118 | **(21)%** | (2)% |
| Interest expense | | **(511)** | | (482) | | (477) | **6** | 1 |
| Income taxes | | **(1,318)** | | (1,154) | | (919) | **14 %** | 26 % |

*Other Income* – Other income decreased in 2008 compared to 2007 due to lower gains from real estate sales and decreased returns on cash investments reflecting lower interest rates. Higher rental and licensing income and lower interest expense on our sale of receivables program partially offset the decreases.

Lower net gains from non-operating asset sales (primarily real estate) drove the reduction in other income in 2007. Recognition of rental income in 2006 from the settlement of a rent dispute also contributed to the year-over-year decrease in other income. Cash investment returns increased $21 million due to larger cash balances and higher interest rates.

*Interest Expense* – Interest expense increased in 2008 versus 2007 due to a higher weighted-average debt level of $8.3 billion, compared to $7.3 billion in 2007. A lower effective interest rate of 6.1% in 2008, compared to 6.6% in 2007, partially offset the effects of the higher weighted-average debt level.

An increase in the weighted-average debt levels to $7.3 billion from $7.1 billion in 2006 generated higher interest expense in 2007. A lower effective interest rate of 6.6% in 2007, compared to 6.7% in 2006, partially offset the effects of the higher debt level.

*Income Taxes* – Income taxes were higher in 2008 compared to 2007, driven by higher pre-tax income. Our effective tax rates were 36.1% and 38.4% in 2008 and 2007, respectively. The lower effective tax rate in 2008 resulted from several reductions in tax expense related to federal audits and state tax law changes. In addition, the effective tax rate in 2007 was increased by Illinois legislation that increased deferred tax expense in the third quarter of 2007.

Income taxes were $235 million higher in 2007 compared to 2006, due primarily to higher pre-tax income and the effect of new tax legislation in the State of Illinois that changed how we determine the amount of our income subject to Illinois tax. The Illinois legislation increased our deferred tax expense by $27 million in 2007. Our effective tax rates were 38.4% and 36.4% in 2007 and 2006, respectively.

## OTHER OPERATING/PERFORMANCE AND FINANCIAL STATISTICS

We report key Railroad performance measures weekly to the Association of American Railroads (AAR), including carloads, average daily inventory of rail cars on our system, average train speed, and average terminal dwell time. We provide this data on our website at www.up.com/investors/reports/index.shtml.

### Operating/Performance Statistics

Included in the table below are Railroad performance measures reported to the AAR:

| | ***2008*** | *2007* | *2006* | ***% Change 2008 v 2007*** | *% Change 2007 v 2006* |
|---|---|---|---|---|---|
| Average train speed (miles per hour) | **23.5** | 21.8 | 21.4 | **8 %** | 2 % |
| Average terminal dwell time (hours) | **24.9** | 25.1 | 27.2 | **(1)%** | (8)% |
| Average rail car inventory (thousands) | **300.7** | 309.9 | 321.6 | **(3)%** | (4)% |
| Gross ton-miles (billions) | **1,020.4** | 1,052.3 | 1,072.5 | **(3)%** | (2)% |
| Revenue ton-miles (billions) | **562.6** | 561.8 | 565.2 | **-** | (1)% |
| Operating ratio | **77.3** | 79.3 | 81.5 | **2.0 pt** | 2.2 pt |
| Employees (average) | **48,242** | 50,089 | 50,739 | **(4)%** | (1)% |
| Customer satisfaction index | **83** | 79 | 72 | **4 pt** | 7 pt |

*Average Train Speed* – Average train speed is calculated by dividing train miles by hours operated on our main lines between terminals. Ongoing network management initiatives, productivity improvements, and lower volume levels contributed to 8% and 2% improvements in average train speed in 2008 and 2007, respectively.

*Average Terminal Dwell Time* – Average terminal dwell time is the average time that a rail car spends at our terminals. Lower average terminal dwell time improves asset utilization and service. Average terminal dwell time improved 1% and 8% in 2008 and 2007, respectively. Lower volumes combined with initiatives to more timely deliver rail cars to our interchange partners and customers improved dwell time in both periods.

*Gross and Revenue Ton-Miles* – Gross ton-miles are calculated by multiplying the weight of loaded and empty freight cars by the number of miles hauled. Revenue ton-miles are calculated by multiplying the weight of freight by the number of tariff miles. Gross ton-miles decreased 3%, while revenue ton-miles were flat in 2008 compared to 2007 with commodity mix changes (notably autos and coal) explaining the variance in year over year growth between the two metrics. In 2007, revenue ton-miles declined 1% in relation to the 1% reduction in carloadings compared to 2006. Gross ton-miles decreased 2% in 2007 driven by a mix shift in freight shipments.

*Operating Ratio* – Operating ratio is defined as our operating expenses as a percentage of operating revenue. Our operating ratios improved 2.0 points to 77.3% in 2008 and 2.2 points to 79.3% in 2007. Price increases, fuel cost recoveries, network management initiatives, and improved productivity more than offset the impact of higher fuel prices.

*Employees* – Productivity initiatives and lower volumes reduced employee levels throughout the Company in 2008 versus 2007. Fewer train and engine personnel due to improved network productivity and 5% lower volume drove the change while productivity initiatives within the support organizations also contributed to a lower full-time equivalent force level. Lower employee levels in 2007 versus 2006

resulted from fewer train and engine personnel due to improved network productivity and 1% lower volume levels, partially offset by more employees maintaining our larger locomotive fleet.

*Customer Satisfaction Index* – The customer satisfaction survey asks customers to rate how satisfied they are with our performance over the last 12 months on a variety of attributes. A higher score indicates higher customer satisfaction. The improvement in survey results in 2008 and 2007 generally reflects customer recognition of our improving service.

**Return on Average Common Shareholders' Equity**

| *Millions of Dollars, Except Percentages* | ***2008*** | *2007* | *2006* |
|---|---|---|---|
| Net income | **$ 2,338** | $ 1,855 | $ 1,606 |
| Average equity | **$ 15,516** | $ 15,448 | $ 14,510 |
| Return on average common shareholders' equity | **15.1%** | 12.0% | 11.1% |

**Return on Invested Capital as Adjusted (ROIC)**

| *Millions of Dollars, Except Percentages* | ***2008*** | *2007* | *2006* |
|---|---|---|---|
| Net income | **$ 2,338** | $ 1,855 | $ 1,606 |
| Add: Interest expense | **511** | 482 | 477 |
| Add: Sale of receivables fees | **23** | 35 | 33 |
| Add: Interest on present value of operating leases | **299** | 292 | 268 |
| Less: Taxes on interest and fees | **(301)** | (310) | (283) |
| Net operating profit after taxes as adjusted (a) | **$ 2,870** | $ 2,354 | $ 2,101 |
| Average equity | **$ 15,516** | $ 15,448 | $ 14,510 |
| Add: Average debt | **8,305** | 7,232 | 7,098 |
| Add: Average value of sold receivables | **592** | 600 | 600 |
| Add: Average present value of operating leases | **3,737** | 3,648 | 3,349 |
| Average invested capital as adjusted (b) | **$ 28,150** | $ 26,928 | $ 25,557 |
| Return on invested capital as adjusted (a/b) | **10.2%** | 8.7% | 8.2% |

ROIC is considered a non-GAAP financial measure by SEC Regulation G and Item 10 of SEC Regulation S-K, and may not be defined and calculated by other companies in the same manner. We believe this measure is important in evaluating the efficiency and effectiveness of the Corporation's long-term capital investments, and we currently use ROIC as a performance criteria in determining certain elements of equity compensation for our executives. ROIC should be considered in addition to, rather than as a substitute for, other information provided in accordance with GAAP. The most comparable GAAP measure is Return on Average Common Shareholders' Equity. The tables above provide a reconciliation from return on average common shareholders' equity to ROIC. Our 2008 ROIC improved 1.5 points compared to 2007 primarily as a result of higher earnings, partially offset by a $1.1 billion increase in average debt.

**Debt to Capital / Adjusted Debt to Capital**

| *Millions of Dollars, Except Percentages* | ***2008*** | *2007* |
|---|---|---|
| Debt (a) | **$ 8,927** | $ 7,682 |
| Equity | **15,447** | 15,585 |
| Capital (b) | **$ 24,374** | $ 23,267 |
| Debt to capital (a/b) | **36.6%** | 33.0% |

| *Millions of Dollars, Except Percentages* | ***2008*** | *2007* |
|---|---|---|
| Debt | **$ 8,927** | $ 7,682 |
| Value of sold receivables | **584** | 600 |
| Net present value of operating leases | **3,690** | 3,783 |
| Unfunded pension and OPEB | **733** | 234 |
| Adjusted debt (a) | **$ 13,934** | $ 12,299 |
| Equity | **15,447** | 15,585 |
| Adjusted capital (b) | **$ 29,381** | $ 27,884 |
| Adjusted debt to capital (a/b) | **47.4%** | 44.1% |

Adjusted debt to capital is a non-GAAP financial measure under SEC Regulation G and Item 10 of SEC Regulation S-K. We believe this measure is important to management and investors in evaluating the total amount of leverage in our capital structure, including off-balance sheet lease obligations, which we generally incur in connection with financing the acquisition of locomotives and freight cars and certain facilities. We monitor the ratio of adjusted debt to capital as we manage our capital structure to balance cost-effective and efficient access to the capital markets with the Corporation's overall cost of capital. Adjusted debt to capital should be considered in addition to, rather than as a substitute for, debt to capital. The tables above provide a reconciliation from debt to capital to adjusted debt to capital. Our December 31, 2008 debt to capital ratios increased as a result of a $1.2 billion net increase in debt from December 31, 2007, and purchases of our common stock under our share repurchase program, partially offset by an increase in retained earnings due to higher earnings in 2008. Equity at December 31, 2008, was reduced by $704 million for other comprehensive losses. Equity at December 31, 2007, was reduced by $74 million for other comprehensive losses. Other comprehensive losses in both years were related primarily to pensions. See note 8 to our consolidated financial statements in Item 8 for more information.

**LIQUIDITY AND CAPITAL RESOURCES**

As of December 31, 2008, our principal sources of liquidity included cash, cash equivalents, the sale of certain receivables, and our revolving credit facility, as well as the availability of commercial paper and other sources of financing through the capital markets. We had $1.9 billion of committed credit available under our credit facility, with no borrowings outstanding as of December 31, 2008. We did not make any borrowings under this facility during the year. The value of the outstanding undivided interest held by investors under the sale of receivables program was $584 million as of December 31, 2008. The sale of receivables program is subject to certain requirements, including maintenance of an investment grade bond rating. If our bond rating were to deteriorate, it could have an adverse impact on our liquidity. Access to commercial paper as well as other capital market financings is dependent on market conditions. Deterioration of our operating results or financial condition due to internal or external factors could negatively impact our ability to utilize commercial paper as a source of liquidity. Access to liquidity through the capital markets is also dependent on our financial stability. Although both short and long-

term debt, including commercial paper, bank provided credit, and publicly issued bonds, are more expensive than in recent years, we currently have access to liquidity through commercial paper and our credit facility. We also expect that we will continue to have access to liquidity by issuing bonds to public or private investors based on our assessment of the current condition of the credit markets and recent debt transactions, including our issuance of long-term debt during the fourth quarter.

At December 31, 2008, and December 31, 2007, we had a working capital deficit of approximately $100 million and $400 million, respectively. A working capital deficit is common in our industry and does not indicate a lack of liquidity. We maintain adequate resources and, when necessary, have access to capital to meet any daily and short-term cash requirements, and we have sufficient financial capacity to satisfy our current liabilities.

| **Cash Flows** | | | |
|---|---|---|---|
| *Millions of Dollars* | ***2008*** | *2007* | *2006* |
| Cash provided by operating activities | **$ 4,070** | $ 3,277 | $ 2,880 |
| Cash used in investing activities | **(2,764)** | (2,426) | (2,042) |
| Cash used in financing activities | **(935)** | (800) | (784) |
| Net change in cash and cash equivalents | **$ 371** | $ 51 | $ 54 |

**Operating Activities**

Higher net income in 2008 and changes in working capital combined to increase cash provided by operating activities. In addition, accelerated tax deductions enacted in 2008 on certain new operating assets resulted in lower income tax payments in 2008. Voluntary pension contributions in 2008 totaling $200 million and other pension contributions of $8 million partially offset the year-over-year increase. Higher net income in 2007 was the primary driver of increased cash provided by operating activities. A favorable comparison due to voluntary pension contributions in 2006 totaling $150 million also contributed to the year-over-year increase. These increases were partially offset by cash payments representing prior period wage increases in accordance with recent union contract ratifications and higher income tax payments.

**Investing Activities**

Increased capital investments and lower proceeds from asset sales drove the increase in cash used in investing activities in 2008 compared to 2007. Higher capital investments and work in process balances drove the increase in cash used in investing in 2007 versus 2006.

The table below details cash capital investments for the years ended December 31, 2008, 2007, and 2006.

| *Millions of Dollars* | ***2008*** | *2007* | *2006* |
|---|---|---|---|
| Track | **$ 1,700** | $ 1,593 | $ 1,487 |
| Capacity and commercial facilities | **742** | 534 | 510 |
| Locomotives and freight cars | **164** | 263 | 135 |
| Technology and other | **174** | 106 | 110 |
| Total | **$ 2,780** | $ 2,496 | $ 2,242 |

**Capital Plan** – In 2009, we expect our total capital investments to be approximately $2.8 billion (which may be revised if business conditions or new laws or regulations affect our ability to generate sufficient

returns on these investments). We expect approximately 80% of our 2009 capital investments will replace and renew existing capital assets. Major investment categories include replacement and improvement of track infrastructure; increasing network and terminal capacity; locomotive and freight car fleet, including the acquisition of 125 high-horsepower locomotives; and technology improvements, including the testing of positive train control, and other capital projects. We expect to fund our 2009 cash capital investments through cash generated from operations, the sale or lease of various operating and non-operating properties, issuance of long-term debt, and cash on hand at December 31, 2008. Our annual capital plan is a critical component of our long-term strategic plan, which we expect will enhance the long-term value of the Corporation for our shareholders by providing sufficient resources to (i) replace and improve our existing track infrastructure to provide safe and fluid operations, (ii) increase network efficiency by adding or improving facilities and track, and (iii) make investments that meet customer demand and take advantage of opportunities for long-term growth.

**Financing Activities**

Cash used in financing activities increased in 2008 versus 2007 due to higher debt repayments of $416 million, an increase of $234 million for the repurchase of common shares (see further discussion of common shares in Market for the Registrant's Common Equity, Related Stockholder Matters, and Issuer Purchases of Equity Securities - Purchases of Equity Securities Part II, Item 5) and an increase of dividends paid, reflecting a higher quarterly dividend. Higher debt issuances of $676 million partially offset these increases. The increase in cash used in financing activities in 2007 resulted primarily from the use of $1.4 billion to repurchase common shares, payment of higher dividends, and lower net proceeds from equity compensation plans ($71 million in 2007 compared to $160 million in 2006). These increases were mostly offset by debt issuances of $1.6 billion in 2007 compared to no issuances in 2006.

**Credit Facilities** – On December 31, 2008, we had $1.9 billion of credit available under our revolving credit facility (the facility). The facility is designated for general corporate purposes and supports the issuance of commercial paper. We did not draw on the facility during 2008. Commitment fees and interest rates payable under the facility are similar to fees and rates available to comparably rated, investment-grade borrowers. The facility allows borrowings at floating rates based on London Interbank Offered Rates, plus a spread, depending upon our senior unsecured debt ratings. The facility requires Union Pacific Corporation to maintain a debt-to-net-worth coverage ratio as a condition to making a borrowing. At December 31, 2008, and December 31, 2007 (and at all times during these periods), we were in compliance with this covenant.

The definition of debt used for purposes of calculating the debt-to-net-worth coverage ratio includes, among other things, certain credit arrangements, capital leases, guarantees and unfunded and vested pension benefits under Title IV of ERISA. At December 31, 2008, the debt-to-net-worth coverage ratio allowed us to carry up to $30.9 billion of debt (as defined in the facility), and we had $9.9 billion of debt (as defined in the facility) outstanding at that date. Under our current capital plans, we expect to continue to satisfy the debt-to-net-worth coverage ratio; however, many factors beyond our reasonable control (including the Risk Factors in Item 1A of this report) could affect our ability to comply with this provision in the future. The facility does not include any other financial restrictions, credit rating triggers (other than rating-dependent pricing), or any other provision that could require us to post collateral. The facility also includes a $75 million cross-default provision and a change-of-control provision. The term of the facility will expire in April 2012, and we currently intend to replace the facility with a substantially similar credit agreement on or before the expiration date, which is consistent with our past practices with respect to our credit facilities.

At December 31, 2008, we had $100 million of commercial paper outstanding. Our commercial paper balance is supported by our revolving credit facility but does not reduce the amount of borrowings available under the facility. During 2008, we issued $600 million of commercial paper, including $300

million issued in September and October as the credit and financial markets deteriorated, and repaid $500 million.

At December 31, 2008, we reclassified as long-term debt approximately $400 million of debt due within one year that we intend to refinance. This reclassification reflected our ability and intent to refinance any short-term borrowings and certain current maturities of long-term debt on a long-term basis. At December 31, 2007, we reclassified as long-term debt approximately $550 million of debt due within one year that we intended to refinance at that time.

**Operating Lease Activities**

During 2008, the Railroad, as lessee, entered into long-term operating lease arrangements covering 82 locomotives, 300 rail cars, and 2,000 intermodal containers with a total equipment cost of approximately $219 million. In total, these new lease arrangements will provide for minimum rental payments of approximately $309 million, with a present value of approximately $178 million.

The lessors financed the purchase of the locomotives, rail cars, and intermodal containers, in part by issuing equipment notes that are non-recourse to the Railroad and are secured by assignments of the underlying leases and security interests in the equipment. The Corporation and the Railroad do not guaranty payment of the equipment notes. The Railroad's obligations to make operating lease payments under the leases are recourse obligations and are not recorded in the Consolidated Statements of Financial Position.

The Railroad has certain renewal and purchase options with respect to the locomotives, rail cars, and intermodal containers. If the Railroad does not exercise these options, the equipment will be returned to the lessors at the end of the lease term.

**Ratio of Earnings to Fixed Charges**

For each of the years ended December 31, 2008, 2007, and 2006, our ratio of earnings to fixed charges was 5.9, 5.1, and 4.4, respectively. Higher net income drove the increases in 2008 and 2007. The ratio of earnings to fixed charges was computed on a consolidated basis. Earnings represent income from continuing operations, less equity earnings net of distributions, plus fixed charges and income taxes. Fixed charges represent interest charges, amortization of debt discount, and the estimated amount representing the interest portion of rental charges. See Exhibit 12 to this report for the calculation of the ratio of earnings to fixed charges.

**Common Shareholders' Equity**

**Dividends** – On July 31, 2008, we increased the quarterly dividend to $0.27 per share, payable beginning on October 1, 2008, to shareholders of record on August 29, 2008. We funded the increase in the quarterly dividend through cash generated from operations, the sale or lease of various operating and non-operating properties, and cash on hand during the fourth quarter.

**Dividend Restrictions** – Our revolving credit facility includes a debt-to-net worth covenant that, under certain circumstances, restricts the payment of cash dividends to our shareholders. The amount of retained earnings available for dividends was $10.5 billion and $11.5 billion at December 31, 2008 and 2007, respectively.

**Stock Split** – On May 28, 2008, we completed a two-for-one stock split, effected in the form of a 100% stock dividend. The stock split entitled all shareholders of record at the close of business on May 12, 2008, to receive one additional share of our common stock, par value $2.50 per share, for each share of common stock held on that date.

**Share Repurchase Program** – On January 30, 2007, our Board of Directors authorized the repurchase of up to 40 million shares of Union Pacific Corporation common stock through the end of 2009. On May 1, 2008, our Board of Directors authorized the repurchase of an additional 40 million common shares by March 31, 2011. Management's assessments of market conditions and other pertinent facts guide the timing and volume of all repurchases. We expect to fund our common stock repurchases through cash generated from operations, the sale or lease of various operating and non-operating properties, debt issuances, and cash on hand at December 31, 2008.

During 2008, we repurchased approximately 22 million shares under this program at an aggregate purchase price of approximately $1.5 billion. In 2007, we repurchased approximately 25 million shares at an aggregate purchase price of approximately $1.5 billion. These shares were recorded in treasury stock at cost, which includes any applicable commissions and fees.

**Shelf Registration Statement and Significant New Borrowings** – Under our current shelf registration statement, we may issue, from time to time, any combination of debt securities, preferred stock, common stock, or warrants for debt securities or preferred stock in one or more offerings. In July 2008, our Board of Directors authorized the issuance of an additional $3 billion of debt securities under our shelf registration. At December 31, 2008, we had authority to issue up to $3 billion of debt securities.

During 2008, we issued the following unsecured, fixed-rate debt securities under our current shelf registration:

| *Date* | *Description of Securities* |
|---|---|
| February 5, 2008 | $750 million of 5.70% Notes due August 15, 2018 |
| October 7, 2008 | $750 million of 7.875% Notes due January 15, 2019 |

The net proceeds from these offerings are for general corporate purposes, including the repurchase of common stock pursuant to our share repurchase program. These debt securities include change-of-control provisions.

We have no immediate plans to issue equity securities; however, we will continue to explore opportunities to replace existing debt or access capital through issuances of debt securities under our shelf registration, and, therefore, we may issue additional debt securities at any time.

On April 17, 2008, we borrowed $100 million under a 5-year-term loan facility (the loan). The loan has a floating rate based on London Interbank Offered Rates, plus a spread, and is prepayable in whole or in part without a premium prior to maturity. The agreement documenting the loan has provisions similar to our revolving credit facility, including identical debt-to-net-worth covenant and change-of-control provisions and similar customary default provisions. The agreement does not include any other financial restrictions, credit rating triggers, or any other provision that would require us to post collateral.

**Off-Balance Sheet Arrangements, Contractual Obligations, and Commercial Commitments**

As described in the notes to the Consolidated Financial Statements and as referenced in the tables below, we have contractual obligations and commercial commitments that may affect our financial condition. Based on our assessment of the underlying provisions and circumstances of our contractual obligations and commercial commitments, including material sources of off-balance sheet and structured finance arrangements, other than the risks that we and other similarly situated companies face with respect to the current and future condition of the capital markets (as described in Item 1A of Part II of this report), there is no known trend, demand, commitment, event, or uncertainty that is reasonably likely to occur that

would have a material adverse effect on our consolidated results of operations, financial condition, or liquidity. In addition, our commercial obligations, financings, and commitments are customary transactions that are similar to those of other comparable corporations, particularly within the transportation industry.

The following tables identify material obligations and commitments as of December 31, 2008:

| ***Contractual Obligations*** *Millions of Dollars* | *Total* | *Payments Due by December 31,* *2009* | *2010* | *2011* | *2012* | *2013* | *After 2013* | *Other* |
|---|---|---|---|---|---|---|---|---|
| Debt [a] | $ 12,627 | $ 1,056 | $ 807 | $ 857 | $ 1,070 | $ 926 | $ 7,911 | $ - |
| Operating leases | 5,909 | 657 | 614 | 580 | 465 | 389 | 3,204 | - |
| Capital lease obligations [b] | 1,898 | 188 | 168 | 178 | 122 | 152 | 1,090 | - |
| Purchase obligations [c] | 3,323 | 713 | 384 | 344 | 224 | 239 | 1,387 | 32 |
| Other post retirement benefits [d] | 466 | 42 | 43 | 45 | 45 | 47 | 244 | - |
| Income tax contingencies [e] | 26 | 7 | - | - | - | - | - | 19 |
| Total contractual obligations | $ 24,249 | $ 2,663 | $ 2,016 | $ 2,004 | $ 1,926 | $ 1,753 | $ 13,836 | $ 51 |

*[a] Excludes capital lease obligations of $1,270 million, unamortized discount of $(112) million, and market value adjustments of $19 million for debt with qualifying hedges that are recorded as liabilities on the Consolidated Statements of Financial Position. Includes an interest component of $4,878 million.*

*[b] Represents total obligations, including interest component of $628 million.*

*[c] Purchase obligations include locomotive maintenance contracts; purchase commitments for locomotives, ties, ballast, and rail; and agreements to purchase other goods and services. For amounts where we can not reasonably estimate the year of settlement, they are reflected in the Other column.*

*[d] Includes estimated other post retirement, medical, and life insurance payments and payments made under the unfunded pension plan for the next ten years. No amounts are included for funded pension as no contributions are currently required.*

*[e] Future cash flows for income tax contingencies reflect the recorded liability, including interest and penalties, in accordance with FIN 48 as of December 31, 2008. Where we can reasonably estimate the years in which these liabilities may be settled, this is shown in the table. For amounts where we can not reasonably estimate the year of settlement, they are reflected in the Other column.*

| ***Other Commercial Commitments*** *Millions of Dollars* | *Total* | *Amount of Commitment Expiration per Period* *2009* | *2010* | *2011* | *2012* | *2013* | *After 2013* |
|---|---|---|---|---|---|---|---|
| Credit facilities [a] | $ 1,900 | $ - | $ - | $ - | $ 1,900 | $ - | $ - |
| Sale of receivables [b] | 700 | 700 | - | - | - | - | - |
| Guarantees [c] | 449 | 2 | 61 | 77 | 22 | 8 | 279 |
| Standby letters of credit [d] | 28 | 13 | 15 | - | - | - | - |
| Total commercial commitments | $ 3,077 | $ 715 | $ 76 | $ 77 | $ 1,922 | $ 8 | $ 279 |

*[a] None of the credit facility was used as of December 31, 2008.*

*[b] $584 million of the sale of receivables program was utilized at December 31, 2008.*

*[c] Includes guaranteed obligations related to our headquarters building, equipment financings, and affiliated operations.*

*[d] None of the letters of credit were drawn upon as of December 31, 2008.*

**Off-Balance Sheet Arrangements**

**Sale of Receivables** – The Railroad transfers most of its accounts receivable to Union Pacific Receivables, Inc. (UPRI), a bankruptcy-remote subsidiary, as part of a sale of receivables facility. UPRI sells, without recourse on a 364-day revolving basis, an undivided interest in such accounts receivable to investors. The total capacity to sell undivided interests to investors under the facility was $700 million and $600 million at December 31, 2008 and 2007, respectively. The value of the outstanding undivided interest held by investors under the facility was $584 million and $600 million at December 31, 2008 and 2007, respectively. UPRI reduced the outstanding undivided interest held by investors due to a decrease in available receivables at December 31, 2008. The value of the outstanding undivided interest held by investors is not included in our Consolidated Financial Statements. The value of the undivided interest held by investors was supported by $1,015 million and $1,071 million of accounts receivable held by UPRI at December 31, 2008 and 2007, respectively. At December 31, 2008 and 2007, the value of the interest retained by UPRI was $431 million and $471 million, respectively. This retained interest is included in accounts receivable in our Consolidated Financial Statements. The interest sold to investors is sold at carrying value, which approximates fair value, and there is no gain or loss recognized from the transaction.

The value of the outstanding undivided interest held by investors could fluctuate based upon the availability of eligible receivables and is directly affected by changing business volumes and credit risks, including default and dilution. If default or dilution percentages were to increase one percentage point, the amount of eligible receivables would decrease by $6 million. Should our credit rating fall below investment grade, the value of the outstanding undivided interest held by investors would be reduced, and, in certain cases, the investors would have the right to discontinue the facility.

The Railroad services the sold receivables; however, the Railroad does not recognize any servicing asset or liability as the servicing fees adequately compensate us for these responsibilities. The Railroad collected approximately $17.8 billion and $16.1 billion during the years ended December 31, 2008 and 2007, respectively. UPRI used certain of these proceeds to purchase new receivables under the facility.

The costs of the sale of receivables program are included in other income and were $23 million, $35 million, and $33 million for 2008, 2007, and 2006, respectively. The costs include interest, program fees paid to banks, commercial paper issuing costs, and fees for unused commitment availability.

The investors have no recourse to the Railroad’s other assets except for customary warranty and indemnity claims. Creditors of the Railroad do not have recourse to the assets of UPRI. In October 2008, we extended the sale of receivables program to August 2009 without any significant changes in terms, except to increase the capacity to sell undivided interests to $660 million. The capacity was increased to $700 million in December 2008. At January 16, 2009 the amount utilized under the sale of receivables program was $560 million.

**Guarantees** – At December 31, 2008, we were contingently liable for $449 million in guarantees. We have recorded a liability of $4 million and $5 million for the fair value of these obligations as of December 31, 2008 and 2007, respectively. We entered into these contingent guarantees in the normal course of business, and they include guaranteed obligations related to our headquarters building, equipment financings, and affiliated operations. The final guarantee expires in 2022. We are not aware of any existing event of default that would require us to satisfy these guarantees. We do not expect that these guarantees will have a material adverse effect on our consolidated financial condition, results of operations, or liquidity.

**OTHER MATTERS**

**Inflation** – The cumulative effect of long periods of inflation significantly increases asset replacement costs for capital-intensive companies. As a result, assuming that we replace all operating assets at current price levels, depreciation charges (on an inflation-adjusted basis) would be substantially greater than historically reported amounts.

**Derivative Financial Instruments** – We may use derivative financial instruments in limited instances to assist in managing our overall exposure to fluctuations in interest rates and fuel prices. We are not a party to leveraged derivatives and, by policy, do not use derivative financial instruments for speculative purposes. Derivative financial instruments qualifying for hedge accounting must maintain a specified level of effectiveness between the hedging instrument and the item being hedged, both at inception and throughout the hedged period. We formally document the nature and relationships between the hedging instruments and hedged items at inception, as well as our risk-management objectives, strategies for undertaking the various hedge transactions, and method of assessing hedge effectiveness. Changes in the fair market value of derivative financial instruments that do not qualify for hedge accounting are charged to earnings. We may use swaps, collars, futures, and/or forward contracts to mitigate the risk of adverse movements in interest rates and fuel prices; however, the use of these derivative financial instruments may limit future benefits from favorable price movements.

**Market and Credit Risk** – We address market risk related to derivative financial instruments by selecting instruments with value fluctuations that highly correlate with the underlying hedged item. We manage credit risk related to derivative financial instruments, which is minimal, by requiring high credit standards for counterparties and periodic settlements. At December 31, 2008 and 2007, we were not required to provide collateral, nor had we received collateral, relating to our hedging activities.

**Determination of Fair Value** – We determine the fair values of our derivative financial instrument positions based upon current fair values as quoted by recognized dealers or the present value of expected future cash flows.

**Sensitivity Analyses** – The sensitivity analyses that follow illustrate the economic effect that hypothetical changes in interest rates could have on our results of operations and financial condition. These hypothetical changes do not consider other factors that could impact actual results.

At December 31, 2008, we had variable-rate debt representing approximately 5% of our total debt. If variable interest rates average one percentage point higher in 2009 than our December 31, 2008 variable rate, which was approximately 4%, our interest expense would increase by approximately $4 million. This amount was determined by considering the impact of the hypothetical interest rate on the balances of our variable-rate debt at December 31, 2008.

Market risk for fixed-rate debt is estimated as the potential increase in fair value resulting from a hypothetical one percentage point decrease in interest rates as of December 31, 2008, and amounts to an increase of approximately $568 million to the fair value of our debt at December 31, 2008. We estimated the fair values of our fixed-rate debt by considering the impact of the hypothetical interest rates on quoted market prices and current borrowing rates.

**Interest Rate Fair Value Hedges** – We manage our overall exposure to fluctuations in interest rates by adjusting the proportion of fixed and floating rate debt instruments within our debt portfolio over a given period. We generally manage the mix of fixed and floating rate debt through the issuance of targeted amounts of each as debt matures or as we require incremental borrowings. We employ derivatives, primarily swaps, as one of the tools to obtain the targeted mix. In addition, we also obtain flexibility in managing interest costs and the interest rate mix within our debt portfolio by evaluating the issuance of and managing outstanding callable fixed-rate debt securities.

Swaps allow us to convert debt from fixed rates to variable rates and thereby hedge the risk of changes in the debt's fair value attributable to the changes in interest rates. We account for swaps as fair value hedges using the short-cut method pursuant to FASB Statement No. 133, *Accounting for Derivative Instruments and Hedging Activities*; therefore, we do not record any ineffectiveness within our Consolidated Financial Statements.

**Interest Rate Cash Flow Hedges** – We report changes in the fair value of cash flow hedges in accumulated other comprehensive loss until the hedged item affects earnings. At both December 31, 2008 and 2007, we had reductions of $4 million, recorded as an accumulated other comprehensive loss that is being amortized on a straight-line basis through September 30, 2014. As of December 31, 2008 and 2007, we had no interest rate cash flow hedges outstanding.

**Accounting Pronouncements** – In March 2008, FASB issued Statement No. 161, *Disclosures about Derivative Instruments and Hedging Activities, an amendment of FASB Statement No. 133* (FAS 161). FAS 161 amends and expands the disclosure requirements of FAS 133 to clarify how and why companies use derivative instruments. In addition, FAS 161 requires more disclosures regarding how companies account for derivative instruments and the impact derivatives have on a company's financial statements. This statement is effective for us beginning in 2009 and will only impact our disclosures. It will have no impact on our financial position, results of operations and cash flows.

In May 2008, the FASB issued Statement No. 162, *The Hierarchy of Generally Accepted Accounting Principles* (FAS 162). FAS 162 identifies the sources of accounting principles and the framework for selecting the principles to be used in the preparation of financial statements that are presented in conformity with generally accepted accounting principles in the United States. FAS 162 is effective 60 days following the SEC's approval of the Public Company Accounting Oversight Board amendments to AU Section 411, "*The Meaning of 'Present Fairly in Conformity with Generally Accepted Accounting Principles*'". FAS 162 is not expected to have a material impact on our financial statements.

In June 2008, the FASB released FSP EITF 03-6-1 on Emerging Issues Task Force Issue 03-6, *Participating Securities and the Two-Class Method under FASB Statement No. 128* (EITF 03-6). The staff position concludes that unvested share-based payment awards that contain nonforfeitable rights to dividends or dividend equivalents are participating securities as defined in EITF 03-6; and therefore, should be included in computing earnings per share using the two-class method. As discussed in note 3, we pay nonforfeitable dividends on our unvested retention awards and performance retention awards. This staff position will be effective for us beginning in 2009. We expect that this staff position will result in additional disclosure only and not affect our consolidated financial position, results of operations, or cash flows.

In December 2008, the FASB issued FSP FAS 132(R)-1, *Employers' Disclosure about Postretirement Benefit Plan Assets*, which amends Statement 132(R) to require more detailed disclosures about employers' pension plan assets. New disclosures will include more information on investment strategies, major categories of plan assets, concentrations of risk within plan assets and valuation techniques used to measure the fair value of plan assets. This new standard requires new disclosures only, and will have no impact on our consolidated financial position, results of operations or cash flows. These new disclosures will be required for us beginning in our 2009 Form 10-K.

**Asserted and Unasserted Claims** – Various claims and lawsuits are pending against us and certain of our subsidiaries. We cannot fully determine the effect of all asserted and unasserted claims on our consolidated results of operations, financial condition, or liquidity; however, to the extent possible, where asserted and unasserted claims are considered probable and where such claims can be reasonably estimated, we have recorded a liability. We do not expect that any known lawsuits, claims, environmental costs, commitments, contingent liabilities, or guarantees will have a material adverse effect on our

consolidated results of operations, financial condition, or liquidity after taking into account liabilities previously recorded for these matters.

**Indemnities** – Our maximum potential exposure under indemnification arrangements, including certain tax indemnifications, can range from a specified dollar amount to an unlimited amount, depending on the nature of the transactions and the agreements. Due to uncertainty as to whether claims will be made or how they will be resolved, we cannot reasonably determine the probability of an adverse claim or reasonably estimate any adverse liability or the total maximum exposure under these indemnification arrangements. We do not have any reason to believe that we will be required to make any material payments under these indemnity provisions.

**Climate Change** – Although climate change could have an adverse impact on our operations and financial performance in the future (see Risk Factors under Item 1A of this report), we are currently unable to predict the manner or severity of such impact. However, we continue to take steps and explore opportunities to reduce the impact of our operations on the environment, including investments in new technologies, using training programs to reduce fuel consumption, and changing our operations to increase fuel efficiency.

## CRITICAL ACCOUNTING POLICIES

Our Consolidated Financial Statements have been prepared in accordance with GAAP. The preparation of these financial statements requires estimation and judgment that affect the reported amounts of revenues, expenses, assets, and liabilities. We base our estimates on historical experience and on various other assumptions that we believe are reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. The following critical accounting policies are a subset of our significant accounting policies described in note 1 to the Financial Statements and Supplementary Data, Item 8. These critical accounting policies affect significant areas of our financial statements and involve judgment and estimates. If these estimates differ significantly from actual results, the impact on our Consolidated Financial Statements may be material.

**Asbestos** – We are a defendant in a number of lawsuits in which current and former employees and other parties allege exposure to asbestos. We engage a third party with extensive experience in estimating resolution costs for asbestos-related claims to assist us in assessing our potential liability. This liability is updated annually and excludes future defense and processing costs. The liability for resolving both asserted and unasserted claims was based on the following assumptions:

- The ratio of future claims by alleged disease would be consistent with historical averages.
- The number of claims filed against us will decline each year.
- The average settlement values for asserted and unasserted claims will be equivalent to historical averages.
- The percentage of claims dismissed in the future will be equivalent to historical averages.

Our asbestos-related liability activity was as follows:

| *Millions of Dollars* | ***2008*** | *2007* | *2006* |
|---|---|---|---|
| Beginning balance | **$ 265** | $ 302 | $ 311 |
| Accruals/(credits) | **(42)** | (20) | - |
| Payments | **(10)** | (17) | (9) |
| Ending balance at December 31 | **$ 213** | $ 265 | $ 302 |
| Current portion, ending balance at December 31 | **$ 12** | $ 11 | $ 13 |

Approximately 17% of the recorded liability related to asserted claims and approximately 83% related to unasserted claims at December 31, 2008. These claims are expected to be paid out over the next 30 years. In conjunction with the liability update performed in 2008, we also reassessed estimated insurance recoveries. We have recognized an asset for estimated insurance recoveries at December 31, 2008 and 2007. We will continue to review actual experience and adjust our estimate as warranted. Our asbestos-related claims activity was as follows:

| | ***2008*** | *2007* | *2006* |
|---|---|---|---|
| Open claims, beginning balance | **2,086** | 2,277 | 2,435 |
| New claims | **256** | 269 | 316 |
| Settled or dismissed claims | **(475)** | (460) | (474) |
| Open claims, ending balance at December 31 | **1,867** | 2,086 | 2,277 |

We believe that our estimates of liability for asbestos-related claims and insurance recoveries are reasonable and probable. The amounts recorded for asbestos-related liabilities and related insurance recoveries were based on currently known facts. However, future events, such as the number of new claims to be filed each year, average settlement costs, and insurance coverage issues, could cause the actual costs and insurance recoveries to be higher or lower than the projected amounts. Estimates also may vary in the future if strategies, activities, and outcomes of asbestos litigation materially change; federal and state laws governing asbestos litigation increase or decrease the probability or amount of compensation of claimants; and there are material changes with respect to payments made to claimants by other defendants.

**Environmental** – We are subject to federal, state, and local environmental laws and regulations. We identified 339 sites at which we are or may be liable for remediation costs associated with alleged contamination or for violations of environmental requirements. This includes 33 sites that are the subject of actions taken by the U.S. government, 18 of which are currently on the Superfund National Priorities List. Certain federal legislation imposes joint and several liability for the remediation of identified sites; consequently, our ultimate environmental liability may include costs relating to activities of other parties, in addition to costs relating to our own activities at each site.

Our environmental liability activity was as follows:

| *Millions of Dollars* | ***2008*** | *2007* | *2006* |
|---|---|---|---|
| Beginning balance | **$ 209** | $ 210 | $ 213 |
| Accruals | **46** | 41 | 39 |
| Payments | **(46)** | (42) | (42) |
| Ending balance at December 31 | **$ 209** | $ 209 | $ 210 |
| Current portion, ending balance at December 31 | **$ 58** | $ 63 | $ 54 |

Our environmental site activity was as follows:

| | ***2008*** | *2007* | *2006* |
|---|---|---|---|
| Open sites, beginning balance | **339** | 367 | 370 |
| New sites | **82** | 72 | 50 |
| Closed sites | **(82)** | (100) | (53) |
| Open sites, ending balance at December 31 | **339** | 339 | 367 |

When we identify an environmental issue with respect to property owned, leased, or otherwise used in our business, we and our consultants perform environmental assessments on the property. We expense the cost of the assessments as incurred. We accrue the cost of remediation where our obligation is probable and we can reasonably estimate such costs. We do not discount our environmental liabilities when the timing of the anticipated cash payments is not fixed or readily determinable.

The liability includes future costs for remediation and restoration of sites, as well as ongoing monitoring costs, but excludes any anticipated recoveries from third parties. Cost estimates are based on information available for each site, financial viability of other potentially responsible parties, and existing technology, laws, and regulations. The ultimate liability for remediation is difficult to determine because of the number of potentially responsible parties, site-specific cost sharing arrangements with other potentially responsible parties, the degree of contamination by various wastes, the scarcity and quality of volumetric data related to many of the sites, and the speculative nature of remediation costs. Estimates of liability may vary over time due to changes in federal, state, and local laws governing environmental remediation as well as changes to the remediation plan for each site. Current obligations are not expected to have a material adverse effect on our consolidated results of operations, financial condition, or liquidity.

**Personal Injury** – The cost of personal injuries to employees and others related to our activities is charged to expense based on estimates of the ultimate cost and number of incidents each year. We use third-party actuaries to assist us in measuring the expense and liability, including unasserted claims. The Federal Employers' Liability Act (FELA) governs compensation for work-related accidents. Under FELA, damages are assessed based on a finding of fault through litigation or out-of-court settlements. We offer a comprehensive variety of services and rehabilitation programs for employees who are injured at work.

Our personal injury liability is discounted to present value using applicable U.S. Treasury rates. Approximately 88% of the recorded liability related to asserted claims, and approximately 12% related to unasserted claims at December 31, 2008. Estimates can vary over time due to evolving trends in litigation. Our personal injury liability activity was as follows:

| *Millions of Dollars* | ***2008*** | *2007* | *2006* |
|---|---|---|---|
| Beginning balance | **$ 593** | $ 631 | $ 619 |
| Accruals | **201** | 165 | 240 |
| Payments | **(173)** | (203) | (228) |
| Ending balance at December 31 | **$ 621** | $ 593 | $ 631 |
| Current portion, ending balance at December 31 | **$ 186** | $ 204 | $ 233 |

Our personal injury claims activity was as follows:

| | ***2008*** | *2007* | *2006* |
|---|---|---|---|
| Open claims, beginning balance | **4,084** | 4,126 | 4,197 |
| New claims | **3,692** | 4,133 | 4,190 |
| Settled or dismissed claims | **(3,697)** | (4,175) | (4,261) |
| Open claims, ending balance at December 31 | **4,079** | 4,084 | 4,126 |

**Property and Depreciation –** Our rail operations are highly capital intensive. Each year we develop a capital program for the acquisition or construction of fixed assets. Assets purchased or constructed throughout the year that were not part of the original program are capitalized if they meet applicable minimum units of property criteria, which are approved by the STB. Properties are carried at cost, and we follow the group method of depreciation. Our large base of homogeneous, network-type assets turns over on a continuous basis. The group method of depreciation treats each asset class as a pool of resources, not as singular items. Under group depreciation, all items with similar physical characteristics, use, and expected life are grouped together in a single asset class, and are depreciated using composite depreciation rates. The cost (net of salvage) of depreciable rail property retired or replaced in the ordinary course of business is charged to accumulated depreciation and no gain or loss is recognized. A gain or loss is recognized in other income for all other property upon disposition because the gain or loss is not part of rail operations.

We compute depreciation principally on the straight-line method based on estimated service lives of depreciable property. We use a unit of production convention to depreciate rail in high-density traffic corridors. We calculate service lives using Company-specific retirement data. We perform and submit depreciation rate studies to the STB at least every three years for equipment and every six years for road property (i.e., rail and other track material, ties, and ballast). These rate studies are reviewed and approved by the STB. These studies are used to develop our approved composite depreciation rates by asset class. During 2008, we completed depreciation rate studies for both track and road property, which will be used to calculate depreciation expense in 2009 and beyond.

When we purchase an asset, we capitalize all costs necessary to make the asset ready for its intended use. However, many of our assets are self-constructed. A large portion of our capital expenditures is for track structure expansion (capacity projects) and replacement (program projects), which is typically performed by our employees. Approximately 13% of our full-time equivalent employees are dedicated to the construction of capital assets. Costs that are directly attributable or overhead costs that relate directly to

capital projects are capitalized. Direct costs that are capitalized as part of self-constructed assets include material, labor, and work equipment. Indirect costs are capitalized if they clearly relate to the construction of the asset. These costs are allocated using appropriate statistical bases. The capitalization of indirect costs is consistent with FASB Statement No. 67, *Accounting for Costs and Initial Rental Operations of Real Estate Projects.*

General and administrative expenditures are expensed as incurred. Normal repairs and maintenance are also expensed as incurred, while costs incurred that extend the useful life of an asset, improve the safety of our operations or improve operating efficiency are capitalized.

Assets held under capital leases are recorded at the lower of the net present value of the minimum lease payments or the fair value of the leased asset at the inception of the lease. Amortization expense is computed using the straight-line method over the shorter of the estimated useful lives of the assets or the period of the related lease.

Significant capital spending in recent years increased the total value of our depreciable assets. Cash capital spending totaled $2.8 billion for the year ended December 31, 2008, while depreciation expense totaled $1.4 billion. We use various methods to estimate useful lives for each group of depreciable property. Variances to these estimates could have a material impact on our Consolidated Financial Statements. If the estimated useful lives of all depreciable assets were increased by one year, annual depreciation expense would decrease by approximately $48 million. If the estimated useful lives of all depreciable assets were decreased by one year, annual depreciation expense would increase by approximately $52 million.

**Income Taxes –** As required under FASB Statement No. 109, *Accounting for Income Taxes*, we account for income taxes by recording taxes payable or refundable for the current year and deferred tax assets and liabilities for the expected future tax consequences of events that have been recognized in our financial statements or tax returns. These expected future tax consequences are measured based on provisions of tax law as currently enacted; the effects of future changes in tax laws are not anticipated. Future tax law changes, such as a change in the corporate tax rate, could have a material impact on our financial condition or results of operations. For example, a 1% increase in the federal income tax rate would increase our deferred tax liability by approximately $260 million.

When appropriate, we record a valuation allowance against deferred tax assets to offset future tax benefits that may not be realized. In determining whether a valuation allowance is appropriate, we consider whether it is more likely than not that all or some portion of our deferred tax assets will not be realized, based on management's judgments regarding the best available evidence about future events.

When we have claimed tax benefits that may be challenged by a tax authority, these uncertain tax positions are accounted for under FASB Interpretation No. 48, *Accounting for Uncertainty in Income Taxes*, *an Interpretation of FASB Statement No. 109* (FIN 48). We adopted FIN 48 beginning January 1, 2007. Prior to 2007, income tax contingencies were accounted for under FASB Statement No. 5, *Accounting for Contingencies*.

Under FIN 48, we recognize tax benefits only for tax positions that are more likely than not to be sustained upon examination by tax authorities. The amount recognized is measured as the largest amount of benefit that is greater than 50 percent likely to be realized upon settlement. A liability for "unrecognized tax benefits" is recorded for any tax benefits claimed in our tax returns that do not meet these recognition and measurement standards.

**Pension and Other Postretirement Benefits** – We use third-party actuaries to assist us in properly measuring the liabilities and expenses associated with providing pension and defined contribution medical and life insurance benefits (OPEB) to eligible employees. In order to use actuarial methods to value the

liabilities and expenses we must make several assumptions. The critical assumptions used to measure pension obligations and expenses are the discount rate and expected rate of return on pension assets. For OPEB, the critical assumptions are the discount rate and healthcare cost trend rate.

We evaluate our critical assumptions at least annually, and selected assumptions are based on the following factors:

- Discount rate is based on a Mercer yield curve of high quality corporate bonds (rated AA by a recognized rating agency) for which the timing and amount of cash flows matches our plans' expected benefit payments.

- Expected return on plan assets is based on our asset allocation mix and our historical return, taking into consideration current and expected market conditions.

- Healthcare cost trend rate is based on our historical rates of inflation and expected market conditions.

The following tables present the key assumptions used to measure pension and OPEB expense for 2008 and the estimated impact on 2008 pension and OPEB expense relative to a change in those assumptions:

| ***Assumptions*** | *Pension* | *OPEB* |
|---|---|---|
| Discount rate | 6.50% | 6.50% |
| Salary increase | 3.50% | N/A |
| Expected return on plan assets | 8.00% | N/A |
| Healthcare cost trend rate: | | |
| Pre-65 current | N/A | 8.00% |
| Pre-65 level in 2011 | N/A | 5.00% |
| Post-65 current | N/A | 10.00% |
| Post-65 level in 2013 | N/A | 5.00% |

| ***Sensitivities*** | *Increase in Expense* | |
|---|---|---|
| *Millions of Dollars* | *Pension* | *OPEB* |
| 0.25% decrease in discount rate | $ 6 | $ 2 |
| 0.25% increase in salary scale | $ 2 | N/A |
| 0.25% decrease in expected return on plan assets | $ 5 | N/A |
| 1% increase in healthcare cost trend rate | N/A | $ 6 |

## CAUTIONARY INFORMATION

Certain statements in this report, and statements in other reports or information filed or to be filed with the SEC (as well as information included in oral statements or other written statements made or to be made by us), are, or will be, forward-looking statements as defined by the Securities Act of 1933 and the Securities Exchange Act of 1934. These forward-looking statements and information include, without limitation, statements in the Chairman's letter preceding Part I regarding long-term demand, capital investments, the economic outlook, and our financial position, statements regarding dividends in Item 5 and statements and information set forth under the captions "2009 Outlook" and "Liquidity and Capital Resources" in this Item 7, and any other statements or information in this report (including information incorporated herein by reference) regarding: expectations as to operational or service improvements; expectations regarding the effectiveness of steps taken or to be taken to improve operations, service, infrastructure improvements, and transportation plan modifications (including statements set forth in Item

2 regarding expectations related to our capital expenditures); expectations as to cost savings, revenue growth, and earnings; the time by which goals, targets, or objectives will be achieved; projections, predictions, expectations, estimates, or forecasts as to our business, financial and operational results, future economic performance, and general economic conditions; proposed new products and services; estimates of costs relating to environmental remediation and restoration; expectations that claims, litigation, environmental costs, commitments, contingent liabilities, labor negotiations or agreements, or other matters will not have a material adverse effect on our consolidated results of operations, financial condition, or liquidity and any other similar expressions concerning matters that are not historical facts.

Forward-looking statements and information reflect the good faith consideration by management of currently available information, and may be based on underlying assumptions believed to be reasonable under the circumstances. However, such information and assumptions (and, therefore, such forward-looking statements and information) are or may be subject to variables or unknown or unforeseeable events or circumstances over which management has little or no influence or control. The Risk Factors in Item 1A of this report could affect our future results and could cause those results or other outcomes to differ materially from those expressed or implied in the forward-looking statements. Forward-looking statements should not be read as a guarantee of future performance or results, and will not necessarily be accurate indications of the times that, or by which, such performance or results will be achieved. Forward-looking information is subject to risks and uncertainties that could cause actual performance or results to differ materially from those expressed in the statements.

Forward-looking statements speak only as of the date the statement was made. We assume no obligation to update forward-looking information to reflect actual results, changes in assumptions or changes in other factors affecting forward-looking information. If we do update one or more forward-looking statements, no inference should be drawn that we will make additional updates with respect thereto or with respect to other forward-looking statements.

**Item 7A. <u>Quantitative and Qualitative Disclosures about Market Risk</u>**

Information concerning market risk sensitive instruments is set forth under Management's Discussion and Analysis of Financial Condition and Results of Operations – Other Matters, Item 7.

***************************************

**Item 8. Financial Statements and Supplementary Data**

**Index to Consolidated Financial Statements** **Page**

Report of Independent Registered Public Accounting Firm ........ 54

Consolidated Statements of Income
For the Years Ended December 31, 2008, 2007, and 2006 ........ 55

Consolidated Statements of Financial Position
At December 31, 2008 and 2007 ........ 56

Consolidated Statements of Cash Flows
For the Years Ended December 31, 2008, 2007, and 2006 ........ 57

Consolidated Statements of Changes in Common Shareholders' Equity
For the Years Ended December 31, 2008, 2007, and 2006 ........ 58

Notes to the Consolidated Financial Statements ........ 59

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

Union Pacific Corporation, its Directors, and Shareholders:

We have audited the accompanying consolidated statements of financial position of Union Pacific Corporation and Subsidiary Companies (the Corporation) as of December 31, 2008 and 2007, and the related consolidated statements of income, changes in common shareholders' equity, and cash flows for each of the three years in the period ended December 31, 2008. Our audits also included the financial statement schedule listed in the Table of Contents at Part IV, Item 15. These financial statements and financial statement schedule are the responsibility of the Corporation's management. Our responsibility is to express an opinion on the consolidated financial statements and financial statement schedule based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of Union Pacific Corporation and Subsidiary Companies as of December 31, 2008 and 2007, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2008, in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, such financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

As discussed in Note 4 to the consolidated financial statements, in 2006 the Corporation adopted Statement of Financial Accounting Standards No. 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans.*

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the Corporation's internal control over financial reporting as of December 31, 2008, based on the criteria established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 5, 2009, expressed an unqualified opinion on the Corporation's internal control over financial reporting.

Deloitte & Touche LLP

Omaha, Nebraska
February 5, 2009

**CONSOLIDATED STATEMENTS OF INCOME**

*Union Pacific Corporation and Subsidiary Companies*

| *Millions, Except Per Share Amounts, for the Years Ended December 31,* | ***2008*** | *2007* | *2006* |
|---|---|---|---|
| Operating revenues: | | | |
| Freight revenues | **$ 17,118** | $ 15,486 | $ 14,791 |
| Other revenues | **852** | 797 | 787 |
| Total operating revenues | **17,970** | 16,283 | 15,578 |
| Operating expenses: | | | |
| Compensation and benefits | **4,457** | 4,526 | 4,535 |
| Fuel | **3,983** | 3,104 | 2,968 |
| Purchased services and materials | **1,902** | 1,856 | 1,756 |
| Depreciation | **1,387** | 1,321 | 1,237 |
| Equipment and other rents | **1,326** | 1,368 | 1,396 |
| Other | **840** | 733 | 802 |
| Total operating expenses | **13,895** | 12,908 | 12,694 |
| Operating income | **4,075** | 3,375 | 2,884 |
| Other income (note 5) | **92** | 116 | 118 |
| Interest expense | **(511)** | (482) | (477) |
| Income before income taxes | **3,656** | 3,009 | 2,525 |
| Income taxes (note 6) | **(1,318)** | (1,154) | (919) |
| Net income | **$ 2,338** | $ 1,855 | $ 1,606 |
| Share and Per Share (notes 2 and 7): | | | |
| Earnings per share - basic | **$ 4.58** | $ 3.49 | $ 2.98 |
| Earnings per share - diluted | **$ 4.54** | $ 3.46 | $ 2.95 |
| Weighted average number of shares - basic | **510.6** | 531.9 | 538.9 |
| Weighted average number of shares - diluted | **515.0** | 536.8 | 543.9 |
| Dividends declared per share | **$ 0.98** | $ 0.745 | $ 0.60 |

*The accompanying notes are an integral part of these Consolidated Financial Statements.*

**CONSOLIDATED STATEMENTS OF FINANCIAL POSITION**

*Union Pacific Corporation and Subsidiary Companies*

| *Millions of Dollars, as of December 31,* | ***2008*** | *2007* |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | **$ 1,249** | $ 878 |
| Accounts receivable, net | **594** | 632 |
| Materials and supplies | **450** | 453 |
| Current deferred income taxes (note 6) | **276** | 336 |
| Other current assets | **244** | 295 |
| Total current assets | **2,813** | 2,594 |
| Investments | **974** | 923 |
| Net properties (note 9) | **35,701** | 34,158 |
| Other assets | **234** | 358 |
| Total assets | **$ 39,722** | $ 38,033 |
| **Liabilities and Common Shareholders' Equity** | | |
| Current liabilities: | | |
| Accounts payable and other current liabilities (note 10) | **$ 2,560** | $ 2,902 |
| Debt due within one year (note 13) | **320** | 139 |
| Total current liabilities | **2,880** | 3,041 |
| Debt due after one year (note 13) | **8,607** | 7,543 |
| Deferred income taxes (note 6) | **10,282** | 10,050 |
| Other long-term liabilities | **2,506** | 1,814 |
| Commitments and contingencies (note 15) | | |
| Total liabilities | **24,275** | 22,448 |
| Common shareholders' equity (note 2): | | |
| Common shares, $2.50 par value, 800,000,000 and 500,000,000 authorized; 552,775,812 and 276,162,141 issued; 503,225,705 and 260,869,647 outstanding, respectively | **1,382** | 690 |
| Paid-in-surplus | **3,949** | 3,926 |
| Retained earnings | **13,813** | 12,667 |
| Treasury stock | **(2,993)** | (1,624) |
| Accumulated other comprehensive loss (note 8) | **(704)** | (74) |
| Total common shareholders' equity | **15,447** | 15,585 |
| Total liabilities and common shareholders' equity | **$ 39,722** | $ 38,033 |

*The accompanying notes are an integral part of these Consolidated Financial Statements.*

**CONSOLIDATED STATEMENTS OF CASH FLOWS**

*Union Pacific Corporation and Subsidiary Companies*

| *Millions of Dollars, for the Years Ended December 31,* | ***2008*** | *2007* | *2006* |
|---|---|---|---|
| **Operating Activities** | | | |
| Net income | **$ 2,338** | $ 1,855 | $ 1,606 |
| Adjustments to reconcile net income to cash provided by operating activities: | | | |
| Depreciation | **1,387** | 1,321 | 1,237 |
| Deferred income taxes and unrecognized tax benefits | **547** | 332 | 235 |
| Stock-based compensation expense | **65** | 44 | 35 |
| Net gain from asset sales | **(41)** | (52) | (72) |
| Other operating activities, net | **24** | (251) | (175) |
| Changes in current assets and liabilities, net | **(250)** | 28 | 14 |
| Cash provided by operating activities | **4,070** | 3,277 | 2,880 |
| **Investing Activities** | | | |
| Capital investments | **(2,780)** | (2,496) | (2,242) |
| Proceeds from asset sales | **93** | 122 | 133 |
| Acquisition of equipment pending financing | **(388)** | (621) | (536) |
| Proceeds from sale of assets financed | **388** | 621 | 536 |
| Other investing activities, net | **(77)** | (52) | 67 |
| Cash used in investing activities | **(2,764)** | (2,426) | (2,042) |
| **Financing Activities** | | | |
| Debt issued | **2,257** | 1,581 | - |
| Common share repurchases (note 16) | **(1,609)** | (1,375) | - |
| Debt repaid | **(1,208)** | (792) | (657) |
| Dividends paid | **(481)** | (364) | (322) |
| Cash received for option exercises | **83** | 132 | 177 |
| Treasury shares repurchased for employee payroll taxes | **(28)** | (61) | (17) |
| Excess tax benefits from equity compensation plans | **54** | 76 | 29 |
| Other financing activities, net | **(3)** | 3 | 6 |
| Cash used in financing activities | **(935)** | (800) | (784) |
| Net change in cash and cash equivalents | **371** | 51 | 54 |
| Cash and cash equivalents at beginning of year | **878** | 827 | 773 |
| Cash and cash equivalents at end of year | **$ 1,249** | $ 878 | $ 827 |
| **Changes in Current Assets and Liabilities** | | | |
| Accounts receivable, net | **$ 38** | $ 47 | $ 68 |
| Materials and supplies | **3** | (58) | (64) |
| Other current assets | **51** | (104) | (21) |
| Accounts payable and other current liabilities | **(342)** | 143 | 31 |
| Total | **$ (250)** | $ 28 | $ 14 |
| **Supplemental Cash Flow Information** | | | |
| Non-cash investing and financing activities: | | | |
| Capital lease financings | **$ 175** | $ 82 | $ 16 |
| Cash dividends declared but not yet paid | **132** | 112 | 80 |
| Capital investments accrued but not yet paid | **93** | 126 | 106 |
| Common shares repurchased but not yet paid | **-** | 82 | - |
| Cash paid during the year for: | | | |
| Interest, net of amounts capitalized | **$ (500)** | $ (467) | $ (492) |
| Income taxes, net of refunds | **(699)** | (839) | (549) |

*The accompanying notes are an integral part of these Consolidated Financial Statements.*

**CONSOLIDATED STATEMENTS OF CHANGES IN COMMON SHAREHOLDERS' EQUITY**

*Union Pacific Corporation and Subsidiary Companies*

| *Millions of Dollars* *Thousands of Shares* | *Common Shares* | *Treasury Shares* | *Common Shares* | *Paid-in-Surplus* | *Retained Earnings* | *Treasury Stock* | *Accumulated Other Comprehensive Income/(Loss) (note 8)* | *Total* |
|---|---|---|---|---|---|---|---|---|
| Balance at January 1, 2006 | 275,799 | (9,164) | $ 689 | $3,915 | $ 9,932 | $ (599) | $(230) | $13,707 |
| Comprehensive income: | | | | | | | | |
| Net income | | | - | - | 1,606 | - | - | 1,606 |
| Other comp. income | | | - | - | - | - | 167 | 167 |
| Total comp. income (note 8) | | | - | - | 1,606 | - | 167 | 1,773 |
| FAS 158 adoption (note 4) | | | - | - | - | - | (79) | (79) |
| Conversion, stock option exercises, forfeitures, and other | 163 | 3,374 | 1 | 28 | - | 205 | - | 234 |
| Cash dividends declared ($1.20 per share) | - | - | - | - | (323) | - | - | (323) |
| Balance at December 31, 2006 | 275,962 | (5,790) | $ 690 | $3,943 | $11,215 | $ (394) | $(142) | $15,312 |
| Cumulative effect of adoption of FIN 48 (note 6) | - | - | - | - | (7) | - | - | (7) |
| Balance at January 1, 2007 | 275,962 | (5,790) | $ 690 | $3,943 | $11,208 | $ (394) | $(142) | $15,305 |
| Comprehensive income: | | | | | | | | |
| Net income | | | - | - | 1,855 | - | - | 1,855 |
| Other comp. income | | | - | - | - | - | 68 | 68 |
| Total comp. income (note 8) | | | - | - | 1,855 | - | 68 | 1,923 |
| Conversion, stock option exercises, forfeitures, and other | 200 | 3,122 | - | (17) | - | 227 | - | 210 |
| Share repurchases (note 16) | - | (12,624) | - | - | - | (1,457) | - | (1,457) |
| Cash dividends declared ($1.49 per share) | - | - | - | - | (396) | - | - | (396) |
| Balance at December 31, 2007 | 276,162 | (15,292) | $ 690 | $3,926 | $12,667 | $(1,624) | $ (74) | $15,585 |
| Comprehensive income: | | | - | - | - | - | - | - |
| Net income | | | - | - | 2,338 | - | - | 2,338 |
| Other comp. income/(loss) | | | - | - | - | - | (630) | (630) |
| Total comp. income (note 8) | | | | | 2,338 | | (630) | 1,708 |
| Conversion, stock option exercises, forfeitures, and other | 452 | 3,210 | 1 | 23 | - | 158 | - | 182 |
| Share repurchases (note 16) | - | (22,176) | - | - | - | (1,527) | - | (1,527) |
| Common stock dividend (note 2) | 276,162 | (15,292) | 691 | - | (691) | - | - | - |
| Cash dividends declared ($0.98 per share) | - | - | - | - | (501) | - | - | (501) |
| **Balance at December 31, 2008** | **552,776** | **(49,550)** | **$1,382** | **$3,949** | **$13,813** | **$(2,993)** | **$(704)** | **$15,447** |

*The accompanying notes are an integral part of these Consolidated Financial Statements.*

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
*Union Pacific Corporation and Subsidiary Companies*

For purposes of this report, unless the context otherwise requires, all references herein to the "Corporation", "UPC", "we", "us", and "our" mean Union Pacific Corporation and its subsidiaries, including Union Pacific Railroad Company, which will be separately referred to herein as "UPRR" or the "Railroad".

## 1. Nature of Operations and Significant Accounting Policies

**Operations and Segmentation** – We are a Class I railroad that operates in the United States. We have 32,012 route miles, linking Pacific Coast and Gulf Coast ports with the Midwest and eastern United States gateways and providing several corridors to key Mexican gateways. We serve the western two-thirds of the country and maintain coordinated schedules with other rail carriers for the handling of freight to and from the Atlantic Coast, the Pacific Coast, the Southeast, the Southwest, Canada, and Mexico. Export and import traffic is moved through Gulf Coast and Pacific Coast ports and across the Mexican and Canadian borders.

The Railroad, along with its subsidiaries and rail affiliates, is our one reportable operating segment. Although revenues are analyzed by commodity group, we analyze the net financial results of the Railroad as one segment due to the integrated nature of our rail network. The following table provides revenue by commodity group:

| *Millions of Dollars* | ***2008*** | *2007* | *2006* |
|---|---|---|---|
| Agricultural | **$ 3,174** | $ 2,605 | $ 2,385 |
| Automotive | **1,344** | 1,458 | 1,427 |
| Chemicals | **2,494** | 2,287 | 2,084 |
| Energy | **3,810** | 3,134 | 2,949 |
| Industrial Products | **3,273** | 3,077 | 3,135 |
| Intermodal | **3,023** | 2,925 | 2,811 |
| Total freight revenues | **$ 17,118** | $ 15,486 | $ 14,791 |
| Other revenues | **852** | 797 | 787 |
| Total operating revenues | **$ 17,970** | $ 16,283 | $ 15,578 |

**Basis of Presentation –** Certain prior year amounts have been reclassified to conform to the current period financial statement presentation. The reclassifications include reporting freight revenues instead of commodity revenues. The amounts reclassified from freight revenues to other revenues totaled $30 million and $71 million for the years ended December 31, 2007, and December 31, 2006, respectively. In addition, we modified our operating expense categories to report fuel used in railroad operations as a stand-alone category, to combine purchased services and materials into one line, and to reclassify certain other expenses among operating expense categories. These reclassifications had no impact on previously reported operating revenues, total operating expenses, operating income or net income.

### Significant Accounting Policies

**Principles of Consolidation** – The Consolidated Financial Statements include the accounts of Union Pacific Corporation and all of its subsidiaries. Investments in affiliated companies (20% to 50% owned) are accounted for using the equity method of accounting. All significant intercompany transactions are eliminated. The Corporation evaluates its less than majority-owned investments for consolidation

pursuant to Financial Accounting Standards Board (FASB) Interpretation No. 46 (Revised 2003), *Consolidation of Variable Interest Entities, an Interpretation of Accounting Research Bulletin No. 51* (FIN 46(R)). We currently have no less than majority-owned investments that require consolidation under FIN 46(R).

**Cash and Cash Equivalents –** Cash equivalents consist of investments with original maturities of three months or less.

**Materials and Supplies –** Materials and supplies are carried at the lower of average cost or market.

**Property and Depreciation** – See note 9.

**Impairment of Long-lived Assets –** We review long-lived assets, including identifiable intangibles, for impairment when events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. If impairment indicators are present and the estimated future undiscounted cash flows are less than the carrying value of the long-lived assets, the carrying value is reduced to the estimated fair value as measured by the discounted cash flows.

**Revenue Recognition –** We recognize freight revenues on a percentage-of-completion basis as freight moves from origin to destination. The allocation of revenue between reporting periods is based on the relative transit time in each reporting period with expenses recognized as incurred. Other revenues are recognized as service is performed or contractual obligations are met. Customer incentives, which are primarily provided for shipping a specified cumulative volume or shipping to/from specific locations, are recorded as a reduction to operating revenues based on actual or projected future customer shipments.

**Translation of Foreign Currency –** Our portion of the assets and liabilities related to foreign investments are translated into U.S. dollars at the exchange rates in effect at the balance sheet date. Revenue and expenses are translated at the average rates of exchange prevailing during the year. Unrealized gains or losses are reflected within common shareholders' equity as accumulated other comprehensive income or loss.

**Financial Instruments –** The carrying value of our non-derivative financial instruments approximates fair value. The fair value of financial instruments is generally determined by reference to market values as quoted by recognized dealers or developed based upon the present value of expected future cash flows.

We periodically use derivative financial instruments, for other than trading purposes, to manage risk related to changes in fuel prices and interest rates.

**Stock-Based Compensation –** We have several stock-based compensation plans under which employees and non-employee directors receive stock options, nonvested retention shares, and nonvested stock units. We refer to the nonvested shares and stock units collectively as "retention awards". We have elected to issue treasury shares to cover option exercises and stock unit vestings, while new shares are issued when retention shares vest.

We adopted FASB Statement No. 123(R), *Share-Based Payment* (FAS 123(R)), on January 1, 2006. FAS 123(R) requires us to measure and recognize compensation expense for all stock-based awards made to employees and directors, including stock options. Compensation expense is based on the calculated fair value of the awards as measured at the grant date and is expensed ratably over the service period of the awards (generally the vesting period). The fair value of retention awards is the closing stock price on the date of grant, while the fair value of stock options is determined by using the Black-Scholes option pricing model. We elected to use the modified prospective transition method as permitted by FAS 123(R) and did not restate financial results for prior periods. We did not make an adjustment for the cumulative effect of estimated forfeitures, as the impact was not material.

Information regarding stock-based compensation appears in the table below:

| *Millions of Dollars* | ***2008*** | *2007* | *2006* |
|---|---|---|---|
| Stock-based compensation, before tax: | | | |
| Stock options | **$ 25** | $ 21 | $ 14 |
| Retention awards | **40** | 23 | 21 |
| Total stock-based compensation, before tax | **$ 65** | $ 44 | $ 35 |
| Total stock-based compensation, after tax | **$ 40** | $ 27 | $ 22 |

**Earnings Per Share –** Basic earnings per share are calculated on the weighted-average number of common shares outstanding during each period. Diluted earnings per share include shares issuable upon exercise of outstanding stock options and stock-based awards where the conversion of such instruments would be dilutive.

**Use of Estimates –** Our Consolidated Financial Statements include estimates and assumptions regarding certain assets, liabilities, revenue, and expenses and the disclosure of certain contingent assets and liabilities. Actual future results may differ from such estimates.

**Income Taxes –** As required under FASB Statement No. 109, *Accounting for Income Taxes*, we account for income taxes by recording taxes payable or refundable for the current year and deferred tax assets and liabilities for the expected future tax consequences of events that have been recognized in our financial statements or tax returns. These expected future tax consequences are measured based on provisions of tax law as currently enacted; the effects of future changes in tax laws are not anticipated. Future tax law changes, such as a change in the corporate tax rate, could have a material impact on our financial condition and liquidity.

When appropriate, we record a valuation allowance against deferred tax assets to offset future tax benefits that may not be realized. In determining whether a valuation allowance is appropriate, we consider whether it is more likely than not that all or some portion of our deferred tax assets will not be realized, based on management's judgments regarding the best available evidence about future events.

When we have claimed tax benefits that may be challenged by a tax authority, these uncertain tax positions are accounted for under FASB Interpretation No. 48, *Accounting for Uncertainty in Income Taxes, an Interpretation of FASB Statement No. 109* (FIN 48). We adopted FIN 48 beginning January 1, 2007. Prior to 2007, income tax contingencies were accounted for under FASB Statement No. 5, *Accounting for Contingencies*.

Under FIN 48, we recognize tax benefits only for tax positions that are more likely than not to be sustained upon examination by tax authorities. The amount recognized is measured as the largest amount of benefit that is greater than 50 percent likely to be realized upon settlement. A liability for "unrecognized tax benefits" is recorded for any tax benefits claimed in our tax returns that do not meet these recognition and measurement standards.

**Pension and Postretirement Benefits –** We incur certain employment-related expenses associated with pensions and postretirement health benefits. In order to measure the expense associated with these benefits, we must make various assumptions including discount rates used to value certain liabilities, expected return on plan assets used to fund these expenses, salary increases, employee turnover rates, anticipated mortality rates, and expected future healthcare costs. The assumptions used by us are based on

our historical experience as well as current facts and circumstances. We use third-party actuaries to assist us in properly measuring the expense and liability associated with these benefits.

**Personal Injury –** The cost of injuries to employees and others on our property is charged to expense based on estimates of the ultimate cost and number of incidents each year. We use third-party actuaries to assist us in properly measuring the expense and liability. Our personal injury liability is discounted to present value using applicable U.S. Treasury rates. Legal fees and incidental costs are expensed as incurred.

**Environmental –** When environmental issues have been identified with respect to property currently or formerly owned, leased, or otherwise used in the conduct of our business, we and our consultants perform environmental assessments on such property. We expense the cost of the assessments as incurred. We accrue the cost of remediation where our obligation is probable and such costs can be reasonably estimated. We do not discount our environmental liabilities when the timing of the anticipated cash payments is not fixed or readily determinable. Legal fees and incidental costs are expensed as incurred.

**Asbestos –** We estimate a liability for asserted and unasserted asbestos-related claims based on an assessment of the number and value of those claims. We use an external consulting firm to assist us in properly measuring the expense and liability. Our liability for asbestos-related claims is not discounted to present value due to the uncertainty surrounding the timing of future payments. Legal fees and incidental costs are expensed as incurred.

**2. Stock Split**

On May 28, 2008, we completed a two-for-one stock split, effected in the form of a 100% stock dividend. The stock split entitled all shareholders of record at the close of business on May 12, 2008, to receive one additional share of our common stock, par value $2.50 per share, for each share of common stock held on that date. All references to common shares and per share amounts (excluding the Consolidated Statements of Changes in Common Shareholders' Equity and December 31, 2007, Consolidated Statements of Financial Position) have been restated to reflect the stock split for all periods presented.

**3. Stock Options and Other Stock Plans**

We have 144,980 options outstanding under the 1993 Stock Option and Retention Stock Plan of Union Pacific Corporation (1993 Plan). There are 7,140 restricted shares outstanding under the 1992 Restricted Stock Plan for Non-Employee Directors of Union Pacific Corporation. We no longer grant options or awards of retention shares and units under these plans.

In April 2000, the shareholders approved the Union Pacific Corporation 2000 Directors Plan (Directors Plan) whereby 1,100,000 shares of our common stock (550,000 pre-split) were reserved for issuance to our non-employee directors. Under the Directors Plan, each non-employee director, upon his or her initial election to the Board of Directors, receives a grant of 2,000 shares of retention shares or retention stock units (1,000 pre-split). Prior to December 31, 2007, each non-employee director received annually an option to purchase at fair value a number of shares of our common stock, not to exceed 10,000 shares (5,000 pre-split) during any calendar year, determined by dividing 60,000 by 1/3 of the fair market value of one share of our common stock on the date of such Board of Directors meeting, with the resulting quotient rounded up or down to the nearest 50 shares. As of December 31, 2008, 16,000 restricted shares were outstanding under the Directors Plan and 311,000 options were outstanding under the Directors Plan.

The Union Pacific Corporation 2001 Stock Incentive Plan (2001 Plan) was approved by the shareholders in April 2001. The 2001 Plan reserved 24,000,000 shares of our common stock (12,000,000 pre-split) for issuance to eligible employees of the Corporation and its subsidiaries in the form of non-qualified

options, incentive stock options, retention shares, stock units, and incentive bonus awards. Non-employee directors were not eligible for awards under the 2001 Plan. As of December 31, 2008, 4,095,039 options were outstanding under the 2001 Plan. We no longer grant any stock options or other stock or unit awards under this plan.

The Union Pacific Corporation 2004 Stock Incentive Plan (2004 Plan) was approved by shareholders in April 2004. The 2004 Plan reserved 42,000,000 shares of our common stock (21,000,000 pre-split) for issuance, plus any shares subject to awards made under the 2001 Plan and the 1993 Plan that were outstanding on April 16, 2004, and became available for regrant pursuant to the terms of the 2004 Plan. Under the 2004 Plan, non-qualified options, stock appreciation rights, retention shares, stock units, and incentive bonus awards may be granted to eligible employees of the Corporation and its subsidiaries. Non-employee directors are not eligible for awards under the 2004 Plan. As of December 31, 2008, 7,431,886 options and 2,891,339 retention shares and stock units were outstanding under the 2004 Plan.

Pursuant to the above plans 36,961,123; 38,601,728; and 39,088,490 shares of our common stock were authorized and available for grant at December 31, 2008, 2007, and 2006, respectively.

**Stock Options** – We estimate the fair value of our stock option awards using the Black-Scholes option pricing model. Groups of employees and non-employee directors that have similar historical and expected exercise behavior are considered separately for valuation purposes. The table below shows the annual weighted-average assumptions used for valuation purposes:

| *Weighted-Average Assumptions* | ***2008*** | *2007* | *2006* |
|---|---|---|---|
| Risk-free interest rate | **2.8%** | 4.9% | 4.5% |
| Dividend yield | **1.4%** | 1.4% | 1.4% |
| Expected life (years) | **5.3** | 4.7 | 6.0 |
| Volatility | **22.2%** | 20.9% | 25.3% |
| Weighted-average grant-date fair value of options granted | **$ 13.35** | $ 11.19 | $ 12.49 |

The risk-free rate is based on the U.S. Treasury yield curve in effect at the time of grant; the dividend yield is calculated as the ratio of dividends paid per share of common stock to the stock price on the date of grant; the expected life is based on historical and expected exercise behavior; and volatility is based on the historical volatility of our stock price over the expected life of the option.

A summary of stock option activity during 2008 is presented below:

| | *Shares (thous.)* | *Weighted-Average Exercise Price* | *Weighted-Average Remaining Contractual Term* | *Aggregate Intrinsic Value (millions)* |
|---|---|---|---|---|
| Outstanding at January 1, 2008 | 15,127 | $ 35.77 | 6.0 yrs. | $ 409 |
| Granted | 1,571 | 62.40 | N/A | N/A |
| Exercised | (4,351) | 31.61 | N/A | N/A |
| Forfeited or expired | (364) | 34.53 | N/A | N/A |
| Outstanding at December 31, 2008 | 11,983 | $ 40.81 | 5.6 yrs. | $ 108 |
| Vested or expected to vest at December 31, 2008 | 11,870 | $ 40.69 | 5.6 yrs. | $ 108 |
| Options exercisable at December 31, 2008 | 8,216 | $ 35.13 | 4.4 yrs. | $ 105 |

Stock options are granted at the closing price on the date of grant, have ten-year contractual terms, and vest no later than three years from the date of grant. None of the stock options outstanding at December 31, 2008 are subject to performance or market-based vesting conditions.

At December 31, 2008, there was $21 million of unrecognized compensation expense related to nonvested stock options, which is expected to be recognized over a weighted-average period of 0.9 years. Additional information regarding stock option exercises appears in the table below:

| *Millions of Dollars* | ***2008*** | *2007* | *2006* |
|---|---|---|---|
| Intrinsic value of stock options exercised | **$ 169** | $ 208 | $ 124 |
| Cash received from option exercises | **83** | 132 | 177 |
| Tax benefit realized from option exercises | **63** | 78 | 44 |
| Aggregate grant-date fair value of stock options vested | **21** | 11 | 26 |

**Retention Awards –** The fair value of retention awards is based on the closing price of the stock on the grant date. Dividend equivalents are paid to participants during the vesting periods.

Changes in our retention awards during 2008 were as follows:

| | *Shares (thous.)* | *Weighted-Average Grant-Date Fair Value* |
|---|---|---|
| Nonvested at January 1, 2008 | 1,624 | $ 42.04 |
| Granted | 655 | 62.42 |
| Vested | (206) | 33.13 |
| Forfeited | (58) | 46.32 |
| Nonvested at December 31, 2008 | 2,015 | $ 49.39 |

Retention awards are granted at no cost to the employee or non-employee director and vest over periods lasting up to four years. At December 31, 2008, there was $52 million of total unrecognized compensation expense related to nonvested retention awards, which is expected to be recognized over a weighted-average period of 1.9 years.

**Performance Retention Awards** – In January 2008, our Board of Directors approved performance stock unit grants. Other than higher performance targets, the basic terms of these performance stock units are identical to those granted in January 2006 and January 2007, including using annual return on invested capital (ROIC) as the performance measure. Stock units awarded to selected employees under these grants are subject to continued employment for 37 months and the attainment of certain levels of ROIC. We expense the fair value of the units that are probable of being earned based on our forecasted ROIC over the 3-year performance period. We measure the fair value of these performance stock units based upon the closing price of the underlying common stock as of the date of grant, reduced by the present value of estimated future dividends. Dividend equivalents are paid to participants only after the units are earned.

The assumptions used to calculate the present value of estimated future dividends related to the January 2008 grant were as follows:

| | 2008 |
|---|---|
| Dividend per share per quarter | $ 0.22 |
| Risk-free interest rate at date of grant | 2.3% |

Changes in our performance retention awards during 2008 were as follows:

| | Shares (thous.) | Weighted-Average Grant-Date Fair Value |
|---|---|---|
| Nonvested at January 1, 2008 | 589 | $ 45.27 |
| Granted | 325 | 60.25 |
| Vested | (5) | 43.91 |
| Forfeited | (36) | 49.13 |
| Nonvested at December 31, 2008 | 873 | $ 50.70 |

At December 31, 2008, there was $19 million of total unrecognized compensation expense related to nonvested performance retention awards, which is expected to be recognized over a weighted-average period of 1.2 years. A portion of this expense is subject to achievement of the ROIC levels established for the performance stock unit grants.

**4. Retirement Plans**

**Pension and Other Postretirement Benefits**

*Pension Plans* – We provide defined benefit retirement income to eligible non-union employees through qualified and non-qualified (supplemental) pension plans. Qualified and non-qualified pension benefits are based on years of service and the highest compensation during the latest years of employment, with specific reductions made for early retirements.

*Other Postretirement Benefits (OPEB)* – We provide defined contribution medical and life insurance benefits for eligible retirees. These benefits are funded as medical claims and life insurance premiums are paid.

**Funded Status**

We adopted FASB Statement No. 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans* (FAS 158), at the end of 2006, which required us to separately recognize the overfunded or underfunded status of our pension and OPEB plans as an asset or liability. The funded status represents the difference between the projected benefit obligation (PBO) and the fair value of the plan assets. The PBO is the present value of benefits earned to date by plan participants, including the effect of assumed future salary increases. The PBO of the OPEB plan is equal to the accumulated benefit obligation, as the present value of the OPEB liabilities is not affected by salary increases. Plan assets are measured at fair value. We use a December 31 measurement date for plan assets and obligations for all our retirement plans.

Changes in our PBO and plan assets are as follows for the years ended December 31:

| ***Funded Status*** | *Pension* | | *OPEB* | |
|---|---|---|---|---|
| *Millions of Dollars* | ***2008*** | *2007* | ***2008*** | *2007* |
| Projected Benefit Obligation | | | | |
| Projected benefit obligation at beginning of year | **$ 2,112** | $ 2,113 | **$ 326** | $ 374 |
| Service cost | **34** | 34 | **3** | 3 |
| Interest cost | **137** | 124 | **24** | 20 |
| Plan amendments | **-** | - | **(9)** | (10) |
| Actuarial loss (gain) | **132** | (33) | **101** | (34) |
| Gross benefits paid | **(143)** | (126) | **(27)** | (27) |
| Projected benefit obligation at end of year | **$ 2,272** | $ 2,112 | **$ 418** | $ 326 |
| Plan Assets | | | | |
| Fair value of plan assets at beginning of year | **$ 2,058** | $ 1,989 | **$ -** | $ - |
| Actual return on plan assets | **(592)** | 183 | **-** | - |
| Voluntary funded pension plan contributions | **200** | - | **-** | - |
| Other funded pension plan contributions | **8** | - | **-** | - |
| Non-qualified plan benefit contributions | **12** | 12 | **27** | 27 |
| Gross benefits paid | **(143)** | (126) | **(27)** | (27) |
| Fair value of plan assets at end of year | **$ 1,543** | $ 2,058 | **$ -** | $ - |
| Funded status at end of year | **$ (729)** | $ (54) | **$ (418)** | $ (326) |

Amounts recognized in the statement of financial position as of December 31, 2008 and 2007 consist of:

| | *Pension* | | *OPEB* | |
|---|---|---|---|---|
| *Millions of Dollars* | ***2008*** | *2007* | ***2008*** | *2007* |
| Noncurrent assets | **$ -** | $ 120 | **$ -** | $ - |
| Current liabilities | **(12)** | (11) | **(30)** | (27) |
| Noncurrent liabilities | **(717)** | (163) | **(388)** | (299) |
| Net amounts recognized at end of year | **$ (729)** | $ (54) | **$ (418)** | $ (326) |

Pre-tax amounts recognized in accumulated other comprehensive income/(loss) as of December 31, 2008 consist of:

| *Millions of Dollars* | *Pension* | *OPEB* | *Total* |
|---|---|---|---|
| Prior service (cost)/credit | $ (12) | $ 111 | $ 99 |
| Net actuarial loss | (1,023) | (172) | (1,195) |
| Total | $ (1,035) | $ (61) | $ (1,096) |

Pre-tax amounts recognized in accumulated other comprehensive income/(loss) as of December 31, 2007 consist of:

| *Millions of Dollars* | *Pension* | *OPEB* | *Total* |
|---|---|---|---|
| Prior service (cost)/credit | $ (18) | $ 137 | $ 119 |
| Net actuarial loss | (158) | (85) | (243) |
| Total | $ (176) | $ 52 | $ (124) |

Other pre-tax changes recognized in other comprehensive income during 2008 were as follows:

| *Millions of Dollars* | *Pension* | *OPEB* | *Total* |
|---|---|---|---|
| Prior service credit arising during the year | $ - | $ (9) | $ (9) |
| Net actuarial loss arising during the year | 875 | 101 | 976 |
| Amortization of prior service (cost)/credit | (6) | 34 | 28 |
| Amortization of actuarial (loss) | (10) | (13) | (23) |
| Total | $ 859 | $ 113 | $ 972 |

Amounts included in accumulated other comprehensive income expected to be amortized into net periodic cost (benefit) during 2009:

| *Millions of Dollars* | *Pension* | *OPEB* | *Total* |
|---|---|---|---|
| Prior service cost (credit) | $ 5 | $ (35) | $ (30) |
| Net actuarial loss | 26 | 15 | 41 |
| Total | $ 31 | $ (20) | $ 11 |

*Underfunded Accumulated Benefit Obligation* – The accumulated benefit obligation (ABO) is the present value of benefits earned to date, assuming no future salary growth. The underfunded accumulated benefit obligation represents the difference between the ABO and the fair value of plan assets. At December 31, 2007, the only pension plan that was underfunded was our non-qualified (supplemental) plan, which is not funded by design. At December 31, 2008, the non-qualified (supplemental) plan ABO was $189 million. The PBO, ABO, and fair value of plan assets for pension plans with accumulated benefit obligations in excess of the fair value of the plan assets were as follows for the years ended December 31:

| ***Underfunded Accumulated Benefit Obligation*** | | |
|---|---|---|
| *Millions of Dollars* | ***2008*** | *2007* |
| Projected benefit obligation | **$ (2,272)** | $ (175) |
| Accumulated benefit obligation | **$ (2,201)** | $ (172) |
| Fair value of plan assets | **1,543** | - |
| Underfunded Accumulated Benefit Obligation | **$ (658)** | $ (172) |

The ABO for all defined benefit pension plans was $2.2 billion and $2.0 billion at December 31, 2008 and 2007, respectively.

*Assumptions* – The weighted-average actuarial assumptions used to determine benefit obligations at December 31:

| | Pension | | OPEB | |
|---|---|---|---|---|
| *Percentages* | ***2008*** | *2007* | ***2008*** | *2007* |
| Discount rate | **6.25%** | 6.50% | **6.25%** | 6.50% |
| Salary increase | **3.50%** | 3.50% | **N/A** | N/A |
| Health care cost trend rate for next year (employees under 65) | **N/A** | N/A | **6.60%** | 8.00% |
| Health care cost trend rate for next year (employees over 65) | **N/A** | N/A | **9.40%** | 10.00% |
| Ultimate health care cost trend rate | **N/A** | N/A | **4.50%** | 5.00% |
| Year ultimate trend rate reached | **N/A** | N/A | **2028** | 2013 |

**Expense**

Both pension and OPEB expense are determined based upon the annual service cost of benefits (the actuarial cost of benefits earned during a period) and the interest cost on those liabilities, less the expected return on plan assets. The expected long-term rate of return on plan assets is applied to a calculated value of plan assets that recognizes changes in fair value over a five-year period. This practice is intended to reduce year-to-year volatility in pension expense, but it can have the effect of delaying the recognition of differences between actual returns on assets and expected returns based on long-term rate of return assumptions. Differences in actual experience in relation to assumptions are not recognized in net income immediately, but are deferred and, if necessary, amortized as pension or OPEB expense.

The components of our net periodic pension and OPEB cost/(benefit) were as follows for the years ended December 31:

| | Pension | | | OPEB | | |
|---|---|---|---|---|---|---|
| *Millions of Dollars* | ***2008*** | *2007* | *2006* | ***2008*** | *2007* | *2006* |
| Net Periodic Benefit Cost: | | | | | | |
| Service cost | **$ 34** | $ 34 | $ 35 | **$ 3** | $ 3 | $ 4 |
| Interest cost | **137** | 124 | 117 | **24** | 20 | 21 |
| Expected return on plan assets | **(152)** | (144) | (134) | **-** | - | - |
| Amortization of: | | | | | | |
| Prior service cost/(credit) | **6** | 6 | 7 | **(35)** | (33) | (33) |
| Actuarial loss | **10** | 18 | 21 | **13** | 8 | 13 |
| Net periodic benefit cost/(benefit) | **$ 35** | $ 38 | $ 46 | **$ 5** | $ (2) | $ 5 |

*Assumptions* – The weighted-average actuarial assumptions used to determine expense were as follows for the years ended December 31:

| | *Pension* | | | *OPEB* | | |
|---|---|---|---|---|---|---|
| *Percentages* | ***2008*** | *2007* | *2006* | ***2008*** | *2007* | *2006* |
| Discount rate | **6.50%** | 6.00% | 5.75% | **6.50%** | 6.00% | 5.75% |
| Expected return on plan assets | **8.00%** | 8.00% | 8.00% | **N/A** | N/A | N/A |
| Salary increase | **3.50%** | 3.00% | 2.75% | **N/A** | N/A | N/A |
| Health care cost trend rate for next year (employees under 65) | **N/A** | N/A | N/A | **8.00%** | 9.00% | 9.00% |
| Health care cost trend rate for next year (employees over 65) | **N/A** | N/A | N/A | **10.00%** | 11.00% | 9.00% |
| Ultimate healthcare cost trend rate | **N/A** | N/A | N/A | **5.00%** | 5.00% | 5.00% |
| Year ultimate trend reached | **N/A** | N/A | N/A | **2013** | 2013 | 2010 |

For 2008, the discount rate was based on a Mercer yield curve of high quality corporate bonds with cash flows matching our plans' expected benefit payments. For 2007 and 2006, the discount rate was based on a hypothetical portfolio of high quality corporate bonds with cash flows matching our plans' expected benefit payments. The expected return on plan assets is based on our asset allocation mix and our historical return, taking into account current and expected market conditions. The actual return (loss) on pension plan assets, net of fees, was approximately (30)% in 2008, 9% in 2007, and 14% in 2006.

Assumed healthcare cost trend rates have a significant effect on the expense and liabilities reported for healthcare plans. The assumed healthcare cost trend rate is based on historical rates and expected market conditions. A one-percentage point change in the assumed healthcare cost trend rates would have the following effects on OPEB:

| *Millions of Dollars* | *One % pt. Increase* | *One % pt. Decrease* |
|---|---|---|
| Effect on total service and interest cost components | $ 3 | $ (2) |
| Effect on accumulated benefit obligation | 42 | (35) |

**Cash Contributions**

The following table details our cash contributions for the qualified pension plan and the benefit payments for the non-qualified and OPEB plans:

| | *Pension* | | |
|---|---|---|---|
| *Millions of Dollars* | *Qualified* | *Non-qualified* | *OPEB* |
| 2007 | $ - | $ 12 | $ 27 |
| 2008 | 208 | 12 | 27 |
| 2009 Expected | 25 [a] | 12 | 30 |

[a] *While we do not expect any required contributions during 2009, we intend to fund at least $25 million. This amount may be higher based on cash generated from operations and financial market considerations.*

Our policy with respect to funding the qualified plans is to fund at least the minimum required by the Pension Protection Act of 2006 and not more than the maximum amount deductible for tax purposes. All contributions made to the qualified pension plans in 2008 were voluntary and were made with cash generated from operations.

The OPEB plans are not funded and are not subject to any minimum regulatory funding requirements. Benefit payments for each year represent claims paid for medical and life insurance, and we anticipate our 2009 OPEB payments will be made from cash generated from operations.

**Benefit Payments**

The following table details expected benefit payments for the years 2009 through 2018:

| *Millions of Dollars* | *Pension* | *OPEB* |
|---|---|---|
| 2009 | $ 132 | $ 30 |
| 2010 | 136 | 30 |
| 2011 | 142 | 31 |
| 2012 | 147 | 31 |
| 2013 | 154 | 32 |
| Years 2014 -2018 | 857 | 161 |

**Asset Allocation Strategy**

Our pension plan asset allocation at December 31, 2008 and 2007, and target allocation for 2009, are as follows:

| | *Target Allocation 2009* | *Percentage of Plan Assets December 31,* | |
|---|---|---|---|
| | | ***2008*** | *2007* |
| Equity securities | 60% to 70% | **68%** | 68% |
| Debt securities | 20% to 30% | **23** | 23 |
| Real estate | 2% to 8% | **6** | 4 |
| Commodities | 4% to 6% | **3** | 5 |
| Total | | **100%** | 100% |

The investment strategy for pension plan assets is to maintain a broadly diversified portfolio designed to achieve our target of an average long-term rate of return of 8%. While we believe we can achieve a long-term average rate of return of 8%, we cannot be certain that the portfolio will perform to our expectations. Assets are strategically allocated among equity, debt, and other investments in order to achieve a diversification level that dampens fluctuations in investment returns. Asset allocation target ranges for equity, debt, and other portfolios are evaluated at least every three years with the assistance of an independent external consulting firm. Actual asset allocations are monitored monthly, and rebalancing actions are executed at least quarterly, if needed.

The pension plan investments are held in a Master Trust, with The Northern Trust Company. Investments in the Master Trust are valued at fair value, which has been determined based on fair value of the underlying investments of the Master Trust. Investments in securities traded on public security exchanges are valued at their closing market prices on the valuation date; where no sale was made on the valuation date, the security is generally valued at its most recent bid price. Certain short-term investments are carried at cost, which approximates fair value. Investments in registered investment companies and common trust funds, which primarily invest in stocks, bonds, and commodity futures, are valued using publicly available market prices for the underlying investments held by these entities.

The majority of pension plan assets are invested in equity securities, because equity portfolios have historically provided higher returns than debt and other asset classes over extended time horizons, and are expected to do so in the future. Correspondingly, equity investments also entail greater risks than other investments. Equity risks are balanced by investing a significant portion of the plan's assets in high quality debt securities. The average quality rating of the debt portfolio exceeded AA as of December 31, 2008 and 2007. The debt portfolio is also broadly diversified and invested primarily in U.S. Treasury, mortgage, and corporate securities with an intermediate average maturity. The weighted-average maturity of the debt portfolio was 5 years at both December 31, 2008 and 2007, respectively.

The investment of pension plan assets in securities issued by Union Pacific is specifically prohibited for both the equity and debt portfolios, other than through index fund holdings.

**Other Retirement Programs**

*Thrift Plan* – We provide a defined contribution plan (thrift plan) to eligible non-union employees and make matching contributions to the thrift plan. We match 50 cents for each dollar contributed by employees up to the first six percent of compensation contributed. Our thrift plan contributions were $14 million in 2008, $14 million in 2007, and $13 million in 2006.

*Railroad Retirement System* – All Railroad employees are covered by the Railroad Retirement System (the System). Contributions made to the System are expensed as incurred and amounted to approximately $620 million in 2008, $616 million in 2007, and $615 million in 2006.

*Collective Bargaining Agreements* – Under collective bargaining agreements, we provide certain postretirement healthcare and life insurance benefits for eligible union employees. Premiums under the plans are expensed as incurred and amounted to $49 million in 2008 and $40 million in both 2007 and 2006.

**5. Other Income**

Other income included the following for the years ended December 31:

| *Millions of Dollars* | ***2008*** | *2007* | *2006* |
|---|---|---|---|
| Rental income | **$ 87** | $ 68 | $ 83 |
| Net gain on non-operating asset dispositions | **41** | 52 | 72 |
| Interest income | **21** | 50 | 29 |
| Sale of receivables fees | **(23)** | (35) | (33) |
| Non-operating environmental costs and other | **(34)** | (19) | (33) |
| Total | **$ 92** | $ 116 | $ 118 |

**6. Income Taxes**

Components of income tax expense/(benefit) were as follows for the years ended December 31:

| *Millions of Dollars* | ***2008*** | *2007* | *2006* |
|---|---|---|---|
| Current | **$ 771** | $ 822 | $ 684 |
| Deferred | **681** | 354 | 235 |
| Unrecognized tax benefits | **(134)** | (22) | N/A |
| Total income tax expense | **$ 1,318** | $ 1,154 | $ 919 |

For the years ended December 31, reconciliation between statutory and effective tax rates is as follows:

| *Tax Rate Percentages* | ***2008*** | *2007* | *2006* |
|---|---|---|---|
| Federal statutory tax rate | **35.0%** | 35.0% | 35.0% |
| State statutory rates, net of federal benefits | **3.0** | 2.9 | 2.9 |
| Deferred tax adjustments | **(0.7)** | 1.0 | (0.5) |
| Tax credits | **(0.9)** | (0.6) | (1.0) |
| Other | **(0.3)** | 0.1 | - |
| Effective tax rate | **36.1%** | 38.4% | 36.4% |

In the third quarter of 2007, the State of Illinois enacted legislation that changed how we determine the amount of our income subject to Illinois tax. This legislation caused an increase to our deferred tax expense of $27 million for 2007. In January of 2008, Illinois enacted technical corrections legislation that made additional changes in how we determine the amount of our income subject to Illinois tax. This technical corrections legislation resulted in a reduction of deferred tax expense of $16 million in the first quarter of 2008.

Deferred tax assets and liabilities are recorded for the expected future tax consequences of events that are reported in different periods for financial reporting and income tax purposes. The majority of our deferred tax liabilities relate to differences between the tax bases and financial reporting amounts of our land and depreciable property, due to accelerated tax depreciation, revaluation of assets in purchase accounting transactions, and differences in capitalization methods.

Deferred income tax liabilities/(assets) were comprised of the following at December 31:

| *Millions of Dollars* | ***2008*** | *2007* |
|---|---|---|
| Net current deferred income tax asset | **$ (276)** | $ (336) |
| Property | **10,006** | 9,467 |
| State taxes, net of federal benefits | **675** | 691 |
| Other | **(399)** | (108) |
| Net long-term deferred income tax liabilities | **10,282** | 10,050 |
| Net deferred income tax liability | **$ 10,006** | $ 9,714 |

Under FIN 48, tax benefits are recognized only for tax positions that are more likely than not to be sustained upon examination by tax authorities. The amount recognized is measured as the largest amount

of benefit that is greater than 50 percent likely to be realized upon settlement. Unrecognized tax benefits are tax benefits claimed in our tax returns that do not meet these recognition and measurement standards.

We adopted FIN 48 on January 1, 2007. At adoption, our total liabilities for unrecognized tax benefits were $227 million pre-tax, or $173 million after including tax benefits for the deductibility of interest and state taxes. Of this amount, $7 million was recorded as a decrease to beginning retained earnings for the cumulative effect of adopting FIN 48. The remaining $166 million had been previously accrued under either FASB Statement No. 5, *Accounting for Contingencies*, or FASB Statement No. 109, *Accounting for Income Taxes*. The entire $173 million was classified as non-current in the Consolidated Statement of Financial Position.

A reconciliation of changes in unrecognized tax benefits liabilities/(assets) from the beginning to the end of the reporting period is as follows:

| *Millions of Dollars* | ***2008*** | *2007* |
|---|---|---|
| Unrecognized tax benefits at January 1 | **$ 161** | $ 227 |
| Increases for positions taken in current year | **10** | 15 |
| Increases for positions taken in prior years | **1** | 7 |
| Decreases for positions taken in prior years | **(23)** | (45) |
| Decreases for positions expected to be taken in future years | **-** | (41) |
| Settlements with taxing authorities | **(55)** | (1) |
| Increases (decreases) for interest and penalties | **(68)** | 3 |
| Other increases (decreases) | **-** | (4) |
| Unrecognized tax benefits at December 31 | **$ 26** | $ 161 |

A portion of our unrecognized tax benefits would, if recognized, reduce our effective tax rate. The remaining unrecognized tax benefits relate to tax positions for which only the timing of the benefit is uncertain. Recognition of these tax benefits would reduce our effective tax rate only through a reduction of accrued interest and penalties. The unrecognized tax benefits that would reduce our effective tax rate are as follows:

| *Millions of Dollars* | ***2008*** | *2007* |
|---|---|---|
| Unrecognized tax benefits that would reduce the effective tax rate | **$ 79** | $ 142 |
| Unrecognized tax benefits that would not reduce the effective tax rate | **(53)** | 19 |
| Total unrecognized tax benefits | **$ 26** | $ 161 |

We recognize interest and penalties as part of income tax expense. Total accrued liabilities for interest and penalties were $10 million and $78 million at December 31, 2008 and 2007, respectively. Total interest and penalties recognized as part of income tax expense (benefit) were $(9) million for 2008 and $3 million for 2007.

For all federal income tax years prior to 1995, the Internal Revenue Service (IRS) examinations have been completed and the statute of limitations bars any additional tax assessments. We filed interest refund claims in 2007 for years 1986 through 1994, and we received the refunds in April of 2008. However, some interest calculation issues remain open back to 1986. In the third quarter of 2008, we signed a closing agreement resolving all tax matters at IRS Appeals for tax years 1995 through 1998. In connection with the settlement, in the fourth quarter of 2008 we paid the IRS $52 million of tax and $67 million of interest, which substantially reduced our liability for unrecognized tax benefits. The settlement

had an immaterial effect on our income tax expense. The statute of limitations for these years will expire in 2009, except for calculations of interest.

The IRS has completed its examinations and issued notices of deficiency for tax years 1999 through 2004. We disagree with many of their proposed adjustments, and we are at IRS Appeals for these years. The IRS is examining our tax returns for tax years 2005 and 2006. Additionally, several state tax authorities are examining our state income tax returns for tax years 2000 through 2006.

We do not expect that the amount of unrecognized tax benefits will change significantly during the next 12 months, although it is reasonably possible that we may resolve several state tax disputes that could reduce unrecognized tax benefits by approximately $5 - 10 million. Of the $26 million balance at December 31, 2008, $7 million is classified as current in the Consolidated Statement of Financial Position, primarily for state payments related to the settlement for tax years 1995 through 1998 described above.

**7. Earnings Per Share**

The following table provides a reconciliation between basic and diluted earnings per share for the years ended December 31:

| *Millions of Dollars, Except Per Share Amounts* | ***2008*** | *2007* | *2006* |
|---|---|---|---|
| Net income | **$ 2,338** | $ 1,855 | $ 1,606 |
| Weighted-average number of shares outstanding: | | | |
| Basic | **510.6** | 531.9 | 538.9 |
| Dilutive effect of stock options | **3.4** | 4.2 | 4.0 |
| Dilutive effect of retention shares and units | **1.0** | 0.7 | 1.0 |
| Diluted | **515.0** | 536.8 | 543.9 |
| Earnings per share – basic | **$ 4.58** | $ 3.49 | $ 2.98 |
| Earnings per share – diluted | **$ 4.54** | $ 3.46 | $ 2.95 |

Common stock options totaling 1.0 million, 0.8 million, and 2.8 million for 2008, 2007, and 2006, respectively, were excluded from the computation of diluted earnings per share because the exercise prices of these options exceeded the average market price of our common stock for the respective periods, and the effect of their inclusion would be anti-dilutive.

**8. Comprehensive Income/(Loss)**

Comprehensive income/(loss) was as follows:

| *Millions of Dollars* | ***2008*** | *2007* | *2006* |
|---|---|---|---|
| Net income | **$ 2,338** | $ 1,855 | $ 1,606 |
| Other comprehensive income/(loss): | | | |
| Defined benefit plans | **(604)** | 65 | 170 |
| Foreign currency translation | **(26)** | 2 | (4) |
| Derivatives | **-** | 1 | 1 |
| Total other comprehensive income/(loss) [a] | **(630)** | 68 | 167 |
| Total comprehensive income | **$ 1,708** | $ 1,923 | $ 1,773 |

*[a] Net of deferred taxes of $390 million, $52 million, and $102 million during 2008, 2007, and 2006, respectively.*

The after-tax components of accumulated other comprehensive loss were as follows:

| *Millions of Dollars* | ***Dec. 31, 2008*** | *Dec. 31, 2007* |
|---|---|---|
| Defined benefit plans | **$ (659)** | $ (55) |
| Foreign currency translation | **(41)** | (15) |
| Derivatives | **(4)** | (4) |
| Total | **$ (704)** | $ (74) |

## 9. Properties

The following table lists the major categories of property and equipment, as well as the average composite depreciation rate for each category:

| *Millions of Dollars, Except Percentages* | | ***Dec. 31, 2008*** | | *Dec. 31, 2007* | *Depreciation Rate for 2008* |
|---|---|---|---|---|---|
| Land | **$** | **4,861** | $ | 4,760 | N/A |
| Road | | | | | |
| Rail and other track material | | **11,366** | | 10,622 | 4.2% |
| Ties | | **6,827** | | 6,354 | 2.7% |
| Ballast | | **3,635** | | 3,369 | 2.9% |
| Other [a] | | **12,520** | | 11,865 | 2.3% |
| Total Road | | **34,348** | | 32,210 | 3.1% |
| Equipment | | | | | |
| Locomotives | | **5,157** | | 5,092 | 4.7% |
| Freight cars | | **1,985** | | 2,059 | 4.1% |
| Work equipment and other | | **158** | | 157 | 3.6% |
| Total Equipment | | **7,300** | | 7,308 | 4.5% |
| Technology and other | | **468** | | 441 | 12.7% |
| Construction in progress | | **938** | | 935 | N/A |
| Total properties | **$** | **47,915** | $ | 45,654 | N/A |
| Accumulated depreciation | | **(12,214)** | | (11,496) | N/A |
| Net properties | **$** | **35,701** | $ | 34,158 | N/A |

*[a] Other includes grading, bridges and tunnels, signals, buildings, and other road assets.*

**Property and Depreciation –** Our rail operations are highly capital intensive. Each year we develop a capital program for the acquisition or construction of fixed assets. Assets purchased or constructed throughout the year that were not part of the original program are capitalized if they meet applicable minimum units of property criteria, which are approved by the STB. Properties are carried at cost, and we follow the group method of depreciation. Our large base of homogeneous, network-type assets turns over on a continuous basis. The group method of depreciation treats each asset class as a pool of resources, not as singular items. Under group depreciation, all items with similar physical characteristics, use, and expected life are grouped together in a single asset class, and are depreciated using composite depreciation rates. The cost (net of salvage) of depreciable rail property retired or replaced in the ordinary course of business is charged to accumulated depreciation and no gain or loss is recognized. A gain or loss is recognized in other income for all other property upon disposition because the gain or loss is not part of rail operations.

We compute depreciation principally on the straight-line method based on estimated service lives of depreciable property. We use a unit of production convention to depreciate rail in high-density traffic corridors. We calculate service lives using Company-specific retirement data. We perform and submit depreciation rate studies to the STB at least every three years for equipment and every six years for road property (i.e., rail and other track material, ties, and ballast). These rate studies, are reviewed and approved by the STB. These studies are used to develop our approved composite depreciation rates by asset class.

When we purchase an asset, we capitalize all costs necessary to make the asset ready for its intended use. However, many of our assets are self-constructed. A large portion of our capital expenditures is for track structure expansion (capacity projects) and replacement (program projects), which is typically performed by our employees. Approximately 13% of our full-time equivalent employees are dedicated to the construction of capital assets. Costs that are directly attributable or overhead costs that relate directly to capital projects are capitalized. Direct costs that are capitalized as part of self-constructed assets include material, labor, and work equipment. Indirect costs are capitalized if they clearly relate to the construction of the asset. These costs are allocated using appropriate statistical bases. The capitalization of indirect costs is consistent with FASB Statement No. 67, *Accounting for Costs and Initial Rental Operations of Real Estate Projects.*

General and administrative expenditures are expensed as incurred. Normal repairs and maintenance are also expensed as incurred, while costs incurred that extend the useful life of an asset, improve the safety of our operations or improve operating efficiency are capitalized.

Assets held under capital leases are recorded at the lower of the net present value of the minimum lease payments or the fair value of the leased asset at the inception of the lease. Amortization expense is computed using the straight-line method over the shorter of the estimated useful lives of the assets or the period of the related lease.

**10. Accounts Payable and Other Current Liabilities**

| *Millions of Dollars* | ***Dec. 31, 2008*** | *Dec. 31, 2007* |
|---|---|---|
| Accounts payable | **$ 629** | $ 732 |
| Accrued wages and vacation | **367** | 394 |
| Accrued casualty costs | **390** | 371 |
| Income and other taxes | **207** | 343 |
| Dividends and interest | **328** | 284 |
| Equipment rents payable | **93** | 103 |
| Other | **546** | 675 |
| Total accounts payable and other current liabilities | **$ 2,560** | $ 2,902 |

**11. Fair Value Measurements**

During the first quarter of 2008, we fully adopted FASB Statement No. 157, *Fair Value Measurements* (FAS 157). FAS 157 established a framework for measuring fair value and expanded disclosures about fair value measurements. The adoption of FAS 157 had no impact on our financial position or results of operations.

FAS 157 applies to all assets and liabilities that are measured and reported on a fair value basis. This enables the reader of the financial statements to assess the inputs used to develop those measurements by establishing a hierarchy for ranking the quality and reliability of the information used to determine fair values. The statement requires that each asset and liability carried at fair value be classified into one of the following categories:

Level 1: Quoted market prices in active markets for identical assets or liabilities.
Level 2: Observable market based inputs or unobservable inputs that are corroborated by market data.
Level 3: Unobservable inputs that are not corroborated by market data.

At December 31, 2008, the fair value of our derivative asset was approximately $19 million (see note 12). We determined the fair value of our derivative financial instrument position based upon current fair values as quoted by recognized dealers or the present value of expected future cash flows. As prescribed by FAS 157, we recognize the fair value of our derivative assets as a Level 2 valuation.

**12. Financial Instruments**

**Strategy and Risk** – We may use derivative financial instruments in limited instances for other than trading purposes to assist in managing our overall exposure to fluctuations in interest rates and fuel prices. We are not a party to leveraged derivatives and, by policy, do not use derivative financial instruments for speculative purposes. Derivative financial instruments qualifying for hedge accounting must maintain a specified level of effectiveness between the hedging instrument and the item being hedged, both at inception and throughout the hedged period. We formally document the nature and relationships between the hedging instruments and hedged items at inception, as well as our risk-management objectives, strategies for undertaking the various hedge transactions, and method of assessing hedge effectiveness. Changes in the fair market value of derivative financial instruments that do not qualify for hedge accounting are charged to earnings. We may use swaps, collars, futures, and/or forward contracts to mitigate the risk of adverse movements in interest rates and fuel prices; however, the use of these derivative financial instruments may limit future benefits from favorable price movements.

**Market and Credit Risk** – We address market risk related to derivative financial instruments by selecting instruments with value fluctuations that highly correlate with the underlying hedged item. We manage credit risk related to derivative financial instruments, which is minimal, by requiring high credit standards for counterparties and periodic settlements. At December 31, 2008 and 2007, we were not required to provide collateral, nor had we received collateral, relating to our hedging activities.

**Determination of Fair Value** – We determine the fair values of our derivative financial instrument positions based upon current fair values as quoted by recognized dealers or the present value of expected future cash flows.

**Interest Rate Fair Value Hedges** – We manage our overall exposure to fluctuations in interest rates by adjusting the proportion of fixed and floating rate debt instruments within our debt portfolio over a given period. We generally manage the mix of fixed and floating rate debt through the issuance of targeted amounts of each as debt matures or as we require incremental borrowings. We employ derivatives, primarily swaps, as one of the tools to obtain the targeted mix. In addition, we also obtain flexibility in managing interest costs and the interest rate mix within our debt portfolio by evaluating the issuance of and managing outstanding callable fixed-rate debt securities.

Swaps allow us to convert debt from fixed rates to variable rates and thereby hedge the risk of changes in the debt's fair value attributable to the changes in interest rates. We account for swaps as fair value hedges using the short-cut method pursuant to FASB Statement No. 133, *Accounting for Derivative Instruments and Hedging Activities*; therefore, we do not record any ineffectiveness within our Consolidated Financial Statements.

The following is a summary of our interest rate derivatives qualifying as fair value hedges:

| *Millions of Dollars, Except Percentages* | ***2008*** | *2007* |
|---|---|---|
| Amount of debt hedged | **$ 250** | $ 250 |
| Percentage of total debt portfolio | **3%** | 3% |
| Gross fair value asset position | **$ 19** | $ 2 |

**Interest Rate Cash Flow Hedges** – We report changes in the fair value of cash flow hedges in accumulated other comprehensive loss until the hedged item affects earnings. At both December 31, 2008 and 2007, we had reductions of $4 million recorded as an accumulated other comprehensive loss that is being amortized on a straight-line basis through September 30, 2014. As of December 31, 2008 and 2007, we had no interest rate cash flow hedges outstanding.

**Earnings Impact** – Our use of derivative financial instruments had the following impact on pre-tax income for the years ended December 31:

| *Millions of Dollars* | ***2008*** | *2007* | *2006* |
|---|---|---|---|
| (Increase)/decrease in interest expense from interest rate hedging | **$ 1** | $ (8) | $ (8) |
| (Increase)/decrease in fuel expense from fuel derivatives | **1** | (1) | 3 |
| Increase/(decrease) in pre-tax income | **$ 2** | $ (9) | $ (5) |

**Fair Value of Debt Instruments** – The fair value of our short- and long-term debt was estimated using quoted market prices, where available, or current borrowing rates. At December 31, 2008, the fair value of total debt is approximately $247 million less than the carrying value. At December 31, 2007, the fair value of total debt exceeded the carrying value by approximately $96 million. At December 31, 2008 and 2007, approximately $320 million and $181 million, respectively, of fixed-rate debt securities contained call provisions that allowed us to retire the debt instruments prior to final maturity, with the payment of fixed call premiums, or in certain cases, at par.

**Sale of Receivables** – The Railroad transfers most of its accounts receivable to Union Pacific Receivables, Inc. (UPRI), a bankruptcy-remote subsidiary, as part of a sale of receivables facility. UPRI sells, without recourse on a 364-day revolving basis, an undivided interest in such accounts receivable to investors. The total capacity to sell undivided interests to investors under the facility was $700 million and $600 million at December 31, 2008 and 2007, respectively. The value of the outstanding undivided interest held by investors under the facility was $584 million and $600 million at December 31, 2008 and 2007, respectively. UPRI reduced the outstanding undivided interest held by investors due to a decrease in available receivables at December 31, 2008. The value of the outstanding undivided interest held by investors is not included in our Consolidated Financial Statements. The value of the undivided interest held by investors was supported by $1,015 million and $1,071 million of accounts receivable held by UPRI at December 31, 2008 and 2007, respectively. At December 31, 2008 and 2007, the value of the interest retained by UPRI was $431 million and $471 million, respectively. This retained interest is included in accounts receivable in our Consolidated Financial Statements. The interest sold to investors is sold at carrying value, which approximates fair value, and there is no gain or loss recognized from the transaction.

The value of the outstanding undivided interest held by investors could fluctuate based upon the availability of eligible receivables and is directly affected by changing business volumes and credit risks, including default and dilution. If default or dilution percentages were to increase one percentage point, the amount of eligible receivables would decrease by $6 million. Should our credit rating fall below investment grade, the value of the outstanding undivided interest held by investors would be reduced, and, in certain cases, the investors would have the right to discontinue the facility.

The Railroad services the sold receivables; however, the Railroad does not recognize any servicing asset or liability as the servicing fees adequately compensate us for these responsibilities. The Railroad collected approximately $17.8 billion and $16.1 billion during the years ended December 31, 2008 and 2007, respectively. UPRI used certain of these proceeds to purchase new receivables under the facility.

The costs of the sale of receivables program are included in other income and were $23 million, $35 million, and $33 million for 2008, 2007, and 2006, respectively. The costs include interest, program fees paid to banks, commercial paper issuing costs, and fees for unused commitment availability.

The investors have no recourse to the Railroad's other assets except for customary warranty and indemnity claims. Creditors of the Railroad do not have recourse to the assets of UPRI. In October 2008, we extended the sale of receivables program to August 2009 without any significant changes in terms, except to increase the capacity to sell undivided interests to $660 million. The capacity was increased to $700 million in December 2008. At January 16, 2009 the amount utilized under the sale of receivables program was $560 million.

**13. Debt**

Total debt as of December 31, 2008 and 2007, net of interest rate swaps designated as fair value hedges, is summarized below:

| *Millions of Dollars* | ***2008*** | *2007* |
|---|---|---|
| Notes and debentures, 3.0% to 7.9% due through 2054 [a] | **$ 6,934** | $ 5,968 |
| Capitalized leases, 4.7% to 9.5% due through 2028 | **1,270** | 1,219 |
| Equipment obligations, 6.2% to 8.1% due through 2031 | **255** | 291 |
| Tax-exempt financings, 4.0% to 5.7% due through 2026 | **185** | 188 |
| Commercial paper, 3.35% to 4.3% due through 2009 | **100** | - |
| Floating rate term loan, due through 2013 | **100** | - |
| Medium-term notes, 9.2% to 10.0% due through 2020 | **61** | 61 |
| Mortgage bonds, 4.8% due through 2030 | **58** | 59 |
| Other [b] | **76** | - |
| Unamortized discount | **(112)** | (104) |
| Total debt [a] | **$ 8,927** | $ 7,682 |
| Less current portion | **(320)** | (139) |
| Total long-term debt | **$ 8,607** | $ 7,543 |

*[a] 2008 and 2007 included a write-up of $19 million and $2 million, respectively, due to market value adjustments for debt with qualifying fair value hedges that are recorded on the Consolidated Statements of Financial Position.*
*[b] This amount was repaid during January of 2009.*

**Debt Maturities** – The following table presents aggregate debt maturities as of December 31, 2008, excluding market value adjustments.

| *Millions of Dollars* | |
|---|---|
| 2009 | $ 720 |
| 2010 | 465 |
| 2011 | 555 |
| 2012 | 746 |
| 2013 | 713 |
| Thereafter | 5,728 |
| Total debt | $ 8,927 |

As of December 31, 2008, we have reclassified as long-term debt approximately $400 million of debt due within one year that we intend to refinance. This reclassification reflects our ability and intent to refinance any short-term borrowings and certain current maturities of long-term debt on a long-term basis. At December 31, 2007, we reclassified as long-term debt approximately $550 million of debt due within one year that we intended to refinance at that time.

**Mortgaged Properties** – Equipment with a carrying value of approximately $2.7 billion and $2.8 billion at December 31, 2008 and 2007, respectively, serves as collateral for capital leases and other types of equipment obligations in accordance with the secured financing arrangements utilized to acquire such railroad equipment.

As a result of the merger of Missouri Pacific Railroad Company (MPRR) with and into UPRR on January 1, 1997, and pursuant to the underlying indentures for the MPRR mortgage bonds, UPRR must maintain the same value of assets after the merger in order to comply with the security requirements of the mortgage bonds. As of the merger date, the value of the MPRR assets that secured the mortgage bonds was approximately $6.0 billion. In accordance with the terms of the indentures, this collateral value must be maintained during the entire term of the mortgage bonds irrespective of the outstanding balance of such bonds.

**Credit Facilities** – On December 31, 2008, we had $1.9 billion of credit available under our revolving credit facility (the facility). The facility is designated for general corporate purposes and supports the issuance of commercial paper. We did not draw on the facility during 2008. Commitment fees and interest rates payable under the facility are similar to fees and rates available to comparably rated, investment-grade borrowers. The facility allows borrowings at floating rates based on London Interbank Offered Rates, plus a spread, depending upon our senior unsecured debt ratings. The facility requires Union Pacific Corporation to maintain a debt-to-net-worth coverage ratio as a condition to making a borrowing. At December 31, 2008, and December 31, 2007 (and at all times during these periods), we were in compliance with this covenant.

The definition of debt used for purposes of calculating the debt-to-net-worth coverage ratio includes, among other things, certain credit arrangements, capital leases, guarantees and unfunded and vested pension benefits under Title IV of ERISA. At December 31, 2008, the debt-to-net-worth coverage ratio allowed us to carry up to $30.9 billion of debt (as defined in the facility), and we had $9.9 billion of debt (as defined in the facility) outstanding at that date. Under our current capital plans, we expect to continue to satisfy the debt-to-net-worth coverage ratio; however, many factors beyond our reasonable control (including the Risk Factors in Item 1A of this report) could affect our ability to comply with this provision in the future. The facility does not include any other financial restrictions, credit rating triggers (other than rating-dependent pricing), or any other provision that could require us to post collateral. The

facility also includes a $75 million cross-default provision and a change-of-control provision. The term of the facility will expire in April 2012, and we currently intend to replace the facility with a substantially similar credit agreement on or before the expiration date, which is consistent with our past practices with respect to our credit facilities.

At December 31, 2008, we had $100 million of commercial paper outstanding. Our commercial paper balance is supported by our revolving credit facility but does not reduce the amount of borrowings available under the facility. During 2008, we issued $600 million of commercial paper, including $300 million issued in September and October as the credit and financial markets deteriorated, and repaid $500 million.

**Shelf Registration Statement and Significant New Borrowings** – Under our current shelf registration statement, we may issue, from time to time, any combination of debt securities, preferred stock, common stock, or warrants for debt securities or preferred stock in one or more offerings. In July 2008, our Board of Directors authorized the issuance of an additional $3 billion of debt securities under our shelf registration. At December 31, 2008, we had authority to issue up to $3 billion of debt securities.

During 2008, we issued the following unsecured, fixed-rate debt securities under our current shelf registration:

| *Date* | *Description of Securities* |
|---|---|
| February 5, 2008 | $750 million of 5.70% Notes due August 15, 2018 |
| October 7, 2008 | $750 million of 7.875% Notes due January 15, 2019 |

The net proceeds from these offerings were for general corporate purposes, including the repurchase of common stock pursuant to our share repurchase program. These debt securities include change-of-control provisions.

We have no immediate plans to issue equity securities; however, we will continue to explore opportunities to replace existing debt or access capital through issuances of debt securities under our shelf registration, and, therefore, we may issue additional debt securities at any time.

On April 17, 2008, we borrowed $100 million under a 5-year-term loan facility (the loan). The loan has a floating rate based on London Interbank Offered Rates, plus a spread, and is prepayable in whole or in part without a premium prior to maturity. The agreement documenting the loan has provisions similar to our revolving credit facility, including identical debt-to-net-worth covenant and change-of-control provisions and similar customary default provisions. The agreement does not include any other financial restrictions, credit rating triggers, or any other provision that would require us to post collateral.

**14. Leases**

We lease certain locomotives, freight cars, and other property. The Consolidated Statement of Financial Position as of December 31, 2008 and 2007 included $2,024 million, net of $869 million of amortization, and $2,062 million, net of $887 million of amortization, respectively, for properties held under capital leases. A charge to income resulting from the amortization for assets held under capital leases is included within depreciation expense in our Consolidated Statements of Income. Future minimum lease payments for operating and capital leases with initial or remaining non-cancelable lease terms in excess of one year as of December 31, 2008 were as follows:

| *Millions of Dollars* | *Operating Leases* | *Capital Leases* |
|---|---|---|
| 2009 | $ 657 | $ 188 |
| 2010 | 614 | 168 |
| 2011 | 580 | 178 |
| 2012 | 465 | 122 |
| 2013 | 389 | 152 |
| Later years | 3,204 | 1,090 |
| Total minimum lease payments | $ 5,909 | $ 1,898 |
| Amount representing interest | N/A | 628 |
| Present value of minimum lease payments | N/A | $ 1,270 |

The majority of capital lease payments relate to locomotives. Rent expense for operating leases with terms exceeding one month was $747 million in 2008, $810 million in 2007, and $798 million in 2006. When cash rental payments are not made on a straight-line basis, we recognize variable rental expense on a straight-line basis over the lease term. Contingent rentals and sub-rentals are not significant.

**15. Commitments and Contingencies**

**Asserted and Unasserted Claims** – Various claims and lawsuits are pending against us and certain of our subsidiaries. We cannot fully determine the effect of all asserted and unasserted claims on our consolidated results of operations, financial condition, or liquidity; however, to the extent possible, where asserted and unasserted claims are considered probable and where such claims can be reasonably estimated, we have recorded a liability. We do not expect that any known lawsuits, claims, environmental costs, commitments, contingent liabilities, or guarantees will have a material adverse effect on our consolidated results of operations, financial condition, or liquidity after taking into account liabilities and insurance recoveries previously recorded for these matters.

**Personal Injury** – The cost of personal injuries to employees and others related to our activities is charged to expense based on estimates of the ultimate cost and number of incidents each year. We use third-party actuaries to assist us in measuring the expense and liability, including unasserted claims. The Federal Employers' Liability Act (FELA) governs compensation for work-related accidents. Under FELA, damages are assessed based on a finding of fault through litigation or out-of-court settlements. We offer a comprehensive variety of services and rehabilitation programs for employees who are injured at work.

Our personal injury liability is discounted to present value using applicable U.S. Treasury rates. Approximately 88% of the recorded liability related to asserted claims, and approximately 12% related to unasserted claims at December 31, 2008. Because of the uncertainty surrounding the ultimate outcome of personal injury claims, it is reasonably possible that future costs to settle these claims may range from

approximately $621 million to $677 million. We believe that the $621 million liability recorded at December 31, 2008, is the best estimate of the present value of the future settlement costs of personal injury claims. Our personal injury liability activity was as follows:

| *Millions of Dollars* | ***2008*** | *2007* | *2006* |
|---|---|---|---|
| Beginning balance | **$ 593** | $ 631 | $ 619 |
| Accruals | **201** | 165 | 240 |
| Payments | **(173)** | (203) | (228) |
| Ending balance at December 31 | **$ 621** | $ 593 | $ 631 |
| Current portion, ending balance at December 31 | **$ 186** | $ 204 | $ 233 |

**Asbestos** – We are a defendant in a number of lawsuits in which current and former employees and other parties allege exposure to asbestos. We engage a third party with extensive experience in estimating resolution costs for asbestos-related claims to assist us in assessing our potential liability. This liability is updated annually and excludes future defense and processing costs. The liability for resolving both asserted and unasserted claims was based on the following assumptions:

- The ratio of future claims by alleged disease would be consistent with historical averages.
- The number of claims filed against us will decline each year.
- The average settlement values for asserted and unasserted claims will be equivalent to historical averages.
- The percentage of claims dismissed in the future will be equivalent to historical averages.

| *Millions of Dollars* | ***2008*** | *2007* | *2006* |
|---|---|---|---|
| Beginning balance | **$ 265** | $ 302 | $ 311 |
| Accruals/(credits) | **(42)** | (20) | - |
| Payments | **(10)** | (17) | (9) |
| Ending balance at December 31 | **$ 213** | $ 265 | $ 302 |
| Current portion, ending balance at December 31 | **$ 12** | $ 11 | $ 13 |

Our liability for asbestos-related claims is not discounted to present value due to the uncertainty surrounding the timing of future payments. Approximately 17% of the recorded liability related to asserted claims and approximately 83% related to unasserted claims at December 31, 2008. These claims are expected to be paid out over the next 30 years. In conjunction with the liability update performed in 2008, we also reassessed estimated insurance recoveries. We have recognized an asset for estimated insurance recoveries at December 31, 2008 and 2007. We will continue to review actual experience and adjust our estimate as warranted.

We believe that our estimates of liability for asbestos-related claims and insurance recoveries are reasonable and probable. The amounts recorded for asbestos-related liabilities and related insurance recoveries were based on currently known facts. However, future events, such as the number of new claims to be filed each year, average settlement costs, and insurance coverage issues, could cause the actual costs and insurance recoveries to be higher or lower than the projected amounts. Estimates also may vary in the future if strategies, activities, and outcomes of asbestos litigation materially change;

federal and state laws governing asbestos litigation increase or decrease the probability or amount of compensation of claimants; and there are material changes with respect to payments made to claimants by other defendants.

**Environmental** – We are subject to federal, state, and local environmental laws and regulations. We identified 339 sites at which we are or may be liable for remediation costs associated with alleged contamination or for violations of environmental requirements. This includes 33 sites that are the subject of actions taken by the U.S. government, 18 of which are currently on the Superfund National Priorities List. Certain federal legislation imposes joint and several liability for the remediation of identified sites; consequently, our ultimate environmental liability may include costs relating to activities of other parties, in addition to costs relating to our own activities at each site. Our environmental liability activity was as follows:

| *Millions of Dollars* | ***2008*** | *2007* | *2006* |
|---|---|---|---|
| Beginning balance | **$ 209** | $ 210 | $ 213 |
| Accruals | **46** | 41 | 39 |
| Payments | **(46)** | (42) | (42) |
| Ending balance at December 31 | **$ 209** | $ 209 | $ 210 |
| Current portion, ending balance at December 31 | **$ 58** | $ 63 | $ 54 |

When we identify an environmental issue with respect to property owned, leased, or otherwise used in our business, we and our consultants perform environmental assessments on the property. We expense the cost of the assessments as incurred. We accrue the cost of remediation where our obligation is probable and we can reasonably estimate such costs. We do not discount our environmental liabilities when the timing of the anticipated cash payments is not fixed or readily determinable. At December 31, 2008, approximately 13% of our environmental liability was discounted at 3.53%, while approximately 13% of our environmental liability was discounted at 4.15% at December 31, 2007.

The liability includes future costs for remediation and restoration of sites, as well as ongoing monitoring costs, but excludes any anticipated recoveries from third parties. Cost estimates are based on information available for each site, financial viability of other potentially responsible parties, and existing technology, laws, and regulations. The ultimate liability for remediation is difficult to determine because of the number of potentially responsible parties, site-specific cost sharing arrangements with other potentially responsible parties, the degree of contamination by various wastes, the scarcity and quality of volumetric data related to many of the sites, and the speculative nature of remediation costs. Estimates of liability may vary over time due to changes in federal, state, and local laws governing environmental remediation. Current obligations are not expected to have a material adverse effect on our consolidated results of operations, financial condition, or liquidity.

**Guarantees** – At December 31, 2008, we were contingently liable for $449 million in guarantees. We have recorded a liability of $4 million and $5 million for the fair value of these obligations as of December 31, 2008 and 2007, respectively. We entered into these contingent guarantees in the normal course of business, and they include guaranteed obligations related to our headquarters building, equipment financings, and affiliated operations. The final guarantee expires in 2022. We are not aware of any existing event of default that would require us to satisfy these guarantees. We do not expect that these guarantees will have a material adverse effect on our consolidated financial condition, results of operations, or liquidity.

**Indemnities** – Our maximum potential exposure under indemnification arrangements, including certain tax indemnifications, can range from a specified dollar amount to an unlimited amount, depending on the

nature of the transactions and the agreements. Due to uncertainty as to whether claims will be made or how they will be resolved, we cannot reasonably determine the probability of an adverse claim or reasonably estimate any adverse liability or the total maximum exposure under these indemnification arrangements. We do not have any reason to believe that we will be required to make any material payments under these indemnity provisions.

**16. Share Repurchase Program**

On January 30, 2007, our Board of Directors authorized the repurchase of up to 40 million shares of Union Pacific Corporation common stock through the end of 2009. On May 1, 2008, our Board of Directors authorized the repurchase of an additional 40 million common shares by March 31, 2011. As of December 31, 2008, we have repurchased a total of $3 billion of Union Pacific Corporation common stock since the original repurchase plan was authorized. Our assessments of market conditions and other pertinent facts guide the timing and volume of all repurchases. We expect to fund our common stock repurchases through cash generated from operations, the sale or lease of various operating and non-operating properties, debt issuances, and cash on hand.

| | *Number of Shares Purchased [a]* | | *Average Price Paid [a]* | |
|---|---|---|---|---|
| | ***2008*** | *2007* | ***2008*** | *2007* |
| First quarter | **6,512,278** | 4,088,000 | **$ 61.83** | $ 49.34 |
| Second quarter | **6,337,197** | 7,299,400 | **75.83** | 58.20 |
| Third quarter | **5,943,111** | 9,064,042 | **74.85** | 57.97 |
| Fourth quarter | **3,383,282** | 4,795,600 | **58.72** | 63.68 |
| Total | **22,175,868** | 25,247,042 | **$ 68.84** | $ 57.72 |
| Remaining number of shares that may yet be repurchased [a] | | | | 32,577,090 |

*[a] All share numbers and prices have been restated to reflect the stock split completed on May 28, 2008 (see Note 2).*

**17. Accounting Pronouncements**

In March 2008, FASB issued Statement No. 161, *Disclosures about Derivative Instruments and Hedging Activities, an amendment of FASB Statement No. 133* (FAS 161). FAS 161 amends and expands the disclosure requirements of FAS 133 to clarify how and why companies use derivative instruments. In addition, FAS 161 requires more disclosures regarding how companies account for derivative instruments and the impact derivatives have on a company's financial statements. This statement is effective for us beginning in 2009 and will only impact our disclosures. It will have no impact on our financial position, results of operations and cash flows.

In May 2008, the FASB issued Statement No. 162, *The Hierarchy of Generally Accepted Accounting Principles* (FAS 162). FAS 162 identifies the sources of accounting principles and the framework for selecting the principles to be used in the preparation of financial statements that are presented in conformity with generally accepted accounting principles in the United States. FAS 162 is effective 60 days following the SEC's approval of the Public Company Accounting Oversight Board amendments to AU Section 411, "*The Meaning of 'Present Fairly in Conformity with Generally Accepted Accounting Principles*'". FAS 162 is not expected to have a material impact on our financial statements.

In June 2008, the FASB released FSP EITF 03-6-1 on Emerging Issues Task Force Issue 03-6, *Participating Securities and the Two-Class Method under FASB Statement No. 128* (EITF 03-6). The staff position concludes that unvested share-based payment awards that contain nonforfeitable rights to dividends or dividend equivalents are participating securities as defined in EITF 03-6; and therefore,

should be included in computing earnings per share using the two-class method. As discussed in note 3, we pay nonforfeitable dividends on our unvested retention awards and performance retention awards. This staff position will be effective for us beginning in 2009. We expect that this staff position will result in additional disclosure only and not affect our consolidated financial position, results of operations, or cash flows.

In December 2008, the FASB issued FSP FAS 132(R)-1, *Employers' Disclosure about Postretirement Benefit Plan Assets*, which amends Statement 132(R) to require more detailed disclosures about employers' pension plan assets. New disclosures will include more information on investment strategies, major categories of plan assets, concentrations of risk within plan assets and valuation techniques used to measure the fair value of plan assets. This new standard requires new disclosures only, and will have no impact on our consolidated financial position, results of operations or cash flows. These new disclosures will be required for us beginning in our 2009 Form 10-K.

**18. Selected Quarterly Data (Unaudited)**

*Millions of Dollars, Except Per Share Amounts*

| *2008* | *Mar. 31* | *Jun. 30* | *Sep.30* | *Dec. 31* |
|---|---|---|---|---|
| Operating revenues | $ 4,270 | $ 4,568 | $ 4,846 | $ 4,286 |
| Operating income | 788 | 931 | 1,215 | 1,141 |
| Net income | 443 | 531 | 703 | 661 |
| Net income per share | | | | |
| Basic | 0.86 | 1.03 | 1.39 | 1.31 |
| Diluted | 0.85 | 1.02 | 1.38 | 1.31 |
| *2007* | *Mar. 31* | *Jun. 30* | *Sep.30* | *Dec. 31* |
| Operating revenues | $ 3,849 | $ 4,046 | $ 4,191 | $ 4,197 |
| Operating income | 719 | 787 | 1,005 | 864 |
| Net income | 386 | 446 | 532 | 491 |
| Net income per share | | | | |
| Basic | 0.71 | 0.83 | 1.01 | 0.94 |
| Diluted | 0.71 | 0.82 | 1.00 | 0.93 |

**Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

None.

**Item 9A. Controls and Procedures**

As of the end of the period covered by this report, the Corporation carried out an evaluation, under the supervision and with the participation of the Corporation's management, including the Corporation's Chief Executive Officer (CEO) and Executive Vice President – Finance and Chief Financial Officer (CFO), of the effectiveness of the design and operation of the Corporation's disclosure controls and procedures pursuant to Exchange Act Rules 13a-15 and 15d-15. In designing and evaluating the disclosure controls and procedures, management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. Based upon that evaluation, the CEO and the CFO concluded that, as of the end of the period covered by this report, the Corporation's disclosure controls and procedures were effective to provide reasonable assurance that information required to be disclosed in our Exchange Act reports is recorded, processed, summarized and reported within the time periods specified by the SEC, and that such information is accumulated and communicated to management, including the CEO and CFO, as appropriate, to allow timely decisions regarding required disclosure.

Additionally, the CEO and CFO determined that there have been no changes to the Corporation's internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) during the last fiscal quarter that have materially affected, or are reasonably likely to materially affect, the Corporation's internal control over financial reporting.

**Item 9B. Other Information**

None.

## MANAGEMENT'S ANNUAL REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING

The management of Union Pacific Corporation and Subsidiary Companies (the Corporation) is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)). The Corporation's internal control system was designed to provide reasonable assurance to the Corporation's management and Board of Directors regarding the preparation and fair presentation of published financial statements.

All internal control systems, no matter how well designed, have inherent limitations. Therefore, even those systems determined to be effective can provide only reasonable assurance with respect to financial statement preparation and presentation.

The Corporation's management assessed the effectiveness of the Corporation's internal control over financial reporting as of December 31, 2008. In making this assessment, it used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in *Internal Control – Integrated Framework.* Based on our assessment management believes that, as of December 31, 2008, the Corporation's internal control over financial reporting is effective based on those criteria.

The Corporation's independent registered public accounting firm has issued an attestation report on the effectiveness of the Corporation's internal control over financial reporting. This report appears on page 90.

February 4, 2009

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

Union Pacific Corporation, its Directors, and Shareholders:

We have audited the internal control over financial reporting of Union Pacific Corporation and Subsidiary Companies (the Corporation) as of December 31, 2008, based on criteria established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. The Corporation's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management’s Annual Report on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on the Corporation's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed by, or under the supervision of, the company's principal executive and principal financial officers, or persons performing similar functions, and effected by the company's board of directors, management, and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of the inherent limitations of internal control over financial reporting, including the possibility of collusion or improper management override of controls, material misstatements due to error or fraud may not be prevented or detected on a timely basis. Also, projections of any evaluation of the effectiveness of the internal control over financial reporting to future periods are subject to the risk that the controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, the Corporation maintained, in all material respects, effective internal control over financial reporting as of December 31, 2008, based on the criteria established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated financial statements and financial statement schedule as of and for the year ended December 31, 2008 of the Corporation and our report dated February 5, 2009 expressed an unqualified opinion on those financial statements and financial statement schedule and included an explanatory paragraph regarding the Corporation’s adoption, in 2006, of Statement of Financial Accounting Standards No. 158, *Employers’ Accounting for Defined Benefit Pension and Other Postretirement Plans.*

Deloitte & Touche LLP

Omaha, Nebraska
February 5, 2009

# PART III

## Item 10. Directors, Executive Officers, and Corporate Governance

(a) Directors of Registrant.

Information as to the names, ages, positions and offices with UPC, terms of office, periods of service, business experience during the past five years and certain other directorships held by each director or person nominated to become a director of UPC is set forth in the Election of Directors segment of the Proxy Statement and is incorporated herein by reference.

Information concerning our Audit Committee and the independence of its members, along with information about the audit committee financial expert(s) serving on the Audit Committee, is set forth in the Audit Committee segment of the Proxy Statement and is incorporated herein by reference.

(b) Executive Officers of Registrant.

Information concerning the executive officers of UPC and its subsidiaries is presented in Part I of this report under Executive Officers of the Registrant and Principal Executive Officers of Subsidiaries.

(c) Section 16(a) Compliance.

Information concerning compliance with Section 16(a) of the Securities Exchange Act of 1934 is set forth in the Section 16(a) Beneficial Ownership Reporting Compliance segment of the Proxy Statement and is incorporated herein by reference.

(d) Code of Ethics for Chief Executive Officer and Senior Financial Officers of Registrant.

The Board of Directors of UPC has adopted the UPC Code of Ethics for the Chief Executive Officer and Senior Financial Officers (the Code). A copy of the Code may be found on the Internet at our website www.up.com/investors. We intend to disclose any amendments to the Code or any waiver from a provision of the Code on our website.

## Item 11. Executive Compensation

Information concerning compensation received by our directors and our named executive officers is presented in the Compensation Discussion and Analysis, Summary Compensation Table, Grants of Plan-Based Awards in Fiscal Year 2008, Outstanding Equity Awards at 2008 Fiscal Year-End, Option Exercises and Stock Vested in Fiscal Year 2008, Pension Benefits at 2008 Fiscal Year-End, Nonqualified Deferred Compensation at 2008 Fiscal Year-End, Potential Payments Upon Termination or Change in Control and Director Compensation in Fiscal Year 2008 segments of the Proxy Statement and is incorporated herein by reference. Additional information regarding compensation of directors, including Board committee members, is set forth in the By-Laws of UPC and the Stock Unit Grant and Deferred Compensation Plan for the Board of Directors, both of which are included as exhibits to this report. Information regarding the Compensation Committee is set forth in the Compensation Committee Interlocks and Insider Participation and Compensation Committee Report segments of the Proxy Statement and is incorporated herein by reference.

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

Information as to the number of shares of our equity securities beneficially owned by each of our directors and nominees for director, our named executive officers, our directors and executive officers as a group, and certain beneficial owners is set forth in the Security Ownership of Certain Beneficial Owners and Management segment of the Proxy Statement and is incorporated herein by reference.

The following table summarizes the equity compensation plans under which Union Pacific Corporation common stock may be issued as of December 31, 2008.

| *Plan Category* | *Number of securities to be issued upon exercise of outstanding options, warrants and rights (a)* | *Weighted-average exercise price of outstanding options, warrants and rights (b)* | *Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) (c)* |
|---|---|---|---|
| Equity compensation plans approved by security holders | 13,477,830 [1] | $ 40.81 [2] | 36,961,123 |
| Total | 13,477,830 | $ 40.81 | 36,961,123 |

*[1] Includes 1,494,925 retention units that do not have an exercise price. Does not include 1,419,554 retention shares that are actually issued and outstanding.*

*[2] Does not include the retention units or retention shares described above in footnote [1].*

**Item 13. Certain Relationships and Related Transactions and Director Independence**

Information on related transactions is set forth in the Certain Relationships and Related Transactions and Compensation Committee Interlocks and Insider Participation segments of the Proxy Statement and is incorporated herein by reference. We do not have any relationship with any outside third party that would enable such a party to negotiate terms of a material transaction that may not be available to, or available from, other parties on an arm's-length basis.

Information regarding the independence of our directors is set forth in the Director Independence segment of the Proxy Statement and is incorporated herein by reference.

**Item 14. Principal Accountant Fees and Services**

Information concerning the fees billed by our independent registered public accounting firm and the nature of services comprising the fees for each of the two most recent fiscal years in each of the following categories: (i) audit fees, (ii) audit-related fees, (iii) tax fees, and (iv) all other fees, is set forth in the Independent Registered Public Accounting Firm's Fees and Services segment of the Proxy Statement and is incorporated herein by reference.

Information concerning our Audit Committee's policies and procedures pertaining to pre-approval of audit and non-audit services rendered by our independent registered public accounting firm is set forth in the Audit Committee segment of the Proxy Statement and is incorporated herein by reference.

## PART IV

**Item 15. Exhibits, Financial Statement Schedules**

(a) Financial Statements, Financial Statement Schedules, and Exhibits:

(1) Financial Statements

The financial statements filed as part of this filing are listed on the index to the Financial Statements and Supplementary Data, Item 8, on page 53.

(2) Financial Statement Schedules

Schedule II - Valuation and Qualifying Accounts

Schedules not listed above have been omitted because they are not applicable or not required or the information required to be set forth therein is included in the Financial Statements and Supplementary Data, Item 8, or notes thereto.

(3) Exhibits

Exhibits are listed in the exhibit index beginning on page 96. The exhibits include management contracts, compensatory plans and arrangements required to be filed as exhibits to the Form 10-K by Item 601 (10) (iii) of Regulation S-K.

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, on this 6th day of February, 2009.

UNION PACIFIC CORPORATION

By /s/ James R. Young
James R. Young,
Chairman, President, Chief
Executive Officer, and Director

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below, on this 6th day of February, 2009, by the following persons on behalf of the registrant and in the capacities indicated.

PRINCIPAL EXECUTIVE OFFICER
AND DIRECTOR:

/s/ James R. Young
James R. Young,
Chairman, President, Chief
Executive Officer, and Director

PRINCIPAL FINANCIAL OFFICER:

/s/ Robert M. Knight, Jr.
Robert M. Knight, Jr.,
Executive Vice President - Finance
and Chief Financial Officer

PRINCIPAL ACCOUNTING OFFICER:

/s/ Jeffrey P. Totusek
Jeffrey P. Totusek,
Vice President and Controller

DIRECTORS:

Andrew H. Card, Jr.*
Erroll B. Davis, Jr.*
Thomas J. Donohue*
Archie W. Dunham*
Judith Richards Hope*

Charles C. Krulak*
Michael W. McConnell*
Thomas F. McLarty III*
Steven R. Rogel*

* By /s/ Thomas E. Whitaker
Thomas E. Whitaker, Attorney-in-fact

**SCHEDULE II – VALUATION AND QUALIFYING ACCOUNTS**
*Union Pacific Corporation and Subsidiary Companies*

| *Millions of Dollars, for the Years Ended December 31,* | ***2008*** | *2007* | *2006* |
|---|---|---|---|
| Allowance for doubtful accounts: | | | |
| Balance, beginning of period | **$ 75** | $ 99 | $ 126 |
| Charges/(reduction) to expense | **23** | (7) | (7) |
| Net recoveries/(write-offs) | **7** | (17) | (20) |
| Balance, end of period | **$ 105** | $ 75 | $ 99 |
| Allowance for doubtful accounts are presented in the Consolidated Statements of Financial Position as follows: | | | |
| Current | **$ 10** | $ 3 | $ 6 |
| Long-term | **95** | 72 | 93 |
| Balance, end of period | **$ 105** | $ 75 | $ 99 |
| Accrued casualty costs: | | | |
| Balance, beginning of period | **$ 1,170** | $ 1,277 | $ 1,354 |
| Charges to expense | **322** | 328 | 417 |
| Cash payments and other reductions | **(286)** | (435) | (494) |
| Balance, end of period | **$ 1,206** | $ 1,170 | $ 1,277 |
| Accrued casualty costs are presented in the Consolidated Statements of Financial Position as follows: | | | |
| Current | **$ 390** | $ 371 | $ 409 |
| Long-term | **816** | 799 | 868 |
| Balance, end of period | **$ 1,206** | $ 1,170 | $ 1,277 |

**UNION PACIFIC CORPORATION**
**Exhibit Index**

| Exhibit No. | Description |
|---|---|
| Filed with this Statement | |
| 10(a) | Form of 2009 Long Term Plan Stock Unit Agreement. |
| 10(b) | Form of Stock Unit Agreement for Executives dated February 5, 2009. |
| 10(c) | Supplemental Thrift Plan (409A Non-Grandfathered Component) of Union Pacific Corporation, effective as of January 1, 2009. |
| 10(d) | Supplemental Thrift Plan (409A Grandfathered Component) of Union Pacific Corporation, as amended and restated in its entirety, effective as of January 1, 2009. |
| 10(e) | Supplemental Pension Plan for Officers and Managers (409A Non-Grandfathered Component) of Union Pacific Corporation and Affiliates, as amended and restated in its entirety effective as of January 1, 1989, including all amendments adopted through January 1, 2009. |
| 10(f) | Supplemental Pension Plan for Officers and Managers (409A Grandfathered Component) of Union Pacific Corporation and Affiliates, as amended and restated in its entirety effective as of January 1, 1989, including all amendments adopted through January 1, 2009. |
| 10(g) | Union Pacific Corporation Executive Incentive Plan, effective May 5, 2005, amended and restated effective January 1, 2009. |
| 10(h) | Deferred Compensation Plan (409A Non-Grandfathered Component) of Union Pacific Corporation, effective as January1, 2009. |
| 10 (i) | Deferred Compensation Plan (409A Grandfathered Component) of Union Pacific Corporation, as amended and restated in its entirety, effective as January1, 2009. |
| 10(j) | Union Pacific Corporation 2000 Directors Plan, effective as of April 21, 2000, as amended November 16, 2006, January 30, 2007 and January 1, 2009. |
| 10(k) | Union Pacific Corporation Stock Unit Grant and Deferred Compensation Plan for the Board of Directors (409A Non-Grandfathered Component), effective as of January 1, 2009. |
| 10(l) | Union Pacific Corporation Stock Unit Grant and Deferred Compensation Plan for the Board of Directors (409A Grandfathered Component), as amended and restated in its entirety, effective as of January 1, 2009. |
| 10(m) | Union Pacific Corporation 2004 Stock Incentive Plan, originally effective as of April 16, 2004 and amended and restated effective January 1, 2009. |
| 10(n) | Union Pacific Corporation Key Employee Continuity Plan, dated as of November 16, 2000, as amended and restated effective as of January 1, 2009. |

| | |
|---|---|
| 10(o) | 2006 Long Term Plan Amended and Restated Stock Unit Agreement. |
| 10(p) | 2007 Long Term Plan Amended and Restated Stock Unit Agreement. |
| 10(q) | 2008 Long Term Plan Amended and Restated Stock Unit Agreement. |
| 12 | Ratio of Earnings to Fixed Charges. |
| 21 | List of the Corporation's significant subsidiaries and their respective states of incorporation. |
| 23 | Independent Registered Public Accounting Firm's Consent. |
| 24 | Powers of attorney executed by the directors of UPC. |
| 31(a) | Certifications Pursuant to Rule 13a-14(a), of the Exchange Act, as Adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 - James R. Young. |
| 31(b) | Certifications Pursuant to Rule 13a-14(a), of the Exchange Act, as Adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 - Robert M. Knight, Jr. |
| 32 | Certifications Pursuant to 18 U.S.C. Section 1350, as Adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 - James R. Young and Robert M. Knight, Jr. |

Incorporated by Reference

| | |
|---|---|
| 3(a) | By-Laws of UPC, as amended, effective September 25, 2008, are incorporated herein by reference to Exhibit 3.2 to the Corporation's Current Report on Form 8-K dated September 30, 2008. |
| 3(b) | Revised Articles of Incorporation of UPC, as amended through May 1, 2008, are incorporated herein by reference to Exhibit 3(a) to the Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2008. |
| 4(a) | Indenture, dated as of December 20, 1996, between UPC and Wells Fargo Bank, National Association, as successor to Citibank, N.A., as Trustee, is incorporated herein by reference to Exhibit 4.1 to UPC's Registration Statement on Form S-3 (No. 333-18345). |
| 4(b) | Indenture, dated as of April 1, 1999, between UPC and The Bank of New York, as successor to JP Morgan Chase Bank, formerly The Chase Manhattan Bank, as Trustee, is incorporated herein by reference to Exhibit 4.2 to UPC's Registration Statement on Form S-3 (No. 333-75989). |
| 4(c) | Form of Debt Security is incorporated herein by reference to Exhibit 4.3 to UPC's Registration Statement on Form S-3 (No. 33-59323). |
| 4(d) | Form of Debt Security (Note) is incorporated by reference to Exhibit 4.1 to the Corporation's Current Report of Form 8-K, dated February 5, 2008. |

| | |
|---|---|
| 4(e) | Form of Debt Security (Note) is incorporated by reference to Exhibit 4.1 to UPC's Current Report of Form 8-K, dated October 7, 2008.<br><br>Certain instruments evidencing long-term indebtedness of UPC are not filed as exhibits because the total amount of securities authorized under any single such instrument does not exceed 10% of the Corporation's total consolidated assets. UPC agrees to furnish the Commission with a copy of any such instrument upon request by the Commission. |
| 10(r) | The 1993 Stock Option and Retention Stock Plan of UPC, as amended November 16, 2006, is incorporated herein by reference to Exhibit 10 to the Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2007. |
| 10(s) | UPC 2001 Stock Incentive Plan, as amended November 16, 2006, is incorporated herein by reference to Exhibit 10(e) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 2006. |
| 10(t) | Amended and Restated Registration Rights Agreement, dated as of July 12, 1996, among UPC, UP Holding Company, Inc., Union Pacific Merger Co. and Southern Pacific Rail Corporation (SP) is incorporated herein by reference to Annex J to the Joint Proxy Statement/Prospectus included in Post-Effective Amendment No. 2 to UPC's Registration Statement on Form S-4 (No. 33-64707). |
| 10(u) | Agreement, dated September 25, 1995, among UPC, UPRR, Missouri Pacific Railroad Company (MPRR), SP, Southern Pacific Transportation Company (SPT), The Denver & Rio Grande Western Railroad Company (D&RGW), St. Louis Southwestern Railway Company (SLSRC) and SPCSL Corp. (SPCSL), on the one hand, and Burlington Northern Railroad Company (BN) and The Atchison, Topeka and Santa Fe Railway Company (Santa Fe), on the other hand, is incorporated by reference to Exhibit 10.11 to UPC's Registration Statement on Form S-4 (No. 33-64707). |
| 10(v) | Supplemental Agreement, dated November 18, 1995, between UPC, UPRR, MPRR, SP, SPT, D&RGW, SLSRC and SPCSL, on the one hand, and BN and Santa Fe, on the other hand, is incorporated herein by reference to Exhibit 10.12 to UPC's Registration Statement on Form S-4 (No. 33-64707). |
| 10(w) | The Pension Plan for Non-Employee Directors of UPC, as amended January 25, 1996, is incorporated herein by reference to Exhibit 10(w) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 1995. |
| 10(x) | The Executive Life Insurance Plan of UPC, as amended October 1997, is incorporated herein by reference to Exhibit 10(t) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 1997. |
| 10(y) | Charitable Contribution Plan for Non-Employee Directors of Union Pacific Corporation is incorporated herein by reference to Exhibit 10(z) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 1995. |

| | |
|---|---|
| 10(z) | Form of Non-Qualified Stock Option Agreement for Executives is incorporated herein by reference to Exhibit 10(a) to the Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2004. |
| 10(aa) | Form of Stock Unit Agreement for Executives is incorporated herein by reference to Exhibit 10(b) to the Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2004. |
| 10(bb) | Form of Non-Qualified Stock Option Agreement for Directors is incorporated herein by reference to Exhibit 10(d) to the Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2004. |
| 10(cc) | Form of Stock Unit Agreement for Executives, is incorporated herein by reference to Exhibit 10(b) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 2005. |
| 10(dd) | Form of Non-Qualified Stock Option Agreement for Executives, is incorporated herein by reference to Exhibit 10(c) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 2005. |
| 10(ee) | Executive Incentive Plan (2005) – Deferred Compensation Program, dated December 21, 2005, is incorporated herein by reference to Exhibit 10(g) to the Corporation's Annual Report on Form 10-K for the year ended December 31, 2005. |
| 99 | U.S. $1,900,000,000 5-year revolving credit agreement, dated as of April 20, 2007, is incorporated herein by reference to Exhibit 99 to the Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2007. |

**Exhibit 12**

**RATIO OF EARNINGS TO FIXED CHARGES**
*Union Pacific Corporation and Subsidiary Companies*

| *Millions of Dollars, Except for Ratios* | ***2008*** | *2007* | *2006* | *2005* | *2004* |
|---|---|---|---|---|---|
| Fixed charges: | | | | | |
| Interest expense including | | | | | |
| amortization of debt discount | **$ 511** | $ 482 | $ 477 | $ 504 | $ 527 |
| Portion of rentals representing an interest factor | **226** | 237 | 243 | 220 | 206 |
| Total fixed charges | **$ 737** | $ 719 | $ 720 | $ 724 | $ 733 |
| Earnings available for fixed charges: | | | | | |
| Net income | **$ 2,338** | $ 1,855 | $ 1,606 | $ 1,026 | $ 604 |
| Equity earnings net of distributions | **(53)** | (69) | (59) | (48) | (47) |
| Income taxes | **1,318** | 1,154 | 919 | 410 | 252 |
| Fixed charges | **737** | 719 | 720 | 724 | 733 |
| Earnings available for fixed charges | **$ 4,340** | $ 3,659 | $ 3,186 | $ 2,112 | $ 1,542 |
| Ratio of earnings to fixed charges | **5.9** | 5.1 | 4.4 | 2.9 | 2.1 |

**Exhibit 21**

**SIGNIFICANT SUBSIDIARIES OF UNION PACIFIC CORPORATION**

| Name of Corporation | State of Incorporation |
|---|---|
| Union Pacific Railroad Company ........................................................................ | Delaware |
| Southern Pacific Rail Corporation ...................................................................... | Utah |

**Exhibit 23**

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

We consent to the incorporation by reference in Post-Effective Amendment No. 1 to Registration Statement No. 33-12513, Registration Statement No. 33-53968, Registration Statement No. 33-49785, Registration Statement No. 33-49849, Registration Statement No. 33-51071, Registration Statement No. 333-10797, Registration Statement No. 333-13115, Registration Statement No. 333-16563, Registration Statement No. 333-88225, Registration Statement No. 333-88709, Registration Statement No. 333-57958, Registration Statement No. 333-61856, Registration Statement No. 333-42768, Registration Statement No. 333-106707, Registration Statement No. 333-106708, Registration Statement No. 333-105714, Registration Statement No. 333-105715, Registration Statement No. 333-116003, Registration Statement No. 333-132324 and Registration Statement No. 333-155708 on Forms S-8 and Registration Statement No. 333-88666, Amendment No. 1 to Registration Statement No. 333-88666, Registration Statement No. 333-111185, and Registration Statement No. 333-141084 on Forms S-3 of our reports dated February 5, 2009, relating to the consolidated financial statements and financial statement schedule of Union Pacific Corporation and Subsidiary Companies (the Corporation) (which report expressed an unqualified opinion and included an explanatory paragraph relating to the Corporation's adoption, in 2006, of Statement of Financial Accounting Standards No. 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans*) and the effectiveness of the Corporation's internal control over financial reporting, appearing in this Annual Report on Form 10-K of Union Pacific Corporation and Subsidiary Companies for the year ended December 31, 2008.

Deloitte & Touche LLP

Omaha, Nebraska
February 5, 2009

**Exhibit 24**

**UNION PACIFIC CORPORATION**
**Powers of Attorney**

Each of the undersigned directors of Union Pacific Corporation, a Utah corporation (the Company), do hereby appoint each of James R. Young, Barbara W. Schaefer, and Thomas E. Whitaker his or her true and lawful attorney-in-fact and agent, to sign on his or her behalf the Company's Annual Report on Form 10-K, for the year ended December 31, 2008, and any and all amendments thereto, and to file the same, with all exhibits thereto, with the Securities and Exchange Commission.

IN WITNESS WHEREOF, the undersigned have executed this Power of Attorney as of February 5, 2009.

/s/ Andrew H. Card, Jr.
Andrew H. Card, Jr.

/s/ Erroll B. Davis, Jr.
Erroll B. Davis, Jr.

/s/ Thomas J. Donohue
Thomas J. Donohue

/s/ Archie W. Dunham
Archie W. Dunham

/s/ Judith Richards Hope
Judith Richards Hope

/s/ Charles C. Krulak
Charles C. Krulak

/s/ Michael W. McConnell
Michael W. McConnell

/s/ Thomas F. McLarty III
Thomas F. McLarty III

/s/ Steven R. Rogel
Steven R. Rogel

**Exhibit 31(a)**

**CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER**

I, James R. Young, certify that:

1. I have reviewed this annual report on Form 10-K of Union Pacific Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 6, 2009

/s/ James R. Young
James R. Young
Chairman, President and
Chief Executive Officer

**Exhibit 31(b)**

**CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER**

I, Robert M. Knight, certify that:

1. I have reviewed this annual report on Form 10-K of Union Pacific Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 6, 2009

/s/ Robert M. Knight
Robert M. Knight
Executive Vice President – Finance and
Chief Financial Officer

**Exhibit 32**

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the accompanying Annual Report of Union Pacific Corporation (the Corporation) on Form 10-K for the period ending December 31, 2008, as filed with the Securities and Exchange Commission on the date hereof (the Report), I, James R. Young, Chairman, President and Chief Executive Officer of the Corporation, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to the best of my knowledge, that:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Corporation.

By: /s/ James R. Young
James R. Young
Chairman, President and
Chief Executive Officer
Union Pacific Corporation

February 6, 2009

A signed original of this written statement required by Section 906 has been provided to the Corporation and will be retained by the Corporation and furnished to the Securities and Exchange Commission or its staff upon request.

**CERTIFICATION OF CHIEF FINANCIAL OFFICER PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the accompanying Annual Report of Union Pacific Corporation (the Corporation) on Form 10-K for the period ending December 31, 2008, as filed with the Securities and Exchange Commission on the date hereof (the Report), I, Robert M. Knight, Jr., Executive Vice President - Finance and Chief Financial Officer of the Corporation, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to the best of my knowledge, that:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Corporation.

By: /s/ Robert M. Knight, Jr.
Robert M. Knight, Jr.
Executive Vice President - Finance and
Chief Financial Officer
Union Pacific Corporation

February 6, 2009

A signed original of this written statement required by Section 906 has been provided to the Corporation and will be retained by the Corporation and furnished to the Securities and Exchange Commission or its staff upon request.

# EXHIBIT PX0708

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549
**FORM 10-K**

(X) ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 For the fiscal year ended **DEC. 31, 2005**

( ) TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 For the transition period from _________ to _________

Commission file number 1-8339

**NORFOLK SOUTHERN CORPORATION**
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Virginia**<br>(State or other jurisdiction of incorporation) | **52-1188014**<br>(IRS Employer Identification No.) |
| **Three Commercial Place**<br>**Norfolk, Virginia**<br>(Address of principal executive offices) | **23510-2191**<br>Zip Code |
| Registrant's telephone number, including area code | **(757) 629-2680** |

**No Change**
(Former name, former address and former fiscal year, if changed since last report.)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each Class | Name of each exchange on which registered |
|---|---|
| **Norfolk Southern Corporation Common Stock (Par Value $1.00)** | **New York Stock Exchange** |

Securities registered pursuant to Section 12(g) of the Act: NONE

Indicate by checkmark if the registrant is well-known seasoned issuer as defined in Rule 405 of the Securities Act. Yes (X) No ( )

Indicate by checkmark if the registrant is not required to file such reports pursuant to section 13 or 15(d) of the Act. Yes ( ) No (X)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days. Yes (X) No ( )

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ( )

Indicate by checkmark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ( ) No (X)

The aggregate market value of the voting common equity held by nonaffiliates as of June 30, 2005 was $12,524,405,303 (based on the closing price as quoted on the New York Stock Exchange on that date).

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act.
Large accelerated filer [X] Accelerated filer [ ] Non-accelerated filer [ ]

The number of shares outstanding of each of the registrant's classes of common stock, as of Jan. 31, 2006: 412,236,777 (excluding 20,833,125 shares held by registrant's consolidated subsidiaries).

**DOCUMENTS INCORPORATED BY REFERENCE:**

Portions of the Registrant's definitive proxy statement to be filed electronically pursuant to Regulation 14A not later than 120 days after the end of the fiscal year, are incorporated by reference in Part III.

**TABLE OF CONTENTS**

**NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES (NS)**


| | | | Page |
|---|---|---|---|
| Part I. | 1 and 2. | Business and Properties | K3 |
| | 1A. | Risk Factors | K12 |
| | 1B. | Unresolved Staff Comments | K15 |
| | 3. | Legal Proceedings | K15 |
| | 4. | Submission of Matters to a Vote of Security Holders | K15 |
| | | Executive Officers of the Registrant | K16 |
| Part II. | 5. | Market for Registrant's Common Equity and Related Stockholders Matters | K18 |
| | 6. | Selected Financial Data | K19 |
| | 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | K21 |
| | 7A. | Quantitative and Qualitative Disclosures About Market Risk | K41 |
| | 8. | Financial Statements and Supplementary Data | K42 |
| | 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | K82 |
| | 9A. | Controls and Procedures | K82 |
| Part III. | 10. | Directors and Executive Officers of the Registrant | K83 |
| | 11. | Executive Compensation | K83 |
| | 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | K83 |
| | 13. | Certain Relationships and Related Transactions | K86 |
| | 14. | Principal Accountant Fees and Services | K86 |
| Part IV. | 15. | Exhibits and Financial Statement Schedules | K87 |
| | | Power of Attorney | K95 |
| | | Signatures | K95 |

## PART I

## NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES (NS)

### Item 1. Business. and Item 2. Properties.

**GENERAL -** Norfolk Southern Corporation (Norfolk Southern) was incorporated on July 23, 1980, under the laws of the Commonwealth of Virginia. On June l, 1982, Norfolk Southern acquired control of two major operating railroads, Norfolk and Western Railway Company (NW) and Southern Railway Company (Southern) in accordance with an Agreement of Merger and Reorganization dated as of July 31, 1980, and with the approval of the transaction by the Interstate Commerce Commission (now the Surface Transportation Board [STB]). Effective Dec. 31, 1990, Norfolk Southern transferred all the common stock of NW to Southern, and Southern's name was changed to Norfolk Southern Railway Company (Norfolk Southern Railway or NSR). Effective Sept. 1, 1998, NW was merged with and into Norfolk Southern Railway. As of Dec. 31, 2005, all the common stock of Norfolk Southern Railway was owned directly by Norfolk Southern.

Through a limited liability company, Norfolk Southern and CSX Corporation (CSX) jointly own Conrail Inc. (Conrail), whose primary subsidiary is Consolidated Rail Corporation (CRC). Norfolk Southern has a 58% economic and 50% voting interest in the jointly owned entity, and CSX has the remainder of the economic and voting interests. CRC owns and operates certain properties (the Shared Assets Areas) for the joint and exclusive benefit of NSR and CSX Transportation Inc. (CSXT). On June 1, 1999, NSR and CSXT, began operating separate portions of Conrail's rail routes and assets. On August 27, 2004, NS, CSX and Conrail completed a corporate reorganization of Conrail (Conrail Corporate Reorganization), which established direct ownership and control by NSR and CSX Transportation, Inc. (CSXT) of two former CRC subsidiaries, Pennsylvania Lines LLC (PRR) and New York Central Lines LLC (NYC), respectively (See Note 5 to the Consolidated Financial Statements).

Norfolk Southern makes available free of charge through its website, www.nscorp.com, its annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and all amendments to those reports as soon as reasonably practicable after such material is electronically filed with or furnished to the Securities and Exchange Commission (SEC). Additionally, Norfolk Southern's corporate governance guidelines, board committee charters, code of ethics and code of ethical conduct for senior financial officers are available on the company's website and in print to any shareholder who requests them.

Unless otherwise indicated, Norfolk Southern and its subsidiaries are referred to collectively as NS.

**RAILROAD OPERATIONS –** As of Dec. 31, 2005, NS' railroads operated approximately 21,200 miles of road in 22 eastern states, the District of Columbia and Ontario, Canada. The miles

operated, which includes leased lines between Cincinnati, Ohio, and Chattanooga, Tennessee, and trackage rights over property owned by North Carolina Railway Company, were as follows:

**Mileage Operated as of Dec. 31, 2005**

| | **Miles of Road** | **Second and Other Main Track** | **Passing Track, Crossovers and Turnouts** | **Way and Yard Switching** | **Total** |
|---|---|---|---|---|---|
| Owned | 16,237 | 2,808 | 2,087 | 8,598 | 29,730 |
| Operated under lease, contract or trackage rights | 4,947 | 1,978 | 417 | 969 | 8,311 |
| Total | 21,184 | 4,786 | 2,504 | 9,567 | 38,041 |

NS' railroads carry raw materials, intermediate products and finished goods primarily in the Southeast, East and Midwest and, via interchange with other rail carriers, to and from the rest of the United States and parts of Canada. They also transport overseas freight through several Atlantic and Gulf Coast ports, which include:

| | | |
|---|---|---|
| The ports of New York/New Jersey | Philadelphia, PA | Camden, NJ |
| Baltimore, MD | Wilmington, DE | Norfolk, VA |
| Morehead City, NC | Charleston, SC | Savannah, GA |
| Brunswick, GA | Jacksonville, FL | Mobile, AL |
| New Orleans, LA | | |

The lines of NS' railroads reach most of the larger industrial and trading centers of the Southeast, Northeast, Mid-Atlantic region and Midwest. In addition, haulage arrangements with connecting carriers allow NS' railroads to provide single-line service to and from additional markets. Highlights of our service network are as follows:

Haulage, trackage rights and interline arrangements with:

| | | |
|---|---|---|
| Florida East Coast Railway Company | - | Service to Southern and Eastern Florida |
| The Kansas City Southern Railway Company | - | Transcontinental intermodal service via Dallas with the Burlington Northern Santa Fe Railway Company |
| Canadian Pacific Railway Company | - | Service to New England |
| Guilford Transportation Industries | - | Service to New England |

Leading centers originating and terminating freight traffic:

| | | |
|---|---|---|
| Chicago | Norfolk | Detroit |
| Atlanta | New York City | Jacksonville |
| Kansas City, MO | Baltimore | Buffalo |
| Charleston | Cleveland | Columbus |
| Philadelphia | Pittsburgh | Toledo |
| Greensboro | Charlotte | Savannah |

Major interterritorial gateways:

| | | |
|---|---|---|
| Chicago | Memphis | Sidney/Salem, IL |
| New Orleans | Kansas City | Buffalo |
| St. Louis | Meridian, MS | |

Corridors with heaviest freight volume:

New York City area to Chicago (via Allentown and Pittsburgh)

Chicago to Jacksonville (via Cincinnati, Chattanooga and Atlanta)

Appalachian coal fields of Virginia, West Virginia and Kentucky to Norfolk and Sandusky, OH

Cleveland to Kansas City

Knoxville to Chattanooga

The system's lines also reach many individual industries, electric generating facilities, mines (in western Virginia, eastern Kentucky, southern and northern West Virginia and western Pennsylvania), distribution centers, transload facilities and other business located in smaller communities in its service area.

**Triple Crown Operations** – Triple Crown Services Company (TCSC), NS' subsidiary, offers door-to-door intermodal service using RoadRailer® equipment and domestic containers. RoadRailer® units are enclosed vans that can be pulled over highways in tractor-trailer configuration and over the rails by locomotives. TCSC provides intermodal service in major traffic corridors, including those between the Midwest and the Northeast, the Midwest and the Southeast, and the Midwest and Texas.

The following table sets forth certain statistics relating to NS railroads' operations for the past 5 years:

**Rail Operating Statistics**

| | Years Ended Dec. 31, | | | | |
|---|---|---|---|---|---|
| | **2005** | **2004** | **2003** | **2002** | **2001** |
| Revenue ton miles (billions) | 203 | 198 | 183 | 179 | 182 |
| Freight train miles traveled (millions) | 81.2 | 77.7 | 73.9 | 72.6 | 70.0 |
| Revenue per ton mile | $0.0421 | $0.0369 | $0.0353 | $0.0350 | $0.0339 |
| Revenue ton miles per man-hour worked | 3,146 | 3,347 | 3,111 | 3,067 | 3,023 |
| Percentage ratio of railway operating expenses to railway operating revenues | 75.2% | 76.7% | 83.5%[1] | 81.5% | 83.7% |

[1]Includes $107 million of costs for a voluntary separation program, which added 1.6 percentage points to the ratio.

**RAILWAY OPERATING REVENUES --** NS' total railway operating revenues were $8.5 billion in 2005. See the financial information by traffic segment in Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**COAL TRAFFIC --** Coal, coke and iron ore -- most of which is bituminous coal -- is NS' railroads' largest commodity group as measured by revenues. The railroads handled a total of 187 million tons in

2005, most of which originated on NS' lines in West Virginia, Virginia, Pennsylvania and Kentucky. Revenues from coal, coke and iron ore accounted for about 25% of NS' total railway operating revenues in 2005.

Total coal handled through all system ports in 2005 was 38 million tons. Of this total, 12 million tons (including coastwise traffic) moved through Norfolk, Virginia, 4 million tons moved through the Baltimore Terminal, 14 million tons moved to various docks on the Ohio River, and 8 million tons moved to various Lake Erie ports. Other than coal for export, virtually all coal handled by NS' railroads was terminated in states east of the Mississippi River.

See the discussion of coal traffic, by type of coal, in Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**GENERAL MERCHANDISE TRAFFIC -** General merchandise traffic is composed of five major commodity groupings: automotive; chemicals; metals and construction; agriculture, consumer products and government; and paper, clay and forest products. The automotive group includes finished vehicles for BMW, DaimlerChrysler, Ford Motor Company, General Motors, Honda, Isuzu, Jaguar, Land Rover, Mazda, Mercedes-Benz, Mitsubishi, Nissan, Saab, Subaru, Suzuki, Toyota and Volkswagen, and auto parts for Ford Motor Company, General Motors, Mercedes-Benz and Toyota. The chemicals group includes sulfur and related chemicals, petroleum products, chlorine and bleaching compounds, plastics, rubber, industrial chemicals, chemical wastes and municipal wastes. The metals and construction group includes steel, aluminum products, machinery, scrap metals, cement, aggregates, bricks and minerals. The agriculture, consumer products and government group includes soybeans, wheat, corn, fertilizer, animal and poultry feed, food oils, flour, beverages, canned goods, sweeteners, consumer products, ethanol and items for the military. The paper, clay and forest products group includes lumber and wood products, pulp board and paper products, wood fibers, wood pulp, scrap paper and clay.

In 2005, 144 million tons of general merchandise freight, or approximately 66% of total general merchandise tonnage handled by NS, originated online. The balance of general merchandise traffic was received from connecting carriers at interterritorial gateways. The principal interchange points for NS-received traffic included Chicago, Memphis, New Orleans, Cincinnati, Kansas City, Detroit, Hagerstown, St. Louis/East St. Louis and Louisville. General merchandise carloads handled in 2005 were 2.9 million, the revenue from which accounted for 54% of NS' total railway operating revenues in 2005.

See the discussion of general merchandise rail traffic by commodity group in Part II, Item 7, "Management's Discussion and Analysis of Financial Conditions and Results of Operations."

**INTERMODAL TRAFFIC -** The intermodal market consists of shipments moving in trailers, domestic and international containers, and Roadrailer® equipment. These shipments are handled on behalf of intermodal marketing companies, international steamship lines, truckers and other shippers. Intermodal units handled in 2005 were 3.2 million, the revenues from which accounted for 21% of NS' total railway operating revenues for the year.

See the discussion of intermodal traffic in Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**FREIGHT RATES -** In 2005, NS' railroads continued their reliance on private contracts and exempt price quotes as their predominant pricing mechanisms. Thus, a major portion of NS' railroads' freight business is not currently economically regulated by the government. In general, market forces have been substituted for government regulation and now are the primary determinant of rail service prices. In 2005, coal movements that had been moving under common carrier (tariff) rates to Duke Energy and Carolina

Power and Light power plants began moving under contract rates as part of the settlement agreements resolving the rail transportation rate cases brought by each of the utilities. In 2004 there were significant coal movements moving under common carrier (tariff) rates that had previously moved under rates contained in transportation contracts.

In 2005, NS' railroads were found by the STB to be "revenue adequate" based on results for the year 2004. A railroad is "revenue adequate" under the applicable law when its return on net investment exceeds the rail industry's composite cost of capital. This determination is made pursuant to a statutory requirement.

**PASSENGER OPERATIONS -** Regularly scheduled passenger trains are operated by Amtrak on NS' lines between Alexandria and New Orleans, between Greensboro and Selma, North Carolina, between Chicago, Illinois, and Detroit, Michigan, and between Chicago and Harrisburg, Pennsylvania. Commuter trains are operated on the NS line between Manassas and Alexandria in accordance with contracts with two transportation commissions of the Commonwealth of Virginia. NS also leases the Chicago to Manhattan, Illinois, line to the Commuter Rail Division of the Regional Transportation Authority of Northeast Illinois. NS operates lines on which Amtrak conducts regularly scheduled passenger operations. In addition, NS provides freight service over lines with significant ongoing Amtrak and commuter passenger operations, and is conducting freight operations over some trackage owned by Amtrak or by New Jersey Transit, the Southeastern Pennsylvania Transportation Authority, Metro-North Commuter Railroad Company and Maryland DOT. Finally, passenger operations are conducted either by Amtrak or by the commuter agencies over trackage owned by Conrail in the Shared Assets Areas.

**NONCARRIER OPERATIONS -** NS' noncarrier subsidiaries engage principally in the acquisition, leasing and management of coal, oil, gas and minerals; the development of commercial real estate; telecommunications; and the leasing or sale of rail property and equipment. In 2005, no such noncarrier subsidiary or industry segment grouping of noncarrier subsidiaries met the requirements for a reportable business segment set forth in Statement of Financial Accounting Standards No. 131.

## RAILWAY PROPERTY

The NS railroad system extends across 22 states, the District of Columbia and portions of Canada. The railroad infrastructure makes the company capital intensive with total property of approximately $21 billion.

**Capital Expenditures -** Capital expenditures for road, equipment and other property for the past five years were as follows (including capitalized leases):

| | Capital Expenditures | | | | |
|---|---|---|---|---|---|
| | 2005 | 2004 | 2003 | 2002 | 2001 |
| | | | *($ in millions)* | | |
| Road | $ 739 | $ 607 | $ 495 | $ 519 | $ 505 |
| Equipment | 284 | 429 | 218 | 174 | 233 |
| Other property | 2 | 5 | 7 | 2 | 8 |
| Total | $ 1,025 | $ 1,041 | $ 720 | $ 695 | $ 746 |

Capital spending and maintenance programs are and have been designed to assure the ability to provide safe, efficient and reliable transportation services. For 2006, NS has budgeted $1.15 billion of capital

spending. On Dec. 2, 2005, NS announced an agreement to form a joint venture with Kansas City Southern pursuant to which NS intends to contribute $300 million in cash in exchange for a 30% interest in the joint venture. See the discussion following “Cash used for investing activities,” in Part II, Item 7, “Management's Discussion and Analysis of Financial Condition and Results of Operations.”

**Equipment -** As of Dec. 31, 2005, NS owned or leased the following units of equipment:

| | Number of Units | | | Capacity |
|---|---|---|---|---|
| | **Owned*** | **Leased**** | **Total** | **of Equipment** |
| Locomotives: | | | | (Horsepower) |
| Multiple purpose | 3,360 | 150 | 3,510 | 12,077,200 |
| Switching | 207 | -- | 207 | 303,700 |
| Auxiliary units | 74 | -- | 74 | -- |
| Total locomotives | 3,641 | 150 | 3,791 | 12,380,900 |
| Freight cars: | | | | (Tons) |
| Hopper | 19,313 | 814 | 20,127 | 2,127,459 |
| Box | 18,615 | 2,257 | 20,872 | 1,652,499 |
| Covered hopper | 9,207 | 2,725 | 11,932 | 1,302,758 |
| Gondola | 30,118 | 8,031 | 38,149 | 4,090,723 |
| Flat | 2,785 | 1,339 | 4,124 | 321,218 |
| Caboose | 238 | -- | 238 | -- |
| Other | 4,012 | -- | 4,012 | 199,706 |
| Total freight cars | 84,288 | 15,166 | 99,454 | 9,694,363 |
| Other: | | | | |
| Work equipment | 5,422 | 3 | 5,425 | |
| Vehicles | 3,948 | -- | 3,948 | |
| Highway trailers and containers | 450 | 10,253 | 10,703 | |
| RoadRailer® | 6,784 | 197 | 6,981 | |
| Miscellaneous | 1,447 | 19,012 | 20,459 | |
| Total other | 18,051 | 29,465 | 47,516 | |

* Includes equipment leased to outside parties and equipment subject to equipment trusts, conditional sale agreements and capitalized leases.

** Includes 18 locomotives and 6,550 freight cars leased from CRC.

The following table indicates the number and year built for locomotives and freight cars owned at Dec. 31, 2005.

| | Year Built | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **2005** | **2004** | **2003** | **2002** | **2001** | **1994-2000** | **1989-1993** | **1988 & Before** | **Total** |
| Locomotives: | | | | | | | | | |
| No. of units | 89 | 207 | 100 | --* | 160 | 975 | 465 | 1,645 | 3,641 |
| % of fleet | 2% | 6% | 3% | --% | 4% | 27% | 13% | 45% | 100% |
| Freight cars: | | | | | | | | | |
| No. of units | 71 | -- | -- | -- | 44 | 9,475 | 6,866 | 67,832 | 84,288 |
| % of fleet | --% | --% | --% | --% | --% | 11% | 8% | 81% | 100% |

*Fifty of the locomotives built in 2001 were purchased in 2002.

The following table shows the average age of NS' locomotive and freight car fleets at Dec. 31, 2005, and the number of retirements in 2005:

| | **Locomotives** | **Freight Cars** |
|---|---|---|
| Average age – in service | 17.2 years | 28.4 years |
| Retirements | 52 units | 1,499 units |
| Average age – retired | 27.4 years | 34.1 years |

Between 1988 and 2000, about 29,000 coal cars were rebodied. As a result, the remaining serviceability of the freight car fleet is greater than may be inferred from the high percentage of freight cars built in earlier years.

| | Annual Average Bad Order Ratio | | | | |
|---|---|---|---|---|---|
| | **2005** | **2004** | **2003** | **2002** | **2001** |
| Freight cars | 6.3% | 7.4% | 7.4% | 8.1% | 6.9% |
| Locomotives | 6.2% | 6.3% | 6.2% | 6.3% | 5.8% |

Ongoing freight car and locomotive maintenance programs are intended to ensure the highest standards of safety, reliability, customer satisfaction and equipment marketability. The freight car bad order ratio rose in 2001 and 2002 as a result of decreased maintenance activity. The declines in 2005 and 2003 reflected an increase in maintenance activity as well as the retirement of unserviceable units. The locomotive bad order ratio includes units out of service for required inspections every 92 days and program work such as overhauls. The elevated ratio through 2005 reflected units out of service related to the resumption of maintenance and modification activities.

**Encumbrances -** Certain railroad equipment is subject to the prior lien of equipment financing obligations amounting to approximately $650 million as of Dec. 31, 2005, and $930 million as of Dec. 31, 2004.

**Track Maintenance -** Of the approximately 38,000 total miles of track operated, NS had responsibility for maintaining about 30,000 miles of track with the remainder being operated under trackage rights.

Over 75% of the main line trackage (including first, second, third and branch main tracks, all excluding trackage rights) has rail ranging from 131 to 155 pounds per yard with the standard installation currently at 136 pounds per yard. Approximately 44% of NS lines carried 20 million or more gross tons per track mile.

The following table summarizes several measurements regarding NS' track roadway additions and replacements during the past five years:

| | **2005** | **2004** | **2003** | **2002** | **2001** |
|---|---|---|---|---|---|
| Track miles of rail installed | 302 | 246 | 233 | 235 | 254 |
| Miles of track surfaced | 4,663 | 5,055 | 5,105 | 5,270 | 3,836 |
| New crossties installed (millions) | 2.5 | 2.5 | 2.8 | 2.8 | 1.5 |

**Microwave System -** The NS microwave system, consisting of approximately 7,400 radio route miles, 424 core stations, 14 secondary stations and 5 passive repeater stations, provides communications between most operating locations. The microwave system is used primarily for voice communications, VHF radio control circuits, data and facsimile transmissions, traffic control operations and AEI data transmissions.

**Traffic Control -** Of the approximately 16,200 route miles owned by NS, 11,052 miles are signalized, including 8,030 miles of centralized traffic control (CTC) and 3,022 miles of automatic block signals. Of the 8,030 miles of CTC, 2,715 miles are controlled by data radio originating at 215 base station radio sites.

**Computers -** A computer network consisting of a centralized data center in Atlanta, Georgia, and various distributed computers throughout the company connects the yards, terminals, transportation offices, rolling stock repair points, sales offices and other key system locations. Operating and traffic data are processed and stored to provide customers with information on their shipments throughout the system. Computer systems provide current information on the location of every train and each car on line, as well as related waybill and other train and car movement data. In addition, the computer systems are utilized to assist management in the performance of a variety of functions and services including payroll, car and revenue accounting, billing, material management activities and controls, and special studies.

**ENVIRONMENTAL MATTERS -** Compliance with federal, state and local laws and regulations relating to the protection of the environment is a principal NS goal. To date, such compliance has not affected materially NS' capital additions, earnings, liquidity or competitive position. See the discussion of “Personal Injury, Environmental and Legal Liabilities” in Part II, Item 7, “Management's Discussion and Analysis of Financial Condition and Results of Operations,” and in Note 18 to the Consolidated Financial Statements.

**EMPLOYEES –** The following table shows the average number of employees and the average cost per employee for wages and benefits:

| | 2005 | 2004 | 2003 | 2002 | 2001 |
|---|---|---|---|---|---|
| Average number of employees | 30,294 | 28,475 | 28,753 | 28,970 | 30,894 |
| Average wage cost per employee | $61,000 | $59,000 | $58,000 | $54,000 | $52,000 |
| Average benefit cost per employee | $29,000 | $28,000 | $28,000 | $24,000 | $21,000 |

Approximately 85% of NS' railroad employees are covered by collective bargaining agreements with 14 different labor unions. See the discussion of “Labor Agreements” in Part II, Item 7, “Management's Discussion and Analysis of Financial Condition and Results of Operations.”

**GOVERNMENT REGULATION -** In addition to environmental, safety, securities and other regulations generally applicable to all businesses, NS' railroads are subject to regulation by the STB. The STB has jurisdiction over some rates, routes, conditions of service and the extension or abandonment of rail lines. The STB also has jurisdiction over the consolidation, merger or acquisition of control of and by rail common carriers. The Federal Railroad Administration regulates certain track and mechanical equipment standards.

The relaxation of economic regulation of railroads, begun over two decades ago under the Staggers Rail Act of 1980, has continued. Significant exemptions are TOFC/COFC (i.e., “piggyback”) business, rail boxcar traffic, lumber, manufactured steel, automobiles and certain bulk commodities such as sand, gravel, pulpwood and wood chips for paper manufacturing. Transportation contracts on regulated shipments effectively remove those shipments from regulation as well for the duration of the contract. About 80% of NS' freight revenues come from either exempt traffic or traffic moving under transportation contracts.

Efforts may be made in 2006 to re-subject the rail industry to unwarranted federal economic regulation. The Staggers Rail Act of 1980, which substantially reduced such regulation, encouraged and enabled rail carriers to innovate and to compete for business, thereby contributing to the economic health of the nation and to the revitalization of the industry. Accordingly, NS will oppose efforts to reimpose unwarranted economic regulation.

**COMPETITION -** There is continuing strong competition among rail, water and highway carriers. Price is usually only one factor of importance as shippers and receivers choose a transport mode and specific hauling company. Inventory carrying costs, service reliability, ease of handling and the desire to avoid loss and damage during transit are also important considerations, especially for higher-valued finished goods, machinery and consumer products. Even for raw materials, semifinished goods and work-in-process, users are increasingly sensitive to transport arrangements that minimize problems at successive production stages.

NS' primary rail competitor is the CSX system; both operate throughout much of the same territory. Other railroads also operate in parts of the territory. NS also competes with motor carriers, water carriers and with shippers who have the additional option of handling their own goods in private carriage.

Certain marketing strategies among railroads and between railroads and motor carriers enable carriers to compete more effectively in specific markets.

**Item 1A. Risk Factors.**

**NS is subject to significant governmental regulation and legislation over commercial, environmental and operating matters.** Railroads are subject to commercial regulation by the Surface Transportation Board, which has jurisdiction over some rates, routes, conditions of service and the extension or abandonment of rail lines. The STB also has jurisdiction over the consolidation, merger or acquisition of control of and by rail common carriers. Occasional efforts are made to re-subject the rail industry to unwarranted federal economic regulation. Economic re-regulation of the rail industry could negatively impact NS' ability to determine prices for rail services and reduce capital spending on its rail network, resulting in a material adverse effect on NS' results of operations, financial condition, and liquidity.

NS' operations are subject to extensive federal, state, and local environmental laws and regulations concerning, among other things, emissions to the air; discharges to water ways or ground water supplies; handling, storage, transportation, and disposal of waste and other materials; and the cleanup of hazardous material or petroleum releases. The risk of incurring environmental liability - for acts and omissions, past, present and future - is inherent in the railroad business. Several of NS' subsidiaries own, or have owned, land used as operating property or held for sale, or which is leased or may have been leased and operated by others. Environmental problems that are latent or undisclosed may exist on these properties, and NS could incur environmental liabilities or costs, the amount and materiality of which cannot be estimated reliably at this time, with respect to one or more of these properties. Moreover, lawsuits and claims involving other unidentified environmental sites and matters are likely to arise from time to time, and the resulting liabilities could have a significant effect on financial condition, results of operations or liquidity in a particular year or quarter.

The Federal Railroad Administration regulates a host of operations matters including track and mechanical equipment standards; signaling systems; testing and inspection of grade crossing warning devices, hours of service of operating employees; drug and alcohol testing; locomotive engineer certification; and reporting of employee injuries, among other areas. NS' unintentional failure to comply with applicable laws and regulations could have a material adverse effect on NS, and changes in the legislative or regulatory frameworks within which NS operates could adversely affect its business.

**NS may be affected by general economic conditions.** Prolonged negative changes in domestic and global economic conditions affecting the producers and consumers of the commodities NS carries may have an adverse effect on its operating results, financial condition, and liquidity. Economic conditions resulting in bankruptcies of one or more large customers could have a significant impact in a particular quarter.

**NS faces competition from other transportation providers.** NS is subject to competition from motor carriers, railroads, and to a lesser extent, ships, barges, and pipelines on the basis of transit time, pricing, and the quality and reliability of service. While NS has used primarily internal resources to build or acquire and maintain its rail system, trucks and barges have been able to use public rights-of-way maintained by public entities. Any future improvements or expenditures materially increasing the quality or reducing the cost of alternative modes of transportation in the regions in which NS operates, or legislation granting materially greater latitude for motor carriers with respect to size or weight limitations, could have a material adverse effect on its results of operations, financial condition, and liquidity.

**NS, as a common carrier by rail, must offer to transport hazardous materials, regardless of risk.** Transportation of certain hazardous materials could create catastrophic losses in terms of personal injury and property damage costs, and compromise critical parts of our rail network. Legislation introduced in Congress in early 2005 would give federal regulators increased authority to conduct investigations and

levy substantial fines and penalties in connection with railroad accidents. Federal regulators also would be required to prescribe new regulations governing railroads' transportation of hazardous materials. If enacted, such legislation and regulations could impose significant additional costs on railroads. Additionally, regulations adopted by the Department of Transportation and regulations contemplated by the Department of Homeland Security could significantly increase the costs associated with moving hazardous materials on NS' lines. Further, certain local governments have sought to enact ordinances banning hazardous materials moving by rail within their borders. Some legislators have contemplated pre-notification requirements for hazardous materials shipments. If promulgated such ordinances could require the re-routing of hazardous materials shipments, with the potential for significant additional costs and network inefficiencies.

**The operations of carriers with which NS interchanges may adversely affect its operations.** NS' ability to provide rail service to customers in the U.S. and Canada depends in large part upon its ability to maintain cooperative relationships with connecting carriers with respect to, among other matters, freight rates, revenue divisions, car supply, reciprocal switching, interchange, trackage rights and locomotive availability. Deterioration in the operations of, or service provided by connecting carriers, or in our relationship with those connecting carriers, could result in NS' inability to meet its customers' demands or require NS to use alternate train routes, which could result in significant additional costs and network inefficiencies.

**NS relies on technology and technology improvements in its business operations.** If NS experiences significant disruption or failure of one or more of its information technology systems, including computer hardware, software, and communications equipment, NS could experience a service interruption, security breach, or other operational difficulties, which could have a material adverse impact on its results of operations, financial condition, and liquidity. Additionally, if NS does not have sufficient capital to acquire new technology or if it is unable to implement new technology, NS may suffer a competitive disadvantage within the rail industry and with companies providing other modes of transportation service, which could have a material adverse effect on its results of operations, financial position, and liquidity.

During 2006, NS will relocate its primary production data center to a newly renovated, state-of-the-art data center. Relocation of primary production applications will begin in April and continue through November. Multiple strategies are being utilized to minimize risk such as purchasing seed equipment for the new data center in support of all mission critical applications. This would include all network components, Mainframe, Teradata and server based critical infrastructure. For less critical applications, the equipment will be shutdown and transported to the new data center. In all cases disaster recovery readiness for mission critical applications will be maintained.

**The vast majority of NS employees belong to labor unions, and labor agreements, strikes, or work stoppages could adversely affect its operations.** Approximately 26,000, or about 85%, of NS railroad employees are covered by collective bargaining agreements with various labor unions. If unionized workers were to engage in a strike, work stoppage, or other slowdown, NS could experience a significant disruption of its operations. Additionally, future national labor agreements, or renegotiation of labor agreements or provisions of labor agreements, could significantly increase NS' costs for healthcare, wages, and other benefits. Any of these factors could have a material adverse impact on NS' results of operations, financial condition, and liquidity.

**NS may be subject to various claims and lawsuits that could result in significant expenditures.** The nature of NS' business exposes it to the potential for various claims and litigation related to labor and employment, personal injury, freight loss and other property damage, and other matters. Job-related personal injury and occupational claims are subject to the Federal Employers' Liability Act (FELA), which is applicable only to railroads. FELA's fault-based tort system produces results that are

unpredictable and inconsistent as compared with a no-fault worker's compensation system. The variability inherent in this system could result in actual costs being very different from the liability recorded.

Any material changes to current litigation trends or a catastrophic rail accident involving any or all of freight loss or property damage, personal injury, and environmental liability could have a material adverse effect on NS' operating results, financial condition, and liquidity to the extent not covered by insurance. NS has obtained commercial insurance for potential losses for third-party liability and first-party property damages. Specified levels of risk are retained on a self-insurance basis (currently up to $25 million per occurrence for bodily injury and property damage to third parties and $12.5 million per occurrence for property owned by NS or in its care, custody or control). Insurance is available from a limited number of insurers and may not continue to be available or, if available, may not be obtainable on terms acceptable to NS.

**Severe weather could result in significant business interruptions and expenditures.** Severe weather conditions and other natural phenomena, including hurricanes and floods, may cause significant business interruptions and result in increased costs, increased liabilities, and decreased revenues, which could have an adverse effect on NS' operating results, financial condition, and liquidity.

**Unpredictability of demand for rail services resulting in the unavailability of qualified personnel could adversely affect NS' operational efficiency and ability to meet demand.** Workforce demographics, training requirements, and the availability of qualified personnel, particularly engineers and trainmen, could each have a negative impact on NS' ability to meet demand for rail service. Unpredictable increases in demand for rail services may exacerbate such risks, which could have a negative impact on NS' operational efficiency and otherwise have a material adverse effect on its results of operations, financial condition, and liquidity.

**NS may be affected by terrorism or war.** Any terrorist attack, or other similar event, any government response thereto, and war or risk of war could cause significant business interruption and may adversely affect NS' results of operations, financial condition, and liquidity. Because NS plays a critical role in the nation's transportation system, it could become the target of such an attack or have a significant role in the government's preemptive approach or response to an attack or war.

Although NS currently maintains insurance coverage for third-party liability arising out of war and acts of terrorism, its current insurance coverage for first-party property damage and damage to property in NS' care, custody or control does not apply to damage caused by war and may not apply to certain acts of terrorism. In addition, premiums for some or all of NS' current insurance programs covering these losses could increase dramatically, or insurance coverage for certain losses may not be available to NS in the future.

**NS may be affected by supply constraints resulting from disruptions in the fuel markets or the nature of some of its supplier markets.** NS consumes over 500 million gallons of diesel fuel each year. Fuel availability could be affected by any limitation in the fuel supply or by any imposition of mandatory allocation or rationing regulations. If a severe fuel supply shortage arose from production curtailments, disruption of oil imports, disruption of domestic refinery production, damage to refinery or pipeline infrastructure, political unrest, war or otherwise, NS' operating results, financial condition, and liquidity could be affected. Also, such an event would impact NS as well as its customers and other transportation companies.

Due to the capital intensive nature and industry-specific requirements of the rail industry, there are high barriers of entry for potential new suppliers of core railroad items, such as locomotives and rolling stock

equipment. Additionally, NS competes with other industries for available capacity and raw materials used in the production of certain track materials, such as rail and ties. Changes in the competitive landscapes of these limited-supplier markets could result in increased prices or material shortages that could materially affect NS' operating results, financial condition, and liquidity.

**Item 1B. Unresolved Staff Comments.**

None.

**Item 3. Legal Proceedings.**

None.

**Item 4. Submission of Matters to a Vote of Security Holders.**

There were no matters submitted to a vote of security holders during the fourth quarter of 2005.

**Executive Officers of the Registrant.**

Norfolk Southern's executive officers generally are elected and designated annually by the Board of Directors at its first meeting held after the annual meeting of stockholders, and they hold office until their successors are elected. Executive officers also may be elected and designated throughout the year as the Board of Directors considers appropriate. There are no family relationships among the officers, nor any arrangement or understanding between any officer and any other person pursuant to which the officer was selected. The following table sets forth certain information, as of January 31, 2006, relating to the executive officers.

| Name, Age, Present Position | Business Experience During Past Five Years |
|---|---|
| David R. Goode, 65, Chairman | Present position since November 1, 2005. Served as Chairman and Chief Executive Officer from October 1, 2004, to November 1, 2005, and prior thereto was Chairman, President and Chief Executive Officer. Mr. Goode will retire from position as Chairman effective February 1, 2006, and he will serve as special advisor to the Chief Executive Officer until his retirement effective March 1, 2006. |
| Charles W. Moorman, 53, President and Chief Executive Officer | Present position since November 1, 2005. Served as President from October 1, 2004 to November 1, 2005; as Senior Vice President – Corporate Planning and Services from December 1, 2003 to October 1, 2004; Senior Vice President – Corporate Services from February 1, 2003 to December 1, 2003; also served as President – Thoroughbred Technology and Telecommunications, Inc. since October 1999 and prior thereto was Vice President – Information Technology. Mr. Moorman will succeed Mr. Goode as Chairman effective February 1, 2006. |
| L. I. Prillaman, 62, Vice Chairman and Chief Marketing Officer | Present position since August 1998. |
| Stephen C. Tobias, 61, Vice Chairman and Chief Operating Officer | Present position since August 1998. |
| Henry C. Wolf, 63, Vice Chairman and Chief Financial Officer | Present position since August 1998. |
| James A. Hixon, 52, Executive Vice President – Law and Corporate Relations | Present position since October 1, 2005. Served as Executive Vice President – Finance and Public Affairs From October 1, 2004, to October 1, 2005; Senior Vice President – Legal and Government Affairs from December 1, 2003 to October 1, 2004; Senior Vice President – Administration from February 1, 2001 to December 1, 2003; Senior Vice President – Employee Relations from November 1, 1999 to February 1, 2001; and prior thereto was Vice President – Taxation. |

| | |
|---|---|
| Mark D. Manion, 53, Executive Vice President – Operations | Present position since October 1, 2004. Served as Senior Vice President – Transportation Operations from December 1, 2003 to October 1, 2004; Vice President – Transportation Services and Mechanical from February 1, 2001 to December 1, 2003; and prior thereto was Vice President – Mechanical. |
| Kathryn B. McQuade, 49, Executive Vice President – Planning and Chief Information Officer | Present position since October 1, 2004. Served as Senior Vice President – Finance from December 1, 2003 to October 1, 2004; Senior Vice President – Financial Planning from April 1, 2000 to December 1, 2003; and prior thereto was Vice President – Financial Planning. |
| John P. Rathbone, 53, Executive Vice President – Administration | Present position since October 1, 2004. Served as Senior Vice President – Administration from December 1, 2003 to October 1, 2004; Senior Vice President and Controller from April 2000 to December 1, 2003 and prior thereto was Vice President and Controller. |
| Donald W. Seale, 53, Executive Vice President – Sales and Marketing | Present position since October 1, 2004. Served as Senior Vice President – Marketing Services from December 1, 2003 to October 1, 2004; and prior thereto was Senior Vice President- Merchandise Marketing. |
| Daniel D. Smith, 53, Senior Vice President – Energy and Properties | Present position since December 1, 2003. Served as President- NS Development from February 1, 2001 to December 1, 2003; and prior thereto was President of Pocahontas Land Corporation. |
| James A. Squires, 44, Senior Vice President – Law | Present position since October 1, 2004. Served as Vice President – Law from December 1, 2003 to October 1, 2004; Senior General Counsel from February 1, 2002 to December 1, 2003 and prior thereto was General Counsel. |
| Marta R. Stewart, 48, Vice President and Controller | Present position since December 1, 2003. Prior thereto was Assistant Vice President Corporate Accounting. |

## PART II

## NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES (NS)

**Item 5. Market for Registrant's Common Equity and Related Stockholder Matters.**

### NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES
### STOCK PRICE AND DIVIDEND INFORMATION

The Common Stock of Norfolk Southern Corporation, owned by 48,180 stockholders of record as of Dec. 31, 2005, is traded on the New York Stock Exchange with the symbol NSC. The following table shows the high and low sales prices as reported by Bloomberg L.P. on its internet-based service and dividends per share, by quarter, for 2005 and 2004.

| | Quarter | | | |
|---|---|---|---|---|
| **2005** | 1st | 2nd | 3rd | 4th |
| Market price | | | | |
| High | $ 38.99 | $ 37.78 | $ 40.93 | $ 45.81 |
| Low | 33.21 | 29.60 | 30.70 | 38.01 |
| Dividends per share | $ 0.11 | $ 0.11 | $ 0.13 | $ 0.13 |
| **2004** | | | | |
| Market price | | | | |
| High | $ 24.06 | $ 26.60 | $ 29.79 | $ 36.69 |
| Low | 20.38 | 21.54 | 24.77 | 29.88 |
| Dividends per share | $ 0.08 | $ 0.08 | $ 0.10 | $ 0.10 |

### ISSUER REPURCHASES OF EQUITY SECURITIES

| Period | (a) Total Number of Shares (or Units) Purchased | (b) Average Price Paid per Share (or Unit) | (c) Total Number of Shares (or Units) Purchased as Part of Publicly Announced Plans or Programs[2] | (d) Maximum Number (or Approximate Dollar Value) of Shares (or Units) that may yet be Purchased Under the Plans or Programs[2] |
|---|---|---|---|---|
| Oct. 1-31, 2005 | 2,524[1] | $39.61 | -- | -- |
| Nov. 1-30, 2005 | 32,170[1] | $42.01 | -- | 50,000,000 |
| Dec. 1-31, 2005 | 10,907[1] | $44.28 | -- | 50,000,000 |
| Total | 45,601 | $42.42 | | |

(1) Shares tendered by employees in connection with the exercise of stock options under the Long-Term Incentive Plan.

(2) On Nov. 22, 2005, the Board of Directors authorized a share repurchase program, pursuant to which up to 50 million of the NS' common stock may be purchased by 2015.

**Item 6. Selected Financial Data.**

**NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES**
**FIVE-YEAR FINANCIAL REVIEW 2001-2005**

| | 2005[1] | 2004[2] | 2003[3] | 2002 | 2001 |
|---|---|---|---|---|---|
| | | *($ in millions, except per share amounts)* | | | |
| **RESULTS OF OPERATIONS** | | | | | |
| Railway operating revenues | $ 8,527 | $ 7,312 | $ 6,468 | $ 6,270 | $ 6,170 |
| Railway operating expenses | 6,410 | 5,610 | 5,404 | 5,112 | 5,163 |
| Income from railway operations | 2,117 | 1,702 | 1,064 | 1,158 | 1,007 |
| Other income – net | 74 | 89 | 19 | 66 | 99 |
| Interest expense on debt | 494 | 489 | 497 | 518 | 553 |
| Income from continuing operations before income taxes and accounting changes | 1,697 | 1,302 | 586 | 706 | 553 |
| Provision for income taxes | 416 | 379 | 175 | 246 | 191 |
| Income from continuing operations before accounting changes | 1,281 | 923 | 411 | 460 | 362 |
| Discontinued operations[4] | -- | -- | 10 | -- | 13 |
| Cumulative effect of changes in accounting principles, net of taxes[5] | -- | -- | 114 | -- | -- |
| Net income | $ 1,281 | $ 923 | $ 535 | $ 460 | $ 375 |
| **PER SHARE DATA** | | | | | |
| Income from continuing operations before accounting changes – basic | $ 3.17 | $ 2.34 | $ 1.05 | $ 1.18 | $ 0.94 |
| – diluted | $ 3.11 | $ 2.31 | $ 1.05 | $ 1.18 | $ 0.94 |
| Net income – basic | $ 3.17 | $ 2.34 | $ 1.37 | $ 1.18 | $ 0.97 |
| – diluted | $ 3.11 | $ 2.31 | $ 1.37 | $ 1.18 | $ 0.97 |
| Dividends | $ 0.48 | $ 0.36 | $ 0.30 | $ 0.26 | $ 0.24 |
| Stockholders' equity at year end | $ 22.66 | $ 19.95 | $ 17.83 | $ 16.71 | $ 15.78 |
| **FINANCIAL POSITION** | | | | | |
| Total assets | $ 25,861 | $ 24,750 | $ 20,596 | $ 19,956 | $ 19,418 |
| Total long-term debt, including current maturities[6] | $ 6,930 | $ 7,525 | $ 7,160 | $ 7,364 | $ 7,632 |
| Stockholders' equity | $ 9,289 | $ 7,990 | $ 6,976 | $ 6,500 | $ 6,090 |
| **OTHER** | | | | | |
| Capital expenditures | $ 1,025 | $ 1,041 | $ 720 | $ 695 | $ 746 |
| Average number of shares outstanding (thousands) | 404,170 | 394,201 | 389,788 | 388,213 | 385,158 |
| Number of stockholders at year end | 48,180 | 51,032 | 52,091 | 51,418 | 53,042 |
| Average number of employees: | | | | | |
| Rail | 29,851 | 28,057 | 28,363 | 28,587 | 30,510 |
| Nonrail | 443 | 418 | 390 | 383 | 384 |
| Total | 30,294 | 28,475 | 28,753 | 28,970 | 30,894 |

[1] 2005 provision for income taxes includes a $96 million benefit related to the reduction of NS' deferred income tax liabilities resulting from tax legislation enacted by Ohio. This benefit increased net income by $96 million, or 23 cents per diluted share.

[2] 2004 other income – net includes a $53 million net gain from the Conrail Corporate Reorganization. This gain increased net income by $53 million or 13 cents per diluted share.

[3] 2003 operating expenses include a $107 million charge for a voluntary separation program. Other income – net includes an $84 million charge to recognize the impaired value of certain telecommunications assets. These charges reduced net income by $119 million, or 30 cents per diluted share.

[4] NS sold all the common stock of its motor carrier subsidiary, North American Van Lines, Inc. in 1998. Results in 2001 include an additional after-tax gain of $13 million, or 3 cents per diluted share, that resulted from the expiration of certain indemnity obligations contained in the sales agreement. Results in 2003 include an additional after-tax gain of $10 million, or 3 cents per diluted share, resulting from resolution of tax issues related to the transaction.

[5] Net income in 2003 reflects two accounting changes, the cumulative effect of which increased net income by $114 million, or 29 cents per diluted share: a change in accounting for the cost to remove railroad crossties, which increased net income by $110 million, and a change in accounting related to a special-purpose entity that leases certain locomotives to NS, which increased net income by $4 million.

[6] Excludes notes payable to Conrail of $716 million in 2003, $513 million in 2002 and $301 million in 2001.

See accompanying Consolidated Financial Statements and notes thereto.

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations.**

**Norfolk Southern Corporation and Subsidiaries**
**Management's Discussion and Analysis of**
**Financial Condition and Results of Operations**

The following discussion and analysis should be read in conjunction with the Consolidated Financial Statements and Notes and the Selected Financial Data.

## OVERVIEW

NS' results in 2005 reflect substantial increases in revenues resulting from higher pricing, fuel surcharges and increased traffic volume that kept pace with the growth of the U.S. economy. Revenues increased $1.2 billion, or 17%, in 2005, as high demand for rail freight transportation, coupled with constrained capacity for other modes of transport and the fluidity of the NS network enabled NS to raise rates and handle additional volume. Approximately one-third of the revenue increase was due to higher fuel surcharge amounts. Carloadings were up 322,300 units, or 4%, largely because of a 9% increase in intermodal traffic. For the most part, increased operating expenses of $800 million were reflective of the increased traffic volume as well as sharply higher fuel prices. In addition, casualties and other claims expenses were significantly higher in 2005 related to an accident in Graniteville, South Carolina in January, a large unfavorable jury award in July and two strong Gulf Coast hurricanes in August and September. Despite the 14% increase in expenses, the operating ratio, a measure of the amount of operating revenues consumed by operating expenses, improved to 75.2%, and income from railway operations rose 24%.

The strong operating results translated into significantly improved cash flows which were used to pay off debt and increase dividends while establishing an all-time high cash and short-term investment balance of $1.3 billion at year end. Looking ahead, NS expects business levels to continue to grow in 2006 but at a more modest pace than seen in 2005. NS plans to continue its focus on improving service levels and maintaining an aggressive pricing strategy as business is renewed. Approximately one-half of NS' revenue base is subject to renegotiation or repricing in 2006.

## SUMMARIZED RESULTS OF OPERATIONS

### 2005 Compared with 2004

Net income in 2005 was $1.3 billion, or $3.11 per diluted share, up $358 million, or 39%, compared with $923 million, or $2.31 per diluted share, in 2004. The results in 2005 reflected a $96 million second quarter increase to net income related to state tax law changes (see Note 3), while the results in 2004 reflected a $53 million net gain related to the Conrail Corporate Reorganization (see Note 5). The remaining $315 million increase in net income was primarily due to higher income from railway operations. Railway operating revenues increased $1.2 billion, reflecting higher rates (including the favorable effects of the coal rate cases settled in the second quarter – see below), fuel surcharges and increased traffic volume. Railway operating expenses rose $800 million, or 14%, principally due to higher diesel fuel prices, increased volume-related expenses and casualty claims costs.

**2004 Compared with 2003**

Net income in 2004 of $923 million, or $2.31 per diluted share, was up $388 million, or 73%, compared with net income of $535 million, or $1.37 per diluted share, in 2003. Results in 2003 included a $10 million, or 3 cents per share, gain from discontinued operations (see Note 17) and a $114 million, or 29 cents per share, benefit related to the cumulative effect of changes in accounting principles (see Note 1). Income from continuing operations before accounting changes was $923 million, or $2.31 per diluted share, in 2004, compared with $411 million, or $1.05 per diluted share, in 2003. The increase in 2004 was the result of higher income from railway operations and also included a $53 million net noncash gain from the Conrail Corporate Reorganization (see Note 5). In addition, the comparisons were affected by the costs of a voluntary separation program (see Note 11) and the impairment of certain telecommunications assets (see Note 6) in 2003, which combined to reduce net income in that year by $119 million, or 30 cents per diluted share.

**DETAILED RESULTS OF OPERATIONS**

**Railway Operating Revenues**

Railway operating revenues were $8.5 billion in 2005, $7.3 billion in 2004 and $6.5 billion in 2003. The following table presents a three-year comparison of revenues, volume and average revenue per unit by market group.

| | Revenues ($ in millions) | | | Units (in thousands) | | | Revenue per Unit ($ per unit) | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2005 | 2004 | 2003 | 2005 | 2004 | 2003 | 2005 | 2004 | 2003 |
| Coal | $ 2,115 | $ 1,728 | $ 1,500 | 1,735.4 | 1,690.8 | 1,614.6 | $ 1,219 | $ 1,022 | $ 929 |
| General merchandise: | | | | | | | | | |
| Automotive | 997 | 954 | 936 | 615.9 | 634.6 | 645.1 | 1,620 | 1,503 | 1,450 |
| Metals/construction | 978 | 818 | 699 | 794.2 | 781.1 | 710.2 | 1,231 | 1,048 | 984 |
| Chemicals | 973 | 864 | 772 | 447.0 | 448.5 | 425.7 | 2,176 | 1,927 | 1,815 |
| Agr./cons. prod./govt. | 845 | 727 | 688 | 580.3 | 568.9 | 555.8 | 1,455 | 1,278 | 1,238 |
| Paper/clay/forest | 793 | 684 | 634 | 458.8 | 448.8 | 443.2 | 1,729 | 1,524 | 1,431 |
| General merchandise | 4,586 | 4,047 | 3,729 | 2,896.2 | 2,881.9 | 2,780.0 | 1,583 | 1,404 | 1,341 |
| Intermodal | 1,826 | 1,537 | 1,239 | 3,154.9 | 2,891.5 | 2,466.6 | 579 | 531 | 502 |
| Total | $ 8,527 | $ 7,312 | $ 6,468 | 7,786.5 | 7,464.2 | 6,861.2 | $ 1,095 | $ 980 | $ 943 |

In 2005, revenues increased $1.2 billion, or 17%, reflecting a $539 million, or 13%, rise in general merchandise revenues; a $387 million, or 22%, improvement in coal revenues; and a $289 million, or 19%, increase in intermodal revenues. All market groups collected significant amounts of fuel surcharge, which accounted for approximately one-third of the increase in revenues. At year end 2005, fuel surcharge provisions covered approximately 85% of total revenues.

As shown in the following table, the 2005 revenue improvement was the result of increased average revenues and higher traffic volumes.

**Revenue Variance Analysis**
Increases

| | 2005 vs. 2004 | 2004 vs. 2003 |
|---|---|---|
| | *($ in millions)* | |
| Revenue per unit/mix | $ 899 | $ 275 |
| Volume | 316 | 569 |
| Total | $ 1,215 | $ 844 |

The favorable revenue per unit/mix variance accounted for 74% of the total variance and was driven by higher rates and increased fuel surcharges, offset in part by an unfavorable mix component reflecting a 9% rise in lower average priced intermodal traffic volume. Volume rose by 322,300 units, or 4%.

In 2004, revenues increased $844 million, or 13%, reflecting a $318 million, or 9%, rise in general merchandise revenues, a $298 million, or 24%, increase in intermodal revenues and a $228 million, or 15%, improvement in coal revenues. The revenue improvement was the result of 9% higher traffic volumes and increased average revenues. All general merchandise market groups except automotive posted volume increases over 2003. The favorable revenue per unit/mix variance was driven by higher average revenue per unit that reflected higher rates and increased fuel surcharges, offset in part by the effects of a 17% increase in lower-priced intermodal traffic volume.

Beginning March 1, 2004, NS modified its fuel surcharge program for its merchandise and coal traffic. The fuel surcharge program in effect until that time applied a 2% fuel surcharge to line haul freight charges when the West Texas Intermediate (WTI) crude oil price, as published in the Wall Street Journal, exceeded $28.00 per barrel for 30 consecutive business days. For each $5.00 per barrel increase, an additional 2% fuel surcharge applied. The revised fuel surcharge is based on the monthly average price of WTI crude oil. Line haul freight charges are adjusted by 0.4% for every dollar the average price exceeds $23 per barrel in the second calendar month prior to the month in which the fuel surcharge is applied. The modification in the fuel surcharge program causes the amount charged to more closely reflect fuel price fluctuations. Higher average WTI crude oil prices resulted in an increase in fuel surcharges; however, this was offset by the effect of higher prices for diesel fuel and other oil products.

**COAL** revenues increased $387 million, or 22%, compared with 2004, reflecting higher average revenue per carload and increased traffic volume. Coal average revenue per unit was up 19% compared with 2004, reflecting higher rates, the favorable effects of fuel surcharges, longer-haul business and the rate cases settled in the second quarter (see below). Coal represented 25% of NS' revenues in 2005, and 83% of shipments handled originated on NS' lines. Traffic volumes rose 3% primarily because of increased shipments of utility coal that offset lower export and domestic metallurgical coal, coke and iron ore shipments.

During the second quarter of 2005, NS entered into settlement agreements with two utility customers that resolved their rail transportation rate cases before the Surface Transportation Board (STB). In 2002, Duke Energy (Duke) and Carolina Power & Light (CP&L) each filed rate reasonableness complaints with the STB. In October 2004, the STB found NS' rates to be reasonable in both cases, and at the STB's invitation, Duke and CP&L each initiated proceedings to determine if phasing constraints should apply. As a result of the settlement of these cases, NS recognized $55 million of additional coal revenue related to the period in dispute.

In 2004, coal revenues increased $228 million, or 15%, versus 2003. Traffic volume increased 5% primarily due to higher export, utility and metallurgical coal volumes, which offset declines in coke and iron ore. Average revenue per unit increased 10%, reflecting higher rates, fuel surcharges, a favorable change in the mix of traffic (the rate of increase in longer haul traffic exceeded that of short haul traffic) and improved loading productivity (increased tons per car). Coal, coke and iron ore revenues represented 24% of total railway operating revenues in 2004, and 83% of NS' coal shipments originated on lines it operates.

**Total Coal, Coke and Iron Ore Carloads**

| | 2005 | 2004 | 2003 |
|---|---|---|---|
| | | *(Cars in thousands)* | |
| Utility | 1,292.0 | 1,222.4 | 1,188.5 |
| Export | 139.2 | 157.0 | 116.5 |
| Domestic metallurgical | 209.5 | 214.0 | 213.8 |
| Industrial | 94.7 | 97.4 | 95.8 |
| Total | 1,735.4 | 1,690.8 | 1,614.6 |

**Utility coal** volume increased 6%, compared to 2004, in response to increased coal-fired generation to meet the heavier electricity demand of a strong economy, limited nuclear power generation capacity, higher natural gas prices and utility coal stockpiles which were below target levels across NS' service area. Supply constraints dampened shipments while the increased demand for Eastern U.S. coal prompted some customers to shift to coal from non-traditional sources in Wyoming and Colorado and imported coal. Appalachian coal production increased modestly and western coal production was up 2% in 2005.

In 2004, utility coal volume increased 3%, compared to 2003, as electricity production was up almost 2% in NS' service region responding to higher demand driven by a rebounding U.S. economy. Utilities increased burn to meet the heavier electricity demand and a new rail unloading facility began operating in April 2004 at a northern utility. Utility coal stockpiles were below target levels across NS' service area due in part to the increased demand for coal-fired electric generation. Increased demand for Eastern U.S. coal prompted some customers to shift to coal from non-traditional sources in Wyoming and Colorado in addition to more imported coal. In response, Appalachian coal production increased slightly in 2004 following a decline in 2003.

The outlook for utility coal remains positive. The continued growth in demand for electricity and lower-than-targeted coal stockpiles at the utilities should support increased coal carloads in 2006. Domestic western origin and imported coals are expected to continue to be an important source of additional coal supply to overcome the supply imbalance created by increased utility demand and the supply constraints of Eastern U.S. coal sources. Natural gas prices are expected to remain higher and more volatile than coal energy prices. As always, demand for coal will be influenced by the weather.

A number of evolving environmental issues could affect the utility coal market, depending upon their outcome. These include a national energy policy, proposed multi-emissions legislation, mercury emissions standards, new source review, potential regional programs aimed at capping and reducing power plant $CO_2$ emissions, and ongoing efforts at addressing climate change. Certain utilities have chosen to add emissions control technologies to their electric generating units in advance of governmental requirements and are moving up their plans to more fully utilize their existing coal-fired power plants.

**Export coal** volume decreased 11% in 2005, compared to 2004, due to both coal supply constraints and a weak European steel market. Volume through Norfolk and Baltimore decreased. Norfolk was down approximately 16,000 carloads, or 14%, and Baltimore was down approximately 2,000 carloads, or 6%. U.S. exports in 2005 were constrained by several factors: (1) the tight coal supply from Eastern coal mines caused primarily by the sporadic closure of a major coal mine, (2) the idling of production by European steel manufacturers in order to manage finished goods inventory, and (3) the abundant supply of Chinese coke on the world market lowering the price and making it more economical to buy coke rather than import metallurgical coal from the U.S. and convert it.

In 2004, export coal volume increased 35%, compared to 2003, due to sustained strong global demand for high quality metallurgical coal and China's continued growing consumption of coal for steel production and electricity generation. The devaluation of the dollar resulted in lower U.S. coal prices relative to Australian and Canadian coal prices, which made U.S. coals more economical in traditional European markets. In addition, ocean vessel rates continued to favor U.S. coals. Volume through Baltimore and Norfolk increased dramatically. Baltimore was up approximately 24,000 carloads, or 159%, and Norfolk was up approximately 16,000 carloads, or 16%. However, U.S. exports in 2004 were constrained by the tight coal supply from Eastern coal mines.

Export coal volume for 2006 is expected to show improvement, subject to the availability of U.S. coal, as the European steel market recovers; and international demand for high-quality metallurgical coal is expected to remain high despite the impact of abundant Chinese coke on the world market.

**Domestic metallurgical** coal, coke and iron ore volume was down 2% in 2005, compared with 2004. Declines in domestic coke and iron ore volumes, principally due to the idling of a major steel blast furnace, were partially offset by an 8% increase in metallurgical coal.

For 2004, domestic metallurgical coal, coke and iron ore volume was flat compared with 2003. Metallurgical coal volume was up 12%. However, this was offset by declines in domestic coke and iron ore volumes, principally due to reduced production at an NS-served producer.

Demand for domestic metallurgical coal, coke and iron ore is expected to improve in 2006, as the idled blast furnace is expected to return to operation and metallurgical coal production is expected to grow.

**Other coal** volumes (principally steam coal shipped to industrial plants) decreased 3% versus 2004, primarily due to the diversion of coal to the utility market. In 2004, other coal volumes increased 2% versus 2003, primarily due to new business and the recovery of the U.S. economy.

**GENERAL MERCHANDISE** revenues increased 13% due to higher average rates and fuel surcharges. Traffic volume was up modestly compared with 2004 as decreases in automotive and chemicals traffic offset increases in other business groups. In 2004, general merchandise revenues increased 9% and traffic volume increased 4% compared to 2003, principally due to higher average revenues across all business groups, including increased fuel surcharges, and improved volumes in all but the automotive business group.

**Automotive** revenues rose 5% in 2005 compared with 2004, the result of an 8% increase in average revenue per unit that reflected pricing improvements and higher fuel surcharges. In contrast, traffic volume decreased 3% primarily due to reduced production at Ford and GM, with GM closing assembly plants in Michigan, Maryland and New Jersey. Ford and GM combined operate 17 of 31 assembly plants served by NS. These declines were partially offset by increased production at Honda, Mercedes-Benz and Toyota.

In 2004, automotive revenues increased 2%, reflecting pricing improvements and fuel surcharge increases. In contrast, traffic volume decreased 2% compared to 2003, primarily related to reduced automotive production at Ford and GM, partially offset by increased production at Toyota and Honda.

For 2006, automotive revenues are expected to increase modestly despite a continued decline in traffic volume. Production decreases by U.S. automotive manufacturers are expected to be partially offset by higher domestic production by foreign manufacturers. In addition to the GM plant closures that occurred in 2005, Ford announced that it will close five plants, of which NS serves the St. Louis and Atlanta assembly plants and the Batavia transmission plant.

**Metals and construction** revenue increased 20% and traffic volume increased 2% in 2005 compared with 2004. Revenue per unit rose 17% because of higher rates and fuel surcharges. The volume improvements were due primarily to continued strength at NS-served integrated and electric arc mills and higher aluminum product shipments, which were partially offset by lower scrap metal carloads. Construction traffic volume benefited from increased residential, commercial and highway construction.

For 2004, metals and construction revenue increased 17% and traffic volume increased 10% compared with 2003. The improvement was primarily due to increased production at NS-served integrated mills and mini-mills, the conversion of truck business to rail resulting from a shortage of flatbed trucks as well as higher scrap metal volumes resulting from expanded alliances with key scrap metal shippers and access to new scrap processors and steel mills. Construction traffic volume benefited from increased residential, commercial and highway construction.

Metals and construction volume is expected to be slightly higher in 2006, reflecting continued strength in metals and highway construction, coupled with reconstruction in the Gulf Coast region.

**Chemicals** revenues increased 13%, reflecting higher prices and fuel surcharges, while traffic volume was down slightly, as a result of production curtailment in the Gulf Coast region, compared with a strong 2004. Volume increases for plastic and petroleum products were offset by decreases in industrial and miscellaneous chemicals.

In 2004, chemicals revenues increased 12% and traffic volume increased 5% compared with 2003. Revenue per unit reflected higher prices in response to market conditions and fuel surcharges. The volume increase reflected manufacturers' increased demand across all chemical business groups. Feedstocks and plastic shipments were up as inventories were restocked in anticipation of higher product prices related to increased natural gas costs, and new propane and asphalt terminals in the Southeast added carloads.

Chemical volume is expected to grow modestly in 2006, supported by new and expanded propane and plastic plants in North Carolina and Virginia. However, volume could be adversely affected by the price of natural gas and crude oil, which accounts for more than 50% of the cost of most chemical products and presents a significant competitive challenge that could cause domestic chemical producers to move production overseas.

**Agriculture, consumer products and government** revenue increased 16% and traffic volume increased 2% in 2005 compared with 2004. Average revenue per unit rose 14%, a result of higher rates and fuel surcharges. Traffic volume growth resulted from sweeteners, government traffic and fertilizer. Government traffic growth was primarily due to the support of military operations in Iraq as well as shipments of temporary housing to hurricane-damaged areas. Ethanol traffic increased 38% due to higher shipments from current customers in addition to new business in Georgia and South Carolina.

In 2004, agriculture, consumer products and government revenue increased 6% and traffic volume increased 2% compared with 2003. Revenue per unit improved 3% as a result of changes in traffic mix such as increased ethanol traffic and more long haul feed shipments as well as higher prices. The volume increase was primarily driven by ethanol and fertilizer shipments. Ethanol traffic increased 59% primarily due to the opening of the Northeast market to ethanol as a gasoline additive. Fertilizer was up 7% year-over-year, reflecting higher domestic shipments to industrial customers and increased exports of phosphates, principally to China.

Agriculture, consumer products and government volume is expected to grow in 2006, benefiting from the expanding markets for ethanol and bio-diesel production and continued recovery efforts in the Gulf region.

**Paper, clay and forest products** revenue increased 16% and traffic volume increased 2% in 2005 compared with 2004. Average revenue per unit rose 13% due to higher rates and fuel surcharges. Pulp board, printing paper, newsprint and woodchip produced volume gains despite consolidations within the industry and mill shutdowns.

In 2004, paper, clay and forest products revenue increased 8% and traffic volume increased 1% compared with 2003, reflecting yield improvements in all segments except newsprint, together with higher printing paper, newsprint, pulp board and kaolin shipments as U.S. paper production and demand for paper products strengthened in 2004. Revenue per unit improved 6% principally as a result of price increases but also aided by higher fuel surcharges.

In 2006, paper, clay and forest product revenues are expected to benefit from paper volume, higher construction and demolition debris shipments and a new lumber distribution center that is expected to open in 2006.

**INTERMODAL** revenues increased $289 million, or 19% compared with 2004, reflecting improved traffic volume, higher fuel surcharges, and increased rates. Despite moderated growth in domestic business, traffic volume increased 9% reflecting strength in the international, truckload and Triple Crown Services lines of business. International traffic volume grew by 16% reflecting strength in U.S. consumer markets and growth in the movement of import and export goods through NS-served east coast ports, as well as west coast ports. Truckload volume increased 10% compared with 2004, reflecting additional business with traditional truckload companies. Premium business, which includes parcel and LTL carriers, grew 6% due primarily to new business in the Northern region. Triple Crown Services volume grew 6% reflecting expanded geographic coverage and increased trailer fleet size to meet higher demand. Domestic volume decreased 3% compared with 2004, principally due to the continued reduction in transloading of west coast international freight into domestic containers. Intermodal revenue per unit increased 9%, a result of fuel surcharges and rate increases.

In 2004, intermodal revenue increased 24% and volume increased 17% compared with 2003. Strong demand was driven by an expanding economy led by higher consumer spending, industrial production and international trade, in addition to constraints in truck and other railroads' capacity. International steamship volume was up 15%, tied to the growth in U.S. trade volumes through east and west coast ports. Truckload volume increased 28% as a result of new business with traditional truckload companies. Premium business, which includes parcel and LTL carriers, grew 15% principally due to new parcel service between Chicago and New Jersey. Triple Crown Services Company increased volume by 8% through an expanded trailer fleet and growth in its geographic coverage. Revenue per unit improved 6%, reflecting value-based pricing and fuel surcharges.

In 2006, intermodal revenues are expected to grow as NS plans to open new terminals in Kentucky and Pennsylvania in addition to expanding existing intermodal terminals in Georgia and Ohio. In addition, strong international trade is expected to create growth opportunities in NS' international business segment. Future growth may, however, be tempered by operating improvements at other railroads, as well as constraints in the drayage market.

**Railway Operating Expenses**

Railway operating expenses in 2005 were $6.4 billion, up $800 million, or 14%, compared to 2004, which were up 4% compared to 2003. The 2005 increase was principally due to a sharp rise in the price of diesel fuel, volume-related expense increases, more maintenance activities and higher casualty costs. Carloads rose 4% in 2005 compared to 2004 and 9% in 2004 compared to 2003. The increase in 2004 was largely the result of higher traffic volume, offset in part by the absence of the $107 million cost of a voluntary separation program incurred in 2003.

The railway operating ratio, which measures the percentage of railway operating revenues consumed by railway operating expenses, was 75.2% in 2005, compared with 76.7% in 2004 and 83.5% in 2003.

The following table shows the changes in railway operating expenses summarized by major classifications.

**Operating Expense Variances**
Increases (Decreases)

| | 2005 vs. 2004 | 2004 vs. 2003 |
|---|---|---|
| | *($ in millions)* | |
| Compensation and benefits* | $ 221 | $ (3) |
| Materials, services and rents | 208 | 174 |
| Conrail rents and services | (190) | (100) |
| Depreciation | 176 | 85 |
| Diesel fuel | 278 | 69 |
| Casualties and other claims | 73 | (30) |
| Other | 34 | 11 |
| Total | $ 800 | $ 206 |

* Includes $107 million of voluntary separation costs in 2003.

**Compensation and benefits**, which represents about 40% of total railway operating expenses, increased $221 million, or 10%, compared with 2004 and was flat in 2004 compared with 2003. The 2005 increase reflected increased hours for train operations, including trainees, and equipment maintenance (up $70 million); increased wage rates (up $46 million); increased pension, postretirement and health and welfare benefit costs (up $43 million); higher stock-based compensation (up $22 million); and higher payroll taxes (up $12 million).

NS employment averaged 30,294 in 2005 compared with 28,475 in 2004 and 28,753 in 2003. The increased employment has come almost exclusively in operating department personnel to meet the increased volume and service needs, as well as expected retirements. NS continues to hire and train additional workers in order to meet the requirements of forecasted volumes in light of the demographics of its work force.

In 2005 and prior years, NS accounted for its stock-based compensation under APB No. 25; however, NS will adopt SFAS 123(R) in the first quarter of 2006 (see discussion under "New Accounting Pronouncement" and Note 1) which will result in higher compensation expense. The expense increase will include the effect of accelerated recognition of costs related to grants to retirement-eligible employees. Most NS salaried employees are eligible to retire at age 55 with a reduced pension benefit. SFAS No. 123(R) requires immediate expense recognition for the cost of grants made to such retirement-eligible employees rather than accrual over the expected future service period. About three-quarters of the cost of stock-based compensation granted in January 2006 will be expensed in 2006 (with almost half of the cost in the first quarter) even though some of the components are earned over a three-year period.

In 2004, compensation expenses reflected higher volume-related train and engine payroll expenses, up $39 million; higher wage rates, which added $37 million; increased stock-based compensation, up $24 million; and higher management and locomotive engineer performance-based incentive compensation, which was up $20 million. These increases were offset by lower nonagreement workforce levels, saving $24 million, as well as the absence of the $107 million expense of the 2003 voluntary separation program.

The Railroad Retirement and Survivors' Improvement Act, which took effect Jan. 1, 2002, allows for investment of Tier II assets in a diversified portfolio through the National Railroad Retirement Investment Trust. The law also provides a mechanism for automatic adjustment of Tier II payroll taxes should the trust assets fall below a four-year reserve or exceed a six-year reserve. As a result, the employers' portion of Tier II retirement payroll taxes have been reduced from 14.2% in 2003 to 13.1% in 2004 and to12.6% in 2005 and thereafter. However, these savings are expected to continue to be substantially offset by higher payroll taxes on increased wages and a higher wage base.

**Materials, services and rents** includes costs related to items used for the maintenance of railroad lines, structures and equipment; the costs of services purchased from outside contractors, including the net costs of operating joint (or leased) facilities with other railroads; and the net cost of equipment rentals. This category of expenses increased $208 million, or 13% in 2005 compared to 2004 and increased 12% in 2004 compared to 2003. The increase in 2005 reflected higher volume-related purchased services (up $82 million) and higher maintenance expense (up $74 million). Equipment rents rose $28 million, reflecting higher traffic volume as well as leases from the Conrail Corporate Reorganization (see Note 5).

The 2004 increase was the result of higher purchased services, up $100 million, including higher costs for volume-related intermodal services such as the lifting of containers and trailers and drayage. In addition, locomotive and freight car maintenance expenses rose $23 million, and equipment rents increased $33 million.

Locomotive repair costs increased in 2005 and 2004, due to more maintenance activity related to higher usage from increased traffic volumes coupled with the age of the fleet. This level of expense is expected to continue and may increase depending on traffic volumes.

Equipment rents, which includes the cost to NS of using equipment (mostly freight cars) owned by other railroads or private owners, less the rent paid to NS for the use of its equipment, rose 11% in 2005 and increased 9% in 2004. The increase in 2005 was principally due to additional lease expense for a full year from the Conrail Corporate Reorganization and increased volume-related intermodal shipments. The rise in 2004 was principally due to traffic volume (particularly intermodal shipments) and the absence of favorable settlements that benefited 2003.

**Conrail rents and services** decreased $190 million, or 60%, in 2005 compared to 2004 and decreased 24% in 2004 compared to 2003. This item includes amounts due to CRC for operation of the Shared

Assets Areas (see Note 5). The decline in both 2005 and 2004 was primarily driven by the Conrail Corporate Reorganization, which resulted in the consolidated reporting of individual components of Conrail equity earnings, principally depreciation, equipment rents and interest expense (see Note 5). NS' share of equity earnings after the Conrail Corporate Reorganization is a component of "Other income-net" (see Note 2).

**Depreciation** expense increased $176 million, or 29%, in 2005 compared to 2004 and increased 17% in 2004 compared to 2003. The increases in 2005 and 2004 were primarily a result of the Conrail Corporate Reorganization (see Note 5). In addition, substantial capital investments and improvements affected all years, resulting in higher depreciation expense.

In 2004, NS received the results of a roadway depreciation study from an independent firm of engineers. The results of the study, which were implemented in September 2004, prospectively reduced depreciation expense by approximately $17 million annually. In 2006, NS expects to complete an equipment depreciation study and an analysis of the assets received in the Conrail Corporate Reorganization. The results of these items are expected to reduce depreciation expense, making 2006 comparable with 2005.

**Diesel fuel** expenses increased 62% in 2005 compared with 2004 and increased 18% in 2004 compared with 2003. Diesel fuel expense is recorded net of hedge benefits (see "Market Risks and Hedging Activities," below and Note 16). The increase in 2005 reflects a 43% rise in the average price per gallon and a 2% increase in consumption. The increase in 2004 reflects a 13% rise in the average price per gallon and a 6% increase in consumption. Expenses in 2005 included hedge benefits of $148 million compared with benefits of $140 million in 2004 and $59 million in 2003. NS has hedged approximately 4% of expected 2006 diesel fuel requirements as of Dec. 31, 2005, at an average price of 89 cents per gallon. No new hedges have been entered into since May 2004. Accordingly, if diesel fuel prices remain at their current levels, or increase further, diesel fuel expense will be higher in 2006.

Legislation enacted in the first quarter of 2005 repeals the 4.3 cents per gallon excise tax on railroad diesel fuel and inland waterway fuel by 2007, with the following phased reductions in 2005 and 2006: by 1 cent per gallon from Jan. 1, 2005 through June 30, 2005; 2 cents per gallon from July 1, 2005 through Dec. 31, 2006; and by the full 4.3 cents thereafter. NS consumes over 500 million gallons of diesel fuel per year.

**Casualties and other claims** expenses (including the estimates of costs related to personal injury, property damage and environmental matters) increased 48% in 2005 compared to 2004 and decreased 17% in 2004 compared to 2003. The increase in 2005 reflected costs associated with a derailment in Graniteville, South Carolina (see discussion below), $16 million for an unfavorable jury verdict received in an FELA case, $9 million of higher insurance costs, and $4 million for the portion of the $12.5 million self-insured retention related to Hurricane Katrina expenses. The decline in 2004 reflected favorable personal injury and freight claims development and higher insurance settlements, partially offset by increased derailment expenses.

On Jan. 6, 2005, a collision in Graniteville, South Carolina, between two NS trains caused the release of chlorine gas from a ruptured tank car. NS' liability in 2005 related to this accident includes a current and long-term portion which represents NS' best estimate based on current facts and circumstances. The estimate includes amounts related to business property damage and other economic losses, personal injury and individual property damage claims as well as third-party response costs. NS' commercial insurance policies are expected to cover substantially all expenses related to this derailment above NS' self-insured retention, including NS' response costs and legal fees. Accordingly, the Consolidated Balance Sheet reflects a current and long-term receivable for estimated recoveries from NS' insurance carriers. The $41 million expense recorded in 2005 represents NS'

retention under its insurance policies and other uninsured costs. While it is reasonable to expect that the liability for covered losses could differ from the amount recorded, such a change would be offset by a corresponding change in the insurance receivable. As a result, NS does not believe that it is reasonably likely that its net loss (the difference between the liability and future recoveries) will be materially different than the loss recorded in 2005. NS expects at this time that insurance coverage is adequate to cover potential claims and settlements above its self-insurance retention.

During the third quarter, NS' operations were adversely affected by Hurricane Katrina, and to a lesser extent, Hurricane Rita, both of which struck the Gulf Coast. NS sustained damage to its facilities in the region as a result of Hurricane Katrina but restored rail freight service into and around New Orleans in a relatively short period of time. The damage sustained to NS facilities as a result of Hurricane Katrina did not materially impact NS' financial condition or results of operations and is covered by insurance above the self-insurance retention limit.

The largest component of casualties and other claims expense is personal injury costs. Cases involving occupational injuries comprised about one-third of total employee injury cases resolved and about one-fourth of total payments made. With its long-established commitment to safety, NS continues to work actively to eliminate all employee injuries and to reduce the associated costs. With respect to occupational injuries, which are not caused by a specific accident or event, but result from a claimed exposure over time, the benefits of any existing safety initiatives may not be realized immediately. These types of claims are being asserted by former or retired employees, some of whom have not been actively employed in the rail industry for decades.

The rail industry remains uniquely susceptible to litigation involving job-related accidental injury and occupational claims because of the Federal Employers' Liability Act (FELA), which is applicable only to railroads. FELA's fault-based system, which covers employee claims for job-related injuries, produces results that are unpredictable and inconsistent as compared with a no-fault workers' compensation system.

NS maintains substantial amounts of commercial insurance for potential third-party liability and property damage claims. It also retains reasonable levels of risk through self-insurance (see Note 18). NS expects insurance costs to be higher in 2006.

**Other expenses** increased 15% in 2005 compared to 2004 and 5% in 2004 compared to 2003. Both 2005 and 2004 reflected higher property and sales and use taxes.

**Other income – net** was $74 million in 2005 and $89 million in 2004, which included the $53 million gain from the Conrail Corporate Reorganization (see Note 5). Results in 2005 reflected: (1) higher interest income (up $28 million), (2) equity in earnings of Conrail subsequent to the Conrail Corporate Reorganization (up $26 million), (3) additional coal royalties (up $12 million), and (4) lower interest accruals related to tax liabilities (down $9 million). These income improvements were partially offset by more expense associated with tax credit investments (up $39 million).

In 2004, other income – net increased by $70 million, reflecting the absence of the $84 million telecommunications assets impairment charge that burdened 2003 (see Note 6) and the gain in 2004 on the Conrail Corporate Reorganization (see Note 5). These increases combined to more than offset expenses from an investment in a limited liability company that owns and operates facilities that produce synthetic fuel from coal (see Note 2). The production of synthetic fuel results in tax credits as well as expenses related to the investments. The expenses are recorded as a component of "Other income – net," and the tax credits, as well as tax benefits related to the expenses, are reflected in the provision for income taxes (see Note 3).

**Income Taxes**

Income tax expense in 2005 was $416 million for an effective rate of 25%, compared with effective rates of 29% in 2004 and 30% in 2003. The large decline in 2005 resulted from the Ohio tax legislation changes, which lowered deferred taxes by $96 million and the effective tax rate by six percentage points (see Note 3).

As shown in Note 3 to the Consolidated Financial Statements, which sets forth a reconciliation from the statutory rate to the effective rate for all three years, the effective rates in both 2005 and 2004 were reduced as a result of tax credits from synthetic fuel-related investments. In addition, 2004 benefited from the favorable resolution of an IRS audit of a synthetic fuel related investment. The effective rates in all three years benefited from favorable adjustments upon filing the prior year tax returns and favorable adjustments to state tax liabilities.

The consolidated federal income tax returns for 2002 through 2003 are being audited by the Internal Revenue Service (IRS). The IRS completed its examination of the 2000 and 2001 consolidated federal income tax returns and issued a Revenue Agent's Report in September 2005, which had a negligible effect on the effective tax rate.

For the 2001 through 2004 tax years, 30% and 50% bonus depreciation was allowed for federal income tax purposes. Except for certain areas affected by Hurricane Katrina, bonus depreciation was not available in 2005. In addition, the Conrail Corporate Reorganization resulted in NS receiving assets with less future tax depreciation than book depreciation. As a result, current taxes were higher in 2005 than in earlier years and are expected to remain higher in 2006.

NS' interests in synthetic fuel credits are subject to reduction if the Reference Price of a barrel of oil for the year falls within an inflation-adjusted phase-out range specified by the tax code. The Reference Price for a year is the annual average wellhead price per barrel of unregulated domestic crude oil as determined by the Secretary of the Treasury by April 1 of the following year. In 2004, the phase-out range was $51.35 to $64.47. The phase-out range for 2005 and later years will be adjusted for inflation. No phase out is considered likely in 2005; however, NS cannot predict with certainty the Reference Price of a barrel of oil for later years. If the Reference Price for a year falls within or exceeds the applicable phase-out range for that year, NS' synthetic fuel credits could be reduced or eliminated. However, indemnification arrangements limit NS' exposure if tax credits are reduced due to oil prices.

**Discontinued Operations**

In 2003, income from discontinued operations consisted of a $10 million after-tax gain related to the resolution of tax issues arising from the sale of NS' motor carrier subsidiary (see Note 17).

**FINANCIAL CONDITION, LIQUIDITY AND CAPITAL RESOURCES**

**Cash provided by operating activities,** NS' principal source of liquidity, was $2.1 billion in 2005, compared with $1.7 billion in 2004 and $1.1 billion in 2003. The improvement in 2005 reflected the $415 million increase in income from railway operations as well as the effects of the Conrail Corporate Reorganization (see below), offset in part by higher income tax payments, including a payment made upon settlement of a federal audit cycle. In 2004, the increase was primarily due to increased railway operating income.

Prior to the Conrail Corporate Reorganization (see Note 5), a significant portion of the payments made to PRR under the operating and lease agreements (which were included in "Conrail rents and services" and, therefore, were a use of cash in "Cash provided by operating activities"), was borrowed back from a subsidiary of PRR under a note due in 2032, and therefore, was a source of cash in "Proceeds from borrowings." NS' net cash flow from these borrowings amounted to $118 million in 2004 and $203 million in 2003. This note was effectively extinguished by the reorganization in 2004. Subsequent to the Conrail Corporate Reorganization, payments under "Conrail rents and services" have declined, depreciation charges have increased and the net borrowings have been terminated. Accordingly, NS' cash provided by operating activities after the Conrail Corporate Reorganization has increased.

NS had working capital of $729 million at Dec. 31, 2005, compared with a working capital deficit of $234 million at Dec. 31, 2004. The improvement reflected higher cash provided by operating activities, as well as a $348 million reduction in current maturities of long-term debt. NS expects that cash on hand combined with cash flow from operations will be sufficient to meet its ongoing obligations. This expectation is based on a view that the economy will continue at a moderate growth rate through 2006.

**Contractual obligations** at Dec. 31, 2005, related to NS' long-term debt (including capital leases) (see Note 8), operating leases (see Note 9), agreements with CRC (see Note 5), unconditional purchase obligations (see Note 18) and other long-term obligations (see Note 18), are as follows:

| | Payments Due By Period | | | | |
|---|---|---|---|---|---|
| | **Total** | **2006** | **2007-2008** | **2009-2010** | **2011 and Subsequent** |
| | | | *($ in millions)* | | |
| Long-term debt and capital lease principal | $ 6,930 | $ 314 | $ 860 | $ 816 | $ 4,940 |
| Operating leases | 1,067 | 144 | 255 | 185 | 483 |
| Agreements with CRC | 456 | 25 | 50 | 50 | 331 |
| Unconditional purchase obligations | 341 | 240 | 101 | -- | -- |
| Long-term advances from Conrail | 133 | -- | -- | -- | 133 |
| Other long-term obligations | 17 | 11 | 6 | -- | -- |
| Total | $ 8,944 | $ 734 | $ 1,272 | $ 1,051 | $ 5,887 |

**Off balance sheet arrangements** consist of operating lease obligations, which are included in the table of contractual obligations above and disclosed in Note 9. NS did not renew its accounts receivable securitization program which expired in May 2005.

**Cash used for investing activities** was $1.8 billion in 2005, compared with $1.2 billion in 2004 and $640 million in 2003. The increase in 2005 was principally the result of larger purchases of short-term investments, while the rise in 2004 resulted from higher property additions and the investment in a membership interest in a limited liability company that owns and operates facilities that produce synthetic fuel from coal. Property additions account for most of the recurring spending in this category. The following tables show capital spending (including capital leases) and track and equipment statistics for the past five years.

**Capital Expenditures**

| | 2005 | 2004 | 2003 | 2002 | 2001 |
|---|---|---|---|---|---|
| | | | ($ in millions) | | |
| Road | $ 739 | $ 607 | $ 495 | $ 519 | $ 505 |
| Equipment | 284 | 429 | 218 | 174 | 233 |
| Other property | 2 | 5 | 7 | 2 | 8 |
| Total | $ 1,025 | $ 1,041 | $ 720 | $ 695 | $ 746 |

Capital expenditures in 2005 were $16 million, or 2%, lower than 2004 principally due to decreases in equipment purchases that were partially offset by increased investment in roadway projects. In 2004, higher capital expenditures were primarily due to increased locomotive purchases as well as investment in roadway projects, Triple Crown Services equipment and freight cars.

**Track Structure Statistics (Capital and Maintenance)**

| | 2005 | 2004 | 2003 | 2002 | 2001 |
|---|---|---|---|---|---|
| Track miles of rail installed | 302 | 246 | 233 | 235 | 254 |
| Miles of track surfaced | 4,663 | 5,055 | 5,105 | 5,270 | 3,836 |
| New crossties installed (millions) | 2.5 | 2.5 | 2.8 | 2.8 | 1.5 |

**Average Age of Owned Railway Equipment**

| | 2005 | 2004 | 2003 | 2002 | 2001 |
|---|---|---|---|---|---|
| | | | (years) | | |
| Freight cars | 28.4 | 27.6 | 26.6 | 25.9 | 25.4 |
| Locomotives | 17.2 | 16.8 | 15.3 | 16.1 | 15.7 |
| Retired locomotives | 27.4 | 22.9 | 28.7 | 28.2 | 22.4 |

Through its coal car rebody program, which was suspended in 2000, NS converted about 29,000 hopper cars into high-capacity steel gondolas or hoppers. As a result, the remaining service life of the freight-car fleet is greater than may be inferred from the increasing average age shown in the table above.

For 2006, NS has budgeted $1.15 billion for capital expenditures. The anticipated spending includes $735 million for roadway projects, of which $484 million is for track and bridge program work. Also included are projects for communications, signal and electrical systems, as well as projects for environmental and public improvements such as grade crossing separations and signal upgrades. Other roadway projects include marketing and industrial development initiatives, including increasing track capacity and access to coal receivers and vehicle production and distribution facilities, and continuing investments in intermodal infrastructure. Equipment spending of $358 million includes the purchase of 133 locomotives and upgrades to existing units, improvements to multilevel automobile racks, and projects related to computers and information technology, including additional security and backup systems. NS expects to make all of its capital expenditures with internally generated funds.

On Dec. 2, 2005, NS announced an agreement to form a joint venture with Kansas City Southern pursuant to which NS intends to contribute $300 million in cash, substantially all of which will be used for capital improvements over a period of approximately four years, in exchange for a 30% interest in the joint venture. Kansas City Southern will contribute a 320 mile rail line between Meridian, Mississippi and Shreveport, Louisiana (the “Meridian Speedway”). Closing of the transaction is conditioned on the

receipt of the necessary authority from the Surface Transportation Board. Accordingly, if the transaction is authorized and consummated, NS expects to recognize its pro rata share of the joint venture's earnings or loss as required under the equity method of accounting. The transaction is expected to be modestly dilutive in the early years of the venture due to lost interest income on the cash contributed to the joint venture. However, NS expects that the dilution from the lost interest income will be offset from additional traffic as the investment is made and improvements are completed. The joint venture is expected to increase capacity and improve service on the Meridian Speedway.

NS expects to spend $50 million, in the near future, connected with Heartland Corridor-related projects. The Heartland Corridor is a package of proposed clearance improvements and other facilities that will create a seamless high-capacity intermodal route across Virginia and West Virginia to Midwest markets. Completion of the related projects is contingent on securing public or third-party funding commitments.

NS and other railroads have agreed to participate in the Chicago Region Environmental and Transportation Efficiency (CREATE) project in Chicago. The intent of the proposed public-private partnership is to reduce rail and highway congestion and add freight and passenger capacity in the metropolitan Chicago area. A portion of the public funding has been approved and the parties are working to develop a list of projects to be included in Phase I of the project. Funding requirements will be determined by the selection of Phase I projects. The railroads expect to complete Phase I over the next four years.

**Cash used for financing activities** was $456 million in 2005, compared with $233 million in 2004 and $314 million in 2003. Financing activity in 2005 included: (1) the issuance of $300 million aggregate principal amount of 6% unsecured notes due March 2105, and (2) the issuance of $717 million of unsecured notes ($350 million at 5.64% due 2029 and $367 million at 5.59% due 2025) and payment of $218 million of premium in exchange for $717 million of previously issued unsecured notes ($350 million at 7.8% due 2027, $200 million at 7.25% due 2031, and $167 million at 9.0% due 2021) (see Note 8). The $218 million cash premium payment is reflected as a reduction of debt in the Consolidated Balance Sheets and Statement of Cash Flows and will be amortized as additional interest expense over the terms of the new debt. Investing activities in 2005 and 2004 also included substantial proceeds from employee exercise of stock options. NS' debt-to-total capitalization ratio was 42.7% at Dec. 31, 2005, and 48.5% at Dec. 31, 2004.

In November 2005, NS' Board of Directors authorized the repurchase of up to 50 million shares of NS Common Stock through the end of 2015. The timing and volume of any purchases will be guided by management's assessment of market conditions and other pertinent factors. Near-term purchases under the program are expected to be made with internally generated cash; however, future funding sources could include proceeds from the sale of commercial paper notes or the issuance of long-term debt.

NS currently has in place and available a $1 billion, five-year credit agreement, which provides for borrowings at prevailing rates and includes financial covenants. There were no amounts outstanding under this facility at Dec. 31, 2005, and NS is in compliance with all of the financial covenants. NS also has in place a shelf registration statement on Form S-3 filed with the SEC in September 2004 with $700 million of available capacity (see Note 8). On July 18, 2005, Standard & Poor's (S&P) upgraded its ratings on NS' unsecured debt from BBB to BBB+. Moody's rating remains at Baa1, comparable to S&P's.

## APPLICATION OF CRITICAL ACCOUNTING ESTIMATES

The preparation of financial statements in accordance with U.S. generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. These estimates and assumptions may require significant judgment about matters that are inherently uncertain, and future events are likely to occur that may require management to change them. Accordingly, management regularly reviews these estimates and assumptions based on historical experience, changes in the business environment and other factors that management believes to be reasonable under the circumstances. Management discusses the development, selection and disclosures concerning critical accounting estimates with the Audit Committee of its Board of Directors.

### Pensions and Other Postretirement Benefits

Accounting for pensions and other postretirement benefit plans requires management to make several estimates and assumptions (see Note 11). These include the expected rate of return from investment of the plans' assets, projected increases in medical costs and the expected retirement age of employees as well as their projected earnings and mortality. In addition, the amounts recorded are affected by changes in the interest rate environment because the associated liabilities are discounted to their present value. Management makes these estimates based on the company's historical experience and other information that it deems pertinent under the circumstances (for example, expectations of future stock market performance). Management engages an independent consulting actuarial firm to assist it in selecting appropriate assumptions and valuing its related liabilities.

NS' net pension benefit, which is included in "Compensation and benefits" on its Consolidated Income Statement, was $23 million for the year ended Dec. 31, 2005. In recording this amount, NS assumed a long-term investment rate of return of 9%. Investment experience of the pension fund over the past 10-, 15- and 20-year periods has been a rate of return in excess of 10%. A one percentage point change to this rate of return assumption would result in an $18 million change to the pension credit and, as a result, an equal change in "Compensation and benefits" expense. Changes that are reasonably likely to occur in assumptions concerning retirement age, projected earnings and mortality would not be expected to have a material effect on NS' net pension benefit or net pension asset in the future. The net pension asset is recorded at its net present value using a discount rate that is based on the current interest rate environment in light of the timing of expected benefit payments. Specifically, NS refers to Moody's seasoned Aa corporate bond yields and the changes in such yields; therefore, management has little discretion in this assumption.

NS' net cost for other postretirement benefits, which is also included in "Compensation and benefits," was $62 million for the year ended Dec. 31, 2005. In recording this expense and valuing the net liability for other postretirement benefits, which is included in "Other benefits" as disclosed in Note 11, management estimated future increases in health-care costs. These assumptions, along with the effect of a one percentage point change in them, are described in Note 11.

### Properties and Depreciation

Most of NS' total assets are comprised of long-lived railway properties (see Note 6). As disclosed in Note 1, NS' properties are depreciated using group depreciation. Rail is depreciated primarily on the basis of use measured by gross-ton miles. Other properties are depreciated generally using the straight-line method over the lesser of estimated service or lease lives. NS reviews the carrying amount of properties whenever events or changes in circumstances indicate that such carrying amount may not be

recoverable based on future undiscounted cash flows. Assets that are deemed impaired as a result of such review are recorded at the lesser of carrying amount or fair value.

NS' depreciation expense is based on management's assumptions concerning service lives of its properties as well as the expected net salvage that will be received upon their retirement. These assumptions are the product of periodic depreciation studies that are performed by a firm of consulting engineers. These studies analyze NS' historical patterns of asset use and retirement and take into account any expected change in operation or maintenance practices. NS' recent experience with these studies has been that while they do result in changes in the rates used to depreciate its properties, these changes have not caused a significant effect to its annual depreciation expense. The studies may also indicate that the recorded amount of accumulated depreciation is deficient (or in excess) of the amount indicated by the study. Any such deficiency (or excess) is amortized as a component of depreciation expense over the remaining service lives of the affected class of property. NS' "Depreciation expense" for the year ended Dec. 31, 2005, amounted to $774 million. NS' weighted-average depreciation rates for 2005 are disclosed in Note 6; a one-tenth percentage point increase (or decrease) in these rates would have resulted in a $25 million increase (or decrease) to NS' depreciation expense.

**Personal Injury, Environmental and Legal Liabilities**

NS' expense for "Casualties and other claims" amounted to $224 million for the year ended Dec. 31, 2005. Most of this expense was composed of NS' accrual related to personal injury liabilities (see discussion of FELA in the discussion captioned "Casualties and other claims" above). Job-related personal injury and occupational claims are subject to FELA, which is applicable only to railroads. FELA's fault-based tort system produces results that are unpredictable and inconsistent as compared with a no-fault worker's compensation system. The variability inherent in this system could result in actual costs being very different from the liability recorded. In all cases, NS records a liability when the expected loss for the claim is both probable and estimable.

NS engages an independent consulting actuarial firm to aid in valuing its personal injury liability and determining the amount to accrue during the year. For employee personal injury cases, the actuarial firm studies NS' historical patterns of reserving for claims and subsequent settlements, taking into account relevant outside influences. An estimate of the ultimate amount of the liability, which includes amounts for incurred but unasserted claims, is based on the results of this analysis. For occupational injury claims, the actuarial firm studies NS' history of claim filings, severity, payments and other relevant facts. Additionally, the estimate of the ultimate loss for occupational injuries includes a provision for those claims that have been incurred but not reported by projecting NS' experience into the future as far as can be reasonably determined. NS has recorded this actuarially determined liability. The liability is dependent upon many individual judgments made as to the specific case reserves as well as the judgments of the consulting actuary and management in the periodic studies. Accordingly, there could be significant changes in the liability, which NS would recognize when such a change became known. The most recent actuarial study, completed in the fourth quarter of 2005, resulted in a slight decrease to NS' personal injury liability during the fourth quarter. While the liability recorded is supported by the most recent study, it is reasonably possible that the liability could be higher or lower.

NS is subject to various jurisdictions' environmental laws and regulations. It is NS' policy to record a liability where such liability or loss is probable and its amount can be estimated reasonably (see Note 18). Environmental engineers regularly participate in ongoing evaluations of all known sites and in determining any necessary adjustments to liability estimates. NS also has established an Environmental Policy Council, composed of senior managers, to oversee and interpret its environmental policy.

Operating expenses for environmental matters totaled approximately $16 million in 2005, $11 million in 2004 and $9 million in 2003, and capital expenditures totaled approximately $9 million in each of 2005, 2004 and 2003. Capital expenditures in 2006 are expected to be comparable to those in 2005.

NS' balance sheets included liabilities for environmental exposures in the amount of $58 million at Dec. 31, 2005, and $64 million at Dec. 31, 2004 (of which $12 million was accounted for as a current liability at Dec. 31, 2005, and 2004). At Dec. 31, 2005, the liability represented NS' estimate of the probable cleanup and remediation costs based on available information at 189 identified locations. On that date, 16 sites accounted for $30 million of the liability, and no individual site was considered to be material. NS anticipates that much of this liability will be paid out over five years; however, some costs will be paid out over a longer period.

At some of the 189 locations, certain NS subsidiaries, usually in conjunction with a number of other parties, have been identified as potentially responsible parties by the Environmental Protection Agency (EPA) or similar state authorities under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, or comparable state statutes, which often impose joint and several liability for cleanup costs.

With respect to known environmental sites (whether identified by NS or by the EPA or comparable state authorities), estimates of NS' ultimate potential financial exposure for a given site or in the aggregate for all such sites are necessarily imprecise because of the widely varying costs of currently available cleanup techniques, the likely development of new cleanup technologies, the difficulty of determining in advance the nature and full extent of contamination and each potential participant's share of any estimated loss (and that participant's ability to bear it), and evolving statutory and regulatory standards governing liability. NS estimates its environmental remediation liability on a site-by-site basis, using assumptions and judgments that management deems appropriate for each site. As a result, it is not practical to quantitatively describe the effects of changes in these many assumptions and judgments. NS has consistently applied its methodology of estimating its environmental liabilities.

Based on its assessment of the facts and circumstances now known, management believes that it has recorded the probable costs for dealing with those environmental matters of which the Corporation is aware. Further, management believes that it is unlikely that any known matters, either individually or in the aggregate, will have a material adverse effect on NS' financial position, results of operations or liquidity.

Norfolk Southern and certain subsidiaries are defendants in numerous lawsuits and other claims relating principally to railroad operations. When management concludes that it is probable that a liability has been incurred and the amount of the liability can be reasonably estimated, it is accrued through a charge to expenses. While the ultimate amount of liability incurred in any of these lawsuits and claims is dependent on future developments, in management's opinion the recorded liability, if any, is adequate to cover the future payment of such liability and claims. However, the final outcome of any of these lawsuits and claims cannot be predicted with certainty, and unfavorable or unexpected outcomes could result in additional accruals that could be significant to results of operations in a particular year or quarter. Any adjustments to recorded liabilities will be reflected in expenses in the periods in which such adjustments are known.

**Income Taxes**

NS' net long-term deferred tax liability totaled $6,620 million at Dec. 31, 2005 (see Note 3). This liability is estimated based on the expected future tax consequences of items recognized in the financial statements. After application of the federal statutory tax rate to book income, judgment is required with

respect to the timing and deductibility of expenses in the corporate income tax returns. For state income and other taxes, judgment is also required with respect to the apportionment among the various jurisdictions. A valuation allowance is recorded if management expects that it is more likely than not that its deferred tax assets will not be realized. NS had a $16 million valuation allowance on $775 million of deferred tax assets as of Dec. 31, 2005, reflecting the expectation that most of these assets will be realized. In addition, NS has a recorded liability for its estimate of potential income tax exposures. Management believes this liability for potential exposure to be adequate. Income tax expense is adjusted to the extent the final outcome of these matters differs from the amounts recorded. For every one half percent change in the 2005 effective rate net income would have changed by $8 million.

## OTHER MATTERS

### Labor Agreements

Approximately 26,000, or about 85%, of NS' railroad employees are covered by collective bargaining agreements with various labor unions. These agreements remain in effect until changed pursuant to the Railway Labor Act (RLA). NS largely bargains in concert with other major railroads. Moratorium provisions in the labor agreements govern when the railroads and the unions may propose labor agreement changes. The previous moratorium provisions expired in the latter part of 2004 and the railroads and the rail labor unions thereafter served new proposals to begin the next bargaining round. Industry issues include train crew staffing and employee contributions for health care benefits.

Seven rail unions (Brotherhood of Locomotive Engineers and Trainmen, Brotherhood of Maintenance of Way Employes, American Train Dispatchers Association, Brotherhood of Railroad Signalmen, International Brotherhood of Blacksmiths and Boilermakers, National Conference of Firemen and Oilers, and Sheet Metal Workers International Association) are bargaining together under the auspices of the Rail Labor Bargaining Coalition (RLBC). The railroads filed for mediation with the United Transportation Union (UTU) and with the RLBC unions. The status quo is preserved during mediation while a federal mediator assists the parties in their efforts to reach agreement. If the NMB were to terminate mediation, it would, at that time, propose that the parties arbitrate their differences. A strike could occur 30 days thereafter if the parties did not accept arbitration. However, the President of the United States of America could then appoint an Emergency Board which would delay any strike for a further 60 days while the Board made recommendations and the parties and engaged in further negotiations. The outcome of the negotiations cannot be determined at this point.

### Market Risks and Hedging Activities

NS has used derivative financial instruments to reduce the risk of volatility in its diesel fuel costs and to manage its overall exposure to fluctuations in interest rates.

In 2001, NS began a program to hedge a portion of its diesel fuel consumption. The intent of the program is to assist in the management of NS' aggregate risk exposure to fuel price fluctuations, which can significantly affect NS' operating margins and profitability, through the use of one or more types of derivative instruments.

Diesel fuel costs represented 11% of NS' operating expenses for 2005. The program provides that NS will not enter into any fuel hedges with a duration of more than 36 months, and that no more than 80% of NS' average monthly fuel consumption will be hedged for any month within any 36-month period.

As of Dec. 31, 2005, through swap transactions, NS has hedged approximately 4% of expected 2006 diesel fuel requirements. The effect of these hedges is to yield an average cost of 89 cents per hedged gallon, including federal taxes and transportation. A 10% decrease in diesel fuel prices would reduce NS' asset related to the swaps by approximately $4 million as of Dec. 31, 2005.

However, with fuel prices near historic highs and fuel surcharges being collected under certain tariffs and contracts, NS has not entered into additional hedges since May 2004. Consequently, the past pattern of entering into regular monthly swaps may not be indicative of future hedging activity. If diesel fuel prices remain at their current levels, or increase further, diesel fuel expense will be higher going forward.

NS manages its overall exposure to fluctuations in interest rates by issuing both fixed- and floating-rate debt instruments and by entering into interest-rate hedging transactions to achieve an appropriate mix within its debt portfolio.

At Dec. 31, 2005, NS' debt subject to interest rate fluctuations totaled $285 million. A 1% increase in interest rates would increase NS' total annual interest expense related to all its variable debt by approximately $3 million. Management considers it unlikely that interest rate fluctuations applicable to these instruments will result in a material adverse effect on NS' financial position, results of operations or liquidity.

Some of NS' capital leases, which carry an average fixed rate of 7%, were effectively converted to variable rate obligations using interest rate swap agreements. On Dec. 31, 2005, the average pay rate under these agreements was 7%, and the average receive rate was 5%. During 2005, the effect of the swaps was to reduce interest expense by $2 million. A portion of the lease obligations is payable in Japanese yen. NS eliminated the associated exchange rate risk at the inception of each lease with a yen deposit sufficient to fund the yen-denominated obligation. Most of these deposits are held by foreign banks, primarily Japanese. As a result, NS is exposed to financial market risk relative to Japan. Counterparties to the interest rate swaps and Japanese banks holding yen deposits are major financial institutions believed by management to be creditworthy.

**New Accounting Pronouncement**

In December 2004, the Financial Accounting Standards Board issued Statement of Financial Accounting Standards No. 123(R), “Share-Based Payments”. This statement establishes standards for accounting for transactions in which an entity exchanges its equity instruments for goods or services, such as stock-based compensation plans. NS will adopt this standard in the first quarter of 2006, which will result in higher compensation expense (see Note 1). The statement applies to all awards granted after the effective date and to awards modified, repurchased, or cancelled after that date, as well as awards that are unvested at the effective date.

**Inflation**

In preparing financial statements, U.S. generally accepted accounting principles require the use of historical cost that disregards the effects of inflation on the replacement cost of property. NS, a capital-intensive company, has most of its capital invested in such assets. The replacement cost of these assets, as well as the related depreciation expense, would be substantially greater than the amounts reported on the basis of historical cost.

**FORWARD-LOOKING STATEMENTS**

This Management's Discussion and Analysis of Financial Condition and Results of Operations contains forward-looking statements that may be identified by the use of words like “believe,” “expect,” “anticipate” and “project.” Forward-looking statements reflect management's good-faith evaluation of information currently available. However, such statements are dependent on and, therefore, can be influenced by, a number of external variables over which management has little or no control, including: legislative and regulatory developments; competition and consolidation within the transportation industry; domestic and international economic conditions; the business environment in industries that produce and consume rail freight; the operations of carriers with which we interchange; labor difficulties, including strikes and work stoppages; disruptions to our technology infrastructure including our computer systems; natural events such as severe weather, floods and hurricanes; acts of terrorism or war; fluctuation in prices of key materials, in particular diesel fuel; and changes in securities and capital markets. Forward-looking statements are not, and should not be relied upon as, a guaranty of future performance or results. Nor will they necessarily prove to be accurate indications of the times at or by which any such performance or results will be achieved. As a result, actual outcomes and results may differ materially from those expressed in forward-looking statements. NS undertakes no obligation to update or revise forward-looking statements.

**Item 7A. Quantitative and Qualitative Disclosures about Market Risk.**

The information required by this item is included in Part II, Item 7, “Management's Discussion and Analysis of Financial Condition and Results of Operations” under the heading “Market Risks and Hedging Activities.”

**Item 8. Financial Statements and Supplementary Data.**

## INDEX TO FINANCIAL STATEMENTS


| | Page |
|---|---|
| Report of Management | K43 |
| Reports of Independent Registered Public Accounting Firm | K44 |
| Consolidated Statements of Income<br>Years ended Dec. 31, 2005, 2004 and 2003 | K47 |
| Consolidated Balance Sheets<br>As of Dec. 31, 2005 and 2004 | K48 |
| Consolidated Statements of Cash Flows<br>Years ended Dec. 31, 2005, 2004 and 2003 | K49 |
| Consolidated Statements of Changes in Stockholders' Equity<br>Years ended Dec. 31, 2005, 2004 and 2003 | K50 |
| Notes to Consolidated Financial Statements | K51 |
| The Index to Consolidated Financial Statement Schedule in Item 15 | K87 |

**Report of Management**

February 21, 2006

To the Stockholders
Norfolk Southern Corporation

Management is responsible for establishing and maintaining adequate internal control over financial reporting. In order to ensure that the Corporation's internal control over financial reporting is effective, management regularly assesses such controls and did so most recently for its financial reporting as of December 31, 2005. This assessment was based on criteria for effective internal control over financial reporting described in *Internal Control-Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this assessment, management has concluded that the Corporation maintained effective internal control over financial reporting as of December 31, 2005.

KPMG LLP, independent registered public accounting firm, has audited the Corporation's financial statements and has reported on management's assessment of the effectiveness of the Corporation's internal control over financial reporting as of December 31, 2005.

/s/ Charles W. Moorman
Charles W. Moorman
Chairman, President and
Chief Executive Officer

/s/ Henry C. Wolf
Henry C. Wolf
Vice Chairman and
Chief Financial Officer

/s/ Marta R. Stewart
Marta R. Stewart
Vice President and
Controller

**Report of Independent Registered Public Accounting Firm**

The Stockholders and Board of Directors
Norfolk Southern Corporation:

We have audited management's assessment, included in the accompanying Report of Management, that Norfolk Southern Corporation maintained effective internal control over financial reporting as of December 31, 2005, based on criteria established in *Internal Control—Integrated Framework,* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Norfolk Southern Corporation's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express an opinion on management's assessment and an opinion on the effectiveness of Norfolk Southern Corporation's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with U.S. generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, management's assessment that Norfolk Southern Corporation maintained effective internal control over financial reporting as of December 31, 2005, is fairly stated, in all material respects, based on criteria established in *Internal Control—Integrated Framework*, issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Also in our opinion, Norfolk Southern Corporation maintained, in all material respects, effective internal control over financial reporting as of December 31, 2005, based on criteria established in *Internal Control—Integrated Framework,* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Norfolk Southern Corporation and subsidiaries as of December 31, 2005 and 2004, and the related consolidated statements of income, changes in stockholders' equity and cash flows for each of the years in the three-year period ended December 31, 2005. In connection with our audits of the consolidated financial statements, we have also audited the financial statement schedule as listed in Item 15(A)2. Our report dated February 21, 2006, expressed an unqualified opinion on the consolidated financial statements and financial statement schedule.

/s/ KPMG LLP
Norfolk, Virginia
February 21, 2006

## Report of Independent Registered Public Accounting Firm

The Stockholders and Board of Directors
Norfolk Southern Corporation:

We have audited the accompanying consolidated balance sheets of Norfolk Southern Corporation and subsidiaries as of December 31, 2005 and 2004, and the related consolidated statements of income, changes in stockholders' equity and cash flows for each of the years in the three-year period ended December 31, 2005. In connection with our audits of the consolidated financial statements, we have also audited the financial statement schedule as listed in Item 15(A)2. These consolidated financial statements and financial statement schedule are the responsibility of Norfolk Southern Corporation’s management. Our responsibility is to express an opinion on these consolidated financial statements and financial statement schedule based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Norfolk Southern Corporation and subsidiaries as of December 31, 2005 and 2004, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 2005, in conformity with U.S. generally accepted accounting principles. Also in our opinion, the related financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

As discussed in note 1 to the consolidated financial statements, effective January 1, 2003, Norfolk Southern Corporation adopted Financial Accounting Standards Board Statement No. 143, *Accounting for Asset Retirement Obligations*, and Financial Accounting Standards Board Interpretation No. 46, *Consolidation of Variable Interest Entities*.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of Norfolk Southern Corporation’s internal control over financial reporting as of December 31, 2005, based on criteria established in *Internal Control – Integrated Framework*, issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated February 21, 2006, expressed an unqualified opinion on management’s assessment of, and the effective operation of, internal control over financial reporting.

/s/ KPMG LLP
Norfolk, Virginia
February 21, 2006

**Norfolk Southern Corporation and Subsidiaries**
**Consolidated Statements of Income**

| | Years ended Dec. 31, | | |
|---|---|---|---|
| | **2005** | **2004** | **2003** |
| | *($ in millions, except earnings per share)* | | |
| **Railway operating revenues** | $ 8,527 | $ 7,312 | $ 6,468 |
| **Railway operating expenses** | | | |
| Compensation and benefits (Note 11) | 2,493 | 2,272 | 2,275 |
| Materials, services and rents | 1,809 | 1,601 | 1,427 |
| Conrail rents and services (Note 5) | 129 | 319 | 419 |
| Depreciation (Note 5) | 774 | 598 | 513 |
| Diesel fuel | 727 | 449 | 380 |
| Casualties and other claims (Note 18) | 224 | 151 | 181 |
| Other | 254 | 220 | 209 |
| Total railway operating expenses | 6,410 | 5,610 | 5,404 |
| **Income from railway operations** | 2,117 | 1,702 | 1,064 |
| Other income – net (Note 2) | 74 | 89 | 19 |
| Interest expense on debt (Note 6) | 494 | 489 | 497 |
| Income from continuing operations before income taxes and accounting changes | 1,697 | 1,302 | 586 |
| Provision for income taxes (Note 3) | 416 | 379 | 175 |
| Income from continuing operations before accounting changes | 1,281 | 923 | 411 |
| Discontinued operations – gain on sale of motor carrier, net of taxes (Note 17) | -- | -- | 10 |
| Cumulative effect of changes in accounting principles, net of taxes (Note 1) | -- | -- | 114 |
| **Net income** | $ 1,281 | $ 923 | $ 535 |
| Per share amounts (Note 14): | | | |
| Income from continuing operations before accounting changes | | | |
| Basic | $ 3.17 | $ 2.34 | $ 1.05 |
| Diluted | $ 3.11 | $ 2.31 | $ 1.05 |
| Net income | | | |
| Basic | $ 3.17 | $ 2.34 | $ 1.37 |
| Diluted | $ 3.11 | $ 2.31 | $ 1.37 |

*See accompanying notes to consolidated financial statements.*

**Norfolk Southern Corporation and Subsidiaries**
**Consolidated Balance Sheets**

| | As of Dec. 31, 2005 | | As of Dec. 31, 2004 | |
|---|---|---|---|---|
| | ($ in millions) | | | |
| **Assets** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ | 289 | $ | 467 |
| Short-term investments (Note 5) | | 968 | | 202 |
| Accounts receivable – net (Notes 4 and 18) | | 931 | | 767 |
| Materials and supplies | | 132 | | 104 |
| Deferred income taxes (Note 3) | | 167 | | 187 |
| Other current assets | | 163 | | 240 |
| Total current assets | | 2,650 | | 1,967 |
| Investments (Note 5) | | 1,590 | | 1,499 |
| Properties less accumulated depreciation (Note 6) | | 20,705 | | 20,526 |
| Other assets (Note 18) | | 916 | | 758 |
| **Total assets** | $ | 25,861 | $ | 24,750 |
| **Liabilities and stockholders' equity** | | | | |
| Current liabilities: | | | | |
| Accounts payable (Notes 7 and 18) | $ | 1,163 | $ | 1,090 |
| Income and other taxes | | 231 | | 210 |
| Other current liabilities (Note 7) | | 213 | | 239 |
| Current maturities of long-term debt (Note 8) | | 314 | | 662 |
| Total current liabilities | | 1,921 | | 2,201 |
| Long-term debt (Note 8) | | 6,616 | | 6,863 |
| Other liabilities (Notes 10 and 18) | | 1,415 | | 1,146 |
| Deferred income taxes (Note 3) | | 6,620 | | 6,550 |
| **Total liabilities** | | 16,572 | | 16,760 |
| Stockholders' equity: | | | | |
| Common stock $1.00 per share par value, 1,350,000,000 shares authorized; issued 430,718,913 and 421,346,107 shares, respectively | | 431 | | 421 |
| Additional paid-in capital | | 992 | | 728 |
| Unearned restricted stock (Note 12) | | (17) | | (8) |
| Accumulated other comprehensive loss (Note 13) | | (77) | | (24) |
| Retained income | | 7,980 | | 6,893 |
| Less treasury stock at cost, 20,833,125 and 20,907,125 shares, respectively | | (20) | | (20) |
| **Total stockholders' equity** | | 9,289 | | 7,990 |
| **Total liabilities and stockholders' equity** | $ | 25,861 | $ | 24,750 |

*See accompanying notes to consolidated financial statements.*

**Norfolk Southern Corporation and Subsidiaries**
**Consolidated Statements of Cash Flows**

| | Years Ended Dec. 31, 2005 | 2004 | 2003 |
|---|---|---|---|
| | | ($ in millions) | |
| **Cash flows from operating activities** | | | |
| Net income | $ 1,281 | $ 923 | $ 535 |
| Reconciliation of net income to net cash provided by operating activities: | | | |
| Net cumulative effects of changes in accounting principles | -- | -- | (114) |
| Depreciation | 787 | 609 | 528 |
| Deferred income taxes | 80 | 200 | 132 |
| Equity in earnings of Conrail (Note 5) | (37) | (54) | (58) |
| Gain on Conrail Corporate Reorganization (Note 5) | -- | (53) | -- |
| Gains and losses on properties and investments | (51) | (46) | (45) |
| Income from discontinued operations | -- | -- | (10) |
| Changes in assets and liabilities affecting operations: | | | |
| Accounts receivable (Note 4) | (94) | (71) | (12) |
| Materials and supplies | (28) | (12) | 5 |
| Other current assets | 20 | (18) | (4) |
| Current liabilities other than debt | 55 | 126 | (25) |
| Other – net (Notes 6 and 11) | 92 | 57 | 122 |
| Net cash provided by operating activities | 2,105 | 1,661 | 1,054 |
| **Cash flows from investing activities** | | | |
| Property additions | (1,025) | (1,041) | (720) |
| Property sales and other transactions | 110 | 75 | 78 |
| Investments, including short-term | (1,822) | (396) | (106) |
| Investment sales and other transactions | 910 | 117 | 108 |
| Net cash used for investing activities | (1,827) | (1,245) | (640) |
| **Cash flows from financing activities** | | | |
| Dividends | (194) | (142) | (117) |
| Common stock issued – net | 194 | 162 | 13 |
| Redemption of minority interest | -- | -- | (43) |
| Proceeds from borrowings | 433 | 202 | 261 |
| Debt repayments | (889) | (455) | (428) |
| Net cash used for financing activities | (456) | (233) | (314) |
| Net increase (decrease) in cash and cash equivalents | (178) | 183 | 100 |
| **Cash and cash equivalents** | | | |
| At beginning of year | 467 | 284 | 184 |
| At end of year | $ 289 | $ 467 | $ 284 |
| **Supplemental disclosure of cash flow information** | | | |
| Cash paid during the year for: | | | |
| Interest (net of amounts capitalized) | $ 485 | $ 483 | $ 510 |
| Income taxes (net of refunds) | $ 271 | $ 146 | $ 93 |

*See accompanying notes to consolidated financial statements.*

## Norfolk Southern Corporation and Subsidiaries
## Consolidated Statements of Changes in Stockholders' Equity

| | Common Stock | Additional Paid-in Capital | Unearned Restricted Stock | Accum. Other Compre-hensive Income (Loss) | Retained Income | Treasury Stock | Total |
|---|---|---|---|---|---|---|---|
| | | | *($ in millions, except per share amounts)* | | | | |
| **Balance Dec. 31, 2002** | $ 410 | $ 481 | $ -- | $ (65) | $ 5,694 | $ (20) | $ 6,500 |
| Comprehensive income | | | | | | | |
| Net income | | | | | 535 | | 535 |
| Other comprehensive income (Note 13) | | | | 21 | | | 21 |
| Total comprehensive income | | | | | | | 556 |
| Dividends on Common Stock, $0.30 per share | | | | | (117) | | (117) |
| Other (Notes 11 and 12) | 2 | 40 | (5) | | | | 37 |
| **Balance Dec. 31, 2003** | 412 | 521 | (5) | (44) | 6,112 | (20) | 6,976 |
| Comprehensive income | | | | | | | |
| Net income | | | | | 923 | | 923 |
| Other comprehensive income (Note 13) | | | | 20 | | | 20 |
| Total comprehensive income | | | | | | | 943 |
| Dividends on Common Stock, $0.36 per share | | | | | (142) | | (142) |
| Other (Notes 11 and 12) | 9 | 207 | (3) | | | | 213 |
| **Balance Dec. 31, 2004** | 421 | 728 | (8) | (24) | 6,893 | (20) | 7,990 |
| Comprehensive income | | | | | | | |
| Net income | | | | | 1,281 | | 1,281 |
| Other comprehensive loss (Note 13) | | | | (53) | | | (53) |
| Total comprehensive income | | | | | | | 1,228 |
| Dividends on Common Stock, $0.48 per share | | | | | (194) | | (194) |
| Other (Notes 11 and 12) | 10 | 264 | (9) | | | | 265 |
| **Balance Dec. 31, 2005** | $ 431 | $ 992 | $ (17) | $ (77) | $ 7,980 | $ (20) | $ 9,289 |

*See accompanying notes to consolidated financial statements.*

**Norfolk Southern Corporation and Subsidiaries**
**Notes to Consolidated Financial Statements**

The following Notes are an integral part of the Consolidated Financial Statements.

## 1. Summary of Significant Accounting Policies

### Description of Business

Norfolk Southern Corporation is a Virginia-based holding company engaged principally in the rail transportation business, operating approximately 21,200 route miles primarily in the East and Midwest. These consolidated financial statements include Norfolk Southern Corporation (Norfolk Southern) and its majority-owned and controlled subsidiaries (collectively, NS). Norfolk Southern's major subsidiary is Norfolk Southern Railway Company (NSR). All significant intercompany balances and transactions have been eliminated in consolidation.

The railroad transports raw materials, intermediate products and finished goods classified in the following market groups (percent of total railway operating revenues in 2005): coal (25%); intermodal (21%); automotive (12%); metals/construction (12%); chemicals (11%); agriculture/consumer products/ government (10%); and paper/clay/forest products (9%). Although most of NS' customers are domestic, ultimate points of origination or destination for some of the products transported (particularly coal bound for export and some intermodal containers) may be outside the United States. Approximately 85% of NS' railroad employees are covered by collective bargaining agreements with 14 different labor unions.

### Use of Estimates

The preparation of financial statements in accordance with U.S. generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Management reviews its estimates, including those related to the recoverability and useful lives of assets, as well as liabilities for litigation, environmental remediation, casualty claims, income taxes, and pension and postretirement benefits. Changes in facts and circumstances may result in revised estimates.

### Revenue Recognition

Transportation revenue is recognized proportionally as a shipment moves from origin to destination and related expenses are recognized as incurred. Refunds (which are primarily volume-based incentives) are recorded as a reduction to revenues on the basis of management's best estimate of projected liability, which is based on historical activity, current traffic counts and the expectation of future activity. NS regularly monitors its contract refund liability, and historically, the estimates have not differed significantly from the amounts ultimately refunded. Switching, demurrage and other incidental service revenues are recognized when the services are performed.

### Derivatives

NS does not engage in the trading of derivatives. NS uses derivative financial instruments to reduce the risk of volatility in its diesel fuel costs and in the management of its mix of fixed and floating-rate debt. Management has determined that these derivative instruments qualify as either fair-value or cash-flow

hedges, having values that highly correlate with the underlying hedged exposures, and have designated such instruments as hedging transactions. Income and expense related to the derivative financial instruments are recorded in the same category as generated by the underlying asset or liability. Credit risk related to the derivative financial instruments is considered to be minimal and is managed by requiring high credit standards for counterparties and periodic settlements (see Note 16).

**Stock-Based Compensation**

NS has stock-based employee compensation plans, which are more fully described in Note 12. Through Dec. 31, 2005, NS applied the intrinsic value recognition and measurement principles of APB Opinion No. 25, "Accounting for Stock Issued to Employees" (APB Opinion No. 25), and related interpretations in accounting for these plans (See "Required Accounting Change in 2006," below).

The following table illustrates the effect on net income and earnings per share if NS had applied the fair value recognition provisions of Statement of Financial Accounting Standards No. 123, "Accounting for Stock-Based Compensation" (SFAS No. 123), to stock-based employee compensation:

| | 2005 | 2004 | 2003 |
|---|---|---|---|
| | *($ in millions except per share)* | | |
| Net income, as reported | $ 1,281 | $ 923 | $ 535 |
| Add: Stock-based employee compensation expense included in reported net income, net of related tax effects | 46 | 32 | 18 |
| Deduct: Stock-based employee compensation expense determined under fair value method, net of related tax effects | (45) | (44) | (35) |
| Pro forma net income | $ 1,282 | $ 911 | $ 518 |
| Earnings per share: | | | |
| As reported | | | |
| Basic | $ 3.17 | $ 2.34 | $ 1.37 |
| Diluted | $ 3.11 | $ 2.31 | $ 1.37 |
| Pro forma | | | |
| Basic | $ 3.17 | $ 2.31 | $ 1.33 |
| Diluted | $ 3.10 | $ 2.28 | $ 1.33 |

**Required Accounting Change in 2006**

Effective January 1, 2006, NS adopted Statement of Financial Accounting Standards, No. 123(R), "Share Based Payments," [SFAS No. 123(R)]. This statement applies to awards granted, modified, repurchased or cancelled after the effective date as well as awards that are unvested at the effective date and includes, among other things, the requirement to expense the fair value of stock options. In November 2005, the Board of Directors of NS changed the vesting period on options granted in January 2005 from three years to one year in order to reduce future compensation expense. At the time, these options had an intrinsic value of approximately $9 each and the modification resulted in less than $1 million of compensation expense. Future compensation expense will be reduced by $10 million as a result of this modification.

Under SFAS No. 123(R), all new awards granted to retirement eligible employees must be expensed immediately. Under APB Opinion No. 25 and related interpretations, such awards were amortized over

the stated service period. Such awards were treated similarly under SFAS No. 123 in the pro forma amounts disclosed in the preceding table. As a result of SFAS No. 123(R), expense recognition is accelerated on grants to retirement eligible employees and the effect of this acceleration will be approximately $20 million of additional compensation expense in 2006.

**Cash Equivalents**

"Cash equivalents" are highly liquid investments purchased three months or less from maturity.

**Investments**

Debt securities classified as "held-to-maturity" are reported at amortized cost and marketable equity and debt securities classified as "trading" or "available-for-sale" are recorded at fair value. Unrealized after-tax gains and losses for investments designated as "available-for-sale," are recognized in "Accumulated other comprehensive loss."

Investments where NS has the ability to exercise significant influence over but does not control the entity are accounted for using the equity method in accordance with APB Opinion No. 18, "The Equity Method of Accounting for Investments in Common Stock."

**Materials and Supplies**

"Materials and supplies," consisting mainly of fuel oil and items for maintenance of property and equipment, are stated at the lower of average cost or market. The cost of materials and supplies expected to be used in capital additions or improvements is included in "Properties."

**Properties**

"Properties" are stated principally at cost and are depreciated using group depreciation. Rail is depreciated primarily on the basis of use measured by gross ton-miles. Other properties are depreciated generally using the straight-line method over the lesser of estimated service or lease lives. Depletion of natural resources (see Note 2) is based on units of production. Depreciation in the Consolidated Statements of Cash Flows includes depreciation and depletion. NS capitalizes interest on major capital projects during the period of their construction. Expenditures, including those on leased assets that extend an asset's useful life or increase its utility, are capitalized. Costs related to repairs and maintenance activities that do not extend an asset's useful life or increase its utility are expensed when such repairs are performed. When properties other than land and nonrail assets are sold or retired in the ordinary course of business, the cost of the assets, net of sale proceeds or salvage, is charged to accumulated depreciation, and no gain or loss is recognized through income. Gains and losses on disposal of land and nonrail assets are included in "Other income - net" (see Note 2) since such income is not a product of NS' railroad operations.

NS reviews the carrying amount of properties whenever events or changes in circumstances indicate that such carrying amount may not be recoverable based on future undiscounted cash flows. Assets that are deemed impaired as a result of such review are recorded at the lower of carrying amount or fair value (see Note 6).

**Required Accounting Changes in 2003**

NS adopted Statement of Financial Accounting Standards No. 143, "Accounting for Asset Retirement Obligations," (SFAS No. 143) effective Jan. 1, 2003, and recorded a $110 million net adjustment ($182 million before taxes) for the cumulative effect of this change in accounting on years prior to 2003.

Pursuant to SFAS No. 143, the cost to remove crossties must be recorded as an expense when incurred; previously these removal costs were accrued as a component of depreciation. This change in accounting lowered depreciation expense (because the depreciation rate for crossties no longer reflects cost to remove) and increased compensation and benefits and other expenses (for the costs to remove retired assets). The net effect to total railway operating expenses and net income was not material.

NS also adopted Financial Accounting Standards Board Interpretation No. 46, "Consolidation of Variable Interest Entities," (FIN No. 46) effective Jan. 1, 2003, and recorded a $4 million net adjustment ($6 million before taxes) for the cumulative effect of this change in accounting on years prior to 2003. Pursuant to FIN No. 46, NS consolidated a special-purpose entity that leased certain locomotives to NS. This entity's assets and liabilities at Jan. 1, 2003, included $169 million of locomotives and $157 million of debt related to their purchase as well as a $6 million minority interest liability. This change in accounting increased depreciation and interest expense (to reflect the locomotives as owned assets) and lowered lease expense. The net effect to total railway operating expenses and net income was not material.

The cumulative effect of these changes amounted to $114 million, or 29 cents per share, in 2003.

Reclassifications

Certain amounts have been reclassified to conform to current presentation. Specifically, $112 million of auction rate securities held at Dec. 31, 2004, previously classified as cash equivalents, have been reclassified as short-term investments. These securities were sold in the first quarter of 2005 at market value, which was equal to their carrying cost, and accordingly are included in "Investment sales and other transactions" in the Consolidated Statements of Cash Flows. In addition, the following items shown in the Consolidated Balance Sheet as of Dec. 31, 2004, have been reclassified to conform to the current presentation: (1) "Investment in Conrail" and the amount of investments included in "Other assets" have been reclassified and comprise "Investments" and (2) "Due to Conrail" has been reclassified and is included in the amount shown for "Accounts Payable."

2. Other Income - Net

| | 2005 | 2004 | 2003 |
|---|---|---|---|
| | | *($ in millions)* | |
| Income from natural resources: | | | |
| Royalties from coal | $ 54 | $ 42 | $ 39 |
| Nonoperating depletion and depreciation | (13) | (11) | (15) |
| Subtotal | 41 | 31 | 24 |
| Gains from sale of properties and investments | 49 | 46 | 45 |
| Rental income | 42 | 40 | 38 |
| Interest income | 41 | 13 | 10 |
| Equity in earnings of Conrail (Note 5) | 37 | 11 | -- |
| Corporate-owned life insurance – net | 4 | 8 | 21 |
| Gain from Conrail Corporate Reorganization (Note 5) | -- | 53 | -- |
| Equity in losses of partnerships | (108) | (61) | -- |
| Taxes on nonoperating property | (9) | (8) | (8) |
| Other interest expense | (6) | (17) | (4) |
| Charitable contributions | (4) | (4) | (4) |
| Impairment of telecommunications assets (Note 6) | -- | -- | (84) |
| Other | (13) | (23) | (19) |
| Total | $ 74 | $ 89 | $ 19 |

"Other income - net" includes the income generated by the activities of NS' noncarrier subsidiaries as well as the costs incurred by those subsidiaries in their operations. NS has a 40.5% interest in a limited liability company that owns and operates facilities that produce synthetic fuel from coal. The production of synthetic fuel results in tax credits as well as expenses related to the investments. The expenses are classified in "Equity in losses of partnerships" above.

"Other current assets" in the Consolidated Balance Sheets includes prepaid interest of $47 million at Dec. 31, 2005, and $48 million at Dec. 31, 2004, arising from corporate-owned life insurance borrowings.

**3. Income Taxes**

**Provision for Income Taxes**

| | 2005 | 2004 | 2003 |
|---|---|---|---|
| | | *($ in millions)* | |
| Current: | | | |
| Federal | $ 283 | $ 133 | $ 32 |
| State | 53 | 46 | 11 |
| Total current taxes | 336 | 179 | 43 |
| Deferred: | | | |
| Federal | 220 | 181 | 97 |
| State | (140) | 19 | 35 |
| Total deferred taxes | 80 | 200 | 132 |
| Provision for income taxes | $ 416 | $ 379 | $ 175 |

**Reconciliation of Statutory Rate to Effective Rate**

The "Provision for income taxes" in the Consolidated Statements of Income reflects taxes from continuing operations before accounting changes and differs from the amounts computed by applying the statutory federal corporate tax rate as follows:

| | 2005 | | 2004 | | 2003 | |
|---|---|---|---|---|---|---|
| | Amount | % | Amount | % | Amount | % |
| | | | *($ in millions)* | | | |
| Federal income tax at statutory rate | $ 594 | 35 | $ 456 | 35 | $ 205 | 35 |
| State income taxes, net of federal tax effect | 40 | 2 | 42 | 3 | 30 | 5 |
| Tax credits | (104) | (6) | (80) | (7) | -- | -- |
| Ohio rate change, net of federal tax effect | (96) | (6) | -- | -- | -- | -- |
| Equity in earnings of Conrail | (10) | -- | (18) | (1) | (20) | (3) |
| Gain from Conrail Corporate Reorganization | -- | -- | (19) | (1) | -- | -- |
| Other – net | (8) | -- | (2) | -- | (40) | (7) |
| Provision for income taxes | $ 416 | 25 | $ 379 | 29 | $ 175 | 30 |

In June 2005, Ohio enacted tax legislation that phases out its Corporate Franchise Tax, which was generally based on federal taxable income, and phases in a new gross receipts tax called the Commercial Activity Tax, which is based on current year sales and rentals. The phased elimination of the Corporate Franchise Tax resulted in a reduction in NS' deferred income tax liability, as required by Statement of Financial Accounting Standards No. 109, "Accounting for Income Taxes," which, as noted above, decreased deferred tax expense by $96 million.

**Deferred Tax Assets and Liabilities**

Certain items are reported in different periods for financial reporting and income tax purposes. Deferred tax assets and liabilities are recorded in recognition of these differences.

The tax effects of temporary differences that give rise to significant portions of the deferred tax assets and deferred tax liabilities are as follows:

| | Dec. 31, | |
|---|---|---|
| | **2005** | **2004** |
| | *($ in millions)* | |
| Deferred tax assets: | | |
| Reserves, including casualty and other claims | $ 162 | $ 200 |
| Retiree health and death benefit obligations | 190 | 180 |
| Taxes, including state and property | 390 | 449 |
| Other | 33 | 44 |
| Total gross deferred tax assets | 775 | 873 |
| Less valuation allowance | (16) | (21) |
| Net deferred tax asset | 759 | 852 |
| Deferred tax liabilities: | | |
| Property | (6,957) | (7,022) |
| Other | (255) | (193) |
| Total gross deferred tax liabilities | (7,212) | (7,215) |
| Net deferred tax liability | (6,453) | (6,363) |
| Net current deferred tax asset | 167 | 187 |
| Net long-term deferred tax liability | $ (6,620) | $ (6,550) |

Net deferred income tax liabilities increased by $3,113 million in 2004 as a result of the Conrail Corporate Reorganization (see Note 5). Except for amounts for which a valuation allowance has been provided, management believes that it is more likely than not that future taxable income will be sufficient to realize the deferred tax assets. The valuation allowance at the end of each year relates to subsidiary state income tax net operating losses that may not be utilized prior to their expiration. The total valuation allowance decreased $5 million in 2005, $1 million in 2004 and $2 million in 2003.

**Internal Revenue Service (IRS) Reviews**

Consolidated federal income tax returns have been examined and Revenue Agent Reports have been received for all years up to and including 2001. In 2004, the favorable resolution of the IRS audit of a synthetic fuel-related investment is reflected in the "Tax credits" line of the reconciliation of statutory rate to the effective rate. In 2003, the favorable resolution of prior years' audits is reflected in the "Other – net" line of the reconciliation of statutory rate to the effective rate, as shown above, and comprised most of that line item. The consolidated federal income tax returns for 2002 and 2003 are being audited by the

IRS. The IRS examination for 2002 and 2003 is expected to be completed by the end of 2006. Management believes that adequate provision has been made for any additional taxes and interest thereon that might arise as a result of IRS examinations.

**4. Accounts Receivable**

Until May 2005, NS had in place an accounts receivable sales program. Under this program a bankruptcy-remote special purpose subsidiary of NS sold without recourse undivided ownership interests in a pool of accounts receivable. While there were some sales during 2004 and 2003, there were no accounts receivable sold under this arrangement as of Dec. 31, 2004. The change in "Accounts receivable" included on the Consolidated Statements of Cash Flows related to receivable sales was zero for 2005 and 2004 and a decrease of $30 million in 2003. The fees associated with sales, which are based on the buyers' financing costs, are included in "Other income – net" (see Note 2).

NS' allowance for doubtful accounts was $6 million at Dec. 31, 2005, and $9 million at Dec. 31, 2004. To determine its allowance for doubtful accounts, NS evaluates historical loss experience (which has not been significant), the characteristics of current accounts, as well as general economic conditions and trends.

**5. Investments**

| | Dec. 31, 2005 | Dec. 31, 2004 |
|---|---|---|
| | *($ in millions)* | |
| Short-term investments with average maturities at Dec. 31, 2005: | | |
| Federal government notes, 6 months | $ 348 | $ -- |
| Corporate notes, 10 months | 290 | 40 |
| Commercial paper, 4 months | 251 | -- |
| Municipal debt, 5 months | 43 | 96 |
| Other short-term investments, 6 months | 36 | 66 |
| Total short-term investments | $ 968 | $ 202 |
| Long-term investments: | | |
| Investment in Conrail Inc. | $ 844 | $ 805 |
| Other equity method investments | 331 | 313 |
| Company-owned life insurance at net cash surrender value | 276 | 254 |
| Other investments | 139 | 127 |
| Total long-term investments | $ 1,590 | $ 1,499 |

The $968 million in "Short-term investments" is classified as available-for-sale, of which approximately two-thirds mature within 6 months. Unrealized gains from short-term investments were less than $1 million at Dec. 31, 2005 and $1 million at Dec. 31, 2004.

**Investment in Conrail and Operations Over Its Lines**

**Overview**

Through a limited liability company, Norfolk Southern and CSX Corporation (CSX) jointly own Conrail Inc. (Conrail), whose primary subsidiary is Consolidated Rail Corporation (CRC). NS has a 58% economic and 50% voting interest in the jointly owned entity, and CSX has the remainder of the economic and voting interests. CRC owns and operates certain properties (the Shared Assets Areas) for the joint and exclusive benefit of Norfolk Southern Railway Company (NSR) and CSX Transportation Inc. (CSXT). The costs of operating the Shared Assets Areas are borne by NSR and CSXT based on usage. In addition, NSR and CSXT pay CRC a fee for access to the Shared Assets Areas.

**Conrail Corporate Reorganization**

On August 27, 2004, NS, CSX and Conrail completed a reorganization of Conrail (Conrail Corporate Reorganization), which established direct ownership and control by NSR and CSXT of two former CRC subsidiaries, Pennsylvania Lines LLC (PRR) and New York Central Lines LLC (NYC), respectively. Prior to the Conrail Corporate Reorganization, NSR operated the routes and assets of PRR and CSXT operated the routes and assets of NYC, each in accordance with operating and lease agreements. Pursuant to the Conrail Corporate Reorganization, the operating and lease agreements were terminated and PRR and NYC were merged into NSR and CSXT, respectively. The reorganization did not involve the Shared Assets Areas and did not affect the competitive rail service provided in the Shared Assets Areas. Conrail continues to own, manage and operate the Shared Assets Areas as previously approved by the Surface Transportation Board (STB).

As a part of the Conrail Corporate Reorganization, Conrail restructured its existing unsecured and secured public indebtedness, with the consent of Conrail's debtholders. Prior to the restructuring, there were two series of unsecured public debentures with an outstanding principal amount of approximately $800 million and 13 series of secured debt with an outstanding principal amount of approximately $300 million. Guaranteed debt securities were offered in an approximate 58%/42% ratio in exchange for Conrail's unsecured debentures. Of the $800 million unsecured public debentures, $779 million were tendered and accepted for exchange, and NSR issued unsecured public debentures with a total principal of $452 million and an issue-date fair value of $595 million. Conrail's secured debt and lease obligations remain obligations of Conrail and are supported by leases and subleases which are the direct lease and sublease obligations of NSR or CSXT. Substantially all of these NSR obligations are capital leases and, accordingly, are a component of NS' capital lease obligations (see Note 8).

NS accounted for the transaction at fair value, which resulted in the recognition of a $53 million net gain (reported in "Other income – net") from the tax-free distribution to NS of a portion of its investment in Conrail. NS concluded that fair value was the appropriate measurement for 42% of PRR because the transaction resulted in the complete ownership and control of PRR. The remaining 58% of PRR was recorded at NS' carryover basis. As a result of the transaction, NS' investment in Conrail no longer includes amounts related to PRR and NYC. Instead the assets and liabilities of PRR are reflected in their respective line items in NS' Consolidated Balance Sheet and amounts due to PRR were extinguished.

The following summarizes the effect of the transaction on NS' Consolidated Balance Sheet ($ in millions):

| | | |
|---|---|---|
| Properties | $ | 8,368 |
| Extinguishment of amounts due to PRR | | 870 |
| Other assets and liabilities, net | | 177 |
| Deferred income taxes | | (3,113) |
| Long-term debt, including current maturities | | (734) |
| Net assets received | | 5,568 |
| Investment in Conrail | | (5,515) |
| Gain from Conrail Corporate Reorganization | $ | 53 |

The amounts shown above for the net assets received reflect the fair value of such assets. Properties have been valued based on information received from an independent valuation consultant. The assets of PRR included the note due from NSR discussed below under the heading "Related Party Transactions," which resulted in its effectively being extinguished. Debt has been recorded at fair value based on interest rates at the time of the reorganization. The reduction to NS' investment in Conrail represents the removal of amounts related to NS' equity interests in PRR and NYC as well as amounts related to the Conrail debt that was exchanged or effectively assumed by the leases and subleases entered into to support those obligations.

On the Consolidated Statements of Income, "Conrail rents and services" is reduced as a result of the transaction. After the Conrail Corporate Reorganization, "Conrail rents and services" reflects only the expenses associated with the Shared Assets Areas, and other expenses (primarily the depreciation related to the PRR assets) are reflected in their respective line items in the Consolidated Statements of Income. The transaction's impact on net income was the $53 million gain discussed above. Prospectively, the transaction will have no effect on revenues and will not have a significant ongoing effect on net income. Had the transaction been consummated before the periods presented, there would have been no change in revenues and no significant change to net income.

NS is continuing to apply the equity method of accounting to its remaining investment in Conrail in accordance with APB Opinion No. 18, "The Equity Method of Accounting for Investments in Common Stock." NS is amortizing the excess of the purchase price over Conrail's net equity using the principles of purchase accounting, based primarily on the estimated remaining useful lives of Conrail's depreciable property and equipment, including the related deferred tax effect of the differences in tax and accounting bases for certain assets, as all of the purchase price at acquisition was allocable to Conrail's tangible assets and liabilities. At Dec. 31, 2005, the difference between NS' investment in Conrail and its share of Conrail's underlying net equity was $593 million.

**Related-Party Transactions**

CRC owns and operates certain properties (the Shared Assets Areas) for the joint and exclusive benefit of NSR and CSXT. NSR and CSXT pay CRC a fee for joint and exclusive access to the Shared Assets Areas. In addition, NSR and CSXT pay, based on usage, the costs incurred by CRC to operate the Shared Assets Areas. Future minimum lease payments due to CRC under the Shared Assets Areas agreements are as follows: $25 million in each of 2006 through 2010 and $331 million thereafter.

The components of "Conrail rents and services" are as follows:

| | Years Ended Dec. 31, | | |
|---|---|---|---|
| | **2005** | **2004** | **2003** |
| | | *($ in millions)* | |
| Amounts due to PRR for use by NSR of operating properties and equipment (prior to the Conrail Corporate Reorganization) | $ -- | $ 233 | $ 348 |
| NS' equity in the earnings of Conrail, net of amortization (prior to the Conrail Corporate Reorganization)* | -- | (43) | (58) |
| Expenses for amounts due to CRC for operation of the Shared Assets Areas | 129 | 129 | 129 |
| Conrail rents and services | $ 129 | $ 319 | $ 419 |

*After the reorganization, NS' equity in the earnings of Conrail, net of amortization, is included in "Other income – net," (see Note 2).

Prior to the Conrail Corporate Reorganization, a significant portion of the payments made to PRR was borrowed back from a subsidiary of PRR under a note due in 2032. Amounts outstanding under this note comprised the long-term balance of "Due to Conrail," and this note was effectively extinguished by the reorganization. "Due to Conrail" included in "Accounts payable" (see Note 7) is composed principally of amounts related to expenses included in "Conrail rents and services," as discussed above. "Long-term advances from Conrail," included in "Other liabilities" (see Note 10), bear interest at an average rate of 4.4% and are due in 2035.

NS provides certain general and administrative support functions to Conrail, the fees for which are billed in accordance with several service-provider arrangements and amount to approximately $7 million annually.

**Summary Financial Information – Conrail**

As a result of the Conrail Corporate Reorganization discussed above, two CRC subsidiaries, PRR and NYC, were distributed to NS and CSX, respectively, and CRC's public indebtedness was restructured. The results of the operations of these subsidiaries and their net assets are presented in the following financial information as "Discontinued Operations." The 2005 and 2004 summarized information was derived from unaudited financial statements. The 2003 summarized information was derived from audited financial statements.

**Summarized Income Statement Information - Conrail**

| | Years Ended Dec. 31, | | |
|---|---|---|---|
| | **2005** | **2004** | **2003** |
| | | *($ in millions)* | |
| Operating revenues | $ 378 | $ 352 | $ 316 |
| Operating income (loss) | $ 32 | $ (18) | $ (36) |
| Income from continuing operations | $ 85 | $ 22 | $ 10 |
| Discontinued operations (PRR and NYC) | $ -- | $ 119 | $ 191 |
| Net income | $ 85 | $ 140 | $ 203 |

Note: Conrail adopted FIN No. 46 "Consolidation of Variable Interest Entities," effective Jan. 1, 2004, and recorded a $1 million net adjustment for the cumulative effect of this change in accounting on years prior to 2004. Conrail adopted SFAS No. 143, effective Jan. 1, 2003, and recorded a $40 million net adjustment for the cumulative effect of this change in accounting on years prior to 2003 (including $38 million related to discontinued operations). NS excluded this amount from its determination of equity in earnings of Conrail because an amount related to Conrail is included in NS' cumulative effect adjustment for SFAS No. 143.

**Summarized Balance Sheet Information - Conrail**

| | As of Dec. 31, | |
|---|---|---|
| | **2005** | **2004** |
| | *($ in millions)* | |
| Assets: | | |
| Current assets | $ 233 | $ 334 |
| Noncurrent assets | 1,242 | 1,080 |
| Total assets | $ 1,475 | $ 1,414 |
| Liabilities and stockholders' equity: | | |
| Current liabilities | $ 233 | $ 242 |
| Noncurrent liabilities | 807 | 811 |
| Stockholders' equity | 435 | 361 |
| Total liabilities and stockholders' equity | $ 1,475 | $ 1,414 |

Note: Current assets include amounts due from NS and CSX totaling $134 million at Dec. 31, 2005, and $165 million at Dec. 31, 2004. Noncurrent assets include amounts due from NS and CSX totaling $413 million at Dec. 31, 2005, and $225 million at Dec. 31, 2004. Current liabilities include amounts payable to NS and CSX totaling $6 million at Dec. 31, 2005, and $4 million at Dec. 31, 2004.

**6. Properties**

| | Dec. 31, | | Depreciation |
|---|---|---|---|
| | **2005** | **2004** | **Rate for 2005** |
| | *($ in millions)* | | |
| Land | $ 2,088 | $ 2,083 | |
| Railway property: | | | |
| Road | 18,131 | 17,552 | 2.8% |
| Equipment | 6,838 | 6,661 | 4.4% |
| Other property | 469 | 469 | 2.8% |
| | 27,526 | 26,765 | |
| Less accumulated depreciation | (6,821) | (6,239) | |
| Net properties | $ 20,705 | $ 20,526 | |

Railway property includes $602 million at Dec. 31, 2005, and $618 million at Dec. 31, 2004, of assets recorded pursuant to capital leases with accumulated amortization of $170 million and $149 million at Dec. 31, 2005 and 2004, respectively. Other property includes the costs of obtaining rights to natural resources of $337 million at Dec. 31, 2005, and $341 million at Dec. 31, 2004. Properties increased $8,368 million in 2004 as a result of the Conrail Corporate Reorganization (see Note 5).

**Impairment of Telecommunications Assets in 2003**

In 2003, NS recorded an $84 million non-cash reduction in the carrying value of certain telecommunications assets to recognize their impaired value in accordance with the provisions of SFAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets." NS' subsidiary, Thoroughbred Technology and Telecommunications (T-Cubed), developed fiber optic infrastructure with companies in the telecommunications industry. This industry experienced a severe downturn in 2003; accordingly, T-Cubed monitored the carrying amount of these assets through independent fair market value appraisals. As a result of a deterioration in the long-term prospects for these assets, an updated appraisal obtained in the fourth quarter of 2003 indicated a significant decline in their value. T-Cubed continues to monitor the carrying value of these assets.

**Capitalized Interest**

Total interest cost incurred on debt in 2005, 2004 and 2003 was $505 million, $499 million and $509 million, respectively, of which $11 million, $10 million and $12 million was capitalized.

**7. Current Liabilities**

| | Dec. 31, 2005 | Dec. 31, 2004 |
|---|---|---|
| | *($ in millions)* | |
| Accounts payable: | | |
| Accounts and wages payable | $ 571 | $ 544 |
| Casualty and other claims (Note 18) | 291 | 222 |
| Vacation liability | 119 | 115 |
| Equipment rents payable – net | 101 | 106 |
| Due to Conrail | 56 | 78 |
| Other | 25 | 25 |
| Total | $ 1,163 | $ 1,090 |
| Other current liabilities: | | |
| Interest payable | $ 100 | $ 117 |
| Liabilities for forwarded traffic | 47 | 46 |
| Retiree health and death benefit obligations (Note 11) | 45 | 45 |
| Other | 21 | 31 |
| Total | $ 213 | $ 239 |

**8. Long-term Debt**

| | | Dec. 31, | | |
|---|---|---|---|---|
| | | **2005** | | **2004** |
| | | *($ in millions)* | | |
| Notes and debentures at average rates and maturities as follows: | | | | |
| 7.10%, maturing to 2010 | $ | 1,440 | $ | 1,840 |
| 5.89%, maturing 2011 and 2014 | | 741 | | 741 |
| 8.02%, maturing 2017 to 2025 | | 1,314 | | 1,114 |
| 7.13%, maturing 2027 to 2031 | | 1,300 | | 1,500 |
| 7.21%, maturing 2037 and 2043 | | 855 | | 855 |
| 7.02%, maturing 2097 and 2105 | | 650 | | 350 |
| Equipment obligations at an average rate of 5.54%, maturing to 2014 | | 363 | | 563 |
| Capitalized leases at an average rate of 4.49%, maturing to 2024 | | 290 | | 370 |
| Other debt at an average rate of 7.04%, maturing to 2019 | | 113 | | 113 |
| Discounts and premiums, net | | (136) | | 79 |
| Total long-term debt | | 6,930 | | 7,525 |
| Less current maturities | | (314) | | (662) |
| Long-term debt excluding current maturities | $ | 6,616 | $ | 6,863 |

| | | |
|---|---|---|
| Long-term debt maturities subsequent to 2006 are as follows: | | |
| 2007 | $ | 492 |
| 2008 | | 368 |
| 2009 | | 476 |
| 2010 | | 340 |
| 2011 and subsequent years | | 4,940 |
| Total | $ | 6,616 |

In May 2005, NS issued $717 million of unsecured notes ($350 million at 5.64% due 2029 and $367 million at 5.59% due 2025) and paid $218 million of premium in exchange for $717 million of its previously issued unsecured notes ($350 million at 7.8% due 2027, $200 million at 7.25% due 2031, and $167 million at 9.0% due 2021). The $218 million cash premium payment is reflected as a reduction of debt in the Consolidated Balance Sheet and Statement of Cash Flows and is included in "Discounts and premiums, net." The premium is being amortized as additional interest expense over the terms of the new debt, resulting in effective interest rates of 8.7% for the 2029 notes and 9.0% for the 2025 notes.

In August 2004, pursuant to the Conrail Corporate Reorganization (see Note 5), NSR issued unsecured public debentures with a total principal of $452 million ($314 million at 9.75% due 2020 and $138 million at 7.875% due 2043) and fair value of $595 million. This difference is included in "Discounts and premiums, net" and is being amortized as a reduction of interest expense over the terms of the notes, resulting in effective interest rates of 6.0% for the 2020 notes and 6.2% for the 2043 notes.

The railroad equipment obligations and the capitalized leases are secured by liens on the underlying equipment. Certain lease obligations require the maintenance of yen-denominated deposits, which are pledged to the lessor to satisfy yen-denominated lease payments. These deposits are included in "Other assets" on the balance sheet and totaled $87 million at Dec. 31, 2005, and $100 million at Dec. 31, 2004.

**Shelf Registration**

NS has on file with the Securities and Exchange Commission a Form S-3 shelf registration statement covering the issuance of up to $1 billion of registered debt or equity securities. In 2005, NS issued $300 million of 6% senior notes due March 2105 under this shelf registration statement.

**Credit Agreement, Debt Covenants and Commercial Paper**

In August 2004, NS renewed its $1 billion credit facility under substantially the same terms and conditions as the previous facility for a five-year term expiring in 2009. Any borrowings under the credit agreement are contingent on the continuing effectiveness of the representations and warranties made at the inception of the agreement. NS is subject to various financial covenants with respect to its debt and under its credit agreement, including a minimum net worth requirement, a maximum leverage ratio restriction, certain restrictions on the issuance of further debt by NS or its subsidiaries and the consolidation, merger or sale of substantially all of NS' assets. At Dec. 31, 2005, NS was in compliance with all financial covenants.

NS has the ability to issue commercial paper supported by its $1 billion credit agreement. At Dec. 31, 2005, and Dec. 31, 2004, NS had no outstanding commercial paper or borrowings under the credit agreement.

**9. Lease Commitments**

NS is committed under long-term lease agreements, which expire on various dates through 2067, for equipment, lines of road and other property. The following amounts do not include payments to CRC under the Shared Assets Areas agreements (see Note 5). Future minimum lease payments and operating lease expense are as follows:

| | Operating Leases | Capital Leases |
|---|---|---|
| | *($ in millions)* | |
| 2006 | $ 144 | $ 67 |
| 2007 | 141 | 78 |
| 2008 | 114 | 46 |
| 2009 | 100 | 59 |
| 2010 | 85 | 24 |
| 2011 and subsequent years | 483 | 44 |
| Total | $ 1,067 | $ 318 |
| Less imputed interest on capital leases at an average rate of 5.4% | | (28) |
| Present value of minimum lease payments included in debt | | $ 290 |

**Operating Lease Expense**

| | 2005 | 2004 | 2003 |
|---|---|---|---|
| | | *($ in millions)* | |
| Minimum rents | $ 190 | $ 151 | $ 130 |
| Contingent rents | 75 | 65 | 63 |
| Total | $ 265 | $ 216 | $ 193 |

## 10. Other Liabilities

| | Dec. 31, 2005 | Dec. 31, 2004 |
|---|---|---|
| | *($ in millions)* | |
| Casualty and other claims (Note 18) | $ 421 | $ 315 |
| Retiree health and death benefit obligations (Note 11) | 364 | 354 |
| Deferred compensation | 143 | 143 |
| Long-term advances from Conrail | 133 | -- |
| Net pension obligations (Note 11) | 106 | 94 |
| Other | 248 | 240 |
| Total | $ 1,415 | $ 1,146 |

## 11. Pensions and Other Postretirement Benefits

Norfolk Southern and certain subsidiaries have both funded and unfunded defined benefit pension plans covering principally salaried employees. Norfolk Southern and certain subsidiaries also provide specified health care and death benefits to eligible retired employees and their dependents. Under the present plans, which may be amended or terminated at NS' option, a defined percentage of health care expenses is covered, reduced by any deductibles, copayments, Medicare payments and, in some cases, coverage provided under other group insurance policies.

### Asset Management

Eleven investment firms manage the Company’s defined benefit pension plan’s assets under investment guidelines approved by the Board of Directors. Investments are restricted to domestic fixed income securities, international fixed income securities, domestic and international equity investments and unleveraged exchange-traded options and financial futures. Limitations restrict investment concentration and use of certain derivative instruments. The target asset allocation for equity is 75% of the pension plan’s assets. Fixed income investments must have an average rating of “AA” or better and all fixed income securities must be rated “A” or better except bond index funds. Equity investments must be in liquid securities listed on national exchanges. No investment is permitted in the securities of Norfolk Southern Corporation or its subsidiaries (except through commingled pension trust funds). Investment managers’ returns are expected to exceed selected market indices by prescribed margins.

NS' pension plan weighted-average asset allocations at Dec. 31, 2005 and 2004, by asset category, are as follows:

| Asset Category | Percentage of plan assets at Dec. 31, 2005 | 2004 |
|---|---|---|
| Equity securities | 76% | 76% |
| Debt securities | 24% | 24% |
| Total | 100% | 100% |
| International equity securities included in equity securities above | 11% | 10% |

The postretirement benefit plan assets consist primarily of trust-owned variable life insurance policies with an asset allocation at Dec. 31, 2005, of 66% in equity securities and 34% in debt securities compared with 67% in equity securities and 33% in debt securities at Dec. 31, 2004. The target asset allocation for equity is between 50% and 75% of the plan's assets.

The plans' assumed future returns are based principally on the asset allocation and on the historic returns for the plans' asset classes determined from both actual plan returns and, over longer time periods, market returns for those asset classes.

**Voluntary Separation Program in 2003**

Compensation and benefits expense in 2003 includes $107 million of costs related to a voluntary separation program undertaken in the fourth quarter. Through the program, 553 nonagreement employees were separated from service, of which 314 retired under Norfolk Southern's retirement plan. The costs include $66 million for separation payments and other benefits of the program and $41 million of costs related to the pension and other benefit plans.

**Medicare Changes**

The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (the Act) was signed into law in December 2003. The Act introduced a new prescription drug benefit under Medicare (Medicare Part D) as well as a federal subsidy to sponsors of retiree health care benefit plans that provide a benefit that is at least actuarially equivalent to Medicare Part D. The actuary for Norfolk Southern's medical plan has determined that Norfolk Southern's medical plan's prescription drug benefit for 2006 is actuarially equivalent to the new prescription drug benefit under Medicare Part D. In accordance with Financial Accounting Standards Board Staff Position No. 106-1, NS elected to take into account these legislative changes in the measurement of its postretirement benefit obligations, which resulted in a reduction of $15 million in the net benefit cost in 2005, $9 million in 2004 and no effect on the net benefit cost in 2003.

**Pension and Other Postretirement Benefit Obligations and Plan Assets**

| | Pension Benefits | | Other Benefits | |
|---|---|---|---|---|
| | **2005** | **2004** | **2005** | **2004** |
| | ($ in millions) | | | |
| ***Change in benefit obligations*** | | | | |
| Benefit obligation at beginning of year | $ 1,574 | $ 1,488 | $ 701 | $ 608 |
| Service cost | 23 | 18 | 17 | 15 |
| Interest cost | 87 | 89 | 40 | 39 |
| Settlement | -- | -- | (12) | -- |
| Actuarial losses | 72 | 96 | 60 | 83 |
| Benefits paid | (114) | (117) | (52) | (44) |
| Benefit obligation at end of year | 1,642 | 1,574 | 754 | 701 |
| ***Change in plan assets*** | | | | |
| Fair value of plan assets at beginning of year | 1,806 | 1,720 | 105 | 130 |
| Actual return on plan assets | 126 | 197 | 3 | 10 |
| Employer contribution | 6 | 6 | 52 | 9 |
| Benefits paid | (114) | (117) | (52) | (44) |
| Fair value of plan assets at end of year | 1,824 | 1,806 | 108 | 105 |
| **Funded status** | 182 | 232 | (646) | (596) |
| Unrecognized actuarial loss | 336 | 253 | 264 | 232 |
| Unrecognized prior service cost (benefit) | 14 | 18 | (27) | (35) |
| Net amount recognized | $ 532 | $ 503 | $ (409) | $ (399) |
| Amounts recognized in the Consolidated Balance Sheets consist of: | | | | |
| Prepaid benefit cost | $ 612 | $ 577 | $ -- | $ -- |
| Accrued benefit liability | (106) | (94) | (409) | (399) |
| Accumulated other comprehensive income | 26 | 20 | -- | -- |
| **Net amount recognized** | $ 532 | $ 503 | $ (409) | $ (399) |

During 2005, NS distributed split dollar life insurance policies to eligible retired employees, which resulted in a $12 million reduction of the postretirement benefit obligation.

Following is information for NS' unfunded pension plans which in all cases have no assets and therefore have an accumulated benefit obligation in excess of plan assets:

| | Dec. 31, | |
|---|---|---|
| | **2005** | **2004** |
| | ($ in millions) | |
| Projected benefit obligation | $ 134 | $ 120 |
| Accumulated benefit obligation | $ 106 | $ 94 |

**Pension and Other Postretirement Benefit Costs Components**

| | 2005 | 2004 | 2003 |
|---|---|---|---|
| | | ($ in millions) | |
| ***Pension benefits*** | | | |
| Service cost | $ 23 | $ 18 | $ 20 |
| Interest cost | 87 | 89 | 89 |
| Curtailment loss | -- | -- | 17 |
| Expected return on plan assets | (149) | (149) | (158) |
| Amortization of prior service cost | 2 | 3 | 5 |
| Recognized net actuarial losses | 14 | 3 | 2 |
| Net benefit | $ (23) | $ (36) | $ (25) |
| ***Other postretirement benefits*** | | | |
| Service cost | $ 17 | $ 15 | $ 18 |
| Interest cost | 40 | 39 | 40 |
| Curtailment loss | -- | -- | 10 |
| Special termination benefits | -- | -- | 17 |
| Expected return on plan assets | (9) | (12) | (12) |
| Amortization of prior service cost (benefit) | (8) | (9) | (7) |
| Amortization of unrecognized losses | 22 | 16 | 14 |
| Net cost | $ 62 | $ 49 | $ 80 |

**Pension Assumptions**

Pension and other postretirement benefit costs are determined based on actuarial valuations that reflect appropriate assumptions as of the measurement date, ordinarily the beginning of each year. The funded status of the plans is determined using appropriate assumptions as of each year end. A summary of the major assumptions follows:

| | 2005 | 2004 | 2003 |
|---|---|---|---|
| ***Funded status:*** | | | |
| Discount rate | 5.50% | 5.75% | 6.25% |
| Future salary increases | 4.5% | 4.5% | 4.5% |
| ***Pension cost:*** | | | |
| Discount rate | 5.75% | 6.25% | 6.75% |
| Return on assets in plans | 9% | 9% | 9% |
| Future salary increases | 4.5% | 4.5% | 4.5% |

**Health Care Cost Trend Assumptions**

For measurement purposes at Dec. 31, 2005, increases in the per capita cost of covered health care benefits were assumed to be 9% for 2005 and 8% for 2006. It is assumed the rate will decrease gradually to an ultimate rate of 5% for 2009 and remain at that level thereafter.

Assumed health care cost trend rates have a significant effect on the amounts reported in the financial statements. To illustrate, a one-percentage-point change in the assumed health care cost trend would have the following effects:

| | One percentage point Increase | One percentage point Decrease |
|---|---|---|
| | *($ in millions)* | |
| Increase (decrease) in: | | |
| Total service and interest cost components | $ 7 | $ (6) |
| Postretirement benefit obligation | $ 81 | $ (69) |

**Contributions and Estimated Future Benefit Payments**

In 2006, NS expects to contribute approximately $8 million to its unfunded pension plans for payments to pensioners and $44 million to its other postretirement benefit plans for retiree health benefits.

Benefit payments, which reflect expected future service, as appropriate, are expected to be paid as follows:

| | Pension Benefits | Other Benefits |
|---|---|---|
| | *($ in millions)* | |
| 2006 | $ 116 | $ 44 |
| 2007 | 113 | 45 |
| 2008 | 111 | 46 |
| 2009 | 110 | 47 |
| 2010 | 111 | 49 |
| Years 2011-2015 | 587 | 262 |

Beginning in 2006, the other benefit payments include an estimated annual $4 million reduction due to the Medicare Part D Subsidy.

**Other Postretirement Coverage**

Under collective bargaining agreements, NS and certain subsidiaries participate in a multi-employer benefit plan, which provides certain postretirement health care and life insurance benefits to eligible union employees. Premiums under this plan are expensed as incurred and amounted to $26 million in 2005, $20 million in 2004 and $18 million in 2003.

**Section 401(k) Plans**

Norfolk Southern and certain subsidiaries provide Section 401(k) savings plans for employees. Under the plans, NS matches a portion of employee contributions, subject to applicable limitations. NS' expenses under these plans were $13 million in 2005, and $12 million in each of 2004 and 2003.

**12. Stock-Based Compensation**

Under the stockholder-approved Long-Term Incentive Plan (LTIP), a committee of nonemployee directors of the Board or the chief executive officer (if delegated such authority by the committee) may grant stock options, stock appreciation rights (SARs), restricted shares, restricted stock units and

performance share units (PSUs), up to a maximum of 88,025,000 shares of Norfolk Southern Common Stock (Common Stock). Of these shares, 5,000,000 were approved by the Board for issuance to non-officer participants; as a broad-based issuance, stockholder approval was not required. In May 2005, the stockholders approved an amended LTIP which provided that 8,500,000 shares of stock previously approved for issuance under LTIP could be granted as restricted shares, restricted stock unit shares or performance shares. Under the Board-approved Thoroughbred Stock Option Plan (TSOP), the committee may grant stock options up to a maximum of 6,000,000 shares of Common Stock. Options may be granted for a term not to exceed 10 years, but may not be exercised prior to the first anniversary of the date of grant. Options are exercisable at the fair market value of Common Stock on the date of grant.

The LTIP also permits the payment – on a current or a deferred basis and in cash or in stock – of dividend equivalents on shares of Common Stock covered by options, PSUs or restricted stock units in an amount commensurate with dividends paid on Common Stock. Tax absorption payments also are authorized for any awards under LTIP in amounts estimated to equal the federal and state income taxes applicable to shares of Common Stock issued subject to a share retention agreement.

**Accounting Method**

As disclosed in Note 1, through Dec. 31, 2005, NS applied APB Opinion 25 and related interpretations in accounting for awards made under the plans. Accordingly, grants of PSUs, restricted shares, restricted share units, dividend equivalents, tax absorption payments and SARs resulted in charges to net income, while grants of stock options had no effect on net income. Related compensation costs were $75 million in 2005, $53 million in 2004 and $29 million in 2003. NS recognized additional paid-in capital of $47 million in 2005, $30 million in 2004 and $2 million in 2003 related to the tax benefit generated by stock option exercises.

Note 1 includes a table that illustrates the effect on net income and earnings per share had NS applied the fair value recognition provisions of SFAS No. 123 to stock-based employee compensation. The pro forma amounts include compensation costs calculated using the Black-Scholes option-pricing model, with the following assumptions and no dividend yield:

| | 2005 | 2004 | 2003 |
|---|---|---|---|
| Average expected option life | 5 years | 5 years | 5 years |
| Average risk-free interest rate | 3.7% | 3.2% | 2.8% |
| Average stock-price volatility | 33% | 35% | 33% |
| Per-share grant-date fair value | $ 12.19 | $ 7.95 | $ 6.60 |

**Stock Option Activity**

| | Option Shares | Weighted Average Exercise Price |
|---|---|---|
| Balance Dec. 31, 2002 | 37,658,644 | $ 23.47 |
| Granted | 5,700,000 | 19.63 |
| Exercised | (781,610) | 16.13 |
| Expired | (863,219) | 24.37 |
| Balance Dec. 31, 2003 | 41,713,815 | $ 23.07 |
| Granted | 4,580,500 | 22.02 |
| Exercised | (8,203,589) | 19.60 |
| Expired | (1,233,859) | 24.53 |
| Balance Dec. 31, 2004 | 36,856,867 | $ 23.66 |
| Granted | 1,353,600 | 34.10 |
| Exercised | (8,651,237) | 22.93 |
| Expired | (13,550) | 30.00 |
| Balance Dec. 31, 2005 | 29,545,680 | $ 24.35 |

Of the total options outstanding at Dec. 31, 2005, 28 million were vested and had a weighted-average exercise price of $23.88.

**Stock Options Outstanding**

| Range | Weighted Average Exercise Price | Number Outstanding at Dec. 31, 2005 | Weighted Average Remaining Contractual Life |
|---|---|---|---|
| $ 15.48 - $ 16.94 | 16.12 | 4,587,502 | 4.6 years |
| 19.63 - 22.49 | 21.53 | 13,550,929 | 7.0 years |
| 24.41 - 27.69 | 27.65 | 3,632,042 | 3.0 years |
| 29.46 - 34.10 | 32.58 | 7,775,207 | 2.7 years |
| $ 15.48 - $ 34.10 | 24.35 | 29,545,680 | 5.0 years |

**Performance Share Units**

PSUs provide for awards based on achievement of certain predetermined corporate performance goals at the end of a three-year cycle. PSU grants and average grant-date fair values were 1,344,400 and $34.10 in 2005; 831,000 and $22.02 in 2004; and 946,000 and $19.63 in 2003. PSUs may be paid in the form of shares of Common Stock, cash or any combination thereof. Shares earned and issued may be subject to share retention agreements and held by NS for up to five years.

**Restricted Shares and Restricted Stock Units**

Restricted share and restricted stock unit grants were 576,240 and 384,160, respectively, in 2005, with a grant-date fair value of $34.10 and a five-year restriction period (that may be accelerated to a three-year restriction period upon achievement of specified performance measures), and were 359,040 and 239,360, respectively, in 2004, with a grant date fair value of $22.02 and a three-year restriction period. At

Dec. 31, 2005 and 2004, the balance of unearned compensation was $17 million and $8 million, relating to 1,262,776 and 726,540 restricted shares, respectively. Restricted stock units are payable in cash.

**Shares Available and Issued**

Shares of stock available for future grants and issued in connection with all features of the LTIP and TSOP are as follows:

| | 2005 | 2004 | 2003 |
|---|---|---|---|
| Available for future grants as of Dec. 31: | | | |
| LTIP | 11,321,573 | 14,033,053 | 17,994,726 |
| TSOP | 2,771,400 | 2,773,300 | 2,737,200 |
| Shares of Common Stock issued: | | | |
| LTIP | 9,078,717 | 8,764,021 | 1,412,749 |
| TSOP | 410,750 | 8,700 | -- |

**13. Stockholders' Equity**

**Accumulated Other Comprehensive Loss**

"Accumulated other comprehensive income (loss)" reported in the Consolidated Statements of Changes in Stockholders' Equity consisted of the following:

| | Balance at Beginning of Year | Net Gain (Loss) | Reclassification Adjustments | Balance at End of Year |
|---|---|---|---|---|
| | | *($ in millions)* | | |
| Dec. 31, 2005 | | | | |
| Unrealized gains (losses) on securities | $ 1 | $ (1) | $ -- | $ -- |
| Cash flow hedges | 47 | 55 | (90) | 12 |
| Minimum pension liability | (72) | (17) | -- | (89) |
| Accumulated other comprehensive loss | $ (24) | $ 37 | $ (90) | $ (77) |
| Dec. 31, 2004 | | | | |
| Unrealized gains on securities | $ -- | $ 1 | $ -- | $ 1 |
| Cash flow hedges | 28 | 104 | (85) | 47 |
| Minimum pension liability | (72) | -- | -- | (72) |
| Accumulated other comprehensive loss | $ (44) | $ 105 | $ (85) | $ (24) |

"Other comprehensive income (loss)" reported in the Consolidated Statements of Changes in Stockholders' Equity consisted of the following:

| | Pretax Amount | Tax (Expense) Benefit | Net-of-Tax Amount |
|---|---|---|---|
| | | ($ in millions) | |
| ***Year ended Dec. 31, 2005*** | | | |
| Net gain (loss) arising during the year: | | | |
| Cash flow hedges | $ 92 | $ (37) | $ 55 |
| Reclassification adjustments for gains included in net income | (148) | 58 | (90) |
| Subtotal | (56) | 21 | (35) |
| Unrealized losses on securities | (1) | -- | (1) |
| Minimum pension liability | (19) | 2 | (17) |
| Other comprehensive income (loss) | $ (76) | $ 23 | $ (53) |
| ***Year ended Dec. 31, 2004*** | | | |
| Net gain (loss) arising during the year: | | | |
| Cash flow hedges | $ 171 | $ (67) | $ 104 |
| Reclassification adjustments for gains included in net income | (140) | 55 | (85) |
| Subtotal | 31 | (12) | 19 |
| Unrealized gains on securities | 1 | -- | 1 |
| Other comprehensive income (loss) | $ 32 | $ (12) | $ 20 |
| ***Year ended Dec. 31, 2003*** | | | |
| Net gain (loss) arising during the year: | | | |
| Cash flow hedges | $ 75 | $ (29) | $ 46 |
| Reclassification adjustments for gains included in net income | (59) | 23 | (36) |
| Subtotal | 16 | (6) | 10 |
| Unrealized losses on securities | (1) | -- | (1) |
| Minimum pension liability | 11 | 1 | 12 |
| Other comprehensive income (loss) | $ 26 | $ (5) | $ 21 |

In 2005, 2004 and 2003, Conrail recorded a $22 million loss, a $3 million gain and a $25 million gain, respectively, in other comprehensive income (loss) related to its minimum pension liability. NS' "Other comprehensive income (loss)" includes a $13 million loss for 2005, a $2 million gain for 2004 and a $14 million gain for 2003, arising from the Conrail adjustments.

**14. Earnings Per Share**

The following table sets forth the calculation of basic and diluted earnings per share:

| | 2005 | 2004 | 2003 |
|---|---|---|---|
| | *($ in millions except per share, shares in millions)* | | |
| Income available to common stockholders for basic and diluted computations | $ 1,281 | $ 923 | $ 535 |
| Basic earnings per share: | | | |
| Weighted-average shares outstanding | 404.2 | 394.2 | 389.8 |
| Basic earnings per share | $ 3.17 | $ 2.34 | $ 1.37 |
| Diluted earnings per share: | | | |
| Weighted-average shares outstanding per above | 404.2 | 394.2 | 389.8 |
| Dilutive effect of outstanding options, PSUs and restricted shares (as determined by the application of the treasury stock method) | 8.1 | 5.1 | 1.9 |
| Adjusted weighted-average shares outstanding | 412.3 | 399.3 | 391.7 |
| Diluted earnings per share | $ 3.11 | $ 2.31 | $ 1.37 |

These calculations exclude options whose exercise price exceeded the average market price of Common Stock as follows: 1 million in 2005, 13 million in 2004 and 28 million in 2003.

As disclosed in Note 1, the cumulative effect of changes in accounting principles in 2003 amounted to $114 million, or 29 cents per share (basic and diluted). As disclosed in Note 17, the results in 2003 included discontinued operations of $10 million, or 3 cents per share (basic and diluted).

There are no adjustments to "Net income" or "Income from continuing operations" for the diluted earnings per share computations.

**15. Fair Values of Financial Instruments**

The fair values of "Cash and cash equivalents," "Short-term investments," "Accounts receivable" and "Accounts payable" approximate carrying values because of the short maturity of these financial instruments. The fair value of corporate-owned life insurance approximates carrying value. The carrying amounts and estimated fair values for the remaining financial instruments, excluding derivatives (see Note 16) and investments accounted for under the equity method in accordance with APB Opinion No. 18, consisted of the following at Dec. 31:

| | 2005 | | 2004 | |
|---|---|---|---|---|
| | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
| | *($ in millions)* | | | |
| Investments | $ 139 | $ 160 | $ 125 | $ 134 |
| Long-term debt | (6,930) | (7,934) | (7,525) | (8,577) |

Quoted market prices were used to determine the fair value of marketable securities; underlying net assets were used to estimate the fair value of other investments. The fair values of notes receivable are based on

future discounted cash flows. The fair values of debt were estimated based on quoted market prices or discounted cash flows using current interest rates for debt with similar terms, company rating and remaining maturity.

Carrying amounts of marketable securities reflect unrealized holding gains of less than $1 million on Dec. 31, 2005, and $1 million on Dec. 31, 2004. Sales of "available-for-sale" securities were immaterial for the years ended Dec. 31, 2005, 2004 and 2003; most short-term investments were redeemed at maturity.

**16. Derivative Financial Instruments**

On Jan. 1, 2001, NS adopted Statement of Financial Accounting Standards No. 133, "Accounting for Derivative Instruments and Hedging Activities" (SFAS No. 133), as amended by Statement of Financial Accounting Standards No. 138, "Accounting for Certain Derivative Instruments and Certain Hedging Activities" (SFAS No. 138). The Statements establish accounting and reporting standards for derivative instruments and hedging activities, requiring that all derivatives be recognized in the financial statements as either assets or liabilities and that they be measured at fair value. Changes in fair value are recorded as adjustments to the assets or liabilities being hedged in "Other comprehensive income," or in current earnings, depending on whether the derivative is designated and qualifies for hedge accounting, the type of hedge transaction represented and the effectiveness of the hedge. The settlements of the hedges will result in the reclassification into diesel fuel expense of the related gains or losses recorded as a component of "Other comprehensive income."

NS uses derivative financial instruments to reduce the risk of volatility in its diesel fuel costs and to manage its overall exposure to fluctuations in interest rates. NS does not engage in the trading of derivatives. Management has determined that its derivative financial instruments qualify as either fair-value or cash-flow hedges, having values that highly correlate with the underlying hedged exposures, and has designated such instruments as hedging transactions. Credit risk related to the derivative financial instruments is considered to be minimal and is managed by requiring high credit standards for counterparties and periodic settlements.

**Diesel Fuel Hedging**

NS has hedged a portion of its diesel fuel consumption. The intent of the hedges is to assist in the management of NS' aggregate risk exposure to fuel price fluctuations, which can significantly affect NS' operating margins and profitability. In order to minimize this risk, NS has entered into a series of swaps in order to lock in the purchase prices of some of its diesel fuel. Management has designated these derivative instruments as cash-flow hedges of the exposure to variability in expected future cash flows attributable to fluctuations in diesel fuel prices.

Following is a summary of NS' diesel fuel swaps:

| | 2005 | 2004 |
|---|---|---|
| Number of swaps entered into during the year | -- | 120 |
| Approximate number of gallons hedged (millions) | -- | 157 |
| Approximate average price per gallon of Nymex No. 2 heating oil | n/a | $0.86 |

NS has 4% of estimated 2006 future diesel fuel consumption covered as of Dec. 31, 2005.

Hedges are entered into periodically by competitive bid among selected counterparties; however, no hedges have been placed since May 2004. The goal of this hedging strategy is to reduce the variability of fuel costs over an extended period of time while minimizing the incremental cost of hedging. The

program provides that NS will not enter into any fuel hedges with a duration of more than 36 months, and that no more than 80% of NS' average monthly fuel consumption will be hedged for each month within any 36-month period. After taking into account the effect of the hedging, diesel fuel costs represented 11% of NS' operating expenses for the year ended Dec. 31, 2005, 8% for the year ended Dec. 31, 2004, and 7% for the year ended Dec. 31, 2003.

NS' fuel hedging activity resulted in decreases in diesel fuel expenses of $148 million, $140 million and $59 million for 2005, 2004 and 2003, respectively. Ineffectiveness, or the extent to which changes in the fair value of the heating oil contracts do not offset changes in the fair values of the expected diesel fuel transactions, was a $5 million expense in 2005, a $5 million benefit in 2004 and less than a $1 million benefit in 2003.

**Interest Rate Hedging**

NS manages its overall exposure to fluctuations in interest rates by issuing both fixed and floating-rate debt instruments, and by entering into interest rate hedging transactions. NS had $116 million, or 1.7%, and $151 million, or 2.2%, of its fixed rate debt portfolio hedged as of Dec. 31, 2005, and Dec. 31, 2004, respectively, using interest rate swaps that qualify for and are designated as fair-value hedge transactions. NS' interest rate hedging activity resulted in decreases in interest expenses of $2 million, $6 million and $10 million for 2005, 2004 and 2003, respectively. These swaps have been effective in hedging the changes in fair value of the related debt arising from changes in interest rates and there has been no impact on earnings resulting from ineffectiveness associated with these derivative transactions.

**Fair Values**

The fair values of NS' diesel fuel derivative instruments as of Dec. 31, 2005 and 2004 were determined based upon current market values as quoted by an independent third party. Fair values of interest rate swaps were determined based upon the present value of expected future cash flows discounted at the appropriate implied spot rate from the spot rate yield curve. Fair value adjustments are noncash transactions and, accordingly, are excluded from the Consolidated Statement of Cash Flows. "Accumulated other comprehensive loss," a component of "Stockholders' equity," included unrealized gains of $20 million (pretax) as of Dec. 31, 2005, and $75 million (pretax) as of Dec. 31, 2004, related to the fair value of derivative fuel hedging transactions that will terminate within twelve months of the respective dates. Any future gain or loss actually realized will be based on the fair value of the derivative fuel hedges at the time of termination.

The asset and liability positions of NS' outstanding derivative financial instruments were as follows:

| | Dec. 31, 2005 | Dec. 31, 2004 |
|---|---|---|
| | ($ in millions) | |
| ***Interest rate hedges:*** | | |
| Gross fair value asset position | $ 3 | $ 9 |
| Gross fair value (liability) position | -- | -- |
| ***Fuel hedges:*** | | |
| Gross fair value asset position | 20 | 81 |
| Gross fair value (liability) position | -- | -- |
| Total net asset (liability) position | $ 23 | $ 90 |

**17. Discontinued Operations - Motor Carrier**

On March 28, 1998, NS sold all the common stock of North American Van Lines, Inc. (NAVL), its motor carrier subsidiary. Results in 2003 include an additional after-tax gain of $10 million, or 3 cents per share (basic and diluted), that resulted from resolution of tax issues related to the transaction.

**18. Commitments and Contingencies**

Lawsuits

Norfolk Southern and certain subsidiaries are defendants in numerous lawsuits and other claims relating principally to railroad operations. When management concludes that it is probable that a liability has been incurred and the amount of the liability can be reasonably estimated, it is accrued through a charge to earnings. While the ultimate amount of liability incurred in any of these lawsuits and claims is dependent on future developments, in management's opinion, the recorded liability is adequate to cover the future payment of such liability and claims. However, the final outcome of any of these lawsuits and claims cannot be predicted with certainty, and unfavorable or unexpected outcomes could result in additional accruals that could be significant to results of operations in a particular year or quarter. Any adjustments to the recorded liability will be reflected in earnings in the periods in which such adjustments are known.

NS has been involved in mass tort litigation proceedings arising out of historic flooding events that occurred in West Virginia in 2001. During the third quarter, one of NS' subsidiaries was identified as the target defendant for claims related to a specific sub-watershed. The final outcome of these proceedings is inestimable at this time. Although NS has good defenses to the litigation, an unexpected adverse resolution could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

Casualty Claims

Casualty claims include employee personal injury and occupational claims as well as third-party claims, all exclusive of legal costs. NS engages an independent consulting actuarial firm to aid in valuing its liability for these claims. Job-related accidental injury and occupational claims are subject to the Federal Employers' Liability Act (FELA), which is applicable only to railroads. FELA's fault-based system produces results that are unpredictable and inconsistent as compared with a no-fault workers' compensation system. The variability inherent in this system could result in actual costs being very different from the liability recorded. While the ultimate amount of claims incurred is dependent on future developments, in management's opinion, the recorded liability is adequate to cover the future payments of claims and is supported by the most recent actuarial study. In all cases, NS records a liability when the expected loss for the claim is both probable and estimable.

In 2005, NS recorded a liability related to the Jan. 6, 2005 derailment in Graniteville, SC. The liability, which includes a current and long-term portion, represents NS' best estimate based on current facts and circumstances. The estimate includes amounts related to business property damage and other economic losses, personal injury and individual property damage claims as well as third-party response costs. NS' commercial insurance policies are expected to cover substantially all expenses related to this derailment above NS' self-insured retention, including NS' response costs and legal fees. Accordingly, the Consolidated Balance Sheet reflects a current and long-term receivable for estimated recoveries from NS' insurance carriers. The $41 million expense recorded in 2005 related to this incident represents NS' retention under its insurance policies and other uninsured costs. While it is reasonable to expect that the liability for covered losses could differ from the amount recorded, such

a change would be offset by a corresponding change in the insurance receivable. As a result, NS does not believe that it is reasonably likely that its net loss (the difference between the liability and future recoveries) will be materially different than the loss recorded in 2005. NS expects at this time that insurance coverage is adequate to cover potential claims and settlements above its self-insurance retention.

**Employee personal injury claims** – The largest component of casualties and other claims expense is employee personal injury costs. The actuarial firm engaged by NS provides quarterly studies to aid in valuing its employee personal injury liability and estimating its employee personal injury expense. The actuarial firm studies NS' historical patterns of reserving for claims and subsequent settlements, taking into account relevant outside influences. The actuary uses the results of these analyses to estimate the ultimate amount of the liability, which includes amounts for incurred but unasserted claims. NS adjusts its liability to the actuarially determined amount on a quarterly basis. The estimate of loss liabilities is subject to inherent limitation given the difficulty of predicting future events such as jury decisions, court interpretations or legislative changes and as such the actual loss may vary from the actuarial estimate.

**Occupational claims** – Occupational claims (including asbestosis and other respiratory diseases, as well as repetitive motion) are often not caused by a specific accident or event but rather result from a claimed exposure over time. Many such claims are being asserted by former or retired employees, some of whom have not been employed in the rail industry for decades. The actuarial firm provides an estimate of the occupational claims liability based upon NS' history of claim filings, severity, payments and other pertinent facts. The liability is dependent upon management's judgments made as to the specific case reserves as well as judgments of the consulting actuarial firm in the periodic studies. The actuarial firm's estimate of ultimate loss includes a provision for those claims that have been incurred but not reported. This provision is derived by analyzing industry data and projecting NS' experience into the future as far as can be reasonably determined. NS adjusts its liability to the actuarially determined amount on a quarterly basis. However, it is possible that the recorded liability may not be adequate to cover the future payment of claims. Adjustments to the recorded liability are reflected in operating expenses in the periods in which such adjustments become known.

**Third-party claims** – NS records a liability for third-party claims including those for highway crossing accidents, trespasser and other injuries, automobile liability, property damage and lading damage. The actuarial firm assists with the calculation of potential liability for third-party claims, except lading damage, based upon NS' experience including number and timing of incidents, amount of payments, settlement rates, number of open claims and legal defenses. The actuarial estimate includes a provision for claims that have been incurred but have not yet been reported. Each quarter NS adjusts its liability to the actuarially determined amount. Given the inherent uncertainty in regard to the ultimate outcome of third-party claims, it is possible that future settlement costs may differ from the estimated liability recorded.

Environmental Matters

NS is subject to various jurisdictions' environmental laws and regulations. It is NS' policy to record a liability where such liability or loss is probable and its amount can be estimated reasonably. Claims, if any, against third parties for recovery of cleanup costs incurred by NS are reflected as receivables (when collection is probable) on the balance sheet and are not netted against the associated NS liability. Environmental engineers regularly participate in ongoing evaluations of all known sites and in determining any necessary adjustments to liability estimates. NS also has an Environmental Policy Council, composed of senior managers, to oversee and interpret its environmental policy.

NS' Consolidated Balance Sheets included liabilities for environmental exposures in the amount of $58 million at Dec. 31, 2005, and $64 million at Dec. 31, 2004 (of which $12 million was accounted for as a current liability at Dec. 31, 2005 and 2004). At Dec. 31, 2005, the liability represented NS' estimate of the probable cleanup and remediation costs based on available information at 189 known locations. On that date, 16 sites accounted for $30 million of the liability, and no individual site was considered to be material. NS anticipates that much of this liability will be paid out over five years; however, some costs will be paid out over a longer period.

At some of the 189 locations, certain NS subsidiaries, usually in conjunction with a number of other parties, have been identified as potentially responsible parties by the Environmental Protection Agency (EPA) or similar state authorities under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, or comparable state statutes, which often impose joint and several liability for cleanup costs.

With respect to known environmental sites (whether identified by NS or by the EPA or comparable state authorities), estimates of NS' ultimate potential financial exposure for a given site or in the aggregate for all such sites are necessarily imprecise because of the widely varying costs of currently available cleanup techniques, the likely development of new cleanup technologies, the difficulty of determining in advance the nature and full extent of contamination and each potential participant's share of any estimated loss (and that participant's ability to bear it), and evolving statutory and regulatory standards governing liability.

The risk of incurring environmental liability – for acts and omissions, past, present and future - is inherent in the railroad business. Some of the commodities in NS' traffic mix, particularly those classified as hazardous materials, can pose special risks that NS and its subsidiaries work diligently to minimize. In addition, several NS subsidiaries own, or have owned, land used as operating property, or which is leased and operated by others, or held for sale. Because environmental problems may exist on these properties that are latent or undisclosed, there can be no assurance that NS will not incur environmental liabilities or costs with respect to one or more of them, the amount and materiality of which cannot be estimated reliably at this time. Moreover, lawsuits and claims involving these and potentially other unidentified environmental sites and matters are likely to arise from time to time. The resulting liabilities could have a significant effect on financial condition, results of operations or liquidity in a particular year or quarter.

However, based on its assessment of the facts and circumstances now known, management believes that it has recorded the probable costs for dealing with those environmental matters of which the Corporation is aware. Further, management believes that it is unlikely that any known matters, either individually or in the aggregate, will have a material adverse effect on NS' financial position, results of operations or liquidity.

**Insurance**

NS obtains on behalf of itself and its subsidiaries commercial insurance for potential losses for third-party liability and first-party property damages. Specified levels of risk are retained on a self-insurance basis (up to $25 million per occurrence for bodily injury and property damage to third parties and $12.5 million per occurrence for property owned by NS or in NS' care, custody or control).

**Purchase Commitments**

NSR had outstanding purchase commitments of approximately $341 million in connection with its 2006 and 2007 capital programs, including 133 locomotives in 2006 and 63 locomotives in 2007. In

addition, Norfolk Southern has committed to purchase telecommunications services totaling $17 million through 2007.

**Change-In-Control Arrangements**

Norfolk Southern has compensation agreements with officers and certain key employees that become operative only upon a change in control of the Corporation, as defined in those agreements. The agreements provide generally for payments based on compensation at the time of a covered individual's involuntary or other specified termination and for certain other benefits.

**Guarantees**

In a number of instances, NS and its subsidiaries have agreed to indemnify lenders for additional costs they may bear as a result of certain changes in laws or regulations applicable to their loans. Such changes may include impositions or modifications with respect to taxes, duties, reserves, liquidity, capital adequacy, special deposits, and similar requirements relating to extensions of credit by, deposits with, or the assets or liabilities of such lenders. Similar provisions exist in NS' accounts receivable sales program. The nature and timing of changes in laws or regulations applicable to NS' financings are inherently unpredictable, and therefore NS' exposure in connection with the foregoing indemnifications cannot be quantified. No liability has been recorded related to these indemnifications. In the case of one type of equipment financing, NSR's Japanese leveraged leases, NSR may terminate the leases and ancillary agreements if such a change-in-law indemnity is triggered. Such a termination would require NSR to make early termination payments that would not be expected to have a material adverse effect on NS' financial condition, results of operations or liquidity.

NS has indemnified parties in a number of transactions for U.S. income tax withholding imposed as a result of changes in U.S. tax law. In all cases, NS has the right to unwind the related transaction if the withholding cannot be avoided in the future. Because these indemnities would be triggered and are dependent upon a change in the tax law, the maximum exposure is not quantifiable. Management does not believe that it is likely that it will be required to make any payments under these indemnities.

NS has outstanding warranty liabilities primarily related to work performed at its locomotive facilities. NS has recorded a reserve of less than $1 million as of Dec. 31, 2005, and 2004, for these warranties.

As of Dec. 31, 2005, certain Norfolk Southern subsidiaries are contingently liable as guarantors with respect to $8 million of indebtedness of an entity in which they have an ownership interest, the Terminal Railroad Association of St. Louis, due in 2019. Six other railroads are also jointly and severally liable as guarantors for this indebtedness. No liability has been recorded related to this guaranty.

*** * * * ***

**NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES**
**QUARTERLY FINANCIAL DATA**
**(Unaudited)**

| | Three Months Ended | | | |
|---|---|---|---|---|
| | **March 31** | **June 30** | **Sept. 30** | **Dec. 31** |
| | *(In millions of dollars, except per share amounts)* | | | |
| **2005** | | | | |
| Railway operating revenues | $ 1,961 | $ 2,154 | $ 2,155 | $ 2,257 |
| Income from railway operations | 403 | 592 | 528 | 594 |
| Net income | 194 | 424[1] | 301 | 362 |
| Earnings per share: | | | | |
| Basic | $ 0.48 | $ 1.05[1] | $ 0.74 | $ 0.89 |
| Diluted | $ 0.47 | $ 1.04[1] | $ 0.73 | $ 0.87 |
| **2004** | | | | |
| Railway operating revenues | $ 1,693 | $ 1,813 | $ 1,857 | $ 1,949 |
| Income from railway operations | 346 | 425 | 469 | 462 |
| Net income | 158 | 213 | 288[2] | 264 |
| Earnings per share: | | | | |
| Basic | $ 0.40 | $ 0.55 | $ 0.73[2] | $ 0.66 |
| Diluted | $ 0.40 | $ 0.54 | $ 0.72[2] | $ 0.65 |

[1] Includes a $96 million, or 23 cents per diluted share, benefit related to a reduction of deferred income tax liabilities resulting from tax legislation enacted by Ohio.

[2] Includes a $53 million or 13 cents per diluted share net gain from the Conrail Corporate Reorganization (see Note 5 to the Consolidated Financial Statements).

**Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure.**

None.

**Item 9A. Controls and Procedures.**

**Evaluation of Disclosure Controls and Procedures**

Norfolk Southern's Chief Executive Officer and Chief Financial Officer have evaluated the effectiveness of NS' disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of December 31, 2005. Based on such evaluation, such officers have concluded that, as of Dec. 31, 2005, NS' disclosure controls and procedures are effective in alerting them on a timely basis to material information relating to NS (including its consolidated subsidiaries) required to be included in NS' periodic filings under the Exchange Act.

**Internal Control over Financial Reporting**

The management of Norfolk Southern is responsible for establishing and maintaining adequate internal control over financial reporting. The Corporation's internal control over financial reporting includes those policies and procedures that pertain to the Corporation's ability to record, process, summarize and report reliable financial data. Management recognizes that there are inherent limitations in the effectiveness of any internal control over financial reporting, including the possibility of human error and the circumvention or overriding of internal control. Accordingly, even effective internal control over financial reporting can provide only reasonable assurance with respect to financial statement preparation. Further, because of changes in conditions, the effectiveness of internal control over financial reporting may vary over time.

In order to ensure that the Corporation's internal control over financial reporting is effective, management regularly assesses such controls and did so most recently for its financial reporting as of Dec. 31, 2005. This assessment was based on criteria for effective internal control over financial reporting set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in *Internal Control-Integrated Framework*. Based on our assessment, management has concluded that the Corporation maintained effective internal control over financial reporting as of Dec. 31, 2005.

The Board of Directors, acting through its Audit Committee, is responsible for the oversight of the Corporation's accounting policies, financial reporting and internal control. The Audit Committee of the Board of Directors is comprised entirely of outside directors who are independent of management. The independent registered public accounting firm and the internal auditors have full and unlimited access to the Audit Committee, with or without management, to discuss the adequacy of internal control over financial reporting, and any other matters which they believe should be brought to the attention of the Audit Committee.

Norfolk Southern's management has issued a report of its assessment of internal control over financial reporting, and Norfolk Southern's independent registered public accounting firm has issued a report on this assessment. These reports appear in Part II, Item 8 of this report on Form 10-K.

During the fourth quarter of 2005, management has not identified any changes in NS' internal controls over financial reporting that have materially affected, or are reasonably likely to materially affect, NS' internal control over financial reporting.

## PART III

## NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES (NS)

**Item 10. Directors and Executive Officers of the Registrant.**

In accordance with General Instruction G(3), information called for by Item 10, Part III, is incorporated herein by reference from the information appearing under the caption “Election of Directors,” under the caption “Board of Directors;” and under the caption “Section 16(a) Beneficial Ownership Reporting Compliance” in Norfolk Southern's definitive Proxy Statement for the Norfolk Southern Annual Meeting of Stockholders to be held on May 11, 2006, which definitive Proxy Statement will be filed electronically with the Commission pursuant to Regulation 14A no later than May 1, 2006. The information regarding executive officers called for by Item 401 of Regulation S-K is included in Part I hereof beginning under “Executive Officers of the Registrant.”

**Item 11. Executive Compensation.**

In accordance with General Instruction G(3), information called for by Item 11, Part III, is incorporated herein by reference from the information appearing under the subcaption “Compensation” under the caption “Board of Directors” for directors and under the caption “Executive Compensation” for executives, including the information appearing in the “Summary Compensation Table” and under the subcaptions “Long-Term Incentive Plan” (including the three tables therein), “Pension Plans” (including the table therein), and “Change in Control Arrangements” in Norfolk Southern's definitive Proxy Statement for the Norfolk Southern Annual Meeting of Stockholders to be held on May 11, 2006, which definitive Proxy Statement will be filed electronically with the Commission pursuant to Regulation 14A no later than May 1, 2006.

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters.**

In accordance with General Instruction G(3), information on security ownership of certain beneficial owners and management called for by Item 12, Part III, Item 403 of Regulation S-K, is incorporated herein by reference from the information appearing under the caption “Beneficial Ownership of Stock” and the caption “Executive Compensation” in Norfolk Southern's definitive Proxy Statement for the Norfolk Southern Annual Meeting of Stockholders to be held on May 11, 2006, which definitive Proxy Statement will be filed electronically with the Commission pursuant to Regulation 14A no later than May 1, 2006.

**Equity Compensation Plan Information (as of Dec. 31, 2005)**

| Plan category | Number of securities to be issued upon exercise of outstanding options, warrants and rights (a) | Weighted-average exercise price of outstanding options, warrants and rights (b) | Number of securities remaining available for future issuance under equity Compensation plans (excluding securities reflected in column (a)) (c) |
|---|---|---|---|
| Equity compensation Plans approved by security holders[1] | 28,456,663 | 23.78[(4)] | 11,321,573[(5)] |
| Equity compensation Plans not approved by security holders[2] | 4,210,417[(3)] | 27.79[(3)] | 2,810,400[(6)] |
| Total | 32,667,080 | 24.35 | 14,131,973 |

[1] The Long-Term Incentive Plan, excluding five million shares for broad-based issuance to non-officers.
[2] The Long-Term Incentive Plan's five million shares for broad-based issuance to non-officers, the Thoroughbred Stock Option Plan and the Directors' Restricted Stock Plan.
[3] Includes options and performance share units granted under the Long-Term Incentive Plan on 1,401,267 shares for non-officers and options granted under the Thoroughbred Stock Option Plan.
[4] Calculated without regard to 3,121,400 outstanding performance share units at Dec. 31, 2005.
[5] Of the shares remaining available for grant under plans approved by stockholders, 8,500,000 are available for grant as restricted shares, performance shares or restricted stock unit shares under the Long-Term Incentive Plan.
[6] Of the shares remaining available for grant under plans not approved by stockholders, 39,000 are available for grant as restricted stock under the Directors' Restricted Stock Plan.

**Norfolk Southern Corporation Long-Term Incentive Plan ("LTIP")**

Established on June 28, 1983, and approved by stockholders at their Annual Meeting held on May 10, 1984, LTIP was adopted to promote the success of Norfolk Southern by providing an opportunity for non-employee directors, officers and other key employees to acquire a proprietary interest in the Corporation. On Jan. 23, 2001, the Board of Directors further amended the plan and approved the issuance of an additional 5,000,000 shares of authorized but unissued Common Stock under LTIP to participants who are not officers of Norfolk Southern. The issuance of these shares was broadly-based, and stockholder approval of these shares was not required. Accordingly, this portion of LTIP is included in the number of securities available for future issuance for plans not approved by stockholders. Also on Jan. 23, 2001, the Board adopted an amended plan, which was approved by shareholders on May 10, 2001, that included the reservation for issuance of an additional 30,000,000 shares of authorized but unissued Norfolk Southern Common Stock.

Pursuant to another amendment approved by stockholders on May 12, 2005, not more than 8.5 million of the shares remaining available for issuance under the plan may be awarded as restricted shares, performance shares or restricted stock unit shares. Cash payments of restricted stock units, stock appreciation rights and performance share units will not be applied against the maximum number of

shares issuable under the plan. Any shares of Common Stock subject to options, performance share units or restricted stock units which are not issued as Common Stock will again be available for award under the plan after the expiration or forfeiture of an award.

Non-employee directors, officers and other key employees residing in the United States or Canada are eligible for selection to receive LTIP awards. Under LTIP, the Compensation Committee (Committee) may grant incentive stock options, nonqualified stock options, stock appreciation rights, restricted shares, restricted stock units and performance share units (in addition, dividend equivalents may be awarded for options, restricted stock units and performance share units). The Committee may establish such terms and conditions for the awards as provided in the plan.

For options, the option price per share will not be less than 100% of the fair market value of Norfolk Southern's Common Stock on the effective date the option is granted. All options are subject to a vesting period of at least one year, and the term of the option will not exceed ten years. LTIP specifically prohibits option repricing without stockholder approval, except for capital adjustments.

Performance share units entitle a recipient to receive performance-based compensation at the end of a three-year performance cycle based on Norfolk Southern’s performance during that three-year period. For the 2005 performance share unit awards, corporate performance will be measured using three equally weighted standards established by the committee: (1) three-year average return on average capital invested, (2) three-year average operating ratio and (3) three-year total return to stockholders. Performance share units may be payable in either shares of Norfolk Southern Common Stock or cash.

Restricted stock units are payable in cash or in shares of Norfolk Southern Common Stock at the end of a restriction period of not less than 36 months and not more than 60 months. During the restriction period, the holder of the restricted stock units has no beneficial ownership interest in the Norfolk Southern Common Stock represented by the restricted stock units and has no right to vote the shares represented by the units or to receive dividends (except for dividend equivalent rights that may be awarded with respect to the restricted stock units). Restricted stock units will be forfeited immediately if the holder leaves the continuous employment of Norfolk Southern before the end of the restriction period, unless such employment is terminated by reason of retirement, disability or death or unless the restrictions are waived by Norfolk Southern.

**Norfolk Southern Corporation Thoroughbred Stock Option Plan**

The Board adopted the Norfolk Southern Corporation Thoroughbred Stock Option Plan (“TSOP”) on Jan. 26, 1999, to promote the success of Norfolk Southern by providing an opportunity for nonagreement employees to acquire a proprietary interest in Norfolk Southern and thereby to provide an additional incentive to nonagreement employees to devote their maximum efforts and skills to the advancement, betterment, and prosperity of Norfolk Southern and its stockholders. The plan has not been and is not required to have been approved by stockholders. Six million shares of authorized but unissued Common Stock were reserved for issuance under TSOP.

Active full-time nonagreement employees residing in the United States or Canada are eligible for selection to receive TSOP awards. Under TSOP, the Compensation Committee of the Board of Directors may grant nonqualified stock options subject to such terms and conditions as provided in the plan.

The option price will not be less than 100% of the fair market value of Norfolk Southern's Common Stock on the effective date the options are granted. All options are subject to a vesting period of at least one

year, and the term of the option will not exceed ten years. TSOP specifically prohibits option repricing without stockholder approval, except for capital adjustments.

**Norfolk Southern Corporation Directors' Restricted Stock Plan**

The Norfolk Southern Corporation Directors' Restricted Stock Plan (“Plan”) was adopted on Jan. 1, 1994, and is designed to increase ownership of Norfolk Southern Common Stock by its non-employee directors so as to further align their ownership interest in Norfolk Southern with that of stockholders. The Plan has not been and is not required to have been approved by stockholders. Currently, a maximum of 66,000 shares of Corporation Common Stock may be granted under the Plan. To make grants to eligible directors, Norfolk Southern purchases, through one or more subsidiary companies, the number of shares required in open-market transactions at prevailing market prices, or makes such grants from Norfolk Southern Common Stock already owned by one or more of Norfolk Southern's subsidiary companies.

Only non-employee directors who are not and never have been employees of Norfolk Southern are eligible to participate in the Plan. Upon becoming a director, each eligible director receives a one-time grant of 3,000 restricted shares of Norfolk Southern Common Stock. No individual member of the Board exercises discretion concerning the eligibility of any director or the number of shares granted.

The restriction period applicable to restricted shares granted under the plan begins on the date of the grant and ends on the earlier of the recipient’s death or six months after the recipient ceases to be a director by reason of disability or retirement. During the restriction period shares may not be sold, pledged or otherwise encumbered. Directors will forfeit the restricted shares if they cease to serve as a director of Norfolk Southern for reasons other than their disability, retirement or death.

**Item 13. Certain Relationships and Related Transactions.**

In accordance with General Instruction G(3), information called for by Item 13, Part III, is incorporated herein by reference from the information appearing under the caption “Certain Relationships and Related Transactions” in Norfolk Southern's definitive Proxy Statement for the Norfolk Southern Annual Meeting of Stockholders to be held on May 11, 2006, which definitive Proxy Statement will be filed electronically with the Commission pursuant to Regulation 14A no later than May 1, 2006.

**Item 14. Principal Accountant Fees and Services.**

In accordance with General Instruction G(3), information called for by Item 14, Part III is incorporated herein by reference from the information appearing under the caption “Ratification of Appointment of Independent Registered Public Accounting Firm” in Norfolk Southern’s definitive Proxy Statement for the Norfolk Southern Annual Meeting of Stockholders to be held on May 11, 2006, which definitive proxy statement will be filed electronically with the Commission pursuant to Regulation 14A no later than May 1, 2006.

## PART IV

## NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES (NS)

**Item 15. Exhibits and Financial Statement Schedules.**

Page

(A) The following documents are filed as part of this report:

1. Index to Consolidated Financial Statements


| | |
|---|---|
| Report of Management | K43 |
| Reports of Independent Registered Public Accounting Firm | K44 |
| Consolidated Statements of Income, Years ended Dec. 31, 2005, 2004 and 2003 | K47 |
| Consolidated Balance Sheets As of Dec. 31, 2005 and 2004 | K48 |
| Consolidated Statements of Cash Flows, Years ended Dec. 31, 2005, 2004 and 2003 | K49 |
| Consolidated Statements of Changes in Stockholders' Equity, Years ended Dec. 31, 2005, 2004 and 2003 | K50 |
| Notes to Consolidated Financial Statements | K51 |


2. Financial Statement Schedule:

The following consolidated financial statement schedule should be read in connection with the consolidated financial statements:


| Index to Consolidated Financial Statement Schedule | Page |
|---|---|
| Schedule II - Valuation and Qualifying Accounts | K97 |


Schedules other than the one listed above are omitted either because they are not required or are inapplicable, or because the information is included in the consolidated financial statements or related notes.

3. Exhibits

| Exhibit Number | Description |
|---|---|
| 3 | Articles of Incorporation and Bylaws - |
| 3(i) | The Restated Articles of Incorporation of Norfolk Southern Corporation are incorporated By reference to Exhibit 3(i) to Norfolk Southern Corporation's 10-K filed on March 5, 2001. |
| 3(ii) | The Bylaws of Norfolk Southern Corporation, as amended Jan. 23, 2006, are incorporated by reference to Exhibit 3(ii) to Norfolk Southern Corporation’s Form 8-K filed on Jan. 27, 2006. |

4 Instruments Defining the Rights of Security Holders, Including Indentures:

(a) Indenture, dated as of Jan. 15, 1991, from Norfolk Southern Corporation to First Trust of New York, National Association, as Trustee, is incorporated by reference to Exhibit 4.1 to Norfolk Southern Corporation's Registration Statement on Form S-3 (No. 33-38595).

(b) First Supplemental Indenture, dated May 19, 1997, between Norfolk Southern Corporation and First Trust of New York, National Association, as Trustee, related to the issuance of notes in the principal amount of $4.3 billion, is incorporated herein by reference to Exhibit 1.1(d) to Norfolk Southern Corporation's Form 8-K filed on May 21, 1997.

(c) Second Supplemental Indenture, dated April 26, 1999, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, related to the issuance of notes in the principal amount of $400 million, is incorporated herein by reference to Exhibit 1.1(c) to Norfolk Southern Corporation's Form 8-K filed on April 30, 1999.

(d) Third Supplemental Indenture, dated May 23, 2000, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, related to the issuance of notes in the principal amount of $600 million, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on May 25, 2000.

(e) Fourth Supplemental Indenture, dated as of Feb. 6, 2001, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, related to the issuance of notes in the principal amount of $1 billion, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on Feb. 7, 2001.

(f) Fifth Supplemental Indenture, dated as of July 5, 2001, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, related to the issuance of notes in the principal amount of $250 million, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on July 5, 2001.

(g) Sixth Supplemental Indenture, dated as of April 30, 2002, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, relating to the issuance of notes in the principal amount of $200 million, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on May 1, 2002.

(h) Seventh Supplemental Indenture, dated as of April 30, 2002, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, relating to the issuance of notes in the principal amount of $100 million, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on May 1, 2002.

(i) Eighth Supplemental Indenture, dated as of Sept. 17, 2004, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, relating to the issuance of 5.257% Notes due 2014 ("Securities") in the aggregate principal amount of $441.5 million in connection with Norfolk Southern Corporation's offer to exchange the Securities and cash for up to $400 million of its outstanding 7.350% Notes due 2007, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on Sept. 23, 2004.

(j) Indenture, dated Aug. 27, 2004, among PRR Newco, Inc., as Issuer, and Norfolk Southern Railway Company, as Guarantor, and The Bank of New York, as Trustee, is incorporated herein by reference to Exhibit 4(l) to Norfolk Southern Corporation's Form 10-Q filed on Oct. 28, 2004.

(k) First Supplemental Indenture, dated Aug. 27, 2004, among PRR Newco, Inc., as Issuer, and Norfolk Southern Railway Company, as Guarantor, and The Bank of New York, as Trustee, related to the issuance of notes in the principal amount of approximately $451.8 million, is incorporated herein by reference to Exhibit 4(m) to Norfolk Southern Corporation's Form 10-Q filed on Oct. 28, 2004.

(l) Ninth Supplemental Indenture, dated as of March 11, 2005, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, relating to the issuance of notes in the principal amount of $300 million, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on March 15, 2005.

(m) Tenth Supplemental Indenture, dated as of May 17, 2005, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, relating to the issuance of notes in the principal amount of $366.6 million, is incorporated herein by reference to Exhibit 99.1 to Norfolk Southern Corporation's Form 8-K filed on May 18, 2005.

(n) Eleventh Supplemental Indenture, dated as of May 17, 2005, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, relating to the issuance of notes in the principal amount of $350 million, is incorporated herein by reference to Exhibit 99.2 to Norfolk Southern Corporation's Form 8-K filed on May 18, 2005.

In accordance with Item 601(b)(4)(iii) of Regulation S-K, copies of other instruments of Norfolk Southern Corporation and its subsidiaries with respect to the rights of holders of long-term debt are not filed herewith, or incorporated by reference, but will be furnished to the Commission upon request.

10 Material Contracts -

(a) The Transaction Agreement, dated as of June 10, 1997, by and among CSX, CSX Transportation, Inc., Registrant, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation and CRR Holdings LLC, with certain schedules thereto, previously filed, is incorporated herein by reference to Exhibit 10(a) to Norfolk Southern Corporation's Form 10-K filed on Feb. 24, 2003.

(b) Amendment No. 1, dated as of Aug. 22, 1998, to the Transaction Agreement, dated as of June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation and CRR Holdings LLC, is incorporated herein by reference from Exhibit 10.1 to Norfolk Southern Corporation's Form 10-Q filed on Aug. 11, 1999.

(c) Amendment No. 2, dated as of June 1, 1999, to the Transaction Agreement, dated June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation and CRR Holdings LLC, is incorporated herein by reference from Exhibit 10.2 to Norfolk Southern Corporation's Form 10-Q filed on Aug. 11, 1999.

(d) Shared Assets Area Operating Agreement for North Jersey, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibit thereto, is incorporated herein by reference from Exhibit 10.4 to Norfolk Southern Corporation's Form 10-Q filed on Aug. 11, 1999.

(e) Shared Assets Area Operating Agreement for South Jersey/ Philadelphia, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibit thereto, is incorporated herein by reference from Exhibit 10.5 to Norfolk Southern Corporation's Form 10-Q filed on Aug. 11, 1999.

(f) Shared Assets Area Operating Agreement for Detroit, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibit thereto, is incorporated herein by reference from Exhibit 10.6 to Norfolk Southern Corporation's Form 10-Q filed on Aug. 11, 1999.

(g) Amendment No. 1, dated as of June 1, 2000, to the Shared Assets Areas Operating Agreement for North Jersey, South Jersey/Philadelphia and Detroit, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibit thereto, is incorporated herein by reference to Exhibit 10(h) to Norfolk Southern Corporation's 10-K filed on March 5, 2001.

(h) Amendment No. 2, dated as Jan. 1, 2001, to the Shared Assets Area Operating Agreements for North Jersey, South Jersey/Philadelphia and Detroit, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibit thereto, is incorporated herein by reference to Exhibit 10(j) to Norfolk Southern Corporation's Form 10-K filed on Feb. 21, 2002.

(i) Amendment No. 3, dated as of June 1, 2001, and executed in May of 2002, to the Shared Assets Area Operating Agreement for North Jersey, South Jersey/Philadelphia and Detroit, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibit thereto, is incorporated herein by reference to Exhibit 10(k) to Norfolk Southern Corporation's Form 10-K filed on Feb. 24, 2003.

(j) Monongahela Usage Agreement, dated as of June 1, 1999, by and among CSX Transportation, Inc., Norfolk Southern Railway Company, Pennsylvania Lines LLC and New York Central Lines LLC, with exhibit thereto, is incorporated herein by reference from Exhibit 10.7 to Norfolk Southern Corporation's Form 10-Q filed on Aug. 11, 1999.

(k) The Agreement, entered into as of July 27, 1999, between North Carolina Railroad Company and Norfolk Southern Railway Company, is incorporated herein by reference from Exhibit 10(i) to Norfolk Southern Corporation's Form 10-K filed on March 6, 2000.

(l) The Supplementary Agreement, entered into as of Jan. 1, 1987, between the Trustees of the Cincinnati Southern Railway and The Cincinnati, New Orleans and Texas Pacific Railway Company (the latter a wholly owned subsidiary of Norfolk Southern Railway Company) - extending and amending a Lease, dated as of Oct. 11, 1881 - is incorporated by reference to Exhibit 10(k) to Norfolk Southern Corporation's Form 10-K filed on March 5, 2001.

*(m) The Norfolk Southern Corporation Executive Management Incentive Plan, effective Jan. 25, 2005, is incorporated by reference herein from Exhibit 99 to Norfolk Southern Corporation's Form 8-K filed on May 13, 2005.

*(n) The Norfolk Southern Corporation Long-Term Incentive Plan, as amended effective Jan. 25, 2005, is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation’s Form 8-K filed on May 13, 2005.

*(o) The Norfolk Southern Corporation Officers' Deferred Compensation Plan, as amended effective September 26, 2000, is incorporated herein by reference to Exhibit 10(n) to Norfolk Southern Corporation's Form 10-K filed on March 5, 2001.

*(p) The Norfolk Southern Corporation Executives' Deferred Compensation Plan, as amended effective Jan. 20, 2001, is incorporated herein by reference to Exhibit 10(o) to Norfolk Southern Corporation's Form 10-K filed on March 5, 2001.

*(q) The Directors' Deferred Fee Plan of Norfolk Southern Corporation, as amended effective Jan. 23, 2001, is incorporated herein by reference to Exhibit 10(p) to Norfolk Southern Corporation's Form 10-K filed on March 5, 2001.

*(r) The Norfolk Southern Corporation Directors' Restricted Stock Plan, effective Jan. 1, 1994, as restated Nov. 24, 1998, is incorporated herein by reference from Exhibit 10(h) to Norfolk Southern Corporation's Form 10-K filed on March 24, 1999.

*(s) Form of Severance Agreement, dated as of June 1, 1996, between Norfolk Southern Corporation and certain executive officers (including those defined as “named executive officers” and identified in the Corporation's Proxy Statement for the 1997 through 2001 Annual Meetings of Stockholders), is incorporated herein by reference to Exhibit 10(t) to Norfolk Southern Corporation's Form 10-K filed on Feb. 21, 2002.

*(t) Norfolk Southern Corporation Supplemental (formerly, Excess) Benefit Plan, effective as of Aug. 22, 1999, is incorporated herein by reference to Exhibit 10(r) to Norfolk Southern Corporation's Form 10-K filed on March 6, 2000.

*(u) The Norfolk Southern Corporation Directors' Charitable Award Program, effective Feb. 1, 1996, is incorporated herein by reference to Exhibit 10(v) to Norfolk Southern Corporation's Form 10-K filed on Feb. 21, 2002.

*(v) The Norfolk Southern Corporation Outside Directors' Deferred Stock Unit Program, as amended effective Jan. 28, 2003, is incorporated herein by reference to Exhibit 10(x) to Norfolk Southern Corporation’s Form 10-K filed on Feb. 24, 2003.

*(w) Form of Agreement, dated as of Oct. 1, 2001, providing enhanced pension benefits to three officers in exchange for their continued employment with Norfolk Southern Corporation for two years, is incorporated herein by reference to Exhibit 10(w) to Norfolk Southern Corporation's Form 10-Q filed on Nov. 9, 2001. The agreement was entered into with L. Ike Prillaman, Vice Chairman and Chief Marketing Officer; Stephen C. Tobias, Vice Chairman and Chief Operating Officer; and Henry C. Wolf, Vice Chairman and Chief Financial Officer.

(x) The Norfolk Southern Corporation Thoroughbred Stock Option Plan, as amended effective Jan. 28, 2003, is incorporated herein by reference to Exhibit 10(z) to Norfolk Southern Corporation's Form 10-K filed on Feb. 24, 2003.

*(y) The Norfolk Southern Corporation Restricted Stock Unit Plan, effective Jan. 28, 2003, is incorporated herein by reference to Exhibit 10(bb) to Norfolk Southern Corporation's Form 10-K filed on Feb. 24, 2003.

*(z) The Norfolk Southern Corporation Executive Life Insurance Plan, as amended, effective Oct. 1, 2003, is incorporated herein by reference to Exhibit 10 to Norfolk Southern Corporation's Form 10-Q filed on Oct. 31, 2003.

(aa) Amendment No. 3, dated as of June 1, 1999, and executed in April 2004, to the Transaction Agreement, dated June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation and CRR Holdings LLC, is incorporated herein by reference to Exhibit 10(dd) to Norfolk Southern Corporation's Form 10-Q filed on July 30, 2004.

(bb) Distribution Agreement, dated as of July 26, 2004, by and among CSX Corporation, CSX Transportation, Inc., CSX Rail Holding Corporation, CSX Northeast Holdings Corporation, Norfolk Southern Corporation, Norfolk Southern Railway Company, CRR Holdings LLC, Green Acquisition Corp., Conrail Inc., Consolidated Rail Corporation, New York Central Lines LLC, Pennsylvania Lines LLC, NYC Newco, Inc. and PRR Newco, Inc., is incorporated herein by reference to Exhibit 2.1 to Norfolk Southern Corporation's Form 8-K filed on Sept. 2, 2004.

(cc) Amendment No. 5 to the Transaction Agreement, dated as of Aug. 27, 2004, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation and CRR Holdings LLC, is incorporated herein by reference to Exhibit 10.1 to Norfolk Southern Corporation's Form 8-K filed on Sept. 2, 2004.

(dd) Tax Allocation Agreement, dated as of Aug. 27, 2004, by and among Green Acquisition Corp., Conrail Inc., Consolidated Rail Corporation, New York Central Lines LLC and Pennsylvania Lines LLC, is incorporated herein by reference to Exhibit 10.2 to Norfolk Southern Corporation's Form 8-K filed on Sept. 2, 2004.

(ee) Credit Agreement dated as of Aug. 31, 2004, between Norfolk Southern Corporation and various lenders, is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K/A filed on Sept. 7, 2004.

(ff) Amendment No. 4, dated as of June 1, 2005, and executed in late June 2005, to the Shared Assets Area Operating Agreement for North Jersey, South Jersey/Philadelphia and Detroit, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibits thereto, is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K filed on July 1, 2005.

*(gg) The description of Norfolk Southern Corporation's executive physical reimbursement for non-employee directors and certain executives is incorporated herein by reference to Norfolk Southern Corporation's Form 8-K filed on July 28, 2005.

*(hh) Form of 2006 Incentive Stock Option and Non-Qualified Stock Option Agreement under the Norfolk Southern Long-Term Incentive Plan, is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K/A filed on Dec. 7, 2005.

*(ii) Form of 2006 Restricted Share and Restricted Stock Unit Agreement under the Norfolk Southern Corporation Long-Term Incentive Plan, is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K/A filed on Dec. 7, 2005.

*(jj) Form of 2005 Performance Share Unit Award under the Norfolk Southern Corporation Long-Term Incentive Plan, is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K/A filed on Dec. 7, 2005.

*(kk) Revised annual salaries for certain named executive officers are incorporated herein by reference to Norfolk Southern Corporation's Form 8-K/A filed on Dec. 7, 2005.

**(ll) The Transaction Agreement, dated as of Dec. 1, 2005, by and among Norfolk Southern Corporation, The Alabama Great Southern Railroad Company, Kansas City Southern and The Kansas City Southern Railway Company (Exhibits, annexes and schedules omitted. The Registrant will furnish supplementary copies of such materials to the SEC upon request).

**(mm) Amendment No. 1, dated as of Jan. 17, 2006, by and among Norfolk Southern Corporation, The Alabama Great Southern Railroad Company, Kansas City Southern and the Kansas City Southern Railroad.

*(nn) The retirement agreement, dated Jan. 27, 2006, between Norfolk Southern Corporation and David R. Goode, is incorporated herein by reference to Exhibit 10.1 to Norfolk Southern Corporation's Form 8-K filed on Jan. 27, 2006.

*(oo) The waiver agreement, dated Jan. 27, 2006, between Norfolk Southern Corporation and David R. Goode, providing for the waiver of forfeiture provisions otherwise applicable to certain restricted shares and restricted stock units upon retirement, is incorporated herein by reference to Exhibit 10.2 to Norfolk Southern Corporation's Form 8-K filed on Jan. 27, 2006.

*(pp) Revised fees for outside directors are incorporated herein by reference to Norfolk Southern Corporation's Form 8-K filed on Jan. 27, 2006.

| | |
|---|---|
| **12 | Statement re: Computation of Ratio of Earnings to Fixed Charges. |
| **21 | Subsidiaries of the Registrant. |
| **23.1 | Consent of Independent Registered Public Accounting Firm. |
| **23.2 | Consent of Independent Registered Public Accounting Firms. |
| **31 | Rule 13a-14(a)/15d-14(a) Certifications. |
| **32 | Section 1350 Certifications. |
| **99.1 | Annual CEO Certification pursuant to NYSE Rule 303A.12(a). |
| **99.2 | Unaudited Financial Statements of Conrail Inc. |

* *Management contract or compensatory arrangement.*
** *Filed herewith.*

(B) Exhibits.

The Exhibits required by Item 601 of Regulation S-K as listed in Item 15(A)3 are filed herewith or incorporated herein by references.

(C) Financial Statement Schedules.

Financial statement schedules and separate financial statements specified by this Item are included in Item 15(A)2 or are otherwise not required or are not applicable.

Exhibits 23.1, 31, 32 and 99.1 are included; remaining exhibits are not included in copies assembled for public dissemination. These exhibits are included in the 2005 Form 10-K posted on our website at www.nscorp.com under “Investors” and “SEC Filings” or you may request copies by writing to:

**Office of Corporate Secretary**
**Norfolk Southern Corporation**
**Three Commercial Place**
**Norfolk, Virginia 23510-9219**

## POWER OF ATTORNEY

Each person whose signature appears below under "SIGNATURES" hereby authorizes Henry C. Wolf, James A. Hixon and James A. Squires or any one of them, to execute in the name of each such person, and to file, any amendment to this report and hereby appoints Henry C. Wolf, James A. Hixon and James A. Squires or any one of them, as attorneys-in-fact to sign on his or her behalf, individually and in each capacity stated below, and to file, any and all amendments to this report.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, Norfolk Southern Corporation has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, on this 21st day of February, 2006.

**NORFOLK SOUTHERN CORPORATION**

By: /s/ Charles W. Moorman
Charles W. Moorman
(Chairman, President and Chief Executive Officer)

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below on this 21st day of February 2006, by the following persons on behalf of Norfolk Southern Corporation and in the capacities indicated.

| Signature | Title |
|---|---|
| /s/ Charles W. Moorman<br>(Charles W. Moorman) | Chairman, President and Chief Executive Officer and Director<br>(Principal Executive Officer) |
| /s/ Henry C. Wolf<br>(Henry C. Wolf) | Vice Chairman and Chief Financial Officer<br>(Principal Financial Officer) |
| /s/ Marta R. Stewart<br>(Marta R. Stewart) | Vice President and Controller<br>(Principal Accounting Officer) |
| /s/ Gerald L. Baliles<br>(Gerald L. Baliles) | Director |
| /s/ Daniel A. Carp<br>(Daniel A. Carp) | Director |

| | |
|---|---|
| /s/ Gene R. Carter<br>(Gene R. Carter) | Director |
| /s/ Alston D. Correll<br>(Alston D. Correll) | Director |
| /s/ David R. Goode<br>(David R. Goode) | Director |
| /s/ Landon Hilliard<br>(Landon Hilliard) | Director |
| /s/ Burton M. Joyce<br>(Burton M. Joyce) | Director |
| /s/ Steven F. Leer<br>(Steven F. Leer) | Director |
| /s/ Jane Margaret O'Brien<br>(Jane Margaret O'Brien) | Director |
| /s/ Harold W. Pote<br>(Harold W. Pote) | Director |
| /s/ J. Paul Reason<br>(J. Paul Reason) | Director |

Schedule II

**Norfolk Southern Corporation and Subsidiaries**
**Valuation and Qualifying Accounts**
**Years Ended December 31, 2003, 2004 and 2005**
**(In millions of dollars)**

| | Beginning Balance | Additions charged to: Expenses | Additions charged to: Other Accounts | Deductions | Ending Balance |
|---|---|---|---|---|---|
| ***Year ended December 31, 2003*** | | | | | |
| Valuation allowance (included net in deferred tax liability) for deferred tax assets | $ 24 | $ -- | $ -- | $ 2 [2] | $ 22 |
| Casualty and other claims included in other liabilities | $ 254 | $ 134 | $ 6 [1] | $ 124 [3] | $ 270 |
| Current portion of casualty and other claims included in accounts payable | $ 207 | $ 34 | $ 125 [1] | $ 148 [4] | $ 218 |
| ***Year ended December 31, 2004*** | | | | | |
| Valuation allowance (included net in deferred tax liability) for deferred tax assets | $ 22 | $ -- | $ -- | $ 1 [2] | $ 21 |
| Casualty and other claims included in other liabilities | $ 270 | $ 112 | $ 48 [1] | $ 115 [3] | $ 315 |
| Current portion of casualty and other claims included in accounts payable | $ 218 | $ 23 | $ 124 [1] | $ 143 [4] | $ 222 |
| ***Year ended December 31, 2005*** | | | | | |
| Valuation allowance (included net in deferred tax liability) for deferred tax assets | $ 21 | $ -- | $ -- | $ 5 [2] | $ 16 |
| Casualty and other claims included in other liabilities | $ 315 | $ 311 | $ -- | $ 205 [3] | $ 421 |
| Current portion of casualty and other claims included in accounts payable | $ 222 | $ 92 | $ 114 [1] | $ 137 [4] | $ 291 |

[1] Includes revenue refunds and overcharges provided through deductions from operating revenues and transfers from other accounts.

[2] Reclassifications to/from other assets.

[3] Payments and reclassifications to/from accounts payable.

[4] Payments and reclassifications to/from other liabilities.

# EXHIBIT PX0709

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549
**FORM 10-K**

(X) ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 For the fiscal year ended **DECEMBER 31, 2008**

( ) TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 For the transition period from _________ to _________

Commission file number 1-8339

NORFOLK SOUTHERN

**NORFOLK SOUTHERN CORPORATION**
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Virginia**<br>(State or other jurisdiction of incorporation) | **52-1188014**<br>(IRS Employer Identification No.) |
| **Three Commercial Place**<br>**Norfolk, Virginia**<br>(Address of principal executive offices) | **23510-2191**<br>Zip Code |
| Registrant's telephone number, including area code | **(757) 629-2680** |

Securities registered pursuant to Section 12(b) of the Act:

| Title of each Class | Name of each exchange on which registered |
|---|---|
| **Norfolk Southern Corporation Common Stock (Par Value $1.00)** | **New York Stock Exchange** |

Securities registered pursuant to Section 12(g) of the Act: NONE

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes (X) No ( )

Indicate by check mark if the registrant is not required to file such reports pursuant to Section 13 or 15(d) of the Act. Yes ( ) No (X)

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or Section 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes (X) No ( )

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ( )

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer or smaller reporting company. See definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.
Large accelerated filer (X) Accelerated filer ( ) Non-accelerated filer ( ) Smaller reporting company ( )

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ( ) No (X)

The aggregate market value of the voting common equity held by non-affiliates as of June 30, 2008 was $23,454,318,004 (based on the closing price as quoted on the New York Stock Exchange on that date).

The number of shares outstanding of each of the registrant's classes of common stock, as of January 31, 2009: 366,460,780 (excluding 20,579,088 shares held by the registrant's consolidated subsidiaries).

**DOCUMENTS INCORPORATED BY REFERENCE:**
Portions of the Registrant's definitive proxy statement to be filed electronically pursuant to Regulation 14A not later than 120 days after the end of the fiscal year, are incorporated by reference in Part III.

## TABLE OF CONTENTS

## NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES (NS)


| | | | Page |
|---|---|---|---|
| Part I. | Items 1 and 2. | Business and Properties | K3 |
| | Item 1A. | Risk Factors | K13 |
| | Item 1B. | Unresolved Staff Comments | K16 |
| | Item 3. | Legal Proceedings | K16 |
| | Item 4. | Submission of Matters to a Vote of Security Holders | K16 |
| | | Executive Officers of the Registrant | K17 |
| Part II. | Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | K19 |
| | Item 6. | Selected Financial Data | K20 |
| | Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | K21 |
| | Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | K40 |
| | Item 8. | Financial Statements and Supplementary Data | K41 |
| | Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | K77 |
| | Item 9A. | Controls and Procedures | K77 |
| | Item 9B. | Other Information | K77 |
| Part III. | Item 10. | Directors, Executive Officers and Corporate Governance | K78 |
| | Item 11. | Executive Compensation | K78 |
| | Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | K78 |
| | Item 13. | Certain Relationships and Related Transactions, and Director Independence | K81 |
| | Item 14. | Principal Accountant Fees and Services | K81 |
| Part IV. | Item 15. | Exhibits and Financial Statement Schedules | K82 |
| | | Power of Attorney | K93 |
| | | Signatures | K93 |

# PART I

## NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES (NS)

### Item 1. Business and Item 2. Properties

**GENERAL -** Norfolk Southern Corporation (Norfolk Southern) is a Norfolk, Virginia based company that controls a major freight railroad, Norfolk Southern Railway Company. Norfolk Southern Railway Company is primarily engaged in the rail transportation of raw materials, intermediate products, and finished goods primarily in the Southeast, East, and Midwest and, via interchange with rail carriers, to and from the rest of the United States. Norfolk Southern also transports overseas freight through several Atlantic and Gulf Coast ports. Norfolk Southern provides comprehensive logistics services and offers the most extensive intermodal network in the eastern half of the United States. The common stock of Norfolk Southern is listed on the New York Stock Exchange (NYSE) under the symbol "NSC."

Norfolk Southern was incorporated on July 23, 1980, under the laws of the Commonwealth of Virginia. On June l, 1982, Norfolk Southern acquired control of two major operating railroads, Norfolk and Western Railway Company (NW) and Southern Railway Company (Southern) in accordance with an Agreement of Merger and Reorganization dated as of July 31, 1980, and with the approval of the transaction by the Interstate Commerce Commission (now the Surface Transportation Board [STB]). Effective December 31, 1990, Norfolk Southern transferred all the common stock of NW to Southern, and Southern's name was changed to Norfolk Southern Railway Company (Norfolk Southern Railway or NSR). Effective September 1, 1998, NW was merged with and into Norfolk Southern Railway. As of December 31, 2008, all the common stock of Norfolk Southern Railway was owned directly by Norfolk Southern.

Through a limited liability company, Norfolk Southern and CSX Corporation (CSX) jointly own Conrail Inc. (Conrail), whose primary subsidiary is Consolidated Rail Corporation (CRC). Norfolk Southern has a 58% economic and 50% voting interest in the jointly owned entity, and CSX has the remainder of the economic and voting interests. CRC owns and operates certain properties (the Shared Assets Areas) for the joint and exclusive benefit of NSR and CSX Transportation Inc. (CSXT) (see Note 4 to the Consolidated Financial Statements).

Norfolk Southern makes available free of charge through its website, www.nscorp.com, its annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and all amendments to those reports as soon as reasonably practicable after such material is electronically filed with or furnished to the Securities and Exchange Commission (SEC). In addition, the following documents are available on the company's website and in print to any shareholder who requests them:

- Corporate Governance Guidelines
- Charters of the Committees of the Board of Directors
- The Thoroughbred Code of Ethics
- Code of Ethical Conduct for Senior Financial Officers
- Categorical Independence Standards for Directors

Unless otherwise indicated, Norfolk Southern and its subsidiaries are referred to collectively as NS.

**RAILROAD OPERATIONS –** As of December 31, 2008, NS' railroads operated approximately 21,000 miles of road in 22 eastern states and the District of Columbia.

The system's lines reach many individual industries, electric generating facilities, mines (in western Virginia, eastern Kentucky, southern and northern West Virginia, and western Pennsylvania), distribution centers, transload facilities, and other businesses located in smaller communities in its service area.




Corridors with heaviest freight volume:

- New York City area to Chicago (via Allentown and Pittsburgh)
- Chicago to Macon (via Cincinnati, Chattanooga, and Atlanta)
- Appalachian coal fields of Virginia, West Virginia, and Kentucky to Norfolk and Sandusky, OH
- Cleveland to Kansas City
- Birmingham to Meridian
- Memphis to Chattanooga

The miles operated, which include major leased lines between Cincinnati, Ohio, and Chattanooga, Tennessee, and trackage rights over property owned by North Carolina Railway Company, were as follows:

**Mileage Operated as of December 31, 2008**

| | Miles of Road | Second and Other Main Track | Passing Track, Crossovers and Turnouts | Way and Yard Switching | Total |
|---|---|---|---|---|---|
| Owned | 15,884 | 2,808 | 2,001 | 8,426 | 29,119 |
| Operated under lease, contract or trackage rights | 4,948 | 1,977 | 415 | 968 | 8,308 |
| Total | 20,832 | 4,785 | 2,416 | 9,394 | 37,427 |

**Triple Crown Operations** – Triple Crown Services Company (Triple Crown), NS' subsidiary, offers door-to-door intermodal service using RoadRailer® equipment and domestic containers. RoadRailer® units are enclosed vans that can be pulled over highways in tractor-trailer configuration and over the rails by locomotives. Triple Crown provides intermodal service in major traffic corridors, including those between the Midwest and the Northeast, the Midwest and the Southeast, and the Midwest and Texas.

The following table sets forth certain statistics relating to NS' railroads' operations for the past 5 years:

**Rail Operating Statistics**

| | Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2008 | 2007 | 2006 | 2005 | 2004 |
| Revenue ton miles (billions) | 195 | 196 | 204 | 203 | 198 |
| Freight train miles traveled (millions) | 80.0 | 81.9 | 84.2 | 81.2 | 77.7 |
| Revenue per ton mile | $0.0546 | $0.0481 | $0.0462 | $0.0421 | $0.0369 |
| Revenue ton miles per man-hour worked | 3,075 | 3,066 | 3,196 | 3,146 | 3,347 |
| Percentage ratio of railway operating expenses to railway operating revenues | 71.1% | 72.6% | 72.8% | 75.2% | 76.7% |

**RAILWAY OPERATING REVENUES –** NS' total railway operating revenues were $10.7 billion in 2008. See the financial information by traffic segment in Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**COAL TRAFFIC –** Coal, coke, and iron ore – most of which is bituminous coal – is NS' railroads' largest commodity group as measured by revenues. The railroads handled a total of 194.2 million tons in 2008, most of which originated on NS' lines in West Virginia, Virginia, Pennsylvania, and Kentucky. Revenues from coal, coke, and iron ore accounted for about 29% of NS' total railway operating revenues in 2008.

Total coal handled through all system ports in 2008 was 41.8 million tons. Of this total, 18.9 million tons (including coastwise traffic) moved through Norfolk, Virginia, 5.7 million tons moved through the Baltimore Terminal, 11.3 million tons moved to various docks on the Ohio River, and 5.9 million tons moved to various

Lake Erie ports. Other than coal for export, virtually all coal handled by NS' railroads was terminated in states east of the Mississippi River.

See the discussion of coal traffic, by type of coal, in Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**GENERAL MERCHANDISE TRAFFIC -** General merchandise traffic is composed of five major commodity groupings: automotive; chemicals; metals and construction; agriculture, consumer products and government; and paper, clay and forest products. The automotive group includes finished vehicles for BMW, Chrysler, Ford Motor Company, General Motors, Honda, Isuzu, Jaguar, Land Rover, Mazda, Mercedes-Benz, Mitsubishi, Nissan, Saab, Subaru, Suzuki, Toyota, and Volkswagen, and auto parts for Ford Motor Company, General Motors, Mercedes-Benz, and Toyota. The chemicals group includes sulfur and related chemicals, petroleum products, chlorine and bleaching compounds, plastics, rubber, industrial chemicals, chemical wastes, and municipal wastes. The metals and construction group includes steel, aluminum products, machinery, scrap metals, cement, aggregates, bricks, and minerals. The agriculture, consumer products, and government group includes soybeans, wheat, corn, fertilizer, animal and poultry feed, food oils, flour, beverages, canned goods, sweeteners, consumer products, ethanol, and items for the military. The paper, clay and forest products group includes lumber and wood products, pulp board and paper products, wood fibers, wood pulp, scrap paper, and clay.

In 2008, 135 million tons of general merchandise freight, or approximately 67% of total general merchandise tonnage handled by NS, originated online. The balance of general merchandise traffic was received from connecting carriers at interterritorial gateways. The principal interchange points for NS-received traffic included Chicago, Memphis, New Orleans, Cincinnati, Kansas City, Detroit, Hagerstown, St. Louis/East St. Louis, and Louisville. General merchandise carloads handled in 2008 were 2.6 million, the revenues from which accounted for 52% of NS' total railway operating revenues in 2008.

See the discussion of general merchandise rail traffic by commodity group in Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**INTERMODAL TRAFFIC -** The intermodal market consists of shipments moving in trailers, domestic and international containers, and Roadrailer® equipment. These shipments are handled on behalf of intermodal marketing companies, international steamship lines, truckers, and other shippers. Intermodal units handled in 2008 were 3 million, the revenues from which accounted for 19% of NS' total railway operating revenues for the year.

See the discussion of intermodal traffic in Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**FREIGHT RATES -** In 2008, NS' railroads continued their reliance on private contracts and exempt price quotes as their predominant pricing mechanisms. Thus, a major portion of NS' railroads' freight business is not currently economically regulated by the government. In general, market forces have been substituted for government regulation and now are the primary determinant of rail service prices.

In 2008, NS' railroads were found by the STB to be "revenue adequate" based on results for the year 2006. The STB has not made its revenue adequacy determination for the year 2007. A railroad is "revenue adequate" under the applicable law when its return on net investment exceeds the rail industry's composite cost of capital. This determination is made pursuant to a statutory requirement.

**PASSENGER OPERATIONS**

- Regularly scheduled passenger trains are operated by Amtrak on NS' lines between the following locations:
  - Alexandria, Virginia, and New Orleans, Louisiana
  - Raleigh and Charlotte, North Carolina
  - Selma and Charlotte, North Carolina
  - Chicago, Illinois, and Porter, Indiana
  - Chicago, Illinois, and Battle Creek, Michigan
  - Chicago, Illinois, and Pittsburgh, Pennsylvania
  - Chicago, Illinois, and Detroit, Michigan
  - Pittsburgh and Harrisburg, Pennsylvania
- Commuter trains are operated on the NS line between Manassas and Alexandria in accordance with contracts with two transportation commissions of the Commonwealth of Virginia
- NS leases the Chicago to Manhattan, Illinois, line to the Commuter Rail Division of the Regional Transportation Authority of Northeast Illinois
- NS operates freight service over lines with significant ongoing Amtrak and commuter passenger operations, and is conducting freight operations over trackage owned by:
  - Amtrak
  - New Jersey Transit
  - Southeastern Pennsylvania Transportation Authority
  - Metro-North Commuter Railroad Company
  - Maryland Department of Transportation
- Passenger operations are conducted either by Amtrak or by the commuter agencies over trackage owned by Conrail in the Shared Assets Areas.

**NONCARRIER OPERATIONS -** NS' noncarrier subsidiaries engage principally in the acquisition, leasing, and management of coal, oil, gas and minerals; the development of commercial real estate; telecommunications; and the leasing or sale of rail property and equipment. In 2008, no such noncarrier subsidiary or industry segment grouping of noncarrier subsidiaries met the requirements for a reportable business segment set forth in the Financial Accounting Standards Board issued Statement of Financial Accounting Standards No. 131, "Disclosures About Segments of an Enterprise and Related Information."

**RAILWAY PROPERTY**

The NS railroad system extends across 22 states and the District of Columbia. The railroad infrastructure makes the company capital intensive with total property of approximately $22 billion.

**Capital Expenditures -** Capital expenditures for road, equipment, and other property for the past five years were as follows (including capitalized leases):

**Capital Expenditures**

| | 2008 | 2007 | 2006 | 2005 | 2004 |
|---|---|---|---|---|---|
| | | | *($ in millions)* | | |
| Road and other property | $ 1,070 | $ 894 | $ 756 | $ 741 | $ 612 |
| Equipment | 488 | 447 | 422 | 284 | 429 |
| Total | $ 1,558 | $ 1,341 | $ 1,178 | $ 1,025 | $ 1,041 |

Capital spending and maintenance programs are and have been designed to assure the ability to provide safe, efficient, and reliable rail transportation services. For 2009, NS has budgeted $1.41 billion of capital expenditures. On May 1, 2006, NS and Kansas City Southern (KCS) formed a joint venture, Meridian Speedway LLC (MSLLC), pursuant to which NS intends to contribute $300 million in cash, substantially all of which will be used for capital improvements over a period of approximately three years, in exchange for a 30% interest in the joint venture. Through December 31, 2008, NS has contributed $274 million. See the discussion following "Cash used for investing activities," in Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**Equipment -** As of December 31, 2008, NS owned or leased the following units of equipment:

| | Number of Units | | | Capacity |
|---|---|---|---|---|
| | **Owned*** | **Leased**** | **Total** | **of Equipment** |
| Locomotives: | | | | (Horsepower) |
| Multiple purpose | 3,608 | 132 | 3,740 | 12,991,800 |
| Switching | 148 | -- | 148 | 216,100 |
| Auxiliary units | 88 | -- | 88 | -- |
| Total locomotives | 3,844 | 132 | 3,976 | 13,207,900 |
| Freight cars: | | | | (Tons) |
| Hopper | 18,343 | 805 | 19,148 | 2,081,957 |
| Box | 15,164 | 1,800 | 16,964 | 1,373,553 |
| Covered hopper | 8,593 | 2,759 | 11,352 | 1,248,050 |
| Gondola | 31,338 | 7,225 | 38,563 | 4,164,281 |
| Flat | 2,630 | 1,334 | 3,964 | 318,594 |
| Caboose | 174 | -- | 174 | -- |
| Other | 4,476 | 19 | 4,495 | 223,952 |
| Total freight cars | 80,718 | 13,942 | 94,660 | 9,410,387 |
| Other: | | | | |
| Work equipment | 5,214 | 3 | 5,217 | |
| Vehicles | 4,073 | -- | 4,073 | |
| Highway trailers and containers | 59 | 11,912 | 11,971 | |
| RoadRailer® | 6,515 | 33 | 6,548 | |
| Miscellaneous | 1,277 | 13,519 | 14,796 | |
| Total other | 17,138 | 25,467 | 42,605 | |

* Includes equipment leased to outside parties and equipment subject to equipment trusts, conditional sale agreements, and capitalized leases.

** Includes 4,651 freight cars leased from CRC.

The following table indicates the number and year built for locomotives and freight cars owned at December 31, 2008.

| | Year Built | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2007 | 2006 | 2005 | 2004 | 1999-2003 | 1994-1998 | 1993 & Before | Total |
| Locomotives: | | | | | | | | | |
| No. of units | 40 | 90 | 143 | 89 | 207 | 607 | 628 | 2,040 | 3,844 |
| % of fleet | 1% | 2% | 4% | 2% | 6% | 16% | 16% | 53% | 100% |
| Freight cars: | | | | | | | | | |
| No. of units | 2,360 | 1,200 | 404 | 89 | -- | 1,546 | 6,944 | 68,175 | 80,718 |
| % of fleet | 3% | 1% | 1% | --% | --% | 2% | 9% | 84% | 100% |

The following table shows the average age of NS' locomotive and freight car fleets at December 31, 2008, and the number of retirements in 2008:

| | Locomotives | Freight Cars |
|---|---|---|
| Average age – in service | 18.9 years | 29.9 years |
| Retirements | 14 units | 2,839 units |
| Average age – retired | 34.4 years | 39.6 years |

Ongoing freight car and locomotive maintenance programs are intended to ensure the highest standards of safety, reliability, customer satisfaction, and equipment marketability. The locomotive bad order ratio includes units out of service for required inspections every 92 days and program work such as overhauls.

| | Annual Average Bad Order Ratio | | | | |
|---|---|---|---|---|---|
| | 2008 | 2007 | 2006 | 2005 | 2004 |
| Freight cars | 4.5% | 4.9% | 6.4% | 6.3% | 7.4% |
| Locomotives | 5.8% | 5.7% | 5.7% | 6.2% | 6.3% |

**Encumbrances -** Certain railroad equipment is subject to the prior lien of equipment financing obligations amounting to approximately $236 million as of December 31, 2008, and $389 million as of December 31, 2007.

**Track Maintenance -** Of the approximately 37,500 total miles of track operated, NS had responsibility for maintaining about 30,000 miles of track, with the remainder being operated under trackage rights from another party responsible for maintenance.

Over 75% of the main line trackage (including first, second, third, and branch main tracks, all excluding rail operated pursuant to trackage rights) has rail ranging from 131 to 155 pounds per yard with the standard installation currently at 136 pounds per yard. Approximately 44% of NS lines, excluding rail operated pursuant to trackage rights, carried 20 million or more gross tons per track mile during 2008.

The following table summarizes several measurements regarding NS' track roadway additions and replacements during the past five years:

| | 2008 | 2007 | 2006 | 2005 | 2004 |
|---|---|---|---|---|---|
| Track miles of rail installed | 459 | 401 | 327 | 302 | 246 |
| Miles of track surfaced | 5,209 | 5,014 | 4,871 | 4,663 | 5,055 |
| New crossties installed (millions) | 2.7 | 2.7 | 2.7 | 2.5 | 2.5 |

**Microwave System -** The NS microwave system, consisting of approximately 7,400 radio route miles, 426 core stations, 30 secondary stations, and 5 passive repeater stations, provides communications between most operating locations. The microwave system is used primarily for voice communications, VHF radio control circuits, data and facsimile transmissions, traffic control operations, and AEI data transmissions.

**Traffic Control -** Of the approximately 15,900 route miles owned by NS, about 11,000 miles are signalized, including 8,000 miles of centralized traffic control (CTC) and 3,000 miles of automatic block signals. Of the 8,000 miles of CTC, approximately 3,000 miles are controlled by data radio originating at 266 base station radio sites.

**Computers -** A computer network consisting of a centralized data center in Atlanta, Georgia, and various distributed computers throughout the company connects the yards, terminals, transportation offices, rolling stock repair points, sales offices, and other key system locations. Operating and traffic data are processed and stored to provide customers with information on their shipments throughout the system. Computer systems provide current information on the location of every train and each car on line, as well as related waybill and other train and car movement data. In addition, the computer systems are utilized to assist management in the performance of a variety of functions and services including payroll, car and revenue accounting, billing, material management activities and controls, and special studies.

**ENVIRONMENTAL MATTERS -** Compliance with federal, state, and local laws and regulations relating to the protection of the environment is a principal NS goal. To date, such compliance has not affected materially NS' capital additions, earnings, liquidity, or competitive position. See "Legal Proceedings," Part I, Item 3; "Personal Injury, Environmental, and Legal Liabilities" in Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations;" and Note 17 to the Consolidated Financial Statements.

**EMPLOYEES –** The following table shows the average number of employees and the average cost per employee for wages and benefits:

| | 2008 | 2007 | 2006 | 2005 | 2004 |
|---|---|---|---|---|---|
| Average number of employees | 30,709 | 30,806 | 30,541 | 30,294 | 28,475 |
| Average wage cost per employee | $66,000 | $62,000 | $62,000 | $61,000 | $59,000 |
| Average benefit cost per employee | $31,000 | $30,000 | $32,000 | $29,000 | $28,000 |

Approximately 85% of NS' railroad employees are covered by collective bargaining agreements with various labor unions. See the discussion of "Labor Agreements" in Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**GOVERNMENT REGULATION -** In addition to environmental, safety, securities, and other regulations generally applicable to all businesses, NS' railroads are subject to regulation by the STB. The STB has jurisdiction

over some rates, routes, fuel surcharges, conditions of service, and the extension or abandonment of rail lines. The STB also has jurisdiction over the consolidation, merger, or acquisition of control of and by rail common carriers. The Federal Railroad Administration regulates certain track and mechanical equipment standards.

The relaxation of economic regulation of railroads, begun over two decades ago under the Staggers Rail Act of 1980, includes exemptions of intermodal business (trailer-on-flat-car, container-on-flat-car), rail boxcar traffic, lumber, manufactured steel, automobiles, and certain bulk commodities such as sand, gravel, pulpwood, and wood chips for paper manufacturing. Transportation contracts on regulated shipments effectively remove those shipments from regulation as well for the duration of the contract. About 86% of NS' freight revenues come from either exempt traffic or traffic moving under transportation contracts.

Efforts were made in 2008 to re-subject the rail industry to increased federal economic regulation and such efforts are expected to continue in 2009. The Staggers Rail Act of 1980, which substantially balanced such regulation, encouraged and enabled rail carriers to innovate and to compete for business, thereby contributing to the economic health of the nation and to the revitalization of the industry. Accordingly, NS will continue to oppose efforts to reimpose increased economic regulation.

**COMPETITION –** There is continuing strong competition among rail, water, and highway carriers. Price is usually only one factor of importance as shippers and receivers choose a transport mode and specific hauling company. Inventory carrying costs, service reliability, ease of handling, and the desire to avoid loss and damage during transit are also important considerations, especially for higher-valued finished goods, machinery, and consumer products. Even for raw materials, semifinished goods, and work-in-process, users are increasingly sensitive to transport arrangements that minimize problems at successive production stages.

NS' primary rail competitor is the CSX system; both operate throughout much of the same territory. Other railroads also operate in parts of the territory. NS also competes with motor carriers, water carriers, and with shippers who have the additional option of handling their own goods in private carriage.

Certain marketing strategies among railroads and between railroads and motor carriers enable carriers to compete more effectively in specific markets.

**SECURITY OF OPERATIONS –** NS has taken significant steps to provide enhanced security for the NS rail system. In particular, NS has developed and implemented a comprehensive security plan that is modeled on and was developed in conjunction with the security plan prepared by the Association of American Railroads (AAR) post September 11, 2001. The AAR Security Plan defines four Alert Levels and details the actions and countermeasures that are being applied across the railroad industry as the terrorist threat increases or decreases. The Alert Level actions include countermeasures that will be applied in three general areas: (1) operations (including transportation, engineering, and mechanical); (2) information technology and communications; and (3) railroad police. Although security concerns preclude public disclosure of its contents, the NS Departmental Security Plan outlines the protocol within NS for all concerned to be notified of AAR Alert Level changes. All NS Operations Division employees are advised by their supervisors or train dispatchers, as appropriate, of any change in Alert Level and any additional responsibilities they may incur due to such change.

The NS plan also effectively addresses and complies with Department of Transportation security regulations pertaining to training and security plans with respect to the transportation of hazardous materials. As part of the plan, security awareness training is given to all railroad employees who directly affect hazardous material transportation safety, and this training is integrated into recurring hazardous material training and re-certification programs. Toward that end, NS, working closely with the National Transit Institute at Rutgers University, has developed a four-module uniform national training program. NS also has worked with the Transportation Security Administration (TSA) in developing other industry training programs. More in-depth security training has been given to those select NS employees who have been given specific security responsibilities, and

additional, location-specific security plans have been developed for certain metropolitan areas and each of six port facilities served by NS. With respect to the ports, each facility plan has been approved by the applicable Captain of the Port and subject to inspection by the U.S. Coast Guard.

Additionally, NS engages in close and regular coordination with numerous federal and state agencies, including the U.S. Department of Homeland Security (DHS), the TSA, the Federal Bureau of Investigation (FBI), the Federal Railroad Administration (FRA), the U.S. Coast Guard, U.S. Customs and Border Protection, and various state Homeland Security offices. As one notable example, an NS Police Special Agent, under the auspices of the AAR, has been assigned to the National Joint Terrorism Task Force (NJTTF) operating out of FBI Headquarters in Washington, D.C. to represent and serve as liaison to the North American rail industry. This arrangement improves logistical flow of vital security and law enforcement information with respect to the rail industry as a whole, while having the post filled by an NS Special Agent has served to foster a strong working relationship between NS and the FBI. NS also has become a member of the Customs-Trade Partnership Against Terrorism (C-TPAT) program sponsored by U.S. Customs. C-TPAT allows NS to work closely with U.S. Customs and its customers to develop measures that will help ensure the integrity of freight shipments moving on NS, particularly those moving to or from a foreign country. Based on participation in C-TPAT, NS has ensured that its plan meets all current applicable security recommendations made by U.S. Customs.

Similarly, NS is guided in its operations by various supplemental security action items issued by DHS and U.S. Department of Transportation (DOT), U.S. Coast Guard Maritime Security requirements, as well as voluntary security action items developed in 2006 in collaboration with TSA, DOT, and the freight railroads. Many of the action items are based on lessons learned from DHS and DOT security assessments of rail corridors in High Threat Urban Areas (HTUA) begun in 2004. Particular attention is paid to: (1) the establishment of secure storage areas for rail cars carrying toxic-by-inhalation (TIH) materials; (2) the expedited movement of trains transporting rail cars carrying TIH materials; (3) the minimization of unattended loaded tank cars carrying TIH materials; and (4) cooperation with federal, state, local and tribal governments to identify, through risk assessments, those locations where security risks are the highest. These action items and NS' compliance initiatives are outlined in the various departmental sections of the NS Departmental Security Plan. NS is also taking the appropriate actions to ensure compliance with the 2008 TSA Final Rule addressing Rail Security Sensitive Materials, and the 2008 Pipeline and Hazardous Materials Safety Administration (PHMSA) rail-routing regulations outlined in Docket HM-232E.

In 2008, through participation in the Transportation Community Awareness and Emergency Response (TRANSCAER) Program, NS provided rail accident response training to approximately 4,300 emergency responders, such as local police and fire personnel, representing over 25,000 man-hours of emergency response training. NS also conducted railroad operations classes for FBI agents and the railroad liaison agents from Joint Terrorism Task Forces. NS' other training efforts throughout 2008 included participation in 15 drills including 2 major full-scale exercises with various local, state, and federal agencies conducted in accordance with the DHS Exercise and Evaluation Program. NS also has ongoing programs to sponsor local emergency responders at tank car emergency response training programs conducted at the AAR Transportation Technology Center in Pueblo, Colorado. Also, the NS annual TRANSCAER Whistle-Stop train makes stops in numerous cities, its special training cars serving as a resource to an audience of nearly 1,000 emergency responders annually.

Improvements in equipment design also are expected to play a role in enhancing rail security. The Pipeline and Hazardous Materials Safety Administration (PHMSA), in coordination with the FRA, is amending the Hazardous Materials Regulations to prescribe enhanced safety measures for rail transportation of TIH materials, including interim design standards for railroad tank cars. The rule mandates commodity-specific improvements in safety features and design standards for newly manufactured DOT specification tank cars and an improved top fittings performance standard. The interim standards established in this rule will enhance the accident survivability of TIH tank cars.

## Item 1A. Risk Factors

**NS is subject to significant governmental legislation and regulation over commercial, environmental, and operating matters.** Railroads are subject to the enactment of laws by Congress that could increase economic regulation of the industry. Railroads presently are subject to commercial regulation by the STB, which has jurisdiction over some routes, rates and fuel surcharges, conditions of service, and the extension or abandonment of rail lines. The STB also has jurisdiction over the consolidation, merger, or acquisition of control of and by rail common carriers. Additional economic regulation of the rail industry by Congress or the STB, whether under new or existing laws, could have a significant negative impact on NS' ability to determine prices for rail services and result in a material adverse effect in the future on NS' financial position, results of operations, or liquidity in a particular year or quarter. This potential material adverse effect could also result in reduced capital spending on NS' rail network.

Railroads are subject to safety and security regulation by the DOT and the DHS, which regulate most aspects of NS' operations. Compliance with the Rail Safety Improvement Act of 2008 will result in additional operating costs associated with the statutory mandate to implement positive train control by 2015. In addition, NS' failure to comply with applicable laws and regulations could have a material adverse effect on NS.

NS' operations are subject to extensive federal, state, and local environmental laws and regulations concerning, among other things, emissions to the air; discharges to waterways or ground water supplies; handling, storage, transportation, and disposal of waste and other materials; and the cleanup of hazardous material or petroleum releases. The risk of incurring environmental liability – for acts and omissions, past, present, and future – is inherent in the railroad business. Property owned by NS, whether currently or in the past, is and has been subject to a variety of uses, including NS railroad operations and other industrial activity by past owners or past and present tenants of NS. Environmental problems that are latent or undisclosed may exist on these properties, and NS could incur environmental liabilities or costs, the amount and materiality of which cannot be estimated reliably at this time, with respect to one or more of these properties. Moreover, lawsuits and claims involving other unidentified environmental sites and matters are likely to arise from time to time, and the resulting liabilities could have a significant effect on financial position, results of operations, or liquidity in a particular year or quarter.

**NS, as a common carrier by rail, must offer to transport hazardous materials, regardless of risk.** Transportation of certain hazardous materials could create catastrophic losses in terms of personal injury and property damage costs, and compromise critical parts of our rail network.

**NS may be affected by terrorism or war.** Any terrorist attack, or other similar event, any government response thereto, and war or risk of war could cause significant business interruption and may adversely affect NS' results of operations, financial position, and liquidity in a particular year or quarter. Because NS plays a critical role in the nation's transportation system, it could become the target of such an attack or have a significant role in the government's preemptive approach or response to an attack or war.

Although NS currently maintains insurance coverage for third-party liability arising out of war and acts of terrorism, it maintains only limited insurance coverage for first-party property damage and damage to property in NS' care, custody, or control caused by certain acts of terrorism. In addition, premiums for some or all of NS' current insurance programs covering these losses could increase dramatically, or insurance coverage for certain losses could be unavailable to NS in the future.

**NS may be affected by general economic conditions.** Prolonged negative changes in domestic and global economic conditions affecting the producers and consumers of the commodities NS carries may have an adverse effect on its operating results, financial position, and liquidity. Economic conditions resulting in bankruptcies of one or more large customers could have a significant impact on NS' financial position, results of operations, or liquidity in a particular year or quarter.

**NS may be affected by the impact of environmental regulation on its utility coal customers and/or the value of certain NS assets.** A number of evolving environmental issues could affect the U.S. utility coal market, including potential regional programs aimed at capping and reducing power plant $CO_2$ emissions and ongoing efforts at addressing climate change. Although certain utilities have begun adding or are planning to add emissions control technologies to their electric generating units, allowing them to utilize their existing coal-fired power plants, future regulatory developments in this area could have a negative effect on NS' utility coal customers and/or the value of coal reserves owned by NS and thus an adverse effect on NS' operating results, financial position, and liquidity.

**NS faces competition from other transportation providers.** NS is subject to competition from motor carriers, railroads, and to a lesser extent, ships, barges, and pipelines, on the basis of transit time, pricing, and the quality and reliability of service. While NS has used primarily internal resources to build or acquire and maintain its rail system, trucks and barges have been able to use public rights-of-way maintained by public entities. Any future improvements or expenditures materially increasing the quality or reducing the cost of alternative modes of transportation in the regions in which NS operates, or legislation granting materially greater latitude for motor carriers with respect to size or weight limitations, could have a material adverse effect on its financial position, results of operations, or liquidity in a particular year or quarter.

**The operations of carriers with which NS interchanges may adversely affect its operations.** NS' ability to provide rail service to customers in the U.S. and Canada depends in large part upon its ability to maintain cooperative relationships with connecting carriers with respect to, among other matters, freight rates, revenue divisions, car supply and locomotive availability, data exchange and communications, reciprocal switching, interchange, and trackage rights. Deterioration in the operations of, or service provided by connecting carriers, or in our relationship with those connecting carriers, could result in NS' inability to meet its customers' demands or require NS to use alternate train routes, which could result in significant additional costs and network inefficiencies.

**NS relies on technology and technology improvements in its business operations.** If NS experiences significant disruption or failure of one or more of its information technology systems, including computer hardware, software, and communications equipment, NS could experience a service interruption, security breach, or other operational difficulties, which could have a material adverse impact on its results of operations, financial condition, and liquidity in a particular year or quarter. Additionally, if NS does not have sufficient capital to acquire new technology or if it is unable to implement new technology, NS may suffer a competitive disadvantage within the rail industry and with companies providing other modes of transportation service, which could have a material adverse effect on its financial position, results of operations, or liquidity in a particular year or quarter.

**The vast majority of NS employees belong to labor unions, and labor agreements, strikes, or work stoppages could adversely affect its operations.** Approximately 26,000, or about 85%, of NS railroad employees are covered by collective bargaining agreements with various labor unions. If unionized workers were to engage in a strike, work stoppage, or other slowdown, NS could experience a significant disruption of its operations. Additionally, future national labor agreements, or renegotiation of labor agreements or provisions of labor agreements, could significantly increase NS' costs for healthcare, wages, and other benefits. Any of these factors could have a material adverse impact on NS' financial position, results of operations, or liquidity in a particular year or quarter.

**NS may be subject to various claims and lawsuits that could result in significant expenditures.** The nature of NS' business exposes it to the potential for various claims and litigation related to labor and employment, personal injury, commercial disputes, freight loss and other property damage, and other matters. Job-related

personal injury and occupational claims are subject to the Federal Employers' Liability Act (FELA), which is applicable only to railroads. FELA's fault-based tort system produces results that are unpredictable and inconsistent as compared with a no-fault worker's compensation system. The variability inherent in this system could result in actual costs being very different from the liability recorded.

Any material changes to current litigation trends or a catastrophic rail accident involving any or all of freight loss or property damage, personal injury, and environmental liability could have a material adverse effect on NS' operating results, financial condition, and liquidity to the extent not covered by insurance. NS has obtained insurance for potential losses for third-party liability and first-party property damages. Specified levels of risk are retained on a self-insurance basis (currently up to $25 million and above $1 billion per occurrence for bodily injury and property damage to third parties and $25 million and above $175 million per occurrence for property owned by NS or in its care, custody, or control). Insurance is available from a limited number of insurers and may not continue to be available or, if available, may not be obtainable on terms acceptable to NS.

**Severe weather could result in significant business interruptions and expenditures.** Severe weather conditions and other natural phenomena, including hurricanes, floods, fires, and earthquakes, may cause significant business interruptions and result in increased costs, increased liabilities, and decreased revenues, which could have an adverse effect on NS' financial position, results of operations, or liquidity in a particular year or quarter.

**Unpredictability of demand for rail services resulting in the unavailability of qualified personnel could adversely affect NS' operational efficiency and ability to meet demand.** Workforce demographics, training requirements, and the availability of qualified personnel, particularly engineers and trainmen, could each have a negative impact on NS' ability to meet demand for rail service. Unpredictable increases in demand for rail services may exacerbate such risks, which could have a negative impact on NS' operational efficiency and otherwise have a material adverse effect on its financial position, results of operations, or liquidity in a particular year or quarter.

**NS may be affected by supply constraints resulting from disruptions in the fuel markets or the nature of some of its supplier markets.** NS consumes about 500 million gallons of diesel fuel each year. Fuel availability could be affected by any limitation in the fuel supply or by any imposition of mandatory allocation or rationing regulations. If a severe fuel supply shortage arose from production curtailments, increased demand in existing or emerging foreign markets, disruption of oil imports, disruption of domestic refinery production, damage to refinery or pipeline infrastructure, political unrest, war or other factors, NS' financial position, results of operations, or liquidity in a particular year or quarter could be materially adversely affected. Also, such an event would impact NS as well as its customers and other transportation companies.

Due to the capital intensive nature and industry-specific requirements of the rail industry, there are high barriers of entry for potential new suppliers of core railroad items, such as locomotives and rolling stock equipment. Additionally, NS competes with other industries for available capacity and raw materials used in the production of certain track materials, such as rail and ties. Changes in the competitive landscapes of these limited-supplier markets could result in increased prices or material shortages that could materially affect NS' financial position, results of operations, or liquidity in a particular year or quarter.

**The state of capital markets could adversely affect NS' liquidity.** NS from time-to-time relies on the capital markets to provide some of its capital requirements, including the issuance of long-term debt instruments and commercial paper, as well as the sale of certain receivables. Significant instability or disruptions of the capital markets, including the credit markets, or deterioration of NS' financial condition due to internal or external factors could restrict or eliminate NS' access to, and/or significantly increase the cost of, various financing sources, including bank credit facilities and issuance of corporate bonds. Instability or disruptions of the capital markets and deterioration of NS' financial condition, alone or in combination, could also result in a reduction in NS' credit

rating to below investment grade, which could prohibit or restrict NS from accessing external sources of short- and long-term debt financing and/or significantly increase the associated costs.

**Item 1B. Unresolved Staff Comments**

None.

**Item 3. Legal Proceedings**

The Ohio Environmental Protection Agency has notified Norfolk Southern that it intends to seek penalties and require Norfolk Southern to take remedial actions in connection with alleged violations of the Clean Air and Water Acts stemming from the operation of our coal dock in Ashtabula, Ohio. The Pennsylvania Department of Environmental Protection has submitted to NS a proposed Consent Assessment of Civil Penalty with respect to several alleged environmental releases from September 2007 to the present. Although NS will contest liability and the imposition of any penalties, because these governmental proceedings with respect to environmental laws and regulations involve potential fines, penalties or other monetary sanctions in excess of $100,000, we describe them here consistent with SEC rules and requirements. NS does not believe that the outcome of these proceedings will have a material effect on its financial position, results of operations, or liquidity.

On November 6, 2007, various antitrust class actions filed against NS and other Class 1 railroads in various Federal district courts regarding fuel surcharges were consolidated in the District of Columbia by the Judicial Panel on Multidistrict Litigation. NS believes the allegations in the complaints are without merit and intends to vigorously defend the cases. NS does not believe that the outcome of these proceedings will have a material effect on its financial position, results of operations, or liquidity. A lawsuit containing similar allegations against NS and four other major railroads that was filed on March 25, 2008, in the U.S. District Court for the District of Minnesota was voluntarily dismissed by the plaintiff subject to a tolling agreement entered into in August 2008.

On April 24, 2008, the United States Department of Justice (DOJ) brought an action against NS for alleged violations of federal environmental laws resulting from the discharge of chlorine and oil that occurred as a result of the January 6, 2005 derailment in Graniteville, SC, including claims for civil penalties as well as injunctive relief. On June 24, 2008, NS filed a motion to dismiss DOJ’s claims, contending that insufficient facts have been alleged to support such claims. NS does not believe that the resolution of these claims will have a material adverse effect on its financial position, results of operations, or liquidity.

**Item 4. Submission of Matters to a Vote of Security Holders**

There were no matters submitted to a vote of security holders during the fourth quarter of 2008.

**Executive Officers of the Registrant.**

Norfolk Southern's executive officers generally are elected and designated annually by the Board of Directors at its first meeting held after the annual meeting of stockholders, and they hold office until their successors are elected. Executive officers also may be elected and designated throughout the year as the Board of Directors considers appropriate. There are no family relationships among the officers, nor any arrangement or understanding between any officer and any other person pursuant to which the officer was selected. The following table sets forth certain information, as of February 1, 2009, relating to the executive officers.

| **Name, Age, Present Position** | **Business Experience During Past Five Years** |
|---|---|
| Charles W. Moorman, 56, Chairman, President and Chief Executive Officer | Present position since February 1, 2006. Served as President and Chief Executive Officer from November 1, 2005 to February 1, 2006; as President from October 1, 2004 to November 1, 2005; as Senior Vice President – Corporate Planning and Services from December 1, 2003 to October 1, 2004; Senior Vice President – Corporate Services from February 1, 2003 to December 1, 2003 and prior thereto served as President – Thoroughbred Technology and Telecommunications, Inc. |
| Stephen C. Tobias, 64, Vice Chairman and Chief Operating Officer | Present position since August 1, 1998. |
| Deborah H. Butler, 54, Executive Vice President – Planning and Chief Information Officer | Present position since June 1, 2007. Prior thereto served as Vice President – Customer Service. |
| James A. Hixon, 55, Executive Vice President – Law and Corporate Relations | Present position since October 1, 2005. Served as Executive Vice President – Finance and Public Affairs From October 1, 2004, to October 1, 2005; Senior Vice President – Legal and Government Affairs from December 1, 2003 to October 1, 2004 and prior thereto served as Senior Vice President – Administration. |
| Mark D. Manion, 56, Executive Vice President – Operations | Present position since October 1, 2004. Served as Senior Vice President – Transportation Operations from December 1, 2003 to October 1, 2004 and prior thereto served as Vice President – Transportation Services and Mechanical. |
| John P. Rathbone, 56, Executive Vice President – Administration | Present position since October 1, 2004. Served as Senior Vice President – Administration from December 1, 2003 to October 1, 2004 and prior thereto served as Senior Vice President and Controller. |
| Donald W. Seale, 56, Executive Vice President and Chief Marketing Officer | Present position since April 1, 2006. Served as Executive Vice President – Sales and Marketing from October 1, 2004 to April 1, 2006; as Senior Vice President – Marketing Services from December 1, 2003 to October 1, 2004 and prior thereto was Senior Vice President – Merchandise Marketing. |

| | |
|---|---|
| James A. Squires, 47,<br>Executive Vice President –<br>Finance and Chief Financial<br>Officer | Present position since July 1, 2007.<br>Served as Executive Vice President – Finance from April 1, 2007 to July 1, 2007, Senior Vice President – Financial Planning from April 1, 2006 to April 1, 2007, Senior Vice President – Law from October 1, 2004 to April 1, 2006, as Vice President – Law from December 1, 2003 to October 1, 2004 and prior thereto was Senior General Counsel. |
| Daniel D. Smith, 56,<br>Senior Vice President –<br>Energy and Properties | Present position since December 1, 2003.<br>Prior thereto served as President - NS Development. |
| Marta R. Stewart, 51,<br>Vice President and Controller | Present position since December 1, 2003.<br>Prior thereto was Assistant Vice President Corporate Accounting. |

## PART II

## NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES (NS)

### Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities

### NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES STOCK PRICE AND DIVIDEND INFORMATION

The Common Stock of Norfolk Southern Corporation, owned by 35,466 stockholders of record as of December 31, 2008, is traded on the New York Stock Exchange under the symbol NSC. The following table shows the high and low sales prices as reported by Bloomberg L.P. on its internet-based service and dividends per share, by quarter, for 2008 and 2007.

| | Quarter | | | |
|---|---|---|---|---|
| **2008** | 1st | 2nd | 3rd | 4th |
| Market price | | | | |
| High | $ 56.89 | $ 67.38 | $ 73.64 | $ 65.04 |
| Low | 44.15 | 54.94 | 57.82 | 43.29 |
| Dividends per share | $ 0.29 | $ 0.29 | $ 0.32 | $ 0.32 |
| **2007** | 1st | 2nd | 3rd | 4th |
| Market price | | | | |
| High | $ 53.84 | $ 59.19 | $ 59.77 | $ 54.58 |
| Low | 45.38 | 49.70 | 46.42 | 48.03 |
| Dividends per share | $ 0.22 | $ 0.22 | $ 0.26 | $ 0.26 |

### ISSUER PURCHASES OF EQUITY SECURITIES

| Period | (a) Total Number of Shares (or Units) Purchased (1) | (b) Average Price Paid per Share (or Unit) | (c) Total Number of Shares (or Units) Purchased as Part of Publicly Announced Plans or Programs(2) | (d) Maximum Number (or Approximate Dollar Value) of Shares (or Units) that may yet be Purchased Under the Plans or Programs(2) |
|---|---|---|---|---|
| October 1-31, 2008 | 4,202,600 | 54.43 | 4,202,600 | 10,312,150 |
| November 1-30, 2008 | -- | -- | -- | 10,312,150 |
| December 1-31, 2008 | 2,125 | 47.05 | -- | 10,312,150 |
| Total | 4,204,725 | | 4,202,600 | |

(1) Of this amount 2,125 represent shares tendered by employees in connection with the exercise of stock options under the Long-Term Incentive Plan.

(2) On November 22, 2005, the Board of Directors authorized a share repurchase program, pursuant to which up to 50 million shares of Common Stock could be purchased through December 31, 2015. On March 27, 2007, the Board of Directors amended the program and increased the number of shares that may be repurchased to 75 million, and shortened the repurchase term by five years to December 31, 2010.

## Item 6. Selected Financial Data

**NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES**
**FIVE-YEAR FINANCIAL REVIEW**

| | 2008 | 2007 | 2006 | 2005[1] | 2004[2] |
|---|---|---|---|---|---|
| | | *($ in millions, except per share amounts)* | | | |
| **RESULTS OF OPERATIONS** | | | | | |
| Railway operating revenues | $ 10,661 | $ 9,432 | $ 9,407 | $ 8,527 | $ 7,312 |
| Railway operating expenses | 7,577 | 6,847 | 6,850 | 6,410 | 5,610 |
| Income from railway operations | 3,084 | 2,585 | 2,557 | 2,117 | 1,702 |
| Other income – net | 110 | 93 | 149 | 74 | 76 |
| Interest expense on debt | 444 | 441 | 476 | 494 | 489 |
| Income before income taxes | 2,750 | 2,237 | 2,230 | 1,697 | 1,289 |
| Provision for income taxes | 1,034 | 773 | 749 | 416 | 379 |
| Net income | $ 1,716 | $ 1,464 | $ 1,481 | $ 1,281 | $ 910 |
| **PER SHARE DATA** | | | | | |
| Net income – basic | $ 4.60 | $ 3.74 | $ 3.63 | $ 3.17 | $ 2.31 |
| – diluted | $ 4.52 | $ 3.68 | $ 3.57 | $ 3.11 | $ 2.28 |
| Dividends | $ 1.22 | $ 0.96 | $ 0.68 | $ 0.48 | $ 0.36 |
| Stockholders' equity at year end | $ 26.23 | $ 25.64 | $ 24.19 | $ 22.63 | $ 19.92 |
| **FINANCIAL POSITION** | | | | | |
| Total assets | $ 26,297 | $ 26,144 | $ 26,028 | $ 25,859 | $ 24,748 |
| Total long-term debt, including current maturities | $ 6,667 | $ 6,368 | $ 6,600 | $ 6,930 | $ 7,525 |
| Stockholders' equity | $ 9,607 | $ 9,727 | $ 9,615 | $ 9,276 | $ 7,977 |
| **OTHER** | | | | | |
| Capital expenditures | $ 1,558 | $ 1,341 | $ 1,178 | $ 1,025 | $ 1,041 |
| Average number of shares outstanding (thousands) | 372,276 | 389,626 | 405,988 | 404,170 | 394,201 |
| Number of stockholders at year end | 35,466 | 36,955 | 38,900 | 48,180 | 51,032 |
| Average number of employees: | | | | | |
| Rail | 30,241 | 30,336 | 30,079 | 29,851 | 28,057 |
| Nonrail | 468 | 470 | 462 | 443 | 418 |
| Total | 30,709 | 30,806 | 30,541 | 30,294 | 28,475 |

[1] 2005 provision for income taxes includes a $96 million benefit related to the reduction of NS' deferred income tax liabilities resulting from tax legislation enacted by Ohio. This benefit increased net income by $96 million, or 23 cents per diluted share.

[2] 2004 other income – net includes a $40 million net gain from the Conrail Corporate Reorganization. This gain increased net income by $40 million or 10 cents per diluted share.

See accompanying Consolidated Financial Statements and notes thereto.

## Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations

**Norfolk Southern Corporation and Subsidiaries**
**Management's Discussion and Analysis of**
**Financial Condition and Results of Operations**

The following discussion and analysis should be read in conjunction with the Consolidated Financial Statements and Notes and the Selected Financial Data.

### OVERVIEW

NS' 2008 net income rose 17% largely on the strength of a 19% increase in income from railway operations. Operating results reflected higher average revenue per unit (including fuel surcharge revenue) that more than offset the effects of increased operating expenses and lower traffic volume. Operating revenues increased 13% and operating expenses rose 11% compared to 2007, resulting in a lower operating ratio (a measure of the amount of revenues consumed by expenses) of 71.1%, as compared with 72.6% in 2007.

Cash provided by operating activities was $2.7 billion, exceeding $2 billion for the fourth consecutive year. Coupled with net borrowings of $280 million, this provided funding for increased capital expenditures, share repurchases, and higher dividends.

During 2008, NS purchased and retired 19.4 million shares of NS common stock at a total cost of $1.1 billion under the share repurchase program which the Board of Directors approved in November 2005 and subsequently amended in March 2007 to authorize the repurchase of up to 75 million shares of NS common stock through December 31, 2010. In total, NS has purchased and retired 64.7 million shares under this program at a cost of $3.3 billion.

Looking ahead, NS expects revenues to decline in 2009, reflecting lower traffic volume due to the weak economy and decreased fuel surcharge revenue resulting from lower fuel prices. NS plans to continue to improve service, maintain a market-based approach to pricing, and reduce volume-related costs.

### SUMMARIZED RESULTS OF OPERATIONS

#### 2008 Compared with 2007

Net income in 2008 was $1.7 billion, up $252 million, or 17%, compared with 2007. Diluted earnings per share were $4.52, up 84¢, or 23%. The greater percentage increase in per share earnings was due to fewer shares outstanding as a result of NS' share repurchase program (see Note 13). The increase in net income was primarily due to higher income from railway operations that was offset in part by higher income taxes (see Note 3). Railway operating revenues increased $1.2 billion, as higher average revenue per unit (including fuel surcharges) outweighed lower traffic volumes. Railway operating expenses increased $730 million, principally due to higher fuel costs and increased compensation and benefits expenses.

Oil prices affect NS' results of operations in a variety of ways and can have an overall favorable or unfavorable impact in any particular quarter or year. In addition to the impact of oil prices on general economic conditions and traffic volume, oil prices directly affect NS' revenues through market-based fuel surcharges and contract escalators (see "Railway Operating Revenues") and also affect fuel costs (see "Railway Operating Expenses"). For 2008, oil prices had an overall favorable impact on income from railway operations. Future changes in oil prices may cause volatility in operating results that could be material to a particular quarter or year.

**2007 Compared with 2006**

Net income in 2007 was $1.5 billion, down $17 million, or 1%, compared with 2006. Diluted earnings per share were $3.68, up 11¢, or 3%, reflecting fewer shares outstanding as a result of NS' share repurchase program (see Note 13). The decrease in net income was primarily due to higher income taxes and lower non-operating items that offset higher income from railway operations. Railway operating revenues increased $25 million, as higher average revenue per unit overshadowed lower traffic volumes. Railway operating expenses decreased $3 million, principally due to lower volume-related expenses that offset higher fuel expense.

## DETAILED RESULTS OF OPERATIONS

### Railway Operating Revenues

Railway operating revenues were $10.7 billion in 2008 and $9.4 billion in 2007 and 2006. The following table presents a three-year comparison of revenues, volume, and average revenue per unit by market group.

| | Revenues | | | Units | | | Revenue per Unit | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2007 | 2006 | 2008 | 2007 | 2006 | 2008 | 2007 | 2006 |
| | | *($ in millions)* | | | *(in thousands)* | | | *($ per unit)* | |
| Coal | $ 3,111 | $ 2,315 | $ 2,330 | 1,765.7 | 1,699.4 | 1,760.0 | $ 1,762 | $ 1,363 | $ 1,324 |
| General merchandise: | | | | | | | | | |
| Agr./cons. prod./govt. | 1,282 | 1,047 | 994 | 612.4 | 601.5 | 594.1 | 2,093 | 1,740 | 1,673 |
| Metals/construction | 1,251 | 1,149 | 1,168 | 742.4 | 783.6 | 835.3 | 1,686 | 1,467 | 1,398 |
| Chemicals | 1,238 | 1,166 | 1,079 | 393.7 | 426.7 | 426.4 | 3,144 | 2,732 | 2,530 |
| Paper/clay/forest | 898 | 860 | 891 | 394.1 | 428.1 | 466.7 | 2,280 | 2,010 | 1,909 |
| Automotive | 823 | 974 | 974 | 412.2 | 533.0 | 561.9 | 1,997 | 1,827 | 1,734 |
| General merchandise | 5,492 | 5,196 | 5,106 | 2,554.8 | 2,772.9 | 2,884.4 | 2,150 | 1,874 | 1,770 |
| Intermodal | 2,058 | 1,921 | 1,971 | 3,029.0 | 3,120.7 | 3,256.5 | 679 | 615 | 605 |
| Total | $ 10,661 | $ 9,432 | $ 9,407 | 7,349.5 | 7,593.0 | 7,900.9 | $ 1,451 | $ 1,242 | $ 1,191 |

Revenues increased $1.2 billion in 2008 and $25 million in 2007. As shown in the table below, both revenue improvements were the result of increased average revenue per unit, including fuel surcharge revenue, which more than offset decreased traffic volumes. Fuel surcharge revenue amounted to $1.6 billion in 2008 (up $830 million) compared to $792 million in 2007 and $1 billion in 2006. If fuel prices remain at or near year-end 2008 levels, fuel surcharge revenues in 2009 will be substantially lower, with a corresponding effect on revenue per unit.

Many of Norfolk Southern's negotiated fuel surcharges for coal and general merchandise traffic are based on the monthly average price of West Texas Intermediate Crude Oil (WTI Average Price). These surcharges are reset the first day of each calendar month based on the WTI Average Price for the second preceding calendar month. This two-month lag in computing WTI Average Price coupled with the sharp drop in fuel prices late in the year increased fuel surcharge revenue by approximately $100 million for the year.

**Revenue Variance Analysis**
Increases (Decreases)

| | 2008 vs. 2007 | 2007 vs. 2006 |
|---|---|---|
| | *($ in millions)* | |
| Revenue per unit/mix | $ 1,531 | $ 392 |
| Traffic volume (units) | (302) | (367) |
| Total | $ 1,229 | $ 25 |

Both comparisons reflect large increases in average revenue per unit, a result of higher rates and increased fuel surcharges. Traffic volumes in both years declined. For 2008, traffic volumes for all commodity groups except coal and agriculture/consumer products/government decreased. In 2007, traffic volumes for all commodity groups except agriculture/consumer products/government and chemicals decreased.

On January 26, 2007, the Surface Transportation Board (STB) issued a decision that the type of fuel surcharge imposed by NS and most other large railroads – a fuel surcharge based on a percentage of line haul revenue – would no longer be permitted for regulated traffic that moves under public (tariff) rates. The STB gave the railroads a 90-day transition period to adjust their fuel surcharge programs. During the second quarter of 2007, NS discontinued assessing fuel surcharges on its published (non-intermodal) public rates. Adjustments to public prices now reflect ongoing market conditions. The traffic moving under these tariffs and public quotes comprises about 10% of Norfolk Southern's total revenue base.

**COAL** revenues increased $796 million, or 34%, compared with 2007, reflecting higher rates, including fuel surcharges, and a 4% increase in traffic volume. Coal average revenue per unit was up 29% compared with 2007, reflecting higher rates (which were comprised of pricing increases, contract escalators and the effect of increased longer-haul export coal traffic) and increased fuel surcharges. For 2009, average revenue per unit is expected to decline reflecting the effects of lower fuel surcharges and contract escalators.

Coal represented 29% of NS' revenues in 2008 and 79% of shipments handled originated on NS' lines. As shown in the following table, increased shipments of export, utility, and domestic metallurgical coal more than offset lower industrial shipments.

**Total Coal, Coke, and Iron Ore Tonnage**

| | 2008 | 2007 | 2006 |
|---|---|---|---|
| | | *(Tons in thousands)* | |
| Utility | 144,451 | 142,734 | 148,078 |
| Export | 23,069 | 15,564 | 12,409 |
| Domestic metallurgical | 18,155 | 17,873 | 20,878 |
| Industrial | 8,553 | 9,794 | 9,202 |
| Total | 194,228 | 185,965 | 190,567 |

Coal revenues in 2007 decreased $15 million, or 1%, compared with 2006, as a 2% reduction in tonnage handled more than offset a 3% increase in average revenue per unit. Carloads declined 3%, a higher percentage than the change in tonnage handled because of increased average tonnage per car. Coal represented 25% of NS' revenues in 2007, and 78% of shipments handled originated on NS' lines.

NS is currently involved in litigation with Virginia Electric and Power Company/Old Dominion Electric Cooperative (Virginia Power) regarding rate adjustment provisions in a transportation contract between them. In 2007, the Virginia Supreme Court issued a decision that remanded the case to the trial court on the grounds that neither of its prior decisions constituted a final order. In April 2008, the trial court entered a final order granting NS monetary damages, including interest, and prescribing the methodology for determining future rates. Virginia Power filed a notice of appeal and the Virginia Supreme Court has agreed to hear the appeal. Future developments and the ultimate resolution of this matter could result in NS recognizing additional revenues related to this dispute, which could have a favorable impact on results of operations in a particular year or quarter.

**Utility coal** tonnage increased 1%, compared with 2007, a result of modest stockpile growth in the Northeast.

In 2007, utility coal tonnage decreased 4% compared with 2006, reflecting high stockpile levels (particularly in the Southeast) that led to reduced shipments, despite fairly strong electric generation (up 4%) in the NS service region. In addition, the temporary closure of a major coal mine as well as the loss of business to barge transportation contributed to the decline.

For 2009, utility coal tonnage is expected to weaken, with lower electric demand as a result of a weak economy.

**Export coal** tonnage increased 48% compared to 2007, reflecting increased global demand coupled with weather-related supply constraints in Australia, reduced export volume from China, and the weak U.S. dollar. Norfolk volume increased about 51,000 carloads, or 39%, and Baltimore volume was up about 28,000 carloads, or 102%.

Export coal tonnage in 2007 increased 25% compared to 2006, primarily due to increased demand reflecting a lower valued U.S. dollar as well as loading delays at Australian ports. Norfolk volume increased by approximately 26,000 cars, or 25%, and Baltimore volume was up approximately 4,500 cars, or 19%.

For 2009, export coal tonnage is expected to decrease, reflecting a significant reduction in worldwide steel production, increasing competition into Europe due to changes in ocean freight rates, and the strengthening of the U.S. dollar against other currencies.

**Domestic metallurgical** coal, coke, and iron ore tonnage increased 2% compared with 2007, reflecting the start up of a new coke plant.

In 2007, domestic metallurgical coal, coke, and iron ore tonnage decreased 14% compared with 2006. The decrease was primarily due to coke furnace outages, mine production outages, and reduced spot iron ore traffic.

For 2009, domestic metallurgical coal, coke, and iron ore tonnage is expected to be down due to lower domestic steel demand.

**Other coal** tonnage (principally steam coal shipped to industrial plants) decreased 13% in 2008 compared to 2007 principally due to coal supply constraints. In 2007, other coal tonnage increased 6% versus 2006, primarily due to new business and stronger demand.

For 2009, other coal tonnage is expected to be flat compared to 2008.

**GENERAL MERCHANDISE** revenues in 2008 increased $296 million, or 6%, compared with 2007, as a 15% increase in average revenue per unit, reflecting continued market-based pricing and higher fuel surcharges, more than offset an 8% decline in traffic volume.

In 2007, general merchandise revenues increased $90 million, or 2%, compared with 2006, as a 6% increase in average revenue per unit, more than offset a 4% decline in traffic volume. Revenue in 2007 included $26 million related to a volume-related contract settlement with an automotive customer.

**Agriculture, consumer products, and government** revenue increased 22% in 2008 compared with 2007. The revenue improvement resulted from higher average revenue per unit, which reflected increased rates and higher fuel surcharge revenues. Traffic volume increased 2% as more ethanol, military, feed, soybeans, and food oils shipments offset declines in fertilizers, corn, beverages, and consumer products.

Agriculture, consumer products, and government revenue increased 5% in 2007 compared with 2006. The revenue improvement resulted from higher average revenue per unit, which reflected higher rates. Traffic volume rose modestly as more corn, fertilizer, and ethanol shipments were mitigated by less government and consumer product volume.

For 2009, agriculture revenue is expected to post modest growth, benefiting from increasing demand for biofuel products including ethanol, biodiesel, and feed ingredients from their production, and slightly higher average revenue per unit (including fuel surcharges). However, lower volumes in corn, soybeans, and fertilizer shipments due to softer demand along with declines in consumer products markets are expected to partially offset this growth.

**Metals and construction** revenue increased 9% in 2008 as a 15% increase in average revenue per unit that resulted from increased rates and higher fuel surcharge more than offset the effects of a 5% decrease in traffic volume. The decline in volume was due to reduced demand for construction materials and lower coil, iron, and steel shipments, reflecting the weak housing and automotive sectors.

Metals and construction revenue decreased 2% in 2007 as a 5% increase in average revenue per unit that resulted from higher rates was more than offset by the effects of a 6% decrease in traffic volume. The decline in volume was principally due to lower iron, steel, and coil shipments and reduced demand for construction materials, both reflecting the soft automotive and housing sectors.

For 2009, metals and construction revenues are expected to decline as a result of decreased traffic volumes due to lower steel production in North America coupled with continued weakness in the housing and automotive sectors and lower average revenue per unit (including fuel surcharges).

**Chemicals** revenue in 2008 increased 6%, compared with 2007, a result of increased rates and higher fuel surcharge revenue. Traffic volume declined 8%, reflecting continued weakness in both industrial intermediates and plastics (linked to housing construction declines) in addition to miscellaneous chemicals and petroleum-based products.

In 2007, chemicals revenue increased 8% compared with 2006, reflecting higher rates in all groups. Traffic volume rose modestly as more shipments of industrial intermediates offset fewer shipments in the petroleum, miscellaneous chemicals, and plastics markets, which continued to reflect weakness in housing-related demand.

For 2009, chemicals revenue is expected to decline as a result of reduced volumes, reflecting a weak economic outlook with fewer housing starts and construction-related weaknesses, and lower average revenue per unit (including fuel surcharges).

**Paper, clay, and forest products** revenue increased 4% in 2008 compared with 2007 due to a 13% increase in average revenue per unit which more than offset an 8% decrease in traffic volume. The volume decline reflected the continued housing slowdown and increased trucking capacity available to paper customers.

Paper, clay, and forest products revenue decreased 3% in 2007 compared with 2006 as the effects of higher average revenue per unit were more than offset by an 8% decrease in traffic volume reflecting the housing slowdown and decline in conventional paper markets.

For 2009, paper, clay, and forest products revenues are expected to decline due to economy-related volume declines, including the effects of increased trucking capacity, and lower average revenue per unit (including fuel surcharges).

**Automotive** revenues decreased 16% in 2008 compared to 2007 as lower traffic volumes offset higher average revenue per unit. Volumes decreased 23%, reflecting reduced North American sales and production. Automotive manufacturers, especially the domestic producers, continued to experience significant sales declines during the year. Three assembly plants closed during the year and six implemented shift reductions. In addition, one manufacturer temporarily closed an assembly plant to retool for a new product in 2010. As of year end, Ford,

General Motors, and Chrysler combined operated 14 of 24 assembly plants served by NS. NS continues to monitor the state of the automotive industry and the collectability of the associated receivables.

Automotive revenues were flat in 2007 compared with 2006 as lower traffic volumes offset higher average revenue per unit. Revenue in 2007 included a $26 million volume-related contract settlement. Volume decreased 5%, reflecting softness in demand for vehicles as well as parts, and the closure in June 2007 of an NS-served plant.

For 2009, automotive revenues are expected to decrease reflecting continued production cutbacks and lower average revenue per unit (including fuel surcharges).

**INTERMODAL** revenues increased $137 million, or 7%, compared with 2007, as a 10% increase in average revenue per unit (including fuel surcharges) offset a 3% reduction in traffic volumes. Domestic volume (which includes truckload and intermodal marketing companies' [IMC] volumes) increased 8% compared with 2007, reflecting the relative fuel efficiency of intermodal versus over-the-road transportation and service improvements. International traffic volume declined 9%, primarily driven by the weak economy and less inland rail movement of West Coast port traffic that was partially offset by East Coast port volume growth. The Premium business, which includes parcel and less-than-truckload (LTL) carriers, decreased 6%, as reduced private empty movements and soft parcel business offset LTL conversions. Triple Crown Services Company (Triple Crown), a service with rail-to-highway trailers, experienced a 3% drop in volume primarily driven by reduced auto parts shipments.

Intermodal revenues in 2007 decreased $50 million, or 3%, compared with 2006, as a 4% reduction in traffic volumes offset a 2% increase in average revenue per unit. Truckload volume decreased 10% compared with 2006 and domestic IMC volume declined 4%. Traffic volume for Triple Crown dropped 3%. The declines for truckload, IMC, and Triple Crown were primarily due to lower national demand for dry van shipments resulting from continued weakness in the housing and automotive markets and increased over-the-road competition. International traffic volume decreased 4% reflecting reduced shipments of empty containers and less inland rail transportation of West Coast port traffic, which offset volume growth from East Coast port traffic. Premium business was up 2% reflecting gains in parcel shipments that offset modest declines in LTL shipper traffic.

For 2009, intermodal revenue is expected to decrease from 2008 primarily due to weak economic conditions, pressures from the drayage market and lower average revenue per unit (including fuel surcharges).

**Railway Operating Expenses**

Railway operating expenses in 2008 were $7.6 billion, up $730 million, or 11%, compared to 2007. Expenses in 2007 were about even with expenses in 2006. The increase in 2008 was primarily due to higher fuel costs and increased compensation and benefits expenses. The 2007 comparison reflected volume-related decreases offset by higher fuel expense.

The railway operating ratio, which measures the percentage of operating revenues consumed by operating expenses, improved to 71.1% in 2008, compared with 72.6% in 2007 and 72.8% in 2006.

The following table shows the changes in railway operating expenses summarized by major classifications.

**Operating Expense Variances**
Increases (Decreases)

| | 2008 vs. 2007 | 2007 vs. 2006 |
|---|---|---|
| | *($ in millions)* | |
| Compensation and benefits | $ 132 | $ (85) |
| Purchased services and rents | 48 | (27) |
| Fuel | 469 | 74 |
| Depreciation | 29 | 37 |
| Materials and other | 52 | (2) |
| Total | $ 730 | $ (3) |

**Compensation and benefits**, which represents 35% of total railway operating expenses, increased $132 million, or 5%, compared with 2007, primarily due to higher incentive compensation (up $66 million); increased wage rates (up $54 million); costs associated with lump-sum payments due under a new Brotherhood of Locomotive Engineers and Trainmen (BLET) agreement ($31 million); higher payroll taxes (up $15 million); and, the absence of the 2007 employment tax refund ($9 million). These were partially offset by lower costs associated with trainees (down $19 million), lower health and welfare benefits resulting from higher employee contributions (down $19 million), and lower stock-based compensation (down $7 million). In 2008, compensation and benefits expense benefited from a net pension credit of $39 million; however, primarily due to the market decline in pension assets (see Note 10), NS does not expect a similar benefit in 2009.

In 2007, compensation and benefits decreased $85 million, or 3%, compared with 2006, primarily due to lower incentive compensation (down $48 million), lower volume-related payroll (down $37 million), the absence of the prior year retirement and waiver agreements with former executives as well as the cost of the regular stock-based grant to the former Chief Executive Officer ($24 million), lower stock-based compensation (down $13 million), and lower payroll taxes (down $12 million). These were partially offset by increased wage rates (up $27 million) and higher medical costs (up $27 million).

NS employment averaged 30,709 in 2008 compared with 30,806 in 2007 and 30,541 in 2006. The increase in 2007 in the number of employees was almost exclusively in operating department personnel to improve service needs, as well as to prepare for expected retirements. NS continues to monitor forecasted volumes in light of current economic conditions to ensure appropriate employment levels for service needs.

**Purchased services and rents** includes the costs of services purchased from outside contractors, including the net costs of operating joint (or leased) facilities with other railroads and the net cost of equipment rentals. This category of expenses increased $48 million, or 3%, in 2008 compared to 2007, but decreased $27 million, or 2%, in 2007 compared to 2006.

Purchased services costs were $1,242 million in 2008, $1,172 million in 2007 and $1,165 million in 2006. The increase in 2008 reflected higher intermodal operations costs, transportation operating costs, and professional and legal services. In 2007, higher expenses for maintenance activities were largely offset by volume-related declines.

Equipment rents, which includes the cost to NS of using equipment (mostly freight cars) owned by other railroads or private owners less the rent paid to NS for the use of its equipment, amounted to $357 million, $379 million and $413 million for 2008, 2007 and 2006, respectively. The decreases in 2008 and 2007 were principally due to lower shipment volumes and improved fleet utilization.

**Fuel** expense, which includes the cost of locomotive fuel as well as other fuel used in railway operations, increased $469 million, or 40%, in 2008 compared with 2007, and increased $74 million, or 7%, in 2007 compared with 2006. Fuel expense is recorded net of hedge benefits, although there have been no such benefits since May 2006 when the program wound down (see "Market Risks and Hedging Activities," below and Note 16). The increase in 2008 reflected a 45% increase in the price per gallon of locomotive fuel offset in part by a 3% decline in consumption. The increase in 2007 reflected a 9% increase in the price per gallon of locomotive fuel as well as the absence of hedge benefits offset in part by a 4% decline in consumption.

Legislation enacted in the first quarter of 2005 repealed the 4.3¢ per gallon excise tax on railroad diesel fuel for 2007, with the following phased reductions in 2005 and 2006: 1¢ per gallon from January 1, 2005 through June 30, 2005; 2¢ per gallon from July 1, 2005 through December 31, 2006; and by the full 4.3¢ thereafter. NS consumes about 500 million gallons of locomotive diesel fuel per year.

**Depreciation** expense increased $29 million, or 4%, in 2008 compared to 2007, and $37 million, or 5%, in 2007 compared to 2006. In both years, substantial capital investments and improvements resulted in higher depreciation expense.

**Materials and other** expenses (including the estimates of costs related to personal injury, property damage, and environmental matters) increased $52 million, or 7%, in 2008 compared with 2007, but decreased $2 million in 2007 compared with 2006, as shown in the following table.

| | 2008 | 2007 | 2006 |
|---|---|---|---|
| | | *($ in millions)* | |
| Materials | $ 380 | $ 359 | $ 346 |
| Casualties and other claims | 180 | 171 | 220 |
| Other | 292 | 270 | 236 |
| | $ 852 | $ 800 | $ 802 |

The increase in 2008 was primarily due to costs associated with the Avondale Mills settlement related to the Graniteville accident (see below), as well as higher loss and damage claims and increased material costs for equipment and roadway repairs. These increases were partially offset by favorable personal injury claims development.

In April 2008, NS settled the lawsuit brought by Avondale Mills for claims associated with the January 6, 2005, derailment in Graniteville, SC. A portion of the settlement will not be reimbursed by insurance and was included in 2008 expenses. The total liability related to the derailment represents NS' best estimate based on current facts and circumstances. The estimate includes amounts related to business property damage and other economic losses, personal injury and individual property damage claims, as well as third-party response costs. NS' commercial insurance policies are expected to cover substantially all expenses related to this derailment above the unreimbursed portion and NS' self-insured retention, including NS' response costs and legal fees. The Consolidated Balance Sheets reflect current and long-term receivables for estimated recoveries from NS' insurance carriers. NS is engaged in arbitration with one of its insurance carriers that failed to respond to an insurance claim submitted by NS. NS believes these expenses are covered by the insurance policy and that recovery of the contested amount is probable, in that NS expects the arbitrator will determine the settlement amounts to be reasonable and that the insurer's refusal to consent to and to fund the settlement was a breach of contract. Accordingly, NS has recorded the full recovery attributable to such carrier ($100 million). In October 2008, another of NS' insurance carriers provided the preliminary findings of its review of NS' reimbursement request and reported that it may dispute a portion of that request. NS has initiated arbitration against the carrier

and believes that all expenses contained in the reimbursement request are covered by the insurance policy and that recovery is probable.

The decline in materials and other expense in 2007 was primarily due to lower derailment and personal injury costs, offset in part by higher property and other taxes, and increased materials costs for maintenance activities.

The largest component of casualties and other claims expense is personal injury costs. Cases involving occupational injuries comprised about 52% of total employee injury cases resolved and about 29% of total payments made. With its long-established commitment to safety, NS continues to work actively to eliminate all employee injuries and to reduce the associated costs. With respect to occupational injuries, which are not caused by a specific accident or event but allegedly result from a claimed exposure over time, the benefits of any existing safety initiatives may not be realized immediately. These types of claims are being asserted by former or retired employees, some of whom have not been actively employed in the rail industry for decades. The rail industry remains uniquely susceptible to litigation involving job-related accidental injury and occupational claims because of the Federal Employers' Liability Act (FELA), which is applicable only to railroads. FELA's fault-based system, which covers employee claims for job-related injuries, produces results that are unpredictable and inconsistent as compared with a no-fault workers' compensation system.

NS maintains substantial amounts of insurance for potential third-party liability and property damage claims. It also retains reasonable levels of risk through self-insurance (see Note 17). NS expects insurance costs to be slightly higher in 2009.

**Other Income – Net**

Other income – net was $110 million in 2008, $93 million in 2007, and $149 million in 2006 (see Note 2). The increase in 2008 reflected the absence of expenses related to synthetic fuel investments (see "Income Taxes" below), reduced other interest expense ($27 million) largely due to adjustments to reflect the outcome of certain tax examinations and higher coal royalties (up $12 million). These benefits were offset in part by lower returns and higher borrowing costs on corporate-owned life insurance (down $38 million), lower interest income (down $25 million), fewer gains on sales of property and investments (down $22 million), and lower equity in the earnings of Conrail (down $16 million), which reflects the absence of a tax audit settlement recorded by Conrail in 2007 ($18 million).

The decrease in 2007 reflected lower interest income ($31 million), higher expenses associated with synthetic fuel-related tax credit investments ($15 million), and lower returns from corporate-owned life insurance ($15 million) that combined to offset higher equity in earnings of Conrail ($20 million).

NS has membership interests representing ownership in companies that owned and operated facilities that produced synthetic fuel from coal. In addition, NS purchased two facilities that produced synthetic fuel from coal in 2007. The production of synthetic fuel resulted in tax credits as well as expenses related to the investments. The expenses are recorded as a component of "Other income – net," and the tax credits, as well as tax benefits related to the expenses, are reflected in "Provision for income taxes" (see further discussion below).

**Income Taxes**

Income tax expense in 2008 was $1 billion, for an effective rate of 38%, compared with effective rates of 35% in 2007 and 34% in 2006. The increase in the rate for 2008 was primarily due to the absence of synthetic fuel-related tax credits that expired at the end of 2007. The increase in the rate for 2007 largely resulted from Illinois tax legislation which increased deferred taxes by $19 million (see Note 3).

The tax credits generated by NS' synthetic fuel-related investments reduced the effective tax rate by 3% in 2007 and 2006. Net income in 2007 reflected $5 million less in net benefits from these credits, as compared with the same period of 2006, as shown below:

| | 2007 | 2006 |
|---|---|---|
| | ($ in millions) | |
| Effect in "Other income – net:" | | |
| Expenses on synthetic fuel-related investments | $ 77 | $ 62 |
| Effect in "Provision for income taxes:" | | |
| Tax credits | 60 | 56 |
| Tax benefit of expenses on synthetic-fuel related investments | 30 | 24 |
| Total reduction of income tax expense | 90 | 80 |
| Effect in "Net income:" | | |
| Net benefit from synthetic-fuel related investments | $ 13 | $ 18 |

During 2008, NS resolved both the Internal Revenue Service (IRS) examination of its 2004 and 2005 consolidated federal income tax returns and its appeal of the 2002 and 2003 IRS examination without a material effect in income tax expense. NS' consolidated federal income tax returns for 2006 and 2007 are being audited by the IRS.

## FINANCIAL CONDITION, LIQUIDITY, AND CAPITAL RESOURCES

**Cash provided by operating activities,** NS' principal source of liquidity, was $2.7 billion in 2008 compared with $2.3 billion in 2007 and $2.2 billion in 2006. The improvement in 2008 resulted from increased railway operating income and from bonus tax depreciation which reduced current tax payments. The improvement in 2007 resulted from favorable changes in working capital as well as a modest increase in income from railway operations. NS had working capital deficits of $106 million at December 31, 2008, and $273 million at December 31, 2007. The improvement was largely the result of increased cash and cash equivalents. NS expects that cash on hand combined with cash flow provided by operating activities will be sufficient to meet its ongoing obligations. NS' cash and cash equivalents balances totaled $618 million and $206 million at December 31, 2008 and 2007, respectively.

**Contractual obligations** at December 31, 2008, comprised of NS' long-term debt (including capital leases) (see Note 7), operating leases (see Note 8), agreements with CRC (see Note 4), unrecognized tax benefits (see Note 3), long-term advances from Conrail (see Note 4), and unconditional purchase obligations (see Note 17), were as follows:

**Payments Due By Period**

| | Total | 2009 | 2010-2011 | 2012-2013 | 2014 and Subsequent | Other |
|---|---|---|---|---|---|---|
| | | | ($ in millions) | | | |
| Long-term debt and capital lease principal | $ 6,667 | $ 484 | $ 686 | $ 79 | $ 5,418 | $ -- |
| Operating leases | 873 | 142 | 223 | 149 | 359 | -- |
| Agreements with CRC | 450 | 29 | 58 | 58 | 305 | -- |
| Unrecognized tax benefits* | 169 | 24 | -- | -- | -- | 145 |
| Long-term advances from Conrail | 133 | -- | -- | -- | 133 | -- |
| Unconditional purchase obligations | 119 | 100 | 19 | -- | -- | -- |
| Total | $ 8,411 | $ 779 | $ 986 | $ 286 | $ 6,215 | $ 145 |

* When the amount and timing of liabilities for unrecognized tax benefits can be reasonably estimated, the amount is shown in the table under the appropriate period. When the year of settlement cannot be reasonably estimated, the amount is shown in the Other column.

**Off balance sheet arrangements** consist of obligations related to operating leases, which are included in the table of contractual obligations above and disclosed in Note 8.

**Cash used in investing activities** was $1.2 billion in 2008, compared with $1 billion in 2007 and $684 million in 2006. The increase in 2008 primarily reflected increased property additions. The increase in 2007 primarily reflected lower net proceeds from short-term investment activities and increased property additions.

Property additions account for most of the recurring spending in this category. The following tables show capital spending (including capital leases) and track and equipment statistics for the past five years.

**Capital Expenditures**

| | 2008 | 2007 | 2006 | 2005 | 2004 |
|---|---|---|---|---|---|
| | | | ($ in millions) | | |
| Road and other property | $ 1,070 | $ 894 | $ 756 | $ 741 | $ 612 |
| Equipment | 488 | 447 | 422 | 284 | 429 |
| Total | $ 1,558 | $ 1,341 | $ 1,178 | $ 1,025 | $ 1,041 |

**Track Structure Statistics (Capital and Maintenance)**

| | 2008 | 2007 | 2006 | 2005 | 2004 |
|---|---|---|---|---|---|
| Track miles of rail installed | 459 | 401 | 327 | 302 | 246 |
| Miles of track surfaced | 5,209 | 5,014 | 4,871 | 4,663 | 5,055 |
| New crossties installed (millions) | 2.7 | 2.7 | 2.7 | 2.5 | 2.5 |

**Average Age of Owned Railway Equipment**

| | 2008 | 2007 | 2006 | 2005 | 2004 |
|---|---|---|---|---|---|
| | | | *(years)* | | |
| Freight cars | 29.9 | 30.1 | 30.0 | 29.4 | 28.6 |
| Locomotives | 18.9 | 18.1 | 17.7 | 17.4 | 16.9 |
| Retired locomotives | 34.4 | 30.0 | 35.0 | 27.4 | 22.9 |

For 2009, NS has budgeted $1.41 billion for capital expenditures. The anticipated spending includes $698 million for roadway projects, including the normalized replacement of rail, ties and ballast and the improvement or replacement of bridges. Planned equipment spending of $124 million provides for the acquisition of over 500 super jumbo covered hoppers and continued spending on improvements to the locomotive fleet, including the rebuild and upgrade of existing units. Planned investments in facilities and terminals total $141 million, primarily for intermodal terminals and equipment to add capacity to the intermodal network and bulk transfer facilities to support the ethanol market. Infrastructure investments of $170 million are planned for network improvements to increase mainline capacity as well as various public/private partnership investments such as the Heartland Corridor and the Chicago CREATE project. Norfolk Southern also expects to spend $67 million related to computers, systems and information technology. All capital expenditures are expected to be made with internally generated funds.

The Heartland Corridor is a package of proposed clearance improvements and other facilities that will create a seamless high-capacity intermodal route across Virginia and West Virginia to Midwest markets. During 2006, NS and the states of Ohio, West Virginia and Virginia each entered into a Memorandum of Agreement with the Federal Highway Administration with respect to the tunnel clearance component of the Heartland Corridor that governs the release of up to $95 million in authorized federal funding. In 2006, NS also entered into agreements with two states governing the use of up to $11 million in state funding for the Heartland Corridor rail double-stack clearance project. NS began work on the Heartland Corridor tunnel clearances in October 2007 and the entire project is expected to be completed in 2010. NS expects to spend about $100 million over 2009 and 2010 in connection with this project.

The Chicago Region Environmental and Transportation Efficiency (CREATE) project is a public-private partnership to reduce rail and highway congestion and add freight and passenger capacity in the metropolitan Chicago area. NS and other railroads have agreed to participate in CREATE. A portion of the public funding has been approved and the parties have developed a list of projects to be included in Phase I of the project. A total of $100 million in public funding has been secured for Phase I and the railroads have contributed an additional $100 million. The railroads expect to complete Phase I by the end of 2010. As currently planned, the total project is estimated to cost $1.5 billion with city, state and federal support. If additional public funding is secured, the railroads are expected to contribute a total of $232 million towards the entire project. NS expects to spend approximately $15 million in 2009 related to CREATE projects.

The Meridian Speedway is a 320 mile rail line between Meridian, Mississippi and Shreveport, Louisiana. On May 1, 2006, NS and Kansas City Southern (KCS) formed a joint venture, Meridian Speedway LLC (MSLLC),

pursuant to which NS would contribute $300 million in cash, substantially all of which will be used for capital improvements over a period of approximately three years, in exchange for a 30% interest in the joint venture. To date, NS has contributed $274 million. At the formation of MSLLC, KCS contributed the Meridian Speedway. NS is recognizing its pro rata share of the joint venture's earnings or loss as required under the equity method of accounting. NS' total investment in MSLLC is supported by the fair value of the rail line as well as intangible assets obtained through the transaction. The joint venture is expected to increase capacity and improve service over the Meridian Speedway into the Southeast.

Pan Am Southern LLC (PAS) will include the PAS Lines, which consist of a 155-mile main line track that runs between Mechanicville, New York and Ayer, Massachusetts, along with 281 miles of secondary and branch lines, including trackage rights in New York, Connecticut, Massachusetts, New Hampshire, and Vermont. PAS, when formed, will be a joint venture between NS and Pan Am Railways, Inc. (Pan Am) pursuant to which Pan Am expects to contribute the PAS Lines and NS expects to contribute cash and other property valued at $140 million, a significant portion of which will be used for capital improvements to the PAS Lines and the related construction of new intermodal and automotive terminals in the Albany, New York area. The joint venture is subject to regulatory approvals and other customary closing conditions.

The Crescent Corridor is a multistate network of infrastructure improvements and other facilities geared toward creating a seamless, high-capacity intermodal route spanning 11 states from New Jersey to Louisiana and offering truck-competitive service along several major interstate highway corridors, including I-81 and I-85, as well as I-20, I-40, I-59, and I-75. Based on the public benefits that stand to be derived in the form of highway congestion relief, NS plans to implement the Crescent Corridor through a series of public-private partnerships. Although there is not yet a single, integrated plan for the Crescent Corridor, preliminary work has begun and is slated to continue in 2009, including continued infrastructure improvements and other design and engineering work along the Virginia portion of the Corridor consistent with our matching obligation with respect to funds provided by the Commonwealth of Virginia. NS expects to spend approximately $30 million related to Crescent Corridor projects in 2009.

The MidAmerica Corridor is a proposed cooperative arrangement between NS and Canadian National Railway (CN) to effectively share track between Chicago, St. Louis, Kentucky, and Mississippi in order to establish more efficient routes for traffic moving between the mid-western and southeastern U.S., including potential coal traffic moving to NS-served southeastern utility plants from CN-served Illinois Basin coal producers. To implement the MidAmerica Corridor, NS, at its option, would expend funds during the next five years to upgrade the rail line operated by West Tennessee Railway between Fulton, Kentucky, and Corinth, Mississippi, a line over which NS would operate pursuant to recently obtained trackage rights. The MidAmerica Corridor arrangement is subject to negotiation of definitive agreements between NS and CN, regulatory approvals, and other customary closing conditions.

**Cash used in financing activities** was $1.1 billion in 2008, compared with $1.6 billion in 2007 and $1.3 billion in 2006. The decrease in 2008 reflected a net increase in debt, compared with a net decline in 2007, which was offset in part by higher dividend payments. The increase in 2007 reflected higher share repurchases as a part of NS' share repurchase program (see Note 13), as well as higher debt repayments and increased dividend payments.

Share repurchases totaled $1.1 billion in 2008, $1.2 billion in 2007, and $964 million in 2006 for the purchase and retirement of 19.4 million, 23.6 million, and 21.7 million shares, respectively, of common stock as part of NS' share repurchase program. In March 2007, NS' Board of Directors amended NS' share repurchase program by increasing the authorized amount of share repurchases from 50 million to 75 million shares and shortening the authorized period from 2015 to 2010. To date, almost all of the purchases under the program have been made with internally generated cash. However, future funding sources could include proceeds from the issuance of debt, including the use of the receivable securitization program (see Note 7). The timing and volume of purchases is guided by management's assessment of market conditions and other pertinent facts. Due to economic and market conditions,

NS reduced its share repurchases during the fourth quarter of 2008, and the amount of future purchases is uncertain due to the economic climate.

Through a private offering, NS issued and sold $600 million of unsecured notes in April 2008 (see Note 7), and subsequently exchanged substantially all of these unregistered securities with essentially identical securities registered under the Securities Act of 1933. In January 2009, through another private offering, NS issued $500 million of unsecured notes at 5.75% due 2016 (see Note 7). The net proceeds from the offering were $494 million after deducting the purchase discount and expenses. NS has agreed to exchange the unregistered securities with essentially identical securities registered under the Securities Act of 1933.

Subsequent to the January 2009 offering, NS has remaining authority from its board of directors to issue and sell up to $500 million of additional debt or equity securities through public or private sale. The Form S-3 shelf registration statements previously filed with the Securities and Exchange Commission (SEC) are no longer effective under SEC's Rule 415(a)(5), which provides for a three-year term. NS expects to file a new Form S-3 registration statement during the first quarter of 2009.

NS has in place and available a $1 billion, five-year credit agreement expiring in 2012, which provides for borrowings at prevailing rates and includes covenants. NS had no amounts outstanding under this facility at December 31, 2008, and NS is in compliance with all of the covenants. NS also has an accounts receivable securitization program which was renewed with a new 364-day term ending in October 2009. In addition, NS has the ability to directly access the debt markets.

Looking forward, NS' annual debt maturities are relatively modest and stable from year to year (see Note 7). NS expects to refinance maturing debt over the next several years and modestly increase current debt levels. Overall, NS' goal is to maintain a capital structure with appropriate leverage to support NS' business strategy and provide flexibility through business cycles.

## APPLICATION OF CRITICAL ACCOUNTING ESTIMATES

The preparation of financial statements in accordance with U.S. generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenues and expenses during the reporting period. These estimates and assumptions may require significant judgment about matters that are inherently uncertain, and future events are likely to occur that may require management to make changes to these estimates and assumptions. Accordingly, management regularly reviews these estimates and assumptions based on historical experience, changes in the business environment, and other factors that management believes to be reasonable under the circumstances. Management regularly discusses the development, selection, and disclosures concerning critical accounting estimates with the Audit Committee of its Board of Directors.

### Pensions and Other Postretirement Benefits

Accounting for pensions and other postretirement benefit plans requires management to make several estimates and assumptions (see Note 10). These include the expected rate of return from investment of the plans' assets, projected increases in medical costs, and the expected retirement age of employees as well as their projected earnings and mortality. In addition, the amounts recorded are affected by changes in the interest rate environment because the associated liabilities are discounted to their present value. Management makes these estimates based on the company's historical experience and other information that it deems pertinent under the circumstances (for example, expectations of future stock market performance). Management utilizes an independent consulting actuarial firm's studies to assist it in selecting appropriate assumptions and valuing its related liabilities.

NS' net pension benefit, which is included in "Compensation and benefits" on its Consolidated Statements of Income, was $39 million for the year ended December 31, 2008. In recording this amount, NS assumed a long-term investment rate of return of 9%, which was supported by the long-term total rate of return on plan assets since inception. Given the uncertain economic outlook and the recent volatility in corporate bond indices, management reduced its long-term investment rate of return to 8.75% for 2009. A one percentage point change to this rate of return assumption would result in an $18 million change to the pension credit and, as a result, an equal change in "Compensation and benefits" expense. Changes that are reasonably likely to occur in assumptions concerning retirement age, projected earnings, and mortality would not be expected to have a material effect on NS' net pension benefit or net pension liability in the future. The net pension liability is recorded at its net present value using a discount rate that is based on the current interest rate environment in light of the timing of expected benefit payments. In 2008 and 2007, NS utilized an analysis in which the projected annual cash flows from the pension and postretirement benefit plans were matched with a yield curve based on an appropriate universe of high-quality corporate bonds. NS used the results of the yield curve to select the discount rate that matches the payment stream of the benefits in these plans. In 2006, NS referred to Moody's seasoned Aa corporate bond yields and the changes in such yields in establishing the discount rate.

NS' net cost for other postretirement benefits, which is also included in "Compensation and benefits," was $69 million for the year ended December 31, 2008. In recording this expense and valuing the net liability for other postretirement benefits, which is included in "Other postretirement benefits," management estimated future increases in health-care costs. These assumptions, along with the effect of a one percentage point change in them, are described in Note 10.

**Properties and Depreciation**

Most of NS' total assets are long-lived railway properties (see Note 5). As disclosed in Note 1, NS' properties are depreciated using group depreciation. Rail is depreciated primarily on the basis of use measured by gross-ton miles. Other properties are depreciated generally using the straight-line method over the lesser of estimated service or lease lives. NS reviews the carrying amount of properties whenever events or changes in circumstances indicate that such carrying amount may not be recoverable based on future undiscounted cash flows. Assets that are deemed impaired as a result of such review are recorded at the lesser of carrying amount or fair value.

NS' depreciation expense is based on management's assumptions concerning service lives of its properties as well as the expected net salvage that will be received upon their retirement. In developing these assumptions, NS' management utilizes periodic depreciation studies that are performed by an outside firm of consulting engineers. These studies analyze NS' historical patterns of asset use and retirement and take into account any expected change in operation or maintenance practices. NS' recent experience with these studies has been that while they do result in changes in the rates used to depreciate its properties, these changes have not caused a significant effect to its annual depreciation expense. The studies may also indicate that the recorded amount of accumulated depreciation is deficient (or in excess) of the amount indicated by the study. Any such deficiency (or excess) is amortized as a component of depreciation expense over the remaining service lives of the affected class of property. NS' depreciation expense for the year ended December 31, 2008, amounted to $804 million. NS' weighted-average depreciation rates for 2008 are disclosed in Note 5; a one-tenth percentage point increase (or decrease) in these rates would have resulted in a $28 million increase (or decrease) to depreciation expense.

**Personal Injury, Environmental, and Legal Liabilities**

NS' expense for casualties and other claims, included in "Materials and other," amounted to $180 million for the year ended December 31, 2008. Most of this expense was NS' accrual related to personal injury liabilities. Job-related personal injury and occupational claims are subject to FELA, which is applicable only to railroads. FELA's fault-based tort system produces results that are unpredictable and inconsistent as compared with a no-

fault worker's compensation system. The variability inherent in this system could result in actual costs being very different from the liability recorded. In all cases, NS records a liability when the expected loss for the claim is both probable and estimable.

To aid in valuing its personal injury liability and determining the amount to accrue during the year, NS' management utilizes studies prepared by an independent consulting actuarial firm. For employee personal injury cases, the actuarial firm studies NS' historical patterns of reserving for claims and subsequent settlements, taking into account relevant outside influences. An estimate of the ultimate amount of the liability, which includes amounts for incurred but unasserted claims, is based on the results of this analysis. For occupational injury claims, the actuarial firm studies NS' history of claim filings, severity, payments and other relevant facts. Additionally, the estimate of the ultimate loss for occupational injuries includes a provision for those claims that have been incurred but not reported by projecting NS' experience into the future as far as can be reasonably determined. NS has recorded this actuarially determined liability. The liability is dependent upon many individual judgments made as to the specific case reserves as well as the judgments of the consulting actuary and management in the periodic studies. Accordingly, there could be significant changes in the liability, which NS would recognize when such a change became known. The most recent actuarial study, completed in the fourth quarter of 2008, resulted in a decrease to NS' personal injury liability during the fourth quarter. While the liability recorded is supported by the most recent study, it is reasonably possible that the ultimate liability could be higher or lower.

NS is subject to various jurisdictions' environmental laws and regulations. It is NS' policy to record a liability where such liability or loss is probable and its amount can be estimated reasonably (see Note 17). Claims, if any, against third parties for recovery of cleanup costs incurred by NS, are reflected as receivables (when collection is probable) in the Consolidated Balance Sheets and are not netted against the associated NS liability. Environmental engineers regularly participate in ongoing evaluations of all known sites and in determining any necessary adjustments to liability estimates. NS also has established an Environmental Policy Council, composed of senior managers, to oversee and interpret its environmental policy.

Operating expenses for environmental matters totaled approximately $18 million in 2008, $16 million in 2007 and $19 million in 2006, and capital expenditures for environmental matters totaled approximately $7 million in both 2008 and 2007, and $6 million in 2006. Capital expenditures for environmental matters in 2009 are expected to be about $9 million.

NS' Consolidated Balance Sheets included liabilities for environmental exposures in the amount of $42 million at December 31, 2008, and $46 million at December 31, 2007 (of which $12 million is classified as a current liability at the end of each period). At December 31, 2008, the liability represented NS' estimate of the probable cleanup and remediation costs based on available information at 148 known locations. As of that date, 13 sites accounted for $22 million of the liability, and no individual site was considered to be material. NS anticipates that much of this liability will be paid out over five years; however, some costs will be paid out over a longer period.

At 30 locations, one or more NS subsidiaries, usually in conjunction with a number of other parties, have been identified as potentially responsible parties by the Environmental Protection Agency (EPA) or similar state authorities under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, or comparable state statutes, which often impose joint and several liability for cleanup costs.

With respect to known environmental sites (whether identified by NS or by the EPA or comparable state authorities), estimates of NS' ultimate potential financial exposure for a given site or in the aggregate for all such sites are necessarily imprecise because of the widely varying costs of currently available cleanup techniques, the likely development of new cleanup technologies, the difficulty of determining in advance the nature and full extent of contamination and each potential participant's share of any estimated loss (and that participant's ability to bear it), and evolving statutory and regulatory standards governing liability. NS

estimates its environmental remediation liability on a site-by-site basis, using assumptions and judgments that management deems appropriate for each site. As a result, it is not practical to quantitatively describe the effects of changes in these many assumptions and judgments. NS has consistently applied its methodology of estimating its environmental liabilities.

On April 24, 2008, the United States Department of Justice (DOJ) brought an action against NS for alleged violations of federal environmental laws resulting from the discharge of chlorine and oil that occurred as a result of the January 6, 2005, derailment in Graniteville, SC, including claims for civil penalties as well as injunctive relief. On June 24, 2008, NS filed a motion to dismiss DOJ's claims, contending that insufficient facts have been alleged to support such claims. NS does not believe that the outcome of these proceedings will have a material effect on its financial position, results of operations, or liquidity.

Based on an assessment of known facts and circumstances, management believes that it is unlikely that any such known facts and circumstances, either individually or in the aggregate, will have a material adverse effect on NS' financial position, results of operations, or liquidity.

Norfolk Southern and certain subsidiaries are defendants in numerous lawsuits and other claims relating principally to railroad operations. When management concludes that it is probable that a liability has been incurred and the amount of the liability can be reasonably estimated, it is accrued through a charge to expenses. While the ultimate amount of liability incurred in any of these lawsuits and claims is dependent on future developments, in management's opinion the recorded liability, if any, is adequate to cover the future payment of such liability and claims. However, the final outcome of any of these lawsuits and claims cannot be predicted with certainty, and unfavorable or unexpected outcomes could result in additional accruals that could be significant to results of operations in a particular year or quarter. Any adjustments to recorded liabilities will be reflected in expenses in the periods in which such adjustments are known.

**Income Taxes**

NS' net long-term deferred tax liability totaled $6.4 billion at December 31, 2008 (see Note 3). This liability is estimated based on the expected future tax consequences of items recognized in the financial statements. After application of the federal statutory tax rate to book income, judgment is required with respect to the timing and deductibility of expenses in the corporate income tax returns. For state income and other taxes, judgment is also required with respect to the apportionment among the various jurisdictions. A valuation allowance is recorded if management expects that it is more likely than not that its deferred tax assets will not be realized. NS had an $11 million valuation allowance on $991 million of deferred tax assets as of December 31, 2008, reflecting the expectation that most of these assets will be realized.

In addition, NS has a recorded liability for its estimate of uncertain tax positions taken or expected to be taken in a tax return. Judgment is required in evaluating the application of federal and state tax laws and assessing whether it is more likely than not that a tax position will be sustained on examination and, if so, judgment is also required as to the measurement of the amount of tax benefit that will be realized upon settlement with the taxing authority. Management believes this liability for uncertain tax positions to be adequate. Income tax expense is adjusted in the period in which new information about a tax position becomes available or the final outcome differs from the amounts recorded. For every one half percent change in the 2008 effective tax rate net income would have changed by $14 million.

## OTHER MATTERS

### Labor Agreements

Approximately 26,000, or about 85%, of NS' railroad employees are covered by collective bargaining agreements with various labor unions. These agreements remain in effect until changed pursuant to the Railway Labor Act (RLA). NS largely bargains nationally, in concert with other major railroads. Moratorium provisions in the labor agreements govern when the railroads and the unions may propose changes.

The most recent national bargaining round began in late 2004. Since that time, the railroads have reached national agreements that extend through 2009 with all of the rail unions. Additionally, the current agreement with BLET extends through 2014. Because NS has reached separate agreements with the BLET and the American Train Dispatchers Association (ATDA), only the health and welfare provisions from the national agreements apply to NS' locomotive engineers and ATDA-represented dispatchers. A small number of longshoremen at Ashtabula (Ohio) Docks are represented by the International Longshoremen's Association (ILA) and do not participate in national bargaining. Negotiations are continuing with that organization.

### Market Risks and Hedging Activities

NS has used derivative financial instruments to reduce the risk of volatility in its diesel fuel costs and to manage its overall exposure to fluctuations in interest rates.

In 2001, NS began a program to hedge a portion of its diesel fuel consumption. The intent of the program was to assist in the management of NS' aggregate risk exposure to fuel price fluctuations, which can significantly affect NS' operating margins and profitability, through the use of one or more types of derivative instruments. No new hedges have been entered into since May 2004, and the last remaining contracts were settled in the second quarter of 2006, bringing an end to the benefits from the program. Locomotive diesel fuel costs represented 14% of NS' operating expenses for 2006.

NS manages its overall exposure to fluctuations in interest rates by issuing both fixed- and floating-rate debt instruments and by entering into interest-rate hedging transactions to achieve an appropriate mix within its debt portfolio.

At December 31, 2008, NS' debt subject to interest rate fluctuations totaled $317 million. A 1% point increase in interest rates would increase NS' total annual interest expense related to all its variable debt by approximately $3 million. Management considers it unlikely that interest rate fluctuations applicable to these instruments will result in a material adverse effect on NS' financial position, results of operations, or liquidity.

Some of NS' capital leases, which carry an average fixed rate of 7%, were effectively converted to variable rate obligations using interest rate swap agreements. On December 31, 2008, the average pay rate under these agreements was 3%, and the average receive rate was 7%. During 2008 and 2007, the effect of the swaps was to reduce interest expense by approximately $1 million in both periods. A portion of the lease obligations is payable in Japanese yen. NS eliminated the associated exchange rate risk at the inception of each lease with a yen deposit sufficient to fund the yen-denominated obligation. Most of these deposits are held by foreign banks, primarily Japanese. As a result, NS is exposed to financial market risk relative to Japan. Counterparties to the interest rate swaps and Japanese banks holding yen deposits are major financial institutions believed by management to be creditworthy.

**New Accounting Pronouncements**

In September 2006, the Financial Accounting Standards Board issued Statement of Financial Accounting Standards (SFAS) No. 157, "Fair Value Measurements." This statement, effective for interim or annual reporting periods beginning after November 15, 2007, establishes a framework for measuring fair value in U.S. generally accepted accounting principles and expands disclosures about fair value measurements. Effective January 1, 2008, NS adopted this standard related to financial instrument assets and liabilities with no effect on NS' consolidated financial statements. NS will adopt the provisions of this standard relative to nonfinancial assets and nonfinancial liabilities that are not remeasured at fair value on a recurring basis in the first quarter of 2009. NS does not expect that it will have an effect on NS' consolidated financial statements.

In June 2008, the FASB issued FASB Staff Position (FSP) Emerging Issues Task Force (EITF) 03-6-1, "Determining Whether Instruments Granted in Share-Based Payment Transactions are Participating Securities." This FSP addresses whether instruments granted in share-based payment transactions are participating securities prior to vesting and, therefore, need to be included in the earnings allocation in computing earnings per share under the two-class method as described in SFAS No. 128, "Earnings per Share." NS will adopt the FSP, which affects the calculation of earnings per share, in the first quarter of 2009. The provisions of the FSP are to be applied retrospectively. NS expects that it will not have a material effect on NS' consolidated financial statements.

FSP No. 132(R)-1, "Employers' Disclosures about Postretirement Benefit Plan Assets," was issued on December 30, 2008. This statement, effective for fiscal years ending after December 15, 2009, clarifies an employer's disclosures about plan assets of a defined benefit pension or other postretirement plan. This statement prescribes expanded disclosures regarding investment allocation decisions, categories of plan assets, inputs, and valuation techniques used to measure fair value, the effect of Level 3 inputs on changes in plan assets and significant concentrations of risk. NS will adopt the FSP at the end of 2009 and expects it will not have a material effect on NS' consolidated financial statements.

In December 2007, the FASB issued SFAS No. 160 (SFAS 160), "Noncontrolling Interests in Consolidated Financial Statements," which requires that noncontrolling (minority) interests be reported as a component of equity. NS will adopt the statement in the first quarter of 2009 and expects it will not have a material effect on NS' consolidated financial statements.

**Inflation**

In preparing financial statements, U.S. generally accepted accounting principles require the use of historical cost that disregards the effects of inflation on the replacement cost of property. NS, a capital-intensive company, has most of its capital invested in such property. The replacement cost of these assets, as well as the related depreciation expense, would be substantially greater than the amounts reported on the basis of historical cost.

**Proposed Legislation and Regulations on Safety and Transportation of Hazardous Materials**

Federal regulations were adopted in late 2008 on safety and transportation of hazardous materials. NS is in compliance with those regulations currently effective and expects to be in compliance with those regulations to become effective at a later date.

**FORWARD-LOOKING STATEMENTS**

This Management's Discussion and Analysis of Financial Condition and Results of Operations contains forward-looking statements that may be identified by the use of words like "believe," "expect," "anticipate" and "project." Forward-looking statements reflect management's good-faith evaluation of information currently available.

However, such statements are dependent on and, therefore, can be influenced by, a number of external variables over which management has little or no control, including: domestic and international economic conditions; interest rates; the business environment in industries that produce and consume rail freight; competition and consolidation within the transportation industry; the operations of carriers with which NS interchanges; acts of terrorism or war; fluctuation in prices of key materials, in particular diesel fuel; labor difficulties, including strikes and work stoppages; legislative and regulatory developments; results of litigation; changes in securities and capital markets; disruptions to NS' technology infrastructure, including computer systems; and natural events such as severe weather, hurricanes, and floods. For a discussion of significant risk factors applicable to NS, see Part I, Item 1A "Risk Factors." Forward-looking statements are not, and should not be relied upon as, a guarantee of future performance or results, nor will they necessarily prove to be accurate indications of the times at or by which any such performance or results will be achieved. As a result, actual outcomes and results may differ materially from those expressed in forward-looking statements. NS undertakes no obligation to update or revise forward-looking statements.

**Item 7A. Quantitative and Qualitative Disclosures about Market Risk**

The information required by this item is included in Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations" under the heading "Market Risks and Hedging Activities."

**Item 8. Financial Statements and Supplementary Data**

## INDEX TO FINANCIAL STATEMENTS


| | Page |
|---|---|
| Report of Management | K42 |
| Reports of Independent Registered Public Accounting Firm | K43 |
| Consolidated Statements of Income<br>Years ended December 31, 2008, 2007 and 2006 | K45 |
| Consolidated Balance Sheets<br>As of December 31, 2008 and 2007 | K46 |
| Consolidated Statements of Cash Flows<br>Years ended December 31, 2008, 2007 and 2006 | K47 |
| Consolidated Statements of Changes in Stockholders' Equity<br>Years ended December 31, 2008, 2007 and 2006 | K48 |
| Notes to Consolidated Financial Statements | K49 |
| The Index to Consolidated Financial Statement Schedule in Item 15 | K82 |

**Report of Management**

February 18, 2009

To the Stockholders
Norfolk Southern Corporation

Management is responsible for establishing and maintaining adequate internal control over financial reporting. In order to ensure that the Corporation's internal control over financial reporting is effective, management regularly assesses such controls and did so most recently for its financial reporting as of December 31, 2008. This assessment was based on criteria for effective internal control over financial reporting described in *Internal Control-Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this assessment, management has concluded that the Corporation maintained effective internal control over financial reporting as of December 31, 2008.

KPMG LLP, independent registered public accounting firm, has audited the Corporation's financial statements and issued an attestation report on the Corporation's internal control over financial reporting as of December 31, 2008.

/s/ Charles W. Moorman
Charles W. Moorman
Chairman, President and
Chief Executive Officer

/s/ James A. Squires
James A. Squires
Executive Vice President Finance and
Chief Financial Officer

/s/ Marta R. Stewart
Marta R. Stewart
Vice President and
Controller

**Report of Independent Registered Public Accounting Firm**

The Board of Directors and Stockholders
Norfolk Southern Corporation:

We have audited Norfolk Southern Corporation's internal control over financial reporting as of December 31, 2008, based on criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Norfolk Southern Corporation's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Report of Management. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, Norfolk Southern Corporation maintained, in all material respects, effective internal control over financial reporting as of December 31, 2008, based on criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Norfolk Southern Corporation and subsidiaries as of December 31, 2008 and 2007, and the related consolidated statements of income, changes in stockholders' equity, and cash flows for each of the years in the three-year period ended December 31, 2008, and our report dated February 18, 2009 expressed an unqualified opinion on those consolidated financial statements.

/s/ KPMG LLP
Norfolk, Virginia
February 18, 2009

**Report of Independent Registered Public Accounting Firm**

The Board of Directors and Stockholders
Norfolk Southern Corporation:

We have audited the accompanying consolidated balance sheets of Norfolk Southern Corporation and subsidiaries as of December 31, 2008 and 2007, and the related consolidated statements of income, changes in stockholders' equity, and cash flows for each of the years in the three-year period ended December 31, 2008. In connection with our audits of the consolidated financial statements, we also have audited financial statement schedule as listed in Item 15(A)2. These consolidated financial statements and financial statement schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements and financial statement schedule based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Norfolk Southern Corporation and subsidiaries as of December 31, 2008 and 2007, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 2008, in conformity with U.S. generally accepted accounting principles. Also in our opinion, the related financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

As discussed in note 1 to the consolidated financial statements, Norfolk Southern Corporation adopted Financial Accounting Standards Board Interpretation No. 48, *Accounting for Uncertainty in Income Taxes*, effective January 1, 2007 and Statement of Financial Accounting Standards No. 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans,* effective December 31, 2006.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), Norfolk Southern Corporation's internal control over financial reporting as of December 31, 2008, based on criteria established in *Internal Control – Integrated Framework,* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated February 18, 2009 expressed an unqualified opinion on the effectiveness of the Company's internal control over financial reporting.

/s/ KPMG LLP
Norfolk, Virginia
February 18, 2009

**Norfolk Southern Corporation and Subsidiaries**
**Consolidated Statements of Income**

| | Years ended December 31, | | |
|---|---|---|---|
| | **2008** | **2007** | **2006** |
| | *($ in millions, except earnings per share)* | | |
| **Railway operating revenues** | $ 10,661 | $ 9,432 | $ 9,407 |
| **Railway operating expenses:** | | | |
| Compensation and benefits | 2,684 | 2,552 | 2,637 |
| Purchased services and rents | 1,599 | 1,551 | 1,578 |
| Fuel | 1,638 | 1,169 | 1,095 |
| Depreciation | 804 | 775 | 738 |
| Materials and other | 852 | 800 | 802 |
| Total railway operating expenses | 7,577 | 6,847 | 6,850 |
| **Income from railway operations** | 3,084 | 2,585 | 2,557 |
| Other income – net | 110 | 93 | 149 |
| Interest expense on debt | 444 | 441 | 476 |
| Income before income taxes | 2,750 | 2,237 | 2,230 |
| Provision for income taxes | 1,034 | 773 | 749 |
| **Net income** | $ 1,716 | $ 1,464 | $ 1,481 |
| **Per share amounts:** | | | |
| Net income | | | |
| Basic | $ 4.60 | $ 3.74 | $ 3.63 |
| Diluted | $ 4.52 | $ 3.68 | $ 3.57 |

*See accompanying notes to consolidated financial statements.*

**Norfolk Southern Corporation and Subsidiaries**
**Consolidated Balance Sheets**

| | As of December 31, 2008 | As of December 31, 2007 |
|---|---|---|
| | ($ in millions) | |
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 618 | $ 206 |
| Accounts receivable – net | 870 | 942 |
| Materials and supplies | 194 | 176 |
| Deferred income taxes | 149 | 190 |
| Other current assets | 168 | 161 |
| Total current assets | 1,999 | 1,675 |
| Investments | 1,779 | 1,974 |
| Properties less accumulated depreciation | 22,247 | 21,583 |
| Other assets | 272 | 912 |
| **Total assets** | $ 26,297 | $ 26,144 |
| **Liabilities and stockholders' equity** | | |
| Current liabilities: | | |
| Accounts payable | $ 1,140 | $ 1,139 |
| Income and other taxes | 261 | 203 |
| Other current liabilities | 220 | 237 |
| Current maturities of long-term debt | 484 | 369 |
| Total current liabilities | 2,105 | 1,948 |
| Long-term debt | 6,183 | 5,999 |
| Other liabilities | 2,030 | 2,039 |
| Deferred income taxes | 6,372 | 6,431 |
| **Total liabilities** | 16,690 | 16,417 |
| Stockholders' equity: | | |
| Common stock $1.00 per share par value, 1,350,000,000 shares authorized; outstanding 366,233,106 and 379,297,891 shares, respectively, net of treasury shares | 368 | 380 |
| Additional paid-in capital | 1,680 | 1,466 |
| Accumulated other comprehensive loss | (942) | (399) |
| Retained income | 8,501 | 8,280 |
| **Total stockholders' equity** | 9,607 | 9,727 |
| **Total liabilities and stockholders' equity** | $ 26,297 | $ 26,144 |

*See accompanying notes to consolidated financial statements.*

**Norfolk Southern Corporation and Subsidiaries**
**Consolidated Statements of Cash Flows**

| | Years Ended December 31, 2008 | 2007 | 2006 |
|---|---|---|---|
| | ($ in millions) | | |
| **Cash flows from operating activities** | | | |
| Net income | $ 1,716 | $ 1,464 | $ 1,481 |
| Reconciliation of net income to net cash provided by operating activities: | | | |
| Depreciation | 815 | 786 | 750 |
| Deferred income taxes | 290 | 125 | (8) |
| Gains and losses on properties and investments | (29) | (51) | (54) |
| Changes in assets and liabilities affecting operations: | | | |
| Accounts receivable | 269 | 30 | (60) |
| Materials and supplies | (18) | (25) | (19) |
| Other current assets | (8) | (17) | (11) |
| Current liabilities other than debt | (262) | 38 | 38 |
| Other – net | (58) | (17) | 89 |
| Net cash provided by operating activities | 2,715 | 2,333 | 2,206 |
| **Cash flows from investing activities** | | | |
| Property additions | (1,558) | (1,341) | (1,178) |
| Property sales and other transactions | 109 | 124 | 119 |
| Investments, including short-term | (86) | (635) | (1,804) |
| Investment sales and other transactions | 307 | 827 | 2,179 |
| Net cash used in investing activities | (1,228) | (1,025) | (684) |
| **Cash flows from financing activities** | | | |
| Dividends | (456) | (377) | (278) |
| Common stock issued – net | 229 | 183 | 297 |
| Purchase and retirement of common stock | (1,128) | (1,196) | (964) |
| Proceeds from borrowings | 1,425 | 250 | -- |
| Debt repayments | (1,145) | (489) | (339) |
| Net cash used in financing activities | (1,075) | (1,629) | (1,284) |
| Net increase (decrease) in cash and cash equivalents | 412 | (321) | 238 |
| **Cash and cash equivalents** | | | |
| At beginning of year | 206 | 527 | 289 |
| At end of year | $ 618 | $ 206 | $ 527 |
| **Supplemental disclosure of cash flow information** | | | |
| Cash paid during the year for: | | | |
| Interest (net of amounts capitalized) | $ 421 | $ 441 | $ 473 |
| Income taxes (net of refunds) | $ 615 | $ 603 | $ 692 |

*See accompanying notes to consolidated financial statements.*

**Norfolk Southern Corporation and Subsidiaries**
**Consolidated Statements of Changes in Stockholders' Equity**

| | Common Stock | Additional Paid-in Capital | Unearned Restricted Stock | Accum. Other Compre-hensive Loss | Retained Income | Total |
|---|---|---|---|---|---|---|
| | *($ in millions, except per share amounts)* | | | | | |
| **Balance December 31, 2005** | $ 411 | $ 992 | $ (17) | $ (77) | $ 7,967 | $ 9,276 |
| Comprehensive income | | | | | | |
| Net income | | | | | 1,481 | 1,481 |
| Other comprehensive income | | | | 2 | | 2 |
| Total comprehensive income | | | | | | 1,483 |
| Adoption of SFAS 158, net of tax | | | | (294) | | (294) |
| Dividends on Common Stock, $0.68 per share | | | | | (278) | (278) |
| Share repurchases | (22) | (63) | | | (879) | (964) |
| Stock-based compensation, including tax benefit of $85 | 9 | 372 | 17 | | (8) | 390 |
| Other | | 2 | | | | 2 |
| **Balance December 31, 2006** | $ 398 | $ 1,303 | $ -- | $ (369) | $ 8,283 | $ 9,615 |
| Comprehensive income | | | | | | |
| Net income | | | | | 1,464 | 1,464 |
| Other comprehensive loss | | | | (30) | | (30) |
| Total comprehensive income | | | | | | 1,434 |
| Adoption of FIN 48, net of tax | | | | | 10 | 10 |
| Dividends on Common Stock, $0.96 per share | | | | | (377) | (377) |
| Share repurchases | (24) | (81) | | | (1,091) | (1,196) |
| Stock-based compensation, including tax benefit of $57 | 6 | 238 | | | (9) | 235 |
| Other | | 6 | | | | 6 |
| **Balance December 31, 2007** | $ 380 | $ 1,466 | $ -- | $ (399) | $ 8,280 | $ 9,727 |
| Net income | | | | | 1,716 | 1,716 |
| Other comprehensive loss | | | | (543) | | (543) |
| Total comprehensive income | | | | | | 1,173 |
| Dividends on Common Stock, $1.22 per share | | | | | (456) | (456) |
| Share repurchases | (19) | (79) | | | (1,030) | (1,128) |
| Stock-based compensation, including tax benefit of $76 | 6 | 287 | | | (9) | 284 |
| Other | 1 | 6 | | | | 7 |
| **Balance December 31, 2008** | $ 368 | $ 1,680 | $ -- | $ (942) | $ 8,501 | $ 9,607 |

*See accompanying notes to consolidated financial statements.*

**Norfolk Southern Corporation and Subsidiaries**
**Notes to Consolidated Financial Statements**

The following Notes are an integral part of the Consolidated Financial Statements.

## 1. Summary of Significant Accounting Policies

### Description of Business

Norfolk Southern Corporation is a Virginia-based holding company engaged principally in the rail transportation business, operating approximately 21,000 route miles primarily in the East and Midwest. These consolidated financial statements include Norfolk Southern Corporation (Norfolk Southern) and its majority-owned and controlled subsidiaries (collectively, NS). Norfolk Southern's major subsidiary is Norfolk Southern Railway Company (NSR). All significant intercompany balances and transactions have been eliminated in consolidation.

NSR and its railroad subsidiaries transport raw materials, intermediate products and finished goods classified in the following market groups (percent of total railway operating revenues in 2008): coal (29%); intermodal (19%); agriculture/consumer products/government (12%); metals/construction (12%); chemicals (12%); paper/clay/forest products (8%); and automotive (8%). Although most of NS' customers are domestic, ultimate points of origination or destination for some of the products transported (particularly coal bound for export and some intermodal containers) may be outside the United States. Approximately 85% of NS' railroad employees are covered by collective bargaining agreements with various labor unions.

### Use of Estimates

The preparation of financial statements in accordance with U.S. generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Management periodically reviews its estimates, including those related to the recoverability and useful lives of assets, as well as liabilities for litigation, environmental remediation, casualty claims, income taxes, and pension and other postretirement benefits. Changes in facts and circumstances may result in revised estimates.

### Revenue Recognition

Transportation revenue is recognized proportionally as a shipment moves from origin to destination and related expenses are recognized as incurred. Refunds (which are primarily volume-based incentives) are recorded as a reduction to revenues on the basis of management's best estimate of projected liability, which is based on historical activity, current traffic counts and the expectation of future activity. NS regularly monitors its contract refund liability, and historically, the estimates have not differed significantly from the amounts ultimately refunded. Switching, demurrage and other incidental service revenues are recognized when the services are performed.

### Derivatives

NS does not engage in the trading of derivatives. NS has used derivative financial instruments to reduce the risk of volatility in its diesel fuel costs and in the management of its mix of fixed and floating-rate debt. Management has determined that these derivative instruments qualify as either fair-value or cash-flow hedges, having values that highly correlate with the underlying hedged exposures, and has designated such instruments as hedging

transactions. Income and expense related to the derivative financial instruments are recorded in the same category as generated by the underlying asset or liability. Credit risk related to the derivative financial instruments is considered to be minimal and is managed by requiring high credit standards for counterparties and periodic settlements (see Note 16).

**Cash Equivalents**

"Cash equivalents" are highly liquid investments purchased three months or less from maturity.

**Allowance for Doubtful Accounts**

NS' allowance for doubtful accounts was $5 million at December 31, 2008, and December 31, 2007. To determine its allowance for doubtful accounts, NS evaluates historical loss experience (which has not been significant), the characteristics of current accounts, as well as general economic conditions and trends.

**Materials and Supplies**

"Materials and supplies," consisting mainly of fuel oil and items for maintenance of property and equipment, are stated at the lower of average cost or market. The cost of materials and supplies expected to be used in capital additions or improvements is included in "Properties."

**Investments**

Debt securities classified as "held-to-maturity" are reported at amortized cost and marketable equity and debt securities classified as "trading" or "available-for-sale" are recorded at fair value. Unrealized after-tax gains and losses for investments designated as "available-for-sale," are recognized in "Accumulated other comprehensive loss."

Investments where NS has the ability to exercise significant influence over but does not control the entity are accounted for using the equity method in accordance with APB Opinion No. 18, "The Equity Method of Accounting for Investments in Common Stock."

**Properties**

"Properties" are stated principally at cost and are depreciated using group depreciation. Rail is depreciated primarily on the basis of use measured by gross ton-miles. Other properties are depreciated generally using the straight-line method over the lesser of estimated service or lease lives. Depletion of natural resources (see Note 2) is based on units of production. Depreciation in the Consolidated Statements of Cash Flows includes depreciation and depletion. NS capitalizes interest on major capital projects during the period of their construction. Expenditures, including those on leased assets that extend an asset's useful life or increase its utility, are capitalized. Expenditures capitalized include those that are directly related to a capital project and may include materials, labor, and equipment, in addition to an allocable portion of indirect costs that clearly relate to a particular project. Costs related to repairs and maintenance activities that do not extend an asset's useful life or increase its utility are expensed when such repairs are performed. When properties other than land and nonrail assets are sold or retired in the ordinary course of business, the cost of the assets, net of sale proceeds or salvage, is charged to accumulated depreciation, and no gain or loss is recognized through income. Gains and losses on disposal of land and nonrail assets are included in "Other income - net" (see Note 2) since such income is not a product of NS' railroad operations.

NS reviews the carrying amount of properties whenever events or changes in circumstances indicate that such carrying amount may not be recoverable based on future undiscounted cash flows. Assets that are deemed impaired as a result of such review are recorded at the lower of carrying amount or fair value.

**Required Accounting Changes**

Effective January 1, 2008, NS adopted the Financial Accounting Standards Board issued Statement of Financial Accounting Standards (SFAS) No. 157, "Fair Value Measurements," related to financial instrument assets and liabilities with no effect on NS' consolidated financial statements. This statement, effective for interim or annual reporting periods beginning after November 15, 2007, establishes a framework for measuring fair value in U.S. generally accepted accounting principles and expands disclosures about fair value measurements.

Effective January 1, 2007, NS adopted Financial Accounting Standards Board Interpretation No. 48 (FIN 48), "Accounting for Uncertainty in Income Taxes," which clarifies accounting for uncertainty in income taxes recognized in an enterprise's financial statements in accordance with SFAS No. 109, "Accounting for Income Taxes." FIN 48 prescribes a recognition threshold and measurement attribute for a tax position taken or expected to be taken in a tax return. Under the guidelines of FIN 48, an entity should recognize the financial statement benefit of a tax position if it determines that it is more likely than not that the position will be sustained on examination (see Note 3).

Effective December 31, 2006, NS adopted SFAS No. 158, "Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans" (SFAS 158) (see Note 10).

Effective January 1, 2006, NS adopted SFAS No. 123(R), "Share-Based Payment," [SFAS 123(R)]. This statement applies to awards granted, modified, repurchased or cancelled after the effective date as well as awards that are unvested at the effective date and includes, among other things, the requirement to expense the fair value of stock options. The standard also requires that awards to be settled in cash be measured at fair value at each reporting date until ultimate settlement. NS adopted SFAS 123(R) using the modified prospective method, which requires application of the standard to all awards granted, modified, repurchased or cancelled on or after January 1, 2006, and to all awards for which the requisite service has not been rendered as of such date. In accordance with the modified prospective approach, prior period financial statements have not been restated to reflect the impact of SFAS 123(R). Under SFAS 123(R), all new awards granted to retirement eligible employees must be expensed immediately. Under APB Opinion No. 25 and related interpretations, such awards were amortized over the stated service period.

In June 2008, the FASB issued FASB Staff Position (FSP) Emerging Issues Task Force (EITF) 03-6-1, "Determining Whether Instruments Granted in Share-Based Payment Transactions are Participating Securities." This FSP addresses whether instruments granted in share-based payment transactions are participating securities prior to vesting and, therefore, need to be included in the earnings allocation in computing earnings per share under the two-class method as described in SFAS No. 128, "Earnings per Share." NS will adopt the FSP, which affects the calculation of earnings per share, in the first quarter of 2009. The provisions of the FSP are to be applied retrospectively. NS expects that it will not have a material effect on NS' consolidated financial statements.

## 2. Other Income - Net

| | 2008 | 2007 | 2006 |
|---|---|---|---|
| | | ($ in millions) | |
| Income from natural resources: | | | |
| Royalties from coal | $ 64 | $ 52 | $ 55 |
| Nonoperating depletion and depreciation | (11) | (11) | (12) |
| Subtotal | 53 | 41 | 43 |
| Rental income | 47 | 46 | 45 |
| Gains and losses from sale of properties and investments | 29 | 51 | 54 |
| Equity in earnings of Conrail (Note 4) | 29 | 45 | 25 |
| Interest income | 20 | 45 | 76 |
| Other interest expense – net | 2 | (25) | (15) |
| Expenses related to synthetic fuel investments | -- | (77) | (62) |
| Corporate-owned life insurance – net | (31) | 7 | 22 |
| Taxes on nonoperating property | (10) | (10) | (9) |
| Other | (29) | (30) | (30) |
| Total | $ 110 | $ 93 | $ 149 |

"Other income – net" includes income and costs not part of rail operations and the income generated by the activities of NS' noncarrier subsidiaries as well as the costs incurred by those subsidiaries in their operations. NS had a 40.5% interest in a limited liability company that owned and operated facilities that produced synthetic fuel from coal. In addition, in 2007 NS purchased two facilities that produced synthetic fuel from coal. The production of synthetic fuel resulted in tax credits as well as expenses related to the investments. The expenses are included in "Expenses related to synthetic fuel investments" above. The tax credits related to the synthetic fuel investments expired at the end of 2007 and are no longer available.

## 3. Income Taxes

### Provision for Income Taxes

| | 2008 | 2007 | 2006 |
|---|---|---|---|
| | | ($ in millions) | |
| Current: | | | |
| Federal | $ 657 | $ 570 | $ 666 |
| State | 87 | 78 | 91 |
| Total current taxes | 744 | 648 | 757 |
| Deferred: | | | |
| Federal | 257 | 77 | 3 |
| State | 33 | 48 | (11) |
| Total deferred taxes | 290 | 125 | (8) |
| Provision for income taxes | $ 1,034 | $ 773 | $ 749 |

**Reconciliation of Statutory Rate to Effective Rate**

The "Provision for income taxes" in the Consolidated Statements of Income differs from the amounts computed by applying the statutory federal corporate tax rate as follows:

| | 2008 | | 2007 | | 2006 | |
|---|---|---|---|---|---|---|
| | Amount | % | Amount | % | Amount | % |
| | | | ($ in millions) | | | |
| Federal income tax at statutory rate | $ 963 | 35 | $ 783 | 35 | $ 780 | 35 |
| State income taxes, net of Federal tax effect | 77 | 3 | 63 | 3 | 52 | 2 |
| Illinois tax law change, net of Federal tax effect | 1 | -- | 19 | 1 | -- | -- |
| Tax credits | (2) | -- | (65) | (3) | (62) | (3) |
| Other – net | (5) | -- | (27) | (1) | (21) | -- |
| Provision for income taxes | $ 1,034 | 38 | $ 773 | 35 | $ 749 | 34 |

Illinois enacted tax legislation in August 2007, revised in January 2008, that modified the way transportation companies apportion their taxable income to the state. The change resulted in an increase in NS' deferred income tax liability in the third quarter of 2007, as required by SFAS No. 109, "Accounting for Income Taxes," which increased deferred tax expense by $1 million in 2008 and $19 million in 2007.

**Deferred Tax Assets and Liabilities**

Certain items are reported in different periods for financial reporting and income tax purposes. Deferred tax assets and liabilities are recorded in recognition of these differences. The tax effects of temporary differences that give rise to significant portions of the deferred tax assets and deferred tax liabilities are as follows:

| | December 31, 2008 | December 31, 2007 |
|---|---|---|
| | ($ in millions) | |
| Deferred tax assets: | | |
| Compensation and benefits, including postretirement | $ 728 | $ 417 |
| Accruals, including casualty and other claims | 218 | 219 |
| Other | 45 | 49 |
| Total gross deferred tax assets | 991 | 685 |
| Less valuation allowance | (11) | (10) |
| Net deferred tax asset | 980 | 675 |
| Deferred tax liabilities: | | |
| Property | (6,957) | (6,683) |
| Other | (246) | (233) |
| Total gross deferred tax liabilities | (7,203) | (6,916) |
| Net deferred tax liability | (6,223) | (6,241) |
| Net current deferred tax asset | 149 | 190 |
| Net long-term deferred tax liability | $ (6,372) | $ (6,431) |

Except for amounts for which a valuation allowance has been provided, management believes that it is more likely than not that the results of future operations will generate sufficient taxable income to realize the deferred

tax assets. The valuation allowance at the end of each year relates to subsidiary state income tax net operating losses that may not be utilized prior to their expiration. The total valuation allowance increased $1 million in 2008 and 2007, and decreased $1 million in 2006.

**Uncertain Tax Positions**

A reconciliation of the beginning and ending amount of unrecognized tax benefits is as follows ($ in millions):

| | December 31, 2008 | December 31, 2007 |
|---|---|---|
| Balance at beginning of year | $ 167 | $ 179 |
| Additions based on tax positions related to the current year | 73 | 65 |
| Additions for tax positions of prior years | 4 | 9 |
| Reductions for tax positions of prior years | (63) | (84) |
| Settlements with taxing authorities | (9) | -- |
| Lapse of statutes of limitations | (3) | (2) |
| Balance at end of year | $ 169 | $ 167 |

Included in the balance of unrecognized tax benefits at December 31, 2008, are potential benefits of $60 million that would affect the effective tax rate if recognized. As a result of the implementation of FIN 48 on January 1, 2007 (see Note 1), NS recognized a $10 million increase to stockholders equity, $2 million of which related to investments accounted for under the equity method of accounting. Unrecognized tax benefits are adjusted in the period in which new information about a tax position becomes available or the final outcome differs from the amount recorded.

NS expects that the total amount of unrecognized tax benefits at December 31, 2008, will decrease by approximately $55 million in 2009 due to tax positions for which there was an uncertainty about the timing of deductibility in earlier years but deductibility may become certain by the close of 2009. NS' consolidated federal income tax returns for 2006 and 2007 are being audited by the Internal Revenue Service (IRS). NS anticipates that the IRS will complete its examination of the 2006 and 2007 years within the next twelve months. It is reasonably possible that the amount of unrecognized tax benefits will change due to the completion of the IRS examination of the 2006 and 2007 years, but an estimate of the change cannot be made. State income tax returns generally are subject to examination for a period of three to four years after filing of the return. In addition, NS is generally obligated to report changes in taxable income arising from federal income tax examinations to the states within a period of up to two years from the date the federal examination is final. NS has various state income tax returns either under examination, administrative appeals, or litigation. It is reasonably possible that the amount of unrecognized tax benefits will decrease in 2009 as a result of the lapse of state statutes of limitations, but the amount is not expected to be significant. NS does not expect that any of the above potential changes in unrecognized tax benefits will have a material effect on NS' financial position, results of operations, or liquidity.

Interest related to unrecognized tax benefits, which is included in "Other income – net," amounted to $15 million of income in 2008, $12 million of expense in 2007 and $2 million of income in 2006. Penalties related to tax matters are included in "Provision for income taxes" and totaled zero in each of 2008, 2007, and 2006. NS has recorded a liability of $20 million at December 31, 2008, and $28 million at December 31, 2007, for the payment of interest on unrecognized tax benefits. NS has no liability recorded at December 31, 2008, and December 31, 2007, for the payment of penalties on unrecognized tax benefits.

**4. Investments**

| | December 31, 2008 | December 31, 2007 |
|---|---|---|
| | ($ in millions) | |
| Long-term investments: | | |
| Investment in Conrail Inc. | $ 868 | $ 899 |
| Other equity method investments | 650 | 594 |
| Company-owned life insurance at net cash surrender value | 74 | 327 |
| Other investments | 187 | 154 |
| Total long-term investments | $ 1,779 | $ 1,974 |

"Other equity method investments" above includes $267 million at December 31, 2008, and $240 million at December 31, 2007, related to NS' investment in Meridian Speedway LLC, a joint venture formed with Kansas City Southern in 2006.

**Investment in Conrail**

Through a limited liability company, Norfolk Southern and CSX Corporation (CSX) jointly own Conrail Inc. (Conrail), whose primary subsidiary is Consolidated Rail Corporation (CRC). NS has a 58% economic and 50% voting interest in the jointly owned entity, and CSX has the remainder of the economic and voting interests. NS is applying the equity method of accounting to its investment in Conrail in accordance with APB Opinion No. 18, "The Equity Method of Accounting for Investments in Common Stock." NS is amortizing the excess of the purchase price over Conrail's net equity using the principles of purchase accounting, based primarily on the estimated useful lives of Conrail's depreciable property and equipment, including the related deferred tax effect of the differences in tax accounting bases for such assets, as all of the purchase price at acquisition was allocable to Conrail's tangible assets and liabilities.

At December 31, 2008, based on the funded status of Conrail's pension plans, recorded in accordance with SFAS 158, NS reduced its proportional investment in Conrail by $60 million. This resulted in a $55 million loss recorded to "other comprehensive income (loss)" and a combined federal and state deferred tax asset of $5 million. At December 31, 2007, NS' year-end SFAS 158 adjustment increased its proportional investment in Conrail by $6 million. This resulted in $5 million of income recorded to "other comprehensive income (loss)" and a combined federal and state deferred tax liability of about $1 million. At December 31, 2008, the difference between NS' investment in Conrail and its share of Conrail's underlying net equity was $551 million. NS' equity in the earnings of Conrail, net of amortization, included in "Other income – net" was $29 million, $45 million, and $25 million in 2008, 2007, and 2006, respectively.

CRC owns and operates certain properties (the Shared Assets Areas) for the joint and exclusive benefit of NSR and CSX Transportation, Inc. (CSXT). The costs of operating the Shared Assets Areas are borne by NSR and CSXT based on usage. In addition, NSR and CSXT pay CRC a fee for access to the Shared Assets Areas. "Purchased services and rents" and "Fuel" include expenses for amounts due to CRC for operation of the Shared Assets Areas totaling $131 million in 2008 and $126 million in both 2007 and 2006. Future minimum lease payments due to CRC under the Shared Assets Areas agreements are as follows: $29 million in each of 2009 through 2013 and $305 million thereafter. NS provides certain general and administrative support functions to Conrail, the fees for which are billed in accordance with several service-provider arrangements and amount to approximately $7 million annually.

"Accounts payable" includes $82 million at December 31, 2008, and $78 million at December 31, 2007, due to Conrail for the operation of the Shared Assets Areas. In addition, "Other liabilities" includes $133 million at December 31, 2008, and December 31, 2007, for long-term advances from Conrail, maturing 2035, that bear interest at an average rate of 4.4%.

**5. Properties**

| | December 31, 2008 | December 31, 2007 | Depreciation Rate for 2008 |
|---|---|---|---|
| | *($ in millions)* | | |
| Land | $ 2,119 | $ 2,085 | |
| Railway property: | | | |
| Road | 20,240 | 19,420 | 2.7% |
| Equipment | 7,688 | 7,413 | 3.7% |
| Other property | 473 | 471 | 2.3% |
| | 30,520 | 29,389 | |
| Less accumulated depreciation | (8,273) | (7,806) | |
| Net properties | $ 22,247 | $ 21,583 | |

Railway property includes $483 million at December 31, 2008, and $504 million at December 31, 2007, of assets recorded pursuant to capital leases with accumulated amortization of $189 million and $175 million at December 31, 2008 and 2007, respectively. Other property includes the costs of obtaining rights to natural resources of $336 million at December 31, 2008, and $337 million at December 31, 2007, with accumulated depletion of $179 million and $172 million at December 31, 2008 and 2007, respectively.

**Capitalized Interest**

Total interest cost incurred on debt in 2008, 2007 and 2006 was $459 million, $455 million, and $489 million, respectively, of which $15 million, $14 million, and $13 million was capitalized.

**6. Current Liabilities**

| | December 31, 2008 | December 31, 2007 |
|---|---|---|
| | *($ in millions)* | |
| Accounts payable: | | |
| Accounts and wages payable | $ 577 | $ 568 |
| Casualty and other claims (Note 17) | 248 | 259 |
| Vacation liability | 125 | 123 |
| Equipment rents payable – net | 84 | 87 |
| Due to Conrail (Note 4) | 82 | 78 |
| Other | 24 | 24 |
| Total | $ 1,140 | $ 1,139 |
| Other current liabilities: | | |
| Interest payable | $ 91 | $ 90 |
| Retiree benefit obligations (Note 10) | 59 | 57 |
| Liabilities for forwarded traffic | 44 | 53 |
| Other | 26 | 37 |
| Total | $ 220 | $ 237 |

**7. Long-term Debt**

Long-term debt as of December 31, 2008, with weighted average interest rates and maturities is presented below:

| | December 31, 2008 | December 31, 2007 |
|---|---|---|
| | ($ in millions) | |
| Notes and debentures: | | |
| 6.56%, maturing to 2014 | $ 1,431 | $ 1,631 |
| 6.68%, maturing 2017 and 2018 | 1,150 | 550 |
| 8.21%, maturing 2020 to 2025 | 764 | 764 |
| 7.12%, maturing 2027 to 2031 | 1,290 | 1,290 |
| 7.21%, maturing 2037 and 2043 | 855 | 855 |
| 7.02%, maturing 2097 and 2105 | 650 | 650 |
| Securitization borrowings, 3.01% | 300 | 250 |
| Capitalized leases, 4.16%, maturing to 2024 | 139 | 165 |
| Other debt, 7.50%, maturing to 2019 | 113 | 113 |
| Equipment obligations, 6.45%, maturing to 2014 | 99 | 226 |
| Discounts and premiums, net | (124) | (126) |
| Total long-term debt | 6,667 | 6,368 |
| Less current maturities | (484) | (369) |
| Long-term debt excluding current maturities | $ 6,183 | $ 5,999 |

| | |
|---|---|
| Long-term debt maturities subsequent to 2009 are as follows: | |
| 2010 | $ 344 |
| 2011 | 342 |
| 2012 | 33 |
| 2013 | 46 |
| 2014 and subsequent years | 5,418 |
| Total | $ 6,183 |

During the second quarter of 2008, $200 million of commercial paper matured and was refinanced as part of a private offering under which NS issued and sold $600 million of unsecured notes at 5.75% due 2018. NS subsequently exchanged substantially all of these unregistered securities with essentially identical securities registered under the Securities Act of 1933.

In November 2007, NS entered into a $500 million receivables securitization facility under which NSR sells substantially all of its eligible third-party receivables to an NS subsidiary, which in turn may transfer beneficial interests in the receivables to various commercial paper vehicles. Amounts received under the facility are accounted for as borrowings. Under this facility, NS received $425 million and repaid $375 million in 2008. At December 31, 2008 and 2007, the amounts outstanding under the facility were $300 million at an average variable interest rate of 3.01% and $250 million at an average variable interest rate of 5.57%, respectively. The facility has a 364-day term which was renewed and amended in October 2008; however, NS intends to refinance these borrowings by issuing long-term debt, which is supported by its $1 billion credit agreement (see below). Accordingly, amounts outstanding are included in the line item “Long-term debt” in the Consolidated Balance Sheets. At December 31, 2008, and December 31, 2007, the amounts of receivables included in “Accounts receivable – net” serving as collateral for these borrowings were $719 million and $778 million, respectively.

The railroad equipment obligations and the capitalized leases are secured by liens on the underlying equipment. Certain lease obligations require the maintenance of yen-denominated deposits, which are pledged to the lessor to

satisfy yen-denominated lease payments. These deposits are included in "Other assets" in the Consolidated Balance Sheets and totaled $85 million at December 31, 2008, and $80 million at December 31, 2007.

**Issuance of Debt or Equity Securities**

NS has authority from its board of directors for the issuance and public or private sale of up to $1 billion of debt or equity securities. Under this authority, NS issued $500 million of unsecured notes in January 2009 at 5.75% due in 2016 in a private offering. The net proceeds from the offering were approximately $494 million after deducting the purchase discount and expenses. NS has agreed to exchange these unregistered securities with essentially identical securities registered under the Securities Act of 1933.

Subsequent to the January 2009 offering, NS has remaining authority from its board of directors to issue and sell up to $500 million of additional debt or equity securities through public or private sale. The Form S-3 shelf registration statements previously filed with the Securities and Exchange Commission (SEC) are no longer effective under SEC's Rule 415(a)(5), which provides for a three-year term. NS expects to file a new Form S-3 registration statement during the first quarter of 2009.

**Credit Agreement, Debt Covenants and Commercial Paper**

NS has in place and available a $1 billion, five-year credit agreement expiring in 2012, which provides for borrowings at prevailing rates and includes covenants. NS had no amounts outstanding under this facility at December 31, 2008, and NS is in compliance with all of the covenants.

NS has the ability to issue commercial paper supported by its $1 billion credit agreement. At December 31, 2008 and 2007, NS had no outstanding commercial paper.

**8. Lease Commitments**

NS is committed under long-term lease agreements, which expire on various dates through 2067, for equipment, lines of road and other property. The following amounts do not include payments to CRC under the Shared Assets Areas agreements (see Note 4). Future minimum lease payments and operating lease expense are as follows:

| | Operating Leases | Capital Leases |
|---|---|---|
| | *($ in millions)* | |
| 2009 | $ 142 | $ 66 |
| 2010 | 129 | 28 |
| 2011 | 94 | 26 |
| 2012 | 79 | 17 |
| 2013 | 70 | 3 |
| 2014 and subsequent years | 359 | 5 |
| Total | $ 873 | $ 145 |
| Less imputed interest on capital leases at an average rate of 5.3% | | (6) |
| Present value of minimum lease payments included in debt | | $ 139 |

**Operating Lease Expense**

| | 2008 | 2007 | 2006 |
|---|---|---|---|
| | | ($ in millions) | |
| Minimum rents | $ 183 | $ 191 | $ 197 |
| Contingent rents | 80 | 79 | 79 |
| Total | $ 263 | $ 270 | $ 276 |

Contingent rents are primarily comprised of usage-based rent paid to other railroads for joint facility operations.

**9. Other Liabilities**

| | December 31, | |
|---|---|---|
| | 2008 | 2007 |
| | ($ in millions) | |
| Retiree health and death benefit obligations (Note 10) | $ 732 | $ 635 |
| Net pension obligations (Note 10) | 329 | 150 |
| Casualty and other claims (Note 17) | 320 | 588 |
| Federal and state income taxes | 144 | 131 |
| Long-term advances from Conrail (Note 4) | 133 | 133 |
| Deferred compensation | 131 | 148 |
| Other | 241 | 254 |
| Total | $ 2,030 | $ 2,039 |

**10. Pensions and Other Postretirement Benefits**

Norfolk Southern and certain subsidiaries have both funded and unfunded defined benefit pension plans covering principally salaried employees. Norfolk Southern and certain subsidiaries also provide specified health care and death benefits to eligible retired employees and their dependents. Under the present plans, which may be amended or terminated at NS' option, a defined percentage of health care expenses is covered, reduced by any deductibles, co-payments, Medicare payments and, in some cases, coverage provided under other group insurance policies.

**Pension and Other Postretirement Benefit Obligations and Plan Assets**

| | Pension Benefits | | Other Postretirement Benefits | |
|---|---|---|---|---|
| | 2008 | 2007 | 2008 | 2007 |
| | ($ in millions) | | | |
| ***Change in benefit obligations*** | | | | |
| Benefit obligation at beginning of year | $ 1,644 | $ 1,650 | $ 859 | $ 785 |
| Service cost | 25 | 24 | 16 | 21 |
| Interest cost | 99 | 92 | 51 | 46 |
| Actuarial (gains) losses | 4 | (12) | 44 | 53 |
| Plan amendments | 7 | -- | -- | -- |
| Benefits paid | (109) | (110) | (50) | (46) |
| Benefit obligation at end of year | 1,670 | 1,644 | 920 | 859 |
| ***Change in plan assets*** | | | | |
| Fair value of plan assets at beginning of year | 1,963 | 1,939 | 176 | 119 |
| Actual return on plan assets | (531) | 125 | (38) | 6 |
| Employer contribution | 10 | 9 | 50 | 97 |
| Benefits paid | (109) | (110) | (50) | (46) |
| Fair value of plan assets at end of year | 1,333 | 1,963 | 138 | 176 |
| **Funded status at end of year** | $ (337) | $ 319 | $ (782) | $ (683) |
| Amounts recognized in the Consolidated Balance Sheets consist of: | | | | |
| Noncurrent assets | $ 1 | $ 478 | $ -- | $ -- |
| Current liabilities | (9) | (9) | (50) | (48) |
| Noncurrent liabilities | (329) | (150) | (732) | (635) |
| **Net amount recognized** | $ (337) | $ 319 | $ (782) | $ (683) |
| Amounts recognized in accumulated other comprehensive loss (pretax) consist of: | | | | |
| Net loss | $ 991 | $ 290 | $ 351 | $ 279 |
| Prior service cost (benefit) | 13 | 9 | (2) | (10) |

NS' unfunded pension plans, included above, which in all cases have no assets and therefore have an accumulated benefit obligation in excess of plan assets, had projected benefit obligations of $168 million at December 31, 2008, and $159 million at December 31, 2007, and had accumulated benefit obligations of $146 million at December 31, 2008, and $137 million at December 31, 2007.

**Pension and Other Postretirement Benefit Cost Components**

| | 2008 | 2007 | 2006 |
|---|---|---|---|
| | | ($ in millions) | |
| ***Pension benefits*** | | | |
| Service cost | $ 25 | $ 24 | $ 27 |
| Interest cost | 99 | 92 | 88 |
| Expected return on plan assets | (173) | (167) | (159) |
| Amortization of prior service cost | 3 | 2 | 2 |
| Amortization of net losses | 7 | 9 | 13 |
| Net benefit | $ (39) | $ (40) | $ (29) |
| ***Other postretirement benefits*** | | | |
| Service cost | $ 16 | $ 21 | $ 19 |
| Interest cost | 51 | 46 | 42 |
| Expected return on plan assets | (15) | (11) | (10) |
| Amortization of prior service benefit | (8) | (8) | (8) |
| Amortization of net losses | 25 | 28 | 27 |
| Net cost | $ 69 | $ 76 | $ 70 |

**Other Changes in Plan Assets and Benefit Obligations Recognized in Other Comprehensive Loss**

| | 2008 | |
|---|---|---|
| | Pension Benefits | Other Postretirement Benefits |
| | ($ in millions) | |
| Net loss arising during the year | $ 708 | $ 97 |
| Prior service cost arising during the year | 7 | -- |
| Amortization of prior service cost | (3) | 8 |
| Amortization of net losses | (7) | (25) |
| Total recognized in other comprehensive loss | $ 705 | $ 80 |
| Total recognized in net periodic (benefit) cost and other comprehensive loss | $ 666 | $ 149 |

The estimated net loss and prior service cost for the defined benefit pension plans that will be amortized from accumulated other comprehensive loss into net periodic cost over the next year are $25 million and $3 million, respectively. The estimated net loss and prior service benefit for the other defined benefit postretirement plans that will be amortized from accumulated other comprehensive loss into net periodic benefit cost over the next year are $34 million and $2 million, respectively.

As of December 31, 2006, NS adopted SFAS 158. This statement requires an employer to recognize in its statement of financial position the overfunded or underfunded status of defined benefit pension and postretirement plans measured as the difference between the fair value of plan assets and the benefit obligation. Employers must also recognize as a component of other comprehensive income, net of tax, the actuarial gains and losses and the prior service costs, credits, and transition costs that arise during the period. As a result of adopting this standard, NS reduced its pension asset by $217 million and increased its pension and postretirement liabilities by $258 million in its December 31, 2006, Consolidated Balance Sheet, with a corresponding reduction to stockholders' equity of $292 million (net of tax) reflected as an increase to accumulated other comprehensive loss. In addition, NS recognized a $2 million reduction to stockholders' equity related to its proportionate share

of Conrail's adoption of SFAS 158. The adoption of SFAS 158 has no impact on years prior to 2006 and has no effect on the calculation of expenses for pensions and post-retirement benefits.

**Pension and Other Postretirement Benefit Assumptions**

Pension and other postretirement benefit costs are determined based on actuarial valuations that reflect appropriate assumptions as of the measurement date, ordinarily the beginning of each year. The funded status of the plans is determined using appropriate assumptions as of each year end. A summary of the major assumptions follows:

| | 2008 | 2007 | 2006 |
|---|---|---|---|
| ***Funded status:*** | | | |
| Discount rate | 6.25% | 6.25% | 5.75% |
| Future salary increases | 4.5% | 4.5% | 4.5% |
| ***Pension cost:*** | | | |
| Discount rate | 6.25% | 5.75% | 5.50% |
| Return on assets in plans | 9% | 9% | 9% |
| Future salary increases | 4.5% | 4.5% | 4.5% |
| ***Other postretirement benefit cost:*** | | | |
| Discount rate | 6.25% | 5.75% | 5.50% |
| Return on assets in plan | 8.5% | 9% | 9% |

To determine the discount rate in 2008 and 2007, NS utilized an analysis in which the projected annual cash flows from the pension and postretirement benefit plans were matched with a yield curve based on an appropriate universe of high-quality corporate bonds. NS used the results of the yield curve to select the discount rate that matches the payment stream of the benefits in these plans. In 2006, NS referred to Moody's seasoned Aa corporate bond yields and the changes in such yields in establishing the discount rate.

**Health Care Cost Trend Assumptions**

For measurement purposes at December 31, 2008, increases in the per capita cost of covered health care benefits were assumed to be 8.5% for 2008 and 8.8% for 2009. It is assumed the rate will decrease gradually to an ultimate rate of 5% for 2014 and remain at that level thereafter.

Assumed health care cost trend rates have a significant effect on the amounts reported in the financial statements. To illustrate, a one-percentage-point change in the assumed health care cost trend would have the following effects:

| | One percentage point Increase | One percentage point Decrease |
|---|---|---|
| | *($ in millions)* | |
| Increase (decrease) in: | | |
| Total service and interest cost components | $ 9 | $ (7) |
| Postretirement benefit obligation | $ 113 | $ (94) |

**Asset Management**

Eleven investment firms manage NS' defined benefit pension plan's assets under investment guidelines approved by the Board of Directors. Investments are restricted to domestic fixed income securities, international fixed income securities, domestic and international equity investments, and unleveraged exchange-traded options and financial futures. Limitations restrict investment concentration and use of certain derivative instruments. The target asset allocation for equity is 75% of the pension plan's assets. Fixed income investments must have an average

rating of "AA" or better and all fixed income securities must be rated "A" or better except bond index funds. Equity investments must be in liquid securities listed on national exchanges. No investment is permitted in the securities of Norfolk Southern Corporation or its subsidiaries (except through commingled pension trust funds). Investment managers' returns are expected to meet or exceed selected market indices by prescribed margins.

NS' pension plan weighted-average asset allocations at December 31, 2008 and 2007, by asset category, were as follows:

| | Percentage of plan assets at December 31, | |
|---|---|---|
| **Asset Category** | **2008** | **2007** |
| Domestic equity securities | 58% | 65% |
| International equity securities | 11% | 10% |
| Debt securities | 31% | 25% |
| Total | 100% | 100% |

The postretirement benefit plan assets consist primarily of trust-owned variable life insurance policies with an asset allocation at December 31, 2008, of 53% in equity securities and 47% in debt securities compared with 65% in equity securities and 35% in debt securities at December 31, 2007. The target asset allocation for equity is between 50% and 75% of the plan's assets.

The plans' assumed future returns are based principally on the asset allocation and on the historic returns for the plans' asset classes determined from both actual plan returns and, over longer time periods, market returns for those asset classes. In 2008, 2007, and 2006 NS assumed a return on pension plan assets of 9%. For 2009, NS assumes an 8.75% return on pension plan assets. A one percentage point change to the rate of return assumption would result in an $18 million change to the net pension (benefit) cost and, as a result, an equal change in "Compensation and benefits" expense.

**Contributions and Estimated Future Benefit Payments**

In 2009, NS expects to contribute approximately $9 million to its unfunded pension plans for payments to pensioners and $50 million to its other postretirement benefit plans for retiree health benefits. NS does not expect to contribute to its funded pension plan in 2009.

Benefit payments, which reflect expected future service, as appropriate, are expected to be paid as follows:

| | Pension Benefits | Other Postretirement Benefits |
|---|---|---|
| | *($ in millions)* | |
| 2009 | $ 111 | $ 50 |
| 2010 | 114 | 54 |
| 2011 | 116 | 57 |
| 2012 | 119 | 59 |
| 2013 | 122 | 62 |
| Years 2014-2018 | 646 | 339 |

The other postretirement benefit payments include an estimated average annual reduction due to the Medicare Part D Subsidy of about $6 million.

**Other Postretirement Coverage**

Under collective bargaining agreements, NS and certain subsidiaries participate in a multi-employer benefit plan, which provides certain postretirement health care and life insurance benefits to eligible union employees. Premiums under this plan are expensed as incurred and amounted to $33 million in 2008, $27 million in 2007, and $26 million in 2006.

**Section 401(k) Plans**

Norfolk Southern and certain subsidiaries provide Section 401(k) savings plans for employees. Under the plans, NS matches a portion of employee contributions, subject to applicable limitations. NS' matching contributions, recorded as an expense, under these plans were $15 million in 2008 and $14 million in both 2007 and 2006.

**11. Stock-Based Compensation**

Under the stockholder-approved Long-Term Incentive Plan (LTIP), a committee of nonemployee directors of the Board or the chief executive officer (if delegated such authority by the committee) may grant stock options, stock appreciation rights (SARs), restricted stock units, restricted shares, performance shares, and performance share units (PSUs), up to a maximum of 88,025,000 shares of Norfolk Southern Common Stock (Common Stock). Of these shares, 5,000,000 were approved by the Board for issuance to non-officer participants; as a broad-based issuance, stockholder approval was not required. In May 2005, the stockholders approved an amended LTIP which provided that 8,500,000 shares of stock previously approved for issuance under LTIP could be granted as restricted stock units, restricted shares or performance shares. Under the Board-approved Thoroughbred Stock Option Plan (TSOP), the committee may grant stock options up to a maximum of 6,000,000 shares of Common Stock; as a broad-based stock option plan, stockholder approval of TSOP was not required. NS uses newly issued shares to satisfy any exercises and awards under LTIP and TSOP.

The LTIP also permits the payment – on a current or a deferred basis and in cash or in stock – of dividend equivalents on shares of Common Stock covered by options, PSUs or restricted stock units in an amount commensurate with regular quarterly dividends paid on Common Stock. Tax absorption payments also are authorized for any awards under LTIP in amounts estimated to equal the federal and state income taxes applicable to shares of Common Stock issued subject to a share retention agreement.

During the first quarter of 2008, a committee of nonemployee directors of NS' Board granted stock options, restricted stock units and PSUs pursuant to the LTIP and granted stock options pursuant to the TSOP. Receipt of an award under LTIP was made contingent upon the awardee's execution of a non-compete agreement, and all awards under LTIP were made subject to forfeiture in the event the awardee "engages in competing employment" for a period of time following retirement.

**Accounting Method**

As disclosed in Note 1, prior to the adoption of SFAS 123(R), NS applied APB Opinion 25 and related interpretations in accounting for awards made under the plans. Accordingly, grants of PSUs, restricted stock units, restricted shares, dividend equivalents, tax absorption payments and SARs resulted in charges to net income, while grants of stock options had no effect on net income. Under SFAS 123(R), all awards result in charges to net income while dividend equivalents, which are all related to equity classified awards, are charged to retained income. Related compensation costs were $89 million in 2008, $96 million in 2007 and $129 million in 2006. The total tax effects recognized in income in relation to stock-based compensation were benefits of $30 million in 2008, $32 million in 2007 and $44 million in 2006.

"Common stock issued – net" in the Consolidated Statements of Cash Flows for the years ended December 31, 2008, 2007 and 2006 includes tax benefits generated from tax deductions in excess of compensation costs recognized (excess tax benefits) for share based awards of $76 million, $57 million and $85 million, respectively.

**Stock Options**

Options may be granted for a term not to exceed 10 years and are subject to a vesting period of at least one year. Option exercise prices are at not less than the fair market value of Common Stock on the effective date of the grant. In the first quarter of 2008, 1,162,600 options were granted under the LTIP and 250,000 options were granted under the TSOP. In each case, the grant price was $50.74, which was the fair market value of Common Stock on the date of grant. The options have a term of ten years but may not be exercised prior to the third anniversary of the date of grant. Holders of the options granted under the LTIP who remain actively employed receive cash dividend equivalent payments for five years in an amount equal to the regular quarterly dividends paid on Common Stock.

In the first quarter of 2007, 1,203,300 options were granted under the LTIP and 251,000 options were granted under the TSOP, each with a grant price of $49.555, but may not be exercised prior to the third anniversary of the date of grant. In the first quarter of 2006, 1,188,700 options were granted under the LTIP and 238,000 options were granted under the TSOP, each with a grant price of $49.425, but may not be exercised prior to the first anniversary of the date of grant. For both 2007 and 2006, the grant price was the fair market value of Common Stock on the date of grant, and the options have a term of ten years.

The fair value of each option award in 2008, 2007 and 2006 was measured on the date of grant using a lattice-based option valuation model. Expected volatilities are based on implied volatilities from traded options on Common Stock and historical volatility of Common Stock. NS uses historical data to estimate option exercises and employee terminations within the valuation model. The average expected option life is derived from the output of the valuation model and represents the period of time that options granted are expected to be outstanding. The average risk-free interest rate is based on the U.S. Treasury yield curve in effect at the time of grant. For options granted that include dividend equivalent payments, a dividend yield of zero was used. For the 2008 and 2007 TSOP grants a dividend yield of 2.29% and 1.5%, respectively, was used because no dividend equivalent payments are made on these options. The assumptions for the 2008, 2007 and 2006 LTIP and TSOP grants are shown in the following table:

| | 2008 | 2007 | 2006 |
|---|---|---|---|
| Expected volatility range | 25% - 32% | 26.1% - 33.3% | 23.5% - 34.5% |
| Average expected volatility | 32% | 33% | 27% |
| Average risk-free interest rate | 3.68% | 4.9% | 4.5% |
| Average expected option term – LTIP | 5.9 years | 5.6 years | 3.7 years |
| Per-share grant-date fair value – LTIP | $19.32 | $19.82 | $13.47 |
| Average expected option term – TSOP | 8.0 years | 6.5 years | 3.7 years |
| Per-share grant-date fair value – TSOP | $16.29 | $17.88 | $13.47 |
| Options granted (LTIP and TSOP) | 1,412,600 | 1,454,300 | 1,427,400 |

A summary of options outstanding as of December 31, 2008, and changes during the twelve months then ended is presented below:

| | Option Shares | | Weighted Avg. Exercise Price |
|---|---|---|---|
| Outstanding at December 31, 2007 | 18,579,892 | $ | 27.51 |
| Granted | 1,412,600 | | 50.74 |
| Exercised | (5,697,049) | | 24.60 |
| Forfeited | (10,720) | | 36.40 |
| Outstanding at December 31, 2008 | 14,284,723 | $ | 30.95 |
| Exercisable at December 31, 2008 | 11,465,323 | $ | 26.23 |

The aggregate intrinsic value of options outstanding at December 31, 2008, was $242 million with a weighted-average remaining contractual term of 4.9 years. Of these options outstanding, 11,465,323 were exercisable and had an aggregate intrinsic value of $242 million with a weighted average remaining contractual term of 4 years. The following table provides information related to options exercised as of December 31 for the respective years:

| | | 2008 | | 2007<br>*($ in millions)* | | 2006 |
|---|---|---|---|---|---|---|
| Options exercised | | 5,697,049 | | 5,110,334 | | 8,677,254 |
| Total intrinsic value | $ | 208 | $ | 145 | $ | 226 |
| Cash received upon exercise of options | $ | 137 | $ | 126 | $ | 212 |
| Related excess tax benefits realized | $ | 73 | $ | 52 | $ | 79 |

At December 31, 2008, there was $12 million of total unrecognized compensation related to stock options granted under the LTIP and TSOP, which is expected to be recognized over a weighted-average period of approximately 1.6 years.

**Restricted Stock Units and Restricted Shares**

Restricted stock unit and restricted share grants were 299,950 and zero, respectively, in 2008, with a grant-date fair value of $50.47 and a five-year restriction period. In 2007, restricted stock unit and restricted share grants were 321,450 and zero, respectively, with a grant-date fair value of $50.01 and a five-year restriction period. In 2006, restricted stock unit and restricted share grants were 332,150 and 332,150, respectively, with a grant-date fair value of $49.60 and a three-year restriction period. Restricted stock units granted in 2008 and 2007 will be settled through issuance of shares of Common Stock. The restricted stock unit grants include cash dividend equivalent payments during the restriction period commensurate with regular quarterly dividends paid on Common Stock.

A summary of the status of restricted stock units and restricted shares as of December 31, 2008, and changes during the twelve months then ended is presented below:

| | Units | Shares | | Weighted - Average Grant-Date Fair Value |
|---|---|---|---|---|
| Nonvested at December 31, 2007 | 957,352 | 811,600 | $ | 42.53 |
| Granted | 299,950 | -- | | 50.47 |
| Vested | (5,437) | (8,156) | | 34.10 |
| Forfeited | -- | -- | | -- |
| Nonvested at December 31, 2008 | 1,251,865 | 803,444 | $ | 43.72 |

At December 31, 2008, there was $12 million of total unrecognized compensation related to restricted stock units and restricted shares granted under the LTIP, which is expected to be recognized over a weighted-average period of approximately 1.5 years. The total fair values of the restricted stock units paid in cash and restricted shares vested during the twelve months ended December 31, 2008, 2007 and 2006 were $1 million, $22 million, and $40 million, respectively. The total related excess tax benefits realized were $1 million in 2008, $3 million in 2007, and $6 million in 2006.

**Performance Share Units**

PSUs provide for awards based on achievement of certain predetermined corporate performance goals (total shareholder return, return on average invested capital and operating ratio) at the end of a three-year cycle. PSU grants and average grant-date fair values were 1,162,600 and $50.465 in 2008; 1,203,300 and $49.555 in 2007; and 1,163,600 and $49.425 in 2006. One-half of any PSUs earned will be paid in the form of shares of Common Stock with the other half to be paid in cash. A summary of the status of PSUs as of December 31, 2008, and changes during the twelve months then ended is presented below:

| | Performance Share Units | | Weighted - Average Grant-Date Fair Value |
|---|---|---|---|
| Balance December 31, 2007 | 3,603,100 | $ | 43.91 |
| Granted | 1,162,600 | | 50.47 |
| Earned – paid in Common Stock | (506,852) | | 34.10 |
| Earned – paid in cash | (507,147) | | 34.10 |
| Unearned | (292,701) | | 34.10 |
| Forfeited | -- | | -- |
| Balance December 31, 2008 | 3,459,000 | $ | 49.82 |

As of December 31, 2008, there was $18 million of total unrecognized compensation related to PSUs granted under the LTIP, which is expected to be recognized over a weighted-average period of approximately 1.1 years. The total fair values of PSUs earned and paid in cash during the twelve months ended December 31, 2008, 2007 and 2006 were $26 million, $18 million, and $34 million, respectively. The total related excess tax benefits realized were $2 million in 2008, $2 million in 2007, and zero in 2006.

**Shares Available and Issued**

Shares of stock available for future grants and issued in connection with all features of the LTIP and TSOP as of December 31, were as follows:

| | 2008 | 2007 | 2006 |
|---|---|---|---|
| Available for future grants: | | | |
| LTIP | 6,837,414 | 8,937,651 | 9,288,283 |
| TSOP | 2,042,420 | 2,290,700 | 2,538,700 |
| Shares of Common Stock issued: | | | |
| LTIP | 5,569,683 | 5,199,060 | 8,517,911 |
| TSOP | 642,538 | 540,877 | 836,783 |

## 12. Stockholders' Equity

**Common Stock**

Common stock is reported net of shares held by consolidated subsidiaries (Treasury Shares) of Norfolk Southern. Treasury Shares at December 31, 2008, and 2007, amounted to 20,579,088 and 20,683,686 shares, respectively, with a cost of $19 million in 2008 and $20 million in 2007.

**Accumulated Other Comprehensive Loss**

"Accumulated other comprehensive loss" reported in the Consolidated Statements of Changes in Stockholders' Equity consisted of the following:

| | Balance at Beginning of Year | Net Gain (Loss) | Reclassification Adjustments | Balance at End of Year |
|---|---|---|---|---|
| | | *($ in millions)* | | |
| December 31, 2008 | | | | |
| Pension and other postretirement liabilities | $ (349) | $ (498) | $ 16 | $ (831) |
| Other comprehensive loss of equity investees | (50) | (61) | -- | (111) |
| Accumulated other comprehensive loss | $ (399) | $ (559) | $ 16 | $ (942) |
| December 31, 2007 | | | | |
| Pension and other postretirement liabilities | $ (315) | $ (54) | $ 20 | $ (349) |
| Other comprehensive loss of equity investees | (55) | 5 | -- | (50) |
| Unrealized gains on securities | 1 | -- | (1) | -- |
| Accumulated other comprehensive loss | $ (369) | $ (49) | $ 19 | $ (399) |

**Other Comprehensive Income (Loss)**

"Other comprehensive income (loss)" reported in the Consolidated Statements of Changes in Stockholders' Equity consisted of the following:

| | Pretax Amount | Tax (Expense) Benefit | Net-of-Tax Amount |
|---|---|---|---|
| | | *($ in millions)* | |
| ***Year ended December 31, 2008*** | | | |
| Net gain (loss) arising during the year: | | | |
| Pensions and other postretirement benefits | $ (812) | $ 314 | $ (498) |
| Reclassification adjustments for costs included in net income | 27 | (11) | 16 |
| Subtotal | (785) | 303 | (482) |
| Other comprehensive income (loss) of equity investees | (65) | 4 | (61) |
| Other comprehensive income (loss) | $ (850) | $ 307 | $ (543) |
| ***Year ended December 31, 2007*** | | | |
| Net gain (loss) arising during the year: | | | |
| Pensions and other postretirement benefits | $ (88) | $ 34 | $ (54) |
| Reclassification adjustments for costs included in net income | 31 | (11) | 20 |
| Subtotal | (57) | 23 | (34) |
| Other comprehensive income of equity investees | 5 | -- | 5 |
| Reclassification adjustment for unrealized gains on securities included in net income | (2) | 1 | (1) |
| Other comprehensive income (loss) | $ (54) | $ 24 | $ (30) |
| ***Year ended December 31, 2006*** | | | |
| Net gain (loss) arising during the year: | | | |
| Cash flow hedges | $ (1) | $ 1 | $ -- |
| Reclassification adjustments for gains included in net income | (20) | 8 | (12) |
| Subtotal | (21) | 9 | (12) |
| Unrealized gains on securities | 1 | -- | 1 |
| Minimum pension liability | (10) | 4 | (6) |
| Other comprehensive income of equity investees | 15 | 4 | 19 |
| Other comprehensive income (loss) | $ (15) | $ 17 | $ 2 |

**13. Stock Repurchase Program**

In March 2007, NS' Board of Directors amended NS' share repurchase program, increasing the authorized amount of share repurchases from 50 million to 75 million shares and shortening the term of the program from 2015 to 2010. The timing and volume of purchases is guided by management's assessment of market conditions and other pertinent facts. Near-term purchases under the program are expected to be made with internally generated cash or proceeds from borrowings. NS repurchased and retired 19.4 million shares, 23.6 million shares, and 21.7 million shares of its common stock under this program in 2008, 2007, and 2006, respectively, at a cost of $1.1 billion, $1.2 billion, and $964 million, respectively. Since inception of this program in 2006, NS has repurchased and retired 64.7 million shares of Common Stock at a total cost of $3.3 billion.

**14. Earnings Per Share**

The following tables set forth the calculation of basic and diluted earnings per share:

| | 2008 | 2007 | 2006 |
|---|---|---|---|
| | *($ in millions except per share, shares in millions)* | | |
| Basic earnings per share: | | | |
| Income available to common stockholders | $ 1,711 | $ 1,459 | $ 1,475 |
| Weighted-average shares outstanding | 372.3 | 389.6 | 406.0 |
| Basic earnings per share | $ 4.60 | $ 3.74 | $ 3.63 |

Income available to common stockholders for both 2008 and 2007 reflects a $5 million reduction, and in 2006 a $6 million reduction for the after-tax effect of dividend equivalent payments made to holders of vested stock options.

| | 2008 | 2007 | 2006 |
|---|---|---|---|
| | *($ in millions except per share, shares in millions)* | | |
| Diluted earnings per share: | | | |
| Income available to common stockholders | $ 1,716 | $ 1,464 | $ 1,481 |
| Weighted-average shares outstanding per above | 372.3 | 389.6 | 406.0 |
| Dilutive effect of outstanding options and share-settled awards (as determined by the application of the treasury stock method) | 7.7 | 8.2 | 8.7 |
| Adjusted weighted-average shares outstanding | 380.0 | 397.8 | 414.7 |
| Diluted earnings per share | $ 4.52 | $ 3.68 | $ 3.57 |

The diluted calculations exclude options having exercise prices exceeding the average market price of Common Stock as follows: zero in 2008 and 2007 and 1 million in 2006.

**15. Fair Values of Financial Instruments**

The fair values of “Cash and cash equivalents,” “Accounts receivable” and “Accounts payable” approximate carrying values because of the short maturity of these financial instruments. The fair value of corporate-owned life insurance approximates carrying value. The carrying amounts and estimated fair values for the remaining financial instruments, excluding derivatives and investments accounted for under the equity method in accordance with APB Opinion No. 18, consisted of the following at December 31:

| | 2008 | | 2007 | |
|---|---|---|---|---|
| | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
| | *($ in millions)* | | | |
| Investments | $ 187 | $ 202 | $ 154 | $ 173 |
| Long-term debt | $ (6,667) | $ (6,885) | $ (6,368) | $ (6,935) |

Underlying net assets were used to estimate the fair value of investments. The fair values of notes receivable are based on future discounted cash flows. The fair values of debt were estimated based on quoted market prices or discounted cash flows using current interest rates for debt with similar terms, company rating and remaining maturity.

Carrying amounts of marketable securities reflect unrealized holding gains of zero on December 31, 2008 and 2007. Sales of “available-for-sale” securities were immaterial for the years ended December 31, 2008, 2007, and 2006; most short-term investments were redeemed at maturity during 2007.

**16. Derivative Financial Instruments**

All derivatives are recognized in the financial statements as either assets or liabilities and are measured at fair value. Changes in fair value are recorded as adjustments to the assets or liabilities being hedged in “Other comprehensive loss,” or in current earnings, depending on whether the derivative is designated and qualifies for hedge accounting, the type of hedge transaction represented and the effectiveness of the hedge.

NS has used derivative financial instruments to reduce the risk of volatility in its diesel fuel costs and to manage its overall exposure to fluctuations in interest rates. NS does not engage in the trading of derivatives. Management has determined that its derivative financial instruments qualify as either fair-value or cash-flow hedges, having values that highly correlate with the underlying hedged exposures, and has designated such instruments as hedging transactions. Credit risk related to the derivative financial instruments is considered to be minimal and is managed by requiring high credit standards for counterparties and periodic settlements.

**Diesel Fuel Hedging**

From 2001 until May 2004, NS entered into heating oil contracts that hedged a portion of its diesel fuel consumption. The intent of the program was to assist in the management of NS’ aggregate risk exposure to fuel price fluctuations, which can significantly affect NS’ operating margins and profitability, through the use of one or more types of derivative instruments. The goal of this hedging strategy was to reduce the variability of fuel costs over an extended period of time while minimizing the incremental cost of hedging. The program provided that NS would not enter into any fuel hedges with a duration of more than 36 months, and that no more than 80% of NS’ average monthly fuel consumption would be hedged for any month within any 36-month period. After taking into account the effect of the hedging, diesel fuel costs represented 14% of NS’ operating expenses for the year ended December 31, 2006. The last remaining contracts were settled in the second quarter of 2006, bringing an end to this program. NS’ fuel hedging activity resulted in a decrease in diesel fuel expense of $20 million in 2006. Ineffectiveness, or the extent to which changes in the fair value of the heating oil contracts did not offset changes in the fair values of the expected diesel fuel transactions, resulted in a $1 million expense in 2006.

**Interest Rate Hedging**

NS manages its overall exposure to fluctuations in interest rates by issuing both fixed- and floating-rate debt instruments, and by entering into interest rate hedging transactions to achieve an appropriate mix within its debt portfolio. NS had $17 million, or less than 1%, and $59 million, or about 1%, of its fixed rate debt portfolio hedged as of December 31, 2008, and December 31, 2007, respectively, using interest rate swaps that qualify for and are designated as fair-value hedge transactions. NS' interest rate hedging activity resulted in decreases in interest expense of approximately $1 million for 2008, 2007, and 2006. These swaps have been effective in hedging the changes in fair value of the related debt arising from changes in interest rates and there has been no impact on earnings resulting from ineffectiveness associated with these derivative transactions.

**Fair Values**

Fair values of interest rate swaps at December 31, 2008, and December 31, 2007, were determined based upon the present value of expected future cash flows discounted at the appropriate implied spot rate from the spot rate yield curve. Fair value adjustments are noncash transactions and, accordingly, are excluded from the Consolidated Statements of Cash Flows. The gross and net asset position of NS' outstanding derivative financial instruments was approximately $1 million at December 31, 2008 and 2007.

**17. Commitments and Contingencies**

**Lawsuits**

Norfolk Southern and/or certain subsidiaries are defendants in numerous lawsuits and other claims relating principally to railroad operations. When management concludes that it is probable that a liability has been incurred and the amount of the liability can be reasonably estimated, it is accrued through a charge to earnings. While the ultimate amount of liability incurred in any of these lawsuits and claims is dependent on future developments, in management's opinion, the recorded liability is adequate to cover the future payment of such liability and claims. However, the final outcome of any of these lawsuits and claims cannot be predicted with certainty, and unfavorable or unexpected outcomes could result in additional accruals that could be significant to results of operations in a particular year or quarter. Any adjustments to the recorded liability will be reflected in earnings in the periods in which such adjustments are known.

**Casualty Claims**

Casualty claims include employee personal injury and occupational claims as well as third-party claims, all exclusive of legal costs. To aid in valuing its personal injury liability and determining the amount to accrue with respect to such claim during the year, NS' management utilizes studies prepared by an independent consulting actuarial firm. Job-related accidental injury and occupational claims are subject to the Federal Employers' Liability Act (FELA), which is applicable only to railroads. FELA's fault-based system produces results that are unpredictable and inconsistent as compared with a no-fault workers' compensation system. The variability inherent in this system could result in actual costs being different from the liability recorded. While the ultimate amount of claims incurred is dependent on future developments, in management's opinion, the recorded liability is adequate to cover the future payments of claims and is supported by the most recent actuarial study. In all cases, NS records a liability when the expected loss for the claim is both probable and estimable.

In April 2008, NS settled the lawsuit brought by Avondale Mills for claims associated with the January 6, 2005, derailment in Graniteville, SC. The total liability related to the derailment represents NS' best estimate based on current facts and circumstances. The estimate includes amounts related to business property damage and other economic losses, personal injury and individual property damage claims, as well as third-party response costs. NS' commercial insurance policies are expected to cover substantially all expenses related to this

derailment above the unreimbursed portion and NS' self-insured retention, including NS' response costs and legal fees. The Consolidated Balance Sheets reflect current and long-term receivables for estimated recoveries from NS' insurance carriers. NS is engaged in arbitration with one of its insurance carriers that failed to respond to an insurance claim submitted by NS. NS believes these expenses are covered by the insurance policy and that recovery of any contested amount is probable, in that NS expects the arbitrator will determine the settlement amounts to be reasonable and that the insurer's refusal to consent to and to fund the settlement was a breach of contract. Accordingly, NS has recorded the full recovery attributable to such carrier ($100 million). In October 2008, another of NS' insurance carriers provided the preliminary findings of its review of NS' reimbursement request and reported that it may dispute a portion of that request. NS has initiated arbitration against the carrier and believes that all expenses contained in the reimbursement request are covered by the insurance policy and that recovery is probable.

**Employee personal injury claims** – The largest component of casualties and other claims expense is employee personal injury costs. The independent actuarial firm engaged by NS provides quarterly studies to aid in valuing its employee personal injury liability and estimating its employee personal injury expense. The actuarial firm studies NS' historical patterns of reserving for claims and subsequent settlements, taking into account relevant outside influences. The actuary uses the results of these analyses to estimate the ultimate amount of the liability, which includes amounts for incurred but unasserted claims. NS adjusts its liability quarterly based upon management's assessment and the results of the study. The estimate of loss liabilities is subject to inherent limitation given the difficulty of predicting future events such as jury decisions, court interpretations, or legislative changes and as such the actual loss may vary from the estimated liability recorded.

**Occupational claims** – Occupational claims (including asbestosis and other respiratory diseases, as well as conditions allegedly related to repetitive motion) are often not caused by a specific accident or event but rather allegedly result from a claimed exposure over time. Many such claims are being asserted by former or retired employees, some of whom have not been employed in the rail industry for decades. The independent actuarial firm provides an estimate of the occupational claims liability based upon NS' history of claim filings, severity, payments, and other pertinent facts. The liability is dependent upon management's judgments made as to the specific case reserves as well as judgments of the consulting independent actuarial firm in the periodic studies. The actuarial firm's estimate of ultimate loss includes a provision for those claims that have been incurred but not reported. This provision is derived by analyzing industry data and projecting NS' experience into the future as far as can be reasonably determined. NS adjusts its liability quarterly based upon management's assessment and the results of the study. However, it is possible that the recorded liability may not be adequate to cover the future payment of claims. Adjustments to the recorded liability are reflected in operating expenses in the periods in which such adjustments become known.

**Third-party claims** – NS records a liability for third-party claims including those for highway crossing accidents, trespasser and other injuries, automobile liability, property damage, and lading damage. The independent actuarial firm assists with the calculation of potential liability for third-party claims, except lading damage, based upon NS' experience including number and timing of incidents, amount of payments, settlement rates, number of open claims, and legal defenses. The actuarial estimate includes a provision for claims that have been incurred but have not yet been reported. Each quarter NS adjusts its liability based upon management's assessment and the results of the study. Given the inherent uncertainty in regard to the ultimate outcome of third-party claims, it is possible that the actual loss may differ from the estimated liability recorded.

**Environmental Matters**

NS is subject to various jurisdictions' environmental laws and regulations. It is NS' policy to record a liability where such liability or loss is probable and its amount can be estimated reasonably. Claims, if any, against third parties for recovery of cleanup costs incurred by NS are reflected as receivables (when collection is probable) in the Consolidated Balance Sheets and are not netted against the associated NS liability.

Environmental engineers regularly participate in ongoing evaluations of all known sites and in determining any necessary adjustments to liability estimates. NS also has an Environmental Policy Council, composed of senior managers, to oversee and interpret its environmental policy.

NS' Consolidated Balance Sheets include liabilities for environmental exposures in the amount of $42 million at December 31, 2008, and $46 million at December 31, 2007 (of which $12 million is classified as a current liability at December 31, 2008 and 2007). At December 31, 2008, the liability represents NS' estimate of the probable cleanup and remediation costs based on available information at 148 known locations compared with 155 locations at December 31, 2007. As of December 31, 2008, 13 sites accounted for $22 million of the liability, and no individual site was considered to be material. NS anticipates that much of this liability will be paid out over five years; however, some costs will be paid out over a longer period.

At 30 locations, one or more Norfolk Southern subsidiaries, usually in conjunction with a number of other parties, have been identified as potentially responsible parties by the Environmental Protection Agency (EPA) or similar state authorities under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, or comparable state statutes, which often impose joint and several liability for cleanup costs.

With respect to known environmental sites (whether identified by NS or by the EPA or comparable state authorities), estimates of NS' ultimate potential financial exposure for a given site or in the aggregate for all such sites are necessarily imprecise because of the widely varying costs of currently available cleanup techniques, the likely development of new cleanup technologies, the difficulty of determining in advance the nature and full extent of contamination and each potential participant's share of any estimated loss (and that participant's ability to bear it), and evolving statutory and regulatory standards governing liability.

The risk of incurring environmental liability – for acts and omissions, past, present and future - is inherent in the railroad business. Some of the commodities in NS' traffic mix, particularly those classified as hazardous materials, pose special risks that NS and its subsidiaries work diligently to minimize. In addition, several NS subsidiaries own, or have owned, land used as operating property, or which is leased and operated by others, or held for sale. Because environmental problems may exist on these properties that are latent or undisclosed, there can be no assurance that NS will not incur environmental liabilities or costs with respect to one or more of them, the amount and materiality of which cannot be estimated reliably at this time. Moreover, lawsuits and claims involving these and potentially other unidentified environmental sites and matters are likely to arise from time to time. The resulting liabilities could have a significant effect on financial position, results of operations, or liquidity in a particular year or quarter.

On April 24, 2008, the United States Department of Justice (DOJ) brought an action against NS for alleged violations of federal environmental laws resulting from the discharge of chlorine and oil that occurred as a result of the January 6, 2005, derailment in Graniteville, SC, including claims for civil penalties as well as injunctive relief. On June 24, 2008, NS filed a motion to dismiss DOJ's claims, contending that insufficient facts have been alleged to support such claims. NS does not believe that the outcome of these proceedings will have a material effect on its financial position, results of operations, or liquidity.

Based on its assessment of the facts and circumstances now known, management believes that it has recorded the probable costs for dealing with those environmental matters of which NS is aware. Further, management believes that it is unlikely that any known matters, either individually or in the aggregate, will have a material adverse effect on NS' financial position, results of operations, or liquidity.

**Insurance**

Norfolk Southern obtains on behalf of itself and its subsidiaries insurance for potential losses for third-party liability and first-party property damages. NS is currently self-insured up to $25 million and above $1 billion

per occurrence for bodily injury and property damage to third parties and up to $25 million and above $175 million per occurrence for property owned by NS or in NS' care, custody or control.

**Purchase Commitments**

At December 31, 2008, NS had outstanding purchase commitments of approximately $119 million primarily for freight cars, RoadRailer® trailers and track material in connection with its capital programs through 2010.

**Change-In-Control Arrangements**

Norfolk Southern has compensation agreements with officers and certain key employees that become operative only upon a change in control of Norfolk Southern, as defined in those agreements. The agreements provide generally for payments based on compensation at the time of a covered individual's involuntary or other specified termination and for certain other benefits.

**Guarantees**

In a number of instances, Norfolk Southern and its subsidiaries have agreed to indemnify lenders for additional costs they may bear as a result of certain changes in laws or regulations applicable to their loans. Such changes may include impositions or modifications with respect to taxes, duties, reserves, liquidity, capital adequacy, special deposits, and similar requirements relating to extensions of credit by, deposits with, or the assets or liabilities of such lenders. The nature and timing of changes in laws or regulations applicable to NS' financings are inherently unpredictable, and therefore NS' exposure in connection with the foregoing indemnifications cannot be quantified. No liability has been recorded related to these indemnifications. In the case of one type of equipment financing, NSR's Japanese leveraged leases, NSR may terminate the leases and ancillary agreements if such a change-in-law indemnity is triggered. Such a termination would require NSR to make early termination payments that would not be expected to have a material effect on NS' financial position, results of operations, or liquidity.

NS has indemnified parties in a number of transactions for U.S. income tax withholding imposed as a result of changes in U.S. tax law. In all cases, NS has the right to unwind the related transaction if the withholding cannot be avoided in the future. Because these indemnities would be triggered and are dependent upon a change in the tax law, the maximum exposure is not quantifiable. Management does not believe that it is likely that it will be required to make any payments under these indemnities.

As of December 31, 2008, certain Norfolk Southern subsidiaries are contingently liable as guarantors with respect to $8 million of indebtedness, due in 2019, of an entity in which they have an ownership interest, the Terminal Railroad Association of St. Louis. Four other railroads are also jointly and severally liable as guarantors for this indebtedness. No liability has been recorded related to this guaranty.

*** * * * ***

**NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES**
**QUARTERLY FINANCIAL DATA**
**(Unaudited)**

| | Three Months Ended | | | |
|---|---|---|---|---|
| | **March 31** | **June 30** | **September 30** | **December 31** |
| | *($ in millions, except per share amounts)* | | | |
| **2008** | | | | |
| Railway operating revenues | $ 2,500 | $ 2,765 | $ 2,894 | $ 2,502 |
| Income from railway operations | 578 | 799 | 894 | 813 |
| Net income | 291 | 453 | 520 | 452 |
| Earnings per share: | | | | |
| Basic | $ 0.77 | $ 1.20 | $ 1.39 | $ 1.23 |
| Diluted | $ 0.76 | $ 1.18 | $ 1.37 | $ 1.21 |
| **2007** | | | | |
| Railway operating revenues | $ 2,247 | $ 2,378 | $ 2,353 | $ 2,454 |
| Income from railway operations | 528 | 690 | 681 | 686 |
| Net income | 285 | 394 | 386 | 399 |
| Earnings per share: | | | | |
| Basic | $ 0.72 | $ 1.00 | $ 0.99 | $ 1.04 |
| Diluted | $ 0.71 | $ 0.98 | $ 0.97 | $ 1.02 |

## Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure

None.

## Item 9A. Controls and Procedures

### Evaluation of Disclosure Controls and Procedures

Norfolk Southern's Chief Executive Officer and Chief Financial Officer, with the assistance of management, evaluated the effectiveness of NS' disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of December 31, 2008. Based on such evaluation, such officers have concluded that, as of December 31, 2008, NS' disclosure controls and procedures were effective to ensure that information required to be disclosed in NS' reports under the Exchange Act is recorded, processed, summarized, and reported, within the time period specified in the SEC's rules and forms, and that such information is accumulated and communicated to management, including the Chief Executive Officer and the Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

### Internal Control Over Financial Reporting

The management of Norfolk Southern is responsible for establishing and maintaining adequate internal control over financial reporting. Norfolk Southern's internal control over financial reporting includes those policies and procedures that pertain to its ability to record, process, summarize, and report reliable financial data. Management recognizes that there are inherent limitations in the effectiveness of any internal control over financial reporting, including the possibility of human error and the circumvention or overriding of internal control. Accordingly, even effective internal control over financial reporting can provide only reasonable assurance with respect to financial statement preparation. Further, because of changes in conditions, the effectiveness of internal control over financial reporting may vary over time.

In order to ensure that Norfolk Southern's internal control over financial reporting is effective, management regularly assesses such controls and did so most recently for its financial reporting as of December 31, 2008. This assessment was based on criteria for effective internal control over financial reporting set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in *Internal Control-Integrated Framework*. Based on our assessment, management has concluded that Norfolk Southern maintained effective internal control over financial reporting as of December 31, 2008.

The Board of Directors, acting through its Audit Committee, is responsible for the oversight of Norfolk Southern's accounting policies, financial reporting and internal control. The Audit Committee of the Board of Directors is comprised entirely of outside directors who are independent of management. The independent registered public accounting firm and the internal auditors have full and unlimited access to the Audit Committee, with or without management, to discuss the adequacy of internal control over financial reporting, and any other matters which they believe should be brought to the attention of the Audit Committee.

Norfolk Southern's management has issued a report of its assessment of internal control over financial reporting, and Norfolk Southern's independent registered public accounting firm has issued an attestation report on Norfolk Southern's internal controls over financial reporting as of December 31, 2008. These reports appear in Part II, Item 8 of this report on Form 10-K.

During the fourth quarter of 2008, management has not identified any changes in internal controls over financial reporting that have materially affected, or are reasonably likely to materially affect, NS' internal control over financial reporting.

## Item 9B. Other Information

None.

# PART III

## NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES (NS)

### Item 10. Directors, Executive Officers and Corporate Governance

In accordance with General Instruction G(3), information called for by Item 10, Part III, is incorporated herein by reference from the information appearing under the caption "Election of Directors," under the caption "Section 16(a) Beneficial Ownership Reporting Compliance," under the caption "Corporate Governance," and under the caption "Committees" in Norfolk Southern's definitive Proxy Statement for the Annual Meeting of Stockholders to be held on May 14, 2009, which definitive Proxy Statement will be filed electronically with the Securities and Exchange Commission (Commission) pursuant to Regulation 14A. The information regarding executive officers called for by Item 401 of Regulation S-K is included in Part I hereof beginning under "Executive Officers of the Registrant."

### Item 11. Executive Compensation

In accordance with General Instruction G(3), information called for by Item 11, Part III, is incorporated herein by reference from the information:

- appearing under the subcaption "Compensation" under the caption "Board of Directors" for directors, including the "2008 Non-Employee Director Compensation Table" and the "Narrative to Non-Employee Director Compensation Table;"
- appearing under the caption "Executive Compensation" for executives, including the "Compensation Discussion and Analysis," the information appearing in the "Summary Compensation Table" and the "2008 Grants of Plan-Based Awards" table, including the narrative to such tables, the "Outstanding Equity Awards at Fiscal Year-End 2008" and "Option Exercises and Stock Vested in 2008" tables, and the tabular and narrative information appearing under the subcaptions "Retirement Benefits," "Deferred Compensation," and "Potential Payments Upon a Change in Control or Other Termination of Employment;" and
- appearing under the captions "Compensation Committee Interlocks and Insider Participation" and "Compensation Committee Report,"

in each case included in Norfolk Southern's definitive Proxy Statement for the Annual Meeting of Stockholders to be held on May 14, 2009, which definitive Proxy Statement will be filed electronically with the Commission pursuant to Regulation 14A.

### Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters

In accordance with General Instruction G(3), information on security ownership of certain beneficial owners and management called for by Item 12, Part III, Item 403 of Regulation S-K, is incorporated herein by reference from the information appearing under the caption "Beneficial Ownership of Stock" in Norfolk Southern's definitive Proxy Statement for the Annual Meeting of Stockholders to be held on May 14, 2009, which definitive Proxy Statement will be filed electronically with the Commission pursuant to Regulation 14A.

**Equity Compensation Plan Information (as of December 31, 2008)**

| Plan Category | Number of securities to be issued upon exercise of outstanding options, warrants and rights (a) | | Weighted-average Exercise price of outstanding options, warrants and rights (b) | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) (c) |
|---|---|---|---|---|
| Equity compensation plans approved by security holders[1] | 14,937,465 [3] | $ | 31.26 [5] | 6,837,414 [6] |
| Equity compensation plans not approved by security holders[2] | 1,946,100 [4] | $ | 35.52 | 2,072,420 [7] |
| Total | 16,883,565 | | | 8,909,834 |

1 The Long-Term Incentive Plan, excluding five million shares for broad-based issuance to non-officers.

2 The Long-Term Incentive Plan's five million shares for broad-based issuance to non-officers, the Thoroughbred Stock Option Plan and the Directors' Restricted Stock Plan.

3 Includes options, restricted stock units and performance share units granted under the Long-Term Incentive Plan that may be settled in shares of stock.

4 Includes options granted under the Long-Term Incentive Plan on 428,168 shares for non-officers and options granted under the Thoroughbred Stock Option Plan.

5 Calculated without regard to 2,598,842 outstanding restricted stock units and performance share units at December 31, 2008.

6 Of the shares remaining available for grant under plans approved by stockholders, 5,582,679 are available for grant as restricted shares, performance shares or restricted stock unit shares under the Long-Term Incentive Plan.

7 Of the shares remaining available for grant under plans not approved by stockholders, 30,000 are available for grant as restricted stock under the Directors' Restricted Stock Plan.

**Norfolk Southern Corporation Long-Term Incentive Plan ("LTIP")**

Established on June 28, 1983, and approved by stockholders at their Annual Meeting held on May 10, 1984, LTIP was adopted to promote the success of Norfolk Southern by providing an opportunity for non-employee directors, officers and other key employees to acquire a proprietary interest in the Corporation. On January 23, 2001, the Board of Directors further amended LTIP and approved the issuance of an additional 5,000,000 shares of authorized but unissued Common Stock under LTIP to participants who are not officers of Norfolk Southern. The issuance of these shares was broadly-based, and stockholder approval of these shares was not required. Accordingly, this portion of LTIP is included in the number of securities available for future issuance for plans not approved by stockholders. Also on January 23, 2001, the Board amended LTIP, which amendment was approved by shareholders on May 10, 2001, that included the reservation for issuance of an additional 30,000,000 shares of authorized but unissued Norfolk Southern Common Stock.

Pursuant to another amendment approved by stockholders on May 12, 2005, not more than 8,500,000 of the shares remaining available for issuance under LTIP may be awarded as restricted shares, performance shares or restricted stock unit shares. Cash payments of restricted stock units, stock appreciation rights, and performance share units will not be applied against the maximum number of shares issuable under LTIP. Any shares of Common Stock

subject to options, performance share units, restricted shares or restricted stock units which are not issued as Common Stock will again be available for award under LTIP after the expiration or forfeiture of an award.

Non-employee directors, officers and other key employees residing in the United States or Canada are eligible for selection to receive LTIP awards. Under LTIP, the Compensation Committee (Committee) may grant incentive stock options, nonqualified stock options, stock appreciation rights, restricted shares, restricted stock units, and performance share units. In addition, dividend equivalents may be awarded for options, restricted stock units, and performance share units. The Committee may make awards under LTIP subject to forfeiture under certain circumstances and may establish such other terms and conditions for the awards as provided in LTIP.

For options, the option price per share will not be less than 100% of the fair market value of Norfolk Southern's Common Stock on the effective date the option is granted. All options are subject to a vesting period of at least one year, and the term of the option will not exceed ten years. LTIP specifically prohibits option repricing without stockholder approval, except for capital adjustments.

Performance share units entitle a recipient to receive performance-based compensation at the end of a three-year performance cycle based on Norfolk Southern's performance during that three-year period. For the 2008 performance share unit awards, corporate performance will be measured using three equally weighted standards established by the Committee: (1) three-year average return on average capital invested, (2) three-year average operating ratio, and (3) three-year total return to stockholders as compared with the average total return on all stocks comprising the S&P 500 composite stock price index. Performance share units may be payable in either shares of Norfolk Southern Common Stock or cash.

Restricted stock units are payable in cash or in shares of Norfolk Southern Common Stock at the end of a restriction period of not less than 36 months and not more than 60 months. During the restriction period, the holder of the restricted stock units has no beneficial ownership interest in the Norfolk Southern Common Stock represented by the restricted stock units and has no right to vote the shares represented by the units or to receive dividends (except for dividend equivalent rights that may be awarded with respect to the restricted stock units). The Committee at its discretion may waive the restriction period.

**Norfolk Southern Corporation Thoroughbred Stock Option Plan**

The Board adopted the Norfolk Southern Corporation Thoroughbred Stock Option Plan ("TSOP") on January 26, 1999, to promote the success of Norfolk Southern by providing an opportunity for nonagreement employees to acquire a proprietary interest in Norfolk Southern and thereby to provide an additional incentive to nonagreement employees to devote their maximum efforts and skills to the advancement, betterment, and prosperity of Norfolk Southern and its stockholders. Under the TSOP there were 6,000,000 shares of authorized but unissued Common Stock reserved for issuance. TSOP has not been and is not required to have been approved by stockholders.

Active full-time nonagreement employees residing in the United States or Canada are eligible for selection to receive TSOP awards. Under TSOP, the Committee may grant nonqualified stock options subject to such terms and conditions as provided in TSOP.

The option price will not be less than 100% of the fair market value of Norfolk Southern's Common Stock on the effective date the options are granted. All options are subject to a vesting period of at least one year, and the term of the option will not exceed ten years. Options awarded in 2008 are subject to a three-year vesting period. TSOP specifically prohibits option repricing without stockholder approval, except for capital adjustments.

**Norfolk Southern Corporation Directors' Restricted Stock Plan**

The Norfolk Southern Corporation Directors' Restricted Stock Plan ("Plan") was adopted on January 1, 1994, and is designed to increase ownership of Norfolk Southern Common Stock by its non-employee directors so as to further align their ownership interest in Norfolk Southern with that of stockholders. The Plan has not been and is not required to have been approved by stockholders. Currently, a maximum of 66,000 shares of Norfolk Southern Common Stock may be granted under the Plan. To make grants to eligible directors, Norfolk Southern purchases, through one or more subsidiary companies, the number of shares required in open-market transactions at prevailing market prices, or makes such grants from Norfolk Southern Common Stock already owned by one or more of Norfolk Southern's subsidiary companies.

Only non-employee directors who are not and never have been employees of Norfolk Southern are eligible to participate in the Plan. Upon becoming a director, each eligible director receives a one-time grant of 3,000 restricted shares of Norfolk Southern Common Stock. No individual member of the Board exercises discretion concerning the eligibility of any director or the number of shares granted.

The restriction period applicable to restricted shares granted under the Plan begins on the date of the grant and ends on the earlier of the recipient's death or six months after the recipient ceases to be a director by reason of disability or retirement. During the restriction period shares may not be sold, pledged, or otherwise encumbered. Directors will forfeit the restricted shares if they cease to serve as a director of Norfolk Southern for reasons other than their disability, retirement, or death.

**Item 13. Certain Relationships and Related Transactions, and Director Independence**

In accordance with General Instruction G(3), information called for by Part III, Item 13, is incorporated herein by reference from the information appearing under the caption "Transactions with Related Persons" and under the caption "Director Independence" in Norfolk Southern's definitive Proxy Statement for the Annual Meeting of Stockholders to be held on May 14, 2009, which definitive Proxy Statement will be filed electronically with the Commission pursuant to Regulation 14A.

**Item 14. Principal Accountant Fees and Services**

In accordance with General Instruction G(3), information called for by Part III, Item 14, is incorporated herein by reference from the information appearing under the caption "Ratification of Appointment of Independent Registered Public Accounting Firm" in Norfolk Southern's definitive Proxy Statement for the Annual Meeting of Stockholders to be held on May 14, 2009, which definitive proxy statement will be filed electronically with the Commission pursuant to Regulation 14A.

## PART IV

## NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES (NS)

### Item 15. Exhibits and Financial Statement Schedules

Page

(A) The following documents are filed as part of this report:

1. Index to Consolidated Financial Statements


| | |
|---|---|
| Report of Management | K42 |
| Reports of Independent Registered Public Accounting Firm | K43 |
| Consolidated Statements of Income, Years ended December 31, 2008, 2007 and 2006 | K45 |
| Consolidated Balance Sheets as of December 31, 2008 and 2007 | K46 |
| Consolidated Statements of Cash Flows, Years ended December 31, 2008, 2007 and 2006 | K47 |
| Consolidated Statements of Changes in Stockholders' Equity, Years ended December 31, 2008, 2007 and 2006 | K48 |
| Notes to Consolidated Financial Statements | K49 |


2. Financial Statement Schedule:

The following consolidated financial statement schedule should be read in connection with the consolidated financial statements:


| Index to Consolidated Financial Statement Schedule | Page |
|---|---|
| Schedule II - Valuation and Qualifying Accounts | K95 |


Schedules other than the one listed above are omitted either because they are not required or are inapplicable, or because the information is included in the consolidated financial statements or related notes.

3. Exhibits

| Exhibit Number | Description |
|---|---|
| 3 | Articles of Incorporation and Bylaws - |
| 3(i) | The Restated Articles of Incorporation of Norfolk Southern Corporation are incorporated by reference to Exhibit 3(i) to Norfolk Southern Corporation's 10-K filed on March 5, 2001. |
| 3(ii) | The Bylaws of Norfolk Southern Corporation, as amended effective January 27, 2009, are incorporated by reference to Exhibit 3(ii) to Norfolk Southern Corporation's Form 8-K filed on January 30, 2009. |
| 4 | Instruments Defining the Rights of Security Holders, Including Indentures: |
| (a) | Indenture, dated as of January 15, 1991, from Norfolk Southern Corporation to First Trust of New York, National Association, as Trustee, is incorporated by reference to Exhibit 4.1 to Norfolk Southern Corporation's Registration Statement on Form S-3 (No. 33-38595). |

(b) First Supplemental Indenture, dated May 19, 1997, between Norfolk Southern Corporation and First Trust of New York, National Association, as Trustee, related to the issuance of notes in the principal amount of $4.3 billion, is incorporated herein by reference to Exhibit 1.1(d) to Norfolk Southern Corporation's Form 8-K filed on May 21, 1997.

(c) Second Supplemental Indenture, dated April 26, 1999, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, related to the issuance of notes in the principal amount of $400 million, is incorporated herein by reference to Exhibit 1.1(c) to Norfolk Southern Corporation's Form 8-K filed on April 30, 1999.

(d) Third Supplemental Indenture, dated May 23, 2000, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, related to the issuance of notes in the principal amount of $600 million, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on May 25, 2000.

(e) Fourth Supplemental Indenture, dated as of February 6, 2001, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, related to the issuance of notes in the principal amount of $1 billion, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on February 7, 2001.

(f) Sixth Supplemental Indenture, dated as of April 30, 2002, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, relating to the issuance of notes in the principal amount of $200 million, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on May 1, 2002.

(g) Eighth Supplemental Indenture, dated as of September 17, 2004, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, relating to the issuance of 5.257% Notes due 2014 ("Securities") in the aggregate principal amount of $441.5 million in connection with Norfolk Southern Corporation's offer to exchange the Securities and cash for up to $400 million of its outstanding 7.350% Notes due 2007, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on September 23, 2004.

(h) Indenture, dated August 27, 2004, among PRR Newco, Inc., as Issuer, and Norfolk Southern Railway Company, as Guarantor, and The Bank of New York, as Trustee, is incorporated herein by reference to Exhibit 4(l) to Norfolk Southern Corporation's Form 10-Q filed on October 28, 2004.

(i) First Supplemental Indenture, dated August 27, 2004, among PRR Newco, Inc., as Issuer, and Norfolk Southern Railway Company, as Guarantor, and The Bank of New York, as Trustee, related to the issuance of notes in the principal amount of approximately $451.8 million, is incorporated herein by reference to Exhibit 4(m) to Norfolk Southern Corporation's Form 10-Q filed on October 28, 2004.

(j) Ninth Supplemental Indenture, dated as of March 11, 2005, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, relating to the issuance of notes in the principal amount of $300 million, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on March 15, 2005.

(k) Tenth Supplemental Indenture, dated as of May 17, 2005, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, relating to the issuance of notes in the principal amount of $366.6 million, is incorporated herein by reference to Exhibit 99.1 to Norfolk Southern Corporation's Form 8-K filed on May 18, 2005.

(l) Eleventh Supplemental Indenture, dated as of May 17, 2005, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, relating to the issuance of notes in the principal amount of $350 million, is incorporated herein by reference to Exhibit 99.2 to Norfolk Southern Corporation's Form 8-K filed on May 18, 2005.

(m) Indenture, dated as of April 4, 2008, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, relating to the issuance of notes in the principal amount of $600 million, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on April 9, 2008.

(n) Indenture, dated as of January 15, 2009, between Norfolk Southern Corporation and U.S. Bank trust National Association, as Trustee, relating to the issuance of notes in the principal amount of $500 million, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on January 20, 2009.

(o) Registration Rights Agreement, dated as of January 15, 2009, among Norfolk Southern Corporation and Citigroup Global Markets Inc., J.P. Morgan Securities Inc and UBS Securities LLC, is incorporated herein by reference to Exhibit 4.2 to Norfolk Southern Corporation's Form 8-K filed on January 20, 2009.

(p) In accordance with Item 601(b)(4)(iii) of Regulation S-K, copies of other instruments of Norfolk Southern Corporation and its subsidiaries with respect to the rights of holders of long-term debt are not filed herewith, or incorporated by reference, but will be furnished to the Commission upon request.

10 Material Contracts -

(a) The Transaction Agreement, dated as of June 10, 1997, by and among CSX, CSX Transportation, Inc., Registrant, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation, and CRR Holdings LLC, with certain schedules thereto, previously filed, is incorporated herein by reference to Exhibit 10(a) to Norfolk Southern Corporation's Form 10-K filed on February 24, 2003.

(b) Amendment No. 1, dated as of August 22, 1998, to the Transaction Agreement, dated as of June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation, and CRR Holdings LLC, is incorporated herein by reference from Exhibit 10.1 to Norfolk Southern Corporation's Form 10-Q filed on August 11, 1999.

(c) Amendment No. 2, dated as of June 1, 1999, to the Transaction Agreement, dated June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation, and CRR Holdings LLC, is incorporated herein by reference from Exhibit 10.2 to Norfolk Southern Corporation's Form 10-Q filed on August 11, 1999.

(d) Amendment No. 3, dated as of June 1, 1999, and executed in April 2004, to the Transaction Agreement, dated June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation, and CRR Holdings LLC, is incorporated herein by reference to Exhibit 10(dd) to Norfolk Southern Corporation's Form 10-Q filed on July 30, 2004.

(e) Amendment No. 5 to the Transaction Agreement, dated as of August 27, 2004, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation, and CRR Holdings LLC, is incorporated herein by reference to Exhibit 10.1 to Norfolk Southern Corporation's Form 8-K filed on September 2, 2004.

(f) Amendment No. 6, dated as of April 1, 2007, to the Transaction Agreement dated June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation, and CRR Holdings LLC is incorporated herein by reference to Exhibit 10.5 to Norfolk Southern Corporation's Form 10-Q filed on July 27, 2007.

(g) Shared Assets Area Operating Agreement for North Jersey, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc., and Norfolk Southern Railway Company, with exhibit thereto, is incorporated herein by reference from Exhibit 10.4 to Norfolk Southern Corporation's Form 10-Q filed on August 11, 1999.

(h) Shared Assets Area Operating Agreement for Detroit, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc., and Norfolk Southern Railway Company, with exhibit thereto, is incorporated herein by reference from Exhibit 10.6 to Norfolk Southern Corporation's Form 10-Q filed on August 11, 1999.

(i) Shared Assets Area Operating Agreement for South Jersey/Philadelphia, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation Inc., and Norfolk Southern Railway Company, with exhibit thereto, is incorporated herein by reference from Exhibit 10.5 to Norfolk Southern Corporation's Form 10-Q filed on August 11, 1999.

(j) Amendment No. 1, dated as of June 1, 2000, to the Shared Assets Areas Operating Agreement for North Jersey, South Jersey/Philadelphia, and Detroit, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc., and Norfolk Southern Railway Company, with exhibit thereto, is incorporated herein by reference to Exhibit 10(h) to Norfolk Southern Corporation's 10-K filed on March 5, 2001.

(k) Amendment No. 2, dated as January 1, 2001, to the Shared Assets Area Operating Agreements for North Jersey, South Jersey/Philadelphia, and Detroit, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc., and Norfolk Southern Railway Company, with exhibit thereto, is incorporated herein by reference to Exhibit 10(j) to Norfolk Southern Corporation's Form 10-K filed on February 21, 2002.

(l) Amendment No. 3, dated as of June 1, 2001, and executed in May of 2002, to the Shared Assets Area Operating Agreement for North Jersey, South Jersey/Philadelphia, and Detroit, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc., and Norfolk Southern Railway Company, with exhibit thereto, is incorporated herein by reference to Exhibit 10(k) to Norfolk Southern Corporation's Form 10-K filed on February 24, 2003.

(m) Amendment No. 4, dated as of June 1, 2005, and executed in late June 2005, to the Shared Assets Area Operating Agreement for North Jersey, South Jersey/Philadelphia, and Detroit, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc., and Norfolk Southern Railway Company, with exhibits thereto, is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K filed on July 1, 2005.

(n) Monongahela Usage Agreement, dated as of June 1, 1999, by and among CSX Transportation, Inc., Norfolk Southern Railway Company, Pennsylvania Lines LLC, and New York Central Lines LLC, with exhibit thereto, is incorporated herein by reference from Exhibit 10.7 to Norfolk Southern Corporation's Form 10-Q filed on August 11, 1999.

(o) The Agreement, entered into as of July 27, 1999, between North Carolina Railroad Company and Norfolk Southern Railway Company, is incorporated herein by reference from Exhibit 10(i) to Norfolk Southern Corporation's Form 10-K filed on March 6, 2000.

(p) First Amendment dated March 19, 2007, to the Master Agreement dated July 27, 1999, by and between North Carolina Railroad Company and Norfolk Southern Railway Company is incorporated herein by reference to Exhibit 10.3 to Norfolk Southern Corporation's Form 10-Q filed on July 27, 2007.

(q) The Supplementary Agreement, entered into as of January 1, 1987, between the Trustees of the Cincinnati Southern Railway and The Cincinnati, New Orleans and Texas Pacific Railway Company (the latter a wholly owned subsidiary of Norfolk Southern Railway Company) – extending and amending a Lease, dated as of October 11, 1881 - is incorporated by reference to Exhibit 10(k) to Norfolk Southern Corporation's Form 10-K filed on March 5, 2001.

(r)* The Norfolk Southern Corporation Executive Management Incentive Plan, effective January 25, 2005, is incorporated by reference herein from Exhibit 99 to Norfolk Southern Corporation's Form 8-K filed on May 13, 2005.

(s)* The Norfolk Southern Corporation Officers' Deferred Compensation Plan, as amended effective September 26, 2000, is incorporated herein by reference to Exhibit 10(n) to Norfolk Southern Corporation's Form 10-K filed on March 5, 2001.

(t)* The Norfolk Southern Corporation Executives' Deferred Compensation Plan, as amended effective January 20, 2001, is incorporated herein by reference to Exhibit 10(o) to Norfolk Southern Corporation's Form 10-K filed on March 5, 2001.

(u)* The Directors' Deferred Fee Plan of Norfolk Southern Corporation, as amended effective January 23, 2001, is incorporated herein by reference to Exhibit 10(p) to Norfolk Southern Corporation's Form 10-K filed on March 5, 2001.

(v)* The Norfolk Southern Corporation Directors' Restricted Stock Plan, effective January 1, 1994, as restated November 24, 1998, is incorporated herein by reference from Exhibit 10(h) to Norfolk Southern Corporation's Form 10-K filed on March 24, 1999.

(w)* Form of Severance Agreement, dated as of June 1, 1996, between Norfolk Southern Corporation and certain executive officers (including those defined as "named executive officers" and identified in the Corporation's Proxy Statement for the 1997 through 2001 Annual Meetings of Stockholders), is incorporated herein by reference to Exhibit 10(t) to Norfolk Southern Corporation's Form 10-K filed on February 21, 2002.

(x)*,** Supplemental Benefit Plan of Norfolk Southern Corporation and Participating Subsidiary Companies, as amended effective January 1, 2009.

(y)* The Norfolk Southern Corporation Directors' Charitable Award Program, as amended effective July 2007, is incorporated herein by reference to Exhibit 10.6 to Norfolk Southern Corporation's Form 10-Q filed on July 27, 2007.

(z)* The Norfolk Southern Corporation Outside Directors' Deferred Stock Unit Program, as amended effective January 22, 2008, is incorporated herein by reference to Exhibit 10.1 to Norfolk Southern Corporation's Form 8-K filed on January 25, 2008.

(aa)* Form of Agreement, dated as of October 1, 2001, providing enhanced pension benefits to three officers in exchange for their continued employment with Norfolk Southern Corporation for two years, is incorporated herein by reference to Exhibit 10(w) to Norfolk Southern Corporation's Form 10-Q filed on November 9, 2001. The agreement was entered into with L. Ike Prillaman, former Vice Chairman and Chief Marketing Officer; Stephen C. Tobias, Vice Chairman and Chief Operating Officer; and Henry C. Wolf, former Vice Chairman and Chief Financial Officer.

(bb) The Norfolk Southern Corporation Thoroughbred Stock Option Plan, as amended effective January 28, 2003, is incorporated herein by reference to Exhibit 10(z) to Norfolk Southern Corporation's Form 10-K filed on February 24, 2003.

(cc)* The Norfolk Southern Corporation Restricted Stock Unit Plan, effective January 28, 2003, is incorporated herein by reference to Exhibit 10(bb) to Norfolk Southern Corporation's Form 10-K filed on February 24, 2003.

(dd)*,** The Norfolk Southern Corporation Executive Life Insurance Plan, as amended and restated effective January 1, 2009.

(ee) Distribution Agreement, dated as of July 26, 2004, by and among CSX Corporation, CSX Transportation, Inc., CSX Rail Holding Corporation, CSX Northeast Holdings Corporation, Norfolk Southern Corporation, Norfolk Southern Railway Company, CRR Holdings LLC, Green Acquisition Corp., Conrail Inc., Consolidated Rail Corporation, New York Central Lines LLC, Pennsylvania Lines LLC, NYC Newco, Inc., and PRR Newco, Inc., is incorporated herein by reference to Exhibit 2.1 to Norfolk Southern Corporation's Form 8-K filed on September 2, 2004.

(ff) Tax Allocation Agreement, dated as of August 27, 2004, by and among Green Acquisition Corp., Conrail Inc., Consolidated Rail Corporation, New York Central Lines LLC, and Pennsylvania Lines LLC, is incorporated herein by reference to Exhibit 10.2 to Norfolk Southern Corporation's Form 8-K filed on September 2, 2004.

(gg) Amended and Restated Credit Agreement dated as of June 26, 2007, with respect to the Registrant's $1 billion unsecured revolving credit facility, is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K filed on June 27, 2007.

(hh)* The description of Norfolk Southern Corporation's executive physical reimbursement for non-employee directors and certain executives is incorporated herein by reference to Norfolk Southern Corporation's Form 8-K filed on July 28, 2005.

(ii)* Form of 2005 Incentive Stock Option and Non-Qualified Stock Option Agreement under the Norfolk Southern Long-Term Incentive Plan, is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K filed on January 7, 2005.

(jj)* Form of 2005 Restricted Share Agreement under the Norfolk Southern Long-Term Incentive Plan, is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K filed on January 7, 2005.

(kk)* Form of 2006 Incentive Stock Option and Non-Qualified Stock Option Agreement under the Norfolk Southern Long-Term Incentive Plan, is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K/A filed on December 7, 2005.

(ll)* Form of 2005 Restricted Stock Unit Agreement under the Norfolk Southern Long-Term Incentive Plan, is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K filed on January 7, 2005.

(mm)* Form of 2006 Restricted Share and Restricted Stock Unit Agreement under the Norfolk Southern Corporation Long-Term Incentive Plan, is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K/A filed on December 7, 2005.

(nn)* Form of 2006 Performance Share Unit Award under the Norfolk Southern Corporation Long-Term Incentive Plan, is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K/A filed on December 7, 2005.

(oo) The Transaction Agreement, dated as of December 1, 2005, by and among Norfolk Southern Corporation, The Alabama Great Southern Railroad Company, Kansas City Southern, and The Kansas City Southern Railway Company is incorporated herein by reference to Exhibit 10.(ll) to Norfolk Southern Corporation's Form 10-K filed on February 23, 2006 (Exhibits, annexes and schedules omitted. The Registrant will furnish supplementary copies of such materials to the SEC upon request).

(pp) Amendment No. 1, dated as of January 17, 2006, by and among Norfolk Southern Corporation, The Alabama Great Southern Railroad Company, Kansas City Southern, and the Kansas City Southern Railroad is incorporated herein by reference to Exhibit 10.(mm) to Norfolk Southern Corporation's Form 10-K filed on February 23, 2006.

(qq) Amendment No. 2, dated as of May 1, 2006, to the Transaction Agreement, dated as of December 1, 2005, by and among Norfolk Southern Corporation, The Alabama Great Southern Railroad Company, Kansas City Southern, and The Kansas City Southern Railway Company is incorporated herein by reference to Exhibit 10.1 to Norfolk Southern Corporation's Form 8-K filed on May 4, 2006.

(rr)* The retirement agreement, dated January 27, 2006, between Norfolk Southern Corporation and David R. Goode, is incorporated herein by reference to Exhibit 10.1 to Norfolk Southern Corporation's Form 8-K filed on January 27, 2006.

(ss)* The waiver agreement, dated January 27, 2006, between Norfolk Southern Corporation and David R. Goode, providing for the waiver of forfeiture provisions otherwise applicable to certain restricted shares and restricted stock units upon retirement, is incorporated herein by reference to Exhibit 10.2 to Norfolk Southern Corporation's Form 8-K filed on January 27, 2006.

(tt)* Revised fees for outside directors are incorporated herein by reference to Norfolk Southern Corporation's Form 8-K filed on January 27, 2006.

(uu)* The retirement agreement, dated March 28, 2006, between Norfolk Southern Corporation and L. Ike Prillaman, is incorporated herein by reference to Exhibit 10.1 to Norfolk Southern Corporation's Form 8-K filed on March 31, 2006.

| | |
|---|---|
| (vv)* | The waiver agreement, dated March 28, 2006, between Norfolk Southern Corporation and L. Ike Prillaman, providing for the waiver of forfeiture provisions otherwise applicable to certain restricted shares and restricted stock units upon retirement, is incorporated herein by reference to Exhibit 10.2 to Norfolk Southern Corporation's Form 8-K filed on March 31, 2006. |
| (ww) | Limited Liability Company Agreement of Meridian Speedway, LLC, dated as of May 1, 2006, by and among The Alabama Great Southern Railroad Company and Kansas City Southern is incorporated herein by reference to Exhibit 10.2 to Norfolk Southern Corporation's Form 8-K filed on May 4, 2006. |
| (xx)* | The Norfolk Southern Corporation Long-Term Incentive Plan, as amended effective July 25, 2006, is incorporated herein by reference to Exhibit 10.3 to Norfolk Southern Corporation's Form 10-Q filed on July 28, 2006. |
| (yy)* | Form of Norfolk Southern Corporation Long-Term Incentive Plan, 2007 Award Agreement is incorporated herein by reference to Exhibit 10.1 to Norfolk Southern Corporation's Form 8-K filed on January 11, 2007. |
| (zz)*,** | Retirement Plan of Norfolk Southern Corporation and Participating Subsidiary Companies effective June 1, 1982, amended effective January 1, 2009. |
| (aaa)* | The retirement agreement between Norfolk Southern Corporation and Henry C. Wolf is incorporated herein by reference to Exhibit 10.1 to Norfolk Southern Corporation's Form 8-K filed on May 11, 2007. |
| (bbb)* | The waiver agreement between Norfolk Southern Corporation and Henry C. Wolf is incorporated herein by reference to Exhibit 10.2 to Norfolk Southern Corporation's Form 8-K filed on May 11, 2007. |
| (ccc) | Transfer and Administration Agreement dated as of November 8, 2007, with respect to the Registrant's $500 million receivables securitization facility is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K filed on November 14, 2007. |
| (ddd)* | Form of Norfolk Southern Corporation Long-Term Incentive Plan 2008 Award Agreement is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K filed on November 20, 2007. |
| (eee) | Dealer Agreement dated as of January 23, 2008, between the Registrant and J. P. Morgan Securities Inc. is incorporated herein by reference to Exhibit 10.1 to Norfolk Southern Corporation's Form 8-K filed on January 25, 2008. |
| (fff) | Dealer Agreement dated as of January 23, 2008, between the Registrant and Goldman, Sachs & Co. is incorporated herein by reference to Exhibit 10.2 to Norfolk Southern Corporation's Form 8-K filed on January 25, 2008. |
| (ggg)* | 2008 Award Agreement between Norfolk Southern Corporation and Gerald L. Baliles, dated January 24, 2008, is incorporated herein by reference to Exhibit 10.2 to Norfolk Southern Corporation's Form 8-K filed on January 25, 2008. |

| | |
|---|---|
| (hhh)* | 2008 Award Agreement between Norfolk Southern Corporation and Daniel A. Carp, dated January 24, 2008, is incorporated herein by reference to Exhibit 10.3 to Norfolk Southern Corporation's Form 8-K filed on January 25, 2008. |
| (iii)* | 2008 Award Agreement between Norfolk Southern Corporation and Gene R. Carter, dated January 24, 2008, is incorporated herein by reference to Exhibit 10.4 to Norfolk Southern Corporation's Form 8-K filed on January 25, 2008. |
| (jjj)* | 2008 Award Agreement between Norfolk Southern Corporation and Alston D. Correll, dated January 24, 2008, is incorporated herein by reference to Exhibit 10.5 to Norfolk Southern Corporation's Form 8-K filed on January 25, 2008. |
| (kkk)* | 2008 Award Agreement between Norfolk Southern Corporation and Landon Hilliard, dated January 24, 2008, is incorporated herein by reference to Exhibit 10.6 to Norfolk Southern Corporation's Form 8-K filed on January 25, 2008. |
| (lll)* | 2008 Award Agreement between Norfolk Southern Corporation and Burton M. Joyce, dated January 24, 2008, is incorporated herein by reference to Exhibit 10.7 to Norfolk Southern Corporation's Form 8-K filed on January 25, 2008. |
| (mmm)* | 2008 Award Agreement between Norfolk Southern Corporation and Steven F. Leer, dated January 24, 2008, is incorporated herein by reference to Exhibit 10.8 to Norfolk Southern Corporation's Form 8-K filed on January 25, 2008. |
| (nnn)* | 2008 Award Agreement between Norfolk Southern Corporation and Jane M. O'Brien, dated January 24, 2008, is incorporated herein by reference to Exhibit 10.9 to Norfolk Southern Corporation's Form 8-K filed on January 25, 2008. |
| (ooo)* | 2008 Award Agreement between Norfolk Southern Corporation and J. Paul Reason, dated January 24, 2008, is incorporated herein by reference to Exhibit 10.10 to Norfolk Southern Corporation's Form 8-K filed on January 25, 2008. |
| (ppp) | Omnibus Amendment, dated as of March 18, 2008, to the Transfer and Administration Agreement dated as of November 8, 2007, is incorporated herein by reference to Exhibit 10.1 to Norfolk Southern Corporation's Form 10-Q filed on April 23, 2008. |
| (qqq) | Transaction Agreement (the "Pan Am Transaction Agreement"), dated May 15, 2008, by and among Norfolk Southern Railway Company, Pan Am Railways, Inc., Boston and Maine Corporation, and Springfield Terminal Railway Company, is incorporated herein by reference to Exhibit 10.1 to Norfolk Southern Corporation's Form 10-Q filed on July 24, 2008 (Exhibits, annexes and schedules omitted. The Registrant will furnish supplementary copies of such materials to the SEC upon request.) |
| (rrr)** | Letter Agreement, dated October 21, 2008, by and among Norfolk Southern Railway Company, Pan Am Railways, Inc., Boston and Maine Corporation, and Springfield Terminal Railway Company amending certain terms of the Pan Am Transaction Agreement. |
| (sss)* | Directors' Deferred Fee Plan of Norfolk Southern Corporation, as amended effective January 1, 2009, is incorporated herein by reference to Exhibit 10.01 to Norfolk Southern Corporation's Form 8-K filed on July 24, 2008. |

| | |
|---|---|
| (ttt)* | Norfolk Southern Corporation Executives' Deferred Compensation Plan, as amended effective January 1, 2009, is incorporated herein by reference to Exhibit 10.02 to Norfolk Southern Corporation's Form 8-K filed on July 24, 2008. |
| (uuu)* | Amendment to Norfolk Southern Corporation Officers' Deferred Compensation Plan, effective January 1, 2008, is incorporated herein by reference to Exhibit 10.03 to Norfolk Southern Corporation's Form 8-K filed on July 24, 2008. |
| (vvv)* | Norfolk Southern Corporation Long-Term Incentive Plan, as amended effective January 1, 2009, is incorporated herein by reference to Exhibit 10.04 to Norfolk Southern Corporation's Form 8-K filed on July 24, 2008. |
| (www)* | Norfolk Southern Corporation Restricted Stock Unit Plan, as amended effective January 1, 2009, is incorporated herein by reference to Exhibit 10.05 to Norfolk Southern Corporation's Form 8-K filed on July 24, 2008. |
| (xxx) | Amendment No. 1 to Transfer and Administration Agreement dated as of October 22, 2008, and effective as of October 23, 2008, with respect to the Registrant's $500 million receivables securitization facility, is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K filed on October 23, 2008. |
| (yyy)* | Stock Unit Plan of Norfolk Southern Corporation dated as of July 24, 2001, as amended on August 21, 2008, with an effective date of January 1, 2009, is incorporated herein by reference to Exhibit 10.1 to Norfolk Southern Corporation's Form 10-Q filed on October 24, 2008. |
| (zzz)* | Form of Norfolk Southern Corporation Long-Term Incentive Plan 2009 Award Agreement is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K/A filed on December 17, 2008. |
| (aaaa)*,** | Form of Amended and Restated Change in Control Agreement between Norfolk Southern Corporation and certain executive officers (including those defined as "named executive officers" and identified in the Corporation's Proxy Statement for the 2008 annual Meetings of Stockholders). |
| (bbbb)* | 2009 Award Agreement between Norfolk Southern Corporation and Gerald L. Baliles, dated January 29, 2009, is incorporated herein by reference to Exhibit 10.1 to Norfolk Southern Corporation's Form 8-K filed on January 30, 2009. |
| (cccc)* | 2009 Award Agreement between Norfolk Southern Corporation and Daniel A. Carp, dated January 29, 2009, is incorporated herein by reference to Exhibit 10.2 to Norfolk Southern Corporation's Form 8-K filed on January 30, 2009. |
| (dddd)* | 2009 Award Agreement between Norfolk Southern Corporation and Gene R. Carter, dated January 29, 2009, is incorporated herein by reference to Exhibit 10.3 to Norfolk Southern Corporation's Form 8-K filed on January 30, 2009. |
| (eeee)* | 2009 Award Agreement between Norfolk Southern Corporation and Alston D. Correll, dated January 29, 2009, is incorporated herein by reference to Exhibit 10.4 to Norfolk Southern Corporation's Form 8-K filed on January 30, 2009. |
| (ffff)* | 2009 Award Agreement between Norfolk Southern Corporation and Landon Hilliard, dated January 29, 2009, is incorporated herein by reference to Exhibit 10.5 to Norfolk Southern Corporation's Form 8-K filed on January 30, 2009. |

| | |
|---|---|
| (gggg)* | 2009 Award Agreement between Norfolk Southern Corporation and Karen N. Horn, dated January 29, 2009, is incorporated herein by reference to Exhibit 10.6 to Norfolk Southern Corporation's Form 8-K filed on January 30, 2009. |
| (hhhh)* | 2009 Award Agreement between Norfolk Southern Corporation and Burton M. Joyce, dated January 29, 2009, is incorporated herein by reference to Exhibit 10.7 to Norfolk Southern Corporation's Form 8-K filed on January 30, 2009. |
| (iiii)* | 2009 Award Agreement between Norfolk Southern Corporation and Steven F. Leer, dated January 29, 2009, is incorporated herein by reference to Exhibit 10.8 to Norfolk Southern Corporation's Form 8-K filed on January 30, 2009. |
| (jjjj)* | 2009 Award Agreement between Norfolk Southern Corporation and Michael D. Lockhart, dated January 29, 2009, is incorporated herein by reference to Exhibit 10.9 to Norfolk Southern Corporation's Form 8-K filed on January 30, 2009. |
| (kkkk)* | 2009 Award Agreement between Norfolk Southern Corporation and J. Paul Reason, dated January 29, 2009, is incorporated herein by reference to Exhibit 10.10 to Norfolk Southern Corporation's Form 8-K filed on January 30, 2009. |
| 12** | Statement re: Computation of Ratio of Earnings to Fixed Charges. |
| 21** | Subsidiaries of the Registrant. |
| 23** | Consent of Independent Registered Public Accounting Firm. |
| 31** | Rule 13a-14(a)/15d-14(a) Certifications. |
| 32** | Section 1350 Certifications. |
| 99** | Annual CEO Certification pursuant to NYSE Rule 303A.12(a). |

* *Management contract or compensatory arrangement.*
** *Filed herewith.*

(B) Exhibits.

The Exhibits required by Item 601 of Regulation S-K as listed in Item 15(A)3 are filed herewith or incorporated herein by references.

(C) Financial Statement Schedules.

Financial statement schedules and separate financial statements specified by this Item are included in Item 15(A)2 or are otherwise not required or are not applicable.

Exhibits 23, 31, 32 and 99 are included in copies assembled for public dissemination. All exhibits are included in the 2008 Form 10-K posted on our website at www.nscorp.com under "Investors" and "SEC Filings" or you may request copies by writing to:

**Office of Corporate Secretary**
**Norfolk Southern Corporation**
**Three Commercial Place**
**Norfolk, Virginia 23510-9219**

## POWER OF ATTORNEY

Each person whose signature appears below under "SIGNATURES" hereby authorizes James A. Hixon and James A. Squires or one of them, to execute in the name of each such person, and to file, any amendment to this report and hereby appoints James A. Hixon and James A. Squires or any one of them, as attorneys-in-fact to sign on his or her behalf, individually and in each capacity stated below, and to file, any and all amendments to this report.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, Norfolk Southern Corporation has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, on this 18th day of February 2009.

**NORFOLK SOUTHERN CORPORATION**

/s/ Charles W. Moorman
By: Charles W. Moorman
(Chairman, President and Chief Executive Officer)

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below on this 18th day of February 2009, by the following persons on behalf of Norfolk Southern Corporation and in the capacities indicated.

| Signature | Title |
|---|---|
| /s/ Charles W. Moorman<br>(Charles W. Moorman) | Chairman, President and Chief Executive Officer and Director<br>(Principal Executive Officer) |
| /s/ James A. Squires<br>(James A. Squires) | Executive Vice President Finance and Chief Financial Officer<br>(Principal Financial Officer) |
| /s/ Marta R. Stewart<br>(Marta R. Stewart) | Vice President and Controller<br>(Principal Accounting Officer) |
| /s/ Gerald L. Baliles<br>(Gerald L. Baliles) | Director |
| /s/ Daniel A. Carp<br>(Daniel A. Carp) | Director |
| /s/ Gene R. Carter<br>(Gene R. Carter) | Director |

/s/ Alston D. Correll — Director
(Alston D. Correll)

/s/ Landon Hilliard — Director
(Landon Hilliard)

/s/ Karen N. Horn — Director
(Karen N. Horn)

/s/ Burton M. Joyce — Director
(Burton M. Joyce)

/s/ Steven F. Leer — Director
(Steven F. Leer)

/s/ Michael D. Lockhart — Director
(Michael D. Lockhart)

/s/ J. Paul Reason — Director
(J. Paul Reason)

Schedule II

**Norfolk Southern Corporation and Subsidiaries**
**Valuation and Qualifying Accounts**
**Years Ended December 31, 2006, 2007 and 2008**
**($ in millions)**

| | Beginning Balance | Additions charged to: Expenses | Additions charged to: Other Accounts | Deductions | Ending Balance |
|---|---|---|---|---|---|
| ***Year ended December 31, 2006*** | | | | | |
| Valuation allowance (included net in deferred tax liability) for deferred tax assets | $ 10 | $ -- | $ -- | $ 1 [2] | $ 9 |
| Casualty and other claims included in other liabilities | $ 421 | $ 217 | $ -- | $ 167 [3] | $ 471 |
| Current portion of casualty and other claims included in accounts payable | $ 291 | $ 40 | $ 124 [1] | $ 154 [4] | $ 301 |
| ***Year ended December 31, 2007*** | | | | | |
| Valuation allowance (included net in deferred tax liability) for deferred tax assets | $ 9 | $ 1 | $ -- | $ -- | $ 10 |
| Casualty and other claims included in other liabilities | $ 471 | $ 113 | $ 162 [3,4] | $ 158 [3] | $ 588 |
| Current portion of casualty and other claims included in accounts payable | $ 301 | $ 17 | $ 122 [1] | $ 181 [4] | $ 259 |
| ***Year ended December 31, 2008*** | | | | | |
| Valuation allowance (included net in deferred tax liability) for deferred tax assets | $ 10 | $ 1 | $ -- | $ -- | $ 11 |
| Casualty and other claims included in other liabilities | $ 588 | $ 84 | $ 80 [3,4] | $ 432 [3] | $ 320 |
| Current portion of casualty and other claims included in accounts payable | $ 259 | $ 28 | $ 127 [1] | $ 166 [4] | $ 248 |

[1] Includes revenue refunds and overcharges provided through deductions from operating revenues and transfers from other accounts.

[2] Reclassifications to/from other assets.

[3] Payments and reclassifications to/from accounts payable.

[4] Payments and reclassifications to/from other liabilities.

# EXHIBIT PX0710

# Union Pacific Posts Record Results

## First Quarter 2006 Earnings Per Share More Than Doubled

Omaha, Neb., April 20, 2006 –

- **First quarter 2006 earnings more than doubled to $1.15 per diluted share.**
- **Commodity revenue was an all-time quarterly record of $3.5 billion, up 18 percent.**
- **Operating income grew 93 percent to $605 million.**
- **First quarter 2006 operating ratio improved 6.4 points to 83.7 percent.**

Union Pacific Corporation (NYSE: UNP) today reported earnings of $1.15 per diluted share, or net income of $311 million. This compares to $0.48 per diluted share, or net income of $128 million in the first quarter of 2005, which included the estimated $34 million net income impact of the January West Coast storm. This was the best first quarter earnings ever posted by the company.

"This quarter was positive for us in many ways," said Jim Young, president and chief executive officer. "We experienced record growth in our business, moved these volumes more efficiently and improved our bottom-line results. Most importantly, we provided better service to our customers."

### First Quarter Summary

Union Pacific Corporation reported record operating revenue of $3.7 billion in the first quarter of 2006 compared to last year's $3.2 billion. Operating income in the first quarter of 2006 was $605 million compared to $313 million for the same period in 2005 – a 93 percent improvement.

- First quarter 2006 commodity revenue was an all-time record of $3.5 billion, up 18 percent, compared to $3.0 billion in 2005. Drivers of the increase were a 4 percent increase in volumes as well as increased fuel surcharge revenue and yields.
- First quarter 2006 average revenue per car was at an all-time best $1,481, versus $1,306 in the first quarter of 2005.
- The operating ratio improved to 83.7 percent in the first quarter of 2006 from 90.1 percent in the first quarter 2005.
- The Railroad's 2006 average quarterly fuel price of $1.87 per gallon compares to $1.45 per gallon paid a year ago.

### 2006 First Quarter Commodity Revenue Summary versus 2005

- Agricultural up 26 percent
- Automotive, Industrial Products and Intermodal each up 23 percent
- Chemicals up 14 percent
- Energy up 5 percent

### Looking Forward

"Looking ahead we continue to see solid demand, which should support future volume and yield growth," Young said. "Our challenge will be to continue to handle that growth more efficiently.

"Although we made progress in the quarter with our operating initiatives, we have a long way to go before we are satisfied with our service, velocity and returns. We will work hard over the weeks and months ahead to make further improvement."

Union Pacific Corporation owns one of America's leading transportation companies. Its principal operating company, Union Pacific Railroad, links 23 states in the western two-thirds of the country and serves the fastest-growing U.S. population centers. Union Pacific's diversified business mix includes Agricultural Products, Automotive, Chemicals, Energy, Industrial Products and Intermodal. The railroad offers competitive long-haul routes from all major West Coast and Gulf Coast ports to eastern gateways. Union Pacific connects with Canada's rail systems and is the only railroad serving all six major gateways to Mexico, making it North America's premier rail franchise.

Supplemental financial information is attached.

Additional information regarding Union Pacific is available on our Web site, www.up.com.

Our contact for investors is Jennifer Hamann at (402) 544-4227.
Our media contact is Kathryn Blackwell (402) 544-3753.

*This press release and related materials may contain statements about the Corporation's future that are not statements of historical fact. These statements are, or will be, forward-looking statements as defined by the Securities Act of 1933 and the Securities Exchange Act of 1934. Forward-looking statements include, without limitation, information or statements regarding: expectations as to continued or increasing demand for rail transportation in excess of supply; expectations regarding operational improvements, including the effectiveness of network management initiatives that have been or will be implemented to improve system velocity, customer service and shareholder returns; expectations as to increased returns, cost savings, revenue growth and earnings; expectations regarding fuel price; the time by which certain objectives will be achieved, including expected improvements in velocity and implementation of network management initiatives; estimates of costs relating to environmental remediation and restoration; proposed new products and services; expectations that claims, lawsuits, environmental costs, commitments, contingent liabilities, labor negotiations or agreements, or other matters will not have a material adverse effect on our consolidated financial position, results of operations or liquidity; and statements concerning projections, predictions, expectations, estimates or forecasts as to the Corporation's and its subsidiaries' business, financial and operational results, and future economic performance; and statements of management's beliefs, expectations, goals and objectives and other similar expressions concerning matters that are not historical facts.*

*Forward-looking statements should not be read as a guarantee of future performance or results, and will not necessarily be accurate indications of the times that, or by which, such performance or results will be achieved. Forward-looking information, including expectations as to operational, service and network fluidity improvements are subject to risks and uncertainties that could cause actual performance or results to differ materially from those expressed in the statements.*

*Important factors that could affect the Corporation's and its subsidiaries' future results and could cause those results or other outcomes to differ materially from those expressed or implied in the forward-looking statements include, but are not limited to: whether the Corporation and its subsidiaries are fully successful in implementing their financial and operational initiatives, including those plans and management initiatives to improve system velocity and network performance or otherwise improve operations; the impact of ongoing track maintenance and restoration work being performed in the Southern Powder River Basin of Wyoming; the outcome of claims and litigation, including those related to environmental contamination, personal injuries, and occupational illnesses arising from hearing loss, repetitive motion and exposure to asbestos and diesel fumes; legislative and regulatory developments, including possible enactment of initiatives to re-regulate the rail industry; the impact of a rail accident involving the release of hazardous materials; natural events such as severe weather, fire, floods, hurricanes and earthquakes; changes in fuel prices; changes in labor costs, labor stoppages, and the availability of qualified personnel required for our operations; industry competition, conditions, performance and consolidation; legislative, regulatory and legal developments involving taxation, including enactment of new federal or state income tax rates, revisions of controlling authority and the*

*outcome of tax claims and litigation; changes in securities and capital markets; the effects of adverse general economic conditions, both within the United States and globally; any adverse economic or operational repercussions from terrorist activities and any governmental response thereto; and war or risk of war. More information regarding risk factors is available in the Corporation's Annual Report on Form 10-K for 2005, which was filed with the SEC on February 24, 2006. The Corporation updates information regarding risk factors if circumstances require such updates in its periodic reports on Form 10-Q (or such other reports that may be filed with the SEC).*

*Forward-looking statements speak only as of the date the statements were made. The Corporation assumes no obligation to update forward-looking information to reflect actual results, changes in assumptions or changes in other factors affecting forward-looking information. If the Corporation does update one or more forward-looking statements, no inference should be drawn that the Corporation will make additional updates with respect thereto or with respect to other forward-looking statements. References to our website are provided for convenience and, therefore, information on the Web site is not, and should not be construed to be, incorporated by reference herein.*

*The statements and information contained in the news releases provided by Union Pacific speak only as of the date issued. Such information by its nature may become outdated, and investors should not assume that the statements and information contained in Union Pacific's news releases remain current after the date issued. Union Pacific makes no commitment, and disclaims any duty, to update any of this information.*

Privacy Feedback ©Copyright 2017

# EXHIBIT PX0711

Morningstar® Document Research℠

# FORM 10-K

## CSX CORP - csx

**Filed: March 10, 2004 (period: December 26, 2003)**

Annual report which provides a comprehensive overview of the company for the past year

Powered by Morningstar® Document Research℠

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

**Washington, D.C. 20549**

# Form 10-K

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 26, 2003**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from to**

**Commission file number 1-8022**

# CSX Corporation

*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Virginia**<br>*(State or other jurisdiction of incorporation or organization)* | **62-1051971**<br>*(I.R.S. Employer Identification No.)* |
| **500 Water Street, 15th Floor, Jacksonville, Florida**<br>*(Address of principal executive offices)* | **32202**<br>*(Zip Code)* |

**(904) 359-3200**

*(Registrant's telephone number, including area code)*

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Name of exchange on which registered |
|---|---|
| Common Stock, $1 Par Value | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act:**

**None**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.
Yes ☑ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☑

Indicate by check mark whether the registrant is an accelerated filer (as defined in Exchange Act Rule 12b-2). Yes ☑ No ☐

On June 27, 2003, the aggregate market value of the Registrant's voting stock held by non-affiliates was approximately $5.3 billion (based on the New York Stock Exchange closing price on such date).

On March 5, 2004, there were 215,036,069 shares of Common Stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the Registrant's Definitive Proxy Statement to be filed with respect to its annual meeting of shareholders scheduled to be held on May 5, 2004 ("Proxy Statement")


Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**FORM 10-K**

**TABLE OF CONTENTS**


| Item No. | | Page |
|---|---|---|
| | **PART I** | |
| 1. | Business | 3 |
| 2. | Properties | 4 |
| 3. | Legal Proceedings | 4 |
| 4. | Submission of Matters to a Vote of Security Holders | 5 |
| | **PART II** | |
| 5. | Market for Registrant's Common Equity and Related Stockholder Matters | 6 |
| 6. | Selected Financial Data | 8 |
| 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 9 |
| 7A. | Quantitative and Qualitative Disclosures About Market Risk | 38 |
| 8. | Financial Statements and Supplementary Data | 39 |
| 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 92 |
| 9A. | Controls and Procedures | 93 |
| | **PART III** | |
| 10. | Directors and Executive Officers of the Registrant | 93 |
| 11. | Executive Compensation | 93 |
| 12. | Security Ownership of Certain Beneficial Owners and Management | 93 |
| 13. | Certain Relationships and Related Transactions | 93 |
| 14. | Principal Accounting Fees and Services | 93 |
| | **PART IV** | |
| 15. | Exhibits, Financial Statement Schedules and Reports on Form 8-K | 94 |

Signatures 99




Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**FORM 10-K**

**PART I**

**Item 1.** ***Business***

CSX Corporation ("CSX" or the "Company") operates one of the largest rail networks in the United States and also arranges for and provides integrated rail and truck ("intermodal") transportation services across the United States and key markets in Canada and Mexico. Its marine operations include an international terminal services company, which operates and develops container terminals, distribution facilities and related terminal activities.

In February 2003, CSX conveyed most of its interest in its domestic container-shipping subsidiary, CSX Lines LLC ("CSX Lines"), to a new venture formed with the Carlyle Group for approximately $300 million (gross cash proceeds of approximately $240 million, $214 million net of transaction costs and $60 million of securities).

**Operating Segments**

Following are the operating revenue and operating income by segment at December 26, 2003 (see Management's Discussion and Analysis for prior year data):

| | Rail | Intermodal | Surface Transportation | International Terminals | Eliminations/ Other(2) | Total |
|---|---|---|---|---|---|---|
| | | | (Dollars in Millions) (Unaudited)(1) | | | |
| **Operating Revenue** | **$6,182** | **$1,257** | **$7,439** | **$226** | **$128** | **$7,793** |
| | 79% | 16% | 95% | 3% | 2% | 100% |
| **Operating Income (Loss)** | **$ 541** | **$ 110** | **$ 651** | **$ 69** | **$ (94)** | **$ 626** |
| | 86% | 18% | 104% | 11% | (15)% | 100% |

(1) Prior periods have been reclassified to conform to the current presentation.

(2) Eliminations/ Other consists of the following:
- Charge incurred upon entering into settlement agreements with Maersk
- Reclassification of International Terminals minority interest expense
- Operations of CSX Lines and gain amortization
- Expenses related to the 2003 retirement of the Company's former Chairman and Chief Executive Officer
- Other items

***Surface Transportation***

*CSX Transportation Inc.*

CSX Transportation Inc. ("CSXT") is the largest rail network in the eastern United States, providing rail freight transportation over a network of more than 23,000 route miles in 23 states, the District of Columbia and two Canadian provinces. Headquartered in Jacksonville, Florida, CSXT accounted for 79% of CSX's operating revenue and 86% of operating income in 2003.

*CSX Intermodal Inc.*

CSX Intermodal Inc. ("CSXI") is the nation's only transcontinental intermodal transportation service provider, operating a network of dedicated intermodal facilities across North America. The CSXI network runs approximately 450 dedicated trains between its 45 terminals weekly. CSXI accounted for 16% of CSX's operating revenue and 18% of operating income in 2003. Its headquarters are located in Jacksonville, Florida.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

***International Terminals***

CSX World Terminals LLC ("CSX World Terminals") operates container-freight terminal facilities in Asia, Europe, Australia, Latin America and the United States. CSX World Terminals accounted for 3% of CSX's operating revenues and 11% of operating income in 2003. CSX World Terminals is headquartered in Charlotte, North Carolina.

***Non-transportation***

The Greenbrier is a AAA Five-Diamond resort located in White Sulphur Springs, West Virginia. CSX Real Property Inc. is responsible for sales, leasing and development of CSX-owned properties, and is headquartered in Jacksonville, Florida.

**General**

CSX employed an average of 37,516 employees during 2003. The Company considers employee relations to be good. Most of CSX's employees are represented by labor unions and are covered by collective bargaining agreements. Some of these agreements are scheduled to expire in 2004. CSX is in the process of renegotiating most of these agreements, but the outcome of these negotiations is uncertain at this time. For rail employees negotiations have generally taken place over a number of years and previously have not resulted in any extended work stoppages. The existing agreements have remained in effect and will continue to remain in effect until new agreements are reached or the Railway Labor Act's procedures (which include mediation, cooling-off periods, and the possibility of Presidential intervention) are exhausted.

The Company makes available free of charge through its website at www.csx.com, its annual reports on Form 10-K, quarterly reports on Form 10-Q and current reports on Form 8-K, and all amendments thereto, as soon as reasonably practicable after such reports are filed with or furnished to the Securities and Exchange Commission.

For additional information concerning business conducted by CSX during 2003, see "Management's Discussion and Analysis of Financial Condition and Results of Operations" and Note 19 to the Financial Statements under the caption "Business Segments."

**Item 2.** ***Properties***

In response to this Item, see the information set forth on page 32 under the caption "Depreciation Policies Under the Group Life Method," in Note 1 to the Financial Statements under the caption "Nature of Operations and Significant Accounting Policies," and in Note 9 to the Financial Statements under the caption "Properties."

**Item 3.** ***Legal Proceedings***

CSX is involved in routine litigation incidental to its business and is a party to a number of legal actions and claims, various governmental proceedings and private civil lawsuits, including those related to environmental matters. Federal Employers' Liability Act claims by employees, other personal injury claims, and disputes and complaints involving certain transportation rates and charges. Some of the legal proceedings include claims for punitive as well as compensatory damages, and others purport to be class actions. While the final outcome of these matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded along with applicable insurance, it is the opinion of CSX management that none of these items will have a material adverse effect on the results of operations, financial position or liquidity of CSX. However, an unexpected adverse resolution of one or more of these items could have a material adverse effect on the results of operations in a particular quarter or fiscal year. The company is also party to a number of actions, the resolution



 Powered by Morningstar® Document Research℠

of which could result in gain realization in amounts that could be material to results of operations in the quarters received.

In further response to this Item, see the information set forth in "Management's Discussion and Analysis of Financial Condition and Results of Operations," of this document under the caption "Casualty, Legal and Environmental Reserves" and under the caption "Commitments and Contingencies."

**Item 4.** ***Submission of Matters to a Vote of Security Holders***

There were no matters submitted to a vote of security holders in the fourth quarter of 2003.

**Executive Officers of the Registrant**

Executive officers of CSX Corporation are elected by the CSX Board of Directors and generally hold office until the next annual election of officers. Officers of CSX business units are elected annually by the respective Boards of Directors of the business units. There are no family relationships or any arrangement or understanding between any officer and any other person pursuant to which such officer was selected. Effective March 31, 2004 our executive officers will be as follows:

| Name and Age | Business Experience During Past 5 Years |
|---|---|
| Michael J. Ward, 53 | Chairman of the Board, President and Chief Executive Officer of CSX, having been elected as Chairman and Chief Executive Officer in January 2003 and as President in July 2002. He has served CSX Transportation, Inc., the Company's rail subsidiary, as President since November 2000 and as President and Chief Executive Officer since October 2002. Previously, Mr. Ward served CSX Transportation as Executive Vice President — Operations from April through November 2000, as Executive Vice President — Coal Service Group from August 1999 to April 2000, and prior to that as Executive Vice President — Coal and Merger Planning from October 1998 to August 1999. |
| Andrew B. Fogarty, 58 | President and Chief Executive Officer, CSX World Terminals, LLC, since January 2004. Before January 2004, Mr. Fogarty served as Senior Vice President — Corporate Services of CSX since May 2003 and as Executive Vice President — Corporate Services of CSX from July 2001 to May 2003. Before that, he served as Senior Vice President — Corporate Services. |
| Ellen M. Fitzsimmons, 43 | Senior Vice President — Law and Public Affairs since December 2003. Before December 2003, Ms. Fitzsimmons served as Senior Vice President — Law and Corporate Secretary since May 2003 and as Senior Vice President — Law from February 2001 to May 2003. Prior thereto, she served as General Counsel — Corporate. |
| Clarence W. Gooden, 52 | Senior Vice President — Merchandise Service Group, CSX Transportation since 2002. Prior to 2002, Mr. Gooden served as President of CSX Intermodal from 2001 to 2002; Senior Vice President — Coal Service Group from 2000 to 2001; Vice President — System Transportation from 1999 to 2000; Vice President — Transportation Field Operations from 1998 to 1999. |



 Powered by Morningstar® Document Research℠

| Name and Age | Business Experience During Past 5 Years |
|---|---|
| Robert J. Haulter, 50 | Senior Vice President — Human Resources and Labor Relations since December 2003. Before December 2003, Mr. Haulter served as CSX Senior Vice President — Human Resources since July 2002. Before July 2002, he served CSX Transportation, Inc., as Senior Vice President — Human Resources from May 2002 to July 2002; as Vice President — Human Resources from December 2000 to May 2002; as Assistant Vice President of Operations Support from September 2000 to December 2000; as Assistant Vice President — Strategic Development from November 1999 to September 2000; and as Assistant Vice President — Integration Planning before November 1999. |
| Oscar Munoz, 44 | Executive Vice President and Chief Financial Officer since May 2003. Before May 2003, Mr. Munoz served as Chief Financial Officer and Vice President, Consumer Services, AT&T Corporation, from January 2001 to May 2003; as Senior Vice President — Finance & Administration, Qwest Communications International, Inc. from June to December 2000; as Chief Financial Officer & Vice President, U.S. West Retail Markets from April 1999 to May 2000; and before April 1999 as Controller and Vice President, USWEST Communications, Inc. |
| Carolyn T. Sizemore, 41 | Vice President and Controller of CSX since April 2002. Prior to April 2002, Ms. Sizemore served as Assistant Vice President and Assistant Controller from July 2001 to April 2002; Assistant Vice President Financial Planning from June 1999 to July 2001; and prior to June 1999, as Senior Director — Financial and Strategic Measurement. |

## PART II

### Item 5. *Market for Registrant's Common Equity and Related Stockholder Matters*

**Market Information**

CSX's common stock is listed on the New York, London and Swiss stock exchanges and trades with unlisted privileges on the Midwest, Boston, Cincinnati, Pacific and Philadelphia stock exchanges. The official trading symbol is "CSX."

**Description of Common and Preferred Stocks**

A total of 300 million shares of common stock are authorized, of which 215,071,005 shares were outstanding as of December 26, 2003. Each share is entitled to one vote in all matters requiring a vote of shareholders. There are no pre-emptive rights. At December 26, 2003, there were 56,331 registered common stock shareholders.

A total of 25 million shares of preferred stock are authorized, none of which are currently outstanding. CSX previously issued Series A preferred stock consisting of 250,000 shares of $7 Cumulative Convertible Preferred Stock. All outstanding shares of Series A Preferred Stock were redeemed as of July 31, 1992. Prior to October 2003, 3,000,000 shares of preferred stock had been designated as Series B Preferred Stock in conjunction with the Company's Shareholder Rights Plan. In October 2003, the expiration date of the shareholder rights under the Shareholder Rights Plan was accelerated, resulting in the effective termination of the Plan. The Company's Articles of Incorporation were amended to eliminate the designation of shares for Series B Preferred.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

**Equity Compensation Plan Information**

The following table summarizes the equity compensation plans under which CSX Corporation common stock may be issued as of December 26, 2003.

| Plan Category | (a) Number of securities to be issued upon exercise of outstanding options, warrants and rights (000's) | (b) Weighted-average exercise price of outstanding options, warrants and rights | (c) Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) (000's) |
|---|---|---|---|
| Equity compensation plans approved by security holders | 22,633 | $ 39.11 | 7,060(1) |
| Equity compensation plans not approved by security holders(2) | 664 | $ 44.89 | — |
| Total | 23,297 | | 7,060(1) |

(1) The number of shares remaining available for future issuance under plans approved by shareholders includes 59,038 shares available for employee purchase pursuant to the 2002 Employee Stock Purchase Plan; 642,192 shares available for stock option grants, payment of director compensation, and stock grants pursuant to the CSX Stock Plan for Directors; and 6,358,934 shares available for grant in the form of stock options, performance units, restricted stock, stock appreciation rights, and stock awards pursuant to the CSX Omnibus Incentive Plan.

(2) The 1990 Stock Award Plan ("1990 Plan") is the only CSX equity compensation plan that has not been approved by shareholders. Upon approval of the CSX Omnibus Incentive Plan by shareholders in 2000, the plan was closed to further grants. No options have been granted under the 1990 Plan since 1999.

The following table sets forth, for the quarters indicated, the dividends declared and the high and low sales prices of the Company's common stock:

| | Quarter | | | |
|---|---|---|---|---|
| | 1st | 2nd | 3rd | 4th |
| **2003** | | | | |
| Dividends | $ 0.10 | $ 0.10 | $ 0.10 | $ 0.10 |
| Common Stock Price: | | | | |
| High | $30.85 | $33.16 | $32.99 | $36.29 |
| Low | $25.50 | $28.20 | $28.92 | $29.07 |
| **2002** | | | | |
| Dividends | $ 0.10 | $ 0.10 | $ 0.10 | $ 0.10 |
| Common Stock Price: | | | | |
| High | $41.40 | $37.90 | $36.77 | $30.12 |
| Low | $34.81 | $32.41 | $25.75 | $25.09 |



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

**Item 6.** ***Selected Financial Data***

| | 2003 | 2002 | 2001 | 2000 | 1999 |
|---|---|---|---|---|---|
| | (Dollars in Millions, Except Per Share Amounts) | | | | |
| **Earnings from Continuing Operations** | | | | | |
| Operating Revenue | $ 7,793 | $ 8,152 | $ 8,110 | $ 8,191 | $ 10,375 |
| Operating Expense | 7,167 | 7,025 | 7,153 | 7,386 | 9,802 |
| Operating Income | $ 626 | $ 1,127 | $ 957 | $ 805 | $ 573 |
| Net Earnings from Continuing Operations | $ 246 | $ 424 | $ 293 | $ 186 | $ 32 |
| Earnings Per Share: | | | | | |
| From Continuing Operations | $ 1.14 | $ 2.00 | $ 1.39 | $ 0.88 | $ 0.15 |
| From Continuing Operations, Assuming Dilution | $ 1.14 | $ 1.99 | $ 1.38 | $ 0.88 | $ 0.15 |
| **Financial Position** | | | | | |
| Cash, Cash Equivalents and Short-term Investments | $ 368 | $ 264 | $ 618 | $ 686 | $ 974 |
| Working Capital Deficit | $ (307) | $ (665) | $ (1,023) | $ (1,231) | $ (910) |
| Total Assets | $ 21,745 | $ 20,951 | $ 20,801 | $ 20,548 | $ 20,828 |
| Long-term Debt | $ 6,886 | $ 6,519 | $ 5,839 | $ 5,896 | $ 6,304 |
| Shareholders' Equity | $ 6,453 | $ 6,241 | $ 6,120 | $ 6,017 | $ 5,756 |
| **Other Data Per Common Share** | | | | | |
| Cash Dividends | $ 0.40 | $ 0.40 | $ 0.80 | $ 1.20 | $ 1.20 |
| Book Value | $ 30.01 | $ 29.07 | $ 28.64 | $ 28.28 | $ 26.35 |
| Market Price | | | | | |
| High | $ 36.29 | $ 41.40 | $ 41.30 | $ 33.44 | $ 53.94 |
| Low | $ 25.50 | $ 25.09 | $ 24.81 | $ 19.50 | $ 28.81 |
| **Employees — Annual Averages** | | | | | |
| Rail | 32,892 | 33,468 | 35,014 | 35,496 | 31,952 |
| Other | 4,624 | 6,471 | 6,446 | 9,955 | 16,998 |
| Total | 37,516 | 39,939 | 41,460 | 45,451 | 48,950 |

See accompanying Consolidated Financial Statements





Powered by Morningstar® Document Research℠

Significant events include the following:

| | | |
|---|---|---|
| 2003 | — | Pretax income of $93 million, $57 million after tax, or 26 cents per share, as a cumulative effect of accounting change, representing the reversal of the accrued liability for crosstie removal costs in conjunction with the adoption of SFAS 143, "Accounting for Asset Retirement Obligations." (See Note 1, Nature of Operations and Significant Accounting Policies) |
| | — | A charge of $232 million pretax, $145 million after tax in conjunction with the change in estimate of casualty reserves to include an estimate of incurred but not reported claims for asbestos and other occupational injuries to be received over the next seven years. (See Note 10, Casualty, Environmental, and Other Reserves) |
| | — | A charge of $108 million pretax, $67 after tax to account for the Company entering into two settlement agreements with Maersk that resolved all material disputes pending between the companies arising out of the 1999 sale of the international container-shipping assets. (See Note 18, Commitments and Contingencies). |
| | — | A charge of $34 million pretax, $21 million after tax as the initial charge for separation expenses related to the management restructuring announced in November 2003. In addition, the Company recorded a credit of $22 million pretax, $13 million after tax related to revised estimates for railroad retirement taxes and the amount of benefits that will be paid to individuals under the $1.3 billion charges for separation plans initially recorded in 1991 and 1992. For the year, the Company has recorded a net restructuring charge of $22 million, $13 million after tax that includes these items and additional separation charges that were included in the third quarter results. (See Note 4, Restructuring) |
| 2002 | — | A charge to write-down indefinite lived intangible assets as a cumulative effect of accounting change, which reduced earnings $83 million pretax, $43 million after tax and consideration of minority interest, 20 cents per share (See Note 1, Nature of Operations and Significant Accounting Policies). |
| 2001 | — | A charge of $60 million pretax, $37 million after tax to account for the settlement of the 1987 New Orleans tank car fire litigation. |
| 1999 | — | A loss on the sale of international container-shipping assets net of a related benefit from discontinuing depreciation of those assets from the date they were classified as "held for disposition." The net effect of the loss and the depreciation benefit reduced earnings by $360 million pretax, $271 million after tax. |
| | — | A charge of $55 million pretax, $34 million after tax to recognize the cost of a workforce reduction program at the Company's rail and intermodal units. |
| | — | A gain of $27 million pretax, $17 million after tax on the sale of the Company's Grand Teton Lodge resort subsidiary. |

**Item 7.** ***Management's Discussion and Analysis of Financial Condition and Results of Operations***

**Overview**

***General***

CSX Corporation ("CSX" or the "Company") operates one of the largest rail networks in the United States and also arranges for and provides integrated rail and truck ("intermodal") transportation services across the United States and key markets in Canada and Mexico. Surface Transportation, which includes CSX's rail and intermodal units, generated revenue of $7.4 billion in 2003 compared to $7.2 billion in 2002. Operating income for Surface Transportation was $651 million in 2003 compared to $995 million in 2002. CSX's marine operations include an international terminal services company, which operates and develops container terminals,



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

distribution facilities and related terminal activities. In February 2003, CSX conveyed most of its interest in its domestic container-shipping subsidiary, CSX Lines, to a new venture formed with the Carlyle Group. CSX also owns and operates the Greenbrier, a AAA Five-Diamond resort located in White Sulphur Springs, West Virginia.

In 2003, revenue and volume grew in response to strategies to persuade new customers to ship via a combination of rail and truck, the introduction of new customer services, and the economic recovery. However, as discussed below increased costs and operating inefficiency in the rail network decreased CSX's overall profitability.

***Surface Transportation***

CSX's rail system is a network, defined by its more than 23,000 route miles, through which goods and services flow. The inefficiency of any one element in that network can have an effect on other components, and ultimately affect the operating efficiency of the entire network. The decline in CSX's operating efficiency, coupled with the increased price of fuel and other higher costs, reduced CSX's profit in 2003.

In addition to reviewing various financial measures, CSX management uses non-financial indicators to monitor performance and operating efficiency of its network. Those include:

| Key Non-Financial Performance Indicators | 2003 | 2002 | % Improvement (Decline) |
|---|---|---|---|
| Personal Injury Frequency Index (Per 100 Employees) | 2.20 | 1.98 | (11)% |
| FRA Train Accidents Frequency (Per Million Train Miles) | 4.37 | 3.34 | (31) |
| Average Velocity, All Trains (Miles Per Hour) | 21.1 | 22.5 | (6) |
| Average System Dwell Time (Hours) | 25.3 | 23.2 | (9) |
| Average Total Cars-On-Line | 229,926 | 229,609 | — |
| On-Time Originations | 62.0% | 76.4% | (19) |
| On-Time Arrivals | 56.9% | 76.9% | (26) |
| Average Recrews (Per Day) | 50 | 26 | (92)% |

The decline in these non-financial performance measures contributed to higher operating expenses and resulted in a higher operating ratio for Surface Transportation, which increased to 91.2% in 2003 from 86.1% in 2002. The number of injuries per 100 employees increased by 11%, while the number of FRA-reportable train accidents per million train miles showed a 31% increase from 2002 to 2003. Average train velocity, which is a measure of efficiency, decreased 6% from 22.5 miles per hour in 2002 to 21.1 miles per hour in 2003. The average system dwell time, which measures the amount of time between car arrival and departure from yards, increased 9% from 2002 to 2003. The percent of scheduled trains departing the origin station at or prior to the scheduled departure time and the percent of scheduled trains arriving at the destination station within two hours of the scheduled arrival time both showed year-over-year declines. The number of relief crews called per day on average, which is an indicator of efficiency in the use of crews, showed the largest percent decline, increasing from 26 to 50.

CSX management is taking steps to identify the source of operating inefficiencies and reduce operating expenses. Management also is evaluating ways to restore the network operating efficiency, while maintaining volume. This includes reducing both gross ton-miles and the number of times a railcar is handled, or switched, en route to its final destination. Because American industry has changed significantly in recent years. Management believes there are portions of CSX's non-core network that could be more efficiently used by third parties. The Company is currently evaluating the lease or sale of up to 3,000 miles of its non-core network. This would allow CSX to return approximately 50 locomotives to the core network, reduce capital outlays and decrease operating expenses.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

These changes will allow for and require organizational improvements. CSX is undertaking a major management restructuring that began in November 2003 and is expected to conclude near the end of the first quarter of 2004. Management believes that the conveyance of CSX Lines in February of 2003 and the resolution of the disputes with Maersk relating to the 1999 sale of the international container shipping assets will allow management to focus on its core surface transportation segment.

***International Terminals***

CSX World Terminals' ("CSXWT") Hong Kong terminal accounted for approximately 67% of CSXWT's revenues and 62% of operating income in 2003. The Hong Kong terminal showed a year-over-year volume decrease of 7.2%, which corresponded with a 5.8% decrease in revenue versus 2002. Competitive pressures are rising as customers are shifting their traffic from facilities in Hong Kong to newly opened terminals in South China's Guangdong region. This shift will also translate into reduced volumes and revenue. A significant customer of CSXWT announced that it would terminate its marine terminal services contract during the first quarter of 2004. This is expected to negatively impact CSXWT's 2004 operating income by approximately $29 million and cash flow by approximately $21 million. In December 2004, another contract is scheduled to expire. Negotiations are in process to maintain this contract, but if negotiations are unsuccessful, 2005 operating income may be negatively impacted by $20 million. CSXWT expects that it will be able to replace all or substantially all of the lost volume with new customers representing long and short-term commercial commitments. However, due to the increased competitive pressures, it is possible that the profit margins achieved in the past will not be realized in the near term.

Recognizing its need to diversify beyond the Hong Kong terminal, CSXWT has been expanding its capacity and market reach. During 2003, CSX's minority owned terminal operation located in the Shandong Province of the People's Republic of China commenced operations. CSXWT has also completed the first phase of its terminal construction in Caucedo, which is located in the Dominican Republic. The Caucedo terminal company is an unconsolidated entity of CSXWT that began operations in December 2003. In response to competition in the South China Guangdong region, CSXWT has initiatives in process to maintain and improve its productivity standards.

In addition to volume, CSXWT monitors terminal productivity or lifts per hour. For the years ended December 26, 2003 and December 27, 2002, lifts per hour for some of the main terminals was as follows:

| Terminal | Port's % of CSXWT Operating Income | Lifts Per Hour | | |
|---|---|---|---|---|
| | | 2003 | 2002 | % Improvement (Decline) |
| Hong Kong, China | 62% | 40.4 | 39.1 | 3% |
| Adelaide, Australia | 5% | 22.3 | 21.6 | 3% |
| Germershiem, Germany | 5% | 23.7 | 25.2 | (6)% |
| Rio Haina, Dominican Republic | 5% | 25.8 | 26.1 | (1)% |

Overall, terminal productivity remained relatively stable in 2003 compared to 2002.

**Financial Results of Operations**

***Consolidated Results***

CSX follows a 52/53-week fiscal reporting calendar. Fiscal years 2003 and 2002 consisted of 52 weeks ending on December 26, 2003 and December 27, 2002, respectively.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

***2003 vs. 2002***

*Operating Revenue*

Operating revenue decreased $359 million for the year ended December 26, 2003 to $7.8 billion, compared to $8.2 billion for the prior year. A $627 million decline in consolidated revenue resulted from a reduction of revenue in the domestic container-shipping segment as a majority of CSX's interest in CSX Lines was conveyed during the first quarter of 2003 (See Note 3, Divestitures). Excluding revenue from this conveyance, revenue increased $268 million primarily due to an increase in Surface Transportation revenue.

*Operating Income*

Operating income for the year ended December 26, 2003 was down $501 million to $626 million, compared to $1.1 billion in the prior year. The prior year included $38 million of operating income of CSX Lines, which was conveyed to a new venture formed with the Carlyle Group in the first quarter of 2003. Excluding operating income from this conveyance, 2003 operating income decreased $463 million.

The decrease in operating income is primarily the result of two charges taken during 2003 totaling $340 million. The Company recorded a $232 million charge in conjunction with the change in estimate for casualty reserves, which is reflected in operating expense as "Provision for Casualty Claims" (See Note 10, Casualty, Environmental and Other Reserves). Also, CSX entered into two settlement agreements, which together resolve all material outstanding disputes with Maersk. This decreased the Company's operating income by $108 million, and is reflected in operating expense as the additional loss on sale of international container-shipping assets (See Note 18, Commitments and Contingencies).

The Company also recorded $34 million pretax as the initial charge for separation expenses related to the management restructuring announced in November 2003. In addition, the Company recorded a credit of $22 million pretax related to revised estimates for railroad retirement taxes and the amount of benefits that will ultimately be paid to individuals under the $1.3 billion charges for separation plans initially recorded in 1991 and 1992. For the year, the Company has recorded a net restructuring charge of $22 million that includes these items and additional separation charges that were included in the third quarter results. (See Note 4, Restructuring).

Materials, supplies and other expenses decreased $62 million, or 4%, year-over-year, as a result of the conveyance of most of the Company's interest in its domestic container-shipping subsidiary, CSX Lines. Excluding the $244 million of expenses of CSX Lines, materials, supplies and other increased $193 million year-over-year. Approximately $80 million of this increase relates to increased costs for personal injuries and safety issues. An additional $20 million of the expense deterioration is due to increased cost of derailments. The remaining increase results from volume increases, inflationary effects and general operational inefficiencies, as reflected by the decline in the non-financial performance indicators.

Fuel expense for Surface Transportation operations increased $117 million in 2003, as compared to the prior year. The expense increase is primarily due to $102 million in fuel price increases, while increased volumes were also a factor. The average price per gallon of fuel was 96 cents per gallon for 2003 compared to 78 cents per gallon for 2002. In order to minimize future exposure to fuel price fluctuation risk, during 2003 the Company entered into a series of swaps in order to fix the price on a portion of its estimated future fuel purchases. As of December 26, 2003, 18% and 21% of 2004 and 2005, respectively, estimated fuel purchases were hedged. Fuel swaps did not have an effect on fuel expense for the year ended December 26, 2003.



Source: CSX CORP, 10-K, March 10, 2004
Powered by Morningstar® Document Research℠

Favorably impacting expense was the absence of a management bonus at its Surface Transportation companies in 2003, as approximately $45 million of such expense was recorded in 2002.

*Other Income*

Other income increased $16 million to $57 million for the year ended December 26, 2003, compared to $41 million for the prior year. A decrease in discounts on sales of accounts receivable due to the discontinuance of this program and a loss on sale in 2002 that did not recur in 2003 had a favorable impact, but were partially offset by lower interest income and reduced real estate gains.

*Interest Expense*

Interest expense decreased $27 million for the year ended December 26, 2003 as compared to the prior year. Lower interest rates on floating rate debt and the favorable impact of interest rate swaps (see Note 12, Derivative Financial Instruments) continued to benefit the Company.

*Net Earnings*

Net earnings were $246 million, or $1.14 per share, for the year ended December 26, 2003, compared to $424 million, or $1.99 per share for the prior year.

The year ended December 26, 2003 included an after-tax cumulative effect of accounting change benefit of $57 million, 26 cents per share, related to the adoption of Statement of Financial Accounting Standard ("SFAS") 143, "Accounting for Asset Retirement Obligations," while the year ended December 27, 2002 included an after-tax cumulative effect of accounting change charge of $43 million, 20 cents per share, related to the adoption of SFAS 142, "Goodwill and Other Intangible Assets."

Earnings before the cumulative effect of accounting changes were $189 million and $467 million for the years ended December 26, 2003 and December 27, 2002, respectively. The $278 million year-over-year decrease in net earnings primarily results from a $145 million after-tax charge to increase the Company's provision for casualty reserves, a $67 million after-tax charge to record the loss on sale of international container-shipping assets and a $21 million after-tax charge to record amounts associated with the management restructuring.

The remaining decrease results from the decline in operating income as discussed above, somewhat offset by the favorable impact of decreased interest expenses and income taxes.

***2002 vs. 2001***

*Operating Revenue*

Fiscal year 2001 consisted of 52 weeks ending on December 28, 2001. Operating revenue of $8.2 billion in 2002 was slightly higher than 2001, resulting mainly from an increase in revenues at the Company's domestic container-shipping unit, CSX Lines, which offset a small decrease at the Company's Surface Transportation units.

*Operating Income*

Operating expense of $7.0 billion in 2002 was 2% lower due mainly to lower fuel and labor costs at the Company's Surface Transportation business. The effect on 2001 of the $60 million New Orleans litigation settlement contributed to the favorable year-to-year comparison.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

*Other Income*

Other income was up $32 million in 2002 as compared to 2001, due mainly to reduced losses relating to equity investments and other favorable miscellaneous items, offset by lower interest income.

*Interest Expense*

Interest expense was reduced by $73 million in 2002 as compared to 2001, due to refinancing fixed-rate maturities at lower interest rates, and to a greater percentage of outstanding debt during 2002 bearing a floating rate of interest through the use of interest rate swap agreements.

*Net Earnings*

The Company reported net earnings for 2002 of $424 million, $1.99 per share, compared to $293 million, $1.38 per share in 2001. Results for 2002 include the write-down of indefinite lived intangible assets as a cumulative effect of accounting change, which reduced net earnings $43 million after tax. Results for 2001 include a provision to account for the settlement of the New Orleans tank car fire litigation, which reduced net earnings by $37 million after tax. Excluding the cumulative effect of the accounting change and the New Orleans litigation provision, net earnings were $467 million for 2002, compared with $330 million for 2001. This increase is the result of increased operating income on a consolidated basis of $110 million (excluding the pretax charge of $60 million in 2001 for the New Orleans litigation provision), higher other income of $32 million and lower interest expense of $73 million.

The following tables provide a detail of operating revenue and expense by segment:

| | Rail | Intermodal | Surface Transportation | International Terminals | Eliminations/ Other(2) | Total |
|---|---|---|---|---|---|---|
| | | | (Dollars in Millions) (Unaudited)(1) | | | |
| ***Fiscal Year Ended December 26, 2003*** | | | | | | |
| **Operating Revenue** | **$ 6,182** | **$ 1,257** | **$ 7,439** | **$ 226** | **$ 128** | **$ 7,793** |
| **Operating Expense** | | | | | | |
| Labor and Fringe | 2,555 | 73 | 2,628 | 51 | 61 | 2,740 |
| Materials, Supplies and Other | 1,329 | 201 | 1,530 | 76 | 56 | 1,662 |
| Conrail Rents, Fees & Services | 342 | — | 342 | — | — | 342 |
| Building and Equipment Rent | 418 | 144 | 562 | 8 | (4) | 566 |
| Inland Transportation | (399) | 697 | 298 | 6 | 16 | 320 |
| Depreciation | 579 | 32 | 611 | 9 | 9 | 629 |
| Fuel | 566 | — | 566 | — | 15 | 581 |
| Miscellaneous | — | — | — | 7 | (42) | (35) |
| Provision for Casualty Claims(3) | 229 | — | 229 | — | 3 | 232 |
| Additional Loss on Sale(4) | — | — | — | — | 108 | 108 |
| Restructuring Charge — Net(5) | 22 | — | 22 | — | — | 22 |
| **Total Operating Expense** | **5,641** | **1,147** | **6,788** | **157** | **222** | **7,167** |
| **Operating Income (Loss)** | **$ 541** | **$ 110** | **$ 651** | **$ 69** | **$ (94)** | **$ 626** |
| **Operating Ratio** | 91.2% | 91.2% | 91.2% | 69.5% | | |
| **Employment — Annual Averages** | 32,892 | 1,119 | 34,011 | 1,016 | | |
| **Property Additions** | 974 | 47 | 1,021 | 9 | | |



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

| | Rail | Intermodal | Surface Transportation | International Terminals | Eliminations/ Other(2) | Total |
|---|---|---|---|---|---|---|
| | (Dollars in Millions) (Unaudited)(1) | | | | | |
| ***Fiscal Year Ended December 27, 2002*** | | | | | | |
| **Operating Revenue** | **$ 6,003** | **$ 1,180** | **$ 7,183** | **$ 236** | **$ 733** | **$ 8,152** |
| **Operating Expense** | | | | | | |
| Labor and Fringe | 2,530 | 67 | 2,597 | 57 | 232 | 2,886 |
| Materials, Supplies and Other | 1,212 | 179 | 1,391 | 77 | 256 | 1,724 |
| Conrail Rents, Fees & Services | 322 | — | 322 | — | — | 322 |
| Building and Equipment Rent | 425 | 131 | 556 | 9 | 36 | 601 |
| Inland Transportation | (365) | 633 | 268 | 7 | 95 | 370 |
| Depreciation | 576 | 29 | 605 | 9 | 24 | 638 |
| Fuel | 449 | — | 449 | — | 66 | 515 |
| Miscellaneous | — | — | — | 8 | (39) | (31) |
| **Total Operating Expense** | **5,149** | **1,039** | **6,188** | **167** | **670** | **7,025** |
| **Operating Income** | **$ 854** | **$ 141** | **$ 995** | **$ 69** | **$ 63** | **$ 1,127** |
| **Operating Ratio** | 85.8% | 88.1% | 86.1% | 70.8% | | |
| **Employment — Annual Averages** | 33,468 | 1,091 | 34,559 | 1,261 | | |
| **Property Additions** | 981 | 29 | 1,010 | 11 | | |
| ***Fiscal Year Ended December 28, 2001*** | | | | | | |
| **Operating Revenue** | **$ 6,082** | **$ 1,112** | **$ 7,194** | **$ 236** | **$ 680** | **$ 8,110** |
| **Operating Expense** | | | | | | |
| Labor and Fringe | 2,585 | 65 | 2,650 | 62 | 222 | 2,934 |
| Materials, Supplies and Other | 1,212 | 173 | 1,385 | 70 | 234 | 1,689 |
| Conrail Rents, Fees & Services | 336 | — | 336 | — | — | 336 |
| Building and Equipment Rent | 442 | 123 | 565 | 9 | 52 | 626 |
| Inland Transportation | (371) | 616 | 245 | 7 | 85 | 337 |
| Depreciation | 550 | 31 | 581 | 8 | 24 | 613 |
| Fuel | 525 | — | 525 | — | 60 | 585 |
| New Orleans Litigation Provision(6) | 60 | — | 60 | — | — | 60 |
| Miscellaneous | — | — | — | 9 | (36) | (27) |
| **Total Operating Expense** | **5,339** | **1,008** | **6,347** | **165** | **641** | **7,153** |
| **Operating Income** | **$ 743** | **$ 104** | **$ 847** | **$ 71** | **$ 39** | **$ 957** |
| **Operating Ratio** | 87.8% | 90.6% | 88.2% | 69.9% | | |
| **Employment — Annual Averages** | 35,014 | 1,116 | 36,130 | 1,305 | | |
| **Property Additions** | 848 | 12 | 860 | 19 | | |

(1) Prior periods have been reclassified to conform to the current presentation.

(2) Eliminations/Other consists of the following:

- Charge incurred upon entering into settlement agreements with Maersk
- Reclassification of International Terminals minority interest expense
- Operations of CSX Lines and gain amortization
- Expenses related to the 2003 retirement of the Company's former Chairman and Chief Executive Officer
- Other items



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

(3) Represents 2003 charges recorded in connection with the Company's change in estimating casualty reserves, which impacted Surface Transportation operating income by $229 million. (See Note 10, Casualty, Environmental and Other Reserves.)

(4) Represents 2003 charges incurred upon entering into settlement agreements with Maersk. (See Note 18, Commitments and Contingencies.)

(5) Includes the 2003 restructuring charge recorded in connection with the management restructuring and the favorable change in estimate of benefits to be paid under 1991 and 1992 separation plans. (See Note 4, Restructuring.)

(6) Represents a 2001 charge to account for the settlement of the 1987 New Orleans tank car fire litigation. This charge reduced operating income by $60 million.

***Surface Transportation Results***

The following tables provide Surface Transportation carload and revenue data by service group and commodity:

***Fiscal Years Ended December 26, 2003, December 27, 2002 and December 28, 2001***

| | Carloads | | | Revenue | | |
|---|---|---|---|---|---|---|
| | **2003** | **2002** | **2001** | **2003** | **2002** | **2001** |
| | | **(Thousands)** | | | **(Dollars in Millions)** | |
| Merchandise | | | | | | |
| Phosphates and Fertilizer | 460 | 463 | 441 | $ 329 | $ 324 | $ 306 |
| Metals | 348 | 319 | 320 | 435 | 401 | 395 |
| Forest and Industrial | 604 | 590 | 596 | 806 | 771 | 777 |
| Agricultural and Food | 457 | 452 | 467 | 660 | 648 | 661 |
| Chemicals | 544 | 542 | 540 | 993 | 964 | 937 |
| Emerging Markets | 476 | 424 | 435 | 471 | 398 | 384 |
| Total Merchandise | 2,889 | 2,790 | 2,799 | 3,694 | 3,506 | 3,460 |
| Automotive | 529 | 538 | 516 | 853 | 845 | 794 |
| Coal, Coke and Iron Ore | | | | | | |
| Coal | 1,570 | 1,574 | 1,722 | 1,543 | 1,529 | 1,671 |
| Coke and Iron Ore | 65 | 70 | 77 | 57 | 69 | 68 |
| Total Coal, Coke and Iron Ore | 1,635 | 1,644 | 1,799 | 1,600 | 1,598 | 1,739 |
| Other | — | — | — | 35 | 54 | 89 |
| Total Rail | 5,053 | 4,972 | 5,114 | 6,182 | 6,003 | 6,082 |
| Intermodal | | | | | | |
| Domestic | 1,060 | 982 | 901 | 784 | 696 | 625 |
| International | 1,170 | 1,137 | 1,103 | 469 | 476 | 470 |
| Other | — | — | — | 4 | 8 | 17 |
| Total Intermodal | 2,230 | 2,119 | 2,004 | 1,257 | 1,180 | 1,112 |
| Total Surface Transportation | 7,283 | 7,091 | 7,118 | $ 7,439 | $ 7,183 | $ 7,194 |



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

*Rail*

***2003 vs. 2002***

*Operating Revenue*

CSX categorizes rail revenues in three main areas:

1. Merchandise, which includes the following markets:

- Phosphates and Fertilizers
- Metals
- Forest and Industrial
- Agricultural and Food
- Chemicals
- Emerging Markets

2. Automotive

3. Coal, Coke and Iron Ore

*Merchandise Revenue*

Merchandise showed strength during 2003 with revenue up 5% on 4% volume growth. All markets showed year-over-year revenue improvement, and all except phosphates and fertilizers experienced increased volumes. Emerging markets realized the most improvement, with 18% revenue growth on 12% volume growth. Aggregates and cement traffic grew faster than average industry growth rates due to new industrial development and increased conversion of truck traffic to rail. Ammunition volumes increased throughout the year and strength continued in waste markets. The metals sector also showed strength in 2003. Revenue improved 8% on 9% volume growth, driven by strong global steel demand, particularly for scrap and sheet steel. Other factors contributing to improvement include strength in semi-finish metals and continued increases in modal conversions. Demand for building products, lumber and paper products resulted in an increase in forest and industrial revenue of 5% on 2% volume growth. The agricultural and food and chemical sectors also realized revenue increases, while volumes remained consistent with 2002. Phosphates and fertilizers revenues increased slightly year-over-year despite decreased volume, due to domestic phosphates and ammonia strength.

*Automotive Revenue*

Volume declined largely due to a 200,000 unit year-over-year decrease in North American light vehicle production. Haul extensions and price increases drove improvements in revenue per car.

*Coal, Coke and Iron Ore Revenue*

Coal, coke and iron ore volumes and revenue remained consistent with results in the prior year. Export moves were strong due to high European steam coal demand for electricity generation. Steel related traffic was weak throughout the year, but showed renewed strength during the fourth quarter due to consolidation in the steel industry and shifts in scrap metal demands that resulted in increased traffic and revenue for CSX. Utility revenue was favorable due to pricing initiatives and higher average length of haul. Improvements in these areas were offset by abnormally harsh winter weather during the first quarter which adversely affected lake loadings, as lakes were frozen.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

*Operating Expense*

Total rail operating expenses increased $492 million, or 10% in 2003 as compared to 2002. Increases in most expense categories were somewhat offset by decreases in building and equipment rent.

The primary component of the expense increase was a charge of $229 million recorded in conjunction with the Company's change in estimate for its casualty reserves to include an estimate of incurred but not reported claims for asbestos and other occupational injuries that could be received over the next seven years. This charge is reflected as "Provision for Casualty Claims" in the financial statements. (See Note 10, Casualty, Environmental and Other Reserves.)

Labor and fringe expense remained relatively consistent year-over-year. The cost of labor inflation was offset by December-over-December reductions in staff of approximately 1,200 and the favorable impact of the absence of a management bonus in 2003, as approximately $45 million of such expense was recorded in 2002.

Materials, supplies and other expenses increased $117 million, or 10%, year-over-year. One of the primary drivers was approximately $80 million of increased cost for personal injury and related safety issues. An additional $20 million of the expense deterioration is due to increased cost of derailments. Additionally, due to the adoption of Statement of Financial Accounting Standard ("SFAS") 143, "Accounting for Asset Retirement Obligations," as discussed below, depreciation expense has been decreased and materials, supplies and other increased to account for the discontinuation of the accrual of cross-tie removal as a component of depreciation expense. The remaining increase results from volume increases, inflationary effects and general operational inefficiencies.

Conrail rents, fees & services expense increased $20 million in 2003, as compared to the prior year, as a result of increased usage of Shared Asset Areas, a contractual increase in the rental fee for Shared Area facilities, and a favorable tax adjustment in the prior year. (See Note 2, Investment In and Integrated Rail Operations With Conrail.)

Building and equipment rent decreased $7 million in 2003 compared to the prior year principally as a result of reduced car rentals from other railroads.

Inland transportation, which represents CSXI's use of the CSXT rail networks, remained relatively consistent year-over-year. The offsetting expense associated with this amount is reflected in CSXI's operating expense, and thus eliminates on a Surface Transportation level.

Depreciation remained consistent year-over-year. The rail segment had capital additions of approximately $1 billion, but the additional depreciation was offset by the reduction in depreciation associated with the adoption of SFAS 143, "Accounting for Asset Retirement Obligations." In conjunction with the group-life method of accounting for asset costs, the Company historically accrued crosstie removal costs as a component of depreciation, which is not permitted under SFAS 143. The effect is to decrease depreciation expense and increase material, supplies and other expense.

Fuel expense increased $117 million in 2003, as compared to the prior year. The expense increase is primarily due to $102 million in fuel price increases, while increased volumes were also a factor. The average price per gallon of fuel was 96 cents per gallon for 2003 compared to 78 cents per gallon for 2002. In order to minimize future exposure to fuel price fluctuation risk, during 2003 the Company entered into a series of swaps in order to fix the price of a portion of its estimated future fuel purchases. As of December 26, 2003, 18% and 21% of 2004 and 2005, respectively, estimated fuel purchases were hedged. Fuel swaps did not have an effect on fuel expense for the year ended December 26, 2003.

The net $22 million restructuring charge in 2003 represents the cost of CSX's reorganization charges offset by reductions in 1991/1992 separation reserves. (See Note 4, Restructuring.)



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

*Operating Income*

Operating income decreased $313 million to $541 million in 2003, compared to $854 million in 2002 primarily due to the $229 million provision for casualty claims, the $22 million net restructuring charge and other expense increases as previously discussed. Excluding the provision for casualty claims and net restructuring charge, operating income would have been $792 million.

***2002 vs. 2001***

*Operating Revenue*

Overall rail revenues were down $79 million to $6.0 billion in 2002, with increases in merchandise and automotive revenues being offset by lower coal revenues. CSX's pricing programs and product mix helped overcome a 3% decrease in carloads in 2002.

*Merchandise Revenue*

Overall merchandise revenues were up 1%, or $47 million in 2002 over 2001. Improvements in phosphates and fertilizers, chemicals, emerging markets, metals and paper and forest products more than offset decreases in minerals, agricultural products and food and consumer products. Pricing programs and favorable mix helped the Company offset the effect of a small decrease in merchandise carloads in 2002 as compared to 2001.

*Automotive Revenue*

Automotive revenues improved 6%, or $51 million in 2002 as a result of yield improvement driven by favorable mix and extended linehauls. Year-over-year volume increases were driven by higher light truck production levels and aggressive manufacturer incentives that stimulated automobile sales during 2002.

*Coal, Coke and Iron Ore Revenue*

Coal revenues had a significant impact on the rail segment's 2002 financial results. Coal revenue was down 9%, or $143 million from 2001's strong performance due to reduced volumes. Export carloads were down significantly as a result of the reduced competitive standing of U.S. coal in the international market, while metallurgical and industrial markets were down in the second half of 2002.

*Other Revenue*

Other revenue decreased $35 million in 2002 as compared to 2001 primarily because there were lower fuel surcharges billed to customers.

*Operating Expense*

Total rail operating expenses decreased $190 million, or 4% in 2002 as compared to 2001. Reductions in most expense categories were somewhat offset by increases in depreciation and reduced intercompany volume with CSX Intermodal. Also, 2001 included $60 million relating to the New Orleans litigation settlement. Fuel costs decreased $76 million in 2002, of which $69 million is attributable to lower fuel prices. The net impact on operating income of reduced fuel price was $44 million since $25 million of fuel surcharge revenue was discontinued.

Labor and fringe costs decreased $44 million year-over-year including savings from reductions in overall employment. These savings were offset by increased labor costs relating to cost of living wage increases. Employee count was approximately 950 lower at the end of 2002 as compared to 2001.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Building and equipment costs were down $17 million mainly due to continued reduction in car hire as the railroad took cars offline and ran more efficiently.

Conrail operating fees, rents and services decreased $14 million in 2002 as compared to 2001. Decreased costs in operating the shared asset areas, tax settlements, efficiency improvements and adjustments to reflect lower reserve requirements for car hire, overcharges, interline and other claims all reduced this expense.

Materials, supplies and other costs at the rail unit were down $11 million in 2002, as compared to 2001, due to reduced transportation costs, fewer accidents and adjustments to estimated state and local tax liabilities to reflect actual assessments. These decreases were offset by higher legal fees and maintenance costs, and $40 million in favorable insurance settlements received in 2001 that were not repeated in 2002.

Depreciation expense increased $26 million as compared to 2001, as a result of a higher depreciable asset base.

*Operating Income*

Rail operating income increased by $111 million to $854 million in 2002 as compared to 2001, due to operating expense decreases noted previously and the New Orleans litigation provision. Excluding the 2001 charge for the New Orleans litigation provision, operating income was up $51 million or 6% for the year.

*Intermodal*

***2003 vs. 2002***

CSX Intermodal domestic revenue improved 13% on 8% volume increase due to increased unloading and loading (“transloading”) of international containers into domestic containers and new programs. Strength in truck brokerage continued due to the rollout of the new Pegasus information management system, which provides real-time information regarding driver availability and location, service quality tracking and financial performance. The parcel sector also showed year-over-year strength. International strength in general import growth was partially offset by continued international import/export diversions of freight carried entirely via water routes from west coast ports to east coast ports. These diversions have resulted in volume declines, shorter hauls and lower per-unit revenue.

Intermodal operating expense increased $108 million compared to the prior year. The increase is due primarily to traffic mix and inflationary factors. Additionally, the Company recognized a $15 million positive contract settlement in 2002. Operating income decreased to $110 million in 2003, compared to $141 million in the prior year.

***2002 vs. 2001***

CSXI reported operating revenue of $1.2 billion in 2002, as compared to $1.1 billion in 2001. The increase was primarily due to continued success in efforts to convert truck traffic onto the intermodal network.

CSXI operating expense increased $31 million in 2002. This increase was the result of $32 million in higher inland transportation costs due to increased volumes handled during 2002. Also, due to volume increases, building and equipment rent increased $8 million, and materials, supplies and other increased $6 million. The increase was partially offset by a $15 million positive contract settlement. Other costs were relatively flat year-over-year.

CSXI operating income was up $37 million in 2002 as compared to 2001, due to the $68 million increase in revenues, offset by a $31 million increase in operating expenses. These results were also impacted by the $15 million positive contract settlement noted above.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

*International Terminals*

***2003 vs. 2002***

CSXWT's revenue decreased $10 million, or 4% to $226 million for 2003, compared to $236 million in the prior year, primarily due to weakness in the Hong Kong market. Expense decreased to $157 million for the year, compared to $167 million for 2002, partially attributable to reduced labor and fringe costs associated with reduced volume at its Hong Kong operations and a $6 million gain related to the divestiture of a portion of the Caucedo terminal ownership interest, which offset other miscellaneous expenses in 2002. Operating income remained consistent at $69 million in 2003 and 2002.

During 2003, a significant customer of CSXWT announced that it would terminate its marine terminal services contract during the first quarter of 2004. This is expected to negatively impact CSXWT's 2004 operating income by approximately $29 million and cash flow by approximately $21 million. In December 2004, another contract is scheduled to expire. Negotiations are in process to maintain this contract, but if negotiations are unsuccessful, 2005 operating income may be negatively impacted by $20 million. CSXWT expects that it will be able to replace all or substantially all of the lost volume with new customers representing long and short-term commercial commitments. However, due to the increased competitive pressures, it is possible that the profit margins achieved in the past will not be realized in the near term. Under the provisions of FASB Statement No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets," companies are required to review their assets for potential impairment losses if there are certain impairment indicators present. Given these indicators, the Company evaluated the undiscounted cash flows estimated to be generated by this terminal, whose long-lived assets are recorded at $59 million, and concluded that the forecasted future undiscounted cash flows exceeded the book value of the assets; therefore no impairment write-down is necessary at this time.

***2002 vs. 2001***

CSX World Terminals' operating revenues were flat at $236 million in 2002 and 2001. Operating expenses were up $2 million in 2002 over 2001 due to lower earnings from equity investments. Miscellaneous operating expenses in 2002 and 2001 include $6 million and $3 million gains, respectively, from transactions relating to equity investments. Operating income was $69 million for 2002, a $2 million decrease from $71 million in 2001.

**Liquidity and Capital Resources**

*Operating Activities*

Cash provided by operations for 2003 was $804 million, compared to $1.1 billion for 2002, and $827 million in 2001. The $323 million decrease in 2003, as compared to the prior year, reflects the $380 million termination of the accounts receivable facility. (See Note 8, Accounts Receivable). Excluding that, cash provided by operating activities was slightly higher than 2002, at $1.2 billion. Real estate activities contributed $122 million to operating cash flow, as compared to $137 million provided in 2002.

In 2002 cash provided from operations was $1.1 billion, a $300 million increase over 2001. Higher operating income, lower interest expense and significant cash flow relating to real estate activities contributed to the increase, while there was a $85 million negative effect attributable to the New Orleans tank car fire settlement payment.

*Investing Activities*

Net cash used by investing activities was $807 million in 2003 compared to $775 million in 2002 and $965 million in 2001. While 2003 capital expenditures approximated 2002 levels,



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

reduced proceeds from maturities of short-term investments led to the increase in cash used for investing activities. Proceeds of $214 million from the sale of CSX Lines in the first quarter of 2003 (See Note 3, Divestitures) helped to offset the impact of reduced short-term investment proceeds.

Property additions totaled $1.1 billion in 2003 and 2002 and $930 million in 2001. The 2003 and 2002 increases over 2001 were related to replacement of cars and locomotives. Of Surface Transportation's $1 billion in 2003 capital expenditures, substantially all related to replacing track, locomotives and other costs necessary to maintain the Company's rail system. 2004 capital expenditures are expected to be approximately $1 billion.

*Financing Activities*

Financing activities provided cash of $172 million during 2003 and $15 million in 2001, compared to a $362 million use of cash during 2002. In 2003, net issuances of $419 million in long-term debt were principally used to repay short-term obligations incurred as a result of the termination of the Company's accounts receivable sales program.

***Debt Issuances and Credit Facilities***

In December 2003, CSX executed a $75 million revolving loan facility that matures in 2005. Borrowings under the facility will bear interest at a rate that fluctuates with LIBOR. In addition, the Company pays an annual commitment fee of 0.15% for the period the facility is not drawn. This debt may be redeemed at any time after May 2004, with additional borrowings allowed through the maturity of the facility. As of December 26, 2003, the Company had $75 million in aggregate principal amount outstanding under this borrowing.

In November 2003, CSX issued $200 million aggregate principal amount of the Company's Notes due 2014 and $200 million aggregate principal amount of the Company's Notes due 2006. The 2014 Notes bear interest at the rate of 5.30% per year and mature on February 15, 2014. The 2006 Notes bear interest at the rate of 2.75% per year and mature on February 15, 2006. The 2014 Notes may be redeemed by the Company at any time, but the 2006 Notes cannot be redeemed before maturity.

In August 2003, the Company issued $300 million aggregate principal amount Notes due 2013. These Notes bear interest at the rate of 5.50% and mature on August 1, 2013. The Notes may be redeemed by the Company at any time.

CSX increased its borrowings from Conrail by approximately $144 million year-over-year in 2003 in addition to the $146 million increase in 2002. Also, during 2002 the Conrail note was extended to a five year term.

During 2002, CSX issued $200 million of 4.88% notes due in 2009 and $400 million of 6.30% notes due in 2012.

The Company has a $1 billion five-year revolving credit facility and a $345 million 364-day revolving credit facility. Generally, these facilities may be used to support the Company's commercial paper, working capital and other general corporate purposes. Under the 364-day facility, the Company pays an annual fee to the participating banks of .125% of total commitment. Under the five-year facility, the Company pays annual fees to the participating banks that may range from 0.08% to 0.23% of total commitment, depending on the Company's credit rating. As of December 26, 2003, the Company had no borrowings outstanding under these facilities and there were no commercial paper borrowings outstanding. CSX had commercial paper borrowings supported by these credit facilities of approximately $140 million at the end of 2002.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

***Debt Repayments***

CSX repaid long-term debt of $500 million in 2003, $1.2 billion in 2002, and $266 million in 2001. The Company also paid a net $141 million in short-term debt during 2003. The primary sources of 2003 repayments were the $214 million of proceeds from the conveyance of CSX Lines (see Note 3, Divestitures) and the issuance of new debt.

Long-term and short-term debt at December 26, 2003 and December 27, 2002, totaled $7.3 billion and $7.1 billion, respectively. The ratio of debt to total capitalization was 51% at the end of 2003, and 52% at the end of 2002 and 2001.

***Convertible Debentures***

In October 2001, CSX issued $564 million aggregate principal amount at maturity in unsubordinated zero coupon convertible debentures (the "debentures") due October 30, 2021 for an initial offering price of approximately $462 million. At December 26, 2003 and December 27, 2002, outstanding debentures are included in long-term debt, at a carrying value of $447 million and $467 million, respectively. These debentures accrete (increase) in value at a yield to maturity of 1% per year. The accretion rate may be reset on October 30, 2007, October 30, 2011, and October 30, 2016 to a rate based on five-year United States Treasury Notes minus 2.8%. In no event, however, will the yield to maturity be reset below 1% or above 3% per annum. Accretion in value on the debentures is recorded for each period, but will not be paid prior to maturity.

Under the terms of the debentures, holders had the option to require the Company to purchase their debentures at a purchase price equal to the accreted value of the debentures in October 2003. CSX purchased $15 million aggregate principal amount at maturity of the debentures at an aggregate cost of $13 million. In November 2003, the Company made a one-time cash payment of $23.00 per $1,000 aggregate principal amount at maturity to holders who did not require the Company to purchase their debentures. This resulted in a $13 million cash payment, which will be amortized over the remaining term of the debentures. In addition, the terms of the debentures were amended to permit holders to cause the Company to purchase the debentures on October 30, 2005, at their accreted value of $852.48 per $1,000 principal amount at maturity, in addition to the purchase dates provided under the terms of the debentures. Similarly, the debentures allow holders to require the Company to purchase their debentures in October 2006, October 2008, October 2011, and October 2016, at a purchase price equal to the accreted value of the debentures. In 2005, 2006 and 2008, CSX may elect to pay the purchase price in cash and/or shares of common stock, while CSX may pay the purchase price only in cash on the last two purchase dates. CSX may redeem the debentures for cash at any time on or after October 30, 2008, at a redemption price equal to the accreted value of the debentures.

Holders may convert debentures into CSX common stock if certain requirements defined in the debentures and the related indenture are met. Holders may convert if the closing sale price of CSX common stock for at least 20 of the 30 preceding trading days is more than the applicable percentage (which is initially 120% and will decline over the life of the debentures to 110%) of the accreted conversion price per share of the Company's common stock. The "accreted conversion price" per share of common stock is the quotient of the accreted value of a debenture divided by the number of shares of common stock issuable upon conversion of that debenture. Holders may also convert if the Company's senior long-term unsecured credit ratings are downgraded by Moody's Investors Service Inc. to below Ba1 and by Standard & Poor's Rating Services to below BB+, if the debentures have been called for redemption, if the Company makes specified distributions to holders of CSX common stock, or if the company is a party to specified consolidations, mergers, or transfers or leases of all or substantially all of the Company's assets. For each debenture surrendered for conversion, a holder will initially receive 17.75 shares of CSX common stock, which is equivalent to an initial conversion price of $46.16



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

per share. The initial conversion rate will be adjusted for reasons specified in the indenture, but will not be adjusted for accretion. Instead, accretion on the debentures will be deemed paid by the common stock received by the holder on conversion.

***Shelf Registration Statements***

CSX has $600 million of remaining capacity under a shelf registration that may be used, subject to market conditions, to issue debt or other securities at the Company's discretion. The Company presently intends to use the proceeds from the sale of any securities issued under its shelf registration statements to finance cash requirements, including refinancing existing debt as it matures. While the Company seeks to give itself flexibility with respect to meeting such needs, there can be no assurance that market conditions would permit the Company to sell such securities on acceptable terms at any given time, or at all.

***Dividends***

In mid-year 2001, the board of directors announced that the regular quarterly dividend payable would be reduced to 10 cents per share. CSX had paid a regular quarterly dividend of 30 cents per share since the fourth quarter of 1997 and did so through June of 2001. Dividends paid in 2003, 2002 and 2001 were as follows:

| | 2003 | 2002 | 2001 |
|---|---|---|---|
| Dividend Per Share | $0.40 | $0.40 | $0.80 |
| Total Cash Paid for Dividends (In Millions) | $ 86 | $ 86 | $ 171 |

***Working Capital***

The Company's working capital deficit at December 26, 2003, was $307 million, as compared to $665 million at December 27, 2002. A working capital deficit is not unusual for the Company and other companies in the industry and does not indicate a lack of liquidity. The Company continues to maintain adequate current assets to satisfy current liabilities and maturing obligations when they come due and has sufficient financial capacity to manage its day-to-day cash requirements and any obligations arising from legal, tax and other regulatory rulings.

***Credit Ratings***

As of December 26, 2003, CSX Corporation's long-term unsecured debt obligations were rated BBB and Baa2 by Standard and Poor's and by Moody's Investor Service, respectively. In the event CSX's long-term unsecured bond ratings were reduced to BBB- and Baa3, the Company's drawn and undrawn borrowing costs under the $1.0 billion and $345 million revolving credit facilities would not materially increase. However, at year-end 2003, the Company had no borrowings outstanding under these credit facilities. The Company's short-term commercial paper program is rated A-2 and P-2 by Standard and Poor's and Moody's Investor Service, respectively. Should these ratings decline to A-3 and P-3, the company's cost and access to the commercial paper markets could be adversely affected. At year-end 2003, the Company had no commercial paper borrowings outstanding.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

**Schedule of Contractual Obligations and Commercial Commitments**

The following table sets forth maturities of the Company's contractual obligations:

| Type of Obligation | 2004 | 2005 | 2006 | 2007 | 2008 | Thereafter | Total |
|---|---|---|---|---|---|---|---|
| | | | | (Millions of Dollars) | | | |
| Long-term Debt (see Note 11)(a) | $426 | $247 | $ 598 | $1,080 | $ 615 | $4,291 | $ 7,257 |
| Operating Leases — Net (see Note 18)(b) | 150 | 138 | 112 | 117 | 98 | 516 | 1,131 |
| Agreements with Conrail (see Note 2)(c) | 260 | 247 | 236 | 229 | 224 | 3,118 | 4,314 |
| Purchase Obligations (see Note 18)(d) | 132 | 138 | 166 | 171 | 171 | 1,866 | 2,644 |
| Total Contractual Obligations | $968 | $770 | $1,112 | $1,597 | $1,108 | $9,791 | $15,346 |

The following table sets forth the maturities of the Company's other commitments:

| Type of Commitment | 2004 | 2005 | 2006 | 2007 | 2008 | Thereafter | Total |
|---|---|---|---|---|---|---|---|
| Unused Lines of Credit (see Note 11) | $345 | $ — | $1,000 | $ — | $ — | $ — | $1,345 |
| Guarantees (see Note 18)(e) | 140 | 122 | 98 | 140 | 102 | 240 | 842 |
| Other | 99 | 14 | 8 | — | — | 36 | 157 |
| Total Other Commitments | $584 | $136 | $1,106 | $140 | $102 | $276 | $2,344 |

(a) The fair market value of the interest rate swap agreements of $55 million, which is included in long-term debt on the balance sheet, is not included on the debt maturity schedule. Capital leases of $206 million are included in long-term debt.

(b) CSX has entered into various operating lease agreements primarily for rail transportation equipment.

(c) Agreements with Conrail represents commitments to pay Conrail per various agreements.

(d) Commercial commitments consists of a $2.6 billion maintenance program which expires in 2026 relating to CSX's fleet of locomotives. This program replaced an internal maintenance program.

(e) Approximately $440 million of these guarantees relate to certain lease obligations that CSX remains contingently liable for that were assumed by Maersk. Accordingly, CSX has collateral liens on the assets relating to these leases and indemnities provided by Maersk that it will fulfill the commitments. CSX believes that Maersk will fulfill its contractual commitments with respect to such leases and that CSX will have no further liabilities relating to these obligations. Approximately $97 million relates to construction and cash deficiency support guarantees at one of the Company's equity investments. CSX guarantees approximately $300 million relating to leases assumed as part of CSX's conveyance of its interest in CSX Lines.

**Off-Balance Sheet Arrangements**

There are no off-balance sheet arrangements, except as noted above, that are reasonably likely to have an effect on our financial condition or results of operations.

**Market Risk**

CSX addresses market risk exposure to fluctuations in interest rates and the risk of volatility in its fuel costs through the use of derivative financial instruments. The Company does not hold or issue derivative financial instruments for trading purposes.

The Company addresses its exposure to interest rate market risk through a controlled program of risk management that includes the use of interest rate swap agreements. As of December 26, 2003, the Company had various interest rate swap agreements on $1.3 billion of its outstanding notes payable. In the event of a 1% increase or decrease in the LIBOR interest rate, the interest expense related to these agreements would increase or decrease approximately $13 million on an annual basis.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

During 2003, the Company began a program to hedge its exposure to fuel price volatility through swap transactions. As of December 26, 2003, CSX has hedged approximately 18% and 21% of expected requirements for 2004 and 2005, respectively. The Company expects that by the end of 2004 the programs will result in an increase in the amount of fuel hedged to approximately 76% of 2005 annual purchases. At December 26, 2003, a 1% change in fuel prices would result in an increase or decrease in the asset related to the swaps of approximately $1 million. The Company is subject to risk relating to changes in the price of diesel fuel. At the end of 2003, the Company had not entered into any long-term commitments for forward fuel purchases. The Company's rail unit average annual fuel consumption is approximately 570 million gallons. A one-cent change in the price per gallon of fuel would impact fuel expense by approximately $6 million.

The Company is exposed to loss in the event of non-performance by any counter-party to the interest rate swap or fuel hedging agreements. The Company does not anticipate non-performance by such counter-parties, and no material loss would be expected from non-performance.

Exclusive of derivative contracts that swap fixed rate notes to floating interest rates, at December 26, 2003 and December 27, 2002, CSX had approximately $714 million and $709 million, respectively, of floating rate debt outstanding. A 1% variance in interest rates would on average effect annual interest expense by approximately $7 million.

While the Company's international terminals segment does business in several foreign countries, a substantial portion of its revenue and expenses are transacted in U.S. dollars, or currencies with little fluctuation against the U.S. dollar. For this reason, CSX does not believe its foreign currency market risk is significant.

A substantial increase in the fair market value of the Company's stock price could negatively impact earnings per share due to the dilutive effect of stock options and convertible debt.

**Investment In and Integrated Rail Operations with Conrail**

See background, accounting and financial reporting effects and summary financial information in Note 2, Investment In and Integrated Rail Operations with Conrail.

***Conrail's Results of Operations***

***2003 vs. 2002***

Conrail Inc. ("Conrail") reported net income of $203 million in 2003, which included a cumulative effect of accounting change benefit of $40 million. Excluding the cumulative effect of accounting change, net income was $163 million, as compared with $180 million in 2002. Operating revenues were up $25 million to $918 million from the prior year. However, operating expenses were up 6% to $659 million.

In June 2003, CSX, Norfolk Southern Corporation ("NS") and Conrail jointly filed a petition with the Surface Transportation Board ("STB") to establish direct ownership and control by CSX's and NS' respective subsidiaries, CSX Transportation Inc. ("CSXT") and Norfolk Southern Railway ("NSR") of their portions of the Conrail system already operated by them separately and independently under various agreements. These portions of the Conrail system are currently owned by Conrail's subsidiaries, New York Central Lines LLC ("NYC") and Pennsylvania Lines LLC ("PRR"). The ownership of NYC and PRR would be transferred ("spun off") to CSXT and NSR, respectively. Conrail would continue to own, manage and operate the Shared Asset Areas as previously approved by the STB. STB approval to proceed with the spin-off transaction and a favorable ruling from the IRS qualifying the



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

transaction as a non-taxable disposition were received in November 2003. The transaction remains subject to a number of other conditions.

If all necessary conditions are satisfied, unsecured debt securities of newly formed subsidiaries of CSXT and NSR would be offered in a 42%/58% ratio in exchange for Conrail's unsecured debentures. The debt securities issued by its respective subsidiary would be fully and unconditionally guaranteed by CSXT or NSR. Upon completion of the proposed transaction, the subsidiaries would be merged into CSXT and NSR, respectively, and the new debt securities thus would become direct unsecured obligations of CSXT or NSR. Conrail's secured debt and lease obligations will remain obligations of Conrail and are expected to be supported by new leases and subleases which, upon completion of the proposed transaction, would be the direct lease and sublease obligations, also on a 42%/58% ratio, of CSXT and NSR. CSX will record the proposed transaction at fair value based on the results of an independent valuation of NYC, with any difference from carrying value resulting in a gain or loss. The Company can not predict the outcome of the valuation and the impact on the Company's financial statements.

CSX, NS and Conrail are working to complete the spin-off transaction in 2004. Upon consummation of the proposed transaction, CSX's investment in Conrail will no longer include the amounts related to NYC and PRR. Instead the assets and liabilities of NYC will be reflected in their respective line items in CSX's consolidated balance sheet. Conrail will continue to own, manage and operate the Shared Asset Areas.

***2002 vs. 2001***

Conrail reported net income of $180 million in 2002, compared with $174 million in 2001. Operating revenues were down $10 million to $893 million in 2002, while operating expenses were favorable $16 million year-over-year. Lower costs in the Shared Asset Areas, tax settlements and lower reserve requirements for car hire, overcharges, interline and other claims helped improve 2002 results.

***Financial Condition and Liquidity***

Conrail's operating activities provided cash of $412 million in 2003, compared with $423 million in 2002 and $502 million in 2001. The decrease in cash provided by operations in 2003 is a result of decreased operating income. The decrease in cash provided by operations in 2002 compared to 2001 reflected large payments of casualty claims. Cash generated from operations is the principal source of liquidity and is primarily used for debt repayments and capital expenditures.

Debt repayments totaled $57 million, $59 million and $61 million in 2003, 2002 and 2001, respectively. Capital expenditures were $35 million, $23 million and $47 million in 2003, 2002 and 2001, respectively. Total cash used for financing activities was $360 million, most of which results from an increase in the amount receivable from CSX and Norfolk Southern under their respective notes (See Note 2, Investment In and Integrated Rail Operations with Conrail).

Conrail had working capital deficits of $22 million and $29 million at December 26, 2003 and December 27, 2002, respectively. A working capital deficit is not unusual for the Company and does not indicate a lack of liquidity. The Company continues to maintain adequate current assets to satisfy current liabilities and maturing obligations when they come due and has sufficient financial capacity to manage its day-to-day cash requirements and any obligations arising from legal, tax and other regulatory rulings.

**Divestitures**

In February 2003, CSX conveyed most of its interest in its domestic container-shipping subsidiary, CSX Lines LLC ("CSX Lines"), to a new venture formed with the Carlyle Group for approximately $300 million (gross cash proceeds of approximately $240 million, $214 million net of transaction costs, and $60 million of securities). CSX Lines was subsequently renamed



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Horizon Lines LLC ("Horizon"). Horizon has subleased equipment and/or assigned vessel leases from certain affiliates of CSX covering the primary financial obligations related to $300 million of leases under which CSX or one of its affiliates will remain a lessee/ sublessor or guarantor. A deferred pretax gain of approximately $127 million as a result of the transaction will be recognized over the 12-year sub-lease term. Approximately $9 million of this gain was recognized during 2003. The securities have a term of 7 years and a preferred return feature. During the third quarter, CSX received a $15 million payment from Horizon Lines, which included $3 million of interest, in return of a portion of its investment in Horizon and now holds $48 million of securities.

**Other Matters**

***Matters Arising out of Sale of International Container-Shipping Assets***

In 2003, CSX finalized a settlement agreement with Maersk resolving all remaining material disputes pending directly between the two companies, consisting predominantly of two major disputes. The first dispute involved a post-closing working capital adjustment to the sale price for which the Company had recorded a receivable of approximately $70 million. The second dispute involved a claim of 425 million Dutch Guilders (approximately $180 million at then prevailing currency exchange rates) plus interest by Europe Container Terminals BV ("ECT") alleging breaches of contract by the Company at the Rotterdam container terminal facility owned by ECT.

Also in 2003, CSX entered into a final settlement agreement with Maersk allocating responsibility between the two companies for third party claims and litigation relating to the assets acquired by Maersk.

The two settlements reduced the Company's 2003 earnings by $108 million pretax, $67 million after tax. This charge is reflected in the financial statements as an additional loss on the sale of the international container-shipping assets. Neither settlement has a material impact on cash flows.

***Restructuring***

In November 2003, the Company announced a management restructuring plan to streamline the structure at a number of its companies, eliminate organizational layers and realign certain functions. The initiative will reduce the non-union workforce by 800 to 1,000 positions over the last quarter of 2003 and the first half of 2004. As of December 26, 2003, 20 employees have been terminated under this program. The Company recorded an initial charge related to this reduction of $34 million pretax, in 2003, to record the lowest amount of expense to be incurred under this program. The total estimated cost of the program is expected to be in the range of $60 million to $80 million. The majority of separation benefits will be paid from CSX's qualified pension plans, with the remainder being paid from general corporate funds.

Also in 2003, the Company recorded a $10 million restructuring charge related to another workforce reduction program. Substantially all of this amount had been paid out at December 27, 2003.

In 2003, the Company recorded a $22 million pretax credit related to a favorable change in estimate related to the 1991 and 1992 separation plans. These plans provided for workforce reductions, improvements in productivity and other cost reductions. The reduction in estimate for these plans results from lower railroad retirement taxes and other benefits than had been built into the initial $1.3 billion charge.

A net $22 million restructuring charge was recorded representing the cost of the restructuring initiatives offset by reductions in 1991/1992 separation reserves. The associated expense is included in operating expense on the Income Statement as "Restructuring Charge — Net."



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

**Critical Accounting Estimates**

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires that management make estimates in reporting the amounts of certain assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amount of certain revenues and expenses during the reporting period. Actual results may differ from those estimates. Significant estimates using management judgment are made for the following areas:

1. Casualty, legal and environmental reserves

2. Pension and postretirement medical plan accounting

3. Depreciation policies for its assets under the group-life method

These estimates and assumptions are discussed with the Audit Committee of the Board of Directors on a regular basis.

***1. Casualty, Legal and Environmental Reserves***

*Casualty Reserve Management*

Casualty reserves represent accruals for the uninsured portion of occupational injury and personal injury claims. These reserves are recorded upon the first reporting of a claim, and estimates are updated as information develops. The amount of liability accrued is based on the type and severity of the claim, and an estimate of future claims development based on current trends and historical data. The Company believes it has recorded liabilities in sufficient amounts to cover all identified claims and estimates of incurred but not reported personal injury claims for the next seven years. During 2003, the Company retained third party professionals to work with it to project the number of asbestos and other occupational injury claims to be received over the next seven years and the related costs. Based on this analysis the Company established reserves for the probable and reasonably estimable asbestos and other occupational injury liabilities. Other occupational claims include allegations of exposure to certain materials in the work place, such as solvents and diesel fuel, or alleged physical injuries, such as carpal tunnel syndrome or hearing loss. In conjunction with the change in estimate, in 2003 the Company recorded a charge of $206 million to increase its provision for these claims. Approximately $141 million of this amount relates to asbestos claims. Additionally, the provision for personal injury claims was increased by $26 million as a result of a change in estimate.

Estimates for all of these claims are subject to significant uncertainty relating to the outcomes of negotiated settlements and other developments and are not suited to subjecting to a sensitivity analysis. As facts and circumstances change, the Company may have to change its estimates, and changes could have a material impact on the Company’s financial results. Events such as adverse verdicts, catastrophic accidents and legal settlements will cause the Company to revise its estimated liabilities, which the Company reviews and appropriately adjusts quarterly. Personal and occupational injury liabilities amount to $864 million and $605 million at December 26, 2003 and December 27, 2002, respectively. (See Note 10, Casualty, Environmental and Other Reserves).

*Legal Reserves*

In accordance with SFAS 5, “Accounting for Contingencies,” an accrual for a loss contingency is established if information available prior to issuance of the financial statements indicates that it is (1) probable that an asset has been impaired or a liability has been incurred at the date of the financial statements, and (2) the amount of loss can be reasonably estimated. If no accrual is made for a loss contingency because one or both of these conditions are not met, or if an exposure to loss exists in excess of the amount accrued, disclosure of the



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

contingency is made when there is at least a reasonable possibility that a loss or an additional loss may have been incurred. The Company evaluates all exposures relating to legal liabilities on an ongoing basis and records reserves when appropriate under the guidance noted above.

In 2003, CSX finalized a settlement agreement with Maersk resolving all remaining material disputes pending directly between the two companies, consisting predominantly of two major disputes. The two settlements reduced the Company's 2003 earnings by $108 million pretax, $67 million after tax. This charge is reflected in the financial statements as an additional loss on the sale of the international container-shipping assets. Neither settlement has a material impact on cash flows.

In 2001 Duke Energy Corporation ("Duke") filed a complaint before the U.S. Surface Transportation Board alleging that certain CSXT common carrier coal rates are unreasonably high. In February 2004, the STB issued a decision finding that the CSXT common carrier rates were reasonable. While approving the rate levels, the STB also invited Duke to request a phase-in of rate increases over some time period. The nature and amount of any such phase-in is uncertain, and would only apply to billings subsequent to December 2001. CSXT will continue to consider and pursue all available legal defenses in this matter. Administrative and legal appeals are possible, and could take several years to resolve. An unfavorable outcome to this complaint would not have a material effect on the Company.

The Company increased a reserve in 2001 to account for the impact of the negotiated settlement of the New Orleans tank car fire. This negotiation resulted in the Company recording an additional charge of $60 million pretax, $37 million after tax in 2001.

*Environmental Management*

CSXT is a party to various proceedings, including administrative and judicial proceedings, involving private parties and regulatory agencies related to environmental issues. CSXT has been identified as a potentially responsible party ("PRP") at approximately 260 environmentally impaired sites, many of which are, or may be, subject to remedial action under the Federal Superfund statute ("Superfund") or similar state statutes. A number of these proceedings are based on allegations that CSXT, or its railroad predecessors, sent hazardous substances to the facilities in question for disposal. Some of the proceedings involve property formerly or currently owned by CSXT or its railroad predecessors. Proceedings arising under Superfund or similar state statutes can involve numerous other companies who generated the waste or owned or operated the property and involve the allocation of liability for costs associated with site investigation and cleanup, which could be substantial.

At least once each quarter, CSXT reviews its role with respect to each such location, giving consideration to a number of factors, including:

- the type of cleanup required,
- the nature of CSXT's alleged connection to the location (e.g., generator of waste sent to the site, or owner or operator of the site),
- the extent of CSXT's alleged connection (e.g., volume of waste sent to the location and other relevant factors),
- the accuracy and strength of evidence connecting CSXT to the location,
- and the number, connection, and financial viability of other named and unnamed PRP's at the location.

Based on the review process, CSXT has recorded reserves to cover estimated contingent future environmental costs with respect to such sites. The recorded liabilities for estimated future environmental costs at December 26, 2003, and December 27, 2002 were $45 million and



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

$35 million, respectively. These liabilities, which are undiscounted, include amounts representing CSXT's estimate of unasserted claims, which CSXT believes to be immaterial. The liability includes future costs for all sites where the Company's obligation is (1) deemed probable and (2) can be reasonably estimated. The liability includes future costs for remediation and restoration of sites as well as any significant ongoing monitoring costs, but excludes any anticipated insurance recoveries. During 2003, the Company increased its estimate for environmental liabilities by a net $10 million due to continuing evaluation of the adequacy of the reserve. The majority of the December 26, 2003 environmental liability is expected to be paid out over the next seven years.

The Company does not currently possess sufficient information to reasonably estimate the amounts of additional liabilities, if any, on some sites until completion of future environmental studies. Also, changes in federal and state laws and regulations may impact, favorably or unfavorably, the effort required to remediate sites. In addition, latent conditions at any given location could result in exposure, the amount and materiality of which cannot presently be reliably estimated. Based upon information currently available, however, the Company believes its environmental reserves are adequate to accomplish remedial actions to comply with present laws and regulations, and that the ultimate liability for these matters, if any, will not materially affect its overall results of operations and financial condition.

***2. Pension and Postretirement Medical Plan Accounting***

The Company sponsors defined benefit pension plans, principally for salaried personnel. The plans provide eligible employees with retirement benefits based principally on years of service and compensation rates near retirement. In addition to the defined benefit pension plans, the Company sponsors three plans that provide medical and life insurance benefits to most full-time salaried employees upon their retirement. The postretirement medical plans are contributory (partially funded by retirees), with retiree contributions adjusted annually. The life insurance plan is non-contributory. The benefit obligation for these plans represents the liability of the Company for current and retired employees and is affected primarily by the following:

1. Service cost (benefits attributed to employee service during the period)

2. Interest cost (interest on the liability due to the passage of time)

3. Actuarial gains/losses (experience during the year different from that assumed and changes in plan assumptions)

4. Benefits paid to participants

Plan assets are amounts that have been segregated and restricted to provide benefits, and include amounts contributed by the Company and amounts earned from investing contributions, less benefits paid. The pension plans are funded at not less than the minimum funding standards set forth in the Employee Retirement Income Security Act of 1974. Plan assets consist primarily of common stocks, corporate bonds and cash and cash equivalents. The Company funds the cost of the postretirement medical and life insurance benefits on a pay-as-you-go basis. The accounting for these plans is subject to the guidance provided in SFAS No. 87, "Employers Accounting for Pensions," and SFAS No. 106, "Employers' Accounting for Postretirement Benefits Other than Pensions." Both of these statements require that management make certain assumptions relating to the following:

1. Long-term rate of return of plan assets

2. Discount rates used to measure future obligations and interest expense

3. Salary scale inflation rates

4. Health care cost trend rates and other assumptions



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

All of these assumptions and estimates can have a significant impact on the Company's accounting for these plans and the amount of expense recorded in a reporting period. These assumptions are made as of the beginning of the year. The Company uses a plan year of Oct. 1 through Sept. 30 to value its pension and postretirement plans on an actuarial basis. As permitted by SFAS 87, the Company has elected to use this fiscal year as it provides for more timely analysis. The Company engages third-party actuaries to compute the amounts of liabilities and expenses relating to these plans subject to the assumptions that the Company selects for its plans. The Company reviews its actuarial assumptions on an annual basis and makes modifications to the assumptions based on current rates and trends when appropriate. Additionally, as CSX expects a curtailment (event that impacts the future service, and therefore benefits, to be earned by employees under the plan), to occur in the first quarter of 2004 as a result of the Management Restructuring, and accordingly, will review actuarial assumptions as required by SFAS 88 and SFAS 106. The impact of the curtailment is expected to be immaterial. Currently, the Company does not expect any significant changes to its assumptions.

*Long-term Rate of Return on Plan Assets*

The expected return on the Company's pension plan assets is based on the Company's expectation of the long-term average rate of return on assets in the pension funds (based on a composite yield of AA-rated corporate bonds), which is reflective of the current and projected asset mix of the funds. As this estimate is long-term, it is not adjusted as frequently as other assumptions used in pension accounting. However, the impact of the last few years' overall market returns did cause CSX to reevaluate the rate used in calculating its liability at September 30, 2002 (the end of the measurement period for 2002) and adjust it from 9.5% to 8.9%. This change will increase the amount of pension expense reported in future periods. The Company evaluated the investment performance during 2003 as well as future expectations and determined that an adjustment to the long-term rate of return is not warranted. CSX will continue to evaluate its performance on an ongoing basis and if appropriate will adjust the long-term rate of return. A 1% change in the rate of return assumption would change pension expense by $15 million.

*Discount Rates*

Discount rates are based on comparable rates for long-term liabilities that reflect a similar time horizon to payments that the Company will make for pension and postretirement medical payments. These rates are analyzed every year and adjusted accordingly. As such, management has minimal discretion with respect to the discount rates used. The discount rate impacts the amount of liability recorded and also the amount of the interest expense component of pension and postretirement expense. CSX's assumed discount rates used in calculating the liability at September 30, 2003 and September 30, 2002, respectively, were 6.0% and 6.5% for the pension liabilities and 5.0% and 5.5% for postretirement medical benefits. The difference between the rate used for pension vs. postretirement is due to the different time horizon of future payments.

*Salary Scale Inflation*

Salary scale inflation rates are based on current trends and historical data accumulated by the Company. The Company reviews this assumption on a regular basis and makes adjustments when appropriate. CSX lowered this rate from 4.5% in 2001 to 3.3% for 2002 and 2003.

*Health Care Cost Trend Rates*

The health care cost trend rate is based on current trends and historical data. Due to the increasing costs of providing health care benefits, the Company increased the inflation assumption for health care costs for the 2002 year. No changes were deemed necessary to the health care cost trend rate in 2003. The current assumed rate is 11% decreasing gradually until



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

reaching 4.5% in 2012. A 1% change in the health care cost trend rate assumption would effect expense by $2 million.

*Summary Pension Assumptions*

| | Pension Benefits | | Postretirement Benefits | |
|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 |
| | (Dollars in Millions) | | | |
| Expected Long-term Return on Plan Assets: | | | | |
| Benefit Cost for Plan Year | 8.90% | 9.50% | n/a | n/a |
| Benefit Obligation at End of Plan Year | 8.90% | 8.90% | n/a | n/a |
| Discount Rates: | | | | |
| Benefit Cost for Plan Year | 6.50% | 7.25% | 5.50% | 7.25% |
| Benefit Obligation at End of Plan Year | 6.00% | 6.50% | 5.00% | 5.50% |
| Salary Scale Inflation | 3.30% | 3.30% | 3.30% | 3.30% |

*Other Assumptions Relating to Pensions and Postretirement Benefits*

The calculations made by the actuaries also include assumptions relating to mortality rates, turnover, and retirement age. These assumptions are based on historical data and are approved by management. As a result of changes in assumptions for fiscal year 2004, net periodic pension benefit cost and postretirement benefit costs for 2004 are expected to increase approximately $7 million.

In December 2003, the President of the United States signed into law the "Medicare Prescription Drug, Improvement and Modernization Act of 2003" ("the Act"), which introduces a prescription drug benefit under Medicare Part D as well as a federal subsidy to sponsors of retiree health care benefit plans that provide a benefit that is actuarially equivalent to Medicare Part D. SFAS 106 requires that changes in the law that take effect in the future and affect future benefit coverage shall be considered in current-period benefit measurements. However, as significant uncertainties exist for how to account for the subsidy a plan sponsor may not have sufficient information available to measure effects of the Act, prepare related actuarial valuations, and ensure proper accounting. Therefore, FASB has issued staff position No. FAS 106-1 which allows a plan sponsor to elect to defer recognizing the effects of the Act until authoritative guidance on the accounting for the federal subsidy is issued, or until certain other events occur. When the guidance is issued, it may cause CSX to revise previously reported information. CSX is currently evaluating how this legislation may impact its postretirement benefit plans. (See Note 17, "Employee Benefit Plans.")

***3. Depreciation Policies Under the Group-Life Method***

The Company accounts for its rail assets, including main-line track, locomotives and freight cars, using the group-life method. This method pools similar assets by road and equipment type and then depreciates each group as a whole. These assets represent 94% of the Company's total fixed assets and amounted to $12.9 billion on a net basis at December 26, 2003. Under the group-life method, the useful lives of rail assets are determined by the performance of a life-study which includes:

- statistical analysis of historical retirements for each group of property
- evaluation of the current operations
- previous assessment of the condition of the assets and outlook for their continued use
- comparison of assets to the same asset groups with other companies.

The results of the life study process determine the service lives for each asset group. These studies are conducted by a third party expert and analyzed by the Company's management. Changes in asset lives due to the results of the life studies could significantly impact future periods depreciation expense and thus the Company's results of operations. Events that could cause the Company to change its estimates relating to the lives of its asset groups could be changes in historical results, technological improvements and changes in specific assets. In 2003, the Company completed life studies for all of its rail assets. The effect of theses studies was to increase the average useful lives on its equipment and track assets, while decreasing the average useful lives on many of the roadway assets. These changes in average useful lives of the assets will have minimal net reduction on depreciation expense in the future. As a result, the net increase in depreciation expense was $1 million in 2003, while the impact will be a decrease of approximately $13 million in 2004 and thereafter.

Additionally, with the adoption of Statement of Financial Accounting Standard ("SFAS") 143, "Accounting for Asset Retirement Obligations" in 2003, CSX recorded pretax income of $93 million, $57 million after tax as a cumulative effect of an accounting change, representing the reversal of the accrued liability for crosstie removal costs. On an ongoing basis, depreciation expense will be reduced, while labor and fringe and materials, supplies and other expense will be increased by approximately $12 million annually.

In 2003, the Accounting Standards Executive Committee (AcSEC) of the American Institute of Certified Public Accountants voted to approve the Statement of Position (SOP) Accounting for Certain Costs and Activities related to Property, Plant and Equipment and presented it to the Financial Accounting Standards Board (FASB) for approval. If the FASB causes the SOP to be applicable, certain costs and activities that are currently capitalized may require immediate recognition and alternatively, some costs and activities that are currently expensed may require capitalization. In addition, the SOP will require additional refinement in asset componentization, potentially altering the amount of depreciation expense recognized. While the Company is evaluating the proposal, it has not yet determined what effect it may have if passed by the FASB. However, the effect could be material.

**New Accounting Pronouncements and Change In Accounting Policy**

SFAS 143, "Accounting for Asset Retirement Obligations" was issued in 2001. This statement addresses financial accounting and reporting for legal obligations associated with the retirement of tangible long-lived assets and the associated retirement costs. In conjunction with the group-life method of accounting for asset costs, the Company historically accrued crosstie removal costs as a component of depreciation, which is not permitted under SFAS 143. As noted above, with the adoption of SFAS 143 in fiscal year 2003, CSX recorded pretax income of $93 million, $57 million after tax as a cumulative effect of an accounting change, representing the reversal of the accrued liability for crosstie removal costs. The adoption of SFAS 143 did not have a material effect on prior reporting periods, and the Company does not believe it will have a material effect on future earnings. On an ongoing basis, depreciation expense will be reduced, while labor and fringe and materials, supplies and other expense will be increased by approximately $12 million annually.

SFAS 148, "Accounting for Stock-Based Compensation — Transition and Disclosure" was issued in December 2002. SFAS 148 amends SFAS 123, "Accounting for Stock-Based Compensation," to provide alternative methods of transition to Statement 123's fair value method of accounting for stock-based employee compensation and require disclosure of the effects of an entity's accounting policy with respect to stock-based employee compensation. Effective beginning with fiscal year 2003, CSX has voluntarily adopted the fair value recognition provisions of SFAS 123, "Accounting for Stock-Based Compensation," and adopted the disclosure requirements of SFAS 148, "Accounting for Stock-Based Compensation — Transition and Disclosure — an amendment of SFAS 123." In accordance with the prospective method of



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

adoption permitted under SFAS 148, stock-based awards issued subsequent to fiscal year 2002 are accounted for under the fair value recognition provisions of SFAS 123 utilizing the Black-Scholes valuation method and, accordingly, are expensed. (See Note 15, Stock Plans.)

In 2003, the Financial Accounting Standards Board ("FASB") issued Interpretation No. 46, "Consolidation of Variable Interest Entities," which requires a variable interest entity ("VIE") to be consolidated by a company that is subject to a majority of the risk of loss from the variable interest entity's activities or is entitled to receive a majority of the entity's residual returns, or both. Interpretation No. 46 also requires disclosures about VIEs that the company is not required to consolidate but in which it has a significant variable interest. Also in 2003, Interpretation 46 ("46R"), a revision to FASB Interpretation No. 46 was issued, to clarify some of the provisions of, and to exempt certain entities from Interpretation 46 requirements. Under the new guidance, CSX will consolidate Four Rivers Transportation, Inc. ("FRT"), a shortline railroad, into its financial statements at the beginning of fiscal 2004. Presently, FRT is accounted for under the equity method of accounting. The adoption of Interpretation No. 46 will not have a material impact on results of operations in future reporting periods.

In 2002, the FASB issued Financial Accounting Standard Interpretation ("FASI") No. 45, "Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others." This statement requires that certain guarantees be recorded at fair value on the statement of financial position and additional disclosures be made about guarantees. CSX did not realize a financial statement impact with the adoption of the accounting provisions of this statement in fiscal year 2003 and does not anticipate a future impact. (See Note 18, Commitments and Contingencies.)

In 2001, SFAS 142, "Goodwill and Other Intangible Assets", was issued. Under the provisions of SFAS 142, goodwill and other indefinite lived intangible assets are no longer amortized, but are reviewed for impairment on a periodic basis. The Company adopted this standard for fiscal 2002, and incurred a pretax charge of $83 million, $43 million after tax and minority interest as a cumulative effect of an accounting change, which represents the difference between book value and the fair value of indefinite lived intangible assets. These indefinite lived intangible assets are permits and licenses that the Company holds relating to a proposed pipeline to transfer natural gas from Alaska's North Slope to the port in Valdez, Alaska. The fair value was determined using a discount method of projected future cash flows relating to these assets. The carrying value of these assets is now approximately $3 million. The adoption of SFAS 142 did not have a material effect on prior reporting periods, and the Company does not believe it will have a material effect on future earnings. The Company does not have any other significant indefinite lived intangible assets.

In 2002, SFAS 144, "Accounting for the Impairment or Disposal of Long-Lived Assets," was issued. This statement requires that long-lived assets to be disposed of by sale are no longer measured on a net realizable value basis, and future operating losses are no longer recognized before they occur. In addition, this statement modifies the reporting requirements for discontinued operations. Long-lived assets, whether to be held for disposition or held and used, should be measured at the lower of its carrying amount or fair value less cost to dispose. The Company applied the provisions of this statement relating to the accounting for the conveyance of its wholly-owned subsidiary, CSX Lines, to a third party in 2003 (See Note 3, Divestitures). In addition, another of the Company's subsidiaries, CSX World Terminals, was notified of a significant customer loss for 2004 and possible customer loss for 2005. Given these indicators, the Company evaluated the undiscounted cash flows estimated to be generated by this terminal, whose long-lived assets are recorded at $59 million and concluded that the forecasted future undiscounted cash flows exceeded the book value of its long-lived assets, therefore no impairment write-down is necessary at this time.

**Regulation and Legislation**

Rail operations are subject to the regulatory jurisdiction of the Surface Transportation Board ("STB") of the United States Department of Transportation ("DOT"), the Federal Railroad Administration of DOT and other state and regulatory agencies. The regulation and legislation passed by these organization can significantly affect the costs and profitability of the Company's business.

In response to the heightened threat of terrorism in the wake of the September 2001 attacks on the World Trade Center, Pentagon and airline infrastructure, federal, state and local regulatory agencies are evaluating various proposals with respect to the transportation industry. Some of these proposals relate to the transport of hazardous material. Certain metropolitan areas considered at high risk for a terrorist attack may be the subject of future regulation. The ultimate legislation passed by federal, state and local regulators related to issues of security has the potential to severely affect CSX's operations and costs.

**Factors Expected to Influence 2004**

During the upcoming year, there are several key areas which continue to affect the operations and profitability of CSX. Management believes that the Company must remain focused on improving the efficiency of its rail network, reducing its operating expense and restoring higher service levels. General economic factors, including the cost of fuel, may also influence 2004 operating results.

Improving operating efficiency in Surface Transportation while maintaining volume is critical to success in lowering the operating ratio, and in turn improving financial performance. To do so, management believes that CSX must optimize its network routing, including a reduction in both gross ton miles and the number of times a car is handled or switched en route to the final destination. CSX is utilizing internal and external consultants to assist with the network optimization effort.

Fuel represents a significant expense of CSX Surface Transportation operations and was a factor in 2003 expense increases. Fuel prices can vary significantly from period to period and significantly impact future results. Although CSX has implemented a fuel price hedging program, it will remain subject to fuel price fluctuations for the majority of 2004 fuel purchases. Approximately 18% of 2004 fuel purchases are currently hedged at an average cost of 70 cents per gallon, exclusive of taxes and transportation costs. Each month, the Company is systematically increasing its hedged amount so that in July of 2005, 76% of the estimated fuel purchases should be hedged for a 24 month period.

CSX faces inherent business risk of exposure to property damage and personal injury claims in the event of train accidents, including derailments. The Company is also subject to exposure to occupational injury claims. While CSX is working diligently to enhance its safety programs and to continue to raise the awareness levels of its employees concerning safety, the Company cannot ensure that it will not experience any material property damage, personal or occupational claims in the future or that we will not incur significant costs to defend such claims. Additionally, the Company cannot ensure that existing claims will not suffer adverse development not currently reflected in reserve estimates, as the ultimate outcome of existing claims is subject to numerous factors which are outside of CSX's control. CSX engages outside parties to assist with the evaluation of certain of the occupational and personal injury claims, and believes that it is adequately reserved to cover all potential claims. However, final amounts determined to be due to any outstanding matters may differ materially from the recorded reserves.

The ability of the Company to effectively implement the management restructuring will be an important factor in future success. Once complete, the organization of the Company should be conducive to enhanced accountability, faster, more reliable communication, better decision



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

making and a more competitive cost structure. Executing the restructuring while minimizing the impact of the possible disruption associated with the elimination of a significant portion of the Company's existing management will be critical to the Company's short-term success.

The ability of the Company to replace, in both the long and short-term, the business lost due to competitive pressures in the Hong Kong terminals market will have a direct impact on the profitability of the Company's International Terminals segment. While management is diligently working to attract new customers, there can be no guarantee that new customers will be gained. Also, it is likely that the margins experienced in the past at the Company's Hong Kong terminal operations will not continue for the near term, even if the lost volume is replaced. The International Terminals segment's revenue and operating income represented approximately 3% and 11% of the Company's consolidated revenues and operating income, respectively for 2003.

**Forward-Looking Statements**

This Form 10-K contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act with respect to, among other items:

- projections and estimates of earnings, revenues, cost-savings, expenses, or other financial items;
- statements of management's plans, strategies and objectives for future operations, and management's expectations as to future performance and operations and the time by which objectives will be achieved;
- statements concerning proposed new products and services; and
- statements regarding future economic, industry or market conditions or performance.

Forward-looking statements are typically identified by words or phrases such as "believe", "expect", "anticipate", "project", and similar expressions. The Company cautions against placing undue reliance on forward-looking statements, which reflect its current beliefs and are based on information currently available to it as of the date the forward-looking statement is made. The Company undertakes no obligation to update or revise any forward-looking statement. If the Company does update any forward-looking statement, no inference should be drawn that the Company will make additional updates with respect to that statement or any other forward-looking statements.

Forward-looking statements are subject to a number of risks and uncertainties, and actual performance or results could differ materially from that anticipated by these forward-looking statements. Factors that may cause actual results to differ materially from those contemplated by these forward-looking statements include, among others:

- Operating factors — the Company's success in implementing its financial and operational initiatives, the extent to which the Company is successful in gaining long-term relationships with new customers or retaining existing relationships with current customers, changes in operating conditions and costs, competition, commodity concentrations, computer viruses, changes in labor costs and labor difficulties including stoppages affecting either the Company's operations or our customers' ability to deliver goods to the Company for shipment, loss of essential services such as electricity, and natural occurrences such as extreme weather conditions, floods and earthquakes or other disruptions of the Company's operations, systems, property or equipment;
- General economic and industry factors — material changes in domestic or international economic or business conditions, including those affecting the rail industry such as customer demand, effects of adverse economic conditions affecting shippers, adverse economic conditions in the industries and geographic areas that consume and produce freight, competition from other modes of freight transportation such as trucking,



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

competition and consolidation within the transportation industry generally, changes in fuel prices and changes in securities and capital markets;

- Legal and regulatory factors — developments and changes in laws and regulations, the ultimate outcome of shipper and rate claims subject to adjudication, environmental investigations or proceedings and the outcome of other types of claims and litigation involving or affecting the Company.

Other important assumptions and factors that could cause actual results to differ materially from those in the forward-looking statements are specified elsewhere in this Annual Report and in the Company's other SEC reports, accessible on the SEC's website at www.sec.gov and the Company's website at www.csx.com.

**Item 7A.** ***Quantitative and Qualitative Disclosures about Market Risk***

The information required by this item is included in Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations" under the heading "Market Risk."



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

**Item 8.** ***Financial Statements and Supplementary Data***

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**


| | Page |
|---|---|
| Report of Independent Certified Public Accountants | 40 |
| CSX Corporation | |
| Consolidated Financial Statements and Notes to Consolidated Financial Statements Submitted Herewith: | |
| Consolidated Income Statement — Fiscal Years Ended December 26, 2003, December 27, 2002 and December 28, 2001 | 41 |
| Consolidated Balance Sheet — December 26, 2003 and December 27, 2002 | 42 |
| Consolidated Cash Flow Statement — Fiscal Years Ended December 26, 2003, December 27, 2002 and December 28, 2001 | 43 |
| Consolidated Statement of Changes in Shareholders' Equity — Fiscal Years Ended December 26, 2003, December 27, 2002 and December 28, 2001 | 44 |
| Notes to Consolidated Financial Statements | 45 |




Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**REPORT OF ERNST & YOUNG LLP, INDEPENDENT CERTIFIED PUBLIC ACCOUNTANTS**

To the Shareholders and Board of Directors of CSX Corporation

We have audited the accompanying consolidated balance sheet of CSX Corporation and subsidiaries as of December 26, 2003 and December 27, 2002, and the related consolidated statements of income, cash flows, and changes in shareholders' equity for each of the three fiscal years in the period ended December 26, 2003. These consolidated financial statements are the responsibility of the company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of CSX Corporation and subsidiaries at December 26, 2003 and December 27, 2002, and the consolidated results of their operations and their cash flows for each of the three fiscal years in the period ended December 26, 2003, in conformity with accounting principles generally accepted in the United States.

As discussed in Note 1 to the consolidated financial statements, in 2003 the Company changed its method of accounting for railroad tie removal costs and stock-based compensation, and in 2002 the Company changed its method of accounting for indefinite lived intangible assets.

Jacksonville, Florida

February 10, 2004



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**CONSOLIDATED INCOME STATEMENT**

| | For Fiscal Years Ended | | |
|---|---|---|---|
| | Dec. 26, 2003 | Dec. 27, 2002 | Dec. 28, 2001 |
| | | (Dollars in Millions, Except Per Share Amounts) | |
| **Operating Income** | | | |
| Operating Revenue | $ 7,793 | $ 8,152 | $ 8,110 |
| Operating Expense | 7,167 | 7,025 | 7,153 |
| Operating Income | 626 | 1,127 | 957 |
| **Other Income and Expense** | | | |
| Other Income | 57 | 41 | 9 |
| Interest Expense | 418 | 445 | 518 |
| **Earnings** | | | |
| Earnings Before Income Taxes | 265 | 723 | 448 |
| Income Tax Expense | 76 | 256 | 155 |
| Earnings before Cumulative Effect of Accounting Change | 189 | 467 | 293 |
| Cumulative Effect of Accounting Change, Net of Taxes | 57 | (43) | — |
| Net Earnings | $ 246 | $ 424 | $ 293 |
| **Per Common Share** | | | |
| Earnings Per Share: | | | |
| Before Cumulative Effect of Accounting Change | $ 0.88 | $ 2.20 | $ 1.39 |
| Cumulative Effect of Accounting Change | 0.26 | (0.20) | — |
| Including Cumulative Effect of Accounting Change | $ 1.14 | $ 2.00 | $ 1.39 |
| Earnings Per Share, Assuming Dilution: | | | |
| Before Cumulative Effect of Accounting Change | $ 0.88 | $ 2.19 | $ 1.38 |
| Cumulative Effect of Accounting Change | 0.26 | (0.20) | — |
| Including Cumulative Effect of Accounting Change | $ 1.14 | $ 1.99 | $ 1.38 |
| Average Common Shares Outstanding (Thousands) | 213,964 | 212,729 | 211,668 |
| Average Common Shares Outstanding, Assuming Dilution (Thousands) | 214,396 | 213,512 | 212,409 |
| Cash Dividends Paid Per Common Share | $ 0.40 | $ 0.40 | $ 0.80 |

See accompanying Notes to Consolidated Financial Statements.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**CONSOLIDATED BALANCE SHEET**

| | Dec. 26, 2003 | Dec. 27, 2002 |
|---|---|---|
| | (Dollars in Millions) | |
| **ASSETS** | | |
| Current Assets | | |
| Cash, Cash Equivalents and Short-term Investments | $ 368 | $ 264 |
| Accounts Receivable — Net | 1,163 | 799 |
| Materials and Supplies | 170 | 180 |
| Deferred Income Taxes | 136 | 128 |
| Assets Held for Disposition | — | 263 |
| Other Current Assets | 66 | 155 |
| Total Current Assets | 1,903 | 1,789 |
| Properties | 19,267 | 18,560 |
| Accumulated Depreciation | 5,537 | 5,274 |
| Properties — Net | 13,730 | 13,286 |
| Investment in Conrail | 4,678 | 4,653 |
| Affiliates and Other Companies | 515 | 381 |
| Other Long-term Assets | 934 | 842 |
| Total Assets | $21,760 | $20,951 |
| **LIABILITIES** | | |
| Current Liabilities | | |
| Accounts Payable | $ 827 | $ 802 |
| Labor and Fringe Benefits Payable | 397 | 457 |
| Casualty, Environmental and Other Reserves | 280 | 246 |
| Current Maturities of Long-term Debt | 426 | 391 |
| Short-term Debt | 2 | 143 |
| Income and Other Taxes Payable | 123 | 144 |
| Liabilities Held for Disposition | — | 104 |
| Other Current Liabilities | 155 | 167 |
| Total Current Liabilities | 2,210 | 2,454 |
| Casualty, Environmental and Other Reserves | 836 | 604 |
| Long-term Debt | 6,886 | 6,519 |
| Deferred Income Taxes | 3,752 | 3,567 |
| Other Long-term Liabilities | 1,623 | 1,566 |
| Total Liabilities | 15,307 | 14,710 |
| **Shareholders' Equity** | | |
| Common Stock, $1 Par Value | 215 | 215 |
| Other Capital | 1,579 | 1,547 |
| Retained Earnings | 4,957 | 4,797 |
| Accumulated Other Comprehensive Loss | (298) | (318) |
| Total Shareholders' Equity | 6,453 | 6,241 |
| Total Liabilities and Shareholders' Equity | $21,760 | $20,951 |

See accompanying Notes to Consolidated Financial Statements.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**CONSOLIDATED CASH FLOW STATEMENT**

| | Fiscal Years Ended | | |
|---|---|---|---|
| | Dec. 26, 2003 | Dec. 27, 2002 | Dec. 28, 2001 |
| | (Dollars in Millions) | | |
| **Operating Activities** | | | |
| Net Earnings | $ 246 | $ 424 | $ 293 |
| Adjustments to Reconcile Net Earnings to Net Cash Provided: | | | |
| Depreciation | 643 | 649 | 622 |
| Deferred Income Taxes | 119 | 172 | 197 |
| Cumulative Effect of Accounting Change, Net of Tax | (57) | 43 | — |
| Additional Loss on Sale | 108 | — | — |
| Provision for Casualty Reserves | 232 | — | — |
| Restructuring — Net | 22 | — | — |
| Other Operating Activities | (108) | (108) | (13) |
| Changes in Operating Assets and Liabilities: | | | |
| Termination of Sale of Receivables | (380) | — | — |
| Accounts Receivable | 19 | 30 | 7 |
| Other Current Assets | 40 | 23 | (17) |
| Accounts Payable | 49 | (83) | (51) |
| Other Current Liabilities | (129) | (23) | (211) |
| Net Cash Provided by Operating Activities | 804 | 1,127 | 827 |
| **Investing Activities** | | | |
| Property Additions | (1,059) | (1,080) | (930) |
| Net Proceeds from Divestitures and Sale of Assets | 214 | — | — |
| Short-term Investments — Net | 68 | 350 | (51) |
| Other Investing Activities | (30) | (45) | 16 |
| Net Cash Used by Investing Activities | (807) | (775) | (965) |
| **Financing Activities** | | | |
| Short-term Debt — Net | (141) | 140 | (524) |
| Long-term Debt Issued | 919 | 748 | 962 |
| Long-term Debt Repaid | (500) | (1,159) | (266) |
| Dividends Paid | (86) | (86) | (171) |
| Other Financing Activities | (20) | (5) | 14 |
| Net Cash Provided (Used) by Financing Activities | 172 | (362) | 15 |
| Net Decrease in Cash and Cash Equivalents | 169 | (10) | (123) |
| **Cash, Cash Equivalents and Short-term Investments** | | | |
| Cash and Cash Equivalents at Beginning of Year | 127 | 137 | 260 |
| Cash and Cash Equivalents at End of Year | 296 | 127 | 137 |
| Short-term Investments at End of Year | 72 | 137 | 481 |
| Cash, Cash Equivalents and Short-term Investments at End of Year | $ 368 | $ 264 | $ 618 |
| **Supplemental Cash Flow Information** | | | |
| Interest Paid — Net of Amounts Capitalized | $ 415 | $ 448 | $ 509 |
| Income Taxes Paid | $ 134 | $ 44 | $ 250 |

See accompanying Notes to Consolidated Financial Statements



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**CONSOLIDATED STATEMENT OF CHANGES IN SHAREHOLDERS' EQUITY**

| | Common Shares Outstanding (Thousands) | Common Stock | Other Capital | Retained Earnings | Accumulated Other Comprehensive Loss | Total |
|---|---|---|---|---|---|---|
| | | | (Dollars in Millions) | | | |
| Balance Dec. 29, 2000 | 212,738 | $213 | $1,467 | $4,337 | $ — | $6,017 |
| Comprehensive Earnings: | | | | | | |
| Net Earnings | — | — | — | 293 | — | 293 |
| Other Comprehensive Income (See Note 13) | — | — | — | — | (45) | (45) |
| Comprehensive Earnings | | | | | | 248 |
| Dividends | — | — | — | (171) | — | (171) |
| Common Stock Issued (Repurchased) — Net | 950 | 1 | 25 | — | — | 26 |
| Balance Dec. 28, 2001 | 213,688 | 214 | 1,492 | 4,459 | (45) | 6,120 |
| Comprehensive Earnings: | | | | | | |
| Net Earnings | — | — | — | 424 | — | 424 |
| Other Comprehensive Income (See Note 13) | — | — | — | — | (273) | (273) |
| Comprehensive Earnings | | | | | | 151 |
| Dividends | — | — | — | (86) | — | (86) |
| Common Stock Issued (Repurchased) — Net | 999 | 1 | 55 | — | — | 56 |
| Balance Dec. 27, 2002 | 214,687 | 215 | 1,547 | 4,797 | (318) | 6,241 |
| Comprehensive Earnings: | | | | | | |
| Net Earnings | — | — | — | 246 | — | 246 |
| Other Comprehensive Income (See Note 13) | — | — | — | — | 20 | 20 |
| Comprehensive Earnings | | | | | | 266 |
| Dividends | — | — | — | (86) | — | (86) |
| Common Stock Issued (Repurchased) — Net | 384 | — | 32 | — | — | 32 |
| Balance Dec. 26, 2003 | 215,071 | $215 | $1,579 | $4,957 | $(298) | $6,453 |

See accompanying Notes to Consolidated Financial Statements



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Note 1. Nature of Operations and Significant Accounting Policies**

***Nature of Operations***

CSX Corporation, including its majority-owned subsidiaries (collectively, “CSX” or “Company”), is a freight transportation company with principal business units providing rail, intermodal and international terminal services.

- Rail transportation services are provided principally throughout the Eastern United States and accounted for 79% of the Company’s 2003 operating revenue.
- Intermodal services are provided through a dedicated network of terminals and facilities across North America and accounted for 16% of operating revenue in 2003.
- International terminal operations are located in Asia, Europe, Australia and Latin America and accounted for 3% of operating revenues in 2003.

In 2003, CSX conveyed most of its interest in its domestic container-shipping subsidiary, CSX Lines LLC (“CSX Lines”), to a new venture formed with the Carlyle Group for approximately $300 million (gross cash proceeds of approximately $240 million, $214 million net of transaction costs and $60 million of securities). (See Note 3, Divestitures.)

Rail shipments include merchandise, automotive products and coal, coke and iron ore. Service groups as a percent of rail revenue are as follows:

| | Fiscal Years Ended | |
|---|---|---|
| | 2003 | 2002 |
| Merchandise | 60% | 58% |
| Automotive | 14% | 14% |
| Coal, Coke and Iron Ore | 26% | 27% |
| Other | — | 1% |
| Total | 100% | 100% |

Merchandise traffic includes the following markets:

| | |
|---|---|
| • Phosphates and Fertilizer | • Agricultural and Food |
| • Metals | • Chemicals |
| • Forest and Industrial | • Emerging Markets |

Coal shipments originate mainly from mining locations in the Eastern United States and primarily supply domestic utility and export markets.

***Principles of Consolidation***

The consolidated financial statements include CSX and its majority-owned subsidiaries. All significant intercompany accounts and transactions have been eliminated. Investments in companies that are not majority-owned are carried at cost (if less than 20% owned and the Company has no significant influence) or equity (if the Company has significant influence).



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

***Fiscal Year***

CSX follows a 52/53 week fiscal reporting calendar. Fiscal years 2003, 2002 and 2001 consisted of 52 weeks. A 52-week fiscal year has four 13-week quarters. A 53-week year occurs periodically with the next one occurring in 2004. Fiscal years 2003, 2002 and 2001 ended on:

- December 26, 2003
- December 27, 2002
- December 28, 2001

***Earnings Per Share***

Basic earnings per share is calculated by dividing income available to common stockholders by the weighted-average number of common shares outstanding during the period. Earnings per share, assuming dilution, starts with the basic calculation described above and adjusts the denominator for the effect of potential dilution of common shares during the period, mainly from employee stock options. This difference increases the denominator for the additional common shares that would have been outstanding if these shares had been issued. Potentially dilutive common shares at CSX include stock options and awards, and shares that would be issued relating to convertible long-term debt. References to earnings per share in the Notes to Consolidated Financial Statements assume dilution.

***Cash, Cash Equivalents and Short-term Investments***

On a daily basis, cash in excess of current operating requirements is invested in various highly liquid investments having a maturity of three months or less at the date of acquisition. These investments are carried at cost, which approximates market value, and are classified as cash equivalents.

***Materials and Supplies***

Materials and supplies consist primarily of fuel and items for replacement and maintenance of track and equipment, and are carried at average cost.

***Properties***

All properties are stated at cost less an allowance for accumulated depreciation. Rail assets, including main-line track, locomotives and freight cars are depreciated using the group-life method. This method pools similar assets by road and equipment type and then depreciates each group as a whole. These assets represent approximately 94% of the Company's total fixed assets and amounted to $12.9 billion on a net basis at December 26, 2003. The majority of other property is depreciated using the straight-line method on a per asset basis.

Regulations enforced by the Surface Transportation Board ("STB") of the U.S. Department of Transportation require periodic formal studies of ultimate service lives for all railroad assets, which include:

- statistical analysis of historical retirements for each group of property
- evaluation of the current operations
- previous assessment of the condition of the assets and outlook for their continued use
- comparison of assets to the same asset groups with other companies.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

The results of the life study process determine the service lives for each asset group under the group-life method. These studies are conducted by a third party expert and analyzed by the Company's management. Resulting service life estimates are subject to review and approval by the STB. Road assets, including main-line track, have estimated service lives ranging from 5 (system roadway machinery) to 80 (grading) years. Equipment assets, including locomotives and freight cars, have estimated service lives ranging from 6 (vehicles) to 29 (work equipment) years.

Changes in asset lives due to the results of the life studies could significantly impact future periods depreciation expense and thus the Company's results of operations. Events that could cause the Company to change its estimates relating to the lives of its asset groups could be changes in historical results, technological improvements and changes in specific assets. The Company completed life studies on road, track and equipment in 2003 and has partially reflected the results in its 2003 financial statements. As a result, the net increase in depreciation expense was $1 million in 2003, while the impact will be a decrease of approximately $13 million in 2004 and thereafter.

For retirements or disposals of depreciable rail assets that occur in the ordinary course of business, the asset cost (net of salvage value or sales proceeds) is charged to accumulated depreciation and no gain or loss is recognized. For retirements or disposals of non-rail depreciable assets, infrequent disposal of rail assets outside the normal course of business and for all dispositions of land, the resulting gains or losses are recognized at the time of disposal. Expenditures that significantly increase asset values or extend useful lives are capitalized. Repair and maintenance expenditures are charged to operating expense when the work is performed.

Properties and other long-lived assets are reviewed for impairment whenever events or business conditions indicate the carrying amount of such assets may not be fully recoverable. Initial assessments of recoverability are based on estimates of undiscounted future net cash flows associated with an asset or a group of assets in accordance with SFAS 144. Where impairment is indicated, the assets are evaluated, and their carrying amount is reduced to fair value based on undiscounted net cash flows or other estimates of fair value.

The FASB is currently considering the proposed Statement of Position (SOP), "Accounting for Certain Costs and Activities related to Property, Plant and Equipment" If this SOP is issued, certain costs and activities that are currently capitalized may require immediate expense recognition and alternatively, some costs and activities that are currently expensed may require capitalization. In addition, the SOP would require additional refinement in asset componentization. potentially altering the amount of depreciation expense recognized. The Company is currently evaluating the potential impact on the financial statements, but is not yet in a position to determine what effect it may have if passed by the FASB. However, the effect could be material.

***Revenue and Expense Recognition***

Surface Transportation (rail and intermodal) revenue and expense are recognized proportionately as freight moves from origin to destination. Prior to the conveyance of CSX Lines in 2003, container-shipping revenue, and a corresponding accrual for the estimated cost to complete delivery, was recorded when cargo first sailed from its port of origin. International Terminals revenue and expense are recognized when vessels depart from the terminal. All other revenue is recorded upon completion of service.

***Casualty Reserves***

Casualty reserves represent accruals for the uninsured portion of occupational injury and personal injury claims. These reserves are recorded upon the first reporting of a claim, and estimates are updated as information develops. The amount of liability accrued is based on the type and severity of the claim and an estimate of future claims development based on current trends and historical data. The Company believes it has recorded liabilities in sufficient amounts to cover all identified claims and estimates of incurred but not reported personal injury and accident claims. In 2003, the Company changed its estimate of casualty reserves to also include an estimate of incurred but not reported claims for asbestos and other occupational injuries to be received over the next seven years. Other occupational claims include allegations of exposure to certain materials in the work place, such as solvents and diesel fuel, or alleged physical injuries, such as carpal tunnel syndrome or hearing loss. In conjunction with the change in estimate, in 2003 the Company recorded a charge of $206 million to increase its provision for these claims. Approximately $141 million of this amount relates to asbestos claims. Additionally, the provision for personal injury claims was increased by $26 million as a result of a change in estimate.

Personal and occupational injury liabilities amount to $864 million and $605 million at December 26, 2003 and December 27, 2002, respectively.

***Environmental Costs***

The Company incurs costs for environmental corrective efforts, such as the study and clean-up of environmental contamination. Environmental costs are charged to expense when they relate to an existing condition caused by past operations and do not contribute to current or future revenue generation. Liabilities for environmental corrective efforts are recorded when CSX's responsibility is (1) deemed probable and (2) the amount can be reasonably estimated. Generally, the timing of these accruals coincides with the completion of a feasibility study or the Company's commitment to a formal plan of action. Environmental reserves at December 26, 2003 and December 27, 2002 were $45 million and $35 million, respectively.

***Stock-Based Compensation***

Effective beginning with fiscal year 2003, CSX voluntarily adopted the fair value recognition provisions of SFAS 123, "Accounting for Stock-Based Compensation," and adopted the disclosure requirements of SFAS 148, "Accounting for Stock-Based Compensation — Transition and Disclosure — an amendment of SFAS 123." In accordance with the prospective method of adoption permitted under SFAS 148, the Company has adopted the fair value recognition provisions on a prospective basis and accordingly, expense of $5 million was recognized in the year ended December 26, 2003 for stock options granted in May 2003. Additionally, $3 million of other stock-based compensation was recorded pursuant to other stock compensation arrangements, but was offset by an expense reversal related to a retirement. The following table sets forth net earnings and the pro-forma computation of basic earnings per share and earnings per



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

share, assuming dilution had stock compensation expense been determined based on the fair values of stock awards at the date of grant:

| | December 26, 2003 | December 27, 2002 | December 28, 2001 |
|---|---|---|---|
| | (Dollars in Millions, Except Per Share Amounts) | | |
| Net Earnings (Loss) — As Reported | $ 246 | $ 424 | $ 293 |
| Add: Stock Based Employee Compensation Expense Included in Reported Net Income — Net of Related Tax Effects | 3 | 4 | 6 |
| Deduct: Total Stock Based Employee Compensation Expense Determined under the Fair Value Based Method for all Awards — Net of Related Tax Effects | (34) | (29) | (19) |
| Pro Forma Net Earnings | $ 215 | $ 399 | $ 280 |
| Earnings (Loss) Per Share: | | | |
| Basic — As Reported | $ 1.14 | $ 2.00 | $ 1.39 |
| Basic — Pro Forma | $ 1.00 | $ 1.87 | $ 1.32 |
| Diluted — As Reported | $ 1.14 | $ 1.99 | $ 1.38 |
| Diluted — Pro Forma | $ 1.00 | $ 1.86 | $ 1.32 |

***Comprehensive Earnings***

CSX reports comprehensive earnings (loss) in accordance with SFAS 130, "Reporting Comprehensive Income," in the Consolidated Statement of Changes in Shareholders' Equity. Comprehensive earnings is defined as all changes in shareholders' equity during a period, other than those resulting from investments by and distributions to shareholders (i.e. issuance of equity securities and dividends). Accumulated other comprehensive loss at December 26, 2003 and December 27, 2002 consists primarily of minimum pension liabilities.

***Derivative Financial Instruments***

The Company recognizes all derivatives as either assets or liabilities in the statement of financial position and measures those instruments at fair value.

*Interest Rate Swaps*

The Company has entered into several interest rate swaps as part of its program to address interest rate market risk exposure. CSX's interest rate swaps are designated and qualify as fair value hedges under SFAS 133, "Accounting for Derivative Instruments and Hedging Activities." For derivative instruments that are designated and qualify as a fair value hedge, the gains and losses on the derivative instrument, as well as the offsetting gain or loss on the hedged item attributable to the hedged risk, are recognized in current earnings during the period of change in fair values. If the change in the value of the hedging instrument offsets the change in the value of the hedged item, the hedge is considered perfectly effective. The accounting for hedge effectiveness is measured at least quarterly based on the relative change in fair value between the derivative contract and the hedged item over time. Any change in fair value resulting from ineffectiveness, the amount by which the change in the value of the hedge does not exactly offset the change in the value of the hedged item, is recognized immediately in earnings. The Company's interest rate swaps qualify as perfectly effective fair value hedges. As such, there is



 Powered by Morningstar® Document Research℠

no ineffective portion to the hedge recognized in earnings. Adjustments to the fair value of the interest rate swap agreements are recorded in other assets and other liabilities.

The differential to be paid or received under these agreements is accrued consistently with the terms of the agreements and is recognized in interest expense over the term of the related debt. The related amounts payable to or receivable from counterparties are included in other liabilities or assets. Cash flows related to interest rate swap agreements are classified as "Operating activities" in the Cash Flow Statement.

*Fuel Hedging*

In 2003, CSX began a program to hedge a portion of its 2004 and 2005 locomotive fuel purchases. In order to minimize exposure to fuel price fluctuation risk, the Company has entered into a series of swaps in order to fix the price of a portion of its estimated future fuel purchases.

The program limits fuel hedges to a 24-month duration and a maximum of 80% of CSX's average monthly fuel purchased for any month within the 24-month period, and places the hedges among selected counterparties. Fuel hedging activity did not have an effect on fuel expense for the year ended December 26, 2003. Ineffectiveness, or the extent to which changes in the fair values of the fuel swaps did not offset changes in the fair values of the expected fuel purchases, is recorded in fuel expense and is immaterial.

These instruments qualify, and are designated by management, as cash-flow hedges of variability in expected future cash flows attributable to fluctuations in fuel prices. The fair values of fuel derivative instruments are determined based upon quoted market prices and are recorded on the balance sheet with offsetting adjustments to Accumulated Other Comprehensive Income, a component of Shareholders' Equity. This amount was approximately $6 million as of December 26, 2003. Fair value adjustments are noncash transactions, and accordingly, are excluded from the Cash Flow Statement.

The Company is exposed to credit loss in the event of nonperformance by other parties to interest rate swap and fuel hedge agreements. However, the Company does not anticipate nonperformance by the counterparties.

***New Accounting Pronouncements***

Statement of Financial Accounting Standard ("SFAS") 143, "Accounting for Asset Retirement Obligations" was issued in 2001. This statement addresses financial accounting and reporting for legal obligations associated with the retirement of tangible long-lived assets and the associated retirement costs. In conjunction with the group-life method of accounting for asset costs, the Company historically accrued crosstie removal costs as a component of depreciation, which is not permitted under SFAS 143. With the adoption of SFAS 143 in fiscal year 2003, CSX recorded pretax income of $93 million, $57 million after tax as a cumulative effect of an accounting change, representing the reversal of the accrued liability for crosstie removal costs. The adoption of SFAS 143 did not have a material effect on prior reporting periods, and the Company does not believe it will have a material effect on future earnings. On an ongoing basis, depreciation expense will be reduced, while labor and fringe and materials, supplies and other expense will be increased by approximately $12 million annually.

SFAS 148, "Accounting for Stock-Based Compensation — Transition and Disclosure" was issued in December 2002. SFAS 148 amends SFAS 123, "Accounting for Stock-Based Compensation," to provide alternative methods of transition to Statement 123's fair value method of accounting for stock-based employee compensation and require disclosure of the effects of an



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

entity's accounting policy with respect to stock-based employee compensation. Effective beginning with fiscal year 2003, CSX has voluntarily adopted the fair value recognition provisions of SFAS 123, "Accounting for Stock-Based Compensation," and adopted the disclosure requirements of SFAS 148, "Accounting for Stock-Based Compensation — Transition and Disclosure — an amendment of SFAS 123." In accordance with the prospective method of adoption permitted under SFAS 148, stock-based awards issued subsequent to fiscal year 2002 are accounted for under the fair value recognition provisions of SFAS 123 utilizing the Black-Scholes valuation method and, accordingly, are expensed. (See Note 15, Stock Plans.)

In 2003, the Financial Accounting Standards Board ("FASB") issued Interpretation No. 46, "Consolidation of Variable Interest Entities," requires a variable interest entity ("VIE") to be consolidated by a company that is subject to a majority of the risk of loss from the variable interest entity's activities or is entitled to receive a majority of the entity's residual returns, or both. Interpretation No. 46 also requires disclosures about VIEs that the company is not required to consolidate but in which it has a significant variable interest. Also in 2003, Interpretation 46 ("46R"), a revision to FASB Interpretation No. 46, to clarify some of the provisions of, and to exempt certain entities from Interpretation 46 requirements. Under the new guidance, CSX will consolidate Four Rivers Transportation, Inc. ("FRT"), a short-line railroad, into its financial statements beginning December 27, 2003. Presently, FRT is accounted for under the equity method of accounting. The adoption of Interpretation No. 46 will not have a material impact on future reporting periods.

In 2002, the FASB issued Financial Accounting Standard Interpretation ("FASI") No. 45, "Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others." This statement requires that certain guarantees be recorded at fair value on the statement of financial position and additional disclosures be made about guarantees. CSX adopted the accounting provisions of this statement in fiscal year 2003. (See Note 18, Commitments and Contingencies.)

In 2001, SFAS 142, "Goodwill and Other Intangible Assets", was issued. Under the provisions of SFAS 142, goodwill and other indefinite lived intangible assets are no longer amortized, but are reviewed for impairment on a periodic basis. The Company adopted this standard for fiscal 2002, and incurred a pretax charge of $83 million, $43 million after tax and minority interest as a cumulative effect of an accounting change, which represents the difference between book value and the fair value of indefinite lived intangible assets. These indefinite lived intangible assets are permits and licenses that the Company holds relating to a proposed pipeline to transfer natural gas from Alaska's North Slope to the port in Valdez, Alaska. The fair value was determined using a discount method of projected future cash flows relating to these assets. The carrying value of these assets is now approximately $3 million. The adoption of SFAS 142 did not have a material effect on prior reporting periods, and the Company does not believe it will have a material effect on future earnings. The Company does not have any other significant indefinite lived intangible assets.

In 2002, SFAS 144, "Accounting for the Impairment or Disposal of Long-Lived Assets," was issued. This statement requires that long-lived assets to be disposed of by sale are no longer measured on a net realizable value basis, and future operating losses are no longer recognized before they occur. In addition, this statement modifies the reporting requirements for discontinued operations. Long-lived assets, whether to be held for disposition or held and used, should be measured at the lower of its carrying amount or fair value less cost to dispose. The Company applied the provisions of this statement relating to the accounting for the conveyance of its wholly-owned subsidiary, CSX Lines, to a third party in 2003 (See Note 3, Divestitures). In



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

addition, another of the Company's subsidiaries, CSX World Terminals, was notified of a significant customer loss for 2004 and possible customer loss for 2005. Given these indicators, the Company evaluated the undiscounted cash flows estimated to be generated by this terminal, whose long-lived assets are recorded at $59 million and concluded that the forecasted future undiscounted cash flows exceeded the book value of its long-lived assets, therefore no impairment write-down is necessary at this time.

***Prior-year Data***

Certain prior-year data has been reclassified to conform to the 2003 presentation.

***Use of Estimates***

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires that management make estimates in reporting the amounts of certain assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amount of certain revenues and expenses during the reporting period. Actual results may differ from those estimates. Critical accounting estimates using management judgment are made for the following areas:

1. Casualty, legal and environmental reserves

2. Pension and postretirement medical plan accounting

3. Depreciation polices for its assets under the group-life method

**Note 2. Investment In and Integrated Rail Operations with Conrail**

***Background***

CSX and Norfolk Southern Corporation ("Norfolk Southern") acquired Conrail Inc. ("Conrail") in May 1997. Conrail owns the primary freight railroad system serving the Northeastern United States, and its rail network extends throughout several Midwestern states and into Canada. CSX and Norfolk Southern, through a jointly owned acquisition entity, hold economic interests in Conrail of 42% and 58%, respectively, and voting interests of 50% each. CSX and Norfolk Southern operate over allocated portions of the Conrail lines.

The rail subsidiaries of CSX and Norfolk Southern each operate separate portions of the Conrail system pursuant to various operating agreements. Under these agreements, the railroads pay operating fees to Conrail for the use of right-of-way and rent for the use of equipment. Conrail continues to provide rail services in certain shared geographic areas ("Shared Asset Areas") for the joint benefit of CSX and Norfolk Southern, for which it is compensated on the basis of usage by the respective railroads.

In June 2003, CSX, Norfolk Southern Corporation ("NS") and Conrail jointly filed a petition with the Surface Transportation Board ("STB") to establish direct ownership and control by CSX's and NS' respective subsidiaries, CSX Transportation Inc. ("CSXT") and Norfolk Southern Railway ("NSR") of their portions of the Conrail system already operated by them separately and independently under various agreements. These portions of the Conrail system are currently owned by Conrail's subsidiaries, New York Central Lines ("NYC") and Pennsylvania Lines LLC ("PRR"). The ownership of NYC and PRR would be transferred ("spun off") to CSXT and NSR, respectively. Conrail would continue to own, manage and operate the Shared Asset Areas as previously approved by the STB. STB approval to proceed with the spin-off transaction and a



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

favorable ruling from the IRS qualifying the transaction as a non-taxable disposition were received in November 2003. The transaction remains subject to a number of other conditions.

If all necessary conditions are satisfied, unsecured debt securities of newly formed subsidiaries of CSXT and NSR would be offered in a 42%/58% ratio in exchange for Conrail's unsecured debentures. The debt securities issued by its respective subsidiary would be fully and unconditionally guaranteed by CSXT or NSR. Upon completion of the proposed transaction, the subsidiaries would be merged into CSXT and NSR, respectively, and the new debt securities thus would become direct unsecured obligations of CSXT or NSR. Conrail's secured debt and lease obligations will remain obligations of Conrail and are expected to be supported by new leases and subleases which, upon completion of the proposed transaction, would be the direct lease and sublease obligations, also on a 42%/58% ratio, of CSXT and NSR. CSX will record the proposed transaction at fair value based on the results of an independent valuation of NYC, with any difference from carrying value resulting in a gain or loss. The Company can not predict the outcome of the valuation and the impact on the Company's financial statements.

CSX, NSR and Conrail are working to complete all necessary steps to consummate the spin-off transaction in 2004. Upon consummation of the proposed transaction, CSX's investment in Conrail will no longer include the amounts related to NYC and PRR. Instead the assets and liabilities or NYC will be reflected in their respective line items in CSX's consolidated balance sheet. Conrail will continue to own, manage and operate the Shared Asset Areas.

***Accounting and Financial Reporting Effects***

CSX's rail and intermodal operating revenue includes revenue from traffic previously moving on Conrail. Operating expenses include costs incurred to handle that traffic and operate the former Conrail lines. Rail operating expense includes an expense category, "Conrail Fees, Rents and Services," which reflects:

1. Right of way usage fees and equipment rental payments to Conrail

2. Transportation, switching, and terminal service charges provided by Conrail in the Shared Asset Areas that Conrail operates for the joint benefit of CSX and Norfolk Southern

3. Amortization of the fair value write-up arising from the acquisition of Conrail

4. CSX's 42% share of Conrail's net income recognized under the equity method of accounting

***Detail of Conrail Operating Fees, Rents and Services***

| | Fiscal Years Ended | | |
|---|---|---|---|
| | 2003 | 2002 | 2001 |
| | (Dollars in Millions) | | |
| Rents and Services | $357 | $346 | $353 |
| Purchase Price Amortization and Other | 54 | 52 | 56 |
| Equity in Income of Conrail | (69) | (76) | (73) |
| Total | $342 | $322 | $336 |

***Conrail Financial Information***

| | Fiscal Years Ended | | |
|---|---|---|---|
| | 2003 | 2002 | 2001 |
| | (Dollars in Millions) | | |
| Income Statement Information: | | | |
| Revenues | $918 | $893 | $903 |
| Expenses | 659 | 623 | 639 |
| Operating Income | $259 | $270 | $264 |
| Net Income Before Cumulative Effect of Accounting Change | $163 | $180 | $174 |
| Cumulative Effect of Accounting Change | 40 | — | — |
| Net Income | $203 | $180 | $174 |

| | Dec. 31, | |
|---|---|---|
| | 2003 | 2002 |
| | (Dollars in Millions) | |
| Balance Sheet Information: | | |
| Current Assets | $ 257 | $ 300 |
| Property and Equipment and Other Assets | 7,959 | 7,857 |
| Total Assets | $8,216 | $8,157 |
| Current Liabilities | $ 279 | $ 329 |
| Long-term Debt | 1,067 | 1,123 |
| Other Liabilities | 2,416 | 2,479 |
| Total Liabilities | 3,762 | 3,931 |
| Stockholders' Equity | 4,454 | 4,226 |
| Total Liabilities and Stockholders' Equity | $8,216 | $8,157 |

***Transactions with Conrail***

As listed below, CSX has amounts payable to Conrail, representing expenses incurred under the operating, equipment and shared area agreements with Conrail. Also, Conrail advances its available cash balances to CSX and Norfolk Southern under variable-rate notes, with CSX's note maturing on March 28, 2007.

| | Dec. 26, 2003 | Dec. 27, 2002 |
|---|---|---|
| | (Dollars in Millions) | |
| CSX Payable to Conrail | $ 71 | $ 69 |
| Conrail Advances to CSX | $ 515 | $ 371 |
| Interest Rates on Conrail Advances to CSX | 1.66% | 1.82% |

| | Fiscal Years Ended | | |
|---|---|---|---|
| | 2003 | 2002 | 2001 |
| | (Dollars in Millions) | | |
| Interest Expense Related To Conrail Advances | $ 7 | $ 8 | $ 5 |

The agreement under which CSXT operates its allocated portion of the Conrail route system has an initial term of 25 years and may be renewed at CSXT's option for two five-year terms.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Operating fees paid to Conrail under the agreement are subject to adjustment every six years based on the fair value of the underlying system. Lease agreements for the Conrail equipment operated by CSXT cover varying terms. CSXT is responsible for all costs of operating, maintaining, and improving the routes and equipment under these agreements.

On December 26, 2003, future minimum payments to Conrail under the operating, equipment and shared area agreements were as follows:

| | Future Minimum Payments |
|---|---|
| | (Dollars in Millions) |
| 2004 | $ 260 |
| 2005 | 247 |
| 2006 | 236 |
| 2007 | 229 |
| 2008 | 224 |
| Thereafter | 3,118 |
| Total | $ 4,314 |

In the event of the consummation of the spin-off transaction, the future minimum payments will be reduced.

**Note 3. Divestitures**

In February 2003, CSX conveyed most of its interest in its domestic container-shipping subsidiary, CSX Lines LLC (“CSX Lines”), to a new venture formed with the Carlyle Group for approximately $300 million (gross cash proceeds of approximately $240 million, $214 million net of transaction costs and $60 million of securities). CSX Lines was subsequently renamed Horizon Lines LLC (“Horizon”). Horizon has subleased vessel and equipment from certain affiliates of CSX covering the primary financial obligations related to $300 million of leases under which CSX or one of its affiliates will remain a lessee/ sublessor or guarantor. A deferred pretax gain of approximately $127 million as a result of the transaction will be recognized over the 12-year sub-lease term. Approximately $9 million of this gain was recognized in 2003. The securities have a term of 7 years and a preferred return feature. During the third quarter, CSX received a $15 million payment from Horizon Lines, which included $3 million of interest, in return of a portion of its investment in Horizon and now holds $48 million of securities.

**Note 4. Restructuring**

In November 2003, the Company announced a management restructuring plan to streamline the structure at a number of its companies, eliminate organizational layers and realign certain functions. The initiative will reduce the non-union workforce by 800 to 1,000 positions over the last quarter of 2003 and the first half of 2004. As of December 26, 2003, 20 employees have been terminated under this program. The Company recorded an initial charge related to this reduction of $34 million pretax, in 2003, to record the lowest amount of expense to be incurred under this program. The total estimated cost of the program is expected to be in the range of $60 million to $80 million. The majority of separation benefits will be paid from CSX’s qualified pension plans, with the remainder being paid from general corporate funds.

Also in 2003, the Company recorded a $10 million restructuring charge related to another workforce reduction program. Substantially all of this amount had been paid out at December 26, 2003.



 Powered by Morningstar® Document Research℠

In 2003, the Company recorded a $22 million pretax credit related to a favorable change in estimate related to the 1991 and 1992 separation plans. These plans provided for workforce reductions, improvements in productivity and other cost reductions. The reduction in estimate for these plans results from lower railroad retirement taxes and other benefits than had been built into the initial $1.3 billion charge.

A net $22 million restructuring charge was recorded representing the cost of the restructuring initiatives offset by reductions in 1991/1992 separation reserves. The associated expense is included in operating expense on the Income Statement as “Restructuring Charge — Net.”

**Note 5. Operating Expense**

Operating expense consists of the following:

| | Fiscal Years Ended | | |
|---|---|---|---|
| | 2003 | 2002 | 2001 |
| | (Dollars in Millions) | | |
| Labor and Fringe | $ 2,740 | $ 2,886 | $ 2,934 |
| Materials, Supplies and Other | 1,627 | 1,693 | 1,662 |
| Conrail Rents, Fees and Services | 342 | 322 | 336 |
| Building and Equipment Rent | 566 | 601 | 626 |
| Inland Transportation | 320 | 370 | 337 |
| Depreciation | 629 | 638 | 613 |
| Fuel | 581 | 515 | 585 |
| Provision for Casualty Claims (See Note 10) | 232 | — | — |
| Additional Loss on Sale (See Note 18) | 108 | — | — |
| Restructuring Charge — Net | 22 | — | — |
| New Orleans Litigation Provision | — | — | 60 |
| Total | $ 7,167 | $ 7,025 | $ 7,153 |
| Selling, General and Administrative Expenses included in above categories | $ 651 | $ 657 | $ 708 |



 Powered by Morningstar® Document Research℠

**Note 6. Other Income**

Other income consists of the following:

| | Fiscal Years Ended | | |
|---|---|---|---|
| | 2003 | 2002 | 2001 |
| | (Dollars in Millions) | | |
| Interest Income | $ 21 | $ 27 | $ 47 |
| Income from Real Estate and Resort Operations | 95 | 108 | 101 |
| Discounts on Sales of Accounts Receivable | (10) | (26) | (34) |
| Minority Interest | (42) | (42) | (39) |
| Equity Income (Loss) of Other Affiliates | 2 | (3) | (27) |
| Miscellaneous | (9) | (23) | (39) |
| Total | $ 57 | $ 41 | $ 9 |
| Gross Revenue from Real Estate and Resort Operations Included in Other Income | $274 | $261 | $254 |

**Note 7. Income Taxes**

Earnings from domestic and foreign operations and related income tax expense are as follows:

| | Fiscal Years Ended | | |
|---|---|---|---|
| | 2003 | 2002 | 2001 |
| | (Dollars in Millions) | | |
| Net Earnings from Continuing Operations Before Income Taxes: | | | |
| Domestic | $186 | $648 | $379 |
| Foreign | 79 | 75 | 69 |
| Net Earnings from Continuing Operations Before Income Taxes: | $265 | $723 | $448 |

The significant components of deferred tax assets and liabilities include:

| | Dec. 26, 2003 | | Dec. 27, 2002 | |
|---|---|---|---|---|
| | Assets | Liabilities | Assets | Liabilities |
| | (Dollars in Millions) | | | |
| Productivity/Restructuring Charges | $ 79 | $ — | $ 80 | $ — |
| Employee Benefit Plans | 336 | — | 445 | — |
| Accelerated Depreciation | — | 4,047 | — | 3,812 |
| Other | 917 | 901 | 741 | 893 |
| Total | $1,332 | $4,948 | $1,266 | $4,705 |
| Net Deferred Tax Liabilities | | $3,616 | | $3,439 |

The primary factors in the change in year-end net deferred income tax liability balances include:

- Annual provision for deferred income tax expense
- Minimum pension liability
- Cumulative effects of accounting changes



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

The Company has not recorded domestic deferred or additional foreign income taxes related to undistributed earnings of foreign subsidiaries that are considered to be indefinitely reinvested. These earnings amounted to $387 million, $341 million and $291 million at December 26, 2003, December 27, 2002 and December 28, 2001, respectively. These amounts may become taxable upon their remittance as dividends or upon the sale or liquidation of these foreign subsidiaries. It is not practical to determine the amount of net additional income tax that may be payable if such earnings were repatriated.

The Company files a consolidated federal income tax return, which includes its principal domestic subsidiaries. Examinations of the federal income tax returns of CSX have been completed through 1993. Tax returns for 1994 through 2002 currently are under examination. Management believes adequate provision has been made for any adjustments that might be assessed.

The breakdown of income tax expense (benefit) between current and deferred is as follows:

| | Fiscal Years Ended | | |
|---|---|---|---|
| | 2003 | 2002 | 2001 |
| | (Dollars in Millions) | | |
| Current: | | | |
| Federal | $ (68) | $ 50 | $ (64) |
| Foreign | 18 | 16 | 15 |
| State | 7 | 17 | 3 |
| Total Current | $ (43) | $ 83 | $ (46) |
| Deferred: | | | |
| Federal | $ 125 | $ 154 | $ 176 |
| Foreign | 2 | — | 10 |
| State | (8) | 19 | 15 |
| Total Deferred | $ 119 | $ 173 | $ 201 |
| Total | $ 76 | $ 256 | $ 155 |

Income tax expense reconciled to the tax computed at statutory rates is as follows:

| | Fiscal Years Ended | | | | | |
|---|---|---|---|---|---|---|
| | 2003 | | 2002 | | 2001 | |
| | (Dollars in Millions) | | | | | |
| Tax at Statutory Rates | $ 93 | 35% | $ 253 | 35% | $ 157 | 35% |
| State Income Taxes | — | — | 23 | 3% | 12 | 3% |
| Equity in Conrail Earnings | (9) | (3)% | (12) | (2)% | (10) | (2)% |
| Foreign Operations | (6) | (2)% | (9) | (1)% | (1) | — |
| Other Items | (2) | (1)% | 1 | — | (3) | (1)% |
| Income Tax Expense/Rate | $ 76 | 29% | $ 256 | 35% | $ 155 | 35% |

The decrease in the effective income tax rate is attributable to a larger portion of the Company's earnings being earned in foreign jurisdictions with statutory income tax rates below the U.S. statutory income tax rate and the cumulative impact of adjustments to the deferred effective state income tax rate due to favorable state tax regulations.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

**Note 8. Accounts Receivable**

***Sale of Accounts Receivable***

During 2003, CSXT discontinued the sale of accounts receivable, which resulted in a $380 million increase in accounts receivable. Previously, CSXT sold, without recourse, a revolving pool of accounts receivable to CSX Trade Receivables Corporation ("CTRC"), a bankruptcy-remote entity wholly-owned by CSX Corporation. CTRC transferred the accounts receivable to a master trust and caused the trust to issue multiple series of certificates representing undivided interests in the receivables. The certificates issued by the master trust were sold to investors, and the proceeds from those sales were paid to CSXT.

Two series of certificates were outstanding as of December 27, 2002. One series in the amount of $300 million was sold to investors in 1998 and matured in June 2003. A second series of $200 million was sold to a private entity in 2000 and matured in June 2003 as well. As of December 27, 2002, the amounts sold under the private and public series were $80 million and $300 million respectively. The amount retained in the master trust at December 27, 2002 was $534 million. The fair value of retained interests approximated book value as the receivables were collected in approximately one month.

Net losses associated with the sale of receivables are as follows:

| | Fiscal Years Ended | | |
|---|---|---|---|
| | **2003** | **2002** | **2001** |
| | **(Dollars in Millions)** | | |
| Discounts on Sales of Accounts Receivable | $ 10 | $ 26 | $ 34 |

CSXT retained responsibility for servicing accounts receivables held by the master trust. The average servicing period was approximately one month. No servicing asset or liability was recorded since the fees CSXT received approximated its related costs.

***Allowance for Doubtful Accounts***

The Company maintains an allowance for doubtful accounts based on the expected collectibility of all accounts receivable. The allowance for doubtful accounts is included in the balance sheet as follows:

| | Fiscal Years Ended | |
|---|---|---|
| | **Dec. 26, 2003** | **Dec. 27, 2002** |
| | **(Dollars in Millions)** | |
| Allowance for Doubtful Accounts | $ 71 | $ 90 |

The decrease in the allowance for doubtful accounts is due to the write-off of uncollectible receivables during 2003.



 Powered by Morningstar® Document Research℠

**Note 9. Properties**

Properties consist of the following:

| | Dec. 26, 2003 | | | Dec. 27, 2002 | | |
|---|---|---|---|---|---|---|
| | Cost | Accumulated Depreciation | Net | Cost | Accumulated Depreciation | Net |
| | (Dollars in Millions) | | | | | |
| Rail: | | | | | | |
| Road | $12,147 | $2,683 | $ 9,464 | $11,541 | $2,498 | $ 9,043 |
| Equipment | 5,686 | 2,225 | 3,461 | 5,671 | 2,225 | 3,446 |
| Total Rail | 17,833 | 4,908 | 12,925 | 17,212 | 4,723 | 12,489 |
| Intermodal | 488 | 209 | 279 | 442 | 173 | 269 |
| Total Surface Transportation | 18,321 | 5,117 | 13,204 | 17,654 | 4,896 | 12,758 |
| Other | 946 | 420 | 526 | 906 | 378 | 528 |
| Total Properties | $19,267 | $5,537 | $13,730 | $18,560 | $5,274 | $13,286 |

**Note 10. Casualty, Environmental and Other Reserves**

Activity related to casualty, environmental and other reserves is as follows:

| | Casualty and Other Reserves | Separation Liabilities | Environmental Reserves | Total |
|---|---|---|---|---|
| | (Dollars in Millions) | | | |
| Balance Dec. 29, 2000 | $ 698 | $256 | $ 41 | $ 995 |
| Charged to Expense | 234 | — | 1 | 235 |
| Payments | (271) | (14) | (10) | (295) |
| Balance Dec. 28, 2001 | 661 | 242 | 32 | 935 |
| Charged to Expense | 231 | — | 17 | 248 |
| Payments | (287) | (32) | (14) | (333) |
| Balance Dec. 27, 2002 | 605 | 210 | 35 | 850 |
| Charged to Expense | 307 | 44 | 23 | 374 |
| Changes in Estimate | 232 | (22) | — | 210 |
| Payments | (280) | (25) | (13) | (318) |
| Balance Dec. 26, 2003 | $ 864 | $207 | $ 45 | $1,116 |



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Reserve balances are as follows:

| | Dec. 26, 2003 | Dec. 27, 2002 |
|---|---|---|
| | (Dollars in Millions) | |
| Current Reserves | | |
| Casualty and Other | $ 198 | $ 216 |
| Separation | 52 | 15 |
| Environmental | 30 | 15 |
| Total Current Reserves | 280 | 246 |
| Long-term Casualty, Environmental and Other Reserves | 836 | 604 |
| Total Casualty, Environmental and Other Reserves | $ 1,116 | $ 850 |

***Casualty Reserves***

Casualty reserves represent accruals for the uninsured portion of occupational injury and personal injury claims. In the third quarter of 2003, the Company changed its estimate of casualty reserves to include an estimate of incurred but not reported claims for asbestos and other occupational injuries to be received over the next seven years. Other occupational claims include allegations of exposure to certain materials in the work place, such as solvents and diesel fuel, or alleged physical injuries, such as carpal tunnel syndrome or hearing loss.

In conjunction with the 2003 change in estimate, the Company recorded a charge of $232 million to increase its provision for casualty reserves. Approximately $141 million relates to asbestos claims.

*Asbestos and Other Occupational Injuries*

During 2003, the Company retained third party professionals to work with it to project the number of asbestos and other occupational injury claims to be received over the next seven years and the related costs. Based on this analysis the Company established reserves for the probable and reasonably estimable asbestos and other occupational injury liabilities.

The methodology used by the third party to project future occupational injury claims was based largely on CSX's recent experience, including claim-filing and settlement rates, injury and disease mix, open claims and claim settlement costs. However, projecting future occupational injury claims and settlements costs is subject to numerous variables that are difficult to predict. In addition to the significant uncertainties surrounding the number of claims that might be received, other variables, including the type and severity of the injury or disease alleged by each claimant, the long latency period associated with exposure, dismissal rates, costs of medical treatment, uncertainties surrounding the litigation process from jurisdiction to jurisdiction and from case to case and the impact of changes in legislative or judicial standards, may cause actual results to differ significantly from estimates. Furthermore, predictions with respect to these variables are subject to greater uncertainty as the projection period lengthens. In light of these uncertainties, CSX believes that seven years is the most reasonable period for estimating future claims, and that claims received after that period are not reasonably estimable.

CSX increased its reserve for asbestos and other occupational claims by a net $206 million to cover the estimate of incurred but not reported claims to be filed during the next seven years. Reflecting the additional provisions, CSX's reserve for asbestos and other occupational claims on



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

an undiscounted basis amounted to $345 million at December 26, 2003, compared to $171 million at December 27, 2002.

A summary of existing claims activity is as follows:

| | Fiscal Year Ended | |
|---|---|---|
| | Dec. 26, 2003 | Dec. 27, 2002 |
| Asserted Claims: | | |
| Open Claims — Beginning of Period | 14,278 | 15,365 |
| New Claims Filed | 2,368 | 2,095 |
| Claims Settled | (3,382) | (2,877) |
| Claims Dismissed | (360) | (305) |
| Open Claims — End of Period | 12,904 | 14,278 |

Approximately 5,500 of the open claims above are asbestos claims against the Company's previously owned international container-shipping business, Sea-Land. Because the Sea-Land claims are claims against multiple vessel owners, the Company's reserves reflect its portion of those claims. The remaining open claims have been asserted against CSX Transportation. At December 26, 2003 and December 27, 2002, the Company had approximately $13 million and $10 million reserved for the Sea-Land claims.

Estimates for these claims are subject to significant uncertainty relating to the outcomes of negotiated settlements and other developments. As facts and circumstances change, the Company may have to change its estimates, and changes could have a material impact on the Company's financial results. Such events as adverse verdicts, catastrophic accidents and legal settlements will cause the Company to revise its estimated liabilities, which the Company reviews and appropriately adjusts quarterly.

*Personal Injury*

During 2003, CSX retained an independent actuarial firm to assess the value of CSX's personal injury portfolio. This firm's methods and procedures yielded a slightly higher valuation for personal injury claims than previously recognized by CSX due to a higher estimated cost for adverse development. Utilizing the analysis provided, CSX increased its reserves for alleged personal injury claims by $26 million.

***Separation Liability***

Separation liabilities at December 26, 2003, include productivity charges recorded in 1991 and 1992 to provide for the estimated costs of implementing workforce reductions, improvements in productivity and other cost reductions at the Company's major transportation units. The remaining separation liabilities are expected to be paid out over the next 15 to 20 years.

In 2003, the Company recorded a $22 million pretax credit related to revised estimates for railroad retirement taxes and the amount of benefits that will be paid to individuals under the $1.3 billion charges initially recorded in 1991 and 1992. This amount is netted with separation expenses related to the 2003 Management Restructuring, as discussed in Note 4.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

***Environmental Reserves***

CSXT is a party to various proceedings, including administrative and judicial proceedings, involving private parties and regulatory agencies related to environmental issues. CSXT has been identified as a potentially responsible party ("PRP") at approximately 260 environmentally impaired sites, many of which are, or may be, subject to remedial action under the Federal Superfund statute ("Superfund") or similar state statutes. A number of these proceedings are based on allegations that CSXT, or its railroad predecessors, sent hazardous substances to the facilities in question for disposal. Some of the proceedings involve property formerly or currently owned by CSXT or its railroad predecessors. Proceedings arising under Superfund or similar state statutes can involve numerous other companies who generated the waste or owned or operated the property and involve the allocation of liability for costs associated with site investigation and cleanup, which could be substantial.

At least once each quarter, CSXT reviews its role with respect to each such location, giving consideration to a number of factors, including the type of cleanup required, the nature of CSXT's alleged connection to the location (e.g., generator of waste sent to the site, or owner or operator of the site), the extent of CSXT's alleged connection (e.g., volume of waste sent to the location and other relevant factors), the accuracy and strength of evidence connecting CSXT to the location, and the number, connection, and financial viability of other named and unnamed PRP's at the location.

Based on the review process, CSXT has recorded reserves to cover estimated contingent future environmental costs with respect to such sites. The recorded liabilities for estimated future environmental costs at December 26, 2003, and December 27, 2002 were $45 million and $35 million, respectively. These liabilities, which are undiscounted, include amounts representing CSXT's estimate of unasserted claims, which CSXT believes to be immaterial. The liability includes future costs for all sites where the Company's obligation is (1) deemed probable and (2) where such costs can be reasonably estimated. The liability includes future costs for remediation and restoration of sites as well as any significant ongoing monitoring costs, but excludes any anticipated insurance recoveries. The majority of the December 26, 2003 environmental liability is expected to be paid out over the next seven years.

The Company does not currently possess sufficient information to reasonably estimate the amounts of additional liabilities, if any, on some sites until completion of future environmental studies. In addition, latent conditions at any given location could result in exposure, the amount and materiality of which cannot presently be reliably estimated. Based upon information currently available, however, the Company believes its environmental reserves are adequate to accomplish remedial actions to comply with present laws and regulations, and that the ultimate liability for these matters, if any, will not materially affect its overall results of operations and financial condition.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

**Note 11. Debt and Credit Agreements**

Debt is as follows:

| | Maturity | Average Interest Rates at December 26, 2003 | December 26, 2003 | December 27, 2002 |
|---|---|---|---|---|
| | | (Dollars in Millions) | | |
| Convertible Debentures, net of $91 and $97 discount, respectively | 2021 | 1.0% | $ 447 | $ 467 |
| Notes | 2004–2032 | 6.8% | 5,956 | 5,285 |
| Equipment Obligations | 2004–2015 | 7.0% | 703 | 855 |
| Mortgage Bonds | N/A | N/A | — | 55 |
| Other Obligations, Including Capital Leases | 2004–2010 | 2.9% | 206 | 248 |
| Total | | | 7,312 | 6,910 |
| Less Debt Due Within One Year | | | 426 | 391 |
| Total Long-Term Debt | | | $6,886 | $6,519 |

***Debt Issuances***

In December 2003, CSX executed a $75 million revolving loan that matures in 2005. Borrowings under the facility will bear interest at a rate that fluctuates with LIBOR. In addition, the Company pays an annual commitment fee of 0.15% for the period the facility is not drawn. This debt may be redeemed at any time after May 2004, with additional borrowings allowed through the maturity of the facility. As of December 26, 2003, the Company had $75 million in aggregate principal amount outstanding under this borrowing.

In November 2003, CSX issued $200 million aggregate principal amount of the Company's Notes due 2014 and $200 million aggregate principal amount of the Company's Notes due 2006. The 2014 Notes bear interest at the rate of 5.30% per year and mature on February 15, 2014. The 2006 Notes bear interest at the rate of 2.75% per year and will mature on February 15, 2006. The 2014 Notes may be redeemed by the Company at any time, but the 2006 Notes cannot be redeemed before maturity.

CSX increased its borrowings from Conrail by approximately $144 million year-over-year in 2003 in addition to the $146 million increase in 2002. Also, during 2002 the Conrail note was extended to a five year term.

In August 2003, the Company issued $300 million aggregate principal amount Notes due in 2013. These Notes bear interest at the rate of 5.5% and mature on August 1, 2013. The Notes may be redeemed by the Company at any time.

During 2002, CSX issued $200 million of 4.88% notes due in 2009 and $400 million of 6.30% notes due in 2012.

***Credit Facilities***

The Company has a $1 billion five-year revolving credit facility and a $345 million 364-day revolving credit facility. Generally these facilities may be used to support the Company's



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

commercial paper, working capital and other general corporate purposes. Under the 364-day facility, the Company pays an annual fee to the participating banks of .125% of total commitment. Under the five-year facility, the Company pays annual fees to the participating banks that may range from 0.08% to 0.23% of total commitment, depending on the Company's credit rating. As of December 26, 2003, the Company had no borrowings outstanding under these facilities. CSX had commercial paper borrowings supported by these credit facilities of $140 million at the end of 2002.

***Convertible Debentures***

In October 2001, CSX issued $564 million aggregate principal amount at maturity in unsubordinated zero coupon convertible debentures (the "debentures") due October 30, 2021 for an initial offering price of approximately $462 million. At December 26, 2003 and December 27, 2002, outstanding debentures are included in long-term debt, at a carrying value of $447 million and $467 million, respectively. These debentures accrete in value at a yield to maturity of 1% per year. The accretion rate may be reset on October 30, 2007, October 30, 2011, and October 30, 2016 to a rate based on five-year United States Treasury Notes minus 2.8%. In no event, however, will the yield to maturity be reset below 1% or above 3% per annum. Accretion in value on the debentures is recorded for each period, but will not be paid prior to maturity.

Under the terms of the debentures, holders had the option to require the Company to purchase their debentures at a purchase price equal to the accreted value of the debentures in October 2003. CSX purchased $15 million aggregate principal amount at maturity of the debentures at an aggregate cost of $13 million. In November 2003, the Company made a one-time cash payment of $23.00 per $1,000 aggregate principal amount at maturity to holders who did not require the Company to purchase their debentures. This resulted in a $13 million cash payment, which will be amortized over the remaining term of the debentures. In addition, the terms of the debentures were amended to permit holders to cause the Company to purchase the debentures on October 30, 2005, at their accreted value of $852.48 per $1,000 principal amount at maturity, in addition to the purchase dates provided under the terms of the debentures. Similarly, the debentures allow holders to require the Company to purchase their debentures in October 2006, October 2008, October 2011, and October 2016, at a purchase price equal to the accreted value of the debentures. In 2005, 2006 and 2008, CSX may elect to pay the purchase price in cash and/or shares of common stock, while CSX may pay the purchase price only in cash on the last two purchase dates. CSX may redeem the debentures for cash at any time on or after October 30, 2008, at a redemption price equal to the accreted value of the debentures.

Holders may convert debentures into CSX common stock if certain requirements defined in the debentures and the related indenture are met. Holders may convert if the closing sale price of CSX common stock for at least 20 of the 30 preceding trading days is more than the applicable percentage (which is initially 120% and will decline over the life of the debentures to 110%) of the accreted conversion price per share of the Company's common stock. The "accreted conversion price" per share of common stock is the quotient of the accreted value of a debenture divided by the number of shares of common stock issuable upon conversion of that debenture. Holders may also convert if the Company's senior long-term unsecured credit ratings are downgraded by Moody's Investors Service Inc. to below Ba1 and by Standard & Poor's Rating Services to below BB+, if the debentures have been called for redemption, if the Company makes specified distributions to holders of CSX common stock, or if the company is a party to specified consolidations, mergers, or transfers or leases of all or substantially all of the Company's assets. For each debenture surrendered for conversion, a holder will initially receive 17.75 shares of CSX common stock, which is equivalent to an initial conversion price of $46.16



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

per share. The initial conversion rate will be adjusted for reasons specified in the indenture, but will not be adjusted for accretion. Instead, accretion on the debentures will be deemed paid by the common stock received by the holder on conversion.

***Shelf Registration Statements***

CSX has $600 million of remaining capacity under a shelf registration that may be used, subject to market conditions, to issue debt or other securities at the Company's discretion. The Company presently intends to use the proceeds from the sale of any securities issued under its shelf registration statements to finance cash requirements, including refinancing existing debt as it matures. While the Company seeks to give itself flexibility with respect to meeting such needs, there can be no assurance that market conditions would permit the Company to sell such securities on acceptable terms at any given time, or at all.

***Short-term Debt Balance and Rates***

| | Dec. 26, 2003 | Dec. 27, 2002 |
|---|---|---|
| | (Dollars in Millions) | |
| Short-term Debt | $2 | $143 |
| Weighted Average Interest Rates | 1.21% | 1.46% |

***Long-term Debt Maturities***

| | (Dollars in Millions) |
|---|---|
| 2004 | $ 426 |
| 2005 | 247 |
| 2006 | 598 |
| 2007 | 1,080 |
| 2008 | 615 |
| 2009 and Thereafter | 4,291 |
| Total | $ 7,257(a) |

(a) The fair market value of the interest rate swap agreements of $55 million, which is included in long-term debt on the balance sheet, is not included on the debt maturity schedule.

Certain of CSX's rail unit properties are pledged as security for various rail-related long-term debt issues. In addition, the Company has approximately $111 million in assets which are specifically designated to fund an equal amount of long-term debt.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

**Note 12. Derivative Financial Instruments**

***Interest Rate Swaps***

CSX has entered into various interest rate swap agreements to hedge the fair value of the following fixed rate notes:

| Maturity Date | Notional Amount (Millions) | Fixed Interest Rate | Variable Rate at December 26, 2003 |
|---|---|---|---|
| May 1, 2007 | $ 450 | 7.45% | 4.42% |
| May 4, 2004 | 300 | 7.25% | 3.91% |
| August 15, 2006 | 300 | 9.00% | 6.09% |
| May 1, 2032 | 150 | 8.30% | 2.76% |
| June 22, 2005 | 50 | 6.46% | 2.66% |
| Total/Average | $ 1,250 | 7.00% | 3.95% |

Under these agreements, the Company will pay variable interest based on LIBOR in exchange for a fixed rate, effectively transforming the notes to floating rate obligations. The instruments qualify, and are designated, as fair value hedges.

The interest rate swap agreements are designated and qualify as fair value hedges and the gain or loss on the derivative instrument, as well as the offsetting gain or loss on the fixed rate note attributable to the hedged risk, are recognized in current earnings during the period of change in fair values. Hedge effectiveness is measured at least quarterly based on the relative change in fair value of the derivative contract in comparison with changes over time in the fair value of the fixed rate notes. Any change in fair value resulting from ineffectiveness, as defined by SFAS 133, "Accounting For Derivative Instruments and Hedging Activities," is recognized immediately in earnings. The Company's interest rate swaps qualify as perfectly effective fair value hedges, as defined by SFAS 133. As such, there was no ineffective portion to the hedge recognized in earnings during the current or prior year periods. Long-term debt has been increased by $55 million and $78 million for the fair market value of the interest rate swap agreements at December 26, 2003 and December 27, 2002, respectively.

The differential to be paid or received under these agreements is accrued based on the terms of the agreements and is recognized in interest expense over the term of the related debt. The related amounts payable to, or receivable from, counterparties are included in other current liabilities or assets. Cash flows related to interest rate swap agreements are classified as "Operating Activities" in the Consolidated Cash Flow Statement. For the years ended December 26, 2003 and December 27, 2002, the Company reduced interest expense by approximately $44 million and $34 million, respectively, as a result of the interest rate swap agreements that were in place during that year.

The Company is exposed to credit loss in the event of nonperformance by the other parties to the interest rate swap agreements. However, the Company does not anticipate nonperformance by the counterparties.

***Fuel Hedging***

In 2003, CSX began a program to hedge a portion of its 2004 and 2005 locomotive fuel purchases. This program was established to manage exposure to fuel price fluctuations. In order

to minimize this risk, CSX has entered into a series of swaps in order to fix the price of a portion of its estimated future fuel purchases.

Following is a summary of fuel swaps executed during the year:

| | Dec. 26, 2003 |
|---|---|
| Approximate Gallons Hedged (Millions) | 236 |
| Average Price Per Gallon | $0.70 |
| Swap Maturities | Feb. 2004 – Dec. 2005 |

| | 2004 | 2005 |
|---|---|---|
| Estimated % of Future Fuel Consumption Hedged at December 26, 2003 | 18% | 21% |

The program limits fuel hedges to a 24-month duration and a maximum of 80% of CSX's average monthly fuel purchased for any month within the 24-month period, and places the hedges among selected counterparties. Fuel hedging activity did not have an effect on fuel expense for the year ended December 26, 2003. Ineffectiveness, or the extent to which changes in the fair values of the fuel swaps did not offset changes in the fair values of the expected fuel purchases, is recorded in fuel expense and is immaterial.

These instruments qualify, and are designated by management, as cash-flow hedges of variability in expected future cash flows attributable to fluctuations in fuel prices. The fair values of fuel derivative instruments are determined based upon quoted marked prices and are recorded on the balance sheet with offsetting adjustments to Accumulated Other Comprehensive Income, a component of Shareholders' Equity. As of December 26, 2003 this component was $6 million after tax. The amounts recorded in accumulated other comprehensive income will be recorded in earnings in the period in which the hedged fuel is consumed. Fair value adjustments are noncash transactions, and accordingly, are excluded from the Cash Flow Statement.

The Company is exposed to credit loss in the event of nonperformance by other parties to fuel swap agreements. However, the Company does not anticipate nonperformance by the counterparties.

**Note 13. Shareholders Equity**

***Common and Preferred Stocks***

Common and Preferred Stock consists of (in thousands):

| Common Stock, $1 Par Value | Dec. 26, 2003 |
|---|---|
| Common Shares Authorized | 300,000 |
| Common Shares Issued and Outstanding | 215,071 |
| Additional Potential Shares: | |
| Stock Options | 23,297 |
| Convertible Debt | 9,924 |

| Preferred Stock | Dec. 26, 2003 |
|---|---|
| Preferred Shares Authorized | 25,000 |
| Preferred Shares Outstanding | — |

Holders of Common Stock are entitled to one vote on all matters requiring a vote for each share held. Preferred Stock is senior to common stock with respect to dividends and upon liquidation of the Company.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Prior to October 2003, 3,000,000 shares had been designated as Series B Preferred Stock in conjunction with the Company's Shareholder Rights Plan. In October 2003, the expiration date of the shareholder rights under the Shareholder Rights Plan was accelerated, resulting in the effective termination of the Plan, and the Company's Articles of Incorporation were amended to eliminate the designation of shares for Series B Preferred.

***Accumulated Other Comprehensive Loss***

Accumulated other comprehensive loss in the Consolidated Statement of Changes in Shareholders' Equity consists of the following:

| | Balance December 27, 2002 | Net Gain (Loss) | Balance December 26, 2003 |
|---|---|---|---|
| | | (Dollars in Millions) | |
| Minimum Pension Liability (Net of $160 and $153 of taxes as of December 27, 2002 and December 26, 2003, respectively) | $ (318) | $ 8 | $ (310) |
| Fuel Hedging Adjustment (Net of $3 taxes) | — | 6 | 6 |
| Other (Net of $3 taxes) | — | 6 | 6 |
| | $ (318) | $ 20 | $ (298) |

Other comprehensive income in 2002 and 2001 represented adjustments to the minimum pension liability, net of taxes of $152 million and $10 million, respectively.

**Note 14. Earnings Per Share**

The following table sets forth the computation of basic earnings per share and earnings per share, assuming dilution:

| | 2003 | 2002 | 2001 |
|---|---|---|---|
| Numerator (Millions): | | | |
| Net Earnings Before Cumulative Effect of Accounting Change | $ 189 | $ 467 | $ 293 |
| Denominator (Thousands): | | | |
| Average Common Shares Outstanding | 213,964 | 212,729 | 211,668 |
| Effect of Potentially Dilutive Common Shares | 432 | 783 | 741 |
| Average Common Shares Outstanding, Assuming Dilution | 214,396 | 213,512 | 212,409 |
| Earnings Per Share: | | | |
| Before Cumulative Effect of Accounting Change | $ 0.88 | $ 2.20 | $ 1.39 |
| Assuming Dilution, Before Cumulative Effect of Accounting Change | $ 1.14 | $ 2.19 | $ 1.38 |

Earnings per share are based on the weighted average number of common shares outstanding. Earnings per share, assuming dilution, are based on the weighted average number of common shares outstanding adjusted for the effect of potential common shares outstanding during the period, mainly arising from the exercise of employee stock options. Potential common shares at CSX include stock options and awards and shares that would be issued relating to convertible long-term debt.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Certain potential common shares (convertible debt and stock options) for all three years shown were not included in the computation of earnings per share, assuming dilution, since their exercise or conversion prices were greater than the average market price of the common shares during the period and, therefore, their effect is antidilutive. These potential common shares were as follows:

| | Fiscal Year | | |
|---|---|---|---|
| | 2003 | 2002 | 2001 |
| Number of Shares (thousands) | 28,421 | 33,800 | 29,900 |
| Average Exercise/ Conversion Price | $ 46.94 | $ 46.31 | $ 47.26 |

A substantial increase in the fair market value of the Company's stock price could negatively impact earnings per share due to the dilutive effect of stock options and convertible debt.

**Note 15. Stock Plans**

The Company maintains several stock option and award plans designed to encourage ownership of its stock and provide incentives for employees to contribute to its success.

Effective beginning with fiscal year 2003, CSX voluntarily adopted the fair value recognition provisions of SFAS 123, "Accounting for Stock-Based Compensation," and adopted the disclosure requirements of SFAS 148, "Accounting for Stock-Based Compensation — Transition and Disclosure — an amendment of SFAS 123." Under SFAS 123, all stock based awards will be expensed at fair value. In accordance with the prospective method of adoption permitted under SFAS 148, the Company has adopted the fair value recognition provisions on a prospective basis. Previously, the Company accounted for stock-based compensation under the intrinsic-value method of Accounting Principles Board Opinion (APB) No. 25, "Accounting to Stock Issued to Employees." Under APB 25, CSX expensed amounts associated with stock-based awards and disclosures were required for any stock option awards.

Total compensation expense associated with stock based compensation was $5 million, $6 million and $9 million in 2003, 2002 and 2001, respectively.

***Stock Options and Awards***

CSX stock option and award plans provide primarily (1) stock options and (2) restricted stock awards ("RSAs") to eligible officers and employees. Awards granted under the various plans are determined by the board of directors.

At December 26, 2003, there were 3,554 current or former employees with grants outstanding under the various plans. A total of approximately 39 million shares were reserved for issuance under the plans of which 9 million were available for new grants. The remaining shares are assigned to outstanding stock options and stock awards.

The fair value of options granted in 2003, 2002 and 2001 was estimated as of the dates of grant using the Black-Scholes option model.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

| | Fiscal Year | | |
|---|---|---|---|
| | 2003 | 2002 | 2001 |
| Black-Scholes Assumptions: | | | |
| Expected Dividend Yield | 1.10% | 1.10% | 2.30% |
| Risk-free Interest Rate | 2.53% | 4.30% | 5.00% |
| Expected Stock Volatility | 28% | 27% | 27% |
| Expected Term Until Exercise | 6 years | 6 years | 6 years |
| Average Fair Value of Stock Options Granted | $8.93 | $ 11.76 | $ 10.71 |

1. *Stock Options*

The majority of stock options have been granted with 10-year terms. Options outstanding at December 26, 2003, are generally exercisable three to ten years after date of grant. The exercise price for options granted equals the market price of the underlying stock on the date of grant. A summary of the Company's stock option activity and related information for the fiscal years ended December 26, 2003, December 27, 2002 and December 28, 2001 follows:

| | 2003 | | 2002 | | 2001 | |
|---|---|---|---|---|---|---|
| | Weighted-Average Shares (000s) | Average Exercise Price | Weighted-Average Shares (000s) | Average Exercise Price | Weighted-Average Shares (000s) | Average Exercise Price |
| Outstanding at Beginning of Year | 26,022 | $40.45 | 23,650 | $39.49 | 20,126 | $38.69 |
| Granted | 3,477 | $38.14 | 3,438 | $38.14 | 5,041 | $39.42 |
| Exchanged, Canceled or Expired | (5,909) | $39.91 | (46) | $44.89 | (737) | $40.25 |
| Exercised | (293) | $22.42 | (1,020) | $31.45 | (780) | $25.16 |
| Outstanding at End of Year | 23,297 | $39.35 | 26,022 | $40.45 | 23,650 | $39.49 |
| Exercisable at End of Year | 7,104 | $41.13 | 8,513 | $41.58 | 8,426 | $40.00 |

The following table summarizes information about stock options outstanding at December 26, 2003:

| | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|
| Exercise Price | Number Outstanding (000s) | Weighted-average Remaining Contractual Life (Years) | Weighted-average Exercise Price | Number Outstanding (000s) | Weighted-average Exercise Price |
| $20 to $29 | 2,050 | 6.3 | $23.85 | 614 | $24.09 |
| $30 to $39 | 12,167 | 7.4 | $36.87 | 1,386 | $37.75 |
| $40 to $49 | 6,805 | 4.2 | $43.60 | 4,628 | $43.34 |
| $50 to $59 | 2,275 | 2.9 | $53.07 | 476 | $51.43 |
| Total | 23,297 | 5.9 | $39.27 | 7,104 | $41.13 |

During the years ended December 26, 2003 and December 27, 2002, 0.3 million and 1.0 million options, respectively, were exercised.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

2. *Restricted Stock Awards ("RSAs")*

At December 26, 2003 and December 27, 2002, 248,500 and 469,500 RSAs, respectively were outstanding. The RSA's outstanding at December 26, 2003, vest over a three- to five-year employment period. The weighted-average fair value of RSAs was $30.97 as of the date of grant. Approximately $2 million, $6 million and $9 million was expensed in 2003, 2002 and 2001, respectively, in connection with restricted stock awards.

***Stock Purchase and Loan Plan***

The Stock Purchase and Loan Plan ("SPLP") provided for the purchase of common stock and related rights by eligible officers and key employees of the Company and entitled them to obtain loans with respect to the shares purchased. There were no shares issued, withdrawn, exchanged or cancelled under the SPLP in 2003, 2002 or 2001. The Plan expired in 2003. There were approximately 70,000 shares outstanding in 2002 and 2001, respectively, under this program.

***Stock Purchase and Dividend Reinvestment Plans***

1. *Stock Purchase Plan*

The 2001 Employee Stock Purchase Plan ("ESPP") allows eligible employees to purchase CSX common stock at a discount. Specifically, participating employees were able to purchase CSX stock at the lower of 85% of fair market value on December 1 (beginning of the annual offering period) or 85% of fair market value on November 30 of the following year (end of the annual offering period). In effect, employees received a 12-month stock option to purchase Company stock. Once purchased, the shares were unrestricted and could generally be sold or transferred at any time. Approximately 540,000 shares and 570,000 shares were purchased by employees under this plan during 2003 and 2002, respectively. This plan was not extended for 2004.

The predecessor to the 2001 ESPP was the 1991 Employee Stock Purchase and Dividend Reinvestment Plan. Employees purchased 25,565 shares under the plan in 2001 at a weighted-average market price of $30.43.

2. *Dividend Reinvestment Plan*

The Company maintains the Shareholder Dividend Reinvestment Plan under which shareholders may purchase additional shares of stock. At December 26, 2003, there were 4,626,035 shares available for issuance under this plan.

***Stock Plan for Directors***

The Stock Plan for Directors, approved by the shareholders in 1992, governs in part the manner in which directors' fees and retainers are paid. A minimum of 40% of the retainers must be paid in common stock of the Company. In 2004, the minimum retainer to be paid in stock increases to 50%. In addition, each director may elect to receive up to 100% of the remaining retainer and fees in the form of common stock of the Company. In 1997, shareholders approved amendments to the Plan that would permit additional awards of stock or stock options. In 2003, 36,219 shares of stock were issued to the directors, resulting in $1 million of expense. In 2002, 45,195 shares of stock were issued to the directors, resulting in $1 million of expense. In 2001, 52,000 stock options were granted with an exercise price of $35.08. The Plan permits each director to elect to transfer stock into a trust that will hold the shares until the participant's death,



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

disability, retirement as a director, other cessation of services as a director, or change in control of the Company. At December 26, 2003, there were 0.6 million shares of common stock reserved for issuance under this Plan.

**Note 16. Fair Value of Financial Instruments**

Fair values of the Company's financial instruments are estimated by reference to quoted prices from market sources and financial institutions, as well as other valuation techniques. Long-term debt is the only financial instrument of the Company with fair values significantly different from their carrying amounts. At December 26, 2003, the fair value of long-term debt, including current maturities, was $7.8 billion, compared with a carrying amount of $7.3 billion. At December 27, 2002, the fair value of long-term debt, including current maturities, was $7.4 billion, compared with a carrying amount of $6.9 billion. The fair value of long-term debt has been estimated using discounted cash flow analysis based upon the Company's current incremental borrowing rates for similar types of financing arrangements. The Company's interest rate swap agreements at December 26, 2003 and December 27, 2002 had a positive value of $55 and $78 million, respectively. The Company's fuel hedging agreements at December 26, 2003 had a positive value of $9 million. CSX had no fuel hedge agreements at December 27, 2002.

**Note 17. Employee Benefit Plans**

The Company sponsors defined benefit pension plans, principally for salaried personnel. The plans provide eligible employees with retirement benefits based principally on years of service and compensation rates near retirement.

In addition to the defined benefit pension plans, the Company sponsors three plans that provide medical and life insurance benefits to most full-time salaried employees upon their retirement. The postretirement medical plans are contributory (partially funded by retiree), with retiree contributions adjusted annually. The life insurance plan is non-contributory.

The benefit obligation for these plans represents the liability of the Company for current and retired employees and is affected primarily by the following:

1. Service cost (benefits attributed to employee service during the period)

2. Interest cost (interest on the liability due to the passage of time)

3. Actuarial gains/losses (experience during the year different from that assumed and changes in plan assumptions)

4. Benefits paid to participants

Plan assets are amounts that have been segregated and restricted to provide benefits, and include amounts contributed by the Company and amounts earned from investing contributions, less benefits paid. The Company uses a plan year of October 1 through September 30 to value its pension and postretirement plans on an actuarial basis. The Company funds the cost of the postretirement medical and life insurance benefits on a pay-as-you go basis. The pension plans are funded at not less than the minimum funding standards set forth in the Employee Retirement



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Income Security Act of 1974. The distribution of pension plan assets as of the September 30, 2003 measurement date is as follows:

| | 2003 | | 2002 | |
|---|---|---|---|---|
| | Amount | Percent of Total Assets | Amount | Percent of Total Assets |
| | (Dollars in Millions) | | | |
| Common Stocks | $ 863 | 60% | $ 732 | 55% |
| Fixed Income | 557 | 38% | 590 | 45% |
| Cash and Cash Equivalents | 31 | 2% | 2 | — |
| Total | $ 1,451 | 100% | $ 1,324 | 100% |

CSX has established a target allocation of 60% equity and 40% fixed income investments. Further diversification and risk control is achieved by policy allocations to various equity styles and investment managers. Allocations are maintained at within 3% of targets. No leverage or investment in CSX securities is allowed. The goal is to maintain assets at or above benefit obligations (long-term liabilities) without corporate contributions.

CSX expects to make cash contributions of $14 million to its pension plan in 2004.

Benefit obligation and plan asset information is as follows:

| | Pension Benefits | | Postretirement Benefits | |
|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 |
| | (Dollars in Millions) | | | |
| **Actuarial Present Value of Benefit Obligation** | | | | |
| Accumulated Benefit Obligation | $ 1,785 | $ 1,688 | N/A | N/A |
| Projected Benefit Obligation | $ 1,916 | $ 1,806 | $ 513 | $ 499 |
| **Change in Projected Benefit Obligation:** | | | | |
| Projected Benefit Obligation at Beginning of Plan Year | $ 1,806 | $ 1,700 | $ 499 | $ 420 |
| Service Cost | 38 | 40 | 11 | 11 |
| Interest Cost | 113 | 119 | 25 | 29 |
| Impact of Plan Changes(1)/ Business Dispositions | (7) | — | (32) | — |
| Plan Participants' Contributions | — | — | 12 | 10 |
| Actuarial Loss | 135 | 84 | 46 | 70 |
| Benefits Paid | (169) | (137) | (48) | (41) |
| Benefit Obligation at End of Plan Year | $ 1,916 | $ 1,806 | $ 513 | $ 499 |



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

| | Pension Benefits | | Postretirement Benefits | |
|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 |
| | (Dollars in Millions) | | | |
| **Change in Plan Assets:** | | | | |
| Fair Value of Plan Assets at Beginning of Plan Year | $ 1,324 | $ 1,493 | $ — | $ — |
| Actual Return on Plan Assets | 241 | (48) | — | — |
| Employer Contributions | 55 | 16 | 36 | 31 |
| Plan Participants' Contributions | — | — | 12 | 10 |
| Benefits Paid | (169) | (137) | (48) | (41) |
| Fair Value of Plan Assets at End of Plan Year | $ 1,451 | $ 1,324 | $ — | $ — |
| **Funded Status** | $ (465) | $ (482) | $ (513) | $ (499) |

(1) Postretirement benefits reflects the impact of changing the plan benefit for individuals retiring after February 2003 which caps the employer cost at $8,000 (plus $7,000 for spouses).

The funded status, or amount by which the benefit obligation exceeds the fair value of plan assets, represents a liability. At December 26, 2003, the status of CSX plans is as follows:

| | Aggregate Projected Benefit Obligation | Aggregate Fair Value of Plan Assets |
|---|---|---|
| For plans with a projected benefit obligation in excess of plan assets | $ 1.9 billion | $ 1.5 billion |
| For plans with an accumulated benefit obligation in excess of plan assets | $ 1.8 million | $ 1.5 million |

The following table shows the reconciliation of the funded status of the plan with the amount recorded in the statement of financial position:

| | Pension Benefits | | Postretirement Benefits | |
|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 |
| | (Dollars in Millions) | | | |
| Funded Status | $ (465) | $ (482) | $ (513) | $ (499) |
| Unrecognized Actuarial Loss | 487 | 474 | 222 | 190 |
| Unrecognized Prior Service Cost | 34 | 40 | (27) | — |
| Fourth Quarter Activity: | | | | |
| Employer Contributions to Pension Plans | 3 | 3 | — | — |
| Net Postretirement Benefits Paid | — | — | 10 | 8 |
| Net Amount Recognized in Consolidated Balance Sheet | $ 59 | $ 35 | $ (308) | $ (301) |

A liability is recognized if net periodic pension cost (cost of a pension plan for a period, including service cost, interest cost, actual return on plan assets, gain or loss, amortization of unrecognized prior service cost) recognized exceeds amounts the employer has contributed to the plan. An asset is recognized if net periodic pension cost is less than amounts the employer has contributed to the plan.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

The amount recognized in the statement of financial position consists of:

| | Pension Benefits | | Postretirement Benefits | |
|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 |
| | (Dollars in Millions) | | | |
| Accrued Benefit Liability | $(393) | $(430) | $(308) | $(301) |
| Intangible Asset | 34 | 40 | — | — |
| Accumulated Other Comprehensive Loss | 418 | 425 | — | — |
| Net Amount Recognized in Consolidated Balance Sheet | $ 59 | $ 35 | $(308) | $(301) |

Components of net periodic pension cost are as follows:

| | Pension Benefits | | | Postretirement Benefits | | |
|---|---|---|---|---|---|---|
| | 2003 | 2002 | 2001 | 2003 | 2002 | 2001 |
| | (Dollars in Millions) | | | | | |
| Service Cost | $ 38 | $ 40 | $ 41 | $ 11 | $ 11 | $ 9 |
| Interest Cost | 113 | 119 | 121 | 25 | 29 | 26 |
| Expected Return on Plan Assets | (137) | (152) | (150) | — | — | — |
| Amortization of Prior Service Cost | 4 | 5 | 3 | (5) | — | (1) |
| Recognized Net Actuarial (Gain) Loss | — | (9) | (11) | 14 | 8 | 3 |
| Net Periodic Benefit Cost | 18 | 3 | 4 | 45 | 48 | 37 |
| Special Termination Benefits — Workforce Reduction Program/ Curtailments | 13 | — | 10 | — | — | — |
| Net Periodic Benefit Cost Including Special Termination Benefits | $ 31 | $ 3 | $ 14 | $ 45 | $ 48 | $ 37 |

The $13 million termination charge in 2003 represents a curtailments charge associated with the retirement of the Company's former Chairman and Chief Executive Officer. The $10 million charge was the result of a workforce reduction program that occurred in 2001.

During 2003 and 2002, CSX recorded changes in its minimum pension liability. These changes did not affect net earnings, but are a component of accumulated other comprehensive loss on an after-tax basis. In 2003, the minimum pension liability increased by $6 million, reducing accumulated other comprehensive income by $3 million after tax. In 2002, the minimum pension liability increased by $398 million, reducing accumulated other comprehensive income by $248 million after tax. The Company also recorded $10 million and $25 million after tax effect of accumulated other comprehensive income, relating to Conrail's minimum pension liability for December 26, 2003 and December 27, 2002, respectively.



 Powered by Morningstar® Document Research℠

Weighted-average assumptions used in accounting for the plans are as follows:

| | Pension Benefits | | Postretirement Benefits | |
|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 |
| Expected Long-term Return on Plan Assets: | | | | |
| Benefit Cost for Plan Year | 8.90% | 9.50% | n/a | n/a |
| Benefit Obligation at End of Plan Year | 8.90% | 8.90% | n/a | n/a |
| Discount Rates: | | | | |
| Benefit Cost for Plan Year | 6.50% | 7.25% | 5.50% | 7.25% |
| Benefit Obligation at End of Plan Year | 6.00% | 6.50% | 5.00% | 5.50% |
| Salary Scale Inflation | 3.30% | 3.30% | 3.30% | 3.30% |

The net postretirement benefit obligation was determined using the assumption that the health care cost trend rate for medical plans was 11% for 2003 and 2002, decreasing gradually to 4.5% by 2012 and remaining at that level thereafter. A 1% change in the assumed health care cost trend rate would have the following effects:

| | 1% Increase | 1% Decrease |
|---|---|---|
| | (Dollars in Millions) | |
| Effect on postretirement benefits service and interest cost | $ 2 | $ (2) |
| Effect on postretirement benefit obligation | $ 27 | $ (28) |

In December 2003, the President of the United States signed into law the “Medicare Prescription Drug, Improvement and Modernization Act of 2003” (“the Act”), which introduces a prescription drug benefit under Medicare Part D as well as a federal subsidy to sponsors of retiree health care benefit plans that provide a benefit that is actuarially equivalent to Medicare Part D. SFAS 106 requires that changes in the law that take effect in the future and affect future benefit coverage shall be considered in current-period benefit measurements. However, as significant uncertainties exist for how to account for the subsidy a plan sponsor may not have sufficient information available to measure effects of the Act, prepare related actuarial valuations, and ensure proper accounting. Therefore, FASB has issued staff position No. FAS 106-1 which allows a plan sponsor to elect to defer recognizing the effects of the Act until authoritative guidance on the accounting for the federal subsidy is issued, or until certain other events occur. When the guidance is issued, it may cause CSX to revise previously reported information. CSX is currently evaluating how this legislation may impact its postretirement benefit plans.

***Other Plans***

The Company maintains savings plans for virtually all full-time salaried employees and certain employees covered by collective bargaining agreements. Expense associated with these plans was $15 million, $15 million and $16 million for 2003, 2002 and 2001, respectively.

Under collective bargaining agreements, the Company participates in a number of union-sponsored, multi-employer benefit plans. Payments to these plans are made as part of aggregate assessments generally based on number of employees covered, hours worked, tonnage moved or a combination thereof. Total contributions of $360 million, $315 million and $292 million were made to these plans in 2003, 2002 and 2001, respectively.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

**Note 18. Commitments and Contingencies**

***Lease Commitments***

The Company has various lease agreements with other parties with terms up to 42 years. Non-cancelable, long-term leases generally include provisions for maintenance, options to purchase and options to extend the terms.

At December 26, 2003, minimum building and equipment rentals under these operating leases are as follows:

| | Operating Leases | Sublease Income | Net Lease Commitments |
|---|---|---|---|
| | | (Dollars in Millions) | |
| 2004 | $ 210 | $ 60 | $ 150 |
| 2005 | 190 | 52 | 138 |
| 2006 | 163 | 51 | 112 |
| 2007 | 177 | 60 | 117 |
| 2008 | 141 | 43 | 98 |
| Thereafter | 678 | 162 | 516 |
| Total | $1,559 | $428 | $1,131 |

Rent expense on operating leases totaled $564 million in 2003, $605 million in 2002 and $629 million in 2001. These amounts include net daily rental charges on railroad operating equipment aggregating $297 million, $295 million, and $289 million in 2003, 2002 and 2001, respectively which are not long-term commitments. In addition to these commitments, the Company also has agreements covering routes and equipment leased from Conrail. See Note 2, Investment In and Integrated Rail Operations with Conrail, for a description of these commitments.

***Purchase Commitments***

The Company has a commitment under a long-term maintenance program for approximately 40% of CSXT's fleet of locomotives. The agreement expires in 2026 and totals $2.6 billion. Minimum payments under this agreement are as follows:

| | Minimum Payments |
|---|---|
| | (Dollars in Millions) |
| 2004 | $ 132 |
| 2005 | 138 |
| 2006 | 166 |
| 2007 | 171 |
| 2008 | 171 |
| Thereafter | 1,866 |
| Total | $ 2,644 |

The long-term maintenance program assures CSX access to efficient, high-quality locomotive maintenance services at settled price levels through the term of the program. Under the program, CSX paid $130 million, $124 million and $126 million in fiscal years 2003, 2002 and 2001, respectively.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

***Guarantees***

The Company and its subsidiaries are contingently liable individually and jointly with others as guarantors of obligations principally relating to leased equipment, joint ventures and joint facilities used by CSX in its business operations. Utilizing a CSX guarantee for these obligations allows CSX to take advantage of lower interest rates and obtain other favorable terms when negotiating leases or financing debt. Guarantees are contingent commitments issued by the Company that could require CSX or one of its affiliates to make payment to or to perform certain actions for the guaranteed party based on another entity's failure to perform. Upon the adoption of FIN 45 in 2003, the Company's evaluation of its guarantees did not result in any amounts for guarantees being recorded on the balance sheet. CSX's guarantees can be segregated into three main categories:

1. Guarantees of approximately $440 million of lease commitments assumed by A.P. Moller-Maersk ("Maersk") for which the Company is contingently liable. CSX believes that Maersk will fulfill its contractual commitments with respect to such leases and that CSX will have no further liabilities for those obligations.

2. Guarantees of approximately $97 million relating to construction and cash deficiency support guarantees at several of the Company's international terminal locations under development. The non-performance of one of its partners, cost overruns or non-compliance with financing loan covenants could cause the Company to have to perform under these guarantees.

3. CSX guarantees of approximately $300 million relating to leases assumed as part of CSX's conveyance of its interest in CSX Lines in February 2003, as discussed in Note 3, Divestitures.

The maximum amount of future payments the Company could be required to make under these guarantees is the amount of the guarantees themselves.

***Self-Insurance***

The Company obtains substantial amounts of commercial insurance for potential losses for third-party liability and property damages. Specified levels of risk (up to $35 million for property and $25 million for liability per occurrence) are retained on a self-insurance basis. The Company uses a combination of third-party and self-insurance to realize savings on insurance premium costs.

***Matters Arising Out of Sale of International Container-Shipping Assets***

In 2003, CSX finalized a settlement agreement with Maersk resolving all remaining material disputes pending directly between the two companies, consisting predominantly of two major disputes. The first dispute involved a post-closing working capital adjustment to the sale price for which the Company had recorded a receivable of approximately $70 million. The second dispute involved a claim of 425 million Dutch Guilders (approximately $180 million at then prevailing currency exchange rates) plus interest by Europe Container Terminals BV ("ECT") alleging breaches of contract by the Company at the Rotterdam container terminal facility owned by ECT.

Also in 2003, CSX entered into a final settlement agreement with Maersk allocating responsibility between the two companies for third party claims and litigation relating to the assets acquired by Maersk.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

The two settlements reduced the Company's 2003 earnings by $108 million pretax, $67 million after tax. This charge is reflected in the financial statements as an additional loss on the sale of the international container-shipping assets. Neither settlement has a material impact on cash flows.

***STB Proceeding***

In 2001 Duke Energy Corporation ("Duke") filed a complaint before the U.S. Surface Transportation Board ("STB") alleging that certain CSXT common carrier coal rates are unreasonably high. In February 2004, the STB issued a decision finding that the CSXT common carrier rates were reasonable. While approving the rate levels, the STB also invited Duke to request a phase-in of rate increases over some time period. The nature and amount of any such phase-in is uncertain, and would only apply to billings subsequent to December 2001. CSXT will continue to consider and pursue all available legal defenses in this matter. Administrative and legal appeals are possible, and could take several years to resolve. An unfavorable outcome to this complaint would not have a material effect on the Company.

***Contract Settlement***

In 2002, the Company received $44 million as the first of two payments to settle a contract dispute. During 2002, the Company recognized approximately $7 million of the first payment in other income as this amount related to prior periods. The remaining $37 million will be recognized over the contract period, which ends in 2020. The second payment of $23 million was received in 2003 and will be recognized over the contract period which ends in 2020. The results of this settlement will provide approximately $3 million in annual pretax earnings through 2020.

***Other Legal Proceedings***

CSX is involved in routine litigation incidental to its business and is a party to a number of legal actions and claims, various governmental proceedings and private civil lawsuits, including those related to environmental matters. Federal Employers' Liability Act claims by employees, other personal injury claims, and disputes and complaints involving certain transportation rates and charges. Some of the legal proceedings include claims for punitive as well as compensatory damages, and others purport to be class actions. While the final outcome of these matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded along with applicable insurance, it is the opinion of CSX management that none of these items will have a material adverse effect on the results of operations, financial position or liquidity of CSX. However, an unexpected adverse resolution of one or more of these items could have a material adverse effect on the results of operations in a particular quarter or fiscal year. The company is also party to a number of actions, the resolution of which could result in gain realization in amounts that could be material to results of operations in the quarters received.

**Note 19. Business Segments**

The Company operates in three business segments: rail, intermodal, and international terminals. The rail segment provides rail freight transportation over a network of more than 23,000 route miles in 23 states, the District of Columbia and two Canadian provinces. The intermodal segment provides transcontinental intermodal transportation services and operates a network of dedicated intermodal facilities across North America. The international terminals segment operates container freight terminal facilities and related businesses in Asia, Europe,



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Australia, Latin America and the United States. The Company's segments are strategic business units that offer different services and are managed separately based on the differences in these services. Because of their close interrelationship, the rail and intermodal segments are viewed on a combined basis as Surface Transportation operations.

The Company evaluates performance and allocates resources based on several factors, of which the primary financial measure is business segment operating income, defined as income from operations excluding the effects of non-recurring charges and gains. The accounting policies of the segments are the same as those described in the summary of significant accounting policies (Note 1), except that for segment reporting purposes, CSX includes minority interest expense on the international terminals segment's joint venture businesses in operating expense. These amounts are reclassified through eliminations in CSX's consolidated financial statements to other income. Intersegment sales and transfers are generally accounted for as if the sales or transfers were to third parties, at current market prices.

Business segment information for the years ended December 26, 2003, December 27, 2002 and December 28, 2001 is as follows:

| | Surface Transportation | | | | | |
|---|---|---|---|---|---|---|
| | Rail | Intermodal | Total | International Terminals | Other(1) | Total |
| | | | (Dollars in Millions) | | | |
| **2003** | | | | | | |
| Revenues from External Customers | $ 6,182 | $ 1,257 | $ 7,439 | $ 226 | $ 128 | $ 7,793 |
| Intersegment Revenues | — | 4 | 4 | — | — | 4 |
| Segment Operating Income | 541 | 110 | 651 | 69 | 1 | 721 |
| Assets | 12,923 | 611 | 13,534 | 1,020 | — | 14,554 |
| Depreciation Expense | 579 | 32 | 611 | 9 | — | 620 |
| Property Additions | 974 | 47 | 1,021 | 9 | 12 | 1,042 |
| **2002** | | | | | | |
| Revenues from External Customers | $ 6,003 | $ 1,156 | $ 7,159 | $ 235 | $ 758 | $ 8,152 |
| Intersegment Revenues | — | 24 | 24 | 1 | — | 25 |
| Segment Operating Income | 854 | 141 | 995 | 69 | 38 | 1,102 |
| Assets | 12,738 | 537 | 13,275 | 959 | 309 | 14,543 |
| Depreciation Expense | 576 | 29 | 605 | 9 | 17 | 631 |
| Property Additions | 981 | 29 | 1,010 | 11 | 19 | 1,040 |
| **2001** | | | | | | |
| Revenues from External Customers | $ 6,082 | $ 1,092 | $ 7,174 | $ 234 | $ 681 | $ 8,089 |
| Intersegment Revenues | — | 20 | 20 | 2 | — | 22 |
| Segment Operating Income | 803 | 104 | 907 | 71 | 32 | 1,010 |
| Assets | 12,948 | 432 | 13,380 | 880 | 504 | 14,764 |
| Depreciation Expense | 550 | 31 | 581 | 8 | 24 | 613 |
| Property Additions | 848 | 12 | 860 | 19 | 11 | 890 |



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

(1) Prior to the conveyance of CSX Lines, it was a segment of CSX and was presented with international terminals on a combined basis, as the Marine Services operations of the Company. Results for CSX Lines are now presented in the other column.

A reconciliation of the totals reported for the business segments to the applicable line items in the consolidated financial statements is as follows:

| | Fiscal Years Ended | | |
|---|---|---|---|
| | 2003 | 2002 | 2001 |
| | (Dollars in Millions) | | |
| Revenues: | | | |
| Total External Revenues for Business Segments | $7,793 | $8,152 | $8,089 |
| Intersegment Revenues for Business Segments | 4 | 25 | 22 |
| Elimination of Intersegment Revenues | (4) | (25) | (22) |
| Other | — | — | 21 |
| Total Consolidated Revenues | $7,793 | $8,152 | $8,110 |
| Operating Income: | | | |
| Total Operating Income for Business Segments | $ 721 | $1,102 | $1,010 |
| Reclassification of Minority Interest Expense for International Terminals Segment(a) | 36 | 39 | 36 |
| Unallocated Corporate Expenses | (23) | (14) | (29) |
| New Orleans Litigation Provision | — | — | (60) |
| Additional Loss on Sale (See Note 13) | (108) | — | — |
| Total Consolidated Operating Income (Loss) | $ 626 | $1,127 | $ 957 |

| | Fiscal Years Ended | | |
|---|---|---|---|
| | 2003 | 2002 | 2001 |
| | (Dollars in Millions) | | |
| **Assets:** | | | |
| Assets for Business Segments | $14,554 | $14,543 | $14,764 |
| Investment in Conrail | 4,678 | 4,653 | 4,655 |
| Elimination of Intersegment Receivables | (17) | (128) | (185) |
| Non-segment Assets(b) | 2,545 | 1,883 | 1,567 |
| Total Consolidated Assets | $21,760 | $20,951 | $20,801 |
| **Depreciation Expense** | | | |
| Depreciation for Business Segments | 620 | 631 | 613 |
| Non-segment Depreciation(b) | 9 | 18 | 9 |
| Total Consolidated Depreciation Expense | $ 629 | $ 649 | $ 622 |
| **Property Additions** | | | |
| Property Additions for Business Segments | 1,042 | 1,040 | 890 |
| Non-segment Property Additions(b) | 17 | 40 | 40 |
| Total Consolidated Property Additions | $ 1,059 | $ 1,080 | $ 930 |



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

(a) International Terminals minority interest expense which is reclassified to other income in consolidation.

(b) Non-segment assets include corporate cash and cash equivalents and assets of non-transportation businesses and discontinued operations. Non-segment depreciation and property additions are primarily attributable to non-transportation businesses and discontinued operations. Principal non-transportation businesses include real estate and resort operations.

Revenues in the United States comprise more than 95% of total consolidated revenues. Approximately 95% of the Company's long-lived assets are located in the United States. The Company does not have a single external customer that represents 10% or more of its consolidated revenue.

**Note 20. Summarized Consolidating Financial Data — CSX Vessel Leasing (formerly Sea-Land)**

During 1987, Sea-Land entered into agreements to sell and lease back, by charter, three new U.S.-built , U.S.-flag, D-7 class container ships. The ships were not included in the sale of international liner assets to Maersk in December 1999 and the related debt remains an obligation of CSX Lines. CSX has guaranteed the obligations of CSX Lines pursuant to the related charters which, along with the container ships, serve as collateral for debt securities registered with the Securities and Exchange Commission (SEC). As noted in Note 3 of the Annual Report, Divestitures, CSX agreed to convey certain assets of CSX Lines to Horizon Lines LLC. These obligations are not part of this transaction and another CSX entity became the obligor in 2003. In accordance with SEC disclosure requirements, consolidating summarized financial information for



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

the parent and obligor are as follows (certain prior year amounts have been reclassified to conform to the 2003 presentation):

**Consolidating Income Statement**

| Fiscal Year Ended December 26, 2003 | CSX Corporation | CSX Vessel Leasing | Other | Eliminations | Consolidated |
|---|---|---|---|---|---|
| | | | (Dollars in Millions) | | |
| Operating Revenue | $ — | $ — | $7,866 | $ (73) | $7,793 |
| Operating Expense | (152) | — | 7,383 | (64) | 7,167 |
| Operating Income (Loss) | 152 | — | 483 | (9) | 626 |
| Equity in Earnings of Subsidiaries | 414 | — | — | (414) | — |
| Other Income (Expense) | (23) | 4 | 100 | (24) | 57 |
| Interest Expense | 373 | — | 78 | (33) | 418 |
| Earnings Before Income Taxes and Cumulative Effect of Accounting Change | 170 | 4 | 505 | (414) | 265 |
| Income Tax Expense (Benefit) | (76) | — | 152 | — | 76 |
| Earnings Before Cumulative Effect of Accounting Change | 246 | 4 | 353 | (414) | 189 |
| Cumulative Effect of Accounting Change — Net of Tax | — | — | 57 | — | 57 |
| **Net Earnings** | $ 246 | $ 4 | $ 410 | $(414) | $ 246 |

| Fiscal Year Ended December 27, 2002 | CSX Corporation | CSX Lines | Other | Eliminations | Consolidated |
|---|---|---|---|---|---|
| | | | (Dollars in Millions) | | |
| Operating Revenue | $ — | $758 | $7,485 | $ (91) | $8,152 |
| Operating Expense | (241) | 720 | 6,628 | (82) | 7,025 |
| Operating Income(Loss) | 241 | 38 | 857 | (9) | 1,127 |
| Equity in Earnings of Subsidiaries | 549 | — | — | (549) | — |
| Other Income (Expense) | (24) | 5 | 103 | (43) | 41 |
| Interest Expense | 394 | 7 | 96 | (52) | 445 |
| Earnings Before Income Taxes | 372 | 36 | 864 | (549) | 723 |
| Income Tax Expense (Benefit) | (52) | 14 | 294 | — | 256 |
| Earnings Before Cumulative Effect of Accounting Change | 424 | 22 | 570 | (549) | 467 |
| Cumulative Effect on Prior Years of Accounting Change | — | — | (43) | — | (43) |
| **Net Earnings** | $ 424 | $ 22 | $ 527 | $(549) | $ 424 |



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

**Consolidating Income Statement**

| Fiscal Year Ended December 28, 2001 | CSX Corporation | CSX Lines | Other | Eliminations | Consolidated |
|---|---|---|---|---|---|
| | | | (Dollars in Millions) | | |
| Operating Revenue | $ — | $ 681 | $ 7,862 | $ (433) | $ 8,110 |
| Operating Expense | (199) | 649 | 7,128 | (425) | 7,153 |
| Operating Income(Loss) | 199 | 32 | 734 | (8) | 957 |
| Equity in Earnings of Subsidiaries | 480 | — | — | (480) | — |
| Other Income | (11) | 9 | 88 | (77) | 9 |
| Interest Expense | 469 | 13 | 121 | (85) | 518 |
| Earnings before Income Taxes | 199 | 28 | 701 | (480) | 448 |
| Income Tax Expense (Benefit) | (94) | 11 | 238 | — | 155 |
| **Net Earnings** | $ 293 | $ 17 | $ 463 | $ (480) | $ 293 |



 Powered by Morningstar® Document Research℠

CSX CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

CSX CORPORATION

CONSOLIDATING BALANCE SHEET

| December 26, 2003 | CSX Corporation | CSX Vessel Leasing | Other | Eliminations | Consolidated |
|---|---|---|---|---|---|
| | | | (Dollars in Millions) | | |
| **ASSETS** | | | | | |
| Current Assets: | | | | | |
| Cash, Cash Equivalents and Short-term Investments | $ 1,210 | $ 45 | $ (887) | $ — | $ 368 |
| Accounts Receivable — Net | 45 | 15 | 1,126 | (23) | 1,163 |
| Materials and Supplies | — | — | 170 | — | 170 |
| Deferred Income Taxes | — | — | 136 | — | 136 |
| Other Current Assets | 6 | — | 197 | (137) | 66 |
| Total Current Assets | 1,261 | 60 | 742 | (160) | 1,903 |
| Properties | 25 | — | 19,242 | — | 19,267 |
| Accumulated Depreciation | 24 | — | 5,513 | — | 5,537 |
| Properties — Net | 1 | — | 13,729 | — | 13,730 |
| Investment in Conrail | 331 | — | 4,347 | — | 4,678 |
| Affiliates and Other Companies | 12,638 | — | 944 | (13,067) | 515 |
| Investment in Consolidated Subsidiaries | — | — | — | — | — |
| Other Long-term Assets | 1,299 | — | 269 | (634) | 934 |
| Total Assets | $ 15,530 | $ 60 | $ 20,031 | $ (13,861) | $ 21,760 |
| **LIABILITIES** | | | | | |
| Current Liabilities: | | | | | |
| Accounts Payable | $ 88 | $ — | $ 761 | $ (22) | $ 827 |
| Labor and Fringe Benefits Payable | 6 | — | 391 | — | 397 |
| Payable to Affiliates | — | — | 137 | (137) | — |
| Casualty, Environmental and Other Reserves | 5 | — | 275 | — | 280 |
| Current Maturities of Long-term Debt | 300 | — | 126 | — | 426 |
| Short-term Debt | — | — | 2 | — | 2 |
| Income and Other Taxes Payable | 1,464 | — | (1,340) | (1) | 123 |
| Other Current Liabilities | 21 | 20 | 114 | — | 155 |
| Total Current Liabilities | 1,884 | 20 | 466 | (160) | 2,210 |
| Long-term Debt | 6,085 | — | 801 | — | 6,886 |
| Deferred Income Taxes | (12) | — | 3,764 | — | 3,752 |
| Casualty, Environmental and Other reserves | — | — | 836 | — | 836 |
| Long-term Payable to Affiliates | 396 | — | 128 | (524) | — |
| Other Long-term Liabilities | 748 | 36 | 957 | (118) | 1,623 |
| Total Liabilities | 9,101 | 56 | 6,952 | (802) | 15,307 |
| **Shareholder's Equity** | | | | | |
| Preferred Stock | — | — | 396 | (396) | — |
| Common Stock | 215 | — | 209 | (209) | 215 |
| Other Capital | 1,579 | 1 | 8,052 | (8,053) | 1,579 |
| Retained Earnings | 4,957 | 3 | 4,398 | (4,401) | 4,957 |
| Accumulated Other Comprehensive Loss | (322) | — | 24 | — | (298) |
| Total Shareholders' Equity | 6,429 | 4 | 13,079 | (13,059) | 6,453 |
| Total Liabilities and Shareholders' Equity | $ 15,530 | $ 60 | $ 20,031 | $ (13,861) | $ 21,760 |



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

**CSX CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**CSX CORPORATION**

**CONSOLIDATING BALANCE SHEET**

| December 27, 2002 | CSX Corporation | CSX Lines | Other | Eliminations | Consolidated |
|---|---|---|---|---|---|
| | | | (Dollars in Millions) | | |
| **ASSETS** | | | | | |
| Cash, Cash Equivalents & Short-term Investments | $ 379 | $ 37 | $ (152) | $ — | $ 264 |
| Accounts Receivable — Net | 43 | — | 902 | (146) | 799 |
| Materials and Supplies | — | — | 180 | — | 180 |
| Deferred Income Taxes | — | — | 128 | — | 128 |
| Assets Held for Disposition | — | 263 | — | — | 263 |
| Other Current Assets | 5 | — | 287 | (137) | 155 |
| Total Current Assets | 427 | 300 | 1,345 | (283) | 1,789 |
| Properties | 33 | 11 | 18,516 | — | 18,560 |
| Accumulated Depreciation | (29) | (2) | (5,243) | — | (5,274) |
| Properties, Net | 4 | 9 | 13,273 | — | 13,286 |
| Investment in Conrail | 342 | — | 4,311 | — | 4,653 |
| Affiliates and Other Companies | — | — | 414 | (33) | 381 |
| Investment in Consolidated Subsidiaries | 12,761 | — | 396 | (13,157) | — |
| Other Long-term Assets | 1,192 | — | 273 | (623) | 842 |
| Total Assets | $ 14,726 | $ 309 | $ 20,012 | $ (14,096) | $ 20,951 |
| **LIABILITIES** | | | | | |
| Accounts Payable | $ 77 | $ 20 | $ 848 | $ (143) | $ 802 |
| Labor and Fringe Benefits Payable | 49 | 11 | 397 | — | 457 |
| Payable to Affiliates | — | — | 137 | (137) | — |
| Casualty, Environmental and Other Reserves | 1 | — | 245 | — | 246 |
| Current Maturities of Long-term Debt | 150 | — | 241 | — | 391 |
| Short-term Debt | 140 | — | 3 | — | 143 |
| Liabilities Held for Disposition | — | 104 | — | — | 104 |
| Income and Other Taxes Payable | 1,458 | 9 | (1,284) | (39) | 144 |
| Other Current Liabilities | 28 | 4 | 99 | 36 | 167 |
| Total Current Liabilities | 1,903 | 148 | 686 | (283) | 2,454 |
| Casualty, Environmental and Other Reserves | 4 | 1 | 599 | — | 604 |
| Long-term Debt | 5,510 | — | 1,009 | — | 6,519 |
| Deferred Income Taxes | — | 3 | 3,564 | — | 3,567 |
| Long Term Payable to Affiliates | 396 | — | 148 | (544) | — |
| Other Long-term Liabilities | 685 | 49 | 925 | (93) | 1,566 |
| Total Liabilities | 8,498 | 201 | 6,931 | (920) | 14,710 |
| **Shareholders' Equity** | | | | | |
| Preferred Stock | — | — | 396 | (396) | — |
| Common Stock | 215 | — | 209 | (209) | 215 |
| Other Capital | 1,547 | 73 | 8,238 | (8,311) | 1,547 |
| Retained Earnings | 4,797 | 35 | 4,225 | (4,260) | 4,797 |
| Accumulated Other Comprehensive Loss | (331) | — | 13 | — | (318) |
| Total Shareholders' Equity | 6,228 | 108 | 13,081 | (13,176) | 6,241 |
| Total Liabilities and Shareholders' Equity | $ 14,726 | $ 309 | $ 20,012 | $ (14,096) | $ 20,951 |

**Consolidating Cash Flow Statements**

**Fiscal Year Ended December 26, 2003**

| | CSX Corporation | CSX Vessel Leasing | Other | Eliminations | Consolidated |
|---|---|---|---|---|---|
| | | | (Dollars in Millions) | | |
| **Operating Activities** | | | | | |
| **Net Cash Provided (Used) by Operating Activities** | $ 41 | $ — | $ 1,004 | $ (241) | $ 804 |
| **Investing Activities** | | | | | |
| Property Additions | — | — | (1,059) | — | (1,059) |
| Net Proceeds from Divestitures | 214 | — | — | — | 214 |
| Short-term Investments | 69 | — | (1) | — | 68 |
| Other Investing Activities | 29 | — | 220 | (279) | (30) |
| **Net Cash Provided (Used) by Investing Activities** | 312 | — | (840) | (279) | (807) |
| **Financing Activities** | | | | | |
| Short-term Debt-Net | (140) | — | (1) | — | (141) |
| Long-term Debt Issued | 919 | — | — | — | 919 |
| Long-term Debt Repaid | (175) | — | (325) | — | (500) |
| Cash Dividends Paid | (86) | — | (239) | 239 | (86) |
| Other Financing Activities | 29 | 45 | (375) | 281 | (20) |
| **Net Cash Provided (Used) by Financing Activities** | 547 | 45 | (940) | 520 | 172 |
| **Net Increase (Decrease) in Cash and Cash Equivalents** | 900 | 45 | (776) | — | 169 |
| **Cash and Cash Equivalents at Beginning of Period** | 263 | — | (136) | — | 127 |
| **Cash and Cash Equivalents at End of Period** | $ 1,163 | $ 45 | $ (912) | $ — | $ 296 |



 Powered by Morningstar® Document Research℠

CSX CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Consolidating Cash Flow Statements

Fiscal Year Ended December 27, 2002

| | CSX Corporation | CSX Lines | Other | Eliminations | Consolidated |
|---|---|---|---|---|---|
| | | | (Dollars in Millions) | | |
| **Operating Activities** | | | | | |
| **Net Cash Provided (Used) by Operating Activities** | $ 288 | $ 15 | $ 1,041 | $(217) | $ 1,127 |
| **Investing Activities** | | | | | |
| Property Additions | (4) | (19) | (1,057) | — | (1,080) |
| Short-term Investments-Net | 135 | (26) | 241 | — | 350 |
| Other Investing Activities | (10) | 14 | (29) | (20) | (45) |
| **Net Cash Provided (Used) by Investing Activities** | 121 | (31) | (845) | (20) | (775) |
| **Financing Activities** | | | | | |
| Short-term Debt-Net | 140 | — | — | — | 140 |
| Long-term Debt Issued | 746 | — | 2 | — | 748 |
| Long-term Debt Repaid | (950) | — | (209) | — | (1,159) |
| Dividends Paid | (86) | — | (209) | 209 | (86) |
| Other Financing Activities | 32 | — | (65) | 28 | (5) |
| **Net Cash Provided (Used) by Financing Activities** | (118) | — | (481) | 237 | (362) |
| **Net Increase (Decrease) in Cash and Cash Equivalents** | 291 | (16) | (285) | — | (10) |
| **Cash and Cash Equivalents at Beginning of Period** | 156 | — | (19) | — | 137 |
| **Cash and Cash Equivalents at End of Period** | $ 447 | $(16) | $ (304) | $ — | $ 127 |



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

**Consolidating Cash Flow Statements**

**Fiscal Year Ended December 28, 2001**

| | CSX Corporation | CSX Lines | Other | Eliminations | Consolidated |
|---|---|---|---|---|---|
| | | | (Dollars in Millions) | | |
| **Operating Activities** | | | | | |
| **Net Cash Provided (Used) by Operating Activities** | $ (85) | $ 80 | $ 1,090 | $ (258) | $ 827 |
| **Investing Activities** | | | | | |
| Property Additions | — | (11) | (919) | — | (930) |
| Short-term Investments-Net | 169 | — | (220) | — | (51) |
| Other Investing Activities | (191) | 1 | 1,369 | (1,163) | 16 |
| **Net Cash Provided (Used) by Investing Activities** | (22) | (10) | 230 | (1,163) | (965) |
| **Financing Activities** | | | | | |
| Short-term Debt-Net | (524) | — | — | — | (524) |
| Long-term Debt Issued | 962 | — | — | — | 962 |
| Long-term Debt Repaid | (60) | (21) | (185) | — | (266) |
| Cash Dividends Paid | (174) | — | (222) | 225 | (171) |
| Common Stock Issued | 26 | — | (160) | 134 | — |
| Common Stock Retired | (1) | — | 1 | — | — |
| Other Financing Activities | (13) | (49) | (986) | 1,062 | 14 |
| **Net Cash Provided (Used) by Financing Activities** | 216 | (70) | (1,552) | 1,421 | 15 |
| **Net Increase (Decrease) in Cash and Cash Equivalents** | 109 | — | (232) | — | (123) |
| **Cash and Cash Equivalents at Beginning of Period** | 47 | — | 213 | — | 260 |
| **Cash and Cash Equivalents at End of Period** | $ 156 | $ — | $ (19) | $ — | $ 137 |

**Note 21. Quarterly Financial Data (unaudited)(a)**

| Year | 2003 | | | | 2002 | | | |
|---|---|---|---|---|---|---|---|---|
| Quarter | 1st(b) | 2nd | 3rd(c) | 4th(d) | 1st(e) | 2nd | 3rd | 4th |
| | (Dollars in Millions, Except Per Share Amounts) | | | | | | | |
| Operating Revenue | $2,016 | $1,942 | $1,882 | $1,953 | $1,964 | $2,073 | $2,055 | $2,060 |
| Operating Expense | 1,839 | 1,657 | 1,980 | 1,691 | 1,752 | 1,752 | 1,779 | 1,742 |
| Operating Income | 177 | 285 | (98) | 262 | 212 | 321 | 276 | 318 |
| Other Income (Expense) | (10) | 19 | 21 | 27 | 9 | 4 | 28 | — |
| Interest Expense | 103 | 105 | 103 | 107 | 114 | 116 | 108 | 107 |
| Earnings Before Income Taxes And Cumulative Effect of Accounting Change | 64 | 199 | (180) | 182 | 107 | 209 | 196 | 211 |
| Income Tax Expense | 22 | 72 | (77) | 59 | 39 | 74 | 69 | 74 |
| Earnings before Cumulative Effect of Accounting Change | 42 | 127 | (103) | 123 | 68 | 135 | 127 | 137 |
| Cumulative Effect of Accounting Change — Net of Tax | 57 | — | — | — | (43) | — | — | — |
| Net Earnings | $ 99 | $ 127 | $ (103) | $ 123 | $ 25 | $ 135 | $ 127 | $ 137 |
| **Per Common Share** | | | | | | | | |
| Earnings Per Share: | | | | | | | | |
| Before Cumulative Effect of Accounting Change | $ 0.20 | $ 0.59 | $ (0.48) | $ 0.57 | $ 0.32 | $ 0.63 | $ 0.60 | $ 0.64 |
| Cumulative Effect of Accounting Change | 0.26 | — | — | — | (0.20) | — | — | — |
| Including Cumulative Effect of Accounting Change | $ 0.46 | $ 0.59 | $ (0.48) | $ 0.57 | $ 0.12 | $ 0.63 | $ 0.60 | $ 0.64 |
| Earnings Per Share, Assuming Dilution: | | | | | | | | |
| Before Cumulative Effect of Accounting Change | $ 0.20 | $ 0.59 | $ (0.48) | $ 0.57 | $ 0.32 | $ 0.63 | $ 0.60 | $ 0.64 |
| Cumulative Effect of Accounting Change | 0.26 | — | — | — | (0.20) | — | — | — |
| Including Cumulative Effect of Accounting Change | $ 0.46 | $ 0.59 | $ (0.48) | $ 0.57 | $ 0.12 | $ 0.63 | $ 0.60 | $ 0.64 |
| Dividend Per Share | $ 0.10 | $ 0.10 | $ 0.10 | $ 0.10 | $ 0.10 | $ 0.10 | $ 0.10 | $ 0.10 |
| Market Price | | | | | | | | |
| High | $30.85 | $33.16 | $32.99 | $36.29 | $41.40 | $37.90 | $36.77 | $30.12 |
| Low | $25.50 | $28.20 | $28.92 | $29.07 | $34.81 | $32.41 | $25.75 | $25.09 |

(a) Periods presented are 13 week quarters.
(b) Included in the first quarter of 2003 is a credit of $57 million after tax, 26 cents per share, resulting from the cumulative effect of an accounting change for asset retirement obligations.
(c) Included in the third quarter of 2003 is a charge of $232 million reflecting a change in estimate of casualty reserves. Also included in the third quarter of 2003 is a charge of



 Powered by Morningstar® Document Research℠

$108 million to account for the Company entering into two settlement agreements with Maersk that resolved all material disputes between the two companies arising out of the 1999 sale of international container shipping assets to Maersk.

(d) Included in the fourth quarter of 2003 is a charge of $34 million representing the initial charge for separation expenses related to the management restructuring announced in November 2003. Also, in the fourth quarter of 2003, the Company recorded a credit of $22 million related to revised estimates for amounts to be paid to individuals under separation plans initially recorded in 1991 and 1992.

(e) Included in the first quarter of 2002 is a charge of $83 million ($43 million after tax and minority interest) to write-down indefinite lived intangible assets, resulting from the cumulative effect of an accounting change.



 Powered by Morningstar® Document Research℠

**Item 9.** ***Changes in and Disagreements with Accountants on Accounting and Financial Disclosure***

None.

**Item 9A.** ***Controls and Procedures***

As of December 26, 2003, under the supervision and with the participation of the Company's Chief Executive Officer (CEO) and the Chief Financial Officer (CFO), management has evaluated the effectiveness of the design and operation of the Company's disclosure controls and procedures. Based on that evaluation, the CEO and CFO concluded that the Company's disclosure controls and procedures were effective as of December 26, 2003. There were no changes in the Company's internal controls over financial reporting during the fourth quarter of 2003 that have materially affected or are reasonably likely to materially affect the Company's internal control over financial reporting.

## PART III

**Item 10.** ***Directors and Executive Officers of the Registrant***

In accordance with Instruction G(3) of Form 10-K, the information required by this Item is incorporated herein by reference to the Proxy Statement, except for the information regarding the executive officers of the Registrant which is included in Part I of this report under the caption "Executive Officers of the Registrant."

**Item 11.** ***Executive Compensation***

In accordance with Instruction G (3) of Form 10-K, the information required by this Item is incorporated herein by reference to the Proxy Statement.

**Item 12.** ***Security Ownership of Certain Beneficial Owners and Management***

In accordance with Instruction G (3) of Form 10-K, the information required by this Item is incorporated herein by reference to the Proxy Statement.

**Item 13.** ***Certain Relationships and Related Transactions***

In accordance with Instruction G (3) of Form 10-K, the information required by this Item is incorporated herein by reference to the Proxy Statement.

**Item 14.** ***Principal Accounting Fees and Services***

In accordance with Instruction G (3) of Form 10-K, the information required by this Item is incorporated herein by reference to the Proxy Statement.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

## PART IV

**Item 15.** ***Exhibits, Financial Statement Schedules, and Reports on Form 8-K***

(a)(1) *Financial Statements*

See Index to Consolidated Financial Statements on page 39.

(2) *Financial Statement Schedules*

The information required by Rule 3-09 is included in Note 2 to the consolidated financial statements, "Investment in and Integrated Rail Operations with Conrail" and the Audited Consolidated Financial Statements of Conrail Inc., filed herewith as exhibit 99.3. The information required by Schedule II is included in Note 9 to the consolidated financial statements, "Casualty, Environmental and Other Reserves." All other financial statement schedules are not applicable.

(3) *Exhibits*

| | |
|---|---|
| 3.1 | Amended and Restated Articles of Incorporation of the Registrant (incorporated herein by reference to Exhibit 3.1 to the Registrant's Form 10-Q dated October 10, 2003) |
| 3.2 | Bylaws of the Registrant, amended as of May 7, 2003 (incorporated herein by reference to Exhibit 3.2 of the Registrant's Form 10-Q dated September 30, 2003). |
| 4.1(a) | Indenture, dated August 1, 1990, between the Registrant and The Chase Manhattan Bank, as Trustee (incorporated herein by reference to the Registrant's Form SE, dated September 7, 1990, filed with the Commission) |
| 4.1(b) | First Supplemental Indenture, dated as of June 15, 1991, between the Registrant and The Chase Manhattan Bank, as Trustee (incorporated herein by reference to Exhibit 4(c) to the Registrant's Form SE, dated May 28, 1992, filed with the Commission) |
| 4.1(c) | Second Supplemental Indenture, dated as of May 6, 1997, between the Registrant and The Chase Manhattan Bank, as Trustee (incorporated herein by reference to Exhibit 4.3 to the Registrant's Registration Statement on Form S-4 (Registration No. 333-28523) filed with the Commission on June 5, 1997) |
| 4.1(d) | Third Supplemental Indenture, dated as of April 22, 1998, between the Registrant and The Chase Manhattan Bank, as Trustee (incorporated herein by reference to Exhibit 4.2 to the Registrant's Current Report on Form 8-K filed with the Commission on May 12, 1998) |
| 4.1(e) | Fourth Supplemental Indenture, dated as of October 30, 2001, between the Registrant and The Chase Manhattan Bank, as Trustee (incorporated herein by reference to Exhibit 4.1 to the Registrant's Report on Form 10-Q filed with the Commission on November 7, 2001) |
| 4.1(f) | Fifth Supplemental Indenture, dated as of October 27, 2003 between the Registrant and The Chase Manhattan Bank, as Trustee (incorporated herein by reference to Exhibit 4.1 to the registrant's Report on Form 8-K filed with the Commission on October 27, 2003). |

Pursuant to Regulation S-K, Item 601(b)(4)(iii), instruments that define the rights of holders of the Registrant's long-term debt securities, where the long-term debt securities authorized under each such instrument do not exceed 10% of the Registrant's total assets, have been omitted and will be furnished to the Commission upon request.

| | |
|---|---|
| 10.1* | CSX Stock Plan for Directors (as amended through January 1, 2004)** |
| 10.2* | Corporate Director Deferred Compensation Plan (as amended through January 1, 2004)** |



 Powered by Morningstar® Document Research℠

| | |
|---|---|
| 10.3* | CSX Corporation 2002 Corporate Director Deferred Compensation Plan (as amended through January 1, 2004)** |
| 10.4 | CSX Directors' Charitable Gift Plan, as amended (incorporated herein by reference to Exhibit 10.4 to the Registrant's Annual Report on Form 10-K dated March 4, 1994)** |
| 10.5* | CSX Directors' Matching Gift Plan (as amended through December 31, 2003)** |
| 10.6 | Employment and Consulting Agreement with J. W. Snow (incorporated herein by reference to Exhibit 10.3 to the Registrant's Report on Form 10-Q dated November 7, 2001)** |
| 10.7 | Restricted Stock Award Agreement with J. W. Snow (incorporated herein by reference to Exhibit 10.4 to the Registrant's Report on Form 10-Q dated November 7, 2001)** |
| 10.8 | Stock Option Agreement with J. W. Snow (incorporated herein by reference to Exhibit 10.5 to the Registrant's Report on Form 10-Q dated November 7, 2001)** |
| 10.9 | Agreement with J. W. Snow (incorporated herein by reference to Exhibit 10.9 to the Registrant's Annual Report on Form 10-K dated March 4, 1994)** |
| 10.10 | Employment Agreement with J. W. Snow (incorporated herein by reference to Exhibit 10.12 to the Registrant's Annual Report on Form 10-K dated March, 7, 2000)** |
| 10.11 | Special Employment Agreement with M. J. Ward (incorporated herein by reference to Exhibit 10.6 to the Registrant's Report on Form 10-Q dated November 7, 2001)** |
| 10.12 | Restricted Stock Award Agreement with M. J. Ward (incorporated herein by reference to Exhibit 10.7 to the Registrant's Report on Form 10-Q dated November 7, 2001)** |
| 10.13 | Railroad Retirement Benefits Agreement with M. J. Ward (incorporated herein by reference to Exhibit 10.13 to the Registrant's Report on Form 10-K dated February 26, 2003)** |
| 10.14 | Form of Agreement with R.J. Grassi (incorporated herein by reference to Exhibit 10.6 to the Registrant's Annual Report on Form 10-K dated March 3, 1995)** |
| 10.15 | Form of Amendment to Agreement with R.J. Grassi (incorporated herein by reference to Exhibit 10.7 to the Registrant's Annual Report on Form 10-K dated March 14, 1997)** |
| 10.16 | Supplement to Agreement with R.J. Grassi (incorporated herein by reference to Exhibit 10.15 to the Registrant's Annual Report on Form 10-K dated March 4, 2002)** |
| 10.17 | Amendment to Supplement to Agreement with R.J. Grassi (incorporated herein by reference to Exhibit 10.17 to the Registrant's Report on Form 10-K dated February 26, 2003)** |
| 10.18 | Employment Agreement with O. Munoz (incorporated herein by reference to Exhibit 10.1 to the Registrant's Report on Form 10-Q dated September 30, 2003)** |
| 10.19 | Restricted Stock Award Agreement with O. Munoz (incorporated herein by reference to Exhibit 10.2 to the Registrant's Report on Form 10-Q dated September 30, 2003)** |
| 10.20 | Retirement and Consulting Agreement with Paul R. Goodwin (incorporated herein by reference to Exhibit 10.1 to Registrant's Report on Form 10-Q dated April 30, 2003)** |
| 10.21 | Form of Employment Agreement with P. R. Goodwin and M. J. Ward (incorporated by reference to Exhibit 10.16 of the Registrant's Report on Form 10-K dated February 28, 2001)** |
| 10.22 | Form of Stock Option Agreement (incorporated by reference to Exhibit 10.17 of the Registrant's Report on Form 10-K dated March 4, 2002)** |



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

| | |
|---|---|
| 10.24* | 1987 Long-Term Performance Stock Plan, as Amended and Restated effective April 25, 1996 (as amended through February 7, 2003)** |
| 10.25* | Deferred Compensation Program for Executives of CSX Corporation and Affiliated Companies (as amended through January 1, 1998)** |
| 10.26* | 2002 Deferred Compensation Plan of CSX Corporation and Affiliated Corporations (as amended through February 7, 2003)** |
| 10.27* | Supplementary Savings Plan and Incentive Award Deferral Plan for Eligible Executives of CSX Corporation and Affiliated Companies (as Amended through February 7, 2003)** |
| 10.28 | Special Retirement Plan of CSX Corporation and Affiliated Companies, as Amended through February 14, 2001(incorporated by reference to Exhibit 10.23 of the Registrant's Report on Form 10-K dated March 4, 2002)** |
| 10.29 | Supplemental Retirement Benefit Plan of CSX Corporation and Affiliated Companies, as Amended through February 14, 2001 (incorporated by reference to Exhibit 10.24 of the Registrant's Report on Form 10-K dated March 4, 2002)** |
| 10.30 | Senior Executive Incentive Compensation Plan (incorporated herein by reference to Appendix B to the Registrant's Definitive Proxy Statement dated March 17, 2000)** |
| 10.31 | CSX Omnibus Incentive Plan, as Amended through February 14, 2001 (incorporated by reference to Exhibit 10.26 of the Registrant's Report on Form 10-K dated March 4, 2002)** |
| 10.32 | 1990 Stock Award Plan as Amended and Restated Effective February 14, 1996 (as Amended through September 8, 1999) (incorporated by reference to Exhibit 10.24 to the Registrant's Annual Report on Form 10-K dated March 7, 2000)** |
| 10.34 | Amended and Restated Credit Agreement (incorporated herein by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed with the Commission on June 4, 1997) |
| 10.35 | Transaction Agreement (incorporated herein by reference to Exhibit 10 to the Registrant's Current Report on Form 8-K filed with the Commission on July 8, 1997) |
| 10.36 | Amendment No. 1, dated as of August 22, 1998, to the Transaction Agreement, dated as of June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation, and CRR Holdings LLC. (incorporated herein by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed with the Commission on June 11, 1999) |
| 10.37 | Amendment No. 2, dated as of June 1, 1999, to the Transaction Agreement, dated June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation, and CRR Holdings, LLC. (incorporated herein by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed with the Commission on June 11, 1999) |
| 10.38 | Amendment No. 3, dated as of August 1, 2000, to the Transaction Agreement by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation, and CRR Holdings LLC. (incorporated herein by reference to Exhibit 10.34 to the Registrant's Annual Report on Form 10-K dated March 1, 2001) |
| 10.39 | Operating Agreement, dated as of June 1, 1999, by and between New York Central Lines LLC and CSX Transportation, Inc. (incorporated herein by reference to Exhibit 10.3 to the Registrant's Current Report on Form 8-K filed with the Commission on June 11, 1999) |



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

| | |
|---|---|
| 10.40 | Shared Assets Area Operating Agreement for North Jersey, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc., and Norfolk Southern Railway Company, with exhibit thereto (incorporated herein by reference to Exhibit 10.4 to the Registrant's Current Report on Form 8-K filed with the Commission on June 11, 1999) |
| 10.41 | Shared Assets Area Operating Agreement for Southern Jersey/ Philadelphia, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc., and Norfolk Southern Railway Company, with exhibit thereto (incorporated herein by reference to Exhibit 10.5 to the Registrant's Current Report on Form 8-K filed with the Commission on June 11, 1999) |
| 10.42 | Shared Assets Area Operating Agreement for Detroit, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc., and Norfolk Southern Railway Corporation, with exhibit thereto (incorporated herein by reference to Exhibit 10.6 to the Registrant's Current Report on Form 8-K filed with the Commission on June 11, 1999) |
| 10.43 | Monongahela Usage Agreement, dated as of June 1, 1999, by and among CSX Transportation, Inc., Norfolk Southern Railway Company, Pennsylvania Lines LLC, and New York Central Lines LLC, with exhibit thereto (incorporated herein by reference to Exhibit 10.7 to the Registrant's Current Report on Form 8-K filed with the Commission on June 11, 1999) |
| 10.44 | 364-Day, $300 Million Revolving Credit Agreement dated as of May 17, 2002 |
| 10.45* | Five-Year Revolving Credit Agreement dated as of June 8, 2001 (incorporated by reference to the Registrant's Current Report on Form 8-K filed with the Commission on October 29, 2001) [this Agreement was amended by First Amendment, dated as of May 17, 2002 and by Second Amendment, dated as of May 14, 2003] |
| 10.46 | 364-Day $345 Million Revolving Credit Agreement dated as of May 14, 2003 (incorporated by reference to the Registrant's Current Report on Form 8-K filed with the Commission on August 1, 2003) |
| 12* | Computation of Ratio of Earnings to Fixed Charges |
| 14* | Code of Ethics |
| 21* | Subsidiaries of the Registrant |
| 23.1* | Consent of Ernst & Young LLP |
| 23.2* | Consent of Ernst & Young LLP and KPMG LLP, Independent Auditors |
| 24* | Powers of Attorney |
| 31.1* | Principal Executive Officer Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 31.2* | Principal Financial Officer Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32.1* | Principal Executive Officer Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 32.2* | Principal Financial Officer Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 99.3* | Audited Consolidated Financial Statements of Conrail Inc. for the Years Ended December 31, 2003, 2002, and 2001 |

* Filed herewith

** Management Contract or Compensatory Plan or Arrangement



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

(b) *Reports on Form 8-K*

- Form 8-K filed on October 2, 2003, to report as an "Item 5: Other Item" the issuance of a press release announcing its intention to satisfy in cash its obligation to purchase its Zero Coupon Convertible Debentures due October 30, 2021.

- Form 8-K filed on October 10, 2003, to report as an "Item 5: Other Item" Board of Director approval of Amendment No. 2 to the Rights Agreement between the Company and Harris Trust and Savings Bank, to change the final expiration date of the Rights Agreement from June 8, 2008 to October 10, 2003 and to effectively cause the expiration of the preferred stock purchase rights granted under the Rights Agreement on October 10, 2003.

- Form 8-K filed on October 27, 2003, to report as an "Item 5: Other Item" the announcement that it would make a one-time cash payment of $23.00 per $1,000 aggregate principal amount at maturity to holders of its Zero Coupon Convertible Debentures due 2021 (the "Debentures") who do not require the Corporation to purchase their Debentures on October 30, 2003 and were holders of record as of the close of business on October 31, 2003. In addition, the Corporation announced that effective as of October 27, 2003, it amended the terms of the Debentures to permit holders of the Debentures, at their option, to cause the Corporation to purchase the Debentures on October 30, 2005, at their accreted value of $852.48 per $1,000 principal amount at maturity.

- Form 8-K filed on November 10, 2003, to report as an "Item 5: Other Item" the issuance of a press release announcing streamlining of management structure.

- Form 8-K filed on November 14, 2003, to report as an "Item 5: Other Item" entering into an Underwriting Agreement for the public offering of $200,000,000 aggregate principal amount of the Company's 5.30% Notes due 2014 and $200,000,000 aggregate principal amount of the Company's 2.75% Notes due 2006.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

CSX CORPORATION
(Registrant)

By: /s/ CAROLYN T. SIZEMORE

Carolyn T. Sizemore
*Vice President and Controller*
*(Principal Accounting Officer)*

Dated: March 10, 2004

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities indicated on March 10, 2004.

| Signature | Title |
|---|---|
| * <br> Michael J. Ward | Chairman of the Board, President, Chief Executive Officer and Director (Principal Executive Officer) |
| * <br> Oscar Munoz | Executive Vice President and Chief Financial Officer (Principal Financial Officer) |
| /s/ ELIZABETH E. BAILEY <br> Elizabeth E. Bailey | Director |
| /s/ ROBERT L. BURRUS JR. <br> Robert L. Burrus Jr. | Director |
| /s/ BRUCE C. GOTTWALD <br> Bruce C. Gottwald | Director |
| /s/ EDWARD J. KELLY III <br> Edward J. Kelly III | Director |
| /s/ ROBERT D. KUNISCH <br> Robert D. Kunisch | Director |
| /s/ SOUTHWOOD J. MORCOTT <br> Southwood J. Morcott | Director |



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

| Signature | Title |
|---|---|
| /s/ DAVID M. RATCLIFFE<br>David M. Ratcliffe | Director |
| /s/ CHARLES E. RICE<br>Charles E. Rice | Director |
| /s/ WILLIAM C. RICHARDSON<br>William C. Richardson | Director |
| /s/ FRANK S. ROYAL M.D.<br>Frank S. Royal M.D. | Director |
| /s/ DONALD J. SHEPARD<br>Donald J. Shepard | Director |

*By: /s/ ELLEN M. FITZSIMMONS

Ellen M. Fitzsimmons
*Attorney-in-Fact*

EXHIBIT 10.1

AMENDED AND RESTATED CSX CORPORATION
STOCK PLAN FOR DIRECTORS
(APPROVED APRIL 17, 1997)

1. NAME OF PLAN. This plan shall be known as the "Amended and Restated CSX Corporation Stock Plan for Directors" (the "Plan".)

2. PURPOSE OF PLAN. The purpose of the Plan is to enable CSX Corporation, a Virginia corporation (the "Company"), to attract and retain persons of exceptional ability to serve as directors and to solidify the common interests of its directors and shareholders in enhancing the value of the Company's Stock. The Plan provides for grants of Stock, grants of options to acquire Stock, and payment of directors' retainers and fees in Stock.

3. EFFECTIVE DATE AND TERM AND SHARES SUBJECT TO PLAN. The Plan shall be effective as of the date it is adopted by the Board of Directors of the Company, subject, however, to approval by at least a majority of the outstanding shares of Stock present or represented and entitled to vote at a meeting of shareholders of the Company not later than April 17, 1997, and shall remain in effect until amended or terminated by action of the Board. Of the 1,000,000 shares subject to the Plan as of May 1, 1992, the date of original approval by shareholders of the Company, 956,728 shares remain unissued and subject to the Plan as of March 18, 1997.

4. ELIGIBLE PARTICIPANTS. Each member of the Board from time to time who is not a full-time employee of the Company or any of its subsidiaries shall be a participant ("Participant") in the Plan.

5. DEFINITIONS.

   (a) "Annual Meeting" means the Company's Annual Meeting of Shareholders.

   (b) "Board of Directors" or "Board" means the Board of Directors of CSX Corporation.

   (c) "Business Day" means, if relevant to a determination of the value of Stock, a day on which shares of Stock are or could be traded on the New York Stock Exchange (or other national stock exchange, or if not so listed, could be traded over-the-counter). In all other cases, the term means a day on which the offices of the Company are open for the conduct of business in the normal course.

   (d) "Payment Date" means the fifteenth day of the last month of each quarter of the Corporation's fiscal year or, if the fifteenth day of such month is not a Business Day, on the next Business Day following the fifteenth day of such month.

   (e) "Fair Market Value" means, as of any given date, the mean between the high and low selling prices of the Stock per share on the New York Stock Exchange on such date (or, if there is no reported sale on such date, on the last preceding date on which any reported sale occurred).

(f) "Stock" means the Common Stock of the Company and rights, options or warrants for the purchase of securities of the Company which may be issued with shares of Stock pursuant, and subject, to plans or agreements adopted or entered into from time to time by the Company. If the par value of Stock is changed, or in the event of a change in the capital structure of the Company, the shares resulting from such a change shall be deemed to be Stock within the meaning the Plan.

6. SHARES AND STOCK OPTIONS.

(a) Commencing May 1, 1992, the annual retainer payable to each Participant for service on the Board shall be payable in part in shares of Stock subject to any applicable deferrals and restrictions set forth in Section 8 hereof. Subject to paragraphs (b) and (c) below, each Participant shall be paid 40 percent of the annual retainer payable to each Participant for service on the Board (the "Designated Percentage") in shares of Stock. The shares shall be deducted at their Fair Market Value, determined as of the Business Day immediately preceding the date of the Company's Annual Meeting of Shareholders ("Annual Meeting"), from the Participant's annual retainer.

(b) Any person who becomes a non-employee director following the Company's Annual Meeting, whether by appointment or election as a director or by change in status from a full-time employee, shall receive shares of Stock as a portion of the compensation to be paid to such Participant until the next Annual Meeting. The number of shares of Stock issued to such Participant shall be determined by dividing the product of the pro rata portion of the annual retainer to be paid to such director and the Designated Percentage by the Fair Market Value on the day such person becomes a Participant. A Participant who becomes a non-employee director following the Company's Annual Meeting may, at the beginning of such term, make his or her Annual Election as set forth in paragraph (c) below regardless of the number of months remaining until the next Annual Meeting.

(c) Each Participant may also make one election during the period from Annual Meeting to the next Annual Meeting (the "Annual Election") to receive up to 100 percent of his or her retainers and/or fees in shares of Stock, subject to any applicable deferrals and restrictions set forth in Section 8 hereof. The Annual Election must be in writing and shall be delivered to the Corporate Secretary of the Company no later than six months prior to the next Annual Meeting. The Annual Election shall be irrevocable in respect of the year to which it pertains and shall specify the applicable percentage of the annual retainers and/or fees above the Designated Percentage that such Participant wishes to receive in shares of Stock. The Annual Election shall not be effective until at least six months and one day following its execution and receipt by the Company.

(d) In addition to the awards described in the previous provisions of this Section 6, the Board may make additional awards of Stock or options to acquire Stock to Participants upon such terms as it deems fit; provided, however, that options to acquire Stock ("Stock Options") shall be subject to the restrictions in Section 10.

7. PAYMENT OF SHARES. Payments to directors of Stock or Stock Options pursuant to this Plan shall be made as follows, subject to any applicable deferrals and restrictions pursuant to Section 8 of this Plan:



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

(a) Shares payable as the Designated Percentage pursuant to Section 6 of the Plan shall be payable immediately following the Company's Annual Meeting.

(b) Following payment of the Designated Percentage, the balance of each director's retainers to be paid in Stock, if any, shall be prorated and paid on the Payment Dates remaining until the next Annual Meeting.

(c) Unless otherwise specified by resolution of the Board of Directors, any compensation to be paid in Stock and any grant of Stock shall be made on or as of the Payment Date next succeeding the date on which such payments have been earned or are otherwise payable or issuable.

(d) The number of shares to be issued in payment of retainers and fees denominated in dollars shall be calculated on the basis of the Fair Market Value on the Payment Date as of which such shares are issued.

8. DEFERRALS AND RESTRICTIONS ON PAYMENT. Payment of shares issuable under Section 6 shall, at the Participant's election (which election must be in writing and shall be delivered to the Corporate Secretary of the Company no later than six months prior to the next Annual Meeting), be deferred in accordance with a deferral election made by the Participant and filed with the Company. The Company shall transfer shares of Stock or other assets equal in value to a number of shares as to which payment is deferred to a trust to secure the Company's obligation to pay shares of Stock to the Participant in the future, but any assets transferred shall remain subject to the claims of the Company's creditors and any interest the Participant may be deemed to have in the trust may not be sold, hypothecated or transferred (including, without limitation, transfer by gift or donation). The Company shall distribute Stock deferred pursuant to this Section 8 in accordance with elections made by each participant on forms approved by the Board; provided, however, that upon a Change of Control, as hereinafter defined, all Stock previously deferred shall be issued immediately, except that a Participant may elect that shares which would be distributed to him or to her upon a Change of Control may continue to be held in trust for distribution in accordance with this Section 8. Such election with respect to Change of Control described in the preceding sentence shall be effective no earlier than the Annual Meeting following such election. The Participant's right to receive the shares issued under Section 6 shall not be affected by a termination of the trust described herein.

9. SHARE CERTIFICATES, VOTING AND OTHER RIGHTS. The certificates for shares issued hereunder shall be issued in the name of the Participant or the trustee of the trust described in Section 8, as the case may be, and shall be held by such Participant or such trustee; provided, however, that each Participant shall be entitled to all rights of a shareholder with respect to Stock for all such shares issued in his name, including the right to vote the shares, and the Participant or the trustee, as the case may be, shall receive all dividends and other distributions paid or made with respect thereto.

10. PROCEDURES WITH RESPECT TO STOCK OPTIONS.

(a) Each Stock Option granted pursuant to the Plan:

(i) will consist of an option to purchase shares of Stock at a purchase price not less than 100 percent of the Fair Market Value of the Stock on the date of grant;



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

(ii) will be exercisable during the time period specified in the terms of the grant and reflected in an agreement entered into with a Participant, but such exercise shall not be earlier than one year after the date of grant of the Stock Option and not later than 15 years after the date of grant of the Stock Option, with the determination of the final date of exercise of the Stock Option to be made at the time of grant.

(b) In the event of the death of a Participant who holds unexercised Stock Options awarded under the Plan, the Stock Option may be exercised by a beneficiary designated by the Participant prior to his death, or if no beneficiary is designated, by the executor or executrix of the Participant's estate or by the person or persons to whom the Participant's rights have passed by will or the laws of descent and distribution, such exercise to be in accordance with the provisions of the Plan and to the same extent as though the Participant were then living.

11. FRACTIONS OF SHARES. The Company shall not issue fractions of shares. Whenever under the terms of the Plan a fractional share would otherwise be required to be issued, the Participant or the trustee of the trust described in Section 8, as the case may be, shall be paid in cash for such fractional share based upon the same Fair Market Value which was utilized to determine the number of shares to be issued on the relevant Payment Date.

12. CHANGE OF CONTROL. "CHANGE OF CONTROL" SHALL MEAN ANY OF THE FOLLOWING:

(a) Stock Acquisition. The acquisition, by any individual, entity or group [within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")] (a "Person") of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 20 percent or more of either (i) the then outstanding shares of Stock of the Company, or (ii) the combined voting power of the then outstanding voting securities of the Company entitled to vote generally in the election of directors (the "Outstanding Company Voting Securities"); provided, however, that for purposes of this subsection (a), the following acquisitions shall not constitute a Change of Control: (i) any acquisition directly from the Company; (ii) any acquisition by the Company; (iii) any acquisition by any employee benefit plan (or related trust) sponsored or maintained by the Company or any corporation controlled by the Company; or (iv) any acquisition by any corporation pursuant to a transaction which complies with clauses (i), (ii) and (iii) of subsection (c) of this Section 12; or

(b) Board Composition. Individuals who, as of the date hereof, constitute the Board of Directors (the "Incumbent Board") cease for any reason to constitute at least a majority of the Board of Directors; provided, however, that any individual becoming a director subsequent to the date hereof whose election or nomination for election by the Company's shareholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board shall be considered as though such individual were a member of the Incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office occurs as a result of an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board of Directors; or



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

(c) Business Combination. Approval by the shareholders of the Company of a reorganization, merger, consolidation or sale or other disposition of all or substantially all of the assets of the Company or its principal subsidiary that is not subject, as a matter of law or contract, to approval by the Surface Transportation Board or any successor agency or regulatory body having jurisdiction over such transactions (the "Agency") (a "Business Combination"), in each case, unless, following such Business Combination:

(i) all or substantially all of the individuals and entities who were the beneficial owners, respectively, of the Stock and Outstanding Company Voting Securities immediately prior to such Business Combination beneficially own, directly or indirectly, more than 50 percent of, respectively, the then outstanding shares of common stock and the combined voting power of the then outstanding voting securities entitled to vote generally in the election of directors, as the case may be, of the corporation resulting from such Business Combination (including, without limitation, a corporation which as a result of such transaction owns the Company or its principal subsidiary or all or substantially all of the assets of the Company or its principal subsidiary either directly or through one or more subsidiaries) in substantially the same proportions as their ownership, immediately prior to such Business Combination of the Stock and Outstanding Company Voting Securities, as the case may be;

(ii) no Person (excluding any corporation resulting from such Business Combination or any employee benefit plan (or related trust) of the Company or such corporation resulting from such Business Combination) beneficially owns, directly or indirectly, 20% or more of, respectively, the then outstanding shares of common stock of the corporation resulting from such Business Combination or the combined voting power of the then outstanding voting securities of such corporation except to the extent that such ownership existed prior to the Business Combination; and

(iii) at least a majority of the members of the Board resulting from such Business Combination were members of the Incumbent Board at the time of the execution of the initial agreement, or of the action of the Board of Directors, providing for such Business Combination; or

(d) Regulated Business Combination. Approval by the shareholders of the Company of a Business Combination that is subject, as a matter of law or contract, to approval by the Agency (a "Regulated Business Combination") unless such Business Combination complies with clauses (i), (ii) and (iii) of subsection (c) of this Section 12; or

(e) Liquidation or Dissolution. Approval by the shareholders of the Company of a complete liquidation or dissolution of the Company or its principal subsidiary.

13. WITHHOLDING TAXES. Whenever the Company proposes or is required to issue or to transfer shares of Stock under the Plan, or whenever the Company is required to withhold taxes upon exercise of Stock Options under the Plan, a Participant:

(a) Shall remit to the Company an amount sufficient to satisfy any federal, state or local withholding tax liability prior to the delivery of any certificate or certificates for such shares; or



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

(b) To the extent permitted by applicable laws, including regulations promulgated under the Securities Exchange Act of 1934, such federal, state or local withholding tax liability may be satisfied prior to the delivery of any certificate or certificates for the shares by an adjustment, equal in value to such liability, in the number of shares to be transferred to the Participant.

14. AMENDMENT. This Plan may be amended by action of a majority of the Board of Directors, and approval by shareholders shall not be required for any amendment which does not authorize additional shares to be subject to the Plan.

15. ADMINISTRATION. The Plan will be administered by the Board. Except as otherwise specifically provided in the Plan, the Board will have the entire authority to interpret and administer the Plan, including the power and complete discretion with respect to any award of Stock or Stock Options to determine the terms and conditions of the award, the number of shares of Stock to be covered by the award, the time or times when an award will be granted, when Stock Options may be exercised, and the manner in which payment may be made upon the exercise of Stock Options. If the Board determines that a spin-off, stock dividend or other distribution not in the form of cash or Stock, consolidation, merger, dissolution, liquidation or other similar corporate transaction or event affects a Stock Option such that an adjustment is appropriate to preserve the intended benefits of a Stock Option, the Board may make such equitable changes or adjustments in the Stock Option as it deems necessary or appropriate. The Board may adopt rules and regulations for carrying out the Plan. The interpretation and construction of any provision of the Plan by the Board will be final and conclusive.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

AMENDMENT TO THE AMENDED AND RESTATED
CSX CORPORTION STOCK PLAN FOR DIRECTORS

The Plan is amended, effective January 1, 2004, as follows:

1. Section 6(a) of the Plan is amended by adding the following sentence as the penultimate sentence thereof:

   "Effective January 1, 2004, the Designated Percentage of the annual retainer paid in shares of Stock shall be 50 percent."

2. Section 11 of the Plan is amended, effective January 1, 2004, by adding the following sentence to the end thereof:

   "Notwithstanding the foregoing, in the event that the recordkeeping system for the Plan is able to properly account for fractional shares, fractional shares may be issued instead of cash."


Powered by Morningstar® Document Research℠

EXHIBIT 10.2

# CSX CORPORATION
# CORPORATE DIRECTOR DEFERRED COMPENSATION PLAN

EFFECTIVE NOVEMBER 1. 1980

As Amended and Restated Effective January 1, 1995
(As Amended through December 31, 1997)

1. Purpose

The purpose of this Plan is to permit members of the Board of Directors of CSX Corporation to elect deferred receipt of director's fees. This Plan is intended to constitute a deferred compensation plan for corporate director's fees in accordance with Revenue Ruling 71-419. Cumulative Bulletin 1971-2, page 220.

2. Definitions

The following words or terms used herein shall have the following meanings:

(a) "Administrator. -- means CSX Corporation

(i) Prior to a Change of Control, the Administrator shall be responsible for the general administration of the Plan, claims review, and for carrying out its provisions. Administration of the Plan shall be carried out consistent with the terms of the Plan.

(ii) Following a Change of Control, the Benefits Trust Committee may remove and/or replace the Administrator.

(iii) The Administrator shall have sole and absolute discretion to interpret the Plan and determine eligibility for and benefits hereunder. Decisions of the Administrator regarding participation in and the calculation of benefits under the Plan shall at all times be binding and conclusive on Participants, their beneficiaries, heirs and assigns.

(iv) Notwithstanding subsection (iii) above, following a Change of Control, final benefit determinations for Participants, their beneficiaries, heirs and assigns and decisions regarding benefit claims under the Plan shall rest with the Benefits Trust Committee or its delegate in its sole judgment and absolute discretion.

(b) "Benefits Trust Committee" -- means the committee established pursuant to the CSX Corporation and Affiliated Companies Benefits Assurance Trust document.

(c) "Board" -- means the Board of Directors of CSX

(c) "Change of Control" -- means any of the following:

(i) Stock Acquisition. The acquisition, by any individual, entity or group [within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")](a "Person") of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 20% or more of either (A) the then outstanding shares of common stock of the Corporation (the "Outstanding Corporation Common Stock"), or (B) the combined voting power of the then outstanding voting securities of the Corporation entitled to vote generally in the election of directors


Powered by Morningstar® Document Research℠

(the "Outstanding Corporation Voting Securities"); provided, however, that for purposes of this subsection(i), the following acquisitions shall not constitute a Change of Control (A) any acquisition directly from the Corporation; (B) any acquisition by the Corporation; (C) any acquisition by any employee benefit plan (or related trust) sponsored or maintained by the Corporation or any corporation controlled by the Corporation; or (D) any acquisition by any corporation pursuant to a transaction which complies with clauses (A), (B) and (C) of subsection (iii) of this Section 2(d); or

(ii) Board Composition. Individuals who, as of the date hereof, constitute the Board of Directors (the "Incumbent Board") cease for any reason to constitute at least a majority of the Board of Directors; provided, however, that any individual becoming a director subsequent to the date hereof whose election or nomination for election by the Corporation's shareholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board shall be considered as though such individual were a member of the Incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office occurs as a result of an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board of Directors; or

(iii) Business Combination. Approval by the shareholders of the Corporation of a reorganization, merger, consolidation or sale or other disposition of all or substantially all of the assets of the Corporation or its principal subsidiary that is not subject, as a matter of law or contract, to approval by the Interstate Commerce Commission or any successor agency or regulatory body having jurisdiction over such transactions (the "Agency") (a "Business Combination"), in each case, unless, following such Business Combination:

(A) all or substantially all of the individuals and entities who were the beneficial owners, respectively, of the Outstanding Corporation Common Stock and Outstanding Corporation Voting Securities immediately prior to such Business Combination beneficially own, directly or indirectly, more than 50% of respectively, the then outstanding shares of common stock and the combined voting power of the then outstanding voting securities entitled to vote generally in the election of directors, as the case may be, of the corporation resulting from such Business Combination (including, without limitation, a corporation which as a result of such transaction owns the Corporation or its principal subsidiary or all or substantially all of the assets of the Corporation or its principal subsidiary either directly or through one or more subsidiaries) in substantially the same proportions as their ownership, immediately prior to such Business Combination of the Outstanding Corporation Common Stock and Outstanding Corporation Voting Securities, as the case may be;

(B) no Person (excluding any corporation resulting from such Business Combination or any employee benefit plan (or related trust) of the Corporation or such corporation resulting from such Business Combination) beneficially owns, directly or indirectly. 20% or more of, respectively, the then outstanding shares of common stock of the corporation resulting from such Business Combination or the combined voting power of the then outstanding voting securities of such corporation



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

except to the extent that such ownership existed prior to the Business Combination, and

(C) at least a majority of the members of the board of directors resulting from such Business Combination were members of the Incumbent Board at the time of the execution of the initial agreement, or of the action of the Board of Directors, providing for such Business Combination; or

(iv) Regulated Business Combination. Approval by the shareholders of the Corporation of a Business Combination that is subject, as a matter of law or contract, to approval by the Agency (a "Regulated Business Combination") unless such Business Combination complies with clauses (A), (B) and (C) of subsection (iii) of this Section 2(d); or

(v) Liquidation or Dissolution. Approval by the shareholders of the Corporation of a complete liquidation or dissolution of the Corporation or its principal subsidiary.

(e) "CSX" or "Corporation" -- means CSX Corporation

(f) "CSX's Accountants" -- means the independent accountants, actuaries, benefits consulting firm or other entity engaged by CSX to provide Participant's accounting services for the Plan and, if selected or changed following a Change of Control, approved by the Benefits Trust Committee.

(g) "Director's Fees" -- means any compensation, whether for Board meetings or for Committee meetings or otherwise, earned by a Member for services rendered as a Member during a particular calendar year in which he has elected to be a Participant

(h) "Member" -- means any person duly elected to the Board

(i) "Participant" -- means any Member who elects to participate in the Plan

(j) "Plan" -- means Corporate Director Deferred Compensation Plan

(k) "Secretary" -- means the Corporate Secretary of CSX

(l) "Trust" -- means the trust created under the CSX and Affiliated Companies Benefits Assurance Trust Agreement or a grantor trust or trusts established by CSX which will substantially conform to the terms of the Internal Revenue Service model trust as described in Revenue Procedure 92-64, 1992-2 C.B. 422. Except as provided in Section 10. CSX is not obligated to make any contribution to the Trust.

(m) "Valuation Date" - means the last day of each calendar quarter and such other dates as the Administrator deems necessary or appropriate to value the Participants' benefits under this Plan. However, following a Change of Control,



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

the selection of a Valuation Date other than the last day of each calendar quarter shall be subject to the approval of the Benefits Trust Committee.

In any instance in which the male gender is used herein, it shall also include persons of the female gender in appropriate circumstances.

3. Merger Provisions

Any person who was a Participant under the Chessie System, Inc. Corporate Director Deferred Compensation Plan or who was a director and had made an election under the Seaboard Coast Line Industries, Inc. Nonfunded Deferred Compensation Plan for Directors shall automatically become a Participant under this Plan effective upon the merger of Chessie System, Inc. and Seaboard Coast Line Industries, Inc. into the Corporation, provided that such a person shall be a Member as defined in this Plan.

Director's Fees deferred previously under the terms of the aforesaid director deferred compensation plans of Chessie System, Inc. and Seaboard Coast Line Industries, Inc. shall remain subject to the terms and conditions respectively provided therein, and the terms of this Plan shall only govern as to Director's Fees earned on and after the date of merger into the Corporation.

4. Participation

A Member may become a Participant for any calendar year by filing a written Election to Participate in the Plan with the Secretary not later than December 31 immediately prior to the year in which Director's Fees are to be earned. Following a Change of Control, all Elections to Participate are subject to the approval of the Benefits Trust Committee.

An Election to Participate may be made with respect to all or any part of Director's Fees to be earned for any year or years to which such Election to Participate may relate.

An Election to Participate, once filed, shall apply to Director's Fees earned in subsequent years in which a Participant shall serve as a Member, unless amended or revoked by written request to the Secretary.

Any person who becomes a Member and who was not a Member on the preceding December 31 may file an Election to Participate before his term as a Member begins.

5. Deferral of Director's Fees

CSX shall, during any year in which a Participant has an Election to Participate on file with the Secretary, withhold and defer payment of all or any specified part of Participant's Director's Fees in accordance with his Election to Participate. Prior to the beginning of any year, a Participant can elect to have all or any portion of the amounts withheld, including all earnings thereon, or to be withheld, credited to an interest-accruing account ("Interest Account") and/or to an enhanced interest-accruing account for calendar years 1986, 1987, 1989 and 1990 ("Enhanced Interest Account"), and/or to a CSX Phantom Stock Account ("Stock Account"). Such deferral election can be made or changed before the beginning of any year.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Interest shall accrue on the Interest Account from the date the deferred Director's Fee would otherwise have been paid to the Participant until it is actually paid, such interest to be credited to the Participant's account and compounded quarterly at the end of each calendar quarter. The rate of interest will be reviewed periodically, provided, however, following a Change of Control, any change in the rate of interest is subject to the approval of the Benefits Trust Committee.

Interest shall accrue on the Enhanced Interest Account from the first day of the month following the deferral and shall compound thereafter at an annual rate of 16% until all amounts are finally paid to the Participant.

Credits to the Stock Account shall be in full and fractional units based on the closing price for CSX common stock as reported on the New York Stock Exchange - Composite Listing ("NYSE") on the date the fees would otherwise have been paid to the Participant. Dividends shall be credited in full and fractional units to the account based on the number of units in the account on the record date and calculated based on the closing price for CSX common stock on the dividend payment date.

A Participant, while a Member, may elect prior to the beginning of any year to transfer all or any portion of amounts deferred, including all earnings thereon, to an Enhanced Interest Account, an Interest Account and/or a Stock Account, provided, however, that no transfer may be made out of an Enhanced Interest Account.

6. Distribution of Deferred Director's Fees

Amounts deferred under the Plan and credited to an Interest Account or Stock Account shall be distributed to a Participant from the account(s) maintained in respect of his account in a lump sum at the beginning of the year following the year in which a Participant ceases to be a Member, unless he shall elect installments as provided below. Amounts deferred and credited to an Enhanced Interest Account shall be distributed over an installment period elected by the Participant.

The value of a Participant's Interest Account shall be the sum of amounts deferred and all interest accrued thereon. The value of an Enhanced Interest Account shall be the sum of amounts deferred and all interest accrued thereon. The value of a Stock Account shall be the value of the units in a Participant's account based on the closing price for CSX common stock as reported on the NYSE on the last business day of the year in which a Participant ceases to be a Member, unless he shall elect annual or quarterly installments as provided below. The value of a Stock Account will fluctuate in value in line with the fluctuation in the price of CSX common stock. There can be no assurance on the market value of the phantom units either at the time of acquisition or at any time during the distribution period, nor can there be any assurance as to the continuation of dividends.

Distribution of Deferred amounts shall begin with either the first day of the calendar year immediately following the year in which a Participant shall cease to be a Member for any reason other than death, or the first day of the calendar year immediately following the year in which a Participant shall cease to be a Member and shall have attained age 65, as the Member may elect.

If installment payments are elected for Interest or Stock Accounts, payments shall be made, as the Participant may elect, for either (a) five years, (b) ten years, or (c) any other designated period which shall be not less than the period he was a Participant nor exceed ten years. For Enhanced Interest Accounts, the Participant may elect to receive payments over (a) five years, (b) ten years, or (c) fifteen years.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

For Interest Accounts and Stock Accounts, installments shall be on an annual or quarterly basis as the Member may elect. The amount of each installment shall be determined by multiplying the value of the Participant's account at the end of the calendar quarter immediately preceding the installment date by a fraction, the numerator of which shall be one (1) and the denominator of which shall be the number of installment payments over which payment of such amount is to be made, less the number of installment payments theretofore made.

For Enhanced Interest Accounts, payments shall be in level installments on a monthly basis over the number of years (five, ten, or fifteen) as elected by the Member.

The elections provided in this Section 6 shall be made in writing in a Participant's Election to Participate and shall be subject to all other provisions of the Plan relating thereto and to the deferral of receipt of Director's Fees.

In the event a Participant shall die while he is a Member, the amount appearing as the credit balance of his account, or the value of the units in his Stock Account, shall be paid in either a lump sum or installments (consistent with the election made by the Participant as described in this Section 6) to his Designated Beneficiary. Each Participant may file with the Secretary a Designation of Beneficiary for this purpose.

In the event a Participant shall die after he ceases to be a Member and before he has received complete distribution from his account, any credit balance of his account, including interest, or the value of the units in his Stock Account, shall be paid to his Designated Beneficiary consistent with the election made by the Participant as described in this Section 6.

In the event a Participant shall not file a Designation of Beneficiary, or his Designated Beneficiary is not living at the Participant's death, the balance credited to his account, including interest, shall be paid in full to his estate not later than the tenth day of the calendar year following his date of death.

7. Death Benefit

For Participants electing to have deferred Director's Fees credited to an Enhanced Interest Account who die while a Member, a death benefit equal to the greater of three times the amount of Director's Fees deferred or the amount of Director's Fees deferred plus accumulated interest will be paid to the Member's Designated Beneficiary. For Participants in an Enhanced Interest Account who die after ceasing to be a Member, a lump sum death benefit of $10,000 will be paid to the Designated Beneficiary. This death benefit shall apply only to Director's Fees deferred after December 31, 1985 and which have been credited to an Enhanced Interest Account. This death benefit shall not apply to any amounts credited to an Enhanced Interest Account by reason of transfer from an Interest Account and/or a Stock Account.

In the event a Participant shall not file a Designation of Beneficiary, or the Designated Beneficiary is not living at the Participant's death, the death benefit shall be paid to the Participant's estate.

8. Amendment or Termination of Election to Participate

A Participant may amend or terminate his Election to Participate by written request to the Secretary, which shall become effective for the calendar year following the year in which his request is



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

made; provided, however, that no amendment shall be made to contravene the deferral of Director's Fees previously made under the provisions of this Plan.

In the event a Participant amends or terminates his Election to Participate and remains a Member, he shall not be entitled to receive any distribution from his account until he ceases to be a Member, and distributions shall be made only as provided in Section 6 of this Plan.

9. Obligation of Csx

This Plan shall be unfunded and credits to the memorandum account(s) of each Participant shall not be set apart for him nor otherwise made available so that he may draw upon it at any time, except as provided in this Plan. Neither any Participant nor his Designated Beneficiary shall have any right, title, or interest in such credits or any claim against them. Payments may only be made at such times and in the manner expressly provided in this Plan. CSX's contractual obligation is to make the payments when due. No notes or security for the payment of any Participant's account shall be issued by CSX.

10. Change of Control

10.1 If a Change of Control has occurred, the Administrator shall cause CSX to contribute to the Trust, within 7 days of such Change of Control, a lump sum payment equal to the unfunded aggregate value of the amount each Participant would be eligible to receive (determined under 10.2 below) as of the latest Valuation Date coinciding with or preceding the date of Change of Control to the extent such amounts are not already in the Trust. The aggregate value of the amount of the lump sum to be contributed to the Trust pursuant to this Section 10 shall be determined by CSX's Accountants after consultation with the entity then maintaining the Plan's records. Thereafter, CSX's Accountants shall annually determine as of a Valuation Date for each Participant not receiving a lump sum payment pursuant to Section 10.2, below, the amounts which would be payable under such subsection were a Change of Control to occur at the date of such determination. To the extent that the value of the assets held in the Trust relating to this Plan do not equal the aggregate amount described in the preceding sentence, at the time of the valuation, as determined by CSX's Accountants, CSX shall make a lump sum contribution to the Trust equal to the difference. In no event, however, shall the Company's contribution to the Trust be less than the amount that would have been contributed thereto with respect to liabilities relating to the Plan (including related administrative and investment expenses), pursuant to and at the time and in the manner provided under Section l(h) of the Trust.

10.2 In the event a Change of Control has occurred, the trustee of the Trust shall, within 45 days of such Change of Control, pay to each Participant not making an election under 10.3 below, a lump sum payment equal to the amount the Participant would have been entitled to receive determined under Section 6 had he ceased to be a Member and selected an immediate lump sum payment. The amount of each Participant's lump sum payment shall be determined by CSX's Accountants.

10.3 Each Participant may elect in a time and manner determined by the Administrator but in no event later than December 31, 1996, or the occurrence of a Change of Control, if earlier, to have amounts and benefits determined and payable under the terms of the Plan as if a Change of Control had not occurred. New Participants in the Plan may elect in a time and



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

manner determined by the Administrator, but in no event later than 90 days after becoming a Participant, to have amounts and benefits determined and payable under the terms of the Plan as if a Change of Control had not occurred. A Participant who has made an election, as set forth in the two preceding sentences, may, at any time and from time to time, change that election; provided, however, a change of election that is made within one year of a Change of Control shall be invalid.

10.4 Notwithstanding anything in the Plan to the contrary, each Participant who has made an election under Section 10.3, above, may elect within 90 days following a Change of Control, in a time and manner determined by the Administrator, to receive a lump sum payment calculated under the provisions of 10.3, above, determined as of the Valuation Date next preceding such payment, except that such calculated amount shall be reduced by 5% and such reduction shall be irrevocably forfeited to CSX by the Participant. Furthermore, as a result of such election, the Participant shall no longer be eligible to participate or otherwise benefit from the Plan. Payments under this Section 10.4 shall be made not later than 7 days following receipt by CSX of the Participant's election. The Administrator shall, no later than 7 days after a Change of Control has occurred, give written notification to each Participant eligible to make an election under this Section 10.4, that a Change of Control has occurred and informing such Participant of the availability of the election.

11. Claims Against Participant's Account

No credits to the account of any Participant under this Plan shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, or charge, and any attempt to do so shall be void. Nor shall any credit be subject to attachment or legal process for debts or other obligations. Nothing contained in this Plan shall give any Participant any interest, lien, or claim against any specific asset of CSX. No Participant or his Designated Beneficiary shall have any rights other than as a general creditor of CSX.

12. Competition by Participant

In the event a Participant ceases to be a Member and becomes a proprietor, officer, partner, employee, director, or otherwise becomes affiliated with any business that is in competition with the Corporation, the entire balance credited to his account, including interest, or the value of the units in his Stock Account, if prior to a Change of Control, may, if directed by the Board in its sole discretion, be paid immediately to him in a lump sum. Following a Change of Control, such a decision by the Board is subject to the approval of the Benefits Trust Committee.

13. Payment of Credit Balance to Participant's Account

Notwithstanding anything herein to the contrary, prior to a Change of Control, the Board may, in its sole discretion, direct payment in a lump sum of any or all of the credit balance appearing at the time in the account of a Participant, and/or of the value of the units in his Stock Account. Following a Change of Control, such action by the Board is subject to the approval of the Benefits Trust Committee.

Further, the obligations of CSX and the benefit due any Participant or Designated Beneficiary under the Plan shall be reduced by any amount received in regard thereto under the Trust or any similar trust or other vehicle.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

14. Joint and Several Obligation

To the extent reflected by resolutions of the applicable boards of directors, obligations for benefits under this Plan shall be joint and several.

15. Amendment or Termination

Prior to a Change of Control, this Plan may be altered, amended, suspended, or terminated at any time by the Board, on the recommendation of the Compensation Committee of the Board, provided, however, that no alteration, amendment, suspension, or termination shall be made to this Plan which would result in the distribution of amounts credited to the accounts of all Participants in any manner other than is provided in this Plan without the consent of all Participants.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

AMENDMENT TO THE CSX CORPORATION
CORPORATE DIRECTOR DEFERRED COMPENSATION PLAN

WHEREAS, CSX Corporation (the "Company") sponsors the CSX Corporation Corporate Director Deferred Compensation Plan (the "Plan"), effective as of November 1, 1980 for the benefit of members of the Company's Board of Directors (the "Board"); and

WHEREAS, pursuant to Section 15, the Board has the right to amend the Plan; and

WHEREAS, the Board desires to amend the Plan.

NOW, THEREFORE, the Plan is amended, effective January 1, 2004, as follows:

Section 5 of the Plan is amended by adding the following sentence to the third paragraph thereof:

> "Notwithstanding the foregoing sentence, effective January 1, 2004, interest will be credited at the rate of 10-year U.S. Treasury bonds as published by the Wall Street Journal on the last day of the preceding calendar year. Such rate will be reviewed and updated annually."


Powered by Morningstar® Document Research℠

EXHIBIT 10.3

# CSX CORPORATION
# 2002 CORPORATE DIRECTOR DEFERRED COMPENSATION PLAN

EFFECTIVE JANUARY 1, 2003

The purpose of this Plan is to permit members of the Board of Directors of CSX Corporation to elect deferred receipt of director's fees. This Plan is intended to constitute a deferred compensation plan for corporate director's fees. This Plan is not intended to replace or supercede any prior Director's deferral plans.

1. Definitions

The following words or terms used herein shall have the following meanings:

(a) "Account" or "Accounts"-- means the bookkeeping account(s) maintained for each Participant to record the amount of Director's Fees he has elected to defer, as adjusted pursuant to Section 4.

(b) "Administrator" -- means CSX Corporation

(i) Prior to a Change of Control, the Administrator shall be responsible for the general administration of the Plan, claims review, and for carrying out its provisions. Administration of the Plan shall be carried out consistent with the terms of the Plan.

(ii) Following a Change of Control, the Benefits Trust Committee may remove and/or replace the Administrator.

(iii) The Administrator shall have sole and absolute discretion to interpret the Plan and determine eligibility for and benefits hereunder. Decisions of the Administrator regarding participation in and the calculation of benefits under the Plan shall at all times be binding and conclusive on Participants, their beneficiaries, heirs and assigns.

(iv) Notwithstanding subsection (iii) above, following a Change of Control, final benefit determinations for Participants, their beneficiaries, heirs and assigns and decisions regarding benefit claims under the Plan shall rest with the Benefits Trust Committee or its delegate in its sole judgment and absolute discretion.

(c) "Benefits Trust. Committee" -- means the committee established pursuant to the CSX Corporation and Affiliated Companies Benefits Assurance Trust document.

(d) "Board" -- means the Board of Directors of CSX.

(e) "Change -of Control" -- means any of the following:

(i) Stock Acquisition. The acquisition, by any individual, entity or group within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of

 Powered by Morningstar® Document Research℠

1934, as amended (the "Exchange Act")(a "Person") of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 20% or more of either (A) the then outstanding shares of common stock of the Corporation (the "Outstanding Corporation Common Stock"), or (B) the combined voting power of the then outstanding voting securities of the Corporation entitled to vote generally in the election of directors (the "Outstanding Corporation Voting Securities"); provided, however, that for purposes of this subsection (i), the following acquisitions shall not constitute a Change -of Control: (A) any acquisition directly from the Corporation; (B) any acquisition by the Corporation; (C) any acquisition by any employee benefit plan (or related trust) sponsored or maintained by the Corporation or any corporation controlled by the Corporation; or (D) any acquisition by any corporation pursuant to a transaction which complies with clauses (A), (B) and (C) of subsection (iii) of this Section 2(d); or

(ii) Board Composition. Individuals who, as of the date hereof, constitute the Board of Directors (the "Incumbent Board") cease for any reason to constitute at least a majority of the Board of Directors; provided, however, that any individual becoming a director subsequent to the date hereof whose election or nomination for election by the Corporation's shareholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board shall be considered as though such individual were a member of the Incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office occurs as a result of an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board of Directors; or

(iii) Business Combination. Approval by the shareholders of the Corporation of a reorganization, merger, consolidation or sale or other disposition of all or substantially all of the assets of the Corporation or its principal subsidiary that is not subject, as a matter of law or contract, to approval by the Interstate Commerce Commission or any successor agency or regulatory body having jurisdiction over such transactions (the "Agency") (a "Business Combination"), in each case, unless, following such Business Combination:

(A) all or substantially all of the individuals and entities who were the beneficial owners, respectively, of the Outstanding Corporation Common Stock and Outstanding Corporation Voting Securities immediately prior to such Business Combination beneficially own, directly or indirectly, more than 50% of, respectively, the then outstanding shares of common stock and the combined voting power of the then outstanding voting securities entitled to vote generally in the election of directors, as the case may be, of the corporation resulting from such Business Combination (including, without limitation, a corporation which as a result of such transaction owns the Corporation or its principal subsidiary or all or substantially all of the assets of the Corporation or its principal subsidiary either directly or through one or more subsidiaries) in substantially the same proportions as their ownership, immediately prior to


Powered by Morningstar® Document Research℠

such Business Combination of the Outstanding Corporation Common Stock and Outstanding Corporation Voting Securities, as the case may be;



Source: CSX CORP, 10-K, March 10, 2004
Powered by Morningstar® Document Research℠

(B) no Person (excluding any corporation resulting from such Business Combination or any employee benefit plan (or related trust) of the Corporation or such corporation resulting from such Business Combination) beneficially owns, directly or indirectly, 20% or more of, respectively, the then outstanding shares of common stock of the corporation resulting from such Business Combination or the combined voting power of the then outstanding voting securities of such corporation except to the extent that such ownership existed prior to the Business Combination; and

(C) at least a majority of the members of the board of directors resulting from such Business Combination were members of the Incumbent Board at the time of the execution of the initial agreement, or of the action of the Board of Directors, providing for such Business Combination; or

(iv) Regulated Business Combination. Approval by the shareholders of the Corporation of a Business Combination that is subject, as a matter of law or contract, to approval by the Agency (a "Regulated Business Combination") unless such Business Combination complies with clauses (A), (B) and (C) of subsection (iii) of this Section 2(d); or

(v) Liquidation or Dissolution. Approval by the shareholders of the Corporation of a complete liquidation or dissolution of the Corporation or its principal subsidiary.

(f) "CSX" or "Corporation" -- means CSX Corporation

(g) "CSX's Accountants" -- means the independent accountants, actuaries, benefits consulting firm or other entity engaged by CSX to provide Participant's accounting services for the Plan and, if selected or changed following a Change -of Control, approved by the Benefits Trust Committee.

(h) "Deferral Agreement" -- means an agreement between a Participant and CSX under which the Participant agrees to defer Director's Fees under the Plan. The Deferral Agreement shall be on a form prescribed by the Administrator and shall include any amendments, attachments or appendices.

(i) "Director's Fees" -- means any compensation, whether for retainer, for Board meetings or for Committee meetings or otherwise, payable either in cash or in stock, earned by a Member for services rendered as a Member.

(j) "Distribution Event" -- means any of the events listed in Section 1(e), "Change -of Control," with the following modification: the words "Approval by the shareholders of the Corporation of," in the first line of Sections 1(e)(iii) and 1(e)(iv) are replaced for purposes of this Section 1(j) with the words, "Consummation of, i.e., actual change in ownership of Outstanding Corporation Common Stock, Outstanding Corporation Voting Securities, and/or assets of the Corporation or its principal subsidiary by reason of,".



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

(k) "Effective Date" -- means January 1, 2003.

(l) "Enrollment Form" -- means the form prescribed by the Administrator that a Member who has previously made deferrals under a prior CSX deferral plan for Directors may file pursuant to Section 4 in order to become a Participant in the Plan.

(m) "Form of Payment Election" -- means the election by the Participant of the form of distribution (lump sum or installments) he will receive from his Account pursuant to Section 6.

(n) "Member" -- means any person duly elected to the Board.

(o) "Partial Distribution Election" -- means a Distribution Election for a portion of a Participant's Account under Section 5.

(p) "Participant" -- means any Member who elects to participate in the Plan.

(q) "Plan" -- means the CSX Corporation 2002 Corporate Director Deferred Compensation Plan.

(r) "Secretary" -- means the Corporate Secretary of CSX.

(s) "Trust" -- means the trust created under the CSX and Affiliated Companies Benefits Assurance Trust Agreement or a grantor trust or trusts established by CSX which will substantially conform to the terms of the Internal Revenue Service model trust as described in Revenue Procedure 92-64, 1992-2 C.B. 422. Except as provided in Section 9, CSX is not obligated to make any contribution to the Trust.

(t) "Term" -- means the annual term for which a Member is elected to serve on the Board of Directors of CSX.

(u) "Valuation Date" -- means the last day of each calendar quarter and such other dates as the Administrator deems necessary or appropriate to value the Participants' benefits under this Plan. However, following a Change -of Control, the selection of a Valuation Date other than the last day of each calendar quarter shall be subject to the approval of the Benefits Trust Committee.

In any instance in which the male gender is used herein, it shall also include persons of the female gender in appropriate circumstances.

2. Participation

A Member may elect to become a Participant for any Term by filing an initial Deferral Agreement or an Enrollment Form with the Secretary not later than (i) the Effective date or (ii) a date six months prior to the Annual Meeting for the Term for which Director's Fees are to be earned, whichever is



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

later. Such Deferral Agreement shall be effective for purposes of deferring Director's Fees only as provided in Section 3. Such Enrollment Form shall be effective for purposes of transferring balances previously deferred under a prior Company deferral plan to the Participant's Accounts only as provided in Section 4. Following a Change -of Control, all Deferral Elections are subject to the approval of the Benefits Trust Committee.

3. Deferral of Director's Fees

(a) CSX shall, during any year in which a Participant has a Deferral Election on file with the Secretary, withhold and defer payment of all or any specified part of Participant's Director's Fees in accordance with his Deferral Election. A Participant may elect to change the amount of Director's Fees he elects to defer, modify a Deferral Agreement or revoke a Deferral Agreement by filing a new Deferral Agreement with the Secretary not later than (i) a date six months prior to the Annual Meeting for the Term for which Director's Fees are to be earned or (ii) November 1 of the calendar year immediately prior to the Annual Meeting for the Term for which Director's Fees are to be earned, whichever is later.

(b) Any person who becomes a Member and who was not a Member six months prior to the beginning of his Term as a Member may file a Deferral Election during the first thirty (30) days he is a Member.

4. Participant's Accounts

(a) A Participant may elect on a Deferral Agreement to have all or any portion of the eligible deferred Director's Fees credited to an interest-accruing account ("Interest Account") and/or to a CSX Phantom Stock Account ("Phantom Stock Account").

(b) A Participant who is eligible to receive a portion of his Director's Fees in CSX common stock pursuant to the CSX Corporation Stock Plan for Directors may file with the Secretary a Deferral Agreement with respect to such CSX common stock. A Participant's Stock Account ("Stock Account") will be created when he files his initial Deferral Agreement with respect to Director's Fees payable in CSX common stock.

(c) Interest shall accrue on the Interest Account from the first day of the month following the deferred Director's Fee would otherwise have been paid to the Participant until it is actually paid, such interest to be credited to the Participant's Account and compounded quarterly at the end of each calendar quarter. The rate of interest will be reviewed periodically, provided, however, following a Change -of Control, any change in the rate of interest is subject to the approval of the Benefits Trust Committee.

(d) Credits to the Phantom Stock Account and the Stock Account shall be in full and fractional units based on the average of the high and low price for CSX common stock as reported on the New York Stock Exchange - Composite Listing ("NYSE") on the date the Director's Fees would otherwise have been paid to the Participant.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

(e) Dividends shall be credited in full and fractional units to the Phantom Stock Account based on the number of units in the Account on the record date and calculated based on the average of the high and low price for CSX common stock on the dividend payment date.

(f) Dividends shall be credited in full and fractional units to the Stock Account based on the number of units in the Account on the record date and calculated based on (i) the actual purchase price of CSX common stock acquired to the extent shares are actually purchased by the trustee of the Director's Stock Trust or a successor trust, or (ii) the number of units in the Account on the record date and calculated based on the average of the high and low price for CSX common stock on the dividend payment date.

(g) A Participant, while a Member, may elect at any time to transfer all or any portion of amounts deferred, including all earnings thereon, between an Interest Account and a Phantom Stock Account. No transfer may be made into or out of a Stock Account.

(h) A Member who has previously deferred shares of CSX common stock granted pursuant to the CSX Corporation Stock Plan for Directors ("Stock Plan") may elect to have a Stock Account created for him in the Plan on the Effective Date by filing an Enrollment Form with the Secretary on or before the Effective Date. Filing the Enrollment Form will cause the transfer of such previously deferred share balances to the Participant's Stock Account on the Effective Date, and the Member will enjoy all rights and privileges of a Participant including the ability to file initial Distribution Elections and Form of Payment Elections. A properly filed Enrollment Form will cause all prior elections made with respect to such previously deferred shares to be void immediately, unless otherwise stated in this Section 4.

(i) A Member who is a participant in the CSX Corporation Corporate Director Deferred Compensation Plan ("Director Plan") may elect to have an Interest Account or a Phantom Stock Account created for him in the Plan on the Effective Date by filing an Enrollment Form with the Secretary on or before the Effective Date. Filing the Enrollment Form will cause the transfer of balances previously deferred to the Participant's Accounts on the Effective Date, and the Member will enjoy all rights and privileges of a Participant including the ability to file initial Distribution Elections and Form of Payment Elections and to transfer shares between an Interest Account and a Phantom Stock Account. A properly filed Enrollment Form will cause all prior elections made under the Director Plan to be void immediately, unless otherwise stated in this Section 4.

(j) With respect to transfers to a Participant's Accounts of amounts previously deferred pursuant to Sections 4(i) and 4(j):

(i) No initial Distribution Election made with respect to such previously deferred amounts which designates distribution upon attainment of a designated age under Section 5 that will be attained within 12 months following the Effective Date shall be filed.

(ii) No initial Distribution Election made with respect to such previously deferred amounts which designates distribution upon the Participant's retirement from the Board under Section 5 shall be effective if distribution would occur within 12 months following the Effective Date.

(iii) Any prior election made with respect to such previously deferred amounts which designates distribution upon the Participant's retirement from the Board shall remain in effect for 12 months following the Effective Date, and shall be void thereafter.

(k) The value of a Participant's Interest Account shall be the sum of amounts deferred and all interest accrued thereon. The value of a Phantom Stock Account or Stock Account shall be the value of the units in a Participant's Account based on the average of the high and low price for CSX common stock as reported on the NYSE on the last business day prior to the date of any lump sum or installment distribution. The value of a Phantom Stock Account or Stock Account will fluctuate in value in line with the fluctuation in the price of CSX common stock. There can be no assurance on the market value of CSX common stock either at the time of crediting to a Participant's Account or at any time during the distribution period, nor can there be any assurance as to the continuation of dividends.

5. Distribution of Deferred Director's Fees

(a) Amounts deferred under the Plan and credited to an Account shall be distributed to a Participant from such Account in a lump sum one year following the date in which a Participant ceases to be a Member, unless he shall file a Distribution Election as provided in this Section 5 or a Form of Payment Election as provided in Section 6.

(b) A Participant may file with the Secretary a Distribution Election for the distribution from an Account upon:

(i) attainment of a designated age, however, he shall not elect an age that he will attain less than one year subsequent to his Distribution Election; or

(ii) retirement from the Board.

(c) A Participant may file a Distribution Election or change a Distribution Election at any time prior to:

(i) a date that is 30 days subsequent to the date of his retirement from the Board in the case of his initial Distribution Election; or

(ii) one year prior to the date distribution is to commence under his Distribution Election then in effect,

after which time no Distribution Election shall be filed.

(e) A Participant may make a Partial Distribution Election with respect to any portion of a Participant's Account, provided no Distribution Election shall be made for a portion of an Account less than $2,000, as determined as of the date the election is made. No Participant shall have more than two Distribution Elections in effect for an Account at any time.

(f) Except in the event of retirement from the board, distribution made pursuant to a



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Distribution Election shall not commence prior to a date that is three years subsequent to the date the Participant first makes a Deferral under either this Plan or a predecessor plan which provides for the deferral of Director's Fees

(g) Any Distribution Election made in proper form by a Participant shall be effective and distribution shall commence pursuant to such Distribution Election. Any Distribution Election not made in proper form shall be void. Distributions from a Participant's Stock Account shall be made only in shares of CSX common stock.

(h) A Participant may request and receive a withdrawal from his Account at any time without filing a Distribution Election under this Section 5. Any such withdrawal shall result in the forfeiture of an amount equal to the portion of the Participant's Account that is withdrawn, multiplied by the Mid-term Applicable Federal Rate determined as of the Valuation Date upon which the withdrawal is effective. Notwithstanding the preceding, following a Change of Control, any decisions or determinations by the Administrator under this Section 5 shall be subject to the approval of the Benefits Trust Committee.

(i) A Participant may make one additional election to defer (but not accelerate) commencement of payment under the Plan at any time six months before payments are to have commenced ("Re-deferral Election). Such Re-deferral Election shall be made in a form prescribed by the Administrator. If such Re-deferral Election is to a designated age the re-deferral shall be for a period not less than one year from the date the Re-deferral Election is made.

6. Form of Payment

The Form of Payment Elections provided in this Section 6 shall be made in writing and may be changed at any time prior to a date that is six months prior to the date distribution is to commence, after which time the Form of Payment Election shall be irrevocable. If installment payments are elected for an Account, payments shall be made, as the Participant may elect, for either (a) five years, (b) ten years, or (c) fifteen years. Installments shall be on an annual or quarterly basis as the Participant may elect. The amount of each installment shall be determined by multiplying the value of the Participant's account at the end of the calendar quarter immediately preceding the installment date by a fraction, the numerator of which shall be one (1) and the denominator of which shall be the number of installment payments over which payment of such amount is to be made, less the number of installment payments theretofore made. In the case of installments from a Stock Account, fractional share amounts shall be rounded up to the next highest whole share amount, except in the case of the final installment, in which case a cash payment will be made for any fractional shares.

7. Death of a Participant

(a) In the event a Participant shall die while he is a Member, the balance of his Accounts shall be paid in either a lump sum or installments (consistent with the Form of Payment Elections made by the Participant as described in Section 6) to his Designated Beneficiary. Each Participant may file with the Secretary a Designation of Beneficiary for this purpose.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

(b) In the event a Participant shall die after he ceases to be a Member and before he has received complete distribution from his Account, the balance credited to his Account, (including applicable interest) shall be paid to his Designated Beneficiary consistent with the Form of Payment Elections made by the Participant as described in Section 6.

(c) In the event a Participant shall not file a Designation of Beneficiary, or his Designated Beneficiary is not living at the Participant's death, the balance credited to his Accounts, (including applicable interest) shall be paid in full to his estate not later than the tenth day of the calendar year following his date of death.

8. Obligation of CSX

This Plan shall be unfunded and credits to the Accounts of each Participant shall not be set apart for him nor otherwise made available so that he may draw upon it at any time, except as provided in this Plan. Neither any Participant nor his Designated Beneficiary shall have any right, title, or interest in such credits or any claim against them. Payments may only be made at such times and in the manner expressly provided in this Plan. CSX's contractual obligation is to make the payments when due. No notes or security for the payment of any Participant's account shall be issued by CSX.

9. Change of Control

(a) If a Change of Control has occurred, the Administrator shall cause CSX to contribute to the Trust, within 7 days of such Change of Control, a lump sum payment equal to the unfunded aggregate value of the amount each Participant would be eligible to receive under 9(b) below (but calculated with respect to the Valuation Date described in this sentence, rather than the date of the applicable Distribution Event) as of the latest Valuation Date coinciding with or preceding the date of Change of Control to the extent such amounts are not already in the Trust. The aggregate value of the amount of the lump sum to be contributed to the Trust pursuant to this Section 9 shall be determined by CSX's Accountants after consultation with the entity then maintaining the Plan's records. Thereafter, CSX's Accountants shall annually determine as of a Valuation Date for each Participant not receiving a lump sum payment pursuant to Section 9(b), below, the amounts which would be payable under such subsection were a Distribution Event to occur at the date of such determination. To the extent that the value of the assets held in the Trust relating to this Plan do not equal the aggregate amount described in the preceding sentence, at the time of the valuation, as determined by CSX's Accountants, CSX shall make a lump sum contribution to the Trust equal to the difference. In no event, however, shall the Company's contribution to the Trust be less than the amount that would have been contributed thereto with respect to liabilities relating to the Plan (including related administrative and investment expenses), pursuant to and at the time and in the manner provided under Section 1(h) of the Trust.

(b) In the event a Distribution Event has occurred, the trustee of the Trust shall, within 45days of such Distribution Event, pay to each Participant not making an election under 9(c) below, a lump sum payment equal to the amount the Participant would have been entitled to receive determined under Section 6 had he ceased to be a Member and selected an immediate lump sum payment. The amount of each Participant's lump sum payment shall be determined by CSX's Accountants.



 Powered by Morningstar® Document Research℠

(c) New Participants in the Plan may elect in a time and manner determined by the Administrator, but in no event later than 90 days after becoming a Participant, to have amounts and benefits determined and payable under the terms of the Plan as if a Distribution Event had not occurred. A Participant who has made an election, as set forth in the two preceding sentences, may, at any time and from time to time, change that election; provided, however, a change of election that is made within one year of a Distribution Event shall be invalid.

(d) Notwithstanding anything in the Plan to the contrary, each Participant who has made an election under Section 9(c), above, may elect within 90 days following a Distribution Event, in a time and manner determined by the Administrator, to receive a lump sum payment calculated under the provisions of 9(c), above, determined as of the Valuation Date next preceding such payment, except that such calculated amount shall be reduced by 5% and such reduction shall be irrevocably forfeited to CSX by the Participant. Furthermore, as a result of such election, the Participant shall no longer be eligible to participate or otherwise benefit from the Plan. Payments under this Section 9(d)shall be made not later than 7 days following receipt by CSX of the Participant's election. The Administrator shall, no later than 7 days after a Distribution Event has occurred, give written notification to each Participant eligible to make an election under this Section 9(d), that a Distribution Event has occurred and informing such Participant of the availability of the election.

10. Claims Against Participant's Account

No credits to the account of any Participant under this Plan shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, or charge, and any attempt to do so shall be void. Nor shall any credit be subject to attachment or legal process for debts or other obligations. Nothing contained in this Plan shall give any Participant any interest, lien, or claim against any specific asset of CSX. No Participant or his Designated Beneficiary shall have any rights other than as a general creditor of CSX.

11. Competition by Participant

In the event a Participant ceases to be a Member and becomes a proprietor, officer, partner, employee, director, or otherwise becomes affiliated with any business that is in competition with the Corporation, the entire balance credited to his account, including interest, or the value of the units in his Phantom Stock Account or Stock Account, if prior to a Change of Control, may, if directed by the Board in its sole discretion, be paid immediately to him in a lump sum. Following a Change of Control, such a decision by the Board is subject to the approval of the Benefits Trust Committee.

12. Payment of Credit Balance to Participant's Account

Notwithstanding anything herein to the contrary, prior to a Change of Control, the Board may, in its sole discretion, direct payment in a lump sum, of any or all of the credit balance appearing at the time in the account of a Participant, and/or of the value of the units in his Phantom Stock Account or Stock



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Account. Following a Change of Control, such action by the Board is subject to the approval of the Benefits Trust Committee.

Further, the obligations of CSX and the benefit due any Participant or Designated Beneficiary under the Plan shall be reduced by any amount received in regard thereto under the Trust or any similar trust or other vehicle.

13. Joint and Several Obligation

To the extent reflected by resolutions of the applicable boards of directors, obligations for benefits under this Plan shall be joint and several.

14. Amendment or Termination

Prior to a Change of Control, this Plan may be altered, amended, suspended, or terminated at any time by the Board, on the recommendation of the Compensation Committee of the Board, provided, however, that no alteration, amendment, suspension, or termination shall be made to this Plan which would result in the distribution of amounts credited to the accounts of all Participants in any manner other than is provided in this Plan without the consent of all Participants.

15. Impact of Future Legislation or Regulation

(a) This Section 15 shall become operative upon the enactment of any change in applicable statutory law or the promulgation by the Internal Revenue Service of a final regulation or other pronouncement having the force of law, which statutory law, as changed, or final regulation or pronouncement, as promulgated, would cause any Participant to include in his federal gross income amounts accrued by the Participant under the Plan on a date (an "Early Taxation Event") prior to the date on which such amounts are made available to him or her hereunder.

(b) Notwithstanding any other Section of this Plan to the contrary (but subject to subsection (c), below), as of an Early Taxation Event, the feature or features of this Plan, or the election by a Participant that would cause the Early Taxation Event shall be null and void, to the extent, and only to the extent, required to prevent the Participant from being required to include in his federal gross income amounts accrued by the Participant under the Plan prior to the date on which such amounts are made available to him hereunder. By way of example, but not by way of limiting the generality of the foregoing, if a statute is enacted that would require a Participant to include in his or her federal gross income amounts accrued by the Participant under the Plan prior to the date on which such amounts are made available to him or her because of the Participant's right to receive a distribution of a portion of his Account under Section 6(h), the right of all Participants to receive distributions under Section 6(h) shall be null and void as of the effective date of that statute. If only a portion of a Participant's Account is impacted by the change in the law, then only such portion shall be subject to this Section, with the remainder of the Account not so affected being subject to such rights and features as if the law were not changed. If the law only impacts Participants who have a certain status with respect to the



Source: CSX CORP, 10-K, March 10, 2004
Powered by Morningstar® Document Research℠

Company, then only such Participants shall be subject to this Section.

(c) Notwithstanding Section 15(b) above, if an Early Taxation Event occurs (e.g., if a change in law is retroactive), , the amounts that become taxable on the Early Taxation Event shall be distributed to each Participant as soon as practicable following such Early Taxation Event or if later, the date of enactment or promulgation.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

AMENDMENT TO THE 2002 DIRECTOR DEFERRED COMPENSATION PLAN

Effective January 1, 2004, interest will be credited at the rate of 10-year U.S. Treasury bonds as published by the Wall Street Journal on the last day of the preceding calendar year. Such rate will be reviewed and updated annually.


Powered by Morningstar® Document Research℠

CSX CORPORATION
DIRECTORS' MATCHING GIFT PROGRAM

DIRECTORS' MATCHING GIFT PROGRAM

CSX Corporation's Matching Gift Program is part of the Company's commitment to higher education. An educated population benefits the Company and the communities in which it does business. The Employee Matching Gift Program provides an opportunity for employees to determine directly the recipients of some of the Company's charitable donations.

Directors and retired Directors of the company are entitled to participate in the Matching Gift program under the "Directors' Matching Gift Program," Gifts by Directors or retired Directors may be made jointly with a spouse. The participant need not be an alumnus of the eligible educational institution receiving the gift.

ELIGIBLE INSTITUTIONS

Colleges, including junior colleges, technical schools or other educational institutions above the high school level, universities, graduate end professional schools, or a state association of independent colleges and universities or other national association, foundation or fund which collects an distributes donations to independent colleges and universities, which is:

1. Located within the United States or one of its territories:

2. Public or private;

3. Non-profit, non-proprietary;

4. Accredited or approved by a recognized national or regional accrediting association; and

5. Recognized by the Internal Revenue Service as an organization to which contributions are tax deductible.

CONTRIBUTIONS/CONDITIONS

- Individual contributions, with a minimum of $25 and a maximum of $5,000 per institution, per calendar year, will be matched, with a maximum annual Company match of $25,000 per Director. The matching rate is one to one.

- Contributions must be a personal gift from the Director's own funds, paid in cash or securities, and not a pledged gift.

- Funds will not be matched for extra-curricular programs or any other non-educational purposes such as sports, alumni capital improvement projects, dues, subscriptions, insurance premiums, or other such non-direct payments.

PROGRAM ADMINISTRATION

The program is administered by the Corporate Secretary of CSX Corporation, and may be suspended, revoked, terminated or amended by the Company at any time.

Questions as to interpretation, application, administration or other aspects of the program shall be decided by the Corporate Secretary.



 Powered by Morningstar® Document Research℠

The Corporate Secretary reserves the right to determine eligibility of an institution to receive matching funds under this program.

INSTRUCTIONS

- Part A of the Application in this folder should be completed by the Director and the entire folder should accompany the Director's gift to an eligible institution.

- The qualifying institution, upon receipt of the gift and this folder, should complete Part B of the Application and return the entire folder to the Contributions Coordinator at the address below.

- Upon request, the beneficiary institution will provide evidence of its tax exempt status under section 501 (c) (3) of the Internal Revenue Code.

- All applications for matching gifts received during any calendar year will be paid when administratively convenient but not less than semi-annually.

- Additional forms may be secured from the Contributions Coordinator. Requests for information and all correspondence relating to the Directors' Matching Gift Program should be addressed to:

Contributions Coordinator
CSX Corporation
P.O. Box 85629
Richmond, VA 23285-5629



 Powered by Morningstar® Document Research℠

Part A-Director's Section

(To be completed by Director, who is to send this entire pamphlet, together with gift, to educational institution)

Date__________________

Enclosed is my personal donation of $______________________________
to_______________________________________

Name of Educational Institution

I hereby authorize the institution named above to report this gift to the Contributions Coordinator of CSX Corporation, for the purpose of qualifying for a contribution in accordance with the provisions of the Company's Matching Gift Program.

______________________________________________________________________
Director's Name (print in full)

______________________________________________________________________
Director's Address

______________________________________________________________________
City State Zip

______________________________________________________________________
Director's Signature



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Part 5-Beneficiary's Section

(To be completed by an appropriate financial officer of the educational institution, and returned to Matching Gifts Administrator, P.O. Box 85629, Richmond, VA 23285-5629

I hereby certify that a donation of $____________________ was received on______ 18___, from ____________________________________ in favor of this institution;
Name of Donor

And I further certify that this institution meets all the requirements for eligibility as set forth in CSX Corporation's Matching Gift Program. Contributions to the beneficiary institution shown are tax deductible by CSX Corporation pursuant to Section 501(c)(3) of the Internal Revenue Code, and that the beneficiary institution will provide evidence of this status upon request.

_______________________________________ ____________________________
Name of Educational Institution Signature

_______________________________________ ____________________________
Address of Educational Institution Name (print or type in full)

_______________________________________ ____________________________
Title

_______________________________________ ____________________________
Date



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

EXHIBIT 10.24

# CSX CORPORATION

## 1987 LONG-TERM PERFORMANCE STOCK PLAN

As Amended and Restated Effective April 25, 1996
(As Amended through September 8, 1999)

1. PURPOSE.

The purpose of the CSX Corporation Long-Term Performance Stock Plan (the "Plan") is to attract and retain outstanding individuals as officers and key employees of CSX Corporation and its subsidiaries, to furnish motivation for the achievement of long-term performance objectives by providing such persons opportunities to acquire ownership of common shares of the Company, monetary payments based on the value of such shares or the financial performance of the Company; or both, on terms as herein provided. It is intended that the Incentives provided under this Plan will be treated as qualified performance-based compensation within the meaning of Section 162(m) of the Code. The Company believes there are circumstances, however, where the provision of compensation that is not fully deductible may be more consistent with the compensation philosophy of the Company and/or may be in the Company's and its shareholders' best interests. The Company reserves the right to exercise discretion and retain flexibility in this regard and in certain circumstances to provide incentives that do not qualify as deductible under Section 162(m).

2. DEFINITIONS.

Whenever the following words are capitalized and used in the Plan, they shall have the respective meanings set forth below, unless a different meaning is expressly provided. Unless the context clearly indicates to the contrary, in reading this document the singular shall include the plural and the masculine shall include the feminine.

a. "Beneficiary": The term Beneficiary shall mean the person designated by the Participant, on a form provided by the Company, to exercise the Participant's rights in accordance with Section 14 of the Plan in the event of his death.

b. "Benefits Trust Committee": The term Benefits Trust Committee means the committee established pursuant to the CSX Corporation and Affiliated Companies Benefits Assurance Trust.

c. "Board of Directors": The term Board of Directors or Board means the Board of Directors of CSX Corporation.

d. "Cause": The term Cause means (i) an act or acts of personal dishonesty of a Participant intended to result in substantial personal enrichment of the Participant at the expense of the Company or any of its subsidiaries, (ii) violation of the management responsibilities by the Participant which is demonstrably willful and deliberate on the Participant's part and which is not remedied in a reasonable period of time after receipt of written notice from the Company or a subsidiary, or (iii) the conviction of the Participant of a felony involving moral turpitude.


Powered by Morningstar® Document Research℠

e. "Change in Control": The term Change in Control is defined in Section 22.

f. "Code": The term Code means the Internal Revenue Code of 1986, as amended.

g. "Committee": The term Committee means the Compensation Committee of the Board of Directors.

h. "Company": The term Company means CSX Corporation.

i. "Completed Month": The term Completed Month shall mean a period beginning on the monthly anniversary date of a grant of an Incentive and ending on the day before the next monthly anniversary.

j. "Covered Employee": The term Covered Employee shall mean the chief executive officer of the Company or any other individual who is among the four (4) highest compensated officers or who is otherwise a "covered employee" within the meaning of Section 162(m) of the Code, as determined by the Committee.

k. "Disability": The term Disability means long-term disability as determined under the Company's Salary Continuance and Long-Term Disability Plan.

l. "Divisive Transaction": The term Divisive Transaction means a transaction in which the Participant's employer ceases to be a Subsidiary or there is a sale of substantially all of the assets of the Subsidiary.

m. "Exchange Act": The term Exchange Act means the Securities Exchange Act of 1934, as amended.

n. "Exercisability Requirements": The term Exercisability Requirements used with respect to any grant of options means such restrictions or conditions on the exercise of such options that the Committee may, in its discretion, add to the one-year holding requirement contained in Sections 7 and 8.

o. "Fair Market Value": The term Fair Market Value shall be deemed to be the mean between the highest and lowest quoted selling prices of the stock per share as reported under New York Stock Exchange-Composite Transactions on the day of reference to any event to which the term is pertinent, or, if there is no sale that day, on the last previous day on which any such sale occurred.

p. "Functional Group": The term Functional Group means a group of employees, identified by the Compensation Committee, in its sole discretion, to be subject to a common set of Performance Objectives.

q. "Incentive": The term Incentive means any incentive under the Plan described in Section 6.

r. "Objective Standard": The term Objective Standard means a formula or standard by which a third party, having knowledge of the relevant performance results, could calculate the amount to be paid to a Participant. Such formula or standard shall specify the individual



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

employees or class of employees to which it applies, and shall preclude discretion to increase the amount payable that would otherwise be due upon attainment of the objective.

s. "Participant": The term Participant means an individual designated by the Committee as a Participant pursuant to Section 5.

t. "Performance Objective": The term Performance Objective shall mean a performance objective established in writing by the Committee within ninety (90) days of the commencement of the Performance Period to which the Performance Objective relates and at a time when the outcome of such objective is substantially uncertain. Each Performance Objective shall be established in such a way that a third party having knowledge of the relevant facts could determine whether the objective is met. A Performance Objective may be based on one or more business criteria that apply to the individual Participant, a business unit or the Company as a whole, and shall state, in terms of an Objective Standard, the method of computing the amount payable to the Participant if the Performance Objective is attained. With respect to Incentives granted to Covered Employees, the material terms of the Performance Objective shall be disclosed to, and must be subsequently approved by, a vote of the shareholders of the Company, consistent with the requirements of Section 162(m) of the Code and the regulations thereunder. The Performance Objectives for any Performance Period shall be based on one or more of the following measures, as determined by the Committee in writing within ninety (90) days of the commencement of the Performance Period:

1. The achievement by the Company or business unit of specific levels of Return on Invested Capital ("ROIC"). ROIC for the Company or business unit means its results of operations divided by its capital.

2. The generation by the Company or business unit of free cash flow.

3. The creation by the Company or business unit of specific levels of Economic Value Added ("EVA"). EVA for the Company or business unit means its ROIC less its cost of capital multiplied by its capital.

4. The creation by the Company of specific levels of Total Shareholder Return ("TSR"). TSR for the Company means total return to shareholders as measured by stock price appreciation plus dividends.

u. "Performance Period": The term Performance Period means a fixed period of time, established by the Committee, during which a Participant performs service for the Company and during which Performance Objectives may be achieved.

v. "Plan": The term Plan means this CSX Corporation 1987 Long-Term Performance Stock Plan as amended or restated from time to time.

w. "Retirement": The term Retirement means a termination of employment after age 55 with eligibility to begin immediately receiving retirement benefits under the Company's defined benefit pension plan.

x. "Separation From Employment": The term Separation From Employment means an employee's separation from employment with the Company or a Subsidiary as a result of



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Retirement, death, Disability, or termination of employment (voluntarily or involuntarily). A Participant in receipt of periodic severance payments shall be considered separated from employment on the day preceding the day such severance payments commenced.

y. "Subsidiary": The term Subsidiary means, with respect to any corporation, or corporation more than 50% of whose voting shares are owned directly or indirectly by the Company.

z. "Trust": The term Trust means the CSX Corporation and Affiliated Companies Executives' Stock Trust or such other trust or trusts which substantially conforms to the terms of the Internal Revenue Service model trust as described in Revenue Procedure 92-64, 1992-2 C.B. 422.

3. NUMBER OF SHARES.

Subject to the provisions of Section 19 of this Plan, the maximum number of shares which may be issued pursuant to the Incentives shall be 21,000,000 shares of the Company's common stock, par value $1.00 per share. The maximum number of such shares that may be issued pursuant to any type of Incentive shall be 17,500,000 shares. The remaining 3,500,000 shares may be issued only pursuant to grants of Incentive Stock Options, Non-Qualified Stock Options, and Stock Appreciation Rights. Such shares shall be authorized and unissued shares of the Company's common stock. Subject to the provisions of Section 19, if any Incentive granted under the Plan shall terminate or expire for any reason without having been exercised in full, the unissued shares subject thereto shall again be available for the purposes of the Plan. Similarly, shares which have been issued, but which the Company retains or which the Participant tenders to the Company in satisfaction of income and payroll tax withholding obligations or in satisfaction of the exercise price of any option shall remain authorized and shall again be available for the purposes of the Plan, provided, however, that any such previously issued shares shall not be the subject of any grant under the Plan to any officer of the Company who, at the time of such grant, is subject to the short-swing trading provisions of Section 16 of the Exchange Act.

4. ADMINISTRATION.

a. Prior to a Change of Control, the Plan shall be administered by the Committee. The Committee shall consist of three or more members of the Board of Directors. No member of the Committee shall be eligible to receive any Incentives under the Plan while a member of the Committee. A majority of the Committee shall constitute a quorum. The Committee shall recommend to the Board individuals to receive Incentives, including the type and amount thereof, unless the Board shall have delegated to the Committee the authority and power to select persons to whom Incentives may be granted, to establish the type and amount thereof, and to make such grants.

Subject to the express provisions of the Plan, the Committee shall have authority to construe any agreements entered into with any person in respect of any Incentive or Incentives, to prescribe, amend and rescind rules and regulations relating to the Plan, to determine the terms and provisions of any such agreements and to make all other determinations necessary or advisable for administering the Plan. The Committee may correct any defect or supply any omission or reconcile any inconsistency in the Plan or in any agreement under the Plan in the manner and to the extent it shall deem expedient to carry it into effect, and it shall be the sole and final judge of such expedience. Any determination of the Committee under the Plan may be made without notice of meeting of the Committee by a writing signed by a majority of the Committee members. The determinations of the Committee on the matters referred to in this Section 4 shall be conclusive.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

b. Following a Change of Control, the Benefits Trust Committee may remove and/or replace the Committee as the Plan Administrator. Additionally, following a Change of Control, any and all final benefit determinations for Participants, their beneficiaries, heirs and assigns and decisions regarding benefit claims under this Plan shall rest with the Benefits Trust Committee or its delegate in its sole judgment and absolute discretion.

5. ELIGIBILITY AND PARTICIPATION.

Incentives may be granted only to officers and key employees of the Company and of its Subsidiaries at the time of such grant as the Committee in its sole discretion may designate from time to time to receive an Incentive or Incentives. An officer or key employee who is so designated shall become a Participant. A director of the Company or of a Subsidiary who is not also an officer or employee of the Company or of such Subsidiary will not be eligible to receive an Incentive.

The Committee's designation of an individual to receive an Incentive at any time shall not require the Committee to designate such person to receive an Incentive at any other time. The Committee shall consider such factors as it deems pertinent in selecting Participants and in determining the type and amount of their respective Incentives, including without limitation (a) the financial condition of the Company, (b) anticipated financial results for the current or future years, including return on invested capital, (c) the contribution by the Participant to the profitability and development of the Company through achievement of established strategic objectives, and (d) other compensation provided to Participants.

6. INCENTIVES.

Incentives may be granted in any one or a combination of (a) Incentive Stock Options; (b) Non-Qualified Stock Options; (c) Stock Appreciation Rights; (d) Performance Shares; (e) Performance Units; (f) Restricted Stock; and (g) Incentive Compensation Program Shares, all as described below and pursuant to the terms set forth in Sections 3 and 7-12 hereof. With respect to Items (a)-(c), the maximum number of shares of common stock of the Company with respect to which these Incentives may be granted in any Plan Year to any Participant will be 750,000. With respect to Items (d)-(f), the maximum number of shares of common stock of the Company with respect to which these Incentives may be granted during any Plan Year to any Participant will be 150,000.

7. INCENTIVE STOCK OPTIONS.

Incentive Stock Options (ISOs) will consist of options to purchase shares of the Company's common stock at purchase prices not less than 100 percent of the Fair Market Value of such common stock on the date of grant. ISOs will be exercisable upon the date or dates specified in an option agreement entered into with a Participant but not earlier than one year after the date of grant of the options and not later than 10 years after the date of grant of the options; provided, however, that whether or not the one-year holding requirement is satisfied, any Exercisability Requirements must be satisfied. For options granted after December 31, 1986, the aggregate Fair Market Value, determined at the date of grant, of shares for which ISOs are exercisable for the first time by a Participant during any calendar year shall not exceed $100,000.

Notwithstanding the provisions of Section 5 of this Plan, no individual will be eligible for or granted an ISO if that individual owns stock of the Company possessing more than 10 percent of the total combined voting power of all classes of the stock of the Company or its Subsidiaries.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Any Participant who is an option holder may exercise his option to purchase stock in whole or in part upon the date or dates specified in the option agreement offered to him. In no case may an option be exercised for a fraction of a share. Except as set forth in this Section 7, Section 12 and in Sections 14 through 16, no option holder may exercise an option unless at the time of exercise he has been in the continuous employ of the Company or one of its Subsidiaries since the grant of such option. An option holder under this Plan shall have no rights as a shareholder with respect to any shares subject to such option until such shares have been issued.

For purposes of this Section 7, written notice of exercise must be received by the Corporate Secretary of the Company not less than one year nor more than 10 years after the option is granted. Such notice must state the number of shares being exercised and must be accompanied by payment of the full purchase price of such shares. Payment for the shares for which an option is exercised may be made by (1) a personal check or money order payable to CSX Corporation; (2) a tender by the employee (in accordance with procedures established by the Company) of shares of the Company's common stock having a Fair Market Value on the date of tender equaling the purchase price of the shares for which the option is being exercised; or (3) any combination of (1) and (2).

8. NON-QUALIFIED STOCK OPTIONS.

NQSOs will be exercisable upon the date or dates specified in an option agreement entered into with a Participant but not earlier than one year after the date of grant of the options and not later than 10 years after the date of grant of the options (15 years if the NQSO grant was a 15-year grant); provided, however, that whether or not the one-year holding requirement is satisfied, any Exercisability Requirements must be satisfied.

Any Participant may exercise an option to purchase stock upon the date or dates specified in the option agreement offered to him. In no case may an option be exercised for a fraction of a share. Except as set forth in this Section 7, Section 12 and in Sections 14 through 16, no option holder may exercise an option unless at the time of exercise he has been in the continuous employ of the Company or one of its Subsidiaries since the grant of his option. An option holder under this Plan shall have no rights as a shareholder with respect to any shares subject to such option until such shares have been issued.

For purposes of this Section 8, written notice of exercise must be received by the Corporate Secretary of the Company, not earlier than one year nor later than 10 years after the option is granted; provided, however, effective for grants of options after December 31, 1998, the term of the option may be 15 years instead of 10 years. Such notice must state the number of shares being exercised and must be accompanied by payment of the full purchase price of such shares. Payment for the shares for which an option is exercised may be made by (1) a personal check or money order payable to CSX Corporation; (2) a tender by the employee (in accordance with procedures established by the Company) of shares of the Company's common stock having a Fair Market Value on the date of tender equaling the purchase price of the shares for which the option is being exercised; (3) the delivery of a properly executed exercise notice, together with irrevocable instructions to a broker to promptly deliver to the Company either sale proceeds of shares sold to pay the purchase price or the amount loaned by the broker to pay the purchase price; or (4) any combination of (1), (2) and (3).

Non-Qualified Stock Options (NQSOs) will consist of options to purchase shares of the Company's common stock at purchase prices not less than 100 percent of the Fair Market Value of such common stock on the date of grant; provided, further, effective for grants of options after December 31, 1998, the term of the option may be 15 years instead of 10 years.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

9. Stock Appreciation Rights.

Any option granted under the Plan may include a stock appreciation right (SAR) by which the participant may surrender to the Company all or a portion of the option to the extent exercisable at the time of surrender and receive in exchange a payment equal to the excess of the Fair Market Value of the shares covered by the option portion surrendered over the aggregate option price of such shares. Such payment shall be made in shares of Company common stock, in cash, or partly in shares and partly in cash, as the Committee in its sole discretion shall determine, but in no event shall the number of shares of common stock delivered upon a surrender exceed the number the option holder could then purchase upon exercise of the option. Such rights may be granted by the Committee concurrently with the option or thereafter by amendment upon such terms and conditions as the Committee may determine.

The Committee may also grant, in addition to, or in lieu of options to purchase stock, SARs which will entitle the Participant to receive a payment upon surrender of that right, or portion of that right in accordance with the provisions of the Plan, equaling the difference between the Fair Market Value of a stated number of shares of Company common stock on the date of the grant and the Fair Market Value of a comparable number of shares of Company common stock on the day of surrender, adjusted for stock dividends declared between the time of the grant of the SAR and its surrender. The Committee shall have the right to limit the amount of appreciation with respect to any or all of the SARs granted. Payment made upon the exercise of the SARs may be in cash or shares of Company common stock, or partly in shares and partly in cash, as the Committee in its sole discretion shall determine.

For purposes of this Section 9, written notice must be received by the Corporate Secretary of the Company not earlier than one year nor later than 10 years after the SAR is granted. Such notice must state the number of SARs being surrendered and the method of settlement desired within the guidelines established from time to time by the Committee. The SAR holder will receive settlement based on the Fair Market Value on the day the written request is received by the Corporate Secretary of the Company.

In certain situations as determined by the Committee, for purposes of this Section 9, written notice must be received by the Corporate Secretary of the Company between the third and twelfth business days after the public release of the Company's quarterly earnings report, or between such other, different period as may hereinafter be established by the Securities and Exchange Commission. For such settlements, a Participant subject to a restricted exercise period shall receive settlement based on the highest Fair Market Value during the period described in the foregoing sentence.

The Committee may not grant an SAR or other rights under this Section 9 in connection with an incentive stock option if such grant would cause the option or the Plan not to qualify under Section 422 of the Code or if it is prohibited by such section or Treasury regulations issued thereunder. Any grant of an SAR or other rights which would disqualify either the option as an ISO or the Plan, or which is prohibited by Section 422 of the Code or Treasury regulations issued thereunder, is and will be considered as void and vesting no rights in the grantee. It is a condition for eligibility for the benefits of the option and of the Plan that the Participant agree that in the event an SAR or other right granted should be determined to be void as provided by the foregoing, the Participant has no right or cause of action against the Company.

10. Performance Unit Awards and Performance Share Awards.

The Committee may grant Performance Unit Awards (PUAs) and Performance Share Awards (PSAs) under which payment shall be made in shares of the Company's common stock, in cash, or partly in shares and partly in cash, as the Committee in its sole discretion shall determine. PUAs and PSAs may be awarded to individual Participants or to a Functional Group. Awards to a Functional Group shall be subject



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

to distribution by the Chief Executive Officer of the Company, or by his designees, to individuals within such group. At the time of the grant, the Committee shall establish in writing and communicate to Participants, and to members of a Functional Group who can be identified, Performance Objectives to be achieved during the Performance Period. Awards of PUAs and PSAs may be determined by the average level of attainment of Performance Objectives over multiple Performance Periods.

Prior to the payment of PUAs and PSAs, the Committee shall determine the extent to which Performance Objectives have been attained during the Performance Period or Performance Periods in order to determine the level of payment to be made, if any, and shall record such results in the minutes of the meeting of the Committee. In no instance will payment be made if the Performance Objectives are not attained.

Payment, if any, shall be made in a lump sum or in installments, in cash or shares of Company common stock, as determined by the Committee, commencing as promptly as feasible following the end of the Performance Period, except that (a) payments to be made in cash may be deferred subject to such terms and conditions as may be prescribed by the Company, and (b) payments to be made in Company common stock may be deferred pursuant to an election filed on forms prescribed and provided by and filed with the Company. A Participant may elect annually to defer to a date certain, or the occurrence of an event, as provided in the form, the receipt of all or any part of shares of Company common stock he may subsequently become entitled to receive. On forms provided by and filed with the Company, the Participant shall also specify whether, when the deferral period expires or when the restrictions below lapse, payment will be in a lump sum or installments over a period not exceeding twenty (20) years. The Committee shall prescribe the time periods during which the election must be filed in order to be effective. Elections to defer, once effective, are irrevocable. Changes regarding the date of payment, the period over which payments are to be made and the method of payment are subject to substantial penalties. However, a One-Time Change of Distribution Election may be made to change the timing or the form of payment without penalty. Any such election which changes a distribution election on "termination of employment" or "the earlier of termination or a specified age" shall be void in the event the Participant's employment terminates within twelve (12) months following the date of the election.

If a Participant has made an effective election to defer the payment of shares of common stock, the Company shall, within a reasonable period of time after the deferral election is made, transfer shares of common stock or other assets equal in value to the number of shares as to which payment is deferred to the Trust to secure the Company's obligation to pay shares of common stock to the Participant in the future. However, in any event, the Company shall make any previously deferred payment of shares to the Participant upon:

a. the death of the Participant;

b. the Disability of the Participant;

c. the Participant's termination of employment with the Company or a subsidiary of the Company, subject to the Participant's deferral election;

d. A Divisive Transaction, subject to the Participant's deferral election; or

e. a Change in Control.

If a former Participant who has not received distribution of his entire deferred payment under this Section is reemployed and again becomes a Participant in the Plan, he may suspend payment of any remaining amounts deferred, by notifying the Company in writing, and make a new deferral election, without penalty, with respect to those amounts and new amounts deferred so long as such change does not accelerate the timing of any payment to the Participant; provided, however, distributions shall



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

continue if the commencement of distribution was because the Participant chose a specific age for the commencement of benefits and that age has been attained.

Notwithstanding a Participant's election to defer the payment of shares of common stock pursuant to this Section 10, the Company shall make cash payments to Participants following each common stock dividend payment date equal to the dividends payable on the number of shares of Company common stock credited to the Participant's account as of the dividend record date (including shares for which an election to defer has been made and any reinvested dividends thereon). A Participant may elect to defer receipt of the cash payments pursuant to election forms prescribed and provided by and filed with the Company. Such deferred cash payments shall be credited to the Participant's account and reinvested in shares of Company common stock as of the dividend payment date. An election to defer, once effective, shall be irrevocable for the calendar year, and shall continue in effect with respect to subsequent calendar years until changed by a timely filed new election.

Any dividends paid on shares of Company common stock held in the Trust shall be paid to the Trust and shall be reinvested in shares of Company common stock, or other assets equal in value, to secure the Company's obligation to pay shares of common stock to Participants in the future.

11. RESTRICTED STOCK.

A Restricted Stock Award (RSA) shall entitle the Participant, subject to his continued employment during the restriction period determined by the Committee and his complete satisfaction of any other conditions, restrictions and limitations imposed in accordance with the Plan, to the unconditional ownership of the shares of the Company's common stock covered by the grant without payment therefore.

The Committee may grant RSAs at any time or from time to time to a Participant selected by the Committee in its sole discretion. The Committee shall establish at the time of grant of each RSA a Performance Period and Performance Objectives to be achieved during the Performance Period.

At the time of grant, the Performance Period and Performance Objectives shall be set forth either in agreements or in guidelines communicated to the Participant in such form consistent with this Plan as the Committee shall approve from time to time.

Following the conclusion of each Performance Period and prior to payment, the Committee shall determine the extent to which Performance Objectives have been attained or a degree of achievement between maximum and minimum Performance Objectives during the Performance Period in order to determine the level of payment to be made, if any, and shall record such results in the minutes of the meeting of the Committee. In no instance will payment be made if the Performance Objectives are not attained.

At the time that an RSA is granted, the Committee shall establish in the written agreement a restriction period applicable to all shares covered by such grant. Subject to the provisions of the next following paragraph, the Participant shall have all of the rights of a stockholder of record with respect to the shares covered by the grant to receive dividends or other distributions in respect of such shares (provided, however, that any shares of stock of the Company distributed with respect to such shares shall be subject to all of the restrictions applicable to such shares) and to vote such shares on all matters submitted to the stockholders of the Company, but such shares shall not be sold, exchanged, pledged, hypothecated or otherwise disposed of at any time prior to the expiration of the restriction period, including by operation of law, and any purported disposition, including by operation of law, shall result in automatic forfeiture of any such shares.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Except as hereinafter provided, if, during the restriction period applicable to such grant, a Separation From Employment of a Participant occurs for any reason other than death, Disability or Retirement, all shares covered by such grant shall be forfeited to the Company automatically. If the Participant's Separation From Employment is because of Retirement or death, or in the event of Disability, the Participant or his successor in interest shall be entitled to unconditional ownership of a fraction of the total number of shares covered by such grant of which the numerator is the number of whole calendar months in the period commencing with the first whole calendar month following the date of grant and ending with the whole calendar month including the date of death, Disability or Retirement, and of which the denominator is the number of whole calendar months in the applicable restriction period. Any fractional shares shall be disregarded.

The Committee may, at the time of granting any RSA, impose such other conditions, restrictions or limitations upon the rights of the Participants during the restriction period or upon the Participant's right to acquire unconditional ownership of shares as the Committee may, in its discretion, determine and set forth in the written agreement.

At the time of grant of an RSA, the Company shall cause to be issued and registered in the name of the Participant a stock certificate representing the full number of shares covered thereby, which certificate shall bear an appropriate legend referring to the terms, conditions and restrictions applicable to such grant, and the grantee shall execute and deliver to the Company a stock power endorsed in blank covering such shares. Such stock certificate and stock power shall be held by the Company or its designee until the expiration of the restriction period, at which time the same shall be delivered to the Participant or his designee if all of the conditions and restrictions of the grant have been satisfied, or until the forfeiture of such shares, at which time the same shall be cancelled and the shares shall be returned to the status of unissued shares.

12. INCENTIVE COMPENSATION PROGRAM SHARES.

A Participant who receives base compensation in excess of a dollar level to be determined by the Committee and who is eligible to receive an award under the Company's Incentive Compensation Program ("ICP") may elect, by filing the prescribed election form with the Company in accordance with rules established by the Committee, to receive all or part of his annual ICP award in shares of the Company's common stock, rather than cash; provided, however, the Participant must agree that his receipt of the stock will be deferred until his retirement or termination of employment, with a minimum deferral period of three (3) years. Elections to defer are irrevocable. A Participant who makes such election shall, at the time that the stock is deferred, receive an additional award of stock equal to a percentage, established by the Committee from time to time, of the amount that he elected to have deferred, but not to exceed 25% (the "Stock Premium"). The Participant's election to defer shall also apply to the Stock Premium.

If a Participant made an effective election to defer the payment of shares of common stock and receive the Stock Premium, the Company shall, within a reasonable period of time after the deferral election is made, transfer shares of common stock or other assets equal in value to the number of shares as to which payment is deferred to the Trust to secure the Company's obligation to pay shares of common stock to the Participant in the future. However, in any event, the Company shall make any previously deferred payment of shares to the Participant upon:

a. the death of the Participant;

b. the Disability of the Participant;



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

c. the Participant's termination of employment with the Company or a subsidiary of the Company, subject to the Participant's deferral election and the three (3) year deferral requirement;

d. a Divisive Transaction, subject to the Participant's deferral election; or

e. a Change in Control.

Notwithstanding any provisions of this Plan to the contrary, upon the occurrence of a Divisive Transaction, the three (3) year holding requirement of the stock premium for deferred ICP shares shall be deemed satisfied.

Notwithstanding a Participant's election to defer the payment of shares of common stock pursuant to this Section 12, the Company shall make cash payments to Participants following each common stock dividend payment date equal to the dividends payable on the number of shares of Company common stock credited to the Participant's account as of the dividend record date (including shares for which an election to defer has been made and any reinvested dividends thereon). A Participant may elect to defer receipt of the cash payments pursuant to election forms prescribed and provided by and filed with the Company. Such deferred cash payments shall be credited to the Participant's account and reinvested in shares of Company common stock as of the dividend payment date. An election to defer, once effective, shall be irrevocable for the calendar year, and shall continue in effect with respect to subsequent calendar years until changed by a timely filed new election.

13. CONTRIBUTIONS TO THE TRUST.

a. The Company shall make contributions to the Trust to secure a source of future payments with respect to Participant's deferral elections pursuant to Sections 10 and 12. The Trustee shall be responsible only for contributions actually received by it hereunder and the Trustee shall have no duty or responsibility with respect to the timing, amounts and sufficiency of the contributions made or to be made by the Company hereunder.

b. The Company may make contributions to the Trust in Common Stock.

c. A separate bookkeeping account (an "Account") shall be established by the Trustee for each Participant covered by the Trust pursuant to the Plan, as directed in writing by the Company. A Participant may have more than one Account. Each account is intended to represent the amount of a Participant's deferred and unpaid benefit under the related provisions of the Plan. The value of a Participant's Account at any time will equal the fair market value of the number of shares of Common Stock owed to a Participant under the affected provisions of this Plan at such time. The number of shares owed at any time will equal the number of shares of Common Stock which were originally deferred by the Participant (including any applicable Stock Premium), plus, the number of Common Stock Shares which would have been acquired if dividends subsequently declared by the Company had been paid with respect to such shares and reinvested in Common Stock. "Account" may also mean individual sub-accounts which have been or may be established under this Plan from time to time.

d. Within sixty days following the close of each calendar year, or more frequently or at such other time as may be required by the Trust Agreement, the Trustee shall provide the Company and each Participant with a written statement of the Account of each Participant.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

14. SEPARATION FROM EMPLOYMENT AND DIVISIVE TRANSACTIONS.

If the Participant's Separation From Employment is because of Disability or death, the right of the Participant or his successor in interest to exercise an ISO. NQSO or SAR shall terminate not later than five years after the date of such Disability or death, but in no event later than 10 years from the date of grant (15 years if the NQSO grant was a 15-year grant); provided, however, that if such Participant is eligible to retire with the ability to begin immediately receiving retirement benefits under the Company's pension plan, his or his successor in interest's right to exercise any ISOs, NQSOs or SARs shall be determined as if his Separation From Employment was because of Retirement.

If the Participant's Separation From Employment is because of his Retirement, the right of the Participant or his successor in interest to exercise an ISO, NQSO or SAR shall terminate not later than 10 years from the date of grant (15 years if the NQSO grant was a 15-year grant).

Unless the Committee deems it necessary in individual cases (except with respect to Covered Employees) to extend a Participant's exercise period, if a Participant's Separation From Employment is for any reason other than Retirement, Disability or death, the right of the Participant to exercise an ISO, NQSO or SAR shall terminate not later than one year from the date of Separation From Employment, but in no event later than 10 years after the date of grant (15 years if the NQSO grant was a 15-year grant). For any ISO, NQSO or SAR granted after December 31, 1998, the Participant must exercise within 30 days instead of one year.

At the time of his Separation From Employment for any reason other than Cause, a Participant shall vest in a portion of any Incentives granted under Sections 7 (ISOs), 8 (NQSOs) or 9 (SARs) that he has held for less than one year from the date of the grant. The portion of such Incentives in which the Participants shall vest shall be determined by multiplying all shares subject to such Incentives by a fraction, the numerator of which shall be the number of Completed Months of employment following the date of grant and the denominator of which shall be twelve.

A Participant who vests in any Incentives under the preceding paragraph may not exercise such Incentives prior to the satisfaction of the one-year holding requirement and the Exercisability Requirements pertaining to such Incentives. Any Incentives vested under the preceding paragraph must be exercised within one year from the date of the Participant's Separation From Employment.

If the Participant's employer is a Subsidiary involved in a Divisive Transaction or if the Participant's employment is terminated with the consent of the Company (as a result of a business transaction or a reduction in force or any other circumstances approved by the Committee), the right of the Participant or his successor in interest to exercise an ISO, NQSO or SAR shall terminate not less than three years after the date of the closing of such Divisive Transaction or after the date the Participant's employment is terminated with the consent of the Company, but in no event later than 10 years from the date of grant (15 years if the NQSO grant was a 15-year grant); provided, however, that if such Participant is eligible to retire with the ability to begin immediately receiving retirement benefits under the Company's pension plan, his or his successor in interest's right to exercise any ISO, NQSO' or SAR' shall be determined as if he had retired. Notwithstanding anything to the contrary in this paragraph, a Participant may not exercise such Incentives prior to satisfaction of the one year holding requirement and the Exercisability Requirements pertaining to such Incentives. In the event of a Divisive Transaction, employees of Sea-Land Service, Inc., hired by that corporation prior to January 1, 1986, shall be deemed eligible to retire upon termination of employment after age 50 with 20 years of service and eligibility to begin immediately receiving retirement benefits under the Company's defined benefit pension plan.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

As to PUAs or PSAs, in the event of a Participant's Separation from Employment because of his Retirement, Disability or death prior to the end of the applicable Performance Period, or if the Participant's employer is a Subsidiary involved in a Divisive Transaction prior to the end of the applicable Performance Period, payment, if any, to the extent earned under the applicable Performance Objectives and awarded by the Committee, shall be payable at the end of the Performance Period in proportion to the active service of the Participant during the Performance Period, as determined by the Committee. If the Separation From Employment prior to the end of the Performance Period is for any other reason, the Participant's participation in Section 10 of the Plan shall immediately terminate, his agreement shall become void and the PUA or PSA shall be canceled.

Notwithstanding anything to the contrary in this Plan, if a Participant or former Participant (a) becomes the owner, director or employee of a competitor of the Company or its subsidiaries, (b) has his employment terminated by the Company or one of its subsidiaries on account of actions by the Participant which are detrimental to the interests of the Company or its subsidiaries, or (c) engages in conduct subsequent to the termination of his employment with the Company or its subsidiaries which the Committee determines to be detrimental to the interests of the Company or its subsidiaries then the Committee may, in its sole discretion, pay the Participant or former Participant a single sum payment equal to the amount of his unpaid benefits which were awarded and deferred under Sections 10 or 12 of the Plan; provided, however, if the deferral has been for less than three (3) years under Section 12, the Participant shall not be eligible to receive the Stock Premium. The single sum payment shall be made as soon as practicable following the date the Participant or former Participant becomes an owner, director or employee of a competitor, his termination of employment or the Committee's determination of detrimental conduct, as the case may be, and shall be in lieu of all other benefits which may be payable to the Participant or former Participant under this Plan.

Effective for Incentives granted after December 31, 1998, notwithstanding anything to the contrary in this Plan, if a Participant or former Participant (a) becomes associated with, recruits or solicits customers or other employees of the Company or its Subsidiaries for, is employed by, renders services to, or owns any interest in (other than any nonsubstantial interest, as determined by the Committee) any business that is in competition with the Company or one of its subsidiaries, (b) has his employment terminated by the Company or one of its subsidiaries for Cause or on account of actions, by the Participant which are detrimental to the interests of the Company or its subsidiaries, or (c) engages in, or has engaged in, conduct at the time of or subsequent to the termination of his employment with the Company or its subsidiaries which the Committee determines to be detrimental to the interests of the Company or its subsidiaries then the Committee may, in its sole discretion, except following a Change of Control, cancel all outstanding Incentives of the Participant, including immediately terminating any Options held by the Participant, regardless of whether then exercisable.

15. INCENTIVES NON-ASSIGNABLE AND NON-TRANSFERABLE.

Any Incentive granted under this Plan shall be non-assignable and non-transferable other than as provided in Section 16 and shall be exercisable (including any action of surrender and exercise of rights under Section 9) during the Participant's lifetime only by the Participant who is the holder of the Incentive or by his guardian or legal representative.

16. DEATH OF OPTION HOLDER.

In the event of the death of a Participant who is an Incentive holder under the Plan while employed by the Company or one of its subsidiaries or prior to exercise of all rights under an Incentive, the Incentive theretofore granted may be exercised (including any action of surrender and exercise of rights under



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Section 9) by the Participant's Beneficiary or, if no Beneficiary is designated, by the executor or executrix of the Participant's estate or by the person or persons to whom rights under the Incentive shall pass by will or the laws of descent and distribution in accordance with the provisions of the Plan and of the option and to the same extent as though the Participant were then living.

17. NO RIGHT TO CONTINUED EMPLOYMENT.

Notwithstanding any other provisions of this Plan to the contrary, it is a condition for eligibility for any benefit or right under this Plan that each individual agrees that his or her designation as a Participant and any grant made under the Plan may be rescinded and determined to be void and forfeited entirely in the absolute and sole discretion of the Committee in the event that such individual is discharged for Cause.

Incentives granted under the Plan shall not be affected by any change of employment so long as the Incentive holder has not suffered a Separation From Employment. A leave of absence granted by the Company or one of its subsidiaries shall not constitute Separation From Employment unless so determined by the Committee. Nothing in the Plan or in any Incentive granted pursuant to the Plan shall confer on any individual any right to continue in the employ of the Company or one of its subsidiaries or interfere in any way with the right of the Company or such subsidiary to terminate employment at any time.

18. FUNDING METHOD.

To the extent reflected by resolutions of the applicable boards of directors, obligations for benefits under this Plan shall be joint and several.

19. ADJUSTMENT OF SHARES.

a. In the event of any change (through recapitalization, merger, consolidation, stock dividend, split-up, combination or exchanges of shares or otherwise) in the character or amount of the Company's common stock prior to exercise of any Incentive granted under this Plan, the Incentives, to the extent not exercised, shall entitle the Participant who is the holder to such number and kind of securities as he would have been entitled to had he actually owned the stock subject to the Incentives at the time of the occurrence of such change. If any such event should occur, prior to exercise of an Incentive granted hereunder, which shall increase or decrease the amount of common stock outstanding and which the Committee, in its sole discretion, shall determine equitably requires an adjustment in the number of shares which the Incentive holder should be permitted to acquire, such adjustment as the Committee shall determine may be made, and when so made shall be effective and binding for all purposes of the Plan.

b. Incentives may also be granted having terms and provisions which vary from those specified in the Plan provided that any Incentives granted pursuant to this paragraph are granted in substitution for, or in connection with the assumption of, then existing Incentives granted by another corporation and assumed or otherwise agreed to be provided for by the Company pursuant to or by reason of a transaction involving a corporate merger, consolidation, acquisition of property or stock, separation, reorganization or liquidation to which the Company or a subsidiary corporation is a party.

c. The obligations of the Company or any of its affiliated corporations and the benefit due any Participant, surviving spouse or beneficiary hereunder shall be reduced by any amount received in regard thereto under the CSX Corporation and Affiliated Companies Executives' Stock Trust or any similar trust or trusts or other vehicle.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

d. Notwithstanding the preceding, following a Change of Control, the authority to delay payment of a Participant's benefits rests solely with the Benefits Trust Committee

20. LOANS TO OPTION HOLDERS.

The Committee may adopt programs and procedures pursuant to which the Company may lend money to any Participant who is an Incentive holder for the purpose of assisting the Participant to acquire or carry shares of common stock issued upon the exercise of Incentives granted under the Plan.

21. TERMINATION AND AMENDMENT OF PLAN.

a. Unless the Plan shall have been previously terminated as hereinafter provided, the Plan shall terminate on April 27, 2000, and no Incentives under it shall be granted thereafter. The Board of Directors, without further approval of the company's shareholders, may at any time prior to that date terminate the Plan, and thereafter no further Incentives may be granted under the Plan. However, Incentives previously granted thereunder may continue to be exercised in accordance with the terms thereof. Following a Change of Control, all amendments to this Plan are subject to the approval of the Benefits Trust Committee.

b. Prior to a Change of Control, the Board of Directors, without further approval of the shareholders, may, on the recommendation of the Compensation Committee of the Board, amend the Plan from time to time in such respects as the Board may deem advisable; provided, however, that no amendment shall become effective without prior approval of the shareholders which would: (i) increase (except in accordance with Section 19) the maximum number of shares for which Incentives may be granted under the Plan; (ii) reduce (except in accordance with Section 19) the Incentive price below the Fair Market Value of the Company's common stock on the date of grant of the Incentive; (iii) extend the term of the Plan beyond April 27, 2000; (iv) change the standards of eligibility prescribed by Section 5; or (v) increase the maximum awards identified in Sections 7, 8, 9, 10 and 11. Following a Change of Control, all amendments to this Plan are subject to the approval of the Benefits Trust Committee.

c. No termination or amendment of the Plan may, without the consent of a Participant who is a holder of an Incentive then existing, terminate his or her Incentive or materially and adversely affect his or her rights under the Incentive.

22. CHANGE IN CONTROL.

a. Notwithstanding any provision of this Plan to the contrary, upon the occurrence of a Change in Control as set forth in subsection b., below: (i) all stock options then outstanding under this Plan shall become fully exercisable as of the date of the Change in Control, whether or not then otherwise exercisable; (ii) all SARs which have been outstanding for at least six months shall become fully exercisable as of the date of the Change in Control, whether or not then otherwise exercisable; (iii) all terms and conditions of RSAs then outstanding shall be deemed satisfied as of the date of the Change in Control; (iv) all PUAs and PSAs then outstanding shall be deemed to have been fully earned and to be immediately payable in cash as of the date of the Change of Control, however, Participants may defer those cash payments, as stock, into the Trust, consistent with the deferral provisions of Section 10; and (v) the three (3) year holding requirement of the Stock Premium for deferred ICP shall be deemed satisfied.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

b. A "Change in Control" shall mean any of the following:

(i) Stock Acquisition. The acquisition, by any individual, entity or group [within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")] (a "Person") of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 20% or more of either (A) the then outstanding shares of common stock of the Company (the "Outstanding Company Common Stock"), or (B) the combined voting power of the then outstanding voting securities of the Company entitled to vote generally in the election of directors (the "Outstanding Company Voting Securities"); provided, however, that for purposes of this subsection (i), the following acquisitions shall not constitute a Change of Control: (A) any acquisition directly from the Company; (B) any acquisition by the Company; (C) any acquisition by any employee benefit plan (or related trust) sponsored or maintained by the Company or any corporation controlled by the Company; or (D)any acquisition by any corporation pursuant to a transaction which complies with clauses (A), (B) and (C) of subsection (iii) of this Section 22(b); or

(ii) Board Composition. Individuals who, as of the date hereof, constitute the Board of Directors (the "Incumbent Board") cease for any reason to constitute at least a majority of the Board of Directors; provided, however, that any individual becoming a director subsequent to the date hereof whose election or nomination for election by the Company's shareholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board shall be considered as though such individual were a member of the Incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office occurs as a result of an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board of Directors; or

(iii) Business Combination. Approval by the shareholders of the Company of a reorganization, merger, consolidation or sale or other disposition of all or substantially all of the assets of the Company or its principal subsidiary that is not subject, as a matter of law or contract, to approval by the Interstate Commerce Commission or any successor agency or regulatory body having jurisdiction over such transactions (the "Agency") (a "Business Combination"), in each case, unless, following such Business Combination:

(A) all or substantially all of the individuals and entities who were the beneficial owners, respectively, of the Outstanding Company Common Stock and Outstanding Company Voting Securities immediately prior to such Business Combination beneficially own, directly or indirectly, more than 50% of, respectively, the then outstanding shares of common stock and the combined voting power of the then outstanding voting securities entitled to vote generally in the election of directors, as the case may be, of the corporation resulting from such Business Combination (including, without limitation, a corporation which as a result of such transaction owns the Company or its principal subsidiary or all or substantially all of the assets of the Company or its principal subsidiary either directly or through one or more subsidiaries) in substantially the same proportions as



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

their ownership, immediately prior to such Business Combination of the Outstanding Company Common Stock and Outstanding Company Voting Securities, as the case may be;

(B) no Person (excluding any corporation resulting from such Business Combination or any employee benefit plan (or related trust) of the Company or such corporation resulting from such Business Combination) beneficially owns, directly or indirectly, 20% or more of, respectively, the then outstanding shares of common stock of the corporation resulting from such Business Combination or the combined voting power of the then outstanding voting securities of such corporation except to the extent that such ownership existed prior to the Business Combination; and

(C) at least a majority of the members of the board of directors resulting from such Business Combination were members of the Incumbent Board at the time of the execution of the initial agreement, or of the action of the Board of Directors, providing for such Business Combination; or

(iv) Regulated Business Combination. Approval by the shareholders of the Company of a Business Combination that is subject, as a matter of law or contract, to approval by the Agency (a "Regulated Business Combination") unless such Business Combination complies with clauses (A), (B) and (C) of subsection (iii) of this Section 22(b); or

(v) Liquidation or Dissolution. Approval by the shareholders of the Company of a complete liquidation or dissolution of the Company or its principal subsidiary.

c. Each Participant who has elected to defer the payment of PSAs pursuant to Section 10 or an ICP award pursuant to Section 12, may elect in a time and manner determined by the Committee, but in no event later than December 31, 1996 or the occurrence of a Change in Control, if earlier, to have amounts and benefits currently deferred, and to be deferred, under the Plan determined and payable under the terms of the Plan as if a Change in Control had not occurred. New Participants in the Plan may elect in a time and manner determined by the Committee, but in no event later than ninety (90) days after becoming a Participant, to have amounts and benefits currently deferred, and to be deferred, under the Plan determined and payable under the terms of the Plan as if a Change in Control had not occurred. A Participant who has made an election, as set forth in the two preceding sentences, may at any time and from time to time, change that election; provided, however, a change of election that is made within one year of a Change in Control shall be invalid.

d. Upon a Change of Control, the Company or Subsidiary shall, as soon as possible, but in no event more than seven (7) days following the Change of Control make an irrevocable contribution to the Trust in an amount that is sufficient to pay each Participant or beneficiary of this Plan the benefits to which Participants of this Plan or their beneficiaries would be entitled based on elections under Sections 10 and 12 (including any applicable Stock Premium), and for which the Company is liable pursuant to the terms of this Plan as of the date on which the Change of Control occurred. The amount of the Company's irrevocable contributions shall be based on the actuarial valuation and accounting for the most recent calendar year or more recent period for the Plan, as approved by the independent actuary engaged by the Company prior to the Change of Control and approved by the Benefits Trust Committee if selected or changed following a Change of Control (the "Actuary"), and shall include an amount deemed necessary to pay estimated administrative expenses for the following five (5) years. The Benefits Trust Committee shall



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

cause such actuarial valuations or accountings to be updated, using Participant data supplied to the Actuary by the Company, through a date no earlier than the date of the initial contribution and shall notify the Company of the amount of additional contributions required as soon as practicable.

23. COMPLIANCE WITH REGULATORY AUTHORITIES.

Any shares purchased or distributed pursuant to any Incentives granted under this Plan must be held for investment and not with a view to the distribution or resale thereof. Each person who shall exercise an Incentive granted under this Plan may be required to give satisfactory assurances to such effect to the Company as a condition to the issuance to him or to her of shares pursuant to such exercise; provided, however, that the Company may waive such condition if it shall determine that such resale or distribution may be otherwise lawfully made without registration under the Securities Act of 1933, or if satisfactory arrangements for such registration are made. Each Incentive granted under this Plan is further subject to the condition that if at any time the Board shall in its sole discretion determine that the listing, registration or qualification of the shares covered by such Incentive upon any securities exchange or under any state or federal law, or the consent or approval of any governmental regulatory body, is necessary or desirable as a condition of or in connection with the granting of such Incentives or the purchase or transfer of shares thereunder, the delivery of any or all shares of stock pursuant to exercise of the Incentive may be withheld unless and until such listing, registration, qualification, consent or approval shall have been effected or obtained free of any conditions not acceptable to the Board.

24. WITHHOLDING TAX.

Whenever the Company proposes or is required to issue or transfer shares of common stock under the Plan, a Participant shall remit to the Company an amount sufficient to satisfy any federal, state or local income and payroll tax withholding liability prior to the delivery of any certificate or certificates for such shares. Alternatively, to the extent permitted by applicable laws, such federal, state or local income and payroll tax withholding liability may be satisfied prior to the delivery of any certificate or certificates for the shares by an adjustment, equal in value to such liability, in the number of shares to be transferred to the Participant. Whenever under the Plan payments are to be made in cash, such payments shall be net of an amount sufficient to satisfy any federal, state or local income and payroll tax withholding liability.

25. NON-UNIFORM DETERMINATIONS.

Determinations by the Committee under the Plan, including, without limitation, determinations of the persons to receive Incentives and the form, amount and timing of such Incentives, and the terms and provisions of such Incentives and the agreements evidencing the same need not be uniform, and may be made by the Committee selectively among persons who receive, or are eligible to receive, Incentives under the Plan, whether or not such persons are similarly situated.

Without amending the Plan, Incentives may be granted to eligible employees who are foreign nationals or who are employed outside the United States or both, on such terms and conditions different from those specified in the Plan as may, in the judgment of the Committee, be necessary or desirable to further the purposes of the Plan. Such different terms and conditions may be reflected in Addenda to the Plan.

26. CONSTRUCTION.

The Plan shall be governed by the laws of the Commonwealth of Virginia.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

ADDENDUM.

Addendum I

Pursuant to Sections 4a and 8 of the Plan, with respect to any Non-Qualified Stock Option ("NQSO") granted to any Participant who may be subject to taxation in The Netherlands at any time during the term of such NQSO, the Committee shall have the authority to impose additional conditions on the exercise of the NQSO.

Effective for any NQSO granted after December 31, 1997, the Committee may, in addition to any other conditions specified in the option agreement, require that the NQSO is granted conditionally. Such conditions shall include that the NQSO can be exercised only with the approval of the Participant's Senior Vice President - Human Resources ("SVP-HR"). Such approval shall be granted at the discretion of the SVP-HR, which shall not be unreasonably refused. Approval may be refused for reasons which shall be set forth in the option agreement such as, but not limited to, the following: (i) termination of employment for willful or gross misconduct or receipt of notice of termination for such conduct; (ii) disclosure of confidential information; or (iii) rendering services to a competitor. Once approval has been obtained, the Participant must immediately exercise the NQSO. If approval is refused or if the NQSO is not exercised immediately upon receipt of approval, it shall be forfeited.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

AMENDMENT

CSX CORPORATION 1987 LONG-TERM PERFORMANCE STOCK PLAN

Pursuant to Section 21 of the CSX Corporation 1987 Long-Term Performance Stock Plan as Amended Through September 8, 1999 (the "Plan"), the Plan is amended effective February 7, 2003 as follows:

The penultimate paragraph of Section 14 is amended to read as follows:

> "Notwithstanding anything to the contrary in the Plan, if a Participant or former Participant (a) becomes the owner, director or employee of a competitor of the Company or its subsidiaries; (b) has his employment terminated by the Company or one of its subsidiaries on account of actions by the Participant which are detrimental to the interests of the Company or its subsidiaries, (c) engages in conduct subsequent to the termination of his employment with the Company or its subsidiaries which the Committee determines to be detrimental to the interests of the Company or its subsidiaries; or (d) is required to divest his or her interest under the Plan under applicable law, regulation or rules, then the Committee may, in its sole discretion, pay the Participant or former Participant a single sum payment equal to the amount of his unpaid benefits which were awarded and deferred under Sections 10 or 12 of the Plan; provided, however, if the deferral has been for less than three (3) years under Section 12, the Participant or former Participant shall not be eligible to receive the Stock Premium. The single sum payment shall be made as soon as practicable following the date the Participant or former Participant is affected by one of the circumstances described in this Section 14 and such payment shall be in lieu of all other benefits which may be payable to the Participant or former Participant under this Plan."

EXHIBIT 10.25

DEFERRED COMPENSATION PROGRAM
FOR EXECUTIVES OF CSX CORPORATION
AND AFFILIATED COMPANIES

As Amended and Restated January 1, 1998

1. Purpose

The purpose of this Program is to provide eligible executives with an opportunity to supplement their retirement income. This Program is intended to benefit a select group of management or highly compensated employees.

2. Definitions

2.1 "Administrator" means the Corporation. The duties of the administrator shall be performed by a person or persons designated by the Chief Executive Officer of the Corporation to perform such duties.

2.2 "Affiliated Company" means the Corporation and any company or corporation directly or indirectly controlled by the Corporation which the Compensation Committee designates for participation in this Program in accordance with Section 15.2.

2.3 "Award" means, for any year, the amount awarded to an employee of an Affiliated Company for that year and, in the absence of a Deferral Agreement with respect to such amount, payable to him in the succeeding year under the MICP, including any special incentive award.

2.4 "Benefits Trust Committee" means the committee created pursuant to the CSX Corporation and Affiliated Companies Benefits Assurance Trust Agreement.

2.5 "Board" means the Board of Directors of the Corporation.

2.6 "Change of Control" shall mean any of the following:

(a) Stock Acquisition. The acquisition, by any individual, entity or group [within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")] (a "Person") of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 20% or more of either (i) the then outstanding shares of common stock of the Corporation (the "Outstanding Corporation Common Stock"), or (ii) the combined voting power of the then outstanding voting securities of the Corporation entitled to vote generally in the election of directors (the "Outstanding Corporation Voting Securities"); provided, however, that for purposes of this subsection (a), the following acquisitions shall not constitute a Change of Control: (i) any acquisition directly from the Corporation; (ii) any acquisition by the Corporation; (iii) any acquisition by any employee benefit plan (or related trust) sponsored or maintained by the Corporation or any corporation controlled by the Corporation; or (iv) any acquisition by any corporation pursuant to a transaction which complies with clauses (i), (ii) and (iii) of subsection (c) of this Section 2.6; or

 Powered by Morningstar® Document Research℠

(b) Board Composition. Individuals who, as of the date hereof, constitute the Board of Directors (the "Incumbent Board") cease for any reason to constitute at least a majority of the Board of Directors; provided, however, that any individual becoming a director subsequent to the date hereof whose election or nomination for election by the Corporation's shareholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board shall be considered as though such individual were a member of the Incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office occurs as a result of an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board of Directors; or

(c) Business Combination. Approval by the shareholders of the Corporation of a reorganization, merger, consolidation or sale or other disposition of all or substantially all of the assets of the Corporation or its principal subsidiary that is not subject, as a matter of law or contract, to approval by the Interstate Commerce Commission or any successor agency or regulatory body having jurisdiction over such transactions (the "Agency") (a "Business Combination"), in each case, unless, following such Business Combination:

(i) all or substantially all of the individuals and entities who were the beneficial owners, respectively, of the Outstanding Corporation Common Stock and Outstanding Corporation Voting Securities immediately prior to such Business Combination beneficially own, directly or indirectly, more than 50% of, respectively, the then outstanding shares of common stock and the combined voting power of the then outstanding voting securities entitled to vote generally in the election of directors, as the case may be, of the corporation resulting from such Business Combination (including, without limitation, a corporation which as a result of such transaction owns the Corporation or its principal subsidiary or all or substantially all of the assets of the Corporation or its principal subsidiary either directly or through one or more subsidiaries) in substantially the same proportions as their ownership, immediately prior to such Business Combination of the Outstanding Corporation Common Stock and Outstanding Corporation Voting Securities, as the case may be;

(ii) no Person (excluding any corporation resulting from such Business Combination or any employee benefit plan (or related trust) of the Corporation or such corporation resulting from such Business Combination) beneficially owns, directly or indirectly, 20% or more of, respectively, the then outstanding shares of common stock of the corporation resulting from such Business Combination or the combined voting power of the then outstanding voting securities of such corporation except to the extent that such ownership existed prior to the Business Combination; and

(iii) at least a majority of the members of the board of directors resulting from such Business Combination were members of the

Incumbent Board at the time of the execution of the initial agreement, or of the action of the Board of Directors, providing for such Business Combination; or

(d) Regulated Business Combination. Approval by the shareholders of the Corporation of a Business Combination that is subject, as a matter of law or contract, to approval by the Agency (a "Regulated Business Combination") unless such Business Combination complies with clauses (i), (ii) and (iii) of subsection (c) of this Section XI(5); or

(e) Liquidation or Dissolution. Approval by the shareholders of the Corporation of a complete liquidation or dissolution of the Corporation or its principal subsidiary.

2.7 "Compensation Committee" means the Compensation Committee of the Board.

2.8 "Corporation" means CSX Corporation, a Virginia corporation, and any successor thereto by merger, purchase or otherwise.

2.9 "Corporation's Accountant's" means the independent accountant or accountants engaged by the Corporation and, if selected or changed following a Change of Control, approved by the Benefits Trust Committee.

2.10 "Deferral Agreement" means a completed agreement, including any attachments and appendices thereto, in the form determined by the Administrator, between an Eligible Executive and the Affiliated Company of which he is an employee, under which the Eligible Executive agrees to defer all or a portion of his Award in accordance with the provisions of Section 3.

2.11 "Deferral Date" means with respect to any Deferral Agreement entered into by an Eligible Executive, the first day of the month in which the Award subject to the Deferral Agreement would be payable to the Eligible Executive in the absence of such Deferral Agreement.

2.12 "Divisive Transaction" means a transaction in which the Participant's employer ceases to be a Subsidiary or there is a sale of substantially all of the assets of the Subsidiary.

2.13 "Eligible Executive" means, for any year, an employee of an Affiliated Company who is in salary grades 22 through 40 as of (a) December 30th of such year or (b) for calendar years beginning on or after January 1, 1986, the date in such year he retired from the Affiliated Companies or terminated on account of disability, as determined by the Administrator, provided, however, that the Administrator, in its sole discretion, may designate any other employee of an Affiliated Company as an Eligible Executive for such year. Notwithstanding the preceding, following a Change of Control, such action by the Administrator is subject to the approval of the Benefits Trust Committee.

2.14 "Equivalent" means of equal present or accumulated value based on the interest rates set forth in the applicable Deferral Agreements. In determining Equivalent values, only the value of benefits for which the eligibility requirements have been met shall be included.

2.15 "MICP" means the Affiliated Companies' Management Incentive Compensation Plans, as from time to time in effect.

2.16 "Normal Retirement Date" means the later of:

(a) the last day of the month in which a Participant's 62nd birthday occurs, or

(b) the earlier of (i) the last day of the month preceding the 2nd anniversary of the Participant's earliest Deferral Date or (ii) the last day of the month in which a Participant's 65th birthday occurs.

2.17 "Participant" means an Eligible Executive who elects to defer a portion of his Award in accordance with the provisions of Section 3.

2.18 "Program" means this Deferred Compensation Program for Executives of CSX Corporation and Affiliated Companies.

2.19 "Service" means an employee's months of continuous employment with the Affiliated Companies. In the event the employee has a break in his continuous employment, his period of employment prior to the break shall be credited to the employee in accordance with the rules governing breaks in service under the CSX Pension Plan.

2.20 "Subsidiary" means a corporation more than 50% of the voting shares of which are owned directly or indirectly by the Corporation.

2.21 "Trust" means the CSX Corporation and Affiliated Companies Benefits Assurance Trust. Except as provided in Section 18, the Corporation is not obligated to make any contribution to the Trust.

2.22 "Valuation Date" means the last day of each calendar quarter and such other dates as the Administrator deems necessary or appropriate to value the Participants' benefits under this Program. Following a Change of Control, the Benefits Trust Committee shall have final approval over any date selected other than the last day of each calendar year.

3. Deferral of Awards

3.1 At any time prior to the close of business on December 30 in any calendar year, an Eligible Executive may elect to defer all or a portion of his Award, if any, for that year. Such election shall be made by filing a Deferral Agreement with the Administrator on or before the close of business on December 30 of the calendar year for which the Award is made. In the event that December 30 does not fall on a weekday, such filing must be made by the close of business on the last prior business day.

3.2 Subject to the provisions of Sections 3.3 and 3.4:

(a) an Eligible Executive in 1985 may elect to defer up to 100% of his 1985 Award;

(b) an Eligible Executive in 1986 may elect to defer up to 100% of his 1986 Award;



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

(c) an Eligible Executive in 1988 may elect to defer up to 100% of his 1988 Award; and

(d) an Eligible Executive in 1989 may elect to defer up to 100% of his 1989 Award.

3.3 The minimum amount which an Eligible Executive may defer in any year shall be the lesser of $5,000 or the maximum amount determined under Section 3.2. If an Eligible Executive elects to defer less than this amount, his election shall not be effective.

3.4 In its sole discretion, the Compensation Committee may, at any time, impose additional limits on the maximum amount which an Eligible Executive may elect to defer under this Program in any year or may impose additional requirements on the Eligible Executive's right to defer the maximum amount under this Program in any year.

3.5 An Eligible Executive's election to defer all or a portion of his Award shall be effective on the last day such deferral may be elected, under Section 3.1, for the year for which the Award is made. An Eligible Executive may revoke or change his election to defer all or a portion of his Award at any time prior to the date the election becomes effective. Any such revocation or change shall be made in a form and manner determined by the Administrator.

3.6 Notwithstanding the preceding, following a Change of Control, any discretionary decisions made by the Compensation Committee or the Administrator with respect to this Section 3 shall be subject to the approval of the Benefits Trust Committee.

4. Normal Retirement Benefit

A Participant who retires from employment with the Affiliated Companies on his Normal Retirement Date shall receive a benefit Equivalent to the sum of the amounts set forth in the Participant's Deferral Agreement(s) plus accrued interest. The benefit shall be paid in 180 equal monthly installments commencing on the first day of the month next following the Participant's retirement date, but in no event prior to the first day of the month next following the Participant's last Deferral Date, unless the Participant elects to receive his benefit in accordance with Section 9 of this Program.

5. Delayed Retirement Benefit

A Participant who retires or otherwise terminates his employment with the Affiliated Companies after his Normal Retirement Date shall receive a benefit equal to the benefit he would have received under Section 4 had his benefit commenced on his Normal Retirement Date, increased by 5/6 of 1% for each complete calendar month between his Normal Retirement Date and the date his benefit commences. The benefit shall be paid in 180 equal monthly installments commencing on the first day of the month next following the Participant's termination of employment, but in no event prior to the first day of the month next following the Participant's last Deferral Date, unless the Participant elects to receive his benefit in accordance with Section 9 of this Program.

6. Early Retirement Benefit

A Participant who has attained age 55, has completed 120 months of Service and terminates his employment with the Affiliated Companies prior to his Normal Retirement Date shall receive a benefit



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

commencing on the first day of the month following his Normal Retirement Date but in no event prior to the first day of the month following the Participant's last Deferral Date. The Participant's benefit shall be equal to the benefit the Participant would have received under Section 4 had he terminated his employment on his Normal Retirement Date. However, the Participant may elect a lump sum under Section 9 or may elect, in a time and manner determined by the Administrator, to have payment of his benefit commence on the first day of any month preceding his Normal Retirement Date, and following the latest of (i) his termination of employment, (ii) 24 months after his earliest Deferral Date and (iii) the first of the month following his last Deferral Date, in which event the amount of his benefit shall be reduced by 5/6 of 1% for each complete calendar month between the date his benefit commences and the first day of the month next following his Normal Retirement Date. However, in no event shall the monthly benefit be less than an amount Equivalent to the Participant's deferrals with accrued interest. Benefits under this Section 6 shall be paid in 180 equal monthly installments, unless the Participant elects to receive his benefit in accordance with Section 9 of this Program.

7. Separation Benefit

7.1 A Participant who terminates his employment with the Affiliated Companies prior to being eligible for a benefit under Sections 4 or 6, but after having completed 120 months of Service, shall receive a monthly benefit commencing on the first day of the month next following his Normal Retirement Date; provided, however, that a Participant shall not be eligible for a benefit under this Section 7.1 if the Participant terminates employment without the consent of the Affiliated Companies. The benefit shall be equal to the monthly benefit the Participant would have received under Section 4 had he terminated employment on his Normal Retirement Date. However, the Participant may elect a lump sum pursuant to Section 9, or may elect, in a time and manner determined by the Administrator, to have monthly benefits commence on the first day of any month, prior to his Normal Retirement Date, and following the latest of (i) his termination of employment with the Affiliated Companies, (ii) his 55th birthday or (iii) the last day of the month prior to the 2nd anniversary of his earliest Deferral Date, in which event the amount of his benefit shall be reduced by 5/6 of 1% for each complete calendar month between the date his benefit commences and the first day of the month next following his Normal Retirement Date. However, in no event shall the monthly benefit be less than an amount Equivalent to the Participant's deferred amounts with accrued interest. Monthly benefits under this Section 7.1 shall be paid in 180 equal monthly installments. For purposes of this program and particularly this Section 7, if a Participant's employer is involved in a Divisive Transaction, the Participant will be deemed to have terminated his employment with an Affiliated Company with the consent of the Affiliated Company.

7.2 A Participant who terminates his employment with the Affiliated Companies, other than on account of death, and is not eligible for a benefit under Section 7.1 shall receive a single sum payment equal to the sum of the amounts the Participant deferred under his Deferral Agreements plus accrued interest. However, if the Participant terminates his employment with the Affiliated Companies on account of a disability within the meaning of Section 8.1, he shall receive a benefit under this Section 7.2 only if the Participant elects, in a time and manner determined by the Administrator, to receive such benefit and to cease accruing Service under Section 8.1. The single sum payment shall be made on the first day of the month next following the Participant's termination of employment, or as soon as practicable thereafter. The Participant shall not receive any other benefits under this Program.

8. Disability

8.1 A Participant who, in the sole judgment of the Administrator, becomes totally and permanently disabled prior to his termination of employment with the Affiliated Companies, and does



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

not make an election under Section 7.2 to receive a benefit under such Section, shall continue to accrue Service during his period of disability as if he remained an active employee. Such a Participant shall be eligible to receive a benefit under Sections 4, 6 or 7.1 when he meets the age and Service requirements for such a benefit, provided that following a Change of Control, any decisions of the Administrator pursuant to this Section 8.1 is subject to the approval of the Benefits Trust Committee.

8.2 The Administrator may, in its sole discretion, require a Participant to submit to a medical examination by a physician approved by the Administrator, or present other evidence satisfactory to the Administrator, to establish the existence or continuance of his disability. The Administrator may require such medical examination or other evidence not more than once per year. A Participant who refuses to submit to any required medical examination or to present any other required evidence under this Section 8.2 shall not be disabled for purposes of this Program and shall only be eligible to receive the benefit he would have received under the Program had he terminated his employment with the Affiliated Companies immediately prior to the date of such request. Notwithstanding the preceding, following a Change of Control, any decision by the Administrator made pursuant to this Section 8.2 is subject to approval by the Benefits Trust Committee.

9. Single Sum Payments

A Participant who is eligible to receive a benefit under Sections 4, 5, 6, 7.1 or 8.1 of the Program but whose benefits hereunder have not yet commenced may, with the consent of the Administrator, elect, in a time and manner determined by the Administrator, to receive his benefit in the form of a single sum. The single sum shall be in the amount of the Participant's deferred amounts plus accrued interest, provided that, in the case of a Participant then eligible for immediate commencement of monthly benefits, such single sum shall not be less than an amount Equivalent to the value of such monthly benefits. Such single sum shall be paid on the first day of the fourth month following the later of (i) the Participant's termination of employment with the Affiliated Companies, or (ii) the date such election is received by the Administrator. Notwithstanding any other provision hereof, such amount shall be determined as of a date three months prior to the date of payment and shall not accrue interest beyond such earlier date. Furthermore, following a Change of Control, any decision of the Administrator made pursuant to this Section 8.2 is subject to approval by the Benefits Trust Committee.

10. Hardship Withdrawal

10.1 While employed by the Affiliated Companies, a Participant may, in the event of a severe financial hardship, request a withdrawal of an amount which does not exceed the single sum amount determined in Section 9. The withdrawal shall be made in a time and manner determined by the Administrator, and shall not be for a greater amount than the amount required to meet the financial hardship, and shall be subject to approval by the Administrator.

10.2 For purposes of this Section 10, financial hardship shall include:

(a) Education of a dependent child where the Participant can show that without the withdrawal under this Section 10 the education would be unavailable to the child;

(b) Illness of the Participant or his dependents, resulting in severe financial hardship to the Participant;



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

(c) The loss of the Participant's home or it contents, to the extent not reimbursable by insurance or otherwise, if such loss results in a severe financial hardship to the Participant; and

(d) Any other extraordinary circumstances of the Participant approved by the Administrator if such circumstances would result in a present or impending critical financial need which the Participant is unable to satisfy with funds reasonably available from other sources.

10.3 If a Participant makes a withdrawal under this Section 10, any other benefit which he may be entitled to under this Program on his termination of employment shall be appropriately adjusted to take into account the amount the Participant received under this Section 10.

10.4 Following a Change of Control, any decision by the Administrator made pursuant to this Section 10 is subject to the approval of the Benefits Trust Committee.

11. Death Benefits

11.1 Except as provided in Section 11.10(b), if a Participant dies while employed by an Affiliated Company, his beneficiary shall be eligible to receive a single sum benefit equal to the greatest of:

(a) three times the sum of the amount(s) the Participant deferred under his Deferral Agreement(s);

(b) the amounts the Participant deferred under his Deferral Agreement(s) plus accrued interest; or

(c) an amount Equivalent to the monthly benefit the Participant could have received under the Program, if any, had he terminated his employment with the Affiliated Companies on the day immediately preceding his death and elected to begin receiving the benefit on the first day of the following month.

The benefit is payable on the first day of the month next following the date of the Participant's death, and shall be in lieu of all other benefits payable under this Program, other than any benefit payable under Section 11.6.

11.2 If a Participant who has terminated his employment with the Affiliated Companies after becoming eligible for a benefit under Sections 4, 5 or 6, dies prior to the commencement of any benefit under this Program, his beneficiary shall receive a benefit under Section 11.1

11.3 If a Participant who is totally and permanently disabled under Section 8.1 dies prior to receiving a benefit under this Program, his beneficiary shall receive a benefit under Section 11.1

11.4 If a Participant who is eligible for a benefit under Section 7.1 dies prior to receiving a benefit, his beneficiary will receive a benefit based on the greater of the amounts determined under Sections 11.1(b)and 11.1(c).



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

11.5 If a Participant dies after commencing to receive a benefit, other than a benefit under Section 7.2, but prior to receiving all remaining benefits due, the remaining benefits shall be paid to the Participant's beneficiary or contingent beneficiary, whichever is applicable.

11.6 In addition to any other benefit payable under this Section 11, in the case of a Participant (i) who dies while employed by an Affiliated Company after becoming eligible for benefits under Sections 4, 5, or 6 hereof, or (ii) who terminates employment while eligible for a benefit under Section 4, 5 or 6 of the Program and then dies, his beneficiary shall be eligible to receive a benefit of $10,000, payable in a single sum. This benefit shall be payable as soon as practicable following the presentation to the Administrator, and the Administrator's examination and approval of, any information or material, including proof of death of the Participant, the Administrator may request. Notwithstanding anything to the contrary, a benefit shall not be payable on account of the death of a Participant who received a single sum benefit under Sections 12 or 16 of the Program.

11.7 A Participant may, in a time and manner determined by the Administrator, designate a beneficiary and one or more contingent beneficiaries (which may include the Participant's estate) to receive any benefits which may be payable under this Section 11. If the Participant fails to designate a beneficiary or contingent beneficiary, or if the beneficiary and the contingent beneficiaries do not survive the Participant, such benefits shall be paid to the Participant's estate. The Participant may also designate a remainder beneficiary to receive any benefits which may be payable under Section 11.9.

11.8 A Participant may revoke or change any designation made under Section 11.7 in a time and manner determined by the Administrator.

11.9 If, pursuant to Section 11.7, payments commence to a beneficiary or contingent beneficiary and if such beneficiary or contingent beneficiary dies prior to receiving all payments due under this Program, any remaining payments shall be made to the Participant's remainder beneficiary. If, at the date of such death, there is no surviving remainder beneficiary, the remaining benefits hereunder shall be paid to the estate of the beneficiary or contingent beneficiary previously in receipt of benefits hereunder.

11.10 (a) If any benefits are payable under this Section 11 to an individual other than the Participant's spouse or child under age 21 (or child under age 25 who is a full- time student at an accredited institution of higher education), the benefit shall be paid in the form of a single sum.

(b) If benefits become payable to the Participant's spouse or his child under age 21 (or his child under age 25 who is a full-time student at an accredited institute of higher education), such benefits (other than benefits under Section 11.6) shall be payable in 180 monthly installments Equivalent to the single sum amount determined under Section 11.1 through 11.5 hereof, as applicable. Monthly benefits shall commence on the first day of the month following the Participant's death. The Participant may elect, in a time and manner determined by the Administrator to have any amounts which may be payable under the Program paid in accordance with Section 11.10(a).

(c) Notwithstanding anything to the contrary in this Program, if a Participant's child under age 21 (or child under age 25 who is a full-time student at an accredited institute of higher education) is receiving a benefit under this Program in the form of installment payments, upon his attaining age 21 (or age 25 or ceasing to be a



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

full-time student at an accredited institute of higher education) he shall receive a single sum Equivalent to his remaining installments in lieu of receiving such remaining installments.

12. Special Distribution Rules

12.1 Notwithstanding anything to the contrary in this Program, if (a) a Participant becomes the owner, director or employee of a competitor of the Affiliated Companies, (b) his employment is terminated by an Affiliated Company on account of actions by the Participant which are detrimental to the interests of any Affiliated Company, or (c) he engages in conduct subsequent to the termination of his employment with the Affiliated Companies which the Administrator determines to be detrimental to the interests of an Affiliated Company, then the Administrator may, in its sole discretion, pay a Participant a single sum payment equal to the sum of the amounts the Participant deferred under his Deferral Agreements plus accrued interest, reduced by an amount Equivalent to any payments the Participant may already have received under this Program. However, if the Participant is receiving a benefit under the Program, or could be receiving an immediate benefit under the Program, the single sum shall not be less than an amount Equivalent to the remaining monthly benefit the Participant is, or could be, receiving. The single sum payment shall be made as soon as practicable following the Participant's becoming an owner, director or employee of a competitor, his termination of employment or the Administrator's determination of detrimental conduct, as the case may be, and shall be in lieu of all other benefits which may be payable to the Participant under this Program.

12.2 Notwithstanding anything to the contrary contained herein, the Corporation may delay payment of a benefit under this Program to any Participant who is determined to be among the top five most highly paid executives for the year the benefit under this Program would otherwise be paid; provided, however, if a Participant's payment is delayed, the benefit to which he is entitled will not decrease after the date it would otherwise be distributed.

12.3 Notwithstanding the preceding, following a Change of Control, the Administrator's authority to make decisions under this Section 12 is subject to the approval of the Benefits Trust Committee.

13. Benefit Determinations Following a Change of Control

13.1 Following a Change of Control, final benefit determinations for Participants, their beneficiaries, heirs and assigns and decisions regarding benefits under this Program shall rest with the Benefits Trust Committee or its delegate in its sole and absolute discretion.

14. Funding

14.1 To the extent reflected by resolutions of the applicable boards of directors, obligations for benefits under this Program shall be joint and several.

14.2 The obligations of the Corporation and any of its affiliated corporations and the benefit due any Participant, surviving spouse or beneficiary hereunder shall be reduced by any amount received in regard thereto under the Benefits Assurance Trust or any similar trust or other vehicle.

15.. Administration



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

15.1 This Program shall be administered by the Corporation. Certain administrative functions, as set forth in this Program, shall be the responsibility of the Administrator. The Administrator shall interpret the Program, establish regulations to further the purposes of the Program and take any other action necessary to the proper operation of the Program. Following a Change of Control, the Benefits Trust Committee may remove and/or replace the Administrator.

15.2 Prior to a Change of Control, the Compensation Committee, in its sole discretion and upon such terms as it may prescribe, may permit any company or corporation directly or indirectly controlled by the Corporation to participate in the Program for such periods as it may determine. Following a Change of Control, no entity shall become or cease to be a participating company without the consent of the Benefits Trust Committee.

15.3 The Administrator shall provide adequate notice in writing to any Participant, beneficiary, contingent beneficiary or remainder beneficiary whose claim for benefits under this Program has been denied, setting forth the specific reasons for such denial. A reasonable opportunity shall be afforded to any such Participant, beneficiary, contingent beneficiary or remainder beneficiary for a full and fair review by the Administrator of its decision denying the claim. Prior to a Change of Control, the Administrator's decision on any such review shall be final and binding on the Participant, beneficiary, contingent beneficiary, remainder beneficiary and all other interested persons. All acts and decisions of the Administrator shall be final and binding upon all Participants and employees of the Affiliated Companies.

15.4 Following a Change of Control, all benefit determinations for Participants, their beneficiaries, heirs and assigns and decisions regarding benefit claims under this Program shall rest with the Benefits Trust Committee or its delegate in its sole and absolute discretion.

16. Termination and Amendment of the Program

6.1 Prior to a Change of Control, the Board may, in its sole discretion, terminate this Program and the related Deferral Agreement(s) at any time. Following a Change of Control, this Program may not be terminated without the approval of the Benefits Trust Committee. In the event the Program and related Deferral Agreement(s) are terminated. Participants shall receive a single sum payment equal to the sum of the amounts they deferred under their Deferral Agreements plus accrued interest, reduced by an amount Equivalent to any payments the Participant may already have received under this Program. However, if the Participant is receiving a benefit under the Program, or could be receiving an immediate benefit under the Program, the single sum shall not be less than an amount Equivalent to the monthly benefit the Participant is, or could be, receiving. The single sum payment shall be made as soon as practicable following the date the Program is terminated and shall be in lieu of any other benefit which may be payable to the Participant under this Program.

16.2 Prior to a Change of Control, the Board, in its sole discretion, may amend this Program and the related Deferral Agreements in any way on thirty (30) days prior notice to the Participants. Following a Change of Control, all amendments are subject to the approval of the Benefits Trust Committee. If any amendment to this Program or to the Deferral Agreements shall adversely affect the rights of a Participant, the Participant must consent in writing to such amendment prior to its effective date. If the Participant does not consent to the amendment, the Program, shall be deemed to be terminated with respect to the Participant and he shall receive a single sum payment in accordance with Section 16.1.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

16.3 Notwithstanding anything to the contrary' in this Section 16, prior to a Change of Control, the Board must act to terminate or amend the Program or the Deferral Agreements in a uniform and nondiscriminatory manner. Following a Change of Control, such actions are subject to the approval of the Benefits Trust Committee

17. Miscellaneous

17.1 The existence of this Program or a Deferral Agreement does not constitute a contract for continued employment between an Eligible Executive or a Participant and an Affiliated Company. The Affiliated Companies reserve the right to modify an Eligible Executive's or Participant's compensation and to terminate the employment of an Eligible Executive or a Participant for any reason and at any time, notwithstanding the existence of this Program or of a Deferral Agreement. The Affiliated Companies reserve the right not to grant Awards to Eligible Executives and Participants for any reason.

17.2 A Participant's rights to benefit payments under the Program are not subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, attachment or garnishment by creditors of the Participant, his beneficiary, contingent beneficiaries, remainder beneficiary, heirs or personal representative.

17.3 Except for Section 18 herein, nothing contained in this Program or in a Deferral Agreement shall require the Affiliated Companies to segregate any monies from their general funds, or to create any trusts, or to make any special deposits for any amounts to be paid to any Participant, beneficiary, contingent beneficiary or remainder beneficiary. Neither the Participant, his beneficiary, contingent beneficiaries, remainder beneficiary, heirs or personal representatives shall have any right, title or interest in or to any funds of the Affiliated Companies on account of this Program or on account of having completed a Deferral Agreement.

17.4 All payments under this Program shall be net of an amount sufficient to satisfy any federal, state or local withholding and payroll tax requirements.

17.5 Prior to paying any benefit under this Program, the Administrator may require the Participant, beneficiary, contingent beneficiary or remainder beneficiary to provide such information or material as the Administrator, in its sole discretion, shall deem necessary for it to make any determination it may be required to make under this Program. The Administrator may withhold payment of any benefit under this Program until it receives all such information and material and is reasonably satisfied of its correctness and genuineness.

17.6 Each Participant shall have the status of a general unsecured creditor of the Affiliated Companies, and this Program constitutes a mere promise by the Affiliated Companies to make benefit payments in the future.

17.7 The Program is intended to be unfunded for tax purposes and for purposes of Title I of ERISA.

17.8 The masculine pronoun shall mean the feminine pronoun and all singular shall include the plural wherever appropriate.

17.9 The terms of this Program and any Deferral Agreement shall be governed by the laws of the Commonwealth of Virginia.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

17.10 The invalidity or unenforceability of any provision of this Program or of a Deferral Agreement shall in no way affect the validity or enforceability of any other provision.

18. Change of Control

18.1 If a Change of Control has occurred, the Corporation shall contribute to the Trust, within 7 days of such Change of Control, a lump sum payment equal to the greater of (i) the aggregate value of the amount each Participant would be eligible to receive (determined under Section 18.2 below) as of a Valuation Date coinciding with or next preceding the date of Change of Control or (ii) the amount determined under Section l(h) of the Trust attributable to liabilities relating to the Program, to the extent such amounts are not already in the Trust. The aggregate value of the amount of the lump sum to be contributed to the Trust pursuant to this Section 18 shall be determined by the Corporation's Accountants after consultation with the entity then maintaining the Program's records. Thereafter, the Corporation's Accountants shall annually determine for each Participant not receiving a lump sum payment pursuant to subsection 18.2 below the amount which would be payable under such subsection were a Change of Control to occur at the date of such determination. To the extent that the value of the assets held in the Trust relating to this Program do not equal the amount described in the preceding sentence, at the time of the valuation, as determined by the Corporation's Accountants, the Corporation shall make a lump sum contribution to the Trust equal to the difference.

18.2 In the event a Change of Control has occurred, the trustee of the Trust shall, within 45 days of such Change of Control, pay to each Participant not making an election under 18.3 below, a lump sum payment equal to the amount the Participant would have been entitled to receive determined under Section 6 had he retired early and selected a lump sum payment. The amount of each Participant's lump sum payment shall be determined by the Corporation's Accountants after consultation with the entity then maintaining the Program's records.

18.3 Each Participant may elect in a time and manner determined by the Administrator, but in no event later than December 31, 1996, or the occurrence of a Change of Control, if earlier, to have amounts and benefits determined and payable under the terms of the Program as if a Change of Control had not occurred. New Participants in the Program may elect in a time and manner determined by the Administrator, but in no event later than 90 days after becoming a Participant, to have amounts and benefits determined and payable under the terms of the Program as if a Change of Control had not occurred. A Participant who has made an election, as set forth in the two preceding sentences, may, at any time and from time to time, change that election; provided, however, a change of election that is made within one year of a Change of Control shall be invalid.

18.4 Notwithstanding anything in this Program to the contrary, each Participant who has made an election under 18.3 above may elect within 90 days following a Change of Control, in a time and manner determined by the Benefits Trust Committee, to receive a lump sum payment calculated under the provisions of 18.2 above, except that such calculated amount shall be reduced by 5% and such reduction shall be irrevocably forfeited to the Corporation by the Participant. Furthermore, as a result of such election, the Participant shall no longer be eligible to participate or otherwise benefit from the Program. Payments under this subsection 18.4 shall be made not later than 7 days following receipt by the Corporation of the Participant's election. The Benefits Trust Committee shall, no later than 7 days after a Change of Control has occurred, give written notification to each Participant eligible to make an election under this subsection 18.4, that a Change of Control has occurred and informing such Participant of the availability of the election.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

EXHIBIT 10.26

# 2002 DEFERRED COMPENSATION PLAN
# OF CSX CORPORATION AND AFFILIATED COMPANIES


Powered by Morningstar® Document Research℠

TABLE OF CONTENTS


| | Page |
|---|---|
| INTRODUCTION | 1 |
| ARTICLE 1. DEFINITIONS | 1 |
| 1.1 Account | 1 |
| 1.2 Administrator | 1 |
| 1.3 Affiliated Company | 1 |
| 1.4 Award | 1 |
| 1.5 Award Deferral Agreement | 1 |
| 1.6 Benefits Trust Committee | 1 |
| 1.7 Board of Directors | 1 |
| 1.8 Change of Control | 1 |
| 1.9 Code | 3 |
| 1.10 Committee | 3 |
| 1.11 Company Stock | 3 |
| 1.12 Compensation | 3 |
| 1.13 Corporation | 3 |
| 1.14 Deferral Agreement | 3 |
| 1.15 Distribution Election | 4 |
| 1.16 Distribution Event | 4 |
| 1.17 Divisive Transaction | 4 |
| 1.18 Effective Date | 4 |
| 1.19 Eligible Executive | 4 |
| 1.20 Enrollment Form | 5 |
| 1.21 Executive Stock Account | 5 |
| 1.22 Form of Payment Election | 5 |
| 1.23 ICP Award | 5 |
| 1.24 Independent Accountant | 5 |
| 1.25 Matching Credits | 5 |
| 1.26 Member | 5 |
| 1.27 Partial Distribution Election | 5 |
| 1.28 Participating Company | 5 |
| 1.29 Plan | 6 |
| 1.30 Salary Deferrals | 6 |
| 1.31 Salary Deferral Agreement | 6 |
| 1.32 Stock Award | 6 |
| 1.33 Subsidiary | 6 |
| 1.34 Tax Savings Thrift Plan | 6 |
| 1.35 Trust | 6 |
| 1.36 Valuation Date | 6 |
| ARTICLE 2. MEMBERSHIP | 6 |
| 2.1 In General | 6 |
| 2.2 Termination of Employment; Re-employment | 6 |
| 2.3 Change in Status | 7 |
| 2.4 Membership Following a Change of Control | 7 |




Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

ARTICLES 3. DEFERRAL AGREEMENTS.................................................. 7

3.1 Deferral Agreement.................................................. 7
3.2 Modification

of Deferral Agreement.......................................... 8

ARTICLE 4. AWARD DEFERRAL PROGRAM.................................................. 8

4.1 Filing Requirements.................................................. 8
4.2 Amount of Deferral.................................................. 9
4.3 Crediting to Account.................................................. 9

ARTICLES 5. SALARY DEFERRAL PROGRAM.................................................. 9

5.1 Filing Requirements.................................................. 9
5.2 Salary Deferral Agreement.................................................. 9
5.3 Amount of Salary Deferrals.................................................. 10
5.4 Effect of Hardship Withdrawal.................................................. 10
5.5 Certain Additional Credits.................................................. 10

ARTICLE 6. EXECUTIVE STOCK DEFERRAL PROGRAM.................................................. 11

6.1 Stock Awards.................................................. 11
6.2 Executive Stock Account.................................................. 11
6.3 Dividend Reinvestment.................................................. 12

ARTICLE 7. MAINTENANCE OF ACCOUNTS.................................................. 12

7.1 Creation of Account.................................................. 12
7.2 Adjustment of Account.................................................. 13
7.3 Investment Performance Elections.................................................. 13
7.4 Changing Investment Performance Elections.................................................. 14
7.5 Vesting of Account.................................................. 14
7.6 Action Following a Change of Control.................................................. 14

ARTICLE 8. DISTRIBUTION OF BENEFITS.................................................. 14

8.1 Commencement of Distribution.................................................. 14
8.2 Distribution Election.................................................. 14
8.3 Delay of Payment.................................................. 15
8.4 Account Adjustment.................................................. 16
8.5 Hardship Withdrawal, Forfeiture.................................................. 16
8.6 Designation of Beneficiary.................................................. 17
8.7 Special Distribution Rules.................................................. 17
8.8 Status of Account Pending Distribution.................................................. 17
8.9 One-time Re-deferral Election.................................................. 17
8.10 Change of Control.................................................. 18

ARTICLE 9. FORM OF PAYMENT.................................................. 19

9.1 Timing of Distribution.................................................. 19
9.2 Form of Payment Election.................................................. 19
9.3 Installments and Withdrawals Pro-Rata.................................................. 20

ARTICLE 10. AMENDMENT OR TERMINATION.................................................. 20

10.1 Right to Terminate.................................................. 20
10.2 Right to Amend.................................................. 20
10.3 Uniform Action.................................................. 21



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

ARTICLE 11. GENERAL PROVISIONS.................................................. 21

11.1 No Funding.............................................................. 21
11.2 Obligation.............................................................. 21
11.3 No Contract of Employment............................................... 21
11.4 Withholding Taxes....................................................... 21
11.5 Nonalienation........................................................... 21
11.6 Administration.......................................................... 22
11.7 Impact of Future Legislation or Regulation.............................. 23
11.8 Construction............................................................ 23



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

INTRODUCTION

This 2002 Deferred Compensation Plan of CSX Corporation and Affiliated Companies (the "Plan") was adopted July 9, 2002. This Plan is generally intended to provide certain executives eligible to participate in the Tax Savings Thrift Plan for Employees of CSX Corporation and Affiliated Companies (the "Savings Plan") with an opportunity to defer the receipt of a portion of their salary, and/or award(s) under the various incentive compensation plans and programs of CSX that may be offered from time to time and to restore employer matching contributions lost under the Savings Plan because of the application of Sections 401(a)(17), 401 (k), 401 (m) and 415 of the Internal Revenue Code of 1986, as amended. Eligible executives may, if they so elect, designate all or a portion of such deferrals to be used for payment of education expenses for one or more members of their families. The Plan is unfunded and is maintained by CSX Corporation and Affiliated Companies primarily for the purpose of providing deferred compensation for a select group of management or highly-compensated employees.

ARTICLE 1. DEFINITIONS

1.1 ACCOUNT means the bookkeeping account maintained for each Member to record his Salary Deferrals, Matching Credits and the amount of Awards he has elected to defer, as adjusted pursuant to Article 7.

1.2 ADMINISTRATOR means the Corporation. The duties of the Administrator shall be performed by a person or persons designated by the Chief Executive Officer of the Corporation to perform such duties.

1.3 AFFILIATED COMPANY means the Corporation and any company or corporation directly or indirectly controlled by the Corporation.

1.4 AWARD means the amount other than salary awarded to an employee of an Affiliated Company under the various incentive compensation plans and programs of CSX that may be offered from time to time, and which has been designated by the Administrator as eligible for deferral under the Plan, including but not limited to ICP Awards, stock awards, stock options and special incentive awards.

1.5 AWARD DEFERRAL AGREEMENT means a Deferral Agreement filed in accordance with the Award deferral program described in Article 4.

1.6 BENEFITS TRUST COMMITTEE means the committee created pursuant to the CSX Corporation and Affiliated Companies Benefits Assurance Trust Agreement.

1.7 BOARD OF DIRECTORS or "Board" means the Board of Directors of the Corporation.

1.8 CHANGE OF CONTROL means any of the following:

(a) Stock Acquisition. The acquisition, by any individual, entity or group [within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities



Powered by Morningstar® Document Research℠

Exchange Act of 1934, as amended (the "Exchange Act")] (a "Person") of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 20% or more of either (i) the then outstanding shares of common stock of the Corporation (the "Outstanding Corporation Common Stock"), or (ii) the combined voting power of the then outstanding voting securities of the Corporation entitled to vote generally in the election of directors (the "Outstanding Corporation Voting Securities"); provided, however, that for purposes of this subsection (a), the following acquisitions shall not constitute a Change of Control: (i) any acquisition directly from the Corporation; (ii) any acquisition by the Corporation; (iii) any acquisition by any employee benefit plan (or related trust) sponsored or maintained by the Corporation or any corporation controlled by the Corporation; or (iv) any acquisition by any corporation pursuant to a transaction which complies with clauses (i), (ii) and (iii) of subsection (c) of this Section 1.8; or

(b) Board Composition. Individuals who, as of the date hereof, constitute the Board of Directors (the "Incumbent Board") cease for any reason to constitute at least a majority of the Board of Directors; provided, however, that any individual becoming a director subsequent to the date hereof whose election or nomination for election by the Corporation's shareholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board shall be considered as though such individual were a member of the Incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office occurs as a result of an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board of Directors; or

(c) Business Combination. Approval by the shareholders of the Corporation of a reorganization, merger, consolidation or sale or other disposition of all or substantially all of the assets of the Corporation or its principal subsidiary that is not subject, as a matter of law or contract, to approval by the Interstate Commerce Commission or any successor agency or regulatory body having jurisdiction over such transactions (the "Agency") (a "Business Combination"), in each case, unless, following such Business Combination:

(i) all or substantially all of the individuals and entities who were the beneficial owners, respectively, of the Outstanding Corporation Common Stock and Outstanding Corporation Voting Securities immediately prior to such Business Combination beneficially own, directly or indirectly, more than 50% of, respectively, the then outstanding shares of common stock and the combined voting power of the then outstanding voting securities entitled to vote generally in the election of directors, as the case may be, of the corporation resulting from such Business Combination (including, without limitation, a corporation which as a result of such transaction owns the Corporation or its principal subsidiary or all or substantially all of the assets of the Corporation or its principal subsidiary either directly or through one or more subsidiaries) in substantially the same proportions as their ownership, immediately prior to such Business Combination of the Outstanding Corporation Common



 Powered by Morningstar® Document Research℠

Stock and Outstanding Corporation Voting Securities, as the case may be;

(ii) no Person (excluding any corporation resulting from such Business Combination or any employee benefit plan (or related trust) of the Corporation or such corporation resulting from such Business Combination) beneficially owns, directly or indirectly, 20% or more of, respectively, the then outstanding shares of common stock of the corporation resulting from such Business Combination or the combined voting power of the then outstanding voting securities of such corporation except to the extent that such ownership existed prior to the Business Combination; and

(iii) at least a majority of the members of the board of directors resulting from such Business Combination were members of the Incumbent Board at the time of the execution of the initial agreement, or of the action of the Board of Directors, providing for such Business Combination; or

(d) Regulated Business Combination. Approval by the shareholders of the Corporation of a Business Combination that is subject, as a matter of law or contract, to approval by the Agency (a "Regulated Business Combination") unless such Business Combination complies with clauses (i), (ii) and (iii) of subsection (c) of this Section 1.8; or

(e) Liquidation or Dissolution. Approval by the shareholders of the Corporation of a complete liquidation or dissolution of the Corporation or its principal subsidiary.

1.9 CODE means the Internal Revenue Code of 1986, as amended from time to time.

1.10 COMMITTEE means the Compensation Committee of the Board of Directors of CSX Corporation.

1.11 COMPANY STOCK means the common stock of the Corporation.

1.12 COMPENSATION means the "Base Compensation" of an Eligible Executive as defined in the Tax Savings Thrift Plan, determined prior to: (a) any Salary Deferrals under Article 5; and (b) any limit on compensation imposed by Section 401(a)(17) of the Code.

1.13 CORPORATION means CSX Corporation, a Virginia corporation, and any successor thereto by merger, purchase or otherwise.

1.14 DEFERRAL AGREEMENT means an agreement between an Eligible Executive and a Participating Company of which he is an employee under which the Eligible Executive agrees to defer an Award or make Salary Deferrals under the Plan, as the case may be. The Deferral Agreement shall be on a form prescribed by the Administrator and shall include any amendments, attachments or appendices.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

1.15 DISTRIBUTION ELECTION means the election by the Member of the event triggering the commencement of distribution under Section 8.2.

1.16 DISTRIBUTION EVENT means any of the events listed in Section 1.8, "Change of Control," with the following modification: the words, "Approval by the shareholders of the Corporation of," in the first line of Sections 1.8(c) and 1.8(d) are replaced for purposes of this Section 1.16 with the words, "Consummation of, i.e., actual change in ownership of Outstanding Corporation Common Stock, Outstanding Corporation Voting Stock, and/or assets of the Corporation or its principal subsidiary by reason of,".

1.17 DIVISIVE TRANSACTION means a transaction in which the Eligible Executive's employer ceases to be a Subsidiary or there is a sale of substantially all of the assets of the Subsidiary.

1.18 EFFECTIVE DATE means November 30, 2002 or with respect to the Eligible Executives of a company which adopts the Plan, it means the date such company becomes a Participating Company.

1.19 ELIGIBLE EXECUTIVE means an employee of a Participating Company, provided that:

(a) For purposes of the award deferral program described in Article 4:

(i) Such employee is employed by a Participating Company in salary band 6 or above as of December 30 of the calendar year for which the Award is made (or in the case of a multiple-year Award, December 30 of the last calendar year for which the Award is made); and

(ii) (A) is employed by a Participating Company and is receiving Compensation of one hundred thousand dollars ($100,000) or more per year; or (B) retired from the Participating Companies or terminated employment with the Participating Companies on account of disability as determined by the Administrator, and was receiving compensation of one hundred thousand dollars ($100,000) or more per year at the time of such retirement or termination.

(b) For purposes of the salary deferral program described in Article 5, such employee is:

(i) eligible for membership in the Tax Savings Thrift Plan; and

(ii) employed in salary band 6 or above; and

(iii) receiving Compensation of one hundred thousand dollars ($100,000) or more per year.

(c) The Compensation amount set forth in subsections (a)(ii) and (b)(ii) shall be adjusted no more frequently than annually, based on (i) changes in the Consumer Price Index ("CPI"), such adjustment to be made in increments of ten thousand dollars ($10,000) only, rounded to next lowest increment as



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

indicated by the CPI, or (ii) in the discretion of the Chief Executive Officer, a review of data regarding eligibility to participate in this type of program. An employee who is eligible to participate because his Compensation satisfies the requirements of subsection (a)(ii) or (b)(iii) above, and is excluded from participation only because of a subsequent increase in the Compensation requirement shall continue to be eligible to participate.

(d) The Chief Executive Officer of the Corporation or his designee may designate any other employee or former employee of an Affiliated Company as an Eligible Executive, including an employee or former employee who has previously made deferrals under a prior Company deferral plan; provided, however, only those employees or former employees considered to be a select group of management or highly compensated may be designated as Eligible Executives under this Plan. Notwithstanding the preceding, following a Change of Control, such designations are subject to the approval of the Benefits Trust Committee.

1.20 ENROLLMENT FORM means the form prescribed by the Administrator that an Eligible Executive who has previously made deferrals under a prior Company deferral plan may file pursuant to Section 2.1 in order to become a Member and participate in the Plan.

1.21 EXECUTIVE STOCK ACCOUNT means the bookkeeping account maintained for each Member to record his deferral of Stock Awards pursuant to Article 6.

1.22 FORM OF PAYMENT ELECTION means the election by the Member of the form of distribution he will receive from his Account or Executive Stock Account pursuant to Section 9.2.

1.23 ICP AWARD means the Participating Companies' Incentive Compensation Program, including but not limited to the Management Incentive Compensation Program ("MICP") and the Senior Management Incentive Compensation Program ("SMICP").

1.24 INDEPENDENT ACCOUNTANT means the independent accountants engaged by the Corporation and, if selected or changed following a Change of Control, approved by the Benefits Trust Committee.

1.25 MATCHING CREDITS means amounts credited to the Account of a Member pursuant to Section 5.5.

1.26 MEMBER means, except as otherwise provided in Article 2, each Eligible Executive who has executed an initial Deferral Agreement or Enrollment Form as described in Section 2.1.

1.27 PARTIAL DISTRIBUTION ELECTION means a Distribution Election for a portion of a Member's Account under Section 8.2(d).

1.28 PARTICIPATING COMPANY means the Corporation and any company or corporation directly or indirectly controlled by the Corporation, which the Committee designates as eligible to participate in the Plan in accordance with Section 11.6(e).



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

1.29 PLAN means this 2002 Deferred Compensation Plan of CSX Corporation and Affiliated Companies, as amended from time to time.

1.30 SALARY DEFERRALS means the amounts credited to a Member's Account under Section 5.3.

1.31 SALARY DEFERRAL AGREEMENT means a Deferral Agreement filed in accordance with the salary deferral program described in Article 5.

1.32 STOCK AWARD means an Award that is or will be payable in Company Stock issued pursuant to the CSX Omnibus Incentive Plan ("COIP") or another of the Corporation's stock incentive plans, including but not limited to Performance Shares, nonqualified stock options, Incentive Stock Options, restricted stock and stock appreciation rights.

1.33 SUBSIDIARY means a corporation more than 50% of the voting shares of which are owned directly or indirectly by the Corporation.

1.34 TAX SAVINGS THRIFT PLAN means the Tax Savings Thrift Plan for Employees of CSX Corporation and Affiliated Companies, as amended from time to time.

1.35 TRUST means the CSX Corporation and Affiliated Companies Benefits Assurance Trust.

1.36 VALUATION DATE means the last business day of each calendar month following the Effective Date.

ARTICLE 2. MEMBERSHIP

2.1 IN GENERAL:

(a) An Eligible Executive shall become a Member as of the date he files his initial Deferral Agreement or an Enrollment Form with the Administrator. Such Deferral Agreement shall be effective for purposes of deferring an Award or making Salary Deferrals only as provided in Articles 4 and 5. Such Enrollment Form shall be effective for purposes of transferring balances previously deferred under a prior Company deferral plan to the Member's Account or Executive Stock Account only as provided in Articles 6 and 7.

(b) As a condition of membership, the Administrator may require such other information as it deems appropriate.

2.2 TERMINATION OF EMPLOYMENT; RE-EMPLOYMENT:

(a) Subject to Section 2.4, membership shall not cease upon a Member's termination of employment. In the event that a Member ceases to be employed by an Affiliated Company, his Salary Deferrals and Matching Credits shall thereupon be suspended until such time as he shall be re-employed as an Eligible Executive by an Affiliated Company.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

(b) In the event that a Member ceases to be employed by an Affiliated Company he shall continue to be a Member of the Plan but shall not be eligible to defer any portion of any future Awards until such time as he shall be re-employed as an Eligible Executive by an Affiliated Company.

(c) Upon re-employment as an Eligible Executive a Member may participate in the Plan as follows:

(i) in the case of a Member who prior to re-employment received the balance in his Account or Executive Stock Account, by executing a Deferral Agreement or Enrollment Form as provided in Section 2.1 as though for all purposes of the Plan the Affiliated Companies had never employed the Member;

(ii) in the case of a Member who prior to re-employment did not receive the balance in his Account or Executive Stock Account, by executing a Deferral Agreement or Enrollment Form as provided in Section 2.1, provided his Distribution Elections and beneficiary designation shall remain in effect.

(iii) distributions shall cease if the commencement of distribution was because of the Member's termination of employment (including retirement);

(iv) distributions shall continue if the commencement of distribution was because the Member chose a specific date or age for the commencement of benefits and that date or age has been attained.

2.3 CHANGE IN STATUS:

(a) In the event that a Member ceases to be an Eligible Executive with respect to Salary Deferrals but continues to be employed by an Affiliated Company, his Salary Deferrals and Matching Credits shall thereupon be suspended until such time as he shall once again become an Eligible Executive. All other provisions of his Salary Deferral Agreement shall remain in force and he shall continue to be a Member of the Plan.

(b) In the event that a Member ceases to be an Eligible Executive with respect to the deferral of Awards hereunder but continues to be employed by an Affiliated Company, he shall continue to be a Member of the Plan but shall not be eligible to defer any portion of any future Awards until such time as he shall once again become an Eligible Executive.

2.4 MEMBERSHIP FOLLOWING A CHANGE OF CONTROL: Following a Change of Control, any membership determinations or discretionary actions pursuant to this Article 2 shall be subject to the approval of the Benefits Trust Committee.

ARTICLE 3. DEFERRAL AGREEMENTS

3.1 DEFERRAL AGREEMENT: A Deferral Agreement shall be in a form, including electronic form approved by the Administrator, which shall be the sole judge of the



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

proper completion thereof. Such Agreement shall provide for the deferral of an Award or for Salary Deferrals and may include such other provisions as the Administrator deems appropriate.

3.2 MODIFICATION OF DEFERRAL AGREEMENT: A Member may elect to change, modify or revoke a Deferral Agreement as follows by filing a new Deferral Agreement:

(a) A Member may change the amount of Award he elects to defer on an Award Deferral Agreement prior to the Agreement's effective date as provided in Article 4.

(b) A Member may change the rate of his Salary Deferrals or suspend his Salary Deferrals as provided in Article 5.

ARTICLE 4. AWARD DEFERRAL PROGRAM

4.1 FILING REQUIREMENTS:

(a) With respect to an ICP Award made for a calendar year or multiple years and determined and paid in the following calendar year, an Eligible Executive may elect, subject to Section 4.2(a) to defer all or a portion of his Award, if any, for that year. Such election shall be made by filing an Award Deferral Agreement with the Administrator on or before the close of business on November 15 of the calendar year (or, in the case of a multiple-year Award, the last calendar year) for which the Award is earned. An election to defer a portion of an Award shall be an integral percentage of such Award.

(b) With respect to an ICP Award, notwithstanding Section 4.1 (a), an individual who becomes an Eligible Executive after November 15 of the calendar year for which an Award is made, but prior to the first day of the month in which such Award is determined including required action by the Board, may elect, subject to Section 4.2(a) to defer all or a portion of that Award in accordance with this Section 4.1(b). Such election shall be made by filing an Award Deferral Agreement during the 30 day or shorter period beginning on the date the individual becomes an Eligible Executive and ending no later than the last day of the month preceding the month in which the Award is determined.

(c) With respect to an ICP Award, an Eligible Executive's election to defer all or a portion of his Award shall be effective on the last day that such deferral may be elected under Section 4.1 (a) or 4.1 (b) and shall be effective only for the Award in question. An Eligible Executive may revoke or change his election to defer all or a portion of his Award at any time prior to the date the election becomes effective, as described in the preceding sentence. Any such revocation or change shall be made in a form and manner determined by the Administrator.

(d) With respect to an Award other than an ICP Award, an Eligible Executive shall be entitled to defer an Award by filing an Award Deferral Agreement with the Administrator on or before the close of business on November 15 of the calendar year immediately prior to the year in which the



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Award is paid or made available to the Eligible Executive. Such Award Deferral Agreement shall be effective only for the Award in question.

(e) The Committee in its sole discretion may require that certain Awards must be deferred, in which case no Award Deferral Agreement shall be required to be filed.

4.2 AMOUNT OF DEFERRAL:

(a) With respect to an ICP Award, prior to a Change of Control, the Committee in its sole discretion, may establish such maximum limit on the amount of Award an Eligible Executive may defer for a calendar year as the Committee deems appropriate. Such maximum limit shall appear on the Eligible Executive's Award Deferral Agreement for the year. Following a Change of Control, the Committee's decision is subject to the final approval of the Benefits Trust Committee.

(b) With respect to an ICP Award there shall be no minimum amount of deferral allowed unless otherwise designated by the Administrator.

(c) With respect to an Award other than an ICP Award there shall be neither minimum nor maximum amount of deferral allowed unless otherwise designated by the Administrator.

4.3 CREDITING TO ACCOUNT: The amount of Award which an Eligible Executive has elected to defer shall be credited to his Account on the date coincident with or as soon as reasonably practicable following the date the Award would have been paid to the Eligible Executive.

ARTICLE 5. SALARY DEFERRAL PROGRAM

5.1 FILING REQUIREMENTS:

(a) An individual who is an Eligible Executive immediately prior to the Effective Date may file a Salary Deferral Agreement or an Enrollment Form with the Administrator, within such period prior to the Effective Date and in such manner as the Administrator may prescribe.

(b) An individual who becomes an Eligible Executive on or after the Effective Date may file a Salary Deferral Agreement with the Administrator during the calendar month he becomes an Eligible Executive, in such manner as the Administrator may prescribe.

(c) An Eligible Executive who fails to file a Salary Deferral Agreement with the Administrator as provided in Sections 5.1 (a) and 5.1 (b) may file a Salary Deferral Agreement in any subsequent month of December.

5.2 SALARY DEFERRAL AGREEMENT:

(a) A Member's Salary Deferral Agreement shall authorize a reduction in his base pay with respect to his Salary Deferrals under the Plan. Such salary



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

reduction shall be an integral percentage not in excess of fifty (50%) percent. The Agreement shall be effective for payroll periods beginning on or after the later of: (i) the Effective Date; or (ii) the first day of the month following the date the Salary Deferral Agreement is filed with the Administrator in accordance with Section 5.1. Paychecks applicable to said payroll periods shall be reduced accordingly.

(b) A Salary Deferral Agreement shall not be revoked or modified with respect to prior deferrals and shall remain in effect until such time as the Member files with the Administrator a new Salary Deferral Agreement.

(c) A Member who is a participant in the Tax Savings Thrift Plan will have his salary deferral election under the Tax Savings Thrift Plan serve as his Salary Deferral Agreement under this Plan, and will not file a separate Salary Deferral Agreement.

5.3 AMOUNT OF SALARY DEFERRALS: On each pay date, or as soon as reasonably practicable thereafter, following the effective date of an Eligible Executive's Salary Deferral Agreement, his Account shall be credited with an amount of Salary Deferral, if any, for the payroll period ending thereon, as he elects in his Salary Deferral Agreement, provided, however, that no Salary Deferral shall be made under this Plan for any payroll period unless the Eligible Executive is prevented from making elective deferrals under the Tax Savings Thrift Plan for such payroll period as a result of Section 402(g) and/or 401 (k)(3) of the Code, and provided further that, for the payroll period in which such Salary Deferral is first made, it shall be limited to the excess of the amount otherwise determined for such payroll period under this Section 5.3 over the Eligible Executive's elective deferrals under the Tax Savings Thrift Plan for such payroll period.

5.4 EFFECT OF HARDSHIP WITHDRAWAL: In the event a Member makes a Hardship Withdrawal under Section 8.5 of the Plan, his Salary Deferrals under the Plan will be automatically suspended. The Member may apply to the Administrator to resume his Salary Deferrals with respect to payroll periods beginning on or after the January 1 following the date of suspension, at a time and in a manner determined by the Administrator; provided, that the Administrator shall approve such resumption only if the Administrator determines that the Member is no longer incurring such hardship. Notwithstanding the preceding, following a Change of Control, such action by the Administrator is subject to approval by the Benefits Trust Committee.

5.5 CERTAIN ADDITIONAL CREDITS:

On each pay date, or as soon as reasonably practicable thereafter, there shall be credited Matching Credits to the Account of a Member determined as follows: the greater of (a) or (b), minus (c), where

(a) is the employer matching contributions the Member would have received under the Tax Savings Thrift Plan if the provisions of Sections 401 (k)(3), 401(m)(9) and 415 of the Code had not applied to the Tax Savings Thrift Plan; and

(b) is the employer matching contributions the Member would have received under the Tax Savings Thrift Plan if his deferrals under this Plan had



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

been contributed to the Tax Savings Thrift Plan (in addition to those amounts actually contributed to that Plan), based on Compensation as defined in this Plan and as if the provisions of Sections 401(a)(17), 401(k)(3), 401(m)(2), 401(m)(9) and 415 of the Code had not applied to the Tax Savings Thrift Plan; and

(c) is the employer matching contributions made on his behalf for the applicable period to the Tax Savings Thrift Plan.

ARTICLE 6. EXECUTIVE STOCK DEFERRAL PROGRAM

6.1 STOCK AWARDS: An Eligible Executive who is eligible to receive a Stock Award, the terms of which permit its deferral, may file with the Administrator an Award Deferral Agreement with respect to a Stock Award, pursuant to Article 4.

6.2 EXECUTIVE STOCK ACCOUNT:

(a) A Member's Executive Stock Account will be created when he files his initial Award Deferral Agreement with respect to a Stock Award. An Executive Stock Account will be credited based upon the performance of Company Stock. No Member shall make an Investment Performance Election with respect to his Executive Stock Account.

(b) A Member shall be eligible to file Distribution Elections pursuant to Article 8 and Form of Payment Elections pursuant to Article 9 with respect to his Executive Stock Account. If a Member has not filed a Distribution Election distribution of his Executive Stock Account will be made pursuant to Section 8.1. If a Member has not filed a Form of Payment Election distribution of his Executive Stock Account will be made pursuant to Section 9.1. Distributions from a Member's Executive Stock Account shall be made only in shares of Company Stock.

(c) An Eligible Executive who has previously deferred shares of Company Stock granted pursuant to the CSX Omnibus Incentive Plan ("COIP") or another of the Corporation's stock incentive plans may elect to have an Executive Stock Account created for him in the Plan on the Effective Date by filing an Enrollment Form with the Administrator on or before the Effective Date. Filing the Enrollment Form will cause the transfer of such previously deferred share balances to the Member's Executive Stock Account on the Effective Date, and the Member will enjoy all rights and privileges of a Member including the ability to file initial Distribution Elections and Form of Payment Elections. A properly filed Enrollment Form will cause all prior elections made with respect to such previously deferred shares to be void immediately, unless otherwise stated in this Section 6.2.

(i) No initial Distribution Election made pursuant to this Section 6.2 with respect to such previously deferred shares which designates distribution upon attainment of a designated age under Section 8.2(a)(i) that is within one year after the Effective Date shall be filed.

(ii) No initial Distribution Election made pursuant to this Section 6.2 with respect to such previously deferred shares which designates distribution upon the Member's termination of employment with the Affiliated Companies under Section 8.2(a)(ii) shall be effective if distribution would occur within one year after the Effective Date.

(iii) Any prior election made with respect to such previously deferred shares which designates distribution upon the Member's termination of employment with the Affiliated Companies shall remain in effect until one year after the Effective Date, and shall be void thereafter.

6.3 DIVIDEND REINVESTMENT: A Member may elect annually, at such time as the Administrator may prescribe prior to the close of business on November 15 in any calendar year, in the form and manner prescribed by the Administrator to receive credit in his Executive Stock Account for dividends paid on Company Stock, in the amount with which such Executive Stock Account would have been credited assuming it had been invested in Company Stock ("Dividend Equivalents"). Absent such an election, Dividend Equivalents will be paid currently to the Member by the Company.

ARTICLE 7. MAINTENANCE OF ACCOUNTS

7.1 CREATION OF ACCOUNT:

(a) A Member's Account will be created when he files his initial Deferral Agreement.

(b) An Eligible Executive who is a Member of the Supplementary Savings And Incentive Award Deferral Plan For Eligible Executives Of CSX Corporation And Affiliated Companies (the "SSP") may elect to have an Account created for him in the Plan on the Effective Date by filing an Enrollment Form with the Administrator on or before the Effective Date. Filing the Enrollment Form will cause the transfer of balances previously deferred under the SSP to the Member's Account on the Effective Date, and the Member will enjoy all rights and privileges of a Member including the ability to file initial Investment Performance Elections, Distribution Elections and Form of Payment Elections. A properly filed Enrollment Form will cause all prior elections made under the SSP to be void immediately, unless otherwise stated in this Section 7.1, however the Member's investment fund allocations under the SSP shall remain in effect for transferred balances until such time as the Member reallocates the current balance of his Account pursuant to section 7.4(b).

(i) No initial Distribution Election made pursuant to this Section 7.1 with respect to such previously deferred amounts which designates distribution upon attainment of a designated age under Section 8.2(a)(i) that is within one year after the Effective Date shall be filed.

(ii) No initial Distribution Election made pursuant to this Section 7.1 with respect to such previously deferred amounts which designates distribution upon the Member's termination of employment



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

with the Affiliated Companies under Section 8.2(a)(ii) shall be effective if distribution would occur within one year after the Effective Date.

(iii) Any prior election made under the SSP which designates distribution upon the Member's termination of employment with the Affiliated Companies shall remain in effect until one year after the Effective Date, and shall be void thereafter.

(c) A Member shall be eligible to file Distribution Elections pursuant to Article 8 and Form of Payment Elections pursuant to Article 9 with respect to his Account. If a Member has not filed a Distribution Election distribution of his Account will be made pursuant to Section 8.1. If a Member has not filed a Form of Payment Election distribution of his Account will be made pursuant to Section 9.1.

7.2 ADJUSTMENT OF ACCOUNT:

(a) As of each pay date, or as soon as reasonably practicable thereafter, each Account shall be credited or debited with the amount of earnings or losses with which such Account would have been credited or debited, assuming it had been invested in one or more investment funds, or earned the rate of return of one or more indices of investment performance, designated by the Administrator and elected by the Member, for purposes of measuring the investment performance of his Account.

(b) The Administrator shall designate at least one investment fund or index of investment performance and may designate other investment funds or investment indices to be used to measure the investment performance of Accounts. The designation of any such investment funds or indices shall not require the Affiliated Companies to invest or earmark their general assets in any specific manner. The Administrator may change the designation of investment funds or indices from time to time, in its sole discretion, and any such change shall not be deemed to be an amendment affecting Members' rights under Section 10.2.

(c) For purposes of Section 7.2(a), the portion of a Member's Account attributable to Matching Credits shall initially be credited based upon the performance of "Fund E" (CSX Stock Fund) under the Tax Savings Thrift Plan.

7.3 INVESTMENT PERFORMANCE ELECTIONS: In the event the Administrator designates more than one investment fund or index of investment performance under Section 7.2, each Member shall file an initial investment performance election with the Administrator with respect to the investment of his Account. The election shall designate the investment fund or funds or index or indices of investment performance, which shall be used to measure the investment performance of the Member's Account. The election shall be made within such time period and on such form as the Administrator may prescribe and shall be in integral percentages of the Member's Account balance or deferral. The election shall be effective as of the beginning of the payroll period next following the date the election is filed. In the event a Member does not file an investment performance election, his Account shall be credited with earnings and losses



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

as if the Account had earned the same rate of return as the Stable Value Fund under the Tax Savings Thrift Plan.

7.4 CHANGING INVESTMENT PERFORMANCE ELECTIONS:

(a) A Member may change his election in Section 7.3 with respect to his Account by filing an appropriate written notice with the Administrator. The notice shall be effective as of the beginning of the first payroll period following the date the notice is filed with the Administrator.

(b) A Member may reallocate the current balance of his Account, thereby changing the investment fund or funds or index or indices of investment performance used to measure the future investment performance of his existing Account balance, by filing an appropriate notice with the Administrator. Such notice shall be effective as soon as administratively practicable following its receipt by the Administrator. A Member may not reallocate the balance of his Executive Stock Account to any investment other than Company Stock.

7.5 VESTING OF ACCOUNT: Each Member shall be fully vested in his Account or Executive Stock Account.

7.6 ACTION FOLLOWING A CHANGE OF CONTROL: Following a Change of Control, any action taken by the Administrator pursuant to this Article 7 is subject to the approval of the Benefits Trust Committee.

ARTICLE 8. DISTRIBUTION OF BENEFITS

8.1 COMMENCEMENT OF DISTRIBUTION: The distribution of the Member's Account or Executive Stock Account shall commence on the date that is one year following the Member's termination of employment with the Affiliated Companies, or at such time as may be designated by the Member on a Distribution Election pursuant to Section 8.2.

8.2 DISTRIBUTION ELECTION

(a) A Member may file with the Administrator a Distribution Election for the distribution upon:

(i) attainment of a designated age not earlier than age 50 nor later than age 70-1/2, however he shall not elect an age less than one year subsequent to his current age; or

(ii) termination of employment with the Affiliated Companies.

(b) A Member may file with the Administrator a Partial Distribution Election for the distribution on attainment of a designated age for the payment of the expenses directly or indirectly arising from enrollment in a college, university, another post-secondary institution of higher learning or a secondary educational institution in the name of one or more of:



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

(i) each of the Member's children,

(ii) each of the Member's brothers, sisters, their spouses, the Member's spouse, or

(iii) each of the foregoing's lineal descendants.

(c) A Member may file a Distribution Election or change a Distribution Election at any time prior to:

(i) a date that is 30 days subsequent to the date of his termination of employment in the case of his initial Distribution Election; or

(ii) one year prior to the date distribution is to commence under his Distribution Election then in effect, after which time no Distribution Election shall be filed.

(d) A Member may make a Partial Distribution Election with respect to any portion of his Account or Executive Stock Account, provided no Distribution Election shall be made for a portion of an Account or Executive Stock Account less than $2,000, as determined as of the date the election is made. No Member shall have more than four Distribution Elections in effect at any time.

(e) In no event may distribution made pursuant to a Distribution Election commence prior to a date that is three years subsequent to the date the Member first makes a Salary Deferral or Award Deferral under either this Plan, the SSP, the COIP or another of the Corporation's stock incentive plans for which an Executive Stock Account has been established.

(f) For purposes of this Plan and particularly this Article 8, if the Member's employer is involved in a Divisive Transaction, the Member will be considered to have terminated his employment with an Affiliated Company on the closing date of the Divisive Transaction, provide the Member's employment with his employer has not otherwise terminated prior to that date.

(g) Notwithstanding anything in Section 8.1 or 8.2 to the contrary, upon death of a Member, the balance of his Account or Executive Stock Account shall be distributed to his beneficiary as soon as administratively practicable following the January 1 coincident with or next following his date of death.

(h) Any Distribution Election made in proper form by a Member shall be effective and distribution shall commence pursuant to such Distribution Election. Any Distribution Election not made in proper form shall be void.

8.3 DELAY OF PAYMENT

(a) Notwithstanding the foregoing, prior to a Change of Control, the Corporation may delay payment of a benefit under this Plan to any Member who is determined to be among the top five most highly paid executives for the year the benefit under this Plan would otherwise be paid; provided, however, if a



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Member's payment is delayed, the benefit to which he is entitled will not decrease after the date it would otherwise be distributed.

(b) Notwithstanding the preceding, following a Change of Control, the authority to delay payment of a Member's Account or Executive Stock Account rests solely with the Benefits Trust Committee.

8.4 ACCOUNT ADJUSTMENT: The obligations of the Corporation or any of its affiliated corporations and the benefits due any Member, surviving spouse or beneficiary hereunder shall be reduced by any amount received in regard thereto under the Benefits Assurance Trust or any similar trust or other vehicle.

8.5 HARDSHIP WITHDRAWAL, FORFEITURE:

(a) While employed by the Participating Companies, a. Member may, in the event of a severe financial hardship, request a withdrawal from his Account or Executive Stock Account without filing a Distribution Election under Section 8.2. The request shall be made in a time and manner determined by the Administrator, shall not be for a greater amount than the amount required to meet the financial hardship, and shall be subject to approval by the Administrator. The Administrator shall consider any requests for payment under this Section 8.5 on a uniform and nondiscriminatory basis and in accordance with the standards of interpretation described in section 457 of the Code and the regulations thereunder. The circumstances that will constitute a severe financial hardship will depend upon the facts of each case, but, in any case, no withdrawal may be made to the extent that such hardship is or may be relieved: (i) through reimbursement or compensation by available insurance or otherwise or (ii) by liquidation of the Member's assets, to the extent the liquidation of such assets would not itself cause severe financial hardship.

(b) For purposes of this Section 8.5 severe financial hardship may include any of the following circumstances:

(i) illness or injury of the Member or his dependents,

(ii) the loss of the Member's home or its contents due to casualty, or

(iii) any other extraordinary and unforeseeable circumstances of the Member approved by the Administrator,

as long as those circumstances result in a present or impending critical financial need, including the inability to educate the Member's dependent child(ren).

(c) Notwithstanding the preceding, a Member may request and receive a withdrawal from his Account or Executive Stock Account at any time without filing a Distribution Election under Section 8.2. Any such withdrawal which is not determined by the Administrator to be a hardship withdrawal under this Section 8.5 shall result in the forfeiture of an amount equal to the portion of the Member's Account or Executive Stock Account, as applicable, that is withdrawn,



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

multiplied by the Mid-term Applicable Federal Rate determined as of the Valuation Date upon which the withdrawal is effective.

(d) Notwithstanding the preceding, following a Change of Control, any decisions or determinations by the Administrator under this Section 8.5 shall be subject to the approval of the Benefits Trust Committee.

8.6 DESIGNATION OF BENEFICIARY: A Member may, at a time and in a manner determined by the Administrator, designate a beneficiary and one or more contingent beneficiaries (which may include the Member's estate) to receive any benefits which may be payable under this Plan upon his death. If the Member does not designate a beneficiary or contingent beneficiary, or if the beneficiary and the contingent beneficiaries do not survive the Member, such benefits shall be paid to the Member's estate. A Member may revoke or change any designation made under this Section 8.6 in a time and manner determined by the Administrator.

8.7 SPECIAL DISTRIBUTION RULES: Notwithstanding anything to the contrary in this Plan, if (a) a Member becomes the owner, director or employee of a competitor of the Affiliated Companies, (b) his employment is terminated by an Affiliated Company on account of actions by the Member which are detrimental to the interests of the Affiliated Company, or (c) he engages in conduct subsequent to the termination of his employment with the Affiliated Companies which the Administrator determines to be detrimental to the interests of an Affiliated Company, then the Administrator may, in its sole discretion, pay the Member a single sum payment or, in the case of an Executive Stock Account, a distribution in shares of Company Stock equal to the balance in his Account or Executive Stock Account. The single sum payment or distribution of shares shall be made as soon as practicable following the date the Member becomes an owner, director or employee of a competitor, his termination of employment or the Administrator's determination of detrimental conduct, as the case may be, and shall be in lieu of all other benefits which may be payable to the Member under this Plan.

8.8 STATUS OF ACCOUNT PENDING DISTRIBUTION:

(a) Pending distribution, a Member's Account shall continue to be credited with earnings and losses as provided in Section 7.2. The Member shall be entitled to change his investment elections under Section 7.3 or apply for Hardship withdrawals under Section 8.5. In the event of the death of a Member, his Account shall be credited with earnings and losses as if the Account had earned the same rate of return as the CSX Corporation Cash Pool Earnings Rate or, in the sole discretion of the Administrator, the rate of return of such other index of investment performance or investment fund which may be designated by the Administrator as a measure for investment performance of Members' Accounts commencing with the Valuation Date coincident with or next following the Member's date of death.

(b) Pending distribution, a Member's Executive Stock Account shall continue to be credited based on the performance of Company Stock as provided in Section 6.2.

8.9 ONE-TIME RE-DEFERRAL ELECTION: A Member may make one additional election to defer (but not accelerate) commencement of payment under the Plan at any



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

time six months before payments are to have commenced pursuant to Section 8.1 or 8.2 ("Re-deferral Election). Such Re-deferral Election shall be made in a form prescribed by the Administrator. If such Re-deferral Election is to a designated age the re-deferral shall be for a period not less than one year from the date the Re-deferral Election is made.

8.10 CHANGE OF CONTROL:

(a) A Member shall be eligible to make a separate Distribution Election which shall be effective only in the event of a Change of Control.

(b) If a Change of Control has occurred, the Corporation and Participating Companies shall contribute to the Trust within 7 days of such Change of Control, a lump sum payment equal to the greater of (i) the aggregate value of the amount each Member would be eligible to receive (determined under (b) below) as of the latest Valuation Date coinciding with or preceding the date of Change of Control or (ii) the amount determined under Section 1(h) of the Trust attributable to liabilities relating to the Plan to the extent such amounts are not already in the Trust. The aggregate value of the amount of the lump sum to be contributed to the Trust pursuant to this Section 8.10 shall be determined by the Independent Accountants after consultation with the entity then maintaining the Plan's records, and shall be projected, if necessary, to such Valuation Date from the last valuation of Members' Accounts or Executive Stock Accounts for which information is readily available. Thereafter, the Independent Accountants shall annually determine as of a Valuation Date for each Member not receiving a lump sum payment pursuant to subsection (c) below the value of each Member's Accounts or Executive Stock Accounts. To the extent that the value of the assets held in the Trust relating to this Plan do not equal the aggregate amount described in the preceding sentence, at the time of the valuation, as determined by the Independent Accountants, the Corporation and Participating Companies shall make a lump sum contribution to the Trust equal to the difference.

(c) In the event a Distribution Event has occurred, the trustee of the Trust shall, within 45 days of such Distribution Event, pay to each Member not making an election under (d) below, a lump sum payment or, in the case of an Executive Stock Account, a distribution in shares of Company Stock equal to the value of the Member's Account or Executive Stock Account (determined under Article 6) as of the Valuation Date coinciding with or next preceding the date of such Distribution Event. The amount of each Member's lump sum payment or Company Stock distribution shall be determined by the Independent Accountants after consultation with the entity then maintaining the Plan's records, and shall be projected, if necessary, to such Valuation Date from the last valuation of Member's Account or Executive Stock Account for which information is readily available.

(d) Each Member may elect in a time and manner determined by the Administrator, but in no event later than 90 days following the Effective Date, to have amounts and benefits determined and payable under the terms of the Plan as if a Distribution Event had not occurred. New Members of the Plan may elect in a time and manner determined by the Administrator, but in no event later than 90 days after becoming a Member, to have amounts and benefits determined



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

and payable under the terms of the Plan as if a Distribution Event had not occurred. A Member who has made an election, as set forth in the two preceding sentences, may, at any time and from time to time, change that election; provided, however, a change of election that is made within one year of a Distribution Event shall be invalid.

(e) Notwithstanding anything in the Plan to the contrary, each Member who has made an election under (d) above may elect within 90 days following a Distribution Event, in a time and manner determined by the Benefits Trust Committee, to receive a lump sum payment or, in the case of an Executive Stock Account, a distribution in shares of Company Stock, calculated under the provisions of (b) above determined as of the Valuation Date next preceding such payment, except that such calculated amount shall be reduced by an amount equal to such calculated amount, multiplied by the Mid-term Applicable Federal Rate determined as of the Valuation Date next preceding such payment and such reduction shall be irrevocably forfeited by the Member. Furthermore, as a result of such election, the Member shall no longer be eligible to participate or otherwise benefit from the Plan. Payments under this subsection (e) shall be made not later than 7 days following receipt by the Corporation of a Member's election. The Benefits Trust Committee shall, no later than 7 days after a Distribution Event has occurred, give written notification to each Member eligible to make an election under this subsection (e), that a Distribution Event has occurred and informing such Member of the availability of the election.

ARTICLE 9. FORM OF PAYMENT

9.1 TINNING OF DISTRIBUTION: Unless a Form of Payment Election is made pursuant to Section 9.2 below,

(a) a Member's Account shall be distributed to him, or in the event of his death to his Beneficiary, in a cash single sum payment as provided in Section 8.1.

(b) a Member's Executive Stock Account shall be distributed to him, or in the event of his death to his Beneficiary, in a single distribution of shares as provided in Section 8.1.

9.2 FORM OF PAYMENT ELECTION

(a) A Member may make a Form of Payment Election to receive distribution of his Account or Executive Stock Account in semi-annual installments over a period not to exceed twenty (20) years. Installments shall be determined as of each January 15 and July 15 (or in the case of an Executive Stock Account, December 30 and June 30) and shall be paid as soon as administratively practicable thereafter. The amount of each installment shall equal the balance in the Account or Executive Stock Account as of the Valuation Date of determination, divided by the number of remaining installments (including the installment being determined). If a Member dies before payment of the entire balance of his Account or Executive Stock Account, the remaining balance shall be paid in a single sum to his beneficiary as soon as administratively practicable following his date of death. Lump sum payments shall be determined and paid



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

as soon as administratively practicable following the date the Member incurs the distributable event elected on a Distribution Election under Section 8.2.

(b) A Member may make a separate Form of Payment Election with respect to any portion of his Account for which a Partial Distribution Election has been made pursuant to Section 8.2(d).

(c) A Member may change his Form of Payment Election at any time prior to a date that is six months prior to the date the distribution is to commence, after which time the Form of Payment Election shall be irrevocable.

9.3 INSTALLMENTS AND WITHDRAWALS PRO-RATA: In the event of any payment other than a single lump-sum, such as installment payment, partial distribution or hardship withdrawal, such payment or withdrawal shall be made on a pro-rata basis from the portions of the Member's existing Account balance which are subject to different measures of investment performance.

ARTICLE 10. AMENDMENT OR TERMINATION

10.1 RIGHT TO TERMINATE:

(a) Prior to a Change of Control, the Board may, in its sole discretion, terminate this Plan and the related Deferral Agreements at any time. Following a Change of Control, this Plan may not be terminated without the approval of the Benefits Trust Committee.

(b) Prior to a Change of Control, the Committee may terminate an Affiliated Company's participation as a Participating Company in this Plan for any reason at any time. Following a Change of Control, an Affiliated Company may not be terminated from participation as a Participating Company without the consent of the Benefits Trust Committee.

(c) Prior to a Change of Control, an Affiliated Company's board of directors may terminate that Affiliated Company's participation as a Participating Company for any reason at any time. Following a Change of Control, an Affiliated Company's participation as a Participating Company may not be terminated without the consent of the Benefits Trust Committee.

(d) In the event the Plan and related Deferral Agreements are terminated, each Member and Beneficiary shall receive a single sum payment, or, in the case of an Executive Stock Account, a distribution in shares of Company Stock equal to the balance in his Account or Executive Stock Account. The single sum payment shall be made as soon as practicable following the date the Plan is terminated and shall be in lieu of any other benefit which may be payable to the Member or beneficiary under this Plan.

10.2 RIGHT TO AMEND: Prior to a Change of Control, the Board may, in its sole discretion, amend this Plan and the related Deferral Agreements and Enrollment Forms on 30 days prior notice to the Members. Following a Change of Control, all amendments to this Plan are subject to the approval of the Benefits Trust Committee. If any amendment to this Plan or to the Deferral Agreements or Enrollment Forms shall



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

adversely affect the rights of a Member, such Member must consent in writing to such amendment prior to its effective date. If such Member does not consent to the amendment, the Plan and related Deferral Agreements and Enrollment Forms shall be deemed to be terminated with respect to such Member and he shall receive a single sum payment of his Account, or, in the case of an Executive Stock Account, a distribution in shares of Company Stock, as soon thereafter as is practicable. Notwithstanding the foregoing, the Administrator's change in any investment funds or investment index under Section 7.2(b) or the restriction of future deferrals under the salary deferral program or award deferral program shall not be deemed to adversely affect any Member's rights.

10.3 UNIFORM ACTION: Notwithstanding anything in the Plan to the contrary, any action to amend or terminate the Plan or the Deferral Agreements or Enrollment Forms must be taken in a uniform and nondiscriminatory manner. Notwithstanding the preceding, any such action taken by the Administrator following a Change of Control is subject to the approval of the Benefits Trust Committee.

ARTICLE 11. GENERAL PROVISIONS

11.1 NO FUNDING: Nothing contained in this Plan or in a Deferral Agreement shall cause this Plan to be a funded retirement plan. Neither the Member, his beneficiary, contingent beneficiaries, heirs or personal representatives shall have any right, title or interest in or to any funds of the Trust or the Affiliated Companies on account of this Plan or on account of having completed a Deferral Agreement or Enrollment Form. The assets held in the Trust shall be subject to the claims of creditors of the Corporation, and the Trust's assets shall be used to discharge said claims in the event of the Corporation's insolvency. Each Member shall have the status of a general unsecured creditor of the Affiliated Companies and this Plan constitutes a mere promise by the Affiliated Companies to make benefit payments in the future.

11.2 OBLIGATION: To the extent reflected by resolutions of the applicable boards of directors, obligations for benefits under this Plan shall be joint and several.

11.3 NO CONTRACT OF EMPLOYMENT: The existence of this Plan, a Deferral Agreement or an Enrollment Form does not constitute a contract for continued employment between an Eligible Executive or a Member and an Affiliated Company. The Affiliated Companies reserve the right to modify an Eligible Executive's or Member's remuneration and to terminate an Eligible Executive or a Member for any reason and at any time, notwithstanding the existence of this Plan, a Deferral Agreement or an Enrollment Form.

11.4 WITHHOLDING TAXES: All applicable FICA, RRTA or other employment taxes due on deferrals under this Plan shall be withheld from non-deferred salary, Awards or other earnings. All payments under this Plan shall be net of an amount sufficient to satisfy any federal, state or local income tax withholding requirements.

11.5 NONALIENATION: The right to receive any benefit under this Plan may not be transferred, assigned, pledged or encumbered by a Member, beneficiary or contingent beneficiary in any manner and any attempt to do so shall be void. No such benefit shall be subject to garnishment, attachment or other legal or equitable process without the prior written consent of the Affiliated Companies. Notwithstanding the



 Powered by Morningstar® Document Research℠

preceding, following a Change of Control, the Administrator shall not implement such action without the consent of the Benefits Trust Committee.

11.6 ADMINISTRATION:

(a) Prior to a Change of Control, the Administrator of the Plan shall be responsible for the general administration of the Plan, claims review, and for carrying out its provisions. Administration of the Plan shall be carried out consistent with the terms and conditions of the Plan.

(b) Following a Change of Control, the Benefits Trust Committee may remove and/or replace the Administrator.

(c) The Administrator shall have sole and absolute discretion to interpret the Plan, determine eligibility for and benefits due hereunder. Decisions of the Administrator regarding benefits under the Plan shall at all times be binding and conclusive on Members, their beneficiaries, heirs and assigns. Notwithstanding the preceding, following a Change of Control, final benefit determinations for Members, their beneficiaries, heirs and assigns and decisions regarding benefit claims under the Plan shall rest with the Benefits Trust Committee or its delegate in its sole and absolute discretion.

(d) Prior to paying any benefit under this Plan, the Administrator may require the Member, beneficiary or contingent beneficiary to provide such information or material as the Administrator, in its sole discretion, shall deem necessary for it to make any determination it may be required to make under this Plan. The Administrator may withhold payment of any benefit under this Plan until it receives all such information and material and is reasonably satisfied of its correctness and genuineness. The Administrator shall provide adequate notice in writing to any Member, beneficiary or contingent beneficiary whose claim for benefits under this Plan has been denied, setting forth the specific reasons for such denial. A reasonable opportunity shall be afforded to any such Member, beneficiary or contingent beneficiary for a full and fair review by the Administrator of its decision denying the claim. The Administrator's decision on any such review shall be final and binding on the Member, beneficiary or contingent beneficiary and all other interested persons. All acts and decisions of the Administrator shall be final and binding upon all Members, beneficiaries, contingent beneficiaries and employees of the Affiliated Companies. Notwithstanding the preceding, following a Change of Control, any and all decisions by the Administrator are subject to the approval of the Benefits Trust Committee.

(e) Prior to a Change of Control, the Committee in its sole discretion and upon such terms as it may prescribe, may permit any company or corporation directly or indirectly controlled by the Corporation to participate in the Plan. After a Change of Control, such permission must be approved by the Benefits Trust Committee.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

11.7 IMPACT OF FUTURE LEGISLATION OR REGULATION

(a) This Section 11.7 shall become operative upon the enactment of any change in applicable statutory law or the promulgation by the Internal Revenue Service of a final regulation or other pronouncement having the force of law, which statutory law, as changed, or final regulation or pronouncement, as promulgated, would cause any Member to include in his or her federal gross income amounts accrued by the Member under the Plan on a date (an "Early Taxation Event") prior to the date on which such amounts are made available to him or her hereunder.

(b) Notwithstanding any other Section of this Plan to the contrary (but subject to subsection (c), below), as of an Early Taxation Event, the feature or features of this Plan, or the election by a Member that would cause the Early Taxation Event shall be null and void, to the extent, and only to the extent, required to prevent the Member from being required to include in his federal gross income amounts accrued by the Member under the Plan prior to the date on which such amounts are made available to him hereunder. By way of example, but not by way of limiting the generality of the foregoing, if a statute is enacted that would require a Member to include in his or her federal gross income amounts accrued by the Member under the Plan prior to the date on which such amounts are made available to him or her because of the Member's right to receive a distribution of a portion of his Account under Section 8.5, the right of all Members to receive distributions under Section 8.5 shall be null and void as of the effective date of that statute. If only a portion of a Member's Account is impacted by the change in the law, then only such portion shall be subject to this Section, with the remainder of the Account not so affected being subject to such rights and features as if the law were not changed. If the law only impacts Members who have a certain status with respect to the Company, then only such Members shall be subject to this Section.

(c) Notwithstanding Section 11.7(b) above, if an Early Taxation Event occurs (e.g., if a change in law is retroactive), the amounts that become taxable on the Early Taxation Event shall be distributed to each Participant as soon as practicable following such Early Taxation Event or if later, the date or enactment or promulgation.

11.8 CONSTRUCTION:

(a) The Plan is intended to constitute an unfunded deferred compensation arrangement for a select group of management or highly compensated employees and all rights hereunder shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia to the extent not preempted by federal law.

(b) The masculine pronoun means the feminine wherever appropriate.

(c) The captions inserted herein are inserted as a matter of convenience and shall not affect the construction of the Plan.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

AMENDMENT

2002 DEFERRED COMPENSATION PLAN OF
CSX CORPORATION AND AFFILIATED COMPANIES

Pursuant to Section 10.2 of the 2002 Deferred Compensation Plan of CSX Corporation and Affiliated Companies (the "Plan"), the Plan is amended effective February 7, 2003 as follows:

Section 8.7 is amended to read as follows:

> "Notwithstanding anything to the contrary in this Plan, if (a) a Member becomes the owner, director or employee of a competitor of the Affiliated Companies; (b) his employment is terminated by an Affiliated Company on account of actions by the Member which are detrimental to the interests of the Affiliated Company; (c) he engages in conduct subsequent to the termination of his employment with the Affiliated Companies which the Administrator determines to be detrimental to the interests of an Affiliated Company; or (d) is required to divest his or her interest under the Plan under applicable law, regulation or rules, then the Administrator may, in its sole discretion, pay the Member a single sum payment equal to the balance in his Account. In such event, the single sum payment shall be made as soon as practicable following the date the Member is affected by one of the circumstances described in this Section 8.7 and such payment shall be in lieu of all other benefits which may be payable to the Member under this Plan."


Powered by Morningstar® Document Research℠

EXHIBIT 10.27

# SUPPLEMENTARY SAVINGS AND INCENTIVE AWARD DEFERRAL PLAN FOR ELIGIBLE EXECUTIVES OF CSX CORPORATION AND AFFILIATED COMPANIES

As Amended and Restated January 1, 1995
(As Amended through September 8, 1999)


Powered by Morningstar® Document Research℠

TABLE OF CONTENTS


| | | Page |
|---|---|---|
| ARTICLE 1. DEFINITIONS | | 1 |
| 1.1 | Account | 1 |
| 1.2 | Administrator | 1 |
| 1.3 | Affiliated Company | 1 |
| 1.4 | Award | 1 |
| 1.5 | Award Deferral Agreement | 1 |
| 1.6 | Benefits Trust Committee | 2 |
| 1.7 | Board of Directors | 2 |
| 1.8 | Change of Control | 2 |
| 1.9 | Code | 3 |
| 1.10 | Committee | 3 |
| 1.11 | Compensation | 3 |
| 1.12 | Corporation | 3 |
| 1.13 | Deferral Agreement | 3 |
| 1.14 | Distribution Option(s) | 4 |
| 1.15 | Divisive Transaction | 4 |
| 1.16 | Effective Date | 4 |
| 1.17 | Eligible Executive | 4 |
| 1.18 | Independent Accountant | 4 |
| 1.19 | Matching Credits | 4 |
| 1.20 | Member | 4 |
| 1.21 | MICP | 4 |
| 1.22 | Participating Company | 4 |
| 1.23 | Plan | 5 |
| 1.24 | Salary Deferrals | 5 |
| 1.25 | Salary Deferral Agreement | 5 |
| 1.26 | Salary Deferral Percentage | 5 |
| 1.27 | SMICP | 5 |
| 1.28 | Subsidiary | 5 |
| 1.29 | Tax Savings Thrift Plan | 5 |
| 1.30 | Trust | 5 |
| 1.31 | Valuation Date | 5 |
| ARTICLE 2. MEMBERSHIP AND DEFERRAL AGREEMENTS | | 5 |
| 2.1 | In General | 5 |
| 2.2 | Modification of Initial Deferral Agreement | 6 |
| 2.3 | Termination of Membership; Re-employment | 6 |
| 2.4 | Change in Status | 7 |
| 2.5 | Membership Following a Change in Control | 7 |
| ARTICLE 3. AWARD DEFERRAL PROGRAM | | 7 |
| 3.1......Filing Requirements | | 7 |
| 3.2 | Amount of Deferral | 8 |
| 3.3 | Crediting to Account | 8 |

| | | Page |
|---|---|---|
| ARTICLE 4. SALARY DEFERRAL PROGRAM | | 9 |
| 4.1 | Filing Requirements | 9 |
| 4.2 | Salary Deferral Agreement | 9 |
| 4.3 | Amount of Salary Deferrals | 9 |
| 4.4 | Changing Salary Deferrals | 10 |
| 4.5 | Certain Additional Credits | 10 |
| ARTICLE 5. MAINTENANCE OF ACCOUNTS | | 11 |
| 5.1 | Adjustment of Account | 11 |
| 52 | Investment Performance Elections | 12 |
| 5.3 | Changing Investment Elections | 12 |
| 5.4 | Vesting of Account | 12 |
| 5.5 | Individual Accounts | 13 |
| 5.6 | Action Following a Change of Control | 13 |
| ARTICLE 6. PAYMENT OF BENEFITS | | 13 |
| 6.1 | Commencement of Payment | 13 |
| 6.2 | Method of Payment | 15 |
| 6.3 | Applicability | 16 |
| 6.4 | Hardship Withdrawal | 16 |
| 6.5 | Designation of Beneficiary | 16 |
| 6.6 | Special Distribution Rules | 17 |
| 6.7 | Status of Account Pending Distribution | 17 |
| 6.8 | Installments and Withdrawals Pro-Rata | 17 |
| 6.9 | Change of Control | 18 |
| ARTICLE 7. AMENDMENT OR TERMINATION | | 19 |
| 7.1 | Right to Terminate | 19 |
| 7.2 | Right to Amend | 19 |
| 7.3 | Uniform Action | 20 |
| ARTICLE 8. GENERAL PROVISIONS | | 20 |
| 8.1 | No Funding | 20 |
| 8.2 | Obligation | 20 |
| 8.3 | No Contract of Employment | 20 |
| 8.4 | Withholding Taxes | 20 |
| 8.5 | Nonalienation | 20 |
| 8.6 | Administration | 20 |
| 8.7 | Construction | 21 |
| ARTICLE 9. POST-SECONDARY EDUCATION SUB-ACCOUNTS | | 21 |
| 9.1......Post-Secondary Education Sub-accounts | | 21 |
| 9.2 | Distribution of Post-Secondary Education Sub-accounts | 22 |
| 9.3 | Construction | 23 |


 Powered by Morningstar® Document Research℠

INTRODUCTION

This Supplementary Savings and Incentive Award Deferral Plan for Eligible Executives of CSX Corporation and Affiliated Companies (the "Plan") was adopted October 1, 1987 and has been subsequently amended from time to time. This restatement of the Plan is effective January 1, 1995. This Plan is generally intended to provide certain executives eligible to participate in the Tax Savings Thrift Plan for Employees of CSX Corporation and Affiliated Companies (the "Savings Plan") with an opportunity to defer a portion of their salary, and/or award(s) under the Management Incentive Compensation Program ("MICP") and/or the Senior Management Incentive Compensation Program ("SMICP") until their retirement or other termination of employment and to restore employer matching contributions lost under the Savings Plan because of the application of Sections 401(aX17), 401(k), 401(m) and 415 of the Internal Revenue Code of 1986, as amended. Commencing with respect to MICP awards paid and salary earned after 1990, eligible executives may, if they so elect, designate all or a portion of such deferrals to be used for payment of education expenses for one or more members of their families. The Plan is unfunded and is maintained by CSX Corporation and Affiliated Companies primarily for the purpose of providing deferred compensation for a select group of management or highly-compensated employees. The Plan as restated effective January 1, 1995 (and amended through December 31, 1997) reads as hereinafter set forth.

ARTICLE I. DEFINITIONS

1.1 ACCOUNT MEANS the bookkeeping account maintained for each Member to record his Salary Deferrals, Matching Credits and the amount of Awards he has elected to defer, as adjusted pursuant to Article 5. The Account shall consist of the "Education Sub-accounts", if any, established pursuant to Article 9 and all amounts not in those accounts shall be allocated to one or more "Retirement Sub- accounts". The Administrator may establish a maximum number of "Retirement Sub-accounts" which a Member may have at any time. In addition to any Retirement Sub-accounts established by the Administrator, an additional Retirement Sub-account known as the Cash Plan Retirement Sub-account shall be established for deferrals of payments from the CSX Market Value Cash Plan. The Administrator also may establish such other sub-accounts within a Member's Account as it deems necessary to implement the provisions of the Plan.

1.2 ADMINISTRATOR means the Corporation. The duties of the Administrator shall be performed by a person or persons designated by the Chief Executive Officer of the Corporation to perform such duties.

13 AFFILIATED Company means the Corporation and any company or corporation directly or indirectly controlled by the Corporation.

1.4 AWARD means for any year (i) the amount awarded to an employee of an Affiliated Company for that year (including any special incentive award) and, in the absence of an Award Deferral Agreement with respect to such amount, payable in the succeeding year under the MICP and/or SMICP or other incentive award otherwise payable in cash as determined by the Committee; and (ii) the amount paid from the CSX Market Value Cash Plan with respect to such year and, in the absence of an Award Deferral Agreement with respect to such amount and with respect to such year, payable in cash under the CSX Market Value Cash Plan.

1.5 AWARD DEFERRAL AGREEMENT means a Deferral Agreement filed in accordance with the award deferral program described in Article 3.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

1.6 BENEFITS TRUST Committee means the committee created pursuant to the CSX Corporation and Affiliated Companies Benefits Assurance Trust Agreement.

1.7 BOARD OF DIRECTORS or "Board" means the Board of Directors of the Corporation.

1.8 CHANGE OF CONTROL means any of the following:

(a) Stock Acquisition. The acquisition, by any individual, entity or group [within the meaning of Section 13(dX3) or 14(dX2) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")] (a "Person") of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 20% or more of either (i) the then outstanding shares of common stock of the Corporation (the "Outstanding Corporation Common Stock"), or (ii) the combined voting power of the then outstanding voting securities of the Corporation entitled to vote generally in the election of directors (the "Outstanding Corporation Voting Securities"); provided, however, that for purposes of this subsection (a), the following acquisitions shall not constitute a Change of Control: (i) any acquisition directly from the Corporation; (ii) any acquisition by the Corporation; (iii) any acquisition by any employee benefit plan (or related trust) sponsored or maintained by the Corporation or any corporation controlled by the Corporation; or (iv) any acquisition by any corporation pursuant to a transaction which complies with clauses (i), (ii) and (iii) of subsection (c) of this Section 1.8; or

(b) Board Composition. Individuals who, as of the date hereof, constitute the Board of Directors (the "Incumbent Board") cease for any reason to constitute at least a majority of the Board of Directors; provided, however, that any individual becoming a director subsequent to the date hereof whose election or nomination for election by the Corporation's shareholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board shall be considered as though such individual were a member of the Incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office occurs as a result of an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board of Directors; or

(c) Business Combination. Approval by the shareholders of the Corporation of a reorganization, merger, consolidation or sale or other disposition of all or substantially all of the assets of the Corporation or its principal subsidiary that is not subject, as a matter of law or contract, to approval by the Interstate Commerce Commission or any successor agency or regulatory body having jurisdiction over such transactions (the "Agency") (a "Business Combination"), in each case, unless, following such Business Combination:

(i) all or substantially all of the individuals and entities who were the beneficial owners, respectively, of the Outstanding Corporation Common Stock and Outstanding Corporation Voting Securities immediately prior to such Business Combination beneficially own, directly or indirectly, more than 50% of, respectively, the then outstanding shares of common stock and the combined voting power of the then outstanding voting securities entitled to vote generally in the election of directors, as the case may be, of the corporation resulting from such Business Combination (including, without limitation, a corporation which as a result of such transaction owns the Corporation or its principal subsidiary or all or substantially all of the assets of the Corporation or its principal subsidiary either directly or



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

through one or more subsidiaries) in substantially the same proportions as their ownership, immediately prior to such Business Combination of the Outstanding Corporation Common Stock and Outstanding Corporation Voting Securities, as the case may be;

(ii) no Person (excluding any corporation resulting from such Business Combination or any employee benefit plan (or related trust) of the Corporation or such corporation resulting from such Business Combination) beneficially owns, directly or indirectly, 20% or more of, respectively, the then outstanding shares of common stock of the corporation resulting from such Business Combination or the combined voting power of the then outstanding voting securities of such corporation except to the extent that such ownership existed prior to the Business Combination; and

(iii) at least a majority of the members of the board of directors resulting from such Business Combination were members of the Incumbent Board at the time of the execution of the initial agreement, or of the action of the Board of Directors, providing for such Business Combination; or

(d) Regulated Business Combination. Approval by the shareholders of the Corporation of a Business Combination that is subject, as a matter of law or contract, to approval by the Agency (a "Regulated Business Combination") unless such Business Combination complies with clauses (i), (ii) and (iii) of subsection (c) of this Section 1.8; or

(e) Liquidation or Dissolution. Approval by the shareholders of the Corporation of a complete liquidation or dissolution of the Corporation or its principal subsidiary.

1.9 CODE means the Internal Revenue Code of 1986, as amended from time to time.

1.10 COMMITTEE means the Compensation Committee of the Board of Directors of CSX Corporation.

1.11 COMPENSATION means the "Base Compensation" of an Eligible Executive as defined in the Tax Savings Thrift Plan, determined prior to: (a) any Salary Deferrals under Article 4; and (b) any limit on compensation imposed by Section 401(a)(17) of the Code.

1.12 CORPORATION means CSX Corporation, a Virginia corporation, and any successor thereto by merger, purchase or otherwise. 1.13 Deferral Agreement means either an Award Deferral Agreement or a Salary Deferral Agreement, or both if the context so requires. A Deferral Agreement shall be a completed agreement between an Eligible Executive and a Participating Company of which he is an employee under which the Eligible Executive agrees to defer an Award or make Salary Deferrals under the Plan, as the case may be. The Deferral Agreement shall be on a form prescribed by the Administrator and shall include any amendments, attachments or appendices.

1.14 DISTRIBUTION OPTION(S) means, with respect to each sub-account under the Plan, the election by the Member of (i) the event triggering the commencement of distribution, and (ii) the form of 1.11



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

payment. Distribution Option elections are made on the initial Deferral Agreement with respect to any sub-account.

1.15 DIVISIVE TRANSACTION means a transaction in which the Eligible Executive's employer ceases to be a Subsidiary or there is a sale of substantially all of the assets of the Subsidiary.

1.16 EFFECTIVE DATE means October 1, 1987 or with respect to the Eligible Executives of a company which adopts the Plan, it means the date such company becomes a Participating Company.

1.17 ELIGIBLE EXECUTIVE means an employee of a Participating Company, provided that:

(a) For purposes of the award deferral program described in Article 3:

(i) prior to January 1, 1995, such employee is employed by a Participating Company in salary grades 21 through 40 inclusive, as of December 30 of the calendar year in question; or

(ii) on and after January 1, 1995 and before January 1, 1999, such employee: (A) is employed by a Participating Company and is receiving Compensation of one hundred thousand dollars ($100,000) or more per year; or (B) retired from the Participating Companies or terminated employment with the Participating Companies on account of disability as determined by the Administrator, and was receiving compensation of one hundred thousand dollars ($100,000) or more per year at the time of such retirement or termination; or

(iii) on and after January 1, 1999, such employee: (A) is employed by a Participating Company and is receiving compensation of one hundred twenty five thousand dollars ($125,000) or more per year; or (B) retired from the Participating Companies or terminated employment with the Participating Companies on account of disability as determined by the Administrator, and was receiving Compensation of one hundred twenty five thousand dollars ($125,000) or more per year at the time of such retirement or termination. An employee who, in 1998, was eligible to participate because his Compensation satisfied the requirements of subsection (ii), and is excluded from participation only because of the increase in the Compensation requirement in this subsection (iii), shall continue to be eligible to participate.

(b) For purposes of the salary deferral program described in Article 4, such employee is eligible for membership in the Tax Savings Thrift Plan, and;

(i) Prior to January 1, 1995, such employee is employed in salary grades 21 through 40 inclusive; or



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

(ii) Compensation of one hundred thousand dollars ($100,000) or more per year; or

(iii) on and after January 1, 1999, is receiving Compensation of one hundred twenty five thousand dollars ($125,000) or more per year. An employee who, in 1998, was eligible to participate because his Compensation satisfied the requirements of subsection (ii), but is excluded from participation only because of the increase in the Compensation requirement in this subsection (iii), shall continue to be eligible to participate.

(c) After January 1, 1999, the compensation amount set forth in subsections (a)(iii) and (b)(iii) may, in the discretion of the Chief Executive Officer, be adjusted no more frequently than annually, based on a review of data regarding eligibility to participate in this type of program.

(d) The Chief Executive Officer of the Corporation or his designee may designate any other employee or former employee of an Affiliated Company as an Eligible Executive; provided, however, only those employees or former employees considered to be a select group of management or highly compensated may be designated as Eligible Executives under this Plan. Notwithstanding the preceding, following a Change of Control, such designations are subject to the approval of the Benefits Trust Committee.

1.18 INDEPENDENT ACCOUNTANT means the independent accountants engaged by the Corporation and, if selected or changed following a Change of Control, approved by the Benefits Trust Committee. 1.19 Matching Credits means amounts credited to the Account of a Member pursuant to Section 4.5.

1.20 MEMBER means, except as otherwise provided in Article 2, each Eligible Executive who has executed an initial Deferral Agreement as described in Section 2.1.

1.21 MICP means the Participating Companies' Management Incentive Compensation Program.

1.22 PARTICIPATING COMPANY means the Corporation and any company or corporation directly or indirectly controlled by the Corporation, which the Committee designates as eligible to participate in the Plan in accordance with Section 8.6(e).

1.23 PLAN means this Supplementary Savings and Incentive Award Deferral Plan for Eligible Executives of CSX Corporation and Affiliated Companies, as amended from time to time.

1.24 SALARY DEFERRALS means the amounts credited to a Member's Account under Section 4.3.

1.25 SALARY DEFERRAL AGREEMENT means a Deferral Agreement filed in accordance with the salary deferral program described in Article 4.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

1.26 SALARY DEFERRAL PERCENTAGE means a percentage of an Eligible Executive's Base Compensation elected in a Salary Deferral Agreement, pursuant to Section 4.1 hereof, and shall be an integral percentage not in excess of fifty (50%) percent.

1.27 SMICP means the Participating Companies' Senior Management Incentive Compensation Program.

128 SUBSIDIARY means a corporation more than 50% of the voting shares of which are owned directly or indirectly by the Corporation.

1.29 TAX SAVINGS THRIFT PLAN means the Tax Savings Thrift Plan for Employees of CSX Corporation and Affiliated Companies, as amended from time to time. 1.30 Trust means the CSX Corporation and Affiliated Companies Benefits Assurance Trust. 1.31 Valuation Date means the last business day of each calendar month following the Effective Date.

ARTICLE 2. MEMBERSHIP AND DEFERRAL AGREEMENTS

2.1 IN GENERAL:

(a) An Eligible Executive shall become a Member as of the date he files his initial Deferral Agreement with the Administrator. However, such Deferral Agreement shall be effective for purposes of deferring an Award or making Salary Deferrals only as provided in Articles 3 and 4.

(b) A Deferral Agreement shall be in writing and properly completed upon a form approved by the Administrator, which shall be the sole judge of the proper completion thereof. Except as provided in Section 4.1(d), such Agreement shall provide for the deferral of an Award or for Salary Deferrals, shall specify the Distribution Options, and may include such other provisions as the Administrator deems appropriate. A Deferral Agreement shall not be revoked or modified with respect to the allocation of prior deferrals except pursuant to the establishment of an Education Sub-account as provided in Article 9. Distribution Options elected may not be modified or revoked except as provided in Section 6.1 or 6.2.

(c) As a condition of membership, the Administrator may require such other information as it deems appropriate.

2.2 MODIFICATION OF INITIAL DEFERRAL AGREEMENT:

(a) A Member may elect to change, modify or revoke a Deferral Agreement as follows:

(i) A Member may change the amount of Award he elects to defer on an Award Deferral Agreement prior to the Agreement's effective date as provided in Article 3.

(ii) A Member may change the rate of his Salary Deferrals, or suspend his Salary Deferrals on account of severe financial hardship, as provided in Article 4.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

(iii) A Member may change the event entitling him to distribution, as designated on his election of Distribution Options, as provided in Section 6.1(c)(i).

(iv) A Member may change the event entitling him to distribution as designated on his election of Distribution Options, subject to the five percent (5%) penalty described in Section 6. l(c)(ii).

(v) A Member may change the form of payment, as designated on his election of Distribution Options, as provided in Section 6.2(c)(i).

(vi) A Member may change the form of payment as designated on his election of Distribution Options, subject to the five percent (5%) penalty described in Section 6.2(c)(ii).

(b) Notwithstanding any provision in Section 2.2(a) to the contrary, the establishment of an Education Sub-account with respect to future Salary Deferrals and Awards as provided in Article 9 shall not be deemed a change for the purposes of Section 2.2(a).

2.3 TERMINATION OF MEMBERSHIP; RE-EMPLOYMENT:

(a) Membership shall cease, subject to Section 2.4, upon a Member's termination of employment; provided that if a former Eligible Executive is receiving severance payments under a Participating Company's severance pay program or is eligible to defer an Award under Article 3, he shall not be deemed to have terminated employment until the later of the date the severance payments cease or the date the Award would have been paid. Membership shall be continued during a leave of absence approved by the Participating Companies.

(b) Upon re-employment as an Eligible Executive, a former Member may become a Member again as follows:

(i) in the case of a former Member who prior to re-employment received the balance in his Account, by executing a Deferral Agreement under Section 2.1 as though for all purposes of the Plan the Affiliated Companies had never employed the former Member,

(ii) in the case of a former Member who prior to re-employment did not receive the balance in his Account, by executing a Deferral Agreement under Section 2.1; provided his Distribution Options and beneficiary designation shall remain in effect.

(c) If a former Member is reemployed as an Eligible Executive and becomes a Member again pursuant to (b)(ii): (i) upon notice to the Administrator by the Participant, distributions from a Retirement Sub-account shall cease if the commencement of distribution was because of the Member's termination of employment (including retirement); (ii) distributions from a Retirement Sub-account shall continue if the commencement of distribution was because the Member chose a specific age for the commencement of benefits and that age has been attained. Except for distributions which must continue pursuant to (c)(ii), a reemployed Member may change Distribution Option elections with respect to his Retirement Sub-accounts without penalty so long as such change does not accelerate the timing of any payment to the Member.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

2.4 CHANGE IN STATUS:

(a) In the event that a Member ceases to be an Eligible Executive with respect to Salary Deferrals but continues to be employed by an Affiliated Company, his Salary Deferrals and Matching Credits shall thereupon be suspended until such time as he shall once again become an Eligible Executive. All other provisions of his Salary Deferral Agreement shall remain in force and he shall continue to be a Member of the Plan.

(b) In the event that a Member ceases to be an Eligible Executive with respect to the deferral of Awards hereunder but continues to be employed by an Affiliated Company, he shall continue to be a Member of the Plan but shall not be eligible to defer any portion of any future Awards until such time as he shall once again become an Eligible Executive.

2.5 MEMBERSHIP FOLLOWING A CHANGE OF CONTROL: Following a Change of Control, any membership determinations or discretionary actions pursuant to this Article 2 shall be subject to the approval of the Benefits Trust Committee.

ARTICLE 3. AWARD DEFERRAL PROGRAM

3.1 FILING REQUIREMENTS:

(a) With respect to an Award identified in Section 1.4(i), at such time as the Administrator may prescribe prior to the close of business on December 30 in any calendar year, an Eligible Executive may elect to defer all or a portion of his Award, if any, for that year. Such Award is determined and paid in the following calendar year. Such election shall be made by filing an Award Deferral Agreement with the Administrator on or before the close of business on December 30 of the calendar year for which the Award is made. In the event that December 30 does not fall on a weekday, such filing must be made by the close of business on the last prior business day.

(b) With respect to an Award identified in Section 1.4(i), notwithstanding Section 3.1(a), an individual who becomes an Eligible Executive after the calendar year for which an Award is made, but prior to the first day of the month in which such Award is determined including required action by the Board, may elect to defer all or a portion of that Award in accordance with this Section 3.1(b). Such election shall be made by filing an Award Deferral Agreement during the 30 day or shorter period beginning on the date the individual becomes an Eligible Executive and ending no later than the last day of the month preceding the month in which the Award is determined.

(c) With respect to an Award identified in Section 1.4(i), an Eligible Executive's election to defer all or a portion of his Award shall be effective on the last day that such deferral may be elected under Section 3.1(a) or 3. l(b) and shall be effective only for the Award in question. An Eligible Executive may revoke or change his election to defer all or a portion of his Award at any time prior to the date the election becomes effective, as described in the preceding sentence. Any such revocation or change shall be made in a form and manner determined by the Administrator.

(d) With respect to an Award identified in Section 1.4(ii), at such time and in accordance with such rules as the Administrator may prescribe prior to the close of business on



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

December 30 in any calendar year, an Eligible Executive may elect to defer all or a portion of any such Award. Awards identified in Section 1.4(ii) may not be deferred into Education Sub-accounts.

(e) An Eligible Executive shall not be entitled to defer an Award on or after attaining the age, if any, which he has designated under Section 6.1(c) or 6.1(d) for the purpose of commencing distribution of his Account (or, if applicable, his Retirement Sub-account). In the event a Member establishes an Education Sub-account pursuant to Article 9, he shall not be entitled to defer all or any portion of an Award into such a Sub-account after attaining the age which he has designated for the purpose of commencing distribution from that Sub-account.

(f) An Eligible Executive shall not be entitled to defer an Award if he is eligible to defer his award under another nonqualified program of deferred compensation maintained by an Affiliated Company.

3.2 AMOUNT OF DEFERRAL:

(a) With respect to an Award identified in Section 1.4(i), prior to a Change of Control, in its sole discretion, the Committee may establish such maximum limit on the amount of Award an Eligible Executive may defer for a calendar year as the Committee deems appropriate. Such maximum limit shall appear on the Eligible Executive's Award Deferral Agreement for the year. Following a Change of Control, the Committee's decision is subject to the final approval of the Benefits Trust Committee.

(b) With respect to an Award identified in Section 1.4(i), the minimum amount which an Eligible Executive may defer in any year shall be the lesser of $5,000 or the maximum amount determined under Section 3.2(a) above. If an Eligible Executive elects to defer less than this amount, his election shall not be effective.

(c) With respect to an Award identified in Section 1.4(ii), there shall be no minimum nor maximum amount of deferral allowed.

3.3 CREDITING TO ACCOUNT:

(a) The amount of Award which an Eligible Executive has elected to defer for a calendar year shall be credited to his Account as of the Valuation Date coincident with or next following the date the Award would have been paid to the Eligible Executive. (b) An additional credit shall be made to the Account as of the Valuation Date described in Section 3.3(a) above, determined as if the amount of Award deferred had earned the same rate of return as the CSX Cash Pool Earnings Rate from the date the Award would have been paid until the Valuation Date it is credited to the Eligible Executive's Account. In lieu of the CSX Corporation Cash Pool Earnings Rate, the Committee may designate, prior to a Change of Control, from time to time, such other indices of investment performance or investment funds as the measure of investment performance under this Section 3.3(b). Following a Change of Control, the Committee's decision is subject to final approval of the Benefits Trust Committee.

ARTICLE 4. SALARY DEFERRAL PROGRAM



 Powered by Morningstar® Document Research℠

4.1 FILING REQUIREMENTS:

(a) An individual who is an Eligible Executive immediately prior to the Effective Date may file a Salary Deferral Agreement with the Administrator, within such period prior to the Effective Date and in such manner as the Administrator may prescribe.

(b) An individual who becomes an Eligible Executive on or after the Effective Date may file a Salary Deferral Agreement with the Administrator during the calendar month he becomes an Eligible Executive, in such manner as the Administrator may prescribe.

(c) An Eligible Executive who fails to file a Salary Deferral Agreement with the Administrator as provided in Sections 4.1 (a) and 4.1(b) may file a Salary Deferral Agreement in any subsequent month of December.

(d) An Eligible Executive who has not otherwise Filed a Deferral Agreement shall file a Salary Deferral Agreement under Sections 4. l(a) or 4. l(b), whichever applies, in order to receive the Matching Credits described in Section 4.5, provided that such agreement need not provide for Salary Deferrals.

4.2 SALARY DEFERRAL AGREEMENT: An Eligible Executive's Salary Deferral Agreement shall authorize a reduction in his base pay with respect to his Salary Deferrals under the Plan. The Agreement shall be effective for payroll periods beginning on or after the later of: (a) the Effective Date; or (b) the first day of the month following the date the Salary Deferral Agreement is filed with the Administrator in accordance with Section 4.1. Paychecks applicable to said payroll periods shall be reduced accordingly.

4.3 AMOUNT OF SALARY DEFERRALS:

(a) On each Valuation Date following the effective date of an Eligible Executive's Salary Deferral Agreement, his Sub-accounts shall be credited with an amount of Salary Deferral, if any, for the payroll period ending thereon, as he elects in his Salary Deferral Agreement. Such Salary Deferral for any payroll period shall be determined as the sum of his Basic Salary Deferral for such payroll period determined under subparagraph (i) and his Additional Salary Deferral for such month, determined under subparagraph (ii) as follows:

(i) An Eligible Executive's Basic Salary Deferral shall be determined by multiplying his Compensation for a payroll period by the excess of his Salary Deferral Percentage over the percentage determined in subparagraph (ii) below

(ii) An Eligible Executive's Additional Salary Deferral shall be determined by multiplying his Compensation for a payroll period by a percentage determined as (A) the excess of his Salary Deferral Percentage over 15%, divided by (B) .85.

provided, however, that no Basic Salary Deferral shall be made under this Plan for any payroll period unless the Eligible Executive is prevented from making elective deferrals under the Tax Savings Thrift Plan for such payroll period as a result of Section 402(g) and/or 401(k)(3) of the Code, and provided further that, for the payroll period in which such Basic Salary Deferral is first made, it shall be limited to the excess of the amount otherwise determined for such payroll period under Section 4.3(a)(i) over the Eligible Executive's elective deferrals under the Tax Savings Thrift

Plan for such payroll period. If applicable, Additional Salary Deferrals shall be made for each payroll period of the year to which the Salary Deferral Agreement applies, without regard to whether the Eligible Executive makes elective deferrals under the Tax Savings Thrift Plan and without regard to any Basic Salary Deferrals under this Plan.

(b) An Eligible Executive shall not be entitled to make Salary Deferrals on or after attaining the age, if any, which he has designated under Section 6.1(c) or 6. l(d) for the purpose of commencing distribution of his Account (or, if applicable, his Retirement Sub-account). In the event a Member establishes an Education Sub-account pursuant to Article 9, he shall not be entitled to make Salary Deferrals into such Sub-account after attaining the age which he has designated for the purpose of commencing distribution from that Sub-account.

4.4 CHANGING SALARY DEFERRALS:

(a) An Eligible Executive's election on his Salary Deferral Agreement of the rate at which he authorizes Salary Deferrals under the Plan shall remain in effect in subsequent calendar years unless he files with the Administrator an amendment to his Salary Deferral Agreement modifying or revoking such election. The amendment shall be filed by December 30 and shall be effective for payroll periods beginning on or after the following January 1.

(b) Notwithstanding Section 4.4(a), an Eligible Executive may, in the event of a severe financial hardship, request a suspension of his Salary Deferrals under the Plan. The request shall be made at a time and in a manner determined by the Administrator, and shall be effective as of such date as the Administrator prescribes. The Administrator shall apply standards, to the extent applicable, identical to those described in Section 6.3 in making its determination. The Eligible Executive may apply to the Administrator to resume his Salary Deferrals with respect to payroll periods beginning on or after the January 1 following the date of suspension, at a time and in a manner determined by the Administrator; provided, that the Administrator shall approve such resumption only if the Administrator determines that the Eligible Executive is no longer incurring such hardship. Notwithstanding the preceding, following a Change of Control, such action by the Administrator is subject to approval by the Benefits Trust Committee.

4.5 CERTAIN ADDITIONAL CREDITS:

On each Valuation Date, there shall be credited Matching Credits to the Retirement Sub-account(s) of an Eligible Executive determined as follows:

(a) For payroll periods prior to the inception of Basic Salary Deferrals hereunder, the greater of (b)(i) or (ii)

(b) For payroll periods during which Basic Salary Deferrals are effective, the greater of (i) or (iii), minus (iv), where

(i) is the employer matching contributions the Eligible Executive would have received under the Tax Savings Thrift Plan if the provisions of Sections 401(k)(3), 401(m)(9) and 415 of the Code had not applied to the Tax Savings Thrift Plan; and

(ii) is an amount determined as 3% of the Eligible Executive's additional Salary Deferrals; and



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

(iii) is the employer matching contributions the Eligible Executive would have received under the Tax Savings Thrift Plan if his deferrals under this Plan had been contributed to the Tax Savings Thrift Plan (in addition to those amounts actually contributed to that Plan), based on "Compensation" as defined in this Plan and as if the provisions of Sections 401(a)(17), 401(k)(3), 401(m)(2), 401(m)(9) and 415 of the Code had not applied to the Tax Savings Thrift Plan; and

(iv) is the employer matching contributions made on his behalf for the applicable period to the Tax Savings Thrift Plan.

No Matching Credits shall be credited to a Member's Education Sub-account.

ARTICLE 5. MAINTENANCE OF ACCOUNTS

5.1 ADJUSTMENT OF ACCOUNT:

(a) As of each Valuation Date each Account (and, if applicable, each Sub-account) shall be credited or debited with the amount of earnings or losses with which such Sub-account would have been credited or debited, assuming it had been invested in one or more investment funds, or earned the rate of return of one or more indices of investment performance, designated by the Administrator and, if applicable, elected by the Member or former Member, for purposes of measuring the investment performance of his Sub-accounts.

(b) The Administrator shall designate at least one investment fund or index of investment performance and may designate other investment funds or investment indices to be used to measure the investment performance of Accounts. The designation of any such investment funds or indices shall not require the Affiliated Companies to invest or earmark their general assets in any specific manner. The Administrator may change the designation of investment funds or indices from time to time, in its sole discretion, and any such change shall not be deemed to be an amendment affecting Members' or former Members' rights under Section 7.2.

(c) For purposes of Section 5. 1(a), the portion of a Member's Retirement Sub-accounts attributable to Matching Credits shall be credited or debited with earnings or losses based upon the performance of "Fund E" (CSX Stock Fund) under the Tax Savings Thrift Plan.

(d) As of February 1, 1989, there shall be credited to the Account of each Eligible Executive who participated in the Supplemental Benefit Plan of Sea-Land Corporation and Affiliated Companies the amount of deferred compensation under that plan as of January 31, 1989 attributable to amounts credited under that plan for the purpose of restoring contributions to a defined contribution plan which were limited by Section 415 of the Code. Such amounts shall be treated as Salary Deferrals under the Plan, and unless transferred pursuant to Section 5.3(a), shall earn the same rate of return as the CSX Cash Pool Earnings Rate.

5.2 INVESTMENT PERFORMANCE ELECTIONS:

(a) In the event the Administrator designates more than one investment fund or index of investment performance under Section 5.1, each Member and, if applicable, former Member, shall file an initial investment election with the Administrator with respect to the investment of his



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Salary Deferrals within such time period and on such form as the Administrator may prescribe. The election shall designate the investment fund or funds or index or indices of investment performance which shall be used to measure the investment performance of the Member's Salary Deferrals. The election shall be effective as of the beginning of the payroll period next following the date the election is filed. The election shall be in increments of 1%.

(b) In the event the Administrator designates more than one investment fund or index under Section 5.1, each Member shall file an initial investment election each calendar year in which he defers an Award with respect to the amount deferred. The election shall be made within such time period and on such form as the Administrator prescribes and shall be in increments of 1% of the amount deferred. The election shall be effective on the Valuation Date on which the amount determined is credited to the Member's Account. (c) A Member may not elect separate investment funds or indices of investment performance with respect to each Sub-account.

5.3 CHANGING INVESTMENT ELECTIONS:

(a) A Member may change his election in Section 5.2(a) with respect to his future Salary Deferrals, no more than once each calendar quarter, by filing an appropriate written notice with the Administrator. The notice shall be effective as of the beginning of the first payroll period following the date the notice is filed with the Administrator.

(b) A Member or, if applicable, former Member may reallocate the current balance of his Retirement and/or Education Sub-accounts, thereby changing the investment fund or funds or index or indices of investment performance used to measure the future investment performance of his existing Account balance, by filing an appropriate written notice with the Administrator. Each Retirement or Education Sub-account may be reallocated separately. The election shall be effective as of the last business day of the calendar quarter following the month in which the notice is filed. No election under this Section 5.3(b) shall apply to the portion of a Member's Account attributable to Matching Credits.

5.4 VESTING OF ACCOUNT: EACH MEMBER SHALL BE FULLY VESTED IN HIS ACCOUNT.

5.5 INDIVIDUAL ACCOUNTS: The Administrator shall maintain, or cause to be maintained, records showing the individual balances of each Account and each Sub-account. At least once a year, each Member and, if applicable, former Member shall be furnished with a statement setting forth the value of his Account and his Sub-accounts.

5.6 ACTION FOLLOWING A CHANGE OF CONTROL: Following a Change of Control, any action taken by the Administrator pursuant to this Article 5 is subject to the approval of the Benefits Trust Committee.

ARTICLE 6. PAYMENT OF BENEFITS

6.1 COMMENCEMENT OF PAYMENT:

(a) The distribution of the Member's or former Member's Account shall commence, pursuant to Section 6.2, on or after the occurrence of (i), (ii), (iii) or (iv) below, as designated by the Member as a Distribution Option election:



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

(i) the Member's termination of employment with the Affiliated Companies,

(ii) attainment of a designated age not earlier than age 59-1/2 (on or after January 1, 1995 age 50) nor later than age 70-1/2,

(iii) the earlier of (i) or (ii) above, or

(iv) the later of (i) or (ii) above.

In the event a Member elects either (ii) or (iii) above, he may not elect an age less than three years subsequent to his current age. If a Member elects to defer an Award identified in Section 1.4(ii) (a payment from the CSX Market Value Cash Plan), such deferral must extend the commencement of distribution beyond December 31, 2004. A Member or former Member shall not change his Distribution Option election of the designation of the event which entitles him to distribution of his Account, except as provided in Section 6.1(c) below; provided, however, no change in Distribution Option election shall be allowed if it results in changing the deferral of commencement of distribution of an Award identified in Section 1.4(ii) to a time before January I, 2005. For purposes of this Plan and particularly this Section 6.l(a), if the Member's employer is involved in a Divisive Transaction, the Member will not be considered to have terminated his employment with an Affiliated Company until his employment with his employer terminates.

(b) Effective January 1, 1995, a Member or former Member shall, pursuant to Section 6.9, be eligible to make a Distribution Option election of the designation of the event which entitles him to distribution of his Account in the event of a Change of Control. (c) A Member or former Member may change his Distribution Option election of the designation of the events which entitle him to distribution of his Account under Section 6.1 (a) and Section 6.l(b), as follows:

(i) A Member or former Member may make a request in writing to the Administrator to defer the Member's designated distribution event under Section 6.1 (a). The requests must be filed with the Administrator at least one year prior to when distribution would commence based on the current designation. The deferral requests must specify a distribution event described in Section 6.1 (a), shall be subject to approval of the Administrator and, if approved, shall be effective as of the date that is one year after the request is filed with the Administrator. If the Member's current distribution event will occur upon his termination of employment and the Member's employment terminates within one year after the deferral request is made, the deferral request shall not be effective. A deferral request under this Section 6.1(c)(i) shall not result in a forfeiture of the Member's or former Member's Account.

(ii) Notwithstanding Section 6.1(c)(i), a Member or former Member may change his designated distribution event under Section 6.1 (a) or 6.1(b), no more frequently than once in any calendar year, by filing with the Administrator an amendment to his Distribution Option election on or before December 30 (or the last preceding business day if December 30 is not a weekday). The change shall be limited to those events entitling a



 Powered by Morningstar® Document Research℠

Member to a distribution that are described in Section 6.1(a), shall be subject to approval of the Administrator and, if approved, shall be effective as of the last Valuation Date of the calendar year in which the change is filed. Unless the election complies with the requirements of Section 6.1(c)(i), or unless the provisions of Section 6.1(e) apply, an election under this Section 6.1(c)(ii) shall result in the forfeiture of five percent (5%) of the Member's or former Member's Account, determined as of the Valuation Date upon which the election is effective. If the Member or former Member changes the form in which his Account is to be distributed under Section 6.2(c)(ii) at the same time as he changes his designated distribution event under this Section 6.1(c)(ii), the combined forfeitures will be five percent (5%) of the Member's or former Member's Account, determined as of the Valuation Date upon which the election is effective.

(d) Notwithstanding anything in this Section 6.1 or Article 9 to the contrary, a Member's Account shall be distributed upon his death.

(e) A Member may not change the designation of the event which entitles him to distribution of one or more Education Sub-accounts, except that a Member may transfer the entire amount in any Education Sub-account to one or more other Education Sub-accounts and one or more of his Retirement Sub-accounts, or any combination thereof, subject to a possible forfeiture of five percent (5%) of the Sub-account so transferred, as provided in Article 9.

(f) Notwithstanding the foregoing, prior to a Change of Control, the Corporation may delay payment of a benefit under this Plan to any Member who is determined to be among the top five most highly paid executives for the year the benefit under this Plan would otherwise be paid; provided, however, if a Member's payment is delayed, the benefit to which he is entitled will not decrease after the date it would otherwise be distributed.

(g) Notwithstanding the preceding, following a Change of Control, the authority to delay payment of a Member's or former Member's Account rests solely with the Benefits Trust Committee.

6.2 METHOD OF PAYMENT:

(a) A Member's or former Member's Retirement Sub-account(s) shall be distributed to him, or in the event of his death to his Beneficiary, in a cash single sum payment as soon as administratively practicable following the January 1 coincident with or next following the date the Member incurs the Distribution Option elected under Section 6.1 or his date of death, as the case may be. Matching Credits earned in respect to periods following the date of such distributable event shall be paid directly to the Member in cash as soon as practical. Notwithstanding the foregoing, a Member or former Member may make a Distribution Option election to receive distribution of his Account in semi-annual installments over a period not to exceed twenty (20) years. Installments shall be determined as of each June 30 and December 31 and shall be paid as soon as administratively practicable thereafter. Installments shall commence as of the July 1 or January 1 coincident with or next following the date the Member incurs the distributable event elected as a Distribution Option under Section 6.1, or as soon as administratively practicable thereafter. The amount of each installment shall equal the balance in the Account as of the Valuation Date of determination, divided by the number of remaining installments (including the



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

installment being determined). The Distribution Option election shall be irrevocable except as provided in Section 6.2(c) below. If a Member or former Member dies before payment of the entire balance of his Account, the remaining balance shall be paid in a single sum to his Beneficiary as soon as administratively practicable following the January 1 coincident with or next following his date of death. (b) Effective January 1, 1995, a Member or former Member shall, pursuant to Section 6.9, be eligible to make a separate Distribution Option election of the form of payment of his Account in the event of a Change of Control.

(c) Notwithstanding Section 6.2(a) and Section 6.2(b), a Member or former Member may change the Distribution Option election of the form in which his Account is distributed, as follows:

(i) A Member or former Member may make a one-time request to the Administrator to change the form in which his Account is to be distributed under Section 6.2(a). A Member or former Member may also make a onetime request to change the form in which his Account is to be distributed under Section 6.2(b). The request must be filed in writing with the Administrator at least one year prior to when distribution would commence based on the current designation. The requests must specify a form of distribution described in Section 6.2(a), shall be subject to approval of the Administrator and, if approved, shall be effective as of the date that is one year after the request is filed with the Administrator. If the Member's distribution event will occur upon his termination of employment and the Member's employment terminates within one year after the request is filed, the request shall not be effective. A request under this Section 6.2(c)(i) shall not result in a forfeiture of the Member's or former Member's Account.

(ii) Notwithstanding Section 6,2(cXD, a Member or former Member may change the form in which his Account is to be distributed under Section 6.2(a) or 6.2(b), no more frequently than once in any calendar year, by filing with the Administrator an amendment to his Distribution Option election on or before December 30 (or the last preceding business day if December 30 is not a weekday). The change shall be limited to those forms of distribution described in Section 6.2(a), shall be subject to approval of the Administrator and, if approved, shall be effective as of the last Valuation Date of the calendar year in which it is filed. Unless the election complies with the requirements for a one-time request under Section 6.2(c)(i), or unless the provisions of Section 6.2(d) apply, an election under this Section 6.2(c)(ii) shall result in the forfeiture of five percent (5%) of the Member's or former Member's Account, determined as of the Valuation Date upon which the election is effective. If the Member or former Member changes his designated distribution event under this Section 6.2(c)(ii) at the same time as he changes the form in which his Account is to be distributed under Section 6.1(c)(ii), the combined forfeiture will be five percent (5%) of the Member's or former Member's Account, determined as of the Valuation Date upon which the election is effective.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

(d) In the event the Member's Account consists of one or more Retirement Sub-accounts and one or more Education Sub-accounts, the provisions of this Section 6.2 shall apply exclusively to the Member's Retirement Sub-accounts. A Member may not change the form in which his Education Sub-accounts are distributed, except that a Member may transfer the entire amount in any Education Sub-account to one or more other Education Sub-accounts and one or more Retirement Sub-accounts, or any combination thereof, subject to a possible forfeiture of five percent (5%) of the Sub-account so transferred, as provided in Article 9.

6.3 APPLICABILITY: In the event the Member's Account consists of one or more Retirement Sub-accounts and one or more Education Sub-accounts, the provisions of Sections 6.1 (a) and 6.1(c) and 6.2 shall apply exclusively to the Member's Retirement Sub-accounts.

6.4 ACCOUNT ADJUSTMENT: The obligations of the Corporation or any of its affiliated corporations and the benefits due any Member, former Member, surviving spouse or beneficiary hereunder shall be reduced by any amount received in regard thereto under the Benefits Assurance Trust or any similar trust or other vehicle.

6.5 HARDSHIP WITHDRAWAL:

(a) While employed by the Participating Companies, a Member or former Member may, in the event of a severe financial hardship, request a withdrawal from his Account. The request shall be made in a time and manner determined by the Administrator, shall not be for a greater amount than the amount required to meet the financial hardship, and shall be subject to approval by the Administrator. (b) For purposes of this Section 6.5 financial hardship shall include:

(i) education of a dependent child where the Member or former Member shows that without the withdrawal under this Section the education would be unavailable to the child;

(ii) illness of the Member or former Member or his dependents, resulting in severe financial hardship to the Member or former Member;

(iii) the loss of the Member's or former Member's home or its contents, to the extent not reimbursable by insurance or otherwise, if such loss results in a severe financial hardship to the Member or former Member;

(iv) any other extraordinary circumstances of the Member or former Member approved by the Administrator if such circumstances would result in a present or impending critical financial need which the Member or former Member is unable to satisfy with funds reasonably available from other sources.

(c) Notwithstanding the preceding, following a Change of Control, any decisions or determinations by the Administrator under this Section 6.5 shall be subject to the approval of the Benefits Trust Committee.

6.6 DESIGNATION OF BENEFICIARY: A Member or former Member may, at a time and in a manner determined by the Administrator, designate a beneficiary and one or more contingent beneficiaries



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

(which may include the Member's or former Member's estate) to receive any benefits which may be payable under this Plan upon his death. If the Member or former Member do not designate a beneficiary or contingent beneficiary, or if the beneficiary and the contingent beneficiaries do not survive the Member or former Member, such benefits shall be paid to the Member's or former Member's estate. A Member or former Member may revoke or change any designation made under this Section 6.6 in a time and manner determined by the Administrator.

6.7 SPECIAL DISTRIBUTION RULES: Notwithstanding anything to the contrary in this Plan, if (a) a Member or former Member becomes the owner, director or employee of a competitor of the Affiliated Companies, (b) his employment is terminated by an Affiliated Company on account of actions by the Member Which are detrimental to the interests of the Affiliated Company, or (c) he engages in conduct subsequent to the termination of his employment with the Affiliated Companies which the Administrator determines to be detrimental to the interests of an Affiliated Company, then the Administrator may, in its sole discretion, pay the Member or former Member a single sum payment equal to the balance in his Account. The single sum payment shall be made as soon as practicable following the date the Member or former Member becomes an owner, director or employee of a competitor, his termination of employment or the Administrator's determination of detrimental conduct, as the case may be, and shall be in lieu of all other benefits which may be payable to the Member or former Member under this Plan.

6.8 STATUS OF ACCOUNT PENDING DISTRIBUTION: Pending distribution, a former Member's Account (and, if applicable, a former Member's Sub-accounts) shall continue to be credited with earnings and losses as provided in Section 5.1. The former Member shall be entitled to change his investment elections under Section 5.3 or apply for Hardship withdrawals under Section 6.5 to the same extent as if he were a Member of the Plan. In the event of the death of a Member or former Member, his Sub-accounts shall be credited with earnings and losses as if the Sub-accounts had earned the same rate of return as the CSX Corporation Cash Pool Earnings Rate or, in the sole discretion of the Administrator, the rate of return of such other index of investment performance or investment fund which may be designated by the Administrator as a measure for investment performance of Members' or former Members' Accounts (and, if applicable, their Sub-accounts), commencing with the Valuation Date coincident with or next following the Member's or former Member's date of death.

6.9 INSTALLMENTS AND WITHDRAWALS PRO-RATA: In the event of an installment payment or hardship withdrawal, such payment or withdrawal shall be made on a pro-rata basis from the portions of the Member's or former Member's existing Account balance which are subject to different measures of investment performance. In the event of a hardship withdrawal, the withdrawal shall be made on a pro-rata basis from all of the Member's or former Member's Sub-accounts. 6.10 Change of Control:

6.10 CHANGE OF CONTROLS:

(a) If a Change of Control has occurred, the Corporation and Participating Companies shall contribute to the Trust within 7 days of such Change of Control, a lump sum payment equal to the greater of (i) the aggregate value of the amount each Member or former Member would be eligible to receive (determined under (b) below) as of the latest Valuation Date coinciding with or preceding the date of Change of Control or (ii) the amount determined under Section 1(h) of the Trust attributable to liabilities relating to the Plan to the extent such amounts are not already in the Trust. The aggregate value of the amount of the lump sum to be contributed to the Trust pursuant to this Section 6.10 shall be determined by the Independent Accountants after consultation with the entity then maintaining the Plan's records, and shall be projected, if necessary, to such Valuation Date from the last valuation of Members' or former Members' Accounts for which information is readily available. Thereafter, the Independent Accountants shall annually determine as of a



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Valuation Date for each Member or former Member not receiving a lump sum payment pursuant to subsection (b) below the value of each Member or former Member's Accounts. To the extent that the value of the assets held in the Trust relating to this Plan do not equal the aggregate amount described in the preceding sentence, at the time of the valuation, as determined by the Independent Accountants, the Corporation and Participating Companies shall make a lump sum contribution to the Trust equal to the difference.

(b) In the event a Change of Control has occurred, the trustee of the Trust shall, within 45 days of such Change of Control, pay to each Member or former Member not making an election under (c) below, a lump sum payment equal to the value of the Member's or former Member's Accounts (determined under Article 5) as of the Valuation Date coinciding with or next preceding the date of such Change of Control. The amount of each Member's or former Member's lump sum payment shall be determined by the Independent Accountants after consultation with the entity then maintaining the Plan's records, and shall be projected, if necessary, to such Valuation Date from the last valuation of Member's or former Member's Accounts for which information is readily available.

(c) Each Member or former Member may elect in a time and manner determined by the Administrator, but in no event later than December 31, 1996, or the occurrence of a Change of Control, if earlier, to have amounts and benefits determined and payable under the terms of the Plan as if a Change of Control had not occurred. New Members of the Plan may elect in a time and manner determined by the Administrator, but in no event later than 90 days after becoming a Member, to have amounts and benefits determined and payable under the terms of the Plan as if a Change of Control had not occurred. A Member or former Member who has made an election, as set forth in the two preceding sentences, may, at any time and from time to time, change that election; provided, however, a change of election that is made within one year of a Change of Control shall be invalid.

(d) Notwithstanding anything in the Plan to the contrary, each Member or former Member who has made an election under (c) above may elect within 90 days following a Change of Control, in a time and manner determined by the Benefits Trust Committee, to receive a lump sum payment calculated under the provisions of (b) above determined as of the Valuation Date next preceding such payment, except that such calculated amount shall be reduced by 5% and such reduction shall be irrevocably forfeited by the Member or former Member. Furthermore, as a result of such election, the Member or former Member shall no longer be eligible to participate or otherwise benefit from the Plan. Payments under this subsection (d) shall be made not later than 7 days following receipt by the Corporation of a Member's or former Member's election. The Benefits Trust Committee shall, no later than 7 days after a Change of Control has occurred, give written notification to each Member or former Member eligible to make an election under this subsection (d), that a Change of Control has occurred and informing such Member or former Member of the availability of the election.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

ARTICLE 7. AMENDMENT OR TERMINATION

7.1 RIGHT TO TERMINATE:

(a) Prior to a Change of Control, the Board may, in its sole discretion, terminate this Plan and the related Deferral Agreements at any time. Following a Change of Control, this Plan may not be terminated without the approval of the Benefits Trust Committee.

(b) Prior to a Change of Control, the Committee may terminate an Affiliated Company's participation as a Participating Company in this Plan for any reason at any time. Following a Change of Control, an Affiliated Company may not be terminated from participation as a Participating Company without the consent of the Benefits Trust Committee.

(c) Prior to a Change of Control, an Affiliated Company's board of directors may terminate that Affiliated Company's participation as a Participating Company for any reason at any time. Following a Change of Control, an Affiliated Company's participation as a Participating Company may not be terminated without the consent of the Benefits Trust Committee.

(d) In the event the Plan and related Deferral Agreements are terminated, each Member, former Member and Beneficiary shall receive a single sum payment equal to the balance in his Account. The single sum payment shall be made as soon as practicable following the date the Plan is terminated and shall be in lieu of any other benefit which may be payable to the Member, former Member or Beneficiary under this Plan.

7.2 RIGHT TO AMEND: Prior to a Change of Control, the Board may, in its sole discretion, amend this Plan and the related Deferral Agreements on 30 days prior notice to the Members and, where applicable, former Members. Following a Change of Control, all amendments to this Plan are subject to the approval of the Benefits Trust Committee. If any amendment to this Plan or to the Deferral Agreements shall adversely affect the rights of a Member or former Member, such individual must consent in writing to such amendment prior to its effective date. If such individual does not consent to the amendment, the Plan and related Deferral Agreements shall be deemed to be terminated with respect to such individual and he shall receive a single sum payment of his Account as soon thereafter as is practicable. Notwithstanding the foregoing, the Administrator's change in any investment funds or investment index under Section 5.1(b) or the restriction of future deferrals under the salary deferral program or award deferral program shall not be deemed to adversely affect any Member's or former Member's rights.

7.3 UNIFORM ACTION: Notwithstanding anything in the Plan to the contrary, any action to amend or terminate the Plan or the Deferral Agreements must be taken in a uniform and nondiscriminatory manner. Notwithstanding the preceding, any such action taken by the Administrator following a Change of Control is subject to the approval of the Benefits Trust Committee.

ARTICLE 8. GENERAL PROVISIONS

8.1 NO FUNDING: Nothing contained in this Plan or in a Deferral Agreement shall cause this Plan to be a funded retirement plan. Neither the Member, former Member, his beneficiary, contingent beneficiaries, heirs or personal representatives shall have any right, title or interest in or to any funds of the Trust or the Affiliated Companies on account of this Plan or on account of having completed a Deferral Agreement. The assets held in the Trust shall be subject to the claims of creditors of the Corporation, and the Trust's assets shall be used to discharge said claims in the event of the Corporation's insolvency. Each



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Member or former Member shall have the status of a general unsecured creditor of the Affiliated Companies and this Plan constitutes a mere promise by the Affiliated Companies to make benefit payments in the future.

8.2 OBLIGATION: To the extent reflected by resolutions of the applicable boards of directors, obligations for benefits under this Plan shall be joint and several.

8.3 NO CONTRACT OF EMPLOYMENT: The existence of this Plan or of a Deferral Agreement does not constitute a contract for continued employment between an Eligible Executive or a Member and an Affiliated Company. The Affiliated Companies reserve the right to modify an Eligible Executive's or Member's remuneration and to terminate an Eligible Executive or a Member for any reason and at any time, notwithstanding the existence of this Plan or of a Deferral Agreement.

8.4 WITHHOLDING TAXES: All payments under this Plan shall be net of an amount sufficient to satisfy any federal, state or local withholding and payroll tax requirements.

8.5 NONALIENATION: The right to receive any benefit under this Plan may not be transferred, assigned, pledged or encumbered by a Member, former Member, beneficiary or contingent beneficiary in any manner and any attempt to do so shall be void. No such benefit shall be subject to garnishment, attachment or other legal or equitable process without the prior written consent of the Affiliated Companies. Notwithstanding the preceding, following a Change of Control, the Administrator shall not implement such action without the consent of the Benefits Trust Committee.

8.6 ADMINISTRATION:

(a) Prior to a Change of Control, the Administrator of the Plan shall be responsible for the general administration of the Plan, claims review, and for carrying out its provisions. Administration of the Plan shall be carried out consistent with the terms and conditions of the Plan.

(b) Following a Change of Control, the Benefits Trust Committee may remove and/or replace the Administrator.

(c) The Administrator shall have sole and absolute discretion to interpret the Plan, determine eligibility for and benefits due hereunder. Decisions of the Administrator regarding benefits under the Plan shall at all times be binding and conclusive on Members, their beneficiaries, heirs and assigns. Notwithstanding the preceding, following a Change of Control, final benefit determinations for Members, their beneficiaries, heirs and assigns and decisions regarding benefit claims under the Plan shall rest with the Benefits Trust Committee or its delegate in its sole and absolute discretion.

(d) Prior to paying any benefit under this Plan, the Administrator may require the Member or former Member, beneficiary or contingent beneficiary to provide such information or material as the Administrator, in its sole discretion, shall deem necessary for it to make any determination it may be required to make under this Plan. The Administrator may withhold payment of any benefit under this Plan until it receives all such information and material and is reasonably satisfied of its correctness and genuineness. The Administrator shall provide adequate notice in writing to any Member, former Member, beneficiary or contingent beneficiary whose claim for benefits under this Plan has been denied, setting forth the specific reasons for such denial. A reasonable opportunity shall be afforded to any such Member, former Member, beneficiary or contingent beneficiary for a full and fair review by the Administrator of its decision denying the

claim. The Administrator's decision on any such review shall be final and binding on the Member, former Member, beneficiary or contingent beneficiary and all other interested persons. All acts and decisions of the Administrator shall be final and binding upon all Members, former Members, beneficiaries, contingent beneficiaries and employees of the Affiliated Companies. Notwithstanding the preceding, following a Change of Control, any and all decisions by the Administrator are subject to the approval of the Benefits Trust Committee.

(e) Prior to a Change of Control, the Committee in its sole discretion and upon such terms as it may prescribe, may permit any company or corporation directly or indirectly controlled by the Corporation to participate in the Plan. After a Change of Control, such permission must be approved by the Benefits Trust Committee.

8.7 CONSTRUCTION:

(a) The Plan is intended to constitute an unfunded deferred compensation arrangement for a select group of management or highly compensated employees and all rights hereunder shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia to the extent not preempted by federal law.

(b) The masculine pronoun means the feminine wherever appropriate.

(c) The captions inserted herein are inserted as a matter of convenience and shall not affect the construction of the Plan.

## ARTICLE 9. EDUCATION SUB-ACCOUNTS

9.1 EDUCATION SUB-ACCOUNTS:

(a) Notwithstanding any provision of this Plan to the contrary, with respect to amounts deferred under Salary Deferral Agreements and Award Deferral Agreements effective on or after December 31, 1990, a Member may direct the Administrator to establish a separate sub-account in the name of one or more of:

(i) each of the Member's children,

(ii) each of the Member's brothers, sisters, their spouses, the Member's spouse, or

(iii) each of the foregoing's lineal descendants, for the payment of their expenses directly or indirectly arising from enrollment in a college, university, another post-secondary institution of higher learning or a secondary educational institution. Each sub-account established pursuant to this Section 9.1(a) shall be referred to as an "Education Sub-account."

(b) The Member may instruct the Administrator to allocate all or a portion of any amount deferred under an Award Deferral Agreement in respect to an Award granted after December 31, 1990 to one or more of the Education Sub-accounts established pursuant to Section 9.1(a).



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

(c) A Member may instruct the Administrator to allocate all or any portion of the amount he defers for periods commencing after December 31, 1990 pursuant to his Salary Deferral Agreement to one or more of the Education Sub-accounts established pursuant to Section 9.1(a).

(d) Any elections pursuant to Sections 9.1 (a) and 9.1(b) shall be made in whole percentages.

(e) No Matching Credits shall be allocated to any Education Sub-account.

9.2 DISTRIBUTION OF EDUCATION SUB-ACCOUNTS:

(a) Amounts allocated to one or more of a Member's Education Sub-accounts shall be distributed to the Member upon the attainment of the certain age of the Member, specifically designated by the Member for this purpose with regard to that Sub-account.

(b) A Member or former Member may transfer the entire amount but not less than that amount in any Education Sub-account to one or more other Education Sub-accounts, a Retirement Sub-account, or any combination thereof, by filing the appropriate form or forms with the Administrator not later than the last business day of the calendar year preceding the calendar year in which distribution of that Education Sub-account was to begin; provided, however, if such transfer accelerates the timing of the payment to the Member, there shall be a forfeiture of five percent (5%) of the Member's or former Member's Sub-account so transferred, determined as of the Valuation Date upon which the transfer is effective. In no event may a Member transfer all or any portion of the amount in a Retirement Sub-account to his Education Sub-accounts. Except as provided in this Section 9.2(b) or 9.2(c) below, a Member or former Member may not change the time or form of distribution of his Education Sub-accounts.

(c) In the event that the individual for whom an Education Sub-account is established dies while funds remain in that Sub-account, a Member or former Member may transfer without penalty the entire amount but not less than that amount in that Sub-account in accordance with the provisions of (i) or (ii) below:

(i) to one or more existing Education Sub-accounts and/or a new Education Sub-account established in accordance with the provisions of Section 9.1 hereof; or

(ii) to a Retirement Sub-account.

If a Member or former Member elects to transfer funds in accordance with (ii) and he has not previously established a Retirement Sub-account, such a Sub-account shall be established automatically and the Member or former Member promptly thereafter will be required to execute an amendment to his Deferral Agreement which shall specify the option under Section 6.1 (a) which will entitle him to distribution of the Retirement Sub-account and the form of distribution under Section 6.2(a).

(d) A Member's or former Member's Education Sub-accounts shall be distributed to him, or in the event of his death to his Beneficiary, in a cash single sum payment as soon as administratively practicable following the January 1 coincident with or next following the date the Member incurs the distributable event or events elected under Section 9.2(a) or his date of death, as the case may be. Notwithstanding the foregoing, a Member or former Member may elect to receive

distribution of one or more of his Education Sub-accounts in semi-annual installments over a period not to exceed six (6) years. Installments shall be determined as of each June 30 and December 31 and shall be paid as soon as administratively practicable thereafter. Installments shall commence as of the June 30 or December 31 coincident with or next following the date the Member incurs the distributable event elected under Section 9.2(a) with regard to a Sub-account, or as soon as administratively practicable thereafter. The amount of each installment shall equal the balance in the applicable Education Sub-account as of the Valuation Date of determination, divided by the number of remaining installments (including the installment being determined). If a Member or former Member dies before payment of the entire balance of all of his Education Sub-accounts, the remaining balance or balances, as the case may be, shall be paid in a single sum to his Beneficiary as soon as administratively practicable following the January 1 coincident with or next following his date of death.

9.3 CONSTRUCTION: To the extent any provision in this Article 9 is inconsistent with any other provision of this Plan, the provisions in Article 9 shall govern.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

AMENDMENT

SUPPLEMENTARY SAVINGS AND INCENTIVE AWARD DEFERRAL PLAN FOR
ELIGIBLE EXECUTIVES OF CSX CORPORATION AND AFFILIATED COMPANIES

Pursuant to Section 7.2 of the Supplementary Savings and Incentive Award Deferral Plan for Eligible Executives of CSX Corporation and Affiliated Companies, as Amended and Restated Through February 14, 2001 (the "Plan"), the Plan is amended effective February 7, 2003 as follows:

Section 6.7 is amended to read as follows:

"Notwithstanding anything to the contrary in the Plan, if (a) a Member or former Member becomes the owner, director or employee of a competitor of the Affiliated Companies; (b) his employment is terminated by an Affiliated Company on account of actions by the Member which are detrimental to the interests of the Affiliated Company; (c) he engages in conduct subsequent to the termination of his employment with the Affiliated Companies which the Administrator determines to be detrimental to the interests of an Affiliated Company; or (d) is required to divest his or her interest under the Plan under applicable law, regulation or rules, then the Administrator may, in its sole discretion, pay the Member or former Member a single sum payment equal to the balance in his Account. In such event, the single sum payment shall be made as soon as practicable following the date the Member or former Member or is affected by one of the circumstances described in this Section 6.7 and such payment shall be in lieu of all other benefits which may be payable to the Member or former Member under this Plan."

Exhibit 10.45
EXECUTION COPY

# SECOND AMENDMENT

SECOND AMENDMENT, dated as of May 14, 2003 (this "AMENDMENT"), to the FIVE-YEAR REVOLVING CREDIT AGREEMENT, dated as of June 8, 2001 (as amended, supplemented or otherwise modified, the "CREDIT AGREEMENT"), among CSX CORPORATION, a Virginia corporation, as Borrower, the LENDERS parties thereto, CITIBANK, N.A. and THE BANK OF NOVA SCOTIA, as Co-Syndication Agents, CREDIT SUISSE FIRST BOSTON and MIZUHO CORPORATE BANK, LTD., as Co-Documentation Agents, and JPMORGAN CHASE BANK (formerly known as THE CHASE MANHATTAN BANK), as Administrative Agent.

W I T N E S S E T H:

WHEREAS, pursuant to the Credit Agreement, the Lenders have agreed to make certain loans and other extensions of credit to the Borrower; and

WHEREAS, the Borrower has requested and, upon this Amendment becoming effective, the Lenders have agreed, to amend certain provisions of the Credit Agreement upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and the mutual agreements contained herein, the parties hereto agree as follows:

## SECTION 1. DEFINITIONS

1.1 DEFINED TERMS. Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given such terms in the Credit Agreement.

## SECTION 2. AMENDMENTS TO CREDIT AGREEMENT

2.1 AMENDMENT TO SECTION 5.01. Section 5.01 of the Credit Agreement is hereby amended by adding at the end of such Section the following new paragraph:

> Information required to be delivered pursuant to this Section 5.01 shall be deemed to have been delivered to the Lenders on the date on which the Borrower provides written notice to the Lenders that such information has been posted on the Borrower's website on the Internet at http://www.csx.com or is available on the website of the SEC at http://www.sec.gov (to the extent such information has been posted or is available as described in such notice). Information required to be delivered pursuant to this Section 5.01 may also be delivered by electronic communication pursuant to procedures approved by the Administrative Agent pursuant to Section 9.01(b) hereto.


Powered by Morningstar® Document Research℠

2.2 AMENDMENT TO SECTION 9.01. Section 9.01 of the Credit Agreement is hereby amended by adding at the end of such Section the following new paragraph:

> (d) Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent (upon any such procedures' approval, the Administrative Agent shall provide notice thereof to the applicable Lender); PROVIDED that the foregoing shall not apply to notices pursuant to Article II unless otherwise agreed by the Administrative Agent and the applicable Lender. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it prior to such communication (upon any such procedures' approval, the Administrative Agent shall provide notice thereof to the Lenders); PROVIDED that approval of such procedures may be limited to particular notices or communications.

SECTION 3. MISCELLANEOUS

3.1 LIMITED EFFECT. Except as expressly amended, modified and supplemented hereby, the Credit Agreement is, and shall remain, in full force and effect in accordance with its terms.

3.2 EFFECTIVENESS. This Amendment shall become effective as of the date hereof upon receipt by the Administrative Agent of a counterpart hereof duly executed by the Borrower and the Majority Lenders on or prior to 5:00 p.m., New York City time, on May 14, 2003.

3.3 REPRESENTATIONS AND WARRANTIES. On and as of the date hereof and after giving effect to this Amendment, the Borrower hereby confirms, reaffirms and restates the representations and warranties set forth in Article III of the Credit Agreement MUTATIS MUTANDIS, except to the extent that such representations and warranties expressly relate to a specific earlier date in which case the Borrower hereby confirms, reaffirms and restates such representations and warranties as of such earlier date.

3.4 COUNTERPARTS. This Amendment may be executed by one or more of the parties hereto on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. A set of the copies of this Amendment signed by all the parties shall be lodged with the Borrower and the Administrative Agent. This Amendment may be delivered by facsimile transmission of the relevant signature pages hereof.

3.5 GOVERNING LAW. THIS AMENDMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO THE CONFLICTS OF LAW PRINCIPLES THEREOF.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

CSX CORPORATION,
as Borrower

By: /s/ DAVID A. BOOR
-----------------------------------
Title: Vice President and Treasurer

JPMORGAN CHASE BANK,
as Administrative Agent and as a Lender,

By: /s/ ROBERT P. KELLAS
-----------------------------------
Title: Vice President

CITIBANK, N.A.,
as Co-Syndication Agent and as a Lender,

By: /s/ DAVID L. HARRIS
-----------------------------------
Title: Vice President

THE BANK OF NOVA SCOTIA,
as Co-Syndication Agent and as a Lender,

By: /s/ TODD S. MELLER
-----------------------------------
Title: Managing Director

CREDIT SUISSE FIRST BOSTON,
as Co-Documentation Agent and as a Lender,

By: /s/ JOSEPH ADIPIETRO
-----------------------------------
Title: Director

By: /s/ CASSANDRA DROOGAN
-----------------------------------
Title: Associate



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

MIZUHO CORPORATE BANK, LTD.,
as Co-Documentation Agent and as a Lender,

By: /s/ RAYMOND VENTURA
------------------------------------
Title: S.V.P.

PNC BANK, NATIONAL ASSOCIATION

By: /s/ DOUGLAS WINTERS
------------------------------------
Title: Sr. Vice President

BANK OF TOKYO-MITSUBISHI TRUST COMPANY

By: /s/ J.W. RHODES
------------------------------------
Title: VP--Manager

THE BANK OF NEW YORK

By: /s/ STEVEN P. CAVALUZZO
------------------------------------
Title: Vice President

BANK ONE, NA

By: /s/
------------------------------------
Title: Managing Director

WACHOVIA BANK, NATIONAL ASSOCIATION

By: /s/ FRITZ BLUMER
------------------------------------
Title: Vice President



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

FLEET NATIONAL BANK

By: /s/ DAVID J. DOUCETTE
-----------------------------------
Title: Vice President

SUNTRUST BANK, A GEORGIA BANK

By: /s/ MARK FLATIN
-----------------------------------
Title: Director

UBS AG, CAYMAN ISLANDS BRANCH

By: /s/
-----------------------------------
Title: Director

By: /s/
-----------------------------------
Title: Associate Director

DEUTSCHE BANK AG NEW YORK BRANCH

By: /s/ CHRIS HOWE
-----------------------------------
Title: Director

By: /s/ HARALD MILDNER
-----------------------------------
Title: Vice President

THE MITSUBISHI TRUST AND BANKING CORPORATION

By:
-----------------------------------
Title:

THE NORTHERN TRUST COMPANY

By: /s/ ERIC DYBING
-----------------------------------
Title: Second Vice President



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

FIFTH THIRD BANK

By: /s/ ANDREW L. BUSCHLE
------------------------------------
Title: Vice President

UFJ BANK LIMITED

By: /s/ JOHN T. FEENEY
------------------------------------
Title: Vice President

EXHIBIT 12

Computation of Earnings to Fixed Charges
CSX Corporation
Ratio of Earnings to Fixed Charges
(Millions of Dollars)

| | FOR THE FISCAL YEARS ENDED | | | | |
|---|---|---|---|---|---|
| | DEC. 26, 2003 | DEC. 27, 2002 | DEC. 28, 2001 | DEC. 29, 2000 | DEC. 31, 1999 |
| Earnings: | | | | | |
| Earnings Before Income Taxes | $ 265 | $ 723 | $ 448 | $ 277 | $ 104 |
| Interest Expense | 418 | 445 | 518 | 550 | 528 |
| Amortization of debt discount | -- | -- | -- | 1 | -- |
| Interest Portion of Fixed Rent | 62 | 77 | 88 | 109 | 151 |
| Undistributed earnings of unconsolidated subsidiaries | (40) | (44) | (2) | (18) | (58) |
| Earnings, as Adjusted | $ 705 | $ 1,201 | $ 1,052 | $ 919 | $ 725 |
| Fixed Charges: | | | | | |
| Interest Expense | $ 418 | $ 445 | $ 518 | $ 550 | $ 528 |
| Capitalized Interest | 3 | 3 | 7 | 6 | 8 |
| Amortization of Debt Discount | -- | -- | -- | 1 | -- |
| Interest Portion of Fixed Rent | 62 | 77 | 88 | 109 | 151 |
| Fixed Charges | $ 483 | $ 525 | $ 613 | $ 666 | $ 687 |
| Ration of Earnings to Fixed Charges | 1.5x | 2.3x | 1.7x | 1.4x | 1.1x |

 Powered by Morningstar® Document Research SM

EXHIBIT 14

# CSX CODE OF ETHICS

## LETTER FROM THE PRESIDENT, CHAIRMAN & CEO

February 2004

Dear CSX Colleague:

Enclosed is a copy of CSX Corporation's updated and revised Code of Ethics. The Code is intended to inform all employees in the CSX family of companies of the Company's expectations and of employees' legal and ethical responsibilities and obligations. CSX and its affiliated companies strive to apply high ethical, moral and legal principles in every aspect of business conduct. That is what "Right results, right way" means.

Our corporate vision is to be the safest, most progressive North American railroad, relentless in the pursuit of customer and employee excellence. At its core, the Code of Ethics expresses the fundamental values that must drive our behavior. At CSX, we believe that living by a set of core values will guide the way we treat each other and how we make business decisions. These shared values are vital to securing and maintaining respect from our shareholders, employees, Government officials and the public at large. We regard the quality of our products and services, the safety of our employees and customers, and our integrity in business dealings among our most valuable assets. Our daily performance can add to, or detract from, our company's reputation and value as a freight transportation company, an employer, a member of our local communities and a national corporate citizen.

Although some of the policies included in this Code of Ethics may not apply to you, I ask that you read the entire booklet and agree to abide by its terms, as it applies to you. Each year, I will ask you to re-read the Code of Ethics.

Thank you for your part in maintaining our role as a leader in the marketplace and in making us a leader in legal and ethical behavior.

Sincerely,

Michael J. Ward
CSX Corporation
Chairman, President and Chief Executive Officer

CSX Ethics Information Hotline: 1-800-737-1663


Powered by Morningstar® Document Research℠

CSX's ETHICS AND COMPLIANCE PROGRAM

CSX Corporation and its affiliated companies (referred to herein as "CSX" or the "Company") are committed to maintaining high ethical and legal standards in every aspect of its business conduct. CSX's reputation for adherence to laws, regulations and its written Code of Ethics is more important than the position or personal advancement of any one officer or employee. CSX's continued success and, most importantly, the lives and safety of its employees and customers, depends on the strength of the Company's efforts to detect, prevent and promptly remedy any actual or suspected misconduct.

CSX operates a corporate-wide program to coordinate, implement and monitor compliance with corporate values; laws and regulations applicable to the Company's business operations; and Company policies and procedures. Oversight of the Ethics and Compliance Program is the responsibility of Audit and Advisory Services.

CSX expects its directors, officers and employees to understand and abide by all legal requirements governing the Company's business and operations. The Company provides ongoing education and guidance concerning applicable laws and regulations. Employees who wish to obtain more information on these issues should talk with their supervisor or call the CSX Ethics Information Hotline at 1-800-737-1663. Complying with the law, however, is just part of what we must do. Directors, officers and employees should continually try to avoid even the appearance of impropriety in matters involving legal obligations, the Company's Code of Ethics or other Company policies and procedures.

CSX CODE OF ETHICS

CSX Corporation has in place a Code of Ethics applicable to all directors, officers and employees of the corporation and its subsidiaries, wherever located.(1) The Code covers conflicts of interest, insider trading, protection of confidential information and proper use of company assets, and compliance with laws and regulations applicable to the Company's business operations, among other issues central to our business and operations. This Code of Ethics provides the framework for the rules and policies of the subsidiary for which you work. Copies of those rules are available from your supervisor or Human Resources representative. Depending on your job description, you may be subject to additional and more specific rules covering one or more of the topics discussed in this Code of Ethics.

It is important for you to understand that:

- You are personally responsible for your own conduct in complying with all provisions of this Code of Ethics and for promptly reporting known or suspected violations of this Code of Ethics to your supervisor, manager or the CSX Ethics Information Hotline (1-800-737-1663).

- If you are a supervisor or manager, you are responsible and accountable for ensuring that your employees understand and comply with this Code of Ethics;

------------------------------

(1) CSX Corporation is comprised of principal business units, other transportation business units and non-transportation units. Principal business units of CSX Corporation are CSX Transportation, CSX Intermodal and CSX World Terminals LLC. Other transportation business units include CSX Technology; CSX Real Property; TRANSFLO; Total Distribution Services, Inc; and BridgePoint. Non-transportation business units are The Greenbrier resort hotel and Yukon Pacific Corporation.



 Powered by Morningstar® Document Research℠

- No one in this Company has the authority or right to order, request or even influence you to violate this Code of Ethics or the law;

- You will not be excused for violating this Code of Ethics for any reason, even at the request of another person, including your supervisors, managers or Company officers;

- Any attempt by any person to have another violate this Code of Ethics, whether successful or not, is itself a violation and may be a violation of the law;

- Any retaliation or threat of retaliation against any person for refusing to violate this Code of Ethics or for reporting in good faith a violation or suspected violation of this Code of Ethics is itself a violation and may be a violation of the law;

- Every reported violation of this Code of Ethics will be investigated, and every actual violation will constitute a basis for disciplinary action involving the person violating this Code of Ethics and may result in civil or criminal action against that person; and

- Any employee who acts contrary to this Code of Ethics, or who knowingly gives a false report regarding a violation of this Code, may be subject to disciplinary action, up to and including termination of employment.

As part of CSX's commitment to ethics and compliance, all directors, officers and employees of CSX and its affiliated companies have a duty to promptly report any actual or suspected misconduct. Failure to fulfill this duty is a violation of CSX's Code of Ethics and may result in disciplinary measures up to and including dismissal in appropriate cases. Failure to report actual or suspected misconduct also may expose the Company and its directors, officers, and employees to potential criminal and civil penalties, and damages to the Company's reputation.

If you have questions about this Code of Ethics or concerns about someone's workplace conduct, first contact your manager. If you do not feel comfortable doing this, you may contact other CSX resources available to you:

- Law Department

- The CSX Ethics Information Hotline

THE CSX ETHICS INFORMATION HOTLINE (1-800-737-1663)

In support of its Code of Ethics and to facilitate reporting of any suspected misconduct, CSX maintains a toll-free CSX ETHICS INFORMATION HOTLINE, which is available 24 hours a day, 7 days a week at 1-800-737-1663, for individuals to report actual or suspected misconduct, ask questions, or raise concerns about business ethics and compliance matters, without fear of retaliation. CSX has a non-retaliation policy that prohibits retaliation against an employee for raising a concern or reporting actual or suspected misconduct in good faith. Anyone may contact the CSX Ethics Information Hotline if they have compliance questions or concerns, and callers have the right to remain anonymous, if they wish. Investigations will be conducted in as confidential a manner as possible, depending upon the circumstances presented.

At the direction of CSX's management, the CSX Ethics Information Hotline is administered by CSX's Senior Director, Ethics & Compliance and is staffed by members of the Ethics & Compliance Group in Audit and Advisory Services, who are responsible for receiving and handling calls made to the CSX Ethics Information Hotline. The Senior Director, Ethics & Compliance and members of the Ethics & Compliance Group under his direction have been appropriately trained on CSX's hotline procedures, including interviewing and investigative techniques. All reports to the Hotline will be reviewed and investigated promptly and appropriate

CSX Ethics Information Hotline: 1-800-737-1663

 Powered by Morningstar® Document Research℠

remedial measures will be undertaken. The Director, Ethics & Compliance will report periodically to the Audit Committee on calls received by the Ethics Information Hotline, including reports concerning financial and accounting issues.

CSX VALUES

At CSX, we believe that living by a set of fundamental core values help define the true measure of a company - they guide the way we treat each other and how we make business decisions. When all employees are aligned to fundamental guiding principles, companies consistently deliver superior financial results that ensure long-term success.

At CSX, we have developed a core ideology that is the foundation for everything we do and is embodied in the motto: "Right results, right way." This creates an environment that allows us to maintain a focus on what is important, while challenging everything else in a drive for continuous improvement. There is nothing magical about this concept. It is the discipline of execution that distinguishes great companies. It is about building an organization that has purpose, focus and alignment; that lives its values every day; and that creates an environment that allows employees to grow and to produce superior results.

This core ideology - our vision, purpose and values - is the heart and soul of our Company. We believe that adhering to this core ideology will help us become an even stronger and sustainable organization - a leader in an evolving business world. For more information about CSX values, visit our web site at http://www.csx.com/index.cfm?fuseaction=company.values.

GUIDE TO BUSINESS CONDUCT

CSX is committed to maintaining high ethical and legal standards in its business conduct. We expect every director, officer, and employee to conduct himself or herself in accordance with the following Guide to Business Conduct.

CONDUCT INVOLVING OURSELVES AND OUR FELLOW EMPLOYEES

The basis of our values is dignity and mutual respect. These fundamental values drive our business.

MANAGEMENT RESPONSIBILITY

At CSX, leaders must show a commitment to CSX's values through their actions. They must also promote an environment where compliance is expected and ethical behavior is the norm. All CSX directors, officers and employees must comply with the Company's values and principles. No one may ask any CSX director, officer or employee to break the law or violate the Company's policies, procedures and values.

RESPECT AND FAIR TREATMENT

CSX is firmly committed to the principles of equality of opportunity in employment and human relationships. Each CSX employee is expected to treat fellow employees with respect and dignity.

CSX offers employment, training, compensation and advancement on the basis of qualification, merit and business needs, regardless of race, color, religion, sex (including pregnancy, childbirth or related medical conditions), age, national origin or ancestry, physical or mental disability, veteran status, secular orientation or any status protected by law not listed here. Fulfillment of our commitment to equal employment opportunity requires action by all employees throughout CSX. We all have a responsibility to promote equal employment opportunities. CSX is pledged

CSX Ethics Information Hotline: 1-800-737-1663


Powered by Morningstar® Document Research℠

to affirmative action programs that provides employment and promotional opportunities for minorities, women, individuals with disabilities and veterans. Employees are encouraged to contact their Human Resources representative to review the Affirmative Action Plan for the CSX company for which they work.

Similarly, business relationships with competitors, suppliers and customers of CSX must always be conducted free of discrimination based on race, color, religion, sex (including pregnancy, childbirth, or related medical conditions), age, national origin or ancestry, physical or mental disability, veteran status, sexual orientation, marital status or any status protected by law not listed here. All CSX employees are responsible for implementing CSX's policy of non-discrimination. This may require special affirmative action by all levels of executive, managerial and supervisory personnel to seek out competent persons and business entities entitled to the benefits of the broad CSX commitment to equal opportunity.

Employees are encouraged to review the Equal Employment Opportunity policy for the CSX company for which they work and to direct any questions or complaints to the appropriate individuals designated in that policy.

HARASSMENT

Our policy is to provide a work environment that is pleasant, professional and free from intimidation, hostility or other offenses that might interfere with work performance. CSX does not tolerate any form of harassment - verbal, physical or visual - by supervisors, other employees, customers, vendors, agents or other third parties. Harassment is personally offensive, lowers morale and interferes with the ability to work cooperatively. Accordingly, CSX companies have a zero tolerance for harassment based on sex, race, color, religion, national origin, age physical or mental disability, veteran status, or any other status protected by applicable federal or state law.

Employees are encouraged to review the Policy on Harassment for the CSX company for which they work and to direct any questions or complaints to the appropriate individuals designated in that policy.

EMPLOYEE PRIVACY

CSX companies respect the privacy of all employees. CSX will only use employee records as necessary for business needs, and will share employee information only for business reasons consistent with applicable laws. Some personal employee information is very sensitive and cannot be made public under many laws. This includes certain payroll records and medical history records.

CONDUCT INVOLVING OUR BUSINESS PARTNERS

Our values, honesty and standards of conduct do not stop with our actions, or at our doors. We expect the same from our suppliers, customers and others with whom we do business.

FAIR COMPETITION AND ANTITRUST REQUIREMENTS

All business activities of the CSX companies are highly competitive, and it is the policy of CSX to compete aggressively, but fairly. A major part of CSX's commitment to compete fairly is a commitment to comply with the antitrust laws. In general, these complex laws prohibit any form of agreement or understanding - whether formal or informal, written or oral, express or implied - between or among competitors that unreasonably limits or restricts competition between them. Breaking these laws can bring very severe penalties (civil and criminal) to both the Company and the individual. CSX's commitment to compliance with the antitrust laws includes the following guidelines:

CSX Ethics Information Hotline: 1-800-737-1663

- CSX employees may not discuss, or enter into a formal or informal agreement with competitors about prices other than joint line rates (sometimes called "through rates"). This includes agreements about matters affecting price such as demurrage terms, credit terms and other "price-like" commercial terms.

- CSX employees may not discuss, or enter into a formal or informal agreement with competitors about dividing customers, sales territories, or lines of business between themselves.

- This policy also prohibits any unfair or untrue disparagement of a CSX competitor.

- Absent compelling special circumstances, CSX companies should select all vendors and contractors on the basis of competitive bids.

GATHERING AND USING COMPETITIVE INFORMATION

To compete in the marketplace, it is necessary and legal to gather competitive information. CSX employees may only gather information through lawful means. Information about competitors' rates and other actions in the marketplace can almost always be freely received from CSX customers. Employees should maintain the confidentiality of information entrusted to them by the Company or its customers, except when disclosure is authorized or legally mandated. CSX employees must never use any illegal or unethical means to obtain information about other companies.

CSX employees should not share confidential information from suppliers or customers with anyone outside CSX without written permission. Confidential information includes all non-public information that is shared with you in the reasonable expectation that it will be kept confidential and that might be of use to that company's competitors, or harmful to CSX or CSX customers, if disclosed. If agreements are signed to protect information, be sure to follow their terms and conditions. Do not steal trade secret information, and do not suggest or ask others to disclose trade secrets, especially new employees hired from a competitor. New hires may not bring papers or computer records from prior employers, if those papers or records contain proprietary or confidential information belonging to their prior employer.

ACCURATE AND COMPLETE BOOKS, RECORDS AND ACCOUNTING

A company's credibility is judged in many ways - one fundamental way is the integrity of its books, records and accounting. In addition to our own commitment to accurately report financial performance, CSX companies are required by securities laws to report financial information in accordance with generally accepted accounting principles.

Every CSX director, officer and employee must help ensure that reporting of business and financial information - computerized, paper or otherwise - is accurate, complete and timely. This includes accurate recording of costs, revenues, time sheets, vouchers, bills, payroll and benefits records, and regulatory data, among other business information.

In addition, all directors, officers and employees of CSX companies must:

- Follow all laws, accounting requirements and company procedures for reporting financial information;

- Never deliberately make a false or misleading entry in any report or record;

- Never suppress, alter or destroy company records without authorization;

CSX Ethics Information Hotline: 1-800-737-1663

- Never sell, transfer or dispose of company assets without proper documentation and authorization;

- Cooperate with our internal and outside auditors;

- Contact the accounting or auditing organization with any questions about the proper recording of business and financial transactions; and

- Contact the Law Department with any legal questions you may have relating to these topics.

DOING BUSINESS WITH THE GOVERNMENT

Each year, CSX companies do substantial business with the U.S. and other Governments. While integrity is the foundation for our dealing with all customers, special rules apply when the Government is our customer, which are very different from those that govern our dealings with private sector companies. Violations of Government procurement laws can result in criminal and civil penalties, loss of contracts and ineligibility from doing further business with the Government. Under the civil False Claims Act, in particular, the Government can impose liability on a contractor for the submission of false claims to the Government, or a false statement in support of a claim, including the costs of the lawsuit, triple the amount of its actual damages, and a civil penalty of between $5,000 and $10,000 for each false claim. A "claim" is a request or demand for money or property submitted by a contractor to the Government, such as an invoice or contract billing. For this reason, it is important that all invoices or billings submitted by CSX to the Government be accurate and complete.

Those involved in bidding or providing products or services under a Government contract need to know these special rules, which include, but are not limited to, the following:

- Never seek or accept from any federal agency, or from any other source, a competitor's confidential bid or proposal information or an agency's source selection information prior to the award of the agency contract to which the information relates.

- Know the special rules on offering or providing gifts, gratuities or entertainment to Government employees, and obtain any advance approvals required by Company procedures.

- When dealing with a quasi-governmental body, know whether government procurement laws and/or ethics rules apply to your dealings with them.

- Know and follow the anti-kickback rules, including restrictions on gifts by those seeking business from the Government and from Government contractors.

- Understand "most favored customer" pricing and disclosure requirements and verify compliance.

- Conform strictly to the contract specifications, and all quality, quantity, delivery and testing requirements.

- Charging and allocation of costs, including employee time and overhead, provision of any cost or pricing data and billings to the Government must always be accurate, complete and in full compliance with applicable procurement rules and regulations.

- Be truthful, accurate, current and complete in all representations and certifications made to Government agencies.

CSX Ethics Information Hotline: 1-800-737-1663


Powered by Morningstar® Document Research℠

- Do not falsify any document or provide any misleading information relating to the award, performance or payment under any Government contract or subcontract.

- Know your Government customer's rules and regulations, including the requirements of standard contract clauses incorporated in the contract, either directly or by reference.

- Refrain from initiating any employment discussions with any current or former Government employee without first consulting with the Legal Department.

If you are involved with any aspect of a Government contract, you must not take any action that would violate any of these requirements.

DEALING WITH SUPPLIERS

CSX's Purchasing and Materials group handles the procurement, materials management and transport of items and services necessary for running a railroad and the Company, including investment recovery activities. The relationships we establish with our suppliers are important to us. The values of CSX are applicable in all of our dealings with suppliers, including a commitment to achieving the right results in the right way. CSX's policy is to base all procurement decisions on the best value received by CSX. CSX companies will not knowingly use suppliers who participate in any of the following activities: supply unsafe products or services; violate laws or regulations; or use child labor or forced labor.

Good procurement conduct - which is required of any CSX employee in any department who has dealings with supplier or vendors - includes the following:

- Use established corporate-wide or regional supply (leveraged) agreements;

- Whenever possible, obtain competitive bids when leveraged agreements do not exist;

- Ensure the overall performance capability of the supplier, including delivery, quality and financial status;

- Make sure that purchase agreements clearly state the services or products to be provided, the basis for earning payment, and the applicable rate or fee;

- The fee or price paid for goods and services by CSX must represent the value of the goods or services provided;

- Avoid reciprocal agreements;

- Encourage support for minority and women-owned businesses; and

- Purchase in support of CSX's Environmental, Safety and Health values and policies.

RELATIONSHIPS AND CONFLICTS OF INTEREST

Fair Dealing: Each CSX employee should endeavor to deal fairly with the Company's customers, suppliers, competitors and employees. No CSX director, officer or employee should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practice.

CSX Ethics Information Hotline: 1-800-737-1663


Powered by Morningstar® Document Research℠

Conflicts of Interest: A "conflict of interest" occurs when an individual's private interest interferes in any way - or even just appears to interfere - with the interests of the Company as a whole. A conflict situation can arise when a director, officer or employee takes actions or has interests that may make it difficult to perform his or her company work objectively and effectively. Conflicts of interest also arise when a director, officer or employee, or a friend or member of his or her family, receives improper personal benefits as a result of his or her position in the Company. Loans to, or guarantees of obligations of, such persons are of special concern.

It is CSX policy that no director, officer or employee - or any member of his or her immediate family - should acquire a financial interest in, or accept employment by, an entity doing business with a CSX company if the interest or employment would conflict with the employee's performance of his or her duties. Similarly, no CSX director, officer or employee should take any business action for personal benefit, or to benefit a friend or relative.

Corporate Opportunities: Pursuant to CSX's policy prohibiting conflicts of interest, CSX directors, officers and employees are expected to make decisions in the best interests of the Company, and not for personal gain. CSX directors, officers and employees are prohibited from: (1) taking for themselves personally opportunities that are discovered through the use of corporate property, information or position; (2) using corporate property, information or position for personal gain; and (3) competing with the Company.

Directors, officers and employees owe a duty to the Company to advance its legitimate interests when the opportunity to do so arises. CSX directors, officers and employees also have a duty to report to the CSX Ethics Information Hotline any situation that may appear to present a conflict of interest.

ENTERTAINMENT AND GIFTS

Ethical considerations are extremely important in supplier, competitor and customer relationships. CSX's position is clear: no gift, favor, hospitality or entertainment should be accepted or provided if it will create a feeling of obligation, compromise judgement or appear to influence the recipient. Kickbacks, bribes, rebates or other forms of illegal consideration are never acceptable, and should never be given or accepted by anyone acting on behalf of a CSX company. Receiving or giving gifts of cash or cash equivalents, including gift certificates, prepaid credit or charge cards, or gift cards, is never permitted.

To help ensure that your decisions are the right ones, ask yourself the following questions when giving or receiving any form of business entertainment or gift:

- Is it legal, customary and in good taste?

- Is it clearly related to the conduct of CSX business?

- Would you feel comfortable giving or receiving the entertainment or gift in a public setting?

- Could the offer influence or appear to influence your business judgement in any way?

If any doubt exists as to the impact that giving or receiving entertainment or gifts could have on the reputation of the Company or your personal reputation, the entertainment or gift should not be offered or accepted. Because these judgements sometimes can be difficult, CSX has established certain standards for exchanging entertainment and gifts which are described below. Your organization may choose to establish entertainment and gift policies that are more restrictive than those described below.

CSX Ethics Information Hotline: 1-800-737-1663

 Powered by Morningstar® Document Research℠

It is generally accepted business practice to provide and accept meals and entertainment that occur in conjunction with business meetings and conferences provided the meals and entertainment are not lavish. It is also acceptable to accompany a supplier or customer to recreational or social outings that have a clear business goal or charitable purpose. Invitations that involve customer or supplier provided overnight accommodations may be accepted only with the prior written approval of the department head. Employees should never solicit entertainment from suppliers or customers.

Gifts are defined as items, products or services given to an employee by a competitor, supplier, customer or any other party with whom CSX does business. Tickets to sporting or other events where the supplier or customer has no intention of accompanying the employee are considered gifts.

Employees may accept nominal gifts defined as having a value of up to $100 per year from a single organization. Employees may not solicit gifts. No gift may be offered in violation of another organization's standards.

CSX employees dealing with Government officials should be particularly alert to the special rules that may limit or prohibit giving gifts, gratuities, entertainment or other favors to Government officials. In conducting business with Government officials, CSX will abide by all existing regulations and laws. Specific questions regarding Government officials should be directed to Government Affairs, the Law Department or the Ethics Information Hotline.

CONDUCT INVOLVING OUR BUSINESS RESOURCES

CSX is committed to protecting its business resources. We expect every director, officer and employee to follow the standards set for the in the following Conduct Involving our Business Resources.

RESPONSIBLE USE OF COMPANY ASSETS

CSX employees should respect Company property and use Company assets, including computers and related information technology assets, only in accordance with established company policies, including the CSX Information Users Policy. Theft, carelessness, misuse and waste of company property have a direct impact on the Company's profitability. Company assets and resources should be used only to conduct company business, and not for personal gain or any non-business purpose.

DOCUMENT AND RECORDS MANAGEMENT

CSX's records and information are Company assets. The Company's Records and Information Management program assists employees in managing these assets efficiently and in accordance with Company policy.

Records and information can exist in many ways, such as documents, files, graphs, and databases, and may be kept in hard copy, electronically or on film. In order to ensure that valuable business information is well-organized and available when needed, employees should properly label and carefully handle confidential and proprietary information in accordance with procedures set forth in the CSX Records and Information Management Manual.

The Company's Record and Information Management program includes records retention policies and procedures. Check with your supervisor or the Company's Record Manager for policies regarding the retention of documents and other records that you handle, if any. Keep in mind that certain records and information pertaining to our business must be maintained for specific periods of time for legal reasons or for review by regulatory authorities.

CSX Ethics Information Hotline: 1-800-737-1663


Powered by Morningstar® Document Research℠

In addition, from time to time, we receive requests from Government agencies or other third parties for documents and records relating to our business. Once we have received such a request, we are often prohibited by law from destroying documents or information responsive to that request. CSX companies have developed a policy to suspend records disposition when such circumstances arise. This policy, known as a "Legal Hold Policy," is designed to ensure that all affected personnel and departments are promptly notified and relevant documents and information are identified, segregated and preserved when a legal obligation arises to preserve or retain them. If you are advised that the Company has received any such document request, you must not destroy any requested or related documents or records until you have been advised by the Law Department that you are permitted to do so.

INSIDER TRADING

In the course of your employment with CSX, you may become aware of material information about CSX or other companies that has not been made public. The use of such "inside information" about CSX or another company for your financial or other benefit is not only unethical, but also may be a violation of strict Federal laws against "insider trading" in securities (for example, stocks, bonds and options).

"Inside information" means information that:

- Is not available to the public, and

- Is "material."

"Material information" means information that a reasonable investor would likely consider important in deciding whether to buy or sell a security. Many of our employees may have inside information simply by virtue of their positions. Inside information might include, for example:

- The purchase or sale of a major asset;

- Changes in dividend policy;

- Mergers, acquisitions and joint ventures;

- Significant changes in operations or business plans;

- Major developments in litigation;

- The financial condition or operating results of a company, including earnings statements and forecasts; and

- Regulatory developments.

If you have knowledge of any of these kinds of information - and the information is non-public - it is inside information, and no CSX employee may buy or sell securities while aware of inside information. Inside information can also be information you obtained confidentially during the course of your work about another company - for example, from a customer or supplier. You should also be aware that the insider trading prohibition applies to people outside of CSX companies who obtain the information from one of our employees (for example, an employee's spouse, friends or broker). This means you must never give someone outside your company a "tip" regarding non-public inside information - this includes discussions on Internet "chat rooms." If you do, and the person you provided the information to uses it to trade, both you an the person you provided the information to are subject to action under the Federal securities law.

CSX Ethics Information Hotline: 1-800-737-1663

Securities law violations are taken very seriously and can be prosecuted even when the amount involved is small, or the "tipper" makes no profit at all. Government agencies regularly monitor trading activities through computerized searches. CSX employees (and outsiders they are associated with) who have inside information can lawfully trade in the market once the information is made public through established channels and enough time has passed for the information to be absorbed by the public.

If you have questions or concerns about your responsibilities under the insider trading laws, contact the Law Department or the CSX Ethics Information Hotline for further guidance.

ACCURACY OF BOOKS, RECORDS AND FINANCIAL REPORTING

Investors count on CSX to use and provide accurate information so they can make informed decisions. All CSX officers and employees must properly record many kinds of business information. All financial books, records and reports must correctly reflect transactions and events on a timely basis. These records must meet both generally accepted accounting principles and CSX's internal control requirements. The following are examples of activities that are not allowed:

- Failing to record or disclose funds or assets that should be recorded in a timely manner;

- Making false claims on an expense report, time sheet or any other report;

- Giving false or misleading quality or safety results or reports;

- Understating or overstating known liabilities or assets;

- Delaying the entry of items that should be current expenses;

- Hiding the true nature of any transaction; or

- Providing inaccurate or misleading information for Company benefit programs.

CSX directors, officers and employees must be sure that any document they prepare or sign is correct and truthful.

INTELLECTUAL PROPERTY

CSX's intellectual property - patents, trade secrets, trademarks, copyrights and other proprietary information - is considered a valuable Company asset. It is CSX's policy to establish, protect, maintain and defend its rights in all commercially significant intellectual property and to use those rights in responsible ways. All CSX employees must take steps to safeguard those assets.

In addition to protecting CSX's intellectual property rights, CSX respects the valid intellectual property rights of others. Unauthorized use of the intellectual property rights of others may expose CSX to civil lawsuits and damages. Theft and misappropriation of trade secrets, proprietary information or other intellectual property may result in significant fines and criminal penalties to both CSX and to the individual. New CSX products, services (including e-commerce initiatives), processes and software, and any proposed use of the intellectual property of others, should be timely and reasonably reviewed for infringement.

USE OF COMPUTER RESOURCES

CSX companies have specific policies concerning employee use of Company e-mail, the Internet and Company intranet, and other electronic information sources while on Company time or using

CSX Ethics Information Hotline: 1-800-737-1663

 Powered by Morningstar® Document Research℠

Company computers. E-mail and the Internet are powerful communication tools and valuable business assets. However, improper use of e-mail, Internet and Company intranet services can waste time and resources, and create legal liabilities and embarrassment for our employees and our Company. CSX's Information Users Policy explains what employees can and cannot do when using the Company's computer resources and includes policies pertaining to use of e-mail, the Internet and Company intranet, and the export of software and other information through CSX computer resources.

CSX employees should use extreme caution when using e-mail to transmit information that may contain our company trade secrets, business plans or any other confidential or proprietary information (including the confidential or proprietary information of others). CSX employees must not send e-mail messages or otherwise use our e-mail or Internet systems in connection with:

- Engaging in illegal, fraudulent or malicious activities;
- Copying or distributing copyrighted material - for example, software, database files, MP3 files, documentation or copyrighted articles using our Company e-mail systems;
- Engaging in activities on behalf of organizations with no professional or business affiliation with our Company;
- Sending or storing offensive, sexually explicit, obscene or defamatory material;
- Annoying or harassing other people;
- Using another person's identity without explicit authorization;
- Attempting to test, circumvent or defeat security or auditing systems, without prior authorization;
- Permitting any unauthorized person to access our company e-mail systems; or
- Distributing chain letters, solicitations or offers to buy or sell goods.

CSX does allow limited personal use of our Company e-mail and Internet systems, so long as such use is reasonable, does not violate any provision of this Code of Ethics or copyright laws, and does not interfere with your productivity or the productivity of your co-workers. You must assume that an e-mail message may be disclosed to or read by individuals other than the intended recipient(s), since messages can easily be forwarded to other individuals and retained indefinitely. Therefore, you should never create an e-mail message that you or the Company would not want used as evidence in any dispute, investigation or lawsuit. Finally, because e-mail messages can often be read out of context, it is extremely important that you avoid writing any e-mail message that even appears to violate any provision of the law or this Code of Ethics.

CONDUCT INVOLVING OUR COMMUNITIES

At CSX, we are deeply committed to enhancing the quality of life in the communities we serve.

ENVIRONMENTAL POLICY

As a global transportation leader, CSX is committed to protecting the environment and ensuring the safety and health of our employees and the public. We back our commitment by promoting best practices in environmental stewardship.

Daily decisions and actions at CSX are guided by the following environmental principles:

CSX Ethics Information Hotline: 1-800-737-1663

- Comply with applicable environmental laws and regulations;
- Make operations safe for employees, customers and the environment;
- Minimize waste, prevent pollution, and incorporate recycling in all practices and operations;
- Strive to eliminate releases that impact the environment;
- Employ sound environmental practices to address and redevelop environmentally impacted property;
- Encourage open and candid communication with employees, customers, and the public regarding the Company's environmental program and any hazard that may arise from its operations;
- Strive continually to improve environmental performance.

SAFETY POLICY

The safe operation of CSX activities is always a primary goal. All CSX officers and employees, without exception, are responsible for ensuring that CSX operations are conducted safely. We are committed to provide transportation services in a manner that will ensure the safety of our employees, our customers and the communities we serve. Employees are expected to observe all safety rules and practices and to follow instructions concerning safe and efficient work practices. All employees should advise their supervisor or other management representatives immediately if they see a work practice or activity they consider to be conducted in an unsafe or careless manner.

CSX provides emergency planning assistance and training to local fire, police and emergency response personnel in communities served by our Company.

POLITICAL CONTRIBUTIONS AND PUBLIC SERVICE INVOLVEMENT

CSX and its subsidiaries work hard to earn and maintain the respect of the communities in which they operate. As good neighbors and good corporate citizens, we seek to support the efforts of our many employee-volunteers who contribute time and talent to local organizations. At the same time, we support a wide variety of regional and national organizations dedicated to improving the health, safety and well-being of our nation's citizens. CSX employees are encouraged to speak out on important community issues. Employees must be careful, however, not to give the impression that they are speaking on behalf of a CSX company unless they are actually authorized to do so.

No CSX company is permitted to contribute, directly or indirectly, to any Federal political campaign. Employees may not use company expense accounts to pay for any personal political contributions or seek any other form of company reimbursement.

In addition, employees should not use company facilities or resources for the benefit of any party or candidate, including an employee individually running for office. Employees are encouraged to contribute to properly established political action committees.

THE U.S. FOREIGN CORRUPT PRACTICES ACT ("FCPA")

The FCPA prohibits the giving or offering of money or anything of value, either directly or through a third party, to an official of a foreign government, foreign government agency or instrumentality (which may include government monopolies, corporations, etc.) or to any foreign political party,

CSX Ethics Information Hotline: 1-800-737-1663


Powered by Morningstar® Document Research℠

party official or candidate, except for certain narrow exceptions as discussed below. The FCPA prohibits bribes and other improper payment regardless of the fact that they may be widely accepted or even seem necessary in the foreign country in question. A violation is a serious criminal offense for both companies and individuals, and may result in fines, loss of export privileges and imprisonment for individuals.

CSX's policy with respect to foreign corrupt practices and irregular transactions is to respect and adhere to the FCPA and laws of each country in which it does, and never to engage in bribery. In certain circumstances, so-called "facilitating payments" - small payments to foreign government officials for routine governmental actions - are permissible under the FCPA. The purpose of such payments is to expedite the performance of a duty that the Government official is otherwise required to perform, and is distinguishable from a bribe, which is a payment given to persuade an official to give favorable treatment or exercise his discretion in favor of a payment-giver. CSX policy requires written pre-approval by the Law Department of any facilitating payment.

INTERNATIONAL BUSINESS

CSX policy is to fully comply with the specific laws and regulations of all countries where we do business, and with all U.S. laws affecting international trade, such as anti-boycott, trade sanction, export control and foreign corrupt practices laws. Violations of these laws carry stiff civil and criminal penalties for individuals and the Company, and could cause serious damage not only to our corporate reputation, but also to the public at large. Employees involved in foreign operations should be aware of these laws, and should always consult with the Law Department to ensure that CSX companies do not violate any relevant laws.

-----------------

CSX Ethics Information Hotline: 1-800-737-1663



Powered by Morningstar® Document Research℠

EXHIBIT 21

SUBSIDIARIES OF THE REGISTRANT

As of December 26, 2003, the Registrant was the beneficial owner of 100% of the common stock of the following significant subsidiaries:

CSX Transportation, Inc. (a Virginia corporation)
CSX Rail Holding Corporation (a Delaware corporation)
CSX Intermodal, Inc. (a Delaware corporation)
CSX Technology, Inc. (a Virginia corporation)
CSX Residual Company (a Delaware corporation)
SL Service, Inc. (a Delaware corporation)

As of December 26, 2003, none of the other subsidiaries included in the Registrant's consolidated financial statements constitute a significant subsidiary.


Powered by Morningstar® Document Research℠

EXHIBIT 23.1

Consent of Independent Auditors

We consent to the incorporation by reference in each Form S-3 Registration Statement or Post-Effective Amendment (Registration Nos. 33-2084, 333-54700 and 333-60134) and in each Form S-8 Registration Statement (Registration Nos. 33-16230, 33-25537, 33-29136, 33-37449, 33-41498, 33-41499, 33-41735, 33-41736, 33-57029, 333-09213, 333-73427, 333-73429, 333-32008, 333-43382, 333-48896 and 333-66604) of our report dated February 10, 2004, with respect to the consolidated financial statements of CSX Corporation included in this Annual Report (Form 10-K) for the fiscal year ended December 26, 2003.

/s/ Ernst & Young LLP

Jacksonville, Florida
March 9, 2004

EXHIBIT 23.2

Consent of Independent Auditors

We consent to the use of our report dated January 27, 2004, with respect to the consolidated financial statements of Conrail Inc. and subsidiaries as of December 31, 2003 in this Annual Report (Form 10-K) of CSX Corporation and subsidiaries (CSX).

We also consent to the incorporation by reference in each Form S-3 Registration Statement or Post-Effective Amendment (Registration Nos. 33-2084, 333-54700 and 333-60134) and in each Form S-8 Registration Statement (Registration Nos. 33-16230, 33-25537, 33-29136, 33-37449, 33-41498, 33-41499, 33-41735, 33-41736, 33-57029, 333-09213, 333-73427, 333-73429, 333-32008, 333-43382, 333-48896 and 333-66604) of our report dated January 27, 2004, with respect to the consolidated financial statements of Conrail Inc. and subsidiaries as of December 31, 2003 included in this Annual Report (Form 10-K) of CSX for the fiscal year ended December 26, 2003.

/s/ Ernst & Young LLP
Jacksonville, Florida
March 9, 2004

/s/ KPMG LLP
Norfolk, Virginia
March 9, 2004


Powered by Morningstar® Document Research℠

EXHIBIT 24

# POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS that each of the undersigned officers and directors of CSX CORPORATION, a Virginia Corporation, which is to file with the Securities and Exchange Commission, Washington, D. C., a Form 10-K (Annual Report), hereby constitutes and appoints Carolyn T. Sizemore and Ellen M. Fitzsimmons his true and lawful attorneys-in-fact and agents, for him and in his name, place and stead to sign said Form 10-K, and any and all amendments thereto, with power where appropriate to affix the corporate seal of CSX Corporation thereto and to attest said seal, and to file said Form 10-K, and any and all other documents in connection therewith, with the Securities and Exchange Commission, hereby granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform any and all acts and things requisite and necessary to be done in and about the premises as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or either of them, may lawfully do or cause to be done by virtue hereof.

IN WITNESS WHEREOF, the undersigned have hereunto set their hands this 9th day of March 2004.

/s/ ELIZABETH E. BAILEY
Elizabeth E. Bailey

/s/ ROBERT L. BURRUS, JR
Robert L. Burrus, Jr.

/s/ BRUCE C. GOTTWALD
Bruce C. Gottwald

/s/ EDWARD J. KELLY, III
Edward J. Kelly, III

/s/ ROBERT D. KUNISCH
Robert D. Kunisch

/s/ SOUTHWOOD J. MORCOTT
Southwood J. Morcott

/s/ DAVID M. RATCLIFFE
David M. Ratcliffe

/s/ CHARLES E. RICE
Charles E. Rice

/s/ WILLIAM C. RICHARDSON
William C. Richardson

/s/ FRANK S. ROYAL
Frank S. Royal

/s/ DONALD J. SHEPARD
Donald J. Shepard

/s/ MICHAEL J. WARD
Michael J. Ward

/s/ OSCAR MUNOZ
Oscar Munoz


Powered by Morningstar® Document Research℠

EXHIBIT 31.1

CERTIFICATE OF CHIEF EXECUTIVE OFFICER

I, Michael J. Ward, certify that:

1. I have reviewed this annual report on Form 10-K of CSX Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) [omitted pursuant to the guidance of Release No. 33-8283 (June 5, 2003)]

   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 9, 2004

/s/ MICHAEL J. WARD

-------------------------------------

Michael J. Ward
Chairman, President and Chief
Executive
Officer

 Powered by Morningstar® Document Research℠

EXHIBIT 31.2

CERTIFICATE OF CHIEF FINANCIAL OFFICER

I, Oscar Munoz, certify that:

1. I have reviewed this annual report on Form 10-K of CSX Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) [omitted pursuant to the guidance of Release No. 33-8283 (June 5, 2003)]

   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 9, 2004

/s/ OSCAR MUNOZ

-------------------------------------

Oscar Munoz
Executive Vice President and Chief
Financial Officer


Powered by Morningstar® Document Research℠

EXHIBIT 32.1

CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Annual Report of CSX Corporation on Form 10-K for the period ending December 26, 2003 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Michael J. Ward, Chief Executive Officer of the registrant, certify, pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to my knowledge, that:

1. The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the registrant.

Date: March 9, 2004

/s/ MICHAEL J. WARD

--------------------------------------

Michael J. Ward
Chairman and Chief Executive Officer


Powered by Morningstar® Document Research℠

EXHIBIT 32.2

CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Annual Report of CSX Corporation on Form 10-K for the period ending December 26, 2003 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Oscar Munoz, Chief Financial Officer of the registrant, certify, pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to my knowledge, that:

1. The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the registrant.

Date: March 9, 2004

/s/ OSCAR MUNOZ

--------------------------------------

Oscar Munoz
Executive Vice President and Chief Financial Officer


Powered by Morningstar® Document Research℠

EXHIBIT 99.3

# REPORT OF MANAGEMENT

THE STOCKHOLDERS
CONRAIL INC.

Management is responsible for the preparation, integrity and objectivity of the Company's consolidated financial statements. The consolidated financial statements are prepared in conformity with accounting principles generally accepted in the United States of America and include amounts based on management's best estimates and judgment.

The Company maintains a system of internal accounting controls and procedures, which is continually reviewed and supported by written policies and guidelines and supplemented by internal audit services. The system provides reasonable assurance that assets are safeguarded against loss from unauthorized use and that the books and records reflect the transactions of the Company and are reliable for the preparation of financial statements. The concept of reasonable assurance recognizes that the cost of a system of internal accounting controls should not exceed the benefits derived and also recognizes that the evaluation of these factors necessarily requires estimates and judgments by management.

The Company's consolidated financial statements are audited by its independent accountants. Their audit is conducted in accordance with auditing standards generally accepted in the United States of America and considers the Company's system of internal accounting controls to determine the nature, timing and extent of the auditing procedures required for expressing an opinion on the Company's financial statements.

The Company's Board of Directors, which is comprised of an equal number of directors from Norfolk Southern Corporation ("NSC") and CSX Corporation ("CSX"), pursues its oversight responsibilities for the consolidated financial statements and corporate conduct through periodic meetings with and written reports from the Company's management.

/s/ Gregory R. Weber
-------------------------
Gregory R. Weber
Chief Executive Officer

/s/ Joseph W. Rogers
-------------------------
Joseph W. Rogers
Chief Financial Officer

January 27, 2004


Powered by Morningstar® Document Research℠

# INDEPENDENT AUDITORS' REPORT

THE STOCKHOLDERS AND BOARD OF DIRECTORS
CONRAIL INC.:

We have audited the accompanying consolidated balance sheets of Conrail Inc. and subsidiaries as of December 31, 2003 and 2002, and the related consolidated statements of income, stockholders' equity and cash flows for each of the years in the three-year period ended December 31, 2003. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Conrail Inc. and subsidiaries as of December 31, 2003 and 2002, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 2003, in conformity with accounting principles generally accepted in the United States of America.

As discussed in Note 1 to the consolidated financial statements, effective January 1, 2003 the Company adopted Financial Accounting Standards Board Statement No. 143, "Accounting for Asset Retirement Obligations."

/s/ KPMG LLP
---------------------
KPMG LLP
Norfolk, Virginia

/s/ Ernst & Young LLP
------------------------
Ernst & Young LLP
Jacksonville, Florida

January 27, 2004



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

CONRAIL INC.
CONSOLIDATED STATEMENTS OF INCOME

| ($ In Millions) | 2003 | 2002 | 2001 |
|---|---|---|---|
| | YEARS ENDED DECEMBER 31, | | |
| REVENUES - NSC/CSX (NOTE 2) | $ 836 | $ 813 | $ 823 |
| REVENUES - THIRD PARTIES | 82 | 80 | 80 |
| Total operating revenues | 918 | 893 | 903 |
| OPERATING EXPENSES (NOTE 3) | | | |
| Compensation and benefits | 168 | 151 | 158 |
| Fuel | 7 | 6 | 7 |
| Material, services and rents | 119 | 125 | 143 |
| Depreciation and amortization | 329 | 322 | 325 |
| Casualties and insurance | 17 | 2 | (13) |
| Other | 19 | 17 | 19 |
| Total operating expenses | 659 | 623 | 639 |
| Income from operations | 259 | 270 | 264 |
| Interest expense | (99) | (104) | (109) |
| Other income, net (Note 10) | 96 | 94 | 103 |
| Income from continuing operations before income taxes and accounting change | 256 | 260 | 258 |
| Provision for income taxes (Note 7) | 93 | 80 | 84 |
| Income from continuing operations before accounting change | 163 | 180 | 174 |
| Cumulative effect of change in accounting principle, net of taxes (Note 1) | 40 | -- | -- |
| NET INCOME | $ 203 | $ 180 | $ 174 |

See accompanying notes to the consolidated financial statements.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

CONRAIL INC.
CONSOLIDATED BALANCE SHEETS

| ($ In Millions) | DECEMBER 31, 2003 | DECEMBER 31, 2002 |
|---|---|---|
| **ASSETS** | | |
| CURRENT ASSETS | | |
| Cash and cash equivalents | $ 18 | $ 23 |
| Accounts receivable, net | 34 | 35 |
| Due from NSR/CSXT (Note 2) | 136 | 158 |
| Material and supplies | 8 | 8 |
| Deferred tax assets (Note 7) | 45 | 65 |
| Other current assets | 16 | 11 |
| Total current assets | 257 | 300 |
| PROPERTY AND EQUIPMENT, NET (NOTE 4) | 6,119 | 6,382 |
| NOTES RECEIVABLE FROM NSC/CSX (NOTE 2) | 1,231 | 892 |
| OTHER ASSETS | 609 | 583 |
| Total assets | $ 8,216 | $ 8,157 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| CURRENT LIABILITIES | | |
| Accounts payable | 37 | 33 |
| Current maturities of long-term debt (Note 6) | 58 | 57 |
| Due to NSC/CSX (Note 2) | 5 | 9 |
| Wages and employee benefits | 31 | 31 |
| Casualty reserves | 39 | 69 |
| Accrued and other current liabilities (Note 5) | 109 | 130 |
| Total current liabilities | 279 | 329 |
| LONG-TERM DEBT (NOTE 6) | 1,067 | 1,123 |
| CASUALTY RESERVES | 125 | 119 |
| DEFERRED INCOME TAXES (NOTE 7) | 1,836 | 1,822 |
| OTHER LIABILITIES | 455 | 538 |
| Total liabilities | 3,762 | 3,931 |
| COMMITMENTS AND CONTINGENCIES (NOTE 11) | | |
| STOCKHOLDERS' EQUITY (NOTES 3 AND 9) | | |
| Common stock ($1 par value; 100 shares authorized, issued and outstanding) | -- | -- |
| Additional paid-in capital | 2,221 | 2,221 |
| Retained earnings | 2,337 | 2,134 |
| Accumulated other comprehensive loss | (104) | (129) |
| Total stockholders' equity | 4,454 | 4,226 |
| Total liabilities and stockholders' equity | $ 8,216 | $ 8,157 |

See accompanying notes to the consolidated financial statements.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

CONRAIL INC.
CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY

($ in Millions)

| | Additional Paid-In Capital | Unearned ESOP Compensation | Retained Earnings | Accumulated Other Comprehensive Loss | Total |
|---|---|---|---|---|---|
| BALANCE, JANUARY 1, 2001 | $ 2,222 | $ (20) | $ 1,780 | $ -- | $ 3,982 |
| Comprehensive income - 2001 | | | | | |
| Net Income | -- | -- | 174 | -- | 174 |
| Minimum pension liability, net of $45 million income taxes (Note 8) | -- | -- | -- | (70) | (70) |
| Total comprehensive income | | | | | 104 |
| Allocation of unearned ESOP compensation | (1) | 20 | -- | -- | 19 |
| BALANCE, DECEMBER 31, 2001 | 2,221 | -- | 1,954 | (70) | 4,105 |
| Comprehensive income - 2002 | | | | | |
| Net Income | -- | -- | 180 | -- | 180 |
| Minimum pension liability, net of $39 million income taxes (Note 8) | -- | -- | -- | (59) | (59) |
| Total comprehensive income | | | | | 121 |
| BALANCE, DECEMBER 31, 2002 | 2,221 | -- | 2,134 | (129) | 4,226 |
| Comprehensive income - 2003 | | | | | |
| Net Income | -- | -- | 203 | -- | 203 |
| Minimum pension liability, net of $16 million income taxes (Note 8) | -- | -- | -- | 25 | 25 |
| Total comprehensive income | | | | | 228 |
| BALANCE, DECEMBER 31, 2003 | $ 2,221 | $ -- | $ 2,337 | ($ 104) | $ 4,454 |

See accompanying notes to the consolidated financial statements.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

CONRAIL INC.
CONSOLIDATED STATEMENTS OF CASH FLOWS

| ($ In Millions) | YEARS ENDED DECEMBER 31, 2003 | 2002 | 2001 |
|---|---|---|---|
| CASH FLOWS FROM OPERATING ACTIVITIES | | | |
| Net income | $ 203 | $ 180 | $ 174 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Net cumulative effect of change in accounting principle | (40) | -- | -- |
| Depreciation and amortization | 329 | 322 | 325 |
| Deferred income taxes | (12) | (9) | (18) |
| Equity in earnings of affiliates | (19) | (19) | (24) |
| Gains from sales of property | (7) | (3) | (2) |
| Pension credit | (4) | (17) | (19) |
| Changes in: | | | |
| Accounts receivable | 1 | (3) | 1 |
| Accounts and wages payable | 4 | (14) | (32) |
| Due from NSR/CSXT | 22 | 14 | 60 |
| Due to NSC/CSX | (4) | (3) | (19) |
| Other | (61) | (25) | 56 |
| Net cash provided by operating activities | 412 | 423 | 502 |
| CASH FLOWS FROM INVESTING ACTIVITIES | | | |
| Property and equipment acquisitions | (35) | (23) | (47) |
| Notes receivable from NSC/CSX | (339) | (377) | (424) |
| Proceeds from disposal of property and equipment | 12 | 14 | 14 |
| Other | 2 | 11 | -- |
| Net cash used in investing activities | (360) | (375) | (457) |
| CASH FLOWS FROM FINANCING ACTIVITIES | | | |
| Payment of long-term debt | (57) | (59) | (61) |
| Net cash used in financing activities | (57) | (59) | (61) |
| NET DECREASE IN CASH AND CASH EQUIVALENTS | (5) | (11) | (16) |
| CASH AND CASH EQUIVALENTS | | | |
| At beginning of year | 23 | 34 | 50 |
| At end of year | $ 18 | $ 23 | $ 34 |

See accompanying notes to the consolidated financial statements.

Powered by Morningstar® Document Research℠

CONRAIL INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

1. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

DESCRIPTION OF BUSINESS

Conrail Inc. ("Conrail") is a holding company whose principal subsidiary is Consolidated Rail Corporation ("CRC"), the major freight railroad in the Northeast. Norfolk Southern Corporation ("NSC") and CSX Corporation ("CSX"), the major railroads in the Southeast, jointly control Conrail through their ownership interests in CRR Holdings LLC ("CRR"), whose primary subsidiary is Green Acquisition Corporation ("Green Acquisition"), which owns Conrail. NSC and CSX have equity interests in CRR of 58% and 42%, respectively, and voting interests of 50% each. Under operating and lease agreements, NSC and CSX operate a substantial portion of the Conrail properties through their railroad subsidiaries, Norfolk Southern Railway Company ("NSR") and CSX Transportation, Inc. ("CSXT")(Note 2).

PRINCIPLES OF CONSOLIDATION

The consolidated financial statements include Conrail and majority-owned subsidiaries. Investments in 20% to 50% owned companies are accounted for by the equity method. All significant intercompany accounts and transactions have been eliminated.

CASH EQUIVALENTS

Cash equivalents consist of highly liquid securities purchased with a maturity of three months or less, and are stated at cost which approximates market value.

MATERIAL AND SUPPLIES

Material and supplies consist of maintenance material valued at the lower of cost or market.

PROPERTY AND EQUIPMENT

Property and equipment are recorded at cost. Depreciation is provided using the composite straight-line method over estimated service lives. Expenditures, including those on leased assets that extend an asset's useful life or increase its utility, are capitalized. Maintenance expense is recognized when repairs are performed. The cost (net of salvage) of depreciable property retired or replaced in the ordinary course of business is charged to accumulated depreciation and no gain or loss is recognized. In 2003, the overall depreciation rate averaged 3.4% for all roadway and equipment.

During 2003, the Company completed a study to update the estimated useful lives of its roadway and track property and the associated accumulated depreciation reserves. This review did not have a material impact on the Company's consolidated financial statements.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

ASSET IMPAIRMENT

Long-lived assets are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Expected future cash flows from the use and disposition of long-lived assets are compared to the current carrying amounts to determine the potential impairment loss.

NEW ACCOUNTING PRONOUNCEMENTS

The Company adopted Financial Accounting Standards Board (FASB) Statement of Financial Accounting Standards (SFAS) No. 143, "Accounting for Asset Retirement Obligations", effective January 1, 2003. Pursuant to SFAS 143, companies are precluded from accruing removal cost expenses that are not legal obligations. Previously, Conrail and most other railroads had accrued removal costs as a component of depreciation expense. In the first quarter of 2003, the Company recorded income of $40 million for the cumulative effect of this change ($65 million before taxes). Effective with this pronouncement, removal cost are expensed as incurred. This change did not have a material impact on the Company's consolidated financial statements.

Also in 2003, the FASB issued Interpretation No. 46, "Consolidation of Variable Interest Entities" (FIN 46) which requires that a variable interest entity be consolidated by the company that is subject to a majority of the economic risks and/or rewards of that entity. The FASB delayed until 2004, the implementation of FIN 46 for certain variable entities that existed prior to February 1, 2003. The Company has a fifty percent non-controlling interest in Locomotive Management Services (LMS), an unconsolidated partnership established in 1994, which will likely be consolidated pursuant to FIN 46. LMS, a locomotive leasing venture, had assets totaling $37 million as of December 31, 2003, consisting primarily of depreciable equipment property. Total liabilities as of December 31, 2003 totaled $40 million, including $30 million in long-term debt installments maturing in 2012. If consolidation is required, the impact on the consolidated financial statements will be immaterial -(Note 11).

REVENUE RECOGNITION

The Company's major sources of revenues are from NSC and CSX, primarily in the form of rental revenues and operating fees, which are recognized when earned (Note 2). Conrail also has third party revenues, which are recognized when earned, related to the operations of Indiana Harbor Belt Railroad Company, a 51% owned terminal railroad subsidiary.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

USE OF ESTIMATES

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenues and expenses during the reporting period. Management reviews its estimates, including those related to the recoverability and useful lives of assets as well as liabilities for litigation, environmental remediation, casualty claims, income taxes and pension and postretirement benefits. Changes in facts and circumstances may result in revised estimates.

RECLASSIFICATIONS

Certain amounts in the consolidated financial statements and notes thereto have been reclassified to conform to the 2003 presentation.

2. RELATED PARTIES TRANSACTIONS

BACKGROUND

On May 23, 1997, NSC and CSX completed their joint acquisition of Conrail stock. On June 17, 1997, NSC and CSX executed an agreement that generally outlines the methods of governing and operating Conrail and its subsidiaries ("Transaction Agreement"). On July 23, 1998, the Surface Transportation Board ("STB") issued a written opinion that permitted NSC and CSX to exercise operating control of Conrail beginning August 22, 1998. On June 1, 1999, NSC and CSX began to operate over certain Conrail lines.

OPERATIONS BY NSR AND CSXT

The majority of CRC's routes and assets are segregated into separate subsidiaries of CRC, Pennsylvania Lines LLC ("PRR") and New York Central Lines LLC ("NYC"). PRR and NYC have separate but identical operating and lease agreements with NSR and CSXT, respectively, (the "Operating Agreements") which govern substantially all nonequipment assets to be used by NSR and CSXT and have initial 25-year terms, renewable at the options of NSR and CSXT for two 5-year terms. Payments made under the Operating Agreements are based on appraised values that are subject to adjustment every six years. NSR and CSXT have also leased or subleased certain equipment assets at rentals based on appraised values for varying term lengths from PRR and NYC, respectively, as well as from CRC.

NSC and CSX also have agreements with CRC governing other Conrail properties that continue to be owned and operated by Conrail ("the Shared Assets Areas"). NSR and CSXT pay CRC a fee for joint and exclusive access to the Shared Assets Areas. In addition, NSR and CSXT pay, based on usage, the costs incurred by CRC to operate the Shared Assets Areas plus a profit factor.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Payments made by NSR to Conrail under the Shared Assets agreements were $135 million and $115 million during 2003 and 2002, respectively, of which $31 million and $23 million, were minimum rents. Payments made by CSXT to Conrail under the Shared Assets agreements were $124 million and $92 million during 2003 and 2002, respectively, of which $24 million and $17 million, were minimum rents.

Payments from NSR under the Operating Agreements to PRR amounted to $348 million and $339 million during 2003 and 2002, respectively. Payments from CSXT under the Operating Agreements to NYC amounted to $253 million and $248 million during 2003 and 2002, respectively. In addition, costs necessary to operate and maintain the related assets under these agreements, including leasehold improvements, are borne by NSR and CSXT.

Future minimum lease payments to be received from NSR/CSXT are as follows:

$ IN MILLIONS

| | NSR TO PRR | NSR TO CRC | CSXT TO NYC | CSXT TO CRC | TOTAL |
|---|---|---|---|---|---|
| 2004 | $ 342 | $ 32 | $ 237 | $ 23 | $ 634 |
| 2005 | 321 | 33 | 223 | 24 | 601 |
| 2006 | 307 | 34 | 212 | 24 | 577 |
| 2007 | 295 | 34 | 205 | 24 | 558 |
| 2008 | 290 | 34 | 200 | 24 | 548 |
| 2009 and Beyond | 4,128 | 551 | 2,740 | 378 | 7,797 |
| TOTAL | $ 5,683 | $ 718 | $ 3,817 | $ 497 | $10,715 |

RELATED PARTY BALANCES AND TRANSACTIONS

"Due from NSR/CSXT" at December 31, 2003 and 2002, is primarily comprised of amounts due for the above-described operating and rental activities.

PRR and NYC have interest-bearing notes receivable due from NSC and CSX. As of December 31, 2003, the notes receivable due from NSC and CSX included in noncurrent assets were $716 million and $515 million, respectively. At December 31, 2002, the notes receivable balances from NSC and CSX included in noncurrent assets were $513 million and $379 million, respectively. The interest rates on the notes receivable from NSC and CSX are variable and were both 1.66% at December 31, 2003. Interest income related to the PRR and NYC notes receivable was $16 million in 2003, $18 million in 2002 and $13 million in 2001.



 Powered by Morningstar® Document Research℠

"Due to NSC/CSX" includes amounts payable for property and equipment rentals, as well as amounts related to service provider agreements with both NSC and CSX to provide certain general and administrative support to CRC.

A summary of the "Due to NSC and CSX" activity for the services described above follows:

$ IN MILLIONS

| | PAYMENTS TO NSC | | PAYMENTS TO CSX | |
|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 |
| Service Provider Agreements | $ 7 | $ 5 | $ 3 | $- |
| Material purchases | 18 | 20 | -- | -- |
| Rental of locomotives, equipment and facilities | 5 | 5 | 4 | 4 |
| Capital Project activities | 6 | 5 | -- | -- |
| TOTAL PAYMENTS | $36 | $35 | $ 7 | $ 4 |

| | 2003 | 2002 | 2003 | 2002 |
|---|---|---|---|---|
| Due to "NSC and CSX" at December 31 | $ 3 | $ 7 | $ 2 | $ 2 |

From time to time, NSC and CSX, as the indirect owners of Conrail, may need to provide some of Conrail's cash requirements through capital contributions, loans or advances. Through December 31, 2003 there have been no transactions under these arrangements.

PROPOSED SPIN-OFF OF PRR AND NYC

In June 2003, Conrail together with NSC and CSX, filed a joint petition with the STB to establish direct ownership and control by NSR and CSXT of PRR and NYC, respectively. The proposed transaction would replace the existing operating agreements and allow NSR and CSXT to operate PRR and NYC, respectively, via direct ownership. The proposed transaction does not involve the Shared Assets Areas. The proposed transaction is subject to a number of conditions, including STB approval, an Internal Revenue Service



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

(IRS) ruling qualifying it as a nontaxable distribution and obtaining consents from Conrail's debt holders. (In 2003, the IRS issued a ruling that the reorganization would qualify as a tax-free distribution. Also in 2003, the STB granted its authorization to carry out the proposed transaction, subject to certain conditions.)

As a part of the proposed transaction, Conrail would undertake a restructuring of its existing unsecured and secured public indebtedness. Currently the Company has two series of unsecured public debentures with an outstanding principal amount of $800 million at December 31, 2003 and 13 series of secured debt with an outstanding principal amount of approximately $321 million at December 31, 2003. It is currently contemplated that guaranteed debt securities of two newly formed corporate subsidiaries of NSR and CSXT would be offered in a 58%/42% ratio in exchange for Conrail's unsecured debentures. Upon completion of the proposed transaction, the new debt securities would become direct unsecured obligations of NSR and CSXT, respectively.

Conrail's secured debt and lease obligations will remain obligations of Conrail and are expected to be supported by new leases and subleases which, upon completion of the proposed transaction, would be the direct lease and sublease obligations of NSR or CSXT.

Conrail, NS and CSX are working to complete all steps necessary to consummate the spin-off in 2004. A valuation of NYC and PRR will be performed prior to effecting the spin-off transaction. The results of the valuation could impact the carrying value of the assets of NYC and PRR. Upon consummation of the proposed transaction, the Company's primary source of revenue will be related to the operation of the Shared Assets Areas instead of the operating and equipment rental activities of PRR and NYC. The Company's future operating expenses will also reflect this change in operations. Accordingly, the Company's prospective operating results will be significantly different than those currently reported.

3. TRANSITION, ACQUISITION-RELATED AND OTHER ITEMS

During the first quarter of 2002 and the fourth quarter of 2001, the Company received cash proceeds totaling $4 million and $42 million respectively, from several London-based insurance carriers as settlement for current and future exposures related to personal injury, occupational, environmental and other claims. The Company recognized pretax gains of $4 million and $14 million, respectively, which is included in the "Casualties and insurance" line item of the income statement for 2002 and 2001.

During 2002, accrued termination payments totaling $1 million were made to 6 non-union employees whose non-executive positions were eliminated as a result of the joint acquisition of Conrail. During 2001 accrued termination payments of $15 million were made. Most of these termination



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

payments have been made in the form of supplemental retirement benefits from the Company's pension plan. As of December 31, 2003, the remaining amount of this liability is less than $1 million.

During the second quarter of 2001, the Company received a $50 million cash payment for transferring to a third party certain of its rights to license, manage and market signboard advertising on the Company's property for 25 years. The payment is being recognized into other income on a straight-line basis over the 25 year contract period.

Also during 2001, the Company made final settlement of a long-term liability related to the non-union Employee Stock Ownership (ESOP) termination, which did not require use of the Company's cash for settlement. The liability, the balance of which was $20 million at December 31, 2000, was settled as the remaining cash proceeds held by the ESOP as a result of selling its ESOP preferred stock in conjunction with the joint acquisition, were allocated to eligible participants.

The Company has a long-term liability in connection with employment "change in control" agreements with certain current and former executives, which became operative as a result of the joint acquisition of Conrail. Payments were $4 million in 2003, $1 million in 2002 and $9 million in 2001 and were made primarily from the Company's pension plan. The remaining amount, approximately $24 million at December 31, 2003, will be paid out at the discretion of the participants in the program.

4. PROPERTY AND EQUIPMENT DECEMBER 31,

| | 2003 | 2002 |
|---|---|---|
| | (IN MILLIONS) | |
| Roadway | $ 7,400 | $ 7,476 |
| Equipment | 1,544 | 1,511 |
| Less: Accumulated depreciation | (3,029) | (2,828) |
| | 5,915 | 6,159 |
| Capital leases (primarily equipment) | 416 | 496 |
| Accumulated amortization | (212) | (273) |
| | 204 | 223 |
| | $ 6,119 | $ 6,382 |



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Substantially all assets are leased to NSR or CSXT (Note 2).

5. ACCRUED AND OTHER CURRENT LIABILITIES

| | DECEMBER 31, 2003 | DECEMBER 31, 2002 |
|---|---|---|
| | (IN MILLIONS) | |
| Operating leases | $ 47 | $ 47 |
| Income and other taxes | 36 | 47 |
| Other | 26 | 36 |
| | $109 | $130 |

6. LONG-TERM DEBT AND LEASES

LONG-TERM DEBT

Long-term debt outstanding, including the weighted average interest rates at December 31, 2003, is composed of the following:

| | DECEMBER 31, 2003 | DECEMBER 31, 2002 |
|---|---|---|
| | (IN MILLIONS) | |
| Capital leases | $ 157 | $ 192 |
| Debentures payable,7.88%,due 2043 | 250 | 250 |
| Debentures payable,9.75%,due 2020 | 550 | 550 |
| Equipment and other obligations,6.97% | 168 | 188 |
| | 1,125 | 1,180 |
| Less current portion | (58) | (57) |
| | $ 1,067 | $ 1,123 |

Interest payments were $100 million in 2003, $105 million in 2002 and $113 million in 2001.

Equipment and other obligations mature in 2004 through 2043 and are collateralized by assets with a net book value of $208 million at December 31, 2003. Maturities of long-term debt other than capital leases are $21 million in 2004, $20 million in 2005, $21 million in 2006, $43 million in 2007, $18 million in 2008 and $845 million in total from 2009 through 2043.

LEASES

The Company's noncancelable long-term leases generally include options to purchase at fair value and to extend the terms. Certain lease obligations are payable in Japanese yen, which require the maintenance of yen-denominated deposits sufficient to satisfy the yen-denominated obligation. These deposits are included in the "Other assets" line item of the balance sheet and totaled $43 million and $45 million at December 31,



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

2003 and December 31, 2002, respectively. Capital leases have been discounted at rates ranging from 3.09% to 14.26% and are collateralized by assets with a net book value of $204 million at December 31, 2003.

Minimum commitments, exclusive of executory costs borne by the Company, are:

| | CAPITAL LEASES | OPERATING LEASES |
|---|---|---|
| | (IN MILLIONS) | |
| 2004 | $ 54 | $ 58 |
| 2005 | 38 | 58 |
| 2006 | 25 | 56 |
| 2007 | 27 | 55 |
| 2008 | 15 | 51 |
| 2009 - 2025 | 39 | 271 |
| Total | 198 | $549 |
| Less interest portion | (41) | |
| Present value | $ 157 | |

Operating lease rent expense was $60 million in 2003, $62 million in 2002 and $70 million in 2001.

7. INCOME TAXES

The provisions for income taxes are composed of the following:

| | 2003 | 2002 | 2001 |
|---|---|---|---|
| | | (IN MILLIONS) | |
| Current | | | |
| Federal | $ 94 | $ 81 | $ 77 |
| State | 11 | 8 | 25 |
| | 105 | 89 | 102 |
| Deferred | | | |
| Federal | (21) | (20) | (22) |
| State | 9 | 11 | 4 |
| | (12) | (9) | (18) |
| | $ 93 | $ 80 | $ 84 |



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Reconciliation of the U.S. statutory tax rates with the effective tax rates is as follows:

| | 2003 | 2002 | 2001 |
|---|---|---|---|
| Statutory tax rate | 35.0% | 35.0% | 35.0% |
| State income taxes, net of federal benefit | | 4.24.2 | 4.2 |
| Settlement of IRS audit | -- | (5.6) | -- |
| Settlement of state tax issues | -- | -- | (3.5) |
| Other | (2.9) | (2.8) | (3.1) |
| Effective tax rate | 36.3% | 30.8% | 32.6% |

The Company has reached final settlements with the Internal Revenue Service ("IRS") related to all of the audits of the Company's consolidated federal income tax returns through the fiscal year May 23,1997. As a result of the settlement Conrail received tax refunds of $24 million and reduced tax expense by $14 million during 2002. The Company's consolidated income tax returns for the short tax year period May 24, 1997-December 31, 1997 and calender year periods 1998 through 2001 are currently being examined by the IRS. Federal and state income tax payments were $129 million in 2003, $113 million in 2002 and $86 million in 2001.

Significant components of the Company's deferred income tax assets (liabilities) are as follows:

| | DECEMBER 31, 2003 | DECEMBER 31, 2002 |
|---|---|---|
| | (IN MILLIONS) | |
| Current assets | $ 1 | $ 5 |
| Current liabilities | 44 | 60 |
| CURRENT DEFERRED TAX ASSET, NET | $ 45 | $ 65 |
| Noncurrent liabilities: | | |
| Property and equipment | (1,970) | (2,000) |
| Other | (117) | (112) |
| | (2,087) | (2,112) |
| Noncurrent assets: | | |
| Nondeductible reserves and other liabilities | 251 | 290 |
| DEFERRED INCOME TAX LIABILITIES, NET | $(1,836) | $(1,822) |

The Company has not recorded a valuation allowance, as management believes that it is more likely than not that the results of future operations will generate sufficient taxable income to realize the deferred tax assets.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

8. PENSION AND POSTRETIREMENT BENEFITS

The Company and its subsidiaries sponsor several qualified and nonqualified pension plans and other postretirement benefit plans for its employees.

PENSION PLAN ASSET MANAGEMENT

Six investment firms manage the Company's defined benefit pension plan's assets under investment guidelines approved by a pension fund investment committee. Investments are allocated among domestic fixed income investments, and domestic and international equity investments. Limitations restrict investment concentration and use of certain derivative instruments. Fixed income investments must have an average rating of `AA' or better. Equity investments must be in liquid securities listed on national exchanges. However no direct investment is permitted in the securities of either NSC or CSX. Equity investment managers have specific equity strategies and their returns are expected to exceed selected market indices by prescribed margins.

The target asset allocation range is for equity allocations to be between 44% and 56% of the fund's assets with approximately 10% of the assets allocated to international equity investments. The asset allocation on December 31, 2003, was 45% in fixed income investments and 55% in equity investments including 13% in international equities. This compared to 54% fixed income and 46% equity including 9% international equity as of December 31, 2002.

The plan's assumed future returns are based principally on the asset allocation and the historic returns for the plan's asset classes determined from both the actual plan returns and, over longer time periods, the market returns for those asset classes.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

MEDICARE CHANGES

The Medicare Prescription Drug, Improvement and Modernization Act of 2003 (the Act) was signed into law in December 2003. The Act introduces a prescription drug benefit under Medicare Part D as well as a federal subsidy to sponsors of retiree health care benefit plans that provide a benefit that is at least actuarially equivalent to Medicare Part D. Because significant uncertainties exist regarding the measurement and disclosure requirements of the Act, the FASB has issued staff position No. FAS 106.1, which allows a plan sponsor to recognize or defer accounting for the effects of the Act in their 2003 financial statements. The Company has elected the deferral option and is currently evaluating how the Act may impact its postretirement benefit obligations. Specific authoritative guidance on the accounting for the Act's subsidy is pending, and that guidance, when issued, could require the Company to change previously reported information.

The following tables provide a reconciliation of the changes in the plans' benefit obligations and fair value of assets over the two-year period ending December 31, 2003, and a statement of the funded status as of December 31 of both years:

| | PENSION BENEFITS | | OTHER POSTRETIREMENT BENEFITS | |
|---|---|---|---|---|
| (IN MILLIONS) | 2003 | 2002 | 2003 | 2002 |
| CHANGE IN BENEFIT OBLIGATION | | | | |
| Net benefit obligation at beginning of year | $ 646 | $ 662 | $ 37 | $ 36 |
| Service cost | 1 | 1 | -- | -- |
| Interest cost | 41 | 44 | 2 | 3 |
| Plan participants' contributions | -- | -- | 4 | 6 |
| Actuarial losses | 32 | 5 | 4 | 2 |
| Benefits paid | (65) | (66) | (10) | (10) |
| Net benefit obligation at end of year | $ 655 | $ 646 | $ 37 | $ 37 |
| CHANGE IN PLAN ASSETS | | | | |
| Fair value of plan assets at beginning of year | $ 522 | $ 613 | $ 7 | $ 8 |
| Actual return on plan assets | 117 | (28) | -- | 1 |
| Employer contributions | 2 | 3 | 5 | 2 |
| Plan participants' contributions | -- | -- | 4 | 6 |
| Benefits paid | (65) | (66) | (10) | (10) |
| Fair value of plan assets at end of year | $ 576 | $ 522 | $ 6 | $ 7 |
| Funded status at end of year | $ (79) | $(124) | $ (31) | $ (30) |
| Unrecognized prior service cost | 7 | 8 | (1) | (1) |
| Unrecognized actuarial (gains)losses | 168 | 206 | (5) | (9) |
| Net amount recognized at year end | $ 96 | $ 90 | $ (37) | $ (40) |



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

The following amounts have been recognized in the balance sheets as of December 31:

| (IN MILLIONS) | PENSION BENEFITS 2003 | PENSION BENEFITS 2002 | OTHER POSTRETIREMENT BENEFITS 2003 | OTHER POSTRETIREMENT BENEFITS 2002 |
|---|---|---|---|---|
| Prepaid pension cost | $ 131 | $ 126 | -- | -- |
| Accrued benefit cost | (214) | (257) | $ (37) | $(40) |
| Intangible asset | 7 | 8 | -- | -- |
| Accumulated other comprehensive loss | 172 | 213 | -- | -- |
| | $ 96 | $ 90 | $ (37) | $(40) |

All of the Company's plans for postretirement benefits other than pensions have no plan assets except for the retiree life insurance plan, which has $6 million and $7 million of assets in 2003 and 2002, respectively. The aggregate benefit obligation for the postretirement plans other than pensions was $37 million at, both December 31, 2003 and 2002, respectively.

The projected benefit obligation, accumulated benefit obligation and fair value of plan assets for the pension plans with accumulated benefit obligations in excess of plan assets were $648 million, $641 million and $566 million, respectively, as of December 31, 2003 and $639 million, $635 million and $514 million, respectively as of December 31, 2002. As required by Statement of Financial Accounting Standard No. 87 "Employers'Accounting for Pensions", the Company has recorded an additional minimum liability of $179 million and $220 million at December 31, 2003 and December 31, 2002, respectively. The additional liability was partially offset by an intangible asset to the extent of previously unrecognized prior service costs of $7 million at both December 31, 2003 and December 31, 2002. The remaining amounts, $104 million as of December 31, 2003 and $129 million as of December 31, 2002, are recorded as a component of stockholders' equity, net of related tax benefits as "Accumulated Other Comprehensive Loss".



Source: CSX CORP, 10-K, March 10, 2004
Powered by Morningstar® Document Research℠

CONRAIL INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

The assumptions used in the measurement of the Company's benefit obligation are as follows:

| | PENSION BENEFITS | | OTHER POSTRETIREMENT BENEFITS | |
|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 |
| FUNDED STATUS: | | | | |
| Discount rate | 6.25% | 6.75% | 6.25% | 6.75% |
| Rate of compensation increase | 5.00% | 5.00% | 5.00% | 5.00% |
| PENSION COST: | | | | |
| Discount rate | 6.75% | 7.25% | 6.75% | 7.25% |
| Expected return on plan assets | 9.00% | 9.00% | 8.00% | 8.00% |
| Rate of compensation increase | 5.00% | 5.00% | 5.00% | 5.00% |

A 10% annual rate of increase in the per capita cost of covered health care benefits was assumed for 2003, gradually decreasing to 5% by the year 2006.

Assumed health care cost trend rates affect amounts reported for the health care plans. The effect of a one percentage point increase and (decrease) in the assumed health care cost trend rate on the accumulated postretirement benefit obligation is $1 million and $(1) million, respectively.

The components of the Company's net periodic benefit cost for the plans are as follows:

| | PENSION BENEFITS | | | OTHER POSTRETIREMENT BENEFITS | | |
|---|---|---|---|---|---|---|
| (IN MILLIONS) | 2003 | 2002 | 2001 | 2003 | 2002 | 2001 |
| Service cost | $ 1 | $ 1 | $ 2 | $ -- | $ -- | $ -- |
| Interest cost | 41 | 44 | 45 | 2 | 3 | 3 |
| Expected return on assets | (52) | (62) | (66) | -- | (1) | (1) |
| Amortization of: | | | | | | |
| Transition asset | -- | -- | (1) | -- | -- | -- |
| Prior service cost | 1 | 1 | 1 | -- | -- | -- |
| Actuarial (gain)loss | 5 | (1) | (1) | -- | -- | (1) |
| | $ (4) | $(17) | $(20) | $ 2 | $ 2 | $ 1 |



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

CONTRIBUTIONS FOR PENSION AND OTHER POSTRETIREMENT BENEFITS

The Company expects to contribute approximately $2 million to the pension plans and $3 million to the other postretirement benefit plans in 2004.

SAVINGS PLANS

The Company and certain subsidiaries provide 401(k) savings plans for union and non-union employees. For the non-union savings plan, the Company matches a portion of employee contributions, subject to the applicable limitations. Savings plan expense related to the non-union savings plan was $1 million in each of the years 2003, 2002 and 2001. There is no Company match provision under the union employee plan except for certain unions, which negotiated a Company match as part of their contract provisions.

INCENTIVE COMPENSATION PLANS

The Company has an incentive compensation plan for all non-union employees in which employees receive targeted cash awards upon attainment of certain performance criteria established by the Company's Board of Directors. Compensation expense under this plan was $3 million in 2003 and 2002 and $2 million in 2001.

The Company also has a long-term incentive plan under which phantom stock options are granted to officers and other key non-union employees. The option price for the phantom shares is equal to the blended fair market value of NSC and CSX common stock at the date of grant. Options will vest one year after grant date and the option term may not exceed ten years. Upon exercise, eligible participants will receive cash payments equal to the appreciation on the composite NSC and CSX common stock fair values. Compensation expense for this plan was $2 million in 2003, less than $1 million in 2002 and $2 million in 2001.

9. STOCKHOLDERS' EQUITY

COMMON STOCK

On May 23, 1997, the NSC/CSX joint tender offer for the remaining outstanding shares of Conrail's common and preferred stock was concluded, and on June 2, 1997, Conrail became the surviving corporation in a merger with Green Merger Corp. and remained the only subsidiary of Green Acquisition, an entity jointly-owned by NSC and CSX. As a result, the remaining outstanding capital stock of Conrail was acquired by NSC and CSX and Green Acquisition was issued 100 shares of Conrail's common stock.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

UNDISTRIBUTED EARNINGS OF EQUITY INVESTEES

"Retained earnings" includes undistributed earnings of equity investees of $218 million, $199 million and $180 million at December 31, 2003, 2002 and 2001, respectively.

10. OTHER INCOME, NET

| | 2003 | 2002 | 2001 |
|---|---|---|---|
| | | (IN MILLIONS) | |
| Interest income | $ 20 | $ 23 | $ 21 |
| Rental income | 46 | 45 | 47 |
| Property sales | 7 | 3 | 2 |
| Equity in earnings of affiliates | 19 | 19 | 24 |
| Other, net | 4 | 4 | 9 |
| | $ 96 | $ 94 | $103 |

11. COMMITMENTS AND CONTINGENCIES

ENVIRONMENTAL

The Company is subject to various federal, state and local laws and regulations regarding environmental matters. CRC is a party to various proceedings brought by both regulatory agencies and private parties under federal, state and local laws, including Superfund laws, and has also received inquiries from governmental agencies with respect to other potential environmental issues. At December 31, 2003, CRC has received, together with other companies, notices of its involvement as a potentially responsible party or requests for information under the Superfund laws with respect to cleanup and/or removal costs due to its status as an alleged transporter, generator or property owner at 37 locations. Due to the number of parties involved at many of these sites, the wide range of costs of possible remediation alternatives, the changing technology and the length of time over which these matters develop, it is often not possible to estimate CRC's liability for the costs associated with the assessment and remediation of contaminated sites.



Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

Although the Company's operating results and liquidity could be significantly affected in any quarterly or annual reporting period if CRC were held principally liable in certain of these actions, at December 31, 2003, the Company had accrued $61 million, an amount it believes is sufficient to cover the probable liability and remediation costs that will be incurred at Superfund sites and other sites based on known information and using various estimating techniques. The Company anticipates that much of this liability will be paid out over five years; however some costs will be paid out over a longer period. The Company believes the ultimate liability for these matters will not materially affect its consolidated financial condition.

The Company spent $5 million in 2003, $6 million in 2002 and $10 million in 2001 for environmental remediation and related costs. In addition, the Company's capital expenditures for environmental control and abatement projects were less than $1 million in each of the years 2001 thru 2003.

CASUALTY

The Company is involved in various legal actions, principally relating to occupational health claims, personal injuries, casualties and property damage. The casualty claim liability is determined using the aid of an independent actuarial firm based upon claims filed and an estimate of claims incurred but not yet reported. The Company is generally self-insured for casualty claims. Claims in excess of self-insurance levels are insured up to excess coverage limits. While the ultimate amounts of claims incurred are dependent upon future developments, in management's opinion, the recorded liability is adequate to cover expected probable payments.

Expense recognized for casualty claims is included in the "Casualties and insurance" line item of the income statement. For 2003, the expense recognized was consistent with actuarial estimates. During both 2002 and 2001, the Company, based on favorable claims development, recognized actuarial determined gains of $16 million and $12 million respectively.

LABOR

CRC had 1,346 employees at December 31, 2003; approximately 89% of whom are represented by 11 different labor organizations and are covered by 16 separate collective bargaining agreements. These agreements remain in effect until changed pursuant to the Railway Labor Act. The Company was engaged in collective bargaining at December 31, 2003 with labor organizations representing approximately 6% of its labor force.

GUARANTEES

CRC currently guarantees the principal and interest payments in the amount of $27 million on Equipment Trust Certificates for LMS. In addition, CRC is also contingently liable as guarantor with respect to $3 million of indebtedness for an affiliate company, Triple Crown Services. No liability has been recorded related to these guarantees.



Source: CSX CORP, 10-K, March 10, 2004
Powered by Morningstar® Document Research℠

Also the Company is contingently liable under indemnification provisions related to the sale of tax benefits. This liability is recorded in the "Other liability" line item of the balance sheet and totaled $13 million at both December 31, 2003 and December 31, 2002.

12. FAIR VALUES OF FINANCIAL INSTRUMENTS

The fair values of "Cash and cash equivalents," "Accounts receivable," "Notes receivable from NSC/CSX" and "Accounts payable" approximate the carrying values of these financial instruments at December 31, 2003 and 2002.

Using current market prices when available, or a valuation based on the yield to maturity of comparable debt instruments having similar characteristics, credit rating and maturity, the total fair value of the Company's long-term debt, including the current portion, but excluding capital leases, is $1,260 million and $1,254 million at December 31, 2003 and 2002, respectively, compared with carrying values of $968 million and $988 million at December 31, 2003 and 2002.



Created by Morningstar® Document Research
http://documentresearch.morningstar.com

Source: CSX CORP, 10-K, March 10, 2004 Powered by Morningstar® Document Research℠

# EXHIBIT PX0712

<DOCUMENT>
<TYPE>10-K
<SEQUENCE>1
<FILENAME>d10k.txt
<DESCRIPTION>FORM 10-K
<TEXT>
<PAGE>

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

FORM 10-K

(Mark One)

|X| ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2001

OR

|_| TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from ____ to ____
Commission file number 1-6324

THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| Delaware | 41-6034000 |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| 2650 Lou Menk Drive<br>Fort Worth, Texas | 76131-2830 |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code:
(817) 333-2000

SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:

The securities listed below are registered on the New York Stock Exchange.

| | Title of each class |
|---|---|
| Burlington Northern Inc. (Now The Burlington Northern and Santa Fe Railway Company) | Northern Pacific Railway Company General Lien Railway and Land Grant 3% Bonds, due 2047 |
| Consolidated Mortgage Bonds | |
| 9.25%, Series H, due 2006 | Great Northern Railway Company |
| 6.55%, Series K, due 2020 | General Mortgage Bonds |
| 3.80%, Series L, due 2020 | 2 5/8%, Series Q, due 2010 |
| 3.20%, Series M, due 2045 | |
| 8.15%, Series N, due 2020 | |
| 6.55%, Series O, due 2020 | |
| 8.15%, Series P, due 2020 | St. Louis-San Francisco Railway Company Income Debentures, 5%, Series A, due 2006 |

<PAGE>

SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:

None

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes |X| No |_|

| Class | Outstanding |
|---|---|
| Common Stock, par value $1.00 as of January 31, 2002* | 1,000 shares |

* The Burlington Northern and Santa Fe Railway Company is a wholly-owned

subsidiary of Burlington Northern Santa Fe Corporation (BNSF), as a result there is no market data with respect to registrant's shares.

DOCUMENTS INCORPORATED BY REFERENCE

None

REGISTRANT MEETS THE CONDITIONS SET FORTH IN GENERAL INSTRUCTION I(1)(a) AND (b) OF FORM 10-K AND IS THEREFORE FILING THIS FORM 10-K WITH THE REDUCED DISCLOSURE FORMAT.

<PAGE>

TABLE OF CONTENTS


| | Page |
|---|---|
| PART I | |
| Items 1 and 2. Business and Properties | 1 |
| Item 3. Legal Proceedings | 8 |
| PART II | |
| Item 5. Market for Registrant's Common Equity and Related Stockholder Matters | 10 |
| Item 7. Management's Narrative Analysis of Results of Operations | 10 |
| Item 7A. Quantitative and Qualitative Disclosures About Market Risk | 12 |
| Item 8. Financial Statements and Supplementary Data | 16 |
| Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 37 |
| PART IV | |
| Item 14. Exhibits, Financial Statement Schedules, and Reports on Form 8-K | 38 |
| SIGNATURES | S-1 |

SCHEDULE II - VALUATION AND QUALIFYING ACCOUNTS F-1

EXHIBIT INDEX E-1



<PAGE>

PART I

Items 1 and 2. Business and Properties

The Burlington Northern and Santa Fe Railway Company (BNSF Railway or Company), formerly known as the Burlington Northern Railroad Company (BNRR), was incorporated in the State of Delaware on January 13, 1961, and is a wholly-owned subsidiary of Burlington Northern Santa Fe Corporation (BNSF). On September 22, 1995, the stockholders of Burlington Northern Inc. (BNI) and Santa Fe Pacific Corporation (SFP) became the stockholders of BNSF pursuant to a business combination of the two companies. To effect the combination, BNSF was formed to act as the parent holding company of BNI and SFP. BNI and SFP each owned a large, Class I railroad: the BNRR and The Atchison, Topeka and Santa Fe Railway Company (ATSF), respectively.

On December 30, 1996, BNI merged with and into SFP. On December 31, 1996, ATSF merged with and into BNRR, and BNRR changed its name to The Burlington Northern and Santa Fe Railway Company. On January 2, 1998, BNSF Railway's parent, SFP, merged with and into BNSF Railway.

In December 2001, a wholly-owned subsidiary of BNSF, Burlington Northern Santa Fe British Columbia, Ltd. (BNSF BC) was transferred to BNSF Railway.

BNSF Railway operates one of the largest railroad systems in the United States. At December 31, 2001, BNSF Railway had approximately 39,000 employees.

Track Configuration

As of December 31, 2001, BNSF Railway operated over a railroad system consisting of approximately 33,000 route miles of track (excluding second, third and fourth main tracks, yard tracks, and sidings), approximately 25,000 miles of which are

owned route miles, including easements, through 28 states and two Canadian provinces. Approximately 8,000 route miles of BNSF Railway's system consisted of trackage rights that permit BNSF Railway to operate its trains with its crews over another railroad's tracks. BNSF Railway operates over other trackage through lease or contractual arrangements.

As of December 31, 2001, the total BNSF Railway system, including first, second, third and fourth main tracks, yard tracks, and sidings, consisted of approximately 50,000 operated miles of track, all of which are owned by or held under easement by BNSF Railway except for approximately 8,300 miles operated under trackage rights agreements with other parties. At December 31, 2001, approximately 26,600 miles of BNSF Railway's track consisted of 112-pound per yard or heavier rail, including approximately 19,100 track miles of 131-pound per yard or heavier rail.



<PAGE>

Equipment Configuration

BNSF Railway owned or had under non-cancelable leases exceeding one year the following units of railroad rolling stock as of the dates shown below:

| At December 31, | 2001 | 2000 | 1999 |
|---|---|---|---|
| Diesel Locomotives | 4,863 | 4,966 | 5,095 |
| Locomotives Under Power Purchase Agreements | 99 | 99 | 99 |
| Freight Cars: | | | |
| Box-general purpose | 852 | 896 | 913 |
| Box-specially equipped | 8,720 | 9,785 | 10,111 |
| Open Hopper | 9,456 | 9,984 | 10,287 |
| Covered Hopper | 41,688 | 44,632 | 45,463 |
| Gondola | 12,158 | 12,415 | 12,753 |
| Refrigerator | 5,765 | 6,111 | 6,236 |
| Autorack | 4,673 | 4,775 | 4,799 |
| Flat | 6,143 | 6,389 | 6,468 |

| | | | |
|---|---|---|---|
| Tank | 477 | 480 | 482 |
| Caboose | 287 | 305 | 319 |
| Other | 480 | 727 | 728 |
| Total Freight Cars | 90,699 | 96,499 | 98,559 |
| Domestic Containers | 7,500 | 10,999 | 11,019 |
| Trailers | 2,200 | 2,201 | 2,213 |
| Domestic Chassis | 7,300 | 9,405 | 9,406 |
| Company Service Cars | 4,291 | 4,334 | 4,399 |
| Commuter Passenger Cars | 141 | 141 | 141 |

The average age from date of manufacture of the locomotive fleet at December 31, 2001, was 13 years; the average age from date of manufacture or remanufacture of the freight car fleet at December 31, 2001, was 17 years. These averages are not weighted to reflect the greater capacities of the newer equipment.

Capital Expenditures and Maintenance

BNSF Railway cash capital expenditures for the periods indicated were as follows:

| Year Ended December 31, | 2001 | 2000 | 1999 |
|---|---|---|---|
| | | (in millions) | |
| Maintenance of way | | | |
| Rail | $ 233 | $ 210 | $ 256 |
| Ties | 254 | 206 | 170 |
| Surfacing | 146 | 134 | 130 |
| Other | 335 | 285 | 254 |
| Total maintenance of way | 968 | 835 | 810 |
| Mechanical | 183 | 221 | 240 |
| Information services | 69 | 66 | 72 |
| Other | 101 | 144 | 151 |
| Total maintenance of business | 1,321 | 1,266 | 1,273 |
| New locomotives and freight cars | -- | -- | 261 |
| Terminal and line expansion | 126 | 99 | 233 |
| Capitalized interest and other | 12 | 34 | 19 |

| | | | |
|---|---|---|---|
| Total cash capital expenditures | $1,459 | $1,399 | $1,786 |

The above table does not include expenditures for equipment financed through operating leases (principally locomotives and rolling stock). BNSF Railway's planned 2002 cash capital expenditures approximate $1.4 billion. Approximately



<PAGE>

$1.25 billion of the total planned capital expenditures will be for maintenance of business activities, primarily consisting of expenditures to maintain BNSF Railway's track, signals, bridges and tunnels, as well as to overhaul locomotives and freight cars with the remainder to be spent on terminal and line expansions and other projects.

As of December 31, 2001, General Electric Company and the Electro-Motive Division of General Motors Corporation performed locomotive maintenance and overhauls for BNSF Railway under various maintenance agreements that covered approximately 3,000 locomotives. These agreements require the work to be done at BNSF Railway's facilities using BNSF Railway employees.

The majority of maintenance of way expenditures for track has been for rail and tie refurbishment and track resurfacing. The extent of the BNSF Railway track maintenance program is depicted in the following table:

| Year Ended December 31, | 2001 | 2000 | 1999 |
|---|---|---|---|
| Track miles of rail laid (a) | 891 | 738 | 942 |
| Cross ties inserted (thousands) (a) | 2,704 | 2,527 | 2,365 |
| Track resurfaced (miles) | 11,011 | 11,228 | 10,505 |

(a) Includes expenditures for both maintenance of existing route system and expansion projects. These expenditures are primarily capitalized.

BNSF Railway's planned 2002 track maintenance of way program, together with expansion projects, will result in the installation of approximately 625 track miles of rail, the replacement of about 2.2 million ties, and the resurfacing of approximately 12,000 miles of track.

Property and Facilities

BNSF Railway operates various facilities and equipment to support its transportation system, including its infrastructure and locomotives and freight cars as described above. The Company also owns or leases other equipment to support rail operations, including highway trailers, containers and vehicles. Support facilities for rail operations include yards and terminals throughout its rail network, system locomotive shops to perform locomotive servicing and maintenance, a centralized network operations center for train dispatching and network operations monitoring and management in Fort Worth, Texas, computers, telecommunications equipment, signal systems, and other support systems. Transfer facilities are maintained for rail-to-rail as well as intermodal transfer of containers, trailers and other freight traffic. These facilities include 36 major intermodal hubs located across the system and three intermodal hub centers off-line used in connection with haulage agreements with other railroads. BNSF Railway's largest intermodal facilities in terms of 2001 volume were:

| Intermodal Facilities | Units |
|---|---|
| Hobart Yard (California) | 1,041,000 |
| Corwith Yard (Illinois) | 739,000 |
| Willow Springs (Illinois) | 668,000 |
| Chicago Hub Center (Illinois) | 410,000 |
| Alliance (Texas) | 409,000 |
| San Bernardino (California) | 408,000 |
| Argentine (Kansas) | 257,000 |

BNSF Railway owns 26 automotive distribution facilities where automobiles are loaded or unloaded from multi-level rail cars and serves eight port facilities in the United States and Canada.

BNSF Railway's largest freight car classification yards based on the average daily number of cars processed (excluding cars that do not change trains at the terminal and intermodal and coal cars) are shown below:

<PAGE>

| Classification Yard | Daily Average Cars Processed |
|---|---|
| Argentine (Kansas) | 2,050 |
| Galesburg (Illinois) | 1,550 |
| Pasco (Washington) | 1,450 |
| Barstow (California) | 1,275 |
| Memphis (Tennessee) | 1,250 |

As of December 31, 2001, certain BNSF Railway properties and other assets were subject to liens securing $425 million of mortgage debt. Certain locomotives and rolling stock of BNSF Railway are subject to equipment obligations and leases, as referred to in Notes 9 and 11 to the Consolidated Financial Statements.

Employees and Labor Relations

Productivity as measured by thousand revenue ton-miles per employee has risen steadily in the last three years as shown in the table below.

<TABLE>
<CAPTION>

| Year Ended December 31, | 2001 | 2000 | 1999 |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Thousand revenue ton-miles divided by average number of employees | 12,796 | 12,342 | 11,564 |
| Compensation and benefits expense per thousand revenue ton-miles | $ 5.68 | $ 5.55 | $ 5.62 |

</TABLE>

Approximately 88 percent of BNSF Railway's employees are union-represented. BNSF Railway's union employees work under collective bargaining agreements with 13

different labor organizations. The negotiating process for new, major collective bargaining agreements covering all of BNSF Railway's union employees has been underway since the bargaining round was initiated November 1, 1999. Wages, health and welfare benefits, work rules, and other issues have traditionally been addressed through industry-wide negotiations. These negotiations have generally taken place over a number of months and have previously not resulted in any extended work stoppages. The existing agreements have remained in effect and will continue to remain in effect until new agreements are reached or the Railway Labor Act's procedures (which include mediation, cooling-off periods, and the possibility of Presidential intervention) are exhausted. The current agreements provide for periodic wage increases until new agreements are reached. The National Carriers' Conference Committee (NCCC), BNSF Railway's multi-employer collective bargaining representative, reached a final agreement with the Brotherhood of Maintenance of Way Employes (BMWE) resolving wage, work rule and benefit issues through 2004 which was implemented in July 2001. BMWE represents BNSF Railway's track, bridge and building maintenance employees, or about one-fourth of BNSF Railway's unionized workforce. In June 2001, the NCCC reached a tentative agreement with the International Brotherhood of Electrical Workers (IBEW), which represents approximately five percent of BNSF Railway's unionized workforce, addressing wage and work rule issues through 2004, but leaving health and welfare benefit issues for settlement in separate talks with other railroad unions. IBEW members failed to ratify the tentative agreement. No new talks with IBEW are scheduled. During the third quarter of 2000, the NCCC reached a tentative agreement with the United Transportation Union (UTU) covering wage and work rule issues through the year 2004 for conductors, brakemen, yardmen, yardmasters and firemen, approximately one-third of BNSF Railway's unionized workforce. This agreement is also subject to ratification by the UTU's membership. As in the tentative IBEW agreement, health and welfare benefit issues were not resolved with UTU and remain the subject of continuing negotiations.

Railroad industry personnel are covered by the Railroad Retirement System instead of Social Security. BNSF Railway's contributions under the Railroad Retirement System have been approximately triple those in industries covered by Social Security. The Railroad Retirement System, funded primarily by payroll taxes on covered employers and employees, includes a benefit roughly equivalent to Social Security (Tier I), an additional benefit similar to that allowed in some private defined-benefit plans (Tier II), and other benefits. Investment of Tier II Railroad Retirement assets has until recently been limited to special interest-bearing U. S. Treasury securities. The Railroad Retirement and Survivors' Improvement Act (Act) of 2001 creates a new National Railroad Retirement Investment Trust to hold Tier II Railroad Retirement assets and

empowers the trustees to invest these assets in the same types of investments available to private



<PAGE>

sector retirement plans. In addition to liberalizing certain retirement benefit requirements for rail employees, the Act reduces Tier II railroad retirement tax rates on rail employers beginning in 2002 and eliminates a supplemental annuity tax. The Company expects to realize savings of approximately $20 million in 2002 and $50 million in 2003. Future adjustments in the Tier II Railroad Retirement tax rates assessed on both rail employers and rail employees will depend on Railroad Retirement fund levels and annual savings could be as much as $80 million by 2005.

Railroad industry personnel are also covered by the Federal Employers' Liability Act (FELA) rather than by state workers' compensation systems. FELA is a fault-based system, with compensation for injuries settled by negotiation and litigation, not subject to specific statutory limitations on the amount of recovery. By contrast, most other industries are covered under state, no-fault workers' compensation plans with standard compensation schedules. BNSF Railway believes it has adequate liabilities recorded for its FELA claims. However, the ultimate costs of these FELA claims are uncertain and the actual costs could be significantly higher than anticipated.

Business Mix

In serving the Midwest, Pacific Northwest and the Western, Southwestern, and Southeastern regions and ports of the country, BNSF Railway transports, through one operating transportation services segment, a wide range of products and commodities derived from manufacturing, agricultural, and natural resource industries. Accordingly, its financial performance is influenced by, among other things, general and industry economic conditions at the international, national and regional levels.

Major markets served directly by BNSF Railway include Albuquerque, Amarillo, Billings, Birmingham, Bismarck/Mandan, Cheyenne, Chicago, Corpus Christi, Council Bluffs, Dallas, Denver, Des Moines, Duluth/Superior, El Paso, Eugene/Salem, Fargo/Moorhead, Fort Worth, Fresno/Bakersfield, Galesburg, Galveston, Grand Forks, Helena, Houston, Kansas City, Lake Charles, Lincoln,

Little Rock/Pine Bluff, the Los Angeles Basin, Lubbock, Memphis, Minot, Mobile, New Orleans, Oklahoma City, Olympia, Omaha, Peoria, Phoenix, Portland, the Quad Cities, Reno/Sparks, Sacramento, Salt Lake City/Ogden, San Antonio, San Bernadino, San Diego, the San Francisco Bay area, the San Joaquin Valley area, St. Louis/East St. Louis, St. Paul/Minneapolis, Seattle, Sioux City, Sioux Falls, Spokane, Springfield (Missouri), Stockton, Tacoma, Topeka, Tulsa, Waco, Wichita, Vancouver (British Columbia), Wenatchee, Winnipeg (Manitoba) and Yakima. BNSF Railway serves Cedar Rapids through a "Voluntary Coordination Agreement" with the Cedar Rapids and Iowa City Railway Company and Iowa Interstate Railroad, and through a haulage agreement with Canadian National Railway Company (CN). Other major cities are served through Intermodal Market Extension terminals located at various off-line points. Major ports served include Beaumont, Bellingham, Brownsville, Corpus Christi, Everett, Galveston, Houston, Kalama, Long Beach, Longview, Los Angeles, Mobile, New Orleans, Portland, Richmond (Oakland), San Diego, Seattle, Duluth/Superior, Tacoma, Vancouver (Washington), and Vancouver (British Columbia). Canadian traffic is accessed through border crossings in Minnesota, Montana, North Dakota, and Washington, as well as through interchange with Canadian railroads at Chicago, Minneapolis/St. Paul, and other gateways. BNSF Railway also accesses markets in Mexico through United States/Mexico crossings at Brownsville, Eagle Pass and El Paso, Texas, and San Diego, California, and through an interline agreement with the Texas Mexican Railway Company, BNSF Railway reaches Laredo, Texas, a major rail gateway between the U.S. and Mexico.

Consumer Products: The consumer freight business provided approximately 37 percent of freight revenues in 2001 and consisted of the following seven types of business:

- International. International business consists primarily of container traffic from steamship companies and accounted for approximately 29 percent of total Consumer Products revenues.

- Direct Marketing. Direct marketing generated approximately 23 percent of total Consumer Products revenue. These center around intermodal traffic contracted from United Parcel Service and the United States Postal Service, and service for nationwide LTL (Less-Than-Truckload) carriers including Yellow Freight, Roadway Express and Consolidated Freightways.

- Truckload. Truckload traffic represented approximately 14 percent of total Consumer Products revenue. This traffic is comprised of business through the joint service arrangement with J.B. Hunt, as well as business from Schneider National and other truckload carriers.

- Automotive. The transportation of both assembled motor vehicles and shipments of vehicle parts to numerous destinations throughout the Midwest, Southwest, West and Pacific Northwest provided about 13 percent of 2001 total Consumer Products revenue.

- Intermodal Marketing Companies. Approximately 12 percent of total Consumer Products revenue was generated through intermodal marketing companies, primarily shipper agents and consolidators.

- Perishables and Dry Boxcar. Perishables and Dry Boxcar represented approximately 9 percent of total Consumer Products revenue. This group consists of beverages, canned goods and perishable food items. Other consumer goods handled include cotton, salt, rubber and tires, and miscellaneous boxcar shipments.

Industrial Products: Industrial Products' freight business provided approximately 23 percent of BNSF Railway's freight revenues in 2001 and consists of the following four business areas:

- Construction Products. The construction products sector represented approximately 36 percent of total Industrial Products revenue in 2001. This sector serves virtually all of the commodities included in or resulting from the production of steel along with mineral commodities such as clays, sands, cements, aggregates, sodium compounds and other industrial minerals. Industrial taconite, an iron ore derivative produced in northern Minnesota, scrap steel and coal coke are BNSF Railway's primary input products transported, while finished steel products range from structural beams and steel coils to wire and nails. BNSF Railway links the integrated steel mills in the East with fabricators in the West and Southwest. Service is also provided to various mini-mills in the Southwest that produce rebar, beams and coiled rod to the construction industry. Industrial minerals include various mined and processed commodities such as cement and aggregates (construction sand, gravel and crushed stone) that generally move to domestic markets for use in general construction and public work projects, including highways. Borates and

clays move to domestic points as well as to export markets primarily through West Coast ports. Sodium compounds, primarily soda ash, are moved to domestic markets for use in the manufacturing of glass and other industrial products. Sand is utilized in the manufacturing of glass and for use in foundry and oil drilling applications.

o Building Products. This sector includes primary forest product commodities such as lumber, plywood, oriented strand board, particleboard, paper products, pulpmill feedstocks, wood pulp and sawlogs, which resulted in approximately 35 percent of total 2001 Industrial Products revenue. Also, included in this sector are government, machinery and waste traffic. This diverse commodities group primarily originates from the Pacific Northwest, Western Canada, upper Midwest, and the Southeast for shipment mainly into domestic markets. Industries served include construction, furniture, photography, publishing, newspaper and industrial packaging. Shipments of waste, ranging from municipal waste to contaminated soil, are transported to landfills and reclamation centers across the country. Government and machinery business includes aircraft parts, agricultural and construction machinery, military equipment and large industrial machinery.

o Chemicals and Plastics. The chemicals and plastics sector represents approximately 16 percent of total 2001 Industrial Products revenue. This group is composed of industrial chemicals and plastics commodities. These commodities include caustic soda, chlorine, industrial gases, acids, polyethylene, polypropylene and polyvinyl chloride. Industrial chemicals and plastics resins are used by the automotive, housing, and packaging industries, as well as for feedstocks, to produce other chemical and plastic products. These commodities originate primarily in the Gulf Coast region for shipment mainly into domestic markets.

o Petroleum. Commodities included in the petroleum sector are liquefied petroleum gas (LPG), diesel fuels, asphalt, alcohol/solvents, petroleum coke, lubes/oils/waxes and carbon black, which made up 13 percent of total Industrial Products revenue for 2001. Product use varies based on commodity, and includes the use of LPG for heating purposes, diesel fuel and lubes to run heavy machinery, and asphalt for road projects and roofing. Products within



<PAGE>

this group originate and terminate throughout the BNSF Railway network with the largest areas of activities being the Texas Gulf, Pacific Northwest, California, Montana and Illinois.

Coal: Based on carloadings and tons hauled, BNSF Railway is the largest transporter of low-sulfur coal in the United States. The transportation of coal contributed about 23 percent of 2001 freight revenues. Approximately 90 percent of BNSF Railway's coal traffic originated in the Powder River Basin of Wyoming and Montana during the three years ended December 31, 2001. These coal shipments were destined for coal-fired electric generating stations located primarily in the North Central, South Central and Mountain regions of the United States.

BNSF Railway also transports increasing amounts of low-sulfur coal from the Powder River Basin for delivery to markets in the eastern and southeastern portions of the United States. The low-sulfur coal from the Powder River Basin is abundant, inexpensive to mine, clean-burning, and has a low delivered-cost to power plants. Also, deregulation in the electric utility industry is causing power generators to seek lower cost fuel sources and boost demand for Powder River Basin coal.

Other coal shipments originate principally in Colorado, Illinois, New Mexico and North Dakota and are moved to electrical generating stations and industrial plants in the Mountain and North Central regions.

Agricultural Products: The transportation of Agricultural Products provided approximately 17 percent of 2001 total freight revenues and includes wheat, corn, bulk foods, soybeans, oil seeds and meals, feeds, barley, oats and rye, flour and mill products, milo, oils, specialty grains, malt, ethanol and fertilizer. The BNSF Railway system is strategically located to serve the grain-producing regions of the Midwest and Great Plains. In addition to serving most grain-producing areas, BNSF Railway serves most major terminal, storage, feeding and food-processing locations. Furthermore, BNSF Railway has access to major export markets in the Pacific Northwest, western Great Lakes, Texas Gulf and Mexico.

Freight Statistics. The following table sets forth certain freight statistics relating to rail operations for the periods indicated. Certain prior period amounts have been restated for current classification.

| Year Ended December 31, | 2001 | 2000 | 1999 |
|---|---|---|---|

Case 1:07-mc-00489-BAH Document 1229-7 Filed 11/22/24 Page 2186 of 3766

| | | | |
|---|---|---|---|
| Revenue ton-miles (millions) | 501,829 | 491,959 | 493,207 |
| Freight revenue per thousand revenue ton-miles | $ 18.11 | $ 18.52 | $ 18.40 |
| Average length of haul (miles) | 992 | 996 | 994 |

For revenues, cars/units and average revenue per unit information for the two years ended December 31, 2001, see the revenue table included as part of Item 7, Management's Narrative Analysis of Results of Operations.

Government Regulation and Legislation

Rail operations are subject to the regulatory jurisdiction of the Surface Transportation Board (STB) of the United States Department of Transportation (DOT), the Federal Railroad Administration of DOT, the Occupational Safety and Health Administration (OSHA), and state regulatory agencies. The STB, which is the successor to the Interstate Commerce Commission (ICC), has jurisdiction over disputes and complaints involving certain rates, routes and services, the sale or abandonment of rail lines, applications for line extensions and construction, and consolidation or merger with, or acquisition of control of, rail common carriers. The outcome of STB proceedings can affect the costs and profitability of BNSF Railway's business.

DOT and OSHA have jurisdiction under several federal statutes over a number of safety and health aspects of rail operations. State agencies regulate some aspects of rail operations with respect to health and safety in areas not otherwise preempted by federal law.

BNSF Railway's rail operations, as well as those of its competitors, are subject to extensive federal, state and local environmental regulation. These laws cover discharges to waters, air emissions, toxic substances, and the generation, handling, storage, transportation, and disposal of waste and hazardous materials. This regulation has the effect of



<PAGE>

increasing the cost and liabilities associated with rail operations. Environmental risks are also inherent in rail operations, which frequently involve transporting chemicals and other hazardous materials.

Many of BNSF Railway's land holdings are and have been used for industrial or transportation-related purposes or leased to commercial or industrial companies whose activities may have resulted in discharges onto the property. As a result, BNSF Railway is now subject and will from time to time continue to be subject to environmental cleanup and enforcement actions. In particular, the federal Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), also known as the "Superfund" law, generally imposes joint and several liability for cleanup and enforcement costs, without regard to fault or the legality of the original conduct, on current and former owners and operators of a site. Accordingly, BNSF Railway may be responsible under CERCLA and other federal and state statutes for all or part of the costs to clean up sites at which certain substances may have been released by BNSF Railway, its current lessees, former owners or lessees of properties, or other third parties. For further discussion, see Note 11 to the Consolidated Financial Statements.

Competition

The business environment in which BNSF Railway operates remains highly competitive. Depending on the specific market, deregulated motor carriers, other railroads and river barges may exert pressure on price and service levels. The presence of advanced, high service truck lines with expedited delivery, subsidized infrastructure and minimal empty mileage continues to affect the market for non-bulk, time sensitive freight. The potential expansion of longer combination vehicles could further encroach upon markets traditionally served by railroads. In order to remain competitive, BNSF Railway and other railroads strive to develop and implement operating efficiencies to improve productivity.

As railroads streamline, rationalize and otherwise enhance their franchises, competition among rail carriers intensifies. BNSF Railway's primary rail competitor in the western region of the United States is Union Pacific Railroad Company (UP). Other Class I railroads and numerous regional railroads and motor carriers also operate in parts of the same territories served by BNSF Railway.

As a condition to approval of the merger (UP/SP) of rail carriers controlled by UP and Southern Pacific Transportation Company (SP), the STB in its 1996 decision required the grant to BNSF Railway of trackage rights over approximately 4,000 miles of UP/SP track. BNSF Railway also purchased over 335 miles of track from UP/SP as a result of the STB's decision. BNSF Railway and UP compete head-to-head in Gulf Coast, Intermountain and West Coast markets served by these lines. In 1998, BNSF Railway and UP entered into an agreement to exchange half interests in the two pieces of the former SP rail line between

Houston and New Orleans which were separately owned by the two railroads. Both railroads now have access to all customers, including chemical, steel, gas and other companies, along the entire line, including on former SP branch lines.

The STB approved the division of Consolidated Rail Corporation (Conrail) between CSX Corporation and Norfolk Southern Corporation, which was implemented in 1999. CSX and Norfolk Southern operate the two largest rail systems in the eastern United States. Also, in 1999, CN acquired Illinois Central Corporation (IC). CN is Canada's largest railroad and reaches the U.S. cities of Detroit and Chicago, while IC had operations extending from Chicago to the Gulf of Mexico and west through Iowa. In 2001, CN acquired Wisconsin Central, a regional railroad with track and trackage rights in Illinois, Wisconsin, Minnesota, Michigan and the province of Ontario.

Item 3. Legal Proceedings

In September 2001, BNSF Railway was notified by the Nebraska Department of Environmental Quality of alleged environmental violations in connection with a November 4, 2000, derailment in Scottsbluff, Nebraska, that involved hazardous commodities. If not resolved, this matter could result in litigation brought by the Nebraska Attorney General and monetary sanctions exceeding $100 thousand.

BNSF Railway and its subsidiaries are parties to a number of legal actions and claims, various governmental proceedings and private civil suits arising in the ordinary course of business, including those related to environmental matters and personal injury claims. While the final outcome of these matters cannot be predicted with certainty, considering among



<PAGE>

other things the meritorious legal defenses available, it is the opinion of BNSF Railway management that none of these items, when finally resolved, will have a material adverse effect on the results of operations, financial position or liquidity of BNSF Railway; although, an adverse resolution of a number of these items could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

Reference is made to Note 5 to the Consolidated Financial Statements for information concerning certain pending administrative appeals with the Internal

Revenue Service.




<PAGE>

PART II

Item 5. Market For Registrant's Common Equity And Related Stockholder Matters

All of BNSF Railway's common stock is owned by BNSF and therefore is not traded on any market.

Item 7. Management's Narrative Analysis of Results of Operations

Management's narrative analysis relates to the results of operations of The Burlington Northern and Santa Fe Railway Company and its majority-owned subsidiaries (collectively, BNSF Railway or Company). BNSF Railway is a wholly-owned subsidiary of BNSF. The following narrative analysis should be read in conjunction with the Consolidated Financial Statements and the accompanying notes (beginning on page 18).

Results of Operations

Year Ended December 31, 2001 Compared with Year Ended December 31, 2000

BNSF Railway recorded net income for 2001 of $952 million compared with $1,199 million for 2000. The decrease in net income is primarily due to a $356 million decrease in operating income and $47 million in losses related to non-rail investments. The decrease in operating income reflects an increase in compensation and benefits costs, higher fuel expenses and higher materials and other costs, which included a $66 million fourth quarter charge for workforce reduction related costs.

Revenue Table

The following table presents BNSF Railway's revenue information by commodity for the years ended December 31, 2001 and 2000, and includes certain reclassifications of prior year information to conform to current year presentation.

<TABLE>
<CAPTION>

| | Revenues | | Cars / Units | | Average Revenue Per Car / Unit | |
|---|---|---|---|---|---|---|
| | 2001 | 2000 | 2001 | 2000 | 2001 | 2000 |
| | (in millions) | | (in thousands) | | | |
| Consumer Products | $ 3,350 | $ 3,400 | 3,752 | 3,850 | $ 893 | $ 883 |
| Coal | 2,123 | 2,131 | 2,133 | 2,023 | 995 | 1,053 |
| Industrial Products | 2,080 | 2,114 | 1,442 | 1,501 | 1,442 | 1,408 |
| Agricultural Products | 1,531 | 1,462 | 828 | 793 | 1,849 | 1,844 |
| Total Freight Revenues | 9,084 | 9,107 | 8,155 | 8,167 | $ 1,114 | $ 1,115 |
| Other Revenues | 117 | 95 | | | | |
| Total Operating Revenues | $ 9,201 | $ 9,202 | | | | |

</TABLE>

Revenues

Total revenues of $9,201 million for 2001 were essentially flat compared with 2000. In 2001, the sluggish economy hampered BNSF Railway's revenue growth; although, based on reporting to the Association of American Railroads (AAR), BNSF Railway's share of the western United States rail traffic market remained essentially unchanged at approximately 43 percent.

Consumer Products revenues of $3,350 million for 2001 were $50 million, or 1 percent, less than 2000 due to decreased loadings in the LTL sector and the loss in late 2000 of some automotive contract business as well as decreases in the automotive sector as a result of sluggish industry-wide sales. Additionally, a significant automotive contract was lost at the end of the third quarter of 2001 and is expected to affect future automotive revenues. These declines were partially offset by a ten percent growth in the intermodal truckload business, increased international revenues, increases in dry



<PAGE>

boxcar business due to strong beverage shipments, and a $32 million favorable transportation contract settlement in automotive revenues.

Coal revenues of $2,123 million for 2001 decreased $8 million from 2000 revenues of $2,131 million. The decrease in revenues was primarily a result of lower revenue per car on certain contract renewals, partially offset by a 6 percent increase in coal tons shipped due to colder weather, tight eastern coal supplies and high natural gas prices.

Industrial Products revenues of $2,080 million for 2001 were $34 million, or 2 percent, lower than 2000, despite increased revenue per car as a result of selected price increases and increased length of haul. Revenues for the year fell due to continued production cutbacks affecting most sectors. These decreases were partially offset by increases in the petroleum products sector resulting from increases in LPG and asphalt shipments.

Agricultural Products revenues of $1,531 million for 2001 were $69 million, or 5 percent, higher than revenues for 2000 primarily due to an increased demand for corn, soybean and oilseed/meals, partially offset by a decline in fertilizer shipments. Additionally, average revenue per car increased due to increases in length of haul.

Expenses

| Year Ended December 31, | 2001 | 2000 |
|---|---|---|
| | (in millions) | |

| | | |
|---|---|---|
| Compensation and benefits | $2,850 | $2,729 |
| Purchased services | 1,084 | 1,023 |
| Depreciation and amortization | 908 | 894 |
| Equipment rents | 740 | 742 |
| Fuel | 973 | 932 |
| Materials and other | 897 | 777 |
| Total operating expenses | $7,452 | $7,097 |
| Interest expense | $ 170 | $ 184 |
| Other expense (income), net | $ 50 | $ 5 |

Total operating expenses for 2001 were $7,452 million, an increase of $355 million, or 5 percent, over 2000 primarily due to: (i) increased compensation and benefits of $121 million related to higher wages and increased health and welfare costs offset by efficiency gains as measured by gross ton-miles (GTM) per employee and reduced headcounts; (ii) workforce reduction related costs of $66 million; (iii) higher fuel prices; and (iv) flooding in the upper Midwest and more severe winter weather conditions early in 2001 which increased expenses compared to 2000.

Compensation and benefits expenses of $2,850 million were $121 million, or 4 percent, higher than 2000 primarily due to wage rate increases and higher benefit rates. In addition, scheduled wages were significantly higher in the first and second quarters as a result of more severe weather conditions requiring increased maintenance and additional crews. These increases were partially offset by lower employment levels.

Purchased services of $1,084 million for 2001 were $61 million, or 6 percent, higher than 2000 due to higher ramping expenses incurred as a result of new services added which improve efficiency and safety at the intermodal ramp facilities, decreased recoveries as compared with the prior year, increased legal expense primarily related to coal rate disputes, higher contract equipment maintenance costs due to more locomotives under maintenance contracts, increased haulage expense, and increased other expenses as a result of flooding in the upper Midwest in the early part of the year.

Depreciation and amortization expenses of $908 million for 2001 were $14 million, or 2 percent, higher than 2000, primarily due to a higher capital base.

Equipment rents expenses for 2001 of $740 million were $2 million lower than 2000 reflecting reduced equipment levels, including cars, trailers, containers and automotive equipment.



<PAGE>

Fuel expenses of $973 million for 2001 were $41 million, or 4 percent, higher than 2000 primarily as a result of a 3-cent increase in the average all-in cost per gallon of diesel fuel. Consumption in 2001 was 1,177 million gallons compared with 1,173 million gallons in 2000. However, GTM per gallon increased to 762 from 746, or 2 percent, compared with 2000, attributable to newer locomotive fleet, fuel economy initiatives during the year, and commodity mix. The 3-cent increase in the average all-in cost per gallon of diesel fuel is net of a 6-cent decrease in the average purchase price more than offset by a 9-cent decrease in the hedge benefit per gallon as compared with a 13-cent hedge benefit in 2000.

Materials and other expenses of $897 million for 2001 were $120 million, or 15 percent, higher than 2000 principally reflecting: (i) workforce reduction costs of $66 million incurred in the fourth quarter of 2001 for severance, pension, medical, benefit and other related costs for approximately 400 positions (see Note 10 of the Consolidated Financial Statements); (ii) increases in environmental and casualty expenses compared with 2000; (iii) lower income from easements; and (iv) increased costs caused by flooding in the upper Midwest and higher utilities as a result of higher rates and increased consumption due to more severe winter weather conditions early in 2001. Additionally, during 2000 the Company incurred $42 million of charges due to employee-related severance, medical and other benefit costs and the loss of previously earned state tax incentives.

Interest expense of $170 million for 2001 was $14 million, or 8 percent, lower than 2000, reflecting lower debt levels.

Other expense was $45 million higher compared with 2000 primarily due to $47 million in losses recognized related to non-rail investments and fewer land sales in 2001. The non-rail investments consisted of Pathnet Telecommunications, Inc., a telecommunications venture; a portfolio of other non-core real-estate investments and a decline in the cash surrender value of company owned life

insurance policies.

Other Matters

FORWARD-LOOKING INFORMATION

To the extent that statements made by the Company relate to the Company's future economic performance or business outlook, predictions or expectations of financial or operational results, or refer to matters which are not historical facts, such statements are forward-looking statements within the meaning of the federal securities laws. Forward-looking statements involve a number of risks and uncertainties and actual results may differ materially. Factors that could cause actual results to differ materially include, but are not limited to, economic and industry conditions: material adverse changes in economic or industry conditions, both within the United States and globally, customer demand, effects of adverse economic conditions affecting shippers, adverse economic conditions in the industries and geographic areas that produce and consume freight, competition and consolidation within the transportation industry, the extent to which the Company is successful in gaining new long-term relationships or retaining existing ones, changes in fuel prices, and changes in labor costs and labor difficulties including stoppages; legal and regulatory factors: developments and changes in laws and regulations and the ultimate outcome of shipper claims, environmental investigations or proceedings and other types of claims and litigation; and operating factors: technical difficulties, changes in operating conditions and costs, competition and commodity concentrations, the Company's ability to achieve its operational and financial initiatives and to contain costs, as well as natural events such as severe weather, floods, earthquakes and other disruptions involving the Company's infrastructure, operating systems, and equipment.

The Company cautions against placing undue reliance on forward-looking statements, which reflect its current beliefs and are based on information currently available to it on the date a forward-looking statement is made. The Company undertakes no obligation to revise forward-looking statements to reflect future events, changes in circumstances or changes in beliefs.

Item 7A. Quantitative and Qualitative Disclosures About Market Risk

In the ordinary course of business, BNSF Railway utilizes various financial instruments which inherently have some degree of market risk. The qualitative and quantitative information presented in the Management's Narrative Analysis of

<PAGE>

Results of Operations section and Notes 3 and 9 of the Consolidated Financial Statements describe significant aspects of BNSF Railway's financial instrument programs, which have a material market risk.

INTEREST RATE SENSITIVITY

From time to time, BNSF Railway enters into various interest rate-hedging transactions for purposes of managing exposure to fluctuations in interest rates and establishing rates in anticipation of future debt issuances as well as to convert a portion of its fixed-rate long-term debt to floating-rate debt to manage its ratio of fixed-rate long-term debt to floating-rate debt. BNSF Railway's measurement of the fair value of its interest rate swap is based on estimates of the mid-market values for the transactions provided by the counterparties to this agreement.

As discussed in Note 9 in the Consolidated Financial Statements, the Company used an interest rate swap to minimize exposure to risk. This swap is accounted for as a fair value hedge under Statement of Financial Accounting Standards (SFAS) No. 133.

All swap transactions outstanding with an interest rate component are reflected in the table below.

<TABLE>
<CAPTION>

| | December 31, 2001 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Maturity Date | | | | | | | |
| | 2002 | 2003 | 2004 | 2005 | 2006 | There-after | Total | Fair Value |
| | ---- | ---- | ---- | ---- | ---- | ----- | ----- | ----- |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |

Fair Value Hedge
Fixed to Variable swap (in millions) -- -- $ 100 -- $ 100 $ --
Fixed Rate -- -- 8.63% -- 8.63%
Floating Rate -- -- 6.18% -- 6.18%
</TABLE>

The tables below provide information about BNSF Railway's derivative financial instruments and other financial instruments that are sensitive to changes in interest rates as of December 31, 2001 and 2000. For debt obligations, the tables present principal cash flows and related weighted average interest rates by contractual maturity dates. The variable rate is based on implied forward rates in the yield curve at December 31, 2001. The fair values presented in the table below do not include the fair value of the swap.

Current and Long-Term Debt

<TABLE>
<CAPTION>

| <S> | December 31, 2001 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Maturity Date | | | | | | | |
| | 2002 | 2003 | 2004 | 2005 | 2006 | There-after | Total | Fair Value |
| Fixed-Rate Debt (in millions) | $ 288 | $ 144 | $ 144 | $ 144 | $ 430 | $1,114 | $2,264 | $2,351 |
| Average Interest Rate | 7.09% | 7.19% | 7.08% | 7.12% | 8.43% | 7.04% | 7.33% | |
| Variable-Rate Debt (in millions) | | | | | $ 100 | | $ 100 | $ 109 |
| Average Interest Rate | | | | | 8.47% | | 8.47% | |

</TABLE>

<PAGE>

<TABLE>
<CAPTION>

| | December 31, 2000 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Maturity Date | | | | | | | |
| <S> | 2001 <C> | 2002 <C> | 2003 <C> | 2004 <C> | 2005 <C> | There-after <C> | Total <C> | Fair Value <C> |
| Fixed-Rate Debt (in millions) | $ 232 | $ 288 | $ 145 | $ 244 | $ 140 | $1,591 | $2,640 | $2,661 |
| Average Interest Rate | 7.70% | 7.09% | 7.18% | 7.70% | 7.13% | 7.42% | 7.41% | -- |

</TABLE>

The fair value of BNSF Railway's long-term debt is primarily based on quoted market prices for the same or similar issues, or on the current rates that would be offered to BNSF Railway for debt of the same remaining maturities.

As described below, excluded from the 2001 and 2000 tables are $117 million and $114 million, respectively, of intercompany notes payable to BNSF.

At December 31, 2001 and 2000, BNSF Railway had $117 and $114 million, respectively, of intercompany notes payable to BNSF at a variable interest rate of 1.0 percent above the monthly average of the daily effective Federal Funds rate. During the first six months of 2000, BNSF Railway and BNSF agreed to offset $614 million of the variable rate notes payable against $614 million of variable rate notes receivable. During 2001, BNSF Railway also had additional net borrowings of $3 million of variable rate notes. Proceeds from borrowings are primarily used to fund capital expenditures and other investing activities. Interest is paid semi-annually on all intercompany notes payable. Interest expense on intercompany notes payable is reflected in Interest Income, Related

Parties in the consolidated income statements. The intercompany notes are due on demand; however, it is not anticipated that BNSF Railway will be required to pay these obligations in the next twelve months.

At December 31, 2001 and 2000, BNSF Railway had $825 million and $639 million, respectively, of intercompany notes receivable from BNSF with a variable interest rate of 1.0 percent above the monthly average of the daily effective Federal Funds rate. The increase of $186 million in intercompany notes receivable is due to net borrowings by BNSF during 2001. Interest is collected semi-annually on all intercompany notes receivable.

The 2001 and 2000 balances include a $130 million receivable due SFP Pipelines Holdings, Inc., a subsidiary of BNSF Railway, from BNSF. Interest income from intercompany notes receivable is presented in Interest Income, Related Parties in the consolidated income statements.

During 2001, BNSF BC was transferred into BNSF Railway. The primary asset as of the date of the transfer was a note receivable of $1,662 million from BNSF Railway including accrued interest. Due to the transfer of BNSF BC into BNSF Railway, this note and related interest is now eliminated on a consolidated BNSF Railway basis.

In the BNSF Railway consolidated balance sheets, the intercompany notes receivable are presented net of the intercompany notes payable discussed above. BNSF Railway had net intercompany notes receivable balances of $708 million and $525 million at December 31, 2001 and 2000, respectively.

COMMODITY PRICE SENSITIVITY

BNSF Railway has a program to hedge against fluctuations in the price of its diesel fuel purchases. Swap transactions are typically based on the price of pipeline delivery of Gulf Coast #2 heating oil. BNSF Railway either pays or receives the difference between the hedge price and the actual average price of Gulf Coast #2 heating oil during a specified determination period for a specified number of gallons. Swap transactions are generally settled with the counterparty in cash. Based on historical information, BNSF Railway believes there is a significant correlation between the market prices of diesel fuel and Gulf Coast #2 heating oil.

BNSF Railway measures the fair value of Gulf Coast #2 heating oil swaps from daily forward price data provided by various external counterparties. To value a swap, the Company uses a 3-month average of forward Gulf Coast #2 heating oil

prices for the period hedged. The fair value of fuel costless collars is calculated and provided by the corresponding counterparty. The tables below provide information about BNSF Railway's diesel fuel hedging instruments that are sensitive to changes in diesel fuel prices. The tables present notional amounts in gallons and the weighted average



<PAGE>

contract prices by contractual maturity date. The prices included in the tables below do not include taxes, transportation costs, certain other fuel handling costs and any differences which may occur from time to time between the prices of commodities hedged and the purchase price of BNSF Railway's diesel fuel.

| | December 31, 2001 | |
|---|---|---|
| | 2002 Maturity Date | Fair Value |
| Diesel Fuel Swaps: | | |
| Gallons (in millions) | 296 | $ (1) |
| Weighted average price per gallon | $ 0.57 | -- |
| Diesel Fuel Costless Collars: | | |
| Gallons (in millions) | 50 | $ (3) |
| Weighted average price per gallon - calls | $ 0.65 | -- |
| Weighted average price per gallon - puts | $ 0.57 | -- |

| | December 31, 2000 | | | |
|---|---|---|---|---|
| | Maturity Date | | | |
| | 2001 | 2002 | Total | Fair Value |
| Diesel Fuel Swaps: | | | | |
| Gallons (in millions) | 277 | 101 | 378 | $ 74 |
| Weighted average price per gallon | $0.49 | $0.50 | $0.50 | -- |

At December 31, 2001 and 2000, BNSF Railway maintained fuel inventories for use in normal operations which were not material to BNSF Railway's overall financial position and, therefore, represent no significant market exposure.

Between December 31, 2001 and January 31, 2002, the Company entered into additional fuel hedge transactions to hedge the equivalent of approximately 54 million gallons of diesel fuel in 2002 at an average price of 55 cents per gallon. At January 31, 2002, BNSF Railway's fuel hedging program covered approximately 35 percent of estimated fuel purchases for 2002.

In addition, between December 31, 2001 and January 31, 2002, the Company entered into fuel swap agreements utilizing West Texas Intermediate (WTI) crude oil to hedge the equivalent of approximately 101 million and 50 million gallons of diesel fuel for 2003 and 2004, respectively, at an average price of $20.58 per barrel.



<PAGE>

Item 8. Financial Statements and Supplementary Data

The Consolidated Financial Statements of BNSF Railway, together with the report of independent accountants, are included as part of this filing.

The following documents are filed as a part of this report:


| 1. Consolidated Financial Statements | Page |
|---|---|
| Report of Independent Accountants | 17 |
| Consolidated Statements of Income for the three years ended December 31, 2001 | 18 |
| Consolidated Balance Sheets as of December 31, 2001 and 2000 | 19 |
| Consolidated Statements of Cash Flows for the three years ended December 31, 2001 | 20 |
| Consolidated Statements of Changes in Stockholder's Equity for the three years ended December 31, 2001 | 21 |
| Notes to Consolidated Financial Statements | 22 - 36 |

<PAGE>

REPORT OF INDEPENDENT ACCOUNTANTS

To the Stockholder and Board of Directors of
The Burlington Northern and Santa Fe Railway Company and Subsidiaries

In our opinion, the consolidated financial statements listed in the accompanying index present fairly, in all material respects, the financial position of The Burlington Northern and Santa Fe Railway Company and subsidiary companies at December 31, 2001 and 2000, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2001 in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the financial statement schedule appearing under Item 14(a)(2) on page 38 presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements. These financial statements and the financial statement schedule are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements and the financial statement schedule based on our audits. We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

/s/ PricewaterhouseCoopers LLP
PricewaterhouseCoopers LLP
Fort Worth, Texas
February 6, 2002



<PAGE>

THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF INCOME

(Dollars in millions)

| Year Ended December 31, | 2001 | 2000 | 1999 |
|---|---|---|---|
| Revenues | 9,201 | 9,202 | 9,189 |
| Operating expenses: | | | |
| Compensation and benefits | 2,850 | 2,729 | 2,770 |
| Purchased services | 1,084 | 1,023 | 1,051 |
| Depreciation and amortization | 908 | 894 | 896 |
| Equipment rents | 740 | 742 | 752 |
| Fuel | 973 | 932 | 700 |
| Materials and other | 897 | 777 | 818 |
| Total operating expenses | 7,452 | 7,097 | 6,987 |
| Operating income | 1,749 | 2,105 | 2,202 |
| Interest expense | 170 | 184 | 184 |
| Interest income, related parties | (21) | (20) | (5) |
| Other expense (income), net | 50 | 5 | (42) |
| Income before income taxes | 1,550 | 1,936 | 2,065 |
| Income tax expense | 598 | 737 | 761 |
| Net income | $ 952 | $ 1,199 | $ 1,304 |

See accompanying Notes to Consolidated Financial Statements.



<PAGE>

THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES

CONSOLIDATED BALANCE SHEETS

(Dollars in millions, shares in thousands)

| December 31, | 2001 | 2000 |
|---|---|---|
| ASSETS | | |
| Current assets: | | |
| Cash and cash equivalents | $ 78 | $ 123 |
| Accounts receivable, net | 227 | 353 |
| Materials and supplies | 191 | 220 |
| Current portion of deferred income taxes | 306 | 299 |
| Other current assets | 21 | 125 |
| Total current assets | 823 | 1,120 |
| Property and equipment, net | 23,056 | 22,287 |
| Other assets | 853 | 1,008 |
| Intercompany notes receivable, net | 708 | 525 |
| Total assets | $ 25,440 | $ 24,940 |
| LIABILITIES AND STOCKHOLDER'S EQUITY | | |
| Current liabilities: | | |
| Accounts payable and other current liabilities | $ 1,857 | $ 1,954 |
| Long-term debt due within one year | 288 | 232 |
| Total current liabilities | 2,145 | 2,186 |
| Long-term debt | 2,076 | 2,408 |
| Deferred income taxes | 6,723 | 6,398 |
| Casualty and environmental liabilities | 423 | 430 |
| Employee merger and separation costs | 216 | 262 |
| Other liabilities | 1,032 | 1,025 |
| Total liabilities | 12,615 | 12,709 |
| Commitments and contingencies (see Notes 3, 9 and 11) | | |
| Stockholder's equity: | | |
| Common stock, $1 par value, (1,000 shares authorized, issued and outstanding) and paid-in capital | 6,286 | 6,286 |

| | | |
|---|---|---|
| Retained earnings | 6,549 | 5,955 |
| Accumulated other comprehensive loss | (10) | (10) |
| Total stockholder's equity | 12,825 | 12,231 |
| Total liabilities and stockholder's equity | $ 25,440 | $ 24,940 |

See accompanying Notes to Consolidated Financial Statements.



<PAGE>

THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF CASH FLOWS

(Dollars in millions)

<TABLE>
<CAPTION>

| Year Ended December 31, | 2001 | 2000 | 1999 |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| OPERATING ACTIVITIES | | | |
| Net income | $ 952 | 1,199 | 1,304 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation and amortization | 908 | 894 | 896 |
| Deferred income taxes | 318 | 362 | 438 |
| Employee merger and separation costs paid | (55) | (58) | (93) |
| Other, net | 50 | 20 | (128) |
| Changes in current assets and liabilities: | | | |
| Accounts receivable | 126 | 41 | 196 |
| Materials and supplies | 29 | 35 | (11) |
| Other current assets | 103 | (62) | (30) |
| Accounts payable and other current liabilities | (97) | (94) | 286 |
| Net cash provided by operating activities | 2,334 | 2,337 | 2,858 |

| | | | |
|---|---|---|---|
| INVESTING ACTIVITIES | | | |
| Capital expenditures | (1,459) | (1,399) | (1,786) |
| Other, net | (106) | (265) | (152) |
| Net cash used for investing activities | (1,565) | (1,664) | (1,938) |
| FINANCING ACTIVITIES | | | |
| Proceeds from issuance of long-term debt | -- | 50 | 279 |
| Payments on long-term debt | (277) | (160) | (293) |
| Net change in intercompany notes receivable and payable | (183) | (373) | (860) |
| Dividends paid | (358) | (150) | -- |
| Other, net | 4 | 1 | (61) |
| Net cash used in financing activities | (814) | (632) | (935) |
| (Decrease) increase in cash and cash equivalents | (45) | 41 | (15) |
| Cash and cash equivalents: | | | |
| Beginning of year | 123 | 82 | 97 |
| End of year | $ 78 | $ 123 | $ 82 |
| SUPPLEMENTAL CASH FLOW INFORMATION | | | |
| Interest paid, net of amounts capitalized | $ 212 | $ 197 | $ 195 |
| Income taxes paid, net of refunds | $ 278 | $ 448 | $ 183 |

</TABLE>

See accompanying Notes to Consolidated Financial Statements.



<PAGE>

THE BURLINGTON NORTHERN AND SANTA FE CORPORATION AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDER'S EQUITY

(Dollars in millions)

<TABLE>
<CAPTION>
------------------------------------------------------------------------------------------------------
Common Accumulated
Stock
and Other Total
Paid-in
Retained Comprehensive Stockholder's
Capital Earnings
Income (Loss) Equity
-------------------------------------------- ---------
--------- ------------- -------------
<S> <C>
<C> <C> <C>
Balance at December 31, 1998 $ 6,286 $ 3,601
$ (8) $ 9,879

Comprehensive income:
Net income --
1,304 -- 1,304
Minimum pension liability
adjustment, net of tax
expense of $0.5 --
-- 1 1
---------
--------- ------------- -------------
Total comprehensive income --
1,304 1 1,305
---------
--------- ------------- -------------
Other --
1 -- 1
-------------------------------------------- ---------
--------- ------------- -------------
Balance at December 31, 1999 $ 6,286 $ 4,906
$ (7) $ 11,185

Comprehensive income:
Net income --
1,199 -- 1,199
Minimum pension liability

```
    adjustment, net of tax
    benefit of $1.5                                        --
 --               (3)               (3)
                                                    ---------
 ---------    ------------    ------------
      Total comprehensive income                           --
 1,199                (3)           1,196
                                                    ---------
 ---------    ------------    ------------
 Dividends paid                                            --
 (150)               --             (150)
 ----------------------------------------   ---------
 ---------    ------------    ------------
 Balance at December 31, 2000                       $   6,286   $   5,955
 $         (10)   $      12,231

 Comprehensive income:
   Net income
 952                 --             952
   Cumulative effect of adoption of
     SFAS No. 133, net of tax expense
     of
 $35
 56               56
   Gain on derivative instruments,
     included in net income, net of tax
     expense of
 $18
 (30)             (30)
   Change in fair value of derivative
     instruments, net of tax benefit of
 $17                                       (28)             (28)
   Minimum pension liability adjustment,
     net of tax expense of
 $1.3                                                         2                2
                                                    ---------
 ---------    ------------    ------------
     Total comprehensive income                            --
 952                 --             952
                                                    ---------
 ---------    ------------    ------------
```

| | | | | |
|---|---|---|---|---|
| Dividends paid | -- | -- | -- | (358) | (358) |
| Balance at December 31, 2001 | $ 6,286 | $ 6,549 | $ (10) | $ 12,825 |

</TABLE>

See accompanying Notes to Consolidated Financial Statements.



<PAGE>

THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

1. THE COMPANY

The Burlington Northern Santa Fe Railway Company and its majority-owned subsidiaries (collectively, BNSF Railway or Company) are a wholly-owned subsidiary of Burlington Northern Santa Fe Corporation (BSNF). BNSF Railway operates one of the largest railroad networks in North America with approximately 33,000 route miles covering 28 states and two Canadian provinces. Through one operating transportation services segment, BNSF Railway transports a wide range of products and commodities including the transportation of Consumer and Industrial Products, Coal, and Agricultural Products, derived from manufacturing, agricultural, and natural resource industries, which constituted 37 percent, 23 percent, 23 percent and 17 percent, respectively, of total revenues for the year ended December 31, 2001.

BNSF Railway was formerly known as the Burlington Northern Railroad Company (BNRR). On December 31, 1996, The Atchison, Topeka and Santa Fe Railway Company (ATSF) merged with and into Burlington Northern Railroad Company (BNRR) and the name of the surviving entity, BNRR, was changed to the Burlington Northern and Santa Fe Railway Company. Additionally, on January 2, 1998, BNSF Railway's parent, Santa Fe Pacific Corporation (SFP), merged with and into BNSF Railway.

2. ACCOUNTING POLICIES

Principles of Consolidation

The consolidated financial statements include the accounts of BNSF Railway. All significant intercompany accounts and transactions have been eliminated.

In December 2001, a wholly-owned subsidiary of BNSF, Burlington Northern Santa Fe British Columbia, Ltd. (BNSF BC) was transferred to BNSF Railway. For accounting purposes, the transfer of BNSF BC to BNSF Railway was treated as a combination of subsidiaries for the periods BNSF Railway and BNSF BC were under common control (see Note 13). Accordingly, the consolidated balance sheets at December 31, 2001 and 2000, and the consolidated statements of income, cash flows and changes in stockholder's equity for the years ended December 31, 2001, 2000 and 1999, have been adjusted to include the results of BNSF BC. As a result, the amounts reported in the consolidated financial statements of BNSF Railway will differ from amounts reported in BNSF Railway's Form 10-K for the year ended December 31, 2000, and Forms 10-Q for the quarters ended March 31, June 30 and September 30, 2001.

USE OF ESTIMATES

The preparation of financial statements in accordance with generally accepted accounting principles (GAAP) requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the periods presented. Actual results could differ from those estimates.

REVENUE RECOGNITION

Transportation revenues are recognized based upon the proportion of service provided as of the balance sheet date. Revenues from ancillary services are recognized when performed.

CASH AND CASH EQUIVALENTS

All short-term investments with original maturities of less than 90 days are considered cash equivalents. Cash equivalents are stated at cost, which approximates market value because of the short maturity of these instruments.

<PAGE>

MATERIALS AND SUPPLIES

Materials and supplies, which consist mainly of rail, ties and other items for construction and maintenance of property and equipment, as well as diesel fuel, are valued at the lower of average cost or market.

PROPERTY AND EQUIPMENT, NET

Property and equipment are depreciated and amortized on a straight-line basis over their estimated useful lives. Upon normal sale or retirement of depreciable railroad property, cost less net salvage value is charged to accumulated depreciation and no gain or loss is recognized. Significant premature retirements and the disposal of land and non-rail property are recorded as gains or losses at the time of their occurrence.

The Company self-constructs portions of its track structure and rebuilds certain classes of rolling stock. In addition to direct labor and material, certain indirect costs are capitalized. Expenditures which significantly increase asset values or extend useful lives are capitalized. Repair and maintenance expenditures are charged to operating expense when the work is performed. Property and equipment are stated at cost.

The Company incurs certain direct labor, contract service and other costs associated with the development and installation of internal-use computer software. Costs for newly developed software or significant enhancements to existing software are typically capitalized. Research, preliminary project, operations, maintenance and training costs are charged to operating expense when the work is performed.

Long-lived assets are reviewed for impairment when events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. If impairment indicators are present and the estimated future undiscounted cash flows are less than the carrying value of the long-lived assets, the carrying value is reduced to the estimated fair value as measured by the discounted cash flows.

PERSONAL INJURY CLAIMS

Personal injury liabilities are estimated on an actuarial basis. Incurred but not reported liabilities are included in the estimates based on historical experience. Estimates for these liabilities are not discounted.

RECLASSIFICATIONS

Certain comparative prior year amounts in the consolidated financial statements and accompanying notes have been reclassified to conform to the current year presentation. These reclassifications had no effect on previously reported operating income and net income.

3. HEDGING ACTIVITIES

On January 1, 2001, BNSF Railway adopted Statement of Financial Accounting Standards (SFAS) No. 133, Accounting for Derivative Instruments and Hedging Activities, and recorded a cumulative transition benefit of $56 million, net of tax, to Accumulated Other Comprehensive Income (AOCI). The standard requires that all derivatives be recorded on the balance sheet at fair value and establishes criteria for documentation and measurement of hedging activities.

The Company currently uses derivatives to hedge against increases in diesel fuel prices and interest rates as well as to convert a portion of its fixed-rate long-term debt to floating-rate debt. The Company formally documents the relationship between the hedging instrument and the hedged item, as well as the risk management objective and strategy for the use of the hedging instrument. This documentation includes linking the derivatives that are designated as fair value or cash flow hedges to specific assets or liabilities on the balance sheet, commitments or forecasted transactions. The Company assesses at the time a derivative contract is entered into, and at least quarterly, whether the derivative item is effective in offsetting the changes in fair value or cash flows. Any change in fair value resulting from ineffectiveness, as defined by SFAS No. 133, is recognized in current period earnings. For derivative instruments that are designated and qualify as cash flow hedges, the effective portion of the gain or loss on the derivative instrument is recorded in AOCI as a separate



<PAGE>

component of Stockholder's Equity and reclassified into earnings in the period during which the hedge transaction affects earnings.

BNSF Railway monitors its hedging positions and credit ratings of its counterparties and does not anticipate losses due to counterparty nonperformance.

FUEL

Fuel costs represented 13 percent of total operating expenses during 2001 and 2000. Due to the significance of diesel fuel expenses to the operations of BNSF Railway and the historical volatility of fuel prices, the Company maintains a program to hedge against fluctuations in the price of its diesel fuel purchases. The intent of the program is to protect the Company's operating margins and overall profitability from adverse fuel price changes by entering into fuel-hedge instruments based on management's evaluation of current and expected diesel fuel price trends. However, to the extent the Company hedges portions of its fuel purchases, it may not realize the impact of decreases in fuel prices. Conversely, to the extent the Company does not hedge portions of its fuel purchases, it may be adversely affected by increases in fuel prices. Based on annualized fuel consumption during 2001 and excluding the impact of the hedging program, each one-cent increase in the price of fuel would result in approximately $12 million of additional fuel expense on an annual basis.

The fuel-hedging program includes the use of derivatives that are accounted for as cash flow hedges. As of December 31, 2001, BNSF Railway had entered into fuel swap agreements utilizing Gulf Coast #2 heating oil to hedge the equivalent of approximately 296 million gallons of diesel fuel at an average price of approximately 57 cents per gallon. Additionally, as of December 31, 2001, BNSF Railway had entered into costless collar agreements effective through 2002 for the equivalent of approximately 50 million gallons of diesel fuel at an average call price of approximately 65 cents per gallon and an average put price of approximately 57 cents per gallon. The above prices do not include taxes, transportation costs, certain other fuel handling costs, and any differences which may occur from time to time between the prices of commodities hedged and the purchase price of BNSF Railway's diesel fuel. At December 31, 2001, BNSF Railway's fuel-hedging program covered an average of 31 percent of estimated fuel purchases for 2002. Hedge positions are closely monitored to ensure that they will not exceed actual fuel requirements in any period.

As a result of adopting SFAS No. 133, the Company recorded a cumulative transition benefit of $56 million, net of tax, to AOCI related to deferred gains

on transactions as of January 1, 2001. Subsequent changes in fair value for the effective portion of derivatives qualifying as hedges are recognized in Other Comprehensive Income (OCI) until the purchase of the related hedged item is recognized in earnings, at which time changes in fair value previously recorded in OCI are reclassified to earnings and recognized in fuel expense. During 2001, the Company recognized a loss of approximately $100 thousand related to the ineffective portion of derivatives in fuel expense. At December 31, 2001, AOCI includes a pretax loss of $4 million, all of which relates to derivative transactions that will expire throughout 2002. Settled fuel hedging contracts are a $3 million payable and a $50 million receivable at December 31, 2001 and 2000, respectively, and are recorded in working capital.

BNSF Railway measures the fair value of fuel swaps from daily forward price data provided by various external counterparties. To value a fuel swap, the Company uses a 3-month average of forward Gulf Coast #2 heating oil prices for the period hedged. The fair value of fuel costless collars is calculated and provided by the corresponding counterparty.

INTEREST RATE

The Company also enters interest rate swaps to convert fixed-rate debt to floating-rate debt. These swaps are accounted for as fair value hedges under SFAS 133. These fair value hedges qualify for the short cut method of recognition and, therefore, no portion of these swaps is treated as ineffective.

In December 2001, BNSF Railway entered into an interest rate swap to convert $100 million of fixed-rate debt to floating-rate debt. The floating rate to be paid by BNSF Railway as of December 31, 2001, on the swap was 6.18 percent and the fixed rate BNSF Railway is to receive is 8.63 percent. The floating rate fluctuates quarterly based on LIBOR. The swap expires in 2004. The fair market value of this swap at December 31, 2001, was insignificant.



<PAGE>

BNSF Railway's measurement of the fair value of the interest rate swap is based on estimates of the mid-market values for the transaction provided by the counterparties to this agreement.

4. OTHER EXPENSE (INCOME), NET

Other expense (income), net includes the following (in millions):

| Year Ended December 31, | 2001 | 2000 | 1999 |
|---|---|---|---|
| Gain on property dispositions | $(20) | $(29) | $(26) |
| Write-down of non-rail investments | 47 | -- | -- |
| Deferred gain on prior period line sale | -- | -- | (50) |
| Accounts receivable sale fees | 30 | 40 | 33 |
| Miscellaneous, net | (7) | (6) | 1 |
| Total | $ 50 | $ 5 | $(42) |

Losses recognized in 2001 related to non-rail investments consisted primarily of Pathnet Telecommunications, Inc., a telecommunications venture; a decline in the cash surrender value of company owned life insurance policies; and a portfolio of other non-core real-estate investments.

BNSF Railway recognized a $50 million deferred gain in the third quarter of 1999 in connection with the sale of rail lines in southern California in 1992 and 1993 that was partially offset by $13 million of costs related to those sales.

5. INCOME TAXES

Income tax expense was as follows (in millions):

| Year Ended December 31, | 2001 | 2000 | 1999 |
|---|---|---|---|
| Current: | | | |
| Federal | $250 | $332 | $296 |
| State | 30 | 43 | 27 |
| Total current | 280 | 375 | 323 |
| Deferred: | | | |
| Federal | 274 | 308 | 379 |
| State | 44 | 54 | 59 |
| Total deferred | 318 | 362 | 438 |

| | | | |
|---|---|---|---|
| Total | $598 | $737 | $761 |

Reconciliation of the federal statutory income tax rate to the effective tax rate was as follows:

| Year Ended December 31, | 2001 | 2000 | 1999 |
|---|---|---|---|
| Federal statutory income tax rate | 35.0% | 35.0% | 35.0% |
| State income taxes, net of federal tax benefit | 3.1 | 3.5 | 2.9 |
| Other, net | 0.5 | (0.4) | (1.0) |
| Effective tax rate | 38.6% | 38.1% | 36.9% |



<PAGE>

The components of deferred tax assets and liabilities were as follows (in millions):

| December 31, | 2001 | 2000 |
|---|---|---|
| Deferred tax liabilities: | | |
| Depreciation and amortization | $(6,671) | $(6,382) |
| Other | (422) | (440) |
| Total deferred tax liabilities | (7,093) | (6,822) |
| Deferred tax assets: | | |
| Casualty and environmental | 274 | 273 |
| Employee merger and separation costs | 105 | 119 |
| Post-retirement benefits | 99 | 95 |
| Other | 198 | 236 |
| Total deferred tax assets | 676 | 723 |
| Net deferred tax liability | $(6,417) | $(6,099) |

| | | |
|---|---|---|
| Noncurrent deferred income tax liability | $(6,723) | $(6,398) |
| Current deferred income tax asset | 306 | 299 |
| Net deferred tax liability | $(6,417) | $(6,099) |

In accordance with the income tax allocation agreement between BNSF and BNSF Railway, the Company makes payments to or receives refunds from BNSF based on its separate consolidated tax liabilities. The federal income tax returns of BNSF's predecessor companies, Burlington Northern, Inc. (BNI) and Santa Fe Pacific Corporation (SFP) have been examined through 1994 and the merger date in September 1995, respectively. All years prior to 1992 for BNI and 1993 for SFP are closed. Issues relating to the years 1992 through 1994 for BNI and for the years 1993 through the merger date in September 1995 for SFP are being contested through various stages of administrative appeal. BNSF is currently under Internal Revenue Service examination for years 1995 through 1999. In addition, BNSF and its subsidiaries have various state income tax returns in the process of examination, administrative appeal or litigation. Management believes that adequate provision has been made for any adjustment that might be assessed for open years through 2001.

6. ACCOUNTS RECEIVABLE, NET

BNSF Railway maintains an allowance for uncollectible accounts receivable. At December 31, 2001 and 2000, $65 million and $49 million, respectively, of such allowances had been recorded.

BNSF Railway, through a special purpose subsidiary, sells variable rate certificates that mature in 2002 under its accounts receivable sales program (A/R sales program). The certificates evidence undivided interests in an accounts receivable master trust. The master trust's assets include an ownership interest in a revolving portfolio of BNSF Railway's accounts receivable that are used to support the certificates. In 2001, BNSF Railway increased capacity to sell variable rate certificates under the A/R sales program by $100 million to $700 million.

Certificates outstanding under the A/R sales program were $625 million and $600 million at December 31, 2001 and 2000, respectively, which provided $25 million of cash for 2001. These certificates were supported by $844 million of receivables at December 31, 2001, and $882 million of receivables at December 31, 2000. When BNSF Railway sells these receivables to the master trust, it

Case 1:07-mc-00489-BAH Document 1229-7 Filed 11/22/24 Page 2217 of 3766

retains an undivided interest in the receivables sold. Due to a relatively short collection cycle, the fair value of this undivided interest is calculated as the gross amount of receivables less an allowance for uncollectable accounts. At December 31, 2001 and 2000, BNSF Railway's retained interest in these receivables totaled $219 million and $282 million, respectively, less the normal allowances for uncollectable accounts. The retained interest in 2001 and 2000 reflects the total receivables sold less $625 million and $600 million, respectively, of receivables derecognized in connection with the sale of the certificates. The investors in the master trust have no recourse to BNSF Railway's other assets.

BNSF Railway has retained the collection responsibility with respect to the accounts receivable. The costs of the sales of receivables to the master trust vary monthly relative to certain interest rates. These costs are included in Other Expense



<PAGE>

(Income), Net. The costs of these sales in 2001 and 2000 were $30 million and $40 million, respectively. These costs were based on weighted average interest rates of 4.8 percent in 2001 and 6.7 percent in 2000. Proceeds from collections reinvested in the A/R sales program were approximately $10 billion in both 2001 and 2000.

BNSF Railway's A/R sales program includes a provision that allows the institutions participating in this program, at their option, to cancel the program if BNSF Railway's senior unsecured credit rating falls below investment grade. Upon cancellation, BNSF Railway would not be able to sell additional receivables under this program. If such event were to occur, BNSF would have sufficient liquidity remaining under its revolving credit agreements to fund the full amount of securities outstanding under the A/R sales program at December 31, 2001. BNSF Railway is not aware of any pending significant adverse changes to its credit ratings that would cause it to fall below investment grade.

7. PROPERTY AND EQUIPMENT, NET

Property and equipment, net (in millions), and the weighted average annual depreciation rate (%) were as follows:

| December 31, | 2001 | 2000 | 2001 Depreciation Rate |
|---|---|---|---|
| Land | $ 1,416 | $ 1,406 | --% |
| Track structure | 12,434 | 11,879 | 3.9 |
| Other roadway | 9,407 | 9,117 | 2.5 |
| Locomotives | 2,759 | 2,799 | 5.7 |
| Freight cars and other equipment | 1,719 | 1,821 | 5.0 |
| Computer hardware and software | 266 | 331 | 16.2 |
| Total cost | 28,001 | 27,353 | |
| Less accumulated depreciation and amortization | (4,945) | (5,066) | |
| Property and equipment, net | $ 23,056 | $ 22,287 | |

The consolidated balance sheets at December 31, 2001 and 2000, included $1,202 million and $1,195 million, respectively, for property and equipment under capital leases.

8. ACCOUNTS PAYABLE AND OTHER CURRENT LIABILITIES

Accounts payable and other current liabilities consisted of the following (in millions):

| December 31, | 2001 | 2000 |
|---|---|---|
| Compensation and benefits payable | $ 353 | $ 351 |
| Casualty and environmental liabilities | 237 | 229 |
| Tax liabilities | 293 | 268 |
| Rents and leases | 166 | 142 |
| Accounts payable | 155 | 226 |
| Contract allowances | 127 | 109 |
| Accrued interest | 47 | 30 |
| Employee merger and separation costs | 58 | 49 |
| Other | 421 | 550 |
| Total | $1,857 | $1,954 |

<PAGE>

9. DEBT

Debt outstanding was as follows (in millions):

| December 31, | 2001 | 2000 |
|---|---|---|
| Equipment and other obligations, weighted average rate of 7.3 percent, due 2002 to 2016 | $ 677 | $ 742 |
| Capitalized lease obligations, weighted average rate of 6.6 percent, due 2002 to 2016 | 672 | 736 |
| Notes and debentures, weighted average rate of 7.5 percent, due 2002 to 2023 | 616 | 718 |
| Mortgage bonds, weighted average rate of 7.9 percent, due 2002 to 2047 | 425 | 467 |
| Unamortized discount and other, net | (26) | (23) |
| Total | 2,364 | 2,640 |
| Less current portion of long-term debt | (288) | (232) |
| Long-term debt | $ 2,076 | $ 2,408 |

Aggregate long-term debt scheduled maturities are $288 million, $144 million, $244 million, $144 million and $430 million for 2002 through 2006, respectively.

Certain BNSF Railway properties and other assets are subject to liens securing $425 million of mortgage debt. Certain locomotives and rolling stock of BNSF Railway are subject to equipment obligations and capital leases. During 2000, BNSF Railway issued $50 million of privately placed debt collateralized by locomotives that were acquired in 1999. This debt carries an interest rate of 7.77 percent and has annual maturities through 2015.

In December 2001, BNSF Railway entered into an interest rate swap to convert $100 million of fixed-rate debt to floating-rate debt. The floating rate to be paid by BNSF Railway as of December 31, 2001, on the swap was 6.18 percent, and the fixed rate BNSF Railway is to receive is 8.63 percent. The floating rate fluctuates quarterly based on LIBOR. The swap expires in 2004.

The carrying amounts of BNSF Railway's long-term debt at December 31, 2001 and 2000, were $2,364 million and $2,640 million, respectively, while the estimated fair values at December 31, 2001 and 2000, were $2,460 million and $2,661 million, respectively. The fair value of BNSF Railway's long-term debt is primarily based on quoted market prices for the same or similar issues, or on the current rates that would be offered to BNSF Railway for debt of the same remaining maturities.

Santa Fe Pacific Pipelines, Inc. an indirect wholly-owned subsidiary of BNSF Railway, in connection with its remaining 0.5 percent special limited partner interest in SFPP, L.P., is contingently liable for $190 million of certain Kinder Morgan Energy Partners, L.P. debt.

BNSF Railway and another major railroad jointly and severally guarantee $75 million of debt of KCT Intermodal Transportation Corporation, the proceeds of which were being used to finance the construction of a double track grade separation bridge in Kansas City, Missouri, operated and used by Kansas City Terminal Railway Company (KCTRC). BNSF Railway has a 25 percent ownership in KCTRC and accounts for its interest using the equity method of accounting.

During 2001, the Company entered into agreements to form a partnership (the Partnership) with subsidiaries of three chemical manufacturing companies that ship their products on its railroad network. The purpose of this Partnership is to construct and operate a 13-mile railroad which will service several chemical and plastics manufacturing facilities in the Houston, Texas, area. BNSF Railway

owns a 48 percent limited partnership interest and a one percent general partnership interest in the Partnership and will act as the general partner and operator of this facility. The Company has agreed to guarantee debt incurred by the partnership, which is expected to be approximately $85 million in connection with the construction of this line, and will provide up to $15 million of interim financing during the construction period. As of December 31, 2001, BNSF Railway had no guarantees outstanding under this agreement and had advanced approximately $6 million to the Partnership under the interim financing arrangement.

In addition, BNSF Railway guarantees $14 million of other debt and leases related to various facilities.

BNSF Railway does not expect to perform under these guarantees in the foreseeable future.



<PAGE>

10. EMPLOYEE MERGER AND SEPARATION COSTS

Employee merger and separation costs activity was as follows (in millions):

| | 2001 | 2000 | 1999 |
|---|---|---|---|
| Beginning balance at January 1, | $ 310 | $ 356 | $ 474 |
| Accruals | 30 | 22 | 29 |
| Payments | (55) | (58) | (93) |
| Other | (11) | (10) | (54) |
| Ending balance at December 31, | $ 274 | $ 310 | $ 356 |

Employee merger and separation liabilities of $274 million and $310 million are included in the consolidated balance sheets at December 31, 2001 and 2000, respectively, and principally represent: (i) employee-related severance costs for the consolidation of clerical functions, material handlers in mechanical shops and trainmen on reserve boards; (ii) deferred benefits payable upon separation or retirement to certain active conductors, trainmen and locomotive engineers; and (iii) certain non-union employee severance costs. Employee merger

and separation expenses are recorded in Materials and Other in the consolidated income statements. At December 31, 2001, $58 million of the remaining liabilities are included in current liabilities for anticipated costs to be paid in 2002.

During the fourth quarter of 2001, the Company recorded a $66 million charge including $61 million for workforce reduction related costs. Of the $61 million, $30 million was recorded in Employee Merger and Separation Costs and $31 million was recorded for benefits to be received under the Company's retirement and medical plans.

Consolidation of Clerical Functions

Liabilities related to the consolidation of clerical functions were $69 million and $96 million at December 31, 2001 and 2000, respectively, and primarily provide for severance costs associated with the clerical consolidation plan adopted in 1995 upon consummation of the business combination of BNSF's predecessor companies Burlington Northern Inc. and Santa Fe Pacific Corporation (the Merger). The consolidation plan resulted in the elimination of approximately 1,500 permanent positions and was substantially completed during 1999.

In 2001, 2000 and 1999, the Company recorded $6 million, $10 million and $54 million, respectively, of reversals for certain liabilities associated with the consolidation plan. These liabilities related to planned workforce reductions that are no longer required due to the Company's ability to place certain identified employees in alternate positions. The remaining liability balance at December 31, 2001, represents benefits to be paid to affected employees who did not receive lump-sum payments, but instead will be paid over five to ten years or in some cases through retirement.

In the fourth quarter of 2001, the Company recorded a charge of $9 million of costs related to the reduction of approximately 40 material handlers and other clerical positions. In the second quarter of 2000, the Company recorded a charge of $17 million for severance, medical and other benefit costs related to approximately 140 material handlers in mechanical shops. Liabilities remaining at December 31, 2001, related to this program reflect elections to receive payments over the next several years rather than lump-sum payments.

Conductors, Trainmen and Locomotive Engineers

Liabilities related to deferred benefits payable upon separation or retirement

to certain active conductors, trainmen and locomotive engineers were $170 million and $183 million at December 31, 2001 and 2000, respectively. These costs were primarily incurred in connection with labor agreements reached prior to the Merger which, among other things, reduced train crew sizes and allowed for more flexible work rules. In 2001, the Company recorded a $5 million reversal of certain deferred benefits payable to reflect a change in estimates.



<PAGE>

In the second quarter of 2000, the Company incurred $3 million of costs for severance, medical and other benefit costs for approximately 50 trainmen on reserve boards. The remaining reserve of less than $100 thousand at December 31, 2001, will be paid during the next year to severed employees who elected to receive their payments over time.

Non-Union Employee Severance

Liabilities principally related to certain remaining non-union employee severances resulting from the fourth quarter 2001 workforce reduction, the second quarter 1999 reorganization, and the Merger were $35 million and $30 million at December 31, 2001 and 2000, respectively. These costs will be paid over the next several years based on deferral elections made by the employees.

During the fourth quarter of 2001, the Company reduced 400 positions through severance, normal attrition and the elimination of contractors. The Company recorded $21 million of expense for severance, medical and other benefits associated with the costs of terminating 360 employees and approximately $31 million for benefits to be received under the Company's retirement and medical plans. Substantially all of these planned reductions were completed at December 31, 2001.

In the second quarter of 2000, the Company incurred $2 million of costs for severance, medical and other benefit costs for ten involuntarily terminated non-union positions. These planned reductions were completed at December 31, 2000.

In the second quarter of 1999, the Company incurred $45 million of reorganization costs for severance, pension, medical and other benefit costs for

approximately 325 involuntarily terminated non-union employees. Components of the costs include approximately $29 million relating to severance costs for non-union employees and approximately $16 million for benefits to be received under the Company's retirement and medical plans. Substantially all of the planned reductions were made by September 30, 1999.

11. COMMITMENTS AND CONTINGENCIES

LEASE COMMITMENTS

BNSF Railway has substantial lease commitments for locomotives, freight cars, trailers, office buildings and other property, and many of these leases provide the option to purchase the leased item at fair market value at the end of the lease. However, some provide fixed price purchase options. Future minimum lease payments (which reflect leases having non-cancelable lease terms in excess of one year) as of December 31, 2001, are summarized as follows (in millions):

<TABLE>
<CAPTION>

| December 31, | Capital Leases | Operating Leases |
|---|---|---|
| <S> | <C> | <C> |
| 2002 | $ 107 | $ 404 |
| 2003 | 107 | 394 |
| 2004 | 107 | 375 |
| 2005 | 103 | 344 |
| 2006 | 102 | 324 |
| Thereafter | 330 | 3,346 |
| Total | 856 | $5,187 |
| Less amount representing interest | (184) | |
| Present value of minimum lease payments | $ 672 | |

</TABLE>

Lease rental expense for all operating leases was $432 million, $424 million and $435 million for the years ended December 31, 2001, 2000 and 1999, respectively. Contingent rentals and sublease rentals were not significant.

<PAGE>

CASUALTY AND ENVIRONMENTAL

Personal injury claims, including work-related injuries to employees, are a significant expense for the railroad industry. Employees of BNSF Railway are compensated for work-related injuries according to the provisions of the Federal Employers' Liability Act (FELA). FELA's system of requiring the finding of fault, coupled with unscheduled awards and reliance on the jury system, contributed to significant increases in expense in past years. BNSF Railway has implemented a number of safety programs to reduce the number of personal injuries as well as the associated claims and personal injury expense. BNSF Railway made payments for personal injuries of approximately $173 million, $178 million and $179 million in 2001, 2000 and 1999, respectively. At December 31, 2001 and 2000, the Company had recorded liabilities of $458 million and $436 million, respectively, related to both asserted and unasserted personal injury claims.

The Company's operations, as well as those of its competitors, are subject to extensive federal, state and local environmental regulation. BNSF Railway's operating procedures include practices to protect the environment from the risks inherent in railroad operations, which frequently involve transporting chemicals and other hazardous materials. Additionally, many of BNSF Railway's land holdings are and have been used for industrial or transportation-related purposes or leased to commercial or industrial companies whose activities may have resulted in discharges onto the property. As a result, BNSF Railway is subject to environmental cleanup and enforcement actions. In particular, the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), also known as the Superfund law, as well as similar state laws generally impose joint and several liability for cleanup and enforcement costs on current and former owners and operators of a site without regard to fault or the legality of the original conduct. BNSF Railway has been notified that it is a potentially responsible party (PRP) for study and cleanup costs at approximately 30 Superfund sites for which investigation and remediation payments are or will be made or are yet to be determined (the Superfund sites) and, in many instances, is one of several PRPs. In addition, BNSF Railway may be considered a PRP under certain other laws. Accordingly, under CERCLA and other federal and state statutes, BNSF Railway may be held jointly and severally liable for all environmental costs associated with a particular site. If there

are other PRPs, BNSF Railway generally participates in the cleanup of these sites through cost-sharing agreements with terms that vary from site to site. Costs are typically allocated based on relative volumetric contribution of material, the amount of time the site was owned or operated, and/or the portion of the total site owned or operated by each PRP.

Environmental costs include initial site surveys and environmental studies of potentially contaminated sites as well as costs for remediation and restoration of sites determined to be contaminated. Liabilities for environmental cleanup costs are initially recorded when BNSF Railway's liability for environmental cleanup is both probable and a reasonable estimate of associated costs can be made. Adjustments to initial estimates are recorded as necessary based upon additional information developed in subsequent periods. BNSF Railway conducts an ongoing environmental contingency analysis, which considers a combination of factors including independent consulting reports, site visits, legal reviews, analysis of the likelihood of participation in and the ability of other PRPs to pay for cleanup, and historical trend analyses.

BNSF Railway is involved in a number of administrative and judicial proceedings and other mandatory cleanup efforts at approximately 390 sites, including the Superfund sites, at which it is participating in the study or cleanup, or both, of alleged environmental contamination. BNSF Railway paid approximately $72 million, $49 million and $67 million during 2001, 2000 and 1999, respectively, for mandatory and unasserted cleanup efforts, including amounts expended under federal and state voluntary cleanup programs. BNSF Railway has recorded liabilities for remediation and restoration of all known sites of $202 million at December 31, 2001, compared with $223 million at December 31, 2000. BNSF Railway anticipates that the majority of the accrued costs at December 31, 2001, will be paid over the next five years. No individual site is considered to be material.

Liabilities recorded for environmental costs represent BNSF Railway's best estimates for remediation and restoration of these sites and include both asserted and unasserted claims. Unasserted claims are not considered to be a material component of the liability. Although recorded liabilities include BNSF Railway's best estimates of all costs, without reduction for anticipated recoveries from third parties, BNSF Railway's total cleanup costs at these sites cannot be predicted with certainty due to various factors such as the extent of corrective actions that may be required, evolving environmental laws and regulations, advances in environmental technology, the extent of other parties' participation in cleanup efforts, developments in ongoing environmental analyses related to sites determined to be contaminated, and developments in

environmental surveys and studies of potentially contaminated sites. As a result, future charges to



<PAGE>

income for environmental liabilities could have a significant effect on results of operations in a particular quarter or fiscal year as individual site studies and remediation and restoration efforts proceed or as new sites arise. However, management believes it is unlikely any identified matters, either individually or in the aggregate, will have a material adverse effect on BNSF Railway's results of operations, financial position or liquidity.

OTHER COMMITMENTS

In the normal course of business, the Company enters into long-term contractual requirements for future goods and services needed for the operations of the business. Such commitments are not in excess of expected requirements and are not reasonably likely to result in performance penalties or payments that would have a material adverse affect on the Company's liquidity.

OTHER CLAIMS AND LITIGATION

BNSF Railway and its subsidiaries are parties to a number of legal actions and claims, various governmental proceedings and private civil suits arising in the ordinary course of business, including those related to environmental matters and personal injury claims. While the final outcome of these items cannot be predicted with certainty, considering among other things the meritorious legal defenses available, it is the opinion of management that none of these items, when finally resolved, will have a material adverse effect on the results of operations, financial position or liquidity of BNSF Railway; although, an adverse resolution of a number of these items could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

12. RETIREMENT PLANS AND OTHER POSTEMPLOYMENT BENEFIT PLANS

BNSF Railway is included with certain other BNSF Railway affiliates in the qualified BNSF Retirement Plan and the nonqualified BNSF Supplemental Retirement Plan.

BNSF sponsors two significant defined benefit pension plans: a funded, noncontributory qualified BNSF Retirement Plan, which covers substantially all non-union employees, and an unfunded, nonqualified BNSF Supplemental Retirement Plan, which covers certain officers and other employees. The benefits under BNSF's plans are based on years of credited service and the highest five-year average compensation levels. BNSF's funding policy is to contribute annually not less than the regulatory minimum and not more than the maximum amount deductible for income tax purposes.

Certain salaried employees of BNSF Railway that have met certain age and years of service requirements are eligible for medical benefits and life insurance coverage during retirement. The retiree medical plan is contributory and provides benefits to retirees, their covered dependents and beneficiaries. Retiree contributions are adjusted annually. The plan also contains fixed deductibles, coinsurance and out-of-pocket limitations. The life insurance plan is noncontributory and covers retirees only. BNSF Railway's policy is to fund benefits payable under the medical and life insurance plans as they come due. Employees beginning salaried employment with BNSF Railway subsequent to September 22, 1995, are not eligible for benefits under these plans.



<PAGE>

Components of the net benefit costs for these plans were as follows (in millions):

<TABLE>
<CAPTION>

| | Pension Benefits | | | Medical and Life Benefits | | |
|---|---|---|---|---|---|---|
| December 31, | 2001 | 2000 | 1999 | 2001 | 2000 | 1999 |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
| Service cost | $ 13 | $ 13 | $ 15 | $ 4 | $ | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | 4 | $ 5 |
| Interest cost | 102 | 100 | 100 | 18 | 18 | 17 |
| Expected return on plan assets | (136) | (129) | (126) | -- | -- | -- |
| Curtailments/settlements | 10 | -- | -- | 3 | -- | -- |
| Special termination benefits | 18 | -- | 10 | -- | -- | 6 |
| Actuarial loss | 1 | -- | -- | -- | -- | -- |
| Net amortization and deferred amounts | 2 | 3 | 3 | -- | 1 | 1 |
| Net cost (benefit) | $ 10 | $ (13) | $ 2 | $ 25 | $ 23 | $ 29 |

</TABLE>

The following tables show the change in benefit obligation and plan assets of the plans on a September 30 measurement date (in millions):

<TABLE>
<CAPTION>

| | Pension Benefits | | Medical and Life Benefits | |
|---|---|---|---|---|
| Change in Benefit Obligation | 2001 | 2000 | 2001 | 2000 |
| <S> | <C> | <C> | <C> | <C> |
| Benefit obligation at beginning of period | $ 1,419 | $ 1,387 | $ 247 | $ 244 |
| Service cost | 13 | 13 | 4 | 4 |
| Interest cost | 102 | 100 | 18 | 18 |
| Plan participants' contributions | -- | -- | 5 | 3 |
| Amendments | -- | -- | -- | (7) |
| Actuarial loss | 68 | 39 | 60 | 7 |
| Curtailments/settlements | 8 | -- | 3 | -- |
| Special termination benefits | 18 | -- | -- | -- |
| Benefits paid | (121) | (120) | (23) | (22) |

| | | | | |
|---|---|---|---|---|
| Benefit obligation at end of period | $ 1,507 | $ 1,419 | $ 314 | $ 247 |

</TABLE>

<TABLE>
<CAPTION>

| Change in Plan Assets | Pension Benefits 2001 | Pension Benefits 2000 | Medical and Life Benefits 2001 | Medical and Life Benefits 2000 |
|---|---|---|---|---|
| Fair value of plan assets at beginning of period | $ 1,577 | $ 1,530 | $ -- | $ -- |
| Actual return on plan assets | (115) | 162 | -- | -- |
| Employer contribution | 4 | 5 | 19 | 19 |
| Plan participants' contributions | -- | -- | 4 | 3 |
| Benefits paid | (121) | (120) | (23) | (22) |
| Fair value of plan assets at end of period | $ 1,345 | $ 1,577 | $ -- | $ -- |

</TABLE>



<PAGE>

The following tables show the reconciliation of the funded status of the plans

with amounts recorded in the consolidated balance sheets (in millions):

| December 31, | Pension Benefits 2001 | Pension Benefits 2000 | Medical and Life Benefits 2001 | Medical and Life Benefits 2000 |
|---|---|---|---|---|
| Funded status | $ (162) | $ 158 | $ (314) | $ (247) |
| Unrecognized net loss (gain) | 169 | (146) | 60 | (1) |
| Unrecognized prior service cost | (6) | (6) | (1) | (1) |
| Unamortized net transition obligation | 3 | 5 | -- | -- |
| Net amount recognized | $ 4 | $ 11 | $ (255) | $ (249) |

| December 31, | Pension Benefits 2001 | Pension Benefits 2000 | Medical and Life Benefits 2001 | Medical and Life Benefits 2000 |
|---|---|---|---|---|
| Amounts recognized in the consolidated balance sheets consist of: | | | | |
| Prepaid benefit cost | $ 42 | $ 45 | $ -- | $ -- |
| Accrued benefit liability | (50) | (50) | (255) | (249) |
| Accumulated other comprehensive loss | 12 | 16 | -- | -- |
| Net amount recognized | $ 4 | $ 11 | $ (255) | $ (249) |

The assumptions used in accounting for the BNSF plans were as follows:

<TABLE>
<CAPTION>

| Assumptions | Pension Benefits 2001 | Pension Benefits 2000 | Medical and Life Benefits 2001 | Medical and Life Benefits 2000 |
|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> |
| Discount rate | 7.0% | 7.5% | 7.0% | 7.5% |
| Rate of increase in compensation levels | 4.0% | 4.0% | -- | -- |

| | | | | |
|---|---|---|---|---|
| Expected return on plan assets | 9.5% | 9.5% | -- | -- |

</TABLE>

For purposes of the medical and life benefits calculations for 2001, the assumed health care cost trend rate for both managed care and non-managed care medical costs is 12 percent and is assumed to decrease 1 percent for each future year until the ultimate rate of 5 percent is reached in 2008 and remain constant thereafter. Increasing the assumed health care cost trend rates by 1 percentage point would increase the accumulated post-retirement benefit obligation by $26 million and the combined service and interest components of net post-retirement benefit cost recognized in 2001 by $2 million. Decreasing the assumed health care cost trend rates by 1 percentage point would decrease the accumulated post-retirement benefit obligation by $22 million and the combined service and interest components of net post-retirement benefit cost recognized in 2001 by $2 million.

OTHER PLANS

Under collective bargaining agreements, BNSF Railway participates in multi-employer benefit plans which provide certain post-retirement health care and life insurance benefits for eligible union employees. Insurance premiums paid attributable to retirees, which are generally expensed as incurred, were $18 million, $15 million and $14 million, in 2001, 2000 and 1999, respectively.



<PAGE>

DEFINED CONTRIBUTION PLANS

BNSF sponsors 401(k) thrift and profit sharing plans which cover substantially all non-union employees and certain union employees. BNSF matches 50 percent of the first 6 percent of non-union employees' contributions, which are subject to certain percentage limits of the employees' earnings, at each pay period. Depending on BNSF's performance, an additional matching contribution of up to 30 percent of the first 6 percent can be made at the end of the year. Employer contributions for all non-union employees are subject to a five-year length of service vesting schedule. BNSF's 401(k) matching expense was $14 million, $16 million and $18 million in 2001, 2000 and 1999, respectively.

13. RELATED PARTY TRANSACTIONS

BNSF Railway is involved with BNSF and certain of its subsidiaries in related party transactions in the ordinary course of business, which include payments made on each other's behalf and performance of services. Under the terms of a tax allocation agreement with BNSF, BNSF Railway made federal and state income tax payments, net of refunds, of $278 million, $448 million and $183 million during 2001, 2000 and 1999, respectively, which are reflected in changes in working capital in the consolidated statements of cash flows.

BNSF Railway had net intercompany receivable balances at December 31, 2001 and 2000, of $55 million and $39 million, respectively, which are reflected in accounts receivable in the consolidated balance sheets. Net intercompany receivable or payable balances are settled in the ordinary course of business.

At December 31, 2001 and 2000, BNSF Railway had $117 and $114 million, respectively, of intercompany notes payable to BNSF at a variable interest rate of 1.0 percent above the monthly average of the daily effective Federal Funds rate. During the first six months of 2000, BNSF Railway and BNSF agreed to offset $614 million of the variable rate notes payable against $614 million of variable rate notes receivable. During 2001, BNSF Railway also had additional net borrowings of $3 million of variable rate notes. Proceeds from borrowings are primarily used to fund capital expenditures and other investing activities. Interest is paid semi-annually on all intercompany notes payable. Interest expense on intercompany notes payable is reflected in Interest Income, Related Parties in the consolidated income statements. The intercompany notes are due on demand; however, it is not anticipated that BNSF Railway will be required to pay these obligations in the next twelve months.

At December 31, 2001 and 2000, BNSF Railway had $825 million and $639 million, respectively, of intercompany notes receivable from BNSF with a variable interest rate of 1.0 percent above the monthly average of the daily effective Federal Funds rate. The $186 million increase in intercompany notes receivable is primarily due to the additional borrowings of $791 million and $605 million of repayments from BNSF during 2001. Interest is collected semi-annually on all intercompany notes receivable. In the BNSF Railway consolidated balance sheets, the intercompany notes receivable are presented net of the intercompany notes payable discussed above. BNSF Railway had net intercompany notes receivable balances of $708 million and $525 million at December 31, 2001 and 2000, respectively.

The 2001 and 2000 balances include a $130 million receivable due SFP Pipelines Holdings, Inc., a subsidiary of BNSF Railway, from BNSF. Interest income from

intercompany notes receivable is presented in Interest Income, Related Parties in the consolidated income statements.

During 2001, BNSF BC was transferred into BNSF Railway. The primary asset as of the date of the transfer was a note receivable of $1,662 million from BNSF Railway including accrued interest. Due to the transfer of BNSF BC into BNSF Railway, this note and related interest is now eliminated on a consolidated BNSF Railway basis.

During 2001 and 2000, BNSF Railway paid dividends of $358 million and $150 million, respectively, to BNSF. BNSF Railway paid no dividends during 1999.

Under various plans, BNSF has granted options to employees to purchase its common stock at a price not less than the fair market value at the date of grant. Certain employees of BNSF Railway participate in these plans. In addition, BNSF had other long-term incentive plans administered separately on behalf of employees which are participated in by certain BNSF Railway employees. These plans include, among other things, incentive compensation, issuance of restricted stock and a discounted stock purchase program. Compensation expense is recorded for stock incentive plans in accordance with Accounting Principles Board Opinion 25 and was not material in 2001, 2000 or 1999.



<PAGE>

14. QUARTERLY FINANCIAL DATA - UNAUDITED

| (In millions) | Fourth | Third | Second | First |
|---|---|---|---|---|
| 2001 | | | | |
| Revenues | $2,300 | $2,341 | $2,269 | $2,291 |
| Operating income | $ 405 | $ 500 | $ 426 | $ 418 |
| Net income | $ 208 | $ 281 | $ 248 | $ 214 |
| | | | | |
| 2000 | | | | |
| Revenues | $2,338 | $2,342 | $2,260 | $2,262 |
| Operating income | $ 544 | $ 570 | $ 482 | $ 509 |

| | | | | |
|---|---|---|---|---|
| Net income | $ 307 | $ 330 | $ 275 | $ 287 |

The table above reflects the current presentation, which is different than previously reported on Form 10-Q (see Note 2).



<PAGE>

Item 9. Changes in and Disagreements With Accountants on Accounting and Financial Disclosure

None.



<PAGE>

PART IV

Item 14. Exhibits, Financial Statement Schedules, and Reports on Form 8-K

(a) The following documents are filed as a part of this report:

1. Consolidated Financial Statements - See Item 8

2. Consolidated Financial Statement :
   Schedule II - Valuation and Qualifying Accounts - See page F-1

Schedules other than that listed above are omitted because they are not required or applicable, or the required information is included in the consolidated financial statements or related notes.

3. Exhibits:
   See Index of Exhibits on page E-1 for a description of the exhibits filed as a part of this Report.

(b) Reports on Form 8-K
None.



<PAGE>

SIGNATURES

The Burlington Northern and Santa Fe Railway Company, pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

THE BURLINGTON NORTHERN AND
SANTA FE RAILWAY COMPANY

By: /s/ Matthew K. Rose
Matthew K. Rose
President and Chief Executive Officer

Dated: February 15, 2002

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of The Burlington Northern and Santa Fe Railway Company and in the capacities and on the date indicated.

| | |
|---|---|
| /s/ Matthew K. Rose<br>Matthew K. Rose | President and Chief Executive Officer<br>(Principal Executive Officer) and Director |
| /s/ Thomas N. Hund<br>Thomas N. Hund | Executive Vice President and Chief Financial Officer<br>(Principal Financial Officer) and Director |

/s/ Dennis R. Johnson Vice President and Controller
------------------------
Dennis R. Johnson (Principal Accounting Officer)

/s/ Carl R. Ice Director
------------------------
Carl R. Ice

/s/ Jeffrey R. Moreland Director
------------------------
Jeffrey R. Moreland

/s/ Charles S. Schultz Director
------------------------
Charles S. Schultz

Dated: February 15, 2002

S-1

<PAGE>

SCHEDULE II

THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES

VALUATION AND QUALIFYING ACCOUNTS

For the Years Ended December 31, 2001, 2000 and 1999
(in millions)

<TABLE>
<CAPTION>
---------------------------------------------- ------------
------------ ------------ ------------
Balance
at Additions Balance at
Beginning of

```
Charged to                            End of
                   Description                    Period
Income       Deductions       Period
----------------------------------------------  ------------
------------   ------------   ------------
                                                                                    (a)            (b)
<S>                                             <C>
<C>           <C>           <C>
December 31, 2001:
Personal injury and environmental liabilities   $        659   $
246   $        245   $        660

December 31, 2000:
Personal injury and environmental liabilities   $        678   $
208   $        227   $        659

December 31, 1999:
Personal injury and environmental liabilities   $        635   $
295   $        252   $        678
</TABLE>
```

Notes:

(a) Represents cash payments
(b) Classified in the consolidated balance sheets as follows:

| | 2001 | 2000 | 1999 |
|---|---|---|---|
| Accounts payable and other current liabilities | $237 | $229 | $255 |
| Casualty and environmental liabilities | 423 | 430 | 423 |
| | $660 | $659 | $678 |



<PAGE>

THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES

INDEX OF EXHIBITS

| Exhibit Number | Description |
|---|---|
| 3.1 | Restated Certificate of Incorporation of The Burlington Northern and Santa Fe Railway Company effective December 31, 1996. Incorporated by reference to The Burlington Northern and Santa Fe Railway Company's Report on Form 10-K for the fiscal year ended December 31, 1996. |
| 3.2 | By-Laws of BNSF as amended through July 17, 1991. Incorporated by reference to Exhibit 3.2 to The Burlington Northern Railroad Company's Report on Form 10-K for the fiscal year ended December 31, 1991. |
| 4.1 | BNSF Railway is not filing any instruments evidencing indebtedness because the total amount of securities authorized under any single such instrument does not exceed ten percent of BNSF Railway's total assets. Copies of any such material instruments will be furnished to the Securities and Exchange Commission upon request. |
| 12.1 | Statement regarding the Computation of Ratio of Earnings to Fixed Charges. |



</TEXT>
</DOCUMENT>

# EXHIBIT PX0713

Case 1:07-mc-00489-BAH Document 1229-7 Filed 11/22/24 Page 2241 of 3766
10-K 1 d10k.htm FORM 10-K

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

# FORM 10-K

x ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2002

OR

¨ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from to

Commission File Number: 1-6324

# THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY
**(Exact name of registrant as specified in its charter)**

| **Delaware** | **41-6034000** |
|---|---|
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |

**2650 Lou Menk Drive**
**Fort Worth, Texas 76131-2830**
**(Address of principal executive offices, including zip code)**

**(800) 795-2673**
**(Registrant's telephone number, including area code)**

**Securities registered pursuant to Section 12(b) of the Act:**

The securities listed below are registered on the New York Stock Exchange.

**Title of each class**

Burlington Northern, Inc.
(Now The Burlington Northern and Santa Fe Railway Company)
Consolidated Mortgage Bonds
9.25%, Series H, due 2006
6.55%, Series K, due 2020
3.80%, Series L, due 2020
3.20%, Series M, due 2045
8.15%, Series N, due 2020
6.55%, Series O, due 2020
8.15%, Series P, due 2020

Northern Pacific Railway Company

General Lien Railway and Land Grant 3% Bonds, due 2047

Great Northern Railway Company General Mortgage Bonds 2 5/8%, Series Q, due 2010

St. Louis-San Francisco Railway Company Income Debentures, 5%, Series A, due 2006

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirement for the past 90 days. Yes__ü__No____

Indicate the number of shares outstanding of each of the registrant's classes of common stock, as of the latest practicable date: 1,000 shares of Outstanding Common Stock, $1.00 par value, as of January 31, 2003.

*The Burlington Northern and Santa Fe Railway Company is a wholly-owned subsidiary of Burlington Northern Santa Fe Corporation (BNSF); as a result, there is no market data with respect to registrant's shares.

**DOCUMENTS INCORPORATED BY REFERENCE**

None

REGISTRANT MEETS THE CONDITIONS SET FORTH IN THE GENERAL INSTRUCTION (I)(1)(a) AND (b) OF FORM 10-K AND IS THEREFORE FILING THIS FORM WITH THE REDUCED DISCLOSURE FORMAT.

Table of Contents

## TABLE OF CONTENTS


| | | Page |
|---|---|---|
| | **PART I** | |
| Items 1 and 2. | Business and Properties | 1 |
| Item 3. | Legal Proceedings | 8 |
| | **PART II** | |
| Item 5. | Market for Registrant's Common Equity and Related Stockholder Matters | 10 |
| Item 7. | Management's Narrative Analysis of Results of Operations | 10 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 12 |
| Item 8. | Financial Statements and Supplementary Data | 16 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 38 |
| | **PART III** | |
| Item 14. | Controls and Procedures | 39 |
| | **PART IV** | |
| Item 15. | Exhibits, Financial Statement Schedules, and Reports on Form 8-K | 40 |
| Signatures | | S-1 |
| Certifications | | S-2 |
| Schedule II – Valuation and Qualifying Accounts | | F-1 |
| Exhibits | | E-1 |

Table of Contents

## PART I

### Items 1 and 2. Business and Properties

The Burlington Northern and Santa Fe Railway Company (BNSF Railway or Company), formerly known as the Burlington Northern Railroad Company (BNRR) was incorporated in the State of Delaware on January 13, 1961, and is a wholly-owned subsidiary of Burlington Northern Santa Fe Corporation (BNSF). On September 22, 1995, the stockholders of Burlington Northern Inc. (BNI) and Santa Fe Pacific Corporation (SFP) became the stockholders of BNSF pursuant to a business combination of the two companies. To effect the combination, BNSF was formed to act as the parent holding company of BNI and SFP. BNI and SFP each owned a large, Class I railroad: the BNRR and The Atchison, Topeka and Santa Fe Railway Company (ATSF), respectively.

On December 30, 1996, BNI merged with and into SFP. On December 31, 1996, The Atchison, Topeka and Santa Fe Railway Company (ATSF) merged with and into BNRR, and BNRR changed its name to The Burlington Northern and Santa Fe Railway Company. On January 2, 1998, BNSF Railway's parent, SFP, merged with and into BNSF Railway.

BNSF Railway operates one of the largest railroad systems in the United States. At December 31, 2002, BNSF Railway had approximately 36,000 employees.

BNSF Railway's Internet address is www.bnsf.com. Through this internet website (found in the "Investors" link) BNSF Railway makes available, free of charge, its Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, and Current Reports on Form 8-K, and all amendments to those reports, as soon as reasonably practicable after these reports are electronically filed with or furnished to the Securities and Exchange Commission.

### Track Configuration

As of December 31, 2002, BNSF Railway operates over a railroad system consisting of approximately 33,000 route miles of track (excluding second, third and fourth main tracks, yard tracks, and sidings), approximately 25,000 miles of which are owned route miles, including easements, through 28 states and two Canadian provinces. Approximately 8,000 route miles of BNSF Railway's system consist of trackage rights that permit BNSF Railway to operate its trains with its crews over another railroad's tracks. BNSF Railway operates over other trackage through lease or other contractual arrangements.

As of December 31, 2002, the total BNSF Railway system, including first, second, third and fourth main tracks, yard tracks, and sidings, consists of approximately 50,000 operated miles of track, all of which are owned by or held under easement by BNSF Railway except for approximately 8,000 route miles operated under trackage rights. At December 31, 2002, approximately 27,000 miles of BNSF Railway's track consists of 112-pound per yard or heavier rail, including approximately 19,000 track miles of 131-pound per yard or heavier rail.

Table of Contents

**Equipment Configuration**

BNSF Railway owned or had under non-cancelable leases exceeding one year the following units of railroad rolling stock as of the dates shown below:

| | At December 31, | | |
|---|---|---|---|
| | 2002 | 2001 | 2000 |
| Diesel Locomotives | 5,184 | 5,216 | 5,320 |
| Locomotives Under Power Purchase Agreements | — | 99 | 99 |
| Locomotive Auxiliary and Other Self Powered Units | 42 | 42 | 42 |
| Freight Cars: | | | |
| Box-general purpose | 559 | 581 | 625 |
| Box-specially equipped | 9,612 | 9,641 | 10,706 |
| Open Hopper | 10,848 | 11,094 | 11,622 |
| Covered Hopper | 37,609 | 38,007 | 40,951 |
| Gondola | 14,942 | 15,075 | 15,332 |
| Refrigerator | 5,588 | 5,554 | 5,900 |
| Autorack | 843 | 877 | 979 |
| Flat | 7,946 | 7,844 | 8,090 |
| Tank | 501 | 506 | 509 |
| Caboose | 291 | 315 | 333 |
| Other | 28 | 28 | 275 |
| Total Freight Cars | 88,767 | 89,522 | 95,322 |
| Domestic Containers | 8,197 | 8,259 | 7,845 |
| Trailers | 2,163 | 2,200 | 2,200 |
| Domestic Chassis | 8,180 | 8,205 | 9,721 |
| Company Service Cars | 4,035 | 4,132 | 4,175 |
| Commuter Passenger Cars | 160 | 160 | 160 |

The average age from date of manufacture of the locomotive fleet at December 31, 2002, was 15 years; the average age from date of manufacture or remanufacture of the freight car fleet at December 31, 2002, was 16 years. These averages are not weighted to reflect the greater capacities of the newer equipment.

**Capital Expenditures and Maintenance**

BNSF Railway cash capital expenditures for the periods indicated were as follows:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2002 | 2001 | 2000 |
| | (in millions) | | |

| | | | |
|---|---|---|---|
| Maintenance of way | | | |
| Rail | $ 193 | $ 233 | $ 210 |
| Ties | 222 | 254 | 206 |
| Surfacing | 161 | 146 | 134 |
| Other | 325 | 335 | 285 |
| Total maintenance of way | 901 | 968 | 835 |
| Mechanical | 168 | 183 | 221 |
| Information services | 79 | 69 | 66 |
| Other | 95 | 101 | 144 |
| Total maintenance of business | 1,243 | 1,321 | 1,266 |
| Terminal and line expansion | 103 | 126 | 99 |
| Capitalized interest and other | 12 | 12 | 34 |
| Total cash capital expenditures | $ 1,358 | $ 1,459 | $ 1,399 |

The above table does not include expenditures for equipment financed through operating leases (principally locomotives and rolling stock). BNSF Railway's planned 2003 cash capital expenditures approximate $1.4 billion. Approximately $1.2 billion of the total planned capital expenditures will be for maintenance of business activities, primarily consisting of expenditures to maintain BNSF Railway's track, signals, bridges and tunnels, as well as to overhaul locomotives and freight cars with the remainder to be spent on terminal and line expansions and other projects.

Table of Contents

As of December 31, 2002, General Electric Company and the Electro-Motive Division of General Motors Corporation performed locomotive maintenance and overhauls for BNSF Railway under various maintenance agreements that covered approximately 2,600 locomotives. These agreements require the work to be done at BNSF Railway's facilities using BNSF Railway employees. In addition, the Company entered into a locomotive maintenance contract with Alstom Transportation, Inc. (Alstom) in the fourth quarter of 2002. Alstom will begin performing maintenance on a portion of the Company's locomotives in 2003.

The majority of maintenance of way expenditures for track has been for rail and tie refurbishment and track resurfacing. The extent of the BNSF Railway track maintenance program is depicted in the following table:

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2002** | **2001** | **2000** |
| Track miles of rail laid [(a)] | 685 | 891 | 738 |
| Cross ties inserted (thousands) [(a)] | 2,248 | 2,704 | 2,527 |
| Track resurfaced (miles) | 12,499 | 11,011 | 11,228 |

(a) Includes expenditures for both maintenance of existing route system and expansion projects. These expenditures are primarily capitalized.

BNSF Railway's planned 2003 track maintenance of way program will result in the installation of approximately 700 track miles of rail, the replacement of about 2.2 million ties, and the resurfacing of approximately 11,000 miles of track.

**Property and Facilities**

BNSF Railway operates various facilities and equipment to support its transportation system, including its infrastructure and locomotives and freight cars as described above. It also owns or leases other equipment to support rail operations, including highway trailers, containers and vehicles. Support facilities for rail operations include yards and terminals throughout its rail network, system locomotive shops to perform locomotive servicing and maintenance, a centralized network operations center for train dispatching and network operations monitoring and management in Fort Worth, Texas, computers, telecommunications equipment, signal systems, and other support systems. Transfer facilities are maintained for rail-to-rail as well as intermodal transfer of containers, trailers and other freight traffic. These facilities include 36 major intermodal hubs located across the system and three intermodal hub centers off-line used in connection with haulage agreements with other railroads. BNSF Railway's largest intermodal facilities in terms of 2002 volume were:

| **Intermodal Facilities** | **Lifts** |
|---|---|
| Hobart Yard (California) | 1,086,000 |
| Corwith Yard (Illinois) | 713,000 |
| Willow Springs (Illinois) | 674,000 |
| Cicero (Illinois) | 455,000 |
| San Bernardino (California) | 450,000 |
| Alliance (Texas) | 438,000 |
| Argentine (Kansas) | 252,000 |

BNSF Railway owns 26 automotive distribution facilities where automobiles are loaded or unloaded from multi-level rail cars and serves eight port facilities in the United States and Canada.

BNSF Railway's largest freight car classification yards based on the average daily number of cars processed (excluding cars that do not change trains at the terminal and intermodal and coal cars) are shown below:

| **Classification Yard** | **Daily Average Cars Processed** |
|---|---|
| Argentine (Kansas) | 1,728 |
| Galesburg (Illinois) | 1,524 |
| Barstow (California) | 1,276 |
| Pasco (Washington) | 1,175 |
| Memphis (Tennessee) | 1,078 |

As of December 31, 2002, certain BNSF Railway properties and other assets are subject to liens securing $422 million of mortgage debt. Certain locomotives and rolling stock of BNSF Railway are subject to equipment obligations and leases, as referred to in Notes 9 and 10 to the Consolidated Financial Statements.

Table of Contents

**Employees and Labor Relations**

Productivity, as measured by thousand revenue ton miles per employee, has risen steadily in the last three years as shown in the table below.

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2002 | 2001 | 2000 |
| Thousand revenue ton miles divided by average number of employees | 13,117 | 12,796 | 12,342 |

Approximately 87 percent of BNSF Railway's employees are union-represented. BNSF Railway's union employees work under collective bargaining agreements with 13 different labor organizations. The negotiating process for new, major collective bargaining agreements covering all of BNSF Railway's union employees has been underway since the bargaining round was initiated November 1, 1999. Wages, health and welfare benefits, work rules, and other issues have traditionally been addressed through industry-wide negotiations. These negotiations have generally taken place over a number of months and have previously not resulted in any extended work stoppages. The existing agreements have remained in effect and will continue to remain in effect until new agreements are reached or the Railway Labor Act's procedures (which include mediation, cooling-off periods, and the possibility of Presidential intervention) are exhausted. The current agreements provide for periodic wage increases until new agreements are reached.

The National Carriers' Conference Committee (NCCC), BNSF Railway's multi-employer collective bargaining representative, reached a final agreement in August 2002, with the United Transportation Union (UTU) covering wage, work rule, and locomotive remote control issues through the year 2004 for conductors, brakemen, yardmen, yardmasters and firemen, which represent approximately one-third of BNSF Railway's unionized workforce. The new agreement also creates a final and binding process for resolving health and welfare issues, mainly involving employees sharing in rising benefit costs. The agreement commits each side to participate in a study and negotiation period, during which the parties will examine alternative ways to control rising healthcare costs. The parties have scheduled meetings on this issue in the first quarter of 2003. Failing these efforts, either party could send unresolved health and welfare issues to final and binding arbitration.

The NCCC also reached a final agreement with the Transportation Communications Union (TCU) providing for final and binding arbitration of wage and benefit issues through 2004. This agreement averts the possibility of self help by the parties over bargaining round issues. The arbitrator conducted hearings in the case commencing January 20, 2003, and issued a final and binding decision on January 23, 2003. The arbitration result settles all wage, work rule and medical benefit issues between the parties through 2004. TCU represents BNSF Railway's clerks, carmen and patrolmen, who make up about 15 percent of BNSF Railway's unionized workforce.

In October 2002, the NCCC and International Brotherhood of Boilermakers and Blacksmiths (IBB) made a final agreement resolving wage and work rule issues through 2004, but leaving health and welfare benefit issues to be settled based on the outcome of the bargaining round process with other rail labor unions. IBB represents around 100 BNSF Railway employees, less than 1 percent of the unionized workforce.

In spring 2001, the NCCC and Brotherhood of Maintenance of Way Employes (BMWE) reached an agreement resolving wage, work rule and benefit issues through 2004, which was implemented in July 2001. BMWE represents BNSF Railway's track, bridge and building maintenance employees, or about one-fifth of BNSF Railway's unionized workforce.

In June 2001, the NCCC reached a tentative agreement with the International Brotherhood of Electrical Workers (IBEW), which

Case 1:07-mc-00489-BAH Document 1229-7 Filed 11/22/24 Page 2250 of 3766
represents approximately 5 percent of BNSF Railway's unionized workforce, addressing wage and work rule issues through 2004, but leaving health and welfare benefit issues for settlement in separate talks with other railroad unions. IBEW members failed to ratify the tentative agreement.

Along with four other major railroads, BNSF Railway reached agreement with the Brotherhood of Locomotive Engineers (BLE) and UTU to arbitrate labor agreement issues raised by BLE stemming from the railroads' implementation of locomotive remote control technology and assignment of remote control operations to employees represented by UTU. The arbitration board decided the case on January 13, 2003, sustaining the railroads' right to assign remote control locomotive operations in and around terminals to ground service employees represented solely by UTU. The decision is final and binding on all parties.

Railroad industry personnel are covered by the Railroad Retirement System instead of Social Security. BNSF Railway's contributions under the Railroad Retirement System have been approximately triple those in industries covered by Social Security. The Railroad Retirement System, funded primarily by payroll taxes on covered employers and

Table of Contents

employees, includes a benefit roughly equivalent to Social Security (Tier I), an additional benefit similar to that allowed in some private defined-benefit plans (Tier II), and other benefits. Investment of Tier II Railroad Retirement assets had, until 2001, been limited to special interest-bearing U. S. Treasury securities. The Railroad Retirement and Survivors' Improvement Act of 2001 (Act) creates a new National Railroad Retirement Investment Trust to hold Tier II Railroad Retirement assets and empowers the trustees to invest these assets in the same types of investments available to private sector retirement plans. In addition to liberalizing certain retirement benefit requirements for rail employees, the Act reduced Tier II Railroad Retirement tax rates on rail employers beginning in 2002 and eliminated a supplemental annuity tax. The Company realized savings of approximately $20 million in 2002 and expects to realize savings of $50 million in 2003. Future adjustments in the Tier II Railroad Retirement tax rates assessed will depend on Railroad Retirement fund levels, and annual savings could be as much as $80 million by 2004.

Railroad industry personnel are also covered by the Federal Employers' Liability Act (FELA) rather than by state workers' compensation systems. FELA is a fault-based system, with compensation for injuries settled by negotiation and litigation, not subject to specific statutory limitations on the amount of recovery. By contrast, most other industries are covered under state, no-fault workers' compensation plans with standard compensation schedules. BNSF Railway believes it has adequate recorded liabilities for its FELA claims. However, the ultimate costs of these FELA claims are uncertain and the actual costs could be significantly higher than anticipated.

**Business Mix**

In serving the Midwest, Pacific Northwest and the Western, Southwestern, and Southeastern regions and ports of the country, BNSF Railway transports, through one operating transportation services segment, a wide range of products and commodities derived from manufacturing, agricultural, and natural resource industries. Accordingly, its financial performance is influenced by, among other things, general and industry economic conditions at the international, national, and regional levels. See below for a graphical view of the Company's primary routes including trackage rights.




Major ports served include Beaumont, Bellingham, Brownsville, Corpus Christi, Everett, Galveston, Houston, Kalama, Long Beach, Longview, Los Angeles, Mobile, New Orleans, Portland, Richmond (Oakland), San Diego, Seattle, Duluth/Superior, Tacoma, Vancouver (Washington) and Vancouver (British Columbia). Canadian traffic is also accessed through interchange with Canadian railroads at Chicago, Minneapolis/St. Paul and other gateways. BNSF Railway also accesses markets in Mexico through United States/Mexico crossings at Brownsville, Eagle Pass and El Paso, Texas, and San Diego, California, and through an interline agreement with the Texas Mexican Railway Company, BNSF Railway reaches Laredo, Texas, a major rail gateway between the U.S. and Mexico. BNSF Railway works closely with its over 200 shortline partners to more efficiently serve many smaller markets. Also, in 2002 BNSF Railway entered into

**Table of Contents**

marketing agreements with Kansas City Southern Railway Company (KCS) and Canadian National Railway Company (CN) expanding the marketing reach for the organizations.

***Consumer Products****:* The consumer freight business provided approximately 38 percent of freight revenues in 2002 and consisted of the following business sectors:

- *International*. International business consists primarily of container traffic from steamship companies and accounted for approximately 32 percent of total Consumer Products revenues.
- *Direct Marketing*. Direct marketing generated approximately 23 percent of total Consumer Products revenue. This business centers around intermodal traffic contracted from parcel shippers such as United Parcel Service and service for nationwide and regional LTL (less-than-truckload) carriers including Yellow Freight and Roadway Express.
- *Truckload*. Truckload traffic represented approximately 16 percent of total Consumer Products revenue. This traffic is comprised of business through the joint service arrangement with J.B. Hunt, as well as business from Schneider National and other truckload carriers.
- *Intermodal Marketing Companies*. Approximately 12 percent of total Consumer Products revenue was generated through intermodal marketing companies, primarily shipper agents and consolidators.
- *Automotive*. The transportation of both assembled motor vehicles and shipments of vehicle parts to numerous destinations throughout the Midwest, Southwest, West and Pacific Northwest provided about 9 percent of 2002 total Consumer Products revenue.
- *Perishables and Dry Boxcar*. Perishables and Dry Boxcar represented approximately 8 percent of total Consumer Products revenue. This group consists of beverages, canned goods and perishable food items. Other consumer goods handled include cotton, salt, rubber and tires, and miscellaneous boxcar shipments.

***Coal****:* Based on total carloadings and tons hauled since the passage of the Clean Air Act of 1970, BNSF Railway is the largest transporter of low-sulfur coal in the United States. The transportation of coal contributed about 23 percent of 2002 freight revenues. Approximately 90 percent of BNSF Railway's coal traffic originated in the Powder River Basin of Wyoming and Montana during the three years ended December 31, 2002. These coal shipments were destined for coal-fired electric generating stations located primarily in the North Central, South Central and Mountain regions of the United States. BNSF Railway also transports large amounts of low-sulfur coal from the Powder River Basin to markets in the eastern and southeastern portions of the United States. The low-sulfur coal from the Powder River Basin is abundant, inexpensive to mine, clean-burning, and has a low delivered-cost to power plants. Also, deregulation in the electric utility industry is causing power generators to seek lower cost fuel sources and this increases demand for Powder River Basin coal.

Other coal shipments originate principally in Colorado, Illinois, New Mexico and North Dakota and are moved to electrical generating stations and industrial plants in the Mountain and North Central regions.

***Industrial Products***: Industrial Products' freight business provided approximately 23 percent of BNSF Railway's freight revenues in 2002 and consists of the following four business areas:

Case 1:07-mc-00489-BAH Document 1229-7 Filed 11/22/24 Page 2254 of 3766

- *Building Products*. This sector includes primary forest product commodities such as lumber, plywood, oriented strand board, particleboard, paper products, pulpmill feedstocks, wood pulp and sawlogs, which resulted in approximately 35 percent of total 2002 Industrial Products revenue. Also included in this sector are government, machinery and waste traffic. Commodities from this diverse group primarily originate from the Pacific Northwest, Western Canada, upper Midwest, and the Southeast for shipment mainly into domestic markets. Industries served include construction, furniture, photography, publishing, newspaper and industrial packaging. Shipments of waste, ranging from municipal waste to contaminated soil, are transported to landfills and reclamation centers across the country. The government and machinery business includes aircraft parts, agricultural and construction machinery, military equipment and large industrial machinery.

- *Construction Products*. The construction products sector represented approximately 35 percent of total Industrial Products revenue in 2002. This sector serves virtually all of the commodities included in or resulting from the production of steel along with mineral commodities such as clays, sands, cements, aggregates, sodium compounds and other industrial minerals. Industrial taconite, an iron ore derivative produced in northern Minnesota, scrap steel and coal coke are BNSF Railway's primary input products

Table of Contents

transported. Finished steel products range from structural beams and steel coils to wire and nails. BNSF Railway links the integrated steel mills in the East with fabricators in the West and Southwest. Service is also provided to various mini-mills in the Southwest that produce rebar, beams and coiled rod for the construction industry. Industrial minerals include various mined and processed commodities such as cement and aggregates (construction sand, gravel and crushed stone) that generally move to domestic markets for use in general construction and public work projects, including highways. Borates and clays move to domestic points as well as to export markets primarily through West Coast ports. Sodium compounds, primarily soda ash, are moved to domestic markets for use in the manufacturing of glass and other industrial products. Sand is utilized in the manufacturing of glass and in foundry and oil drilling applications.

- *Chemicals and Plastics*. The chemicals and plastics sector represents approximately 17 percent of total 2002 Industrial Products revenue. This group is composed of industrial chemicals and plastics commodities. These commodities include caustic soda, chlorine, industrial gases, acids, polyethylene, polypropylene and polyvinyl chloride. Industrial chemicals and plastics resins are used by the automotive, housing, and packaging industries, as well as for feedstocks, to produce other chemical and plastic products. These commodities originate primarily in the Gulf Coast region for shipment mainly into domestic markets.

- *Petroleum*. Commodities included in the petroleum sector are liquefied petroleum gas (LPG), diesel fuels, asphalt, alcohol, solvents, petroleum coke, lubes, oils, waxes and carbon black, which made up 13 percent of total Industrial Products revenue for 2002. Product use varies based on commodity, and includes the use of LPG for heating purposes, diesel fuel and lubes to run heavy machinery, and asphalt for road projects and roofing. Products within this group originate and terminate throughout the BNSF Railway network, with the largest areas of activities being the Texas Gulf, Pacific Northwest, California, Montana and Illinois.

***Agricultural Products****:* The transportation of Agricultural Products provided approximately 16 percent of 2002 total freight revenues and includes wheat, corn, bulk foods, soybeans, oil seeds and meals, feeds, barley, oats and rye, flour and mill products, milo, oils, specialty grains, malt, ethanol and fertilizer. The BNSF Railway system is strategically located to serve the grain-producing regions of the Midwest and Great Plains. The Company is developing and operating a shuttle network for grain, grain products and fertilizer, which allows customers to buy freight transportation with guaranteed service commitments. In addition to serving most grain-producing areas, BNSF Railway serves most major terminal, storage, feeding and food-processing locations. Furthermore, BNSF Railway has access to major export markets in the Pacific Northwest, western Great Lakes, Texas Gulf and Mexico.

***Freight Statistics***: The following table sets forth certain freight statistics relating to rail operations for the periods indicated:

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2002** | **2001** | **2000** |
| Revenue ton miles (millions) | 490,234 | 501,829 | 491,959 |
| Freight revenue per thousand revenue ton miles | $ 18.08 | $ 18.10 | $ 18.51 |
| Average length of haul (miles) | 992 | 992 | 996 |

For revenue, cars/units and average revenue per unit information for the two years ended December 31, 2002, see the revenue table included as part of Item 7, Management's Narrative Analysis of Results of Operations.

**Government Regulation and Legislation**

Rail operations are subject to the regulatory jurisdiction of the Surface Transportation Board (STB) of the United States

Department of Transportation (DOT), the Federal Railroad Administration of DOT, the Occupational Safety and Health Administration (OSHA), and state regulatory agencies. The STB has jurisdiction over disputes and complaints involving certain rates, routes and services, the sale or abandonment of rail lines, applications for line extensions and construction, and consolidation or merger with, or acquisition of control of, rail common carriers. The outcome of STB proceedings can affect the costs and profitability of BNSF Railway's business.

DOT and OSHA have jurisdiction under several federal statutes over a number of safety and health aspects of rail operations. State agencies regulate some aspects of rail operations with respect to health and safety in areas not otherwise preempted by federal law.

BNSF Railway's rail operations, as well as those of its competitors, are subject to extensive federal, state and local environmental regulation. These laws cover discharges to waters, air emissions, toxic substances, and the generation, handling, storage, transportation, and disposal of waste and hazardous materials. This regulation has the effect of

Table of Contents

increasing the cost and liabilities associated with rail operations. Environmental risks are also inherent in rail operations, which frequently involve transporting chemicals and other hazardous materials.

Many of BNSF Railway's land holdings are and have been used for industrial or transportation-related purposes or leased to commercial or industrial companies whose activities may have resulted in discharges onto the property. As a result, BNSF Railway is now subject and will from time to time continue to be subject to environmental cleanup and enforcement actions. In particular, the federal Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), also known as the Superfund law, generally imposes joint and several liability for cleanup and enforcement costs, without regard to fault or the legality of the original conduct, on current and former owners and operators of a site. Accordingly, BNSF Railway may be responsible under CERCLA and other federal and state statutes for all or part of the costs to cleanup sites at which certain substances may have been released by BNSF Railway, its current lessees, former owners or lessees of properties, or other third parties. For further discussion, see Note 10 to the Consolidated Financial Statements.

**Competition**

The business environment in which BNSF Railway operates remains highly competitive. Depending on the specific market, deregulated motor carriers, other railroads and river barges may exert pressure on price and service levels. The presence of advanced, high service truck lines with expedited delivery, subsidized infrastructure and minimal empty mileage continues to affect the market for non-bulk, time sensitive freight. The potential expansion of longer combination vehicles could further encroach upon markets traditionally served by railroads. In order to remain competitive, BNSF Railway and other railroads strive to develop and implement operating efficiencies to improve productivity.

As railroads streamline, rationalize and otherwise enhance their franchises, competition among rail carriers intensifies. BNSF Railway's primary rail competitor in the western region of the United States is the Union Pacific Railroad Company (UP). Other Class I railroads and numerous regional railroads and motor carriers also operate in parts of the same territories served by BNSF Railway.

Based on reporting to the Association of American Railroads, in 2002, BNSF Railway's share of the western United States rail traffic was approximately 43 percent.

**Item 3. Legal Proceedings**

*Ray Ridgeway, et al. v. Burlington Northern Santa Fe Corporation and The Burlington Northern and Santa Fe Railway Company*, No. 48-185170-00 (District Court of Tarrant County, Texas, 48th Judicial District) is a state court action filed on October 27, 2000. The plaintiffs' causes of action include alleged breach of contract, negligence, and breach of fiduciary duties with respect to a special dividend that was paid in 1988 by a Burlington Northern Santa Fe Corporation (BNSF) predecessor, Santa Fe Southern Pacific Corporation (SFSP). The complaint alleges that SFSP erroneously informed shareholders as to the tax treatment of the dividend—specifically, the apportionment of the dividend as either a distribution of earnings and profits or a return of capital—which allegedly caused some shareholders to overpay their income taxes. The plaintiffs assert through their expert's report, that SFSP had essentially no accumulated earnings and profits and that the entire dividend distribution should have been treated as a return of capital, rather than the approximately 34 percent that SFSP determined was a return of capital. Plaintiffs have a motion pending to certify a class of former SFSP shareholders which BNSF Railway has opposed, but a decision on class certification issues is not expected until the second quarter of 2003. BNSF Railway believes these claims lack merit and that it has substantial defenses on both the merits of these claims and the attempted class action, and it is defending these claims vigorously.

BNSF Railway and its subsidiaries are parties to a number of legal actions and claims, various governmental proceedings and private civil suits arising in the ordinary course of business, including those related to environmental matters, Federal

Employers' Liability Act claims by BNSF Railway employees, other personal injury claims, and disputes and complaints involving certain transportation rates and charges (including complaints seeking refunds of prior charges paid for coal transportation and the prescription of future rates for such movements). Some of the legal proceedings include claims for punitive as well as compensatory damages, and a few proceedings purport to be class actions. While the final outcome of these matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded along with applicable insurance, it is the opinion of BNSF Railway's management that none of these items, when finally resolved, will have a material adverse effect on the results of operations, financial position or liquidity of BNSF Railway, although an adverse resolution of a number of these items could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

Case 1:07-mc-00489-BAH Document 1229-7 Filed 11/22/24 Page 2259 of 3766

Table of Contents

Reference is made to Note 5 to the Consolidated Financial Statements for information concerning certain pending tax related administrative or adjudicative state proceedings or appeals.

Table of Contents

## PART II

**Item 5. Market for Registrant's Common Equity and Related Stockholder Matters**

BNSF Railway's common stock is owned by BNSF and therefore is not traded on any market.

**Item 7. Management's Narrative Analysis of Results of Operations**

Management's narrative analysis relates to the results of operations of The Burlington Northern and Santa Fe Railway Company and its majority-owned subsidiaries (collectively, BNSF Railway or Company). BNSF Railway is a wholly-owned subsidiary of BNSF. The following narrative analysis should be read in conjunction with the Consolidated Financial Statements and the accompanying notes (beginning on page 22).

***Results of Operations***

**Year Ended December 31, 2002 Compared with Year Ended December 31, 2001**

BNSF Railway recorded net income for 2002 of $961 million compared with net income for 2001 of $952 million. Operating income of $1,676 million in 2002 was $93 million lower than 2001.

**Revenue Table**

The following table presents BNSF Railway's revenue information by commodity for the years ended December 31, 2002 and 2001.

| | Revenues | | Cars/Units | | Average Revenue Per Car/ Unit | |
|---|---|---|---|---|---|---|
| | 2002 | 2001 | 2002 | 2001 | 2002 | 2001 |
| | (in millions) | | (in thousands) | | | |
| Consumer Products | $3,345 | $3,350 | 3,880 | 3,752 | $ 862 | $ 893 |
| Coal | 2,071 | 2,123 | 2,097 | 2,133 | 988 | 995 |
| Industrial Products | 2,041 | 2,080 | 1,415 | 1,442 | 1,442 | 1,442 |
| Agricultural Products | 1,408 | 1,531 | 794 | 828 | 1,773 | 1,849 |
| Total Freight Revenues | 8,865 | 9,084 | 8,186 | 8,155 | $ 1,083 | $ 1,114 |
| Other Revenues | 98 | 117 | | | | |
| Total Operating Revenues | $8,963 | $9,201 | | | | |

**Revenues**

Total revenues of $8,963 million for 2002 were $238 million, or 3 percent, lower than 2001. In 2002, the combined effect of the soft economy, a mild winter, reduced foreign demand for agricultural products and the loss of an automotive contract in the third quarter of 2001 contributed to a decrease in BNSF Railway's revenues.

Based on reporting to the Association of American Railroads (AAR), in 2002, BNSF Railway's share of the western United States rail traffic was approximately 43 percent.

Consumer Products revenues of $3,345 million for 2002 were essentially flat compared with 2001. Excluding the automotive revenue contract settlement gain of $32 million in 2001, Consumer Products revenues for 2002 were $27 million, or 1 percent, higher than 2001 primarily due to increased intermodal volumes in the international and truckload businesses partially offset by decreased automotive revenues related to a contract loss in 2001. International increases were driven by favorable trans-Pacific trade and new contracts. Truckload revenues were up due to strong growth from the Company's primary accounts and modal conversion of highway traffic from new and existing shippers. The reduction in revenue per car/unit is related to a decrease in automotive traffic and an increase in international traffic, which primarily moves in containers and unit trains, and due to the lower cost structure, moves at lower rates per unit.

Coal revenues of $2,071 million for 2002 decreased $52 million, or 2 percent, versus 2001. Volume was lower than 2001 primarily as a result of reduced demand in the first half of 2002 caused by mild winter weather. Revenue per car/unit decreased as a result of modest price decreases related to the renewal of some contracts and rate adjustment factors in existing contracts that were negative in the first half of the year.

Industrial Products revenues of $2,041 million for 2002 were $39 million, or 2 percent, lower than 2001. An

Table of Contents

increase in the chemicals and plastics sector tied to strength in automotive and home construction along with a new contract was more than offset by general softness in the petroleum, building and construction product sectors. Petroleum was down due to higher heating fuel inventories as a result of the mild winter. Building and construction product sectors were down primarily due to weak paper and steel markets.

Agricultural Products revenues of $1,408 million for 2002 were $123 million, or 8 percent, lower than revenues for 2001 primarily due to decreased soybean, wheat and corn exports due to global market conditions. The decrease in export traffic resulted in lower revenue per unit due to a shorter length of haul. Domestic corn shipments to feedlots were also down from 2001 due to reduced feedlot demand, high inventory levels remaining from 2001 shipments and crop production conditions.

**Expenses**

| | Year Ended December 31, | |
|---|---|---|
| | **2002** | **2001** |
| | (in millions) | |
| Compensation and benefits | $ 2,878 | $ 2,850 |
| Purchased services | 1,132 | 1,088 |
| Depreciation and amortization | 930 | 908 |
| Equipment rents | 698 | 736 |
| Fuel | 833 | 973 |
| Materials and other | 816 | 877 |
| Total operating expenses | $ 7,287 | $ 7,432 |
| Interest expense | $ 153 | $ 170 |
| Other expense, net | $ 12 | $ 70 |

Total operating expenses for 2002 were $7,287 million, a decrease of $145 million, or 2 percent, over 2001 primarily due to a lower total cost per gallon of diesel fuel, lower equipment rents expense driven by an initiative to use less foreign equipment and increased gains on property dispositions.

Compensation and benefits expenses of $2,878 million were $28 million, or 1 percent, higher than 2001 primarily due to increases in health and welfare costs, principally due to an increase in rates, incentive compensation, and pension expense primarily reflecting a decrease in the long-term rate of return assumption for pension assets. These increases were partially offset by reduced labor expenses as a result of lower employment levels.

Purchased services of $1,132 million for 2002 were $44 million, or 4 percent, higher than 2001 due to a one-time flood related recovery and higher other recoveries in 2001, higher insurance expense in 2002, as well as higher service contracts expense related to an agreement to outsource the management of a large portion of BNSF Railway's information technology infrastructure.

Depreciation and amortization expenses of $930 million for 2002 were $22 million, or 2 percent, higher than 2001 primarily due to a higher capital base.

Case 1:07-mc-00489-BAH Document 1229-7 Filed 11/22/24 Page 2263 of 3766

Equipment rents expenses for 2002 of $698 million were $38 million, or 5 percent, lower than 2001. The decrease is primarily due to lower carload equipment expense driven by an initiative to use less foreign equipment, short-term lease incentives and lower auto equipment expense as a result of the loss of an automotive contract in the third quarter of 2001.

Fuel expenses of $833 million for 2002 were $140 million, or 14 percent, lower than 2001. The decrease in fuel expense was primarily the result of a 10-cent decrease in the average all-in cost per gallon of diesel fuel. The decrease in the average all-in cost per gallon of diesel fuel includes a 10-cent decrease ($115 million) in the average purchase price and a hedge benefit of 4 cents ($50 million). The hedge benefit for the same period in 2001 was 4 cents per gallon ($48 million). Consumption in 2002 was 1,149 million gallons compared with 1,177 million gallons in 2001.

Materials and other expenses of $816 million for 2002 were $61 million, or 7 percent, lower than 2001 principally due to a $66 million charge for workforce reduction related costs in 2001, increased gains on property dispositions and lower costs on leased locomotives partially offset by higher personal injury expense in 2002.

Interest expense of $153 million for 2002 was $17 million, or 10 percent, lower than 2001. This decrease was primarily the result of lower average debt levels.

Table of Contents

Other expense was $12 million or $58 million lower compared with 2001 primarily due to $47 million of losses recognized in 2001 related to non-rail investments. The non-rail investments consisted of Pathnet Telecommunications, Inc., a telecommunications venture; a portfolio of other non-core investments; and a decline in the cash surrender value of company owned life insurance policies. In addition, there was a decrease in accounts receivable sale fees in 2002 compared with 2001.

***Other Matters***

**Forward-Looking Information**

To the extent that statements made by the Company relate to the Company's future economic performance or business outlook, projections or expectations of financial or operational results, or refer to matters that are not historical facts, such statements are "forward-looking" statements within the meaning of the federal securities laws. Forward-looking statements involve a number of risks and uncertainties, and actual results may differ materially. Important factors that could cause actual results to differ materially include, but are not limited to, *economic and industry conditions*: material adverse changes in economic or industry conditions, both in the United States and globally, customer demand, effects of adverse economic conditions affecting shippers, adverse economic conditions in the industries and geographic areas that produce and consume freight, competition and consolidation within the transportation industry, the extent to which BNSF Railway is successful in gaining new long-term relationships with customers or retaining existing ones, changes in fuel prices, changes in the securities and capital markets, and changes in labor costs and labor difficulties, including stoppages affecting either BNSF Railway's operations or our customers' abilities to deliver goods to BNSF Railway for shipment; *legal and regulatory factors*: developments and changes in laws and regulations and the ultimate outcome of shipper and rate claims subject to adjudication, environmental investigations or proceedings and other types of claims and litigation; and *operating factors*: technical difficulties, changes in operating conditions and costs, competition, and commodity concentrations, the Company's ability to achieve its operational and financial initiatives and to contain costs, as well as natural events such as severe weather, floods and earthquakes or other disruptions of BNSF Railway's operating systems, structures, or equipment.

The Company cautions against placing undue reliance on forward-looking statements, which reflect its current beliefs and are based on information currently available to it as of the date a forward-looking statement is made. The Company undertakes no obligation to revise forward-looking statements to reflect future events, changes in circumstances, or changes in beliefs. In the event the Company does update any forward-looking statement, no inference should be made that the Company will make additional updates with respect to that statement, related matters, or any other forward-looking statements. Any corrections or revisions may appear in the Company's public filings with the Securities and Exchange Commission, which are accessible at www.sec.gov and on the Company's website at www.bnsf.com, and which investors are advised to consult.

**Item 7A. Quantitative and Qualitative Disclosures About Market Risk**

In the ordinary course of business, BNSF Railway utilizes various financial instruments that inherently have some degree of market risk. The qualitative and quantitative information presented in the Management's Narrative Analysis of Results of Operations section and Notes 3 and 9 of the Consolidated Financial Statements describe significant aspects of BNSF Railway's financial instrument programs which have a material market risk.

*Commodity Price Sensitivity*

BNSF Railway has a program to hedge against fluctuations in the price of its diesel fuel purchases. Existing hedge transactions as of December 31, 2002, are based on the front month settlement price of West Texas Intermediate crude oil (WTI). The hedge prices do not include taxes, transportation costs, certain other fuel handling costs, and any differences which may occur between the prices of WTI and the purchase price of BNSF Railway's diesel fuel, including refining costs. The sum of all such costs typically ranges between 12 and 30 cents per gallon. For swaps, BNSF Railway either pays or receives the difference between

the hedge price and the actual average price of the hedge commodity during a specified determination period for a specified number of gallons. For costless collars, if the average hedge commodity price for a specified determination period is greater than the cap price, BNSF Railway receives the difference for a specified number of gallons. If the average commodity price is less than the floor price, BNSF Railway pays the difference for a specified number of gallons. If the commodity price is between the floor price and the cap price, BNSF Railway neither makes nor receives a payment. Hedge transactions are generally settled with the counterparty in cash. Based on historical information, BNSF Railway believes there is a significant correlation between the market prices for diesel fuel and WTI. See Note 3 to the Company's Consolidated Financial Statements.

Table of Contents

The tables below provide fuel hedge data for the WTI fuel hedges outstanding at December 31, 2002.

| | Quarter Ended | | | | |
|---|---|---|---|---|---|
| **2003** | **March 31,** | **June 30,** | **September 30,** | **December 31,** | **Annual** |
| **WTI Swaps** | | | | | |
| Barrels hedged (in thousands) | 600 | 600 | 600 | 600 | 2,400 |
| Equivalent gallons hedged (in millions) | 25.20 | 25.20 | 25.20 | 25.20 | 100.80 |
| Average swap price (per barrel) | $ 20.41 | $ 20.52 | $ 20.59 | $ 20.67 | $ 20.55 |
| Fair value (in millions) | $ 4 | $ 3 | $ 2 | $ 2 | $ 11 |
| **WTI Collars** | | | | | |
| Barrels hedged (in thousands) | 3,450 | 3,450 | 2,100 | 2,100 | 11,100 |
| Equivalent gallons hedged (in millions) | 144.90 | 144.90 | 88.20 | 88.20 | 466.20 |
| Average cap price (per barrel) | $ 29.16 | $ 27.89 | $ 26.63 | $ 26.05 | $ 27.70 |
| Average floor price (per barrel) | $ 24.92 | $ 23.50 | $ 22.24 | $ 21.65 | $ 23.35 |
| Fair value (in millions) | $ 7 | $ 4 | $ 1 | $ 1 | $ 13 |

| | Quarter Ended | | | | |
|---|---|---|---|---|---|
| **2004** | **March 31,** | **June 30,** | **September 30,** | **December 31,** | **Annual** |
| **WTI Swaps** | | | | | |
| Barrels hedged (in thousands) | 525 | 525 | 525 | 525 | 2,100 |
| Equivalent gallons hedged (in millions) | 22.05 | 22.05 | 22.05 | 22.05 | 88.20 |
| Average swap price (per barrel) | $ 20.68 | $ 20.64 | $ 20.61 | $ 20.58 | $ 20.63 |
| Fair value (in millions) | $ 2 | $ 2 | $ 1 | $ 1 | $ 6 |
| **WTI Collars** | | | | | |
| Barrels hedged (in thousands) | 900 | 900 | 900 | 900 | 3,600 |
| Equivalent gallons hedged (in millions) | 37.80 | 37.80 | 37.80 | 37.80 | 151.20 |
| Average cap price (per barrel) | $ 25.10 | $ 24.96 | $ 24.90 | $ 24.88 | $ 24.96 |
| Average floor price (per barrel) | $ 20.69 | $ 20.51 | $ 20.38 | $ 20.35 | $ 20.48 |
| Fair value (in millions) | $ 1 | $ — | $ — | $ — | $ 1 |

| | Quarter Ended | | | | |
|---|---|---|---|---|---|
| **2005** | **March 31,** | **June 30,** | **September 30,** | **December 31,** | **Annual** |
| **WTI Collars** | | | | | |
| Barrels hedged (in thousands) | 750 | 750 | 750 | 750 | 3,000 |
| Equivalent gallons hedged (in millions) | 31.50 | 31.50 | 31.50 | 31.50 | 126.00 |
| Average cap price (per barrel) | $ 24.89 | $ 24.88 | $ 24.88 | $ 24.88 | $ 24.88 |
| Average floor price (per barrel) | $ 20.41 | $ 20.40 | $ 20.37 | $ 20.35 | $ 20.38 |
| Fair value (in millions) | $ — | $ — | $ — | $ — | $ — |

The table below provides summarized comparative information for hedge transactions as of December 31, 2001, which were

based on the price of pipeline delivery of Gulf Coast #2 heating oil.

| | December 31, 2001 | | | |
|---|---|---|---|---|
| | 2002 Maturity Date | | Fair Value | |
| Diesel Fuel Swaps: | | | | |
| Gallons (in millions) | | 296 | $ | (1) |
| Weighted average price per gallon | $ | 0.57 | | |
| Diesel Fuel Costless Collars: | | | | |
| Gallons (in millions) | | 50 | $ | (3) |
| Weighted average price per gallon – calls | $ | 0.65 | | |
| Weighted average price per gallon – puts | $ | 0.57 | | |

At December 31, 2002, BNSF Railway maintained fuel inventories for use in normal operations which were not material to BNSF Railway's overall financial position and, therefore, represent no significant market exposure.

Table of Contents

*Interest Rate Sensitivity*

From time to time, BNSF Railway enters into various interest rate hedging transactions for purposes of managing exposure to fluctuations in interest rates and establishing rates in anticipation of future debt issuances as well as to convert a portion of its fixed-rate long-term debt to floating-rate debt to manage its ratio of fixed-rate debt to floating-rate debt. BNSF Railway's measurement of fair value of interest rate swaps is based on estimates of the mid-market values for the transactions provided by the counterparties to these agreements.

As discussed in Note 3 in the Consolidated Financial Statements, the Company uses an interest rate swap to minimize exposure to risk. This swap is accounted for as a fair value hedge as required under SFAS No. 133.

The swap transaction outstanding with an interest rate component is reflected in the tables below.

| | December 31, 2002 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Maturity Date | | | | | | | |
| | 2003 | 2004 | 2005 | 2006 | 2007 | There-after | Total | Fair Value |
| **Fair value hedge** | | | | | | | | |
| Fixed to variable swap (in millions) | — | $ 100 | — | — | — | — | $ 100 | $ 5 |
| Average fixed rate | — | 8.63% | — | — | — | — | 8.63% | — |
| Average floating rate | — | 5.98% | — | — | — | — | 5.98% | — |

| | December 31, 2001 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Maturity Date | | | | | | | |
| | 2002 | 2003 | 2004 | 2005 | 2006 | There-after | Total | Fair Value |
| **Fair value hedge** | | | | | | | | |
| Fixed to variable swap (in millions) | — | — | $ 100 | — | — | — | $ 100 | $ — |
| Average fixed rate | — | — | 8.63% | — | — | — | 8.63% | — |
| Average floating rate | — | — | 6.18% | — | — | — | 6.18% | — |

The tables below provide fair value information for the Company's debt obligations including principal cash flows and related weighted average interest rates by contractual maturity dates. Weighted average variable rates are based on implied forward rates in the yield curve at December 31, 2002. The fair values presented in the table below do not include the fair value of the swap.

| | December 31, 2002 |
|---|---|
| | Maturity Date |

| | 2003 | 2004 | 2005 | 2006 | 2007 | There-after | Total | Fair Value |
|---|---|---|---|---|---|---|---|---|
| Fixed-Rate Debt (in millions) | $ 173 | $ 145 | $ 146 | $ 433 | $ 136 | $ 1,119 | $2,152 | $2,198 |
| Average Interest Rate | 6.42% | 7.06% | 7.10% | 8.41% | 6.90% | 7.14% | 7.32% | |
| Variable-Rate Debt (in millions) | — | $ 104 | — | — | — | — | $ 104 | $ 119 |
| Average Interest Rate | — | 6.08% | — | — | — | — | 6.08% | |

| | December 31, 2001 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Maturity Date | | | | | | | |
| | 2002 | 2003 | 2004 | 2005 | 2006 | There-after | Total | Fair Value |
| Fixed-Rate Debt (in millions) | $ 288 | $ 144 | $ 144 | $ 144 | $ 430 | $ 1,114 | $2,264 | $ 2,351 |
| Average Interest Rate | 7.09% | 7.19% | 7.08% | 7.12% | 8.43% | 7.04% | 7.33% | |
| Variable-Rate Debt (in millions) | — | — | $ 100 | — | — | — | $ 100 | $ 109 |
| Average Interest Rate | — | — | 8.47% | — | — | — | 8.47% | |

**Table of Contents**

The fair value of BNSF Railway's long-term debt is primarily based on quoted market prices for the same or similar issues, or on the current rates that would be offered to BNSF Railway for debt of the same remaining maturities.

As described below, excluded from the 2002 and 2001 tables are $67 million and $117 million, respectively, of intercompany notes payable to BNSF.

At December 31, 2002 and 2001, BNSF Railway had $67 million and $117 million, respectively, of intercompany notes payable to BNSF at a variable interest rate of 1.0 percent above the monthly average of the daily effective Federal Funds rate. During 2002, BNSF Railway had additional net repayments of $50 million of variable rate notes. Interest is paid semi-annually on all intercompany notes payable. Interest expense on intercompany notes payable is reflected in Interest income, related parties in the Consolidated Income Statements. The intercompany notes are due on demand.

At December 31, 2002 and 2001, BNSF Railway had $1,256 million and $825 million, respectively, of intercompany notes receivable from BNSF with a variable interest rate of 1.0 percent above the monthly average of the daily effective Federal Funds rate. The increase of $431 million in intercompany notes receivable is due to net borrowings by BNSF during 2002. Interest is collected semi-annually on all intercompany notes receivable.

In BNSF Railway's Consolidated Balance Sheets, the intercompany notes receivable are presented net of the intercompany notes payable discussed above. BNSF Railway had a net intercompany notes receivable balance of $1,189 and $708 million at December 31, 2002 and 2001, respectively.

Table of Contents

**Item 8. Financial Statements and Supplementary Data**

The Consolidated Financial Statements of BNSF Railway, together with the report of independent accountants, are included as part of this filing.

The following documents are filed as a part of this report:


| | Page |
|---|---|
| **1. Consolidated Financial Statements** | |
| Report of Independent Accountants | 17 |
| Consolidated Statements of Income for the three years ended December 31, 2002 | 18 |
| Consolidated Balance Sheets as of December 31, 2002 and 2001 | 19 |
| Consolidated Statements of Cash Flows for the three years ended December 31, 2002 | 20 |
| Consolidated Statements of Changes in Stockholder's Equity for the three years ended December 31, 2002 | 21 |
| Notes to Consolidated Financial Statements | 22-37 |

Table of Contents

**REPORT OF INDEPENDENT ACCOUNTANTS**

To the Stockholders and Board
of Directors of The Burlington
Northern and Santa Fe Railway Company
and Subsidiaries

In our opinion, the consolidated financial statements listed in the accompanying index present fairly, in all material respects, the financial position of The Burlington Northern and Santa Fe Railway Company and subsidiary companies at December 31, 2002 and 2001, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2002, in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the financial statement schedule appearing under Item 15 (a)(2) presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements. These financial statements and the financial statement schedule are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements and the financial statement schedule based on our audits. We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

/s/ PricewaterhouseCoopers LLP

Fort Worth, Texas
February 6, 2003

Table of Contents

**THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF INCOME**
**(Dollars in millions)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2002** | **2001** | **2000** |
| Revenues | $ 8,963 | $ 9,201 | $ 9,202 |
| Operating expenses: | | | |
| Compensation and benefits | 2,878 | 2,850 | 2,729 |
| Purchased services | 1,132 | 1,088 | 1,025 |
| Depreciation and amortization | 930 | 908 | 894 |
| Equipment rents | 698 | 736 | 740 |
| Fuel | 833 | 973 | 932 |
| Materials and other | 816 | 877 | 747 |
| Total operating expenses | 7,287 | 7,432 | 7,067 |
| Operating income | 1,676 | 1,769 | 2,135 |
| Interest expense | 153 | 170 | 184 |
| Interest income, related parties | (20) | (21) | (20) |
| Other expense, net | 12 | 70 | 35 |
| Income before income taxes | 1,531 | 1,550 | 1,936 |
| Income tax expense | 570 | 598 | 737 |
| Net income | $ 961 | $ 952 | $ 1,199 |

See accompanying Notes to Consolidated Financial Statements.

Table of Contents

**THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**
**(Dollars in millions, shares in thousands)**

| | December 31, | |
|---|---|---|
| | **2002** | **2001** |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 28 | $ 78 |
| Accounts receivable, net | 138 | 227 |
| Materials and supplies | 226 | 191 |
| Current portion of deferred income taxes | 302 | 306 |
| Other current assets | 73 | 21 |
| Total current assets | 767 | 823 |
| Property and equipment, net | 23,968 | 23,056 |
| Other assets | 849 | 853 |
| Intercompany notes receivable, net | 1,189 | 708 |
| Total assets | $26,773 | $25,440 |
| **LIABILITIES AND STOCKHOLDER’S EQUITY** | | |
| Current liabilities: | | |
| Accounts payable and other current liabilities | $ 1,875 | $ 1,857 |
| Long-term debt due within one year | 173 | 288 |
| Total current liabilities | 2,048 | 2,145 |
| Long-term debt | 2,083 | 2,076 |
| Deferred income taxes | 6,966 | 6,723 |
| Casualty and environmental liabilities | 352 | 423 |
| Minimum pension liability | 368 | 12 |
| Employee merger and separation costs | 170 | 216 |
| Other liabilities | 1,198 | 1,020 |
| Total liabilities | 13,185 | 12,615 |
| Commitments and contingencies (see Notes 3, 9 and 10) | | |
| Stockholder’s equity: | | |
| Common stock, $1 par value 1,000 shares authorized; issued and outstanding and paid-in capital | 6,286 | 6,286 |
| Retained earnings | 7,510 | 6,549 |
| Accumulated other comprehensive loss | (208) | (10) |
| Total stockholder’s equity | 13,588 | 12,825 |
| Total liabilities and stockholder’s equity | $26,773 | $25,440 |

See accompanying Notes to Consolidated Financial Statements.

Table of Contents

**THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(Dollars in millions)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2002** | **2001** | **2000** |
| **OPERATING ACTIVITIES** | | | |
| Net income | $ 961 | $ 952 | $ 1,199 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation and amortization | 930 | 908 | 894 |
| Deferred income taxes | 441 | 318 | 362 |
| Employee merger and separation costs paid | (55) | (55) | (58) |
| Other, net | (147) | 50 | 20 |
| Changes in current assets and liabilities: | | | |
| Accounts receivable, net | 89 | 126 | 41 |
| Materials and supplies | (25) | 29 | 35 |
| Other current assets | (24) | 103 | (62) |
| Accounts payable and other current liabilities | 68 | (97) | (94) |
| Net cash provided by operating activities | 2,238 | 2,334 | 2,337 |
| **INVESTING ACTIVITIES** | | | |
| Capital expenditures | (1,358) | (1,459) | (1,399) |
| Other, net | (161) | (106) | (265) |
| Net cash used for investing activities | (1,519) | (1,565) | (1,664) |
| **FINANCING ACTIVITIES** | | | |
| Proceeds from issuance of long-term debt | — | — | 50 |
| Payments on long-term debt | (290) | (277) | (160) |
| Net change in intercompany notes receivable and payable | (481) | (183) | (373) |
| Dividends paid | — | (358) | (150) |
| Other, net | 2 | 4 | 1 |
| Net cash used for financing activities | (769) | (814) | (632) |
| (Decrease) increase in cash and cash equivalents | (50) | (45) | 41 |
| Cash and cash equivalents: | | | |
| Beginning of year | 78 | 123 | 82 |
| End of year | $ 28 | $ 78 | $ 123 |
| **SUPPLEMENTAL CASH FLOW INFORMATION** | | | |
| Interest paid, net of amounts capitalized | $ 174 | $ 212 | $ 197 |
| Income taxes paid, net of refunds | $ 178 | $ 278 | $ 448 |

Case 1:07-mc-00489-BAH Document 1229-7 Filed 11/22/24 Page 2277 of 3766

| | | | |
|---|---|---|---|
| Non-cash facilities financing | $ 138 | $ — | $ — |

See accompanying Notes to Consolidated Financial Statements.

Table of Contents

**THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDER'S EQUITY**
**(Dollars in millions)**

| | Common Stock and Paid-in Capital | Retained Earnings | Accumulated Other Comprehensive Income (Loss) | Total Stockholder's Equity |
|---|---|---|---|---|
| Balance at December 31, 1999 | $ 6,286 | $ 4,906 | $ (7) | $ 11,185 |
| Comprehensive income: | | | | |
| Net income | — | 1,199 | — | 1,199 |
| Minimum pension liability adjustment, net of tax benefit of $2 | — | — | (3) | (3) |
| Total comprehensive income | — | 1,199 | (3) | 1,196 |
| Dividends paid | — | (150) | — | (150) |
| Balance at December 31, 2000 | 6,286 | 5,955 | (10) | 12,231 |
| Comprehensive income: | | | | |
| Net income | — | 952 | — | 952 |
| Cumulative effect of adoption of SFAS No. 133, net of tax expense of $35 | — | — | 56 | 56 |
| Gain on derivative instruments, included in net income, net of tax expense of $18 | — | — | (30) | (30) |
| Change in fair value of derivative instruments, net of tax benefit of $18 | — | — | (28) | (28) |
| Minimum pension liability adjustment, net of tax expense of $1 | — | — | 2 | 2 |
| Total comprehensive income | — | 952 | — | 952 |
| Dividends paid | — | (358) | — | (358) |
| Balance at December 31, 2001 | 6,286 | 6,549 | (10) | 12,825 |
| Comprehensive income: | | | | |
| Net income | — | 961 | — | 961 |
| Gain on derivative instruments, included in net income, net of tax expense of $19 | — | — | (31) | (31) |
| Change in fair value of derivative instruments, net of tax expense of $32 | — | — | 53 | 53 |
| Minimum pension liability adjustment, net of tax benefit of $136 | — | — | (220) | (220) |
| Total comprehensive income | | 961 | (198) | 763 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Balance at December 31, 2002 | $ | 6,286 | $ | 7,510 | $ | (208) | $ | 13,588 |

See accompanying Notes to Consolidated Financial Statements

Table of Contents

**THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**1. The Company**

The Burlington Northern and Santa Fe Railway Company and its majority-owned subsidiaries (collectively, BNSF Railway or Company) is a wholly-owned subsidiary of Burlington Northern Santa Fe Corporation (BNSF). BNSF Railway operates one of the largest railroad networks in North America with approximately 33,000 route miles covering 28 states and two Canadian provinces. Through one operating transportation services segment, BNSF Railway transports a wide range of products and commodities including the transportation of Consumer Products, Coal, Industrial Products and Agricultural Products, derived from manufacturing, agricultural and natural resource industries, which constituted 38 percent, 23 percent, 23 percent and 16 percent, respectively, of total freight revenues for the year ended December 31, 2002.

BNSF Railway was formerly known as the Burlington Northern Railroad Company (BNRR). On December 31, 1996, The Atchison, Topeka and Santa Fe Railway Company (ATSF) merged with and into BNRR and the name of the surviving entity, BNRR, was changed to The Burlington Northern and Santa Fe Railway Company. Additionally, on January 2, 1998, BNSF Railway's parent, Santa Fe Pacific Corporation (SFP), merged with and into BNSF Railway.

**2. Significant Accounting Policies**

*Principles of Consolidation*

The Consolidated Financial Statements include the accounts of BNSF Railway. All significant intercompany accounts and transactions have been eliminated.

*Use of Estimates*

The preparation of financial statements in accordance with generally accepted accounting principles (GAAP) requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the periods presented. Actual results could differ from those estimates.

*Revenue Recognition*

Transportation revenues are recognized based upon the proportion of service provided as of the balance sheet date. Revenues from ancillary services are recognized when performed.

*Cash and Cash Equivalents*

All short-term investments with original maturities of less than 90 days are considered cash equivalents. Cash equivalents are stated at cost, which approximates market value because of the short maturity of these instruments.

*Materials and Supplies*

Materials and supplies, which consist mainly of rail, ties and other items for construction and maintenance of property and equipment, as well as diesel fuel, are valued at the lower of average cost or market.

*Property and Equipment, net*

Property and equipment are depreciated and amortized on a straight-line basis over their estimated useful lives. Upon normal sale or retirement of depreciable railroad property, cost less net salvage value is charged to accumulated depreciation and no gain or loss is recognized. Significant premature retirements and the disposal of land and non-rail property are recorded as gains or losses at the time of their occurrence.

The Company self-constructs portions of its track structure and rebuilds certain classes of rolling stock. In addition to direct labor and material, certain indirect costs are capitalized. Expenditures which significantly increase asset values or extend useful lives are capitalized. Repair and maintenance expenditures are charged to operating expense when the work is performed. Property and equipment are stated at cost.

Table of Contents

THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

The Company incurs certain direct labor, contract service and other costs associated with the development and installation of internal-use computer software. Costs for newly developed software or significant enhancements to existing software are typically capitalized. Research, preliminary project, operations, maintenance and training costs are charged to operating expense when the work is performed.

Long-lived assets are reviewed for impairment when events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. If impairment indicators are present and the estimated future undiscounted cash flows are less than the carrying value of the long-lived assets, the carrying value is reduced to the estimated fair value as measured by the discounted cash flows.

*Environmental Liabilities*

Liabilities for environmental cleanup costs are initially recorded when BNSF Railway's liability for environmental cleanup is both probable and a reasonable estimate of associated costs can be made. Adjustments to initial estimates are recorded as necessary based upon additional information developed in subsequent periods. Estimates for these liabilities are undiscounted.

*Personal Injury Claims*

Personal injury liabilities are estimated on an actuarial basis. Incurred but not reported liabilities are included in the estimates based on historical experience. Estimates for these liabilities are undiscounted.

*Income Taxes*

Deferred tax assets and liabilities are measured using the tax rates that apply to taxable income in the period in which the deferred tax asset or liability is expected to be realized or paid. Valuation allowances are established to reduce deferred tax assets if it is more likely than not that some or all of the deferred tax asset will not be realized.

*Pension and Other Post-Employment Benefits*

Annual pension and other post-employment benefits (OPEB) expenses are calculated by third party actuaries using standard actuarial methodologies. The actuaries assist the Company in making estimates based on historical information, current information and estimates about future events and circumstances. Significant assumptions used in the valuation of pension and OPEB include expected return on plan assets, discount rate, rate of increase in compensation levels and the health care cost trend rate.

*Reclassifications*

Certain comparative prior year amounts in the Consolidated Financial Statements and accompanying notes have been reclassified to conform to the current year presentation. These reclassifications effected previously reported Operating income but had no effect on previously reported Net income.

The change to previously reported Operating income is due to the reclassification of gains on property dispositions from Other expense, net to Operating expenses. These reclassifications increased previously reported annual Operating income by $20 million and $30 million for the years ended December 31, 2001 and 2000, respectively.

**3. Hedging Activities**

On January 1, 2001, BNSF Railway adopted SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities*, and recorded a cumulative transition benefit of $56 million, net of tax, to Accumulated Other Comprehensive Income (AOCI). The standard requires that all derivatives be recorded on the balance sheet at fair value and establishes criteria for documentation and measurement of hedging activities.

The Company currently uses derivatives to hedge against increases in diesel fuel prices and to convert a portion of its fixed-rate long-term debt to floating-rate debt. The Company formally documents the relationship between the hedging instrument and the hedged item, as well as the risk management objective and strategy for the use of the hedging instrument. This documentation includes linking the derivatives that are designated as fair value or cash flow hedges to specific assets or liabilities on the balance sheet, commitments or forecasted transactions. The Company assesses at the time a derivative contract is entered into, and at least quarterly, whether the derivative item is effective in offsetting the changes in fair value or cash flows. Any change in fair value resulting from ineffectiveness, as defined by SFAS No. 133,

Table of Contents

**THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

is recognized in current period earnings. For derivative instruments that are designated and qualify as cash flow hedges, the effective portion of the gain or loss on the derivative instrument is recorded in AOCI as a separate component of stockholder's equity and reclassified into earnings in the period during which the hedge transaction affects earnings.

BNSF Railway monitors its hedging positions and credit ratings of its counterparties and does not anticipate losses due to counterparty nonperformance.

*Fuel*

Fuel costs represented 11, 13 and 13 percent of total operating expenses during 2002, 2001 and 2000, respectively. Due to the significance of diesel fuel expenses to the operations of BNSF Railway and the historical volatility of fuel prices, the Company maintains a program to hedge against fluctuations in the price of its diesel fuel purchases. The intent of the program is to protect the Company's operating margins and overall profitability from adverse fuel price changes by entering into fuel-hedge instruments based on management's evaluation of current and expected diesel fuel price trends. However, to the extent the Company hedges portions of its fuel purchases, it may not realize the impact of decreases in fuel prices. Conversely, to the extent the Company does not hedge portions of its fuel purchases, it may be adversely affected by increases in fuel prices. Based on fuel consumption during 2002 and excluding the impact of the hedging program, each one-cent increase in the price of fuel would result in approximately $11 million of additional fuel expense on an annual basis.

The fuel hedging program includes the use of derivatives that are accounted for as cash flow hedges. As of December 31, 2002, BNSF Railway had entered into fuel swap and costless collar agreements utilizing West Texas Intermediate crude oil (WTI). The hedge prices do not include taxes, transportation costs, certain other fuel handling costs, and any differences which may occur between the prices of WTI and the purchase price of BNSF Railway's diesel fuel, including refining costs. The sum of all such costs typically ranges between 12 and 30 cents per gallon. The tables below provide fuel hedge data for the WTI fuel hedges outstanding at December 31, 2002.

| | Quarter Ended | | | | |
|---|---|---|---|---|---|
| **2003** | **March 31,** | **June 30,** | **September 30,** | **December 31,** | **Annual** |
| **WTI Swaps** | | | | | |
| Barrels hedged (in thousands) | 600 | 600 | 600 | 600 | 2,400 |
| Equivalent gallons hedged (in millions) | 25.20 | 25.20 | 25.20 | 25.20 | 100.80 |
| Average swap price (per barrel) | $ 20.41 | $ 20.52 | $ 20.59 | $ 20.67 | $ 20.55 |
| Fair value (in millions) | $ 4 | $ 3 | $ 2 | $ 2 | $ 11 |
| **WTI Collars** | | | | | |
| Barrels hedged (in thousands) | 3,450 | 3,450 | 2,100 | 2,100 | 11,100 |
| Equivalent gallons hedged (in millions) | 144.90 | 144.90 | 88.20 | 88.20 | 466.20 |
| Average cap price (per barrel) | $ 29.16 | $ 27.89 | $ 26.63 | $ 26.05 | $ 27.70 |
| Average floor price (per barrel) | $ 24.92 | $ 23.50 | $ 22.24 | $ 21.65 | $ 23.35 |
| Fair value (in millions) | $ 7 | $ 4 | $ 1 | $ 1 | $ 13 |

**Quarter Ended**

| 2004 | March 31, | June 30, | September 30, | December 31, | Annual |
|---|---|---|---|---|---|
| **WTI Swaps** | | | | | |
| Barrels hedged (in thousands) | 525 | 525 | 525 | 525 | 2,100 |
| Equivalent gallons hedged (in millions) | 22.05 | 22.05 | 22.05 | 22.05 | 88.20 |
| Average swap price (per barrel) | $ 20.68 | $ 20.64 | $ 20.61 | $ 20.58 | $ 20.63 |
| Fair value (in millions) | $ 2 | $ 2 | $ 1 | $ 1 | $ 6 |
| **WTI Collars** | | | | | |
| Barrels hedged (in thousands) | 900 | 900 | 900 | 900 | 3,600 |
| Equivalent gallons hedged (in millions) | 37.80 | 37.80 | 37.80 | 37.80 | 151.20 |
| Average cap price (per barrel) | $ 25.10 | $ 24.96 | $ 24.90 | $ 24.88 | $ 24.96 |
| Average floor price (per barrel) | $ 20.69 | $ 20.51 | $ 20.38 | $ 20.35 | $ 20.48 |
| Fair value (in millions) | $ 1 | $ — | $ — | $ — | $ 1 |

Table of Contents

THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

| | Quarter Ended | | | | |
|---|---|---|---|---|---|
| 2005 | March 31, | June 30, | September 30, | December 31, | Annual |
| **WTI Collars** | | | | | |
| Barrels hedged (in thousands) | 750 | 750 | 750 | 750 | 3,000 |
| Equivalent gallons hedged (in millions) | 31.50 | 31.50 | 31.50 | 31.50 | 126.00 |
| Average cap price (per barrel) | $ 24.89 | $ 24.88 | $ 24.88 | $ 24.88 | $ 24.88 |
| Average floor price (per barrel) | $ 20.41 | $ 20.40 | $ 20.37 | $ 20.35 | $ 20.38 |
| Fair value (in millions) | $ — | $ — | $ — | $ — | $ — |

As of December 31, 2002, BNSF Railway's total fuel hedging program covered approximately 49 percent, 20 percent and 10 percent of estimated fuel purchases for 2003, 2004 and 2005, respectively. Hedge positions are closely monitored to ensure that they will not exceed actual fuel requirements in any period.

As a result of adopting SFAS No. 133, the Company recorded a cumulative transition benefit of $56 million, net of tax, to AOCI related to fuel hedging transactions as of January 1, 2001. Subsequent changes in fair value for the effective portion of derivatives qualifying as hedges are recognized in Other Comprehensive Income (OCI) until the purchase of the related hedged item is recognized in earnings, at which time changes in fair value previously recorded in OCI are reclassified to earnings and recognized in fuel expense.

The amounts recorded in the Consolidated Statements of Income since the adoption of SFAS No. 133 for fuel hedge transactions were as follows (in millions):

| | Year Ended December 31, | |
|---|---|---|
| | 2002 | 2001 |
| Hedge benefit | $ 50 | $ 48 |
| Tax effect | 19 | 18 |
| Hedge benefit, net of tax | $ 31 | $ 30 |

Since the adoption of SFAS No. 133, the ineffective portion of fuel hedge transactions has been de minimis.

The amounts recorded in the Consolidated Balance Sheets for fuel hedge transactions were as follows (in millions):

| | December 31, | |
|---|---|---|
| | 2002 | 2001 |
| Fuel hedging asset (liability) | $ 31 | $ (4) |
| Tax effect | 12 | (2) |

| | | | | |
|---|---|---|---|---|
| Amount included in AOCI, net of tax | $ | 19 | $ | (2) |
| Settled fuel hedging contracts receivable (payable) | $ | 29 | $ | (3) |

Amounts recorded in AOCI represent the fair value less the ineffective portion of unexpired hedges.

BNSF Railway measures the fair value of hedges from data provided by various external counterparties. To value a swap, the Company uses a three-month average of forward commodity prices for the period hedged. The fair values of costless collars are calculated and provided by the corresponding counterparties.

*Interest Rate*

From time to time, BNSF Railway enters into various interest rate hedging transactions for purposes of managing exposure to fluctuations in interest rates and establishing rates in anticipation of future debt issuances as well as to convert a portion of its fixed-rate long-term debt to floating-rate debt. The Company uses an interest rate swap as part of its interest rate risk management strategy.

As of December 31, 2002, BNSF Railway had entered into one swap on a notional amount of $100 million in which it pays a floating rate, which fluctuates quarterly, based on LIBOR. The floating rate to be paid by BNSF Railway as of December 31, 2002, was 5.98 percent and the fixed rate BNSF Railway is to receive is 8.63 percent. This swap will expire in 2004.

Table of Contents

**THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The amounts recorded in the Consolidated Statements of Income since the adoption of SFAS No. 133 for the interest rate fair value hedge transaction was as follows (in millions):

| | Year Ended December 31, | |
|---|---|---|
| | **2002** | **2001** |
| Hedge benefit | $ 2 | $ — |
| Tax effect | 1 | — |
| Hedge benefit, net of tax | $ 1 | $ — |

The amounts recorded in other assets with a corresponding increase to debt on the Consolidated Balance Sheets for the interest rate fair value hedge transaction, which represents the fair value of the unexpired hedge, was as follows (in millions):

| | December 31, | |
|---|---|---|
| | **2002** | **2001** |
| Short-term interest rate hedging asset | $ 1 | $ — |
| Long-term interest rate hedging asset | $ 4 | $ — |

**4. Other Expense, Net**

Other expense, net includes the following (in millions):

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2002** | **2001** | **2000** |
| Accounts receivable sale fees | $ 12 | $ 30 | $ 40 |
| Write-down of non-rail investments | — | 47 | — |
| Miscellaneous, net | — | (7) | (5) |
| Total | $ 12 | $ 70 | $ 35 |

Losses recognized in 2001 related to non-rail investments consisted primarily of Pathnet Telecommunications, Inc., a telecommunications venture; a decline in the cash surrender value of company owned life insurance policies; and a portfolio of other non-core investments.

## 5. Income Taxes

Income tax expense was as follows (in millions):

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2002 | 2001 | 2000 |
| Current: | | | |
| Federal | $ 115 | $ 250 | $ 332 |
| State | 14 | 30 | 43 |
| Total current | 129 | 280 | 375 |
| Deferred: | | | |
| Federal | 386 | 274 | 308 |
| State | 55 | 44 | 54 |
| Total deferred | 441 | 318 | 362 |
| Total | $ 570 | $ 598 | $ 737 |

Reconciliation of the federal statutory income tax rate to the effective tax rate was as follows:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2002 | 2001 | 2000 |
| Federal statutory income tax rate | 35.0% | 35.0% | 35.0% |
| State income taxes, net of federal tax benefit | 3.0 | 3.1 | 3.5 |
| Other, net | (0.8) | 0.5 | (0.4) |
| Effective tax rate | 37.2% | 38.6% | 38.1% |

Table of Contents

THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

The components of deferred tax assets and liabilities were as follows (in millions):

| | December 31, | |
|---|---|---|
| | 2002 | 2001 |
| Deferred tax liabilities: | | |
| Depreciation and amortization | $(7,148) | $(6,671) |
| Other | (403) | (422) |
| Total deferred tax liabilities | (7,551) | (7,093) |
| Deferred tax assets: | | |
| Casualty and environmental | 218 | 253 |
| Employee merger and separation costs | 80 | 105 |
| Pension and post-retirement benefits | 237 | 99 |
| Other | 352 | 219 |
| Total deferred tax assets | 887 | 676 |
| Net deferred tax liability | $(6,664) | $(6,417) |
| Noncurrent deferred income tax liability | $(6,966) | $(6,723) |
| Current deferred income tax asset | 302 | 306 |
| Net deferred tax liability | $(6,664) | $(6,417) |

In accordance with the income allocation agreement between BNSF and BNSF Railway, the Company makes payments to or receives refunds from BNSF based on its separate consolidated tax liabilities. All federal income tax returns of BNSF's predecessor companies, Burlington Northern Inc. and Santa Fe Pacific Corporation are closed through 1994 and the business combination date September 1995, respectively. BNSF Railway is currently under Internal Revenue Service examination for years 1995 through 1999. In addition, BNSF Railway and its subsidiaries have various state income tax returns in the process of examination, administrative appeal or litigation. Management believes that adequate provision has been made for any adjustment that might be assessed for open years through 2002.

## 6. Accounts Receivable, Net

BNSF Railway transfers most of its accounts receivable to Santa Fe Receivables Corporation (SFRC) a special purpose subsidiary. SFRC transfers an undivided interest in such receivables, with limited exceptions, to a master trust, and causes the trust to issue an undivided interest in the receivables to investors (the A/R sales program). The undivided interests in the master trust may be in the form of certificates or purchased interests.

In 2001, SFRC increased capacity to sell undivided interests to investors under the A/R sales program by $100 million to $700

million. Outstanding undivided interests held by investors under the A/R sales program were $594 million, net of $8 million of excess cash held in the trust, and $625 million at December 31, 2002 and 2001, respectively. These receivables were derecognized by BNSF Railway in connection with the sale of undivided interests under the A/R sales program. The undivided interests were supported by $771 million and $844 million of receivables transferred by SFRC to the master trust at December 31, 2002 and 2001, respectively. When SFRC transfers these receivables to the master trust, it retains an undivided interest in the receivables sold. This retained interest is included in accounts receivable in the Company's financial statements. SFRC's retained interest in these receivables of $177 million and $219 million at December 31, 2002 and 2001, respectively, less an allowance for uncollectible accounts, reflected the total accounts receivables transferred by SFRC to the master trust less $594 million and $625 million, in 2002 and 2001, respectively, of outstanding undivided interests held by investors. Due to a relatively short collection cycle, the fair value of the undivided interest transferred to investors in the A/R sales program approximated book value and there was no gain or loss from the transaction.

The Company retains the collection responsibility with respect to the accounts receivable. Proceeds from collections reinvested in the A/R sales program were approximately $9.5 billion in 2002 and $9.8 billion in 2001. No servicing asset or liability has been recorded since the fees the Company receives for servicing the receivables approximate the related costs. SFRC's costs of the sale of receivables are included in Other expense, net and were $12 million and $30 million in 2002 and 2001, respectively. These costs fluctuate monthly with changes in prevailing interest rates, and were based on weighted average interest rates of 2.0 percent in 2002 and 4.8 percent in 2001. These costs include interest, discounts associated with transferring the receivables under the A/R sales program to SFRC, program fees paid to banks, incidental commercial paper issuing costs, and fees for unused commitment availability.

The amount of accounts receivable transferred by BNSF Railway to SFRC fluctuates based upon the availability of receivables and is directly affected by changing business volumes and credit risks, including dilution and delinquencies. BNSF Railway has historically experienced very low levels of default or dilution. If dilution or delinquency percentages were to increase one percentage point, the value of BNSF Railway's retained interest would increase by approximately $8 million.

Receivables funded under the A/R sales program may not include amounts over ninety days past due or concentrations over certain limits with any one customer. At December 31, 2002 and 2001, $77 million and $72 million, respectively, of accounts receivable were greater than ninety days old. The Company maintains an allowance for bill adjustments and uncollectible accounts based upon the expected collectibility of accounts receivable, including receivables transferred to the master trust. Credit losses are based on specific identification of uncollectible accounts and application of historical collection percentages by aging category. At December 31, 2002 and 2001, $82 million and $65 million, respectively, of such allowances had been recorded. During the year ended December 31, 2002, 2001 and 2000, $7 million, $8 million and $4 million, respectively, of accounts receivable were written off.

The investors in the master trust have no recourse to BNSF Railway's other assets except for customary warranty and indemnity claims. Creditors of BNSF Railway have no recourse to the assets of the master trust or SFRC unless and until all claims of their respective creditors have been paid. The A/R sales program includes provisions that, if triggered, allow the investors participating in this program, at their option, to cancel the program. At December 31, 2002, BNSF Railway was in compliance with these provisions.

Table of Contents

**THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

## 7. Property and Equipment, Net

Property and equipment, net (in millions), and the weighted average annual depreciation rate (%) were as follows:

| | December 31, | | |
|---|---|---|---|
| | 2002 | 2001 | 2002 Depreciation Rate |
| Land | $ 1,481 | $ 1,416 | — % |
| Track structure | 13,003 | 12,434 | 4.0 |
| Other roadway | 9,713 | 9,407 | 2.5 |
| Locomotives | 2,721 | 2,759 | 5.6 |
| Freight cars and other equipment | 1,678 | 1,719 | 4.8 |
| Computer hardware and software | 254 | 266 | 16.9 |
| Total cost | 28,850 | 28,001 | |
| Less accumulated depreciation and amortization | (4,882) | (4,945) | |
| Property and equipment, net | $23,968 | $23,056 | |

The Consolidated Balance Sheets at December 31, 2002 and 2001, included $972 million, net of $249 million of amortization, and $949 million, net of $253 million of amortization, respectively, for property and equipment under capital leases, primarily for locomotives.

## 8. Accounts Payable and Other Current Liabilities

Accounts payable and other current liabilities consisted of the following (in millions):

| | December 31, | |
|---|---|---|
| | 2002 | 2001 |
| Compensation and benefits payable | $ 409 | $ 353 |
| Casualty and environmental liabilities | 217 | 237 |
| Tax liabilities | 260 | 293 |
| Rents and leases | 150 | 166 |
| Accounts payable | 201 | 155 |
| Contract allowances | 124 | 127 |
| Accrued interest | 42 | 47 |
| Employee merger and separation costs | 40 | 58 |
| Other | 432 | 421 |

Case 1:07-mc-00489-BAH Document 1229-7 Filed 11/22/24 Page 2293 of 3766

| | | |
|---|---|---|
| Total | $1,875 | $1,857 |

Table of Contents

THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

## 9. Debt

Debt outstanding was as follows (in millions):

| | December 31, | |
|---|---|---|
| | 2002 | 2001 |
| Capitalized lease obligations, weighted average rate of 6.5 percent, due 2003 to 2023 | $ 646 | $ 672 |
| Equipment obligations, weighted average rate of 7.2 percent, due 2003 to 2016 | 611 | 677 |
| Notes and debentures, weighted average rate of 7.6 percent, due 2003 to 2023 | 467 | 616 |
| Mortgage bonds, weighted average rate of 7.9 percent, due 2003 to 2047 | 422 | 425 |
| Financing obligations, weighted average rate of 7.0 percent, due 2012 to 2022 | 138 | — |
| Unamortized discount and other, net | (28) | (26) |
| Total | 2,256 | 2,364 |
| Less current portion of long-term debt | (173) | (288) |
| Long-term debt | $2,083 | $2,076 |

Notes and debentures include fair value adjustments for hedges of $4 million and $0 million at December 31, 2002 and 2001, respectively.

Certain BNSF Railway properties and other assets are subject to liens securing $422 million of mortgage debt. Certain locomotives and rolling stock of BNSF Railway are subject to equipment obligations and capital leases.

Aggregate long-term debt scheduled maturities for 2003 through 2007 are $173 million, $249 million, $146 million, $433 million and $136 million, respectively.

The carrying amounts of BNSF Railway's long-term debt at December 31, 2002 and 2001, were $2,256 million and $2,364 million, respectively, while the estimated fair values at December 31, 2002 and 2001, were $2,317 million and $2,460 million, respectively. The fair value of BNSF Railway's long-term debt is primarily based on quoted market prices for the same or similar issues or on the current rates that would be offered to BNSF Railway for debt of the same remaining maturities.

*Mortgage Bonds*

*2003*

In January, the Company exercised an option to call $29 million of 2.63 percent mortgage bonds issued by a predecessor company and due January 1, 2010. Cash generated from operations was used to fund the call.

*Notes and Debentures*

*2001*

BNSF Railway entered into an interest rate swap to convert $100 million of fixed-rate debt to floating-rate debt. The floating rate that BNSF Railway pays on the swap is 5.98 percent and the fixed rate BNSF Railway receives is 8.63 percent. The floating rate fluctuates quarterly based on LIBOR. The swap expires in 2004.

*Financing Obligations*

*2002*

The Company financed the construction of an intermodal facility by a third party and entered into an agreement to lease the intermodal facility for 20 years. This lease transaction is accounted for as a financing and has a purchase option. The Company recorded an asset in Property and equipment, net and a liability in Long-term debt of $138 million which represents the fair market value at lease inception.

Table of Contents

**THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Guarantees*

Debt guaranteed by the Company is as follows:

| | Guarantees | | | | |
|---|---|---|---|---|---|
| | **BNSF Railway Ownership Percentage** | **Principal Amount Guaranteed** | **Maximum Future Payments** | **Maximum Recourse Amount (a)** | **Remaining Term (in years)** |
| **Counterparty** | | | | | |
| Kinder Morgan Energy Partners LP | 0.5% | $ 190 | $ 190 | $ — | Termination of Ownership |
| Kansas City Terminal Intermodal Transportation Corporation | 0.0% | $ 70 | $ 118 | $ 118 | 16 |
| The Unified Government of Wyandotte County/Kansas City, Kansas | 0.0% | $ 14 | $ 24 | $ — | 20 |
| Westside Intermodal Transportation Corporation | 0.0% | $ 45 | $ 78 | $ — | 20 |
| San Jacinto Partnership | 49.0% | $ — | $ — | $ — | N/A |
| All other | 0.0% | $ 19 | $ 23 | $ 7 | Various |

(a) – Reflects the maximum amount the Company could recover from a third party other than the counterparty.

Kinder Morgan Energy Partners LP

Santa Fe Pacific Pipelines, Inc (SFPP), an indirect, wholly-owned subsidiary of BNSF Railway, has a guarantee in connection with its remaining special limited partnership interest in SFPP, L.P. All obligations with respect to the guarantee will cease upon termination of ownership rights which would occur upon a put notice issued by BNSF Railway or the exercise of the call rights by the general partners of SFPP, L.P.

Kansas City Terminal Intermodal Transportation Corporation

BNSF Railway and another major railroad jointly and severally guarantee $70 million of debt of Kansas City Terminal Intermodal Transportation Corporation, the proceeds of which were used to finance construction of a double track grade separation bridge in Kansas City, Missouri, which is operated and used by Kansas City Terminal Railway Company (KCTRC). BNSF Railway has a 25 percent ownership in KCTRC and accounts for its interest using the equity method of accounting.

The Unified Government of Wyandotte County/Kansas City, Kansas and Westside Intermodal Transportation Corporation

Proceeds of guaranteed debt are being used to finance construction of a bridge that will connect BNSF Railway's Argentine Yard in Kansas City, Kansas, with the KCTRC mainline tracks in Kansas City, Missouri. The bridge will be operated by KCTRC.

San Jacinto Partnership

BNSF Railway has agreed to guarantee approximately $85 million of debt, none of which was issued as of December 31, 2002. The proceeds from the debt are to be used to construct and operate a 13-mile railroad which will service several chemical and plastics manufacturing facilities in the Houston, Texas area. In addition, BNSF Railway has advanced the San Jacinto Partnership $16 million in interim construction financing which is expected to be repaid in 2003 when the debt is expected to be issued.

All other

BNSF Railway guarantees $19 million of other debt and leases including the guarantee of the residual value of certain leased assets totaling approximately $6 million. BNSF holds a performance bond and has the option to sub-lease property to recover up to $7 million of the $19 million of guarantees. These guarantees expire between 2006 and 2014.

Other than the performance bond discussed above, there is no collateral held by a third party which BNSF Railway could obtain and liquidate to recover any amounts paid under the above guarantees.

Other than amounts recorded for capitalized leases, none of the guarantees above are recorded in the Consolidated Financial Statements of the Company. BNSF Railway does not expect performance under these guarantees to have a material effect on the Company in the foreseeable future.

Table of Contents

**THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

## 10. Commitments and Contingencies

*Lease Commitments*

BNSF Railway has substantial lease commitments for locomotives, freight cars, trailers and containers, office buildings and other property, and many of these leases provide the option to purchase the leased item at fair market value at the end of the lease. However, some provide fixed price purchase options. Future minimum lease payments (which reflect leases having non-cancelable lease terms in excess of one year) as of December 31, 2002, are summarized as follows (in millions):

| | December 31, | |
|---|---|---|
| | Capital Leases | Operating Leases |
| 2003 | $ 109 | $ 425 |
| 2004 | 109 | 428 |
| 2005 | 109 | 398 |
| 2006 | 108 | 367 |
| 2007 | 96 | 334 |
| Thereafter | 272 | 3,585 |
| Total | 803 | $ 5,537 |
| Less amount representing interest | 157 | |
| Present value of minimum lease payments | $ 646 | |

Lease rental expense for all operating leases was $448 million, $443 million and $428 million for the years ended December 31, 2002, 2001 and 2000, respectively. Contingent rentals and sublease rentals were not significant.

*Other Commitments*

In the normal course of business, the Company enters into long-term contractual requirements for future goods and services needed for the operations of the business. Such commitments are not in excess of expected requirements and are not reasonably likely to result in performance penalties or payments that would have a material adverse effect on the Company's liquidity.

*Casualty and Environmental*

Personal injury claims, including work-related injuries to employees, are a significant expense for the railroad industry. Employees of BNSF Railway are compensated for work-related injuries according to the provisions of the Federal Employers' Liability Act (FELA). FELA's system of requiring the finding of fault, coupled with unscheduled awards and reliance on the jury system, contributed to significant increases in expense in past years. BNSF Railway has implemented a number of safety programs to reduce the number of personal injuries as well as the associated claims and personal injury expense.

BNSF formed a wholly-owned subsidiary, Burlington Northern Santa Fe Insurance Company, Ltd. (BNSF IC), in the second quarter of 2002. BNSF IC provides insurance coverage for certain punitive damage risks incurred after April 1, 1998, FELA claims, railroad protective and force account insurance claims incurred after January 1, 2002, and certain other claims which are subject to reinsurance. During the year ended December 31, 2002, BNSF Railway had paid premiums of $133 million to BNSF IC for such coverage. At December 31, 2002, there was no unamortized premium remaining in the Consolidated Balance Sheets.

The Company recognized personal injury expenses of approximately $94 million, $195 million and $168 million during 2002, 2001 and 2000, respectively for claims not insured by BNSF IC. BNSF Railway made payments for personal injuries of approximately $179 million, $173 million and $178 million in 2002, 2001 and 2000, respectively. At December 31, 2002 and 2001, the Company had recorded liabilities of $373 million and $458 million, respectively, related to both asserted and unasserted personal injury claims. Of these amounts, $166 million and $184 million, respectively, are included in current liabilities. BNSF Railway's liabilities for both asserted and unasserted personal injury claims are undiscounted.

Table of Contents

**THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The Company's operations, as well as those of its competitors, are subject to extensive federal, state and local environmental regulation. BNSF Railway's operating procedures include practices to protect the environment from the risks inherent in railroad operations, which frequently involve transporting chemicals and other hazardous materials. Additionally, many of BNSF Railway's land holdings are and have been used for industrial or transportation-related purposes or leased to commercial or industrial companies whose activities may have resulted in discharges onto the property. As a result, BNSF Railway is subject to environmental cleanup and enforcement actions. In particular, the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), also known as the Superfund law, as well as similar state laws generally impose joint and several liability for cleanup and enforcement costs on current and former owners and operators of a site without regard to fault or the legality of the original conduct. BNSF Railway has been notified that it is a potentially responsible party (PRP) for study and cleanup costs at approximately 30 Superfund sites for which investigation and remediation payments are or will be made or are yet to be determined (the Superfund sites) and, in many instances, is one of several PRPs. In addition, BNSF Railway may be considered a PRP under certain other laws. Accordingly, under CERCLA and other federal and state statutes, BNSF Railway may be held jointly and severally liable for all environmental costs associated with a particular site. If there are other PRPs, BNSF Railway generally participates in the cleanup of these sites through cost-sharing agreements with terms that vary from site to site. Costs are typically allocated based on relative volumetric contribution of material, the amount of time the site was owned or operated, and/or the portion of the total site owned or operated by each PRP.

Environmental costs include initial site surveys and environmental studies of potentially contaminated sites as well as costs for remediation and restoration of sites determined to be contaminated. Liabilities for environmental cleanup costs are initially recorded when BNSF Railway's liability for environmental cleanup is both probable and a reasonable estimate of associated costs can be made. Adjustments to initial estimates are recorded as necessary based upon additional information developed in subsequent periods. BNSF Railway conducts an ongoing environmental contingency analysis, which considers a combination of factors including independent consulting reports, site visits, legal reviews, analysis of the likelihood of participation in and the ability of other PRPs to pay for cleanup, and historical trend analyses.

BNSF Railway is involved in a number of administrative and judicial proceedings and other mandatory cleanup efforts at approximately 415 sites, including the Superfund sites, at which it is participating in the study or cleanup, or both, of alleged environmental contamination. The Company recognized environmental expenses of approximately $43 million, $51 million and $40 million during 2002, 2001 and 2000, respectively. BNSF Railway paid approximately $49 million, $72 million and $49 million during 2002, 2001 and 2000, respectively, for mandatory and unasserted cleanup efforts, including amounts expended under federal and state voluntary cleanup programs. BNSF Railway has recorded liabilities for remediation and restoration of all known sites of $196 million at December 31, 2002, compared with $202 million at December 31, 2001. Of these amounts, $51 million and $53 million, respectively, are included in current liabilities. BNSF Railway's environmental liabilities are not discounted. BNSF Railway anticipates that the majority of the accrued costs at December 31, 2002, will be paid over the next five years and no individual site is considered to be material.

Liabilities recorded for environmental costs represent BNSF Railway's best estimates for remediation and restoration of these sites and include both asserted and unasserted claims. Unasserted claims are not considered to be a material component of the liability. Although recorded liabilities include BNSF Railway's best estimates of all costs, without reduction for anticipated recoveries from third parties, BNSF Railway's total cleanup costs at these sites cannot be predicted with certainty due to various factors such as the extent of corrective actions that may be required, evolving environmental laws and regulations, advances in environmental technology, the extent of other parties' participation in cleanup efforts, developments in ongoing environmental analyses related to sites determined to be contaminated, and developments in environmental surveys and studies of potentially

contaminated sites. As a result, future charges to income for environmental liabilities could have a significant effect on results of operations in a particular quarter or fiscal year as individual site studies and remediation and restoration efforts proceed or as new sites arise. However, management believes it is unlikely any identified matters, either individually or in the aggregate, will have a material adverse effect on BNSF Railway's results of operations, financial position or liquidity.

*Other Claims and Litigation*

BNSF Railway and its subsidiaries are parties to a number of legal actions and claims, various governmental proceedings and private civil suits arising in the ordinary course of business, including those related to environmental matters, Federal Employers' Liability Act claims by BNSF Railway employees, other personal injury claims, and disputes and complaints involving certain transportation rates and charges (including complaints seeking refunds of prior charges paid for coal transportation and the prescription of future rates for such movements). Some of the legal proceedings include claims for punitive as well as compensatory damages, and a few proceedings purport to be class actions. While the final outcome of these matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded along with applicable insurance, it is the opinion of BNSF Railway's management that none of these items, when finally resolved, will have a material adverse effect on the results

Table of Contents

THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

of operations, financial position or liquidity of BNSF Railway, although an adverse resolution of a number of these items could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

## 11. Employee Merger and Separation Costs

Employee merger and separation costs activity was as follows (in millions):

| | 2002 | 2001 | 2000 |
|---|---|---|---|
| Beginning balance at January 1, | $274 | $310 | $356 |
| Accruals | 1 | 30 | 22 |
| Payments | (55) | (55) | (58) |
| Other | (10) | (11) | (10) |
| Ending balance at December 31, | $210 | $274 | $310 |

Employee merger and separation liabilities of $210 million and $274 million are included in the Consolidated Balance Sheets at December 31, 2002 and 2001, respectively, and principally represent: (i) employee-related severance costs for the consolidation of clerical functions, material handlers in mechanical shops and trainmen on reserve boards; (ii) deferred benefits payable upon separation or retirement to certain active conductors, trainmen and locomotive engineers; and (iii) certain non-union employee severance costs. Employee merger and separation expenses are recorded in Materials and other in the Consolidated Income Statements. At December 31, 2002, $40 million of the remaining liabilities are included in current liabilities for anticipated costs to be paid in 2003.

During the fourth quarter of 2001, the Company recorded a $66 million charge for workforce reduction related costs which resulted in $30 million being recorded in Employee merger and separation costs.

*Conductors, Trainmen and Locomotive Engineers*

Liabilities related to deferred benefits payable upon separation or retirement to certain active conductors, trainmen and locomotive engineers were $163 million and $170 million at December 31, 2002 and 2001, respectively. These costs were primarily incurred in connection with labor agreements reached prior to the consummation of the business combination of BNSF's predecessor companies Burlington Northern Inc. and Santa Fe Pacific Corporation (the Merger) which, among other things, reduced train crew sizes and allowed for more flexible work rules. In 2001, the Company recorded a $5 million reversal of certain deferred benefits payable to reflect a change in estimates.

In the second quarter of 2000, the Company incurred $3 million of costs for severance, medical and other benefit costs for approximately 50 trainmen on reserve boards. All remaining payments were made in 2002.

*Consolidation of Clerical Functions*

Liabilities related to the consolidation of clerical functions were $25 million and $69 million at December 31, 2002 and 2001, respectively, and primarily provide for severance costs associated with the clerical consolidation plan adopted in 1995 upon the Merger. The consolidation plan resulted in the elimination of approximately 1,500 permanent positions and was substantially

completed during 1999.

In the fourth quarter of 2001, the Company recorded a charge of $9 million of costs related to the reduction of approximately 40 material handlers and other clerical positions. In the second quarter of 2000, the Company recorded a charge of $17 million for severance, medical and other benefit costs related to approximately 140 material handlers in mechanical shops.

In 2002, 2001 and 2000, the Company recorded $10 million, $6 million and $10 million, respectively, of reversals for certain liabilities associated with the consolidation of clerical functions. These reversals primarily reflect accrued payments related to workforce reductions for positions under collective bargaining agreements where the Company was able to place affected individuals in alternate positions. The remaining liability balance at December 31, 2002, represents benefits to be paid to affected employees who did not receive lump-sum payments, but instead will be paid over five to ten years or in some cases through retirement.

*Non-Union Employee Severance*

Liabilities principally related to certain remaining non-union employee severances resulting from the fourth quarter 2001 workforce reduction, the second quarter 1999 reorganization, and the Merger were $22 million and $35 million at

Table of Contents

**THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

December 31, 2002 and 2001, respectively. These costs will be paid over the next several years based on deferral elections made by the employees.

During the fourth quarter of 2001, the Company reduced 400 positions through severance, normal attrition and the elimination of contractors. The Company recorded $21 million of expenses for severance, medical and other benefits associated with the costs of terminating 360 employees and approximately $31 million for benefits to be received under the Company's retirement and medical plans. During the fourth quarter of 2002, the Company recorded a charge of $1 million related to this program as a result of higher costs than originally estimated. Substantially all of these planned reductions were completed at December 31, 2001.

In the second quarter of 2000, the Company incurred $2 million of costs for severance, medical and other benefit costs for ten involuntarily terminated non-union positions. These planned reductions were completed at December 31, 2000.

**12. Retirement Plans and Other Postemployment Benefit Plans**

BNSF Railway sponsors a funded, noncontributory qualified BNSF Railway Retirement Plan, which covers substantially all non-union employees and an unfunded, nonqualified BNSF Railway Supplemental Retirement Plan, which covers certain officers and other employees. The benefits under these BNSF Railway plans are based on years of credited service and the highest five-year average compensation levels. BNSF Railway's funding policy is to contribute annually not less than the regulatory minimum and not more than the maximum amount deductible for income tax purposes with respect to the funded plan.

Certain salaried employees of BNSF Railway that have met certain age and years of service requirements are eligible for medical benefits and life insurance coverage during retirement. The retiree medical plan is contributory and provides benefits to retirees, their covered dependents and beneficiaries. Retiree contributions are adjusted annually. The plan also contains fixed deductibles, coinsurance and out-of pocket limitations. The basic life insurance plan is noncontributory and covers retirees only. Optional life insurance coverage is available for some retirees; however, the retiree is responsible for the full cost. BNSF Railway's policy is to fund benefits payable under the medical and life insurance plans as they come due. Employees beginning salaried employment with BNSF Railway subsequent to September 22, 1995, are not eligible for medical benefits during retirement.

Components of the net (benefit) cost for these plans were as follows (in millions):

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | Pension Benefits | | | Medical and Life Benefits | | |
| | 2002 | 2001 | 2000 | 2002 | 2001 | 2000 |
| Service cost | $ 15 | $ 13 | $ 13 | $ 6 | $ 4 | $ 4 |
| Interest cost | 100 | 102 | 100 | 21 | 18 | 18 |
| Expected return on plan assets | (127) | (136) | (129) | — | — | — |
| Curtailments/settlements | — | 10 | — | — | 3 | — |
| Special termination benefits | 2 | 18 | — | — | — | — |
| Actuarial loss | 1 | 1 | — | 3 | — | — |
| Net amortization and deferred amounts | 2 | 2 | 3 | — | — | 1 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Net (benefit) cost | $ (7) | $ 10 | $ (13) | $ 30 | $ 25 | $ 23 |

Table of Contents

**THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The following tables show the change in benefit obligation and plan assets of the plans based on a September 30 measurement date (in millions):

| | Pension Benefits | | Medical and Life Benefits | |
|---|---|---|---|---|
| | **2002** | **2001** | **2002** | **2001** |
| **Change in Benefit Obligation** | | | | |
| Benefit obligation at beginning of period | $ 1,507 | $ 1,419 | $ 314 | $ 247 |
| Service cost | 15 | 13 | 6 | 4 |
| Interest cost | 100 | 102 | 21 | 18 |
| Plan participants' contributions | — | — | 5 | 4 |
| Amendments | 2 | — | (12) | — |
| Actuarial loss | 117 | 68 | 54 | 61 |
| Curtailments/settlements | (13) | 8 | — | 3 |
| Special termination benefits | 2 | 18 | — | — |
| Benefits paid | (119) | (121) | (25) | (23) |
| Benefit obligation at end of period | $ 1,611 | $ 1,507 | $ 363 | $ 314 |

| | Pension Benefits | | Medical and Life Benefits | |
|---|---|---|---|---|
| | **2002** | **2001** | **2002** | **2001** |
| **Change in Plan Assets** | | | | |
| Fair value of plan assets at beginning of period | $ 1,345 | $ 1,577 | $ — | $ — |
| Actual return on plan assets | (67) | (115) | — | — |
| Settlements | (13) | — | — | — |
| Employer contribution | 5 | 4 | 20 | 19 |
| Plan participants' contributions | — | — | 5 | 4 |
| Benefits paid | (119) | (121) | (25) | (23) |
| Fair value of plan assets at end of period | $ 1,151 | $ 1,345 | $ — | $ — |

The following tables show the reconciliation of the funded status of the plans with amounts recorded in the Consolidated Balance Sheets (in millions):

| | December 31, | |
|---|---|---|
| | **Pension Benefits** | **Medical and Life Benefits** |

| | 2002 | 2001 | 2002 | 2001 |
|---|---|---|---|---|
| Funded status | $ (460) | $ (162) | $ (363) | $ (314) |
| Unrecognized net loss | 479 | 169 | 111 | 60 |
| Unrecognized prior service cost | (3) | (6) | (12) | (1) |
| Unamortized net transition obligation | — | 3 | — | — |
| Net amount recognized | $ 16 | $ 4 | $ (264) | $ (255) |

| | December 31, | | | |
|---|---|---|---|---|
| | Pension Benefits | | Medical and Life Benefits | |
| | 2002 | 2001 | 2002 | 2001 |
| Amounts recognized in the consolidated balance sheets consist of: | | | | |
| Prepaid benefit cost | $ — | $ 42 | $ — | $ — |
| Accrued benefit liability | (352) | (50) | (264) | (255) |
| Accumulated other comprehensive loss | 368 | 12 | — | — |
| Net amount recognized | $ 16 | $ 4 | $ (264) | $ (255) |

Table of Contents

THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

The assumptions used in accounting for the BNSF Railway plans were as follows:

| | Pension Benefits | | Medical and Life Benefits | |
|---|---|---|---|---|
| | 2002 | 2001 | 2002 | 2001 |
| **Assumptions** | | | | |
| Discount rate | 6.5% | 7.0% | 6.5% | 7.0% |
| Rate of increase in compensation levels | 3.9% | 4.0% | — | — |
| Expected return on plan assets | 8.5% | 9.5% | — | — |

For purposes of the medical and life benefits calculations for 2002, the assumed health care cost trend rate for both managed care and non-managed care medical costs is 11 percent and is assumed to decrease one percent for each future year until the ultimate rate of five percent is reached in 2009 and remain constant thereafter. Increasing the assumed health care cost trend rates by one percentage point would increase the accumulated post-retirement benefit obligation by $36 million and the combined service and interest components of net post-retirement benefit cost recognized in 2002 by $3 million. Decreasing the assumed health care cost trend rates by one percentage point would decrease the accumulated post-retirement benefit obligation by $30 million and the combined service and interest components of net post-retirement benefit cost recognized in 2002 by $3 million.

*Defined Contribution Plans*

BNSF Railway sponsors 401(k) plans which cover substantially all employees. BNSF Railway matches 50 percent of the first six percent of non-union employees' contributions and matches 25 percent on the first four percent of a limited number of union employees' contributions, which are subject to certain percentage limits of the employees' earnings, at each pay period. Depending on BNSF Railway's performance, non-union employees can receive an additional matching contribution of up to 30 percent of the first six percent at the end of the year. Employer contributions for all non-union employees are subject to a five-year length of service vesting schedule. BNSF Railway's 401(k) matching expense was $15 million, $14 million and $16 million in 2002, 2001 and 2000, respectively.

*Other*

Under collective bargaining agreements, BNSF Railway participates in multi-employer benefit plans which provide certain post-retirement health care and life insurance benefits for eligible union employees. Insurance premiums paid attributable to retirees, which are generally expensed as incurred, were $20 million, $18 million and $15 million, in 2002, 2001 and 2000, respectively.

## 13. Related Party Transactions

BNSF Railway is involved with BNSF and certain of its subsidiaries in related party transactions in the ordinary course of business, which include payments made on each other's behalf and performance of services. Under the terms of a tax allocation agreement with BNSF, BNSF Railway made federal and state income tax payments, net of refunds, of $178 million, $278 million and $448 million during 2002, 2001 and 2000, respectively, which are reflected in changes in working capital in the consolidated statement of cash flows.

BNSF Railway had a net intercompany payable balance of $7 million and a net intercompany receivable balance of $55 million at December 31, 2002 and 2001, respectively, which are reflected in accounts payable and accounts receivable in the Consolidated Balance Sheets. Net intercompany receivable or payable balances are settled in the ordinary course of business.

At December 31, 2002 and 2001, BNSF Railway had $67 million and $117 million, respectively, of intercompany notes payable to BNSF at a variable interest rate of 1.0 percent above the monthly average of the daily effective Federal Funds rate. During 2002, BNSF Railway had additional borrowings of $35 million of variable rate notes and made repayments of $85 million. Proceeds from borrowings are primarily used to fund capital expenditures and other investing activities. Interest is paid semi-annually on all intercompany notes payable. Interest expense on intercompany notes payable is reflected in Interest income, related parties in the Consolidated Income Statements. The intercompany notes are due on demand.

At December 31, 2002 and 2001, BNSF Railway had $1,256 million and $825 million, respectively, of intercompany notes receivable from BNSF with a variable interest rate of 1.0 percent above the monthly average of the

Table of Contents

THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

daily effective Federal Funds rate. The $431 million increase in intercompany notes receivable is primarily due to additional borrowings of $798 million offset by $367 million of repayments from BNSF during 2002. Interest is collected semi-annually on all intercompany notes receivable. The intercompany notes receivable are presented net of the intercompany notes payable discussed above in the Consolidated Balance Sheets. Interest income from intercompany notes receivable is presented in Interest income, related parties in the Consolidated Income Statements.

During 2001 and 2000, BNSF Railway paid dividends of $358 million and $150 million, respectively. BNSF Railway did not pay any dividends during 2002.

Under various plans, BNSF has granted options to employees to purchase its common stock at a price not less than the fair market value at the date of grant. Certain employees of BNSF Railway participate in these plans. In addition, BNSF has other long-term incentive plans administered separately on behalf of employees that are participated in by certain BNSF Railway employees. These plans include, among other things, incentive compensation, issuance of restricted stock and a discounted stock purchase program. Compensation expense, net of tax, recorded for stock incentive plans in accordance with Accounting Principles Board Opinion 25 was $10 million, $8 million and $0 million for the years ended 2002, 2001 and 2000, respectively.

## 14. Accounting Pronouncements

The Financial Accounting Standards Board (FASB) issued SFAS No. 143, *Accounting for Asset Retirement Obligations*, which is effective for fiscal years beginning after June 15, 2002. SFAS No. 143 addresses financial accounting and reporting for obligations associated with the retirement of tangible long-lived assets and the associated asset retirement costs, which will affect the Company's accounting for track structure removal costs. While the standard will have no effect on the Company's liquidity, it will result in a cumulative effect adjustment in the first quarter of 2003 which the Company is currently quantifying along with the ongoing impact it will have on results of operations. The Company does not believe the standard will have a material adverse effect on the Company's financial position.

The FASB issued Interpretation No. 46 (FIN 46), *Consolidation of Variable Interest Entities*, which is effective immediately to variable interest entities created after January 31, 2003, and applies in the first interim period beginning after June 15, 2003 to variable interest entities created before February 1, 2003. FIN 46 addresses the consolidation of variable interest entities through identification of a primary beneficiary. The Company has not yet determined the impact of FIN 46. The Company's accounts receivable sales program will be unaffected by this new pronouncement.

## 15. Quarterly Financial Data—Unaudited

| | Fourth | Third | Second | First |
|---|---|---|---|---|
| | | (In millions) | | |
| **2002** | | | | |
| Revenues | $ 2,293 | $2,304 | $ 2,206 | $2,160 |
| Operating income | $ 443 | $ 423 | $ 427 | $ 383 |
| Net income | $ 258 | $ 245 | $ 240 | $ 218 |
| **2001** | (a) | (b) | | (c) |
| Revenues | $ 2,300 | $2,341 | $ 2,269 | $2,291 |
| Operating income | $ 406 | $ 505 | $ 433 | $ 425 |

| | | | | |
|---|---|---|---|---|
| Net income | $ 209 | $ 281 | $ 248 | $ 214 |

(a) Includes a $66 million charge for work force reduction related costs.
(b) Includes $32 million related to an automotive revenue contract settlement gain partially offset by an $11 million loss on non-rail investments.
(c) Includes a $36 million loss on non-rail investments.

Certain amounts in the table above have been reclassified to conform to the current presentation which is different than previously reported on Form 10-Q due to the reclassification of gains on property dispositions from Other expense, net to Operating expenses.

Net adjustments to previously reported 2002 quarterly Operating income include increases of $4 million, $23 million and $18 million for the third, second and first quarters, respectively. Adjustments to previously reported 2001 quarterly Operating income include increases of $1 million, $5 million, $7 million and $7 million for the fourth, third, second and first quarters, respectively.

Case 1:07-mc-00489-BAH Document 1229-7 Filed 11/22/24 Page 2312 of 3766

Table of Contents

**Item 9. Changes in and Disagreements With Accountants on Accounting and Financial Disclosure**

None.

Table of Contents

## PART III

### Item 14. Controls and Procedures

Based on their evaluation as of a date within 90 days of the filing date of this annual report on Form 10-K, BNSF Railway's principal executive officer and principal financial officer have concluded that BNSF Railway's disclosure controls and procedures (as defined in Rules 13a-14(c) and 15d-14(c) of the Securities Exchange Act of 1934) are effective to ensure that information required to be disclosed by BNSF Railway in its filings under the Securities Exchange Act of 1934 is processed, recorded, summarized, and reported within the time periods specified in Securities and Exchange Commission rules and forms. There have been no significant changes in the Company's internal controls, or in other factors that could significantly affect its internal controls, since the date of their most recent evaluation.

Table of Contents

## PART IV

**Item 15. Exhibits, Financial Statement Schedules, and Reports on Form 8-K**

(a) The following documents are filed as part of this report:

1. Consolidated Financial Statements—See Item 8

2. Consolidated Financial Statement Schedules:
Schedule II—Valuation and Qualifying Accounts—See page F-1

Schedules other than those listed above are omitted because they are not required or applicable, or the required information is included in the Consolidated Financial Statements or related notes.

3. Exhibits:
See Index to Exhibits beginning on page E-1 for a description of the exhibits filed as a part of this Report on Form 10-K.

(b) Reports on Form 8-K
None.

Table of Contents

## SIGNATURES

**Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, The Burlington Northern and Santa Fe Railway Company has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.**

THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY

By: /s/ Matthew K. Rose

**Matthew K. Rose**
**Chairman, President and Chief Executive Officer**

Dated: February 14, 2003

**Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of The Burlington Northern and Santa Fe Railway Company and in the capacities and on the date indicated.**

| Signature | Title |
| --- | --- |
| /s/ Matthew K. Rose*<br>**Matthew K. Rose** | President and Chief Executive Officer (Principal Executive Officer) and Director |
| /s/ Thomas N. Hund*<br>**Thomas N. Hund** | Executive Vice President and Chief Financial Officer (Principal Financial Officer) and Director |
| /s/ Dennis R. Johnson*<br>**Dennis R. Johnson** | Vice President and Controller (Principal Accounting Officer) |
| /s/ Carl R. Ice*<br>**Carl R. Ice** | Director |
| /s/ Jeffrey R. Moreland*<br>**Jeffrey R. Moreland** | Director |
| /s/ Charles S. Schultz*<br>**Charles S. Schultz** | Director |

Dated: February 14, 2003 *By: /s/ Jeffrey R. Moreland

**Jeffrey R. Moreland**
*Executive Vice President Law &*
*Government Affairs and Secretary*

Table of Contents

**CERTIFICATIONS PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Matthew K. Rose, certify that:

1. I have reviewed this annual report on Form 10-K of The Burlington Northern and Santa Fe Railway Company;

2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and we have:

   a) designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

   b) evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

   c) presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

   a) all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

   b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6. The registrant's other certifying officer and I have indicated in this annual report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

Date: February 14, 2003

/s/ MATTHEW K. ROSE

**Matthew K. Rose**
**Chairman, President and**
**Chief Executive Officer**

Table of Contents

I, Thomas N. Hund, certify that:

1. I have reviewed this annual report on Form 10-K of The Burlington Northern and Santa Fe Railway Company;

2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4. The registrant’s other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and we have:

   a) designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

   b) evaluated the effectiveness of the registrant’s disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the “Evaluation Date”); and

   c) presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5. The registrant’s other certifying officer and I have disclosed, based on our most recent evaluation, to the registrant’s auditors and the audit committee of registrant’s board of directors (or persons performing the equivalent function):

   a) all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant’s ability to record, process, summarize and report financial data and have identified for the registrant’s auditors any material weaknesses in internal controls; and

   b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant’s internal controls; and

6. The registrant’s other certifying officer and I have indicated in this annual report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

Date: February 14, 2003

/s/ THOMAS N. HUND

**Thomas N. Hund**
**Executive Vice President and**
**Chief Financial Officer**

Table of Contents

**SCHEDULE II**
**THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES**
**VALUATION AND QUALIFYING ACCOUNTS**
**For the Years Ended December 31, 2002, 2001 and 2000**
**(in millions)**

| Description | Balance at Beginning of Period | Additions Charged to Income | Deductions (a) | Balance at End of Period (b) |
|---|---|---|---|---|
| December 31, 2002<br>Personal injury and environmental liabilities | $ 660 | $ 137 | $ 228 | $ 569 |
| December 31, 2001<br>Personal injury and environmental liabilities | $ 659 | $ 246 | $ 245 | $ 660 |
| December 31, 2000<br>Personal injury and environmental liabilities | $ 678 | $ 208 | $ 227 | $ 659 |

(a) Represents cash payments, net of recoveries
(b) Classified in the Consolidated Balance Sheets as follows:

| | 2002 | 2001 | 2000 |
|---|---|---|---|
| Accounts payable and other current liabilities | $ 217 | $ 237 | $ 229 |
| Casualty and environmental liabilities | 352 | 423 | 430 |
| | $ 569 | $ 660 | $ 659 |

Table of Contents

**THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES**

**INDEX OF EXHIBITS**

| Exhibit Number | Description |
|---|---|
| 3.1 | Restated Certificate of Incorporation of The Burlington Northern and Santa Fe Railway Company effective December 31, 1996. Incorporated by reference to The Burlington Northern and Santa Fe Railway Company's Report on Form 10-K for the fiscal year ended December 31, 1996. |
| 3.2 | By-Laws of BNSF Railway as amended through July 17, 1991. Incorporated by reference to Exhibit 3.2 to The Burlington Northern and Santa Fe Railway Company Report on Form 10-K for the fiscal year ended December 31, 1991. |
| 4.1 | BNSF Railway is not filing any instruments evidencing indebtedness because the total amount of securities authorized under any single such instrument does not exceed ten percent of BNSF Railway's total assets. Copies of any such material instruments will be furnished to the Securities and Exchange Commission upon request. |
| 12.1 | Statement regarding the Computation of Ratio of Earnings to Fixed Charges. |
| 99.1 | Certification pursuant to 18 U.S.C. §1350 (Section 906 of Sarbanes-Oxley Act of 2002). |

# EXHIBIT PX0714

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

**FORM 10-K**

(X) ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the fiscal year ended **DECEMBER 31, 2002**

( ) TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the transition period from _________ to _________

Commission file number 1-8339

# NORFOLK SOUTHERN CORPORATION

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Virginia** | **52-1188014** |
| (State or other jurisdiction of incorporation or organization) | (IRS Employer Identification No.) |
| **Three Commercial Place** **Norfolk, Virginia** | **23510-2191** |
| (Address of principal executive offices) | Zip Code |
| Registrant's telephone number, including area code | **(757) 629-2680** |

**No Change**
(Former name, former address and former fiscal year, if changed since last report.)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each Class | Name of each exchange on which registered |
|---|---|
| **Norfolk Southern Corporation Common Stock (Par Value $1.00)** | **New York Stock Exchange** |

Securities registered pursuant to Section 12(g) of the Act: NONE

Indicate by check mark whether the registrant (1) has filed all report required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days. Yes (X) No ( )

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. (X)

The number of shares outstanding of each of the registrant's classes of common stock, as of January 31, 2003:
389,057,174 (excluding 21,169,125 shares held by registrant's consolidated subsidiaries).

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Act). Yes (X) No ( )

The aggregate market value of the voting common equity held by nonaffiliates as of June 28, 2002 was $9,079,736,767 (based on the closing price as quoted on the New York Stock Exchange on that date).

**DOCUMENTS INCORPORATED BY REFERENCE:**

Portions of the Registrant's definitive proxy statement to be filed electronically pursuant to Regulation 14A not later than 120 days after the end of the fiscal year, are incorporated by reference in Part III.

## TABLE OF CONTENTS

## NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES (NS)


| | | | Page |
|---|---|---|---|
| Part I. | 1. | Business | K3 |
| | 2. | Properties | K3 |
| | 3. | Legal Proceedings | K12 |
| | 4. | Submission of Matters to a Vote of Security Holders<br>Executive Officers of the Registrant | K12 |
| Part II. | 5. | Market for Registrant's Common Stock and Related Stockholders Matters | K14 |
| | 6. | Selected Financial Data | K15 |
| | 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | K16 |
| | 7A. | Quantitative and Qualitative Disclosures About Market Risk | K35 |
| | 8. | Financial Statements and Supplementary Data | K36 |
| | 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | K66 |
| Part III. | 10. | Directors and Executive Officers of the Registrant | K66 |
| | 11. | Executive Compensation | K66 |
| | 12. | Security Ownership of Certain Beneficial Owners and Management | K66 |
| | 13. | Certain Relationships and Related Transactions | K69 |
| | 14. | Controls and Procedures | K69 |
| Part IV. | 15. | Exhibits, Financial Statement Schedule and Reports on Form 8-K<br>Index to Consolidated Financial Statement Schedule | K70 |
| | Power of Attorney | | K76 |
| | Signatures | | K76 |
| | Certifications of CEO and CFO | | K78 |
| | Exhibit Index | | K81 |

# PART I

## NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES (NS)

### Item 1. Business. and Item 2. Properties.

**GENERAL -** Norfolk Southern Corporation (Norfolk Southern) was incorporated on July 23, 1980, under the laws of the Commonwealth of Virginia. On June l, 1982, Norfolk Southern acquired control of two major operating railroads, Norfolk and Western Railway Company (NW) and Southern Railway Company (Southern) in accordance with an Agreement of Merger and Reorganization dated as of July 31, 1980, and with the approval of the transaction by the Interstate Commerce Commission (ICC) (now the Surface Transportation Board [STB]).

Effective Dec. 31, 1990, Norfolk Southern transferred all the common stock of NW to Southern, and Southern's name was changed to Norfolk Southern Railway Company (Norfolk Southern Railway). Effective Sept. 1, 1998, NW was merged with and into Norfolk Southern Railway. As of Dec. 31, 2002, all the common stock of Norfolk Southern Railway and 22.5% of its voting preferred stock (resulting in 95.2% voting control) was owned directly by Norfolk Southern.

Through a jointly owned entity, Norfolk Southern and CSX Corporation (CSX) own the stock of Conrail Inc., which owns the major freight railroad in the Northeast. Norfolk Southern has a 58% economic and 50% voting interest in the jointly owned entity. See also the discussion concerning operation of a portion of Conrail's rail assets, below.

On March 28, 1998, Norfolk Southern closed the sale of its motor carrier company, North American Van Lines, Inc. (NAVL) (see "Discontinued Operations" and Note 17). NAVL's results are presented as "Discontinued operations" in the accompanying financial information.

Norfolk Southern makes available free of charge through its website, www.nscorp.com, its annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and all amendments to those reports as soon as reasonably practicable after such material is electronically filed with or furnished to the Securities and Exchange Commission.

Unless indicated otherwise, Norfolk Southern and its subsidiaries are referred to collectively as NS.

**OPERATION OF A PORTION OF THE CONRAIL RAIL ASSETS -** On June 1, 1999, Norfolk Southern and CSX, through their respective railroad subsidiaries, began operating separate portions of Conrail's rail routes and assets. Substantially all such assets are owned by two wholly owned subsidiaries of Consolidated Rail Corporation (CRC); one of those subsidiaries, Pennsylvania Lines LLC (PRR), has entered into various operating and leasing arrangements, more particularly described in Note 2, with Norfolk Southern Railway. Certain rail assets (Shared Assets Areas) still are owned by CRC, which operates them for joint and exclusive use by Norfolk Southern Railway and the rail subsidiary of CSX.

Operation of the PRR routes and assets increased the size of the system over which Norfolk Southern Railway provides service by nearly 50% and afforded access to the New York metropolitan area, to much of the Northeast and to most of the major East Coast ports north of Norfolk, Virginia. Also, leasing arrangements with PRR augmented Norfolk Southern Railway's locomotive, freight car and intermodal fleet.

**RAILROAD OPERATIONS** - As of Dec. 31, 2002, NS' railroads operated approximately 21,500 miles of road in the states of Alabama, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Kentucky, Louisiana, Maryland, Michigan, Mississippi, Missouri, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Virginia, West Virginia, the District of Columbia and in the Province of Ontario, Canada. The miles operated were as follows:

**Mileage Operated as of Dec. 31, 2002**

| | Miles of Road | Second and Other Main Track | Passing Track, Crossovers and Turnouts | Way and Yard Switching | Total |
|---|---|---|---|---|---|
| Owned | 11,745 | 1,384 | 1,625 | 5,969 | 20,723 |
| Operated under lease, contract or trackage rights | 9,813 | 3,441 | 891 | 3,647 | 17,792 |
| Total | 21,558 | 4,825 | 2,516 | 9,616 | 38,515 |

In addition to the lines leased from Conrail previously discussed, NS' railroads have major leased lines between Cincinnati, Ohio, and Chattanooga, Tennessee, and operate over trackage owned by North Carolina Railway Company (NCRR). The Cincinnati-Chattanooga lease, covering about 335 miles of road, expires in 2026, and is subject to an option to extend the lease for an additional 25 years, at terms to be agreed upon. The trackage rights over NCRR cover approximately 315 miles of road under an agreement through 2014 with the right to renew for two additional 15-year periods.

NS' railroads carry raw materials, intermediate products and finished goods primarily in the Southeast, East and Midwest, and via interchange with other rail carriers, to and from the rest of the United States and parts of Canada. They also transport overseas freight through several Atlantic and Gulf Coast ports. Atlantic ports served by NS include: Norfolk, Virginia; Morehead City, North Carolina; Charleston, South Carolina; Savannah and Brunswick, Georgia; Jacksonville, Florida; Baltimore, Maryland; Philadelphia, Pennsylvania/Camden, New Jersey; Wilmington, Delaware; and the Ports of New York/New Jersey. Gulf Coast ports served include Mobile, Alabama, and New Orleans, Louisiana.

The lines of NS' railroads reach most of the larger industrial and trading centers of the Southeast, Northeast, Mid-Atlantic region and Midwest. Chicago, Norfolk, Detroit, Atlanta, Metropolitan New York City, Jacksonville, Kansas City (Missouri), Baltimore, Buffalo, Charleston, Cleveland, Columbus, Philadelphia, Pittsburgh, Toledo, Greensboro, Charlotte and Savannah are among the leading centers originating and terminating freight traffic on the system. In addition, haulage arrangements with connecting carriers allow NS' railroads to provide single-line service to and from additional markets, including haulage provided by Florida East Coast Railway Company to serve southern and eastern Florida, including the port cities of Miami, West Palm Beach and Fort Lauderdale; and haulage provided by The Kansas City Southern Railway Company to provide transcontinental intermodal service via a connection with the Burlington Northern and Santa Fe Railway Company. Service is provided to New England, including the Port of Boston, via haulage, trackage rights and interline arrangements with Canadian Pacific Railway Company and Guilford Transportation Industries. The system's lines also reach many individual industries, electric generating facilities, mines (in western Virginia, eastern Kentucky, southern and northern West Virginia and western Pennsylvania), distribution centers, transload facilities and other businesses located in smaller communities in its service area. The traffic corridors carrying the heaviest volumes of freight include those from the New York City area to Chicago (via Allentown and Pittsburgh); Chicago to Jacksonville (via Cincinnati, Chattanooga and Atlanta); Appalachian coal fields of Virginia, West Virginia and Kentucky, to Norfolk and Sandusky, Ohio; Cleveland to Kansas City; and Knoxville to Chattanooga. Chicago, Memphis, Sidney/Salem, New Orleans, Kansas City, Buffalo, St. Louis and Meridian are major gateways for interterritorial system traffic.

**Triple Crown Operations** - Until April 1993, NS' intermodal subsidiary, Triple Crown Services, Inc. (TCS), offered intermodal service using RoadRailer® equipment and domestic containers. RoadRailer® units are enclosed vans that can be pulled over highways in tractor-trailer configuration and over the rails by locomotives. On April 1, 1993, the business, name and operations of TCS were transferred to Triple Crown Services Company (TCSC), a partnership in which subsidiaries of NS and Conrail are equal partners. From April 1, 1993, to June 1, 1999, the revenues of TCSC were not consolidated with the results of NS; however, effective June 1, 1999, NS gained control of TCSC and, therefore, now includes

TCSC's results in its consolidated financial statements. TCSC offers door-to-door intermodal service using RoadRailer® equipment in major traffic corridors, including those between the Midwest and the Northeast, the Midwest and the Southeast and the Midwest and Texas/Mexico.

The following table sets forth certain statistics relating to NS railroads' operations for the past 5 years, including operations in the Northern Region that commenced June 1, 1999:

**Rail Operating Statistics**

| | Year Ended Dec. 31, 2002 | 2001 | 2000 | 1999 | 1998 |
|---|---|---|---|---|---|
| Revenue ton miles (billions) | 179 | 182 | 197 | 167 | 135 |
| Freight train miles traveled (millions) | 72.6 | 70.0 | 74.4 | 61.5 | 53.0 |
| Revenue per ton mile | $0.0350 | $0.0339 | $0.0312 | $0.0315 | $0.0316 |
| Revenue ton miles per man-hour worked | 3,067 | 3,023 | 2,888 | 2,577 | 2,659 |
| Percentage ratio of railway operating expenses to railway operating revenues | 81.5% | 83.7% | 89.7% | 86.3% | 75.3% |

**RAILWAY OPERATING REVENUES -** NS' total railway operating revenues were $6.3 billion in 2002. Revenue, shipments and revenue yield by principal railway operating revenue sources for the past five years are set forth in the following table.

**Principal Sources of Railway Operating Revenues**

*(Revenues in millions, shipments in thousands, revenue yield in dollars per shipment)*

| | Year Ended Dec. 31, 2002 | 2001 | 2000 | 1999 | 1998 |
|---|---|---|---|---|---|
| COAL | | | | | |
| Revenues | $ 1,441 | $ 1,521 | $ 1,435 | $ 1,322 | $ 1,252 |
| % of total revenues | 23% | 25% | 23% | 25% | 29% |
| Shipments | 1,610 | 1,695 | 1,687 | 1,519 | 1,310 |
| % of total shipments | 24% | 26% | 25% | 25% | 27% |
| Revenue Yield | $ 895 | $ 897 | $ 850 | $ 870 | $ 955 |
| AUTOMOTIVE | | | | | |
| Revenues | $ 961 | $ 885 | $ 921 | $ 746 | $ 577 |
| % of total revenues | 15% | 14% | 15% | 14% | 13% |
| Shipments | 662 | 622 | 692 | 611 | 487 |
| % of total shipments | 10% | 9% | 10% | 10% | 10% |
| Revenue Yield | $ 1,450 | $ 1,423 | $ 1,331 | $ 1,220 | $ 1,186 |
| CHEMICALS | | | | | |
| Revenues | $ 769 | $ 752 | $ 756 | $ 641 | $ 492 |
| % of total revenues | 12% | 12% | 13% | 12% | 12% |
| Shipments | 434 | 432 | 453 | 394 | 315 |
| % of total shipments | 6% | 6% | 6% | 7% | 7% |
| Revenue Yield | $ 1,773 | $ 1,742 | $ 1,668 | $ 1,627 | $ 1,559 |

**Principal Sources of Railway Operating Revenues (continued)**

| | Year Ended Dec. 31, | | | | |
|---|---|---|---|---|---|
| | **2002** | **2001** | **2000** | **1999** | **1998** |
| *(Revenues in millions, shipments in thousands, revenue yield in dollars per shipment)* | | | | | |
| METALS/CONSTRUCTION | | | | | |
| Revenues | $ 692 | $ 674 | $ 689 | $ 567 | $ 375 |
| % of total revenues | 11% | 11% | 11% | 11% | 9% |
| Shipments | 716 | 703 | 757 | 587 | 372 |
| % of total shipments | 11% | 11% | 11% | 10% | 8% |
| Revenue Yield | $ 966 | $ 959 | $ 911 | $ 965 | $ 1,008 |
| AGR./CONSUMER PRODUCTS/GOVT. | | | | | |
| Revenues | $ 623 | $ 603 | $ 609 | $ 539 | $ 468 |
| % of total revenues | 10% | 10% | 10% | 11% | 11% |
| Shipments | 507 | 509 | 525 | 489 | 441 |
| % of total shipments | 8% | 8% | 8% | 8% | 9% |
| Revenue Yield | $ 1,228 | $ 1,185 | $ 1,160 | $ 1,103 | $ 1,063 |
| PAPER/CLAY/FOREST | | | | | |
| Revenues | $ 603 | $ 612 | $ 630 | $ 578 | $ 535 |
| % of total revenues | 10% | 10% | 10% | 11% | 13% |
| Shipments | 438 | 450 | 491 | 465 | 445 |
| % of total shipments | 6% | 7% | 7% | 8% | 9% |
| Revenue Yield | $ 1,378 | $ 1,357 | $ 1,285 | $ 1,243 | $ 1,202 |
| INTERMODAL | | | | | |
| Revenues | $ 1,181 | $ 1,123 | $ 1,119 | $ 849 | $ 555 |
| % of total revenues | 19% | 18% | 18% | 16% | 13% |
| Shipments | 2,354 | 2,214 | 2,242 | 1,896 | 1,443 |
| % of total shipments | 35% | 33% | 33% | 32% | 30% |
| Revenue Yield | $ 502 | $ 507 | $ 499 | $ 448 | $ 385 |
| TOTALS | | | | | |
| Railway Operating Revenues | $ 6,270 | $ 6,170 | $ 6,159 | $ 5,242 | $ 4,254 |
| Railway Shipments | 6,721 | 6,625 | 6,847 | 5,961 | 4,813 |
| Railway Revenue Yield | $ 933 | $ 931 | $ 900 | $ 879 | $ 884 |

**COAL TRAFFIC** - Coal, coke and iron ore -- most of which is bituminous coal -- is NS' railroads' largest commodity group as measured by revenues. The railroads handled a total of 170.4 million tons in 2002, most of which originated on NS' lines in West Virginia, Virginia, Pennsylvania and Kentucky. Revenues from coal, coke and iron ore accounted for about 23% of NS' total railway operating revenues in 2002.

Coal, coke and iron ore tonnage by market for the past five years are set forth in the following table.

**Coal, Coke and Iron Ore Tonnage by Market**

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2002** | **2001** | **2000** | **1999** | **1998** |
| | | | *(tons in thousands)* | | |
| Utility | 127,747 | 132,325 | 119,284 | 107,381 | 83,225 |
| Export | 11,342 | 13,872 | 19,845 | 18,373 | 24,453 |
| Steel | 21,578 | 20,457 | 25,003 | 21,399 | 18,236 |
| Industrial | 9,733 | 11,377 | 10,781 | 10,348 | 8,382 |
| | 170,400 | 178,031 | 174,913 | 157,501 | 134,296 |

Total coal handled through all system ports in 2002 was 32 million tons. Of this total, 10 million tons (including coastwise traffic) moved through Lamberts Point, Virginia, 3 million tons moved through the Baltimore Terminal, 11 million tons moved to various docks on the Ohio River, and 8 million tons moved to various Lake Erie ports. Other than coal for export, virtually all coal handled by NS' railroads was terminated in states east of the Mississippi River.

See the discussion of coal traffic, by type of coal, in Part II, Item 7, "Management's Discussion and Analysis."

**GENERAL MERCHANDISE TRAFFIC -** General merchandise traffic is composed of five major commodity groupings: automotive; chemicals; metals and construction; agriculture, consumer products and government; and paper, clay and forest products. The automotive group includes finished vehicles for BMW, Daimler Chrysler, Ford Motor Company, General Motors, Honda, Isuzu, Jaguar, Land Rover, Mazda, Mercedes-Benz, Mitsubishi, Nissan, Saab, Subaru, Suzuki, Toyota and Volkswagen, and auto parts for Ford Motor Company, General Motors, Mercedes-Benz and Toyota. The chemicals group includes sulfur and related chemicals, petroleum products, chlorine and bleaching compounds, plastics, rubber, industrial chemicals, chemical wastes and municipal wastes. The metals and construction group includes steel, aluminum products, machinery, scrap metals, cement, aggregates, bricks and minerals. The agriculture, consumer products and government group includes soybeans, wheat, corn, fertilizer, animal and poultry feed, food oils, flour, beverages, canned goods, sweeteners, consumer products and items for the military. The paper, clay and forest products group includes lumber and wood products, pulpboard and paper products, woodfibers, woodpulp, scrap paper and clay. General merchandise carloads handled in 2002 were 2.76 million, compared with 2.72 million handled in 2001, an increase of 2%.

In 2002, 134 million tons of general merchandise freight, or approximately 67% of total general merchandise tonnage handled by NS, originated online. The balance of general merchandise traffic was received from connecting carriers at interterritorial gateways. The principal interchange points for NS-received traffic included Chicago, Memphis, New Orleans, Cincinnati, Kansas City, Detroit, Hagerstown, St. Louis/East St. Louis and Louisville.

See the discussion of general merchandise rail traffic by commodity group in Part II, Item 7, "Management's Discussion and Analysis."

**INTERMODAL TRAFFIC -** The intermodal market consists of shipments moving in trailers, domestic and international containers, and Roadrailer® equipment. These shipments are handled on behalf of intermodal marketing companies, international steamship lines, truckers and other shippers. Intermodal units handled in 2002 were 2.35 million, compared with 2.21 million handled in 2001, an increase of 6%.

See the discussion of intermodal traffic in Part II, Item 7, "Management's Discussion and Analysis."

**FREIGHT RATES -** In 2002, NS' railroads continued their reliance on private contracts and exempt price quotes as their predominant pricing mechanisms. Thus, a major portion of NS' railroads' freight business is not currently economically regulated by the government. In general, market forces have been substituted for government regulation and now are the primary determinant of rail service prices. However, in 2002 there were significant coal movements moving under common carrier (tariff) rates which had previously moved under rates contained in transportation contracts. Beginning Jan. 1, 2002, coal moving to Duke Energy's (Duke) Belew's Creek, Allen, Buck and Dan River generating stations moved under common carrier rates and beginning April 1, 2002, coal moving to Carolina Power and Light's (CP&L) Hyco and Mayo plants moved under common carrier rates. Duke and CP&L have challenged the reasonableness of these common carrier rates in proceedings currently pending before the Surface Transportation Board.

In 2002, NS' railroads were found by the STB not to be "revenue adequate" based on results for the year 2001. A railroad is "revenue adequate" under the applicable law when its return on net investment exceeds the rail industry's composite cost of capital. This determination is made pursuant to statutory requirement and does not adversely impact NS' liquidity or capital resources.

**PASSENGER OPERATIONS -** Regularly scheduled passenger trains are operated by Amtrak on NS' lines between Alexandria and New Orleans, and between Greensboro and Selma, North Carolina. Commuter trains are operated on the NS line between Manassas and Alexandria in accordance with contracts with two transportation commissions of the Commonwealth of Virginia. NS also leases the Chicago to Manhattan, Illinois, line to the Commuter Rail Division of the Regional Transportation Authority of Northeast Illinois. Since June 1, 1999, Norfolk Southern Railway has operated former Conrail lines on which Amtrak conducts regularly scheduled passenger operations between Chicago, Illinois, and Detroit, Michigan, and between Chicago and Harrisburg, Pennsylvania.

Also since June 1, 1999, through its operation of PRR's routes, Norfolk Southern Railway has been providing freight service over former Conrail lines with significant ongoing Amtrak and commuter passenger operations, and is conducting freight operations over some trackage owned by Amtrak or by New Jersey Transit, the Southeastern Pennsylvania Transportation Authority, Metro-North Commuter Railway Company and Maryland DOT. Finally, passenger operations are conducted either by Amtrak or by the commuter agencies over trackage owned by Pennsylvania Lines LLC, or by Conrail in the Shared Assets Areas.

**NONCARRIER OPERATIONS -** NS' noncarrier subsidiaries engage principally in the acquisition, leasing and management of coal, oil, gas and minerals; the development of commercial real estate; telecommunications; and the leasing or sale of rail property and equipment. In 2002, no such noncarrier subsidiary or industry segment grouping of noncarrier subsidiaries met the requirements for a reportable business segment set forth in Statement of Financial Accounting Standards No. 131.

**RAILWAY PROPERTY**

The NS railroad system extends across 22 states and portions of Canada. The railroad infrastructure makes the company very capital intensive with total property of approximately $11 billion and investment in Conrail of approximately $6 billion.

**Capital Expenditures -** Capital expenditures for road, equipment and other property for the past five years were as follows (including capitalized leases):

| | Capital Expenditures | | | | |
|---|---|---|---|---|---|
| | **2002** | **2001** | **2000** | **1999** | **1998** |
| | | | *($ in millions)* | | |
| Road | $ 519 | $ 505 | $ 557 | $ 559 | $ 612 |
| Equipment | 174 | 233 | 146 | 349 | 442 |
| Other property | 2 | 8 | 28 | 4 | 6 |
| Total | $ 695 | $ 746 | $ 731 | $ 912 | $ 1,060 |

Capital spending and maintenance programs are and have been designed to assure the ability to provide safe, efficient and reliable transportation services. For 2003, NS has budgeted $798 million of capital spending. See the discussion following "Cash used for investing activities," in Part II, Item 7, "Management's Discussion and Analysis."

**Equipment -** As of Dec. 31, 2002, NS owned or leased the following units of equipment:

| | Number of Units | | | Capacity |
|---|---|---|---|---|
| | **Owned*** | **Leased**** | **Total** | **of Equipment** |
| Locomotives: | | | | (Horsepower) |
| Multiple purpose | 2,259 | 1,001 | 3,260 | 10,959,200 |
| Switching | 105 | 102 | 207 | 302,800 |
| Auxiliary units | 59 | 18 | 77 | 0 |
| Total locomotives | 2,423 | 1,121 | 3,544 | 11,262,000 |
| Freight cars: | | | | (Tons) |
| Hopper | 18,568 | 5,036 | 23,604 | 2,486,500 |
| Box | 17,184 | 4,438 | 21,622 | 1,687,530 |
| Covered hopper | 9,956 | 3,097 | 13,053 | 1,423,216 |
| Gondola | 27,619 | 11,077 | 38,696 | 4,148,610 |
| Flat | 3,420 | 1,485 | 4,905 | 363,566 |
| Caboose | 169 | 57 | 226 | 0 |
| Other | 3,375 | 0 | 3,375 | 172,247 |
| Total freight cars | 80,291 | 25,190 | 105,481 | 10,281,669 |
| Other: | | | | |
| Work equipment | 4,619 | 1,584 | 6,203 | |
| Vehicles | 3,529 | 1,063 | 4,592 | |
| Highway trailers and containers | 881 | 7,397 | 8,278 | |
| RoadRailer® | 5,570 | -- | 5,570 | |
| Miscellaneous | 1,431 | 10,185 | 11,616 | |
| Total other | 16,030 | 20,229 | 36,259 | |

* Includes equipment leased to outside parties and equipment subject to equipment trusts, conditional sale agreements and capitalized leases.

** Includes locomotives, freight cars and units of other equipment leased from PRR.

The following table indicates the number and year built for locomotives and freight cars owned at Dec. 31, 2002.

| | Year Built | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2002 | 2001 | 2000 | 1999 | 1998 | 1993-1997 | 1988-1992 | 1987 & Before | Total |
| Locomotives: | | | | | | | | | |
| No. of units | -- | 160 | 60 | 147 | 119 | 420 | 257 | 1,260 | 2,423 |
| % of fleet | --% | 7% | 2% | 6% | 5% | 17% | 11% | 52% | 100% |
| Freight cars: | | | | | | | | | |
| No. of units | -- | -- | 112 | 515 | 1,566 | 6,048 | 6,098 | 65,952 | 80,291 |
| % of fleet | --% | --% | --% | 1% | 2% | 7% | 8% | 82% | 100% |

As of Dec. 31, 2002, the average age of the locomotive fleet was 16.1 years. During 2002, 52 locomotives, the average age of which was 28.2 years, were retired. The average age of the freight car fleet at Dec. 31, 2002, was 25.9 years. During 2002, 3,013 freight cars were retired.

Since 1988, about 29,000 coal cars have been rebodied. As a result, the remaining serviceability of the freight car fleet is greater than may be inferred from the high percentage of freight cars built in earlier years.

| | Annual Average Bad Order Ratio | | | | |
|---|---|---|---|---|---|
| | 2002 | 2001 | 2000 | 1999 | 1998 |
| Freight cars (excluding cabooses): | | | | | |
| NS Rail | 8.1% | 6.9% | 5.7% | 3.7% | 4.1% |
| Locomotives: | | | | | |
| NS Rail | 6.3% | 5.8% | 5.5% | 5.3% | 4.3% |

Ongoing freight car and locomotive maintenance programs are intended to ensure the highest standards of safety, reliability, customer satisfaction and equipment marketability. In past years, the freight car bad order ratio reflected the storage of certain types of cars that were not in high demand. The ratio rose in 2000, 2001 and 2002 as a result of decreased maintenance activity. A review began in 2002 to address several hundred unserviceable, overage and commercially obsolete freight cars, which will likely result in their disposition in 2003. The locomotive bad order ratio includes units out of service for required inspections every 92 days and program work such as overhauls. The increase in the locomotive bad order ratio in 1999 was primarily due to the maintenance requirements of units being rented to meet short-term needs and to weather-related failures. The ratio rose slightly in 2000 as maintenance activities were curtailed in response to a slowing economy. The elevated ratio through 2001 and 2002 reflected units out of service related to the resumption of maintenance and modification activities.

**Track Maintenance** - Of the approximately 38,500 total miles of track operated, NS had responsibility for maintaining about 31,000 miles of track with the remainder being operated under trackage rights. Over 75% of the main line trackage (including first, second, third and branch main tracks, all excluding trackage rights) has rail ranging from 131 to 155 pounds per yard with the standard installation currently at 141 pounds per yard. Approximately 40% of NS lines carried 20 million or more gross tons per track mile.

The following table summarizes several measurements regarding NS' track roadway additions and replacements during the past five years:

| | 2002 | 2001 | 2000 | 1999 | 1998 |
|---|---|---|---|---|---|
| Track miles of rail installed | 235 | 254 | 390 | 403 | 429 |
| Miles of track surfaced | 5,270 | 3,836 | 3,687 | 5,087 | 4,715 |
| New crossties installed (millions) | 2.8 | 1.5 | 1.5 | 2.3 | 2.0 |

**Microwave System** - The NS microwave system, consisting of approximately 7,282 radio route miles, 442 active stations and 4 passive repeater stations, provides communications between most operating locations. The microwave system is used primarily for voice communications, VHF radio control circuits, data and facsimile transmissions, traffic control operations and AEI data transmissions.

**Traffic Control** - Of a total of 21,500 route miles operated by NS, excluding trackage rights over foreign lines, 11,511 miles are signalized, including 8,546 miles of centralized traffic control (CTC) and 2,965 miles of automatic block signals. Of the 8,546 miles of CTC, 1,895 miles are controlled by data radio originating at 148 base station radio sites.

**Computers** - A computer network consisting of a centralized data center in Atlanta, Georgia, and various distributed computers throughout the company connects the yards, terminals, transportation offices, rolling stock repair points, sales offices and other key system locations. Operating and traffic data are processed and stored to provide customers with information on their shipments throughout the system. Computer systems provide current information on the location of every train and each car on line, as well as related waybill and other train and car movement data. In addition, the computer systems are utilized to assist management in the performance of a variety of functions and services including payroll, car and revenue accounting, billing, material management activities and controls, and special studies.

**Other** - The railroads have extensive facilities for support of operations, including freight depots, car construction shops, maintenance shops, office buildings, and signals and communications facilities.

**Encumbrances** - Certain railroad equipment is subject to the prior lien of equipment financing obligations amounting to approximately $864 million as of Dec. 31, 2002, and $895 million at Dec. 31, 2001.

**ENVIRONMENTAL MATTERS** - Compliance with federal, state and local laws and regulations relating to the protection of the environment is a principal NS goal. To date, such compliance has not affected materially NS' capital additions, earnings, liquidity or competitive position. See the discussion of "Environmental Matters" in Part II, Item 7, "Management's Discussion and Analysis," and in Note 18 to the Consolidated Financial Statements.

**EMPLOYEES** - NS employed an average of 28,970 employees in 2002, compared with an average of 30,894 in 2001. The decrease reflects NS' continuous drive to operate more efficiently, accompanied by railroad retirement legislation late in 2001, which lowered the retirement age for rail employees. The approximate average cost per employee during 2002 was $54,000 in wages and $24,000 in employee benefits.

Approximately 85% of NS' railroad employees are covered by collective bargaining agreements with 15 different labor unions. See the discussion of "Labor Agreements" in Part II, Item 7, "Management's Discussion and Analysis."

**GOVERNMENT REGULATION** - In addition to environmental, safety, securities and other regulations generally applicable to all businesses, NS' railroads are subject to regulation by the STB, which succeeded the ICC on Jan. 1, 1996. The STB has jurisdiction over some rates, routes, conditions of service and the extension or abandonment of rail lines. The STB also has jurisdiction over the

consolidation, merger or acquisition of control of and by rail common carriers. The Department of Transportation regulates certain track and mechanical equipment standards.

The relaxation of economic regulation of railroads, begun over two decades ago by the ICC under the Staggers Rail Act of 1980, has continued under the STB. Significant exemptions are TOFC/COFC (i.e., "piggyback") business, rail boxcar traffic, lumber, manufactured steel, automobiles and certain bulk commodities such as sand, gravel, pulpwood and wood chips for paper manufacturing. Transportation contracts on regulated shipments effectively remove those shipments from regulation as well. About 80% of NS' freight revenues come from either exempt traffic or traffic moving under transportation contracts.

Efforts may be made in 2003 to re-subject the rail industry to unwarranted federal economic regulation. The Staggers Rail Act of 1980, which substantially reduced such regulation, encouraged and enabled rail carriers to innovate and to compete for business, thereby contributing to the economic health of the nation and to the revitalization of the industry. Accordingly, NS will oppose efforts to reimpose unwarranted economic regulation.

**COMPETITION -** There is continuing strong competition among rail, water and highway carriers. Price is usually only one factor of importance as shippers and receivers choose a transport mode and specific hauling company. Inventory carrying costs, service reliability, ease of handling and the desire to avoid loss and damage during transit are also important considerations, especially for higher-valued finished goods, machinery and consumer products. Even for raw materials, semifinished goods and work-in-process, users are increasingly sensitive to transport arrangements that minimize problems at successive production stages.

NS' primary rail competitor is the CSX system; both operate throughout much of the same territory. Other railroads also operate in parts of the territory. NS also competes with motor carriers, water carriers and with shippers who have the additional option of handling their own goods in private carriage.

Certain marketing strategies between railroads and between railroads and motor carriers enable carriers to compete more effectively in specific markets.

## Item 3. Legal Proceedings.

None.

## Item 4. Submission of Matters to a Vote of Security Holders.

There were no matters submitted to a vote of security holders during the fourth quarter of 2002.

## Executive Officers of the Registrant.

Norfolk Southern's executive officers generally are elected and designated annually by the Board of Directors at its first meeting held after the annual meeting of stockholders, and they hold office until their successors are elected. Executive officers also may be elected and designated throughout the year as the Board of Directors considers appropriate. There are no family relationships among the officers, nor any arrangement or understanding between any officer and any other person pursuant to which the officer was selected. The following table sets forth certain information, as of February 1, 2003, relating to the executive officers.

| Name, Age, Present Position | Business Experience During Past Five Years |
|---|---|
| David R. Goode, 62, Chairman, President and Chief Executive Officer | Present position since September 1992. |
| L. I. Prillaman, 59, Vice Chairman and Chief Marketing Officer | Present position since August 1998; prior thereto was Executive Vice President Marketing. |
| Stephen C. Tobias, 58, Vice Chairman and Chief Operating Officer | Present position since August 1998; prior thereto was Executive Vice President Operations. |
| Henry C. Wolf, 60, Vice Chairman and Chief Financial Officer | Present position since August 1998; prior thereto was Executive Vice President Finance. |
| John F. Corcoran, 62, Senior Vice President Public Affairs | Present position since August 1997; prior thereto was Vice President Public Affairs |
| John W. Fox, Jr., 55, Senior Vice President Coal Services | Present position since April 2001. Served as Senior Vice President Coal Marketing from December 1999 to April 1, 2001, and prior thereto was Vice President Coal Marketing. |
| James A. Hixon, 49, Senior Vice President Administration | Present position since February 2001. Served as Senior Vice President Employee Relations from November 1999 to February 2001, and prior thereto was Vice President Taxation. |
| Henry D. Light, 62, Senior Vice President Law | Present position since January 22, 2002. Served as Vice President Law from April 2000 to January 22, 2002, and prior thereto General Counsel Operations. |
| James W. McClellan, 63, Senior Vice President Planning | Present position since August 1998; prior thereto was Vice President Strategic Planning |
| Kathryn B. McQuade, 46, Senior Vice President Financial Planning | Present position since April 2000. Served as Vice President Financial Planning from August 1998 to April 2000, and prior thereto was Vice President Internal Audit. |
| Charles W. Moorman, 51, Senior Vice President Corporate Services | Present position since February 1, 2003. Also serves as President Thoroughbred Technology and Telecommunications, Inc. since October 1999, and prior thereto was Vice President Information Technology. |
| John P. Rathbone, 51, Senior Vice President and Controller | Present position since April 2000; prior thereto was Vice President and Controller |
| Stephen P. Renken, 59, Senior Vice President Chief Information Officer | Present position since February 2001. Served as Vice President Information Technology September 1999 to February 2001, Assistant Vice President Program Management from December 1997 to September 1999, and prior thereto was a consultant to NS. |

| | |
|---|---|
| John M. Samuels, 59, Senior Vice President Operations Planning and Support | Present position since April 2000; Served as Vice President Operations Planning and Budget from January 1998 to April 2000; and prior thereto was Vice President Operating Assets of Conrail. |
| Donald W. Seale, 50, Senior Vice President Merchandise Marketing | Present position since December 1999; prior thereto was Vice President Merchandise Marketing. |

## PART II

**Item 5. Market for Registrant's Common Stock and Related Stockholder Matters.**

**NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES**
**STOCK PRICE AND DIVIDEND INFORMATION**
*(Unaudited)*

The Common Stock of Norfolk Southern Corporation, owned by 51,418 stockholders of record as of Dec. 31, 2002, is traded on the New York Stock Exchange with the symbol NSC. The following table shows the high and low sales prices as reported by Bloomberg L.P. on its internet-based service and dividends per share, by quarter, for 2002 and 2001 (prices quoted in fractions have been rounded to the nearest cent).

| | Quarter | | | |
|---|---|---|---|---|
| **2002** | **1st** | **2nd** | **3rd** | **4th** |
| Market price | | | | |
| High | $ 26.98 | $ 24.45 | $ 23.90 | $ 22.54 |
| Low | 18.26 | 19.85 | 17.20 | 18.70 |
| Dividends per share | $ 0.06 | $ 0.06 | $ 0.07 | $ 0.07 |
| **2001** | **1st** | **2nd** | **3rd** | **4th** |
| Market price | | | | |
| High | $ 18.90 | $ 24.11 | $ 22.60 | $ 19.88 |
| Low | 13.63 | 15.80 | 13.41 | 15.19 |
| Dividends per share | $ 0.06 | $ 0.06 | $ 0.06 | $ 0.06 |

**Item 6. Selected Financial Data.**

**NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES**
**FIVE-YEAR FINANCIAL REVIEW**
**1998-2002**

| | 2002 | 2001 | 2000[(1)] | 1999[(2)] | 1998 |
|---|---|---|---|---|---|
| | *($ in millions, except per share amounts)* | | | | |
| **RESULTS OF OPERATIONS** | | | | | |
| Railway operating revenues | $ 6,270 | $ 6,170 | $ 6,159 | $ 5,242 | $ 4,254 |
| Railway operating expenses | 5,112 | 5,163 | 5,526 | 4,524 | 3,202 |
| Income from railway operations | 1,158 | 1,007 | 633 | 718 | 1,052 |
| Other income – net | 66 | 99 | 168 | 164 | 309 |
| Interest expense on debt | 518 | 553 | 551 | 531 | 516 |
| Income from continuing operations before income taxes | 706 | 553 | 250 | 351 | 845 |
| Provision for income taxes | 246 | 191 | 78 | 112 | 215 |
| Income from continuing operations | 460 | 362 | 172 | 239 | 630 |
| Discontinued operations [(3)] | -- | 13 | -- | -- | 104 |
| Net income | $ 460 | $ 375 | $ 172 | $ 239 | $ 734 |
| **PER SHARE DATA** | | | | | |
| Net income – basic | $ 1.18 | $ 0.97 | $ 0.45 | $ 0.63 | $ 1.94 |
| Net income – diluted | $ 1.18 | $ 0.97 | $ 0.45 | $ 0.63 | $ 1.93 |
| Dividends | $ 0.26 | $ 0.24 | $ 0.80 | $ 0.80 | $ 0.80 |
| Stockholders' equity at year end | $ 16.71 | $ 15.78 | $ 15.16 | $ 15.50 | $ 15.61 |
| **FINANCIAL POSITION** | | | | | |
| Total assets | $ 19,956 | $ 19,418 | $ 18,976 | $ 19,250 | $ 18,180 |
| Total long-term debt, including current maturities | $ 7,364 | $ 7,632 | $ 7,636 | $ 8,059 | $ 7,624 |
| Stockholders' equity | $ 6,500 | $ 6,090 | $ 5,824 | $ 5,932 | $ 5,921 |
| **OTHER** | | | | | |
| Capital expenditures | $ 695 | $ 746 | $ 731 | $ 912 | $ 1,060 |
| Average number of shares outstanding (thousands) | 388,213 | 385,158 | 383,358 | 380,606 | 378,749 |
| Number of stockholders at year end | 51,418 | 53,042 | 53,194 | 51,123 | 51,727 |
| Average number of employees: | | | | | |
| Rail | 28,587 | 30,510 | 33,344 | 30,897 | 24,185 |
| Nonrail | 383 | 384 | 394 | 269 | 115 |
| Total | 28,970 | 30,894 | 33,738 | 31,166 | 24,300 |

(1) 2000 operating expenses include $165 million in work-force reduction costs for early retirement and separation programs. These costs reduced net income by $101 million, or 26 cents per diluted share.

(2) On June 1, 1999, NS began operating a substantial portion of Conrail's properties. As a result, both its railroad route miles and the number of its railroad employees increased by approximately 50% on that date.

(3) In 1998, NS sold all the common stock of its motor carrier subsidiary, North American Van Lines, Inc. (NAVL), for $207 million and recorded a $90 million pretax ($105 million, or 28 cents per diluted share, after-tax) gain. Accordingly, NAVL's results of operations, financial position and cash flows are presented as "Discontinued operations." Results in 2001 include an additional after-tax gain of $13 million, or 3 cents per diluted share, that resulted from the expiration of certain indemnities contained in the sales agreement.

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations.**

**NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES**
**Management's Discussion and Analysis of**
**Financial Condition and Results of Operations**

The following discussion and analysis should be read in conjunction with the Consolidated Financial Statements and Notes and the Five-Year Financial Review.

## SUMMARIZED RESULTS OF OPERATIONS

### 2002 Compared with 2001

Net income was $460 million in 2002, up $85 million, or 23%. Results in 2001 included a $13 million gain from discontinued operations related to the 1998 sale of NS' former motor carrier subsidiary (see Note 17). Excluding that gain from 2001's results, net income was up $98 million, or 27%, in 2002. The improvement was primarily the result of a $151 million, or 15%, increase in income from railway operations.

Diluted earnings per share were $1.18, up 22%. Excluding the discontinued operations gain, diluted earnings per share increased 26%.

### 2001 Compared with 2000

Net income in 2001 was $375 million, up 118%. Income from continuing operations, which excludes the $13 million discontinued operations gain, was $362 million, up 110%. Results in 2000 included $165 million of costs related to actions taken to reduce the size of the work force, which reduced income from continuing operations by $101 million, or 26 cents per diluted share. Excluding these costs, income from continuing operations increased $89 million, or 33%, in 2001. The improvement resulted from higher income from railway operations, which was up $209 million, or 26%, that more than offset lower nonoperating income, which was down $69 million (see Note 3).

Diluted earnings per share were 97 cents, up 116%. Diluted earnings per share from continuing operations were 94 cents, up 109%. Excluding the work-force reduction costs in 2000, diluted earnings per share from continuing operations were up 32%.

## DETAILED RESULTS OF OPERATIONS

### Railway Operating Revenues

Railway operating revenues were $6.3 billion in 2002, and $6.2 billion in both 2001 and 2000. The following table presents a three-year comparison of revenues by market group.

**Revenues by Market Group**

| | 2002 | 2001 | 2000 |
|---|---|---|---|
| | | *($ in millions)* | |
| Coal | $ 1,441 | $ 1,521 | $ 1,435 |
| General merchandise: | | | |
| Automotive | 961 | 885 | 921 |
| Chemicals | 769 | 752 | 756 |
| Metals/construction | 692 | 674 | 689 |
| Agriculture/consumer products/ government | 623 | 603 | 609 |
| Paper/clay/forest | 603 | 612 | 630 |
| General merchandise | 3,648 | 3,526 | 3,605 |
| Intermodal | 1,181 | 1,123 | 1,119 |
| Total | $ 6,270 | $ 6,170 | $ 6,159 |

In 2002, revenues increased 2%, as a 3% rise in general merchandise revenues coupled with a 5% improvement in intermodal revenues offset a 5% decline in coal revenues. All but one of the general merchandise market groups (paper, clay and forest products) posted increases over 2001. As shown in the following table, most of the revenue improvement was the result of higher traffic volumes. The favorable revenue per unit/mix variance was driven by higher average revenue per unit, offset in part by the effects of unfavorable changes in the mix of traffic.

**Revenue Variance Analysis**
Increases (Decreases)

| | 2002 vs. 2001 | 2001 vs. 2000 |
|---|---|---|
| | *($ in millions)* | |
| Volume | $ 89 | $ (200) |
| Revenue per unit/mix | 11 | 211 |
| Total | $ 100 | $ 11 |

In 2001, revenues fell for all the general merchandise market groups. However, a 6% increase in coal revenues offset the effects of the lower general merchandise revenues. Revenue per unit increased in all market groups, principally due to rate increases, use of higher-capacity equipment and favorable changes in the mix of traffic.

**COAL** tonnage decreased 4% in 2002 and revenues declined 5%. Revenue per unit declined slightly, reflecting unfavorable changes in the mix of traffic (more shorter-haul business) that offset the effects of rate increases and gains in tonnage per car. Coal, coke and iron ore represented 23% of total railway operating revenues in 2002, and 84% of NS' coal shipments originated on lines it operates.

In 2001, coal tonnage increased 2%, and revenues improved 6%. Revenue per unit increased 6%, a result of rate increases, including lower volume-related refunds on export coal shipments, gains in tonnage per car and favorable changes in the mix of traffic (less shorter-haul business).

**Total Coal, Coke and Iron Ore Tonnage**

| | 2002 | 2001 | 2000 |
|---|---|---|---|
| | | *(In millions of tons)* | |
| Utility | 128 | 133 | 119 |
| Export | 11 | 14 | 20 |
| Domestic metallurgical | 21 | 20 | 25 |
| Other | 10 | 11 | 11 |
| Total | 170 | 178 | 175 |

**Utility coal** tonnage decreased 3% in 2002, a result of lower demand that reflected the weak economy, high coal stockpile levels entering the year, mild temperatures in the first quarter, reduced stockpile targets set by utility companies and increased generation from new natural gas-fired plants. Licensing requirements for these new plants resulted in additional generation that temporarily displaced coal-fired generation.

In 2001, utility coal traffic increased 11%, reflecting higher demand for coal-fired electricity and the effects of very high natural gas prices early in the year. High demand for coal, a volatile market for natural gas and production problems at a number of large mines in the East late in 2000 combined to increase demand somewhat early in 2001 with a resulting increase in coal prices. Utility coal traffic volume also benefited somewhat from the shifting of coal that traditionally would have been bound for export to the domestic market.

Two of NS' utility customers, Duke Energy (Duke) and Carolina Power and Light (CP&L), have filed rate reasonableness complaints at the Surface Transportation Board (STB) alleging that the NS tariff rates for the transportation of coal to their solely served power plants are unreasonable. NS is disputing these allegations. Since January 1, 2002, in the case of Duke and since April 1, 2002, in the case of CP&L, NS has been billing and collecting amounts from the customers based on the challenged tariff rates. Management expects that the resolution of these cases, which is anticipated to occur in 2003, will not have a material effect on NS' financial statements.

The near-term outlook for utility coal remains positive. Coal-fired generation remains the lowest cost marginal source of electricity. Coal plant generation should continue to track the U.S. economy, and management expects that utilities will use coal-fired plants to meet increased demand because of coal's low cost. As always, demand will be influenced by the weather. In addition, while the price of natural gas can affect demand for utility coal, its higher price and volatility may improve the long-term competitive position of coal-fired generation.

Phase II of Title IV of the Clean Air Act Amendments of 1990, which imposed more stringent limits on sulfur dioxide emissions, took effect on Jan. 1, 2000. Many of the mines served by NS produce coals that satisfy Phase II requirements. In addition, substantial banks of sulfur dioxide allowances held by many NS-served utilities, as well as implementation of sulfur dioxide emission control systems at many NS-served plants, should continue to provide a market for other NS-served mines.

While the Phase II impact on NS utility coal has been minimal, there are a number of other evolving environmental issues that have the potential to increase or ease cost pressures on the utility coal market, depending upon their outcome. These include a potential new national energy policy, proposed multi-pollutant legislation, a proposed new rule concerning "new source review," the impending mercury emissions standard and the fate of U.S. participation in the Kyoto Protocol.

Although impending developments with these environmental issues could potentially increase cost pressures on coal-fired generation, the outlook remains positive for maintaining coal's position in the power generation mix for regions served by NS. However, different developments with these issues could actually ease cost pressures on coal-fired generation, further strengthening coal's position.

The 1999 decision by a federal district court judge in West Virginia holding that some common mountaintop mining practices in the coal industry are illegal was overturned in April 2001 by the U.S. Fourth Circuit Court of Appeals. In January 2002, the U.S. Supreme Court refused to hear an appeal of the case. In May 2002, the same district court judge made a similar ruling in a different case in which NS had again intervened. In January 2003, this ruling also was overturned by the Fourth Circuit Court of Appeals.

**Export coal** tonnage declined 18% in 2002. Steam coal exports through Baltimore declined 4%, and export metallurgical coals through Norfolk declined 22%. During the first half of 2002, demand for U.S. coal was soft as international buyers focused their purchases toward other, lower-priced sources. Market uncertainty resulted in late contract settlements and delayed shipments. Late in 2002, demand for U.S. coking coals increased, reflecting a shift in the market as exports from China, Australia and Poland declined. As a result, shipments through Norfolk increased in the fourth quarter.

In 2001, export coal tonnage decreased 30%. The rapid rise of domestic utility coal prices early in the year enticed many foreign-market suppliers to place much of their 2001 production in the domestic utility markets. In addition, production difficulties at several large NS-served mines and flooding in West Virginia in July significantly reduced the supply of low volatility coal. The combination of these factors resulted in most of the decline in shipments of export coal. Steam coal exports through Baltimore declined 32%, and export metallurgical coals through Norfolk declined by 30%. Demand for steam coal to export strengthened in the last half of 2001; however, strong U.S. demand limited NS' participation in this market. Demand for coking coal to export continued to soften, as steel production moved from traditional NS markets in Europe to Asia, which in recent years has been supplied by Australian or Canadian coals.

It is expected that export coal tonnage will continue to be limited by supply and subject to the fluctuations of the world market. The increase in demand for U.S. coals seen in the fourth quarter of 2002 has continued into the first quarter of 2003, and early indications are that these market forces should remain in place as contracts are settled in the spring for the coming year. Should these market forces continue, U.S. coal export volumes could recover somewhat. However, the inherent volatility and uncertainties in this market make predictions especially vulnerable.

**Domestic metallurgical** coal, coke and iron ore tonnage increased 5% in 2002, reflecting higher U.S. steel production that was aided by the imported steel tariff program implemented in 2002. In addition, continued strong vehicle production resulted in demand for steel.

In 2001, domestic metallurgical coal, coke and iron ore tonnage decreased 18% due to a decline in the market for domestic steel. The softening economy and an increase in steel imports drastically cut blast furnace production, sharply reducing the demand for coking coal, iron ore and coke. The increase in imported steel also resulted in lower prices that put pressure on the U.S. steel industry and led to plant closures and bankruptcies that included some NS customers.

Domestic metallurgical coal, coke and iron ore traffic is expected to continue to experience modest gains during the two-year life of the import tariffs. However, long-term demand is expected to decline, reflecting advanced technologies that allow production of steel using less coke.

**Other coal** tonnage, principally steam coal shipped to manufacturing plants, decreased 14% in 2002, but increased 6% in 2001. The decline in 2002 was primarily the result of the weak economy. The gain in 2001 resulted from new and increased business from industrial customers.

**GENERAL MERCHANDISE** traffic volume (carloads) increased 2% in 2002, and revenues increased 3%, principally due to a 9% improvement in automotive revenues. In 2001, traffic volume decreased 7%, and revenues decreased 2%, reflecting the effects of a weak economy.

**Automotive** traffic volume increased 7%, and revenues increased 9% in 2002, principally due to a rise in vehicle production and new business. Revenue per unit increased 2%, reflecting some pricing improvements, extended length of haul, special ancillary services and the settlement of a disputed charge.

In 2001, automotive traffic volume decreased 10%, and revenues declined 4%, principally due to a 10% drop in vehicle production. Revenue per unit increased 7%, principally due to rate increases, efficiencies gained from the redesign of the mixing center network and use of higher capacity equipment.

Automotive revenues in 2003 are expected to be lower than those of 2002. Light vehicle production is predicted to be down slightly, and NS' largest automotive customer has announced a 5% decrease in first quarter 2003 production.

**Chemicals** traffic volume increased slightly, and revenues increased 2% in 2002. Higher traffic volume for plastics and a small increase for miscellaneous chemicals offset a decline for petroleum products. Demand for plastics was supported by increases in light vehicle production and housing starts. Traffic volume also benefited from increased shipments through NS' Thoroughbred Bulk Transfer (TBT) facilities that handle chemicals and bulk commodities for customers not located on NS-served lines. Revenue per unit increased as a result of a favorable change in the mix of traffic (more higher-rated business) and market-driven rate increases.

In 2001, chemicals traffic volume decreased 5%, and revenues decreased 1%. The weak economy depressed shipments of petroleum, plastics, industrial and miscellaneous chemicals. These declines were partially offset by new business through NS' TBT facilities. Revenue per unit increased due to higher rates and a favorable change in the mix of traffic (more longer-haul moves).

Chemicals revenues are expected to improve in 2003, supported by a recovering economy, new business and improved revenue per unit.

**Metals and construction** traffic volume increased 2%, and revenues improved 3% in 2002, reflecting improvement in the steel industry, which was aided by the two-year imported steel tariff program implemented in 2002. Metals volume benefited from resumption of production at some mills that closed in 2001 and increased volume from new mills. Construction traffic declined, primarily as a result of reductions in highway projects due to state government budget pressures.

In 2001, metals and construction traffic volume decreased 7%, and revenues declined 2%, reflecting weakness in the steel and construction industries. The steel industry recession, which began in 2000, resulted in excess capacity and the closing of numerous steel mills. Revenue per unit increased due to higher rates and favorable changes in the mix of traffic.

Metals and construction revenues are expected to continue to benefit from added production along NS' lines, although further consolidation in the steel industry is expected. Construction markets may benefit from new business from stone quarries and cement terminals in the Southeast.

**Agriculture, consumer products and government** traffic volume decreased slightly in 2002, but revenues increased 3%. Traffic volume increases for corn, food products and beverages largely offset declines for soybeans and feed. Corn volume benefited from increased shipments from the Midwest to

drought-stricken areas in the East. The increase for food products was primarily the result of new business. Soybean and feed volumes were adversely affected by lower domestic and export demand. Revenue per unit increased because of higher rates, increased length of haul and favorable changes in the mix of traffic.

In 2001, agriculture, consumer products and government traffic volume decreased 3%, and revenues declined 1%, primarily due to reduced shipments of fertilizer. This decline was due to soft farm demand, record high natural gas prices early in the year (which curtailed production of certain fertilizers) and increased imports. This was mitigated by traffic volume increases for grain, flour and canned goods. The revenue per unit increase was primarily due to favorable changes in the mix of traffic.

Agriculture, consumer products and government revenues in 2003 are expected to continue to benefit from higher corn, fertilizer and food product volume. Fertilizer volumes may be favorably affected by the reopening of a large phosphate fertilizer plant.

**Paper, clay and forest products** traffic volume declined 3%, and revenues decreased 1%, in 2002, primarily due to continued weakness in the paper market, especially in the first half of the year. Traffic volume improved later in the year as the paper market strengthened. In addition, NS gained business from conversion of truck shipments to rail and from continued strength in housing starts. Revenue per unit benefited from rate increases and a decline in shorter-haul business.

In 2001, paper, clay and forest products traffic volume declined 8%, and revenues decreased 3%, primarily due to a weakened paper market. Paper shipments were adversely affected by reduced production at many NS-served paper mills, a result of sluggish newspaper advertising and soft demand for paper. Lumber traffic began the year weak, improved in late summer, but softened late in the year due to short-term weakness in housing starts. Revenue per unit increased principally due to higher rates.

Paper, clay and forest products revenues are expected to improve slightly in 2003 as a result of a recovering economy, service improvements and new business.

**INTERMODAL** traffic volume increased 6%, and revenues increased 5%, in 2002. Volume growth was principally the result of new and improved services that resulted in new business, including the conversion of truck business to rail. International traffic, which accounts for about half of intermodal volume, increased 10%, supported by growth in trade activity and new business, including the conversion of over-the-road traffic. Domestic shipments grew 6%, primarily because of new business gained from the conversion of truck shipments. Triple Crown Services Company (TCS) volume increased 4%. Revenue per unit declined as a result of an increase in shorter-haul business and the absence of fuel surcharges that were in place in 2001, which were partially offset by some rate increases.

In 2001, intermodal traffic volume decreased 1%, but revenues increased slightly. Domestic traffic volume was up in the first half of the year, but demand increasingly weakened as the year progressed, which eroded NS' base of traffic. New business supported by the opening of three new terminals and other initiatives mitigated the effects of the weakened economy. International traffic grew slightly as U.S. imports slowed with the economy. TCS traffic volume increased 1% despite economic conditions, as it continued to provide reliable, trucklike service. Intermodal revenue per unit dropped later in the year, reflecting the expiration of fuel surcharges that were implemented late in 2000 and the introduction of new shorter-haul business.

In 2003, intermodal revenues are expected to continue to benefit from new business supported by continued improvements in service and conversion of truck traffic to rail.

**Railway Operating Expenses**

Railway operating expenses decreased 1% in 2002, while carloads increased 1%. In 2001, railway operating expenses declined 7%. However, expenses in 2000 included $165 million of costs related to actions taken to reduce the size of the work force. Excluding these costs, railway operating expenses decreased 4% in 2001, while carloads dropped 3%.

The railway operating ratio, which measures the percentage of railway operating revenues consumed by railway operating expenses, was 81.5% in 2002, compared with 83.7% in 2001 and 87% in 2000 (excluding the work-force reduction costs, which increased the ratio 2.7 percentage points). Both declines primarily resulted from gains in efficiency, although 2002 also benefited from higher traffic volume, and 2001 benefited from increased revenue per unit. The efficiency gains in 2002 were principally the result of the implementation of a new operating plan that emphasizes adherence to a schedule and reductions in service variability. These improvements came despite a continuing change in the mix of traffic (more resource-intensive traffic, such as automotive and intermodal, coupled with the decrease in export coal traffic).

The following table shows the changes in railway operating expenses summarized by major classifications.

**Operating Expense Variances**
Increases (Decreases)

| | 2002 vs. 2001 | 2001 vs. 2000 |
|---|---|---|
| | *($ in millions)* | |
| Compensation and benefits* | $ 8 | $ (220) |
| Materials, services and rents | 13 | (1) |
| Conrail rents and services | (9) | (57) |
| Depreciation | 1 | 11 |
| Diesel fuel | (70) | (66) |
| Casualties and other claims | 28 | 1 |
| Other | (22) | (31) |
| Total | $ (51) | $ (363) |

* Includes $165 million of work-force reduction costs in 2000.

**Compensation and benefits** represented 40% of total railway operating expenses and increased slightly in 2002. Higher wage rates, reduced pension income (see Note 11) and increased health and welfare benefits costs more than offset savings from reduced employment levels and lower payroll taxes (see the discussion of the Railroad Retirement and Survivors' Improvement Act, below). Medical costs are expected to continue to increase in 2003, a result of higher costs for active employees and an increase in the expected inflation related to postretirement benefits.

In 2001, compensation and benefits decreased 10%; however, this comparison reflects the $165 million of work-force reduction costs in 2000. Excluding those costs, compensation and benefits decreased 3%, primarily a result of savings attributable to the reduced size of the work force, which were somewhat offset by higher wages and benefit costs for union employees, higher incentive compensation and reduced pension income.

The Railroad Retirement and Survivors' Improvement Act, which took effect on Jan. 1, 2002, provides for a phased reduction of the employers' portions of Tier II Railroad Retirement payroll taxes. The phase-in calls for a reduction from 15.6% in 2002 to 14.2% in 2003 and 13.1% in 2004. In addition, the supplemental annuity tax was eliminated. These changes resulted in an estimated $21 million reduction in payroll taxes in 2002 and are expected to result in savings of $20 million in 2003, compared with

2002. However, these savings are expected to be offset by an increase in the railroad unemployment tax rate, higher payroll taxes on increased wages and a higher wage base. The new law allows for investment of Tier II assets in a diversified portfolio through the newly established National Railroad Retirement Investment Trust. The law also provides a mechanism for automatic adjustment of future Tier II payroll taxes should the trust assets fall below a four-year reserve or exceed a six-year reserve.

**Materials, services and rents** includes items used for the maintenance of the railroad's lines, structures and equipment; the costs of services purchased from outside contractors, including the net costs of operating joint (or leased) facilities with other railroads; and the net cost of equipment rentals. This category of expenses increased 1% in 2002 and decreased slightly in 2001.

The increase in 2002 was the result of higher volume-related expenses for automotive and intermodal traffic, increased material costs for locomotives, higher expenses for roadway and bridge repairs and increased derailment costs. These higher costs were largely offset by a significant reduction in equipment rents. In 2001, the effects of lower equipment rents were largely offset by higher costs for purchased services, including expenses for software, consulting and legal fees.

Equipment rents, which includes the cost to NS of using equipment (mostly freight cars) owned by other railroads or private owners, less the rent paid to NS for the use of its equipment, decreased 14% in 2002 and 11% in 2001. The decline in 2002 was principally the result of continued improvement in cycle times, reflecting efficiency gains and, for intermodal equipment, service design and process changes implemented during the year. The decrease in 2001 was primarily due to shorter car cycle times that resulted in fewer car days on line and fewer freight car and locomotive leases.

Locomotive repair costs increased in 2002 and 2001, principally due to renewed maintenance activity, which is expected to continue into 2003. Freight car maintenance costs, which were relatively flat in 2002, are also likely to increase in 2003, as it is expected that the economy will recover and more freight cars are due for maintenance.

**Conrail rents and services** decreased 2% in 2002 and 12% in 2001. This item includes amounts due to PRR and CRC for use of their operating properties and equipment and CRC's operation of the Shared Assets Areas. Also included is NS' equity in Conrail's net earnings, plus the additional amortization related to the difference between NS' investment in Conrail and its underlying equity (see Note 2). Both declines reflected higher Conrail earnings and lower expenses in the Shared Assets Areas (see "Conrail's Results of Operations, Financial Condition and Liquidity," below).

**Depreciation** expense was up slightly in 2002 and increased 2% in 2001. Substantial levels of capital spending affected both years; however, depreciation expense in 2002 benefited from lower rates implemented early in the year following completion of a periodic study (see Note 1, "Properties," for NS' depreciation policy).

**Diesel fuel** expenses decreased 17% in 2002 and 14% in 2001. The decline in 2002 reflected a 16% drop in the average price per gallon and slightly lower consumption. Expenses in 2002 included a $10 million benefit from the hedging program initiated in the second quarter of 2001 (see "Market Risks and Hedging Activities," below and Note 16). The decrease in 2001 was the result of an 8% drop in consumption and a 7% decline in the average price per gallon. Expenses in 2001 included $8 million of cost related to the hedging program. NS expects diesel fuel prices to be higher in 2003.

**Casualties and other claims** expenses (including the estimates of costs related to personal injury, property damage and environmental matters) increased 20% in 2002, but only slightly in 2001. The increase in 2002 reflected adverse personal injury claims development as indicated by an actuarial study and higher expenses for loss and damage to lading, as well as higher insurance and environmental remediation costs.

The largest component of casualties and other claims expense is personal injury costs. In 2002, cases involving occupational injuries comprised about 30% of the total employee injury cases settled and 24% of the total settlement payments made. Injuries of this type are not generally caused by a specific accident or event, but, rather, result from a claimed exposure over time. Many such claims are being asserted by former or retired employees, some of whom have not been actively employed in the rail industry for decades. NS continues to work actively to eliminate all employee injuries and to reduce the associated costs.

The rail industry remains uniquely susceptible to litigation involving job-related accidental injury and occupational claims because of the Federal Employers' Liability Act (FELA), which is applicable only to railroads. This law, which covers employee claims for job-related injuries, produces results that are unpredictable and inconsistent as compared with a no-fault workers' compensation system.

NS, like many other businesses in the U.S., has experienced difficulty obtaining property and casualty insurance at reasonable terms since the September 11 terrorist attacks. Thus far, NS has been successful in maintaining a substantial amount of commercial insurance for third-party personal injury, property damage and FELA claims that exceed the self-insured retention. However, both the cost of this commercial insurance and the amount of risk that NS retains through self-insurance has more than doubled since the attacks.

**Other expenses** decreased 10% in 2002 and 13% in 2001. The decline in 2002 reflected lower expenses for property and sales and use taxes. The decrease in 2001 was principally the result of lower bad debt costs, reduced franchise and property taxes, and lower travel and employee-relocation expenses.

**Other Income – Net**

Other income – net was $66 million in 2002, $99 million in 2001 and $168 million in 2000 (see Note 3). The decline in 2002 was primarily the result of higher interest accruals on federal income tax liabilities, lower gains from the sale of properties and investments, and the absence of a $13 million gain from a nonrecurring settlement that benefited 2001. These reductions were partially offset by reduced discount from the sales of receivables (due to a lower amount of receivables sold and a lower interest rate environment, which favorably affects the amount of discount). The reduction in 2001 resulted from the absence of $101 million of gains that occurred in 2000 related to the sale of timber rights and gas and oil royalty and working interests. This was somewhat offset by lower interest accruals on federal income tax liabilities and the $13 million nonrecurring settlement gain. Results in 2001 also included an $18 million gain from a large property sale that closed in December.

**Income Taxes**

Income tax expense in 2002 was $246 million for an effective rate of 35%, compared with effective rates of 35% in 2001 and 31% in 2000. Excluding the equity in Conrail's after-tax earnings, the effective rates were 38% in 2002 and 2001 and 34% in 2000.

The effective rates in 2002 and 2001 were higher than that of 2000, primarily due to dispositions of tax benefits related to coal-seam gas properties. The effective rates in all three years benefited from favorable adjustments upon filing the prior year tax returns and favorable adjustments to state tax liabilities. In addition, 2000 benefited from investments in coal-seam gas properties. The 2003 effective rate may benefit from the resolution of various tax audits.

In March 2002, the Job Creation and Worker Assistance Act of 2002 was signed into law and began providing immediate tax incentives for business. A 30% additional first-year depreciation allowance was a primary element of this legislation. This depreciation incentive continues for three years, and during these years the resulting acceleration of tax depreciation deductions will improve cash flow by reducing current tax expense and increasing deferred tax expense by significant amounts.

**Discontinued Operations**

Income from discontinued operations in 2001 consisted of a $13 million after-tax gain related to the sale of NS' motor carrier subsidiary (see Note 17).

## FINANCIAL CONDITION, LIQUIDITY AND CAPITAL RESOURCES

**Cash provided by operating activities,** NS' principal source of liquidity, was $803 million in 2002, compared with $654 million in 2001 and $1.3 billion in 2000. In 2002, the improvement was the result of higher income from railway operations and favorable changes in working capital, which were offset, in part, by fewer accounts receivable sold (see Note 5). Receivable sales declined $270 million in 2002 and $88 million in 2001. The significant decline in operating cash flow in 2001 reflects the commencement in 2000 of the accounts receivable sales program. Excluding the infusion of cash in 2000 from the start of this program, operating cash flow declined by $300 million in 2001. The decrease primarily resulted from an $88 million reduction in the amount of accounts receivable sold, higher tax payments including amounts applicable to prior years, an increase in telecommunication receivables, bonus payments in 2001 (no such payments in 2000) and the timing of payrolls.

A significant portion of payments made to PRR (which are included in "Conrail Rents and Services" and, therefore, are a use of cash in "Cash provided by operating activities") are borrowed back from a PRR subsidiary and, therefore, are a source of cash in "Proceeds from borrowings." NS' net cash flow from these borrowings amounted to $212 million in 2002 and $250 million in 2001.

NS' working capital deficit was $554 million at Dec. 31, 2002, compared with $1.3 billion at Dec. 31, 2001. The decline resulted principally from the change in the terms of the note under which NS borrows funds from a subsidiary of PRR (see Note 2) and a reduction in the amount of debt due within one year. Debt due in 2003 is expected to be paid using cash generated from operations (including sales of accounts receivable) and cash on hand.

NS currently has the capability to increase the amount of accounts receivable being sold under the revolving sale program to meet its more immediate working capital needs. During 2002, the amount of receivables NS could sell under this program ranged from $368 million to $421 million, and the amount of receivables NS sold ranged from $30 million to $400 million. Moreover, NS has the capability to issue up to $1 billion of commercial paper (see Note 8); however, reductions in its credit ratings could limit NS' ability to access the commercial paper markets (see also the discussion of financing activities, below).

NS expects to generate sufficient cash flow from operations to meet its ongoing obligations. This expectation is based on a view that the economy will remain flat for the first half of 2003 and resume growth in the third and fourth quarters.

**Contractual obligations** at Dec. 31, 2002, related to NS' long-term debt (including capital leases), operating leases, agreements with CRC, unconditional purchase obligations and other long-term obligations are as follows:

| | Total | 2003 | 2004-2005 | 2006-2007 | 2008 and Subsequent |
|---|---|---|---|---|---|
| | | | ($ in millions) | | |
| Long-term debt and capital leases | $ 7,364 | $ 358 | $ 856 | $ 1,153 | $ 4,997 |
| Operating leases | 880 | 113 | 166 | 115 | 486 |
| Agreements with CRC | 748 | 30 | 65 | 68 | 585 |
| Unconditional purchase obligations | 164 | 164 | -- | -- | -- |
| Other long-term obligations | 38 | 8 | 16 | 14 | -- |
| Total | $ 9,194 | $ 673 | $ 1,103 | $ 1,350 | $ 6,068 |

NS also has contractual obligations to PRR as disclosed in Note 2. However, NS has the ability to borrow back funds from PRR to the extent they are not needed to fund contractual obligations at Conrail. As an indirect owner of Conrail, NS may need to make capital contributions, loans or advances to Conrail to fund its contractual obligations. The following table presents 58% of Conrail's contractual obligations for long-term debt (including capital leases) and operating leases. Conrail has no unconditional purchase or other long-term obligations.

| | Total | 2003 | 2004-2005 | 2006-2007 | 2008 and Subsequent |
|---|---|---|---|---|---|
| | | | ($ in millions) | | |
| Long-term debt and capital leases | $ 684 | $ 33 | $ 62 | $ 62 | $ 527 |
| Operating leases | 327 | 32 | 64 | 62 | 169 |
| Total | $ 1,011 | $ 65 | $ 126 | $ 124 | $ 696 |

NS also has two transactions not included in the balance sheets or in the previous table of its contractual obligations consisting of an accounts receivable sale program (see Note 5) and an operating lease covering 140 locomotives (see Note 9).

Under the accounts receivable sale program, NS sells without recourse undivided ownership interests in a pool of accounts receivable to two unrelated buyers. NS has no ownership interest in the buyers. The buyers issued debt to fund their initial purchase, and NS used the proceeds it received from the initial purchase primarily to pay down its outstanding debt. NS has no obligation related to the buyers' debt, and there is no existing obligation to repurchase sold receivables. Upon termination of the program, the buyers would cease purchasing new receivables and would retain collections related to the previously sold receivables (see Note 5).

The operating lease covering the 140 locomotives is renewable annually at NS' option and expires in 2008. The lessor is a special-purpose entity formed to enter into this transaction, but it is not related to NS and its owner has a substantive residual equity capital investment at risk in the entity. The lessor owns the locomotives and issued debt to finance their purchase. NS has no obligation related to the debt. NS has the option to purchase the locomotives, but also can return them to the lessor. The return provisions of the lease are not so onerous as to preclude this option. If NS does not purchase the locomotives at the end of the maximum lease term, it is liable for any shortfall in the then fair value of the locomotives and a specified residual value. NS does not expect to be required to make any payments

under this provision (see Note 9). As the primary beneficiary of the business of the lessor, effective Jan. 1, 2003, NS consolidated the assets (locomotives) and liabilities (debt) of this special-purpose entity when it implemented Financial Accounting Standards Board Interpretation No. 46 (see "New Accounting Pronouncement" on page K34).

**Cash used for investing activities** increased 12% in 2002 and 3% in 2001. Property additions, which account for most of the recurring spending in this category, were down 8% in 2002, following a 2% increase in 2001. Property sales were significantly lower in 2002, which resulted in the net increase in cash used for investing activities despite the reduction in capital spending. The following tables show capital spending (including capital leases) and track and equipment statistics for the past five years.

**Capital Expenditures**

| | 2002 | 2001 | 2000<br>*($ in millions)* | 1999 | 1998 |
|---|---|---|---|---|---|
| Road | $ 519 | $ 505 | $ 557 | $ 559 | $ 612 |
| Equipment | 174 | 233 | 146 | 349 | 442 |
| Other property | 2 | 8 | 28 | 4 | 6 |
| Total | $ 695 | $ 746 | $ 731 | $ 912 | $ 1,060 |

Capital expenditures (which in 2002 included $6 million of capitalized leases) decreased 7% in 2002, but increased 2% in 2001. The decline in 2002 reflected lower spending for intermodal facilities, as NS completed in 2001 several significant projects that expanded the capacity of the intermodal network. Higher spending on track program work was offset by fewer locomotive purchases (50 in 2002 compared with 100 in 2001). Outlays in 2001 included amounts for locomotive purchases (no such purchases were made in 2000 as locomotives were leased) that were somewhat offset by lower expenditures for freight car purchases and roadway projects. In 2002, 2001 and 2000, spending for road included fiber-optic infrastructure (see "Telecommunications Subsidiary," below).

**Track Structure Statistics (Capital and Maintenance)**

| | 2002 | 2001 | 2000 | 1999 | 1998 |
|---|---|---|---|---|---|
| Track miles of rail installed | 235 | 254 | 390 | 403 | 429 |
| Miles of track surfaced | 5,270 | 3,836 | 3,687 | 5,087 | 4,715 |
| New crossties installed (millions) | 2.8 | 1.5 | 1.5 | 2.3 | 2.0 |

**Average Age of Owned Railway Equipment**

| | 2002 | 2001 | 2000<br>*(years)* | 1999 | 1998 |
|---|---|---|---|---|---|
| Freight cars | 25.9 | 25.4 | 24.6 | 23.8 | 23.6 |
| Locomotives | 16.1 | 15.7 | 16.1 | 15.4 | 15.4 |
| Retired locomotives | 28.2 | 22.4 | 24.5 | 22.7 | 20.6 |

The table above excludes equipment leased from PRR (see Note 2), which comprises 17% of the freight car fleet and 25% of the locomotive fleet.

Through its coal car rebody program, which was suspended in 2000, NS converted about 29,000 hopper cars into high-capacity steel gondolas or hoppers. As a result, the remaining service life of the freight-car fleet is greater than may be inferred from the increasing average age shown in the table above.

For 2003, NS has budgeted $798 million for capital expenditures. The anticipated spending includes $499 million for roadway projects, of which $383 million is for track and bridge program work. Also included are projects for communications, signal and electrical systems, as well as projects for environmental and public improvements such as grade crossing separations and signal upgrades. Other roadway projects include marketing and industrial development initiatives, including increasing track capacity and access to coal receivers and vehicle production and distribution facilities, and continuing investments in intermodal infrastructure. Equipment spending of $246 million includes the purchase of 100 locomotives and upgrades to existing units, improvements to multilevel automobile racks, and projects related to computers and information technology, including additional security and backup systems.

**Cash used for financing activities** in 2002 was $150 million. Financing activities provided cash of $151 million in 2001 and used cash of $798 million in 2000. The comparisons reflect a net reduction of debt in 2002, a net increase in 2001 and a net reduction in 2000. The comparison in 2001 also reflected the effects of the reduction to the dividend in January 2001. Financing activities include loan transactions with a subsidiary of PRR that resulted in net borrowings of $212 million in 2002 and $250 million in 2001 and net repayments of $72 million in 2000 (see Note 2). Excluding these borrowings, debt was reduced $303 million in 2002, $20 million in 2001 and $422 million in 2000. The net reduction of debt in 2000 was accomplished in part with the proceeds from the sale of accounts receivable. NS' debt-to-total capitalization ratio (excluding notes payable to the PRR subsidiary) at year end was 53.1% in 2002 and 55.6% in 2001.

NS currently has in place a $1 billion, five-year credit agreement, which provides for borrowings at prevailing rates and includes financial covenants (see Note 8).

NS has outstanding $717 million of its 7.05% notes due May 1, 2037. Each holder of a 2037 note may require NS to redeem all or part of the note at face value, plus accrued and unpaid interest, on May 1, 2004. NS will not know the amount of 2037 notes that it may be required to redeem until April 1, 2004. NS expects to be able to redeem any such notes using cash generated from operations (including sales of accounts receivable), cash on hand and proceeds from borrowings.

## APPLICATION OF CRITICAL ACCOUNTING ESTIMATES

The preparation of financial statements in accordance with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. These estimates and assumptions may require significant judgment about matters that are inherently uncertain, and future events are likely to occur that may require management to change them. Accordingly, management regularly reviews these estimates and assumptions based on historical experience, changes in the business environment and other factors that management believes to be reasonable under the circumstances. Management discusses the development, selection and disclosures concerning critical accounting estimates with the Audit Committee of its Board of Directors.

### Pensions and Other Postretirement Benefits

Accounting for pensions and other postretirement benefit plans requires management to make several estimates and assumptions (see Note 11). These include the expected rate of return from investment of the plans' assets, projected increases in medical costs and the expected retirement age of employees as well as their projected earnings and mortality. In addition, the amounts recorded are affected by changes in the interest rate environment because the associated liabilities are discounted to their present value. Management makes these estimates based on the company's historical experience and other information that it deems pertinent under the circumstances (for example, expectations of future stock market

performance). Management engages an independent consulting actuarial firm to aid it in selecting appropriate assumptions and valuing its related liabilities.

NS' net pension benefit, which is included in "Compensation and benefits" on its Consolidated Income Statement, was $79 million for the year ended Dec. 31, 2002. In recording this amount, NS assumed a long-term investment rate of return of 9%, compared with the 10% rate used in the previous two years. Investment experience of the pension fund over the past 10-, 15- and 20-year periods has been in excess of 10%. A one percentage point change to this rate of return assumption would result in a $20 million change to the pension credit and, as a result, an equal change in "Compensation and benefits" expense. Changes that are reasonably likely to occur in assumptions concerning retirement age, projected earnings and mortality would not be expected to have a material effect on NS' net pension benefit or net pension asset in the future. The net pension asset is recorded at its net present value using a discount rate that is based on the current interest rate environment; therefore, management has little discretion in this assumption.

NS' net cost for other postretirement benefits, which is also included in "Compensation and benefits," was $34 million for the year ended Dec. 31, 2002. In recording this expense and valuing the net liability for other postretirement benefits, which is included in "Other benefits" as disclosed in Note 11, management estimated future increases in health-care costs. These assumptions, along with the effect of a one percentage point change in them, are described in Note 11.

**Properties and Depreciation**

Most of NS' total assets are comprised of long-lived railway properties (see Note 6) and its investment in Conrail (see Note 2). Most of Conrail's assets are long-lived railway properties. As disclosed in Note 1, NS' properties are depreciated using group depreciation. Rail is depreciated primarily on the basis of use measured by gross-ton miles. Other properties are depreciated generally using the straight-line method over the lesser of estimated service or lease lives. NS reviews the carrying amount of properties whenever events or changes in circumstances indicate that such carrying amount may not be recoverable based on future undiscounted cash flows or estimated net realizable value. Assets that are deemed impaired as a result of such review are recorded at the lesser of carrying amount or fair value. NS is amortizing the excess of the purchase price paid for its investment in Conrail over its share of Conrail's net equity using the principles of purchase accounting, based primarily on the estimated remaining useful lives of Conrail's properties.

NS' depreciation expense is based on management's assumptions concerning service lives of its properties as well as the expected net salvage that will be received upon their retirement. These assumptions are the product of periodic depreciation studies that are performed by a firm of consulting engineers. These studies analyze NS' historical patterns of asset use and retirement and take into account any expected change in operation or maintenance practices. NS' recent experience with these studies has been that while they do result in changes in the rates used to depreciate its properties, these changes have not caused a significant effect to its annual depreciation expense. The studies may also indicate that the recorded amount of accumulated depreciation is deficient (or in excess) of the amount indicated by the study. Any such deficiency (or excess) is amortized as a component of depreciation expense over the remaining service lives of the affected class of property. NS' "Depreciation expense" for the year ended Dec. 31, 2002, amounted to $515 million. NS' weighted-average depreciation rates for 2002 are disclosed in Note 6; a one-tenth percentage point increase (or decrease) in these rates would result in a $17 million increase (or decrease) to NS' depreciation expense.

**Personal Injury, Environmental and Legal Liabilities**

NS' expense for "Casualties and other claims" amounted to $171 million for the year ended Dec. 31, 2002. Most of this expense was composed of NS' accrual related to personal injury liabilities (see discussion of FELA in the discussion captioned "Casualties and other claims" on page K23). NS

engages an independent consulting actuarial firm to aid in valuing its personal injury liability and determining the amount to accrue during the year. The actuarial firm studies NS' historical patterns of reserving for claims and subsequent settlements. The actuary also takes into account outside influences considered pertinent. The study uses the results of these analyses to estimate the ultimate amount of the liability, which includes amounts for incurred but unasserted claims. NS has recorded this actuarially determined liability. The liability is dependent upon many individual judgments made as to the specific case reserves as well as the judgments of the consulting actuary and management in the periodic studies. Accordingly, there could be significant changes in the liability, which NS would recognize when such a change became known. The most recent actuarial study was performed as of June 30, 2002, and resulted in an increase to NS' personal injury liability during the third quarter. While the liability recorded is supported by the most recent study, it is reasonably possible that the liability could be higher or lower.

NS is subject to various jurisdictions' environmental laws and regulations. It is NS' policy to record a liability where such liability or loss is probable and its amount can be estimated reasonably (see Note 18). Environmental engineers regularly participate in ongoing evaluations of all known sites and in determining any necessary adjustments to liability estimates. NS also has established an Environmental Policy Council, composed of senior managers, to oversee and interpret its environmental policy.

Operating expenses for environmental matters totaled approximately $15 million in 2002, $12 million in 2001, and $11 million in 2000, and capital expenditures totaled approximately $10 million in each of 2002, 2001 and 2000. Capital expenditures in 2003 are expected to be comparable to those in 2002.

NS' balance sheets included liabilities for environmental exposures in the amount of $29 million at Dec. 31, 2002, and $33 million at Dec. 31, 2001 (of which $8 million was accounted for as a current liability in each year). At Dec. 31, 2002, the liability represented NS' estimate of the probable cleanup and remediation costs based on available information at 114 identified locations. On that date, 10 sites accounted for $16 million of the liability, and no individual site was considered to be material. NS anticipates that much of this liability will be paid out over five years; however, some costs will be paid out over a longer period.

At some of the 114 locations, certain NS subsidiaries, usually in conjunction with a number of other parties, have been identified as potentially responsible parties by the Environmental Protection Agency (EPA) or similar state authorities under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, or comparable state statutes, which often impose joint and several liability for cleanup costs.

With respect to known environmental sites (whether identified by NS or by the EPA or comparable state authorities), estimates of NS' ultimate potential financial exposure for a given site or in the aggregate for all such sites are necessarily imprecise because of the widely varying costs of currently available cleanup techniques, the likely development of new cleanup technologies, the difficulty of determining in advance the nature and full extent of contamination and each potential participant's share of any estimated loss (and that participant's ability to bear it), and evolving statutory and regulatory standards governing liability. NS estimates its environmental remediation liability on a site-by-site basis, using assumptions and judgments that management deems appropriate for each site. As a result, it is not practical to quantitatively discuss the effects of changes in these many assumptions and judgments. NS has consistently applied its methodology of estimating its environmental liabilities.

The risk of incurring environmental liability – for acts and omissions, past, present and future – is inherent in the railroad business. Some of the commodities in NS' traffic mix, particularly those classified as hazardous materials, can pose special risks that NS and its subsidiaries work diligently to minimize. In addition, several NS subsidiaries own, or have owned, land used as operating property, or which is leased or may have been leased and operated by others, or held for sale. Because environmental problems may exist on these properties that are latent or undisclosed, there can be no assurance that NS will not incur environmentally related liabilities or costs with respect to one or more of them, the amount and materiality of which cannot be estimated reliably at this time. Moreover, lawsuits and claims involving these and potentially other now-unidentified environmental sites and matters are

likely to arise from time to time. The resulting liabilities could have a significant effect on financial condition, results of operations or liquidity in a particular year or quarter.

However, based on its assessment of the facts and circumstances now known, management believes that it has recorded the probable costs for dealing with those environmental matters of which the Corporation is aware. Further, management believes that it is unlikely that any known matters, either individually or in the aggregate, will have a material adverse effect on NS' financial position, results of operations or liquidity.

Norfolk Southern and certain subsidiaries are defendants in numerous lawsuits and other claims relating principally to railroad operations. When management concludes that it is probable that a liability has been incurred and the amount of the liability can be reasonably estimated, it is accrued through a charge to expenses. While the ultimate amount of liability incurred in any of these lawsuits and claims is dependent on future developments, in management's opinion the recorded liability, if any, is adequate to cover the future payment of such liability and claims. However, the final outcome of any of these lawsuits and claims cannot be predicted with certainty, and unfavorable or unexpected outcomes could result in additional accruals that could be significant to results of operations in a particular year or quarter. Any adjustments to recorded liability will be reflected in expenses in the periods in which such adjustments are known.

**Income Taxes**

NS' net deferred tax liability totaled $3,010 million at Dec. 31, 2002 (see Note 4). This liability is estimated based on the expected future tax consequences of items recognized in the financial statements. After application of the federal statutory tax rate to book income, judgment is required with respect to the timing and deductibility of expenses in the corporate income tax returns. For state income and other taxes, judgment is also required with respect to the apportionment among the various jurisdictions. A valuation allowance is recorded if management expects that it is more likely than not that its deferred tax assets will not be realized. NS has only a $24 million valuation allowance on $592 million of deferred tax assets as of Dec. 31, 2002, reflecting the expectation that most of these assets will be realized. For 2002, 2001 and 2000, the effective tax rates, excluding NS' equity in Conrail's earnings, were 38%, 38% and 34%, respectively. For every 1/2% change in the 2002 effective tax rate, net income would have changed by $4 million.

**CONRAIL'S RESULTS OF OPERATIONS, FINANCIAL CONDITION AND LIQUIDITY**

Conrail's net income was $180 million in 2002, compared with $174 million in 2001 and $170 million in 2000 (see Note 2). The increase in 2002 was primarily the result of a favorable federal tax settlement. The improvement in 2001 reflected lower casualties and other claims expenses, a favorable adjustment to state income tax reserves and environmental and insurance settlements in Conrail's favor. These positive items were offset in part by the absence of significant gains from the sale of property.

Conrail's operating revenues were $893 million in 2002, $903 million in 2001 and $985 million in 2000. Both decreases resulted from the expiration of certain equipment leases and lower operating fees, largely because of reduced operating costs in the Shared Assets Areas. The decline in 2001 also reflected lower revenues at Conrail's Indiana Harbor Belt subsidiary.

Conrail's operating expenses were $623 million in 2002, $639 million in 2001 and $749 million in 2000. The decrease in 2002 reflected lower expenses for materials, services and rents and compensation and benefits, which were offset, in part, by higher costs for casualties and other claims. The decline in 2001 was primarily due to lower expenses for materials, services and rents; casualties and other claims; and compensation and benefits.

Conrail's cash provided by operations decreased $79 million, or 16%, in 2002, and increased $140 million, or 39%, in 2001. The decline in 2002 was primarily the result of the absence of two items that benefited 2001: a $50 million cash payment for transferring to a third party certain rights to license, manage and market signboard advertising on Conrail's property for 25 years and proceeds from a favorable insurance settlement. This was offset, in part, by favorable changes in working capital. The increase in 2001 was largely the result of the two unusual items discussed above. Cash generated from operations is Conrail's principal source of liquidity and is primarily used for debt repayments and capital expenditures. Debt repayments totaled $59 million in 2002 and $61 million in 2001. Capital expenditures totaled $23 million in 2002 and $47 million in 2001.

Conrail had a working capital deficit of $29 million at Dec. 31, 2002, compared with working capital of $438 million at Dec. 31, 2001, which included $687 million of amounts receivable from NS and CSX. Conrail is not an SEC registrant and, therefore, presently cannot issue any publicly traded securities. Conrail is expected to have sufficient cash flow to meet its ongoing obligations.

NS' equity in earnings of Conrail, net of amortization, was $54 million in 2002, $44 million in 2001 and $21 million in 2000. NS' other comprehensive loss for 2002 and 2001, as shown in the Consolidated Statement of Changes in Stockholders' Equity, included $34 million and $41 million, respectively, for its portion of Conrail's other comprehensive loss (see Note 13).

## OTHER MATTERS

### Telecommunications Subsidiary

NS' subsidiary, Thoroughbred Technology and Telecommunications, Inc. (T-Cubed), has developed fiber optic infrastructure with members of the telecommunications industry. This industry has experienced a severe downturn. As a result of changes in the values of telecommunications assets, T-Cubed is monitoring its carrying amount of these assets, as required by SFAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets." To date, based on known facts and circumstances, management believes that its ultimate investment in these assets will be recovered, and accordingly, no impairment has been recognized (see Note 6).

During 2001, one of T-Cubed's codevelopers, 360networks (USA), inc. ("360"), filed for protection under Chapter 11 of the U.S. Bankruptcy Code and foreign laws. 360 owes T-Cubed amounts for work performed on certain joint projects; and T-Cubed owes 360 amounts for work performed on other joint projects. The bankruptcy judge has approved set-off of these amounts, leaving about $7 million due to T-Cubed from 360. T-Cubed has the right to collect this amount from any proceeds due 360 from the sale of joint assets. Management believes that it will collect this receivable.

T-Cubed is engaged in contract litigation with a second codeveloper, Williams Communications, LLC ("Williams Communications"), concerning the latter's obligation to purchase fiber optic infrastructure installed by T-Cubed between Cleveland, Ohio, and northern Virginia. On Jan. 29, 2003, the United States District Court for the Northern District of Georgia entered an order requiring Williams Communications to pay T-Cubed the remaining amount due for such infrastructure, approximately $36 million, plus prejudgment interest at a rate of 9% per annum. Williams Communications may elect to appeal. The ability to collect and retain a judgment against Williams Communications may be limited due to its financial condition; however, the shortfall, if any, cannot now be determined. Its parent, Williams Communications Group, Inc., filed in April 2002 a voluntary petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code, and emerged from bankruptcy in October 2002. Williams Communications was not included in the bankruptcy petition (see Note 18).

**Labor Arbitration**

Several hundred claims have been filed with NSR on behalf of employees furloughed after June 1, 1999, for various periods of time, alleging that the furloughs were a result of the Conrail transaction and seeking "New York Dock" income protection benefits. Several labor organizations have initiated arbitration on behalf of individual employees. Other disputes are pending wherein similar benefits are sought under labor agreement provisions that, in management's judgment, do not apply to the involved circumstances.

Based on known facts, including the availability of legal defenses, management believes that NS will prevail in these disputes and that any potential liability for the involved claims should not have a material adverse effect on NS' financial position, results of operations or liquidity. Depending on the outcome of these arbitrations, additional claims may be filed or progressed to arbitration. Should all such claimants prevail, there could be a significant effect on results of operations in a particular quarter (see Note 18).

**Labor Agreements**

Approximately 24,000 of NS' railroad employees are covered by collective bargaining agreements with 15 different labor unions. These agreements remain in effect until changed pursuant to the Railway Labor Act. Moratorium provisions in these agreements permitted NS and the unions to propose such changes in late 1999; negotiations at the national level commenced shortly thereafter. The outcome of these negotiations is uncertain at this time. However, agreements have been reached with the Brotherhood of Maintenance of Way Employes (BMWE), which represents about 4,200 NS employees; the Brotherhood of Locomotive Engineers (BLE), which represents about 4,500 NS employees; the United Transportation Union (UTU), which represents about 6,700 NS employees; the International Brotherhood of Boilermakers and Blacksmiths (IBB), which represents about 100 NS employees; and the Transportation Communications International Union (TCU), which represents about 4,400 NS employees. Health and welfare issues have been resolved with BMWE and TCU. The UTU agreement provides that, subsequent to a further period of negotiation, health and welfare issues may be submitted to arbitration. Health and welfare issues with the other organizations have not yet been resolved.

**Market Risks and Hedging Activities**

NS uses derivative financial instruments to reduce the risk of volatility in its diesel fuel costs and to manage its overall exposure to fluctuations in interest rates.

In 2001, NS began a program to hedge a portion of its diesel fuel consumption. The intent of the program is to assist in the management of NS' aggregate risk exposure to fuel price fluctuations, which can significantly affect NS' operating margins and profitability, through the use of one or more types of derivative instruments.

Diesel fuel costs represented 7% of NS' operating expenses for 2002. The program provides that NS will not enter into any fuel hedges with a duration of more than 36 months, and that no more than 80% of NS' average monthly fuel consumption will be hedged for any month within any 36-month period.

As of Dec. 31, 2002, through swap transactions, NS has hedged approximately 62% of expected 2003 diesel fuel requirements. The effect of the hedges is to yield an average cost of 73 cents per hedged gallon, including federal taxes and transportation. A 10% decrease in diesel fuel prices would reduce NS' asset related to the swaps by approximately $30 million as of Dec. 31, 2002.

NS manages its overall exposure to fluctuations in interest rates by issuing both fixed- and floating-rate debt instruments and by entering into interest-rate hedging transactions to achieve an appropriate mix within its debt portfolio.

At Dec. 31, 2002, NS' debt subject to interest rate fluctuations totaled $784 million (excluding debt due to the PRR subsidiary). A 1% increase in interest rates would increase NS' total annual interest expense related to all its variable debt by approximately $8 million. Management considers it unlikely that interest rate fluctuations applicable to these instruments will result in a material adverse effect on NS' financial position, results of operations or liquidity.

Some of NS' capital leases, which carry an average fixed rate of 7%, were effectively converted to variable rate obligations using interest rate swap agreements. On Dec. 31, 2002, the average pay rate under these agreements was 2.1%, and the average receive rate was 7%. During 2002, the effect of the swaps was to reduce interest expense by $9 million. A portion of the lease obligations is payable in Japanese yen. NS eliminated the associated exchange rate risk at the inception of each lease with a yen deposit sufficient to fund the yen-denominated obligation. Most of these deposits are held by foreign banks, primarily Japanese. As a result, NS is exposed to financial market risk relative to Japan. Counterparties to the interest rate swaps and Japanese banks holding yen deposits are major financial institutions believed by management to be creditworthy.

**New Accounting Pronouncements**

The Financial Accounting Standards Board (FASB) has issued Statement No. 143, "Accounting for Asset Retirement Obligations," (SFAS No. 143) which is effective Jan. 1, 2003, and addresses legal obligations associated with the retirement of tangible long-lived assets and the associated asset retirement costs. In accordance with the Uniform System of Accounts for Railroad Companies (see Code of Federal Regulations, Title 49, Subtitle B, Chapter X, Part 1201), NS depreciates track structure (rail, other track material and ties) to its net salvage value (gross salvage less cost to remove). SFAS No. 143 prohibits the accrual of a liability for removal costs absent a legal obligation to remove the related asset. Management believes that there is no such legal obligation to remove track. The SEC staff has recently taken a position with a registrant in another industry that calls into question whether the use of net salvage that results in depreciating more than the cost basis of an asset (negative salvage) is appropriate once SFAS No. 143 becomes effective. NS is in the process of studying its track accounts to determine where current depreciation rates will result in negative salvage. To the extent that NS' accumulated depreciation includes such amounts, they will be removed. The cumulative effect of this catch-up adjustment will be recorded as a change in accounting principle in the first quarter of 2003. Going forward, this change will result in lower depreciation expense (because the depreciation rate will no longer reflect any negative salvage) and higher compensation and benefits expenses (for the labor cost to remove retired assets); NS does not expect that this will result in a material change to its total railway operating expenses.

The FASB has issued Interpretation No. 46, "Consolidation of Variable Interest Entities," (FIN No. 46), which addresses consolidation of certain variable interest entities (also commonly referred to as "special purpose entities"). NS adopted FIN No. 46, effective Jan 1, 2003. As a result, on that date NS consolidated a special-purpose entity that leases certain locomotives to NS (see Note 9). This entity has no other significant assets or liabilities other than the locomotives and the debt related to their purchase, which will be reflected on NS' Consolidated Balance Sheet in 2003. This change in reporting will also have the following effects to NS' Consolidated Income Statement beginning in 2003: operating lease expense will decline, and depreciation expense and interest expense on debt will increase. The net effect of these income statement changes is not significant. Adoption of FIN No. 46 did not have a significant effect on NS' financial position or liquidity.

**Inflation**

Generally accepted accounting principles require the use of historical cost in preparing financial statements. This approach disregards the effects of inflation on the replacement cost of property. NS, a capital-intensive company, has most of its capital invested in such assets. The replacement cost of these assets, as well as the related depreciation expense, would be substantially greater than the amounts reported on the basis of historical cost.

**TRENDS**

**Federal Economic Regulation --** Efforts may be made in 2003 to reimpose unwarranted federal economic regulation on the rail industry. The Staggers Rail Act of 1980, which substantially reduced such regulation, encouraged and enabled rail carriers to innovate and to compete for business. NS and other rail carriers will oppose any efforts to reimpose unwarranted economic regulation.

**Utility Deregulation --** Deregulation of the electrical utility industry is expected to increase competition among electric power generators; deregulation over time would permit wholesalers and possibly retailers of electric power to sell or purchase increasing quantities of power to or from distant parties. The effects of deregulation on NS and on its customers cannot be predicted with certainty; however, NS serves a number of efficient power producers who are expected to remain competitive in this evolving environment.

**Carbon-Based Fuel --** There is growing concern in some quarters that emissions resulting from burning carbon-based fuel, including coal, are contributing to global warming and causing other environmental changes. To the extent that these concerns evolve into a consensus among policy-makers, the impact could be either a reduction in the demand for coal or imposition of more stringent regulations on emissions, which might result in making coal a less economical source of power generation or make permitting of coal-fired facilities even more difficult. The revenues and net income of NSR and other railroads that move large quantities of coal could be affected adversely.

**FORWARD-LOOKING STATEMENTS**

This Management's Discussion and Analysis of Financial Condition and Results of Operations contains forward-looking statements that may be identified by the use of words like "believe," "expect," "anticipate" and "project." Forward-looking statements reflect management's good-faith evaluation of information currently available. However, such statements are dependent on and, therefore, can be influenced by, a number of external variables over which management has little or no control, including: domestic and international economic conditions; the business environment in industries that produce and consume rail freight; competition and consolidation within the transportation industry; fluctuation in prices of key materials, in particular diesel fuel; labor difficulties, including strikes and work stoppages; legislative and regulatory developments; changes in securities and capital markets; and natural events such as severe weather, floods and earthquakes. Forward-looking statements are not, and should not be relied upon as, a guaranty of future performance or results. Nor will they necessarily prove to be accurate indications of the times at or by which any such performance or results will be achieved. As a result, actual outcomes and results may differ materially from those expressed in forward-looking statements. The Company undertakes no obligation to update or revise forward-looking statements.

**Item 7A. Quantitative and Qualitative Disclosures about Market Risk.**

The information required by this item is included in Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations" under the heading "Market Risks and Hedging Activities."

**Item 8. Financial Statements and Supplementary Data.**

## INDEX TO FINANCIAL STATEMENTS


| | Page |
|---|---|
| Report of Management | K37 |
| Independent Auditors' Report | K38 |
| Independent Accountants' Report on Internal Control over Financial Reporting | K38 |
| Consolidated Statements of Income<br>Years ended December 31, 2002, 2001 and 2000 | K39 |
| Consolidated Balance Sheets<br>As of December 31, 2002 and 2001 | K40 |
| Consolidated Statements of Cash Flows<br>Years ended December 31, 2002, 2001 and 2000 | K41 |
| Consolidated Statements of Changes in Stockholders' Equity<br>Years ended December 31, 2002, 2001 and 2000 | K42 |
| Notes to Consolidated Financial Statements | K43 |
| The Index to Consolidated Financial Statement Schedule in Item 15 | K70 |

# REPORT OF MANAGEMENT

January 28, 2003

To the Stockholders
Norfolk Southern Corporation

Management is responsible for the preparation and fair presentation of the financial statements included in this annual report. The financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America and reflect management's judgments and estimates concerning effects of events and transactions that are accounted for or disclosed.

Management is also responsible for establishing and maintaining effective internal control over financial reporting. The Corporation's internal control over financial reporting includes those policies and procedures that pertain to the Corporation's ability to record, process, summarize and report reliable financial data. Management recognizes that there are inherent limitations in the effectiveness of any internal control over financial reporting, including the possibility of human error and the circumvention or overriding of internal control. Accordingly, even effective internal control over financial reporting can provide only reasonable assurance with respect to financial statement preparation. Further, because of changes in conditions, the effectiveness of internal control over financial reporting may vary over time.

In order to ensure that the Corporation's internal control over financial reporting is effective, management regularly assesses such controls and did so most recently for its financial reporting as of December 31, 2002. This assessment was based on criteria for effective internal control over financial reporting described in *Internal Control-Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this assessment, management believes the Corporation maintained effective internal control over financial reporting as of December 31, 2002.

The Board of Directors, acting through its Audit Committee, is responsible for the oversight of the Corporation's accounting policies, financial reporting and internal control. The Audit Committee of the Board of Directors is comprised entirely of outside directors who are independent of management. The Audit Committee is responsible for the appointment and compensation of the independent auditor, and approves decisions regarding the appointment or removal of the Vice President-Internal Audit. It meets periodically with management, the independent auditors, and the internal auditors to ensure that they are carrying out their responsibilities. The Audit Committee is also responsible for performing an oversight role by reviewing and monitoring the financial, accounting and auditing procedures of the Corporation in addition to reviewing the Corporation's financial reports. The independent auditors and the internal auditors have full and unlimited access to the Audit Committee, with or without management, to discuss the adequacy of internal control over financial reporting, and any other matters which they believe should be brought to the attention of the Audit Committee.

KPMG LLP, independent auditors of the Corporation's financial statements, has reported on management's assertion with respect to the effectiveness of the Corporation's internal control over financial reporting as of December 31, 2002.

| | | |
|---|---|---|
| /s/ David R. Goode | /s/ Henry C. Wolf | /s/ John P. Rathbone |
| David R. Goode | Henry C. Wolf | John P. Rathbone |
| Chairman, President and | Vice Chairman and | Senior Vice President and |
| Chief Executive Officer | Chief Financial Officer | Controller |

## INDEPENDENT AUDITORS' REPORT

The Stockholders and Board of Directors
Norfolk Southern Corporation:

We have audited the accompanying consolidated balance sheets of Norfolk Southern Corporation and subsidiaries as of December 31, 2002 and 2001, and the related consolidated statements of income, changes in stockholders' equity and cash flows for each of the years in the three-year period ended December 31, 2002. In connection with our audits of the consolidated financial statements, we have also audited the financial statement schedule as listed in Item 15(A)2. These consolidated financial statements and financial statement schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements and financial statement schedule based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Norfolk Southern Corporation and subsidiaries as of December 31, 2002 and 2001, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 2002 in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, the related financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

/s/ KPMG LLP
Norfolk, Virginia
January 28, 2003

## INDEPENDENT ACCOUNTANTS' REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING

The Board of Directors
Norfolk Southern Corporation:

We have examined management's assertion, included in the accompanying Report of Management, that Norfolk Southern Corporation maintained effective internal control over financial reporting as of December 31, 2002 based on criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Norfolk Southern Corporation's management is responsible for maintaining effective internal control over financial reporting. Our responsibility is to express an opinion on management's assertion based on our examination.

Our examination was conducted in accordance with attestation standards established by the American Institute of Certified Public Accountants and, accordingly, included obtaining an understanding of the internal control over financial reporting, testing, and evaluating the design and operating effectiveness of the internal control, and performing such other procedures as we considered necessary in the circumstances. We believe that our examination provides a reasonable basis for our opinion.

Because of inherent limitations in any internal control, misstatements due to error or fraud may occur and not be detected. Also, projections of any evaluation of the internal control over financial reporting to future periods are subject to the risk that the internal control may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, management's assertion that Norfolk Southern Corporation maintained effective internal control over financial reporting as of December 31, 2002 is fairly stated, in all material respects, based on criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

/s/ KPMG LLP
Norfolk, Virginia
January 28, 2003

**NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES**
**Consolidated Statements of Income**

| | Years ended December 31, 2002 | 2001 | 2000 |
|---|---|---|---|
| | *($ in millions, except earnings per share)* | | |
| **Railway operating revenues** | $ 6,270 | $ 6,170 | $ 6,159 |
| **Railway operating expenses** | | | |
| Compensation and benefits (Note 11) | 2,022 | 2,014 | 2,234 |
| Materials, services and rents | 1,457 | 1,444 | 1,445 |
| Conrail rents and services (Note 2) | 412 | 421 | 478 |
| Depreciation | 515 | 514 | 503 |
| Diesel fuel | 342 | 412 | 478 |
| Casualties and other claims | 171 | 143 | 142 |
| Other | 193 | 215 | 246 |
| Total railway operating expenses | 5,112 | 5,163 | 5,526 |
| **Income from railway operations** | 1,158 | 1,007 | 633 |
| Other income – net (Note 3) | 66 | 99 | 168 |
| Interest expense on debt (Note 6) | (518) | (553) | (551) |
| Income from continuing operations before income taxes | 706 | 553 | 250 |
| Provision for income taxes (Note 4) | 246 | 191 | 78 |
| Income from continuing operations | 460 | 362 | 172 |
| Discontinued operations – gain on sale of motor carrier, net of taxes (Note 17) | -- | 13 | -- |
| **Net income** | $ 460 | $ 375 | $ 172 |
| Earnings per share (Note 14) | | | |
| Income from continuing operations – basic and diluted | $ 1.18 | $ 0.94 | $ 0.45 |
| Net income – basic and diluted | $ 1.18 | $ 0.97 | $ 0.45 |

See accompanying notes to consolidated financial statements.

**NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES**
**Consolidated Balance Sheets**

| | As of Dec. 31, 2002 | As of Dec. 31, 2001 |
|---|---|---|
| | *($ in millions)* | |
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 184 | $ 204 |
| Accounts receivable-net (Note 5) | 683 | 475 |
| Due from Conrail (Note 2) | 6 | 8 |
| Materials and supplies | 97 | 90 |
| Deferred income taxes (Note 4) | 187 | 162 |
| Other current assets | 142 | 108 |
| Total current assets | 1,299 | 1,047 |
| Investment in Conrail (Note 2) | 6,178 | 6,161 |
| Properties less accumulated depreciation (Note 6) | 11,370 | 11,208 |
| Other assets | 1,109 | 1,002 |
| **Total assets** | $ 19,956 | $ 19,418 |
| **Liabilities and stockholders' equity** | | |
| Current liabilities: | | |
| Accounts payable (Note 7) | $ 908 | $ 848 |
| Income and other taxes | 269 | 312 |
| Due to Conrail (Note 2) | 86 | 373 |
| Other current liabilities (Note 7) | 232 | 248 |
| Current maturities of long-term debt (Note 8) | 358 | 605 |
| Total current liabilities | 1,853 | 2,386 |
| Long-term debt (Note 8) | 7,006 | 7,027 |
| Other liabilities (Note 10) | 1,029 | 1,089 |
| Due to Conrail (Note 2) | 513 | -- |
| Minority interests | 45 | 45 |
| Deferred income taxes (Note 4) | 3,010 | 2,781 |
| **Total liabilities** | 13,456 | 13,328 |
| Stockholders' equity: | | |
| Common stock $1.00 per share par value, 1,350,000,000 shares authorized; issued 410,154,465 and 407,000,871 shares, respectively | 410 | 407 |
| Additional paid-in capital | 481 | 423 |
| Accumulated other comprehensive loss (Note 13) | (65) | (55) |
| Retained income | 5,694 | 5,335 |
| Less treasury stock at cost, 21,169,125 shares | (20) | (20) |
| **Total stockholders' equity** | 6,500 | 6,090 |
| **Total liabilities and stockholders' equity** | $ 19,956 | $ 19,418 |

See accompanying notes to consolidated financial statements.

**NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES**
**Consolidated Statements of Cash Flows**

| | Years Ended December 31, 2002 | 2001 | 2000 |
|---|---|---|---|
| | | *($ in millions)* | |
| **Cash flows from operating activities** | | | |
| Net income | $ 460 | $ 375 | $ 172 |
| Reconciliation of net income to net cash provided by operating activities: | | | |
| Depreciation | 529 | 527 | 517 |
| Deferred income taxes | 178 | 44 | 2 |
| Equity in earnings of Conrail | (54) | (44) | (21) |
| Gains and losses on properties and investments | (47) | (59) | (160) |
| Income from discontinued operations | -- | (13) | -- |
| Changes in assets and liabilities affecting operations: | | | |
| Accounts receivable (Note 5) | (208) | (74) | 446 |
| Materials and supplies | (7) | 1 | 9 |
| Other current assets and due from Conrail | 1 | 46 | 60 |
| Current liabilities other than debt | 35 | (27) | 220 |
| Other – net (Note 11) | (84) | (122) | 97 |
| Net cash provided by operating activities | 803 | 654 | 1,342 |
| **Cash flows from investing activities** | | | |
| Property additions | (689) | (746) | (731) |
| Property sales and other transactions | 31 | 156 | 137 |
| Investments, including short-term | (78) | (99) | (77) |
| Investment sales and other transactions | 63 | 88 | 90 |
| Net cash used for investing activities | (673) | (601) | (581) |
| **Cash flows from financing activities** | | | |
| Dividends | (101) | (93) | (306) |
| Common stock issued – net | 42 | 14 | 2 |
| Proceeds from borrowings | 672 | 1,995 | 1,055 |
| Debt repayments | (763) | (1,765) | (1,549) |
| Net cash provided by (used for) financing activities | (150) | 151 | (798) |
| Net increase (decrease) in cash and cash equivalents | (20) | 204 | (37) |
| **Cash and cash equivalents** | | | |
| At beginning of year | 204 | -- | 37 |
| At end of year | $ 184 | $ 204 | $ -- |
| **Supplemental disclosure of cash flow information** | | | |
| Cash paid during the year for: | | | |
| Interest (net of amounts capitalized) | $ 525 | $ 550 | $ 543 |
| Income taxes | $ 54 | $ 74 | $ 5 |

See accompanying notes to consolidated financial statements.

**NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES**
**Consolidated Statements of Changes in Stockholders' Equity**

| | Common Stock | Additional Paid-in Capital | Accum. Other Compre-hensive Loss | Retained Income | Treasury Stock | Total |
|---|---|---|---|---|---|---|
| | | | *($ in millions, except per share amounts)* | | | |
| **Balance Dec. 31, 1999** | $ 404 | $ 372 | $ (11) | $ 5,187 | $ (20) | $ 5,932 |
| Comprehensive income | | | | | | |
| Net income | | | | 172 | | 172 |
| Other comprehensive income (Note 13) | | | 5 | | | 5 |
| Total comprehensive income | | | | | | 177 |
| Dividends on Common Stock, $0.80 per share | | | | (306) | | (306) |
| Other (Notes 11 and 12) | 1 | 20 | | | | 21 |
| **Balance Dec. 31, 2000** | 405 | 392 | (6) | 5,053 | (20) | 5,824 |
| Comprehensive income | | | | | | |
| Net income | | | | 375 | | 375 |
| Other comprehensive loss (Note 13) | | | (49) | | | (49) |
| Total comprehensive income | | | | | | 326 |
| Dividends on Common Stock, $0.24 per share | | | | (93) | | (93) |
| Other (Notes 11 and 12) | 2 | 31 | | | | 33 |
| **Balance Dec. 31, 2001** | $ 407 | $ 423 | $ (55) | $ 5,335 | $ (20) | $ 6,090 |
| Comprehensive income | | | | | | |
| Net income | | | | 460 | | 460 |
| Other comprehensive loss (Note 13) | | | (10) | | | (10) |
| Total comprehensive income | | | | | | 450 |
| Dividends on Common Stock, $0.26 per share | | | | (101) | | (101) |
| Other (Notes 11 and 12) | 3 | 58 | | | | 61 |
| **Balance Dec. 31, 2002** | $ 410 | $ 481 | $ (65) | $ 5,694 | $ (20) | $ 6,500 |

See accompanying notes to consolidated financial statements.

**NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES**
**Notes to Consolidated Financial Statements**

The following Notes are an integral part of the Consolidated Financial Statements.

## 1. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Description of Business

Norfolk Southern Corporation is a Virginia-based holding company engaged principally in the rail transportation business, operating approximately 21,500 route miles primarily in the East and Midwest. These consolidated financial statements include Norfolk Southern Corporation (Norfolk Southern) and its majority-owned and controlled subsidiaries (collectively, NS). Norfolk Southern's major subsidiary is Norfolk Southern Railway Company (NSR). All significant intercompany balances and transactions have been eliminated in consolidation.

The railroad transports raw materials, intermediate products and finished goods classified in the following market groups (percent of total railway operating revenues in 2002): coal (23%); automotive (15%); chemicals (12%); metals/construction (11%); agriculture/consumer products/government (10%); paper/clay/forest products (10%); and intermodal (19%). Ultimate points of origination or destination for some of the freight (particularly coal bound for export and intermodal containers) are outside the United States. Approximately 85% of NS' railroad employees are covered by collective bargaining agreements with 15 different labor unions.

Through a jointly owned entity, Norfolk Southern and CSX Corporation own the stock of Conrail Inc., which owns the major Northeast freight railroad. Norfolk Southern has a 58% economic and 50% voting interest in the jointly owned entity (see Note 2).

### Use of Estimates

The preparation of financial statements in accordance with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Management reviews its estimates, including those related to the recoverability and useful lives of assets, as well as liabilities for litigation, environmental remediation, casualty claims, income taxes, and pension and postretirement benefits. Changes in facts and circumstances may result in revised estimates.

### Cash Equivalents

"Cash equivalents" are highly liquid investments purchased three months or less from maturity.

### Investments

Marketable equity and debt securities are reported at amortized cost or fair value, depending upon their classification as securities "held-to-maturity," "trading" or "available-for-sale." Unrealized gains and losses for investments designated as "available-for-sale," net of taxes, are recognized in "Accumulated other comprehensive loss."

Investments, where NS has the ability to exercise significant influence over but does not control the entity, are accounted for using the equity method in accordance with APB Opinion No. 18, "The Equity Method of Accounting for Investments in Common Stock."

**Materials and Supplies**

"Materials and supplies," consisting mainly of fuel oil and items for maintenance of property and equipment, are stated at the lower of average cost or market. The cost of materials and supplies expected to be used in capital additions or improvements is included in "Properties."

**Properties**

"Properties" are stated principally at cost and are depreciated using group depreciation. Rail is depreciated primarily on the basis of use measured by gross ton-miles. Other properties are depreciated generally using the straight-line method over the lesser of estimated service or lease lives. NS capitalizes interest on major capital projects during the period of their construction. Expenditures, including those on leased assets, that extend an asset's useful life or increase its utility are capitalized. Maintenance expense is recognized when repairs are performed. When properties other than land and nonrail assets are sold or retired in the ordinary course of business, the cost of the assets, net of sale proceeds or salvage, is charged to accumulated depreciation rather than recognized through income. Gains and losses on disposal of land and nonrail assets are included in "Other income - net" (see Note 3).

NS reviews the carrying amount of properties whenever events or changes in circumstances indicate that such carrying amount may not be recoverable based on future undiscounted cash flows or estimated net realizable value. Assets that are deemed impaired as a result of such review are recorded at the lower of carrying amount or fair value.

**Revenue Recognition**

Revenue is recognized proportionally as a shipment moves from origin to destination. Refunds are recorded as a reduction to revenues based on management's best estimate of projected liability.

**Derivatives**

NS does not engage in the trading of derivatives. NS uses derivative financial instruments to reduce the risk of volatility in its diesel fuel costs and in the management of its mix of fixed and floating-rate debt. Management has determined that these derivative instruments qualify as either fair-value or cash-flow hedges, having values that highly correlate with the underlying hedged exposures and have designated such instruments as hedging transactions. Income and expense related to the derivative financial instruments is recorded in the same category as generated by the underlying asset or liability. Credit risk related to the derivative financial instruments is considered to be minimal and is managed by requiring high credit standards for counterparties and periodic settlements.

**Stock-based Compensation**

NS has stock-based employee compensation plans, which are more fully described in Note 12. NS applies the intrinsic value recognition and measurement principles of APB Opinion No. 25, "Accounting for Stock Issued to Employees" (APB Opinion No. 25), and related interpretations in accounting for these plans.

The following table illustrates the effect on net income and earnings per share if NS had applied the fair value recognition provisions of Statement of Financial Accounting Standards No. 123, "Accounting for Stock-Based Compensation" (SFAS No. 123), to stock-based employee compensation:

| | 2002 | 2001 | 2000 |
|---|---|---|---|
| | *($ in millions except per share)* | | |
| Net income, as reported | $ 460 | $ 375 | $ 172 |
| Add: Stock-based employee compensation expense included in reported net income, net of related tax effects | 14 | 12 | 3 |
| Deduct: Stock-based employee compensation expense determined under fair value method, net of related tax effects | (45) | (29) | (26) |
| Pro forma net income | $ 429 | $ 358 | $ 149 |
| Earnings per share: | | | |
| Basic and diluted - as reported | $ 1.18 | $ 0.97 | $ 0.45 |
| Basic and diluted - pro forma | $ 1.10 | $ 0.93 | $ 0.39 |

**Required Accounting Changes**

The adoption of Statement of Financial Accounting Standards No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets," which was effective Jan. 1, 2002, did not have a material effect on NS' consolidated financial statements.

## 2. INVESTMENT IN CONRAIL AND OPERATIONS OVER ITS LINES

**Overview**

Through a limited liability company, Norfolk Southern and CSX Corporation (CSX) jointly own Conrail Inc. (Conrail), whose primary subsidiary is Consolidated Rail Corporation (CRC), the major freight railroad in the Northeast. NS has a 58% economic and 50% voting interest in the jointly owned entity, and CSX has the remainder of the economic and voting interests. From time to time, Norfolk Southern and CSX, as the indirect owners of Conrail, may have to make capital contributions, loans or advances to Conrail under the terms of the Transaction Agreement among NS, CSX and Conrail.

**Operation of Conrail's Lines**

Norfolk Southern's railroad subsidiary, Norfolk Southern Railway Company (NSR), operates as a part of its rail system the routes and assets of Pennsylvania Lines LLC (PRR), a wholly owned subsidiary of CRC, pursuant to operating and lease agreements. CSX Transportation, Inc. (CSXT) operates the routes and assets of another CRC subsidiary under comparable terms.

The Operating Agreement between NSR and PRR governs substantially all nonequipment assets to be operated by NSR and has an initial 25-year term, renewable at the option of NSR for two five-year terms. Payments under the Operating Agreement are subject to adjustment every six years to reflect changes in values. NSR also has leased or subleased for varying terms from PRR a number of equipment assets. Costs necessary to operate and maintain the PRR assets, including leasehold improvements, are borne by NSR. NSR receives all freight revenues on the PRR lines.

NSR and CSXT also have entered into agreements with CRC governing other properties that continue to be owned and operated by CRC (the Shared Assets Areas). NSR and CSXT pay CRC a fee for joint and exclusive access to the Shared Assets Areas. In addition, NSR and CSXT pay, based on usage, the costs incurred by CRC to operate the Shared Assets Areas.

Future minimum lease payments due to PRR under the Operating Agreement and lease agreements and to CRC under the Shared Assets Areas (SAA) agreements are as follows:

| | PRR Oper. Agmt. | PRR Lease Agmt. ($ in millions) | SAA Agmts. |
|---|---|---|---|
| 2003 | $ 217 | $ 116 | $ 30 |
| 2004 | 238 | 94 | 32 |
| 2005 | 246 | 74 | 33 |
| 2006 | 246 | 60 | 34 |
| 2007 | 246 | 48 | 34 |
| 2008 and subsequent years | 4,285 | 129 | 585 |
| Total | $ 5,478 | $ 521 | $ 748 |

Operating lease expense related to the agreements, which is included in "Conrail rents and services," amounted to $468 million in 2002, $467 million in 2001 and $502 million in 2000.

**Investment in Conrail**

NS is applying the equity method of accounting to its investment in Conrail in accordance with APB Opinion No. 18, "The Equity Method of Accounting for Investments in Common Stock." NS is amortizing the excess of the purchase price over Conrail's net equity using the principles of purchase accounting, based primarily on the estimated remaining useful lives of Conrail's depreciable property and equipment, including the related deferred tax effect of the differences in tax and accounting bases for certain assets. At Dec. 31, 2002, the difference between NS' investment in Conrail and its share of Conrail's underlying net equity was $3.7 billion.

NS' consolidated balance sheet at Dec. 31, 2002, includes $60 million of liabilities related to the Conrail transaction, principally for contractual obligations to Conrail employees imposed by the Surface Transportation Board when it approved the transaction. Through Dec. 31, 2002, NS had paid $143 million of such costs.

**Related-Party Transactions**

NS provides certain general and administrative support functions to Conrail, the fees for which are billed in accordance with several service-provider arrangements and totaled $7 million in 2002, $6 million in 2001 and $7 million in 2000.

"Conrail rents and services" includes: (1) expenses for amounts due to PRR and CRC for use by NSR of operating properties and equipment and operation of the Shared Assets Areas and (2) NS' equity in the earnings of Conrail, net of amortization.

A significant portion of payments made to PRR is borrowed back from a subsidiary of PRR. Previously, these loans were made under a demand note; however, in the first quarter of 2002, the subsidiary of PRR exchanged this demand note for a new note due in 2032. As a result, borrowings owed to the subsidiary of PRR now comprise the noncurrent balance "Due to Conrail." The interest rate for these loans is variable and was 1.82% at Dec. 31, 2002. The current balance "Due to Conrail" at Dec. 31, 2002, is composed of amounts related to expenses included in "Conrail rents and services," as discussed above. At Dec. 31, 2001, the current balance "Due to Conrail" included $72 million of such amounts and $301 million of advances owed under the previous demand note.

**Summary Financial Information - Conrail**

The following historical cost basis financial information should be read in conjunction with Conrail's audited financial statements, included as Exhibit 99 to this Annual Report on Form 10-K.

**Summarized Consolidated Statements of Income - Conrail**

| | 2002 | 2001 | 2000 |
|---|---|---|---|
| | | ($ in millions) | |
| Operating revenues | $ 893 | $ 903 | $ 985 |
| Operating expenses | 623 | 639 | 749 |
| Operating income | 270 | 264 | 236 |
| Other – net | (10) | (6) | 31 |
| Income before income taxes | 260 | 258 | 267 |
| Provision for income taxes | 80 | 84 | 97 |
| Net income | $ 180 | $ 174 | $ 170 |

Note: Conrail's results for 2000 included gains from the sale of property that had been written up to fair market value in the allocation of NS' investment in Conrail. Accordingly, the gains related to that fair-value write-up, totaling $17 million after taxes, were excluded in determining NS' equity in Conrail's net income.

**Summarized Consolidated Balance Sheets - Conrail**

| | December 31, 2002 | December 31, 2001 |
|---|---|---|
| | ($ in millions) | |
| Assets: | | |
| Current assets | $ 300 | $ 846 |
| Noncurrent assets | 7,857 | 7,236 |
| Total assets | $ 8,157 | $ 8,082 |
| | | |
| Liabilities and stockholders' equity: | | |
| Current liabilities | $ 329 | $ 408 |
| Noncurrent liabilities | 3,602 | 3,569 |
| Stockholders' equity | 4,226 | 4,105 |
| Total liabilities and stockholders equity | $ 8,157 | $ 8,082 |

Note: Current assets include amounts due from NS and CSX totaling $158 million at Dec. 31, 2002, and $687 million at Dec. 31, 2001. Noncurrent assets include amounts due from NS and CSX totaling $892 million at Dec. 31, 2002, and zero at Dec. 31, 2001. Current liabilities include amounts payable to NS and CSX totaling $9 million at Dec. 31, 2002, and $12 million at Dec. 31, 2001.

### 3. OTHER INCOME - NET

| | 2002 | 2001 | 2000 |
|---|---|---|---|
| | | ($ in millions) | |
| Income from natural resources: | | | |
| Royalties from coal | $ 48 | $ 52 | $ 55 |
| Gains from sale of timber, oil and gas rights and interests | -- | -- | 101 |
| Nonoperating depletion and depreciation | (14) | (13) | (13) |
| Subtotal | 34 | 39 | 143 |
| Gains from sale of properties and investments | 47 | 59 | 59 |
| Rental income | 36 | 40 | 40 |
| Interest income | 12 | 15 | 11 |
| Other interest expense | (31) | 1 | (39) |
| Taxes on nonoperating property | (7) | (11) | (9) |
| Discount on sales of accounts receivable (Note 5) | (4) | (17) | (23) |
| Corporate-owned life insurance – net | (1) | 6 | -- |
| Equity in earnings (losses) of partnerships | (1) | (8) | 3 |
| Charitable contributions | -- | (4) | (4) |
| Other | (19) | (21) | (13) |
| Total | $ 66 | $ 99 | $ 168 |

"Other income - net" includes the income generated by the activities of NS' noncarrier subsidiaries as well as the costs incurred by those subsidiaries in their operations.

"Other current assets" in the Consolidated Balance Sheets includes prepaid interest of $46 million at Dec. 31, 2002, and $45 million at Dec. 31, 2001, arising from corporate-owned life insurance borrowings.

### 4. INCOME TAXES

**Provision for Income Taxes**

| | 2002 | 2001 | 2000 |
|---|---|---|---|
| | | ($ in millions) | |
| Current: | | | |
| Federal | $ 61 | $ 125 | $ 65 |
| State | 7 | 22 | 11 |
| Total current taxes | 68 | 147 | 76 |
| Deferred: | | | |
| Federal | 145 | 35 | 1 |
| State | 33 | 9 | 1 |
| Total deferred taxes | 178 | 44 | 2 |
| Provision for income taxes | $ 246 | $ 191 | $ 78 |

**Reconciliation of Statutory Rate to Effective Rate**

Total income taxes as reflected in the Consolidated Statements of Income differ from the amounts computed by applying the statutory federal corporate tax rate as follows:

| | 2002 Amount | % | 2001 Amount | % | 2000 Amount | % |
|---|---|---|---|---|---|---|
| | ($ in millions) | | | | | |
| Federal income tax at statutory rate | $ 247 | 35 | $ 194 | 35 | $ 87 | 35 |
| State income taxes, net of federal tax benefit | 26 | 4 | 20 | 4 | 8 | 3 |
| Equity in earnings of Conrail | (19) | (3) | (16) | (3) | (7) | (3) |
| Corporate-owned life insurance | (1) | -- | (3) | -- | (2) | (1) |
| Other – net | (7) | (1) | (4) | (1) | (8) | (3) |
| Provision for income taxes | $ 246 | 35 | $ 191 | 35 | $ 78 | 31 |

**Deferred Tax Assets and Liabilities**

Certain items are reported in different periods for financial reporting and income tax purposes. Deferred tax assets and liabilities are recorded in recognition of these differences.

The tax effects of temporary differences that give rise to significant portions of the deferred tax assets and deferred tax liabilities are as follows:

| | December 31, 2002 | December 31, 2001 |
|---|---|---|
| | ($ in millions) | |
| Deferred tax assets: | | |
| Reserves, including casualty and other claims | $ 178 | $ 158 |
| Employee benefits | 26 | 75 |
| Retiree health and death benefit obligations | 138 | 137 |
| Taxes, including state and property | 234 | 221 |
| Other | 16 | 22 |
| Total gross deferred tax assets | 592 | 613 |
| Less valuation allowance | (24) | (18) |
| Net deferred tax asset | 568 | 595 |
| Deferred tax liabilities: | | |
| Property | (3,300) | (3,126) |
| Other | (91) | (88) |
| Total gross deferred tax liabilities | (3,391) | (3,214) |
| Net deferred tax liability | (2,823) | (2,619) |
| Net current deferred tax asset | 187 | 162 |
| Net long-term deferred tax liability | $ (3,010) | $ (2,781) |

Except for amounts for which a valuation allowance has been provided, management believes the other deferred tax assets will be realized. The total valuation allowance increased $6 million in 2002, $6 million in 2001 and $3 million in 2000.

**Internal Revenue Service (IRS) Reviews**

Consolidated federal income tax returns have been examined and Revenue Agent Reports have been received for all years up to and including 1996. The consolidated federal income tax returns for 1997, 1998 and 1999 are being audited by the IRS. Management believes that adequate provision has been made for any additional taxes and interest thereon that might arise as a result of IRS examinations.

## 5. ACCOUNTS RECEIVABLE

In May 2000, a bankruptcy-remote special purpose subsidiary of NS began selling without recourse undivided ownership interests in a pool of accounts receivable. Upon commencement of this program, NS received cash proceeds of $460 million. The buyers have a priority collection interest in the entire pool of receivables and, as a result, NS has retained credit risk to the extent the pool of receivables exceeds the amount sold. NS services and collects the receivables on behalf of the buyers; however, no servicing asset or liability has been recognized because the benefits of servicing are estimated to be just adequate to compensate NS for its responsibilities. Payments collected from sold receivables can be reinvested in new accounts receivable on behalf of the buyers. Should NS' credit rating drop below investment grade, the buyers have the right to discontinue this reinvestment.

Accounts receivable sold under this arrangement, and therefore not included in "Accounts receivable, net" on the Consolidated Balance Sheets, were $30 million at Dec. 31, 2002, and $300 million at Dec. 31, 2001. The fees associated with the sale, which are based on the buyers' financing costs, are included in "Other income – net" (see Note 3). NS' retained interest, which is included in "Accounts receivable, net," is recorded at fair value using estimates of dilution based on NS' historical experience. These estimates are adjusted regularly based on NS' actual experience with the pool, including defaults and credit deterioration. NS has historically experienced very low levels of default. If historical dilution percentages were to increase one percentage point, the value of NS' retained interest would be reduced by approximately $5 million.

NS' allowance for doubtful accounts was $5 million at Dec. 31, 2002, and Dec. 31, 2001.

## 6. PROPERTIES

| | December 31, 2002 | December 31, 2001 | Depreciation Rate for 2002 |
|---|---|---|---|
| | *($ in millions)* | | |
| Railway property: | | | |
| Road | $ 10,859 | $ 10,452 | 2.9% |
| Equipment | 5,573 | 5,559 | 3.9% |
| Other property | 655 | 632 | 3.1% |
| | 17,087 | 16,643 | |
| Less accumulated depreciation | (5,717) | (5,435) | |
| Net properties | $ 11,370 | $ 11,208 | |

Included in properties is approximately $110 million of telecommunications assets consisting of fiber optic conduit. NS evaluated the recoverability of these assets at Dec. 31, 2002, and based on known facts and circumstances, management believes that its investment in these assets will be recovered.

Railway property includes $480 million at Dec. 31, 2002 and $474 million at Dec. 31, 2001, of assets recorded pursuant to capital leases. Other property includes the costs of obtaining rights to natural resources of $341 million at Dec. 31, 2002 and 2001.

**Capitalized Interest**

Total interest cost incurred on debt in 2002, 2001 and 2000 was $529 million, $570 million and $569 million, respectively, of which $11 million, $17 million and $18 million was capitalized.

## 7. CURRENT LIABILITIES

| | December 31, 2002 | December 31, 2001 |
|---|---|---|
| | ($ in millions) | |
| Accounts payable: | | |
| Accounts and wages payable | $ 446 | $ 385 |
| Casualty and other claims | 207 | 192 |
| Equipment rents payable – net | 116 | 130 |
| Vacation liability | 117 | 118 |
| Other | 22 | 23 |
| Total | $ 908 | $ 848 |
| Other current liabilities: | | |
| Interest payable | $ 118 | $ 118 |
| Accrued Conrail-related costs (Note 2) | 34 | 35 |
| Liabilities for forwarded traffic | 34 | 35 |
| Retiree health and death benefit obligations (Note 11) | 31 | 24 |
| Derivative instruments | -- | 17 |
| Other | 15 | 19 |
| Total | $ 232 | $ 248 |

## 8. LONG-TERM DEBT

| | December 31, 2002 | December 31, 2001 |
|---|---|---|
| | ($ in millions) | |
| Notes at average rates and maturities as follows: | | |
| 6.64%, maturing 2003 to 2007 | $ 1,840 | $ 1,500 |
| 6.91%, maturing 2008 to 2011 | 1,200 | 1,750 |
| 8.10%, maturing 2017 to 2021 | 800 | 800 |
| 7.54%, maturing 2027 to 2031 | 1,500 | 1,500 |
| 7.05%, maturing 2037 | 717 | 750 |
| 7.90%, maturing 2097 | 350 | 350 |
| Equipment obligations at an average rate of 4.7%, maturing to 2014 | 558 | 579 |
| Capitalized leases at an average rate of 2.1%, maturing to 2015 | 306 | 316 |
| Other debt at an average rate of 6.1%, maturing to 2019 | 122 | 119 |
| Discounts and premiums, net | (29) | (32) |
| Total long-term debt | 7,364 | 7,632 |
| Less current maturities | (358) | (605) |
| Long-term debt excluding current maturities | $ 7,006 | $ 7,027 |

| | |
|---|---|
| Long-term debt maturities subsequent to 2003 are as follows: | |
| 2004 | $ 356 |
| 2005 | 500 |
| 2006 | 295 |
| 2007 | 858 |
| 2008 and subsequent years | 4,997 |
| Total | $ 7,006 |

Each holder of a 2037 note may require NS to redeem all or part of the note at face value, plus accrued and unpaid interest, on May 1, 2004.

The railroad equipment obligations and the capitalized leases are secured by liens on the underlying equipment.

Certain lease obligations require the maintenance of yen-denominated deposits, which are pledged to the lessor to satisfy yen-denominated lease payments. These deposits are included in “Other assets” on the balance sheet and totaled $86 million at Dec. 31, 2002, and $78 million at Dec. 31, 2001.

**Shelf Registration**

NS filed on Form S-3 a shelf registration statement with the Securities and Exchange Commission covering the issuance of up to $1 billion of securities. As of Dec. 31, 2002, NS had issued a total of $550 million of notes under this shelf registration.

**Commercial Paper and Credit Agreement**

NS has the ability to issue commercial paper backed by a $1 billion credit agreement that expires in 2006. At Dec. 31, 2002, and Dec. 31, 2001, NS had no commercial paper outstanding. Any borrowings under the credit agreement are contingent on the continuing effectiveness of the representations and warranties made at the inception of the agreement.

**Debt Covenants**

NS is subject to various financial covenants with respect to its debt and under its credit agreement, including a minimum net worth requirement, a maximum leverage ratio restriction and certain restrictions on issuance of further debt. At Dec. 31, 2002, NS was in compliance with all debt covenants.

## 9. LEASE COMMITMENTS

NS is committed under long-term lease agreements, which expire on various dates through 2067, for equipment, lines of road and other property. The following amounts do not include payments to PRR under the Operating Agreement and lease agreements or to CRC under the SAA agreements (see Note 2). Future minimum lease payments and operating lease expense, other than to PRR and CRC, are as follows:

| | Operating Leases | Capital Leases |
|---|---|---|
| | *($ in millions)* | |
| 2003 | $ 113 | $ 47 |
| 2004 | 89 | 52 |
| 2005 | 77 | 47 |
| 2006 | 61 | 43 |
| 2007 | 54 | 40 |
| 2008 and subsequent years | 486 | 123 |
| Total | $ 880 | $ 352 |
| Less imputed interest on capital leases at an average rate of 7.0% | | (46) |
| Present value of minimum lease payments included in debt | | $ 306 |

**Operating Lease Expense**

| | 2002 | 2001 | 2000 |
|---|---|---|---|
| | | *($ in millions)* | |
| Minimum rents | $ 140 | $ 149 | $ 167 |
| Contingent rents | 60 | 55 | 61 |
| Total | $ 200 | $ 204 | $ 228 |

During 2000, NS entered into an operating lease for 140 locomotives, which is renewable annually at NS' option, has a maximum term of eight years and includes purchase options. Because the fixed, noncancellable term of the lease is one year, future minimum lease payments in the table above do not include amounts related to this lease. However, operating lease expense in the table above does include amounts related to this lease as follows: $13 million in 2002, $18 million in 2001 and $11 million in 2000. If NS does not renew the lease during the eight-year period or does not purchase the locomotives at the end of the maximum lease term, it is liable for any shortfall in the then fair value of the locomotives and a specified residual value. NS does not expect to be required to make any payments under this provision. As of Dec. 31, 2002, the maximum liability under this provision, assuming NS chose not to renew the lease in 2003 and the then fair value of the locomotives was zero, would be $116 million. The lessor is a special-purpose entity whose activities are limited to those incident to this particular transaction. Upon adoption of Financial Accounting Standards Board Interpretation No. 46, "Consolidation of Variable Interest Entities," which will occur in 2003, NS will consolidate this entity. As a result, the locomotives will be shown as assets, debt will increase, operating lease expense will decline, depreciation expense will increase and interest expense on debt will increase.

## 10. OTHER LIABILITIES

| | December 31, 2002 | December 31, 2001 |
|---|---|---|
| | *($ in millions)* | |
| Retiree health and death benefit obligations (Note 11) | $ 286 | $ 291 |
| Casualty and other claims | 254 | 265 |
| Deferred compensation | 144 | 147 |
| Net pension obligations (Note 11) | 82 | 79 |
| Accrued Conrail-related costs (Note 2) | 26 | 46 |
| Other | 237 | 261 |
| Total | $ 1,029 | $ 1,089 |

## 11. PENSIONS AND OTHER POSTRETIREMENT BENEFITS

Norfolk Southern and certain subsidiaries have both funded and unfunded defined benefit pension plans covering principally salaried employees. Norfolk Southern and certain subsidiaries also provide specified health care and death benefits to eligible retired employees and their dependents. Under the present plans, which may be amended or terminated at NS' option, a defined percentage of health care expenses is covered, reduced by any deductibles, copayments, Medicare payments and, in some cases, coverage provided under other group insurance policies.

**Pension and Other Postretirement Benefit Obligations and Plan Assets**

| | Pension Benefits 2002 | Pension Benefits 2001 | Other Benefits 2002 | Other Benefits 2001 |
|---|---|---|---|---|
| | ($ in millions) | | | |
| ***Change in benefit obligations*** | | | | |
| Benefit obligation at beginning of year | $ 1,324 | $ 1,312 | $ 479 | $ 445 |
| Service cost | 17 | 15 | 13 | 14 |
| Interest cost | 91 | 94 | 33 | 33 |
| Amendment | -- | 6 | -- | -- |
| Legislative changes | -- | (19) | -- | -- |
| Actuarial (gains) losses | 54 | 36 | 98 | 21 |
| Benefits paid | (116) | (120) | (31) | (34) |
| Benefit obligation at end of year | 1,370 | 1,324 | 592 | 479 |
| ***Change in plan assets*** | | | | |
| Fair value of plan assets at beginning of year | 1,798 | 1,999 | 118 | 126 |
| Actual return on plan assets | (201) | (74) | (12) | (8) |
| Employer contribution | 6 | 7 | 31 | 34 |
| 401(h) account transfer | (18) | (14) | -- | -- |
| Benefits paid | (116) | (120) | (31) | (34) |
| Fair value of plan assets at end of year | 1,469 | 1,798 | 106 | 118 |
| **Funded status** | 99 | 474 | (486) | (361) |
| Unrecognized (gain) loss | 305 | (142) | 169 | 46 |
| Unrecognized prior service cost | 26 | 30 | -- | -- |
| Net amount recognized | $ 430 | $ 362 | $ (317) | $ (315) |
| Amounts recognized in the Consolidated Balance Sheets consist of: | | | | |
| Prepaid benefit cost | $ 497 | $ 426 | $ -- | $ -- |
| Accrued benefit liability | (82) | (79) | (317) | (315) |
| Accumulated other comprehensive income | 15 | 15 | -- | -- |
| **Net amount recognized** | $ 430 | $ 362 | $ (317) | $ (315) |

Of the pension plans included above, the unfunded pension plans were the only plans with an accumulated benefit obligation in excess of plan assets. These plans' accumulated benefit obligations were $82 million at Dec. 31, 2002, and $79 million at Dec. 31, 2001. These plans' projected benefit obligations were $94 million at Dec. 31, 2002 and $89 million at Dec. 31, 2001. Because of the nature of such plans, there are no plan assets.

NS received Section 401(h) account transfers, from pension assets, of $18 million in 2002 and $14 million in 2001 as reimbursement for medical payments for retirees.

Legislative changes primarily resulting from the December 2001 amendment to the Railroad Retirement Act ("The Act") increased benefits payable to certain retirees covered by The Act. Since employees' pension benefits paid by NS are offset by a portion of benefits paid under The Act, the amendment served to reduce NS' obligation by approximately $19 million at Dec. 31, 2001.

During 2001, NS amended its qualified and nonqualified pension plans to enhance benefits to certain NS employees. The amendments increased the pension benefit obligation by $6 million at Dec. 31, 2001. During 2000, NS amended its qualified pension plan to allow for the payment of qualifying disability benefits.

**Pension and Other Postretirement Benefit Costs Components**

| | 2002 | 2001 | 2000 |
|---|---|---|---|
| | | ($ in millions) | |
| ***Pension benefits*** | | | |
| Service cost | $ 17 | $ 15 | $ 18 |
| Interest cost | 91 | 94 | 79 |
| Cost of early retirement programs | -- | -- | 119 |
| Expected return on plan assets | (179) | (202) | (192) |
| Amortization of prior service cost | 4 | 4 | 4 |
| Amortization of initial net asset | -- | (3) | (7) |
| Recognized net actuarial gain | (13) | (24) | (38) |
| Net benefit | $ (80) | $ (116) | $ (17) |
| ***Other postretirement benefits*** | | | |
| Service cost | $ 13 | $ 14 | $ 15 |
| Interest cost | 33 | 33 | 27 |
| Cost of early retirement programs | -- | -- | 14 |
| Expected return on plan assets | (13) | (13) | (14) |
| Amortization of prior service cost | -- | -- | (4) |
| Net cost | $ 33 | $ 34 | $ 38 |

**Pension Assumptions**

Pension and other postretirement benefit costs are determined based on actuarial valuations that reflect appropriate assumptions as of the measurement date, ordinarily the beginning of each year. The funded status of the plans is determined using appropriate assumptions as of each year end. A summary of the major assumptions follows:

| | 2002 | 2001 | 2000 |
|---|---|---|---|
| ***Funded status:*** | | | |
| Discount rate | 6.75% | 7.25% | 7.50% |
| Future salary increases | 4.5% | 5% | 5% |
| ***Pension cost:*** | | | |
| Discount rate | 7.25% | 7.50% | 7.75% |
| Return on assets in plans | 9% | 10% | 10% |
| Future salary increases | 5% | 5% | 5% |

**Health Care Cost Trend Assumptions**

For measurement purposes, increases in the per capita cost of covered health care benefits were assumed to be 10% for 2003 and 9% for 2004. It is assumed the rate will decrease gradually to an ultimate rate of 5.0% for 2008 and remain at that level thereafter.

Assumed health care cost trend rates have a significant effect on the amounts reported in the financial statements. To illustrate, a one-percentage-point change in the assumed health care cost trend would have the following effects:

| | One percentage point | |
|---|---|---|
| | Increase | Decrease |
| | ($ in millions) | |
| Increase (decrease) in: | | |
| Total service and interest cost components | $ 6 | $ (5) |
| Postretirement benefit obligation | $ 69 | $ (57) |

**Other Postretirement Coverage**

Under collective bargaining agreements, NS and certain subsidiaries participate in a multi-employer benefit plan, which provides certain postretirement health care and life insurance benefits to eligible union employees. Premiums under this plan are expensed as incurred and amounted to $11 million in 2002, $10 million in 2001 and $7 million in 2000.

**401(k) Plans**

Norfolk Southern and certain subsidiaries provide 401(k) savings plans for employees. Under the plans, NS matches a portion of employee contributions, subject to applicable limitations. Since 1999, NS has contributed newly issued shares of Common Stock for its matching contributions. NS' expenses under these plans were $12 million in 2002, $11 million in 2001 and $12 million in 2000.

**Early Retirement Programs in 2000**

During 2000, NS offered two voluntary early retirement programs to its salaried employees. The principal incentives offered in these programs were enhanced pension benefits, the cost for most of which will be paid from NS' overfunded pension plan. A February program was accepted by 919 of 1,180 eligible employees, and a December program was accepted by 370 of 846 eligible employees. The total cost of these programs, which is included in "Compensation and benefits," was $133 million. The resulting noncash reduction to NS' pension plan asset is included in "Other - net" in the Consolidated Statement of Cash Flows.

**12. STOCK-BASED COMPENSATION**

Under the stockholder-approved Long-Term Incentive Plan (LTIP), a committee of nonemployee directors of the Board may grant stock options, stock appreciation rights (SARs), restricted stock and performance share units (PSUs), up to a maximum 88,025,000 shares of Norfolk Southern Common Stock (Common Stock). Of these shares, 5,000,000 were approved by the Board for issuance to non-officer participants; as a broadly based issuance, stockholder approval was not required. Under the Board-approved Thoroughbred Stock Option Plan (TSOP), the committee may grant stock options up to a maximum of 6,000,000 shares of Common Stock. Options may be granted for a term not to exceed 10 years, but may not be exercised prior to the first anniversary of the date of grant. Options are exercisable at the fair market value of Common Stock on the date of grant.

The LTIP also permits the payment –- on a current or a deferred basis and in cash or in stock –- of dividend equivalents on shares of Common Stock covered by options or PSUs in an amount commensurate with dividends paid on Common Stock. Tax absorption payments also are authorized in amounts estimated to equal the federal and state income taxes applicable to shares of Common Stock issued subject to a share retention agreement.

**Accounting Method**

As disclosed in Note 1, NS applies APB Opinion 25 and related interpretations in accounting for awards made under the plans. Accordingly, grants of PSUs, restricted stock, dividend equivalents, tax absorption payments and SARs result in charges to net income, while grants of stock options have no effect on net income. Related compensation costs were $23 million in 2002, $20 million in 2001 and $5 million in 2000. NS recognized additional paid-in capital of $6 million in 2002, $1 million in 2001 and zero in 2000 related to the tax benefit generated by stock option exercises.

Note 1 includes a table that illustrates the effect on net income and earnings per share had NS applied the fair value recognition provisions of SFAS No. 123 to stock-based employee compensation. The pro forma amounts include compensation costs calculated using the Black-Scholes option-pricing model, with average expected option lives of five years; average risk-free interest rates of 4.6% in 2002, 5.1% in 2001 and 6.8% in 2000; average stock-price volatilities of 32% in 2002, 39% in 2001 and 33% in 2000;

and dividend yields of zero in 2002, 2% in 2001 and 3% in 2000. These assumptions produced per-share grant-date fair values of $8.26 in 2002, $5.48 in 2001, and $5.22 in 2000.

**Stock Option Activity**

| | Option Shares | Weighted Average Exercise Price |
|---|---|---|
| Balance 12/31/99 | 21,116,363 | $ 27.77 |
| Granted | 7,705,800 | 16.94 |
| Exercised | (273,813) | 13.95 |
| Expired | (427,400) | 26.84 |
| Balance 12/31/00 | 28,120,950 | $ 24.96 |
| Granted | 6,985,000 | 15.48 |
| Exercised | (1,079,902) | 16.58 |
| Expired | (612,525) | 26.51 |
| Balance 12/31/01 | 33,413,523 | $ 23.21 |
| Granted | 7,384,000 | 22.49 |
| Exercised | (2,851,538) | 17.48 |
| Expired | (287,341) | 26.73 |
| Balance 12/31/02 | 37,658,644 | $ 23.47 |

Of the total options outstanding at Dec. 31, 2002, 30 million were vested and have a weighted-average exercise price of $23.71.

**Stock Options Outstanding**

| Exercise Price | | Number Outstanding | Weighted Average Remaining |
|---|---|---|---|
| Range | Weighted Average | at 12/31/02 | Contractual Life |
| $15.48 to $16.94 | $ 16.25 | 12,317,834 | 7.6 years |
| $20.09 to $22.49 | 22.20 | 9,001,960 | 7.7 years |
| $24.31 to $27.69 | 26.85 | 7,708,350 | 4.7 years |
| $29.46 to $33.25 | 32.10 | 8,630,500 | 5.5 years |
| $15.48 to $33.25 | $ 23.47 | 37,658,644 | 6.5 years |

**Performance Share Units**

PSUs provide for awards based on achievement of certain predetermined corporate performance goals at the end of a three-year cycle. PSU grants and average grant-date fair market values were 815,000 and $22.49 in 2002; 817,500 and $15.48 in 2001; and 937,500 and $16.94 in 2000. PSUs may be paid in the form of shares of Common Stock, cash or any combination thereof. Shares earned and issued may be subject to share retention agreements and held by NS for up to five years.

**Shares Available and Issued**

Shares of stock available for future grants and issued in connection with all features of the LTIP and TSOP are as follows:

| | 2002 | 2001 | 2000 |
|---|---|---|---|
| Available for future grants 12/31: | | | |
| LTIP | 23,645,146 | 30,816,365 | 2,554,584 |
| TSOP | 2,568,200 | 2,535,000 | 2,488,700 |
| Shares of Common Stock issued: | | | |
| LTIP | 2,917,898 | 1,146,346 | 395,626 |
| TSOP | -- | -- | -- |

**13. STOCKHOLDERS' EQUITY**

**Accumulated Other Comprehensive Loss**

"Accumulated other comprehensive loss" reported in the Consolidated Statements of Changes in Stockholders' Equity consisted of the following:

| | Balance at Beginning of Year | Net Gain (Loss) | Reclassification Adjustments | Balance at End of Year |
|---|---|---|---|---|
| | *($ in millions)* | | | |
| December 31, 2002 | | | | |
| Unrealized gains on securities | $ 6 | $ -- | $ (5) | $ 1 |
| Cash flow hedges | (11) | 35 | (6) | 18 |
| Minimum pension liability | (50) | (34) | -- | (84) |
| Accumulated other comprehensive loss | $ (55) | $ 1 | $ (11) | $ (65) |
| December 31, 2001 | | | | |
| Unrealized gains on securities | $ 7 | $ (1) | $ -- | $ 6 |
| Cash flow hedges | -- | (16) | 5 | (11) |
| Minimum pension liability | (13) | (37) | -- | (50) |
| Accumulated other comprehensive loss | $ (6) | $ (54) | $ 5 | $ (55) |

"Other comprehensive income (loss)" reported in the Consolidated Statements of Changes in Stockholders' Equity consisted of the following:

| | Pretax Amount | Tax (Expense) Benefit | Net-of-Tax Amount |
|---|---|---|---|
| | | ($ in millions) | |
| ***Year ended Dec. 31, 2002*** | | | |
| Net gain (loss) arising during the year: | | | |
| Cash flow hedges | $ 58 | $ (23) | $ 35 |
| Reclassification adjustments for gains included in net income | (10) | 4 | (6) |
| Subtotal | 48 | (19) | 29 |
| Reclassification adjustments for realized gains on securities included in net income | (9) | 4 | (5) |
| Minimum pension liability | (34) | -- | (34) |
| Other comprehensive income (loss) | $ 5 | $ (15) | $ (10) |
| ***Year ended Dec. 31, 2001*** | | | |
| Net gain (loss) arising during the year: | | | |
| Cash flow hedges | $ (27) | $ 11 | $ (16) |
| Reclassification adjustments for gains included in net income | 8 | (3) | 5 |
| Subtotal | (19) | 8 | (11) |
| Unrealized gains (losses) on securities | (1) | -- | (1) |
| Minimum pension liability | (35) | (2) | (37) |
| Other comprehensive income (loss) | $ (55) | $ 6 | $ (49) |
| ***Year ended Dec. 31, 2000*** | | | |
| Net gain (loss) arising during the year: | | | |
| Unrealized gains (losses) on securities | $ 7 | $ (2) | $ 5 |
| Other comprehensive income (loss) | $ 7 | $ (2) | $ 5 |

In 2002 and 2001, Conrail recorded a $59 million and a $70 million loss, respectively, in other comprehensive income related to an increase in its minimum pension liability. NS' "Other comprehensive loss" includes $34 million for 2002 and $41 million for 2001, arising from the Conrail adjustments.

**Undistributed Earnings of Equity Investees**

"Retained income" includes undistributed earnings of equity investees, principally attributable to NS' equity in the earnings of Conrail, of $375 million at Dec. 31, 2002; $355 million at Dec. 31, 2001; and $351 million at Dec. 31, 2000.

## 14. EARNINGS PER SHARE

The following table sets forth the calculation of basic and diluted earnings per share:

| | 2002 | 2001 | 2000 |
|---|---|---|---|
| | *($ in millions except per share, shares in millions)* | | |
| Income available to common stockholders for basic and diluted computations | $ 460 | $ 375 | $ 172 |
| Basic earnings per share: | | | |
| Weighted-average shares outstanding | 388 | 385 | 383 |
| Basic earnings per share | $ 1.18 | $ 0.97 | $ 0.45 |
| Diluted earnings per share: | | | |
| Weighted-average shares outstanding per above | 388 | 385 | 383 |
| Dilutive effect of outstanding options, PSUs and SARs (as determined by the application of the treasury stock method) | 2 | 1 | -- |
| Adjusted weighted-average shares outstanding | 390 | 386 | 383 |
| Diluted earnings per share | $ 1.18 | $ 0.97 | $ 0.45 |

These calculations exclude options for which the exercise price exceeded the average market price of Common Stock as follows: 24 million in 2002, 21 million in 2001 and 26 million in 2000.

There are no adjustments to "Net income" or "Income from continuing operations" for the diluted earnings per share computations.

## 15. FAIR VALUES OF FINANCIAL INSTRUMENTS

The fair values of "Cash and cash equivalents," "Short-term investments," "Accounts receivable" and "Accounts payable" approximate carrying values because of the short maturity of these financial instruments. The fair value of corporate-owned life insurance approximates carrying value. The carrying amounts and estimated fair values for the remaining financial instruments, excluding derivatives (see Note 16) and investments accounted for under the equity method in accordance with APB Opinion No. 18, consisted of the following at Dec. 31:

| | 2002 | | 2001 | |
|---|---|---|---|---|
| | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
| | *($ in millions)* | | | |
| Investments | $ 30 | $ 39 | $ 44 | $ 51 |
| Notes receivable | 93 | 104 | 93 | 98 |
| Long-term debt | (7,364) | (8,412) | (7,632) | (8,067) |

Quoted market prices were used to determine the fair value of marketable securities; underlying net assets were used to estimate the fair value of other investments. The fair values of notes receivable are based on future discounted cash flows. The fair values of debt were estimated based on quoted market prices or discounted cash flows using current interest rates for debt with similar terms, company rating and remaining maturity.

Carrying amounts of marketable securities reflect unrealized holding gains of $1 million on Dec. 31, 2002, and $10 million on Dec. 31, 2001. Sales of "available-for-sale" securities were immaterial for the years ended Dec. 31, 2002, 2001 and 2000.

## 16. DERIVATIVE FINANCIAL INSTRUMENTS

On Jan. 1, 2001, NS adopted Statement of Financial Accounting Standards No. 133, "Accounting for Derivative Instruments and Hedging Activities" (SFAS 133), as amended by Statement of Financial Accounting Standards No. 138, "Accounting for Certain Derivative Instruments and Certain Hedging Activities" (SFAS 138). The Statements establish accounting and reporting standards for derivative instruments and hedging activities, requiring that all derivatives be recognized in the financial statements as either assets or liabilities and that they be measured at fair value. Changes in fair value are recorded as adjustments to the assets or liabilities being hedged in "Other comprehensive income," or in current earnings, depending on whether the derivative is designated and qualifies for hedge accounting, the type of hedge transaction represented and the effectiveness of the hedge.

NS uses derivative financial instruments to reduce the risk of volatility in its diesel fuel costs and to manage its overall exposure to fluctuations in interest rates. NS does not engage in the trading of derivatives. Management has determined that its derivative financial instruments qualify as either fair-value or cash-flow hedges, having values that highly correlate with the underlying hedged exposures, and has designated such instruments as hedging transactions. Credit risk related to the derivative financial instruments is considered to be minimal and is managed by requiring high credit standards for counterparties and periodic settlements.

### Diesel Fuel Hedging

In the second quarter of 2001, NS began a program to hedge a portion of its diesel fuel consumption. The intent of the program is to assist in the management of NS' aggregate risk exposure to fuel price fluctuations, which can significantly affect NS' operating margins and profitability. In order to minimize this risk, NS instituted a continuous hedging strategy for a portion of its estimated future fuel needs by entering into a series of swaps in order to lock in the purchase prices of some of its diesel fuel. Management has designated these derivative instruments as cash-flow hedges of the exposure to variability in expected future cash flows attributable to fluctuations in diesel fuel prices.

Following is a summary of NS' diesel fuel swaps:

| | 2002 | 2001 |
|---|---|---|
| Number of swaps entered into during the year | 288 | 222 |
| Approximate number of gallons hedged (millions) | 393 | 370 |
| Approximate average price per gallon of Nymex No. 2 heating oil | $0.66 | $0.68 |

| | 2003 | 2004 | 2005 |
|---|---|---|---|
| Percent of estimated future diesel fuel consumption covered as of Dec. 31, 2002 | 62% | 22% | -- |

Hedges are placed each month by competitive bid among selected counterparties. The goal of this hedging strategy is to average fuel costs over an extended period of time while minimizing the incremental cost of hedging. The program provides that NS will not enter into any fuel hedges with a duration of more than 36 months, and that no more than 80% of NS' average monthly fuel consumption will be hedged for each month within any 36-month period. Diesel fuel costs represented 7%, 8% and 9% of NS' operating expenses for the years ended Dec. 31, 2002, 2001 and 2000, respectively.

In 2001, NS also purchased eight monthly call options at a strike price of 84 cents per gallon of Nymex No. 2 heating oil. The cost of the monthly options, which expired serially through Dec. 31, 2001, was amortized as a component of diesel fuel expense. Because the price of diesel fuel did not reach the strike price at any time during the period the options were outstanding, NS did not record any benefit related to these transactions.

NS' fuel hedging activity resulted in a net decrease in 2002 diesel fuel expense of $10 million and a net increase in 2001 diesel fuel expense of $8 million. Ineffectiveness related to the use of diesel fuel hedges in 2002 and 2001 was less than $1 million for each year.

**Interest Rate Hedging**

NS manages its overall exposure to fluctuations in interest rates by issuing both fixed and floating-rate debt instruments, and by entering into interest rate hedging transactions. NS had $220 million, or 3.2%, and $251 million, or 3.5%, of its fixed rate debt portfolio hedged at Dec. 31, 2002, and Dec. 31, 2001, respectively, using interest rate swaps that qualify for and are designated as fair-value hedge transactions. These swaps have been effective in hedging the changes in fair value of the related debt arising from changes in interest rates and, accordingly, there has been no impact on earnings resulting from ineffectiveness associated with these derivative transactions.

**Fair Values**

The fair values of NS' diesel fuel derivative instruments at Dec. 31, 2002 and 2001, were determined based upon current fair market values as quoted by third party dealers. Fair values of interest rate swaps were determined based upon the present value of expected future cash flows discounted at the appropriate implied spot rate from the spot rate yield curve. Fair value adjustments are noncash transactions and, accordingly, are excluded from the Consolidated Statement of Cash Flows. "Accumulated other comprehensive loss," a component of "Stockholders' equity," included $29 million (pretax) at Dec. 31, 2002, relating to an increase, and $15 million (pretax) at Dec. 31, 2001, relating to a decrease in the fair value of derivative fuel hedging transactions that will terminate within 12 months.

The asset and liability positions of NS' outstanding derivative financial instruments were as follows:

| | December 31, 2002 | December 31, 2001 |
|---|---|---|
| | *($ in millions)* | |
| *Interest rate hedges:* | | |
| Gross fair market asset position | $ 24 | $ 12 |
| Gross fair market (liability) position | -- | -- |
| *Fuel hedges:* | | |
| Gross fair market asset position | 29 | -- |
| Gross fair market (liability) position | -- | (19) |
| Total net asset (liability) position | $ 53 | $ (7) |

**17. DISCONTINUED OPERATIONS - MOTOR CARRIER**

On March 28, 1998, NS sold all the common stock of North American Van Lines, Inc. (NAVL), its motor carrier subsidiary. Results in 2001 include an additional after-tax gain of $13 million, or 3 cents per share, that resulted from the expiration of certain indemnities contained in the sales agreement.

## 18. COMMITMENTS AND CONTINGENCIES

### Lawsuits

Norfolk Southern and certain subsidiaries are defendants in numerous lawsuits and other claims relating principally to railroad operations. When management concludes that it is probable that a liability has been incurred and the amount of the liability can be reasonably estimated, it is accrued through a charge to expenses. While the ultimate amount of liability incurred in any of these lawsuits and claims is dependent on future developments, in management's opinion the recorded liability is adequate to cover the future payment of such liability. However, the final outcome of any of these lawsuits and claims cannot be predicted with certainty, and unfavorable or unexpected outcomes could result in additional accruals that could be significant to results of operations in a particular year or quarter. Any adjustments to the recorded liability will be reflected in expenses in the periods in which such adjustments are known.

Presently, there are two matters, one involving labor arbitration and other claims for "New York Dock" and other income protection benefits and the other involving contractual obligations of a fiber optic codeveloper, Williams Communications, LLC ("Williams Communications"), where the aggregated range of loss could be from zero to $75 million. Management believes that NS will prevail in both these matters. On January 29, 2003, the United States District Court for the Northern District of Georgia entered an order requiring Williams Communications to pay T-Cubed approximately $36 million, plus prejudgment interest at a rate of 9% per annum, in connection with its contractual obligations to T-Cubed. Williams Communications may elect to appeal. The ability to collect and retain the $36 million receivable due from Williams Communications may be limited because of its financial condition. The shortfall, if any, cannot now be determined. Its parent, Williams Communications Group, Inc., filed in April 2002 a voluntary petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code, and emerged from bankruptcy in October 2002. Williams Communications was not included in the bankruptcy petition. Unfavorable outcomes in either of these matters could result in accruals that could be significant to results of operations in a particular year or quarter.

### Casualty Claims

NS is generally self-insured for casualty claims. Claims in excess of self-insurance levels are insured up to excess coverage limits. The casualty claims liability is determined actuarially, based upon claims filed and an estimate of claims incurred but not yet reported. While the ultimate amount of claims incurred is dependent on future developments, in management's opinion, the recorded liability is adequate to cover the future payments of claims. However, it is possible that the recorded liability may not be adequate to cover the future payment of claims. Adjustments to the recorded liability will be reflected in operating expenses in the periods in which such adjustments are known.

### Environmental Matters

NS is subject to various jurisdictions' environmental laws and regulations. It is NS' policy to record a liability where such liability or loss is probable and its amount can be estimated reasonably. Claims, if any, against third parties for recovery of cleanup costs incurred by NS are reflected as receivables in the balance sheet and are not netted against the associated NS liability. Environmental engineers regularly participate in ongoing evaluations of all identified sites and in determining any necessary adjustments to initial liability estimates. NS also has established an Environmental Policy Council, composed of senior managers, to oversee and interpret its environmental policy.

NS' balance sheets included liabilities for environmental exposures in the amount of $29 million at Dec. 31, 2002, and $33 million at Dec. 31, 2001 (of which $8 million was accounted for as a current liability in each year). At Dec. 31, 2002, the liability represented NS' estimate of the probable cleanup and remediation costs based on available information at 114 identified locations. On that date, 10 sites accounted for $16 million of the liability, and no individual site was considered to be material. NS

anticipates that much of this liability will be paid out over five years; however, some costs will be paid out over a longer period.

At some of the 114 locations, certain NS subsidiaries, usually in conjunction with a number of other parties, have been identified as potentially responsible parties by the Environmental Protection Agency (EPA) or similar state authorities under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, or comparable state statutes, which often impose joint and several liability for cleanup costs.

With respect to known environmental sites (whether identified by NS or by the EPA or comparable state authorities), estimates of NS' ultimate potential financial exposure for a given site or in the aggregate for all such sites are necessarily imprecise because of the widely varying costs of currently available cleanup techniques, the likely development of new cleanup technologies, the difficulty of determining in advance the nature and full extent of contamination and each potential participant's share of any estimated loss (and that participant's ability to bear it), and evolving statutory and regulatory standards governing liability.

The risk of incurring environmental liability – for acts and omissions, past, present and future – is inherent in the railroad business. Some of the commodities in NS' traffic mix, particularly those classified as hazardous materials, can pose special risks that NS and its subsidiaries work diligently to minimize. In addition, several NS subsidiaries own, or have owned, land used as operating property, or which is leased or may have been leased and operated by others, or held for sale. Because environmental problems may exist on these properties that are latent or undisclosed, there can be no assurance that NS will not incur environmentally related liabilities or costs with respect to one or more of them, the amount and materiality of which cannot be estimated reliably at this time. Moreover, lawsuits and claims involving these and other now-unidentified environmental sites and matters are likely to arise from time to time. The resulting liabilities could have a significant effect on financial condition, results of operations or liquidity in a particular year or quarter.

However, based on its assessment of the facts and circumstances now known, management believes that it has recorded the probable costs for dealing with those environmental matters of which the Corporation is aware. Further, management believes that it is unlikely that any identified matters, either individually or in the aggregate, will have a material adverse effect on NS' financial position, results of operations or liquidity.

**Purchase Commitments**

NSR had outstanding purchase commitments of approximately $164 million in connection with its 2003 capital program. In addition, Norfolk Southern has committed to purchase telecommunications services totaling $38 million through 2006.

**Change-In-Control Arrangements**

Norfolk Southern has compensation agreements with officers and certain key employees that become operative only upon a change in control of the Corporation, as defined in those agreements. The agreements provide generally for payments based on compensation at the time of a covered individual's involuntary or other specified termination and for certain other benefits.

**Guarantees**

In a number of instances, NS and its subsidiaries have agreed to indemnify lenders for additional costs they may bear as a result of certain changes in laws or regulations applicable to their loans. Such changes may include impositions or modifications with respect to taxes, duties, reserves, liquidity, capital adequacy, special deposits, and similar requirements relating to extensions of credit by, deposits with, or the assets or liabilities of such lenders. Similar provisions exist in NS' accounts receivable

sales program. The nature and timing of changes in laws or regulations applicable to NS' financings are inherently unpredictable, and therefore NS' exposure in connection with the foregoing indemnifications cannot be quantified. No liability has been recorded related to these indemnifications. In the case of one type of equipment financing, NSR's Japanese leveraged leases, NSR may terminate the leases and ancillary agreements if such a change-in-law indemnity is triggered. Such a termination would require NSR to make early termination payments that would not be expected to have a material adverse effect on NS' financial condition, results of operations or liquidity.

NS has indemnified parties in a number of transactions for U.S. income tax withholding imposed as a result of changes in U.S. tax law. In all cases, NS has the right to unwind the related transaction if the withholding cannot be avoided in the future. Because these indemnities would be triggered and are dependent upon a change in the tax law, the maximum exposure is not quantifiable. Management does not believe that it is likely that it will be required to make any payments under these indemnities.

Norfolk Southern has indemnified the purchaser of North American Van Lines, Inc. (see Note 17) for tax liabilities related to tax years ended on or before the date of sale. The maximum exposure is not quantifiable; however, NS has recorded a reserve for its expected liability under this indemnification. It is unlikely that any additional payments would have a material adverse effect on NS' financial position, results of operations or liquidity.

NS has outstanding warranty liabilities primarily related to work performed at its locomotive facilities. NS has recorded a reserve of less than $2 million as of Dec. 31, 2002 and 2001 for these warranties.

As of Dec. 31, 2002, certain Norfolk Southern subsidiaries are contingently liable as guarantors with respect to $8 million of indebtedness of an entity in which it has an ownership interest, the Terminal Railroad Association of St. Louis, due in 2019. Six other railroads are also jointly and severally liable as guarantors for this indebtedness. No liability has been recorded related to this guaranty.

NS is liable for any shortfall in the then fair market value of certain leased locomotives and a specified residual value for the locomotives if the leases are not renewed, as discussed in Note 9.

**NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES**
**QUARTERLY FINANCIAL DATA**
**(Unaudited)**

| | Three Months Ended | | | |
|---|---|---|---|---|
| | **March 31** | **June 30** | **Sept. 30** | **Dec. 31** |
| | *(In millions of dollars, except per share amounts)* | | | |
| **2002** | | | | |
| Railway operating revenues | $ 1,498 | $ 1,593 | $ 1,598 | $ 1,581 |
| Income from railway operations | 237 | 322 | 311 | 288 |
| Net income | 86 | 119 | 126 | 129 |
| Earnings per share - basic and diluted | $ 0.22 | $ 0.31 | $ 0.32 | $ 0.33 |
| **2001** | | | | |
| Railway operating revenues | $ 1,540 | $ 1,592 | $ 1,508 | $ 1,530 |
| Income from railway operations | 205 | 282 | 245 | 275 |
| Net income | 74* | 107 | 79 | 115 |
| Earnings per share - basic and diluted | $ 0.19* | $ 0.28 | $ 0.20 | $ 0.30 |

* Includes a $13 million, or 3 cents per share, after-tax gain related to the 1998 sale of NS' motor carrier subsidiary (see Note 17).

**Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure.**

None.

## PART III

### NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES (NS)

**Item 10. Directors and Executive Officers of the Registrant.**

In accordance with General Instruction G(3), information called for by Part III is incorporated herein by reference from the information appearing under the caption "Election of Directors," including the subcaptions "Nominees for terms expiring in 2006," "Continuing Directors – those whose terms expire in 2004" and "Continuing Directors – those whose terms expire in 2005" in Norfolk Southern's definitive Proxy Statement, for the Norfolk Southern Annual Meeting of Stockholders to be held on May 8, 2003, which definitive Proxy Statement will be filed electronically with the Commission pursuant to Regulation 14A. The information regarding executive officers called for by Item 401 of Regulation S-K is included in Part I hereof beginning under "Executive Officers of the Registrant."

**Item 11. Executive Compensation.**

In accordance with General Instruction G(3), information called for by Part III is incorporated herein by reference from the information appearing under the subcaption "Compensation" under the caption "Board of Directors" for directors and under the caption "Executive Compensation" for executives, including the information appearing in the "Summary Compensation Table" and under the subcaptions "Long-Term Incentive Plan" (including the three tables therein), "Pension Plans" (including the table therein), and "Change in Control Arrangements" in Norfolk Southern's definitive Proxy Statement, for the Norfolk Southern Annual Meeting of Stockholders to be held on May 8, 2003, which definitive Proxy Statement will be filed electronically with the Commission pursuant to Regulation 14A.

**Item 12. Security Ownership of Certain Beneficial Owners and Management.**

In accordance with General Instruction G(3), information called for by Part III is incorporated herein by reference from the information appearing under the caption "Beneficial Ownership of Stock" in Norfolk Southern's definitive Proxy Statement, for the Norfolk Southern Annual Meeting of Stockholders to be held on May 8, 2003, which definitive Proxy Statement will be filed electronically with the Commission pursuant to Regulation 14A.

**Equity Compensation Plan Information**

| Plan category | Number of securities to be issued upon exercise of outstanding options, warrants and rights (a) | Weighted-average exercise price of outstanding options, warrants and rights (b) | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) (c) |
|---|---|---|---|
| Equity compensation plans approved by security holders (1) | 31,786,844 | $23.57 (4) | 23,645,146 (6) |
| Equity compensation plans not approved by security holders (2) | 8,431,800 (3) | $23.12 (3) (5) | 3,113,200 (7) |
| Total | 40,218,644 | $23.47 | 26,758,346 |

(1) The Long-Term Incentive Plan, excluding five million shares for broad-based issuance to non-officers.
(2) The Long-Term Incentive Plan's five million shares for broad-based issuance to non-officers, the Thoroughbred Stock Option Plan, the Directors' Restricted Stock Plan and the Safety Incentive Plan.
(3) Includes options and performance share units granted under the Long-Term Incentive Plan on five million shares for non-officers and options granted under the Thoroughbred Stock Option Plan.
(4) Calculated without regard to 2,315,000 outstanding performance share units.
(5) Calculated without regard to 245,000 outstanding performance share units.
(6) Of the shares remaining available for grant under plans approved by stockholders, 5,185,000 are available for grant as restricted shares or performance shares under the Long-Term Incentive Plan.
(7) Of the shares remaining available for grant under plans not approved by stockholders, 45,000 are available for grant as restricted stock under the Directors' Restricted Stock Plan and 500,000 are available for grant as stock under the Safety Incentive Plan.

**Norfolk Southern Corporation Long-Term Incentive Plan ("LTIP")**

Established on June 28, 1983, and approved by the stockholders at their Annual Meetings on May 10, 1984, on May 11, 1995, and most recently on May 10, 2001, LTIP was adopted to promote the success of Norfolk Southern by providing an opportunity for officers and other key employees to acquire a proprietary interest in the Corporation. On January 23, 2001, the Board of Directors approved the issuance of an additional 5,000,000 shares of authorized but unissued Common Stock under LTIP to participants who are not officers of Norfolk Southern. The issuance of these shares was broadly-based, and stockholder approval of these shares was not required. Accordingly, this portion of LTIP is included in the number of securities available for future issuance for plans not approved by stockholders. The Board also adopted an amended plan effective January 23, 2001, subject to stockholder approval, which included the reservation for issuance of an additional 30,000,000 shares of authorized but unissued Norfolk Southern Common Stock, with no more than 6 million of such additional shares to be awarded as restricted shares or performance shares (including performance share units earned as performance shares). This amended plan was approved by stockholders on May 10, 2001, resulting in an aggregate of 74,878,604 shares of Common Stock authorized for issuance under LTIP.

Non-employee directors, officers and other key employees residing in the United States or Canada are eligible for selection to receive LTIP awards. Under LTIP, the Performance-Based Compensation Committee (Committee) may grant incentive stock options, nonqualified stock options, stock

appreciation rights, restricted shares and performance share units (in addition, dividend equivalents may be awarded for options and performance share units). The Committee may establish such terms and conditions for the awards as provided in the plan.

For options, the option price per share will not be less than 100% of the fair market value of Norfolk Southern's Common Stock on the effective date the option is granted. All options are subject to a vesting period of at least one year, and the term of the option will not exceed ten years. LTIP specifically prohibits option repricing without stockholder approval, except for capital adjustments.

Performance share units are performance-based awards which are earned upon achievement of goals the Committee establishes at the time of the grant for three equally weighted performance criteria approved by the stockholders -- return on average invested capital, operating ratio, and total return to NS stockholders as compared with the total return on all stocks comprising the S&P 500 Composite Stock Price Index -- and the units may be payable as shares of Norfolk Southern Common Stock or in cash.

**Norfolk Southern Corporation Thoroughbred Stock Option Plan**

The Board adopted the Norfolk Southern Corporation Thoroughbred Stock Option Plan ("TSOP") on January 26, 1999, to promote the success of Norfolk Southern by providing an opportunity for nonagreement employees to acquire a proprietary interest in Norfolk Southern and thereby to provide an additional incentive to nonagreement employees to devote their maximum efforts and skills to the advancement, betterment, and prosperity of Norfolk Southern and its stockholders. The plan has not been approved by stockholders. Six million shares of authorized but unissued Common Stock were reserved for issuance under TSOP.

Active full-time nonagreement employees residing in the United States or Canada are eligible for selection to receive TSOP awards. Under TSOP, the Compensation and Nominating Committee of the Board of Directors may grant nonqualified stock options and may establish such terms and conditions as provided in the plan.

The option price per share will not be less than 100% of the fair market value of Norfolk Southern's Common Stock on the effective date the option is granted. All options are subject to a vesting period of at least one year, and the term of the option will not exceed ten years. TSOP specifically prohibits option repricing without stockholder approval, except for capital adjustments.

**Norfolk Southern Corporation Directors' Restricted Stock Plan**

The Norfolk Southern Corporation Directors' Restricted Stock Plan ("Plan") was adopted on January 1, 1994, and is designed to increase ownership of Norfolk Southern's Common Stock by its non-employee directors so as to further align their ownership interest in Norfolk Southern with that of stockholders. The Plan has not been approved by stockholders. Currently, a maximum of 66,000 shares of Corporation Common Stock may be granted under the Plan. To make the grants to eligible directors, Norfolk Southern purchases, through one or more subsidiary companies, the number of shares required in open-market transactions at prevailing market prices, or makes such grants from Common Stock already owned by one or more of Norfolk Southern's subsidiary companies.

Only non-employee directors, who are not and never have been employees of Norfolk Southern, are eligible to participate in the Plan. Upon becoming a director, each eligible director receives a one-time grant of 3,000 restricted shares of Norfolk Southern Common Stock. No individual member of the Board exercises discretion concerning the eligibility of any director or the number of shares granted.

The restriction period begins on the date of the grant and ends on the earlier of six months after the eligible director ceases to be a director by reason of disability, retirement or death. Directors will forfeit the right to receive the restricted shares if they cease to serve as a director of Norfolk Southern for reasons other than their disability, retirement or death.

**Norfolk Southern Corporation Safety Incentive Plan**

The Norfolk Southern Corporation Safety Incentive Plan ("SIP") is designed to provide an additional incentive for eligible agreement employees to work safely. Under the plan, eligible employees who work without injury during the year receive a safety award payable in shares of Norfolk Southern Common Stock. A SIP award is between five and eight shares of stock.

SIP is broadly-based and has not been approved by stockholders. Shares of Common Stock issued under its terms are not registered under the Securities Act of 1933, pursuant to a no-action letter issued by the Securities and Exchange Commission on November 20, 1992. Accordingly, SIP does not define a specific amount of authorized shares for issuance under the plan. The Board has approved using up to 500,000 authorized but unissued shares for awards under the plan, and the number of shares remaining under this authorization are included in the number of securities available for future issuance for plans not approved by shareholders.

**Item 13. Certain Relationships and Related Transactions.**

In accordance with General Instruction G(3), information called for by Part III is incorporated herein by reference from the information appearing under the caption "Certain Relationships and Related Transactions" in Norfolk Southern's definitive Proxy Statement, for the Norfolk Southern Annual Meeting of Stockholders to be held on May 8, 2003, which definitive Proxy Statement will be filed electronically with the Commission pursuant to Regulation 14A.

**Item 14. Controls and Procedures.**

(a) Evaluation of Disclosure Controls and Procedures.

NS' Chief Executive Officer and Chief Financial Officer have evaluated the effectiveness of NS' disclosure controls and procedures (as such term is defined in Rules 13a-14(c) and 15d-14(c) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"). Based on such evaluation, such officers have concluded that, as of the Evaluation Date, NS' disclosure controls and procedures are effective in alerting them on a timely basis to material information relating to NS (including its consolidated subsidiaries) required to be included in NS' periodic filings under the Exchange Act.

(b) Changes in Internal Controls.

Since the Evaluation Date, there have not been any significant changes in NS' internal controls or in other factors that could significantly affect such controls.

# PART IV

## NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES (NS)

**Item 15. Exhibits, Financial Statement Schedule and Reports on Form 8-K.**

Page

(A) The following documents are filed as part of this report:

1. Index to Consolidated Financial Statements


| | |
|---|---|
| Independent Auditors' Report | K38 |
| Consolidated Statements of Income, Years ended Dec. 31, 2002, 2001 and 2000 | K39 |
| Consolidated Balance Sheets As of Dec. 31, 2002 and 2001 | K40 |
| Consolidated Statements of Cash Flows, Years ended Dec. 31, 2002, 2001 and 2000 | K41 |
| Consolidated Statements of Changes in Stockholders' Equity, Years ended Dec. 31, 2002, 2001 and 2000 | K42 |
| Notes to Consolidated Financial Statements | K43 |


2. Financial Statement Schedule:

The following consolidated financial statement schedule should be read in connection with the consolidated financial statements:


| Index to Consolidated Financial Statement Schedule | Page |
|---|---|
| Schedule II - Valuation and Qualifying Accounts | K80 |


Schedules other than the one listed above are omitted either because they are not required or are inapplicable, or because the information is included in the consolidated financial statements or related notes.

3. Exhibits

| Exhibit Number | Description |
|---|---|
| 3 | Articles of Incorporation and Bylaws - |
| 3(i) | The Restated Articles of Incorporation of Norfolk Southern Corporation are incorporated by reference to Exhibit 3(i) to Norfolk Southern Corporation's 10-K filed on March 5, 2001. |
| 3(ii) | The Bylaws of Norfolk Southern Corporation, as amended December 1, 2002, are filed herewith. |

4 Instruments Defining the Rights of Security Holders, Including Indentures:

(a) Indenture, dated as of January 15, 1991, from Norfolk Southern Corporation to First Trust of New York, National Association, as Trustee, related to the issuance of notes in the principal amount of $750 million, incorporated by reference to Exhibit 4.1 to Norfolk Southern Corporation's Registration Statement on Form S-3 (No. 33-38595).

(b) First Supplemental Indenture, dated May 19, 1997, between Norfolk Southern Corporation and First Trust of New York, National Association, as Trustee, related to the issuance of notes in the principal amount of $4.3 billion, is incorporated herein by reference to Exhibit 1.1(d) to Norfolk Southern Corporation's Form 8-K filed on May 21, 1997.

(c) Second Supplemental Indenture, dated April 26, 1999, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, related to the issuance of notes in the principal amount of $400 million, is incorporated herein by reference to Exhibit 1.1(c) to Norfolk Southern Corporation's Form 8-K filed on April 30, 1999.

(d) Third Supplemental Indenture, dated May 23, 2000, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, related to the issuance of notes in the principal amount of $600 million, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on May 25, 2000.

(e) Fourth Supplemental Indenture, dated as of February 6, 2001, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, related to the issuance of notes in the principal amount of $1 billion, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on February 7, 2001.

(f) Fifth Supplemental Indenture, dated as of July 5, 2001, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, related to the issuance of notes in the principal amount of $250 million, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on July 5, 2001.

(g) Rights Agreement, dated as of September 26, 2000, between Norfolk Southern Corporation and The Bank of New York, with exhibits thereto, is incorporated herein by reference to Exhibit 4 to Norfolk Southern Corporation's Form 8-K filed on September 26, 2000.

(h) Sixth Supplemental Indenture, dated as of April 30, 2002, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, relating to the issuance of notes in the principal amount of $200 million, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on May 1, 2002.

(i) Seventh Supplemental Indenture, dated as of April 30, 2002, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, relating to the issuance of notes in the principal amount of $100 million, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on May 1, 2002.

(j) Amendment to Rights Agreement, dated as of November 26, 2002, between Norfolk Southern Corporation and The Bank of New York, with exhibits thereto, is incorporated by reference to Exhibit 4 to Norfolk Southern Corporation's Form 8-K filed on November 26, 2002.

In accordance with Item 601(b)(4)(iii) of Regulation S-K, copies of other instruments of Norfolk Southern Corporation and its subsidiaries with respect to the rights of holders of long-term debt are not filed herewith, or incorporated by reference, but will be furnished to the Commission upon request.

10 Material Contracts -

(a) The Transaction Agreement, dated as of June 10, 1997, by and among CSX, CSX Transportation, Inc., Registrant, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation and CRR Holdings LLC, with certain schedules thereto, previously filed, is refiled herewith pursuant to Item 10(d) of Regulation S-K.

(b) Amendment No. 1, dated as of August 22, 1998, to the Transaction Agreement, dated as of June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation and CRR Holdings LLC is incorporated herein by reference from Exhibit 10.1 to Norfolk Southern Corporation's Form 10-Q filed on August 11, 1999.

(c) Amendment No. 2, dated as of June 1, 1999, to the Transaction Agreement, dated June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation and CRR Holdings LLC is incorporated herein by reference from Exhibit 10.2 to Norfolk Southern Corporation's Form 10-Q filed on August 11, 1999.

(d) Operating Agreement, dated as of June 1, 1999, by and between Pennsylvania Lines LLC and Norfolk Southern Railway Company is incorporated herein by reference from Exhibit 10.3 to Norfolk Southern Corporation's Form 10-Q filed on August 11, 1999.

(e) Amendment No. 1, dated as of September 29, 2001, to Operating Agreement, dated as of June 1, 1999, by and between Pennsylvania Lines LLC and Norfolk Southern Railway Company, is incorporated herein by reference from Exhibit 10(e) to Norfolk Southern Corporation's Form 10-K filed on February 21, 2002.

(f) Shared Assets Area Operating Agreement for North Jersey, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibit thereto, is incorporated herein by reference from Exhibit 10.4 to Norfolk Southern Corporation's Form 10-Q filed on August 11, 1999.

(g) Shared Assets Area Operating Agreement for South Jersey/ Philadelphia, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibit thereto, is incorporated herein by reference from Exhibit 10.5 to Norfolk Southern Corporation's Form 10-Q filed on August 11, 1999.

(h) Shared Assets Area Operating Agreement for Detroit, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibit thereto, is incorporated herein by reference from Exhibit 10.6 to Norfolk Southern Corporation's Form 10-Q filed on August 11, 1999.

(i) Amendment No. 1, dated as of June 1, 2000, to the Shared Assets Areas Operating Agreement for North Jersey, South Jersey/Philadelphia and Detroit, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibit thereto, is incorporated herein by reference to Exhibit 10(h) to Norfolk Southern Corporation's 10-K filed on March 5, 2001.

(j) Amendment No. 2, dated as January 1, 2001, to the Shared Assets Area Operating Agreements for North Jersey, South Jersey/Philadelphia and Detroit, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibit thereto, is incorporated herein by reference to Exhibit 10(j) to Norfolk Southern Corporation's Form 10-K filed on February 21, 2002.

(k) Amendment No. 3, dated as of June 1, 2001, and executed in May of 2002, to the Shared Assets Area Operating Agreement for North Jersey, South Jersey/Philadelphia and Detroit, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibit thereto, is filed herewith.

(l) Monongahela Usage Agreement, dated as of June 1, 1999, by and among CSX Transportation, Inc., Norfolk Southern Railway Company, Pennsylvania Lines LLC and New York Central Lines LLC, with exhibit thereto, is incorporated herein by reference from Exhibit 10.7 to Norfolk Southern Corporation's Form 10-Q filed on August 11, 1999.

(m) The Agreement, entered into as of July 27, 1999, between North Carolina Railroad Company and Norfolk Southern Railway Company, is incorporated herein by reference from Exhibit 10(i) to Norfolk Southern Corporation's Form 10-K filed on March 6, 2000.

(n) The Supplementary Agreement, entered into as of January 1, 1987, between the Trustees of the Cincinnati Southern Railway and The Cincinnati, New Orleans and Texas Pacific Railway Company (the latter a wholly owned subsidiary of Norfolk Southern Railway Company) - extending and amending a Lease, dated as of October 11, 1881 - is incorporated by reference to Exhibit 10(k) to Norfolk Southern Corporation's Form 10-K filed on March 5, 2001.

(o) The Norfolk Southern Corporation Executive Management Incentive Plan, effective January 25, 2000, is incorporated by reference herein from Exhibit 10(1) to Norfolk Southern Corporation's Form 10-K filed on March 6, 2000.

(p) The Norfolk Southern Corporation Long-Term Incentive Plan, as amended effective January 28, 2003, is filed herewith.

(q) The Norfolk Southern Corporation Officers' Deferred Compensation Plan, as amended effective September 26, 2000, is incorporated herein by reference to Exhibit 10(n) to Norfolk Southern Corporation's Form 10-K filed on March 5, 2001.

(r) The Norfolk Southern Corporation Executives' Deferred Compensation Plan, as amended effective January 20, 2001, is incorporated herein by reference to Exhibit 10(o) to Norfolk Southern Corporation's Form 10-K filed on March 5, 2001.

(s) The Directors' Deferred Fee Plan of Norfolk Southern Corporation, as amended effective January 23, 2001, is incorporated herein by reference to Exhibit 10(p) to Norfolk Southern Corporation's Form 10-K filed on March 5, 2001.

(t) The Norfolk Southern Corporation Directors' Restricted Stock Plan, effective January 1, 1994, as restated November 24, 1998, is incorporated herein by reference from Exhibit 10(h) to Norfolk Southern Corporation's Form 10-K filed on March 24, 1999.

(u) Form of Severance Agreement, dated as of June 1, 1996, between Norfolk Southern Corporation and certain executive officers (including those defined as "named executive officers" and identified in the Corporation's Proxy Statement for the 1997 through 2001 Annual Meetings of Stockholders) is incorporated herein by reference from Exhibit 10(t) to Norfolk Southern Corporation's Form 10-K filed on February 21, 2002.

(v) Norfolk Southern Corporation Supplemental (formerly, Excess) Benefit Plan, effective as of August 22, 1999, is incorporated herein by reference from Exhibit 10(r) to Norfolk Southern Corporation's Form 10-K filed on March 6, 2000.

(w) The Norfolk Southern Corporation Directors' Charitable Award Program, effective February 1, 1996, is incorporated herein by reference from Exhibit 10(v) to Norfolk Southern Corporation's Form 10-K filed on February 21, 2002.

(x) The Norfolk Southern Corporation Outside Directors' Deferred Stock Unit Program, as amended effective January 28, 2003, is filed herewith.

(y) Agreement, dated as of October 1, 2001, providing enhanced pension benefits to three officers in exchange for their continued employment with Norfolk Southern Corporation for two years, is incorporated herein by reference to Exhibit 10(w) to Norfolk Southern Corporation's Form 10-Q filed on November 9, 2001. The agreement was entered into with L. Ike Prillaman, Vice Chairman and Chief Marketing Officer; Stephen C. Tobias, Vice Chairman and Chief Operating Officer; and Henry C. Wolf, Vice Chairman and Chief Financial Officer.

(z) The Norfolk Southern Corporation Thoroughbred Stock Option Plan, as amended effective January 28, 2003, is filed herewith.

(aa) The Norfolk Southern Safety Incentive Plan for Operating Agreement Employees and For Non-Operating Agreement Employees, as amended effective October 1, 2002, is filed herewith.

(bb) The Norfolk Southern Corporation Restricted Stock Unit Plan, effective January 28, 2003, is filed herewith.

12 Statement re: Computation of Ratio of Earnings to Fixed Charges.

21 Subsidiaries of the Registrant.

23 Consents of Experts -

(a) Consent of KPMG LLP.
(b) Consent of KPMG LLP and Ernst & Young LLP.

99 (a) Certifications of the CEO and CFO pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

(b) Conrail Inc. 2002 Annual Report to Stockholders.

(B) Reports on Form 8-K.

A report on Form 8-K was filed November 26, 2002, advising of the amendment of the Rights Agreement to terminate it effective November 26, 2002, and attaching as an exhibit the related press release.

A report on Form 8-K was filed November 12, 2002, advising that the Corporation had decreased its expected long-term rate of return assumption on pension plan assets for purposes of pension accounting, and attaching as an exhibit the related press release.

(C) Exhibits.

The Exhibits required by Item 601 of Regulation S-K as listed in Item 14(a)3 are filed herewith or incorporated herein by references.

(D) Financial Statement Schedules.

Financial statement schedules and separate financial statements specified by this Item are included in Item 14(a)2 or are otherwise not required or are not applicable.

## POWER OF ATTORNEY

Each person whose signature appears below under "SIGNATURES" hereby authorizes Henry C. Wolf and Henry D. Light, or either of them, to execute in the name of each such person, and to file, any amendment to this report and hereby appoints Henry C. Wolf and Henry D. Light, or either of them, as attorneys-in-fact to sign on his or her behalf, individually and in each capacity stated below, and to file, any and all amendments to this report.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, Norfolk Southern Corporation has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, on this 21st day of February, 2003.

**NORFOLK SOUTHERN CORPORATION**

By: /s/ David R. Goode
(David R. Goode, Chairman,
President and Chief Executive Officer)

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below on this 21st day of February, 2003, by the following persons on behalf of Norfolk Southern Corporation and in the capacities indicated.

| Signature | Title |
|---|---|
| /s/ David R. Goode<br>(David R. Goode) | Chairman, President and Chief Executive Officer and Director<br>(Principal Executive Officer) |
| /s/ Henry C. Wolf<br>(Henry C. Wolf) | Vice Chairman and Chief Financial Officer<br>(Principal Financial Officer) |
| /s/ John P. Rathbone<br>(John P. Rathbone) | Senior Vice President and Controller<br>(Principal Accounting Officer) |
| /s/ Gerald L. Baliles<br>(Gerald L. Baliles) | Director |
| /s/ Gene R. Carter<br>(Gene R. Carter) | Director |
| /s/ Alston D. Correll<br>(Alston D. Correll) | Director |

| | |
|---|---|
| /s/ Landon Hilliard<br>(Landon Hilliard) | Director |
| ____________________<br>(Steven F. Leer) | Director |
| ____________________<br>(Jane Margaret O'Brien) | Director |
| /s/ Harold W. Pote<br>(Harold W. Pote) | Director |
| /s/ J. Paul Reason<br>(J. Paul Reason) | Director |

I, David R. Goode, certify that:

1. I have reviewed this annual report on Form 10-K of Norfolk Southern Corporation;
2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;
3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;
4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and have:
   a. designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;
   b. evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and
   c. presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;
5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):
   a. all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and
   b. any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and
6. The registrant's other certifying officers and I have indicated in this annual report whether there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

Date: February 21, 2003

/s/ David R. Goode
David R. Goode
Chairman, President and Chief Executive Officer

I, Henry C. Wolf, certify that:

1. I have reviewed this annual report on Form 10-K of Norfolk Southern Corporation;
2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;
3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;
4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and have:
   a. designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;
   b. evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and
   c. presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;
5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):
   a. all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and
   b. any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and
6. The registrant's other certifying officers and I have indicated in this annual report whether there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

Date: February 21, 2003

/s/ Henry C. Wolf
Henry C. Wolf
Vice Chairman and Chief Financial Officer

Schedule II

**Norfolk Southern Corporation and Subsidiaries**
**Valuation and Qualifying Accounts**
**Years Ended December 31, 2000, 2001 and 2002**
**(In millions of dollars)**

| | Beginning Balance | Additions charged to: Expenses | Additions charged to: Other Accounts | Deductions | Ending Balance |
|---|---|---|---|---|---|
| ***Year ended December 31, 2000*** | | | | | |
| Valuation allowance (included net in deferred tax liability) for deferred tax assets | $ 9 | $ 3 | $ -- | $ -- | $ 12 |
| Casualty and other claims included in other liabilities | $ 275 | $ 117 | $ 8 (1) | $ 138 (2) | $ 262 |
| Current portion of casualty and other claims included in accounts payable | $ 181 | $ 19 | $ 221 (1) | $ 198 (3) | $ 223 |
| ***Year ended December 31, 2001*** | | | | | |
| Valuation allowance (included net in deferred tax liability) for deferred tax assets | $ 12 | $ 6 | $ -- | $ -- | $ 18 |
| Casualty and other claims included in other liabilities | $ 262 | $ 110 | $ 20 (1) | $ 127 (2) | $ 265 |
| Current portion of casualty and other claims included in accounts payable | $ 223 | $ 22 | $ 142 (1) | $ 195 (3) | $ 192 |
| ***Year ended December 31, 2002*** | | | | | |
| Valuation allowance (included net in deferred tax liability) for deferred tax assets | $ 18 | $ 6 | $ -- | $ -- | $ 24 |
| Casualty and other claims included in other liabilities | $ 265 | $ 119 | $ 9 (1) | $ 139 (2) | $ 254 |
| Current portion of casualty and other claims included in accounts payable | $ 192 | $ 32 | $ 124 (1) | $ 141 (3) | $ 207 |

(1) Includes revenue refunds and overcharges provided through deductions from operating revenues and transfers from other accounts.

(2) Payments and reclassifications to/from accounts payable.

(3) Payments and reclassifications to/from other liabilities.

# EXHIBIT INDEX

## NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES (NS)

| Electronic Submission Exhibit Number | Description |
|---|---|
| 3(ii) | The Bylaws of Norfolk Southern Corporation, as amended December 1, 2002. |
| 10(a) | The Transaction Agreement, dated as of June 10, 1997, by and among CSX, CSX Transportation, Inc., Registrant, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation and CRR Holdings LLC, with certain schedules thereto. |
| 10(k) | Amendment No. 3, dated as of June 1, 2001, and executed in May of 2002, to the Shared Assets Area Operating Agreement for North Jersey, South Jersey/Philadelphia and Detroit, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibit thereto. |
| 10(p) | The Norfolk Southern Corporation Long-Term Incentive Plan, as amended effective January 28, 2003. |
| 10(x) | The Norfolk Southern Corporation Outside Directors' Deferred Stock Unit Program, as amended effective January 28, 2003. |
| 10(z) | The Norfolk Southern Corporation Thoroughbred Stock Option Plan, as amended effective January 28, 2003. |
| 10(aa) | The Norfolk Southern Safety Incentive Plan for Operating Agreement Employees and For Non-Operating Agreement Employees, as amended effective October 1, 2002. |
| 10(bb) | The Norfolk Southern Corporation Restricted Stock Unit Plan, effective January 28, 2003. |
| 12 | Statement re: Computation of Ratio of Earnings to Fixed Charges. |
| 21 | Subsidiaries of Norfolk Southern Corporation. |
| 23 | Consents of Experts -<br>(a) Consent of KPMG LLP.<br>(b) Consent of KPMG LLP and Ernst & Young LLP. |
| 99 | (a) Certification of the CEO and CFO pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.<br>(b) Conrail Inc. 2002 Annual Report to Stockholders. |

Exhibits 23(a), 23(b) and 99(a) are included; remaining exhibits are not included in copies assembled for public dissemination. These exhibits are included in the 2002 Form 10-K posted on our website at www.nscorp.com under "SEC documents" or you may request copies by writing to:

**Office of Corporate Secretary**
**Norfolk Southern Corporation**
**Three Commercial Place**
**Norfolk, Virginia 23510-9219**

# PX0715-PX0721

# Filed Under Seal

# EXHIBIT PX0722

Register USER ID PASSWORD LOGIN

Need Password Help?
NS Police Emergency Contact: 800-453-2530
Who to Call

CUSTOMERS | INVESTORS | MEDIA | COMMUNITY | EMPLOYEES | JOB SEEKERS

- Automotive
- Coal
- Industrial Products
- Customer Reference Guide
- Pacesetter
- Equipment Guide
- Intermodal
- Intermodal Rules Circular
- Conditions of Carriage
- Short Line
- Fuel Price News
- Performance Measures
- Public Prices
- Distribution Network
- Ports & International
- Modalgistics
- Real Estate
- Industrial Development
- Subsidiaries
- Publications
- Billing & Payment
- Customer Service Center

Search NScorp.com
Go

Home >> Customers >> Fuel Price News




## 3/1/2004 FSC Program History

The table below lists the fuel surcharge amounts in effect since March 2004. Current fuel surcharge information can be viewed on the fuel surcharge status page.

| Fuel Surcharge Effective Date | Surcharge Amount | Avg. Monthly WTI Price | Basis Month |
|---|---|---|---|
| 12/1/2010 | 23.6% | $81.90 | October-10 |
| 11/1/2010 | 21.2% | $75.31 | September-10 |
| 10/1/2010 | 21.6% | $76.82 | August-10 |
| 9/1/2010 | 21.6% | $76.37 | July-10 |
| 8/1/2010 | 21.2% | $75.35 | June-10 |
| 7/1/2010 | 20.4% | $73.84 | May-10 |
| 6/1/2010 | 24.8% | $84.48 | April-10 |
| 5/1/2010 | 23.6% | $81.24 | March-10 |
| 4/1/2010 | 21.6% | $76.42 | February-10 |
| 3/1/2010 | 22.4% | $78.39 | January-10 |
| 2/1/2010 | 20.8% | $74.31 | December-09 |
| 1/1/2010 | 22.4% | $78.08 | November-09 |
| 12/1/2009 | 21.2% | $75.82 | October-09 |
| 11/1/2009 | 18.8% | $69.46 | September-09 |
| 10/1/2009 | 19.6% | $71.60 | August-09 |
| 9/1/2009 | 16.8% | $64.09 | July-09 |
| 8/1/2009 | 18.8% | $69.68 | June-09 |
| 7/1/2009 | 14.8% | $59.16 | May-09 |
| 6/1/2009 | 10.8% | $49.79 | April-09 |
| 5/1/2009 | 10.0% | $47.98 | March-09 |
| 4/1/2009 | 6.8% | $39.16 | February-09 |
| 3/1/2009 | 7.6% | $41.74 | January-09 |
| 2/1/2009 | 7.6% | $41.43 | December-08 |
| 1/1/2009 | 14.0% | $57.44 | November-08 |
| 12/1/2008 | 21.6% | $76.65 | October-08 |
| 11/1/2008 | 32.4% | $103.90 | September-08 |
| 10/1/2008 | 37.6% | $116.70 | August-08 |
| 9/1/2008 | 44.4% | $133.44 | July-08 |
| 8/1/2008 | 44.4% | $133.93 | June-08 |
| 7/1/2008 | 41.2% | $125.39 | May-08 |
| 6/1/2008 | 36.0% | $112.57 | April-08 |
| 5/1/2008 | 33.2% | $105.56 | March-08 |

**Related Links**

- Average Monthly WTI Price Basis
- Tariff NS - 8004 Terms
- Tariff NS - 8004 History
- Tariff NS - 8003 Terms
- Tariff NS - 8003 History
- 3/1/2004 FSC Program Status
- 3/1/2004 FSC Program Terms
- 3/1/2004 FSC Program History
- 6/30/2000 FSC Program Status
- 6/30/2000 FSC Program Terms
- Historical Fuel Price News
- WTI Daily Reported Prices
- Sign Up for Fuel Surcharge Notification

**Related Publications**

Learn About accessNS

Sign-up for Email Notifications

| | | | |
|---|---|---|---|
| 4/1/2008 | 29.2% | $95.35 | February-08 |
| 3/1/2008 | 28.0% | $92.95 | January-08 |
| 2/1/2008 | 27.6% | $91.37 | December-07 |
| 1/1/2008 | 28.8% | $94.62 | November-07 |
| 12/1/2007 | 25.2% | $85.93 | October-07 |
| 11/1/2007 | 22.8% | $79.93 | September-07 |
| 10/1/2007 | 20.0% | $72.39 | August-07 |
| 9/1/2007 | 20.8% | $74.15 | July-07 |
| 8/1/2007 | 18.0% | $67.48 | June-07 |
| 7/1/2007 | 16.4% | $63.46 | May-07 |
| 6/1/2007 | 16.4% | $63.96 | April-07 |
| 5/1/2007 | 15.2% | $60.56 | March-07 |
| 4/1/2007 | 14.8% | $59.26 | February-07 |
| 3/1/2007 | 12.8% | $54.24 | January-07 |
| 2/1/2007 | 16.0% | $62.03 | December-06 |
| 1/1/2007 | 14.8% | $59.37 | November-06 |
| 12/1/2006 | 14.4% | $58.88 | October-06 |
| 11/1/2006 | 16.4% | $63.87 | September-06 |
| 10/1/2006 | 20.4% | $73.05 | August-06 |
| 9/1/2006 | 20.8% | $74.41 | July-06 |
| 8/1/2006 | 19.2% | $70.96 | June-06 |
| 7/1/2006 | 19.2% | $70.94 | May-06 |
| 6/1/2006 | 18.8% | $69.69 | April-06 |
| 5/1/2006 | 16.0% | $62.90 | March-06 |
| 4/1/2006 | 15.6% | $61.63 | February-06 |
| 3/1/2006 | 17.2% | $65.51 | January-06 |
| 2/1/2006 | 14.8% | $59.43 | December-05 |
| 1/1/2006 | 14.4% | $58.30 | November-05 |
| 12/1/2005 | 16.0% | $62.37 | October-05 |
| 11/1/2005 | 17.2% | $65.57 | September-05 |
| 10/1/2005 | 16.8% | $64.97 | August-05 |
| 9/1/2005 | 14.4% | $58.70 | July-05 |
| 8/1/2005 | 13.6% | $56.31 | June-05 |
| 7/1/2005 | 10.8% | $49.83 | May-05 |
| 6/1/2005 | 12.4% | $53.04 | April-05 |
| 5/1/2005 | 12.8% | $54.22 | March-05 |
| 4/1/2005 | 10.0% | $47.97 | February-2005 |
| 3/1/2005 | 9.6% | $46.84 | January-05 |
| 2/1/2005 | 8.4% | $43.35 | December-04 |
| 1/1/2005 | 10.4% | $48.46 | November-04 |
| 12/1/2004 | 12.4% | $53.13 | October-04 |
| 11/1/2004 | 9.2% | $45.95 | September-04 |
| 10/1/2004 | 8.8% | $44.94 | August-04 |
| 9/1/2004 | 7.2% | $40.80 | July-04 |
| 8/1/2004 | 6.4% | $38.04 | June-04 |
| 7/1/2004 | 7.2% | $40.29 | May-04 |
| 6/1/2004 | 5.6% | $36.70 | April-04 |
| 5/1/2004 | 5.6% | $36.76 | March-04 |
| 4/1/2004 | 4.8% | $34.74 | February-04 |
| 3/1/2004 | 4.8% | $34.27 | January-04 |

*For a record of current WTI daily prices, click here >>*

 © Norfolk Southern Corp. 

# PX0723-PX0730

Filed Under Seal

# EXHIBIT PX0731

BUILDING AMERICA℠

NEWS RELEASE

**UNION PACIFIC REPORTS FOURTH QUARTER EARNINGS**

**2005 Highlights -- Revenue Growth and Improved Efficiency**

**FOR IMMEDIATE RELEASE:**

**OMAHA, Neb., January 19, 2006 –** Union Pacific Corporation (NYSE: UNP) today reported 2005 fourth quarter net income of $296 million, or $1.10 per diluted share, compared to $79 million, or $0.30 per diluted share in the fourth quarter of 2004. The 2004 results include the impact of a non-cash charge for unasserted asbestos claims of $154 million after-tax, or $0.58 per diluted share. Excluding the asbestos charge, 2005 fourth quarter diluted earnings per share increased by 25 percent.

"Union Pacific is operating more efficiently, allowing us to handle record volumes and recover more rapidly from challenges such as hurricanes, the Kansas washouts and severe winter storms," said Jim Young, President and Chief Executive Officer. "We have gained traction throughout the year with our operating initiatives. I am particularly pleased that we converted strong revenue growth into a significant increase in operating income."

**2005 Fourth Quarter Summary**

In the fourth quarter of 2005, Union Pacific Corporation reported operating income of $533 million compared to 2004's $451 million, which excludes the $247 million pre-tax, non-cash asbestos charge.

-more-

- The Railroad's commodity revenue was up 13 percent to a quarterly best $3.5 billion, with all commodities posting increases for the quarter. The main component of the growth was an 11 percent increase in average revenue per car (ARC), which reached an all-time record of $1,428 per car in the fourth quarter. Growth in ARC can be attributed to fuel cost recovery under the Company's surcharge programs and yield improvements.
- Business volumes, as measured by total carloads, grew one percent to a fourth quarter record 2.4 million.
- Operating margin improved to 14.7 percent versus 14.0 percent in 2004. The 2004 fourth quarter results exclude the impact of the non-cash asbestos charge. Including the charge, the reported fourth quarter 2004 operating margin was 6.3 percent.
- The Railroad's average quarterly fuel price including transportation and taxes was $2.08 compared to $1.46 per gallon in 2004, a 42 percent increase.
- Quarterly average train speed, as reported to the Association of American Railroads, was 20.5 mph, the same as the fourth quarter of 2004. Quarterly terminal dwell time improved 4 percent to 29.8 hours versus 31.2 hours reported in the fourth quarter of 2004.

**Fourth Quarter Commodity Revenue Summary versus 2004**

- Industrial Products up 19 percent
- Agricultural up 18 percent
- Intermodal up 14 percent
- Automotive up 8 percent
- Chemicals and Energy each up 6 percent

**2005 Full Year Summary**

Full year 2005 net income was $1.0 billion or $3.85 per diluted share, versus $604 million, or $2.30 per diluted share in 2004. The 2005 full year results include a non-cash income tax expense reduction of $118 million after-tax, or $.44 per diluted share. The 2004 full year results include the impact of the non-cash asbestos charge. The comparison of 2005 and 2004 earnings, excluding the tax and asbestos items, would be $3.41 per diluted share versus $2.89 per diluted share, an 18 percent increase.

- Railroad commodity revenue totaled a record $13.0 billion, an 11 percent increase. The main driver of this growth was a $122 increase in ARC to a record $1,358 per car. Growth in ARC can be attributed to fuel cost recovery under the Company's surcharge programs and yield improvements.
- Business volumes, as measured by total carloads, increased 1 percent to a record level of 9.5 million.
- Operating income was $1.8 billion, a 16 percent increase from $1.5 billion in 2004, which excluded the non-cash asbestos charge. The reported 2004 operating income was $1.3 billion.
- Operating margin improved to 13.2 percent versus 12.6 percent in 2004, excluding the non-cash asbestos charge. The reported 2004 full year operating margin was 10.6 percent.
- The Railroad's average yearly fuel price including transportation and taxes was $1.77 compared to $1.22 per gallon in 2004, a 45 percent increase.
- Average system speed, as reported to the Association of American Railroads, declined 0.3 mph in 2005 to 21.1 mph. This compares to an average system speed of 21.4 mph in 2004. Average terminal dwell time improved 6 percent versus 2004, to 28.7 hours from 30.5 hours.

**2006 Outlook**

"Looking ahead, we are optimistic about 2006. Our network is more resilient than it was at this time last year and we are continuing to build momentum," Young said. "We expect demand will continue to be strong, particularly in the areas of coal and intermodal.

"In 2006, we will focus on providing better service to our customers, improving the efficiency of our network and increasing the financial returns on our business."

**Non-GAAP Reconciliation**

The fourth quarter 2004 operating income, full year 2004 operating income, and diluted earnings per share of $451 million, $1.5 billion and $2.89, respectively, exclude the non-cash charge for unasserted asbestos claims and are non-GAAP measures. The asbestos charge was made to reflect an increase in the Company's estimated liability, which had previously recognized asserted asbestos claims, to also include unasserted claims.

In addition, the full year 2005 net income of $908 million and earnings per diluted share of $3.41 exclude the income tax reduction item reported in the third quarter of 2005 and are also non-GAAP measures. Management believes these measures provide an alternative presentation of results that more accurately reflects on-going Company operations, without the distorting effects of the asbestos charge and income tax expense reduction items. These measures should be considered in addition to, not as a substitute for, operating income, net income and diluted earnings per share.

The following table provides reconciliations for the fourth quarter 2004, full year 2004 and full year 2005 for operating income, net income, diluted earnings per share and operating margin, excluding the asbestos charge and income tax expense reduction, to reported operating income, net income, diluted earnings per share and operating margin:

***Dollars in millions, except per share amounts***

| | Fourth Quarter | | | Full Year | | |
|---|---|---|---|---|---|---|
| | **2005** | **2004** | **Pct Chg** | **2005** | **2004** | **Pct Chg** |
| **Operating Income** | | | | | | |
| As reported | $ 533 | $ 204 | F | $ 1,795 | $ 1,295 | 39% |
| Asbestos Charge | - | 247 | - | - | 247 | - |
| Income Tax Expense Reduction | - | - | - | - | - | - |
| Adjusted | $ 533 | $ 451 | 18% | $ 1,795 | $ 1,542 | 16% |
| **Net Income** | | | | | | |
| As reported | $ 296 | $ 79 | F | $ 1,026 | $ 604 | 70% |
| Asbestos Charge | - | 154 | - | - | 154 | - |
| Income Tax Expense Reduction | - | - | - | (118) | - | - |
| Adjusted | $ 296 | $ 233 | 27% | $ 908 | $ 758 | 20% |
| **Diluted EPS** | | | | | | |
| As reported | $ 1.10 | $ 0.30 | F | $ 3.85 | $ 2.30 | 67% |
| Asbestos Charge | - | 0.58 | - | - | 0.59 | - |
| Income Tax Expense Reduction | - | - | - | (0.44) | - | - |
| Adjusted | $ 1.10 | $ 0.88 | 25% | $ 3.41 | $ 2.89 | 18% |
| **Operating Margin** | | | | | | |
| As reported | 14.7% | 6.3% | 8.4 pts | 13.2% | 10.6% | 2.6 pts |
| Asbestos Charge | - | 7.7% | - | - | 2.0% | - |
| Income Tax Expense Reduction | - | - | - | - | | - |
| Adjusted | 14.7% | 14.0% | 0.7 pts | 13.2% | 12.6% | 0.6 pts |

Union Pacific Corporation owns one of America's leading transportation companies. Its principal operating company, Union Pacific Railroad, is the largest railroad in North America, covering 23 states across the western two-thirds of the United States. A strong focus on quality and a strategically advantageous route structure enable the company to serve customers in critical and fast growing markets. It is a leading carrier of low-sulfur coal used in electrical power generation and has broad coverage of the large chemical-producing areas along the Gulf Coast. With competitive long-haul routes between all major West Coast ports and eastern

gateways, and as the only railroad to serve all six major gateways to Mexico, Union Pacific has the premier rail franchise in North America.

Supplemental financial information is attached.

**Additional information is available at our Web site: www.up.com. Contact for investors is Jennifer Hamann at 402-544-4227. Contact for media is Kathryn Blackwell at 402-544-3753 or 402-319-4288.**

**********

*This press release and related materials may contain statements about the Corporation's future that are not statements of historical fact. These statements are, or will be, forward-looking statements as defined by the Securities Act of 1933 and the Securities Exchange Act of 1934. Forward-looking statements include, without limitation, statements regarding: expectations as to continued or increasing demand for rail transportation in excess of supply; expectations regarding operational improvements, including the effectiveness of network management initiatives that have been or will be implemented to improve system velocity, customer service and shareholder returns; expectations as to increased returns, cost savings, revenue growth and earnings; expectations regarding fuel price; the time by which certain objectives will be achieved, including expected improvements in velocity and implementation of network management initiatives; estimates of costs relating to environmental remediation and restoration; proposed new products and services; expectations that claims, lawsuits, environmental costs, commitments, contingent liabilities, labor negotiations or agreements, or other matters will not have a material adverse effect on our consolidated financial position, results of operations or liquidity; and statements concerning projections, predictions, expectations, estimates or forecasts as to the Corporation's and its subsidiaries' business, financial and operational results, and future economic performance; and statements of management's beliefs, expectations, goals and objectives and other similar expressions concerning matters that are not historical facts.*

*Forward-looking statements should not be read as a guarantee of future performance or results, and will not necessarily be accurate indications of the times that, or by which, such performance or results will be achieved. Forward-looking information, including expectations as to operational, service and network fluidity improvements are subject to risks and uncertainties that could cause actual performance or results to differ materially from those expressed in the statements.*

*Important factors that could affect the Corporation's and its subsidiaries' future results and could cause those results or other outcomes to differ materially from those expressed or implied in the forward-looking statements include, but are not limited to: whether the Corporation and its subsidiaries are fully successful in implementing their financial and operational initiatives, including those plans and management initiatives to improve system velocity and network performance or otherwise improve operations; the impact of ongoing track maintenance and restoration work being performed in the Southern Powder River Basin of Wyoming; industry competition, conditions, performance and consolidation; general legislative and regulatory developments, including possible enactment of initiatives to re-regulate the rail industry; legislative, regulatory and legal developments involving taxation, including enactment of new federal or state income tax rates, revisions of controlling authority and the outcome of tax claims and litigation; changes in securities and capital markets; natural events such as severe weather, fire, floods, hurricanes and earthquakes; the effects of adverse general economic conditions, both within the United States and globally; any adverse economic or operational repercussions from terrorist activities and any governmental response thereto; war or risk of war; changes in fuel prices; changes in labor costs; labor stoppages; and the outcome of claims and litigation, including those related to environmental contamination, personal injuries, and occupational illnesses arising from hearing loss, repetitive motion and exposure to asbestos and diesel fumes.*

-more-

*Forward-looking statements speak only as of the date the statements were made. The Corporation assumes no obligation to update forward-looking information to reflect actual results, changes in assumptions or changes in other factors affecting forward-looking information. If the Corporation does update one or more forward-looking statements, no inference should be drawn that the Corporation will make additional updates with respect thereto or with respect to other forward-looking statements. References to our website are provided for convenience and, therefore, information on the website is not, and should not be construed to be, incorporated by reference herein.*

*-0-*

**UNION PACIFIC CORPORATION**

STATEMENTS OF CONSOLIDATED INCOME

Periods Ended December 31

(Dollars in Millions, Except Per Share Amounts)

(Unaudited)

| | Fourth Quarter | | | Full Year | | |
|---|---|---|---|---|---|---|
| | **2005** | 2004 | Pct Chg | **2005** | 2004 | Pct Chg |
| **Operating Revenues** | **$ 3,621** | $ 3,217 | 13 | **$ 13,578** | $ 12,215 | 11 |
| **Operating Expenses** | | | | | | |
| Salaries, Wages, and Employee Benefits | **1,108** | 1,051 | 5 | **4,375** | 4,167 | 5 |
| Equipment and Other Rents | **353** | 331 | 7 | **1,402** | 1,374 | 2 |
| Depreciation | **300** | 282 | 6 | **1,175** | 1,111 | 6 |
| Fuel and Utilities | **753** | 533 | 41 | **2,562** | 1,816 | 41 |
| Materials and Supplies | **143** | 129 | 11 | **546** | 488 | 12 |
| Purchased Services and Other | **431** | 687 | (37) | **1,723** | 1,964 | (12) |
| Total Operating Expenses | **3,088** | 3,013 | 2 | **11,783** | 10,920 | 8 |
| **Operating Income** | **533** | 204 | F | **1,795** | 1,295 | 39 |
| Other Income - Net | **54** | 22 | F | **145** | 88 | 65 |
| Interest Expense | **(120)** | (130) | (8) | **(504)** | (527) | (4) |
| **Income Before Income Taxes** | **467** | 96 | F | **1,436** | 856 | 68 |
| Income Tax Expense | **(171)** | (17) | U | **(410)** | (252) | 63 |
| **Net Income** | **$ 296** | $ 79 | F | **$ 1,026** | $ 604 | 70 |
| **Basic Earnings Per Share** | **$ 1.11** | $ 0.30 | F | **$ 3.89** | $ 2.33 | 67 |
| **Diluted Earnings Per Share** | **$ 1.10** | $ 0.30 | F | **$ 3.85** | $ 2.30 | 67 |

# UNION PACIFIC RAILROAD

REVENUE DETAIL

Periods Ended December 31

(Unaudited)

| | Fourth Quarter | | | Full Year | | |
|---|---|---|---|---|---|---|
| | **2005** | 2004 | Pct Chg | **2005** | 2004 | Pct Chg |
| **Commodity Revenue (000):** | | | | | | |
| Agricultural | **$ 558,358** | $ 471,259 | 18 | **$ 1,971,210** | $ 1,675,054 | 18 |
| Automotive | **351,572** | 324,410 | 8 | **1,273,188** | 1,235,083 | 3 |
| Chemicals | **475,723** | 446,806 | 6 | **1,849,623** | 1,718,841 | 8 |
| Energy | **629,418** | 592,839 | 6 | **2,577,551** | 2,404,525 | 7 |
| Industrial Products | **746,266** | 627,220 | 19 | **2,819,441** | 2,418,659 | 17 |
| Intermodal | **693,602** | 607,134 | 14 | **2,465,975** | 2,239,815 | 10 |
| Total | **$ 3,454,939** | $ 3,069,668 | 13 | **$ 12,956,988** | $ 11,691,977 | 11 |
| **Revenue Carloads:** | | | | | | |
| Agricultural | **227,456** | 228,912 | (1) | **882,861** | 883,844 | - |
| Automotive | **208,135** | 210,280 | (1) | **796,577** | 825,745 | (4) |
| Chemicals | **218,444** | 232,586 | (6) | **912,734** | 934,843 | (2) |
| Energy | **532,537** | 529,826 | 1 | **2,177,881** | 2,171,520 | - |
| Industrial Products | **368,259** | 368,304 | - | **1,509,081** | 1,514,466 | - |
| Intermodal | **864,586** | 824,337 | 5 | **3,264,303** | 3,127,385 | 4 |
| Total | **2,419,417** | 2,394,245 | 1 | **9,543,437** | 9,457,803 | 1 |
| **Average Revenue per Car:** | | | | | | |
| Agricultural | **$ 2,455** | $ 2,059 | 19 | **$ 2,233** | $ 1,895 | 18 |
| Automotive | **1,689** | 1,543 | 9 | **1,598** | 1,496 | 7 |
| Chemicals | **2,178** | 1,921 | 13 | **2,026** | 1,839 | 10 |
| Energy | **1,182** | 1,119 | 6 | **1,184** | 1,107 | 7 |
| Industrial Products | **2,026** | 1,703 | 19 | **1,868** | 1,597 | 17 |
| Intermodal | **802** | 737 | 9 | **755** | 716 | 5 |
| Total | **$ 1,428** | $ 1,282 | 11 | **$ 1,358** | $ 1,236 | 10 |

# UNION PACIFIC CORPORATION

STATEMENTS OF CONSOLIDATED FINANCIAL POSITION

As of December 31

(Dollars in Millions)

(Unaudited)

| | 2005 | 2004 |
|---|---|---|
| **Assets:** | | |
| Cash and Temporary Investments | **$ 773** | $ 977 |
| Other Current Assets | **1,552** | 1,320 |
| Investments | **806** | 767 |
| Properties - Net | **31,975** | 31,014 |
| Other Assets | **514** | 518 |
| Total | **$ 35,620** | $ 34,596 |
| **Liabilities and Shareholders' Equity:** | | |
| Current Portion of Long Term Debt | **$ 656** | $ 150 |
| Other Current Liabilities | **2,728** | 2,381 |
| Long Term Debt | **6,760** | 7,981 |
| Deferred Income Taxes | **9,482** | 9,180 |
| Other Long Term Liabilities | **2,287** | 2,249 |
| Common Shareholders' Equity | **13,707** | 12,655 |
| Total | **$ 35,620** | $ 34,596 |

# UNION PACIFIC CORPORATION

## STATEMENTS OF CONSOLIDATED CASH FLOWS

For the Twelve Months Ended December 31

(Dollars in Millions)

(Unaudited)

| | **2005** | 2004 |
|---|---|---|
| **Operating Activities:** | | |
| Net Income | **$ 1,026** | $ 604 |
| Depreciation | **1,175** | 1,111 |
| Deferred Income Taxes | **320** | 359 |
| Other | **74** | 183 |
| Cash Provided by Operating Activities | **2,595** | 2,257 |
| **Investing Activities:** | | |
| Capital Investments | **(2,169)** | (1,876) |
| Other | **122** | 144 |
| Cash Used in Investing Activities | **(2,047)** | (1,732) |
| **Financing Activities:** | | |
| Dividends Paid | **(314)** | (310) |
| Debt Repaid | **(699)** | (588) |
| Financings and Other - Net | **261** | 823 |
| Cash Used in Financing Activities | **(752)** | (75) |
| **Net Change in Cash and Temporary Investments** | **$ (204)** | $ 450 |

# APPENDIX

# UNION PACIFIC CORPORATION

## OPERATING AND FINANCIAL STATISTICS

Periods Ended December 31

(Unaudited)

| | Fourth Quarter 2005 | Fourth Quarter 2004 | Pct Chg | Full Year 2005 | Full Year 2004 | Pct Chg |
|---|---|---|---|---|---|---|
| **Operating Statistics:** | | | | | | |
| Revenue Carloads (Thousands) | **2,419** | 2,394 | 1 | **9,543** | 9,458 | 1 |
| Revenue Ton-Miles (Billions) | **136.3** | 137.0 | (1) | **548.8** | 546.3 | - |
| Gross Ton-Miles (GTMs) (Billions) | **262.1** | 262.2 | - | **1,043.9** | 1,037.5 | 1 |
| Operating Margin | **14.7 %** | 6.3 % | 8.4 pt | **13.2 %** | 10.6 % | 2.6 pt |
| Operating Ratio | **85.3 %** | 93.7 % | (8.4) pt | **86.8 %** | 89.4 % | (2.6) pt |
| Average Employees | **49,494** | 49,067 | 1 | **49,747** | 48,329 | 3 |
| GTMs (Millions) per Average Employee | **5.30** | 5.34 | (1) | **20.98** | 21.47 | (2) |
| Average Fuel Price Per Gallon | **$ 2.08** | $ 1.46 | 42 | **$ 1.77** | $ 1.22 | 45 |
| Fuel Consumed in Gallons (Millions) | **340** | 343 | (1) | **1,353** | 1,377 | (2) |
| Fuel Consumption Rate (Gal per 000 GTM) | **1.30** | 1.31 | (1) | **1.30** | 1.33 | (2) |
| **AAR Reported Performance Measures:** | | | | | | |
| Average Train Speed (Miles per Hour) | **20.5** | 20.5 | - | **21.1** | 21.4 | (1) |
| Average Terminal Dwell Time (Hours) | **29.8** | 31.2 | (4) | **28.7** | 30.5 | (6) |
| Average Rail Car Inventory (a) | **326,486** | N/A | N/A | **N/A** | N/A | N/A |
| **Financial:** | | | | | | |
| Weighted Average Shares - Basic (Millions) | **265.6** | 259.8 | 2 | **263.4** | 259.1 | 2 |
| Weighted Average Shares - Diluted (Millions) | **268.9** | 263.1 | 2 | **266.5** | 262.2 | 2 |
| Effective Tax Rate | **36.6 %** | 17.7 % | 18.9 pt | **28.6 %** | 29.4 % | (0.8) pt |
| Debt to Capital (b) | | | | **35.1 %** | 39.1 % | (4.0) pt |
| Lease Adjusted Debt to Capital (c) | | | | **43.6 %** | 45.1 % | (1.5) pt |
| Free Cash Flow (Millions) (d) | | | | **$ 234** | $ 215 | 9 |

(a) On October 1, 2005, the rail car inventory measurement was standardized for all reporting railroads. Rail car inventory for prior periods was not recalculated.

(b) Debt to capital is computed as follows: total debt divided by total debt plus equity.

(c) Lease adjusted debt to capital is computed as follows: total debt plus net present value of operating leases divided by total debt plus equity plus net present value of operating leases.

(d) Free cash flow is a non-GAAP measure; however, we believe that it is important in evaluating our financial performance and measures our ability to generate cash without incurring additional external financings. The following table reconciles cash provided by operating activities (GAAP measure) to free cash flow:

| | Full Year 2005 | Full Year 2004 |
|---|---|---|
| Cash Provided by Operating Activities | $ 2,595 | $ 2,257 |
| Cash Used in Investing Activities | (2,047) | (1,732) |
| Dividends Paid | (314) | (310) |
| Free Cash Flow | $ 234 | $ 215 |

**UNION PACIFIC CORPORATION**

STATEMENTS OF CONSOLIDATED INCOME

By Quarter and Full Year 2005

(Dollars in Millions, Except Per Share Amounts)

(Unaudited)

| | Period Ended | | | | Year Ended |
|---|---|---|---|---|---|
| | March 31 | June 30 | September 30 | December 31 | December 31 |
| **Operating Revenues** | $ 3,152 | $ 3,344 | $ 3,461 | $ 3,621 | $ 13,578 |
| **Operating Expenses** | | | | | |
| Salaries, Wages, and Employee Benefits | 1,099 | 1,075 | 1,093 | 1,108 | 4,375 |
| Equipment and Other Rents | 353 | 340 | 356 | 353 | 1,402 |
| Depreciation | 289 | 292 | 294 | 300 | 1,175 |
| Fuel and Utilities | 539 | 597 | 673 | 753 | 2,562 |
| Materials and Supplies | 135 | 128 | 140 | 143 | 546 |
| Purchased Services and Other | 424 | 444 | 424 | 431 | 1,723 |
| Total Operating Expenses | 2,839 | 2,876 | 2,980 | 3,088 | 11,783 |
| **Operating Income** | 313 | 468 | 481 | 533 | 1,795 |
| Other Income - Net | 20 | 29 | 42 | 54 | 145 |
| Interest Expense | (132) | (128) | (124) | (120) | (504) |
| **Income Before Income Taxes** | 201 | 369 | 399 | 467 | 1,436 |
| Income Tax Expense | (73) | (136) | (30) | (171) | (410) |
| **Net Income** | $ 128 | $ 233 | $ 369 | $ 296 | $ 1,026 |
| **Basic Earnings Per Share** | $ 0.49 | $ 0.89 | $ 1.40 | $ 1.11 | $ 3.89 |
| **Diluted Earnings Per Share** | $ 0.48 | $ 0.88 | $ 1.38 | $ 1.10 | $ 3.85 |

**UNION PACIFIC RAILROAD**
REVENUE DETAIL
By Quarter and Full Year 2005
(Unaudited)

| | Period Ended | | | | Year Ended |
|---|---|---|---|---|---|
| | March 31 | June 30 | September 30 | December 31 | December 31 |
| **Commodity Revenue (000):** | | | | | |
| Agricultural | $ 447,902 | $ 463,261 | $ 501,689 | $ 558,358 | $ 1,971,210 |
| Automotive | 293,105 | 329,166 | 299,345 | 351,572 | 1,273,188 |
| Chemicals | 441,019 | 458,880 | 474,001 | 475,723 | 1,849,623 |
| Energy | 667,783 | 629,437 | 650,913 | 629,418 | 2,577,551 |
| Industrial Products | 630,196 | 718,977 | 724,002 | 746,266 | 2,819,441 |
| Intermodal | 523,927 | 596,755 | 651,691 | 693,602 | 2,465,975 |
| Total | $ 3,003,932 | $ 3,196,476 | $ 3,301,641 | $ 3,454,939 | $12,956,988 |
| **Revenue Carloads:** | | | | | |
| Agricultural | 215,755 | 215,257 | 224,393 | 227,456 | 882,861 |
| Automotive | 192,317 | 210,321 | 185,804 | 208,135 | 796,577 |
| Chemicals | 227,742 | 235,889 | 230,659 | 218,444 | 912,734 |
| Energy | 573,987 | 525,470 | 545,887 | 532,537 | 2,177,881 |
| Industrial Products | 358,560 | 397,418 | 384,844 | 368,259 | 1,509,081 |
| Intermodal | 731,843 | 806,633 | 861,241 | 864,586 | 3,264,303 |
| Total | 2,300,204 | 2,390,988 | 2,432,828 | 2,419,417 | 9,543,437 |
| **Average Revenue per Car:** | | | | | |
| Agricultural | $ 2,076 | $ 2,152 | $ 2,236 | $ 2,455 | $ 2,233 |
| Automotive | 1,524 | 1,565 | 1,611 | 1,689 | 1,598 |
| Chemicals | 1,936 | 1,945 | 2,055 | 2,178 | 2,026 |
| Energy | 1,163 | 1,198 | 1,192 | 1,182 | 1,184 |
| Industrial Products | 1,758 | 1,809 | 1,881 | 2,026 | 1,868 |
| Intermodal | 716 | 740 | 757 | 802 | 755 |
| Total | $ 1,306 | $ 1,337 | $ 1,357 | $ 1,428 | $ 1,358 |

# EXHIBIT PX0732

# Modern Industrial Organization

Fourth Edition

Dennis W. Carlton
Jeffrey M. Perloff



# Modern Industrial Organization

Fourth Edition

# Modern Industrial Organization

Fourth Edition

Dennis W. Carlton
*University of Chicago*

Jeffrey M. Perloff
*University of California, Berkeley*

PEARSON
Addison Wesley

Boston San Francisco New York
London Toronto Sydney Tokyo Singapore Madrid
Mexico City Munich Paris Cape Town Hong Kong Montreal

*To Janie and Jackie*

Editor in Chief: Denise Clinton
Acquisitions Editor: Adrienne D'Ambrosio
Director of Development: Sylvia Mallory
Managing Editor: Jim Rigney
Senior Production Supervisor: Nancy Fenton
Senior Media Producer: Melissa Honig
Marketing Manager: Deborah Meredith
Design Supervisor: Regina Kolenda
Interior Designer: Leslie Haimes
Cover Designer: Leslie Haimes
Illustrator: Jim McLaughlin
Senior Prepress Supervisor: Caroline Fell
Senior Manufacturing Buyer: Hugh Crawford
Compositor: Nesbitt Graphics, Inc.
Cover Image: Stella, Frank (b. 1936) © Copyright ARS, NY. Agbatana II. 1968. Polymer and fluorescent polymer paint on canvas. 10' × 15'. © Copyright ARS, NY. Musee d'Art et d'Industrie, Saint-Etienne. Photo credit: Giraudon

Many of the designations used by manufacturers and sellers to distinguish their products are claimed as trademarks. Where those designations appear in this book and Addison-Wesley is aware of a trademark claim, the designations have been printed in initial caps or all caps.

Library of Congress Cataloging-in-Publication Data

Carlton, Dennis W.
Modern industrial organization / Dennis W. Carlton, Jeffrey M. Perloff.—
4th ed.
p. cm
Includes bibliographical references and index.
ISBN 0-321-18023-2
1. Industrial organization (Economic theory) I. Perloff, Jeffrey M. II. Title

HD2326.C376 2005
338.6—dc22

2004007014

Copyright © 2005 by Dennis W. Carlton and Jeffrey M. Perloff

All rights reserved. No part of this publication may be reproduced, stored in a database or retrieval system, distributed, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written permission of the publisher. Printed in the United States of America.

1 2 3 4 5 6 7 8 9 10—CRW—08 07 06 05 04

of industrial trade associations carried out by the Political and Economic Planning agency in 1953–56 found that 243 of the 1,300 associations (19 percent) attempted to fix prices (Phillips 1972).

**Low Organizational Costs.** Even if a potential cartel could raise prices in the long run and not be discovered, it will not form if the cost of initial organization is too high. The more complex the negotiations, the greater the cost of creating a cartel. Four factors keep the cost low, facilitating the creation of a cartel: Few firms are involved, the market is highly concentrated, all firms produce a nearly identical product, and a trade association exists.

Setting up a secret meeting without the government's knowledge is relatively easy when there are few firms involved. Even if there are many firms in a market, the largest firms may meet and establish a cartel (dominant firm) that does not explicitly include the smaller fringe firms. Of the 606 Department of Justice price-fixing cases (1910–72) examined by Fraas and Greer (1977), the average number of firms involved in each case was 16.7, whereas the median was 8, and the mode was 4.[12] That is, a few cases involving a large number of firms raised the average, but the most common type of case involved 4 firms, and half the cases involved 8 or fewer firms.[13]

Of the Department of Justice price-fixing cases (January 1963–December 1972) studied by Hay and Kelley (1974), only 6.5% involved 50 or more conspirators.[14] The average number of firms in the remaining cases was 7.25. Although only 26% of the cases involved 4 or fewer firms, nearly half (48%) involved 6 or fewer firms, and 79% involved 10 or fewer firms.

Of the global cartels from 1990 to 2003 studied by Connor (2003), the median number of corporate participants was five. More than half (77%) of these cartels had six or fewer firms. Only 13% had 10 or more participants, but most of those were organized by quasi-official European trade associations.

Even where cartels are legal, as are many international cartels not involving U.S. firms, the number of firms is crucial. For example, a long period (1928–72) of successful cartelization by two countries of the world mercury market was followed by years

---

[12]If the number of firms involved in each case is arranged in ascending order, then the middle number is the median number of firms. If there were 5 cases with 2, 4, 5, 8, and 9 firms involved, the median number of firms would be 5. Imagine a graph that plots the cases so that the horizontal axis shows the number of firms involved and the vertical axis shows the number of cases involving a given number of conspiring firms. The mode is the highest point on the plot. The mode is the most common number of conspirators.

[13]The median number of firms involved varied by industry. In natural resources markets, the median number of firms was 13. The corresponding numbers were 7 in manufacturing, 11 in distribution, 15 in construction, 4 in financial institutions, 4 in transportation, and 8 in services.

[14]Hay and Kelley (1974) studied horizontal price-fixing conspiracies that were prosecuted by the U.S. Department of Justice Antitrust Division. Their study excluded price fixing by various professional groups (because they were not covert), but included virtually all other cases that were filed and won in trial or settled by *nolo contendere* ("no contest") pleas. Pleading *nolo contendere* is equivalent to pleading guilty for the purposes of sentencing but is not an admission of guilt by the defendant. When such a plea is accepted by the court, a trial is not necessary. Occasionally, courts accept such pleas over the objection of the Department of Justice.

of unsuccessful attempts at price fixing by a larger group of countries (MacKie-Mason and Pindyck 1986).

If a few large firms make most of the sales in a market, and if they coordinate their activities, they can raise price without involving all the other (smaller) firms in the market. For example, Spain and Italy, which controlled 80% of the world's production of mercury, formed a successful cartel that did not formally involve five other producers (MacKie-Mason and Pindyck 1986).

Empirical evidence supports the view that cartels are more likely in concentrated industries.[15] In 42% of the Department of Justice price-fixing cases studied by Hay and Kelley (1974), the four-firm concentration ratio (the sum of the market shares of the four biggest firms) was over 75%; in another 34% of the cases, the ratios were between 51 and 75%. Thus, in 76% of the cases, the concentration ratio was greater than 50%. Only 6% of the cases had concentration ratios less than 25%. The overall average was 67.7%.[16] Of the global cartels studied by Connor (2003), cartel members usually controlled over 90% of the market's sales. Moreover, when entry caused the cartel's share to drop below 65%, cartel activity typically ceased.

Similarly, the existing evidence shows that cartels are often found in smaller geographic areas. In the U.S. Justice Department price-fixing and other antitrust cases from the passage of the Sherman Act (1890) through 1969 studied by Posner (1970), nearly half (47.4%) the conspiracies were in local or regional markets, 37.6% were nationwide, and 8.7% involved foreign trade. The smaller the geographical area of a market, the more likely it is that a few firms have a large share of the business.

Firms have more difficulty agreeing on relative prices when each firm's product has different qualities or properties. Each time a product is modified, a new relative price must be established. It is easier for a cartel to spot cheating when all it has to examine is a single price. It is relatively difficult to detect price cutting that is achieved by an increase in quality; a firm could increase its quality and hold its price constant if it wanted to increase sales without explicitly violating the pricing agreement.

In virtually all the price-fixing cases studied by Hay and Kelley (1974), the product was relatively homogeneous across firms. In the few exceptions, complicated products or services were allocated on a job-by-job basis that facilitated coordination, or a single issue was isolated for the agreement. For example, a group of swimsuit manufacturers agreed to delay end-of-season discounts. Similarly, virtually all the recent global conspiracies (Connor 2003) involved homogeneous products.

---

[15] Scott (1991a) shows that multimarket contact can be important. Large conglomerates may be potential rivals in a number of markets simultaneously. They can communicate about all these markets at once. It is also potentially more costly to deviate from a cartel agreement in one because it risks destroying all the cartel agreements. To the degree that multimarket contacts are important, the degree of concentration in a single market may be misleading.

[16] To minimize the systematic bias from excluding cases for which the concentration measure could not be determined directly, if the number of firms was known, Hay and Kelley (1974) calculated minimum concentration ratios by assuming each firm had an equal share.

Case 1:07-mc-00489-BAH Document 1229-7 Filed 11/22/24 Page 2434 of 3766

Trade associations, by lowering the costs of meeting and coordinating activities among firms in a market, facilitate the establishment and enforcement of cartels. Most industries have trade associations that meet regularly. Not all industries with trade associations necessarily form cartels. However, as Adam Smith observed, such meetings are conducive to price-fixing agreements, and trade associations are often the mechanism by which large groups coordinate activities. In the Hay and Kelley (1974) study of Department of Justice price-fixing cases, trade associations were involved in 7 out of 8 cases in which more than 15 firms conspired, and in all cases involving more than 25 firms. Overall, 29 percent of the cases involved trade associations. Fraas and Greer (1977) found that 36 percent of all price-fixing cases involved trade associations. Moreover, the median number of firms involved was 16 when there was a trade association, compared to 8 for all cases. Posner (1970) found that 43.6 percent of all antitrust cases involved trade associations.

## Enforcing a Cartel Agreement

Even if a market consists of a small number of firms producing a homogeneous good with no close substitutes, has an inelastic demand curve, and faces no threat of entry, a cartel cannot succeed if members can and want to cheat on the agreement. Some of the factors that lead to the formation of a cartel also help it to detect cheating and enforce its agreement.

**Detecting Cheating.** Cartel agreements are easier to enforce if detecting violations is easy. Four factors aid in the detection of cheating:

- There are few firms in the market.
- Prices do not fluctuate independently.
- Prices are widely known.
- All cartel members sell identical products at the same point in the distribution chain.

With relatively few firms, the cartel may more easily monitor each one, and increases in one firm's share of the market (an indication of price cutting) are easier to detect. Further, moral (or immoral) suasion may be easier when there are only a few conspirators (See **www.aw-bc.com/carlton_perloff** "Broker").

Hay and Kelley (1974) found that most of the price-fixing conspiracies lasting 10 or more years were in markets in which there were few firms and the largest firms made most of the sales. When a large number of firms was involved, conspiracies were generally discovered very quickly, especially because details about some of the large-group organizational meetings often were printed in local newspapers. In contrast, Posner (1970) found that, of the detected cartels, large ones lasted as long as smaller ones. He found that 52 percent of conspiracies involving 10 or fewer firms had lasted for 6 or more years, whereas 64 percent of larger conspiracies persisted that long. Presumably, the more firms involved in a conspiracy, the more

# PX0733-PX0741

Filed Under Seal

# EXHIBIT PX0742

NewsRoom

1/24/07 Fin. Disclosure Wire 14:00:00

FD Wire
Copyright © 2007 CCBN, Inc. and FDCH e-Media, Inc.

January 24, 2007

Q4 2006 **NorfolkSouthern** Corp **EarningsConferenceCall** - Final

CHARLES "WICK" MOORMAN, PRESIDENT, **NORFOLKSOUTHERN** CORP: [Audiostarts in progress] Steve Tobias, Chief Operating Officer, along withDon Seale our Executive Vice President and Chief Marketing Officer,we're also joined by Jim Squires, Senior Vice President, FinancialPlanning, and Bob Fort, Vice President Corporate Communications, RobKessler, Vice President Taxation, Marta Stewart, Vice President andController, [Leighann] [Marilley], Director of Investor Relations andin the back, [inaudible] Melvin, Hank Wolf's assistant and the personwho actually runs this thing.

Well last time at this year I have to tell that I had some concernsas the new CEO of **NorfolkSouthern**. We had just reported recordresults for the third straight year. And I thought that it might bedifficult to improve upon that kind of performance in my first yearon the job. However, I'm glad, and I will say a little relieved tosay that 2006 was another record year for **NorfolkSouthern** capped bya fourth quarter that reflects the strength of our higher valuetransportation products, and our strategic focus.

Throughout 2006, we continued to improve upon our financial andoperating performance, sharpening our customer focus by investing innew capacity to handel our growing business, and by developing andintegrating new technologies to increase reliability, efficiency, andsafety. And our plan for 2007 is to continue the progress and furtherstrengthen those initiatives in order to drive our service levels andsubsequently our financial performance to new heights.

Our financial results for 2006 demonstrated a sustained healthydemand for efficient freight transportation by rail. Our railwayoperating revenues were the highest of any year in **NorfolkSouthern's**history reflecting service consistency and reliability as well as ourfocus on value-based pricing. We posted our best-ever income fromrailway operations, net income, and earnings per share, wesignificantly improved the railway operating ratio, and stockholdersbenefited from a fifth consecutive year of dividend increases thattogether raised the dividends 38%.

As an indication of our confidence in the strategic direction of ourcompany, as you all know, we repurchased 21.8 million shares of ourcommon stock in 2006, for the seventh consecutive year, we loweredour debt to total capitalization ratio, which currently stands at40.7%, excluding operating leases. Naturally, I am pleased to reportthese results. But more significantly, I'm proud because ourperformance continues to showcase the strengths and dedication of ourpeople and our organization. We continue to handle business demandsthat were unimaginable only a few years ago. And do so safely, andefficiently, often in the face of considerable challenges. And wecontinue to produce historically good results that benefit customersand investors alike.

As illustrated, by the board's decision yesterday to increase ourquarterly dividend by $0.04 a share or 22%. In the fourth quarter, wefaced a slightly different set of challenges than those we have seenfor a number of preceding quarters. For the first time in over threeyears, we saw volumes decline slightly, on a year-over-year basis,more on that in a moment, but the most important thing to recognizeis that we were still able to realize significantly improvedfinancial results on a year-over-year basis.

For the fourth quarter, net income was $385 million, or $0.95 pershare, an increase of 6%, compared to the $362 million or $0.87 pershare for the same period last year. For the year, net income was arecord $1.5 billion for $3.57 per share, an increase of 16%, comparedwith the reported net income of $1.3 billion, or 3.11 per share, for2005. And let me remind you that our 2005 results included a $96million benefit from the effects of Ohio tax legislation, whichincreased diluted earnings per share by $0.23, excluding this item,net income for 2006 was 25% higher than the 1.2 billion or $2.88 perdiluted share earned in 2005.

The fourth quarter operating ratio includes a 73.5 compared to 73.7for the same period of 2005. For the year, the operating ratioimproved a full 2.4 percentage points, to 72.8%, and as all of youknow, and as we say consistently lowering the operating ratio on aconsistent basis has always been and continues to be a primary goalfor us. And we remain committed to further improvement in theoperating ratio. Railway operating revenues set records for thefourth quarter and for the year.

The fourth quarter railway operating revenues of $2.3 billion were up3% for 2006. Railway operating revenues totaled $9.4 billion,compared with 8.5 billion in 2005, an increase of 10%. Railwayoperating expenses were $1.7 billion for the quarter, up 3% comparedto the fourth quarter of 2005, and we're up -- and we're $6.9 billionfor 2006, an increase of 7% over 2005. And the increases wereprimarily the result of higher diesel fuel prices, compensation andbenefits, and some volume-related expenses.

Income from railway operations set records for the fourth quarter andthe year, increasing 3% to 614 million for the quarter, and climbing21% to $2.6 billion for the year, compared with the same period of2005. And you will hear all about the details of our financialresults and of our revenues in just a moment from Hank and Don.

In addition, this meeting, I've asked Steve to talk with you for afew minutes about the improvements that we've made and are planningto make in service delivery. Steve, along with Mark MacMahon and therest of the operating team, has done a great job of making what Ibelieve is the best railroad operation in the country even better,and we have even more improvements on the way. Looking ahead, wecontinue to keep a close eye on the economy from where we sit.

For January, we're seeing that like in the fourth quarter, overallcarloadings are experiencing some downward pressures, especially inthe automotive and metal sectors. Now, over the past couple of theyears, one of the ongoing questions that I have been asked is howsustainable is the so-called railroad renaissance. And my stockanswer has always been that we believe that the fundamental driversof the growth that we have seen in this business are structural andlong-lived in nature. But we would know a lot more when we saw theeconomy get soft.

Now, we're clearly facing a somewhat softer economy, at least interms of some of our important markets such as autos, and soft --seeing softness in the overall surface transportation market. Butstill, our traffic volumes are at levels close to our all-time highs,and I think that alone provides ample evidence that the railroadrenaissance is alive and well. We're working aggressively on newbusiness development plans and as we move forward, we will continueour commitment to value-based pricing. We're confident that ourservice efficiency gives us a very competitive and valuable productgoing forward.

2007 presents hurdles very similar to those we have tackled in thelast couple of years including cost pressures in the form ofincreased wages and health and welfare benefits for employees andcontinuing high diesel prices. In addition, I will tell you that weplan to continue our aggressive locomotive and car overhaul program,that we initiated last year. In order to ensure that we can continueto respond to our customers' demands. At the same time, we willobviously be seeking more cost-effective ways of doing business,while always first and foremost improving safety and service to ourcustomers. Now, I will ask Hank to review our numbers. Don will thentell you about the specifics of our markets.

Steve will follow-up with the operations overview. And then we willall gladly take your questions. Thank you. Hank?

HANK WOLF, VP, CFO, **NORFOLKSOUTHERN** CORP: Thank you, Wick. And goodmorning. As Wick indicated, record railway operating revenues andincome from railway operations reduced record net income and earningsper share in 2006. Railway operating revenues for the fourth quarterwere 2.3 billion, up 62 million, or 3% compared with last year.

For the year, revenues were a record 9.4 billion, an increase of 880million, or 10%. Fourth quarter carloads were down 3% from last year,while revenue per unit increased by 6%, yielding a 3% increase inrevenues. For the year, volume increased 1%, while revenue per unitrose by 9%, resulting in the 10% increase in railway operatingrevenues. And Don Seale will provide you with the details of ourrailway operating revenues in just a moment. Railway operatingexpenses for the fourth quarter were 1.7 billion, up 42 million, or3% compared to '05.

For the year, railway operating expenses were 6.9 billion, 440million, or 7% higher than '05. The largest increase in operatingexpenses was for the fourth quarter, and that was in compensation andbenefits, which rose 19 million, or 3%. This increase was primarilyattributable to higher salaries and wages of 11 million, increasedincentive and stock-based compensation of 8 million, and increasedmedical insurance costs for both active and retired employees, whichtotaled 7 million. These increases were offset in part by declines inother items, including lower life insurance and pension costs. Thenext largest increase in the fourth quarter was in materials,services and rents which rose 16 million, or 3%.

Materials expense increased 20 million during the quarter principallydue to increased maintenance activity. Purchase services were up only2 million, and equipment rents declined 6 million for the quarter,reflecting lower traffic volumes. Casualties and other claims were up5 million, or 11% and that was largely as a result of higher expensesrelated to the derailment. Other operating expenses rose 3 million,or 5% compared with last year, primarily due to increased sales anduse taxes. Diesel fuel expense for the quarter increased 3 million,or 1% over '05.

As you may recall, our fuel hedging program wound down in the secondquarter of '06, and no new hedges have been put in place since thattime. The absence of any hedge benefit, which reduced fourth quarter'05 expenses by 28 million, was almost entirely offset by a 10% dropin the average price per gallon, which reduced diesel fuel cost inthe fourth quarter of '06 by 25 million. Depreciation expense wasdown 5 million, or 3% and as you will recall, last year, we conducteda required periodic depreciation study that was completed in thefirst quarter of '06, which indicated longer depreciable lives forsome of our assets.

For the full year, railway operating expenses were up 440 million, or7%. The largest increase in expenses for the year, was in diesel fuelexpense, up 250 million, or 34%. This $250 million increase waslargely due to 129 million less in fuel hedging benefits, and higherprices which increased diesel fuel costs by 113 million. A modestincrease in consumption added another $8 million in fuel costs.

The next largest increase in operating expenses for the year was incompensation and benefits which rose by 144 million, or 6%. As youwill recall, we implemented FAS 123-R on January 1, '06. And ourexpenses included 36 million related to this change in accounting. Inaddition to the effective FAS 123-R, the increase includes 44 millionof higher salaries and wages, 29 million for increased medicalinsurance costs, 17 million of higher payroll taxes, 13 millionrelated to retirement agreements and waiver agreements with twoformer executives in the first quarter. And 11 million for the costof the regular annual stock-based grants to the former CEO, whoretired in the first quarter.

Other miscellaneous items reduced these increases by 6 million. Iwould also like to remind you that under FAS 123-R, we're required toexpense stock-based compensation grants to employees. In addition,we're required to front load the expensing for stock-based grantsmade to employees who are retirement eligible. Stock-basedcompensation granted to employees who are not retirement eligible areexpensed on a quarterly basis over the vesting period. **NorfolkSouthern** has traditionally made stock-based compensation awards inthe first quarter of the year. Therefore, an expense will be recordedin the first quarter of '07, to reflect the grant of stock-basedcompensation for the current year.

Although we won't know the exact amount until we know the stock priceat the end of March, we expect first quarter stock-based compensationexpense, including the front end loading, to be about $0.10 pershare. This reflects an increasing number of employees who will beretirement eligible in '07, rather than a change in the level ofgrants made. Material services and rents

expense were up 86 million,or 5% over last year. Materials costs rose 39 million, reflectingincreased maintenance activities and purchase services expense, wasalso up 39 million. And that was due to increased traffic volumeearlier in the year.

Equipment rents were up 8 million, also primarily due to increasedvolume earlier in the year. The largest decline in expenses was indepreciation, which decreased 36 million, or 5% as a result of thedepreciation study that was completed in the first quarter of '06.Casualties and other claims expense was 4 million, or 2% lower thanlast year. And Conrail rents and services were 3 million lower than'05.

The railway operating ratio for the fourth quarter was 73.5%,compared with a ratio of 73.7% in the fourth quarter of '05. For theyear, the operating ratio was 72.8%, compared with 75.2% last year.This represents our lowest operating ratio since the Conrail mergerand our third lowest operating ratio in the history of **NorfolkSouthern**.

Fourth quarter income from railway operations was 614 million, up 20million, or 3%, over the 594 million produced in '05. For the year,income from railway operations was a record 2.6 billion, up 440million, or 21%. Total other income and expense for the quarter wasan expense of 75 million, compared with an expense of 90 million in'05. Gains on sales of property, and investments, were 10 millionbelow '05, which included a large partial sale -- sale of a largeparcel in the fourth quarter.

Returns from corporate-owned life insurance were 8 million higherthan last year, principally due to improved stock market performance.Expenses related to our is synfuel investments were 6 million lowerthis year reflecting the expected phase-out of a portion of theSection 29 credit. All other was an increase of 5 million. Andinterest expense on debt for the quarter was 6 million lower thanlast year, largely due to less outstanding debt.

As you will recall, I spoke last year about the volatility associatedwith the synthetic fuel investments. For the fourth quarter, averageoil prices were quite close to the average price that we expected atthe beginning of the quarter. Accordingly, the forward curve provedto be correct. And we indeed had a 35% phase-out for the year. Whichresulted in a net benefit in the fourth quarter of about $7 million,and 18 million for the full year.

For the year, total other income and expense was an expense of 327million, compared with an expense of 420 million in '05. Expensesrelated to our synfuel investments were 39 million lower than lastyear, reflecting the phase-out of the section 29 tax credit. Interestincome increased 35 million, as a result of higher cash balances andinterest rates. Returns from corporate-owned life insurance rose 20million, over last year, primarily due to improved market performancefor invested assets.

Equity in Conrail earnings were 12 million lower, and othermiscellaneous items decreased 7 million, over last year. Interestexpense on debt for the year was 18 million lower than last year.Largely due to less outstanding debt. Fourth quarter before incometaxes was 539 million, compared with 504 million, a 7% increase. Forthe year, income before income taxes was 2.2 billion, up 533 million,or 31%, compared with 1.7 billion, in '05. The provision for incometaxes for the fourth quarter was 154 million compared with 142million last year. The effective tax rate was 28.6% compared with28.2% in '05.

For the year, the provision for income taxes was 749 million,compared with 416 million in '05. You will remember that '05 waspositively impacted by a $96 million noncash tax benefit associatedwith changes in the Ohio tax laws. The effective tax rate this yearwas 33.6%, compared with 24.5% in '05. The Ohio tax law changereduced the '05 effective rate by almost 6 percentage points.

Most of the rest of the '06 increase in the effective rate was theresult of reduced section 29 credits this year. Fourth quarter netincome was 385 million, up 6%, compared with the 362 million, earnedlast year. For the year, net income was a record 1.5 billion comparedwith 1.3 billion last year, an increase of 200 million, or 16%.Diluted earnings per share for the fourth quarter were $0.95. Up 9%compared with $0.87 per share earned last year.

For the year, diluted earnings per share were a record $3.57 whichwas 15% above $3.11 per share reported a year ago. Last year, Iprovided you with a comparison of our net income and earnings pershare, excluding the effect of the change in the Ohio tax laws. Onthat same basis, this year's net income of 1.5 billion would havebeen 296 million, or 25% higher than '05.

Similarly, our diluted earnings per share of $3.57 would have been24% higher than the $2.88 per share earned last year, excluding theOhio tax law changes. This slide reconciles the net income andearnings per share for '05, excluding the impact of the Ohio taxlegislation to our reported net income and earnings per share. Andthis reconciliation is posted on our Web site for your reference.Thank you for your attention.

And now, I will turn the program over to Don Seale who will give youan in depth report on our revenues.

DON SEALE, CFO, **NORFOLKSOUTHERN** CORP: Thank you, Hank. And goodmorning to all. My comments this morning will highlight some of thekey factors that drove our markets and results during the past year.And offer some insight as to what we see ahead in 2007.

First, some general commentary about economic conditions. We all knowthe economy was in transition during the year. The outlook wasfavorable in the first quarter of 2006. Mixed in the second. Andgrowth slowed materially in the last half of the year. Due to aweaker housing market, fourth quarter GDP growth continued to trackbelow trend at 2.4%. But improving net exports, business investment,as well as stronger-than-expected consumer spending helped to offsetsome of this downward pressure. Compared to modest growth in GDP, thesignals were less positive from the manufacturing sector.

With fourth quarter output produced the first quarterly decline sincethe second quarter of 2003. The ISM index reflected this decline bydropping below 50 in November for the first time since April of 2003.Weakness in the housing market will continue to slow growth in 2007with annual GDP expected to be at its lowest pace since 2002. Withthe economy growing below its potential, we expect the manufacturingsector to be weaker in the first half of this year. But a weakdollar, continued strong corporate earnings, and low interest rates,should support continued business investment, and boost factoryproduction in the final two quarters of 2007.

Our performance in 2006 reflected the moderating economic conditionsthat I've just discussed, despite new business and developmentprojects across our network. Volume in the fourth quarter reached 1.9million units falling 3% below 2005, and for the year, volume of 7.9million units grew 1%. Agriculture was the only sector producingyear-over-year gains throughout the year, and accordingly saw recordvolume despite difficult comparisons from the previous year.Intermodal, metals and construction, and coal all produced recordvolumes for the year as well. Automotive comparisons were consistentwith four quarters of decline through the year. While our othersectors experienced some variation during the year. And most notably,after 19 consecutive quarters of gains, our intermodal sectorproduced its first year-over-year volume decline since the fourthquarter of 2001.

For the quarter, revenue reached 2.3 billion, increasing 62 million,or 3% over 2005. For the year, revenue of 9.4 billion, grew 880million, or 10%. All of our business groups posted record revenuesfor the year, with the exception of automotive. And automotive endedthe year within 2% of record revenue. Revenue per unit reached a newhigh of $1,203, an increase of $65, or 6% over fourth quarter 2005.Increased pricing produced all of the improvement in RPU for thequarter, as fuel and mix were both flat for the period. We continueto successfully reprice expiring business across all businesssectors, as indicated in previous reports to you, we repriced about50% of our book of business during 2006, and we estimate that abouthalf of our book of business will again be repriced this year.

Turning to our specific markets, coal established both record volumeand revenue, in 2006, volume for the quarter reached 439,000 loads,up 4%, and for the year, we handled a record 1.8 million units. Coalproduced its second highest revenue quarter reaching 592 million, anincrease of 68 million over the same period in 2005. For the year,record revenue of 2.3 billion, exceeded 2005, by 215 million. Revenueper car reached $1,349, up $113 for the quarter, and for the year,revenue per car, up 1324,

Case 1:07-mc-00489-BAH Document 1229-7 Filed 11/22/24 Page 2442 of 3766

increased $105. The higher revenue per carresulted from improved pricing across all markets, fuel surcharges,favorable mix and improvement in tons per car.

Looking at our longer-term trend, in coal, coal, coke and iron orecarloads have now increased in 10 of the past 12 quarters. For thefourth quarter, 78% of our carloadings originated on NS. And 79%originated on NS for the full year. Drilling down a little further inthe coal, utility volume increased 4% in the quarter, despite a 2%decline in electric generation in our service region due to mildweather. Stockpile rebuilding, and a 37% carload increase from thewestern PRB coal fields contributed to these volume gains. Theincrease in western coal was enabled by improved train cycle time,some of which displaced barge traffic.

In addition, imported coal, carloadings by the port of Charleston,South Carolina, increased 92%, compared to fourth quarter 2005. Forthe year, record utility volume increased 41,000 loads or 3%. Westernoriginated coal was up 29% for the year. While imported volumethrough Charleston grew 75%. In the short term, utility coal demandin the first quarter of '07 is expected to be consistent with what wesaw in the fourth quarter. But the market will most likely soften inour view as a result of persistent mild temperatures in the east, andabove average stockpiles.

Turning to export, export coal had its highest volume quarter of theyear reaching 32,000 load, up 13%, or 3600 carloads. For much of theyear, in 2006, overseas receivers completed delivery contracts fornonU.S. coal and many of these carry over deliveries were complete bythe fourth quarter, which increased demand for U.S. coals in Europe.For the year we handled 119,000 car, down 14%, as shipments declinedthrough Lambert's Point and the Port of Baltimore.

Looking ahead, projections for export coal tonnage continue to bevolatile, while ocean freight rates from the U.S. versus Australiasourcing of coal favor U.S. coal into European steel markets andhigher mining costs in the U.S. will likely limit gains for U.S.coals going forward. Domestic metallurgical coke, and iron ore volumereached 52,000 loads in the fourth quarter, down 3%, primarily due toa blast furnace outage. For the year, carloads reached nearly 218,000loads, up 4%, or 8300 cars. Increases in metallurgical volumes weredue to the high demand in the steel industry, which offset a 15%decline in iron ore carloadings caused by blast furnace outages.

Now, turning to our carload business, merchandise revenue reached 1.2billion for the quarter, up 20 million, or 2% over fourth quarter2005, despite a 6% decline in volume. For the year, revenue reached5.1 billion, growing 520 million, or 11% over 2005. Revenue per carreached an all-time high of 1820 for the quarter. Principally drivenby price increases that were slightly offset by lower fuelsurcharges. For the year, revenue per car of 1770 was up $187, or12%, driven by price increases and fuel surcharge revenue. Weaknessin housing, the manufacturing sector, and the automotive industryheld down volume comparisons in merchandise. Volume growth in thefirst half of the year cannot offset significant declines in thefourth quarter for all groups except agriculture.

Our agriculture group had the most consistent volume performancethroughout the year, principally due to increased ethanol and cornshipments. And also achieved the highest growth rate in revenue ofany of our business groups in 2005. Revenue reached 252 million forthe quarter, and 994 million for the year. As you know, demand forethanol has risen sharply in the U.S. and accordingly our shipmentsgrew by 74% or 17,000 carloads last year. And we expect that growthrate to continue. Metals and construction revenue grew to 269 millionin the fourth quarter and 1.2 billion for the year.

Volume rose 5% for the year despite a 7% decline in the fourthquarter. Demand was strong during most of 2006, driven by domesticsteel production, commercial and highway construction projects, andnew business development. Iron and steel shipments led growth with a21% increase for the year. Followed by a 7% gain in scrap metal, and13% gain in cement shipments. Growth from slab steel shipments wassignificant in the year, as we ran 616 slab trains in 2006, up 63%over the previous year.

The fourth quarter decline in steel volume reflected lower productionat domestic steel mills in response to lower steel prices, and highersteel inventory levels. Looking ahead, steel production is expectedto remain soft during the first quarter, with improving conditions inthe second half. Our paper revenue reached 222 million for thequarter, an 891 million for the year, on volume

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.

declines of 5% and 1%respectively. We continue to see strong growth in the market forwaste transportation, including municipal solid waste andconstruction, and demolition debris, with shipments in thesecategories up 39% for the quarter, and 61% for the year.

In conventional paper and forest products, printing paper led volumeincreases growing 9% for the quarter and 10% for the year, primarilydue to continued growth in imported printing paper. Losses weremainly attributable to declines in housing starts, with lumbershipments down 15% in the fourth quarter and 4% for the year. Ourchemical revenue grew to 266 million for the quarter, up 9%, and 1.1billion for the year, up 10%. Despite volume declines of 2% and 4%respectively.

For the quarter, and year, volume declines resulted from a workstoppage in the tire industry, inventory adjustments, the slowinghousing market, and some specific plant closings. The outlook forthis year is one of improvement. We expect growth opportunities fromplant expansions in North Carolina and Virginia, and a newthoroughbred bulk terminal facility that is opening in SomersetKentucky. In the automotive sector, our automotive revenues reached225 million for the quarter, falling 29 million below fourth quarterlast year.

For the year, revenue of 974 million fell 23 million, or 2%.Automotive volume declined 16% for the quarter, and 9% for the year,in the face of North American vehicle production falling 8% for thequarter, with full-year production of 15.2 million units, versus2005, and was the lowest production for automotive in North Americasince 1996. Looking ahead, though, we expect increased shipments forToyota and the other new domestic manufacturers to partially offsetthe impact of the big three restructuring in 2007.

Now, concluding with intermodal, revenue, intermodal revenues reached493 million for the quarter, down 26 million, or 5% versus the fourthquarter 2005. For the year, record revenue of 1.97 billion was up 145million, or 8%. Intermodal volume continued to moderate during thefourth quarter, down 3% due to softening in housing and automotive,coupled with higher motor carrier capacity. As you can see in theMorgan Stanley truckload freight index depicted in this slide,significant variation in trucking capacity has occurred between 2005and 2006.

In late 2005, the industry saw a trend of tight capacity, whichstarted to reverse itself in the first half of 2006. For theremainder of 2006, slowing demand created excess trucking capacity inthe marketplace, which is continuing in 2007. If you look at the 2006*l*ine, you will notice that the index for demand versus supply is nowbelow 2003 levels. Accordingly, our combined truckload and domesticIMC volumes declined 4% in the fourth quarter, and 2% for the year.

IMC carriers saw continued declines across the sector due toincreasing truckload availability, and downward price pressure in thespot market. The expectation for our domestic and truckload businessof 2007 is for continued market pressure but moderate growth. Ourinternational volume fell 1% for the quarter, but was up 9% for theyear. Our East Coast port volume was up 4.5% for the quarter, whileWest Coast port volumes fell 3%. This decline reflected a shift oftranscontinental business, to local and short haul markets throughEast Coast ports, as well as a general softening of the market.

In addition, steam ship line industry consolidation, experiencedearlier in 2006, continues to have an unfavorable impact on our mixof intermodal business.

In 2007, we expect growth to resume in our international segment aswe have renegotiated several of our international customer'scontracts in late '06, and these new contracts are expected togenerate improved pricing, as well as new volume for our network thisyear. Premium intermodal business was down 14% in the fourth quarterand 3% for the year, primarily among LTL shippers who are currentlystruggling to fill capacity. And Triple Crown, expanded its businessin each major segment with the exception of auto parts.

With automotive business impacted by assembly plant closures and cutbacks, Triple Crown has redeployed assets to accelerate growth inconsumer products, which are expected to offset the impact of lowerautomotive volumes in 2007.

Now, looking ahead, we expect continued moderation in our intermodalmarkets in early 2007. But higher levels of growth as the yearprogresses. Systemic factors in the trucking industry such as highercost of operation, highway congestion, and driver availability, arenot expected to materially improve. Increased long-term freightdemand and a recovering economy provide a positive outlook forintermodal growth.

As such, we remain committed to investing not only to improveintermodal service levels but to advance our strategic capacityinitiatives such as the heartland corridor, and the Columbus RickenBacker logistics center. We continue to view Atlanta and thesoutheast as a growth market, and are moving ahead with our KCS jointventure, and enhancements at our southeastern intermodal terminals.Our announcement this week of improved Blue Streak Train service fromLos Angeles to Atlanta with the Union Pacific and our plans to addnew service over Shreveport later this year bode well for thismarket.

So in summary, to sum this up, our results reflected our balancedportfolio of business, in 2006, and in the quarter, with volumegrowth in four of our sectors offsetting declines, in the remainingbusiness units. When we look ahead, our markets will be mixed. Theopportunities and growth potential in intermodal are strong. Optionsfor shippers are increasing, with all water service through thePanama Canal and new Suez service from Asia, boosting intermodalfreight for eastern railroads. Predicting the performance in coal isa little more problematic. As always, utility coal demand is somewhatdependent on the weather, while export coal will be impacted by thedynamics of the international market. And our carload sector will beshaped by the manufacturing economy.

Which we will see some weakness in the short-term, particularly forhousing, automotive, and steel production, with improvement as theyear goes on. Despite a slowing economy, the fundamentals of the railindustry remain strong and solid. Continued infrastructureimprovements to enhance both capacity and service, positions us wellfor further growth, and we fully expect to capitalize on theopportunities ahead.

And to that end, it gives me pleasure to have Steve come up now andreview our current operations and capacity planning. Thank you verymuch. Steve?

STEVE TOBIAS, COO, **NORFOLKSOUTHERN** CORP: Good morning. Thank you,Don. I'm pleased to report that the state of operations on **NorfolkSouthern** is in fact very good. We entered 2007 having successfullymet the dual challenge dure the last 12 months as our people handledrising traffic volumes while continuing their improvement in employeesafety.

In the next few minutes, I will review that safety performance, andthen I will highlight our initiatives to enhance capacity to move thefreight. Safety has been and continues to be our first priority.Safety is good business and attention to the subject undoubtedlyleads to efficiency.

In 2006, we further reduced the number of injuries to our employees.For the full year, reportable injuries fell 18.7%, to 317. Ourpreliminary reportable injury ratio in 2006 improved to one injuryper 200,000 man hours compared to 1.19 the previous year. That's a16% improvement. Even at that, however, we are still short of ourgoal.

For 2007, we've set an aggressive goal of .79 injuries per 200,000man hours and as you have heard me say before, we will not besatisfied until we have worked the number of reportable injuries downto a nice round number. Zero. As the economy has expanded in the lastseveral years, customers ask, is capacity an issue? Seeing thevolumes at their doorsteps and projecting growth in some areas, theywonder if carriers will be able to move at all. They're looking forsigns of congestion. And of course, they're looking for anyindicators that might help them with their forecasting and with theirplanning.

From **NorfolkSouthern's** view, the rising economy manifests itselfthrough consistent carload growth that has continued each year sincethe mid 1990s with the exception of course of 2000 and 2001. Carloadvolumes have been increasing, but have shown

swings in the mix ofcommodities, and in our own ironic fashion, fuel prices present achallenge since they drive more business to us while at the same timeincreasing our costs.

Fortunately, we have been about as prepared as a company could be.When we implemented our top training and operating plan five yearsago, and top two, two years ago, we put into play tools that enableus to react quickly to changing conditions. We created a system thathandles growing traffic volume in a methodic scheduled and realtimemanner. But the system improvements are just one part of theequation. Assets are critical for addressing capacity and we havebeen making the investments necessary to meet the transportationneeds of the marketplace.

For example, at the beginning of last year, we announced a capitalexpenditures program of 1.16 billion, and as a result of a 1% trafficgrowth and other opportunities, we increased our spending anadditional 2.8%, to 1.178 billion. We plan a 1.34 billion capitalbudget for 2007. So correspondingly, let's look at locomotives, railcars, personnel, and infrastructure. This chart lists our criticalassets that independently and collectively affect our capacity tohandle business. Over the last several years, we embarked onsubstantial locomotive repurchase and repair plans.

Last year we and it the trend with a purchase of 142 new diesellocomotives. And general electric and EMD. We rebuilt 52 locomotivesand overhauled 420. This year, we plan to purchase 53 units and tocontinue with rebuilding and overhauling at about the same pace as wedid last year. On the car side, we have always maintained aninventory of coal cars to match the need of coal producers, exportbusinesses, and growing utility assets. With renewed interest in coalas an energy source, we have carefully planned our purchase andrebuild plans.

We repurchased 400 new aluminum coal cars last year and we plan topurchase 1300 coal gondolas this year and at the same time, we areextending the life of some of our aging merchandise and coal cars.This program is cost effective and we plan to continue it at a highlevel. We have several other car development programs under way toreflect marketplace conditions.

For example the dip in automotive market has given us an opportunityto continue our multilevel rebuild program. Let me turn now topersonnel. It takes people to run a railroad. And early in theeconomic recovery, we started an active program to hire and trainpeople to move the freight. People-wise, we are in great shape andour work force has become stable. We continue to calibrate theoverall hiring plan on the basis of attrition forecasting and asmarket conditions dictate.

Last year we hired 1,318 conductors and trained 764 new engineers.This year, we plan to manage attrition and we're considering hiring1100 conductors and training 630 new engineers. System locomotives,cars, and people can take us only so far. And if we had unlimitedtrack and infrastructure, it would take us a long, long way. But wedon't. During the first half of this decade, as we integrated ourportion of the Conrail properties, our efforts centered on capacityand fluidity issues in the midwest, specifically in Ohio, Indiana,and Illinois.

It was critical that connections, routes, and yard capacities alignedwith the rest of our system. That was our focus. Especially as we hada little breather courtesy of the high-tech industry and thehigh-tech downturn. The work we did then is paying off today, withhigher business levels, customer service and train performance in thenorthern half of our company are excellent. Rarely if ever do weexperience episodic or systemic congestion there. This is a goodstory. No question about it.

Now, it is time for us to expand our focus to the south. With top, itis easy and fast to review system-wide performance looking at allroutings and areas for bottlenecks an congestion. Top shows us thatin the southern part of our transportation system, our traffic lanesthemselves are fluid, but certain locations are congested. With thatin mind, we are undertaking infrastructure capacity improvements toaddress bottlenecks in Tennessee, Georgia, Alabama, and Mississippi.

And here are some of the '06-'07 projects. Intermodal yard andimprovements at Louisville Kentucky. And in Allstel near Atlanta.Five miles of double track on the north end of the mountainless tracksection between Atlanta and Chattanooga. Three new long passingsightings and six track extensions to existing sightings. Theseinfrastructure installations will help us relieve

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works. 

episodic congestionand choke points on our southern routes, improving transit times, andreliability. We intend to keep our capital expansion consistent on anongoing basis.

Let me turn now to some quick metrics. As carloadings have moderatedover the past several months, our operating metrics collectively showfluid operations, and favorable trend. This slide shows our dailycars online since 1999. The yellow line shows a 12-week movingaverage. Cars on line currently stand at 185,324 cars, 4% fewer thanlast year. This slide shows weekly average train speed. Current trainspeed stands at 22.8 miles an hour. And it has been higher in recentweeks and currently is 9.1% better than last year.

Again, the moving 12-week average is shown in yellow. This slideshows terminal dwell at 20.3 hours with which is a 14.7% improvementover the 23.8 hours reported last year. Again, the 12-week average isin yellow. Markets aren't static. And neither is our property. Everyday, we work to balance our operating assets against marketplaceneeds. Expectations from all quarters are high, so we are thoroughand aggressive and striking a balance that best serves ourconstituency. Our goal is to place the right assets at the rightplace at the right time. This is a foundation of ensuring capacityfor the future needs of our customers. The current slight dip involume gives us time to rebound on train speed and train performance,while taking advantage of opportunities to institute physicalimprovements.

Our people know what to do, and they are doing it. We continue toreview and analyze our markets and customer needs as we are in factgetting ready for the next wave. I look forward to telling you moreabout our progress in the coming year. Thank you.

CHARLES "WICK" MOORMAN: Thank you, Steve. You've been very patient.But I thought it was important that Steve get up and talk for a fewminutes. You've heard us talk over the past few years about theinvestments we're making. The expenses we're incurring, as well asthe capital.

We have been very, I think, prudent and systematic in terms of howwe've look at our property and how we continue to look at it andinvest in it and I think what the charts show and certainly what allof our internal metrics tell us is that the railroad is running verywell these days, knock on wood, at volumes that quite frankly two orthree years ago, we would have had a very difficult time handlingefficiently, and I think we're setting the stage for further businessgrowth and not only to handle that growth, but to handle it at evenhigher service levels than we have in the past. I can tell you thatwe look at our service levels, and a lot of different ways, and we'renever satisfied with them, but yet I would tell you that our numberstoday reflect a railroad that runs about as well as it probably everhas. So thank you, Steve. And thank you all of you for listening. Iwill say one other thing about the presentation before we open it upfor questions.

Hank mentioned the FAS 123 charges, and the fact that the charge thisyear reflects not higher grant levels, but an aging work force. Thatwas a euphemism for the fact that I and a number of my colleagueshappened to turn 55 this year and we're retirement eligible so wehave no intention of retiring, but under the accounting rules, wetake the charge. So -- but he was gracious enough not to point thatout. Thank you, Hank. All right, if we could take some questions Isaw Scott raised his hand very quickly so.

SCOTT FLOWER, ANALYST, BANC OF AMERICA SECURITIES: Thanks, Wick. Twoquestions. Scott Flower of Banc of America Securities. Two questionsif I could for Don Seale. One would be if you could give us somesense of where the fuel surcharge level is, whether it is covered andsecondly some sense of where you think that might improve in '07? Andthen I had one follow-on.

CHARLES "WICK" MOORMAN: If you want to answer, that go ahead.

DON SEALE: Scott, we concluded 2006 with 91% coverage on our fuelsurcharge program. And you will continue to see that change as timegoes on, because as you know, we are in the process of rebasingbusiness as we go forward to reflect higher fuel prices that havebeen around for a long time now, so -- but we're at 91% coverage. Youwill see -- continue to see fuel surcharge revenue decline goingforward as we rebase and also as we see fluctuations in oil pricesthat we're seeing today.

SCOTT FLOWER: The seconds question relates to the domestic andpremium and truckload intermodal markets, that seems to be wherewe're seeing a little bit more of the shorter term pressures onsupply, demand and balance relative to the domestic truckloadindustry. Is your sense that more of the pressures in the short runwill be manifested by volume just coming off based on how customersare deciding and you're going to stay disciplined on price? Or willthere also be some price pressures because that market may be moreflexible in the short run, based on what is going on in the TL andLTL markets on pricing on that side?

DON SEALE: As I've mentioned, it is our view that the demand thatwe're seeing right now in the excess capacity in trucking, as theeconomy firms up this year, we don't see that excess capacity beingthere long-term. So we don't see any real impact on our pricingmodel. Our pricing model that we saw in 2006, we're continuing onthat basis and we saw a rather good foundation for that goingforward, and so even on the IMC and domestic side, intermodalbusiness, we see this as a short-term phenomenon that we're facingwith respect to capacity right now.

SCOTT FLOWER: Thanks.

CHARLES "WICK" MOORMAN: Let me add that I think our intermodal team,as we've discussed in the past, has done a great job not only ofbringing in growth, but bringing in at good margins. We don't intendto change our philosophy on that, and go out and do things in themarketplace from a pricing standpoint that would significantly alterthe profitability of our intermodal traffic. Tom?

TOM WADEWITZ, ANALYST, JPMORGAN: Yes, another question --

CHARLES "WICK" MOORMAN: Just because you should state your name,sorry.

TOM WADEWITZ: Yes, Thomas Wadewitz, with J.P. Morgan. Anotherquestion for you on the intermodal side. When we look at theintermodal yield in the fourth quarter they were down year-over-year,and I think that is the first time since 2003 that we've seen that.It sounded like there were probably a number of mix factors withinthat as well as fuel surcharge and I was wondering if you could giveus a sense maybe what peer price in intermodal was like in fourthquarter, and then a few thoughts about 2007, intermodal yield, arethey likely to be up? Or do these factors persist?

HANK WOLF: The fourth quarter yield, Tom, was impacted by mix, as Imentioned. We saw our international business decline from thetranscontinental, it was down 3% in the fourth quarter. That isgenerally longer haul, gateway business, versus East Coast portbusiness that may be shorter haul. Over time, we see some of thismigrating though to the East Coast ports that will actually go backas far to the gateway. So we will see Chicago freight, we will seethe gateway freight coming through the East Coast ports, if thistrend continues. So it was mix.

We continue to see good pricing and yield opportunities for '07 onthe international side of our business as well as the othercomponents of intermodal. I mentioned that we concluded some newcontracts late in 2006. We improved our pricing position reflectingtoday's market conditions in those contracts, and that includedinternational business. So now, I will remind you that as we goforward, we will continue to convert traffic from trailers tocontainers. That migration continues. And when we have thatmigration, we have a lower RPU for containers but a higher margin.

CHARLES "WICK" MOORMAN: I think we saw a fair amount of -- a fairamount of the volume decrease in the fourth quarter, actually turnedout to be trailer business, which is business that over the long termwe're happy to supplant with containers.

TOM WADEWITZ: Does that trend then continue in terms of yields beingdown year-over-year? When we look at '07, I'm just trying to get abroad sense, yields up or down.

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works. 

HANK WOLF: Tom, the conversion from trailers to containers willcontinue. In fact, you probably recall that we predicted that wewould be out of the trailer business, much sooner than we really are.It stayed with us longer than we thought it would, but there is avery, very clear trend on going from trailers to domestic container,international containers.

TOM WADEWITZ: And I just got two more, I will give you one for Donand one for Wick, and short questions. On the U.P. NS, the newservice on intermodal, is that really primarily a change in flow oftraffic from Memphis to Shreveport, so you can provide betterservice? Or is it really a new market opportunity that you see whereyou would drive additional traffic, either from CSX or from thetruckload market? And then for Wick, just thoughts on sharerepurchase in '07. Thank you.

DON SEALE: The answer to the first question is both. The announcementthat we made, we operate the Blue Streak service today, as you know,and we've been operating that for some five years now, with U.P.,over Memphis, a very depend service to Atlanta and to the southeast.We will build on that. We adjusted the schedule for availability, thetrain will run the same, but availability will be improved by 12hours, to fourth afternoon service starting in February. We will alsoadd a new train over Memphis that we will build volume on, and thenabout July, August, beginning of the third quarter, we plan tomigrate those trains to the Shreveport gateway using the addedcapacity on the speedway, on a KCS speedway, a joint venture, usingthat added capacity that will be completed by then, and that willreduce the route, the U.P. Memphis NS route by 150 miles and it willreduce the through mileage compared to the competitive route toAtlanta, for example, by 300 miles.

CHARLES "WICK" MOORMAN: The Shreveport route, as we told you before,in terms of the speedway, is the shortest, straightness, we believebest route from L.A. to the southeast. And this is service that willtake advantage of that route. Share repurchase, we have an ongoingshare repurchase program, we were -- I think it is fair to sayprobably aggressive, possibly, in terms of our share repurchases lastyear. We certainly, as you know, made a substantial number of sharerepurchases. We did that obviously on what I would describe assomewhat opportunistic basis in terms of what we saw with our shareprice, and how we feel about the long-term value of our stock. Thisyear, we will continue to repurchase shares. The volumes I think atwhich we do that will be determined upon a number of factors, one ofwhich will be share price, but we will also look our hand over interms of, you know, what we're doing with our cash in general. Ithink the significant dividend increase that we announced yesterdayis certainly part of our plan to return shareholder value, too. Hank,is that a reasonable answer? I check with Hank on my answers here.Let me go there, then there, then there, then there.

TONY HATCH, ANALYST, INVESTEC, INC.: Tony Hatch. Just to follow upagain on intermodal, when you migrate that business over to theMeridian Speedway, if you can make an apples-to-apples comparisonwill be volume be up versus what you had been doing before? In otherwords, are you really replacing the volume?

CHARLES "WICK" MOORMAN: I don't know that we want to speculate onthat right now, Tony. That is a competitive marketplace. We think itis a new service. We think it is a great service that will have a lotof appeal to customers who are in that route today, and new customersas well. But, we've got some plans and projections that I don't wewant to speculate on it right now.

TONY HATCH: Another way to look at what is happening in intermodalalso is what percentage of your business can move directly back tothe highway and might have in the fourth quarter and what percentageof your business can move rail to rail, how much have you locked upand how much -- is it a rail to rail competitive situation going onas well as a slowing economy? Or are you really just seeing lowervolumes because your customers are seeing lower volumes?

CHARLES "WICK" MOORMAN: You're talking about in terms of our fourthquarter volumes?

TONY HATCH: Yes, trying to look at that for the future, but yes.

CHARLES "WICK" MOORMAN: And looking at it, I would say, Don, if youcorrect me if I'm wrong, but what we're really seeing right now, inour opinion, is a direct result of that index that Don showed you.And all of the reading that we do from a

lot of you who follow thetruckload industry, in terms of what is happening to truckingvolumes, and we're seeing a reflection of that, and as Don said, wethink that that over the course of this year will tend to reverseitself. And we will go back, and we're not -- to the extent that youhave trucking competitors that go out and when their volumes get verysoft, do things in the marketplace in terms of pricing or whatever,to take some volume away, we -- as I stated earlier, we are not goingto necessarily follow that, just to keep volume. That's not ourbusiness strategy. Don, is that a fair way to put it. Right here,sir.

JASON SANDLER, ANALYST, CREDIT SUISSE: Thank you. Jason Sandler,Credit Suisse. A question for Don. You said about half your book ofbusiness will roll over again in '07. What percent of the businesshas not been repriced under the rail renaissance? Can you give ausnumber?

DON SEALE: We have -- Jason, we have most of our business now,rotating on about a three-year cycle. And that's -- and as we'vementioned in the past, about two-thirds of our businesses undercontract, the average duration now is three years. So we have a thirdof that two-thirds expiring each year. And then the balance of thoserate instruments are in private quotes or public quotes, and it givesus an opportunity to reprice each year. So we have some legacycontracts that are left that have not been treated. But I will tellyou that that is a shrinking percentage.

CHARLES "WICK" MOORMAN: And clearly, as Don has told you many timesbefore, as we run into those longer-term legacy contracts, our intentis to generally drive them to a three-year duration, to not extendlegacy contracts in that sense.

KEN HOEXTER, ANALYST, MERRILL LYNCH: Good morning. It is Ken Hoexterfrom Merrill Lynch. Actually I'm going to do a quick wrap up onintermodal before I get to other questions but I just wanted toclarify, the West Coast volume, the ports were very strong. Are yousaying it came from the middle of the country and then trucksincreasingly got competitive and you don't expect that competition toslow down going into the first half of the year? Is that -- I'm justtrying to understand. Because I think Tony's question was are youseeing more rail competition, are you seeing volumes overall, itsounded like you were saying volumes overall why slowing but WestCoast ports were very strong so I'm wondering why that didn't flowover to the East Coast.

DON SEALE: Ken, we saw our intermodal volume this past year, July,and August, really represented more of a peak, than we saw inOctober. So I think it was a couple of things at work there. Thesupply chain is elongated. We've got more retailers now takinginventory earlier in the year for the holidays. So we saw that.

The second thing is that there have been some fairly significantprice increases from the West Coast coming to the East Coast. Andwe're seeing that convert, some maritime trade, to the East Coastports and that East Coast port cuts both ways. We gain on that. It isan added opportunity. But the traffic that is close to the port ofentry, like New York, we don't get a haul on that. So it is a two-waystreet on this. So we're seeing some dynamics there that that impactcame to play in the second half of this past year. Now, we're alsoseeing the truckers a little more aggressive with respect to gatewayhauls as well. We don't expect that will continue longer term. Itmight be four months, five months, six months, but that is not alonger-term trend in our view.

KEN HOEXTER: Thanks, Don. It is kind of odd, just because it seemslike the West Coast ports are remaining strong but the East Coast arekind of flat, so you're saying you're seeing a little bit of theopposite. Hank, I think you've gotten off a little too easily thismorning, I just want to clarify two things, you said a $0.10 stockexpense in the first quarter. Is that a $0.10 expense or is that anincrease of $0.10 year on year?

HANK WOLF: That is a $0.10 expense. When you add up all of the movingparts last year, it came to probably $0.09 so it is only going to beslightly higher than it was last year, and that is because so many ofmy colleagues are joining the club, that I have loved to belong tonow for almost 10 years. And --

CHARLES "WICK" MOORMAN: Back up, Hank. Back up.

KEN HOEXTER: I just want to -- we've had a lot of this fuelvolatility on the synfuel tax credits. It looks like at the end ofthe year, a full year now, you had, after all of the expenses andeverything, it looked like you showed an $18 million gain. If I'mright, you know, on a billion 481 of net income, you're talking about1% of your net income for something that has fluctuated, yourearnings and stock, in such a great way during this past year.

HANK WOLF: Every 18 million counts.

KEN HOEXTER: Okay.

HANK WOLF: That ultimately is where I was heading with this, justbecause we love it.

KEN HOEXTER: Okay. Now, explain this going into '07 then. Does it runout in '06-'07? Any chance that you would be interested in sellingthis? If fuel is pulling back, does that give you a better benefitnow that we're at lower prices?

HANK WOLF: Right now, the provisions under section 29 will expire atthe end of this year. So -- '07?

KEN HOEXTER: That's right.

HANK WOLF: So we have at least one more year of potential benefit.With fuel prices where they are today, one would expect that if theycontinued at that level, we would get a higher benefit for the year'07 than we had in '06. But until we know what the fuel prices are,we can't give you that number. What we do internally is make aprojection or an estimate for the year and then each quarter we trueup.

And so to the extend there were wide fluctuations in fuel prices in'06, you not only had an impact on the individual quarter, that wereyou accounting for, but you had a true-up for the prior part of theyear. I think a good place to start in terms of your model would beto say, okay, what do you think the effective tax rate is going tobe? Because the effective tax rate takes this into account. And I'mgoing to break a Cardinal rule that I've had all this time, and thatis, I don't give you forecast numbers or budget numbers, but ourbudget number for effective tax rate is 34%.

KEN HOEXTER: Uh-oh

HANK WOLF: That's all the help I'm going to give you. We're going tohave to to shoot him.

KEN HOEXTER: Last one I have while you're up there, is on fuelsurcharges, I'm sorry, on pricing, actually, if fuel surcharge endsup coming down I think Don was talking about it and you might havesome negative comps, Is there a point where **NorfolkSouthern**considers breaking out pure pricing and fuel surcharge? Especially ifwe're going to see a negative comp which we could end up seeing anegative average revenue per comp.

HANK WOLF: I think I will let Don answer that quet but really andtruly, at least from our perspective, quet but really and truly, atleast from our perspective, we would be reluctant to break out all ofthat information, because that is really competitive information. Wehave competitors in the marketplace and to the extent they have agreater knowledge or understanding of the sensitivities of ourpricing approach, that works to our disadvantage. But Don, do youwant to add something to that?

CHARLES "WICK" MOORMAN: And then I will add something.

DON SEALE: As I mentioned, we are actively rebasing as we go forwardwith respect to pricing, market-based pricing. And we're convertingto the new fuel surcharge level at $64 a barrel. We've got about 10%of our book of business already converted. We're continuing to moveon that. Oil prices have dipped here recently. They went back up to55 yesterday. I think if we have any normalized weather patterns forthe rest of the winter, and demand picks back up in the spring, I'mnot sure we see too many

folks that feel that the forward curve isnot too far off which is $63 a barrel for 2007. So we will continueto work the rebasing effort, and we think that is the right way togo. And have the new fuel surcharge set at $64 for traffic goingforward.

CHARLES "WICK" MOORMAN: Let me -- Ken, you asked some good questions.You did something which actually I have a very difficult time doingwhich is pry something out of Hank. But you also raised a point and Iwant to make one editorial comment about it, and that is the factthat we are in this -- the tax credits, it is in some sense arelatively modest amount of money, but it does in fact add somevolatility to our earnings. The fairly wide swings in fuel prices,which we're seeing these days, can also add some volatility,particularly just on the pure revenue side, keeping in mind as wellthat fuel surcharges typically trail oil prices, by 60 days, so thatadds even more variability into all of this.

But the fact of the matter is that we come here, and report on aquarterly basis, and tell you how we're doing, but we try and manageon a long-term basis, and any opportunity that we have to make moremoney, to increase shareholder value, we're going to take thatopportunity, even if it somehow makes our earnings a little morevolatile, in terms of breaking things out, if we see radicaldifferences in fuel prices, and things like that, we will certainlytry to explain them to you in the very best way that we can, butstill keeping in mind our positions on what we do and that we thinkit competitive versus what we do that can be open information. Butthat's our general philosophy. You saw it in the fourth quarter,where we had some big material and purchase service charges. Theywere really the result of some timing on year-long maintenanceprograms that we have, but we're not going to go in and for the basisof the quarter stop a maintenance program. That doesn't make goodeconomic sense to us. In the back.

SAL VITALELY, ANALYST, CALYON SECURITIES: Good morning. Sal Vitalelywith Calyon Securities. I was just hoping that you could provide somemore granularity on the CapEx budget for '07, of 1.34 billion on asfew dimensions as possible, in terms of what is growth, versus whatis CapEx, and what is maintenance, rather, and additionally, thegrowth CapEx, what sectors or what segments of your business is thatearmarked for?

DON SEALE: We don't break that out very well, because there is a fairamount of cCapEx that you can argue with is both. I will give you thegranularity and then you can think about what -- how it breaks down.Steve mentioned one, we have obviously a base amount that is railcross ties and ballast and programs, signal work that in order tomaintain the railroad, and renew the assets on the railroad, that isa substantial number, which I want to say this year, Steve, do yourecall, 500? Hank? 550, 580? That kind of number? And then we haveother capital that we build on top of that, in terms of requiredprojects. And I.T. things like that.

If you look at the growth component, we always have a fair amount ofmoney. The break down exists, and it is in our press release for newintermodal terminals, certainly new capacity, we have budgeted thisyear, about 50 million for the kind of siding and capacity work thatSteve talked about. A significant component of our capital budgetthis year, which you will see on and ongoing basis for a number ofyears, you saw an early piece of it last year, is renewal of our coalcar fleet. We're buying 1300 coal cars this year. That is -- oh,gosh, north of -- slightly north of $100 million in CapEx just forcoal. And we're doing rebuilding as well. We always kind of try to doa lot of I.T. work, which we count as capacity development, becausewe run the railroad better with that. What am I leaving out? We willget you the break down, but I would say that this year, if I lookedat the budget, in terms of what is setting the stage for newbusiness, and better service, and we link the two very closely, thehigher our service level, the more business we're going to develop,somewhere between 25% and a third of the capital budget is orientedtowards better service and new business development, versus kind ofkeeping the railroad in good running order. Is that a reasonable --

SAL VITALELY: Sure. Thank you very much. And then in terms of thatportion that is growth CapEx, I mean would you say that a fairportion of that is in coal and terminal combined rather than some ofthe other segments?

DON SEALE: No, I wouldn't break it down like that, for the followingreason. You know, intermodal terminals are clearly an intermodalplay, coal cars are clearly -- new better coal cars are clearly coalplay. But we look at the business from a network standpoint. And ifyou look at the maps that Steve showed you about where we're puttinginfrastructure, and you think about new locomotives and you thinkabout new systems, and all of that benefits the entire network. Andit improves the use of all of our assets, it may be a heavilyintermodal quarter that we're investing in, but if we get thevelocities up there, we're going to see

positive impact on our entirelocomotive fleet which helps us turn the merchandise fleet better andmove more coal cars, so we don't try to in general break that out, asfinely as that.

SAL VITALELY: Okay. Thank you.

CHARLES "WICK" MOORMAN: Tony? One more?

TONY HATCH: Sort of related to intermodal and CapEx there, can youtell us what is going on and what stage you're in for the heartlandcorridor building and also with Rickenbacker and what their impactsmight be on business levels this year?

CHARLES "WICK" MOORMAN: The ground has been broken at Rickenbackerand that move is moving ahead. All of the money there is committedand ready to go. We have actually completed now all of the paperworkand approval processes, other than environmental, on the heartlandcorridor on the tunnel clearance program. The FHWA, which willadminister the federal funds has signed off and is on board. Weexpect that work to begin in mid year.

In terms of the business impact, we clearly, you know, we won't berunning stacks on the short route for about three years, but I willsay that [MARIS] is building a new terminal, as some of you I'm sureknow in the port terminal, as some of you I'm sure know in the portof Norfolk. It is a big terminal. I think it is the largest singleprivate investment in a U.S. port in history. We expect to see themstart turning business on. We have a -- I think it is safe to say avery good business relationship with [MARIS], and so we should startto see additional traffic flowing out of that terminal maybe by theend of the year, if they get the operation cranked up and going. Andsee more impact out of it next year, and then by the time we finish,the Heartland corridor, we will see I think some significant newbusiness. That sounds about right on the timetable. But I wouldn'tlook for it this year. Rickenbacker is not projected to open untillate '07. Well, listen, thank you very much for your patience. It isgood to see all of you, as usual. And we look forward to seeing youfor the next report. Thanks.

[Thomson Financial reserves the right to make changes to documents,content, or other information on this web site without obligation tonotify any person of such changes.

In the conference calls upon which Event Transcripts are based,companies may make projections or other forward-looking statementsregarding a variety of items. Such forward-looking statements arebased upon current expectations and involve risks and uncertainties.Actual results may differ materially from those stated in anyforward-looking statement based on a number of important factors andrisks, which are more specifically identified in the companies' mostrecent SEC filings. Although the companies may indicate and believethat the assumptions underlying the forward-looking statements arereasonable, any of the assumptions could prove inaccurate orincorrect and, therefore, there can be no assurance that the resultscontemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUALREPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILEEFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BEMATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THESUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIALOR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANYRESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPONTHE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT.USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALLITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANYINVESTMENT OR OTHER DECISIONS.]

[Copyright: Content copyright 2007 Thomson Financial. ALL RIGHTSRESERVED. Electronic format, layout and metadata, copyright 2007Voxant, Inc. (www.voxant.com) ALL RIGHTS RESERVED. No license isgranted to the user of this material other than for research. Usermay not reproduce or redistribute the material except for user'spersonal or internal use and, in such

case, only one copy may beprinted, nor shall user use any material for commercial purposes orin any fashion that may infringe upon Thomson Financial's or Voxant'scopyright or other proprietary rights or interests in the material;provided, however, that members of the news media may redistributelimited portions (less than 250 words) of this material without aspecific license from Thomson Financial and Voxant so long as theyprovide conspicuous attribution to Thomson Financial and Voxant asthe originators and copyright holders of such material. This is not alegal transcript for purposes of litigation.]

**---- Index References ----**

Company: UNION PACIFIC CORP; INFORMATION MANAGEMENT CORP; STRATEGIC INTERNET INVESTMENTS INC; DEAN WITTER DISCOVER AND CO; AMERICAN V SHIPS MARINE; MERRILL LYNCH; **NORFOLKSOUTHERN** CORP; INTERNATIONAL MICROWAVE CORP; DENTAL HEALTH RESOURCES INC; INTERNATIONAL MILLENNIUM CONSULTANTS INC; KAZAKHSTANCASPISHELF JSK; MORGAN STANLEY; SOCIÉTÉ FINANCIAL SA; SITE (NETHERLANDS); JEFFERSON CAPITAL CORP; CONSOLIDATED RAIL CORP; CSX CORP; BARRA INC; INTERNATIONAL SYS MKTG INC; CONRAIL INC; CHARLES AND COLVARD LTD; FEEDER ASSOCIATE SYSTEMS; INTERAMERICAN MOTOR CORP

News Subject: (Corporate Financial Data (1XO59); Economic Statistics (1EC52); Economics & Trade (1EC26); Economic Indicators (1EC19))

Industry: (Freight Transportation (1FR88); Land Transportation (1LA43); Railroads (1RA98); Investment Management (1IN34); Trucking (1TR88); Securities Investment (1SE57); Metals & Mining (1ME07); Railroad Equipment (1RA68); Passenger Transportation (1PA35); Passenger Railroads (1PA89); Transportation (1TR48); Steel & Iron (1ST73); Freight Railroads (1FR84); Financial Services (1FI37); Traffic (1TR52); Natural Resources (1NA60); Stocks (1EQ09))

Language: EN

Other Indexing: (BANC OF AMERICA; BLUE STREAK; BLUE STREAK TRAIN; CHARLES; COLUMBUS RICKEN BACKER; CONRAIL; CSX; FAS; FHWA; FINANCIAL; GDP; HEARTLAND; IMC; ISM; KCS; LAMBERT; LTL; MARIS; MERIDIAN SPEEDWAY; MERRILL LYNCH; MOORMAN; MORGAN STANLEY; **NORFOLKSOUTHERN**; **NORFOLKSOUTHERN** CORP; NS; OHIO; PRB; RPU; SEALE; SITE; TAXATION; TRANSCRIPTION; TRANSCRIPTS; UP; UP NS; UNION PACIFIC; USERS; VOXANT) (Alabama; Bob Fort; Casualties; Corporate Communications; Credit Suisse; Drilling; Equity; Hank; Hank Wolf; J.P. Morgan; Jason; Jason Sandler; Jim Squires; Mark MacMahon; Marta Stewart; Rarely; Rickenbacker; Rob Kessler; Sal Vitalely; Scott; Scott Flower; SEC FILINGS; Steve; Steve Tobias; Thomas Wadewitz; Tony; Triple Crown; Western; Wick)

Word Count: 13867

**End of Document**

© 2013 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT PX0743

NewsRoom

11/8/05 Fin. Disclosure Wire 12:49:14

FD Wire
Copyright © 2005 CCBN, Inc. and FDCH e-Media, Inc.

November 8, 2005

Q3 2005 **BurlingtonNorthernSantaFe** Corporation **EarningsConferenceCall** - Final

OPERATOR: Ladies and gentlemen, thank you so much for standing by.Welcome to the BNSF corporation conference call hosted by Matt Rose.At the request of your host, all lines are in a listen-only mode.Later, we will conduct a question-and-answer session. [OPERATORINSTRUCTIONS] As a reminder, this conference is being recorded.

I would now like to turn the conference over to BNSF Chairman,President and Chief Executive Officer, Mr. Matt Rose. Please goahead.

MATT ROSE, CHAIRMAN, PRESIDENT, CEO, **BURLINGTONNORTHERNSANTAFE**CORPORATION: Thank you, Karen. Good morning, everybody. Welcome toour third quarter financial presentation. With me here in Fort Worththis morning is Tom Hund, EVP and Chief Financial Officer; Carl Ice,EVP and Chief Operating Officer; and John Lanigan, EVP and ChiefMarketing Officer.

Our presentation this morning is available by webcast, so I'll startby directing everyone's attention to our first slide regarding theforward-looking statements. And of course, this statement basicallycautions everyone that any forward-looking information presentedtoday could be affected by a number of factors including fuel prices,changes in economic conditions or my favorite, weather. Any of thesecould cause actual results to differ materially from any forecastinformation we provide today.

Let's take a look at our results. We're very, very pleased to reportrecord quarterly earnings per share of $1.09, which is an increase of42% over adjusted third quarter results last year. We were able toaccomplish this in spite of operational issues due to the hurricanes,accelerated maintenance in the PRB and snowstorms in the northernplains.

Freight revenues increased 18%, to a record quarterly high of $3.2billion. Of the 18% increase in revenue, 4% was unit growth, 6% wasattributable to price, and another 7% coming from fuel surcharges.John will give you his report on all of the components by businesssegment in his review.

We continue to realize more value for our services and improved ouroperating leverage, which was clearly evident in the 360-basis pointimprovement in our operating ratio, down to 75.8%. Carl will providean overview of our key productivity measurements and the fluidity ofour network. Now I'll turn it over to Tom for a detailed review ofour financial results. Tom?

TOM HUND, CFO, EVP, **BURLINGTONNORTHERNSANTAFE** CORPORATION: Thanks,Matt. Earnings per share in the third quarter was an all-timequarterly record of $1.09, which was 42% higher than the adjusted2004 earnings per share and almost double third quarter 2003 earningsper share. As you recall, 2004 third quarter earnings included theimpact of $465 million pre-tax charge for change in estimate ofunasserted asbestos and environmental liabilities. So consequently,for comparative purposes, we have incorporated an adjusted 2004measure in our financial metrics to exclude the impacts of thischarge.

Quarterly income -- or operating income in the third quarter was alsoan all-time quarterly record of $778 million, an increase of $213million or about 38% higher compared to adjusted 2004 operatingincome. The increase in operating income was driven by freightrevenue growth of 18% and continued strong cost control.

Third quarter operating ratio of 75.8% decreased more than 350 basispoints from the adjusted 2004 operating ratio of 79.4%. And as alwaysJohn will cover revenue and now I'll give the details on expenses.

Operating expense was $2.539 billion for the quarter. When excludingthe 2004 charges for asbestos and environmental expense, operatingexpenses were 14% higher than 2004, of which more than half of thisincrease was driven by higher fuel expense in addition to the 5%increase in gross ton miles. The composition of our expenses isgenerally in line with what you have seen before with the exceptionof fuel, which is now about 20% of th total.

Compensation and benefits expenses was $900 million, up 5.5%.Employment increased 5% from 2004 to 2005, with the increaseprimarily in transportation. While compensation and benefits foremployee was up about 0.5%. In the fourth quarter of 2005, we expectboth employment and compensation and benefits to be about 5% higherthan the fourth quarter of last year.

Purchased services were $432 million for the quarter and in line withprior guidance. The BNSF Logistics, which continues to showsignificant growth, impacted our purchase transportation cost by $11million, which is offset by similar increases in other revenue.Additionally, as was mentioned in previous quarters, customer storageat our intermodal facilities was reclassified to other revenue during2005. So when excluding BNSF Logistics and the effect of thereclassification, purchase services was up about 12%. This increasewas primarily due to higher volume-related cost for ramping services,locomotive and equipment contract maintenance and haulage, and in thefourth quarter of 2005 we expect purchased services to be about $440million.

Depreciation expense was $271 million and in line with prior guidanceand we expect fourth quarter depreciation expense to be about $280million.

Third quarter equipment rents expense was $223 million, an increaseof $13 million due to stronger volumes we experienced and higherlease rates. In the fourth quarter we expect equipment rents to beabout $235 million. Material and other expense was $214 million. Andwhen excluding the 2004 third quarter $465 million charge, materialand other expenses were down 4% compare to the third quarter of 2004.In the fourth quarter, we expect material and other to be about $215million.

And finally, fuel expense of $499 million was 50% higher, principallydue to record high fuel prices. And we expect fourth quarter fuelexpense to be about $615 million. So in summary, we expect fourthquarter operating expenses to be about 16% higher than the fourthquarter of 2004, of which about 60% is attributable to higher fuelexpense. Looking a little closer at fuel, in the third quarter,average fuel price per gallon was $1.89 before hedge or $1.43 afterhedge.

Turning to our hedge position, we're about 45% hedge for the fourthquarter with two-thirds of our hedge covered by swaps and theremainder using collars. And as we look forward to 2006, we're about27% hedged in total. As you can see in the slide, the hedges declinethroughout the year from 39% in the first quarter to about 15% in thefourth quarter. This reduced hedge position will be partially offsetby improved effectiveness of our fuel surcharge program. Obviously,fuel charges will have an impact, but we expect to headwind on netprice of about $150 million year-over-year.

There is no change in our capital commitments from last quarter andwe anticipate 2005 total capital commitments to be about $2.150billion.

Other expenses for the third quarter was $16 million compared toother income of $5 million in 2004, which included a large state taxrefund that accounted for the majority of the year-over-year change.We expect fourth quarter to be an expense of around $5 million. Thethird quarter tax rate was 37% and we anticipate it to be about 38%in the fourth quarter.

And finally, turning to our share repurchases, we bought back about2.4 million shares in the third quarter. Outstanding shares are about20% lower since the share repurchase program began in 1998. Now I'llturn it to over to John for a detailed look at freight revenues bybusiness segment.

JOHN LANIGAN, CMO, EVP, **BURLINGTONNORTHERNSANTAFE** CORPORATION:Thanks, Tom. Third quarter was an all-time record for BNSF in bothvolume and revenue. Coal, Industrial Products and Consumer Productshad all-time quarterly revenue records, while Ag had a record thirdquarter for revenue.

Our revenue growth is due to several major factors. First, revenueton mile growth of 5%, which was driven by the continued economicexpansion, record container imports, the continuing impact of lastyear's record grain crops, as well as strong exports and strongutility demand. Second, ongoing success with price increases, whichis reflective of the overall tightness in surface transportationcapacity and higher RCAF. And third, fuel price recovery. We builtabout $200 million more in fuel surcharge than a year ago, driven byrecord fuel prices during the quarter, as well as increasedparticipation. All four business segments has strong revenue growth,which I will cover in more detail a few minutes.

Fuel surcharges for the second quarter showed a year-over-yearincrease of about $200 million. In the third quarter, our direct fuelsurcharge program was about 70% effective in recouping higher fuelprices. The increase in fuel surcharge revenue reflects a combinationof higher fuel prices, higher account participation rate and highervolumes.

Turning to the business units now, Coal had a record quarter withrevenues of $622 million. Third quarter RCAF was up 6.1%, which droveCoal's average price increases of about 3%. NCTA nominations continueto be very strong, as utility demand in BNSF coal territorycontinues. Third quarter tons of $66.3 million exceeded the samequarter last year by about 1%. The PRB joint line performance wasaffected by track and mine maintenance, which Carl will discuss inmore detail in a few minutes. We continue to receive inquiries and towork with eastern utilities regarding the transportation of PRB Coalto their facilities, which confirms our belief in strong PRB coalmarkets.

In our Ag Products business unit, revenues were up 25%, setting athird quarter record. PNW export volumes were up about 5% compared tothe prior year. Gulf exports were up 56% due to increased corn andwheat shipments. Another driver of revenue growth was in oil seed andsoybean meal, with volumes up 29% due to increase exports from Texasto California. This segment comprises about 30% of the smallercommodities that are grouped in the Other category.

Industrial Products revenues were up 17%, an all-time revenue recordfor any quarter. Units were down 2% driven by less dredge businessthan in 2004, the impact of Hurricane Rita and maintenance outages attwo [Takenite] plants during the last two weeks of September.However, the volume decline was offset by improvement in yieldquality and higher fuel surcharges.

Consumer Products broke another all-time quarterly record withdouble-digit growth in all but one segment. International grew nearly30% as we continue to see strong import demand on the west coast. Infact, about 75% of our total volume growth in the third quarter camefrom this segment.

Our Domestic Intermodal Segments continue to benefit from tight truckcapacity. Our Truckload Segment grew 26% for the quarter and ourPerishable Segment grew 16%. And finally, our Auto franchise grow35%, benefiting from a new Honda plant in Lincoln, Alabama and someGM used vehicle business that we started handling in October of lastyear.

Looking forward, we expect to see continued growth during the fourthquarter of 2005. Coal demand is very strong and our outlook remainspositive for the fourth quarter. In Ag, we expect PNW and Gulfexports to remain strong. Industrial Products should continue to seerevenue growth from yield improvement and fuel surcharges, offset bya reduction in waste products volume in the fourth quarter due toless dredge products. And in Consumer, we expect to experience solidgrowth driven by continued strong demand for international anddomestic truckload services. We believe trade growth via the westcoast to be

exponential to GDP growth, and truckload growth tocontinue as a result of the tight truck capacity. Overall, we expectanother positive quarter with revenue growth in in the mid-teens.Carl?

CARL ICE, COO, EVP, **BURLINGTONNORTHERNSANTAFE** CORPORATION: Thanks,John. The key areas we'll be discussing are service and productivity,highlighting our successful focus on maintaining a fluid networkwhile we expand network capacity with various productivityinitiatives. As Matt mentioned, we have had to work around severalissues -- we had to work around several issues during the thirdquarter. In July we discussed our maintenance plan in the PRB. Wehave completed the double track maintenance on schedule and are wellthrough the triple-track portions. We have recently made someadjustments to this plan to accommodate more loadings, although allcritical items of the plan will be completed.

Also during the quarter, we had to manage around coal minemaintenance and weather-related production issues at the mines. Goingforward, our loadings have already started to ramp-up. For instancein the numbers we'll announce tomorrow, we'll show an 8%year-over-year increase to the same week last year and we should bestrong in the fourth quarter. Next year we will have ongoingmaintenance in the PRB but our additional capacity that is comingonline will enable our to handle more volume.

As to the hurricanes, of course you all know a great deal about thoseand certainly, a number of people have been impacted, including ouremployees, and our thoughts stay with them. As to the railroad, our-- our prepreparation served us well as did the path of the hurricane-- hurricanes rather, to our geography. And with that, our facilitiesweren't greatly impacted and our operations started back up prettyquickly. Typically, we wouldn't have a discussion with you about --about the impacts, but we thought this is a time that furtherdescribing the -- the underlining dynamics would be helpful.

What happens as we make preparations like this is we'll stop the flowof cars into an area. So in other words, we stop the pipeline of carsmoving in. And we move cars away from the area and shut ourfacilities down so they won't be damaged greatly. With that then, wecurtail the production, and of course in this case, the facilitiesalso being shutting down, with some still not back online, we wind upas our operations start up with much larger queues than normal thatwant to move into the area. these cars into the area. As we thenbegin our operations back, we start to move in these cars into thearea. And frankly, we got more cars moved into the area than weshould have and that created some congestion for us and also had someoverimpacts on locomotives associated with that extra inventory. Allof that led to some impacts on our inventory and overall our velocitymeasures. So when you add it all up, the direct operating expenseimpact from the hurricanes won't be great, but it did have someimpact on our measures and our velocity.

Now as we turn to our -- our traditional measures of service, asusual, we'll put that in context with showing the volume growth thatwe have had. You can see that our GTM's and unit miles were up 5% --5% and 5.4% respectively in the quarter. And an incredible 21% and25% since 2002.

Taking a look at service for the quarter, our on-time performance wasslightly below last year, that was a direct result of the issues wehave already talked about. Of course it's important to say, we're notsatisfied with this level of service and we're working diligently toimprove it.

Now you can see the impacts even more so in our velocity measures. Ofthe drop here, the vast majority about 70% of that was related tocoal, where we have an overusage of assets in relation to the volumesthat we're moving. But we can really see all of that better, I think,as we go to the segmentation in the inventory slide.

Our inventory is up about 6% year-over-year, and our units are upless than that. This is the first time we've had that relationshipthrough our growth period. And if you segment it, I think it helps tounderstand what is going on here. First, the majority of the increasewas in coal. We well discussed that, this is something we'll getthrough as this quarter unfolds and quarters going forward. And thenmerchandise had the impacts from the storms we already described.Those two things together did have impacts on our locomotive fleet,and the usage of that. So that had some impacts in the intermodal,which was the next

largest increase. And also we positioned someextra equipment in so we would be prepared to handle the fourthquarter ramp -- additional volume increases that John describedduring his segment.

Now with all of that, we still managed to keep our network fluid andwe'll expect that to be the case. And our inventory levels shouldshow improvement after Thanksgiving. Now one of the key ways we havekept our network fluid, as we have discussed with you before, is theutilization of our existing capacity. One of those key measures isunits per train. And you can see once again in the third quarter, wesaw good improvement, a 4% increase year-over-year.

Now, that same capacity help also is a productivity improvement, aswell, and as we turn to our productivity slide, you can see that andour other initiatives did have -- did create a slight increase inproductivity despite the fact that we have hired a significant numberof employees since 2003 and put employees in position for our heavyfourth quarter volume and as well as the attrition that will start --that you always see in the first quarter of next year. In summary, aswe move forward, we'll continue to focus on the network and velocityand we'll work hard to better utilize our assets and improveproductivity.

MATT ROSE: Thanks, Carl. Let's take a look at our outlook for thefourth quarter. We expect freight revenue growth to continue in themid-teens reflecting the strong current demand and yieldimprovements.

As Carl indicated, some of our operating metrics slipped in the thirdquarter. I believe we're taking the necessary steps, though, to keepour network fluid. We're focused on balancing profitable growth andimproving our operations to maximize the overall network capacity,which should result in an operating ratio of about 76% in the fourthquarter, which is an improvement over last year. An increase inearnings per share of about 25%, which will include $0.04 as a resultof JB Hunt arbitration decision. For the full year we expect ROIC toexceed 9% and free cash flow after dividends to exceed $500 million.

Last week there was an SDB hearing on the 25th anniversary of theStaggers Act. Some of you participated and we appreciated your input.One of the primary themes we heard from almost every constituent wasa concern over rail capacity reflecting the change in demand forsurface transportation. This increase in shipper demand for railtransportation will allow us to realize increased value for ourfranchise, make prudent additions to capacity and also providesuperior returns for our shareholders. With that, Karen, I thinkwe're ready to open it up for questions.

OPERATOR: Very good. [OPERATOR INSTRUCTIONS] Our first question comesfrom the line of Scott Flower. Please go ahead, sir. From Citigroup.

SCOTT FLOWER, ANALYST, SMITH BARNEY CITIGROUP: Good morning all.

MATT ROSE: Good morning, Scott

SCOTT FLOWER: Hi, just a few questions. I wanted to get a sense of --I know that Carl showed us some of the charts and productivity andobviously over the last couple of years you've had enormous increasein volumes. But obviously, that trend line has been flattening as welook '04 toward '05. Are we finding that as the network gets muchtighter that some of the gains in productivity are waning? I'm justtrying to get a better sense of how you look at productivity relativeto the sharp ramp. And I understand you had a sharp ramp over thelast few years versus where we may go going. I guess the chart I'dpoint to is on page 33 that you all showed.

CARL ICE: Well, that -- that chart is the GTM's firm employees count?

SCOTT FLOWER: Yes, and miles, I think, as well.

CARL ICE: Yes. Well, you correctly described how the third quartercompared to last year in the third quarter. If you do do a compoundover the last few years though, we still see solid improvement.Certainly, it's gotten harder over the years as we --

as we madeimprovements to keep making improvements, but I expect that long-termwe'll do better than this. We'll return to 1% or 2% improvement inproductivity.

SCOTT FLOWER: Okay. Just a couple of other quick ones. In the -- Iguess late September, early October timeframe you all had a prettysignificant derailment on the Trans Con and that obviously hadripples across the network. And I guess the question I have got thereis -- and I know this is a complex issue and obviously do the bestyou can to simplify it. But are you getting so tight up againstcapacity that small, little events -- and this is obviously a bigevent -- have fairly disproportionate impacts? I guess why I'm askingthis is, how tight are you up against capacity in different parts ofthe Trans Con?

And secondly, does this protend that we need to spend a little bitmore inclemently on CapEx? Whether it's relocos, whether it's forincremental sidings or signaling -- I'm just trying to get a sense --because obviously that detailment has a substantive impact on yourvelocity measurements. And I don't think you really have fullyrecovered to date from the events in Illinois.

JOHN LANIGAN: Take that one? Why don't you start, and then I'll add acouple --

MATT ROSE: I mean, certainly, as -- as we had the big volumeincreases we talked about a number of times, we can't just shrug offan incident like we once could. With 20% more GTM's than we had in2002, it makes it more difficult. But we have added capacity as wehave come along as well, so I think what you should expect to seegoing forward as we have impacts that -- that we -- they are harderfor us to work around, but that we'll still recover. Some of that,then underscores what we have talked to you in previous discussionsabout how important reliability of the equipment and infrastructureis. And we'll continue to drive those at the same time.

We will have to add some capacity as we go forward so we can bepositioned for maintainability. That -- that's perhaps as big ofimpact as anything as we -- as we drive higher reliability of ourinfrastructure, then we'll have to be doing maintenance and we'llhave to have a network that we can do maintenance while the trafficstill moves. So that could be some of the focuses you see on capital,moving forward.

JOHN LANIGAN: I would just add, Scott, if you look at year-over-yearwe're spending our capital, we're getting our twice the amount ofexpansion capital. And quite frankly, when we get to things like theTrans Con, the expansion capital really is to be able to providereliability and provide maintainability and provide recoverablity, interms of the types of interruptions that we, of course, want to doaway with all together.

SCOTT FLOWER: So should we expect CapEx to go up next year?

JOHN LANIGAN: We haven't decided. We haven't finalized our CapExplan. But our big question, as it's been every October of the last 3years, 2 years at least is, what is the growth number going to be?And we're not done with our planning models yet. And I think when westep back and try to put perspective on -- from our -- our context ofwhy we're struggling with -- with some of our fluidity, it's verysimple to me. It's -- we handled about 950,000 units in '04. That wasover45% of the entire industry growth. This year, it looks like we'reon track to do about 500,000 units more, which is just incrediblegrowth. And we don't see any structurally that prevents us fromhandling that. Our -- our only problem is being able to plan what wethink the demand line is going to be to where we need to spend themoney. So I don't think that there's any structural problems. It'sjust we got to get the input number correct, going into it.

SCOTT FLOWER: Last quick question for Tom. Why was the comp foremployees so low? Was that a mix effect from all of the new hires? Or-- I wouldn't have anticipated the comp per employee to be up onlyhalf a percent. Maybe you may have explained that previously. Shouldwe expect that type of unit inflation going forward? Is that due tomix? Help us to understand that a little better. And then I'll letsomeone else have it.

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works. 

TOM HUND: We talked about this a little bit at the second quartercause we saw a comparable phenomenon there. I think some of it isthat the comps year-over-year in that last year, we worked some ofour employees more overtime and had certain arbitrations they gotpaid for, things like that. Additionally, this year incentive comp isa little lower. I think that all those things go together to say that-- comps for employees has been flattish to up very slightly, boththe second and the third, and I think we probably expect that for thefourth quarter. And I think after that it probably starts to be amore normalized inflation offset by some initiatives.

SCOTT FLOWER: Thank you.

OPERATOR: Thank you our next come comes from the line of EdwardWolfe, Bear Stearns.Please go ahead.

EDWARD WOLFE, ANALYST, BEAR STEARNS: Hi, guys. Just a couple of quickfollow-ups before some other questions. The head count growth you hadgiven was 5% going forward? Is that fourth quarter year-over-year?

TOM HUND: Yes. Yes, fourth quarter year-over-year and it was alsothird quarter year-over-year.

EDWARD WOLFE: And the $0.04 that you noted of the gain from the JBHunt arbitration, is that included in your fourth quarter 25%guidance?

TOM HUND: Yes, it is.

EDWARD WOLFE: So it's a $1.10, give or take, once you include -- netof the $0.04 of JB Hunt. $1.14 with JB hunt?

TOM HUND: That's directionally right.

EDWARD WOLFE: Okay. Just want to make sure I'm in the right --

TOM HUND: Yes.

EDWARD WOLFE: Hey, John, you talked about the fuel surcharge, and Ithought you said a number something like -- you're getting aneffective 70% of the surcharge. Are you talking about 70% of yourvolume? What was that similar number a year ago?

JOHN LANIGAN: Yes, that's -- that's 70% coverage of the increasedfuel expense related to our volume and revenues. So -- and comparedto a year ago, we were probably, this time last year, in the 60%range.

EDWARD WOLFE: Okay. On the PRB stuff, Carl, you mentioned that weshould see better numbers on Thursday. Can you talk a little bitabout why that's ramping up? We have heard some issues that perhapsyou guys were going to slow down some of the maintenance to allowsome of the log jam to free itself. Is some of this that you'repushing out maintenance, going forward? And when do you think we'regoing to be through it, at this point?

CARL ICE: Okay. First, we did adjust the maintenance plan a week orso ago -- maybe 2 weeks ago.

MATT ROSE: 10 days ago.

CARL ICE: 10 days ago. Thank you, Matt. And in that we eliminated thenight shift on undercutting. So that was done to accommodate moreloadings. We did have, earlier in this month, one of our mostsignificant days of work. One of our -- one of our most complicatedareas with a bridge in the middle of two other tracks and a hill andso forth. So that was part of the impacts that you saw in the firstcouple of weeks. So you would have seen some natural ramp-up afterthat. But the combination

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works. 

of the change -- changes in the plan, andwhere we will be doing the maintenance as we go through the rest ofthe year should help us to continue to load.

In terms of when we're through it, we -- as we have alreadyindicated, next year we think we'll be better positioned to handlemore volume. We'll have a longer plan horizon. We'll have a full yearof the capacity we added this year. We'll have capacity that comes online next year. All of that should help us.

Now, we will have another significant year of undercutting. Comparedto the 4 years before this year, it -- it's a fair amount bigger. Wewon't have the concrete type program. We won't have bridge work,we'll have a lot fewer turn-outs, a lot less rail, just to be reallydetailed for a moment. And given the areas we worked in this year,being the most critical and the most difficult, then next year we'llhave a maintenance program that will be -- still be a significantprogram, but we should be well-positioned to add more volume.

MATT ROSE: As far as this year, Ed, it kind of depends on MotherNature. Our plan is to work through the first week of December. Andof course, if we have significant weather before that, that will becurtailed. And the whole goal is to get the railroad set to go intothe deep freeze up there. And so you'll see, I believe, certainly bythe first week of December, the -- after the first week of December,all of the maintenance will be done. And assuming again, that we havegot some normal type of winter weather, the railroad ought to openup, assuming the mines can stay up with us and loadings ought toincrease.

EDWARD WOLFE: Assuming all those puts and takes and that you make itthere in there any first quarter of next year, what do you thinkcapacity could grow if the volume were there for you? Could it grow10%?

MATT ROSE: Well, when we think about next year's coal number, I thinkyou have to -- it's kind of all over the ballpark. But it's going tobe big, however you look at it. The -- I'm not sure that the -- themines nor the railroads will be able to fulfill all of the marketdemand. And of course, part of that market demand will be restockingof coal inventories.

So we haven't -- we haven't seen the final forecast from ourcustomers. But I -- I think from a total PRB standpoint, you couldsee a market demand in the 50 to 70 millions tons. And at the upperend, quite frankly, I'm not sure the mines could load out that kindof -- and if they could, quite frankly, I'm not sure the railroadscould handle it. So the real organic growth, if you will, ofnon-restocking will probably be about half of that. And so we'reexpecting, at BNSF, to gear up to be able to handle in the -- in theballpark of 20 to 25 million tons a year more in '06 more than '05.So it's going to be significant. And we're going to, I believe, havethe assets in terms of coal sets and power and crews to be able tohandle that kind of growth.

EDWARD WOLFE: That's very helpful. Thank you. Just one quick follow-- question on the cash flow side. There's an offset in the CapEx,the $447 million you reported in the quarter, a positive of $320million. Is that from selling equipment? Or what is that $320 millionof cash that came in?

TOM HUND: I'm not sure, Ed, what are you referring to? Where are yougetting the $337 from?

EDWARD WOLFE: I'm looking on the cash flow statement.

TOM HUND: There shouldn't be anything in CapEx.

EDWARD WOLFE: There was a CapEx of $447, and then there was a $320***o***ffset of that - a positive. It's in other net, I'm sorry,

TOM HUND: Within investing activities. That's timing of equipmentfinancing. That's just when you get the funds versus earlier in theyear. We gather equipment until we have critical mass and then wefinance. You just get that flopping over quarter over quarter,typically.

EDWARD WOLFE: That's just timing of the cash?

TOM HUND: Yes.

EDWARD WOLFE: Thank you very much, guys, for all of the time.

TOM HUND: Thank you.

OPERATOR: Thank you. We have a question from the line of Ken Hoexter,Merrill Lynch. Please go ahead.

KEN HOEXTER, ANALYST, MERRILL LYNCH: Hi, great. Good morning. John,could you talk a little bit about where -- what percent of revenueshave yet to be repriced as you go through the addition of fuelsurcharges? What percent you still have left to kind of renew on thecontract basis?

JOHN LANIGAN: From a standpoint of fuel surcharge coverage, Ken?

KEN HOEXTER: Yes.

JOHN LANIGAN: Well, we have got about 70% coverage right now, so wethink effectively, we ought to be able to get up into the low tomid-90s in the longer-term. We still have 20 plus percent left to go.

KEN HOEXTER: And then, Tom, you keep some hedge on the exposedportion of fuel going forward on a continuous basis, if you expectabout 90% coverage?

TOM HUND: I would say we haven't made that decision. We have a verysmall amount hedge growth, about 3%. And I think going forward we'lljust -- we'll look at what we think is most appropriate.

KEN HOEXTER: You mean '07?

TOM HUND: I'm sorry, '07. Yes, '07 is about 3%, yes.

KEN HOEXTER: Last question. John, could you give us an update on theports as we go through peak season now? Obviously, we're seeing ashift of some commodities away from Houston during the hurricanes.And you saw some great growth in some of the Pacific Northwest portsand also some of the east coast ports. Are you seeing capacity flowpretty smoothly?

JOHN LANIGAN: We actually are, Ken. They've done a much better jobpreparing for this peak than last year. I think with things like thePeer Paths Program in southern California, we're just seeing arenewed emphasis on productivity. There is still a lot of latentcapacity for them to continue to exploit in the years to come, but --but things look much, much better this year than they did last year.

KEN HOEXTER: Great. Thanks.

JOHN LANIGAN: Thanks, Ken.

OPERATOR: Our next question comes from the line of James Valentine,Morgan Stanley. Please go ahead.

JAMES VALENTINE, ANALYST, MORGAN STANLEY DEAN WITTER: Thanks. Greatquarter, guys.

MATT ROSE: Thanks, Jim.

JAMES VALENTINE: First, in terms of the momentum that you have beenbuilding throughout the year on pricing. And I think even last yearwhen you had a 5% pricing, I think you guys were a little cautiousand said, hey, that may be not be sustainable, and here you have 6%.So I applaud you guys for seeing the momentum. But it just seems tobe your guidance here for the fourth quarter doesn't seem to have themomentum continuing into the fourth quarter here. And I'm justwondering is that a bit of BNSF's conservatism on guidance? Or isthere something that you think -- is there some reason that thismomentum is slowing?

TOM HUND: Well, Jim, I think first of all, if you look at the -- say,the third quarter of '04 compared to the fourth quarter of '04,you'll see the fourth quarter is a much tougher comparison. You endup -- I think fourth quarter last year, the operating ratio was about77 compared to the 79.4 whatever it was for the third quarter. So Ithink we're saying -- if you look at third quarter of '05 versusfourth quarter of '05, the quarters look fairly comparable. $3 plusbillion dollars of revenues, 76 OR. It's just that you are into amuch tougher comp when you finally hit fourth quarter of '04.

JAMES VALENTINE: Okay. Second question is, on the 25 tons on the PRB,Matt, I assume that's your tons not total tons, right?

MATT ROSE: 20 to 25 million tons on BNSF.

JAMES VALENTINE: Okay. That's going to be about what, 10% coal growthrate?

MATT ROSE: In that order of magnitude.

JAMES VALENTINE: And could you address the issues I have been readingfrom the trade journals about a lack of of coal sets as a potentialconstraining factor? I would love nothing more than to see you and UPsee 10% coal volume growth next year. But I'm just wondering, is thispotentially going to be another -- next year we'll have anotherbottleneck, and it's not going to be maintenance and it's not goingto be the mines, but it could be a lack of coal sets?

MATT ROSE: I -- I don't really think that coal sets will be the longpole in the tent, Jim. I think it's going to be making sure that themines load-out capacity can handle that kind of volume, and therailroad fluidity of the joint line in the network. We're going topush this thing really hard. But I think we have got, right now, wehave got -- our problem is almost the reverse. We have got too manyassets for the volumes that we're handling, causing quite frankly,congestion of the assets. So I think given, when -- when I know oursets are coming on and when I have seen our utility sets coming on, Idon't think that coal sets will be the long pole in the tent.

Again, if I go back to this unabated demand number of what -- ifeverybody wanted to increase their stockpiles and replenish plus theorganic growth, so kind of three legs of the demand stool, I thinkyou would see a number as high as 60 to 70 million tons of unabateddemand. I'm not sure that the coal sets are there for that kind ofnumber.

JAMES VALENTINE: Great, okay. One last coal question. The fact thatwe've seen the tube spike in PRB coal pricing recently, I guess it'sa good and bad news story. And I wanted to get your thoughts on them.On the one hand, you see these really high prices here. That could bea sign that it's going to tougher for the railroads to really extracteconomic rents relative to eastern coal. On the other hand, you couldsay that, look it truly shows that this is a tight market and demandfor PRB coal that we can see -- $5, $10, $20 a ton type increases.Can you give us some thoughts on what this allows -- what kind ofsignal this sends to you? Or what this allows you to do longer-term,on pricing?

MATT ROSE: Well, I'm not sure I really understand all of the driversof coal commodity pricing anyway, so I'm -- I certainly don'tunderstand the natural gas commodity pricing. And I think to somedegree,e coal commodity pricing may be reacting to what we're seeingin terms of gas prices. And, quite frankly, I think also that themarket perceives that we're not satisfying all of the demand outthere on the rail side, so coal commodity pricing has been going up.I think as the railroads improve their fluidity, as we start tosatisfy more of that demand -- I can't forecast what the impact willbe on coal commodity pricing. All I know, on

the rail side is, thatwe have very, very strong demand outlook -- forecast from ourcustomers. And at the end of the day, what our customers want us todo is to make enough money to significantly reinvest in our coalfranchise, and that's what we're going to do.

JAMES VALENTINE: Okay. Great. Thanks guys. It has been a greatquarter.

MATT ROSE: Thanks.

OPERATOR: Thank you our next question comes from the line of JohnBarnes, BB&T Capital Markets.

JOHN BARNES, ANALYST, BB&T CAPITAL MARKETS: Thanks. NIce job on thequarter, guys. Matt, could you give us an idea -- you talked a littlebit about head count increase in the back half of this year. As youlook into '06 and you are talking about the growth opportunities likewith coal just now, what do you see in terms of head count outlookfor '06?

MATT ROSE: Well, again, we don't have our plan set for '06, but ifyou can get your head around 3% GDP, our units will probably grow inexcess of that because of our growth factors in intermodal and coal.We have got two things going on, John, just the natural current dayreplenishment of our work force as they retire. But we have also got-- we are spending a lot of time in our Company on our work-forceplanning model, as we look in the next five years. And we know thatwe have got just significant retirements because of the age of ourwork force. And so you are going to see us err on the side of pullingforward more new workers to make sure that we have properly trainedwork force to be able to handle the next several years.

So we haven't set our final plans on that but -- but you are going tosee us talk -- you are going to hear us talk a lot about our workforce planning model, and you'll see us put programs in place thatwill make sure that we attract and retain and that we position thisCompany for the next five year change. Because it will just beabsolutely critical and very, very significant to our Company.

JOHN BARNES: So you would rather been over-staffed in the near term,just to ensure that you'd never fall behind?

MATT ROSE: Going forward into '06, that is a true statement.

JOHN BARNES: Okay. Very good. You guys made the announcement -- yousold a lot of your containers to Swift, I guess, during the quarter.Could you give us an update on where that stands on further assetsales in the intermodal business?

JOHN LANIGAN: We're going to continue with the program over the nextyear to 18 months to really move out of the equipment realm in theintermodal business. We really believe in the model that ourcustomers bring private equipment to the table and that's the mostefficient model for the supply chain. And we're just going continueforward with that -- with that process at this point.

JOHN BARNES: Okay. And then lastly, I have read a couple of placesthat there have been some developing issues with concrete ties, thatthere has been some premature break down in the ties themselves andthe longevity is not as was promised. Have you all seen any problemwith that in your maintenance? And is that -- is that going result inpotential CapEx increase as you go into the next couple of years?

CARL ICE: I -- I don't think so, John. The -- the issue around coalis that the heavy axle loadings are significant, and we're learningmore and more about those as we go forward. And what is that isshowing us is we need to be very attentive to ongoing maintenancearound the concrete ties. For instance, having an undercutting cyclethat keeps the balance section good under them. And also railabrasion, making sure that there is a pad that goes between the railand the tie itself. And if that's not appropriately maintained, therail can get down to the tie and start to wear into the tie. Both ofthose things can destroy the integrity.

So we have got to make sure we are on top of those, and perhaps therewere some that may have underestimated that, but if that's all done,they ought to last okay. Again, it all comes back and underscores theimportance of things, like undercutting, as we've discussed.

MATT ROSE: And I think it's evidenced, John, by one of the majorprojects we had this summer in the PRB, is where we took a large woodtie section and replaced it with concrete ties. Without a doubt, likeCarl said, if you asterisk the coal story, there's really nosurprises with concrete ties. We have to maintain them, which we havealways known, but we're still committed to heavy axle loadingmountain-grade territories, curvatures, where we are very verysatisfied with concrete tie wear.

JOHN BARNES: Very good. Thanks for your time, guys.

OPERATOR: Next question comes from the line of John Larkin of LeggMason. Please go ahead.

JOHN LARKIN, ANALYST, LEGG MASON WOOD WALKER: Good morning, everyone.Question on the intermodal growth -- I think John said 70% of thatwas from international customers. What percentage of that camethrough ports other than LA and Long Beach? And now that LA and LongBeach has smoothed out their operation and the big ships are coming,would you anticipate some of that shifting back to LA in '06 and '07?

JOHN LANIGAN: Its's about a 75/25 split John, 75 in the south, 25 inthe north, plus or minus a few percentage points. I don't have thenumbers directly in front of me, but that's directionally correct.I'm not sure we'll see movement back -- I think a number of thesteamship lines have made commitments to the northern ports and arevery satisfied with the number of the improvements that those portsare making. And those ports are also becoming much more aggressive intheir capital expenditures and their marketing efforts as well. And Ibelieve that the steamship lines look at it as a good natural hedgegoing forward.

MATT ROSE: John, I'll just give you a little counter to that. I don'tthink it's so much a movement back. but I think as the San Pedroports prove they can handle volume, we'll see additional growththere. But it won't be a shift from Tacoma or Oakland, it will justbe that those ports will take a higher percent of the growth goingforward. And at the end of the day, if you look at any of thecontainer forecasts, all of these ports are going to have more growththan they can probably handle. And those ports that do a better jobwill be the ones that outpace the economy.

JOHN LANIGAN: I think the other piece, too, John, is with theincreased volumes, both we and the steamship lines are doing a betterjob of directing the right traffic to the right ports depending uponwhat the final destination is. Which is helping us build moreefficient and effective trains at origin points as well. For example,freight going to the Chicago area is gong to Seattle, as an example,because it makes a lot of sense from a transit time and directionlocation. And -- and freight going into the southeast is going intosouthern California, and I think we'll continue to work withsteamship lines to have the right freight go to the right port andthat helps as well.

JOHN LARKIN: I had another question for Tom on the so-called $150million of head wins that you'll be working your way through, I guessin '06. I gather that's because the hedges are winding downward thefuel surcharges aren't fully in place. Is that the correct read ofthat comment?

TOM HUND: That's exactly right.

JOHN LARKIN: Okay. One final comment, maybe for John Lanigan on thegrain experts through the gulf ports. Those were up dramatically. Iwas wondering if those were curtailed at all by of the hurricanes,and in fact would have been much greater otherwise.

JOHN LANIGAN: Probably just the opposite because the grain didn'tflow through New Orleans, it flowed through Houston. We participatedin that. Normally, on the corn side, normally wouldn't see that, thatwould go down the river to New Orleans. So we actually got a nicelittle push because of it.

JOHN LARKIN: I got it. Thanks very much.

OPERATOR: Thank you. Our next question in queue comes from RandyCousins, BMO Nesbitt Burns. Please go ahead.

RANDY COUSINS, ANALYST, BMO NESBITT BURNS: Good morning. Your balancesheet, given the level of profitability that you are reporting isimproving quite dramatically. You are generating high levels ofprofitability. Can you give us some indication of how you arethinking about spending the free cash flow between buy back, adividend increases, pension funding, potential acquisitions ororganic growth? Again, you kind of getting to that -- earning yourcost of capital, I think, a lot faster than you guys thought. How areyou going to allocate incremental dough?

MATT ROSE: Tom, you want to go through the -- ?

TOM HUND: Sure. I think actually -- first of all, there's no answerthat endures through all periods of time. But I think right now wherewe are is somewhere we have been for the last several years. Whichis, we'll look at, I'll call it discretionary cash, we've got, makesure that we look at what we see coming at us as far as volume, andthat was what Matt was talking about, not knowing exactly what we areplanning for '06. But some of that will obviously go for expansioncapital.

Then we'll look at our balance sheet. I think right now, from a debtto cap standpoint and coverage standpoint, we're in good shape. Soit's normal that we are going to shore that up.

And then from there, look at returning to shareholders and that's acombination of dividend and share buy back. Increased our dividenddouble-digit each of the last 3 years. Haven't made commitment thatwe'll do that every year, but I will tell you that next July we'lllook at the dividend again with the board, do what we think isappropriate and then also continue with an opportunistic sharebuyback program. More of the same is, I guess, where we are at rightnow.

RANDY COUSINS: Do you see it evolving or changing in the sense thatthere will be a greater emphasis on reinvestment back in the road? Oris it going to be a greater investment in emphasis with -- in termsof returning capital to shareholders as you share buyback ordividends?

MATT ROSE: We -- we think as long as we can see a clear path todouble-digit returns that that's the best way to return toshareholders. As long as we're comfortable with your businessbusiness model, you'll see us increase our investments. If we are notcomfortable with our business model, you will see us increase our --our cash flow back, in terms of dividends or stock rebuy backs.

TOM HUND: And hopefully, with growing earnings and cash flow, you areable to do both.

MATT ROSE: Absolutely.

RANDY COUSINS: Matt, I guess the short version then is that theemphasis in incremental cash flow -- I take it from what you'retelling me is that you're comfortable with the kind of returns yougetting in the business, but the emphasis is going to be put onreinvesting back into the railroad and expanding capacity.

MATT ROSE: We are comfortable that we are moving towards the point ofbeing comfortable with our returns. We have made significantprogress, and as long as we can continue to see a clear path ofcontinued improvement on our returns, we believe

our shareholderswant us to grow this business through operating income and net incomeand return both, as Tom said, through continued dividend increases,but also by increasing the revenue through that capital expenditurethat we'll bring to our Company.

RANDY COUSINS: Okay. Just coming back to slide 29, which is theon-time performance, clearly there's been a deterioration over thelast three or four years. Do you guys have any sense as to what thathas cost you in terms of operating ratio? And then conversely, whatis the opportunity that you can get back to the previous levels interms of operating ratio improvement?

MATT ROSE: I -- I don't think that we would say it's a meaningfulimpact. When we look at the -- the operating expenses of slow downand congestion, we can certainly do the math on equipment rents andalso excess crew payments. And we have done that math and it iswithout a doubt, it's in the millions of millions of dollars, butit's not in the tens of millions of dollars, so we know that for afact. We also know that as density builds on the railroad, it allowsus to optimize train size, which offsets or counter-balances some ofthose inefficiencies in terms of operating expenses and helpprofitability of the rail network.

We're more concerned on two issues. One is, increasing the velocity,which increases the service by providing more assets to be able toattack more demand. As well as we're concerned that we're notfulfilling the expectations of our customers. And we want to makesure that we get our service up so they will continue to look andview rail as a long-term strategy for diversion.

RANDY COUSINS: Okay. Final question, you guys previously indicatedthe number of test burns you were doing for 2005. I wonder if youcould give us any indication of what is coming down the pipe, interms of test burns for 2006? And then the potential to convert thesetest burns into actual contracts for the railroad, what is the statustoday versus your expectations for 2006? Are we just sovolume-constrained with the existing customers that the opportunityto take advantage of these tests burns just isn't there?

MATT ROSE: We have got about 13 test burns so far this year. Andwe've got about that many on the books right now, yet to do. Andthose will not all get done this year. Those will move into nextyear. And so that's kind of the standing demand right now for testburns, is about 13.

Clearly, with the demand of current customers, that puts someconstraints on even being able to do the test burns. But we will overtime, find the opportunities to get those done. And over time we dobelieve those present tremendous new market opportunities. And as wereturn to some more equilibrium in the market, we're hopeful that anumber of those will convert to contracts longer term.

RANDY COUSINS: At this point in time, though, none of the 13 testreturn burns that you have done today have converted to contract?

MATT ROSE: We have converted some to some permanent tonnage. Yes.

RANDY COUSINS: Can you give us an indication of how many? And whatkind of tonnage?

MATT ROSE: I don't have that in my fingertips.

RANDY COUSINS: Okay. Thank you very much.

OPERATOR: Our next question comes from the line of Tom Wadewitz, J.P.Morgan. Please go ahead.

TOM WADEWITZ, ANALYST, JP MORGAN CHASE: Good morning. Great quarter,guys.

MATT ROSE: Thanks.

TOM WADEWITZ: I have two questions for you. The first is with respectto capacity. I know you have had a couple of questions on thisalready. As you look at 2006, can you give us a sense of just roughlywhat type of volume you are planning for? And then if, as it has beenthe last couple of years, it's a lot better than that? What is the --how much head room is there in that? If you plan for five can you do10? Or after doing that for a couple of years, would that just reallyput the railroad in a state of congestion and so forth.

MATT ROSE: In '04 replanned for five and we did ten. In '05 we'redoing more than we planned for, as well. Certainly, if we planned forfive and did 10, over a number of years we would have significantproblems. But given that we are increasing our expansion capital, andI think we'll -- you will see us our fluidity return.

Our -- our objective here is to get that demand forecast is a littlemore in balance with the reality. And if we can do that, Tom, wereally think we have a high level of success. We'll restore ourfluidity where it needs to be and where it should be. So we're justtrying to ignore -- we -- having more demand than -- than capacity is-- it is a good -- it's a good position to be in, certainly beats theother side. But we have got to get our forecast more in line withwhat reality is and if we do that then it will really help from anoperating standpoint as well.

TOM WADEWITZ: Should we view that as a similar type of profile whereyou plan for mid single digits for '06 or -- ?

MATT ROSE: We just haven't finished our planning models for '06. Sowe're just not going to give a forecast on that we'll do that inJanuary and go through the whole year with you guys. But, again, Ithink it depends on how the -- the hurricane impacts, -- what -- whatI have seen is GDP in the 3% range. And we've said all along that wethink with our product mix of intermodal and at least short tomidterm with coal, that should grow in excess of that number.

CARL ICE: And as Matt has already said, if we run well more than weplanned for a long period of time, that's clearly difficult. But wewould expect longer-term to return to what we always do, which is toallow us some room to flex either way.

TOM WADEWITZ: Right. So Matt, to use your terminology a little bithere, what do you think the long pole in the tent is in 2006? Where,if those numbers are 10% again, you would really run into capacityissues? Is it on the track side?

MATT ROSE: No. If it's 10%, it will be power.

TOM WADEWITZ: Okay. So power is where it will be tight.

MATT ROSE: Yes..

TOM WADEWITZ: One last question for you. On the intermodal side, theyields were notably -- I mean, they have been very strong, but theyaccelerated above 12% year-over-year. I think they are about 9% insecond. How long do you think that continues? And how much of that12% is fuel surcharge? I know you gave us the overall numbers, Idon't know if you have given us the break down within intermodal.

JOHN LANIGAN: We don't break it down within the individual businessunits. We really have made good progress across all of the businessunits and coverage factors have continued to increase throughout theyear for fuel surcharge. But -- but also we have had a number ofcontracts come due over the last year, year and a half in intermodal.And we've been pursuing the yield management strategy that we'vetalked about for the last year, so .

MATT ROSE: And again, density -- as our growth happens in intermodal,density really helps yield in the business for our ability tooptimize our train profiles, train length, destination, et cetera. Weare able to take operating expense out, even in terms of some demandsthat are above our forecasts.

TOM WADEWITZ: It is possible that you see double-digit yield growthin intermodal continue for another couple quarters?

JOHN LANIGAN: It's always hard to predict the future. It depends uponwhat kind of volumes continue to come into the west coast and ifthere is any kind of disruptions on those volumes. We're going tocontinue to focus on our yield management programs. But -- we -- wedon't have the number of contracts coming due over the next couple ofquarters that we have had over the last six or eight quarters.

TOM WADEWITZ: Okay. Thank you for the time.

OPERATOR: Our next question comes from the line of Jordan Alliger,Deutsche Bank. Please go ahead.

JORDAN ALLIGER, ANALYST, DEUTSCHE BANK: Yes, just sort of one quickfollow-up question on -- on the performance, actually. Obviously, the-- the tight capacity and demand has led to the strength in pricing.I'm just wondering, from a longer-term, big picture standpoint,should we see more of a correlation between price and on-timeperformance? In other words, whether a pick up or continue to trenddown over time, will it sort itself out so that price is morecorrelated with that or -- or no?

MATT ROSE: You know, Jordan, it's a little heresy, but I would sayno. I think long-term, within some of our businesses, certainly thepremium business, as on-time performance improves you can make thatillustration that you will see that. In others of our business, whatwe've got to do is restore our velocity. Again, for our own sake toimprove our asset terms. And I don't think it has that much of acorrelation on whether or not service is better, whether or not pricewill improve. Because I can go back through the years and show youwhere prices -- where service improved tremendously and prices werefalling, so I don't think that that gate swings both ways. We have acertain segment of our business that you can say that about, but --but a large part of our business I don't think you can make thatcorrelation.

JORDAN ALLIGER: Thank you.

OPERATOR: Next question comes from the line of Jason Seidl, CreditSuisse First Boston. Please go ahead.

JASON SEIDL, ANALYST, CREDIT SUISSE FIRST BOSTON: Gentlemen, goodmorning. Only one quick one here. John, I believe you were talking afuel surcharge at 70% coverage and the goal over the longer-term isto get it to the mid-90s. Can you give us a sense of where you thinkit's going to fall for 2006?

JOHN LANIGAN: We think it will get up into the high 70s in '06.

JASON SEIDL: Thank you.

OPERATOR: We now have a follow-up from the line of Scott Flower,Citigroup. Please go ahead.

SCOTT FLOWER: Just two -- two quick ones for John. Has thedeminuation in ocean spreads and I know they are still relativelywide, starting have an impact on PNW grain? Obviously, the rate ofchange in third quarter was not as strong as it has been, you arelacking comparisons. But ocean spreads, although relatively wide,seem to be narrowing. Is that starting to have an impact on grainmovements?

JOHN LANIGAN: We don't see that at all, Scott, it's still over $20spread and we think that's wide enough to continue to push to thePNW. Additionally, when you look at the dislocation from New Orleansand the port of Beaumont, Texas basically being wiped out duringhurricane Rita, that just creates a structural issue to deal with aswell. So we don't see any shift in demand at this point, away fromthe PNW.

SCOTT FLOWER: The other question, which is broader is, obviously youraverage pricing has been accelerating -- is there a point at which,between fuel surcharge and just base price that versus the value ofwhat you are moving, you start to create some dislocations in theproduct markets? Is there a point at which that price number has todecelerate for no other reason, related to competition with UP, whichI know you compete in trucking cost, versus just what is going on inthe product market that you are serving?

MATT ROSE: I'm sure there's point in there, Scott, that if we everget into that point we're not doing our job.

SCOTT FLOWER: So you take it you don't think you're anywhere nearthat point?

MATT ROSE: Well, I'm not saying that. I think in certain markets ourjob as -- on the railroad marketing side is to find that point ofindifference and move toward that. And if you ever cross it thenwe're not doing the job, from marketing standpoint. As long as we'regrowing in a number of these markets, we haven't reached that point.

Now we certainly have told -- have told you all in the past, that weare in the three or four year period of repricing the whole book ofbusiness with the change of what we have seen in these transportationmarkets, from a demand-supply. We shouldn't expect to see this typeof value created, in terms of just the price piece, over the nextfour years as well. But I -- I don't think that we have seen, we --we don't believe that we're to the point where we have pricedourselves out of markets. We're not trying to demarket our railroad,we're not trying to move traffic off our railroad, we're trying tomove prices up that reflect the demand levels, as well as thecapacity.

SCOTT FLOWER: Just one quick one that. Just what you said, and I'lllet you go. Where do you think you are in that three or four yearsort of getting the water level to the right level? Are we in yeartwo or are we in year four?

MATT ROSE: I don't know, John, when we think about repricing -- it'sa little different in different businesses.

JOHN LANIGAN: Yes, I think it's in the two to three year range. Andwe really have different cycles in our different businesses, Scott.And the other piece that you've got to look at is -- with the headwins in the trucking industry from a capacity and demand standpoint,as well. That is in many of our businesses, a potentiallysubstitutable service. And those costs and prices continue to rise,in some cases faster their ours may be.

It's an interesting dynamic out in the marketplace. And as we havetalked about in the past couple of years, we have also embarked upona plan to shorten the duration of our contracts. And that allows us,during markets like this, to maybe get a second bite at the apple,depending upon what the cycle is and what is going on with overallservice transportation capacity. So it's all going to relate to thevalue of the service that we provide versus the economic strengthoverall.

SCOTT FLOWER: Great. Thank you.

OPERATOR: We have a follow-up from the line of James Valentine,Morgan Stanley. Please go ahead.

JAMES VALENTINE: Great. Thanks. Matt, could you maybe provide alittle color in terms of the trends in coal pricing? Those newcontracts, as they rollover, are they coming in at 10%, 20%, 30%,even 50% above some of the former rates, like we've been seeing overthe past year? Or has some of that decelerated?

MATT ROSE: It just depends on the contract. It depends on where theorigin of the coal is, where the destination is, how long thecontract has been in. We're seeing contracts being renewed in the --as low as 2% or 3% increase and we're seeing them being renewed insignificant double-digit type increases. It just depends on theduration of it and everything else. Our goal, as we have stated is,to get our coal business up, that supports full reinvestment. And toalso make sure that the margins will continue to support theexpansion that we think that -- that's going to be required in thecoal business.

JAMES VALENTINE: Will you say those pricing trends are acceleratingor decelerating in terms of the magnitude of the increases you aregetting?

MATT ROSE: Well again, I wouldn't say it's accelerating ordecelerating in terms of the increases. But I will tell you coal isour longest renewal process. So our average contract in coal is muchlonger than our average contract in intermodal.

JAMES VALENTINE: Right.

MATT ROSE: So when John describes where we're at in the overallrepricing of the market, there's more business longer-term toreplacing coal, just because of the phenomenon of the longer-termcontracts.

JAMES VALENTINE: Great. My last question has to do with the positivetrain control. I hear from the unions that they say, look, BN isdoing more on this effort than anybody else, in the sense you havethis 100, 110-mile track in southern Illinois where you're testingit. But then they come back and they say, but this still isn't readyyet, it has got too many errors, it's still too new of a technologyto think it can be rolled out at anytime in the next two, threeyears. And so, we at the unions don't see why we should even bediscussing this one-man crew potential.

I wouldn't expect you to negotiate here on a conference call, but canyou maybe provide some parameters on the probability of the timing, Iguess? Better yet, the timing on how soon we could go to one-mancrews? Is it a 2010 event? Or could it be before then?

MATT ROSE: Well, again, we are in the middle of rounds so I'm notgoing to talk a lot about timing. But we're committed to traincontrol technology. We wouldn't call it PTC, but we're committed totrain control technology to improve the safety for our employees, aswell as safety for the communities in which we operate.

We have got this test that the FRA -- we have run over 1,000 runs. Wethink it is working exactly like it is intended to work. We're goingto be working with the FRA to begin another pilot after thecompletion of that second pilot, then -- then we'll be ready to startto implement.

This is a multi, multi-year process. It's certainly not somethingthat will happen in 2006, but I'm not sure -- or I'm positive thatwe're not going to be satisfied at all of waiting until 2010. Sosomewhere in between there, Jim, is where the reality is, and we'recommitted to it. We think it makes -- we think -- we know it makessense for our customers, for our employees, and I -- I do mean allemployees within BNSF. And we'll just continue to work through theround, as well as with the FRA, to develop what we think is -- couldbe a very important technology.

JAMES VALENTINE: Great. Thanks so much.

MATT ROSE: Okay. We have one more question? No, that's it? Okay. Ithink that's it. We appreciate everybody's interest, and we will seeyou all live in January in New York City. Thank you very much.

OPERATOR: Thank you. Ladies and gentlemen, that does conclude ourconference for today. Thank you for your participation, and for usingAT&T Executive Teleconference. [OPERATOR INSTRUCTIONS]

[Thomson Financial reserves the right to make changes to documents,content, or other information on this web site without obligation tonotify any person of such changes.

In the conference calls upon which Event Transcripts are based,companies may make projections or other forward-looking statementsregarding a variety of items. Such forward-looking statements arebased upon current expectations and involve risks and uncertainties.Actual results may differ materially from those stated in anyforward-looking statement based on a number

of important factors andrisks, which are more specifically identified in the companies' mostrecent SEC filings. Although the companies may indicate and believethat the assumptions underlying the forward-looking statements arereasonable, any of the assumptions could prove inaccurate orincorrect and, therefore, there can be no assurance that the resultscontemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUALREPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILEEFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BEMATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THESUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIALOR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANYRESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPONTHE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT.USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALLITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANYINVESTMENT OR OTHER DECISIONS.]

[Copyright: Content copyright 2005 Thomson Financial. ALL RIGHTSRESERVED. Electronic format, layout and metadata, copyright 2005Morningside Partners, LLC. ALL RIGHTS RESERVED. No license is grantedto the user of this material other than for research. User may notreproduce or redistribute the material except for user's personal orinternal use and, in such case, only one copy may be printed, norshall user use any material for commercial purposes or in any fashionthat may infringe upon Thomson Financial's or Morningside Partners'copyright or other proprietary rights or interests in the material;provided, however, that members of the news media may redistributelimited portions (less than 250 words) of this material without aspecific license from Thomson Financial and Morningside Partners solong as they provide conspicuous attribution to Thomson Financial andMorningside Partners as the originators and copyright holders of suchmaterial. This is not a legal transcript for purposes of litigation.]

**---- Index References ----**

Company: CITIGROUP INC; **BURLINGTONNORTHERNSANTAFE** CORP; DEUTSCHE BANK AG; BEAR STEARNS COMPANIES INC; HUNT (J B ) TRANSPORT SERVICES INC; MORGAN STANLEY

News Subject: (Corporate Financial Data (1XO59); Business Management (1BU42); Sales & Marketing (1MA51); Major Corporations (1MA93); Company Profiles (1CO63); Economic Statistics (1EC52); Contracts & Orders (1CO29); Employment (1EM26); Economics & Trade (1EC26); Economic Indicators (1EC19))

Industry: (Financial Services Networking (1FI57); Freight Transportation (1FR88); Railroads (1RA98); Networking Administration (1NE06); Transportation (1TR48); Industrial Construction (1IN90); Freight Railroads (1FR84); Financial Services (1FI37); I.T. in Financial Services (1IT24); Traffic (1TR52); Freight Transportation Logistics & Distribution (1FR45); I.T. (1IT96); Construction (1CO11); Land Transportation (1LA43); Passenger Transportation (1PA35); Network Benchmarking & Measurement (1NE97); Networking (1NE45); I.T. in Transportation (1IT48))

Region: (North America (1NO39); Texas (1TE14); California (1CA98); Americas (1AM92); USA (1US73))

Language: EN

Other Indexing: (BB; BEAR STEARNS; BN; BNSF; BNSF LOGISTICS; BURLINGTON NORTHERN; CITIGROUP; COAL; CORPORATION; DEUTSCHE BANK; DOMESTIC INTERMODAL SEGMENTS; EDWARD WOLFE; EVP; FINANCIAL; FRA; GDP; GM; GTM; JASON SEIDL CREDIT SUISSE; JB; JB HUNT; JOHN LARKIN OF LEGG; LA; MERRILL LYNCH; MORGAN STANLEY; MORGAN STANLEY DEAN WITTER; NCTA; NORTHERN; OPERATOR; PEER PATHS PROGRAM; PNW; PRB; PRB COAL; RCAF; SANTA FE CORP; SCOTT FLOWER CITIGROUP; SITE; TRANSCRIPTION; TRANSCRIPTS; USERS) (Ag; Ag Products; Carl; Carl Ice; Consumer; Consumer Products; Ed;

EDWARD; EDWARD WOLFE; Gulf; J.P. Morgan; James Valentine; Jim; John; John Barnes; John Lanigan; JOHN LARKIN; Ken; Ladies; Matt; Matt Rose; Morningside Partners; Outstanding; Products; Scott; SEC FILINGS; Tom; Tom Hund; Tom Wadewitz)

Word Count: 13613

**End of Document**

© 2013 Thomson Reuters. No claim to original U.S. Government Works.

NewsRoom

# EXHIBIT PX0744

NewsRoom

10/24/06 Fin. Disclosure Wire 13:45:00

FD Wire
Copyright © 2006 CCBN, Inc. and FDCH e-Media, Inc.

October 24, 2006

Q3 2006 **BurlingtonNorthernSantaFe** Corporation **EarningsConferenceCall** - Final

OPERATOR: Welcome to the BNSF Corporation conference call hosted byMatt Rose. At the request of your host, all lines are in alisten-only mode. Later, we will conduct a question-and-answersession. (OPERATOR INSTRUCTIONS). As a reminder, this conference isbeing recorded.

I would now like to turn the conference over to BNSF Chairman,President and Chief Executive Officer, Mr. Matt Rose. Please goahead, sir.

MATT ROSE, CHAIRMAN, PRESIDENT & CEO, **BURLINGTONNORTHERNSANTAFE**CORPORATION: Thank you, Roxanne. Good morning, everybody, and welcometo our third-quarter financial presentation. With me here today inFort Worth are Tom Hund, EVP, Chief Financial Officer; Carl Ice, EVP,Chief Operations Officer; and John Lanigan, EVP, Chief MarketingOfficer.

Our presentation this morning is available by Webcast, so I'm goingto start by directing everyone's attention to our first slideregarding the forward-looking statements. This statement basicallycautions everyone that any forward-looking information presented heretoday could be affected by a number of factors which could causeactual results to differ materially from any forecast informationthat we provide. I would also like to mention that we will beproviding non-GAAP measures this morning in our commentary, and askthat you refer to the Investor Relations page on our website toreconcile to GAAP.

All right, well, taking a look at our results for the third quarter,we are really pleased to report quarterly earnings per share of $1.33, an increase of 22% over third-quarter results last year. Weexperienced strong, double-digit revenue growth in each of our fourbusiness units. Total freight revenues increased 19% to an all-timequarterly record of $3.8 billion. The components of the 19% increasein revenues were well balanced among unit growth, price, and fuelsurcharge, with about one-third attributable to each.

John will give you a detailed report for each of our business unitsin his review. The operating ratio of 75.9% was basically flat whencompared to the third quarter of last year. But when you take out theimpact of fuel surcharge on both revenue and expenses, the operatingratio would have been down to about 72%, or down about 130 basispoints from the third quarter of last year. Tom will provide you withthe details of the impact from fuel as well as a complete review ofother expense categories. Carl will then review productivityimprovements during the quarter and the progress we are making on ourvelocity initiative.

Now, I'm going to turn it over to Tom for a review of the financialresults. Tom?

TOM HUND, EVP AND CFO, **BURLINGTONNORTHERNSANTAFE** CORPORATION:Thanks, Matt. Earnings per share in the third quarter was an all-timequarterly record of $1.33, 22% higher than the third quarter of 2005.And operating income

in the third quarter was also an all-timequarterly record of $920 million, an increase of $142 million, or 18%higher than 2005. And the increase in operating revenue income wasdriven by freight revenue growth of 19% and continued cost control.

Third-quarter operating ratio was 75.9%, but as Matt said, whenexcluding the impact of fuel surcharge on both revenue and expenses,the operating ratio would have been close to 72% or 130 points lowerthan last year. As always, John will cover revenue, and I will givethe detail on expenses.

Operating expense was $3.019 billion for the quarter, or 19% higherthan the third quarter of 2005. About 60% of this increase, though,was driven by fuel expense -- by higher fuel expense. And thecomposition of our expenses is generally in line with historicaltrends, with the exception of fuel, which has increased 7 percentagepoints versus the prior year.

Compensation and benefits expense was $975 million, up 8%, and inline with prior guidance. Employment increased about 5% from 2005 to2006, with the increase primarily in transportation and engineering,while compensation and benefits per employee was up about 3%. Andabout half of the increase in compensation and benefits per employeeis driven by higher pension and stock option expense, with theremainder due to higher wages and benefits offset by productivityimprovements.

In the fourth quarter, we expect compensation and benefits expense tobe up about 8%, and headcount to be about 4% due to continuing strongvolumes.

Purchase service expense was $500 million for the quarter, up 16%, or$68 million. The majority of this increase was due to highervolume-related costs for ramping services, locomotive contractmaintenance, and haulage. The remainder of the increase is due to ourgrowing BNSF Logistics Company, which increased $11 million and isoffset in other revenue.

Now in the fourth quarter of 2006, we expect purchased services to beabout $465 million.

Depreciation expense was $284 million, and we expect fourth-quarterdepreciation expense to be about $295 million, due to our increasingcapital base.

Third-quarter equipment rents expense was $232 million or about 4%higher than 2005. Now in the fourth quarter, we expect equipmentrents to be about $255 million. The increase over last quarter isprimarily driven by growth in our intermodal business unit, as wellas additional locomotives. Also contributing to the increase overlast quarter is $10 million in credits from customer equipment usagethat will no longer be an offset to equipment rents expense, asequipment has been subleased. So going forward, the sublease revenuewill be recorded in other revenues.

Material and other expense was $236 million for the quarter, up 10%,and higher than guidance due to an unfavorable development at anexisting environmental site. The majority of the year-over-yearvariance is driven by higher material expense due to higher commodityprices and, to a lesser extent, volumes. Now, in the fourth quarter,material and other expense are anticipated to be about $230 million.This is essentially flat with 2005, and excluding twocommuter-related transactions last year, which resulted in a net lossof $57 million.

And finally, fuel expense of $792 million was 59% higher than thirdquarter of 2005. And this is about $30 million higher than theguidance we provided last quarter, due principally to higher fuelprices. Because of the lag in collection of fuel charges, only aportion of this increase was recovered through the fuel surchargeprogram. Now, based upon the current forward curve, we expectfourth-quarter fuel expense to be about $760 million.

Taking a little closer look at fuel, in the third quarter, averagefuel price per gallon was $2.35 before hedge, or $2.12 after hedge.

And turning to our hedge position, we are about 14% hedged for thefourth quarter. Next year, we are about 10% hedged in the firstquarter, and a modest amount in the second through fourth quarters.Now, a fair amount has been written about what happens net net whenfuel prices drop. But for BNSF, there are three moving parts.

First, our hedges decline in value immediately. Second, our fuelpurchase price declines, but because of inventory already in thesystem, it takes several weeks to hit the P&L. Finally, the fuelsurcharge declines. About half of our surcharge program has aone-week lag, so the decline is pretty quick. The other half has atwo-month lag. Now, in the third quarter, we had about a $30 millionheadwind from all of these moving parts. And finally, last quarter,we told you we anticipated about a $30 million headwind in the fourthquarter. Because of the decline in fuel prices, we now anticipate itto be about one-half of that number.

So in summary, we expect fourth-quarter operating expenses to beabout 9% higher than the fourth quarter of 2005. Similar to the thirdquarter, about 60% of the increase is attributable to higher fuelexpense, with the remainder coming principally due to strongervolumes.

Interest expense in the third quarter was $125 million, and in linewith prior guidance. Other expense for the third quarter was $10million. And third quarter tax rate returned to a more normal levelof 38%. And we anticipate free cash flow to exceed $700 million for2006.

Turning to our share repurchase program, we bought back 3.2 millionshares in the third quarter, and outstanding shares are about 23%lower since the share repurchase program began in 1998.

And finally, our capital commitments have not changed from lastquarter. We anticipate 2006 total capital commitments to be about$2.6 billion. And as you can see from the line on the chart, ourreturn on invested capital has improved each year since 2003, and weexpect to approach 11% in 2006.

Now, I will turn it over to John for a detailed review of freightrevenues by business unit.

JOHN LANIGAN, EVP AND CMO, BURLINGTONNORTHERNSANTAFE CORPORATION:Thanks, Tom, and good morning, everyone. The third quarter was our18th consecutive quarter of year-over-year volume growth, and weposted all-time records in both freight revenue and units. Each ofour four business groups also achieved all-time records in bothrevenue and units.

This quarter, I wanted again to take some time to explain the variouscomponents of our revenue growth by business unit. In coal, revenuewithout fuel grew by 17%. The drivers of this growth included volume,which was up 12% due to continued strong demand as well as improvedoperating performance. In addition, strong revenue quality resultedin 4% price growth, driven by increases in the index escalators alongwith contractual price increases. The significant increase in coalvolume, which has a lower revenue per RTM than the Company average,but also a lower-cost, had a negative commodity mix impact on theoverall business, which I will recap later.

For ag products, products, strong volume and price growth highlightthe quarter for ag. Mix was primarily driven by a shorter length ofhaul in grain products, driven by bulk foods and oilseeds and meals.

Industrial Products' revenue excluding fuel surcharge grew 12%. Thecomponents that drove this growth were solid volume growth and strongprice.

Consumer Products revenue excluding fuel grew 11%, driven by strongvolume and price. The mix change was driven by two factors. First,our equipment privatization strategy, which transfers asset ownershipto the shipper, reducing revenue per unit and creating significantlymore revenue empties. This trend will continue in the fourth quarteras the privatization strategy continues to roll out. And second,stronger growth in international traffic compared to domestictraffic.

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works. 

So overall, we delivered a strong revenue performance driven byvolume and price. Total fuel surcharges billed in third quarter were$507 million, which is about $225 million more in fuel surchargesthan a year ago, driven by record fuel prices during the quarter aswell as increased fuel surcharge effectiveness.

And as I have discussed in the previous few slides, the overallchange in mix was primarily driven by the significant growth in coal,our intermodal privatization strategy, and stronger internationalintermodal shipments.

Returning to the overall business unit performance, in the thirdquarter, coal surpassed our record-setting second quarter withall-time records in revenue, tons, units, average sets in service,and tons per train. In addition, loadings per day in the thirdquarter were 55.6 per day systemwide, and 50.2 on the PRB, bothall-time highs.

As we continue to ramp up our operations on the PRB, third-quartertonnage grew by 11% over third quarter 2005, and by 3% over secondquarter 2006. We continue to forecast around 10% tonnage growth for2006, which will significantly exceed all previous records.

In our agricultural products business unit, we produced an all-timerecord quarter for both revenue and units. PNW export volumes were up9% compared to the prior year due to strong soybean shipments. GrainGulf exports were flat, with increases in corn offsetting wheatdecreases.

Wheat exports were down about 50% due to two factors. First, theSouthern U.S. wheat crop reduction resulting from drought and globalprice competition.

Industrial Products revenues were up 17%, with an all-time revenuerecord for any quarter, driven by strong improvement in yield qualityand an all-time volume record. Revenue ton miles were up 4%, led bydouble-digit volume growth in steel products and aluminum.

Consumer Products had a record all-time quarter, with strongdouble-digit revenue growth as well as record unit growth.International drove the growth, with all-time records in both revenueand units. Revenues were up nearly 25%, and units grew almost 11%.West Coast imports continued to experience strong growth. With fluidoperations at the West Coast ports and new, larger vessels servingthe transpacific routes, many shippers have shifted volumes back toSouthern California.

The truckload segment reported almost 24% growth, and continues tobenefit from tight truck capacity.

So looking forward, we expect to see continued growth during thefourth quarter of 2006. Coal demand is very strong, and our outlookremains positive for the fourth quarter. In ag, we expect PNW soybeanexports to continue their strong growth, partially offset by declinesin wheat. In addition, corn will continue to be shipped to the Gulfand show large gains, but what will continue to be impacted by thepoor crop and high what prices. Recent large wheat sales to Iraq willimprove PNW and Gulf prospects going forward.

Industrial Products should continue to see improving yields andmoderate volume growth. And in consumer, we should experience solidgrowth driven by continued, strong demand for international anddomestic truckload services. Global Insight's port tracker has ratedWest coast ports low for congestion despite record container volumesprojected for this year's peak season.

In the fourth quarter, an unfavorable mix impact will result from thesignificant growth in coal, which has the lowest cents per revenueton mile of all our businesses. Additional factors include continued,strong growth in international and the continuation of the equipmentprivatization strategy, as well as last year's J.B. Hunt settlement.Also, fuel surcharge revenue will have a lesser impact due to reducedoil prices.

So overall, we expect another positive quarter with revenue growth ofaround 10%.

And now, I will turn it over to Carl Ice for a discussion onoperations.

CARL ICE, EVP AND COO, **BURLINGTONNORTHERNSANTAFE** CORPORATION:Thanks, John. Good morning, everyone. During my segment, we will bediscussing our continued focus on productivity and velocity.

As Matt, Tom, and certainly John mentioned, we've handled asignificant amount of volume this quarter, setting records in bothGTMs and RTMs. At the same time, we have improved our operations, andwe are running a better railroad and providing better service to ourcustomers in any measure that you examine.

As you all know, velocity has been a key focus throughout the year,with initiatives in terminal aligned throughput, train networkdesign, train size, infrastructure and equipment reliability as wellas our capital expansion. And we are seeing these initiatives resultin improvements.

First in locomotives -- we have seen an increase year-over-year invelocity, and this third quarter was flat with the second quarterwhile handling the higher volume that I mentioned a moment ago. Andmost importantly, we saw improvement throughout the quarter inlocomotive velocity.

Our improvement is even more striking in car velocity, as you seethat in the third quarter, we're at 195 large improvement over lastyear, and significant improvement over the second quarter. Wetypically don't talk to you all about train speed, but we know thatyou track it and write about it, so I am sure you have noted that wehave seen year-over-year improvement in train speed and have hadmultiple weeks at levels that we have not seen for sometime.

We have seen an improvement in on-time performance, consistent withthe velocity improvements that I've mentioned. And we will continueto drive improvement here to keep giving better service to ourcustomers.

As we turn to productivity, we have seen continued improvement inboth GTMs and unit miles per employee, and we expect thatlong-running trend to continue.

Equipment and inventory is also a positive story. Our inventory hadgrown only about at half the rate that our volume increases occurred.As always, this is the best demonstration of the fluidity of ourrailroad and this again shows the impact of the velocity improvementswe have had.

Lastly, train size continue to be one of our key initiatives thatdrives productivity as well as capacity, and you can see continuedimprovement.

In summary, we had a good quarter. We had solid cost control, and wehave seen steady improvement in both productivity and velocity.

MATT ROSE: Thanks, Carl. Let's look at the outlook for the fourthquarter. We expect freight revenue growth to be about 10%. Unitgrowth will look a lot like the third quarter, actually, perhaps evenjust a touch bit stronger. Pricing looks like it will remain strong,increasing about 5%.

Given the mix issues that John described, including lower fuelsurcharge revenue due to lower fuel prices, revenue per unit growthwill moderate to low single digits. We expect fourth-quarter earningsper share growth of about 20% to 25% over 2005 GAAP reported earningsof $1.13 per share, which includes the benefit of the Hunt settlementand the net loss of $57 million from the two commuter-relatedtransactions that Tom mentioned.

For the full year, we anticipate return on invested capital again toapproach 11%, and free cash flow after dividends to exceed $700million. We continue to see strong demand for all railtransportation, in all the sectors except products related to thebuilding starts, which contributed only to a fairly small part of ouroverall revenue. We expect the drivers of this demand to continueover the longer-term, providing annual revenue growth in the 7% to10% range and double-digit earnings growth.

With that, Roxanne, I believe we are ready to start and open up forsome questions.

OPERATOR: (OPERATOR INSTRUCTIONS).

EDWARD WOLFE, ANALYST, BEAR, STEARNS & CO.: Bear Stearns.

EDWARD WOLFE: I am just digesting the last slide with the growthrate. And I am just wondering what I thought I had heard you sayearlier in the presentation -- or at least Tom said that your fuelexpectations net in fourth quarter versus where you thought a quarterago or about $15 million better or so. Is that included in yourexpectations there? Or has something else offset that benefit thatyou see versus maybe a quarter ago?

MATT ROSE: No, that's included, Ed.

EDWARD WOLFE: The net impact from fuel in the quarter -- am I lookingat it right? If, as you reported, it is obviously $0.15 of more costthan revenue surcharge. But I am kind of a -- per carloading, it isabout $0.04 or so of a negative impact.

MATT ROSE: Now, Ed, which quarter? Are we talking about thirdquarter?

EDWARD WOLFE: Third quarter, I'm sorry.

MATT ROSE: Okay.

EDWARD WOLFE: Is that looking at it the way you look at it? Or arethere other puts and takes that are not so obvious? I mean, just asnet of the hedges the way you reported costs versus revenue?

MATT ROSE: And are you including surcharges?

EDWARD WOLFE: Yes.

MATT ROSE: Okay. And I think that is part of my comments, we sawabout a $30 million headwind, and that would be the change in price,the change in hedge value, and the change in surcharge, all of thatexclusive of volume. So in other words, the volume increase in fuelis a separate component that we are not attributing to that. So whenyou put all of those in the mix, year-over-year, it is about a $30million negative item. So that would be -- I think you said $0.04. Iwould say that is probably $0.05 a share, something like that.

EDWARD WOLFE: Okay, so we are looking at that about right. Can youtalk a little bit, John, about what we are hearing about coalproduction cuts from some of the PRB coal providers like Peabodyrecently? What does that mean for volume growth next year as youthink about it? Obviously, the demand feels like it is there, but isthe production going to be there?

JOHN LANIGAN: Well, obviously, that will remain to be seen. Wecertainly have heard the same stories that you have heard, and we arereconciling all of the forecasts for next year. We continued toprovide the capacity and build the capacity to handle the demand inthe marketplace. And so if one mine goes down, potentially anothermine ramps up. So we will have to see how that plays out.

TOM HUND: We are expecting, though, to have I think -- safe to say arobust year in coal next year, kind of for the same drivers it hadthis year. We will still have some carryover of demand that we didnot meet this year, which will be fine, and then we will see kilowattgrowth, and then we will see more Eastern conversion, and then wewill start to see the first movements to a new coal-fired plant in'07 -- just pretty modest, but we will expect to see fairly healthygrowth in the basin next year.

EDWARD WOLFE: Do you expect to lift your unofficial embargo and takenew customers? And if so, when?

TOM HUND: We don't have an embargo on. We have not had an embargo onfor a long time, and we are being open for business, if you will, interms of Eastern conversion at this point in time.

EDWARD WOLFE: Did you do Eastern conversions in the third quarter?

TOM HUND: You know, we didn't. We are working with a couple ofcustomers now. With the amount of demand that was out there in '06,we slowed down the Eastern conversions, so we are just now going backand working with the market on where people want to do test burns.And you will see us start to engage that again.

EDWARD WOLFE: And again, in terms of productivity cuts, though, fromthe mines, what percentage should we think about, as we think of nextyear, that is possible?

TOM HUND: You know, we do not know. You have seen a couple of minereports. And I just believe that given the demand, that I assume thatthe miners are going to respond to it, and be able to produce thecoal. That's about the only thing we can do. Going into this thing,we think that there is going to be strong demand in coal next year,and we are going to have the rail capacity, and we are going havefaith that the miners are going to mine it.

EDWARD WOLFE: And you get no sense in talking to your mines that thatis going to be any different from that?

TOM HUND: No.

EDWARD WOLFE: Okay. Just one quick last thing, on Slide 25, where youtalk about Consumer Products, you have got IMC down 10%, andtruckload up 24%. And I am just trying to understand how you know aproduct is an IMC versus a truckload? Like where does J.B. Hunt fallin that, for instance?

MATT ROSE: J.B. Hunt's truckload -- IMC, it is identified by customer-- by who the shipper is, in that case, in intermodal, it is who thetrucking company is or the IMC. So the IMC's would be people like HubGroup and truckload guys would be the Hunts and Schneiders and Swift.So whoever originates it, that is the bucket it falls in.

EDWARD WOLFE: Who else besides Hub is in that bucket? Pacer -- whoelse?

MATT ROSE: Alliance Shippers, and then some other small guys.

OPERATOR: Ken Hoexter, Merrill Lynch.

KEN HOEXTER, ANALYST, MERRILL LYNCH: Matt, can I just clarify -- didyou say pricing would moderate to the low single digits into 2007?

MATT ROSE: No, we did not say that.

KEN HOEXTER: I'm sorry; I thought you said that pricing was going tomoderate to low single digits at some point.

TOM HUND: We said RPU -- revenue per unit.

KEN HOEXTER: Okay.

TOM HUND: And that is a fourth quarter (multiple speakers) issue,only.

MATT ROSE: Yes, and that is related to some of the mix things thatJohn talked about.

KEN HOEXTER: Okay. Now, I just want to understand -- as far as youroperating ratio, I understand if you pull fuel out. But just thinkingabout it overall, Matt, you noted that volumes should be at similarlevels in the fourth quarter to third quarter. Is there kind of ashift in your focus at all toward -- I don't know, maybe keeping thisvolume growth going at the expense of focusing on getting theoperating ratios, say, to the low 70s, high 60s -- whatever it mightbe. Is there any kind of concerted shift now that your ROI is kind ofat levels that you approve of?

MATT ROSE: I don't think so, Ken. I mean, we believe -- we havebelieved for a long time that the way to long-term sustainedshareholder value is through growth. And we have also said that togrow, at least on our railroad, we need to have the capacity to growand we have got to be able to improve our returns to substantiatethat growth or to warrant that capital investment.

And so I think our model, quite frankly, is working very well. We aregrowing. We are improving our returns. We are able to bring that tothe bottom line. We are improving shareholder value.

So I think you'll continue to see us very active on developing newproducts and very interested in growing, because long-term, that isjust the key, I think, to any business, and it certainly has been thekey issue that the railroad industry has suffered with, when you lookat it over a long period of time. And so we are going to continue toposition our Company to grow profitably.

KEN HOEXTER: And Tom, what percent of revenues now have thesurcharges attached?

TOM HUND: John, why don't you handle that?

JOHN LANIGAN: Yes, we have about 80% fuel effectiveness coverage,which means we are covering about 80% of the run-up over the base,but we have got some sort of fuel surcharge -- either the full fuelsurcharge, or RCAP on about 90% of our business.

KEN HOEXTER: Okay. And then what percent is the active surchargeversus the RCAP?

JOHN LANIGAN: Oh, it is about 90/10 on a split basis.

KEN HOEXTER: 10% being the RCAP?

JOHN LANIGAN: Right.

KEN HOEXTER: Okay. And then -- and so I am just wondering, because itseems like with 14% of the business still hedged this quarter, itseemed like a pretty large exposure. Is that more due to the delay ofthe timing that -- I think, Tom or John mentioned before about thatkind of two-week or one-month -- or two-month delay versus a weekdelay?

JOHN LANIGAN: You're referring to you expected more of a benefit inthe third quarter, or I'm not sure what --?

KEN HOEXTER: Yes, I guess, with the surcharge coverage, would haveexpected maybe a little bit more flowthrough to offset some of thoseincreased fuel costs.

JOHN LANIGAN: Yes, although remember prices dropped late in thequarter, and when that happens, they get reflected in the hedgeimmediately. And then some of the other things -- the next mostsensitive is -- the one-week delay in about half of our surchargebusiness, and then next would be the actual price of fuel, because ofwhat is built up in the -- I'll say within the system.

So we have got a couple of things that on the negative side thatimpact fairly quickly. So what happened is actually third quarter gota little bit worse, and fourth quarter got a little bit better.

KEN HOEXTER: Fair point. My last question would be -- just any majorcoal contracts coming up for renewal in the fourth quarter into 2007?Can you give kind of percentage of base?

TOM HUND: We see about 10% of our coal contracts every year, Ken, andwe continue to sign coal contracts this year. And as long as we cancontinue to provide the capacity, we don't expect that to change nextyear.

OPERATOR: John Larkin, Stifel Nicolaus.

JOHN LARKIN, ANALYST, STIFEL NICOLAUS: I had a question perhaps forJohn Lanigan. I think at your investor conference a few months back,you indicated that the coal contracts that had not been renegotiatedduring the period of pricing renaissance were coming due over, say,the next six years or so. You also alluded to the fact that some ofthe international steamship contracts also had yet to berenegotiated. Could you give us a similar feel as to how quicklythose are going to come up, and what sorts of increases you might beblending in over time in that area?

JOHN LANIGAN: Well, the coal contracts -- they continue to play outover that five- to ten-year period, John. So Matt just mentionedabout 10% a year, so that is a good number there.

On the international steamship side, we have gone through almost allof our customers with the exception of one customer who we arecurrently negotiating with whose contract expires next year. And soonce we are through that, we will have been through all of that grouponce, and some start to come up again as early as late next year.

JOHN LARKIN: I see. Now as you work your way through those contracts,do you feel as though there will be a transfer of volume back fromwhat I would call running the international boxes intact to theinland points of the U.S. to more of a transloading phenomenon, likewe have had the past couple of years? Or do you think the movetowards moving the international boxes intact will continue?

JOHN LANIGAN: I think the international boxes intact will continue.Our international volume in the third quarter is up about 11%, whichwould all be intact volume moving inland. So we have continued a verystrong trend of growth on boxes moving inland.

JOHN LARKIN: Okay. Then a question regarding the operations -- niceimprovement in the on-time performance. Yet, you are still at 80.2%,which I guess leaves quite a bit of room for improvement. What isyour goal on that metric? And how long do you think it will take toachieve it? And can you give us some sense for the benefits ofachieving that goal ultimately?

TOM HUND: John, I think we separated out, of course, which businessthat needs a higher on-time performance, and it's intermodal. And wehave said all along we need to be in the 90% range for intermodal. Wehave made some improvement in intermodal. I think all of ourintermodal customers would tell you they are getting a much betterride this year than they got last year.

The rest of the businesses, quite frankly, we focus more on assetvelocity -- coal, for instance, we use a cycle time. Ag -- both ofthose businesses, it is really just so we can haul more business, notthat the business will "divert" so much poorer service.

Butwe are just going to be a lot more efficient. We will have to havefewer locomotives, fewer cars, and then merchandise -- you know,again, I think we focus more on consistency rather than on-time. Butwe continue to show the on-time, but the big one really -- if youwant to see more business come to the railroad, it is going to be inintermodal. And we think we need to be in the 90% range there.

JOHN LARKIN: Fair to say that you are currently at 80% there alongwith the overall network average?

TOM HUND: No, for intermodal, we are a little higher than that.

JOHN LARKIN: Okay. And then maybe just one last question on the workthat is going on up on the joint line in the Powder River Basin.Could you give us an update as to how that is progressing withrespect to triple-tracking the whole joint line, widening the trackcenters, cleaning the ballast or the ballast dust? Just to give ussome confidence that we are not going have any kind of the issuesthat we had last year?

MATT ROSE: Yes, because we said we would, but Carl, why don't yougive John a little more flavor than I --

CARL ICE: I also don't think we will. If you separate that into acouple of pieces, first, our maintenance plan continues. Wedefinitely believe that the line is in much better shape going intothe winter even than it was last year, which is an improvement overthe year before. We will hit -- generally hit our targets around theundercutting. We will continue to balance that, check on thecondition of the railroad versus making -- hitting loadings at thesame time. So all of that is moving forward.

That of course will not completely be solved until we solve the coaldust issues, though. We will eventually have to go back and deal withthose. So that remains an important priority for us. But we don'texpect any problem from that.

We have cut over all of our expansions this year on time. We justfinished one of the major one last week. We have a couple smallerones to do the rest of the year, but they are in relatively goodshape. We could begin grading for the rest of the third main in thenext week or so. We will do that as long as the weather lets us. Sowe would expect to be on schedule early next year for that. And thanthe fourth track that is at Logan Hill, we are in design phases ofthat now.

So significant amount of work going on. I think we will continue todo a good job of blending that versus making sure we handle thebusiness and move as many trains out of there as we can.

MATT ROSE: Coal has pretty much played out exactly like we thought itwould this year, John. I have seen the -- I would say in the last 45days, we have seen more mine delays than we like to see, than wewould have expected to see. But overall, we are hauling a lot ofcoal, and we are satisfying -- we are not totally satisfying themarket, but I think that if you would talk again to our utilities, Iwill assure you we don't have any utilities in crisis or panic. Andtheir stockpiles have all -- has been reported by FERC and otherpeople, stockpiles actually rose during the summer months, which isvery unusual. So we are starting to earn that dependability, thatreliability factor again.

JOHN LARKIN: I really appreciate the update. Thank you.

OPERATOR: Jason Seidl, Credit Suisse.

JASON SEIDL, ANALYST, CREDIT SUISSE: John, I want to touch onsomething you mentioned -- with truckload up almost 24%, here in yourConsumer Product, you mentioned tight truck capacity. We are seeingsort of an easing out there in the marketplace from all our channelchecks. Should we expect that to maybe decelerate a little bit in thegrowth rate going in the fourth quarter and into '07?

MATT ROSE: John?

JOHN LANIGAN: Yes, it is a little tough to predict, Jason. But Ithink one of the things you do have to keep in mind is that over thelast ten years or so, a number of these truckload carriers havereally placed big bets on intermodal. And although on the fringes, ifthey have some trucks softness, obviously, they will be a little bitmore aggressive to go out and get business. But they are going tofirst go after that intermediate tight business versus the long-haulbusiness that we specialize in. Our average length of haul inintermodal is about 2000 miles, and that is not ideal for truckload,because they lose a driver for close to a week if they put a singledriver on a load of that type of distance. So it is a little bit onthe fringes.

And the other piece is because the likes of Hunt and Schneider andSwift and others have really put so much emphasis on intermodal, theydon't have the trucks or the drivers to make a wholesale change on ashort period of time. And if they felt that there was anydeceleration in the economy, I don't think that they would be makingdecisions to make big truck purchases to try to place a big bet to goin the other direction. I think they have all really come toappreciate intermodal as a vital part of their portfolio and it'spart of the services that they offer their customers.

So could there be some activity on the fringe? Obviously, yes, but wedon't think it would be a big deal.

JASON SEIDL: So, John, I guess another way to think about it -- thisis sort of more of a modal shift that has occurred over a long periodof time, and now you are going to benefit from that going forward.

JOHN LANIGAN: Yes, that is how we think about it.

JASON SEIDL: Okay, great. Another question -- and, John, this may befor you as well. You mentioned the strength in consumer buildingproducts, but weakness in I guess domestic building products. Now isthat sort of consumer versus residential construction going on there?

JOHN LANIGAN: Yes, the issue on the industrial side of our businessfrom a standpoint of the down part of that market is related housingstarts. Because we still see very strong construction materialmovements related to road construction and commercial construction.So aggregate, steel -- we had a record quarter for steel, forexample. The components that go into the commercial construction,highway construction and those sorts of activities still remains verystrong.

JASON SEIDL: Perfect. Thank you, gentlemen. Nice quarter.

OPERATOR: Kevin Maczka, BB&T Capital Markets.

KEVIN MACZKA, ANALYST, BB&T CAPITAL MARKETS: Just a question goingback to service -- to follow up on that one. You have two slides inhere on velocity. It looks like the locomotive velocity is relativelyflat sequentially and a little bit better improvement on the carvelocity. I am just wondering, is there anything there that is notgoing according to your plan so far? Is that about the pace ofimprovement that you were looking for?

MATT ROSE: Carl, why don't you start?

CARL ICE: Sure. Well, you are right that locomotive was flatsequentially -- I assume meaning comparing the second and thirdquarter. We did show improvement year-over-year, and typically, thethird quarter is a little more challenging than the second, becausethere is more volume. So I do believe we made improvement there.

What you could not see in that slide is what happened during thequarter and we improved across the quarter. So I think we are makingthe progress we would like to make. You asked, are we are right ontrack? We always have high expectations, so we would like to be alittle farther ahead. But generally, we are about on target.

KEVIN MACZKA: Is there some hurdle out there that you are still yetto overcome to get a more material improvement there in velocity, oris it just kind of making slow but sure progress?

CARL ICE: Slow but sure.

MATT ROSE: It's 7.4% unit growth is the only little hurdle that isout there. And it just is like a tidal wave every day, every week,every quarter. It is just phenomenal volume that is out on therailroad. And you think about a railroad -- an industry that isusually translating two-thirds of a percent GDP, and we are justbanging through these 7% and 8% unit growth numbers. And it is notwithout its challenges, but the railroad is doing well and startingto show improvements, is, I think, very, very significant.

KEVIN MACZKA: Okay, great. And on the cost side, you mentioned the7.4% volume growth. It looks like costs, excluding fuel, was up morelike 9%. I'm sure that is probably not your goal to have costs higherthan volume growth. And we have seen some other of your peers reportlower cost increase than that. Of course, they are not growing quitethe volume the way you are. I am just wondering if there is some bigopportunity yet there on the table in terms of cost improvement,excluding fuel?

MATT ROSE: Well, I think we would certainly always believe there isopportunity, so we would expect to continue to offset parts ofinflation. You do have an inflation component, though, when you arecomparing volume increases and cost increases. So said differently,we grew with volume, and depending on what you think inflation is, weoffset a percentage of that. So if the question is, is there a bigthing, no, I don't think that there is one big thing we will go do tosee a breakthrough. We will continue to drive steady improvement onthis as well.

If you look at our key productivity measures, such as GTM's and unitmiles per employee, which we think is the best one, we continue toshow improvement there. We will expect to show continued improvementas we go forward. And certainly, train size is a part of that. Soexpect us to continue to make improvement.

TOM HUND: And this is Tom -- a couple of things more from obviouslythe bookkeeping, accounting side. You have got about, oh, a $20million or so related to the increased stock option expense for theyear as well as increased pension expense; it's probably a little bitless than that. So some of that flows through every quarter, andprobably if you combine that with the logistics growth that we haveseen, I refer to that as being $11 million for the quarter, which isa gross up of both revenue and expenses, so that is clearly affectingthe expense side -- if you take one quarter worth of stock optionplus pension plus that, that accounts for about a percentage of ouroverall expense increase, which is more driven by I will sayaccounting phenomena than anything else.

OPERATOR: Randy Cousins, BMO Capital Markets.

RANDY COUSINS, ANALYST, BMO CAPITAL MARKETS: I guess the firstquestion I would like to talk about is with reference to youragricultural business. If I look at the price component on your slideversus the second quarter, I see kind of the price component is 4% inthis quarter versus 6% in the second. And I wondered if you couldgive me some sense as to sort of what is happening there? is there aparticular reason why it has dropped off? And I guess as a relatedquestion, could you guys comment on sort of the STB/GAO review of agrates?

MATT ROSE: On the price side, the biggest issue has to do with thedecline in wheat and the poor wheat crop. Wheat is the highest-ratedcommodity we handle in agricultural products. So when we have a toughyear in wheat, it affected price and we had a very tough quarter onthe wheat side.

JOHN LANIGAN: As far as the GAO report, Randy, I think it pretty muchhas indicated what the railroads have been saying, and what anybodywho studies this industry and says that there has been tremendousefficiencies passed into the marketplace over the last severaldecades, and that real rates have -- any way you want to look atthem, have really been passed into the marketplace.

The GAO, I think, properly points out that this ought to be aquestion of where we go from here in terms of how capacity is broughtinto this. Railroads need to be profitable.

And then finally, they pointed out some issues around what we referto as captivity, and some issues where customers -- some customershaven't benefited from as other customers have.

But I think the STB is -- also, they have a small shipper hearing,rule-making that is going to come forth over the next several months.And I am sure that there will be pieces of that will solve for someof those issues. So I think generally, the GAO report was a fairreport; sometimes, some of the numbers that they look at -- itdoesn't include things like allowances and rebates. So you can get alittle tripped up on some of the rate issues on the face value. Butit generally, I think, pointed out a success story in deregulation.

RANDY COUSINS: But you don't see any risk, particularly in your agbusiness, as a consequence to what the GAO said or sort of the STB'sapproach to it?

JOHN LANIGAN: Well, I mean, there is always risk in the regulatoryprocess. But I think the fundamentals get back to very simplequestions. If the ag business wants continued capital investment,like in the case of what we have been doing -- and for us to continueto invest in terms of cars and locomotives, then there is going tohave to be a return that is warranted for that. And we believe that,given a balanced review of all of those various factors, we believethat the proper regulatory model will continue to be adhered to.

RANDY COUSINS: Okay. Carl, I wonder if you could talk about a networkcongestion on kind of a regional basis. You know, I think at theanalyst day, you kind of indicated that there was obviouslycongestion in the PRB; I think you suggested sort of MississippiDelta and Pacific Northwest sort of on a regional.

And I also would kind of like to know sort of how things are flowingon the southern Transcon. Is the anyplace that is causing abottleneck, and do you see any relief over the next three to sixmonths in any of those areas?

CARL ICE: Well, you have perfectly described the three places wementioned at analyst day. We have made improvement on all of those.That is certainly part of the reason you saw the velocity increaseswe described. So I don't think at this point we would say there is aplace that is the bottleneck. Certainly, those places that we hadcongestion lagged the performance in some of the other locations, sowe will continue to drive improvement there.

The southern Transcon is flowing great right now.

MATT ROSE: I think, Randy, it is safe to say that our largestchallenge of those three would be the PRB. The PNW is really cleanedup. The southern Transcon, as Carl mentioned, is running very well.

We have still got some issues with the PRB. And it is still -- it isa multifaceted issue of being able to have the mines with the coaland have the maintenance work done and so we have got more assets inthe PRB than we would like. But at the end of the day, we see a clearpath to cleaning a lot of this up with additional capacity and justbetter coordination, quite frankly.

RANDY COUSINS: And I guess the last question is -- you guys have donea number of test burns coming out of the PRB, and you had a bunch ofplanned test burns out of the PRB. And obviously, this is businessthat presumably new contract goes -- put in place, it is going tohave better economics than some of the historicals.

Could you speak to sort of the opportunity to add new business atsort of current market economics as opposed to incremental volume onold economics?

JOHN LANIGAN: Well, we are going to have to see, Randy, how thosetest burns play out. As Matt mentioned earlier, we are open forbusiness, and actively talking to Eastern utilities and planning testburns. We have a number that are in the queue to perform. Andobviously, the hope would be going forward that the results of thosetest burns would be the desire for them to burn PRB coal at today'smarket rate, so that would be a positive development.

RANDY COUSINS: And, John, could you give us some sense, to sort oflike -- is that 5% of the business, 2% of the business --?

JOHN LANIGAN: It is really hard to handicap that, Randy, becausethere's a lot of timing issues when you do test burns, becausedepending upon their ongoing contracts that they currently have, andalso having to change the boiler characteristics and the timing onthat, sometimes we will have a very successful test burn and thecustomer cannot convert for a year or two because of either capitalexpense of converting the boiler or their existing contract. So itreally depends on a case-by-case basis.

OPERATOR: John Kartsonas, Citigroup.

JOHN KARTSONAS, ANALYST, CITIGROUP: Just a quick question. You talkabout the fact that you have seen a switch of containership volumesfrom the Pacific Northwest down to the L.A./Long Beach area. Can youtalk a little bit about that -- why this is happening, and whetherthat is a net positive or negative for you, or it doesn't reallymatter?

MATT ROSE: The reason that it has happened is that many of thesteamship lines have big investments in Southern California, and theywere hedging their bets when they had the port locked out almost fouryears ago now. And also, the fact that their biggest local market isin Southern California, as well. So obviously, they want to bring alot of freight to Southern California because a large percentage ofit stays in that local market for consumption, and the markets in thePacific Northwest are not as big.

From an overall system perspective, as long as we have balancedoperations on both ends -- in other words, trains coming in, trainscoming out, it does not impact us significantly if there is someshift between North and South.

JOHN KARTSONAS: So you think like, looking further down the road,that is going to continue to be the case? I mean, you havesignificant expansions down in the South California. Is that going tobe the case going forward, you think?

MATT ROSE: I think as Southern California fills up [low], you willsee more demand shoved up to the Pacific Northwest, which is fine. Wehave got capacity on the railroad to be able to handle that, and itis a good route for us. And we would like to see that business growup there.

OPERATOR: Tom Wadewitz, JPMorgan.

TOM WADEWITZ, ANALYST, JPMORGAN CHASE & CO.: I have a question onfuel hedging and fuel impact, and then one on pricing. So maybe if wecan start with the fuel.

If I look at this chart that Tom Hund presented on mark-to-markethedge benefit, you had something like a $530 million benefit in '05,and then you go down to $343 million in '06. And you have got thatyear-over-year head wind. As you look to 2007, you are only showingus first quarter. But if that hedge benefit goes down to the $33million you've got in first quarter, or to a substantially lowernumber, it seems that that would be a pretty significant margin headwind. And I am wondering if you can give me some thoughts on that --is that offset by other factors, or is that a fair way to look at theimpact of fuel hedge in '07?

MATT ROSE: First of all, Tom, on that slide, we did not show the outquarters, because while we have hedged a very modest amount, you canthink of those as basically being zero. If you go back to our SECdocuments, we've had nothing hedged before. We have put some modesthedges in place, but they are more or less at market. So we havenothing of consequence beyond the first quarter of '07.

So you have looked at it exactly right. We have a significant headwind related to the hedges. Now that will be offset by the othermoving parts. The biggest one will be the increase in fuel surcharge.

At this point, we are not giving guidance on '07. Obviously, it isnot going to be the full amount, so there will be some significantoffset to the hedge drop. But we are really -- in January, we willgive some guidance on all pieces of '07, including fuel, because thatis obviously a significant moving part.

TOM WADEWITZ: I guess just directionally, do you think that thereduction in fuel hedge next year is going to be a greater impactthan it has been this year? Or is it similar magnitude or less?

MATT ROSE: Are you talking just hedge?

TOM WADEWITZ: Yes. I mean, I guess I am looking at this as saying ifyou are not too far from being covered by fuel surcharge, you are notfully covered, but -- yes, I am looking just hedge.

MATT ROSE: Well, just hedge, as you have pointed out -- I mean, thisyear, is in the $350 million range compared to the I think $530 youquoted from last year. And you can see off this chart -- hedge isonly worth $33 million next year. So you have got a $300 million orso reduction in hedge. As I say, we do expect a sizable portion ofthat to be offset, but we will give you that guidance in January.

TOM WADEWITZ: Okay. I guess the other side of that would be -- if youare -- you know, John said 80% effective coverage. You can move thatnumber up and offset some of the impact. Can you give me a sense ofwhat that number might move up to next year in terms of the effectivesurcharge coverage?

JOHN LANIGAN: Yes. We have been, over the last couple of years, Tom,once we kind of got through the initial slug, we have been moving upin the 3% to 5% range a year for the last couple of years. I think wewill be able to do that again next year.

MATT ROSE: And remember, John, 80% is off of where we are now,because obviously, we made progress in the first three quarters ofthis year. So when you look at next year, you have got I'll say thelapping effect of the increase from this year.

TOM WADEWITZ: So should I think of it as 80% going to 85%, or shouldI think of it going to 90%?

JOHN LANIGAN: Not 90%.

TOM HUND: Not 90%, no.

JOHN LANIGAN: More in the 85%, 86% range.

TOM WADEWITZ: Okay. And then just the last one -- I appreciate thetime on the call here. Pricing next year -- do you think that itslows meaningfully, given -- it is a tough comp every year, given howmuch price you have already gotten. But also given that there is somesoftness in truckload -- I mean, I know you have a long haulfranchise which protects you a bit. But do you think there is some onthe margin impact from the, I guess increased -- or worseningsupply/demand dynamic in truckload that would cause a littledeceleration in your pure price that you get next year?

JOHN LANIGAN: It's always tough to predict price in the future, Tom,as you and I have talked about in the past. And so right now, all thefundamentals look good for another positive pricing year next year.And it is really based on the overall business conditions, not justwhat goes on in the truckload market, what goes on in theinternational market. For example, Global Insights just raised theirChina import forecast growth from 8% to 9% a couple of weeks ago for'07. So there's a lot of moving parts that will impact our overallprice, but we at this point feel that next year will still be apositive pricing story.

TOM WADEWITZ: Do you think the truckload situation matters, or thereis not much sensitivity?

JOHN LANIGAN: Well, it does -- I mean, it matters. It is acomplementary service, and it is an input to what we do. But we willhave to see how that plays out, and if there is truly a slowdown intrucking that persists for some period of time.

OPERATOR: Scott Flower, Banc of America Securities.

SCOTT FLOWER, ANALYST, CITIGROUP: Just wondered if I could get asense -- I know, Matt, you talked about guidance for fourth quarter.And it may have just been a round figure, but you talked about 5%price. Is that 5% price plus or minus? Because obviously, the lastfour quarters, you have been running 6. And I know you don't manageto price on each individual quarter. So is that just a round figure?

MATT ROSE: John?

JOHN LANIGAN: Yes, I think it is. Again, a lot of it depends upon howthe quarter plays out and what commodities are strong and the mixcomponents that we talked about, Scott. We still see strong pricing,as I just mentioned. So that is an about number.

SCOTT FLOWER: Okay. And then obviously, there has been somemoderation in truckload. And obviously, Arkansas Best -- and I don'tknow how much they do with you or not, but they've talked aboutmoving business off of intermodal to try to keep their drivers busy.

Does your length of haul mitigate how quickly you see that, and thatbecomes a shorter haul rail phenomenon, that will see some of theimpacts, if there is just a midcycle ripple as opposed to yourlong-haul franchise? Is that a fair way of thinking about it?

JOHN LANIGAN: Well, Arkansas Best is an LTL carrier for openers, sothey have got a little different dynamic in the way they run theiroperation on their terminal-to-terminal versus the truckload guy. Sothat there is a little different factor there. But that aside, the2000 mile length of haul that we have in intermodal is a naturaladvantage for the Western railroads, because trucking companiestypically don't like to have single drivers run that distance becauseof the amount of time that it takes for them to do it.

SCOTT FLOWER: And then one last one. Matt, where are labornegotiations? Have they sort of just gotten to the point where it isjust health-care and basically comp costs? Or are there other issuesreally that are sort of at play here? Or has it just become sort of a-- what can you improve on health-care versus what's a reasonablewage inflation rate to accept for the industry?

MATT ROSE: I think that is a pretty good summary, Scott. You know, wehave said publicly that the significant through productivity oftwo-to-one was moving off the table. There is other productivityissues that are out there that we think need to be brought up-to-datein terms of agreements. Certainly, health-care is something thateverybody should be concerned about. And so I think the round willpretty much be formed in those various issues. We are kind of -- weare slogging through it. It is -- we have said all along probablynothing will happen this year; probably be into '07 before itresolves itself.

SCOTT FLOWER: Do you think '07 is a reasonable [bogey sometime] toget this done?

MATT ROSE: Yes. That will be the third year, which would be kind ofrecord pace compared to most routes.

OPERATOR: Edward Wolfe, Bear Stearns.

EDWARD WOLFE: I want to understand again your compensation andbenefit guidance for the fourth quarter. Can you talk a little bitabout what you are expecting for number of employees and employee --did you say it should be up 8% all in all, year-over-year?

TOM HUND: Cost of benefits up 8, with about half of that driven by a4% headcount increase.

EDWARD WOLFE: And that is on a base of 913 last year?

TOM HUND: Give me one second to check that.

EDWARD WOLFE: There wasn't anything bizarre in there. I am justtrying to understand.

TOM HUND: In comp and benefits, no. Off of last year, let me justfind the fourth-quarter comp and benefits from last year -- thatsounds -- yes, it's off of 913. Yes. That's correct.

MATT ROSE: Okay. I think that's it. I appreciate everybody'sinterest, and we will talk to you in January. Thank you very much.

OPERATOR: Ladies and gentlemen, this conference will be available forreplay after 1 PM today through November 7 at midnight. You mayaccess the AT&T Teleconference Replay System at any time bydialing 1-800-475-6701 and entering the access code 843-357.International participants dial 320-365-3844. (OPERATORINSTRUCTIONS).

That does conclude our conference for today. Thank you for yourparticipation and for using AT&T Executive Teleconference. Youmay now disconnect.

[Thomson Financial reserves the right to make changes to documents,content, or other information on this web site without obligation tonotify any person of such changes.

In the conference calls upon which Event Transcripts are based,companies may make projections or other forward-looking statementsregarding a variety of items. Such forward-looking statements arebased upon current expectations and involve risks and uncertainties.Actual results may differ materially from those stated in anyforward-looking statement based on a number of important factors andrisks, which are more specifically identified in the companies' mostrecent SEC filings. Although the companies may indicate and believethat the assumptions underlying the forward-looking statements arereasonable, any of the assumptions could prove inaccurate orincorrect and, therefore, there can be no assurance that the resultscontemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUALREPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILEEFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BEMATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THESUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIALOR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANYRESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPONTHE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT.USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALLITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANYINVESTMENT OR OTHER DECISIONS.]

[Copyright: Content copyright 2006 Thomson Financial. ALL RIGHTSRESERVED. Electronic format, layout and metadata, copyright 2006Voxant, Inc. (www.voxant.com) ALL RIGHTS RESERVED. No license isgranted to the user of this material other than for research. Usermay not reproduce or redistribute the material except for user'spersonal or internal use and, in such case, only one copy may beprinted, nor shall user use any material for commercial purposes orin any fashion that may infringe upon Thomson Financial's or Voxant'scopyright or other proprietary rights or interests in the material;provided, however, that members of the news media may redistributelimited portions (less than 250 words) of this material without aspecific license

from Thomson Financial and Voxant so long as theyprovide conspicuous attribution to Thomson Financial and Voxant asthe originators and copyright holders of such material. This is not alegal transcript for purposes of litigation.]

**---- Index References ----**

Company: TOGOLAISE DES BOISSONS; INFORMATION MANAGEMENT CORP; AMERICAN V SHIPS MARINE; IMC; BEAR STEARNS COMPANIES INC; MERRILL LYNCH; PACIFIC NORTHWEST BANCORP; BURLINGTON NORTHERN AND SANTA FE RAILWY CO; INTERNATIONAL MICROWAVE CORP; SOCIÉTÉ FINANCIAL SA; BNSF RAILWAY CO; GESTION TECNICA DE MONTAJES Y CONSTRUCIONES SA; SITE (NETHERLANDS); BEAR STEARNS CO; BNSF CORP; **BURLINGTONNORTHERNSANTAFE** CORP; PACIFIC NORTHWEST PRODUCTIONS INC; SEC SOCIETE EUROPEENNE DE COMMUNICATION; INTERAMERICAN MOTOR CORP

News Subject: (Corporate Financial Data (1XO59); HR & Labor Management (1HR87); Business Management (1BU42); Employment (1EM26); Compensation (1CO80); Commodities (1CO82); Economics & Trade (1EC26); Major Corporations (1MA93); Economic Indicators (1EC19))

Industry: (Land Transportation (1LA43); Railroads (1RA98); Trucking (1TR88); Passenger Transportation (1PA35); Banking (1BA20); Transportation (1TR48); Freight Railroads (1FR84); Financial Services (1FI37); Traffic (1TR52))

Region: (Americas (1AM92); North America (1NO39); USA (1US73); California (1CA98))

Language: EN

Other Indexing: (BEAR STEARNS CO; BNSF; BNSF CORP; BURLINGTON NORTHERN; CITIGROUP; CORPORATION; EVP; FERC; FINANCIAL; GAAP; GAO; GTM; IMC; MATT ROSE; MERRILL LYNCH; NORTHERN; PACIFIC NORTHWEST; PEABODY; PM; PNW; PRB; RCAP; ROI; ROSE; ROSE: OKAY; SANTA FE CORP; SEC; SITE; STB; TRANSCRIPTION; TRANSCRIPTS; USERS; VOXANT; YES MATT ROSE) (Alliance Shippers; Arkansas; Carl; Carl Ice; Consumer Product; Consumer Products; Eastern; EDWARD; EDWARD WOLFE; Employment; Global Insights; Hunt; Hunts; Insight; J.B. Hunt; Jason; John; John Kartsonas; John Lanigan; John Larkin; Matt; Matt Rose; Pacer; Products; Randy; RTMs; Schneider; Schneiders; Scott; Tom; Tom Hund; Tom Wadewitz; Webcast)

Word Count: 11896

**End of Document**

© 2013 Thomson Reuters. No claim to original U.S. Government Works.

NewsRoom

# PX0745

# Filed Under Seal

# EXHIBIT PX0746

# Carload Rate Based Standard HDF Fuel Surcharge

Union Pacific's carload rate based standard HDF fuel surcharge program is based on the Department of Energy (DOE) On-Highway Diesel Fuel Price (US Average). Information about actual fuel surcharges applied and details about the program are included below.

This fuel surcharge program will apply as follows:

- Fuel surcharge will be adjusted on a monthly basis.
- The basis for the surcharge will be determined by the U.S. Average price of DOE On-Highway Diesel Fuel for a calendar month, as reported weekly on the U.S. Department of Energy Web site (www.eia.doe.gov).
- In the event the average monthly price of Retail On-Highway Diesel Fuel, equals or exceeds $1.35 per gallon, a surcharge beginning at 1.5% will apply.
- For every five cent increase above $1.35 per gallon, the surcharge applied will increase by 0.5%. See threshold schedule for more details.
- When the average DOE price drops below $1.35 per gallon, no fuel surcharge will apply.
- The surcharge will be billed to applicable shipments beginning the second month following the month on which the DOE average price calculation was based. (Example: the average reported DOE price for the month of February 2007 would determine the fuel surcharge applied throughout the month of April 2007.)
- Fractions of dollars resulting from the application of a fuel surcharge will be dropped if less than fifty (50) cents and increased to the next whole dollar if fifty (50) cents or more.

This surcharge became effective with shipments billed on or after June 1, 2003. The fuel surcharge will be applied to the line haul freight charge(s) that make reference to this fuel cost recovery program.

This program does not affect UP's existing Intermodal surcharge program.

The DOE price is reported weekly on the U.S. Department of Energy Web site.

## Fuel Surcharge Rate

| MONTH APPLIED | SURCHARGE APPLIED | BASIS MONTH | HDF AVG. MONTHLY PRICE |
|---|---|---|---|
| Mar 2010 | 16.0% | Jan 2010 | $2.845 |
| Feb 2010 | 15.0% | Dec 2009 | $2.745 |
| Jan 2010 | 15.5% | Nov 2009 | $2.792 |
| Dec 2009 | 14.5% | Oct 2009 | $2.672 |
| Nov 2009 | 14.0% | Sept 2009 | $2.626 |
| Oct 2009 | 14.0% | Aug 2009 | $2.634 |
| Sept 2009 | 13.0% | July 2009 | $2.540 |
| Aug 2009 | 13.0% | June 2009 | $2.529 |

| | | | |
|---|---|---|---|
| July 2009 | 10.0% | May 2009 | $2.227 |
| June 2009 | 10.0% | Apr 2009 | $2.220 |
| May 2009 | 8.5% | Mar 2009 | $2.092 |
| Apr 2009 | 9.5% | Feb 2009 | $2.195 |
| Mar 2009 | 10.5% | Jan 2009 | $2.292 |
| Feb 2009 | 12.0% | Dec 2008 | $2.449 |
| Jan 2009 | 16.5% | Nov 2008 | $2.876 |
| Dec 2008 | 23.5% | Oct 2008 | $3.576 |
| Nov 2008 | 28.0% | Sept 2008 | $4.024 |
| Oct 2008 | 31.0% | Aug 2008 | $4.302 |
| Sept 2008 | 35.0% | July 2008 | $4.703 |
| Aug 2008 | 34.5% | June 2008 | $4.677 |
| July 2008 | 32.0% | May 2008 | $4.425 |
| June 2008 | 28.5% | April 2008 | $4.084 |
| May 2008 | 26.5% | March 2008 | $3.881 |
| April 2008 | 21.5% | February 2008 | $3.377 |
| March 2008 | 21.0% | January 2008 | $3.308 |
| February 2008 | 21.0% | December 2007 | $3.341 |
| January 2008 | 21.5% | November 2007 | $3.396 |
| December 2007 | 18.5% | October 2007 | $3.075 |
| November 2007 | 17.5% | September 2007 | $2.953 |
| October 2007 | 16.5% | August 2007 | $2.869 |
| Sept 2007 | 16.5% | July 2007 | $2.868 |
| Aug 2007 | 16.0% | June 2007 | $2.808 |
| July 2007 | 15.5% | May 2007 | $2.796 |
| June 2007 | 16.0% | April 2007 | $2.834 |
| May 2007 | 14.5% | March 2007 | $2.667 |
| April 2007 | 12.5% | February 2007 | $2.488 |
| March 2007 | 12.5% | January 2007 | $2.485 |
| February 2007 | 14.0% | December 2006 | $2.610 |
| January 2007 | 13.0% | November 2006 | $2.545 |
| December 2006 | 13.0% | October 2006 | $2.519 |
| November 2006 | 15.5% | September 2006 | $2.783 |
| October 2006 | 18.0% | August 2006 | $3.045 |
| Sept 2006 | 17.0% | July 2006 | $2.934 |

| | | | |
|---|---|---|---|
| | 16.5% | June 2006 | $2.898 |
| July 2006 | 16.5% | May 2006 | $2.897 |
| June 2006 | 15.0% | April 2006 | $2.728 |
| May 2006 | 13.5% | March 2006 | $2.559 |
| April 2006 | 12.5% | February 2006 | $2.475 |
| March 2006 | 12.5% | January 2006 | $2.467 |
| February 2006 | 12.0% | December 2005 | $2.443 |
| January 2006 | 13.5% | November 2005 | $2.573 |
| December 2005 | 18.5% | October 2005 | $3.095 |
| November 2005 | 16.0% | September 2005 | $2.819 |
| October 2005 | 13.0% | August 2005 | $2.500 |
| September 2005 | 11.5% | July 2005 | $2.373 |
| August 2005 | 10.5% | June 2005 | $2.290 |
| July 2005 | 9.5% | May 2005 | $2.199 |
| June 2005 | 10.5% | April 2005 | $2.292 |
| May 2005 | 10% | March 2005 | $2.214 |
| April 2005 | 8% | February 2005 | $2.027 |
| March 2005 | 7.5% | January 2005 | $1.959 |
| February 2005 | 8.0% | December 2004 | $2.009 |
| January 2005 | 9.0% | November 2004 | $2.147 |
| December 2004 | 9.0% | October 2004 | $2.134 |
| November 2004 | 7.0% | September 2004 | $1.917 |
| October 2004 | 6.0% | August 2004 | $1.833 |
| September 2004 | 5.0% | July 2004 | $1.739 |
| August 2004 | 5.0% | June 2004 | $1.711 |
| July 2004 | 5.0% | May 2004 | $1.746 |
| June 2004 | 4.5% | Apr. 2004 | $1.692 |
| May 2004 | 4.0% | Mar. 2004 | $1.629 |
| April 2004 | 3.5% | Feb. 2004 | $1.582 |
| March 2004 | 3.5% | Jan. 2004 | $1.551 |
| February 2004 | 2.5% | Dec. 2003 | $1.490 |
| January 2004 | 2.5% | Nov. 2003 | $1.482 |
| December 2003 | 2.5% | Oct. 2003 | $1.495 |
| November 2003 | 2.5% | Sept. 2003 | $1.467 |
| October 2003 | 2.5% | Aug. 2003 | $1.487 |

| | | | |
|---|---|---|---|
| | 2.0% | July 2003 | $1.435 |
| August 2003 | 2.0% | June 2003 | $1.424 |
| July 2003 | 2.5% | May 2003 | $1.451 |
| June 2003 | 2.0%* | April 2003 | $1.533 |

*UP elected to reduce the Fuel Surcharge to 2% for the month of June 2003.

# EXHIBIT PX0747

You are here: ShipCSX > Fuel Surcharge Archive

February 11, 2004 9:21 AM EST Help

# Fuel Surcharge Archive

The table below lists fuel surcharges that were based on Tariffs 8100 and 8200, Item 12000- Series. Current fuel surcharge information can be viewed in the fuel surcharge status report.

| Fuel Surcharge Effective Date | Surcharge Amount | Surcharge Status | Avg. Monthly WTI Price* | Basis Month |
|---|---|---|---|---|
| 10/25/00 | 2.0% | Expired | N/A | N/A |
| 10/31/01 | 0.0% | Expired | N/A | N/A |
| 10/17/02 | 2.0% | Expired | N/A | N/A |
| 12/11/02 | 0.0% | Expired | N/A | N/A |
| 01/29/03 | 2.0% | Expired | N/A | N/A |
| 06/01/03 | 2.4% | Expired | $28.25 | April 2003 |
| 07/01/03 | 2.4% | Expired | $28.14 | May 2003 |
| 08/01/03 | 3.2% | Expired | $30.72 | June 2003 |
| 09/01/03 | 3.2% | Expired | $30.76 | July 2003 |
| 10/01/03 | 3.6% | Expired | $31.59 | August 2003 |
| 11/01/03 | 2.4% | Expired | $28.29 | September 2003 |
| 12/01/03 | 3.2% | Expired | $30.33 | October 2003 |
| 01/01/04 | 3.6% | Expired | $31.1 | November 2003 |

* Based on prices as published in The Wall Street Journal.

- Status Report
- WTI Crude Oil Prices
- Tariffs 8100 & 8200
- Archive
- About the Fuel Surcharge

**Fuel Surcharge News**

CSXT Fuel Surcharge will change from 4% to 4.8% effective March 1, 2004

**Fuel Surcharge E-mails**

Sign Up to receive an e-mail notification any time a fuel surcharge change occurs.

Enter your e-mail address:

Subscribe
Unsubscribe
Submit

# EXHIBIT PX0748

Intentionally omitted

# EXHIBIT PX0749

(http://www.bnsf.com/index.html)

# BNSF Rules Book 6100 - Carload Fuel Surcharge

A fuel surcharge may be applied to price authorities subject to BNSF Rules Book 6100. The surcharge for the followin month will be determined on the first of the prior month based on the U.S. average price of Retail On-Highway Diesel for the second prior month. The Fuel Surcharge Rate (FSR) is determined from the table found in item 3375 of BNSF Rules Book 6100 Series. The BNSF Rules Book 6100 can be found online at: **Miscellaneous Pricing Publications (http://newdomino.bnsf.com/website/prices.nsf/ByRateNoMisc?Openview)**.

## Carload Fuel Surcharge Rate Based on Retail On-Highway Diesel Fuel (HDF).

HDF = Prior Period's monthly average of the US average price of Retail On-Highway Diesel Fuel as reported on the U Department of Energy's web pages at:
**Click here for EIA Retail On-Highway Diesel Prices**
**(http://tonto.eia.doe.gov/oog/info/wohdp/diesel_detail_report_combined.asp)**

To receive updates to the Carload Fuel Surcharge as well as other Carload Pricing updates by email, **log in to your BNSF secured account (https://www.bnsf.com/bnsf.sph/myBNSF)**, select Customer Subscription Service, and subscı to Pricing Updates.

## Carload Fuel Surcharge Rate

| For the Month of: | Prior HDF Average: |
|---|---|
| Apr 2010 (available 02/23/10) | Feb 2010 (available 02/23/10) |
| Mar 2010 16.0% | Jan 2010 $2.845 |
| Feb 2010 15.0% | Dec 2009 $2.745 |
| Jan 2010 15.5% | Nov 2009 $2.792 |
| Dec 2009 14.5% | Oct 2009 $2.672 |
| Nov 2009 14.0% | Sep 2009 $2.626 |
| Oct 2009 14.0% | Aug 2009 $2.634 |
| Sep 2009 13.0% | July 2009 $2.540 |
| Aug 2009 13.0% | June 2009 $2.529 |
| July 2009 10.0% | May 2009 $2.227 |
| June 2009 10.0% | Apr 2009 $2.220 |
| May 2009 8.5% | Mar 2009 $2.092 |
| Apr 2009 9.5% | Feb 2009 $2.195 |
| Mar 2009 10.5% | Jan 2009 $2.292 |
| Feb 2009 12.0% | Dec 2008 $2.449 |
| Jan 2009 16.5% | Nov 2008 $2.876 |
| Dec 2008 23.5% | Oct 2008 $3.576 |
| Nov 2008 28.0% | Sep 2008 $4.024 |

| | |
|---|---|
| Oct 2008 31.0% | Aug 2008 $4.302 |
| Sep 2008 35.0% | July 2008 $4.703 |
| Aug 2008 34.5% | June 2008 $4.677 |
| July 2008 32.0% | May 2008 $4.425 |
| June 2008 28.5% | Apr 2008 $4.0835 |
| May 2008 26.5% | Mar 2008 $3.88 |
| Apr 2008 21.5% | Feb 2008 $3.377 |
| Mar 2008 21.0% | Jan 2008 $3.308 |
| Feb 2008 21.0% | Dec 2007 $3.341 |
| Jan 2008 21.5% | Nov 2007 $3.396 |
| Dec 2007 18.5% | Oct 2007 $3.075 |
| Nov 2007 17.5% | Sept 2007 $2.953 |
| Oct 2007 16.5% | Aug 2007 $2.869 |
| Sep 2007 16.5% | July 2007 $2.868 |
| Aug 2007 16.0% | June 2007 $2.808 |
| July 2007 15.5% | May 2007 $2.796 |
| June 2007 16.0% | Apr 2007 $2.834 |
| May 2007 14.5% | Mar 2007 $2.667 |
| Apr 2007 12.5% | Feb 2007 $2.488 |
| Mar 2007 12.5% | Jan 2007 $2.485 |
| Feb 2007 14.0% | Dec 2006 $2.610 |
| Jan 2007 13.0% | Nov 2006 $2.545 |
| Dec 2006 13.0% | Oct 2006 $2.519 |
| Nov 2006 15.5% | Sep 2006 $2.783 |
| Oct 2006 18.0% | Aug 2006 $3.045 |
| Sep 2006 17.0% | July 2006 $2.934 |
| Aug 2006 16.5% | June 2006 $2.898 |
| July 2006 16.5% | May 2006 $2.897 |
| June 2006 15.0% | Apr 2006 $2.728 |
| May 2006 13.5% | Mar 2006 $2.559 |
| Apr 2006 12.5% | Feb 2006 $2.475 |
| Mar 2006 12.5% | Jan 2006 $2.467 |
| Feb 2006 12.0% | Dec 2005 $2.443 |
| Jan 2006 13.5% | Nov 2005 $2.573 |

| | |
|---|---|
| Dec 2005 18.5% | Oct 2005 $3.095 |
| Nov 2005 16.0% | Sep 2005 $2.819 |
| Oct 2005 13.0% | Aug 2005 $2.500 |
| Sept 2005 11.5% | July 2005 $2.373 |
| Aug 2005 10.5% | June 2005 $2.290 |
| July 2005 9.5% | May 2005 $2.199 |
| June 2005 10.5% | Apr 2005 $2.292 |
| May 2005 10.0% | Mar 2005 $2.214 |
| Apr 2005 8.0% | Feb 2005 $2.027 |
| Mar 2005 7.5% | Jan 2005 $1.959 |
| Feb 2005 8.0% | Dec 2004 $2.009 |
| Jan 2005 9.0% | Nov 2004 $2.147 |
| Dec 2004 9.0% | Oct 2004 $2.134 |
| Nov 2004 7.0% | Sept 2004 $1.917 |
| Oct 2004 6.0% | Aug 2004 $1.833 |
| Sep 2004 5.0% | July 2004 $1.739 |
| Aug 2004 5.0% | June 2004 $1.711 |
| July 2004 5.0% | May 2004 $1.746 |
| June 2004 4.5% | Apr 2004 $1.692 |
| May 2004 4.0% | Mar 2004 $1.629 |
| Apr 2004 3.5% | Feb 2004 $1.582 |
| Mar 2004 3.5% | Jan 2004 $1.551 |
| Feb 2004 2.5% | Dec 2003 $1.490 |
| Jan 2004 2.5% | Nov 2003 $1.482 |
| Dec 2003 2.5% | Oct 2003 $1.481 |
| Nov 2003 2.5% | Sept 2003 $1.467 |
| Oct 2003 2.5% | Aug 2003 $1.487 |
| Sept 2003 2.0% | July 2003 $1.435 |
| Aug 2003 2.0% | June 2003 $1.424 |
| July 2003 2.5% | May 2003 $1.451 |
| June 2003 3.0% | Apr 2003 $1.533 |
| May 2003 2.0% * | Mar 2003 $1.708 |
| APR 2003 4.5% | Feb 2003 $1.654 |
| Mar 2003 2.5% | Jan 2003 $1.488 |

| | |
|---|---|
| Feb 2003 2.0% | Dec 2002 $1.429 |
| Jan 2003 2.0% | Nov 2002 $1.420 |
| DEC 2002 2.5% | Oct 2002 $1.462 |
| Nov 2002 2.0% | Sep 2002 $1.411 |
| Oct 2002 1.0% | Aug 2002 $1.328 |
| Sep 2002 0.0% | July 2002 $1.299 |
| Aug 2002 0.0% | June 2002 $1.286 |
| July 2002 1.0% | May 2002 $1.305 |
| June 2002 1.0% | APR 2002 $1.309 |
| May 2002 0.0% | Mar 2002 $1.230 |
| APR 2002 0.0% | Feb 2002 $1.152 |

## Carload Fuel Surcharge Table

| Prior Period's Avg. Price of HDF between: | Applicable Fuel Surcharge: |
|---|---|
| $1.25 to $1.299 | 0.5% |
| $1.30 to $1.349 | 1.0% |
| $1.35 to $1.399 | 1.5% |
| $1.40 to $1.449 | 2.0% |
| $1.45 to $1.499 | 2.5% |
| $1.50 to $1.549 | 3.0% |
| $1.55 to $1.599 | 3.5% |
| $1.60 to $1.649 | 4.0% |
| $1.65 to $1.699 | 4.5% |
| $1.70 to $1.749 | 5.0% |
| $1.75 to $1.799 | 5.5% |
| $1.80 to $1.849 | 6.0% |
| $1.85 to $1.899 | 6.5% |
| $1.90 to $1.949 | 7.0% |
| $1.95 to $1.999 | 7.5% |
| $2.00 to $2.049 | 8.0% |
| $2.05 to $2.099 | 8.50% |
| $2.10 to $2.149 | 9.00% |
| $2.15 to $2.199 | 9.50% |

| | |
|---|---|
| $2.20 to $2.249 | 10.00% |
| $2.25 to $2.299 | 10.50% |
| $2.30 to $2.349 | 11.00% |
| $2.35 to $2.399 | 11.50% |
| $2.40 to $2.449 | 12.00% |
| $2.45 to $2.499 | 12.50% |
| $2.50 to $2.549 | 13.00% |
| $2.55 to $2.599 | 13.50% |
| $2.60 to $2.649 | 14.00% |
| $2.65 to $2.699 | 14.50% |
| $2.70 to $2.749 | 15.00% |
| $2.75 to $2.799 | 15.50% |
| $2.80 to $2.849 | 16.00% |
| $2.85 to $2.899 | 16.50% |
| $2.90 to $2.949 | 17.00% |
| $2.95 to $2.999 | 17.50% |
| $3.00 to $3.049 | 18.00% |

Each $0.05 per gallon increase there after apply an additional .5%

*** BNSF elected to amend item 3375 of BNSF Rules book BNSF-6100-A, effective May 1, 2003 to reduce the carload Fuel Surcharge to 2% for the month of May 2003.**

For surcharge comments or questions, email auxpricing@bnsf.com (mailto:auxpricing@bnsf.com )

# EXHIBIT PX0750

VOLUME NO. 23

# Railroad Ten-Year Trends

## 1996-2005



**Policy and Economics Department**

**ASSOCIATION OF AMERICAN RAILROADS**

Copyright © 2006 by the Association of American Railroads. All rights reserved. No part of this work may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopying and recording, or by an information storage or retrieval system, without permission in writing from the Association of American Railroads.

# PREFACE

***RAILROAD TEN-YEAR TRENDS*** offers a comprehensive cross section of railroad industry data in a tabular/graphic format. This volume (No. 23) contains detailed information for all U.S. freight railroads, in addition to that traditionally published solely for Class I railroads. As the title implies, most data are presented for the ten-year period 1996 to 2005.

The tables are organized into the following sections:

- Profile of the U.S. Freight Railroad Industry
- Class I Railroad Statistics
  (Includes 2005 Performance, Traffic and Revenue, Financial Statistics, Labor, Plant and Equipment, and Operations)
- List of U.S. Freight Railroads
- Railroad Organizations
- Railroad Web Sites

The data for Class I railroads are derived from various annual reports to the Surface Transportation Board (STB), formerly known as the Interstate Commerce Commission (ICC). *[For simplicity, in this publication, "STB" refers to both the Surface Transportation Board (formed January 1, 1996) and its predecessor, the Interstate Commerce Commission.]* Data for non-Class I railroads are collected from an annual survey by the Policy and Economics Department (P&E) of the Association of American Railroads (AAR). In most cases, the source of data in this publication is P&E's *Analysis of Class I Railroads* series. The *Analysis* and other data sources are summarized below. Data are taken from the most recent source document identified and may also include information from previous editions of that publication. In addition, non-published data have been used in the compilation of a limited number of tables; those sources are identified only in the appropriate table.

## AAR Publications

**AAR Railroad Cost Indexes**: Quarterly publication containing price indexes of various railroad costs. Based on data for Class I railroads.

***Analysis of Class I Railroads***: Annual publication containing more than 750 financial and operating statistics of each Class I railroad for the most recent year. In most cases, data are compiled from the Annual Report Form R-1 reports filed by Class I railroads with the STB. Additional data sources include the STB Revenue Adequacy Decisions, STB Wage Forms A and B, and the AAR's *Freight Commodity Statistics.*

***Freight Commodity Statistics***: Annual publication containing regional and national gross freight revenues, tonnage, and carload originations and terminations. Data are for Class I railroads only.

***Profiles of U.S. Railroads***: Database (updated annually) of selected operating statistics compiled from a comprehensive survey of all common-carrier U.S. freight railroads.

***Railroad Equipment Report***: Annual report containing (1) freight car ownership, capacity, installations, orders and rebuilds by car type, covering all railroads and private car owners; and (2) locomotive ownership, horsepower, installations, and rebuilds for Class I railroads.

***Weekly Railroad Traffic***: Weekly electronic publication containing carloadings by railroad and commodity. Contains data for all Class I railroads and some non-Class I railroads.



AAR-E-00004093

**AAR Data (not in a publication)**
***Carload Waybill Statistics***: The AAR extracts data from the STB's *Carload Waybill Sample,* a statistical sample of essentially all U.S. railroad freight traffic.

***Universal Machine Language Equipment Register (UMLER)***: Continuously updated computerized inventory of railroad equipment used in interchange service.

**Surface Transportation Board (STB)**
***STB Revenue Adequacy Decisions***: Annual determination of the Class I railroads' revenue adequacy under specified Ex Parte procedures. Contains data for Class I railroads only.

***STB Wage Forms A and B***: Annual publication containing employment, hours, and wage data. Contains data for Class I railroads only.

**Eno Transportation Foundation, Inc.**
***Transportation in America***: Annual publication containing statistical information on all modes of transportation. Contains data for all railroads and other transportation modes. *Transportation In America* has not been published for several years, but work is being done to revive it.

**Energy Information Administration, U.S. Department of Energy**
***Annual Coal Report 2005***: Annual publication containing various production and consumption data pertaining to the U.S. coal industry.

**National Agricultural Statistics Service, U.S. Department of Agriculture**
***Agricultural Statistics Data Base***: Grain production data as of September 30, 2006.

**Bureau of Economic Analysis, U.S. Department of Commerce**
***Survey of Current Business***: Monthly report containing various economic statistics such as the GDP, GDP Deflator, and Industrial Production.

Where appropriate, a "notes" page containing explanatory information pertinent to a section's tables has been placed at the beginning of the section. Notes also appear on the individual tables when further information is necessary.

The consist of the railroad industry is dynamic: shifts in the composition of the various railroad groupings (Class I, Regional, Local Linehaul, and Local Switching & Terminal) impact the comparability of the data from year to year. Factors affecting the consist include mergers, the creation of new railroads, bankruptcies, dissolutions and declassifications (see tables on pages 29 to 30).

In a given table, due to independent rounding, individual figures may not sum to the total shown. The value of a figure is the same in each place it appears in the publication, even though the associated numbers used to compute the statistic may be rounded differently in the respective tables.

Unless otherwise noted, all dollar values are stated in current (that year's) dollars.

# TABLE OF CONTENTS

## PROFILE OF THE U.S. FREIGHT RAILROAD INDUSTRY

Definitions . . . 8
2005 Industry Overview . . . 9
Number of Railroads . . . 10
Number of Employees . . . 10
Miles of Road Operated and Miles of Road Owned . . . 11
Freight Revenue . . . 12
Carloads Originated . . . 12
Railroad Mileage Operated in Each State - 2005 . . . 13
Number of Railroads Operating in Each State - 2005 . . . 14
U.S. Rail Mileage By Operator - 2005 . . . 16
Operating Regional and Local Railroads by Year Established . . . 17
Operating Regional and Local Railroads Created from Class I Railroads . . . 18
Industry Distributions . . . 20
Measures of Operating Efficiency - 2005 . . . 22
Distribution of Intercity Freight Traffic: Ton-Miles . . . 24
Distribution of Intercity Freight Traffic: Tons Carried . . . 25
Distribution of Intercity Freight Revenues . . . 26

## CLASS I RAILROAD STATISTICS

2005 Class I Railroad Systems . . . 28
Class I Unifications . . . 29
Consolidation of R-1 Annual Reports to the STB . . . 29
Railroad Declassifications . . . 30
2005 STB Reporting Requirements . . . 30

### 2005 Performance

2005 Class I Railroad Performance Summary . . . 33
Rankings of Railroads . . . 34
2005 Traffic by Major Commodity Group . . . 38
2005 Revenue Per Ton and Ton-Mile by Commodity Group . . . 40

### Traffic and Revenue

Freight Traffic . . . 43
Real Gross Domestic Product vs. Rail Ton-Miles . . . 44
Tonnage by Major Commodity Group . . . 45
Carloadings by Major Commodity Group . . . 46
Revenue by Major Commodity Group . . . 47

# TABLE OF CONTENTS, cont.


## Traffic and Revenue, cont.

Revenue Per Ton-Mile by Major Commodity Group . . . 48
Revenue Per Ton by Major Commodity Group . . . 49
Revenue Per Ton-Mile in Current and Constant Dollars . . . 50
Rail Transportation of Coal . . . 51
Rail Transportation of Grain . . . 54
Rail Transportation of Chemicals and Allied Products . . . 58
Rail Transportation of Motor Vehicles and Equipment . . . 69
Intermodal Traffic . . . 61

## Financial Statistics

Statement of Financial Results . . . 65
Statement of Financial Position . . . 66
Statement of Cash Flows . . . 67
Summary of Net Railway Operating Income . . . 68
Distribution of Railway Expenses . . . 68
Net Railway Operating Income . . . 69
Railroad Inflation Indexes . . . 70
Capital Expenditures for Roadway and Equipment . . . 71
Property Investment . . . 72
Debt/Capital Ratio . . . 73
Investment Turnover . . . 74
Debt and Interest Charges . . . 75
Equipment Obligations . . . 76
Retained Funds and Capital Expenditures . . . 77
External Sources of Funds . . . 78
Cash Flow . . . 79
Railroad Taxes . . . 80
Coverage Ratio . . . 81
Revenues and Expenses Per Mile of Road Operated . . . 82
Operating Ratio and Special Charges . . . 83
Working Capital and Current Ratio . . . 84
Cost of Debt and Equity Capital . . . 85
Rate of Return on Net Investment and Cost of Capital . . . 86
Revenue Margin . . . 87
Shareholders' Equity . . . 88
Dividend Appropriations . . . 89
Return on Shareholders' Equity . . . 90

# TABLE OF CONTENTS, cont.

## Labor

Average Number of Employees . . . . 93
Freight Railroad Employees By State of Residence - 2005 . . . . 94
Health and Welfare Rates . . . . 95
Railroad Retirement Tax Rates . . . . 95
2005 Employment and Annual Wages by Class . . . . 96
Employees and Compensation . . . . 97
Compensation Per Hour Paid and Worked . . . . 98
Employment by Class . . . . 99
Employee Hours Paid For and Hours Worked . . . . 100

## Plant and Equipment

Mileage Owned and Rail and Crossties Installed . . . . 103
Mileage Operated by State . . . . 104
Mileage Operated by State by Railroad - 2005 . . . . 105
Rail Laid . . . . 106
Crossties Installed . . . . 106
Weight of Rail in Place - 2005 . . . . 107
Locomotives and Freight Cars Installed . . . . 108
Cost of Freight Cars . . . . 109
Cost of Locomotives . . . . 109
Age of Locomotives and Freight Cars . . . . 110
Freight Cars in Service . . . . 111
Freight Cars in Service by Car Type . . . . 112
New Freight Car Installations by Car Type . . . . 113
Capacity of the Freight Car Fleet . . . . 114
Capacity by Car Type . . . . 115
Locomotives in Service (and Horsepower) . . . . 116

## Operations

Summary of Freight Operations . . . . 119
Freight Train-Hours . . . . 120
Locomotive Unit-Miles in Freight Service . . . . 121
Loaded and Empty Freight Car-Miles . . . . 122
Loaded and Empty Freight Car-Miles by Car Type . . . . 123
Freight Car-Miles by Train Type . . . . 124
Traffic Density . . . . 124
Average Length of Haul . . . . 125
Average Tons Per Carload . . . . 126
Average Number of Cars Per Freight Train . . . . 127
Average Freight Train Load . . . . 127



AAR-E-00004097

# TABLE OF CONTENTS, cont.

**Operations, cont.**

Freight Loss and Damage Claims . . . . 128
Ton-Miles Per Mile of Road Operated . . . . 129
Revenue Ton-Miles Per Car Loaded . . . . 130
Revenue Ton-Miles Per Employee and Employee-Hour . . . . 130
Net Ton-Miles Per Loaded Car-Mile . . . . 131
Net Ton-Miles Per Train-Hour . . . . 131
Average Train Speed . . . . 132
Employees and Employee-Hours Per Mile of Road Operated . . . . 133
Diesel Fuel Cost . . . . 134
Consumption of Diesel Fuel . . . . 135
Fuel Efficiency . . . . 136

## LIST OF U.S. FREIGHT RAILROADS

Class I Railroads . . . . 139
Regional Railroads . . . . 140
Local Linehaul Railroads . . . . 141
Local Switching and Terminal Railroads . . . . 146

## RAILROAD ORGANIZATIONS

American Railway Engineering and Maintenance-of-Way Association . . . . 151
American Short Line and Regional Railroad Association . . . . 152
Association of American Railroads . . . . 153
National Railway Labor Conference . . . . 154
RAILINC . . . . 155
Railroad Retirement Board . . . . 156
Railway Engineering-Maintenance Suppliers Association . . . . 157
Railway Supply Institute . . . . 158
Transportation Technology Center, Inc. . . . . 159
TTX Company . . . . 160

## RAILROAD WEB SITES

Individual Railroads . . . . 163
Railroad Holding Companies . . . . 173

## GLOSSARY

## INDEX



AAR-E-00004098

# PROFILE OF THE U.S. FREIGHT RAILROAD INDUSTRY

# DEFINITIONS

For regulatory purposes, the Surface Transportation Board classifies railroads into three groups — Class I, Class II, and Class III — based on annual operating revenue. Class I railroads have the largest revenues and Class III railroads have the smallest. The Class I railroads have substantial reporting requirements to the STB for use in its regulatory functions. In contrast to the STB's regulatory needs, the major focus of a database developed by the AAR's Policy and Economics Department is tracking changes in the railroad industry resulting from the creation of new roads spun off from Class I carriers. Some of these new roads are hundreds of miles long, while others operate only one or two miles. The AAR's classification scheme is designed to distinguish between these roads and their different operating characteristics. After reviewing several factors, it was determined that the combination of miles of road operated and revenue was sufficient to make the needed distinction. The definitions for all three AAR categories are as follows:

## Class I Railroad

In 2005, the STB Class I threshold was annual operating revenue of $319.3 million. This threshold is indexed to a base of $250 million in 1991 and adjusted annually in concert with changes in the "Railroad Freight Rate Index" published by the Bureau of Labor Statistics. Seven Class I railroads (see list on page 28) reported to the STB for 2005. Declassification from Class I status occurs when a railroad falls below the applicable threshold for three consecutive years.

## Regional Railroad

Regional railroads are non-Class I, linehaul, freight railroads which operate at least 350 miles of road and/or earn at least $40 million in revenue. There were 30 Regional railroads in 2005.

## Local Railroad

Local railroads include freight railroads which are not Class I or Regional; they operate under 350 miles of road and earn less than $40 million annually. The Local railroad category can be further subdivided into local linehaul carriers and switching & terminal carriers. This latter category is composed of railroads which primarily provide switching and/or terminal services for other railroads. They usually have a relatively large number of employees per mile of track. In 2005 there were 523 Local railroads, of which 320 were linehaul and 203 were switching & terminal.

## Notes:

Both Canadian National Railway (CN) and Canadian Pacific Railway (CPR) own Class I rail systems in the United States, including Grand Trunk Corporation by CN and Soo Line by CPR. In 2005, CN also owned 47 additional miles in the United States, while CPR owned 514 miles (mainly the former Delaware & Hudson Railway). With trackage rights, these mileages increase to 48 for CN and 1,320 for CPR. Beginning in 1996, separate operational data for these mileages are not available.

This publication uses CNGT to represent CN's Grand Trunk Corporation – a Class I railroad.



AAR-E-00004100

# 2005 INDUSTRY OVERVIEW

| Type of Railroad | Number of Railroads | Miles of Road* in the U.S. | Number of Employees | Freight Revenue (thousands $) |
|---|---|---|---|---|
| U.S. Class I | 7 | 95,664 | 162,438 | $44,456,580 |
| U.S. Regional | 30 | 15,388 | 7,322 | 1,481,692 |
| U.S. Local | 523 | 29,197 | 12,047 | 1,939,957 |
| Linehaul | 320 | 22,519 | 5,744 | 1,117,336 |
| Switching & Terminal | 203 | 6,678 | 6,303 | 822,621 |
| Total U.S. Railroads | 560 | 140,249 | 181,807 | $47,878,229 |
| Canadian Railroads** | 2 | 561 | - | - |
| Total Freight Railroads | 562 | 140,810 | - | - |

**PERCENT**

| Type of Railroad | Number of Railroads | Miles of Road* in the U.S. | Number of Employees | Freight Revenue |
|---|---|---|---|---|
| U.S. Class I | 1.2 % | 67.9 % | 89.3 % | 92.9 % |
| U.S. Regional | 5.3 | 10.9 | 4.0 | 3.1 |
| U.S. Local | 93.1 | 20.7 | 6.6 | 4.1 |
| Linehaul | 56.9 | 16.0 | 3.2 | 2.3 |
| Switching & Terminal | 36.1 | 4.7 | 3.5 | 1.7 |
| Total U.S. Railroads | 99.6 % | 99.6 % | 100.0 % | 100.0 % |
| Canadian Railroads** | 0.4 | 0.4 | - | - |
| Total Freight Railroads | 100.0 % | 100.0 % | - | - |

* Miles of roadway operated excluding double-counting for trackage rights. Some mileage is not railroad owned. Miles of roadway excludes yard tracks and sidings, and does not reflect the fact that a mile of road may include two, three, or more parallel tracks. U.S. railroads also control an additional 471 miles of road in Canada and Mexico. See page 16 for more detail on the mileage in the U.S. rail network.

** Canadian railroad operations in the United States in addition to U.S. railroads owned by Canadian carriers. Two Class I railroads are controlled by Canadian railroads but listed in the U.S. railroad categories.

Source: AAR - *Profiles of U.S. Railroads*



AAR-E-00004101

# NUMBER OF RAILROADS

| Year | Class I | Regional | Local Linehaul | Local Switching & Terminal | Total* |
|---|---|---|---|---|---|
| 1996 | 10 | 32 | 299 | 212 | 553 |
| 1997 | 9 | 34 | 300 | 207 | 550 |
| 1998 | 9 | 35 | 309 | 206 | 559 |
| 1999 | 9 | 36 | 305 | 205 | 555 |
| 2000 | 8 | 35 | 304 | 213 | 560 |
| 2001 | 8 | 34 | 314 | 215 | 571 |
| 2002 | 7 | 31 | 309 | 205 | 552 |
| 2003 | 7 | 32 | 304 | 206 | 549 |
| 2004 | 7 | 31 | 314 | 204 | 556 |
| 2005 | 7 | 30 | 320 | 203 | 560 |

* Two Canadian railroads have operations in the U.S. in addition to the U.S. railroads they own.
Note: See notes on page 8. Source: AAR - *Profiles of U.S. Railroads*

# NUMBER OF EMPLOYEES

| Year | Class I | Regional | Local Linehaul | Local Switching & Terminal | Total |
|---|---|---|---|---|---|
| 1996 | 181,809 | 10,491 | 6,084 | 6,946 | 205,330 |
| 1997 | 177,981 | 10,995 | 5,791 | 5,950 | 200,717 |
| 1998 | 178,222 | 11,094 | 5,781 | 5,809 | 200,906 |
| 1999 | 177,557 | 11,372 | 5,296 | 7,158 | 201,383 |
| 2000 | 168,360 | 11,254 | 4,877 | 7,317 | 191,808 |
| 2001 | 162,155 | 10,302 | 5,023 | 6,889 | 184,369 |
| 2002 | 157,372 | 7,807 | 5,102 | 6,779 | 177,060 |
| 2003 | 154,652 | 7,877 | 5,045 | 6,488 | 174,062 |
| 2004 | 157,699 | 7,422 | 5,349 | 6,429 | 176,899 |
| 2005 | 162,438 | 7,322 | 5,744 | 6,303 | 181,807 |

Note: See notes on pages 8 and 92. Source: AAR - *Profiles of U.S. Railroads*



AAR-E-00004102

# MILES OF ROAD OPERATED

| Year | Class I | Regional | Local Linehaul | Local Switching & Terminal | Total |
|---|---|---|---|---|---|
| 1996 | 126,682 | 19,660 | 20,814 | 6,740 | 173,896 |
| 1997 | 121,670 | 21,466 | 21,339 | 6,810 | 171,285 |
| 1998 | 119,813 | 21,356 | 21,848 | 6,781 | 169,798 |
| 1999 | 120,986 | 21,250 | 21,118 | 7,304 | 170,658 |
| 2000 | 120,597 | 20,978 | 21,512 | 7,425 | 170,512 |
| 2001 | 121,013 | 20,067 | 22,491 | 7,859 | 171,430 |
| 2002 | 123,070 | 17,157 | 21,899 | 7,546 | 169,672 |
| 2003 | 122,293 | 18,090 | 21,543 | 7,733 | 169,659 |
| 2004 | 121,400 | 18,032 | 22,701 | 7,429 | 169,562 |
| 2005 | 120,565 | 17,706 | 24,542 | 7,763 | 170,576 |

Note: Excludes mileage for Canadian railroads. See notes on pages 8 and 102, or see page 16 for detail.

Source: AAR - *Profiles of U.S. Railroads*

# MILES OF ROAD OWNED

| Year | Class I | Regional | Local Linehaul | Local Switching & Terminal | Total |
|---|---|---|---|---|---|
| 1996 | 103,340 | 13,837 | 14,577 | 4,361 | 136,115 |
| 1997 | 99,516 | 14,643 | 14,844 | 4,358 | 133,361 |
| 1998 | 97,932 | 14,509 | 15,045 | 4,324 | 131,810 |
| 1999 | 88,849 | 14,473 | 14,142 | 4,563 | 122,027 |
| 2000 | 88,485 | 13,904 | 14,029 | 4,532 | 120,950 |
| 2001 | 87,360 | 13,200 | 14,308 | 4,302 | 119,170 |
| 2002 | 89,912 | 10,663 | 13,404 | 3,744 | 117,723 |
| 2003 | 88,954 | 11,411 | 13,075 | 3,827 | 117,267 |
| 2004 | 95,111 | 11,428 | 13,338 | 3,471 | 123,348 |
| 2005 | 93,648 | 11,093 | 13,202 | 3,555 | 121,498 |

Note: Class I data in this table do not match the figures on page 103 because different definitions of ownership were used. Total excludes Canadian railroads operating in the United States. Freight railroads operate approximately 19,000 miles owned by governments, Canadian owners, private owners, and Amtrak. See notes on pages 8 and 102, or see page 16 for detail.

Source: AAR - Profiles of U.S. Railroads



AAR-E-00004103

# FREIGHT REVENUE

(Millions of Dollars)

| | Class I | Regional | Local Linehaul | Local Switching & Terminal | Total |
|---|---|---|---|---|---|
| 1996 | $31,889 | $1,542 | $809 | $663 | $34,903 |
| 1997 | 32,322 | 1,611 | 852 | 564 | 35,349 |
| 1998 | 32,247 | 1,586 | 856 | 606 | 35,295 |
| 1999 | 32,680 | 1,765 | 860 | 588 | 35,893 |
| 2000 | 33,083 | 1,743 | 822 | 634 | 36,282 |
| 2001 | 33,533 | 1,576 | 884 | 586 | 36,579 |
| 2002 | 34,110 | 1,303 | 915 | 593 | 36,921 |
| 2003 | 35,413 | 1,352 | 906 | 597 | 38,268 |
| 2004 | 39,131 | 1,410 | 984 | 635 | 42,160 |
| 2005 | 44,457 | 1,482 | 1,117 | 823 | 47,878 |

Note: Revenues for some non-Class I railroads are estimated. See also note on page 8.
Source: AAR - *Profiles of U.S. Railroads*

# CARLOADS ORIGINATED

(Thousands of Carloads)

| | Class I | Regional | Local Linehaul | Local Switching & Terminal | Total |
|---|---|---|---|---|---|
| 1996 | 24,159 | 2,039 | 1,603 | 1,510 | 29,311 |
| 1997 | 25,016 | 1,953 | 1,642 | 1,309 | 29,920 |
| 1998 | 25,705 | 2,173 | 1,849 | 1,722 | 31,449 |
| 1999 | 27,096 | 2,152 | 1,897 | 1,280 | 32,425 |
| 2000 | 27,763 | 2,174 | 1,712 | 1,352 | 33,000 |
| 2001 | 27,205 | 1,924 | 1,698 | 1,123 | 31,950 |
| 2002 | 27,901 | 1,729 | 1,749 | 1,050 | 32,430 |
| 2003 | 28,870 | 1,610 | 1,715 | 1,081 | 33,276 |
| 2004 | 30,095 | 1,399 | 1,775 | 1,102 | 34,370 |
| 2005 | 31,142 | 1,448 | 1,910 | 1,062 | 35,562 |

Note: Carloads for some non-Class I railroads are estimated. See also note on page 8.
Source: AAR - *Profiles of U.S. Railroads*

# RAILROAD MILEAGE OPERATED IN EACH STATE - 2005

| | U.S. Railroads | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | Local | | | | |
| State | Class I | Regional | Linehaul | Switching & Terminal | U.S. Total | Other* | Grand Total |
| Alabama | 2,684 | 344 | 605 | 154 | 3,787 | 0 | 3,787 |
| Alaska | 0 | 506 | 0 | 0 | 506 | 0 | 506 |
| Arizona | 1,287 | 0 | 382 | 203 | 1,872 | 0 | 1,872 |
| Arkansas | 2,550 | 208 | 720 | 113 | 3,591 | 0 | 3,591 |
| California | 5,488 | 52 | 1,285 | 510 | 7,335 | 0 | 7,335 |
| Colorado | 2,930 | 157 | 324 | 98 | 3,509 | 0 | 3,509 |
| Connecticut | 69 | 412 | 222 | 0 | 703 | 0 | 703 |
| Delaware | 247 | 0 | 24 | 11 | 282 | 0 | 282 |
| Dist. of Columbia | 34 | 0 | 0 | 5 | 39 | 0 | 39 |
| Florida | 1,802 | 431 | 734 | 4 | 2,971 | 0 | 2,971 |
| Georgia | 3,426 | 0 | 1,474 | 1 | 4,901 | 0 | 4,901 |
| Hawaii | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Idaho | 992 | 100 | 439 | 147 | 1,678 | 0 | 1,678 |
| Illinois | 7,955 | 620 | 785 | 413 | 9,773 | 0 | 9,773 |
| Indiana | 3,666 | 57 | 1,226 | 219 | 5,168 | 0 | 5,168 |
| Iowa | 2,804 | 1,006 | 334 | 52 | 4,196 | 0 | 4,196 |
| Kansas | 3,986 | 1,808 | 38 | 248 | 6,080 | 0 | 6,080 |
| Kentucky | 2,261 | 290 | 220 | 0 | 2,771 | 0 | 2,771 |
| Louisiana | 2,614 | 0 | 733 | 60 | 3,407 | 0 | 3,407 |
| Maine | 0 | 876 | 284 | 2 | 1,162 | 0 | 1,162 |
| Maryland | 836 | 125 | 176 | 27 | 1,164 | 0 | 1,164 |
| Massachusetts | 435 | 502 | 310 | 10 | 1,257 | 0 | 1,257 |
| Michigan | 2,579 | 440 | 1,182 | 260 | 4,461 | 1 | 4,462 |
| Minnesota | 4,036 | 714 | 889 | 156 | 5,795 | 44 | 5,839 |
| Mississippi | 1,966 | 46 | 406 | 170 | 2,588 | 0 | 2,588 |
| Missouri | 4,134 | 488 | 61 | 154 | 4,837 | 0 | 4,837 |
| Montana | 2,108 | 865 | 338 | 0 | 3,311 | 0 | 3,311 |
| Nebraska | 2,709 | 366 | 519 | 15 | 3,609 | 0 | 3,609 |
| Nevada | 2,005 | 0 | 0 | 0 | 2,005 | 0 | 2,005 |
| New Hampshire | 0 | 172 | 296 | 0 | 468 | 0 | 468 |
| New Jersey | 1,581 | 108 | 199 | 873 | 2,761 | 68 | 2,829 |
| New Mexico | 2,037 | 0 | 94 | 310 | 2,441 | 0 | 2,441 |
| New York | 2,172 | 427 | 1,178 | 129 | 3,906 | 803 | 4,709 |
| North Carolina | 2,568 | 0 | 549 | 226 | 3,343 | 0 | 3,343 |
| North Dakota | 2,405 | 1,239 | 79 | 0 | 3,723 | 0 | 3,723 |
| Ohio | 4,183 | 1,117 | 959 | 422 | 6,681 | 0 | 6,681 |
| Oklahoma | 2,626 | 78 | 958 | 318 | 3,980 | 0 | 3,980 |
| Oregon | 1,451 | 798 | 498 | 152 | 2,899 | 0 | 2,899 |
| Pennsylvania | 3,605 | 692 | 1,518 | 687 | 6,502 | 452 | 6,954 |
| Rhode Island | 0 | 138 | 0 | 0 | 138 | 0 | 138 |
| South Carolina | 2,080 | 0 | 231 | 93 | 2,404 | 0 | 2,404 |
| South Dakota | 932 | 793 | 186 | 24 | 1,935 | 0 | 1,935 |
| Tennessee | 2,083 | 0 | 665 | 67 | 2,815 | 0 | 2,815 |
| Texas | 12,265 | 393 | 831 | 1,022 | 14,511 | 0 | 14,511 |
| Utah | 1,763 | 0 | 254 | 93 | 2,110 | 0 | 2,110 |
| Vermont | 0 | 79 | 538 | 0 | 617 | 0 | 617 |
| Virginia | 3,151 | 0 | 359 | 63 | 3,573 | 0 | 3,573 |
| Washington | 2,169 | 371 | 840 | 211 | 3,591 | 0 | 3,591 |
| West Virginia | 2,160 | 10 | 344 | 4 | 2,518 | 0 | 2,518 |
| Wisconsin | 3,331 | 620 | 178 | 7 | 4,136 | 0 | 4,136 |
| Wyoming | 1,847 | 6 | 0 | 30 | 1,883 | 0 | 1,883 |
| U.S. TOTAL | 120,012 | 17,454 | 24,464 | 7,763 | 169,693 | 1,368 | 171,061 |

* Canadian railroads (other than CNGT or SOO, which are included in the U.S. railroads).
See note on page 8. See page 16 for more detail on mileages and to reconcile with mileages on other pages.
Data in this table include trackage rights.
Source: AAR - *Profiles of U.S. Railroads*



AAR-E-00004105

# NUMBER OF RAILROADS OPERATING IN EACH STATE - 2005

| | U.S. Railroads | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | Local | | | | |
| State | Class I | Regional | Linehaul | Switching & Terminal | U.S. Total | Other* | Grand Total |
| Alabama | 4 | 1 | 15 | 5 | 25 | 0 | 25 |
| Alaska | 0 | 1 | 0 | 0 | 1 | 0 | 1 |
| Arizona | 2 | 0 | 6 | 2 | 10 | 0 | 10 |
| Arkansas | 3 | 1 | 16 | 5 | 25 | 0 | 25 |
| California | 2 | 1 | 15 | 11 | 29 | 0 | 29 |
| Colorado | 2 | 3 | 5 | 3 | 13 | 0 | 13 |
| Connecticut | 1 | 2 | 5 | 0 | 8 | 0 | 8 |
| Delaware | 2 | 0 | 1 | 2 | 5 | 0 | 5 |
| Dist. of Columbia | 2 | 0 | 0 | 1 | 3 | 0 | 3 |
| Florida | 2 | 2 | 9 | 1 | 14 | 0 | 14 |
| Georgia | 2 | 0 | 19 | 1 | 22 | 0 | 22 |
| Hawaii | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Idaho | 2 | 2 | 5 | 2 | 11 | 0 | 11 |
| Illinois | 7 | 4 | 12 | 18 | 41 | 0 | 41 |
| Indiana | 5 | 2 | 20 | 13 | 40 | 0 | 40 |
| Iowa | 4 | 3 | 6 | 4 | 17 | 0 | 17 |
| Kansas | 4 | 6 | 2 | 3 | 15 | 0 | 15 |
| Kentucky | 5 | 1 | 7 | 0 | 13 | 0 | 13 |
| Louisiana | 6 | 0 | 9 | 2 | 17 | 0 | 17 |
| Maine | 0 | 2 | 4 | 1 | 7 | 0 | 7 |
| Maryland | 2 | 1 | 4 | 2 | 9 | 0 | 9 |
| Massachusetts | 1 | 2 | 5 | 3 | 11 | 0 | 11 |
| Michigan | 4 | 2 | 10 | 7 | 23 | 1 | 24 |
| Minnesota | 4 | 4 | 8 | 3 | 19 | 1 | 20 |
| Mississippi | 5 | 1 | 15 | 5 | 26 | 0 | 26 |
| Missouri | 5 | 2 | 2 | 7 | 16 | 0 | 16 |
| Montana | 2 | 2 | 4 | 0 | 8 | 0 | 8 |
| Nebraska | 2 | 2 | 3 | 3 | 10 | 0 | 10 |
| Nevada | 2 | 0 | 0 | 0 | 2 | 0 | 2 |
| New Hampshire | 0 | 1 | 8 | 0 | 9 | 0 | 9 |
| New Jersey | 2 | 1 | 7 | 6 | 16 | 1 | 17 |
| New Mexico | 2 | 0 | 2 | 1 | 5 | 0 | 5 |
| New York | 2 | 4 | 21 | 7 | 34 | 2 | 36 |
| North Carolina | 2 | 0 | 13 | 8 | 23 | 0 | 23 |
| North Dakota | 2 | 3 | 2 | 0 | 7 | 0 | 7 |
| Ohio | 4 | 2 | 12 | 16 | 34 | 0 | 34 |
| Oklahoma | 3 | 1 | 11 | 5 | 20 | 0 | 20 |
| Oregon | 2 | 3 | 10 | 6 | 21 | 0 | 21 |
| Pennsylvania | 3 | 2 | 28 | 24 | 57 | 1 | 58 |
| Rhode Island | 0 | 1 | 0 | 0 | 1 | 0 | 1 |
| South Carolina | 2 | 0 | 7 | 4 | 13 | 0 | 13 |
| South Dakota | 2 | 2 | 5 | 2 | 11 | 0 | 11 |
| Tennessee | 6 | 0 | 12 | 6 | 24 | 0 | 24 |
| Texas | 3 | 1 | 19 | 21 | 44 | 0 | 44 |
| Utah | 2 | 0 | 2 | 2 | 6 | 0 | 6 |
| Vermont | 0 | 2 | 6 | 0 | 8 | 0 | 8 |
| Virginia | 2 | 0 | 5 | 2 | 9 | 0 | 9 |
| Washington | 2 | 2 | 9 | 6 | 19 | 0 | 19 |
| West Virginia | 2 | 1 | 5 | 1 | 9 | 0 | 9 |
| Wisconsin | 4 | 2 | 3 | 1 | 10 | 0 | 10 |
| Wyoming | 2 | 1 | 0 | 1 | 4 | 0 | 4 |
| U.S. TOTAL | 7 | 30 | 320 | 203 | 560 | 2 | 562 |

* Canadian railroads (other than CNGT or SOO, which are included in the U.S. railroads).
Source: AAR - *Profiles of U.S. Railroads*

# FREIGHT RAILROADS OPERATING IN EACH STATE - 2005



# U.S. RAIL MILEAGE BY OPERATOR – 2005

| | Miles of Roadway | | | | | | |
|---|---|---|---|---|---|---|---|
| | Owned by a Railroad and Operated: | | | | | Total Operated | |
| Railroad Operator | By Owner | Only by a Different Railroad (Leased) | Both by Owner and Non-Owner (Tr. Rights) | Owned by Govmnt. Entity | All Other | Including Trackage Rights | Excluding Trackage Rights |
| ***Railroads in the U.S., U.S. Mileage Only*** | | | | | | | |
| U.S. Class I - U.S. owned | 85,563 | 753 | 22,062 | 1,307 | 80 | 109,765 | 87,703 |
| U.S. Class I - Canadian owned | 7,949 | 12 | 2,286 | 0 | 0 | 10,247 | 7,961 |
| U.S. Class I - Total | 93,512 | 765 | 24,348 | 1,307 | 80 | 120,012 | 95,664 |
| U.S. Regional | 10,866 | 1,835 | 2,066 | 2,557 | 130 | 17,454 | 15,388 |
| U.S. Local Linehaul | 13,188 | 4,731 | 1,945 | 4,259 | 341 | 24,464 | 22,519 |
| U.S. Local Switching & Terminal | 3,555 | 1,393 | 1,085 | 1,608 | 122 | 7,763 | 6,678 |
| **Total Mileage, U.S. Railroads** | 121,121 | 8,724 | 29,444 | 9,731 | 673 | 169,693 | 140,249 |
| Canadian Railroads, U.S. Operations | 561 | 0 | 807 | 0 | 0 | 1,368 | 561 |
| **Total Mileage in U.S.** | 121,682 | 8,724 | 30,251 | 9,731 | 673 | 171,061 | 140,810 |
| ***Railroads in the U.S., All Mileage*** | | | | | | | |
| U.S. Class I - U.S. owned | 85,699 | 783 | 22,449 | 1,307 | 80 | 110,318 | 87,869 |
| U.S. Class I - Canadian owned | 7,949 | 12 | 2,286 | 0 | 0 | 10,247 | 7,961 |
| U.S. Class I - Total | 93,648 | 795 | 24,735 | 1,307 | 80 | 120,565 | 95,830 |
| U.S. Regional | 11,093 | 1,835 | 2,091 | 2,557 | 130 | 17,706 | 15,615 |
| U.S. Local Linehaul | 13,202 | 4,735 | 1,945 | 4,259 | 401 | 24,542 | 22,597 |
| U.S. Local Switching & Terminal | 3,555 | 1,393 | 1,085 | 1,608 | 122 | 7,763 | 6,678 |
| **Total Mileage, U.S. Railroads*** | 121,498 | 8,758 | 29,856 | 9,731 | 733 | 170,576 | 140,720 |
| Canadian Railroads, U.S. Operations | 561 | 0 | 807 | 0 | 0 | 1,368 | 561 |
| **Total Mileage** | 122,059 | 8,758 | 30,663 | 9,731 | 733 | 171,944 | 141,281 |

Notes:
* Includes mileage operated by U.S. railroads in Canada and Mexico.
Government Entities are state governments, local governments, industrial development agencies, port authorities, etc.
"Canadian Railroads, U.S. Operations" mileage shown here excludes the Canadian railroad-owned U.S. Class I railroads (CNGT and SOO).

Source: AAR - *Profiles of U.S. Railroads*

# REGIONAL AND LOCAL RAILROADS OPERATING IN 2005 BY YEAR ESTABLISHED

| Year | Number of | | Miles of Road | |
|---|---|---|---|---|
| Established | Railroads | Employees | Operated | Owned |
| 1996 | 21 | 331 | 2,395 | 1,958 |
| 1997 | 19 | 1,079 | 3,077 | 1,814 |
| 1998 | 16 | 194 | 989 | 224 |
| 1999 | 10 | 1,325 | 1,929 | 847 |
| 2000 | 14 | 141 | 1,077 | 191 |
| 2001 | 19 | 162 | 1,577 | 792 |
| 2002 | 9 | 160 | 208 | 32 |
| 2003 | 8 | 74 | 561 | 402 |
| 2004 | 18 | 281 | 1,108 | 222 |
| 2005 | 15 | 145 | 1,206 | 76 |

Source: AAR - *Profiles of U.S. Railroads*






AAR-E-00004109

# OPERATING REGIONAL AND LOCAL RAILROADS CREATED FROM CLASS I RAILROADS SINCE 1996

| | Year Started | 2005 Miles Operated | Employees |
|---|---|---|---|
| **Burlington Northern and Santa Fe Railway** | | | |
| Cascade & Columbia River Railroad | 1996 | 137 | 9 |
| Cimarron Valley Railroad | 1996 | 266 | 18 |
| Columbia Basin Railroad Company, Inc. | 1996 | 84 | 30 |
| Minnesota Northern Railroad, Inc. | 1996 | 271 | 18 |
| Nebraska Northeastern Railway Co. | 1996 | 120 | 10 |
| Nebraska, Kansas & Colorado Railway, Inc. | 1996 | 529 | 25 |
| Palouse River & Coulee City Railroad | 1996 | 396 | 19 |
| Alabama & Gulf Coast Railway | 1997 | 435 | 76 |
| Illinois Railway | 1997 | 113 | 17 |
| Pacific Harbor Line, Inc. | 1997 | 21 | 140 |
| Puget Sound & Pacific Railroad Co. | 1997 | 149 | 42 |
| St. Croix Valley Railroad Co. | 1997 | 60 | 2 |
| Albany & Eastern Railroad Company | 1998 | 67 | 20 |
| Ballard Terminal Railroad Co. | 1998 | 3 | 5 |
| Stillwater Central Railroad, Inc. | 1998 | 265 | 24 |
| Texas Rock Crusher Railway Co. | 1998 | 6 | 9 |
| Timber Rock Railroad, Inc. | 1998 | 290 | 56 |
| West Isle Line, Inc. | 1998 | 5 | 0 |
| Rock & Rail, LLC | 1999 | 59 | 8 |
| South Plains Switching, Ltd. Co. | 1999 | 21 | 0 |
| Meeker Southern Railroad | 2000 | 5 | 5 |
| Central Illinois Railroad Co. | 2001 | 12 | 5 |
| Missouri & Valley Park Railroad Corp. | 2002 | 27 | 20 |
| Richmond Pacific Railroad Corp. | 2002 | 10 | 14 |
| Alliance Terminal Railroad, LLC | 2004 | 7 | 24 |
| Central Washington Railroad Company | 2004 | 60 | 19 |
| Kettle Falls International Railway, LLC | 2004 | 160 | 16 |
| Mission Mountain Railroad | 2004 | 39 | 8 |
| **Consolidated Rail Corp.*** | | | |
| Connecticut Southern Railroad Inc. | 1996 | 78 | 18 |
| Effingham Railroad Co. | 1996 | 4 | 3 |
| Falls Road Railroad Co., Inc. | 1996 | 41 | 11 |
| Flats Industrial Railroad Co. | 1996 | 3 | 4 |
| Juniata Valley Railroad Co. | 1996 | 12 | 0 |
| Lycoming Valley Railroad Co. | 1996 | 101 | 36 |

| | Year Started | 2005 Miles Operated | Employees |
|---|---|---|---|
| **Consolidated Rail Corp.*, cont.** | | | |
| Pittsburgh & Ohio Central Railroad Co. | 1996 | 42 | 10 |
| R. J. Corman Railroad / Allentown Lines | 1996 | 7 | 1 |
| New York & Greenwood Lake Railway | 1997 | 2 | 6 |
| Youngstown Belt Railroad Co. | 1997 | 32 | 42 |
| Conrail Inc. | 1999 | 1,201 | 1,217 |
| **Canadian National Railway (Grand Trunk Corporation)** | | | |
| Kosciusko & Southwestern Railway | 2000 | 21 | 0 |
| **Canadian Pacific Railway (Soo Line Railroad)** | | | |
| Iowa, Chicago & Eastern Railroad | 1997 | 1,336 | 580 |
| Northern Plains Railroad, Inc. | 1997 | 417 | 38 |
| Sunflour Railroad, Inc. | 2000 | 26 | 0 |
| Progressive Rail Inc. | 2001 | 110 | 40 |
| **CSX Transportation*** | | | |
| Pickens Railway Co. - Honea Path Div. | 1997 | 28 | 7 |
| Youngstown Belt Railroad Co. | 1997 | 32 | 42 |
| West Virginia Central Railroad | 1998 | 98 | 7 |
| Georgia & Florida Railway | 1999 | 300 | 36 |
| Conecuh Valley Railroad | 2001 | 15 | 3 |
| Fore River Transportation Corporation | 2001 | 4 | 10 |
| R. J. Corman RR / Central Kentucky Lines | 2003 | 114 | 36 |
| Alabama & Tennessee River Railway, LLC | 2004 | 122 | 50 |
| Chesapeake and Indiana Railroad Co. | 2004 | 33 | 4 |
| Chicago, Ft. Wayne & Eastern | 2004 | 280 | 43 |
| East Brookfield & Spencer Railroad, LLC | 2004 | 4 | 15 |
| Fulton County Railway, LLC | 2004 | 55 | 9 |
| Riceboro Southern Railway, LLC | 2004 | 33 | 2 |
| Evansville Western Railway | 2005 | 124 | unknown |
| First Coast Railroad | 2005 | 32 | 12 |
| Marquette Rail, LLC | 2005 | 130 | 28 |
| R.J. Corman Railroad / West Virginia Line | 2005 | 12 | 3 |
| Saginaw Bay Southern Railway Company | 2005 | 70 | unknown |

AAR-E-00004110

# OPERATING REGIONAL AND LOCAL RAILROADS CREATED FROM CLASS I RAILROADS SINCE 1996

| | Year Started | 2005 Miles Operated | Employees |
|---|---|---|---|
| **Kansas City Southern Railway Co.** | | | |
| Meridian Southern Railway, LLC | 2000 | 60 | 9 |
| Kaw River Railroad | 2004 | 28 | 19 |
| Alabama Southern Railroad | 2005 | 86 | 25 |
| Arkansas Southern Railroad | 2005 | 61 | 7 |
| Louisiana Southern Railroad, Inc. | 2005 | 157 | 29 |
| **Norfolk Southern Corp.*** | | | |
| Luxapalila Valley Railroad, Inc. | 1996 | 34 | 4 |
| Heritage Railroad Corp. | 1997 | 16 | 2 |
| Pickens Railway Co. - Honea Path Div. | 1997 | 28 | 7 |
| Knoxville & Holston River Railroad Co. | 1998 | 18 | 6 |
| Georgia & Florida Railway | 1999 | 300 | 36 |
| B&H Rail Corp. | 2001 | 50 | 6 |
| East Chattanooga Belt Railway Co. | 2001 | 4 | 2 |
| The Athens Line, LLC | 2001 | 22 | 2 |
| Western New York & Pennsylvania Railroad | 2001 | 233 | 20 |
| Chattahoochee Bay Railroad Inc. | 2003 | 26 | 4 |
| Central New York Railroad Corporation | 2004 | 149 | 7 |
| Morehead & South Fork Railroad Co., Inc. | 2005 | 10 | 5 |
| **Union Pacific Railroad Company** | | | |
| Alamo Gulf Coast Railroad Co. | 1996 | 10 | 10 |
| Arkansas & Oklahoma Railroad, Inc. | 1996 | 127 | 18 |
| Palouse River & Coulee City Railroad | 1996 | 396 | 19 |
| Corpus Christi Terminal Railroad, Inc. | 1997 | 4 | 13 |
| Lake County Railroad | 1997 | 56 | 0 |
| Pacific Harbor Line, Inc. | 1997 | 21 | 140 |
| Puget Sound & Pacific Railroad Co. | 1997 | 149 | 42 |
| Albany & Eastern Railroad Company | 1998 | 67 | 20 |
| Bighorn Divide & Wyoming Railroad Inc. | 1998 | 30 | 12 |
| New Orleans & Gulf Coast Railway Co., Inc. | 1999 | 32 | 16 |
| Rock & Rail, LLC | 1999 | 59 | 8 |

| | Year Started | 2005 Miles Operated | Employees |
|---|---|---|---|
| **Union Pacific Railroad Company (continued)** | | | |
| Boone & Scenic Valley Railroad | 2001 | 2 | 0 |
| Iowa Northwestern Railroad | 2001 | 27 | 4 |
| Richmond Pacific Railroad Corp. | 2002 | 10 | 14 |
| San Luis & Rio Grande Railroad, Inc. | 2003 | 149 | 8 |
| Modoc Northern Railroad Company | 2005 | 107 | 10 |
| Wisconsin Northern | 2005 | 58 | 5 |

**General Notes**

This table includes railroads created from predecessor railroads. For example: Union Pacific and Southern Pacific merged during the mid-1990s, and they were both Class I railroads at that time. Consequently, railroads created from Southern Pacific line are now listed under the Union Pacific heading. In addition, some railroads consist of line from more than one Class I railroad. Not included are second- or third-generation railroads which were created from railroads that were themselves originally created from one or more Class I railroads since 1994.

**Footnotes**

* - Consolidated Rail Corporation (CR) is no longer a Class I railroad. Since most of CR's infrastructure is operated by CSX Transportation (CSX) or Norfolk Southern (NS), railroads created from CR line should be listed under the CSX or NS heading. Because these CR "spinoff" railroads would be difficult to assign to either CSX or NS, they are listed under the Conrail heading.

**Zero and Unknown Employees**

Railroads with zero employees have zero *full-time* freight employees. Railroads with "unknown" for employees are new railroads with an unknown number of full-time freight employees.





AAR-E-00004111

# INDUSTRY DISTRIBUTIONS

## ANNUAL FREIGHT REVENUE - 2005

(thousands $)

| Type of Railroad | High | Low |
|---|---|---|
| Class I | $12,856,131 | $668,712 |
| Regional | 232,300 | 1,385 |
| Local | | |
| Linehaul | 26,150 | 0 |
| Switching & Term. | 85,049 | 2 |

Note: Exact revenues for the following number of railroads are unknown: 5 Regional, 96 Local Linehaul, and 49 Local Switching & Terminal.

## MILES OF ROAD OPERATED DECEMBER 31, 2005

| Type of Railroad | High | Low |
|---|---|---|
| Class I | 32,426 | 3,197 |
| Regional | 1,336 | 168 |
| Local | | |
| Linehaul | 342 | 1 |
| Switching & Term. | 1,201 | 1 |

## CARLOADS CARRIED - 2005

| Type of Railroad | High | Low |
|---|---|---|
| Class I | 10,024,189 | 841,537 |
| Regional | 403,913 | 2,454 |
| Local | | |
| Linehaul | 137,857 | 3 |
| Switching & Term. | 636,377 | 6 |

Note: Carloadings for the following number of railroads are unknown: 19 Local Linehaul and 8 Local Switching and Terminal.

## EMPLOYEES - 2005

| Type of Railroad | High | Low |
|---|---|---|
| Class I | 51,095 | 2,699 |
| Regional | 892 | 12 |
| Local | | |
| Linehaul | 163 | 0 |
| Switching & Term. | 1,217 | 0 |

Note: Totals for Regional and Local railroads include employees who spend at least 50 percent of their time on freight railroad business.

Source: AAR - *Profiles of U.S. Railroads*













Source: AAR - *Profiles of U.S. Railroads*



AAR-E-00004113

# MEASURES OF OPERATING EFFICIENCY - 2005

| Measure | Class I | Regional | Local Linehaul | Local Switching & Terminal |
|---|---|---|---|---|
| Revenue Per Mile Operated ($000) | $369 | $ 84 | $ 47 | $108 |
| Revenue Per Employee ($000) | $274 | $204 | $203 | $151 |
| Revenue Per Carload Carried ($) | $1,150 | $563 | $311 | $188 |
| Employees Per Mile Operated | 1.35 | 0.41 | 0.24 | 0.85 |
| Employees Per Thousand Carloads | 4.20 | 2.76 | 1.60 | 1.12 |
| Carloads Carried Per Employee | 238 | 362 | 624 | 894 |
| Carloads Carried Per Mile Operated | 321 | 150 | 150 | 658 |

Note: Figures are based on data supplied by railroads. Source: AAR - *Profiles of U.S. Railroads*












AAR-E-00004114

# MEASURES OF OPERATING EFFICIENCY - 2005















AAR-E-00004115

# DISTRIBUTION OF FREIGHT TRAFFIC: TON-MILES

**Distribution of Ton-Miles**

| Year | Railroads | Trucks | Water | Oil Pipelines | Air |
|---|---|---|---|---|---|
| 1995 | 34.9 % | 27.4 % | 21.4 % | 15.9 % | 0.3 % |
| 1996 | 35.9 | 27.7 | 19.9 | 16.1 | 0.4 |
| 1997 | 36.2 | 28.9 | 18.4 | 16.1 | 0.4 |
| 1998 | 37.2 | 29.3 | 17.3 | 15.9 | 0.4 |
| 1999 | 37.9 | 29.6 | 16.5 | 15.6 | 0.4 |
| 2000 | 38.9 | 30.0 | 16.2 | 14.5 | 0.4 |
| 2001 | 39.7 | 30.2 | 15.5 | 14.3 | 0.3 |
| 2002 | 39.5 | 30.7 | 15.1 | 14.4 | 0.3 |
| 2003 | 39.3 | 31.0 | 14.9 | 14.5 | 0.4 |
| 2004 | 39.8 | 31.0 | 14.7 | 14.2 | 0.4 |

Source: USDOT, Research and Innovative Technologies Administration, Bureau of Transportation Statistics, *National Transportation Statistics,* Table 1-46b

Note: Some intra-city ton-miles are included. Gas pipelines have been excluded. 2005 not yet available.

Distribution of Ton-Miles - 2004






AAR-E-00004116

# DISTRIBUTION OF INTERCITY FREIGHT TRAFFIC: TONS CARRIED

**Distribution of Intercity Tonnage**

| Year | Railroads | Trucks | Water | Oil Pipelines | Air |
|---|---|---|---|---|---|
| 1992 | 26.7 % | 42.3 % | 15.1 % | 15.8 % | 0.1 % |
| 1993 | 26.0 | 44.2 | 14.3 | 15.4 | 0.1 |
| 1994 | 26.2 | 45.2 | 13.9 | 14.6 | 0.1 |
| 1995 | 25.7 | 46.1 | 13.5 | 14.5 | 0.1 |
| 1996 | 25.8 | 46.3 | 13.1 | 14.6 | 0.2 |
| 1997 | 25.1 | 47.6 | 13.0 | 14.1 | 0.2 |
| 1998 | 25.1 | 48.7 | 12.3 | 13.7 | 0.2 |
| 1999 | 25.3 | 49.2 | 11.7 | 13.6 | 0.2 |
| 2000 | 25.3 | 49.8 | 11.4 | 13.3 | 0.2 |
| 2001 *p* | 25.5 | 49.5 | 11.3 | 13.5 | 0.2 |

Note: In addition to regulated carriers, for-hire and private carriers are included in the above data. Water tonnage includes coastal traffic. *p - preliminary*

Note: 2002 though 2005 non-railroad intercity tonnage data were not available at the time this publication was printed.

Source: Eno Transportation Foundation, Inc. - *Transportation in America*

## Distribution of Intercity Tonnage - 2001






AAR-E-00004117

# DISTRIBUTION OF INTERCITY FREIGHT REVENUES

| | MILLIONS OF DOLLARS | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Mode** | **1992** | **1993** | **1994** | **1995** | **1996** | **1997** | **1998** | **1999** | **2000** | **2001p** |
| Trucks | $176,800 | $189,700 | $204,876 | $219,627 | $235,440 | $257,807 | $282,814 | $304,563 | $305,165 | $309,444 |
| Railroads | 30,473 | 30,775 | 33,121 | 34,605 | 35,059 | 35,349 | 35,294 | 36,084 | 36,454 | 36,736 |
| Bus | 130 | 128 | 128 | 130 | 132 | 134 | 141 | 149 | 146 | 148 |
| Water | 3,388 | 3,377 | 3,445 | 3,549 | 3,433 | 3,514 | 3,514 | 3,466 | 3,516 | 3,380 |
| Inland | 2,801 | 2,816 | 2,868 | 2,964 | 2,861 | 2,899 | 2,904 | 2,918 | 2,960 | 2,894 |
| Great Lakes | 587 | 561 | 577 | 585 | 572 | 615 | 610 | 548 | 556 | 486 |
| Oil Pipelines | 8,548 | 8,470 | 8,676 | 9,077 | 8,637 | 8,632 | 8,579 | 9,067 | 8,958 | 9,066 |
| Regulated | 7,185 | 6,949 | 7,353 | 7,751 | 7,310 | 7,278 | 7,212 | 7,645 | 7,551 | 7,649 |
| Non-Regulated | 1,363 | 1,521 | 1,323 | 1,326 | 1,327 | 1,354 | 1,367 | 1,422 | 1,407 | 1,417 |
| Domestic Air | 10,968 | 11,775 | 12,793 | 13,917 | 14,721 | 16,472 | 17,802 | 18,608 | 19,800 | 18,446 |
| Freight Forwarders | 4,402 | 4,666 | 5,133 | 4,956 | 5,352 | 5,620 | 6,046 | 7,529 | 7,820 | 7,672 |
| **TOTAL** | $234,709 | $248,891 | $268,172 | $285,861 | $302,774 | $327,528 | $354,190 | $379,466 | $381,859 | $384,892 |
| | PERCENT OF TOTAL | | | | | | | | | |
| **Mode** | **1992** | **1993** | **1994** | **1995** | **1996** | **1997** | **1998** | **1999** | **2000** | **2001p** |
| Trucks | 75.3 | 76.2 | 76.4 | 76.8 | 77.8 | 78.7 | 79.8 | 80.3 | 79.9 | 80.4 |
| Railroads | 13.0 | 12.4 | 12.4 | 12.1 | 11.6 | 10.8 | 10.0 | 9.5 | 9.5 | 9.5 |
| Bus | 0.1 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Water | 1.4 | 1.4 | 1.3 | 1.2 | 1.1 | 1.1 | 1.0 | 0.9 | 0.9 | 0.9 |
| Inland | 1.2 | 1.1 | 1.1 | 1.0 | 0.9 | 0.9 | 0.8 | 0.8 | 0.8 | 0.8 |
| Great Lakes | 0.3 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.1 | 0.1 | 0.1 |
| Oil Pipelines | 3.6 | 3.4 | 3.2 | 3.2 | 2.9 | 2.6 | 2.4 | 2.4 | 2.3 | 2.4 |
| Regulated | 3.1 | 2.8 | 2.7 | 2.7 | 2.4 | 2.2 | 2.0 | 2.0 | 2.0 | 2.0 |
| Non-Regulated | 0.6 | 0.6 | 0.5 | 0.5 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 |
| Domestic Air | 4.7 | 4.7 | 4.8 | 4.9 | 4.9 | 5.0 | 5.0 | 4.9 | 5.2 | 4.8 |
| Freight Forwarders | 1.9 | 1.9 | 1.9 | 1.7 | 1.8 | 1.7 | 1.7 | 2.0 | 2.0 | 2.0 |
| **TOTAL** | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |

*p - preliminary*     Source: Eno Transportation Foundation, Inc. - *Transportation in America*

Note: Data for 2002-2005 are not available.
Listed below are railroad industry freight revenues provided by the Association of American Railroads (in millions):

| | |
|---|---|
| 2002 | $36,921 |
| 2003 | $38,268 |
| 2004 | $42,160 |
| 2005 | $47,878 |



AAR-E-00004118

# CLASS I
# RAILROAD
# STATISTICS

# 2005 CLASS I RAILROAD SYSTEMS

BNSF Railway Company

Canadian National Railway[1] (a.k.a. CN)
(Grand Trunk Corporation)

Canadian Pacific Railway[1]
(Soo Line Railroad Company)

CSX Transportation, Inc.

Kansas City Southern Railway Company

Norfolk Southern

Union Pacific Railroad Company

*Notes:*

[1] - The entire Canadian National Railway (CN) and Canadian Pacific Railway (CPR) systems are not U.S. Class I railroads. However, major portions of their U.S. operations (Grand Trunk Corporation and Soo Line, respectively) meet the U.S. regulatory criteria and are individual Class I railroads. CN and CPR also operate U.S. mileage separate from their respective Class I systems.



AAR-E-00004120

# CLASS I UNIFICATIONS 1996-2005

| Effective Date of Unification | Type of Unification | Applicant Railroads | Controlling Railroad/Company |
|---|---|---|---|
| 9-11-1996 | Merger | Union Pacific and Southern Pacific | Union Pacific |
| 6-1-1999 | Joint acquisition | Conrail, CSX, Norfolk Southern | CSX, Norfolk Southern |
| 7-1-1999 | Merger | Canadian National Railway (CN), Illinois Central Railroad | Canadian National Railway |
| 5-10-2004 | Purchase | CN, Bessemer & Lake Erie, and Duluth, Missabe & Iron Range (both Class II but used to be Class I) | Canadian National Railway |

Source: AAR

# CONSOLIDATION OF R-1 ANNUAL REPORTS TO THE STB

**UNION PACIFIC RAILROAD COMPANY**

Southern Pacific Transportation Company (1996)

**CSX TRANSPORTATION, INC. and NORFOLK SOUTHERN COMBINED RAILROAD SUBSIDIARIES**

Consolidated Rail Corporation (Conrail) (1999)[1]

**GRAND TRUNK CORPORATION[2]**

Grand Trunk Western Railroad Inc. (2001)
Illinois Central Railroad Company (2001)
Class II Wisconsin Central Ltd. and others beginning 2002
Class II Bessemer & Lake Erie and Duluth, Missabe & Iron Range in 2004

**KANSAS CITY SOUTHERN**

Class II Gateway Western beginning 2001.
Class II Texas Mexican Railway beginning 2005.

( ) indicates last year reporting separately

[1] Reported a complete annual report for January through May 1999, and a partial report for the full year. CSX and NS each own a portion of the former Conrail.

[2] A 2001 ruling by the Surface Transportation Board directed CN to report nearly all of its U.S. operations as one entity beginning 2002, including two previously separate Class I railroads plus some non-Class I operations. See note on page 32. This publication uses CNGT to represent CN's Grand Trunk Corporation.



AAR-E-00004121

# RAILROAD DECLASSIFICATIONS

| | | Operations in Year Prior to Declassification | | | |
|---|---|---|---|---|---|
| Railroad | Year Declassified | Miles of Road Operated | Number of Employees | Operating Revenues ($000) | Carloads Originated |
| Conrail (Jan.-May 1999) | 2000 | 8,663 | 19,805 | $1,516,462 | 1,128,980 |
| Conrail (full year 1998) | | 10,797 | 19,933 | 3,749,139 | 2,856,690 |

Source: AAR

# 2005 STB FINANCIAL & STATISTICAL REPORTING REQUIREMENTS*

**Monthly**

Monthly Report of Number of Employees of Class I Railroads
(49 CFR 1246 M-350 Wage Form C due 15 days after end of month)
Waybill Sample Data (49 CFR 1244 Due 60 days after period)

**Quarterly**

Quarterly Report of Revenue, Expense and Income (49 CFR 1243.1 Form RE&I due 50 days after quarter)
Quarterly Condensed Balance Sheet (49 CFR 1243.2 Form CBS due 30 days after quarter)

**Quarterly/Annual**

Report of Freight Commodity Statistics
(49 CFR 1248 Form QCS annual due 90 days after year, quarterly due 60 days after quarter)
Report of Railroad Employees, Service and Compensation
(49 CFR 1245 Wage Forms A & B annual due 45 days after year, quarterly due 30 days after quarter)

**Annual**

Annual Report (49 CFR 1201 Form R-1 due March 31 after year)
Annual Report of Cars Loaded and Cars Terminated (49 CFR 1247 Form STB-54, due 90 days after year)
Schedule 250 (Consolidated Information For Revenue Adequacy...due April 30 of following year)

* Requirements for Class I railroads only, except Waybill Sample Data

Source: AAR

# 2005
# PERFORMANCE

# NOTES

- Unless specifically noted, data in the Class I section reflect the operations of Class I railroads only. The data presented in most tables reflect the Class I consist of railroads for the year indicated. The consist has changed over time because of mergers, bankruptcies, and declassifications from Class I status and will therefore affect the trends. Class I railroads are classified as such by the STB on the basis of their operating revenues. Prior to 1982, the Class I revenue threshold was increased only four times. In 1982 the STB adopted a procedure to adjust the threshold annually for inflation by restating the 1978 threshold of $50 million in constant dollars. With Ex Parte No. 492 in June 1992, the STB raised the threshold for Class I status from $50 million in 1978 dollars to $250 million in 1991 dollars. Below are the 1996-2005 revenue thresholds for Class I railroads:

| Year | Annual Operating Revenue (millions) |
|---|---|
| 1996 | $255.0 |
| 1997 | 256.4 |
| 1998 | 259.4 |
| 1999 | 258.5 |
| 2000 | 261.9 |
| 2001 | 266.7 |
| 2002 | 272.0 |
| 2003 | 277.7 |
| 2004 | 289.4 |
| 2005 | 319.3 |

- The Surface Transportation Board served a decision in Ex Parte No. 634 on November 7, 2001, that, effective January 1, 2002, "Class I rail systems should file consolidated reports that combine the operations of all their commonly controlled railroads or railroad-related affiliates functioning as an integrated rail system within the United States." This did not affect 2001 reporting. In 2002, reporting for two Class I railroads owned by Canadian National Railway (CN) – Grand Trunk Western and Illinois Central – was replaced with a single combined entity known as Grand Trunk Corporation. (The abbreviation for Grand Trunk Corporation used in this publication is CNGT.) Nearly all of CN's 2002 U.S. rail operations were included in CNGT, including some regional and local railroads that have not been included in Class I statistics previously. Thus, the STB ruling reduced the number of Class I railroads from 8 to 7, but the ruling increased the size (revenue, tonnage, etc.) of the Class I group because of the consolidation of some regional and local railroads. CN has since added more railroads to Grand Trunk Corporation. Beginning May 2004, most CNGT statistics include Great Lakes Transportation, which consists primarily of the Bessemer & Lake Erie Railroad and the Duluth, Missabe & Iron Range Railway – two regional railroads that were Class I during the early 1980s. Beginning 2005, all Great Lakes statistics are included.

# 2005 CLASS I RAILROAD PERFORMANCE SUMMARY

| | |
|---|---|
| **TRAFFIC AND REVENUE** | |
| Tons originated | 1,898,721,166 |
| Carloads originated | 31,142,217 |
| Revenue ton-miles (000) | 1,696,424,792 |
| Revenue per ton-mile | 2.621¢ |
| **FINANCIAL STATISTICS ($000)** | |
| Operating revenue | $46,118,002 |
| Operating expenses | $37,842,772 |
| Depreciation | $4,312,960 |
| Current taxes | $4,898,027 |
| Net railway operating income | $6,075,280 |
| Ordinary income | $4,916,536 |
| Capital expenditures | $7,068,453 |
| Net investment, as reported | $108,891,825 |
| **EMPLOYMENT AND WAGES** | |
| Number of employees | 162,438 |
| Total wages ($000) | $10,879,317 |
| Average annual wages | $66,975 |
| **PLANT AND EQUIPMENT** | |
| Miles of road operated | 120,565 |
| Number of freight cars in service* | 1,534,717 |
| Capacity of freight car fleet* (tons) | 154,134,414 |
| Number of locomotives in service | 22,779 |
| Capacity of locomotive fleet (horsepower) | 78,986,152 |
| **OPERATIONS** | |
| Tons per carload originated | 61.0 |
| Revenue ton-miles per car loaded | 54,473 |
| Average freight train load (tons) | 3,115 |
| Average length of haul (miles) | 893 |
| Cars per freight train | 68.9 |
| Freight loss and damage claims | $122,820,211 |
| Gallons of fuel consumed in freight service | 4,097,864,564 |
| Revenue ton-miles per gallon of fuel | 414 |
| Revenue ton-miles per freight service employee | 10,481 |
| Freight service employees per mile of road operated | 1.3 |

* All North American freight car owners

# RANKING OF RAILROADS BY 2005 OPERATING REVENUE

| Rank | Railroad | Operating Revenue (thousands $) | Percent of Total |
|---|---|---|---|
| 1 | Union Pacific Railroad Company | $13,545,349 | 29.37 % |
| 2 | BNSF Railway Company | 12,845,580 | 27.85 |
| 3 | Norfolk Southern | 8,526,827 | 18.49 |
| 4 | CSX Transportation | 7,688,738 | 16.67 |
| 5 | Grand Trunk Corporation (CN owned) | 2,024,734 | 4.39 |
| 6 | Kansas City Southern Railway Company | 799,604 | 1.73 |
| 7 | Soo Line Railroad Company (CPR owned) | 687,170 | 1.49 |
| | **Total** | **$46,118,002** | **100.00 %** |






AAR-E-00004126

# RANKING OF RAILROADS BY 2005 REVENUE TON-MILES

| Rank | Railroad | Revenue Ton-Miles (thousands) | Percent of Total |
|---|---|---|---|
| 1 | BNSF Railway Company | 594,675,532 | 35.05 % |
| 2 | Union Pacific Railroad Company | 548,761,432 | 32.35 |
| 3 | CSX Transportation | 247,410,850 | 14.58 |
| 4 | Norfolk Southern | 202,751,314 | 11.95 |
| 5 | Grand Trunk Corporation (CN owned) | 54,063,480 | 3.19 |
| 6 | Kansas City Southern Railway Company | 25,167,380 | 1.48 |
| 7 | Soo Line Railroad Company (CPR owned) | 23,594,804 | 1.39 |
| | **Total** | **1,696,424,792** | **100.00 %** |



# RANKING OF RAILROADS BY 2005 EMPLOYMENT

| Rank | Railroad | Number of Employees | Percent of Total |
|---|---|---|---|
| 1 | Union Pacific Railroad Company | 51,095 | 31.46 % |
| 2 | BNSF Railway Company | 39,358 | 24.23 |
| 3 | CSX Transportation | 30,486 | 18.77 |
| 4 | Norfolk Southern | 29,880 | 18.39 |
| 5 | Grand Trunk Corporation (CN owned) | 6,133 | 3.78 |
| 6 | Kansas City Southern Railway Company | 2,787 | 1.72 |
| 7 | Soo Line Railroad Company (CPR owned) | 2,699 | 1.66 |
| | **Total** | **162,438** | **100.00 %** |



# RANKING OF RAILROADS BY 2005 MILES OF ROAD OPERATED

| Rank | Railroad | Miles of Road Operated | Percent of Total |
|---|---|---|---|
| 1 | Union Pacific Railroad Company | 32,426 | 26.90 % |
| 2 | BNSF Railway Company | 32,154 | 26.67 |
| 3 | CSX Transportation | 21,357 | 17.71 |
| 4 | Norfolk Southern | 21,184 | 17.57 |
| 5 | Grand Trunk Corporation (CN owned) | 6,736 | 5.59 |
| 6 | Soo Line Railroad Company (CPR owned) | 3,511 | 2.91 |
| 7 | Kansas City Southern Railway Company | 3,197 | 2.65 |
| | **Total** | **120,565** | **100.00 %** |



# 2005 TRAFFIC BY MAJOR COMMODITY GROUP

| STCC | Commodity | Carloads Originated | Growth | Tons Originated | Growth | Gross Freight Revenue | Growth |
|---|---|---|---|---|---|---|---|
| 01 | Farm Products | 1,510,251 | -0.6% | 140,441,409 | -0.8% | 3,628,016,555 | 14.2% |
| 10 | Metallic Ores | 661,971 | 95.2% | 59,941,025 | 79.0% | 485,059,232 | 53.1% |
| 11 | Coal | 7,201,742 | 1.4% | 804,138,846 | 1.6% | 9,393,039,904 | 11.6% |
| 14 | Nonmetallic Minerals | 1,488,057 | 4.0% | 145,696,967 | 4.1% | 1,292,738,306 | 14.3% |
| 20 | Food & Kindred Products | 1,448,340 | -0.9% | 102,190,855 | 1.8% | 3,252,990,276 | 12.5% |
| 24 | Lumber & Wood Products | 611,373 | -0.7% | 47,602,967 | 0.5% | 2,278,225,216 | 18.4% |
| 26 | Pulp, Paper & Allied Products | 679,231 | 1.6% | 38,242,032 | 0.5% | 1,953,090,165 | 12.9% |
| 28 | Chemicals & Allied Products | 1,937,298 | -2.2% | 165,470,015 | -1.2% | 5,432,184,493 | 6.5% |
| 29 | Petroleum & Coal Products | 689,058 | 5.8% | 57,340,731 | 6.8% | 1,500,497,472 | 18.3% |
| 32 | Stone, Clay & Glass Products | 602,679 | 1.4% | 55,230,898 | 3.2% | 1,504,895,006 | 13.8% |
| 33 | Primary Metal Products | 679,734 | -3.0% | 57,177,836 | -2.3% | 1,734,201,834 | 14.3% |
| 37 | Transportation Equipment | 1,922,995 | 4.0% | 37,920,666 | 2.0% | 3,960,255,352 | 5.7% |
| 40 | Waste & Scrap Materials | 705,590 | -2.7% | 47,344,831 | 2.8% | 1,069,751,783 | 11.8% |
| 46 | Misc. Mixed Shipments* | 8,153,470 | 4.7% | 119,835,175 | 5.5% | 6,998,025,210 | 14.0% |
| | **Subtotal** | **28,291,789** | | **1,878,574,253** | | **44,482,970,804** | |
| | All Others | 2,850,428 | | 20,146,913 | | 2,259,874,635 | |
| | **Total** | **31,142,217** | **3.5%** | **1,898,721,166** | **3.0%** | **46,742,845,439** | **12.3%** |

* Intermodal traffic comprises most of this category. Some intermodal traffic is also dispersed among the commodity categories shown here, and the All Other category is about 80 percent intermodal.

Note: Growth is change from the previous year. High growth for Metallic Ores was caused by the acquisition of a regional railroad.

Source: AAR - *Freight Commodity Statistics*












AAR-E-00004130

# DISTRIBUTION OF 2005 TRAFFIC BY MAJOR COMMODITY GROUP

| STCC | Commodity | Percent of: Carloads Originated | Tons Originated | Gross Freight Revenue | Rank: Carloads | Tons | Revenue |
|---|---|---|---|---|---|---|---|
| 01 | Farm Products | 4.8 % | 7.4 % | 7.8 % | 5 | 4 | 5 |
| 10 | Metallic Ores | 2.1 | 3.2 | 1.0 | 12 | 7 | 14 |
| 11 | Coal | 23.1 | 42.4 | 20.1 | 2 | 1 | 1 |
| 14 | Nonmetallic Minerals | 4.8 | 7.7 | 2.8 | 6 | 3 | 12 |
| 20 | Food & Kindred Products | 4.7 | 5.4 | 7.0 | 7 | 6 | 6 |
| 24 | Lumber & Wood Products | 2.0 | 2.5 | 4.9 | 13 | 11 | 7 |
| 26 | Pulp, Paper & Allied Products | 2.2 | 2.0 | 4.2 | 11 | 13 | 8 |
| 28 | Chemicals & Allied Products | 6.2 | 8.7 | 11.6 | 3 | 2 | 3 |
| 29 | Petroleum & Coal Products | 2.2 | 3.0 | 3.2 | 9 | 8 | 11 |
| 32 | Stone, Clay & Glass Products | 1.9 | 2.9 | 3.2 | 14 | 10 | 10 |
| 33 | Primary Metal Products | 2.2 | 3.0 | 3.7 | 10 | 9 | 9 |
| 37 | Transportation Equipment | 6.2 | 2.0 | 8.5 | 4 | 14 | 4 |
| 40 | Waste & Scrap Materials | 2.3 | 2.5 | 2.3 | 8 | 12 | 13 |
| 46 | Misc. Mixed Shipments* | 26.2 | 6.3 | 15.0 | 1 | 5 | 2 |
| | **Subtotal** | **90.8 %** | **98.9 %** | **95.2 %** | | | |
| | All Others | 9.2 | 1.1 | 4.8 | | | |
| | **Total** | **100.0 %** | **100.0 %** | **100.0 %** | | | |

* Intermodal traffic comprises most of this category. Some intermodal traffic is also dispersed among the other categories.
Source: AAR - *Freight Commodity Statistics*









AAR-E-00004131

# 2005 REVENUE PER TON AND TON-MILE BY COMMODITY GROUP

| STCC | Commodity | Freight Revenue Per Ton | Freight Revenue Per Ton-Mile | Rank of Freight Revenue Per Ton | Rank of Freight Revenue Per Ton-Mile |
|---|---|---|---|---|---|
| 01 | Farm Products | $25.83 | 2.477 ¢ | 10 | 13 |
| 10 | Metallic Ores | 8.09 | 3.382 | 14 | 11 |
| 11 | Coal | 11.68 | 1.735 | 12 | 14 |
| 14 | Nonmetallic Minerals | 8.87 | 3.531 | 13 | 10 |
| 20 | Food & Kindred Products | 31.83 | 3.364 | 6 | 12 |
| 24 | Lumber & Wood Products | 47.86 | 3.630 | 4 | 9 |
| 26 | Pulp, Paper & Allied Products | 51.07 | 4.921 | 3 | 2 |
| 28 | Chemicals & Allied Products | 32.83 | 4.087 | 5 | 6 |
| 29 | Petroleum & Coal Products | 26.17 | 3.874 | 9 | 8 |
| 32 | Stone, Clay & Glass Products | 27.25 | 4.495 | 8 | 4 |
| 33 | Primary Metal Products | 30.33 | 4.472 | 7 | 5 |
| 37 | Transportation Equipment | 104.44 | 10.967 | 1 | 1 |
| 40 | Waste & Scrap Materials | 22.59 | 4.761 | 11 | 3 |
| 46 | Misc. Mixed Shipments | 58.40 | 3.946 | 2 | 7 |

Sources: revenue per ton: AAR - *Freight Commodity Statistics;* revenue per ton-mile: *2005 Carload Waybill Statistics*









AAR-E-00004132

# TRAFFIC AND REVENUE

# NOTES

- The revenue figures in this section and on page 38 of the previous section do not match the freight revenue figures shown elsewhere in this publication because they reflect gross revenue from freight, without any adjustment for absorption or correction, as collected annually for the *Freight Commodity Statistics.*

- Grain, as used in this publication, is defined as STCC 0113 and 01144 – barley, corn (except popcorn), oats, rice (rough), rye, sorghum grains, wheat (except buckwheat), grain not elsewhere classified, and soybeans. For 2005 railroad tonnage, 53 percent of grain was corn, 29 percent was wheat, and 12 percent was soybeans.

# FREIGHT TRAFFIC

| Year | Carloads Originated (000) | Carloads Originated Growth | Tons Originated (mil) | Tons Originated Growth | Revenue Ton-Miles (bil) | Revenue Ton-Miles Growth |
|---|---|---|---|---|---|---|
| 1996 | 24,159 | 1.8% | 1,611 | 4.0% | 1,356 | 3.9% |
| 1997 | 25,016 | 3.6% | 1,585 | -1.6% | 1,349 | -0.5% |
| 1998 | 25,705 | 2.8% | 1,649 | 4.0% | 1,377 | 2.1% |
| 1999 | 27,096 | 5.4% | 1,717 | 4.1% | 1,433 | 4.1% |
| 2000 | 27,763 | 2.5% | 1,738 | 1.3% | 1,466 | 2.3% |
| 2001 | 27,205 | -2.0% | 1,742 | 0.2% | 1,495 | 2.0% |
| 2002 | 27,901 | 2.6% | 1,767 | 1.4% | 1,507 | 0.8% |
| 2003 | 28,870 | 3.5% | 1,799 | 1.8% | 1,551 | 2.9% |
| 2004 | 30,095 | 4.2% | 1,844 | 2.5% | 1,663 | 7.2% |
| 2005 | 31,142 | 3.5% | 1,899 | 3.0% | 1,696 | 2.0% |






AAR-E-00004135

# REAL GROSS DOMESTIC PRODUCT VS. RAIL TON-MILES




| Year | Real Gross Domestic Product ($ bil) | Chg. | Rail Ton-Miles (bil) | Chg. |
|---|---|---|---|---|
| 1996 | $8,328.9 | | 1,356.0 | |
| 1997 | 8,703.5 | 4.5% | 1,348.9 | -0.5% |
| 1998 | 9,066.9 | 4.2% | 1,376.8 | 2.1% |
| 1999 | 9,470.3 | 4.4% | 1,433.5 | 4.1% |
| 2000 | 9,817.0 | 3.7% | 1,466.0 | 2.3% |
| 2001 | 9,890.7 | 0.8% | 1,495.5 | 2.0% |
| 2002 | 10,048.8 | 1.6% | 1,507.0 | 0.8% |
| 2003 | 10,320.6 | 2.7% | 1,551.4 | 2.9% |
| 2004 | 10,755.7 | 4.2% | 1,662.6 | 7.2% |
| 2005 | 11,134.8 | 3.5% | 1,696.4 | 2.0% |

Source for Real GDP: *Economic Indicators*, Council of Economic Advisers, June 2006. Real GDP is stated in chained (2000) dollars.



AAR-E-00004136

# TONNAGE BY MAJOR COMMODITY GROUP

(Millions of Tons Originated)

| STCC and Commodity | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|---|---|---|
| 01 - Farm Products | 141.6 | 125.6 | 129.0 | 139.0 | 135.7 | 137.0 | 137.7 | 141.3 | 141.5 | 140.4 |
| 10 - Metallic Ores | 42.0 | 31.9 | 30.5 | 29.1 | 31.6 | 24.8 | 31.4 | 32.7 | 33.5 | 59.9 |
| 11 - Coal | 705.2 | 705.1 | 749.4 | 750.8 | 757.8 | 801.0 | 785.0 | 784.0 | 791.5 | 804.1 |
| 14 - Nonmetallic Minerals | 112.6 | 109.3 | 120.1 | 125.1 | 125.9 | 122.7 | 125.6 | 132.6 | 139.9 | 145.7 |
| 20 - Food & Kindred Products | 86.9 | 85.7 | 87.3 | 92.2 | 93.9 | 97.9 | 102.2 | 102.1 | 100.4 | 102.2 |
| 24 - Lumber & Wood Products | 49.2 | 48.1 | 47.4 | 50.3 | 48.9 | 45.7 | 47.5 | 47.5 | 47.4 | 47.6 |
| 26 - Pulp, Paper & Allied Products | 33.3 | 32.1 | 31.3 | 35.4 | 36.1 | 33.5 | 37.2 | 38.5 | 38.1 | 38.2 |
| 28 - Chemicals & Allied Products | 138.5 | 139.8 | 139.4 | 153.6 | 155.0 | 149.7 | 157.0 | 161.5 | 167.5 | 165.5 |
| 29 - Petroleum & Coal Products | 42.1 | 39.3 | 37.9 | 40.4 | 42.2 | 42.1 | 42.0 | 49.5 | 53.7 | 57.3 |
| 32 - Stone, Clay & Glass Products | 41.8 | 40.9 | 41.0 | 47.4 | 48.3 | 46.5 | 49.3 | 51.0 | 53.5 | 55.2 |
| 33 - Primary Metal Products | 49.1 | 49.6 | 53.4 | 56.5 | 59.8 | 53.2 | 55.0 | 54.4 | 58.6 | 57.2 |
| 37 - Transportation Equipment | 29.2 | 31.4 | 35.7 | 40.2 | 41.5 | 36.5 | 37.8 | 36.3 | 37.2 | 37.9 |
| 40 - Waste & Scrap Material | 37.5 | 37.0 | 36.4 | 39.7 | 40.1 | 37.5 | 39.4 | 41.5 | 46.0 | 47.3 |
| 46 - Misc. Mixed Shipments* | 79.6 | 86.4 | 87.5 | 95.6 | 101.0 | 92.0 | 97.2 | 103.9 | 113.6 | 119.8 |
| All Other | 22.3 | 23.1 | 22.4 | 21.5 | 20.4 | 21.6 | 22.3 | 22.2 | 22.0 | 20.1 |
| Total | 1,610.9 | 1,585.2 | 1,648.7 | 1,716.9 | 1,738.4 | 1,742.0 | 1,766.7 | 1,799.1 | 1,844.2 | 1,898.7 |

* Predominately intermodal.
Source: AAR - *Freight Commodity Statistics*



# CARLOADINGS BY MAJOR COMMODITY GROUP

(Thousands of Carloads Originated)

| STCC and Commodity | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|---|---|---|
| 01 - Farm Products | 1,530 | 1,408 | 1,404 | 1,477 | 1,437 | 1,461 | 1,471 | 1,519 | 1,519 | 1,510 |
| 10 - Metallic Ores | 443 | 327 | 311 | 295 | 322 | 251 | 328 | 331 | 339 | 662 |
| 11 - Coal | 6,746 | 6,703 | 7,027 | 6,965 | 6,954 | 7,295 | 7,088 | 7,037 | 7,102 | 7,202 |
| 14 - Nonmetallic Minerals | 1,176 | 1,160 | 1,256 | 1,306 | 1,309 | 1,280 | 1,310 | 1,370 | 1,430 | 1,488 |
| 20 - Food & Kindred Products | 1,302 | 1,295 | 1,282 | 1,354 | 1,377 | 1,446 | 1,472 | 1,478 | 1,461 | 1,448 |
| 24 - Lumber & Wood Products | 682 | 669 | 645 | 673 | 648 | 603 | 619 | 612 | 616 | 611 |
| 26 - Pulp, Paper & Allied Products | 589 | 582 | 547 | 612 | 633 | 601 | 646 | 667 | 669 | 679 |
| 28 - Chemicals & Allied Products | 1,639 | 1,674 | 1,653 | 1,814 | 1,820 | 1,777 | 1,866 | 1,913 | 1,981 | 1,937 |
| 29 - Petroleum & Coal Products | 567 | 534 | 510 | 543 | 565 | 547 | 533 | 606 | 651 | 689 |
| 32 - Stone, Clay & Glass Products | 491 | 485 | 475 | 538 | 541 | 528 | 559 | 581 | 594 | 603 |
| 33 - Primary Metal Products | 597 | 604 | 644 | 682 | 723 | 642 | 656 | 648 | 701 | 680 |
| 37 - Transportation Equipment | 1,442 | 1,485 | 1,671 | 1,896 | 1,984 | 1,777 | 1,831 | 1,811 | 1,849 | 1,923 |
| 40 - Waste & Scrap Material | 605 | 608 | 581 | 624 | 619 | 591 | 617 | 651 | 725 | 706 |
| 46 - Misc. Mixed Shipments* | 4,869 | 5,793 | 5,930 | 6,451 | 6,796 | 6,231 | 6,650 | 7,145 | 7,791 | 8,153 |
| All Other | 1,480 | 1,688 | 1,768 | 1,866 | 2,036 | 2,177 | 2,255 | 2,500 | 2,666 | 2,850 |
| Total | 24,159 | 25,016 | 25,705 | 27,096 | 27,763 | 27,205 | 27,901 | 28,870 | 30,095 | 31,142 |

* Predominately intermodal.
Source: AAR - *Freight Commodity Statistics*






AAR-E-00004138

# REVENUE BY MAJOR COMMODITY GROUP

(Millions of Dollars)

| STCC and Commodity | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|---|---|---|
| 01 - Farm Products | $2,807 | $2,645 | $2,529 | $2,720 | $2,673 | $2,741 | $2,711 | $2,870 | $3,176 | $3,628 |
| 10 - Metallic Ores | 382 | 399 | 373 | 336 | 338 | 288 | 285 | 289 | 317 | 485 |
| 11 - Coal | 7,706 | 7,698 | 7,997 | 7,739 | 7,794 | 8,181 | 7,797 | 7,890 | 8,418 | 9,393 |
| 14 - Nonmetallic Minerals | 895 | 899 | 920 | 955 | 969 | 945 | 967 | 1,041 | 1,131 | 1,293 |
| 20 - Food & Kindred Products | 2,378 | 2,385 | 2,378 | 2,400 | 2,424 | 2,579 | 2,657 | 2,760 | 2,892 | 3,253 |
| 24 - Lumber & Wood Products | 1,409 | 1,471 | 1,487 | 1,528 | 1,524 | 1,519 | 1,628 | 1,745 | 1,924 | 2,278 |
| 26 - Pulp, Paper & Allied Products | 1,485 | 1,507 | 1,472 | 1,457 | 1,526 | 1,457 | 1,567 | 1,646 | 1,730 | 1,953 |
| 28 - Chemicals & Allied Products | 4,660 | 4,764 | 4,610 | 4,616 | 4,636 | 4,504 | 4,658 | 4,779 | 5,100 | 5,432 |
| 29 - Petroleum & Coal Products | 1,013 | 1,028 | 991 | 980 | 1,010 | 1,014 | 1,026 | 1,123 | 1,268 | 1,500 |
| 32 - Stone, Clay & Glass Products | 1,033 | 1,063 | 1,056 | 1,089 | 1,113 | 1,090 | 1,149 | 1,211 | 1,323 | 1,505 |
| 33 - Primary Metal Products | 1,254 | 1,294 | 1,304 | 1,289 | 1,371 | 1,292 | 1,288 | 1,349 | 1,518 | 1,734 |
| 37 - Transportation Equipment | 3,390 | 3,462 | 3,339 | 3,582 | 3,843 | 3,590 | 3,731 | 3,707 | 3,746 | 3,960 |
| 40 - Waste & Scrap Material | 702 | 711 | 693 | 689 | 706 | 685 | 717 | 799 | 956 | 1,070 |
| 46 - Misc. Mixed Shipments* | 3,900 | 4,306 | 4,416 | 4,685 | 4,927 | 4,581 | 4,900 | 5,413 | 6,141 | 6,998 |
| All Other | 1,296 | 1,331 | 1,334 | 1,375 | 1,480 | 1,597 | 1,660 | 1,813 | 1,980 | 2,260 |
| Total | 34,310 | 34,964 | 34,898 | 35,441 | 36,331 | 36,063 | 36,742 | 38,434 | 41,622 | 46,743 |

Note: The revenues on this page are based on original waybills, and do not include the rebates and billing corrections that are reflected in the income statement-based freight revenue on pages 9, 12, and 65.

* Predominately intermodal.
Source: AAR - *Freight Commodity Statistics*






AAR-E-00004139

# REVENUE PER TON-MILE BY MAJOR COMMODITY GROUP

**CURRENT DOLLARS**
(Cents Per Ton-Mile)

| STCC and Commodity | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|---|---|---|
| 01 - Farm Products | 2.28¢ | 2.33¢ | 2.33¢ | 2.21¢ | 2.18¢ | 2.19¢ | 2.24¢ | 2.19¢ | 2.31¢ | 2.48¢ |
| 10 - Metallic Ores | 2.45 | 2.97 | 3.25 | 2.99 | 3.19 | 2.55 | 3.10 | 3.06 | 3.14 | 3.38 |
| 11 - Coal | 1.81 | 1.84 | 1.72 | 1.64 | 1.61 | 1.56 | 1.53 | 1.56 | 1.59 | 1.73 |
| 14 - Nonmetallic Minerals | 3.03 | 3.08 | 3.13 | 3.11 | 3.01 | 3.17 | 3.07 | 2.99 | 3.31 | 3.53 |
| 20 - Food & Kindred Products | 2.96 | 2.93 | 2.93 | 2.98 | 2.95 | 3.01 | 3.01 | 2.96 | 3.20 | 3.36 |
| 24 - Lumber & Wood Products | 3.03 | 3.05 | 3.10 | 3.10 | 3.11 | 3.15 | 3.32 | 3.37 | 3.37 | 3.63 |
| 26 - Pulp, Paper & Allied Prod. | 3.83 | 3.75 | 3.84 | 3.93 | 3.96 | 4.01 | 4.11 | 4.16 | 4.47 | 4.92 |
| 28 - Chemicals & Allied Prod. | 3.80 | 3.78 | 3.74 | 3.68 | 3.57 | 3.67 | 3.94 | 3.82 | 3.80 | 4.09 |
| 29 - Petroleum & Coal Prod. | 3.72 | 3.65 | 3.57 | 3.51 | 3.41 | 3.48 | 3.65 | 3.54 | 3.62 | 3.87 |
| 32 - Stone, Clay & Glass Prod. | 3.58 | 3.57 | 3.64 | 3.59 | 3.55 | 3.72 | 3.82 | 3.84 | 4.16 | 4.49 |
| 33 - Primary Metal Products | 3.13 | 3.17 | 3.24 | 3.31 | 3.29 | 3.51 | 3.54 | 3.62 | 3.96 | 4.47 |
| 37 - Transportation Equipment | 10.96 | 10.83 | 10.55 | 10.53 | 10.84 | 11.39 | 11.87 | 10.63 | 11.14 | 10.97 |
| 40 - Waste & Scrap Material | 3.73 | 3.80 | 3.74 | 3.70 | 3.71 | 3.77 | 3.78 | 3.77 | 4.17 | 4.76 |
| 46 - Misc. Mixed Shipments* | 3.07 | 3.10 | 3.13 | 3.16 | 3.19 | 3.27 | 3.28 | 3.36 | 3.72 | 3.95 |

**CONSTANT 2005 DOLLARS**
(Cents Per Ton-Mile)

| STCC and Commodity | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|---|---|---|
| 01 - Farm Products | 2.74¢ | 2.75¢ | 2.72¢ | 2.54¢ | 2.45¢ | 2.41¢ | 2.42¢ | 2.32¢ | 2.38¢ | 2.48¢ |
| 10 - Metallic Ores | 2.94 | 3.51 | 3.79 | 3.44 | 3.59 | 2.81 | 3.35 | 3.24 | 3.24 | 3.38 |
| 11 - Coal | 2.17 | 2.17 | 2.01 | 1.89 | 1.82 | 1.72 | 1.66 | 1.65 | 1.64 | 1.73 |
| 14 - Nonmetallic Minerals | 3.64 | 3.64 | 3.65 | 3.59 | 3.39 | 3.49 | 3.32 | 3.16 | 3.41 | 3.53 |
| 20 - Food & Kindred Products | 3.56 | 3.46 | 3.43 | 3.43 | 3.32 | 3.31 | 3.25 | 3.13 | 3.29 | 3.36 |
| 24 - Lumber & Wood Products | 3.63 | 3.60 | 3.63 | 3.57 | 3.51 | 3.47 | 3.60 | 3.57 | 3.48 | 3.63 |
| 26 - Pulp, Paper & Allied Prod. | 4.60 | 4.44 | 4.49 | 4.52 | 4.46 | 4.42 | 4.45 | 4.41 | 4.61 | 4.92 |
| 28 - Chemicals & Allied Prod. | 4.57 | 4.47 | 4.37 | 4.24 | 4.02 | 4.04 | 4.26 | 4.05 | 3.92 | 4.09 |
| 29 - Petroleum & Coal Prod. | 4.47 | 4.31 | 4.18 | 4.04 | 3.84 | 3.83 | 3.95 | 3.75 | 3.73 | 3.87 |
| 32 - Stone, Clay & Glass Prod. | 4.30 | 4.22 | 4.26 | 4.14 | 4.01 | 4.10 | 4.14 | 4.07 | 4.29 | 4.49 |
| 33 - Primary Metal Products | 3.76 | 3.75 | 3.78 | 3.81 | 3.71 | 3.86 | 3.83 | 3.83 | 4.08 | 4.47 |
| 37 - Transportation Equipment | 13.17 | 12.80 | 12.32 | 12.13 | 12.22 | 12.54 | 12.85 | 11.27 | 11.48 | 10.97 |
| 40 - Waste & Scrap Material | 4.48 | 4.49 | 4.38 | 4.26 | 4.18 | 4.15 | 4.09 | 3.99 | 4.30 | 4.76 |
| 46 - Misc. Mixed Shipments* | 3.69 | 3.66 | 3.66 | 3.65 | 3.60 | 3.60 | 3.55 | 3.55 | 3.83 | 3.95 |

Source: AAR - *Carload Waybill Statistics* based on STB *Waybill Sample*
Note: *Carload Waybill Statistics* include non-Class I railroads.
* Predominately intermodal.

Note: To be more consistent with the tables for tons, carloads, and revenue, this table does not segregate hazardous materials. Figures for years prior to 2001 will not necessarily match the same years in older editions, which segregated hazardous materials, especially for STCCs 14, 28, and 29.

# REVENUE PER TON BY MAJOR COMMODITY GROUP

| STCC and Commodity | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|---|---|---|
| 01 - Farm Products | $19.82 | $21.07 | $19.60 | $19.57 | $19.70 | $20.01 | $19.68 | $20.31 | $22.44 | $25.83 |
| 10 - Metallic Ores | 9.09 | 12.51 | 12.22 | 11.58 | 10.71 | 11.58 | 9.09 | 8.83 | 9.47 | 8.09 |
| 11 - Coal | 10.93 | 10.92 | 10.67 | 10.31 | 10.28 | 10.21 | 9.93 | 10.06 | 10.64 | 11.68 |
| 14 - Nonmetallic Minerals | 7.95 | 8.22 | 7.66 | 7.64 | 7.69 | 7.70 | 7.70 | 7.85 | 8.09 | 8.87 |
| 20 - Food & Kindred Products | 27.36 | 27.82 | 27.25 | 26.03 | 25.82 | 26.33 | 25.99 | 27.03 | 28.82 | 31.83 |
| 24 - Lumber & Wood Products | 28.65 | 30.55 | 31.39 | 30.39 | 31.14 | 33.21 | 34.26 | 36.77 | 40.62 | 47.86 |
| 26 - Pulp, Paper & Allied Products | 44.58 | 46.92 | 46.96 | 41.10 | 42.22 | 43.42 | 42.10 | 42.72 | 45.44 | 51.07 |
| 28 - Chemicals & Allied Products | 33.64 | 34.08 | 33.07 | 30.05 | 29.90 | 30.08 | 29.67 | 29.59 | 30.45 | 32.83 |
| 29 - Petroleum & Coal Products | 24.09 | 26.20 | 26.17 | 24.24 | 23.90 | 24.07 | 24.45 | 22.69 | 23.62 | 26.17 |
| 32 - Stone, Clay & Glass Products | 24.71 | 25.97 | 25.77 | 22.98 | 23.05 | 23.44 | 23.32 | 23.72 | 24.73 | 27.25 |
| 33 - Primary Metal Products | 25.56 | 26.11 | 24.40 | 22.83 | 22.93 | 24.29 | 23.43 | 24.79 | 25.92 | 30.33 |
| 37 - Transportation Equipment | 116.09 | 110.24 | 93.47 | 89.03 | 92.51 | 98.24 | 98.73 | 102.13 | 100.74 | 104.44 |
| 40 - Waste & Scrap Material | 18.70 | 19.24 | 19.03 | 17.35 | 17.61 | 18.28 | 18.19 | 19.25 | 20.77 | 22.59 |
| 46 - Misc. Mixed Shipments* | 48.99 | 49.84 | 50.49 | 49.00 | 48.76 | 49.81 | 50.40 | 52.11 | 54.08 | 58.40 |

* Predominately intermodal.

Source: AAR - *Freight Commodity Statistics*






AAR-E-00004141

# REVENUE PER TON-MILE IN CURRENT AND CONSTANT DOLLARS

| | Freight Revenue Per Ton-Mile | |
|---|---|---|
| Year | Current $ | Constant 2005 $ |
| 1996 | 2.352¢ | 2.825¢ |
| 1997 | 2.396 | 2.831 |
| 1998 | 2.342 | 2.737 |
| 1999 | 2.280 | 2.626 |
| 2000 | 2.257 | 2.544 |
| 2001 | 2.242 | 2.468 |
| 2002 | 2.263 | 2.449 |
| 2003 | 2.283 | 2.419 |
| 2004 | 2.354 | 2.425 |
| 2005 | 2.621 | 2.621 |

Note: Constant dollar figures are derived using the chain-type price indexes for GDP. Data are for all commodities and intermodal.






AAR-E-00004142

# RAIL TRANSPORTATION OF COAL

| Year | Tons Originated (millions) | Carloads Originated (thousands) | Coal Revenue (millions $) | Coal as Percent of Total Traffic | | |
|---|---|---|---|---|---|---|
| | | | | Tonnage | Carloads | Revenue |
| 1996 | 705 | 6,746 | $7,706 | 43.8 % | 27.9 % | 22.5 % |
| 1997 | 705 | 6,703 | 7,698 | 44.5 | 26.8 | 22.0 |
| 1998 | 749 | 7,027 | 7,997 | 45.5 | 27.3 | 22.9 |
| 1999 | 751 | 6,965 | 7,739 | 43.7 | 25.7 | 21.8 |
| 2000 | 758 | 6,954 | 7,794 | 43.6 | 25.0 | 21.5 |
| 2001 | 801 | 7,295 | 8,181 | 46.0 | 26.8 | 22.7 |
| 2002 | 785 | 7,088 | 7,797 | 44.4 | 25.4 | 21.2 |
| 2003 | 784 | 7,037 | 7,890 | 43.6 | 24.4 | 20.5 |
| 2004 | 792 | 7,102 | 8,418 | 42.9 | 23.6 | 20.2 |
| 2005 | 804 | 7,202 | 9,393 | 42.4 | 23.1 | 20.1 |

Note: See note on page 42.






AAR-E-00004143

# TRANSPORTATION OF COAL BY RAILROAD - 2005

| | Carloads Carried | | | Tons Carried | | | Gross Freight Revenue | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Coal (000s) | Total (000s) | Coal as % of RR's Total | Coal (000s) | Total (000s) | Coal as % of RR's Total | Coal ($ mil) | Total ($ mil) | Coal as % of RR's Total | This RR as % of Total Coal Rev. |
| BNSF | 2,249 | 10,024 | 22.4% | 260,133 | 558,198 | 46.6% | $2,628 | $13,498 | 19.5% | 28.0% |
| CNGT | 325 | 2,291 | 14.2% | 35,650 | 181,995 | 19.6% | 130 | 1,814 | 7.2% | 1.4% |
| CSX | 1,583 | 7,250 | 21.8% | 168,389 | 465,910 | 36.1% | 1,819 | 8,185 | 22.2% | 19.4% |
| KCS | 230 | 910 | 25.3% | 27,220 | 74,334 | 36.6% | 124 | 752 | 16.5% | 1.3% |
| NS | 1,672 | 7,811 | 21.4% | 180,569 | 444,332 | 40.6% | 2,083 | 8,247 | 25.3% | 22.2% |
| SOO | 107 | 842 | 12.7% | 11,381 | 53,366 | 21.3% | 54 | 739 | 7.3% | 0.6% |
| UP | 2,134 | 9,543 | 22.4% | 245,922 | 597,899 | 41.1% | 2,555 | 13,510 | 18.9% | 27.2% |
| TOTAL | — | — | — | — | — | — | $9,393 | $46,743 | 20.1% | 100.0% |

Source: AAR *Freight Commodity Statistics*






AAR-E-00004144

# RAIL COAL TRAFFIC AS A PERCENT OF DOMESTIC COAL PRODUCTION

| Year | Total Tons U.S. Production (millions) | Transported by Rail: Tons Originated (millions) | Transported by Rail: Percent of Production |
|---|---|---|---|
| 1996 | 1,064 | 705 | 66.3 % |
| 1997 | 1,090 | 705 | 64.7 |
| 1998 | 1,118 | 749 | 67.1 |
| 1999 | 1,100 | 751 | 68.2 |
| 2000 | 1,074 | 758 | 70.6 |
| 2001 | 1,128 | 801 | 71.0 |
| 2002 | 1,094 | 785 | 71.7 |
| 2003 | 1,072 | 784 | 73.2 |
| 2004 | 1,112 | 792 | 71.2 |
| 2005 | 1,133 | 804 | 71.0 |

Sources: U.S. Department of Energy, Energy Information Administration and AAR - *Freight Commodity Statistics*




See note on page 42.



AAR-E-00004145

# RAIL TRANSPORTATION OF GRAIN

| Year | Tons Originated (millions) | Carloads Originated (thousands) | Grain Revenue (millions $) | Grain as Percent of Total Traffic: Tonnage | Carloads | Revenue |
|---|---|---|---|---|---|---|
| 1996 | 134 | 1,359 | $2,527 | 8.3 % | 5.6 % | 7.4 % |
| 1997 | 118 | 1,234 | 2,368 | 7.4 | 4.9 | 6.8 |
| 1998 | 121 | 1,240 | 2,275 | 7.4 | 4.8 | 6.5 |
| 1999 | 132 | 1,333 | 2,500 | 7.7 | 4.9 | 7.1 |
| 2000 | 129 | 1,294 | 2,438 | 7.4 | 4.7 | 6.7 |
| 2001 | 130 | 1,313 | 2,490 | 7.5 | 4.8 | 6.9 |
| 2002 | 131 | 1,322 | 2,445 | 7.4 | 4.7 | 6.7 |
| 2003 | 134 | 1,365 | 2,590 | 7.4 | 4.7 | 6.7 |
| 2004 | 135 | 1,369 | 2,873 | 7.3 | 4.5 | 6.9 |
| 2005 | 133 | 1,357 | 3,266 | 7.0 | 4.4 | 7.0 |

Note: See note on page 42.






AAR-E-00004146

# TRANSPORTATION OF GRAIN BY RAILROAD - 2005

| | Carloads Carried | | | Tons Carried | | | Gross Freight Revenue | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Grain (000s) | Total (000s) | Grain as % of RR's Total | Grain (000s) | Total (000s) | Grain as % of RR's Total | Grain ($ mil) | Total ($ mil) | Grain as % of RR's Total | This RR as % of Total Grain Rev. |
| BNSF | 520 | 10,024 | 5.2% | 54,249 | 558,198 | 9.7% | $1,455 | $13,498 | 10.8% | 44.5% |
| CNGT | 138 | 2,291 | 6.0% | 13,606 | 181,995 | 7.5% | 149 | 1,814 | 8.2% | 4.6% |
| CSX | 186 | 7,250 | 2.6% | 13,008 | 465,910 | 2.8% | 285 | 8,185 | 3.5% | 8.7% |
| KCS | 71 | 910 | 7.8% | 7,048 | 74,334 | 9.5% | 95 | 752 | 12.6% | 2.9% |
| NS | 200 | 7,811 | 2.6% | 20,213 | 444,332 | 4.5% | 266 | 8,247 | 3.2% | 8.1% |
| SOO | 104 | 842 | 12.3% | 10,206 | 53,366 | 19.1% | 162 | 739 | 21.9% | 5.0% |
| UP | 369 | 9,543 | 3.9% | 37,750 | 597,899 | 6.3% | 855 | 13,510 | 6.3% | 26.2% |
| TOTAL | — | — | — | — | — | — | $3,266 | $46,743 | 7.0% | 100.0% |

Source: AAR *Freight Commodity Statistics*






AAR-E-00004147

# GRAIN FLEET

| Year | Grain Hoppers[1] | Total Capacity (cubic feet) |
|---|---|---|
| 1996 | 253,808 | 1,202,790,651 |
| 1997 | 265,220 | 1,261,840,533 |
| 1998 | 270,277 | 1,289,574,265 |
| 1999 | 275,542 | 1,316,943,530 |
| 2000 | 270,697 | 1,294,143,575 |
| 2001 | 266,934 | 1,277,401,238 |
| 2002 | 262,759 | 1,259,436,329 |
| 2003 | 259,685 | 1,248,561,491 |
| 2004 | 256,648 | 1,238,603,291 |
| 2005 | 263,417 | 1,275,208,760 |

[1]Includes covered hoppers categorized as C113, C114, C313, and C314 cars. Figures include North American cars owned by railroads and private owners, and exclude pre-registered cars. Capacity figures are based on cubic foot capacity of each car.

Source: AAR - UMLER database






AAR-E-00004148

# RAIL GRAIN TRAFFIC AS A PERCENT OF DOMESTIC GRAIN PRODUCTION

| | | Transported by Rail | | | |
|---|---|---|---|---|---|
| Year | U.S. Production in Bushels (millions) | Carloads Originated | Bushels Originated (millions) | Percent of Production | Average Bushels Per Car |
| 1996 | 15,621 | 1,359,093 | 4,730 | 30.3 % | 3,480 |
| 1997 | 15,952 | 1,234,099 | 4,168 | 26.1 | 3,377 |
| 1998 | 16,506 | 1,239,668 | 4,277 | 25.9 | 3,450 |
| 1999 | 15,862 | 1,332,901 | 4,659 | 29.4 | 3,496 |
| 2000 | 16,271 | 1,293,567 | 4,539 | 27.9 | 3,509 |
| 2001 | 15,706 | 1,312,934 | 4,589 | 29.2 | 3,496 |
| 2002 | 14,508 | 1,321,897 | 4,603 | 31.7 | 3,482 |
| 2003 | 16,174 | 1,365,336 | 4,699 | 29.1 | 3,442 |
| 2004 | 18,482 *r* | 1,369,247 | 4,730 | 25.6 | 3,455 |
| 2005 | 17,527 | 1,357,488 | 4,683 | 26.7 | 3,450 |

*r* - revised
Source for U.S. grain production: U.S. Department of Agriculture, National Agricultural Statistics Service. Bushels originated based on each type of grain's tonnage (from AAR's *Freight Commodity Statistics*) and weight per bushel. See page 42 for definition of grain.






AAR-E-00004149

# RAIL TRANSPORTATION OF CHEMICALS AND ALLIED PRODUCTS

| Year | Tons Originated (millions) | Carloads Originated (thousands) | Revenue (millions $) | Chemicals as a Percent of Total Traffic: Tonnage | Carloads | Revenue |
|---|---|---|---|---|---|---|
| 1996 | 140.1 | 1,667.8 | $4,706.4 | 8.7 % | 6.9 % | 13.7 % |
| 1997 | 141.5 | 1,705.0 | 4,815.1 | 8.9 | 6.8 | 13.8 |
| 1998 | 141.0 | 1,680.3 | 4,655.1 | 8.6 | 6.5 | 13.3 |
| 1999 | 155.4 | 1,843.8 | 4,664.1 | 9.1 | 6.8 | 13.2 |
| 2000 | 156.5 | 1,844.0 | 4,680.4 | 9.0 | 6.6 | 12.9 |
| 2001 | 151.1 | 1,800.6 | 4,547.6 | 8.7 | 6.6 | 12.6 |
| 2002 | 158.7 | 1,891.1 | 4,706.9 | 9.0 | 6.8 | 12.8 |
| 2003 | 163.0 | 1,937.4 | 4,827.0 | 9.1 | 6.7 | 12.6 |
| 2004 | 169.0 | 2,007.7 | 5,154.2 | 9.2 | 6.7 | 12.4 |
| 2005 | 167.2 | 1,965.9 | 5,508.6 | 8.8 | 6.3 | 11.8 |

Note: On this page "chemicals and allied products" refers to STCC 28 plus a small amount from STCC 29.






AAR-E-00004150

# TRANSPORTATION OF CHEMICALS BY RAILROAD - 2005

| | Carloads Carried | | | Tons Carried | | | Gross Freight Revenue | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Chemical (000s) | Total (000s) | Chemicals as % of RR's Total | Chemical (000s) | Total (000s) | Chemicals as % of RR's Total | Chemical ($ mil) | Total ($ mil) | Chemicals as % of RR's Total | This RR as % of Total Chem Rev |
| BNSF | 396 | 10,024 | 3.9% | 34,193 | 558,198 | 6.1% | $883 | $13,498 | 6.5% | 16.0% |
| CNGT | 302 | 2,291 | 13.2% | 28,120 | 181,995 | 15.5% | 315 | 1,814 | 17.4% | 5.7% |
| CSX | 646 | 7,250 | 8.9% | 54,793 | 465,910 | 11.8% | 1,205 | 8,185 | 14.7% | 21.9% |
| KCS | 108 | 910 | 11.8% | 9,049 | 74,334 | 12.2% | 118 | 752 | 15.7% | 2.1% |
| NS | 490 | 7,811 | 6.3% | 39,765 | 444,332 | 8.9% | 966 | 8,247 | 11.7% | 17.5% |
| SOO | 96 | 842 | 11.5% | 8,893 | 53,366 | 16.7% | 125 | 739 | 16.9% | 2.3% |
| UP | 847 | 9,543 | 8.9% | 76,307 | 597,899 | 12.8% | 1,897 | 13,510 | 14.0% | 34.4% |
| TOTAL | — | — | — | — | — | — | $5,509 | $46,743 | 11.8% | 100.0% |

Source: AAR *Freight Commodity Statistics*
Note: On this page "chemicals and allied products" refers to STCC 28 plus a small amount from STCC 29.

# TRANSPORTATION OF MOTOR VEHICLES BY RAILROAD - 2005

| | Carloads Carried | | | Tons Carried | | | Gross Freight Revenue | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Mot. Veh. (000s) | Total (000s) | Mot. Veh. as % of RR's Total | Mot. Veh. (000s) | Total (000s) | Mot. Veh. as % of RR's Total | Mot. Veh. ($ mil) | Total ($ mil) | Mot. Veh. as % of RR's Total | This RR as % of Total Mot. Veh. |
| BNSF | 212 | 10,024 | 2.1% | 3,891 | 558,198 | 0.7% | 431 | $13,498 | 3.2% | 11.4% |
| CNGT | 223 | 2,291 | 9.7% | 4,781 | 181,995 | 2.6% | 190 | 1,814 | 10.5% | 5.0% |
| CSX | 516 | 7,250 | 7.1% | 11,421 | 465,910 | 2.5% | 855 | 8,185 | 10.5% | 22.5% |
| KCS | 7 | 910 | 0.8% | 145 | 74,334 | 0.2% | 6 | 752 | 0.8% | 0.2% |
| NS | 763 | 7,811 | 9.8% | 15,444 | 444,332 | 3.5% | 965 | 8,247 | 11.7% | 25.4% |
| SOO | 70 | 842 | 8.4% | 1,468 | 53,366 | 2.8% | 67 | 739 | 9.1% | 1.8% |
| UP | 727 | 9,543 | 7.6% | 14,173 | 597,899 | 2.4% | 1,281 | 13,510 | 9.5% | 33.8% |
| TOTAL | — | — | — | — | — | — | $3,796 | $46,743 | 8.1% | 100.0% |

Source: AAR - *Freight Commodity Statistics*



AAR-E-00004151

# RAIL TRANSPORTATION OF MOTOR VEHICLES AND EQUIPMENT

| Year | Tons Originated (millions) | Carloads Originated (thousands) | Revenue (millions $) | Motor Vehicles and Equipment as a Percent of Total Traffic | | |
|---|---|---|---|---|---|---|
| | | | | Tonnage | Carloads | Revenue |
| 1996 | 26.7 | 1,341.0 | $3,292.6 | 1.7 % | 5.6 % | 9.6 % |
| 1997 | 28.7 | 1,380.1 | 3,347.4 | 1.8 | 5.5 | 9.6 |
| 1998 | 32.6 | 1,546.1 | 3,196.5 | 2.0 | 6.0 | 9.2 |
| 1999 | 37.5 | 1,764.1 | 3,453.4 | 2.2 | 6.5 | 9.7 |
| 2000 | 39.3 | 1,860.0 | 3,731.0 | 2.3 | 6.7 | 10.3 |
| 2001 | 34.5 | 1,650.2 | 3,470.8 | 2.0 | 6.1 | 9.6 |
| 2002 | 35.9 | 1,720.2 | 3,625.9 | 2.0 | 6.2 | 9.9 |
| 2003 | 34.3 | 1,681.2 | 3,588.5 | 1.9 | 5.8 | 9.3 |
| 2004 | 35.3 | 1,729.6 | 3,622.6 | 1.9 | 5.7 | 8.7 |
| 2005 | 35.6 | 1,786.9 | 3,796.1 | 1.9 | 5.7 | 8.1 |






AAR-E-00004152

# 2005 INTERMODAL TRAFFIC

| STCC and Commodity | Intermodal Traffic As Percent Of STCC: Tons | STCC: Ton-Miles | Total Intermodal: Tons | Total Intermodal: Ton-Miles |
|---|---|---|---|---|
| 01 - Farm Products | 1.1 % | 1.8 % | 1.0 | 1.1 % |
| 10 - Metallic Ores | 0.0 | 0.1 | 0.0 | 0.0 |
| 11 - Coal | 0.0 | 0.0 | 0.0 | 0.0 |
| 14 - Nonmetallic Minerals | 0.1 | 0.9 | 0.1 | 0.1 |
| 20 - Food & Kindred Products | 6.2 | 9.8 | 3.7 | 4.2 |
| 23 - Apparel & Other Finished Textile | 99.9 | 100.0 | 1.1 | 1.2 |
| 24 - Lumber & Wood Products, Excluding Furniture | 1.2 | 1.7 | 0.5 | 0.6 |
| 26 - Pulp, Paper & Allied Products | 4.8 | 6.7 | 1.4 | 1.4 |
| 28 - Chemicals & Allied Products | 2.3 | 3.7 | 2.3 | 2.3 |
| 29 - Petroleum & Coal Products | 0.4 | 0.9 | 0.2 | 0.2 |
| 30 - Rubber & Misc. Plastic | 87.7 | 89.1 | 0.8 | 1.0 |
| 32 - Stone, Clay, Glass, Concrete Products | 0.9 | 2.1 | 0.3 | 0.3 |
| 33 - Primary Metal Products | 1.0 | 2.5 | 0.3 | 0.5 |
| 36 - Electrical Machinery, Equipment & Supplies | 62.2 | 65.4 | 0.7 | 0.7 |
| 37 - Transportation Equipment | 8.9 | 11.5 | 2.8 | 2.3 |
| 40 - Waste & Scrap Materials | 10.7 | 8.3 | 2.9 | 0.8 |
| 42 - Containers, Shipping, Returned Empty | 98.9 | 98.7 | 6.8 | 5.4 |
| 43 - Mail | 94.8 | 97.0 | 0.3 | 0.2 |
| 44 - Freight Forwarder Traffic | 100.0 | 100.0 | 1.7 | 2.0 |
| 46 - Misc. Mixed Shipments | 99.9 | 99.9 | 70.0 | 72.6 |
| 47 - Small Packaged Freight Shipments | 100.0 | 100.0 | 0.7 | 0.8 |
| All Other | 47.0 | 57.3 | 2.3 | 2.4 |
| Total | 8.7 | 15.6 | 100.0 | 100.0 |

Source: AAR car type analysis of STB *Carload Waybill Statistics*
Note: *Carload Waybill Statistics* include non-Class I railroads.






AAR-E-00004153

# INTERMODAL TRAFFIC




| Year | Trailers & Containers | Trailers | Containers |
|---|---|---|---|
| 1996 | 9,316,146 | 3,446,672 | 5,869,474 |
| 1997 | 9,995,768 | 3,586,030 | 6,409,738 |
| 1998 | 10,127,073 | 3,457,578 | 6,669,495 |
| 1999 | 10,565,246 | 3,407,428 | 7,157,818 |
| 2000 | 10,972,687 | 3,093,180 | 7,879,507 |
| 2001 | 10,751,094 | 2,794,484 | 7,956,610 |
| 2002 | 11,367,331 | 2,755,765 | 8,611,566 |
| 2003 | 12,110,086 | 2,842,833 | 9,267,253 |
| 2004 | 13,152,687 | 3,077,456 | 10,075,231 |
| 2005 *p* | 13,939,349 | 3,091,809 | 10,847,540 |

*p - preliminary*

Data include the Canadian operations of Canadian National Railway and Canadian Pacific Railway in addition to their U.S. operations, and some non-Class I U.S. railroads. Each year is defined as 52 weeks. Source: AAR *Weekly Railroad Traffic*



AAR-E-00004154

# FINANCIAL STATISTICS

# NOTES

- The figures on page 86 for Net Railway Operating Income (NROI) and Average Net Investment are based on STB Revenue Adequacy methodology. The Revenue Adequacy NROI shown includes, in addition to the industry's NROI, the following: (1) the inclusion of NROIs of affiliated railroads and any other affiliates which meet certain tests; (2) an adjustment to exclude tax expenses not related to rail operations; (3) the inclusion of certain interest income; and (4) the gain (loss) from certain land or segment sales, transfers or reclassifications from rail to non-rail operations. The average net investment includes net assets of Class I railroads plus the net assets of any affiliated railroads, and any other affiliates which meet certain tests for inclusion. The total net assets are then reduced by total accumulated deferred tax liabilities. Predecessor values were used where appropriate.

- The "As Reported" net investment figures shown in this section include net investment in road and equipment, less interest during construction and debits in other elements of investment, plus working capital allowance.

  The "Revenue Adequacy" net investment figures shown on page 86 for 1996 to 2005 are based on procedures promulgated by the STB in Ex Parte No. 393, Standards for Revenue Adequacy. In 1985, the Standards were revised to include the use of depreciation accounting in lieu of RRB for track structure investment and subtraction of accumulated deferred tax reserves from the net investment base. In 1988, the Standards were revised to include in the investment base the net assets of any affiliated Class II and Class III railroads, and any other affiliates meeting certain tests for inclusion.

- "Capital Expenditures" as found on most pages is capital expenditures for road and equipment. The Capital Expenditures on pages 33 and 77 are total capital expenditures, which includes (in addition to the capital expenditures for road and equipment) small amounts of interest during construction, other elements of investment, and construction in progress. The capital expenditures found in the statement of cash flows on page 67 are based on cash payments during the years indicated. Railroads may also sign long-term non-cancellable operating leases to acquire new rolling stock. New operating leases are not listed under capital expenditures, but are often quantified by using the new present value of the future lease payments. New operating leases quantified in this manner are sometimes listed with capital expenditures as capital commitments.



AAR-E-00004156

# STATEMENT OF FINANCIAL RESULTS

(Millions of Dollars)

| | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|---|---|---|
| **OPERATING REVENUE** | | | | | | | | | | |
| Freight | $31,889 | $32,322 | $32,247 | $32,680 | $33,083 | $33,533 | $34,110 | $35,413 | $39,131 | $44,457 |
| Passenger | 59 | 60 | 61 | 61 | 62 | 62 | 61 | 62 | 63 | 65 |
| All Other Revenues | 745 | 736 | 843 | 780 | 957 | 981 | 1,155 | 1,164 | 1,323 | 1,597 |
| **TOTAL OPER. REV.** | **$32,693** | **$33,118** | **$33,151** | **$33,521** | **$34,102** | **$34,576** | **$35,327** | **$36,639** | **$40,517** | **$46,118** |
| Growth Rate For Op. Rev. | -- | 1.3% | 0.1% | 1.1% | 1.7% | 1.4% | 2.2% | 3.7% | 10.6% | 13.8% |
| **OPERATING EXPENSES** | | | | | | | | | | |
| Way & Structures | $4,456 | $4,657 | $4,715 | $5,062 | $5,034 | $5,127 | $5,503 | $5,812 | $6,389 | $6,498 |
| Equipment | 6,960 | 6,917 | 7,090 | 7,488 | 7,265 | 7,181 | 7,159 | 7,321 | 7,928 | 8,079 |
| Transportation | 11,738 | 12,311 | 12,066 | 12,267 | 13,349 | 13,309 | 13,058 | 14,212 | 16,203 | 18,658 |
| General & Admin. | 3,177 | 3,405 | 4,045 | 3,194 | 3,393 | 3,546 | 3,873 | 4,095 | 4,586 | 4,608 |
| **TOTAL OPER. EXP.** | **$26,331** | **$27,291** | **$27,916** | **$28,011** | **$29,040** | **$29,164** | **$29,592** | **$31,440** | **$35,107** | **$37,843** |
| Growth Rate For Op. Exp. | -- | 3.6% | 2.3% | 0.3% | 3.7% | 0.4% | 1.5% | 6.2% | 11.7% | 7.8% |
| **NET REVENUE FROM OPERATIONS** | **$6,361** | **$5,827** | **$5,235** | **$5,510** | **$5,062** | **$5,412** | **$5,735** | **$5,199** | **$5,410** | **$8,275** |
| **OPERATING RATIO** | **80.54%** | **82.40%** | **84.21%** | **83.56%** | **85.16%** | **84.35%** | **83.77%** | **85.81%** | **86.65%** | **82.06%** |
| **OTHER INCOME** | $1,021 | $939 | $1,033 | $766 | $713 | $741 | $910 | $592 | $697 | $811 |
| **OTHER DEDUCTIONS** | 327 | 598 | 465 | 275 | 415 | 635 | 466 | 571 | 584 | 725 |
| **INCOME BEFORE FIXED CHARGES** | $7,055 | $6,168 | $5,803 | $6,001 | $5,361 | $5,517 | $6,179 | $5,220 | $5,523 | $8,361 |
| **TOTAL FIXED CHARGES** | $1,104 | $1,118 | $1,419 | $1,356 | $1,420 | $1,154 | $1,147 | $1,035 | $1,106 | $1,212 |
| **INCOME AFTER FIXED CHARGES** | $5,951 | $5,051 | $4,384 | $4,645 | $3,941 | $4,363 | $5,032 | $4,185 | $4,418 | $7,149 |
| Contingent Interest | 10 | 10 | 5 | 5 | 9 | 8 | 8 | 8 | 8 | 8 |
| Unusual or Infrequent Items (dr.) cr. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Provision for Taxes: | | | | | | | | | | |
| Federal Income | 869 | 654 | 724 | 379 | 382 | 485 | 330 | 318 | 413 | 1,714 |
| State & Other | 17 | 27 | (1) | 6 | 66 | 54 | 46 | 76 | 108 | 232 |
| Deferred Taxes | 1,169 | 1,204 | 850 | 1,279 | 982 | 1,076 | 1,447 | 1,100 | 1,022 | 278 |
| Total Taxes | $2,056 | $1,886 | $1,573 | $1,664 | $1,430 | $1,614 | $1,823 | $1,494 | $1,543 | $2,224 |
| **NET INCOME FROM CONTING. OPERATS.** | **$3,885** | **$3,155** | **$2,807** | **$2,976** | **$2,501** | **$2,740** | **$3,201** | **$2,683** | **$2,867** | **$4,917** |
| **Discontinued Operations (dr.) cr.** | – | 1 | – | – | – | – | – | – | – | – |
| **ORDINARY INCOME** | **$3,885** | **$3,156** | **$2,807** | **$2,976** | **$2,501** | **$2,740** | **$3,201** | **$2,683** | **$2,867** | **$4,917** |
| **EXTRAORDINARY ITEMS & ACCOUNTING CHANGES (dr.) cr.** | 0 | 0 | 0 | (6) | (1) | (0) | 0 | 4 | 0 | 0 |
| **NET INCOME** | **$3,885** | **$3,156** | **$2,807** | **$2,971** | **$2,500** | **$2,740** | **$3,201** | **$2,687** | **$2,867** | **$4,917** |



AAR-E-00004157

# STATEMENT OF FINANCIAL POSITION

(Millions of Dollars)

| | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | | | |
| Current Assets: | | | | | | | | | | |
| Cash & Short Term Investm. | $854 | $1,053 | $458 | $254 | $272 | $425 | $349 | $554 | $1,269 | $1,670 |
| Accounts Receivable (Net) | 4,025 | 3,411 | 3,022 | 2,510 | 1,713 | 1,909 | 1,920 | 2,461 | 2,917 | 4,015 |
| Materials and Supplies | 917 | 866 | 982 | 958 | 949 | 769 | 846 | 859 | 998 | 1,155 |
| Other Current Assets | 1,237 | 1,077 | 1,317 | 901 | 1,020 | 1,496 | 1,233 | 1,330 | 2,010 | 1,920 |
| **Total Current Assets** | **$7,033** | **$6,406** | **$5,780** | **$4,623** | **$3,954** | **$4,598** | **$4,347** | **$5,204** | **$7,194** | **$8,760** |
| **Total Other Assets** | **$6,656** | **$6,137** | **$6,409** | **$5,284** | **$5,691** | **$6,484** | **$6,907** | **$7,430** | **$9,438** | **$10,775** |
| Road and Equipment: | | | | | | | | | | |
| Road | $64,666 | $69,724 | $73,869 | $69,684 | $72,630 | $75,622 | $84,285 | $87,877 | $105,682 | $109,935 |
| Equipment | 22,908 | 23,220 | 25,263 | 24,446 | 24,489 | 24,086 | 24,668 | 26,080 | 27,883 | 28,143 |
| Unallocated Items | 1,642 | 2,367 | 2,333 | 1,930 | 1,676 | 1,572 | 1,492 | 1,597 | 1,708 | 2,376 |
| Accumulated Depreciation and Amortization | 24,070 | 22,008 | 23,487 | 22,034 | 22,763 | 23,193 | 25,095 | 27,615 | 30,047 | 32,818 |
| **Net Road and Equipment** | **$65,145** | **$73,304** | **$77,977** | **$74,026** | **$76,032** | **$78,087** | **$85,351** | **$87,940** | **$105,227** | **$107,636** |
| **TOTAL ASSETS** | **$78,834** | **$85,847** | **$90,166** | **$83,933** | **$85,677** | **$89,169** | **$96,605** | **$100,574** | **$121,858** | **$127,172** |
| **LIABILITIES** | | | | | | | | | | |
| Current Liabilities: | | | | | | | | | | |
| Accounts Payable | $8,117 | $8,136 | $8,110 | $7,517 | $7,731 | $8,638 | $8,400 | $10,198 | $10,236 | $11,146 |
| Taxes Accrued | 628 | 551 | 785 | 884 | 818 | 1,001 | 767 | 770 | 872 | 1,161 |
| Other Current Liabilities | 671 | 543 | 445 | 448 | 406 | 430 | 328 | 337 | 342 | 281 |
| Equip. Obligations & Other LTD Due Within One Year | 559 | 611 | 882 | 609 | 783 | 811 | 889 | 649 | 915 | 900 |
| **Total Current Liabilities** | **$9,975** | **$9,841** | **$10,223** | **$9,458** | **$9,737** | **$10,880** | **$10,385** | **$11,954** | **$12,365** | **$13,488** |
| Long Term Liabilities: | | | | | | | | | | |
| Funded Debt Unmatured | $2,858 | $2,748 | $3,470 | $2,345 | $2,689 | $2,452 | $2,477 | $2,394 | $3,044 | $2,782 |
| Equipment Obligations | 2,698 | 2,415 | 2,838 | 2,824 | 2,745 | 2,456 | 2,100 | 1,914 | 1,539 | 1,363 |
| Capital Lease Obligations | 2,201 | 2,606 | 2,873 | 2,474 | 2,425 | 2,386 | 2,455 | 2,284 | 2,363 | 2,041 |
| Debt in Default | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Accounts Payable - Affiliated Companies | 4,635 | 6,132 | 9,192 | 8,959 | 7,549 | 6,867 | 6,282 | 7,264 | 8,114 | 8,743 |
| Accumul. Deferred Income Tax Credit | 16,822 | 19,140 | 20,218 | 19,846 | 20,784 | 23,046 | 25,837 | 27,028 | 33,722 | 34,178 |
| Other Long Term Liabilities | 7,421 | 7,968 | 8,376 | 7,550 | 7,347 | 6,260 | 7,394 | 6,586 | 8,756 | 8,747 |
| **Total Long Term Liabilities** | **$36,634** | **$41,010** | **$46,967** | **$43,998** | **$43,539** | **$43,467** | **$46,546** | **$47,470** | **$57,538** | **$57,855** |
| **TOTAL LIABILITIES** | **$46,609** | **$50,850** | **$57,190** | **$53,456** | **$53,277** | **$54,346** | **$56,931** | **$59,424** | **$69,903** | **$71,343** |
| **SHAREHOLDERS' EQUITY** | | | | | | | | | | |
| Capital Stock: | | | | | | | | | | |
| Common Stock | $1,474 | $661 | $666 | $666 | $666 | $766 | $2,539 | $2,469 | $2,469 | $2,469 |
| Preferred Stock | 58 | 50 | 48 | 46 | 44 | 42 | 39 | 37 | 35 | 32 |
| Total | 1,532 | 711 | 714 | 712 | 710 | 808 | 2,578 | 2,506 | 2,503 | 2,501 |
| Additional Paid In Capital | 13,081 | 15,246 | 13,557 | 11,896 | 12,237 | 13,829 | 13,813 | 13,945 | 23,598 | 23,898 |
| Retained Earnings | 17,616 | 19,043 | 18,710 | 17,874 | 19,457 | 20,189 | 23,287 | 24,703 | 25,858 | 29,433 |
| Less: Treasury Stock | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| **Net Shareholders' Equity** | **$32,225** | **$34,996** | **$32,976** | **$30,478** | **$32,401** | **$34,822** | **$39,675** | **$41,151** | **$51,955** | **$55,828** |
| **TOTAL LIABILITIES AND SHAREHOLDERS' EQUITY** | **$78,834** | **$85,847** | **$90,166** | **$83,933** | **$85,677** | **$89,169** | **$96,605** | **$100,574** | **$121,858** | **$127,172** |

# STATEMENT OF CASH FLOWS

(Millions of Dollars)

| | | Year Ended Dec. 31 | |
|---|---|---|---|
| | | 2005 | 2004 |
| **Cash Generated From Continuing Operations** | Income (Loss) from Continuing Operations | $4,917 | $2,867 |
| | Adjustments to Reconcile Earnings to Cash Generated: | | |
| | Loss (Gain) on Sale or Disposal of Tangible Property & Investment | (178) | (131) |
| | Depreciation and Amortization Expenses | 4,319 | 3,842 |
| | Increase (Decrease) in Provision for Deferred Income Taxes | 280 | 1,052 |
| | Net Increase (Decrease) in Undistrib. Earnings (Losses) of Affiliates | 2 | (15) |
| | (Increase) Decrease in Accounts Receivable | (1,006) | (347) |
| | (Increase) Decrease in Materials & Supplies & Other Current Assets | (61) | (375) |
| | Increase (Decrease) in Current Liabilities Other than Debt | 699 | 574 |
| | Net Increase (Decrease) in Other | (603) | 488 |
| | Cash Generated from Continuing Operations | 8,369 | 7,954 |
| | Add (Subtract) Cash Generated (Paid) by Reason of Discontinued Operations and Extraordinary Items | 0 | 0 |
| | **Net Cash Generated from Operations** | **$8,369** | **$7,954** |
| **Investment Activities** | Proceeds from Sale of Property | $486 | $250 |
| | Capital Expenditures[1] | (6,752) | (5,870) |
| | Net Change in Temporary Cash Investment Not Qualifying as Cash Equivalents | (765) | (88) |
| | Proceeds from Sale/Repayment of Investment and Advances | 1,677 | 113 |
| | Purchase Price of Long-Term Investment and Advances | (1,806) | (527) |
| | Net Decrease (Increase) in Sinking and Other Special Funds | (35) | (45) |
| | Other | (312) | 5 |
| | **Cash Used for Investment Activities** | **($7,508)** | **($6,162)** |
| **Financing Activities** | Proceeds from Issuance of Long-Term Debt | $2,601 | $1,708 |
| | Principal Payments of Long-Term Debt | (3,139) | (1,969) |
| | Proceeds from Issuance of Capital Stock | 99 | 0 |
| | Purchase Price of Acquiring Treasury Stock | 190 | 3 |
| | Cash Dividends Paid | (571) | (546) |
| | Other | (744) | (365) |
| | **Cash Generated from (Used for) Financing Activities** | **($1,564)** | **($1,169)** |
| **Cash & Cash Equivalents** | Increase (Decrease) in Cash and Cash Equivalents | ($702) | $623 |
| | Cash and Cash Equivalents at Beginning of the Year | 1,054 | 542 |
| | **Cash and Cash Equivalents at End of the Year** | **$352** | **$1,166** |

[1] The capital expenditures figures shown above are based on cash payments in the year indicated. Capital expenditure figures shown elsewhere in this publication are based on the amounts recorded in the property records during the year.



AAR-E-00004159

# SUMMARY OF NET RAILWAY OPERATING INCOME

(Millions of Dollars)

| CATEGORY | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|---|---|---|
| Net Revenue From Oprtns | $6,361 | $5,827 | $5,235 | $5,510 | $5,062 | $5,412 | $5,735 | $5,199 | $5,410 | $8,275 |
| Less: | | | | | | | | | | |
| Current & Deferred Income Taxes | 2,056 | 1,886 | 1,573 | 1,664 | 1,430 | 1,614 | 1,823 | 1,494 | 1,543 | 2,224 |
| Income from Lease of Road & Equipment | 31 | 22 | 24 | 25 | 25 | 25 | 27 | 26 | 21 | 31 |
| Plus: | | | | | | | | | | |
| Rent for Leased Roads & Equipment | 63 | 65 | 61 | 225 | 317 | 338 | 363 | 400 | 301 | 55 |
| Net Railway Oper. Income | 4,338 | 3,984 | 3,698 | 4,047 | 3,924 | 4,111 | 4,248 | 4,078 | 4,147 | 6,075 |

# DISTRIBUTION OF RAILWAY EXPENSES

(Millions of Dollars)

| CATEGORY | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|---|---|---|
| Labor (Salaries & Wages) | $8,011 | $8,787 | $8,774 | $8,627 | $8,156 | $8,261 | $8,211 | $8,598 | $9,429 | $9,977 |
| Health & Welfare, Pensions | 968 | 906 | 834 | 888 | 749 | 995 | 1,327 | 1,508 | 1,587 | 1,699 |
| Payroll Taxes | 1,889 | 1,957 | 2,081 | 2,106 | 2,216 | 2,220 | 2,157 | 2,069 | 2,047 | 2,118 |
| Other Taxes | 1,610 | 1,353 | 1,479 | 1,073 | 1,181 | 1,377 | 1,120 | 1,147 | 1,410 | 2,780 |
| Fuel | 2,436 | 2,443 | 2,063 | 2,079 | 3,254 | 3,191 | 2,751 | 3,436 | 4,367 | 6,238 |
| Other Materials & Supplies & Misc. Expenses | 4,933 | 4,969 | 5,752 | 5,493 | 5,355 | 5,128 | 5,409 | 5,734 | 6,820 | 7,604 |
| Loss & Damage, Injuries & Insurance | 1,205 | 1,147 | 1,080 | 1,055 | 964 | 976 | 1,262 | 1,499 | 1,793 | 1,199 |
| Depreciation | 2,749 | 2,877 | 3,101 | 3,092 | 3,096 | 3,192 | 3,351 | 3,480 | 3,835 | 4,313 |
| Hire of Equipment & Joint Facility Net Rent | 3,384 | 3,491 | 3,437 | 3,782 | 4,226 | 4,049 | 4,044 | 3,989 | 4,059 | 3,836 |
| Provision for Deferd. Taxes | 1,169 | 1,204 | 850 | 1,279 | 982 | 1,076 | 1,447 | 1,100 | 1,022 | 278 |
| TOTAL EXPENSES | $28,355 | $29,134 | $29,452 | $29,474 | $30,178 | $30,464 | $31,080 | $32,561 | $36,370 | $40,043 |

(Percent of Total Expenses)

| CATEGORY | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|---|---|---|
| Labor (Salaries & Wages) | 28.3% | 30.2 % | 29.8 % | 29.3% | 27.0% | 27.1% | 26.4% | 26.4% | 25.9% | 24.9% |
| Health & Welfare, Pensions | 3.4 | 3.1 | 2.8 | 3.0 | 2.5 | 3.3 | 4.3 | 4.6 | 4.4 | 4.2 |
| Payroll Taxes | 6.7 | 6.7 | 7.1 | 7.1 | 7.3 | 7.3 | 6.9 | 6.4 | 5.6 | 5.3 |
| Other Taxes | 5.7 | 4.6 | 5.0 | 3.6 | 3.9 | 4.5 | 3.6 | 3.5 | 3.9 | 6.9 |
| Fuel | 8.6 | 8.4 | 7.0 | 7.1 | 10.8 | 10.5 | 8.9 | 10.6 | 12.0 | 15.6 |
| Other Materials & Supplies & Misc. Expenses | 17.4 | 17.1 | 19.5 | 18.6 | 17.7 | 16.8 | 17.4 | 17.6 | 18.8 | 19.0 |
| Loss & Damage, Injuries & Insurance | 4.2 | 3.9 | 3.7 | 3.6 | 3.2 | 3.2 | 4.1 | 4.6 | 4.9 | 3.0 |
| Depreciation | 9.7 | 9.9 | 10.5 | 10.5 | 10.3 | 10.5 | 10.8 | 10.7 | 10.5 | 10.8 |
| Hire of Equipment & Joint Facility Net Rent | 11.9 | 12.0 | 11.7 | 12.8 | 14.0 | 13.3 | 13.0 | 12.3 | 11.2 | 9.6 |
| Provision for Deferd. Taxes | 4.1 | 4.1 | 2.9 | 4.3 | 3.3 | 3.5 | 4.7 | 3.4 | 2.8 | 0.7 |
| TOTAL EXPENSES | 100.0% | 100.0% | 100.0% | 100.0% | 100.0 % | 100.0% | 100.0 % | 100.0% | 100.0% | 100.0% |

Note: See note on page 92 concerning Labor.
Note: Materials & Supplies alone represent 4.5 percent of 2005 expenses.



AAR-E-00004160

# NET RAILWAY OPERATING INCOME

| Year | NROI (thousands $) |
|---|---|
| 1996 | $4,338,097 |
| 1997 | 3,984,016 |
| 1998 | 3,698,457 |
| 1999 | 4,046,939 |
| 2000 | 3,923,995 |
| 2001 | 4,111,377 |
| 2002 | 4,247,712 |
| 2003 | 4,078,120 |
| 2004 | 4,146,876 |
| 2005 | 6,075,280 |






AAR-E-00004161

# RAILROAD INFLATION INDEXES

Index (1977 = 100)

| Year | Railroad Cost Recovery Index | Wages and Supplements | Materials and Supplies | Fuel | Other Expenses |
|---|---|---|---|---|---|
| 1996 | 263.0 | 294.3 | 193.5 | 198.0 | 249.8 |
| 1997 | 267.1 | 300.9 | 196.9 | 192.3 | 254.1 |
| 1998 | 270.9 | 308.4 | 199.1 | 153.9 | 264.3 |
| 1999 | 270.3 | 304.9 | 198.7 | 156.3 | 265.3 |
| 2000 | 295.0 | 323.3 | 198.1 | 252.0 | 275.5 |
| 2001 | 303.4 | 340.3 | 203.8 | 246.7 | 280.9 |
| 2002 | 305.7 | 355.7 | 202.5 | 212.5 | 283.5 |
| 2003 | 316.7 | 367.0 | 202.6 | 257.2 | 286.4 |
| 2004 | 334.1 | 363.6 | 216.4 | 342.1 | 300.7 |
| 2005 | 376.8 | 381.6 | 235.1 | 499.3 | 319.0 |

Note: Other expenses includes equipment rents, purchased services, depreciation, interest, taxes (other than income and payroll), and all other operating expenses. Source: AAR - *AAR Railroad Cost Indexes*.






AAR-E-00004162

# CAPITAL EXPENDITURES FOR ROADWAY AND EQUIPMENT

(Millions of Dollars)

| Year | Capital Expenditures for Roadway and Equipment | Equipment | Percent of Total | Roadway and Structures | Percent of Total |
|---|---|---|---|---|---|
| 1996 | $6,101 | $2,202 | 36.1 % | $3,899 | 63.9 % |
| 1997 | 6,266 | 2,146 | 34.2 | 4,121 | 65.8 |
| 1998 | 7,196 | 2,321 | 32.3 | 4,875 | 67.7 |
| 1999 | 6,629 | 2,183 | 32.9 | 4,446 | 67.1 |
| 2000 | 6,057 | 1,508 | 24.9 | 4,549 | 75.1 |
| 2001 | 5,434 | 1,013 | 18.6 | 4,421 | 81.4 |
| 2002 | 5,666 | 1,021 | 18.0 | 4,645 | 82.0 |
| 2003 | 5,861 | 1,300 | 22.2 | 4,561 | 77.8 |
| 2004 | 6,242 | 1,301 | 20.8 | 4,941 | 79.2 |
| 2005 | 6,390 | 1,026 | 16.1 | 5,364 | 83.9 |

Note: Equipment includes cars, locomotives and other equipment. Roadway and Structures includes terminals, track, bridges and structures, classification yards and port terminals.






AAR-E-00004163

# PROPERTY INVESTMENT

(Millions of Dollars)

| At Year End | Investment Property Used In Railroad Service | Working Capital Allowed | Gross Investment | Accumulated Depreciation and Amortization | Net Investment[1] |
|---|---|---|---|---|---|
| 1996 | $88,883 | $1,163 | $90,046 | $23,932 | $66,113 |
| 1997 | 94,972 | 1,086 | 96,058 | 21,862 | 74,196 |
| 1998 | 101,126 | 1,045 | 102,171 | 23,338 | 78,832 |
| 1999 | 102,368 | 1,006 | 103,424 | 23,177 | 80,247 |
| 2000 | 105,188 | 901 | 106,136 | 23,989 | 82,147 |
| 2001 | 107,677 | 862 | 108,588 | 24,635 | 83,953 |
| 2002 | 116,750 | 970 | 117,770 | 26,649 | 91,121 |
| 2003 | 121,838 | 1,042 | 122,902 | 29,215 | 93,686 |
| 2004 | 134,596 | 1,324 | 135,941 | 29,771 | 106,170 |
| 2005 | 139,713 | 1,667 | 141,400 | 32,508 | 108,892 |

[1] As reported. See note on page 64.






AAR-E-00004164

# DEBT/CAPITAL RATIO




(Millions of Dollars)

| At Year End | Long-Term Debt | Total Capital | Debt/ Capital Ratio |
|---|---|---|---|
| 1996 | $12,392 | $44,617 | 0.278 |
| 1997 | 13,901 | 48,898 | 0.284 |
| 1998 | 18,373 | 51,349 | 0.358 |
| 1999 | 16,602 | 47,080 | 0.353 |
| 2000 | 15,408 | 47,809 | 0.322 |
| 2001 | 14,161 | 48,983 | 0.289 |
| 2002 | 13,315 | 52,990 | 0.251 |
| 2003 | 13,856 | 55,007 | 0.252 |
| 2004 | 15,060 | 67,016 | 0.225 |
| 2005 | 14,930 | 70,758 | 0.211 |



AAR-E-00004165

# INVESTMENT TURNOVER

(Millions of Dollars)

| Year | Operating Revenue | Net Investment[1] | Capital Turnover Rate (times) |
|---|---|---|---|
| 1996 | $32,693 | $66,113 | 0.49 |
| 1997 | 33,118 | 74,196 | 0.45 |
| 1998 | 33,151 | 78,832 | 0.42 |
| 1999 | 33,521 | 80,247 | 0.42 |
| 2000 | 34,102 | 82,147 | 0.42 |
| 2001 | 34,576 | 83,953 | 0.41 |
| 2002 | 35,327 | 91,121 | 0.39 |
| 2003 | 36,639 | 93,686 | 0.39 |
| 2004 | 40,517 | 106,170 | 0.38 |
| 2005 | 46,118 | 108,892 | 0.42 |

[1] Note: see note on page 64.









AAR-E-00004166

# DEBT AND INTEREST CHARGES




(Millions of Dollars)

| Year | Debt | Interest Charges | Interest Charges As A Percentage of Debt |
|---|---|---|---|
| 1996 | $12,950 | $1,100 | 8.5 % |
| 1997 | 14,512 | 1,114 | 7.7 |
| 1998 | 19,255 | 1,406 | 7.3 |
| 1999 | 17,211 | 1,347 | 7.8 |
| 2000 | 16,191 | 1,410 | 8.7 |
| 2001 | 14,972 | 1,147 | 7.7 |
| 2002 | 14,203 | 1,140 | 8.0 |
| 2003 | 14,506 | 1,028 | 7.1 |
| 2004 | 15,975 | 1,103 | 6.9 |
| 2005 | 15,829 | 1,209 | 7.6 |

Interest expense includes interest on funded and unfunded debt, plus contingent interest. Debt includes funded unmatured, equipment obligations, capitalized leases, accounts payable to affiliates, and long-term debt due within one year.

# EQUIPMENT OBLIGATIONS




(Millions of Dollars)

| Year | Issued During Year | Outstanding At End of Year | Average Interest Rate on Issues During Year |
|---|---|---|---|
| 1996 | $325 | $2,698 | 6.90 % |
| 1997 | 77 | 2,415 | 6.64 |
| 1998 | 138 | 2,838 | 5.98 |
| 1999 | 566 | 2,824 | 6.33 |
| 2000 | 190 | 2,745 | 8.10 |
| 2001 | 174 | 2,456 | 4.42 |
| 2002 | 0 | 2,100 | n.a. |
| 2003 | 0 | 1,914 | n.a. |
| 2004 | 0 | 1,539 | n.a. |
| 2005 | 0 | 1,363 | n.a. |

n.a. - not applicable



AAR-E-00004168

# RETAINED FUNDS AND CAPITAL EXPENDITURES

(Millions of Dollars)

| Year | Retained Funds | Capital Expenditures |
|---|---|---|
| 1996 | $5,257 | $6,550 |
| 1997 | 6,335 | 6,737 |
| 1998 | 6,168 | 7,357 |
| 1999 | 6,288 | 6,193 |
| 2000 | 6,236 | 5,290 |
| 2001 | 5,537 | 5,113 |
| 2002 | 7,517 | 5,605 |
| 2003 | 6,549 | 5,989 |
| 2004 | 7,199 | 6,345 |
| 2005 | 8,947 | 7,068 |

Note: Retained funds represent income before extraordinary charges, plus deferred taxes and depreciation, less cash dividends and equity in undistributed earnings of affiliated companies. See note on capital expenditures on page 64.



# EXTERNAL SOURCES OF FUNDS

(Millions of Dollars)

| Year | New Debt | Sale of Property | New Stock | Total |
|---|---|---|---|---|
| 1996 | $1,805 | $598 | $600 | $3,004 |
| 1997 | 1,619 | 744 | 0 | 2,363 |
| 1998 | 1,665 | 463 | 5 | 2,132 |
| 1999 | 2,193 | 340 | 0 | 2,533 |
| 2000 | 1,655 | 545 | 0 | 2,200 |
| 2001 | 648 | 388 | 0 | 1,036 |
| 2002 | 765 | 491 | 28 | 1,284 |
| 2003 | 630 | 319 | 0 | 948 |
| 2004 | 1,708 | 250 | 0 | 1,958 |
| 2005 | 2,601 | 486 | 99 | 3,186 |






AAR-E-00004170

# CASH FLOW




(Millions of Dollars)

| Year | Net Income[1] | Depreciation and Amortization | Deferred Taxes[2] | Net Decrease (Increase) in Subsidiary's Undistributed Income | Cash Flow[3] |
|---|---|---|---|---|---|
| 1996 | $3,885 | $2,868 | $1,150 | ($114) | $7,790 |
| 1997 | 3,155 | 2,980 | 1,206 | (187) | 7,153 |
| 1998 | 2,807 | 3,157 | 860 | (139) | 6,684 |
| 1999 | 2,976 | 3,144 | 1,281 | (80) | 7,321 |
| 2000 | 2,501 | 3,133 | 996 | 25 | 6,656 |
| 2001 | 2,740 | 3,225 | 1,078 | (85) | 6,957 |
| 2002 | 3,201 | 3,383 | 1,450 | (112) | 7,922 |
| 2003 | 2,683 | 3,482 | 1,063 | (39) | 7,189 |
| 2004 | 2,867 | 3,842 | 1,052 | (15) | 7,745 |
| 2005 | 4,917 | 4,319 | 280 | 2 | 9,518 |

[1] Represents net income from continuing operations.
[2] Represents net change in deferred tax liabilities.
[3] Sum of net income from continuing operations, depreciation and amortization, deferred taxes, and net decrease (increase) in subsidiaries' undistributed income.

# RAILROAD TAXES

(Thousands of Dollars)

| | Payroll Taxes | | | | Federal Taxes | | | State, Local & Foreign | |
|---|---|---|---|---|---|---|---|---|---|
| Year | Railroad Retirement | Supp. Annuity | Hospital Insurance | Unemp. Insurance | Income | Other | Deferred Taxes | Taxes | Total |
| 1996 | $1,655,837 | $103,354 | $118,722 | $11,301 | $869,246 | $25,871 | $1,169,323 | $715,357 | $4,669,011 |
| 1997 | 1,701,700 | 104,471 | 136,982 | 13,524 | 654,095 | 6,471 | 1,204,394 | 692,413 | 4,514,050 |
| 1998 | 1,776,785 | 111,692 | 142,396 | 50,272 | 723,647 | 74,587 | 850,247 | 681,174 | 4,410,800 |
| 1999 | 1,819,073 | 85,561 | 141,825 | 60,005 | 378,890 | 60,963 | 1,279,487 | 632,776 | 4,458,580 |
| 2000 | 1,973,126 | 82,898 | 143,082 | 17,245 | 381,679 | 79,532 | 982,045 | 719,737 | 4,379,344 |
| 2001 | 1,958,427 | 75,050 | 140,071 | 46,552 | 484,798 | 150,535 | 1,075,834 | 741,670 | 4,672,937 |
| 2002 | 1,934,672 | (3,091) | 140,867 | 84,515 | 329,846 | 98,398 | 1,447,024 | 692,178 | 4,724,409 |
| 2003 | 1,824,859 | (3) | 143,578 | 100,467 | 317,827 | 87,501 | 1,100,161 | 742,063 | 4,316,453 |
| 2004 | 1,827,203 | (2) | 155,605 | 64,682 | 413,210 | 156,199 | 1,021,949 | 840,809 | 4,479,655 |
| 2005 | 1,896,296 | (2) | 167,225 | 54,049 | 1,714,472 | 90,777 | 278,149 | 975,210 | 5,176,176 |

Note: Fuel taxes are not included. Federal fuel taxes for 2005 are estimated to be $119 million.
Note: The Supplemental Annuity Tax was eliminated by the Railroad Retirement and Survivors' Improvement Act of 2001.






AAR-E-00004172

# COVERAGE RATIO

| Year | Income Before Fixed Charges And Federal Income Taxes (millions $) | Fixed and Contingent Interest Charges (millions $) | Coverage Ratio of Interest Charges (times) |
|---|---|---|---|
| 1996 | $7,055 | $1,114 | 6.33 |
| 1997 | 6,168 | 1,128 | 5.47 |
| 1998 | 5,803 | 1,424 | 4.08 |
| 1999 | 6,001 | 1,361 | 4.41 |
| 2000 | 5,361 | 1,429 | 3.75 |
| 2001 | 5,517 | 1,163 | 4.74 |
| 2002 | 6,179 | 1,154 | 5.35 |
| 2003 | 5,220 | 1,042 | 5.01 |
| 2004 | 5,523 | 1,113 | 4.96 |
| 2005 | 8,361 | 1,220 | 6.85 |






AAR-E-00004173

# REVENUE AND EXPENSES PER MILE OF ROAD OPERATED

| Year | Freight Revenue Per Mile of Road Operated | Freight Expenses Per Mile of Road Operated |
|---|---|---|
| 1996 | $251,721 | $207,152 |
| 1997 | 265,655 | 223,499 |
| 1998 | 269,147 | 232,185 |
| 1999 | 270,115 | 230,697 |
| 2000 | 274,326 | 239,920 |
| 2001 | 277,098 | 240,080 |
| 2002 | 277,163 | 239,543 |
| 2003 | 289,572 | 256,159 |
| 2004 | 322,333 | 288,170 |
| 2005 | 368,735 | 312,757 |



# OPERATING RATIO AND SPECIAL CHARGES

| | ($000) | | | Operating Ratio | |
|---|---|---|---|---|---|
| Year | Operating Revenue | Operating Expense | Special Charges | With Special Charges | Special Charges Removed |
| 1996 | $32,692,638 | $26,331,375 | $86,098 | 80.54 % | 80.28 % |
| 1997 | 33,118,031 | 27,290,643 | 632,800 | 82.40 | 80.49 |
| 1998 | 33,150,891 | 27,916,320 | 519,944 | 84.21 | 82.64 |
| 1999 | 33,521,176 | 28,010,857 | 221,000 | 83.56 | 82.90 |
| 2000 | 34,102,141 | 29,039,948 | 123,400 | 85.16 | 84.79 |
| 2001 | 34,575,851 | 29,163,867 | 0 | 84.35 | 84.35 |
| 2002 | 35,327,265 | 29,592,326 | 0 | 83.77 | 83.77 |
| 2003 | 36,638,941 | 31,440,382 | 0 | 85.81 | 85.81 |
| 2004 | 40,517,155 | 35,106,830 | 743,000 | 86.65 | 84.81 |
| 2005 | 46,118,002 | 37,842,772 | (28,600) | 82.06 | 82.12 |

In 2005, a settlement in an environmental lawsuit enabled one railroad to reduce related accrued liabilities, causing the rare occurrence of negative special charges.






AAR-E-00004175

# WORKING CAPITAL AND CURRENT RATIO

| Year | Current Assets (millions $) | Current Liabilities (millions $) | Net Working Capital (millions $) | Current Ratio |
|---|---|---|---|---|
| 1996 | $7,033 | $9,975 | ($2,942) | 0.71 |
| 1997 | 6,406 | 9,841 | (3,434) | 0.65 |
| 1998 | 5,780 | 10,223 | (4,443) | 0.57 |
| 1999 | 4,623 | 9,458 | (4,834) | 0.49 |
| 2000 | 3,954 | 9,737 | (5,783) | 0.41 |
| 2001 | 4,598 | 10,880 | (6,282) | 0.42 |
| 2002 | 4,347 | 10,385 | (6,037) | 0.42 |
| 2003 | 5,204 | 11,954 | (6,750) | 0.44 |
| 2004 | 7,194 | 12,365 | (5,171) | 0.58 |
| 2005 | 8,760 | 13,488 | (4,729) | 0.65 |

Note: Current ratio = total current assets divided by total current liabilities.






AAR-E-00004176

# COST OF DEBT AND EQUITY CAPITAL

| Year | Debt[1] | Equity | | Total | Capital Structure | | |
|---|---|---|---|---|---|---|---|
| | | Preferred | Common | | Debt | Equity Preferred | Equity Common |
| 1996 | 7.4 % | 2.3 % | 13.9 % | 11.9 % | 28.0 % | 1.3 % | 70.7 % |
| 1997 | 7.2 | 6.1 | 13.8 | 11.8 | 29.7 | 0.1 | 70.3 |
| 1998 | 6.6 | 6.2 | 13.1 | 10.7 | 36.0 | 1.4 | 62.6 |
| 1999 | 7.2 | 6.3 | 12.9 | 10.8 | 35.5 | 1.8 | 62.7 |
| 2000 | 8.0 | 6.3 | 13.9 | 11.0 | 45.4 | 2.5 | 52.1 |
| 2001 | 6.9 | 6.3 | 12.8 | 10.2 | 41.8 | 2.2 | 56.0 |
| 2002 | 6.0 | 6.3 | 12.6 | 9.8 | 41.2 | 2.1 | 56.7 |
| 2003 | 5.0 | n.a. | 12.7 | 9.4 | 42.8 | 0.0 | 57.2 |
| 2004 | 5.3 | n.a. | 13.2 | 10.1 | 38.5 | 0.0 | 61.5 |
| 2005 | 5.4 | n.a. | 15.2 | 12.2 | 30.4 | 0.0 | 69.6 |

n.a. - not applicable
[1] Based on current cost of debt.
Source: STB Ex Parte decisions









AAR-E-00004177

# RATE OF RETURN ON NET INVESTMENT AND COST OF CAPITAL




| Year | Net Railway Operating Income (millions $) | Average Net Investment (millions $) | Rate of Return on Net Investment | STB Cost of Capital |
|---|---|---|---|---|
| 1996 | $4,627 | $49,442 | 9.4 % | 11.9 % |
| 1997 | 4,159 | 54,981 | 7.6 | 11.8 |
| 1998 | 4,055 | 57,948 | 7.0 | 10.7 |
| 1999 | 4,022 | 58,010 | 6.9 | 10.8 |
| 2000 | 4,146 | 64,020 | 6.5 | 11.0 |
| 2001 | 4,378 | 63,935 | 6.8 | 10.2 |
| 2002 | 4,604 | 65,369 | 7.0 | 9.8 |
| 2003 | 4,211 | 66,501 | 6.3 | 9.4 |
| 2004 | 4,295 | 70,235 | 6.1 | 10.1 |
| 2005 | 6,278 | 74,172 | 8.5 | 12.2 |

Note: The figures show above are based on the STB's decisions in Revenue Adequacy proceedings. Those "Revenue Adequacy" figures differ from similar "As Reported" figures found elsewhere in this publication. See the notes on page 64 for a complete explanation.

# REVENUE MARGIN

| Year | Freight Revenue Per Ton-Mile (cents) | Freight Operating Expenses Per Ton-Mile (cents) | Freight Revenue Margin Per Ton-Mile (cents) |
|---|---|---|---|
| 1996 | 2.352¢ | 1.935¢ | 0.416¢ |
| 1997 | 2.396 | 2.016 | 0.380 |
| 1998 | 2.342 | 2.021 | 0.322 |
| 1999 | 2.280 | 1.947 | 0.333 |
| 2000 | 2.257 | 1.974 | 0.283 |
| 2001 | 2.242 | 1.943 | 0.300 |
| 2002 | 2.263 | 1.956 | 0.307 |
| 2003 | 2.283 | 2.019 | 0.263 |
| 2004 | 2.354 | 2.104 | 0.249 |
| 2005 | 2.621 | 2.223 | 0.398 |






AAR-E-00004179

# SHAREHOLDERS' EQUITY

(Millions of Dollars)

| Year | Total | Capital Stock | Additional Paid In Capital | Retained Earnings |
|---|---|---|---|---|
| 1996 | $32,225 | $1,532 | $13,081 | $17,616 |
| 1997 | 34,996 | 711 | 15,246 | 19,043 |
| 1998 | 32,976 | 714 | 13,557 | 18,710 |
| 1999 | 30,478 | 712 | 11,896 | 17,874 |
| 2000 | 32,401 | 710 | 12,237 | 19,457 |
| 2001 | 34,822 | 808 | 13,829 | 20,189 |
| 2002 | 39,675 | 2,578 | 13,813 | 23,287 |
| 2003 | 41,151 | 2,506 | 13,945 | 24,703 |
| 2004 | 51,955 | 2,503 | 23,598 | 25,858 |
| 2005 | 55,828 | 2,501 | 23,898 | 29,433 |

Note: The "Total" column reflects a reduction for treasury stock.






AAR-E-00004180

# DIVIDEND APPROPRIATIONS

(Thousands of Dollars)

| | Dividends (Cash and Non-Cash) | | |
|---|---|---|---|
| Year | Common Stock | Preferred Stock | Total |
| 1996 | $3,936,260 | $798 | $3,937,058 |
| 1997 | 994,542 | 200 | 994,742 |
| 1998 | 1,520,812 | 0 | 1,520,812 |
| 1999 | 2,083,857 | 0 | 2,083,857 |
| 2000 | 818,693 | 0 | 818,693 |
| 2001 | 2,120,195 | 0 | 2,120,195 |
| 2002 | 870,166 | 0 | 870,166 |
| 2003 | 1,406,107 | 0 | 1,406,107 |
| 2004 | 1,888,486 | 0 | 1,888,486 |
| 2005 | 1,266,675 | 0 | 1,266,675 |






AAR-E-00004181

# RETURN ON SHAREHOLDERS' EQUITY

| Year | Net Income (millions $) | Average Shareholders' Equity (millions $) | Return on Equity |
|---|---|---|---|
| 1996 | $3,885 | $31,822 | 12.2 % |
| 1997 | 3,156 | 34,042 | 9.3 |
| 1998 | 2,807 | 32,283 | 8.7 |
| 1999 | 2,971 | 31,727 | 9.4 |
| 2000 | 2,500 | 31,439 | 8.0 |
| 2001 | 2,740 | 34,439 | 8.0 |
| 2002 | 3,201 | 38,655 | 8.3 |
| 2003 | 2,687 | 40,413 | 6.6 |
| 2004 | 2,867 | 46,554 | 6.2 |
| 2005 | 4,917 | 53,892 | 9.1 |






AAR-E-00004182

# LABOR

# NOTES

- Labor as a percent of operating expenses, as shown on page 97, differs from that shown on page 68 for several reasons. The total expenses used for the calculation on page 68 are total operating expenses, plus income taxes, while those used for page 97 are freight operating expenses, which exclude income taxes. Furthermore, labor expenses on page 68 is wages only, while on page 97 labor compensation includes both wages and benefits. Labor on both pages has been adjusted, beginning in 2001, to include a parent corporation's management fee recorded as purchased services. In earlier years, this expense was recorded in wages and fringe benefits.

# AVERAGE NUMBER OF EMPLOYEES




| Railroad | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|---|---|---|
| Union Pacific RR Co. | 53,647 | 52,533 | 53,346 | 53,306 | 51,112 | 48,923 | 47,219 | 46,302 | 49,511 | 51,095 |
| BNSF Railway | 43,731 | 43,468 | 44,352 | 42,659 | 39,881 | 39,222 | 37,366 | 36,604 | 37,507 | 39,358 |
| CSX Transportation* | 38,576 | 37,440 | 35,363 | 35,988 | 34,283 | 33,872 | 32,425 | 31,740 | 30,683 | 30,486 |
| Norfolk Southern* | 34,213 | 33,690 | 34,550 | 35,192 | 33,344 | 30,534 | 28,751 | 28,488 | 28,163 | 29,880 |
| Grand Trunk Corporation | 5,056 | 4,899 | 4,738 | 4,630 | 4,357 | 4,291 | 6,411 | 6,214 | 6,530 | 6,133 |
| Kansas City Southern Rwy. Co. | 2,665 | 2,585 | 2,624 | 2,640 | 2,568 | 2,546 | 2,516 | 2,648 | 2,670 | 2,787 |
| Soo Line Railroad Co. | 3,921 | 3,366 | 3,249 | 3,142 | 2,815 | 2,767 | 2,684 | 2,655 | 2,635 | 2,699 |
| TOTAL | 181,809 | 177,981 | 178,222 | 177,557 | 168,360 | 162,155 | 157,372 | 154,651 | 157,699 | 162,438 |

Note: Consist of roads for all years includes only those Class I railroads and predecessor Class I railroads which are included in 2005 Class I systems (i.e., a constant 2005 consist). Therefore, totals may not agree with employee counts for prior years shown elsewhere in this publication. Union Pacific includes Chicago and North Western and Southern Pacific. Burlington Northern Santa Fe includes Burlington Northern and the Atchison, Topeka, and Santa Fe Railway. Grand Trunk Corporation includes Grand Trunk Western and Illinois Central, some former regional and local railroads beginning 2002, and more former regional railroads beginning 2004. The consolidation of regional railroads into a Class I railroad can have a significant impact on statistics, and accounts for the increase in employees shown for Grand Trunk Corporation (2002, 2004) and Kansas City Southern (1998, 2005).

* Norfolk Southern and CSX Transportation include allocated portions of Conrail.



AAR-E-00004185

# FREIGHT RAILROAD EMPLOYEES BY STATE OF RESIDENCE - 2005

| State | Employees | State | Employees |
|---|---|---|---|
| Alabama | 3,677 | Montana | 2,719 |
| Alaska | 429 | Nebraska | 10,626 |
| Arizona | 2,895 | Nevada | 830 |
| Arkansas | 3,651 | New Hampshire | 217 |
| California | 10,282 | New Jersey | 1,154 |
| Colorado | 2,906 | New Mexico | 1,729 |
| Connecticut | 107 | New York | 2,973 |
| Delaware | 202 | North Carolina | 2,389 |
| District of Columbia | 8 | North Dakota | 1,704 |
| Florida | 5,904 | Ohio | 8,007 |
| Georgia | 7,049 | Oklahoma | 1,807 |
| Hawaii | 0 | Oregon | 2,408 |
| Idaho | 1,374 | Pennsylvania | 7,159 |
| Illinois | 12,742 | Rhode Island | 71 |
| Indiana | 5,860 | South Carolina | 1,732 |
| Iowa | 3,896 | South Dakota | 758 |
| Kansas | 5,571 | Tennessee | 4,054 |
| Kentucky | 4,341 | Texas | 16,771 |
| Louisiana | 3,265 | Utah | 1,946 |
| Maine | 679 | Vermont | 202 |
| Maryland | 1,555 | Virginia | 5,409 |
| Massachusetts | 812 | Washington | 4,132 |
| Michigan | 3,916 | West Virginia | 2,804 |
| Minnesota | 4,379 | Wisconsin | 3,236 |
| Mississippi | 1,762 | Wyoming | 2,829 |
| Missouri | 6,879 | | |
| | | **TOTAL U.S.** | **181,807** |

Note: The employee estimates shown above are based on STB and AAR employee counts and Railroad Retirement system employee distributions. All freight (Class I, regional and local) railroad employees are included except the U.S. railroad operations of Canadian National Railway and Canadian Pacific Railway that are other than CNGT and SOO, respectively.



AAR-E-00004186

# HEALTH AND WELFARE RATES

National Contract Monthly Employer Contribution* Per Union Employee

| Year | Group Health and Life | Early Retirement Major Medical | Group Dental | Group Vision | Supplemental Sickness: Maint. of Way | Supplemental Sickness: Shop Crafts | Supplemental Sickness: Signal-men | Supplemental Sickness: Yard Masters |
|---|---|---|---|---|---|---|---|---|
| 1996 | $450.62 | $15.89 | $32.26 | - | $31.79 | $33.96 | $25.95 | $37.46 |
| 1997 | 489.98 | 17.67 | 29.44 | - | 30.15 | 31.23 | 12.47 | 34.75 |
| 1998 | 472.09 | 24.38 | 31.60 | - | 22.90 | 27.17 | 14.69 | 31.33 |
| 1999 | 447.85 | 17.46 | 35.15 | - | 18.80 | 21.26 | 12.01 | 24.16 |
| 2000 | 598.26 | 22.35 | 34.15 | $7.51 | 18.04 | 20.24 | 7.25 | 30.78 |
| 2001 | 705.52 | 30.35 | 43.27 | 7.51 | 24.53 | 38.51 | 23.59 | 29.65 |
| 2002 | 836.48 | 40.09 ** | 43.41 | 8.40 | 33.32 | 46.22 | 32.24 | 32.18 |
| 2003 | 875.93 | 65.73 | 52.20 | 8.61 | 39.25 | 47.50 | 31.75 | 31.33 |
| 2004 | 935.45 | 70.93 | 52.20 | 9.37 | 38.00 | 61.00 | 33.00 | 40.74 |
| 2005 | 948.19 | 90.57 | 47.20 | 10.84 | 36.00 | 61.00 | 32.00 | 44.48 |
| 2006 | 1,001.02 | 87.86 | 47.20 | 10.66 | 36.00 | 61.00 | 32.00 | 47.06 |
| 2007 | 1,097.66 | 89.06 | 47.14 | 10.70 | 36.06 | 61.06 | 32.06 | 41.13 |

* Excludes any reductions caused by employee H&W cost sharing.
** Rate was $31.00 for January and February. Source: National Railway Labor Conference

# RAILROAD RETIREMENT TAX RATES

| Year | Tier I: Non-Medicare | Tier I: Medicare | Tier II: Employee | Tier II: Employer | Earnings Base: Tier I | Earnings Base: Medicare | Earnings Base: Tier II |
|---|---|---|---|---|---|---|---|
| 1996 | 6.20 % | 1.45 % | 4.90 % | 16.10 % | $62,700 | No Limit | $46,500 |
| 1997 | 6.20 | 1.45 | 4.90 | 16.10 | 65,400 | No Limit | 48,600 |
| 1998 | 6.20 | 1.45 | 4.90 | 16.10 | 68,400 | No Limit | 50,700 |
| 1999 | 6.20 | 1.45 | 4.90 | 16.10 | 72,600 | No Limit | 53,700 |
| 2000 | 6.20 | 1.45 | 4.90 | 16.10 | 76,200 | No Limit | 56,700 |
| 2001 | 6.20 | 1.45 | 4.90 | 16.10 | 80,400 | No Limit | 59,700 |
| 2002 | 6.20 | 1.45 | 4.90 | 15.60 | 84,900 | No Limit | 63,000 |
| 2003 | 6.20 | 1.45 | 4.90 | 14.20 | 87,000 | No Limit | 64,500 |
| 2004 | 6.20 | 1.45 | 4.90 | 13.10 | 87,900 | No Limit | 65,100 |
| 2005 | 6.20 | 1.45 | 4.40 | 12.60 | 90,000 | No Limit | 66,900 |
| 2006 | 6.20 | 1.45 | 4.40 | 12.60 | 94,200 | No Limit | 69,900 |
| 2007 | 6.20 | 1.45 | 3.90 | 12.10 | 97,500 | No Limit | 72,600 |

Source: Railroad Retirement Board

Note: Both employers and employees pay at the rate shown in the Tier I column.



AAR-E-00004187

# 2005 EMPLOYMENT AND ANNUAL WAGES BY CLASS




| Employee Group | Average Number of Employees | Total Wages (thousands $) | Average Annual Wages |
|---|---|---|---|
| Executives, Officials and Staff Assistants | 9,359 | $1,014,931 | $108,444 |
| Professional and Administrative | 13,558 | 864,050 | 63,730 |
| Maintenance of Way and Structures | 33,967 | 1,935,184 | 56,972 |
| Maintenance of Equipment and Stores | 29,940 | 1,601,419 | 53,488 |
| Transportation, Other than Train & Engine | 7,307 | 479,619 | 65,638 |
| Transportation, Train and Engine | 68,307 | 4,984,114 | 72,966 |
| TOTAL | 162,438 | $10,879,317 | $66,975 |






AAR-E-00004188

# EMPLOYEES AND COMPENSATION

| Year | Number of Employees | Total Wages (millions $) | Average Annual Wages Per Employee | Payroll Taxes (millions $) | Health & Welfare Benefits & Pensions (millions $) | Total Compensation (millions $) | Average Annual Compensation Per Employee |
|---|---|---|---|---|---|---|---|
| 1996 | 181,809 | $9,202 | $50,611 | $2,170 | $1,112 | $12,483 | $68,662 |
| 1997 | 177,981 | 9,235 | 51,889 | 2,057 | 953 | 12,244 | 68,796 |
| 1998 | 178,222 | 9,938 | 55,764 | 2,357 | 944 | 13,240 | 74,288 |
| 1999 | 177,557 | 9,603 | 54,082 | 2,345 | 989 | 12,936 | 72,856 |
| 2000 | 168,360 | 9,623 | 57,157 | 2,615 | 884 | 13,122 | 77,938 |
| 2001 | 162,155 | 9,430 | 58,153 | 2,534 | 1,136 | 13,100 | 80,785 |
| 2002 | 157,372 | 9,387 | 59,650 | 2,466 | 1,517 | 13,370 | 84,960 |
| 2003 | 154,652 | 9,576 | 61,920 | 2,304 | 1,680 | 13,560 | 87,682 |
| 2004 | 157,699 | 10,337 | 65,550 | 2,245 | 1,740 | 14,322 | 90,819 |
| 2005 | 162,438 | 10,879 | 66,975 | 2,309 | 1,853 | 15,041 | 92,598 |

Note: Total compensation included in this table covers both operating and capitalized labor expenses. Although total wages are available on that basis, only that portion of fringe benefits (payroll taxes, health and welfare benefits, and pensions) charged to operating expenses is available. Therefore, fringe benefits charged to operating expenses have been multiplied by the ratio of total wages to wages charged to operating expenses to estimate operating and capitalized expenses for those components of compensation. See also note on page 92.






AAR-E-00004189

# COMPENSATION PER HOUR PAID AND WORKED

| Year | Labor Compensation (millions $) | Employee Hours: Paid (millions) | Employee Hours: Worked (millions) | Labor Compensation Per Hour: Paid | Labor Compensation Per Hour: Worked |
|---|---|---|---|---|---|
| 1996 | $12,483 | 459 | 358 | $27.21 | $34.86 |
| 1997 | 12,244 | 455 | 354 | 26.89 | 34.60 |
| 1998 | 13,240 | 468 | 361 | 28.32 | 36.71 |
| 1999 | 12,936 | 458 | 349 | 28.23 | 37.09 |
| 2000 | 13,122 | 447 | 340 | 29.37 | 38.60 |
| 2001 | 13,100 | 427 | 325 | 30.68 | 40.35 |
| 2002 | 13,370 | 414 | 314 | 32.27 | 42.56 |
| 2003 | 13,560 | 409 | 312 | 33.14 | 43.49 |
| 2004 | 14,322 | 427 | 321 | 33.55 | 44.65 |
| 2005 | 15,041 | 424 | 328 | 35.51 | 45.85 |

Note: The total labor compensation figures are those derived on page 97 (using estimated fringe benefits).






AAR-E-00004190

# EMPLOYMENT BY CLASS

| Year | Total | Executives, Officials and Staff Assistants | Professional and Administrative | Maintenance of Way and Structures | Maintenance of Equipment and Stores | Transportation Other than Train and Engine | Transportation Train and Engine |
|---|---|---|---|---|---|---|---|
| 1996 | 181,809 | 9,617 | 24,197 | 39,519 | 35,571 | 9,377 | 63,528 |
| 1997 | 177,981 | 10,236 | 21,744 | 39,582 | 34,438 | 8,559 | 63,422 |
| 1998 | 178,222 | 11,200 | 19,214 | 38,626 | 35,260 | 8,278 | 65,644 |
| 1999 | 177,557 | 11,580 | 18,755 | 37,744 | 35,454 | 8,297 | 65,727 |
| 2000 | 168,360 | 11,026 | 17,124 | 35,859 | 33,260 | 7,877 | 63,214 |
| 2001 | 162,155 | 10,834 | 15,917 | 34,392 | 31,702 | 7,454 | 61,856 |
| 2002 | 157,372 | 9,494 | 15,837 | 34,902 | 29,947 | 7,552 | 59,640 |
| 2003 | 154,652 | 9,396 | 14,761 | 34,154 | 28,784 | 7,516 | 60,041 |
| 2004 | 157,699 | 9,127 | 13,763 | 33,711 | 29,196 | 7,514 | 64,388 |
| 2005 | 162,438 | 9,359 | 13,558 | 33,967 | 29,940 | 7,307 | 68,307 |

Total Employment by Class






AAR-E-00004191

# EMPLOYEE HOURS PAID FOR AND HOURS WORKED

| Year | Number of Employees | Employee Hours Paid For (thousands) | Employee Hours Paid For Per Employee | Employee Hours Worked (thousands) | Employee Hours Worked Per Employee |
|---|---|---|---|---|---|
| 1996 | 181,809 | 458,861 | 2,524 | 358,094 | 1,970 |
| 1997 | 177,981 | 455,295 | 2,558 | 353,898 | 1,988 |
| 1998 | 178,222 | 467,573 | 2,624 | 360,686 | 2,024 |
| 1999 | 177,557 | 458,242 | 2,581 | 348,778 | 1,964 |
| 2000 | 168,360 | 446,837 | 2,654 | 339,972 | 2,019 |
| 2001 | 162,155 | 426,937 | 2,633 | 324,624 | 2,002 |
| 2002 | 157,372 | 414,366 | 2,633 | 314,180 | 1,996 |
| 2003 | 154,652 | 409,208 | 2,646 | 311,812 | 2,016 |
| 2004 | 157,699 | 426,932 | 2,707 | 320,738 | 2,034 |
| 2005 | 162,438 | 423,579 | 2,608 | 328,061 | 2,020 |









AAR-E-00004192

# PLANT AND EQUIPMENT

# NOTES

- The miles of road in the United States that are operated by at least one railroad, and owned by any owner (including railroads, non-railroads, foreign owners, and governments), total to approximately 141,000 miles. Mileage differences for most of the pages in this publication can be reconciled by using the data on page 16. The three major causes of differences are (1) mileage operated compared to owned, (2) mileage in the U.S. compared to U.S. railroad mileage that includes Canada, and (3) Class I mileage compared to mileage for all railroads.

- The total Class I miles of road owned shown on pages 11 and 103 differ because of slight differences in definitions. The miles on page 11 are strictly mileage owned that is operated by the railroad, while the mileage on 103 is closer to mileage for which the railroad has maintenance responsibility. Both pages use miles operated less trackage rights, meaning there is no double-counting for trackage rights or line owned that is not used. The difference between the two pages is caused by the mileage on page 11 also excluding line of proprietary companies, line leased, and line under contract.

- The purchase of Conrail caused two significant changes in the miles of road owned on page 11. The decrease in miles of road owned for 1999 was caused by an arrangement where Conrail, which is jointly owned by CSX Corporation and Norfolk Southern Corporation, leased line to two subsidiaries of its owners: CSX Transportation and Norfolk Southern Railway. The miles of road increased in 2004 as CSX Transportation and Norfolk Southern Railway took ownership of line formerly leased from Conrail.

- The total miles of road operated shown on page 11 differs from the miles operated on pages 104 and 105 because the mileage on page 104 and 105 is Class I mileage operated in the United States only. The U.S. Class I railroads also operate 553 miles of road in Canada and Mexico. The mileage by state totals also exclude U.S. non-Class I railroads which operate 49,681 miles in the U.S. and 330 miles in Canada and Mexico. Canadian railroads also operate 1,368 miles in the United States in addition to the Canadian-owned Class I figures included in the Class I totals.

- The miles figure shown on page 107 does not equal any of the mileage figures shown elsewhere in this publication because data is collected for a railroad's "main" track only.

- All mileage owned in this publication is mileage owned that is operated.

- For 2005, the Major Railroads group on page 111 consists of BNSF Railway, Canadian National Railway, Canadian Pacific Railway, CSX Transportation, Ferrocarril Mexicano (a.k.a. Ferromex), Kansas City Southern, Kansas City Southern de México, Norfolk Southern, and Union Pacific Railroad. Together, these railroads represent the five largest U.S. railroads, the two largest Canadian railroads, and the two largest Mexican railroads. Canadian National and Canadian Pacific have significant operations in the United States. Union Pacific owns a portion of Ferrocarril Mexicano. Kansas City Southern owns Kansas City Southern de México.

# MILEAGE OWNED AND RAIL AND CROSSTIES INSTALLED

| Year | Miles of Road Owned | Tons of Rail Laid | Crossties Installed (thousands) |
|---|---|---|---|
| 1996 | 105,779 | 872,008 | 14,269 |
| 1997 | 102,128 | 756,512 | 13,363 |
| 1998 | 100,570 | 883,754 | 12,185 |
| 1999 | 99,430 | 982,688 | 12,147 |
| 2000 | 99,250 | 922,392 | 11,454 |
| 2001 | 97,817 | 857,118 | 11,983 |
| 2002 | 100,125 | 760,777 | 13,416 |
| 2003 | 99,126 | 772,048 | 13,777 |
| 2004 | 97,662 | 636,449 | 13,813 |
| 2005 | 95,830 | 632,483 | 14,260 |









AAR-E-00004195

# MILEAGE OPERATED BY STATE

| State | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|---|---|---|
| Alabama | 3,310 | 3,149 | 3,149 | 3,149 | 3,149 | 3,149 | 3,149 | 2,900 | 2,913 | 2,684 |
| Arizona | 1,334 | 1,333 | 1,333 | 1,333 | 1,333 | 1,336 | 1,259 | 1,261 | 1,287 | 1,287 |
| Arkansas | 2,970 | 2,781 | 2,726 | 2,725 | 2,714 | 2,607 | 2,604 | 2,607 | 2,612 | 2,550 |
| California | 5,761 | 5,559 | 5,604 | 5,597 | 5,861 | 5,742 | 5,746 | 5,585 | 5,587 | 5,488 |
| Colorado | 3,659 | 3,274 | 3,096 | 3,098 | 2,967 | 3,114 | 3,005 | 2,908 | 2,811 | 2,930 |
| Connecticut | 120 | 70 | 67 | 69 | 69 | 69 | 69 | 69 | 69 | 69 |
| Delaware | 217 | 235 | 226 | 246 | 246 | 246 | 246 | 247 | 247 | 247 |
| Dist. of Columbia | 36 | 32 | 32 | 34 | 36 | 35 | 34 | 34 | 34 | 34 |
| Florida | 1,973 | 1,899 | 1,899 | 1,899 | 1,895 | 1,895 | 1,897 | 1,896 | 1,895 | 1,802 |
| Georgia | 3,580 | 3,576 | 3,548 | 3,548 | 3,548 | 3,545 | 3,516 | 3,522 | 3,478 | 3,426 |
| Idaho | 1,497 | 1,482 | 1,108 | 1,072 | 983 | 1,001 | 1,000 | 1,000 | 993 | 992 |
| Illinois | 6,976 | 8,092 | 8,063 | 8,091 | 8,088 | 7,762 | 7,929 | 8,067 | 8,027 | 7,955 |
| Indiana | 3,590 | 3,635 | 3,706 | 3,876 | 3,828 | 3,816 | 3,830 | 3,828 | 3,633 | 3,666 |
| Iowa | 3,233 | 2,507 | 2,505 | 2,457 | 2,431 | 2,643 | 2,954 | 2,849 | 2,819 | 2,804 |
| Kansas | 5,118 | 4,174 | 4,144 | 4,252 | 4,273 | 4,330 | 4,148 | 4,092 | 4,035 | 3,986 |
| Kentucky | 2,480 | 2,436 | 2,440 | 2,441 | 2,441 | 2,433 | 2,385 | 2,299 | 2,262 | 2,261 |
| Louisiana | 2,716 | 2,682 | 2,664 | 2,664 | 2,656 | 2,793 | 2,784 | 2,788 | 2,794 | 2,614 |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | 764 | 768 | 769 | 836 | 835 | 834 | 834 | 835 | 835 | 836 |
| Massachusetts | 431 | 470 | 470 | 454 | 455 | 448 | 436 | 434 | 435 | 435 |
| Michigan | 2,427 | 2,248 | 2,178 | 2,230 | 2,228 | 2,228 | 2,755 | 2,752 | 2,731 | 2,579 |
| Minnesota | 4,152 | 3,846 | 3,842 | 3,836 | 3,675 | 3,646 | 3,899 | 3,906 | 4,050 | 4,036 |
| Mississippi | 2,172 | 2,183 | 2,102 | 2,101 | 2,011 | 2,009 | 2,008 | 2,016 | 1,998 | 1,966 |
| Missouri | 4,307 | 3,879 | 3,877 | 3,631 | 3,616 | 4,167 | 4,159 | 4,087 | 4,150 | 4,134 |
| Montana | 2,261 | 2,261 | 2,261 | 2,261 | 2,277 | 2,277 | 2,263 | 2,310 | 2,271 | 2,108 |
| Nebraska | 3,279 | 2,852 | 2,852 | 2,796 | 2,766 | 2,714 | 2,696 | 2,688 | 2,726 | 2,709 |
| Nevada | 2,064 | 1,916 | 1,916 | 1,916 | 1,916 | 2,008 | 2,009 | 2,009 | 2,004 | 2,005 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 948 | 964 | 965 | 1,582 | 1,582 | 1,581 | 1,581 | 1,581 | 1,581 | 1,581 |
| New Mexico | 2,249 | 2,250 | 2,249 | 2,250 | 2,236 | 2,173 | 2,172 | 2,234 | 2,003 | 2,037 |
| New York | 2,290 | 2,240 | 2,238 | 2,255 | 2,258 | 2,261 | 2,250 | 2,245 | 2,171 | 2,172 |
| North Carolina | 2,597 | 2,595 | 2,595 | 2,588 | 2,588 | 2,583 | 2,580 | 2,579 | 2,576 | 2,568 |
| North Dakota | 3,106 | 2,716 | 2,669 | 2,612 | 2,571 | 2,549 | 2,541 | 2,475 | 2,475 | 2,405 |
| Ohio | 4,275 | 4,179 | 4,184 | 4,534 | 4,526 | 4,526 | 4,525 | 4,510 | 4,165 | 4,183 |
| Oklahoma | 2,857 | 2,811 | 2,692 | 2,693 | 2,645 | 2,532 | 2,536 | 2,536 | 2,635 | 2,626 |
| Oregon | 2,073 | 1,948 | 1,428 | 1,426 | 1,427 | 1,518 | 1,447 | 1,433 | 1,471 | 1,451 |
| Pennsylvania | 3,269 | 3,358 | 3,332 | 3,666 | 3,654 | 3,651 | 3,649 | 3,566 | 3,650 | 3,605 |
| Rhode Island | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Carolina | 2,191 | 2,144 | 2,133 | 2,131 | 2,127 | 2,097 | 2,097 | 2,097 | 2,097 | 2,080 |
| South Dakota | 1,012 | 1,013 | 1,013 | 1,013 | 986 | 937 | 936 | 937 | 936 | 932 |
| Tennessee | 2,340 | 2,347 | 2,342 | 2,332 | 2,331 | 2,168 | 2,111 | 2,097 | 2,083 | 2,083 |
| Texas | 12,275 | 11,409 | 11,383 | 11,286 | 11,377 | 11,569 | 11,407 | 11,432 | 11,580 | 12,265 |
| Utah | 1,744 | 1,802 | 1,767 | 1,765 | 1,765 | 1,785 | 1,770 | 1,769 | 1,766 | 1,763 |
| Vermont | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia | 3,212 | 3,205 | 3,202 | 3,195 | 3,195 | 3,194 | 3,194 | 3,184 | 3,184 | 3,151 |
| Washington | 2,643 | 2,488 | 2,348 | 2,336 | 2,330 | 2,389 | 2,390 | 2,392 | 2,190 | 2,169 |
| West Virginia | 2,536 | 2,374 | 2,326 | 2,391 | 2,391 | 2,397 | 2,371 | 2,360 | 2,320 | 2,160 |
| Wisconsin | 2,000 | 1,880 | 1,868 | 1,820 | 1,817 | 1,832 | 3,484 | 3,462 | 3,421 | 3,331 |
| Wyoming | 2,065 | 2,013 | 1,928 | 1,924 | 1,919 | 1,849 | 1,846 | 1,846 | 1,847 | 1,847 |
| Total | 126,109 | 121,075 | 119,239 | 120,411 | 120,022 | 120,438 | 122,501 | 121,724 | 120,847 | 120,012 |

Note: There has never been Class I railroad mileage in Alaska or Hawaii. See also the note on page 102.

# MILEAGE OPERATED BY STATE BY RAILROAD - 2005

| State | BNSF | CNGT | CSX | KCS | NS | SOO | UP | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Alabama | 244 | 41 | 1,028 | 0 | 1,371 | 0 | 0 | 2,684 | AL |
| Arizona | 595 | 0 | 0 | 0 | 0 | 0 | 692 | 1,287 | AZ |
| Arkansas | 1,052 | 0 | 0 | 162 | 0 | 0 | 1,336 | 2,550 | AR |
| California | 2,130 | 0 | 0 | 0 | 0 | 0 | 3,358 | 5,488 | CA |
| Colorado | 1,400 | 0 | 0 | 0 | 0 | 0 | 1,530 | 2,930 | CO |
| Connecticut | 0 | 0 | 69 | 0 | 0 | 0 | 0 | 69 | CT |
| Delaware | 0 | 0 | 44 | 0 | 203 | 0 | 0 | 247 | DE |
| Dist. of Columbia | 0 | 0 | 21 | 0 | 13 | 0 | 0 | 34 | DC |
| Florida | 0 | 0 | 1,653 | 0 | 149 | 0 | 0 | 1,802 | FL |
| Georgia | 0 | 0 | 1,626 | 0 | 1,800 | 0 | 0 | 3,426 | GA |
| Idaho | 125 | 0 | 0 | 0 | 0 | 0 | 867 | 992 | ID |
| Illinois | 1,414 | 1,518 | 957 | 182 | 1,260 | 387 | 2,237 | 7,955 | IL |
| Indiana | 0 | 80 | 1,637 | 0 | 1,543 | 402 | 4 | 3,666 | IN |
| Iowa | 675 | 605 | 0 | 0 | 44 | 0 | 1,480 | 2,804 | IA |
| Kansas | 1,753 | 0 | 0 | 18 | 2 | 0 | 2,213 | 3,986 | KS |
| Kentucky | 13 | 106 | 1,710 | 0 | 431 | 1 | 0 | 2,261 | KY |
| Louisiana | 348 | 263 | 43 | 737 | 81 | 0 | 1,142 | 2,614 | LA |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | ME |
| Maryland | 0 | 0 | 567 | 0 | 269 | 0 | 0 | 836 | MD |
| Massachusetts | 0 | 0 | 435 | 0 | 0 | 0 | 0 | 435 | MA |
| Michigan | 0 | 1,016 | 567 | 0 | 644 | 352 | 0 | 2,579 | MI |
| Minnesota | 1,693 | 435 | 0 | 0 | 0 | 1,240 | 668 | 4,036 | MN |
| Mississippi | 179 | 851 | 94 | 631 | 211 | 0 | 0 | 1,966 | MS |
| Missouri | 1,764 | 0 | 13 | 418 | 409 | 0 | 1,530 | 4,134 | MO |
| Montana | 1,983 | 0 | 0 | 0 | 0 | 0 | 125 | 2,108 | MT |
| Nebraska | 1,634 | 0 | 0 | 0 | 0 | 0 | 1,075 | 2,709 | NE |
| Nevada | 805 | 0 | 0 | 0 | 0 | 0 | 1,200 | 2,005 | NV |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | NH |
| New Jersey | 0 | 0 | 648 | 0 | 933 | 0 | 0 | 1,581 | NJ |
| New Mexico | 1,394 | 0 | 0 | 0 | 0 | 0 | 643 | 2,037 | NM |
| New York | 0 | 0 | 1,310 | 0 | 862 | 0 | 0 | 2,172 | NY |
| North Carolina | 0 | 0 | 1,137 | 0 | 1,431 | 0 | 0 | 2,568 | NC |
| North Dakota | 1,923 | 0 | 0 | 0 | 0 | 482 | 0 | 2,405 | ND |
| Ohio | 0 | 7 | 1,914 | 0 | 2,233 | 29 | 0 | 4,183 | OH |
| Oklahoma | 1,293 | 0 | 0 | 151 | 0 | 0 | 1,182 | 2,626 | OK |
| Oregon | 386 | 0 | 0 | 0 | 0 | 0 | 1,065 | 1,451 | OR |
| Pennsylvania | 0 | 155 | 1,062 | 0 | 2,388 | 0 | 0 | 3,605 | PA |
| Rhode Island | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | RI |
| South Carolina | 0 | 0 | 1,297 | 0 | 783 | 0 | 0 | 2,080 | SC |
| South Dakota | 926 | 0 | 0 | 0 | 0 | 6 | 0 | 932 | SD |
| Tennessee | 17 | 145 | 1,010 | 5 | 890 | 0 | 16 | 2,083 | TN |
| Texas | 4,995 | 0 | 0 | 893 | 0 | 0 | 6,377 | 12,265 | TX |
| Utah | 433 | 0 | 0 | 0 | 0 | 0 | 1,330 | 1,763 | UT |
| Vermont | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | VT |
| Virginia | 0 | 0 | 1,051 | 0 | 2,100 | 0 | 0 | 3,151 | VA |
| Washington | 1,621 | 0 | 0 | 0 | 0 | 0 | 548 | 2,169 | WA |
| West Virginia | 0 | 0 | 1,327 | 0 | 833 | 0 | 0 | 2,160 | WV |
| Wisconsin | 273 | 1,514 | 0 | 0 | 0 | 612 | 932 | 3,331 | WI |
| Wyoming | 971 | 0 | 0 | 0 | 0 | 0 | 876 | 1,847 | WY |
| Total U.S. | 32,039 | 6,736 | 21,220 | 3,197 | 20,883 | 3,511 | 32,426 | 120,012 | Total |

Note: There has never been Class I railroad mileage in Alaska or Hawaii. See also the note on page 102.



AAR-E-00004197

# RAIL LAID

| Year | Tons of Rail: Laid in Replacement: New | Relay | Total | Laid in Addition: New | Relay | Total | Track Miles of Welded Rail Laid to Date |
|---|---|---|---|---|---|---|---|
| 1996 | 454,426 | 348,882 | 803,308 | 37,062 | 31,638 | 68,700 | 102,889 |
| 1997 | 481,064 | 161,618 | 642,682 | 68,662 | 45,168 | 113,830 | 102,756 |
| 1998 | 519,651 | 159,337 | 678,988 | 133,961 | 70,805 | 204,766 | 103,815 |
| 1999 | 578,443 | 190,884 | 769,327 | 120,270 | 93,091 | 213,361 | 104,646 |
| 2000 | 556,503 | 169,600 | 726,103 | 133,489 | 62,800 | 196,289 | 105,691 |
| 2001 | 484,100 | 176,006 | 660,106 | 139,766 | 57,246 | 197,012 | 102,748 |
| 2002 | 477,217 | 158,317 | 635,534 | 107,725 | 17,518 | 125,243 | 103,306 |
| 2003 | 457,695 | 174,942 | 632,637 | 115,133 | 24,278 | 139,411 | 103,868 |
| 2004 | 443,381 | 147,982 | 591,363 | 28,045 | 17,041 | 45,086 | 105,807 |
| 2005 | 423,954 | 129,333 | 553,287 | 54,447 | 24,749 | 79,196 | 106,244 |

# CROSSTIES INSTALLED

| Year | Number of Ties: Laid in Replacement: Wood Treated | Wood Untreated | Other | Total | Laid in Addition: Wood Treated | Wood Untreated | Other | Total | Switch & Bridge Ties (board ft.) |
|---|---|---|---|---|---|---|---|---|---|
| 1996 | 12,556,656 | 0 | 891,142 | 13,447,798 | 633,244 | 0 | 187,544 | 820,788 | 44,006,333 |
| 1997 | 11,322,381 | 0 | 539,805 | 11,862,186 | 1,046,380 | 0 | 454,806 | 1,501,186 | 31,644,098 |
| 1998 | 9,732,112 | 0 | 661,593 | 10,393,705 | 993,826 | 0 | 797,516 | 1,791,342 | 36,673,741 |
| 1999 | 10,221,733 | 0 | 595,725 | 10,817,458 | 840,533 | 0 | 489,186 | 1,329,719 | 29,798,217 |
| 2000 | 10,243,067 | 0 | 508,958 | 10,752,025 | 559,737 | 0 | 142,409 | 702,146 | 22,809,440 |
| 2001 | 10,678,352 | 0 | 757,089 | 11,435,441 | 404,335 | 0 | 143,253 | 547,588 | 27,190,732 |
| 2002 | 12,490,451 | 0 | 654,547 | 13,144,998 | 206,370 | 0 | 64,395 | 270,765 | 28,331,391 |
| 2003 | 12,544,066 | 0 | 698,196 | 13,242,262 | 230,824 | 0 | 304,234 | 535,058 | 29,140,247 |
| 2004 | 12,672,121 | 0 | 642,809 | 13,314,930 | 236,868 | 0 | 260,990 | 497,858 | 30,876,640 |
| 2005 | 12,803,897 | 0 | 602,123 | 13,406,020 | 356,500 | 0 | 497,629 | 854,129 | 28,986,396 |



AAR-E-00004198

# WEIGHT OF RAIL IN PLACE - 2005

| Pounds Per Yard | Miles | Percent of Total Miles | Cumulative Percent |
|---|---|---|---|
| 150 & Over | 275 | 0.2 % | 0.2 % |
| 140-149 | 6,837 | 6.1 | 6.4 |
| 130-139 | 67,490 | 60.6 | 67.0 |
| 120-129 | 3,994 | 3.6 | 70.6 |
| 110-119 | 25,219 | 22.6 | 93.2 |
| 100-109 | 3,228 | 2.9 | 96.1 |
| 90-99 | 2,996 | 2.7 | 98.8 |
| 0-89 | 1,330 | 1.2 | 100.0 |
| TOTAL | 111,369 | 100.0 % | – |

See note on page 102.






AAR-E-00004199

# LOCOMOTIVES AND FREIGHT CARS INSTALLED

| | Locomotives (Class I Only) | | | | | Freight Cars* |
|---|---|---|---|---|---|---|
| Year | Purchased New | Leased New | Total New | Rebuilt | Grand Total | Installed New |
| 1996 | 434 | 327 | 761 | 60 | 821 | 57,877 |
| 1997 | 338 | 405 | 743 | 68 | 811 | 50,396 |
| 1998 | 585 | 304 | 889 | 172 | 1,061 | 75,685 |
| 1999 | 437 | 272 | 709 | 156 | 865 | 74,223 |
| 2000 | 174 | 466 | 640 | 81 | 721 | 55,791 |
| 2001 | 290 | 420 | 710 | 45 | 755 | 34,260 |
| 2002 | 224 | 521 | 745 | 33 | 778 | 17,714 |
| 2003 | 464 | 123 | 587 | 34 | 621 | 32,184 |
| 2004 | 379 | 742 | 1,121 | 5 | 1,126 | 46,871 |
| 2005 | 220 | 607 | 827 | 84 | 911 | 68,612 |

* Freight cars include additions in the U.S. and Canada by any railroads, car companies or shippers.

All locomotives data are for U.S. Class I railroads only.

Sources: Installed new freight cars: AAR - *Railroad Equipment Report 2006*; Locomotives: R-1 Annual Reports of Class I Railroads.









AAR-E-00004200

# COST OF FREIGHT CARS

| Year | All Freight Cars | Box Cars: Plain | Box Cars: Equip. | Flat Cars: General Service | Flat Cars: Special Service | Gondola Cars | Hopper Cars: Open Top | Hopper Cars: Covered | Refrig-erator Cars | Tank Cars |
|---|---|---|---|---|---|---|---|---|---|---|
| 1996 | $53,423 | $57,500 | 88,264 | – | $45,339 | $48,577 | $60,827 | $53,217 | – | – |
| 1997 | 63,069 | – | 90,814 | – | 44,696 | – | – | 57,374 | – | – |
| 1998 | 48,191 | – | 79,589 | – | 40,460 | 60,797 | – | 49,730 | – | – |
| 1999 | 60,845 | – | 86,502 | – | 41,446 | 63,687 | – | – | – | – |
| 2000 | 49,891 | – | 84,047 | – | 43,149 | 62,225 | – | – | – | – |
| 2001 | 43,685 | – | – | – | 43,712 | – | – | 36,750 | – | – |
| 2002 | 54,000 | – | – | – | 54,000 | – | – | – | – | – |
| 2003 | 49,000 | – | – | – | – | 49,000 | – | – | – | – |
| 2004 | 72,005 | – | – | – | 57,950 | – | – | – | $130,565 | – |
| 2005 | 58,225 | – | – | – | 58,225 | – | – | – | | – |

Note: These costs are based on a weighted average of new units purchased each year by Class I railroads, and could fluctuate depending on the specifications of the equipment acquired. Prices do not include leased equipment. Source: R-1 Annual Reports of Class I Railroads.

# COST OF LOCOMOTIVES

| Year | Diesel-Electric: DC-Traction | Diesel-Electric: AC-Traction | Diesel-Electric: Total |
|---|---|---|---|
| 1996 | $1,203,386 | $1,932,728 | $1,669,657 |
| 1997 | 1,183,258 | 1,886,000 | 1,573,632 |
| 1998 | 1,306,479 | 1,745,365 | 1,580,635 |
| 1999 | 1,295,012 | 2,055,133 | 1,756,702 |
| 2000 | 1,393,700 | 2,154,360 | 2,077,525 |
| 2001 | 1,274,913 | 1,827,455 | 1,656,124 |
| 2002 | 1,310,240 | 1,605,804 | 1,530,019 |
| 2003 | 1,451,754 | 1,538,318 | 1,494,959 |
| 2004 | 1,366,911 | 1,722,247 | 1,480,356 |
| 2005 | 1,623,414 | 1,526,096 | 1,613,682 |

Note: The variations from year-to-year in average price can be partially attributed to differences in features. Leased equipment is not represented here.
Source: R-1 Annual Reports of Class I Railroads.

# AGE OF LOCOMOTIVES AND FREIGHT CARS




**Age Distribution of Diesel Locomotive Fleet - December 31, 2005**

| Date Built | Units in Age Bracket | Percent Of Total |
|---|---|---|
| Jan. 1, 2005 - Dec. 31, 2005 | 807 | 3.5 |
| Jan. 1, 2000 - Dec. 31, 2004 | 4,350 | 19.1 |
| Jan. 1, 1995 - Dec. 31, 1999 | 4,348 | 19.1 |
| Jan. 1, 1990 - Dec. 31, 1994 | 2,783 | 12.2 |
| Jan. 1, 1985 - Dec. 31, 1989 | 1,786 | 7.8 |
| Before 1985 | 8,705 | 38.2 |
| Total | 22,779 | 100.0 % |

**Age Distribution of Railroad-Owned Freight Cars - January 2, 2006**

| Car Age (years) | Cars in Age Bracket | Percent Of Total |
|---|---|---|
| 0-10 | 151,293 | 24.2 % |
| 11-20 | 93,418 | 14.9 |
| 21-30 | 205,489 | 32.8 |
| 31-40 | 158,631 | 25.3 |
| 41-50 | 17,189 | 2.7 |
| Total | 626,020 | 100.0 % |

The average age for U.S. railroad-owned freight cars is 22.3 years.

Note: The data used to determine the age distribution of the freight car fleets are not available from the same data sources used for ownership figures shown elsewhere in this publication. Therefore, the figures shown above for the total fleet size do not precisely match those shown on other pages.

Sources: Locomotives - R-1 Annual Reports; Freight Cars - AAR/UMLER database



AAR-E-00004202

# FREIGHT CARS IN SERVICE

| Year End | Total | Major Railroads | Other Railroads | Car Companies and Shippers |
|---|---|---|---|---|
| 1996 | 1,240,573 | 570,865 | 87,364 | 582,344 |
| 1997 | 1,415,261 | 678,825 | 119,310 | 617,126 |
| 1998 | 1,461,155 | 682,926 | 126,798 | 651,431 |
| 1999 | 1,513,596 | 687,721 | 131,845 | 694,030 |
| 2000 | 1,526,912 | 668,168 | 137,431 | 721,313 |
| 2001 | 1,538,673 | 673,421 | 135,690 | 729,562 |
| 2002 | 1,518,935 | 648,403 | 139,091 | 731,441 |
| 2003 | 1,502,203 | 643,047 | 133,415 | 725,741 |
| 2004 | 1,511,639 | 652,532 | 130,595 | 728,512 |
| 2005 | 1,534,717 | 648,820 | 132,421 | 753,476 |

Notes:
Years prior to 1997 are U.S. only. 1997 through 2000 are for the U.S. and Canada. Beginning 2001, Mexico is also included.

See note on page 102 for list of railroads in Major Railroads group.

The Car Companies and Shippers column includes a significant number of cars owned by TTX, a railroad-owned freight car leasing company with one of the largest fleets available for lease.

Source: AAR - *Railroad Equipment Report 2006*

2005 North American Freight Car Fleet






AAR-E-00004203

# FREIGHT CARS IN SERVICE BY CAR TYPE

**Revenue Freight Cars in Service: All Railroads and Private Owners**

| Year End | Box Cars: Plain | Box Cars: Equipped | Gondolas | Hopper Cars: Open | Hopper Cars: Covered | Flat | Refrig-erator | Tank | Other |
|---|---|---|---|---|---|---|---|---|---|
| 1996 | 39,155 | 117,129 | 179,046 | 166,980 | 350,611 | 131,840 | 31,103 | 215,482 | 9,227 |
| 1997 | 34,238 | 150,097 | 203,407 | 167,048 | 417,790 | 160,559 | 30,208 | 242,333 | 9,581 |
| 1998 | 27,791 | 157,951 | 213,968 | 167,225 | 433,298 | 170,845 | 30,225 | 250,416 | 9,436 |
| 1999 | 26,004 | 163,080 | 226,094 | 172,827 | 449,932 | 177,876 | 28,973 | 260,171 | 8,639 |
| 2000 | 24,133 | 161,385 | 227,080 | 170,262 | 456,412 | 185,816 | 27,277 | 266,320 | 8,227 |
| 2001 | 31,493 | 162,775 | 231,790 | 162,002 | 463,533 | 185,669 | 26,507 | 266,997 | 7,907 |
| 2002 | 29,228 | 161,111 | 230,906 | 158,553 | 455,626 | 184,680 | 25,489 | 265,704 | 7,638 |
| 2003 | 26,581 | 159,460 | 228,807 | 152,056 | 450,713 | 187,799 | 24,786 | 264,521 | 7,480 |
| 2004 | 25,224 | 162,321 | 231,786 | 152,689 | 446,303 | 197,552 | 24,763 | 263,863 | 7,138 |
| 2005 | 26,074 | 159,138 | 231,645 | 158,851 | 452,275 | 206,474 | 24,698 | 268,919 | 6,643 |

Source: AAR - *Railroad Equipment Report 2006*
Note: 1996 is U.S. only. 1997-2000 include U.S. and Canada. Beginning 2001, Mexico is also included.

2005 North American Freight Car Fleet and Typical Commodities Carried






AAR-E-00004204

# NEW FREIGHT CAR INSTALLATIONS BY CAR TYPE




| Car Types | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|---|---|---|
| Box Cars | 3,161 | 1,477 | 3,322 | 4,551 | 3,853 | 3,164 | 1,769 | 4,324 | 5,470 | 3,753 |
| Flat Cars | 2,262 | 7,326 | 20,716 | 14,448 | 18,280 | 10,935 | 3,922 | 10,151 | 18,884 | 22,119 |
| Gondolas | 6,968 | 7,658 | 11,637 | 14,472 | 5,151 | 2,566 | 2,190 | 3,469 | 5,225 | 6,864 |
| Open Top Hoppers | 2,298 | 4,223 | 5,307 | 7,447 | 3,672 | 793 | 2,036 | 2,259 | 2,751 | 9,440 |
| Covered Hoppers | 30,915 | 19,128 | 21,299 | 20,504 | 15,069 | 9,240 | 2,278 | 3,801 | 5,602 | 14,873 |
| Tank Cars | 11,588 | 10,090 | 12,551 | 12,801 | 9,766 | 7,560 | 5,519 | 8,176 | 8,939 | 11,563 |
| Others | 685 | 494 | 853 | 0 | 0 | 2 | 0 | 4 | 0 | 0 |
| Total New Cars | 57,877 | 50,396 | 75,685 | 74,223 | 55,791 | 34,260 | 17,714 | 32,184 | 46,871 | 68,612 |

Note: Figures include Class I railroads, other railroads, and other car owners. Canadian-owned cars are also included.

Source: AAR - *Railroad Equipment Report 2006*



AAR-E-00004205

# CAPACITY OF THE FREIGHT CAR FLEET

| Year End | Number of Freight Cars (millions) | Average Capacity Per Car (tons) | Total Capacity (million tons) |
|---|---|---|---|
| 1996 | 1.24 | 95.6 | 118.6 |
| 1997 | 1.42 | 96.2 | 136.1 |
| 1998 | 1.46 | 96.8 | 141.5 |
| 1999 | 1.51 | 97.8 | 148.0 |
| 2000 | 1.53 | 98.3 | 150.1 |
| 2001 | 1.54 | 98.2 | 151.2 |
| 2002 | 1.52 | 98.9 | 150.2 |
| 2003 | 1.50 | 99.3 | 149.2 |
| 2004 | 1.51 | 99.7 | 150.7 |
| 2005 | 1.53 | 100.4 | 154.1 |

Note: Prior to 1997, figures are for U.S. only. Figures for 1997 through 2000 are for U.S. and Canada. Beginning 2001, Mexico is also included. Figures include Class I railroads, other railroads, and other car owners.
Source: AAR - *Railroad Equipment Report 2006*









AAR-E-00004206

# CAPACITY BY CAR TYPE




**Average Capacity Per Car in Tons**

| Car Types | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Box Cars** | | | | | | | | | | |
| Plain 40 ft. | 56 | 54 | 55 | 55 | 52 | 68 | 72 | 57 | 57 | 56 |
| Plain 50 ft. | 80 | 82 | 89 | 90 | 91 | 91 | 95 | 90 | 90 | 92 |
| Equipped | 79 | 77 | 80 | 80 | 80 | 81 | 81 | 83 | 82 | 82 |
| **Gondolas** | | | | | | | | | | |
| Plain | 109 | 108 | 109 | 107 | 110 | 110 | 110 | 111 | 113 | 111 |
| Equipped | 97 | 97 | 98 | 95 | 98 | 98 | 97 | 100 | 98 | 101 |
| **Covered Hoppers** | 101 | 101 | 100 | 98 | 101 | 103 | 103 | 103 | 101 | 103 |
| **Open Top Hoppers** | | | | | | | | | | |
| General Service | 102 | 100 | 102 | 102 | 101 | 102 | 102 | 103 | 98 | 104 |
| Special Service | 94 | 97 | 97 | 100 | 100 | 96 | 95 | 100 | 99 | 100 |
| **Refrigerators** | | | | | | | | | | |
| Mechanical | 74 | 71 | 73 | 90 | 74 | 77 | 77 | 72 | 74 | 79 |
| Non-Mechanical | 76 | 76 | 77 | 73 | 77 | 78 | 78 | 77 | 77 | 77 |
| **Flat Cars** | | | | | | | | | | |
| TOFC/COFC* | 109 | 123 | 84 | 84 | 112 | 95 | 94 | 179 | 194 | 212 |
| Multi-Level | 34 | 37 | 39 | 41 | 38 | 39 | 38 | 39 | 36 | 38 |
| General Service | 75 | 74 | 74 | 77 | 73 | 74 | 86 | 85 | 86 | 73 |
| All Other | 90 | 87 | 86 | 83 | 86 | 86 | 87 | 92 | 93 | 98 |
| **All Other Types** | 76 | 74 | 75 | 67 | 67 | 68 | 62 | 63 | 62 | 61 |
| **Total** | 92 | 92 | 92 | 91 | 93 | 93 | 93 | 96 | 95 | 97 |

Source: Annual Report Form R-1 reported by all U.S. Class I railroads to the Surface Transportation Board (excludes shipper and leasing company cars).
* The variation in TOFC/COFC Flat Car average capacity is caused by articulation.

# LOCOMOTIVES IN SERVICE

| Year | Total Units in Service | AC Traction Units Included in Total | Average Horsepower Per Unit | Aggregate Horsepower (millions) |
|---|---|---|---|---|
| 1996 | 19,269 | 1,246 | 2,985 | 57.5 |
| 1997 | 19,684 | 1,771 | 3,060 | 60.2 |
| 1998 | 20,261 | 2,216 | 3,126 | 63.3 |
| 1999 | 20,256 | 2,810 | 3,200 | 64.8 |
| 2000 | 20,028 | 3,046 | 3,261 | 65.3 |
| 2001 | 19,745 | 3,255 | 3,275 | 64.7 |
| 2002 | 20,506 | 3,492 | 3,378 | 69.3 |
| 2003 | 20,774 | 3,740 | 3,415 | 70.9 |
| 2004 | 22,015 | 4,139 | 3,458 | 76.1 |
| 2005 | 22,779 | 4,700 | 3,467 | 79.0 |









AAR-E-00004208

# OPERATIONS

# NOTES

- The average cost per gallon of diesel fuel on page 134 includes the impacts of diesel fuel prices *and* railroad hedging activities, and will not exactly match the average *price* of diesel fuel. Railroads use derivatives to hedge against increases in diesel fuel prices, and successful hedging can lower fuel costs. However, to the extent a railroad hedges portions of its fuel purchases, it may not realize the impact of decreases in fuel prices.



AAR-E-00004210

# SUMMARY OF FREIGHT OPERATIONS

| Year | Train-Miles (thousands) | Train-Hours (thousands) | Car-Miles (millions) | Locomotive Unit-Miles (thousands) |
|---|---|---|---|---|
| 1996 | 468,792 | 21,325 | 31,715 | 1,465,149 |
| 1997 | 474,954 | 24,673 | 31,660 | 1,423,229 |
| 1998 | 474,947 | 24,898 | 32,657 | 1,439,703 |
| 1999 | 490,442 | 24,335 | 33,851 | 1,503,947 |
| 2000 | 504,001 | 24,433 | 34,590 | 1,502,819 |
| 2001 | 499,546 | 24,288 | 34,243 | 1,477,546 |
| 2002 | 499,668 | 23,864 | 34,680 | 1,443,531 |
| 2003 | 515,999 | 25,849 | 35,555 | 1,484,074 |
| 2004 | 534,696 | 28,225 | 37,071 | 1,538,385 |
| 2005 | 547,566 | 29,505 | 37,712 | 1,587,650 |






AAR-E-00004211

# FREIGHT TRAIN-HOURS

(Thousands of Train-Hours)

| | | Switching | |
|---|---|---|---|
| Year | Road Service | Road Service | Yard |
| 1996 | 21,325 | 3,144 | 11,475 |
| 1997 | 24,673 | 2,985 | 10,976 |
| 1998 | 24,898 | 3,251 | 11,285 |
| 1999 | 24,335 | 3,556 | 11,235 |
| 2000 | 24,433 | 3,852 | 11,202 |
| 2001 | 24,288 | 4,370 | 10,699 |
| 2002 | 23,864 | 4,417 | 10,287 |
| 2003 | 25,849 | 4,218 | 9,498 |
| 2004 | 28,225 | 4,601 | 10,556 |
| 2005 | 29,505 | 5,194 | 11,018 |






AAR-E-00004212

# LOCOMOTIVE UNIT-MILES IN FREIGHT SERVICE

(Thousands of Unit-Miles)

| Year | Total | Road Service | Switching Road | Switching Yard |
|---|---|---|---|---|
| 1996 | 1,465,149 | 1,311,351 | 45,598 | 108,201 |
| 1997 | 1,423,229 | 1,281,768 | 43,310 | 98,151 |
| 1998 | 1,439,703 | 1,285,706 | 51,532 | 102,465 |
| 1999 | 1,503,947 | 1,349,580 | 52,260 | 102,106 |
| 2000 | 1,502,819 | 1,354,590 | 49,820 | 98,409 |
| 2001 | 1,477,546 | 1,327,669 | 58,231 | 91,645 |
| 2002 | 1,443,531 | 1,300,574 | 56,114 | 86,843 |
| 2003 | 1,484,074 | 1,353,885 | 51,259 | 78,931 |
| 2004 | 1,538,385 | 1,398,450 | 56,313 | 83,622 |
| 2005 | 1,587,650 | 1,447,014 | 55,900 | 84,736 |






AAR-E-00004213

# LOADED AND EMPTY FREIGHT CAR-MILES

| Year | Total Freight Car-Miles (millions) | Loaded Car-Miles (millions) | Empty Car-Miles (millions) | Loaded Car-Miles as a Percent of Total |
|---|---|---|---|---|
| 1996 | 31,715 | 18,074 | 13,641 | 57.0 % |
| 1997 | 31,660 | 18,227 | 13,433 | 57.6 |
| 1998 | 32,657 | 18,821 | 13,837 | 57.6 |
| 1999 | 33,851 | 19,415 | 14,436 | 57.4 |
| 2000 | 34,590 | 20,066 | 14,524 | 58.0 |
| 2001 | 34,243 | 20,663 | 13,580 | 60.3 |
| 2002 | 34,680 | 21,077 | 13,603 | 60.8 |
| 2003 | 35,555 | 21,721 | 13,834 | 61.1 |
| 2004 | 37,071 | 21,168 | 15,903 | 57.1 |
| 2005 | 37,712 | 21,470 | 16,242 | 56.9 |

Note: Non-revenue car-miles have been divided equally between loaded and empty car-miles.






AAR-E-00004214

# LOADED AND EMPTY FREIGHT CAR-MILES BY CAR TYPE

## LOADED

(Thousands of Car-Miles)

| Year | Box Cars | Covered Hoppers | Refrig-erators | Gondolas | Open Top Hoppers | Flats | Tank Cars | All Others | Total All Cars |
|---|---|---|---|---|---|---|---|---|---|
| 1996 | 1,664,086 | 2,387,301 | 391,732 | 1,539,968 | 1,588,670 | 5,152,665 | 1,006,268 | 230,915 | 13,961,605 |
| 1997 | 1,668,366 | 2,490,617 | 365,247 | 1,570,695 | 1,711,525 | 5,231,507 | 1,093,373 | 223,394 | 14,354,724 |
| 1998 | 1,703,627 | 2,661,856 | 356,450 | 1,841,484 | 1,675,851 | 5,104,810 | 1,233,132 | 292,857 | 14,870,067 |
| 1999 | 1,690,936 | 2,845,104 | 351,669 | 1,924,820 | 1,691,338 | 5,196,075 | 1,254,188 | 283,506 | 15,237,636 |
| 2000 | 1,673,204 | 2,804,879 | 355,996 | 2,099,335 | 1,690,278 | 5,362,528 | 1,274,675 | 378,529 | 15,639,424 |
| 2001 | 1,561,487 | 2,892,725 | 369,967 | 2,057,144 | 1,815,211 | 5,218,403 | 1,285,665 | 497,397 | 15,697,999 |
| 2002 | 1,595,643 | 2,862,897 | 372,275 | 2,046,569 | 1,738,967 | 5,609,454 | 1,317,012 | 540,015 | 16,082,832 |
| 2003 | 1,587,522 | 3,020,174 | 377,505 | 2,199,322 | 1,775,426 | 5,739,934 | 1,370,579 | 627,231 | 16,697,693 |
| 2004 | 1,629,396 | 3,166,027 | 356,174 | 2,439,762 | 1,764,700 | 5,886,391 | 1,423,957 | 699,602 | 17,366,009 |
| 2005 | 1,620,481 | 3,264,820 | 350,671 | 2,543,692 | 1,851,226 | 5,825,910 | 1,485,441 | 847,501 | 17,789,742 |

Note: Excludes non-revenue car-miles.

## EMPTY

(Thousands of Car-Miles)

| Year | Box Cars | Covered Hoppers | Refrig-erators | Gondolas | Open Top Hoppers | Flats | Tank Cars | All Others | Total All Cars |
|---|---|---|---|---|---|---|---|---|---|
| 1996 | 1,273,320 | 2,398,804 | 270,634 | 1,507,733 | 1,558,538 | 1,419,183 | 1,043,174 | 57,502 | 9,528,888 |
| 1997 | 1,217,327 | 2,422,924 | 242,874 | 1,501,967 | 1,644,196 | 1,346,012 | 1,136,707 | 48,039 | 9,560,046 |
| 1998 | 1,264,340 | 2,429,680 | 234,781 | 1,772,160 | 1,598,446 | 1,445,830 | 1,059,945 | 81,120 | 9,886,302 |
| 1999 | 1,294,521 | 2,600,503 | 244,589 | 1,821,558 | 1,629,130 | 1,505,070 | 1,094,795 | 68,681 | 10,258,847 |
| 2000 | 1,345,399 | 2,339,647 | 242,123 | 2,018,116 | 1,623,292 | 1,590,761 | 850,037 | 88,480 | 10,097,855 |
| 2001 | 1,281,687 | 2,041,702 | 246,464 | 1,396,890 | 1,358,284 | 1,560,665 | 623,627 | 106,425 | 8,615,744 |
| 2002 | 1,306,804 | 1,996,610 | 257,047 | 1,296,587 | 1,286,822 | 1,673,691 | 689,845 | 101,666 | 8,609,072 |
| 2003 | 1,274,827 | 2,112,597 | 258,335 | 1,362,868 | 1,271,904 | 1,705,739 | 704,075 | 119,886 | 8,810,231 |
| 2004 | 1,279,809 | 2,892,800 | 260,587 | 2,600,634 | 1,833,849 | 1,863,385 | 1,245,170 | 125,330 | 12,101,564 |
| 2005 | 1,251,453 | 3,020,240 | 267,550 | 2,760,176 | 1,900,184 | 1,897,727 | 1,318,967 | 145,635 | 12,561,932 |

Note: Excludes non-revenue car-miles.



AAR-E-00004215

# FREIGHT CAR-MILES BY TRAIN TYPE

(Millions of Car-Miles)

| Year | Total Freight | Unit Train | Way Train | Through Train |
|---|---|---|---|---|
| 1996 | 31,715 | 10,669 | 1,482 | 19,565 |
| 1997 | 31,660 | 8,951 | 1,500 | 21,209 |
| 1998 | 32,657 | 9,171 | 1,534 | 21,952 |
| 1999 | 33,851 | 11,911 | 1,295 | 20,645 |
| 2000 | 34,590 | 12,185 | 1,223 | 21,182 |
| 2001 | 34,243 | 12,852 | 1,220 | 20,171 |
| 2002 | 34,680 | 12,665 | 1,282 | 20,734 |
| 2003 | 35,555 | 12,937 | 1,254 | 21,364 |
| 2004 | 37,071 | 13,831 | 1,285 | 21,954 |
| 2005 | 37,712 | 14,017 | 1,265 | 22,430 |

# TRAFFIC DENSITY

| | Millions of Revenue Ton-Miles Per Owned Mile of | | Thousands of Car-Miles Per Owned Mile of | |
|---|---|---|---|---|
| Year | Road | Track | Road | Track |
| 1996 | 12.82 | 7.66 | 299.8 | 179.2 |
| 1997 | 13.21 | 7.82 | 310.0 | 183.5 |
| 1998 | 13.69 | 8.05 | 324.7 | 190.9 |
| 1999 | 14.42 | 8.48 | 340.5 | 200.3 |
| 2000 | 14.77 | 8.70 | 348.5 | 205.2 |
| 2001 | 15.29 | 8.94 | 350.1 | 204.7 |
| 2002 | 15.05 | 8.86 | 346.4 | 203.9 |
| 2003 | 15.65 | 9.18 | 358.7 | 210.3 |
| 2004 | 17.02 | 9.94 | 379.6 | 221.6 |
| 2005 | 17.70 | 10.33 | 393.5 | 229.5 |



AAR-E-00004216

# AVERAGE LENGTH OF HAUL




| Year | Revenue Ton-Miles (billions) | Tons Originated (millions) | Average Length of Haul (miles) |
|---|---|---|---|
| 1996 | 1,356 | 1,611 | 842 |
| 1997 | 1,349 | 1,585 | 851 |
| 1998 | 1,377 | 1,649 | 835 |
| 1999 | 1,433 | 1,717 | 835 |
| 2000 | 1,466 | 1,738 | 843 |
| 2001 | 1,495 | 1,742 | 858 |
| 2002 | 1,507 | 1,767 | 853 |
| 2003 | 1,551 | 1,799 | 862 |
| 2004 | 1,663 | 1,844 | 902 |
| 2005 | 1,696 | 1,899 | 893 |



AAR-E-00004217

# AVERAGE TONS PER CARLOAD

| Year | Tons Originated (thousands) | Carloads Originated (thousands) | Tons Per Carload Originated |
|---|---|---|---|
| 1996 | 1,610,941 | 24,159 | 66.7 |
| 1997 | 1,585,244 | 25,016 | 63.4 |
| 1998 | 1,648,665 | 25,705 | 64.1 |
| 1999 | 1,716,859 | 27,096 | 63.4 |
| 2000 | 1,738,383 | 27,763 | 62.6 |
| 2001 | 1,741,967 | 27,205 | 64.0 |
| 2002 | 1,766,671 | 27,901 | 63.3 |
| 2003 | 1,799,066 | 28,870 | 62.3 |
| 2004 | 1,844,202 | 30,095 | 61.3 |
| 2005 | 1,898,721 | 31,142 | 61.0 |






AAR-E-00004218

# AVERAGE NUMBER OF CARS PER FREIGHT TRAIN

| Year | Total Freight Car-Miles (millions) | Freight Train-Miles (thousands) | Average Number of Cars Per Train |
|---|---|---|---|
| 1996 | 31,715 | 468,792 | 67.7 |
| 1997 | 31,660 | 474,954 | 66.7 |
| 1998 | 32,657 | 474,947 | 68.8 |
| 1999 | 33,851 | 490,442 | 69.0 |
| 2000 | 34,590 | 504,001 | 68.6 |
| 2001 | 34,243 | 499,546 | 68.5 |
| 2002 | 34,680 | 499,668 | 69.4 |
| 2003 | 35,555 | 515,999 | 68.9 |
| 2004 | 37,071 | 534,696 | 69.3 |
| 2005 | 37,712 | 547,566 | 68.9 |

# AVERAGE FREIGHT TRAIN LOAD

| Year | Gross Ton-Miles Excluding Locomotives (millions) | Net Ton-Miles (millions) | Freight Train-Miles (thousands) | Average Freight-Train Weight Including Weight of Cars (tons) | Average Freight-Train Load (tons) |
|---|---|---|---|---|---|
| 1996 | 2,462,226 | 1,365,100 | 468,792 | 5,252 | 2,912 |
| 1997 | 2,559,165 | 1,359,008 | 474,954 | 5,388 | 2,861 |
| 1998 | 2,623,429 | 1,388,304 | 474,947 | 5,524 | 2,923 |
| 1999 | 2,732,297 | 1,445,268 | 490,442 | 5,571 | 2,947 |
| 2000 | 2,803,690 | 1,473,206 | 504,001 | 5,563 | 2,923 |
| 2001 | 2,817,312 | 1,501,059 | 499,546 | 5,640 | 3,005 |
| 2002 | 2,829,281 | 1,513,905 | 499,668 | 5,662 | 3,030 |
| 2003 | 2,912,541 | 1,560,137 | 515,999 | 5,644 | 3,024 |
| 2004 | 3,090,707 | 1,671,203 | 534,696 | 5,780 | 3,126 |
| 2005 | 3,157,201 | 1,705,549 | 547,566 | 5,766 | 3,115 |



AAR-E-00004219

# FREIGHT LOSS AND DAMAGE CLAIMS

| Year | Claims (millions $) | Percent of Freight Revenue |
|---|---|---|
| 1996 | $121 | 0.38 % |
| 1997 | 113 | 0.35 |
| 1998 | 119 | 0.37 |
| 1999 | 99 | 0.31 |
| 2000 | 101 | 0.31 |
| 2001 | 115 | 0.35 |
| 2002 | 108 | 0.33 |
| 2003 | 103 | 0.31 |
| 2004 | 105 | 0.28 |
| 2005 | 123 | 0.29 |

Source: AAR






AAR-E-00004220

# TON-MILES PER MILE OF ROAD OPERATED

| Year | Gross Ton-Miles Excluding Locomotives (millions) | Net Ton-Miles (millions) | Revenue Ton-Miles (millions) | Average Miles of Road Operated | Ton-Miles Per Mile of Road (thousands) | | |
|---|---|---|---|---|---|---|---|
| | | | | | Gross Ton-Miles | Net Ton-Miles | Revenue Ton-Miles |
| 1996 | 2,462,226 | 1,365,100 | 1,355,975 | 126,682 | 19,436 | 10,776 | 10,704 |
| 1997 | 2,559,165 | 1,359,008 | 1,348,926 | 121,670 | 21,034 | 11,170 | 11,087 |
| 1998 | 2,623,429 | 1,388,304 | 1,376,802 | 119,813 | 21,896 | 11,587 | 11,491 |
| 1999 | 2,732,297 | 1,445,268 | 1,433,461 | 120,986 | 22,584 | 11,946 | 11,848 |
| 2000 | 2,803,690 | 1,473,206 | 1,465,960 | 120,597 | 23,248 | 12,216 | 12,156 |
| 2001 | 2,817,312 | 1,501,059 | 1,495,472 | 121,013 | 23,281 | 12,404 | 12,358 |
| 2002 | 2,829,281 | 1,513,905 | 1,507,011 | 123,070 | 22,989 | 12,301 | 12,245 |
| 2003 | 2,912,541 | 1,560,137 | 1,551,438 | 122,293 | 23,816 | 12,757 | 12,686 |
| 2004 | 3,090,707 | 1,671,203 | 1,662,598 | 121,400 | 25,459 | 13,766 | 13,695 |
| 2005 | 3,157,201 | 1,705,549 | 1,696,425 | 120,565 | 26,187 | 14,146 | 14,071 |



# REVENUE TON-MILES PER CAR LOADED

| Year | Revenue Ton-Miles (millions) | Carloads Originated (thousands) | Revenue Ton-Miles Per Car Loaded |
|---|---|---|---|
| 1996 | 1,355,975 | 24,159 | 56,128 |
| 1997 | 1,348,926 | 25,016 | 53,922 |
| 1998 | 1,376,802 | 25,705 | 53,562 |
| 1999 | 1,433,461 | 27,096 | 52,903 |
| 2000 | 1,465,960 | 27,763 | 52,803 |
| 2001 | 1,495,472 | 27,205 | 54,970 |
| 2002 | 1,507,011 | 27,901 | 54,012 |
| 2003 | 1,551,438 | 28,870 | 53,739 |
| 2004 | 1,662,598 | 30,095 | 55,245 |
| 2005 | 1,696,425 | 31,142 | 54,473 |

# REVENUE TON-MILES PER EMPLOYEE AND EMPLOYEE-HOUR

| | Revenue Ton-Miles Per Freight Service | |
|---|---|---|
| Year | Employee (millions) | Employee-Hour Paid For |
| 1996 | 7.5 | 2,965 |
| 1997 | 7.6 | 2,973 |
| 1998 | 7.8 | 2,955 |
| 1999 | 8.1 | 3,139 |
| 2000 | 8.7 | 3,293 |
| 2001 | 9.3 | 3,516 |
| 2002 | 9.6 | 3,651 |
| 2003 | 10.1 | 3,805 |
| 2004 | 10.6 | 3,908 |
| 2005 | 10.5 | 4,019 |

Note: Freight service employment and hours are estimated on the basis of the ratio of freight operating expenses to total operating expenses.



AAR-E-00004222

# NET TON-MILES PER LOADED CAR-MILE

| Year | Net Ton-Miles (millions) | Loaded Car-Miles (millions) | Net Ton-Miles Per Loaded Car-Mile |
|---|---|---|---|
| 1996 | 1,365,100 | 18,074 | 75.5 |
| 1997 | 1,359,008 | 18,227 | 74.6 |
| 1998 | 1,388,304 | 18,821 | 73.8 |
| 1999 | 1,445,268 | 19,415 | 74.4 |
| 2000 | 1,473,206 | 20,066 | 73.4 |
| 2001 | 1,501,059 | 20,663 | 72.6 |
| 2002 | 1,513,905 | 21,077 | 71.8 |
| 2003 | 1,560,137 | 21,721 | 71.8 |
| 2004 | 1,671,203 | 21,168 | 79.0 |
| 2005 | 1,705,549 | 21,470 | 79.4 |

Note: Loaded car-miles include 50 percent of non-revenue car-miles.

# NET TON-MILES PER TRAIN-HOUR

| Year | Net Ton-Miles (millions) | Freight Train-Hours (thousands) | Net Ton-Miles Per Loaded Train-Hour |
|---|---|---|---|
| 1996 | 1,365,100 | 21,325 | 64,015 |
| 1997 | 1,359,008 | 24,673 | 55,080 |
| 1998 | 1,388,304 | 24,898 | 55,760 |
| 1999 | 1,445,268 | 24,335 | 59,390 |
| 2000 | 1,473,206 | 24,433 | 60,295 |
| 2001 | 1,501,059 | 24,288 | 61,802 |
| 2002 | 1,513,905 | 23,864 | 63,439 |
| 2003 | 1,560,137 | 25,849 | 60,356 |
| 2004 | 1,671,203 | 28,225 | 59,209 |
| 2005 | 1,705,549 | 29,505 | 57,806 |



AAR-E-00004223

# AVERAGE TRAIN SPEED




| Year | Freight Train-Miles (thousands) | Freight Train-Hours (thousands) | Freight Train-Miles Per Train-Hour |
|---|---|---|---|
| 1996 | 468,792 | 21,325 | 22.0 |
| 1997 | 474,954 | 24,673 | 19.2 |
| 1998 | 474,947 | 24,898 | 19.1 |
| 1999 | 490,442 | 24,335 | 20.2 |
| 2000 | 504,001 | 24,433 | 20.6 |
| 2001 | 499,546 | 24,288 | 20.6 |
| 2002 | 499,668 | 23,864 | 20.9 |
| 2003 | 515,999 | 25,849 | 20.0 |
| 2004 | 534,696 | 28,225 | 18.9 |
| 2005 | 547,566 | 29,505 | 18.6 |



AAR-E-00004224

# EMPLOYEES AND EMPLOYEE-HOURS PER MILE OF ROAD OPERATED

| Year | Employees Per Mile of Road Operated (Freight) | Employee-Hours Per Mile of Road Operated (Freight) |
|---|---|---|
| 1996 | 1.43 | 3,611 |
| 1997 | 1.46 | 3,730 |
| 1998 | 1.48 | 3,890 |
| 1999 | 1.46 | 3,775 |
| 2000 | 1.39 | 3,693 |
| 2001 | 1.34 | 3,516 |
| 2002 | 1.27 | 3,355 |
| 2003 | 1.26 | 3,335 |
| 2004 | 1.29 | 3,506 |
| 2005 | 1.34 | 3,501 |

Note: Freight service employment and hours are estimated on the basis of the ratio of freight operating expenses to total operating expenses.






AAR-E-00004225

# DIESEL FUEL COST

| Year | Average Cost Per Gallon Cents | Index |
|---|---|---|
| 1996 | 67.66¢ | 100.0 |
| 1997 | 67.82 | 100.2 |
| 1998 | 57.00 | 84.2 |
| 1999 | 55.45 | 82.0 |
| 2000 | 87.46 | 129.3 |
| 2001 | 85.54 | 126.4 |
| 2002 | 73.33 | 108.4 |
| 2003 | 89.25 | 131.9 |
| 2004 | 106.98 | 158.1 |
| 2005 | 151.42 | 223.8 |




See note on page 118.



AAR-E-00004226

# CONSUMPTION OF DIESEL FUEL

(Millions of Gallons)

| Year | Total | Freight Service | Passenger Service | Switching | Work Train |
|---|---|---|---|---|---|
| 1996 | 3,601 | 3,265 | 9 | 314 | 13 |
| 1997 | 3,603 | 3,273 | 8 | 301 | 20 |
| 1998 | 3,619 | 3,305 | 7 | 277 | 29 |
| 1999 | 3,749 | 3,389 | 8 | 326 | 26 |
| 2000 | 3,720 | 3,391 | 9 | 310 | 11 |
| 2001 | 3,730 | 3,406 | 10 | 304 | 10 |
| 2002 | 3,751 | 3,417 | 10 | 313 | 11 |
| 2003 | 3,849 | 3,508 | 11 | 318 | 12 |
| 2004 | 4,082 | 3,741 | 10 | 319 | 13 |
| 2005 | 4,120 | 3,781 | 10 | 317 | 12 |






AAR-E-00004227

# FUEL EFFICIENCY

| Year | Revenue Ton-Miles (millions) | Fuel Consumed in Freight Service and Switching (million gallons) | Ton-Miles Per Gallon of Fuel Consumed |
|---|---|---|---|
| 1996 | 1,355,975 | 3,579 | 379 |
| 1997 | 1,348,926 | 3,575 | 377 |
| 1998 | 1,376,802 | 3,583 | 384 |
| 1999 | 1,433,461 | 3,715 | 386 |
| 2000 | 1,465,960 | 3,700 | 396 |
| 2001 | 1,495,472 | 3,710 | 403 |
| 2002 | 1,507,011 | 3,730 | 404 |
| 2003 | 1,551,438 | 3,826 | 405 |
| 2004 | 1,662,598 | 4,059 | 410 |
| 2005 | 1,696,425 | 4,098 | 414 |






AAR-E-00004228

# LIST OF U.S. FREIGHT RAILROADS

# NOTES

- The railroad lists are from the AAR's *Profiles of U.S. Railroads,* and are as of December 31, 2005. See page 8 for definitions of Class I, Regional, and Local railroads.



AAR-E-00004230

# U.S. FREIGHT RAILROADS 2005

**Class I Railroads**

BNSF Railway Company
CSX Transportation
Grand Trunk Corporation
Kansas City Southern Railway Company
Norfolk Southern
Soo Line Railroad Company
Union Pacific Railroad Company



AAR-E-00004231

# U.S. FREIGHT RAILROADS 2005

**Regional Railroads**

Alabama & Gulf Coast Railway
Alaska Railroad Corp.
Buffalo & Pittsburgh Railroad, Inc.
Central Oregon & Pacific Railroad
Dakota, Minnesota & Eastern Railroad
Dakota, Missouri Valley, & Western
Elgin, Joliet & Eastern Railway
Florida East Coast Railway
Indiana & Ohio Railway, The
Iowa Interstate Railroad, Ltd.
Iowa, Chicago & Eastern Railroad
Kansas & Oklahoma Railroad, Inc.
Kyle Railroad
Missouri & Northern Arkansas Railroad
Montana Rail Link
Montreal, Maine & Atlantic Railway Ltd.
Nebraska, Kansas & Colorado Railway, Inc.
New York, Susquehanna & Western Rwy.
Northern Plains Railroad, Inc.
Paducah & Louisville Railway
Palouse River & Coulee City Railroad
Pan Am Railways
Portland & Western Railroad, Inc.
Providence and Worcester Railroad Company
Red River Valley & Western Railroad Co.
South Kansas & Oklahoma Railroad
Texas Pacifico Transportation Ltd.
Tuscola & Saginaw Bay Railway
Wheeling & Lake Erie Railway Co.
Wisconsin & Southern Railroad

**Notes:**
Guilford Rail System was renamed Pan Am Railways in March 2006.
Texas Mexican Railway, a regional in 2004, is reported as part of Kansas City Southern in 2005.

# U.S. FREIGHT RAILROADS 2005

**Local Linehaul Railroads**

Aberdeen & Rockfish Railroad
Aberdeen, Carolina and Western Railway Co.
Acadiana Railway Company, Inc.
Alabama & Tennessee River Railway, LLC
Alabama Southern Railroad
Albany & Eastern Railroad Company
Alexander Railroad
Algers, Winslow & Western Railway
Aliquippa & Ohio River Railroad Co.
Almanor Railroad
AN Railway, LLC
Angelina & Neches River Railroad
Ann Arbor Railroad Co.
Apache Railway
Appalachian & Ohio Railroad
Arcade & Attica Railroad
Arizona & California Railroad Co.
Arizona Central Railroad, Inc.
Arkansas & Missouri Railroad
Arkansas & Oklahoma Railroad, Inc.
Arkansas Midland Railroad Co.
Arkansas Southern Railroad
Arkansas, Louisiana & Mississippi Railroad
Ashland Railway Co.
AT&L Railroad
Atlantic & Western Railway
B&H Rail Corp.
Batten Kill Railroad Co., Inc.
Bauxite & Northern Railway
Bay Coast Railroad
Bay Colony Railroad Corp.
Bay Line Railroad, LLC
Belvidere & Delaware River Railway Co.
Blacklands Railroad, The
Blackwell Northern Gateway Railroad Company
Bloomer Line, The
Border Pacific Railroad
Buckingham Branch Railroad Co.
Caddo Valley Railroad Company
Caldwell County Railroad Co.
Caney Fork & Western Railroad
Carolina Coastal Railway, Inc.
Carolina Southern Railroad Co.
Carrizo Gorge Railway Inc.
Cascade & Columbia River Railroad
Cedar Rapids & Iowa City Railway
Central Montana Rail
Central New England Railroad Co., Inc.
Central New York Railroad Corporation
Central Railroad Co. of Indiana
Central Railroad Co. of Indianapolis
Central Washington Railroad Company
Chattahoochee Bay Railroad Inc.
Chattahoochee Industrial Railroad
Chattooga & Chickamauga Railway Co.
Chesapeake & Albemarle Railroad Co.
Chesapeake and Indiana Railroad Company
Chicago, Ft. Wayne & Eastern
Chicago, SouthShore, & South Bend Railroad
City of Prineville Railway
Claremont Concord Railroad Corp.
Clarendon & Pittsford Railroad
Cleveland Commercial Railroad Company
Columbia & Cowlitz Railway
Columbia Basin Railroad Company, Inc.



AAR-E-00004233

# U.S. FREIGHT RAILROADS 2005

**Local Linehaul Railroads (cont.)**

Columbus & Greenville Railway
Columbus & Ohio River Rail Road Co., The
Commonwealth Railway, Inc.
Conecuh Valley Railroad
Connecticut Southern Railroad Inc.
Copper Basin Railway, Inc.
D&I Railroad
Dakota Short Line
Dardanelle & Russellville Railroad
De Queen & Eastern Railroad
Delaware-Lackawanna Railroad Co., Inc.
Delta Southern Railroad
Depew, Lancaster & Western Railroad
Dubois County Railroad
East Cooper & Berkeley Railroad Co.
East Tennessee Railway, LP
Eastern Alabama Railway
Eastern Idaho Railroad, Inc.
Eastern Maine Railway Co.
Effingham Railroad Co.
El Dorado & Wesson Railway
Elkhart & Western Railroad Co.
Escanaba & Lake Superior Railroad
Evansville Western Railway
Everett Railroad
Falls Road Railroad Co., Inc.
Finger Lakes Railway Corp.
First Coast Railroad
Florida Central Railroad Co.
Florida Midland Railroad Co.
Florida Northern Railroad Co., Inc.
Fulton County Railroad, Inc.
Fulton County Railway LLC
Georgetown Railroad
Georgia & Florida Railway
Georgia Central Railway, LP
Georgia Midland Railroad
Georgia Northeastern Railroad Co., Inc.
Georgia Southwestern Railroad, Inc.
Georgia Woodlands Railroad
Gettysburg & Northern Railroad Co.
Gloster Southern Railroad Co.
Golden Isles Terminal Railroad, Inc.
Golden Triangle Railroad
Grainbelt Corp.
Grand Rapids Eastern Railroad
Great Northwest Railroad
Great Smoky Mountains Railroad, Inc.
Great Walton Railroad Co.
Great Western Railway of Colorado, LLC
Green Mountain Railroad Corp.
Gulf, Colorado & San Saba Railway
Hampton & Branchville Railroad
Hampton Railway, Inc.
Hartwell Railroad Co.
Heart of Georgia Railroad, Inc.
Hollidaysburg & Roaring Spring Railroad
Hollis & Eastern Railroad
Hoosier Southern Railroad
Housatonic Railroad Co., Inc.
Huntsville & Madison County RR Auth.
Huron & Eastern Railway
Idaho & Sedalia Transportation Company, LLC
Idaho Northern & Pacific Railroad Co.



AAR-E-00004234

# U.S. FREIGHT RAILROADS 2005

**Local Linehaul Railroads (cont.)**

Illinois & Midland Railroad, Inc.
Illinois Railway
Illinois Western Railroad Co.
Indiana Northeastern Railroad Co.
Indiana Rail Road, The
Indiana Southern Railroad, Inc.
Iowa Northern Railway Co.
Iowa Northwestern Railroad
Iowa Traction Railroad Co.
Juniata Valley Railroad Co.
Kankakee, Beaverville & Southern Railroad
Kaw River Railroad
Kentucky & Tennessee Railway
Keokuk Junction Railway
Kettle Falls International Railway LLC
Kiamichi Railroad Company
Knox & Kane Railroad Co.
Kosciusko & Southwestern Railway
KWT Railroad, Inc.
Lake State Railway Co.
Lake Superior & Ishpeming Railroad
Lancaster & Chester Railway
Laurinburg & Southern Railroad
Little Rock & Western Railway, LP
Livonia, Avon & Lakeville Railroad Corp.
Louisiana & Delta Railroad, Inc.
Louisiana & North West Railroad Co.
Louisiana Southern Railroad, Inc.
Louisville & Indiana Railroad Co.
Lowville & Beaver River Railroad
Luxapalila Valley Railroad, Inc.
Lycoming Valley Railroad Co.
M & B Railroad, LLC
Madison Railroad
Magma Arizona Railroad Co.
Maine Eastern Railroad
Marquette Rail, LLC
Maryland & Delaware Railroad
Maryland Midland Railway
Massachusetts Central Railroad Corp.
McCloud Railway Co.
Meridian Southern Railway, LLC
Middletown & Hummelstown Railroad Co.
Middletown and New Jersey Rwy. Co. Inc.
Mid-Michigan Railroad, Inc.
Milford-Bennington Railroad Co.
Minnesota Northern Railroad, Inc.
Minnesota Prairie Line
Minnesota Southern Railway, Inc.
Minnesota, Dakota & Western Railway
Mission Mountain Railroad
Mississippi & Skuna Valley Railway
Mississippi Export Railroad
Mississippi Southern Railroad
Mississippian Railway Cooperative, Inc.
Modoc Northern Railroad Company
Mohall Central Railroad, Inc.
Mohawk, Adirondack & Northern Railroad
Morristown & Erie Railway, Inc.
Mt. Hood Railroad Co.
Nash County Railroad Corp.
Nashville & Eastern Railroad Corp.
Naugatuck Railroad Co.
NEBKOTA Railway, Inc.



AAR-E-00004235

# U.S. FREIGHT RAILROADS 2005

**Local Linehaul Railroads (cont.)**

Nebraska Central Railroad
Nebraska Northeastern Railway Co.
New England Central Railroad, Inc.
New England Southern Railroad Co.
New Hampshire Central Railroad, Inc.
New Hampshire Northcoast Corp.
New Hope & Ivyland Railroad
New Jersey Rail Carrier, LLC
New York & Atlantic Railway
New York & Greenwood Lake Railway
New York & Lake Erie Railroad
New York & Ogdensburg Railway Co.
Nittany & Bald Eagle Railroad
North Shore Railroad
Northwestern Pacific Railway Co., LLC
Ohio & Pennsylvania Railroad Co.
Ohio Central Railroad, Inc.
Ohio Southern Railroad, Inc.
Ohio Valley Railroad Company
Oil Creek & Titusville Lines, Inc.
Old Augusta Railroad, LLC
Ontario Central Railroad
Ontario Midland Railroad Corp.
Otter Tail Valley Railroad
Ouachita Railroad
Panhandle Northern Railroad
Pecos Valley Southern Railway
Pee Dee River Railway
Pend Oreille Valley Railroad
Penn Eastern Rail Lines, Inc.
Pennsylvania & Southern Railway
Pickens Railway Co.
Pickens Railway Co. - Honea Path Div.
Pioneer Valley Railroad
Point Comfort & Northern Railway
Prescott & Northwestern Railroad
Progressive Rail Inc.
Puget Sound & Pacific Railroad Co.
R. J. Corman Railroad / Bardstown Line
R. J. Corman Railroad / Central Kentucky Lines
R. J. Corman Railroad / Cleveland Line
R. J. Corman Railroad / Memphis Line
R. J. Corman Railroad / Penn. Line
R. J. Corman Railroad / Western Ohio Line
R.J. Corman Railroad / West Virginia Line
Rarus Railway Corp.
Reading Blue Mountain & Northern RR Co.
Redmont Railway Co.
Riceboro Southern Railway, LLC
Rochester & Southern Railroad, Inc.
Rock & Rail, LLC
Rockdale, Sandow & Southern Railroad
Sabine River & Northern Railroad
Saginaw Bay Southern Railway Company
Salt Lake, Garfield & Western Railway
San Diego & Imperial Valley Railroad
San Joaquin Valley Railroad Co.
San Luis & Rio Grande Railroad, Inc.
San Luis Central Railroad
San Manuel Arizona Railroad
Sand Springs Railway Company
Sandersville Railroad
Santa Fe Southern Railway, Inc.
Santa Maria Valley Railroad



AAR-E-00004236

# U.S. FREIGHT RAILROADS 2005

**Local Linehaul Railroads (cont.)**

Seminole Gulf Railway, LP
Sequatchie Valley Railroad
Shamokin Valley Railroad Co.
Sierra Northern Railway
Sisseton Milbank Railroad, Inc.
SMS Rail Service, Inc.
South Branch Valley Railroad
South Central Florida Express Inc.
South Central Tennessee Railroad, LLC
Southern Indiana Railway
Southern Railroad Co. of NJ
St. Croix Valley Railroad Co.
St. Lawrence & Atlantic Railroad Co.
St. Marys Railroad
Stillwater Central Railroad, Inc.
Stockton Terminal & Eastern Railroad
Stourbridge Railroad Co.
Sunflour Railroad, Inc.
Tacoma Rail Mountain Division
Tennessee Southern Railroad Co., Inc.
Tennken Railroad
Texas & Northern Railway Co.
Texas North Western Railway
Texas Rock Crusher Railway Co.
Texas-New Mexico Railroad
The Athens Line, LLC
Thermal Belt Railway
Three Notch Railroad Co., Inc.
Timber Rock Railroad, Inc.
Toledo, Peoria & Western Railway Corp.
Tomahawk Railway, LP
Trona Railway Co.
Tulsa-Sapulpa Union Railway Co., LLC
Twin Cities & Western Railroad Co.
Tyburn Railroad Co.
Union County Industrial Railroad Co.
Utah Railway Co.
V & S Railway, Inc.
Valdosta Railway, LP
Vandalia Railroad
Ventura County Railroad Company
Vermont Railway
Walking Horse & Eastern Railroad
Wallowa Union Railroad Authority
Warren & Saline River Railroad Co.
Washington County Railroad Company
Wellsboro & Corning Railroad
West Isle Line, Inc.
West Tennessee Railroad
West Texas & Lubbock Railway
West Virginia Central Railroad
Western New York & Pennsylvania Railroad
Western Rail Road Co.
Willamette & Pacific Railroad
Willamette Valley Railway Co.
Winchester & Western Railroad
Wiregrass Central Railroad Co.
Wisconsin Northern
Wyoming & Colorado Railroad Company, Inc.
Yadkin Valley Railroad Co.
Yellowstone Valley Railroad
York Railway Company
Yreka Western Railroad



AAR-E-00004237

# U.S. FREIGHT RAILROADS 2005

**Local Switching and Terminal Railroads**

Adrian & Blissfield Rail Road Co.
Akron Barberton Cluster Railway
Alabama & Florida Railway Co.
Alabama Railroad Co.
Alamo Gulf Coast Railroad Co.
Albany Port Railroad Corp.
Allegheny Valley Railroad Co.
Alliance Terminal Railroad LLC
Appanoose County Community Railroad
Arizona Eastern Railway Co.
Ashtabula, Carson & Jefferson Railroad
Austin Area Terminal Railroad
Ballard Terminal Railroad Co.
Belt Railway Company of Chicago
BG & CM Railroad
Bighorn Divide & Wyoming Railroad Inc.
Birmingham Southern Railroad
Black River & Western Railroad
Boone & Scenic Valley Railroad
Brandon Corporation
Brandywine Valley Railroad Company
Brownsville & Rio Grande Intl. Railroad
Buffalo Southern Railroad
Burlington Junction Railway
C & NC Railroad Corp.
California Northern Railroad
Camp Chase Railroad Co.
Canton Railroad
Cape Fear Railways
Carolina Piedmont Div., SC Central RR
Central California Traction Co.
Central Illinois Railroad Co.
Central Indiana & Western Railroad
Central Midland Railway
Chestnut Ridge Railway Corporation
Chicago Rail Link
Cimarron Valley Railroad
City of Rochelle Railroad
Clinton Terminal Railroad Co.
Cloquet Terminal Railroad Company, Inc.
CMC Railroad, Inc.
Coe Rail
Colorado & Wyoming Railway
Columbia Terminal
Conrail Inc.
Corpus Christi Terminal Railroad, Inc.
Crab Orchard & Egyptian Railroad
Dakota Southern Railway
Dallas, Garland & Northeastern Railroad
Decatur Junction Railway Co.
Delray Connecting Railroad
Delta Valley & Southern Railway
Denver Rock Island Railroad
East Brookfield & Spencer Railroad LLC
East Camden & Highland Railroad
East Chattanooga Belt Railway Co.
East Erie Commercial Railroad
East Jersey Railroad & Terminal Co.
East Penn Railways, Inc.
Eastern Illinois Railroad Co.
Ellis & Eastern Co.
Farmrail Corp.
Flats Industrial Railroad Co.
Fordyce & Princeton Railroad
Fore River Transportation Corporation
Fort Smith Railroad
Fort Worth & Western Railroad Co.
Galveston Railway, LP
Garden City Western Railway
Grafton & Upton Railroad
Great Western Railway of Iowa
Heritage Railroad Corp.



AAR-E-00004238

# U.S. FREIGHT RAILROADS 2005

**Local Switching and Terminal Railroads (cont.)**

High Point, Thomasville & Denton RR
Hutchinson & Northern Railway
Indian Creek Railroad
Indiana Harbor Belt Railroad
Indiana Southwestern Railway Co.
ISG Cleveland Works Railway Company
ISG South Chicago & Indiana Harbor Railway Co.
Jefferson Warrior Railroad
Kendallville Terminal Railway Co.
Kiski Junction Railroad
Knoxville & Holston River Railroad Co.
Lake County Railroad
Lake Terminal Railroad Co.
Landisville Terminal & Transfer Company
Lehigh Valley Rail Management - Bethlehem Div.
Lehigh Valley Rail Management - Johnstown Div.
Little Kanawha River Rail
Little Rock Port Railroad
Longview Switching Co.
Los Angeles Junction Railway
Louisville, New Albany & Corydon Railroad
Luzerne and Susquehanna Railway Co.
Mahoning Valley Railway, The
Manufacturers Junction Railway
Manufacturers Railway Co.
Massena Terminal Railroad
Maumee & Western Railroad Corp.
McKeesport Connecting Railroad Co.
Meeker Southern Railroad
MG Rail, Inc.
Michigan Shore Railroad
Michigan Southern Railroad Company
Minnesota Commercial Railway
Mississippi Central Railroad Co.
Mississippi Delta Railroad
Mississippi Tennessee Railroad, LLC
Missouri & Valley Park Railroad Corp.
Missouri North Central Railroad
Modesto & Empire Traction Co.
Morehead & South Fork Railroad Co., Inc.
Moscow, Camden & San Augustine Railroad
Mount Vernon Terminal Railway
Municipality of East Troy Railroad
N. D. C. Railroad Company
Napa Valley Railroad Co.
Nashville & Western Railroad Corp.
New Castle Industrial Railroad
New Orleans & Gulf Coast Railway Co., Inc.
New Orleans Public Belt Railroad
New York Cross Harbor Railroad
Newburgh & South Shore Railroad
North Carolina & Virginia Railroad Co
Northern Lines Railway
Northern Ohio & Western Railway
Northwestern Oklahoma Railroad
Oakland Terminal Railway
Ohi-Rail Corp.
Omaha, Lincoln & Beatrice Railway
Oregon Pacific Railroad Co.
Owego & Harford Railway, Inc.
Pacific Harbor Line, Inc.
Patapsco & Back Rivers Railroad
Peninsula Terminal Co.
Pennsylvania Southwestern Railroad, Inc.
Pioneer Industrial Railway Co.
Pittsburgh & Ohio Central Railroad Co.
Pittsburgh, Allegheny & McKees Rocks RR
Port Bienville Railroad
Port Jersey Railroad
Port of Tillamook Bay Railroad
Port Terminal Railroad Association
Port Terminal Railroad of South Carolina



AAR-E-00004239

# U.S. FREIGHT RAILROADS 2005

**Local Switching and Terminal Railroads (cont.)**

Port Utilities Comm. of Charleston, S.C.
Portland Terminal Railroad Co.
Quincy Railroad
R. J. Corman Railroad / Allentown Lines
Raritan Central Railway, LLC
Republic N&T Railroad Inc.
Richmond Pacific Railroad Corp.
Rio Valley Switching Co.
Riverport Railroad, LLC
Salt Lake City Southern Railroad
San Pedro Southwestern Railroad
Santa Cruz, Big Trees & Pacific Railway
Savannah Port Terminal Railroad, Inc.
Semo Port Railroad, Inc.
Shawnee Terminal Railway Co.
Sidney & Lowe Railroad
South Brooklyn Railway
South Buffalo Railway
South Carolina Central Railroad
South Plains Lamesa Railroad, Ltd.
South Plains Switching, Ltd. Co.
Southern Switching Co.
Southwest Pennsylvania Railroad
Southwestern RR Co., New Mexico Division
Southwestern RR Co., Texas Division
St. Maries River Railroad
Strasburg Rail Road Co.
Tacoma Rail
Talleyrand Terminal Railroad Co.
Tazewell & Peoria Railroad Inc.
Terminal Railroad Assn. of St. Louis
Terminal Railway Alabama State Docks
Texas Central Business Lines Corp.
Texas City Terminal Railway
Texas South-Eastern Railroad
Texas, Gonzales & Northern Railway Co.
Tishomingo Railroad Company, Inc.
Towanda-Monroeton Shipper Lifeline
Tri-City & Olympia Railroad Company
Turners Island, LLC
Turtle Creek Industrial Railroad
Union Railroad
Upper Merion & Plymouth Railroad Company
US Rail Corporation-Jackson Division
Utah Central Railway Co.
Vermillion Valley Railroad Co.
Virginia Southern Railroad
Wabash Central Railroad Corp.
Warren and Trumbull Railroad Co.
Washington Terminal Company
WCTU Railway Co.
West Michigan Railroad Co.
Wichita, Tillman & Jackson Railway Co.
Wilmington & Western Railway Corp.
Wilmington Terminal Railroad, LP
Winamac Southern Railway Co.
Winston-Salem Southbound Railway
Youngstown & Austintown Railroad, Inc.
Youngstown Belt Railroad Co.

# RAILROAD ORGANIZATIONS

**- This page intentionally blank -**



AAR-E-00004242

# AMERICAN RAILWAY ENGINEERING AND MAINTENANCE-OF-WAY ASSOCIATION

10003 Derekwood Lane, Suite 210
Lanham, MD 20706
(301) 459-3200 Fax (301) 459-8077
www.arema.org

**Inception**
The American Railway Engineering and Maintenance-of-Way Association (AREMA) was formed on October 1, 1997, as the result of a merger of three engineering support associations, namely the American Railway Bridge and Building Association, the American Railway Engineering Association, and the Roadmasters and Maintenance of Way Association, along with functions of the Communications and Signal Division of the Association of American Railroads.

**Mission**
The development and advancement of both technical and practical knowledge and recommended practices pertaining to the design, construction, and maintenance of railway infrastructure.

**Meetings and Seminars**
Visit the AREMA web site for the latest information on all meetings, conferences, and seminars.

**Membership**
There are five classes of membership: member, associate member, life member, student affiliate, and honorary member. The AREMA Constitution and Bylaws make no provision for company or organization membership. Therefore, only an individual person may submit an application to become a member of AREMA.

Source: American Railway Engineering and Maintenance-of-Way Association

# AMERICAN SHORT LINE AND REGIONAL RAILROAD ASSOCIATION

50 F Street, N.W., Suite 7020
Washington, DC 20001-1536
(202) 628-4500 Fax (202) 628-6430
www.aslrra.org

**Inception**

In 1913, representatives of 22 short line railroads organized the Short Line Railroad Association of the Southeast. Accumulated experience led to the general belief that this Association should become national in scope; subsequently the name was changed to the American Short Line Railroad Association. The headquarters office of the ASLRA was established in Washington, D.C. in 1917. The ASLRA consolidated with Regional Railroads of America on January 1, 1998, to form the American Short Line and Regional Railroad Association.

**Mission**

To represent the collective interests of small railroads (short line, switching & terminal, and regional rail carriers) in all relevant areas of transportation legislation and regulation and in industry matters, and to provide essential information and services for the purpose of supporting the needs of its members in maintaining safe, cost effective rail transportation.

**Major Functions**

*Legislative:* Develops and presents the views of small railroads on a wide range of federal legislative initiatives through direct contact with members of Congress and their staffs; in testimony before Congressional committees; in informational briefings to legislative staff and executive department agencies; and as an active member of the AAR's Washington Legislative Representatives group.

*Regulation:* Develops and presents the views of small railroads on federal regulatory matters through direct liaison with DOT, FRA, STB and EPA personnel; analyzes proposed regulations with respect to their impact on small carriers; prepares ASLRRA responses and justifications in conjunction with short line witnesses; presents testimony; conducts training seminars on implementation matters and represents member railroads as requested.

*Industry Affairs:* Develops and presents the views of small railroads on the operations, engineering, mechanical and other initiatives of the AAR through membership on high level AAR committees; forms ad hoc short line and regional railroad committees; sponsors special meetings; assesses cost and administrative impact data on small carriers; develops industry funding to give small railroads access to central networks; and interacts with Railinc regarding network information systems.

*Information:* Serves as the "eyes and ears" of small railroads and informs members about industry and government affairs, policies and trends; provides educational opportunities through meetings and seminars and on-line training; collects and analyzes data on short line and regional railroad operations; and promotes the role of small railroads as a major element in the national transportation network.

*Traffic and Publications:* Serves as an agent for traffic and tariff purposes for subscribing railroads; produces joint line and individual line tariffs, contracts and publications; and acts as statutory agent for members. Makes available federal and industry publications of value to short line operators.

**Membership**

Over 400 Regional and Local railroads, and over 275 associate members from rail-related industries.



AAR-E-00004244

# ASSOCIATION OF AMERICAN RAILROADS

50 F Street, N.W.
Washington, DC 20001
(202) 639-2100 Fax (202) 639-2558
www.aar.org

**Inception**
The AAR was established in 1934 as an umbrella organization consolidating a number of smaller, more specialized groups. Among its forerunners were the Master Car Builders Association, the General Time Convention, the American Railway Association, the Association of Railway Executives, the Railway Accounting Officers Association, the Railway Treasury Officers Organization, the Bureau of Railway Economics, and the Bureau for Safe Transportation of Explosives and Other Dangerous Articles.

**Services**
The AAR serves its members in matters that require joint handling, in the interest of an adequate and efficient railroad system. These matters include operation, maintenance, safety, theoretical and applied research, economics, finance, accounting, data systems, legislative matters, and public affairs. The AAR represents the railroads before Congressional committees, regulatory and administrative forums, and the courts. In addition to representation, the AAR provides leadership for the industry. One of its most important functions is providing staff, as well as continuity, for professional committees made up of executives of member railroads.

The AAR has two subsidiaries. The Transportation Technology Center, Inc. (TTCI) operates the Transportation Test Center near Pueblo, Colorado, and performs transportation technology research, testing, and consulting for railroads, governments, manufacturers, and other interests around the world. The other AAR subsidiary, RAILINC Corp., maintains the computer and communication resources which permit the operational and administrative interaction among railroads and between railroads and railroad customers.

**Membership**
All of the major freight railroads in the United States, the principal railroads of Canada and Mexico, and Amtrak (the only intercity passenger railroad in the continental U.S.) are members of the AAR. In addition, AAR memberships are held by regional and local freight railroads, commuter railroads, and rail industry suppliers. Railroad members account for 76 percent of the miles of road in the United States. U.S. members account for 93 percent of the employees, and 95 percent of the freight revenue of U.S. freight railroads. Like their U.S. counterparts, the Canadian and Mexican members account for most of the freight rail service in their respective countries.

**Composition of Board of Directors**
The Board of Directors is composed of Chief Executive Officers of member railroads and the President of the AAR. Amtrak and the larger member railroads are always on the Board, while an additional position is occupied by a representative of a smaller railroad member.



AAR-E-00004245

# NATIONAL RAILWAY LABOR CONFERENCE

1901 L Street, N.W., Suite 500
Washington, DC 20036
(202) 862-7200

**Inception**
The National Railway Labor Conference became operational on January 1, 1963, when it took over the responsibilities of three regional associations that had been the railroads' representatives in labor negotiations in their respective areas. The NRLC offices were moved from Chicago to Washington, D.C., in 1968. The NRLC reports to an Executive Board made up of Class I railroad chief executives.

**Services Provided**
All U.S. Class I freight railroads and many smaller lines are members of the NRLC. The NRLC represents most of its members in multi-employer collective bargaining with the thirteen major rail unions. It also advises railroads on labor-related matters, including the interpretation of labor contracts; administers the industry-wide health and welfare plans for rail employees; represents the industry on rail labor issues before Congressional committees, other governmental bodies, and the courts; provides training programs; and represents railroads in labor arbitration cases before the National Railroad Adjustment Board and other tribunals.

Source: National Railway Labor Conference



AAR-E-00004246

RAILINC

7001 Weston Parkway, Suite 200
Cary, NC 27513
(877) 922-7245 Fax (919) 651-5405
www.railinc.com
sales@railinc.com

Railinca, a subsidiary of the Association of American Railroads (AAR), is the supplier of time-tested products and services like UMLER/EMIS, TRAIN II, Interline Settlement, Railcar Accounting, Steelroads, RailSight and EDI connection services. These systems and services support railroads, shippers, equipment owners and suppliers along every link of their supply chains. Class Is, short lines, regional railroads, and transportation professionals alike use Railinc's tools and information to manage and analyze their rail traffic.

**Selected Products:**

***Equipment Tracking and Tracing*** – including Steelroads; Railinc provides a single source for track and trace information for shipments moving on more than 520 railroads in the U.S., Canada and Mexico.

***EDI Network/Value Added Network (VAN) Messaging Services -*** a portal to the North American rail industry and our customers' supply chain partners, linking more than 1,500 trading partners.

***TRAIN II System*** – (Tele-Rail Automated Information Network) physical location and status information on rail equipment.

***Equipment Registration and Information System (Umler/EMIS)*** – physical characteristics, transportation management information and pool assignments of over 3.5 million pieces of rail equipment in North America.

***Railroad Reference Information databases*** – (a.k.a. Industry Reference Files) includes Centralized Station Master, Customer Identification File, Itinerary Database, Junction Interchange Database, Mark Register, Official Railroad Station List, Serving Carrier/Reciprocal Switch Database, Shipment Conditions, Standard Transportation Commodity Code.

***Data Exchange Systems*** – Car Hire, Car Repair Billing, Freight Loss & Damage, and Switching Settlements.

***Interline Transportation Services*** – Deprescription, Embargo, Marks, Tank Car Mileage Equalization, Car Accounting Rate Distribution System, Car Hire Accounting Rate Master, Car Repair Price Master.

***Damage Prevention and Loading Services*** – DP&LS supports industry initiatives to improve the transportation of motor vehicles by railcar and evaluates performance at vehicle handling facilities.

Source: Railinc

# RAILROAD RETIREMENT BOARD

844 N. Rush Street
Chicago, IL 60611-2092
(312) 751-4500
www.rrb.gov

**Background**

The Railroad Retirement Board was created in the 1930s by New Deal legislation establishing a retirement benefit program for the nation's railroad workers. Private industrial pension plans had been pioneered in the railroad industry; the first industrial pension plan in America was established on a railroad in 1874. By the 1930s, pension plans were far more developed in the railroad industry than in most other businesses or industries, but these plans began to fail during the Great Depression.

The first Railroad Retirement Act, enacted on June 27, 1934, was declared unconstitutional by the Supreme Court before it became operational. A new retirement bill was enacted on August 29, 1935. This bill was also challenged on the grounds that neither the railroads nor the employees could be forced to contribute to annuity payments. At the suggestion of President Roosevelt, the President of the Association of American Railroads and the Chairman of the Railway Labor Executives' Association formed a joint conference to work out a solution to the pension issue. The conference's proposals resulted in the Railroad Retirement Act of 1937. Since that time, there have been many amendments and additions to the Act, most notably in 1974, 1981, 1983, and 2001.

Legislation enacted in 1974 restructured railroad retirement benefits into two tiers, so as to coordinate them more fully with social security benefits. The first tier is based on combined railroad retirement and social security credits, using social security benefit formulas. The second tier is based on railroad service only and is comparable to the pensions paid over and above social security benefits in other heavy industries.

**Functions of the Board**

The Railroad Retirement Board is an independent agency in the executive branch of the federal government whose primary function is to administer, under the Railroad Retirement Act and the Railroad Unemployment Insurance Act, comprehensive retirement-survivor and unemployment-sickness benefit programs covering railroad workers engaged in interstate commerce, employees of railroad labor organizations and their subordinate units, and railroad associations. The Board's three members are appointed by the President and include a Carrier Member, a Labor Member, and a Public Member. While the railroad retirement system has remained separate from the social security system, the two systems are closely coordinated with regard to earnings credits, benefit payments, and taxes.

During Fiscal Year 2006, retirement-survivor benefits of some $9.4 billion were paid to about 619,000 beneficiaries, while net unemployment-sickness benefits of $73 million were paid to some 28,000 claimants. As of the end of Fiscal Year 2006, the average annuity paid to retired rail employees was about $1,850 a month, spouse benefits averaged $670 a month, and benefits for aged widow(er)s averaged $1,120 a month. The maximum biweekly rate for unemployment and sickness benefits was $570.

Source: Railroad Retirement Board



AAR-E-00004248

# RAILWAY ENGINEERING-MAINTENANCE SUPPLIERS ASSOCIATION

417 West Broad Street, Suite 203
Falls Church, VA 22046
(703) 241-8514 Fax: (703) 241-8589
www.remsa.org
e-mail: home@remsa.org

**Inception**
The Railway Engineering-Maintenance Suppliers Association (REMSA) is the outgrowth of two predecessor associations: National Railway Appliances Association and the Association of Track and Structure Suppliers. The NRAA, under several different names, had been in existence since 1894; the AT&SS, since 1914. These two associations merged to form REMSA in 1965.

**Mission**
REMSA's mission is to provide global business development opportunities to members; to transfer knowledge about markets, products, and the industry to members and their customers; and to support government initiatives that advance the North American railroad industry.

**Membership**
Membership is limited to corporations, firms, and individuals engaged in the manufacture or sale of railway transportation equipment, products, and services; engineers or contractors engaged in construction and/or maintenance of transportation facilities; and publishers of the technical press and others associated with the railway transportation industry.

Source: Railway Engineering-Maintenance Suppliers Association

# RAILWAY SUPPLY INSTITUTE

50 F Street NW
Suite 7030
Washington, DC 20001
(202) 347-4664 Fax: (202) 347-0047

29W 140 Butterfield Road
Suite 103A
Warrenville, IL 60555
(630) 393-0106 Fax: (630) 393-0108

www.rsiweb.org

**Inception**

The Railway Supply Institute formally came into existence on January 1, 2003, with a consolidation of the Railway Supply Association and the Railway Progress Institute. The Railway Progress Institute was organized as the Railway Business Association in 1908, and the name was changed to Railway Progress Institute in 1955. The Railway Supply Association was organized in 1938 under the name Allied Mechanical Association, and changed its name to the Railway Supply Association in 1962.

**Services**

The Railway Supply Institute (RSI) is the international association of suppliers to the railroads and to rail mass transit systems. The RSI represents the railroad supply industry on all important legislative and regulatory matters. RSI's goals are accomplished through the work of its committees, which serve the RSI membership in a variety of areas. The committees are the American Railway Car Institute (ARCI), Equipment Leasing, Grade Crossing Safety, International Trade, Maintenance-of-Way, Passenger Transportation, Public Relations/Marketing, Quality Assurance, RSI Board, Standard Coupler Manufacturers, State Taxation, Tank Cars, and Train Control Technologies. The RSI also sponsors a trade show every other year, where members can display their products for customers.



AAR-E-00004250

Transportation
Technology Center, Inc.

P. O. Box 11130, 55500 DOT Road
Pueblo, Colorado 81001
(719) 584-0750 Fax (719) 584-0711
www.ttci.aar.com

Transportation Technology Center, Inc. (TTCI), a subsidiary of the Association of American Railroads (AAR), provides technological services to railway industries around the world. TTCI is headquartered at the Federal Railroad Administration's Transportation Technology Center (TTC), Pueblo, Colorado, a world-class facility offering a wide range of unique capabilities for research, development, testing, consulting, and training for all railway-related technologies.

TTCI serves member railroads through the AAR's strategic research initiative program and is focused on enhancing railroad safety, reliability, and productivity. TTCI plays a major role in the development and application of new technologies for railways, suppliers, governments, and others involved in rail transportation. Training services are provided to help all customers apply new technology.

TTCI also operates the world's foremost emergency response training center for transportation accidents involving hazardous materials and dangerous commodities. Training services are offered at its state-of-the-art facility or brought to customers anywhere around the world. TTC is isolated and secure inside a 52-square-mile area with a vast array of specialized tracks and testing facilities. Its remoteness makes it perfect for rail security testing and training and for conducting realistic exercises. TTCI also has extensive experience in conducting tests for transporting spent nuclear fuel.

All types of freight and passenger rolling stock, vehicle and track components, and safety devices can be tested. Forty-eight miles of test tracks are used for track structure and vehicle performance testing, life-cycle prediction and component reliability, lading damage prevention tests, and freight ride quality and passenger comfort.

TTCI has a wide range of facilities to assist transit companies evaluate their vehicles curving ability, component wear, and ride quality issues. In many cases, these tests are augmented with TTCI's vehicle dynamics program NUCARS™.

TTCI(UK) Ltd. was incorporated in June 2004 as a wholly owned subsidiary of the Transportation Technology Center, Inc. (TTCI). TTCI(UK) Ltd. is a professional engineering consulting firm that provides services to the European Union.



AAR-E-00004251

# TTX COMPANY

101 North Wacker Drive
Chicago, IL 60606
(312) 853-3223 Fax (312) 984-3790
www.ttx.com

**Inception**
TTX provides the railroad industry with a fleet of reliable, high quality railcars and related car management services to meet the specific needs of their rail customers. TTX, under the name Trailer Train, was created on November 9, 1955, and began operations March 17, 1956, to address a need to meet public demand for TOFC (trailer on flat car) service using a car pooling concept plus uniform design characteristics to permit expeditious interchanging of traffic. Today, TTX's fleet of 147,120 railcars consists of three major types: intermodal, autorack and general use. Specialized flatcars haul lumber, agricultural, military and other heavy-duty equipment.

**Operational Characteristics**
TTX's free running fleet is available to railroads on a daily rental basis upon demand. This provides the railroads access to a large fleet of cars without incurring long term financial obligations. The TTX goal is to supply well-maintained equipment wherever needed at the lowest cost possible, while permitting financing of equipment on reasonable terms. To accomplish this mission, TTX must size its fleet in a prudent manner consistent with user needs, balancing new equipment acquisitions with innovative modifications and upgrades to its existing fleet.

**Size of Fleet 12/31/05**

| *Car Type* | *Number of Cars* |
|---|---|
| Intermodal | 46,099 * |
| Autorack | 49,127 |
| Box Cars | 19,816 |
| Lumber & Building | 14,987 |
| Gondolas | 1,877 |
| Other General Use | 15,214 |
| Total | 147,120 |

* - At December 31, 2005, the intermodal cars provided the capacity to carry approximately 213,600 trailers or containers at least 40 feet in length.

**Owners of TTX**

Union Pacific Railroad Company
CSX Transportation, Inc.
Norfolk Southern Railway Company
BNSF Railway Company
Canadian National Railway Company
Canadian Pacific Railway Company
Florida East Coast Railway Company
Pan Am Railways
Kansas City Southern Railway Company

Source: TTX and TTX annual report



AAR-E-00004252

# RAILROAD WEB SITES

# NOTES

- The railroad Web sites shown in this publication constitute a listing of North American freight railroad (and Amtrak) sites known to be operational as of October 2006. Railroads that began operations in 2006, which will not be listed on pages 139 through 148 herein, may be included in this section. Unofficial Web sites are not included.

- This section has three parts. The first part is a listing of individual railroads divided by country and their Web sites. The second part of this section lists railroad holding companies that own or control more than one railroad, the North American railroads held, and their Web sites. The third section lists six railroad web sites that contain information on hundreds of their interline partner railroads. In some cases, these web sites are a railroad's sole representation on the web.

- Ferrocarril Mexicano is a subsidiary of Grupo Ferroviario Mexicanno, a joint venture of Grupo Mexico and Union Pacific Railroad.

- Grupo Transportación Ferroviaria Mexicana, parent of the railroad Kansas City Southern de México, is 100 percent owned by Kansas City Southern. The railroad was known as TFM until it was renamed in December 2005.



AAR-E-00004254

# RAILROAD WEB SITES

## Canadian Railroads

| | |
|---|---|
| Alberta RailNet Inc. | www.albertarailnet.com |
| Canadian National Railway Company | www.cn.ca |
| Canadian Pacific Railway Company | www.cpr.ca |
| Cape Breton & Central Nova Scotia Rwy. | www.railamerica.com/railmaps/CBNS.htm |
| Carlton Trail Railway | www.omnitrax.com/ctr.shtml |
| Essex Terminal Railway | www.etr.ca |
| Goderich-Exeter Railway | www.railamerica.com/railmaps/GEXR.htm |
| Hudson Bay Railway | www.omnitrax.com/hbry.shtml |
| Huron Central Railway | www.gwrr.com/default.cfm?action=rail&section=3B6a |
| Lakeland & Waterways Railway | www.railamerica.com/railmaps/LWR.htm |
| Mackenzie Northern Railway | www.railamerica.com/railmaps/MKNR.htm |
| New Brunswick Southern Railway | www.nbsouthern.com |
| Okanagan Valley Railway | www.omnitrax.com/ovr.shtml |
| Ontario Northland | www.ontc.on.ca/english/02freight/index.html |
| Ontario Southland Railway | www.osrinc.ca/ |
| Ottawa Valley Railway | www.railamerica.com/railmaps/OVR.htm |
| Port Colborne Harbour Railway | www.trilliumrailway.com/pchr.asp |
| Quebec-Gatineau Railway | www.gwrr.com/default.cfm?action=rail&section=3B6a |
| Southern Ontario Railway | www.railamerica.com/railmaps/SOR.htm |
| Southern Railway of British Columbia | www.sryraillink.com |
| St. Lawrence & Atlantic RR (Québec) Inc. | www.gwrr.com/default.cfm?action=rail&section=3B6a |
| St. Thomas & Eastern Railway | www.trilliumrailway.com/ster.asp |
| VIA Rail | www.viarail.ca |

## Mexican Railroads

| | |
|---|---|
| Ferrocarril Coahuila Durango | www.lfcd.com.mx |
| Ferrocarril Mexicano (Ferromex) | www.ferromex.com.mx/ |
| Ferrocarril y Terminal del Valle de Mexico | www.ferrovalle.com.mx/ |
| Ferrocarriles Chiapas-Mayab (FCCM) | www.gwrr.com/default.cfm?action=rail&section=3B7a |
| Ferrosur | www.ferrosur.com.mx/gxpsites/hgxpp001.aspx |
| Kansas City Southern de México* | www.tfm.com.mx and www.kcsi.com/corporate/kcsm.html |

* See note on page 162 concerning KCSM and TFM



AAR-E-00004255

# RAILROAD WEB SITES

**U.S. Railroads**

| | |
|---|---|
| Aberdeen & Rockfish Railroad Company | www.aberdeen-rockfish.com |
| Aberdeen, Carolina & Western Railway | www.acwr.com |
| Alabama & Florida Railway Co. | www.pioneer-railcorp.com/Subsidiaries/AF/af.html |
| Alabama & Gulf Coast Railway | www.railamerica.com/railmaps/AGR.htm |
| Alabama & Tennessee River Railway | www.omnitrax.com/atn.shtml |
| Alabama Railroad Co. | www.pioneer-railcorp.com/Subsidiaries/ALAB/alab.html |
| Alabama Southern Railroad | www.watcocompanies.com/Railroads/ABS%20(Alabama)/ABS%20main%20page.htm |
| Alaska Railroad | www.alaskarailroad.com/arrc7.html |
| Albany & Eastern Railroad Company | www.albanyeastern.com/pages/1/index.htm |
| Aliquippa and Ohio River Railroad | www.ohiocentral.com |
| Amtrak | www.amtrak.com |
| AN Railroad | www.gwrr.com/default.cfm?action=rail&section=3B5a |
| Ann Arbor Railroad Co. | www.annarbor-railroad.com |
| Appalachian and Ohio Railroad | www.a-orailroad.com |
| Arcade & Attica Railroad | www.anarr.com/ |
| Arizona & California Railroad | www.railamerica.com/railmaps/ARZC.htm |
| Arizona Eastern Railway Company | www.iowapacific.com |
| Arkansas & Missouri Railroad | www.arkansasmissouri-rr.com |
| Arkansas Midland Railroad | www.pinsly.com/arkansas_midland.htm |
| Arkansas Southern Railroad | www.watcocompanies.com/Railroads/ARS%20(Arkansas)/ARS%20main%20page.htm |
| Arkansas, Louisiana & Mississippi Railroad | www.gwrr.com/default.cfm?action=rail&section=3B17a |
| Ashtabula, Carson & Jefferson Railroad | www.acjrailroad.com |
| Atlantic & Western Railway | www.gwrr.com/default.cfm?action=rail&section=3B5a |

| | |
|---|---|
| B&H Rail Corp. | www.lalrr.com/bh.html |
| Bauxite & Northern Railway Co. | www.railamerica.com/railmaps/BXNR.htm |
| Bay Colony Railroad Corp. | www.baycolonyrr.com |
| Bay Line Railroad | www.gwrr.com/default.cfm?action=rail&section=3B5a |
| Belt Railway Company of Chicago | www.beltrailway.com |
| Belvidere & Deleware River Railway | www.brwrr.com/Freight/bdrv059.htm |
| Birmingham Southern Railroad | www.tstarinc.com/birmingham/index.html |
| Black River & Western Railroad | www.brwrr.com/Freight/brw066.htm |
| Blacklands Railroad | www.blacklandsrailroad.com/ |
| BNSF Railway Company | www.bnsf.com |
| Brownsville & Rio Grande Valley Internat. RR | www.brgrr.com |
| Buffalo & Pittsburgh Railroad | www.gwrr.com/default.cfm?action=rail&section=3B3a |



AAR-E-00004256

# RAILROAD WEB SITES

## U.S. Railroads

| | |
|---|---|
| California Northern Railroad | www.railamerica.com/railmaps/CFNR.htm |
| Canton Railroad Company | www.cantonrr.com |
| Carolina Coastal Railway | www.mlrail.com/CLNA.htm |
| Carolina Piedmont Railroad | www.railamerica.com/railmaps/CPDR.htm |
| Cascade & Columbia River Railroad Co. | www.railamerica.com/railmaps/CSCD.htm |
| Cedar Rapids and Iowa City Railway Co. | www.crandic.com |
| Central Midland Railway | www.cmrailway.com |
| Central Oregon & Pacific Railroad | www.railamerica.com/railmaps/CORP.htm |
| Central Railroad of Indiana | www.railamerica.com/railmaps/CIND.htm |
| Central Railroad of Indianapolis | www.railamerica.com/railmaps/CERA.htm |
| Chattahoochee Industrial Railroad | www.gwrr.com/default.cfm?action=rail&section=3B18a |
| Chattooga and Chickamauga Railway Co. | www.cagy.com/cckyrail.htm |
| Chesapeake & Albemarle Railroad | www.railamerica.com/railmaps/CARR.htm |
| Chicago Rail Link | www.omnitrax.com/crl.shtml |
| Chicago SouthShore & South Bend Railroad | www.anacostia.com/css/css.html |
| Chicago, Fort Wayne & Eastern | www.railamerica.com/railmaps/CFER.htm |
| City of Prineville Railway | www.cityofprinevillerailway.com/ |
| Claremont Concord Railroad | www.theccrr.com |
| Clarendon and Pittsford Railroad | www.vermontrailway.com/freight.html |
| Columbia Basin Railroad | www.cbrr.com |
| Columbia Terminal Railroad | www.gocolumbiamo.com/WaterandLight/COLT/ |
| Columbus and Greenville Railway Company | www.cagy.com/cgrail.htm |
| Columbus and Ohio River Rail Road Co. | www.ohiocentral.com |
| Commonwealth Railway | www.gwrr.com/default.cfm?action=rail&section=3B5a |
| Connecticut Southern Railroad | www.railamerica.com/railmaps/CSO.htm |
| Corpus Christi Terminal Railroad | www.gwrr.com/default.cfm?action=rail&section=3B5a |
| CSX Transportation | www.csxt.com |
| D & I Railroad | www.lgeverist.com/products/index.php?id=40&parentid=17 |
| Dakota, Minnesota & Eastern Railroad Corp. | www.dmerail.com |
| Dakota, Missouri Valley, & Western | www.dmvwrr.com |
| Dallas, Garland & Northeastern Railroad | www.railamerica.com/railmaps/DGNO.htm |
| Decatur Junction Railway Co. | www.pioneer-railcorp.com/Subsidiaries/DT/dt.html |
| Delta Southern Railroad | www.deltasouthernrailroad.com |



AAR-E-00004257

# RAILROAD WEB SITES

**U.S. Railroads**

| | |
|---|---|
| East Camden & Highland Railroad | www.eachrailroad.com/ |
| East Tennessee Railway | www.gwrr.com/default.cfm?action=rail&section=3B5c |
| Eastern Alabama Railway | www.railamerica.com/railmaps/EARY.htm |
| Eastern Idaho Railroad Company | www.watcocompanies.com/Railroads/eirr/eirr.htm |
| Effingham Railroad Company | www.efrr.com |
| Elgin, Joliet & Eastern Railway | www.tstarinc.com/eje/index.html |
| Elkhart & Western Railroad Co. | www.pioneer-railcorp.com/Subsidiaries/EWR/ewr.html |
| Escanaba & Lake Superior Railroad | www.elsrr.com |
| Evansville Western Railway | www.evwr.com |
| Everett Railroad | www.everettrailroad.com |
| Farmrail Corp. | www.farmrail.com/Freight_Service.htm |
| Finger Lakes Railway Corp. | www.fglkrail.com/Findex.html |
| First Coast Railroad | www.gwrr.com/default.cfm?action=rail&section=3B5a |
| Florida Central Railroad | www.pinsly.com/florida_central.html |
| Florida East Coast Railway | www.fecrwy.com |
| Florida Midland Railroad | www.pinsly.com/florida_midland.html |
| Florida Northern Railroad | www.pinsly.com/florida_northern.html |
| Fordyce & Princeton Railroad | www.gwrr.com/default.cfm?action=rail&section=3B17a |
| Fort Smith Railroad Co. | www.pioneer-railcorp.com/Subsidiaries/FSR/fsr.html |
| Fort Worth & Western Railroad | www.fwwr.net |
| Fulton County Railway | www.omnitrax.com/fcr.shtml |
| Galveston Railroad | www.gwrr.com/default.cfm?action=rail&section=3B5a |
| Garden City Western Railway | www.pioneer-railcorp.com/Subsidiaries/GCW/gcw.html |
| Georgia & Florida Railway | www.omnitrax.com/gfrr.shtml |
| Georgia Central Railway | www.gwrr.com/default.cfm?action=rail&section=3B5a |
| Georgia Northeastern Railroad | www.gnrr.com |
| Georgia Southwestern Railroad | www.gswrr.com |
| Georgia Woodlands Railroad | www.omnitrax.com/gwrc.shtml |
| Gettysburg & Northern Railroad Co. | www.pioneer-railcorp.com/Subsidiaries/GET/get.html |
| Golden Isles Terminal Railroad | www.gwrr.com/default.cfm?action=rail&section=3B5a |
| Grainbelt Corp. | www.farmrail.com |
| Grand Rapids Eastern Railroad | www.railamerica.com/railmaps/GR.htm |
| Great Northwest Railroad | www.watcocompanies.com/Railroads/gnr/grnw.htm |
| Great Western Railway of Colorado | www.omnitrax.com/grw.shtml |
| Great Western Railway of Iowa | www.omnitrax.com/cbgr.shtml |
| Green Mountain Railroad | www.vermontrailway.com/freight.html |



AAR-E-00004258

# RAILROAD WEB SITES

## U.S. Railroads

| | |
|---|---|
| Heart of Georgia Railroad | www.hograil.com |
| Hollidaysburg & Roaring Spring Railroad | www.everettrailroad.com |
| Hoosier Southern Railroad | www.pcrailport.com/hsrailroad.htm |
| Housatonic Railroad Co., Inc. | www.housatonicrailroad.com |
| Huntsville and Madison County RR Auth. | www.hmcrr.com |
| Huron & Eastern Railway | www.railamerica.com/railmaps/HESR.htm |
| Idaho Northern & Pacific Railroad Co. | www.rgpc.com/inprgeneralinformation.htm |
| Illinois & Midland Railroad | www.gwrr.com/default.cfm?action=rail&section=3B1a |
| Illinois Railway, Inc. | www.omnitrax.com/ir.shtml |
| Illinois Western Railroad | www.illwestern.com |
| Indiana & Ohio Railway | www.railamerica.com/railmaps/IORY.htm |
| Indiana Harbor Belt Railroad | www.ihbrr.com |
| Indiana Rail Road Company | www.inrd.com/main.html |
| Indiana Southern Railroad | www.railamerica.com/railmaps/ISRR.htm |
| Indiana Southwestern Railway | www.pioneer-railcorp.com/Subsidiaries/ISW/isw.html |
| Iowa Interstate Railroad | www.iaisrr.com |
| Iowa, Chicago & Eastern Railroad | www.icerail.com |
| Juniata Valley Railroad | www.nshr.com/JVRR/jvrr.shtml |
| Kansas and Oklahoma Railroad | www.watcocompanies.com/Railroads/ko/ko.htm |
| Kansas City Southern Railway Company | www.kcsi.com/corporate/kcsr.html |
| Kaw River Railroad | www.watcocompanies.com/Railroads/kaw/kaw%20main%20page.htm |
| Kendalville Terminal Railway Co. | www.pioneer-railcorp.com/Subsidiaries/KTR/ktr.html |
| Keokuk Junction Railway Co. | www.pioneer-railcorp.com/Subsidiaries/KJRY/kjry.html |
| Kettle Falls International Railway | www.omnitrax.com/kfr.shtml |
| Kiamichi Railroad | www.railamerica.com/railmaps/KRR.htm |
| Kiski Junction Railroad | www.kiskijunction.com |
| Kosciusko & Southwestern Railway | www.ksry.com/freight.htm |
| KWT Railway | www.gwrr.com/default.cfm?action=rail&section=3B5a |
| Kyle Railroad Company | www.railamerica.com/railmaps/KYLE.htm |

# RAILROAD WEB SITES

## U.S. Railroads

| | |
|---|---|
| Lake State Railway | www.lsrc.com |
| Lake Terminal Railroad | www.tstarinc.com/ltr/index.html |
| Lancaster and Chester Railway Company | www.landcrailroad.com |
| Landisville Terminal & Transfer Company | www.mlrail.com/LNVT.htm |
| Little Rock & Western Railway | www.gwrr.com/default.cfm?action=rail&section=3B5a |
| Little Rock Port Authority Railroad | www.lrport.dina.org/facilities/railroad.html |
| Livonia, Avon & Lakeville Railroad | www.lalrr.com/lal.html |
| Louisiana & Delta Railroad | www.gwrr.com/default.cfm?action=rail&section=3B2a |
| Louisiana Southern Railroad | www.watcocompanies.com/Railroads/LAS%20(Louisiana)/LAS%20main%20page.htm |
| Louisville & Indiana Railroad | www.anacostia.com/lirc/lir.html |
| Louisville, New Albany & Corydon Railroad | www.lnacrr.com/freight.htm |
| Luxapalila Valley Railroad Company, Inc. | www.cagy.com/lxvrrail.htm |
| Lycoming Valley Railroad | www.nshr.com/LVRR/lvrr.shtml |
| | |
| M & B Railroad | www.gwrr.com/default.cfm?action=rail&section=3B5a |
| Madison Railroad | www.madisonrailroad.com |
| Mahoning Valley Railway Co. | www.ohiocentral.com |
| Manufacturers' Junction Railway | www.omnitrax.com/mj.shtml |
| Manufacturers Railway Company | www.anheuser-busch.com/business%5Funits/index.h |
| Maryland Midland Railway, Inc. | www.mmidrwy.com |
| Massachusetts Central Railroad Corp. | www.masscentralrr.com |
| Massena Terminal RR Co. | www.railamerica.com/railmaps/MSTR.htm |
| McKeesport Connecting Railroad | www.tstarinc.com/mcrr/index.html |
| Meridian Southern Railway, LLC | www.meridiansouthern.com |
| Michigan Shore Railroad | www.railamerica.com/railmaps/MS.htm |
| Michigan Southern Railroad | www.pioneer-railcorp.com/Subsidiaries/MSO/mso.html |
| Middletown & Hummelstown Railroad | www.mhrailroad.com/indexF.html |
| Mid-Michigan Railroad | www.railamerica.com/railmaps/MMRR.htm |
| Minnesota Commercial Railway | www.mnnr.net |
| Minnesota Prairie Line | www.tcwr.net/mpli.html |
| Mission Mountain Railroad | www.watcocompanies.com/Railroads/mmt/mmt.htm |
| Mississippi Central Railroad Co. | www.pioneer-railcorp.com/Subsidiaries/MSCI/msci.html |
| Mississippi Export Railroad | www.mserailroad.com |
| Mississippi Southern Railroad | www.watcocompanies.com/Railroads/MSR/MSR%20main%20page.htm |
| Mississippian Railway Cooperative, Inc. | www.homanindustries.com/mrc.php |
| Missouri & Northern Arkansas Railroad | www.railamerica.com/railmaps/MNA.htm |
| Modesto & Empire Traction Co. | www.metrr.com/rail.html |
| Montana Rail Link | www.montanarail.com |
| Montreal, Maine & Atlantic Railway Ltd. | www.mmarail.com |
| Morristown & Erie Railway Inc. | www.merail.com |
| Mount Hood Railroad | www.mthoodrr.com/freight.html |



AAR-E-00004260

# RAILROAD WEB SITES

## U.S. Railroads

| | |
|---|---|
| Nebraska Central Railroad Company | www.rgpc.com/ncrcgeneralinformation.htm |
| Nebraska Kansas Colorado Railway | www.omnitrax.com/nkcr.shtml |
| Nebraska, Kansas & Colorado RailNet | www.nkcrail.com |
| New England Central Railroad | www.railamerica.com/railmaps/NECR.htm |
| New Orleans & Gulf Coast Railway Co. | www.rgpc.com/nogcgeneralinformation.htm |
| New York & Atlantic Railway | www.anacostia.com/nyar/nyar.html |
| New York & Lake Erie Railroad | www.nylerr.com/NYLE.php |
| New York Cross Harbor Railroad | www.nyrr.com |
| New York, Susquehanna & Western Rwy. | www.nysw.com |
| Newburgh & South Shore Railroad | www.omnitrax.com/nsr.shtml |
| Nittany & Bald Eagle Railroad | www.nshr.com/NBER/nber.shtml |
| Norfolk Southern | www.nscorp.com |
| North Carolina & Virginia Railroad | www.railamerica.com/railmaps/NCVA.htm |
| North Shore Railroad | www.nshr.com/NSHR/nshr.shtml |
| Northern Lines Railway | www.anacostia.com/nlr/nlr.html |
| Northern Ohio & Western Railway | www.omnitrax.com/now.shtml |
| Northern Plains Railroad, Inc. | www.nprail.com |
| | |
| Ohio and Pennsylvania Railroad Corp. | www.ohiocentral.com |
| Ohio Central Railroad, Inc. | www.ohiocentral.com |
| Ohio Southern Railroad, Inc. | www.ohiocentral.com |
| Oil Creek & Titusville Lines | www.nylerr.com/OCTL.php |
| Ontario Central Railroad | www.onctrr.com |
| Otter Tail Valley Railroad | www.railamerica.com/railmaps/OTVR.htm |
| | |
| Pacific Harbor Line, Inc. | www.anacostia.com/phl/phl.html |
| Paducah & Louisville Railway | www.palrr.com |
| Palouse River & Coulee City Railroad | www.watcocompanies.com/Railroads/blmr_pcc/blmr_pcc.htm |
| Pan Am Railways | www.guilfordrail.com |
| Panhandle Northern Railroad | www.omnitrax.com/pnr.shtml |
| Penn Jersey Rail Lines Inc. | www.sms-pennjerseyrail.com/ |
| Pennsylvania Southwestern Railroad | www.watcocompanies.com/Railroads/pswr/pswr.htm |
| Pioneer Valley Railroad | www.pvrr.com |
| Pittsburgh and Ohio Central Railroad | www.ohiocentral.com |
| Point Comfort & Northern Railway Co. | www.railamerica.com/railmaps/PCNR.htm |
| Port Bienville Railroad | www.portandharbor.com/railroad.html |
| Port Jersey Railroad | www.pjrr.com |
| Port of Tillamook Bay Railroad | www.potb.org/railroad.htm |
| Port Terminal Railroad Association | www.ptra.com |
| Portland & Western Railroad | www.gwrr.com/default.cfm?action=rail&section=3B4a |

# RAILROAD WEB SITES

## U.S. Railroads

| | |
|---|---|
| Progressive Rail Inc. | www.progressiverail.com |
| Providence & Worcester Railroad Co. | www.pwrr.com |
| Puget Sound & Pacific Railroad | www.railamerica.com/railmaps/PSAP.htm |
| | |
| R. J. Corman RR Co. / Allentown Lines | www.rjcorman.com/shortline/allentown.shtml |
| R. J. Corman RR Co. / Bardstown Line | www.rjcorman.com/shortline/bardstown.shtml |
| R. J. Corman RR Co. / Central KY Lines | www.rjcorman.com/shortline/centralky.shtml |
| R. J. Corman RR Co. / Cleveland Line | www.rjcorman.com/shortline/cleveland.shtml |
| R. J. Corman RR Co. / Memphis Line | www.rjcorman.com/shortline/memphis.shtml |
| R. J. Corman RR Co. / Penn. Lines | www.rjcorman.com/shortline/penn.shtml |
| R. J. Corman RR Co. / TN Terminal | www.rjcorman.com/shortline/TNTerminal.shtml |
| R. J. Corman RR Co. / West Virginia Line | www.rjcorman.com/shortline/westvirginia.shtml |
| R. J. Corman RR Co. / Western Ohio Lines | www.rjcorman.com/shortline/westohio.shtml |
| Raritan Central Railway | www.raritancentralrr.com |
| Reading Blue Mountain & Northern Railroad | www.readingnorthern.com |
| Red River Valley & Western Railroad | www.rrvw.net |
| Riceboro Southern Railway | www.gwrr.com/default.cfm?action=rail&section=3B5a |
| Richmond Pacific Railroad | www.levinterminal.com/index_files/rail.htm |
| Riverport Railroad, LLC | www.riverportrailroad.com |
| Rochester & Southern Railroad | www.gwrr.com/default.cfm?action=rail&section=3B3a |
| Rockdale, Sandow & Southern RR Co. | www.railamerica.com/railmaps/RSSR.htm |
| | |
| Saginaw Valley Railway | www.railamerica.com/railmaps/SGVY.htm |
| San Diego & Imperial Valley Railroad | www.railamerica.com/railmaps/SDIY.htm |
| San Joaquin Valley Railroad | www.railamerica.com/railmaps/SJVR.htm |
| San Luis & Rio Grande Railroad | www.iowapacific.com |
| Sand Springs Railway | www.gerdauameristeel.com |
| Santa Fe Southern Railway | www.sfsr.com/freight.html |
| Savannah Port Terminal Railroad | www.gwrr.com/default.cfm?action=rail&section=3B5a |
| Seminole Gulf Railway | www.semgulf.com/freight.htm |
| Semo Port Railroad | www.semoport.com/railroad/index.html |
| Shamokin Valley Railroad | www.nshr.com/SVRR/svrr.shtml |
| Shawnee Terminal Railway Company | www.pioneer-railcorp.com/Subsidiaries/STR/str.htm |
| Sierra Northern Railway | www.sacramentorivertrain.com/freight.html |
| SMS Rail Service, Inc. | www.smsrail.com |
| South Buffalo Railway Company | www.gwrr.com/default.cfm?action=rail&section=3B3a |
| South Carolina Central Railroad | www.railamerica.com/railmaps/SCRF.htm |
| South Kansas & Oklahoma Railroad | www.watcocompanies.com/Railroads/sekr_skol/sekr_skol.htm |
| St. Lawrence & Atlantic Railroad Co. | www.gwrr.com/default.cfm?action=rail&section=3B6a#sla |



AAR-E-00004262

# RAILROAD WEB SITES

## U.S. Railroads

| | |
|---|---|
| Stillwater Central Railroad | www.watcocompanies.com/Railroads/slwc/slwc.htm |
| Stockton Terminal & Eastern Railroad | www.sterailroad.com |
| | |
| Tacoma Rail | www.tacomarail.com |
| Talleyrand Terminal Railroad | www.gwrr.com/default.cfm?action=rail&section=3B5a |
| Tazewell & Peoria Railroad | www.gwrr.com/default.cfm?action=rail&section=3B1a |
| Tennessee Southern Railroad | www.tnsou.com |
| Texas Mexican Railway* | www.kcsi.com/corporate/tmr.html |
| Texas Northeastern Railroad | www.railamerica.com/railmaps/TNER.htm |
| Timber Rock Railroad | www.watcocompanies.com/Railroads/tibr/tibr.htm |
| Tishomingo Railroad | www.tishomingorail.com/index.htm |
| Toledo, Peoria & Western Railway | www.railamerica.com/railmaps/TPW.htm |
| Tomahawk Railway | www.gwrr.com/default.cfm?action=rail&section=3B5c |
| Tri-City & Olympia Railroad Company | www.tcry.com |
| Tulsa-Sapulpa Union Railway Company | www.tsurailway.com |
| Tuscola & Saginaw Bay Railway | www.tsbrailway.com |
| Twin Cities & Western Railroad Company | www.tcwr.net |
| | |
| Union County Industrial Railroad | www.nshr.com/UCIR/ucir.shtml |
| Union Pacific Railroad Company | www.up.com |
| Union Railroad Company | www.tstarinc.com/union/index.html |
| US Rail Corporation - Jackson Division | www.usrailcorp.com |
| Utah Railway Company | www.gwrr.com/default.cfm?action=rail&section=3B15a |
| | |
| Valdosta Railway | www.gwrr.com/default.cfm?action=rail&section=3B5a |
| Vandalia Railroad Co. | www.pioneer-railcorp.com/Subsidiaries/VRRC/vrrc.htm |
| Vaughan Railroad | www.amvestcorp.com/vaughan.htm |
| Ventura County Railroad Company | www.railamerica.com/railmaps/VCRR.htm |
| Vermillion Valley Railroad Co. | www.indianaboxcar.com/vv/vvr.html |
| Vermont Railway | www.vermontrailway.com/freight.html |
| Vicksburg Southern Railroad | www.watcocompanies.com/railroads/VSOR/VSOR%20main%20page.htm |
| Virginia Southern Railroad | www.railamerica.com/railmaps/VSRR.htm |

* Owned by Kansas City Southern

# RAILROAD WEB SITES

**U.S. Railroads**

| | |
|---|---|
| Warren and Trumbull Railroad Company | www.ohiocentral.com |
| Washington County Railroad | www.vermontrailway.com/freight.html |
| Wellsboro & Corning Railroad | www.nshr.com/WCOR/wcor.shtml |
| West Michigan Railroad Co. | www.pioneer-railcorp.com/Subsidiaries/WMI/wmi.htm |
| West Tennessee Railroad | www.wtnnrr.com |
| West Virginia Central Railroad | www.mountainrail.com/wvc_freight.html |
| Western New York & Pennsylvania RR | www.wnyprr.com |
| Wheeling & Lake Erie Railway | www.wlerwy.com |
| Wichita, Tillman & Jackson Railway | www.rgpc.com/wtjrgeneralinformation.htm |
| Willamette & Pacific Railroad | www.gwrr.com/default.cfm?action=rail&section=3B4a |
| Wilmington Terminal Railroad | www.gwrr.com/default.cfm?action=rail&section=3B5a |
| Wisconsin & Southern Railroad Company | www.wsorrailroad.com |
| Yellowstone Valley Railroad | www.watcocompanies.com/Railroads/YSVR/YSVR%20%20main%20page.htm |
| York Railway Company | www.gwrr.com/default.cfm?action=rail&section=3B16a |
| Youngstown and Austintown Railroad Inc. | www.ohiocentral.com |
| Youngstown Belt Railroad Company | www.ohiocentral.com |



AAR-E-00004264

# RAILROAD WEB SITES

## Railroad Holding Companies

| | |
|---|---|
| Anacostia & Pacific Company, Inc. | www.anacostia.com/home.html |
| Chicago SouthShore & South Bend Railroad | www.anacostia.com/css/css.html |
| Louisville & Indiana Railroad | www.anacostia.com/lirc/lir.html |
| New York & Atlantic Railway | www.anacostia.com/nya/nya.html |
| Northern Lines Railway | www.anacostia.com/nlr/nlr.html |
| Pacific Harbor Line, Inc. | www.anacostia.com/phl/phl.html |
| Black River Railroad System | www.brwrr.com |
| Belvidere & Delaware River Railway | www.brwrr.com/Freight/bdrv059.htm |
| Black River & Western Railroad | www.brwrr.com/Freight/brw066.htm |
| Cagy Industries | www.cagy.com |
| Chattooga and Chickamauga Railway Co. | www.cagy.com/cckyrail.htm |
| Columbus and Greenville Railway Company | www.cagy.com/cgrail.htm |
| Luxapalila Valley Railroad Company, Inc. | www.cagy.com/lxvrrail.htm |
| Cedar American Rail Holdings | |
| Dakota, Minnesota & Eastern Railroad Corp. | www.dmerail.com |
| Iowa, Chicago & Eastern Railroad Corp. | www.icerail.com |
| Farmrail System, Inc. | www.farmrail.com |
| Farmrail Corp. | www.farmrail.com/Freight_Service.htm |
| Grainbelt Corp. | www.farmrail.com |
| Four Rivers Transportation | www.4riverstransportation.com |
| Appalachian & Ohio Railroad | www.a-orailroad.com |
| Evansville Western Railway | www.evwr.com |
| Paducah & Louisville Railway | www.palrr.com |



AAR-E-00004265

# RAILROAD WEB SITES

## Railroad Holding Companies

| | |
|---|---|
| Genesee & Wyoming Inc. | www.gwrr.com |
| AN Railway | www.gwrr.com/default.cfm?action=rail&section=3B5a |
| Arkansas, Louisiana & Mississippi Railroad | www.gwrr.com/default.cfm?action=rail&section=3B17a |
| Atlantic & Western Railway | www.gwrr.com/default.cfm?action=rail&section=3B5a |
| Bay Line Railroad | www.gwrr.com/default.cfm?action=rail&section=3B5a |
| Buffalo & Pittsburgh Railroad | www.gwrr.com/default.cfm?action=rail&section=3B3a |
| Chattahoochee Industrial Railroad | www.gwrr.com/default.cfm?action=rail&section=3B18a |
| Commonwealth Railway | www.gwrr.com/default.cfm?action=rail&section=3B5a |
| Corpus Christi Terminal Railroad | www.gwrr.com/default.cfm?action=rail&section=3B5a |
| East Tennessee Railway | www.gwrr.com/default.cfm?action=rail&section=3B5c |
| Ferrocarriles Chiapas-Mayab (FCCM) | www.gwrr.com/default.cfm?action=rail&section=3B7a |
| First Coast Railroad | www.gwrr.com/default.cfm?action=rail&section=3B5a |
| Fordyce & Princeton Railroad | www.gwrr.com/default.cfm?action=rail&section=3B17a |
| Galveston Railroad | www.gwrr.com/default.cfm?action=rail&section=3B5a |
| Georgia Central Railway | www.gwrr.com/default.cfm?action=rail&section=3B5a |
| Golden Isles Terminal Railroad | www.gwrr.com/default.cfm?action=rail&section=3B5a |
| Huron Central Railway | www.gwrr.com/default.cfm?action=rail&section=3B6a |
| Illinois & Midland Railroad | www.gwrr.com/default.cfm?action=rail&section=3B1a |
| Kentucky West Tennessee Railway | www.gwrr.com/default.cfm?action=rail&section=3B5a |
| Little Rock & Western Railway | www.gwrr.com/default.cfm?action=rail&section=3B5a |
| Louisiana & Delta Railroad | www.gwrr.com/default.cfm?action=rail&section=3B2a |
| Meridian & Bigbee Railroad | www.gwrr.com/default.cfm?action=rail&section=3B5a |
| Portland & Western Railroad | www.gwrr.com/default.cfm?action=rail&section=3B4a |
| Quebec-Gatineau Railway | www.gwrr.com/default.cfm?action=rail&section=3B6a |
| Riceboro Southern Railway | www.gwrr.com/default.cfm?action=rail&section=3B5a |
| Rochester & Southern Railroad | www.gwrr.com/default.cfm?action=rail&section=3B3a |
| Salt Lake City Southern Railroad | www.gwrr.com/default.cfm?action=rail&section=3B15a |
| Savannah Port Terminal Railroad | www.gwrr.com/default.cfm?action=rail&section=3B5a |
| South Buffalo Railway Company | www.gwrr.com/default.cfm?action=rail&section=3B3a |
| St. Lawrence & Atlantic Railroad Co. | www.gwrr.com/default.cfm?action=rail&section=3B6a |
| St. Lawrence & Atlantic RR (Québec) Inc. | www.gwrr.com/default.cfm?action=rail&section=3B6a |
| Talleyrand Terminal Railroad | www.gwrr.com/default.cfm?action=rail&section=3B5a |
| Tazewell & Peoria Railroad | www.gwrr.com/default.cfm?action=rail&section=3B1a |
| Tomahawk Railway | www.gwrr.com/default.cfm?action=rail&section=3B5c |
| Utah Railway Company | www.gwrr.com/default.cfm?action=rail&section=3B15a |
| Valdosta Railway | www.gwrr.com/default.cfm?action=rail&section=3B5a |
| Western Kentucky Railway | http://www.gwrr.com/default.cfm?action=rail&section=3B5a |
| Willamette & Pacific Railroad | www.gwrr.com/default.cfm?action=rail&section=3B4a |
| Wilmington Terminal Railroad | www.gwrr.com/default.cfm?action=rail&section=3B5a |
| York Railway Company | www.gwrr.com/default.cfm?action=rail&section=3B16a |



AAR-E-00004266

# RAILROAD WEB SITES

**Railroad Holding Companies**

| | |
|---|---|
| Kansas City Southern | www.kcsi.com |
| Kansas City Southern Railway Company | www.kcsi.com/corporate/kcsr.html |
| Texas Mexican Railway* | www.kcsi.com/corporate/tmr.html |
| Kansas City Southern de México* | www.tfm.com.mx |
| Livonia, Avon & Lakeville Railroad Corp. | www.lalrr.com |
| B&H Rail Corp. | www.lalrr.com/bh.html |
| Livonia, Avon & Lakeville Railroad | www.lalrr.com/lal.html |
| Ontario Central Railroad | www.onctrr.com |
| Western New York & Pennsylvania RR | www.wnyprr.com |
| Main Line Rail Management | www.mlrail.com |
| Carolina Coastal Railway | www.mlrail.com/CLNA.htm |
| Landisville Terminal & Transfer Company | www.mlrail.com/LNVT.htm |
| North Shore Railroad System | www.nshr.com |
| Juniata Valley Railroad | www.nshr.com/JVRR/jvrr.shtml |
| Lycoming Valley Railroad | www.nshr.com/LVRR/lvrr.shtml |
| Nittany & Bald Eagle Railroad | www.nshr.com/NBER/nber.shtml |
| North Shore Railroad | www.nshr.com/NSHR/nshr.shtml |
| Shamokin Valley Railroad | www.nshr.com/SVRR/svrr.shtml |
| Union County Industrial Railroad | www.nshr.com/UCIR/ucir.shtml |
| Wellsboro & Corning Railroad | www.nshr.com/WCOR/wcor.shtml |

* See notes on page 162.



AAR-E-00004267

# RAILROAD WEB SITES

**Railroad Holding Companies**

| | |
|---|---|
| Ohio Central Railroad System | www.ohiocentral.com |
| Aliquippa and Ohio River Railroad | www.ohiocentral.com/about_railroads.htm |
| Columbus and Ohio River Rail Road Co. | www.ohiocentral.com/about_railroads.htm |
| Mahoning Valley Railway Co. | www.ohiocentral.com/about_railroads.htm |
| Ohio and Pennsylvania Railroad Corp. | www.ohiocentral.com/about_railroads.htm |
| Ohio Central Railroad, Inc. | www.ohiocentral.com/about_railroads.htm |
| Ohio Southern Railroad, Inc. | www.ohiocentral.com/about_railroads.htm |
| Pittsburgh and Ohio Central Railroad | www.ohiocentral.com/about_railroads.htm |
| Warren and Trumbull Railroad Company | www.ohiocentral.com/about_railroads.htm |
| Youngstown and Austintown Railroad Inc. | www.ohiocentral.com/about_railroads.htm |
| Youngstown Belt Railroad Company | www.ohiocentral.com/about_railroads.htm |

| | |
|---|---|
| OmniTRAX | www.omnitrax.com |
| Alabama & Tennessee River Railway | www.omnitrax.com/atn.shtml |
| Alliance Terminal Railroad, LLC | www.omnitrax.com/railways.shtml |
| Carlton Trail Railway | www.omnitrax.com/ctr.shtml |
| Chicago Rail Link | www.omnitrax.com/crl.shtml |
| Fulton County Railway | www.omnitrax.com/fcr.shtml |
| Georgia & Florida Railway | www.omnitrax.com/gfrr.shtml |
| Georgia Woodlands Railroad | www.omnitrax.com/gwrc.shtml |
| Great Western Railway of Colorado | www.omnitrax.com/grw.shtml |
| Great Western Railway of Iowa | www.omnitrax.com/cbgr.shtml |
| Hudson Bay Railway | www.omnitrax.com/hbry.shtml |
| Illinois Railway, Inc. | www.omnitrax.com/ir.shtml |
| Kettle Falls International Railway | www.omnitrax.com/kfr.shtml |
| Manufacturers' Junction Railway | www.omnitrax.com/mj.shtml |
| Nebraska Kansas Colorado Railway | www.omnitrax.com/nkcr.shtml |
| Newburgh & South Shore Railroad | www.omnitrax.com/nsr.shtml |
| Northern Ohio & Western Railway | www.omnitrax.com/now.shtml |
| Okanagan Valley Railway | www.omnitrax.com/ovr.shtml |
| Panhandle Northern Railroad | www.omnitrax.com/pnr.shtml |



AAR-E-00004268

# RAILROAD WEB SITES

**Railroad Holding Companies**

| | |
|---|---|
| Pinsly Railroad Company | www.pinsly.com |
| Arkansas Midland Railroad | www.pinsly.com/arkansas_midland.html |
| Florida Central Railroad | www.pinsly.com/florida_central.html |
| Florida Midland Railroad | www.pinsly.com/florida_midland.html |
| Florida Northern Railroad | www.pinsly.com/florida_northern.html |
| Pioneer Valley Railroad | www.pvrr.com |

| | |
|---|---|
| Pioneer Railcorp | www.pioneer-railcorp.com |
| Alabama & Florida Railway Co. | www.pioneer-railcorp.com/Subsidiaries/AF/af.html |
| Alabama Railroad Co. | www.pioneer-railcorp.com/Subsidiaries/ALAB/alab.html |
| Decatur Junction Railway Co. | www.pioneer-railcorp.com/Subsidiaries/DT/dt.html |
| Elkhart & Western Railroad Co. | www.pioneer-railcorp.com/Subsidiaries/EWR/ewr.html |
| Fort Smith Railroad Co. | www.pioneer-railcorp.com/Subsidiaries/FSR/fsr.html |
| Garden City Western Railway | www.pioneer-railcorp.com/Subsidiaries/GCW/gcw.html |
| Gettysburg & Northern Railroad Co. | www.pioneer-railcorp.com/Subsidiaries/GET/get.html |
| Indiana Southwestern Railway | www.pioneer-railcorp.com/Subsidiaries/ISW/isw.html |
| Kendallville Terminal Railway Co. | www.pioneer-railcorp.com/Subsidiaries/KTR/ktr.html |
| Keokuk Junction Railway Co. | www.pioneer-railcorp.com/Subsidiaries/KJRY/kjry.html |
| Michigan Southern Railroad | www.pioneer-railcorp.com/Subsidiaries/MSO/mso.html |
| Mississippi Central Railroad Co. | www.pioneer-railcorp.com/Subsidiaries/MSCI/msci.html |
| Shawnee Terminal Railway Company | www.pioneer-railcorp.com/Subsidiaries/STR/str.htm |
| Vandalia Railroad Co. | www.pioneer-railcorp.com/Subsidiaries/VRRC/vrrc.htm |
| West Michigan Railroad Co. | www.pioneer-railcorp.com/Subsidiaries/WMI/wmi.htm |

| | |
|---|---|
| R.J. Corman Railroad Group | www.rjcorman.com |
| R. J. Corman RR Co. / Allentown Lines | www.rjcorman.com/shortline/allentown.shtml |
| R. J. Corman RR Co. / Bardstown Line | www.rjcorman.com/shortline/bardstown.shtml |
| R. J. Corman RR Co. / Central KY Lines | www.rjcorman.com/shortline/centralky.shtml |
| R. J. Corman RR Co. / Cleveland Line | www.rjcorman.com/shortline/cleveland.shtml |
| R. J. Corman RR Co. / Memphis Line | www.rjcorman.com/shortline/memphis.shtml |
| R. J. Corman RR Co. / Penn. Lines | www.rjcorman.com/shortline/penn.shtml |
| R. J. Corman RR Co. / TN Terminal | www.rjcorman.com/shortline/TNTerminal.shtml |
| R. J. Corman RR Co. / Western Ohio Lines | www.rjcorman.com/shortline/westohio.shtml |
| R. J. Corman RR Co. / West Virginia Line | www.rjcorman.com/shortline/westvirginia.shtml |



AAR-E-00004269

# RAILROAD WEB SITES

## Railroad Holding Companies

| | |
|---|---|
| RailAmerica, Inc. | www.railamerica.com |
| Alabama & Gulf Coast Railway | www.railamerica.com/railmaps/AGR.htm |
| Arizona & California Railroad | www.railamerica.com/railmaps/ARZC.htm |
| Bauxite & Northern Railway Co. | www.railamerica.com/railmaps/BXNR.htm |
| California Northern Railroad | www.railamerica.com/railmaps/CFNR.htm |
| Cape Breton & Central Nova Scotia Rwy. | www.railamerica.com/railmaps/CBNS.htm |
| Carolina Piedmont Railroad | www.railamerica.com/railmaps/CPDR.htm |
| Cascade & Columbia River Railroad Co. | www.railamerica.com/railmaps/CSCD.htm |
| Central Oregon & Pacific Railroad | www.railamerica.com/railmaps/CORP.htm |
| Central Railroad of Indiana | www.railamerica.com/railmaps/CIND.htm |
| Central Railroad of Indianapolis | www.railamerica.com/railmaps/CERA.htm |
| Chesapeake & Albemarle Railroad | www.railamerica.com/railmaps/CARR.htm |
| Chicago, Fort Wayne & Eastern | www.railamerica.com/railmaps/CFER.htm |
| Connecticut Southern Railroad | www.railamerica.com/railmaps/CSO.htm |
| Dallas, Garland & Northeastern Railroad | www.railamerica.com/railmaps/DGNO.htm |
| Eastern Alabama Railway | www.railamerica.com/railmaps/EARY.htm |
| Goderich-Exeter Railway | www.railamerica.com/railmaps/GEXR.htm |
| Grand Rapids Eastern Railroad | www.railamerica.com/railmaps/GR.htm |
| Huron & Eastern Railway | www.railamerica.com/railmaps/HESR.htm |
| Indiana & Ohio Railway | www.railamerica.com/railmaps/IORY.htm |
| Indiana Southern Railroad | www.railamerica.com/railmaps/ISRR.htm |
| Kiamichi Railroad | www.railamerica.com/railmaps/KRR.htm |
| Kyle Railroad Company | www.railamerica.com/railmaps/KYLE.htm |
| Massena Terminal RR Co. | www.railamerica.com/railmaps/MSTR.htm |
| Michigan Shore Railroad | www.railamerica.com/railmaps/MS.htm |
| Mid-Michigan Railroad | www.railamerica.com/railmaps/MMRR.htm |
| Missouri & Northern Arkansas Railroad | www.railamerica.com/railmaps/MNA.htm |
| New England Central Railroad | www.railamerica.com/railmaps/NECR.htm |
| North Carolina & Virginia Railroad | www.railamerica.com/railmaps/NCVA.htm |
| Ottawa Valley Railway | www.railamerica.com/railmaps/OVR.htm |
| Otter Tail Valley Railroad | www.railamerica.com/railmaps/OTVR.htm |
| Point Comfort & Northern Railway Co. | www.railamerica.com/railmaps/PCNR.htm |
| Puget Sound & Pacific Railroad | www.railamerica.com/railmaps/PSAP.htm |
| Rockdale, Sandow & Southern RR Co. | www.railamerica.com/railmaps/RSSR.htm |
| Saginaw Valley Railway | www.railamerica.com/railmaps/SGVY.htm |
| San Diego & Imperial Valley Railroad | www.railamerica.com/railmaps/SDIY.htm |
| San Joaquin Valley Railroad | www.railamerica.com/railmaps/SJVR.htm |
| South Carolina Central Railroad | www.railamerica.com/railmaps/SCRF.htm |
| Southern Ontario Railway | www.railamerica.com/railmaps/SOR.htm |
| Texas Northeastern Railroad | www.railamerica.com/railmaps/TNER.htm |
| Toledo, Peoria & Western Railway | www.railamerica.com/railmaps/TPW.htm |
| Ventura County Railroad Company | www.railamerica.com/railmaps/VCRR.htm |
| Virginia Southern Railroad | www.railamerica.com/railmaps/VSRR.htm |



AAR-E-00004270

# RAILROAD WEB SITES

## Railroad Holding Companies

| | |
|---|---|
| Rio Grande Pacific Corporation | www.rgpc.com |
| Idaho Northern & Pacific Railroad Co. | www.rgpc.com/inprgeneralinformation.htm |
| Nebraska Central Railroad Company | www.rgpc.com/ncrcgeneralinformation.htm |
| New Orleans & Gulf Coast Railway Co. | www.rgpc.com/nogcgeneralinformation.htm |
| Wichita, Tillman & Jackson Railway | www.rgpc.com/wtjrgeneralinformation.htm |
| | |
| Transtar | www.tstarinc.com |
| Birmingham Southern Railroad | www.tstarinc.com/birmingham/index.html |
| Elgin, Joliet & Eastern Railway | www.tstarinc.com/eje/index.html |
| Lake Terminal Railroad | www.tstarinc.com/ltr/index.html |
| McKeesport Connecting Railroad | www.tstarinc.com/mcrr/index.html |
| Union Railroad Company | www.tstarinc.com/union/index.html |
| | |
| Trillium Railway Co. Ltd. | www.trilliumrailway.com/default.asp |
| Port Colborne Harbour Railway | www.trilliumrailway.com/pchr.asp |
| St. Thomas & Eastern Railway | www.trilliumrailway.com/ster.asp |
| | |
| Vermont Rail System | www.vermontrailway.com |
| Clarendon and Pittsford Railroad | www.vermontrailway.com/freight.html |
| Green Mountain Railroad | www.vermontrailway.com/freight.html |
| New York & Ogdensburg Railway | www.vermontrailway.com/freight.html |
| Vermont Railway | www.vermontrailway.com/freight.html |
| Washington County Railroad | www.vermontrailway.com/freight.html |
| | |
| The Washington Companies | www.washcorp.com |
| Montana Rail Link | www.montanarail.com |
| Southern Railway of British Columbia | www.sryraillink.com |
| | |
| Watco Companies, Inc. | www.watcocompanies.com |
| Alabama Southern Railroad | www.watcocompanies.com/Railroads/ABS%20(Alabama)/ABS%20main%20page.htm |
| Arkansas Southern Railroad | www.watcocompanies.com/Railroads/ARS%20(Arkansas)/ARS%20main%20page.htm |
| Eastern Idaho Railroad Company | www.watcocompanies.com/Railroads/eirr/eirr.htm |
| Great Northwest Railroad | www.watcocompanies.com/Railroads/gnr/grnw.htm |
| Kansas and Oklahoma Railroad | www.watcocompanies.com/Railroads/ko/ko.htm |
| Kaw River Railroad | www.watcocompanies.com/Railroads/kaw/kaw%20main%20page.htm |
| Louisiana Southern Railroad | www.watcocompanies.com/Railroads/LAS%20(Louisiana)/LAS%20main%20page.htm |
| Mission Mountain Railroad | www.watcocompanies.com/Railroads/mmt/mmt.htm |
| Mississippi Southern Railroad | www.watcocompanies.com/Railroads/MSR/MSR%20main%20page.htm |
| Palouse River & Coulee City Railroad | www.watcocompanies.com/Railroads/blmr_pcc/blmr_pcc.htm |
| Pennsylvania Southwestern Railroad | www.watcocompanies.com/Railroads/pswr/pswr.htm |
| South Kansas & Oklahoma Railroad | www.watcocompanies.com/Railroads/sekr_skol/sekr_skol.htm |
| Stillwater Central Railroad | www.watcocompanies.com/Railroads/slwc/slwc.htm |
| Timber Rock Railroad | www.watcocompanies.com/Railroads/tibr/tibr.htm |
| Vicksburg Southern Railroad | www.watcocompanies.com/Railroads/VSOR/VSOR%20main%20page.htm |
| Yellowstone Valley Railroad | www.watcocompanies.com/Railroads/YSVR/YSVR%20%20main%20page.htm |

# RAILROAD WEB SITES

## Shortline Sites

North America's largest freight railroads maintain web sites that provide valuable information about hundreds of their shortline-interline partners. For many railroads, these sites are their sole representation on the internet.

BNSF Shortlines
http://domino.bnsf.com/website/shortlin.nsf

CN Shortlines
http://cnplus.cn.ca/IT/Shortlines/SL_Static.nsf/sl_home/English?OpenDocument

CP Shortlines
http://www8.cpr.ca/cms/English/Customers/New+Customers/Where+We+Ship/Shortlines.htm

CSX Shortlines
http://www.csx.com/?fuseaction=customers.sl

NS Shortlines
http://www.nscorp.com/nscorp/index.jsp (select "shortline" under Doing Business)

UP Shortlines
http://www.uprr.com/customers/shortline/lines/index.shtml

# GLOSSARY

**- This page intentionally blank -**



AAR-E-00004274

# GLOSSARY

**ARTICULATED CAR -** A car (freight or passenger) consisting of two or more units, permanently coupled, free to swivel, the inner ends being carried on one common center truck (wheel-axle etc. assembly).

**AVERAGE LENGTH OF HAUL** - The average distance in miles one ton is carried. Computed by dividing total ton-miles by tons of freight. For industry calculations, use tons originated. For individual railroads, use tons carried.

**CASH FLOW** - Indication of net cash income or net revenue minus cash expenses. The sum of net income from continuing operations, depreciation and amortization, deferred taxes and the net decrease or increase in subsidiaries' undistributed income.

**CAR CAPACITY** - Load limitation of a freight car in terms of volume or weight. With some types of low-density freight, a freight car can become full before it reaches its weight limit.

**CARLOAD** - A shipment of not less than 10,000 pounds of one commodity from one consignor to one consignee. An *originated carload* is one which is loaded and begins its journey on a particular railroad; a *carried carload* is any carload which travels on a particular railroad; and a *terminated carload* is a carload which ends its journey and is unloaded on a particular railroad. Originated and terminated carloads are counted only once, while carried carloads are counted on every railroad which handles them.

**CAR-MILE** - The movement of a car a distance of one mile. An *empty car-mile* is a mile run by a freight car without a load; a *loaded car-mile* is a mile run by a freight car with a load. In the case of intermodal movements, the car-miles generated will be loaded or empty depending on whether the trailers/containers are moved with or without a waybill.

**CLASS I RAILROAD** - As determined by the Surface Transportation Board, a railroad with annual operating revenues that exceed a threshold indexed to a base of $250 million in 1991 dollars. The threshold in 2005 was $319.3 million.

**CODE OF FEDERAL REGULATIONS (a.k.a. CFR)** - A codification of the general and permanent rules published in the Federal Register by the Executive departments and agencies of the federal government. Title 49 contains transportation-related items.

**COST OF CAPITAL** - The rate of return on investment needed to attract and retain capital in amounts adequate to provide a sound railroad system. The STB cost of capital is a weighted average rate of return computed by the Surface Transportation Board using the proportions of railroad debt and equity as determined by market values (as opposed to book values) and current market rates.

**COVERAGE RATIO** - Fixed charge coverage is a ratio indicating the number of times income is a multiple of fixed charge expense. The higher the value the more able the firm is to pay current interest charges. Calculated as income before fixed charges and taxes divided by fixed and contingent interest charges.

**EMPLOYEE HOURS PAID FOR** - Sum of straight time and overtime hours, plus holiday, vacations, sick leave, jury duty, etc.

**EMPLOYEE HOURS WORKED** - Sum of straight time hours and overtime hours worked by employees.

**EQUIPMENT INSTALLED** - A term applied to new and used equipment purchased, equipment leased from others, the return to service of equipment that was leased to others, equipment rebuilt or converted, and units (except locomotives) transferred from one class of service to another.

**EQUIPMENT OBLIGATIONS** - A method of railroad financing which is secured by a lien on the equipment. Includes equipment bonds, equipment trust agreements and conditional sales agreements.

**EQUIPMENT RENTS** - Payments and receipts for all time and mileage usage of interchanged locomotives, freight cars, and other revenue equipment, and the lease rentals of equipment with terms of 30 days or more.

**FREIGHT LOSS AND DAMAGE** - Claims paid by railroads for loss or damage to freight in connection with the freight's receipt, transportation or delivery.

**FREIGHT SERVICE OPERATING EXPENSES** - The sum of operating expenses directly assignable to freight service and an apportionment of expenses common to both freight and passenger service.



AAR-E-00004275

# GLOSSARY, cont.

**FREIGHT SERVICE REVENUE -** Revenue from the transportation of freight; switching of freight train cars; water transfers of freight, vehicles and livestock; movement of freight trains at a rate per train mile or for a lump sum; storage of freight; demurrage, grain elevators, stockyards, and miscellaneous services and facilities in connection with freight transportation.

**GROSS TON-MILES -** The number of tons behind the locomotive (cars and contents, company service equipment, and cabooses) multiplied by the distance moved in road freight trains.

**INTERMODAL SERVICE -** In railroad transportation, the movement of trailers or containers on railroad freight cars. Also referred to as piggyback or TOFC/COFC (trailer on a flat car/container on a flat car).

**INTERSTATE COMMERCE COMMISSION -** A U.S. government agency established in 1887 which was responsible for regulatory oversight of certain aspects of the railroad industry (among many responsibilities), including railroad mergers and acquisitions, abandonments, and tariffs for certain commodities. The ICC was succeeded by the Surface Transportation Board on January 1, 1996.

**JOINT FACILITY -** Any owned or leased carrier operating property occupied or operated jointly by the carrier and one or more other carriers, under an arrangement whereby the cost and income are apportioned to the parties to the joint agreement. Portions of a structure or other property used exclusively by each of two or more carriers are not joint facilities.

**JOINT FACILITY (CR) -** The carrier's proportion of revenue collected by others in connection with the operation of joint tracks, yards, terminals, and other facilities.

**JOINT FACILITY (DR) -** The proportion of revenue from the operation of joint tracks, yards, terminals, and other facilities, which is creditable to other companies.

**LEASE RENTALS** The rentals of property and equipment with terms of 30 days or longer. Such rentals exclude joint facility and joint trackage rents, insurance and maintenance elements of lease payments, and all elements of capitalized leases.

**LINEHAUL** - The movement of trains between terminals and stations on the main or branch lines of the road, exclusive of switching movements.

**LOCAL RAILROAD** - As defined by the Association of American Railroads, a freight railroad which operates under 350 miles of track and has annual operating revenues of less than $40 million. Local railroads can be local linehaul railroads or switching and terminal railroads.

**LOCOMOTIVE UNIT MILE** - The movement of a locomotive unit one mile under its own power. Miles of locomotives in helper service are computed on the basis of actual distance run in such service. Locomotive unit miles in road service are based on the actual distance run between terminals and/or stations. Train switching locomotive unit miles are computed at the rate of six miles per hour for the time actually engaged in such service.

**MAIN TRACK** - A track extending through and between stations upon which trains are operated. Main track of switching and terminal companies is all track kept clear for the passage of trains.

**MILES OF ROAD OPERATED** - The single or first main track, measured by the distance between terminals, over which railway transportation service is conducted.

**MILES OF ROAD OWNED** - The aggregate length of roadway owned, excluding yard tracks, sidings, and parallel lines. In some instances, miles of road owned is defined as miles operated excluding trackage rights.

**MILES OF TRACK OPERATED** - Total track mileage consisting of first, second and other main tracks, and of yard tracks and sidings over which railway transportation service is conducted.

**MILES OF TRACK OWNED** - The aggregate length of track owned, including yard tracks and sidings. Parallel lines are counted separately.

**NET INVESTMENT IN RAILROAD PROPERTY** - Gross investment in railroad road and equipment used in railroad operations, less accrued depreciation and amortization, plus cash and materials and supplies. The "Revenue Adequacy" version subtracts accumulated deferred tax reserves and adds net assets for certain affiliates.



AAR-E-00004276

# GLOSSARY, cont.

**NET RAILWAY OPERATING INCOME (NROI) -** Operating revenues minus the sum of operating expenses, current and deferred income taxes, and net rents for leased road and equipment. NROI excludes non-operating income and expenses and fixed charges (interest expenses). The "Revenue Adequacy" version includes some adjustments for: affiliates, some non-rail related taxes, inclusion of certain interest income, and gain (loss) from certain land or segment sales or reclassifications.

**NET TON-MILE -** The movement of a ton of revenue and/or non revenue freight a distance of one mile. Includes a reasonable portion of the weight of exclusive work equipment and motorcar trains.

**NON REVENUE FREIGHT -** Company materials and supplies transported without charge in freight trains of a particular railroad for its own use.

**OPERATING EXPENSES -** Expenses of furnishing transportation service including the expense of maintenance and depreciation of the plant and equipment used in the service.

**OPERATING RATIO -** The ratio of operating expenses to operating revenues. Usually stated as a percentage.

**OPERATING REVENUES -** The amount of money that a carrier receives from transportation operations.

**ORDINARY INCOME -** Net operating revenue (operating revenue less operating expenses), plus net other income, less fixed charges, less unusual or infrequent items, less income taxes, and less discontinued operations (net).

**PAYROLL TAXES -** Taxes based upon wages paid to employees, usually imposed for retirement and unemployment benefits. Both employers and employees contribute, sometimes at different rates. Employer contributions are part of fringe benefits in operating expenses.

**R-1 REPORT -** An annual statistical report submitted to the Surface Transportation Board by each Class I railroad.

**RAILROAD COST ADJUSTMENT FACTOR -** A quarterly forecast of railroad inflation determined by the STB based on the AAR's All-Inclusive Index (AII), which measures changes in the price levels of inputs to railroad operations.

**RATE OF RETURN ON NET INVESTMENT (ROI) -** The ratio of net railway operating income (NROI) to average net investment in transportation property. Since 1985, the ROI has been based on the ICC/STB's revenue adequacy standards.

**RATE OF RETURN ON SHAREHOLDERS' EQUITY (ROE)** - The ratio of net income (after taxes, discontinued operations, and extraordinary items) to average shareholders' equity (the sum of capital stock, additional paid-in capital, and retained earnings). Prior to the mid-1980s, ordinary income was often used in lieu of net income to calculate ROE.

**REGIONAL RAILROAD** - As defined by the Association of American Railroads, a non-Class I, linehaul, freight railroad which operates at least 350 miles of track and/or has annual operating revenues of at least $40 million.

**REVENUE ADEQUACY** - Based on STB standards, a railroad is revenue adequate when its rate of return on net investment (ROI) equals or exceeds the railroad industry's current cost of capital. Revenue adequacy status can impact rate cases. It also affects the general perception of the industry.

**REVENUE TON MILE** - The movement of a ton of freight one mile for revenue.

**RIGHT OF WAY** - A strip of land of various widths upon which a railroad and its facilities are built.

**ROLLING STOCK** - Transportation equipment on wheels, especially locomotives and freight cars.

**SALARIES AND WAGES CHARGEABLE TO OPERATING EXPENSES** - Includes direct compensation paid or payable to employees for services related to maintenance and operation of a railroad, including profit sharing, stock option plans, and paid time off. Excludes amounts payable for services chargeable to additions, betterments, new construction work, labor billed by contractors, other companies, and joint facilities.

**SIDING** - A track auxiliary to the main track for meeting or passing trains, or a track for industrial purposes.

**STANDARD TRANSPORTATION COMMODITY CODE (STCC)** - A coding system, using two to seven digits, designed and maintained by the Association of American Railroads to classify all commodities or articles which move or may move in freight (primarily rail) transportation.



AAR-E-00004277

# GLOSSARY, cont.

**SURFACE TRANSPORTATION BOARD (STB) -** An independent agency within the U.S. Department of Transportation that is the successor to the Interstate Commerce Commission. The STB was created by the Interstate Commerce Commission Termination Act of 1995 and began operations on January 1, 1996. It is responsible for regulatory oversight of certain aspects of the railroad industry.

**SWITCHING AND TERMINAL RAILROAD -** A railroad primarily performing switching service, furnishing terminal trackage, bridges, or other facilities such as union freight stations, operating ferries, or performing any one or combination of these functions. The Code of Federal Regulations (49 Part 1201) states that all switching & terminal railroads will be classified as Class III railroads regardless of their operating revenues.

**SWITCHING SERVICE -** A railway service performed under yard rules and regulations. It may involve the classification of cars according to commodity and destination; the assembling of cars for train movement; changing the position of cars for purposes of loading, unloading, and weighing; the placing of locomotives and cars for repair and storage; and the moving of equipment in connection with the carrier's work service not constituting a road movement.

**THROUGH TRAIN -** A train operated between two or more major concentration or distribution points.

**TIME PAID FOR BUT NOT WORKED** - Payment for holidays, absence due to leave, vacations, and miscellaneous time paid for but not worked (such as attending court, suspensions, sickness, etc.).

**TON-MILE** - The movement of a ton one mile. See also revenue ton-mile.

**TONNAGE** - The aggregate weight (in units of 2000 pounds) of shipments that travel on a particular railroad. An *originated ton* is one which is loaded and begins its journey on a particular railroad; a *carried ton* is any ton which travels on a particular railroad; and a *terminated ton* is a ton which ends its journey and is unloaded on a particular railroad. Originated and terminated tons are counted only once, while carried tons are counted on every railroad which handles them.

**TRACK MILE** - One mile of single track (see also miles of track operated).

**TRAIN-HOUR** - The elapsed time of a road freight train between the time of leaving the initial terminal and the time of arrival at the final terminal including train switching at way stations and delays on the road.

**TRAIN-MILE** - The movement of a train a distance of one mile.

**TRUCK -** (as relates to rail cars) The assembly of wheels, axles, bearings, side frames, brake rigging, and springs whose function is to provide support, mobility, and guidance to a rail car.

**UNIT TRAIN** - A train with a fixed, coupled consist of cars operated continuously in shuttle service under load from origin and delivered intact at destination and returning usually empty for reloading at the same origin. Applicable tariffs and/or contracts for unit trains generally require that a specific minimum tonnage or number of carloads be tendered as a unit for shipment on one bill of lading.

**WAY TRAIN** - A train operated primarily to gather and distribute cars in road service and move them between way stations or way points.

**WAYBILL** - The document covering a shipment and showing the forwarding and receiving stations, the name of consignor and consignee, the car initials and number, the routing, the description and weight of the commodity, instructions for special services, the rate, total charges, advances and waybill reference for previous services, and the amount prepaid.

**WORK EQUIPMENT** - Equipment which can be coupled in a train for movement over the carrier's tracks, and which is used in the carrier's work service. Includes such equipment as ballast cars, business cars, company cars, derrick cars, ditching cars, outfit cars, pile drivers, snow dozers, tool cars, wrecking cars, and others.

**WORK TRAIN** - A train engaged in company service for which no revenue is received, such as inspection units, trains transporting employees to and from work, wrecking trains, and trains run for distributing material and supplies for use in connection with operations.

**YARD** - A system of tracks within defined limits, whether or not part of a terminal, designed for switching services, over which movements not authorized by time table or by train order may be made, subject to prescribed signals, rules and requirements.

# INDEX

**- This page intentionally blank -**

# INDEX


## A

Air
- Intercity freight revenues, 26
- Ton-miles, 24
- Tons carried, 25

American Railway Engineering and
- Maintenance-of-Way Association, 151

American Short Line & Regional Railroad
- Association, 152

Assets
- Current, 66, 84
- Other, 66
- Road and Equipment, 66
- Total, 66

Association of American Railroads, 1, 153
Average length of haul, 33, 125

## B

Bus, intercity freight revenues, 26

## C

Capital
- Additional paid in, 66, 88
- Cost of, 85-86
- Stock, 66, 88
- Total, 73
- Turnover rate, 74

Capital expenditures
- Roadway and equipment, 71
- Total, 33, 67, 77

Car-Miles
- By train type, 124
- Empty, 122-123
- Loaded, 122-123, 131
- Total, 119, 122, 127

Carloads
- Carried, by type of railroad, 20
- Carried, industry distribution, 21
- Originated, 12, 33, 38, 43, 46, 126, 130
- Originated by commodity, 38-39, 46
- Originated by type of railroad, 12
- Originated, chemicals, 38-39, 46, 59
- Originated, coal, 38-39, 46, 51, 52
- Originated, grain, 38-39, 54, 57
- Originated, motor vehicles, 38-39, 46, 61

Carloads carried per
- Employee, 22-23
- Mile operated, 22-23

Cars per freight train, 33, 127
Cash and cash equivalents, 67
Cash flow, 67, 79
Cash generated from continuing operations, 67
Chemicals, rail transportation of, 58-59

Class I railroads
- Consolidation of R-1 reports, 29
- Declassifications, 30
- Definition, 8, 32
- STB reporting requirements, 30
- List of, 139
- List of systems, 28
- Unifications, 29

Coal
- Rail transportation of, 51-53
- U.S. production, 53

Compensation per
- Employee, 97
- Hour, 98

Contingent interest, 65, 81
Cost of capital, 85-86
Coverage ratio, 81
Crossties installed, 103, 106
Current ratio, 84

## D

Debt
- Long-term, 73, 75
- New, 76, 78

Debt/capital ratio, 73
Declassifications, 30
Density, Traffic, 124
Depreciation
- Accumulated, and amortization, 72
- Amortization and, 79
- Expense, 33, 68

Discontinued operations, net income from, 65
Distribution of
- Intercity freight revenue by mode, 26
- Intercity ton-miles by mode, 24
- Intercity tons carried by mode, 25
- Class I railroad traffic, by commodity, 39
- Railroads by carloads, 21
- Railroads by employees, 21
- Railroads by mileage, 21
- Railroads by revenue, 21
- Railroads by state, 14-15
- Railway expenses, 68

Dividend appropriations, 89
Dividends, 67, 89

## E

Employee hours
- Paid, 98, 100
- Worked, 98, 100

Employee hours per mile of road operated, 133
Employees
- By class, 96, 99
- By railroad, 93




AAR-E-00004281

Employees, cont.
- By state, 94
- Industry distribution, 21
- Number of, 9-10, 20, 33, 36, 93, 96-97, 99-100
- Number of, by ownership of railroad, 16
- Railroad, ranking by, 36
- Wages, 33, 96-98

Employees per
- Carload carried, 22-23
- Mile of road operated, 22-23, 33, 133

Equipment obligations, 76
Expenses
- Distribution of, 68
- Inflation index, 70
- Operating, 33, 65, 83

Expenses per
- Mile of road operated, 82
- Ton-mile, 87

External sources of funds, 78
Extraordinary items and accounting changes, 65

## F

Financing activities, 67
Fixed and contingent interest, 81
Fixed charges, 65
Freight cars
- Age of, 110
- Capacity, 33, 114-115
- Cost of, 109
- In service, 33, 111-112, 114
- Installed, 108, 113

Freight forwarders, intercity freight revenues, 26
Freight revenue
- By commodity, 38-39, 47
- By type of railroad, 9, 12
- Class I, 9, 12, 65
- Coal, 38-39, 47, 51
- Chemicals, 38-39, 47, 58-59
- Grain, 38-39, 47, 54
- Motor Vehicles, 38-39, 47, 59-60
- *See also "revenue"*

Fuel
- Consumption, 33, 135, 136
- Efficiency, 136
- Inflation index, 70
- Average price per gallon, 134

## G

Grain
- Fleet capacity, 56
- Rail transportation of, 54-57
- U.S. production, 57

Gross ton-miles, 129

## H

Health and welfare benefits, pensions, 68, 97
Horsepower, locomotive, 33, 116

## I

Income
- After fixed charges, 65
- Before fixed charges, 65
- Before fixed charges and federal income taxes, 81
- From lease of road and equipment, 68
- Net, 65, 90
- Net Railway Operating, 68-69, 86
- Net, from continuing operations, 65
- Ordinary, 33, 65
- Other, 65

Industrial production, 44
Inflation indexes, 70
Intercity
- Freight revenues by mode, 26
- Ton-miles by mode, 24
- Tons carried by mode, 25

Interest charges, 75
Intermodal traffic, 61-62
Investment
- Average net, 86
- Gross property, 72
- Net property as reported, 33, 72, 74
- Net, rate of return on, 86
- Property, 72
- Turnover, 74

Investment activities, 67

## L

Labor
- Average annual wages, 33, 96-97
- Compensation, 97-98
- Compensation per hour, 98
- Costs as a percent of freight expenses, 97
- Expenses, 68
- Health and welfare benefits, pensions, 68, 97
- Payroll taxes, 97
- Productivity, 130, 133
- Wages and supplements inflation index, 70

Length of haul, average, 33, 125
Liabilities
- Current, 66, 84
- Long-term, 66
- Total, 66
- Total, and shareholders' equity, 66

Local linehaul railroads
- Carloads carried, 12, 20
- Created, 17-19
- Definition, 8
- Employees, 9-10, 20
- Freight revenue, 9, 12, 20
- List of, 141-145
- Measures of operating efficiency, 22-23
- Miles of road operated, 9, 11, 13, 20
- Miles of road owned, 11
- Number of, 9-10
- Ownership of, 16
- State distribution, 14-15



AAR-E-00004282

Local switching and terminal railroads
- Carloads carried, 12, 20
- Created, 17-19
- Definition, 8
- Employees, 9-10, 20
- Freight revenue, 9, 12, 20
- List of, 146-148
- Measures of operating efficiency, 22-23
- Miles of road operated, 9, 11, 13, 20
- Miles of road owned, 11
- Number of, 9-10
- Ownership of, 16
- State distribution, 14-15

Locomotive, unit-miles, 119, 121
Locomotives
- Age of Fleet, 110
- Horsepower, 33, 116
- Installed, 108
- Number in service, 33, 116

Loss and damage claims, 33, 128

## M

Materials and supplies
- Expense, 68
- Inflation index, 70

Miles of road
- Operated, 9, 11, 13, 20, 33, 37, 129
- Operated, by operator and owner, 16
- Operated, by state, 13, 104-105
- Operated, Class I, ranking by railroad, 37
- Operated, industry distribution, 20-21
- Owned, 11, 103

Motor vehicles and equipment
- Rail transportation of, 59-60

## N

National Railway Labor Conference, 154
Net income, 65, 90
Net income from continuing operations, 65, 79
Net investment, average, 86
Net property investment, 72
Net railway operating income, 33, 68-69, 86
Net revenue from operations, 65, 68
Net ton-miles, 129, 131
Net ton-miles per
- Loaded car-mile, 131
- Mile of road operated, 129
- Train-hour, 131

Net working capital, 84
Number of cars per train, average, 33, 127
Number of railroads
- By ownership of railroad, 16
- By state, 14-15
- By state by type of railroad, 14
- By type of railroad, 9-10
- Industry distribution, 21

## O

Oil pipelines
- Intercity freight revenue, 26
- Ton-Miles, 24
- Tons carried, 25

Operating expenses, 33, 65
Operating expenses per ton-mile, 87
Operating ratio, 65, 83
Operating revenue, 33-34, 65, 74
Ordinary income, 33, 65

## R

Rail
- Tons laid, 103, 106
- Weight of, 107
- Welded, 106

Railinc, 155
Railroad Cost Recovery Index, 70
Railroad modal share
- Intercity freight revenue, 26
- Ton-Miles, 24
- Tons carried, 25

Railroad ownership, 16
Railroad Retirement Board, 156
Railroad retirement taxes, 80, 95
Railway Engineering-Maintenance Suppliers Assn., 157
Railway Progress Institute, 158
Ranking by commodity of
- Freight traffic, 38-39
- Revenue per ton, 40
- Revenue per ton-mile, 40

Ranking of Class I railroads by
- Employment, 36
- Miles of road operated, 37
- Operating revenue, 34
- Revenue ton-miles, 35

Rate of return
- On net investment, 86
- On shareholders' equity, 90

RCR index, 70
Regional railroads
- Carloads carried, 12, 20
- Created, 17-19
- Definition, 8
- Employees, 9-10, 20
- Freight revenue, 9, 12, 20
- List of, 146-148
- Measures of operating efficiency, 22-23
- Miles of road operated, 9, 11, 13, 20
- Miles of road owned, 11
- Number of, 9-10
- Ownership of, 16
- State distribution, 14-15

Reporting requirements, STB, 30
Retained earnings, 88
Retained funds, 77
Revenue
- By commodity, 38-39, 47
- By type of railroad, 12, 20



AAR-E-00004283

Revenue, cont.
- Chemicals, 38-39, 47, 59
- Class I, ranking by, 34
- Coal, 38-39, 47, 51
- Freight, industry distribution, 21
- Grain, 38-39, 47, 54
- Intercity freight modal distribution of, 26
- Motor vehicles, 38-39, 47, 61
- Net, from operations, 68
- Operating, 33-34, 65, 74, 83

Revenue margin per ton-mile, 87
Revenue per carload carried, 22
Revenue per employee, 22
Revenue per mile of road operated, 22, 82
Revenue per ton, by commodity, 40, 49
Revenue per ton-mile
- Average, all commodities, 33, 50, 87
- By commodity, 40, 48
- Current and constant dollar, 48, 50

Revenue ton-miles
- Class I, ranking by, 35
- Total, 33, 35, 43, 125, 130, 136

Revenue ton-miles per
- Car loaded, 33, 130
- Employee, 33, 130
- Employee hour paid for, 130
- Gallon of fuel, 33, 136
- Mile of road operated, 129

## S

Shareholders' equity
- And total liabilities, 66
- Average, 90
- Net, 66
- Return on, 90
- Total, 88

Special charges, 83
Speed, average train, 132
Stock
- Capital, 66, 88
- Common, 66
- Financing activities and, 67
- New, 78
- Preferred, 66
- Total, 66
- Treasury, 66

Switching and terminal railroads
- See "Local switching and terminal railroads"

## T

Taxes
- Current, 33
- Deferred, 65, 68, 79-80
- Federal, 65, 80
- Income, 68
- Other, 68
- Payroll, 68, 80, 97
- Railroad Retirement, 95

Taxes, cont.
- State and other, 65
- State, local and foreign, 80
- Total, 65, 80

Ton-miles
- Gross, 127, 129
- Intercity distribution of by mode, 24
- Net, 127, 129, 131
- Revenue, 33, 129-130
- Versus industrial production, 44

Ton-miles per
- Employee, 33
- Gallon of fuel consumed, 33, 136
- Loaded car-mile, 131
- Loaded train-hour, 131
- Mile of road operated, 129

Tons
- Intercity modal distribution of, 25
- Originated, 33, 38, 43, 125-126
- Originated by commodity, 38-39, 45
- Originated, chemicals, 38-39, 45, 59
- Originated, chemicals, by railroad, 60
- Originated, coal, 38-39, 45, 51, 53
- Originated, coal, by railroad, 52
- Originated, grain, 38-39, 45, 54-55
- Originated, grain, by railroad, 55
- Originated, motor vehicles, 38-39, 45, 61
- Originated, motor vehicles, by railroad, 60

Tons per train, 127
Tons per carload originated, 33, 126
Train load, average, 33, 127
Train-hours, 119-120, 131-132
Train-miles, 119, 127, 132
Train-miles per train-hour, 132
Transportation Technology Center, Inc., 159
Truck
- Intercity freight revenue, 26
- Ton-miles, 24
- Tons carried, 25

TTX Company (Trailer Train), 160

## U

Unifications, Class I, 29
Unit-miles, locomotive, 119, 121
Unusual or infrequent items, 65

## W

Wages and supplements, inflation index, 70
Water
- Intercity freight revenue, 26
- Ton-miles, 24
- Tons carried, 25

World Wide Web sites, 163
Working capital allowed, 72
Working capital, net, 84



AAR-E-00004284

# EXHIBIT PX0751

WISCONSIN FEDERATION OF COOPERATIVES

# Railroaded!

## A Fact Sheet on Captive Shipping

Since Congress passed the Staggers Rail Act of 1980, more than 40 mergers and consolidations have decreased the number of Class 1 railroads from over 40 to only seven. Four of these major railroads control more than 94 percent of the industry's revenue and own over 90 percent of the country's track miles. The lack of rail-to-rail competition has led to an increase in the number of captive shippers, rising rail rates, and deterioration in service quality. For many products, including coal, chemicals, and agricultural products, it is not feasible to ship by any means other than rail, leaving some of the shippers of these products "captive" to the single railroad that serves them. The following are just a few examples of the industries and companies forced to pay exorbitant rates for poor service because of their captive shipper status.

### ►Utilities

Dairyland Power Cooperative is a generation and transmission cooperative providing power to about 525,000 residents of Wisconsin, Minnesota, Iowa, and Illinois. Each year Dairyland spends about $40 million to transport 3 million tons of coal, but with rising rates and deteriorating service its transportation expenses could skyrocket.




Source: "Rail Price Advisor" (1st Quarter, 2003), published by Escalation Consultants, Inc.

Other shippers of Western coal have recently experienced rate increases of 50 to100 percent. Similar increases in the cost of moving Dairyland's coal would increase Dairyland's total annual expenditures by 8 to 16 percent. In 2004, one of the Western railroads failed to deliver more than 25 percent of scheduled shipments, causing Dairyland's fuel budget to jump 10 percent.

### ►Agriculture

Cooperative Plus Inc. (CPI), a farm supply cooperative with several locations throughout Southeastern Wisconsin, has seen their rates to ship grain from Burlington to Chicago more than double since December 2003, due to unannounced rate hikes last November. These increases have put them at a substantial disadvantage because their rates with Canadian National Railway (CN) are now more than twice that of some of their competitors who can use Wisconsin & Southern Railroad Co. Despite cutting expenses in the once profitable grain department, for the past two years the company has had to absorb huge operational losses that significantly decreases its profitability and has deterred any plans for capital investments in the company's Burlington location.

### ►Lumber and Paper

Johnson Timber Corporation buys and sells timber, logs, and pulpwood. Johnson Timber is only served by CN and is therefore subject to rates that can double at a moment's notice and unreliable service, making it nearly impossible to create any kind of business plan. When only about 30 percent of its requests for rail cars arrive at their scheduled time, Johnson Timber is forced to use trucks to transport their lumber to prevent it from deteriorating in the yards. The move toward using more trucking produces increased transportation costs for the company, making it less competitive within the state and in the global economy.

# Current Federal Legislation

## ►The Railroad Competition Acts (S.919, H.R.2047)

The companion legislation introduced in the Senate (S. 919) and House of Representatives (H.R. 2047) focuses on ensuring competition in the railroad industry and providing reasonable rates for captive shippers. Among other changes that would benefit captive shippers, these pieces of legislation would:

**Clarify National Rail Policy** to ensure effective competition, maintain reasonable rates, and maintain the quality of rail transportation service.

**Require that Railroads Must Quote Rates to Their Customers** between any two points on their systems.

**Eliminate Barriers to Competition** between Class I, II, and III rail carriers.

**Cap Filing Fees** for captive rate complaints to the level of comparable federal district court filing fees.

"When enacted into law, this legislation will truly improve rail transportation by providing fairness and openness in the negotiations between railroads and their customers over rates and service."

– Statement of the Captive Rail Customer Community in Support of the Railroad Competition Act of 2005.

## ►The Railroad Antitrust and Competition Act (H.R.3318)

H.R.3318, introduced by Representative Mark Green (R-WI), would amend the Clayton Act, giving shippers, states, and the U.S. Justice Department the ability to bring antitrust cases against the railroads if they believe anti-competitive measures are being taken, as well as giving the Justice Department a role in reviewing railroad merger proposals.

"Our principal purpose in this legislation is to update the antitrust law and to really get at the longstanding exemption that the railroad industry has had," said Rep. Green. "Railroads have now been operating in a deregulated environment for 25 years and I think we're long past the time when we need to reexamine the antitrust law in respect to railroads."

***Prepared by the Wisconsin Federation of Cooperatives, August 2005.***

# EXHIBIT PX0752

Intentionally omitted

# PX0753-PX0754

Filed Under Seal

# EXHIBIT PX0755

# Railroads Face Fierce Competition

Spurred in large part by e-commerce and global population growth, the U.S. Department of Transportation estimates demand for freight will grow 30% by 2040.

Railroads are the best way to meet much of this increased demand. They are the most environmentally friendly way to move freight over land; are extremely safe; and efficiently and cost effectively haul freight across a vast 140,000-mile national network.

However, railroads are not guaranteed a slice of the freight transportation pie. Instead, they must earn it by offering the price and service that their customers want while taking on multiple types of competition. This includes from other railroads, other modes of transportation, product competition and geographic competition. Rail customer needs are changing as the transportation market quickly evolves. Railroads are adapting to meet these needs by privately investing in infrastructure, equipment and technology to provide safe, cost-effective and reliable service.

To be successful in such a competitive marketplace, railroads must have policies that allow them to continually invest back into their network. A healthy and competitive freight rail system is critical to our transportation network and our national economy.

# Freight railroads serve shippers from almost every industrial, wholesale, retail and resource-based sector of the economy.

For some shippers, transportation costs can determine the transportation mode they select. These dynamics mean railroads must provide reliable and affordable service. The Surface Transportation Board (STB) is the economic regulator of freight railroads. The STB helps ensure railroads earn adequate revenues and that shippers have access to reasonably priced and efficient rail service. The STB can set maximum reasonable rates or take other actions if a railroad has acted improperly. Most rail customers — including those served by only one railroad — do not need STB regulatory protection because market forces ensure competitive rates and service.

## Rail shippers are not “captive” to railroads.

The simple truth is that access to only one railroad does not mean there is a lack of transportation options for that shipper. Some shippers mischaracterize themselves as “captive” if they only have access to one railroad. This message is misleading for a couple reasons. First, most rail customers have always been served by only one railroad, as most shippers cannot economically support two railroads, just like most cities cannot support two MLB teams. Second, many shippers have other modal options, like truck or water carrier, to move their products. The reason that most rail traffic is not subject to STB regulation is because there are competitive forces in the marketplace that make regulatory oversight unnecessary. Therefore, a shipper is not “captive” just because two railroads do not come to its front door.

## Rail mergers did not create “captive” shippers.

The economic regulator of the industry — the STB — must authorize rail mergers. For over 50 years, if a proposed merger would have reduced rail-to-rail competition, the regulator has either rejected it or imposed mitigating conditions. In fact, mitigation conditions, like trackage rights, were placed on every major merger since the Staggers Act, to ensure shippers that had multiple railroads serving them prior to the merger still had multiple-railroad service following the merger. Most importantly, no merger has allowed a shipper to go from two railroads to one.

In addition, the last major merger was more than 20 years ago. Mergers have done nothing to reduce regulators’ substantial authority to protect shippers against unreasonable railroad pricing or practices, much less create captivity. Instead, mergers created the efficient rail network we have today. They extended the benefits of single-line service to more shippers, for more commodities, over longer distances, while opening new markets for shippers in the process. Railroads passed many of these productivity gains to their customers in the form of lower rates. Average rail rates today are 44% lower than in 1981, meaning the average rail shipper can move significantly more freight for about the same price it paid more almost 40 years ago.




DOWNLOAD FULL INFOGRAPHIC

Rapid technological innovations like autonomous trucks and even hyperloop will only increase the competitive landscape. Here are just a few examples of the many competitive restraints railroads currently face:

## Rail-to-rail competition

Railroads are private companies that compete against each other for business. Rail customers often have connections to competing railroads, either directly or in conjunction with a short-haul truck movement. Some rail customers can also build (or credibly threaten to build) a new rail line to a competing railroad.

## Other modal competition

Most rail customers can also ship via trucks, barges and/or pipelines. Trucks are freight rail's largest competitor. However, trucks use infrastructure (e.g., public highways) subsidized by the federal government, while railroads fully fund their infrastructure. This means the costs trucks offer shippers are artificially deflated.

Many experts agree that trucks — which are not subject to the same type of regulatory scrutiny as railroads — will deploy a combination of autonomous, electric and platooning vehicles in the near future. These technological advancements could increase delivery times, improve on-time performance and significantly lower trucks' labor and fuel costs — making trucks even fiercer competition for railroads.

## Product competition

Product competition refers to the widespread ability of a firm to substitute one product for another in its production process. For example, a utility can generate electricity from natural gas (which

railroads do not generally carry) instead of coal (which railroads do carry). Similarly, a fertilizer manufacturer may substitute soda ash moved by rail, with caustic soda transported by truck. Therefore, product options can also constrain transportation rates.

## Geographic competition

A rail customer can often get the same product from — or ship the same product to — a different geographic area. For example, taconite is a low-grade iron ore, that when combined with clay, creates pellets that can be transported to steel manufacturers and melted into steel. This clay is available from Wyoming mines served by one railroad and from Minnesota mines served by another. Iron ore producers can pit one railroad against the other for clay deliveries. This is another type of real-world competition, called geographic competition, that also constrains rail rates.

## Shipper generated competition

Shippers can also generate competition between railroads before they build a manufacturing plant. They do this by negotiating favorable contracts when evaluating potential plant locations. Over the long term, shippers can locate or relocate plants on the lines of different railroads. Shippers often make the business decision to locate their facilities at sites with access to only one railroad. This means other factors, aside from having multiple rail service options, can drive the decision to locate a shipper's facility.

## Future disruptions

Technological, regulatory or structural changes over time will give shippers leverage over railroads. For example, fracking made natural gas much more abundant and less expensive. In turn, natural gas delivered via pipeline become the preferred fuel source for electricity generation, instead of coal delivered by trains. This marketplace disruption constrains the rates railroads can charge for delivering coal to utilities.

Additional technological changes that disrupt the transportation market and increase competition are sure to come in the years ahead, including transformative technologies like hyperloop. Although we cannot predict the future, we do know that new technologies have the potential to not only disrupt the transportation market, but also enhance competition.

RELATED

Freight Rail's Investments Fuel America

Understanding Forced Access

Cost-benefit Analysis Can Help STB Regulate Wisely

ABOUT US

Our Leadership

Become a Member

Subsidiaries

Railroad Careers

NEWS & EVENTS

OPERATIONS

BLOG

FREIGHT RAIL RESOURCES

PRIVACY POLICY

CONTACT US

THE SIGNAL NEWSLETTER

425 3rd Street SW Washington, DC 20024

Get freight rail industry news right to your inbox, from important policy updates to fun facts about America's private, nearly 140,000-mile network.

FULL NAME

EMAIL ADDRESS

ORGANIZATION

SUBSCRIBE

Privacy - Terms

# EXHIBIT PX0756

HOUSE COMMITTEE ON THE JUDICIARY

SUBCOMMITTEE ON COURTS AND COMPETITION POLICY

---

HEARING ON H.R. 233

RAILROAD ANTITRUST ENFORCEMENT ACT OF 2009

---

WRITTEN TESTIMONY OF

ASSOCIATION OF AMERICAN RAILROADS

---

PRESENTED BY

J. MICHAEL HEMMER

SENIOR VICE PRESIDENT – LAW AND GENERAL COUNSEL

UNION PACIFIC RAILROAD COMPANY

Date of Submission: May 15, 2009
Date of Hearing: May 19, 2009

PENGAD 800-631-6989 EXHIBIT Hamburger 12

HOUSE COMMITTEE ON THE JUDICIARY

SUBCOMMITTEE ON COURTS AND COMPETITION POLICY

---

HEARING ON H.R. 233

RAILROAD ANTITRUST ENFORCEMENT ACT OF 2009

---

WRITTEN TESTIMONY OF

ASSOCIATION OF AMERICAN RAILROADS

---

Mr. Chairman and Members of the Subcommittee, my name is J. Michael Hemmer. I am the Senior Vice President - Law and General Counsel of Union Pacific Railroad Company. I am pleased to testify today on behalf of the Association of American Railroads and its member freight railroads on H.R. 233, the "Railroad Antitrust Enforcement Act of 2007." The AAR's members account for 75 percent of U.S. freight rail mileage, 92 percent of employees, and 95 percent of revenues.

At the outset, I want to be sure that everyone understands that the rail industry does not object to H.R. 233's stated goal of having the railroads conduct their affairs in accordance with the antitrust laws of the United States. They have done so for decades and continue to do so. The railroads strongly believe that their actions already comport with the antitrust laws in conjunction with applicable regulatory requirements.

The railroads are concerned about some aspects of H.R. 233, because we believe the bill is not simply about removing antitrust exemptions, although most of its supporters probably assume that it is. The aspects of the bill that remove antitrust exemptions are the least troubling provisions.

In many fundamental respects, the bill goes much further. It appears to represent an attempt to overturn long-established regulatory policies that have provided enormous benefits to shippers and American consumers. It even creates new regulatory law on matters unrelated to antitrust. And it consistently treats railroads differently than other regulated industries.

Accordingly, the bill would damage the public interest and severely distort the relationship between regulation and antitrust laws. Moreover, using an antitrust bill to achieve regulatory objectives will produce unintended consequences, and virtually guarantee confusion and disruptive litigation. We will illustrate numerous conflicts between this bill and existing or proposed economic regulation. If the United States Congress wants to address rail transportation policies, it should adopt a unified approach that coordinates economic regulation with antitrust law. They should not be at war.

## I. A BRIEF HISTORY OF RAILROAD REGULATION AND ANTITRUST LAW

It is worth recalling that government policies drove railroads to the edge of ruin twice during the Twentieth Century. Early in that century, Congress passed a series of acts that imposed ever tighter regulatory restrictions on railroads in order to reduce shipping rates (prices) and inhibit price competition between U.S. railroads.[1] Investors almost immediately abandoned the railroads, as railroads lost the ability to earn reasonable returns on

[1] E.g., Elkins Act, ch. 708, 32 Stat. 847 (1903); Hepburn Act, ch. 3591, 34 Stat. 584 (1906); Mann-Elkins Act, ch. 309, 36 Stat. 539 (1910).

investments. In fact, a panic over rail securities in 1907 drove the entire economy into a recession.[2]

By the time the United States entered World War I, the railroads had to be nationalized. Nationalization was necessary, not because railroad managements were incompetent to meet the needs of the war, but because the railroads had been unable to invest and were falling apart. Moreover, federal pooling restrictions and antitrust law prohibited coordination to support the war effort. Finally, in 1920, Congress passed the Transportation Act of 1920 to revise regulation and provide the opportunity for the railroads to regain their financial health.

Over subsequent decades, an array of government policies again crippled the railroads. On the one hand, taxpayers subsidized competing forms of transportation—the airlines that took passengers off of private passenger trains and the trucks that took rail cargo onto an Interstate Highway system built with federal funds. On the other hand, the railroads were forced to maintain money-losing services, their rates could not respond to the marketplace, and their attempts to become more efficient were blocked by government action. No one in the railroad industry can forget the Interstate Commerce Commission's ("ICC") refusal to allow a railroad to <u>reduce</u> its rates for grain transportation when it bought larger, more efficient rail cars. Nor will we forget the regulatory nightmare of a rail acquisition proceeding that lasted so long that the intended patient—the weak Rock Island railroad—died on the operating table.

I began my railroad career working as a union employee for the Rock Island, a large midwestern railroad. It went bankrupt largely because of government policies and regulatory

---

[2] In 1907, the railroads comprised one of America's largest industries and were a major engine of the American economy. Today, all of the Class I railroads combined are smaller than a number of rail customers.

delays. Many of my union co-workers lost their jobs. Around that same time, another midwestern carrier and all of the railroads in the Northeast also fell into bankruptcy, throwing tens of thousands of employees out of work. In 1972, the average return on investment of the rail industry was approximately two percent, less than a child's savings account at the time.

No recession and no financial crisis caused this collapse. Instead, one only needed to look to the government's policies for the explanation.

Today's growing desire to fundamentally increase governmental controls on the railroads, whether in the guise of antitrust legislation or new economic regulation, needs to be considered with 20th Century history as a cautionary tale. To the extent that the objective of any Congressional proposal is to reduce shipping costs for certain rail shippers, whether by regulation or antitrust, public officials should note the following facts:

- Railroads have lost some 20 percent of their revenues in the last three months.
- Congress recently imposed an unfunded government mandate for railroads to install at least $8 billion of Positive Train Control systems.
- The Government is requiring over $2 billion in new environmental controls, with carbon restrictions on the horizon.
- TSA and DOT have imposed hundreds of millions in added costs for secure handling of extremely hazardous chemicals—less than one percent of rail traffic.
- The new administration proposes—and the railroads do not oppose—federal programs to expand passenger train service, mostly on freight railroad tracks that will require additional investment.

The railroads can carry only so many burdens at one time before governmental policy forces them to retrench.

* * * *

Freight railroads provide significant public benefits when government's hand is not too heavy. Since the Staggers Rail Act reforms in 1980 adopted national policy that railroads must be allowed to earn their cost of capital, railroads and their investors have delivered a revitalized rail network. We take traffic off of America's highways to reduce congestion and damage to roads. We carry cargo with one-third the carbon emissions of other forms of transportation. We reduce America's dependence on foreign oil by moving a ton of freight 436 miles on one gallon of fuel. We are also cost effective offering the low cost alternative for surface freight transportation. For example, it cost 54% less, in inflation-adjusted terms, to move freight by rail in 2007 than it did in 1981.

And we truly lay golden eggs for America, by doing all of this with <u>private</u> money instead of public funds. We attract private investors to invest billions of dollars in transportation infrastructure that benefits shippers and consumers and displaces taxpayer investment. But all of that private investment will be at risk if the lessons of the past are forgotten.

Much is at stake here. The government cannot force investors to loan money to the railroads. Without that investment, railroads may wither, as they did in the past, and Congress will then be left with the choice of bailing them out with taxpayer funds—or building even more highways. We ask the Subcommittee to be thoughtful about its actions and their potential, unintended consequences. In particular, we ask the Subcommittee to be mindful of the relationship between regulation and antitrust law and to ensure that those regimes work in harmony.

II. RAILROADS ARE ALREADY SUBJECT TO THE ANTITRUST LAWS

Let's return to 1980, when Congress rebalanced regulation with the antitrust laws to save a failing freight industry. Because of the railroad industry's dire straits, Congress removed layers of burdensome regulation when it passed the Staggers Act, under the leadership of the Democratic Representative from West Virginia, Harley O. Staggers. The Act's goals included: "to assist the rail system to remain viable in the private sector" and "to provide a regulatory process that balances the needs of carriers, shippers and the public." Pub. L. 96-488, 94 Stat. 1895, 1897 (1980). Wherever economic regulation was removed, antitrust law took its place. For example, the Act allowed railroads for the first time since the 1800s to enter contracts with shippers outside the purview of the ICC, and in that arena made clear that "[i]f anticompetitive behavior is alleged, under this section, the antitrust laws are the appropriate and only remedy available." Pub. L. 96-448, House Rep. 96-1035, 1980 USCAN 3978, 4003.

The often-asserted claim that railroads are "exempted from antitrust laws in most respects" (S. Rep. 111-9, The Railroad Antitrust Enforcement Act of 2009, p. 2) is a myth. Railroads cannot and do not get together to set prices for competing services. We cannot and do not allocate markets or customers. We cannot and do not engage in the unlawful tying of one product to the purchase of another to harm competition. All of those activities would violate the antitrust laws and would subject us to Department of Justice ("DOJ") action and private treble-damage litigation.

Indeed, at this very moment, certain shippers have brought billions of dollars of antitrust claims against the nation's four largest railroads for allegedly violating the Sherman Act in setting fuel surcharges. In re Rail Freight Fuel Surcharge Antitrust Litigation, D.D.C.,

MDL No. 1869, Misc. No. 07-489. We believe that those claims are without merit. Union Pacific did not coordinate its fuel surcharge programs with any other railroad, and it alone has employed 57 different fuel-surcharge programs. Nevertheless, the four largest railroads are being forced to spend many millions of dollars per year to defend against these claims. We do not assert in that case that we are exempt from the antitrust laws. Our defense is that we complied with the antitrust laws.

Only in limited areas where the railroads are subject to regulation do antitrust exemptions apply. Vestigial antitrust immunities remain because Congress wanted to retain economic regulation in specific areas in the ICC, renamed the Surface Transportation Board ("STB"). Congress chose to retain economic regulation to protect the public interest, because the agency had a century of experience with railroads and their customers. Congress expressly told that agency to consider a number of policy objectives in discharging its functions. 49 U.S.C. § 10101. Freight railroads are exempt from antitrust laws only where Congress decided that it wanted an agency to pursue those policies in regulating railroads.

Thus, there is no gap—no yawning hole—where railroad actions are exempt from antitrust laws but free of regulatory oversight. Some groups of shippers dislike the way that the ICC and the STB have applied this oversight. (Indeed, we understand that is why some support H.R. 233.) However, whatever may or may not have occurred in the past, the STB is today aggressively protecting shipper interests.[3] If Congress now wants to alter the balance between regulation and antitrust, it should act in a coordinated, not piecemeal manner. This is what Congress has always done to assure that the Nation's transportation policies are harmonized with antitrust laws: "Congress was faced with the duty of

[3] For example, in a recent decision, the STB reversed a prior decision upholding rail charges and awarded the largest amount of relief in history in favor of a coal shipper and against the railroad. The award cost the railroad some $345 million.

harmonizing and reconciling the policy of the antitrust laws as applicable to common carriers with the national transportation policy." S. Rep. 94-499, 1976 USCAN 14, 28. Crossing the boundaries of committee jurisdiction, Congress should coordinate regulation with the antitrust laws. As we will demonstrate, H.R. 233 addresses antitrust exemptions and more without considering interactions with regulation, existing or future. That concerns us, and it should concern all policymakers.

## III. ONLY CERTAIN PROVISIONS OF H.R. 233 ACTUALLY REPEAL ANTITRUST EXEMPTIONS

The stated intent of this bill is to repeal antitrust exemptions. In four respects, it does that. First, it would repeal the so-called "Keogh Doctrine." Second, it would repeal provisions of 49 U.S.C. § 10706 that confer antitrust immunity for what were once known as "rate bureaus." Third, it would remove the exemption in 49 U.S.C. § 11321 that prevents DOJ from reviewing proposed railroad acquisitions and mergers. Finally, it would allow private parties, like the Government can today, to seek injunctions. The railroads see no reason to make these changes, some of which discriminate against railroads, but we recognize that they are consistent with the stated purpose of the bill, which is to repeal antitrust exemptions.

A. Eliminate the "Keogh Doctrine" for railroads, but not for utilities. Section 2(a), which would eliminate the Keogh Doctrine (also known as the "filed-rate" doctrine) would have little effect on railroads. Many years ago, the railroads filed their rates—their prices—with the ICC. The ICC reviewed them, opponents routinely filed protests, and the agency often suspended and revised rates. In a case called Keogh, the courts, quite reasonably, ruled that rates supervised by a regulator could not be attacked by shippers

seeking damages under the antitrust laws. Keogh v. Chicago & N.W.Ry., 260 U.S. 156, 43 S. Ct. 47 (1922).

While the railroads are still subject to rate regulation, for all practical purposes railroads no longer file their rates with regulators. Accordingly, what the courts would say about railroads and the Keogh Doctrine is far from clear. In any event, I can assure you that no railroad counsel tells a client to act contrary to the provisions of the antitrust laws in reliance on the Keogh Doctrine. Repealing the Keogh Doctrine will have little or no practical effect on railroad actions or shipper remedies.

Ironically, some electrical utilities actively support H.R. 233 even though the primary users of the Keogh Doctrine are electrical utilities. E.g., Utilimax.com, Inc. v. PPL Energy Plus, LLC, 273 F.Supp.2d 573 (E.D. Pa. 2003); aff'd 378 F.3d 303 (3d Cir. 2004). Recent assertions that the electric utility industry is "fully subject to the antitrust laws" are therefore mistaken. Thus, this provision of the bill is one of many that single out railroads for disparate treatment. The Subcommittee could easily modify Section 2(a) of H.R. 233 to level the playing field by repealing the Keogh Doctrine for all industries.

B Repeal antitrust immunity for "rate bureaus". Like repealing the Keogh Doctrine, Section 8(a)'s repeal of rate bureau immunity under 49 U.S.C. § 10706 would have minimal impact on the railroads. The railroads eliminated virtually all of the rate bureaus many decades ago.

As difficult as this may be to believe, railroads for decades were required by law to agree on prices and charge the same price regardless of which route a shipper choose between two points. In that regulatory environment, Congress essentially forced railroads to use rate bureaus to develop rates, and it conferred antitrust immunity on the process. But

Congress changed that policy in the Staggers Act and rebalanced the interface of regulation with antitrust law. The rate bureaus are gone, and railroads must compete on price and service—subject to the antitrust laws. This transition demonstrates that antitrust laws and regulation have long worked in tandem, not at cross-purposes.

For all practical purposes, Section 10706 continues to apply in only one modest respect, which is to establish the complex mechanics for paying rentals for use of rail cars ("car hire") between railroads and by railroads to other car owners. 49 U.S.C. § 10706(a)(d)(C). Railroads do not collectively establish the rental prices they pay each other. They must negotiate those bilaterally. The collective activity merely establishes the processes for payments, collections, adjustments, and the like. This activity is not controversial and is accepted by all stakeholders because it simplifies and therefore reduces transaction costs. It was approved by the STB's predecessor, which prescribed numerous protections, such as recording of all proceedings. The vestigial antitrust immunity for this minor activity facilitates significant efficiencies and should not be eliminated. This collective action might well survive antitrust review as a joint venture, but one of the unintended consequences of this legislation is that this activity may be called into question and the erratic results that emerge from district courts under the antitrust laws would create unnecessary risks and costs.

C. Authorize dual agency review of rail mergers. Section 8 of the bill provides that rail mergers would be reviewed by both the STB and the DOJ. We think dual reviews are unnecessary, and we do not understand what that added review would accomplish other than consuming governmental resources.

Indeed, the Justice Department is likely to impose a narrower competition test on future railroad mergers than would the Surface Transportation Board, which looks to the broader public interest. It is virtually inconceivable that the STB would today approve a major rail merger that the Justice Department, applying its narrower focus only on competition issues, would conclude is anticompetitive.

The STB has strengthened its standards for reviewing rail mergers for competitive effects. In the past, the ICC and the STB consistently ensured that shippers with competing rail service before the merger retained two competitive rail options afterward. The STB required continuation of prior competition through "conditions" on mergers. In 2001, the STB adopted new regulation governing major rail mergers, which would not only protect competition but would improve it. The new regulations elevated the importance of competition to an even higher level, and imposed a new requirement. In most future merger proposals between Class I railroads, the applicants must demonstrate that they have taken steps to enhance competition—to create competition that did not previously exist. 49 C.F.R. § 1180.1. This is a much tougher standard than that established by the antitrust laws, under which the DOJ must persuade a court that the effect of the transaction may be "substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. The railroads do not understand the benefits of having additional agencies apply narrower antitrust standards to the same transactions with the attendant increase in administrative burdens on such transactions

D. <u>Allow private antitrust injunctions against railroads, but not other carriers</u>. Section 5 of the bill is yet another provision that would treat railroads differently from other regulated carriers. The Clayton Act contains a restriction on private (but not DOJ) injunction

actions against common carriers. 15 U.S.C. § 26. Section 5 would treat railroads differently from other common carriers by excluding only railroads from the ban on private injunctions.

That ban was adopted and applied to all common carriers for a sensible reason: it prevents trial courts and juries, which can reach a multiplicity of outcomes, from reaching different and conflicting outcomes than a regulator on matters subject to regulation. See, e.g., Central Transfer Co. v. Terminal R.R. Ass'n, 288 U.S. 469, 475, 53 S. Ct. 444, 446 (1933). Section 5 of the bill, therefore, would create another incompatibility between rail regulation and antitrust. If adopted, it would subject railroads to potentially conflicting obligations, with an agency telling them to behave one way and a jury telling them to pay treble damages for behaving that same way. An antitrust court would be called upon to address a specific set of facts without viewing the broader public-interest implications that a regulatory agency would consider.

## IV. SEVERAL OF THE BILL'S PROVISIONS DO NOT REPEAL EXEMPTIONS, ARE DESIGNED TO OVERRIDE REGULATORY DECISIONS, WOULD HARM SHIPPERS, AND CREATE CONFLICTS WITH THE REGULATORY REGIME

Whether intended or not, several provisions of H.R. 233 appear to be designed for the primary purpose of overturning regulatory decisions. This is most obvious with respect to Section 8's directive to the STB to decide certain proceedings in a way that favors the interests of local communities. This provision has nothing to do with antitrust. Similarly, conferring new powers on the Federal Trade Commission ("FTC"), which would apply only to the railroad industry and not to any other type of common carrier, would create a frontal conflict with the STB's "exclusive" jurisdiction over the same subject matter. Finally, and most startlingly, the bill limits as to railroads only the doctrine of primary jurisdiction, which is not an antitrust exemption at all, but a judicially-made and essential accommodation

between regulatory regimes and all manner of proceedings in the courts. That provision in particular would have unintended consequences and would, in many contexts, put statutory blindfolds on the courts.

A. Give communities priority rights in some regulatory decisions. Two provisions of H.R. 233 would expressly require the Surface Transportation Board to consider impacts on "affected communities" in making certain regulatory decisions. Section 8(a), 8(b). These provisions are unrelated to the antitrust laws and are instead modifications of regulatory policy.

These provisions are also unnecessary and undesirable. They would adopt "NOT IN MY BACKYARD" as official federal policy for railroad industry transactions. This could block transactions with significant value to shippers and consumers. The rail industry needs to expand over time, and this provision could bar transactions that would be necessary to ensure adequate capacity in the future. Every shipper in America ought to oppose them.

No change in law is warranted. The Surface Transportation Board applies to the National Environmental Policy Act ("NEPA") to consider environmental effects of its decisions, including impacts on communities. The Board's regulations contain extensive rules requiring railroads to file environmental detail in connection with rail transactions. 49 C.F. R. § 1180.6. Far from ignoring those provisions, the Board applies them aggressively. In a recent, small-scale rail consolidation proceeding, for example, the applicants were charged more than $20 million in administrative costs to perform environmental analyses, not including the multi-million-dollar costs of environmental mitigation. Environmental analysis has become the most burdensome aspect of rail consolidation proceedings.

The railroads see no reason to subject the rail industry, or the Surface Transportation Board, to greater environmental review than applies to government action on highway projects, airport expansions, or any other part of the economy. NEPA is an effective law with a fully developed body of interpretations. Accordingly, we respectfully suggest that these provisions to favor local interests have no place in antitrust legislation.

B. Allow the FTC to regulate competition for rail carriers, but not for other carriers, under principles that extend beyond the antitrust statutes. Section 7 of H.R. 233 is yet another example of applying a different legal standard to railroads than Congress applies to other carriers. It also could create a glaring conflict with STB rail regulation.

Section 7 modifies the Federal Trade Commission Act (15 U.S.C. § 45(a)(2)) by excluding rail carriers from a general exclusion that deprives the FTC of jurisdiction over common carriers. Under Section 2(b), the FTC would gain authority over rail carriers under Section 5 of the Federal Trade Commission Act "to the extent such section 5 applies to unfair methods of competition." (See also Section 9(b)). Clearly, railroads would be treated unlike other common carriers, which are not subject to the jurisdiction of the FTC.

The conflict with STB jurisdiction is especially troubling. Indeed, H.R. 233 does not attempt to address an express statutory conflict that it would create with 49 U.S.C. § 10501(b), which grants the STB "exclusive" jurisdiction over rail transportation, rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of railroads. Id.

The STB regulates railroad conduct through two primary sources of authority, as well as its general authority. First, the STB has exclusive jurisdiction to determine the scope of a rail carrier's "common-carrier obligation." 49 U.S.C. 11101(a). Indeed, the STB is

adjudicating a common-carrier dispute involving Union Pacific today. Union Pacific Railroad Co. -- Petition for Declaratory Order, STB Finance Docket No. 35219. In such matters, the Board's charge is to determine whether a request for transportation is "reasonable" and must be satisfied by the railroad. Granite State Concrete Co. v. STB, 417 F.3d 85, 92 (1st Cir. 2005). As parties in the pending proceeding have argued, this determination involves issues of rail competition. Second, a significant STB role is to determine the reasonableness of railroad "practices," which encompass a wide range of conduct that relates to competition. 49 U.S.C. § 10701.

The clash between FTC jurisdiction over "unfair methods of competition" and STB exclusive jurisdiction over rail common carriage and rail practices is foreseeable and would undermine public policies that matter. The STB is required by law to discharge its exclusive jurisdiction in the public interest and in accordance with the framework of a Rail Transportation Policy that Congress imposed on the agency. 49 U.S.C. § 10101. Its statutory responsibility therefore is to consider an array of public-interest factors. In contrast, the FTC has an entirely separate body of precedent and policy that extends into matters of policy. Although the FTC's focus is on promoting competition, the Supreme Court has made clear that the prohibition in Section 5 of the FTC Act against "unfair methods of competition" encompasses "not only practices that violate the Sherman Act and other antitrust laws, but also practices that the Commission determines are against public policy for other reasons." FTC v. Ind. Fed'n of Dentists, 476 U.S. 447, 454 (1986). The current

Chairman of the FTC has also stated that he regards the FTC as "an agency with authority that extend[s] well beyond the limits of the antitrust laws."[4]

It seems virtually inevitable that the standards applied by these two agencies would diverge, even if both were giving consideration to competitive effects as a principal component of their public interest determination. The nation could be at risk if the STB were to conclude, in the exercise of its wisdom and expertise as regards national transportation policy, that certain conduct furthers the public interest and should be encouraged, whereas an inquiry by the FTC more narrowly focused on its competition-based standards might find that the conduct should be enjoined, thereby thwarting the STB's policy objectives.

This additional, likely conflict underscores the need for coordination between antitrust policy and regulatory policy.

C. Restrict primary jurisdiction for railroads, but no other regulated entities.

Section 6 of H.R. 233 restricts the doctrine of "primary jurisdiction," which balances regulation with all other types of law for every regulated industry. Under the primary jurisdiction doctrine, a court will normally defer to an expert agency when the agency has jurisdiction over the subject matter of a legal dispute.

The primary jurisdiction doctrine is not an antitrust exemption at all. As one court explained, the doctrine is properly invoked where there is: "(1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory scheme that (4) requires expertise or uniformity in

[4] "'Tales from the Crypt' - Episodes '08 and '09: The Return of Section 5 ('Unfair Methods of Competition in Commerce are Hereby Declared Unlawful')," Remarks of Commissioner Leibowitz at FTC Section 5 Workshop (Oct. 17, 2008).

administration." United States v. General Dynamics Corp., 828 F.2d 1356, 1362 (9th Cir. Cal. 1987). Discouraging primary jurisdiction would be a major change in jurisprudence that would reach far beyond the antitrust laws. It would leave courts without the benefit of a regulatory agency's expertise when regulation is involved.

Section 6 would give trial courts the power to disregard agency action, but only with respect to railroads. Accordingly, the many public statements that H.R. 233 is intended to treat railroads like other industries is again not correct. Section 6 would treat railroads uniquely, leaving electrical utilities and other regulated industries with the important doctrine of primary jurisdiction.[5]

Section 6 also proves that H.R. 233 is intended to override regulation, and not merely to remove antitrust exemptions. Exemptions could be removed without touching the primary jurisdiction doctrine. The railroads believe that this overreaching provision is in the bill for the purpose of allowing antitrust attacks to overturn regulatory decisions of the types described below.[6]

1. Allow lawsuits for "bottleneck" rates. Thirty years ago, shippers could dictate railroad routing of each shipment, spreading rail shipments over innumerable routes, increasing costs and preventing railroads from using economies of density. Some shippers took advantage of this power by using railroads as rolling warehouses. They achieved this by requiring railroads to route shipments over the slowest possible routes using the largest possible number of handoffs ("interchanges") between railroads. I recall interchanging transcontinental lumber shipments to the out-of-the-way, 90-mile Oklahoma City, Ada &

---

[5] Because of ambiguous drafting, a trial court might be unsure whether to defer to the agency. Section 6 says that the court "shall not be required" to defer, suggesting that courts limit deference. It might or it might not. No one can predict what individual courts will do.

[6] The Committee Report on H.R. 1650 outlined this intent. H.R. Rep. 110-860.

Atoka Railway because shippers wanted to delay the shipments until they could find a buyer somewhere in the South or East.

For the last three decades, federal policy has allowed railroads to act like rational businesses instead. Railroads were given the opportunity to offer faster and more reliable service with fewer handoffs. As a result, railroad productivity has flourished. This productivity saved many billions of dollars, most of which were either passed along to shippers in the form of lower rates and improved utilization of shipper-supplied cars or reinvested in the railroads' physical plant to continue to improve rail service.

However, H.R. 233 would attempt to use the antitrust laws to reverse this successful policy and throw the industry 30 years backward. In the scenario envisioned by the bill, shippers could force railroads to quote rates and reroute rail shipments to any interchange point that the shipper chooses, under threat of treble-damage antitrust lawsuits. This would yield unintended consequences.

The goal, as confirmed by the draft Judiciary Committee Report for last session's bill, is to overturn 1996 STB decisions known as the "Bottleneck Rate" cases.[7] Those decisions, based on longstanding ICC case law, held that, under most circumstances, a railroad that is the only railroad serving a location is not required to compete against itself by delivering shipments to a competing rail carrier over a so-called "bottleneck segment." Instead, the carrier that serves the entire route is allowed to carry the shipment all the way from origin to a destination on its own route.[8] Some shippers believe that this decision deprived them of

[7] E.g., Central Power & Light Co. v. Southern Pacific Transportation Co., 1 S.T.B. 1059 (1996), aff'd sub nom. MidAmerican Energy Co. v. STB, 169 F.3d 1099 (8th Cir. 1999)

[8] The originating carrier must, of course, interchange a shipment to another carrier if the originating carrier cannot serve the destination.

competition between two carriers over portions of rail routes where there is more than one available rail line.

Years of debate about the "Bottleneck Rate" cases have yielded an abstract, dry discussion about regulatory theory. This debate has lost sight of a critically important, real-world fact. If H.R. 233 were passed in its current form, and if railroads were required by antitrust courts to provide service on any "bottleneck" segment a shipper selects,[9] the physical operations of the nation's rail network would be severely disrupted, returning the industry to the lower productivity of the pre-Staggers Act era.

Requiring "bottleneck" service on demand would change the physical routing of rail cars. It would undermine railroad productivity built under three decades of public policy. It would increase railroad costs. It would impair service quality and reduce asset utilization. It would strand railroad assets in which railroads invested billions of private capital in recent years. It would require new investments to support new routings (assuming railroads could raise money from investors), yet shippers could change their minds about those routes on a whim. It would create new impacts on local communities and negative environmental impacts by forcing traffic through little-used connection points and over little-used rail lines throughout the nation.

What is important to recognize, which H.R. 233 does not, is that any evaluation of "bottleneck" practices needs to address two fundamental concerns, i.e., the impact on rail network operations and the appropriate level of compensation for the "bottleneck" carrier. These issues are properly within the purview of regulatory, not antitrust, policy. Also often forgotten when "bottleneck" issues are discussed is that the STB retained and still has the

[9] The railroads do not concede that an antitrust court would find a refusal to quote a bottleneck rate unlawful. Recent Supreme Court decisions reject an antitrust duty of one firm to aid a competitor under most circumstances. See Trinko, Linkline, cited below.

power to regulate the originating carrier's rate to ensure that it is "reasonable," thereby protecting the shipper, and the STB is very active today.[10]

No one has studied, or could comprehensively study, the full operational or environmental effects of a "bottleneck rate" requirement on the national rail system, and the Subcommittee has no way of knowing how disruptive and damaging it would ultimately be. Evaluating the public interest in a network industry is inevitably a regulatory function. By turning the question over to individual courts, none of which would take into account the total rail network concerns, H.R. 233—if attacks on regulatory policy succeed—would produce inconsistent and disruptive decisions by the courts. As a reminder, the railroads would strongly contest any attempt to use the antitrust laws in this way.

Note also that the objective of the proponents of these lawsuits – lower rates – could not be achieved through resort to the antitrust courts alone. Even if such courts did order a railroad to provide service and quote a rate, they would not have a basis for establishing a rate at any particular level. Courts are not equipped to engage in ratemaking, and the Supreme Court has instructed that they not engage in this activity in antitrust cases. As the Supreme Court reiterated only a few months ago, "Courts are ill suited 'to act as central planners, identifying the proper price, quantity, and other terms of dealing.'" Pacific Bell Telephone Co. v. Linkline Communications, Inc., ___ U.S. ____, 129 S. Ct. 1109, 1121 (2009) (quoting Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 408, 124 S. Ct. 872, (2004).). The Court endorsed the view that antitrust courts should not get involved "when compulsory access requires the court to assume the day-to-

[10] In addition to handing down the biggest rate award in its history, the STB recently mediated a "small shipper" case to a satisfactory settlement. Another shipper filed another such case this month against Union Pacific.

day controls characteristic of a regulatory agency." Id. at 415. Yet Section 6 ironically cautions them against deferring to any agency for assistance.

2. Allow attacks on "paper barriers." Similarly, another principal objective of H.R. 233's restriction on primary jurisdiction, as shown by last session's Committee report, is to overturn so-called "paper barriers." What is a "paper barrier"? It is a provision of a sale or lease from a larger railroad to a smaller rail purchaser or a lessee of a rail line that was previously operated by the larger railroad, but which both parties agree can be operated more efficiently by the smaller railroad. The "paper barrier," in one way or another, provides that the majority of the rail traffic that originates or terminates on the segment operated by the smaller railroad would continue to flow over the larger railroad's network, as it did before the transaction.

Why do large railroads and smaller railroads enter into contracts with "paper barriers"? They do so because the smaller railroad could not otherwise afford to acquire or lease the rail line at all, and because the traffic handled by the smaller railroad continues to be important to supporting the larger railroad's network. Most of these short rail lines are barely economical to operate, even with their lower cost structures afforded by these transactions. Therefore, a "paper barrier" is simply a very efficient financing mechanism, allowing both the smaller and larger railroad to share in the benefits of the transaction by sharing traffic, rather than requiring the smaller railroad to pay the large railroad money up-front or make annual rental payments. To illustrate the point, no lessee of a Union Pacific rail line has within memory—if ever—paid any rent for the use of Union Pacific's properties. They pay "rent" by routing traffic over Union Pacific.

"Paper barriers" have been a huge success for the nation's shippers and consumers. They spawned an entire industry of hundreds of short-line railroads, which have a reputation for providing high quality, customer-oriented service. These transactions also have avoided the unpleasant alternative: in many instances, the larger railroad would otherwise have abandoned service on the rail line, eliminating rail service altogether and also eliminating the opportunity for new shippers to locate on that rail line. In addition, some of the transactions create new competitive opportunities that did not previously exist. Some transactions allow a portion of the shipments to be routed via a competing carrier—new competition that might not have existed without the transaction. Finally, the railroad industry has developed a process to allow service over a competing rail carrier for new shippers who locate on a short line under most conditions where the shippers' traffic would otherwise be lost to rail transportation if the "paper barrier" was not waived.[11]

For decades, the ICC and the STB strongly supported these spin-offs, including their financing arrangements. Proponents of H.R. 233 hope to overturn "paper barriers" using the same mechanism that would be applied to overturn the Bottleneck Rate cases. Under Section 6, the courts would be guided not to defer under primary jurisdiction to the regulatory agency that approved the transactions and instead to allow attacks on regulatory decisions. The railroads do not believe that antitrust attacks would succeed, but they would have undesirable effects if they did. (The railroads also believe that any successful attacks would raise Constitutional issues.)

Meanwhile, this has become a solution looking for a problem. The STB has already revised its policies to effectively discourage future transactions that use "paper barriers," and

---

[11] Rail Industry Agreement between the larger railroads and the American Short Line and Regional Railroad Association.

it has opened up the opportunity to challenge existing transactions. STB Ex Parte No. 575, Review of Rail Access and Competition Issues – Renewed Petition of the Western Coal Traffic League (Decision served Oct. 30, 2007). That STB decision has already had the unfortunate result of ending the creation of new short lines by my railroad. If a purchaser cannot pay rent on our assists, we have no motivation to make the assets available for free. If H.R. 233 passes, an unintended consequence will be that the "short line movement," as it is called, will end. No railroad would risk an antitrust case when it can retain its lightly-used rail lines—or abandon them—and avoid the risk.

* * * *

The railroads are not aware of any effort to reconcile proposed changes in the application of antitrust law to railroads with either existing railroad regulation or with proposed changes to regulation that both Houses of Congress are considering. Indeed, some advocacy groups are explicitly supporting this legislation, while simultaneously pursuing separate legislation that would address the same topics by regulation.

We are not aware of any study of the effects of the inevitable interactions between these regimes on the railroads, on shippers, or on consumer welfare. Many assume, automatically, that more antitrust exposure automatically advances the public interest, but, hundreds of times in the past, Congress has reached the opposite conclusion. It has expanded economic regulation and created immunities to allow regulation to function. No one can be certain what effects a new mix might have if it comes to pass, but they would surely be inefficient, uncoordinated, and likely contrary to the Nation's vital transportation needs.

Finally, in many ways, if antitrust law remains as it is today, this legislation does not even solve its proponents concerns. But the bill's unintended consequences for rail

investment, because of the uncertainty it creates and the potential for conflicting court decisions, and the impacts to rail efficiency are large.

IV. H.R. 233 RAISES SIGNIFICANT CONCERNS ABOUT RETROACTIVE APPLICATION

Jurisprudence dating back over 200 years establishes that laws normally apply only prospectively. As the Supreme Court explained in its most recent decision on the subject:

> "Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted. For that reason, the 'principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal appeal.'"

Landgraf v. USI Film Products, 511 U.S. 244, 265 (1994) (citations omitted). We assume that the Subcommittee intends H.R. 233 to apply only prospectively. The language of Section 9, however, leaves ample room for an antitrust agency or plaintiff to bring a case attacking past conduct—conduct that has been expressly immunized from the antitrust laws.

Section 9(b) prohibits antitrust actions based on behavior that: (1) occurs after the 180th day after enactment of H.R. 233; and (2) was previously immunized from the antitrust laws. This leaves open the possibility that transactions previously approved as in the public interest, immunized from the antitrust laws, and fully implemented may be challenged as unlawful, if the conduct that is the essence of the approved transaction continues on the 181st day. This, in turn, could lead to antitrust attacks on the continuing operation of every ICC-approved or STB-approved transaction in railroad history.

To take an example involving my company, Union Pacific received ICC authorization in 1982 to acquire the Missouri Pacific Railroad Company and Western Pacific Railroad Company, two other western railroads. Pursuant to the governing statute, the ICC's approval

order gave UP full and unrestricted authority to take all steps necessary to implement that merger, including combining the three companies and unifying their operations. Union Pacific—Control—Missouri Pacific, Western Pacific, 366 I.C.C. 462 (1982). All of that happened, and the three former railroads are no longer distinguishable. Nevertheless, under Section 9, an antitrust plaintiff could argue that the ongoing conduct made possible by the acquisition, although lawful in every respect at the time and implemented with antitrust immunity, violates antitrust standards on the 181st day after enactment.

This problem, of course, is not limited to the Union Pacific-Missouri Pacific-Western Pacific transaction. It applies with equal force to hundreds of rail mergers and line sales from the past. Logically, the same claim could be raised against other rail mergers and line sales approved 20, 40, or even 60 years ago, involving railroads we hardly remember today, as well as many other approved transactions.

In the event such antitrust actions proceeded, and succeeded, the railroads would probably raise due process claims under the United States Constitution, given the regulatory framework that exempted these transactions from antitrust scrutiny when the parties elected to consummate them. Railroads also could assert massive "takings" claims under the Tucker Act, which could end up costing taxpayers billions of dollars. This is just another unintended consequence of the legislation of which policy makers should be aware.

We respectfully suggest that the Subcommittee take a very close look at the language of Section 9 and eliminate this potential retroactive application.

## V. THE BILL AND ANY COMMITTEE REPORT SHOULD NOT PREJUDGE ANTITRUST CASES OR ATTEMPT TO ALTER ANTITRUST JURISPRUDENCE

The railroads understood that H.R. 233's purpose is to remove exemptions and open the courts for antitrust complaints. As we have already noted, the bill does much more than that.

Neither the language of the bill nor any accompanying report should prejudge how a court should decide a case. The railroads are concerned, because the Report for last Congress's H.R. 1650 strongly suggested that the railroads had already been put on trial and lost.

Regarding "bottleneck rates," long-established Supreme Court precedent, cited earlier, holds that firms must aid, or provide their assets to, competitors under only rare and unusual circumstances. In general, firms, including firms with monopolies, are free under American law to decide with whom they will do business. See Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 408 (2004) ("as a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise [its] own independent discretion as to parties with whom [it] will deal'") (quoting United States v. Colgate & Co., 250 U.S. 300, 307 (1919)). That right is not entirely unqualified, but the Supreme Court has instructed extreme caution in basing antitrust liability on a "refusal to cooperate with rivals." Id., 540 U.S. at 408-10 (noting, for example, that the Aspen Skiing case, Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585 (1985), which found liability on facts where an alleged monopolist discontinued a prior course of cooperation, is "at or near the outer boundary of §2 liability"). An antitrust court would be even less likely to rule for a plaintiff in an industry structure where a regulatory agency offers a remedy for unreasonable prices and also has the authority to grant the kind of competitive access that seekers of bottleneck rates desire. See id., 540 U.S. at 411-12 (noting that regulatory structure that enabled a regulator to grant access counseled strongly against applying the antitrust laws).

Regarding "paper barriers," sales and leases to shortline railroads do not reduce competition in any way. The transactions preserve service on a rail line that might otherwise

be abandoned and preserve the competitive situation that existed before the transaction. Contractual provisions that are a central part of the consideration for such transactions, and which address the basic terms of the ongoing traffic-interchange relationship between the large railroad and the smaller railroad it created, should not be found unreasonably anticompetitive by antitrust courts.

We have been told that the objective of H.R. 233 is simply to open antitrust courts to shippers by removing exemptions. However, the report that accompanied last session's H.R. 1650 went further, strongly suggesting that the drafters had already tried and convicted the railroads. We respectfully ask that the report remain neutral regarding how antitrust courts should decide any new case.

It would come as a major surprise if H.R. 233 were intended to revise decades of antitrust jurisprudence or to make substantive changes in those laws. Similarly, it would be quite surprising if this bill, directed at one industry, were to be viewed as overturning Supreme Court decisions. Accordingly, we respectfully suggest that the bill should include a "savings provision" stating that the bill has no such intent. The bill should not create any presumption or inference that any conduct or activity is in violation of the antitrust laws.

## VI. CHANGES IN ANTITRUST LAW AND RAIL REGULATION MUST BE COORDINATED

Congress should address the interaction of antitrust laws with the regulatory regime it has already established or that it may establish in the future. Because parts of H.R. 233 are designed to override regulatory decisions, they would inevitably create conflicts and uncertainty for railroads, railroad customers, and courts. That same uncertainty may cause investors to be cautious about the railroad industry, increasing borrowing costs and reducing the railroad industry's ability to draw capital from the private sector. The railroad industry

urges this Subcommittee not to act in isolation, but to work with colleagues in other committees of jurisdiction to craft a coherent, national rail policy that integrates regulation with antitrust jurisprudence.

Conflicts with regulatory regimes become especially evident if one contrasts H.R. 233 with H.R. 2125, introduced during the last Congress. H.R. 233 is designed to allow shippers to challenge so-called "paper barriers" in antitrust courts. Section 103 of H.R. 2125 addressed the same matter, granting the STB the authority to review future "paper barriers" under specific standards and to make policy decisions about whether terminating the "paper barrier" would "materially impair the ability of an affected rail carrier to provide service to the public or would otherwise be inconsistent with the public interest." Antitrust courts are not equipped to apply those specific standards or to make the policy decisions that H.R. 2125 would have imposed.

Similarly, H.R. 233 is designed to allow shippers to bring antitrust claims to force railroads to provide "bottleneck" service on demand. Section 102 of H.R. 2125, however, gave that power explicitly to the Surface Transportation Board, eliminating any role for antitrust courts. H.R. 233 creates yet another direct conflict with existing and future regulatory policy by authorizing the FTC to regulate practices that the STB also regulates, creating conflicting results.

As noted earlier, Section 6 of H.R. 233 would confuse matters still further by directing that courts "shall not be required to defer to the jurisdiction of the Surface Transportation Board." Section 6. Thus, while district courts are discouraged from deferring, they may defer. As a result, different courts and the regulatory agency could well reach opposite conclusions about the same type of dispute or even the very same actions. For

example, a district court might conclude that a particular railroad practice is unreasonable under the antitrust laws, but the Surface Transportation Board might decide that the practice is in the public interest. Congress should not allow such conflicts to arise, much less induce them.

In both Houses of Congress, we believe legislation is likely to be introduced that would propose to alter regulation of our rail industry. Antitrust laws should be carefully and thoughtfully integrated with existing regulation or whatever legislation is proposed from the commerce committees. Pushing forward with laws that address the same subject matter can only produce confusion for all stakeholders in rail transportation, and involve the courts and agencies in years of litigation to unwind the confusion. Throughout that uncertainty, investors would be reluctant to invest their dollars in an industry with an uncertain future. We urge this Subcommittee to pursue rational coordination, not a flawed partial solution that may be undermined by future legislation.

# PX0757-PX0760

Filed Under Seal

# EXHIBIT PX0761

BEFORE THE
SURFACE TRANSPORTATION BOARD

---

EX PARTE 661

---

RAIL FUEL SURCHARGES

---

# WRITTEN STATEMENT OF NORFOLK SOUTHERN CORPORATION

---


James A. Hixon
William A. Galanko
George A. Aspatore
John M. Scheib
Norfolk Southern Corporation
Three Commercial Place
Norfolk, VA 23510
(757) 629-2657

G. Paul Moates
Paul A. Hemmersbaugh
Matthew J. Warren
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000
(202) 736-8711 (Fax)

*Attorneys for Norfolk Southern Railway Company*


Dated: April 27, 2006

EXHIBIT
PENGAD 800-631-6989
Seale - 3

WRITTEN STATEMENT OF NORFOLK SOUTHERN CORPORATION

I am Donald W. Seale, and I serve as Executive Vice-President and Chief Marketing Officer of Norfolk Southern Corporation. In 1976, I started my career with the Norfolk and Western Railway Company, a Norfolk Southern predecessor company, and have served in numerous positions primarily in marketing and sales over the past 30 years.

In this testimony, I will provide an overview of what Norfolk Southern has experienced in the fuel market and the ways in which Norfolk Southern has tried to respond to the shift in the fuel market, including implementation of fuel surcharge programs – which we have always viewed as an energy surcharge. I will then review Norfolk Southern's original and modified fuel surcharge programs for public rate authorities for non-intermodal traffic and explain our recently announced new fuel surcharge program for such public rate authorities.[1] Additionally, I will discuss the expected ramifications in the transportation marketplace from implementation of this new program.

As with many rail issues, the best place to start is with an understanding of the commercial realities. The marketplace for fuel has dramatically changed and Norfolk Southern has responded by adopting, and now twice refining, a fuel surcharge program to respond to that change. That dramatic increase in the price of oil, has given Norfolk Southern a competitive advantage against other modes of transportation that we recognize in our total price of transportation – transportation rate plus other charges, including a fuel surcharge. At the same time, we have continued to see the traffic levels

[1] "Public rate authorities" are tariff prices for customers who have not entered into a contract with Norfolk Southern.

on our railroad grow and to increase capital investment as we work to have the capacity needed to serve our customers.

## I. The Fuel Market Has Dramatically Changed and the Days of $20 Per Barrel Oil Appear to Be Gone For Good.

From 1987 until early 2003, the oil markets were generally stable and predictable. Oil for the most part fluctuated around $20 per barrel for most of the period and between $20 and $30 per barrel since 2000. Norfolk Southern thought – indeed hoped—that the oil price increases we began to see as 2003 progressed were temporary. Many others did as well. For example, in May 2004, UBS Investment Research forecasted declines in the price of West Texas Intermediate Crude Oil ("WTI") to $26 per barrel in 2005.[2] In November 2004, James Mulva, Chief Executive Officer of ConocoPhillips, the third largest U.S. oil company, predicted that the price of WTI would slide to an average of $26 per barrel in 2006.[3] Likewise, the federal government's Energy Information Agency ("EIA") predicted on multiple occasions in 2004 and 2005 that oil prices would decline. It now appears that there has been a fundamental and structural change in this market. The old baseline of about $20-$25 per barrel is no more.

It is our best guess – and I emphasize that it is only a guess – that most of the time from this point forward we will see oil at $60 per barrel or more. Like many other companies, Norfolk Southern monitors the oil market as a proxy for the expected price of its fuel and has attempted to adjust to the shift in the oil market and to the resulting

---

2 *Lower Energy Prices? Fall from High Prices Is Forecast*, Industry Week, at 73 (May 2004).

3 *Around the Region*, Houston Chronicle News Service, at 3 (Nov. 18, 2004).

changes in the transportation market. But it has been challenging to keep up with the dramatic and rapid shift.

Prior to early 2003, the oil market was relatively predictable. While there were spikes and troughs in the market, generally the price of WTI ranged between $20 and $30 per barrel range. Chart 1 below shows the price of WTI from 1987 to the present.[4]

**CHART 1: HISTORIC PRICE OF WTI**




This stability through 2003 meant that forecasters were generally able to predict the fuel market. For example, the EIA's oil price forecast was generally accurate even at the end of this period of stability. Although in 1999 it incorrectly estimated the timing of the impact of a new Organization of Petroleum Exporting Countries agreement that restricted oil production, its other predictions during this period were very good. Indeed, EIA's predictions from 1999 to early 2003 were generally correct. For example:

---

4 Data source is http://tonto.eia.doe.gov/dnav/pet/hist/rwtcM.htm.



NS 001001198

- In January 2000, EIA accurately predicted a $5 per barrel increase in the price of WTI.
- In July 2000, EIA accurately forecasted the price of WTI to end 2000 above $25 per barrel and to decline to $22 per barrel in 2001.
- In January 2001, EIA accurately predicted the price of WTI at $27 per barrel in 2001 with a decline to around $22 per barrel in 2002.
- In July 2001, EIA forecasted that the price of WTI would be around $28 per barrel for 2001 and 2002, which was generally correct except for the decline in price of WTI to about $20 per barrel in late 2001 and early 2002.
- In January 2002, EIA accurately predicted an increase in the price of WTI by the end of 2002.
- In July 2002, EIA predicted that the price of WTI would be around $26 per barrel in 2002, which was generally correct except at the end of the year when there was a strike by oil workers in Venezuela. It also accurately forecasted that the price of WTI would increase to about $29 per barrel in 2003.
- In March 2003, EIA accurately forecasted a decline in the price of WTI to around $27 by the end of 2003.

In part, EIA was so accurate because the price of WTI fluctuated, based on events, between $20 and $30 per barrel.

This relatively stable and predictable period of fuel prices ended in mid-2003. From that point until today, oil prices climbed significantly and the fuel market appears to have undergone a fundamental and structural shift. That upward shift in the market was unpredictable – ruining the previously good track record of EIA and some of the leading private sector experts on oil.

For example, in July 2003, EIA predicted that the price of WTI would be $26 per barrel by the end of 2004, which represented a decline of about $5 per barrel from the

price of WTI at the time of the prediction. Instead, the price of WTI skyrocketed by about $13 per barrel over that period.

Moreover, in subsequent EIA forecasts, its predictions were consistently wrong as the price of WTI continued to climb. For example:

- In April 2004, it forecasted the price of WTI to be $30 per barrel in 2004. Instead it rose through the high $40s and even went above $50 per barrel. It also predicted that the price of WTI would decline from $30 per barrel during 2005. (Instead the price of WTI shot through the $50 per barrel range.)
- In January 2005, EIA forecasted $42 to $43 per barrel throughout 2005 and 2006. (But we are now seeing prices over $70 per barrel.)
- In May 2005, EIA predicated that the price of WTI would be $50 per barrel throughout 2005 and 2006. (Again, we are now seeing prices over $70 per barrel.)

Only in its more recent forecasts has EIA begun to recognize that higher oil prices appear to be here to stay. In September 2005 and in January 2006, it estimated that the price of WTI for 2005 through 2007 would be between $61 and $62 per barrel. The idea that fuel prices will remain at this high level is also supported by the forward curve – which shows the price buyers are willing to pay at a specific time in the future – for light sweet crude oil, which shows prices between $69 and $76 per barrel through 2012.[5] However, the oil prices we are hoping for as well as EIA's predictions of $61-62 per barrel through 2007 may be too low.

EIA data are helpful to illustrate the fundamental change in the marketplace that has occurred since January 2003, although it is only one source of data that Norfolk

[5] Forward curve available at http://www.nymex.com/. Data referenced in the text is as of April 26, 2006. Even now there are ambiguities about what will happen in the fuel market in the future. Even as EIA and the future curve for light sweet crude oil show prices going higher, some private forecasting companies, such as Moody's and Global Insight, predict declines of varying degrees between now and the end of 2008.

Southern uses to understand the fuel market. This government agency has access to supply and demand information that is available to few others. Yet, even it has struggled since January 2003 to understand and to forecast accurately the transition in the fuel market. Like EIA and others, Norfolk Southern has closely monitored the fuel market and has struggled to adapt to the change. As explained in the next section, Norfolk Southern has responded on several occasions to the effects on its business and in the transportation marketplace that have resulted from increases in oil prices.

## II. Norfolk Southern Has Continually Monitored and Responded to the Changing Fuel Market.

Fuel is a major expense for Norfolk Southern. Norfolk Southern consumes over 500 million gallons per year. Last year, Norfolk Southern incurred $875 million in operating expense for fuel.[6] This level of expense was 47% higher than the prior year, although Norfolk Southern consumed only 2% more fuel than the prior year.

Like other railroads and other transportation companies, Norfolk Southern looks for ways to limit the impact of fluctuations in the price of fuel. As the upward shift in the oil market began, Norfolk Southern realized it had to act. Although Norfolk Southern had hoped oil prices were climbing only temporarily, it adopted its first fuel surcharge program on non-intermodal public rate authorities in 2000, which I will refer to as the "original fuel surcharge." In March 2004, Norfolk Southern refined its fuel surcharge to

6 This figure excludes any hedge benefits.

be more responsive to fluctuations in the price of oil, which at that time was continuing to rise. I will refer to this fuel surcharge program as the "modified fuel surcharge."[7]

**A. Norfolk Southern Adopted and Refined a Fuel Surcharge Program.**

Norfolk Southern's original fuel surcharge applied whenever the price of WTI was greater than $28.00 for 30 consecutive Wall Street Journal publication days. At that point, the applicable fuel surcharge percentage was 2% of the line-haul rate.

The applicable fuel surcharge percentage would change after the daily price of WTI, as published in the Wall Street Journal, was higher than the next higher or lower trigger point for 30 consecutive days. The trigger points increased from $28.00 in $5.00 increments, while the applicable fuel surcharge percentage increased in increments of 2%. The following tables illustrate the WTI trigger points and applicable fuel surcharge percentages:

| WTI price for 30 consecutive days above . . . | Fuel Surcharge Percentage |
|---|---|
| $28.00 | 2% |
| $33.00 | 4% |
| $38.00 | 6% |
| $43.00 | 8% |
| $48.00 | 10% |

[7] The fuel surcharges described herein apply to regulated and exempt traffic, except intermodal, that is not under contract. Norfolk Southern also includes fuel surcharges in contracts, which by statute are outside the regulatory regime pursuant to 49 USC 10709.

| WTI price for 30 consecutive days below . . . | Fuel Surcharge Percentage |
|---|---|
| $28.00 | 0% |
| $33.00 | 2% |
| $38.00 | 4% |
| $43.00 | 6% |
| $48.00 | 8% |

Thus, if the fuel surcharge percentage was 8% and for 30 consecutive publication days the Wall Street Journal reported the WTI price at less than $43.00 per barrel (but greater than $38), then the applicable fuel surcharge percentage would decline to 6%. Conversely if the Wall Street Journal reported the WTI price for 30 consecutive days was greater than $48.00 per barrel (but less than $53), then the applicable fuel surcharge percentage would rise to 10%.

Because the fuel surcharge changed only after 30 consecutive days of the price of WTI being above or below a trigger point, it was less reflective of the fuel market. The $5.00 increments for the trigger points and the larger spread in the applicable percentages also made this fuel surcharge less reflective of the fuel market. For example, on January 13, 2003, the price of WTI had been below $48 per barrel for 29 consecutive days as reported in the Wall Street Journal. But on the 30th day, the price was reported at $48.38. Accordingly, the customers did not get a reduction in the fuel surcharge.

In addition, the change could occur at any time during the month, which made it hard for customers to plan.

On March 1, 2004, Norfolk Southern began using its modified fuel surcharge program, which addressed many of the weaknesses in its original fuel surcharge. This modified fuel surcharge program remains applicable to many of the rates published before July 1, 2006.

The modified fuel surcharge is based on the monthly average price of WTI. The average monthly WTI price for a given calendar month is determined by adding the daily WTI prices published in the Wall Street Journal during a calendar month,[8] and dividing the result by the number of days so published. The result is rounded to the nearest cent.

A fuel surcharge applies when the monthly average WTI price exceeds $23.00. Norfolk Southern assesses a fuel surcharge two calendar months later. Thus, if the WTI Average Price exceeds $23.00 in January, Norfolk Southern assesses the applicable fuel surcharge percentage to all bills of lading dated in the month of March. The applicable fuel surcharge percentage, if any, changes monthly.

The applicable fuel surcharge equals 0.4% of the line-haul freight rate for every $1.00, or portion thereof, in excess of $23.00. A few examples illustrate the way the fuel surcharge works:

| WTI Average Monthly Price Per Barrel | Fuel Surcharge Percentage |
|---|---|
| $23.00 and below | No Surcharge |
| $23.01-$24.00 | 0.4% |
| $24.01-$25.00 | 0.8% |
| $25.01-$26.00 | 1.2% |

For April 2006, Norfolk Southern's fuel surcharge is 15.6%.

This program had important benefits over the original fuel surcharge program. First, the fuel surcharge changed every month, which meant it was more closely tied to the fuel markets. Second, the fuel charge was also more closely tied to the fuel markets because it changed in smaller increments (0.4%) and with smaller fluctuations in the monthly average WTI price (every $1.00). Third, it provided additional lead time for

[8] If the Wall Street Journal ceases publication of the price of WTI, Norfolk Southern would employ a suitable substitute source of price.

customers to prepare for a change in the fuel surcharge. Fourth, it was easier to administer because customers knew the fuel surcharge would be recalculated monthly and would not change during the month.

### B. The Fuel Market Has Made the Original and Modified Fuel Surcharge Programs Outdated.

Norfolk Southern's fuel surcharge programs were a response to the rising oil prices described above. They were consistent with what other railroads were doing at the time. They were also consistent with the fuel surcharge mechanisms approved by the Interstate Commerce Commission during the oil crisis of the 1970s in that they applied as a percentage of the line-haul rate.[9]

When Norfolk Southern adopted its original and modified fuel surcharges it established trigger points in the $20s, which is where the market generally had been in the recent past and was then-forecasted to be. While these fuel surcharges were in effect, Norfolk Southern became more successful at recovering its fuel costs. In several earlier years, the increase in Norfolk Southern's fuel surcharge revenue was less, sometimes substantially less, than its increased diesel fuel, gasoline, and lubricant expenses. But, in 2005 with the highest oil prices since we adopted a fuel surcharge program, Norfolk Southern's increase in fuel surcharge revenue exceeded the increase in its diesel fuel, gasoline, and lubricants expenses.

Norfolk Southern's 2005 experience is similar to other transportation companies. For example, Federal Express reported in its 2005 Annual Report that its "fuel surcharge

[9] Fuel Related Increases, X-305-A, Investigation and Suspension Docket No. 8968, 349 I.C.C. 173 (Feb. 26, 1975).

revenue more than offset higher jet fuel prices in 2005." In addition, in 2005, Swift Transportation had year-over-year revenues from fuel surcharges that were greater than its year-over-year increase in fuel costs, whereas it had not in 2004.[10]

Although we do not believe that a year-over-year comparison is the proper way to analyze fuel surcharge recovery, the fuel prices that we saw in 2005 caused us to look harder at what sustained higher oil prices would mean for Norfolk Southern and our customers. For some time, Norfolk Southern has been examining the fuel markets and evaluating possible responses. The ongoing dialogue with the Board, which includes this hearing, over issues related to fuel have helped sharpen our focus and crystallize our thinking. We now believe a new baseline is appropriate in light of the trend in oil prices over the last 12 to 24 months. We hold this belief despite the fact that there are still uncertainties about the price of oil and its impacts on Norfolk Southern. Recognizing that no fuel surcharge will ever be perfect, we decided to refine our fuel surcharge program a second time

## III. Norfolk Southern's New Fuel Surcharge Program Responds to Change in Fuel Market.

On April 24, 2006, Norfolk Southern announced a new fuel surcharge program for public rate authorities for non-intermodal traffic in response to what it perceives as persistently higher oil prices. Norfolk Southern's new fuel surcharge program is based on the monthly average price of WTI, which is calculated in the same way as under the

---

10 According to its 2005 10-K, Swift's fuel costs were $164 million more than in 2004 while its fuel surcharge revenue was $202 million more than in 2004. Comparatively, Swift's fuel costs in 2004 were $120 million more than in 2003 while its fuel surcharge revenue in 2004 was $101 million more than in 2003. Based on data in Securities and Exchange Commission Form 10-K filed by Swift Transportation on March 6, 2006, available at www.sec.gov.

old fuel surcharge program. The applicable fuel surcharge, if any, will change monthly and will still apply two calendar months later.

However, a fuel surcharge will apply when the monthly average WTI price exceeds $64.00, rather than when it exceeds $23.00. In addition, the applicable fuel surcharge will be 0.3%, rather than 0.4%, of the line-haul freight rate for every $1.00, or portion thereof, in excess of $64.00.

Norfolk Southern's decision to reduce its fuel surcharge percentage is consistent with what other transportation companies have done. Last year, Federal Express lowered its fuel surcharge index by 2%.[11] Canadian National also reduced its fuel surcharge last year on two occasions.[12] Similarly, United Parcel Service also reduced its fuel surcharge index by 2% on domestic and international air traffic effective January 2006.[13] A few examples illustrate the way the new fuel surcharge will work:

| WTI Average Price Per Barrel | Fuel Surcharge Percentage |
|---|---|
| $64.00 and below | No Surcharge |
| $64.01-$65.00 | 0.3% |
| $65.01-$66.00 | 0.6% |
| $66.01-$67.00 | 0.9% |

During the period in which we considered and planned to make this refinement, we thought it would result in customers paying no fuel surcharge. For example, based on the average price of WTI in February and March, shippers subject to this fuel surcharge would have paid no fuel surcharge at all.

[11] Securities and Exchange Commission Form 10-K filed by Federal Express Corporation on July 14, 2005, at 23, available at www.sec.gov.

[12] Canadian National Railway Company CN 7401-A Fuel Surcharge Notice, available at http://www.cn.ca/customer_centre/services_support/supp_services_tariffs/en_KFChargeableServices.shtml

[13] Securities and Exchange Commission Form 10-K filed by United Parcel Service on Mar. 14, 2006, at 26-27, available at www.sec.gov.

But fuel prices remain volatile for a variety of reasons including what is happening in Iran, the growing consumption in China, and a host of other factors. For example, since the Board announced this hearing, the price of WTI has increased from $61.78 per barrel (March 14, 2006) to $68.38 per barrel (April 26, 2006), and was almost $74 per barrel at one point during this period. In light of the continued volatility and uncertainty in the oil market, Norfolk Southern will continue to monitor the oil market and will consider further refinements to its fuel surcharges as appropriate.

We are aware that some parties to this hearing have expressed concerns over the fairness of how fuel surcharges are applied in the rail industry. Norfolk Southern has looked and continues to look at ways to address this problem, including creating a mileage-based fuel surcharge program. However, any solution to this issue is complex and would result in some shippers paying more than they currently pay in fuel surcharges.

In addition, attempting to tailor a fuel surcharge to each individual movement, of which there are hundreds of thousands on Norfolk Southern, would be expensive, time consuming and, at the end of the day, most likely impossible. There are too many variables that determine how much fuel is needed for each individual movement. Those variables include the weight of the loaded car, the grade over which the car must travel, the total number of miles the car must be transported, whether the car is moved in a unit train, how many locomotives are on the train, and how many times the car must be switched. As a result Norfolk Southern would have to calculate and bill thousands of different fuel surcharges for each of the movements. This would be no small task given the 64,000 lanes in which our traffic moves and the 1,925 commodities (excluding

intermodal) different STCC codes of commodities we carry. Accordingly, it is nearly impossible – given the number of customers Norfolk Southern has and the even larger number of individual movements it handles – to calibrate any fuel surcharge program to recover the incremental cost of fuel.

## IV. Demand Continues to Grow, and Norfolk Southern's Total Price for Transportation Will Remain at Market Levels So That It Can Continue to Aggressively Invest In Capacity.

Since we adopted our original fuel surcharge, traffic on Norfolk Southern has grown steadily. Between 2000 and 2005, our traffic volume is up 14%, which compares to 1.1% growth in the Low Tech Industrial Production Index over the same period. And our volumes continue to grow. Traffic volumes were up 5% in the first quarter of 2006 compared to the first quarter of 2005.

We strive to set our overall prices at market levels, and we will continue to do so. We use the market as our gauge when negotiating contract arrangements and when determining the appropriate level of our public rate authorities.

We will continue to set our rates at market levels. Accordingly, a lower fuel surcharge will often mean a higher base transportation rate as we set our prices at the optimal market level. So a different fuel surcharge does not necessarily mean that customers' transportation bills will decline, which is not unusual when demand is so strong. For example, when Federal Express lowered its fuel surcharge index by 2% last year, it increased its average list price by 4.6%.[14] Similarly, when United Parcel Service

[14] Securities and Exchange Commission Form 10-K filed by Federal Express Corporation on July 14, 2005, at 23, available at www.sec.gov.

reduced its fuel surcharge index by 2% on domestic and international air effective January 2006, it did so only after taking a 5.5% rate increase.[15]

Maintaining rates at market levels is critically important in these times of increasing freight transportation demand. We all know that the U.S Department of Transportation has estimated that the demand for freight transportation will increase by 55 percent by 2020 and that the American Association of State Highway and Transportation Officials projected that freight tonnage will grow by almost 57 percent between 2000 and 2020. Norfolk Southern is seeing that growth. Last year our intermodal volume was up 9% in units, coal volume was up 3% in carloads, and construction materials and metals, forest products, and agriculture shipments were each up 2% in carloads. This year has started with similarly robust demand.

At the Board's Hearing on the 25th Anniversary of the Staggers Rail Act of 1980: A Review and Look Ahead, Mr. Stephen C. Tobias, Vice Chairman and Chief Operating Officer of Norfolk Southern Corporation, testified to the capacity needs of our railroad – not just to meet the increasing demand we are facing but to be able to respond to the events that affect our ability to serve our customers, such as Hurricane Katrina.[16] Those needs include expanded infrastructure as well as investments in technology – not to mention simply maintaining our existing network.

For 2006, our capital budget is about $1.2 billion – almost one-half a billion dollars, or 65 percent, more than in 2002. Norfolk Southern is purchasing 120 new locomotives and is rehabilitating 420 locomotives this year in addition to the 491

---

15 Securities and Exchange Commission Form 10-K filed by United Parcel Service on Mar. 14, 2006, at 26-27, available at www.sec.gov.

16 Written Testimony of Stephen C. Tobias, Ex Parte 658, Hearing on the 25th Anniversary of the Staggers Rail Act of 1980: A Review and Look Ahead (submitted Oct. 12, 2005).

locomotives it rehabilitated last year. We are also investing heavily in some of the corridors on which we see further growth, including the Heartland Corridor project, which when completed will permit double-stack intermodal service from the Port of Norfolk to Columbus, Ohio. Maintaining market rates will help us to grow our capacity to meet this nation's transportation needs.

## V. Reporting Requirements.

The Board's order regarding this hearing asked the parties to address "whether and how [the Board's reporting requirements] should be adjusted to provide rail customers with better information on a carrier's fuel costs and the revenues collected through fuel surcharges."

NS already provides public information in response to the requirements of the Board. Each year, Norfolk Southern files its R-1 with the Board. It also files with the Board quarterly data. Moreover, Norfolk Southern also provides a considerable amount of financial information to the public through its filings with the Securities Exchange Commission. Accordingly, Norfolk Southern does not think additional reporting would serve much purpose.

Nevertheless, if the Board determined that there was some value in adding yet further reporting requirements, Norfolk Southern asks that any reporting obligation be prospective only and that the Board allow us at least 90 days to modify our systems to minimize the cost of compliance.

## VI. Conclusion

Like so many other companies, Norfolk Southern has had to conduct its business in the face of dramatic increases in the price of oil and has struggled to understand and respond to those increases. At the same time, it has faced unprecedented demand for its rail services – a demand that shows no signs of abating and that requires us to continue aggressively to invest in capacity on our railroad.

Our new fuel surcharge program responds to what we believe is a fundamental and structural shift in the oil market to sustained higher fuel prices. However, our latest announcement is only the most recent in a series of actions Norfolk Southern has taken during this shift in the fuel market and the resulting changes in the transportation marketplace. As events warrant, we will continue to respond to the oil market and the changes it produces in the transportation marketplace.

**CERTIFICATE OF SERVICE**

I verify that on this day, April 27, 2006, I have caused copies of the Written Statement of Norfolk Southern Corporation to be served upon all parties of record in this proceeding by first-class mail or more expeditious method of delivery.

Matthew J. Warren

# EXHIBIT PX0762

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549
**FORM 10-K**

(X) ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 For the fiscal year ended **DEC. 31, 2007**

( ) TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 For the transition period from _________ to _________

Commission file number 1-8339

NORFOLK SOUTHERN

**NORFOLK SOUTHERN CORPORATION**
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Virginia**<br>(State or other jurisdiction of incorporation) | **52-1188014**<br>(IRS Employer Identification No.) |
| **Three Commercial Place**<br>**Norfolk, Virginia**<br>(Address of principal executive offices) | **23510-2191**<br>Zip Code |
| Registrant's telephone number, including area code | **(757) 629-2680** |

**No Change**
(Former name, former address and former fiscal year, if changed since last report.)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each Class | Name of each exchange on which registered |
|---|---|
| **Norfolk Southern Corporation Common Stock (Par Value $1.00)** | **New York Stock Exchange** |

Securities registered pursuant to Section 12(g) of the Act: NONE

Indicate by checkmark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes (X) No ( )

Indicate by checkmark if the registrant is not required to file such reports pursuant to Section 13 or 15(d) of the Act. Yes ( ) No (X)

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or Section 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes (X) No ( )

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ( )

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act.
Large accelerated filer (X) Accelerated filer ( ) Non-accelerated filer ( )

Indicate by checkmark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ( ) No (X)

The aggregate market value of the voting common equity held by nonaffiliates as of June 29, 2007 was $20,633,804,749 (based on the closing price as quoted on the New York Stock Exchange on that date).

The number of shares outstanding of each of the registrant's classes of common stock, as of Jan. 31, 2008: 376,332,668 (excluding 20,672,924 shares held by the registrant's consolidated subsidiaries).

**DOCUMENTS INCORPORATED BY REFERENCE:**

Portions of the Registrant's definitive proxy statement to be filed electronically pursuant to Regulation 14A not later than 120 days after the end of the fiscal year, are incorporated by reference in Part III.

## TABLE OF CONTENTS

## NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES (NS)


| | | | Page |
|---|---|---|---|
| Part I. | Items 1 and 2. | Business and Properties | K3 |
| | Item 1A. | Risk Factors | K13 |
| | Item 1B. | Unresolved Staff Comments | K15 |
| | Item 3. | Legal Proceedings | K16 |
| | Item 4. | Submission of Matters to a Vote of Security Holders | K16 |
| | | Executive Officers of the Registrant | K17 |
| Part II. | Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | K19 |
| | Item 6. | Selected Financial Data | K20 |
| | Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | K22 |
| | Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | K39 |
| | Item 8. | Financial Statements and Supplementary Data | K40 |
| | Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | K77 |
| | Item 9A. | Controls and Procedures | K77 |
| | Item 9B. | Other Information | K77 |
| Part III. | Item 10. | Directors, Executive Officers and Corporate Governance | K78 |
| | Item 11. | Executive Compensation | K78 |
| | Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | K78 |
| | Item 13. | Certain Relationships and Related Transactions, and Director Independence | K81 |
| | Item 14. | Principal Accountant Fees and Services | K81 |
| Part IV. | Item 15. | Exhibits and Financial Statement Schedules | K82 |
| | | Power of Attorney | K92 |
| | | Signatures | K92 |

# PART I

## NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES (NS)

### Item 1. Business. and Item 2. Properties.

**GENERAL -** Norfolk Southern Corporation (Norfolk Southern) is a Norfolk, Virginia based company that controls a major freight railroad, Norfolk Southern Railway Company. Norfolk Southern Railway Company is primarily engaged in the rail transportation of raw materials, intermediate products and finished goods primarily in the Southeast, East and Midwest and, via interchange with rail carriers, to and from the rest of the United States. Norfolk Southern also transports overseas freight through several Atlantic and Gulf Coast ports. Norfolk Southern provides comprehensive logistics services and offers the most extensive intermodal network in the eastern half of the United States. The common stock of Norfolk Southern is listed on the New York Stock Exchange (NYSE) under the symbol "NSC."

Norfolk Southern was incorporated on July 23, 1980, under the laws of the Commonwealth of Virginia. On June l, 1982, Norfolk Southern acquired control of two major operating railroads, Norfolk and Western Railway Company (NW) and Southern Railway Company (Southern) in accordance with an Agreement of Merger and Reorganization dated as of July 31, 1980, and with the approval of the transaction by the Interstate Commerce Commission (now the Surface Transportation Board [STB]). Effective Dec. 31, 1990, Norfolk Southern transferred all the common stock of NW to Southern, and Southern's name was changed to Norfolk Southern Railway Company (Norfolk Southern Railway or NSR). Effective Sept. 1, 1998, NW was merged with and into Norfolk Southern Railway. As of Dec. 31, 2007, all the common stock of Norfolk Southern Railway was owned directly by Norfolk Southern.

Through a limited liability company, Norfolk Southern and CSX Corporation (CSX) jointly own Conrail Inc. (Conrail), whose primary subsidiary is Consolidated Rail Corporation (CRC). Norfolk Southern has a 58% economic and 50% voting interest in the jointly owned entity, and CSX has the remainder of the economic and voting interests. CRC owns and operates certain properties (the Shared Assets Areas) for the joint and exclusive benefit of NSR and CSX Transportation Inc. (CSXT) (see Note 4 to the Consolidated Financial Statements).

Norfolk Southern makes available free of charge through its website, www.nscorp.com, its annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and all amendments to those reports as soon as reasonably practicable after such material is electronically filed with or furnished to the Securities and Exchange Commission (SEC). In addition, the following documents are available on the company's website and in print to any shareholder who requests them:

- Corporate Governance Guidelines
- Charters of the Committees of the Board of Directors
- The Thoroughbred Code of Ethics for employees
- Code of Ethical Conduct for Senior Financial Officers
- Categorical Independence Standards for Directors

Unless otherwise indicated, Norfolk Southern and its subsidiaries are referred to collectively as NS.

**RAILROAD OPERATIONS –** As of Dec. 31, 2007, NS' railroads operated approximately 21,000 miles of road in 22 eastern states and the District of Columbia.

The system's lines reach many individual industries, electric generating facilities, mines (in western Virginia, eastern Kentucky, southern and northern West Virginia and western Pennsylvania), distribution centers, transload facilities and other businesses located in smaller communities in its service area.




Corridors with heaviest freight volume:

New York City area to Chicago (via Allentown and Pittsburgh)

Chicago to Macon (via Cincinnati, Chattanooga and Atlanta)

Appalachian coal fields of Virginia, West Virginia and Kentucky to Norfolk and Sandusky, OH

Cleveland to Kansas City

Birmingham to Meridian

Memphis to Chattanooga

The miles operated, which include major leased lines between Cincinnati, Ohio, and Chattanooga, Tennessee, and trackage rights over property owned by North Carolina Railway Company, were as follows:

**Mileage Operated as of Dec. 31, 2007**

| | Miles of Road | Second and Other Main Track | Passing Track, Crossovers and Turnouts | Way and Yard Switching | Total |
|---|---|---|---|---|---|
| Owned | 15,943 | 2,808 | 2,045 | 8,492 | 29,288 |
| Operated under lease, contract or trackage rights | 4,948 | 1,977 | 417 | 970 | 8,312 |
| Total | 20,891 | 4,785 | 2,462 | 9,462 | 37,600 |

**Triple Crown Operations** – Triple Crown Services Company (TCSC), NS' subsidiary, offers door-to-door intermodal service using RoadRailer® equipment and domestic containers. RoadRailer® units are enclosed vans that can be pulled over highways in tractor-trailer configuration and over the rails by locomotives. TCSC provides intermodal service in major traffic corridors, including those between the Midwest and the Northeast, the Midwest and the Southeast, and the Midwest and Texas.

The following table sets forth certain statistics relating to NS railroads' operations for the past 5 years:

**Rail Operating Statistics**

| | Years Ended Dec. 31, | | | | |
|---|---|---|---|---|---|
| | 2007 | 2006 | 2005 | 2004 | 2003 |
| Revenue ton miles (billions) | 196 | 204 | 203 | 198 | 183 |
| Freight train miles traveled (millions) | 81.9 | 84.2 | 81.2 | 77.7 | 73.9 |
| Revenue per ton mile | $0.0481 | $0.0462 | $0.0421 | $0.0369 | $0.0353 |
| Revenue ton miles per man-hour worked | 3,066 | 3,196 | 3,146 | 3,347 | 3,111 |
| Percentage ratio of railway operating expenses to railway operating revenues | 72.6% | 72.8% | 75.2% | 76.7% | 83.5%[1] |

[1]Includes $107 million of costs for a voluntary separation program, which added 1.6 percentage points to the ratio.

**RAILWAY OPERATING REVENUES --** NS' total railway operating revenues were $9.4 billion in 2007. See the financial information by traffic segment in Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**COAL TRAFFIC --** Coal, coke and iron ore -- most of which is bituminous coal -- is NS' railroads' largest commodity group as measured by revenues. The railroads handled a total of 186.0 million tons in 2007, most of which originated on NS' lines in West Virginia, Virginia, Pennsylvania and Kentucky. Revenues from coal, coke and iron ore accounted for about 25% of NS' total railway operating revenues in 2007.

Total coal handled through all system ports in 2007 was 34.1 million tons. Of this total, 13.4 million tons (including coastwise traffic) moved through Norfolk, Virginia, 2.9 million tons moved through the Baltimore Terminal, 10.9 million tons moved to various docks on the Ohio River, and 6.9 million tons moved to various

Lake Erie ports. Other than coal for export, virtually all coal handled by NS' railroads was terminated in states east of the Mississippi River.

See the discussion of coal traffic, by type of coal, in Part II, Item 7, “Management's Discussion and Analysis of Financial Condition and Results of Operations.”

**GENERAL MERCHANDISE TRAFFIC -** General merchandise traffic is composed of five major commodity groupings: automotive; chemicals; metals and construction; agriculture, consumer products and government; and paper, clay and forest products. The automotive group includes finished vehicles for BMW, Chrysler, Ford Motor Company, General Motors, Honda, Isuzu, Jaguar, Land Rover, Mazda, Mercedes-Benz, Mitsubishi, Nissan, Saab, Subaru, Suzuki, Toyota and Volkswagen, and auto parts for Ford Motor Company, General Motors, Mercedes-Benz and Toyota. The chemicals group includes sulfur and related chemicals, petroleum products, chlorine and bleaching compounds, plastics, rubber, industrial chemicals, chemical wastes and municipal wastes. The metals and construction group includes steel, aluminum products, machinery, scrap metals, cement, aggregates, bricks and minerals. The agriculture, consumer products and government group includes soybeans, wheat, corn, fertilizer, animal and poultry feed, food oils, flour, beverages, canned goods, sweeteners, consumer products, ethanol and items for the military. The paper, clay and forest products group includes lumber and wood products, pulp board and paper products, wood fibers, wood pulp, scrap paper and clay.

In 2007, 142 million tons of general merchandise freight, or approximately 67% of total general merchandise tonnage handled by NS, originated online. The balance of general merchandise traffic was received from connecting carriers at interterritorial gateways. The principal interchange points for NS-received traffic included Chicago, Memphis, New Orleans, Cincinnati, Kansas City, Detroit, Hagerstown, St. Louis/East St. Louis and Louisville. General merchandise carloads handled in 2007 were 2.8 million, the revenue from which accounted for 55% of NS’ total railway operating revenues in 2007.

See the discussion of general merchandise rail traffic by commodity group in Part II, Item 7, “Management's Discussion and Analysis of Financial Condition and Results of Operations.”

**INTERMODAL TRAFFIC -** The intermodal market consists of shipments moving in trailers, domestic and international containers, and Roadrailer® equipment. These shipments are handled on behalf of intermodal marketing companies, international steamship lines, truckers and other shippers. Intermodal units handled in 2007 were 3.1 million, the revenues from which accounted for 20% of NS’ total railway operating revenues for the year.

See the discussion of intermodal traffic in Part II, Item 7, “Management's Discussion and Analysis of Financial Condition and Results of Operations.”

**FREIGHT RATES -** In 2007, NS' railroads continued their reliance on private contracts and exempt price quotes as their predominant pricing mechanisms. Thus, a major portion of NS' railroads' freight business is not currently economically regulated by the government. In general, market forces have been substituted for government regulation and now are the primary determinant of rail service prices.

In 2006, NS' railroads were found by the STB to be “revenue adequate” based on results for the year 2005. The STB has not made its revenue adequacy determination for the year 2006. A railroad is “revenue adequate” under the applicable law when its return on net investment exceeds the rail industry's composite cost of capital. This determination is made pursuant to a statutory requirement.

**PASSENGER OPERATIONS**

- Regularly scheduled passenger trains are operated by Amtrak on NS' lines between the following locations:
  - Alexandria, Virginia, and New Orleans, Louisiana
  - Raleigh and Charlotte, North Carolina
  - Selma and Charlotte, North Carolina
  - Chicago, Illinois, and Porter, Indiana
  - Chicago, Illinois, and Battle Creek, Michigan
  - Chicago, Illinois, and Pittsburgh, Pennsylvania
  - Chicago, Illinois, and Detroit, Michigan
  - Pittsburgh and Harrisburg, Pennsylvania
- Commuter trains are operated on the NS line between Manassas and Alexandria in accordance with contracts with two transportation commissions of the Commonwealth of Virginia
- NS leases the Chicago to Manhattan, Illinois, line to the Commuter Rail Division of the Regional Transportation Authority of Northeast Illinois
- NS operates freight service over lines with significant ongoing Amtrak and commuter passenger operations, and is conducting freight operations over trackage owned by:
  - Amtrak
  - New Jersey Transit
  - Southeastern Pennsylvania Transportation Authority
  - Metro-North Commuter Railroad Company
  - Maryland Department of Transportation
- Passenger operations are conducted either by Amtrak or by the commuter agencies over trackage owned by Conrail in the Shared Assets Areas.

**NONCARRIER OPERATIONS -** NS' noncarrier subsidiaries engage principally in the acquisition, leasing and management of coal, oil, gas and minerals; the development of commercial real estate; telecommunications; and the leasing or sale of rail property and equipment. In 2007, no such noncarrier subsidiary or industry segment grouping of noncarrier subsidiaries met the requirements for a reportable business segment set forth in Statement of Financial Accounting Standards No. 131.

**RAILWAY PROPERTY**

The NS railroad system extends across 22 states and the District of Columbia. The railroad infrastructure makes the company capital intensive with total property of approximately $22 billion.

**Capital Expenditures -** Capital expenditures for road, equipment and other property for the past five years were as follows (including capitalized leases):

**Capital Expenditures**

| | 2007 | 2006 | 2005 | 2004 | 2003 |
|---|---|---|---|---|---|
| | | | *($ in millions)* | | |
| Road and other property | $ 894 | $ 756 | $ 741 | $ 612 | $ 502 |
| Equipment | 447 | 422 | 284 | 429 | 218 |
| Total | $ 1,341 | $ 1,178 | $ 1,025 | $ 1,041 | $ 720 |

Capital spending and maintenance programs are and have been designed to assure the ability to provide safe, efficient and reliable transportation services. For 2008, NS has budgeted $1.43 billion of capital expenditures. On May 1, 2006, NS and Kansas City Southern (KCS) formed a joint venture (MSLLC) pursuant to which NS intends to contribute $300 million in cash, substantially all of which will be used for capital improvements over a period of approximately three years, in exchange for a 30% interest in the joint venture. Through Dec. 31, 2007, NS has contributed $240 million, see the discussion following "Cash used for investing activities," in Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**Equipment -** As of Dec. 31, 2007, NS owned or leased the following units of equipment:

| | | Number of Units | | Capacity |
|---|---|---|---|---|
| | **Owned*** | **Leased**** | **Total** | **Of Equipment** |
| Locomotives: | | | | (Horsepower) |
| Multiple purpose | 3,593 | 132 | 3,725 | 12,888,500 |
| Switching | 149 | -- | 149 | 216,700 |
| Auxiliary units | 74 | -- | 74 | -- |
| Total locomotives | 3,816 | 132 | 3,948 | 13,105,200 |
| Freight cars: | | | | (Tons) |
| Hopper | 17,153 | 808 | 17,961 | 1,916,374 |
| Box | 16,145 | 2,078 | 18,223 | 1,465,342 |
| Covered hopper | 8,830 | 2,805 | 11,635 | 1,274,667 |
| Gondola | 31,335 | 7,959 | 39,294 | 4,231,932 |
| Flat | 2,656 | 1,335 | 3,991 | 313,570 |
| Caboose | 177 | -- | 177 | -- |
| Other | 4,236 | 20 | 4,256 | 212,311 |
| Total freight cars | 80,532 | 15,005 | 95,537 | 9,414,196 |
| Other: | | | | |
| Work equipment | 5,274 | 3 | 5,277 | |
| Vehicles | 4,164 | -- | 4,164 | |
| Highway trailers and containers | 171 | 11,413 | 11,584 | |
| RoadRailer® | 7,035 | 193 | 7,228 | |
| Miscellaneous | 1,314 | 15,826 | 17,140 | |
| Total other | 17,958 | 27,435 | 45,393 | |

* Includes equipment leased to outside parties and equipment subject to equipment trusts, conditional sale agreements and capitalized leases.

** Includes 60 locomotives and 5,776 freight cars leased from CRC.

The following table indicates the number and year built for locomotives and freight cars owned at Dec. 31, 2007.

| | Year Built | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2007 | 2006 | 2005 | 2004 | 2003 | 1996-2002 | 1991-1995 | 1990 & Before | Total |
| Locomotives: | | | | | | | | | |
| No. of units | 90 | 143 | 89 | 207 | 100 | 906 | 487 | 1,794 | 3,816 |
| % of fleet | 2% | 4% | 2% | 5% | 3% | 24% | 13% | 47% | 100% |
| Freight cars: | | | | | | | | | |
| No. of units | 1,200 | 404 | 89 | -- | -- | 5,620 | 5,008 | 68,211 | 80,532 |
| % of fleet | 1% | 1% | --% | --% | --% | 7% | 6% | 85% | 100% |

The following table shows the average age of NS' locomotive and freight car fleets at Dec. 31, 2007, and the number of retirements in 2007:

| | Locomotives | Freight Cars |
|---|---|---|
| Average age – in service | 18.1 years | 30.1 years |
| Retirements | 64 units | 3,598 units |
| Average age – retired | 30.0 years | 38.9 years |

Between 1988 and 2000, about 29,000 coal cars were rebodied. As a result, the remaining serviceability of the freight car fleet is greater than may be inferred from the high percentage of freight cars built in earlier years.

Ongoing freight car and locomotive maintenance programs are intended to ensure the highest standards of safety, reliability, customer satisfaction and equipment marketability. The locomotive bad order ratio includes units out of service for required inspections every 92 days and program work such as overhauls.

**Annual Average Bad Order Ratio**

| | 2007 | 2006 | 2005 | 2004 | 2003 |
|---|---|---|---|---|---|
| Freight cars | 4.9% | 6.4% | 6.3% | 7.4% | 7.4% |
| Locomotives | 5.7% | 5.7% | 6.2% | 6.3% | 6.2% |

**Encumbrances -** Certain railroad equipment is subject to the prior lien of equipment financing obligations amounting to approximately $389 million as of Dec. 31, 2007, and $534 million as of Dec. 31, 2006.

**Track Maintenance -** Of the approximately 38,000 total miles of track operated, NS had responsibility for maintaining about 29,300 miles of track with the remainder being operated under trackage rights.

Over 75% of the main line trackage (including first, second, third and branch main tracks, all excluding trackage rights) has rail ranging from 131 to 155 pounds per yard with the standard installation currently at 136 pounds per yard. Approximately 45% of NS lines carried 20 million or more gross tons per track mile during 2007.

The following table summarizes several measurements regarding NS' track roadway additions and replacements during the past five years:

| | 2007 | 2006 | 2005 | 2004 | 2003 |
|---|---|---|---|---|---|
| Track miles of rail installed | 401 | 327 | 302 | 246 | 233 |
| Miles of track surfaced | 5,014 | 4,871 | 4,663 | 5,055 | 5,105 |
| New crossties installed (millions) | 2.7 | 2.7 | 2.5 | 2.5 | 2.8 |

**Microwave System -** The NS microwave system, consisting of approximately 7,400 radio route miles, 424 core stations, 14 secondary stations and 5 passive repeater stations, provides communications between most operating locations. The microwave system is used primarily for voice communications, VHF radio control circuits, data and facsimile transmissions, traffic control operations and AEI data transmissions.

**Traffic Control -** Of the approximately 15,900 route miles owned by NS, about 11,000 miles are signalized, including 8,000 miles of centralized traffic control (CTC) and 3,000 miles of automatic block signals. Of the 8,000 miles of CTC, approximately 3,000 miles are controlled by data radio originating at 258 base station radio sites.

**Computers -** A computer network consisting of a centralized data center in Atlanta, Georgia, and various distributed computers throughout the company connects the yards, terminals, transportation offices, rolling stock repair points, sales offices and other key system locations. Operating and traffic data are processed and stored to provide customers with information on their shipments throughout the system. Computer systems provide current information on the location of every train and each car on line, as well as related waybill and other train and car movement data. In addition, the computer systems are utilized to assist management in the performance of a variety of functions and services including payroll, car and revenue accounting, billing, material management activities and controls, and special studies.

**ENVIRONMENTAL MATTERS -** Compliance with federal, state and local laws and regulations relating to the protection of the environment is a principal NS goal. To date, such compliance has not affected materially NS' capital additions, earnings, liquidity or competitive position. See “Legal Proceedings,” Part I, Item 3; “Personal Injury, Environmental and Legal Liabilities” in Part II, Item 7, “Management's Discussion and Analysis of Financial Condition and Results of Operations;” and Note 17 to the Consolidated Financial Statements.

**EMPLOYEES –** The following table shows the average number of employees and the average cost per employee for wages and benefits:

| | 2007 | 2006 | 2005 | 2004 | 2003 |
|---|---|---|---|---|---|
| Average number of employees | 30,806 | 30,541 | 30,294 | 28,475 | 28,753 |
| Average wage cost per employee | $62,000 | $62,000 | $61,000 | $59,000 | $58,000 |
| Average benefit cost per employee | $30,000 | $32,000 | $29,000 | $28,000 | $28,000 |

Approximately 85% of NS' railroad employees are covered by collective bargaining agreements with various labor unions. See the discussion of “Labor Agreements” in Part II, Item 7, “Management's Discussion and Analysis of Financial Condition and Results of Operations.”

**GOVERNMENT REGULATION -** In addition to environmental, safety, securities and other regulations generally applicable to all businesses, NS' railroads are subject to regulation by the STB. The STB has

jurisdiction over some rates, routes, conditions of service and the extension or abandonment of rail lines. The STB also has jurisdiction over the consolidation, merger or acquisition of control of and by rail common carriers. The Federal Railroad Administration regulates certain track and mechanical equipment standards.

The relaxation of economic regulation of railroads, begun over two decades ago under the Staggers Rail Act of 1980, includes exemptions of intermodal business (trailer-on-flat-car, container-on-flat-car), rail boxcar traffic, lumber, manufactured steel, automobiles and certain bulk commodities such as sand, gravel, pulpwood and wood chips for paper manufacturing. Transportation contracts on regulated shipments effectively remove those shipments from regulation as well for the duration of the contract. About 87% of NS' freight revenues come from either exempt traffic or traffic moving under transportation contracts.

Efforts were made in 2007 to re-subject the rail industry to unwarranted federal economic regulation and such efforts are expected to continue in 2008. The Staggers Rail Act of 1980, which substantially reduced such regulation, encouraged and enabled rail carriers to innovate and to compete for business, thereby contributing to the economic health of the nation and to the revitalization of the industry. Accordingly, NS will continue to oppose efforts to reimpose unwarranted economic regulation.

**COMPETITION -** There is continuing strong competition among rail, water and highway carriers. Price is usually only one factor of importance as shippers and receivers choose a transport mode and specific hauling company. Inventory carrying costs, service reliability, ease of handling and the desire to avoid loss and damage during transit are also important considerations, especially for higher-valued finished goods, machinery and consumer products. Even for raw materials, semifinished goods and work-in-process, users are increasingly sensitive to transport arrangements that minimize problems at successive production stages.

NS' primary rail competitor is the CSX system; both operate throughout much of the same territory. Other railroads also operate in parts of the territory. NS also competes with motor carriers, water carriers and with shippers who have the additional option of handling their own goods in private carriage.

Certain marketing strategies among railroads and between railroads and motor carriers enable carriers to compete more effectively in specific markets.

**SECURITY OF OPERATIONS -** NS has taken significant steps to provide enhanced security for the NS rail system. In particular, NS has developed and implemented a comprehensive security plan that is modeled on and was developed in conjunction with the security plan prepared by the Association of American Railroads (AAR) post September 11, 2001. The AAR Security Plan defines four Alert Levels and details the actions and countermeasures that are being applied across the railroad industry, as the terrorist threat increases or decreases. The Alert Level actions include countermeasures that will be applied in three general areas: (1) operations (including transportation, engineering, and mechanical); (2) information technology and communications; and (3) railroad police. Although security concerns preclude public disclosure of its contents, the NS Departmental Security Plan outlines the protocol within NS for all concerned to be notified of AAR Alert Level changes. All NS Operations Division employees are advised by their supervisors or train dispatchers, as appropriate, of any change in Alert Level and any additional responsibilities they may incur due to such change.

The NS plan also effectively addresses and complies with Department of Transportation security regulations pertaining to training and security plans with respect to the transportation of hazardous materials. Among more focused elements of the plan, security awareness training is given to all railroad employees who directly affect hazardous material transportation safety, and this training is integrated into recurring hazardous material training and re-certification programs. Toward that end, NS, working closely with the National Transit Institute at Rutgers University, developed a four-module uniform national training program. More in-depth security training has been given to those select NS employees who have been given specific security responsibilities, and additional,

location-specific security plans have been developed for certain metropolitan areas and each of six port facilities served by NS. With respect to the ports, each facility plan has been approved by the applicable Captain of the Port and subject to inspection by the U.S. Coast Guard.

Additionally, NS engages in close and regular coordination with numerous federal and state agencies, including the U.S. Department of Homeland Security (DHS), the Transportation Security Administration (TSA), the Federal Bureau of Investigation (FBI), the Federal Railroad Administration (FRA), the U.S. Coast Guard, U.S. Customs and Border Protection and various state Homeland Security offices. As one notable example, an NS Police Special Agent, under the auspices of the AAR, has been assigned to the National Joint Terrorism Task Force (NJTTF) operating out of FBI Headquarters in Washington, D.C. to represent and serve as liaison to the North American rail industry. This arrangement improves logistical flow of vital security and law enforcement information with respect to the rail industry as a whole, while having the post filled by an NS Special Agent has served to foster a strong working relationship between NS and the FBI. NS also has become a member of the Customs-Trade Partnership Against Terrorism (C-TPAT) program sponsored by U.S. Customs. C-TPAT allows NS to work closely with U.S. Customs and its customers to develop measures that will help ensure the integrity of freight shipments moving on NS, particularly those moving to or from a foreign country. Based on participation in C-TPAT, NS has ensured that its plan meets all current applicable security recommendations made by U.S. Customs.

Similarly, NS is guided in its operations by various supplemental security action items issued by DHS and U.S. Department of Transportation (DOT), U.S. Coast Guard Maritime Security requirements, as well as voluntary security action items developed in collaboration with TSA, DOT, and the freight railroads in 2006. Many of the action items are based on lessons learned from DHS and DOT security assessments of rail corridors in High Threat Urban Areas (HTUA) begun in 2004. Particular attention is paid to: (1) the establishment of secure storage areas for rail cars carrying toxic-by-inhalation (TIH) materials; (2) the expedited movement of trains transporting rail cars carrying TIH materials; (3) the minimization of unattended loaded tank cars carrying TIH materials; and (4) cooperation with federal, state, local and tribal governments to identify, through risk assessments, those locations where security risks are the highest. These action items and NS' compliance initiatives are outlined in the various departmental sections of the NS Departmental Security Plan.

In 2007, through participation in the Transportation Community Awareness and Emergency Response (TRANSCAER) Program, NS provided rail accident response training to approximately 5,000 emergency responders, such as local police and fire personnel, representing over 22,000 man-hours of emergency response training. NS' other training efforts throughout 2007 included participation in a major security drill with Amtrak and the State of Delaware in New Castle County, as well as coordinating table-top exercises involving the "staged" release of TIH shipments with various local, state, and federal agencies. NS also has ongoing programs to sponsor local emergency responders at tank car emergency response training programs conducted at the AAR Transportation Technology Center in Pueblo, Colorado, and its annual TRANSCAER Whistle-Stop train makes stops in numerous cities, its special training cars serving as a resource to an audience of nearly 1,000 emergency responders annually.

Improvements in equipment design also are expected to play a role in enhancing rail security. The AAR has developed new tank car specifications for chlorine and anhydrous ammonia which are scheduled to become effective on March 31, 2008. In the near future, the FRA is also expected to issue a proposed regulation addressing the redesign of pressurized tank cars used for the transportation of TIH gases and liquids. A consortium of chemical companies is also studying improvements in tank car head, shell, fittings, and thermal protection in order to improve the survivability of current tank cars.

**Item 1A. Risk Factors.**

**NS is subject to significant governmental regulation and legislation over commercial, environmental and operating matters.**

Railroads are subject to commercial regulation by the STB, which has jurisdiction over some routes, fuel surcharges, conditions of service and the extension or abandonment of rail lines. The STB also has jurisdiction over the consolidation, merger or acquisition of control of and by rail common carriers. In addition, Congress could enact re-regulation legislation. Economic re-regulation of the rail industry by Congress could have a significant negative impact on NS' ability to determine prices for rail services, reduce capital spending on its rail network, and result in a material adverse effect in the future on NS' financial position, results of operations or liquidity in a particular year or quarter.

Railroads are subject to safety and security regulation by the DOT and the DHS, which regulate most aspects of NS' operations. Proposed amendments to federal rail safety statutes, if enacted, could add significantly to operating costs and increase the number of employees NS and other railroads employ. In addition, NS' failure to comply with applicable laws and regulations could have a material adverse effect on NS.

NS' operations are subject to extensive federal, state, and local environmental laws and regulations concerning, among other things, emissions to the air; discharges to water ways or ground water supplies; handling, storage, transportation, and disposal of waste and other materials; and the cleanup of hazardous material or petroleum releases. The risk of incurring environmental liability – for acts and omissions, past, present and future – is inherent in the railroad business. Several of NS' subsidiaries own, or have owned, land used as operating property or held for sale, or which is leased or may have been leased and operated by others. Environmental problems that are latent or undisclosed may exist on these properties, and NS could incur environmental liabilities or costs, the amount and materiality of which cannot be estimated reliably at this time, with respect to one or more of these properties. Moreover, lawsuits and claims involving other unidentified environmental sites and matters are likely to arise from time to time, and the resulting liabilities could have a significant effect on financial position, results of operations or liquidity in a particular year or quarter.

**NS, as a common carrier by rail, must offer to transport hazardous materials, regardless of risk.** Transportation of certain hazardous materials could create catastrophic losses in terms of personal injury and property damage costs, and compromise critical parts of our rail network. Legislation introduced in Congress would give federal regulators increased authority to conduct investigations and levy substantial fines and penalties in connection with railroad accidents. Under provisions enacted in August 2007, federal regulators are required to prescribe new regulations governing railroads' transportation of hazardous materials, including annual routing analyses, security risk assessments and employee security training. Regulations proposed in late 2006 by DHS mandating chain of custody and security measures likely will cause service degradation and higher costs for the transportation of toxic inhalation hazard materials. Further, certain local governments have sought to enact ordinances banning hazardous materials moving by rail within their borders. Some legislators have contemplated pre-notification requirements for hazardous materials shipments. If promulgated such ordinances could require the re-routing of hazardous materials shipments, with the potential for significant additional costs and network inefficiencies.

**NS may be affected by terrorism or war.** Any terrorist attack, or other similar event, any government response thereto, and war or risk of war could cause significant business interruption and may adversely affect NS' results of operations, financial position, and liquidity in a particular year or quarter. Because NS plays a critical role in the nation's transportation system, it could become the target of such an attack or have a significant role in the government's preemptive approach or response to an attack or war.

Although NS currently maintains insurance coverage for third-party liability arising out of war and acts of terrorism, it maintains only limited insurance coverage for first-party property damage and damage to property in NS' care, custody or control caused by certain acts of terrorism. In addition, premiums for some or all of NS' current insurance programs covering these losses could increase dramatically, or insurance coverage for certain losses may not be available to NS in the future.

**NS may be affected by general economic conditions.** Prolonged negative changes in domestic and global economic conditions affecting the producers and consumers of the commodities NS carries may have an adverse effect on its operating results, financial position, and liquidity. Economic conditions resulting in bankruptcies of one or more large customers could have a significant impact on NS' financial position, results of operations or liquidity in a particular year or quarter.

**NS faces competition from other transportation providers.** NS is subject to competition from motor carriers, railroads, and to a lesser extent, ships, barges, and pipelines, on the basis of transit time, pricing, and the quality and reliability of service. While NS has used primarily internal resources to build or acquire and maintain its rail system, trucks and barges have been able to use public rights-of-way maintained by public entities. Any future improvements or expenditures materially increasing the quality or reducing the cost of alternative modes of transportation in the regions in which NS operates, or legislation granting materially greater latitude for motor carriers with respect to size or weight limitations, could have a material adverse effect on its financial position, results of operations or liquidity in a particular year or quarter.

**The operations of carriers with which NS interchanges may adversely affect its operations.** NS' ability to provide rail service to customers in the U.S. and Canada depends in large part upon its ability to maintain cooperative relationships with connecting carriers with respect to, among other matters, freight rates, revenue divisions, car supply and locomotive availability, data exchange and communications, reciprocal switching, interchange and trackage rights. Deterioration in the operations of, or service provided by connecting carriers, or in our relationship with those connecting carriers, could result in NS' inability to meet its customers' demands or require NS to use alternate train routes, which could result in significant additional costs and network inefficiencies.

**NS relies on technology and technology improvements in its business operations.** If NS experiences significant disruption or failure of one or more of its information technology systems, including computer hardware, software, and communications equipment, NS could experience a service interruption, security breach, or other operational difficulties, which could have a material adverse impact on its results of operations, financial condition, and liquidity in a particular year or quarter. Additionally, if NS does not have sufficient capital to acquire new technology or if it is unable to implement new technology, NS may suffer a competitive disadvantage within the rail industry and with companies providing other modes of transportation service, which could have a material adverse effect on its financial position, results of operations or liquidity in a particular year or quarter.

**The vast majority of NS employees belong to labor unions, and labor agreements, strikes, or work stoppages could adversely affect its operations.** Approximately 26,000, or about 85%, of NS railroad employees are covered by collective bargaining agreements with various labor unions. If unionized workers were to engage in a strike, work stoppage, or other slowdown, NS could experience a significant disruption of its operations. Additionally, future national labor agreements, or renegotiation of labor agreements or provisions of labor agreements, could significantly increase NS' costs for healthcare, wages, and other benefits. Any of these factors could have a material adverse impact on NS' financial position, results of operations or liquidity in a particular year or quarter.

**NS may be subject to various claims and lawsuits that could result in significant expenditures.** The nature of NS' business exposes it to the potential for various claims and litigation related to labor and employment, personal injury, commercial disputes, freight loss and other property damage, and other matters. Job-related

personal injury and occupational claims are subject to the Federal Employers' Liability Act (FELA), which is applicable only to railroads. FELA's fault-based tort system produces results that are unpredictable and inconsistent as compared with a no-fault worker's compensation system. The variability inherent in this system could result in actual costs being very different from the liability recorded.

Any material changes to current litigation trends or a catastrophic rail accident involving any or all of freight loss or property damage, personal injury, and environmental liability could have a material adverse effect on NS' operating results, financial condition, and liquidity to the extent not covered by insurance. NS has obtained insurance for potential losses for third-party liability and first-party property damages. Specified levels of risk are retained on a self-insurance basis (currently up to $25 million and above $1 billion per occurrence for bodily injury and property damage to third parties and $25 million and above $175 million per occurrence for property owned by NS or in its care, custody or control). Insurance is available from a limited number of insurers and may not continue to be available or, if available, may not be obtainable on terms acceptable to NS.

**Severe weather could result in significant business interruptions and expenditures.** Severe weather conditions and other natural phenomena, including hurricanes and floods, may cause significant business interruptions and result in increased costs, increased liabilities, and decreased revenues, which could have an adverse effect on NS' financial position, results of operations or liquidity in a particular year or quarter.

**Unpredictability of demand for rail services resulting in the unavailability of qualified personnel could adversely affect NS' operational efficiency and ability to meet demand.** Workforce demographics, training requirements, and the availability of qualified personnel, particularly engineers and trainmen, could each have a negative impact on NS' ability to meet demand for rail service. Unpredictable increases in demand for rail services may exacerbate such risks, which could have a negative impact on NS' operational efficiency and otherwise have a material adverse effect on its financial position, results of operations or liquidity in a particular year or quarter.

**NS may be affected by supply constraints resulting from disruptions in the fuel markets or the nature of some of its supplier markets.** NS consumes about 500 million gallons of diesel fuel each year. Fuel availability could be affected by any limitation in the fuel supply or by any imposition of mandatory allocation or rationing regulations. If a severe fuel supply shortage arose from production curtailments, disruption of oil imports, disruption of domestic refinery production, damage to refinery or pipeline infrastructure, political unrest, war or otherwise, NS' financial position, results of operations or liquidity in a particular year or quarter could be adversely affected. Also, such an event would impact NS as well as its customers and other transportation companies.

Due to the capital intensive nature and industry-specific requirements of the rail industry, there are high barriers of entry for potential new suppliers of core railroad items, such as locomotives and rolling stock equipment. Additionally, NS competes with other industries for available capacity and raw materials used in the production of certain track materials, such as rail and ties. Changes in the competitive landscapes of these limited-supplier markets could result in increased prices or material shortages that could materially affect NS' financial position, results of operations or liquidity in a particular year or quarter.

**Item 1B. Unresolved Staff Comments.**

None.

**Item 3. Legal Proceedings.**

As of Feb. 14, 2008, 28 antitrust class actions have been filed against NS and other Class 1 railroads in various Federal district courts regarding fuel surcharges. On November 6, 2007, these actions were consolidated in the District of Columbia by the Judicial Panel on Multidistrict Litigation. NS believes the allegations in the complaints are without merit and intends to vigorously defend the cases. In addition, NS received a subpoena from a state grand jury on July 13, 2007, requesting documents and materials relating to the setting of fuel surcharges. NS is cooperating with the state in its investigation. NS does not believe that the outcome of these proceedings will have a material effect on its financial position, results of operations, or liquidity.

On November 30, 2007, NS received notice from the United States Department of Justice (DOJ) that the DOJ is prepared to bring an action against NS for alleged violations of federal environmental laws resulting from the discharge of chlorine and oil that occurred as a result of the Jan. 6, 2005 derailment in Graniteville, SC, including claims for civil penalties as well as injunctive relief. The notice further indicates that the State of South Carolina may also join in any action against NS. NS is in discussions with the DOJ in an effort to settle the DOJ's claims. NS does not believe that the resolution of these claims will have a material adverse effect on its financial position, results of operations or liquidity.

On Oct. 19, 2006, the Pennsylvania Department of Environmental Protection (PDEP) issued an assessment of civil penalties against NS and filed a complaint for civil penalties with the Pennsylvania Environmental Hearing Board (EHB) requesting that the EHB impose civil penalties upon NS for alleged violations of state environmental laws and regulations resulting from a discharge of sodium hydroxide that occurred as a result of the derailment of a NS train in Norwich Township, Pennsylvania, on June 30, 2006. PDEP's actions sought to impose combined penalties of $8,890,000 for alleged past violations and $46,420 per day for alleged continuing violations of state environmental laws and regulations. NS appealed the fines to the EHB. The Pennsylvania Fish and Boat Commission sought financial restitution for damages alleged to have been caused by this accident. In addition, the Pennsylvania Attorney General and the McKean County District Attorney filed three misdemeanor charges for alleged violations of state environmental and aquatic resource protection laws and regulations. NS has entered into a settlement agreement with all Commonwealth of Pennsylvania parties, pursuant to which all claims by the Commonwealth for civil liability resulting from the derailment and spill were resolved, with NS agreeing to pay approximately $7.35 million in restitution to compensate for all natural resource damages and the agencies' response costs caused by the derailment and spill. NS has also pled no contest to the three misdemeanor charges and has paid fines in the amount of $250,000 to resolve them.

**Item 4. Submission of Matters to a Vote of Security Holders.**

There were no matters submitted to a vote of security holders during the fourth quarter of 2007.

**Executive Officers of the Registrant.**

Norfolk Southern's executive officers generally are elected and designated annually by the Board of Directors at its first meeting held after the annual meeting of stockholders, and they hold office until their successors are elected. Executive officers also may be elected and designated throughout the year as the Board of Directors considers appropriate. There are no family relationships among the officers, nor any arrangement or understanding between any officer and any other person pursuant to which the officer was selected. The following table sets forth certain information, as of Feb. 1, 2008, relating to the executive officers.

| **Name, Age, Present Position** | **Business Experience During Past Five Years** |
|---|---|
| Charles W. Moorman, 55, Chairman, President and Chief Executive Officer | Present position since Feb. 1, 2006. Served as President and Chief Executive Officer from Nov. 1, 2005 to Feb. 1, 2006; as President from Oct. 1, 2004 to Nov. 1, 2005; as Senior Vice President – Corporate Planning and Services from Dec. 1, 2003 to Oct. 1, 2004; Senior Vice President – Corporate Services from Feb. 1, 2003 to Dec. 1, 2003 and prior thereto served as President – Thoroughbred Technology and Telecommunications, Inc. |
| Stephen C. Tobias, 63, Vice Chairman and Chief Operating Officer | Present position since Aug. 1, 1998. |
| Deborah H. Butler, 54, Executive Vice President – Planning and Chief Information Officer | Present position since June 1, 2007. Prior thereto served as Vice President – Customer Service. |
| James A. Hixon, 54, Executive Vice President – Law and Corporate Relations | Present position since Oct. 1, 2005. Served as Executive Vice President – Finance and Public Affairs From Oct. 1, 2004, to Oct. 1, 2005; Senior Vice President – Legal and Government Affairs from Dec. 1, 2003 to Oct. 1, 2004 and prior thereto served as Senior Vice President – Administration. |
| Mark D. Manion, 55, Executive Vice President – Operations | Present position since Oct. 1, 2004. Served as Senior Vice President – Transportation Operations from Dec. 1, 2003 to Oct. 1, 2004 and prior thereto served as Vice President – Transportation Services and Mechanical. |
| John P. Rathbone, 55, Executive Vice President – Administration | Present position since Oct. 1, 2004. Served as Senior Vice President – Administration from Dec. 1, 2003 to Oct. 1, 2004 and prior thereto served as Senior Vice President and Controller. |
| Donald W. Seale, 55, Executive Vice President and Chief Marketing Officer | Present position since April 1, 2006. Served as Executive Vice President – Sales and Marketing from Oct. 1, 2004 to April 1, 2006; as Senior Vice President – Marketing Services from Dec. 1, 2003 to Oct. 1, 2004 and prior thereto was Senior Vice President – Merchandise Marketing. |

| | |
|---|---|
| James A. Squires, 46, Executive Vice President – Finance and Chief Financial Officer | Present position since July 1, 2007. Served as Executive Vice President – Finance from April 1, 2007 to July 1, 2007, Senior Vice President – Financial Planning from April 1, 2006 to April 1, 2007, Senior Vice President – Law from Oct. 1, 2004 to April 1, 2006, as Vice President – Law from Dec. 1, 2003 to Oct. 1, 2004 and prior thereto was Senior General Counsel. |
| Daniel D. Smith, 55, Senior Vice President – Energy and Properties | Present position since Dec. 1, 2003. Prior thereto served as President- NS Development. |
| Marta R. Stewart, 50, Vice President and Controller | Present position since Dec. 1, 2003. Prior thereto was Assistant Vice President Corporate Accounting. |

## PART II

### NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES (NS)

**Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities.**

### NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES
### STOCK PRICE AND DIVIDEND INFORMATION

The Common Stock of Norfolk Southern Corporation, owned by 36,955 stockholders of record as of Dec. 31, 2007, is traded on the New York Stock Exchange under the symbol NSC. The following table shows the high and low sales prices as reported by Bloomberg L.P. on its internet-based service and dividends per share, by quarter, for 2007 and 2006.

| | Quarter | | | |
|---|---|---|---|---|
| **2007** | **1st** | **2nd** | **3rd** | **4th** |
| Market price | | | | |
| High | $ 53.84 | $ 59.19 | $ 59.77 | $ 54.58 |
| Low | 45.38 | 49.70 | 46.42 | 48.03 |
| Dividends per share | $ 0.22 | $ 0.22 | $ 0.26 | $ 0.26 |
| **2006** | **1st** | **2nd** | **3rd** | **4th** |
| Market price | | | | |
| High | $ 54.93 | $ 57.71 | $ 54.00 | $ 55.07 |
| Low | 41.22 | 46.17 | 39.10 | 42.80 |
| Dividends per share | $ 0.16 | $ 0.16 | $ 0.18 | $ 0.18 |

### ISSUER PURCHASES OF EQUITY SECURITIES

| Period | (a) Total Number of Shares (or Units) Purchased (1) | (b) Average Price Paid per Share (or Unit) | (c) Total Number of Shares (or Units) Purchased as Part of Publicly Announced Plans or Programs(2) | (d) Maximum Number (or Approximate Dollar Value) of Shares (or Units) that may yet be Purchased Under the Plans or Programs(2) |
|---|---|---|---|---|
| Oct. 1-31, 2007 | 1,497,874 | 52.16 | 1,496,000 | 36,603,355 |
| Nov. 1-30, 2007 | 3,877,808 | 50.16 | 3,868,000 | 32,735,355 |
| Dec. 1-31, 2007 | 3,064,884 | 50.82 | 3,063,000 | 29,672,355 |
| Total | 8,440,566 | | 8,427,000 | |

(1) Of this amount 13,566 represent shares tendered by employees in connection with the exercise of stock options under the Long-Term Incentive Plan.

(2) On Nov. 22, 2005, the Board of Directors authorized a share repurchase program, pursuant to which up to 50 million shares of Common Stock could be purchased through Dec. 31, 2015. On March 27, 2007, the Board of Directors amended the program and increased the number of shares that may be repurchased to 75 million, and shortened the repurchase term by five years to Dec. 31, 2010.

**Item 6. Selected Financial Data.**

NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES
FIVE-YEAR FINANCIAL REVIEW

| | 2007 | 2006 | 2005[1] | 2004[2] | 2003[3] |
|---|---|---|---|---|---|
| | | *($ in millions, except per share amounts)* | | | |
| **RESULTS OF OPERATIONS** | | | | | |
| Railway operating revenues | $ 9,432 | $ 9,407 | $ 8,527 | $ 7,312 | $ 6,468 |
| Railway operating expenses | 6,847 | 6,850 | 6,410 | 5,610 | 5,404 |
| Income from railway operations | 2,585 | 2,557 | 2,117 | 1,702 | 1,064 |
| Other income – net | 93 | 149 | 74 | 76 | 19 |
| Interest expense on debt | 441 | 476 | 494 | 489 | 497 |
| Income from continuing operations before income taxes and accounting changes | 2,237 | 2,230 | 1,697 | 1,289 | 586 |
| Provision for income taxes | 773 | 749 | 416 | 379 | 175 |
| Income from continuing operations before accounting changes | 1,464 | 1,481 | 1,281 | 910 | 411 |
| Discontinued operations[4] | -- | -- | -- | -- | 10 |
| Cumulative effect of changes in accounting principles, net of taxes[5] | -- | -- | -- | -- | 114 |
| Net income | $ 1,464 | $ 1,481 | $ 1,281 | $ 910 | $ 535 |
| **PER SHARE DATA** | | | | | |
| Income from continuing operations before accounting changes – basic | $ 3.74 | $ 3.63 | $ 3.17 | $ 2.31 | $ 1.05 |
| – diluted | $ 3.68 | $ 3.57 | $ 3.11 | $ 2.28 | $ 1.05 |
| Net income – basic | $ 3.74 | $ 3.63 | $ 3.17 | $ 2.31 | $ 1.37 |
| – diluted | $ 3.68 | $ 3.57 | $ 3.11 | $ 2.28 | $ 1.37 |
| Dividends | $ 0.96 | $ 0.68 | $ 0.48 | $ 0.36 | $ 0.30 |
| Stockholders' equity at year end | $ 25.64 | $ 24.19 | $ 22.63 | $ 19.92 | $ 17.83 |
| **FINANCIAL POSITION** | | | | | |
| Total assets | $ 26,144 | $ 26,028 | $ 25,859 | $ 24,748 | $ 20,596 |
| Total long-term debt, including current maturities[6] | $ 6,368 | $ 6,600 | $ 6,930 | $ 7,525 | $ 7,160 |
| Stockholders' equity | $ 9,727 | $ 9,615 | $ 9,276 | $ 7,977 | $ 6,976 |
| **OTHER** | | | | | |
| Capital expenditures | $ 1,341 | $ 1,178 | $ 1,025 | $ 1,041 | $ 720 |
| Average number of shares outstanding (thousands) | 389,626 | 405,988 | 404,170 | 394,201 | 389,788 |
| Number of stockholders at year end | 36,955 | 38,900 | 48,180 | 51,032 | 52,091 |
| Average number of employees: | | | | | |
| Rail | 30,336 | 30,079 | 29,851 | 28,057 | 28,363 |
| Nonrail | 470 | 462 | 443 | 418 | 390 |
| Total | 30,806 | 30,541 | 30,294 | 28,475 | 28,753 |

[1] 2005 provision for income taxes includes a $96 million benefit related to the reduction of NS' deferred income tax liabilities resulting from tax legislation enacted by Ohio. This benefit increased net income by $96 million, or 23 cents per diluted share.

[2] 2004 other income – net includes a $40 million net gain from the Conrail Corporate Reorganization. This gain increased net income by $40 million or 10 cents per diluted share.

[3] 2003 operating expenses include a $107 million charge for a voluntary separation program. Other income – net includes an $84 million charge to recognize the impaired value of certain telecommunications assets. These charges reduced net income by $119 million, or 30 cents per diluted share.

[4] 2003 discontinued operations relate to the 1998 sale of the common stock of motor carrier subsidiary, North American Van Lines, Inc. Results in 2003 include an additional after-tax gain of $10 million, or 3 cents per diluted share, resulting from resolution of tax issues related to the transaction.

[5] 2003 net income reflects two accounting changes, the cumulative effect of which increased net income by $114 million, or 29 cents per diluted share: a change in accounting for the cost to remove railroad crossties, which increased net income by $110 million, and a change in accounting related to a special-purpose entity that leases certain locomotives to NS, which increased net income by $4 million.

[6] 2003 long-term debt excludes notes payable to Conrail of $716 million.

See accompanying Consolidated Financial Statements and notes thereto.

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations.**

**Norfolk Southern Corporation and Subsidiaries**
**Management's Discussion and Analysis of**
**Financial Condition and Results of Operations**

The following discussion and analysis should be read in conjunction with the Consolidated Financial Statements and Notes and the Selected Financial Data.

## OVERVIEW

NS' 2007 results reflected softness in the overall economy that resulted in reduced traffic volumes. Despite this, railway operating revenues increased slightly as improved average revenue per unit offset the volume declines. Railway operating expenses were about even, resulting in a railway operating ratio (a measure of the amount of revenues consumed by operating expenses) of 72.6%, which improved modestly from 2006.

Cash provided by operating activities exceeded $2 billion for the third consecutive year and, along with a reduction in cash and short-term investment balances, provided funding for increased capital expenditures, significant share repurchases and higher dividends.

Looking ahead, NS expects revenues to continue to grow, reflecting higher average revenue per unit and modestly higher traffic volume, particularly later in 2008 provided the overall economy improves. NS plans to continue to improve service and maintain a market-based approach to pricing.

During 2007, NS purchased and retired 23.6 million shares of NS common stock at a total cost of $1.2 billion under the share repurchase program approved by the Board of Directors on Nov. 22, 2005. The Board of Directors amended the program in March 2007 and authorized the repurchase of up to 75 million shares of NS common stock through Dec. 31, 2010. In total, NS has purchased and retired 45.3 million shares under this program at a total cost of $2.2 billion.

## SUMMARIZED RESULTS OF OPERATIONS

### 2007 Compared with 2006

Net income in 2007 was $1.5 billion, down $17 million, or 1%, compared with 2006. Diluted earnings per share were $3.68, up $0.11, or 3%, reflecting fewer shares outstanding as a result of NS' share repurchase program (see Note 13). The decrease in net income was primarily due to higher income taxes and lower non-operating items that offset higher income from railway operations. Railway operating revenues increased $25 million, as higher average revenue per unit overshadowed lower traffic volumes. Railway operating expenses decreased $3 million, principally due to lower volume-related expenses that offset higher fuel expense.

### 2006 Compared with 2005

Net income in 2006 was $1.5 billion, or $3.57 per diluted share, up $200 million, or 16%, compared with $1.3 billion, or $3.11 per diluted share, in 2005. The increase in net income was primarily due to higher income from railway operations, offset in part by the absence of the $96 million income tax benefit recorded in 2005 because of Ohio tax law changes (see Note 3). Railway operating revenues increased $880 million, reflecting higher rates, including fuel surcharges that accounted for about 40% of the increase, and modestly higher traffic volume. Railway operating expenses rose $440 million, or 7%, principally due to higher fuel prices and increased compensation and benefit costs.

## DETAILED RESULTS OF OPERATIONS

### Railway Operating Revenues

Railway operating revenues were $9.4 billion in 2007 and 2006, and $8.5 billion in 2005. The following table presents a three-year comparison of revenues, volume and average revenue per unit by market group.

| | Revenues | | | Units | | | Revenue per Unit | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2007 | 2006 | 2005 | 2007 | 2006 | 2005 | 2007 | 2006 | 2005 |
| | ($ in millions) | | | (in thousands) | | | ($ per unit) | | |
| Coal | $ 2,315 | $ 2,330 | $ 2,115 | 1,699.4 | 1,760.0 | 1,735.4 | $ 1,363 | $ 1,324 | $ 1,219 |
| General merchandise: | | | | | | | | | |
| Chemicals | 1,166 | 1,079 | 978 | 426.7 | 426.4 | 442.1 | 2,732 | 2,530 | 2,212 |
| Metals/construction | 1,149 | 1,168 | 978 | 783.6 | 835.3 | 794.2 | 1,467 | 1,398 | 1,231 |
| Agr./cons. prod./govt. | 1,047 | 994 | 832 | 601.5 | 594.1 | 571.8 | 1,740 | 1,673 | 1,454 |
| Automotive | 974 | 974 | 997 | 533.0 | 561.9 | 615.9 | 1,827 | 1,734 | 1,620 |
| Paper/clay/forest | 860 | 891 | 801 | 428.1 | 466.7 | 472.2 | 2,010 | 1,909 | 1,697 |
| General merchandise | 5,196 | 5,106 | 4,586 | 2,772.9 | 2,884.4 | 2,896.2 | 1,874 | 1,770 | 1,583 |
| Intermodal | 1,921 | 1,971 | 1,826 | 3,120.7 | 3,256.5 | 3,154.9 | 615 | 605 | 579 |
| Total | $ 9,432 | $ 9,407 | $ 8,527 | 7,593.0 | 7,900.9 | 7,786.5 | $ 1,242 | $ 1,191 | $ 1,095 |

Revenues increased $25 million in 2007 and $880 million in 2006. Automotive revenue in 2007 included $26 million related to a contract volume settlement. As shown in the following table, the increase in 2007 was due to higher average revenue per unit that more than offset decreased traffic volumes, whereas the improvement in 2006 was the result of increased average revenue per unit and higher traffic volumes.

**Revenue Variance Analysis**
Increases

| | 2007 vs. 2006 | 2006 vs. 2005 |
|---|---|---|
| | ($ in millions) | |
| Revenue per unit/mix | $ 392 | $ 755 |
| Traffic volume (units) | (367) | 125 |
| Total | $ 25 | $ 880 |

Both comparisons reflect large increases in average revenue per unit, a result of higher rates. In 2006 about 40% of the revenue increase was attributable to higher fuel surcharges. Traffic volume decreased in 2007, reflecting declines in all commodity groups except agriculture/consumer products/government, and chemicals. In 2006, traffic volume rose 1%, principally due to higher intermodal and metals/construction shipments.

On January 26, 2007, the Surface Transportation Board (STB) issued a decision that the type of fuel surcharge imposed by NS and most other large railroads – a fuel surcharge based on a percentage of line haul revenue – would no longer be permitted for regulated traffic that moves under public (tariff) rates. The STB gave the railroads a 90-day transition period to adjust their fuel surcharge programs. During the second quarter, NS discontinued assessing fuel surcharges on its published (non-intermodal) public rates. Future adjustments to public prices will reflect ongoing market conditions. NS does not expect that compliance with the new STB regulations will have a material effect on its financial condition, results of operations or liquidity. The traffic moving under these tariffs and public quotes comprised less than 10% of Norfolk Southern's total revenue base.

**COAL** revenues decreased $15 million, or 1%, compared with 2006, as a 2% reduction in tonnage handled more than offset a 3% increase in average revenue per unit. Carloads declined 3%, a higher percentage than the change in tonnage handled because of increased average tonnage per car. Coal represented 25% of NS' revenues in 2007, and 78% of shipments handled originated on NS' lines. As shown in the following table, decreased shipments of utility and domestic metallurgical coal more than offset higher export and industrial shipments.

**Total Coal, Coke and Iron Ore Tonnage**

| | 2007 | 2006 | 2005 |
|---|---|---|---|
| | | *(Tons in thousands)* | |
| Utility | 142,734 | 148,078 | 142,522 |
| Domestic metallurgical | 17,873 | 20,878 | 20,076 |
| Export | 15,564 | 12,409 | 14,531 |
| Industrial | 9,794 | 9,202 | 9,524 |
| Total | 185,965 | 190,567 | 186,653 |

Coal revenues in 2006 increased $215 million, or 10%, compared with 2005, which reflected higher average revenue per unit and slightly higher traffic volume. Coal average revenue per unit was up 9% compared with 2005, reflecting increased fuel surcharges and higher rates, tempered by the absence of a $55 million benefit from coal rate settlements in the second quarter of 2005. Coal represented 25% of NS' revenues in 2006, and 79% of shipments handled originated on NS' lines. Traffic volumes rose 1%, primarily because of increased shipments of utility and domestic metallurgical coal that offset lower export and iron ore shipments.

NS is currently involved in litigation with Virginia Electric and Power Company/Old Dominion Electric Cooperative (Virginia Power) regarding rate adjustment provisions in a transportation contract between them. During the second quarter of 2007, the Virginia Supreme Court issued a decision that remanded the case to the trial court on the grounds that neither of its prior decisions constituted a final order. Future developments and the ultimate resolution of this matter could result in NS recognizing additional revenues related to this dispute, which could have a favorable impact on results of operations in a particular year or quarter.

**Utility coal** tonnage decreased 4%, compared with 2006, reflecting high stockpile levels (particularly in the Southeast) that led to reduced shipments, despite fairly strong electric generation (up 4%) in the NS service region. In addition, the temporary closure of a major coal mine as well as the loss of business to barge transportation contributed to the decline.

In 2006, utility coal tonnage increased 4%, compared with 2005, reflecting the rebuilding of stockpiles by customers, more shipments from the Powder River Basin in the West and higher shipments of import coal through Charleston, SC.

A number of evolving environmental issues could affect the utility coal market. These include potential regional programs aimed at capping and reducing power plant $CO_2$ emissions, and ongoing efforts at addressing climate change. In response to changes in environmental regulations, certain utilities have begun adding or are planning to add emissions control technologies to their electric generating units, allowing them to utilize their existing coal-fired power plants.

In 2008, demand for utility coal is expected to be mixed, with declining utility inventories in the Northeast stimulating growth but above normal stockpiles in the Southeast mitigating the growth.

**Domestic metallurgical** coal, coke and iron ore tonnage decreased 14% in 2007 compared with 2006. The decrease was primarily due to coke furnace outages, mine production outages and reduced spot iron ore traffic.

Domestic metallurgical coal, coke and iron ore tonnage increased 4% in 2006 compared with 2005. The increase was driven by higher domestic metallurgical coal and coke shipments in the first half of the year in response to steel-making demand, which more than offset a decline in iron ore volume caused by the shutdown of a blast furnace at a major customer location.

In 2008, domestic metallurgical coal, coke and iron ore demand is expected to be comparable to 2007 for the first half of the year; however, demand is expected to increase in the second half due to plant expansions.

**Export coal** tonnage in 2007 increased 25% compared to 2006, primarily due to increased demand reflecting a lower valued dollar as well as loading delays at Australian ports. Norfolk volume increased by approximately 26,000 cars, or 25%, and Baltimore volume was up approximately 4,500 cars, or 19%.

In 2006, export coal tonnage decreased 15% compared to 2005, reflecting weaker demand for U.S. coal as Europe and Asia continued to increase purchases from other countries. Baltimore volume was down approximately 13,500 cars, or 37%, and Norfolk volume declined by approximately 3,000 cars, or 3%.

In 2008, export coal tonnage is expected to increase, reflecting increased global demand.

**Other coal** tonnage (principally steam coal shipped to industrial plants) increased 6% versus 2006, primarily due to new business and stronger demand. In 2006, other coal tonnage decreased 3% versus 2005, primarily due to plant closures and mine production problems.

**GENERAL MERCHANDISE** revenues increased $90 million, or 2%, in 2007 compared with 2006, as a 6% increase in average revenue per unit, reflecting continued market-based pricing in all groups, more than offset a 4% decline in traffic volume. Revenue in 2007 included $26 million related to a volume-related contract settlement with an automotive customer.

In 2006, general merchandise revenues increased $520 million, or 11%, compared with 2005, as all market groups posted higher average revenue per unit driven by increased rates and fuel surcharges. Traffic volume declined slightly as improved metals and construction and agriculture volumes were offset by declines in the other business groups.

**Chemicals** revenue increased 8% compared with 2006, reflecting higher rates in all groups. Traffic volume rose modestly as more shipments of industrial intermediates offset fewer shipments in the petroleum, miscellaneous chemicals and plastics markets, which continued to reflect weakness in housing-related demand.

In 2006, chemicals revenues increased 10%, despite a 4% drop in traffic volume, reflecting increased rates and fuel surcharges. Petroleum, industrial and plastics traffic volumes were down as a result of lower inventories arising from post-Katrina conditions, the closure of several plants on NS lines and the weaker housing and automotive markets.

In 2008, chemicals revenue is expected to improve, principally due to increased average revenue per unit as volumes are expected to be comparable to 2007.

**Metals and construction** revenue decreased 2% in 2007 as a 5% increase in average revenue per unit that resulted from higher rates was more than offset by the effects of a 6% decrease in traffic volume. The decline in volume was principally due to lower iron, steel and coil shipments and reduced demand for construction materials, both reflecting the soft automotive and housing sectors.

In 2006, metals and construction revenue increased 19% and traffic volume increased 5% compared with 2005 as declines in the fourth quarter were offset by higher volumes through the rest of the year. Revenue per unit rose

14% because of increased rates and fuel surcharges. The increase in traffic volume was driven primarily by higher import slab business to NS-served steel mills, more scrap metal shipments and higher sand, gravel and cement traffic for commercial and highway construction projects.

In 2008, metals and construction revenues are expected to grow as a result of higher traffic volumes, principally due to new business, and improved average revenue per unit. However, growth could be somewhat dampened by the continued softness of the automotive and housing markets.

**Agriculture, consumer products and government** revenue increased 5% in 2007 compared with 2006. The revenue improvement resulted from higher average revenue per unit, which reflected higher rates. Traffic volume rose modestly as more corn, fertilizer and ethanol shipments were mitigated by less government and consumer product volume.

In 2006, agriculture, consumer products and government revenue increased 19% and traffic volume increased 4% compared with 2005. Average revenue per unit rose 15%, a result of higher rates and fuel surcharges. Traffic volume growth resulted from increased ethanol, military and corn shipments. Military traffic growth was primarily due to the continued support of military operations in Iraq.

Agriculture revenue is expected to continue to grow in 2008, benefiting from increasing demand for biofuel products including corn, soybeans and ethanol, as well as higher rates. However, lower volumes in consumer products are expected to partially offset this growth.

**Automotive** revenues were flat in 2007 compared with 2006 as lower traffic volumes offset higher average revenue per unit. Revenue in 2007 included a $26 million volume-related contract settlement. Volume decreased 5%, reflecting softness in demand for vehicles as well as parts, and the closure in June 2007 of an NS-served plant.

In 2006, automotive revenues declined 2% compared with 2005 as lower volumes offset increased average revenue per unit, including fuel surcharges. Volume decreased 9% primarily due to substantial production cuts at Ford, General Motors and Daimler-Chrysler assembly plants, including two NS-served plant closures at Ford and one at General Motors during 2006. Reduced production at Honda and BMW also contributed to the volume decrease.

For 2008, automotive revenues are expected to be lower, reflecting continued production cutbacks and weak demand.

**Paper, clay and forest products** revenue decreased 3% in 2007 compared with 2006 as the effects of higher average revenue per unit were more than offset by an 8% decrease in traffic volume reflecting the continued housing slowdown and decline in conventional paper markets.

In 2006, paper, clay and forest products revenue increased 11% compared with 2005 due to higher average revenue per unit, including fuel surcharges, despite a 1% decrease in traffic volume. Higher solid waste and debris traffic, and growth in traffic from the import of printing paper, partially offset reduced pulp and pulp board shipments.

In 2008, paper, clay and forest products revenues are expected to be about even as growth in waste and debris transportation and higher revenue per unit are expected to be tempered by continued weakness in housing-related markets.

**INTERMODAL** revenues decreased $50 million, or 3%, compared with 2006, as a 4% reduction in traffic volumes offset a 2% increase in average revenue per unit. Truckload volume decreased 10% compared with

2006 and domestic intermodal marketing companies (IMC) volume declined 4%. Traffic volume for Triple Crown Services Company (Triple Crown), a service with rail-to-highway trailers, dropped 3%. The declines for truckload, IMC and Triple Crown were primarily due to lower national demand for dry van shipments resulting from continued weakness in the housing and automotive markets and increased over-the-road competition. International traffic volume decreased 4% reflecting reduced shipments of empty containers and less inland rail transportation of West Coast port traffic, which offset volume growth from East Coast port traffic. Premium business, which includes parcel and LTL (less-than-truckload) carriers, was up 2% reflecting gains in parcel shipments that offset modest declines in LTL shipper traffic.

In 2006, intermodal revenues increased $145 million, or 8%, compared with 2005, largely because of higher fuel surcharges, increased rates and improved traffic volume. Traffic volume for the year rose 3% notwithstanding a 3% decline in the fourth quarter. Truckload volume increased 8% reflecting continued expansion of business with traditional truckload companies. IMC volume declined 9%, a result of declines in the housing, construction and automotive markets. Triple Crown Services Company had flat volume compared with 2005 as higher consumer product shipments were offset by weaker automotive-related shipments. International traffic volume rose 9% reflecting growth in imported goods from Asia and exported goods through NS-served East Coast ports, as well as West Coast ports. Premium business was down 3% as lower LTL shipper traffic offset modest gains in parcel shipments. Intermodal revenue per unit increased 4%, principally a result of higher fuel surcharges as well as increased rates and longer-haul international traffic, which was offset in part by the ongoing shift of shipments from higher revenue per unit, rail-provided assets (trailers and containers) to lower revenue per unit shipments in shipper-provided equipment.

For 2008, intermodal revenue is expected to show improvement bolstered by higher average revenue per unit and modest improvement in volumes.

**Railway Operating Expenses**

Railway operating expenses in 2007 were $6.8 billion, about even with expenses in 2006, which were up $440 million compared to 2005. The 2007 comparison reflected volume-related decreases offset by higher fuel expense. The increase in 2006 was due to higher fuel prices and increased compensation and benefits.

The railway operating ratio, which measures the percentage of railway operating revenues consumed by railway operating expenses, improved to 72.6% in 2007, compared with 72.8% in 2006 and 75.2% in 2005.

The following table shows the changes in railway operating expenses summarized by major classifications (prior year amounts have been reclassified to conform to the current year presentation).

**Operating Expense Variances**
Increases (Decreases)

| | 2007 vs. 2006 | 2006 vs. 2005 |
|---|---|---|
| | *($ in millions)* | |
| Compensation and benefits | $ (85) | $ 144 |
| Purchased services and rents | (27) | 31 |
| Fuel | 74 | 274 |
| Depreciation | 37 | (36) |
| Materials and other | (2) | 27 |
| Total | $ (3) | $ 440 |

**Compensation and benefits**, which represents 37% of total railway operating expenses, decreased $85 million, or 3%, compared with 2006, primarily due to lower incentive compensation (down $48 million), lower volume-related payroll (down $37 million), the absence of the prior year retirement and waiver agreements with former executives as well as the cost of the regular stock-based grant to the former Chief Executive Officer ($24 million), lower stock-based compensation (down $13 million), and lower payroll taxes (down $12 million), that were partially offset by increased wage rates (up $27 million) and higher medical costs (up $27 million).

In 2006, compensation and benefits increased $144 million, or 6%, compared with 2005. Expenses in 2006 included the effect of the implementation of Statement of Accounting Standards No. 123(R) "Share-Based Payment," which increased stock-based compensation expense by $27 million. Most of the increase was reflected in the first quarter which included the effect of accelerated recognition of costs related to grants to retirement-eligible employees. The remaining increase was attributable to increased salaries and wages (up $44 million), higher health and welfare benefit costs (up $29 million), retirement and waiver agreements entered into in the first quarter as well as the cost of the regular stock-based grant to the former chief executive officer who retired (up $24 million), and higher payroll taxes (up $17 million).

NS employment averaged 30,806 in 2007 compared with 30,541 in 2006 and 30,294 in 2005. The increased number of employees was almost exclusively in operating department personnel to meet service needs, as well as to prepare for expected retirements. NS continues to hire and train additional workers in order to meet the requirements of forecasted volumes in light of the demographics of its work force.

**Purchased services and rents** includes the costs of services purchased from outside contractors, including the net costs of operating joint (or leased) facilities with other railroads and the net cost of equipment rentals. This category of expenses decreased $27 million, or 2%, in 2007 compared to 2006, but increased $31 million, or 2%, in 2006 compared to 2005. The decline in 2007 was principally due to lower equipment rents, while the 2006 increase reflected increased maintenance activities.

Purchased services costs were $1,172 million in 2007, $1,165 million in 2006 and $1,142 million in 2005. In 2007, higher expenses for maintenance activities were largely offset by volume-related declines. The increase in 2006 reflected higher intermodal volume-related expenses.

Equipment rents, which includes the cost to NS of using equipment (mostly freight cars) owned by other railroads or private owners less the rent paid to NS for the use of its equipment, amounted to $379 million, $413 million and $405 million for 2007, 2006 and 2005, respectively. The decrease in 2007 was principally due to lower shipment volumes. The increase in 2006 was primarily due to a reduction in rents received on automotive equipment as a result of decreased shipments.

**Fuel** expense, which includes the cost of locomotive fuel as well as other fuel used in railway operations, increased $74 million, or 7%, in 2007 compared with 2006, and increased $274 million, or 33%, in 2006 compared with 2005. Fuel expense is recorded net of hedge benefits, although there have been no such benefits since May 2006 when the program wound down (see "Market Risks and Hedging Activities," below and Note 16). The increase in 2007 reflected a 9% increase in the price per gallon of locomotive fuel as well as the absence of hedge benefits offset in part by a 4% decline in consumption. Expense in 2006 included hedge benefits of $20 million compared with benefits of $148 million in 2005, and reflected a 13% rise in the average price per gallon with a 1% increase in consumption.

Legislation enacted in the first quarter of 2005 repealed the 4.3 cents per gallon excise tax on railroad diesel fuel for 2007, with the following phased reductions in 2005 and 2006: 1 cent per gallon from Jan. 1, 2005 through June 30, 2005; 2 cents per gallon from July 1, 2005 through Dec. 31, 2006; and by the full 4.3 cents thereafter. NS consumes about 500 million gallons of locomotive diesel fuel per year.

**Depreciation** expense increased $37 million, or 5%, in 2007 compared to 2006, but decreased $36 million, or 5%, in 2006 compared with 2005. In both years, substantial capital investments and improvements resulted in higher depreciation expense. The net decrease in 2006 reflected the results of an equipment depreciation study and an analysis of the assets received in the Conrail Corporation Reorganization completed in 2006.

**Materials and other** expenses (including the estimates of costs related to personal injury, property damage and environmental matters) decreased $2 million in 2007 compared with 2006, but increased $27 million, or 3%, in 2006 compared to 2005, as shown in the following table.

| | 2007 | 2006 | 2005 |
|---|---|---|---|
| | | *($ in millions)* | |
| Materials | $ 359 | $ 346 | $ 315 |
| Casualties and other claims | 171 | 220 | 224 |
| Other | 270 | 236 | 236 |
| | $ 800 | $ 802 | $ 775 |

The decline in 2007 was primarily due to lower derailment and personal injury costs, offset in part by higher property and other taxes, and increased materials costs for maintenance activities.

The increase in 2006 reflected increased locomotive and freight car repair costs due to more maintenance activity related to higher usage from increased traffic volumes coupled with the age of the fleet, as well as higher expenses arising from derailments and insurance costs. These increases were partially offset by the absence of $38 million of costs associated with the 2005 derailment in Graniteville, South Carolina, and an unfavorable jury verdict in an employee injury case.

In 2005, NS recorded a liability related to the Jan. 6, 2005 derailment in Graniteville, SC. The liability, which includes a current and long-term portion, represents NS' best estimate based on current facts and circumstances. The estimate includes amounts related to business property damage and other economic losses, personal injury and individual property damage claims as well as third-party response costs. NS' commercial insurance policies are expected to cover substantially all expenses related to this derailment above NS' self-insured retention, including NS' response costs and legal fees. Accordingly, the Consolidated Balance Sheets reflect a current and long-term receivable for estimated recoveries from NS' insurance carriers. While it is reasonable to expect that the liability for covered losses could differ from the amount recorded, such a change would be offset by a corresponding change in the insurance receivable. As a result, NS does not believe that it is reasonably likely that its net loss (the difference between the liability and future recoveries) will be materially different than the loss previously recorded. NS expects at this time that insurance coverage is adequate to cover potential claims and settlements above its self-insurance retention.

The largest component of casualties and other claims expense is personal injury costs. Cases involving occupational injuries comprised about 60% of total employee injury cases resolved and about 40% of total payments made. With its long-established commitment to safety, NS continues to work actively to eliminate all employee injuries and to reduce the associated costs. With respect to occupational injuries, which are not caused by a specific accident or event but result from a claimed exposure over time, the benefits of any existing safety initiatives may not be realized immediately. These types of claims are being asserted by former or retired employees, some of whom have not been actively employed in the rail industry for decades.
The rail industry remains uniquely susceptible to litigation involving job-related accidental injury and occupational claims because of the Federal Employers' Liability Act (FELA), which is applicable only to railroads. FELA's fault-based system, which covers employee claims for job-related injuries, produces results that are unpredictable and inconsistent as compared with a no-fault workers' compensation system.

NS maintains substantial amounts of insurance for potential third-party liability and property damage claims. It also retains reasonable levels of risk through self-insurance (see Note 17). NS expects insurance costs to be slightly higher in 2008.

**Other Income – Net**

Other income – net was $93 million in 2007, $149 million in 2006 and $74 million in 2005 (see Note 2). The decrease in 2007 reflected lower interest income ($31 million), higher expenses associated with synthetic fuel-related tax credit investments ($15 million) and lower returns from corporate-owned life insurance ($15 million) that combined to offset higher equity in earnings of Conrail ($20 million).

NS has membership interests representing ownership in companies that owned and operated facilities that produced synthetic fuel from coal. In addition, NS purchased two facilities that produced synthetic fuel from coal in 2007. The production of synthetic fuel resulted in tax credits as well as expenses related to the investments. The expenses are recorded as a component of "Other income – net," and the tax credits, as well as tax benefits related to the expenses, are reflected in "Provision for income taxes" (see discussion below).

Results in 2006 reflected lower expense associated with tax credit investments primarily due to synthetic fuel related investments, greater interest income, and higher returns from corporate-owned life insurance, that were partially offset by lower equity in Conrail earnings.

**Income Taxes**

Income tax expense in 2007 was $773 million for an effective rate of 35%, compared with effective rates of 34% in 2006 and 25% in 2005. The increase in the rate for 2007 largely resulted from Illinois tax legislation which increased deferred taxes by $19 million (see Note 3). The increase in the rate for 2006 was primarily due to the absence of an Ohio tax law change that lowered the effective rate in 2005 as well as fewer tax credits from synthetic fuel-related investments. Synthetic fuel tax credits were available through the end of 2007.

Synthetic fuel credits are subject to reduction if the Reference Price of a barrel of oil for the year falls within an inflation-adjusted phase-out range specified by the tax code. The Reference Price for a year is the annual average wellhead price per barrel of unregulated domestic crude oil as determined by the Secretary of the Treasury by April 1 of the following year. In 2006, the phase-out range was $55.06 to $69.12, and the phase-out range is adjusted annually for inflation. While NS cannot predict with certainty the Reference Price for the year, NS estimated a 66% phase-out of synthetic fuel credits in 2007 based on actual oil prices during the year.

Net income in 2007 reflects $5 million less in net benefits from these credits, as compared with the same period of 2006, as shown below:

| | 2007 | 2006 | 2005 |
|---|---|---|---|
| | | *($ in millions)* | |
| Effect in "Other income – net:" | | | |
| Expenses on synthetic fuel related investments | $ 77 | $ 62 | $ 102 |
| Effect in "Provision for income taxes:" | | | |
| Tax credits | 60 | 56 | 98 |
| Tax benefit of expenses on synthetic fuel related investments | 30 | 24 | 40 |
| Total reduction of income tax expense | 90 | 80 | 138 |
| Effect in "Net income:" | | | |
| Net benefit from synthetic fuel related investments | $ 13 | $ 18 | $ 36 |

The tax credits generated by NS' synthetic fuel related investments, which reduced the effective tax rate by 3% in 2007 and 2006, and 6% in 2005, expired at the end of 2007 and, accordingly, the effective tax rate is expected to increase in 2008 (see Note 3).

NS' consolidated federal income tax returns for 2004 and 2005 are being audited by the Internal Revenue Service (IRS). The IRS completed its examination of the 2002 and 2003 consolidated federal income tax returns during the third quarter of 2006 and NS has appealed certain adjustments proposed by the IRS. The results of the examination had a negligible effect on the effective tax rate.

## FINANCIAL CONDITION, LIQUIDITY AND CAPITAL RESOURCES

**Cash provided by operating activities,** NS' principal source of liquidity, was $2.3 billion in 2007, compared with $2.2 billion in 2006 and $2.1 billion in 2005. The improvement in 2007 resulted from favorable changes in working capital as well as the modest improvement in income from railway operations. In 2006, higher income from railway operations was partially offset by higher income tax payments. NS had a working capital deficit of $273 million at Dec. 31, 2007, compared with working capital of $307 million at Dec. 31, 2006. The change was largely the result of reduced cash and short-term investments that were used to repurchase stock. NS expects that cash on hand combined with cash flow provided by operating activities will be sufficient to meet its ongoing obligations. NS' cash, cash equivalents and short-term investment balances totaled $206 million and $918 million at Dec. 31, 2007 and 2006, respectively.

**Contractual obligations** at Dec. 31, 2007, comprised of NS' long-term debt (including capital leases) (see Note 7), operating leases (see Note 8), agreements with CRC (see Note 4), unconditional purchase obligations (see Note 17), long-term advances from Conrail (see Note 4) and unrecognized tax benefits (see Note 3) were as follows:

| | Payments Due By Period<br>Total | 2008 | 2009-<br>2010 | 2011-<br>2012 | 2013 and<br>Subsequent | Other |
|---|---|---|---|---|---|---|
| | | | ($ in millions) | | | |
| Long-term debt and capital lease principal | $ 6,368 | $ 369 | $ 817 | $ 369 | $ 4,813 | $ -- |
| Operating leases | 937 | 138 | 243 | 151 | 405 | -- |
| Agreements with CRC | 457 | 28 | 56 | 56 | 317 | -- |
| Unconditional purchase obligations | 298 | 201 | 97 | -- | -- | -- |
| Unrecognized tax benefits* | 167 | 36 | -- | -- | -- | 131 |
| Long-term advances from Conrail | 133 | -- | -- | -- | 133 | -- |
| Total | $ 8,360 | $ 772 | $ 1,213 | $ 576 | $ 5,668 | $ 131 |

* When the amount and timing of liabilities for unrecognized tax benefits can be reasonably estimated, the amount is shown in the table under the appropriate period. When the year of settlement cannot be reasonably estimated, the amount is shown in the Other column.

**Off balance sheet arrangements** consist of obligations related to operating leases, which are included in the table of contractual obligations above and disclosed in Note 8.

**Cash used for investing activities** was $1 billion in 2007, compared with $684 million in 2006 and $1.8 billion in 2005. The increase in 2007 primarily reflected lower net proceeds from short-term investment sales and purchases and increased property additions. The decrease in 2006 reflected higher proceeds from short-term investment sales, principally to fund share repurchases reflected in financing activities, offset in part by the $100 million investment in Meridian Speedway LLC (MSLLC) (see discussion below) and increased property additions.

Property additions account for most of the recurring spending in this category. The following tables show capital spending (including capital leases) and track and equipment statistics for the past five years.

**Capital Expenditures**

| | 2007 | 2006 | 2005 | 2004 | 2003 |
|---|---|---|---|---|---|
| | | | *($ in millions)* | | |
| Road and other property | $ 894 | $ 756 | $ 741 | $ 612 | $ 502 |
| Equipment | 447 | 422 | 284 | 429 | 218 |
| Total | $ 1,341 | $ 1,178 | $ 1,025 | $ 1,041 | $ 720 |

**Track Structure Statistics (Capital and Maintenance)**

| | 2007 | 2006 | 2005 | 2004 | 2003 |
|---|---|---|---|---|---|
| Track miles of rail installed | 401 | 327 | 302 | 246 | 233 |
| Miles of track surfaced | 5,014 | 4,871 | 4,663 | 5,055 | 5,105 |
| New crossties installed (millions) | 2.7 | 2.7 | 2.5 | 2.5 | 2.8 |

**Average Age of Owned Railway Equipment**

| | 2007 | 2006 | 2005 | 2004 | 2003 |
|---|---|---|---|---|---|
| | | | *(years)* | | |
| Freight cars | 30.1 | 30.0 | 29.4 | 28.6 | 27.8 |
| Locomotives | 18.1 | 17.7 | 17.4 | 16.9 | 15.3 |
| Retired locomotives | 30.0 | 35.0 | 27.4 | 22.9 | 28.7 |

For 2008, NS has budgeted $1.43 billion for capital expenditures. The anticipated spending includes $613 million for rail, crosstie, ballast and bridge programs, and $339 million is provided for infrastructure and expansion investments, including increased mainline capacity, track upgrades and expansions to accommodate new customers or traffic and large network public/private partnership investments such as the Heartland Corridor and Chicago CREATE programs (see discussion below). Norfolk Southern expects to spend approximately $143 million on intermodal terminals and equipment to add capacity to the intermodal network, increased access and capacity for coal and merchandise traffic, and bulk transfer facilities. Planned equipment spending of $264 million provides $119 million for locomotives, including the purchase of 15 new units and continued spending on improvements to the locomotive fleet. Approximately $145 million will be spent on freight cars, including the acquisition of 1,330 new higher capacity coal cars as part of a multi-year program to replace the existing coal car fleet, the purchase of 321 freight cars upon their lease expiration, 163 multi-level automobile racks and improvements to multi-level racks. Norfolk Southern also expects to spend $66 million related to computers, systems and information technology. NS expects to make all of its capital expenditures with internally generated funds.

The Meridian Speedway is a 320 mile rail line between Meridian, Mississippi and Shreveport, Louisiana. On May 1, 2006, NS and Kansas City Southern (KCS) formed a joint venture (MSLLC) pursuant to which NS expects to contribute $300 million in cash, substantially all of which will be used for capital improvements over a period of approximately three years, in exchange for a 30% interest in the joint venture. To date, NS has contributed $240 million. At the formation of MSLLC, KCS contributed the Meridian Speedway. NS is recognizing its pro rata share of the joint venture's earnings or loss as required under the equity method of accounting. NS' total investment in MSLLC is supported by the fair value of the rail line as well as intangible assets obtained through the transaction. The joint venture is expected to increase capacity and improve service over the Meridian Speedway into the Southeast.

The Heartland Corridor is a package of proposed clearance improvements and other facilities that will create a seamless high-capacity intermodal route across Virginia and West Virginia to Midwest markets. During 2006, with respect to the tunnel clearance component of the Heartland Corridor, NS and the states of Ohio, West Virginia and Virginia each entered into a Memorandum of Agreement with the Federal Highway Administration that governs the release of up to $95 million in authorized federal funding. In 2006, NS also entered into agreements with two states governing the use of up to $11 million in state funding for the Heartland Corridor rail double-stack clearance project. NS expects to spend about $60 million in connection with this project. NS began work on the Heartland Corridor tunnel clearances in October 2007 and the entire project is expected to be completed by 2010.

The Chicago Region Environmental and Transportation Efficiency (CREATE) project is a public-private partnership to reduce rail and highway congestion and add freight and passenger capacity in the metropolitan Chicago area. NS and other railroads have agreed to participate in CREATE. A portion of the public funding has been approved and the parties have developed a list of projects to be included in Phase I of the project. A total of $100 million in public funding has been secured for Phase I and the railroads have contributed an additional $100 million. The railroads expect to complete Phase I over the next three years. As currently planned, the total project is estimated to cost $1.5 billion with city, state and federal support. If additional public funding is secured, the railroads are expected to contribute a total of $232 million towards the entire project with NS' share slated to be $34 million.

**Cash used for financing activities** was $1.6 billion in 2007, compared with $1.3 billion in 2006 and $456 million in 2005. The increases reflected higher share repurchases as a part of NS' ongoing share repurchase program (see Note 13), as well as higher debt repayments and increased dividend payments. Financing activities in 2007 include $250 million of proceeds from NS' receivable securitization facility (see Note 7).

Share repurchases totaled $1.2 billion in 2007 and $964 million in 2006 for the purchase and retirement of 23.6 million shares and 21.7 million shares, respectively, of common stock as part of NS' ongoing share repurchase program. In March 2007, NS' Board of Directors amended NS' share repurchase program by increasing the authorized amount of share repurchases from 50 million to 75 million shares and shortening the authorized period from 2015 to 2010. The timing and volume of purchases is guided by management's assessment of market conditions and other pertinent facts. To date, almost all of the purchases under the program have been made with internally generated cash. However, future funding sources are expected to include proceeds from the issuance of debt, including the use of the receivable securitization program (see Note 7). Dependent on economic and market conditions, NS expects to purchase and retire a similar amount of shares in 2008.

NS has in place and available a $1 billion, five-year credit agreement expiring in 2012, which provides for borrowings at prevailing rates and includes financial covenants. There were no amounts outstanding under this facility at Dec. 31, 2007, and NS is in compliance with all of the financial covenants. NS also has in place two shelf registration statements on Form S-3 filed with the SEC in March 2001 and September 2004 under which up to $700 million of additional debt or equity securities could be issued (see Note 7).

Looking forward, NS expects to refinance maturing debt over the next several years and modestly increase current debt levels. Overall, NS' goal is to maintain a capital structure with appropriate leverage to support NS' business strategy and provide flexibility through business cycles.

## APPLICATION OF CRITICAL ACCOUNTING ESTIMATES

The preparation of financial statements in accordance with U.S. generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. These estimates and assumptions may require significant judgment about matters that are inherently uncertain, and future events are likely to occur that may require management to change them. Accordingly, management regularly reviews these estimates and assumptions based on historical experience, changes in the business environment and other factors that management believes to be reasonable under the circumstances. Management regularly discusses the development, selection and disclosures concerning critical accounting estimates with the Audit Committee of its Board of Directors. There have been no significant changes to the Application of Critical Accounting Estimates disclosure contained in NS' Form 10-K as of Dec. 31, 2007, with the exception of the adoption of Financial Accounting Standards Board Interpretation No. 48, "Accounting for Uncertainty in Income Taxes," which is discussed below in "New Accounting Pronouncements" and in Note 3.

### Pensions and Other Postretirement Benefits

Accounting for pensions and other postretirement benefit plans requires management to make several estimates and assumptions (see Note 10). These include the expected rate of return from investment of the plans' assets, projected increases in medical costs and the expected retirement age of employees as well as their projected earnings and mortality. In addition, the amounts recorded are affected by changes in the interest rate environment because the associated liabilities are discounted to their present value. Management makes these estimates based on the company's historical experience and other information that it deems pertinent under the circumstances (for example, expectations of future stock market performance). Management utilizes an independent consulting actuarial firm's studies to assist it in selecting appropriate assumptions and valuing its related liabilities.

NS' net pension benefit, which is included in "Compensation and benefits" on its Consolidated Statements of Income, was $40 million for the year ended Dec. 31, 2007. In recording this amount, NS assumed a long-term investment rate of return of 9%. Investment experience of the pension fund over the past 10-, 15- and 20-year periods has been a rate of return in excess of 10% and supports the current rate of return assumption. A one percentage point change to this rate of return assumption would result in a $19 million change to the pension credit and, as a result, an equal change in "Compensation and benefits" expense. Changes that are reasonably likely to occur in assumptions concerning retirement age, projected earnings and mortality would not be expected to have a material effect on NS' net pension benefit or net pension asset in the future. The net pension asset is recorded at its net present value using a discount rate that is based on the current interest rate environment in light of the timing of expected benefit payments. In 2007, NS utilized an analysis in which the projected annual cash flows from the pension and postretirement benefit plans were matched with a yield curve based on an appropriate universe of high-quality corporate bonds. NS used the results of the yield curve to select the discount rate that matches the payment stream of the benefits in these plans. Previously, NS referred to Moody's seasoned Aa corporate bond yields and the changes in such yields in establishing the discount rate.

NS' net cost for other postretirement benefits, which is also included in "Compensation and benefits," was $76 million for the year ended Dec. 31, 2007. In recording this expense and valuing the net liability for other postretirement benefits, which is included in "Other postretirement benefits" as disclosed in Note 10,

management estimated future increases in health-care costs. These assumptions, along with the effect of a one percentage point change in them, are described in Note 10.

**Properties and Depreciation**

Most of NS' total assets are comprised of long-lived railway properties (see Note 5). As disclosed in Note 1, NS' properties are depreciated using group depreciation. Rail is depreciated primarily on the basis of use measured by gross-ton miles. Other properties are depreciated generally using the straight-line method over the lesser of estimated service or lease lives. NS reviews the carrying amount of properties whenever events or changes in circumstances indicate that such carrying amount may not be recoverable based on future undiscounted cash flows. Assets that are deemed impaired as a result of such review are recorded at the lesser of carrying amount or fair value.

NS' depreciation expense is based on management's assumptions concerning service lives of its properties as well as the expected net salvage that will be received upon their retirement. In developing these assumptions, NS' management utilizes periodic depreciation studies that are performed by an outside firm of consulting engineers. These studies analyze NS' historical patterns of asset use and retirement and take into account any expected change in operation or maintenance practices. NS' recent experience with these studies has been that while they do result in changes in the rates used to depreciate its properties, these changes have not caused a significant effect to its annual depreciation expense. The studies may also indicate that the recorded amount of accumulated depreciation is deficient (or in excess) of the amount indicated by the study. Any such deficiency (or excess) is amortized as a component of depreciation expense over the remaining service lives of the affected class of property. NS' depreciation expense for the year ended Dec. 31, 2007, amounted to $775 million. NS' weighted-average depreciation rates for 2007 are disclosed in Note 5; a one-tenth percentage point increase (or decrease) in these rates would have resulted in a $27 million increase (or decrease) to NS' depreciation expense.

**Personal Injury, Environmental and Legal Liabilities**

NS' expense for casualties and other claims, included in "Materials and other," amounted to $171 million for the year ended Dec. 31, 2007. Most of this expense was composed of NS' accrual related to personal injury liabilities. Job-related personal injury and occupational claims are subject to FELA, which is applicable only to railroads. FELA's fault-based tort system produces results that are unpredictable and inconsistent as compared with a no-fault worker's compensation system. The variability inherent in this system could result in actual costs being very different from the liability recorded. In all cases, NS records a liability when the expected loss for the claim is both probable and estimable.

To aid in valuing its personal injury liability and determining the amount to accrue during the year, NS' management utilizes studies prepared by an independent consulting actuarial firm. For employee personal injury cases, the actuarial firm studies NS' historical patterns of reserving for claims and subsequent settlements, taking into account relevant outside influences. An estimate of the ultimate amount of the liability, which includes amounts for incurred but unasserted claims, is based on the results of this analysis. For occupational injury claims, the actuarial firm studies NS' history of claim filings, severity, payments and other relevant facts. Additionally, the estimate of the ultimate loss for occupational injuries includes a provision for those claims that have been incurred but not reported by projecting NS' experience into the future as far as can be reasonably determined. NS has recorded this actuarially determined liability. The liability is dependent upon many individual judgments made as to the specific case reserves as well as the judgments of the consulting actuary and management in the periodic studies. Accordingly, there could be significant changes in the liability, which NS would recognize when such a change became known. The most recent actuarial study, completed in the fourth quarter of 2007, resulted in a decrease to NS' personal injury liability during the fourth quarter. While the liability recorded is supported by the most recent study, it is reasonably possible that the ultimate liability could be higher or lower.

NS is subject to various jurisdictions' environmental laws and regulations. It is NS' policy to record a liability where such liability or loss is probable and its amount can be estimated reasonably (see Note 17). Claims, if any, against third parties for recovery of cleanup costs incurred by NS, are reflected as receivables (when collection is probable) in the Consolidated Balance Sheets and are not netted against the associated NS liability. Environmental engineers regularly participate in ongoing evaluations of all known sites and in determining any necessary adjustments to liability estimates. NS also has established an Environmental Policy Council, composed of senior managers, to oversee and interpret its environmental policy.

Operating expenses for environmental matters totaled approximately $16 million in 2007, $19 million in 2006 and $16 million in 2005, and capital expenditures totaled approximately $7 million in 2007, $6 million in 2006 and $9 million in 2005. Capital expenditures in 2008 are expected to be comparable to those in 2007.

NS' Consolidated Balance Sheets included liabilities for environmental exposures in the amount of $46 million at Dec. 31, 2007, and $54 million at Dec. 31, 2006 (of which $12 million was accounted for as a current liability at Dec. 31, 2007 and 2006). At Dec. 31, 2007, the liability represented NS' estimate of the probable cleanup and remediation costs based on available information at 155 identified locations. On that date, 13 sites accounted for $25 million of the liability, and no individual site was considered to be material. NS anticipates that much of this liability will be paid out over five years; however, some costs will be paid out over a longer period.

At 32 locations, one or more NS subsidiaries, usually in conjunction with a number of other parties, have been identified as potentially responsible parties by the Environmental Protection Agency (EPA) or similar state authorities under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, or comparable state statutes, which often impose joint and several liability for cleanup costs.

With respect to known environmental sites (whether identified by NS or by the EPA or comparable state authorities), estimates of NS' ultimate potential financial exposure for a given site or in the aggregate for all such sites are necessarily imprecise because of the widely varying costs of currently available cleanup techniques, the likely development of new cleanup technologies, the difficulty of determining in advance the nature and full extent of contamination and each potential participant's share of any estimated loss (and that participant's ability to bear it), and evolving statutory and regulatory standards governing liability. NS estimates its environmental remediation liability on a site-by-site basis, using assumptions and judgments that management deems appropriate for each site. As a result, it is not practical to quantitatively describe the effects of changes in these many assumptions and judgments. NS has consistently applied its methodology of estimating its environmental liabilities.

Based on an assessment of known facts and circumstances, management believes that it is unlikely that any known matters, either individually or in the aggregate, will have a material adverse effect on NS' financial position, results of operations or liquidity.

Norfolk Southern and certain subsidiaries are defendants in numerous lawsuits and other claims relating principally to railroad operations. When management concludes that it is probable that a liability has been incurred and the amount of the liability can be reasonably estimated, it is accrued through a charge to expenses. While the ultimate amount of liability incurred in any of these lawsuits and claims is dependent on future developments, in management's opinion the recorded liability, if any, is adequate to cover the future payment of such liability and claims. However, the final outcome of any of these lawsuits and claims cannot be predicted with certainty, and unfavorable or unexpected outcomes could result in additional accruals that could be significant to results of operations in a particular year or quarter. Any adjustments to recorded liabilities will be reflected in expenses in the periods in which such adjustments are known.

**Income Taxes**

NS' net long-term deferred tax liability totaled $6.4 billion at Dec. 31, 2007 (see Note 3). This liability is estimated based on the expected future tax consequences of items recognized in the financial statements. After application of the federal statutory tax rate to book income, judgment is required with respect to the timing and deductibility of expenses in the corporate income tax returns. For state income and other taxes, judgment is also required with respect to the apportionment among the various jurisdictions. A valuation allowance is recorded if management expects that it is more likely than not that its deferred tax assets will not be realized. NS had a $10 million valuation allowance on $685 million of deferred tax assets as of Dec. 31, 2007, reflecting the expectation that most of these assets will be realized.

In addition, NS has a recorded liability for its estimate of uncertain tax positions taken or expected to be taken in a tax return. Judgment is required in evaluating the application of federal and state tax laws and assessing whether it is more likely than not that a tax position will be sustained on examination and, if so, judgment is also required as to the measurement of the amount of tax benefit that will realized upon settlement with the taxing authority. Management believes this liability for uncertain tax positions to be adequate. Income tax expense is adjusted in the period in which new information about a tax position becomes available or the final outcome differs from the amounts recorded. For every one half percent change in the 2007 effective rate net income would have changed by $11 million.

## OTHER MATTERS

**Labor Agreements**

Approximately 26,000, or about 85%, of NS' railroad employees are covered by labor agreements with various labor unions. These agreements remain in effect until changed pursuant to the Railway Labor Act (RLA). NS largely bargains in concert with other major railroads. Moratorium provisions in the labor agreements govern when the railroads and the unions may propose changes. The most recent bargaining round began in late 2004. Since that time, the railroads have finalized agreements that extend through 2009 with all of the major rail unions except the United Transportation Union (UTU) and the International Association of Machinists (IAM). A tentative agreement has been reached with the UTU that is subject to ratification by employees.

NS previously reached separate agreements with the Brotherhood of Locomotive Engineers and Trainmen (BLET) and the American Train Dispatchers Association (ATDA) through 2009. Thus, only the health and welfare provisions from the national agreements will apply to NS' locomotive engineers and ATDA-represented dispatchers. NS recently reached a tentative agreement with BLET that would have further extended its contract with that union through 2014. However, that agreement was not ratified by employees.

A tentative national agreement with IAM was not ratified by employees. Negotiations with IAM are being mediated by the National Mediation Board (NMB), a federal agency. The status quo is preserved during mediation (that is, the union may not strike and management may not change the labor agreements) while the NMB assists the parties in their efforts to reach agreement. If the NMB were to terminate mediation, it would, at that time, propose that the parties arbitrate their differences. A strike could occur 30 days thereafter if the parties did not accept arbitration. However, the President of the United States of America could then appoint an Emergency Board which would delay any strike for a further 60 days while the Board made recommendations and the parties engaged in further negotiations. The outcome of the negotiations cannot be determined at this time.

**Market Risks and Hedging Activities**

NS has used derivative financial instruments to reduce the risk of volatility in its diesel fuel costs and to manage its overall exposure to fluctuations in interest rates.

In 2001, NS began a program to hedge a portion of its diesel fuel consumption. The intent of the program was to assist in the management of NS' aggregate risk exposure to fuel price fluctuations, which can significantly affect NS' operating margins and profitability, through the use of one or more types of derivative instruments. No new hedges have been entered into since May of 2004, and the last remaining contracts were settled in the second quarter of 2006, bringing an end to the benefits from the program. Locomotive diesel fuel costs represented 14% of NS' operating expenses for 2006 and 11% for 2005.

NS manages its overall exposure to fluctuations in interest rates by issuing both fixed- and floating-rate debt instruments and by entering into interest-rate hedging transactions to achieve an appropriate mix within its debt portfolio.

At Dec. 31, 2007, NS' debt subject to interest rate fluctuations totaled $413 million. A 1% point increase in interest rates would increase NS' total annual interest expense related to all its variable debt by approximately $4 million. Management considers it unlikely that interest rate fluctuations applicable to these instruments will result in a material adverse effect on NS' financial position, results of operations or liquidity.

Some of NS' capital leases, which carry an average fixed rate of 7%, were effectively converted to variable rate obligations using interest rate swap agreements. On Dec. 31, 2007, the average pay rate under these agreements was 5%, and the average receive rate was 7%. During 2007 and 2006, the effect of the swaps was to reduce interest expense by $1 million and $1 million, respectively. A portion of the lease obligations is payable in Japanese yen. NS eliminated the associated exchange rate risk at the inception of each lease with a yen deposit sufficient to fund the yen-denominated obligation. Most of these deposits are held by foreign banks, primarily Japanese. As a result, NS is exposed to financial market risk relative to Japan. Counterparties to the interest rate swaps and Japanese banks holding yen deposits are major financial institutions believed by management to be creditworthy.

**New Accounting Pronouncements**

In September 2006, the Financial Accounting Standards Board issued Statement of Financial Accounting Standards No. 157, Fair Value Measurements. This statement, effective for interim or annual reporting periods beginning after Nov. 15, 2007, establishes a framework for measuring fair value in generally accepted accounting principles and expands disclosures about fair value measurements. NS will adopt the statement in the first quarter of 2008 and expects it will not have a material effect on NS' consolidated financial statements.

FASB Interpretation No. (FIN) 48, "Accounting for Uncertainty in Income Taxes," issued in June 2006, clarifies accounting for uncertainty in income taxes recognized in an enterprise's financial statements in accordance with SFAS No. 109, "Accounting for Income Taxes." FIN 48 prescribes a recognition threshold and measurement attribute for a tax position taken or expected to be taken in a tax return. Under the guidelines of FIN 48, an entity should recognize the financial statement benefit of a tax position if it determines that it is more likely than not that the position will be sustained on examination. NS adopted this Interpretation in the first quarter of 2007 (see Notes 1 and 3).

**Inflation**

In preparing financial statements, U.S. generally accepted accounting principles require the use of historical cost that disregards the effects of inflation on the replacement cost of property. NS, a capital-intensive company, has

most of its capital invested in such assets. The replacement cost of these assets, as well as the related depreciation expense, would be substantially greater than the amounts reported on the basis of historical cost.

**Proposed Legislation and Regulations on Safety and Transportation of Hazardous Materials**

Regulations proposed by the Department of Homeland Security in late 2006 would mandate that railroads adopt chain of custody and security measures. If enacted, such regulations could cause service degradation and higher costs for the transportation of toxic inhalation hazard materials. In addition, certain local governments have sought to enact ordinances banning hazardous materials moving by rail within their borders. Some legislators have contemplated pre-notification requirements for hazardous material shipments. If promulgated, such ordinances could require the re-routing of hazardous materials shipments, with the potential for significant additional costs and network inefficiencies. Accordingly, NS will oppose efforts to impose unwarranted regulation in this area.

**FORWARD-LOOKING STATEMENTS**

This Management's Discussion and Analysis of Financial Condition and Results of Operations contains forward-looking statements that may be identified by the use of words like “believe,” “expect,” “anticipate” and “project.” Forward-looking statements reflect management's good-faith evaluation of information currently available. However, such statements are dependent on and, therefore, can be influenced by, a number of external variables over which management has little or no control, including: domestic and international economic conditions; interest rates; the business environment in industries that produce and consume rail freight; competition and consolidation within the transportation industry; the operations of carriers with which NS interchanges; acts of terrorism or war; fluctuation in prices of key materials, in particular diesel fuel; labor difficulties, including strikes and work stoppages; legislative and regulatory developments; results of litigation; changes in securities and capital markets; disruptions to NS’ technology infrastructure, including computer systems; and natural events such as severe weather, hurricanes and floods. For a discussion of significant risk factors applicable to NS, see Part I, Item 1A “Risk Factors.” Forward-looking statements are not, and should not be relied upon as, a guarantee of future performance or results, nor will they necessarily prove to be accurate indications of the times at or by which any such performance or results will be achieved. As a result, actual outcomes and results may differ materially from those expressed in forward-looking statements. NS undertakes no obligation to update or revise forward-looking statements.

**Item 7A. Quantitative and Qualitative Disclosures about Market Risk.**

The information required by this item is included in Part II, Item 7, “Management's Discussion and Analysis of Financial Condition and Results of Operations” under the heading “Market Risks and Hedging Activities.”

**Item 8. Financial Statements and Supplementary Data.**

## INDEX TO FINANCIAL STATEMENTS


| | Page |
|---|---|
| Report of Management | K41 |
| Reports of Independent Registered Public Accounting Firm | K42 |
| Consolidated Statements of Income<br>Years ended Dec. 31, 2007, 2006 and 2005 | K44 |
| Consolidated Balance Sheets<br>As of Dec. 31, 2007 and 2006 | K45 |
| Consolidated Statements of Cash Flows<br>Years ended Dec. 31, 2007, 2006 and 2005 | K46 |
| Consolidated Statements of Changes in Stockholders' Equity<br>Years ended Dec. 31, 2007, 2006 and 2005 | K47 |
| Notes to Consolidated Financial Statements | K48 |
| The Index to Consolidated Financial Statement Schedule in Item 15 | K82 |

**Report of Management**

Feb. 15, 2008

To the Stockholders
Norfolk Southern Corporation

Management is responsible for establishing and maintaining adequate internal control over financial reporting. In order to ensure that the Corporation's internal control over financial reporting is effective, management regularly assesses such controls and did so most recently for its financial reporting as of Dec. 31, 2007. This assessment was based on criteria for effective internal control over financial reporting described in *Internal Control-Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this assessment, management has concluded that the Corporation maintained effective internal control over financial reporting as of Dec. 31, 2007.

KPMG LLP, independent registered public accounting firm, has audited the Corporation's financial statements and issued an attestation report on the Corporation's internal control over financial reporting as of Dec. 31, 2007.

| | | |
|---|---|---|
| /s/ Charles W. Moorman | /s/ James A. Squires | /s/ Marta R. Stewart |
| Charles W. Moorman | James A. Squires | Marta R. Stewart |
| Chairman, President and | Executive Vice President Finance and | Vice President and |
| Chief Executive Officer | Chief Financial Officer | Controller |

**Report of Independent Registered Public Accounting Firm**

The Board of Directors and Stockholders
Norfolk Southern Corporation:

We have audited Norfolk Southern Corporation's internal control over financial reporting as of December 31, 2007, based on criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Norfolk Southern Corporation's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Report of Management. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, Norfolk Southern Corporation maintained, in all material respects, effective internal control over financial reporting as of December 31, 2007, based on criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Norfolk Southern Corporation as of December 31, 2007 and 2006, and the related consolidated statements of income, changes in stockholders' equity, and cash flows for each of the years in the three-year period ended December 31, 2007, and our report dated February 15, 2008 expressed an unqualified opinion on those consolidated financial statements.

/s/ KPMG LLP
Norfolk, Virginia
February 15, 2008

## Report of Independent Registered Public Accounting Firm

The Board of Directors and Stockholders
Norfolk Southern Corporation:

We have audited the accompanying consolidated balance sheets of Norfolk Southern Corporation and subsidiaries as of December 31, 2007 and 2006, and the related consolidated statements of income, changes in stockholders' equity, and cash flows for each of the years in the three-year period ended December 31, 2007. In connection with our audits of the consolidated financial statements, we also have audited the financial statement schedule as listed in Item 15(A)2. These consolidated financial statements and financial statement schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements and financial statement schedule based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Norfolk Southern Corporation and subsidiaries as of December 31, 2007 and 2006, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 2007, in conformity with U.S. generally accepted accounting principles. Also in our opinion, the related financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

As discussed in note 1 to the consolidated financial statements, Norfolk Southern Corporation adopted Financial Accounting Standards Board Interpretation No. 48, *Accounting for Uncertainty in Income Taxes*, effective January 1, 2007, Statement of Financial Accounting Standards No. 123 (revised 2004), *Share-Based Payment*, effective January 1, 2006, and Statement of Financial Accounting Standards No. 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans*, effective December 31, 2006.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), Norfolk Southern Corporation's internal control over financial reporting as of December 31, 2007, based on criteria established in *Internal Control – Integrated Framework*, issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated February 15, 2008 expressed an unqualified opinion on the effectiveness of the Company's internal control over financial reporting.

/s/ KPMG LLP
Norfolk, Virginia
February 15, 2008

**Norfolk Southern Corporation and Subsidiaries**
**Consolidated Statements of Income**

| | Years ended Dec. 31, | | |
|---|---|---|---|
| | **2007** | **2006** | **2005** |
| | *($ in millions, except earnings per share)* | | |
| **Railway operating revenues** | $ 9,432 | $ 9,407 | $ 8,527 |
| **Railway operating expenses:** | | | |
| Compensation and benefits | 2,552 | 2,637 | 2,493 |
| Purchased services and rents | 1,551 | 1,578 | 1,547 |
| Fuel | 1,169 | 1,095 | 821 |
| Depreciation | 775 | 738 | 774 |
| Materials and other | 800 | 802 | 775 |
| Total railway operating expenses | 6,847 | 6,850 | 6,410 |
| **Income from railway operations** | 2,585 | 2,557 | 2,117 |
| Other income – net | 93 | 149 | 74 |
| Interest expense on debt | 441 | 476 | 494 |
| Income before income taxes | 2,237 | 2,230 | 1,697 |
| Provision for income taxes | 773 | 749 | 416 |
| **Net income** | $ 1,464 | $ 1,481 | $ 1,281 |
| **Per share amounts:** | | | |
| Net income | | | |
| Basic | $ 3.74 | $ 3.63 | $ 3.17 |
| Diluted | $ 3.68 | $ 3.57 | $ 3.11 |

*See accompanying notes to consolidated financial statements.*

**Norfolk Southern Corporation and Subsidiaries**
**Consolidated Balance Sheets**

| | As of Dec. 31, | |
|---|---|---|
| | **2007** | **2006** |
| | *($ in millions)* | |
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 206 | $ 527 |
| Short-term investments | -- | 391 |
| Accounts receivable – net | 942 | 992 |
| Materials and supplies | 176 | 151 |
| Deferred income taxes | 190 | 186 |
| Other current assets | 161 | 153 |
| Total current assets | 1,675 | 2,400 |
| Investments | 1,974 | 1,755 |
| Properties less accumulated depreciation | 21,583 | 21,098 |
| Other assets | 912 | 775 |
| **Total assets** | $ 26,144 | $ 26,028 |
| **Liabilities and stockholders' equity** | | |
| Current liabilities: | | |
| Accounts payable | $ 1,139 | $ 1,181 |
| Income and other taxes | 203 | 205 |
| Other current liabilities | 237 | 216 |
| Current maturities of long-term debt | 369 | 491 |
| Total current liabilities | 1,948 | 2,093 |
| Long-term debt | 5,999 | 6,109 |
| Other liabilities | 2,039 | 1,767 |
| Deferred income taxes | 6,431 | 6,444 |
| **Total liabilities** | 16,417 | 16,413 |
| Stockholders' equity: | | |
| Common stock $1.00 per share par value, 1,350,000,000 shares authorized; outstanding 379,297,891 and 397,419,601 shares, respectively, net of treasury shares | 380 | 398 |
| Additional paid-in capital | 1,466 | 1,303 |
| Accumulated other comprehensive loss | (399) | (369) |
| Retained income | 8,280 | 8,283 |
| **Total stockholders' equity** | 9,727 | 9,615 |
| **Total liabilities and stockholders' equity** | $ 26,144 | $ 26,028 |

*See accompanying notes to consolidated financial statements.*

**Norfolk Southern Corporation and Subsidiaries**
**Consolidated Statements of Cash Flows**

| | Years Ended Dec. 31, 2007 | 2006 | 2005 |
|---|---|---|---|
| | ($ in millions) | | |
| **Cash flows from operating activities** | | | |
| Net income | $ 1,464 | $ 1,481 | $ 1,281 |
| Reconciliation of net income to net cash provided by operating activities: | | | |
| Depreciation | 786 | 750 | 787 |
| Deferred income taxes | 125 | (8) | 80 |
| Gains and losses on properties and investments | (51) | (54) | (51) |
| Changes in assets and liabilities affecting operations: | | | |
| Accounts receivable | 30 | (60) | (94) |
| Materials and supplies | (25) | (19) | (28) |
| Other current assets | (17) | (11) | 20 |
| Current liabilities other than debt | 38 | 38 | 55 |
| Other – net | (17) | 89 | 55 |
| Net cash provided by operating activities | 2,333 | 2,206 | 2,105 |
| **Cash flows from investing activities** | | | |
| Property additions | (1,341) | (1,178) | (1,025) |
| Property sales and other transactions | 124 | 119 | 110 |
| Investments, including short-term | (635) | (1,804) | (1,822) |
| Investment sales and other transactions | 827 | 2,179 | 910 |
| Net cash used for investing activities | (1,025) | (684) | (1,827) |
| **Cash flows from financing activities** | | | |
| Dividends | (377) | (278) | (194) |
| Common stock issued – net | 183 | 297 | 194 |
| Purchase and retirement of common stock | (1,196) | (964) | -- |
| Proceeds from borrowings | 250 | -- | 433 |
| Debt repayments | (489) | (339) | (889) |
| Net cash used for financing activities | (1,629) | (1,284) | (456) |
| Net increase (decrease) in cash and cash equivalents | (321) | 238 | (178) |
| **Cash and cash equivalents** | | | |
| At beginning of year | 527 | 289 | 467 |
| At end of year | $ 206 | $ 527 | $ 289 |
| **Supplemental disclosure of cash flow information** | | | |
| Cash paid during the year for: | | | |
| Interest (net of amounts capitalized) | $ 441 | $ 473 | $ 485 |
| Income taxes (net of refunds) | $ 603 | $ 692 | $ 271 |

*See accompanying notes to consolidated financial statements.*

## Norfolk Southern Corporation and Subsidiaries
## Consolidated Statements of Changes in Stockholders' Equity

| | Common Stock | Additional Paid-in Capital | Unearned Restricted Stock | Accum. Other Compre-hensive Loss | Retained Income | Total |
|---|---|---|---|---|---|---|
| | ($ in millions, except per share amounts) | | | | | |
| **Balance Dec. 31, 2004** | $ 401 | $ 728 | $ (8) | $ (24) | $ 6,880 | $ 7,977 |
| Comprehensive income | | | | | | |
| Net income | | | | | 1,281 | 1,281 |
| Other comprehensive loss | | | | (53) | | (53) |
| Total comprehensive income | | | | | | 1,228 |
| Dividends on Common Stock, $0.48 per share | | | | | (194) | (194) |
| Stock-based compensation, including tax benefit of $47 | 10 | 260 | (9) | | | 261 |
| Other | | 4 | | | | 4 |
| **Balance Dec. 31, 2005** | 411 | 992 | (17) | (77) | 7,967 | 9,276 |
| Comprehensive income | | | | | | |
| Net income | | | | | 1,481 | 1,481 |
| Other comprehensive income | | | | 2 | | 2 |
| Total comprehensive income | | | | | | 1,483 |
| Adoption of SFAS 158, net of tax | | | | (294) | | (294) |
| Dividends on Common Stock, $0.68 per share | | | | | (278) | (278) |
| Share repurchases | (22) | (63) | | | (879) | (964) |
| Stock-based compensation, including tax benefit of $85 | 9 | 372 | 17 | | (8) | 390 |
| Other | | 2 | | | | 2 |
| **Balance Dec. 31, 2006** | $ 398 | $ 1,303 | $ -- | $ (369) | $ 8,283 | $ 9,615 |
| Comprehensive income | | | | | | |
| Net income | | | | | 1,464 | 1,464 |
| Other comprehensive loss | | | | (30) | | (30) |
| Total comprehensive income | | | | | | 1,434 |
| Adoption of FIN 48, net of tax | | | | | 10 | 10 |
| Dividends on Common Stock, $0.96 per share | | | | | (377) | (377) |
| Share repurchases | (24) | (81) | | | (1,091) | (1,196) |
| Stock-based compensation, including tax benefit of $57 | 6 | 238 | | | (9) | 235 |
| Other | | 6 | | | | 6 |
| **Balance Dec. 31, 2007** | $ 380 | $ 1,466 | $ -- | $ (399) | $ 8,280 | $ 9,727 |

*See accompanying notes to consolidated financial statements.*

**Norfolk Southern Corporation and Subsidiaries**
**Notes to Consolidated Financial Statements**

The following Notes are an integral part of the Consolidated Financial Statements.

## 1. Summary of Significant Accounting Policies

### Description of Business

Norfolk Southern Corporation is a Virginia-based holding company engaged principally in the rail transportation business, operating approximately 21,000 route miles primarily in the East and Midwest. These consolidated financial statements include Norfolk Southern Corporation (Norfolk Southern) and its majority-owned and controlled subsidiaries (collectively, NS). Norfolk Southern's major subsidiary is Norfolk Southern Railway Company (NSR). All significant intercompany balances and transactions have been eliminated in consolidation.

NSR and its railroad subsidiaries transport raw materials, intermediate products and finished goods classified in the following market groups (percent of total railway operating revenues in 2007): coal (25%); intermodal (20%); chemicals (13%); metals/construction (12%); agriculture/consumer products/government (11%); automotive (10%); and paper/clay/forest products (9%). Although most of NS' customers are domestic, ultimate points of origination or destination for some of the products transported (particularly coal bound for export and some intermodal containers) may be outside the United States. Approximately 85% of NS' railroad employees are covered by collective bargaining agreements with various labor unions.

### Use of Estimates

The preparation of financial statements in accordance with U.S. generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Management periodically reviews its estimates, including those related to the recoverability and useful lives of assets, as well as liabilities for litigation, environmental remediation, casualty claims, income taxes, and pension and other postretirement benefits. Changes in facts and circumstances may result in revised estimates.

### Revenue Recognition

Transportation revenue is recognized proportionally as a shipment moves from origin to destination and related expenses are recognized as incurred. Refunds (which are primarily volume-based incentives) are recorded as a reduction to revenues on the basis of management's best estimate of projected liability, which is based on historical activity, current traffic counts and the expectation of future activity. NS regularly monitors its contract refund liability, and historically, the estimates have not differed significantly from the amounts ultimately refunded. Switching, demurrage and other incidental service revenues are recognized when the services are performed.

### Derivatives

NS does not engage in the trading of derivatives. NS uses derivative financial instruments to reduce the risk of volatility in its diesel fuel costs and in the management of its mix of fixed and floating-rate debt. Management has determined that these derivative instruments qualify as either fair-value or cash-flow hedges, having values that highly correlate with the underlying hedged exposures, and has designated such instruments as hedging

transactions. Income and expense related to the derivative financial instruments are recorded in the same category as generated by the underlying asset or liability. Credit risk related to the derivative financial instruments is considered to be minimal and is managed by requiring high credit standards for counterparties and periodic settlements (see Note 16).

**Stock-Based Compensation**

NS has stock-based employee compensation plans, which are more fully described in Note 11. Through Dec. 31, 2005, NS applied the intrinsic value recognition and measurement principles of APB Opinion No. 25, "Accounting for Stock Issued to Employees" (APB Opinion 25), and related interpretations in accounting for these plans (See "Required Accounting Changes," below).

The following table illustrates the effect on net income and earnings per share if NS had applied the fair value recognition provisions of Statement of Financial Accounting Standards No. 123, "Accounting for Stock-Based Compensation" (SFAS 123), to stock-based employee compensation:

| | | 2005<br>*($ in millions, except per share)* |
|---|---|---|
| Net income, as reported | $ | 1,281 |
| Add: Stock-based employee compensation expense as reported | | 46 |
| Deduct: Stock-based employee compensation expense determined under fair value method | | (45) |
| Pro forma net income | $ | 1,282 |
| Earnings per share: | | |
| As reported | | |
| Basic | $ | 3.17 |
| Diluted | $ | 3.11 |
| Pro forma | | |
| Basic | $ | 3.17 |
| Diluted | $ | 3.10 |

**Required Accounting Changes**

Effective Jan. 1, 2007, NS adopted Financial Accounting Standards Board Interpretation No. 48 (FIN 48), "Accounting for Uncertainty in Income Taxes," which clarifies accounting for uncertainty in income taxes recognized in an enterprise's financial statements in accordance with SFAS No. 109, "Accounting for Income Taxes." FIN 48 prescribes a recognition threshold and measurement attribute for a tax position taken or expected to be taken in a tax return. Under the guidelines of FIN 48, an entity should recognize the financial statement benefit of a tax position if it determines that it is more likely than not that the position will be sustained on examination (see Note 3).

Effective Dec. 31, 2006, NS adopted Statement of Financial Accounting Standards (SFAS) No. 158, "Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans" (see Note 10).

Effective January 1, 2006, NS adopted Statement of Financial Accounting Standards No. 123(R), "Share-Based Payment," [SFAS 123(R)]. This statement applies to awards granted, modified, repurchased or cancelled after the

effective date as well as awards that are unvested at the effective date and includes, among other things, the requirement to expense the fair value of stock options. The standard also requires that awards to be settled in cash be measured at fair value at each reporting date until ultimate settlement. NS adopted SFAS 123(R) using the modified prospective method, which requires application of the standard to all awards granted, modified, repurchased or cancelled on or after January 1, 2006, and to all awards for which the requisite service has not been rendered as of such date. In accordance with the modified prospective approach, prior period financial statements have not been restated to reflect the impact of SFAS 123(R). As compared to amounts that would have been recognized under APB Opinion 25, the adoption of SFAS 123(R) resulted in $27 million of additional compensation expense for 2006, including the immediate expensing of 2006 grants made to retirement-eligible employees, which reduced net income by $20 million, or 5 cents per basic and diluted share. Under SFAS 123(R), all new awards granted to retirement eligible employees must be expensed immediately. Under APB Opinion No. 25 and related interpretations, such awards were amortized over the stated service period. Such awards were treated similarly under SFAS 123 in the pro forma amounts disclosed in the preceding table.

**Cash Equivalents**

“Cash equivalents” are highly liquid investments purchased three months or less from maturity.

**Allowance for Doubtful Accounts**

NS' allowance for doubtful accounts was $5 million at Dec. 31, 2007 and 2006. To determine its allowance for doubtful accounts, NS evaluates historical loss experience (which has not been significant), the characteristics of current accounts, as well as general economic conditions and trends.

**Materials and Supplies**

“Materials and supplies,” consisting mainly of fuel oil and items for maintenance of property and equipment, are stated at the lower of average cost or market. The cost of materials and supplies expected to be used in capital additions or improvements is included in “Properties.”

**Investments**

Debt securities classified as “held-to-maturity” are reported at amortized cost and marketable equity and debt securities classified as “trading” or “available-for-sale” are recorded at fair value. Unrealized after-tax gains and losses for investments designated as “available-for-sale,” are recognized in “Accumulated other comprehensive loss.”

Investments where NS has the ability to exercise significant influence over but does not control the entity are accounted for using the equity method in accordance with APB Opinion No. 18, “The Equity Method of Accounting for Investments in Common Stock.”

**Properties**

“Properties” are stated principally at cost and are depreciated using group depreciation. Rail is depreciated primarily on the basis of use measured by gross ton-miles. Other properties are depreciated generally using the straight-line method over the lesser of estimated service or lease lives. Depletion of natural resources (see Note 2) is based on units of production. Depreciation in the Consolidated Statements of Cash Flows includes depreciation and depletion. NS capitalizes interest on major capital projects during the period of their construction. Expenditures, including those on leased assets that extend an asset's useful life or increase its utility, are capitalized. Costs related to repairs and maintenance activities that do not extend an asset’s useful life or increase its utility are expensed when such repairs are performed. When properties other than land and nonrail assets are

sold or retired in the ordinary course of business, the cost of the assets, net of sale proceeds or salvage, is charged to accumulated depreciation, and no gain or loss is recognized through income. Gains and losses on disposal of land and nonrail assets are included in "Other income - net" (see Note 2) since such income is not a product of NS' railroad operations.

NS reviews the carrying amount of properties whenever events or changes in circumstances indicate that such carrying amount may not be recoverable based on future undiscounted cash flows. Assets that are deemed impaired as a result of such review are recorded at the lower of carrying amount or fair value.

**Reclassifications**

Certain comparative prior year amounts presented in "Railway operating expenses" have been reclassified to conform to the current year presentation. Amounts previously presented as "Diesel fuel" (used in locomotives) have been combined with other fuel and related costs and are now presented as "Fuel." Additionally, certain other groupings of costs within "Railway operating expenses" have been changed.

**2. Other Income - Net**

| | 2007 | 2006 | 2005 |
|---|---|---|---|
| | | *($ in millions)* | |
| Income from natural resources: | | | |
| Royalties from coal | $ 52 | $ 55 | $ 54 |
| Nonoperating depletion and depreciation | (11) | (12) | (13) |
| Subtotal | 41 | 43 | 41 |
| Gains and losses from sale of properties and investments | 51 | 54 | 49 |
| Rental income | 46 | 45 | 42 |
| Equity in earnings of Conrail (Note 4) | 45 | 25 | 37 |
| Interest income | 45 | 76 | 41 |
| Corporate-owned life insurance – net | 9 | 24 | 4 |
| Expenses related to synthetic fuel investments | (77) | (62) | (102) |
| Other interest expense | (27) | (17) | (6) |
| Taxes on nonoperating property | (10) | (9) | (9) |
| Other | (30) | (30) | (23) |
| Total | $ 93 | $ 149 | $ 74 |

"Other income - net" includes income and costs not part of rail operations and the income generated by the activities of NS' noncarrier subsidiaries as well as the costs incurred by those subsidiaries in their operations. NS has a 40.5% interest in a limited liability company that owned and operated facilities that produced synthetic fuel from coal. In addition, in 2007 NS purchased two facilities that produced synthetic fuel from coal. The production of synthetic fuel resulted in tax credits as well as expenses related to the investments. The expenses are included in "Expenses related to synthetic fuel investments" above.

"Other current assets" in the Consolidated Balance Sheets includes prepaid interest of $58 million at Dec. 31, 2007, and $50 million at Dec. 31, 2006, arising from corporate-owned life insurance borrowings.

### 3. Income Taxes

**Provision for Income Taxes**

| | 2007 | 2006 | 2005 |
|---|---|---|---|
| | | *($ in millions)* | |
| Current: | | | |
| Federal | $ 570 | $ 666 | $ 283 |
| State | 78 | 91 | 53 |
| Total current taxes | 648 | 757 | 336 |
| Deferred: | | | |
| Federal | 77 | 3 | 220 |
| State | 48 | (11) | (140) |
| Total deferred taxes | 125 | (8) | 80 |
| Provision for income taxes | $ 773 | $ 749 | $ 416 |

**Reconciliation of Statutory Rate to Effective Rate**

The "Provision for income taxes" in the Consolidated Statements of Income differs from the amounts computed by applying the statutory federal corporate tax rate as follows:

| | 2007 | | 2006 | | 2005 | |
|---|---|---|---|---|---|---|
| | Amount | % | Amount | % | Amount | % |
| | | | *($ in millions)* | | | |
| Federal income tax at statutory rate | $ 783 | 35 | $ 780 | 35 | $ 594 | 35 |
| State income taxes, net of Federal tax effect | 63 | 3 | 52 | 2 | 40 | 2 |
| Tax credits | (65) | (3) | (62) | (3) | (104) | (6) |
| Ohio rate change, net of Federal tax effect | -- | -- | -- | -- | (96) | (6) |
| Illinois tax law change, net of Federal tax effect | 19 | 1 | -- | -- | -- | -- |
| Other – net | (27) | (1) | (21) | -- | (18) | -- |
| Provision for income taxes | $ 773 | 35 | $ 749 | 34 | $ 416 | 25 |

In August 2007, Illinois enacted tax legislation that modifies the way in which transportation companies apportion their taxable income to the state. The change resulted in an increase in NS' deferred income tax liability in the third quarter, as required by Statement of Financial Accounting Standards No. 109, "Accounting for Income Taxes," which increased deferred tax expense by $19 million.

In June 2005, Ohio enacted tax legislation that phases out its Corporate Franchise Tax, which was generally based on federal taxable income, and phases in a new gross receipts tax called the Commercial Activity Tax, which is based on current year sales and rentals. The phased elimination of the Corporate Franchise Tax resulted in a reduction in NS' deferred income tax liability, as required by Statement of Financial Accounting Standards No. 109, "Accounting for Income Taxes," which, as noted above, decreased deferred tax expense by $96 million.

**Deferred Tax Assets and Liabilities**

Certain items are reported in different periods for financial reporting and income tax purposes. Deferred tax assets and liabilities are recorded in recognition of these differences. The tax effects of temporary differences that give rise to significant portions of the deferred tax assets and deferred tax liabilities are as follows:

| | Dec. 31, 2007 | Dec. 31, 2006 |
|---|---|---|
| | *($ in millions)* | |
| Deferred tax assets: | | |
| Compensation and benefits, including post-retirement | $ 417 | $ 382 |
| Accruals, including casualty and other claims | 219 | 211 |
| Other | 49 | 44 |
| Total gross deferred tax assets | 685 | 637 |
| Less valuation allowance | (10) | (9) |
| Net deferred tax asset | 675 | 628 |
| Deferred tax liabilities: | | |
| Property | (6,683) | (6,659) |
| Other | (233) | (227) |
| Total gross deferred tax liabilities | (6,916) | (6,886) |
| Net deferred tax liability | (6,241) | (6,258) |
| Net current deferred tax asset | 190 | 186 |
| Net long-term deferred tax liability | $ (6,431) | $ (6,444) |

Except for amounts for which a valuation allowance has been provided, management believes that it is more likely than not that the results of future operations will generate sufficient taxable income to realize the deferred tax assets. The valuation allowance at the end of each year relates to subsidiary state income tax net operating losses that may not be utilized prior to their expiration. The total valuation allowance increased $1 million in 2007, and decreased $1 million in 2006 and $3 million in 2005.

**Uncertain Tax Positions**

As a result of the implementation of FIN 48 on Jan. 1, 2007 (see Note 1), NS recognized a $10 million increase to stockholders' equity, $2 million of which related to investments accounted for under the equity method of accounting. A reconciliation of the beginning and ending amount of unrecognized tax benefits is as follows ($ in millions):

| | |
|---|---|
| Balance at January 1, 2007 | $179 |
| Additions based on tax positions related to the current year | 65 |
| Additions for tax positions of prior years | 9 |
| Reductions for tax positions of prior years | (84) |
| Settlements with taxing authorities | -- |
| Lapse of statutes of limitations | (2) |
| Balance at December 31, 2007 | $167 |

Included in the balance of unrecognized tax benefits at December 31, 2007, are potential benefits of $56 million that would affect the effective tax rate if recognized. Unrecognized tax benefits are adjusted in the period in which new information about a tax position becomes available or the final outcome differs from the amount recorded.

NS expects that the total amount of unrecognized tax benefits at Dec. 31, 2007, will decrease by between $30 million and $35 million in 2008 due to tax positions for which there was an uncertainty about the timing of deductibility in earlier years but deductibility may become certain by the close of 2008. NS' consolidated federal income tax returns for 2004 and 2005 are being audited by the Internal Revenue Service (IRS). NS anticipates that the IRS will complete its examination of the 2004 and 2005 years within the next twelve months. It is reasonably possible that the amount of unrecognized tax benefits will change due to the completion of the IRS examination of the 2004 and 2005 years, but an estimate of the change cannot be made. The IRS completed its examination of the 2002 and 2003 consolidated federal income tax returns during the third quarter of 2006 and NS appealed certain adjustments proposed by the IRS. State income tax returns generally are subject to examination for a period of three to four years after filing of the return. In addition, NS is generally obligated to report changes in taxable income arising from federal income tax examinations to the states within a period of up to two years from the date the federal examination is final. NS has various state income tax returns either under examination, administrative appeals, or litigation. It is reasonably possible that the amount of unrecognized tax benefits will decrease in 2008 as a result of the lapse of state statutes of limitations, but the amount is not expected to be significant. NS does not expect that any of the above potential changes in unrecognized tax benefits will have a material effect on NS' financial position, results of operations or liquidity.

Interest related to unrecognized tax benefits, which is included in "Other income – net," amounted to $12 million of expense in 2007 and income of $2 million in 2006 and $12 million in 2005. Penalties related to tax matters are included in "Provision for income taxes" and totaled zero in each of 2007, 2006 and 2005. NS has recorded a liability of $28 million at Dec. 31, 2007, and $17 million at Jan. 1, 2007, for the payment of interest on unrecognized tax benefits. NS has no liability recorded at Dec. 31, 2007, and Jan. 1, 2007, for the payment of penalties on unrecognized tax benefits.

**4. Investments**

| | Dec. 31, 2007 | Dec. 31, 2006 |
|---|---|---|
| | *($ in millions)* | |
| Short-term investments with average maturities: | | |
| Federal government notes, 5 months | $ -- | $ 124 |
| Corporate notes, 4 months | -- | 117 |
| Commercial paper, 2 months | -- | 74 |
| Municipal debt, 1 month | -- | 22 |
| Other short-term investments, less than one month | -- | 54 |
| Total short-term investments | $ -- | $ 391 |
| Long-term investments: | | |
| Investment in Conrail Inc. | $ 899 | $ 849 |
| Other equity method investments | 594 | 451 |
| Company-owned life insurance at net cash surrender value | 327 | 310 |
| Other investments | 154 | 145 |
| Total long-term investments | $ 1,974 | $ 1,755 |

Other equity method investments includes $240 million at Dec. 31, 2007, and $100 million at Dec. 31, 2006, related to NS' investment in Meridian Speedway LLC, a joint venture formed with Kansas City Southern in 2006.

**Investment in Conrail**

Through a limited liability company, Norfolk Southern and CSX Corporation (CSX) jointly own Conrail Inc. (Conrail), whose primary subsidiary is Consolidated Rail Corporation (CRC). NS has a 58% economic and 50% voting interest in the jointly owned entity, and CSX has the remainder of the economic and voting interests. NS is applying the equity method of accounting to its remaining investment in Conrail in accordance with APB Opinion No. 18, "The Equity Method of Accounting for Investments in Common Stock." NS is amortizing the excess of the purchase price over Conrail's net equity using the principles of purchase accounting, based primarily on the estimated useful lives of Conrail's depreciable property and equipment, including the related deferred tax effect of the differences in tax accounting bases for such assets, as all of the purchase price at acquisition was allocable to Conrail's tangible assets and liabilities. At Dec. 31, 2007, the difference between NS' investment in Conrail and its share of Conrail's underlying net equity was $555 million.

CRC owns and operates certain properties (the Shared Assets Areas) for the joint and exclusive benefit of NSR and CSX Transportation, Inc. (CSXT). The costs of operating the Shared Assets Areas are borne by NSR and CSXT based on usage. In addition, NSR and CSXT pay CRC a fee for access to the Shared Assets Areas. "Purchased services and rents" includes expenses for amounts due to CRC for operation of the Shared Assets Areas of $126 million in 2007 and 2006, and $129 million in 2005. Future minimum lease payments due to CRC under the Shared Assets Areas agreements are as follows: $28 million in each of 2008 through 2012 and $317 million thereafter. NS provides certain general and administrative support functions to Conrail, the fees for which are billed in accordance with several service-provider arrangements and amount to approximately $7 million annually.

"Accounts payable" includes $78 million at Dec. 31, 2007, and $68 million at Dec. 31, 2006, due to Conrail for the operation of the Shared Assets Areas. In addition, "Other liabilities" includes $133 million at Dec. 31, 2007 and 2006 for long-term advances from Conrail, maturing 2035, entered into in 2005 that bear interest at an average rate of 4.4%.

**5. Properties**

| | Dec. 31, 2007 | Dec. 31, 2006 | Depreciation Rate for 2007 |
|---|---|---|---|
| | *($ in millions)* | | |
| Land | $ 2,085 | $ 2,082 | |
| Railway property: | | | |
| Road | 19,420 | 18,725 | 2.7% |
| Equipment | 7,413 | 7,085 | 3.7% |
| Other property | 471 | 471 | 2.3% |
| | 29,389 | 28,363 | |
| Less accumulated depreciation | (7,806) | (7,265) | |
| Net properties | $ 21,583 | $ 21,098 | |

Railway property includes $504 million at Dec. 31, 2007, and $602 million at Dec. 31, 2006, of assets recorded pursuant to capital leases with accumulated amortization of $175 million and $192 million at Dec. 31, 2007 and 2006, respectively. Other property includes the costs of obtaining rights to natural resources of $337 million at

Dec. 31, 2007 and 2006, with accumulated depletion of $172 million and $165 million at Dec. 31, 2007 and 2006, respectively.

**Capitalized Interest**

Total interest cost incurred on debt in 2007, 2006 and 2005 was $455 million, $489 million and $505 million, respectively, of which $14 million, $13 million and $11 million was capitalized.

## 6. Current Liabilities

| | Dec. 31, 2007 | Dec. 31, 2006 |
|---|---|---|
| | *($ in millions)* | |
| Accounts payable: | | |
| Accounts and wages payable | $ 568 | $ 569 |
| Casualty and other claims (Note 17) | 259 | 301 |
| Vacation liability | 123 | 120 |
| Equipment rents payable – net | 87 | 96 |
| Due to Conrail (Note 4) | 78 | 68 |
| Other | 24 | 27 |
| Total | $ 1,139 | $ 1,181 |
| Other current liabilities: | | |
| Interest payable | $ 90 | $ 88 |
| Retiree benefit obligations (Note 10) | 57 | 53 |
| Liabilities for forwarded traffic | 53 | 50 |
| Other | 37 | 25 |
| Total | $ 237 | $ 216 |

**7. Long-term Debt**

Long-term debt as of Dec. 31, 2007, with weighted average interest rates and maturities is presented below:

| | Dec. 31, 2007 | Dec. 31, 2006 |
|---|---|---|
| | ($ in millions) | |
| Notes and debentures: | | |
| 6.91%, maturing to 2011 | $ 1,200 | $ 1,540 |
| 6.66%, maturing 2014 and 2017 | 981 | 981 |
| 8.23%, maturing 2020 to 2025 | 764 | 764 |
| 7.12%, maturing 2027 to 2031 | 1,290 | 1,290 |
| 7.21%, maturing 2037 and 2043 | 855 | 855 |
| 7.02%, maturing 2097 and 2105 | 650 | 650 |
| Securitization borrowings, 5.57% | 250 | -- |
| Equipment obligations, 6.13%, maturing to 2014 | 226 | 306 |
| Capitalized leases, 4.84%, maturing to 2024 | 165 | 231 |
| Other debt, 7.18%, maturing to 2019 | 113 | 113 |
| Discounts and premiums, net | (126) | (130) |
| Total long-term debt | 6,368 | 6,600 |
| Less current maturities | (369) | (491) |
| Long-term debt excluding current maturities | $ 5,999 | $ 6,109 |

| | |
|---|---|
| Long-term debt maturities subsequent to 2008 are as follows: | |
| 2009 | $ 477 |
| 2010 | 340 |
| 2011 | 338 |
| 2012 | 31 |
| 2013 and subsequent years | 4,813 |
| Total | $ 5,999 |

In November 2007, NS entered into a $500 million receivables securitization facility under which NSR sells substantially all of its eligible third-party receivables to an NS subsidiary, which in turn may transfer beneficial interests in the receivables to various commercial paper vehicles. Amounts received under the facility are accounted for as borrowings. The facility has a 364-day term; however, NS intends to refinance these borrowings by issuing long-term debt, which is supported by its $1 billion credit agreement (see below). Accordingly, amounts outstanding are included in the line item “Long-term debt” in the Consolidated Balance Sheet. At Dec. 31, 2007, the amount of receivables included in “Accounts receivable – net” serving as collateral for these borrowings was $778 million.

In May 2005, NS issued $717 million of unsecured notes ($350 million at 5.64% due 2029 and $367 million at 5.59% due 2025) and paid $218 million of premium in exchange for $717 million of its previously issued unsecured notes ($350 million at 7.8% due 2027, $200 million at 7.25% due 2031, and $167 million at 9.0% due 2021). The $218 million cash premium payment is reflected as a reduction of debt in the Consolidated Balance Sheet and Statement of Cash Flows and is included in “Discounts and premiums, net.” The premium is being amortized as additional interest expense over the terms of the new debt, resulting in effective interest rates of 8.7% for the 2029 notes and 9.0% for the 2025 notes.

“Discounts and premiums, net” at Dec. 31, 2007 and 2006, includes $126 million and $130 million, respectively, related to $314 million face amount of 9.75% notes due in 2020 and $138 million face amount of 7.875% notes due 2043, which is being amortized as a reduction of interest expense over the terms of the notes, resulting in effective interest rates of 6.0% and 6.2%, respectively.

The railroad equipment obligations and the capitalized leases are secured by liens on the underlying equipment. Certain lease obligations require the maintenance of yen-denominated deposits, which are pledged to the lessor to satisfy yen-denominated lease payments. These deposits are included in “Other assets” on the balance sheet and totaled $80 million at Dec. 31, 2007, and $85 million at Dec. 31, 2006.

**Shelf Registration**

NS has on file with the Securities and Exchange Commission two Form S-3 shelf registration statements, under which up to $700 million of additional debt or equity securities could be issued.

**Credit Agreement, Debt Covenants and Commercial Paper**

NS has in place a five-year $1 billion credit facility expiring in 2012. Any borrowings under the credit agreement are contingent on the continuing effectiveness of certain representations and warranties made at the inception of the agreement. NS is subject to various financial covenants with respect to its debt and under its credit agreement, including a maximum leverage ratio restriction, certain restrictions on the issuance of further debt by NS or its subsidiaries and the consolidation, merger or sale of substantially all of NS’ assets. At Dec. 31, 2007, NS was in compliance with all financial covenants.

NS has the ability to issue commercial paper supported by its $1 billion credit agreement. At Dec. 31, 2007, and Dec. 31, 2006, NS had no outstanding commercial paper or borrowings under the credit agreement.

**8. Lease Commitments**

NS is committed under long-term lease agreements, which expire on various dates through 2067, for equipment, lines of road and other property. The following amounts do not include payments to CRC under the Shared Assets Areas agreements (see Note 4). Future minimum lease payments and operating lease expense are as follows:

| | Operating Leases | Capital Leases |
|---|---|---|
| | *($ in millions)* | |
| 2008 | $ 138 | $ 46 |
| 2009 | 130 | 60 |
| 2010 | 113 | 25 |
| 2011 | 81 | 22 |
| 2012 | 70 | 15 |
| 2013 and subsequent years | 405 | 8 |
| Total | $ 937 | $ 176 |
| Less imputed interest on capital leases at an average rate of 5.4% | | (11) |
| Present value of minimum lease payments included in debt | | $ 165 |

**Operating Lease Expense**

| | 2007 | 2006 | 2005 |
|---|---|---|---|
| | | *($ in millions)* | |
| Minimum rents | $ 191 | $ 197 | $ 190 |
| Contingent rents | 79 | 79 | 75 |
| Total | $ 270 | $ 276 | $ 265 |

Contingent rents is primarily comprised of usage-based rent paid to other railroads for joint facility operations.

### 9. Other Liabilities

| | Dec. 31, 2007 | Dec. 31, 2006 |
|---|---|---|
| | *($ in millions)* | |
| Retiree health and death benefit obligations (Note 10) | $ 635 | $ 621 |
| Casualty and other claims (Note 17) | 588 | 471 |
| Net pension obligations (Note 10) | 150 | 144 |
| Deferred compensation | 148 | 149 |
| Long-term advances from Conrail (Note 4) | 133 | 133 |
| Federal and state income taxes | 131 | -- |
| Other | 254 | 249 |
| Total | $ 2,039 | $ 1,767 |

### 10. Pensions and Other Postretirement Benefits

Norfolk Southern and certain subsidiaries have both funded and unfunded defined benefit pension plans covering principally salaried employees. Norfolk Southern and certain subsidiaries also provide specified health care and death benefits to eligible retired employees and their dependents. Under the present plans, which may be amended or terminated at NS' option, a defined percentage of health care expenses is covered, reduced by any deductibles, co-payments, Medicare payments and, in some cases, coverage provided under other group insurance policies.

**Required Accounting Change**

As of Dec. 31, 2006, NS adopted SFAS No. 158, "Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans" (SFAS 158). This statement requires an employer to recognize in its statement of financial position the overfunded or underfunded status of defined benefit pension and postretirement plans measured as the difference between the fair value of plan assets and the benefit obligation. Employers must also recognize as a component of other comprehensive income, net of tax, the actuarial gains and losses and the prior service costs, credits and transition costs that arise during the period. As a result of adopting this standard, NS reduced its pension asset by $217 million and increased its pension and postretirement liabilities by $258 million in its Consolidated Balance Sheet, with a corresponding reduction to stockholders' equity of $292 million (net of tax) reflected as an increase to accumulated other comprehensive loss. In addition, NS recognized a $2 million reduction to stockholders' equity related to its proportionate share of Conrail's adoption of SFAS 158. The adoption of SFAS 158 has no impact on years prior to 2006 and has no effect on the calculation of expenses for pensions and post-retirement benefits.

**Pension and Other Postretirement Benefit Obligations and Plan Assets**

| | Pension Benefits | | Other Postretirement Benefits | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| | ($ in millions) | | | |
| ***Change in benefit obligations*** | | | | |
| Benefit obligation at beginning of year | $ 1,650 | $ 1,642 | $ 785 | $ 754 |
| Service cost | 24 | 27 | 21 | 19 |
| Interest cost | 92 | 88 | 46 | 42 |
| Actuarial (gains) losses | (12) | 6 | 53 | 14 |
| Benefits paid | (110) | (113) | (46) | (44) |
| Benefit obligation at end of year | 1,644 | 1,650 | 859 | 785 |
| ***Change in plan assets*** | | | | |
| Fair value of plan assets at beginning of year | 1,939 | 1,824 | 119 | 108 |
| Actual return on plan assets | 125 | 220 | 6 | 11 |
| Employer contribution | 9 | 8 | 97 | 44 |
| Benefits paid | (110) | (113) | (46) | (44) |
| Fair value of plan assets at end of year | 1,963 | 1,939 | 176 | 119 |
| **Funded status at end of year** | $ 319 | $ 289 | $ (683) | $ (666) |
| Amounts recognized in the Consolidated Balance Sheets consist of: | | | | |
| Noncurrent assets | $ 478 | $ 441 | $ -- | $ -- |
| Current liabilities | (9) | (8) | (48) | (45) |
| Noncurrent liabilities | (150) | (144) | (635) | (621) |
| **Net amount recognized** | $ 319 | $ 289 | $ (683) | $ (666) |
| Amounts recognized in accumulated other comprehensive loss (pretax) consist of: | | | | |
| Net loss | $ 290 | $ -- | $ 279 | $ -- |
| Prior service cost (benefit) | 9 | -- | (10) | -- |
| Impact of implementation of SFAS 158 | -- | 244 | -- | 231 |

NS' unfunded pension plans, included above, which in all cases have no assets and therefore have an accumulated benefit obligation in excess of plan assets, had projected benefit obligations of $159 million at Dec. 31, 2007, and $152 million at Dec. 31, 2006, and had accumulated benefit obligations of $137 million at Dec. 31, 2007, and $125 million at Dec. 31, 2006.

**Pension and Other Postretirement Benefit Cost Components**

| | 2007 | 2006 | 2005 |
|---|---|---|---|
| | | ($ in millions) | |
| ***Pension benefits*** | | | |
| Service cost | $ 24 | $ 27 | $ 23 |
| Interest cost | 92 | 88 | 87 |
| Expected return on plan assets | (167) | (159) | (149) |
| Amortization of prior service cost | 2 | 2 | 2 |
| Amortization of net losses | 9 | 13 | 14 |
| Net benefit | $ (40) | $ (29) | $ (23) |
| ***Other postretirement benefits*** | | | |
| Service cost | $ 21 | $ 19 | $ 17 |
| Interest cost | 46 | 42 | 40 |
| Expected return on plan assets | (11) | (10) | (9) |
| Amortization of prior service benefit | (8) | (8) | (8) |
| Amortization of net losses | 28 | 27 | 22 |
| Net cost | $ 76 | $ 70 | $ 62 |

**Other Changes in Plan Assets and Benefit Obligations Recognized in Other Comprehensive Loss**

| | 2007 | |
|---|---|---|
| | Pension Benefits | Other Postretirement Benefits |
| | ($ in millions) | |
| Net loss arising during the year | $ 30 | $ 58 |
| Amortization of prior service cost | (2) | 8 |
| Amortization of net loss | (9) | (28) |
| Total recognized in other comprehensive loss | $ 19 | $ 38 |
| Total recognized in net periodic (benefit) cost and other comprehensive loss | $ (21) | $ 114 |

The estimated net loss and prior service cost for the defined benefit pension plans that will be amortized from accumulated other comprehensive loss into net periodic benefit cost over the next year are $7 million and $3 million, respectively. The estimated net loss and prior service benefit for the other defined benefit postretirement plans that will be amortized from accumulated other comprehensive loss into net periodic benefit cost over the next year are $30 million and $8 million, respectively.

**Pension Assumptions**

Pension and other postretirement benefit costs are determined based on actuarial valuations that reflect appropriate assumptions as of the measurement date, ordinarily the beginning of each year. The funded status of the plans is determined using appropriate assumptions as of each year end. A summary of the major assumptions follows:

| | 2007 | 2006 | 2005 |
|---|---|---|---|
| ***Funded status:*** | | | |
| Discount rate | 6.25% | 5.75% | 5.50% |
| Future salary increases | 4.5% | 4.5% | 4.5% |
| ***Pension cost:*** | | | |
| Discount rate | 5.75% | 5.50% | 5.75% |
| Return on assets in plans | 9% | 9% | 9% |
| Future salary increases | 4.5% | 4.5% | 4.5% |

To determine the discount rate in 2007, NS utilized an analysis in which the projected annual cash flows from the pension and postretirement benefit plans were matched with a yield curve based on an appropriate universe of high-quality corporate bonds. NS used the results of the yield curve to select the discount rate that matches the payment stream of the benefits in these plans. Previously, NS referred to Moody's seasoned Aa corporate bond yields and the changes in such yields in establishing the discount rate.

**Health Care Cost Trend Assumptions**

For measurement purposes at Dec. 31, 2007, increases in the per capita cost of covered health care benefits were assumed to be 9% for 2007 and 8.5% for 2008. It is assumed the rate will decrease gradually to an ultimate rate of 5% for 2012 and remain at that level thereafter.

Assumed health care cost trend rates have a significant effect on the amounts reported in the financial statements. To illustrate, a one-percentage-point change in the assumed health care cost trend would have the following effects:

| | One percentage point Increase | One percentage point Decrease |
|---|---|---|
| | *($ in millions)* | |
| Increase (decrease) in: | | |
| Total service and interest cost components | $ 9 | $ (7) |
| Postretirement benefit obligation | $ 100 | $ (84) |

**Asset Management**

Eleven investment firms manage NS' defined benefit pension plan's assets under investment guidelines approved by the Board of Directors. Investments are restricted to domestic fixed income securities, international fixed income securities, domestic and international equity investments and unleveraged exchange-traded options and financial futures. Limitations restrict investment concentration and use of certain derivative instruments. The target asset allocation for equity is 75% of the pension plan's assets. Fixed income investments must have an average rating of "AA" or better and all fixed income securities must be rated "A" or better except bond index funds. Equity investments must be in liquid securities listed on national exchanges. No investment is permitted in the securities of Norfolk Southern Corporation or its subsidiaries (except through commingled pension trust funds). Investment managers' returns are expected to meet or exceed selected market indices by prescribed margins.

NS' pension plan weighted-average asset allocations at Dec. 31, 2007 and 2006, by asset category, were as follows:

| Asset Category | Percentage of plan assets at Dec. 31, 2007 | 2006 |
|---|---|---|
| Equity securities | 75% | 77% |
| Debt securities | 25% | 23% |
| Total | 100% | 100% |
| International equity securities included in equity securities above | 10% | 10% |

The postretirement benefit plan assets consist primarily of trust-owned variable life insurance policies with an asset allocation at Dec. 31, 2007, of 65% in equity securities and 35% in debt securities compared with 67% in equity securities and 33% in debt securities at Dec. 31, 2006. The target asset allocation for equity is between 50% and 75% of the plan's assets.

The plans' assumed future returns are based principally on the asset allocation and on the historic returns for the plans' asset classes determined from both actual plan returns and, over longer time periods, market returns for those asset classes.

**Contributions and Estimated Future Benefit Payments**

In 2008, NS expects to contribute approximately $9 million to its unfunded pension plans for payments to pensioners and $48 million to its other postretirement benefit plans for retiree health benefits.

Benefit payments, which reflect expected future service, as appropriate, are expected to be paid as follows:

| | Pension Benefits | Other Postretirement Benefits |
|---|---|---|
| | *($ in millions)* | |
| 2008 | $ 111 | $ 48 |
| 2009 | 112 | 51 |
| 2010 | 114 | 54 |
| 2011 | 117 | 57 |
| 2012 | 120 | 59 |
| Years 2013-2017 | 636 | 322 |

The other postretirement benefit payments include an estimated annual reduction due to the Medicare Part D Subsidy of about $6 million.

**Other Postretirement Coverage**

Under collective bargaining agreements, NS and certain subsidiaries participate in a multi-employer benefit plan, which provides certain postretirement health care and life insurance benefits to eligible union employees. Premiums under this plan are expensed as incurred and amounted to $27 million in 2007 and $26 million in 2006 and 2005.

**Section 401(k) Plans**

Norfolk Southern and certain subsidiaries provide Section 401(k) savings plans for employees. Under the plans, NS matches a portion of employee contributions, subject to applicable limitations. NS' expenses under these plans were $14 million in 2007 and 2006, and $13 million in 2005.

**11. Stock-Based Compensation**

Under the stockholder-approved Long-Term Incentive Plan (LTIP), a committee of nonemployee directors of the Board or the chief executive officer (if delegated such authority by the committee) may grant stock options, stock appreciation rights (SARs), restricted shares, restricted stock units, performance shares and performance share units (PSUs), up to a maximum of 88,025,000 shares of Norfolk Southern Common Stock (Common Stock). Of these shares, 5,000,000 were approved by the Board for issuance to non-officer participants; as a broad-based issuance, stockholder approval was not required. In May 2005, the stockholders approved an amended LTIP which provided that 8,500,000 shares of stock previously approved for issuance under LTIP could be granted as restricted shares, restricted stock unit shares or performance shares. Under the Board-approved Thoroughbred Stock Option Plan (TSOP), the committee may grant stock options up to a maximum of 6,000,000 shares of Common Stock; as a broad-based stock option plan, stockholder approval of TSOP was not required. NS uses newly issued shares to satisfy any exercises and awards under LTIP and TSOP.

The LTIP also permits the payment – on a current or a deferred basis and in cash or in stock – of dividend equivalents on shares of Common Stock covered by options, PSUs or restricted stock units in an amount commensurate with dividends paid on Common Stock. Tax absorption payments also are authorized for any awards under LTIP in amounts estimated to equal the federal and state income taxes applicable to shares of Common Stock issued subject to a share retention agreement.

During the first quarter of 2007, a committee of nonemployee directors of NS' Board granted stock options, restricted stock units and PSUs pursuant to the LTIP and granted stock options pursuant to the TSOP. Receipt of an award under LTIP was made contingent upon the awardee's execution of a non-compete agreement, and all awards under LTIP were made subject to forfeiture in the event the awardee "engages in competing employment" for a period of time following retirement.

**Accounting Method**

As disclosed in Note 1, prior to the adoption of SFAS 123(R), NS applied APB Opinion 25 and related interpretations in accounting for awards made under the plans. Accordingly, grants of PSUs, restricted shares, restricted share units, dividend equivalents, tax absorption payments and SARs resulted in charges to net income, while grants of stock options had no effect on net income. Under SFAS 123(R), all awards will result in charges to net income while dividend equivalents are charged to retained earnings. Related compensation costs were $96 million in 2007, $129 million in 2006 and $75 million in 2005. The total tax effect recognized in income in relation to stock-based compensation was a benefit of $32 million in 2007, $44 million in 2006 and $27 million in 2005.

**Stock Options**

Options may be granted for a term not to exceed 10 years and are subject to a vesting period of at least one year. Option exercise prices are at not less than the fair market value of Common Stock on the effective date of the grant. In the first quarter of 2007, 1,203,300 options were granted under the LTIP and 251,000 options were granted under the TSOP. In each case, the grant price was $49.555, which was the fair market value of Common Stock on the date of grant, and the options have a term of ten years but may not be exercised prior to the third

anniversary of the date of grant. Holders of the options granted under LTIP who remain employed by NS receive cash dividend equivalent payments for five years commensurate with dividends paid on Common Stock.

In the first quarter of 2006, 1,188,700 options were granted under the LTIP and 238,000 options were granted under the TSOP. In each case, the grant price was $49.425, which was the fair market value of Common Stock on the date of grant, and the options have a term of ten years but may not be exercised prior to the first anniversary of the date of grant.

The fair value of each option award in 2007 and 2006 was measured on the date of grant using a lattice-based option valuation model. Expected volatilities are based on implied volatilities from traded options on Common Stock and historical volatility of Common Stock. NS uses historical data to estimate option exercises and employee terminations within the valuation model. The average expected option life is derived from the output of the valuation model and represents the period of time that options granted are expected to be outstanding. The average risk-free interest rate is based on the U.S. Treasury yield curve in effect at the time of grant. For options granted that include dividend equivalent payments, a dividend yield of zero was used. For purposes of pro forma information required under SFAS 123, the fair value of the option awards in 2005 was determined using the Black-Scholes option-pricing model. The assumptions for 2007, 2006 and 2005 are shown in the following table:

| | **2007** | **2006** | **2005** |
|---|---|---|---|
| Expected volatility range | 26.1% - 33.3% | 23.5% - 34.5% | n/a |
| Average expected volatility | 33% | 27% | 33% |
| Average expected option term | 5.6 years | 3.7 years | 5 years |
| Average risk-free interest rate | 4.9% | 4.5% | 3.7% |
| Per-share grant-date fair value | $19.82 | $13.47 | $12.19 |
| Options granted (LTIP and TSOP) | 1,454,300 | 1,427,400 | 1,353,600 |

The grant date fair value of the 2007 TSOP grant was $17.88 using the same assumptions as the 2007 LTIP grant, except a dividend yield of 1.5% was used because no dividend equivalents are paid on these options and the average expected option term was 6.5 years.

A summary of options outstanding as of Dec. 31, 2007, and changes during the twelve months then ended is presented below:

| | **Option Shares** | **Weighted Avg. Exercise Price** |
|---|---|---|
| Outstanding at Dec. 31, 2006 | 22,276,526 | $ 25.68 |
| Granted | 1,454,300 | 49.56 |
| Exercised | (5,110,334) | 25.65 |
| Forfeited | (40,600) | 49.55 |
| Outstanding at Dec. 31, 2007 | 18,579,892 | 27.51 |
| Exercisable at Dec. 31, 2007 | 17,165,692 | 25.69 |

The aggregate intrinsic value of options outstanding at Dec. 31, 2007, was $426 million and had a weighted-average remaining contractual term of 4.7 years. Of these options outstanding, 17,165,692 were exercisable and had an aggregate intrinsic value of $425 million with a weighted average remaining contractual term of 4.4 years.

The following table provides information related to options exercised as of Dec. 31 for the respective years:

| | 2007 | 2006 | 2005 |
|---|---|---|---|
| | | *($ in millions)* | |
| Total intrinsic value | $ 145 | $ 226 | $ 139 |
| Cash received upon exercise of options | $ 126 | $ 212 | $ 194 |
| Related tax benefit realized | $ 52 | $ 79 | $ 47 |

Prior to the adoption of SFAS 123(R), NS presented tax benefits generated from tax deductions in excess of compensation costs recognized for share-based awards (excess tax benefits) as operating cash flows in the Consolidated Statements of Cash Flows. Beginning in 2006, SFAS 123(R) requires excess tax benefits to be classified as financing cash flows. Accordingly, "Common stock issued – net" in the Consolidated Statements of Cash Flows for the years ended Dec. 31, 2007 and 2006, included $57 million and $85 million of such tax benefits, respectively.

In November of 2005, the Board of Directors of NS changed the vesting periods on options granted in January 2005 from three years to one year in order to reduce future compensation expense. At the time, each of these options had an intrinsic value of approximately $9 and the modification resulted in less than $1 million of compensation expense.

**Restricted Shares and Restricted Stock Units**

Restricted share and restricted stock unit grants were zero and 321,450, respectively, in 2007, with a grant-date fair value of $50.01 and a 5-year restriction period, and were 332,150 and 332,150, respectively, in 2006, with a grant-date fair value of $49.60 and a three-year restriction period, and were 576,240 and 384,160, respectively, in 2005, with a grant-date fair value of $34.10 and a five-year restriction period. Restricted stock units granted in 2007 will be settled through issuance of shares of Common Stock. The restricted stock unit grants include cash dividend equivalent payments during the restriction period commensurate with dividends paid on Common Stock.

A summary of the status of restricted shares and restricted stock units as of Dec. 31, 2007, and changes during the twelve months then ended is presented below:

| | Shares | Units | Weighted - Average Grant-Date Fair Value |
|---|---|---|---|
| Nonvested at Dec. 31, 2006 | 1,118,682 | 851,956 | $ 36.78 |
| Granted | -- | 321,450 | 50.01 |
| Vested | (272,482) | (181,654) | 23.18 |
| Forfeited | (34,600) | (34,400) | 35.96 |
| Nonvested at Dec. 31, 2007 | 811,600 | 957,352 | $ 42.53 |

At Dec. 31, 2007, there was $16 million of total unrecognized compensation related to restricted shares and restricted stock units. That cost is expected to be recognized over a weighted-average period of approximately 2.1 years. The total fair value of the restricted shares vested and restricted stock units paid in cash during the twelve months ended Dec. 31, 2007, 2006 and 2005 was $22 million, $40 million and $2 million, respectively. The total related tax benefit realized was $3 million in 2007 and $6 million in 2006.

**Performance Share Units**

PSUs provide for awards based on achievement of certain predetermined corporate performance goals (total shareholder return, return on average invested capital and operating ratio) at the end of a three-year cycle. PSU

grants and average grant-date fair values were 1,203,300 and $49.555 in 2007; 1,163,600 and $49.425 in 2006; and 1,344,400 and $34.10 in 2005. One-half of any PSUs earned will be paid in the form of shares of Common Stock with the other half to be paid in cash.

A summary of the status of PSUs as of Dec. 31, 2007, and changes during the twelve months then ended is presented below:

| | Performance Share Units | | Weighted - Average Grant-Date Fair Value |
|---|---|---|---|
| Balance Dec. 31, 2006 | 3,301,800 | $ | 36.46 |
| Granted | 1,203,300 | | 49.56 |
| Earned | (358,764) | | 22.02 |
| Paid in cash | (358,790) | | 22.02 |
| Unearned | (103,446) | | 22.02 |
| Forfeited | (81,000) | | 45.89 |
| Balance Dec. 31, 2007 | 3,603,100 | | 43.91 |

As of Dec. 31, 2007, there was $19 million of total unrecognized compensation related to PSUs granted under the LTIP which is expected to be recognized over a weighted-average period of 1.0 year. The total fair value of PSUs earned and paid in cash during the twelve months ended Dec. 31, 2007, 2006 and 2005 was $18 million, $34 million and $18 million, respectively. The total related tax benefit realized was $2 million in 2007 and zero in 2006.

**Shares Available and Issued**

Shares of stock available for future grants and issued in connection with all features of the LTIP and TSOP as of Dec. 31, were as follows:

| | 2007 | 2006 | 2005 |
|---|---|---|---|
| Available for future grants: | | | |
| LTIP | 8,937,651 | 9,288,283 | 11,321,573 |
| TSOP | 2,290,700 | 2,538,700 | 2,771,400 |
| Shares of Common Stock issued: | | | |
| LTIP | 5,199,060 | 8,517,911 | 9,078,717 |
| TSOP | 540,877 | 836,783 | 410,750 |

## 12. Stockholders' Equity

### Common Stock

Common stock is reported net of shares held by consolidated subsidiaries (Treasury Shares) of Norfolk Southern. Treasury Shares at Dec. 31, 2007 and 2006, amounted to 20,683,686 and 20,780,638 shares, respectively, with a cost of $20 million in both years.

### Accumulated Other Comprehensive Loss

"Accumulated other comprehensive loss" reported in the Consolidated Statements of Changes in Stockholders' Equity consisted of the following:

| | Balance at Beginning of Year | Net Gain (Loss) | Reclassification Adjustments | Balance at End of Year |
|---|---|---|---|---|
| | | *($ in millions)* | | |
| Dec. 31, 2007 | | | | |
| Pension and other postretirement liabilities | $ (315) | $ (54) | $ 20 | $ (349) |
| Other comprehensive loss of equity investees | (55) | 5 | -- | (50) |
| Unrealized gains on securities | 1 | -- | (1) | -- |
| Accumulated other comprehensive loss | $ (369) | $ (49) | $ 19 | $ (399) |
| Dec. 31, 2006 | | | | |
| Pension and other postretirement liabilities | $ -- | $ (315) | $ -- | $ (315) |
| Other comprehensive loss of equity investees | (72) | 17 | -- | (55) |
| Unrealized gains on securities | -- | 1 | -- | 1 |
| Cash flow hedges | 12 | -- | (12) | -- |
| Minimum pension liability | (17) | 17 | -- | -- |
| Accumulated other comprehensive loss | $ (77) | $ (280) | $ (12) | $ (369) |

**Other Comprehensive Income (Loss)**

"Other comprehensive income (loss)" reported in the Consolidated Statements of Changes in Stockholders' Equity consisted of the following:

| | Pretax Amount | Tax (Expense) Benefit | Net-of-Tax Amount |
|---|---|---|---|
| | | *($ in millions)* | |
| ***Year ended Dec. 31, 2007*** | | | |
| Net gain (loss) arising during the year: | | | |
| Pensions and other postretirement benefits | $ (88) | $ 34 | $ (54) |
| Reclassification adjustments for costs included in net income | 31 | (11) | 20 |
| Subtotal | (57) | 23 | (34) |
| Other comprehensive income of equity investees | 5 | -- | 5 |
| Reclassification adjustment for unrealized gains on securities included in net income | (2) | 1 | (1) |
| Other comprehensive income (loss) | $ (54) | $ 24 | $ (30) |
| ***Year ended Dec. 31, 2006*** | | | |
| Net gain (loss) arising during the year: | | | |
| Cash flow hedges | $ (1) | $ 1 | $ -- |
| Reclassification adjustments for gains included in net income | (20) | 8 | (12) |
| Subtotal | (21) | 9 | (12) |
| Unrealized gains on securities | 1 | -- | 1 |
| Minimum pension liability | (10) | 4 | (6) |
| Other comprehensive income of equity investees | 15 | 4 | 19 |
| Other comprehensive income (loss) | $ (15) | $ 17 | $ 2 |
| ***Year ended Dec. 31, 2005*** | | | |
| Net gain (loss) arising during the year: | | | |
| Cash flow hedges | $ 92 | $ (37) | $ 55 |
| Reclassification adjustments for gains included in net income | (148) | 58 | (90) |
| Subtotal | (56) | 21 | (35) |
| Unrealized losses on securities | (1) | -- | (1) |
| Minimum pension liability | (6) | 2 | (4) |
| Other comprehensive loss of equity investees | (13) | -- | (13) |
| Other comprehensive income (loss) | $ (76) | $ 23 | $ (53) |

## 13. Stock Purchase Program

In March 2007, NS' Board of Directors amended NS' share repurchase program and increased the authorized amount of share repurchases from 50 million to 75 million shares and shortened the authorized period from 2015 to 2010. The timing and volume of purchases is guided by management's assessment of market conditions and other pertinent facts. Near-term purchases under the program are expected to be made with internally generated cash; however, future funding sources could include proceeds from the sale of commercial paper notes or the increase of long-term debt. NS purchased and retired 23.6 million shares and 21.7 million shares of its common stock under this program in 2007 and 2006, respectively, at a cost of $1.2 billion and $964 million, respectively.

## 14. Earnings Per Share

The following tables set forth the calculation of basic and diluted earnings per share:

| | 2007 | 2006 | 2005 |
|---|---|---|---|
| | *($ in millions except per share, shares in millions)* | | |
| Basic earnings per share: | | | |
| Income available to common stockholders | $ 1,459 | $ 1,475 | $ 1,281 |
| Weighted-average shares outstanding | 389.6 | 406.0 | 404.2 |
| Basic earnings per share | $ 3.74 | $ 3.63 | $ 3.17 |

Income available to common stockholders for 2007 and 2006 reflects a $5 million and $6 million reduction, respectively, for the after-tax effect of dividend equivalent payments made to holders of vested stock options.

| | 2007 | 2006 | 2005 |
|---|---|---|---|
| | *($ in millions except per share, shares in millions)* | | |
| Diluted earnings per share: | | | |
| Income available to common stockholders | $ 1,464 | $ 1,481 | $ 1,281 |
| Weighted-average shares outstanding per above | 389.6 | 406.0 | 404.2 |
| Dilutive effect of outstanding options and share-settled awards (as determined by the application of the treasury stock method) | 8.2 | 8.7 | 8.1 |
| Adjusted weighted-average shares outstanding | 397.8 | 414.7 | 412.3 |
| Diluted earnings per share | $ 3.68 | $ 3.57 | $ 3.11 |

The diluted calculations exclude options whose exercise price exceeded the average market price of Common Stock as follows: zero in 2007, 1 million in 2006 and 1 million in 2005.

**15. Fair Values of Financial Instruments**

The fair values of "Cash and cash equivalents," "Short-term investments," "Accounts receivable" and "Accounts payable" approximate carrying values because of the short maturity of these financial instruments. The fair value of corporate-owned life insurance approximates carrying value. The carrying amounts and estimated fair values for the remaining financial instruments, excluding derivatives and investments accounted for under the equity method in accordance with APB Opinion No. 18, consisted of the following at Dec. 31:

| | 2007 | | 2006 | |
|---|---|---|---|---|
| | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
| | *($ in millions)* | | | |
| Investments | $ 154 | $ 173 | $ 145 | $ 166 |
| Long-term debt | $ (6,368) | $ (6,935) | $ (6,600) | $ (7,370) |

Underlying net assets were used to estimate the fair value of investments. The fair values of notes receivable are based on future discounted cash flows. The fair values of debt were estimated based on quoted market prices or discounted cash flows using current interest rates for debt with similar terms, company rating and remaining maturity.

Carrying amounts of marketable securities reflect unrealized holding gains of zero on Dec. 31, 2007, and $1 million on Dec. 31, 2006. Sales of "available-for-sale" securities were immaterial for the years ended Dec. 31, 2007, 2006 and 2005; most short-term investments were redeemed at maturity.

**16. Derivative Financial Instruments**

All derivatives are recognized in the financial statements as either assets or liabilities and are measured at fair value. Changes in fair value are recorded as adjustments to the assets or liabilities being hedged in "Other comprehensive loss," or in current earnings, depending on whether the derivative is designated and qualifies for hedge accounting, the type of hedge transaction represented and the effectiveness of the hedge.

NS has used derivative financial instruments to reduce the risk of volatility in its diesel fuel costs and to manage its overall exposure to fluctuations in interest rates. NS does not engage in the trading of derivatives. Management has determined that its derivative financial instruments qualify as either fair-value or cash-flow hedges, having values that highly correlate with the underlying hedged exposures, and has designated such instruments as hedging transactions. Credit risk related to the derivative financial instruments is considered to be minimal and is managed by requiring high credit standards for counterparties and periodic settlements.

**Diesel Fuel Hedging**

From 2001 until May 2004, NS entered into contracts that hedged a portion of its diesel fuel consumption. The intent of the program was to assist in the management of NS' aggregate risk exposure to fuel price fluctuations, which can significantly affect NS' operating margins and profitability, through the use of one or more types of derivative instruments. The goal of this hedging strategy was to reduce the variability of fuel costs over an extended period of time while minimizing the incremental cost of hedging. The program provided that NS would not enter into any fuel hedges with a duration of more than 36 months, and that no more than 80% of NS' average monthly fuel consumption would be hedged for any month within any 36-month period. After taking into account the effect of the hedging, diesel fuel costs represented 14% and 11% of NS' operating expenses for the years ended Dec. 31, 2006 and 2005, respectively. The last remaining contracts were settled in the second quarter of 2006, bringing an end to this program. NS' fuel hedging activity resulted in decreases in diesel fuel expenses

of $20 million in 2006 and $148 million in 2005. Ineffectiveness, or the extent to which changes in the fair value of the heating oil contracts do not offset changes in the fair values of the expected diesel fuel transactions, was a $1 million expense in 2006 and a $5 million expense in 2005.

**Interest Rate Hedging**

NS manages its overall exposure to fluctuations in interest rates by issuing both fixed and floating-rate debt instruments, and by entering into interest rate hedging transactions to achieve an appropriate mix within its debt portfolio. NS had $59 million and $83 million, or about 1%, of its fixed rate debt portfolio hedged as of Dec. 31, 2007, and Dec. 31, 2006, respectively, using interest rate swaps that qualify for and are designated as fair-value hedge transactions. NS' interest rate hedging activity resulted in decreases in interest expenses of $1 million for 2007 and 2006, and $2 million for 2005. These swaps have been effective in hedging the changes in fair value of the related debt arising from changes in interest rates and there has been no impact on earnings resulting from ineffectiveness associated with these derivative transactions.

**Fair Values**

Fair values of interest rate swaps at Dec. 31, 2007, and Dec. 31, 2006, were determined based upon the present value of expected future cash flows discounted at the appropriate implied spot rate from the spot rate yield curve. Fair value adjustments are noncash transactions and, accordingly, are excluded from the Consolidated Statements of Cash Flows. The total net asset position of NS' outstanding derivative financial instruments was comprised of a gross fair value asset position of $1 million at both Dec. 31, 2007, and Dec. 31, 2006.

**17. Commitments and Contingencies**

**Lawsuits**

Norfolk Southern and certain subsidiaries are defendants in numerous lawsuits and other claims relating principally to railroad operations. When management concludes that it is probable that a liability has been incurred and the amount of the liability can be reasonably estimated, it is accrued through a charge to earnings. While the ultimate amount of liability incurred in any of these lawsuits and claims is dependent on future developments, in management's opinion, the recorded liability is adequate to cover the future payment of such liability and claims. However, the final outcome of any of these lawsuits and claims cannot be predicted with certainty, and unfavorable or unexpected outcomes could result in additional accruals that could be significant to results of operations in a particular year or quarter. Any adjustments to the recorded liability will be reflected in earnings in the periods in which such adjustments are known.

**Casualty Claims**

Casualty claims include employee personal injury and occupational claims as well as third-party claims, all exclusive of legal costs. To aid in valuing its personal injury liability and determining the amount to accrue during the year, NS' management utilizes studies prepared by an independent consulting actuarial firm. Job-related accidental injury and occupational claims are subject to the Federal Employers' Liability Act (FELA), which is applicable only to railroads. FELA's fault-based system produces results that are unpredictable and inconsistent as compared with a no-fault workers' compensation system. The variability inherent in this system could result in actual costs being very different from the liability recorded. While the ultimate amount of claims incurred is dependent on future developments, in management's opinion, the recorded liability is adequate to cover the future payments of claims and is supported by the most recent actuarial study. In all cases, NS records a liability when the expected loss for the claim is both probable and estimable.

In 2005, NS recorded a liability related to the Jan. 6, 2005 derailment in Graniteville, SC. The liability, which includes a current and long-term portion, represents NS' best estimate based on current facts and circumstances. The estimate includes amounts related to business property damage and other economic losses, personal injury and individual property damage claims as well as third-party response costs. NS' commercial insurance policies are expected to cover substantially all expenses related to this derailment above NS' self-insured retention, including NS' response costs and legal fees. Accordingly, the Consolidated Balance Sheets reflect a current and long-term receivable for estimated recoveries from NS' insurance carriers. While it is reasonable to expect that the liability for covered losses could differ from the amount recorded, such a change would be offset by a corresponding change in the insurance receivable. As a result, NS does not believe that it is reasonably likely that its net loss (the difference between the liability and future recoveries) will be materially different than the loss recorded in 2005. NS expects at this time that insurance coverage is adequate to cover potential claims and settlements above its self-insurance retention. Expenses in 2005 included $41 million related to this incident, representing NS' retention under its insurance policies and other uninsured costs.

**Employee personal injury claims** – The largest component of casualties and other claims expense is employee personal injury costs. The actuarial firm engaged by NS provides quarterly studies to aid in valuing its employee personal injury liability and estimating its employee personal injury expense. The actuarial firm studies NS' historical patterns of reserving for claims and subsequent settlements, taking into account relevant outside influences. The actuary uses the results of these analyses to estimate the ultimate amount of the liability, which includes amounts for incurred but unasserted claims. NS adjusts its liability quarterly based upon management's assessment and the results of the study. The estimate of loss liabilities is subject to inherent limitation given the difficulty of predicting future events such as jury decisions, court interpretations or legislative changes and as such the actual loss may vary from the amount recorded.

**Occupational claims** – Occupational claims (including asbestosis and other respiratory diseases, as well as repetitive motion) are often not caused by a specific accident or event but rather result from a claimed exposure over time. Many such claims are being asserted by former or retired employees, some of whom have not been employed in the rail industry for decades. The actuarial firm provides an estimate of the occupational claims liability based upon NS' history of claim filings, severity, payments and other pertinent facts. The liability is dependent upon management's judgments made as to the specific case reserves as well as judgments of the consulting actuarial firm in the periodic studies. The actuarial firm's estimate of ultimate loss includes a provision for those claims that have been incurred but not reported. This provision is derived by analyzing industry data and projecting NS' experience into the future as far as can be reasonably determined. NS adjusts its liability quarterly based upon management's assessment and the results of the study. However, it is possible that the recorded liability may not be adequate to cover the future payment of claims. Adjustments to the recorded liability are reflected in operating expenses in the periods in which such adjustments become known.

**Third-party claims** – NS records a liability for third-party claims including those for highway crossing accidents, trespasser and other injuries, automobile liability, property damage and lading damage. The actuarial firm assists with the calculation of potential liability for third-party claims, except lading damage, based upon NS' experience including number and timing of incidents, amount of payments, settlement rates, number of open claims and legal defenses. The actuarial estimate includes a provision for claims that have been incurred but have not yet been reported. Each quarter NS adjusts its liability based upon management's assessment and the results of the study. Given the inherent uncertainty in regard to the ultimate outcome of third-party claims, it is possible that future settlement costs may differ from the estimated liability recorded.

**Environmental Matters**

NS is subject to various jurisdictions' environmental laws and regulations. It is NS' policy to record a liability where such liability or loss is probable and its amount can be estimated reasonably. Claims, if any, against

third parties for recovery of cleanup costs incurred by NS are reflected as receivables (when collection is probable) on the balance sheet and are not netted against the associated NS liability. Environmental engineers regularly participate in ongoing evaluations of all known sites and in determining any necessary adjustments to liability estimates. NS also has an Environmental Policy Council, composed of senior managers, to oversee and interpret its environmental policy.

NS' Consolidated Balance Sheets included liabilities for environmental exposures in the amount of $46 million at Dec. 31, 2007, and $54 million at Dec. 31, 2006 (of which $12 million was accounted for as a current liability at Dec. 31, 2007 and 2006). At Dec. 31, 2007, the liability represented NS' estimate of the probable cleanup and remediation costs based on available information at 155 known locations compared with 172 locations at Dec. 31, 2006. On that date, 13 sites accounted for $25 million of the liability, and no individual site was considered to be material. NS anticipates that much of this liability will be paid out over five years; however, some costs will be paid out over a longer period.

At 32 locations, one or more NS subsidiaries, usually in conjunction with a number of other parties, have been identified as potentially responsible parties by the Environmental Protection Agency (EPA) or similar state authorities under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, or comparable state statutes, which often impose joint and several liability for cleanup costs.

With respect to known environmental sites (whether identified by NS or by the EPA or comparable state authorities), estimates of NS' ultimate potential financial exposure for a given site or in the aggregate for all such sites are necessarily imprecise because of the widely varying costs of currently available cleanup techniques, the likely development of new cleanup technologies, the difficulty of determining in advance the nature and full extent of contamination and each potential participant's share of any estimated loss (and that participant's ability to bear it), and evolving statutory and regulatory standards governing liability.

The risk of incurring environmental liability – for acts and omissions, past, present and future - is inherent in the railroad business. Some of the commodities in NS' traffic mix, particularly those classified as hazardous materials, can pose special risks that NS and its subsidiaries work diligently to minimize. In addition, several NS subsidiaries own, or have owned, land used as operating property, or which is leased and operated by others, or held for sale. Because environmental problems may exist on these properties that are latent or undisclosed, there can be no assurance that NS will not incur environmental liabilities or costs with respect to one or more of them, the amount and materiality of which cannot be estimated reliably at this time. Moreover, lawsuits and claims involving these and potentially other unidentified environmental sites and matters are likely to arise from time to time. The resulting liabilities could have a significant effect on financial position, results of operations or liquidity in a particular year or quarter.

However, based on its assessment of the facts and circumstances now known, management believes that it has recorded the probable costs for dealing with those environmental matters of which NS is aware. Further, management believes that it is unlikely that any known matters, either individually or in the aggregate, will have a material adverse effect on NS' financial position, results of operations or liquidity.

**Insurance**

NS obtains on behalf of itself and its subsidiaries insurance for potential losses for third-party liability and first-party property damages. NS is currently self-insured up to $25 million and above $1 billion per occurrence for bodily injury and property damage to third parties and up to $25 million and above $175 million per occurrence for property owned by NS or in NS’ care, custody or control.

**Purchase Commitments**

At Dec. 31, 2007, NSR had outstanding purchase commitments of approximately $298 million primarily for coal hoppers, locomotives, RoadRailer® trailers, and track material in connection with its capital programs through 2009.

**Change-In-Control Arrangements**

Norfolk Southern has compensation agreements with officers and certain key employees that become operative only upon a change in control of Norfolk Southern, as defined in those agreements. The agreements provide generally for payments based on compensation at the time of a covered individual's involuntary or other specified termination and for certain other benefits.

**Guarantees**

In a number of instances, NS and its subsidiaries have agreed to indemnify lenders for additional costs they may bear as a result of certain changes in laws or regulations applicable to their loans. Such changes may include impositions or modifications with respect to taxes, duties, reserves, liquidity, capital adequacy, special deposits, and similar requirements relating to extensions of credit by, deposits with, or the assets or liabilities of such lenders. The nature and timing of changes in laws or regulations applicable to NS' financings are inherently unpredictable, and therefore NS' exposure in connection with the foregoing indemnifications cannot be quantified. No liability has been recorded related to these indemnifications. In the case of one type of equipment financing, NSR's Japanese leveraged leases, NSR may terminate the leases and ancillary agreements if such a change-in-law indemnity is triggered. Such a termination would require NSR to make early termination payments that would not be expected to have a material adverse effect on NS' financial position, results of operations or liquidity.

NS has indemnified parties in a number of transactions for U.S. income tax withholding imposed as a result of changes in U.S. tax law. In all cases, NS has the right to unwind the related transaction if the withholding cannot be avoided in the future. Because these indemnities would be triggered and are dependent upon a change in the tax law, the maximum exposure is not quantifiable. Management does not believe that it is likely that it will be required to make any payments under these indemnities.

As of Dec. 31, 2007, certain Norfolk Southern subsidiaries are contingently liable as guarantors with respect to $8 million of indebtedness of an entity in which they have an ownership interest, the Terminal Railroad Association of St. Louis, due in 2019. Four other railroads are also jointly and severally liable as guarantors for this indebtedness. No liability has been recorded related to this guaranty.

*** * * * ***

**NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES**
**QUARTERLY FINANCIAL DATA**
**(Unaudited)**

| | Three Months Ended | | | |
|---|---|---|---|---|
| | **March 31** | **June 30** | **Sept. 30** | **Dec. 31** |
| | *($ in millions, except per share amounts)* | | | |
| **2007** | | | | |
| Railway operating revenues | $ 2,247 | $ 2,378 | $ 2,353 | $ 2,454 |
| Income from railway operations | 528 | 690 | 681 | 686 |
| Net income | 285 | 394 | 386 | 399 |
| Earnings per share: | | | | |
| Basic | $ 0.72 | $ 1.00 | $ 0.99 | $ 1.04 |
| Diluted | $ 0.71 | $ 0.98 | $ 0.97 | $ 1.02 |
| **2006** | | | | |
| Railway operating revenues | $ 2,303 | $ 2,392 | $ 2,393 | $ 2,319 |
| Income from railway operations | 551 | 677 | 715 | 614 |
| Net income | 305 | 375 | 416 | 385 |
| Earnings per share: | | | | |
| Basic | $ 0.74 | $ 0.91 | $ 1.04 | $ 0.97 |
| Diluted | $ 0.72 | $ 0.89 | $ 1.02 | $ 0.95 |

**Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure.**

None.

**Item 9A. Controls and Procedures.**

**Evaluation of Disclosure Controls and Procedures**

Norfolk Southern's Chief Executive Officer and Chief Financial Officer, with the assistance of management, evaluated the effectiveness of NS' disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of Dec. 31, 2007. Based on such evaluation, such officers have concluded that, as of Dec. 31, 2007, NS' disclosure controls and procedures were effective to ensure that information required to be disclosed in NS' reports under the Exchange Act is recorded, processed, summarized and reported, within the time period specified in the SEC's rules and forms, and that such information is accumulated and communicated to management, including the Chief Executive Officer and the Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

**Internal Control Over Financial Reporting**

The management of Norfolk Southern is responsible for establishing and maintaining adequate internal control over financial reporting. Norfolk Southern's internal control over financial reporting includes those policies and procedures that pertain to its ability to record, process, summarize and report reliable financial data. Management recognizes that there are inherent limitations in the effectiveness of any internal control over financial reporting, including the possibility of human error and the circumvention or overriding of internal control. Accordingly, even effective internal control over financial reporting can provide only reasonable assurance with respect to financial statement preparation. Further, because of changes in conditions, the effectiveness of internal control over financial reporting may vary over time.

In order to ensure that Norfolk Southern's internal control over financial reporting is effective, management regularly assesses such controls and did so most recently for its financial reporting as of Dec. 31, 2007. This assessment was based on criteria for effective internal control over financial reporting set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in *Internal Control-Integrated Framework*. Based on our assessment, management has concluded that Norfolk Southern maintained effective internal control over financial reporting as of Dec. 31, 2007.

The Board of Directors, acting through its Audit Committee, is responsible for the oversight of Norfolk Southern's accounting policies, financial reporting and internal control. The Audit Committee of the Board of Directors is comprised entirely of outside directors who are independent of management. The independent registered public accounting firm and the internal auditors have full and unlimited access to the Audit Committee, with or without management, to discuss the adequacy of internal control over financial reporting, and any other matters which they believe should be brought to the attention of the Audit Committee.

Norfolk Southern's management has issued a report of its assessment of internal control over financial reporting, and Norfolk Southern's independent registered public accounting firm has issued an attestation report on Norfolk Southern's internal controls over financial reporting as of Dec. 31, 2007. These reports appear in Part II, Item 8 of this report on Form 10-K.

During the fourth quarter of 2007, management has not identified any changes in internal controls over financial reporting that have materially affected, or are reasonably likely to materially affect, NS' internal control over financial reporting.

**Item 9B. Other Information.**

None.

# PART III

## NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES (NS)

**Item 10. Directors, Executive Officers and Corporate Governance.**

In accordance with General Instruction G(3), information called for by Item 10, Part III, is incorporated herein by reference from the information appearing under the caption "Election of Directors," under the caption "Section 16(a) Beneficial Ownership Reporting Compliance," under the caption "Corporate Governance," and under the caption "Committees" in Norfolk Southern's definitive Proxy Statement for the Annual Meeting of Stockholders to be held on May 8, 2008, which definitive Proxy Statement will be filed electronically with the Securities and Exchange Commission (Commission) pursuant to Regulation 14A. The information regarding executive officers called for by Item 401 of Regulation S-K is included in Part I hereof beginning under "Executive Officers of the Registrant."

**Item 11. Executive Compensation.**

In accordance with General Instruction G(3), information called for by Item 11, Part III, is incorporated herein by reference from the information:

- appearing under the subcaption "Compensation" under the caption "Board of Directors" for directors, including the "2007 Non-Employee Director Compensation Table" and the "Narrative to Non-Employee Director Compensation Table;"
- appearing under the caption "Executive Compensation" for executives, including the "Compensation Discussion and Analysis," the information appearing in the "Summary Compensation Table" and the "2007 Grants of Plan-Based Awards" table, including the narrative to such tables, the "Outstanding Equity Awards at Fiscal Year-End 2007" and "Option Exercises and Stock Vested in 2007" tables and the tabular and narrative information appearing under the subcaptions "Retirement Benefits," "Deferred Compensation," and "Potential Payments Upon a Change in Control or Other Termination of Employment;" and
- appearing under the captions "Compensation Committee Interlocks and Insider Participation" and "Compensation Committee Report,"

in each case included in Norfolk Southern's definitive Proxy Statement for the Annual Meeting of Stockholders to be held on May 8, 2008, which definitive Proxy Statement will be filed electronically with the Commission pursuant to Regulation 14A.

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters.**

In accordance with General Instruction G(3), information on security ownership of certain beneficial owners and management called for by Item 12, Part III, Item 403 of Regulation S-K, is incorporated herein by reference from the information appearing under the caption "Beneficial Ownership of Stock" in Norfolk Southern's definitive Proxy Statement for the Annual Meeting of Stockholders to be held on May 8, 2008, which definitive Proxy Statement will be filed electronically with the Commission pursuant to Regulation 14A.

**Equity Compensation Plan Information (as of Dec. 31, 2007)**

| Plan Category | Number of securities to be issued upon exercise of outstanding options, warrants and rights (a) | | Weighted-average Exercise price of outstanding options, warrants and rights (b) | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) (c) |
|---|---|---|---|---|
| Equity compensation plans approved by security holders[1] | 18,782,702[(3)] | $ | 25.71[(5)] | 8,937,651[(6)] |
| Equity compensation plans not approved by security holders[2] | 2,567,775[(4)] | $ | 32.10 | 2,326,700[(7)] |
| Total | 21,350,477 | | | 11,264,351 |

1 The Long-Term Incentive Plan, excluding five million shares for broad-based issuance to non-officers.

2 The Long-Term Incentive Plan's five million shares for broad-based issuance to non-officers, the Thoroughbred Stock Option Plan and the Directors' Restricted Stock Plan.

3 Includes options, restricted stock units and performance share units granted under the Long-Term Incentive Plan that may be settled in shares of stock.

4 Includes options granted under the Long-Term Incentive Plan on 655,585 shares for non-officers and options granted under the Thoroughbred Stock Option Plan.

5 Calculated without regard to 2,115,000 outstanding restricted stock units and performance share units at Dec. 31, 2007.

6 Of the shares remaining available for grant under plans approved by stockholders, 6,703,196 are available for grant as restricted shares, performance shares or restricted stock unit shares under the Long-Term Incentive Plan.

7 Of the shares remaining available for grant under plans not approved by stockholders, 36,000 are available for grant as restricted stock under the Directors' Restricted Stock Plan.

**Norfolk Southern Corporation Long-Term Incentive Plan ("LTIP")**

Established on June 28, 1983, and approved by stockholders at their Annual Meeting held on May 10, 1984, LTIP was adopted to promote the success of Norfolk Southern by providing an opportunity for non-employee directors, officers and other key employees to acquire a proprietary interest in the Corporation. On Jan. 23, 2001, the Board of Directors further amended LTIP and approved the issuance of an additional 5,000,000 shares of authorized but unissued Common Stock under LTIP to participants who are not officers of Norfolk Southern. The issuance of these shares was broadly-based, and stockholder approval of these shares was not required. Accordingly, this portion of LTIP is included in the number of securities available for future issuance for plans not approved by stockholders. Also on Jan. 23, 2001, the Board amended LTIP, which amendment was approved by shareholders on May 10, 2001, that included the reservation for issuance of an additional 30,000,000 shares of authorized but unissued Norfolk Southern Common Stock.

Pursuant to another amendment approved by stockholders on May 12, 2005, not more than 8,500,000 of the shares remaining available for issuance under LTIP may be awarded as restricted shares, performance shares or restricted stock unit shares. Cash payments of restricted stock units, stock appreciation rights and performance share units will not be applied against the maximum number of shares issuable under LTIP. Any shares of

Common Stock subject to options, performance share units or restricted stock units which are not issued as Common Stock will again be available for award under LTIP after the expiration or forfeiture of an award.

Non-employee directors, officers and other key employees residing in the United States or Canada are eligible for selection to receive LTIP awards. Under LTIP, the Compensation Committee (Committee) may grant incentive stock options, nonqualified stock options, stock appreciation rights, restricted shares, restricted stock units and performance share units. In addition, dividend equivalents may be awarded for options, restricted stock units and performance share units. The Committee may make awards under LTIP subject to forfeiture under certain circumstances and may establish such other terms and conditions for the awards as provided in LTIP.

For options, the option price per share will not be less than 100% of the fair market value of Norfolk Southern's Common Stock on the effective date the option is granted. All options are subject to a vesting period of at least one year, and the term of the option will not exceed ten years. LTIP specifically prohibits option repricing without stockholder approval, except for capital adjustments.

Performance share units entitle a recipient to receive performance-based compensation at the end of a three-year performance cycle based on Norfolk Southern’s performance during that three-year period. For the 2007 performance share unit awards, corporate performance will be measured using three equally weighted standards established by the Committee: (1) three-year average return on average capital invested, (2) three-year average operating ratio and (3) three-year total return to stockholders as compared with the average total return on all stocks comprising the S&P 500 composite stock price index. Performance share units may be payable in either shares of Norfolk Southern Common Stock or cash.

Restricted stock units are payable in cash or in shares of Norfolk Southern Common Stock at the end of a restriction period of not less than 36 months and not more than 60 months. During the restriction period, the holder of the restricted stock units has no beneficial ownership interest in the Norfolk Southern Common Stock represented by the restricted stock units and has no right to vote the shares represented by the units or to receive dividends (except for dividend equivalent rights that may be awarded with respect to the restricted stock units). The Committee at its discretion may waive the restriction period.

**Norfolk Southern Corporation Thoroughbred Stock Option Plan**

The Board adopted the Norfolk Southern Corporation Thoroughbred Stock Option Plan (“TSOP”) on Jan. 26, 1999, to promote the success of Norfolk Southern by providing an opportunity for nonagreement employees to acquire a proprietary interest in Norfolk Southern and thereby to provide an additional incentive to nonagreement employees to devote their maximum efforts and skills to the advancement, betterment, and prosperity of Norfolk Southern and its stockholders. TSOP has not been and is not required to have been approved by stockholders. There are 6,000,000 shares of authorized but unissued Common Stock reserved for issuance under TSOP.

Active full-time nonagreement employees residing in the United States or Canada are eligible for selection to receive TSOP awards. Under TSOP, the Committee may grant nonqualified stock options subject to such terms and conditions as provided in TSOP.

The option price will not be less than 100% of the fair market value of Norfolk Southern's Common Stock on the effective date the options are granted. All options are subject to a vesting period of at least one year, and the term of the option will not exceed ten years. Options awarded in 2007 are subject to a three-year vesting period. TSOP specifically prohibits option repricing without stockholder approval, except for capital adjustments.

**Norfolk Southern Corporation Directors' Restricted Stock Plan**

The Norfolk Southern Corporation Directors' Restricted Stock Plan ("Plan") was adopted on Jan. 1, 1994, and is designed to increase ownership of Norfolk Southern Common Stock by its non-employee directors so as to further align their ownership interest in Norfolk Southern with that of stockholders. The Plan has not been and is not required to have been approved by stockholders. Currently, a maximum of 66,000 shares of Norfolk Southern Common Stock may be granted under the Plan. To make grants to eligible directors, Norfolk Southern purchases, through one or more subsidiary companies, the number of shares required in open-market transactions at prevailing market prices, or makes such grants from Norfolk Southern Common Stock already owned by one or more of Norfolk Southern's subsidiary companies.

Only non-employee directors who are not and never have been employees of Norfolk Southern are eligible to participate in the Plan. Upon becoming a director, each eligible director receives a one-time grant of 3,000 restricted shares of Norfolk Southern Common Stock. No individual member of the Board exercises discretion concerning the eligibility of any director or the number of shares granted.

The restriction period applicable to restricted shares granted under the Plan begins on the date of the grant and ends on the earlier of the recipient's death or six months after the recipient ceases to be a director by reason of disability or retirement. During the restriction period shares may not be sold, pledged or otherwise encumbered. Directors will forfeit the restricted shares if they cease to serve as a director of Norfolk Southern for reasons other than their disability, retirement or death.

**Item 13. Certain Relationships and Related Transactions, and Director Independence.**

In accordance with General Instruction G(3), information called for by Item 13, Part III, is incorporated herein by reference from the information appearing under the caption "Transactions with Related Persons" and under the caption "Director Independence" in Norfolk Southern's definitive Proxy Statement for the Annual Meeting of Stockholders to be held on May 8, 2008, which definitive Proxy Statement will be filed electronically with the Commission pursuant to Regulation 14A.

**Item 14. Principal Accountant Fees and Services.**

In accordance with General Instruction G(3), information called for by Item 14, Part III is incorporated herein by reference from the information appearing under the caption "Ratification of Appointment of Independent Registered Public Accounting Firm" in Norfolk Southern's definitive Proxy Statement for the Annual Meeting of Stockholders to be held on May 8, 2008, which definitive proxy statement will be filed electronically with the Commission pursuant to Regulation 14A.

# PART IV

## NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES (NS)

**Item 15. Exhibits and Financial Statement Schedules.**

Page

(A) The following documents are filed as part of this report:

1. Index to Consolidated Financial Statements


| | |
|---|---|
| Report of Management | K41 |
| Reports of Independent Registered Public Accounting Firm | K42 |
| Consolidated Statements of Income, Years ended Dec. 31, 2007, 2006 and 2005 | K44 |
| Consolidated Balance Sheets as of Dec. 31, 2007 and 2006 | K45 |
| Consolidated Statements of Cash Flows, Years ended Dec. 31, 2007, 2006 and 2005 | K46 |
| Consolidated Statements of Changes in Stockholders' Equity, Years ended Dec. 31, 2007, 2006 and 2005 | K47 |
| Notes to Consolidated Financial Statements | K48 |


2. Financial Statement Schedule:

The following consolidated financial statement schedule should be read in connection with the consolidated financial statements:


| Index to Consolidated Financial Statement Schedule | Page |
|---|---|
| Schedule II - Valuation and Qualifying Accounts | K94 |


Schedules other than the one listed above are omitted either because they are not required or are inapplicable, or because the information is included in the consolidated financial statements or related notes.

3. Exhibits

| Exhibit Number | Description |
|---|---|
| 3 | Articles of Incorporation and Bylaws - |
| 3(i) | The Restated Articles of Incorporation of Norfolk Southern Corporation are incorporated by reference to Exhibit 3(i) to Norfolk Southern Corporation's 10-K filed on March 5, 2001. |
| 3(ii) | The Bylaws of Norfolk Southern Corporation, as amended effective Feb. 1, 2008, are incorporated by reference to Exhibit 3 to Norfolk Southern Corporation’s Form 8-K filed on Jan. 25, 2008. |

4 Instruments Defining the Rights of Security Holders, Including Indentures:

(a) Indenture, dated as of Jan. 15, 1991, from Norfolk Southern Corporation to First Trust of New York, National Association, as Trustee, is incorporated by reference to Exhibit 4.1 to Norfolk Southern Corporation's Registration Statement on Form S-3 (No. 33-38595).

(b) First Supplemental Indenture, dated May 19, 1997, between Norfolk Southern Corporation and First Trust of New York, National Association, as Trustee, related to the issuance of notes in the principal amount of $4.3 billion, is incorporated herein by reference to Exhibit 1.1(d) to Norfolk Southern Corporation's Form 8-K filed on May 21, 1997.

(c) Second Supplemental Indenture, dated April 26, 1999, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, related to the issuance of notes in the principal amount of $400 million, is incorporated herein by reference to Exhibit 1.1(c) to Norfolk Southern Corporation's Form 8-K filed on April 30, 1999.

(d) Third Supplemental Indenture, dated May 23, 2000, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, related to the issuance of notes in the principal amount of $600 million, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on May 25, 2000.

(e) Fourth Supplemental Indenture, dated as of Feb. 6, 2001, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, related to the issuance of notes in the principal amount of $1 billion, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on Feb. 7, 2001.

(f) Sixth Supplemental Indenture, dated as of April 30, 2002, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, relating to the issuance of notes in the principal amount of $200 million, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on May 1, 2002.

(g) Eighth Supplemental Indenture, dated as of Sept. 17, 2004, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, relating to the issuance of 5.257% Notes due 2014 ("Securities") in the aggregate principal amount of $441.5 million in connection with Norfolk Southern Corporation's offer to exchange the Securities and cash for up to $400 million of its outstanding 7.350% Notes due 2007, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on Sept. 23, 2004.

(h) Indenture, dated Aug. 27, 2004, among PRR Newco, Inc., as Issuer, and Norfolk Southern Railway Company, as Guarantor, and The Bank of New York, as Trustee, is incorporated herein by reference to Exhibit 4(l) to Norfolk Southern Corporation's Form 10-Q filed on Oct. 28, 2004.

(i) First Supplemental Indenture, dated Aug. 27, 2004, among PRR Newco, Inc., as Issuer, and Norfolk Southern Railway Company, as Guarantor, and The Bank of New York, as Trustee, related to the issuance of notes in the principal amount of approximately $451.8 million, is incorporated herein by reference to Exhibit 4(m) to Norfolk Southern Corporation's Form 10-Q filed on Oct. 28, 2004.

(j) Ninth Supplemental Indenture, dated as of March 11, 2005, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, relating to the issuance of notes in the principal amount of $300 million, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on March 15, 2005.

(k) Tenth Supplemental Indenture, dated as of May 17, 2005, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, relating to the issuance of notes in the principal amount of $366.6 million, is incorporated herein by reference to Exhibit 99.1 to Norfolk Southern Corporation's Form 8-K filed on May 18, 2005.

(l) Eleventh Supplemental Indenture, dated as of May 17, 2005, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, relating to the issuance of notes in the principal amount of $350 million, is incorporated herein by reference to Exhibit 99.2 to Norfolk Southern Corporation's Form 8-K filed on May 18, 2005.

In accordance with Item 601(b)(4)(iii) of Regulation S-K, copies of other instruments of Norfolk Southern Corporation and its subsidiaries with respect to the rights of holders of long-term debt are not filed herewith, or incorporated by reference, but will be furnished to the Commission upon request.

10 Material Contracts -

(a) The Transaction Agreement, dated as of June 10, 1997, by and among CSX, CSX Transportation, Inc., Registrant, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation and CRR Holdings LLC, with certain schedules thereto, previously filed, is incorporated herein by reference to Exhibit 10(a) to Norfolk Southern Corporation's Form 10-K filed on Feb. 24, 2003.

(b) Amendment No. 1, dated as of Aug. 22, 1998, to the Transaction Agreement, dated as of June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation and CRR Holdings LLC, is incorporated herein by reference from Exhibit 10.1 to Norfolk Southern Corporation's Form 10-Q filed on Aug. 11, 1999.

(c) Amendment No. 2, dated as of June 1, 1999, to the Transaction Agreement, dated June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation and CRR Holdings LLC, is incorporated herein by reference from Exhibit 10.2 to Norfolk Southern Corporation's Form 10-Q filed on Aug. 11, 1999.

(d) Amendment No. 3, dated as of June 1, 1999, and executed in April 2004, to the Transaction Agreement, dated June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation and CRR Holdings LLC, is incorporated herein by reference to Exhibit 10(dd) to Norfolk Southern Corporation's Form 10-Q filed on July 30, 2004.

(e) Amendment No. 5 to the Transaction Agreement, dated as of Aug. 27, 2004, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation and CRR Holdings LLC, is incorporated herein by reference to Exhibit 10.1 to Norfolk Southern Corporation’s Form 8-K filed on Sept. 2, 2004.

(f) Shared Assets Area Operating Agreement for North Jersey, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibit thereto, is incorporated herein by reference from Exhibit 10.4 to Norfolk Southern Corporation's Form 10-Q filed on Aug. 11, 1999.

(g) Shared Assets Area Operating Agreement for Detroit, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibit thereto, is incorporated herein by reference from Exhibit 10.6 to Norfolk Southern Corporation's Form 10-Q filed on Aug. 11, 1999.

(h) Amendment No. 1, dated as of June 1, 2000, to the Shared Assets Areas Operating Agreement for North Jersey, South Jersey/Philadelphia and Detroit, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibit thereto, is incorporated herein by reference to Exhibit 10(h) to Norfolk Southern Corporation's 10-K filed on March 5, 2001.

(i) Amendment No. 2, dated as Jan. 1, 2001, to the Shared Assets Area Operating Agreements for North Jersey, South Jersey/Philadelphia and Detroit, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibit thereto, is incorporated herein by reference to Exhibit 10(j) to Norfolk Southern Corporation's Form 10-K filed on Feb. 21, 2002.

(j) Amendment No. 3, dated as of June 1, 2001, and executed in May of 2002, to the Shared Assets Area Operating Agreement for North Jersey, South Jersey/Philadelphia and Detroit, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibit thereto, is incorporated herein by reference to Exhibit 10(k) to Norfolk Southern Corporation’s Form 10-K filed on Feb. 24, 2003.

(k) Amendment No. 4, dated as of June 1, 2005, and executed in late June 2005, to the Shared Assets Area Operating Agreement for North Jersey, South Jersey/Philadelphia and Detroit, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibits thereto, is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation’s Form 8-K filed on July 1, 2005.

(l) Monongahela Usage Agreement, dated as of June 1, 1999, by and among CSX Transportation, Inc., Norfolk Southern Railway Company, Pennsylvania Lines LLC and New York Central Lines LLC, with exhibit thereto, is incorporated herein by reference from Exhibit 10.7 to Norfolk Southern Corporation's Form 10-Q filed on Aug. 11, 1999.

(m) The Agreement, entered into as of July 27, 1999, between North Carolina Railroad Company and Norfolk Southern Railway Company, is incorporated herein by reference from Exhibit 10(i) to Norfolk Southern Corporation's Form 10-K filed on March 6, 2000.

(n) First Amendment dated March 19, 2007, to the Master Agreement dated July 27, 1999, by and between North Carolina Railroad Company and Norfolk Southern Railway Company is incorporated herein by reference to Exhibit 10.3 to Norfolk Southern Corporation's Form 10-Q filed on July 27, 2007.

(o) The Supplementary Agreement, entered into as of Jan. 1, 1987, between the Trustees of the Cincinnati Southern Railway and The Cincinnati, New Orleans and Texas Pacific Railway Company (the latter a wholly owned subsidiary of Norfolk Southern Railway Company) - extending and amending a Lease, dated as of Oct. 11, 1881 - is incorporated by reference to Exhibit 10(k) to Norfolk Southern Corporation's Form 10-K filed on March 5, 2001.

*(p) The Norfolk Southern Corporation Executive Management Incentive Plan, effective Jan. 25, 2005, is incorporated by reference herein from Exhibit 99 to Norfolk Southern Corporation's Form 8-K filed on May 13, 2005.

*(q) The Norfolk Southern Corporation Officers' Deferred Compensation Plan, as amended effective September 26, 2000, is incorporated herein by reference to Exhibit 10(n) to Norfolk Southern Corporation's Form 10-K filed on March 5, 2001.

*(r) The Norfolk Southern Corporation Executives' Deferred Compensation Plan, as amended effective Jan. 20, 2001, is incorporated herein by reference to Exhibit 10(o) to Norfolk Southern Corporation's Form 10-K filed on March 5, 2001.

*(s) The Directors' Deferred Fee Plan of Norfolk Southern Corporation, as amended effective Jan. 23, 2001, is incorporated herein by reference to Exhibit 10(p) to Norfolk Southern Corporation's Form 10-K filed on March 5, 2001.

*(t) The Norfolk Southern Corporation Directors' Restricted Stock Plan, effective Jan. 1, 1994, as restated Nov. 24, 1998, is incorporated herein by reference from Exhibit 10(h) to Norfolk Southern Corporation's Form 10-K filed on March 24, 1999.

*(u) Form of Severance Agreement, dated as of June 1, 1996, between Norfolk Southern Corporation and certain executive officers (including those defined as "named executive officers" and identified in the Corporation's Proxy Statement for the 1997 through 2001 Annual Meetings of Stockholders), is incorporated herein by reference to Exhibit 10(t) to Norfolk Southern Corporation's Form 10-K filed on Feb. 21, 2002.

*,**(v) Norfolk Southern Corporation Supplemental (formerly, Excess) Benefit Plan, as amended effective as of May 2, 2005.

*(w) The Norfolk Southern Corporation Directors' Charitable Award Program, as amended effective July 2007, is incorporated herein by reference to Exhibit 10.6 to Norfolk Southern Corporation's Form 10-Q filed on July 27, 2007.

*(x) The Norfolk Southern Corporation Outside Directors' Deferred Stock Unit Program, as amended effective Jan. 22, 2008, is incorporated herein by reference to Exhibit 10.1 to Norfolk Southern Corporation's Form 8-K filed on Jan. 25, 2008.

*(y) Form of Agreement, dated as of Oct. 1, 2001, providing enhanced pension benefits to three officers in exchange for their continued employment with Norfolk Southern Corporation for two years, is incorporated herein by reference to Exhibit 10(w) to Norfolk Southern Corporation's Form 10-Q filed on Nov. 9, 2001. The agreement was entered into with L. Ike Prillaman, former Vice Chairman and Chief Marketing Officer; Stephen C. Tobias, Vice Chairman and Chief Operating Officer; and Henry C. Wolf, former Vice Chairman and Chief Financial Officer.

(z) The Norfolk Southern Corporation Thoroughbred Stock Option Plan, as amended effective Jan. 28, 2003, is incorporated herein by reference to Exhibit 10(z) to Norfolk Southern Corporation's Form 10-K filed on Feb. 24, 2003.

*(aa) The Norfolk Southern Corporation Restricted Stock Unit Plan, effective Jan. 28, 2003, is incorporated herein by reference to Exhibit 10(bb) to Norfolk Southern Corporation's Form 10-K filed on Feb. 24, 2003.

*(bb) The Norfolk Southern Corporation Executive Life Insurance Plan, as amended, effective Oct. 1, 2003, is incorporated herein by reference to Exhibit 10 to Norfolk Southern Corporation's Form 10-Q filed on Oct. 31, 2003.

(cc) Distribution Agreement, dated as of July 26, 2004, by and among CSX Corporation, CSX Transportation, Inc., CSX Rail Holding Corporation, CSX Northeast Holdings Corporation, Norfolk Southern Corporation, Norfolk Southern Railway Company, CRR Holdings LLC, Green Acquisition Corp., Conrail Inc., Consolidated Rail Corporation, New York Central Lines LLC, Pennsylvania Lines LLC, NYC Newco, Inc. and PRR Newco, Inc., is incorporated herein by reference to Exhibit 2.1 to Norfolk Southern Corporation's Form 8-K filed on Sept. 2, 2004.

(dd) Tax Allocation Agreement, dated as of Aug. 27, 2004, by and among Green Acquisition Corp., Conrail Inc., Consolidated Rail Corporation, New York Central Lines LLC and Pennsylvania Lines LLC, is incorporated herein by reference to Exhibit 10.2 to Norfolk Southern Corporation's Form 8-K filed on Sept. 2, 2004.

(ee) Amended and Restated Credit Agreement dated as of June 26, 2007, with respect to the Registrant's $1 billion unsecured revolving credit facility, is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K filed on June 27, 2007.

*(ff) The description of Norfolk Southern Corporation's executive physical reimbursement for non-employee directors and certain executives is incorporated herein by reference to Norfolk Southern Corporation's Form 8-K filed on July 28, 2005.

*(gg) Form of 2006 Incentive Stock Option and Non-Qualified Stock Option Agreement under the Norfolk Southern Long-Term Incentive Plan, is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K/A filed on Dec. 7, 2005.

*(hh) Form of 2006 Restricted Share and Restricted Stock Unit Agreement under the Norfolk Southern Corporation Long-Term Incentive Plan, is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K/A filed on Dec. 7, 2005.

*(ii) Form of 2005 Performance Share Unit Award under the Norfolk Southern Corporation Long-Term Incentive Plan, is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K/A filed on Dec. 7, 2005.

(jj) The Transaction Agreement, dated as of Dec. 1, 2005, by and among Norfolk Southern Corporation, The Alabama Great Southern Railroad Company, Kansas City Southern and The Kansas City Southern Railway Company (Exhibits, annexes and schedules omitted. The Registrant will furnish supplementary copies of such materials to the SEC upon request).

(kk) Amendment No. 1, dated as of Jan. 17, 2006, by and among Norfolk Southern Corporation, The Alabama Great Southern Railroad Company, Kansas City Southern and the Kansas City Southern Railroad.

(ll) Amendment No. 2, dated as of May 1, 2006, to the Transaction Agreement, dated as of Dec. 1, 2005, by and among Norfolk Southern Corporation, The Alabama Great Southern Railroad Company, Kansas City Southern and The Kansas City Southern Railway Company is incorporated herein by reference to Exhibit 10.1 to Norfolk Southern Corporation's Form 8-K filed on May 4, 2006.

*(mm) The retirement agreement, dated Jan. 27, 2006, between Norfolk Southern Corporation and David R. Goode, is incorporated herein by reference to Exhibit 10.1 to Norfolk Southern Corporation's Form 8-K filed on Jan. 27, 2006.

*(nn) The waiver agreement, dated Jan. 27, 2006, between Norfolk Southern Corporation and David R. Goode, providing for the waiver of forfeiture provisions otherwise applicable to certain restricted shares and restricted stock units upon retirement, is incorporated herein by reference to Exhibit 10.2 to Norfolk Southern Corporation's Form 8-K filed on Jan. 27, 2006.

*(oo) Revised fees for outside directors are incorporated herein by reference to Norfolk Southern Corporation's Form 8-K filed on Jan. 27, 2006.

*(pp) The retirement agreement, dated Mar. 28, 2006, between Norfolk Southern Corporation and L. Ike Prillaman, is incorporated herein by reference to Exhibit 10.1 to Norfolk Southern Corporation's Form 8-K filed on Mar. 31, 2006.

*(qq) The waiver agreement, dated Mar. 28, 2006, between Norfolk Southern Corporation and L. Ike Prillaman, providing for the waiver of forfeiture provisions otherwise applicable to certain restricted shares and restricted stock units upon retirement, is incorporated herein by reference to Exhibit 10.2 to Norfolk Southern Corporation's Form 8-K filed on Mar. 31, 2006.

(rr) Limited Liability Company Agreement of Meridian Speedway, LLC, dated as of May 1, 2006, by and among The Alabama Great Southern Railroad Company and Kansas City Southern is incorporated herein by reference to Exhibit 10.2 to Norfolk Southern Corporation's Form 8-K filed on May 4, 2006.

*(ss) The Norfolk Southern Corporation Long-Term Incentive Plan, as amended effective July 25, 2006, is incorporated herein by reference to Exhibit 10.3 to Norfolk Southern Corporation's Form 10-Q filed on July 28, 2006.

*(tt) Form of Norfolk Southern Corporation Long-Term Incentive Plan, 2007 Award Agreement is incorporated herein by reference to Exhibit 10.1 to Norfolk Southern Corporation's Form 8-K filed on Jan. 11, 2007.

*,**(uu) Retirement Plan of Norfolk Southern Corporation and Participating Subsidiary Companies effective June 1, 1982, amended effective Dec. 31, 2007.

*(vv) The retirement agreement between Norfolk Southern Corporation and Henry C. Wolf is incorporated herein by reference to Exhibit 10.1 to Norfolk Southern Corporation's Form 8-K filed on May 11, 2007.

*(ww) The waiver agreement between Norfolk Southern Corporation and Henry C. Wolf is incorporated herein by reference to Exhibit 10.2 to Norfolk Southern Corporation's Form 8-K filed on May 11, 2007.

(xx) Transfer and Administration Agreement dated as of Nov. 8, 2007, with respect to the Registrant's $500 million receivables securitization facility is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K filed on Nov. 14, 2007.

* (yy) Form of Norfolk Southern Corporation Long-Term Incentive Plan 2008 Award Agreement is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K filed on Nov. 20, 2007.

(zz) Dealer Agreement dated as of Jan. 23, 2008, between the Registrant and J. P. Morgan Securities Inc. is incorporated herein by reference to Exhibit 10.1 to Norfolk Southern Corporation's Form 8-K filed on Jan. 25, 2008.

(aaa) Dealer Agreement dated as of Jan. 23, 2008, between the Registrant and Goldman, Sachs & Co. is incorporated herein by reference to Exhibit 10.2 to Norfolk Southern Corporation's Form 8-K filed on Jan. 25, 2008.

*(bbb) 2008 Award Agreement between Norfolk Southern Corporation and Gerald L. Baliles, dated Jan. 24, 2008, is incorporated herein by reference to Exhibit 10.2 to Norfolk Southern Corporation's Form 8-K filed on Jan. 25, 2008.

*(ccc) 2008 Award Agreement between Norfolk Southern Corporation and Daniel A. Carp, dated Jan. 24, 2008, is incorporated herein by reference to Exhibit 10.3 to Norfolk Southern Corporation's Form 8-K filed on Jan. 25, 2008.

*(ddd) 2008 Award Agreement between Norfolk Southern Corporation and Gene R. Carter, dated Jan. 24, 2008, is incorporated herein by reference to Exhibit 10.4 to Norfolk Southern Corporation's Form 8-K filed on Jan. 25, 2008.

*(eee) 2008 Award Agreement between Norfolk Southern Corporation and Alston D. Correll, dated Jan. 24, 2008, is incorporated herein by reference to Exhibit 10.5 to Norfolk Southern Corporation's Form 8-K filed on Jan. 25, 2008.

*(fff) 2008 Award Agreement between Norfolk Southern Corporation and Landon Hilliard, dated Jan. 24, 2008, is incorporated herein by reference to Exhibit 10.6 to Norfolk Southern Corporation's Form 8-K filed on Jan. 25, 2008.

*(ggg) 2008 Award Agreement between Norfolk Southern Corporation and Burton M. Joyce, dated Jan. 24, 2008, is incorporated herein by reference to Exhibit 10.7 to Norfolk Southern Corporation's Form 8-K filed on Jan. 25, 2008.

*(hhh) 2008 Award Agreement between Norfolk Southern Corporation and Steven F. Leer, dated Jan. 24, 2008, is incorporated herein by reference to Exhibit 10.8 to Norfolk Southern Corporation's Form 8-K filed on Jan. 25, 2008.

*(iii) 2008 Award Agreement between Norfolk Southern Corporation and Jane M. O'Brien, dated Jan. 24, 2008, is incorporated herein by reference to Exhibit 10.9 to Norfolk Southern Corporation's Form 8-K filed on Jan. 25, 2008.

*(jjj) 2008 Award Agreement between Norfolk Southern Corporation and J. Paul Reason, dated Jan. 24, 2008, is incorporated herein by reference to Exhibit 10.10 to Norfolk Southern Corporation's Form 8-K filed on Jan. 25, 2008.

**12 Statement re: Computation of Ratio of Earnings to Fixed Charges.

**21 Subsidiaries of the Registrant.

**23 Consent of Independent Registered Public Accounting Firm.

**31 Rule 13a-14(a)/15d-14(a) Certifications.

**32 Section 1350 Certifications.

**99 Annual CEO Certification pursuant to NYSE Rule 303A.12(a).

* *Management contract or compensatory arrangement.*
** *Filed herewith.*

(B) Exhibits.

The Exhibits required by Item 601 of Regulation S-K as listed in Item 15(A)3 are filed herewith or incorporated herein by references.

(C) Financial Statement Schedules.

Financial statement schedules and separate financial statements specified by this Item are included in Item 15(A)2 or are otherwise not required or are not applicable.

Exhibits 23, 31, 32 and 99 are included in copies assembled for public dissemination. All exhibits are included in the 2007 Form 10-K posted on our website at www.nscorp.com under "Investors" and "SEC Filings" or you may request copies by writing to:

**Office of Corporate Secretary**
**Norfolk Southern Corporation**
**Three Commercial Place**
**Norfolk, Virginia 23510-9219**

## POWER OF ATTORNEY

Each person whose signature appears below under "SIGNATURES" hereby authorizes James A. Hixon and James A. Squires or one of them, to execute in the name of each such person, and to file, any amendment to this report and hereby appoints James A. Hixon and James A. Squires or any one of them, as attorneys-in-fact to sign on his or her behalf, individually and in each capacity stated below, and to file, any and all amendments to this report.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, Norfolk Southern Corporation has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, on this 15th day of February 2008.

**NORFOLK SOUTHERN CORPORATION**

By: Charles W. Moorman
(Chairman, President and Chief Executive Officer)

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below on this 15th day of February 2008, by the following persons on behalf of Norfolk Southern Corporation and in the capacities indicated.

| Signature | Title |
|---|---|
| /s/ Charles W. Moorman<br>(Charles W. Moorman) | Chairman, President and Chief Executive Officer and Director<br>(Principal Executive Officer) |
| /s/ James A. Squires<br>(James A. Squires) | Executive Vice President Finance and Chief Financial Officer<br>(Principal Financial Officer) |
| /s/ Marta R. Stewart<br>(Marta R. Stewart) | Vice President and Controller<br>(Principal Accounting Officer) |
| /s/ Gerald L. Baliles<br>(Gerald L. Baliles) | Director |
| /s/ Daniel A. Carp<br>(Daniel A. Carp) | Director |
| /s/ Gene R. Carter<br>(Gene R. Carter) | Director |

| | |
|---|---|
| /s/ Alston D. Correll<br>(Alston D. Correll) | Director |
| /s/ Landon Hilliard<br>(Landon Hilliard) | Director |
| /s/ Burton M. Joyce<br>(Burton M. Joyce) | Director |
| /s/ Steven F. Leer<br>(Steven F. Leer) | Director |
| /s/ J. Paul Reason<br>(J. Paul Reason) | Director |

Schedule II

**Norfolk Southern Corporation and Subsidiaries**
**Valuation and Qualifying Accounts**
**Years Ended December 31, 2005, 2006 and 2007**
**($ in millions)**

| | | Additions charged to: | | | |
|---|---|---|---|---|---|
| | Beginning Balance | Expenses | Other Accounts | Deductions | Ending Balance |
| ***Year ended December 31, 2005*** | | | | | |
| Valuation allowance (included net in deferred tax liability) for deferred tax assets | $ 13 | $ -- | $ -- | $ 3 [2] | $ 10 |
| Casualty and other claims included in other liabilities | $ 315 | $ 311 | $ -- | $ 205 [3] | $ 421 |
| Current portion of casualty and other claims included in accounts payable | $ 222 | $ 92 | $ 114 [1] | $ 137 [4] | $ 291 |
| ***Year ended December 31, 2006*** | | | | | |
| Valuation allowance (included net in deferred tax liability) for deferred tax assets | $ 10 | $ -- | $ -- | $ 1 [2] | $ 9 |
| Casualty and other claims included in other liabilities | $ 421 | $ 217 | $ -- | $ 167 [3] | $ 471 |
| Current portion of casualty and other claims included in accounts payable | $ 291 | $ 40 | $ 124 [1] | $ 154 [4] | $ 301 |
| ***Year ended December 31, 2007*** | | | | | |
| Valuation allowance (included net in deferred tax liability) for deferred tax assets | $ 9 | $ 1 | $ -- | $ -- | $ 10 |
| Casualty and other claims included in other liabilities | $ 471 | $ 113 | $ 162 [3,4] | $ 158 [3] | $ 588 |
| Current portion of casualty and other claims included in accounts payable | $ 301 | $ 17 | $ 122 [1] | $ 181 [4] | $ 259 |

[1]Includes revenue refunds and overcharges provided through deductions from operating revenues and transfers from other accounts.

[2]Reclassifications to/from other assets.

[3]Payments and reclassifications to/from accounts payable.

[4]Payments and reclassifications to/from other liabilities.

# PX0763

Filed Under Seal

# EXHIBIT PX0764

Morningstar® Document Research℠

# FORM 10-K

## CSX CORP - csx

**Filed: February 19, 2009 (period: December 26, 2008)**

Annual report which provides a comprehensive overview of the company for the past year

Powered by Morningstar® Document Research℠

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

**FORM 10-K**

(X) ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 26, 2008

OR

( ) TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from __________ to __________

Commission File Number 1-8022

# CSX CORPORATION

(*Exact name of registrant as specified in its charter*)

| **Virginia** | | **62-1051971** |
|---|---|---|
| *(State or other jurisdiction of incorporation or organization)* | | *(I.R.S. Employer Identification No.)* |
| **500 Water Street, 15th Floor, Jacksonville, FL** | **32202** | **(904) 359-3200** |
| *(Address of principal executive offices)* | *(Zip Code)* | *(Telephone number, including area code)* |

**Securities registered pursuant to Section 12(b) of the Act:**

| **Title of each class** | **Name of exchange on which registered** |
|---|---|
| Common Stock, $1 Par Value | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer (as defined in Rule 405 of the Securities Act). Yes (X) No ( )

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ( ) No (X)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes (X) No ( )

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ( )

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer or a non-accelerated filer (as defined in Exchange Act Rule 12b-2).
Large Accelerated Filer (X) Accelerated Filer ( ) Non-accelerated Filer ( )

Indicate by check mark whether the registrant is a shell company (as defined in Exchange Act Rule 12b-2). Yes ( ) No (X)

On June 27, 2008 (which is the last day of the second quarter and the required date to use), the aggregate market value of the Registrant's voting stock held by non-affiliates was approximately $25.2 billion (based on the New York Stock Exchange closing price on such date).

There were 399,254,173 shares of Common Stock outstanding on January 30, 2009 (the latest practicable date that is closest to the filing date).

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the Registrant's Definitive Proxy Statement (the "Proxy Statement") to be filed no later than 120 days after the end of the

fiscal year with respect to its annual meeting of shareholders scheduled to be held on May 6, 2009.



Powered by Morningstar® Document Research℠

**CSX CORPORATION**
**FORM 10-K**
**TABLE OF CONTENTS**


| Item No. | | Page |
|---|---|---|
| | **PART I** | |
| 1. | Business by Segment | 3 |
| | 1A. Risk Factors | 8 |
| | 1B. Unresolved Staff Comments | 14 |
| 2. | Properties by Segment | 14 |
| 3. | Legal Proceedings | 19 |
| 4. | Submission of Matters to a Vote of Security Holders and Executive Officers of the Registrant | 20 |
| | **PART II** | |
| 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 23 |
| 6. | Selected Financial Data | 26 |
| 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 28 |
| | • Strategic Overview | 28 |
| | • 2008 Highlights | 30 |
| | • Forward-Looking Statements | 33 |
| | • Financial Results of Operations | 36 |
| | • Liquidity and Capital Resources | 48 |
| | • Schedule of Contractual Obligations and Commercial Commitments | 51 |
| | • Off-Balance Sheet Arrangements | 52 |
| | • Critical Accounting Estimates | 52 |
| 7A. | Quantitative and Qualitative Disclosures about Market Risk | 63 |
| 8. | Financial Statements and Supplementary Data | 66 |
| 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 138 |
| 9A. | Controls and Procedures | 138 |
| 9B. | Other Information | 140 |
| | **PART III** | |
| 10. | Directors, Executive Officers of the Registrant and Corporate Governance | 141 |
| 11. | Executive Compensation | 141 |
| 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 141 |
| 13. | Certain Relationships and Related Transactions, and Director Independence | 141 |
| 14. | Principal Accounting Fees and Services | 141 |
| | **PART IV** | |
| 15. | Exhibits and Financial Statement Schedules | 142 |
| | Signatures | 150 |




Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**CSX CORPORATION**
**PART I**

### Item 1. Business by Segment

CSX Corporation ("CSX") together with its subsidiaries (the "Company"), based in Jacksonville, Florida, is one of the nation's leading transportation suppliers. The Company's rail and intermodal businesses provide rail-based transportation services including traditional rail service and the transport of intermodal containers and trailers.

### Rail

CSX's principal operating company, CSX Transportation, Inc. ("CSXT"), provides a crucial link to the transportation supply chain through its approximately 21,000 route mile rail network, which serves major population centers in 23 states east of the Mississippi River, the District of Columbia, and the Canadian provinces of Ontario and Quebec. It serves 70 ocean, river and lake ports along the Atlantic and Gulf Coasts, the Mississippi River, the Great Lakes and the St. Lawrence Seaway. CSXT also serves thousands of production and distribution facilities through track connections to more than 230 short-line and regional railroads.

*Other Entities*

In addition to CSXT, the rail segment includes Total Distribution Services, Inc. ("TDSI"), Transflo Terminal Services, Inc. ("Transflo"), CSX Technology, Inc. ("CSX Technology") and other subsidiaries. TDSI serves the automotive industry with distribution centers and storage locations, while Transflo provides logistical solutions for transferring products from rail to trucks. Technology and other support services are provided by CSX Technology and other subsidiaries.

### Intermodal

CSX Intermodal, Inc. ("Intermodal"), one of the nation's largest coast-to-coast intermodal transportation providers, is a stand-alone, integrated intermodal company linking customers to railroads via trucks and terminals. Containers and trailers are loaded and unloaded from trains, and trucks provide the link between intermodal terminals and the customer.

### Lines of Business

Together, the rail and intermodal segments generated $11.3 billion of revenue during 2008 and served four primary lines of business:

- The merchandise business is the most diverse market with nearly 2.5 million carloads per year of aggregates, which include crushed stone, sand and gravel, metal, phosphate, fertilizer, food, consumer, agricultural, paper and chemical products. The merchandise business generated approximately 49% of the Company's revenue in 2008 and 37% of volume.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

- Coal, which delivered approximately 1.9 million carloads of coal, coke and iron ore to electricity generating power plants, ocean, river and lake piers and terminals, steel makers and industrial plants, accounted for approximately 29% of the Company's revenue in 2008 and 28% of volume. The Company transports almost one-third of every ton of coal used for generating electricity in the areas it serves.

- Automotive, which delivers finished vehicles and auto parts, generated approximately 7% of the Company's revenue and 5% of the Company's volume in 2008. The Company delivers approximately 30% of North America's light vehicles, serving both traditional manufacturers and the increasing number of global manufacturers.

- Intermodal offers a competitive cost advantage over long-haul trucking by combining the economics of rail transportation with the short-haul flexibility of trucks. Through its network of more than 50 terminals, Intermodal serves all major markets east of the Mississippi River and transports mainly manufactured consumer goods in containers, providing customers with truck-like service for longer shipments. For 2008, Intermodal accounted for approximately 13% of the Company's total revenue and 30% of volume.

Other revenue, which includes revenue from regional railroads, demurrage, switching and other incidental charges, accounted for 2% of the Company's total 2008 revenue. Revenue from regional railroads includes shipments by railroads that the Company does not directly operate. Demurrage represents charges assessed by railroads when shippers or receivers of freight hold railcars beyond a specified period of time. Switching revenue is generated when CSXT switches cars between trains for a customer or another railroad.

**Other Businesses**

CSX's other holdings include CSX Real Property, Inc., a subsidiary responsible for the Company's real estate sales, leasing, acquisition and management and development activities, and the Greenbrier Hotel Corporation, formerly known as CSX Hotels, Inc., a resort doing business as The Greenbrier. These items are classified in other income because they are not considered by the Company to be operating activities and results may fluctuate with the timing of real estate sales and resort seasonality. See Note 9, Other Income, for more information related to the Company's investment in The Greenbrier resort.

**Financial Information about Operating Segments**

See Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations for operating revenue, operating income and total assets by segment for each of the last three fiscal years.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**Company History**

A leader in freight rail transportation for more than 180 years, the Company's roots date back to the early nineteenth century when The Baltimore and Ohio Railroad Company ("B&O") – the nation's first common carrier – was chartered in 1827. Since that time, the Company has built on the foundation laid by early pioneers who had a vision to create a railroad that could safely and reliably service the ever-increasing demands of a growing nation.

Since its founding, numerous railroads have combined with the former B&O through merger and consolidation to create what has become CSX. Each of the railroads that combined into the CSX family brought unique and valuable geographical reach to new markets, gateways, cities, ports and transportation corridors.

CSX was incorporated in 1978 under Virginia law. In 1980, the Company completed the merger of the Chessie System ("Chessie") and Seaboard Coast Line Industries ("Seaboard") into CSX. The merger allowed the Company to connect northern population centers and Appalachian coal fields to growing southeastern markets. In 1986, the Chessie and Seaboard operating entities were transferred to the rail entity CSXT, which was created through the merger. Intermodal was originally formed in 1986 in order to provide nationwide, door-to-door intermodal service.

In 1997, CSXT and Norfolk Southern Railway jointly acquired the rights to operate Conrail, Inc. ("Conrail") and then in 2004, CSXT acquired an allocated portion of Conrail's assets, which CSXT operated. Conrail was formed in 1976 from several financially troubled northeast railroads to restructure and revive the region's railroads. The Company's acquisition of key portions of Conrail allows CSXT to link the northeast, including New England and the New York metropolitan area, with Chicago, midwest markets and the growing areas in the southeast that were already served by CSXT. This current rail network allows the Company to directly serve every major market in the eastern United States with dependable, environmentally friendly and fuel efficient freight transportation and intermodal service.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**Regulatory Environment**

The Company's operations are subject to a variety of federal, state and local laws and regulations, generally applicable to many businesses in the United States. The railroad operations conducted by the Company's subsidiaries, including CSXT, are subject in many respects to the regulatory jurisdiction of the Surface Transportation Board ("STB"), the Federal Railroad Administration ("FRA"), and its sister agency within the U.S. Department of Transportation ("DOT"), the Pipeline and Hazardous Materials Safety Administration ("PHMSA"). Together, FRA and PHMSA have broad jurisdiction over railroad operating standards and practices, including track, freight cars and locomotives, and hazardous materials requirements. Additionally, the Transportation Security Administration ("TSA"), a component of the Department of Homeland Security ("DHS"), has broad authority over railroad operating practices that may include homeland security implications. In some cases, state and local laws and regulations can be preempted in their application to railroads by the operation of these and other federal authorities.

Decisions of these and other agencies can affect the profitability of the Company's business. For further discussion on regulatory risks to the Company, see Item 1A. Risk Factors beginning on page 8.

Although the Staggers Act of 1980 significantly deregulated rail rates and much of the rail traffic of the Company's subsidiaries is currently exempt from rate regulation by agency decision, the STB has broad jurisdiction over railroad commercial practices, including some railroad rates. This includes jurisdiction over freight car charges, the transfer, extension or abandonment of rail lines, rates charged on certain regulated rail traffic and any acquisition of control over rail common carriers. In 2008, for example, the STB issued a decision modifying its policies governing certain contractual terms sometimes used in sales of rail lines. See Note 6, Commitments and Contingencies for further information.

In 2008, Congress enacted the Rail Safety Improvement Act. The legislation includes a mandate that all Class I freight railroads implement a positive train control system ("PTC") by December 31, 2015. PTC must be installed on all main lines with passenger and computer operations as well as those over which toxic-by-inhalation hazardous materials ("TIH") are transported. Implementation of a PTC system is designed to prevent train-to-train collisions, over-speed derailments, incursions into established work-zone limits, and a train from diverting off-course onto another set of tracks through a switch left in a wrong position. Significant capital costs are anticipated with the implementation of PTC as well as ongoing operating expenses.

Also in 2008, the TSA issued rules that apply to the transportation of certain kinds of highly hazardous materials. The new rules place significant new security and safety requirements on passenger and freight railroad carriers, rail transit systems, and facilities that ship hazardous materials by rail.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**Competition**

The business environment in which the Company operates is highly competitive. Shippers typically select transportation providers that offer the most compelling combination of service and price. Service requirements, both in terms of transit time and reliability, vary by shipper and commodity. As a result, the Company's primary competition varies by commodity, geographic location and mode of available transportation.

CSXT's primary rail competitor is Norfolk Southern Railway, which operates throughout much of CSX's territory. Other railroads also operate in parts of CSXT's territory. Depending on the specific market, competing railroads and deregulated motor carriers may exert pressure on price and service levels. For further discussion on the risk of competition to the Company, see Item 1A. Risk Factors beginning on page 8.

**Other Information**

CSX makes available on its website www.csx.com, free of charge, its annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and all amendments to those reports as soon as reasonably practicable after such reports are filed with or furnished to the Securities and Exchange Commission ("SEC"). Additionally, the Company has posted its code of ethics on its website, which is also available to any shareholder who requests it. This Form 10-K and other SEC filings made by CSX are also accessible through the SEC's website at www.sec.gov.

CSX has included the certifications of its Chief Executive Officer ("CEO") and the Chief Financial Officer ("CFO") regarding the Company's public disclosure required by Section 302 of the Sarbanes-Oxley Act of 2002 ("the Act") as Exhibit 31, as well as Section 906 of the Act as Exhibit 32 to this Form 10-K report. Additionally, on October 23, 2008, CSX filed its annual CEO certification with the New York Stock Exchange ("NYSE") confirming CSX's compliance with the NYSE Corporate Governance Listing Standards. The CEO was not aware of any violations of these standards by CSX as of January 30, 2009 (the latest practicable date that is closest to the filing of this Form 10-K). This certification is also included as Exhibit 99 to this Form 10-K.

The Company's annual average number of employees was approximately 34,000 in 2008, which includes approximately 29,000 union employees. Most of the Company's employees provide or support transportation services. The information set forth in Item 6. Selected Financial Data is incorporated herein by reference.

For additional information concerning business conducted by the Company during 2008, see Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations and Item 8. Financial Statements and Supplementary Data - Note 17 Business Segments.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**Item 1A. Risk Factors**

The following risk factors could have a materially adverse effect on the Company's financial condition, results of operations or liquidity, and could cause those results to differ materially from those expressed or implied in the Company's forward-looking statements. Although the risks described below are those that management believes are the most significant, these are not the only risks facing the Company. Additional risks and uncertainties not currently known to the Company or that the Company currently does not deem to be material also may materially impact the Company's financial condition, results of operations or liquidity.

***New legislation or regulatory changes could impact the Company's earnings or restrict its ability to independently negotiate prices.***

Political changes could result in legislative or regulatory changes that impose new burdens on the Company, increase operating costs, reduce operating efficiency or limit revenues. Legislation passed by Congress or new regulations issued by federal agencies can significantly affect the revenues, costs and profitability of the Company's business. The railroad industry is vulnerable to economic re-regulation by Congress, which could have a significant negative impact on the Company's ability to determine prices for rail services and would likely force a reduction in capital spending. For example, statutes imposing price or labor constraints or affecting rail-to-rail competition could adversely affect the Company's profitability. Also, additional regulations related to environmental matters such as greenhouse gas emissions could increase the Company's operating costs or reduce operating efficiencies or impact the business of CSX customers.

***Government regulation and compliance risks may affect the Company's operations and financial results.***

The Company is subject to the jurisdiction of various regulatory agencies, including the STB, the FRA and other state and federal regulatory agencies for a variety of economic, health, safety, labor, environmental, tax, legal and other matters. The FRA regulates several of the Company's core operations including track and mechanical equipment standards, signaling systems, inspection of grade crossing warning devices, locomotive engineer certifications and employee injury reporting, among other areas.

In addition, the DOT and DHS have crafted rules requiring new safety measures and security protocols. These regulations will increase operational costs and affect freight transportation routes. Legislation recently enacted by Congress will also increase compliance risks. The Rail Safety Improvement Act of 2008 imposes limits on employee work hours and may result in higher operating costs for the Company.

Noncompliance with applicable laws or regulations could erode public confidence in the Company and can subject the Company to fines, penalties and other legal or regulatory sanctions. In addition, a change in these regulations could increase operating costs and reduce operating efficiency.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

***General economic conditions could negatively impact demand for commodities and other freight.***

The current economic environment has impacted demand for rail and intermodal services. Further decline in general domestic and global economic conditions that affect demand for the commodities that the Company carries or that lead to bankruptcies or liquidations of one or more large customers of the Company could reduce the Company's revenues, increase its bad debt expense, reduce its ability to make capital expenditures or have other adverse effects. Because certain of the Company's customers are in the automotive, housing and other industries, continued weakness or further downturns in these sectors could adversely affect the Company's operating results.

***Weaknesses in the capital and credit markets could negatively impact the Company's access to capital.***

The Company is in a capital intensive industry that requires continuing infrastructure improvements and acquisition of capital assets. The Company from time to time accesses the credit markets for additional liquidity. Credit markets have recently experienced adverse conditions, increasing the costs associated with issuing debt. These conditions may further increase the Company's funding costs, limit the Company's ability to sell debt securities on acceptable terms and impede the Company's attempts to revise its current debt arrangements as contemplated.

***CSXT, as a common carrier by rail, is required by law to transport hazardous materials, which could expose the Company to significant costs and claims.***

Under federal regulations, CSXT is required to transport hazardous materials under its common carrier obligation. A train accident involving the transport of hazardous materials could result in significant claims arising from personal injury, property damage, and environmental penalties and remediation. Such claims could exceed existing insurance coverage or insurance may not continue to be available at commercially reasonable rates. CSXT is also required to comply with regulations regarding the handling of hazardous materials.

In November 2008, the TSA issued final rules placing significant new security and safety requirements on passenger and freight railroad carriers, rail transit systems, and facilities that ship hazardous materials by rail. Noncompliance with these rules can subject the Company to significant penalties and could be a factor in litigation arising out of a train accident. Finally, legislation preventing the transport of hazardous materials through certain cities could result in network congestion and increase the length of haul for hazardous substances, which could result in increased operating costs, reduced operating efficiency or increase the risk of an accident involving the transport of hazardous materials.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

***Future acts of terrorism, war or regulatory changes to combat the risk of terrorism may cause significant disruptions in the Company's operations.***

Terrorist attacks, along with any government response to those attacks, may adversely affect the Company's financial condition, results of operations or liquidity. CSXT's rail lines or other key infrastructure may be direct targets or indirect casualties of acts of terror or war. This risk could cause significant business interruption and result in increased costs and liabilities and decreased revenues. In addition, premiums charged for some or all of the insurance coverage currently maintained by the Company could increase dramatically or the coverage may no longer be available.

Furthermore, in response to the heightened risk of terrorism, federal, state and local governmental bodies are proposing and, in some cases, have adopted various legislation and regulations relating to security issues that impact the transportation industry. For example, the DHS adopted regulations that require freight railroads to implement additional security protocols when transporting hazardous materials. Complying with these regulations could continue to increase the Company's operating costs and reduce operating efficiencies.

***The Company is subject to environmental laws and regulations that may result in significant costs.***

The Company's operations are subject to wide-ranging federal, state and local environmental laws and regulations concerning, among other things, emissions into the air, discharges into water, the handling, storage, transportation and disposal of waste and other materials and clean-up of hazardous material or petroleum releases. In certain circumstances, environmental liability can extend to formerly owned or operated properties, leased properties, adjacent properties and properties owned by third parties or Company predecessors, as well as to properties currently owned and used by the Company.

The Company has been, and may be subject to, allegations or findings to the effect that it has violated, or is strictly liable under, environmental laws or regulations, and such violations can result in the Company's incurring fines, penalties or costs relating to the clean-up of environmental contamination. Although the Company believes it has appropriately recorded current and long-term liabilities for known future environmental costs, it could incur significant costs that exceed reserves or require unanticipated cash expenditures as a result of any of the foregoing and may be required to incur significant expenses to investigate and remediate known, unknown or future environmental contamination.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

***Severe weather or other natural occurrences could result in significant business interruptions and expenditures in excess of available insurance coverage.***

The Company's operations may be affected by external factors such as severe weather and other natural occurrences, including floods, fires, hurricanes and earthquakes. Insurance maintained by the Company to protect against loss of business and other related consequences resulting from these natural occurrences is subject to limitations on coverage, depending on the nature of the risk insured against. This insurance may not be sufficient to cover all of the Company's damages or damages to others and this insurance may not continue to be available at commercially reasonable rates. Even with insurance, if any natural occurrence leads to a catastrophic interruption of service, the Company may not be able to restore service without a significant interruption in operations.

***The Company may be subject to various claims and lawsuits that could result in significant expenditures.***

The Company is subject to various existing lawsuits, including putative class action litigation alleging violations of antitrust laws and potential unknown litigation. The Company may experience material judgments or incur significant costs to defend any such lawsuits. Additionally, existing litigation may suffer adverse developments not currently reflected in the Company's reserve estimates as the ultimate outcome of existing litigation is subject to numerous factors outside of the Company's control. While the Company uses its best efforts to evaluate existing litigation, the final judgments or settlement amounts may differ materially from the recorded reserves.

***Increases in the number and magnitude of property damage and personal injury claims could adversely affect the Company's operating results.***

The Company faces inherent business risk from exposure to property damage, occupational injury claims, and personal injury claims resulting from train accidents, worker injury claims under the Federal Employers' Liability Act ("FELA") and claims from outside parties resulting from the Company's operations. The Company could experience material property damage, personal injury or occupational claims in the future and it may incur significant costs to defend such claims.

Existing claims may suffer adverse developments not currently reflected in reserve estimates, as the ultimate outcome of existing claims is subject to numerous factors outside of the Company's control. Although the Company establishes reserves and maintains insurance to cover these types of claims, final amounts determined to be due on any outstanding matters may differ materially from the recorded reserves and exceed the Company's insurance coverage.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

***Failure to complete negotiations on collective bargaining agreements could result in strikes and/or work stoppages.***

Most of CSXT's employees are represented by labor unions and are covered by collective bargaining agreements. Generally speaking, these agreements are bargained nationally by the National Carriers Committee. In the rail industry, negotiations have generally taken place over a number of years and previously have not resulted in any extended work stoppages. Over the last 30 years, there were only six days of work stoppage related to labor disputes over national handling. If the Company is unable to negotiate acceptable agreements, it could result in strikes by the affected workers, loss of business and increased operating costs as a result of higher wages or benefits paid to union members. Under the Railway Labor Act's procedures (which include mediation, cooling-off periods and the possibility of Presidential intervention), neither party may take action until the procedures are exhausted.

***The Company faces competition from other transportation providers.***

The Company experiences competition in the form of pricing, service, reliability and other factors from other transportation providers including railroads and motor carriers that operate similar routes across its service area and, to a less significant extent, barges, ships and pipelines. Transportation providers such as motor carriers and barges utilize public rights-of-way that are built and maintained by governmental entities while CSXT and other railroads must build and maintain rail networks using largely internal resources. Any future improvements or expenditures materially increasing the quality or reducing the cost of alternative modes of transportation, or legislation providing for less stringent size or weight restrictions on trucks, could negatively impact the Company's competitive position.

***Network congestion could have a negative impact on service and operating efficiency.***

The Company may experience rail network difficulties related to network capacity, unplanned increases in demand for rail service, increased passenger activities in capacity-constrained areas or regulatory changes impacting when CSXT can transport freight or service routes that could have a negative effect on the Company's operational fluidity, leading to deterioration of service, asset utilization and overall efficiency.

***The Company relies on the stability and availability of its technology systems to operate its business.***

The Company relies on information technology in all aspects of its business. A significant disruption or failure of the Company's information technology systems, including computer hardware, software and communications equipment, could result in a service interruption, safety failure, security breach or other operational difficulties. While the Company has taken steps to mitigate these risks, the performance and reliability of its technology systems are critical to its ability to operate and compete effectively.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

***Disruption of the supply chain could negatively impact operating efficiency and increase costs.***

The capital intensive nature and sophistication of core rail equipment (including rolling stock equipment, locomotives, rail, and ties) limits the number of railroad equipment suppliers. If any of the current manufacturers stops production or experiences a supply shortage, the Company could experience a significant cost increase or material shortage. In addition, a few critical railroad suppliers are foreign. Adverse developments in international relations, new trade regulations, disruptions in international shipping, or increases in global demand could make procurement of these supplies more difficult or increase the Company's operating costs.

Additionally, if a fuel supply shortage were to arise, whether due to the Organization of the Petroleum Exporting Countries or other production restrictions, lower refinery outputs, a disruption of oil imports or otherwise, the Company would be negatively impacted.



Source: CSX CORP, 10-K, February 19, 2009
Powered by Morningstar® Document Research℠

**Item 1B. Unresolved Staff Comments**

None.

**Item 2. Properties by Segment**

**Rail Property**

CSXT's properties primarily consist of track and its related infrastructure, locomotives and freight cars. These categories and the geography of the network are described below.

***Track and Infrastructure***

Serving 23 states, the District of Columbia, and the Canadian provinces of Ontario and Quebec, the CSXT rail network serves, among other markets, New York, Philadelphia and Boston in the northeast and mid-Atlantic, the southeast markets of Atlanta, Miami and New Orleans, and the midwestern cities of St. Louis, Memphis and Chicago.

CSXT's track structure includes main thoroughfares connecting terminals and yards (known as mainline track), track within terminals and switching yards, track adjacent to the mainlines used for passing trains, track connecting the mainline track to customer locations and track that diverts trains from one track to another known as turnouts. Total track miles are greater than the Company's approximately 21,000 route miles, which reflect the size of CSXT's rail network that connects markets, customers and western railroads. At December 2008, the breakdown of track miles was as follows:

| | Track Miles |
|---|---|
| Mainline track | 26,753 |
| Terminals and switching yards | 9,602 |
| Passing sidings and turnouts | 969 |
| Total | 37,324 |

In addition to its physical track structure, CSXT operates numerous yards and terminals. These serve as the hubs between CSXT and its local customers and as sorting facilities where rail cars often are received, re-sorted and placed onto new outbound trains.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

The following 36 yards are identified as key to the CSXT system (listed in alphabetical order by state):

**Rail Yards or Terminals**

| | |
|---|---|
| Birmingham, AL | Detroit, MI |
| Mobile, AL | Hamlet, NC |
| Montgomery, AL | Rocky Mount, NC |
| Baldwin, FL | Buffalo, NY |
| Moncrief (Jacksonville), FL | Selkirk, NY |
| Tampa, FL | Syracuse, NY |
| Atlanta, GA | Cincinnati, OH |
| East Savannah, GA | Cleveland, OH |
| Waycross, GA | Columbus, OH |
| Avon (Indianapolis), IN | Stanley (Toledo), OH |
| Chicago, IL | Walbridge (Toledo), OH |
| Evansville, IN | Willard, OH |
| Louisville, KY | Greenwich (Philadelphia), PA |
| Russell, KY | Charleston, SC |
| New Orleans, LA | Florence, SC |
| Cumberland, MD | Erwin, TN |
| Curtis Bay (Baltimore), MD | Nashville, TN |
| Locust Point (Baltimore), MD | Richmond, VA |

For a list of Intermodal's terminals, see page 18.

***Network Geography***

CSXT's rail operations are primarily focused on four major transportation networks and corridors which are defined geographically and by commodity flows below.

Coal Network – The CSXT coal network connects the coal mining operations in nine eastern states with industrial areas in the northeast and mid-Atlantic, as well as many river, lake, and deep water port facilities. Coal is used to generate more than half of the electricity in the United States. CSXT's coal network is well positioned to supply utility markets in both the northeast and southeast.

Southeastern Corridor – This critical part of the network runs between CSXT's western gateways of Chicago, St. Louis and Memphis through the cities of Nashville, Birmingham, and Atlanta and markets in the southeast. The corridor provides direct rail service between the coal reserves of the southern Illinois basin and the increasing demand for coal in the southeast. The Southeastern Corridor is the premier rail route connecting these key cities, gateways, and markets and positions CSXT well to efficiently handle projected traffic volumes of intermodal, coal, automotive and general merchandise traffic.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

Interstate 90 (I-90) Corridor – This CSXT corridor links Chicago and metropolitan areas in New York and New England. This route, also known as the "waterlevel route", has minimal hills and grades and nearly all of it has two main tracks (referred to as double track). These superior engineering attributes permit the corridor to support consistent, high-speed intermodal, automotive and merchandise service. This corridor is a primary route for import traffic moving eastward across the country, through Chicago and into the population centers in the northeast. The I-90 Corridor is also a critical link between ports in New York, New Jersey, and Pennsylvania and consumption markets in the midwest.

Interstate 95 (I-95) Corridor – The CSXT I-95 Corridor connects Charleston, Jacksonville, Miami and many other cities throughout the southeast with the heavily populated northeastern cities of Baltimore, Philadelphia, and New York. CSXT primarily transports food and consumer products, as well as metals and chemicals along this line. It is the only rail corridor along the eastern seaboard south of Washington, D.C., and provides access to all the major eastern ports.

***Locomotives***

CSXT focuses on maximum use of its fleet and prudent investment in new units to drive the rail network. Better locomotive management can help CSXT move freight more efficiently, while continued investment in CSXT's power source can enable CSXT to operate more locomotives better.

CSXT operates more than 4,000 locomotives, of which over 95% are owned by CSXT. Freight locomotives are the power source used primarily to pull rail cars. Switching locomotives are used in yards to sort railcars so that the right railcar gets attached to the right train in order to get it to its final destination. Auxiliary units are typically used to provide extra traction for heavy trains in hilly terrain. At December 2008, CSXT's fleet of owned and long-term leased locomotives consisted of the following types of locomotives:

| | Locomotives | % |
|---|---|---|
| Freight | 3,600 | 87% |
| Switching | 322 | 8% |
| Auxiliary Units | 221 | 5% |
| Total | 4,143 | 100% |



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

The table below indicates the number and year built for locomotives owned or on long-term lease at December 2008.

| Year Built | Locomotives | % |
|---|---|---|
| 1989 and before | 2,021 | 50% |
| 1990 - 1994 | 541 | 13% |
| 1995 - 1999 | 601 | 15% |
| 2000 - 2004 | 380 | 9% |
| 2005 | 100 | 2% |
| 2006 | 100 | 2% |
| 2007 | 184 | 4% |
| 2008 | 216 | 5% |
| Total | 4,143 | 100% |

***Freight Car Fleet***

The average daily fleet of cars-on-line consists of approximately 224,000 cars, but at any point in time, over half of the railcars on the CSXT system are not owned or leased by CSXT. Examples of these are: railcars owned by other railroads (which are utilized by CSXT), shipper-furnished or private cars (which are generally used only in that shipper's service) and multi-level railcars.

CSXT's freight car fleet consists of six main types of cars:

Gondolas – Support CSXT's metals markets and provide transport for woodchips and other bulk commodities. Some gondolas are equipped with special hoods for protecting products like coil and sheet steel.

Open-top hoppers – Transport heavy dry bulk commodities such as coal, coke, stone, sand, ores and gravel that are resistant to weather conditions.

Box cars – Include a variety of tonnages, sizes, door configurations and heights to accommodate a wide range of finished products, including paper, auto parts, appliances and building materials. Insulated box cars deliver food products, canned goods, beer and wine.

Covered hoppers – Have a permanent roof and are segregated based upon commodity density. Lighter bulk commodities such as grain, fertilizer, flour, salt, sugar, clay and lime are shipped in large cars called jumbo covered hoppers. Heavier commodities like cement, ground limestone and glass sand are shipped in small cube covered hoppers.

Multi-level flat cars – Transport finished automobiles and are differentiated by the number of levels: bi-levels for large vehicles such as pickup trucks and SUVs and tri-levels for sedans and smaller automobiles.

Flat cars – Used for shipping intermodal containers and trailers or bulk and finished goods, such as lumber, pipe, plywood, drywall and pulpwood.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

Other cars owned or leased on the network include, but are not limited to, center beam cars for transporting lumber and building products.

CSXT owns more than 60% of its freight cars. At December 2008, CSXT's owned and long-term leased freight car fleet consisted of the following:

| | Freight Cars | % |
|---|---|---|
| Gondolas | 26,377 | 29% |
| Open-top hoppers | 18,760 | 21% |
| Box cars | 13,198 | 14% |
| Covered hoppers | 12,915 | 14% |
| Multi-level flat cars | 11,772 | 13% |
| Flat cars | 7,195 | 8% |
| Other cars | 1,133 | 1% |
| Total | 91,350 | 100% |

**Intermodal Property**

***Infrastructure***

Intermodal serves 56 terminals in 22 states. These terminals serve as a transfer point between rail and trucks. If the city or state has more than one terminal, it is indicated by the number next to it (listed in alphabetical order by state).

| Intermodal Terminals | |
|---|---|
| Mobile, AL | Kansas City, MO |
| Lathrop, CA | Charlotte, NC |
| Los Angeles/Long Beach, CA (3) | Buffalo, NY |
| Oakland, CA | Syracuse, NY |
| Jacksonville, FL (2) | New York/New Jersey (6) |
| Miami, FL | Cincinnati, OH |
| Orlando, FL | Cleveland, OH |
| Tampa, FL | Columbus, OH (2) |
| Atlanta, GA (2) | Marion, OH |
| Savannah, GA (2) | Portland, OR |
| Chicago, IL (3) | Chambersburg, PA |
| East St. Louis, IL (2) | Philadelphia, PA |
| Indianapolis, IN | Charleston, SC |
| Evansville, IN | Memphis, TN (2) |
| New Orleans, LA | Nashville, TN |
| Boston, MA | Houston, TX |
| Springfield, MA | Dallas, TX |
| Worcester, MA (3) | Portsmouth, VA |
| Baltimore, MD | Seattle, WA |
| Detroit, MI | |



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

***Equipment***

Intermodal equipment consists primarily of containers, chassis and other equipment (such as lift equipment). Containers are weather-proof boxes used for bulk shipment of freight, and chassis are the wheeled support framework for a container that allows it to be attached to a tractor. All of Intermodal's chassis are leased. Intermodal also has other types of equipment such as doublestack railcars, which are railcars that allow for two containers to be mounted one above the other.

At December 2008, Intermodal owned or long-term leased equipment consisted of the following:

| | Equipment | % |
|---|---|---|
| Containers | 14,577 | 52% |
| Chassis | 13,060 | 47% |
| Other | 426 | 2% |
| **Total** | 28,063 | 100% |

**Item 3. Legal Proceedings**

The Company is subject to various legal proceedings and claims that arise in the ordinary course of business. For more information on legal proceedings, see Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations under the caption "Critical Accounting Estimates – Casualty, Environmental and Legal Reserves" and Item 8. Financial Statements and Supplementary Data - Note 6 Commitments and Contingencies under the caption "Other Legal Proceedings."



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**Item 4. Submission of Matters to a Vote of Security Holders**

There were no matters submitted to a vote of security holders in the fourth quarter of 2008.

**Executive Officers of the Registrant**

Executive officers of the Company are elected by the CSX Board of Directors and generally hold office until the next annual election of officers. There are no family relationships or any arrangement or understanding between any officer and any other person pursuant to which such officer was elected. As of the date of this filing, the executive officers are:

| Name and Age | Business Experience During Past 5 Years |
|---|---|
| Michael J. Ward, 58<br>*Chairman, President and Chief Executive Officer* | A 31-year veteran of the Company, Ward has served as Chairman, President and Chief Executive Officer of CSX since January 2003. In 2000, he was named President of CSXT, and he was later appointed President of CSX and elected to the Board of Directors in 2002.<br><br>His distinguished railroad career has included key executive positions in nearly all aspects of the Company's business, including sales and marketing, operations and finance. |
| Oscar Munoz, 49<br>*Executive Vice President and Chief Financial Officer* | Munoz has served as Executive Vice President and Chief Financial Officer of CSX and CSXT since May 2003 and is responsible for management and oversight of all financial, strategic planning, information technology, purchasing and real estate activities of CSX.<br><br>He brings to the Company years of experience from a variety of industries. Before joining CSX in 2003, Munoz served as Chief Financial Officer and Vice President of AT&T Consumer Services. He has also held key executive positions within the telecommunication and beverage industries, including the Coca-Cola Company and Pepsico Corporation. |



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

| Name and Age | Business Experience During Past 5 Years |
| --- | --- |
| Tony L. Ingram, 62<br>*Executive Vice President and Chief Operating Officer* | Ingram has served as Executive Vice President and Chief Operating Officer of CSXT since March 2004 and manages all aspects of the Company's operations across its 21,000 mile network, including transportation, service design, customer service, engineering and mechanical.<br><br>Prior to joining CSXT in 2004, Ingram spent more than 30 years at Norfolk Southern where he served as Senior Vice President – Transportation, Network and Mechanical from February 2003 to March 2004 and Vice President, Transportation – Operations from March 2000 to February 2003. |
| Clarence W. Gooden, 57<br>*Executive Vice President of Sales and Marketing and Chief Commercial Officer* | Gooden has been the Executive Vice President and Chief Commercial Officer of CSX and CSXT since April 2004 and is responsible for generating customer revenue, forecasting business trends and developing CSX's model for future revenue growth.<br><br>A member of the Company for more than 35 years, Gooden has held key executive positions in both operations and sales and marketing, including being appointed President of CSX Intermodal in 2001 and Senior Vice President of the Merchandise Service Group in 2002. |
| Ellen M. Fitzsimmons, 48<br>*Senior Vice President of Law and Public Affairs, General Counsel and Corporate Secretary* | Fitzsimmons has been the Senior Vice President of Law and Public Affairs, General Counsel, and Corporate Secretary since December 2003. She serves as the Company's chief legal officer and oversees all government relations and public affairs activities.<br><br>During her 17-year tenure with the Company, her broad responsibilities have included key roles in major risk and corporate governance-related areas. |



Source: CSX CORP, 10-K, February 19, 2009
Powered by Morningstar® Document Research℠

Table of Contents


| Name and Age | Business Experience During Past 5 Years |
|---|---|
| Lisa A. Mancini, 49<br>*Senior Vice President of Human Resources and Labor Relations* | Mancini assumed the role of Senior Vice President of Human Resources and Labor Relations in January 2009 and is responsible for employee compensation and benefits, labor relations, organizational development and transformation, recruitment, training and various administrative activities. She previously served as Vice President-Strategic Infrastructure Initiatives from 2007 to 2009 and, prior to that, Vice President – Labor Relations.<br><br>Prior to joining CSX in 2003, Mancini served as Chief Operating Officer of the San Francisco Municipal Railway and held executive positions at the San Francisco Municipal Transportation Authority and Southeastern Pennsylvania Transportation Authority. |
| Carolyn T. Sizemore, 45<br>*Vice President and Controller* | Sizemore has served as Vice President and Controller of CSX and CSXT since April 2002 and is responsible for financial and regulatory reporting, paying the Company's 34,000 employees, accounts payable and billing and collections for outside party expenditures along with various other accounting processes.<br><br>Her responsibilities during her 19-year tenure with the Company have included roles in finance and audit-related areas including a variety of positions in accounting, finance strategies, budgets and performance analysis. |



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**CSX CORPORATION**
**PART II**

### Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities

**Market Information**

CSX's common stock is listed on the NYSE, which is its principal trading market, and is traded over-the-counter and on exchanges nationwide. The official trading symbol is "CSX."

**Description of Common and Preferred Stock**

A total of 600 million shares of common stock are authorized, of which 390,526,847 shares were outstanding as of December 2008. Each share is entitled to one vote in all matters requiring a vote of shareholders. There are no pre-emptive rights. At January 30, 2009, the latest practicable date, there were 40,626 common stock shareholders of record. The weighted average of common shares outstanding, which was used in the calculation of diluted earnings per share, was approximately 409 million as of December 26, 2008. (See Note 2, Earnings Per Share.)

A total of 25 million shares of preferred stock is authorized, none of which is currently outstanding.

The following table sets forth, for the quarters indicated, the dividends declared and the high and low share prices of CSX common stock as required by SEC Regulation S-K.

| | Quarter | | | | |
|---|---|---|---|---|---|
| | **1st** | **2nd** | **3rd** | **4th** | **Year** |
| **2008** | | | | | |
| Dividends | $0.15 | $0.18 | $0.22 | $0.22 | $0.77 |
| Common Stock Price | | | | | |
| High | $58.10 | $70.70 | $69.50 | $56.35 | $70.70 |
| Low | $39.87 | $55.04 | $50.50 | $30.61 | $30.61 |
| | | | | | |
| **2007** | | | | | |
| Dividends | $0.12 | $0.12 | $0.15 | $0.15 | $0.54 |
| Common Stock Price | | | | | |
| High | $42.53 | $47.38 | $51.88 | $46.49 | $51.88 |
| Low | $33.50 | $39.36 | $38.09 | $40.17 | $33.50 |



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**Stock Performance Graph**

The cumulative shareholder returns, assuming reinvestment of dividends, on $100 invested at December 31, 2003 is illustrated on the graph below. The Company references the Standard & Poor 500 Stock Index ("S&P 500") and the Dow Jones U.S. Transportation Average Index, which provide comparisons to a broad-based market index and other companies in the transportation industry. As shown in the graph, CSX's five-year stock returns significantly outpaced those of the S&P 500.ock




| | Dec 2003 | Dec 2004 | Dec 2005 | Dec 2006 | Dec 2007 | Dec 2008 |
|---|---|---|---|---|---|---|
| CSX CORPORATION | 100.00 | 112.91 | 144.42 | 197.92 | 256.14 | 191.93 |
| S & P 500* | 100.00 | 110.88 | 116.33 | 134.70 | 142.09 | 89.53 |
| DJ US TRANSPORTATION AVG | 100.00 | 127.73 | 142.61 | 156.60 | 158.83 | 124.83 |

** The S&P 500 is a registered trademark of the McGraw-Hill Companies, Inc.*

**CSX Purchases of Equity Securities**

CSX is required to disclose any purchases of its own common stock for the most recent quarter. CSX purchases its own shares for two primary reasons: to further its goals under its share repurchase program and to fund the Company's contribution required to be paid in CSX common stock under a 401(k) plan which covers certain union employees.

In March 2008, CSX announced an increase to its share repurchase program, prospectively targeting $3 billion in shares. Since that announcement, CSX has completed its internal target of $1.25 billion in share repurchases during 2008. As a result, the company has remaining authority of $1.75 billion. Further repurchases will be dependent upon an improvement in the capital market and business conditions.

Share repurchase activity for fourth quarter 2008 was as follows:

| | CSX Purchases of Equity Securities for the Quarter | | | |
|---|---|---|---|---|
| **Fourth Quarter** | **Total Number of Shares Purchased** | **Average Price Paid per Share** | **Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs** | **Approximate Dollar Value of Shares that May Yet Be Purchased Under the Plans or Programs** |
| Beginning Fourth Quarter Balance | | | | $2,013,000,965 |
| October | | | | |
| (September 27, 2008 - October 24, 2008) | 4,776,500 | $55.05 | 4,776,500 | $1,750,065,626 |
| November - December | | | | |
| (October 25, 2008 - December 26, 2008) | - | $ - | - | $1,750,065,626 |
| Total/Ending Balance | 4,776,500 | $55.05 | 4,776,500 | $1,750,065,626 |



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**Item 6. Selected Financial Data**

Selected financial data and significant events related to the Company's financial results for the last five fiscal years are listed below.

| | Fiscal Years | | | | |
|---|---|---|---|---|---|
| *(Dollars in Millions, Except Per Share Amounts)* | **2008** | 2007 | 2006 | 2005 | 2004 |
| **Earnings From Continuing Operations** | | | | | |
| Operating Revenue | **$11,255** | $10,030 | $9,566 | $8,618 | $8,040 |
| Operating Expense | **8,487** | 7,770 | 7,417 | 7,062 | 7,043 |
| Operating Income | **$2,768** | $2,260 | $2,149 | $1,556 | $997 |
| Earnings from Continuing Operations | **$1,365** | $1,226 | $1,310 | $720 | $418 |
| Earnings Per Share: | | | | | |
| From Continuing Operations | **$3.41** | $2.85 | $2.98 | $1.67 | $0.97 |
| From Continuing Operations, Assuming Dilution | **3.34** | 2.74 | 2.82 | 1.59 | 0.94 |
| **Financial Position** | | | | | |
| Cash, Cash Equivalents and Short-term Investments | **$745** | $714 | $900 | $602 | $859 |
| Total Assets | **26,288** | 25,534 | 25,129 | 24,232 | 24,605 |
| Long-term Debt | **7,512** | 6,470 | 5,362 | 5,093 | 6,248 |
| Shareholders' Equity | **8,048** | 8,685 | 8,942 | 7,954 | 6,811 |
| **Other Data Per Common Share** | | | | | |
| Dividend Per Share | **$0.77** | $0.54 | $0.33 | $0.215 | $0.20 |
| **Employees -- Annual Averages** | | | | | |
| Rail | **31,664** | 32,477 | 32,987 | 32,033 | 32,074 |
| Other | **2,699** | 2,966 | 3,018 | 3,076 | 3,833 |
| Total | **34,363** | 35,443 | 36,005 | 35,109 | 35,907 |

Significant Events

2008 -- Recognized an impairment loss of $166 million pre-tax, or $107 million after-tax, on investment in The Greenbrier resort.

-- Recognized a tax benefit of $18 million principally related to the settlement of federal income tax audits and certain other tax matters.

-- Recorded a non-cash adjustment to income of $30 million pre-tax, or $19 million after-tax, to correct equity earnings from a non-consolidated subsidiary.

2007 -- Recognized gains of $27 million pre-tax, or $17 million after-tax, on insurance recoveries from claims related to Hurricane Katrina. (See Note 13, Hurricane Katrina.)

2006 -- Two-for-one split of the Company's common stock effective 2006. All periods have been retroactively restated to reflect the stock split.

-- Recognized gains of $168 million pre-tax, or $104 million after-tax, on insurance recoveries from claims related to Hurricane Katrina. (See Note 13, Hurricane Katrina.)



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

Significant events, continued:

| | | |
|---|---|---|
| | -- | Recognized an income tax benefit of $151 million primarily related to the resolution of certain tax matters, including resolution of ordinary course federal income tax audits for 1994 – 1998. |
| | -- | Recognized a $26 million after-tax non-cash gain on additional Conrail property received. |
| 2005 | -- | Recognized a charge of $192 million pre-tax, or $123 million after-tax, to repurchase $1.0 billion of outstanding debt, for costs of the increase in current market value above original issue value. (See Note 8, Debt and Credit Agreements.) |
| | -- | Recognized an income tax benefit of $71 million for the Ohio legislative change to gradually eliminate its corporate franchise tax. |
| 2004 | -- | Recognized a charge of $71 million pre-tax, or $44 million after-tax, for separation expenses related to management restructuring. |
| | -- | Recognized a $16 million after-tax non-cash gain on the Conrail spin-off transaction. |



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

## Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations

### STRATEGIC OVERVIEW

The Company provides customers with access to an expansive and interconnected transportation network that links ports, production facilities and distribution centers to markets in the Northeast, Midwest and southern states. The Company serves major markets in the eastern United States and has direct access to all Atlantic and Gulf Coast ports, as well as the Mississippi River, the Great Lakes and the St. Lawrence Seaway. The Company also has access to Pacific ports through alliances with western railroads. Overall, the CSXT transportation network encompasses approximately 21,000 route miles of track in 23 states, the District of Columbia and the Canadian provinces of Ontario and Quebec.

The Company transports a broad portfolio of products, ranging from coal to new energy sources such as ethanol, to automobiles, chemicals and consumer electronics. Those goods are transported across the country in a way that minimizes the impact on the environment, takes traffic off an already congested highway system and minimizes fuel consumption and transportation costs.

The Company's transportation network serves some of the largest population centers in the nation. More than two-thirds of Americans live within the Company's service territory, accounting for about three-quarters of the nation's consumption. With a mix of pricing, productivity gains, and prudent investment in train network and rail efficiency, the Company will position itself to take full advantage of an eventual economic recovery.

Over the past five years, the Company has made substantial strides in improving operating performance. In 2004, CSXT implemented the ONE Plan, which is being updated to drive greater network efficiencies. The Company also continues to advance its Total Service Integration ("TSI") initiative, which aims to better align the Company's capabilities with customer demands. TSI aims to optimize train size and increase asset utilization while delivering more reliable service to customers. Increases in train size reduce the overall number of shipments resulting in less network congestion and idle time for locomotives and reduce loading and unloading time for customers. These efforts combined with other efficiencies have resulted in substantial improvements in the Company's operating income, operating ratio/margin and free cash flow.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

In 2008, the Company launched the National Gateway, a multi-million dollar public-private infrastructure initiative to create a more efficient freight transportation link between the Mid-Atlantic ports and the Midwest. When completed, the National Gateway will provide greater capacity for product shipments in and out of the Midwest, reduce truck traffic on already crowded highways and create new jobs.

The global recession that intensified in late 2008 will continue to impact CSX's business in 2009, and rail volume will be lower for the year. Beginning in late December, the Company began taking aggressive actions to manage costs and right-size resources to match demand conditions. The Company has made adjustments to the ONE Plan to reduce the size of its scheduled train network in order to conserve resources. As a result, the Company has begun furloughing employees (which is a temporary layoff) who will return to work when business conditions improve. Additionally, the Company has reduced the number of active locomotives on its network and has placed older locomotives in storage to reduce maintenance costs. The Company will continue to modify the ONE Plan and adjust resources accordingly in order to seek to maximize efficiencies in the current business environment.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**2008 HIGHLIGHTS**

- Revenue grew $1.2 billion or 12% to $11.3 billion.
- Expenses increased $717 million or 9% to $8.5 billion.
- Operating income increased $508 million or 22% to $2.8 billion.
- Service and safety measurements remained strong.

Despite a challenging economy in the later part of 2008, CSX delivered solid financial results. Revenue and revenue per unit increased 12% and 17%, respectively, from a year ago reflecting yield management initiatives and higher fuel recovery due to higher fuel prices during most of the year. Under CSXT's fuel surcharge program, CSXT bills the customer on a two month lag for fuel. This lag creates higher fuel recovery in a period when fuel prices are declining. Conversely, this lag creates lower fuel recovery in a period when fuel prices are increasing.

These positive results in revenue were achieved despite volume declines in three of the Company's four lines of business. The overall 4% volume decrease versus last year was primarily driven by continued weakness in the merchandise market relating to housing construction and associated markets as well as declines in automotive production.

For additional information, refer to Rail and Intermodal Results of Operations discussed on pages 38 through 40.

Throughout 2008, the Company continued its focus on safety and operating performance. Leadership and high levels of employee commitment to the Company's safety programs delivered solid improvement in both FRA personal injury and train accident frequencies. Personal injury frequency improved to a record 1.14, a 7% improvement compared to 2007. FRA train accident frequency fell to 2.68, an 11% improvement versus the prior year.

The Company's safety and train accident prevention programs rely on broad employee involvement. The programs utilize operating rules training, compliance measurement, root cause analysis, communication, structured competition and leadership to create a safer environment for employees and the public. Continued capital investment in Company assets, including track, bridges, signals, and detection technology, also supports improved safety performance.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

Key service metrics remained at historically high levels in 2008. On-time train originations and arrivals, 79% and 70% respectively, were identical over both years. Average dwell rose slightly to 23.3 hours, primarily due to lower demand levels and resulting surpluses in certain equipment types. Average train velocity declined 1%, although the network remained fluid. Cars-on-line rose slightly with cars counts increasing 1%. The Company aims to improve key operating measures to achieve increased efficiency and higher levels of service reliability.

| **RAIL OPERATING STATISTICS (Estimated)** | | **Fiscal Years** | | **Improvement/** |
|---|---|---|---|---|
| | | **2008** | 2007 | ***(Decline)*** % |
| **Service Measurements** | FRA Personal Injuries Frequency Index | **1.14** | 1.23 | *7%* |
| | FRA Train Accident Rate | **2.68** | 3.01 | *11* |
| | On-Time Train Originations | **79%** | 79% | - |
| | On-Time Destination Arrivals | **70%** | 70% | - |
| | Dwell | **23.3** | 23.2 | - |
| | Cars-On-Line | **223,574** | 221,943 | *(1)* |
| | System Train Velocity | **20.5** | 20.8 | *(1)* |
| | | | | ***Increase/ (Decrease)*** |
| **Resources** | Route Miles | **21,205** | 21,227 | -% |
| | Locomotives (owned and long-term leased) | **4,143** | 4,007 | *3* |
| | Freight Cars (owned and long-term leased) | **91,350** | 94,364 | *(3)%* |

*Key Performance Measures Definitions*

FRA Personal Injuries Frequency Index – Number of FRA-reportable injuries per 200,000 man-hours.

FRA Train Accident Rate – Number of FRA-reportable train accidents per million train-miles.

On-Time Train Originations – Percent of scheduled road trains that depart the origin yard on-time or ahead of schedule.

On-Time Destination Arrivals – Percent of scheduled road trains that arrive at the destination yard on-time to two hours late (30 minutes for intermodal trains).

Dwell – Amount of time in hours between car arrival at and departure from the yard. It does not include cars moving through the yard on the same train.

Cars-On-Line – A count of all cars on the network (does not include locomotives, cabooses, trailers, containers or maintenance equipment).

System Train Velocity – Average train speed between terminals in miles per hour (does not include locals, yard jobs, work trains or passenger trains).



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

Table of Contents


In addition to producing sound financial, safety and service results, CSX continued to focus on investing in its business and creating long-term value for shareholders during 2008. The company has taken a balanced approach in deploying its capital through strategic investment, share repurchases and increased dividends for the benefit of shareholders.

Capital expenditures of $1.7 billion in 2008 were slightly lower than prior year. The Company remains committed to maintaining and improving its existing infrastructure and to positioning itself for long-term growth through expanding network and terminal capacity. As described below, free cash flow before dividends increased $845 million to $1.2 billion. This increase was primarily driven by increased cash from operations which were a result of higher earnings.

CSX also steadily increased the quarterly dividend in 2008. First, CSX increased its quarterly dividend from $0.15 to $0.18 during the second quarter of 2008. It then increased the dividend again during the third quarter of 2008 to $0.22, which represented a 47% increase from the quarterly dividend level at fourth quarter 2007. Additionally, CSX completed $1.25 billion of its $3 billion share repurchase program announced during 2008. See Note 1, Nature of Operations and Significant Accounting Policies.

**Non-GAAP Reconciliation**

Free cash flow is considered a non-GAAP financial measure under SEC Regulation G, *Disclosure of Non-GAAP Measures.* Management believes, however, that free cash flow is important in evaluating the Company's financial performance and measures an ability to generate cash without incurring additional external financing. Free cash flow should be considered in addition to, rather than a substitute for, cash provided by operating activities.

Free cash flow is calculated by using net cash from operations and adjusting for property additions and certain other investing activities. Also, added to free cash flow is the Company's 42% economic interest in Conrail's free cash flow which is not consolidated in CSX amounts.

The following table reconciles cash provided by operating activities (GAAP measure) to free cash flow (non-GAAP measure).

| | **Fiscal Years** | | |
|---|---|---|---|
| | **2008** | 2007 | *Change* |
| *(Dollars in Millions)* | | | |
| Net cash provided by operating activities | **$2,914** | $2,184 | *$730* |
| Property additions | **(1,740)** | (1,773) | *33* |
| Other investing activities | **36** | (41) | *77* |
| Conrail free cash flow | **11** | 6 | *5* |
| Free Cash Flow (before payment of dividends) | **$1,221** | $376 | *$845* |



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

## FORWARD-LOOKING STATEMENTS

Certain statements in this report and in other materials filed with the SEC, as well as information included in oral statements or other written statements made by the Company, are forward-looking statements within the meaning of the Securities Act of 1933 and the Securities Exchange Act of 1934. These forward-looking statements include, among others, statements regarding:

- expectations as to results of operations and operational initiatives;
- expectations as to the effect of claims, lawsuits, environmental costs, commitments, contingent liabilities, labor negotiations or agreements on the Company's financial condition, result of operations or liquidity;
- management's plans, goals, strategies and objectives for future operations and other similar expressions concerning matters that are not historical facts, and management's expectations as to future performance and operations and the time by which objectives will be achieved; and
- future economic, industry or market conditions or performance and their effect on the Company's financial condition, results of operations or liquidity.

Forward-looking statements are typically identified by words or phrases such as "believe," "expect," "anticipate," "project," "estimate," "preliminary" and similar expressions. The Company cautions against placing undue reliance on forward-looking statements, which reflect its good faith beliefs with respect to future events and are based on information currently available to it as of the date the forward-looking statement is made. Forward-looking statements should not be read as a guarantee of future performance or results and will not necessarily be accurate indications of the timing when, or by which, such performance or results will be achieved.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

Forward-looking statements are subject to a number of risks and uncertainties and actual performance or results could differ materially from those anticipated by these forward-looking statements. The Company undertakes no obligation to update or revise any forward-looking statement. If the Company does update any forward-looking statement, no inference should be drawn that the Company will make additional updates with respect to that statement or any other forward-looking statements. The following important factors, in addition to those discussed in Item 1A (Risk Factors) and elsewhere in this report, may cause actual results to differ materially from those contemplated by these forward-looking statements:

- legislative, regulatory or legal developments involving transportation, including rail or intermodal transportation, the environment, hazardous materials, taxation, including the outcome of tax claims and litigation, the potential enactment of initiatives to re-regulate the rail industry and the ultimate outcome of shipper and rate claims subject to adjudication;
- the outcome of litigation and claims, including, but not limited to, those related to fuel surcharge, environmental contamination, personal injuries and occupational illnesses;
- material changes in domestic or international economic or business conditions, including those affecting the transportation industry such as access to capital markets, ability to revise debt arrangements as contemplated, customer demand, customer acceptance of price increases, effects of adverse economic conditions affecting shippers and adverse economic conditions in the industries and geographic areas that consume and produce freight;
- worsening conditions in the financial markets that may affect timely access to capital markets, as well as the cost of capital;
- availability of insurance coverage at commercially reasonable rates or insufficient insurance coverage to cover claims or damages;
- changes in fuel prices, surcharges for fuel and the availability of fuel;
- the impact of increased passenger activities in capacity-constrained areas or regulatory changes affecting when CSXT can transport freight or service routes;
- natural events such as severe weather conditions, including floods, fire, hurricanes and earthquakes, a pandemic crisis affecting the health of the Company's employees, its shippers or the consumers of goods, or other unforeseen disruptions of the Company's operations, systems, property or equipment;



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

- noncompliance with applicable laws or regulations;
- the inherent risks associated with safety and security, including the availability and cost of insurance, the availability and vulnerability of information technology, adverse economic or operational effects from actual or threatened war or terrorist activities and any governmental response;
- labor costs and labor difficulties, including stoppages affecting either the Company's operations or the customers' ability to deliver goods to the Company for shipment;
- competition from other modes of freight transportation, such as trucking and competition and consolidation within the transportation industry generally;
- the Company's success in implementing its strategic plans and operational objectives and improving operating efficiency; and
- changes in operating conditions and costs or commodity concentrations.

Other important assumptions and factors that could cause actual results to differ materially from those in the forward-looking statements are specified elsewhere in this report and in CSX's other SEC reports, accessible on the SEC's website at www.sec.gov and the Company's website at www.csx.com.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**CSX CORPORATION**
**PART II**

## FINANCIAL RESULTS OF OPERATIONS

***2008 vs. 2007 Results of Operations***

*(Dollars in Millions)*
*Fiscal Year*

| | Rail (b) | | Intermodal | | CSX Consolidated (a) | | | |
|---|---|---|---|---|---|---|---|---|
| | **2008** | 2007 | **2008** | 2007 | **2008** | 2007 | *$ Change* | *% Change* |
| **Revenue** | **$9,789** | $8,674 | **$1,466** | $1,356 | **$11,255** | $10,030 | *$1,225* | *12%* |
| **Operating Expense:** | | | | | | | | |
| Labor and Fringe | **2,879** | 2,905 | **76** | 81 | **2,955** | 2,986 | *31* | *(1)* |
| Materials, Supplies and Other (a) | **1,933** | 1,747 | **200** | 178 | **2,133** | 1,925 | *(208)* | *11* |
| Fuel (a) | **1,810** | 1,307 | **7** | 5 | **1,817** | 1,312 | *(505)* | *38* |
| Depreciation | **879** | 849 | **25** | 34 | **904** | 883 | *(21)* | *2* |
| Equipment and Other Rents | **317** | 341 | **108** | 110 | **425** | 451 | *26* | *(6)* |
| Inland Transportation | **(507)** | (448) | **760** | 688 | **253** | 240 | *(13)* | *5* |
| Gain on Insurance Recoveries | **-** | (27) | **-** | - | **-** | (27) | *(27)* | *(100)* |
| **Total Expense** | **7,311** | 6,674 | **1,176** | 1,096 | **8,487** | 7,770 | *(717)* | *9* |
| **Operating Income** | **$2,478** | $2,000 | **$290** | $260 | **$2,768** | $2,260 | *$508* | *22* |
| | | | | | | | | |
| Other Income (Expense) - Net | | | | | **(103)** | 89 | *(192)* | *(216)* |
| Interest Expense | | | | | **(519)** | (417) | *(102)* | *24* |
| Income Tax Expense | | | | | **(781)** | (706) | *(75)* | *11* |
| **Earnings from Continuing Operations** | | | | | **1,365** | 1,226 | *139* | *11* |
| Discontinued Operations | | | | | **-** | 110 | *(110)* | *(100)* |
| **Net Earnings** | | | | | **$1,365** | $1,336 | *$29* | *2* |
| | | | | | | | | |
| **Earnings Per Diluted Share** | | | | | | | | |
| From Continuing Operations | | | | | **3.34** | 2.74 | *0.60* | *22* |
| Discontinued Operations | | | | | **-** | 0.25 | *(0.25)* | *(100)* |
| **Net Earnings** | | | | | **3.34** | 2.99 | *0.35* | *12%* |
| | | | | | | | | |
| **Operating Ratio** | **74.7%** | 76.9% | **80.2%** | 80.8% | **75.4%** | 77.5% | | |
| **Total Assets** | **$25,343** | $24,502 | **$321** | $283 | | | | |

*(a) Beginning in 2008, certain items have been reclassified within the income statement. Certain prior-year data have been reclassified to conform to the 2008 presentation.*

- *The Company reclassified all items within other operating income and certain items within other income into the Rail segment. As a result of this change, CSX consolidated operating income and Surface Transportation operating income are now the same; therefore, the Company will no longer report separate Surface Transportation results. The Rail segment was not materially impacted by these reclassifications.*

- *The Company reclassified all non-locomotive fuel related costs previously included in materials, supplies and other into fuel on the Company's consolidated income statement so that it now includes all fuel used for operations and maintenance. For 2008 and 2007, these amounts were $150 million and $102 million, respectively.*

*(b) In addition to CSXT, the Rail segment includes non-railroad subsidiaries such as TDSI, Transflo, CSX Technology and other subsidiaries.*



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

Table of Contents

**VOLUME AND REVENUE** *(Unaudited)*

*Volume (Thousands of Units); Revenue (Dollars in Millions); Revenue Per Unit (Dollars)*

Table of Contents

Fiscal Years

| | Volume | | | Revenue | | | Revenue Per Unit | | |
|---|---|---|---|---|---|---|---|---|---|
| | **2008** | 2007 | *% Change* | **2008** | 2007 | *% Change* | **2008** | 2007 | *% Change* |
| Chemicals | **488** | 522 | *(7) %* | **$1,437** | $1,313 | *9 %* | **$2,945** | $2,515 | *17%* |
| Metals | **337** | 355 | *(5)* | **751** | 702 | *7* | **2,228** | 1,977 | *13* |
| **Total Industrial** | **825** | 877 | *(6)* | **2,188** | 2,015 | *9* | **2,652** | 2,298 | *15* |
| | | | | | | | | | |
| Emerging Markets | **429** | 491 | *(13)* | **628** | 605 | *4* | **1,464** | 1,232 | *19* |
| Forest Products | **316** | 352 | *(10)* | **722** | 722 | - | **2,285** | 2,051 | *11* |
| Food and Consumer | **199** | 212 | *(6)* | **456** | 441 | *3* | **2,291** | 2,080 | *10* |
| **Total Housing** | **944** | 1,055 | *(11)* | **1,806** | 1,768 | *2* | **1,913** | 1,676 | *14* |
| | | | | | | | | | |
| Agricultural Products | **432** | 410 | *5* | **1,011** | 786 | *29* | **2,340** | 1,917 | *22* |
| Phosphates and Fertilizers | **335** | 362 | *(7)* | **460** | 421 | *9* | **1,373** | 1,163 | *18* |
| **Total Agriculture** | **767** | 772 | *(1)* | **1,471** | 1,207 | *22* | **1,918** | 1,563 | *23* |
| | | | | | | | | | |
| **Total Merchandise** | **2,536** | 2,704 | *(6)* | **5,465** | 4,990 | *10* | **2,155** | 1,845 | *17* |
| | | | | | | | | | |
| Coal | **1,779** | 1,771 | - | **3,110** | 2,483 | *25* | **1,748** | 1,402 | *25* |
| Coke and Iron Ore | **100** | 91 | *10* | **175** | 120 | *46* | **1,750** | 1,319 | *33* |
| **Total Coal** | **1,879** | 1,862 | *1* | **3,285** | 2,603 | *26* | **1,748** | 1,398 | *25* |
| | | | | | | | | | |
| **Automotive** | **343** | 439 | *(22)* | **784** | 839 | *(7)* | **2,286** | 1,911 | *20* |
| | | | | | | | | | |
| **Other** | **-** | - | - | **255** | 242 | *5* | **-** | - | - |
| **Total Rail** | **4,758** | 5,005 | *(5)* | **9,789** | 8,674 | *13* | **2,057** | 1,733 | *19* |
| | | | | | | | | | |
| International | **1,000** | 1,132 | *(12)* | **509** | 525 | *(3)* | **509** | 464 | *10* |
| Domestic | **1,069** | 979 | *9* | **929** | 807 | *15* | **869** | 824 | *5* |
| Other | **-** | - | - | **28** | 24 | *17* | **-** | - | - |
| **Total Intermodal** | **2,069** | 2,111 | *(2)* | **1,466** | 1,356 | *8* | **709** | 642 | *10* |
| | | | | | | | | | |
| **Total** | **6,827** | 7,116 | *(4) %* | **$11,255** | $10,030 | *12 %* | **$1,649** | $1,409 | *17 %* |

*Prior periods have been reclassified to conform to the current presentation.*

***2008 vs. 2007 Rail Results of Operations***

**Rail Operating Revenue**

Rail revenue, which excludes Intermodal, is categorized by three main lines of business: merchandise, coal and automotive. Rail revenue increased $1.1 billion, or 13%, to $9.8 billion in 2008 as compared to prior year. CSXT was able to achieve continued pricing gains predominantly due to the overall cost and service advantages that the Company's rail based solutions provide to customers versus other modes of transportation. Higher fuel cost recovery, coupled with favorable pricing, more than offset volume losses driven by the weakening economy.

*Merchandise*

Chemicals – Revenue and revenue-per-unit improved due to a continued favorable pricing environment and fuel recoveries. Volume was down as a result of declines in plastic and plastic feedstock shipments, driven by weakness in housing, automotive and consumer goods markets.

Emerging Markets – Revenue and revenue-per-unit grew due to continued yield management efforts and favorable fuel recovery. Volume was down as a result of declines in aggregate shipments, such as crushed stone, sand and gravel, caused by a continued weakness in both residential and non-residential construction. These declines more than offset growth in shipments of scrubber limestone and transportation equipment.

Forest Products – Revenue was flat and volume declined as shipments of building products slowed due to the decline in residential housing starts. Further driving volume declines was a reduction in printing paper and newsprint as a combination of electronic media substitution and reduced advertising pages affected demand.

Agricultural Products – Revenue and volume increased due to continued growth in ethanol shipments and strong domestic demand in feed ingredients. Revenue-per-unit grew as a result of continued focus on yield management and increased fuel recovery.

Metals – Revenue and revenue-per-unit increased due to higher fuel recovery and continued pricing actions. Lower demand for steel due to continued weakness in construction and automobile production resulted in volume declines. These declines more than offset growth in shipments of pipe which were driven by increases in drilling activity and pipeline construction.

Phosphates and Fertilizers – Volume declined in phosphate shipments as weak international and domestic demand resulted in plant curtailments. Revenue-per-unit increases were driven primarily by yield initiatives and increased fuel recovery.



Source: CSX CORP, 10-K, February 19, 2009
Powered by Morningstar® Document Research℠

Food and Consumer – Volume declined with decreased demand for building products, appliances and consumer goods driven by the weakening economy and housing market. Revenue-per-unit growth resulted from favorable fuel recoveries and yield initiatives.

*Coal*

Favorable pricing and fuel recovery positively influenced revenue and revenue-per-unit. Volumes were slightly up as strength in the export and river markets were offset by weakness in electric utility shipments.

*Automotive*

Volume and revenue declined due to a reduction in light vehicle production, several plant closures, and lower vehicle sales driven by the slowing economy and tight credit environment. Consistent with the overall automotive market, volumes continued to shift to foreign brands produced domestically. Revenue-per-unit improved due to yield initiatives and higher fuel recoveries.

**Rail Operating Expense**

Total rail operating expenses for 2008 increased 10% or $637 million to $7.3 billion compared to the prior year. The description of what is included in each category as well as significant year over year changes is described below.

Labor and Fringe expenses include employee compensation and benefit programs. These expenses are primarily affected by inflation, headcount, wage rates, incentives earned, healthcare plan costs, and pension and other post-retirement plan expenses. These expenses decreased $26 million primarily driven by reduced staffing levels and lower benefit costs which were mostly offset by wage inflation.

Materials, Supplies and Other expenses consist primarily of materials and contracted services to maintain infrastructure and equipment and for terminal services at intermodal and automotive facilities. This category also includes costs related to casualty claims, environmental remediation, train accidents, utilities, property and sales taxes and professional services. Materials, supplies and other expenses increased by $186 million in 2008 primarily due to favorable personal injury reserve benefits in the prior year. Additionally, these costs increased as a result of inflation, proxy contest and related litigation costs and other items.

Fuel expense includes locomotive diesel fuel as well as non-locomotive fuel. This expense is driven by the market price and locomotive consumption of diesel fuel. This expense increased $503 million due to higher fuel prices during most of the year which more than offset increased fuel efficiency.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

Depreciation expense primarily relates to recognizing the cost of a capital asset, such as locomotives, railcars and track structure, over its useful life. This expense is impacted primarily by the capital expenditures made each year. This expense increased $30 million primarily due to a larger asset base as a result of higher capital spending. This increase was partially offset by lower depreciation rates resulting from periodic asset life studies.

Equipment and Other Rents primarily includes rent paid for freight cars owned by other railroads or private companies, net of rents received by CSXT for use of CSXT equipment. This category of expenses also includes lease expenses primarily for locomotives, railcars, containers and trailers, office and other rentals. These expenses decreased $24 million due mainly to lower volume and fewer locomotive leases.

Inland Transportation expense included in the rail segment is primarily for amounts paid to CSXT from Intermodal for shipments on CSXT's network. These intercompany charges are eliminated in consolidated results. The remaining consolidated amount is expense paid by Intermodal to other transportation companies.

Gain on Insurance Recoveries includes gains on insurance recoveries related to Hurricane Katrina. The decrease of $27 million is attributable to gains recognized in 2007 that were not repeated in 2008.

***2008 vs. 2007 Intermodal Results of Operations***

Intermodal operating income increased to $290 million, an increase of 12% or $30 million versus last year. Improved fuel recovery and a favorable traffic mix boosted revenue per unit and allowed for an 8% increase in revenue despite 2% fewer loads. The volume impact of the continued deceleration of international traffic was somewhat offset by domestic growth in railroad provided container shipments, over-the-road truckload conversion, and short-haul moves in the Southeast.

Intermodal operating expense increased 7% or $80 million to $1.2 billion driven primarily by higher fuel prices and increased purchased transportation expense linked to growth in domestic transcontinental traffic. Additionally, depreciation decreased based on the results of a periodic review of asset useful lives that was completed a year ago.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

***2008 vs. 2007 Additional Consolidated Results***

*Other Income (Expense) – Net*

Other income decreased $192 million to a net expense of $103 million in 2008 primarily due to the recognition of a pre-tax impairment loss of $166 million related to the write-down of the investment in The Greenbrier resort.

*Interest Expense*

Interest expense increased $102 million in 2008 to $519 million due primarily to higher average debt balances in 2008.

*Income Tax Expense*

Income tax expense increased $75 million to $781 million which was driven by higher operating income in 2008. This increase was partially offset by an $18 million income tax benefit during 2008 principally related to the settlement of federal income tax audits and certain other tax matters.

*Net Earnings*

Net earnings increased $29 million to $1.4 billion and earnings per diluted share increased $.35 to $3.34 in 2008. This increase was primarily due to the following factors:

- Operating income increased $508 million primarily driven by higher revenues. This increase in operating income was offset by an impairment loss associated with The Greenbrier resort along with higher interest expense due to higher debt levels.

- Offsetting this increase was a $110 million 2007 tax benefit associated with the sale of CSX's International Terminals business which is reported as discontinued operations in the prior year.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

Table of Contents


***2007 vs. 2006 Results of Operations***

*(Dollars in Millions)*
*Fiscal Year*

| | Rail (b) | | Intermodal | | CSX Consolidated (a) | | | |
|---|---|---|---|---|---|---|---|---|
| | **2007** | 2006 | **2007** | 2006 | **2007** | 2006 | *$ Change* | *% Change* |
| **Revenue** | **$8,674** | $8,154 | **$1,356** | $1,412 | **$10,030** | $9,566 | *$464* | *5%* |
| **Operating Expense:** | | | | | | | | |
| Labor and Fringe | **2,905** | 2,848 | **81** | 82 | **2,986** | 2,930 | *(56)* | *2* |
| Materials, Supplies and Other (a) | **1,747** | 1,653 | **178** | 187 | **1,925** | 1,840 | *(85)* | *5* |
| Fuel (a) | **1,307** | 1,204 | **5** | 5 | **1,312** | 1,209 | *(103)* | *9* |
| Depreciation | **849** | 819 | **34** | 38 | **883** | 857 | *(26)* | *3* |
| Equipment and Other Rents | **341** | 377 | **110** | 130 | **451** | 507 | *56* | *(11)* |
| Inland Transportation | **(448)** | (462) | **688** | 704 | **240** | 242 | *2* | *(1)* |
| Gain on Insurance Recoveries | **(27)** | (166) | **-** | (2) | **(27)** | (168) | *(141)* | *(84)* |
| **Total Expense** | **6,674** | 6,273 | **1,096** | 1,144 | **7,770** | 7,417 | (353) | 5 |
| **Operating Income** | **$2,000** | $1,881 | **$260** | $268 | **$2,260** | $2,149 | *$111* | *5* |
| | | | | | | | | |
| Other Income (Expense) - Net | | | | | **89** | 84 | *5* | *6* |
| Interest Expense | | | | | **(417)** | (392) | *(25)* | *6* |
| Income Tax Expense | | | | | **(706)** | (531) | *(175)* | *33* |
| **Earnings from Continuing Operations** | | | | | **1,226** | 1,310 | *(84)* | *(6)* |
| Discontinued Operations | | | | | **110** | - | *110* | *NM* |
| **Net Earnings** | | | | | **$1,336** | $1,310 | *$26* | *2* |
| | | | | | | | | |
| **Earnings Per Diluted Share** | | | | | | | | |
| From Continuing Operations | | | | | **2.74** | 2.82 | *(0.08)* | *(3)* |
| Discontinued Operations | | | | | **0.25** | - | *0.25* | *NM* |
| **Net Earnings** | | | | | **2.99** | 2.82 | *0.17* | *6%* |
| | | | | | | | | |
| **Operating Ratio** | **76.9%** | 76.9% | **80.8%** | 81.0% | **77.5%** | 77.5% | | |
| **Total Assets** | **$24,502** | $24,212 | **$283** | $276 | | | | |

*NM – not meaningful*

a) *Beginning in 2008, certain items have been reclassified within the income statement. Certain prior-year data have been reclassified to conform to the 2008 presentation.*

- *The Company reclassified all items within other operating income and certain items within other income into the Rail segment. As a result of this change, CSX consolidated operating income and Surface Transportation operating income are now the same; therefore, the Company will no longer report separate Surface Transportation results. The Rail segment was not materially impacted by these reclassifications.*

- *The Company reclassified all non-locomotive fuel related costs previously included in materials, supplies and other into fuel on the Company's consolidated income statement so that it now includes all fuel used for operations and maintenance. For 2007 and 2006, these amounts were $102 million and $97 million, respectively.*

b) *In addition to CSXT, the Rail segment includes non-railroad subsidiaries such as TDSI, Transflo, CSX Technology, and other subsidiaries.*



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**VOLUME AND REVENUE** *(Unaudited)*
*Volume (Thousands of Units); Revenue (Dollars in Millions); Revenue Per Unit (Dollars)*
*Fiscal Years*

| | Volume | | | Revenue | | | Revenue Per Unit | | |
|---|---|---|---|---|---|---|---|---|---|
| | **2007** | 2006 | *% Change* | **2007** | 2006 | *% Change* | **2007** | 2006 | *% Change* |
| Chemicals | **522** | 528 | *(1) %* | **$1,313** | $1,210 | *9 %* | **$2,515** | $2,292 | *10%* |
| Metals | **355** | 364 | *(2)* | **702** | 673 | *4* | **1,977** | 1,849 | *7* |
| **Total Industrial** | **877** | 892 | *(2)* | **2,015** | 1,883 | *7* | **2,298** | 2,111 | *9* |
| | | | | | | | | | |
| Emerging Markets | **491** | 524 | *(6)* | **605** | 580 | *4* | **1,232** | 1,107 | *11* |
| Forest Products | **352** | 404 | *(13)* | **722** | 773 | *(7)* | **2,051** | 1,913 | *7* |
| Food and Consumer | **212** | 245 | *(13)* | **441** | 477 | *(8)* | **2,080** | 1,947 | *7* |
| **Total Housing** | **1,055** | 1,173 | *(10)* | **1,768** | 1,830 | *(3)* | **1,676** | 1,560 | *7* |
| | | | | | | | | | |
| Agricultural Products | **410** | 397 | *3* | **786** | 681 | *15* | **1,917** | 1,715 | *12* |
| Phosphates and Fertilizers | **362** | 362 | - | **421** | 354 | *19* | **1,163** | 978 | *19* |
| **Total Agriculture** | **772** | 759 | *2* | **1,207** | 1,035 | *17* | **1,563** | 1,364 | *15* |
| | | | | | | | | | |
| **Total Merchandise** | **2,704** | 2,824 | *(4)* | **4,990** | 4,748 | *5* | **1,845** | 1,681 | *10* |
| | | | | | | | | | |
| Coal | **1,771** | 1,798 | *(2)* | **2,483** | 2,259 | *10* | **1,402** | 1,256 | *12* |
| Coke and Iron Ore | **91** | 94 | *(3)* | **120** | 119 | *1* | **1,319** | 1,266 | *4* |
| **Total Coal** | **1,862** | 1,892 | *(2)* | **2,603** | 2,378 | *9* | **1,398** | 1,257 | *11* |
| | | | | | | | | | |
| **Automotive** | **439** | 463 | *(5)* | **839** | 847 | *(1)* | **1,911** | 1,829 | *4* |
| | | | | | | | | | |
| **Other** | **-** | - | - | **242** | 181 | *34* | **-** | - | - |
| **Total Rail** | **5,005** | 5,179 | *(3)* | **8,674** | 8,154 | *6* | **1,733** | 1,574 | *10* |
| | | | | | | | | | |
| International | **1,132** | 1,281 | *(12)* | **525** | 580 | *(9)* | **464** | 453 | *2* |
| Domestic | **979** | 898 | *9* | **807** | 786 | *3* | **824** | 875 | *(6)* |
| Other | **-** | - | - | **24** | 46 | *(48)* | **-** | - | - |
| **Total Intermodal** | **2,111** | 2,179 | *(3)* | **1,356** | 1,412 | *(4)* | **642** | 648 | *(1)* |
| | | | | | | | | | |
| **Total** | **7,116** | 7,358 | *(3) %* | **$10,030** | $9,566 | *5 %* | **$1,409** | $1,300 | *8 %* |



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

***2007 vs. 2006 Rail Results of Operations***

**Rail Operating Revenue**

Rail revenue is categorized by three main lines of business: merchandise, coal and automotive. Revenue increased $520 million, or 6%, to $8.7 billion in 2007 as compared to prior year. CSXT was able to achieve continued pricing gains predominantly due to the overall cost and service advantages that the Company's rail based solutions provide to customers versus other modes of transportation. These pricing gains more than offset volume weakness in housing construction, domestic automobile production and related markets.

*Merchandise*

Chemicals – Revenue and revenue per unit improved due to a continued favorable pricing environment. Overall volume declined slightly driven by reduced chlorine shipments and weakness in propane demand due to a milder winter in 2007.

Emerging Markets – Revenue and revenue per unit grew due to continued yield management efforts. Volume was down as a result of declines in aggregate shipments, such as crushed stone, sand and gravel, caused by a continued weakness in residential construction.

Forest Products – Revenue and volume declined as shipments of building products and paper slowed due to the decline in residential housing starts and electronic media substitution.

Agricultural Products – Strong domestic demand in feed ingredients and soybean shipments supported growth in volume and revenue. Ethanol volumes also increased as a result of expanded use in the Northeast. Revenue per unit grew as a result of continued focus on yield management.

Metals – Revenue and revenue per unit increased due to continued pricing actions. Lower demand for steel due to weakness in housing construction and domestic automobile production resulted in volume declines.

Phosphates and Fertilizers – Volume was flat as higher domestic demand was offset by a decrease in export shipments. Favorable mix driven by these volume changes coupled with price increases resulted in significantly improved revenue and revenue per unit.

Food and Consumer – Revenue and volume declines were driven by decreased demand for building products, appliances and roofing granules, which are used to make shingles.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

*Coal*

Favorable pricing positively influenced revenue and revenue per unit. Overall tonnage was flat even though carloads slightly declined due to the use of higher capacity cars allowing the movement of more tons with fewer cars. Strength in the export market was offset by weakness in utility shipments as stockpiles remain at record high levels.

*Automotive*

Volume declined due to a reduction in light vehicle production, several plant closures, and lower vehicle sales driven by the slowing economy and tight credit environment. Consistent with the overall automotive market, volumes continued to shift to foreign brands produced domestically.

*Other Rail Revenue*

The change is primarily due to increased shipments by the Company's regional railroads and more transloading activities associated with ethanol shipments.

**Rail Operating Expense**

Total rail operating expenses for 2007 increased 6% or $401 million to $6.7 billion compared to the prior year. The description of what is included in each category as well as significant year over year changes is described below.

Labor and Fringe expenses include employee compensation and benefit programs. These expenses are primarily affected by inflation, headcount, wage rates, incentives earned, healthcare plan costs, and pension and other post-retirement plan expenses. These expenses increased $57 million primarily due to wage and benefit inflation, which was partially offset by improved productivity and reduced staffing levels.

Materials, Supplies and Other expenses consist primarily of materials and contracted services to maintain infrastructure and equipment and for terminal services at intermodal and automotive facilities. This category also includes costs related to personal injury claims, environmental remediation, train accidents, utilities, property and sales taxes and professional services. Overall, materials, supplies and other expenses increased by $94 million in 2007 primarily due to inflation, higher train accident related costs and higher environmental costs. These costs were partially offset by $99 million of favorable personal injury reserve adjustments during the year. This was due to a trend of significant decreases in the number and severity of work-related injuries for CSXT employees since 2003.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

Depreciation expense primarily relates to recognizing the cost of a capital asset, such as locomotives, railcars and track structure, over its useful life. This expense is impacted primarily by the capital expenditures made each year. This expense increased $30 million primarily due to a larger asset base as a result of higher capital spending partially offset by lower depreciation rates resulting from periodic asset life studies.

Fuel expense includes locomotive diesel fuel as well as non-locomotive fuel. This expense is driven by the market price and locomotive consumption of diesel fuel offset by the effects of any hedging activities. This expense increased $103 million primarily due to higher fuel prices and prior year hedge benefits that were not repeated during 2007 due to the expiration of the fuel hedge program.

Equipment and Other Rents primarily includes rent paid for freight cars owned by other railroads or private companies, net of rents received by CSXT for use of CSXT equipment. This category of expenses also includes lease expenses primarily for locomotives, railcars, containers and trailers, office and other rentals. These expenses decreased $36 million due mainly to lower volume and fewer locomotive leases.

Inland Transportation expense included in the rail segment is for amounts paid to CSXT from Intermodal for shipments on CSXT's network. These intercompany charges are eliminated in consolidated results. The remaining consolidated amount is expense paid by Intermodal to other transportation companies.

Gain on Insurance Recoveries includes gains on insurance recoveries related to Hurricane Katrina. While gains were recognized in both years, the $139 million decrease for 2007 was due to higher cash receipts for lost profits and replacement value of property compared to the value of the property that was damaged in 2006 versus 2007.

***2007 vs. 2006 Intermodal Results of Operations***

Intermodal operating income declined 3% or $8 million to $260 million versus last year on 4% lower revenue, partially offset by volume related cost savings. Revenue and volume decreases reflect losses of several international customers, the slowing of Asian imports throughout the year and mix impact related to growth in new short-haul domestic traffic. Other revenue declined $22 million from the termination of an agreement relating to the storage of containers as well as lower general business levels. Revenue per unit declined slightly with yield gains in the international market being offset by mix changes related to the new short-haul domestic traffic.

Despite rising fuel costs, Intermodal operating expense declined 4% or $48 million to $1.1 billion driven by lower car hire expense related to volume and improved operational efficiency. Additionally, depreciation decreased based on the results of a periodic review of asset useful lives.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

***2007 vs. 2006 Additional Consolidated Results of Operations***

*Other Income*

Other income of $89 million in 2007 was relatively flat compared to the prior year.

*Interest Expense*

Interest expense increased $25 million to $417 million in 2007 primarily due to higher average debt balances.

*Income Tax Expense*

Income tax expense increased $175 million to $706 million. This change is primarily due to higher earnings in 2007 and a prior year income tax benefit of $151 million related to the resolution of certain tax matters that was not repeated.

*Net Earnings*

Consolidated net earnings increased $26 million and totaled $1.3 billion, and earnings per diluted share increased $0.17 to $2.99. The principal elements of these increases were:

- Operating income increased $111 million driven by strong operating results. These strong results were more than offset by $151 million of prior year income tax benefits that were not repeated. The net of these and other items decreased earnings from continuing operations by $84 million or $.08 per diluted share.

- The $110 million or $.25 per diluted share gain in discontinued operations on the Company's consolidated income statement in 2007 related to the resolution of certain tax matters associated with previously discontinued operations.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

## LIQUIDITY AND CAPITAL RESOURCES

Liquidity is a company's ability to generate adequate amounts of cash to meet both current and future needs for obligations as they mature and to provide for planned capital expenditures. In order to have a complete picture of a company's liquidity, its balance sheet, sources and uses of cash flow and external factors should be reviewed.

***Material Changes in the Consolidated Balance Sheets***

CSX's balance sheet reflects its strong capital base and the impact of CSX's balanced approach in deploying its capital for the benefit of its shareholders, which includes reinvestment in the Company's existing infrastructure, investments in the network, share repurchases and dividends.

Long-term debt increased $1 billion to $7.5 billion driven by debt issuances of $1.35 billion in 2008. This increase was partially offset by a $464 million decrease in current maturities of long-term debt due mainly to debt repayments and convertible debt being converted into CSX common stock.

Total shareholder's equity decreased $637 million during 2008. This decrease was mainly attributable to share repurchases that exceeded net earnings as well as adjustments to other comprehensive income related to unrealized pension losses and the payment of dividends. See Note 1, Nature of Operations and Significant Accounting Policies.

***Sources and Uses of Cash***

The Company has multiple sources of cash. First, the Company generates cash from operations. In 2008, the Company generated $2.9 billion of cash from operating activities, which represented a $730 million increase from the prior year due to higher cash flow generated from rail and intermodal operations. Second, CSX has numerous financing sources including a $1.25 billion five-year unsecured revolving credit facility that expires in May 2012. This facility can be increased by an additional $500 million to $1.75 billion with the approval of the lending banks. See Note 8, Debt and Credit Agreements for more information.

CSX also has an effective shelf registration statement on file with the SEC that is unlimited as to amount and may be used, subject to market conditions and CSX Board authorization, to issue debt or equity securities at CSX's discretion. While CSX seeks to give itself flexibility with respect to cash requirements, there can be no assurance that market conditions would permit CSX to sell such debt securities on acceptable terms at any given time, or at all.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

Among other things, the Company uses cash for share repurchases and scheduled payments of debt and leases. CSX also uses cash to pay dividends to shareholders, as declared by the Board of Directors. CSX paid dividends of $308 million in 2008, which was $77 million more than prior year. The increase in 2008 was primarily due to CSX increasing quarterly dividends to $0.22 per share. CSX also repurchased $1.6 billion of shares in 2008.

Net cash used by investing activities during 2008 was $1.4 billion. This use of funds was predominately driven by $1.7 billion of capital additions which are further described below. This use of cash was slightly offset by proceeds from sales of short-term investments.

| | Fiscal Years | | |
|---|---|---|---|
| **Capital Additions** ***(Dollars in millions)*** | **2008** | 2007 | 2006 |
| Track, Bridges, Signals and Other Related | **$933** | $821 | $714 |
| Locomotives and Freight Cars | **454** | 458 | 373 |
| Capacity and Commercial Facilities | **147** | 272 | 247 |
| Hurricanes Katrina / Gustav Asset Replacement | **42** | 24 | 114 |
| Other | **164** | 198 | 191 |
| Total | **$1,740** | $1,773 | $1,639 |

Capital spending and maintenance programs are and have been designed to assure the ability to provide safe, efficient and reliable transportation services. For 2009, CSX plans to spend $1.6 billion of capital of which approximately 90% will be used to sustain the core infrastructure, terminals, locomotives, freight cars and technology. The remaining 10% will be allocated to high return growth and productivity investments.

CSX is continually evaluating market and regulatory conditions that could affect the Company's ability to generate sufficient returns on capital investments. CSX may revise this estimate as a result of changes in business conditions, tax legislation or the enactment of new laws or regulations.

***Liquidity and Working Capital***

Currently, CSX is well positioned from a liquidity standpoint. The Company ended the year with over $700 million of cash, cash equivalents and short-term investments. CSX also has a $1.25 billion credit facility with a diverse portfolio of banks that was not drawn on. Additionally, in January 2009, the Company took advantage of an improvement in capital market conditions and issued $500 million of new debt.

Working capital can also be considered a measure of a company's ability to meet its short-term needs. CSX had a working capital deficit of $13 million and $180 million at December 2008 and 2007, respectively. The favorable change was primarily due to increased earnings.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

The Company's working capital balance varies due to factors such as the timing of scheduled debt payments and changes in cash and cash equivalent balances as discussed above. A working capital deficit is not unusual for CSX or other companies in the industry and does not indicate a lack of liquidity. The Company continues to maintain adequate current assets to satisfy current liabilities and maturing obligations when they come due. Furthermore, CSX has sufficient financial capacity, including the credit facility and shelf registration statement, to manage its day-to-day cash requirements and any anticipated obligations. The Company from time to time accesses the credit markets for additional liquidity. Due to the current economic and credit market environment, CSX may be unable to access capital due lack of market demand or may experience higher interest costs.

***Credit Ratings***

Credit ratings reflect an independent agency's judgment on the likelihood that a borrower will repay a debt obligation at maturity. The ratings reflect many considerations, such as the nature of the borrower's industry and its competitive position, the size of the company, its liquidity and access to capital and the sensitivity of a company's cash flows to changes in the economy. The two largest rating agencies, Standard & Poor's ("S&P") and Moody's Investors Service ("Moody's"), use alphanumeric codes to designate their ratings. The highest quality rating for long-term credit obligations is AAA+ and Aaa1 for S&P and Moody's, respectively. A security rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the assigning rating agency.

Long-term ratings of BBB- and Baa3 or better by S&P and Moody's, respectively, reflect ratings on debt obligations that fall within a band of credit quality considered to be "investment grade." Currently, the long-term ratings for CSX's obligations fall within the investment grade band of credit quality.

Following CSX's 2008 annual meeting, S&P issued a release noting its outlook for CSX changed to negative as a result of the new Board composition; however, S&P further noted it does not anticipate downgrading the rating unless CSX is no longer committed to targeting an investment grade capital structure or adopts a more aggressive financial policy. Moody's outlook for CSX continues to be stable.

If CSX's credit ratings were to decline to lower levels, the Company could experience significant increases in its interest cost for new debt. In addition, the market's demand, and thus the Company's ability to readily issue new debt, could become further influenced by the economic and credit market environment.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**CSX CORPORATION**
**PART II**

## SCHEDULE OF CONTRACTUAL OBLIGATIONS AND COMMERCIAL COMMITMENTS

The following tables set forth maturities of the Company's contractual obligations and other commitments:

| Type of Obligation | 2009 | 2010 | 2011 | 2012 | 2013 | Thereafter | Total |
|---|---|---|---|---|---|---|---|
| *(Dollars in Millions) (Unaudited)* | | | | | | | |
| Contractual Obligations | | | | | | | |
| Long-term Debt (See Note 8) | $319 | $106 | $605 | $507 | $782 | $5,512 | $7,831 |
| Operating Leases - Net (See Note 6) | 77 | 65 | 55 | 52 | 35 | 170 | 454 |
| Agreements with Conrail *(a)* | 13 | 9 | 4 | 3 | 3 | 6 | 38 |
| Purchase Obligations (See Note 6) | 529 | 353 | 449 | 337 | 310 | 4,848 | 6,826 |
| Total Contractual Obligations | $938 | $533 | $1,113 | $899 | $1,130 | $10,536 | $15,149 |
| Other Commitments | | | | | | | |
| Guarantees (See Note 6) | $16 | $16 | $13 | $12 | $ - | $ - | $57 |
| Other*(b)* | 64 | 1 | - | - | - | 40 | 105 |
| Total Other Commitments | $80 | $17 | $13 | $12 | $ - | $40 | $162 |

*(a) Agreements with Conrail (for information about Conrail see Note 14, Related Party Transactions) represent minimum future lease payments for freight cars and locomotives and is included in total net lease commitments of $492 million disclosed in Note 6, Commitments and Contingencies.*

*(b) Other commitments of $64 million predominately consisted of bonds in force. These bonds are surety bonds issued as a guarantee that CSX will perform its contractual obligation.*



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

## OFF-BALANCE SHEET ARRANGEMENTS

For detailed information about the Company's guarantees, operating leases and purchase obligations, see Note 6, Commitments and Contingencies.

There are no off-balance sheet arrangements that are reasonably likely to have a material effect on the Company's financial condition, results of operations or liquidity.

## CRITICAL ACCOUNTING ESTIMATES

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires that management make estimates in reporting the amounts of certain assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements and certain revenues and expenses during the reporting period. Actual results may differ from those estimates. These estimates and assumptions are discussed with the Audit Committee of the Board of Directors on a regular basis. Consistent with the prior year, significant estimates using management judgment are made for the following areas:

- casualty, environmental and legal reserves;
- pension and post-retirement medical plan accounting;
- depreciation policies for assets under the group-life method; and
- income taxes

**Casualty, Environmental and Legal Reserves**

***Casualty***

Casualty reserves represent accruals for personal injury and occupational injury claims. Currently, no individual claim is expected to exceed the Company's self-insured retention amount. To the extent the value of an individual claim exceeds the self-insured retention amount, the Company would present the liability on a gross basis with a corresponding receivable for insurance recoveries. Personal injury and occupational claims are presented on a gross basis and in accordance with SFAS 5, *Accounting for Contingencies* ("SFAS 5"). These reserves fluctuate with changes in estimates provided by independent third parties and reviewed by management, and are offset by the timing of payments. Most of the claims were related to CSXT unless otherwise noted.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

Defense and processing costs, which historically have been insignificant and are anticipated to be insignificant in the future, are not included in the recorded liabilities. The Company is presently self-insured up to $25 million per injury for personal injury and occupational-related claims.

*Personal Injury*

Personal injury reserves represent liabilities for employee work-related and third-party injuries. Work-related injuries for CSXT employees are primarily subject to FELA. In addition to FELA liabilities, employees of other CSX subsidiaries are covered by various state workers' compensation laws, the Federal Longshore and Harbor Worker's Compensation Program or the Maritime Jones Act.

CSXT retains an independent actuarial firm to assist management in assessing the value of personal injury claims and cases. An analysis is performed by the independent actuarial firm semi-annually and is reviewed by management. The methodology used by the actuary includes a development factor to reflect growth or reduction in the value of these personal injury claims. It is based largely on CSXT's historical claims and settlement experience. Actual results may vary from estimates due to the type and severity of the injury, costs of medical treatments and uncertainties in litigation.

Based on management's review of the actuarial analyses performed by an independent actuarial firm, the Company reduced personal injury reserves by $99 million during 2007. This reduction is due to a trend of significant decreases in the number and severity of work-related injuries for CSXT employees since 2003. The analyses further indicated an absence of large catastrophic claims since 2003, which also was determined to be a trend. These reductions were included in materials, supplies and other in the consolidated income statements.

*Occupational*

Occupational claims arise from allegations of exposures to certain materials in the workplace, such as asbestos, solvents (which include soaps and chemicals) and diesel fuels or allegations of chronic physical injuries resulting from work conditions, such as repetitive stress injuries, carpal tunnel syndrome and hearing loss.

*Asbestos*

The Company is party to a number of occupational claims by employees alleging exposure to asbestos in the workplace. The heaviest possible exposure for employees was due to work conducted in and around steam locomotive engines that were largely phased out beginning around the 1950s. However, other types of exposures, including exposure from locomotive component parts and building materials, continued until it was substantially eliminated by 1985. Additionally, the Company has retained liability for asbestos claims filed against the previously owned international container shipping business.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

The Company retains a third party specialist with extensive experience in performing asbestos and other occupational studies to assist management in assessing the value of the Company's claims and cases. The analysis is performed by the specialist semi-annually and is reviewed by management. The objective of the analysis is to determine the number of estimated incurred but not reported ("IBNR") claims and the estimated average cost per claim to be received over the next seven years. Seven years was determined by management to be the time period in which probable claim filings and claim values could be estimated with more certainty.

The Company, with the assistance of the third party specialist, determines its potentially exposed population and it is then able to derive the estimated number of IBNR claims. The estimated average cost per claim is then determined utilizing recent actual average cost per claim data and national industry data. Key elements of the assessment include the following:

- An estimate is computed using a ratio of Company employee data to national employment for select years during the period 1938-2001. The Company uses railroad industry historical census data because it does not have detailed employment records in order to compute the population of potentially exposed employees.

- The projected incidence of disease is estimated based on epidemiological studies using employees' age and the duration and intensity of potential exposure while employed. Epidemiology is the medical science that deals with the incidence, distribution and control of diseases in a population.

- An estimate of the future anticipated claims filing rate by type of disease (non-malignant, cancer and mesothelioma) is computed using the Company's average historical claim filing rates for a three-year calibration period, excluding a surge in claims originating in West Virginia in 2006. These claimants were neither exposed to asbestos in West Virginia nor residents of the state. 850 of these claims remain outstanding. The Company believes these claims will not have merit as no medical evidence has been provided to substantiate the claims and therefore the Company has excluded them from the calibration period. Claim levels have since returned to expected levels and management feels this calibration period represents the best estimate of future filing rates.

- An estimate of the future anticipated dismissal rate by type of claim is computed using the Company's historical average dismissal rates observed during the current calibration period noted above.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

- An estimate of the future anticipated settlement by type of disease is computed using the Company's historical average of dollars paid per claim for pending and future claims using the average settlement by type of incident observed during the current calibration period noted above.

From these assumptions, the Company projects the incidence of each type of disease to the estimated population to determine the total estimated number of employees that could potentially assert a claim. Historical claim filing rates are applied for each type of disease to the total number of employees that could potentially assert a claim to determine the total number of anticipated claim filings by disease type. Historical dismissal rates, which represented claims that were closed without payment, were deducted to calculate the number of future claims by disease type that would likely require payment by the Company. Finally, the number of such claims was multiplied by the average settlement value to estimate the Company's future liability for IBNR asbestos claims.

The estimated future filing rates and estimated average claim values are the most sensitive assumptions for this reserve. A 1% increase or decrease in either the forecasted number of IBNR claims or the average claim values would result in an approximate $1 million increase or decrease in the liability recorded for unasserted asbestos claims.

*Other Occupational*

The Company retains a third party specialist with extensive experience in performing other occupational studies to assist management in assessing the value of the Company's claims and cases. The analysis is performed by the specialist semi-annually and is reviewed by management. Similar to the asbestos liability estimation process, the key elements of the assessment include the following:

- An estimate of the potentially exposed population for other occupational diseases is calculated by projecting active versus retired workforce from 2002 to 2010 using a growth rate projection for overall railroad employment made by the Railroad Retirement Board in its June 2003 report.

- An estimate of the future anticipated claims filing rate by type of injury, employee type, and active versus retired employee is computed using the Company's average historical claim filing rates for the calibration periods management felt were representative of future filing rates. For carpal tunnel and repetitive stress injuries, the current calibration period is a 1-year average of claim filings. Hearing loss uses a 3-year calibration period, and all other diseases or injuries use a 2-year calibration period. An estimate is made to forecast future claims by using the filing rates by disease and the active and retired Company population each year.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

- An estimate of the future anticipated settlement by type of injury is computed using the Company's historical average of dollars paid per claim for pending and future claims using the average settlement by type of injury observed during a period that management feels is representative of future settlement amounts.

The estimated future filing rates and estimated average claim values are the most sensitive assumptions for this reserve. A 1% increase or decrease in either the forecasted number of IBNR claims or the average claim values would not result in a material increase or decrease in the liability recorded for unasserted other occupational claims.

***Environmental***

The Company is a party to various proceedings related to environmental issues, including administrative and judicial proceedings, involving private parties and regulatory agencies. The Company has been identified as a potentially responsible party at approximately 244 environmentally impaired sites. Many of those are, or may be, subject to remedial action under the federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, or CERCLA, also known as the Superfund Law, or similar state statutes. Most of these proceedings arose from environmental conditions on properties used for ongoing or discontinued railroad operations. However, a number of these proceedings are based on allegations that the Company, or its predecessors, sent hazardous substances to facilities owned or operated by others for treatment or disposal. In addition, some of the Company's land holdings were leased to others for commercial or industrial uses that may have resulted in releases of hazardous substances or other regulated materials onto the property and could give rise to proceedings against the Company.

In any such proceedings, the Company is subject to environmental clean-up and enforcement actions under the Superfund Law, as well as similar state laws that may impose joint and several liability for clean-up and enforcement costs on current and former owners and operators of a site without regard to fault or the legality of the original conduct. These costs could be substantial.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

In accordance with Statement of Position 96-1, *Environmental Remediation Liabilities*, the Company reviews its role with respect to each site identified at least once a quarter, giving consideration to a number of factors such as:

- type of clean-up required;
- nature of the Company's alleged connection to the location (e.g., generator of waste sent to the site or owner or operator of the site);
- extent of the Company's alleged connection (e.g., volume of waste sent to the location and other relevant factors); and
- number, connection and financial viability of other named and unnamed potentially responsible parties at the location.

Based on the review process, the Company has recorded amounts to cover contingent anticipated future environmental remediation costs with respect to each site to the extent such costs are estimable and probable. The recorded liabilities for estimated future environmental costs are undiscounted and include amounts representing the Company's estimate of unasserted claims, which the Company believes to be immaterial. The liability includes future costs for remediation and restoration of sites as well as any significant ongoing monitoring costs, but excludes any anticipated insurance recoveries. Payments related to these liabilities are expected to be made over the next several years.

Currently, the Company does not possess sufficient information to reasonably estimate the amounts of additional liabilities, if any, on some sites until completion of future environmental studies. In addition, conditions that are currently unknown could, at any given location, result in exposure, the amount and materiality of which cannot presently be reliably estimated. Based upon information currently available, however, the Company believes its environmental reserves are adequate to fund remedial actions to comply with present laws and regulations, and that the ultimate liability for these matters, if any, will not materially affect its overall financial condition, results of operations or liquidity.

***Legal***

In accordance with SFAS 5, an accrual for a loss contingency is established if information available prior to issuance of the financial statements indicates that it is probable that an asset has been impaired or a liability has been incurred at the date of the financial statements, and the amount of loss can be reasonably estimated. If no accrual is made for a loss contingency because one or both of these conditions are not met, or if an exposure to loss exists in excess of the amount accrued, disclosure of the contingency is made when there is at least a reasonable possibility that a loss or an additional loss may have been incurred.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

The Company evaluates all exposures relating to legal liabilities at least quarterly and adjusts reserves when appropriate under the guidance noted above. The amount of a particular reserve may be influenced by factors that include official rulings, newly discovered or developed evidence, or changes in laws, regulations, and evidentiary standards.

**Pension and Post-retirement Medical Plan Accounting**

The Company sponsors defined benefit pension plans principally for salaried, management personnel. The plans provide eligible employees with retirement benefits based predominantly on years of service and compensation rates near retirement. For employees hired in 2003 or thereafter, benefits are determined based on a cash balance formula, which provides benefits by utilizing interest and pay credits based upon age, service and compensation. CSX made pension plan contributions of $102 million to its qualified defined benefit pension plans in 2008.

In addition to these plans, CSX sponsors a post-retirement medical plan and one life insurance plan that provide benefits to full-time, salaried, management employees hired prior to 2003, upon their retirement if certain eligibility requirements are met. The post-retirement medical plan is contributory (partially funded by retirees), with retiree contributions adjusted annually. The life insurance plan is non-contributory.

The accounting for these plans is subject to the guidance provided in SFAS 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans, an amendment of FASB Statements No. 87, 88, 106, and 132 (R) ("* SFAS 158*"),* SFAS 87, *Employers Accounting for Pensions* ("SFAS 87"), and SFAS 106, *Employers' Accounting for Postretirement Benefits Other than Pension* ("SFAS 106").

SFAS 87 requires that management make certain assumptions relating to the following:

- long-term rate of return on plan assets;
- discount rates used to measure future obligations and interest expense;
- salary scale inflation rates;
- health care cost trend rates; and
- other assumptions.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

These assumptions are determined as of the beginning of the year. As permitted by SFAS 87, the Company previously used a plan measurement date of September 30 to actuarially value its pension and post-retirement plans. During 2008, CSX changed its measurement date to its fiscal year end in accordance with SFAS 158. The effect of the change was a $13 million after-tax reduction to retained earnings. The Company engages independent, external actuaries to compute the amounts of liabilities and expenses relating to these plans subject to the assumptions that the Company selects. The Company reviews the long-term rate of return, discount, salary scale inflation and health care cost trend rates on an annual basis and makes modifications to the assumptions based on current rates and trends as appropriate.

*Long-term Rate of Return on Plan Assets*

The expected long-term average rate of return on plan assets reflects the average rate of earnings expected on the funds invested, or to be invested, to provide for benefits included in the projected benefit obligation. In estimating that rate, the Company gives appropriate consideration to the returns being earned by the plan assets in the funds and the rates of return expected to be available for reinvestment.

The Company's expected long-term average rate of return on assets considers the current and projected asset mix of the funds. Management balances market expectations obtained from various investment managers and economists with both market and actual plan historical returns to develop a reasonable estimate of the expected long-term rate of return on assets. As this assumption is long-term, it is adjusted less frequently than other assumptions used in pension accounting. The long-term rate of return on plan assets used by the Company to value its 2008 pension obligation was 8.5%.

*Discount Rates*

Discount rates affect the amount of liability recorded and the interest expense component of pension and post-retirement expense. Discount rates reflect the rates at which pension and other post-retirement benefits could be effectively settled, or in other words, how much it would cost the Company to buy enough high quality bonds to generate cash flow equal to the Company’s expected future benefit payments. The Company determines the discount rate based on a hypothetical portfolio of high quality bonds with cash flows matching the plans’ expected benefit payments.

The discount rate used by the Company to value its 2008 pension and post-retirement obligations is 6.5%. Each year these discount rates are reevaluated and adjusted to reflect the best estimate of the current effective settlement rates. If interest rates generally decline or rise, the assumed discount rates will change.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

*Salary Scale Inflation Rates*

Salary scale inflation rates are based on current trends and historical data accumulated by the Company. The Company reviews recent wage increases and management incentive compensation payments over the past five years in its assessment of salary scale inflation rates. The Company used a salary scale rate of 3.8% to value its 2008 pension obligation.

*Health Care Cost Trend Rates*

Health care cost trend rates are based on recent plan experience and industry trends. The Company uses actuarial data to substantiate the inflation assumption for health care costs, representing increases in total plan costs (which include claims and administrative fee cost components). The current assumed health care cost trend rate is 9.5% for Medicare-eligible participants and 8.5% for non-Medicare-eligible participants and is expected to decrease gradually until reaching 5% in 2017, based upon current actuarial projections.

*Other Assumptions*

The calculations made by the actuaries also include assumptions relating to mortality rates, turnover and retirement age. These assumptions are based upon historical data and are selected by management.

*2009 Estimated Pension and Post-retirement Expense*

Net periodic pension and post-retirement benefits expense for 2009 is expected to be approximately $44 million and $31 million, respectively, compared to $33 million and $31 million, respectively in 2008.

The following sensitivity analysis illustrates the effect of changes in certain assumptions like discount rates, salaries and health care costs on the 2009 estimated pension and post-retirement expense:

| *(Dollars in Millions)* | Pension | OPEB |
|---|---|---|
| Discount Rate 0.25% change | $4 | $1 |
| Salary Inflation 0.25% change | $1 | $ - |
| Health Care Cost 1% change | N/A | $1 |



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**Depreciation Policies for Assets Under the Group-Life Method**

CSXT accounts for its rail assets, including main-line track, locomotives and freight cars, using the group-life method. The group-life method pools similar assets by type and then depreciates each group as a whole. Under the group-life method, the service lives for each group of rail assets are determined by completing periodic life studies and applying management's assumptions concerning the service lives of its properties. These life studies are conducted by a third party expert, analyzed by the Company's management and approved by the STB. Life studies for equipment assets are required every three years, whereas road and track life studies are required every six years by the STB.

Changes in asset lives due to the results of the life studies could significantly impact future periods' depreciation expense, and thus, the Company's results of operations. Factors taken into account during the life study include:

- statistical analysis of historical retirements for each group of property;
- evaluation of current operations;
- evaluation of technological advances and maintenance schedules;
- previous assessment of the condition of the assets and outlook for their continued use;
- expected net salvage to be received upon retirement; and
- comparison of assets to the same asset groups with other companies.

The life studies may also indicate that the recorded amount of accumulated depreciation is deficient (or in excess) of the appropriate amount indicated by the study. Any such deficiency (or excess) is amortized as a component of depreciation expense over the remaining useful life of the asset group until the next required life study.

Recent experience with life studies has resulted in depreciation rate changes, which did not significantly affect the Company's annual depreciation expense. In 2007, CSXT initiated life studies for its road, equipment and track assets that concluded in 2008, resulting in a reduction in depreciation expense for equipment and road assets and an increase in depreciation expense for track assets.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

Assets depreciated under the group-life method comprise 93% of CSXT's total fixed assets of $23 billion on a net basis at December 2008. The Company's depreciation expense for 2008 amounted to $904 million. A 1% change in the average life of all group-life assets would result in a $9 million change to the Company's annual depreciation expense.

**Income Taxes**

In 2006, the Financial Accounting Standards Board ("FASB") issued Interpretation 48, *Accounting for Uncertainty in Income Taxes* ("FIN 48"), which became effective for CSX beginning in 2007. FIN 48 addressed the determination of how tax benefits claimed or expected to be claimed on a tax return should be recorded in the financial statements. Under FIN 48, the Company must recognize the tax benefit from an uncertain tax position only if it is more likely than not that the tax position will be sustained on examination by the taxing authorities based on the technical merits of the position. The tax benefits recognized in the financial statements from such a position are measured based on the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate resolution. The Company's reassessment of its tax positions in accordance with FIN 48 did not have a material impact on the Company's financial condition, results of operations or liquidity.

CSX files a consolidated federal income tax return, which includes its principal domestic subsidiaries. Examinations of the federal income tax returns of CSX have been completed through 2003 and for 2007. Federal income tax returns for 2004 through 2006 currently are under appeal. Management believes adequate provision has been made for any adjustments that might be assessed. While the final outcome of these matters cannot be predicted with certainty, it is the opinion of CSX management that none of these items will have a material adverse effect on the financial condition, results of operations or liquidity of CSX. An unexpected adverse resolution of one or more of these items, however, could have a material adverse effect on the results of operations in a particular fiscal quarter or fiscal year. Also, the Company is party to a number of legal and administrative proceedings, the resolution of which could result in gain realization in amounts that could be material to results of operations in a particular fiscal quarter or fiscal year.

**New Accounting Pronouncements and Change in Accounting Policy**

See Note 1, Nature of Operations and Significant Accounting Policies under the caption, "New Accounting Pronouncements and Changes in Accounting Policy."



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

Case 1:07-mc-00489-BAH Document 1229-7 Filed 11/22/24 Page 2932 of 3766


**Item 7A. Quantitative and Qualitative Disclosures about Market Risk**

CSX does not hold or issue derivative financial instruments for trading purposes. Historically, the Company has used derivative financial instruments to address market risk exposure to fluctuations in interest rates and the risk of volatility in its fuel costs, but as of December 2008, the Company did not have a significant position in derivative financial instruments.

At December 2008, CSX had $85 million of outstanding floating rate debt obligations outstanding. A 1% fluctuation in interest rates on these notes would cause a $1 million change in interest expense.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**CSX CORPORATION**
**PART II**
**Item 8. Financial Statements and Supplementary Data**

## INDEX TO CONSOLIDATED FINANCIAL STATEMENTS


| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | 65 |
| **CSX Corporation** | |
| Consolidated Financial Statements and Notes to Consolidated Financial Statements Herewith: | |
| Consolidated Income Statements for the Fiscal Years Ended: | 66 |
| December 26, 2008 | |
| December 28, 2007 | |
| December 29, 2006 | |
| Consolidated Balance Sheets as of: | 67 |
| December 26, 2008 | |
| December 28, 2007 | |
| Consolidated Cash Flow Statements for Fiscal Years Ended: | 68 |
| December 26, 2008 | |
| December 28, 2007 | |
| December 29, 2006 | |
| Consolidated Statements of Changes in Shareholders' Equity: | 69 |
| December 26, 2008 | |
| December 28, 2007 | |
| December 29, 2006 | |
| Notes to Consolidated Financial Statements | 70 |




Source: CSX CORP, 10-K, February 19, 2009
Powered by Morningstar® Document Research℠

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Shareholders and Board of Directors of CSX Corporation

We have audited the accompanying consolidated balance sheets of CSX Corporation and subsidiaries as of December 26, 2008 and December 28, 2007, and the related consolidated statements of income, cash flows, and changes in shareholders' equity for each of the three fiscal years in the period ended December 26, 2008. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of CSX Corporation and subsidiaries at December 26, 2008 and December 28, 2007, and the consolidated results of their operations and their cash flows for each of the three fiscal years in the period ended December 26, 2008, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), CSX Corporation's internal control over financial reporting as of December 26, 2008, based on criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 17, 2009 expressed an unqualified opinion thereon.

/s/ Ernst & Young LLP
Independent Certified Public Accountants

Jacksonville, Florida
February 17, 2009



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**CSX CORPORATION**
**PART II**
**Item 8. Financial Statements and Supplementary Data**

# CONSOLIDATED INCOME STATEMENTS

*(Dollars in Millions, Except Per Share Amounts)*

| | Fiscal Years | | |
|---|---|---|---|
| | **2008** | 2007 | 2006 |
| **Operating Revenue** | **$11,255** | $10,030 | $9,566 |
| **Operating Expense** | | | |
| Labor and Fringe | **2,955** | 2,986 | 2,930 |
| Materials, Supplies and Other | **2,133** | 1,925 | 1,840 |
| Fuel | **1,817** | 1,312 | 1,209 |
| Depreciation | **904** | 883 | 857 |
| Equipment and Other Rents | **425** | 451 | 507 |
| Inland Transportation | **253** | 240 | 242 |
| Gain on Insurance recoveries | **-** | (27) | (168) |
| Total Operating Expense | **8,487** | 7,770 | 7,417 |
| **Operating Income** | **2,768** | 2,260 | 2,149 |
| **Other Income and Expense** | | | |
| Other Income (Expense) - Net (Note 9) | **(103)** | 89 | 84 |
| Interest Expense | **(519)** | (417) | (392) |
| **Earnings From Continuing Operations before Income Taxes** | **2,146** | 1,932 | 1,841 |
| Income Tax Expense (Note 12) | **(781)** | (706) | (531) |
| **Earnings From Continuing Operations** | **1,365** | 1,226 | 1,310 |
| Discontinued Operations (Note 15) | **-** | 110 | - |
| **Net Earnings** | **$1,365** | $1,336 | $1,310 |
| **Per Common Share (Note 2)** | | | |
| **Basic Earnings Per Share** | | | |
| From Continuing Operations | **$3.41** | $2.85 | $2.98 |
| Discontinued Operations | **-** | 0.26 | - |
| **Net Earnings** | **$3.41** | $3.11 | $2.98 |
| **Earnings Per Common Share, Assuming Dilution** | | | |
| From Continuing Operations | **$3.34** | $2.74 | $2.82 |
| Discontinued Operations | **-** | 0.25 | - |
| **Net Earnings** | **$3.34** | $2.99 | $2.82 |
| **Average Common Shares Outstanding (Thousands)** | **400,683** | 430,270 | 440,084 |
| **Average Common Shares Outstanding, Assuming Dilution (Thousands)** | **408,602** | 448,280 | 465,934 |
| **Cash Dividends Paid Per Common Share** | **$0.77** | $0.54 | $0.33 |

See accompanying Notes to Consolidated Financial Statements



**CSX CORPORATION**
**PART II**
**Item 8. Financial Statements and Supplementary Data**

# CONSOLIDATED BALANCE SHEETS

*(Dollars in millions)*

| | December 26, 2008 | December 28, 2007 |
|---|---|---|
| **ASSETS** | | |
| **Current Assets:** | | |
| Cash and Cash Equivalents (Note 1) | **$669** | $368 |
| Short-term Investments | **76** | 346 |
| Accounts Receivable, net of allowance for doubtful accounts of $70 and $74, respectively | **1,107** | 1,174 |
| Materials and Supplies | **217** | 240 |
| Deferred Income Taxes | **203** | 254 |
| Other Current Assets | **119** | 109 |
| **Total Current Assets** | **2,391** | 2,491 |
| | | |
| Properties | **30,208** | 28,999 |
| Accumulated Depreciation | **(7,520)** | (7,219) |
| **Properties - Net (Note 10)** | **22,688** | 21,780 |
| | | |
| Investment in Conrail (Note 14) | **609** | 639 |
| Affiliates and Other Companies | **406** | 365 |
| Other Long-term Assets (Note 11) | **194** | 259 |
| **Total Assets** | **$26,288** | $25,534 |
| | | |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| **Current Liabilities:** | | |
| Accounts Payable | **$973** | $976 |
| Labor and Fringe Benefits Payable | **465** | 461 |
| Casualty, Environmental and Other Reserves (Note 5) | **236** | 247 |
| Current Maturities of Long-term Debt (Note 8) | **319** | 783 |
| Short-term Debt | **1** | 4 |
| Income and Other Taxes Payable | **125** | 113 |
| Other Current Liabilities | **285** | 87 |
| **Total Current Liabilities** | **2,404** | 2,671 |
| | | |
| Casualty, Environmental and Other Reserves (Note 5) | **643** | 624 |
| Long-term Debt (Note 8) | **7,512** | 6,470 |
| Deferred Income Taxes | **6,235** | 6,096 |
| Other Long-term Liabilities (Note 11) | **1,446** | 988 |
| **Total Liabilities** | **18,240** | 16,849 |
| | | |
| **Shareholders' Equity:** | | |
| Common Stock, $1 Par Value (Note 3) | **391** | 408 |
| Other Capital | **-** | 37 |
| Retained Earnings (Note 1) | **8,398** | 8,565 |
| Accumulated Other Comprehensive Loss | **(741)** | (325) |
| **Total Shareholders' Equity** | **8,048** | 8,685 |
| **Total Liabilities and Shareholders' Equity** | **$26,288** | $25,534 |

See accompanying Notes to Consolidated Financial Statements



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

## CONSOLIDATED CASH FLOW STATEMENTS
*(Dollars in Millions)*

| | Fiscal Years | | |
|---|---|---|---|
| | **2008** | **2007** | 2006 |
| **OPERATING ACTIVITIES** | | | |
| Net Earnings | **$1,365** | $1,336 | $1,310 |
| Adjustments to Reconcile Net Earnings to Net Cash Provided by Operating Activities: | | | |
| Depreciation | **918** | 890 | 867 |
| Deferred Income Taxes | **435** | 272 | 42 |
| Non-cash Impairment Loss | **166** | - | - |
| Non-cash Discontinued Operations (Note 15) | **-** | (110) | - |
| Net Gain on Conrail spin-off - after tax | **-** | - | (26) |
| Contributions to Qualified Pension Plans (Note 7) | **(102)** | (266) | (28) |
| Other Operating Activities | **65** | (91) | (14) |
| Changes in Operating Assets and Liabilities: | | | |
| Accounts Receivable | **74** | (50) | (33) |
| Other Current Assets | **37** | (41) | 96 |
| Accounts Payable | **(3)** | 48 | 51 |
| Income and Other Taxes Payable | **(46)** | 234 | (103) |
| Other Current Liabilities | **5** | (38) | (104) |
| **Net Cash Provided by Operating Activities** | **2,914** | 2,184 | 2,058 |
| **INVESTING ACTIVITIES** | | | |
| Property Additions | **(1,740)** | (1,773) | (1,639) |
| Purchases of Short-term Investments | **(25)** | (2,338) | (1,412) |
| Proceeds from Sales of Short-term Investments | **280** | 2,459 | 1,290 |
| Other Investing Activities | **36** | (41) | 151 |
| **Net Cash Used in Investing Activities** | **(1,449)** | (1,693) | (1,610) |
| **FINANCING ACTIVITIES** | | | |
| Short-term Debt - Net | **(3)** | (6) | 7 |
| Long-term Debt Issued (Note 8) | **1,351** | 2,381 | 471 |
| Long-term Debt Repaid (Note 8) | **(642)** | (785) | (546) |
| Dividends Paid | **(308)** | (231) | (145) |
| Stock Options Exercised (Note 4) | **83** | 153 | 319 |
| Shares Repurchased (Note 1) | **(1,570)** | (2,174) | (465) |
| Other Financing Activities | **(75)** | 78 | 63 |
| **Net Cash Used in Financing Activities** | **(1,164)** | (584) | (296) |
| Net Increase (Decrease) in Cash and Cash Equivalents | **301** | (93) | 152 |
| **CASH AND CASH EQUIVALENTS** | | | |
| Cash and Cash Equivalents at Beginning of Period | **368** | 461 | 309 |
| **Cash and Cash Equivalents at End of Period** | **$669** | $368 | $461 |
| **SUPPLEMENTAL CASH FLOW INFORMATION** | | | |
| Interest Paid - Net of Amounts Capitalized | **$509** | $411 | $387 |
| Income Taxes Paid | **$276** | $235 | $531 |
| Seller Financed Assets | **$310** | $ 52 | $ - |

See accompanying Notes to Consolidated Financial Statements



Source: CSX CORP, 10-K, February 19, 2009
Powered by Morningstar® Document Research℠

**CSX CORPORATION**
**PART II**
**Item 8. Financial Statements and Supplementary Data**

## CONSOLIDATED STATEMENTS OF CHANGES IN SHAREHOLDERS' EQUITY

*(Dollars in Millions)*

| | Common Shares Outstanding (Thousands) | Common Stock | Other Capital | Retained Earnings | Accumulated Other Comprehensive Income (Loss): Pension and OPEB Adjustments(a) | Fuel Hedge(b) | Other | Total |
|---|---|---|---|---|---|---|---|---|
| **Balance December 30, 2005** | 436,406 | $436 | $1,533 | $6,262 | $(307) | $30 | $ - | $7,954 |
| Comprehensive Earnings: | | | | | | | | |
| Net Earnings | - | - | - | 1,310 | - | - | - | 1,310 |
| Other Comprehensive Income (Loss) | - | - | - | - | (2) | (30) | - | (32) |
| Comprehensive Earnings | | | | | | | | 1,278 |
| Adjustment for Initial Adoption of SFAS 158, net of tax(c) | - | - | - | - | (83) | - | - | (83) |
| Dividends | - | - | - | (145) | - | - | - | (145) |
| Share Repurchases | (14,533) | (14) | (451) | - | - | - | - | (465) |
| Stock Option Exercises and Other | 15,891 | 16 | 387 | - | - | - | - | 403 |
| **Balance December 29, 2006** | 437,764 | 438 | 1,469 | 7,427 | (392) | - | - | 8,942 |
| Comprehensive Earnings: | | | | | | | | |
| Net Earnings | - | - | - | 1,336 | - | - | - | 1,336 |
| Other Comprehensive Income (Loss) | - | - | - | - | 63 | - | 4 | 67 |
| Comprehensive Earnings | | | | | | | | 1,403 |
| Adjustment for Initial Adoption of FIN 48(d) | - | - | - | 33 | - | - | - | 33 |
| Dividends | - | - | - | (231) | - | - | - | (231) |
| Share Repurchases (e) | (50,917) | (51) | (2,123) | - | - | - | - | (2,174) |
| Bond Conversions(f) | 13,296 | 13 | 339 | - | - | - | - | 352 |
| Subsidiary Equity Restructuring | - | - | 72 | - | - | - | - | 72 |
| Stock Option Exercises and Other | 7,721 | 8 | 280 | - | - | - | - | 288 |
| **Balance December 29, 2007** | 407,864 | 408 | 37 | 8,565 | (329) | - | 4 | 8,685 |
| Comprehensive Earnings: | | | | | | | | |
| Net Earnings | - | - | - | 1,365 | - | - | - | 1,365 |
| Other Comprehensive Income (Loss) | - | - | - | - | (411) | - | (5) | (416) |
| Comprehensive Earnings | | | | | | | | 949 |
| Dividends | - | - | - | (308) | - | - | - | (308) |
| Share Repurchases (e) | (28,486) | (28) | (1,542) | - | - | - | - | (1,570) |
| Other Capital Reclass (g) | - | - | 1,211 | (1,211) | - | - | - | - |
| Bond Conversions (f) | 5,042 | 5 | 116 | - | - | - | - | 121 |
| Adjustment for SFAS 158, net of tax (g) | | | | (13) | | | | (13) |
| Stock Option Exercises and Other | 6,106 | 6 | 178 | - | - | - | - | 184 |
| **Balance December 26, 2008** | 390,526 | $391 | $ - | $8,398 | $(740) | $ - | $(1) | $8,048 |

*(a) Pension and Other Postretirement Benefits balances are net of taxes of $197 million, $166 million and $375 million for 2006, 2007 and 2008, respectively.*
*(b) Fuel hedge activity is net of taxes of $21 million for 2006.*
*(c) See Note 1, Nature of Operations and Significant Accounting Policies under caption New Accounting Pronouncements and Changes in Accounting Policy.*
*(d) See Note 12, Income Taxes.*
*(e) See Note 1, Nature of Operations and Significant Accounting Policies under caption Other Items – Share Repurchases.*
*(f) See Note 2, Earnings Per Share and Note 9, Debt and Credit Agreements.*
*(g) See Note 1, Nature of Operations and Significant Accounting Policies under caption Other Items - Retained Earnings.*

Case 1:07-mc-00489-BAH Document 1229-7 Filed 11/22/24 Page 2939 of 3766

See accompanying Notes to Consolidated Financial Statements



Source: CSX CORP, 10-K, February 19, 2009
Powered by Morningstar® Document Research℠

# NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 1. Nature of Operations and Significant Accounting Policies**

***Nature of Operations***

CSX Corporation ("CSX"), and together with its subsidiaries (the "Company"), based in Jacksonville, Florida, is one of the nation's leading transportation suppliers. The Company's rail and intermodal businesses provide rail-based transportation services including traditional rail service and the transport of intermodal containers and trailers.

**Rail**

CSX's principal operating company, CSX Transportation, Inc. ("CSXT"), provides a crucial link to the transportation supply chain through its approximately 21,000 route mile rail network, which serves major population centers in 23 states east of the Mississippi River, the District of Columbia and the Canadian provinces of Ontario and Quebec. It serves 70 ocean, river and lake ports along the Atlantic and Gulf Coasts, the Mississippi River, the Great Lakes and the St. Lawrence Seaway. CSXT also serves thousands of production and distribution facilities through track connections to more than 230 short-line and regional railroads.

*Other Entities*

In addition to CSXT, the rail segment includes non-railroad subsidiaries Total Distribution Services, Inc. ("TDSI"), Transflo Terminal Services, Inc. ("Transflo"), CSX Technology, Inc. ("CSX Technology") and other subsidiaries. TDSI serves the automotive industry with distribution centers and storage locations, while Transflo provides logistical solutions for transferring products from rail to trucks. Technology and other support services are provided by CSX Technology and other subsidiaries.

**Intermodal**

CSX Intermodal, Inc. ("Intermodal"), one of the nation's largest coast-to-coast intermodal transportation providers, is a stand-alone, integrated intermodal company linking customers to railroads via trucks and terminals. Containers and trailers are loaded and unloaded from trains, and trucks provide the link between intermodal terminals and the customer.

**Lines of Business**

Together, the rail and intermodal segments generated $11.3 billion of revenue during 2008 and served four primary lines of business, which are as follows:



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 1. Nature of Operations and Significant Accounting Policies, continued**

- The merchandise business is the most diverse market with nearly 2.5 million carloads per year of aggregates, which includes crushed stone, sand and gravel, metal, phosphate, fertilizer, food, consumer, agricultural, paper and chemical products. The merchandise business generated approximately 49% of the Company's revenue in 2008 and 37% of volume.

- Coal, which delivered approximately 1.9 million carloads of coal, coke and iron ore to electricity generating power plants, ocean, river and lake piers and terminals, steel makers and industrial plants, accounted for approximately 29% of the Company's revenue in 2008 and 28% of volume. The Company transports almost one-third of every ton of coal used for generating electricity in the areas it serves.

- Automotive, which delivers finished vehicles and auto parts, generated approximately 7% of the Company's revenue and 5% of the Company's volume in 2008. The Company delivers approximately 30% of North America's light vehicles, serving both traditional manufacturers and the increasing number of global manufacturers.

- Intermodal offers a competitive cost advantage over long-haul trucking by combining the superior economics of rail transportation with the short-haul flexibility of trucks. Through its network of more than 50 terminals, Intermodal serves all major markets east of the Mississippi and transports mainly manufactured consumer goods in containers, providing customers with truck-like service for longer shipments. For 2008, Intermodal accounted for approximately 13% of the Company's total revenue and 30% of volume.

Other revenue, which includes revenue from regional railroads, demurrage, switching and other incidental charges, accounted for 2% of the Company's total 2008 revenue. Revenue from regional railroads includes shipments by railroads that the Company does not directly operate. Demurrage represents charges assessed by railroads when shippers or receivers of freight hold railcars beyond a specified period of time. Switching revenue is generated when CSXT switches cars between trains for a customer or another railroad.

**Other Businesses**

CSX's other holdings include CSX Real Property, Inc., a subsidiary responsible for the Company's real estate sales, leasing, acquisition and management and development activities, and the Greenbrier Hotel Corporation, formerly known as CSX Hotels, Inc., a resort doing business as The Greenbrier. These items are classified in other income because they are not considered by the Company to be operating activities and results may fluctuate with the timing of real estate sales and resort seasonality. See Note 9, Other Income, for more information related to the Company's investment in The Greenbrier resort.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 1. Nature of Operations and Significant Accounting Policies, continued**

***Basis of Presentation***

In the opinion of management, the accompanying consolidated financial statements contain all normal, recurring adjustments necessary to present fairly the financial position of CSX and its subsidiaries at December 2008 and December 2007, and the Consolidated Statements of Income, Cash Flows and Changes in Shareholders' Equity for fiscal years 2008, 2007 and 2006.

Beginning in 2008, certain items have been reclassified within the income statement. These reclassifications include reclassifying all items previously reported as other operating income and certain items within other income into the Rail segment. As a result of this change, the Company's consolidated operating income and Surface Transportation operating income is now the same; therefore, the Company no longer reports separate Surface transportation results. The Rail segment was not materially impacted by these reclassifications.

Additionally, beginning in 2008, the Company reclassified all non-locomotive fuel related costs previously included in materials, supplies and other into fuel on the Company's consolidated income statement. These amounts were $150 million and $102 million for the years ended 2008 and 2007, respectively. Certain other prior-year data have been reclassified to conform to the 2008 presentation.

***Fiscal Year***

CSX follows a 52/53 week fiscal reporting calendar. This fiscal calendar allows every quarter to consistently end on a Friday and to be of equal duration (13 weeks). However, to maintain this type of reporting calendar, every sixth or seventh year (depending on the Gregorian calendar and when leap year falls), an extra week will be included in one quarter (a 14-week fiscal quarter) and, therefore, that full fiscal year will have 53 weeks.

Fiscal years 2008, 2007 and 2006 each consisted of 52 weeks ending on December 26, 2008, December 28, 2007 and December 29, 2006, respectively. Except as otherwise specified, references to full year indicate CSX's fiscal periods ended on these dates. The next 53 week fiscal year will be 2010.

***Principles of Consolidation***

The consolidated financial statements include results of operations of CSX and its majority-owned subsidiaries. All significant intercompany accounts and transactions have been eliminated. Most investments in companies that were not majority-owned were carried at cost (if less than 20% owned and the Company has no significant influence) or equity (if the Company has significant influence).



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 1. Nature of Operations and Significant Accounting Policies, continued**

***Cash, Cash Equivalents and Short-term Investments***

On a daily basis, cash in excess of current operating requirements is invested in various highly liquid investments having a typical maturity date of three months or less at the date of acquisition. These investments were carried at cost, which approximated market value, and were classified as cash equivalents. Investments in instruments with maturities greater than three months but less than one year were classified as short-term investments.

CSX holds $15 million and $270 million of auction rate securities and classifies these investments as available for sale as of December 2008 and 2007, respectively. Accordingly, these investments were included in current assets on the Consolidated Balance Sheets. On the Consolidated Cash Flow Statements, purchases and sales of these assets were classified within Investing Activities.

***Allowance for Doubtful Accounts***

The Company maintains an allowance for doubtful accounts for the estimated probable losses on uncollectible accounts and other receivables. The allowance is based upon the credit worthiness of customers, historical experience, the age of the receivable and current market and economic conditions, as well as any known trends or uncertainties related to customer billing and account collectibility. Uncollectible amounts were charged against the allowance account. The allowance for doubtful accounts is netted against accounts receivable.

***Materials and Supplies***

Materials and supplies in the Consolidated Balance Sheets were carried at average costs and consist primarily of fuel and parts used in the repair and maintenance of CSXT's freight car and locomotive fleets, equipment and track structure.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 1. Nature of Operations and Significant Accounting Policies, continued**

***Properties***

All properties were stated at historical cost less an allowance for accumulated depreciation. Rail assets, including main-line track, locomotives and freight cars, were depreciated using the group-life method. Under this method, CSXT pools similar assets by road and equipment type and then depreciates each group as a whole. Regulations enforced by the Surface Transportation Board ("STB") of the U.S. Department of Transportation require periodic formal studies of ultimate service lives ("life studies") for all railroad assets. Factors taken into account during a life study include:

- statistical analysis of historical retirements for each group of property;
- evaluation of current operations;
- evaluation of technological advances and maintenance schedules;
- previous assessment of the condition of the assets and outlook for their continued use;
- expected net salvage to be received upon retirement; and
- comparison of assets to the same asset groups with other companies.

The results of the life study process determine the service lives for each asset group under the group-life method. These studies are conducted by a third party expert and are analyzed by the Company's management. Resulting changes in service life estimates are subject to review and approval by the STB. Road assets, including main-line track, have estimated service lives ranging from 6 years for system roadway machinery to 80 years for grading. Equipment assets, including locomotives and freight cars, have estimated service lives ranging from 6 years for motor vehicles to 35 years for work equipment.

Changes in asset lives due to the results of the life studies are applied at the completion of the life study and continue until the next required life study. The life studies may also indicate that the recorded amount of accumulated depreciation is deficient (or in excess) of the amount indicated by the study. Any such deficiency (or excess) amount is amortized as a component of depreciation expense over the remaining useful life of the asset group until the next required life study.

The majority of non-rail property is depreciated using the straight-line method on a per asset basis. The depreciable lives of non-rail property are periodically reviewed by the Company and any changes are applied on a prospective basis. Amortization expense recorded under capital leases is included in depreciation expense on the Consolidated Income Statements.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 1. Nature of Operations and Significant Accounting Policies, continued**

For retirements or disposals of depreciable rail assets that occur in the ordinary course of business, the asset cost (net of salvage value or sales proceeds) is charged to accumulated depreciation and no gain or loss is recognized. For retirements or disposals of non-rail depreciable assets, infrequent disposal of rail assets outside the normal course of business and all dispositions of land, the resulting gains or losses are recognized at the time of disposal. Expenditures that significantly increase asset values or extend useful lives are capitalized. Repair and maintenance expenditures are charged to operating expense when the work is performed.

Properties and other long-lived assets are reviewed for impairment whenever events or business conditions indicate the carrying amount of such assets may not be fully recoverable. Initial assessments of recoverability are based on estimates of undiscounted future net cash flows associated with an asset or a group of assets in accordance with Statement of Financial Accounting Standards ("SFAS") 144, *Accounting for the Impairment or Disposal of Long-Lived Assets*. Where impairment is indicated, the assets are evaluated and their carrying amount is reduced to fair value based on discounted net cash flows or other estimates of fair value.

***Revenue and Expense Recognition***

The Company recognizes freight revenue using Free-On-Board ("FOB") Origin pursuant to Emerging Issues Task Force ("EITF") 91-9, *Revenue and Expense Recognition for Freight Services in Process*. The Company uses method (5) in the EITF, which provides for the allocation of revenue between reporting periods based on relative transit time in each reporting period. Expenses are recognized as incurred.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 1. Nature of Operations and Significant Accounting Policies, continued**

The certain key estimates included in the recognition and measurement of revenue and related accounts receivable under the policies described above are as follows:

- revenue associated with shipments in transit, which are based on historical freight car movement data as well as average cycle times to move commodities from their origin to their final destination or interchange;
- future adjustments to revenue or accounts receivable for billing corrections, billing discounts, bad debts and allowances for doubtful accounts;
- future adjustments to revenue for overcharge claims filed by customers, which are based on historical cash paid to customers for rate overcharges as a percentage of total billing; and
- incentive-based refunds to customers, which are primarily based on customers achieving certain volume thresholds and are recorded as a reduction to revenue on the basis of management's best estimate of the projected liability. This estimate is based on historical activity, current volume levels and a forecast of future volume.

The Company regularly updates the estimates described above based on historical experience. All other revenue, such as demurrage, switching and other incidental charges are recorded upon completion of the service.

***Comprehensive Earnings***

CSX reports comprehensive earnings (loss) in accordance with SFAS 130, *Reporting Comprehensive Income*, in the Consolidated Statement of Changes in Shareholders' Equity. Total comprehensive earnings are defined as all changes in shareholders' equity during a period, other than those resulting from investments by and distributions to shareholders (i.e. issuance of equity securities and dividends). Generally, for CSX, that calculation is net earnings plus or minus adjustments for pension and other post-retirement liabilities. Total comprehensive earnings represent the activity for a period and were $949 million and $1.4 billion for 2008 and 2007, respectively.

While total comprehensive earnings is the activity in a period and is largely driven by net earnings in that period, accumulated other comprehensive income or loss ("AOCI") represents the cumulative balance, net of tax, as of the balance sheet date. For CSX, AOCI is specifically the cumulative balance related to the pension and other post-retirement adjustments and in total reduced overall equity. The balance at December 2008 and December 2007 was $741 million and $325 million, respectively. (See Note 7, Employee Benefit Plans.)



Source: CSX CORP, 10-K, February 19, 2009
Powered by Morningstar® Document Research℠

**NOTE 1. Nature of Operations and Significant Accounting Policies, continued**

***Derivative Financial Instruments***

CSX recognizes all derivatives as either assets or liabilities in the Consolidated Balance Sheets and measures those instruments at fair value. (See Note 16, Derivative Financial Instruments.)

***New Accounting Pronouncements and Changes in Accounting Policy***

CSX adopted the Financial Accounting Standards Board ("FASB") Interpretation 48, *Accounting for Uncertainty in Income Taxes* ("FIN 48"), at the beginning of fiscal year 2007. FIN 48 addressed the determination of how tax benefits claimed or expected to be claimed on an income tax return should be recorded in the financial statements. Under FIN 48, the Company must recognize the tax benefit from an uncertain tax position only if it is more likely than not that the tax position will be sustained upon examination by the taxing authorities, based on the technical merits of the position. These tax benefits recognized in the financial statements are measured based on the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate resolution. The impact of the Company's reassessment of its tax positions in accordance with FIN 48 did not have a material impact on the financial condition, results of operations or liquidity. (See Note 12, Income Taxes.)

In 2007, the FASB issued SFAS No. 157, *Fair Value Measurements*, and the SFAS No. 159, *The Fair Value Option for Financial Assets and Financial Liabilities*. These statements define fair value, provide guidance on fair value measurement and give companies the option to report financial instruments and certain other items at fair value. CSX was not materially impacted by these statements.

In 2007, the FASB issued SFAS No. 160, *Noncontrolling Interests in Consolidated Financial Statements - An amendment of ARB No. 51 ("SFAS 160").* This statement clarifies that minority interest should be reported as equity on the balance sheet. Additionally, it requires disclosure of consolidated net income attributable to the parent and to the noncontrolling interest on the face of the income statement. For CSX, SFAS 160 is effective beginning fiscal year 2009 and the Company does not expect to be materially impacted by this statement.

In September 2006, FASB issued SFAS 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans, an Amendment of FASB Statements No. 87, 88, 106, and 132 (R)* ("SFAS 158"), which changed the accounting rules for reporting and disclosures related to pensions and other post-retirement benefit plans. Pursuant to SFAS 158, the Company was required to change its September measurement date for the pension and other postretirement benefit plans' assets and obligations to its fiscal year end effective in 2008. The effect of the change was a $13 million after-tax reduction to retained earnings.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 1. Nature of Operations and Significant Accounting Policies, continued**

Effective fiscal year 2006, the Company adopted the fair value recognition provisions of SFAS 123(R), *Share-Based Payment* ("SFAS 123(R)") using the modified-prospective-transition method. Under this method, compensation costs recognized in 2006 and forward include all unvested share-based payments as of the beginning of 2006. Share-based compensation at CSX may include stock options, restricted stock awards, stock issued to CSX directors and CSX's Long-term Incentive Plans. The amount of compensation costs recognized is based upon the estimated grant date fair value method under the Black-Scholes-Merton formula and resulted in the recognition of additional compensation cost from the unvested portion of stock options granted prior to 2003.

The adoption of SFAS 123(R) did not result in a material impact to the Company's Consolidated Income Statement or earnings per share. The Company recorded $3 million in 2006 of additional compensation expense for unvested stock options granted prior to 2003. Compensation costs for all other types of share-based payments were consistently reported for all periods presented.

***Use of Estimates***

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires that management make estimates in reporting the amounts of certain assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amount of certain revenues and expenses during the reporting period. Actual results may differ from those estimates. Critical accounting estimates using management judgment are made for the following areas:

- casualty, environmental and legal reserves (see Note 5, Casualty, Environmental and Other Reserves);
- pension and post-retirement medical plan accounting (see Note 7, Employee Benefit Plans);
- depreciation policies for assets under the group-life method (see "Properties" in this note); and
- income taxes (see Note 12, Income Taxes).



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

## NOTE 1. Nature of Operations and Significant Accounting Policies, continued

***Other Items – Share Repurchases***

In March 2008, CSX announced an increase to its share repurchase program, prospectively targeting $3 billion in shares. Since that announcement, CSX has completed its internal target of $1.25 billion in share repurchases. As a result, the Company has remaining authority of $1.75 billion. Further repurchases will be dependent upon an improvement in market and business conditions.

Total share repurchases under all publicly announced plans was as follows:

| | Fiscal Years | |
|---|---|---|
| *(In Millions)* | **2008** | 2007 |
| Number of Shares Repurchased | **28** | 51 |
| Value of Shares Repurchased *(a)* | **$1,550** | $2,174 |

*(a) The difference between shares repurchased on the cash flow statement and statement of changes in stockholders' equity at December 2008 of $1,570 million versus the $1,550 million noted in the table above is the $20 million of shares repurchased to fund the Company's contribution to a 401(k) plan that covers certain union employees.*

***Other Items – Retained Earnings***

During 2008, CSX's other capital balance was reduced to zero as a result of share repurchases. As noted in Accounting Principles Board ("APB") Opinion 6, *Status of Accounting Research Bulletins*, CSX's other capital balance cannot be negative. As a result, retained earnings was reduced by $1.2 billion during 2008, which represented share repurchases occurring after the other capital balance had been reduced to zero. Also during 2008, CSX changed its measurement date to its fiscal year end in accordance with SFAS 158. The effect of the change was a $13 million after-tax adjustment to retained earnings. Generally, retained earnings is only impacted by net earnings and dividends.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 2. Earnings Per Share**

The following table sets forth the computation of basic earnings per share and earnings per share, assuming dilution:

| | Fiscal Years | | |
|---|---|---|---|
| | **2008** | 2007 | 2006 |
| Numerator (Millions): | | | |
| Earnings from Continuing Operations | **$1,365** | $1,226 | $1,310 |
| Interest Expense on Convertible Debt - Net of Tax | **1** | 2 | 4 |
| Net Earnings from Continuing Operations, If-Converted | **1,366** | 1,228 | 1,314 |
| | | | |
| Discontinued Operations - Net of Tax *(a)* | **-** | 110 | - |
| Net Earnings, If-Converted | **1,366** | 1,338 | 1,314 |
| Interest Expense on Convertible Debt - Net of Tax | **(1)** | (2) | (4) |
| Net Earnings | **$1,365** | $1,336 | $1,310 |
| | | | |
| Denominator (Thousands): | | | |
| Average Common Shares Outstanding | **400,683** | 430,270 | 440,084 |
| Convertible Debt | **2,989** | 11,469 | 19,456 |
| Stock Options *(b)* | **3,751** | 5,010 | 6,057 |
| Other Potentially Dilutive Common Shares | **1,179** | 1,531 | 337 |
| Average Common Shares Outstanding, Assuming Dilution | **408,602** | 448,280 | 465,934 |
| | | | |
| Earnings Per Share: | | | |
| Income from Continuing Operations | **$3.41** | $2.85 | $2.98 |
| Discontinued Operations | **-** | 0.26 | - |
| Net Earnings | **$3.41** | $3.11 | $2.98 |
| | | | |
| Earnings Per Share, Assuming Dilution: | | | |
| Income from Continuing Operations | **$3.34** | $2.74 | $2.82 |
| Discontinued Operations | **-** | 0.25 | - |
| Net Earnings | **$3.34** | $2.99 | $2.82 |

*(a) For additional information regarding discontinued operations, see Note 12, Income Taxes.*

*(b) In calculating diluted earnings per share, SFAS 128, Earnings Per Share, requires CSX to include the potential shares that would be outstanding if all outstanding stock options were exercised. This is offset by shares CSX could repurchase using the proceeds from these hypothetical exercises to obtain the common stock equivalent. This number is different from outstanding stock options, which is included in Note 4, Stock Plans and Share-Based Compensation. Also, all stock options were dilutive for the years presented, therefore no stock options were excluded from the diluted earnings per share calculation.*



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 2. Earnings Per Share, continued**

Basic earnings per share is based on the weighted-average number of shares of common stock outstanding. Earnings per share, assuming dilution, is based on the weighted-average number of shares of common stock outstanding adjusted for the effects of common stock that may be issued as a result of the following types of potentially dilutive instruments:

- convertible debt;
- employee stock options; and
- other equity awards, which include unvested restricted stock and long-term incentive awards.

EITF 04-8, The *Effect of Contingently Convertible Debt on Diluted Earnings Per Share,* requires CSX to include additional shares in the computation of earnings per share, assuming dilution. The amount included in diluted earnings per share represents the number of shares that would be issued if all of CSX's outstanding convertible debentures were converted into CSX common stock.

As a result, diluted shares outstanding are not impacted when debentures are converted into CSX common stock because those shares were already included in the diluted shares calculation. Shares outstanding for basic earnings per share, however, are impacted when conversions occur on a weighted average basis. During 2008 and 2007, $142 million and $375 million, respectively, of face value convertible debentures were converted into approximately 5 million and 13 million shares of CSX common stock, respectively. At December 2008, approximately $32 million of convertible debentures at face value remained outstanding, which are convertible into 1 million shares of CSX common stock.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 3. Shareholders' Equity**

Common and preferred stock consists of the following:

| Common Stock, $1 Par Value | December 26, 2008 |
|---|---|
| | *(in thousands)* |
| Common shares authorized | 600,000 |
| Common shares issued and outstanding | 390,526 |
| | |
| **Preferred Stock** | |
| Preferred shares authorized | 25,000 |
| Preferred shares issued and outstanding | - |

Holders of common stock are entitled to one vote on all matters requiring a vote for each share held. Preferred stock is senior to common stock with respect to dividends and upon liquidation of CSX.

**NOTE 4. Stock Plans and Share-Based Compensation**

CSX share-based compensation plans primarily include performance grants, restricted stock awards, stock options and stock plans for directors. CSX has not granted stock options since 2003. Awards granted under the various plans are determined and approved by the Compensation Committee of the Board of Directors or, in certain circumstances, by the Chief Executive Officer for awards to management employees other than senior executives. The Board of Directors approves awards granted to the Company's non-management Directors upon recommendation of the Governance Committee.

As of December 2008, there were 1,622 current or former employees with stock option grants outstanding under the various plans. Most new stock awards were granted under the authorization provided in the CSX Omnibus Incentive Plan. As of December 2008, an additional 11 million shares of stock could be issued under this plan.

SFAS 123(R) requires the cash flows resulting from income tax deductions in excess of compensation costs to be classified as financing cash flows. This requirement resulted in reduced net operating cash flows and increased net financing cash flows of approximately $69 million and $60 million for fiscal years 2008 and 2007, respectively. Prior to the adoption of SFAS 123(R), CSX presented all income tax benefits from deductions resulting from compensation costs as operating cash flows in the Consolidated Cash Flow Statements.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 4. Stock Plans and Share-Based Compensation, continued**

SFAS 123(R) also requires the disclosure of total compensation costs for share-based payment arrangements and the related tax benefits recognized in income. Total pre-tax expense associated with share-based compensation and its related income tax benefit is as follows:

| | Fiscal Years | | |
|---|---|---|---|
| *(Dollars in Millions)* | **2008** | 2007 | 2006 |
| Share-Based Compensation Expense | **$38** | $73 | $45 |
| Income Tax Benefit | **14** | 27 | 17 |

***Stock Options***

Stock options were granted with 10-year terms. Options outstanding as of December 2008 are generally exercisable three to ten years after date of grant. The exercise price for options granted equals the market price of the underlying stock on the grant date. A summary of CSX's stock option activity and related information for the fiscal years 2008, 2007 and 2006 is as follows:

| | Fiscal Years | | | | | |
|---|---|---|---|---|---|---|
| | **2008** | | 2007 | | 2006 | |
| | **Options Outstanding (000s)** | **Weighted-Average Exercise Price** | Options Outstanding (000s) | Weighted-Average Exercise Price | Options Outstanding (000s) | Weighted-Average Exercise Price |
| Outstanding at Beginning of Year | **11,771** | **$18.25** | 19,420 | $18.96 | 34,151 | $20.13 |
| Expired or Canceled | **(21)** | **$19.03** | (44) | $18.05 | (101) | $21.71 |
| Exercised | **(4,441)** | **$18.76** | (7,605) | $20.08 | (14,630) | $21.76 |
| Outstanding at End of Year | **7,309** | **$17.93** | 11,771 | $18.25 | 19,420 | $18.96 |
| Exercisable at End of Year | **7,309** | **$17.93** | 9,612 | $18.73 | 12,670 | $19.78 |



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 4. Stock Plans and Share-Based Compensation, continued**

The following table summarizes information about stock options outstanding at December 2008:

| Exercise Price | Number Outstanding (000s) | Weighted-Average Remaining Contractual Life (Years) | Weighted-Average Exercise Price | Aggregate Intrinsic Value(a) (Millions) |
|---|---|---|---|---|
| **Options Outstanding:** | | | | |
| $10 to $15 | 340 | 1.31 | $12.35 | $9 |
| $15 to $20 | 6,374 | 3.52 | $17.81 | $142 |
| $20 to $25 | 595 | 0.37 | $22.42 | $10 |
| Total | 7,309 | 3.16 | $17.93 | $161 |

*(a) Aggregate intrinsic value represents the amount employees would have received if the options were exercised as of December 2008.*

The total intrinsic value of options exercised, which represents the value paid to current and former employees who exercised options for fiscal years ended 2008, 2007 and 2006, was $165 million, $163 million and $147 million, respectively.

As of December 2008, all options are vested and therefore there will be no future expense related to these options.

***Restricted Stock Awards***

Restricted stock awards vest over an employment period of up to five years. The following table provides information about outstanding restricted stock awards.

| | Fiscal Years | | |
|---|---|---|---|
| | **2008** | 2007 | 2006 |
| Number of Restricted Stock Awards Outstanding *(Thousands)* | **39** | 92 | 220 |
| Weighted Average Fair Value at Grant Date | **$29.61** | $24.26 | $19.44 |
| Restricted Stock Award Expense *(Millions)* | **$1** | $1 | $2 |

**NOTE 4. Stock Plans and Share-Based Compensation, continued**

***Long-term Incentive Plans***

The CSX Long-term Incentive Plans ("LTIP") were adopted under the CSX Omnibus Incentive Plan. The objective of these long-term incentive plans is to motivate and reward key members of management and executives for achieving and exceeding certain financial and strategic initiatives.

In May 2008, 340,000 target performance units were granted to certain layers of management under a new LTIP. This plan covers a three-year cycle ending in fiscal year 2010. The key financial target is consolidated operating ratio, which is defined as annual operating expenses divided by revenue and is calculated excluding certain non-recurring items. Target grants were made in performance units, with each unit being equivalent to one share of CSX stock, and payouts will be made in CSX common stock. The payout range for participants will be between 0% and 200% of the original target grant based upon CSX's attainment of pre-established operating ratio targets for fiscal year 2010. Payouts to certain senior executive officers are subject to a reduction of up to 30% at the discretion of the Compensation Committee of the Board of Directors based upon Company performance against certain CSX strategic initiatives. Units in the plan have a weighted average grant date fair value of $64.86 which includes the value of both the initial grant and subsequent, smaller grants issued at different prices based on grant date fair value to new or promoted employees not previously included.

In 2007, 510,000 target performance units were granted to certain layers of management under a LTIP. This plan covers a three-year cycle ending in fiscal year 2009. The key financial target is Surface Transportation operating ratio, which is defined as annual operating expenses divided by revenue of the Company's rail and intermodal businesses and is calculated excluding certain non-recurring items. Target grants were made in performance units, with each unit being equivalent to one share of CSX stock, and payouts will be made in CSX common stock. The payout range for the majority of participants will be between 0% and 200% of the original target grant based upon CSX's attainment of pre-established operating ratio targets for fiscal year 2009. Payouts for certain senior executive officers are subject to a 20% increase or decrease based upon certain additional pre-established financial targets. For certain senior executive officers, this could result in a maximum payout of 240% of the original grant. However, any payout to certain senior executive officers is also subject to a reduction of up to 30% at the discretion of the Compensation Committee of the Board of Directors based upon Company performance against certain CSX strategic initiatives. Units in the plan have a weighted average grant date fair value of $43.71, which includes the value of both the initial grant and subsequent, smaller grants issued at different prices based on grant date fair value to new or promoted employees not previously included.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 4. Stock Plans and Share-Based Compensation, continued**

In 2006, target performance units were granted to certain layers of management under a LTIP. This plan covered a three-year cycle ending in fiscal year 2008. The terms for this plan are substantially similar to the 2007 plan. Units in the plan had a weighted average grant date fair value of $37.07, which included the value of both the initial grant and subsequent, smaller grants at different prices to new or promoted employees not previously included. This plan ended on December 26, 2008, and CSX issued 814,000 net shares in January 2009 as a result of the achievement of performance targets for the three preceding fiscal years, which had a net market value of $24 million. The CSX Long-term Incentive Plans were adopted under the CSX Omnibus Incentive Plan. The objective of these long-term incentive plans is to motivate and reward key members of management and executives for achieving and exceeding certain financial and strategic initiatives.

Total expense incurred due to long-term incentive plans was as follows:

| | Fiscal Years | | |
|---|---|---|---|
| | **2008** | 2007 | 2006 |
| Long-term Incentive Plan Compensation Expense | **$33** | $67 | $35 |

As of December 2008, there was $15 million of total unrecognized compensation cost related to these plans that is expected to be recognized over a weighted-average period of approximately 1.5 years. The activity related to each of the outstanding long-term incentive plans is summarized as follows:

| | **2007 - 2009 Plan Units Outstanding (000s)** | **2008 - 2010 Plan Units Outstanding (000s)** |
|---|---|---|
| Unvested at December 29, 2006 | - | - |
| Granted in 2007 | 526 | - |
| Forfeited in 2007 | (11) | - |
| Unvested at December 28, 2007 | 515 | - |
| Granted in 2008 | 14 | 350 |
| Forfeited in 2008 | (19) | (10) |
| Unvested at December 26, 2008 | 510 | 340 |



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 4. Stock Plans and Share-Based Compensation, continued**

***Stock Plan for Directors***

The Stock Plan for Directors, approved by the shareholders in 1992, governs in part the manner in which directors' fees and retainers were paid. At the end of 2008, the minimum retainer to be paid in CSX common stock was 50% of the annual retainer, but each director may elect to receive the entire retainer and fees in CSX common stock. In addition, each director receives an annual payment made entirely in CSX common stock. However, in 2008, the Board of Directors elected to change the date of issue from December 2008 to February 2009. Therefore these shares were not issued before year-end. The following table provides information about shares issued to directors.

| | Fiscal Years | | |
|---|---|---|---|
| | **2008** | 2007 | 2006 |
| Shares Issued to Directors *(Thousands)* | **10** | 68 | 70 |
| Expense *(Millions)* | **$1** | $3 | $3 |

The Plan permits each director, in accordance with Internal Revenue Code Section 409A, to defer receipt of fees. Deferred cash amounts were credited to an account and invested in a choice of eight investment selections, including a CSX common stock equivalent fund. Distributions were made in accordance with elections made by the directors, consistent with the terms of the Plan. At December 2008, there were 1 million shares of common stock reserved for issuance under this Plan.

***Shareholder Dividend Reinvestment Plan***

CSX maintains the Shareholder Dividend Reinvestment Plan under which shareholders may use dividends paid on CSX common stock held in the plan to purchase additional shares of stock. The following table provides information about shares available for issuance under this plan at the end of fiscal years 2008, 2007 and 2006.

| | Fiscal Years | | |
|---|---|---|---|
| | **2008** | 2007 | 2006 |
| Number of Shares Available for Issuance *(Thousands)* | **11,101** | 10,906 | 10,642 |



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 5. Casualty, Environmental and Other Reserves**

Activity related to casualty, environmental and other reserves is as follows:

| *(Dollars in Millions)* | Casualty Reserves | Separation Liabilities | Environmental Reserves | Other Reserves | Total |
|---|---|---|---|---|---|
| Balance December 30, 2005 | $675 | $121 | $71 | $97 | $964 |
| Charged to Expense | 143 | - | 20 | 48 | 211 |
| Payments | (181) | (16) | (20) | (52) | (269) |
| Reclassifications*(a)* | - | 15 | - | - | 15 |
| Balance December 29, 2006 | $637 | $120 | $71 | $93 | $921 |
| Charged to Expense*(b)* | 141 | - | 76 | 79 | 296 |
| Change in Estimate | (99) | - | - | - | (99) |
| Payments*(b)* | (133) | (17) | (47) | (50) | (247) |
| Balance December 28, 2007 | $546 | $103 | $100 | $122 | $871 |
| Charged to Expense | 115 | - | 38 | 57 | 210 |
| Payments | (95) | (16) | (38) | (53) | (202) |
| Balance December 26, 2008 | $566 | $87 | $100 | $126 | $879 |

*(a) The reclassifications in 2006 were reclassified from Labor and Fringe Benefits Payable.*

*(b) Charges to expense and payments for environmental reserves were higher in 2007 primarily due to clean-up costs associated with an increase in significant train accidents.*

Casualty, environmental and other reserves were determined to be critical accounting estimates due to the need for significant management judgments. They are provided for in the Consolidated Balance Sheets as follows:

| | **December 26, 2008** | | | December 28, 2007 | | |
|---|---|---|---|---|---|---|
| *(Dollars in Millions)* | **Current** | **Long-term** | **Total** | Current | Long-term | Total |
| Casualty: | | | | | | |
| Personal Injury | **$104** | **$258** | **$362** | $113 | $225 | $338 |
| Occupational | **32** | **172** | **204** | 44 | 164 | 208 |
| Total Casualty | **136** | **430** | **566** | 157 | 389 | 546 |
| Separation | **16** | **71** | **87** | 16 | 87 | 103 |
| Environmental | **42** | **58** | **100** | 42 | 58 | 100 |
| Other | **42** | **84** | **126** | 32 | 90 | 122 |
| Total | **$236** | **$643** | **$879** | $247 | $624 | $871 |



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 5. Casualty, Environmental and Other Reserves, continued**

Details with respect to each type of reserve are described below. Actual settlements and claims received could differ. The final outcome of these matters cannot be predicted with certainty. Considering the legal defenses available, the liabilities that have been recorded and other factors, it is the opinion of management that none of these items, when finally resolved, will have a material effect on the Company's financial condition, results of operations or liquidity. However, should a number of these items occur in the same period, they could have a material effect on the financial condition, results of operations or liquidity in that particular period.

***Casualty***

Casualty reserves represent accruals for personal injury and occupational injury claims. Currently, no individual claim is expected to exceed the Company's self-insured retention amount. To the extent the value of an individual claim exceeds the self-insured retention amount, the Company would present the liability on a gross basis with a corresponding receivable for insurance recoveries. Personal injury and occupational claims are presented on a gross basis and in accordance with SFAS 5, *Accounting for Contingencies* ("SFAS 5"). These reserves fluctuate with changes in independent third party estimates, which are reviewed by management, and are offset by the timing of payments. Most of the claims were related to CSXT unless otherwise noted.

Defense and processing costs, which historically have been insignificant and are anticipated to be insignificant in the future, are not included in the recorded liabilities. The Company is presently self-insured up to $25 million per injury for personal injury and occupational-related claims.

*Personal Injury*

Personal injury reserves represent liabilities for employee work-related and third-party injuries. Work-related injuries for CSXT employees are primarily subject to the Federal Employers' Liability Act ("FELA"). In addition to FELA liabilities, employees of other CSX subsidiaries are covered by various state workers' compensation laws, the Federal Longshore and Harbor Workers' Compensation Program or the Maritime Jones Act.

CSXT retains an independent actuarial firm to assist management in assessing the value of personal injury claims and cases. An analysis is performed by the independent actuarial firm semi-annually and is reviewed by management. The methodology used by the actuary includes a development factor to reflect growth or reduction in the value of these personal injury claims. It is based largely on CSXT's historical claims and settlement experience. Actual results may vary from estimates due to the type and severity of the injury, costs of medical treatments and uncertainties in litigation.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 5. Casualty, Environmental and Other Reserves, continued**

Based on the analyses performed, the Company reduced personal injury reserves by $99 million during 2007. This reduction is due to a trend of significant decreases in the number and severity of work-related injuries for CSXT employees since 2003. The analyses further indicated an absence of large catastrophic claims since 2003, which also was determined to be a trend. These reductions were included in materials, supplies and other in the consolidated income statements.

*Occupational*

Occupational claims arise from allegations of exposures to certain materials in the workplace, such as asbestos, solvents (which include soaps and chemicals) and diesel fuels or allegations of chronic physical injuries resulting from work conditions, such as repetitive stress injuries, carpal tunnel syndrome and hearing loss.

An analysis is performed semi-annually. The methodology used includes an estimate of future anticipated claims based on the Company's trends in average historical claim filing rates, future anticipated dismissal rates and settlement rates.

*Asbestos*

The Company is party to a number of occupational claims by employees alleging exposure to asbestos in the workplace. The heaviest possible exposure for employees was due to work conducted in and around steam locomotive engines that were largely phased out beginning around the 1950s. However, other types of exposures, including exposure from locomotive component parts and building materials, continued until it was substantially eliminated by 1985. Additionally, the Company has retained liability for asbestos claims filed against its previously owned international container shipping business.

The Company retains a third party specialist with extensive experience in performing asbestos and other occupational studies to assist management in assessing the value of the Company's claims and cases. The analysis is performed by the specialist semi-annually and is reviewed by management. The objective of the analysis is to determine the number of estimated incurred but not reported ("IBNR") claims and the estimated average cost per claim to be received over the next seven years. Seven years was determined by management to be the time period in which probable claim filings and claim values could be estimated with more certainty.

Reserves for asbestos related claims were $124 million and $129 million at December 2008 and December 2007, respectively. Reserves for all other occupational claims were $80 million and $79 million at December 2008 and December 2007, respectively.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 5. Casualty, Environmental and Other Reserves, continued**

The Company, with the assistance of the third party specialist, determines it's potentially exposed population and is then able to derive the estimated number of IBNR claims. The estimated average cost per claim is then determined utilizing recent actual average cost per claim data and national industry data. Key elements of the assessment include the following:

- An estimate is computed using a ratio of Company employee data to national employment for select years during the period 1938-2001. The Company uses railroad industry historical census data because it does not have detailed employment records in order to compute the population of potentially exposed employees.

- The projected incidence of disease is estimated based on epidemiological studies using employees' age and the duration and intensity of potential exposure while employed. Epidemiology is the medical science that deals with the incidence, distribution and control of diseases in a population.

- An estimate of the future anticipated claims filing rate by type of disease (non-malignant, cancer and mesothelioma) is computed using the Company's average historical claim filing rates for a three-year calibration period, excluding a surge in claims originating in West Virginia in 2006. These claimants were neither exposed to asbestos in West Virginia nor residents of the state. 850 of these claims remain outstanding. The Company believes these claims will not have merit as no medical evidence has been provided to substantiate the claims and therefore the Company has excluded them from the calibration period. Claim levels have since returned to expected levels and management feels this calibration period represents the best estimate of future filing rates.

- An estimate of the future anticipated dismissal rate by type of claim is computed using the Company's historical average dismissal rates observed during the current calibration period noted above.

- An estimate of the future anticipated settlement by type of disease is computed using the Company's historical average of dollars paid per claim for pending and future claims using the average settlement by type of incident observed during the current calibration period noted above.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 5. Casualty, Environmental and Other Reserves, continued**

From these assumptions, the Company projects the incidence of each type of disease to the estimated population to determine the total estimated number of employees that could potentially assert a claim. Historical claim filing rates were applied for each type of disease to the total number of employees that could potentially assert a claim to determine the total number of anticipated claim filings by disease type. Historical dismissal rates, which represented claims that were closed without payment, were deducted to calculate the number of future claims by disease type that would likely require payment by the Company. Finally, the number of such claims was multiplied by the average settlement value to estimate the Company's future liability for IBNR asbestos claims.

The estimated future filing rates and estimated average claim values were the most sensitive assumptions for this reserve. A 1% increase or decrease in either the forecasted number of IBNR claims or the average claim values would result in an approximate $1 million increase or decrease in the liability recorded for unasserted asbestos claims.

Undiscounted liabilities recorded related to asbestos claims were as follows:

| *(Dollars in Millions)* | **December 2008** | December 2007 |
|---|---|---|
| Asbestos: | | |
| Incurred but not reported claims | **$54** | $54 |
| Asserted claims | **70** | 75 |
| Total liability | **124** | 129 |
| Current liability | **$11** | $15 |

*Other Occupational*

The Company retains a third party specialist with extensive experience in performing other occupational studies to assist management in assessing the value of the Company's claims and cases. The analysis is performed by the specialist semi-annually and is reviewed by management. Similar to the asbestos liability estimation process, the key elements of the assessment include the following:

- An estimate of the potentially exposed population for other occupational diseases is calculated by projecting active versus retired workforce from 2002 to 2010 using a growth rate projection for overall railroad employment made by the Railroad Retirement Board in its June 2003 report.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 5. Casualty, Environmental and Other Reserves, continued**

- An estimate of the future anticipated claims filing rate by type of injury, employee type and active versus retired employee is computed using the Company's average historical claim filing rates for the calibration periods management felt were representative of future filing rates. For carpal tunnel and repetitive stress injuries, the current calibration period is a 1-year average of claim filings. Hearing loss uses a 3-year calibration period, and all other diseases or injuries use a 2-year calibration period. An estimate is made to forecast future claims by using the filing rates by disease and the active and retired Company population each year.

- An estimate of the future anticipated settlement by type of injury is computed using the Company's historical average of dollars paid per claim for pending and future claims using the average settlement by type of injury observed during a period that management feels is representative of future settlement amounts.

The estimated future filing rates and estimated average claim values were the most sensitive assumptions for this reserve. A 1% increase or decrease in either the forecasted number of IBNR claims or the average claim values would not result in a material increase or decrease in the liability recorded for unasserted other occupational claims.

Undiscounted recorded liabilities related to other occupational claims were as follows:

| *(Dollars in Millions)* | **December 2008** | December 2007 |
|---|---|---|
| Other Occupational: | | |
| Incurred but not reported claims | **$46** | $47 |
| Asserted claims | **34** | 32 |
| Total liability | **80** | 79 |
| Current liability | **$21** | $29 |

*Summary*

A summary of asbestos and other occupational claims activity is as follows:

| | **Fiscal Years** | |
|---|---|---|
| | **2008** | 2007 |
| **Asserted Claims** | | |
| Open Claims - Beginning of Year | **10,988** | 11,116 |
| New Claims Filed | **400** | 930 |
| Claims Settled | **(392)** | (553) |
| Claims Dismissed | **(6,092)** | (505) |
| Open Claims - End of Year | **4,904** | 10,988 |



CSX CORPORATION
PART II
Item 8. Financial Statements and Supplementary Data

Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 5. Casualty, Environmental and Other Reserves, continued**

In the prior year, approximately 6,000 of the open claims were asbestos claims against the Company's previously owned international container shipping business. Approximately 5,700 of these claims have been administratively dismissed for lack of medical merit. This reduced the open asbestos claims related to the shipping business claims to approximately 165. Because these claims were against multiple vessel owners, the Company's reserves reflect its portion of those claims. The Company had approximately $3 million and $9 million reserved for these shipping business claims at December 2008 and 2007, respectively. The remaining open claims were asserted against CSXT.

***Separation***

Separation liabilities provide for the estimated benefits provided to certain union employees as a result of implementing workforce reductions, improvements in productivity and certain other cost reductions at the Company's major transportation units since 1991. These liabilities are expected to be paid out over the next 20 years from general corporate funds and may fluctuate depending on the timing of payments and associated taxes.

***Environmental***

The Company is a party to various proceedings related to environmental issues, including administrative and judicial proceedings, involving private parties and regulatory agencies. The Company has been identified as a potentially responsible party at approximately 244 environmentally impaired sites. Many of those are, or may be, subject to remedial action under the federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, or CERCLA, also known as the Superfund Law, or similar state statutes. Most of these proceedings arose from environmental conditions on properties used for ongoing or discontinued railroad operations. However, a number of these proceedings are based on allegations that the Company, or its predecessors, sent hazardous substances to facilities owned or operated by others for treatment or disposal. In addition, some of the Company's land holdings were leased to others for commercial or industrial uses that may have resulted in releases of hazardous substances or other regulated materials onto the property and could give rise to proceedings against the Company.

In any such proceedings, the Company is subject to environmental clean-up and enforcement actions under the Superfund Law, as well as similar state laws that may impose joint and several liability for clean-up and enforcement costs on current and former owners and operators of a site without regard to fault or the legality of the original conduct. These costs could be substantial.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 5. Casualty, Environmental and Other Reserves, continued**

In accordance with Statement of Position 96-1, *Environmental Remediation Liabilities*, the Company reviews its role with respect to each site identified at least once a quarter. Based on the review process, the Company has recorded amounts to cover anticipated contingent future environmental remediation costs with respect to each site to the extent such costs are estimable and probable. The recorded liabilities for estimated future environmental costs are undiscounted and include amounts representing the Company's estimate of unasserted claims, which the Company believes to be immaterial. The liability includes future costs for remediation and restoration of sites as well as any significant ongoing monitoring costs, but excludes any anticipated insurance recoveries. Payments related to these liabilities are expected to be made over the next several years.

Currently, the Company does not possess sufficient information to reasonably estimate the amounts of additional liabilities, if any, on some sites until completion of future environmental studies. In addition, conditions that are currently unknown could, at any given location, result in exposure, the amount and materiality of which cannot presently be reliably estimated. Based upon information currently available, however, the Company believes its environmental reserves are adequate to fund remedial actions to comply with present laws and regulations, and that the ultimate liability for these matters, if any, will not materially affect its overall financial condition, results of operations or liquidity.

***Other***

Other reserves of $126 million and $122 million for 2008 and 2007, respectively, include liabilities for various claims, such as longshoremen disability claims, freight claims and claims for property, automobile and general liability. These liabilities are accrued at the estimable and probable amount in accordance with SFAS 5.

Longshoremen disability claims represent liability for assessments under Section 8f of the United States Longshore and Harbor Workers' Compensation Program. These reserves, of $75 million and $73 million for 2008 and 2007, respectively, have amounts accrued for second injury fund liabilities, which represent the non-medical portion of employee claims which are paid by the United States Department of Labor and are attributed to an earlier injury to the same employee.

Freight claims represent claims for both freight loss and damage and freight rate disputes. Freight loss and damage claims are liabilities that resulted from the loss or damage of customer freight while being handled by the Company's transportation services. Freight rate disputes represent liabilities for customer claims regarding the rate charged by the Company for its transportation services. Liabilities for freight rate disputes are recorded as a reduction of revenue.

The Company accrues for claims related to property, automobile and general liability as noted above. The Company is also required to maintain primary and state mandated coverage for Company property and vehicle fleets. General liability is coverage for liability arising from operations of non-rail subsidiaries.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 6. Commitments and Contingencies**

***Lease Commitments***

The Company has various lease agreements with other parties with terms up to 30 years. Non-cancelable, long-term leases generally include provisions for maintenance, options to purchase and options to extend the terms.

At December 2008, minimum building and equipment rentals and commitments for vessels under these operating leases were as follows:

*(Dollars in millions)*

| Years | Operating Leases | Sublease Income | Net Lease Commitments |
|---|---|---|---|
| 2009 | $127 | $37 | $90 |
| 2010 | 106 | 31 | 75 |
| 2011 | 76 | 17 | 59 |
| 2012 | 76 | 21 | 55 |
| 2013 | 64 | 26 | 38 |
| Thereafter | 224 | 49 | 175 |
| Total | $673 | $181 | $492 |

Operating leases and an equal portion of sublease income include approximately $144 million relating to ongoing operating lease commitments for vessels and equipment, which have been subleased to Horizon Lines, Inc. (“Horizon”), a former subsidiary previously named CSX Lines. CSX believes Horizon will fulfill its contractual commitments with respect to such leases and CSX will have no further liability for those obligations.

In addition to the commitments in the table, the Company also has agreements covering equipment leased from Conrail, Inc. (“Conrail”).

| | Fiscal Years | | |
|---|---|---|---|
| *(Dollars in Millions)* | **2008** | 2007 | 2006 |
| Rent Expense on Operating Leases | **$424** | $446 | $514 |

Rent expense on operating leases included $323 million, $310 million and $355 million of net daily rental charges on railroad operating equipment in 2008, 2007 and 2006, respectively, which are not long-term commitments. The Company uses the straight-line method to recognize rent expense associated with operating leases that include escalations over their terms.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 6. Commitments and Contingencies, continued**

***Purchase Commitments***

CSXT has a commitment under a long-term maintenance program that currently covers 47% of CSXT's fleet of locomotives. The agreement is based on the maintenance cycle for each locomotive. Under CSXT's current obligations, the agreement will expire no earlier than 2028 and may last until 2031 depending upon when certain locomotives are placed in service. The costs expected to be incurred throughout the duration of the agreement fluctuate as locomotives are placed into, or removed from, service or as required maintenance schedules are revised. The increase in costs shown below is a direct result of both adding locomotives to the plan each year as well as inflation. CSXT may terminate the agreement at its option after 2012, though such action would trigger certain liquidated damages provisions.

The following table summarizes the number of locomotives covered and CSXT's payments under the long-term maintenance program:

| | Fiscal Years | | |
|---|---|---|---|
| *(Dollars in Millions)* | **2008** | 2007 | 2006 |
| Amounts Paid | **$253** | $217 | $183 |
| Number of Locomotives | **1,958** | 1,843 | 1,681 |

As a result of agreements executed in 2005 and 2006, CSXT has purchase obligations related to a multi-year plan to acquire additional locomotives between 2006 and 2011. The amount of the ultimate purchase commitment depends upon the model of locomotive acquired and the timing of delivery. Annual payments related to the locomotive purchase obligations, including amounts that would be payable under the long-term maintenance program, were estimated as follows:

| *(Dollars in Millions)* | Payments |
|---|---|
| 2009 | $374 |
| 2010 | 275 |
| 2011 | 393 |
| 2012 | 299 |
| 2013 | 309 |
| Thereafter | 4,848 |
| Total | $6,498 |



Source: CSX CORP, 10-K, February 19, 2009
Powered by Morningstar® Document Research℠

**NOTE 6. Commitments and Contingencies, continued**

Additionally, the Company has various other commitments to purchase technology, communications, railcar maintenance and other services from various suppliers. Total annual payments under all of these additional purchase commitments were estimated as follows:

| *(Dollars in Millions)* | **Payments** |
|---|---|
| 2009 | $155 |
| 2010 | 79 |
| 2011 | 56 |
| 2012 | 38 |
| 2013 | 1 |
| Thereafter | - |
| Total | $329 |

***Insurance***

The Company maintains numerous insurance programs, most notably for third-party casualty liability and for Company property damage and business interruption, with substantial limits. A certain amount of risk is retained by the Company on each of the casualty and property programs. Specifically, the Company has a $25 million deductible for each of the casualty and non-catastrophic property programs and a $50 million deductible for the catastrophic property program. These deductibles only apply to the first event if more than one event occurs in a given year. If a property or liability event occurs in excess of the Company's deductible and the Company does not elect to purchase additional insurance coverage, then the deductible for the second covered event will equal the amount of the claim in the first event.

While the Company's current insurance coverage is adequate to cover its damages, future claims could exceed existing insurance coverage or insurance may not continue to be available at commercially reasonable rates. For information on insurance losses resulting from the effects of Hurricane Katrina on the Company's operations and assets, See Note 13, Hurricane Katrina.

***Guarantees***

CSX and certain of its subsidiaries are contingently liable, individually and jointly with others, as guarantors of approximately $57 million in obligations principally relating to leased equipment, vessels and joint facilities used by the Company in its current and former business operations. Utilizing the Company's guarantee for these obligations allows the obligor to take advantage of lower interest rates and to obtain other favorable terms. Guarantees are contingent commitments issued by the Company that could require CSX or one of its affiliates to make payment to, or to perform certain actions for, the beneficiary of the guarantee based on another entity's failure to perform.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 6. Commitments and Contingencies, continued**

At December 2008, the Company's guarantees primarily related to the following:

- Guarantee of approximately $49 million of obligations of a former subsidiary, CSX Energy, in connection with a sale-leaseback transaction. CSX is, in turn, indemnified by several subsequent owners of the subsidiary against payments made with respect to this guarantee. Management does not expect that CSX will be required to make any payments under this guarantee for which CSX will not be reimbursed. CSX's obligation for this guarantee will be completed in 2012.

- Guarantee of approximately $8 million of lease commitments assumed by A.P. Moller-Maersk ("Maersk") for which CSX is contingently liable. CSX believes Maersk will fulfill its contractual commitments with respect to such lease commitments, and CSX will have no further liabilities for those obligations. CSX's obligation under this guarantee will be completed in 2011.

As of December 2008, the Company had not recognized any liabilities in its financial statements in connection with any guarantee arrangements. The maximum amount of future payments the Company could be required to make under these guarantees is the sum of the guaranteed amounts.

***Fuel Surcharge Antitrust Litigation***

Since 2007, at least 30 putative class action suits have been filed in various federal district courts against CSXT and three other U.S.-based Class I railroads. The lawsuits contain substantially similar allegations to the effect that the defendants' fuel surcharge practices relating to contract and unregulated traffic resulted from an illegal conspiracy in violation of antitrust laws. The suits seek unquantified treble damages (three times the amount of actual damages) allegedly sustained by purported class members, attorneys' fees and other relief. All but three of the lawsuits purport to be filed on behalf of a class of shippers that allegedly purchased rail freight transportation services from the defendants through the use of contracts or through other means exempt from rate regulation during defined periods commencing as early as June 2003 and that were assessed fuel surcharges. Three of the lawsuits purport to be on behalf of indirect purchasers of rail services.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 6. Commitments and Contingencies, continued**

The class action suits have been consolidated in federal court in the District of Columbia. The defendants filed a Motion to Dismiss and oral arguments were heard in October 2008. On November 7, the Court denied the railroads' Motion to Dismiss the claims of shippers who directly purchased transportation services. On December 31, the Court granted in part the railroads' Motion to Dismiss the claims of indirect purchasers who made purchases from railroad shippers rather than directly from the railroads. While the Court found that indirect purchasers' state law claims for money damages are preempted by federal law, it also found that they had stated a federal antitrust claim for injunctive relief. On January 16, 2009, on motion by the indirect plaintiffs, the Court entered final judgment on the state law claims which allow the indirect plaintiffs to seek an immediate appeal. The Court also stayed proceedings relating to the claim for injunctive relief appeal.

Now that the Motion to Dismiss has been decided, discovery will move forward. The railroads intend to ask the Court to first proceed with discovery relating to whether the case is appropriate to certify as a class action and only if a class is certified would merit discovery takes place.

One additional lawsuit was filed, but not served, by an individual shipper. CSXT entered into a tolling agreement with this shipper whereby the shipper agreed to dismiss the lawsuit against CSXT without prejudice and CSXT agreed to extend the statute of limitations for the claims asserted until the end of 2010.

In 2007, CSXT received a grand jury subpoena from the New Jersey Office of the Attorney General seeking information related to the same fuel surcharges that are the subject of the civil actions. In 2008, the New Jersey Office of the Attorney General formally notified CSXT that it had decided not to proceed with its investigation at this time. It is possible that the New Jersey Attorney General could reopen the investigation or that other federal or state agencies could initiate investigations into similar matters.

CSXT believes that its fuel surcharge practices are lawful. Accordingly, CSXT intends to vigorously defend itself against the purported class actions, which it believes are without merit. CSXT cannot predict the outcome of the private lawsuits, which are in their preliminary stages, or of any government investigations, charges or additional litigation that may be filed in the future. Penalties for violating antitrust laws can be severe, involving both potential criminal and civil liability. CSXT is unable to assess at this time the possible financial impact of this litigation. CSXT has not accrued any liability for an adverse outcome in the litigation. If a material adverse outcome were to occur and be sustained, it could have a material adverse impact on the Company's financial condition, results of operations or liquidity.



Source: CSX CORP, 10-K, February 19, 2009
Powered by Morningstar® Document Research℠

**NOTE 6. Commitments and Contingencies, continued**

***STB Rate Case***

During 2008, Seminole Electric Cooperative, Inc. ("Seminole") filed a complaint before the STB against CSXT. CSXT and Seminole were parties to a railroad transportation contract that expired on December 31, 2008. Seminole is contesting tariff rates that went into effect on January 1, 2009 for movements of coal to its existing and planned facilities. Because of the preliminary nature of this case, CSXT is not able to assess at this time the possible financial impact of the STB proceeding. However, the Company will continue to consider and pursue all available legal defenses in this matter.

Also during 2008, E.I. du Pont de Nemours and Company filed a complaint before the STB against CSXT, contesting tariff rates that went into effect on December 1, 2008 for movements of various commodities from and/or to certain of its existing facilities. Similar to the Seminole case, CSXT is not able to assess at this time the possible financial impact of the STB proceeding. The Company will also continue to consider and pursue all available legal defenses in this matter.

***Other Legal Proceedings***

In addition to the matters described above, the Company is involved in litigation incidental to its business and is a party to a number of legal actions and claims, various governmental proceedings and private civil lawsuits, including, but not limited to, those related to environmental matters, FELA claims by employees, other personal injury claims and disputes and complaints involving certain transportation rates and charges. Some of the legal proceedings include claims for compensatory as well as punitive damages and others are, or are purported to be, class actions. While the final outcome of these matters cannot be predicted with certainty, considering, among other things, the legal defenses available and liabilities that have been recorded along with applicable insurance, it is currently the opinion of CSX management that none of these items will have a material adverse effect on the Company's financial condition, results of operations or liquidity. An unexpected adverse resolution of one or more of these items, however, could have a material adverse effect on the Company's financial condition, results of operations or liquidity in a particular quarter or fiscal year.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

## NOTE 7. Employee Benefit Plans

***General***

The Company sponsors defined benefit pension plans principally for salaried, management personnel. The plans provide eligible employees with retirement benefits based predominantly on years of service and compensation rates near retirement. For employees hired after December 31, 2002, benefits are determined based on a cash balance formula, which provides benefits by utilizing interest and pay credits based upon age, service and compensation.

In addition to these plans, the Company sponsors a post-retirement medical plan and a life insurance plan that provide benefits to full-time, salaried, management employees hired on or before December 31, 2002 upon their retirement if certain eligibility requirements are met. The post-retirement medical plan is contributory (partially funded by retirees), with retiree contributions adjusted annually. The life insurance plan is non-contributory.

| | Summary of Participants as of January 1, 2008 | |
|---|---|---|
| | **Pension Plans** | **Post-retirement Medical Plan** |
| Active Employees | 6,548 | 3,465 |
| Retirees and Beneficiaries | 10,908 | 10,285 |
| Other *(a)* | 5,945 | 262 |
| Total | 23,401 | 14,012 |

*(a) For pension plans, the other category consists of terminated but vested former employees. For post-retirement plans, the other category consists of employees on long-term disability that have not yet retired.*

Effective fiscal year 2008, under the provisions of SFAS 158, CSX has changed the measurement date for pension and post-retirement benefit plans from September 30 to the last day of the Company's fiscal year. The Company engages independent, external actuaries to compute the amounts of liabilities and expenses relating to these plans subject to the assumptions that the Company selects. Also, due to recent volatility in the markets, there has been a significant decrease in the value of plan assets and, in turn, a large decrease in the funded status of our qualified pension plan.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 7. Employee Benefit Plans, continued**

The benefit obligation for these plans represents the liability of the Company for current and retired employees and is affected primarily by the following:

- service cost (benefits attributed to employee service during the period);
- interest cost (interest on the liability due to the passage of time);
- actuarial gains/losses (experience during the year different from that assumed and changes in plan assumptions); and
- benefits paid to participants.

***Cash Flows***

Plan assets are amounts that have been segregated and restricted to provide benefits and include amounts contributed by the Company and amounts earned from invested contributions, net of benefits paid. The Company funds the cost of the post-retirement medical and life insurance benefits as well as nonqualified pension benefits on a pay-as-you go basis. Qualified pension plan obligations are funded in accordance with prescribed regulatory requirements and with an objective of meeting minimum funding requirements necessary to avoid restrictions on flexibility of plan operation and benefit payments. There are alternative smoothing methods available both to measure asset values and discounted obligations, as well as to fund any measured under funding over multiple years. The Worker, Retiree and Employer Recovery Act of 2008 further increased this flexibility for plan sponsors in reaction to recent turbulence in the capital markets. While CSX has not yet determined what measurement method it will use for funding purposes, the Company estimates that its minimum 2009 contributions after-tax will range from $3 million to $65 million.

Future expected benefit payments are as follows:

| | Expected Cash Flows | |
|---|---|---|
| *(Dollars in Millions)* | **Pension Benefits** | **Post-retirement Benefits*(a)*** |
| 2009 | $150 | $43 |
| 2010 | 153 | 42 |
| 2011 | 156 | 41 |
| 2012 | 160 | 39 |
| 2013 | 162 | 38 |
| 2014 -2018 | 844 | 170 |
| Total | $1,625 | $373 |

*(a) The post-retirement benefit payments include an estimated annual reduction of $8 million due to the Medicare Part D Subsidy.*



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 7. Employee Benefit Plans, continued**

***Plan Assets***

The CSX Investment Committee ("the Investment Committee"), whose members were selected by the Chief Financial Officer ("CFO") and approved by the Chief Executive Officer ("CEO"), is responsible for oversight and investment of pension plan assets. The Investment Committee utilizes an investment asset allocation strategy that was developed using asset return simulation in conjunction with projected plan liabilities. The allocation seeks maximization of returns within the constraints of acceptable risks considering the long-term investment horizon. A target allocation of 60% equity and 40% fixed income investments was established. Common stocks further target 45% of total plan assets in domestic equity and 15% in international operations. These allocations are managed to be within 3% of the planned allocation, with re-allocations occurring quarterly. Recent volatility in the market has resulted in distributions of asset balances outside of the planned allocations.

The distribution of pension plan assets as of the measurement date is as follows:

| | **December 2008** | | September 2007 | |
|---|---|---|---|---|
| *(Dollars in Millions)* | **Amount** | **Percent of Total Assets** | Amount | Percent of Total Assets |
| Common Stocks | **$714** | **54%** | $964 | 60% |
| Fixed Income | **600** | **45** | 626 | 39 |
| Cash and Cash Equivalents | **17** | **1** | 17 | 1 |
| Total | **$1,331** | **100%** | $1,607 | 100% |

Under the supervision of the Investment Committee, individual investments or fund managers are selected in accordance with standards of prudence applicable to asset diversification and investment suitability. The Company also selects fund managers with differing investment styles and benchmarks their investment returns against appropriate indices. Fund investment performance is continuously monitored. Acceptable performance is determined in the context of the long-term return objectives of the fund and appropriate asset class benchmarks.

Within the Company's equity funds, the U.S. stock segment includes diversification among large and small capitalization stocks. Guidelines established with individual managers limit investment by industry sectors, individual stock issuer concentration and the use of derivatives and CSX securities.

Fixed income securities guidelines established with individual managers specify the types of allowable investments, such as government, corporate and asset-backed bonds, and limit diversification between domestic and foreign investments and the use of derivatives. Additionally, guidelines stipulate minimum credit quality constraints and any prohibited securities.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 7. Employee Benefit Plans, continued**

***Benefit Obligation, Plan Assets and Funded Status***

As a result of the change in valuation date during 2008, plan year 2008 consisted of fifteen months beginning October 1, 2007 and ending December 26, 2008. Plan year 2007 consisted of twelve months beginning October 1, 2006 and ending September 30, 2007. Changes in benefit obligation and the fair value of plan assets for the 2008 and 2007 plan years are as follows:

| | **Pension Benefits** | | **Post-retirement Benefits** | |
|---|---|---|---|---|
| *(Dollars in Millions)* | **Plan Year 2008** | Plan Year 2007 | **Plan Year 2008** | Plan Year 2007 |
| **Actuarial Present Value of Benefit Obligation** | | | | |
| Accumulated Benefit Obligation | **$1,950** | $1,935 | **N/A** | N/A |
| Projected Benefit Obligation | **2,062** | 2,067 | **$373** | $404 |
| **Change in Projected Benefit Obligation:** | | | | |
| Projected Benefit Obligation at Beginning of Plan Year | **$2,067** | $2,078 | **$404** | $398 |
| Service Cost | **41** | 33 | **7** | 6 |
| Interest Cost | **149** | 115 | **27** | 21 |
| Plan Participants' Contributions | **-** | - | **22** | 16 |
| Actuarial (Gain)/Loss | **(12)** | (13) | **(15)** | 22 |
| Benefits Paid | **(183)** | (146) | **(72)** | (59) |
| Benefit Obligation at End of Plan Year | **$2,062** | $2,067 | **$373** | $404 |
| **Change in Plan Assets:** | | | | |
| Fair Value of Plan Assets at Beginning of Plan Year | **$1,607** | $1,511 | **$ -** | $ - |
| Actual Return on Plan Assets | **(466)** | 186 | **-** | - |
| Qualified Employer Contributions*(a)* | **347** | 42 | **-** | - |
| Non-qualified Employer Contributions | **15** | 14 | **50** | 43 |
| Plan Participants' Contributions | **-** | - | **22** | 16 |
| Benefits Paid | **(183)** | (146) | **(72)** | (59) |
| Fair Value of Plan Assets at End of Plan Year | **$1,320** | $1,607 | **$ -** | $ - |
| **Funded Status at December 26, 2008** | **$(742)** | $(460) | **$(373)** | $(404) |

*(a) During plan year 2008, CSX made contributions of $347 million to its qualified defined benefit pension plans. The components of this include $245 million of contributions made in fourth quarter 2007 plus $102 million of contributions made during fiscal year 2008.*



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 7. Employee Benefit Plans, continued**

Employer contributions and net post-retirement benefits paid during the fourth quarter to arrive at the net funded status of qualified and non-qualified benefit plans as of the end of the Company's fiscal year are as follows:

| | Pension Benefits | | Post-retirement Benefits | |
|---|---|---|---|---|
| *(Dollars in Millions)* | **2008** | 2007 | **2008** | 2007 |
| **Funded Status at End of Plan Year*(a)*** | **$(742)** | $(460) | **$(373)** | $(404) |
| **Fourth Quarter Activity:** | | | | |
| Qualified Employer Contributions | **-** | 245 | **-** | - |
| Non-qualified Employer Contributions | **-** | 4 | **-** | - |
| Net Post-retirement Benefits Paid | **-** | - | **-** | 10 |
| **Ending Net Funded Status** | **$(742)** | $(211) | **$(373)** | $(394) |

*(a) As the plan year 2008 and the fiscal year end 2008 are the same, there is no fourth quarter 2008 activity that needs to be added to reconcile to the Ending Net Funded Status for 2008.*

The above "Ending Net Funded Status" for pension benefits at December 2008 reflects measurements prescribed by SFAS 158 and related guidance and includes both qualified and nonqualified pension obligations. For qualified plan funding purposes, assets and discounted liabilities are measured in accordance with the Pension Protection Act of 2006, and the Worker, Retiree and Employer Recovery Act of 2008 as well as other related provisions of the Internal Revenue Code and related regulations. Under these funding provisions and the alternative measurements available thereunder, the Company estimates its unfunded obligation for qualified plans at December 2008 likely ranges from about $110 million to $240 million, after tax, depending upon the measurement method selected. The Company expects that cash requirements to fund future contributions for qualified plans would be funded from cash from operations.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

Table of Contents


**NOTE 7. Employee Benefit Plans, continued**

Amounts related to pension and post-retirement benefits recorded on the balance sheet are as follows:

| | Pension Benefits | | Post-retirement Benefits | |
|---|---|---|---|---|
| *(Dollars in Millions)* | **December 2008** | December 2007 | **December 2008** | December 2007 |
| **Amounts Recorded in Consolidated Balance Sheets:** | | | | |
| Long-term assets | **$ -** | $ 4 | **$ -** | $ - |
| Current Liabilities | **(12)** | (12) | **(42)** | (45) |
| Long-term Liabilities | **(730)** | (203) | **(331)** | (349) |
| Net Amount Recognized in Consolidated Balance Sheet | **$(742)** | $(211) | **$(373)** | $(394) |

The funded status, or amount by which the benefit obligation exceeds the fair value of plan assets, represents a liability. At December 2008, the status of CSX plans was as follows:

| **Benefit Obligations in Excess of Plan Assets** | **Aggregate Fair Value of Plan Assets** | **Aggregate Projected Benefit Obligation** |
|---|---|---|
| Projected benefit obligation | $1.32 billion | ($2.06 billion) |
| Accumulated benefit obligation | $1.32 billion | ($1.95 billion) |

***Net Periodic Benefit Expense***

The following table describes the components of expense/(income) related to net periodic benefit expense.

| | Pension Benefits Fiscal Years | | | Post-retirement Benefits Fiscal Years | | |
|---|---|---|---|---|---|---|
| *(Dollars in Millions)* | **2008** | 2007 | 2006 | **2008** | 2007 | 2006 |
| Service Cost | **$33** | $33 | $36 | **$5** | $6 | $7 |
| Interest Cost | **119** | 115 | 105 | **22** | 21 | 21 |
| Expected Return on Plan Assets | **(144)** | (118) | (117) | **-** | - | - |
| Amortization of Prior Service Cost | **3** | 3 | 4 | **(2)** | (5) | (5) |
| Amortization of Net Loss | **22** | 31 | 34 | **6** | 3 | 7 |
| Net Periodic Benefit Expense | **$33** | $64 | $62 | **$31** | $25 | $30 |



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 7. Employee Benefit Plans, continued**

***Pension and Other Post-Employment Benefits Adjustments***

The following table shows the pre-tax change in other comprehensive income (loss) attributable to the components of net expense and the change in benefit obligation for CSX for pension and other post-employment benefits.

| **Components of Other Comprehensive Income (Loss)** | **Pension Benefits** | | **Post-retirement Benefits** | |
|---|---|---|---|---|
| | **December 2008** | December 2007 | **December 2008** | December 2007 |
| *(Dollars in Millions)* | | | | |
| Recognized in the balance sheet | | | | |
| Gains (Losses) | **$(602)** | $111 | **$22** | $(18) |
| Prior service costs | **3** | 4 | **(2)** | (5) |
| (Income) Expense recognized in the income statement | | | | |
| Amortization of net loss *(a)* | **22** | 31 | **6** | 3 |
| Amortization of prior service cost *(b)* | **3** | 3 | **(2)** | (5) |

*(a) The estimated amount to be expensed for 2009 is $26 million and $4 million for pension benefits and post-retirement benefits, respectively.*

*(b) The estimated amount to be expensed for prior service costs for 2009 is $3 million for pension benefits. There are no remaining prior service costs to be expensed in 2009 for post-retirement benefits.*

At December 2008, the balances of pre-tax amounts to be amortized that are included in accumulated other comprehensive income (a component of Shareholders' Equity) are as follows:

| | **Pension Benefits** | **Post-retirement Benefits** |
|---|---|---|
| (Gains)/Losses | $953 | $67 |
| Prior Service Costs | 13 | - |
| Total | $966 | $67 |



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 7. Employee Benefit Plans, continued**

***Assumptions***

Weighted-average assumptions used in accounting for the plans were as follows:

| | Pension Benefits | | Post-retirement Benefits | |
|---|---|---|---|---|
| | **2008** | 2007 | **2008** | 2007 |
| Expected Long-term Return on Plan Assets: | | | | |
| Benefit Cost for Plan Year | **8.50%** | 8.50% | **N/A** | N/A |
| Benefit Obligation at End of Plan Year | **8.50%** | 8.50% | **N/A** | N/A |
| Discount Rates: | | | | |
| Benefit Cost for Plan Year | **6.00%** | 5.75% | **5.75%** | 5.50% |
| Benefit Obligation at End of Plan Year | **6.50%** | 6.00% | **6.50%** | 5.75% |
| Salary Scale Inflation | **3.80%** | 4.10% | **3.80%** | 4.10% |

The net post-retirement benefit obligation was determined using the following assumptions for the health care cost trend rate for medical plans. The rate is assumed to gradually decrease to 5.0% by 2017. Additionally, there are cost differentials between Medicare and Non-Medicare eligible individuals which are reflected below.

| | Post-retirement Benefits | |
|---|---|---|
| | **2008** | 2007 |
| Health Care Cost Trend Rate | | |
| Components of Benefit Cost: Non-Medicare Eligible | **9.0%** | 10.0% |
| Components of Benefit Cost: Medicare Eligible | **10.0%** | 11.0% |
| Benefit Obligations: Non-Medicare Eligible | **8.5%** | 9.0% |
| Benefit Obligations: Medicare Eligible | **9.5%** | 10.0% |

For every 1% change in the assumed health care cost trend rate, service and interest cost will change $1 million on a pre-tax basis (consolidated income statement impact). For every 1% increase in the health care cost trend rate, the Company’s benefit obligation will increase by $14 million, and for every 1% decrease, the Company’s benefit obligation will decrease by $12 million (consolidated balance sheet impact). An increase in rates has a greater effect on the Company’s benefit obligation due to the impact of compounding on future years.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 7. Employee Benefit Plans, continued**

***Medicare Prescription Drug, Improvement and Modernization Act of 2003***

As required by the Medicare Prescription Drug, Improvement and Modernization Act of 2003 (the "Act"), the Company has determined that its medical plan's prescription drug benefit qualifies as actuarially equivalent to the benefit that would be paid under the Act. The Company has received $2 million and $4 million in tax free federal reimbursement for prescription drug claims in both 2008 and 2007, respectively.

***Other Plans***

Under collective bargaining agreements, the Company participates in a multi-employer benefit plan, which provides certain post-retirement health care and life insurance benefits to eligible contract employees. Premiums under this plan are expensed as incurred and amounted to $36 million, $31 million and $30 million in 2008, 2007 and 2006, respectively.

The Company maintains savings plans for virtually all full-time salaried employees and certain employees covered by collective bargaining agreements. Expense associated with these plans was $25 million, $24 million and $18 million for 2008, 2007 and 2006, respectively.

**NOTE 8. Debt and Credit Agreements**

Debt was as follows:

| *(Dollars in Millions)* | **Maturity** | **Average Interest Rates at December 2008** | **December 2008** | December 2007 |
|---|---|---|---|---|
| Notes | 2009-2043 | 6.6% | **$6,756** | $6,291 |
| Convertible Debentures, net of $3 and $23 discount, respectively | 2021 | 2.1% | **28** | 151 |
| Equipment Obligations | 2009-2023 | 7.1% | **1,002** | 738 |
| Capital Leases | 2009-2015 | 6.5% | **45** | 73 |
| Total Long-term Debt (including current portion) | | | **7,831** | 7,253 |
| Less Debt Due within One Year | | | **(319)** | (783) |
| Long-term Debt (excluding current portion) | | | **$7,512** | $6,470 |

***Early Redemption of Long-term Debt***

In 2007, CSX called $150 million of notes due in 2032. CSX recognized a $10 million reduction to other income for an early redemption premium and the write-off of debt issuance costs related to this early repayment. In 2008, CSX did not redeem any long-term debt before its maturity date.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 8. Debt and Credit Agreements, continued**

***Debt Issuance***

CSX issued a total of $1.4 billion in debt during 2008 as follows:

| Notes | Principal Amount Issued |
|---|---|
| *(Dollars in Millions)* | |
| CSX 6.25% Note due 2015 | $600 |
| CSX 7.45% Note due 2038 | 400 |
| CSXT 8.375% Secured Equipment Notes due 2014*(a)* | 351 |
| | $1,351 |

*(a) The CSXT notes are secured by a security interest in certain railroad equipment.*

These notes were included in the Consolidated Balance Sheets under Long-term Debt and may be redeemed by the Company at any time. The net proceeds from the sale of the notes will be used for general corporate purposes, which may include repurchases of CSX common stock, capital expenditures, working capital requirements, improvements in productivity and other cost reductions at the Company's major transportation units.

Additionally, in January 2009, the Company took advantage of an improvement in capital market conditions and issued $500 million of 7.375% Notes due 2019.

***Convertible Debentures***

In 2001, CSX issued $564 million aggregate principal amount at maturity in unsubordinated zero coupon convertible debentures (the "debentures") due in 2021 for an initial offering price of approximately $462 million. The carrying value of outstanding debentures was $28 million and $151 million, at December 2008 and December 2007, respectively. From their date of issuance, these debentures had accreted (increased) in value at a yield to maturity of 1% per year. In 2007, the accretion rate was reset to 2.1%. The accretion rate may be reset again in October 2011 and October 2016 to a rate based on five-year United States Treasury Notes minus 2.8%. In no event will the yield to maturity be reset below 1% or above 3% per annum. Accretion in value on the debentures is recorded in each month but will not be paid prior to maturity.

The debentures allow holders to require CSX to purchase their debentures in October 2011 and October 2016, at a purchase price equal to the accreted value of the debentures at the time. CSX may redeem the debentures for cash at any time at a redemption price equal to the accreted value of the debentures.

Holders currently may convert their debentures into shares of CSX common stock at a conversion rate of 35.49 common shares per $1,000 principal amount at maturity of debentures. During 2008 and 2007, $142 million and $375 million face value of debentures was converted into 5 and 13 million shares of CSX common stock, respectively. At December 2008, $32 million face value debentures remained outstanding convertible into approximately 1 million shares of CSX common stock.





Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 8. Debt and Credit Agreements, continued**

***Long-term Debt Maturities***

| *(Dollars in Millions)*<br>**Fiscal Years Ending** | **Maturities as of December 2008** |
|---|---|
| 2009 | $319 |
| 2010 | 106 |
| 2011 | 605 |
| 2012 | 507 |
| 2013 | 782 |
| 2014 and Thereafter | 5,512 |
| Total Long-term Debt Maturities (including current portion) | $7,831 |

***Credit Facilities***

In 2006, the Company entered into a $1.25 billion five-year unsecured revolving credit facility and a $15 million secured revolving credit facility expiring in 2011. In 2007, with the consent of the lenders and in accordance with the facility's terms, CSX extended the maturity date of the $1.25 billion facility an additional year, to 2012. CSX also has a $17 million 364-day unsecured revolving credit facility expiring in August 2009.

Additionally, with the approval of the lending banks, CSX may increase its total borrowing capacity under the $1.25 billion facility by $500 million, from $1.25 billion to up to $1.75 billion. The facility was not drawn on as of December 2008. Commitment fees and interest rates payable under the facility were similar to fees and rates available to comparably rated investment-grade borrowers.

In 2008, CSX paid approximately $2 million in total fees associated with the undrawn facilities. These credit facilities allow for borrowings at floating (LIBOR-based) interest rates, plus a spread, depending upon CSX's senior unsecured debt ratings. LIBOR is the London Interbank Offered Rate which is a daily reference rate based on the interest rates at which banks offer to lend unsecured funds. At December 2008, CSX was in compliance with all covenant requirements under the facilities.



Source: CSX CORP, 10-K, February 19, 2009
Powered by Morningstar® Document Research℠

**NOTE 8. Debt and Credit Agreements, continued**

***Fair Value of Financial Instruments***

Fair values of CSX's financial instruments were estimated by reference to quoted prices from market sources and financial institutions as well as other valuation techniques. Long-term debt is the only financial instrument of CSX with fair values significantly different from their carrying amounts. The fair value of long-term debt has been estimated using discounted cash flow analysis based upon CSX's current incremental borrowing rates for similar types of financing arrangements.

| | December | |
|---|---|---|
| *(Dollars in Billions)* | **2008** | 2007 |
| Long-term Debt Including Current Maturities: | | |
| Fair Value | **$7.4** | $7.4 |
| Carrying Value | **$7.8** | $7.3 |



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 9. Other Income (Expense) - Net and Supplemental Data**

Other Income (Expense) - Net consists of the following:

| | Fiscal Years | | |
|---|---|---|---|
| *(Dollars in Millions)* | **2008** | 2007 | 2006 |
| Interest Income *(a)* | **$37** | $55 | $41 |
| Income from Real Estate Operations *(b)* | **39** | 58 | 37 |
| Loss from Resort Operations *(c)* | **(204)** | (16) | (13) |
| Gain on Conrail Property (After Tax) *(d)* | **-** | - | 26 |
| Miscellaneous *(e)* | **25** | (8) | (7) |
| Total Other Income (Expense) - Net | **$(103)** | $89 | $84 |
| | | | |
| Gross revenue from Real Estate and Resort Operations included above | **$168** | $211 | $193 |

*(a) Interest income includes amounts earned from CSX's cash, cash equivalents and short-term investments.*

*(b) Income from real estate includes the results of operations of the Company's non-operating real estate sales, leasing, acquisition and management and development activities. Income may fluctuate as a function of timing of real estate sales.*

*(c) Loss from resort operations in 2008 consists primarily of the $166 million pre-tax write-down of the Company's investment in The Greenbrier resort. Additionally, results from resort operations were down in 2008 because of decreased group business resulting from the uncertainty of labor negotiations and an inability to sufficiently reduce contractual labor costs accordingly.*

*(d) Gain on Conrail property represents a non-cash gain on additional Conrail property value received in 2006.*

*(e) Miscellaneous income includes a number of items which can be income or expense. Examples of these items are equity earnings and/or losses, minority interest expense, investment gains and losses and other non-operating activities.*

- *For the year 2008, CSX recorded additional income of $30 million for an adjustment to correct equity earnings from a non-consolidated subsidiary.*
- *For the year 2007, CSX recorded expense of $10 million related to an early redemption premium and the write-off of debt issuance costs.*

Supplemental data consists of the following:

Operating expense of $8.5 billion, $7.8 billion and $7.4 billion included selling, general & administrative expenses of $670 million, $585 million and $547 million for fiscal years 2008, 2007 and 2006, respectively.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 9. Other Income (Expense) - Net and Supplemental Data, continued**

*Impairment Loss*

Properties and other long-lived assets are reviewed for impairment whenever events or business conditions indicate the carrying amount of such assets may not be fully recoverable. Initial assessments of recoverability are based on estimates of undiscounted future net cash flows associated with an asset or a group of assets in accordance with SFAS 144, *Accounting for the Impairment or Disposal of Long-Lived Assets*. Where impairment is indicated, the assets are evaluated and their carrying amount is reduced to fair value based on discounted net cash flows or other estimates of fair value.

During 2008, the Company identified impairment indicators associated with the Company's resort, The Greenbrier, which caused the Company to review the carrying amount of the assets of the resort. These indicators included: results of a strategic review of the resort's operations to determine the best business strategy going forward, the effect of the severe economic downturn which has negatively impacted the luxury resort industry, and escalating operating losses that are primarily driven by higher labor costs and reduced group business. All of these conditions also contributed to a significant decrease in the market value of the resort.

After a review of the expected future undiscounted cash flows, it was determined that primarily the resort's property, plant and equipment and other assets were impaired. Therefore, during 2008, the Company incurred an impairment loss of $166 million pre-tax or $107 million after-tax to write-down the carrying amount of the assets to fair value. Fair value was determined based on a discounted cash flow analysis. The discounted cash flow analysis was determined by the Company based on estimates of future revenue, expenses and capital expenditures which are considered to be level 3 inputs within the fair value hierarchy under SFAS No. 157, *Fair Value Measurements*. The pre-tax impairment loss is included in other income, consistent with the reporting of the results from operations of the resort as these assets are considered to be non-operating assets of the Company.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**CSX CORPORATION**
**PART II**
**Item 8. Financial Statements and Supplementary Data**

**NOTE 10. Properties**

CSX's capital spending includes purchased or self-constructed assets and property additions that substantially extend the service life or increase the utility of those assets. Indirect costs that can be specifically traced to capital projects are also capitalized. CSX is committed to maintaining and improving its existing infrastructure and expanding its network for long-term growth. Rail operations are capital intensive and CSX accounts for these costs in accordance with GAAP and the Company's capitalization policy. A detail of the Company's properties are as follows:

| *(Dollars in Millions)* | **December 2008** | December 2007 | Annual Depreciation Rate *(a)* |
|---|---|---|---|
| Road | | | |
| Rail and Other Track Material | **$5,324** | $5,079 | 2.9% |
| Ties | **3,503** | 3,355 | 4.2% |
| Ballast | **2,181** | 2,086 | 2.7% |
| Other | **8,449** | 8,322 | 3.0% |
| Total Road | **$19,457** | $18,842 | |
| Equipment *(b)* | | | |
| Locomotive | **$4,335** | $3,985 | 3.6% |
| Freight Cars | **2,777** | 2,582 | 3.8% |
| Work Equipment and Other | **356** | 331 | 3.9% |
| Total Equipment | **$7,468** | $6,898 | |
| Land | **$1,907** | $1,899 | N/A |
| Intermodal | **672** | 612 | N/A |
| Computer Hardware/Software and Other | **443** | 406 | 16.7% |
| Construction In Progress | **261** | 342 | N/A |
| Total Properties | **30,208** | 28,999 | |
| Accumulated Depreciation | **(7,520)** | (7,219) | |
| Net Properties | **$22,688** | $21,780 | |

*(a) Rates apply to CSXT assets which account for more than 95% of total assets. All other property is depreciated on a straight line basis over the asset's useful life. See Note 1, Nature of Operations and Significant Accounting Policies, for more information related to the Company's depreciation policies and asset lives.*

*(b) Included in the table above are $310 million of assets purchased using seller financing. Of that balance, $182 million was included in other current liabilities for 2008 as this amount was unpaid as of year end.*



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**Note 10. Properties, continued**

CSX's largest category of capital spending is track assets which are typically completed by CSX employees. Costs for track projects that are capitalized include:

- costs to purchase or construct new track or to prepare ground for the laying of track;
- rail, field and plant welding which are processes used to connect segments of rail;
- rail grinding which is a procedure for removing ridges and defects in a rail surface to restore rail to its original shape and extend its useful life;
- ballast (material that holds track in line);
- fuels and lubricants associated with tie, rail and surfacing work (the process of raising track to a designated elevation over an extended distance);
- cross, switch and bridge ties which are the braces that support the rails on a track;
- gauging which is the process of standardizing the distance between rails;
- handling costs associated with installing ties or ballast; and
- other track materials.

Normal repairs and maintenance costs of track materials are expensed as incurred. These costs include repairs made to track such as spot replacement of broken or worn rail, ties or ballast, handling costs associated with the removal of ties and other costs of track materials.

Capital spending related to locomotives and freight cars comprise the second largest category of the Company's capital assets. This category includes purchase costs of new locomotives and freight cars as well as certain equipment leases that are considered to be capital leases in accordance with SFAS 13, Accounting for Leases. In addition, costs to modify or rebuild these assets are capitalized if the spending incurred extend the asset's useful life or improve utilization. Improvement projects must meet specified dollar thresholds to be capitalized and are reviewed by management to determine proper accounting treatment. Routine equipment maintenance activities and repairs are expensed as incurred.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 11. Other Long-term Assets and Other Long-term Liabilities**

***Other Long-term Assets***

Other Long-term Assets consisted of the following:

| *(Dollars in Millions)* | **December** **2008** | 2007 |
|---|---|---|
| Goodwill *(a)* | **$64** | $64 |
| Available for Sale Securities *(b)* | **48** | 75 |
| Debt Issuance Costs | **36** | 34 |
| Other Long-term Assets | **46** | 86 |
| Total Other Long-term Assets | **$194** | $259 |

*(a) Goodwill related to subsidiaries of CSXT represents the purchase price in excess of fair value.*
*(b) Available for Sale Securities include investments in marketable securities.*

***Other Long-term Liabilities***

Other Long-term Liabilities consisted of the following:

| *(Dollars in Millions)* | **December** **2008** | 2007 |
|---|---|---|
| Pension Plan Liability *(a)* | **$730** | $203 |
| Post-retirement Benefit Liability *(a)* | **331** | 349 |
| Deferred Gains | **160** | 181 |
| Accrued Deferred Compensation | **77** | 90 |
| Accrued Sick Leave | **24** | 16 |
| Deferred Lease Payments | **21** | 40 |
| Minority Interest | **21** | 21 |
| Income Taxes Payable | **9** | 7 |
| Other Long-term Liabilities | **73** | 81 |
| Total Other Long-term Liabilities | **$1,446** | $988 |

*(a) See Note 7, Employee Benefit Plans, for a discussion on changes in pension and post-retirement benefit liabilities.*



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 12. Income Taxes**

Earnings from continuing operations before income taxes of $2.1 billion, $1.9 billion and $1.8 billion for fiscal years 2008, 2007, and 2006, respectively, represent earnings from domestic operations.

The significant components of deferred tax assets and liabilities include:

| | **2008** | | 2007 | |
|---|---|---|---|---|
| *(Dollars in Millions)* | **Assets** | **Liabilities** | Assets | Liabilities |
| Pension Plans | **$ 282** | **$ -** | $ 81 | $ - |
| Other Employee Benefit Plans | **317** | **-** | 323 | - |
| Accelerated Depreciation | **-** | **6,882** | - | 6,541 |
| Other | **469** | **218** | 447 | 152 |
| Total | **$1,068** | **$7,100** | $851 | $6,693 |
| Net Deferred Tax Liabilities | | **$6,032** | | $5,842 |

The primary factors in the change in year-end net deferred income tax liability balances include:

- Annual provision for deferred income tax expense; and
- Accumulated other comprehensive loss and other capital adjustments;

The breakdown of income tax expense between current and deferred is as follows:

| *(Dollars in Millions)* | **Fiscal Years** | | |
|---|---|---|---|
| Current: | **2008***(a)* | 2007 | 2006 |
| Federal | **$273** | $388 | $458 |
| State | **73** | 46 | 31 |
| Total Current | **346** | 434 | 489 |
| Deferred: | | | |
| Federal | **408** | 237 | 15 |
| State | **27** | 35 | 27 |
| Total Current | **435** | 272 | 42 |
| Total | **$781** | $706 | $531 |

*(a) The increase in deferred tax liability during 2008 is primarily due to the bonus depreciation provision of the Economic Stimulus Act of 2008.*



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 12. Income Taxes, continued**

Income tax expense reconciled to the tax computed at statutory rates is as follows:

| | Fiscal Years | | | | | |
|---|---|---|---|---|---|---|
| *(Dollars In Millions)* | **2008** | | 2007 | | 2006 | |
| Federal Income Taxes | **$751** | **35%** | $676 | 35% | $644 | 35% |
| State Income Taxes | **63** | **3** | 50 | 3 | 37 | 2 |
| Prior Year Audit Resolutions | **(18)** | **(1)** | 5 | - | (132) | (7) |
| Other Items*(a)* | **(15)** | **(1)** | (25) | (1) | (18) | (1) |
| Income Tax Expense/Rate | **$781** | **36%** | $706 | 37% | $531 | 29% |

*(a) Other items primarily include tax impacts from equity in Conrail and other partially owned subsidiaries' earnings.*

The change in the 2008 effective income tax rate compared to the prior year is primarily attributed to prior year audit resolutions.

CSX adopted FIN 48 at the beginning of fiscal year 2007. As a result of the implementation, the Company recognized a $31 million decrease to reserves for uncertain tax positions. This decrease, along with a $2 million reduction for unconsolidated subsidiaries accounted for under the equity method of accounting, was recorded as a cumulative effect adjustment to the beginning balance of retained earnings on the balance sheet.

The change to the total gross unrecognized tax benefits of the Company during the fiscal year ended December 2008 is reconciled as follows:

| **Uncertain Tax Positions:** | Fiscal Year | |
|---|---|---|
| *(Dollars in Millions)* | **2008** | 2007 |
| Beginning Balance | **$58** | $207 |
| Additions based on tax positions related to current year | **3** | 1 |
| Additions based on tax positions related to prior year | **14** | - |
| Settlements with IRS | **(16)** | (148) |
| Lapse of statute of limitations | **(2)** | (2) |
| **Balance at December 2008** | **$57** | $58 |

As of December 2008 and 2007, the Company had approximately $57 million and $58 million, respectively, of total unrecognized tax benefits. After consideration of the impact of federal tax benefits, $50 million for both years, could favorably affect the effective income tax rate. The Company estimates that approximately $22 million of the unrecognized tax benefits as of December 2008 for various state and federal income tax matters will be resolved over the next 12 months. Approximately, $13 million of this total would be closed upon the expiration of statutes. The final outcome of these uncertain tax positions, however, is not yet determinable.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 12. Income Taxes, continued**

The Company files a consolidated federal income tax return, which includes its principal domestic subsidiaries. CSX and its subsidiaries are subject to U.S. federal income tax as well as income tax of multiple state jurisdictions. During 2008, the Internal Revenue Service ("IRS") completed its examination of tax years 2004 through 2006. The Company has appealed a tax adjustment proposed by the IRS with respect to these tax years of which the amount is included in the uncertain tax positions above. The appeals process is expected to last more than one year. During 2008, the IRS completed their examination of the 2007 tax year without exception. All other federal prior tax year audits are settled.

In 2007, the IRS completed its review of the Company's pre-filing agreement, which is an early review of specific transactions. The Company recorded an income tax benefit of $110 million in 2007, primarily associated with the resolution of income tax matters related to former activities of the container shipping and marine service businesses. This benefit is recorded as discontinued operations as the Company no longer operated in these businesses. This benefit is associated with tax basis adjustments, foreign dividends and foreign tax credits from operations over a multi-year period.

CSX's continuing practice is to recognize net interest and penalties related to income tax matters in income tax expense. Included in the consolidated income statements are benefits of $2 million, $8 million, and $79 million for fiscal years 2008, 2007, and 2006, respectively, for the reduction to reserves for interest and penalties for all prior year tax positions. Benefits for interest and penalties are due to favorable tax settlements of prior period tax audits where the Company had previously accrued a liability for interest and penalties. The Company had $2 million and $4 million accrued for interest and penalties for 2008 and 2007, respectively, for all prior year tax positions. The decrease for interest and penalties during both 2008 and 2007 is primarily related to the resolution of federal income tax audits and payments made to the IRS by the Company.

**NOTE 13. Hurricane Katrina**

In August 2005, Hurricane Katrina caused extensive damage to Company assets on the Gulf Coast, including damage to track infrastructure and bridges. Operations were returned to pre-hurricane conditions by the end of the first quarter of 2006.

In order to determine the proper accounting treatment for the damage, the Company reviewed EITF 01-10, *Accounting for the Impact of the Terrorist Attacks of September 11, 2001* , specifically Issue 3, of that consensus, in which the Task Force concluded that insurance recoveries in connection with property and casualty losses should be recognized when realization of the claim for recovery of a loss recognized in the financial statements is deemed probable. Information regarding the Company's insurance coverage at that time, damage estimates and the allocation of the insurance deductible is as follows:



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 13. Hurricane Katrina, continued**

***Insurance Coverage***

In 2005, the Company had insurance coverage of $535 million, after a $25 million deductible (per occurrence), for the following types of losses:

- Fixed Assets Damages – The Company is entitled to the current replacement cost of the damaged assets. The Company's bridges and track damaged by Hurricane Katrina comprised the majority of these types of losses.

- Business Interruption - The Company is entitled to recover the increased costs incurred to allow the Company to continue operations and to minimize the overall business impact to the Company during the period of indemnity. These increased costs include rerouting and other costs.

- Lost Profit - The Company is entitled to recover lost profits, net of associated expenses, during the period of indemnity. The period of indemnity is defined in the relevant policies of insurance and extends not only through the date upon which the railroad network was restored to its original operations, but for such additional time as may be required to restore revenue to the same level as would have existed had no loss occurred.

The Company's insurance policies do not prioritize coverage based on types of losses. As claims were submitted to the insurance companies, they were reviewed and preliminary payments were received until all losses were incurred and documented. A final payment will be received once the Company and its insurers agree on the total value of the claim.

In May 2008, the Company filed a lawsuit in federal court against a number of companies that provide insurance and reinsurance coverage to the Company. The insurance companies have refused to cover certain losses totaling approximately $50 million that the Company has incurred as a result of Hurricane Katrina and which the Company believes are covered by the policies at issue. The specific claims relate to lost profits following the storm, costs associated with replacing two diesel locomotives and claims adjustment expenses. The Company has asked the court to determine whether its damages are covered by the policies. If the Company prevails, a separate proceeding will determine the amount of the Company's recovery. The Company will not recognize gains related to these disputed amounts until they are resolved by the courts.



Source: CSX CORP, 10-K, February 19, 2009
Powered by Morningstar® Document Research℠

**NOTE 13. Hurricane Katrina, continued**

***Damage Estimates***

Management's current loss estimate is approximately $450 million. Damages are categorized as follows:

- Fixed Asset Damages - The cost estimate was based on the replacement value of approximately 39 miles of continuous track, six major bridges, numerous small bridges, signal and communication damage, locomotive repair and facilities damaged throughout the region.

- Incremental Expenses - The Company's incremental expenses relate primarily to rerouting and other costs. Rerouting costs are incurred to move traffic either through alternative locations on the Company's network or on other railroad lines. Other costs include debris removal, maintenance on equipment damaged by water, supplies, environmental expenses, maintenance labor and other various items.

- Lost Profit - The Company estimated the impact on revenue at a location and customer-specific level.

***Allocation of Deductible***

The Company's insurance policies required its participation in the first $25 million of each loss event, without regard to the category of the covered losses. Because the Company's insurance policies do not specifically apply the deductible by the types of losses covered, CSX believes it is inconsistent with the form and economic substance of the Company's policies to attribute the entire deductible to a single component of covered losses. Therefore, the Company allocated the $25 million self-insured deductible among the above three categories of losses in proportion to the best estimate of the total ultimate losses eligible for recovery under the Company's insurance policies.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 13. Hurricane Katrina, continued**

***Gain on Insurance Recoveries***

As of December 2008, the Company has collected $373 million of insurance proceeds and recognized $200 million of pre-tax gains for claims related to Hurricane Katrina cumulatively since 2005. The gains were attributable to recovering amounts in excess of the net book value of damaged fixed assets and to recording recoveries related to lost profits. The $5 million gain on insurance recoveries shown below was included in materials, supplies and other on the consolidated income statements. Additional cash proceeds are expected and will result in future gain recognition.

Details of how the gain was calculated are as follows:

| | Fiscal Years | | |
|---|---|---|---|
| *(Dollars in Millions)* | **2008** | 2007 | 2006 |
| **Total Insurance Proceeds** | **$6** | $29 | $268 |
| Less Recoverable Losses: | | | |
| Net book value of fixed asset damage | **-** | - | (1) |
| Incremental expense | **(1)** | (2) | (56) |
| Prior year receivable | **-** | - | (43) |
| **Gain** | **$5** | $27 | $168 |

Gain contingencies subject to FIN 30, *Accounting for Involuntary Conversions of Nonmonetary Assets to Monetary Assets* and SFAS 5, were not recognized until the period in which all contingencies were resolved or cash proceeds were received. The insurance recovery for the replacement cost of property damage in excess of book value and the recovery of lost profits were considered to be gain contingencies. Therefore the net gain (after applying the insurance deductible) was deferred until the cash proceeds are/were received.

***Cash Flows***

Cash proceeds from the insurers are not specific to the types of losses and so, for cash flow presentation, the Company allocated the proceeds ratably among the three types of losses mentioned above. Allocated cash proceeds for lost profits and incremental expenses were classified as operating activities since they related directly to revenue and expenses from operations and were $3 million, $13 million and $121 million for 2008, 2007 and 2006, respectively. Allocated cash proceeds for fixed asset damage were classified as investing activities because these proceeds had a direct relationship to money the Company spent on property additions to repair the hurricane-damaged assets that were recorded in the same category. Cash proceeds for fixed asset damage were $3 million, $16 million and $147 million for 2008, 2007 and 2006, respectively.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 14. Related Party Transactions**

Through a limited liability company, CSX and Norfolk Southern Corporation ("NS") jointly own Conrail. CSX has a 42% economic interest and 50% voting interest in the jointly owned entity and NS has the remainder of the economic and voting interests. Pursuant to the Accounting Principle Board ("APB") Opinion 18, *The Equity Method of Accounting for Investments in Common Stock*, CSX applies the equity method of accounting to its investment in Conrail.

Conrail owns and operates rail infrastructure for the joint benefit of CSX and NS. This is known as the shared asset area. Conrail charges fees for right-of way usage, equipment rentals and transportation, switching and terminal service charges in the shared asset area. Historically, these expenses were included as an expense category called Conrail rents, fees and services, in the consolidated income statements. Beginning in 2007, these amounts have been included in materials, supplies and other on the consolidated income statements. Prior periods have been reclassified to conform to the current presentation.

Also included in materials, supplies and other are CSX's 42% share of Conrail's income and its amortization of the fair value write-up arising from the acquisition of Conrail and certain other adjustments. The amortization primarily represents the additional after- tax depreciation expense related to the write-up of Conrail's fixed assets when the original purchase price, from the 1997 acquisition of Conrail, was allocated based on fair value.

The following table details the related Conrail amounts included in materials, supplies and other in the Company's consolidated income statements:

| | Fiscal Years | | |
|---|---|---|---|
| *(Dollars in Millions)* | **2008** | 2007 | 2006 |
| Rents, Fees and Services | **$112** | $97 | $91 |
| Purchase Price Amortization and Other | **4** | 4 | 4 |
| Equity in Income of Conrail | **(23)** | (35) | (20) |
| Total Conrail Rents, Fees and Services | **$93** | $66 | $75 |

Interest expense from the promissory notes payable to Conrail, or a subsidiary, was as follows:

| | Fiscal Years | | |
|---|---|---|---|
| *(Dollars in Millions)* | **2008** | 2007 | 2006 |
| Interest Expense Related to Conrail | **$4** | $4 | $4 |



Source: CSX CORP, 10-K, February 19, 2009
Powered by Morningstar® Document Research℠

**NOTE 14. Related Party Transactions, continued**

As required by SFAS 57, *Related Party Disclosures,* the Company has identified below amounts owed to Conrail, or its affiliates, representing liabilities under the operating, equipment and shared area agreements with Conrail. The Company also executed two promissory notes with a subsidiary of Conrail which were included in long-term debt on the consolidated balance sheets.

| *(Dollars in Millions)* | **December 26, 2008** | December 28, 2007 |
|---|---|---|
| **Balance Sheet Information:** | | |
| CSX Payable to Conrail *(a)* | **$63** | $49 |
| Promissory Notes Payable to Conrail Subsidiary | | |
| 4.40% CSX Promissory Note due October 2035 *(b)* | **$73** | $73 |
| 4.52% CSXT Promissory Note due March 2035 *(b)* | **$23** | $23 |

*(a) Included on the consolidated balance sheet of CSX as accounts payable because it is short term in nature.*
*(b) Included on the consolidated balance sheet of CSX as long-term debt.*

**NOTE 15. Discontinued Operations**

In 2005, CSX sold its International Terminals business, which included the capital stock of SL Services, Inc. (“SLSI”) to Dubai Ports International FZE (“DPI”) for gross cash consideration of $1.142 billion.

In 2007, the IRS completed its review of the Company’s pre-filing agreement, which is an early review of specific transactions. The Company recorded an income tax benefit of $110 million, primarily associated with the resolution of income tax matters related to former activities of the marine service businesses, including the International Terminals business described above. This 2007 benefit was recorded as discontinued operations as the Company no longer operates in these businesses. This benefit was associated with tax basis adjustments, foreign dividends and foreign tax credits from operations over a multi-year period.

SLSI held certain residual assets and liabilities as a result of prior divestitures and discontinuances. A wholly-owned subsidiary of CSX retains the rights to those assets and indemnifies DPI, SLSI and related entities against those liabilities pursuant to a separate agreement. CSX guarantees the obligations of its subsidiary under this separate agreement.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 16. Derivative Financial Instruments**

CSX uses derivative financial instruments to manage its overall exposure to fluctuations in interest rates and has previously used such instruments to manage exposure to fluctuations in fuel costs.

***Interest Rate Swaps***

During 2007, CSX repaid $450 million of debentures that matured and called $150 million of debentures due in 2032 (See Note 8, Debt and Credit Agreements). As a result, CSX also settled the interest rate swaps related to these debentures. CSX had $30 million and $35 million of outstanding interest rate swaps that impacted interest expense by $1 million and $2 million for 2008 and 2007, respectively. The interest rate swap agreements were designated and qualified as fair value hedges. CSX's interest rate swaps qualified as perfectly effective, as defined by SFAS 133, *Accounting for Derivative Instruments and Hedging Activities.* As such, there was no ineffective portion to the hedge recognized in earnings during the current or prior year periods.

***Fuel Hedging***

In 2003, CSX began a program to hedge a portion of CSXT's future locomotive fuel purchases. This program was established to manage exposure to fuel price fluctuations. To minimize this risk, CSX entered into a series of swaps. Ineffectiveness, or the extent to which changes in the fair values of the fuel swaps did not offset changes in the fair values of the expected fuel purchases, was immaterial. CSX suspended entering into new swaps in its fuel hedge program in 2004 and there are currently no outstanding contracts.

Fuel hedging activity offset increased fuel expense for fiscal year 2006 by $55 million. Since the end of 2006, there has been no impact on fuel expense as all contracts expired prior to that time.

**NOTE 17. Business Segments**

The Company's consolidated operating income results are comprised of two business segments: Rail and Intermodal. The Rail segment provides rail freight transportation over a network of approximately 21,000 route miles in 23 states, the District of Columbia and the Canadian provinces of Ontario and Quebec. The Intermodal segment provides integrated rail and truck transportation services and operates a network of dedicated intermodal facilities across North America. These segments are strategic business units that offer different services and are managed separately. Performance of the segment is evaluated and resources are allocated based on several factors, of which the principal financial measures are business segment operating income and operating ratio. The accounting policies of the segments are the same as those described in Note 1, Nature of Operations and Significant Accounting Policies.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 17. Business Segments, continued**

Certain segment information has been reclassified to conform to current year presentation. See Note 1, Nature of Operations and Significant Accounting Policies, for further details. Business segment information for the fiscal years 2008, 2007 and 2006 was as follows:

| | Fiscal Years | | |
|---|---|---|---|
| *(Dollars in Millions)* | **2008** | 2007 | 2006 |
| **Revenue from External Customers:** | | | |
| Rail | **$9,789** | $8,674 | $8,154 |
| Intermodal | **1,466** | 1,356 | 1,412 |
| **Consolidated** | **$11,255** | $10,030 | $9,566 |
| | | | |
| **Operating Income:** | | | |
| Rail | **$2,478** | $2,000 | $1,881 |
| Intermodal | **290** | 260 | 268 |
| **Consolidated** | **$2,768** | $2,260 | $2,149 |
| | | | |
| **Assets:** | | | |
| Rail | **$25,343** | $24,502 | $24,212 |
| Intermodal | **321** | 283 | 276 |
| Investment in Conrail | **609** | 639 | 607 |
| Elimination of Intersegment Payables (Receivables) | **(8)** | (121) | (174) |
| Non-segment Assets | **23** | 231 | 208 |
| **Consolidated** | **$26,288** | $25,534 | $25,129 |
| | | | |
| **Depreciation Expense:** | | | |
| Rail | **$879** | $849 | $822 |
| Intermodal | **25** | 34 | 38 |
| **Consolidated** | **$904** | $883 | $860 |
| | | | |
| **Property Additions:** | | | |
| Rail | **$1,672** | $1,678 | $1,595 |
| Intermodal | **62** | 60 | 28 |
| Non-Segment | **6** | 35 | 16 |
| **Consolidated** | **$1,740** | $1,773 | $1,639 |



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**CSX CORPORATION**
**PART II**
**Item 8. Financial Statements and Supplementary Data**

**NOTE 18. Quarterly Financial Data (Unaudited)**

Pursuant to Article 3 of the Securities and Exchange Commission ("SEC")'s Regulation S-X, the following are selected quarterly financial data:

| | **2008** | | | | |
|---|---|---|---|---|---|
| | **Quarters** | | | | |
| *(Dollars in Millions, Except Per Share Amounts)* | **1st** *(a)* | **2nd** *(b)* | **3rd** | **4th** *(c)* | **Full Year** |
| Operating Revenue | **$2,713** | **$2,907** | **$2,961** | **$2,674** | **$11,255** |
| Operating Income | **626** | **717** | **733** | **692** | **2,768** |
| Net Earnings | **$351** | **$385** | **$382** | **$247** | **$1,365** |
| Earnings Per Share: | | | | | |
| Net Earnings | **$0.87** | **$0.95** | **$0.95** | **$0.63** | **$3.41** |
| Earnings Per Share Assuming Dilution: | | | | | |
| Net Earnings | **$0.85** | **$0.93** | **$0.94** | **$0.63** | **$3.34** |
| Dividend Per Share | **$0.15** | **$0.18** | **$0.22** | **$0.22** | **$0.77** |

| | 2007 | | | | |
|---|---|---|---|---|---|
| | Quarters | | | | |
| *(Dollars in Millions, Except Per Share Amounts)* | 1st *(d)* | 2nd | 3rd *(e)* | 4th *(f)* | Full Year *(g)* |
| Operating Revenue | $2,422 | $2,530 | $2,501 | $2,577 | $10,030 |
| Operating Income | 485 | 612 | 558 | 605 | 2,260 |
| Earnings from Continuing Operations | 240 | 324 | 297 | 365 | 1,226 |
| Discontinued Operations | - | - | 110 | - | 110 |
| Net Earnings | $240 | $324 | $407 | $365 | $1,336 |
| Earnings Per Share: | | | | | |
| From Continuing Operations | $0.55 | $0.74 | $0.69 | $0.89 | $2.85 |
| Discontinued Operations | - | - | 0.25 | - | 0.26 |
| Net Earnings | $0.55 | $0.74 | $0.94 | $0.89 | $3.11 |
| Earnings Per Share Assuming Dilution: | | | | | |
| From Continuing Operations | $0.52 | $0.71 | $0.67 | $0.86 | $2.74 |
| Discontinued Operations | - | - | 0.24 | - | 0.25 |
| Net Earnings | $0.52 | $0.71 | $0.91 | $0.86 | $2.99 |
| Dividend Per Share | $0.12 | $0.12 | $0.15 | $0.15 | $0.54 |

*Prior periods have been reclassified to conform to the current presentation.*

*(a) CSX recorded a non-cash adjustment of $30 million to correct equity earnings from a non-consolidated subsidiary resulting in additional income.*
*(b) CSX recognized a tax benefit of $18 million principally related to the settlement of federal income tax audits and certain other tax matters.*
*(c) CSX recognized an impairment loss of $166 million pre-tax on its investment in The Greenbrier resort.*
*(d) CSX recognized an $18 million pre-tax benefit on insurance recoveries from gains related to Hurricane Katrina (See Note 13, Hurricane Katrina).*
*(e) CSX recognized an income tax benefit of $110 million principally associated with the resolution of certain tax matters related to former activities of the container shipping and marine service businesses (See Note 15, Discontinued Operations). Additionally, CSX recognized a $1 million pre-tax benefit on insurance recoveries from gains related to Hurricane Katrina.*
*(f) CSX recognized an $8 million pre-tax benefit on insurance recoveries from gains related to Hurricane Katrina.*
*(g) Total pre-tax benefits on insurance recoveries recognized during fiscal year 2007 were $27 million.*

 Powered by Morningstar® Document Research℠

**NOTE 19. Summarized Consolidating Financial Data**

In 2007, CSXT sold $381 million of Secured Equipment Notes due 2023 in a registered public offering pursuant to an existing shelf registration statement. CSX has fully and unconditionally guaranteed the notes. In connection with the notes, the Company is providing the following condensed consolidating financial information in accordance with SEC disclosure requirements. Each entity in the consolidating financial information follows the same accounting policies as described in the consolidated financial statements, except for the use of the equity method of accounting to reflect ownership interests in subsidiaries which are eliminated upon consolidation and the allocation of certain expenses of CSX incurred for the benefit of its subsidiaries.

The condensed consolidating balance sheets as of December 2008 and December 2007, and the statements of income and cash flows for each of the three fiscal years in the period ended December 2008, for the obligor and parent guarantor are as follows:



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 19. Summarized Consolidating Financial Data**

**Consolidating Income Statements**
*(Dollars in Millions)*

| Fiscal Year Ended December 26, 2008 | CSX Corporation | CSX Transportation | Other | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Operating Revenue | $ - | $9,712 | $1,675 | $(132) | $11,255 |
| Operating Expense | (193) | 7,511 | 1,289 | (120) | 8,487 |
| Operating Income | 193 | 2,201 | 386 | (12) | 2,768 |
| Equity in Earnings of Subsidiaries | 1,469 | - | - | (1,469) | - |
| Other Income (Expense) | 141 | 118 | (172) | (190) | (103) |
| Interest Expense | (544) | (155) | (22) | 202 | (519) |
| Earnings from Continuing Operations before Income Taxes | 1,259 | 2,164 | 192 | (1,469) | 2,146 |
| Income Tax Benefit (Expense) | 106 | (733) | (154) | - | (781) |
| **Net Earnings** | $1,365 | $1,431 | $38 | $(1,469) | $1,365 |

| Fiscal Year Ended December 28, 2007 | CSX Corporation | CSX Transportation | Other | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Operating Revenue | $ - | $8,591 | $1,546 | $(107) | $10,030 |
| Operating Expense | (203) | 6,894 | 1,176 | (97) | 7,770 |
| Operating Income | 203 | 1,697 | 370 | (10) | 2,260 |
| Equity in Earnings of Subsidiaries | 1,363 | - | - | (1,363) | - |
| Other Income (Expense) | 166 | 154 | 194 | (425) | 89 |
| Interest Expense | (568) | (238) | (46) | 435 | (417) |
| Earnings from Continuing Operations before Income Taxes | 1,164 | 1,613 | 518 | (1,363) | 1,932 |
| Income Tax Benefit (Expense) | 62 | (614) | (154) | - | (706) |
| Earnings from Continuing Operations | 1,226 | 999 | 364 | (1,363) | 1,226 |
| Discontinued Operations - Net of Tax | 110 | - | - | - | 110 |
| **Net Earnings** | $1,336 | $999 | $364 | $(1,363) | $1,336 |



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 19. Summarized Consolidating Financial Data, continued**

**Consolidating Income Statements**
*(Dollars in Millions)*

| Fiscal Year Ended December 29, 2006 | CSX Corporation | CSX Transportation | Other | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Operating Revenue | $ - | $8,140 | $1,426 | $ - | $9,566 |
| Operating Expense | (195) | 6,542 | 1,070 | - | 7,417 |
| Operating Income | 195 | 1,598 | 356 | - | 2,149 |
| Equity in Earnings of Subsidiaries | 1,281 | - | - | (1,281) | - |
| Other Income (Expense) | 283 | 87 | 131 | (417) | 84 |
| Interest Expense | (536) | (217) | (56) | 417 | (392) |
| Earnings from Continuing Operations before Income Taxes | 1,223 | 1,468 | 431 | (1,281) | 1,841 |
| Income Tax Benefit (Expense) | 87 | (489) | (129) | - | (531) |
| **Net Earnings** | $1,310 | $979 | $302 | $(1,281) | $1,310 |



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 19. Summarized Consolidating Financial Data, continued**

**Consolidating Balance Sheets**
*(Dollars in Millions)*

| December 26, 2008 | CSX Corporation | CSX Transportation | Other | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Current Assets: | | | | | |
| Cash and Cash Equivalents | $559 | $63 | $47 | $ - | $669 |
| Short-term Investments | - | - | 76 | - | 76 |
| Accounts Receivable - Net | 5 | 1,046 | 56 | - | 1,107 |
| Materials and Supplies | - | 217 | - | - | 217 |
| Deferred Income Taxes | 11 | 187 | 5 | - | 203 |
| Other Current Assets | 112 | 34 | 52 | (79) | 119 |
| Total Current Assets | 687 | 1,547 | 236 | (79) | 2,391 |
| | | | - | | |
| Properties | 6 | 28,958 | 1,244 | - | 30,208 |
| Accumulated Depreciation | (9) | (6,758) | (753) | - | (7,520) |
| Properties - Net | (3) | 22,200 | 491 | - | 22,688 |
| | | | - | | |
| Investment in Conrail | - | - | 609 | - | 609 |
| Affiliates and Other Companies | - | 527 | (121) | - | 406 |
| Investment in Consolidated Subsidiaries | 14,546 | - | 41 | (14,587) | - |
| Other Long-term Assets | 52 | 76 | 109 | (43) | 194 |
| Total Assets | $15,282 | $24,350 | $1,365 | $(14,709) | $26,288 |
| | | | | | |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | | | |
| Current Liabilities: | | | | | |
| Accounts Payable | $99 | $739 | 135 | $ - | $973 |
| Labor and Fringe Benefits Payable | 40 | 366 | 59 | - | 465 |
| Payable to Affiliates | 455 | 765 | (1,153) | (67) | - |
| Casualty, Environmental and Other Reserves | - | 211 | 25 | - | 236 |
| Current Maturities of Long-term Debt | 200 | 116 | 3 | - | 319 |
| Short-term Debt | - | - | 1 | - | 1 |
| Income and Other Taxes Payable | (2) | 208 | (81) | - | 125 |
| Other Current Liabilities | 2 | 271 | 23 | (11) | 285 |
| Total Current Liabilities | 794 | 2,676 | (988) | (78) | 2,404 |
| | | | | | |
| Casualty, Environmental and Other Reserves | 1 | 547 | 95 | - | 643 |
| Long-term Debt | 6,058 | 1,447 | 7 | - | 7,512 |
| Deferred Income Taxes | (629) | 6,591 | 273 | - | 6,235 |
| Long-term Payable to Affiliates | - | - | 44 | (44) | - |
| Other Long-term Liabilities | 1,010 | 513 | (33) | (44) | 1,446 |
| Total Liabilities | 7,234 | 11,774 | (602) | (166) | 18,240 |
| | | | | | |
| Shareholders' Equity: | | | | | |
| Common Stock | 391 | 181 | - | (181) | 391 |
| Other Capital | - | 5,566 | 1,923 | (7,489) | - |
| Retained Earnings | 8,398 | 6,870 | 148 | (7,018) | 8,398 |
| Accumulated Other Comprehensive Loss | (741) | (41) | (104) | 145 | (741) |
| Total Shareholders' Equity | 8,048 | 12,576 | 1,967 | (14,543) | 8,048 |
| Total Liabilities and Shareholders' Equity | $15,282 | $24,350 | $1,365 | $(14,709) | $26,288 |

**NOTE 19. Summarized Consolidating Financial Data, continued**

**Consolidating Balance Sheets**
*(Dollars in Millions)*

| December 28, 2007 | CSX Corporation | CSX Transportation | Other | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Current Assets: | | | | | |
| Cash and Cash Equivalents | $298 | $55 | $15 | $- | $368 |
| Short-term Investments | 270 | - | 76 | - | 346 |
| Accounts Receivable - Net | 10 | 1,069 | 95 | - | 1,174 |
| Materials and Supplies | - | 230 | 10 | - | 240 |
| Deferred Income Taxes | 23 | 232 | (1) | - | 254 |
| Other Current Assets | 25 | 60 | 96 | (72) | 109 |
| Total Current Assets | 626 | 1,646 | 291 | (72) | 2,491 |
| | | | - | | |
| Properties | 6 | 27,606 | 1,387 | - | 28,999 |
| Accumulated Depreciation | (9) | (6,400) | (810) | - | (7,219) |
| Properties - Net | (3) | 21,206 | 577 | - | 21,780 |
| | | | - | | |
| Investment in Conrail | - | - | 639 | - | 639 |
| Affiliates and Other Companies | - | 470 | (105) | - | 365 |
| Investment in Consolidated Subsidiaries | 14,524 | - | 34 | (14,558) | - |
| Other Long-term Assets | (50) | 203 | 162 | (56) | 259 |
| Total Assets | $15,097 | $23,525 | $1,598 | $(14,686) | $25,534 |
| | | | | | |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | | | |
| Current Liabilities: | | | | | |
| Accounts Payable | $90 | $799 | $87 | $- | $976 |
| Labor and Fringe Benefits Payable | 36 | 374 | 51 | - | 461 |
| Payable to Affiliates | 747 | 1,325 | (2,000) | (72) | - |
| Casualty, Environmental and Other Reserves | - | 226 | 21 | - | 247 |
| Current Maturities of Long-term Debt | 669 | 111 | 3 | - | 783 |
| Short-term Debt | - | 2 | 2 | - | 4 |
| Income and Other Taxes Payable | (761) | 572 | 302 | - | 113 |
| Other Current Liabilities | 8 | 72 | 7 | - | 87 |
| Total Current Liabilities | 789 | 3,481 | (1,527) | (72) | 2,671 |
| | | | - | | |
| Casualty, Environmental and Other Reserves | - | 540 | 84 | - | 624 |
| Long-term Debt | 5,229 | 1,230 | 11 | - | 6,470 |
| Deferred Income Taxes | (176) | 6,291 | (19) | - | 6,096 |
| Long-term Payable to Affiliates | - | - | 56 | (56) | - |
| Other Long-term Liabilities | 570 | 541 | (85) | (38) | 988 |
| Total Liabilities | 6,412 | 12,083 | (1,480) | (166) | 16,849 |
| | | | | | |
| Shareholders' Equity: | | | - | | |
| Common Stock | 408 | 181 | - | (181) | 408 |
| Other Capital | 37 | 5,525 | 2,705 | (8,230) | 37 |
| Retained Earnings | 8,565 | 5,769 | 420 | (6,189) | 8,565 |
| Accumulated Other Comprehensive Loss | (325) | (33) | (47) | 80 | (325) |
| Total Shareholders' Equity | 8,685 | 11,442 | 3,078 | (14,520) | 8,685 |
| Total Liabilities and Shareholders' Equity | $15,097 | $23,525 | $1,598 | $(14,686) | $25,534 |



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 19. Summarized Consolidating Financial Data, continued**

**Consolidating Cash Flow Statements**
*(Dollars in Millions)*

| Fiscal Year Ended December 26, 2008 | CSX Corporation | CSX Transportation | Other | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **Operating Activities** | | | | | |
| *Net Cash (Used in) Provided by Operating Activities* | $1,093 | $2,390 | $139 | $(708) | $2,914 |
| **Investing Activities** | | | | | |
| Property Additions | - | (1,635) | (105) | - | (1,740) |
| Purchases of Short-term Investments | (25) | - | - | - | (25) |
| Proceeds from Sales of Short-term Investments | 280 | - | - | - | 280 |
| Other Investing Activities | 569 | 124 | 136 | (793) | 36 |
| *Net Cash Provided by (Used in) Investing Activities* | 824 | (1,511) | 31 | (793) | (1,449) |
| **Financing Activities** | | | | | |
| Short-term Debt - Net | - | (2) | (1) | - | (3) |
| Long-term Debt Issued | 1,000 | 351 | - | - | 1,351 |
| Long-term Debt Repaid | (518) | (121) | (3) | - | (642) |
| Dividends Paid | (314) | (325) | (27) | 358 | (308) |
| Stock Options Exercised | 83 | - | - | - | 83 |
| Shares Repurchased | (1,570) | - | - | - | (1,570) |
| Other Financing Activities | (337) | (774) | (107) | 1,143 | (75) |
| *Net Cash (Used in) Provided by Financing Activities* | (1,656) | (871) | (138) | 1,501 | (1,164) |
| Net (Decrease) Increase in Cash and Cash Equivalents | 261 | 8 | 32 | - | 301 |
| Cash and Cash Equivalents at Beginning of Period | 298 | 55 | 15 | - | 368 |
| Cash and Cash Equivalents at End of Period | $559 | $63 | $47 | $ - | $669 |



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 19. Summarized Consolidating Financial Data, continued**

**Consolidating Cash Flow Statements**
*(Dollars in Millions)*

| Fiscal Year Ended December 28, 2007 | CSX Corporation | CSX Transportation | Other | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **Operating Activities** | | | | | |
| *Net Cash (Used in) Provided by Operating Activities* | $(871) | $2,321 | $919 | $(185) | $2,184 |
| **Investing Activities** | | | | | |
| Property Additions | (2) | (1,632) | (139) | - | (1,773) |
| Purchases of Short-term Investments | (2,338) | - | - | - | (2,338) |
| Proceeds from Sales of Short-term Investments | 2,459 | - | - | - | 2,459 |
| Other Investing Activities | 513 | 235 | (781) | (8) | (41) |
| *Net Cash Provided by (Used in) Investing Activities* | 632 | (1,397) | (920) | (8) | (1,693) |
| **Financing Activities** | | | | | |
| Short-term Debt - Net | - | (6) | - | - | (6) |
| Long-term Debt Issued | 2,000 | 381 | - | - | 2,381 |
| Long-term Debt Repaid | (620) | (142) | (23) | - | (785) |
| Dividends Paid | (236) | (120) | (27) | 152 | (231) |
| Stock Options Exercised | 153 | - | - | - | 153 |
| Shares Repurchased | (2,174) | - | - | - | (2,174) |
| Other Financing Activities | 998 | (999) | 38 | 41 | 78 |
| *Net Cash (Used in) Provided by Financing Activities* | 121 | (886) | (12) | 193 | (584) |
| Net (Decrease) Increase in Cash and Cash Equivalents | (118) | 38 | (13) | - | (93) |
| Cash and Cash Equivalents at Beginning of Period | 416 | 17 | 28 | - | 461 |
| Cash and Cash Equivalents at End of Period | $298 | $55 | 15 | $ - | $368 |



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**NOTE 19. Summarized Consolidating Financial Data, continued**

**Consolidating Cash Flow Statements**
*(Dollars in Millions)*

| Fiscal Year Ended December 29, 2006 | CSX Corporation | CSX Transportation | Other | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **Operating Activities** | | | | | |
| *Net Cash Provided by (Used in) Operating Activities* | $789 | $1,794 | $246 | $(771) | $2,058 |
| **Investing Activities** | | | | | |
| Property Additions | - | (1,554) | (85) | - | (1,639) |
| Purchases of Short-term Investments | (1,412) | - | - | - | (1,412) |
| Proceeds from Sales of Short-term Investments | 1,290 | - | - | - | 1,290 |
| Other Investing Activities | (38) | 128 | 47 | 14 | 151 |
| *Net Cash (Used in) Provided by Investing Activities* | (160) | (1,426) | (38) | 14 | (1,610) |
| **Financing Activities** | | | | | |
| Short-term Debt - Net | - | 8 | (1) | - | 7 |
| Long-term Debt Issued | 400 | 73 | (2) | - | 471 |
| Long-term Debt Repaid | (350) | (128) | (68) | - | (546) |
| Dividends Paid | (148) | (130) | (30) | 163 | (145) |
| Stock Options Exercised | 318 | - | 1 | - | 319 |
| Shares Repurchased | (465) | - | - | - | (465) |
| Other Financing Activities | (225) | (174) | (132) | 594 | 63 |
| *Net Cash (Used in) Provided by Financing Activities* | (470) | (351) | (232) | 757 | (296) |
| Net Increase (Decrease) in Cash and Cash Equivalents | 159 | 17 | (24) | - | 152 |
| Cash and Cash Equivalents at Beginning of Period | 257 | - | 52 | - | 309 |
| Cash and Cash Equivalents at End of Period | $416 | $17 | 28 | $ - | $461 |



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

None.

**Item 9A. Controls and Procedures**

***Evaluation of Disclosure Controls and Procedures***

As of December 26, 2008, under the supervision and with the participation of CSX's Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), management has evaluated the effectiveness of the design and operation of the Company's disclosure controls and procedures. Based on that evaluation, the CEO and CFO concluded that, as of December 26, 2008, the Company's disclosure controls and procedures were effective at the reasonable assurance level in timely alerting them to material information required to be included in CSX's periodic SEC reports. There were no changes in the Company's internal controls over financial reporting during the fourth quarter of 2008 that have materially affected or are reasonably likely to materially affect the Company's internal control over financial reporting.

***Management's Report on Internal Control over Financial Reporting***

CSX's management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rules 13a-15(f) and 15d-15(f). Under the supervision and with the participation of the management of CSX, including CSX's CEO and CFO, CSX conducted an evaluation of the effectiveness of the Company's internal control over financial reporting as of December 26, 2008 based on the framework in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission which is also referred to as COSO. Based on that evaluation, management of CSX concluded that the Company's internal control over financial reporting was effective as of December 26, 2008. Management's assessment of the effectiveness of internal control over financial reporting is expressed at the level of reasonable assurance because a control system, no matter how well designed and operated, can provide only reasonable, but not absolute, assurance that the control system's objectives will be met.

The Company's internal control over financial reporting as of December 26, 2008 has been audited by Ernst & Young LLP, an independent registered public accounting firm, as stated in their report which is included elsewhere herein.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

***Report of Independent Registered Public Accounting Firm***

The Board of Directors and Shareholders of CSX Corporation

We have audited CSX Corporation's internal control over financial reporting as of December 26, 2008, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO criteria). CSX Corporation's management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, CSX Corporation maintained, in all material respects, effective internal control over financial reporting as of December 26, 2008, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the 2008 consolidated financial statements of CSX Corporation and our report dated February 17, 2009 expressed an unqualified opinion thereon.

/s/ Ernst & Young LLP
Independent Certified Public Accountants

Jacksonville, Florida
February 17, 2009

***Changes in Internal Control over Financial Reporting***

There were no material changes in the Company's internal control over financial reporting.

**Item 9B. Other Information**

None



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

### Item 10. Directors, Executive Officers of the Registrant and Corporate Governance

In accordance with Instruction G(3) of Form 10-K, the information required by this item is incorporated herein by reference to the Proxy Statement. The Proxy Statement will be filed not later than April 27, 2009 with respect to its 2009 annual meeting of shareholders, except for the information regarding the executive officers of the Company. Information regarding executive officers is included in Part I of this report under the caption "Executive Officers of the Registrant."

### Item 11. Executive Compensation

In accordance with Instruction G(3) of Form 10-K, the information required by this Item is incorporated herein by reference to the Proxy Statement (see Item 10 above).

### Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters

In accordance with Instruction G(3) of Form 10-K, the information required by this Item is incorporated herein by reference to the Proxy Statement (see Item 10 above).

### Item 13. Certain Relationships and Related Transactions, and Director Independence

In accordance with Instruction G(3) of Form 10-K, the information required by this Item is incorporated herein by reference to the Proxy Statement (see Item 10 above).

### Item 14. Principal Accounting Fees and Services

In accordance with Instruction G(3) of Form 10-K, the information required by this Item is incorporated herein by reference to the Proxy Statement (see Item 10 above).



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**CSX CORPORATION**
**PART IV**

**Item 15. Exhibits, Financial Statement Schedules**

*(a)(1) Financial Statements*

See Index to Consolidated Financial Statements on page 64.

*(2) Financial Statement Schedules*

The information required by Schedule II, *Valuation and Qualifying Accounts*, is included in Note 6 to the Consolidated Financial Statements, Casualty, Environmental and Other Reserves. All other financial statement schedules are not applicable.

*(3) Exhibits*

| | |
|---|---|
| 2.1 | Distribution Agreement, dated as of July 26, 2004, by and among CSX Corporation, CSX Transportation, Inc., CSX Rail Holding Corporation, CSX Northeast Holding Corporation, Norfolk Southern Corporation, Norfolk Southern Railway Company, CRR Holdings LLC, Green Acquisition Corp., Conrail Inc., Consolidated Rail Corporation, New York Central Lines LLC, Pennsylvania Lines LLC, NYC Newco, Inc. and PRR Newco, Inc. (incorporated herein by reference to Exhibit 2.1 to the Registrant's Current Report on Form 8-K filed with the Commission on September 2, 2004) |
| 3.1 | Amended and Restated Articles of Incorporation of the Registrant (incorporated herein by reference to Exhibit 3.1 to the Registrant's Current Report on Form 8-K filed with the Commission on December 14, 2004) |
| 3.1(a) | Articles of Amendment to CSX Corporation's Amended and Restated Articles of Incorporation of the Registrant (incorporated herein by reference to Exhibit 5.03 to the Registrant's Current Report on Form 8-K filed with the Commission on July 18, 2006) |
| 3.2 | Bylaws of the Registrant, amended effective as of September 24, 2008 (incorporated herein by reference to Exhibit 3.2 of the Registrant's Current Report on Form 8-K filed with the Commission on September 25, 2008) |
| | <u>Instruments Defining the Rights of Security Holders, Including Debentures:</u> |
| 4.1(a) | Indenture, dated August 1, 1990, between the Registrant and The Chase Manhattan Bank, as Trustee (incorporated herein by reference to the Registrant's Form SE, dated September 7, 1990, filed with the Commission) |



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

| | |
|---|---|
| 4.1(b) | First Supplemental Indenture, dated as of June 15, 1991, between the Registrant and The Chase Manhattan Bank, as Trustee (incorporated herein by reference to Exhibit 4(c) to the Registrant's Form SE, dated May 28, 1992, filed with the Commission) |
| 4.1(c) | Second Supplemental Indenture, dated as of May 6, 1997, between the Registrant and The Chase Manhattan Bank, as Trustee (incorporated herein by reference to Exhibit 4.3 to the Registrant's Registration Statement on Form S-4 (Registration No. 333-28523) filed with the Commission on June 5, 1997) |
| 4.1(d) | Third Supplemental Indenture, dated as of April 22, 1998, between the Registrant and The Chase Manhattan Bank, as Trustee (incorporated herein by reference to Exhibit 4.2 to the Registrant's Current Report on Form 8-K filed with the Commission on May 12, 1998) |
| 4.1(e) | Fourth Supplemental Indenture, dated as of October 30, 2001, between the Registrant and The Chase Manhattan Bank, as Trustee (incorporated herein by reference to Exhibit 4.1 to the Registrant's Report on Form 10-Q filed with the Commission on November 7, 2001) |
| 4.1(f) | Fifth Supplemental Indenture, dated as of October 27, 2003 between the Registrant and The Chase Manhattan Bank, as Trustee (incorporated herein by reference to Exhibit 4.1 to the Registrant's Report on Form 8-K filed with the Commission on October 27, 2003) |
| 4.1(g) | Sixth Supplemental Indenture, dated as of September 23, 2004 between the Registrant and JP Morgan Chase Bank, formerly The Chase Manhattan Bank, as Trustee (incorporated herein by reference to Exhibit 4.1 to the Registrant's Report on Form 10-Q filed with the Commission on November 3, 2004) |
| 4.1(h) | Seventh Supplemental Indenture, dated as of April 25, 2007, between the Registrant and The Bank of New York (as successor to JP Morgan Chase Bank), as Trustee (incorporated herein by reference to Exhibit 4.4 to the Registrant's Report on Form 8-K filed with the Commission on April 26, 2007). |

Pursuant to Regulation S-K, Item 601(b)(4)(iii), instruments that define the rights of holders of the Registrant's long-term debt securities, where the long-term debt securities authorized under each such instrument do not exceed 10% of the Registrant's total assets, have been omitted and will be furnished to the Commission upon request.



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**CSX CORPORATION**
**PART IV**

Material Contracts:

10.1** CSX Stock Plan for Directors (as amended through January 1, 2004) (incorporated herein by reference to Exhibit 10.1 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 10, 2004)

10.2* ** CSX Directors' Pre-2005 Deferred Compensation Plan (as amended through January 8, 2008)

10.3* ** CSX Directors' Deferred Compensation Plan effective January 1, 2005

10.4** CSX Directors' Charitable Gift Plan, as amended (incorporated herein by reference to Exhibit 10.4 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 4, 1994)

10.5** CSX Directors' Matching Gift Plan (as amended through December 31, 2003) (incorporated herein by reference to Exhibit 10.5 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 10, 2004)

10.6** Railroad Retirement Benefits Agreement with M. J. Ward (incorporated herein by reference to Exhibit 10.13 to the Registrant's Report on Form 10-K filed with the Commission on February 26, 2003)

10.7** Employment Agreement with O. Munoz (incorporated herein by reference to Exhibit 10.1 to the Registrant's Report on Form 10-Q filed with the Commission on July 30, 2003)

10.8** Form of Employment Agreement with executive officers (incorporated herein by reference to Exhibit 10.1 of the Registrant's Current Report on Form 8-K filed with the Commission on January 6, 2005)

10.9** Form of Stock Option Agreement (incorporated herein by reference to Exhibit 10.17 of the Registrant's Report on Form 10-K filed with the Commission on March 4, 2002)

10.10** 1987 Long-term Performance Stock Plan, as Amended and Restated effective April 25, 1996 (as amended through February 7, 2003) (incorporated herein by reference to Exhibit 10.24 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 10, 2004)

10.11** Deferred Compensation Program for Executives of CSX Corporation and Affiliated Companies (as amended through January 1, 1998) (incorporated herein by reference to Exhibit 10.25 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 10, 2004)



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**CSX CORPORATION**
**PART IV**

10.12** 2002 Deferred Compensation Plan of CSX Corporation and Affiliated Corporations (as amended through February 7, 2003) (incorporated herein by reference to Exhibit 10.26 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 10, 2004)

10.13** Supplementary Savings Plan and Incentive Award Deferral Plan for Eligible Executives of CSX Corporation and Affiliated Companies (as Amended through February 7, 2003) (incorporated herein by reference to Exhibit 10.27 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 10, 2004)

10.14** Special Retirement Plan of CSX Corporation and Affiliated Companies (as amended through February 14, 2001) (incorporated herein by reference to Exhibit 10.23 to the Registrant's Report on Form 10-K filed with the Commission on March 4, 2002)

10.15** Supplemental Retirement Benefit Plan of CSX Corporation and Affiliated Companies (as amended through February 14, 2001) (incorporated herein by reference to Exhibit 10.24 of the Registrant's Report on Form 10-K filed with the Commission on March 4, 2002)

10.16** Senior Executive Incentive Compensation Plan (incorporated herein by reference to Appendix B to the Registrant's Definitive Proxy Statement filed with the Commission on March 17, 2000)

10.17* ** CSX Omnibus Incentive Plan (as Amended through December 12, 2007)

10.18** 1990 Stock Award Plan as Amended and Restated Effective February 14, 1996 (as amended through September 8, 1999) (incorporated herein by reference to Exhibit 10.24 to the Registrant's Annual Report on Form 10-K filed with the Commission on March 7, 2000)

10.19 Transaction Agreement, dated as of June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation and CRR Holdings LLC, with certain schedules thereto (incorporated herein by reference to Exhibit 10 to the Registrant’s Current Report on Form 8-K filed with the Commission on July 8, 1997)



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

| | |
|---|---|
| 10.20 | Amendment No. 1, dated as of August 22, 1998, to the Transaction Agreement, dated as of June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation and CRR Holdings LLC (incorporated herein by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed with the Commission on June 11, 1999) |
| 10.21 | Amendment No. 2, dated as of June 1, 1999, to the Transaction Agreement, dated as of June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation and CRR Holdings, LLC (incorporated herein by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed with the Commission on June 11, 1999) |
| 10.22 | Amendment No. 3, dated as of August 1, 2000, to the Transaction Agreement by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation, and CRR Holdings LLC. (incorporated herein by reference to Exhibit 10.34 to the Registrant’s Annual Report on Form 10-K dated March 1, 2001) |
| 10.23 | Amendment No. 4, dated and effective as of June 1, 1999, and executed in April 2004, to the Transaction Agreement, dated as of June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation, and CRR Holdings LLC (incorporated herein by reference to Exhibit 99.1 to the Registrant’s Current Report on Form 8-K filed with the Commission on August 6, 2004) |
| 10.24 | Amendment No. 5, dated as of August 27, 2004, to the Transaction Agreement, dated as of June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation and CRR Holdings LLC (incorporated herein by reference to Exhibit 10.1 to the Registrant’s Current Report on Form 8-K filed with the Commission on September 2, 2004) |
| 10.25 | Shared Assets Area Operating Agreement for Detroit, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Corporation, with exhibit thereto (incorporated herein by reference to Exhibit 10.6 to the Registrant's Current Report on Form 8-K filed with the Commission on June 11, 1999) |



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

| | |
|---|---|
| 10.26 | Shared Assets Area Operating Agreement for North Jersey, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibit thereto (incorporated herein by reference to Exhibit 10.4 to the Registrant's Current Report on Form 8-K filed with the Commission on June 11, 1999) |
| 10.27 | Shared Assets Area Operating Agreement for southern Jersey/Philadelphia, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc. and Norfolk Southern Railway Company, with exhibit thereto (incorporated herein by reference to Exhibit 10.5 to the Registrant's Current Report on Form 8-K filed with the Commission on June 11, 1999) |
| 10.28 | Monongahela Usage Agreement, dated as of June 1, 1999, by and among CSX Transportation, Inc., Norfolk Southern Railway Company, Pennsylvania Lines LLC and New York Central Lines LLC, with exhibit thereto (incorporated herein by reference to Exhibit 10.7 to the Registrant's Current Report on Form 8-K filed with the Commission on June 11, 1999) |
| 10.29 | Tax Allocation Agreement, dated as of August 27, 2004, by and among CSX Corporation, Norfolk Southern Corporation, Green Acquisition Corp., Conrail Inc., Consolidated Rail Corporation, New York Central Lines LLC and Pennsylvania Lines LLC (incorporated herein by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed with the Commission on September 2, 2004) |
| 10.30** | Employment Agreement with T. L. Ingram, dated as of March 15, 2004 (incorporated herein by reference to Exhibit 10.1 to the Registrant's Report on Form 10-Q filed with the Commission on April 30, 2004) |
| 10.31** | Restricted Stock Award Agreement with T. L. Ingram (incorporated herein by reference to Exhibit 10.1 to the Registrant's Report on Form 10-Q filed with the Commission on July 29, 2004) |



Source: CSX CORP, 10-K, February 19, 2009
Powered by Morningstar® Document Research℠

| | |
|---|---|
| 10.32** | Amendment No. 1, dated as of December 13, 2004, to Employment Agreement with T. L. Ingram, dated as of March 15, 2004 (incorporated herein by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed with the Commission on December 14, 2004) |
| 10.33** | Restricted Stock Award Agreement with Ellen M. Fitzsimmons (incorporated herein by reference to Exhibit 10.41 of the Registrant's Annual Report on Form 10-K filed with the Commission on February 24, 2006) |
| 10.34 | Revolving Credit Agreement, dated May 4, 2006 (incorporated herein by reference to Exhibit 99.1 to the Registrant's Current Report on Form 8-K filed with the Commission on May 9, 2006) |
| 10.35 | Underwriting agreement, dated April 20, 2007 (incorporated herein by reference to Exhibit 1.1 to the Registrant's Current Report on Form 8-K filed with the Commission on April 26, 2007) |
| 10.36** | Long-term Incentive Plan, dated May 1, 2007 (incorporated herein by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed with the Commission on May 7, 2007) |
| 10.37 | Underwriting agreement dated September 4, 2007 (incorporated herein by reference to Exhibit 1.1 to the Registrant's Current Report on Form 8-K filed with the Commission on September 10, 2007) |
| 10.38 | Underwriting agreement dated December 10, 2007 (incorporated herein by reference to Exhibit 1.1 to the Registrant's Current Report on Form 8-K filed with the Commission on December 17, 2007) |
| 10.39 | Underwriting agreement dated October 21, 2008 (incorporated herein by reference to Exhibit 1.1 to the Registrant's Current Report on Form 8-K filed with the Commission on October 24, 2008) |
| 10.40 | Underwriting agreement dated January 14, 2009 (incorporated herein by reference to Exhibit 1.1 to the Registrant's Current Report on Form 8-K filed with the Commission on January 20, 2009) |
| 21* | Subsidiaries of the Registrant |
| 23* | Consent of Independent Registered Public Accounting Firm |
| 24* | Powers of Attorney |
| 31* | Rule 13a-14(a) Certifications |



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

32.* Section 1350 Certifications

99 * Annual CEO Certification pursuant to NYSE Rule 303A.12(a).

* Filed herewith
** Management Contract or Compensatory Plan or Arrangement



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

**CSX CORPORATION**
**PART IV**

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**CSX CORPORATION**
(Registrant)

Date: February 13, 2009

By: /s/ CAROLYN T. SIZEMORE
Carolyn T. Sizemore
Vice President and Controller
(Principal Accounting Officer)

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities indicated on February 13, 2009.

| Signature | Title |
|---|---|
| /s/ MICHAEL J. WARD<br>Michael J. Ward | Chairman of the Board, President, Chief Executive Officer and Director (Principal Executive Officer) |
| /s/ OSCAR MUNOZ<br>Oscar Munoz | Executive Vice President and Chief Financial Officer (Principal Financial Officer) |
| /s/ CAROLYN T. SIZEMORE<br>Carolyn T. Sizemore | Vice President and Controller (Principal Accounting Officer) |
| /s/ ELLEN M. FITZSIMMONS<br>Ellen M. Fitzsimmons | Senior Vice President - Law and Public Affairs *Attorney-in-Fact |



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

Table of Contents

**CSX CORPORATION**
**PART IV**

| Signature | Title |
|---|---|
| *<br>Donna M. Alvarado | Director |
| *<br>Alexandre Behring | Director |
| *<br>John B. Breaux | Director |
| *<br>Steven T. Halverson | Director |
| *<br>Christopher Hohn | Director |
| *<br>Edward J. Kelly, III | Director |
| *<br>Gilbert H. Lamphere | Director |
| *<br>John D. McPherson | Director |
| *<br>Timothy T. O'Toole | Director |
| *<br>David M. Ratcliffe | Director |
| *<br>Donald J. Shepard | Director |



Source: CSX CORP, 10-K, February 19, 2009 Powered by Morningstar® Document Research℠

Powered by Morningstar® Document Research℠

Powered by Morningstar® Document Research℠

Exhibit 21

**Subsidiaries of the Registrant**

As of December 26, 2008, the Registrant was the beneficial owner of 100% of the common stock of the following significant subsidiaries:

CSX Transportation, Inc. (a Virginia corporation)
CSX Intermodal, Inc. (a Delaware corporation)

As of December 26, 2008, none of the other subsidiaries included in the Registrant's consolidated financial statements constitute a significant subsidiary.


Powered by Morningstar® Document Research℠

EX-23 3 dex23.htm CONSENT OF ERNST & YOUNG LLP

Exhibit 23

Consent of Independent Registered Public Accounting Firm

We consent to the incorporation by reference in the following Registration Statements:

- Registration Statement (Form S-3 No. 33-2084)
- Registration Statement (Form S-3 No. 333-113637)
- Registration Statement (Form S-3ASR. 333-132051)
- Registration Statement (Form S-3ASR No. 333-140732)
- Registration Statement (Form S-8 No. 33-16230)
- Registration Statement (Form S-8 No. 33-25537)
- Registration Statement (Form S-8 No. 33-29136)
- Registration Statement (Form S-8 No. 33-33853)
- Registration Statement (Form S-8 No. 33-33854)
- Registration Statement (Form S-8 No. 33-37449)
- Registration Statement (Form S-8 No. 33-41498)
- Registration Statement (Form S-8 No. 33-41499)
- Registration Statement (Form S-8 No. 33-41735)
- Registration Statement (Form S-8 No. 33-47655)
- Registration Statement (Form S-8 No. 33-57029)
- Registration Statement (Form S-8 No. 333-09213)
- Registration Statement (Form S-8 No. 333-73429)
- Registration Statement (Form S-8 No. 333-32008)
- Registration Statement (Form S-8 No. 333-43382)
- Registration Statement (Form S-8 No. 333-48896)
- Registration Statement (Form S-8 No. 333-66604)
- Registration Statement (Form S-8 No. 333-110589)

of our reports dated February 17, 2009, with respect to the consolidated financial statements of CSX Corporation and the effectiveness of internal control over financial reporting of CSX Corporation included in this Annual Report (Form 10-K) for CSX Corporation for the year ended December 26, 2008.

/s/ Ernst & Young LLP
Jacksonville, Florida
February 17, 2009


Powered by Morningstar® Document Research℠

Exhibit 24

**POWER OF ATTORNEY**

KNOW ALL PERSONS BY THESE PRESENTS that each of the undersigned officers and directors of CSX CORPORATION, a Virginia Corporation, which is to file with the Securities and Exchange Commission, Washington, D. C., a Form 10-K for fiscal year ended December 26, 2008 hereby constitutes and appoints Carolyn T. Sizemore and Ellen M. Fitzsimmons his/her true and lawful attorneys-in-fact and agents, for him/her and in his/her name, place and stead to sign said Form 10-K, and any and all amendments thereto, with power where appropriate to affix the corporate seal of CSX Corporation thereto and to attest said seal, and to file said Form 10-K, and any and all other documents in connection therewith, with the Securities and Exchange Commission, hereby granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform any and all acts and things requisite and necessary to be done in and about the premises as fully to all intents and purposes as he/she might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or either of them, may lawfully do or cause to be done by virtue hereof.

/s/ DONNA M. ALVARADO
Donna M. Alvarado
February 11, 2009

/s/ ALEXANDRE BEHRING
Alexandre Behring
February 11, 2009

/s/ JOHN B. BREAUX
John B. Breaux
February 11, 2009

/s/ STEVEN T. HALVERSON
Steven T. Halverson
February 11, 2009

/s/ CHRISTOPHER HOHN
Christopher Hohn
February 11, 2009

/s/ EDWARD J. KELLY, III
Edward J. Kelly, III
February 11, 2009

/s/ GILBERT H. LAMPHERE
Gilbert H. Lamphere
February 11, 2009

/s/ JOHN D. McPHERSON
John D. McPherson
February 11, 2009

/s/ TIMOTHY T. O'TOOLE
Timothy T. O'Toole
February 11, 2009

/s/ DAVID M. RATCLIFFE
David M. Ratcliffe
February 11, 2009

/s/ DONALD J. SHEPARD
Donald J. Shepard
February 11, 2009

/s/ MICHAEL J. WARD
Michael J. Ward
February 11, 2009


Powered by Morningstar® Document Research℠

Powered by Morningstar® Document Research℠

Powered by Morningstar® Document Research℠

Exhibit 31

CERTIFICATION OF CEO AND CFO PURSUANT TO EXCHANGE ACT RULE
13a - 14(a) OR RULE 15d-14(a)

I, Michael J. Ward, certify that:

1. I have reviewed this Annual Report on Form 10-K of CSX Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 13, 2009

By: /s/ MICHAEL J. WARD
Michael J. Ward
Chairman, President and Chief Executive Officer


Powered by Morningstar® Document Research℠

I, Oscar Munoz, certify that:

1. I have reviewed this Annual Report on Form 10-K of CSX Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 17, 2009

By: /s/ OSCAR MUNOZ
Oscar Munoz
Executive Vice President and Chief Financial Officer

Powered by Morningstar® Document Research℠

Exhibit 32

CERTIFICATION OF CEO AND CFO REQUIRED BY RULE 13a-14(b) OR RULE 15d-14(b) AND SECTION 1350 OF CHAPTER 63 OF TITLE 18 OF THE U.S. CODE

In connection with the Annual Report of CSX Corporation on Form 10-K for the fiscal year ended December 26, 2008 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Michael J. Ward, Chief Executive Officer of the registrant, certify, pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to my knowledge, that:

1. The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the registrant.

Date: February 13, 2009

By: /s/ MICHAEL J. WARD
Michael J. Ward
Chairman, President and Chief Executive Officer

In connection with the Annual Report of CSX Corporation on Form 10-K for the period ending December 26, 2008 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Oscar Munoz, Chief Financial Officer of the registrant, certify, pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to my knowledge, that:

1. The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the issuer.

Date: February 17, 2009

By: /s/ OSCAR MUNOZ
Oscar Munoz
Executive Vice President and Chief Financial Officer

 Powered by Morningstar® Document Research℠

 Powered by Morningstar® Document Research℠

Powered by Morningstar® Document Research℠

Exhibit 99

Form Last Updated by the NYSE on April 28, 2006

**NYSE Regulation**

# Domestic Company Section 303A Annual CEO Certification

As the Chief Executive Officer of CSX Corporation (CSX), and as required by Section 303A.12(a) of the New York Stock Exchange Listed Company Manual, I hereby certify that as of the date hereof I am not aware of any violation by the Company of NYSE's corporate governance listing standards, other than has been notified to the Exchange pursuant to Section 303A.12(b) and disclosed on Exhibit H to the Company's Domestic Company Section 303A Annual Written Affirmation.

This certification is:

[x] Without qualification

or

[ ] With qualification

By: /s/ MICHAEL J. WARD

Print Name: Michael J. Ward

Title: Chairman, President and Chief Executive Officer

Date: Oct 23, 2008

Note: THE NYSE WILL NOT ACCEPT IF RETYPED, MODIFIED OR IF ANY TEXT IS DELETED. If you have any questions regarding applicability to your Company's circumstances, please call the Corporate Governance department prior to submission.

Date Submitted: Jul 25, 2008



Powered by Morningstar® Document Research℠

Created by Morningstar® Document Research℠
http://documentresearch.morningstar.com

# EXHIBIT PX0765

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549
**FORM 10-K**

(X) ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 For the fiscal year ended **DECEMBER 31, 2008**

( ) TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 For the transition period from _________ to _________

Commission file number 1-8339

**NORFOLK SOUTHERN CORPORATION**
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Virginia**<br>(State or other jurisdiction of incorporation) | **52-1188014**<br>(IRS Employer Identification No.) |
| **Three Commercial Place**<br>**Norfolk, Virginia**<br>(Address of principal executive offices) | **23510-2191**<br>Zip Code |
| Registrant's telephone number, including area code | **(757) 629-2680** |

Securities registered pursuant to Section 12(b) of the Act:

| Title of each Class | Name of each exchange on which registered |
|---|---|
| **Norfolk Southern Corporation Common Stock (Par Value $1.00)** | **New York Stock Exchange** |

Securities registered pursuant to Section 12(g) of the Act: NONE

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes (X) No ( )

Indicate by check mark if the registrant is not required to file such reports pursuant to Section 13 or 15(d) of the Act. Yes ( ) No (X)

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or Section 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes (X) No ( )

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ( )

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer or smaller reporting company. See definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.
Large accelerated filer (X) Accelerated filer ( ) Non-accelerated filer ( ) Smaller reporting company ( )

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ( ) No (X)

The aggregate market value of the voting common equity held by non-affiliates as of June 30, 2008 was $23,454,318,004 (based on the closing price as quoted on the New York Stock Exchange on that date).

The number of shares outstanding of each of the registrant's classes of common stock, as of January 31, 2009: 366,460,780 (excluding 20,579,088 shares held by the registrant's consolidated subsidiaries).

**DOCUMENTS INCORPORATED BY REFERENCE:**

Portions of the Registrant's definitive proxy statement to be filed electronically pursuant to Regulation 14A not later than 120 days after the end of the fiscal year, are incorporated by reference in Part III.

## TABLE OF CONTENTS

## NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES (NS)


| | | | Page |
|---|---|---|---|
| Part I. | Items 1 and 2. | Business and Properties | K3 |
| | Item 1A. | Risk Factors | K13 |
| | Item 1B. | Unresolved Staff Comments | K16 |
| | Item 3. | Legal Proceedings | K16 |
| | Item 4. | Submission of Matters to a Vote of Security Holders | K16 |
| | | Executive Officers of the Registrant | K17 |
| Part II. | Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | K19 |
| | Item 6. | Selected Financial Data | K20 |
| | Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | K21 |
| | Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | K40 |
| | Item 8. | Financial Statements and Supplementary Data | K41 |
| | Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | K77 |
| | Item 9A. | Controls and Procedures | K77 |
| | Item 9B. | Other Information | K77 |
| Part III. | Item 10. | Directors, Executive Officers and Corporate Governance | K78 |
| | Item 11. | Executive Compensation | K78 |
| | Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | K78 |
| | Item 13. | Certain Relationships and Related Transactions, and Director Independence | K81 |
| | Item 14. | Principal Accountant Fees and Services | K81 |
| Part IV. | Item 15. | Exhibits and Financial Statement Schedules | K82 |
| | | Power of Attorney | K93 |
| | | Signatures | K93 |

# PART I

## NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES (NS)

### Item 1. Business and Item 2. Properties

**GENERAL -** Norfolk Southern Corporation (Norfolk Southern) is a Norfolk, Virginia based company that controls a major freight railroad, Norfolk Southern Railway Company. Norfolk Southern Railway Company is primarily engaged in the rail transportation of raw materials, intermediate products, and finished goods primarily in the Southeast, East, and Midwest and, via interchange with rail carriers, to and from the rest of the United States. Norfolk Southern also transports overseas freight through several Atlantic and Gulf Coast ports. Norfolk Southern provides comprehensive logistics services and offers the most extensive intermodal network in the eastern half of the United States. The common stock of Norfolk Southern is listed on the New York Stock Exchange (NYSE) under the symbol “NSC.”

Norfolk Southern was incorporated on July 23, 1980, under the laws of the Commonwealth of Virginia. On June l, 1982, Norfolk Southern acquired control of two major operating railroads, Norfolk and Western Railway Company (NW) and Southern Railway Company (Southern) in accordance with an Agreement of Merger and Reorganization dated as of July 31, 1980, and with the approval of the transaction by the Interstate Commerce Commission (now the Surface Transportation Board [STB]). Effective December 31, 1990, Norfolk Southern transferred all the common stock of NW to Southern, and Southern’s name was changed to Norfolk Southern Railway Company (Norfolk Southern Railway or NSR). Effective September 1, 1998, NW was merged with and into Norfolk Southern Railway. As of December 31, 2008, all the common stock of Norfolk Southern Railway was owned directly by Norfolk Southern.

Through a limited liability company, Norfolk Southern and CSX Corporation (CSX) jointly own Conrail Inc. (Conrail), whose primary subsidiary is Consolidated Rail Corporation (CRC). Norfolk Southern has a 58% economic and 50% voting interest in the jointly owned entity, and CSX has the remainder of the economic and voting interests. CRC owns and operates certain properties (the Shared Assets Areas) for the joint and exclusive benefit of NSR and CSX Transportation Inc. (CSXT) (see Note 4 to the Consolidated Financial Statements).

Norfolk Southern makes available free of charge through its website, www.nscorp.com, its annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and all amendments to those reports as soon as reasonably practicable after such material is electronically filed with or furnished to the Securities and Exchange Commission (SEC). In addition, the following documents are available on the company’s website and in print to any shareholder who requests them:

- Corporate Governance Guidelines
- Charters of the Committees of the Board of Directors
- The Thoroughbred Code of Ethics
- Code of Ethical Conduct for Senior Financial Officers
- Categorical Independence Standards for Directors

Unless otherwise indicated, Norfolk Southern and its subsidiaries are referred to collectively as NS.

**RAILROAD OPERATIONS –** As of December 31, 2008, NS' railroads operated approximately 21,000 miles of road in 22 eastern states and the District of Columbia.

The system's lines reach many individual industries, electric generating facilities, mines (in western Virginia, eastern Kentucky, southern and northern West Virginia, and western Pennsylvania), distribution centers, transload facilities, and other businesses located in smaller communities in its service area.




Corridors with heaviest freight volume:

- New York City area to Chicago (via Allentown and Pittsburgh)
- Chicago to Macon (via Cincinnati, Chattanooga, and Atlanta)
- Appalachian coal fields of Virginia, West Virginia, and Kentucky to Norfolk and Sandusky, OH
- Cleveland to Kansas City
- Birmingham to Meridian
- Memphis to Chattanooga

The miles operated, which include major leased lines between Cincinnati, Ohio, and Chattanooga, Tennessee, and trackage rights over property owned by North Carolina Railway Company, were as follows:

**Mileage Operated as of December 31, 2008**

| | **Miles of Road** | **Second and Other Main Track** | **Passing Track, Crossovers and Turnouts** | **Way and Yard Switching** | **Total** |
|---|---|---|---|---|---|
| Owned | 15,884 | 2,808 | 2,001 | 8,426 | 29,119 |
| Operated under lease, contract or trackage rights | 4,948 | 1,977 | 415 | 968 | 8,308 |
| Total | 20,832 | 4,785 | 2,416 | 9,394 | 37,427 |

**Triple Crown Operations** – Triple Crown Services Company (Triple Crown), NS' subsidiary, offers door-to-door intermodal service using RoadRailer® equipment and domestic containers. RoadRailer® units are enclosed vans that can be pulled over highways in tractor-trailer configuration and over the rails by locomotives. Triple Crown provides intermodal service in major traffic corridors, including those between the Midwest and the Northeast, the Midwest and the Southeast, and the Midwest and Texas.

The following table sets forth certain statistics relating to NS' railroads' operations for the past 5 years:

**Rail Operating Statistics**

| | **Years Ended December 31,** | | | | |
|---|---|---|---|---|---|
| | **2008** | **2007** | **2006** | **2005** | **2004** |
| Revenue ton miles (billions) | 195 | 196 | 204 | 203 | 198 |
| Freight train miles traveled (millions) | 80.0 | 81.9 | 84.2 | 81.2 | 77.7 |
| Revenue per ton mile | $0.0546 | $0.0481 | $0.0462 | $0.0421 | $0.0369 |
| Revenue ton miles per man-hour worked | 3,075 | 3,066 | 3,196 | 3,146 | 3,347 |
| Percentage ratio of railway operating expenses to railway operating revenues | 71.1% | 72.6% | 72.8% | 75.2% | 76.7% |

**RAILWAY OPERATING REVENUES –** NS' total railway operating revenues were $10.7 billion in 2008. See the financial information by traffic segment in Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**COAL TRAFFIC –** Coal, coke, and iron ore – most of which is bituminous coal – is NS' railroads' largest commodity group as measured by revenues. The railroads handled a total of 194.2 million tons in 2008, most of which originated on NS' lines in West Virginia, Virginia, Pennsylvania, and Kentucky. Revenues from coal, coke, and iron ore accounted for about 29% of NS' total railway operating revenues in 2008.

Total coal handled through all system ports in 2008 was 41.8 million tons. Of this total, 18.9 million tons (including coastwise traffic) moved through Norfolk, Virginia, 5.7 million tons moved through the Baltimore Terminal, 11.3 million tons moved to various docks on the Ohio River, and 5.9 million tons moved to various

Lake Erie ports. Other than coal for export, virtually all coal handled by NS' railroads was terminated in states east of the Mississippi River.

See the discussion of coal traffic, by type of coal, in Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**GENERAL MERCHANDISE TRAFFIC -** General merchandise traffic is composed of five major commodity groupings: automotive; chemicals; metals and construction; agriculture, consumer products and government; and paper, clay and forest products. The automotive group includes finished vehicles for BMW, Chrysler, Ford Motor Company, General Motors, Honda, Isuzu, Jaguar, Land Rover, Mazda, Mercedes-Benz, Mitsubishi, Nissan, Saab, Subaru, Suzuki, Toyota, and Volkswagen, and auto parts for Ford Motor Company, General Motors, Mercedes-Benz, and Toyota. The chemicals group includes sulfur and related chemicals, petroleum products, chlorine and bleaching compounds, plastics, rubber, industrial chemicals, chemical wastes, and municipal wastes. The metals and construction group includes steel, aluminum products, machinery, scrap metals, cement, aggregates, bricks, and minerals. The agriculture, consumer products, and government group includes soybeans, wheat, corn, fertilizer, animal and poultry feed, food oils, flour, beverages, canned goods, sweeteners, consumer products, ethanol, and items for the military. The paper, clay and forest products group includes lumber and wood products, pulp board and paper products, wood fibers, wood pulp, scrap paper, and clay.

In 2008, 135 million tons of general merchandise freight, or approximately 67% of total general merchandise tonnage handled by NS, originated online. The balance of general merchandise traffic was received from connecting carriers at interterritorial gateways. The principal interchange points for NS-received traffic included Chicago, Memphis, New Orleans, Cincinnati, Kansas City, Detroit, Hagerstown, St. Louis/East St. Louis, and Louisville. General merchandise carloads handled in 2008 were 2.6 million, the revenues from which accounted for 52% of NS' total railway operating revenues in 2008.

See the discussion of general merchandise rail traffic by commodity group in Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**INTERMODAL TRAFFIC -** The intermodal market consists of shipments moving in trailers, domestic and international containers, and Roadrailer® equipment. These shipments are handled on behalf of intermodal marketing companies, international steamship lines, truckers, and other shippers. Intermodal units handled in 2008 were 3 million, the revenues from which accounted for 19% of NS' total railway operating revenues for the year.

See the discussion of intermodal traffic in Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**FREIGHT RATES -** In 2008, NS' railroads continued their reliance on private contracts and exempt price quotes as their predominant pricing mechanisms. Thus, a major portion of NS' railroads' freight business is not currently economically regulated by the government. In general, market forces have been substituted for government regulation and now are the primary determinant of rail service prices.

In 2008, NS' railroads were found by the STB to be "revenue adequate" based on results for the year 2006. The STB has not made its revenue adequacy determination for the year 2007. A railroad is "revenue adequate" under the applicable law when its return on net investment exceeds the rail industry's composite cost of capital. This determination is made pursuant to a statutory requirement.

**PASSENGER OPERATIONS**

- Regularly scheduled passenger trains are operated by Amtrak on NS' lines between the following locations:
  - Alexandria, Virginia, and New Orleans, Louisiana
  - Raleigh and Charlotte, North Carolina
  - Selma and Charlotte, North Carolina
  - Chicago, Illinois, and Porter, Indiana
  - Chicago, Illinois, and Battle Creek, Michigan
  - Chicago, Illinois, and Pittsburgh, Pennsylvania
  - Chicago, Illinois, and Detroit, Michigan
  - Pittsburgh and Harrisburg, Pennsylvania
- Commuter trains are operated on the NS line between Manassas and Alexandria in accordance with contracts with two transportation commissions of the Commonwealth of Virginia
- NS leases the Chicago to Manhattan, Illinois, line to the Commuter Rail Division of the Regional Transportation Authority of Northeast Illinois
- NS operates freight service over lines with significant ongoing Amtrak and commuter passenger operations, and is conducting freight operations over trackage owned by:
  - Amtrak
  - New Jersey Transit
  - Southeastern Pennsylvania Transportation Authority
  - Metro-North Commuter Railroad Company
  - Maryland Department of Transportation
- Passenger operations are conducted either by Amtrak or by the commuter agencies over trackage owned by Conrail in the Shared Assets Areas.

**NONCARRIER OPERATIONS -** NS' noncarrier subsidiaries engage principally in the acquisition, leasing, and management of coal, oil, gas and minerals; the development of commercial real estate; telecommunications; and the leasing or sale of rail property and equipment. In 2008, no such noncarrier subsidiary or industry segment grouping of noncarrier subsidiaries met the requirements for a reportable business segment set forth in the Financial Accounting Standards Board issued Statement of Financial Accounting Standards No. 131, "Disclosures About Segments of an Enterprise and Related Information."

**RAILWAY PROPERTY**

The NS railroad system extends across 22 states and the District of Columbia. The railroad infrastructure makes the company capital intensive with total property of approximately $22 billion.

**Capital Expenditures -** Capital expenditures for road, equipment, and other property for the past five years were as follows (including capitalized leases):

**Capital Expenditures**

| | **2008** | **2007** | **2006** | **2005** | **2004** |
|---|---|---|---|---|---|
| | | | *($ in millions)* | | |
| Road and other property | $ 1,070 | $ 894 | $ 756 | $ 741 | $ 612 |
| Equipment | 488 | 447 | 422 | 284 | 429 |
| Total | $ 1,558 | $ 1,341 | $ 1,178 | $ 1,025 | $ 1,041 |

Capital spending and maintenance programs are and have been designed to assure the ability to provide safe, efficient, and reliable rail transportation services. For 2009, NS has budgeted $1.41 billion of capital expenditures. On May 1, 2006, NS and Kansas City Southern (KCS) formed a joint venture, Meridian Speedway LLC (MSLLC), pursuant to which NS intends to contribute $300 million in cash, substantially all of which will be used for capital improvements over a period of approximately three years, in exchange for a 30% interest in the joint venture. Through December 31, 2008, NS has contributed $274 million. See the discussion following "Cash used for investing activities," in Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**Equipment -** As of December 31, 2008, NS owned or leased the following units of equipment:

| | Number of Units | | | Capacity |
|---|---|---|---|---|
| | **Owned*** | **Leased**** | **Total** | **of Equipment** |
| Locomotives: | | | | (Horsepower) |
| Multiple purpose | 3,608 | 132 | 3,740 | 12,991,800 |
| Switching | 148 | -- | 148 | 216,100 |
| Auxiliary units | 88 | -- | 88 | -- |
| Total locomotives | 3,844 | 132 | 3,976 | 13,207,900 |
| Freight cars: | | | | (Tons) |
| Hopper | 18,343 | 805 | 19,148 | 2,081,957 |
| Box | 15,164 | 1,800 | 16,964 | 1,373,553 |
| Covered hopper | 8,593 | 2,759 | 11,352 | 1,248,050 |
| Gondola | 31,338 | 7,225 | 38,563 | 4,164,281 |
| Flat | 2,630 | 1,334 | 3,964 | 318,594 |
| Caboose | 174 | -- | 174 | -- |
| Other | 4,476 | 19 | 4,495 | 223,952 |
| Total freight cars | 80,718 | 13,942 | 94,660 | 9,410,387 |
| Other: | | | | |
| Work equipment | 5,214 | 3 | 5,217 | |
| Vehicles | 4,073 | -- | 4,073 | |
| Highway trailers and containers | 59 | 11,912 | 11,971 | |
| RoadRailer® | 6,515 | 33 | 6,548 | |
| Miscellaneous | 1,277 | 13,519 | 14,796 | |
| Total other | 17,138 | 25,467 | 42,605 | |

* Includes equipment leased to outside parties and equipment subject to equipment trusts, conditional sale agreements, and capitalized leases.

** Includes 4,651 freight cars leased from CRC.

The following table indicates the number and year built for locomotives and freight cars owned at December 31, 2008.

| | Year Built | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **2008** | **2007** | **2006** | **2005** | **2004** | **1999-2003** | **1994-1998** | **1993 & Before** | **Total** |
| Locomotives: | | | | | | | | | |
| No. of units | 40 | 90 | 143 | 89 | 207 | 607 | 628 | 2,040 | 3,844 |
| % of fleet | 1% | 2% | 4% | 2% | 6% | 16% | 16% | 53% | 100% |
| Freight cars: | | | | | | | | | |
| No. of units | 2,360 | 1,200 | 404 | 89 | -- | 1,546 | 6,944 | 68,175 | 80,718 |
| % of fleet | 3% | 1% | 1% | --% | --% | 2% | 9% | 84% | 100% |

The following table shows the average age of NS' locomotive and freight car fleets at December 31, 2008, and the number of retirements in 2008:

| | **Locomotives** | **Freight Cars** |
|---|---|---|
| Average age – in service | 18.9 years | 29.9 years |
| Retirements | 14 units | 2,839 units |
| Average age – retired | 34.4 years | 39.6 years |

Ongoing freight car and locomotive maintenance programs are intended to ensure the highest standards of safety, reliability, customer satisfaction, and equipment marketability. The locomotive bad order ratio includes units out of service for required inspections every 92 days and program work such as overhauls.

| | Annual Average Bad Order Ratio | | | | |
|---|---|---|---|---|---|
| | **2008** | **2007** | **2006** | **2005** | **2004** |
| Freight cars | 4.5% | 4.9% | 6.4% | 6.3% | 7.4% |
| Locomotives | 5.8% | 5.7% | 5.7% | 6.2% | 6.3% |

**Encumbrances -** Certain railroad equipment is subject to the prior lien of equipment financing obligations amounting to approximately $236 million as of December 31, 2008, and $389 million as of December 31, 2007.

**Track Maintenance -** Of the approximately 37,500 total miles of track operated, NS had responsibility for maintaining about 30,000 miles of track, with the remainder being operated under trackage rights from another party responsible for maintenance.

Over 75% of the main line trackage (including first, second, third, and branch main tracks, all excluding rail operated pursuant to trackage rights) has rail ranging from 131 to 155 pounds per yard with the standard installation currently at 136 pounds per yard. Approximately 44% of NS lines, excluding rail operated pursuant to trackage rights, carried 20 million or more gross tons per track mile during 2008.

The following table summarizes several measurements regarding NS' track roadway additions and replacements during the past five years:

| | 2008 | 2007 | 2006 | 2005 | 2004 |
|---|---|---|---|---|---|
| Track miles of rail installed | 459 | 401 | 327 | 302 | 246 |
| Miles of track surfaced | 5,209 | 5,014 | 4,871 | 4,663 | 5,055 |
| New crossties installed (millions) | 2.7 | 2.7 | 2.7 | 2.5 | 2.5 |

**Microwave System -** The NS microwave system, consisting of approximately 7,400 radio route miles, 426 core stations, 30 secondary stations, and 5 passive repeater stations, provides communications between most operating locations. The microwave system is used primarily for voice communications, VHF radio control circuits, data and facsimile transmissions, traffic control operations, and AEI data transmissions.

**Traffic Control -** Of the approximately 15,900 route miles owned by NS, about 11,000 miles are signalized, including 8,000 miles of centralized traffic control (CTC) and 3,000 miles of automatic block signals. Of the 8,000 miles of CTC, approximately 3,000 miles are controlled by data radio originating at 266 base station radio sites.

**Computers -** A computer network consisting of a centralized data center in Atlanta, Georgia, and various distributed computers throughout the company connects the yards, terminals, transportation offices, rolling stock repair points, sales offices, and other key system locations. Operating and traffic data are processed and stored to provide customers with information on their shipments throughout the system. Computer systems provide current information on the location of every train and each car on line, as well as related waybill and other train and car movement data. In addition, the computer systems are utilized to assist management in the performance of a variety of functions and services including payroll, car and revenue accounting, billing, material management activities and controls, and special studies.

**ENVIRONMENTAL MATTERS -** Compliance with federal, state, and local laws and regulations relating to the protection of the environment is a principal NS goal. To date, such compliance has not affected materially NS' capital additions, earnings, liquidity, or competitive position. See "Legal Proceedings," Part I, Item 3; "Personal Injury, Environmental, and Legal Liabilities" in Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations;" and Note 17 to the Consolidated Financial Statements.

**EMPLOYEES –** The following table shows the average number of employees and the average cost per employee for wages and benefits:

| | 2008 | 2007 | 2006 | 2005 | 2004 |
|---|---|---|---|---|---|
| Average number of employees | 30,709 | 30,806 | 30,541 | 30,294 | 28,475 |
| Average wage cost per employee | $66,000 | $62,000 | $62,000 | $61,000 | $59,000 |
| Average benefit cost per employee | $31,000 | $30,000 | $32,000 | $29,000 | $28,000 |

Approximately 85% of NS' railroad employees are covered by collective bargaining agreements with various labor unions. See the discussion of "Labor Agreements" in Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**GOVERNMENT REGULATION -** In addition to environmental, safety, securities, and other regulations generally applicable to all businesses, NS' railroads are subject to regulation by the STB. The STB has jurisdiction

over some rates, routes, fuel surcharges, conditions of service, and the extension or abandonment of rail lines. The STB also has jurisdiction over the consolidation, merger, or acquisition of control of and by rail common carriers. The Federal Railroad Administration regulates certain track and mechanical equipment standards.

The relaxation of economic regulation of railroads, begun over two decades ago under the Staggers Rail Act of 1980, includes exemptions of intermodal business (trailer-on-flat-car, container-on-flat-car), rail boxcar traffic, lumber, manufactured steel, automobiles, and certain bulk commodities such as sand, gravel, pulpwood, and wood chips for paper manufacturing. Transportation contracts on regulated shipments effectively remove those shipments from regulation as well for the duration of the contract. About 86% of NS' freight revenues come from either exempt traffic or traffic moving under transportation contracts.

Efforts were made in 2008 to re-subject the rail industry to increased federal economic regulation and such efforts are expected to continue in 2009. The Staggers Rail Act of 1980, which substantially balanced such regulation, encouraged and enabled rail carriers to innovate and to compete for business, thereby contributing to the economic health of the nation and to the revitalization of the industry. Accordingly, NS will continue to oppose efforts to reimpose increased economic regulation.

**COMPETITION –** There is continuing strong competition among rail, water, and highway carriers. Price is usually only one factor of importance as shippers and receivers choose a transport mode and specific hauling company. Inventory carrying costs, service reliability, ease of handling, and the desire to avoid loss and damage during transit are also important considerations, especially for higher-valued finished goods, machinery, and consumer products. Even for raw materials, semifinished goods, and work-in-process, users are increasingly sensitive to transport arrangements that minimize problems at successive production stages.

NS' primary rail competitor is the CSX system; both operate throughout much of the same territory. Other railroads also operate in parts of the territory. NS also competes with motor carriers, water carriers, and with shippers who have the additional option of handling their own goods in private carriage.

Certain marketing strategies among railroads and between railroads and motor carriers enable carriers to compete more effectively in specific markets.

**SECURITY OF OPERATIONS –** NS has taken significant steps to provide enhanced security for the NS rail system. In particular, NS has developed and implemented a comprehensive security plan that is modeled on and was developed in conjunction with the security plan prepared by the Association of American Railroads (AAR) post September 11, 2001. The AAR Security Plan defines four Alert Levels and details the actions and countermeasures that are being applied across the railroad industry as the terrorist threat increases or decreases. The Alert Level actions include countermeasures that will be applied in three general areas: (1) operations (including transportation, engineering, and mechanical); (2) information technology and communications; and (3) railroad police. Although security concerns preclude public disclosure of its contents, the NS Departmental Security Plan outlines the protocol within NS for all concerned to be notified of AAR Alert Level changes. All NS Operations Division employees are advised by their supervisors or train dispatchers, as appropriate, of any change in Alert Level and any additional responsibilities they may incur due to such change.

The NS plan also effectively addresses and complies with Department of Transportation security regulations pertaining to training and security plans with respect to the transportation of hazardous materials. As part of the plan, security awareness training is given to all railroad employees who directly affect hazardous material transportation safety, and this training is integrated into recurring hazardous material training and re-certification programs. Toward that end, NS, working closely with the National Transit Institute at Rutgers University, has developed a four-module uniform national training program. NS also has worked with the Transportation Security Administration (TSA) in developing other industry training programs. More in-depth security training has been given to those select NS employees who have been given specific security responsibilities, and

additional, location-specific security plans have been developed for certain metropolitan areas and each of six port facilities served by NS. With respect to the ports, each facility plan has been approved by the applicable Captain of the Port and subject to inspection by the U.S. Coast Guard.

Additionally, NS engages in close and regular coordination with numerous federal and state agencies, including the U.S. Department of Homeland Security (DHS), the TSA, the Federal Bureau of Investigation (FBI), the Federal Railroad Administration (FRA), the U.S. Coast Guard, U.S. Customs and Border Protection, and various state Homeland Security offices. As one notable example, an NS Police Special Agent, under the auspices of the AAR, has been assigned to the National Joint Terrorism Task Force (NJTTF) operating out of FBI Headquarters in Washington, D.C. to represent and serve as liaison to the North American rail industry. This arrangement improves logistical flow of vital security and law enforcement information with respect to the rail industry as a whole, while having the post filled by an NS Special Agent has served to foster a strong working relationship between NS and the FBI. NS also has become a member of the Customs-Trade Partnership Against Terrorism (C-TPAT) program sponsored by U.S. Customs. C-TPAT allows NS to work closely with U.S. Customs and its customers to develop measures that will help ensure the integrity of freight shipments moving on NS, particularly those moving to or from a foreign country. Based on participation in C-TPAT, NS has ensured that its plan meets all current applicable security recommendations made by U.S. Customs.

Similarly, NS is guided in its operations by various supplemental security action items issued by DHS and U.S. Department of Transportation (DOT), U.S. Coast Guard Maritime Security requirements, as well as voluntary security action items developed in 2006 in collaboration with TSA, DOT, and the freight railroads. Many of the action items are based on lessons learned from DHS and DOT security assessments of rail corridors in High Threat Urban Areas (HTUA) begun in 2004. Particular attention is paid to: (1) the establishment of secure storage areas for rail cars carrying toxic-by-inhalation (TIH) materials; (2) the expedited movement of trains transporting rail cars carrying TIH materials; (3) the minimization of unattended loaded tank cars carrying TIH materials; and (4) cooperation with federal, state, local and tribal governments to identify, through risk assessments, those locations where security risks are the highest. These action items and NS' compliance initiatives are outlined in the various departmental sections of the NS Departmental Security Plan. NS is also taking the appropriate actions to ensure compliance with the 2008 TSA Final Rule addressing Rail Security Sensitive Materials, and the 2008 Pipeline and Hazardous Materials Safety Administration (PHMSA) rail-routing regulations outlined in Docket HM-232E.

In 2008, through participation in the Transportation Community Awareness and Emergency Response (TRANSCAER) Program, NS provided rail accident response training to approximately 4,300 emergency responders, such as local police and fire personnel, representing over 25,000 man-hours of emergency response training. NS also conducted railroad operations classes for FBI agents and the railroad liaison agents from Joint Terrorism Task Forces. NS' other training efforts throughout 2008 included participation in 15 drills including 2 major full-scale exercises with various local, state, and federal agencies conducted in accordance with the DHS Exercise and Evaluation Program. NS also has ongoing programs to sponsor local emergency responders at tank car emergency response training programs conducted at the AAR Transportation Technology Center in Pueblo, Colorado. Also, the NS annual TRANSCAER Whistle-Stop train makes stops in numerous cities, its special training cars serving as a resource to an audience of nearly 1,000 emergency responders annually.

Improvements in equipment design also are expected to play a role in enhancing rail security. The Pipeline and Hazardous Materials Safety Administration (PHMSA), in coordination with the FRA, is amending the Hazardous Materials Regulations to prescribe enhanced safety measures for rail transportation of TIH materials, including interim design standards for railroad tank cars. The rule mandates commodity-specific improvements in safety features and design standards for newly manufactured DOT specification tank cars and an improved top fittings performance standard. The interim standards established in this rule will enhance the accident survivability of TIH tank cars.

## Item 1A. Risk Factors

**NS is subject to significant governmental legislation and regulation over commercial, environmental, and operating matters.** Railroads are subject to the enactment of laws by Congress that could increase economic regulation of the industry. Railroads presently are subject to commercial regulation by the STB, which has jurisdiction over some routes, rates and fuel surcharges, conditions of service, and the extension or abandonment of rail lines. The STB also has jurisdiction over the consolidation, merger, or acquisition of control of and by rail common carriers. Additional economic regulation of the rail industry by Congress or the STB, whether under new or existing laws, could have a significant negative impact on NS' ability to determine prices for rail services and result in a material adverse effect in the future on NS' financial position, results of operations, or liquidity in a particular year or quarter. This potential material adverse effect could also result in reduced capital spending on NS' rail network.

Railroads are subject to safety and security regulation by the DOT and the DHS, which regulate most aspects of NS' operations. Compliance with the Rail Safety Improvement Act of 2008 will result in additional operating costs associated with the statutory mandate to implement positive train control by 2015. In addition, NS' failure to comply with applicable laws and regulations could have a material adverse effect on NS.

NS' operations are subject to extensive federal, state, and local environmental laws and regulations concerning, among other things, emissions to the air; discharges to waterways or ground water supplies; handling, storage, transportation, and disposal of waste and other materials; and the cleanup of hazardous material or petroleum releases. The risk of incurring environmental liability – for acts and omissions, past, present, and future – is inherent in the railroad business. Property owned by NS, whether currently or in the past, is and has been subject to a variety of uses, including NS railroad operations and other industrial activity by past owners or past and present tenants of NS. Environmental problems that are latent or undisclosed may exist on these properties, and NS could incur environmental liabilities or costs, the amount and materiality of which cannot be estimated reliably at this time, with respect to one or more of these properties. Moreover, lawsuits and claims involving other unidentified environmental sites and matters are likely to arise from time to time, and the resulting liabilities could have a significant effect on financial position, results of operations, or liquidity in a particular year or quarter.

**NS, as a common carrier by rail, must offer to transport hazardous materials, regardless of risk.** Transportation of certain hazardous materials could create catastrophic losses in terms of personal injury and property damage costs, and compromise critical parts of our rail network.

**NS may be affected by terrorism or war.** Any terrorist attack, or other similar event, any government response thereto, and war or risk of war could cause significant business interruption and may adversely affect NS' results of operations, financial position, and liquidity in a particular year or quarter. Because NS plays a critical role in the nation's transportation system, it could become the target of such an attack or have a significant role in the government's preemptive approach or response to an attack or war.

Although NS currently maintains insurance coverage for third-party liability arising out of war and acts of terrorism, it maintains only limited insurance coverage for first-party property damage and damage to property in NS' care, custody, or control caused by certain acts of terrorism. In addition, premiums for some or all of NS' current insurance programs covering these losses could increase dramatically, or insurance coverage for certain losses could be unavailable to NS in the future.

**NS may be affected by general economic conditions.** Prolonged negative changes in domestic and global economic conditions affecting the producers and consumers of the commodities NS carries may have an adverse effect on its operating results, financial position, and liquidity. Economic conditions resulting in bankruptcies of one or more large customers could have a significant impact on NS' financial position, results of operations, or liquidity in a particular year or quarter.

**NS may be affected by the impact of environmental regulation on its utility coal customers and/or the value of certain NS assets.** A number of evolving environmental issues could affect the U.S. utility coal market, including potential regional programs aimed at capping and reducing power plant $CO_2$ emissions and ongoing efforts at addressing climate change. Although certain utilities have begun adding or are planning to add emissions control technologies to their electric generating units, allowing them to utilize their existing coal-fired power plants, future regulatory developments in this area could have a negative effect on NS' utility coal customers and/or the value of coal reserves owned by NS and thus an adverse effect on NS' operating results, financial position, and liquidity.

**NS faces competition from other transportation providers.** NS is subject to competition from motor carriers, railroads, and to a lesser extent, ships, barges, and pipelines, on the basis of transit time, pricing, and the quality and reliability of service. While NS has used primarily internal resources to build or acquire and maintain its rail system, trucks and barges have been able to use public rights-of-way maintained by public entities. Any future improvements or expenditures materially increasing the quality or reducing the cost of alternative modes of transportation in the regions in which NS operates, or legislation granting materially greater latitude for motor carriers with respect to size or weight limitations, could have a material adverse effect on its financial position, results of operations, or liquidity in a particular year or quarter.

**The operations of carriers with which NS interchanges may adversely affect its operations.** NS' ability to provide rail service to customers in the U.S. and Canada depends in large part upon its ability to maintain cooperative relationships with connecting carriers with respect to, among other matters, freight rates, revenue divisions, car supply and locomotive availability, data exchange and communications, reciprocal switching, interchange, and trackage rights. Deterioration in the operations of, or service provided by connecting carriers, or in our relationship with those connecting carriers, could result in NS' inability to meet its customers' demands or require NS to use alternate train routes, which could result in significant additional costs and network inefficiencies.

**NS relies on technology and technology improvements in its business operations.** If NS experiences significant disruption or failure of one or more of its information technology systems, including computer hardware, software, and communications equipment, NS could experience a service interruption, security breach, or other operational difficulties, which could have a material adverse impact on its results of operations, financial condition, and liquidity in a particular year or quarter. Additionally, if NS does not have sufficient capital to acquire new technology or if it is unable to implement new technology, NS may suffer a competitive disadvantage within the rail industry and with companies providing other modes of transportation service, which could have a material adverse effect on its financial position, results of operations, or liquidity in a particular year or quarter.

**The vast majority of NS employees belong to labor unions, and labor agreements, strikes, or work stoppages could adversely affect its operations.** Approximately 26,000, or about 85%, of NS railroad employees are covered by collective bargaining agreements with various labor unions. If unionized workers were to engage in a strike, work stoppage, or other slowdown, NS could experience a significant disruption of its operations. Additionally, future national labor agreements, or renegotiation of labor agreements or provisions of labor agreements, could significantly increase NS' costs for healthcare, wages, and other benefits. Any of these factors could have a material adverse impact on NS' financial position, results of operations, or liquidity in a particular year or quarter.

**NS may be subject to various claims and lawsuits that could result in significant expenditures.** The nature of NS' business exposes it to the potential for various claims and litigation related to labor and employment, personal injury, commercial disputes, freight loss and other property damage, and other matters. Job-related

personal injury and occupational claims are subject to the Federal Employers' Liability Act (FELA), which is applicable only to railroads. FELA's fault-based tort system produces results that are unpredictable and inconsistent as compared with a no-fault worker's compensation system. The variability inherent in this system could result in actual costs being very different from the liability recorded.

Any material changes to current litigation trends or a catastrophic rail accident involving any or all of freight loss or property damage, personal injury, and environmental liability could have a material adverse effect on NS' operating results, financial condition, and liquidity to the extent not covered by insurance. NS has obtained insurance for potential losses for third-party liability and first-party property damages. Specified levels of risk are retained on a self-insurance basis (currently up to $25 million and above $1 billion per occurrence for bodily injury and property damage to third parties and $25 million and above $175 million per occurrence for property owned by NS or in its care, custody, or control). Insurance is available from a limited number of insurers and may not continue to be available or, if available, may not be obtainable on terms acceptable to NS.

**Severe weather could result in significant business interruptions and expenditures.** Severe weather conditions and other natural phenomena, including hurricanes, floods, fires, and earthquakes, may cause significant business interruptions and result in increased costs, increased liabilities, and decreased revenues, which could have an adverse effect on NS' financial position, results of operations, or liquidity in a particular year or quarter.

**Unpredictability of demand for rail services resulting in the unavailability of qualified personnel could adversely affect NS' operational efficiency and ability to meet demand.** Workforce demographics, training requirements, and the availability of qualified personnel, particularly engineers and trainmen, could each have a negative impact on NS' ability to meet demand for rail service. Unpredictable increases in demand for rail services may exacerbate such risks, which could have a negative impact on NS' operational efficiency and otherwise have a material adverse effect on its financial position, results of operations, or liquidity in a particular year or quarter.

**NS may be affected by supply constraints resulting from disruptions in the fuel markets or the nature of some of its supplier markets.** NS consumes about 500 million gallons of diesel fuel each year. Fuel availability could be affected by any limitation in the fuel supply or by any imposition of mandatory allocation or rationing regulations. If a severe fuel supply shortage arose from production curtailments, increased demand in existing or emerging foreign markets, disruption of oil imports, disruption of domestic refinery production, damage to refinery or pipeline infrastructure, political unrest, war or other factors, NS' financial position, results of operations, or liquidity in a particular year or quarter could be materially adversely affected. Also, such an event would impact NS as well as its customers and other transportation companies.

Due to the capital intensive nature and industry-specific requirements of the rail industry, there are high barriers of entry for potential new suppliers of core railroad items, such as locomotives and rolling stock equipment. Additionally, NS competes with other industries for available capacity and raw materials used in the production of certain track materials, such as rail and ties. Changes in the competitive landscapes of these limited-supplier markets could result in increased prices or material shortages that could materially affect NS' financial position, results of operations, or liquidity in a particular year or quarter.

**The state of capital markets could adversely affect NS' liquidity.** NS from time-to-time relies on the capital markets to provide some of its capital requirements, including the issuance of long-term debt instruments and commercial paper, as well as the sale of certain receivables. Significant instability or disruptions of the capital markets, including the credit markets, or deterioration of NS' financial condition due to internal or external factors could restrict or eliminate NS' access to, and/or significantly increase the cost of, various financing sources, including bank credit facilities and issuance of corporate bonds. Instability or disruptions of the capital markets and deterioration of NS' financial condition, alone or in combination, could also result in a reduction in NS' credit

rating to below investment grade, which could prohibit or restrict NS from accessing external sources of short- and long-term debt financing and/or significantly increase the associated costs.

## Item 1B. Unresolved Staff Comments

None.

## Item 3. Legal Proceedings

The Ohio Environmental Protection Agency has notified Norfolk Southern that it intends to seek penalties and require Norfolk Southern to take remedial actions in connection with alleged violations of the Clean Air and Water Acts stemming from the operation of our coal dock in Ashtabula, Ohio. The Pennsylvania Department of Environmental Protection has submitted to NS a proposed Consent Assessment of Civil Penalty with respect to several alleged environmental releases from September 2007 to the present. Although NS will contest liability and the imposition of any penalties, because these governmental proceedings with respect to environmental laws and regulations involve potential fines, penalties or other monetary sanctions in excess of $100,000, we describe them here consistent with SEC rules and requirements. NS does not believe that the outcome of these proceedings will have a material effect on its financial position, results of operations, or liquidity.

On November 6, 2007, various antitrust class actions filed against NS and other Class 1 railroads in various Federal district courts regarding fuel surcharges were consolidated in the District of Columbia by the Judicial Panel on Multidistrict Litigation. NS believes the allegations in the complaints are without merit and intends to vigorously defend the cases. NS does not believe that the outcome of these proceedings will have a material effect on its financial position, results of operations, or liquidity. A lawsuit containing similar allegations against NS and four other major railroads that was filed on March 25, 2008, in the U.S. District Court for the District of Minnesota was voluntarily dismissed by the plaintiff subject to a tolling agreement entered into in August 2008.

On April 24, 2008, the United States Department of Justice (DOJ) brought an action against NS for alleged violations of federal environmental laws resulting from the discharge of chlorine and oil that occurred as a result of the January 6, 2005 derailment in Graniteville, SC, including claims for civil penalties as well as injunctive relief. On June 24, 2008, NS filed a motion to dismiss DOJ's claims, contending that insufficient facts have been alleged to support such claims. NS does not believe that the resolution of these claims will have a material adverse effect on its financial position, results of operations, or liquidity.

## Item 4. Submission of Matters to a Vote of Security Holders

There were no matters submitted to a vote of security holders during the fourth quarter of 2008.

**Executive Officers of the Registrant.**

Norfolk Southern's executive officers generally are elected and designated annually by the Board of Directors at its first meeting held after the annual meeting of stockholders, and they hold office until their successors are elected. Executive officers also may be elected and designated throughout the year as the Board of Directors considers appropriate. There are no family relationships among the officers, nor any arrangement or understanding between any officer and any other person pursuant to which the officer was selected. The following table sets forth certain information, as of February 1, 2009, relating to the executive officers.

| Name, Age, Present Position | Business Experience During Past Five Years |
|---|---|
| Charles W. Moorman, 56, Chairman, President and Chief Executive Officer | Present position since February 1, 2006. Served as President and Chief Executive Officer from November 1, 2005 to February 1, 2006; as President from October 1, 2004 to November 1, 2005; as Senior Vice President – Corporate Planning and Services from December 1, 2003 to October 1, 2004; Senior Vice President – Corporate Services from February 1, 2003 to December 1, 2003 and prior thereto served as President – Thoroughbred Technology and Telecommunications, Inc. |
| Stephen C. Tobias, 64, Vice Chairman and Chief Operating Officer | Present position since August 1, 1998. |
| Deborah H. Butler, 54, Executive Vice President – Planning and Chief Information Officer | Present position since June 1, 2007. Prior thereto served as Vice President – Customer Service. |
| James A. Hixon, 55, Executive Vice President – Law and Corporate Relations | Present position since October 1, 2005. Served as Executive Vice President – Finance and Public Affairs From October 1, 2004, to October 1, 2005; Senior Vice President – Legal and Government Affairs from December 1, 2003 to October 1, 2004 and prior thereto served as Senior Vice President – Administration. |
| Mark D. Manion, 56, Executive Vice President – Operations | Present position since October 1, 2004. Served as Senior Vice President – Transportation Operations from December 1, 2003 to October 1, 2004 and prior thereto served as Vice President – Transportation Services and Mechanical. |
| John P. Rathbone, 56, Executive Vice President – Administration | Present position since October 1, 2004. Served as Senior Vice President – Administration from December 1, 2003 to October 1, 2004 and prior thereto served as Senior Vice President and Controller. |
| Donald W. Seale, 56, Executive Vice President and Chief Marketing Officer | Present position since April 1, 2006. Served as Executive Vice President – Sales and Marketing from October 1, 2004 to April 1, 2006; as Senior Vice President – Marketing Services from December 1, 2003 to October 1, 2004 and prior thereto was Senior Vice President – Merchandise Marketing. |

| | |
|---|---|
| James A. Squires, 47, Executive Vice President – Finance and Chief Financial Officer | Present position since July 1, 2007. Served as Executive Vice President – Finance from April 1, 2007 to July 1, 2007, Senior Vice President – Financial Planning from April 1, 2006 to April 1, 2007, Senior Vice President – Law from October 1, 2004 to April 1, 2006, as Vice President – Law from December 1, 2003 to October 1, 2004 and prior thereto was Senior General Counsel. |
| Daniel D. Smith, 56, Senior Vice President – Energy and Properties | Present position since December 1, 2003. Prior thereto served as President - NS Development. |
| Marta R. Stewart, 51, Vice President and Controller | Present position since December 1, 2003. Prior thereto was Assistant Vice President Corporate Accounting. |

## PART II

### NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES (NS)

**Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities**

### NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES STOCK PRICE AND DIVIDEND INFORMATION

The Common Stock of Norfolk Southern Corporation, owned by 35,466 stockholders of record as of December 31, 2008, is traded on the New York Stock Exchange under the symbol NSC. The following table shows the high and low sales prices as reported by Bloomberg L.P. on its internet-based service and dividends per share, by quarter, for 2008 and 2007.

| | Quarter | | | |
|---|---|---|---|---|
| **2008** | **1st** | **2nd** | **3rd** | **4th** |
| Market price | | | | |
| High | $ 56.89 | $ 67.38 | $ 73.64 | $ 65.04 |
| Low | 44.15 | 54.94 | 57.82 | 43.29 |
| Dividends per share | $ 0.29 | $ 0.29 | $ 0.32 | $ 0.32 |
| **2007** | **1st** | **2nd** | **3rd** | **4th** |
| Market price | | | | |
| High | $ 53.84 | $ 59.19 | $ 59.77 | $ 54.58 |
| Low | 45.38 | 49.70 | 46.42 | 48.03 |
| Dividends per share | $ 0.22 | $ 0.22 | $ 0.26 | $ 0.26 |

### ISSUER PURCHASES OF EQUITY SECURITIES

| Period | (a) Total Number of Shares (or Units) Purchased (1) | (b) Average Price Paid per Share (or Unit) | (c) Total Number of Shares (or Units) Purchased as Part of Publicly Announced Plans or Programs(2) | (d) Maximum Number (or Approximate Dollar Value) of Shares (or Units) that may yet be Purchased Under the Plans or Programs(2) |
|---|---|---|---|---|
| October 1-31, 2008 | 4,202,600 | 54.43 | 4,202,600 | 10,312,150 |
| November 1-30, 2008 | -- | -- | -- | 10,312,150 |
| December 1-31, 2008 | 2,125 | 47.05 | -- | 10,312,150 |
| Total | 4,204,725 | | 4,202,600 | |

(1) Of this amount 2,125 represent shares tendered by employees in connection with the exercise of stock options under the Long-Term Incentive Plan.

(2) On November 22, 2005, the Board of Directors authorized a share repurchase program, pursuant to which up to 50 million shares of Common Stock could be purchased through December 31, 2015. On March 27, 2007, the Board of Directors amended the program and increased the number of shares that may be repurchased to 75 million, and shortened the repurchase term by five years to December 31, 2010.

## Item 6. Selected Financial Data

NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES
FIVE-YEAR FINANCIAL REVIEW

| | 2008 | 2007 | 2006 | 2005[1] | 2004[2] |
|---|---|---|---|---|---|
| | | *($ in millions, except per share amounts)* | | | |
| **RESULTS OF OPERATIONS** | | | | | |
| Railway operating revenues | $ 10,661 | $ 9,432 | $ 9,407 | $ 8,527 | $ 7,312 |
| Railway operating expenses | 7,577 | 6,847 | 6,850 | 6,410 | 5,610 |
| Income from railway operations | 3,084 | 2,585 | 2,557 | 2,117 | 1,702 |
| Other income – net | 110 | 93 | 149 | 74 | 76 |
| Interest expense on debt | 444 | 441 | 476 | 494 | 489 |
| Income before income taxes | 2,750 | 2,237 | 2,230 | 1,697 | 1,289 |
| Provision for income taxes | 1,034 | 773 | 749 | 416 | 379 |
| Net income | $ 1,716 | $ 1,464 | $ 1,481 | $ 1,281 | $ 910 |
| **PER SHARE DATA** | | | | | |
| Net income – basic | $ 4.60 | $ 3.74 | $ 3.63 | $ 3.17 | $ 2.31 |
| – diluted | $ 4.52 | $ 3.68 | $ 3.57 | $ 3.11 | $ 2.28 |
| Dividends | $ 1.22 | $ 0.96 | $ 0.68 | $ 0.48 | $ 0.36 |
| Stockholders' equity at year end | $ 26.23 | $ 25.64 | $ 24.19 | $ 22.63 | $ 19.92 |
| **FINANCIAL POSITION** | | | | | |
| Total assets | $ 26,297 | $ 26,144 | $ 26,028 | $ 25,859 | $ 24,748 |
| Total long-term debt, including current maturities | $ 6,667 | $ 6,368 | $ 6,600 | $ 6,930 | $ 7,525 |
| Stockholders' equity | $ 9,607 | $ 9,727 | $ 9,615 | $ 9,276 | $ 7,977 |
| **OTHER** | | | | | |
| Capital expenditures | $ 1,558 | $ 1,341 | $ 1,178 | $ 1,025 | $ 1,041 |
| Average number of shares outstanding (thousands) | 372,276 | 389,626 | 405,988 | 404,170 | 394,201 |
| Number of stockholders at year end | 35,466 | 36,955 | 38,900 | 48,180 | 51,032 |
| Average number of employees: | | | | | |
| Rail | 30,241 | 30,336 | 30,079 | 29,851 | 28,057 |
| Nonrail | 468 | 470 | 462 | 443 | 418 |
| Total | 30,709 | 30,806 | 30,541 | 30,294 | 28,475 |

1 2005 provision for income taxes includes a $96 million benefit related to the reduction of NS' deferred income tax liabilities resulting from tax legislation enacted by Ohio. This benefit increased net income by $96 million, or 23 cents per diluted share.

2 2004 other income – net includes a $40 million net gain from the Conrail Corporate Reorganization. This gain increased net income by $40 million or 10 cents per diluted share.

See accompanying Consolidated Financial Statements and notes thereto.

## Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations

**Norfolk Southern Corporation and Subsidiaries**
**Management's Discussion and Analysis of**
**Financial Condition and Results of Operations**

The following discussion and analysis should be read in conjunction with the Consolidated Financial Statements and Notes and the Selected Financial Data.

### OVERVIEW

NS' 2008 net income rose 17% largely on the strength of a 19% increase in income from railway operations. Operating results reflected higher average revenue per unit (including fuel surcharge revenue) that more than offset the effects of increased operating expenses and lower traffic volume. Operating revenues increased 13% and operating expenses rose 11% compared to 2007, resulting in a lower operating ratio (a measure of the amount of revenues consumed by expenses) of 71.1%, as compared with 72.6% in 2007.

Cash provided by operating activities was $2.7 billion, exceeding $2 billion for the fourth consecutive year. Coupled with net borrowings of $280 million, this provided funding for increased capital expenditures, share repurchases, and higher dividends.

During 2008, NS purchased and retired 19.4 million shares of NS common stock at a total cost of $1.1 billion under the share repurchase program which the Board of Directors approved in November 2005 and subsequently amended in March 2007 to authorize the repurchase of up to 75 million shares of NS common stock through December 31, 2010. In total, NS has purchased and retired 64.7 million shares under this program at a cost of $3.3 billion.

Looking ahead, NS expects revenues to decline in 2009, reflecting lower traffic volume due to the weak economy and decreased fuel surcharge revenue resulting from lower fuel prices. NS plans to continue to improve service, maintain a market-based approach to pricing, and reduce volume-related costs.

### SUMMARIZED RESULTS OF OPERATIONS

#### 2008 Compared with 2007

Net income in 2008 was $1.7 billion, up $252 million, or 17%, compared with 2007. Diluted earnings per share were $4.52, up 84¢, or 23%. The greater percentage increase in per share earnings was due to fewer shares outstanding as a result of NS' share repurchase program (see Note 13). The increase in net income was primarily due to higher income from railway operations that was offset in part by higher income taxes (see Note 3). Railway operating revenues increased $1.2 billion, as higher average revenue per unit (including fuel surcharges) outweighed lower traffic volumes. Railway operating expenses increased $730 million, principally due to higher fuel costs and increased compensation and benefits expenses.

Oil prices affect NS' results of operations in a variety of ways and can have an overall favorable or unfavorable impact in any particular quarter or year. In addition to the impact of oil prices on general economic conditions and traffic volume, oil prices directly affect NS' revenues through market-based fuel surcharges and contract escalators (see "Railway Operating Revenues") and also affect fuel costs (see "Railway Operating Expenses"). For 2008, oil prices had an overall favorable impact on income from railway operations. Future changes in oil prices may cause volatility in operating results that could be material to a particular quarter or year.

**2007 Compared with 2006**

Net income in 2007 was $1.5 billion, down $17 million, or 1%, compared with 2006. Diluted earnings per share were $3.68, up 11¢, or 3%, reflecting fewer shares outstanding as a result of NS' share repurchase program (see Note 13). The decrease in net income was primarily due to higher income taxes and lower non-operating items that offset higher income from railway operations. Railway operating revenues increased $25 million, as higher average revenue per unit overshadowed lower traffic volumes. Railway operating expenses decreased $3 million, principally due to lower volume-related expenses that offset higher fuel expense.

## DETAILED RESULTS OF OPERATIONS

### Railway Operating Revenues

Railway operating revenues were $10.7 billion in 2008 and $9.4 billion in 2007 and 2006. The following table presents a three-year comparison of revenues, volume, and average revenue per unit by market group.

| | Revenues | | | Units | | | Revenue per Unit | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2007 | 2006 | 2008 | 2007 | 2006 | 2008 | 2007 | 2006 |
| | *($ in millions)* | | | *(in thousands)* | | | *($ per unit)* | | |
| Coal | $ 3,111 | $ 2,315 | $ 2,330 | 1,765.7 | 1,699.4 | 1,760.0 | $ 1,762 | $ 1,363 | $ 1,324 |
| General merchandise: | | | | | | | | | |
| Agr./cons. prod./govt. | 1,282 | 1,047 | 994 | 612.4 | 601.5 | 594.1 | 2,093 | 1,740 | 1,673 |
| Metals/construction | 1,251 | 1,149 | 1,168 | 742.4 | 783.6 | 835.3 | 1,686 | 1,467 | 1,398 |
| Chemicals | 1,238 | 1,166 | 1,079 | 393.7 | 426.7 | 426.4 | 3,144 | 2,732 | 2,530 |
| Paper/clay/forest | 898 | 860 | 891 | 394.1 | 428.1 | 466.7 | 2,280 | 2,010 | 1,909 |
| Automotive | 823 | 974 | 974 | 412.2 | 533.0 | 561.9 | 1,997 | 1,827 | 1,734 |
| General merchandise | 5,492 | 5,196 | 5,106 | 2,554.8 | 2,772.9 | 2,884.4 | 2,150 | 1,874 | 1,770 |
| Intermodal | 2,058 | 1,921 | 1,971 | 3,029.0 | 3,120.7 | 3,256.5 | 679 | 615 | 605 |
| Total | $ 10,661 | $ 9,432 | $ 9,407 | 7,349.5 | 7,593.0 | 7,900.9 | $ 1,451 | $ 1,242 | $ 1,191 |

Revenues increased $1.2 billion in 2008 and $25 million in 2007. As shown in the table below, both revenue improvements were the result of increased average revenue per unit, including fuel surcharge revenue, which more than offset decreased traffic volumes. Fuel surcharge revenue amounted to $1.6 billion in 2008 (up $830 million) compared to $792 million in 2007 and $1 billion in 2006. If fuel prices remain at or near year-end 2008 levels, fuel surcharge revenues in 2009 will be substantially lower, with a corresponding effect on revenue per unit.

Many of Norfolk Southern's negotiated fuel surcharges for coal and general merchandise traffic are based on the monthly average price of West Texas Intermediate Crude Oil (WTI Average Price). These surcharges are reset the first day of each calendar month based on the WTI Average Price for the second preceding calendar month. This two-month lag in computing WTI Average Price coupled with the sharp drop in fuel prices late in the year increased fuel surcharge revenue by approximately $100 million for the year.

**Revenue Variance Analysis**
Increases (Decreases)

| | 2008 vs. 2007 | 2007 vs. 2006 |
|---|---|---|
| | *($ in millions)* | |
| Revenue per unit/mix | $ 1,531 | $ 392 |
| Traffic volume (units) | (302) | (367) |
| Total | $ 1,229 | $ 25 |

Both comparisons reflect large increases in average revenue per unit, a result of higher rates and increased fuel surcharges. Traffic volumes in both years declined. For 2008, traffic volumes for all commodity groups except coal and agriculture/consumer products/government decreased. In 2007, traffic volumes for all commodity groups except agriculture/consumer products/government and chemicals decreased.

On January 26, 2007, the Surface Transportation Board (STB) issued a decision that the type of fuel surcharge imposed by NS and most other large railroads – a fuel surcharge based on a percentage of line haul revenue – would no longer be permitted for regulated traffic that moves under public (tariff) rates. The STB gave the railroads a 90-day transition period to adjust their fuel surcharge programs. During the second quarter of 2007, NS discontinued assessing fuel surcharges on its published (non-intermodal) public rates. Adjustments to public prices now reflect ongoing market conditions. The traffic moving under these tariffs and public quotes comprises about 10% of Norfolk Southern's total revenue base.

**COAL** revenues increased $796 million, or 34%, compared with 2007, reflecting higher rates, including fuel surcharges, and a 4% increase in traffic volume. Coal average revenue per unit was up 29% compared with 2007, reflecting higher rates (which were comprised of pricing increases, contract escalators and the effect of increased longer-haul export coal traffic) and increased fuel surcharges. For 2009, average revenue per unit is expected to decline reflecting the effects of lower fuel surcharges and contract escalators.

Coal represented 29% of NS' revenues in 2008 and 79% of shipments handled originated on NS' lines. As shown in the following table, increased shipments of export, utility, and domestic metallurgical coal more than offset lower industrial shipments.

**Total Coal, Coke, and Iron Ore Tonnage**

| | 2008 | 2007 | 2006 |
|---|---|---|---|
| | | *(Tons in thousands)* | |
| Utility | 144,451 | 142,734 | 148,078 |
| Export | 23,069 | 15,564 | 12,409 |
| Domestic metallurgical | 18,155 | 17,873 | 20,878 |
| Industrial | 8,553 | 9,794 | 9,202 |
| Total | 194,228 | 185,965 | 190,567 |

Coal revenues in 2007 decreased $15 million, or 1%, compared with 2006, as a 2% reduction in tonnage handled more than offset a 3% increase in average revenue per unit. Carloads declined 3%, a higher percentage than the change in tonnage handled because of increased average tonnage per car. Coal represented 25% of NS' revenues in 2007, and 78% of shipments handled originated on NS' lines.

NS is currently involved in litigation with Virginia Electric and Power Company/Old Dominion Electric Cooperative (Virginia Power) regarding rate adjustment provisions in a transportation contract between them. In 2007, the Virginia Supreme Court issued a decision that remanded the case to the trial court on the grounds that neither of its prior decisions constituted a final order. In April 2008, the trial court entered a final order granting NS monetary damages, including interest, and prescribing the methodology for determining future rates. Virginia Power filed a notice of appeal and the Virginia Supreme Court has agreed to hear the appeal. Future developments and the ultimate resolution of this matter could result in NS recognizing additional revenues related to this dispute, which could have a favorable impact on results of operations in a particular year or quarter.

**Utility coal** tonnage increased 1%, compared with 2007, a result of modest stockpile growth in the Northeast.

In 2007, utility coal tonnage decreased 4% compared with 2006, reflecting high stockpile levels (particularly in the Southeast) that led to reduced shipments, despite fairly strong electric generation (up 4%) in the NS service region. In addition, the temporary closure of a major coal mine as well as the loss of business to barge transportation contributed to the decline.

For 2009, utility coal tonnage is expected to weaken, with lower electric demand as a result of a weak economy.

**Export coal** tonnage increased 48% compared to 2007, reflecting increased global demand coupled with weather-related supply constraints in Australia, reduced export volume from China, and the weak U.S. dollar. Norfolk volume increased about 51,000 carloads, or 39%, and Baltimore volume was up about 28,000 carloads, or 102%.

Export coal tonnage in 2007 increased 25% compared to 2006, primarily due to increased demand reflecting a lower valued U.S. dollar as well as loading delays at Australian ports. Norfolk volume increased by approximately 26,000 cars, or 25%, and Baltimore volume was up approximately 4,500 cars, or 19%.

For 2009, export coal tonnage is expected to decrease, reflecting a significant reduction in worldwide steel production, increasing competition into Europe due to changes in ocean freight rates, and the strengthening of the U.S. dollar against other currencies.

**Domestic metallurgical** coal, coke, and iron ore tonnage increased 2% compared with 2007, reflecting the start up of a new coke plant.

In 2007, domestic metallurgical coal, coke, and iron ore tonnage decreased 14% compared with 2006. The decrease was primarily due to coke furnace outages, mine production outages, and reduced spot iron ore traffic.

For 2009, domestic metallurgical coal, coke, and iron ore tonnage is expected to be down due to lower domestic steel demand.

**Other coal** tonnage (principally steam coal shipped to industrial plants) decreased 13% in 2008 compared to 2007 principally due to coal supply constraints. In 2007, other coal tonnage increased 6% versus 2006, primarily due to new business and stronger demand.

For 2009, other coal tonnage is expected to be flat compared to 2008.

**GENERAL MERCHANDISE** revenues in 2008 increased $296 million, or 6%, compared with 2007, as a 15% increase in average revenue per unit, reflecting continued market-based pricing and higher fuel surcharges, more than offset an 8% decline in traffic volume.

In 2007, general merchandise revenues increased $90 million, or 2%, compared with 2006, as a 6% increase in average revenue per unit, more than offset a 4% decline in traffic volume. Revenue in 2007 included $26 million related to a volume-related contract settlement with an automotive customer.

**Agriculture, consumer products, and government** revenue increased 22% in 2008 compared with 2007. The revenue improvement resulted from higher average revenue per unit, which reflected increased rates and higher fuel surcharge revenues. Traffic volume increased 2% as more ethanol, military, feed, soybeans, and food oils shipments offset declines in fertilizers, corn, beverages, and consumer products.

Agriculture, consumer products, and government revenue increased 5% in 2007 compared with 2006. The revenue improvement resulted from higher average revenue per unit, which reflected higher rates. Traffic volume rose modestly as more corn, fertilizer, and ethanol shipments were mitigated by less government and consumer product volume.

For 2009, agriculture revenue is expected to post modest growth, benefiting from increasing demand for biofuel products including ethanol, biodiesel, and feed ingredients from their production, and slightly higher average revenue per unit (including fuel surcharges). However, lower volumes in corn, soybeans, and fertilizer shipments due to softer demand along with declines in consumer products markets are expected to partially offset this growth.

**Metals and construction** revenue increased 9% in 2008 as a 15% increase in average revenue per unit that resulted from increased rates and higher fuel surcharge more than offset the effects of a 5% decrease in traffic volume. The decline in volume was due to reduced demand for construction materials and lower coil, iron, and steel shipments, reflecting the weak housing and automotive sectors.

Metals and construction revenue decreased 2% in 2007 as a 5% increase in average revenue per unit that resulted from higher rates was more than offset by the effects of a 6% decrease in traffic volume. The decline in volume was principally due to lower iron, steel, and coil shipments and reduced demand for construction materials, both reflecting the soft automotive and housing sectors.

For 2009, metals and construction revenues are expected to decline as a result of decreased traffic volumes due to lower steel production in North America coupled with continued weakness in the housing and automotive sectors and lower average revenue per unit (including fuel surcharges).

**Chemicals** revenue in 2008 increased 6%, compared with 2007, a result of increased rates and higher fuel surcharge revenue. Traffic volume declined 8%, reflecting continued weakness in both industrial intermediates and plastics (linked to housing construction declines) in addition to miscellaneous chemicals and petroleum-based products.

In 2007, chemicals revenue increased 8% compared with 2006, reflecting higher rates in all groups. Traffic volume rose modestly as more shipments of industrial intermediates offset fewer shipments in the petroleum, miscellaneous chemicals, and plastics markets, which continued to reflect weakness in housing-related demand.

For 2009, chemicals revenue is expected to decline as a result of reduced volumes, reflecting a weak economic outlook with fewer housing starts and construction-related weaknesses, and lower average revenue per unit (including fuel surcharges).

**Paper, clay, and forest products** revenue increased 4% in 2008 compared with 2007 due to a 13% increase in average revenue per unit which more than offset an 8% decrease in traffic volume. The volume decline reflected the continued housing slowdown and increased trucking capacity available to paper customers.

Paper, clay, and forest products revenue decreased 3% in 2007 compared with 2006 as the effects of higher average revenue per unit were more than offset by an 8% decrease in traffic volume reflecting the housing slowdown and decline in conventional paper markets.

For 2009, paper, clay, and forest products revenues are expected to decline due to economy-related volume declines, including the effects of increased trucking capacity, and lower average revenue per unit (including fuel surcharges).

**Automotive** revenues decreased 16% in 2008 compared to 2007 as lower traffic volumes offset higher average revenue per unit. Volumes decreased 23%, reflecting reduced North American sales and production. Automotive manufacturers, especially the domestic producers, continued to experience significant sales declines during the year. Three assembly plants closed during the year and six implemented shift reductions. In addition, one manufacturer temporarily closed an assembly plant to retool for a new product in 2010. As of year end, Ford,

General Motors, and Chrysler combined operated 14 of 24 assembly plants served by NS. NS continues to monitor the state of the automotive industry and the collectability of the associated receivables.

Automotive revenues were flat in 2007 compared with 2006 as lower traffic volumes offset higher average revenue per unit. Revenue in 2007 included a $26 million volume-related contract settlement. Volume decreased 5%, reflecting softness in demand for vehicles as well as parts, and the closure in June 2007 of an NS-served plant.

For 2009, automotive revenues are expected to decrease reflecting continued production cutbacks and lower average revenue per unit (including fuel surcharges).

**INTERMODAL** revenues increased $137 million, or 7%, compared with 2007, as a 10% increase in average revenue per unit (including fuel surcharges) offset a 3% reduction in traffic volumes. Domestic volume (which includes truckload and intermodal marketing companies' [IMC] volumes) increased 8% compared with 2007, reflecting the relative fuel efficiency of intermodal versus over-the-road transportation and service improvements. International traffic volume declined 9%, primarily driven by the weak economy and less inland rail movement of West Coast port traffic that was partially offset by East Coast port volume growth. The Premium business, which includes parcel and less-than-truckload (LTL) carriers, decreased 6%, as reduced private empty movements and soft parcel business offset LTL conversions. Triple Crown Services Company (Triple Crown), a service with rail-to-highway trailers, experienced a 3% drop in volume primarily driven by reduced auto parts shipments.

Intermodal revenues in 2007 decreased $50 million, or 3%, compared with 2006, as a 4% reduction in traffic volumes offset a 2% increase in average revenue per unit. Truckload volume decreased 10% compared with 2006 and domestic IMC volume declined 4%. Traffic volume for Triple Crown dropped 3%. The declines for truckload, IMC, and Triple Crown were primarily due to lower national demand for dry van shipments resulting from continued weakness in the housing and automotive markets and increased over-the-road competition. International traffic volume decreased 4% reflecting reduced shipments of empty containers and less inland rail transportation of West Coast port traffic, which offset volume growth from East Coast port traffic. Premium business was up 2% reflecting gains in parcel shipments that offset modest declines in LTL shipper traffic.

For 2009, intermodal revenue is expected to decrease from 2008 primarily due to weak economic conditions, pressures from the drayage market and lower average revenue per unit (including fuel surcharges).

**Railway Operating Expenses**

Railway operating expenses in 2008 were $7.6 billion, up $730 million, or 11%, compared to 2007. Expenses in 2007 were about even with expenses in 2006. The increase in 2008 was primarily due to higher fuel costs and increased compensation and benefits expenses. The 2007 comparison reflected volume-related decreases offset by higher fuel expense.

The railway operating ratio, which measures the percentage of operating revenues consumed by operating expenses, improved to 71.1% in 2008, compared with 72.6% in 2007 and 72.8% in 2006.

The following table shows the changes in railway operating expenses summarized by major classifications.

**Operating Expense Variances**
Increases (Decreases)

| | 2008 vs. 2007 | 2007 vs. 2006 |
|---|---|---|
| | *($ in millions)* | |
| Compensation and benefits | $ 132 | $ (85) |
| Purchased services and rents | 48 | (27) |
| Fuel | 469 | 74 |
| Depreciation | 29 | 37 |
| Materials and other | 52 | (2) |
| Total | $ 730 | $ (3) |

**Compensation and benefits**, which represents 35% of total railway operating expenses, increased $132 million, or 5%, compared with 2007, primarily due to higher incentive compensation (up $66 million); increased wage rates (up $54 million); costs associated with lump-sum payments due under a new Brotherhood of Locomotive Engineers and Trainmen (BLET) agreement ($31 million); higher payroll taxes (up $15 million); and, the absence of the 2007 employment tax refund ($9 million). These were partially offset by lower costs associated with trainees (down $19 million), lower health and welfare benefits resulting from higher employee contributions (down $19 million), and lower stock-based compensation (down $7 million). In 2008, compensation and benefits expense benefited from a net pension credit of $39 million; however, primarily due to the market decline in pension assets (see Note 10), NS does not expect a similar benefit in 2009.

In 2007, compensation and benefits decreased $85 million, or 3%, compared with 2006, primarily due to lower incentive compensation (down $48 million), lower volume-related payroll (down $37 million), the absence of the prior year retirement and waiver agreements with former executives as well as the cost of the regular stock-based grant to the former Chief Executive Officer ($24 million), lower stock-based compensation (down $13 million), and lower payroll taxes (down $12 million). These were partially offset by increased wage rates (up $27 million) and higher medical costs (up $27 million).

NS employment averaged 30,709 in 2008 compared with 30,806 in 2007 and 30,541 in 2006. The increase in 2007 in the number of employees was almost exclusively in operating department personnel to improve service needs, as well as to prepare for expected retirements. NS continues to monitor forecasted volumes in light of current economic conditions to ensure appropriate employment levels for service needs.

**Purchased services and rents** includes the costs of services purchased from outside contractors, including the net costs of operating joint (or leased) facilities with other railroads and the net cost of equipment rentals. This category of expenses increased $48 million, or 3%, in 2008 compared to 2007, but decreased $27 million, or 2%, in 2007 compared to 2006.

Purchased services costs were $1,242 million in 2008, $1,172 million in 2007 and $1,165 million in 2006. The increase in 2008 reflected higher intermodal operations costs, transportation operating costs, and professional and legal services. In 2007, higher expenses for maintenance activities were largely offset by volume-related declines.

Equipment rents, which includes the cost to NS of using equipment (mostly freight cars) owned by other railroads or private owners less the rent paid to NS for the use of its equipment, amounted to $357 million, $379 million and $413 million for 2008, 2007 and 2006, respectively. The decreases in 2008 and 2007 were principally due to lower shipment volumes and improved fleet utilization.

**Fuel** expense, which includes the cost of locomotive fuel as well as other fuel used in railway operations, increased $469 million, or 40%, in 2008 compared with 2007, and increased $74 million, or 7%, in 2007 compared with 2006. Fuel expense is recorded net of hedge benefits, although there have been no such benefits since May 2006 when the program wound down (see "Market Risks and Hedging Activities," below and Note 16). The increase in 2008 reflected a 45% increase in the price per gallon of locomotive fuel offset in part by a 3% decline in consumption. The increase in 2007 reflected a 9% increase in the price per gallon of locomotive fuel as well as the absence of hedge benefits offset in part by a 4% decline in consumption.

Legislation enacted in the first quarter of 2005 repealed the 4.3¢ per gallon excise tax on railroad diesel fuel for 2007, with the following phased reductions in 2005 and 2006: 1¢ per gallon from January 1, 2005 through June 30, 2005; 2¢ per gallon from July 1, 2005 through December 31, 2006; and by the full 4.3¢ thereafter. NS consumes about 500 million gallons of locomotive diesel fuel per year.

**Depreciation** expense increased $29 million, or 4%, in 2008 compared to 2007, and $37 million, or 5%, in 2007 compared to 2006. In both years, substantial capital investments and improvements resulted in higher depreciation expense.

**Materials and other** expenses (including the estimates of costs related to personal injury, property damage, and environmental matters) increased $52 million, or 7%, in 2008 compared with 2007, but decreased $2 million in 2007 compared with 2006, as shown in the following table.

| | 2008 | 2007 | 2006 |
|---|---|---|---|
| | | *($ in millions)* | |
| Materials | $ 380 | $ 359 | $ 346 |
| Casualties and other claims | 180 | 171 | 220 |
| Other | 292 | 270 | 236 |
| | $ 852 | $ 800 | $ 802 |

The increase in 2008 was primarily due to costs associated with the Avondale Mills settlement related to the Graniteville accident (see below), as well as higher loss and damage claims and increased material costs for equipment and roadway repairs. These increases were partially offset by favorable personal injury claims development.

In April 2008, NS settled the lawsuit brought by Avondale Mills for claims associated with the January 6, 2005, derailment in Graniteville, SC. A portion of the settlement will not be reimbursed by insurance and was included in 2008 expenses. The total liability related to the derailment represents NS' best estimate based on current facts and circumstances. The estimate includes amounts related to business property damage and other economic losses, personal injury and individual property damage claims, as well as third-party response costs. NS' commercial insurance policies are expected to cover substantially all expenses related to this derailment above the unreimbursed portion and NS' self-insured retention, including NS' response costs and legal fees. The Consolidated Balance Sheets reflect current and long-term receivables for estimated recoveries from NS' insurance carriers. NS is engaged in arbitration with one of its insurance carriers that failed to respond to an insurance claim submitted by NS. NS believes these expenses are covered by the insurance policy and that recovery of the contested amount is probable, in that NS expects the arbitrator will determine the settlement amounts to be reasonable and that the insurer's refusal to consent to and to fund the settlement was a breach of contract. Accordingly, NS has recorded the full recovery attributable to such carrier ($100 million). In October 2008, another of NS' insurance carriers provided the preliminary findings of its review of NS' reimbursement request and reported that it may dispute a portion of that request. NS has initiated arbitration against the carrier

and believes that all expenses contained in the reimbursement request are covered by the insurance policy and that recovery is probable.

The decline in materials and other expense in 2007 was primarily due to lower derailment and personal injury costs, offset in part by higher property and other taxes, and increased materials costs for maintenance activities.

The largest component of casualties and other claims expense is personal injury costs. Cases involving occupational injuries comprised about 52% of total employee injury cases resolved and about 29% of total payments made. With its long-established commitment to safety, NS continues to work actively to eliminate all employee injuries and to reduce the associated costs. With respect to occupational injuries, which are not caused by a specific accident or event but allegedly result from a claimed exposure over time, the benefits of any existing safety initiatives may not be realized immediately. These types of claims are being asserted by former or retired employees, some of whom have not been actively employed in the rail industry for decades. The rail industry remains uniquely susceptible to litigation involving job-related accidental injury and occupational claims because of the Federal Employers' Liability Act (FELA), which is applicable only to railroads. FELA's fault-based system, which covers employee claims for job-related injuries, produces results that are unpredictable and inconsistent as compared with a no-fault workers' compensation system.

NS maintains substantial amounts of insurance for potential third-party liability and property damage claims. It also retains reasonable levels of risk through self-insurance (see Note 17). NS expects insurance costs to be slightly higher in 2009.

**Other Income – Net**

Other income – net was $110 million in 2008, $93 million in 2007, and $149 million in 2006 (see Note 2). The increase in 2008 reflected the absence of expenses related to synthetic fuel investments (see "Income Taxes" below), reduced other interest expense ($27 million) largely due to adjustments to reflect the outcome of certain tax examinations and higher coal royalties (up $12 million). These benefits were offset in part by lower returns and higher borrowing costs on corporate-owned life insurance (down $38 million), lower interest income (down $25 million), fewer gains on sales of property and investments (down $22 million), and lower equity in the earnings of Conrail (down $16 million), which reflects the absence of a tax audit settlement recorded by Conrail in 2007 ($18 million).

The decrease in 2007 reflected lower interest income ($31 million), higher expenses associated with synthetic fuel-related tax credit investments ($15 million), and lower returns from corporate-owned life insurance ($15 million) that combined to offset higher equity in earnings of Conrail ($20 million).

NS has membership interests representing ownership in companies that owned and operated facilities that produced synthetic fuel from coal. In addition, NS purchased two facilities that produced synthetic fuel from coal in 2007. The production of synthetic fuel resulted in tax credits as well as expenses related to the investments. The expenses are recorded as a component of "Other income – net," and the tax credits, as well as tax benefits related to the expenses, are reflected in "Provision for income taxes" (see further discussion below).

**Income Taxes**

Income tax expense in 2008 was $1 billion, for an effective rate of 38%, compared with effective rates of 35% in 2007 and 34% in 2006. The increase in the rate for 2008 was primarily due to the absence of synthetic fuel-related tax credits that expired at the end of 2007. The increase in the rate for 2007 largely resulted from Illinois tax legislation which increased deferred taxes by $19 million (see Note 3).

The tax credits generated by NS' synthetic fuel-related investments reduced the effective tax rate by 3% in 2007 and 2006. Net income in 2007 reflected $5 million less in net benefits from these credits, as compared with the same period of 2006, as shown below:

| | 2007 | 2006 |
|---|---|---|
| | ($ in millions) | |
| Effect in "Other income – net:" | | |
| Expenses on synthetic fuel-related investments | $ 77 | $ 62 |
| Effect in "Provision for income taxes:" | | |
| Tax credits | 60 | 56 |
| Tax benefit of expenses on synthetic-fuel related investments | 30 | 24 |
| Total reduction of income tax expense | 90 | 80 |
| Effect in "Net income:" | | |
| Net benefit from synthetic-fuel related investments | $ 13 | $ 18 |

During 2008, NS resolved both the Internal Revenue Service (IRS) examination of its 2004 and 2005 consolidated federal income tax returns and its appeal of the 2002 and 2003 IRS examination without a material effect in income tax expense. NS' consolidated federal income tax returns for 2006 and 2007 are being audited by the IRS.

## FINANCIAL CONDITION, LIQUIDITY, AND CAPITAL RESOURCES

**Cash provided by operating activities,** NS' principal source of liquidity, was $2.7 billion in 2008 compared with $2.3 billion in 2007 and $2.2 billion in 2006. The improvement in 2008 resulted from increased railway operating income and from bonus tax depreciation which reduced current tax payments. The improvement in 2007 resulted from favorable changes in working capital as well as a modest increase in income from railway operations. NS had working capital deficits of $106 million at December 31, 2008, and $273 million at December 31, 2007. The improvement was largely the result of increased cash and cash equivalents. NS expects that cash on hand combined with cash flow provided by operating activities will be sufficient to meet its ongoing obligations. NS' cash and cash equivalents balances totaled $618 million and $206 million at December 31, 2008 and 2007, respectively.

**Contractual obligations** at December 31, 2008, comprised of NS' long-term debt (including capital leases) (see Note 7), operating leases (see Note 8), agreements with CRC (see Note 4), unrecognized tax benefits (see Note 3), long-term advances from Conrail (see Note 4), and unconditional purchase obligations (see Note 17), were as follows:

**Payments Due By Period**

| | Total | 2009 | 2010-2011 | 2012-2013 | 2014 and Subsequent | Other |
|---|---|---|---|---|---|---|
| | | | ($ in millions) | | | |
| Long-term debt and capital lease principal | $ 6,667 | $ 484 | $ 686 | $ 79 | $ 5,418 | $ -- |
| Operating leases | 873 | 142 | 223 | 149 | 359 | -- |
| Agreements with CRC | 450 | 29 | 58 | 58 | 305 | -- |
| Unrecognized tax benefits* | 169 | 24 | -- | -- | -- | 145 |
| Long-term advances from Conrail | 133 | -- | -- | -- | 133 | -- |
| Unconditional purchase obligations | 119 | 100 | 19 | -- | -- | -- |
| Total | $ 8,411 | $ 779 | $ 986 | $ 286 | $ 6,215 | $ 145 |

* When the amount and timing of liabilities for unrecognized tax benefits can be reasonably estimated, the amount is shown in the table under the appropriate period. When the year of settlement cannot be reasonably estimated, the amount is shown in the Other column.

**Off balance sheet arrangements** consist of obligations related to operating leases, which are included in the table of contractual obligations above and disclosed in Note 8.

**Cash used in investing activities** was $1.2 billion in 2008, compared with $1 billion in 2007 and $684 million in 2006. The increase in 2008 primarily reflected increased property additions. The increase in 2007 primarily reflected lower net proceeds from short-term investment activities and increased property additions.

Property additions account for most of the recurring spending in this category. The following tables show capital spending (including capital leases) and track and equipment statistics for the past five years.

**Capital Expenditures**

| | 2008 | 2007 | 2006 | 2005 | 2004 |
|---|---|---|---|---|---|
| | | | ($ in millions) | | |
| Road and other property | $ 1,070 | $ 894 | $ 756 | $ 741 | $ 612 |
| Equipment | 488 | 447 | 422 | 284 | 429 |
| Total | $ 1,558 | $ 1,341 | $ 1,178 | $ 1,025 | $ 1,041 |

**Track Structure Statistics (Capital and Maintenance)**

| | 2008 | 2007 | 2006 | 2005 | 2004 |
|---|---|---|---|---|---|
| Track miles of rail installed | 459 | 401 | 327 | 302 | 246 |
| Miles of track surfaced | 5,209 | 5,014 | 4,871 | 4,663 | 5,055 |
| New crossties installed (millions) | 2.7 | 2.7 | 2.7 | 2.5 | 2.5 |

**Average Age of Owned Railway Equipment**

| | 2008 | 2007 | 2006 | 2005 | 2004 |
|---|---|---|---|---|---|
| | | | *(years)* | | |
| Freight cars | 29.9 | 30.1 | 30.0 | 29.4 | 28.6 |
| Locomotives | 18.9 | 18.1 | 17.7 | 17.4 | 16.9 |
| Retired locomotives | 34.4 | 30.0 | 35.0 | 27.4 | 22.9 |

For 2009, NS has budgeted $1.41 billion for capital expenditures. The anticipated spending includes $698 million for roadway projects, including the normalized replacement of rail, ties and ballast and the improvement or replacement of bridges. Planned equipment spending of $124 million provides for the acquisition of over 500 super jumbo covered hoppers and continued spending on improvements to the locomotive fleet, including the rebuild and upgrade of existing units. Planned investments in facilities and terminals total $141 million, primarily for intermodal terminals and equipment to add capacity to the intermodal network and bulk transfer facilities to support the ethanol market. Infrastructure investments of $170 million are planned for network improvements to increase mainline capacity as well as various public/private partnership investments such as the Heartland Corridor and the Chicago CREATE project. Norfolk Southern also expects to spend $67 million related to computers, systems and information technology. All capital expenditures are expected to be made with internally generated funds.

The Heartland Corridor is a package of proposed clearance improvements and other facilities that will create a seamless high-capacity intermodal route across Virginia and West Virginia to Midwest markets. During 2006, NS and the states of Ohio, West Virginia and Virginia each entered into a Memorandum of Agreement with the Federal Highway Administration with respect to the tunnel clearance component of the Heartland Corridor that governs the release of up to $95 million in authorized federal funding. In 2006, NS also entered into agreements with two states governing the use of up to $11 million in state funding for the Heartland Corridor rail double-stack clearance project. NS began work on the Heartland Corridor tunnel clearances in October 2007 and the entire project is expected to be completed in 2010. NS expects to spend about $100 million over 2009 and 2010 in connection with this project.

The Chicago Region Environmental and Transportation Efficiency (CREATE) project is a public-private partnership to reduce rail and highway congestion and add freight and passenger capacity in the metropolitan Chicago area. NS and other railroads have agreed to participate in CREATE. A portion of the public funding has been approved and the parties have developed a list of projects to be included in Phase I of the project. A total of $100 million in public funding has been secured for Phase I and the railroads have contributed an additional $100 million. The railroads expect to complete Phase I by the end of 2010. As currently planned, the total project is estimated to cost $1.5 billion with city, state and federal support. If additional public funding is secured, the railroads are expected to contribute a total of $232 million towards the entire project. NS expects to spend approximately $15 million in 2009 related to CREATE projects.

The Meridian Speedway is a 320 mile rail line between Meridian, Mississippi and Shreveport, Louisiana. On May 1, 2006, NS and Kansas City Southern (KCS) formed a joint venture, Meridian Speedway LLC (MSLLC),

pursuant to which NS would contribute $300 million in cash, substantially all of which will be used for capital improvements over a period of approximately three years, in exchange for a 30% interest in the joint venture. To date, NS has contributed $274 million. At the formation of MSLLC, KCS contributed the Meridian Speedway. NS is recognizing its pro rata share of the joint venture's earnings or loss as required under the equity method of accounting. NS' total investment in MSLLC is supported by the fair value of the rail line as well as intangible assets obtained through the transaction. The joint venture is expected to increase capacity and improve service over the Meridian Speedway into the Southeast.

Pan Am Southern LLC (PAS) will include the PAS Lines, which consist of a 155-mile main line track that runs between Mechanicville, New York and Ayer, Massachusetts, along with 281 miles of secondary and branch lines, including trackage rights in New York, Connecticut, Massachusetts, New Hampshire, and Vermont. PAS, when formed, will be a joint venture between NS and Pan Am Railways, Inc. (Pan Am) pursuant to which Pan Am expects to contribute the PAS Lines and NS expects to contribute cash and other property valued at $140 million, a significant portion of which will be used for capital improvements to the PAS Lines and the related construction of new intermodal and automotive terminals in the Albany, New York area. The joint venture is subject to regulatory approvals and other customary closing conditions.

The Crescent Corridor is a multistate network of infrastructure improvements and other facilities geared toward creating a seamless, high-capacity intermodal route spanning 11 states from New Jersey to Louisiana and offering truck-competitive service along several major interstate highway corridors, including I-81 and I-85, as well as I-20, I-40, I-59, and I-75. Based on the public benefits that stand to be derived in the form of highway congestion relief, NS plans to implement the Crescent Corridor through a series of public-private partnerships. Although there is not yet a single, integrated plan for the Crescent Corridor, preliminary work has begun and is slated to continue in 2009, including continued infrastructure improvements and other design and engineering work along the Virginia portion of the Corridor consistent with our matching obligation with respect to funds provided by the Commonwealth of Virginia. NS expects to spend approximately $30 million related to Crescent Corridor projects in 2009.

The MidAmerica Corridor is a proposed cooperative arrangement between NS and Canadian National Railway (CN) to effectively share track between Chicago, St. Louis, Kentucky, and Mississippi in order to establish more efficient routes for traffic moving between the mid-western and southeastern U.S., including potential coal traffic moving to NS-served southeastern utility plants from CN-served Illinois Basin coal producers. To implement the MidAmerica Corridor, NS, at its option, would expend funds during the next five years to upgrade the rail line operated by West Tennessee Railway between Fulton, Kentucky, and Corinth, Mississippi, a line over which NS would operate pursuant to recently obtained trackage rights. The MidAmerica Corridor arrangement is subject to negotiation of definitive agreements between NS and CN, regulatory approvals, and other customary closing conditions.

**Cash used in financing activities** was $1.1 billion in 2008, compared with $1.6 billion in 2007 and $1.3 billion in 2006. The decrease in 2008 reflected a net increase in debt, compared with a net decline in 2007, which was offset in part by higher dividend payments. The increase in 2007 reflected higher share repurchases as a part of NS' share repurchase program (see Note 13), as well as higher debt repayments and increased dividend payments.

Share repurchases totaled $1.1 billion in 2008, $1.2 billion in 2007, and $964 million in 2006 for the purchase and retirement of 19.4 million, 23.6 million, and 21.7 million shares, respectively, of common stock as part of NS' share repurchase program. In March 2007, NS' Board of Directors amended NS' share repurchase program by increasing the authorized amount of share repurchases from 50 million to 75 million shares and shortening the authorized period from 2015 to 2010. To date, almost all of the purchases under the program have been made with internally generated cash. However, future funding sources could include proceeds from the issuance of debt, including the use of the receivable securitization program (see Note 7). The timing and volume of purchases is guided by management's assessment of market conditions and other pertinent facts. Due to economic and market conditions,

NS reduced its share repurchases during the fourth quarter of 2008, and the amount of future purchases is uncertain due to the economic climate.

Through a private offering, NS issued and sold $600 million of unsecured notes in April 2008 (see Note 7), and subsequently exchanged substantially all of these unregistered securities with essentially identical securities registered under the Securities Act of 1933. In January 2009, through another private offering, NS issued $500 million of unsecured notes at 5.75% due 2016 (see Note 7). The net proceeds from the offering were $494 million after deducting the purchase discount and expenses. NS has agreed to exchange the unregistered securities with essentially identical securities registered under the Securities Act of 1933.

Subsequent to the January 2009 offering, NS has remaining authority from its board of directors to issue and sell up to $500 million of additional debt or equity securities through public or private sale. The Form S-3 shelf registration statements previously filed with the Securities and Exchange Commission (SEC) are no longer effective under SEC's Rule 415(a)(5), which provides for a three-year term. NS expects to file a new Form S-3 registration statement during the first quarter of 2009.

NS has in place and available a $1 billion, five-year credit agreement expiring in 2012, which provides for borrowings at prevailing rates and includes covenants. NS had no amounts outstanding under this facility at December 31, 2008, and NS is in compliance with all of the covenants. NS also has an accounts receivable securitization program which was renewed with a new 364-day term ending in October 2009. In addition, NS has the ability to directly access the debt markets.

Looking forward, NS' annual debt maturities are relatively modest and stable from year to year (see Note 7). NS expects to refinance maturing debt over the next several years and modestly increase current debt levels. Overall, NS' goal is to maintain a capital structure with appropriate leverage to support NS' business strategy and provide flexibility through business cycles.

## APPLICATION OF CRITICAL ACCOUNTING ESTIMATES

The preparation of financial statements in accordance with U.S. generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenues and expenses during the reporting period. These estimates and assumptions may require significant judgment about matters that are inherently uncertain, and future events are likely to occur that may require management to make changes to these estimates and assumptions. Accordingly, management regularly reviews these estimates and assumptions based on historical experience, changes in the business environment, and other factors that management believes to be reasonable under the circumstances. Management regularly discusses the development, selection, and disclosures concerning critical accounting estimates with the Audit Committee of its Board of Directors.

### Pensions and Other Postretirement Benefits

Accounting for pensions and other postretirement benefit plans requires management to make several estimates and assumptions (see Note 10). These include the expected rate of return from investment of the plans' assets, projected increases in medical costs, and the expected retirement age of employees as well as their projected earnings and mortality. In addition, the amounts recorded are affected by changes in the interest rate environment because the associated liabilities are discounted to their present value. Management makes these estimates based on the company's historical experience and other information that it deems pertinent under the circumstances (for example, expectations of future stock market performance). Management utilizes an independent consulting actuarial firm's studies to assist it in selecting appropriate assumptions and valuing its related liabilities.

NS' net pension benefit, which is included in "Compensation and benefits" on its Consolidated Statements of Income, was $39 million for the year ended December 31, 2008. In recording this amount, NS assumed a long-term investment rate of return of 9%, which was supported by the long-term total rate of return on plan assets since inception. Given the uncertain economic outlook and the recent volatility in corporate bond indices, management reduced its long-term investment rate of return to 8.75% for 2009. A one percentage point change to this rate of return assumption would result in an $18 million change to the pension credit and, as a result, an equal change in "Compensation and benefits" expense. Changes that are reasonably likely to occur in assumptions concerning retirement age, projected earnings, and mortality would not be expected to have a material effect on NS' net pension benefit or net pension liability in the future. The net pension liability is recorded at its net present value using a discount rate that is based on the current interest rate environment in light of the timing of expected benefit payments. In 2008 and 2007, NS utilized an analysis in which the projected annual cash flows from the pension and postretirement benefit plans were matched with a yield curve based on an appropriate universe of high-quality corporate bonds. NS used the results of the yield curve to select the discount rate that matches the payment stream of the benefits in these plans. In 2006, NS referred to Moody's seasoned Aa corporate bond yields and the changes in such yields in establishing the discount rate.

NS' net cost for other postretirement benefits, which is also included in "Compensation and benefits," was $69 million for the year ended December 31, 2008. In recording this expense and valuing the net liability for other postretirement benefits, which is included in "Other postretirement benefits," management estimated future increases in health-care costs. These assumptions, along with the effect of a one percentage point change in them, are described in Note 10.

**Properties and Depreciation**

Most of NS' total assets are long-lived railway properties (see Note 5). As disclosed in Note 1, NS' properties are depreciated using group depreciation. Rail is depreciated primarily on the basis of use measured by gross-ton miles. Other properties are depreciated generally using the straight-line method over the lesser of estimated service or lease lives. NS reviews the carrying amount of properties whenever events or changes in circumstances indicate that such carrying amount may not be recoverable based on future undiscounted cash flows. Assets that are deemed impaired as a result of such review are recorded at the lesser of carrying amount or fair value.

NS' depreciation expense is based on management's assumptions concerning service lives of its properties as well as the expected net salvage that will be received upon their retirement. In developing these assumptions, NS' management utilizes periodic depreciation studies that are performed by an outside firm of consulting engineers. These studies analyze NS' historical patterns of asset use and retirement and take into account any expected change in operation or maintenance practices. NS' recent experience with these studies has been that while they do result in changes in the rates used to depreciate its properties, these changes have not caused a significant effect to its annual depreciation expense. The studies may also indicate that the recorded amount of accumulated depreciation is deficient (or in excess) of the amount indicated by the study. Any such deficiency (or excess) is amortized as a component of depreciation expense over the remaining service lives of the affected class of property. NS' depreciation expense for the year ended December 31, 2008, amounted to $804 million. NS' weighted-average depreciation rates for 2008 are disclosed in Note 5; a one-tenth percentage point increase (or decrease) in these rates would have resulted in a $28 million increase (or decrease) to depreciation expense.

**Personal Injury, Environmental, and Legal Liabilities**

NS' expense for casualties and other claims, included in "Materials and other," amounted to $180 million for the year ended December 31, 2008. Most of this expense was NS' accrual related to personal injury liabilities. Job-related personal injury and occupational claims are subject to FELA, which is applicable only to railroads. FELA's fault-based tort system produces results that are unpredictable and inconsistent as compared with a no-

fault worker's compensation system. The variability inherent in this system could result in actual costs being very different from the liability recorded. In all cases, NS records a liability when the expected loss for the claim is both probable and estimable.

To aid in valuing its personal injury liability and determining the amount to accrue during the year, NS' management utilizes studies prepared by an independent consulting actuarial firm. For employee personal injury cases, the actuarial firm studies NS' historical patterns of reserving for claims and subsequent settlements, taking into account relevant outside influences. An estimate of the ultimate amount of the liability, which includes amounts for incurred but unasserted claims, is based on the results of this analysis. For occupational injury claims, the actuarial firm studies NS' history of claim filings, severity, payments and other relevant facts. Additionally, the estimate of the ultimate loss for occupational injuries includes a provision for those claims that have been incurred but not reported by projecting NS' experience into the future as far as can be reasonably determined. NS has recorded this actuarially determined liability. The liability is dependent upon many individual judgments made as to the specific case reserves as well as the judgments of the consulting actuary and management in the periodic studies. Accordingly, there could be significant changes in the liability, which NS would recognize when such a change became known. The most recent actuarial study, completed in the fourth quarter of 2008, resulted in a decrease to NS' personal injury liability during the fourth quarter. While the liability recorded is supported by the most recent study, it is reasonably possible that the ultimate liability could be higher or lower.

NS is subject to various jurisdictions' environmental laws and regulations. It is NS' policy to record a liability where such liability or loss is probable and its amount can be estimated reasonably (see Note 17). Claims, if any, against third parties for recovery of cleanup costs incurred by NS, are reflected as receivables (when collection is probable) in the Consolidated Balance Sheets and are not netted against the associated NS liability. Environmental engineers regularly participate in ongoing evaluations of all known sites and in determining any necessary adjustments to liability estimates. NS also has established an Environmental Policy Council, composed of senior managers, to oversee and interpret its environmental policy.

Operating expenses for environmental matters totaled approximately $18 million in 2008, $16 million in 2007 and $19 million in 2006, and capital expenditures for environmental matters totaled approximately $7 million in both 2008 and 2007, and $6 million in 2006. Capital expenditures for environmental matters in 2009 are expected to be about $9 million.

NS' Consolidated Balance Sheets included liabilities for environmental exposures in the amount of $42 million at December 31, 2008, and $46 million at December 31, 2007 (of which $12 million is classified as a current liability at the end of each period). At December 31, 2008, the liability represented NS' estimate of the probable cleanup and remediation costs based on available information at 148 known locations. As of that date, 13 sites accounted for $22 million of the liability, and no individual site was considered to be material. NS anticipates that much of this liability will be paid out over five years; however, some costs will be paid out over a longer period.

At 30 locations, one or more NS subsidiaries, usually in conjunction with a number of other parties, have been identified as potentially responsible parties by the Environmental Protection Agency (EPA) or similar state authorities under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, or comparable state statutes, which often impose joint and several liability for cleanup costs.

With respect to known environmental sites (whether identified by NS or by the EPA or comparable state authorities), estimates of NS' ultimate potential financial exposure for a given site or in the aggregate for all such sites are necessarily imprecise because of the widely varying costs of currently available cleanup techniques, the likely development of new cleanup technologies, the difficulty of determining in advance the nature and full extent of contamination and each potential participant's share of any estimated loss (and that participant's ability to bear it), and evolving statutory and regulatory standards governing liability. NS

estimates its environmental remediation liability on a site-by-site basis, using assumptions and judgments that management deems appropriate for each site. As a result, it is not practical to quantitatively describe the effects of changes in these many assumptions and judgments. NS has consistently applied its methodology of estimating its environmental liabilities.

On April 24, 2008, the United States Department of Justice (DOJ) brought an action against NS for alleged violations of federal environmental laws resulting from the discharge of chlorine and oil that occurred as a result of the January 6, 2005, derailment in Graniteville, SC, including claims for civil penalties as well as injunctive relief. On June 24, 2008, NS filed a motion to dismiss DOJ's claims, contending that insufficient facts have been alleged to support such claims. NS does not believe that the outcome of these proceedings will have a material effect on its financial position, results of operations, or liquidity.

Based on an assessment of known facts and circumstances, management believes that it is unlikely that any such known facts and circumstances, either individually or in the aggregate, will have a material adverse effect on NS' financial position, results of operations, or liquidity.

Norfolk Southern and certain subsidiaries are defendants in numerous lawsuits and other claims relating principally to railroad operations. When management concludes that it is probable that a liability has been incurred and the amount of the liability can be reasonably estimated, it is accrued through a charge to expenses. While the ultimate amount of liability incurred in any of these lawsuits and claims is dependent on future developments, in management's opinion the recorded liability, if any, is adequate to cover the future payment of such liability and claims. However, the final outcome of any of these lawsuits and claims cannot be predicted with certainty, and unfavorable or unexpected outcomes could result in additional accruals that could be significant to results of operations in a particular year or quarter. Any adjustments to recorded liabilities will be reflected in expenses in the periods in which such adjustments are known.

**Income Taxes**

NS' net long-term deferred tax liability totaled $6.4 billion at December 31, 2008 (see Note 3). This liability is estimated based on the expected future tax consequences of items recognized in the financial statements. After application of the federal statutory tax rate to book income, judgment is required with respect to the timing and deductibility of expenses in the corporate income tax returns. For state income and other taxes, judgment is also required with respect to the apportionment among the various jurisdictions. A valuation allowance is recorded if management expects that it is more likely than not that its deferred tax assets will not be realized. NS had an $11 million valuation allowance on $991 million of deferred tax assets as of December 31, 2008, reflecting the expectation that most of these assets will be realized.

In addition, NS has a recorded liability for its estimate of uncertain tax positions taken or expected to be taken in a tax return. Judgment is required in evaluating the application of federal and state tax laws and assessing whether it is more likely than not that a tax position will be sustained on examination and, if so, judgment is also required as to the measurement of the amount of tax benefit that will be realized upon settlement with the taxing authority. Management believes this liability for uncertain tax positions to be adequate. Income tax expense is adjusted in the period in which new information about a tax position becomes available or the final outcome differs from the amounts recorded. For every one half percent change in the 2008 effective tax rate net income would have changed by $14 million.

## OTHER MATTERS

### Labor Agreements

Approximately 26,000, or about 85%, of NS' railroad employees are covered by collective bargaining agreements with various labor unions. These agreements remain in effect until changed pursuant to the Railway Labor Act (RLA). NS largely bargains nationally, in concert with other major railroads. Moratorium provisions in the labor agreements govern when the railroads and the unions may propose changes.

The most recent national bargaining round began in late 2004. Since that time, the railroads have reached national agreements that extend through 2009 with all of the rail unions. Additionally, the current agreement with BLET extends through 2014. Because NS has reached separate agreements with the BLET and the American Train Dispatchers Association (ATDA), only the health and welfare provisions from the national agreements apply to NS' locomotive engineers and ATDA-represented dispatchers. A small number of longshoremen at Ashtabula (Ohio) Docks are represented by the International Longshoremen's Association (ILA) and do not participate in national bargaining. Negotiations are continuing with that organization.

### Market Risks and Hedging Activities

NS has used derivative financial instruments to reduce the risk of volatility in its diesel fuel costs and to manage its overall exposure to fluctuations in interest rates.

In 2001, NS began a program to hedge a portion of its diesel fuel consumption. The intent of the program was to assist in the management of NS' aggregate risk exposure to fuel price fluctuations, which can significantly affect NS' operating margins and profitability, through the use of one or more types of derivative instruments. No new hedges have been entered into since May 2004, and the last remaining contracts were settled in the second quarter of 2006, bringing an end to the benefits from the program. Locomotive diesel fuel costs represented 14% of NS' operating expenses for 2006.

NS manages its overall exposure to fluctuations in interest rates by issuing both fixed- and floating-rate debt instruments and by entering into interest-rate hedging transactions to achieve an appropriate mix within its debt portfolio.

At December 31, 2008, NS' debt subject to interest rate fluctuations totaled $317 million. A 1% point increase in interest rates would increase NS' total annual interest expense related to all its variable debt by approximately $3 million. Management considers it unlikely that interest rate fluctuations applicable to these instruments will result in a material adverse effect on NS' financial position, results of operations, or liquidity.

Some of NS' capital leases, which carry an average fixed rate of 7%, were effectively converted to variable rate obligations using interest rate swap agreements. On December 31, 2008, the average pay rate under these agreements was 3%, and the average receive rate was 7%. During 2008 and 2007, the effect of the swaps was to reduce interest expense by approximately $1 million in both periods. A portion of the lease obligations is payable in Japanese yen. NS eliminated the associated exchange rate risk at the inception of each lease with a yen deposit sufficient to fund the yen-denominated obligation. Most of these deposits are held by foreign banks, primarily Japanese. As a result, NS is exposed to financial market risk relative to Japan. Counterparties to the interest rate swaps and Japanese banks holding yen deposits are major financial institutions believed by management to be creditworthy.

**New Accounting Pronouncements**

In September 2006, the Financial Accounting Standards Board issued Statement of Financial Accounting Standards (SFAS) No. 157, "Fair Value Measurements." This statement, effective for interim or annual reporting periods beginning after November 15, 2007, establishes a framework for measuring fair value in U.S. generally accepted accounting principles and expands disclosures about fair value measurements. Effective January 1, 2008, NS adopted this standard related to financial instrument assets and liabilities with no effect on NS' consolidated financial statements. NS will adopt the provisions of this standard relative to nonfinancial assets and nonfinancial liabilities that are not remeasured at fair value on a recurring basis in the first quarter of 2009. NS does not expect that it will have an effect on NS' consolidated financial statements.

In June 2008, the FASB issued FASB Staff Position (FSP) Emerging Issues Task Force (EITF) 03-6-1, "Determining Whether Instruments Granted in Share-Based Payment Transactions are Participating Securities." This FSP addresses whether instruments granted in share-based payment transactions are participating securities prior to vesting and, therefore, need to be included in the earnings allocation in computing earnings per share under the two-class method as described in SFAS No. 128, "Earnings per Share." NS will adopt the FSP, which affects the calculation of earnings per share, in the first quarter of 2009. The provisions of the FSP are to be applied retrospectively. NS expects that it will not have a material effect on NS' consolidated financial statements.

FSP No. 132(R)-1, "Employers' Disclosures about Postretirement Benefit Plan Assets," was issued on December 30, 2008. This statement, effective for fiscal years ending after December 15, 2009, clarifies an employer's disclosures about plan assets of a defined benefit pension or other postretirement plan. This statement prescribes expanded disclosures regarding investment allocation decisions, categories of plan assets, inputs, and valuation techniques used to measure fair value, the effect of Level 3 inputs on changes in plan assets and significant concentrations of risk. NS will adopt the FSP at the end of 2009 and expects it will not have a material effect on NS' consolidated financial statements.

In December 2007, the FASB issued SFAS No. 160 (SFAS 160), "Noncontrolling Interests in Consolidated Financial Statements," which requires that noncontrolling (minority) interests be reported as a component of equity. NS will adopt the statement in the first quarter of 2009 and expects it will not have a material effect on NS' consolidated financial statements.

**Inflation**

In preparing financial statements, U.S. generally accepted accounting principles require the use of historical cost that disregards the effects of inflation on the replacement cost of property. NS, a capital-intensive company, has most of its capital invested in such property. The replacement cost of these assets, as well as the related depreciation expense, would be substantially greater than the amounts reported on the basis of historical cost.

**Proposed Legislation and Regulations on Safety and Transportation of Hazardous Materials**

Federal regulations were adopted in late 2008 on safety and transportation of hazardous materials. NS is in compliance with those regulations currently effective and expects to be in compliance with those regulations to become effective at a later date.

**FORWARD-LOOKING STATEMENTS**

This Management's Discussion and Analysis of Financial Condition and Results of Operations contains forward-looking statements that may be identified by the use of words like "believe," "expect," "anticipate" and "project." Forward-looking statements reflect management's good-faith evaluation of information currently available.

However, such statements are dependent on and, therefore, can be influenced by, a number of external variables over which management has little or no control, including: domestic and international economic conditions; interest rates; the business environment in industries that produce and consume rail freight; competition and consolidation within the transportation industry; the operations of carriers with which NS interchanges; acts of terrorism or war; fluctuation in prices of key materials, in particular diesel fuel; labor difficulties, including strikes and work stoppages; legislative and regulatory developments; results of litigation; changes in securities and capital markets; disruptions to NS' technology infrastructure, including computer systems; and natural events such as severe weather, hurricanes, and floods. For a discussion of significant risk factors applicable to NS, see Part I, Item 1A "Risk Factors." Forward-looking statements are not, and should not be relied upon as, a guarantee of future performance or results, nor will they necessarily prove to be accurate indications of the times at or by which any such performance or results will be achieved. As a result, actual outcomes and results may differ materially from those expressed in forward-looking statements. NS undertakes no obligation to update or revise forward-looking statements.

## Item 7A. Quantitative and Qualitative Disclosures about Market Risk

The information required by this item is included in Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations" under the heading "Market Risks and Hedging Activities."

**Item 8. Financial Statements and Supplementary Data**

## INDEX TO FINANCIAL STATEMENTS


| | Page |
|---|---|
| Report of Management | K42 |
| Reports of Independent Registered Public Accounting Firm | K43 |
| Consolidated Statements of Income<br>Years ended December 31, 2008, 2007 and 2006 | K45 |
| Consolidated Balance Sheets<br>As of December 31, 2008 and 2007 | K46 |
| Consolidated Statements of Cash Flows<br>Years ended December 31, 2008, 2007 and 2006 | K47 |
| Consolidated Statements of Changes in Stockholders' Equity<br>Years ended December 31, 2008, 2007 and 2006 | K48 |
| Notes to Consolidated Financial Statements | K49 |
| The Index to Consolidated Financial Statement Schedule in Item 15 | K82 |

**Report of Management**

February 18, 2009

To the Stockholders
Norfolk Southern Corporation

Management is responsible for establishing and maintaining adequate internal control over financial reporting. In order to ensure that the Corporation's internal control over financial reporting is effective, management regularly assesses such controls and did so most recently for its financial reporting as of December 31, 2008. This assessment was based on criteria for effective internal control over financial reporting described in *Internal Control-Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this assessment, management has concluded that the Corporation maintained effective internal control over financial reporting as of December 31, 2008.

KPMG LLP, independent registered public accounting firm, has audited the Corporation's financial statements and issued an attestation report on the Corporation's internal control over financial reporting as of December 31, 2008.

/s/ Charles W. Moorman
Charles W. Moorman
Chairman, President and
Chief Executive Officer

/s/ James A. Squires
James A. Squires
Executive Vice President Finance and
Chief Financial Officer

/s/ Marta R. Stewart
Marta R. Stewart
Vice President and
Controller

**Report of Independent Registered Public Accounting Firm**

The Board of Directors and Stockholders
Norfolk Southern Corporation:

We have audited Norfolk Southern Corporation's internal control over financial reporting as of December 31, 2008, based on criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Norfolk Southern Corporation's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Report of Management. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, Norfolk Southern Corporation maintained, in all material respects, effective internal control over financial reporting as of December 31, 2008, based on criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Norfolk Southern Corporation and subsidiaries as of December 31, 2008 and 2007, and the related consolidated statements of income, changes in stockholders' equity, and cash flows for each of the years in the three-year period ended December 31, 2008, and our report dated February 18, 2009 expressed an unqualified opinion on those consolidated financial statements.

/s/ KPMG LLP
Norfolk, Virginia
February 18, 2009

**Report of Independent Registered Public Accounting Firm**

The Board of Directors and Stockholders
Norfolk Southern Corporation:

We have audited the accompanying consolidated balance sheets of Norfolk Southern Corporation and subsidiaries as of December 31, 2008 and 2007, and the related consolidated statements of income, changes in stockholders' equity, and cash flows for each of the years in the three-year period ended December 31, 2008. In connection with our audits of the consolidated financial statements, we also have audited financial statement schedule as listed in Item 15(A)2. These consolidated financial statements and financial statement schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements and financial statement schedule based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Norfolk Southern Corporation and subsidiaries as of December 31, 2008 and 2007, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 2008, in conformity with U.S. generally accepted accounting principles. Also in our opinion, the related financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

As discussed in note 1 to the consolidated financial statements, Norfolk Southern Corporation adopted Financial Accounting Standards Board Interpretation No. 48, *Accounting for Uncertainty in Income Taxes*, effective January 1, 2007 and Statement of Financial Accounting Standards No. 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans,* effective December 31, 2006.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), Norfolk Southern Corporation's internal control over financial reporting as of December 31, 2008, based on criteria established in *Internal Control – Integrated Framework,* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated February 18, 2009 expressed an unqualified opinion on the effectiveness of the Company's internal control over financial reporting.

/s/ KPMG LLP
Norfolk, Virginia
February 18, 2009

**Norfolk Southern Corporation and Subsidiaries**
**Consolidated Statements of Income**

| | Years ended December 31, 2008 | 2007 | 2006 |
|---|---|---|---|
| | *($ in millions, except earnings per share)* | | |
| **Railway operating revenues** | $ 10,661 | $ 9,432 | $ 9,407 |
| **Railway operating expenses:** | | | |
| Compensation and benefits | 2,684 | 2,552 | 2,637 |
| Purchased services and rents | 1,599 | 1,551 | 1,578 |
| Fuel | 1,638 | 1,169 | 1,095 |
| Depreciation | 804 | 775 | 738 |
| Materials and other | 852 | 800 | 802 |
| Total railway operating expenses | 7,577 | 6,847 | 6,850 |
| **Income from railway operations** | 3,084 | 2,585 | 2,557 |
| Other income – net | 110 | 93 | 149 |
| Interest expense on debt | 444 | 441 | 476 |
| Income before income taxes | 2,750 | 2,237 | 2,230 |
| Provision for income taxes | 1,034 | 773 | 749 |
| **Net income** | $ 1,716 | $ 1,464 | $ 1,481 |
| **Per share amounts:** | | | |
| Net income | | | |
| Basic | $ 4.60 | $ 3.74 | $ 3.63 |
| Diluted | $ 4.52 | $ 3.68 | $ 3.57 |

*See accompanying notes to consolidated financial statements.*

**Norfolk Southern Corporation and Subsidiaries**
**Consolidated Balance Sheets**

| | As of December 31, | |
|---|---|---|
| | **2008** | **2007** |
| | *($ in millions)* | |
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 618 | $ 206 |
| Accounts receivable – net | 870 | 942 |
| Materials and supplies | 194 | 176 |
| Deferred income taxes | 149 | 190 |
| Other current assets | 168 | 161 |
| Total current assets | 1,999 | 1,675 |
| Investments | 1,779 | 1,974 |
| Properties less accumulated depreciation | 22,247 | 21,583 |
| Other assets | 272 | 912 |
| **Total assets** | $ 26,297 | $ 26,144 |
| **Liabilities and stockholders' equity** | | |
| Current liabilities: | | |
| Accounts payable | $ 1,140 | $ 1,139 |
| Income and other taxes | 261 | 203 |
| Other current liabilities | 220 | 237 |
| Current maturities of long-term debt | 484 | 369 |
| Total current liabilities | 2,105 | 1,948 |
| Long-term debt | 6,183 | 5,999 |
| Other liabilities | 2,030 | 2,039 |
| Deferred income taxes | 6,372 | 6,431 |
| **Total liabilities** | 16,690 | 16,417 |
| Stockholders' equity: | | |
| Common stock $1.00 per share par value, 1,350,000,000 shares authorized; outstanding 366,233,106 and 379,297,891 shares, respectively, net of treasury shares | 368 | 380 |
| Additional paid-in capital | 1,680 | 1,466 |
| Accumulated other comprehensive loss | (942) | (399) |
| Retained income | 8,501 | 8,280 |
| **Total stockholders' equity** | 9,607 | 9,727 |
| **Total liabilities and stockholders' equity** | $ 26,297 | $ 26,144 |

*See accompanying notes to consolidated financial statements.*

**Norfolk Southern Corporation and Subsidiaries**
**Consolidated Statements of Cash Flows**

| | Years Ended December 31, 2008 | 2007 | 2006 |
|---|---|---|---|
| | | ($ in millions) | |
| **Cash flows from operating activities** | | | |
| Net income | $ 1,716 | $ 1,464 | $ 1,481 |
| Reconciliation of net income to net cash provided by operating activities: | | | |
| Depreciation | 815 | 786 | 750 |
| Deferred income taxes | 290 | 125 | (8) |
| Gains and losses on properties and investments | (29) | (51) | (54) |
| Changes in assets and liabilities affecting operations: | | | |
| Accounts receivable | 269 | 30 | (60) |
| Materials and supplies | (18) | (25) | (19) |
| Other current assets | (8) | (17) | (11) |
| Current liabilities other than debt | (262) | 38 | 38 |
| Other – net | (58) | (17) | 89 |
| Net cash provided by operating activities | 2,715 | 2,333 | 2,206 |
| **Cash flows from investing activities** | | | |
| Property additions | (1,558) | (1,341) | (1,178) |
| Property sales and other transactions | 109 | 124 | 119 |
| Investments, including short-term | (86) | (635) | (1,804) |
| Investment sales and other transactions | 307 | 827 | 2,179 |
| Net cash used in investing activities | (1,228) | (1,025) | (684) |
| **Cash flows from financing activities** | | | |
| Dividends | (456) | (377) | (278) |
| Common stock issued – net | 229 | 183 | 297 |
| Purchase and retirement of common stock | (1,128) | (1,196) | (964) |
| Proceeds from borrowings | 1,425 | 250 | -- |
| Debt repayments | (1,145) | (489) | (339) |
| Net cash used in financing activities | (1,075) | (1,629) | (1,284) |
| Net increase (decrease) in cash and cash equivalents | 412 | (321) | 238 |
| **Cash and cash equivalents** | | | |
| At beginning of year | 206 | 527 | 289 |
| At end of year | $ 618 | $ 206 | $ 527 |
| **Supplemental disclosure of cash flow information** | | | |
| Cash paid during the year for: | | | |
| Interest (net of amounts capitalized) | $ 421 | $ 441 | $ 473 |
| Income taxes (net of refunds) | $ 615 | $ 603 | $ 692 |

*See accompanying notes to consolidated financial statements.*

## Norfolk Southern Corporation and Subsidiaries
## Consolidated Statements of Changes in Stockholders' Equity

| | Common Stock | Additional Paid-in Capital | Unearned Restricted Stock | Accum. Other Compre-hensive Loss | Retained Income | Total |
|---|---|---|---|---|---|---|
| | *($ in millions, except per share amounts)* | | | | | |
| **Balance December 31, 2005** | $ 411 | $ 992 | $ (17) | $ (77) | $ 7,967 | $ 9,276 |
| Comprehensive income | | | | | | |
| Net income | | | | | 1,481 | 1,481 |
| Other comprehensive income | | | | 2 | | 2 |
| Total comprehensive income | | | | | | 1,483 |
| Adoption of SFAS 158, net of tax | | | | (294) | | (294) |
| Dividends on Common Stock, $0.68 per share | | | | | (278) | (278) |
| Share repurchases | (22) | (63) | | | (879) | (964) |
| Stock-based compensation, including tax benefit of $85 | 9 | 372 | 17 | | (8) | 390 |
| Other | | 2 | | | | 2 |
| **Balance December 31, 2006** | $ 398 | $ 1,303 | $ -- | $ (369) | $ 8,283 | $ 9,615 |
| Comprehensive income | | | | | | |
| Net income | | | | | 1,464 | 1,464 |
| Other comprehensive loss | | | | (30) | | (30) |
| Total comprehensive income | | | | | | 1,434 |
| Adoption of FIN 48, net of tax | | | | | 10 | 10 |
| Dividends on Common Stock, $0.96 per share | | | | | (377) | (377) |
| Share repurchases | (24) | (81) | | | (1,091) | (1,196) |
| Stock-based compensation, including tax benefit of $57 | 6 | 238 | | | (9) | 235 |
| Other | | 6 | | | | 6 |
| **Balance December 31, 2007** | $ 380 | $ 1,466 | $ -- | $ (399) | $ 8,280 | $ 9,727 |
| Net income | | | | | 1,716 | 1,716 |
| Other comprehensive loss | | | | (543) | | (543) |
| Total comprehensive income | | | | | | 1,173 |
| Dividends on Common Stock, $1.22 per share | | | | | (456) | (456) |
| Share repurchases | (19) | (79) | | | (1,030) | (1,128) |
| Stock-based compensation, including tax benefit of $76 | 6 | 287 | | | (9) | 284 |
| Other | 1 | 6 | | | | 7 |
| **Balance December 31, 2008** | $ 368 | $ 1,680 | $ -- | $ (942) | $ 8,501 | $ 9,607 |

*See accompanying notes to consolidated financial statements.*

**Norfolk Southern Corporation and Subsidiaries**
**Notes to Consolidated Financial Statements**

The following Notes are an integral part of the Consolidated Financial Statements.

## 1. Summary of Significant Accounting Policies

### Description of Business

Norfolk Southern Corporation is a Virginia-based holding company engaged principally in the rail transportation business, operating approximately 21,000 route miles primarily in the East and Midwest. These consolidated financial statements include Norfolk Southern Corporation (Norfolk Southern) and its majority-owned and controlled subsidiaries (collectively, NS). Norfolk Southern's major subsidiary is Norfolk Southern Railway Company (NSR). All significant intercompany balances and transactions have been eliminated in consolidation.

NSR and its railroad subsidiaries transport raw materials, intermediate products and finished goods classified in the following market groups (percent of total railway operating revenues in 2008): coal (29%); intermodal (19%); agriculture/consumer products/government (12%); metals/construction (12%); chemicals (12%); paper/clay/forest products (8%); and automotive (8%). Although most of NS' customers are domestic, ultimate points of origination or destination for some of the products transported (particularly coal bound for export and some intermodal containers) may be outside the United States. Approximately 85% of NS' railroad employees are covered by collective bargaining agreements with various labor unions.

### Use of Estimates

The preparation of financial statements in accordance with U.S. generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Management periodically reviews its estimates, including those related to the recoverability and useful lives of assets, as well as liabilities for litigation, environmental remediation, casualty claims, income taxes, and pension and other postretirement benefits. Changes in facts and circumstances may result in revised estimates.

### Revenue Recognition

Transportation revenue is recognized proportionally as a shipment moves from origin to destination and related expenses are recognized as incurred. Refunds (which are primarily volume-based incentives) are recorded as a reduction to revenues on the basis of management's best estimate of projected liability, which is based on historical activity, current traffic counts and the expectation of future activity. NS regularly monitors its contract refund liability, and historically, the estimates have not differed significantly from the amounts ultimately refunded. Switching, demurrage and other incidental service revenues are recognized when the services are performed.

### Derivatives

NS does not engage in the trading of derivatives. NS has used derivative financial instruments to reduce the risk of volatility in its diesel fuel costs and in the management of its mix of fixed and floating-rate debt. Management has determined that these derivative instruments qualify as either fair-value or cash-flow hedges, having values that highly correlate with the underlying hedged exposures, and has designated such instruments as hedging

transactions. Income and expense related to the derivative financial instruments are recorded in the same category as generated by the underlying asset or liability. Credit risk related to the derivative financial instruments is considered to be minimal and is managed by requiring high credit standards for counterparties and periodic settlements (see Note 16).

**Cash Equivalents**

"Cash equivalents" are highly liquid investments purchased three months or less from maturity.

**Allowance for Doubtful Accounts**

NS' allowance for doubtful accounts was $5 million at December 31, 2008, and December 31, 2007. To determine its allowance for doubtful accounts, NS evaluates historical loss experience (which has not been significant), the characteristics of current accounts, as well as general economic conditions and trends.

**Materials and Supplies**

"Materials and supplies," consisting mainly of fuel oil and items for maintenance of property and equipment, are stated at the lower of average cost or market. The cost of materials and supplies expected to be used in capital additions or improvements is included in "Properties."

**Investments**

Debt securities classified as "held-to-maturity" are reported at amortized cost and marketable equity and debt securities classified as "trading" or "available-for-sale" are recorded at fair value. Unrealized after-tax gains and losses for investments designated as "available-for-sale," are recognized in "Accumulated other comprehensive loss."

Investments where NS has the ability to exercise significant influence over but does not control the entity are accounted for using the equity method in accordance with APB Opinion No. 18, "The Equity Method of Accounting for Investments in Common Stock."

**Properties**

"Properties" are stated principally at cost and are depreciated using group depreciation. Rail is depreciated primarily on the basis of use measured by gross ton-miles. Other properties are depreciated generally using the straight-line method over the lesser of estimated service or lease lives. Depletion of natural resources (see Note 2) is based on units of production. Depreciation in the Consolidated Statements of Cash Flows includes depreciation and depletion. NS capitalizes interest on major capital projects during the period of their construction. Expenditures, including those on leased assets that extend an asset's useful life or increase its utility, are capitalized. Expenditures capitalized include those that are directly related to a capital project and may include materials, labor, and equipment, in addition to an allocable portion of indirect costs that clearly relate to a particular project. Costs related to repairs and maintenance activities that do not extend an asset's useful life or increase its utility are expensed when such repairs are performed. When properties other than land and nonrail assets are sold or retired in the ordinary course of business, the cost of the assets, net of sale proceeds or salvage, is charged to accumulated depreciation, and no gain or loss is recognized through income. Gains and losses on disposal of land and nonrail assets are included in "Other income - net" (see Note 2) since such income is not a product of NS' railroad operations.

NS reviews the carrying amount of properties whenever events or changes in circumstances indicate that such carrying amount may not be recoverable based on future undiscounted cash flows. Assets that are deemed impaired as a result of such review are recorded at the lower of carrying amount or fair value.

**Required Accounting Changes**

Effective January 1, 2008, NS adopted the Financial Accounting Standards Board issued Statement of Financial Accounting Standards (SFAS) No. 157, "Fair Value Measurements," related to financial instrument assets and liabilities with no effect on NS' consolidated financial statements. This statement, effective for interim or annual reporting periods beginning after November 15, 2007, establishes a framework for measuring fair value in U.S. generally accepted accounting principles and expands disclosures about fair value measurements.

Effective January 1, 2007, NS adopted Financial Accounting Standards Board Interpretation No. 48 (FIN 48), "Accounting for Uncertainty in Income Taxes," which clarifies accounting for uncertainty in income taxes recognized in an enterprise's financial statements in accordance with SFAS No. 109, "Accounting for Income Taxes." FIN 48 prescribes a recognition threshold and measurement attribute for a tax position taken or expected to be taken in a tax return. Under the guidelines of FIN 48, an entity should recognize the financial statement benefit of a tax position if it determines that it is more likely than not that the position will be sustained on examination (see Note 3).

Effective December 31, 2006, NS adopted SFAS No. 158, "Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans" (SFAS 158) (see Note 10).

Effective January 1, 2006, NS adopted SFAS No. 123(R), "Share-Based Payment," [SFAS 123(R)]. This statement applies to awards granted, modified, repurchased or cancelled after the effective date as well as awards that are unvested at the effective date and includes, among other things, the requirement to expense the fair value of stock options. The standard also requires that awards to be settled in cash be measured at fair value at each reporting date until ultimate settlement. NS adopted SFAS 123(R) using the modified prospective method, which requires application of the standard to all awards granted, modified, repurchased or cancelled on or after January 1, 2006, and to all awards for which the requisite service has not been rendered as of such date. In accordance with the modified prospective approach, prior period financial statements have not been restated to reflect the impact of SFAS 123(R). Under SFAS 123(R), all new awards granted to retirement eligible employees must be expensed immediately. Under APB Opinion No. 25 and related interpretations, such awards were amortized over the stated service period.

In June 2008, the FASB issued FASB Staff Position (FSP) Emerging Issues Task Force (EITF) 03-6-1, "Determining Whether Instruments Granted in Share-Based Payment Transactions are Participating Securities." This FSP addresses whether instruments granted in share-based payment transactions are participating securities prior to vesting and, therefore, need to be included in the earnings allocation in computing earnings per share under the two-class method as described in SFAS No. 128, "Earnings per Share." NS will adopt the FSP, which affects the calculation of earnings per share, in the first quarter of 2009. The provisions of the FSP are to be applied retrospectively. NS expects that it will not have a material effect on NS' consolidated financial statements.

## 2. Other Income - Net

| | 2008 | 2007 | 2006 |
|---|---|---|---|
| | | *($ in millions)* | |
| Income from natural resources: | | | |
| Royalties from coal | $ 64 | $ 52 | $ 55 |
| Nonoperating depletion and depreciation | (11) | (11) | (12) |
| Subtotal | 53 | 41 | 43 |
| Rental income | 47 | 46 | 45 |
| Gains and losses from sale of properties and investments | 29 | 51 | 54 |
| Equity in earnings of Conrail (Note 4) | 29 | 45 | 25 |
| Interest income | 20 | 45 | 76 |
| Other interest expense – net | 2 | (25) | (15) |
| Expenses related to synthetic fuel investments | -- | (77) | (62) |
| Corporate-owned life insurance – net | (31) | 7 | 22 |
| Taxes on nonoperating property | (10) | (10) | (9) |
| Other | (29) | (30) | (30) |
| Total | $ 110 | $ 93 | $ 149 |

"Other income – net" includes income and costs not part of rail operations and the income generated by the activities of NS' noncarrier subsidiaries as well as the costs incurred by those subsidiaries in their operations. NS had a 40.5% interest in a limited liability company that owned and operated facilities that produced synthetic fuel from coal. In addition, in 2007 NS purchased two facilities that produced synthetic fuel from coal. The production of synthetic fuel resulted in tax credits as well as expenses related to the investments. The expenses are included in "Expenses related to synthetic fuel investments" above. The tax credits related to the synthetic fuel investments expired at the end of 2007 and are no longer available.

## 3. Income Taxes

### Provision for Income Taxes

| | 2008 | 2007 | 2006 |
|---|---|---|---|
| | | *($ in millions)* | |
| Current: | | | |
| Federal | $ 657 | $ 570 | $ 666 |
| State | 87 | 78 | 91 |
| Total current taxes | 744 | 648 | 757 |
| Deferred: | | | |
| Federal | 257 | 77 | 3 |
| State | 33 | 48 | (11) |
| Total deferred taxes | 290 | 125 | (8) |
| Provision for income taxes | $ 1,034 | $ 773 | $ 749 |

**Reconciliation of Statutory Rate to Effective Rate**

The "Provision for income taxes" in the Consolidated Statements of Income differs from the amounts computed by applying the statutory federal corporate tax rate as follows:

| | 2008 | | 2007 | | 2006 | |
|---|---|---|---|---|---|---|
| | Amount | % | Amount | % | Amount | % |
| | | | *($ in millions)* | | | |
| Federal income tax at statutory rate | $ 963 | 35 | $ 783 | 35 | $ 780 | 35 |
| State income taxes, net of Federal tax effect | 77 | 3 | 63 | 3 | 52 | 2 |
| Illinois tax law change, net of Federal tax effect | 1 | -- | 19 | 1 | -- | -- |
| Tax credits | (2) | -- | (65) | (3) | (62) | (3) |
| Other – net | (5) | -- | (27) | (1) | (21) | -- |
| Provision for income taxes | $ 1,034 | 38 | $ 773 | 35 | $ 749 | 34 |

Illinois enacted tax legislation in August 2007, revised in January 2008, that modified the way transportation companies apportion their taxable income to the state. The change resulted in an increase in NS' deferred income tax liability in the third quarter of 2007, as required by SFAS No. 109, "Accounting for Income Taxes," which increased deferred tax expense by $1 million in 2008 and $19 million in 2007.

**Deferred Tax Assets and Liabilities**

Certain items are reported in different periods for financial reporting and income tax purposes. Deferred tax assets and liabilities are recorded in recognition of these differences. The tax effects of temporary differences that give rise to significant portions of the deferred tax assets and deferred tax liabilities are as follows:

| | December 31, 2008 | December 31, 2007 |
|---|---|---|
| | *($ in millions)* | |
| Deferred tax assets: | | |
| Compensation and benefits, including postretirement | $ 728 | $ 417 |
| Accruals, including casualty and other claims | 218 | 219 |
| Other | 45 | 49 |
| Total gross deferred tax assets | 991 | 685 |
| Less valuation allowance | (11) | (10) |
| Net deferred tax asset | 980 | 675 |
| Deferred tax liabilities: | | |
| Property | (6,957) | (6,683) |
| Other | (246) | (233) |
| Total gross deferred tax liabilities | (7,203) | (6,916) |
| Net deferred tax liability | (6,223) | (6,241) |
| Net current deferred tax asset | 149 | 190 |
| Net long-term deferred tax liability | $ (6,372) | $ (6,431) |

Except for amounts for which a valuation allowance has been provided, management believes that it is more likely than not that the results of future operations will generate sufficient taxable income to realize the deferred

tax assets. The valuation allowance at the end of each year relates to subsidiary state income tax net operating losses that may not be utilized prior to their expiration. The total valuation allowance increased $1 million in 2008 and 2007, and decreased $1 million in 2006.

**Uncertain Tax Positions**

A reconciliation of the beginning and ending amount of unrecognized tax benefits is as follows ($ in millions):

| | December 31, | |
|---|---|---|
| | **2008** | **2007** |
| Balance at beginning of year | $ 167 | $ 179 |
| Additions based on tax positions related to the current year | 73 | 65 |
| Additions for tax positions of prior years | 4 | 9 |
| Reductions for tax positions of prior years | (63) | (84) |
| Settlements with taxing authorities | (9) | -- |
| Lapse of statutes of limitations | (3) | (2) |
| Balance at end of year | $ 169 | $ 167 |

Included in the balance of unrecognized tax benefits at December 31, 2008, are potential benefits of $60 million that would affect the effective tax rate if recognized. As a result of the implementation of FIN 48 on January 1, 2007 (see Note 1), NS recognized a $10 million increase to stockholders equity, $2 million of which related to investments accounted for under the equity method of accounting. Unrecognized tax benefits are adjusted in the period in which new information about a tax position becomes available or the final outcome differs from the amount recorded.

NS expects that the total amount of unrecognized tax benefits at December 31, 2008, will decrease by approximately $55 million in 2009 due to tax positions for which there was an uncertainty about the timing of deductibility in earlier years but deductibility may become certain by the close of 2009. NS' consolidated federal income tax returns for 2006 and 2007 are being audited by the Internal Revenue Service (IRS). NS anticipates that the IRS will complete its examination of the 2006 and 2007 years within the next twelve months. It is reasonably possible that the amount of unrecognized tax benefits will change due to the completion of the IRS examination of the 2006 and 2007 years, but an estimate of the change cannot be made. State income tax returns generally are subject to examination for a period of three to four years after filing of the return. In addition, NS is generally obligated to report changes in taxable income arising from federal income tax examinations to the states within a period of up to two years from the date the federal examination is final. NS has various state income tax returns either under examination, administrative appeals, or litigation. It is reasonably possible that the amount of unrecognized tax benefits will decrease in 2009 as a result of the lapse of state statutes of limitations, but the amount is not expected to be significant. NS does not expect that any of the above potential changes in unrecognized tax benefits will have a material effect on NS' financial position, results of operations, or liquidity.

Interest related to unrecognized tax benefits, which is included in "Other income – net," amounted to $15 million of income in 2008, $12 million of expense in 2007 and $2 million of income in 2006. Penalties related to tax matters are included in "Provision for income taxes" and totaled zero in each of 2008, 2007, and 2006. NS has recorded a liability of $20 million at December 31, 2008, and $28 million at December 31, 2007, for the payment of interest on unrecognized tax benefits. NS has no liability recorded at December 31, 2008, and December 31, 2007, for the payment of penalties on unrecognized tax benefits.

## 4. Investments

| | December 31, 2008 | December 31, 2007 |
|---|---|---|
| | ($ in millions) | |
| Long-term investments: | | |
| Investment in Conrail Inc. | $ 868 | $ 899 |
| Other equity method investments | 650 | 594 |
| Company-owned life insurance at net cash surrender value | 74 | 327 |
| Other investments | 187 | 154 |
| Total long-term investments | $ 1,779 | $ 1,974 |

"Other equity method investments" above includes $267 million at December 31, 2008, and $240 million at December 31, 2007, related to NS' investment in Meridian Speedway LLC, a joint venture formed with Kansas City Southern in 2006.

**Investment in Conrail**

Through a limited liability company, Norfolk Southern and CSX Corporation (CSX) jointly own Conrail Inc. (Conrail), whose primary subsidiary is Consolidated Rail Corporation (CRC). NS has a 58% economic and 50% voting interest in the jointly owned entity, and CSX has the remainder of the economic and voting interests. NS is applying the equity method of accounting to its investment in Conrail in accordance with APB Opinion No. 18, "The Equity Method of Accounting for Investments in Common Stock." NS is amortizing the excess of the purchase price over Conrail's net equity using the principles of purchase accounting, based primarily on the estimated useful lives of Conrail's depreciable property and equipment, including the related deferred tax effect of the differences in tax accounting bases for such assets, as all of the purchase price at acquisition was allocable to Conrail's tangible assets and liabilities.

At December 31, 2008, based on the funded status of Conrail's pension plans, recorded in accordance with SFAS 158, NS reduced its proportional investment in Conrail by $60 million. This resulted in a $55 million loss recorded to "other comprehensive income (loss)" and a combined federal and state deferred tax asset of $5 million. At December 31, 2007, NS' year-end SFAS 158 adjustment increased its proportional investment in Conrail by $6 million. This resulted in $5 million of income recorded to "other comprehensive income (loss)" and a combined federal and state deferred tax liability of about $1 million. At December 31, 2008, the difference between NS' investment in Conrail and its share of Conrail's underlying net equity was $551 million. NS' equity in the earnings of Conrail, net of amortization, included in "Other income – net" was $29 million, $45 million, and $25 million in 2008, 2007, and 2006, respectively.

CRC owns and operates certain properties (the Shared Assets Areas) for the joint and exclusive benefit of NSR and CSX Transportation, Inc. (CSXT). The costs of operating the Shared Assets Areas are borne by NSR and CSXT based on usage. In addition, NSR and CSXT pay CRC a fee for access to the Shared Assets Areas. "Purchased services and rents" and "Fuel" include expenses for amounts due to CRC for operation of the Shared Assets Areas totaling $131 million in 2008 and $126 million in both 2007 and 2006. Future minimum lease payments due to CRC under the Shared Assets Areas agreements are as follows: $29 million in each of 2009 through 2013 and $305 million thereafter. NS provides certain general and administrative support functions to Conrail, the fees for which are billed in accordance with several service-provider arrangements and amount to approximately $7 million annually.

"Accounts payable" includes $82 million at December 31, 2008, and $78 million at December 31, 2007, due to Conrail for the operation of the Shared Assets Areas. In addition, "Other liabilities" includes $133 million at December 31, 2008, and December 31, 2007, for long-term advances from Conrail, maturing 2035, that bear interest at an average rate of 4.4%.

**5. Properties**

| | December 31, 2008 | December 31, 2007 | Depreciation Rate for 2008 |
|---|---|---|---|
| | ($ in millions) | | |
| Land | $ 2,119 | $ 2,085 | |
| Railway property: | | | |
| Road | 20,240 | 19,420 | 2.7% |
| Equipment | 7,688 | 7,413 | 3.7% |
| Other property | 473 | 471 | 2.3% |
| | 30,520 | 29,389 | |
| Less accumulated depreciation | (8,273) | (7,806) | |
| Net properties | $ 22,247 | $ 21,583 | |

Railway property includes $483 million at December 31, 2008, and $504 million at December 31, 2007, of assets recorded pursuant to capital leases with accumulated amortization of $189 million and $175 million at December 31, 2008 and 2007, respectively. Other property includes the costs of obtaining rights to natural resources of $336 million at December 31, 2008, and $337 million at December 31, 2007, with accumulated depletion of $179 million and $172 million at December 31, 2008 and 2007, respectively.

**Capitalized Interest**

Total interest cost incurred on debt in 2008, 2007 and 2006 was $459 million, $455 million, and $489 million, respectively, of which $15 million, $14 million, and $13 million was capitalized.

**6. Current Liabilities**

| | December 31, 2008 | December 31, 2007 |
|---|---|---|
| | ($ in millions) | |
| Accounts payable: | | |
| Accounts and wages payable | $ 577 | $ 568 |
| Casualty and other claims (Note 17) | 248 | 259 |
| Vacation liability | 125 | 123 |
| Equipment rents payable – net | 84 | 87 |
| Due to Conrail (Note 4) | 82 | 78 |
| Other | 24 | 24 |
| Total | $ 1,140 | $ 1,139 |
| Other current liabilities: | | |
| Interest payable | $ 91 | $ 90 |
| Retiree benefit obligations (Note 10) | 59 | 57 |
| Liabilities for forwarded traffic | 44 | 53 |
| Other | 26 | 37 |
| Total | $ 220 | $ 237 |

**7. Long-term Debt**

Long-term debt as of December 31, 2008, with weighted average interest rates and maturities is presented below:

| | December 31, 2008 | December 31, 2007 |
|---|---|---|
| | *($ in millions)* | |
| Notes and debentures: | | |
| 6.56%, maturing to 2014 | $ 1,431 | $ 1,631 |
| 6.68%, maturing 2017 and 2018 | 1,150 | 550 |
| 8.21%, maturing 2020 to 2025 | 764 | 764 |
| 7.12%, maturing 2027 to 2031 | 1,290 | 1,290 |
| 7.21%, maturing 2037 and 2043 | 855 | 855 |
| 7.02%, maturing 2097 and 2105 | 650 | 650 |
| Securitization borrowings, 3.01% | 300 | 250 |
| Capitalized leases, 4.16%, maturing to 2024 | 139 | 165 |
| Other debt, 7.50%, maturing to 2019 | 113 | 113 |
| Equipment obligations, 6.45%, maturing to 2014 | 99 | 226 |
| Discounts and premiums, net | (124) | (126) |
| Total long-term debt | 6,667 | 6,368 |
| Less current maturities | (484) | (369) |
| Long-term debt excluding current maturities | $ 6,183 | $ 5,999 |

| | |
|---|---|
| Long-term debt maturities subsequent to 2009 are as follows: | |
| 2010 | $ 344 |
| 2011 | 342 |
| 2012 | 33 |
| 2013 | 46 |
| 2014 and subsequent years | 5,418 |
| Total | $ 6,183 |

During the second quarter of 2008, $200 million of commercial paper matured and was refinanced as part of a private offering under which NS issued and sold $600 million of unsecured notes at 5.75% due 2018. NS subsequently exchanged substantially all of these unregistered securities with essentially identical securities registered under the Securities Act of 1933.

In November 2007, NS entered into a $500 million receivables securitization facility under which NSR sells substantially all of its eligible third-party receivables to an NS subsidiary, which in turn may transfer beneficial interests in the receivables to various commercial paper vehicles. Amounts received under the facility are accounted for as borrowings. Under this facility, NS received $425 million and repaid $375 million in 2008. At December 31, 2008 and 2007, the amounts outstanding under the facility were $300 million at an average variable interest rate of 3.01% and $250 million at an average variable interest rate of 5.57%, respectively. The facility has a 364-day term which was renewed and amended in October 2008; however, NS intends to refinance these borrowings by issuing long-term debt, which is supported by its $1 billion credit agreement (see below). Accordingly, amounts outstanding are included in the line item "Long-term debt" in the Consolidated Balance Sheets. At December 31, 2008, and December 31, 2007, the amounts of receivables included in "Accounts receivable – net" serving as collateral for these borrowings were $719 million and $778 million, respectively.

The railroad equipment obligations and the capitalized leases are secured by liens on the underlying equipment. Certain lease obligations require the maintenance of yen-denominated deposits, which are pledged to the lessor to

satisfy yen-denominated lease payments. These deposits are included in "Other assets" in the Consolidated Balance Sheets and totaled $85 million at December 31, 2008, and $80 million at December 31, 2007.

**Issuance of Debt or Equity Securities**

NS has authority from its board of directors for the issuance and public or private sale of up to $1 billion of debt or equity securities. Under this authority, NS issued $500 million of unsecured notes in January 2009 at 5.75% due in 2016 in a private offering. The net proceeds from the offering were approximately $494 million after deducting the purchase discount and expenses. NS has agreed to exchange these unregistered securities with essentially identical securities registered under the Securities Act of 1933.

Subsequent to the January 2009 offering, NS has remaining authority from its board of directors to issue and sell up to $500 million of additional debt or equity securities through public or private sale. The Form S-3 shelf registration statements previously filed with the Securities and Exchange Commission (SEC) are no longer effective under SEC's Rule 415(a)(5), which provides for a three-year term. NS expects to file a new Form S-3 registration statement during the first quarter of 2009.

**Credit Agreement, Debt Covenants and Commercial Paper**

NS has in place and available a $1 billion, five-year credit agreement expiring in 2012, which provides for borrowings at prevailing rates and includes covenants. NS had no amounts outstanding under this facility at December 31, 2008, and NS is in compliance with all of the covenants.

NS has the ability to issue commercial paper supported by its $1 billion credit agreement. At December 31, 2008 and 2007, NS had no outstanding commercial paper.

**8. Lease Commitments**

NS is committed under long-term lease agreements, which expire on various dates through 2067, for equipment, lines of road and other property. The following amounts do not include payments to CRC under the Shared Assets Areas agreements (see Note 4). Future minimum lease payments and operating lease expense are as follows:

| | Operating Leases | Capital Leases |
|---|---|---|
| | *($ in millions)* | |
| 2009 | $ 142 | $ 66 |
| 2010 | 129 | 28 |
| 2011 | 94 | 26 |
| 2012 | 79 | 17 |
| 2013 | 70 | 3 |
| 2014 and subsequent years | 359 | 5 |
| Total | $ 873 | $ 145 |
| Less imputed interest on capital leases at an average rate of 5.3% | | (6) |
| Present value of minimum lease payments included in debt | | $ 139 |

**Operating Lease Expense**

| | 2008 | 2007 | 2006 |
|---|---|---|---|
| | | ($ in millions) | |
| Minimum rents | $ 183 | $ 191 | $ 197 |
| Contingent rents | 80 | 79 | 79 |
| Total | $ 263 | $ 270 | $ 276 |

Contingent rents are primarily comprised of usage-based rent paid to other railroads for joint facility operations.

**9. Other Liabilities**

| | December 31, 2008 | 2007 |
|---|---|---|
| | ($ in millions) | |
| Retiree health and death benefit obligations (Note 10) | $ 732 | $ 635 |
| Net pension obligations (Note 10) | 329 | 150 |
| Casualty and other claims (Note 17) | 320 | 588 |
| Federal and state income taxes | 144 | 131 |
| Long-term advances from Conrail (Note 4) | 133 | 133 |
| Deferred compensation | 131 | 148 |
| Other | 241 | 254 |
| Total | $ 2,030 | $ 2,039 |

**10. Pensions and Other Postretirement Benefits**

Norfolk Southern and certain subsidiaries have both funded and unfunded defined benefit pension plans covering principally salaried employees. Norfolk Southern and certain subsidiaries also provide specified health care and death benefits to eligible retired employees and their dependents. Under the present plans, which may be amended or terminated at NS' option, a defined percentage of health care expenses is covered, reduced by any deductibles, co-payments, Medicare payments and, in some cases, coverage provided under other group insurance policies.

**Pension and Other Postretirement Benefit Obligations and Plan Assets**

| | Pension Benefits | | Other Postretirement Benefits | |
|---|---|---|---|---|
| | **2008** | **2007** | **2008** | **2007** |
| | ($ in millions) | | | |
| ***Change in benefit obligations*** | | | | |
| Benefit obligation at beginning of year | $ 1,644 | $ 1,650 | $ 859 | $ 785 |
| Service cost | 25 | 24 | 16 | 21 |
| Interest cost | 99 | 92 | 51 | 46 |
| Actuarial (gains) losses | 4 | (12) | 44 | 53 |
| Plan amendments | 7 | -- | -- | -- |
| Benefits paid | (109) | (110) | (50) | (46) |
| Benefit obligation at end of year | 1,670 | 1,644 | 920 | 859 |
| ***Change in plan assets*** | | | | |
| Fair value of plan assets at beginning of year | 1,963 | 1,939 | 176 | 119 |
| Actual return on plan assets | (531) | 125 | (38) | 6 |
| Employer contribution | 10 | 9 | 50 | 97 |
| Benefits paid | (109) | (110) | (50) | (46) |
| Fair value of plan assets at end of year | 1,333 | 1,963 | 138 | 176 |
| **Funded status at end of year** | $ (337) | $ 319 | $ (782) | $ (683) |
| Amounts recognized in the Consolidated Balance Sheets consist of: | | | | |
| Noncurrent assets | $ 1 | $ 478 | $ -- | $ -- |
| Current liabilities | (9) | (9) | (50) | (48) |
| Noncurrent liabilities | (329) | (150) | (732) | (635) |
| **Net amount recognized** | $ (337) | $ 319 | $ (782) | $ (683) |
| Amounts recognized in accumulated other comprehensive loss (pretax) consist of: | | | | |
| Net loss | $ 991 | $ 290 | $ 351 | $ 279 |
| Prior service cost (benefit) | 13 | 9 | (2) | (10) |

NS' unfunded pension plans, included above, which in all cases have no assets and therefore have an accumulated benefit obligation in excess of plan assets, had projected benefit obligations of $168 million at December 31, 2008, and $159 million at December 31, 2007, and had accumulated benefit obligations of $146 million at December 31, 2008, and $137 million at December 31, 2007.

**Pension and Other Postretirement Benefit Cost Components**

| | 2008 | 2007 | 2006 |
|---|---|---|---|
| | | ($ in millions) | |
| ***Pension benefits*** | | | |
| Service cost | $ 25 | $ 24 | $ 27 |
| Interest cost | 99 | 92 | 88 |
| Expected return on plan assets | (173) | (167) | (159) |
| Amortization of prior service cost | 3 | 2 | 2 |
| Amortization of net losses | 7 | 9 | 13 |
| Net benefit | $ (39) | $ (40) | $ (29) |
| ***Other postretirement benefits*** | | | |
| Service cost | $ 16 | $ 21 | $ 19 |
| Interest cost | 51 | 46 | 42 |
| Expected return on plan assets | (15) | (11) | (10) |
| Amortization of prior service benefit | (8) | (8) | (8) |
| Amortization of net losses | 25 | 28 | 27 |
| Net cost | $ 69 | $ 76 | $ 70 |

**Other Changes in Plan Assets and Benefit Obligations Recognized in Other Comprehensive Loss**

| | 2008 | |
|---|---|---|
| | Pension Benefits | Other Postretirement Benefits |
| | ($ in millions) | |
| Net loss arising during the year | $ 708 | $ 97 |
| Prior service cost arising during the year | 7 | -- |
| Amortization of prior service cost | (3) | 8 |
| Amortization of net losses | (7) | (25) |
| Total recognized in other comprehensive loss | $ 705 | $ 80 |
| Total recognized in net periodic (benefit) cost and other comprehensive loss | $ 666 | $ 149 |

The estimated net loss and prior service cost for the defined benefit pension plans that will be amortized from accumulated other comprehensive loss into net periodic cost over the next year are $25 million and $3 million, respectively. The estimated net loss and prior service benefit for the other defined benefit postretirement plans that will be amortized from accumulated other comprehensive loss into net periodic benefit cost over the next year are $34 million and $2 million, respectively.

As of December 31, 2006, NS adopted SFAS 158. This statement requires an employer to recognize in its statement of financial position the overfunded or underfunded status of defined benefit pension and postretirement plans measured as the difference between the fair value of plan assets and the benefit obligation. Employers must also recognize as a component of other comprehensive income, net of tax, the actuarial gains and losses and the prior service costs, credits, and transition costs that arise during the period. As a result of adopting this standard, NS reduced its pension asset by $217 million and increased its pension and postretirement liabilities by $258 million in its December 31, 2006, Consolidated Balance Sheet, with a corresponding reduction to stockholders' equity of $292 million (net of tax) reflected as an increase to accumulated other comprehensive loss. In addition, NS recognized a $2 million reduction to stockholders' equity related to its proportionate share

of Conrail's adoption of SFAS 158. The adoption of SFAS 158 has no impact on years prior to 2006 and has no effect on the calculation of expenses for pensions and post-retirement benefits.

**Pension and Other Postretirement Benefit Assumptions**

Pension and other postretirement benefit costs are determined based on actuarial valuations that reflect appropriate assumptions as of the measurement date, ordinarily the beginning of each year. The funded status of the plans is determined using appropriate assumptions as of each year end. A summary of the major assumptions follows:

| | 2008 | 2007 | 2006 |
|---|---|---|---|
| ***Funded status:*** | | | |
| Discount rate | 6.25% | 6.25% | 5.75% |
| Future salary increases | 4.5% | 4.5% | 4.5% |
| ***Pension cost:*** | | | |
| Discount rate | 6.25% | 5.75% | 5.50% |
| Return on assets in plans | 9% | 9% | 9% |
| Future salary increases | 4.5% | 4.5% | 4.5% |
| ***Other postretirement benefit cost:*** | | | |
| Discount rate | 6.25% | 5.75% | 5.50% |
| Return on assets in plan | 8.5% | 9% | 9% |

To determine the discount rate in 2008 and 2007, NS utilized an analysis in which the projected annual cash flows from the pension and postretirement benefit plans were matched with a yield curve based on an appropriate universe of high-quality corporate bonds. NS used the results of the yield curve to select the discount rate that matches the payment stream of the benefits in these plans. In 2006, NS referred to Moody's seasoned Aa corporate bond yields and the changes in such yields in establishing the discount rate.

**Health Care Cost Trend Assumptions**

For measurement purposes at December 31, 2008, increases in the per capita cost of covered health care benefits were assumed to be 8.5% for 2008 and 8.8% for 2009. It is assumed the rate will decrease gradually to an ultimate rate of 5% for 2014 and remain at that level thereafter.

Assumed health care cost trend rates have a significant effect on the amounts reported in the financial statements. To illustrate, a one-percentage-point change in the assumed health care cost trend would have the following effects:

| | One percentage point | |
|---|---|---|
| | Increase | Decrease |
| | *($ in millions)* | |
| Increase (decrease) in: | | |
| Total service and interest cost components | $ 9 | $ (7) |
| Postretirement benefit obligation | $ 113 | $ (94) |

**Asset Management**

Eleven investment firms manage NS' defined benefit pension plan's assets under investment guidelines approved by the Board of Directors. Investments are restricted to domestic fixed income securities, international fixed income securities, domestic and international equity investments, and unleveraged exchange-traded options and financial futures. Limitations restrict investment concentration and use of certain derivative instruments. The target asset allocation for equity is 75% of the pension plan's assets. Fixed income investments must have an average

rating of "AA" or better and all fixed income securities must be rated "A" or better except bond index funds. Equity investments must be in liquid securities listed on national exchanges. No investment is permitted in the securities of Norfolk Southern Corporation or its subsidiaries (except through commingled pension trust funds). Investment managers' returns are expected to meet or exceed selected market indices by prescribed margins.

NS' pension plan weighted-average asset allocations at December 31, 2008 and 2007, by asset category, were as follows:

| Asset Category | Percentage of plan assets at December 31, 2008 | 2007 |
|---|---|---|
| Domestic equity securities | 58% | 65% |
| International equity securities | 11% | 10% |
| Debt securities | 31% | 25% |
| Total | 100% | 100% |

The postretirement benefit plan assets consist primarily of trust-owned variable life insurance policies with an asset allocation at December 31, 2008, of 53% in equity securities and 47% in debt securities compared with 65% in equity securities and 35% in debt securities at December 31, 2007. The target asset allocation for equity is between 50% and 75% of the plan's assets.

The plans' assumed future returns are based principally on the asset allocation and on the historic returns for the plans' asset classes determined from both actual plan returns and, over longer time periods, market returns for those asset classes. In 2008, 2007, and 2006 NS assumed a return on pension plan assets of 9%. For 2009, NS assumes an 8.75% return on pension plan assets. A one percentage point change to the rate of return assumption would result in an $18 million change to the net pension (benefit) cost and, as a result, an equal change in "Compensation and benefits" expense.

**Contributions and Estimated Future Benefit Payments**

In 2009, NS expects to contribute approximately $9 million to its unfunded pension plans for payments to pensioners and $50 million to its other postretirement benefit plans for retiree health benefits. NS does not expect to contribute to its funded pension plan in 2009.

Benefit payments, which reflect expected future service, as appropriate, are expected to be paid as follows:

| | Pension Benefits | Other Postretirement Benefits |
|---|---|---|
| | *($ in millions)* | |
| 2009 | $ 111 | $ 50 |
| 2010 | 114 | 54 |
| 2011 | 116 | 57 |
| 2012 | 119 | 59 |
| 2013 | 122 | 62 |
| Years 2014-2018 | 646 | 339 |

The other postretirement benefit payments include an estimated average annual reduction due to the Medicare Part D Subsidy of about $6 million.

**Other Postretirement Coverage**

Under collective bargaining agreements, NS and certain subsidiaries participate in a multi-employer benefit plan, which provides certain postretirement health care and life insurance benefits to eligible union employees. Premiums under this plan are expensed as incurred and amounted to $33 million in 2008, $27 million in 2007, and $26 million in 2006.

**Section 401(k) Plans**

Norfolk Southern and certain subsidiaries provide Section 401(k) savings plans for employees. Under the plans, NS matches a portion of employee contributions, subject to applicable limitations. NS' matching contributions, recorded as an expense, under these plans were $15 million in 2008 and $14 million in both 2007 and 2006.

**11. Stock-Based Compensation**

Under the stockholder-approved Long-Term Incentive Plan (LTIP), a committee of nonemployee directors of the Board or the chief executive officer (if delegated such authority by the committee) may grant stock options, stock appreciation rights (SARs), restricted stock units, restricted shares, performance shares, and performance share units (PSUs), up to a maximum of 88,025,000 shares of Norfolk Southern Common Stock (Common Stock). Of these shares, 5,000,000 were approved by the Board for issuance to non-officer participants; as a broad-based issuance, stockholder approval was not required. In May 2005, the stockholders approved an amended LTIP which provided that 8,500,000 shares of stock previously approved for issuance under LTIP could be granted as restricted stock units, restricted shares or performance shares. Under the Board-approved Thoroughbred Stock Option Plan (TSOP), the committee may grant stock options up to a maximum of 6,000,000 shares of Common Stock; as a broad-based stock option plan, stockholder approval of TSOP was not required. NS uses newly issued shares to satisfy any exercises and awards under LTIP and TSOP.

The LTIP also permits the payment – on a current or a deferred basis and in cash or in stock – of dividend equivalents on shares of Common Stock covered by options, PSUs or restricted stock units in an amount commensurate with regular quarterly dividends paid on Common Stock. Tax absorption payments also are authorized for any awards under LTIP in amounts estimated to equal the federal and state income taxes applicable to shares of Common Stock issued subject to a share retention agreement.

During the first quarter of 2008, a committee of nonemployee directors of NS' Board granted stock options, restricted stock units and PSUs pursuant to the LTIP and granted stock options pursuant to the TSOP. Receipt of an award under LTIP was made contingent upon the awardee's execution of a non-compete agreement, and all awards under LTIP were made subject to forfeiture in the event the awardee "engages in competing employment" for a period of time following retirement.

**Accounting Method**

As disclosed in Note 1, prior to the adoption of SFAS 123(R), NS applied APB Opinion 25 and related interpretations in accounting for awards made under the plans. Accordingly, grants of PSUs, restricted stock units, restricted shares, dividend equivalents, tax absorption payments and SARs resulted in charges to net income, while grants of stock options had no effect on net income. Under SFAS 123(R), all awards result in charges to net income while dividend equivalents, which are all related to equity classified awards, are charged to retained income. Related compensation costs were $89 million in 2008, $96 million in 2007 and $129 million in 2006. The total tax effects recognized in income in relation to stock-based compensation were benefits of $30 million in 2008, $32 million in 2007 and $44 million in 2006.

"Common stock issued – net" in the Consolidated Statements of Cash Flows for the years ended December 31, 2008, 2007 and 2006 includes tax benefits generated from tax deductions in excess of compensation costs recognized (excess tax benefits) for share based awards of $76 million, $57 million and $85 million, respectively.

**Stock Options**

Options may be granted for a term not to exceed 10 years and are subject to a vesting period of at least one year. Option exercise prices are at not less than the fair market value of Common Stock on the effective date of the grant. In the first quarter of 2008, 1,162,600 options were granted under the LTIP and 250,000 options were granted under the TSOP. In each case, the grant price was $50.74, which was the fair market value of Common Stock on the date of grant. The options have a term of ten years but may not be exercised prior to the third anniversary of the date of grant. Holders of the options granted under the LTIP who remain actively employed receive cash dividend equivalent payments for five years in an amount equal to the regular quarterly dividends paid on Common Stock.

In the first quarter of 2007, 1,203,300 options were granted under the LTIP and 251,000 options were granted under the TSOP, each with a grant price of $49.555, but may not be exercised prior to the third anniversary of the date of grant. In the first quarter of 2006, 1,188,700 options were granted under the LTIP and 238,000 options were granted under the TSOP, each with a grant price of $49.425, but may not be exercised prior to the first anniversary of the date of grant. For both 2007 and 2006, the grant price was the fair market value of Common Stock on the date of grant, and the options have a term of ten years.

The fair value of each option award in 2008, 2007 and 2006 was measured on the date of grant using a lattice-based option valuation model. Expected volatilities are based on implied volatilities from traded options on Common Stock and historical volatility of Common Stock. NS uses historical data to estimate option exercises and employee terminations within the valuation model. The average expected option life is derived from the output of the valuation model and represents the period of time that options granted are expected to be outstanding. The average risk-free interest rate is based on the U.S. Treasury yield curve in effect at the time of grant. For options granted that include dividend equivalent payments, a dividend yield of zero was used. For the 2008 and 2007 TSOP grants a dividend yield of 2.29% and 1.5%, respectively, was used because no dividend equivalent payments are made on these options. The assumptions for the 2008, 2007 and 2006 LTIP and TSOP grants are shown in the following table:

| | **2008** | **2007** | **2006** |
|---|---|---|---|
| Expected volatility range | 25% - 32% | 26.1% - 33.3% | 23.5% - 34.5% |
| Average expected volatility | 32% | 33% | 27% |
| Average risk-free interest rate | 3.68% | 4.9% | 4.5% |
| Average expected option term – LTIP | 5.9 years | 5.6 years | 3.7 years |
| Per-share grant-date fair value – LTIP | $19.32 | $19.82 | $13.47 |
| Average expected option term – TSOP | 8.0 years | 6.5 years | 3.7 years |
| Per-share grant-date fair value – TSOP | $16.29 | $17.88 | $13.47 |
| Options granted (LTIP and TSOP) | 1,412,600 | 1,454,300 | 1,427,400 |

A summary of options outstanding as of December 31, 2008, and changes during the twelve months then ended is presented below:

| | Option Shares | Weighted Avg. Exercise Price |
|---|---|---|
| Outstanding at December 31, 2007 | 18,579,892 | $ 27.51 |
| Granted | 1,412,600 | 50.74 |
| Exercised | (5,697,049) | 24.60 |
| Forfeited | (10,720) | 36.40 |
| Outstanding at December 31, 2008 | 14,284,723 | $ 30.95 |
| Exercisable at December 31, 2008 | 11,465,323 | $ 26.23 |

The aggregate intrinsic value of options outstanding at December 31, 2008, was $242 million with a weighted-average remaining contractual term of 4.9 years. Of these options outstanding, 11,465,323 were exercisable and had an aggregate intrinsic value of $242 million with a weighted average remaining contractual term of 4 years. The following table provides information related to options exercised as of December 31 for the respective years:

| | 2008 | 2007 *($ in millions)* | 2006 |
|---|---|---|---|
| Options exercised | 5,697,049 | 5,110,334 | 8,677,254 |
| Total intrinsic value | $ 208 | $ 145 | $ 226 |
| Cash received upon exercise of options | $ 137 | $ 126 | $ 212 |
| Related excess tax benefits realized | $ 73 | $ 52 | $ 79 |

At December 31, 2008, there was $12 million of total unrecognized compensation related to stock options granted under the LTIP and TSOP, which is expected to be recognized over a weighted-average period of approximately 1.6 years.

**Restricted Stock Units and Restricted Shares**

Restricted stock unit and restricted share grants were 299,950 and zero, respectively, in 2008, with a grant-date fair value of $50.47 and a five-year restriction period. In 2007, restricted stock unit and restricted share grants were 321,450 and zero, respectively, with a grant-date fair value of $50.01 and a five-year restriction period. In 2006, restricted stock unit and restricted share grants were 332,150 and 332,150, respectively, with a grant-date fair value of $49.60 and a three-year restriction period. Restricted stock units granted in 2008 and 2007 will be settled through issuance of shares of Common Stock. The restricted stock unit grants include cash dividend equivalent payments during the restriction period commensurate with regular quarterly dividends paid on Common Stock.

A summary of the status of restricted stock units and restricted shares as of December 31, 2008, and changes during the twelve months then ended is presented below:

| | Units | Shares | | Weighted - Average Grant-Date Fair Value |
|---|---|---|---|---|
| Nonvested at December 31, 2007 | 957,352 | 811,600 | $ | 42.53 |
| Granted | 299,950 | -- | | 50.47 |
| Vested | (5,437) | (8,156) | | 34.10 |
| Forfeited | -- | -- | | -- |
| Nonvested at December 31, 2008 | 1,251,865 | 803,444 | $ | 43.72 |

At December 31, 2008, there was $12 million of total unrecognized compensation related to restricted stock units and restricted shares granted under the LTIP, which is expected to be recognized over a weighted-average period of approximately 1.5 years. The total fair values of the restricted stock units paid in cash and restricted shares vested during the twelve months ended December 31, 2008, 2007 and 2006 were $1 million, $22 million, and $40 million, respectively. The total related excess tax benefits realized were $1 million in 2008, $3 million in 2007, and $6 million in 2006.

**Performance Share Units**

PSUs provide for awards based on achievement of certain predetermined corporate performance goals (total shareholder return, return on average invested capital and operating ratio) at the end of a three-year cycle. PSU grants and average grant-date fair values were 1,162,600 and $50.465 in 2008; 1,203,300 and $49.555 in 2007; and 1,163,600 and $49.425 in 2006. One-half of any PSUs earned will be paid in the form of shares of Common Stock with the other half to be paid in cash. A summary of the status of PSUs as of December 31, 2008, and changes during the twelve months then ended is presented below:

| | Performance Share Units | | Weighted - Average Grant-Date Fair Value |
|---|---|---|---|
| Balance December 31, 2007 | 3,603,100 | $ | 43.91 |
| Granted | 1,162,600 | | 50.47 |
| Earned – paid in Common Stock | (506,852) | | 34.10 |
| Earned – paid in cash | (507,147) | | 34.10 |
| Unearned | (292,701) | | 34.10 |
| Forfeited | -- | | -- |
| Balance December 31, 2008 | 3,459,000 | $ | 49.82 |

As of December 31, 2008, there was $18 million of total unrecognized compensation related to PSUs granted under the LTIP, which is expected to be recognized over a weighted-average period of approximately 1.1 years. The total fair values of PSUs earned and paid in cash during the twelve months ended December 31, 2008, 2007 and 2006 were $26 million, $18 million, and $34 million, respectively. The total related excess tax benefits realized were $2 million in 2008, $2 million in 2007, and zero in 2006.

### Shares Available and Issued

Shares of stock available for future grants and issued in connection with all features of the LTIP and TSOP as of December 31, were as follows:

| | 2008 | 2007 | 2006 |
|---|---|---|---|
| Available for future grants: | | | |
| LTIP | 6,837,414 | 8,937,651 | 9,288,283 |
| TSOP | 2,042,420 | 2,290,700 | 2,538,700 |
| Shares of Common Stock issued: | | | |
| LTIP | 5,569,683 | 5,199,060 | 8,517,911 |
| TSOP | 642,538 | 540,877 | 836,783 |

## 12. Stockholders' Equity

### Common Stock

Common stock is reported net of shares held by consolidated subsidiaries (Treasury Shares) of Norfolk Southern. Treasury Shares at December 31, 2008, and 2007, amounted to 20,579,088 and 20,683,686 shares, respectively, with a cost of $19 million in 2008 and $20 million in 2007.

### Accumulated Other Comprehensive Loss

"Accumulated other comprehensive loss" reported in the Consolidated Statements of Changes in Stockholders' Equity consisted of the following:

| | Balance at Beginning of Year | Net Gain (Loss) | Reclassification Adjustments | Balance at End of Year |
|---|---|---|---|---|
| | | *($ in millions)* | | |
| December 31, 2008 | | | | |
| Pension and other postretirement liabilities | $ (349) | $ (498) | $ 16 | $ (831) |
| Other comprehensive loss of equity investees | (50) | (61) | -- | (111) |
| Accumulated other comprehensive loss | $ (399) | $ (559) | $ 16 | $ (942) |
| December 31, 2007 | | | | |
| Pension and other postretirement liabilities | $ (315) | $ (54) | $ 20 | $ (349) |
| Other comprehensive loss of equity investees | (55) | 5 | -- | (50) |
| Unrealized gains on securities | 1 | -- | (1) | -- |
| Accumulated other comprehensive loss | $ (369) | $ (49) | $ 19 | $ (399) |

**Other Comprehensive Income (Loss)**

"Other comprehensive income (loss)" reported in the Consolidated Statements of Changes in Stockholders' Equity consisted of the following:

| | Pretax Amount | Tax (Expense) Benefit | Net-of-Tax Amount |
|---|---|---|---|
| | | ($ in millions) | |
| ***Year ended December 31, 2008*** | | | |
| Net gain (loss) arising during the year: | | | |
| Pensions and other postretirement benefits | $ (812) | $ 314 | $ (498) |
| Reclassification adjustments for costs included in net income | 27 | (11) | 16 |
| Subtotal | (785) | 303 | (482) |
| Other comprehensive income (loss) of equity investees | (65) | 4 | (61) |
| Other comprehensive income (loss) | $ (850) | $ 307 | $ (543) |
| ***Year ended December 31, 2007*** | | | |
| Net gain (loss) arising during the year: | | | |
| Pensions and other postretirement benefits | $ (88) | $ 34 | $ (54) |
| Reclassification adjustments for costs included in net income | 31 | (11) | 20 |
| Subtotal | (57) | 23 | (34) |
| Other comprehensive income of equity investees | 5 | -- | 5 |
| Reclassification adjustment for unrealized gains on securities included in net income | (2) | 1 | (1) |
| Other comprehensive income (loss) | $ (54) | $ 24 | $ (30) |
| ***Year ended December 31, 2006*** | | | |
| Net gain (loss) arising during the year: | | | |
| Cash flow hedges | $ (1) | $ 1 | $ -- |
| Reclassification adjustments for gains included in net income | (20) | 8 | (12) |
| Subtotal | (21) | 9 | (12) |
| Unrealized gains on securities | 1 | -- | 1 |
| Minimum pension liability | (10) | 4 | (6) |
| Other comprehensive income of equity investees | 15 | 4 | 19 |
| Other comprehensive income (loss) | $ (15) | $ 17 | $ 2 |

**13. Stock Repurchase Program**

In March 2007, NS' Board of Directors amended NS' share repurchase program, increasing the authorized amount of share repurchases from 50 million to 75 million shares and shortening the term of the program from 2015 to 2010. The timing and volume of purchases is guided by management's assessment of market conditions and other pertinent facts. Near-term purchases under the program are expected to be made with internally generated cash or proceeds from borrowings. NS repurchased and retired 19.4 million shares, 23.6 million shares, and 21.7 million shares of its common stock under this program in 2008, 2007, and 2006, respectively, at a cost of $1.1 billion, $1.2 billion, and $964 million, respectively. Since inception of this program in 2006, NS has repurchased and retired 64.7 million shares of Common Stock at a total cost of $3.3 billion.

**14. Earnings Per Share**

The following tables set forth the calculation of basic and diluted earnings per share:

| | 2008 | 2007 | 2006 |
|---|---|---|---|
| | *($ in millions except per share, shares in millions)* | | |
| Basic earnings per share: | | | |
| Income available to common stockholders | $ 1,711 | $ 1,459 | $ 1,475 |
| Weighted-average shares outstanding | 372.3 | 389.6 | 406.0 |
| Basic earnings per share | $ 4.60 | $ 3.74 | $ 3.63 |

Income available to common stockholders for both 2008 and 2007 reflects a $5 million reduction, and in 2006 a $6 million reduction for the after-tax effect of dividend equivalent payments made to holders of vested stock options.

| | 2008 | 2007 | 2006 |
|---|---|---|---|
| | *($ in millions except per share, shares in millions)* | | |
| Diluted earnings per share: | | | |
| Income available to common stockholders | $ 1,716 | $ 1,464 | $ 1,481 |
| Weighted-average shares outstanding per above | 372.3 | 389.6 | 406.0 |
| Dilutive effect of outstanding options and share-settled awards (as determined by the application of the treasury stock method) | 7.7 | 8.2 | 8.7 |
| Adjusted weighted-average shares outstanding | 380.0 | 397.8 | 414.7 |
| Diluted earnings per share | $ 4.52 | $ 3.68 | $ 3.57 |

The diluted calculations exclude options having exercise prices exceeding the average market price of Common Stock as follows: zero in 2008 and 2007 and 1 million in 2006.

**15. Fair Values of Financial Instruments**

The fair values of "Cash and cash equivalents," "Accounts receivable" and "Accounts payable" approximate carrying values because of the short maturity of these financial instruments. The fair value of corporate-owned life insurance approximates carrying value. The carrying amounts and estimated fair values for the remaining financial instruments, excluding derivatives and investments accounted for under the equity method in accordance with APB Opinion No. 18, consisted of the following at December 31:

| | 2008 | | 2007 | |
|---|---|---|---|---|
| | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
| | *($ in millions)* | | | |
| Investments | $ 187 | $ 202 | $ 154 | $ 173 |
| Long-term debt | $ (6,667) | $ (6,885) | $ (6,368) | $ (6,935) |

Underlying net assets were used to estimate the fair value of investments. The fair values of notes receivable are based on future discounted cash flows. The fair values of debt were estimated based on quoted market prices or discounted cash flows using current interest rates for debt with similar terms, company rating and remaining maturity.

Carrying amounts of marketable securities reflect unrealized holding gains of zero on December 31, 2008 and 2007. Sales of "available-for-sale" securities were immaterial for the years ended December 31, 2008, 2007, and 2006; most short-term investments were redeemed at maturity during 2007.

**16. Derivative Financial Instruments**

All derivatives are recognized in the financial statements as either assets or liabilities and are measured at fair value. Changes in fair value are recorded as adjustments to the assets or liabilities being hedged in "Other comprehensive loss," or in current earnings, depending on whether the derivative is designated and qualifies for hedge accounting, the type of hedge transaction represented and the effectiveness of the hedge.

NS has used derivative financial instruments to reduce the risk of volatility in its diesel fuel costs and to manage its overall exposure to fluctuations in interest rates. NS does not engage in the trading of derivatives. Management has determined that its derivative financial instruments qualify as either fair-value or cash-flow hedges, having values that highly correlate with the underlying hedged exposures, and has designated such instruments as hedging transactions. Credit risk related to the derivative financial instruments is considered to be minimal and is managed by requiring high credit standards for counterparties and periodic settlements.

**Diesel Fuel Hedging**

From 2001 until May 2004, NS entered into heating oil contracts that hedged a portion of its diesel fuel consumption. The intent of the program was to assist in the management of NS' aggregate risk exposure to fuel price fluctuations, which can significantly affect NS' operating margins and profitability, through the use of one or more types of derivative instruments. The goal of this hedging strategy was to reduce the variability of fuel costs over an extended period of time while minimizing the incremental cost of hedging. The program provided that NS would not enter into any fuel hedges with a duration of more than 36 months, and that no more than 80% of NS' average monthly fuel consumption would be hedged for any month within any 36-month period. After taking into account the effect of the hedging, diesel fuel costs represented 14% of NS' operating expenses for the year ended December 31, 2006. The last remaining contracts were settled in the second quarter of 2006, bringing an end to this program. NS' fuel hedging activity resulted in a decrease in diesel fuel expense of $20 million in 2006. Ineffectiveness, or the extent to which changes in the fair value of the heating oil contracts did not offset changes in the fair values of the expected diesel fuel transactions, resulted in a $1 million expense in 2006.

**Interest Rate Hedging**

NS manages its overall exposure to fluctuations in interest rates by issuing both fixed- and floating-rate debt instruments, and by entering into interest rate hedging transactions to achieve an appropriate mix within its debt portfolio. NS had $17 million, or less than 1%, and $59 million, or about 1%, of its fixed rate debt portfolio hedged as of December 31, 2008, and December 31, 2007, respectively, using interest rate swaps that qualify for and are designated as fair-value hedge transactions. NS' interest rate hedging activity resulted in decreases in interest expense of approximately $1 million for 2008, 2007, and 2006. These swaps have been effective in hedging the changes in fair value of the related debt arising from changes in interest rates and there has been no impact on earnings resulting from ineffectiveness associated with these derivative transactions.

**Fair Values**

Fair values of interest rate swaps at December 31, 2008, and December 31, 2007, were determined based upon the present value of expected future cash flows discounted at the appropriate implied spot rate from the spot rate yield curve. Fair value adjustments are noncash transactions and, accordingly, are excluded from the Consolidated Statements of Cash Flows. The gross and net asset position of NS' outstanding derivative financial instruments was approximately $1 million at December 31, 2008 and 2007.

**17. Commitments and Contingencies**

**Lawsuits**

Norfolk Southern and/or certain subsidiaries are defendants in numerous lawsuits and other claims relating principally to railroad operations. When management concludes that it is probable that a liability has been incurred and the amount of the liability can be reasonably estimated, it is accrued through a charge to earnings. While the ultimate amount of liability incurred in any of these lawsuits and claims is dependent on future developments, in management's opinion, the recorded liability is adequate to cover the future payment of such liability and claims. However, the final outcome of any of these lawsuits and claims cannot be predicted with certainty, and unfavorable or unexpected outcomes could result in additional accruals that could be significant to results of operations in a particular year or quarter. Any adjustments to the recorded liability will be reflected in earnings in the periods in which such adjustments are known.

**Casualty Claims**

Casualty claims include employee personal injury and occupational claims as well as third-party claims, all exclusive of legal costs. To aid in valuing its personal injury liability and determining the amount to accrue with respect to such claim during the year, NS' management utilizes studies prepared by an independent consulting actuarial firm. Job-related accidental injury and occupational claims are subject to the Federal Employers' Liability Act (FELA), which is applicable only to railroads. FELA's fault-based system produces results that are unpredictable and inconsistent as compared with a no-fault workers' compensation system. The variability inherent in this system could result in actual costs being different from the liability recorded. While the ultimate amount of claims incurred is dependent on future developments, in management's opinion, the recorded liability is adequate to cover the future payments of claims and is supported by the most recent actuarial study. In all cases, NS records a liability when the expected loss for the claim is both probable and estimable.

In April 2008, NS settled the lawsuit brought by Avondale Mills for claims associated with the January 6, 2005, derailment in Graniteville, SC. The total liability related to the derailment represents NS' best estimate based on current facts and circumstances. The estimate includes amounts related to business property damage and other economic losses, personal injury and individual property damage claims, as well as third-party response costs. NS' commercial insurance policies are expected to cover substantially all expenses related to this

derailment above the unreimbursed portion and NS' self-insured retention, including NS' response costs and legal fees. The Consolidated Balance Sheets reflect current and long-term receivables for estimated recoveries from NS' insurance carriers. NS is engaged in arbitration with one of its insurance carriers that failed to respond to an insurance claim submitted by NS. NS believes these expenses are covered by the insurance policy and that recovery of any contested amount is probable, in that NS expects the arbitrator will determine the settlement amounts to be reasonable and that the insurer's refusal to consent to and to fund the settlement was a breach of contract. Accordingly, NS has recorded the full recovery attributable to such carrier ($100 million). In October 2008, another of NS' insurance carriers provided the preliminary findings of its review of NS' reimbursement request and reported that it may dispute a portion of that request. NS has initiated arbitration against the carrier and believes that all expenses contained in the reimbursement request are covered by the insurance policy and that recovery is probable.

**Employee personal injury claims** – The largest component of casualties and other claims expense is employee personal injury costs. The independent actuarial firm engaged by NS provides quarterly studies to aid in valuing its employee personal injury liability and estimating its employee personal injury expense. The actuarial firm studies NS' historical patterns of reserving for claims and subsequent settlements, taking into account relevant outside influences. The actuary uses the results of these analyses to estimate the ultimate amount of the liability, which includes amounts for incurred but unasserted claims. NS adjusts its liability quarterly based upon management's assessment and the results of the study. The estimate of loss liabilities is subject to inherent limitation given the difficulty of predicting future events such as jury decisions, court interpretations, or legislative changes and as such the actual loss may vary from the estimated liability recorded.

**Occupational claims** – Occupational claims (including asbestosis and other respiratory diseases, as well as conditions allegedly related to repetitive motion) are often not caused by a specific accident or event but rather allegedly result from a claimed exposure over time. Many such claims are being asserted by former or retired employees, some of whom have not been employed in the rail industry for decades. The independent actuarial firm provides an estimate of the occupational claims liability based upon NS' history of claim filings, severity, payments, and other pertinent facts. The liability is dependent upon management's judgments made as to the specific case reserves as well as judgments of the consulting independent actuarial firm in the periodic studies. The actuarial firm's estimate of ultimate loss includes a provision for those claims that have been incurred but not reported. This provision is derived by analyzing industry data and projecting NS' experience into the future as far as can be reasonably determined. NS adjusts its liability quarterly based upon management's assessment and the results of the study. However, it is possible that the recorded liability may not be adequate to cover the future payment of claims. Adjustments to the recorded liability are reflected in operating expenses in the periods in which such adjustments become known.

**Third-party claims** – NS records a liability for third-party claims including those for highway crossing accidents, trespasser and other injuries, automobile liability, property damage, and lading damage. The independent actuarial firm assists with the calculation of potential liability for third-party claims, except lading damage, based upon NS' experience including number and timing of incidents, amount of payments, settlement rates, number of open claims, and legal defenses. The actuarial estimate includes a provision for claims that have been incurred but have not yet been reported. Each quarter NS adjusts its liability based upon management's assessment and the results of the study. Given the inherent uncertainty in regard to the ultimate outcome of third-party claims, it is possible that the actual loss may differ from the estimated liability recorded.

**Environmental Matters**

NS is subject to various jurisdictions' environmental laws and regulations. It is NS' policy to record a liability where such liability or loss is probable and its amount can be estimated reasonably. Claims, if any, against third parties for recovery of cleanup costs incurred by NS are reflected as receivables (when collection is probable) in the Consolidated Balance Sheets and are not netted against the associated NS liability.

Environmental engineers regularly participate in ongoing evaluations of all known sites and in determining any necessary adjustments to liability estimates. NS also has an Environmental Policy Council, composed of senior managers, to oversee and interpret its environmental policy.

NS' Consolidated Balance Sheets include liabilities for environmental exposures in the amount of $42 million at December 31, 2008, and $46 million at December 31, 2007 (of which $12 million is classified as a current liability at December 31, 2008 and 2007). At December 31, 2008, the liability represents NS' estimate of the probable cleanup and remediation costs based on available information at 148 known locations compared with 155 locations at December 31, 2007. As of December 31, 2008, 13 sites accounted for $22 million of the liability, and no individual site was considered to be material. NS anticipates that much of this liability will be paid out over five years; however, some costs will be paid out over a longer period.

At 30 locations, one or more Norfolk Southern subsidiaries, usually in conjunction with a number of other parties, have been identified as potentially responsible parties by the Environmental Protection Agency (EPA) or similar state authorities under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, or comparable state statutes, which often impose joint and several liability for cleanup costs.

With respect to known environmental sites (whether identified by NS or by the EPA or comparable state authorities), estimates of NS' ultimate potential financial exposure for a given site or in the aggregate for all such sites are necessarily imprecise because of the widely varying costs of currently available cleanup techniques, the likely development of new cleanup technologies, the difficulty of determining in advance the nature and full extent of contamination and each potential participant's share of any estimated loss (and that participant's ability to bear it), and evolving statutory and regulatory standards governing liability.

The risk of incurring environmental liability – for acts and omissions, past, present and future - is inherent in the railroad business. Some of the commodities in NS' traffic mix, particularly those classified as hazardous materials, pose special risks that NS and its subsidiaries work diligently to minimize. In addition, several NS subsidiaries own, or have owned, land used as operating property, or which is leased and operated by others, or held for sale. Because environmental problems may exist on these properties that are latent or undisclosed, there can be no assurance that NS will not incur environmental liabilities or costs with respect to one or more of them, the amount and materiality of which cannot be estimated reliably at this time. Moreover, lawsuits and claims involving these and potentially other unidentified environmental sites and matters are likely to arise from time to time. The resulting liabilities could have a significant effect on financial position, results of operations, or liquidity in a particular year or quarter.

On April 24, 2008, the United States Department of Justice (DOJ) brought an action against NS for alleged violations of federal environmental laws resulting from the discharge of chlorine and oil that occurred as a result of the January 6, 2005, derailment in Graniteville, SC, including claims for civil penalties as well as injunctive relief. On June 24, 2008, NS filed a motion to dismiss DOJ's claims, contending that insufficient facts have been alleged to support such claims. NS does not believe that the outcome of these proceedings will have a material effect on its financial position, results of operations, or liquidity.

Based on its assessment of the facts and circumstances now known, management believes that it has recorded the probable costs for dealing with those environmental matters of which NS is aware. Further, management believes that it is unlikely that any known matters, either individually or in the aggregate, will have a material adverse effect on NS' financial position, results of operations, or liquidity.

**Insurance**

Norfolk Southern obtains on behalf of itself and its subsidiaries insurance for potential losses for third-party liability and first-party property damages. NS is currently self-insured up to $25 million and above $1 billion

per occurrence for bodily injury and property damage to third parties and up to $25 million and above $175 million per occurrence for property owned by NS or in NS' care, custody or control.

**Purchase Commitments**

At December 31, 2008, NS had outstanding purchase commitments of approximately $119 million primarily for freight cars, RoadRailer® trailers and track material in connection with its capital programs through 2010.

**Change-In-Control Arrangements**

Norfolk Southern has compensation agreements with officers and certain key employees that become operative only upon a change in control of Norfolk Southern, as defined in those agreements. The agreements provide generally for payments based on compensation at the time of a covered individual's involuntary or other specified termination and for certain other benefits.

**Guarantees**

In a number of instances, Norfolk Southern and its subsidiaries have agreed to indemnify lenders for additional costs they may bear as a result of certain changes in laws or regulations applicable to their loans. Such changes may include impositions or modifications with respect to taxes, duties, reserves, liquidity, capital adequacy, special deposits, and similar requirements relating to extensions of credit by, deposits with, or the assets or liabilities of such lenders. The nature and timing of changes in laws or regulations applicable to NS' financings are inherently unpredictable, and therefore NS' exposure in connection with the foregoing indemnifications cannot be quantified. No liability has been recorded related to these indemnifications. In the case of one type of equipment financing, NSR's Japanese leveraged leases, NSR may terminate the leases and ancillary agreements if such a change-in-law indemnity is triggered. Such a termination would require NSR to make early termination payments that would not be expected to have a material effect on NS' financial position, results of operations, or liquidity.

NS has indemnified parties in a number of transactions for U.S. income tax withholding imposed as a result of changes in U.S. tax law. In all cases, NS has the right to unwind the related transaction if the withholding cannot be avoided in the future. Because these indemnities would be triggered and are dependent upon a change in the tax law, the maximum exposure is not quantifiable. Management does not believe that it is likely that it will be required to make any payments under these indemnities.

As of December 31, 2008, certain Norfolk Southern subsidiaries are contingently liable as guarantors with respect to $8 million of indebtedness, due in 2019, of an entity in which they have an ownership interest, the Terminal Railroad Association of St. Louis. Four other railroads are also jointly and severally liable as guarantors for this indebtedness. No liability has been recorded related to this guaranty.

*** * * * ***

**NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES**
**QUARTERLY FINANCIAL DATA**
**(Unaudited)**

| | Three Months Ended | | | |
|---|---|---|---|---|
| | **March 31** | **June 30** | **September 30** | **December 31** |
| | *($ in millions, except per share amounts)* | | | |
| **2008** | | | | |
| Railway operating revenues | $ 2,500 | $ 2,765 | $ 2,894 | $ 2,502 |
| Income from railway operations | 578 | 799 | 894 | 813 |
| Net income | 291 | 453 | 520 | 452 |
| Earnings per share: | | | | |
| Basic | $ 0.77 | $ 1.20 | $ 1.39 | $ 1.23 |
| Diluted | $ 0.76 | $ 1.18 | $ 1.37 | $ 1.21 |
| **2007** | | | | |
| Railway operating revenues | $ 2,247 | $ 2,378 | $ 2,353 | $ 2,454 |
| Income from railway operations | 528 | 690 | 681 | 686 |
| Net income | 285 | 394 | 386 | 399 |
| Earnings per share: | | | | |
| Basic | $ 0.72 | $ 1.00 | $ 0.99 | $ 1.04 |
| Diluted | $ 0.71 | $ 0.98 | $ 0.97 | $ 1.02 |

**Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

None.

**Item 9A. Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

Norfolk Southern's Chief Executive Officer and Chief Financial Officer, with the assistance of management, evaluated the effectiveness of NS' disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of December 31, 2008. Based on such evaluation, such officers have concluded that, as of December 31, 2008, NS' disclosure controls and procedures were effective to ensure that information required to be disclosed in NS' reports under the Exchange Act is recorded, processed, summarized, and reported, within the time period specified in the SEC's rules and forms, and that such information is accumulated and communicated to management, including the Chief Executive Officer and the Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

**Internal Control Over Financial Reporting**

The management of Norfolk Southern is responsible for establishing and maintaining adequate internal control over financial reporting. Norfolk Southern's internal control over financial reporting includes those policies and procedures that pertain to its ability to record, process, summarize, and report reliable financial data. Management recognizes that there are inherent limitations in the effectiveness of any internal control over financial reporting, including the possibility of human error and the circumvention or overriding of internal control. Accordingly, even effective internal control over financial reporting can provide only reasonable assurance with respect to financial statement preparation. Further, because of changes in conditions, the effectiveness of internal control over financial reporting may vary over time.

In order to ensure that Norfolk Southern's internal control over financial reporting is effective, management regularly assesses such controls and did so most recently for its financial reporting as of December 31, 2008. This assessment was based on criteria for effective internal control over financial reporting set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in *Internal Control-Integrated Framework*. Based on our assessment, management has concluded that Norfolk Southern maintained effective internal control over financial reporting as of December 31, 2008.

The Board of Directors, acting through its Audit Committee, is responsible for the oversight of Norfolk Southern's accounting policies, financial reporting and internal control. The Audit Committee of the Board of Directors is comprised entirely of outside directors who are independent of management. The independent registered public accounting firm and the internal auditors have full and unlimited access to the Audit Committee, with or without management, to discuss the adequacy of internal control over financial reporting, and any other matters which they believe should be brought to the attention of the Audit Committee.

Norfolk Southern's management has issued a report of its assessment of internal control over financial reporting, and Norfolk Southern's independent registered public accounting firm has issued an attestation report on Norfolk Southern's internal controls over financial reporting as of December 31, 2008. These reports appear in Part II, Item 8 of this report on Form 10-K.

During the fourth quarter of 2008, management has not identified any changes in internal controls over financial reporting that have materially affected, or are reasonably likely to materially affect, NS' internal control over financial reporting.

**Item 9B. Other Information**

None.

# PART III

## NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES (NS)

### Item 10. Directors, Executive Officers and Corporate Governance

In accordance with General Instruction G(3), information called for by Item 10, Part III, is incorporated herein by reference from the information appearing under the caption "Election of Directors," under the caption "Section 16(a) Beneficial Ownership Reporting Compliance," under the caption "Corporate Governance," and under the caption "Committees" in Norfolk Southern's definitive Proxy Statement for the Annual Meeting of Stockholders to be held on May 14, 2009, which definitive Proxy Statement will be filed electronically with the Securities and Exchange Commission (Commission) pursuant to Regulation 14A. The information regarding executive officers called for by Item 401 of Regulation S-K is included in Part I hereof beginning under "Executive Officers of the Registrant."

### Item 11. Executive Compensation

In accordance with General Instruction G(3), information called for by Item 11, Part III, is incorporated herein by reference from the information:

- appearing under the subcaption "Compensation" under the caption "Board of Directors" for directors, including the "2008 Non-Employee Director Compensation Table" and the "Narrative to Non-Employee Director Compensation Table;"
- appearing under the caption "Executive Compensation" for executives, including the "Compensation Discussion and Analysis," the information appearing in the "Summary Compensation Table" and the "2008 Grants of Plan-Based Awards" table, including the narrative to such tables, the "Outstanding Equity Awards at Fiscal Year-End 2008" and "Option Exercises and Stock Vested in 2008" tables, and the tabular and narrative information appearing under the subcaptions "Retirement Benefits," "Deferred Compensation," and "Potential Payments Upon a Change in Control or Other Termination of Employment;" and
- appearing under the captions "Compensation Committee Interlocks and Insider Participation" and "Compensation Committee Report,"

in each case included in Norfolk Southern's definitive Proxy Statement for the Annual Meeting of Stockholders to be held on May 14, 2009, which definitive Proxy Statement will be filed electronically with the Commission pursuant to Regulation 14A.

### Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters

In accordance with General Instruction G(3), information on security ownership of certain beneficial owners and management called for by Item 12, Part III, Item 403 of Regulation S-K, is incorporated herein by reference from the information appearing under the caption "Beneficial Ownership of Stock" in Norfolk Southern's definitive Proxy Statement for the Annual Meeting of Stockholders to be held on May 14, 2009, which definitive Proxy Statement will be filed electronically with the Commission pursuant to Regulation 14A.

**Equity Compensation Plan Information (as of December 31, 2008)**

| Plan Category | Number of securities to be issued upon exercise of outstanding options, warrants and rights (a) | | Weighted-average Exercise price of outstanding options, warrants and rights (b) | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) (c) |
|---|---|---|---|---|
| Equity compensation plans approved by security holders[1] | 14,937,465 [3] | $ | 31.26 [5] | 6,837,414 [6] |
| Equity compensation plans not approved by security holders[2] | 1,946,100 [4] | $ | 35.52 | 2,072,420 [7] |
| Total | 16,883,565 | | | 8,909,834 |

1 The Long-Term Incentive Plan, excluding five million shares for broad-based issuance to non-officers.
2 The Long-Term Incentive Plan's five million shares for broad-based issuance to non-officers, the Thoroughbred Stock Option Plan and the Directors' Restricted Stock Plan.
3 Includes options, restricted stock units and performance share units granted under the Long-Term Incentive Plan that may be settled in shares of stock.
4 Includes options granted under the Long-Term Incentive Plan on 428,168 shares for non-officers and options granted under the Thoroughbred Stock Option Plan.
5 Calculated without regard to 2,598,842 outstanding restricted stock units and performance share units at December 31, 2008.
6 Of the shares remaining available for grant under plans approved by stockholders, 5,582,679 are available for grant as restricted shares, performance shares or restricted stock unit shares under the Long-Term Incentive Plan.
7 Of the shares remaining available for grant under plans not approved by stockholders, 30,000 are available for grant as restricted stock under the Directors' Restricted Stock Plan.

**Norfolk Southern Corporation Long-Term Incentive Plan ("LTIP")**

Established on June 28, 1983, and approved by stockholders at their Annual Meeting held on May 10, 1984, LTIP was adopted to promote the success of Norfolk Southern by providing an opportunity for non-employee directors, officers and other key employees to acquire a proprietary interest in the Corporation. On January 23, 2001, the Board of Directors further amended LTIP and approved the issuance of an additional 5,000,000 shares of authorized but unissued Common Stock under LTIP to participants who are not officers of Norfolk Southern. The issuance of these shares was broadly-based, and stockholder approval of these shares was not required. Accordingly, this portion of LTIP is included in the number of securities available for future issuance for plans not approved by stockholders. Also on January 23, 2001, the Board amended LTIP, which amendment was approved by shareholders on May 10, 2001, that included the reservation for issuance of an additional 30,000,000 shares of authorized but unissued Norfolk Southern Common Stock.

Pursuant to another amendment approved by stockholders on May 12, 2005, not more than 8,500,000 of the shares remaining available for issuance under LTIP may be awarded as restricted shares, performance shares or restricted stock unit shares. Cash payments of restricted stock units, stock appreciation rights, and performance share units will not be applied against the maximum number of shares issuable under LTIP. Any shares of Common Stock

subject to options, performance share units, restricted shares or restricted stock units which are not issued as Common Stock will again be available for award under LTIP after the expiration or forfeiture of an award.

Non-employee directors, officers and other key employees residing in the United States or Canada are eligible for selection to receive LTIP awards. Under LTIP, the Compensation Committee (Committee) may grant incentive stock options, nonqualified stock options, stock appreciation rights, restricted shares, restricted stock units, and performance share units. In addition, dividend equivalents may be awarded for options, restricted stock units, and performance share units. The Committee may make awards under LTIP subject to forfeiture under certain circumstances and may establish such other terms and conditions for the awards as provided in LTIP.

For options, the option price per share will not be less than 100% of the fair market value of Norfolk Southern's Common Stock on the effective date the option is granted. All options are subject to a vesting period of at least one year, and the term of the option will not exceed ten years. LTIP specifically prohibits option repricing without stockholder approval, except for capital adjustments.

Performance share units entitle a recipient to receive performance-based compensation at the end of a three-year performance cycle based on Norfolk Southern's performance during that three-year period. For the 2008 performance share unit awards, corporate performance will be measured using three equally weighted standards established by the Committee: (1) three-year average return on average capital invested, (2) three-year average operating ratio, and (3) three-year total return to stockholders as compared with the average total return on all stocks comprising the S&P 500 composite stock price index. Performance share units may be payable in either shares of Norfolk Southern Common Stock or cash.

Restricted stock units are payable in cash or in shares of Norfolk Southern Common Stock at the end of a restriction period of not less than 36 months and not more than 60 months. During the restriction period, the holder of the restricted stock units has no beneficial ownership interest in the Norfolk Southern Common Stock represented by the restricted stock units and has no right to vote the shares represented by the units or to receive dividends (except for dividend equivalent rights that may be awarded with respect to the restricted stock units). The Committee at its discretion may waive the restriction period.

**Norfolk Southern Corporation Thoroughbred Stock Option Plan**

The Board adopted the Norfolk Southern Corporation Thoroughbred Stock Option Plan ("TSOP") on January 26, 1999, to promote the success of Norfolk Southern by providing an opportunity for nonagreement employees to acquire a proprietary interest in Norfolk Southern and thereby to provide an additional incentive to nonagreement employees to devote their maximum efforts and skills to the advancement, betterment, and prosperity of Norfolk Southern and its stockholders. Under the TSOP there were 6,000,000 shares of authorized but unissued Common Stock reserved for issuance. TSOP has not been and is not required to have been approved by stockholders.

Active full-time nonagreement employees residing in the United States or Canada are eligible for selection to receive TSOP awards. Under TSOP, the Committee may grant nonqualified stock options subject to such terms and conditions as provided in TSOP.

The option price will not be less than 100% of the fair market value of Norfolk Southern's Common Stock on the effective date the options are granted. All options are subject to a vesting period of at least one year, and the term of the option will not exceed ten years. Options awarded in 2008 are subject to a three-year vesting period. TSOP specifically prohibits option repricing without stockholder approval, except for capital adjustments.

**Norfolk Southern Corporation Directors' Restricted Stock Plan**

The Norfolk Southern Corporation Directors' Restricted Stock Plan ("Plan") was adopted on January 1, 1994, and is designed to increase ownership of Norfolk Southern Common Stock by its non-employee directors so as to further align their ownership interest in Norfolk Southern with that of stockholders. The Plan has not been and is not required to have been approved by stockholders. Currently, a maximum of 66,000 shares of Norfolk Southern Common Stock may be granted under the Plan. To make grants to eligible directors, Norfolk Southern purchases, through one or more subsidiary companies, the number of shares required in open-market transactions at prevailing market prices, or makes such grants from Norfolk Southern Common Stock already owned by one or more of Norfolk Southern's subsidiary companies.

Only non-employee directors who are not and never have been employees of Norfolk Southern are eligible to participate in the Plan. Upon becoming a director, each eligible director receives a one-time grant of 3,000 restricted shares of Norfolk Southern Common Stock. No individual member of the Board exercises discretion concerning the eligibility of any director or the number of shares granted.

The restriction period applicable to restricted shares granted under the Plan begins on the date of the grant and ends on the earlier of the recipient's death or six months after the recipient ceases to be a director by reason of disability or retirement. During the restriction period shares may not be sold, pledged, or otherwise encumbered. Directors will forfeit the restricted shares if they cease to serve as a director of Norfolk Southern for reasons other than their disability, retirement, or death.

**Item 13. Certain Relationships and Related Transactions, and Director Independence**

In accordance with General Instruction G(3), information called for by Part III, Item 13, is incorporated herein by reference from the information appearing under the caption "Transactions with Related Persons" and under the caption "Director Independence" in Norfolk Southern's definitive Proxy Statement for the Annual Meeting of Stockholders to be held on May 14, 2009, which definitive Proxy Statement will be filed electronically with the Commission pursuant to Regulation 14A.

**Item 14. Principal Accountant Fees and Services**

In accordance with General Instruction G(3), information called for by Part III, Item 14, is incorporated herein by reference from the information appearing under the caption "Ratification of Appointment of Independent Registered Public Accounting Firm" in Norfolk Southern's definitive Proxy Statement for the Annual Meeting of Stockholders to be held on May 14, 2009, which definitive proxy statement will be filed electronically with the Commission pursuant to Regulation 14A.

# PART IV

## NORFOLK SOUTHERN CORPORATION AND SUBSIDIARIES (NS)

## Item 15. Exhibits and Financial Statement Schedules

(A) The following documents are filed as part of this report:

1. Index to Consolidated Financial Statements



| | Page |
|---|---|
| Report of Management | K42 |
| Reports of Independent Registered Public Accounting Firm | K43 |
| Consolidated Statements of Income, Years ended December 31, 2008, 2007 and 2006 | K45 |
| Consolidated Balance Sheets as of December 31, 2008 and 2007 | K46 |
| Consolidated Statements of Cash Flows, Years ended December 31, 2008, 2007 and 2006 | K47 |
| Consolidated Statements of Changes in Stockholders' Equity, Years ended December 31, 2008, 2007 and 2006 | K48 |
| Notes to Consolidated Financial Statements | K49 |



2. Financial Statement Schedule:

The following consolidated financial statement schedule should be read in connection with the consolidated financial statements:



| Index to Consolidated Financial Statement Schedule | Page |
|---|---|
| Schedule II - Valuation and Qualifying Accounts | K95 |



Schedules other than the one listed above are omitted either because they are not required or are inapplicable, or because the information is included in the consolidated financial statements or related notes.

3. Exhibits

| Exhibit Number | Description |
|---|---|
| 3 | Articles of Incorporation and Bylaws - |
| 3(i) | The Restated Articles of Incorporation of Norfolk Southern Corporation are incorporated by reference to Exhibit 3(i) to Norfolk Southern Corporation's 10-K filed on March 5, 2001. |
| 3(ii) | The Bylaws of Norfolk Southern Corporation, as amended effective January 27, 2009, are incorporated by reference to Exhibit 3(ii) to Norfolk Southern Corporation's Form 8-K filed on January 30, 2009. |
| 4 | Instruments Defining the Rights of Security Holders, Including Indentures: |
| (a) | Indenture, dated as of January 15, 1991, from Norfolk Southern Corporation to First Trust of New York, National Association, as Trustee, is incorporated by reference to Exhibit 4.1 to Norfolk Southern Corporation's Registration Statement on Form S-3 (No. 33-38595). |

(b) First Supplemental Indenture, dated May 19, 1997, between Norfolk Southern Corporation and First Trust of New York, National Association, as Trustee, related to the issuance of notes in the principal amount of $4.3 billion, is incorporated herein by reference to Exhibit 1.1(d) to Norfolk Southern Corporation's Form 8-K filed on May 21, 1997.

(c) Second Supplemental Indenture, dated April 26, 1999, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, related to the issuance of notes in the principal amount of $400 million, is incorporated herein by reference to Exhibit 1.1(c) to Norfolk Southern Corporation's Form 8-K filed on April 30, 1999.

(d) Third Supplemental Indenture, dated May 23, 2000, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, related to the issuance of notes in the principal amount of $600 million, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on May 25, 2000.

(e) Fourth Supplemental Indenture, dated as of February 6, 2001, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, related to the issuance of notes in the principal amount of $1 billion, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on February 7, 2001.

(f) Sixth Supplemental Indenture, dated as of April 30, 2002, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, relating to the issuance of notes in the principal amount of $200 million, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on May 1, 2002.

(g) Eighth Supplemental Indenture, dated as of September 17, 2004, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, relating to the issuance of 5.257% Notes due 2014 ("Securities") in the aggregate principal amount of $441.5 million in connection with Norfolk Southern Corporation's offer to exchange the Securities and cash for up to $400 million of its outstanding 7.350% Notes due 2007, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on September 23, 2004.

(h) Indenture, dated August 27, 2004, among PRR Newco, Inc., as Issuer, and Norfolk Southern Railway Company, as Guarantor, and The Bank of New York, as Trustee, is incorporated herein by reference to Exhibit 4(l) to Norfolk Southern Corporation's Form 10-Q filed on October 28, 2004.

(i) First Supplemental Indenture, dated August 27, 2004, among PRR Newco, Inc., as Issuer, and Norfolk Southern Railway Company, as Guarantor, and The Bank of New York, as Trustee, related to the issuance of notes in the principal amount of approximately $451.8 million, is incorporated herein by reference to Exhibit 4(m) to Norfolk Southern Corporation's Form 10-Q filed on October 28, 2004.

(j) Ninth Supplemental Indenture, dated as of March 11, 2005, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, relating to the issuance of notes in the principal amount of $300 million, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on March 15, 2005.

(k) Tenth Supplemental Indenture, dated as of May 17, 2005, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, relating to the issuance of notes in the principal amount of $366.6 million, is incorporated herein by reference to Exhibit 99.1 to Norfolk Southern Corporation's Form 8-K filed on May 18, 2005.

(l) Eleventh Supplemental Indenture, dated as of May 17, 2005, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, relating to the issuance of notes in the principal amount of $350 million, is incorporated herein by reference to Exhibit 99.2 to Norfolk Southern Corporation's Form 8-K filed on May 18, 2005.

(m) Indenture, dated as of April 4, 2008, between Norfolk Southern Corporation and U.S. Bank Trust National Association, as Trustee, relating to the issuance of notes in the principal amount of $600 million, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on April 9, 2008.

(n) Indenture, dated as of January 15, 2009, between Norfolk Southern Corporation and U.S. Bank trust National Association, as Trustee, relating to the issuance of notes in the principal amount of $500 million, is incorporated herein by reference to Exhibit 4.1 to Norfolk Southern Corporation's Form 8-K filed on January 20, 2009.

(o) Registration Rights Agreement, dated as of January 15, 2009, among Norfolk Southern Corporation and Citigroup Global Markets Inc., J.P. Morgan Securities Inc and UBS Securities LLC, is incorporated herein by reference to Exhibit 4.2 to Norfolk Southern Corporation's Form 8-K filed on January 20, 2009.

(p) In accordance with Item 601(b)(4)(iii) of Regulation S-K, copies of other instruments of Norfolk Southern Corporation and its subsidiaries with respect to the rights of holders of long-term debt are not filed herewith, or incorporated by reference, but will be furnished to the Commission upon request.

10 Material Contracts -

(a) The Transaction Agreement, dated as of June 10, 1997, by and among CSX, CSX Transportation, Inc., Registrant, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation, and CRR Holdings LLC, with certain schedules thereto, previously filed, is incorporated herein by reference to Exhibit 10(a) to Norfolk Southern Corporation's Form 10-K filed on February 24, 2003.

(b) Amendment No. 1, dated as of August 22, 1998, to the Transaction Agreement, dated as of June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation, and CRR Holdings LLC, is incorporated herein by reference from Exhibit 10.1 to Norfolk Southern Corporation's Form 10-Q filed on August 11, 1999.

(c) Amendment No. 2, dated as of June 1, 1999, to the Transaction Agreement, dated June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation, and CRR Holdings LLC, is incorporated herein by reference from Exhibit 10.2 to Norfolk Southern Corporation's Form 10-Q filed on August 11, 1999.

(d) Amendment No. 3, dated as of June 1, 1999, and executed in April 2004, to the Transaction Agreement, dated June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation, and CRR Holdings LLC, is incorporated herein by reference to Exhibit 10(dd) to Norfolk Southern Corporation's Form 10-Q filed on July 30, 2004.

(e) Amendment No. 5 to the Transaction Agreement, dated as of August 27, 2004, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Corporation, Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation, and CRR Holdings LLC, is incorporated herein by reference to Exhibit 10.1 to Norfolk Southern Corporation's Form 8-K filed on September 2, 2004.

(f) Amendment No. 6, dated as of April 1, 2007, to the Transaction Agreement dated June 10, 1997, by and among CSX Corporation, CSX Transportation, Inc., Norfolk Southern Railway Company, Conrail Inc., Consolidated Rail Corporation, and CRR Holdings LLC is incorporated herein by reference to Exhibit 10.5 to Norfolk Southern Corporation's Form 10-Q filed on July 27, 2007.

(g) Shared Assets Area Operating Agreement for North Jersey, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc., and Norfolk Southern Railway Company, with exhibit thereto, is incorporated herein by reference from Exhibit 10.4 to Norfolk Southern Corporation's Form 10-Q filed on August 11, 1999.

(h) Shared Assets Area Operating Agreement for Detroit, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc., and Norfolk Southern Railway Company, with exhibit thereto, is incorporated herein by reference from Exhibit 10.6 to Norfolk Southern Corporation's Form 10-Q filed on August 11, 1999.

(i) Shared Assets Area Operating Agreement for South Jersey/Philadelphia, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation Inc., and Norfolk Southern Railway Company, with exhibit thereto, is incorporated herein by reference from Exhibit 10.5 to Norfolk Southern Corporation's Form 10-Q filed on August 11, 1999.

(j) Amendment No. 1, dated as of June 1, 2000, to the Shared Assets Areas Operating Agreement for North Jersey, South Jersey/Philadelphia, and Detroit, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc., and Norfolk Southern Railway Company, with exhibit thereto, is incorporated herein by reference to Exhibit 10(h) to Norfolk Southern Corporation's 10-K filed on March 5, 2001.

(k) Amendment No. 2, dated as January 1, 2001, to the Shared Assets Area Operating Agreements for North Jersey, South Jersey/Philadelphia, and Detroit, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc., and Norfolk Southern Railway Company, with exhibit thereto, is incorporated herein by reference to Exhibit 10(j) to Norfolk Southern Corporation's Form 10-K filed on February 21, 2002.

(l) Amendment No. 3, dated as of June 1, 2001, and executed in May of 2002, to the Shared Assets Area Operating Agreement for North Jersey, South Jersey/Philadelphia, and Detroit, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc., and Norfolk Southern Railway Company, with exhibit thereto, is incorporated herein by reference to Exhibit 10(k) to Norfolk Southern Corporation's Form 10-K filed on February 24, 2003.

(m) Amendment No. 4, dated as of June 1, 2005, and executed in late June 2005, to the Shared Assets Area Operating Agreement for North Jersey, South Jersey/Philadelphia, and Detroit, dated as of June 1, 1999, by and among Consolidated Rail Corporation, CSX Transportation, Inc., and Norfolk Southern Railway Company, with exhibits thereto, is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K filed on July 1, 2005.

(n) Monongahela Usage Agreement, dated as of June 1, 1999, by and among CSX Transportation, Inc., Norfolk Southern Railway Company, Pennsylvania Lines LLC, and New York Central Lines LLC, with exhibit thereto, is incorporated herein by reference from Exhibit 10.7 to Norfolk Southern Corporation's Form 10-Q filed on August 11, 1999.

(o) The Agreement, entered into as of July 27, 1999, between North Carolina Railroad Company and Norfolk Southern Railway Company, is incorporated herein by reference from Exhibit 10(i) to Norfolk Southern Corporation's Form 10-K filed on March 6, 2000.

(p) First Amendment dated March 19, 2007, to the Master Agreement dated July 27, 1999, by and between North Carolina Railroad Company and Norfolk Southern Railway Company is incorporated herein by reference to Exhibit 10.3 to Norfolk Southern Corporation's Form 10-Q filed on July 27, 2007.

(q) The Supplementary Agreement, entered into as of January 1, 1987, between the Trustees of the Cincinnati Southern Railway and The Cincinnati, New Orleans and Texas Pacific Railway Company (the latter a wholly owned subsidiary of Norfolk Southern Railway Company) – extending and amending a Lease, dated as of October 11, 1881 - is incorporated by reference to Exhibit 10(k) to Norfolk Southern Corporation's Form 10-K filed on March 5, 2001.

(r)* The Norfolk Southern Corporation Executive Management Incentive Plan, effective January 25, 2005, is incorporated by reference herein from Exhibit 99 to Norfolk Southern Corporation's Form 8-K filed on May 13, 2005.

(s)* The Norfolk Southern Corporation Officers' Deferred Compensation Plan, as amended effective September 26, 2000, is incorporated herein by reference to Exhibit 10(n) to Norfolk Southern Corporation's Form 10-K filed on March 5, 2001.

(t)* The Norfolk Southern Corporation Executives' Deferred Compensation Plan, as amended effective January 20, 2001, is incorporated herein by reference to Exhibit 10(o) to Norfolk Southern Corporation's Form 10-K filed on March 5, 2001.

(u)* The Directors' Deferred Fee Plan of Norfolk Southern Corporation, as amended effective January 23, 2001, is incorporated herein by reference to Exhibit 10(p) to Norfolk Southern Corporation's Form 10-K filed on March 5, 2001.

(v)* The Norfolk Southern Corporation Directors' Restricted Stock Plan, effective January 1, 1994, as restated November 24, 1998, is incorporated herein by reference from Exhibit 10(h) to Norfolk Southern Corporation's Form 10-K filed on March 24, 1999.

(w)* Form of Severance Agreement, dated as of June 1, 1996, between Norfolk Southern Corporation and certain executive officers (including those defined as "named executive officers" and identified in the Corporation's Proxy Statement for the 1997 through 2001 Annual Meetings of Stockholders), is incorporated herein by reference to Exhibit 10(t) to Norfolk Southern Corporation's Form 10-K filed on February 21, 2002.

(x)*,** Supplemental Benefit Plan of Norfolk Southern Corporation and Participating Subsidiary Companies, as amended effective January 1, 2009.

(y)* The Norfolk Southern Corporation Directors' Charitable Award Program, as amended effective July 2007, is incorporated herein by reference to Exhibit 10.6 to Norfolk Southern Corporation's Form 10-Q filed on July 27, 2007.

(z)* The Norfolk Southern Corporation Outside Directors' Deferred Stock Unit Program, as amended effective January 22, 2008, is incorporated herein by reference to Exhibit 10.1 to Norfolk Southern Corporation's Form 8-K filed on January 25, 2008.

(aa)* Form of Agreement, dated as of October 1, 2001, providing enhanced pension benefits to three officers in exchange for their continued employment with Norfolk Southern Corporation for two years, is incorporated herein by reference to Exhibit 10(w) to Norfolk Southern Corporation's Form 10-Q filed on November 9, 2001. The agreement was entered into with L. Ike Prillaman, former Vice Chairman and Chief Marketing Officer; Stephen C. Tobias, Vice Chairman and Chief Operating Officer; and Henry C. Wolf, former Vice Chairman and Chief Financial Officer.

(bb) The Norfolk Southern Corporation Thoroughbred Stock Option Plan, as amended effective January 28, 2003, is incorporated herein by reference to Exhibit 10(z) to Norfolk Southern Corporation's Form 10-K filed on February 24, 2003.

(cc)* The Norfolk Southern Corporation Restricted Stock Unit Plan, effective January 28, 2003, is incorporated herein by reference to Exhibit 10(bb) to Norfolk Southern Corporation's Form 10-K filed on February 24, 2003.

(dd)*,** The Norfolk Southern Corporation Executive Life Insurance Plan, as amended and restated effective January 1, 2009.

(ee) Distribution Agreement, dated as of July 26, 2004, by and among CSX Corporation, CSX Transportation, Inc., CSX Rail Holding Corporation, CSX Northeast Holdings Corporation, Norfolk Southern Corporation, Norfolk Southern Railway Company, CRR Holdings LLC, Green Acquisition Corp., Conrail Inc., Consolidated Rail Corporation, New York Central Lines LLC, Pennsylvania Lines LLC, NYC Newco, Inc., and PRR Newco, Inc., is incorporated herein by reference to Exhibit 2.1 to Norfolk Southern Corporation's Form 8-K filed on September 2, 2004.

(ff) Tax Allocation Agreement, dated as of August 27, 2004, by and among Green Acquisition Corp., Conrail Inc., Consolidated Rail Corporation, New York Central Lines LLC, and Pennsylvania Lines LLC, is incorporated herein by reference to Exhibit 10.2 to Norfolk Southern Corporation's Form 8-K filed on September 2, 2004.

(gg) Amended and Restated Credit Agreement dated as of June 26, 2007, with respect to the Registrant's $1 billion unsecured revolving credit facility, is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K filed on June 27, 2007.

(hh)* The description of Norfolk Southern Corporation's executive physical reimbursement for non-employee directors and certain executives is incorporated herein by reference to Norfolk Southern Corporation's Form 8-K filed on July 28, 2005.

(ii)* Form of 2005 Incentive Stock Option and Non-Qualified Stock Option Agreement under the Norfolk Southern Long-Term Incentive Plan, is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K filed on January 7, 2005.

(jj)* Form of 2005 Restricted Share Agreement under the Norfolk Southern Long-Term Incentive Plan, is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K filed on January 7, 2005.

(kk)* Form of 2006 Incentive Stock Option and Non-Qualified Stock Option Agreement under the Norfolk Southern Long-Term Incentive Plan, is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K/A filed on December 7, 2005.

(ll)* Form of 2005 Restricted Stock Unit Agreement under the Norfolk Southern Long-Term Incentive Plan, is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K filed on January 7, 2005.

(mm)* Form of 2006 Restricted Share and Restricted Stock Unit Agreement under the Norfolk Southern Corporation Long-Term Incentive Plan, is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K/A filed on December 7, 2005.

(nn)* Form of 2006 Performance Share Unit Award under the Norfolk Southern Corporation Long-Term Incentive Plan, is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K/A filed on December 7, 2005.

(oo) The Transaction Agreement, dated as of December 1, 2005, by and among Norfolk Southern Corporation, The Alabama Great Southern Railroad Company, Kansas City Southern, and The Kansas City Southern Railway Company is incorporated herein by reference to Exhibit 10.(ll) to Norfolk Southern Corporation's Form 10-K filed on February 23, 2006 (Exhibits, annexes and schedules omitted. The Registrant will furnish supplementary copies of such materials to the SEC upon request).

(pp) Amendment No. 1, dated as of January 17, 2006, by and among Norfolk Southern Corporation, The Alabama Great Southern Railroad Company, Kansas City Southern, and the Kansas City Southern Railroad is incorporated herein by reference to Exhibit 10.(mm) to Norfolk Southern Corporation's Form 10-K filed on February 23, 2006.

(qq) Amendment No. 2, dated as of May 1, 2006, to the Transaction Agreement, dated as of December 1, 2005, by and among Norfolk Southern Corporation, The Alabama Great Southern Railroad Company, Kansas City Southern, and The Kansas City Southern Railway Company is incorporated herein by reference to Exhibit 10.1 to Norfolk Southern Corporation's Form 8-K filed on May 4, 2006.

(rr)* The retirement agreement, dated January 27, 2006, between Norfolk Southern Corporation and David R. Goode, is incorporated herein by reference to Exhibit 10.1 to Norfolk Southern Corporation's Form 8-K filed on January 27, 2006.

(ss)* The waiver agreement, dated January 27, 2006, between Norfolk Southern Corporation and David R. Goode, providing for the waiver of forfeiture provisions otherwise applicable to certain restricted shares and restricted stock units upon retirement, is incorporated herein by reference to Exhibit 10.2 to Norfolk Southern Corporation's Form 8-K filed on January 27, 2006.

(tt)* Revised fees for outside directors are incorporated herein by reference to Norfolk Southern Corporation's Form 8-K filed on January 27, 2006.

(uu)* The retirement agreement, dated March 28, 2006, between Norfolk Southern Corporation and L. Ike Prillaman, is incorporated herein by reference to Exhibit 10.1 to Norfolk Southern Corporation's Form 8-K filed on March 31, 2006.

| | |
|---|---|
| (vv)* | The waiver agreement, dated March 28, 2006, between Norfolk Southern Corporation and L. Ike Prillaman, providing for the waiver of forfeiture provisions otherwise applicable to certain restricted shares and restricted stock units upon retirement, is incorporated herein by reference to Exhibit 10.2 to Norfolk Southern Corporation's Form 8-K filed on March 31, 2006. |
| (ww) | Limited Liability Company Agreement of Meridian Speedway, LLC, dated as of May 1, 2006, by and among The Alabama Great Southern Railroad Company and Kansas City Southern is incorporated herein by reference to Exhibit 10.2 to Norfolk Southern Corporation's Form 8-K filed on May 4, 2006. |
| (xx)* | The Norfolk Southern Corporation Long-Term Incentive Plan, as amended effective July 25, 2006, is incorporated herein by reference to Exhibit 10.3 to Norfolk Southern Corporation's Form 10-Q filed on July 28, 2006. |
| (yy)* | Form of Norfolk Southern Corporation Long-Term Incentive Plan, 2007 Award Agreement is incorporated herein by reference to Exhibit 10.1 to Norfolk Southern Corporation's Form 8-K filed on January 11, 2007. |
| (zz)*,** | Retirement Plan of Norfolk Southern Corporation and Participating Subsidiary Companies effective June 1, 1982, amended effective January 1, 2009. |
| (aaa)* | The retirement agreement between Norfolk Southern Corporation and Henry C. Wolf is incorporated herein by reference to Exhibit 10.1 to Norfolk Southern Corporation's Form 8-K filed on May 11, 2007. |
| (bbb)* | The waiver agreement between Norfolk Southern Corporation and Henry C. Wolf is incorporated herein by reference to Exhibit 10.2 to Norfolk Southern Corporation's Form 8-K filed on May 11, 2007. |
| (ccc) | Transfer and Administration Agreement dated as of November 8, 2007, with respect to the Registrant's $500 million receivables securitization facility is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K filed on November 14, 2007. |
| (ddd)* | Form of Norfolk Southern Corporation Long-Term Incentive Plan 2008 Award Agreement is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K filed on November 20, 2007. |
| (eee) | Dealer Agreement dated as of January 23, 2008, between the Registrant and J. P. Morgan Securities Inc. is incorporated herein by reference to Exhibit 10.1 to Norfolk Southern Corporation's Form 8-K filed on January 25, 2008. |
| (fff) | Dealer Agreement dated as of January 23, 2008, between the Registrant and Goldman, Sachs & Co. is incorporated herein by reference to Exhibit 10.2 to Norfolk Southern Corporation's Form 8-K filed on January 25, 2008. |
| (ggg)* | 2008 Award Agreement between Norfolk Southern Corporation and Gerald L. Baliles, dated January 24, 2008, is incorporated herein by reference to Exhibit 10.2 to Norfolk Southern Corporation's Form 8-K filed on January 25, 2008. |

| | |
|---|---|
| (hhh)* | 2008 Award Agreement between Norfolk Southern Corporation and Daniel A. Carp, dated January 24, 2008, is incorporated herein by reference to Exhibit 10.3 to Norfolk Southern Corporation's Form 8-K filed on January 25, 2008. |
| (iii)* | 2008 Award Agreement between Norfolk Southern Corporation and Gene R. Carter, dated January 24, 2008, is incorporated herein by reference to Exhibit 10.4 to Norfolk Southern Corporation's Form 8-K filed on January 25, 2008. |
| (jjj)* | 2008 Award Agreement between Norfolk Southern Corporation and Alston D. Correll, dated January 24, 2008, is incorporated herein by reference to Exhibit 10.5 to Norfolk Southern Corporation's Form 8-K filed on January 25, 2008. |
| (kkk)* | 2008 Award Agreement between Norfolk Southern Corporation and Landon Hilliard, dated January 24, 2008, is incorporated herein by reference to Exhibit 10.6 to Norfolk Southern Corporation's Form 8-K filed on January 25, 2008. |
| (lll)* | 2008 Award Agreement between Norfolk Southern Corporation and Burton M. Joyce, dated January 24, 2008, is incorporated herein by reference to Exhibit 10.7 to Norfolk Southern Corporation's Form 8-K filed on January 25, 2008. |
| (mmm)* | 2008 Award Agreement between Norfolk Southern Corporation and Steven F. Leer, dated January 24, 2008, is incorporated herein by reference to Exhibit 10.8 to Norfolk Southern Corporation's Form 8-K filed on January 25, 2008. |
| (nnn)* | 2008 Award Agreement between Norfolk Southern Corporation and Jane M. O'Brien, dated January 24, 2008, is incorporated herein by reference to Exhibit 10.9 to Norfolk Southern Corporation's Form 8-K filed on January 25, 2008. |
| (ooo)* | 2008 Award Agreement between Norfolk Southern Corporation and J. Paul Reason, dated January 24, 2008, is incorporated herein by reference to Exhibit 10.10 to Norfolk Southern Corporation's Form 8-K filed on January 25, 2008. |
| (ppp) | Omnibus Amendment, dated as of March 18, 2008, to the Transfer and Administration Agreement dated as of November 8, 2007, is incorporated herein by reference to Exhibit 10.1 to Norfolk Southern Corporation's Form 10-Q filed on April 23, 2008. |
| (qqq) | Transaction Agreement (the "Pan Am Transaction Agreement"), dated May 15, 2008, by and among Norfolk Southern Railway Company, Pan Am Railways, Inc., Boston and Maine Corporation, and Springfield Terminal Railway Company, is incorporated herein by reference to Exhibit 10.1 to Norfolk Southern Corporation's Form 10-Q filed on July 24, 2008 (Exhibits, annexes and schedules omitted. The Registrant will furnish supplementary copies of such materials to the SEC upon request.) |
| (rrr)** | Letter Agreement, dated October 21, 2008, by and among Norfolk Southern Railway Company, Pan Am Railways, Inc., Boston and Maine Corporation, and Springfield Terminal Railway Company amending certain terms of the Pan Am Transaction Agreement. |
| (sss)* | Directors' Deferred Fee Plan of Norfolk Southern Corporation, as amended effective January 1, 2009, is incorporated herein by reference to Exhibit 10.01 to Norfolk Southern Corporation's Form 8-K filed on July 24, 2008. |

| | |
|---|---|
| (ttt)* | Norfolk Southern Corporation Executives' Deferred Compensation Plan, as amended effective January 1, 2009, is incorporated herein by reference to Exhibit 10.02 to Norfolk Southern Corporation's Form 8-K filed on July 24, 2008. |
| (uuu)* | Amendment to Norfolk Southern Corporation Officers' Deferred Compensation Plan, effective January 1, 2008, is incorporated herein by reference to Exhibit 10.03 to Norfolk Southern Corporation's Form 8-K filed on July 24, 2008. |
| (vvv)* | Norfolk Southern Corporation Long-Term Incentive Plan, as amended effective January 1, 2009, is incorporated herein by reference to Exhibit 10.04 to Norfolk Southern Corporation's Form 8-K filed on July 24, 2008. |
| (www)* | Norfolk Southern Corporation Restricted Stock Unit Plan, as amended effective January 1, 2009, is incorporated herein by reference to Exhibit 10.05 to Norfolk Southern Corporation's Form 8-K filed on July 24, 2008. |
| (xxx) | Amendment No. 1 to Transfer and Administration Agreement dated as of October 22, 2008, and effective as of October 23, 2008, with respect to the Registrant's $500 million receivables securitization facility, is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K filed on October 23, 2008. |
| (yyy)* | Stock Unit Plan of Norfolk Southern Corporation dated as of July 24, 2001, as amended on August 21, 2008, with an effective date of January 1, 2009, is incorporated herein by reference to Exhibit 10.1 to Norfolk Southern Corporation's Form 10-Q filed on October 24, 2008. |
| (zzz)* | Form of Norfolk Southern Corporation Long-Term Incentive Plan 2009 Award Agreement is incorporated herein by reference to Exhibit 99 to Norfolk Southern Corporation's Form 8-K/A filed on December 17, 2008. |
| (aaaa)*,** | Form of Amended and Restated Change in Control Agreement between Norfolk Southern Corporation and certain executive officers (including those defined as "named executive officers" and identified in the Corporation's Proxy Statement for the 2008 annual Meetings of Stockholders). |
| (bbbb)* | 2009 Award Agreement between Norfolk Southern Corporation and Gerald L. Baliles, dated January 29, 2009, is incorporated herein by reference to Exhibit 10.1 to Norfolk Southern Corporation's Form 8-K filed on January 30, 2009. |
| (cccc)* | 2009 Award Agreement between Norfolk Southern Corporation and Daniel A. Carp, dated January 29, 2009, is incorporated herein by reference to Exhibit 10.2 to Norfolk Southern Corporation's Form 8-K filed on January 30, 2009. |
| (dddd)* | 2009 Award Agreement between Norfolk Southern Corporation and Gene R. Carter, dated January 29, 2009, is incorporated herein by reference to Exhibit 10.3 to Norfolk Southern Corporation's Form 8-K filed on January 30, 2009. |
| (eeee)* | 2009 Award Agreement between Norfolk Southern Corporation and Alston D. Correll, dated January 29, 2009, is incorporated herein by reference to Exhibit 10.4 to Norfolk Southern Corporation's Form 8-K filed on January 30, 2009. |
| (ffff)* | 2009 Award Agreement between Norfolk Southern Corporation and Landon Hilliard, dated January 29, 2009, is incorporated herein by reference to Exhibit 10.5 to Norfolk Southern Corporation's Form 8-K filed on January 30, 2009. |

| | |
|---|---|
| (gggg)* | 2009 Award Agreement between Norfolk Southern Corporation and Karen N. Horn, dated January 29, 2009, is incorporated herein by reference to Exhibit 10.6 to Norfolk Southern Corporation's Form 8-K filed on January 30, 2009. |
| (hhhh)* | 2009 Award Agreement between Norfolk Southern Corporation and Burton M. Joyce, dated January 29, 2009, is incorporated herein by reference to Exhibit 10.7 to Norfolk Southern Corporation's Form 8-K filed on January 30, 2009. |
| (iiii)* | 2009 Award Agreement between Norfolk Southern Corporation and Steven F. Leer, dated January 29, 2009, is incorporated herein by reference to Exhibit 10.8 to Norfolk Southern Corporation's Form 8-K filed on January 30, 2009. |
| (jjjj)* | 2009 Award Agreement between Norfolk Southern Corporation and Michael D. Lockhart, dated January 29, 2009, is incorporated herein by reference to Exhibit 10.9 to Norfolk Southern Corporation's Form 8-K filed on January 30, 2009. |
| (kkkk)* | 2009 Award Agreement between Norfolk Southern Corporation and J. Paul Reason, dated January 29, 2009, is incorporated herein by reference to Exhibit 10.10 to Norfolk Southern Corporation's Form 8-K filed on January 30, 2009. |
| 12** | Statement re: Computation of Ratio of Earnings to Fixed Charges. |
| 21** | Subsidiaries of the Registrant. |
| 23** | Consent of Independent Registered Public Accounting Firm. |
| 31** | Rule 13a-14(a)/15d-14(a) Certifications. |
| 32** | Section 1350 Certifications. |
| 99** | Annual CEO Certification pursuant to NYSE Rule 303A.12(a). |

* *Management contract or compensatory arrangement.*
** *Filed herewith.*

(B) Exhibits.

The Exhibits required by Item 601 of Regulation S-K as listed in Item 15(A)3 are filed herewith or incorporated herein by references.

(C) Financial Statement Schedules.

Financial statement schedules and separate financial statements specified by this Item are included in Item 15(A)2 or are otherwise not required or are not applicable.

Exhibits 23, 31, 32 and 99 are included in copies assembled for public dissemination. All exhibits are included in the 2008 Form 10-K posted on our website at www.nscorp.com under "Investors" and "SEC Filings" or you may request copies by writing to:

**Office of Corporate Secretary**
**Norfolk Southern Corporation**
**Three Commercial Place**
**Norfolk, Virginia 23510-9219**

## POWER OF ATTORNEY

Each person whose signature appears below under "SIGNATURES" hereby authorizes James A. Hixon and James A. Squires or one of them, to execute in the name of each such person, and to file, any amendment to this report and hereby appoints James A. Hixon and James A. Squires or any one of them, as attorneys-in-fact to sign on his or her behalf, individually and in each capacity stated below, and to file, any and all amendments to this report.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, Norfolk Southern Corporation has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, on this 18th day of February 2009.

**NORFOLK SOUTHERN CORPORATION**

/s/ Charles W. Moorman
By: Charles W. Moorman
(Chairman, President and Chief Executive Officer)

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below on this 18th day of February 2009, by the following persons on behalf of Norfolk Southern Corporation and in the capacities indicated.

| Signature | Title |
|---|---|
| /s/ Charles W. Moorman<br>(Charles W. Moorman) | Chairman, President and Chief Executive Officer and Director<br>(Principal Executive Officer) |
| /s/ James A. Squires<br>(James A. Squires) | Executive Vice President Finance and Chief Financial Officer<br>(Principal Financial Officer) |
| /s/ Marta R. Stewart<br>(Marta R. Stewart) | Vice President and Controller<br>(Principal Accounting Officer) |
| /s/ Gerald L. Baliles<br>(Gerald L. Baliles) | Director |
| /s/ Daniel A. Carp<br>(Daniel A. Carp) | Director |
| /s/ Gene R. Carter<br>(Gene R. Carter) | Director |

/s/ Alston D. Correll Director
(Alston D. Correll)

/s/ Landon Hilliard Director
(Landon Hilliard)

/s/ Karen N. Horn Director
(Karen N. Horn)

/s/ Burton M. Joyce Director
(Burton M. Joyce)

/s/ Steven F. Leer Director
(Steven F. Leer)

/s/ Michael D. Lockhart Director
(Michael D. Lockhart)

/s/ J. Paul Reason Director
(J. Paul Reason)

Schedule II

**Norfolk Southern Corporation and Subsidiaries**
**Valuation and Qualifying Accounts**
**Years Ended December 31, 2006, 2007 and 2008**
**($ in millions)**

| | Beginning Balance | Additions charged to: Expenses | Additions charged to: Other Accounts | Deductions | Ending Balance |
|---|---|---|---|---|---|
| ***Year ended December 31, 2006*** | | | | | |
| Valuation allowance (included net in deferred tax liability) for deferred tax assets | $ 10 | $ -- | $ -- | $ 1 [2] | $ 9 |
| Casualty and other claims included in other liabilities | $ 421 | $ 217 | $ -- | $ 167 [3] | $ 471 |
| Current portion of casualty and other claims included in accounts payable | $ 291 | $ 40 | $ 124 [1] | $ 154 [4] | $ 301 |
| ***Year ended December 31, 2007*** | | | | | |
| Valuation allowance (included net in deferred tax liability) for deferred tax assets | $ 9 | $ 1 | $ -- | $ -- | $ 10 |
| Casualty and other claims included in other liabilities | $ 471 | $ 113 | $ 162 [3,4] | $ 158 [3] | $ 588 |
| Current portion of casualty and other claims included in accounts payable | $ 301 | $ 17 | $ 122 [1] | $ 181 [4] | $ 259 |
| ***Year ended December 31, 2008*** | | | | | |
| Valuation allowance (included net in deferred tax liability) for deferred tax assets | $ 10 | $ 1 | $ -- | $ -- | $ 11 |
| Casualty and other claims included in other liabilities | $ 588 | $ 84 | $ 80 [3,4] | $ 432 [3] | $ 320 |
| Current portion of casualty and other claims included in accounts payable | $ 259 | $ 28 | $ 127 [1] | $ 166 [4] | $ 248 |

[1] Includes revenue refunds and overcharges provided through deductions from operating revenues and transfers from other accounts.

[2] Reclassifications to/from other assets.

[3] Payments and reclassifications to/from accounts payable.

[4] Payments and reclassifications to/from other liabilities.

# EXHIBIT PX0766

216419

April 27, 2006

By E-Filing

The Honorable Vernon A. Williams
Secretary
Surface Transportation Board
1925 K Street, N.W.
Washington, D.C. 20423-0001

Re: Ex Parte No. 661 – Rail Fuel Surcharges – Comments

Dear Mr. Williams:

Enclosed for filing in the above proceeding are the comments of Robert M. Knight, Jr., Executive Vice President-Finance and Chief Financial Officer of Union Pacific Corporation and Union Pacific Railroad.

Please direct any questions about these comments or Union Pacific's participation in this proceeding to me at (402) 544-3897 or the e-mail address listed below.

Sincerely,

Lawrence E. Wzorek



**Lawrence E. Wzorek**
Assistant Vice President - Law

**UNION PACIFIC RAILROAD**
1400 Douglas St., Stop 1580, Omaha, NE 68179-1580
ph. (402) 544-3897 fx (402) 501-0129
lewzorek@up.com

***Contains Color Images***

**BEFORE THE**
**SURFACE TRANSPORTATION BOARD**

---

**STB EX PARTE NO. 661**
**RAIL FUEL SURCHARGES**

---

**COMMENTS OF**
**UNION PACIFIC RAILROAD COMPANY**

---

**PRESENTED BY**

**ROBERT M. KNIGHT, JR.**

**EXECUTIVE VICE PRESIDENT-FINANCE**
**AND CHIEF FINANCIAL OFFICER**

**UNION PACIFIC CORPORATION**
**UNION PACIFIC RAILROAD COMPANY**

Date of Submission: April 27, 2006
Date of Public Hearing: May 11, 2006

**BEFORE THE**
**SURFACE TRANSPORTATION BOARD**

---

**STB EX PARTE NO. 661**
**RAIL FUEL SURCHARGES**

---

**COMMENTS OF**
**UNION PACIFIC RAILROAD COMPANY**

---

## INTRODUCTION

My name is Rob Knight. I am the Executive Vice President-Finance and Chief Financial Officer of Union Pacific Corporation and Union Pacific Railroad. I was named to this position in January 2004. I am responsible for all financial activities of both the Corporation and Union Pacific Railroad.

I began my career with Union Pacific Corporation in 1980 and have held a variety of positions in Audit, Accounting, Finance, Human Resources, Quality, and Marketing and Sales. In 1996, I was named vice president, Quality; in 1999, vice president and general manager, Energy in Union Pacific Railroad's Marketing & Sales Department. In 2000, I became vice president and general manager, Automotive, again in the Marketing & Sales Department. I returned to Finance in May 2002, when I became senior vice president, Finance of Union Pacific Corporation, the position I held before my election to my current position. I have a bachelor's degree in business administration from Kansas State University and a master's degree in business administration from Southern Illinois University.

My experience in both Marketing and Finance at Union Pacific has provided me with a unique perspective on Union Pacific's fuel surcharge program. I have spoken with customers, our investors, Wall Street analysts, and others about our need to recover our fuel costs. This issue is of critical importance to Union Pacific. As I will explain, we must recover our fuel costs in order not only to serve our customers, but also to protect our shareholders and employees, who depend on our economic viability.

## SUMMARY OF UP'S POSITION

Let me summarize Union Pacific's position on our fuel surcharge program:

- UP has a comprehensive fuel surcharge program that began for carload traffic in 2002 to offset the high price of diesel fuel. This program has evolved in response to customer comments and input.

- UP does not have a fuel surcharge on 100% of its customers' shipments—although we would like to be able to recover from all shippers. This is a product of the history of the commercial relationships with our customers—large and small—that have developed over time.
    - UP's traffic mix includes regulated, exempt, and contract traffic.
    - Some older contracts do not have fuel surcharge provisions, and those customers have resisted UP's requests for fuel surcharges.
    - New price documents include fuel surcharge provisions.

- UP's fuel surcharge revenue does not fully cover our incremental fuel cost increase.
    - In 2004, UP recovered 52% of incremental fuel costs (i.e., cost above 75¢/gal.).
    - In 2005, UP recovered 74%. Even if all of UP's business in 2005 had been subject to the Highway Diesel Fuel surcharge, UP would have recovered just 99% of its incremental fuel cost.
    - In 2006, UP expects to recover about 90% of its incremental fuel-related cost.

- Due to increasing fuel prices, UP had more than $800 million in unrecovered incremental diesel fuel costs from 2003 through 2005, not including nearly $150 million for other fuel-related expenses.
  - This amounts to a subsidy of shippers at the expense of UP shareholders and employees.

- UP continues to make huge capital investments in its system, although UP does not yet earn its cost of capital.

- Unrecovered fuel costs impair UP's ability to invest in its railroad to meet the increased demand for rail transportation.

- UP must recover 100% of its fuel costs, but UP does not intend to recover through its fuel surcharge program more than 100% of its total fuel expense above 75 cents per gallon.

- UP has been receptive to customers' comments about our fuel surcharge program; and, in fact, our current program was modified from our original plan to be responsive to customer feedback.

- UP wants a fuel surcharge program that
  - enables UP to recover fully its cost of fuel;
  - is responsive to customers;
  - is fair/equitable; and
  - is easy to administer for both UP and its customers.

## HISTORY OF UP'S FUEL COSTS

Union Pacific consumes a huge quantity of diesel fuel. So do other railroads. However, the geographic scope of Union Pacific's system, as well as our traffic mix and the terrain over which we operate, means that Union Pacific uses more diesel fuel than virtually any of the other railroads.

In 2005, UP consumed nearly 1.35 billion gallons of diesel fuel. We have worked diligently to control our consumption. We have invested in more fuel-efficient locomotives and implemented programs to conserve fuel. The following slide depicts the steps UP has taken to reduce fuel consumption.

[Slide #1]




Nevertheless, fuel consumption has grown with the record demand for our rail service.

As the Board well knows, there have been substantial increases in the price of a barrel of oil over the last few years. That trend continues today. The increase in oil prices translates directly into the ever-increasing price we pay for diesel fuel.

The following chart shows the staggering increase in the cost of a gallon of diesel fuel in just the last few years.

[Slide #2]




Our average price for the 1.35 billion gallons last year was $1.77 per gallon, up 55 cents from $1.22 per gallon in 2004. Our average price for a gallon of fuel during the fourth quarter of 2005 was $2.08 per gallon. This resulted in UP spending a total of $2.4 billion on locomotive fuel in 2005.

Fuel prices continue to rise. On April 20, 2006, UP announced its first quarter earnings. We stated that our fuel cost in the first quarter was $1.87 per gallon, up from $1.45 in the first quarter of 2005—but our cost of fuel as of the date of our earnings announcement had risen to $2.10 per gallon.

In addition to diesel fuel, UP purchases electricity and other utilities, as well as gasoline, lubricants, and other fuels for our operations. In 2005 that added $240 million to our costs, up nearly $100 million from 2002 levels. In the first quarter of 2006, our combined fuel and utilities bills totaled $692 million. That category alone represented

22% of our operating expenses. In the first quarter of 2002, fuel and utilities were only 10% of UP's total operating expenses in the quarter.

The chart referred to above [Slide #2] also demonstrates that UP's average fuel cost per gallon averaged 70 cents per gallon from 1992 through 2001, and then remained around 73 cents per gallon from 1997 through 2002. Consequently, when UP began to see the run up in fuel costs, expecting that they would return to lower levels in the foreseeable future, we designed our fuel surcharge program with 75 cents per gallon as the base cost, with a view to collecting the incremental cost above that amount through our fuel surcharge program.

## UNION PACIFIC'S FUEL SURCHARGE PROGRAM

In its Notice of Hearing, the STB asked the railroads to explain the manner in which they calculate and charge their customers fuel surcharges. The Board also asked whether the fuel surcharges fairly reflect the increasing fuel cost of the movements to which they are applied.

Like most companies that have a fuel surcharge program, Union Pacific determines the fuel surcharge to be added to a customer's freight bill by referring to a publicly available index and periodic changes in that index. The fuel surcharge is calculated as a percentage that is applied to the customer's freight bill to determine the total amount of the transportation charge for a particular movement.

UP's fuel surcharge program began around September 2000, when we initiated a series of fuel surcharge provisions on intermodal traffic that was not under contracts. However, these early fuel surcharge provisions did not refer to any index.

On December 1, 2002, UP implemented its first standard fuel surcharge for carload business. The fuel surcharge was based on the price of West Texas Intermediate crude oil (WTI). A fuel surcharge was applied to the pertinent freight bills when the price of WTI oil, as published in *The Wall Street Journal*, exceeded $28 per barrel for 30 consecutive days. The surcharge was applied in 2% increments for every $5 per barrel the WTI exceeded $28 per barrel.

In March 2003, customers informed UP that rapid swings in the WTI prices and the structure of UP's WTI fuel surcharge program impeded customers' ability to budget for fuel surcharge increases. This customer feedback caused UP to re-evaluate the formula of its "standard" fuel surcharge program. Consequently, in April 2003, after further discussions with customers, UP converted the WTI carload surcharge basis from the WTI price published for 30 consecutive days in *The Wall Street Journal* to a WTI monthly average price. We also modified the surcharge schedule to initiate the fuel surcharge and calculate it at 0.4% for each dollar tier above the monthly average of $23 per barrel.

We continued to receive feedback from our customers on our fuel surcharge program. As a result of this customer input, UP linked its standard carload fuel surcharge in June 2003 to the Highway Diesel Fuel (HDF) Index published by the Department of Energy, because we concluded that the HDF is better aligned with the fluctuations in the diesel fuel price that UP pays. Additionally, the HDF is the fuel index used by the trucking industry as well as other carriers with whom we compete for business. It is easier to apply and more widely accepted by our customers as an index with which they are familiar. In moving from the WTI monthly average price calculation

that began at $23.01 per barrel, UP implemented the HDF fuel surcharge at $1.35 per gallon (approximately 80 cents per gallon for UP's fuel price), which was equivalent to approximately $25.50 per barrel under WTI (an increase in the base price of oil from which the fuel surcharge applied).

Union Pacific administers the HDF fuel surcharge program in this manner:

- The fuel surcharge is adjusted on a monthly basis.
- The basis for the surcharge is determined by the HDF for a calendar month, as reported weekly on the DOE website.
- If the average monthly price of HDF equals or exceeds $1.35 per gallon, a surcharge beginning at 1.5% applies. (The $1.35 per gallon equates to a UP fuel price of approximately 80 cents per gallon, while our cost recovery calculation begins at 75 cents per gallon.)
- For every five-cent increase above $1.35 per gallon, the surcharge increases by 0.5%.
- When the average DOE price drops below $1.35 per gallon, no fuel surcharge will apply.
- The surcharge is billed to applicable shipments beginning the second month following the month on which the DOE average price calculation was based. (For example: the average reported DOE price for the month of May 2005 determined the fuel surcharge applied throughout the month of July 2005.) Although UP originally planned to have only a one-month lag, our customers convinced us to go to the second month.
- The HDF program is designed to recover 100% of the incremental fuel expense above 75 cents per gallon if all shipments were covered by this program.

Union Pacific's coal business has a separate fuel surcharge program. Historically, most of our coal business moved under long-term contracts with a variety of escalation provisions. We attempted to simplify the administration of our coal business transportation rates and terms. Consequently, in November 2004, UP established a fuel surcharge for its coal business that is HDF-based. The surcharge begins at the

rate of 1.5% when the HDF index is at $1.35 per gallon. The surcharge increases 0.5% for each additional increase of five cents per gallon up to $1.60 per gallon. After $1.60 per gallon, the surcharge increases 0.75% for each additional five cents per gallon. The variation from the standard HDF program is designed to cover the higher costs associated with the increased fuel consumption on unit coal trains which carry more tonnage than manifest trains.

Our Intermodal Group has determined that the fuel surcharge for intermodal traffic should be calculated based on the HDF, but slightly differently from our carload fuel surcharge because of the comparable nature of this business with motor carriers. As a result, the base for our Intermodal HDF index is $1.25 per gallon (rather than the $1.35 per gallon for carload business). It is calculated by determining the percentage change between the base index and the previous month change. It increases approximately 0.6% for each additional change of four cents per gallon in the index.

It has been UP's experience that the HDF-based fuel surcharge more accurately reflects the change in UP's diesel fuel costs. The attached chart shows the correlation between the HDF index and UP's fuel cost back to 1994.

[Slide #3]




## UP IS NOT FULLY RECOVERING ITS INCREASED FUEL COST

There has been much discussion about the amount of money railroads receive from their fuel surcharges. One thing is certain: Union Pacific is not recovering the full incremental increase in the cost of its fuel via our fuel surcharge program.

Where possible, Union Pacific applies a fuel surcharge in order to capture its incremental cost of fuel above 75 cents a gallon. However, UP does not recover a fuel surcharge on 100% of the shipments we handle. The fuel surcharge is linked to the price document the shipper uses.

Union Pacific handles traffic under published rates regulated by the STB, as well as other shipments that are exempt commodities moving under public circular prices

that are not regulated by the STB. Numerous shipments also move under rail transportation contracts.

During 2005, approximately 80% of our rail transportation revenue was derived from transportation contracts or private rate documents pertinent to a particular shipper. Approximately 20% of our revenue came from traffic moving under published rates, some of which are regulated while others are in exempt public price circulars.

Commercial agreements from the past preclude Union Pacific from applying a fuel surcharge to all of its business. These limitations are being reduced over time. In 2004, our fuel surcharge program produced revenue that recovered 52% of the incremental cost of fuel above 75 cents per gallon. In 2005, when we paid approximately $2.4 billion for locomotive fuel, our fuel surcharge revenue amounted to $1.017 billion, as we reported in our Form 10K to the SEC. Seventy-eight percent of UP's revenue base in 2005 was subject to some form of fuel surcharge. UP recovered the equivalent of 74% of our incremental fuel cost. This demonstrates that UP is not over-collecting from our customer base in total.

There is a significant amount of incremental fuel expense that UP is not recovering via fuel surcharges. In fact, from 2003 through 2005, UP did not recover more than $800 million in additional diesel fuel cost. That is depicted on the following chart. This does not include the nearly $150 million in incremental fuel-related expenses (e.g., utilities, etc.).

[Slide #4]




UP is still not recovering 100% of its incremental fuel expense in 2006. During the first quarter of 2006, we recovered around 90% of our incremental diesel fuel expense. This was a 26% improvement over our 73% recovery in the first quarter of 2005. In essence, Union Pacific and its shareholders have been subsidizing and continue to subsidize the higher cost of fuel for shippers on our railroad.

UP would prefer that every one of its customers pays to offset the higher price for diesel fuel—but they do not. This is a result of the marketplace dynamics. Our commercial relationships with many of our customers have developed over a long period of time. Some customers entered into long-term transportation agreements years ago, when the price of fuel was much lower and we had excess rail capacity to fill. Some of these contracts contain no fuel surcharge formula, while others have a price

adjustment provision based on a formula that gives inadequate weight to the cost of fuel.

Union Pacific is applying a fuel surcharge on every freight bill that it can. We are including a fuel surcharge mechanism in new transportation rate documents, whether that document is a tariff, an exempt circular, or a transportation contract. We will continue to pursue full recovery of our incremental fuel costs.

In the meantime, UP cannot undo or ignore the commercial arrangements it has with some of its customers—who, as a result of negotiations prior to 2003, secured a favorable arrangement before the run up in fuel prices. UP has approached some of these customers who enjoy rates without fuel surcharges (some of whom add fuel surcharges to bills they present to their customers) to determine whether they would agree to modifications that would allow UP to recover at least a part of the increased costs. While a small number of these customers were willing to help us offset our added fuel costs, the vast majority have rejected our request. UP is not able to simply walk away from that business or impose a fuel surcharge just yet.

**UP RESPONSIVENESS TO CUSTOMERS**

Union Pacific has not adopted a fuel surcharge program without listening to our customers. If we wanted to simplify our recovery process and minimize our exposure for unattained fuel costs, we would adopt one fuel surcharge factor. Instead we have four basic indices in place today. We have also accommodated quite a few variations to those indices as a result of past negotiations.

Some customers may pay more than the actual incremental cost of fuel we use to handle their particular shipments. Some pay less. While this may appear inequitable

to some, we believe standard surcharges are the most appropriate and reasonable way to manage a fair, equitable and easily administered fuel surcharge program.

Union Pacific adopted a fuel surcharge at a time when it appeared that the increase in fuel prices would be temporary or transitory. We did not anticipate that the rising cost of fuel would continue virtually unabated for as long as it has. Although this does not appear likely today, there is still a possibility that the price of oil and, consequently, the cost of diesel fuel will decline in the coming months and years. In fact, there have been periodic monthly declines in the surcharge during its use by UP. The use of our current fuel surcharge mechanism means that, as the price of fuel declines, so will the surcharge. In fact, fuel price declines have historically followed significant increases in oil prices that occurred, for example, during the mid-1970's, mid-1980's, and early 1990's.

The Board will hear from an array of participants in this proceeding. Some will tell you that the STB should mandate a fuel surcharge formula that guarantees that each shipper will pay no more than the cost of the fuel used for that particular customer's movements. While that may sound like a desirable goal, it is more difficult than simply calculating the mileage between the origin and destination. Other factors would have to be considered in a formula designed to link the charge to the fuel actually consumed. Those include the weight of the shipment, the terrain over which it travels (e.g., 100 miles over the Rockies is not the same as 100 miles across the plains of the Midwest), weather, train configuration, locomotive type, terminal switching, geographic fuel price differences, etc. Currently, the railroad industry does not have a single master rail mileage table that the freight billing railroad could use to calculate an interline

mileage surcharge. Additionally, customers would need a similar capability in order to maintain accounts payable records.

Shippers and railroads desire simplicity in the formula used. Otherwise, the administrative burden for the railroad of calculating the surcharge and for the customer of auditing or verifying the surcharge becomes insurmountable. It is simply not practical to have a unique fuel surcharge program for individual customers that takes into consideration all of the complex variables associated with their shipments.

## CAPITAL INVESTMENT DEPENDS ON ADEQUATE RETURNS

As the STB is well aware, the rail industry is capital intensive. Railroads spend more of their revenue dollars on capital investments than any other industry. During the period of 1995 through 2004, railroads spent an average of nearly 18% of their revenue dollars on capital items.

**[Slide #5]**



But Class I railroads have not achieved an adequate return on that investment.

The capital demands on railroads continue to be extensive—particularly now that there has been a dramatic increase in rail shipments, and that trend is expected to continue well into the future. Railroads are working to meet that demand by making capital expenditures at record levels. Union Pacific alone has spent approximately $26 billion in capital investments over the past 11 years.

In 2005, we spent more than $2.8 billion and plan to spend about the same amount in 2006. More than one-half of that amount is to maintain our track and physical plant, while another $485 million is projected for growth capacity and commercial facilities. These are investments that take time to design, build and put into service so they necessarily require an authorization in anticipation of a recovery on the investments.

**[Slide #6]**



Meanwhile, however, Union Pacific has not earned a return on its investment in capital expenditures that necessarily justifies investing as much as we have invested or as we plan to invest. The following chart depicts this point.

**[Slide #7]**




Nevertheless, Union Pacific has been willing—so far—to make these continued investments with a view that Union Pacific will eventually earn a return on all it has put into its transportation system for track, locomotives, freight cars, commercial facilities, and technology.

The fuel surcharge program is an integral part of Union Pacific's plan to attain reinvestability. As the attached graph indicates, fuel surcharge revenue has not covered the incremental fuel expense, much less the cost of capital.

**[Slide #8]**




That in turn has contributed to an inadequate return on UP's investment in its business.

It is crucial that railroads be permitted to recover fully their variable costs, like fuel. If Union Pacific cannot recover those costs, it certainly cannot afford to continue to make the annual multi-billion dollar investments needed to meet the demands on our rail network.

## CONCLUSION

We do expect to eventually recover all our incremental fuel costs by means of our fuel surcharge program. But we are not there yet. No one involved with transportation likes high fuel prices. UP certainly does not. Nevertheless, our intent to recover our higher fuel costs has not dampened the demand for our services. But only by recovering our full costs and improving our returns will we be able to continue to

invest in our rail franchise to the benefit of our customers, our employees, and our investors. Changes that involve complex calculations and numerous resources to administer and audit are not practical.

# PX0767-PX0770

Filed Under Seal

# EXHIBIT

# PX0771

NO CHANGE

Original Title Page

# THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY
## BNSF RULES BOOK 6100
(Cancels ATSF Rules Book 6100-A and BN Rules Book 6100-A)

CONTAINING
RULES, REGULATIONS AND SPECIAL CHARGES
GOVERNING
THE TRANSPORTATION OF FREIGHT
ON
THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY
IN
THE UNITED STATES AND CANADA
AND
REGULATIONS GOVERNING CURRENCY EXCHANGE ON TRAFFIC
FROM, TO AND BETWEEN STATIONS IN CANADA
AND
CAR HIRE ON TRAFFIC TO OR FROM MEXICO

For explanation of abbreviations / reference marks, see Item 100

ALSO APPLICABLE ON INTRASTATE TRAFFIC

ISSUED JUNE 2, 1997 EFFECTIVE JULY 4, 1997

Issued by
J. C. Engstrom, P. O. Box 961069, Ft. Worth, TX 76161-0069

## (C) CHECK SHEET OF PAGES

All of the pages contained in this Book are listed consecutively by number and revision number. The pages of the Book, and the supplements to the Book, listed on this page, bear issued dates which are the same as, or are prior to, the issued date of this page. "0" in the revision column indicates an original page.

| REVISION | PAGE | REVISION | PAGE |
|---|---|---|---|
| 0 | Title Page | 0 | 18 |
| 9 | 1 | 3 | 19 |
| 3 | 2 | 0 | 20 |
| 4 | 3 | 0 | 21 |
| 1 | 4 | 0 | 22 |
| 0 | 5 | 3 | 23 |
| 0 | 6 | 2 | 23a |
| 0 | 7 | 2 | 24 |
| 0 | 8 | 0 | 24a |
| 0 | 9 | 0 | 25 |
| 1 | 10 | 0 | 26 |
| 4 | 11 | 0 | 27 |
| 1 | 12 | 0 | 28 |
| 0 | 13 | 0 | 29 |
| 3 | 14 | 0 | 30 |
| 0 | 14a | 0 | 31 |
| 1 | 15 | 0 | 32 |
| 0 | 16 | 0 | 33 |
| 0 | 17 | 0 | 34 |
| | | 0 | 35 |

For explanation of abbreviations / reference marks, see Item 100

ISSUED NOVEMBER 6, 2000 EFFECTIVE NOVEMBER 7, 2000

Issued by J. C. Engstrom, P. O. Box 961069, Ft. Worth, TX 76161-0069

(C) TABLE OF CONTENTS


| SECTION | ITEM | DESCRIPTION |
|---|---|---|
| | 100 | EXPLANATION OF ABBREVIATIONS AND REFERENCE MARKS |
| | 150 | BNSF WEB SITE |
| 1 | | GENERAL RULES AND REGULATIONS |
| | 1000 | DESCRIPTION OF GOVERNING CLASSIFICATION |
| | 1005 | STATION LISTS AND CONDITIONS |
| | 1010 | EXPLOSIVES AND DANGEROUS ARTICLES |
| | 1020 | REFERENCE TO TARIFFS, ITEMS, NOTES, RULES, ETC. |
| | 1025 | OMNIBUS CLAUSE |
| | 1030 | APPLICATION OF ITEMS TO NON-REGULATED TRAFFIC |
| | 1035 | CONSECUTIVE NUMBERS |
| | 1040 | NATIONAL SERVICE ORDER TARIFF |
| | 1045 | CANCELLATION OF ORIGINAL AND REVISED PAGES |
| 2 | | SPECIFIC RULES AND REGULATIONS - WITHOUT CHARGES |
| | 2000 | CHARGES PAYABLE IN UNITED STATES FUNDS |
| | 2025 | DEDUCTIBLE ON LOSS OR DAMAGE OF IRON OR STEEL SCRAP |
| | 2050 | DEFECTIVE CARS, MINIMUM WEIGHTS ON SHIPMENTS LOADED IN |
| | 2075 | DEFINITION OF "INTRASTATE" AND "INTERSTATE" TRAFFIC COMPANY |
| | 2100 | DISTANCES, METHOD OF OBTAINING |
| | 2125 | EMERGENCY ROUTING |
| | 2150 | FREIGHT DAMAGED IN TRANSIT BETWEEN STATIONS ON THE BNSF AND CSP |
| | 2175 | TRANSACTION PRIVILEGES AND EDUCATIONAL EXCISE TAXES ON ARIZONA INTRASTATE TRAFFIC |
| | 2200 | GROSS RECEIPTS TAX ON NEW MEXICO INTRASTATE TRAFFIC |
| | 2225 | MILEAGE ALLOWANCE APPLICATION |
| | 2235 | ORDER BILLS OF LADING, NON-ACCEPTANCE ON GRAIN TO MEXICO |
| | 2250 | RECEIPT AND DELIVERY OF FREIGHT, RESTRICTION ON |
| | 2275 | REFUSED OR UNCLAIMED FREIGHT |
| | 2300 | RETURN OF REFUSED OR REJECTED SHIPMENTS |
| | 2325 | RULES GOVERNING TRANSPORTATION OF RAILWAY PASSENGER CARS |
| | 2350 | SURCHARGE FOR FVW AND WC |
| 3 | | SPECIFIC RULES AND REGULATIONS - WITH CHARGES |
| | 3000 | CHARGE - CANCELLATION OF CAR ORDER |
| | 3025 | CHARGE - CLEANING AND DISINFECTING CARS |
| | 3030 | CHARGE - SUGAR COVERED HOPPER CARS REJECTED FOR CLEANING |
| | 3050 | CHARGE - DETENTION ON HEAVY DUTY FLAT CARS |
| | 3075 | CHARGE - ATTENDANTS/RIDERS ACCOMPANYING FREIGHT SHIPMENTS |


For explanation of abbreviations / reference marks, see Item 100

(C) TABLE OF CONTENTS


| SECTION | ITEM | DESCRIPTION |
|---|---|---|
| 3 | 3100 | CHARGE - ON TRAFFIC OF EXCEPTIONAL DIMENSIONS OR WEIGHT |
| | 3125 | CHARGE - DOCUMENT DELAY CHARGES ON EXPORT TRAFFIC TO MEXICO |
| | 3150 | CHARGE - FAILURE TO COMPLETE UNLOADING OF BENTONITE CLAY |
| | 3175 | CHARGE - FAILURE TO COMPLETE UNLOADING OF INDUSTRIAL SAND |
| | 3200 | CHARGE - FREE TIME AND DETENTION ON CARS DELIVERED TO WATER CARRIERS AT VANCOUVER, BC |
| | 3225 | CHARGE - HAZARDOUS MATERIALS DESTINED TO CANADA |
| | 3250 | CHARGE - FAILURE TO COMPLETE UNLOADING OF SUGAR |
| | 3275 | CHARGE - SHIPMENTS HELD FOR ORDERS |
| | 3300 | CHARGE - SPECIAL FREIGHT TRAIN SERVICE |
| | 3325 | CHARGE - TURNING OF EMPTY UNIT TRAIN CARS |
| | 3350 | CHARGE - DESTINATION DETENTION ON SUGAR CARS |
| | 3375 | CHARGE - FUEL SURCHARGE |
| | 3400 | CHARGE - CREDIT TERMS INCLUDING FINANCE CHARGE |
| 4 | | REGULATIONS GOVERNING CURRENCY EXCHANGE ON TRAFFIC FROM, TO AND BETWEEN STATIONS IN CANADA |
| | 4000 | APPLICATION |
| | 4010 | BASIS OF RATE EXCHANGE |
| | 4020 | GOVERNING DATE FOR APPLICATION OF SURCHARGE OF DISCOUNT |
| | 4030 | SURCHARGE OR DISCOUNT TO BE SHOWN ON FREIGHT BILLS |
| 4A | | APPLICABLE WHEN UNITED STATES CURRENCY IS AT A PREMIUM IN RELATION TO CANADIAN CURRENCY |
| | 4100 | SURCHARGE |
| | 4110 | DOMESTIC TRAFFIC |
| 4B | | APPLICABLE WHEN UNITED STATES CURRENCY IS AT A DISCOUNT IN RELATION TO CANADIAN CURRENCY |
| | 4200 | DISCOUNT |
| | 4210 | DOMESTIC TRAFFIC |
| 5 | | CAR HIRE ON TRAFFIC TO OR FROM MEXICO |
| | 5000 | APPLICATION OF CAR HIRE ON TRAFFIC TO OR FROM MEXICO |
| | 5010 | CAR HIRE DOCUMENTATION ON SHIPMENTS FROM OR TO MEXICO |
| | 5020 | CAR HIRE CHARGES ON TRAFFIC MOVING VIA EL PASO, TX |
| | 5030 | CAR HIRE CHARGES ON TRAFFIC MOVING VIA EAGLE PASS, TX |
| | 5040 | CAR HIRE CHARGES ON TRAFFIC MOVING VIA LAREDO, TX |
| | 5050 | CAR HIRE CHARGES ON TRAFFIC MOVING VIA BROWNSVILLE, TX |


For explanation of abbreviations / reference marks, see Item 100

ISSUED NOVEMBER 6, 2000 EFFECTIVE NOVEMBER 7, 2000

Issued by J. C. Engstrom, P. O. Box 961069, Ft. Worth, TX 76161-0069

ITEM 100
EXPLANATION OF ABBREVIATIONS AND REFERENCE MARKS

| ABBREVIATION | EXPLANATION |
| --- | --- |
| BNSF | Burlington Northern and Santa Fe Railway Company, The |
| BOE | Bureau of Explosives |
| CFR | Code of Federal Regulations |
| OPSL | Official List of Open and Prepay Stations |
| RER | Official Railway Equipment Register |
| TM | The Texas Mexican Railway Company |
| UFC | Uniform Freight Classification |
| US | United States |

| REFERENCE MARK | EXPLANATION |
| --- | --- |
| (A) | Denotes increase. |
| (B) | Denotes reduction. |
| (C) | Denotes changes in wording which result in neither increases nor reductions in charges. |

For explanation of abbreviations / reference marks, see Item 100

ITEM 150
BNSF WEB SITE

This Book is now available on the Internet for viewing or sending directly to your printer. The BNSF Home Page address is http://www.bnsf.com. BNSF has provided a link to the Adobe Homepage so that Acrobat Reader software can be downloaded onto your computer allowing you to print a copy, on your Personal Computer, that will mirror the hard copy you now get via mail. BNSF is also exploring ways to send interested parties an EMail message whenever an amendment or reissue of this Book takes place. Our ultimate goal is to have you, the user of this Book, obtain your copy of the printed information contained in this Book directly from the BNSF web site.

If, at this time, you are not prepared to obtain a copy of this Book directly from the BNSF web site, then a hard copy of this Book will be mailed to you, provided you furnish, to the address shown below, a formal written request for a printed copy. This formal request is required on an annual basis in accordance with the Surface Transportation Board's recent policy decision under Ex Parte 528, Disclosure, Publication, and Notice of Change of Rates and Other Service Terms for Rail Common Carriage.

If your company is already using the Internet and you visit the BNSF web site, your comments regarding access to the Book would be appreciated. If you are not currently using the Internet, your comments regarding the above concept would also be appreciated. All comments should be directed to:

Manager Auxiliary Prices
The Burlington Northern and Santa Fe Railway Company
P. O. Box 961069
Ft. Worth, TX 76161-0069

For explanation of abbreviations / reference marks, see Item 100

## SECTION 1
## GENERAL RULES AND REGULATIONS

### ITEM 1000
### DESCRIPTION OF GOVERNING CLASSIFICATION

The term "Uniform Freight Classification", when used herein, means UFC 6000-Series.

### ITEM 1005
### STATION LISTS AND CONDITIONS

This Book is governed by OPSL 6000-Series to the extent shown below:

A. For additions and abandonments of stations, and, except as otherwise shown herein, for prepay requirements, changes in names of stations, restrictions as to acceptance or delivery of freight, and changes in station facilities.

When a station is abandoned as of a date specified in OPSL 6000-Series, the rates from and to such station are inapplicable on and after that date.

B. For geographical locations of stations.

C. For the identification of stations when stations are shown or referred to by numbers.

### ITEM 1010
### EXPLOSIVES AND DANGEROUS ARTICLES

For rules and regulations governing the transportation of explosives and other dangerous articles, also specifications for shipping containers, and restrictions governing the acceptance and transportation of explosives and other dangerous articles, see BOE 6000-Series.

### ITEM 1020
### REFERENCE TO TARIFFS, ITEMS, NOTES, RULES, ETC.

Where reference is made in this Book to tariffs, items, notes, rules, etc., such references are continuous and include supplements to and successive issues of such tariffs and reissues of such items, notes, rules, etc.

For explanation of abbreviations / reference marks, see Item 100



Issued by J. C. Engstrom, P. O. Box 961069, Ft. Worth, TX 76161-0069

## SECTION 1
## GENERAL RULES AND REGULATIONS

### ITEM 1025
### OMNIBUS CLAUSE

Shipments made under rates referring to this Book are entitled to the following services: Car service, demurrage, drayage, diversion, inspection, reconsignment, stopping, storing, switching, transfer, weighing and other Terminal Services, and are subject to the charges therefor, if any, of the carrier performing the service.

### ITEM 1030
### APPLICATION OF ITEMS TO NON-REGULATED TRAFFIC

On non-regulated rail traffic, such as that transported under an exempt transportation contract, under an exempt rate quotation, or under an exempt rate memorandum, except to the extent that special provisions for accessorial services to be provided by BNSF are stated within the transportation contract, exempt rate quotation or exempt rate memorandum, the rules, regulations and charges for such accessorial services will be as set forth in tariffs or books to which BNSF is a party and shall apply to the same extent and in the same manner as if the subject transportation had been regulated.

As a partial listing of the accessorial services described herein, and not in limitation thereof, accessorial services are defined to include demurrage, detention of freight cars, diversion, holding cars, inspection, protective service, reconsignment, reweighing, special freight train service, spotting, stoppage to complete loading or partly unload, storage, switching, transit, weighing, and other services not specified above.

### ITEM 1035
### CONSECUTIVE NUMBERS

Where consecutive numbers are represented in this Book by the first and last numbers connected by the work "to" or a hyphen, they will be understood to include both of the numbers shown and all numbers in between the first and last numbers.

If the first number only bears a reference mark, such reference mark also applies to the last number shown and to all numbers between the first and last numbers.

For explanation of abbreviations / reference marks, see Item 100

SECTION 1
GENERAL RULES AND REGULATIONS

ITEM 1040
NATIONAL SERVICE ORDER TARIFF

This Book is subject to provisions of various Service Orders and General Permits as shown in NSO 6100-Series.

ITEM 1045
CANCELLATION OF ORIGINAL AND REVISED PAGES

A. When this Book is amended by revised pages, the cancellation of prior pages, except the Title Page, will be affected by means of this rule. A revised page will not show a cancellation notice except when a cancellation notice is necessary because of suspension, rejection, or other reasons. Revisions of each page will be published and filed in numerical sequence.

B. Except where a specific cancellation is shown on a new revised page, a revised page cancels any and all uncancelled revised or original pages, or uncancelled portions thereof, which bear the same page number. (See Exception)

For example: "First Revised Page 10" will have the effect of canceling "Original Page 10"; "45th Revised Page 12" will have the effect of canceling "44th Revised Page 12"; "13th Revised Page 4A" will have the effect of canceling "12th Revised Page 4A" and also "11th Revised Page 4A" if cancellation of the 12th Revised Page takes place on or before its effective date.

EXCEPTION. When a specific cancellation on a prior revised page excepts a previously filed page wholly or in part, this rule does not have the effect of canceling such excepted previously file page or portion thereof.

For explanation of abbreviations / reference marks, see Item 100

## SECTION 2
## SPECIFIC RULES AND REGULATIONS - WITHOUT CHARGES

### ITEM 2000
### CHARGES PAYABLE IN UNITED STATES FUNDS

Except as otherwise provided, rates and charges in this Book, and those making reference to this Book, are stated in money of the United States and are payable in United States' dollars or its equivalent.

### ITEM 2025
### DEDUCTIBLE ON LOSS OR DAMAGE OF IRON OR STEEL SCRAP

No claim or suit for the physical loss or damage to any shipment of Iron or Steel Scrap, transported via BNSF, shall be made or filed by a Customer for amounts of $250.00 or less (Minimum Claim Amount). If customer's proven loss or damage is in excess of the Minimum Claim Amount, the Minimum Claim Amount shall be deducted from any claim made against carrier(s) for any shipments transported by the carrier(s).

### ITEM 2050
### DEFECTIVE CARS, MINIMUM WEIGHTS ON SHIPMENTS LOADED IN

If, by reason of the character, construction, or age of equipment furnished, the minimum carload weight, as specified in the tariffs or classifications, cannot be loaded, the minimum weight to be charged for on shipments loaded therein shall not exceed the safe loading capacity as determined by the Operating, Transportation or Inspection Departments.

### ITEM 2075
### DEFINITION OF "INTRASTATE" AND "INTERSTATE" TRAFFIC

A. The term "Intrastate Traffic" applies to traffic having origin, destination and entire transportation within the same state.

B. The term "Interstate Traffic" applies to:

1. Traffic having origin in one state and destination in another state; or

2. Traffic having origin and destination within the same state when transported via a route operating through another state.

For explanation of abbreviations / reference marks, see Item 100

SECTION 2
SPECIFIC RULES AND REGULATIONS - WITHOUT CHARGES

(C)ITEM 2100
DISTANCE, METHOD OF OBTAINING

Various charges in documents referring to this Book are based on mileages. To determine miles refer to BNSF Internet Public Rate Retrieval or BNSF Rail Mileage Inquiry at BNSF.com. When rates are not shown for exact distances, use rates for next greater distance.

ITEM 2125
EMERGENCY ROUTING

Rates in documents referring to this Book will apply only via the routes and junction points authorized therein, except that when in the case of pronounced traffic congestion (not an embargo), washout, wreck, or other similar emergency, or through carrier's error, carriers forward shipment via other junction points of the same carriers, the rate to apply will be be that specified in the document referring to this Book but not higher than the rate applicable via the route of movement.

ITEM 2150
FREIGHT DAMAGED IN TRANSIT BETWEEN STATIONS ON THE BNSF AND CSP

The following applies on freight shipments that are damaged in transit when moving via the BNSF from or to stations on the CSP.

1. Shipments damaged in transit and refused by consignees, will, upon order of the Director, Freight Claims, Topeka, KS, be returned to shippers via the route and line over which such shipments moved, free of any charges, or, at carrier's option, be forwarded to such point on its lines that offer the best facilities or opportunities for advantageous disposal.

2. Shipments refused by consignees owing to causes for which the carrier is wholly responsible, will, upon order of the Director, Freight Claims, Topeka, KS, be returned to shippers free of any charges, in the same manner as provided for shipments damaged in transit.

For explanation of abbreviations / reference marks, see Item 100



Issued by J. C. Engstrom, P. O. Box 961069, Ft. Worth, TX 76161-0069

## SECTION 2
## SPECIFIC RULES AND REGULATIONS - WITHOUT CHARGES

### ITEM 2175
### TRANSACTION PRIVILEGES AND EDUCATIONAL EXCISE TAXES ON ARIZONA INTRASTATE TRAFFIC

All carload rates and charges in connection with Arizona intrastate traffic are subject to the Arizona transaction privileges and educational excise taxes in effect at the time of shipment

### ITEM 2200
### GROSS RECEIPTS TAX ON NEW MEXICO INTRASTATE TRAFFIC

All carload rates and charges in connection with New Mexico intrastate traffic are subject to the New Mexico Gross Receipts Tax in effect at the time of shipment.

### ITEM 2225
### MILEAGE ALLOWANCE APPLICATION

By use of rates making reference to this Book, shipper warrants that its interest in the equipment used under rates subject to this Book is sufficient to permit it to waive full payment of mileage allowance. Shipper will, and BNSF will not, be liable for mileage allowances in excess of the above obligation. In the event that a party other than the shipper using these rates submits a claim to railroad for mileage allowance payments in excess of BNSF's obligation under this tariff, shipper shall, at BNSF's option, either (1) release, defend and indemnify BNSF from said claim including attorney's fees and cost of litigation, or (2) reimburse BNSF for excess mileage allowances paid by BNSF within thirty (30) days of notice by BNSF.

### ITEM 2235
### ORDER BILLS OF LADING, NON-ACCEPTANCE ON GRAIN TO MEXICO

Shipments of Grain and Grain Products, as defined in Tariff BNSF 4022-4023 Series, from BNSF origins to destinations in Mexico may only be made under a Straight Bill of Lading. Order Bills of Lading for shipments of Grain and Grain Products billed to destinations in Mexico will not be accepted by the BNSF.

For explanation of abbreviations / reference marks, see Item 100



Issued by J. C. Engstrom, P. O. Box 961069, Ft. Worth, TX 76161-0069

## SECTION 2
## SPECIFIC RULES AND REGULATIONS - WITHOUT CHARGES

### ITEM 2250
### RECEIPT AND DELIVERY OF FREIGHT, RESTRICTIONS ON

Nothing in tariffs to which BNSF is a party shall require BNSF to receive or deliver any carload or less than carload shipment when such receipt or delivery is impracticable because of any riot, strike, picketing or other labor disturbance.

### ITEM 2275
### REFUSED OR UNCLAIMED FREIGHT

The following practice will be followed in the handling of freight which is refused or unclaimed.

A. Non-Perishable Freight

Consignee, as described in the waybill, will be notified promptly of the arrival of shipments at destination. In case of refusal by consignee to accept the freight, or if freight is unclaimed five days after notice of arrival has been duly sent or given, consignor will be sent a notice showing:

Name of consignee
Description of freight
Point of origin and date of shipment
whether property has been refused or remains unclaimed;

which notice should also state substantially that if disposition is not arranged for, the property will be subject to sale as provided in Section 4, Paragraph (b) of the Uniform Bill of Lading as published in Tariff UFC 6000-Series.

B. Perishable Freight

Consignee will be notified promptly of the arrival of perishable freight, but whenever necessary to prevent loss or waste, perishable freight which is refused, unclaimed or undelivered may be sold at the discretion of the carrier, without advertising and without further notice, as provided in Section 4, Paragraph (c) of the Uniform Bill of Lading as published in Tariff UFC 6000-Series.

For explanation of abbreviations / reference marks, see Item 100

ISSUED SEPTEMBER 9, 1997 EFFECTIVE OCTOBER 1, 1997

Issued by J. C. Engstrom, P. O. Box 961069, Ft. Worth, TX 76161-0069

## SECTION 2
## SPECIFIC RULES AND REGULATIONS - WITHOUT CHARGES

### ITEM 2300
### RETURN OF REFUSED OR REJECTED SHIPMENTS

A. When a shipment has reached destination but is refused or rejected and not unloaded and is returned to the original point or a directly intermediate point, the return movement will be subject to (1) the rate, minimum weight and route from the original point in effect on date shipment is tendered for return, or (2) to the rate, minimum weight and route applicable for such return movement, if lower.

B. When the refused or rejected shipment moved to destination from a transit station on a reshipping or transit balance rate, the return movement to the transit station will be subject to (1) the local or joint carload rate, minimum weight and route from the transit station to destination in effect on date shipment is tendered for return, or (2) to the rate, minimum weight and route applied for such return movement, if lower.

C. When a refused or rejected car was part of a shipment subject to multiple car or unit train rates, the return movement will be subject to (1) the applicable single car rate, minimum weight and route from the original shipping point to destination in effect on date shipment is tendered for return, or (2) to the rate, minimum weight and route applied for such return movement, if lower.

D. The provision of this item do not apply to Coal (STCC 11).

### ITEM 2325
### RULES GOVERNING TRANSPORTATION OF RAILWAY PASSENGER CARS

Except as otherwise provided, BNSF will not accept for transportation over its line or for placement or storage on its tracks or in its yards any railway passenger car or railroad business car, with or without passengers.

### ITEM 2350
### SURCHARGE FOR FVW AND WC

Rates on all carload traffic originating at Wisconsin stations on the Wisconsin Central Ltd. (WC) and Fox Valley & Western Ltd. (FVW) are subject to the surcharge provisions of Tariff WC 9017.

For explanation of abbreviations / reference marks, see Item 100

SECTION 3
SPECIFIC RULES AND REGULATIONS - WITH CHARGES

ITEM 3000
CHARGE - CANCELLATION OF CAR ORDER

A. If the service of switching or placing has been performed and the car order is canceled, reduced or changed, in addition to the cancellation charge, an intra-terminal switch, as published in the applicable BNSF switching tariff, will be assessed.

B. A cancellation charge of $75.00 per car (See NOTE) will be applied whenever an unfilled car order is canceled, reduced or changed. Cars must already be applied to the order and one of the following conditions must be met before charges are applicable:

1. If order is for equipment furnished by BNSF, cars must be spotted at industry at the time the order is canceled, reduced, or changed (See NOTE); or

2. If order is for equipment furnished by a foreign carrier, cars must be placed on interchange track, already received by BNSF, or spotted at industry at the time the order is canceled, reduced or changed.

NOTE. The cancellation charge does not apply to BNSF owned or leased equipment ordered to load commodities covered by Tariff BNSF 4022-Series and BNSF 4023-Series. For provisions to apply see Item 12163 of BNSF 4022-Series and BNSF 4023-Series.

ITEM 3025
CHARGE - CLEANING AND DISINFECTING CARS

When BNSF is required to disinfect or clean a box car under State, Federal, County, or Municipal regulations, a charge of $234.00 per car will be assessed against the freight payor of the shipment for which such cleaning and disinfecting is made. This charge will be in addition to any applicable charge for fumigation.

For explanation of abbreviations / reference marks, see Item 100

SECTION 3
SPECIFIC RULES AND REGULATIONS - WITH CHARGES

ITEM 3030
CHARGE - SUGAR COVERED HOPPER CARS REJECTED FOR CLEANING

Empty Covered Hopper Cars, last containing Sugar (STCC 20-621 and 20-629), rejected for cleaning will be subject to a charge of $800 when the prior load was originated by the current shipper rejecting the car.

ITEM 3050
CHARGE - DETENTION ON HEAVY DUTY FLAT CARS

For detention and use charges on heavy duty flat cars, see Tariff RPS 6740-Series.

For explanation of abbreviations / reference marks, see Item 100

SECTION 3
SPECIFIC RULES AND REGULATIONS - WITH CHARGES

(C) ITEM 3075
CHARGE - ATTENDANTS/RIDERS ACCOMPANYING FREIGHT SHIPMENTS

A. This item applies for transportation in freight service of each attendant/rider accompanying freight shipments where such transportation is reasonably required. This item will apply only when advance arrangements have been made between the party to accompany freight shipment and BNSF. Each attendant/rider accompanying a shipment under the provisions of this item must execute a BNSF Release Form in accordance with Rule 43 of the Uniform Freight Classification Tariff UFC 6000-Series prior to movement of shipment. Bill of lading covering shipment must indicate when attendant/rider will accompany the shipment, number of such attendants/riders, and points between which they are to accompany the shipment. BNSF is not required to furnish special accommodations for person(s) riding freight trains.

B. The one-way charge for each attendant/rider accompanying freight shipments is as follows:

| BNSF Mileage | Charge Per Attendant/Rider |
|---|---|
| 1000 or less | $250.00 |
| 1001 to 2000 | $400.00 |
| 2000 and over | $650.00 |

To determine miles, refer to BNSF Internet Public Rate Retrieval or BNSF6003 Rail Mileage Inquiry at BNSF.com.

ITEM 3100
CHARGE - ON TRAFFIC OF EXCEPTIONAL DIMENSIONS OR WEIGHT

Traffic of exceptional dimensions or weight, which can only be handled subject to restrictions when accompanied by representatives of the Track and Signal Departments to remove and replace switch stands, targets, and dwarf signals, reinforcing of bridges or track or any extra work required to be done over and above normal handling by representatives of Car or Engineering Department to accompany load for safety reasons, will be subject to additional charges over and above the freight charges based on actual cost incurred by BNSF for services performed.

SECTION 3
SPECIFIC RULES AND REGULATIONS - WITH CHARGES

ITEM 3125
CHARGE - DOCUMENT DELAY CHARGES ON EXPORT TRAFFIC TO MEXICO

Carload shipments moving from the United States to Mexico via any Texas-Mexico border crossing points are subject to the following provisions when held on the BNSF awaiting clearance of Mexican Customs and release for entry into Mexico.

A. Calculations of Charges:

1. Seventy-two (72) hours free time will be allowed for the surrender of all documentation necessary for the clearance of Mexican Customs and release for entry into Mexico.

2. Free time will be computed from the first 12:01 a.m. after "Despacho Previo" (See Note) notification. Saturdays, Sundays, and holidays will be excluded in the computation of free time except as noted below.

   Note: "Despacho Previo" is a Mexican Customs' program to pre-clear exports from the United States into Mexico prior to the interchange of cars to a Mexican railroad.

3. Following the expiration of free time, a Document Delay charge of $50.00 per car, per day, or fraction thereof, will be assessed until the car is released for entry into Mexico.

4. Saturdays, Sundays, and holidays, occurring subsequent to any chargeable day, will be considered chargeable days.

B. Notification and Release:

1. "Despacho Previo" notification will be sent or given by the BNSF to the consignee, or party to receive same, when unit enters the BNSF computer system through customer shipping instructions or interchange receipt from connections carriers.

2. Cars will be considered to be "released" for entry into Mexico when all of the following requirements have been met:

   (a) All freight and accessorial charges due the BNSF have been paid; and

(continued on next page)



ISSUED JUNE 2, 1997 EFFECTIVE JULY 4, 1997

Issued by J. C. Engstrom, P. O. Box 961069, Ft. Worth, TX 76161-0069

SECTION 3
SPECIFIC RULES AND REGULATIONS - WITH CHARGES

ITEM 3125
CHARGE - DOCUMENT DELAY CHARGES ON EXPORT TRAFFIC TO MEXICO (Concluded)

(b) All requirements to legally export the shipment from the United States to Mexico have been met, and the required documents are furnished to the BNSF; and

(c) All requirements to legally import the shipments into Mexico have been met and proof furnished to the BNSF.

C. Holidays:

The United States holidays, as defined in Item 1010 (Non-Chargable Day) of BNSF Demurrage Book 6004-Series, and the following official Mexican Holidays, will be recognized as holidays in the calculation of charges.

Constitution Day - February 5
Birthday of Benito Juarez - March 21
Holy Thursday - Thursday before East Sunday
Labor Day - May 1
Battle of Puebla - May 5
Independence Day - September 16
Columbus Day - October 12
State of the Union Address - November 1
All Saints Day - November 2
Anniversary of Mexican Revolution - November 20
Our Lady of Guadalupe Day - DECEMBER 12

ITEM 3150
CHARGE - FAILURE TO COMPLETE UNLOADING OF BENTONITE CLAY

Open-top or covered hopper cars of Bentonite Clay (STCC 14-511-10 and 32-952-32), which are released from unloading, but have not been completely unloaded, will incur a cleaning charge of $350.00 per car. Such charge will be assessed against the consignee or party responsible for releasing the car before all of the lading has been removed. Refer to to Rules 14 and 27 in Tariff UFC 6000-Series.

For explanation of abbreviations / reference marks, see Item 100

## SECTION 3
## SPECIFIC RULES AND REGULATIONS - WITH CHARGES

### ITEM 3175
### CHARGE - FAILURE TO COMPLETE UNLOADING OF INDUSTRIAL SAND

Covered hopper cars of Industrial Sand (STCC 14-413), which are released from unloading, but have not been completely unloaded, will incur a cleaning charge for any material over 1,000 pounds at a rate of $75.00 for each 2,000 pounds of material over the first 1,000 pounds. Such charge will be assessed against the consignee or party responsible for releasing the car before all of the lading has been removed. Refer to Rule 27 in Tariff UFC 6000-Series.

### ITEM 3200
### CHARGE - FREE TIME AND DETENTION ON CARS DELIVERED TO WATER CARRIERS AT VANCOUVER, BC

This item applies on all railroad and railroad controlled cars for which BNSF pays or receives per diem, including BNSF owned or leased cars.

A. Seven (7) days free time will be allowed from the arrival of loaded or the availability of empty cars for delivery to a water carrier at the BNSF terminal yard in Vancouver, BC, and shall be considered delivered following notification.

B. Free time will begin at the first 12:01 a.m. following telephone notification, confirmed by Fax transmission of the arrival of loaded cars; or the telephone notification of empty cars available at the BNSF terminal yard in Vancouver, BC.

C. After expiration of the free time, the following detention charges apply:

$20.00 per car per day for each of the first fourteen (14) days; and
$60.00 per car per day for each subsequent day.

D. Once detention charges commence, charges are applicable until cars are returned to BNSF tracks in Vancouver, BC.

E. Traffic subject to the provisions of this item are not subject to the provisions of BNSF Demurrage Book 6004-Series, except that the provisions of Item 110 (Charges on Cars Containing Explosives or Hazardous Materials) to BNSF Demurrage Book 6004-Series will apply.

For explanation of abbreviations / reference marks, see Item 100

SECTION 3
SPECIFIC RULES AND REGULATIONS - WITH CHARGES

## ITEM 3225
## CHARGE - HAZARDOUS MATERIALS DESTINED TO CANADA

When a shipment of Hazardous Materials arrives at a border crossing between the United States and Canada without proper documentation in compliance with Canadian Transport Commission Regulations, including the Canadian Hazardous Materials Description and proper Canadian Hazardous Materials Placards attached to the car, and the shipment must be held by BNSF at the border crossing, a charge of $88.00 per day, or portion of a day, will be assessed from the first 7:00 a.m. following notice to the consignor that the shipment is being held awaiting proper documentation and/or placards.

Demurrage and storage charges named in BNSF Demurrage Book 6004-Series will also apply.

## ITEM 3250
## CHARGE - FAILURE TO COMPLETE UNLOADING OF SUGAR

When Covered Hopper Cars of sugar, which are released from unloading, but have not been completely unloaded, are returned to the original shipping point for reasons other than carrier's error, the return will be subject to one of the following conditions, whichever is lower, with a minimum charge of $350: (1) to the rate, minimum weight, and route applicable for such return movement; or (2) the rate, minimum weight, and route from the original point in effect on the date shipment is tendered for return, to the actual weight of the return movement.

Cars will be considered as completely unloaded if the sugar remaining in the car does note exceed three (3) percent of the weight of the last loaded movement.

Cars originating at Billings, MT; Lovell, WY; Longmont, CO; Sterling, CO; Rocky Ford, CO; Ft. Morgan, CO; Bayard, NE; Mitchell, NE; or Scottsbluff, NE may be returned to Billings, MT; Scottsbluff, NE; or Sterling, CO in lieu of the original shipping point. The return will be be subject to the rate, minimum weight, and route as though Billings, MT, Scottsbluff, NE, or Sterling, CO was the original shipping point.

Cars originating in Sidney, MT or Worland, WY may be returned to Sidney, MT or Worland, WY in lieu of the original shipping point. The return will be subject to the rate, minimum weight, and route as though Sidney, MT or Worland, WY were the original shipping point.

For explanation of abbreviations / reference marks, see Item 100

ISSUED JULY 10, 1998 EFFECTIVE SEPTEMBER 1, 1998

Issued by J. C. Engstrom, P. O. Box 961069, Ft. Worth, TX 76161-0069

SECTION 3
SPECIFIC RULES AND REGULATIONS - WITH CHARGES

ITEM 3275
CHARGE - SHIPMENTS HELD FOR ORDERS

A. Carload shipments covered by "Order" or "Order Notify" Bills of Lading, or carload shipments covered by "Straight" Bills of Lading showing consignment to one party with instructions therein, or on which instructions are otherwise given to:

1. Notify or advise another party and deliver only upon surrender of written order; or

2. Deliver only upon surrender of original bill of lading; or

3. When consigned in any other manner which imposes upon the carrier the obligation not to make delivery except upon surrender of original bill of lading or written order;

will not be moved to the designated place of delivery until bill of lading or written order has been surrendered or indemnity bond or other substitute security therefore as defined in Rule 7 of Uniform Freight Classification is given, subject to the provisions in this item and Exceptions 1 and 2 named below.

B. When the place of delivery is designated in the bill of lading or otherwise designated, prior to the arrival of car at destination, and delivery is made to such designated place of delivery, provided a shipment is actually held for surrender of the bill of lading or written order or substitute security as defined in Rule 7 of Uniform Freight Classification, the following charges will apply:

1. When bill of lading or written order is surrendered or indemnity bond or other substitute security is given to an authorized representative of the line-haul delivering carrier prior to arrival at destination, there is no charge.

2. When bill of lading or written order is surrendered or indemnity bond or other substitute security is given . . . .

(a) To the line-haul delivering carrier at other than destination, after car has arrived at billed destination; or

(continued on next page)

For explanation of abbreviations / reference marks, see Item 100



Issued by J. C. Engstrom, P. O. Box 961069, Ft. Worth, TX 76161-0069

SECTION 3
SPECIFIC RULES AND REGULATIONS - WITH CHARGES

ITEM 3275
CHARGE - SHIPMENTS HELD FOR ORDERS (concluded)

(b) To the line-haul delivering carrier at destination or first available hold point prior to destination after notice of arrival is sent or given consignee or party entitled to receive same. If notice of arrival is sent or given consignee or party entitled to receive same on a Sunday or Holiday, as described in Item 1010 of BNSF Demurrage Book 6004-series, the bill of lading or written order does not have to be surrendered or indemnity bond or other substitute security does not have to be given until the first business day following the Sunday or Holiday; or

(c) To any participating line-haul carrier, other than delivering carrier:

Charge is $150.00 per car, not to exceed $600.00 per bill of lading, and is in addition to any other charges that may accrue (i.e., switching, demurrage, storage, etc.)

EXCEPTIONS:

1. Surrender of bills of lading, written orders or other required documents by means of U.S. Mail will be allowed. When mail service is used, the time of mailing by the party which undertakes to surrender such bill of lading, written order or other required document shall be deemed to be the time of surrender. In the case of dispute as to the time of mailing, the postmark date shall govern.

2. When the original bill of lading or written order covering a shipment is not available, the shipment may be delivered in advance of the surrender of the bill of lading or written order as provided in Rule 7 of the Uniform Freight Classification.

For explanation of abbreviations / reference marks, see Item 100



Issued by J. C. Engstrom, P. O. Box 961069, Ft. Worth, TX 76161-0069

SECTION 3
SPECIFIC RULES AND REGULATIONS - WITH CHARGES

(C) ITEM 3300
CHARGE - SPECIAL FREIGHT TRAIN SERVICE

A. Definition of Special Freight Train Service.

1. A train which is operated on an expedited schedule or under special service or transportation requirements specified by the consignor, consignee or the agent of either.

2. A train which is assembled in accordance with instructions given to a rail carrier by the consignor, consignee or the agent of either.

3. A train which is necessary in order to comply with service or other transportation requirements specified by any party to the movement

4. If the special train has cars for more than one destination, each step will constitute a special run and charges for the special movement will be assessed from shipping point to first destination, from first destination to second destination, each as a separate and complete transaction.

B. Requirements for Special Freight Train Service.

Consignee, consignor or the agent of either must request this service in writing or by electronic device to BNSF Marketing/Sales Representative. Requests must be made in sufficient time to enable this carrier and all other carriers to consummate whatever arrangement or agreement which may be necessary to facilitate the movement of such trains. Requests should include, but are not limited to the following information: Date service is required or service window, if applicable; Routing, including origin and destination; Car initial(s) and number(s); Letter of authorization to bill charges, including appropriate patron codes, etc.

C. Furnishing of Special Freight Train Service.

Upon request, service will be provided at the convenience of all carriers involved in the movement.

(continued on next page)

SECTION 3
SPECIFIC RULES AND REGULATIONS - WITH CHARGES

(C) ITEM 3300
CHARGE - SPECIAL FREIGHT TRAIN SERVICE (concluded)

D. Charges for Special Freight Train Service.

BNSF charges are as follows and will be calculated over the actual distance (route) operated by the special train at a charge of $58.00 per mile subject to a minimum charge of $7,500.00. This charge is in addition to published or contract freight rates. Charges for other carriers involved in joint line or local movements will be handled under the provisions of Accounting Rule 11.

E. Switching Charges for Special Freight Train Service.

Switching charges will be assessed as outlined in Special Switching Service items in applicable BNSF switching tariffs.

F. Distances.

To determine miles, refer to BNSF Internet Public Rate Retrieval or BNSF 6003 Rail Mileage Inquiry at BNSF.Com using the actual route of the movement.

ITEM 3325
CHARGE - TURNING OF EMPTY UNIT TRAIN CARS

Upon request of the car owner or lessee, BNSF will turn an entire unit train of empty cars on railroad owned tracks or privately owned loop tracks at a time and place convenient for normal carrier operations, subject to a charge of $1,575.00 per turn. This charge will not apply in connection with cars for loading of Grain or Grain Products moving under rates in Tariff BNSF 4022-Series.

ITEM 3350
CHARGE - DESTINATION DETENTION ON SUGAR CARS

This item to apply to shipments of Sugar (STCC 20-621 and 20-629) moving in Covered Hopper Cars which are railroad owned or railroad controlled.

Detention will be calculated from the first 12:01 a.m. after loaded cars are constructively placed either short of destination or at destination, or spotted at destination, and will continue until such time as cars are released empty back to the railroad. After five days, detention charges of $50 per day per car will be assessed against the Consignor of the railcars. These charges are in addition to any demurrage charges which may also apply.

For explanation of abbreviations / reference marks, see Item 100

SECTION 3
SPECIFIC RULES AND REGULATIONS - WITH CHARGES

ITEM 3375
CHARGE - FUEL SURCHARGE

Shipments made under pricing documents referring hereto may be subject to a fuel surcharge, if applicable. When the average price of West Texas Intermediate Crude Oil (WTI) for the 21st of the prior month through the 20th of the current month (Time Period) equals or exceeds $28.00 per barrel a surcharge may be applied to the total freight charges for each shipment waybill dated on or after the 1st of the following month. Such fuel surcharge shall be included on the bill for freight charges for each shipment. Miscellaneous and accessorial charges shall not be subject to the fuel surcharge.

Fuel Surcharge Rates (FSR) will be adjusted monthly.

FSR = See Table Below.
Where FSR = Fuel Surcharge Rate.
WTI = previous Time Periods average daily price of West Texas Intermediate Crude Oil per Barrel.
Time Period = 21st of the prior month through the 20th of the current month.

Fuel Surcharge applies only when the FSR equals or exceeds 2%.

The source for the closing spot price of WTI will be the Dow Jones International Petroleum Report, whose daily spot quote is published in the Wall Street Journal, and other daily media.

Fuel Surcharge Table

| Time Periods Average Price of WTI Between | Applicable Fuel Surcharge |
|---|---|
| $28.00 to $30.49 | 2.0% |
| $30.50 to $32.99 | 3.0% |
| $33.00 to $35.49 | 4.0% |
| $35.50 to $37.99 | 5.0% |
| $38.00 to $40.49 | 6.0% |
| $40.50 to $42.99 | 7.0% |
| $43.00 to $45.49 | 8.0% |

Each $2.50 per barrel increase thereafter, apply an additional 1%

(Continued on next page)

For explanation of abbreviations / reference marks, see Item 100

ISSUED SEPTEMBER 21, 2000 EFFECTIVE OCTOBER 1, 2000

Issued by J. C. Engstrom, P. O. Box 961069, Ft. Worth, TX 76161-0069

SECTION 3
SPECIFIC RULES AND REGULATIONS - WITH CHARGES

ITEM 3375
CHARGE - FUEL SURCHARGE (concluded)

Example:

For a Fuel Surcharge applied for shipments in the month of October, Assuming the prior Time Periods average daily price of WTI was $34.01 Per bbl.

FSR = 4.0%

Thus, for each $10.00 of freight charges applicable to a shipment referring Hereto the Fuel Surcharge would be $0.40.

ITEM 3400
TERMS GOVERNING EXTENSION OF CREDIT FOR PAYMENT OF TRANSPORTATION CHARGES

If credit is extended to Applicant for the payment of transportation charges, Applicant agrees to pay such transportation charges within the following time periods:

(a) Freight Charges - 15 Calendar days from the date of the freight bill.

(b) Miscellaneous charges (e.g. demurrage, switching, weighing) - 30 calendar days from the date of the miscellaneous bill.

(c) Additional charges for freight transportation and related services (e.g. balance due bills) - 30 calendar days from the date of bill for additional charges.

NOTE: Errors discovered in bills by customers should be corrected by them and paid accordingly. Payment of all bills, including those corrected by customers, must be made within the credit period. Payment of bills alleged to be incorrect will not prejudice patron's claims, filed within the statutory period, for refund of overcharges. If customers receive bills that they feel they are not responsible for paying, they must notify the carrier within the credit terms that they are not responsible for paying the bills.

(continued on next page)



Issued by J. C. Engstrom, P. O. Box 961069, Ft. Worth, TX 76161-0069

## SECTION 3
## TERMS GOVERNING EXTENSION OF CREDIT FOR PAYMENT OF TRANSPORTATION CHARGES (concluded)

FINANCE CHARGES:
The Burlington Northern and Santa Fe Railway will assess a finance charge of 1% per month (12% per annum) on unpaid bills for freight and miscellaneous charges, including demurrage, switching and weighing, which are past our credit terms.

Customers with past due amounts will receive a finance charge invoice each month. Finance charges will be assessed on delinquent bills for freight or miscellaneous charges as of the end of the month reduced by amounts in dispute and any payments received by month end but not posted.

## SECTION 4
## REGULATIONS GOVERNING CURRENCY EXCHANGE ON TRAFFIC FROM, TO, AND BETWEEN STATIONS IN CANADA

### ITEM 4000
### APPLICATION

Except as provided for in the EXCEPTION below, the provisions of this Section and Sections 4A and 4B, apply only when specific reference is made to this Section in individual rate documents.

The regulations in this Section, and Sections 4A and 4B, governing the assessment and collection of charges on international freight traffic, in either direction between points in Canada and points in the United United States, must be observed.

EXCEPTION: When traffic is moving under the following rate authorities, the provisions of this Section, and Sections 4A and 4B will apply.

| Tariff | Item Number |
|---|---|
| NS 4401-Series | 2:2100.00 |
| | 2:2120.00 |
| | 2:2140.00 |
| | 2:2160.00 |
| | 2:2180.00 |
| | 2:2900.00 |
| | 2:2920.00 |
| | 2:2940.00 |
| | 2:2960.00 |
| | 2:2980.00 |

For explanation of abbreviations / reference marks, see Item 100

## SECTION 4
## REGULATIONS GOVERNING CURRENCY EXCHANGE ON TRAFFIC FROM, TO, AND BETWEEN STATIONS IN CANADA

### ITEM 4010
### BASIS OF RATE OF EXCHANGE

For the purpose of determining the rate of surcharge and discount, as referred to in this Section, and Sections 4A and 4B, the following will apply:

The rate of exchange quoted for New York funds by the Wall Street Journal on the last of each month will govern from the first to the fourteenth (inclusive) of the following month. Similarly, such quotation on the fourteenth will govern from the fifteenth to the last day (inclusive) of such month. Should the governing date fall on a Saturday, Sunday or United States legal holiday, the quotation of the preceding day will govern.

### ITEM 4020
### GOVERNING DATE FOR APPLICATION OF SURCHARGE OR DISCOUNT

The governing date for the application of surcharge or discount will be the date of the bill of lading.

### ITEM 4030
### SURCHARGE OR DISCOUNT TO BE SHOWN ON FREIGHT BILLS

The surcharge or discount will be shown as a separate item on the freight bill.

For explanation of abbreviations / reference marks, see Item 100

SECTION 4A
Applicable when United States Currency is at a PREMIUM in relation to Canadian Currency

ITEM 4100
SURCHARGE

The following will apply when converting Canadian Currency to U.S. Currency on traffic and to the extent indicated in Item 4110.

| When Rate of Exchange is: (See Item 4010) | Amount of surcharge or Additional collection |
|---|---|
| 1. Less than 7/8 of 1%. | None. |
| 2. Not less than 7/8 of 1% and not more more than 1%. | 1/2 of 1%. |
| 3. Over 1%. | 60% of rate of exchange |

In determining the surcharge, when the rate of exchange is more than 1%, fractions less than 1/2 will be disregarded and fractions of 1/2 or over will be counted as 1%.

For explanation of abbreviations / reference marks, see Item 100



Issued by J. C. Engstrom, P. O. Box 961069, Ft. Worth, TX 76161-0069

SECTION 4A
Applicable when United States Currency is at a PREMIUM in relation to Canadian Currency

ITEM 4110
DOMESTIC TRAFFIC

The following will apply between Canada and the United States in both directions including advanced charges payable to United States Carriers.

| Application | Amount of surcharge on Additional collection |
|---|---|
| 1. On all shipments including advanced charges payable to United States carriers when such charges are payable and collected in Canada (See NOTE). | As per Paragraphs 2 and 3 of Item 4100. |
| The surcharge should be added to the total through charges and must be assessed in all cases where the charges are collected at points in Canada, whether paid in Canadian or United States currency. | |
| Such surcharge will accrue entirely to the Canadian carrier. | |
| NOTE: Advanced charges, including customs duty and customs entry fees, payable entirely in the United States when such charges are payable and collected in Canada. | 100% of rate of exchange. |
| 2. When all charges are paid in United States Points in United States currency. | None |

For explanation of abbreviations / reference marks, see Item 100

SECTION 4B
Applicable when United States Currency is at a DISCOUNT in relation to Canadian Currency

ITEM 4200
DISCOUNT OR SURCHARGE

The following will apply to the extent indicated in Item 4210.

| When Rate of Exchange is (See Item 4010) | Surcharge or Additional Collection |
|---|---|
| 1. Less than 7/8 of 1%. | None. |
| Not less than 7/8 of 1% and not more than 1.25%. | 1/2 of 1%. |
| Over 1.25%. | 40% of rate of exchange. |
| | DISCOUNT (Allowance) |
| 2. Less than 7/8 of 1%. | None. |
| Not less than 7/8 of 1% and not more than 1%. | 1/2 of 1%. |
| Over 1%. | 60% of rate of exchange. |

In determining the rate of surcharge and the rate of discount, when the rate of exchange is more than shown in this item, fractions less than 1/2 will be disregarded and fractions of 1/2 or over will be counted as 1%.

For explanation of abbreviations / reference marks, see Item 100

SECTION 4B
Applicable when United States Currency is at a DISCOUNT in relation to Canadian Currency

ITEM 4210
DOMESTIC TRAFFIC

A. The following will apply on traffic from Canada to the United States.

| Application | Discount allowance |
| --- | --- |
| All charges, when prepaid, must be paid in Canadian Currency. | As per Paragraph 2 of Item 4200. |
| | **Surcharge or additional Collection to be prepaid** |
| All charges when billed "collect". | As per Paragraph 1 of Item 4200. |

B. The following will apply on traffic from the United States to Canada.

| Application | Surcharge or additional collection |
| --- | --- |
| All charges when "prepaid" | As per Paragraph 1 of Item 4200. |
| | **Discount Allowance** |
| All charges when billed "collect". | As per Paragraph 2 of Item 4200. |

For explanation of abbreviations / reference marks, see Item 100

## SECTION 5
## CAR HIRE ON TRAFFIC TO OR FROM MEXICO

### ITEM 5000
### APPLICATION OF CAR HIRE ON TRAFFIC TO OR FROM MEXICO

A. The provisions of this Section take precedence over all other car hire rates that may be published and applicable on traffic to or from Mexico if it were not for the provisions of this Section.

B. Carload freight for export to Mexico, and empty car or cars on BNSF car orders for loading in Mexico, are subject to the car hire charges as provided in Items 5020 through 5050 and documentation requirements identified in Item 5010.

C. The car hire charges named in Items 5020 through 5050 apply on all freight cars owned, leased, or controlled by any U.S. railroad, Canadian railroad or Trailer Train Corporation, except intermodal and heavy duty flat cars. Intermodal flatcars include all railcars with an an AAR mechanical designation of FC or FCA, and doublestack cars with AAR car types codes of S000 through S999, as described in Tariff RER 6412-Series. Heavy duty flatcars include all railcars with AAR car type codes of F400 through F499, as described in Tariff RER 6412-Series.

D. Shipments held awaiting payment of fees or documentation are subject to to any additional applicable charges, including demurrage, detention, and storage. Payment of the car hire charges will be accepted from the shipper, receiver, or an agent, but it is the responsibility of the party responsible for demurrage.

For explanation of abbreviations / reference marks, see Item 100

## SECTION 5
## CAR HIRE ON TRAFFIC TO OR FROM MEXICO

### ITEM 5010
### CAR HIRE DOCUMENTATION ON SHIPMENTS FROM OR TO MEXICO

The following information must accompany payments of car hires charges:

1. Name of receiver or shipper in the United States.
2. Name of receiver or shipper in the Republic of Mexico.
3. Name, address, and telephone number of the customs broker.
4. Name of the party for whom the customs broker is acting.
5. Date of the request.
6. Car initials and number.
7. Car type.
8. Destination or origin in Mexico. (City and State)
9. The amount paid to BNSF for the shipment.
10. The check number and name of the bank on which the check is drawn.
11. The amount of the check.
12. An original signature of a party authorized to make the request.
13. Notation whether the party making the request is the shipper, the receiver, or an agent, and if an agent, for whom.

For explanation of abbreviations / reference marks, see Item 100

SECTION 5
CAR HIRE ON TRAFFIC TO OR FROM MEXICO

ITEM 5020
CAR HIRE CHARGES ON TRAFFIC MOVING VIA EL PASO, TX

Subject to the provisions of Items 5000 and 5010, the following car hire charges are applicable on traffic moving via El Paso, TX in connection with BNSF. The charges, as shown, are stated in dollars per car in United States dollars.

| Origin or Destination State in Mexico (except as indicated) | Covered Hoppers | Box Cars | Gondolas Flat Cars Open Top Hoppers |
|---|---|---|---|
| Aguascalientes | 225 | 255 | 200 |
| Campeche | 300 | 255 | 200 |
| Chiapas | 300 | 255 | 200 |
| Chihuahua | | | |
| Ciudad Juarez | 40 | 40 | 40 |
| Other than Ciudad Juarez | 100 | 155 | 100 |
| Coahuilla | 100 | 155 | 100 |
| Colima | 225 | 255 | 200 |
| Distritio Federal | 225 | 255 | 200 |
| Durango | 100 | 155 | 100 |
| Estado de Mexico | 225 | 255 | 200 |
| Guanajuato | 225 | 255 | 200 |
| Guerrero | 225 | 255 | 200 |
| Hidalgo | 225 | 255 | 200 |
| Jalisco | 225 | 255 | 200 |
| Michoacan | 225 | 255 | 200 |
| Morelos | 225 | 255 | 200 |
| Nayarit | 225 | 255 | 200 |
| Nuevo Leon | 150 | 200 | 150 |
| Oaxaca | 300 | 255 | 200 |
| Puebla | 225 | 255 | 200 |
| Queretaro | 225 | 255 | 200 |
| San Luis Potosi | 225 | 255 | 200 |
| Sinaloa | 150 | 200 | 150 |
| Sonora | 225 | 255 | 200 |
| Tabasco | 300 | 255 | 200 |
| Tamaulipas | 225 | 255 | 200 |
| Tlaxcala | 225 | 255 | 200 |
| Veracruz | 300 | 255 | 200 |
| Yucatan | 300 | 255 | 200 |
| Zacatecas | 225 | 255 | 200 |

For explanation of abbreviations / reference marks, see Item 100

ISSUED JUNE 2, 1997 EFFECTIVE JULY 4, 1997

Issued by J. C. Engstrom, P. O. Box 961069, Ft. Worth, TX 76161-0069

SECTION 5
CAR HIRE ON TRAFFIC TO OR FROM MEXICO

ITEM 5030
CAR HIRE CHARGES ON TRAFFIC MOVING VIA EAGLE PASS, TX

Subject to the provisions of Items 5000 and 5010, the following car hire charges are applicable on traffic moving via Eagle Pass, TX in connection with BNSF. The charges, as shown, are stated in dollars per car in United States dollars.

| Origin or Destination State in Mexico (except as indicated) | Covered Hoppers | Box Cars | Gondolas Flat Cars Open Top Hoppers |
|---|---|---|---|
| Aguascalientes | 200 | 255 | 200 |
| Campeche | 200 | 255 | 200 |
| Chiapas | 200 | 255 | 200 |
| Chihuahua | 150 | 200 | 150 |
| Coahuilla | | | |
| Piedras Negras | 40 | 40 | 40 |
| Other than Piedras Negras | 100 | 155 | 100 |
| Colima | 200 | 255 | 200 |
| Distritio Federal | 200 | 255 | 200 |
| Durango | 100 | 155 | 100 |
| Estado de Mexico | 200 | 255 | 200 |
| Guanajuato | 200 | 255 | 200 |
| Guerrero | 200 | 255 | 200 |
| Hidalgo | 200 | 255 | 200 |
| Jalisco | 200 | 255 | 200 |
| Michoacan | 200 | 255 | 200 |
| Morelos | 200 | 255 | 200 |
| Nayarit | 200 | 255 | 200 |
| Nuevo Leon | 100 | 155 | 100 |
| Oaxaca | 200 | 255 | 200 |
| Puebla | 200 | 255 | 200 |
| Queretaro | 200 | 255 | 200 |
| San Luis Potosi | 150 | 200 | 150 |
| Sinaloa | 200 | 255 | 200 |
| Sonora | 200 | 255 | 200 |
| Tabasco | 200 | 255 | 200 |
| Tamaulipas | 100 | 155 | 100 |
| Tlaxcala | 200 | 255 | 200 |
| Veracruz | 200 | 255 | 200 |
| Yucatan | 200 | 255 | 200 |
| Zacatecas | 200 | 255 | 200 |

For explanation of abbreviations / reference marks, see Item 100

ISSUED JUNE 2, 1997 EFFECTIVE JULY 4, 1997

Issued by J. C. Engstrom, P. O. Box 961069, Ft. Worth, TX 76161-0069

SECTION 5
CAR HIRE ON TRAFFIC TO OR FROM MEXICO

ITEM 5040
CAR HIRE CHARGES ON TRAFFIC MOVING VIA LAREDO, TX

Subject to the provisions of Items 5000 and 5010, the following car hire charges are applicable on traffic moving via Laredo, TX in connection with BNSF. The charges, as shown, are stated in dollars per car in United States dollars.

| Origin or Destination State in Mexico (except as indicated) | Covered Hoppers | Box Cars | Gondolas Flat Cars Open Top Hoppers |
|---|---|---|---|
| Aguascalientes | 225 | 255 | 200 |
| Campeche | 225 | 255 | 200 |
| Chiapas | 225 | 255 | 200 |
| Chihuahua | 225 | 255 | 200 |
| Coahuilla | 100 | 155 | 100 |
| Colima | 225 | 255 | 200 |
| Distritio Federal | 225 | 255 | 200 |
| Durango | 100 | 155 | 100 |
| Estado de Mexico | 225 | 255 | 200 |
| Guanajuato | 225 | 255 | 200 |
| Guerrero | 225 | 255 | 200 |
| Hidalgo | 225 | 255 | 200 |
| Jalisco | 225 | 255 | 200 |
| Michoacan | 225 | 255 | 200 |
| Morelos | 225 | 255 | 200 |
| Nayarit | 225 | 255 | 200 |
| Nuevo Leon | 100 | 155 | 100 |
| Oaxaca | 225 | 255 | 200 |
| Puebla | 225 | 255 | 200 |
| Queretaro | 225 | 255 | 200 |
| San Luis Potosi | 150 | 200 | 150 |
| Sinaloa | 225 | 255 | 200 |
| Sonora | 225 | 255 | 200 |
| Tabasco | 225 | 255 | 200 |
| Tamaulipas | | | |
| Nuevo Laredo | 40 | 40 | 40 |
| Other than Nuevo Laredo | 100 | 155 | 100 |
| Tlaxcala | 225 | 255 | 200 |
| Veracruz | 225 | 255 | 200 |
| Yucatan | 225 | 255 | 200 |

For explanation of abbreviations / reference marks, see Item 100

ISSUED JUNE 2, 1997 EFFECTIVE JULY 4, 1997

Issued by J. C. Engstrom, P. O. Box 961069, Ft. Worth, TX 76161-0069

## SECTION 5
## CAR HIRE ON TRAFFIC TO OR FROM MEXICO

### ITEM 5050
### CAR HIRE CHARGES ON TRAFFIC MOVING VIA BROWNSVILLE, TX

Subject to the provisions of Items 5000 and 5010, the following car hire charges are applicable on traffic moving via Brownsville, TX in connection with BNSF. The charges, as shown, are stated in dollars per car in United States dollars.

| Origin or Destination State in Mexico (except as indicated) | Covered Hoppers | Box Cars | Gondolas Flat Cars Open Top Hoppers |
|---|---|---|---|
| Aguascalientes | 225 | 255 | 200 |
| Campeche | 225 | 255 | 200 |
| Chiapas | 225 | 255 | 200 |
| Chihuahua | 225 | 255 | 200 |
| Coahuilla | 100 | 155 | 100 |
| Colima | 225 | 255 | 200 |
| Distritio Federal | 225 | 255 | 200 |
| Durango | 100 | 155 | 100 |
| Estado de Mexico | 225 | 255 | 200 |
| Guanajuato | 225 | 255 | 200 |
| Guerrero | 225 | 255 | 200 |
| Hidalgo | 225 | 255 | 200 |
| Jalisco | 225 | 255 | 200 |
| Michoacan | 225 | 255 | 200 |
| Morelos | 225 | 255 | 200 |
| Nayarit | 225 | 255 | 200 |
| Nuevo Leon | 100 | 155 | 100 |
| Oaxaca | 225 | 255 | 200 |
| Puebla | 225 | 255 | 200 |
| Queretaro | 225 | 255 | 200 |
| San Luis Potosi | 150 | 200 | 150 |
| Sinaloa | 225 | 255 | 200 |
| Sonora | 225 | 255 | 200 |
| Tabasco | 225 | 255 | 200 |
| Tamaulipas | | | |
| Matamoros | 40 | 40 | 40 |
| Other than Matamoros | 100 | 155 | 100 |
| Tlaxcala | 225 | 255 | 200 |
| Veracruz | 225 | 255 | 200 |
| Yucatan | 225 | 255 | 200 |
| Zacatecas | 225 | 255 | 200 |

- END -

For explanation of abbreviations / reference marks, see Item 100



Issued by J. C. Engstrom, P. O. Box 961069, Ft. Worth, TX 76161-0069

# PX0772-PX0783

Filed Under Seal

# EXHIBIT

# PX0784

April 27, 2006

By E-Filing

The Honorable Vernon A. Williams
Secretary
Surface Transportation Board
1925 K Street, N.W.
Washington, D.C. 20423-0001

Re: Ex Parte No. 661 – Rail Fuel Surcharges – Comments

Dear Mr. Williams:

Enclosed for filing in the above proceeding are the comments of Robert M. Knight, Jr., Executive Vice President-Finance and Chief Financial Officer of Union Pacific Corporation and Union Pacific Railroad.

Please direct any questions about these comments or Union Pacific's participation in this proceeding to me at (402) 544-3897 or the e-mail address listed below.

Sincerely,

Lawrence E. Wzorek

Lawrence E. Wzorek

**Lawrence E. Wzorek**
Assistant Vice President - Law

**UNION PACIFIC RAILROAD**
1400 Douglas St., Stop 1580, Omaha, NE 68179-1580
ph. (402) 544-3897 fx. (402) 501-0129
lewzorek@up.com

***Contains Color Images***

BEFORE THE
SURFACE TRANSPORTATION BOARD

---

STB EX PARTE NO. 661
RAIL FUEL SURCHARGES

---

# COMMENTS OF
# UNION PACIFIC RAILROAD COMPANY

---

PRESENTED BY

ROBERT M. KNIGHT, JR.

EXECUTIVE VICE PRESIDENT-FINANCE
AND CHIEF FINANCIAL OFFICER

UNION PACIFIC CORPORATION
UNION PACIFIC RAILROAD COMPANY

Date of Submission: April 27, 2006
Date of Public Hearing: May 11, 2006

**BEFORE THE**
**SURFACE TRANSPORTATION BOARD**

---

**STB EX PARTE NO. 661**
**RAIL FUEL SURCHARGES**

---

**COMMENTS OF**
**UNION PACIFIC RAILROAD COMPANY**

---

## INTRODUCTION

My name is Rob Knight. I am the Executive Vice President-Finance and Chief Financial Officer of Union Pacific Corporation and Union Pacific Railroad. I was named to this position in January 2004. I am responsible for all financial activities of both the Corporation and Union Pacific Railroad.

I began my career with Union Pacific Corporation in 1980 and have held a variety of positions in Audit, Accounting, Finance, Human Resources, Quality, and Marketing and Sales. In 1996, I was named vice president, Quality; in 1999, vice president and general manager, Energy in Union Pacific Railroad's Marketing & Sales Department. In 2000, I became vice president and general manager, Automotive, again in the Marketing & Sales Department. I returned to Finance in May 2002, when I became senior vice president, Finance of Union Pacific Corporation, the position I held before my election to my current position. I have a bachelor's degree in business administration from Kansas State University and a master's degree in business administration from Southern Illinois University.

My experience in both Marketing and Finance at Union Pacific has provided me with a unique perspective on Union Pacific's fuel surcharge program. I have spoken with customers, our investors, Wall Street analysts, and others about our need to recover our fuel costs. This issue is of critical importance to Union Pacific. As I will explain, we must recover our fuel costs in order not only to serve our customers, but also to protect our shareholders and employees, who depend on our economic viability.

## SUMMARY OF UP'S POSITION

Let me summarize Union Pacific's position on our fuel surcharge program:

- UP has a comprehensive fuel surcharge program that began for carload traffic in 2002 to offset the high price of diesel fuel. This program has evolved in response to customer comments and input.

- UP does not have a fuel surcharge on 100% of its customers' shipments—although we would like to be able to recover from all shippers. This is a product of the history of the commercial relationships with our customers—large and small—that have developed over time.
  - UP's traffic mix includes regulated, exempt, and contract traffic.
  - Some older contracts do not have fuel surcharge provisions, and those customers have resisted UP's requests for fuel surcharges.
  - New price documents include fuel surcharge provisions.

- UP's fuel surcharge revenue does not fully cover our incremental fuel cost increase.
  - In 2004, UP recovered 52% of incremental fuel costs (i.e., cost above 75¢/gal.).
  - In 2005, UP recovered 74%. Even if all of UP's business in 2005 had been subject to the Highway Diesel Fuel surcharge, UP would have recovered just 99% of its incremental fuel cost.
  - In 2006, UP expects to recover about 90% of its incremental fuel-related cost.

- Due to increasing fuel prices, UP had more than $800 million in unrecovered incremental diesel fuel costs from 2003 through 2005, not including nearly $150 million for other fuel-related expenses.
    - This amounts to a subsidy of shippers at the expense of UP shareholders and employees.

- UP continues to make huge capital investments in its system, although UP does not yet earn its cost of capital.

- Unrecovered fuel costs impair UP's ability to invest in its railroad to meet the increased demand for rail transportation.

- UP must recover 100% of its fuel costs, but UP does not intend to recover through its fuel surcharge program more than 100% of its total fuel expense above 75 cents per gallon.

- UP has been receptive to customers' comments about our fuel surcharge program; and, in fact, our current program was modified from our original plan to be responsive to customer feedback.

- UP wants a fuel surcharge program that
    - enables UP to recover fully its cost of fuel;
    - is responsive to customers;
    - is fair/equitable; and
    - is easy to administer for both UP and its customers.

## HISTORY OF UP'S FUEL COSTS

Union Pacific consumes a huge quantity of diesel fuel. So do other railroads. However, the geographic scope of Union Pacific's system, as well as our traffic mix and the terrain over which we operate, means that Union Pacific uses more diesel fuel than virtually any of the other railroads.

In 2005, UP consumed nearly 1.35 billion gallons of diesel fuel. We have worked diligently to control our consumption. We have invested in more fuel-efficient locomotives and implemented programs to conserve fuel. The following slide depicts the steps UP has taken to reduce fuel consumption.

[Slide #1]




Nevertheless, fuel consumption has grown with the record demand for our rail service.

As the Board well knows, there have been substantial increases in the price of a barrel of oil over the last few years. That trend continues today. The increase in oil prices translates directly into the ever-increasing price we pay for diesel fuel.

The following chart shows the staggering increase in the cost of a gallon of diesel fuel in just the last few years.

**[Slide #2]**




Our average price for the 1.35 billion gallons last year was $1.77 per gallon, up 55 cents from $1.22 per gallon in 2004. Our average price for a gallon of fuel during the fourth quarter of 2005 was $2.08 per gallon. This resulted in UP spending a total of $2.4 billion on locomotive fuel in 2005.

Fuel prices continue to rise. On April 20, 2006, UP announced its first quarter earnings. We stated that our fuel cost in the first quarter was $1.87 per gallon, up from $1.45 in the first quarter of 2005—but our cost of fuel as of the date of our earnings announcement had risen to $2.10 per gallon.

In addition to diesel fuel, UP purchases electricity and other utilities, as well as gasoline, lubricants, and other fuels for our operations. In 2005 that added $240 million to our costs, up nearly $100 million from 2002 levels. In the first quarter of 2006, our combined fuel and utilities bills totaled $692 million. That category alone represented

22% of our operating expenses. In the first quarter of 2002, fuel and utilities were only 10% of UP's total operating expenses in the quarter.

The chart referred to above [Slide #2] also demonstrates that UP's average fuel cost per gallon averaged 70 cents per gallon from 1992 through 2001, and then remained around 73 cents per gallon from 1997 through 2002. Consequently, when UP began to see the run up in fuel costs, expecting that they would return to lower levels in the foreseeable future, we designed our fuel surcharge program with 75 cents per gallon as the base cost, with a view to collecting the incremental cost above that amount through our fuel surcharge program.

## UNION PACIFIC'S FUEL SURCHARGE PROGRAM

In its Notice of Hearing, the STB asked the railroads to explain the manner in which they calculate and charge their customers fuel surcharges. The Board also asked whether the fuel surcharges fairly reflect the increasing fuel cost of the movements to which they are applied.

Like most companies that have a fuel surcharge program, Union Pacific determines the fuel surcharge to be added to a customer's freight bill by referring to a publicly available index and periodic changes in that index. The fuel surcharge is calculated as a percentage that is applied to the customer's freight bill to determine the total amount of the transportation charge for a particular movement.

UP's fuel surcharge program began around September 2000, when we initiated a series of fuel surcharge provisions on intermodal traffic that was not under contracts. However, these early fuel surcharge provisions did not refer to any index.

On December 1, 2002, UP implemented its first standard fuel surcharge for carload business. The fuel surcharge was based on the price of West Texas Intermediate crude oil (WTI). A fuel surcharge was applied to the pertinent freight bills when the price of WTI oil, as published in *The Wall Street Journal*, exceeded $28 per barrel for 30 consecutive days. The surcharge was applied in 2% increments for every $5 per barrel the WTI exceeded $28 per barrel.

In March 2003, customers informed UP that rapid swings in the WTI prices and the structure of UP's WTI fuel surcharge program impeded customers' ability to budget for fuel surcharge increases. This customer feedback caused UP to re-evaluate the formula of its "standard" fuel surcharge program. Consequently, in April 2003, after further discussions with customers, UP converted the WTI carload surcharge basis from the WTI price published for 30 consecutive days in *The Wall Street Journal* to a WTI monthly average price. We also modified the surcharge schedule to initiate the fuel surcharge and calculate it at 0.4% for each dollar tier above the monthly average of $23 per barrel.

We continued to receive feedback from our customers on our fuel surcharge program. As a result of this customer input, UP linked its standard carload fuel surcharge in June 2003 to the Highway Diesel Fuel (HDF) Index published by the Department of Energy, because we concluded that the HDF is better aligned with the fluctuations in the diesel fuel price that UP pays. Additionally, the HDF is the fuel index used by the trucking industry as well as other carriers with whom we compete for business. It is easier to apply and more widely accepted by our customers as an index with which they are familiar. In moving from the WTI monthly average price calculation

that began at $23.01 per barrel, UP implemented the HDF fuel surcharge at $1.35 per gallon (approximately 80 cents per gallon for UP's fuel price), which was equivalent to approximately $25.50 per barrel under WTI (an increase in the base price of oil from which the fuel surcharge applied).

Union Pacific administers the HDF fuel surcharge program in this manner:

- The fuel surcharge is adjusted on a monthly basis.
- The basis for the surcharge is determined by the HDF for a calendar month, as reported weekly on the DOE website.
- If the average monthly price of HDF equals or exceeds $1.35 per gallon, a surcharge beginning at 1.5% applies. (The $1.35 per gallon equates to a UP fuel price of approximately 80 cents per gallon, while our cost recovery calculation begins at 75 cents per gallon.)
- For every five-cent increase above $1.35 per gallon, the surcharge increases by 0.5%.
- When the average DOE price drops below $1.35 per gallon, no fuel surcharge will apply.
- The surcharge is billed to applicable shipments beginning the second month following the month on which the DOE average price calculation was based. (For example: the average reported DOE price for the month of May 2005 determined the fuel surcharge applied throughout the month of July 2005.) Although UP originally planned to have only a one-month lag, our customers convinced us to go to the second month.
- The HDF program is designed to recover 100% of the incremental fuel expense above 75 cents per gallon if all shipments were covered by this program.

Union Pacific's coal business has a separate fuel surcharge program. Historically, most of our coal business moved under long-term contracts with a variety of escalation provisions. We attempted to simplify the administration of our coal business transportation rates and terms. Consequently, in November 2004, UP established a fuel surcharge for its coal business that is HDF-based. The surcharge begins at the

rate of 1.5% when the HDF index is at $1.35 per gallon. The surcharge increases 0.5% for each additional increase of five cents per gallon up to $1.60 per gallon. After $1.60 per gallon, the surcharge increases 0.75% for each additional five cents per gallon. The variation from the standard HDF program is designed to cover the higher costs associated with the increased fuel consumption on unit coal trains which carry more tonnage than manifest trains.

Our Intermodal Group has determined that the fuel surcharge for intermodal traffic should be calculated based on the HDF, but slightly differently from our carload fuel surcharge because of the comparable nature of this business with motor carriers. As a result, the base for our Intermodal HDF index is $1.25 per gallon (rather than the $1.35 per gallon for carload business). It is calculated by determining the percentage change between the base index and the previous month change. It increases approximately 0.6% for each additional change of four cents per gallon in the index.

It has been UP's experience that the HDF-based fuel surcharge more accurately reflects the change in UP's diesel fuel costs. The attached chart shows the correlation between the HDF index and UP's fuel cost back to 1994.

[Slide #3]




## UP IS NOT FULLY RECOVERING ITS INCREASED FUEL COST

There has been much discussion about the amount of money railroads receive from their fuel surcharges. One thing is certain: Union Pacific is not recovering the full incremental increase in the cost of its fuel via our fuel surcharge program.

Where possible, Union Pacific applies a fuel surcharge in order to capture its incremental cost of fuel above 75 cents a gallon. However, UP does not recover a fuel surcharge on 100% of the shipments we handle. The fuel surcharge is linked to the price document the shipper uses.

Union Pacific handles traffic under published rates regulated by the STB, as well as other shipments that are exempt commodities moving under public circular prices

that are not regulated by the STB. Numerous shipments also move under rail transportation contracts.

During 2005, approximately 80% of our rail transportation revenue was derived from transportation contracts or private rate documents pertinent to a particular shipper. Approximately 20% of our revenue came from traffic moving under published rates, some of which are regulated while others are in exempt public price circulars.

Commercial agreements from the past preclude Union Pacific from applying a fuel surcharge to all of its business. These limitations are being reduced over time. In 2004, our fuel surcharge program produced revenue that recovered 52% of the incremental cost of fuel above 75 cents per gallon. In 2005, when we paid approximately $2.4 billion for locomotive fuel, our fuel surcharge revenue amounted to $1.017 billion, as we reported in our Form 10K to the SEC. Seventy-eight percent of UP's revenue base in 2005 was subject to some form of fuel surcharge. UP recovered the equivalent of 74% of our incremental fuel cost. This demonstrates that UP is not over-collecting from our customer base in total.

There is a significant amount of incremental fuel expense that UP is not recovering via fuel surcharges. In fact, from 2003 through 2005, UP did not recover more than $800 million in additional diesel fuel cost. That is depicted on the following chart. This does not include the nearly $150 million in incremental fuel-related expenses (e.g., utilities, etc.).

[Slide #4]




UP is still not recovering 100% of its incremental fuel expense in 2006. During the first quarter of 2006, we recovered around 90% of our incremental diesel fuel expense. This was a 26% improvement over our 73% recovery in the first quarter of 2005. In essence, Union Pacific and its shareholders have been subsidizing and continue to subsidize the higher cost of fuel for shippers on our railroad.

UP would prefer that every one of its customers pays to offset the higher price for diesel fuel—but they do not. This is a result of the marketplace dynamics. Our commercial relationships with many of our customers have developed over a long period of time. Some customers entered into long-term transportation agreements years ago, when the price of fuel was much lower and we had excess rail capacity to fill. Some of these contracts contain no fuel surcharge formula, while others have a price

adjustment provision based on a formula that gives inadequate weight to the cost of fuel.

Union Pacific is applying a fuel surcharge on every freight bill that it can. We are including a fuel surcharge mechanism in new transportation rate documents, whether that document is a tariff, an exempt circular, or a transportation contract. We will continue to pursue full recovery of our incremental fuel costs.

In the meantime, UP cannot undo or ignore the commercial arrangements it has with some of its customers—who, as a result of negotiations prior to 2003, secured a favorable arrangement before the run up in fuel prices. UP has approached some of these customers who enjoy rates without fuel surcharges (some of whom add fuel surcharges to bills they present to their customers) to determine whether they would agree to modifications that would allow UP to recover at least a part of the increased costs. While a small number of these customers were willing to help us offset our added fuel costs, the vast majority have rejected our request. UP is not able to simply walk away from that business or impose a fuel surcharge just yet.

## UP RESPONSIVENESS TO CUSTOMERS

Union Pacific has not adopted a fuel surcharge program without listening to our customers. If we wanted to simplify our recovery process and minimize our exposure for unattained fuel costs, we would adopt one fuel surcharge factor. Instead we have four basic indices in place today. We have also accommodated quite a few variations to those indices as a result of past negotiations.

Some customers may pay more than the actual incremental cost of fuel we use to handle their particular shipments. Some pay less. While this may appear inequitable

to some, we believe standard surcharges are the most appropriate and reasonable way to manage a fair, equitable and easily administered fuel surcharge program.

Union Pacific adopted a fuel surcharge at a time when it appeared that the increase in fuel prices would be temporary or transitory. We did not anticipate that the rising cost of fuel would continue virtually unabated for as long as it has. Although this does not appear likely today, there is still a possibility that the price of oil and, consequently, the cost of diesel fuel will decline in the coming months and years. In fact, there have been periodic monthly declines in the surcharge during its use by UP. The use of our current fuel surcharge mechanism means that, as the price of fuel declines, so will the surcharge. In fact, fuel price declines have historically followed significant increases in oil prices that occurred, for example, during the mid-1970's, mid-1980's, and early 1990's.

The Board will hear from an array of participants in this proceeding. Some will tell you that the STB should mandate a fuel surcharge formula that guarantees that each shipper will pay no more than the cost of the fuel used for that particular customer's movements. While that may sound like a desirable goal, it is more difficult than simply calculating the mileage between the origin and destination. Other factors would have to be considered in a formula designed to link the charge to the fuel actually consumed. Those include the weight of the shipment, the terrain over which it travels (e.g., 100 miles over the Rockies is not the same as 100 miles across the plains of the Midwest), weather, train configuration, locomotive type, terminal switching, geographic fuel price differences, etc. Currently, the railroad industry does not have a single master rail mileage table that the freight billing railroad could use to calculate an interline

mileage surcharge. Additionally, customers would need a similar capability in order to maintain accounts payable records.

Shippers and railroads desire simplicity in the formula used. Otherwise, the administrative burden for the railroad of calculating the surcharge and for the customer of auditing or verifying the surcharge becomes insurmountable. It is simply not practical to have a unique fuel surcharge program for individual customers that takes into consideration all of the complex variables associated with their shipments.

## CAPITAL INVESTMENT DEPENDS ON ADEQUATE RETURNS

As the STB is well aware, the rail industry is capital intensive. Railroads spend more of their revenue dollars on capital investments than any other industry. During the period of 1995 through 2004, railroads spent an average of nearly 18% of their revenue dollars on capital items.

**[Slide #5]**



But Class I railroads have not achieved an adequate return on that investment.

The capital demands on railroads continue to be extensive—particularly now that there has been a dramatic increase in rail shipments, and that trend is expected to continue well into the future. Railroads are working to meet that demand by making capital expenditures at record levels. Union Pacific alone has spent approximately $26 billion in capital investments over the past 11 years.

In 2005, we spent more than $2.8 billion and plan to spend about the same amount in 2006. More than one-half of that amount is to maintain our track and physical plant, while another $485 million is projected for growth capacity and commercial facilities. These are investments that take time to design, build and put into service so they necessarily require an authorization in anticipation of a recovery on the investments.

**[Slide #6]**






AAR-E-00115755

Meanwhile, however, Union Pacific has not earned a return on its investment in capital expenditures that necessarily justifies investing as much as we have invested or as we plan to invest. The following chart depicts this point.

**[Slide #7]**




Nevertheless, Union Pacific has been willing—so far—to make these continued investments with a view that Union Pacific will eventually earn a return on all it has put into its transportation system for track, locomotives, freight cars, commercial facilities, and technology.

The fuel surcharge program is an integral part of Union Pacific's plan to attain reinvestability. As the attached graph indicates, fuel surcharge revenue has not covered the incremental fuel expense, much less the cost of capital.

**[Slide #8]**




That in turn has contributed to an inadequate return on UP's investment in its business.

It is crucial that railroads be permitted to recover fully their variable costs, like fuel. If Union Pacific cannot recover those costs, it certainly cannot afford to continue to make the annual multi-billion dollar investments needed to meet the demands on our rail network.

## CONCLUSION

We do expect to eventually recover all our incremental fuel costs by means of our fuel surcharge program. But we are not there yet. No one involved with transportation likes high fuel prices. UP certainly does not. Nevertheless, our intent to recover our higher fuel costs has not dampened the demand for our services. But only by recovering our full costs and improving our returns will we be able to continue to

invest in our rail franchise to the benefit of our customers, our employees, and our investors. Changes that involve complex calculations and numerous resources to administer and audit are not practical.

# PX0785-PX0844

Filed Under Seal

# EXHIBIT

# PX0845

UNITED STATES OF AMERICA

\+ + + + +

SURFACE TRANSPORTATION BOARD

PUBLIC HEARING

RAIL FUEL SURCHARGES

EX PARTE 661

\+ + + + +

THURSDAY, MAY 11, 2006

\+ + + + +

The Public Hearing convened in Hearing Suite 760, 1925 K Street, N.W., Washington, D.C. 20423-0001, pursuant to notice at 9:00 a.m., Chairman Douglas Buttrey presiding.

SURFACE TRANSPORTATION MEMBERS PRESENT:

DOUGLAS BUTTREY Chairman
FRANCIS MULVEY Vice Chairman

PANELISTS:

GOVERNOR BRIAN SCHWEITZERA

| | |
|---|---|
| TERRY WHITESIDE, | WHEAT & BARLEY COMMISSIONS |
| STEVEN STREGE | NORTH DAKOTA GRAIN DEALERS ASSOCIATION |
| DAN MACK | NATIONAL GRAIN & FEED ASSOCIATION |
| JUDY GILLIES | THE FERTILIZER INSTITUTE |
| ERIC WILKEY | TRANSPORTATION, ELEVATOR, & GRAIN MERCHANTS ASSOCIATION |
| TERRY VOSS | AG PROCESSING |
| GEORGE TELFER | ALLIANCE OF AUTOMOBILE MANUFACTURERS/DAIMLER CHRYSLER |

| | |
|---|---|
| ROBERT NEFF | AMEREN ENERGY FUELS & SERVICES |
| JAY ROMAN | AMEREN ENERGY FUELS & SERVICES/ESCALATION CONSULTANTS |
| THOMAS CROWLEY | WESTERN COAL TRAFFIC LEAGUE |
| PETER PFOHL | WESTERN COAL TRAFFIC LEAGUE |
| BILL MOHL | ENTERGY CORPORATION |
| THOMAS WILCOX | THE AES CORPORATION |
| AMES HELLER | CONCERNED CAPTIVE COAL SHIPPERS |
| MICHAEL LOFTUS | CONCERNED CAPTIVE COAL SHIPPERS |
| STEPHEN POCSIK | TOTAL PETROCHEMICALS USA, INC. |
| MICHAEL MCBRIDE | TOTAL PETROCHEMICALS USA, INC./EDISON ELECTRIC INSTITUTE |
| STEVE SHARP | ARKANSAS ELECTRIC COOPERATIVE CORP. |
| DIANE ELHAKIM | DEGUSSA CORPORATION |
| DAVID WEISEL | POTLATCH FOREST PRODUCT CORP. |
| JAMES CONWAY | GRIFFIN INDUSTRIES |
| DANIEL SLAVIN | GRANITEROCK |
| JOHN FICKER | THE NATIONAL INDUSTRIAL TRANSPORTATION LEAGUE |
| CURT WARFEL | THE NATIONAL INDUSTRIAL TRANSPORTATION LEAGUE |
| THOMAS SCHICK | AMERICAN CHEMISTRY COUNCIL |
| CHARLES LINDERMAN | EDISON ELECTRIC INSTITUTE |
| TOM HUNT | BNSF RAILWAY COMPANY |
| JAMES FOOTE | CANADIAN NATIONAL RAILWAY CO. |
| MARCELLA SZEL | CANADIAN PACIFIC RAILWAY |
| CHRISTOPHER JENKINS | CSX TRANSPORTATION |
| DONALD SEALE | NORFOLK SOUTHERN RAILWAY CO. |
| ROBERT KNIGHT | UNION PACIFIC RAILROAD CO. |
| ROBERT DINGMAN | OIL CREEK & TITUSVILLE LINES |
| TOM O'CONNOR | SNAVELY KING MAJOROS O'CONNOR & LEE, INC. |
| MAZHAR ALI AWAN | TRANSPORTATION ECONOMICS, INC. |
| SANDRA DEARDEN | HIGHROAD CONSULTING, LTD. |
| MICHAEL BEHE | FREIGHT RESOURCES NETWORK, LLC. |

A G E N D A

Opening Remarks - Chairman Buttrey . . . . . . . . 5

Opening Remarks - Vice Chairman Mulvey . . . . . . 11

PANEL I - GOVERNMENT
The Honorable Brian Schweitzer, Gov. Of Montana . 12

PANEL II A - WITNESSES
Eric Wilkey, Arizona Grain . . . . . . . . . . . . 33
Terry Voss, Ag Processing . . . . . . . . . . . . . 36
Dan Mack, Transportation for Feed . . . . . . . . . 40
Steven Strege, North Dakota Grain Dealers Assoc . 49
Terry Whiteside, Wheat and Barley Commission . . 57
Judy Gillies, J.R. Simplot Company . . . . . . . . 62

PANEL II B - WITNESSES
Peter Pfohl, Western Coal Traffic League . . . . . 83
Thomas Crowley, Western Coal Traffic League . . . 88
Bill Mohl, Entergy Corporation . . . . . . . . . . 91
Thomas Wilcox, AES Corporation . . . . . . . . . 101
George Telfer, Daimler Chrysler . . . . . . . . . 111
Robert Neff, Ameren Energy . . . . . . . . . . . 121
Jay Roman, Ameren Energy . . . . . . . . . . . . 126

PANEL II C - WITNESSES
Michael Loftus, Concerned Captive Coal Shippers 148
James Heller, Concerned Captive Coal Shippers . 151
Daniel V. Slavin, Graniterock . . . . . . . . . 168
Steve Sharp, Arkansas Electric Cooperative Corp 174
Diane Elhakim, Degussa Corporation . . . . . . . 180
James Conway, Griffin Industries . . . . . . . . 186
David Weisel, Potlatch Forest Product Corp . . . 192
Stephen Pocsik, Total Petrochemicals USA, Inc . 201
Michael McBride, Total Petrochemicals USA, Inc. 206

Panel III: Trade Associations
John Ficker, The National Industrial
Transportation League . . . . . . . . . . . 227
Curt Warfel, The National Industrial
Transportation League . . . . . . . . . . . 227
Michael McBride, Edison Electric Institute . . 236
Thomas Schick, American Chemistry Council . . . 242

Railroads


Tom Hunt, BNSF Railway Company . . . . . . . . . . 269
James Foote, Canadian National Railway Company 287
Marcella Szel, Canadian Pacific Railway . . . . 296
Christopher Jenkins, CSX Transportation, Inc. . 314
Donald Seale, Norfolk Southern Railway Company 326
Robert Knight,Union Pacific Railroad Company . 334
Robert Dingman, Jr., Oil Creek and Titusville Lines . . . . . . . . . . . . . . . . . . 349


Panel IV: Consultants


Jay Roman, Escalation Consultants, Inc. . . . . 357
Tom O'Connor, Snavely King Majoros O'Connor & Lee, Inc. . . . . . . . . . . . . . . . . 372
Mazhar Ali Awan, Transportation Economics, Inc. 383
Sandra Dearden, Highroad Consulting, Ltd. . . . 396
Michael Behe, Freight Resources Network, LLC . 400

P-R-O-C-E-E-D-I-N-G-S

9:01 a.m.

CHAIRMAN BUTTREY: Well, good morning to everyone. I'd like to call this hearing to order and welcome everyone here today for the Surface Transportation Board's Public Hearing on Rail Fuel Surcharges and the proceeding entitled STB Ex Parte No. 661.

I'm pleased that today's hearing is being simultaneously video webcast available for viewing through the Board's website.

I'd like to welcome all those who are tuned in and watching over the Internet in addition to those who are here in person with us today.

Vice Chairman Mulvey and I are keenly aware of the concerns that have been raised regarding the level of rail fuel surcharges, the way in which they are calculated, how they are levied and who is or is not paying them.

After considerable thought and discussion, we concluded that a public hearing could be very beneficial to provide shippers the opportunity to

publicly comment on the impact of these added charges and their effect on the competitiveness of rail shipped commodities and merchandise and to give each of the major railroads the opportunity to present accurate information about their individual surcharges.

We are all painfully aware that fuel prices are at an all-time high. Today volatility of fuel prices and supply seems to be the norm not the exception. We all deal with it in our daily lives as we buy gasoline for our personal vehicles. But for the railroads, the sticker shock and unpredictability of the current fuel environment has an even bigger impact.

Our railroads are a relatively fuel efficient way to move freight. And their fuel efficiency has been increasing in recent years as newer locomotives are added to the fleet. The cost of fuel is a very significant operating expense for railroads. Their U.S. operation consume several billions of gallons of diesel fuel each year.

I have not heard anyone suggest that

railroads should not be able to respond to the dramatic increases in their fuel cost by imposing surcharges. After all, for the primary freight moving competitors, the trucking industry, diesel fuel surcharges are an accepted practice.

Rather, the concern seems to be focused more on how these rail fuel surcharges are calculated and applied. Or put another way, with a transparency, predictability and fairness of the process.

We are not without some guidance in this area. This is not the first time Federal regulatory process has struggled with fuel surcharge issues. Our predecessor, the Interstate Commerce Commission faced a near crisis situation when diesel fuel prices escalated sharply after OPEC imposed its 1973 oil embargo.

Back then the ICC had jurisdiction over motor carrier rates and practices as well as rail. The rapid escalation of fuel prices hit the independent truckers especially hard. Those owner-operators were typically under contract to perform transportation of regulated commodities for a carrier

with operating authority for which the owner-operator received a fixed percentage of the transportation rate. The transportation rate was set by the regulated carrier.

The owner/operator was responsible for paying all initial costs connected with providing the transportation including fuel out of its fixed percentage of the transportation rate.

Fuel cost rose rapidly in the late 1970s and the owner/operators faced a severe cost crunch. The ICC authorized the regulated motor carriers to impose fuel surcharges on short notice, but this was not enough to solve the problem.

Because the carriers did not pay for the fuel, they had little incentive to impose surcharges promptly. And not all of the surcharges passed through to the owner/operator because of the terms of the contracts.

Several interim steps through the late 1970s also proved insufficient. The ICC finally mandated that carriers must pass through to their owner/operators the maximum allowable surcharge amount

regardless of the terms of their agreements with the owner/operators.

I'll read that again. After several interim steps through the late 1970s proved insufficient. The ICC finally mandated that carriers must pass through to their owner/operators the maximum allowable surcharge amount regardless of the terms of their agreements with the owner/operators.

This order was issued by the ICC in 1981 in a proceeding called Ex Parte Number 311, Sub-part 4.

Although the ICC issued this order with the best of intentions to help hard-pressed owner/operators, the Federal Court ultimately struck it down as being beyond the agency's authority.

In a 1983 holding, the 5th Circuit Court of Appeals found that the ICC had exceeded its statutory authority when it intruded so far into the specifics of how the industry controls surcharges to recover increased fuel cost. And, in effect, altered the terms of the private agreements between the carriers and the owner/operators. This decision which

is printed at 698 F.2d, 1266, is some of the only court guidance we have in this area.

While the facts of that 1983 case are different from the situation before us today in some respects, the two situations are very similar and they both involve indexed mileage-based transportation fuel surcharges. The Court's basic message is a good one to keep in mind as we proceed here today. The agency must be mindful of the limits on its statutory authority.

I think it's also instructive to consider what the court did not have a problem with in this case. It clearly did not have a problem with the idea of fuel surcharges per se to enable carriers to cope with fluctuating fuel costs.

With that background, let's turn to today's hearing. We have a substantial list of shippers, railroads and other interested parties that will testify. Some of the questions that may be raised include the nature of the various rail surcharges, how they are applied, how much revenue they generate, how different classes of traffic are

affected, what index is used for escalation, and how the Board should treat rail fuel surcharges in the uniform rail costing system or URCs.

The Board, of course, has an open mind about these issues. All the testimony, both oral and written, will be given full consideration at this proceeding. I would also like to note that the Board has received comments from two members of Congress, Senator Conrad Burns and Senator Byron Dorgan. They requested that their comments be put in the record for this proceeding and they have been as will comments that may be received later from any other members of Congress.

I plan to run straight through the witness list today in order until about noon. We'll break for lunch and resume an afternoon session that will begin promptly at 1:00 p.m. The hearing will continue until all speakers have been heard.

I will now turn to Vice Chairman Mulvey for his opening statement.

Vice Chairman Mulvey.

VICE CHAIRMAN MULVEY: Thank you, Chairman

Buttrey. And good morning, and let me add my welcome to our panelists and those attending the hearing today. We have a full house today.

As the Chairman noted the Board does, indeed, have an open mind with regard to the issue of fuel surcharges. What troubles the shippers, why the railroads need them, and how assessing them and reporting them could be improved.

We're holding this hearing today to gather information about how various fuel surcharge programs work, to provide a forum to hear the views of all the parties and to open a dialogue between the parties that will help us move towards resolving the problems created by fuel surcharges.

From the shipper perspective, I can fully understand their desire to be treated fairly. Their call for more transparency in the process is reasonable as are their concerns about how fuel surcharges are developed and applied.

And as we stated in our March 14th notice of this hearing, the Board is most interested in the issue as to whether railroad fuel surcharges are being

set in such a manner so that they are used to recover only the increased costs for the particular movements to which the surcharge is applied.

Certainly, no one is suggesting that railroads should not be allowed to recoup their increased fuel costs. Simply browsing through the many filings in this proceeding, shows general shipper support for a fair fuel surcharge program.

But the railroads run into problems with their shippers when the surcharges appear to be profit centers, rather than cost recovery mechanisms, and when there is a lack of clear correlation to increases in the cost of fuel actually paid by the railroads and actually used for the particular movements.

I believe the Board's authority in this area depends largely on how the surcharges are characterized. Prior decisions on surcharges, while providing some guidance, do not give us a clear-cut answer as the circumstances are sufficiently different today from those in the prior decisions.

While engaging in today's collective endeavor to shed some light on the issues surrounding

railroad surcharge programs, it is my hope that we will establish a substantial record, documenting the concerns of shippers, suggestions for improvement on the part of the railroads and ways in which the STB can help the railroads and shippers to work together to find mutually acceptable solutions.

Thank you.

CHAIRMAN BUTTREY: Thank you, Vice Chairman Mulvey.

I believe we're ready to start with our first witness. It's my pleasure at this time to welcome the Governor of Montana, the Honorable Brian Schweitzer to testify.

Governor Schweitzer.

And if you have anybody with you that you would like to introduce, you're certainly welcome to do that as well.

GOVERNOR SCHWEITZER: Thank you very much.

Mr. Chairman, Vice Chairman Mulvey, Staff of the Board, I'd like to thank you for the opportunity and welcome the chance to present the comments on railroad fuel surcharges in this area.

I stand before you--I'm actually sitting down, as the Governor of Montana, but also as a farm producer, a businessman and most importantly as a citizen who has had many years of experience dealing with our railroad problems in Montana.

All four of my grandparents arrived in Montana on Jim Hill's Railroad. They got that ride for nothing. He put them on a homesteader's box car from Ellis Island, brought them out to Montana and that was in 1909. That's the only free ride we got on the railroad. We've been paying for it ever since.

I could have come here with a bunch of big-shot lawyers, but I see the room is full of them already, and talk to you about all of the issues that only an attorney would understand. But instead I came here personally and I want to demonstrate my concern for the lack of focus and energy the past Board has shown about the continuing plight of American industry in the rising of monopoly power of the railroads.

I want to thank personally Chairman Buttrey for his recent visits to Montana to view for himself the problems that we are facing with a single

market dominated railroad. You, Mr. Chairman, and Vice Chairman Mulvey, and any Board staff are welcome to come to Montana at my personal invitation and I'll assure you that the next time you come, there will be some time for fishing and fooling around. We worked pretty hard the last couple of times. The next time you'll get a chance to do a little fishing.

The state of the railroad situation in Montana can definitely be described as a spirit of hope and a story of survival. Montana ranks third among the states in whole wheat production. Specifically, it ranks third in spring wheat production. Second in durum production and Montana also ranks third in barley production, third in lentils, third in dry animal feed, second hog feed production, second in flax.

Montana originated over 37 million tons of rail traffic. It's ranked 17th in the nation. At the same time, Montana bridged 78 million tons of rail traffic.

Our spirit of hope is buoyed by the fact that, well, things can't get much worse. And Montana

is tough. We'll seek compromise solutions to our most vexing problems. Our story of survival is centered around the fact that this Board and its predecessor, the ICC, have allowed the creation of a monopoly in Montana in a land where the goods we produce are mostly bulk commodities and the movement by rail to points outside of Montana.

Now, Montana is dominated by a single railroad, BNSF, which controls 94 percent of Montana's rail system. This makes Montana the number one rail-dominated state in the country.

After Montana at 94 percent is Delaware at 83, followed by Idaho at 80 and North Dakota at 66, South Dakota at 54. BNSF controls over 91 percent of the tonnage hauled out of Montana, 92 percent of the rail revenue in the state and since 1975, Montana has seen over 1,900 miles of rail line abandoned. 1,900 miles of rail abandoned in Montana. Over 37 percent of our rail miles, because there's no rail to rail competition.

The distances are large, very large. To put the vastness in perspective, if one were to place

one quarter of Montana over Washington, D.C., the outer corner would extend all the way to Chicago.

Montana's top four industrial activities are agriculture, tourism, mining and lumber. Montana's economy and wealth is thus highly dependent upon production and shipment of commodities. In order for these commodities to have high value in Montana, they must be shipped to points outside the state or country to market. It is this absolute reliance upon good, affordable and efficient transportation that brings me here today.

We hope for a better day where fairness and regulation and more rail competition will rule the land. Meanwhile, we struggle every day trying to survive under a monopoly.

Here's the math. Large land area plus low population, plus lack of large internal markets, plus long distance for markets, plus raw commodity economy equals heavy reliance on the rails.

Our Montana concerns are founded on four points. Rail transportation is vitally important to Montana's raw commodity based economy. Montana's rail

system increasingly serves simply as a bridge for long distance traffic. Increasing numbers of short lines and abandonments have reduced Montan's shipper access to class one rail service and domination of one class railroad continues as the number one freight issue in Montana.

Well, shippers used to take cases to the Surface Transportation Board expecting to get fair and balanced treatment. But shippers haven't found any relief for a long, long time. They have instead become so discouraged by the past few years that only a very few have the funds or confidence to bring a case.

Faced with the effects of railroad monopoly that were withering away, the key element of Montana's economy, Montana in 1980 filed a class action case. We pursued the McCarty Farms case for 17 years. In this case, the ICC on December 14th, 1984, found that BN had market domination and that its rates were unreasonable. The administrative law judge further found that the rates were higher than 300 percent of the variable costs.

The State of Montana spent $3.1 million, that's the bad news. The good news for all of you in this room was spent on lawyers. And we found the rates were not excessive.

This Board ruled against the farm producers in Montana after changing the regulatory standards twice. Regulatory oversight of the railroads or lack of it affects everything we do in Montana every single day.

Montana has borne the freight charges on commodities produced in Montana. We have no choice. You may not want to hear it, but from where we stand, this Board with its past actions and those of the former ICC, created the railroad mess in Montana and we have done little to fix it.

We didn't want a single monopoly railroad in our state. We stated that over and over again in the hearings that preceded the creation of Burlington Northern. But your predecessors made it happen and they allowed the three major transcontinental railroads to cross Montana to form a single company in Burlington Northern. Montana went from four healthy

transcontinental railroads in 1970 to one today that dominates the entire state.

Then when the Milwaukee Road, ICC's designated competitor for BN failed, just nine years later, no one from this Board or the ICC came out to Montana to clean up the monopoly mess that they created and we live with it every day.

I'm here to tell you that we are tired of paying more than our fair share. We in Montana are supportive of fair treatment of all rail shippers. We're tired of being abused by poor service. We're tired of having a monopoly railroad service, only rail lines that they want to service and not the railroads important to the citizens of Montana. And even though are still in service, they still use the railroad lines in Montana to hide from the tax man by storing thousands of cars on the light density lines and Chairman Buttrey, you saw those thousands of cars when you were in Montana.

They are unable to service the customers on those locked lines and later used this lack of service for grounds for abandonment and you saw that

at Big Sandy where we had cars lined up from Big Sandy nearly to Haver and now we're trying to abandon that line.

Chairman Buttrey on his last visit to my State saw this firsthand and heard directly from the people of Montana about their struggles with the railroad.

I realize that you at the Board will see in these remarks areas that are not germane to the proceedings at hand. But you also have to realize that it's not every day that a governor gets a chance to talk to you. And so I thought I might share a few other things with you.

The fuel surcharge issues is a perfect example of what has gone awry with the monopoly railroads. In Montana we pay some of the highest freight rates in the nation regardless of business. Why? Well, Chairman Buttery heard why when he came out to Montana. Everyone of those farmers that pay these rates, they know why. It's lack of rail to rail competition. In Montana the car shortages start early and last longer. Why? Lack of rail competition.

When BNSF and UP introduced the concept of fuel surcharges several years ago, they based their fuel surcharges on rate levels. Thus, those who were the most captive who had paid the highest rates paid the most fuel surcharge. Montana is tired of paying more for their fair share and that was an unreasonable practice.

After a great deal of rhetoric and exchange with BNSF over a number of years, BNSF announced for direct shipments from Montana, wheat and barley, that there would be a mileage-based fuel surcharge program because it would be inherently fair to those with elevated rate levels. This amounted to recognition by BNSF that rate-based surcharges are an unfair rate practice.

And my transportation advisors told me before we saw that devil in the details from BNSF that Montana would be paying more after a switch to a mileage-based fuel surcharge than they were under the revenue-based fuel surcharge. And you know what? We got our money's worth. They were right.

Today, Montana rail rates are just as high

or higher with the mileage-based fuel charges than they were under the revenue-based fuel charges. Why? Well, because BNSF simply raised the underlying rates and then applied a slightly smaller mileage-based fuel surcharge than the revenue-based fuel surcharge. Plus, BNSF is again making more money while we in Montana are again subsidizing the rest of the rail shippers and railroads in this country.

Yes. BNSF has stated that mileage-based fuel charges would collect essentially the same amount of surcharge as the revenue-based programs. In an area such as Montana where the rate levels are among the highest in the nation, the switch to a mile-based fuel charge in Montana should show substantial relief from excessive rate-based fuel charges. The switch resulted in higher rates. And that makes my point to show that railroads continue to over-collect from Montana.

I want you at the Board to understand that the truth is that the transportation rates we pay include all charges. Transportation to the grain elevators, handling, rail rate and fuel surcharges and

all of those charges continue to go up and up.

BNSF is contemplating modifying and reducing the effect of mile-based fuel surcharges on those shippers but not in areas like Montana where they have a monopoly. Again, Montana is paying more than our fair share and we are darn tired of that. Since I'm in Washington, D.C., I said darn tired.

It is my view that when the Stagger Rail Act of 1980 was passed Congress was seeking two major outcomes by focusing on deregulation. The charge was to (1) produce a stronger rail industry than the one that we had at the time, plagued with multiple bankruptcies and (2) to be protective of the captive rail customers from potential abuse that might occur due to decreased regulatory oversight and the inevitable consolidations that would occur in the future.

There is a call for balance in this bill from Congress.

Chairman Buttrey and I have visited at length about this increased rail to rail competition that was called for by Congress in the Staggers Act

in Title 49, Subtitle IV, Part A, Chapter 101, Section 10101, Rail Transportation Policy. The word "competition" is utilized in four of the 15 parts.

Number one "To allow to the maximum extent possible competition and the demand for services to establish reasonable rates for transportation by the rail."

Number four, "To ensure the development and continuation of a sound railroad system with effective competition among rail carriers and with other modes to meet the need to the public and the national defense."

Five, "To foster sound economic conditions in transportation and to ensure effective competition and coordination between rail carriers and other modes."

And number six part "To maintain reasonable rates when there is an absence of effective competition and where rail rates provide revenues which exceed the amount necessary to maintain the rail system and track capital."

The most pressing question and the heart

of this exploration is what is best to address the public interest? After all, protecting the public interest is clearly what Congress desires when it makes changes in regulatory schemes. In our mind, the rail customer, the public, needs a competitive rail transportation system that provides fairly priced, safe and reliable service.

Are fuel surcharges that recover more than the system-wide fuel cost increases incurred by the railroad reasonable carrier practice? No.

Are fuel surcharges that recover more fuel surcharge for a particular movement than has occurred by a railroad, a reasonable carrier practice? Again, no way.

Are fuel surcharges that are levied on only a part of the rail shippers at levels that return all or more than all of the fuel price increases for the whole railroad system, a reasonable carrier practice? No.

Are fuel surcharges levied on Montana rail shippers who have no alternative other than rail movement that compensate the railroad for the lack of

fuel surcharges on other railroad movements a reasonable carrier practice? Again, no.

One shipper should not be charged more than the actual fuel allocated to the movement of their goods.

When the BNSF's fourth quarter 2005 price for fuel was $1.69 a gallon. At the same time in December 2005,they were assessed an 18.5 fuel surcharge on movements from Montana. On movement from Great Falls, Montana, to the Pacific Northwest in dollars per car, the rate was $3,029 per car.

My costing experts, and we pay them a lot of money, tell me that the estimated fuel cost on BNSF for each gross ton mile per gallon is $758, based on published fourth quarter 2005.

So, for an 882 mile haul, the estimated fuel cost would be about $315.60. Yet, the BNSF was collecting an 18.5 percent fuel surcharge based upon a rate of $560.36, which is a surcharge revenue fuel ratio of 1.78.

And the BNSF was and continues to assess the fuel surcharges that are greater than the actual

fuel costs on movements from Montana even under the mileage-based fuel surcharge system. An unfair rate practice.

Remember that when BNSF in January of 2006 changed to a mileage-based fuel surcharge for these same Montana movements, our rates actually increased again.

And Montana needs fairness in pricing by railroads. They should not have to continue to bear more than their fair share. And that is why this Board exists, to bring fairness of practice to the markets dominated by a monopoly railroad industry.

A lot of change is needed. The railroad needs to price fairly. I am hopeful that you will find that the way the fuel surcharges are being implemented is an unfair rate practice and that you will open a rule-making proceeding to instill fairness to the marketplace.

I hope that you will see a new day at this Board with you, Chairman Buttrey, the great fisherman, and Vice Chairman Mulvey initiating a more balanced approach that was called for by the Congress in the

1980 Staggers Rail Act, because there are so many lawyers here and they're billing so many customers, I'm not going to go on any further. But I will enter the rest of my remarks in the written testimony.

Thank you very much for this opportunity and we'll see you in Montana. Thank you.

CHAIRMAN BUTTREY: Thank you, Governor, very much for your testimony today. I'd like to also thank you personally for the courtesy you extended me on my two visits to Montana and I'm sure we'll be seeing you out there again sometime in the future.

We're trying very much to keep this hearing on schedule. I know you have other appointments today, but I want to give the Vice Chairman a chance to say anything he might like to say to you.

Thanks for coming such a long way to be here.

VICE CHAIRMAN MULVEY: Thank you, Chairman Buttrey.

Like the Chairman, I've also spent some time in Montana. I lived there for awhile back in the

late `60s, early `70s and it's a beautiful, beautiful state. I've been there a number of times since then.

I'm not one of the lawyers in the room. I'm an economist. And as an economist I believe heartily in competition. My whole career has been spent promoting competition and trying to see what we could do to offset the evils of barriers to entry and monopoly. And I feel the same way about the railroad industry in this country. We need to make sure that competition prevails and when competition does not prevail, the shippers are treated fairly.

Both Chairman Buttrey and I are dedicated to the proposition that we are responsible for balancing the interest of shippers for reasonable rates with the needs of the railroads to earn adequate returns. And we are looking at the way the Board does things and the way in which we approach our analyses to make a process that's as fair as possible and to make sure that shippers receive justice before the Board where justice is needed.

So, with that I thank you for your testimony, sir, and have a safe trip back to Montana.

CHAIRMAN BUTTREY: Thank you.

I'd like to now call the first shipper panel as identified as Panel 2 in this hearing.

Speaking will be representatives of the Wheat and Barley Commission, the North Dakota Grain Dealers Association, National Grain and Feed Association, the Fertilizer Institute, the Transportation, Elevator and Grain Merchants Association, and Ag Processing.

We'd like to welcome our guests today at the Board. And what I'd like to do is, if I could for each panel, we'll hear the testimony of all the witnesses on the panel first.

I'd like to remind all witnesses that we have read all the testimony that has been submitted. Therefore, each witness should summarize their presentation and emphasize the main points that they would like to make. Also stay within the time allotted.

Following the testimony we'll turn to questions by myself and Vice Chairman Mulvey alternating the questions and generally limiting

ourselves to five minutes a piece and hopefully not even that much because of the pressing time before us today.

I would appreciate if each one of you would identify yourself for the record when you begin your testimony.

And let's begin from my left and proceed across the panel to my right. And our first witness may proceed.

MR. WILKEY: Chairman Buttrey and Vice Chairman Mulvey, good morning. My name is Eric Wilkey. I am Vice President of Arizona Grain. My office is in Casa Grande, Arizona.

I'm also Chairman of the Transportation, Elevator and Grain Merchants Association on whose behalf I appear before you this morning. TEGMA is a North American trade association that brings together global grain companies, domestic shippers and receivers, railroads, port storage houses, inspection agencies and others involved in the shipment of North American grain to customers all over the world.

Taking this mix of the membership provides

a unique perspective on grain handling and transportation. And I want to thank you for hosting this hearing.

Our position is TEGMA does not dispute the right of U.S. rail carriers to utilize a fuel surcharge to offset an unexpected rise in fuel costs. However, those surcharges should not become profit centers for rail carriers.

TEGMA comes to this hearing to ask the STB to encourage the uniformity and fairness in the application of fuel surcharges. TEGMA has worked to develop a market-based solution that would allow shippers to better manage their fuel price exposure. At issue is the disparity, the wide disparity of methods used to assess fuel surcharges.

In April 2005, to be proactive on this, TEGMA held a fuel surcharge workshop in Kansas City, Missouri. Every class one railroad was invited. Initially, many accepted. However, anti-trust concerns kept them from attending. We believe the Surface Transportation Board can play an important role in having that discussion amongst those parties.

We as attendees developed a proposal for an over-the-counter instrument to hedge the financial risk associated with changes in fuel prices and fuel price volatility. We have shared this proposal with the industry, with the class one railroads and included it in our testimony in the hearing held last fall on the Staggers Act.

TEGMA believes that if U.S. rail carriers adopted a mileage-based surcharge formula and used a common price index and not to be prescriptive, but some examples might be the 9XCD1 or the national U.S. average on highway diesel fuel price index. We believe an effective economically priced hedge for rail fuel surcharges could be built.

TEGMA encourages the STB to use its position and its power to promote the uniformity among the class one rail carriers for fuel surcharge programs. And to facilitate discussions with the class one railroads and others concerned to avoid the anti-trust question. This way a market-based solution could be developed and applied to this difficult issue.

I know from myself in a company that I work with grain is priced to customers various feed yards and feed mills, export customers'. Not on a one-month basis, which we have some idea of what those fuel surcharges would be one month out, but on a three, a six, twelve month and possibly even longer period. And these fuel surcharges not knowing them ahead of time and not having a way to effectively in a price-efficient way hedge that risk out creates great risk.

Any company such as mine that has taken a bet on what fuel prices would do in the last two years has made a pretty dangerous bet and one that probably wasn't very economically based.

So, therefore, we would thank you for the time to present this thought and this idea. We think it is one part of the fuel surcharge question and a reasonably market-based solution to solving it.

Chairman Buttrey, Vice Chairman Mulvey, we thank you for holding this important hearing.

CHAIRMAN BUTTREY: Thank you.

MR. VOSS: Thank you, Chairman Buttrey and

Vice Chairman Mulvey.

My name is Terry Voss and I'm Senior Vice President of Ag Processing, headquartered in Omaha, Nebraska. We've already submitted a written statement, so I'll be brief with this.

First off I need to mention that I'm a member of the Rail Shipper Transportation Advisory Council for the NTB as well as the National Grain Car Council.

The remarks I make today and in my statement are those of our membership and not of those two committees. In fact, in our meetings you have advised us that we cannot talk about anything active in front of the Board and specifically the fuel surcharge.

Our company is owned by 211 grain cooperatives located throughout the Midwest. We've talked to a lot of them and they've called us and they've encouraged us to participate in this hearing on their behalf.

AGP operates 14 slow grain processing, refining ethanol, soy diesel plants as well as several

grain elevators. One hundred percent of our shipments are subject to fuel surcharges. AGP has no problem with fuel surcharges, with the concept as long as it's there to recover the spikes and the swings in the prices. It should be a cost-based mechanism, however.

I'll give you an example. We have a fuel surcharge, we have a freight shipment that moves from the Midwest to California, from Iowa to California. Soy bean meal. Railroad car rates $3,975 a car. The private car rate is $438 less or $3,537 a car. The reason that is is the railroad nets that out. They normally pay a mileage allowance for furnishing the car. This car they just netted out and we get the reduction of the mileage to the freight rate.

The issue is that $438 difference in the freight rate is also in the fuel surcharge. A 13-1/2 percent fuel surcharge in May and 15 percent in June, we paid $59 a car more on a railroad-owned car than we do on an AGP car. It's the same exact car, same exact weight, same exact product, same origin, same destination and literally are hooked together in the same train. That is inequitable. That's not a fuel

cost that should be passed through.

There's no cost difference in my mind in pulling a railroad owned car versus an APG car. I'll disagree with Eric here in a little bit. We're a member of TEGMA and we visited earlier. AGP does not support the retail fuel highway diesel or the West Texas Intermediate Crude Index for a benchmark.

Railroads don't operate on a highway and they don't pay the fuel tax that the trucks do, which are included in the highway diesel tax. We feel the railroad should use a wholesale price that are paid by industrial customers which is available by the Department of Energy on their website. This price excludes the taxes that are levied by each state. This year alone, for example, six states have already increased the fuel tax that they charge. This artificially in my opinion inflates the benchmark where the railroads bench off of. This number, however, is still part of the calculation when they figure their fuel surcharges.

We don't believe the freight surcharge as applied to the freight rate has any relationship to

the fuel cost itself. Fuel surcharges have a very significant impact on our company and our ability to market. As our costs increase, our availability to compete decreases. In fact, today we are losing soy business to South America and Brazil.

BNSF came out with the mileage-based fuel surcharge as the governor said earlier. We support that concept. I think they're on track. No pun intended, but I think they are a little bit wrong in their methodology on how they figure the cents per mile allowance.

I also question why coal is $.22 per mile and agricultural products are 50 percent more or $.33 per mile on a fuel surcharge from that.

Carriers do provide you with R1 reports annually and we've looked at those and we had a consultant look at those and it seems like the fuel surcharges are quite high. We expect fuel surcharges to continue and they should be, I guess, as long as they're tied to the recovery of the fuel shipment cost itself in effect when the rate was established. It would be our preference to be stated in miles, which

can easily be achieved. All of us have that in those computers. If the railroads don't adopt this soon voluntarily, we would ask that the Board do something and maybe in another proceeding.

Thank you.

CHAIRMAN BUTTREY: Thank you, sir.

MR. MACK: Good morning, Chairman Buttery, Vice Chairman Mulvey.

My name is Dan Mack. I'm Vice President of Transportation for Seed, Incorporated, located in St. Paul, Minnesota.

I'm here today, however, representing the National Grain and Feed Association for which I serve as Chairman of the Rail Shipper and Receiver Committee.

We commend the STB for conducting this hearing. As you aware, NGFA and with the Fertilizer Institute and Forest Products Association of Canada sponsored a study of fuel surcharges in late 2004 and engaged in discussions with six of the largest North American class one carriers in 2005 regarding our collective concerns of the fuel surcharges.

Our interest and first work directly with carriers was partly at the urging of the STB for railroads and their customers to seek private sector solutions. Some carriers were responsible for this private sector initiative and made modifications in 2005 and 2006. Other carriers have resisted refinements that might improve formula accuracy and equity.

More than one year has elapsed since we began those discussions. Therefore, this hearing is timely. And as an outcome of this proceeding, the NST raised the issue of whether rail fuel surcharges are part of the rail rate or could be considered an unreasonable practice. In NGFA's view, it would be a misuse of the ICCTA to require a shipper with a complaint regarding the structure of fuel surcharges to bring a formal rail rate challenge at a potential cost of several million dollars.

The railroads have stated their fuel surcharges are necessary to recover unanticipated increases in fuel costs. NGFA does not disagree. However, if fuel surcharges are being used for some

other purpose, the railroads have been misleading their customers. A fuel surcharge has never been necessary and would not be necessary today except to recover fuel costs that are not anticipated at the time the freight rate is established. If the railroad uses fuel surcharges for some other purpose, it is an unreasonable practice.

Fuel surcharges have been described by carriers as hardship measures designed to recover unanticipated costs. As such, they do not fit into the mold of the type of railroad rates intended to be subject to only those with regulatory oversight applicable to market-oriented rates.

NGFA believes that the Board not only has authority under its unreasonable practice jurisdiction to require carriers to be more transparent with fuel surcharge practices, but also to regulate the manner in which fuel surcharges are calculated.

I'd like to discuss with you some of our primary concerns regarding fuel surcharges.

First, we agree that railroads have the right to recover unanticipated increases in fuel

expenses provided such surcharges are reasonably related to the increase in market fuel expenses that have occurred after the railway freight rates were published. Importantly, the measure of what is reasonable excessive should be applied on a shipment basis and not system-wide for each railroad.

Second, in constructing a reasonable fuel surcharge mechanism, we think it makes business sense for the carrier to exclude hedging gains and losses. Hedging strategies are internal to each business and will vary by carrier.

Some have suggested that fuel hedging mechanisms for shippers might be a part of the solution to the surcharge issues. NGFA doesn't agree with this as a remedy. Over time, taking a zero sum gain it can act direct for assessments that may be considered excessive. Hedging mechanisms are the risk of the individual carriers and their individual choice. The losses and gains shouldn't fall to their own benefit.

Thirdly, most railroads assess fuel surcharges on a percentage of the base rate. This

fact alone creates immediate concern regarding the reasonableness of surcharges on individual shipments. This because rail rates are not in general highly correlated with the fuel expense of individual movements. Rather, they are an outgrowth of the differential pricing.

NGFA and many other shipper businesses offer examples of surcharge cost discrimination that occurs among shippers because the surcharges are applied to rates.

Four, some carriers take the position that as long as the full collected surcharge revenues do not exceed the full increase in fuel costs compared with a base period, the fact that some individual shippers are being assessed successfully should not be an issue. We have a fundamental disagreement with this stance. The practice that transfers cost burdens from one customer to another is unreasonable. An unreasonable practice that adversely affects only a portion of the railroad's customers is still an unreasonable practice.

In our view, it is not justifiable for a

carrier to charge a portion of his customers excess fuel surcharges to compensate for commercial decision to not assess the charges on other customers.

Fifth, rail fuel surcharges have caused a great deal of skepticism on the rail customers. A portion of this skepticism is driven by a lack of transparency by the carriers in reporting information.

In NGFA's written submission we provide some estimates of the average per car or compensation costs of the current surcharges. It should be noted we did make several assumptions in deriving these estimates.

We offer specific recommendations on the additional data needed by rail customers to assess whether the surcharges they paid initially are reasonably related to fuel cost increases.

The additional data should be provided voluntarily by carriers. If railroads expect their customers to pass down increased fuel costs, then they should be more than willing to provide appropriate documentation to demonstrate they are only assessing charges that recover those costs and nothing more.

However, to ensure uniform compliance and ensure data comparability, we urge the STB to require the reporting of this information by the carriers.

Our analysis indicates that comparing the fourth quarter 2005 to a base fuel cost period in the fourth quarter of 2001, the average shipper paying the full surcharges is being overcharged on all six major class one carriers. The range in over compensation of fuel costs increased its range from $10 to over $80 per car under what we view to be very conservative assumptions.

Keep in mind that this is only for the average shipper. Those shippers that already paid the highest rates are likely to be overcharged more.

To explain why we believe overcharges are occurring. First, there's a fundamental bias in some of the carriers' formulas. What we mean is that as the price of oil and diesel fuel rise, the formula and calculation provide more surcharge revenue than can be justified by the true cost impacts on the carrier's operation.

Another factor that affects most of the

carriers is a formula so designed in an area when rail rates were much lower than today. Applying the same formula in today's higher rate environment creates a double dipping effect caused by the interaction of higher fuel surcharges percentages applied to a substantially higher rate.

Our point is that many of the factors that affect fuel surcharge assessments have changed. Those that have changed are rail rates, the relationship between diesel oil and crude oil prices, fuel efficiency and lastly the overall level of fuel prices. Because of these changes, we recommend that each of the carriers undertake a serious review of the accuracy and equity of current fuel surcharge formulas and make necessary adjustments.

In this review, we also urge the carriers to consider alternative means of assessing surcharges that are truly more related to fuel cost increases of individual shipments. Specifically, we would recommend the following: First, the carrier should seriously consider surcharge systems that are not applied to the freight rate. Because of the equity

issues caused by differential pricing and because of re-escalations over time, possibly per car charges and some adjustment to mileage ranges on an individual basis should be evaluated.

Secondly, to assess fuel surcharges only to the appropriate extent necessary to allow carriers to recover fuel cost increases unknown at the time the freight rate was published.

Third, if surcharge formulas continue to be applied to rates, railroads need to undertake more frequent review and adjustments to formulas to avoid the double dipping of multiplying higher fuel surcharges to a higher rate.

Lastly, if surcharge formulas continue to be applied to rates, raise the base fuel price at which surcharges begin. This so as to lower the surcharge percentage. This will tend to reduce inequities in applying the surcharge percentage to the different rate structures.

If the carriers choose to not make voluntary corrections to the programs within a reasonable time frame, we urge the STB to issue

guidelines to primary carriers on an accepted methodology for assessing the fuel surcharges. National Grain and Feed appreciates the opportunity to speak before you today.

CHAIRMAN BUTTREY: Thank you very much.

Mr. Strege.

MR. STREGE: Thank you. Good morning, Mr. Chairman and Vice Chairman, staff and all of the testifiers and all those in the room.

My name is Steve Strege. I'm here on behalf of the North Dakota Grain Dealers Association and we are a trade association of country grain elevators in North Dakota and a few in bordering states who receive grain for farmers, clean it, segregate it by qualities and ship it to both domestic users and export ports.

Fuel surcharges raise overall transportation costs. This impacts grain elevators and the price they can pay the farmers for their grain.

The unpredictability of fuel surcharges creates a problem for grain elevators offering forward

price contracts to farmers. Rural communities are affected when less is received for agricultural production in the area. Increased costs can detract from the competitiveness of our grain on the world market. Fuel surcharges have many ripple effects.

We too thank you for holding this hearing and for focusing on the right question, whether railroad fuel surcharges actually reflect the increased fuel cost on the shipment being assessed.

CHAIRMAN BUTTREY: Mr. Strege, excuse me just a moment.

Is his microphone on? They are having trouble hearing in the back. I'm not sure that all the people in the room can hear and I was a little concerned about that. You may have fans back at home that want to hear what you have to say.

MR. STREGE: Oh, they're cheering right now, I'm sure. They probably cheer more for Dan though.

We aren't here today to talk about whether railroads collect enough in total fuel surcharges system-wide to cover their increased fuel costs

system-wide. At the other extreme, I don't think anyone is asking that railroads calculate a unique surcharge for each shipment, although they may have the data to do just that.

Our primary message to you today is that railroad fuel surcharges be reasonably cost-based. You will hear much evidence that they aren't.

Railroads unilaterally impose these charges. Rail customers are forced to pay because they have no effective alternative means of transportation. The broad interest in this hearing testified to the concern and the economic pain suffered.

I read several of the shipper statements. Common themes include evidence of over charges and the desire for cost-based surcharges. We think it is time for the STB to take a closer look and to effect more positive change. It's time for railroads to get surcharges in line with actual increased costs.

Because BNSF is the larger carrier in my region and because it had the higher fuel surcharge over most of the past couple years, it has drawn the

most attention in the Northern Plains.

Early last year BNSF said it was collecting fuel surcharges on only half of its revenue base to the extent some payers were being overcharged to make up for those who were not paying. This is robbing shipper Peter to pay expenses generated by shipper Paul. This is an unreasonable practice on any railroad.

According to a brokerage house analysis quoted in our written submission, some railroads were using fuel surcharges to pad their bottom lines. Railroad earnings were said to face a head wind or drag if fuel prices declined. We believe assessing more fuel surcharge than actual increased fuel expense is an unreasonable practice.

Gentlemen, you have read our written testimony including the spreadsheet about increased fuel cost versus fuel surcharge on BNSF. It view fuel costs from mid-2002 when BNSF last had zero surcharge and compared that to fourth quarter 2004. To its credit, the BNSF has changed its method of calculation. But on a specific movement basis, our

experience and data point out the inaccuracy of using a rate-based method of calculation which all the railroads except the BNSF still do. So, I would like to highlight a few things from that experience.

In one case, the fuel surcharge on a train load was over $41,000 when the actual increased cost was less than $14,000. Surcharges were up six or seven times the increased fuel cost.

Surcharges sometimes exceeded total fuel cost. Surcharges on different grains from the same origin to the same destination varied by 50 percent. These are unreasonable practices.

In some case, surcharges were less for longer hauls than for shorter hauls of the same weight or much the same route. In one example a haul nearly 1,300 miles paid 17 percent more for a car a mile than a haul of almost 1,750 miles. We think that defies common sense and is an unreasonable practice.

We compliment BNSF Railway for making the change to a mileage-based surcharge on grain and coal this past January 1. This is a step in the right direction. It has at least partially eliminated some

of the distortion just mentioned. We think other railroads should follow BNSF's lead and improve upon it. It seems common sense that mileage must be a component of a reasonably cost-based fuel surcharge.

Driving the family car or a railroad locomotive 1,000 miles consumes more fuel than driving it 500 miles.

Another component to a mileage-based surcharge is the per car mile charge. We wonder how BNSF arrived at $.33 per mile for grain this month but only $.22 per miles on coal. This assumes to say that coal should be increased but rail customer confidence is shaken by a process that yields such variable results.

The railroads feed crude oil price or highway diesel price in one end of a black box and out the other end on their fuel surcharge. We need transparency in this process so rail customers know they are paying what is necessary and no more.

While we applaud the BNSF lead in switching to mileage based, mileage based is not an end-all. It must be accompanied by an accurate per

mile charge. I am told that short lines and regional railroads operating in my state get none of the fuel surcharge collected by the major carriers. Clearly these smaller railroads have additional fuel expense. The welfare of these smaller railroads in this regard is of interest to us and should be to the Board.

Railroad fuel surcharges are a big deal by anyone's measure. According to its own financial reports, over 57 percent of BN's total fuel cost in 2005 was covered by a fuel surcharge. It has been over two years, about two years, since fuel surcharges took off in a steady upward climb. With the recent run up in crude oil prices, fuel surcharges on all railroads will become even more of an issue. Some of that may be justifiable. Some of probably not. It is time for the Board to exert its influence and authority on the railroads on behalf of rail customers to inject equity into the situation.

Our association believes that several principles should apply to railroad fuel surcharges. Our short list and what Mr. Mack has said, assessing fuel surcharges is justified only if the railroad is

not recovering its increased fuel cost through some other mechanism such as rate increases or the rail cost adjustment factor.

Surcharges should cover the increased cost of fuel on the shipments to which they are applying. They should be cost-based. Basing a fuel charge on a rate is not an accurate reflection of true increased cost and penalizes captive shippers more than others. The rail customers who pay fuel surcharges should pay for only their own use. They shouldn't have to make up the shortfall for rail customers who don't pay.

If surcharges are necessary, then it seems like short lines and regional railroads should get their fair share. Rail customers are entitled to know how their fuel surcharges are being calculated and if they are equitable.

Open the black box.

One of our members contacted me last week with the thought that where fuel surcharges have been very excessive there should be a rebate back to the payers. This is something the STB might want to consider.

Thank you, Mr. Chairman and Vice Chairman Mulvey for the opportunity and I will try to answer any questions that you might have.

CHAIRMAN BUTTREY: Thank you, Mr. Strege.

Mr. Whiteside.

MR. WHITESIDE: Mr. Chairman and Vice President Mulvey, thank you and the staff. I appreciate the opportunity here to address you.

I represent a number of wheat commissions and barley commissions including Montana Wheat and Barley Committee, Colorado Wheat Administrative Committee, Idaho Barley, Idaho Wheat, Nebraska Wheat Board, the Oklahoma Wheat, South Dakota Wheat Commission, the Texas Wheat Producers as well as the National Association of Wheat Growers.

The reason I go through the list is that I'm going to cover a very large area and the concerns are virtually the same.

I totaled up the number of minutes today and it's going to be about 320 minutes so I'm going to go very quickly.

We have presented a written statement and

I just want to cover a couple of points because I'm honored to be on this panel. This is like a panel of friends. We've worked together most of us on a number of occasions.

The Wheat Commission or the Wheat and Barley Producers recognize that the railroads need to recover unanticipated increases in fuel. We have no quarrel with the concept. We think if the methodology is fair and equitable to all rail customers and collections are not exceeding recovery of charges for changes in fuel, then we think it's a reasonable practice.

Fuel surcharges need to be cost-based. You've heard all down the panel. And they need to be based upon the fuel expended for individual movements.

The current process has four basic claws. The current rail fuel surcharge program is collecting from less than the full universe of customers. You've heard that coming down the line. Rail customers less than the full universe that are being assessed fuel surcharges are being charged surcharges that are greater than the incremental increase in the fuel cost

incurred by the railroads for that particular moment.

Number three, some of the rail customers are being charged fuel surcharges based upon rate level and some are being charged upon mileage formulas which creates a differing level of fuel surcharge burdens on different rail customers.

And number four, the methodologies for attaining the fuel surcharge information leads to uncertainty in the calculating of the correct fuel surcharge assessment. What Mr. Strege calls the black box.

Our calculations, we all have them and have shown that the fuel surcharge, fuel cost ratios of using fourth quarter in `05 run about 25 to 40 percent higher than actual costs. Clearly, we're being assessed incremental fuel costs that lead us to the conclusion that there is an over collection process going on when they're collecting 40 percent more in fuel surcharge than the entire allocated fuel cost of the movement.

We think any future methodology prescribed by this Board must be readily ascertainable, fairly

applied and predictable. You'll have some witnesses later in the day that will talk about transparency all day.

I think it's important that we recognize that the Board has in our opinion ample authorities and their authority is broad enough to examine and correct this fuel surcharge program.

Railroads have tried to sell their fuel surcharge programs as necessary to recover unanticipated increases in fuel cost for the shipments to which the surcharges are applied. Clearly, as Dan Mack has said, if the fuel surcharges are being used for over collection or additional profit, the railroads probably have been misleading their customers.

When a freight rate is established it has a built-in fuel cost. A fuel surcharge is supposed to collect that over and above what's in the rate. And it's what was not anticipated at the time that the freight rate was published.

To the extent that the railroad uses a fuel surcharge for some purpose other than that, it

becomes an additional profit center and that clearly is an unreasonable practice.

Summary. The Wheat and Barley Commission want to thank the Board for the opportunity to present these comments to the Board.

The opportunity to present comments on this issue provides a needed forum to examine the legitimacy of the fuel surcharge assessment as being practiced by the nation's railroads. We who shoulder the burden of the assessment look forward to the future Board action on this issue through the promulgation of rules that will bring fairness to the fuel surcharge assessment process.

We also hope as the Governor just spoke of that this hearing signifies a dawning of a new era of this Board that will continue through hearing processes like these to shine its light on rail practice and customer rail customer issues and will be the source of promulgated change.

And I thank you.

CHAIRMAN BUTTREY: Thank you, sir.

MS. GILLIES: Chairman Buttrey, Vice

Chairman Mulvey. My name is Judy Gillies. I'm the Director of Transportation for the J.R. Simplot Company Ag Business Group. We are headquartered in Idaho where the fishing is great, by the way, Chairman Buttrey.

The Ag Business Group has been plotted the Western based manufacture of agriculture fertilizers. These fertilizers are distributed domestically to growers for use on crops such as gains, rice, potatoes, vegetables and fruit.

Simplot Company is also a member the Fertilizer Institute or TFI. TFI is the national trade association for the fertilizer industry which represents fertilizer producers, distributors, retail agricultural dealerships, equipment suppliers, engineering firms, distributors, retail agriculture dealerships, engineering firms, importers and other companies involved in agriculture.

Many TFI members use rail transportation and have a strong interest in the fuel surcharge methodologies applied by the rail industry. Fuel surcharges if administered properly are an appropriate

means for railroads to recover charges with today's highly volatile fuel costs. Shippers recognize the importance of financially strong railroads and the need for railroads to recover extraordinary fuel costs. However, TFI members are concerned that the fuel surcharge methodologies employed by class one railroads are over-recovering the fuel costs.

TFI co-sponsored a rail fuel surcharge study with the National Industrial Transportation League, National Grain and Feed Association, and other organizations in the year 2004. The result of that study substantiates this concern.

While there are numerous problems with the current fuel surcharge methodologies used by the class one railroads three problems stand out.

One is that the fuel surcharges are not based on actual cost. All but one class one railroad assesses a fuel surcharge based on a percent of the transportation rate of each move.

If fertilizer rates are a commodity market- based rather than mileage-based rate due to the differential pricing of rail transportation rates,

commodities assessed higher rates must pay more in fuel surcharges than commodities assessed a lower rate. This is so even when the cost of fuel is the same.

A second problem with the current fuel surcharge methodology is the lack of transparency. Shippers find it difficult to determine the cost of fuel for a particular move. It's equally difficult to determine if the shipper is paying too much under the fuel surcharge methodology program today.

The third problem TFI is concerned with is that there is no measure to verify the extent of over-recovery by the class one railroad. It is TFI's understanding that some shippers do not pay fuel surcharges due to exclusions in current contracts. Railroads should not assess higher fuel surcharges to shippers not protected by current exclusion clauses to recover the fuel costs of shippers with the exclusion.

As previously mentioned, rail rates for fertilizer are market-based. Factored into these rates is the cost of steel, labor and fuel. Fuel surcharges are calculated as a percentage of that rate

which itself already contains a fuel component.

Fuel surcharge assessments are charged monthly. This swing in rail rates makes planning and pricing difficult for each fertilizer season.

For example, if fuel surcharge changes from 10 percent to 13 percent that difference on a $45 per ton rate is $1.35 a ton. When multiplied by the millions of tens of fertilizer shipped on the railroads each year, the impact to our industry is significant.

Passing on the fuel surcharges to America's farmers is a difficult, if not impossible task. Farmers use fertilizer, plant nutrients and micro nutrients to grow the grain, corn, potatoes, vegetables, fruit and other products.

Because of the ever increasing cost pressures upon the farmers, they are very concerned about their input costs and often simply cannot afford to pay the higher transportation rates. Thus, it is the manufacturers of these important components of our agricultural economy that must cover the fuel surcharge cost.

Again, TFI and shippers in general appreciate the need for the rail carriers to recover the incremental fuel costs. However, we request that the methodologies used to assess fuel surcharges be based upon the cost of fuel used for a particular move. Additionally, we ask the Board to require full disclosure of fuel costs to the shippers.

Thank you for your consideration in this most important matter.

CHAIRMAN BUTTREY: Thank you very much for all your comments this morning. And we appreciate you being mindful of our time schedule.

I'd like to change the order just a little bit if we could and ask the Vice Chairman if he has any questions at this time. Normally the Chairman goes first, but I'm going to offer that to the Vice Chairman.

VICE CHAIRMAN MULVEY: Thank you, Chairman Buttrey. I'll start off with a comment to Mr. Wilkey.

I found your proposal for an over-the-counter instrument that would allow shippers to hedge

the financial risk associated with fuel increases commendable. It's one thing to complain about the practices of railroads but quite another thing to develop a market-based solution to the problem for yourself.

And while we have a mountain of testimony complaining about practices, yours is one of the few that came up with a concrete resolution or a specific approach to the problem. So, I thank you for that.

A couple of people mentioned the difference between the rate for grain and the rate for coal by BNSF even though it's mileage based. And that the grain rate is $.33 a car mile and the coal rate $.22 a car mile.

Could that be attributed to differences in density or the differences in the terrain that grain and coal normally travel over?

Mr. Voss, you mentioned it.

MR. VOSS: I don't know exactly how they figure it. Basically, if you run a hopper train of grain or soy bean meal or something like that, you got 286,000 pounds gross on the rail. You're going to

have the same thing in coal. So, I think if you're pulling 100-car train of coal or a 100-car train of grain, I don't know that it makes a lot of difference as far as weight pull.

Co-efficient drag, I don't know. I'm not an engineer. I don't know how that works, but the train, I don't know. I don't know that there would a 50 percent difference in terrain.

VICE CHAIRMAN MULVEY: 50 percent is giving them a lot.

MR. VOSS: It does to me.

VICE CHAIRMAN MULVEY: You also mentioned--

MR. STREGE: I think Terry hit it right on the nose that the weight is the same generally or pretty close to the same and the coal cars are aluminum and so the return trip would be lighter, although the gross weight of the shipment would be approximately the same.

A terrain might vary, but any railroad movement is going to encounter some hills and valleys and some flat plains. And as you said, Mr. Mulvey, 50 percent difference is quite a bit. We'd be delighted

if we could, you know, just drop down to the coal rate.

VICE CHAIRMAN MULVEY: Mr. Voss, you mentioned you polled your membership in your testimony. I was wondering if you and your members would be amenable to sharing in more detail information that came out of that survey?

MR. VOSS: I would submit it. I don't have it available. I mean, I've got some notes available, but I would submit it for the record if you want it.

VICE CHAIRMAN MULVEY: Thank you very much. I appreciate that.

MR. VOSS: Do you want it for the record?

VICE CHAIRMAN MULVEY: Yes, please.

MR. VOSS: Okay.

VICE CHAIRMAN MULVEY: Thank you.

I have another question.

CHAIRMAN BUTTREY: Go ahead.

VICE CHAIRMAN MULVEY: Okay.

Mr. Mack, your association urges the STB to issue guidelines and parameters to carriers on certain methodologies with assessing the surcharges.

But does the Board really have the expertise in this area? Should the STB give some guidance as to what is reasonable in general terms, by stating, for example, that surcharges should bear some direct relationship to the consumption of fuel. Or would you have the Board design the entire programs, which I'm not sure that we can do?

MR. MACK: I think that the way you would do that obviously and some of the burden would be the Board. Some of the burden would be on the rail industry, shipper, vendor should come together and determine what is an equitable and logical approach.

Obviously, the authority lies in your side--

VICE CHAIRMAN MULVEY: You said that you expected that the benefits from hedging should go to the carriers. They take the risks and, therefore, they should get the benefit or pay the costs if they hedge wrong. But that's not widely agreed upon by other members of the shipping community.

Does anybody have differences as to how hedging should be treated? Should we take into account

hedging in determining what a fair fuel surcharge is? Or should we agree and say that the railroads are taking the risk and they should benefit or not depending upon what happens?

MR. MACK: I can give a perspective.

Our perspective is simply that the risk assessment is entirely up to the railroads whether they choose to hedge or not. Essentially, a hedge is locking in a price. It's not necessarily locking in a better price derived at a later date or a worse price. It's simply deciding to lock in a price.

If there's a gain from that hedge, that should be the reward to the carrier for taking that risk. If there's a loss to that hedge or in other words they could apply for fuel at a later date at a cheaper price, but they'd made a decision to hedge, that's also their burden of error.

Our perspective from the shipper community is that we're not asking for a refund nor do we want to make an additional payment to cover any losses that may occurred from a decision to hedge.

VICE CHAIRMAN MULVEY: Some have suggested

that hedging should be taken into account in deciding whether or not how much the rates should increase if the railroads had hedged the price the fuel.

Anyone want to comment?

MR. VOSS: I agree with Dan. You know, if they want to hedge, and put the money in their pocket. Fine. You know, they're going to be upside down sometime on it. And they're going to have a lot of systems and we don't want to participate in those.

MR. WHITESIDE: I guess I would agree with Also, Mr. Mulvey. The amazing thing is that the way it works right now is, we've talked to the boroughs and they've said well the hedging should be ours, but the losses should be yours. And that's not fair either. So, I think divorcing both of them probably makes a lot of sense.

CHAIRMAN BUTTREY: We've heard anecdotal information and your testimony to the proposition that there may be other customers, rail customers, other than contract customers who are not paying fuel surcharges for one reason or another.

I don't know whether any of you have

information or evidence of that practice being prevalent in the industry or not. But we keep hearing that over and over again that the contract carriers that have these provisions in the contracts that do not allow escalation clauses or fuel surcharges, any extra charges that can be placed top of the rate that's in the contract being prohibited.

Is it your understanding or do you believe that there are situations out there where there are certain customers who are getting preferential treatment by carriers who are not under contract for one reason or another?

MR. STREGE: Mr. Chairman, I could address that perhaps.

I submitted a letter with my written comments from the Burlington Northern Sante Fe that a year ago they were collecting from only 50 percent of their revenue base. I don't know if the other people were all contract or not. That was not said, but at that point it was only half. It is a serious problem because if you're trying to make up 100 percent from 50 percent, well, then you're going to have to over

charge them.

CHAIRMAN BUTTREY: Is anyone suggesting that there is some mechanism for getting to that issue and how you would get to that or solve that problem by going after the contract situation or the contract has concluded that no fuel charges can be assessed? I mean,there doesn't seem to be anybody who is suggesting that there is some way to do that.

MR. STREGE: Mr. Chairman, if the railroad agreed with these shippers that there would not be an escalation clause for a fuel surcharge, I guess they should be stuck with it. But they should not be allowed to collect the shortfall from somebody else.

CHAIRMAN BUTTREY: The data that has been used to support the argument or support the facts about the difference between the charges of grain and coal interests me. I was wondering if you could tell me if some effort has been made in the collection of that data and the presentation of that data, to show the difference between fuel surcharges for coal and grain. Is there some information you might be able to shed on that? Anyone on the panel?

MR. VOSS: I'll just throw in a thought.

If the fuel surcharge is in the contract, I don't think they would publish it on the website every month. I think it would be hidden in the contract or in a contractual agreement between the shipper and the railroad.

MR. WHITESIDE: Our experience has been with our clients is that up until about 1999/2000, there were contracts that were being made by the railroads that had no cost escalation in them for fuel. Right after that, we starting seeing RCAF-- well, before that a small percentage of RCAF, then the full RCAF was being applied in the contracts after that. And then generally the last couple of years they being ALF-2 plus fuel.

So, what we're seeing is that as those contracts that were cut back in the late `90s are coming due, they're going to be subject to at least ALF-2s probably in fuel. So, that catch-up will occur at some point, if you're following what I'm saying.

But I think the recognition is that in 1999 no one ever thought about fuel as being something

that would just skyrocket. And so they weren't even building them into a lot of the contracts that I've been associated with.

MR. VOSS: Our company has not been successful at all in renewing any of our contracts without the fuel in it. So, now all of our contracts are subject to fuel. At one time, not all of them were. And that may be what the railroads are unwinding and I'm going to assume that as they renew these contracts, they're going to treat those the same as they did us and make them subject to fuel.

MR. MACK: Chairman Buttrey, you asked a question earlier, if I may, about are we seeing any fuel surcharge or a need for anything but perhaps a contract that was written with a fuel surcharge? To my knowledge, I have not seen that.

MR. WHITESIDE: We have heard evidence too, some discussion about on the mile-based from the higher mileage areas that one of the railroads is looking at a block mileage to cover a whole area instead of applying individual mileages.

Again, the shorter mileage people probably

end up suffering in that kind of an environment.

CHAIRMAN BUTTREY: Do any of you pay fuel charges based on actual railroad mileage or is it figured on some other basis like taking out the old Rand-McNally map and measuring it or something?

MR. VOSS: All the mileage on Burlington Northern SF is real mileage.

MR. WHITESIDE: I talked a little bit about in my statement about the transition trauma that was associated a little bit with that. I don't blame the railroad because it was trying to come up with a new methodology. But it became very complicated for awhile until finally settled on rail miles. That's in my statement.

So, if we ever come up with some methodology, it should be very clear and transparent.

CHAIRMAN BUTTREY: Is there only one railroad that's using the rail miles or are other people using different types of indices?

MR. MACK: to my knowledge, BNSF is the only one. And it applies on BNSF direct only, not on--

What I'm saying on a lot of it they're probably applying on coal and it applies on grain. Other commodities, I believe, for the most part are still a percentage of the freight rate for the freight bill.

VICE CHAIRMAN MULVEY: You mentioned mileage-based surcharge being fairer than rate- based surcharges. If you could design the system to replace the current rate-based surcharges, would the BNSF system be the one you would choose? Or could you envision some other kind of justice in that system or other system that might be fairer?

Everyone seems to agree that we need to cover the cost of fuel to the extent possible.

Does anybody have a suggestion for a more optimal system than the one we have now or the one that BNSF has proposed or is using?

MR. VOSS: I'm not saying the BNSF system is optimal. It is a good system. I think it's just priced wrong. I think the BN system is a good model as long as it's cost-based and the miles charged for mile reflects the cost base.

MR. WHITESIDE: I think I agree with Terry. I think that that's a good start. The real issue is, if it's over collecting, if it's collecting more than the total fuel of the whole movement and just the incremental, then the system is still awry a little bit. It needs some adjustment.

MR. STREGE: I would say that mileage has to be a part of the equation. I think it would be obvious.

Now, the other factors that would go into it, wheat probably one. Maybe there is something about the aerodynamics of train movement and I don't want to make it too complicated. You don't want to have railroads assessing a unique fuel surcharge on each movement, but those are some of the factors that we know and miles has to be one of them. And it's a matter of getting that multiplier, that per mile charge correct and letting the shippers know how they arrived at that.

Open the black box so people can see what's going on so that we can be assured that it is recovering fuel costs--increased fuel cost only and

not being used for some other means or other goal.

VICE CHAIRMAN MULVEY: Would it be worth it to help assessing such a charge on a merchandise train rather than a unit train of coal or grain? It would be more difficult to hustle out all the individual commodities and all the individual grains on a merchandise train and assessing a charge for each one of those.

MR. VOSS: I'll say day to day it applies on all the ag products whether it's soy bean oil or ethanol or whatever it might be. Single carloads that run in manifest trains today.

All agricultural products are subject to that mileage already. So, I think that model may be in place.

MR. MACK: I also want to make a comment, I guess, on the mileage per car, if I may. And I think it's more conducive --there's more greater collection of cost. It should be noted though that -- is a little more burdensome on a rate base so that's some disadvantages.

And also certainly in the transition

period when you shift from a percentage to miles, there are some market distortions that you incur that do change the economics of modern values from one market to another.

CHAIRMAN BUTTREY: I have to get this on the record. There seems to be agreement on this panel at least. There may not be on other panels but certainly on this panel that some type of nationwide indexing system will be preferable to what we have now.

Is that an accurate statement and if it's not, I'd like to know why it's not?

MR. VOSS: Yes. It is.

CHAIRMAN BUTTREY: It is accurate on this panel.

We want to thank you very much for coming today. We appreciate your testimony. It will go on the record obviously and we'll get prepared for the next panel.

I'd like to call the second shipper panel identified as Panel 2B in the Notice of Hearing.

Speaking will be representatives of the

alliance of Automobile Manufacturers, Daimler Chrysler, Ameren Energy Fuels and Services, Western Coal Traffic League, Entergy Corporation and the AES Corporation.

Again, Vice Chairman Mulvey and I will hold our questions for the panel until all have testified. I would appreciate again if each speaker would identify yourself for the record at the outset of your comments and we'll continue to proceed with the witnesses from left to right.

It's also apparent that there are some witnesses who are appearing here who are wearing a little bit different hats than they sometimes do. We'd like to have for the record if you're representing someone other than what we have here. We'd certainly like to know that for the record.

Do we have enough chairs?

I'd like to encourage all of you to speak as close to the microphone as you can to accommodate people who are trying to listen in the audience and also people who are trying to listen over the Internet.

We'll start from my left to my right whenever we're ready on the PowerPoint.

MR. PFOHL: I'll get started while they're loading the Power Point.

CHAIRMAN BUTTREY: Please proceed.

MR. PFOHL: Chairman Buttrey, Vice Chairman Mulvey, my name is Peter Pfohl and I'm with the law firm of Slover and Loftis. Accompanying me here today is Tom Crowley, President of L.E. Peabody and Associates, an economic consulting firm.

Together we're here today on behalf of the Western Coal Traffic League, an association of 18 electric utilities that collectively move approximately 140 million tons of coal by rail on an annual basis.

Mr. Crowley and I appear today to summarize our written submission and to answer your questions.

I'll start and then I'll turn to Mr. Crowley who will summarize the economic analysis he conducted for the League.

The Board has called this hearing to

discuss the question of whether the carriers' programs are being used only to recover the increased costs of fuel for the particular movement to which the surcharge is applied.

The answer to this question is clearly no. As Mr. Crowley will attest to in a few minutes, for an average western coal haul, both UP and BN collect significantly more in fuel surcharges in the chart than the change in their fuel costs to the tune of between $.53 per ton and $.95 per ton for an average coal move.

Coal League members are well aware of the recent run up in gas prices and they don't generally have an issue with the carriers' attempting to recoup the costs of their services.

Twenty-five years ago the ICC adopted the rail cost adjustment factor index as a mechanism to enable the railroads to adjust their rates to cover changes in their service costs.

As Mr. Crowley will explain, unlike the price data currently relied on by the western carriers in their fuel surcharge programs, the RCAF fuel index

closely tracks the carriers' per gallon cost of locomotive diesel fuel.

Well, the carriers apparently have decided to move away from the proven RCAF index by implementing more lucrative fuel surcharge programs that overcompensate them for their incurred fuel costs. And this is on top of the well-publicized general rate increases they have been able to sustain on their coal customers in the last few years. And these programs are indeed lucrative.

Under the western carriers' programs, 22 percent of surcharges have been applied on the line haul rate per ton of coal. UP and BNSF alone collected $2.1 billion in fuel surcharges in 2005. And as applied on a single average western coal haul, surcharges are approximately $30,000.

Under governing precedent, rail carrier surcharge programs have been sparingly permitted in the past. Those programs were authorized to address unexpected and precipitous increases in prices that were verified by the carriers. But they are for a limited period, typically lasting for no longer than

one year.

The carriers' current programs fail this test as well. The carriers are not implementing fuel surcharges across the board in all common carrier traffic on a long-term basis.

The carriers will likely argue that they have instituted their programs and come to rationally deal with the fuel price increases. However, under governing precedent, when evaluating the reasonableness of railroad practices, the question to be considered is not whether the practice can be described as rational from the railroads' perspective. But instead whether the practice is reasonable as applied.

The problem with the railroads' programs is that they are not reasonably applied today.

The Board is the only regulatory watchdog that is capable of addressing industry fuel surcharge practices on a consistent basis in a manner throughout the nation and with a view towards balancing the interests involved.

The Coal League submits that the Board has

the obligation to ensure that the carriers do not continue to collect any fuel surcharges on movements that do not reasonably track their increases in fuel costs.

The Coal League's analysis verifies that UP and BNSF fuel surcharge programs bear no reasonable relationship to their involved service costs to individual customers. And they should not be allowed to be sustained in their current form. Carriers should instead employ the standard and proven cost recovery mechanism, the RCAF, to recover increased fuel costs on individual movements.

Thank you and I'll now turn to Mr. Crowley to describe his analysis.

MR. CROWLEY: Good morning Chairman Buttrey, Vice Chairman Mulvey.

I was asked to evaluate two issues related to fuel costs. And particularly I was asked to evaluate BNSF and UP.

The chart on the screen summarizes the results of our evaluation of the fuel surcharge program and whether or not it recovers the incremental

costs of higher fuel prices.

The matrix on the left is in dollars per ton and way across the bottom we see the two different BNSF fuel surcharges. One is a percentage, which is the first one on the left. The one in the middle is BNSF's mileage fuel surcharge and the right is UP's fuel surcharge.

The analysis that we performed first evaluated the average move for coal. We calculated the average rate for both BN and UP. Then we calculated the average fuel surcharge from the beginning of the fuel surcharge program through 2005. This represents that change in that time period.

We did the same analysis for BNSF's and UP's fuel cost, again using the average characteristics of an average coal train.

The results of our finding first for the cost. The incremental change in the fuel cost experienced by BN as you see on this chart is $.53 a ton. That would be the same for both fuel surcharges.

For the Union Pacific, the change in their fuel costs were $1.02 per ton.

The green line reflects the application of the fuel surcharge for coal for both of these carriers.

For BNSF on a percent basis, the fuel surcharge would generate $1.30 per ton and the difference between those two numbers obviously is the amount that the fuel surcharge over-recovers.

For the mileage fuel surcharge, the fuel surcharge revenue is $1.48 per ton and again considerably greater than the cost or the incremental cost associated with fuel.

For the Union Pacific the numbers are. The fuel surcharge generated $1.58 per ton and the incremental change in fuel cost for Union Pacific resulted in $1.02 per ton.

Now, both of these carriers are over-recovering their fuel costs increases. Their incremental fuel cost increase.

The second page of this exhibit are the numbers and the values and the sources that support the three columns on the previous graph.

The second question I was asked to address

is whether or not the fuel index portion of the RCAF accurately tracks the fuel cost changes.

What this chart shows you is the change in the RCAF fuel index. That portion of the total RCAF that is fuel. That would be the blue line. And what we're measuring is the cumulative percent change from one 1/2/04 which is when BN began its fuel surcharge program and tracks it through the end of 2005.

The purple line or the chartreuse line or whatever you want to call that color, represents the change in BNSF's fuel price per gallon. And you can see over the same two time periods that the RCAF fuel index actually increases faster than the change in BNSF's fuel price per gallon.

The next chart is a similar analysis except we have substituted the Union Pacific for the Burlington Northern and moved the beginning of the analysis back to 1/2/03, which is the time period when the Union Pacific began their fuel surcharge program. And you can see a similar result to what we saw on the previous chart.

On a cumulative basis from 1/2/03 through

the end of 2005, the RCAF fuel index actually increased faster than the change in UP's fuel price per gallon.

The next chart or the last page are the numbers that support the numbers that were plotted on the previous two graphs.

Thank you.

MR. MOHL: Hello and good morning, Chairman Buttrey and Commission Mulvey.

I would like to thank the Board for taking up the issue of fuel surcharges and allowing me the opportunity to speak with you today.

My name is Bill Mohl. I'm the Vice President of Commercial Operation for Entergy Services, Inc., a subsidiary of Entergy Corporation.

I'm responsible for the procurement of all limited and long-term resources for both fuel and generation for the Entergy operating companies.

The purpose of my testimony today is to highlight Entergy's concerns with the fuel surcharge programs instituted by the nation's railroads. I will not address the Board's authority to review fuel

surcharges or issues related to mileage-based surcharges, both of which are sufficiently covered in our written comments.

Entergy Corporation is an integrated energy company engaged primarily in electric power production and retail distribution operations. We own and operate power plants with approximately 30,000 megawatts of electric generating capacity and deliver electricity to 2.7 million utility customers in Arkansas, Louisiana, Mississippi and Texas, as well as numerous wholesale entities.

Our generation fleet includes several coal plants. Most of the coal fueling these plants comes from the Powder River Basin in Wyoming and is shipped to the plants by rail cars.

For example, Entergy's subsidiary, Entergy Gulf States, receives coal shipped from the Powder River Basin pursuant to contracts with BNSF and the Kansas City Southern Railway or KCS.

These and other railroad transportation contracts now impose fuel surcharges upon the buyer.

In order to simplify my testimony today

and relate specific real life experiences with railroad fuel surcharges, I will occasionally refer to the Burlington Northern Sante Fe coal transportation contract for Entergy Gulf States Nelson Plant in Louisiana.

BNSF imposes fuel surcharges under that contract through BNSF's Public Rules Book 6100, item 3380.

I wish to emphasize, however, that Entergy surcharge issues are not limited to Burlington Northern, but apply to all railroads having transportation contracts subject to fuel surcharge tariffs.

Contrary to the claims of some of the railroads, Entergy is not requesting re-regulation of the railroads. As a threshold manner, Entergy does not object to the concept of fuel surcharges, provided that the surcharge is allowable under the contractor tariff, is limited to the purpose of recovering or refunding genuine documented variations in fuel costs from those assumed and built into the transportation rates to which they apply and are transparent and

subject to regulatory oversight.

To insure that this prerequisite is met, Entergy recommends that five pass-through principles be applied to any railroad fuel surcharge mechanism. These principles are:

(1) Fuel surcharge mechanisms should be strictly cost-based and should not increase the railroad's profitability to the movement to which they apply.

(2) Fuel surcharge mechanisms should be transparent and subject to the oversight of regulatory authority, in this case, the Board.

(3) Fuel surcharge mechanisms should provide for both positive and negative fuel surcharges to allow railroads to recover significant fuel cost increases, as well as allow customers to recover significant fuel cost decreases, as compared to the fuel costs assumed and built into the rates to which they apply.

In addition, no minimum fuel surcharge should apply.

(4) While we prefer the use of a

railroad's actual cost to calculate fuel surcharges, to the extent an index is used, the index should be determined by the Board with input from shippers and other stakeholders to most accurately track variations in the actual unit costs the railroads pay for fuel.

Lastly, non-fuel costs should be clearly segregated from fuel costs. Cost adjustments based upon indices that include both fuel and non-fuel costs should reflect the relative split between the two and prevent over-recovery.

These five principles are not new to the market. They're based on similar principles which are applicable to Entergy and other utilities that pass through fuel costs for electric generation directly to their customers. For these companies, fuel cost related price adjustments both upward and downward are accomplished through an expedited regulatory process conducted separate and apart from the utility's other cost-related rate adjustments.

Adopting and applying Entergy's proposed principles would help insure that railroads recover their actual fuel costs for rail movement, the stated

purpose for fuel surcharges and that their customers are not overcharged for fuel.

Today there are no such assurances. In fact, BNSF's fuel surcharge at Entergy Nelson's plant is expressly not strictly cost-based and allows for the possibility of significant cost over-recovery.

The absence of a cost-driven surcharge is apparent from the way it is calculated. The fuel surcharge is determined by taking a pricing variable and multiplying it by the base rate which includes market components entirely unconnected to the railroad's fuel expense.

For BNSF's fuel surcharge, the variable is established by the index price for on-highway diesel fuel for HDF. The formula provides that if the HDF index price is say between $3.00 and $3.039 over the billing period, the added fuel surcharge for that period is 22-1/2 percent of the base rate.

On its face, a fuel surcharge determined by reference to a base rate incorporating market rates is simply not cost-based.

The effect of this methodology is to

increase incremental fuel surcharges when movements have high market values regardless of the movement's incremental cost to the railroad.

Further, the HDF index itself is not an appropriate measure of a railroad's actual fuel cost. It lacks the necessary nexus to BNSF's actual incremental fuel cost to serve as an appropriate proxy for use in the calculation of the fuel surcharge. The HDF index price is essentially the average retail price paid at truck stops and service stations for diesel fuel. But BNSF is able to buy its fuel in bulk at wholesale, not retail prices, and without certain taxes.

These and other differences introduce a level of unacceptable variability in the fluctuations between the HDF pricing index and BNSF's actual incremental fuel cost.

To illustrate the disconnect between incremental fuel cost recovery and actual fuel cost, consider this. According to BNSF's investor reports, BNSF's average cost for diesel fuel in the third quarter rose by 14.4 percent from 2003 to 2004. In

contrast, the average HDF index price over the same period increased by 25.3 percent.

Under BNSF's fuel surcharge, BNSF shippers would have been forced to pay on an incremental basis almost double the increase BNSF actually incurred for its diesel fuel costs.

The structural flaws caused by the failure to have surcharges track actual fuel cost can lead to absurd results. Under the BNSF formula, for instance, fuel costs recovery can increase even when incremental fuel costs have not changed. A hypothetical illustrates this point.

Let's assume a multi-year transportation agreement with the BNSF fuel surcharge and an initial base rate of $10.00 a ton tied to an index adjustment. If at the beginning of the contract term, the fuel surcharge rate is 20 percent of the base rate, the fuel surcharge adder would be $2.00 a ton with an all-in rate of $12.00 a ton.

Now assume that after one year all non-fuel index cost escalate by 5 percent and that fuel costs stay flat. The base rate would bump up to

$10.50 a ton and despite the fact that fuel cost did not rise at all, the fuel surcharge adder at 20 percent of the base rate would increase to $2.10 a ton.

Similarly, instead of staying flat, fuel costs actually dropped after that first year such that the fuel surcharge rate worked out to be 19.5 percent of base rate, the fuel surcharge would be $2.05 a ton. An amount greater than the $2.00 a ton in the first year when fuel costs were actually higher.

It makes no sense for a fuel surcharge to increase in periods of static or falling fuel prices. Yet, that is exactly what may happen under our rail transportation contracts.

Another failing of BNSF's fuel surcharge is that it does not provide for negative adjustments if and when fuel costs fall below a threshold level. Dips in fuel cost accrue exclusively to the railroad's benefit under the current formulation. This one-way treatment of fuel cost has been imposed by railroads and is fundamentally inconsistent with the purpose of the fuel surcharge.

Moreover, BNSF's fuel surcharge mechanism offers no assurance against double-dipping. Indeed it is quite possible that the current cost of fuel or at least a portion of it was already factored into new BNSF base rates and is being recovered from customers separate and apart from the fuel surcharge.

We know that BNSF's fuel surcharge mechanism kicks in when the HDF index price exceeds $1.24 per gallon. Yet, the HDF index price has not been below that level for four years since March of 2002. The current base rates may include a cost that reflects all or some of this rise. Similarly, there's no guarantee that fuel cost increases captured by index adjustments and base rates are backed out of the BNSF fuel surcharge. In fact, we expect the opposite to be true.

Regrettably, we are unable to be more informed about the specifics of fuel cost recovery. This information is in the hands of the railroads. Customers have no ability to review or audit in any meaningful way the recovery of fuel costs in railroad surcharges and base rates to insure they are receiving

fair and just treatment. Thus, Board oversight in this area is vital.

And, again, I appreciate the opportunity to be able to present this to you today.

Thank you.

CHAIRMAN BUTTREY: Thank you very much, sir.

MR. WILCOX: Good morning, Chairman Buttrey, Vice Chairman Mulvey.

My name is Thomas Wilcox. I'm with the law firm of Troutman Sanders and I'm here on behalf of the AES Corporation.

CHAIRMAN BUTTREY: You need to get a little closer to the microphone and make sure it's on. That's good.

MR. WILCOX: Again, I'm here on behalf of the AES Corporation. I'm accompanied by Mr. Roger Prescott who is Executive Vice President of Peabody and Associates, just to the extent the Board has technical questions about AES' written submitted. And I'm also accompanied by Mr. Mark Michael, the AES Corporation, who is in the audience today.

My testimony will again summarize the written comments submitted by AES on April 27th in this proceeding.

AES Corporation is a holding company with headquarters in Arlington, Virginia. It is a global power company with subsidiaries throughout the world. AES through its subsidiaries operates 20 electric generating facilities in the United States, 9 of which are coal-fired generating stations located in Oklahoma, New York, Indiana and Connecticut. These facilities burn approximately 12 million tons of coal per year. And it's delivered in a single line as well as joint line service by BNSF Railway Company, Norfolk Southern Railway Company, CSX and the Kansas City Southern as well as short lines in some instances.

BNSF, NS and CSX assess AES fuel surcharges in addition to the base railroad rates. These fuel surcharges have been established in public pricing circulations and tariffs but they apply to the contract service that is supplied by the railroads.

AES echoes, I guess, the consensus we've heard so far and I think you'll continue to hear that

the railroads should fully recover the costs of diesel fuel needed to provide service to the AES utilities.

However, as discussed in the written comments in more detail, AES is convinced that the current fuel surcharge as imposed by the class one railroads, although represented as a means to recover spikes in diesel fuel costs, in fact, substantially overcompensate the railroads for their fuel costs, are in fact an increase in the overall rate for transportation.

The fuel surcharges have been imposed in addition to significant base-rated increase as AES' rail transportation contracts have come up for renewal in the past several years. In some cases, the combination of a double digit rate increase in the tariff fuel surcharge mechanism has resulted in the overall cost of transportation in certain facilities increasing 35 percent in the first month of a new contract.

Acceptance of the tariff fuel surcharge is presented on a take it or leave it basis, non-negotiable. All efforts by AES to modify or reduce

the impact of the surcharge during contract negotiations were rejected.

First you have to have coal, so the only alternative for AES' plans that are captive through a single railroad was to take service under even higher common carrier rates and pay an even higher fuel surcharge because the fuel surcharge is based on rates. And then incur the considerable costs and significant uncertainty of a coal rate reasonableness case.

Faced with this alternative, AES essentially bit the bullet and has executed new contracts that accept the tariff fuel surcharges.

So, while AES applauds the Board for holding this hearing, AES echoes the comments that you've heard from others already that this proceeding highlights the need for increased competition in the rail industry and for the promulgation of fair rate-setting standards.

Stated another way, the ability of the class one railroads to force AES and other coal shippers to accept tariff fuel surcharges that

substantially over-recover the fuel costs for the movement into a new contract, is a strong indication that there is insufficient competition in the rail industry today and insufficient regulatory constraints to prevent individual railroads from abusing their market power.

Again, AES does not object to the railroad serving AES' facilities’ recovering spikes in their fuel cost associated with a particular movement via a surcharge. However, AES believes the Board should establish certain parameters.

First, there should be no fuel surcharge allowed when the rail cost adjustment factor is used to adjust the rate. The Board's predecessor determined long ago that fuel surcharges in addition to the RCAF are inappropriate and a double count of fuel costs.

If the railroads have a question of whether the RCAF is adequately recovering their fuel costs, they are free to ask the Board to modify the RCAF procedures to fix the problem they believe they have identified.

Second, to the extent the rate is adjusted, use an index without a fuel component such as the all-inclusive index less fuel, AES agrees with Entergy that the provision should work both ways. The mechanism should be expressly limited to recovery, increases and refunding decreases in the fuel costs built into the transportation rate. A true fuel cost recovery method that is fair to both parties would track the increases and decreases in agreed-upon or established price per gallon of diesel fuel at the time the rate went into effect, multiplied by the gallons consumed by the movement.

Third, surcharge that the fuel cost is based upon must be transparent and subject to regulatory oversight. You've heard that many, many times this morning and AES agrees.

To the extent the Board has not already received sufficient data from the railroads it should modify its existing standards to require the railroads to submit the necessary data.

The Board has jurisdiction under 49 USC 10702.(2) to determine whether the railroads’ fuel

surcharges are an unreasonable practice. AES believes the fuel surcharges implemented by the railroads serving AES facilities are unreasonable practices because they are designed to provide the individual railroad with revenues that exceed the spikes in diesel fuel costs for a particular movement.

AES' written comments set out in detail some of the reasons for why the surcharges do not track costs, some of them you've heard already from other speakers. So, I'll just summarize the points that AES raises which are very similar.

Each railroad employs a surcharge mechanism, multiplies the transportation rate by a percentage derived from the diesel price index. Conceptually because the mechanisms apply a multiplier to the transportation rate, they do not measure the actual fuel cost of a particular movement. Accordingly, the amount assessed essentially for fuel cost recovery bears no relation to the amount of fuel being consumed for the movement.

AES also agrees the WTI and HDF price indexes are not representative of what the railroads

actually pay for fuel.

And the written comments include examples of how fuel hedging and volume discount purchasing of fuel by the railroads is commonplace.

The methods also do not measure accurate fuel costs because they do not factor in distance. Accordingly, the shipper with a shorter routing and you've heard already this morning, the higher rate will pay more fuel cost recovery than a shipper with a longer haul but a lower rate.

BNSF's attempt at mileage-based surcharge is in part a result of BNSF's admission that a percentage of revenue surcharge creates disparities between the surcharge and the actual incremental fuel costs.

The formulas are also not based on current fuel prices. They are based on index fuel price levels that have long since been exceeded and not represented as the current cost of fuel as the railroads factor in the new rates.

It must be presumed that some or all of the individual railroads' current cost of fuel is

factored into the significant base transportation rate increases for AES' facilities. A representation by a particular railroad to the contrary should be critically analyzed by the Board.

Not raising the index threshold of the surcharge to reflect more current fuel prices built into the transportation rates results in the phenomena that was discussed by Mr. Mohl that you could have a current cost of fuel built into the new rate in the contract, fuel costs would stay flat, yet a surcharge would be assessed.

BNSF admits this in its April 24th announcement that it intends to rebate this current fuel surcharge threshold to $64.00 a ton. It's essentially an admission that the current $23.00 per barrel threshold currently used by BNSF is far too low and results in revenues that exceed fuel costs for particular movements.

Unfortunately, this change has no immediate impact on us yet because it only applies to rates that shoot out to July 1, 2006, when it's implemented.

Do these surcharges as applied to AES actually recover the fuel costs for these movements? AES has performed an analysis for some of its plants and the answer is clearly yes. AES strongly suspects that a similar analysis for all its coal fired plants will produce the same results.

However, AES cannot present this information to the Board in a public forum due to confidentiality restrictions. It's willing to do so if ordered by the Board if that's consistent with the confidentiality provisions in its contract.

But all the data the Board needs to conduct a similar analysis and draw its own conclusions is in the hands of the individual railroads. The Board should adopt procedures for obtaining such data in the most transparent manner possible.

In conclusion, the Board needs to be proactive on this issue. AES believes it is no coincidence that the announcement of the hearing was followed shortly thereafter by NS's announcement of provisions to its tariff fuel surcharge.

Hopefully, continued action and oversight by the Board will result in further changes in other railroad surcharges.

Just real quickly just to summarize AES' suggested recommendations.

Clarify that the surcharges may be used for the purpose of recovering actual costs of fuel expended and refunding or crediting to the shipper decreases in fuel costs. Take appropriate action to correct the current publicly published railroad fuel surcharges which could be the creation of standards for them to follow and require each railroad to submit detailed data reflecting its actual costs of fuel and revenues associated with fuel cost recovery for each movement for which the fuel surcharge is assessed.

Thank you.

CHAIRMAN BUTTREY: Thank you, sir.

MR. TELFER: Good morning, Chairman Buttrey, Vice Chairman Mulvey.

My name is George Telfer. I work for Daimler Chrysler, but this morning I'm representing the Alliance of Automobile Manufacturers, which is an

association of 9 finished vehicle manufacturers that have collaborated on this testimony and appointed me as their spokesman.

The importance of our industry in the economy can be seen in the fact that one out of every ten jobs in the U.S. is dependent on the automotive industry. On the other hand, the automotive industry is highly dependent on rail transportation.

We often hear things about captive shippers and so forth and in our industry we can consider ourselves to be captive to this mode of transportation even though we may not be geographically captive to a particular railroad in certain instances.

This can be seen in the fact that about 75 percent of our finished product goes to dealers by way of rail at the distribution points. If this product were to be switched to a highway mode of transportation, it would take a ten-fold increase in the haul away rates that you see carrying cars on the highway, which just wouldn't work on the highway, number one. And number two, there just wouldn't be

enough trucks, there just wouldn't be enough drivers to accomplish that.

So, the bottom line is that our industry needs to use rail. It isn't an option.

In addition to the finished vehicles we ship a lot of our materials into our plants by rail as well.

Before getting into the specific copy because of the fuel surcharge, one of the things that the Alliance wanted to make clear is that while we have concerns on this particular topic, and we do want to express, probably echo pretty much, what other shippers have said about the fuel surcharge mechanisms and where we would like to see things go. At the same time, we would like to reiterate that we really are not pushing for re-regulation. I certainly haven't heard that on behalf of other shippers either. But just to make that clear for the automotive industry that we're not looking for regulation. We're just looking for help and a voice in Washington that will help us work with the railroads to achieve the solutions that we think need to be put in place.

One of the things that's been talked about this morning is that, gosh, fuel is going up. Has gone up. It's a problem. It isn't just a problem for the railroads. It isn't just a problem for fuel surcharges, but it's a problem for anybody that drives a car.

It becomes a particular problem that anybody that builds cars and tries to sell them, because number one, the customer is facing this additional cost. But also we're facing additional costs in the ingredients that go into that car because a lot of the things that go into the car are made out of petroleum, plastics and tires and various other components.

So, out costs are going up in many other areas along besides just this fuel surcharge issue. So, we feel the impact of fuel costs in many ways and so we can sympathize in that respect with the railroads' needing to recover that element of their cost. And, there again, echoing the sentiments of other shippers, we're not against railroads recovering that cost. We simply want to see a more equitable

mechanism.

In recent years, we've seen railroads implement the fuel surcharges even where in the past we've enjoyed negotiated rates, confidential contracts and pretty much everything that the automotive companies have done with the railroads has been in that arena of negotiated rates and so forth.

However, what's happened more recently is the application of the fuel surcharges on top of this and the fuel surcharges are sort of step outside of that two-party arena and become more of a unilateral mandate on the part of the railroads. Perhaps that was necessary because of the urgency of the situation. But today we're in the position that, as many have expressed, that we may have gone too far.

So, like others, we're seeking, you know, some sort of review of that and step back and say, okay. Where do we go from here?

One of the problems that has been stated is that we really haven't seen the detailed analysis. We don't have the transparency to really see, okay, what are the fuel charges that are being assessed to

automotive companies? Collecting the right amount of revenue for the railroads that is equivalent to the increase in fuel cost that it takes to haul our products, to haul our materials into our plants. Or are they, you know, making more money? Are they under-compensated? We just don't know.

So, basically like others, we've had to go to other sources of information and there are plenty of them out there as has been pointed out.

So, we've gone to those sources of information and by and large we've kind of come up with the same conclusions that others have come up with that it kind of looks like we might be paying too much. And this is based on a lot of public information in terms of, you know, how much railroads are paying for fuel. And then, of course, the more confidential information in terms of how much we're paying in fuel surcharges.

So, basically, by doing this kind of an end around analysis, I guess, the Alliance has come to the conclusion that the mechanisms are flawed. And, in fact, work to the financial advantage of the

railroads at this point in time.

And as a result, we believe that the ability to mandate these fuel surcharges has become somewhat of a profit center for the railroads. And it's even starting to show up in some of the materials that railroads are publishing to their stockholders and I'm sure others in the room have seen those.

So, as been pointed out, the increases in the surcharges don't necessarily correlate to increases when the fuel itself rises or remains steady.

So, basically, to summarize the specific issues that the Alliance would present.

One, the current revenue-based surcharge, our percentage of the rate charge, do not correlate with the actual fuel costs incurred by the railroads on those shipments. Again, this is echoing what some of the other shippers have said.

So, what results then is that for higher value materials like finished vehicles where the rate is sometimes predicated on the value of the materials that are being shipped or the product that's being

shipped, part of what's factored into the rate is the risk that the railroad is taking by handling this high-value product which is probably appropriate in terms of setting the rate.

Unfortunately, when you apply the fuel surcharge to that rate, now you're paying fuel on top of the value portion of the rate. So, we're paying for fuel on the value of our product. Well, because the price of fuel went up, it doesn't cost more to ship this high value product. And this is similar to other points that have been made along those lines.

One of the points that we wanted to bring up that's also been mentioned was the appropriateness of the use of the West Texas Intermediate Crude as a reference point or an index to adjust rates.

Some of the information that we have suggests that since 2001 the price of West Texas Crude has actually gone up at almost double the rate of diesel fuel. So, if you look at the index being used to establish the fuel surcharges, we even wind up paying too much surcharge. And then it kind of doesn't swing the other way because if it comes down

to the baseline, then we don't, and the West Texas Crude being a more volatile index, falls below that baseline, then we don't get compensated for that.

One of the things that we questioned and one of the things we're hearing from the railroads is that they're becoming more fuel efficient and we applaud that and we hope that that continues.

In a paper that was authored by the AAR, which is entitled "The Old Review of U.S. Freight Railroads" which was just published the first of this year, they cite the fact that the railroads are three times more fuel efficient than trucks and railroad fuel economy is improving all the time.

Our experience, however, is despite using one-third less fuel, and improving all the time, we're actually paying on a proportional basis higher fuel surcharges for rail than we are for highway carriers. So, there again, it leads us to wonder, you know, is this mechanism working right. And we came to the conclusion that it probably isn't working right.

And then our fourth issue is that we find it frustrating that we don't have the ability to get

the information from the railroads to justify the surcharge methodologies.

The requests for supporting documentation basically are rebuffed and the surcharges have become non-negotiable. It's just fuel went up, here's your charge.

So, in summary, there are four things that we're basically requesting from the Board.

(1) Surcharges should cover only the increased cost of fuel and not be a new source of profit for the railroads.

(2) Railroads should fully disclose both cost and revenue data related to fuel purchases and fuel surcharges. So, in other words, you'd see both sides of the ledger.

(3) Surcharges must be based on the price of locomotive diesel fuel used by the railroads and not some other index.

(4) And then finally, number four, railroads move from a rate-based surcharge to a consumption- based surcharge. And that would be something along the line of the 10 miles or something

like that.

So, I'd like thank you on behalf of the Alliance for conducting this hearing. I think it's a very worthwhile thing to do and I really appreciate being here.

CHAIRMAN BUTTREY: Thank you, sir.

MR. NEFF: Good morning, Mr. Chairman, Vice Chairman Mulvey.

CHAIRMAN BUTTREY: You and Mr. Roman are appearing together. Is thatcorrect?

MR. NEFF: That's correct. Yes. I'll do the first half and Mr. Roman will do the second half of our testimony.

Thank you for allowing Ameren to address the Board this morning on the subject to fuel surcharges.

My name isn't Robert Ness. It's actually F-F. And I'm the Vice President of Fuel Supply for Ameren Energy Fuels and Services in St. Louis, Missouri.

My responsibilities include the acquisition of coal and related transportation for all

Ameren's electric subsidiaries.

The purpose of my testimony this morning is to address the impact of railroad fuel surcharges on Ameren's coal-fired generation. This testimony is given in support of Ameren's written comments which were filed previously with the Board.

Ameren is the largest shipper of Powder River Basin coal in the country, shipping over 35 million tons annually. Ameren's plans rely on rail service as their primary mode of receiving their fuel. Our average haul is over 1,000 miles and our annual freight costs are expected to be over $550 million in 2007.

As are many shippers, our transportation on a whole is transitioning from fixed price confidential contracts to public pricing tariffs. And these new public pricing tariffs are being implemented by the western carriers often contain a non-negotiable fuel surcharge which made a significant impact on Ameren's full generation and Ameren's customers.

As an example, assuming that the diesel index remains at its April 15th, 2006 level of $2.70

per gallon, Ameren's fuel surcharges next year will add up to $83 million. And with other shippers, the amount of the fuel surcharge that Ameren pays will go up and down depending on the price of the fuel-related diesel index.

Clearly, the fuel surcharge will amount to a large sum of money for Ameren and its customer. We, in turn, will have to recover that amount from our customers.

Now, Ameren does not dispute that railroads should be able to recover their increases in fuel costs. We have generation in coal, natural gas and fuel oil and we're familiar with the volatility in the fuel markets and the need to recover the fuel costs.

Utilities have an even larger percentage of their product costs tied to fuel than do the railroads. And most utilities are familiar with fuel hedging and fuel cost recovery methods.

First of all, I want to say fuel cost recovery should not be a mystery to the parties involved. Utilities have been recovering changes in

their fuel costs for years through fuel adjustment clauses, purchased gas adjustment mechanisms and similar regulating tools.

Utilities understand the importance of recovering fuel costs, but we also understand that customers or regulators must be able to understand and be comfortable with the fuel adjustment mechanism.

With the utility fuel pass-through clauses that are generally regulated by state public service commissions, we found that what we would call poor common attributes of fairness. And I posted these on the screen here.

The first attribute of fairness we would call is the recovery of utility fuel costs should be based on actual cost that utilities incur.

The second attribute of fairness is that utility pass-through mechanisms are transparent. We've heard that term a lot this morning. The transparency of costs. That means all parties should know what costs are included, how the costs are calculated and the methodology of the calculation.

The third point is that utilities are not

allowed to over-recover or benefit from this cost recovery of fuel. It is strictly recovery.

And the fourth point is that utilities are required to take actions to minimize the impact of volatile price changes in commodities like fuel through hedging programs and prudent purchasing practices.

Ameren believes that these attributes of fairness which are applied to utilities should also be applied to the railroad cost recovery mechanism. But we find that none of these characteristics are present in the fuel surcharge mechanism as currently practiced by the railroads. Many of the previous speakers had expressed the same thoughts.

It is Ameren's position that the fuel surcharge mechanisms imposed by the railroads in their public pricing tariffs do not adequately reflect the true cost of the increases, are not transparent enough to provide comfort to customers that the charges are fair and they're not structured to prevent over-recovery of fuel costs.

To address these issues further, Ameren

has retained a recognized expert who specializes in contract escalations and I would like to turn the remainder of our turn over to Mr. Jay Roman of Escalation Consultants.

MR. ROMAN: Good morning. Chairman Buttrey, Vice Chairman, Mulvey.

I appreciate the opportunity to address the Board regarding fuel surcharges on behalf of Ameren.

We want to commend the Board for having this hearing. As you can see from the large number of people we have in this room, it's a pretty hot topic. People are really interested in it and I think everybody appreciates the attention that you're giving to this issue.

I'm here today on behalf of Ameren to explain irregularities in the manner in which railroads are imposing fuel surcharges on shippers.

At Escalation Consultants we do quite a bit of work with fuel surcharges and our findings support the prior testimony of Ameren that there are problems with the railroad fuel surcharge programs.

The first attribute of fairness made by Ameren which is up on the board is that fuel surcharge cost recovery should be based on actual cost incurred by railroads. This is contrary to the methodologies established by railroads in these programs.

As an example, both western railroads use on-highway diesel fuel price to initiate their fuel surcharges. This the retail price index that is reflective of what on-highway vehicles pay for diesel fuel. This is not reflective of how the railroads incur their costs. All the class one railroads buy diesel fuel in bulk and pay wholesale prices, not retail prices for fuel.

The largest problem is, however, that fuel surcharges are applied against the entire rate, rather than just a portion of the rate associated with the fuel expenses. This application increases portions of the price for things other than fuel like labor and benefits and overhead, lots of expenses as well as profit.

The surcharge programs the railroads employ are very distant from the actual costs they

incur. And this causes serious concerns about the accuracy of these programs. Based upon my more than 30 years of experience with price escalation issues, I find that if you are escalating a very volatile cost like fuel by an escalation method that is not closely related to the cost that's actually being incurred, you're going to get very inaccurate results.

The analysis that we've done on this demonstrates that's what's happening.

Ameren's code of fairness number two is that fuel pass-through mechanisms need to be transparent and that all parties needs to know what costs are included. We've heard that a lot here today.

Rail fuel surcharges are based on fuel costs in late 2001 and early 2002. As a result there are now a total of four years of escalation included in these programs. It is not clear why surcharge programs allow railroads to charge shippers for four years of escalation on top of current rates. But what we do know is that these surcharge programs are asking shippers to accept that none of the large rate

increases they have received since 2001 cover any portion of the increase in fuel expenses that have occurred in the last four years.

It is very difficult to accept this assumption without any type of documentation from railroads which demonstrate it's an accurate assumption.

From an analyst's standpoint, the greater the number of years of fuel escalation included in these surcharges, the less transparent these surcharges become.

In the future when we get even farther away from the base fuel cost and the surcharge, father away from 2001, this lack of transparency with these programs is going to increase.

Ameren's point of fairness number 3. The fuel surcharges should not allow over-recovery is in conflict with the railroad's fuel surcharge programs because these programs appear to double count the cost increases.

The fuel surcharge programs of railroads are essentially asking shippers to accept that

railroads are recovering the increased cost of expenses like labor and overhead through rate increases over the last four years but at the same time there is no recovery for the increased cost of fuel. This is very difficult to accept and it's a reason many shippers are concerned that fuel surcharges are double counting fuel cost increases.

Concerns about double counting of fuel increases are not being ameliorated by railroads as they have not provided anything to demonstrate the fuel cost increases since 2001 have been broken out from other expenses and removed from rates. Many shippers have incurred large rate increases over the last four years. This makes it hard to accept that none of these increases cover any portion of the railroad's increased cost of fuel.

Ameren's fourth and final point of fairness is that railroads should be expected to minimize their fuel expenses through hedging programs and prudent purchasing practices. Railroads like public utilities should have the obligation to keep costs down to the best of their abilities. This

includes utilizing a well thought out reasonable hedging program with both financial and physical hedging.

As substantial consumers of fuel oil, railroads are in a unique position of being able to perform large-scale physical hedging. And in many cases, they're already doing this.

As a consumer of the actual commodity, the railroad's ability to hedge is much better than that of a shipper and railroads should strive to maintain the lowest fuel cost possible.

In conclusion, Escalation Consultants finds that the current fuel surcharge programs are illogical and I must say also confusing. Our analysis also demonstrate that railroads are over-recovering their fuel cost for these programs.

This afternoon in the consultants' portion of this hearing, I'll demonstrate how that is happening and some numbers on that issue.

Also this afternoon our proposal on how railroads' reporting requirements should be adjusted to provide rail customers and regulators with better

information on carrier's fuel cost and the revenue collected through these surcharges will also be presented.

This concludes my testimony and I thank you for allowing me to address the Board on this issue today.

Thank you.

CHAIRMAN BUTTREY: Thank you, sir.

I thank the entire panel for being here today and for giving testimony in the hearing.

There seems to be a lot of interest among the shipper groups in finding some type of index which might be used for any type of analysis in the future. And I was wondering if there was any kind of unanimity out there on this panel about what that index might be?

There are those who say that coming up is some kind of nationwide index would not be appropriate because fuel prices fluctuate, because of the geographic differences around the country, nobody is convinced that of that apparently that are being afoot. I'd be interested in knowing what your

thoughts are on that.

MR. ROMAN: There is a proposal or a recommendation that we're making this afternoon which these surcharges are applied against revenue. And they're applied against revenue to generate the increase in money that the railroads need to recover their fuel expenses. So, you have this relationship between fuel expenses and revenue. There could be an index that would be foreign which would reflect that fuel expenses are a percentage of revenue.

And if that is formed into an index that change would be reflective of how--essentially, it would make sure that the railroads would be no better off or no worse off than they were before fuel costs actually increased. But I'll go into that more in the presentation this afternoon.

MR. CROWLEY: May I add to that?

I think in the presentation that I made, which seems like hours ago, we still--I had you choose graphs and the graphs measured the exchange in the index that is already published, the fuel component of the RCAF unadjusted, pretty well tracks the changes in

both BN's and UP's fuel costs. So, I think you have the mechanism in hand to track actual fuel cost changes.

MR. TELFER: Right, and from the auto industry, I think we would align with what Mr. Roman said with regard to some sort of an index that comes right from the railroad's actual costs. I think he's suggesting that the actual cost be used as a percentage of revenue and then track the fluctuation as a percentage. But adding to that, which maybe doesn't need to be added but I will, is that by no means that we would want to stay with the surcharge applied to the rate. So, while the index would be derived as a percentage fluctuation of fuel versus revenue, that doesn't mean that we would apply it to the revenue. But we would prefer to have it applied in some other measure such as ton miles.

CHAIRMAN BUTTREY: Mr. Neff, the grain shippers from this morning seems to think you're getting a pretty good deal on your fuel surcharge. I don't know if you were in the room or not, but they seem to think that you're coming out pretty good.

Apparently, there is a huge difference between the fuel surcharge that's being applied to grain and to coal.

Can you explain why that might be true?

MR. NEFF: No. We don't ship any grain. I wasn't really aware of the differences until this morning. We have mostly our coal rates, so I can't explain the difference.

CHAIRMAN BUTTREY: Does anybody have any remarks on that?

MR. PFOHL: I'll just add that we demonstrated in our testimony that the surcharges as applied to coal movements, the railroads are over-recovering. And so there may be a difference in degree of over-recovery, but certainly coal shippers do not believe they are getting a good deal under the current implementation of--

VICE CHAIRMAN MULVEY: Everything is relative, I suppose.

We've heard a lot of discussion about the methodologies and the fairness of the way fuel surcharge are calculated which would be the proper

indices, et cetera.

But in reading your testimonies, you also address the issues of the Board's authority. This is critical. What is the Board's authority in this area? There is some reference to the ICC’s Ex Parte 211 hearing. I think in that hearing the Commission was inclined to look at the RCAF as a way of getting at the increased fuel cost problem, rather than fuel surcharges.

And having said that, could you, and in most of your testimonies, did a very, very good job in addressing this issue of the Board's authority, comment on whether or not the Board has authority, whether or not this, in fact, is an unreasonable practice versus whether it's simply a rate issue and therefore if we're going to consider it, we should consider it in the context of a rate case?

MR. MOHL: From Entergy's perspective, we segregate what the base rate will consist of compared to fuel costs. And we think this fuel cost is an adjustment and not a rate that would come under your authority. And as both Mr. Neff and myself have

testified, this is not uncommon at all and we're simply looking for a reasonable way and a practical way to ensure the railroads get compensated for fuel and their base rate issues remain outside of your jurisdiction. But these adjustments legally, strongly come under your jurisdiction.

VICE CHAIRMAN MULVEY: Others on this issue?

MR. TELFER: I think, and again, I'm not a legal expert.

It is a critical issue and I think from the automotive perspective what we tried to state was that we enjoyed the environment that has existed in the last 25 years. We think that it's done a lot for the partnership between the automotive shippers and the railroads. And we want to continue with that arrangement with regard to rates.

However, the fuel surcharge has not been presented by the railroads as a rate issue, but simply a means of recovering this uncontrollable cost.

We support the recovery of that uncontrollable cost, but we question the methodology.

So, therefore, I would say it's not a rate negotiation issue, but more of a methodology issue that needs some oversight.

VICE CHAIRMAN MULVEY: Well, this afternoon or tonight we'll be discussing the issue as to whether or not there's a way to address this but there's a difference of opinion on how we should deal with it.

A number of you addressed some of the law. Both Mr. Buttrey and I have figured out that the precedent in this area is fairly thin. So, if you can cite some cases--

Mr. WILCOX: There are a couple of decision early on. It's, I guess, the Parrish Heimbecker cases. I'm sorry, I butchered the name, where there used to be the light density fuel surcharge, a commodity surcharge on, I guess, 1070520 or whatever, that was a statutory authorization for surcharges. Then that was repealed and I believe in one of those decision, the Board S&C then said that that authority has gone away, but the Board still has jurisdiction under 10702 for unreasonable practices.

I think you said something earlier that it depends on how it's assessed. And I think the cases are all over the map, but I think there is authority for treating, you know, the manner in which the actual mechanism does what it was represented to do, whether that's a reasonable practice or not.

And so it's sort of a bottom up analysis whether you can set standards that, in effect, will establish the level of the surcharge but really from the bottom up in terms of what are the correct parameters to establish.

VICE CHAIRMAN MULVEY: There's always the measure fairness or reasonableness. Everybody wants this to be fair but I'll try just to be reasonable and whether or not what the railroads are doing is a reasonable practice.

But if the railroads couldn't cross subsidize and we all recognize that the railroads are unable to levy fuel surcharge on all the traffic that they have because of contractual restrictions, therefore, if they could only level a cost-based-- special cost-based surcharges on the traffic they

could assess, they would have to eat, if you like, the other cost increases on most contracts where they couldn't. And we'll talk later about what percentage that is.

What would that do to the railroads bottom line and would that really hurt the railroads in terms of their ability to make the investments in the infrastructure that everybody is so concerned about, the capacity?

Where are the coal companies and the shipper and the utilities especially concerned about making investments in the Powder River Basin to make sure that their coal is flowing?

Would we compromise that if the railroads couldn't recover their total costs even if it meant some--

MR. CROWLEY: I don't think your premise is quite correct. You're assuming that all of the people that don't get this so-called fuel surcharge, all of the contracts that don't have a specific fuel surcharge are not paying the increased cost associated with the fuel. I think that basic premise is

incorrect.

I think I demonstrated this morning that if you have an RCAF or if you had any index in your contract, that is recognizing the increase in fuel, if it's the RCAF it's in the railroad industry. If it's a GDIPD or some other general commodity index, that recognizes the increases in fuel in the industry as well.

So, I think we're talking more about a timing issue than a recovery issue. I think the timing is --there's a slight difference in the timing between when the fuel surcharge is implemented and when the RCAF is implemented. But that's all it is. This doesn't compromise monies for investment and infrastructure at all.

VICE CHAIRMAN MULVEY: Well, the RCAF comes out quarterly. And I guess the rail fuel is available monthly.

Would it be possible to come up with some sort of new RCAF which would take into account the more current changes in fuel costs so we'd have, say an RCAF monthly fuel index or RCAF and--but a fourth

RCAF is you like. An RCAF MF which would have the monthly fuel costs adjustments along with the regular RCAF changes which come quarterly.

MR. CROWLEY: I don't think there's any problem with having a more frequent RCAF. I think that's something that can be done. But again I'm not sure that it's necessary.

In the development of a quarterly RCAF, the Association of American Railroads is forecasting what they think the fuel price will be and that is what you're basing your RCAF increase on. So,if their models are not correct in forecasting, then it's caught up in the next quarter. But if they're over-forecasting, they're over-recovering in that quarter.

So, to the extent we're talking about some slight noise here in the difference between what the forecast is and what the actual is for that particular quarter. But if you want to go more frequently, go more frequently but stay with what you have. It's working. Just make sure that it's implemented.

CHAIRMAN BUTTREY: Mr. Roman, maybe I heard this wrong, but there seemed to be some suggestion

this morning that there might be some way that these fuel surcharges could be calculated on a per car rate, depending on the commodity of the merchandise being shipped.

Is that something that makes sense to you? Maybe even the whole panel here. Is that something that might--

MR. ROMAN: Well, it depends. There's lots of things you can do that have the fuel surcharge based or that actual cost for the movement. And from a common standpoint, I mean, you would always like to have the method as closely related to the costs that are being incurred as possible. It's just a question of how much administrative time and effort is associated with developing that escalation method.

The railroads complained and said we don't want to have, you know a thousand different things that we need to administer around here. It certainly can be done. It's a question of the administration that it actually takes to do it.

CHAIRMAN BUTTREY: When you say administration, you're talking about the software

development?

MR. ROMAN: Well, the software development and it takes more people to do, you know, a thousand different ways than it takes to do one.

But I actually think this issue that we're addressing here and if you really want to solve this, there's really two problems.

One is the fuel surcharges the railroads are applying. And the other is, the Board really needs to have the information in front of them to really see how these provisions are performing.

And some of the things in determining what you actually want to have, I think you have to have the data in front of you to show how well they're performing. Because if you want to structure something that's more closely related to the change in cost, you need to know what's good and bad about the current fuel surcharges. As we've looked at is, you need the input. You need a certain amount of information for the Board to very quickly and easily analyze these programs. Once you know how these programs are performing, it's much easier to actually

develop what you actually want with these fuel surcharges.

And I look at a little of this as Tom was saying, maybe you can just use the RCAF. You can use existing things that are there.

But regardless of what you do use, I think if there's something that could be good to come out of this it would be that the Board would have the information they need to really have an educated assessment of how well these surcharges actually are performing.

And to me I thought out as the first step.

There's lots of things that can be developed, but if they're going to make it any better or they're going to be onerous, those kind of get knocked by the wayside for various reasons.

And so my presentation this afternoon gets into things that would be very helpful to the Board to really see, to make a better assessment of these programs and then go on from there.

VICE CHAIRMAN MULVEY: Yes, Mr. Telfer.

In your testimony you talked about the

fact that you were not a captive shipper. But isn't it true that the percentage of the automobiles moving out of your plant was about 40 percent when the exemption was granted to your industry as an exempt commodity compared to 75 percent today?

MR. TELFER: I'm not familiar with that statistic. And my tenure in transportation goes back to just after the implementation of the Stagers Act. So, my experience prior to that was in the plants and in the flow of materials in the plant.

However, going back the last 20 years, let's say. I don't think that our percentage of vehicles within my company that are shipped by rail has appreciably increased. I think it's been right around the 70 to 75 percent level. Whether that's changed substantially with other automotive shippers, I just don't know. Certainly, the importers who have, you know, several of our members are headquarters/transplants. And for those companies over that period of time they've migrated from importing a lot of their product which would have necessarily involved a lot of rail shipping from the

cost in, even though the costal areas are heavier marketed areas to shipping from domestic plants. And that, you know, warrants a whole different distribution pattern.

So, some of those kinds of things could be influencing that too.

VICE CHAIRMAN MULVEY: I am addressing the problem of double dipping. Mr. Crowley has suggested that the railroads today are pretty much fully recovering their increased cost of fuel through the RCAF. And that the fuel surcharges that they're receiving beyond that really are just going to the bottom line. And most of them are in excess of what fuel cost increases are.

Is that fair to say?

MR. CROWLEY: That's fair.

VICE CHAIRMAN MULVEY: Okay. Well, that's all I have then too for the time being.

Thank you very much.

CHAIRMAN BUTTREY: Thank you very much.

We have about 17 minutes until we are breaking for a lunch break. We're going to try to

keep that schedule. So, the next panel, which is the third panel, Concerned Captive Coal Shippers, Total Petrochemicals USA, Inc., Arkansas Electric Cooperative Corporation, Degussa Corporation, Potlatch Forest Product Corporation, Griffin Industries and Graniterock.

I'd just like to put the panel on notice, if we could, for housekeeping purposes here. We're probably going to have to break this into two pieces. Maybe not legally break it, but we're going to try to adjourn here at 12:00 or as close to 12:00 as we can comfortably do that and reconvene at 1:00. I'll put the panel on notice to that here.

We'll get as far as we can and then we'll break.

So, I'd like to welcome the panel to the Surface Transportation Board today and would you please, as we have been proceeding from my left to right, so if everybody is ready, we'll go ahead and start.

You may proceed.

MR. LOFTUS: Thank you, Chairman Buttrey

and Vice Chairman Mulvey.

My name is Michael Loftus. I'm appearing along with Mr. Heller on behalf of the Concerned Captive Coal Shippers group that have filed comments. The members of that group are listed in the comments.

I would like to make a few quick points and then turn it over to Mr. Heller.

First, we'd like to applaud the Board for initiating this proceeding on what is a very important issue for coal shippers as reflected in what you've already heard.

Second, we believe that the Board fairly has jurisdiction to deal with the reasonableness of the railroads' fuel adjustment mechanisms as rules and practices. We do not believe that an argument to the effect that the fuel surcharge has to be considered a part of the rate and can only be used as an issue relating to the reasonableness of the overall rate is a sound argument.

And I would direct your attention in that regard to pleadings filed by Norfolk Southern in Docket Number 42072, Carolina Power and Light Company

v. Norfolk Southern Railway Company. That issue arose as you may recall in the initial decision the Board found the rates to be unreasonable. And then an issue arose as to whether the fuel surcharge could be assessed on those rates.

And if you'll look at NS's filings on 10/4 and on June 18 on the fuel surcharge issue, you will see that they've characterized the fuel surcharge as a rule or practice and not as a part of the rate.

Third, we believe the Board correctly articulated the issue that you should be looking at in this matter and that is: Are the revenues being recovered through the fuel surcharge mechanisms, "directly and closely correlated to increases in the cost of fuel for the particular movement to which the surcharge is applied"?

We believe that is clearly the question you should be examining. And as Mr. Heller will address, we think it is very clear that the existing fuel surcharge mechanisms do not satisfy the standard.

Fifth, the Concerned Captive Coal Shippers group requests that the Board be clear in this

proceeding that to be reasonable, a fuel surcharge mechanism should satisfy the standard I referenced a moment ago. Second, you should give the railroads a reasonable period of time to develop conforming fuel surcharge mechanism. Then after that period has passed, you should on complaint disallow any fuel surcharge mechanism that does not conform to that standard.

And, finally, where is the Board to direct the railroad to report additional fuel-related data to the Board as we have set forth in our comments?

Thank you.

Mr. Heller.

MR. HELLER: Thank you, Chairman Buttrey and Vice Chairman Mulvey.

My statement specifically analyzes the manner in which fuel surcharges are currently being implemented for specific coal movements.

In my testimony, I've compared the incremental fuel costs incurred by specific railroads resulting from higher diesel fuel prices associated with specific movements to the incremental revenues

that they're receiving under the various fuel surcharge mechanisms for the coal traffic.

I performed this incremental cost verus incremental fuel surcharge revenue analysis to three typical coal movements from the period 2003 to 2005. One was an eastern movement. Two are western movements. One using the revenue based fuel surcharge mechanisms and the other using the BNSF mileage-based surcharge mechanisms.

Under each of these scenarios using typical rates and distances for coal movements, I show that the fuel surcharge significantly over-recovers the actual diesel fuel costs incurred by the railroads for each of these movements. That's similar to testimony you've heard from others.

In the case of the eastern movement on the Norfolk Southern, the recovery is 265 percent more than fuel surcharge revenue than it incurred in additional cost for the same period.

I know that BN has since decided to alter its approach as was discussed previously. It intends to embed the fuel surcharges into those rates.

Under the existing approach which provides a shipper with minimal data about the fuel surcharge over-collections, I don't now that this approach accomplishes anything much more than making it more difficult as was pointed out previously to assess what portion of the fuel surcharge revenue increases are recovered under other mechanisms versus the fuel surcharge mechanism.

In the case of the Burlington Northern using a revenue-based fuel surcharge mechanism in place during 2005, I calculated that the fuel surcharge generated 84 percent more revenue for a typical coal movement than BN incurred in increased diesel fuel costs.

I then did the same calculation using the BN implemented car mile mechanism, same movement parameters and found that the example coal movement recovered 127 percent more than fuel surcharge revenue of the movement incurred in diesel cost increases.

This doesn't imply that a car mile-based fuel surcharge mechanism will always recover more than one based on revenue. It depends on the rate levels,

the movement and the distances involved. But it does indicate that simply switching the form of the fuel surcharge does not necessarily remedy the over-recovery issue.

The level of the fuel surcharge even if it is based on parameters that more closely parallel the costs incurred in movement is important.

While the focus is on the fuel surcharge, it is important as Mr. Crowley pointed out to note that many railroad rates are also subject to the RCAF. In my paper I've shown the increase in the RCAF between the first quarters of 2003 and the fourth quarter of 2005. Over half of the RCAF increase during that period are a rate equivalent to 2.7 percent in the actual rate is driven by fuel price.

While the railroads focus seems to be on comparing the fuel surcharge revenues with changes in diesel costs, it's important to note that fuel surcharge is not now and never has been the only cost recovery mechanism for increases in fuel prices.

When measuring the relationship between revenues recovered by the carriers from the fuel based

cost adjustment mechanisms, it's important to consider the impact of the RCAF as well as the fuel surcharge.

Hedging has also been used by many of the carriers as discussed previously to mitigate the impact of diesel fuel price increases. I noted that some of the carriers' submissions before this panel specifically exclude the effects that hedging when we compare fuel surcharge recovery with increased diesel fuel costs. This will generally in the current environment cause the railroad comparisons to overstate the cost increases that they have incurred.

It also appears from various cites that I present in my paper the financial reports of the individual carriers as well as financial analyst reports during the last three years, some of the carriers took in more in fuel surcharge revenue than their increase in fuel costs.

As the carriers apply their fuel surcharge to a greater volume of coal traffic, carrying higher base rates as was pointed out previously, the effect of the fuel surcharge over time will likely be to accelerate the discrepancy between changes in diesel-

related movement cost and the fuel surcharges.

With regard to your question about reporting mechanisms, I recommend that the Board collect and make available to shippers data which would better demonstrate this relationship between revenue collected as a result of fuel price increases under both a fuel surcharge program and a diesel component of the RCAF or other cost recovery mechanisms as a prelude to considering exactly what form of fuel surcharge would better match movement specific revenues and costs. I'm not sure that data is available right now.

I present specifics in my paper on types of data that are needed for that.

The railroads' contention that movement specific cost analysis would be unwieldy, could be true if it was done with very granular data, but I don't think that's necessary. Whole spectrums of options exist between a percentage-based fuel surcharge and something that looks like a cost analysis.

A program, for example, that aligns

movements specific to fuel surcharge revenues and costs use metrics such as car miles or gross ton miles rather than revenue bases for assessing the fuel surcharge. However, as the BNSF examples shows, simply switching to a distance-based measure doesn't necessarily rectify the over-recovery problem.

Thank you for the opportunity to speak today.

CHAIRMAN BUTTREY: Thank you very much.

I think what we're going to do now is interrupt you right in the middle of these comments to break here for lunch and reconvene the hearing promptly at 1:00. Thank you very much.

(Whereupon, the hearing was recessed at 11:53 a.m. to reconvene at 1:00 p.m. this same day.)

A-F-T-E-R-N-O-O-N P-R-O-C-E-E-D-I-N-G-S

1:02 p.m.

CHAIRMAN BUTTREY: Welcome. Will the hearing come to order please? We're resuming our hearing we began this morning. Glad to see you all -- most of you all actually came back.

We were in the middle of the third panel,

Shipper panel. Mr. Slavin was about to speak when I hope kindly interrupted him so, we could take a break for lunch. We'll try to be as civil about this process as we can be. So, we'll resume with the third panel, Shipper panel, this afternoon.

Mr. Slavin, you may proceed whenever you're ready.

MR. SLAVIN: Chairman Buttrey, Vice Chairman Mulvey, thank you for this opportunity to speak on this issue.

My name's Dan Slavin. I'm the Rail Service Manager for Graniterock Company and I'm going to speak a little bit on the effects of the fuel surcharge program that we're currently using on Graniterock and the communities in which we operate.

A little bit as background, Graniterock's a 106-year-old family owned construction materials and general engineering contractor. In 1992, we were the recipient of the Malcolm Baldrich National Quality Award.

Graniterock has been doing business with the railroad for its entire 106 years as the very

foundation of the company was first centered around supplying railroad ballast to the railroads for expansion.

The company now supplies construction aggregates from Wilson Quarry near Watsonville, California to rail served locations from San Jose to San Francisco. Those are hauls from 40 to 90 miles.

These branch locations rely solely on the Union Pacific for daily rail service as congestion on highways and surrounding neighborhoods makes delivery of aggregates by truck impractical and undesired by local municipalities.

In the peak construction season, our rail shipments run between 90 and 115 rail cars per day. This averages out to anywhere between 11,000 and 18,000 rail cars per year.

The nation is again experiencing an unpredictable large increase in the cost of diesel fuel as we all know. The increased diesel expense is a fact of life that all American business must deal with and we believe that the use of a fair fuel surcharge program is an acceptable method for

recovering the unpredictable fuel cost increases. A fair fuel surcharge program only recovers the additional fuel expense and nothing more.

The current UP fuel surcharge is rate based using the national HDL average. We're unhappy with this program as implemented because we believe it over collects the actual fuel increase for our rail movements.

Taking 2001 as a base year, our analysis of railroad data indicates that for the combined 2004/2005 period Graniterock overpaid the additional fuel expense by over $240,000. In other words, the fuel surcharge was about 26 percent greater than required to recover the additional expense.

We believe that not all rail customers are paying the fuel surcharges. This practice, we believe, is a form of discriminatory pricing.

A recent Wall Street Journal article reported, the article was in the April 18th edition of this year, that the UP says it spent 1.38 billion more on fuel last year than it collected in fuel surcharge revenue partly because some long-term contracts lack

surcharges.

This is consistent with the fact that the surcharges -- fact that the surcharges exceed the increased fuel cost, but at the end of the year, UP's financial disclosures indicate that the amount collected is not sufficient to cover fuel costs. Therefore, clearly, not all customers are paying the charge.

It appears that captive rail customers like Graniterock are forced to pay an excessive fuel surcharge to compensate for larger noncompetitive, non-captive shippers that are unwilling to pay the additional surcharge or have contracts. We believe this is unfair and must be corrected.

Excessive fuel charges coupled with higher than justifiable rate increases over the past two years are forcing freight back on to already congested highways and neighborhoods. This trend is not working in favor of American business and the American public.

The railroads must treat all shippers fairly. This includes captive shippers. A fuel surcharge must only collect the increased fuel expense

for that shipper and nothing more. Captive shippers should not be expected to pay the surcharges the railroad cannot collect from larger non-captive shippers.

We seek the STB to intercede for all rail shippers to insure that railroads design and implement fuel surcharge programs that fairly recover only additional fuel expense for their rail movements. Captive rail shippers should not be held hostage to pay the expenses incurred by larger non-captive shippers.

Please note that Graniterock is charging its customers a surcharge on diesel fuel, asphalt used in our hot mix and other products that use petroleum products. However, these products are -- these surcharges are sufficient to cover only our increased costs and are not used to supply another source of profit. Not only do we believe that this is fair, but in our competitive business, no other surcharge method has been acceptable to our customers

And just in summary, re-stressing some of the points other speakers have made this morning,

surcharges must be cost based, transparent and subject to oversight and thank you for this opportunity to speak.

CHAIRMAN BUTTREY: Thank you. Mr. Sharp.

MR. SHARP: Thank you, Chairman Buttrey and Vice Chairman Mulvey for the opportunity to address this issue before you today.

I am Steve Sharp with Arkansas Electric Cooperative. We own parts of three coal-fired plants in Arkansas that all burn Powder River Basin coal. So, obviously, our interest is in shipment of coal out of the PRB and I would invite you, Chairman Buttrey, if you've never fished in Arkansas, we've got some wonderful fishing. Especially trout fishing on the White River. It's really -- if you've never done that, really it's -- it's really --

CHAIRMAN BUTTREY: Actually, I have done that. Very successful.

MR. SHARP: I can tell you're a true fisherman if you done --

CHAIRMAN BUTTREY: I spent 22 years in Memphis. So, close enough.

MR. SHARP: Oh, you were close by. Very good.

From our standpoint, I'm just going to go very quickly over some highlights. We have submitted testimony. With your permission when I get done, I've got another piece that we'd like to submit to the Board after today that actually I just got -- just got completed last night. I'll just go very quickly.

From our standpoint, the fuel surcharge issue is a perfect example of what happens when you don't have an open competitive market for freight transportation. To our way of thinking, that's a lot of why we got to this point.

We've got no problem with the concept of recovering unforeseen fuel costs in the type of tariff environment that the railroads are pushing towards, but we've seeing this implemented on a unilateral basis, you know, without input from the customers and like I say, we've already seen a couple of them change the system that they implemented not too long ago which there again is another indication that this wasn't necessarily well thought out and properly

constructed system to begin with.

And we do have concerns that in a lot of the instances cost of these fuels and even indices are even being applied to the cost of these fuels that were meant -- originally at least meant to account for cost increases in the fuel. That there may be some double dipping in some of the cost going on.

But, we've also got a concern that as the Board looks at ways of improving this fuel surcharge situation that we retain some element of encouraging increased efficiency and increased productivity with the railroads. There's -- we've got a little bit of concern if the railroads are totally divorced from the fuel cost and the -- even the rate at which they're consuming fuel, that there will no longer be an incentive to push for higher efficiency locomotives and that sort of thing. We'd like for that to be preserved in this process if it's at all possible.

Another issue that I hadn't heard mentioned a lot this morning and starting back this afternoon, the highway diesel fuel that both UP and BNSF use to index their fuel surcharges through is in

our thinking not a perfect way of doing this certainly and others have spoken to some problems with it, but our attorneys discovered that this is going to get a little worse even as soon as this fall.

The on-highway diesel fuel operators are going to be required this fall to comply with some new EPA requirements to phase in ultra-low sulfur diesel fuel for highway use. That is going to cause an increase in over-the-highway diesel costs. It's not going to have any effect on the diesel that the railroads purchase.

So, this is going to further disconnect. The railroads do have to convert to this low -- ultra-low sulfur diesel fuel, but not until 2012. So, there again, we would urge the Board to consider some way of disconnecting this highway diesel fuel index from the fuel surcharges before it gets even further out of kilter.

And the other category that I'd like to emphasize which some people have mentioned, but to our way of thinking, the effect that these fuel surcharges will have on -- is having and will continue to have in

the future captive shippers, something that we're particularly sensitive to.

One of our large coal-burning plants is completely captive to the UP and, therefore, pays a higher rate to get that coal delivered to that plant and as long as these fuel surcharges are being applied to the rate and not to something that better appropriates what the actual fuel cost is, the captive shippers who are already paying higher rates because of their captivity and because of the situation that we find ourselves in with the railroads are just going to be hurt worse because it's that multiplying escalating affect that several people have already talked about and so, we would like to see -- we would like to see a different mechanism that did not -- does not apply to the entire rate.

In -- in part in response to the Board's request for this hearing, we did undertake to make an example of a couple of our plant situations and come up with some specific numbers that we thought would represent the railroad's fuel cost, the increase in their fuel cost and the increase that -- in revenue

that they're going to get under the surcharge amount and that's the work I was referring to that was just finished last night and we'll submit that with the Board's approval. So, you will have that and everyone will have access to.

But, very briefly and this is our Independence plant in Arkansas and our White Bluff plant in Arkansas and this analysis was done by a consultant of ours and we did not use any confidential data at all. This is all using public numbers trying to come up with estimates for what the actual fuel cost was and what the surcharges would do.

In the case of the Independence plant, the fuel surcharge mechanisms over collect by $8,000 per train. Now, this plant takes approximately 375 trains a year. It's a little more than one a day. So, that would result in an excess fuel revenue collection of $3 million a year just for that one plant. Just for that one power plant in Arkansas and we believe this is a very conservative estimate and you can judge that for yourself when you see the numbers.

The other plant that we did the study for

the White Bluff plant, it is in somewhat of a competitive rail situation with Burlington over there in UP.

The analysis of their different fuel surcharge mechanisms showed that as far as over collection per train, they're over collecting almost -- would over collect almost the same amount under the different fuel charges -- fuel surcharge mechanisms of about $4,000 per train.

So, at that plant using this conservative method, it's about $1.5 million per year of over collection. So, we will submit that.

And there again, I appreciate the chance to present these comments and our written testimony and be able to answer questions at the end of day one.

CHAIRMAN BUTTREY: Thank you and those have been read.

MR. SHARP: Thank you.

MS. ELHAKIM: Chairman Buttrey, Vice Chairman Mulvey, my name is Diane Elhakim and I'm the Logistics Manager for Degussa Corporation based in Parsippany, New Jersey and I'd like to thank you for

giving me the opportunity to speak to you today.

This morning we heard individuals speak for many shippers and associations represent entire industries.

I am a shipper. I am a shipper and one of Degussa's core businesses is chemical and not only am I a chemical shipper, I am a captive chemical shipper.

And this morning, we heard about the practice of the railroads in assessing fuel surcharges as a percentage of the rate and historically chemical rates, presently and historically, are assessed some of the highest rates in the rail industry and the captivity factor adds to that.

So, I have submitted written testimony. In the interest of time, I just want to briefly touch on the focus of my testimony being that the unfairness and unreasonableness of the fuel surcharge being assessed as a percentage of the rate.

Speaking to you as an individual shipper today, I would just like to make a case in point. Degussa Corporation has embarked on a major project which involves millions of dollars, the construction

of a plant, the procurement of a rail fleet which is no easy feat today given the long wait for cars. It was my task to procure a long-term rail contract for this move and I had in my hand an offer for a five-year contract with escalation factors based on indexes, the RCAF, for four years after the initial term.

After a short absence from the office, I came back to find my voicemail full of people on the project saying that the railroads had pulled back their offer. It was in the process of being executed, the contract and when I inquired about it, it was true. The railroad had pulled back their offer and reclassified my product as a PIH which is poison by inhalation and instead of a five-year contract, the new offer was a six-month contract with a 220 percent increase on the original rate offered and likewise, the fuel surcharge was increased by 220 percent.

Now, the characteristics of moving this shipment had no bearing on the cost of fuel. It was still a 58,000 pound tank car hauling 180,000 pounds of a liquid commodity and yet, due to this change, all

things being equal in today's market, that would have added an additional $150,000 per year over and above the original fuel surcharge.

Now, is this fair? Absolutely not.

The other situation I would like to talk about is that I can ask for a rate today, today and I will be given say a rate of $3,000 per car plus fuel surcharge. But, the fuel surcharge is based on a 2002 index and I have to think and I do believe that in the railroad's initial rate offer to me, that they take into consideration their current costs. They might be lagging behind a little bit, but I sincerely doubt that it's four years and if that's the case, thank God, Degussa isn't behind four years on my paycheck.

One of the key bench marks used today is the revenue to variable cost analysis and the STB places the threshold for rate reasonableness at 180 percent over the railroad's variable cost. Due to the great fluctuation in this variable cost as it is today, I'm wondering if the fuel surcharge is flying under the radar.

It was mentioned before. Is the fuel

surcharge a rate or a practice? And it could be argued both ways in several different ways depending on the situation and the interpretation.

For example, if a fuel surcharge can be negotiated, to me, that's a rate. If a fuel surcharge is applied based on a given scale across all commodities, that's a practice and again, it could be argued by different people different ways depending on the situation and the interpretation.

In speaking to you as an individual shipper today, I am not here seeking restitution. I say let the past stay in the past. I railroads for years have been deemed revenue inadequate and with the prosperous economy over the last two years and the record volumes that the railroads are handling, capacity issues, dwell times have been a problem for shippers as well as railroads.

With the increased revenues that the railroads have been receiving over the last two years, I think that this is a good thing regardless of how they got it because they've announced collectively $8 billion in infrastructure improvements which include

double and triple tracking, main corridors, expanding yards, adding locomotives, hiring trainmen and crews.

In today's economy with the congestion both in the intermodal business and carload business because even though they're two modes, they share the same tracks. I think this is a good thing and it benefits the shippers in the long run.

However, moving forward, I think there must be a change in the way the railroads are calculating their fuel surcharges. Fuel surcharges are rampant. The fuel costs themselves are extremely high and I don't think they're going any higher. All the reports I've seen, they're not going any lower either.

So, I hereby request that the Surface Transportation Board investigate the method and calculation by which the railroads are applying fuel surcharges. I personally commend those railroads who are attempting and I say attempting to implement a mileage-based fuel surcharge based on a fair scale. It's a first step towards a change that is long overdue.

And I also want to commend the Surface Transportation Board for allowing this hearing to bring this issue forward. Thank you very much.

CHAIRMAN BUTTREY: Thank you very much. Mr. Conway.

MR. CONWAY: Thank you, Chairman Buttrey and to Vice Chairman Mulvey.

My name is James Conway. I am Vice President of Sales and Marketing for Griffin Industries of Cold Spring, Kentucky.

Griffin Industries and this speaker would like to thank the Board for holding what we consider to be very important hearings on a very important topic and we'd also like to thank you for the opportunity to address the Board this afternoon in this session.

Griffin Industries is a 63-year-old family-owned company with 23 plants located in the southeast United States. By today's standards at least at this meeting, we would be considered a small company, but this subject is important to our owners and to our 1500 employees.

We process agricultural waste products into usable commodities such as fats, oils and dairy-feed ingredients. Until recently, we operated a fleet of over 500 tank, box and hopper-bottom cars to assist us in the delivery of our finished products.

Recently, we've had to decrease the size of our fleet by over 10 percent because of increasing cost of delivery by rail providers. It has, in fact, caused us to change the people to whom we do business with and in some cases, have even had to lose customers of a longstanding nature.

Now, we had earlier submitted our written testimony and it is not my intent today to repeat the entirety of that document, but I would like to address what I think are some important issues that are really pertinent to the fuel surcharge.

As energy costs continue to change the landscape of American business, one area that has been especially hard hit by those higher energy costs is agribusiness. Basic commodities which represent the vast majority of agribusiness are traditionally very inelastic to price changes. Many times increased

costs are absorbed by the producer rather than being passed through that maybe many other manufactured products can do. In fact, we sell on a delivered basis and we get all we can get, but we then absorb all increased costs.

Now, our company has had a longstanding partnership with many of the class one railroads in this country. We rely on their service and certainly we respect their right to earn a fair and reasonable profit for the service they provide, but we are also aware that they operate at a somewhat different competitive environment than many companies do.

As a customer, Griffin does not have the ability to change rail suppliers at its individual plant locations. We are locked in to the road that services that particular area and under that circumstance, it is imperative that regulations exist for the fair treatment of unusual cost events.

Now, with particular reference to the current practice of adding fuel surcharges to the base rates, I have four specific concerns that I'd like to express to the Board and I'd like to take just a few

moments to expand on each of them.

First of all, we have been subjected to significant base-rate increases over each of the past few years. In fact, in the written testimony I submitted earlier, I cited that our average base rate went up 17½ percent in 2005 versus 2004 and these were on the heels of substantial increases in base rates both in '04 and '03.

Now, in all cases, these rate increases utilized the RCAF to calculate what those should be and as has been clearly demonstrated and testified earlier today, in our opinion, RCAF does, in fact, include the increased cost of fuel as part of its adjustment factor. In very simple terms, the increased fuel costs have already been factored into the base rates before any surcharge is added.

Number two, we do object to the fact that the fuel surcharge is calculated on the total of the base rate. In other words, the surcharge is calculated on that portion of the base rate that is designed to cover such things as labor, depreciation and other cost factors. All of this even though the

percent of the surcharge is calculated on the actual increase in fuel. If one accepts the need for a fuel surcharge, it should not be applied to the entirety of the base rate.

Number three, that surcharges that are used today are based on the price of number two diesel fuel that was established in the 1990s and on the arbitrary rate of $23 per barrel of crude oil. I would think that none of us would say that either of these two barometers are really relevant in today's economics. They are history.

This is especially true in consideration of the earlier contention that these increases had already been factored into the base rates. The railroad's contention that surcharges were only meant to be applicable for those temporary times that fuel costs are excessive is no longer applicable in today's real world economics. Higher fuel costs are a fact of life and have already been factored in to most base rates as I can determine and should no longer be a vehicle for revenue enhancement.

In view of these objections, if one is to

accept the need for some type of increased fuel cost adjustment and as I said earlier we accept that fact, it should only be applied to the increases in true fuel costs since the last contract or the last tariff rate has been established. This would allow for true fuel cost increases relative to a specific rate and we implore the Board to consider this as a specific recommendation in future handling of fuel surcharges after recent or most recent base-rate changes have occurred.

Mr. Chairman, I would again like to thank the Board for giving Griffin Industries the opportunity to present our side of this important issue.

Please understand that we do not seek special treatment nor do we expect the nation's railroads to subsidize our business. We do ask that increased fuel costs be handled in a fair and reasonable manner, that if surcharges are truly needed that they be transparent, open and market driven, maybe you've heard that before today, and not used to exploit a captive customer's base that rely on the

service and the function of these companies.

We look forward to a fair and reasonable action by this Board in this important issue.

Thank you for your time.

CHAIRMAN BUTTREY: Thank you very much, sir.

MR. WEISEL: Mr. Chairman, Mr. Vice Chairman, I wish I could sit here and say I agree with all my colleagues to the right, but I'll go through my process.

I'm from Idaho and I'm glad there's other people from Idaho, Montana and Eastern Washington. Hopefully, there's nothing wrong with the water out there. So, we're just trying to get through a lot of processes.

I'm Dave Weisel. I'm Director of Distribution for Potlatch Forest Products.

I'll give you a little bit of history. Potlatch celebrated their 100 years in 2003 and we're a forest products, lumber, particle board, paper, consumer products company and we got plants obviously around the 1.5 million acre trees in Arkansas, Idaho

and Minnesota.

We have fuel surcharges in barges, motor carriers, ocean carriers that we use as well as rafts. So, it's not that we're against fuel surcharges. We have them and we understand that the carriers have to get their compensation for out of pocket cost, but doing it on applying the surcharges on the freight rate rather than seeking payment of the increase in the price paid for the consumed fuel, we believe is over compensating and an unreasonable practice.

And Potlatch is convinced that the surcharges that they have no more than reimburse the railroads for higher fuel costs they are incurring and they are not, in fact, establishing a profit center and we have seen nothing from the railroads as data to show us that the fuel surcharges are reasonable or explains why there should be such a wide disparity in the surcharges they are assessing particularly when a lot of them are pegged on the West Texas Intermediate Crude.

And you have a lot of formulas that recognize that the Surface Transportation Board is

going to have a very difficult job in coming up with a reasonable, transparent type of program that we can all sit down and figure out, but I -- however, I would say I've got a pretty difficult job or these companies do of explaining this to our senior management.

I mean to give you a perfect example of something that transpired not too long ago, they said well, Dave, what are some of these guys pegging it on and I said well, West Texas Intermediate Crude. Well, some of them who even alluded that today it's such volatility that you can't budget for it. It does nothing to explain what's consumed. It does nothing to explain what's reasonable. It does nothing to explain where you're going in the future.

So, I do say the BNSF and their mileage program was a good attempt to get it on something that we all recognize. As somebody explained here this morning, you can recognize a car going a thousand miles is going to consume more than a car going 500 miles. So, you can explain that, but explaining some of this is pretty difficult.

If you take the motor carrier as an

example and I understand that's not rail, but you can take a motor carrier and you take the current fuel price and the base fuel price and the divide the result by the average miles per gallon efficiency for a truck. This results in a close approximation of the additional expense. The truck transportation actually incurs due to the increased fuel cost.

For example, where you can relate to, five/six miles per gallon increase in fuel costs for a truck that averages six miles per gallon or results in one cent per mile surcharge. You can relate to that.

And this is the reason we're looking at a cost-based fuel program that can be applied to all railroads. That way, we know what we're paying for. We know what's reasonable and we can track back pending the indexes and the data is relevant where we're going.

I did give you a handout. I'll just take a short moment of explaining what that is. We are not presently on the BNSF mileage program. So, that's the first thing I got to explain, but if you took these

movements Prescott to Dallas, the current rail program under the current fuel surcharges at 223 miles, we'd be paying $347 in fuel surcharge and you can equate that to a thousand board feet per car and a thousand board feet per car of fuel surcharge.

If you take longer miles, Lewiston to Chicago of 1743 miles, you're presently paying $602 or $622.

If you took the BNSF mileage program for the same 1743 miles, you're paying $575 fuel surcharge. If you take the bottom one -- next to the bottom one, Gwinn, Michigan to Mobile, Alabama of 1220 miles, you're paying $394 under the present program. Under the BNSF program, you're paying $403 fuel surcharge.

Under a Rule 11, Lewiston to Kingston, Pennsylvania for a 2413 mile movement, you're paying $1,093 and if you break that out portion-wise, BNSF portion, Lewiston to Chicago, 1743 miles, you're paying $622 and the NS portion for lesser miles from Chicago to beyond of 670 miles, you're paying $471. The total BNSF mileage program for 2413 miles is $796

and if you take what the -- even the railroads are looking at this thing.

And I know it's in a Wall Street Journal article, but if you allow me to read this, it was in the May 8th Wall Street Journal and it says "At last, there's a way to get 410 miles per gallon and at Norfolk Southern, we're conscientious at the pump. We're always working to increase capacity while using less fuel. From improved infrastructure and shorter miles to on-board computers, we are able to accomplish an efficiency unimaginable just a few years ago. Today, we can move a ton of freight an average of 410 miles on just one gallon of diesel fuel. Mileage that keeps America economy strong.’’

And I would have to say that, you know, we just have to take a reasonable and transparent and willing to work with the Board on anything that we need to work on to be able to explain ourselves at the end of the day.

Thank you, Mr. Chairman, Vice Chairman.

CHAIRMAN BUTTREY: Thanks to all of you for your testimony.

The carriers are required under SEC rules to file a great deal of data concerning the internal workings of the individual companies and there's been a lot made here about the issue of transparency.

What is it that you would expect to get on this transparency issue from the carrier that's not already available in their SEC files? That they would be able to let out into the public domain so to speak without being too proprietary.

MR. WEISEL: Well, I think there are elements of fuel or data of fuel that they submit already to the STB and so, I guess what we'd like to see is we can equate miles to miles, but, you know, and you can even do test programs of figuring out okay, are we compensating. Sort of like we do intra. The motor carriers come back to us and say, you know, we got to adjust the miles per gallon because we're not getting that and they can prove that to us on the trucks themselves. We give them that additional increase.

So, it's a data exchange of reasonableness and you can equate it back to something that you can

take to your upper management and say well, I'm changing from six miles per gallon to five and a half miles per gallon because they've proved to me that's what they're getting.

So, I guess I would say I'm not smart enough to know what data's out there, but there must be data out there because this article. Obviously, I don't know where they -- that's marketing grant it, but there must be data available to know what you can move a ton of freight, you know, a mile.

CHAIRMAN BUTTREY: Anyone else?

MR. LOFTUS: Mr. Chairman, I think there is one more member of this panel that hasn't spoken yet.

MR. POCSIK: Total Petrochemicals, sir.

MR. LOFTUS: We can come up after these people are finished if you like or we can do it now. Whatever you like, Mr. Chairman.

CHAIRMAN BUTTREY: I'm sorry. You weren't sitting up at the table there. You probably need to get your testimony in the record right away here before we proceed further with questions.

I apologize for overlooking you.

MR. LOFTUS: That's all right.

CHAIRMAN BUTTREY: I'm sorry.

MR. POCSIK: There's a lot of interest in this topic for sure.

CHAIRMAN BUTTREY: You may proceed.

MR. POCSIK: Good afternoon, Chairman Buttrey and Vice Chairman Mulvey. I appreciate the opportunity to appear before you.

My name is Steve Pocsik and I'm Vice President of Supply Chain for Total Petrochemicals USA, Inc. or as we refer to it, TPI.

With me is our counsel, Michael McBride, who will address legal issues with respect to your authority over fuel surcharges.

I should start by saying that TPI is owned by the fourth largest oil company in the world, Total SA.

TPI is a part of the Petrochemicals Branch at Total SA and we manufacture and sell petrochemicals and plastic.

Our concern with this important issue is

primarily related to the four to five billion pounds of plastic pellets we produce each year and our reliance on the railroads to transport our product throughout North America.

Now, although TPI is owned by an oil company, the Petrochemicals Branch is operated independently and is expected to stand on its own as a profitable financial venture. It not the intention of Total SA to subsidize its different divisions and, in fact, being focused on financial performance, Total SA is not required to own a petrochemical business in order to be profitable. One can validate this by looking at some competing oil companies who have chosen to spin off their petrochemical divisions. Two examples include BP which spun off its petrochemical business into what is now known as Ineos and Shell which spun off part of its petrochemical business into Basell.

Understanding that perspective, I hope you understand that as a major consumer of energy, energy which is not subsidized, we at TPI do understand what rising fuel costs mean to the bottom line. Fuel is as

much a cost to TPI as it is the railroads.

I wish I could say that the plastics industry has the market power that the railroads have. If we did, then perhaps we could pass on to our customers the rising cost of fuel in the form of a fuel surcharge.

We're making a commodity, plastic pellets. Being in an intensely competitive business and fully subject to the anti-trust laws of the United States, my industry has to fight rising fuel costs not with unilaterally imposed fuel surcharges, but with improvements in efficiency.

Having said that, we can understand the basis for a fuel surcharge and since it is being imposed unilaterally and with discipline by the railroads, we have to accept the reality of fuel surcharges.

What we don't understand is the logic that is applied to the calculation method and the lack of transparency and, therefore, understanding as to whether or not these fuel surcharges are simply covering increases in actual fuel costs or whether the

fuel surcharges are padding the pockets of the railroads with additional profits.

For us at TPI, the issue at hand is simple. We ship more than 20,000 hopper cars a year by rail. The rail mode is essential to us. At origin, one-third of our business is captive to a single railroad and at destination, more than half are captive to a single railroad and I point this out because current fuel surcharges as we've heard all morning are based on percentage of the rate that we've had and we all know that captive shippers pay anywhere from two to four times what shippers who have choice pay.

So, calculating the fuel surcharge as a function of the base rate means that for equivalent routes our captive ones pay two to four times as much as those routes that are competitively served. This pricing methodology is illogical and unfair.

The rates we pay in our current agreements have embedded in them the cost of fuel at some price. We know that is true or railroads would have been sharing fuel surcharges from the beginning. Instead,

they began to impose surcharges as fuel prices began to rapidly increase over the last few years.

Our question is this. Are railroad fuel surcharges designed to recover the cost increase relative to the base price or the entire cost of fuel?

We are quite confident based on Wall Street reports that some double dipping is occurring. We are unsure of the extent to which this may be occurring specific to TPI due to the lack of transparency in reporting from the railroads.

It's unclear as to how the fuel surcharge as collected relates to the fuel that is consumed on our routes. By definition though, a fuel surcharge is a function of the rate and TPI's rates have less to do with mileage and more to do with whether routes are closed to a single railroad or competitively served. We can be certain that TPI is paying more than its share for the cost of fuel.

Only if a fuel surcharge is based on mileage or other proximity for actual fuel costs incurred could the methodology be fair.

As a shipper, what do I think is fair? We

expect any fuel surcharge to be based on fuel consumption. More specifically, a fuel surcharge should be based on the actual fuel that is consumed for the ton miles related to our traffic. That means it should not be based on West Texas Intermediate or even highway diesel costs.

Moreover, we expect it to be based on unexpected price increases relative to the base price of fuel that's in the current rate structure. If the price of fuel decreases below the base and we're using a fuel surcharge methodology, we should get a credit.

In summary, we expect the fuel surcharges to be revenue neutral, to be based on fuel consumption for our specific routes and we expect open and transparent reporting of the accounting related to fuel surcharges.

Thank you very much for this opportunity to appear before you.

MR. MCBRIDE: Mr. Chairman, Mr. Vice Chairman, members of the staff, I am Michael McBride.

Let me begin and if I don't conclude within the time allotted on this panel, I am on the

next panel and I'll complete the legal argument on the next panel.

In any event, I want to begin by saying that the question is not whether the railroads are fully recovering their costs through their fuel surcharges. That seemingly has been the question that some people have posed today.

The question ought to be whether the railroads are recovering all of their fuel costs.

Total is in favor of the railroads being able to recover all of their costs, but they do recover fuel costs already in their base rates as Mr. Pocsik has just indicated and through RCAF or other indexed adjustments. So, the question ought to be in addition, thereto, whether they are over recovering for their fuel costs by imposing fuel surcharges as well.

Now, this is not just a semantic dispute because it goes to the heart of your authority. It is not as if the railroads say these are rates and the shippers say these are practices and what's a fellow to do.

Rather the fact is that the railroads say that they charge rates and the railroads then say and we charge fuel surcharges. They, in fact, charge fuel surcharges sometimes in separate invoices or at least as a separate line item on the same invoice.

Therefore, this is an admission against interest that a fuel surcharge is not a rate and as Mr. Loftus already indicated by admission through filings with this Board, Norfolk Southern has called surcharges rules for practices.

Therefore, by definition, the limitations on your authority over rates do not apply to separate charges that they call something other than a rate. This disposes of the Union Pacific versus ICC case cited in your notice. I should know. I argued that case on the side of the Board. That case was a challenge to rates. We alleged market dominance. The ICC did not make a finding of market dominance and all the court held was the ICC had to find market dominance when rates were being challenged. That is the extent of the holding in that case and it has nothing, therefore, to do with fuel surcharges.

We did not indicate -- understand that the Board wanted to adjudicate now whether the exact level of any surcharge was unreasonable and Vice Chairman Mulvey, I do concede the question is whether it is reasonable or unreasonable.

But, we have proffered some evidence, some is attached to the Edison Electric Institute filing you'll be hearing about on the next panel. Others have pointed to a variety of Wall Street reports. There is plenty of evidence that the railroads are over recovering for their fuel costs.

I will be happy to provide additional Wall Street reports if you want them and need them, but I would want to observe that the Norfolk Southern advertisement that the gentleman just read to you from this Monday's Wall Street Journal demonstrates that by the railroad's admission, they are achieving great gains in railroad fuel efficiency and those are not reflected in any fuel surcharge mechanism that the railroads are imposing. Not one despite the differences in the railroad's fuel surcharge mechanisms.

There is a simple solution. If we're all grasping for how to solve the problem, the Board publishes the rail cost adjustment factor with productivity. That registers efficiency gains. As Mr. Crowley indicated, it's based on forecast prices. It's not a lagged index. It's a forecast index. If we want to return to first principles, you ought to say it is presumably reasonable to use the RCAF to adjust rates. Everything else may be subject to a complaint filed with the Board.

Thank you.

CHAIRMAN BUTTREY: Did that get everybody on this panel? I don't want to make the same mistake in the same hearing.

VICE CHAIRMAN MULVEY: I have one more here, but I guess --

CHAIRMAN BUTTREY: You what?

VICE CHAIRMAN MULVEY: I have one more testimony here, but --

CHAIRMAN BUTTREY: Do you have any questions you'd like to --

VICE CHAIRMAN MULVEY: Oh, yes, sure. I

have a follow up.

CHAIRMAN BUTTREY: Go ahead.

VICE CHAIRMAN MULVEY: Mr. McBride, I'll start with you.

One of the things we heard is that if indeed the fuel surcharge is a practice and it's deceptive because it's not really tied to the price of fuel, couldn't the railroads just turn around and say okay, we're going to call it our rate.'' We're going to increase the rates by X amount and that's the end of it.

MR. MCBRIDE: Well, there's been an announcement by one railroad that that's, in fact, what it's going to do. As somebody suggested earlier, that may be a function of the fact that you held this hearing and the shippers will have to deal with that if, in fact, that's what happens on July 1. That's Norfolk Southern as I think you know.

But, I would observe to you that your concern about the railroads raising adequate revenues to pay for the infrastructure that they need which you and I have discussed more than once and which concern

you and I share is not in anyway adversely affected by any action you might take on fuel surcharges. Because since 1980, there has been precious little limitation on railroad rate increases as we all know and if the railroads want to take rate increases and then face the possibility of a complaint or contractual action if there's a contractual limitation on that rate, then so be it. But, at least things would then be transparent and out in the open as to what they're doing.

But, there is no limitation on a railroad's ability to raise revenue. What the shippers are objecting to is that they have a rate whether it's agreed upon or otherwise and then the railroad says oh, and we're not recovering all of our fuel and so, we're going to surcharge for it separately and the shipper says well, show me you're not recovering all your fuel cost and the railroad says no and you've heard that over and over again and that's the problem and there is only one entity in America that can do anything about it and that's you.

VICE CHAIRMAN MULVEY: We need the data to

do that.

MR. MCBRIDE: Absolutely, you can't regulate intelligently without the data.

CHAIRMAN BUTTREY: The article that I read about Norfolk Southern was a little confusing to me about how this rate would kick in. On first blush anyway, it would appear that there would be an inclusion of part of the fuel cost increase in the rate. Then there would be -- at some point-- a new fuel surcharge that would then kick in at a much lower percentage. So, it's a little bit of both. It's not just one or the other.

MR. MCBRIDE: That is true, but there's some curious things about it, too and we might hear more from them later because I obviously don't speak for them and I don't know with certainty how they're going to do it even. But, the clients are confused. I can tell you that.

But, here's what we seem to know. Norfolk Southern has said that the current surcharge was based on some much lower number, 23, 25, $28 a barrel whatever it was. Fuel prices have now raised them to

a much higher level as we all know.

Therefore, they say we're going to reset the rates at the $64 per barrel price, but the curious thing was that when they said that crude oil prices were much higher than $64 a barrel. So, where did $64 come from.

One of my clients suggested that it must have been the number they had in their budget, but there's no relationship to any actual cost of fuel at the time they did that and they've not provided any forecast that oil prices are going to be at $64 on July 1.

So, we start from a number that seems arbitrary and then secondly, they say they're going to raise rates, and the concern that a lot of people have is does that mean then that that becomes a floor.

So, that the concerns you've heard today about if fuel should go back down to say $40 to $50 a barrel, there won't be any corresponding reduction, means that it becomes a one-way mechanism if you have it and this agency and its predecessor have had experience with that.

When the RCAF started to go down in the mid-'80s, the agency ruled that rates should go down accordingly, that adjustment mechanisms should be used to recover costs and not become profit centers and so, we had some concerns about how the NS rate mechanism's going to work.

But, we have at least this much assurance, Mr. Chairman, that there may be some people who get an approved outcome from it because Norfolk Southern has been trying to surcharge on top of contractual rates that have adjustment for the RCAF in them. If they're going to at least try to raise rates that they have a right to raise let's assume, at least, they won't be trying to surcharge one hopes rates that are already being adjusted for fuel.

So, it may be something of a mixed bag I'll concede that we have some very great concerns about and I think the arbitrariness of using something other than off-highway diesel using West Texas Intermediate or on-highway diesel which they don't burn instead of off-highway diesel which they do burn and then picking some arbitrary number like $64 a

barrel and using that as a floor perhaps, all lead to a lot of concerns in the shipping community that this whole fuel surcharge program is becoming a profit center and that we object to.

VICE CHAIRMAN MULVEY: The NS change may be similar to the BNSF change for the grain shipment and falls under the category be careful what you wish for. You may just get it.

With regard to Total, you were talking about the fact that between competitive and noncompetitive chemical traffic, obviously, the rates are different and, therefore, the fuel surcharges are different. Do you have any specific examples you can provide the Board as to whereas the movement and the weights, et cetera are roughly the same be it the fuel surcharge varies a lot because of the differences in the rates?

MR. POCSIK: Yes, in fact, we included that in our written testimony and if you would like more examples, we can provide more. We'd be pleased to do that.

VICE CHAIRMAN MULVEY: Thank you.

SPEAKER: I handed out several copies of the written testimony.

VICE CHAIRMAN MULVEY: Okay.

MR. POCSIK: We submitted separate written testimony.

VICE CHAIRMAN MULVEY: Thank you.

SPEAKER: Let me put it in the record.

VICE CHAIRMAN MULVEY: Thank you.

MR. POCSIK: Would you like more examples?

VICE CHAIRMAN MULVEY: No, I haven't looked at this one yet. I was looking at Mr. McBride's testimony. So, we did read most of this, but it was a lot to read I'll tell you.

Let me see. Mr. Heller, when you were calculating the fuel surcharges, how did you calculate them, the gross fuel surcharges? Were you doing the revenue calculations for the gross fuel surcharges? I mean there was some criticisms of the way they were done by a consultant for Escalation Incorporated in the sense that they were multiplying the fuel surcharges across all the traffic and not just for the traffic that pays them.

Did you do the same thing or were you more traffic specific in your estimates?

MR. HELLER: I was very traffic specific. The way I did this was to do an individual move and do the calculation relative to an individual move. So, I wasn't trying to presume that the railroads were, in fact, applying the surcharges across all their traffic.

The purpose of this was to illustrate. I just understood the question to be from an individual shipment. What would the effect of the revenue fuel surcharges be?

VICE CHAIRMAN MULVEY: Graniterock, you said you’re a captive shipper. You say that the railroads are engaged in discriminatory pricing, but the railroads are allowed to engage in price discrimination or random pricing. Isn't that so? So, why shouldn't they be allowed to differentially price the fuel surcharge if they can differentially price the traffic in general?

MR. SLAVIN: Well, you know, we feel that's basically just unfair. Whether they are

allowed to do so or not, it's, you know, it ought to be fair. It ought to be out in the open and --

VICE CHAIRMAN MULVEY: You said yes, it's not a rate? Because it's a practice not a price. It's not a rate.

MR. SLAVIN: We believe it's a practice.

VICE CHAIRMAN MULVEY: Okay. I have a question for the Arkansas Electric Company. What percent of the fuel surcharge increase is passed on ? How much does that affect your rates to your final customers? The fuel surcharge, as you say, costs you several millions of dollars, but in terms of the impact on the rate to the final electric consumers, how much is that?

MR. SHARP: Any increase we have in our fuel costs as a electric utility that's regulated in the state of Arkansas, that additional cost is passed on to our members.

VICE CHAIRMAN MULVEY: Um-hum.

MR. SHARP: So, you know, they pay every penny of it.

VICE CHAIRMAN MULVEY: But, how much is it

to the final consumer? I mean sometimes this comes down to pennies a month for individual consumers.

MR. SHARP: Oh, as a percentage?

VICE CHAIRMAN MULVEY: Yes.

MR. SHARP: I can get that. I didn't calculate it as a percentage.

VICE CHAIRMAN MULVEY: Okay. You noted that the fuel surcharge rate on coal was about 5 percent higher than on carload traffic, but wouldn't that be due to the fact that coal would be heavier and therefore, because of that, it might be more fuel intensive than carload traffic?

MR. SHARP: Well, there are quite a few differences between the way, as I understand it, like I say, we don't ship any carload grain traffic, but we are involved in a lot of coal and there are a lot of differences. There again, in the shipment of this coal, these are all unit trains that are kept whole as a unit. Typically, 135 cars for our use.

VICE CHAIRMAN MULVEY: Yes.

MR. SHARP: All of our coal comes from the Powder River Basin. Comes to the power plants in

Arkansas and I think the cars go straight back. So, you don't get this adding cars on, taking cars off and so forth. That unit train stays intact from Wyoming to Arkansas and back.

And from Wyoming to Arkansas, the loaded trains are coming in that direction. The elevations up in Wyoming are about 5,000 feet. In Arkansas, it's about 300 feet. So, you're going downhill. You're going downhill with loads and you're going uphill with the empties always, every trip and that saves fuel. I mean there's a big difference between just coasting a train downhill.

Now, obviously, there are areas where they got to go uphill and downhill, but the overall difference is downhill. So, it's going to take less energy.

Where a lot of your grain movements are east/west in nature and you don't see such a big difference in the elevation.

VICE CHAIRMAN MULVEY: That may explain some of the rate differences.

MR. SHARP: It could.

MR. LOFTUS: Vice Chairman Mulvey --

VICE CHAIRMAN MULVEY: Yes.

MR. LOFTUS: -- if I may, I'm on this panel. I just walked --

VICE CHAIRMAN MULVEY: I see.

MR. LOFTUS: Following Jim.

VICE CHAIRMAN MULVEY: He apologized for that.

MR. LOFTUS: If the thrust of your question, Vice Chairman Mulvey, is isn't there reason to believe that notwithstanding the differences the fuel surcharge on the coal traffic may be reasonably related to the incremental fuel cost, the answer is clearly no and that's been demonstrated in Mr. Heller's testimony, in the testimony of others and, in fact, although I haven't seen all the railroad statements, I'm not aware of any railroad suggesting that the fuel surcharge revenues are reasonably related to their increased costs for fuel on a movement-by-movement basis.

So, you know, and while I'm here, you know, you should disallow something that is claimed to

be a fuel cost surcharge if it's not and the fact that as you've pointed out in this environment, the railroads have the pricing power to turn around and increase the rates anyway. Maybe so, but then you know what you're dealing with. You're dealing with a profit margin increase as such and not under the pretext of a fuel cost recovery mechanism.

VICE CHAIRMAN MULVEY: As long as you're up there, do you want to say a few words also about the issue of whether or not this is a rate increase as opposed to a non-rate factor, a practice rather than a price?

MR. LOFTUS: I would. We clearly believe that the fuel surcharge mechanisms are not rates as that term is used in the statute and that they are a practice and as we noted when we spoke earlier, at least one railroad has so acknowledged in writing before this Board and so, we don't believe that this falls under your maximum rate jurisdiction. It falls rather under your jurisdiction over unreasonable rules or practices which you have the authority to set aside.

VICE CHAIRMAN MULVEY: Both the Chairman and I have both expressed some concern about what's out there in terms of precedent. I know that you've cited a number of cases, but are there any specific court or Board or ICC cases you can point us to that might be illustrative for us?

MR. LOFTUS: We would agree with you that authority is sparse in the area. We have in our written comments in the argument section provided the authorities we thought were relevant and I can't say that I can without getting it out and reading you some or do much better than what we've done in writing.

VICE CHAIRMAN MULVEY: Okay. Thank you.

MR. LOFTUS: Thank you.

VICE CHAIRMAN MULVEY: A question for Degussa. Are you limited in your ability to pass on these surcharges? Is the demand for your product relatively elastic with regard to competitors or substitute products?

MS. ELHAKIM: We are limited. Depending on our product line and the market, we are very limited in what we can pass along.

VICE CHAIRMAN MULVEY: Is there any threat to your survival as a business or --

MS. ELHAKIM: To some business units, but I don't want to blame that solely on the fuel surcharge. There are so many other factors affecting the business not just the rail industry.

VICE CHAIRMAN MULVEY: Um-hum.

MS. ELHAKIM: But, again, to some smaller businesses, I do see a threat not just for survival of the entire business, but it's forcing us to selectively decide who we're going to supply based on costs and market and availability.

In some instances, some of our products, we just can't produce them at any sort of -- make sort of profit on them.

VICE CHAIRMAN MULVEY: Thank you.

MS. ELHAKIM: And I'd like to address one of the questions you had posed before about providing examples --

VICE CHAIRMAN MULVEY: Um-hum.

MS. ELHAKIM: --- of different commodities. In my written testimony, I've given

exhibits from three railroads. And I do have other copies if you'd like them.

VICE CHAIRMAN MULVEY: Thank you.

CHAIRMAN BUTTREY: I don't think we have anything further for this panel. So, you're excused and we will take up the next panel.

The next panel for this afternoon is the panel of trade associations. We're expecting testimony from National Industrial Transportation League, the American Chemistry Council and from Edison Electric Institute.

Are there any other people on this panel that wish to testify? Anybody else want to be on this panel?

VICE CHAIRMAN MULVEY: Mr. McBride, are you coming back with the railroads also or are you --

CHAIRMAN BUTTREY: Mr. Ficker, are you ready to go?

MR. FICKER: Mr. Chairman, I have been ready to go from 9:00 this morning.

CHAIRMAN BUTTREY: We welcome this panel this afternoon. It looks like everybody in the

audience is eager to hear what you have to say and so, we'd like to have you proceed.

MR. FICKER: Well, thank you, Mr. Chairman, Mr. Vice Chairman. It's a pleasure to be here as always. The Board is a great place to share ideas about the important world of transportation.

You know us and we know you. We've been with you before on this very subject and we'll talk about that briefly. We've put in our written comments and today we'd like to expand on those comments slightly and we have a Power Point presentation to do that.

And to begin our presentation, I'd like to introduce our first Vice Chairman of the League who will be my boss next year Curt Warfel from Eka Chemicals of Atlanta, Georgia.

Curt.

MR. WARFEL: Thank you, John.

Chairman Buttrey, Vice Chairman Mulvey, the NIT League has a number of key positions relative to fuel surcharges. First off, we agree that a fuel surcharge properly structured and properly

administered is an appropriate method for recovering extraordinary and I'll say it again extraordinary increases in fuel cost. We believe that fuel surcharges which are based on freight cost, it says freight cost here, but really what we're saying is the amount of freight that's being paid creates significant inequities.

We believe that it's improper to rob from Peter to pay Paul and we firmly believe that the STB does have the authority oversee fuel surcharge programs.

Now, John's going to address each of these in a little more detail later on.

Now, while we do believe it is proper to use fuel surcharges to recover increased fuel cost, we ought to point out that there are at least two other means by which a carrier can recover fuel costs. Now, several carriers today have mentioned RCAF. Speakers have mentioned RCAF.

Perhaps more logically, a carrier could enter into shorter term contracts that enable them to recover the cost of fuel a little more quickly.

Now, the League thinks that a snapshot of a proper fuel surcharge program would contain these following elements. It would relate to the actual changes in fuel costs incurred to transport or ship the goods. It would not be revenue generating. It would recognize the differences in fuel costs for different types of rail service. Say, for example, from units running coal to merchandise traffic. It would use an index that accurately reflects a carrier's fuel costs and perhaps most importantly, it would reflect the true based fuel cost used to established a freight rate.

Now, on the other hand, what would an unreasonable fuel surcharge program look like? Well, it would be one that would charge customers -- some customers an excessive fuel surcharge to make up for not charging other customers a fuel surcharge period. It would be based on a percentage of the freight rate which as several speakers have already said today tends to create a significant inequity when looking at different commodity groups. It would use an index that tends to overcompensate the carrier for fuel cost

changes and it would apply the same fuel surcharge rate on price even those issued today that would presumably already have the higher cost of fuel built in.

Well, John's going to talk a little bit about the past history with the League.

MR. FICKER: You all know that we have been with you on this subject for almost two years now. We've come to the Board in 2004, met with the former chairman and talked to him. Along with National Grain and Feed and several other associations, we produced a study and we produced a series of recommendations.

We determined that the best approach was the private sector approach and we agreed to meet with key rail officials which we did and then we met with the Board after that to advise the Board of the effect of those particular meetings.

When we met with rail carriers, we presented to each rail carrier our study and our proposal. We have a proposal and we'll again share that with you today which we believe is a fair,

equitable and transparent proposal.

We would like to commend the BNSF, CN and CP to listening to the arguments that we made and the discussions we had about the unfairness of the current structure and taking some actions to address those things. We believe the actions were well intended and are moving in the right direction. We would probably like to see more.

We're disappointed, however, that the eastern carriers have chosen not to pay any attention to that.

Here is an example of some of the data that has been talked about today that shows over recovery. The green bar recognizes the increased fuel expense per car and the red bar is the actual fuel surcharge revenue per car and anyone can see that there's a significant over recovery out of rail carriers.

Also, it's been pointed out today, Vice Chairman Mulvey, you mentioned does anybody have specific rate examples. Well, here are some specific rate examples. This is the exact same ship, a boxcar,

150,000 pounds and the same origin, Eugene, Oregon to Chicago, Illinois, over the same route, BNSF. Four different commodities, grass seed, lumber, pulp and paper. Because of the rate, the grass seed fuel surcharge is $469 whereas the paper fuel surcharge is $849 which represents an 87 percent increase for the movement of the same product to the same origin from the same destination in exactly the same kind of car.

Now, Peter and Paul is an interesting theory that we've kind of espoused here and it's been talked about a little bit earlier today, but we'd like to elaborate on it if we could.

Some customers are not charged fuel surcharges and that's been clearly pointed out because they have contractual arrangements with railroads which preclude the application of fuel surcharges. That's all well and good. That was a commercial decision made by the parties, well, a long time ago.

And to charge Peter to pay for Paul, we think is wrong, unfair and unreasonable.

Differential pricing is permitted in rate making as Staggers clearly pointed out, but not in the

application of fuel surcharges and carriers should be held accountable for the commercial choices and decisions that they've made and one shipper should not be required to make up for the difference in another shipper. The Board should not be a place where the carriers can come and say to you gee, we can't collect this because of a commercial arrangement that we by the way signed and we hope that you would make that up for us.

There is some significant gaps in the world of fuel surcharges, too and this has been pointed out today. One of the questions earlier to the panels was what data is needed. It's difficult to understand the data that's out there in the carrier's report.

Fuel can well be fuel that's used for moving auto cars and for trucks moving around hauling parts and people to support the rail operations as well as the fuel that's used to haul freight cars and what we're talking about here is the fuel that's used to haul freight cars. We agree with everyone else that hedging should not be a component of this

discussion and there is virtually no data at all in the waybill sample that would allow you to really understand the fuel cost application that's in the approaches that the railroads take.

We believe clearly as Mike McBride pointed out earlier and I'm sure he let go again in a few minutes that the Board has clear jurisdiction in this area. This is clearly pointed out in the statute and ICC history is fairly clear on that subject.

And I'd like to ask Curt to kind of wrap things up.

MR. WARFEL: Basically, we feel there are two key actions which the Board should take.

One, you should order carriers to provide better and more complete fuel cost data and secondly, you should order each carrier to undertake a review of the fuel surcharge methodologies being used today, taking into account principles established in this hearing and further to have the carriers report back to the Board, the results of those findings within 90 days of the Board's order.

So, just to wrap things up here, I guess

if I could pretty much summarize what all the shippers which you've heard from so far have asked for, I mean basically what we're asking for is fairness transparency.

The Board has asked earlier today for a recommended fuel surcharge methodology. John has indicated one is in our proposal. I have copies here if you need them.

And I guess I'd just like to wrap up by again saying thank you for the opportunity to appear before you and thank you for having this hearing. It's a very important issue.

CHAIRMAN BUTTREY: Thank you very much. Mr. McBride.

MR. MCBRIDE: Mr. Chairman, Mr. Vice Chairman, I am standing in for Chuck Linderman this afternoon who was summoned away to deal with the difficult coal supply situation that the industry is facing and which has been given the highest attention as you may be aware.

I also wanted to take a moment since I won't use the full ten minutes since I'll be speaking

for both of us to say that I became aware during the hearing, Mr. Chairman, about the very sad news about one of your key staff members and I wanted to just say he's a friend and he is in our thoughts and prayers and I wish you would convey to his family the same sentiments that you did on behalf of the Board to them.

CHAIRMAN BUTTREY: Thank you.

MR. MCBRIDE: You're welcome.

Edison Electric Institute as I'm sure you know is the association of the investor-owned electric utility industry. Electric utilities as you've today actually have a higher percentage of their total cost in fuel than do the railroads. It would, therefore, be hypocritical to oppose cost recovery on the part of the railroads and obviously, we do not and like all the other shippers whether regulated or unregulated, no one wants to stand in the way of the railroads' being able to recover their costs.

That said, the railroads are in a unique situation. The utilities like other regulated companies have to answer to their regulators about

what their actual fuel costs are and as you heard some explain to you already today, fuel costs are treated entirely separately from the underlying rates and are looked at separately by the regulatory bodies and no utility is ever allowed to recover more than its fuel costs in the course of those separate fuel proceedings.

We think that's not just fair. That's reasonable and that's the law and that ought to be the law here, too.

Now, the railroads also like to say if a contract ever works out in their favor which sometimes they do, contracts sometimes work out in one party's favor, sometimes in the other, that a deal is a deal and we think that's right. We think that's the law and so, if they're under recovering on their contracts, a deal is a deal and the rest of the shippers shouldn't have to pay for that.

There are even railroads that have come before the Board and informed the Board that demand exceeds capacity on certain lines. Well, unless they're being irrational and they're not, the only

possible way that that could be true is if the rates are being held down because of contracts. So, that should not be the burden on the rest of the shipping community.

In any event, as for the law, I just want to supplement a few of the points that I made earlier for Total.

The statute is clear that if an unreasonable practice is involved instead of a rate, you do not have to find market dominance. Therefore, you would not have to proceed rate by rate making the kind of determinations that you do. You could take action of a more generic nature and I think that's what you're hearing the shipping community say to you uniformly. That some action of a uniform nature that is reasonable to the railroads and reasonable to the shippers.

Now, in terms of authority by the way, it may be interesting to know in addition to what I told you earlier that when Congress recodified the Interstate Commerce Act and the Interstate Commerce Commission Termination Act in 1995 it repealed a

provision of the existing statute former Section 10707(a)(h) which read: "The authority of the Commission to determine and prescribe rules, classifications and practices may not be used directly or indirectly to limit the rates which carriers are otherwise authorized to establish under this subtitle."

It is not permissible to assume that Congress engaged in a futile act and therefore, you must presume that Congress intended something by repealing that prohibition and I submit that is consistent with the argument that I made previously that when railroads call surcharges something other than rates, when they charge separately for them, when they say their rules or practices and Congress has said to you you have authority to act without going through the market dominance and complex rate-making determination that otherwise constrains your authority, Congress did not constrain your authority with respect to rules and practices.

So, what we would have then if we were to proceed on the basis of some more agreed upon index

such as your rail cost adjustment factor? Many of us have spent much of our careers getting that index just right. It started in 1977. It wasn't until 1992 that the courts finally blessed the RCAF as it exists today. It's got fuel in it. It's a forecasted index. It's got productivity in it. The railroads prepare the data and submit it to the Board. The data is out there for everyone to see.

No one has explained to me. In any of the railroad filings that I've seen, there is no explanation why the RCAF would not be a fair mechanism, a reasonable mechanism since you yourself publish it for determining a presumptively reasonable recovery of fuel costs and any other recovery of fuel costs should, therefore, be considered at least suspect and subject to challenge before you. Because by definition, it is not, therefore, an adjustment taken in accordance with the mechanism that you have determined as a Board and published quarterly as the proper mechanism under the statute for recovery of cost.

I think I'll conclude there and leave you

the additional minutes that I otherwise would have taken, but I'd be happy to answer any of your questions of course.

CHAIRMAN BUTTREY: Thank you very much. Mr. Schick.

MR. SCHICK: Chairman Buttrey, Vice Chairman Mulvey, I'm Tom Schick. I'm with American Chemistry Council. We're also pleased to be here today to talk about this important matter.

ACC has also submitted as part of its filing in this docket the testimony of Tom O'Connor and Kim Hillenbrand from Snavely King, but they are on panel IV and it was deemed by the Board to leave them on panel IV. So, I look forward to their addressing some of the more technical matters later this afternoon.

ACC membership and we've had two members here testifying in an earlier panel today, but ACC's membership as a whole accounts for about 85 percent of the chemical products including plastic products that are produced in the United States.

Our members depend on the railroads in

this country for safe, secure, efficient transportation of about 170 million tons of traffic and provide more than $5 billion in annual revenue of the railroads. Chemicals are the second largest commodity carried by rail in the United States.

ACC's position on this docket is that indeed railroad fuel surcharges are not reasonable practices under Section 10702 part 2 and we ask the Board to exercise its authority and we have no doubt you have that authority to remedy the flaws in the way that the rail carriers have been calculating and applying those fuel surcharges.

Underlying all of this and I think we've heard a lot about it today is that a railroad's ability to engage in unreasonable practices is based on an absence of effective competition for much of the traffic that our members move by rail. Not all, but much of the traffic and some of our members have testified about that on a previous panel.

Sixty-three percent of the chemical manufacturing plants operated by our members, there's only one rail carrier. That kind of market power is

enhanced beyond the plant when the destination is captive even if the origin point is not.

We ship products by all modes of transportation and in the other modes, of course, there are fuel surcharges, but those are subject to negotiation and they're subject to market forces. What we have here is in many instances an absolute inability to negotiate or a kind of take it or leave it as people have described it earlier in this application of fuel surcharges of the railroads.

As Mr. Pocsik said earlier, we've got costs for energy, too. Chemical manufacturing plastic resin production are very, very energy intensive. We'd like to be able to get that back in passing it along. I think there was a question to Ms. Elhakim. No, we cannot always pass every penny of it along. We'd like to, but we can't.

So, you have to keep in mind that you're dealing with a practice in an industry where there's a lack of competition between the service provider and the customer to begin with.

From our point of view, there are five

aspects of this. John, could you hit the next and final slide here?

This just summarizes the written testimony which we have submitted. I'll go over a couple of the highlights on that and then we can get on to questions.

First of all as many, many folks have already talked about, fuel surcharges as applied by the railroads are not based on the actual fuel consumption. ACC has no quarrel with the concept of fuel cost recovery, but it clearly has to be related to what the cost of fuel is. That should be related to something that has something to do with moving traffic like distance, weight of the shipment, gross tons, gross ton miles, tonnage, carloads, car miles, something like that. Maybe the grade, the uphill, the downhill as we talked about on the previous panel as well. But, it has to have to do with something that has something to do with costs.

Snavely King will address some of this on panel IV when they come up. They've looked at this closely at our request.

The second point on our list of five and I guess everybody's got either four or five points here today, the ones that put the slides up, is that it's inappropriate for a fuel surcharge to be linked to the freight rates. So much has been said about that. So much has been said about the components that go into freight rates. Whether it's non-fuel costs or whether it's other elements. Then I think I'm going to leave that one alone and turn to the third point.

The third point is that higher fuel costs are also being recovered by other means. We've got a good discussion today about the rail cost adjustment factor. We've had a discussion about contracts being renewed, about new tariffs being published or new prices being put out there and it is really stretching anyone's belief to think that these rates haven't changed since 2001 or haven't been encompassing at least some of the fuel surcharge.

So, we would say that a new freight rate shouldn't be subjected to a surcharge unless subsequent to that rate coming out there's another unanticipated increase in fuel cost and it should be

triggered at that point and not cumulated up. No portion of a fuel cost should be recovered twice from any shipper.

Again, Snavely King, Mr. O'Connor will talk about that on the fourth panel, but we want to be sure that you understand aside from the calculations and recommendations he's made that as a matter of principle, we think this is incredibly important.

The fourth point on our list this is what NIT League referred to as robbing Peter to pay Paul. You shouldn't be having some shippers overcharged on fuel surcharges or applying a higher fuel surcharge to those shippers who are subject to it simply because commercial decisions leave other shippers immune from a fuel surcharge. Again, we're not quarreling with the concept of a fuel surcharge, but we don't quite see how captive customers or other customers should be asked to pay for a shortfall that's not -- has nothing to do with the traffic that they're asking to be moved.

The recovery of unanticipated, you know, we keep coming back to unanticipated, unanticipated

fuel cost increases is an admirable objective for any company. We don't quarrel with that from the railroads, but it doesn't mean that it's guaranteed that they will recover let alone over recover the fuel surcharges.

The final point, and this is another one we've talked about a lot today, is transparency. We really need transparency and I think that this something which goes to the heart of what the STB can do under its supervision of the railroad industry. As someone said earlier, Mike, it might have been you, there is no other forum. Nobody else has the authority to look at these kinds of issues except for the STB.

So, what have we heard here and you'll see if you look at the testimony that we submitted and others, we have people analyzing filings to the Securities and Exchange Commission, but not quite getting all the way to where they need to go. We have people looking at the waybill sample, but, of course, the waybill sample doesn't really break out the fuel surcharge. We have people looking at the R1 that are

submitted to the STB, but not quite being able to close the gap. We have shippers making examples or anecdotes or calculations or being asked to submit further ones. We're putting them up on the screen here, but that doesn't quite do it. We have people looking at financial analyst reports and what can the financial analyst put together to see what the effect of fuel surcharge is. We have people reading articles in the Wall Street Journal. We have all kinds of things going on here.

But, the one thing we don't have is we don't have a single central place where the data is collected, is collected in an authoritative manner from the railroads by the Government and it's put out there for everybody's use as it would be by a public service commission looking at a fuel surcharge for an electric power company.

I think it's incumbent on the Board, ACC thinks it's incumbent on the Board to create a set of transparent data and then to have that available to everybody so these things can be assessed. There's no one else who can do it.

So, in conclusion, yes, you have authority. There's no question you have authority. We ask you to remedy the problems in the railroad fuel surcharge practices. They differ from railroad to railroad, but I think you have authority to take a look at that and to fix that.

I look forward not only to panel IV where there will be some discussion of the details of this, but I'm also looking forward to the railroad panel to see what the railroads have to say about all of this.

Thank you.

CHAIRMAN BUTTREY: Thank you. Mr. McBride, I've listened very carefully to your comments, testimony. It sounded at one point during your comments that you think it would be a perfectly reasonable approach for the Board to just simply say we're not going to have fuel surcharges anymore. They're an unreasonable practice and we're just going to require-- let the railroads to put everything in the rate. Is that an accurate recapitulation of what you said?

MR. MCBRIDE: I think you could do that.

I don't think that's the only thing that is appropriate. There are other ways to deal with the problem, but there is an RCAF out there and so, if they're not taking RCAF increases, you could be saying at the same time that we think it would be far more reasonable, accurate and transparent for the railroads to take RCAF increases unless their contracts require something else and if they require something else, it's off the table and outside your jurisdiction anyway.

But, if you take the RCAF increases, those are presumptively reasonable and we won't hear anybody complain about them. If you take anything else, we're not going to tell you can't take a fuel surcharge, but what we are signaling is that we'll entertain complaints if the shippers can prove that the surcharges do, indeed double dip, over recover or otherwise inaccurately compensate the railroads for the fuel cost.

Because what you have in front of you, think about it this way, you have an RCAF that is based on railroad data that your staff scrubs and

applies a productivity adjustment to and puts out for everyone to see every quarter and we can fight about it if we have to and we rarely do anymore because you've got it down to a science.

Nobody could say that about the fuel surcharges. We don't have that transparency. We don't have that data and they're not all the same and they're not even based on off-highway diesel. Not a single railroad that I know of uses as its surcharge the fuel that they use and you've heard about that this morning and I can assure you having represented the petroleum industry on this that when the ultra-low sulfur diesel for highway use comes in in the fall their costs are going to go up to make it, but, the railroads aren't going to be subject to that for the off-highway diesel for several more years, 2012 I believe it is.

So, almost by definition since they're using something other than what they burn, the fuel charges are at least suspect. They ought to be challengeable. I mean it's as if they're using the price of bananas. It's only a coincidence if what

they're using to rely on for their fuel surcharges compensates them in an accurate manner for their fuel costs.

CHAIRMAN BUTTREY: Mr. Ficker, you look like you had something you might want to say.

MR. FICKER: Well, I think there's an important point that Mike just made in this. I'm not near as articulate as Mr. McBride and his fine legal talent that he displays here in front of this agency, but there's a couple of things that have gone on.

We, as you know, have sat with you and explained the proposals that we took. We believe the proper solution to this is for the railroads and the shippers to come down and work something out, but we've tried.

We spent a year and a half talking to the rail carriers, showing them our proposal and our proposal dealt with off-highway diesel price that's published every week by the same energy information agency that publishes the on-highway diesel and it's clearly much more aligned with the cost of the fuel that the railroads consume. So, we believe that's an

appropriate approach as well.

We stand ready and willing to sit down and work with the railroads today, right now to come up with a more equitable, transparent, fair, reasonable approach to fuel surcharges. We don't object to the concept.

Most of the rates today from the majority of our members are market-based rates that are probably not subject to your jurisdiction because they've been exempted over the last many years. So, the reality that we're facing is the need for shippers to be able to say I can see how this cost happens. I can justify it for my organization and I accept it as it is.

Because there's no negotiation on fuel surcharges today. It's a take it or leave it thing. You want this -- you want to move your goods. Here's the price and oh, by the way, you will pay a fuel surcharge and we'll publish that arbitrarily without any discussion with you whatsoever.

CHAIRMAN BUTTREY: Any rebuttal?

MR. MCBRIDE: No rebuttal. I just want to

say that if you think about it this way you might just put the question to the railroads very simply, how could it be unfair to you if we said that you can take RCAF increases and those would be presumptively reasonable, but that anything else is subject to challenge before the Board?

VICE CHAIRMAN MULVEY: Mr. Ficker, historically, fuel surcharges were allowed to be implemented carefully, infrequently, without constant change and only temporarily in response to emergencies. Which of these factors would you say are present today?

MR. FICKER: All of the above.

VICE CHAIRMAN MULVEY: All are present?

MR. FICKER: Many of the above are present. Vice Chairman Mulvey, would you go through that list again? Because you went through it pretty quick.

VICE CHAIRMAN MULVEY: Yes.

MR. FICKER: You've got it written down and I don't.

VICE CHAIRMAN MULVEY: Well, what I said

was historically, fuel surcharges were allowed --

MR. FICKER: Okay.

VICE CHAIRMAN MULVEY: -- to be implemented infrequently, carefully, without constant change and only temporarily in response to emergencies. Which of those characterize today's railroad fuel surcharge?

MR. FICKER: Everything but the first one. I think you said infrequently. There have been frequent. We've had them in place now since about 2001 and the study that we attached to our written testimony clearly points that out.

They should be allowed to exist to compensate for that aberration not the fuel costs and what gets mixed up in this dialogue, and I've seen it in written articles and in dialogue and in hallway conversation, is oh, we're not recovering our cost of fuel. That's not what a fuel surcharge is intended to do. It's intended to recover the extraordinary cost as we point out of fuel.

You have a rate structure. It's meant to recover your fuel costs and there isn't a railroad

that I'm aware of that doesn't look at their cost structure when they're making rates as well as market conditions before they publish a rate for a user.

VICE CHAIRMAN MULVEY: It's been alleged that some firms pay no fuel surcharges at all because of their contracts, but it's also been indicated that some firms pay no fuel surcharges because the railroads feel they would lose the traffic if they levied fuel charges on them. This would be a very truck intermodal traffic. Do any of your members not pay fuel surcharges who don't have them precluded by contract?

MR. FICKER: I'm not aware of any, Vice Chairman. I can assume that that might exist, but from what I've been in contact with members for the last two years on this subject, very few members that I know of escape a fuel surcharge regardless of their transportation characteristics.

VICE CHAIRMAN MULVEY: And, Mr. Schick, is it true that high transportation rates are moving chemical industry jobs offshore, especially rail transportation rates?

MR. SCHICK: I would agree with the first part. High costs are moving chemical industry jobs offshore. I will not say to you that I can point to, with one exception, that I can point to it being caused by: There are many factors, labor costs, energy costs. Energy costs are a huge factor for the chemical industry and various other factors including rail cost is one of them. I can't say to you that it's because of rail costs alone or of rail surcharges alone, but there is no question.

I think Ms. Elhakim covered this when you asked a comparable question that was company specific to her and obviously, I'm not speaking for any one company, but it does grind down into the company and have to make decisions about what's going to be done.

There's an interaction here. Interestingly, I'm sitting next to Mike and he's representing the electric industry. There's a huge interaction here. When the fuel surcharge is applied to coal traffic, it drives up the cost of electricity. Electricity is a very, very large factor in chemical manufacturing. So, we're paying for it there as well.

That also forces utilities to burn more natural gas either because the cost of coal goes up or because of the unavailability of coal. In some cases, there have been shortfalls in the amount of coal delivered from the Powder River Basin. When the cost of gas is driven up, that drives up not only our electric cost, but it also drives up the cost of the gas that we use as fuel and particularly as well as in feed stocks.

So, I mean these fuel surcharges are hitting us in our chemical sector a couple of times over. Just the fuel surcharges themselves.

VICE CHAIRMAN MULVEY: Do you feel that the current RCAF formula is currently being used to recover all the extra cost of fuel to the railroads or is it partially recovering it and the railroads are trying to get the rest of it from the fuel surcharges or is the fuel surcharge almost purely a markup over the cost of --

MR. FICKER: It's hard to tell exactly how that plays out, Vice Chairman. One of the things that I think is important to point out and we point this

out in our written testimony, the fuel surcharge approach began as a small increment. It began as a couple of percentage points and the ease of application was let's just apply it to the freight bill. Here's the freight bill. It's $1,000. We're going to charge you 1 percent more. You're going to pay $1,010 and it was pretty simple.

But, what's happened is those numbers have risen. This whole situation has just gotten out of control and out of hand.

The railroads could have very easily when the price of fuel started to hit 35 and 45 and $50 a barrel said hey, we see there's a problem here. We'll adjust this and I would bet a lot of money we wouldn't be having this hearing today because the issue would have been dealt with. They had that opportunity.

We took that opportunity with them to point this out and urge them to adjust accordingly, but they felt it wasn't in their best interest to do that and you have to ask them and I'm sure you will when they're here why they've done that.

So, the real issue is we have a situation

that grew from a need. The need was left unchecked and it wasn't adjusted to deal with the times. The situation migrated forward and that's what we're urging as an agency to take care or to direct the carriers to work with us on solutions. Because I still believe, firmly believe, that working together with the rail industry we can provide a reasonable approach, transparent approach and a fair approach for everyone.

VICE CHAIRMAN MULVEY: We hope so, too. I have one final question and that is that you point out that the railroads did not act immediately when costs began to rise and then they began to institute the fuel surcharges and to some extent, the fact that the fuel surcharges are increasing more than the price of fuel has increased from the time they instituted it reflect to some extent that there's a catch up going on here. That they were trying to catch up some of the increase that took place before they instituted the surcharges.

MR. FICKER: That graph that we had shown earlier shows they're clearly over compensating --

VICE CHAIRMAN MULVEY: Overcompensating from the base, however, but they're trying to compensate beyond that.

MR. FICKER: Right. I think they've over compensated clearly from going backwards. Now, again, the whole question becomes are you recovering your costs of fuel or the extraordinary increase in the cost of fuel. A very, very important distinction and one I'm sure that you fully understand and fully appreciate and our goal here would be to overcome that recognizing that there's some because of the commercial decisions made by both parties that they're not going to recover that on and that's appropriate.

MR. MCBRIDE: Mr. Vice Chairman, in further response to your earlier question to Mr. Ficker about the way the index works, there are two aspects of this that we need to break apart so you'll understand. The answer to your question is as follows.

The RCAF by definition must recover the exact cost of the fuel that the railroads incur because it has the following feature. They forecast

the fuel for the upcoming quarter as was previously explained to you and then on an after-the-fact basis, it builds in a forecast error adjustment that the Board applies to correct for any forecast errors two quarters hence.

So, on the fuel price itself, it works out over time to exactly recover for the fuel prices. There is, however, a separate aspect of the index that may require another look and that is that the index is periodically re-weighted and fuel is a portion of the railroad's total cost. There was a time where it may have been 5 or 6 or 7 percent. It grew to 10 percent I believe and it's probably higher now.

VICE CHAIRMAN MULVEY: It's 12 percent right now.

MR. MCBRIDE: Twelve percent and so, if the weights in the index are less than the 12 percent figure assuming that to be correct that you just provided --

VICE CHAIRMAN MULVEY: It's 20 percent right now. The railroads estimate their cost. It's 12 percent in the index.

MR. MCBRIDE: In the index. Well, then by definition, the index may need re-weighting. The agency has re-weighted periodically, but on arbitrary time schedules, two or five years since it's been in existence and it may be appropriate to consider a prompt re-weighting of the index so that fuel is not under recovered as a portion of the total cost.

And you heard Mr. Crowley explain you could then publish even monthly if you had any further concerns. It may be difficult to re-weight monthly, but in principle, you ought to be able to re-weight more frequently and I don't hear any principled objection to doing that.

VICE CHAIRMAN MULVEY: Thank you.

MR. SCHICK: Vice Chairman Mulvey, I just want to add that in terms of the RCAF I certainly agree with what Mike and what John have just said. We would agree with that completely.

In terms of this mismatch and I hope there's nobody left in this room who misunderstands the question of over, excuse me, not over, of recovering fuel costs versus recovering that

incremental unanticipated fuel cost.

Our consultant will discuss with you the fact I think that over recovery was $900 million cumulatively to date and that's not even a complete number because of some of these data difficulties they ran into. There were other slides and graphs that were shown today.

So, this is a very important issue and going forward, it should be done with something like the RCAF.

I want to share with the Board one of the member company folks after looking at the draft of ACC's testimony. He said very nice testimony. He says all the points that we wanted to make, but where is the sentence asking for the refund of the overcharge and I said no. I said I had read the Board's order and this is not a rate case and we were not going to ask you to refund the money. We certainly do respect that.

On the other hand when you think about it -- and no matter how much the amount is and I know the railroads have infrastructure needs and we are very

cognizant of that and we want them to be able to invest in their infrastructure because we are so dependent on them. On the other hand, I can't believe that they expected to fund their entire infrastructure or an important component of their infrastructure out of a fuel surcharge on an unanticipated event that might never have come to pass. I mean certainly they have other ways of making rates and other ways of obtaining revenue than to do it through this mechanism which has these flaws that we've talked about today.

Thank you.

VICE CHAIRMAN MULVEY: Thanks.

CHAIRMAN BUTTREY: Mr. McBride.

MR. MCBRIDE: Yes, sir.

CHAIRMAN BUTTREY: I don't want to get the cart before the horse here, but there was a suggestion made earlier in the testimony that if the Board decides it wants to take this record and take some kind of regulatory action, that that regulatory action should be cast in terms of a rulemaking proceeding under the APA. Do you have a position on that or do you have views on that that you would share with us?

MR. MCBRIDE: Well, if you were going to take action with respect to the RCAF, I think you would be obliged to do that because you do publish it and you publish it in accordance with regulations and so, you would have to issue a notice of proposed rulemaking to change those regulations.

If you were to issue a policy statement which you're permitted to do, of course, you could issue a policy statement without having to engage in a rulemaking proceeding.

I think the one thing you can't do is adjudicate today or on the state of this record somebody's actual rates or fuel surcharges. Those would have to be the subject of a separate proceeding.

It just depends on in the first two instances, however, how you choose to proceed and I think you have great latitude to proceed either in a rulemaking with respect to the RCAF or any other rules or to issue a policy statement.

CHAIRMAN BUTTREY: Thank you very much. We will next turn to the railroad panel. We will have the railroad witnesses appear individually not as a

panel. Excuse me. I didn't mean to use the word panel. Vice Chairman Mulvey and I will be asking questions as we have in the other situations.

The first witnesses will be with BNSF Railway Company. We'd ask them to come forward please. We'll take the railroads one at a time.

Thank you very much. You're welcome to proceed.

MR. HUNT: Good afternoon, Chairman Buttrey and Vice Chairman Mulvey.

I'm Tom Hunt. I'm the CFO with Burlington Northern Santa Fe and I appreciate you providing me with the opportunity to speak on this important topic for BNSF.

So, let me address a few key points of our fuel surcharge program.

First of all, the objective of the BNSF fuel surcharge program is to recover the increase in fuel expense and the fuel surcharge program is in response to the high cost of fuel and also the high price volatility. The fuel surcharges are common in many other type of industries such as steamship lines,

utilities, trucking, barges and as was published in the Wall Street Journal last week, we've lawn services and pizza delivery companies instituting fuel surcharges.

The next slide shows that from 2001 to 2005 fuel expenses increased approximately $1.5 billion which is a compounded annual growth rate of 25 percent and this is more than four times the rate of increase in all of our other expenses during this same time period.

This slide illustrates three points. First, fuel has been steadily rising. Second, the price of fuel is very volatile and third, there is a high correlation between highway diesel fuel price and BNSF cost of fuel and the biggest difference between the highway diesel fuel and the BNSF cost is taxes and we use the highway diesel fuel as the fuel surcharge program bench mark because it's a widely accepted public statistic.

But, several have claimed that by using highway diesel fuel we're over recovering as opposed to our own cost and this is not correct as we're

measuring the change over time and unless the spread between the two prices widens significantly which it's clearly not doing on that graph, there's no over recovery occurring.

And let's talk about our hedging program because that's come up through a number of people's discussion today and as it says in the headline of this slide, hedging is independent of fuel surcharge.

Hedging is a cost containment strategy, a risk containment strategy where you lock in a future price or a future range of prices. It's like purchasing insurance and deciding what your deductible should be and what you're limits should be on your property insurance policy. But, there is no free lunch and as shown on the bullets up there, if prices rise, you win. If prices fall, you lose and in 2005, our fuel expense was reduced by 21 percent due to hedging. However, in 1998 when fuel prices were low, our fuel expense was actually increased by 13 percent due to hedging and we, in 1998, did not receive any compensation from our customers for that increase in fuel expense and, therefore, shortfall in

profitability relating to our hedging activities.

And finally, many of our customers are in commodity businesses and they're clearly familiar with hedging strategies.

Well, let's get into the details of the actual surcharge program. The history of our program, and this is before the mileage-based program which started this year, was that the truck fuel surcharge program is widely accepted and recognized and we originally used a percent of freight bill primarily because it was easy to administer and the entry point was adopted based on historical average cost of highway diesel fuel which as we saw earlier has a high correlation to BNSF's price per gallon of the diesel fuel we consume and finally, BNSF charges a lower percent of the freight bill than the truck surcharges.

Well, starting in the first of this year, we moved to a mileage-based program for certain groups and let's talk about that because there's been a lot of commentary today about that program.

Well, first of all, a mileage-based program reflects fuel usage and the tables are built

on a business unit by business unit basis for fuel intensity and the mileage table is based upon rail miles and the intent of our mileage-based program is to only recover our cost above threshold and align the surcharge with fuel consumption. The mileage-based program was initiated for non-interline traffic for coal and agricultural commodities on January 1st, 2006 as a response to our customer concerns. Interline moves on these two commodities still move on a revenue-based surcharge because of the shared movement and therefore, the shared billing between the various carriers.

Consumer and industrial products, our remaining two business units, were not converted to mileage-based upon customer concerns and customer feedback and we expect consumer and industrial products to convert to a mileage-based program over time and if they don't, then we intend to make adjustments to avoid for the potential of over recovery resulting from the compounding effect of rate increases.

Let's actually look at the numbers from

BNSF's perspective and these numbers you can actually tie back to our 10K filed with the SEC. The question is are we over recovering and the answer no, not in any year from 2001 to 2005 nor for the five-year period and if you see the number up in sort of the upper left-hand corner, you can see that we have under recovered over that five-year period by $1.1 billion. Now, this is BNSF fuel expense absent the hedge compared to the recoveries from fuel surcharges.

Also, some assert that we over recover in one line of business and in effect, subsidize others and for the five-year period and for the year 2005, all four of our business units fell short of recovering their cost of fuel.

Three of the business units in 2005 recovered a significant amount, i.e., 75 percent or more of the increase in fuel above base while coal, the other business unit, recovered well under 50 percent above its base.

So, fuel surcharge is clearly not a profit center at BNSF.

But, as I stated earlier, we will continue

to monitor the program and over time do not intend to over recover while still administering a workable program and if we find on a business unit basis over time we are over recovering, we will make adjustments to the program.

So, in conclusion, BNSF's fuel surcharge was implemented to cover escalating fuel cost. BNSF is not fully recovering fuel cost above the base price. BNSF has reacted to customer concerns in the marketplace and BNSF believes that a mileage-based fuel surcharge is the most reasonable and appropriate approach.

And finally, all of the details of our surcharge program are readily available on our website BNSF.com.

Now, that's the end of my slides, but I do have a couple of comments and I modified some of the comments that I made based upon some of the testimony that I've heard this morning, but I do want to touch on two other points that have been brought up this morning and I'm sure they would be things that are clearly on your mind in -- to other people's questions

on them as we've gone through the morning and the early part of the afternoon.

First of all, why is the rate on the mileage-based program for grain greater than coal? Let me give you a couple of things. First of all, I'll start by saying the mileage-based program has only been in effect for four months. So, therefore, we're still working through what I'll call the start up of a new methodology. But, there are clear differences in the business model for coal versus ag.

Difference one, coal moves exclusively in unit train operation. Ag moves some in unit train and some in single car movement.

Second is speed. Coal typically moves at the slowest speed on the railroad while ag moves at a variety of speeds sometimes depending on which train it's on and therefore, the higher the speed, typically, the more horsepower you have. Horsepower being locomotive power and therefore, the more fuel intensity you have.

The third activity that causes a difference between the two is the switching

activities, i.e., activities in the yards where there's fuel being consumed, but not real mileage being added. Coal incurs very little switching activity. Ag, especially, the non-unit train agricultural movements, rather, incur switching activities and then finally weight, which was brought up by one of the individuals earlier, especially on the empty moves. Moving the aluminum cars back as opposed to unit grain trains back clearly causes a difference.

So, I think really the question is not so much why is coal different than ag, but is ag unit train different that ag single car and we have one ag rate. We've debated whether we should actually have two ag rates and that's something I think we'll consider in the future, but right now, we just have the one rate.

But, those are the differences between coal and ag businesses which cause ag to be more fuel intensive than coal.

The second thing I'd like to comment on is this whole issue of RCAF and rail cost adjustment

factor. First of all, we have very few contracts, I mean we're talking a very small percentage that actually have a full RCAF and fuel surcharge on them.

But, from our perspective, RCAF is not really the best recovery methodology and the best match anyway because RCAF is a nationwide average that doesn't reflect the higher fuel usage of a long distance carrier like BNSF.

And secondly, as was indicated in the last panel, the weights aren't necessarily reflective of the current weighting of fuel cost especially for a long haul carrier like BNSF. It really doesn't reflect the volatility and the quickness of the movement.

Then thirdly, there are timing differences and estimations differences that the previous panels have talked about.

And finally, many of our contracts only provide for a percent recovery of RCAF as opposed to full RCAF.

And so, when you add all that up, RCAF has woefully under recovered for us and we don't believe

that there should be any double counting here at all. Actually, we believe the best model should be a mileage-based fuel surcharge coupled with an index that describes an all inclusive less fuel index which would be RCAF absent fuel and we think that's the best model and that would address the concerns of most of the parties that spoke on that topic today.

So, that's the extent of my prepared comments. I'd be ready to answer to questions unless you want to ask questions as a panel.

CHAIRMAN BUTTREY: We're not going to do a panel.

MR. HUNT: Okay.

CHAIRMAN BUTTREY: We'll just ask the questions individually.

MR. HUNT: That would be just fine.

CHAIRMAN BUTTREY: There's been a lot made about who's paying this and who's not paying this and we've heard a little bit of everything really.

Do you have any idea what percentage of your traffic is not paying the fuel charge because there's a contract or for some other reason?

MR. HUNT: We disclose our effectiveness rate and we did it on the last analyst call at around 75 percent expecting we do about 80 percent by the end of this year.

As I indicated through 2005, the business units that clearly had fairly high recovery were coal, or I'm sorry, ag, industrial and consumer products. Coal is the one that clearly is significantly under recovery.

MR. HUNT: And that's because of contracts.

CHAIRMAN BUTTREY: And you can unequivocally state for us today that the fuel increase that you're trying to recover is not the fuel increase that you're losing under contract?

MR. HUNT: Are you saying a cross subsidy between the two?

CHAIRMAN BUTTREY: Right.

MR. HUNT: No, each of the business units and again, from my perspective, you know, we're looking at this on a business unit by business unit basis, each one of them under recovered last year.

CHAIRMAN BUTTREY: Across the board?

MR. HUNT: Yes, all four business units.

CHAIRMAN BUTTREY: Okay. If the indexing methodology that might be adopted in the future was something other than what you're using today, what would you recommend as an alternative?

MR. HUNT: I think something that has a high correlation to the fuel we consume and that -- remember the slide that showed the two lines going in parallel. Something that has a high correlation and if it was something that actually was, you know, an off-highway diesel fuel that was a published statistic, I think there's two things that have to be there, high correlation and public visibility.

You know, as long as we find something like that, I think it's fine. I think, you know, pure oil is not the best because it doesn't include the refining component.

VICE CHAIRMAN MULVEY: Thank you. Your company began to view the RCAF as an inadequate method by which to recapture the increased fuel cost. Couldn't you have petitioned the Board for a change in

the way RCAF is calculated?

MR. HUNT: I imagine we could have. That's probably a bit of, I'll say, almost a regulatory question. I'm not a regulatory attorney.

What we have done is we have calculated an index that essentially mirrors RCAF and therefore, is the all inclusive less fuel and then put the fuel surcharge with that and in most of our contracts that are coming up, that's what we actually are using.

VICE CHAIRMAN MULVEY: So, you have the RCAF with the fuel taken out of it.

MR. HUNT: Right.

VICE CHAIRMAN MULVEY: And then put on the surcharge. So --

MR. HUNT: Correct.

VICE CHAIRMAN MULVEY: -- in your estimation, you're not double dipping in any of these contracts?

MR. HUNT: That's correct and as I said before, there are a very small percentage of contracts that have I'll say a full RCAF and fuel surcharge and that was known at the time we negotiated the contracts

with the customers and that's a small percentage.

VICE CHAIRMAN MULVEY: There's been some charge that the fuel surcharge program does not account for efficiency gains. That the railroads achieve tremendous efficiency gains as they're putting in newer locomotives, replacing the older, less fuel efficient ones.

Is there any way to factor in the fuel efficiency gains or do you think that that's being done?

MR. HUNT: I think over time that needs to be accounted for. I would also say that fuel efficiency is something that moves at almost a fairly glacial pace. A 1 percent improvement in efficiency in a year is a big deal. You know, so it's -- the locomotive -- you think about the turnover in the fleet. We've got over 5,000 over the road locomotives on our property and probably over 6,000 in total counting the road switchers and all that and in a big year, we get 300 new ones. So, it moves at a slow pace.

Over time if we achieve significant

efficiency, we should be adjusting the program to reflect that.

VICE CHAIRMAN MULVEY: You can understand how the shippers feel though. In a sense, some shippers feel that look, you've signed these contracts with other shippers where you've agreed to not levy any fuel surcharges and now, you're coming to us to raise our rates effectively or institute these practices for us to cover the costs of serving others and you can see why the shippers would consider this to be unfair. You made these deals and you signed these contracts. Why shouldn't you bear the burden of the errors in signing contracts that don't allow you to recover all of your costs?

MR. HUNT: And I'd say we do bear the burden of that. That's why in my comments earlier I said coal recovering well less than 50 percent.

The place where we have contracts that are longer term where we've not had I'll say rollover and therefore, an opportunity to negotiate a fuel surcharge is really in coal and that's where we are under recovery and when we think about, you know, the

fuel surcharge I talked about, a 75 percent effectiveness, that the vast majority of that 25 percent difference exists within the coal business group. So, I think we are absorbing that.

VICE CHAIRMAN MULVEY: In one of your charts, the bar chart, titled Cumulative Under Recovery. Fuel expense above threshold. What is a threshold?

MR. HUNT: Well, I'll give you the exact answer.

VICE CHAIRMAN MULVEY: Is that yes.

MR. HUNT: Seventy-three cents BNSF or it's about $1.25 highway diesel fuel.

VICE CHAIRMAN MULVEY: And that's 2001 based?

MR. HUNT: Yes, it's --

VICE CHAIRMAN MULVEY: I was trying to figure out, why the word threshold was used instead of a particular time or a particular number.

MR. HUNT: Our surcharge program is the same for all customers and it's highway diesel fuel and then it starts at $1.25 and ratchets up from

there.

VICE CHAIRMAN MULVEY: But, that suggests that an off-highway diesel fuel would be better because it doesn't take into account a lot of the other charges that are put in highway diesel fuel. How do you feel about that?

MR. HUNT: Back to the question earlier, I think as long as we find an index that has a high correlation to what we burn and is publicly available and agreeable to all parties, I have no problem with that.

VICE CHAIRMAN MULVEY: Thank you.

MR. HUNT: Yes.

VICE CHAIRMAN MULVEY: Doug.

CHAIRMAN BUTTREY: I don't have anything else.

VICE CHAIRMAN MULVEY: Thank you very much.

MR. HUNT: Thank you.

CHAIRMAN BUTTREY: Our next witness is Canadian National. Good afternoon.

MR. FOOTE: Good afternoon, Mr. Chairman,

Mr. Vice Chairman. Thank you for the opportunity to be here today.

For the record, my name is Jim Foote. I'm the Executive Vice President, Sales and Marketing with Canadian National.

With me today is Jean-Jacques Roue who is CN's Senior Marketing Officer.

I'd like to just go through some very, very brief remarks as we have already provided our written comments and answer any questions that you might have.

In 2000, faced with the rising fuel costs, CN, as did all other companies, began to look for ways to reduce the exorbitant expense we were faced with in rising diesel fuel and a surcharge was looked at as a way to do this. Our main focus at that time was, number one, that whatever we do be fair. Two, that it be easy to understand. Three, that it be easy to administer and four, that it not be a profit center.

We implemented our first fuel surcharge in 2001 with our CN tariff 7400. The starting application of that fuel surcharge at that time was

when the price was $24 WTI. We adjusted that quarterly based on the cost of WTI and we adjusted the fuel surcharge up 2 percent for every increase of $5 in WTI.

We kept that fuel surcharge in place for a number of years until after further evaluation. In the spring of 2005, we introduced a new fuel surcharge. That fuel surcharge starts applying a $25 a barrel WTI versus the 24. It is adjusted monthly based on the average price of WTI. The initial charge is 1.5 percent instead of the original 2 percent and each increase in $1 of WTI would take up the price curve on the fuel surcharge of .3 of 1 percent. That was a 25 percent reduction in our fuel surcharge.

Again in 2005 in the fall, we reduced our fuel surcharge tariff again. This time another 16 percent. Same starting point, $25. Same monthly adjustment. Same initial 1.5 percent application, but we were able to reduce the curve from .3 of 1 percent to one-quarter of 1 percent for each increase in the price of -- dollar of WTI.

How we've been able to do this, we've

worked extremely hard to have universal application of our fuel surcharge. Eight-seven percent of our eligible customers pay the tariff fuel surcharge. The other remainder have other recovery mechanisms in there for fuel primarily based on the legacy language in their contracts.

My focusing on universal application of this fuel surcharge, we've been able to reduce what today at $70 a barrel would have been a 20 percent fuel surcharge down to 12.75.

In conclusion, we have focused on simplicity. We have focused on universal application. We have been flexible and made changes where we thought it was appropriate. Most of all, we have been fair. We have not over recovered. If the circumstances dictate that we should reduce the fuel surcharge again, we would do so.

Thank you. Answer any questions you might have.

VICE CHAIRMAN MULVEY: Thank you. You said that 87 percent of eligible customers pay the fuel surcharge. What is the population of ineligible

customers?

MR. FOOTE: It is about 3 percent of our business which is regulated Canadian grain.

VICE CHAIRMAN MULVEY: I see. Okay. So, then you don't have a lot of contracts which preclude the charges --

MR. FOOTE: Basically, the remaining 13 percent.

VICE CHAIRMAN MULVEY: Most of those are subject to the RCAF?

MR. FOOTE: No, they would have other fuel mechanisms--

VICE CHAIRMAN MULVEY: Other fuel mechanisms? Okay. Okay.

CHAIRMAN BUTTREY: Contractual fuel.

VICE CHAIRMAN MULVEY: Contractual fuel.

MR. FOOTE: Correct. Yes.

CHAIRMAN BUTTREY: Escalation clause.

MR. FOOTE: Correct. Yes.

VICE CHAIRMAN MULVEY: Okay.

CHAIRMAN BUTTREY: Or limitations thereof.

MR. FOOTE: Yes, sometimes they're WTI.

Sometimes they're just CPI. They're all over the place and we're trying clean those up as well.

VICE CHAIRMAN MULVEY: Have you been successful in recapturing all your increased cost of fuel since the run up in fuel costs began through your fuel surcharge program?

MR. FOOTE: We are at that point now.

VICE CHAIRMAN MULVEY: Okay. Does your fuel surcharge program account for fuel efficiency gains or do you have any way of factoring in fuel efficiency gains?

MR. FOOTE: We would look at our entire fuel expense and if we thought that it was appropriate or we were getting to the point where we were overcharging in any way, shape or form, we would adjust it to take that into consideration.

VICE CHAIRMAN MULVEY: Okay.

CHAIRMAN BUTTREY: What part of your elements of your program do you get the most push back from your customers? I'm just curious.

MR. FOOTE: All of them. Yes.

CHAIRMAN BUTTREY: Okay.

MR. FOOTE: You know, it is what it is. I mean it's an increase in transportation costs. I mean there's no way around it. One of the things we try --

CHAIRMAN BUTTREY: It's not the index or nothing stands out as being a particular problem. It's everything.

MR. FOOTE: Number one, in order to get universal application, and you've heard that today here, we had to be very arbitrary about the fact that everybody pays it. Some people don't like that. But, that's the only way you can drive down the cost is by spreading it across the entire base and that's the position we took from day one.

Secondly, if you look at our freight rate increases during this same period of time, I think our freight rate -- general freight rate increases have been lower than the average during this period as well. So, we try to be reasonable in the imposition of what has been viewed by some as a hard line that we've taken on this.

CHAIRMAN BUTTREY: And you can

unequivocally say for the record that you're not over recovering your fuel costs?

MR. FOOTE: That's correct.

CHAIRMAN BUTTREY: Okay. Your other Canadian railroad will be testifying here in a moment and the witness is just setting real close behind you there. So, I just want to let you know that they're right there. I was going to ask you a question.

MR. FOOTE: Very cognizant of that.

CHAIRMAN BUTTREY: How does your program compare to other Canadian competitor in terms of your percentages and how it's been received?

MR. FOOTE: To the best of my recollection, to the best of my knowledge, I think in terms of what we base it on and the application, et cetera, it's a reasonably similar program. We have a higher level of application, higher number of customers paying it than I think most do.

Again, that's not necessarily applicable just in fuel surcharge. We take that position in just about every chargeable service that we have and have a reputation unfortunately for being arbitrary

sometimes in those, too. But, whatever charge we have we try to not discriminate and have across the board application.

I think CP's coverage at least from what I see from the published reports is slightly lower. I don't know why. They're a much bigger coal hauler. I don't know the nature of their contracts.

CHAIRMAN BUTTREY: Um-hum.

VICE CHAIRMAN MULVEY: You also use West Texas Intermediate as the base for your rates --

MR. FOOTE: Correct.

VICE CHAIRMAN MULVEY: -- for the big changes? How do you feel about moving to something like off-highway diesel fuel index?

MR. FOOTE: Again, you know, the number one factor here is clarity under -- does everybody understand it. I mean everybody knows crude. I mean you can ask the guy that drove the cab today what the price of crude was and they'll tell you. It's a recognizable index to tie to.

You can dream up a market basket of all kinds of factors that great minds would agree was

exact, but can you understand it and apply it?

So, whatever the index that is used as long as everybody understands it and it doesn't create confusion and more than anything confrontation in the application of it, it is what is.

VICE CHAIRMAN MULVEY: Thank you.

MR. FOOTE: Thank you very much.

VICE CHAIRMAN MULVEY: Thank you very much.

CHAIRMAN BUTTREY: The next witness is I believe Canadian Pacific Railroad. Welcome this afternoon.

MS. SZEL: Good afternoon, Chairman Buttrey, Vice Chairman Mulvey.

As you know, my name is Marcella Szel and I'm the Senior Vice President of Marketing and Sales for the other Canadian railroad Canadian Pacific Railway and I'm responsible for all aspects of the company's marketing and sales efforts which includes our fuel surcharge program and I thank you very much for this opportunity to speak with you here today.

Now, my written testimony discusses in

some detail the reasons why we found it necessary to add a fuel surcharge to our base rate. The principles that guide our program --

CHAIRMAN BUTTREY: Excuse me. Excuse me just a moment. For some reason, it doesn't seem that your microphone is working very well. It might not be on. It might not be close enough.

MS. SZEL: How about this? Is that better?

CHAIRMAN BUTTREY: That's better.

MS. SZEL: Thank you.

CHAIRMAN BUTTREY: We should be able to hear you a lot better. Thank you.

MS. SZEL: So, I'll just repeat that last bit. My written testimony discusses in some detail the reasons why CPR has found it necessary to add a fuel surcharge to the base rate, the principles that guide our program and the manner in which the surcharges are calculated for each of our major U.S. market segments.

In my remarks today, I'd like to emphasize four points that I believe are critical understanding

our program.

First, contrary to some claims being made by some parties, the incremental fuel surcharges collected by CPR have never exceeded the year over year increases in the price of diesel fuel. Even with our efforts to expand the program to include all of our business and periodic adjustments to the level of a surcharge, we have consistently under recovered against the incremental price of fuel.

Secondly, CPR does not engage in any practices such as imposing a fuel surcharge on traffic that is also subject to an RCAF adjustment that might result in double recovery of fuel costs from a particular customer.

Third, CPR's policy is that all shippers should share the burden created by skyrocketing fuel prices. We currently apply some form of fuel recovery mechanism to more than 90 percent of our U.S. business and we have measures in place to bring the balance of our business into the program as soon as we can.

And fourth, CPR's current fuel surcharge program represents a reasonable balance between the

goals of having a workable program and allocating the rising price of fuel in a fair or equitable manner.

So, first some context. The figures that I'm referring to in my remarks today are based upon our U.S. operations. I think it's important also to understand the vast majority of our U.S. business that I refer to moves under transportation contracts. Thus, all matters relating to price for such movements including fuel surcharge are the product of negotiations with our customers.

Now, having said that, the fuel cost management is a critical business issue and fuel is CPR's second largest expense item. In 2005, we spent more than half a billion dollars for fuel and more than 100 million for our U.S. operations. The extreme volatility of fuel prices represents a serious challenge. In the first four months of this year alone, the price of crude oil has increased by about 20 percent. Therefore, CPR like virtually every company that consumes fuel in providing services to customers has found it necessary to add a fuel surcharge.

First let me address the issue of over recovery. From the outset, our program has been designed to permit us to recover the increasing price of diesel fuel and nothing more. CPR has never been able to offset fully the year over year price increase. Our incremental fuel surcharge revenue during 2005 covered only 80 percent of incremental price increases from '04 to '05. Looking further back, the fuel surcharge revenue collected in '04 covered only about 50 percent of the incremental price increase from '03 to '04. So, as these figures show, CPR itself is absorbing a substantial share of the economic burden associated with the rising price of fuel.

Second, with regard to double recovery, we do not double recover. Some parties have expressed concerned that railroads might be double recovering by applying the surcharge on top of other pricing mechanisms that already compensate for changes in fuel.

For example, it's been suggested that this occurs where a movement is subject to both a fuel

surcharge and periodic rate increase based on RCAF index which as we all know measures among other things the changing cost of fuel. CPR does not engage in these practices.

While RCAF based increases were once a common feature of many of our transportation contracts, in recent years, we've moved away from RCAF as a mechanism for recovering incremental fuel costs. Today, with some few exceptions, CPR's fuel surcharge tariffs not RCAF provide the mechanism for adjusting the rates paid by our customers to account for the rising fuel prices.

Where RCAF based provisions do remain in a few of our legacy contracts, we do not also impose a fuel surcharge on top on those contracts.

It has also been suggested that recent base rate increases reflect some or all of the rising price of fuel. CPR's approach is to use the base price to deal with the marketplace factors of demand and capacity in our investment requirements while we rely on the surcharges to manage the fuel exposure.

You know, for instance, at the beginning

of this year if I had tried to enter into a contract with my customer to predetermine what the cost of fuel is going to be, I would never have guessed it would have risen 20 percent in the first quarter. So, we try to manage that separately.

Third, a broad program, like other railroads, CPR faced limitations on its ability to impose fuel surcharges on all customers during initial stages of this program. Now, CPR has a policy requiring that all new transportation contracts or rate quotations incorporate fuel recovery specifically. I've personally issued strict instructions to all of our marketing managers that this policy be applied to all customers. As a result, we now collect some form of fuel recovery in connection with more than 90 percent of our U.S. business.

As older contracts expire, our goal is that no shipper receives a free ride at the expense of others.

Fourth, CPR's program strikes reasonable balance. Concerns have been raised about whether the

methods used by railroads to calculate their fuel surcharges are fair to all shippers and naturally, no shipper wants to pay more than his fair share of the skyrocketing cost of diesel fuel.

We understand these concerns and we do not claim that our fuel surcharge program is perfect in individual application, but given the enormous diversity in transportation characteristics of the traffic we handle and the need for a program that is both workable and easy for customers to understand, it is simply not practical for us to tailor the surcharge on every shipment to the exact characteristics of that shipment.

As other railroads, we handle hundreds of thousands of combination of commodities, car types, weights, distances, terrain, speeds and other factors that affect fuel consumption. Trying to calculate a specific fuel surcharge for each one of these movements much less invoicing thousands of different surcharges accurately would be extremely burdensome, costly and I suspect prone to invoicing inaccuracy and adopting such a complex system would do absolutely

nothing to reduce the total amount that CPR must try to collect to offset the rising price of fuel.

However, CP's fuel surcharges do reflect to some degree the transportation characteristics of the three broad categories of traffic that we handle, carload, intermodal and grain.

Our decision to express fuel surcharges as a percentage of the freight rate is based on several considerations. First, this is a common practice not only in the railroad industry, but among other transportation providers as well.

Second, a fuel surcharge is part of the total freight rate. So, linking this surcharge to the base rate is logical.

Third, it is simple to calculate and easy to administer. This is especially important in connection with the large volume of CP's traffic that moves on an interline basis. Only a tiny fraction of our traffic which moves in the Soo and the D&H is actually local business and I mean a tiny fraction.

Much of our U.S. traffic is forwarded from Canada under contracts influenced by the Canadian

environment and much of our traffic requires cooperation with our connecting carriers in the United States and as the Board knows, it's important that interline shipments move as seamlessly as possible. So, for CPR and its shippers, it makes sense to use the same percentage-based system as our U.S. connections are using for implementation.

Now, we've heard a suggestion here today by a number of people that there might be a simple solution which is a mileage-based type formula. This might have some appeal, but alone, a mileage-based system is not a silver bullet in this circumstance and you just have to think about driving. If you're driving the same car with the same weight and the same road with the same weather from here to New York and you drive at 50 miles an hour versus driving at 70 miles an hour, you're going to have different fuel consumption.

Take that very same drive and drive a fuel efficient Toyota and compare it to let's say a Ford Mustang with a high horsepower, you're going to have another completely different fuel usage. So, these

are characteristics of traffic.

So, in our case when we have intermodal traffic that's speedy movement, scoots around other trains wherever it can, high horsepower to ton ratio, it, in fact, has a higher fuel surcharge than our other traffic to account for that type of other characteristic.

CP has revised its surcharges several times in response to customer feedback and our assessment of the likelihood that the surcharges will appropriately offset the incremental increase in the price of fuel. For example, recent changes have resulted in lower fuel surcharges for both carload traffic and grain.

We are, of course, prepared to consider constructive suggestions for improving our program in ways that would allocate the price equitably while maintaining a system that is administratively workable.

So, in sum, our fuel recovery program is designed to recover only incremental changes in fuel price in the aggregate. So far, we are not achieving

full recovery.

Our surcharges may not be perfect in their distribution, but that's the tradeoff between a perfect program and one that is workable.

Thank you. Happy to answer any questions.

CHAIRMAN BUTTREY: Thank you.

VICE CHAIRMAN MULVEY: The fuel surcharge program you have here in the United States on U.S. traffic, do you have a similar program or the same type program for inter-Canadian traffic or is it different?

MS. SZEL: Some of it is different. We have a very specific U.S. grain fuel surcharge program which is different than what we have in Canada.

VICE CHAIRMAN MULVEY: Could you briefly explain the difference between the two?

MS. SZEL: Well, first of all, it was implemented much later and I'm not happy to say that the reason why it was implemented much later is that in the years when we were bringing on our fuel surcharges we were in very serious service recovery program with our grain business in the United States

and we just didn't think it was fair to impose a fuel surcharge when our customers were very unhappy and rightly so with our service.

So, number one, it was implemented later and the rate on the fuel surcharge in grain is lower than all the other programs. For instance, intermodal traffic is 13.25 percent and U.S. grain is 9.46 percent.

VICE CHAIRMAN MULVEY: But, it has the same basis as the United States; your approach, methodology, is similar in both Canada and the United States?

MS. SZEL: Same methodology. We use on-highway diesel price in the United States. We use WTI plus a crack spread in Canada.

VICE CHAIRMAN MULVEY: You say that a mileage-based rate would not be the silver bullet but wouldn't a mileage-based rate with some adjustments still more closely reflect cost differences than a rate-based rate?

MS. SZEL: So long as you were able to construct something that accounted not just for the

miles, but accounted for all the other characteristics and the movement then one might argue that it would appear to be fairer.

VICE CHAIRMAN MULVEY: Well, you can't account for everything. I don't think it's possible to have a surcharge that would account for all the differences in all of the shipments. Something that at least captured major differences like, for example, weight or terrain or things like that. I mean I have, seen the programs that the various railroads have, including CP's, for monitoring traffic and they are very, very detailed and very, very specific. You can always tell people exactly where their shipment is at any moment in time or at least within some distance of where it is.

And it strikes me that you could construct algorithms which could calculate the fuel surcharge with a little more precision, a little more correlation to the fuel cost than a rate-based one which is based upon differential pricing.

MS. SZEL: I suspect you could construct an algorithm for almost anything, but I can assure you

that I'm not the person who's going to do and that's a fair comment. But, I do repeat that some of the other characteristics of traffic are significant. A higher speed train that requires greater handling uses significantly more fuel than one that doesn't and that's a very significant factor and just because you might know where all your cars are at any given time, it doesn't necessarily mean that that correlates to fuel usage.

VICE CHAIRMAN MULVEY: I meant through calculating what the average speed of that train was going to be, in fact, in matters of the surcharge in the general way.

CHAIRMAN BUTTREY: I think I heard you say over time, over the last year or so or two years, you're still recovering I think you said only about 80 percent of your fuel costs.

MS. SZEL: Yes, that's true.

CHAIRMAN BUTTREY: Increased fuel costs.

MS. SZEL: Increase in fuel cost.

CHAIRMAN BUTTREY: Right.

MS. SZEL: Yes.

CHAIRMAN BUTTREY: Right. Okay. And you say that the reason for that is because some of the people came into the program late and because some of the people using the service have contracts or other agreements that preclude that. Is that what you were saying?

MS. SZEL: Well, it's probably a combination of, for instance, when you've got a differential in your fuel surcharge. You know, for instance, less in the ag business, more in the intermodal business. You're always going to have a spread and it would be unlikely that you would truly recover 100 percent.

CHAIRMAN BUTTREY: Yes.

MS. SZEL: Our goal is to ensure that we spread it as equally as we can among our shippers and achieve 100 percent coverage so that 100 percent of our customers are, in fact, contributing to that fuel surcharge.

CHAIRMAN BUTTREY: I don't know whether you were here this morning when we had a lot of shippers coming in and consultants for shippers coming

and they were basically saying that all the carriers are recovering way above what their increase in fuel costs are and it's almost like we're talking about apples and oranges. There's a total disconnect here between what the parties, the witnesses have said today. It's difficult to understand that.

MS. SZEL: It's an accurate observation.

CHAIRMAN BUTTREY: A total disconnect.

MS. SZEL: Yes.

CHAIRMAN BUTTREY: Any other questions?

VICE CHAIRMAN MULVEY: No, not at this time. Thank you very much.

CHAIRMAN BUTTREY: Thank you very much.

MS. SZEL: Thank you.

CHAIRMAN BUTTREY: Our next witness is from CSX Transportation. Welcome. Good afternoon.

MR. JENKINS: Thank you. Good afternoon. We have Power Point slides. So, if you'll give us just a second here.

CHAIRMAN BUTTREY: We're shocked. You gentlemen may proceed whenever you're ready.

MR. JENKINS: Mr. Chairman, Mr. Vice

Chairman, I apologize for the delay.

My name is Chris Jenkins. I'm the Vice President of Coal and Automotive for CSX Transportation and I'm accompanied today by Pete Shudtz from our Washington office.

We appreciate the opportunity to speak with you on what's really a critical topic of CSX and that is the recovery of our fuel costs and also to talk about how we are going to meet the demands of our customers for more service and more transportation capacity.

Pressure's building on us so that we can move more goods efficiently. For the first time in a generation, demand for transportation on CSX has challenged our capacity. Imported goods are flowing at a faster pace. Every manufacturing industry has shown more interest in rail transportation and greater demands for us to get their goods to the distribution and consumption points.

Now, to meet those challenges, we've got to expand our physical plant. We're rising to that challenge. In 2001, we spent a billion dollars on

capital. Same number for 2002, 2003, 2004 and 2005. A billion dollars a year. Maybe 1.1 billion in 2005.

But, in 2006, we're going to spend $1.4 billion and most of that increase is going into capacity expansion projects. On the Chicago to Florida corridor, for example, we're putting in dozens of new passing sites and extending existing passing sites on a corridor that has seen no capacity for 50 years.

So, what does all that have to do with fuel surcharges? Well, the answer is this. That while we are spending more on capital, in this case an increase of about $300 million shown by the blue bars between 2005 and 2006, we're also spending or spent in 2005 $614 million more on diesel fuel than we spent in 2001 and we project that in 2006 we'll spend $859 million more on diesel fuel.

So, unless we can find a good way to recover that increase in fuel cost, we will hurt our ability to make the capital improvements that are so badly needed.

I think we're ready. Next slide.

Well, here are the numbers. This is our total fuel cost 2002 through 2005. You can see we spent about $2.8 billion in fuel and about a third of that or 1.1 billion has been due to the increase in cost of fuel from 2001.

Well, so, what do we do? You know, our view has been that we need to do exactly what other businesses are doing whether they're airlines, steamship companies, florists. We need a fuel recovery charge and that really we needed to ask our customers to cover the incremental cost of fuel.

Now, I only wish our program was as efficient as has been suggested. It has not been a profit center for us. In fact, we have under recovered $319 million in fuel over the last four years.

Stated differently, our incremental cost of fuel exceeded what we recovered in the fuel surcharge by $319 million. All of our figures excluding gains or losses from hedging. We're talking here about pure fuel costs. So, $319 million that we have been unable to recover.

Now, we're working on this, but the shortfall has a real intangible effect on our ability to respond to the strong demand for our services.

The fuel surcharge program that we put in place is designed to help us achieve that recovery. We believe it's fair, it's appropriate, and it is consistent with the principles of differential pricing.

In our commercial transactions, negotiating the price occurs simultaneously with discussion of the fuel surcharge and all of the other terms and conditions of our contract prices and in effect, the fuel surcharge is part of the price, part of the rate.

What we're trying to do is to distribute as fairly as we can the cost of fuel across our traffic base and we think price provides a very good mechanism for determining how that allocation should take place because price does consider weight and distance. It considers competitive factors. It considers grades, and other operating considerations. Price incorporates an enormous amount of information

about a piece of business.

The other advantage of using price is that it prevents us from charging a fuel surcharge that's too high on some of the lowest rated business. A surcharge that might drive that business away and give us fewer revenues and carloads to spread our fixed costs over.

So, you know, as we go forward, there are a few things to mention. First of all, we think our program is very transparent. It is linked to WTI which is extremely visible. We publish on our web fairly extensive information about calculation of the surcharge for the current month as well as for upcoming periods and it's also the case that as we recover our cumulative losses, we are willing to make adjustments in the program so that it is generating an amount that is consistent with our incremental fuel costs and does not create an over recovery. We want to be competitive, responsive to customer needs.

I want to close just by referring to the point that I made earlier. Our customers want us to move more traffic. We have got to add capacity to do

that and we can only add capacity if we're generating an economic return that allows us to make those investments and in order to do that, we got to take care of the challenge presented by high fuel prices.

Thank you very much and I'd be pleased to take any questions you may have.

CHAIRMAN BUTTREY: You said you had a 319 million shortfall in full cost recovery.

MR. JENKINS: Yes.

CHAIRMAN BUTTREY: What does that 319 million represent?

MR. JENKINS: Well, the 319 million is basically the difference between the amount that we have spent in fuel above our 2001 costs and what we've gotten back through the fuel surcharge. So, we've recovered 319 million less with the fuel surcharge than what we've paid out in excess fuel costs and that is due to the fact that we don't have complete coverage of the fuel surcharge on all of the traffic. We do have contracts particularly older contracts that don't contain fuel surcharge provisions and we're working as those contracts come up for renewal to get

fuel surcharge coverage and broaden the coverage to the point where we get just about all the traffic included.

CHAIRMAN BUTTREY: Do you have any idea why there's such a total disconnect between what you're saying and what all the other witnesses this morning were saying?

MR. JENKINS: I am very sure our numbers are correct and that we know what we have spent on fuel in an incremental sense and we know what we've brought in on the surcharge and so, I can't really address how their computations were done, but we are very sure that ours are correct.

CHAIRMAN BUTTREY: And they seem to be very sure that theirs are correct.

MR. JENKINS: There is a difference of opinion.

CHAIRMAN BUTTREY: Everybody's entitled to their own opinion, but nobody's entitled to their own facts.

VICE CHAIRMAN MULVEY: As Disraeli says there are lies, damn lies, and statistics. So, I'm

not sure what we have here, but Mr. Buttrey is right. I mean there should be facts here. They should be knowable. They should be calculable somehow or another.

Let me ask you a couple of questions. You said that you're not recovering all of your fuel surcharges. Some contracts don't allow them. And you said that you have a $320 million shortfall over the period. Do any of your contracts have RCAF provisions in them which would factor in some of the fuel increases?

MR. JENKINS: Yes.

VICE CHAIRMAN MULVEY: So, at least some of them would be -- so, your shortfall is just the difference between the increased price of fuel and what you recovered from surcharges.

MR. JENKINS: That is correct.

VICE CHAIRMAN MULVEY: Well, then you've also recovered some through an RCAF.

MR. JENKINS: There is RCAF that applies on some of the contracts, but I would point out that there are many of the contracts that do not have RCAF

or many that have RCAF, but it is subject to an annual cap of 1 percent or 2 percent or it's 50 percent of RCAF. There are a lot of things that mean that we don't get pure RCAF on contracts.

VICE CHAIRMAN MULVEY: Would it be possible to tease out what percent of your increased revenues from the RCAF would be attributable to increased prices of fuel that would factor into it?

MR. JENKINS: I think that theoretically that's possible. It would be analytically quite challenging because we're dealing with, you know, several thousand contracts, but in theory at least, that's possible.

VICE CHAIRMAN MULVEY: Your statement unlike all other statements was one of the few that took on the rate versus practice debate.

MR. JENKINS: Yes.

VICE CHAIRMAN MULVEY: Or at least took it on from the standpoint of arguing that it was rate rather than a practice.

I'd like to explore that with you a little bit more hypothetically. What if a complaint is filed

under 11701(a) in which the overall freight rate is not discussed unlike the previous cases that have just been cited? Only the mechanism for recovering the fuel component is at issue and that mechanism is found to be defective on its face.

If the railroad has alternative approaches readily available for recouping its increased fuel costs, (let's say mileage-based rates and let's say the one that's challenged is a rate-based surcharge) and if the Board finds that employing an across the board percentage fuel surcharge is unreasonable in light of the rail transportation policy, then is there a reasonable possibility or probability that the Board could strike down the fuel surcharges as unreasonable practices in your opinion?

MR. JENKINS: Well, I can't express a legal opinion on what falls within or outside the Board's jurisdiction, but I can suggest a couple of things. One is that I have been in the commercial side of CSX for almost 24 years. It's coming up on 24 years and in that period of time, I've been involved with hundreds of contract negotiations and as we got

into the fuel surcharge era, it became very clear that this is one of the items that is part of the negotiation with that customer and the inclusion of a fuel surcharge in a contract may, in fact, change what the base is. It may change the term of the contract. It can have many, many implications that are linked directly to price or to other terms and conditions in the contract.

So, we find that separating the two as a practical matter is not consistent with what happens with our customers in our bargaining sessions.

VICE CHAIRMAN MULVEY: Let's take the demurrage rates and the demurrage rules. That would also be part of a contract. Correct? That clearly is a practice rather than a rate.

MR. JENKINS: In some cases, demurrage would be imbedded in the transportation contract. In many cases the demurrage is separate from the transportation contract.

VICE CHAIRMAN MULVEY: Thank you.

CHAIRMAN BUTTREY: I don't have any further questions.

VICE CHAIRMAN MULVEY: Thank you.

MR. JENKINS: Thank you.

CHAIRMAN BUTTREY: The next panel is from Norfolk Southern. Good afternoon, sir. Nice to have your here. You may proceed whenever you're ready.

MR. SEALE: Okay. Thank you very much. Good afternoon, Chairman Buttrey and Vice Chairman Mulvey.

It's good to be here and I certainly understand the interest in the hearing today. Everyone has an increased interest in fuel charges, the cost of fuel and the impacts on us individually as well as the economy.

I've got six basic points that I'm going to go through and I'll be glad to elaborate on these six points.

First, like everyone else, Norfolk Southern has struggled to really adapt to changing fuel cost and the price of oil. This is not a recent phenomena, but something that we've dealt with since 2000 and beyond that. It is something that we continue to look at and when we look at forecasts that

EIA and others have put out since 2000, it's very clear that no one had the clear forecasting capability to identify what crude oil or derivative prices would be in the next six months particularly starting in 2003. We had some relative stability of costs from 2000 to 2003, but from 2003 until today, it's very volatile.

Second, because of that volatility, Norfolk Southern has adopted three different versions of fuel surcharges since 2000. The original one in 2000. We modified that program again in March of 2004 and we announced a third modification April 24th to apply July 1st of 2006. We'll continue to look at the -- at the formulas to try to adopt what we see as a very volatile unpredictable situation.

Third, we're looking at the oil market like everyone else and I have to say that when I put my hat on in our company and I'm Executive Vice President and Chief Marketing Officer for the record for Norfolk Southern, I wish I could sit here and tell you that I predicted that type of freight demand that we're seeing today, that we saw in 2005 and that we

saw in 2004. My hindsight is 100 percent, but my forecasting capability on that demand was not very good.

The same shortfall in terms of our forecasting capability came into play with respect to crude oil, but with that said, we're going to continue to monitor it and we will continue to modify our program as we go forward as we see fit in terms of the market itself and the cost of oil.

The fourth primary point that I want to make is that, and it relates to the forecast that I just mentioned, our traffic at Norfolk Southern continues to grow and it's grown since -- it's grown 14 percent since 2000, since the inception of our first fuel surcharge program against a low-tech industrial production growth rate of 1 percent.

So, as we have assessed fuel and we've assessed price together in the marketplace over that period of time, our demand numbers and our volume numbers show that we are competitive in the marketplace and the demand continues even today. In the first quarter of 2006, our volume was up 5

percent. It was up another 4 percent for 2005.

So, continuing demand and it appears that the combination of price and fuel surcharge is effective in the marketplace. It's value to the customer.

The fifth point is that we price to the market. We look at market factors in terms of determining our price for all of our services. Fuel is a component of that market price.

When I look at our fuel surcharge of Norfolk Southern, speaking just for our company, I see a three-legged stool. First is a partial cost recovery. The second leg is a market-based component that is brought about by negotiations in the marketplace and then the third is it reflects the efficiency of rail. The fuel surcharge has become a reflection of rail's competitive advantage in the marketplace vis-a-vis fuel efficiency.

So, all three of those factors converge into market-based pricing including fuel.

The sixth point is that we must continue to price for the market at Norfolk Southern to be able

to enhance the capacity to meet the demand that we're seeing. Our capital budget this year is $1,146,000,000. At the end of this year and in a four-year hiring period we will have hired 8,000 employees. A 2,000 employee net gain to the company to handle additional business. We will have spent over $600 million on new locomotives.

All of that is to provide service and these six components are the crux of our fuel surcharge application in the market and we will continue to assess that going forward and do the best we possibly can to make sure that we're matching up total service with value.

Thank you very much.

CHAIRMAN BUTTREY: Thank you, sir.

Maybe you said this in so many words, but I'm asking every single witness that comes here if you could unequivocally state for the record that you're not over recovering your fuel costs.

MR. SEALE: Looking over the last six years since we've had a fuel surcharge, I can state that we have not over recovered over that period of

that time. We continue to work on that. We've got 85 percent of our revenues now covered by some form of fuel surcharge.

The negotiation process is very prevalent in this area. There's a lot of variety to what has been put into place and over that period of time on direct diesel fuel, we have under recovered and then if we look at diesel fuel lubricants and gasoline, that number is larger with respect to the under recovery.

CHAIRMAN BUTTREY: Do you put a number on the under recovery?

MR. SEALE: Only on the direct diesel fuel expense starting at our $23 base.

CHAIRMAN BUTTREY: All fuel.

MR. SEALE: Yes, in 2000, it's $87 million and then if you take in gasoline, lubricants and diesel fuel combined and we all operate huge fleets of wheeled vehicles to support train service. That number climbs to $233 million.

VICE CHAIRMAN MULVEY: Getting back to this rate versus practice debate, is it accurate to

say that in the Carolina Power and Light case that Norfolk Southern argued that the fuel surcharge was a separate rule rather than an element in the base rate and therefore, was not an issue in the rate case? Do you recall that?

MR. SEALE: I do recall that and I also recall that the other party in the case argued that it was part of the rate.

VICE CHAIRMAN MULVEY: People do change sides.

MR. SEALE: Well, you know, at the end of the day when we look at it, like I described it, the three-legged stool. It's difficult to pull off one leg of a stool and sit in it.

VICE CHAIRMAN MULVEY: Have you answered this? What portion of your traffic is not covered by fuel surcharges? Where you have contracts that preclude it or --

MR. SEALE: We estimate 85 percent of our revenue base is covered by some variation of fuel surcharge. Of some fuel and with respect to RCAF, what we have generally been doing is take a percentage

out of RCAF before we apply some variation of fuel.

Most of that's in negotiation and the consummation of the deal that's done is part of that agreement.

VICE CHAIRMAN MULVEY: So, it's RCAF minus fuel. Then the fuel surcharge.

MR. SEALE: That's correct.

VICE CHAIRMAN MULVEY: So, you would argue that you're not over recovering from the fuel surcharge program? Not over recovering from double dipping as they say.

MR. SEALE: We do our absolute best to ensure that that does not occur.

VICE CHAIRMAN MULVEY: Let's see here.

CHAIRMAN BUTTREY: Thank you very much.

MR. SEALE: Thank you.

VICE CHAIRMAN MULVEY: Thank you.

CHAIRMAN BUTTREY: Our next witness is from Union Pacific. Good afternoon.

MR. KNIGHT: Good afternoon. We have a Power Point as well. Very quick here.

Good afternoon. My name Rob Knight. With

me is Mike Rock from our Washington office. I am the Chief Financial Officer at Union Pacific.

During my 25-year career at the railroad, I have also held positions as Vice President and General Manager of both our energy and our automotive groups. I've had a chance to listen to both our customers and our shareholders which has given me a unique perspective on our fuel surcharge initiatives.

The Board has seen my written testimony and there's been a great deal of information discussed here already today. So, I'll just take a few minutes to summarize Union Pacific's key points.

Let me start with a very basic business principle. To stay in business and continue to serve our customers, we must generate enough revenue to cover the cost of doing business. This is as true for Union Pacific Railroad as it is for any other business in America and fuel is a major cost for Union Pacific.

In fact, we are one of the largest consumers of diesel fuel in North America. In 2005, we used 1.35 billion gallons of diesel. We paid $2.4 billion for that fuel and another $150 million in

other fuel related costs such as utilities, gasoline, lubricants and other fuels.

As we all know, fuel prices have risen dramatically in recent years and higher fuel prices have clearly not been a positive for Union Pacific. Nobody likes high fuel prices. They are a tax on the economy and a tax on the national productivity.

We see the impact in our own personal lives as we fill up at the gas pump. When Union Pacific filled up at the gas pump last year, it cost us about 1.4 billion more in locomotive diesel fuel alone than it cost us in 2002. That's a 150 percent increase and a serious financial head wind to overcome.

Given the significant impact of higher fuel costs on our company, we have worked aggressively to reduce our overall fuel consumption. Since 2000, we have acquired nearly 2,700 new fuel efficient locomotives at a cost of over $3.5 billion. Last year, we started taking the first of 180 new hybrid low-emission yard locomotives and we've initiated several changes to our operating practices that have

reduced fuel usage.

As a result of these efforts, we have improved our overall fuel consumption by 7 percent since 2000 while growing our traffic volumes by about 7 percent over the same time frame. Union Pacific does not consume as much fuel as it would without these efforts.

However, our fuel costs have continued to climb. Over the ten years between 1992 and 2002, our diesel fuel prices remained fairly constant averaging below 75 cents per gallon diesel. In 2002, it averaged about 73 cents a gallon and our fuel and utility costs made up only 12 percent of our total operating expenses. By 2005, that percentage had almost doubled to 22 percent of our total operating expenses. Diesel fuel averaged $1.77 per gallon last year and in 2006, is up around $2.20 a gallon diesel.

This rapid disproportionate rise in fuel price is what ultimately led Union Pacific to initiate our fuel surcharge program in 2002. It wasn't clear to us how long or how high fuel prices would rise, but it was clear that we needed to recover this huge and

growing cost of doing business.

Our early attempts at a surcharge weren't very sophisticated, but over time, based on comments and suggestions from our customers, we've modified and improved the surcharge program. We've developed a process that, one, reflects the general fuel price trend, two is easy to understand and three is easy to administer for both our customers and for Union Pacific.

We've set the 75 cent per gallon UP historical average as our baseline. We've linked our surcharge program to the published DOE, on-highway diesel fuel index which is independently calculated and used widely within the transportation industry. This index is easily accessible and as you can see on the slide, is well coordinated and correlated to Union Pacific's fuel price.

Our goal has been to recover 100 percent of the incremental fuel costs above the baseline. We're not there yet.

In a perfect world, 100 percent of our incremental fuel cost would be recovered from 100

percent of our customers. In the real world, however, this has not been the case.

We are including fuel surcharge provisions in all new price documents. However, we have commercial relationships with some of our customers both large and small that have developed over time. Contracts already in place with these customers have prevented us from implementing a surcharge on their business thus far.

As fuel costs have risen dramatically over the past few years, our surcharge recovery has increased as well, but so has the amount of incremental fuel cost not recovered. As you can see on this slide as indicated by the green bar, since 2003, these unrecovered costs have totaled over $800 million, but we are making progress. In 2005, we recovered about 74 percent of the incremental cost. This year, we expect our surcharges to recover about 90 percent of the incremental fuel cost from about 90 percent of our revenue base. Much closer to our goal of 100 percent recovery.

In the first quarter of this year, our

total diesel fuel cost increased by about $150 million over the already high cost level of first quarter of 2005. Our first quarter surcharge recovery increased about 190 million year over year. This has caused some to conclude erroneously that we recovered more than 100 percent of our incremental fuel cost. This is just bad math.

In fact, in the first quarter of this year, we spent almost 400 million in incremental fuel costs above the historical 75 cent per gallon level. We recovered about 90 percent of that increment in the first quarter. This is about $190 million more than we recovered in 2005, but still less than the total incremental cost.

On the surface, the concept of a fuel surcharge seems fairly straightforward, but the deeper you get into the details, the more complex it becomes as we heard today. To actually determine the exact fuel cost incurred by every customer on each move would involve factors as we've talked all day including weight, distance, terrain, weather conditions, equipment type and other factors. This

would be hopelessly complicated, enormously time consuming and administratively costly for both our customers and our company.

We've learned a great deal over the past years as we've worked with our customers and developed a better understanding of the surcharge process. In fact, as I mentioned, our current program reflects modifications from the original mechanisms in response to customer feedback. We're also learning from comments and suggestions generated by this hearing and there may be further modifications and improvements to be made.

In any event, it will be critical that our surcharge program enables Union Pacific to fully recover its cost of fuel. It must be responsive to customers. It must be equitable and still be easy to administer for both Union Pacific and our customers.

As I stated at the beginning of my remarks, Union Pacific must recover its cost of doing business if it intends to stay in business for the long term. Our customers are relying on us to be here for the future to meet their needs and invest for

their growth.

By the end of this year, Union Pacific will have invested nearly $26 billion in its rail network since 1996. This includes nearly 2.8 billion in, excuse me, in 2006 and we expect to continue investing in the future, but we are relying on private investments in private right-of-way and we can only do that if our returns exceed the cost of that invested capital.

In recent years, Union Pacific has not earned a sufficient return to meet let alone exceed its cost of capital as our shareholders and our investors require. In fact, our return on investment in 2005 was only 6.3 percent using the STB methodology as indicated on the chart here which is well below the STB estimated cost of capital at around 10 percent.

Unrecovered fuel costs put additional pressure on those financial returns and impairs our ability to meet the increased demands for rail transportation in the years ahead.

The bottom line, Union Pacific isn't in the business of trying to make money from our fuel

surcharge program. We're in the business of making a fair return by offering valued railroad services to our customers. In order to do this, to stay viable as a company and to reinvest for the long term, it is absolutely essential that our revenues cover our costs of doing business and that includes the unpredictable cost of fuel.

Thank you.

CHAIRMAN BUTTREY: The claim has certainly been made all morning that your company and others are making up their loss on their contract business, on their tariff business. What is your response to that claim?

MR. KNIGHT: I respond by saying that for Union Pacific in the first quarter and we expect for 2006 in total, our recovery above that threshold we expect to be about 90 percent and the total revenue base that will contribute towards that recovery also is 90 percent. So, there's still some business out there that we need to tap into as those contracts come to term and every new price document we put in place will have a fuel recovery, but our 90 percent recovery

is being generated by 90 percent in aggregate.

VICE CHAIRMAN MULVEY: What percentage of your traffic is not covered by fuel surcharges because of contracts? Do you know?

MR. KNIGHT: Well, it would be roughly the remaining 10 percent that doesn't have some sort of --

VICE CHAIRMAN MULVEY: So, only about 10 percent --

MR. KNIGHT: Yes. Yes.

VICE CHAIRMAN MULVEY: -- is precluded.

MR. KNIGHT: And there's a variety of coverage rates within that 90 percent that does have some sort of fuel surcharge, but only 10 percent roughly would have nothing at this point in time.

VICE CHAIRMAN MULVEY: You know, I had heard that there were some contracts that were pretty long lived yet that still had these clauses in them and it would be long time before they could be renegotiated.

MR. KNIGHT: And that is true.

VICE CHAIRMAN MULVEY: Okay. How do you buy your fuel? Do you buy mostly wholesale or, you

buy it mostly wholesale in bulk.

MR. KNIGHT: That's right.

VICE CHAIRMAN MULVEY: Of course.

MR. KNIGHT: Right?

VICE CHAIRMAN MULVEY: But you use basically a different -- you don't use the off-highway rate. You use the on-highway rate. Some argue that the off-highway rate will more closely tie to the actual rate that you pay for fuel for the base rate.

MR. KNIGHT: Right. I heard that today and, in fact, in our case, as I showed on one of my charts, the correlation between the DOE on-highway to the price that we actually pay is very well correlated and it's a very high correlation rate.

So, in our case, we think that correlation exists with the on-highway pricing. I can't speak to the off-highway. Is it a better type of correlation? Frankly, I doubt its any tighter, but perhaps that could be another way of looking at it.

VICE CHAIRMAN MULVEY: You began your testimony discussing the improved fuel efficiency of your locomotive fleet, a 7 percent reduction and

improvement in fuel efficiency over the last 6/7 -- 6 years or so. Is that factored at all into your calculation of the fuel surcharge?

MR. KNIGHT: It is. When we look at establishing the rate that we're going to apply to the surcharge, we take into consideration what we actually are spending. So, the fact that we are doing things more fuel efficiently does go into the mix in terms of setting the rate.

VICE CHAIRMAN MULVEY: And finally, it's been argued that the RCAF might be a fairer way of calculating fuel recovery than using a fuel surcharge. Would you think that getting rid of the fuel surcharges and just relying upon RCAF would be a way of capturing the same proportion of cost that you are now?

MR. KNIGHT: Possibly, as you heard today, I think there's some adjustments that would have to be looked at with RCAF. The biggest one frankly is the lead time. I think as we talked today or spoke earlier, the RCAF is about 12 percent recovery and today our actual fuel expense is closer to 22 percent

of operating expense. So, you've got that long lead time. So -- and there are other inherent issues I suspect that customers if they all are looking at RCAF might find across the entire spectrum of customers.

VICE CHAIRMAN MULVEY: Well, we adjust the weights periodically.

MR. KNIGHT: Right.

VICE CHAIRMAN MULVEY: We could adjust the weights again at a starting point for this and then, of course, fuel data from the AAR's available on a monthly basis and perhaps we could have a new RCAF which would come out monthly just reflecting the fuel and then one that comes out quarterly reflecting the other components, but --

MR. KNIGHT: I think one of the keys would be to be transparent and be something that not only the rails, but also the customer base could readily access and see in the marketplace and not something confusing that would be kind of a mystery to them as to how that was calculated and that's the beauty in mind of the DOE on-highway diesel fuel prices. An index that is readily available. It's not railroad

owned or railroad generated. It's out there for everybody to see and there's no debate over what that number is.

VICE CHAIRMAN MULVEY: Thank you.

CHAIRMAN BUTTREY: There was a lot of testimony this morning about the difference between what grain shippers pay and what coal shippers pay. The grain shippers testified that they were getting a much worse deal if you will than the coal shippers are. I wonder if you have any response to that.

MR. KNIGHT: I don't. We assess our fuel surcharge as a percentage of rate. So, that particular argument I think applied to more of mileage-based rate. But, I think one of the comments that was made earlier which I think is a true statement is that with coal you are generally talking about unit coal trains made up of all that business moves and efficient use of coal trains.

CHAIRMAN BUTTREY: But, aren't you also talking about unit trains when you're talking about grain?

MR. KNIGHT: Well, with grain you have a

large portion of your unit train business, but you have other business in the grain markets that doesn't move as efficiently in unit train business. You have shuttle trains and even smaller cuts as well. So, I don't have a strong opinion in terms of the differences between the ag and the coal markets.

CHAIRMAN BUTTREY: Questions.

VICE CHAIRMAN MULVEY: No. Thank you.

CHAIRMAN BUTTREY: Thank you very much.

MR. KNIGHT: Thank you.

CHAIRMAN BUTTREY: We were conferring about what our schedule would be and we're going to take the next witness. Then we're going to take another 15-minute break. Then we'll come back and have the consultant panel.

So, see you when you're ready, sir.

MR. DINGMAN: Good afternoon. My name is Robert O. Dingman, Jr., President of the Oil Creek and Titusville Lines.

The Oil Creek and Titusville Lines are the short-line railroad in Northwest Pennsylvania operating on 16 miles of leased track between

Rossville and Titusville, Pennsylvania. Oil Creek and Titusville Lines has a junction settlement carrier relationship with Norfolk Southern and its predecessor Conrail since 1986.

Mr. Chairman, Mr. Vice Chairman, valued shippers trade association members, rail consultant and colleague railroads, allow me first to state that Oil Creek and Titusville Lines has no fundamental disagreement with the surcharge as a method of recovering dramatic unpredictable and material increases in fuel and other costs. The imposition of a surcharge is far better than the destruction of service quantity or quality to prevent the failure ofa carrier's enterprise.

However, since the tariff contract or exempt quotation is frequently adjusted every six to 12 months in our experience and it may contain an RCAF adjustment provision, the surcharge should be related only to those price changes which are, in fact, dramatic, unpredictable and in excess of the contractual mechanisms’ ability to make the carrier whole.

The surcharge must not continue to be used to enhance a carrier's profit at a time of tight capacity and unusual traffic demands. This goes beyond being a mere misnomer and is in our opinion an unreasonable practice.

As we understand Norfolk Southern's most recent public announcement, they appropriately recognize the foregoing. Furthermore, they realize that the index they use for calculating the surcharge must be contemporaneous with the time frame for which the quoted price was to be in effect. Hopefully, in addition, they recognize that our shippers may not operate in a protected franchised environment such as that which the railroads enjoy. Thus, the shippers cannot pass on costs as easily and therefore, profiteering through an exorbitant fuel surcharge is unnecessarily and unwisely beating up on our shippers.

Finally, all billing carriers have the right to adjust their cost recovery methods on through rates, but they must divide the additional revenue amongst all carriers in the route who have participated in the rate making. To do otherwise is

profiteering by the billing carrier at the expense of the carrier which actually incurred its share of those increased costs, but did not receive its rightful revenue from the surcharge.

This is the status of the current relationship between Oil Creek and Titusville Lines and Norfolk Southern despite our numerous and repeated attempts to rectify this unfair arrangement with them.

This practice is an unreasonable practice designed either to coerce Oil Creek and Titusville Lines as a short-line carrier into a new and different accounting relationship which is not in our best interest or to profit Norfolk Southern as the collecting carrier by recovering funds as a fuel surcharge on fuel they did not burn.

Conclusion, in either case, Oil Creek and Titusville Lines respectfully ask the Surface Transportation Board to redress this unreasonable practice upon complaint.

Thank you for your time and for your attention to this important matter.

CHAIRMAN BUTTREY: Thank you very much,

sir.

VICE CHAIRMAN MULVEY: Norfolk Southern then enforces fuel surcharges on traffic that you originate and terminate and --

MR. DINGMAN: That's correct.

VICE CHAIRMAN MULVEY: -- they share none of those increased fuel costs with you?

MR. DINGMAN: That's correct.

VICE CHAIRMAN MULVEY: And that's because you negotiated that in your contract with that? You agreed to that in your contract or --

MR. DINGMAN: No, we did not agree to that in the contract.

VICE CHAIRMAN MULVEY: That's just --

MR. DINGMAN: Norfolk Southern deals with the handling line connecting short lines which is a class of accommodating arrangement that they have. I understand that they share and have a mechanism to share fuel surcharges with those carriers.

Oil Creek and Titusville Lines is one of three or four junction settlement carriers that were with Conrail that are now with Norfolk Southern and as

I understand it, those that have not converted do not share in any fuel surcharge.

I see no reason why since we participate in the rate making, since we burn the fuel that we're not eligible to participate in that.

Regardless of the level or the method of calculation on the surcharge, if it is applied to the rate and the rate applies to the entire rate, goes through route, then we are entitled to it and I think that this is prima facie if you will evidence that it is an unreasonable practice, very small, affecting a very small railroad, but it is unreasonable.

The fact of beating up on our shippers is a point which I make to say that if we're going to increase prices dramatically in a time of tight capacity, we have to step to the plate when we negotiate the rates and say so.

In my opinion and I've sat here and listened to the presentations that have been given so eloquently by my good colleagues, they have used the fuel surcharge as a quick way to profit from the tight capacity to raise a lot of money.

Appreciate that. Whether it's right or wrong, I leave to others, but I want our share.

VICE CHAIRMAN MULVEY: You sound suspiciously like somebody else in the railroad business who I won't mention right now, but is always looking for share for all his constituents.

What if you were to just convert to the other accounting system? Would that be terribly burdensome? It would give you the right to --

MR. DINGMAN: It doesn't give you the right to participate in setting and negotiating the rate. You present to Norfolk Southern a category of rate work, a broad category of commodities. We like to be able to find, negotiate rates with the class ones that connect for new customers. We've been successful at that. We have published the rates because we can do it quickly when Norfolk Southern and the other connecting carriers give us permission to do so.

So, we do this as a form of active marketing. We think that the handling line status disrupts that ability.

Now, I might say we have another railroad that I own, New York and Lake Erie Railroad that connects with CSX at Buffalo among others and CSX has many junction settlement carriers and they do automatically divide the surcharge revenue with those carriers. So, they have no issue.

VICE CHAIRMAN MULVEY: Okay. Thank you.

CHAIRMAN BUTTREY: Thank you very much, sir.

MR. DINGMAN: Thank you.

CHAIRMAN BUTTREY: We'll take a 15-minute break.

(Whereupon, at 4:27 p.m. off the record until 4:45 p.m.)

CHAIRMAN BUTTREY: The last panel this afternoon will be Escalation Consultants, Inc., Snavely King Majoros O'Connor & Lee, Transportation Economics, Inc., Highroad Consulting, Ltd. and Freight Resources Network, LLC.

Thank you very much for coming today. We're anxious to hear what you have to say. Thank you.

You may proceed.

MR. ROMAN: Chairman Buttrey, Vice Chairman Mulvey, my name's Jay Roman from Escalation Consultants and I once again appreciate the opportunity to present to the Board.

My written testimony in this proceeding dealt with all the differences there that make the fuel surcharge program very distanced from the actual fuel costs that railroads incur and the analysis that we've done of railroad fuel surcharge programs demonstrates that those differences are contributing to the railroads’ recovering more than their increase in fuel expense.

But, after sitting through this hearing all day, I can appreciate the difficulty of the Board because you have shippers and consultants up here saying that the railroads are over recovering and you have the railroads saying boy, we're not recovering enough. We need to get more.

My testimony's going to try to simplify this issue and to do that, I'd like to start with really how fuel surcharges work.

Fuel surcharges are applied against the total revenue for a movement. They are applied against rates and the reason they're applied against rates is to generate an amount of revenue for the railroad to cover their increases in fuel expenses. So, you have fuel surcharges applied against rates to accumulate money for the railroads to cover expenses. So, this relationship between fuel expenses and then revenue is extremely important because that's what these surcharges do. They're applied against the revenue to cover expenses.

I'd like to focus my testimony on what is happening with the railroads as far as this relationship of fuel expenses in relation to revenue, what it was back before these fuel surcharges were actually generating any revenue and what it is now. You see if the railroads are in a better position right now with fuel costs as a percentage of expenses than they were back in the 2001 time frame when these surcharges weren't really generating any money.

And to do that, what I'd like to do if this button works -- here I'm looking at Norfolk

Southern and in the fourth quarter of 2001, fuel costs as a percentage of revenue were 6.27 percent. Just dividing fuel expenses by their revenue.

In the fourth quarter of 2005, I'm doing a comparable calculation. Only during this time period, if you actually calculated their fuel expenses divided by revenue, you would get a percentage below the 11.68 percent I have there. Because what I am solving for is what fuel expenses would be as a percentage of revenue to the railroads without any fuel surcharge revenue.

So, what I'm doing with the revenue in the fourth quarter of 2005, I'm saying okay, let's get rid of any revenue associated with fuel surcharges and to do that, I'm deflating their revenue by their average fuel surcharge in the fourth quarter of 2005 which is 16.7 percent. I am lowering their revenue.

CHAIRMAN BUTTREY: This is coming right out of the financial statement?

MR. ROMAN: That is correct.

CHAIRMAN BUTTREY: Public documents?

MR. ROMAN: Public documents.

CHAIRMAN BUTTREY: Okay.

MR. ROMAN: Now --

CHAIRMAN BUTTREY: We may stop you, every one of you, in the middle of this because we're not going to do your questions like we normally do. So, the rest of you can be ready for questions at any time.

MR. ROMAN: Would appreciate it.

CHAIRMAN BUTTREY: Good.

MR. ROMAN: The 16.7 percent I'm deflating their revenue. When I divide this lower amount of revenue into the same expenses, the percentage increases of fuel expenses as a percentage of revenue.

So, when I go between the fourth quarter of 2001 to the fourth quarter of 2005, I show the fuel expenses as a percentage of revenue increased 5.41 percent. Now, what that 5.41 percent represents it is the amount that if you apply it to the railroad's revenue in the fourth quarter of 2005, they would be no better off and no worse off as to fuel cost as a percentage of revenue than they were in the fourth quarter of 2001.

This 5.41 percent is substantially below their 16.7 percent fuel surcharge. The difference is 11.29 percent. What I have entitled that is recovery above fuel costs because if they recover 16.7 percent on all their revenue, they would be in a better position in the fourth quarter of 2005 than they would be in the fourth quarter of 2001.

Now, from analyzing all these surcharge programs, what we find is that when these programs were initiated, you had a price per barrel of oil of $23 or $25 per barrel and maybe there were some problems associated with these programs then, but they were very small problems. But, as oil prices went from $25 to $30 to $40 to $50 to $60 to $70 per barrel, these small problems have started to accumulate to be larger problems and what we find through the analysis that we've performed of the railroads is that recovery above fuel cost has increased over time as the price of fuel's increased and the --

CHAIRMAN BUTTREY: Well, it's like compound interest.

MR. ROMAN: If you have a problem with low oil prices, it compounds and becomes a bigger problem with high oil prices. Yes, sir.

CHAIRMAN BUTTREY: I will just ask another question while we're waiting.

MR. ROMAN: Okay.

CHAIRMAN BUTTREY: All right. You've used NS as an example here.

MR. ROMAN: That's correct.

CHAIRMAN BUTTREY: Is it safe for us to assume, I mean the Board to assume that those numbers to some extent approximate the numbers that would be true for the other carriers or is this unique in some way that would keep it from being very similar to the other carriers?

MR. ROMAN: In my testimony, I'm going to be giving the calculation of recovery of all fuel costs for all the major U.S. and Canadian railroads.

CHAIRMAN BUTTREY: So, you're going to give them all.

MR. ROMAN: -- I will take Norfolk

Southern through the total time period and then I'll give the results for the other railroads.

CHAIRMAN BUTTREY: Okay.

VICE CHAIRMAN MULVEY: When you were doing this fuel, your revenues by the fuel surcharge, you calculate the total fuel surcharge against the total revenue?

MR. ROMAN: I'm simply taking their revenue and I divide it by 1.167 percent to deflate by assuming that everyone is getting that fuel charge and deflating the revenue.

VICE CHAIRMAN MULVEY: You're assuming that everyone is paying the fuel surcharge.

MR. ROMAN: That is correct. But, you --

VICE CHAIRMAN MULVEY: But some are over paying it?

MR. ROMAN: But, if everyone is not collecting, this percentage of 11.68 percent would actually be lower. So, the over recovery would be greater because I wouldn't be deflating it by as much.

VICE CHAIRMAN MULVEY: Okay.

MR. ROMAN: Okay. This graph is showing

over time what our calculations are for Norfolk Southern. The blue line with the box on it is simply -- excuse me, the green line with the diamond on it is showing what Norfolk Southern's fuel surcharge is each quarter between the fourth quarter of 2001 and the fourth quarter of 2005. Just putting out there what their surcharge is.

This bluish line with the box on it is called recovery above fuel cost. I've gone through the same calculation I had in the previous illustration each quarter for Norfolk Southern and tracked it against the fuel surcharge.

Now, from an analyst standpoint when you look at a graph like this, the first thing you say is I better go back and check my numbers. Because this is essentially showing that recovery above fuel costs and the way I'm calculating it here is pretty much the same as the railroad's total fuel surcharge out through the latter part of 2004.

When you go back and you check the numbers for why that's happening, this is what you find. I've added a line to this graph. It is this green line

with a diamond on it. This line is reflective of the fuel cost as a percentage of revenue. It is this calculation. What is fuel cost as a percentage of revenue and it's showing that when you divide revenue into fuel cost each quarter, it didn't really change for Norfolk Southern until we got out to the year of 2005.

So, if fuel cost as a percentage of revenue hasn't changed, then it's a question of what is the fuel surcharge? Well, what I've entitled it here is recovery above fuel cost.

Now, I think it's kind of interesting to talk about this line right here, fuel cost as a percentage of revenue. Why would that be staying the same over this whole time frame? We've heard lots of testimony in here today about some of the reasons it would stay the same.

Railroads use hedging. I mean they try to minimize the upward increases in fuel costs that they're subject, too. They institute policies and procedures. When fuel costs go up, you try to use less fuel cost. Try to buy more fuel when it's low

and buy less fuel when it's high.

But, you also cannot ignore the fact, another thing would keep fuel cost as a percentage of revenue the same, is if the railroads are recovering a lot of their fuel costs in their rates. Because when you divide fuel cost by revenue the higher the amount of revenue, the more rate increases they get, the more downward pressure there is on this calculation of fuel cost as a percentage of revenue.

It's simply long division. The higher the denominator, the lower the result that you're going to get and in this case, we have fuel cost as a percentage of revenue not changing out through the latter part of 2004.

Now, when we look at this for the other major U.S. and Canadian railroads, all these numbers here are based on -- as if the railroads had the carload fuel surcharge for all of their movements. Which isn't really going to be the case.

All these changes represent what's happened between the fourth quarter of 2001 and the

fourth quarter of 2005 just like the illustration I put up first with Norfolk Southern and it shows that Canadian Pacific had the highest revenue recovery above fuel cost at 12.1 percent. Well, we know Canadian Pacific revised their fuel surcharge in January of 2006. So, they'll no longer be the highest one here as we come out to the next quarter.

The lowest one here is Union Pacific with a revenue recovery above fuel cost at 1.8 percent, but I have to preface. The western U.S. railroads, here it would be wonderful to have some additional information here to true up these calculations. Because we have calculated all this revenue recovery above fuel cost based upon their carload surcharge program.

As it was stated here today, their fuel surcharges for instance for coal are much higher than they are under the carload program. As an example, in December of 2005, the surcharge program for coal was about 7 percent higher than their carload fuel surcharge program. So, as we get actual numbers from the revenue for the actual fuel surcharge revenue they

collect, we'll true these things up. We think this lower over recovery numbers here will probably increase.

But, I'd like to talk about going out into the future and recommendations.

The way fuel surcharges are applied, they're applied against revenue to get an amount of money to cover fuel expenses. This is a very relevant calculation to be determining how these surcharges are actually performing and what we would recommend that they submit the following information to the STB to help the STB better understand what is actually happening here. To submit their total fuel expense. They already do these types of things. Their total freight revenue. The revenue collected from all their fuel surcharge programs.

Calculation of fuel cost as a percentage of revenue and by that I mean total fuel expense divided by total freight revenue less fuel surcharge revenue and then we'd request that they submit these calculations quarterly for the previous four years.

Now, what this will do, what the

advantages of this are is it would provide an easy to use measure that enables the Board and other interested parties to evaluate whether a railroad's fuel surcharge program is reasonable. I think the Board needs to have something. We've been talking here all day and we have a tale of two cities in this room. You need to have data that you can really evaluate how these programs are performing.

It requires minimal added reporting by the railroads. They already submit most of this information. The information we're really interested in is the revenue they're recovering from their fuel surcharges. It would provide a method for eliminating the four years of fuel escalation railroads are currently receiving under their current fuel surcharge program.

I envision this could be used as an index. You could have an index for each railroad where you could be taking a current rate and you could be adjusting it by this index which would be reflective of how effective this program actually is.

Last, but not least, this is a very

relevant calculation for fuel surcharges that are applied against the rate for a movement. Being as these surcharges are applied against revenue to generate an amount of money to cover expenses, these calculations are probably one of the best ways of determining how these surcharges are actually performing and how closely related they are to the railroads' actual changes and cost.

We've heard a lot of different numbers in here today and I think it would be important to focus on the bottom line as to how these programs are actually performing.

That concludes my testimony. I thank you for once again being able to present to the Board.

CHAIRMAN BUTTREY: Thank you. Thank you very much.

(Whereupon, at 5:00 p.m. the evening session began.)

E-V-E-N-I-N-G S-E-S-S-I-O-N

5:00 p.m.

CHAIRMAN BUTTREY: Tom, go right ahead.

MR. O'CONNOR: Okay. Thank you. Good to be here today. Thank you, Chairman Buttrey, Vice Chairman Mulvey, staff.

My name's Tom O'Connor. I'll be summarizing highlights of the presentation that Kim Hillenbrand and I submitted as testimony and we're going to come to a similar conclusion that Jay offered you just a few minutes ago.

What we were hearing today is a fairly easily solved problem and it's solved by the availability of the data.

We'll conclude with a recommended action plan and the recommended action plan spells out the data that we believe would solve the problem that is before you today.

We are testifying in conjunction with the American Chemistry Council. This slide reiterates some of the points made by Tom Schick in his earlier testimony and I'll just expand on one or two of those

as we go through.

We talked a little bit about how would fuel surcharges be properly applied to specific movements and point of fact, in Canada, they have used off and on since 1926 a formula called the Davis formula which takes account of things which you heard from one of the witnesses earlier today. Takes into account speed, weight, distance and the like. It's an engineering kind of an approach to the problem.

But, what that concept is speaking to is the fact that it's a useful approach and we have it included in our testimony and in our recommendation to link to a service unit and which exact service do you link to and how you link to it remains to be debated. But, linking to it is important.

Fuel surcharges lack transparency. The data collection will solve that problem. It will solve that problem.

Now, in the course of the day, I'm not sure I recorded every recommendation for solving the lack of transparency, but I heard it from auto, coal, lumber, a few more shippers. I heard it finally from

UP. UP wanted something that was transparent.

The class one railroad fuel surcharges all share a fatal flaw and the fatal flaw you heard about earlier today and you've heard about it from practically every shipper with us. The flaw is we're applying a cost increase percentage to a revenue factor. We're really doing a pricing when you take that approach. That's differential pricing not cost recovery. It's differential pricing.

When we are going to apply revenue as the base, we recover costs differently among commodities. That's a rate problem.

We recover costs differently among industries. That's a broader problem.

And ultimately, we over recover fuel costs and we'll probably over recover fuel costs on all of the movements that are exhibiting a revenue cost ratio greater than the average for the year, roughly one -- you might even be over recovering fuel costs for everything that's got an RVC greater than 100. So, you are definitely over recovering differentially.

Now, the class one railroads' fuel

surcharge is similarly flawed. We're looking at five of them. U.S. ones doesn't go forward and they all share that same flaw.

This graph indicates part of the reason why the railroads might resist the use of RCAF. What are we looking at here? We're looking at fuel cost as a percentage of operating cost.

Notice two things here. First of all, the fuel cost as a percentage of operating cost varies significantly among the railroads and it varies significantly within a railroad through time.

The RCAF weights that you heard about earlier today will be stable in terms of, at a given time you'll have the same weight per fuel for all of the applications of the RCAF whether adjusted for productivity or not adjusted for productivity for all carriers, all shipments. What you're looking at is the fact that fuel impacts them differently. Okay.

Now, this graph also shows you one thing, too. It focuses on the annual changes in fuel costs and we'll take a look at those on the next graph.

Here's the 2005 average fuel surcharge

compared to the 2005 change in fuel cost. Now, the difference between those two parameters is a rough measure of over recovery. You can see that all of them by this measure are over recovering. The source of this data parenthetically are the railroads' SEC filings on the company websites and it jumps right out at you. This data should be available to the STB and much of it already would be available reported in some format to the STB.

VICE CHAIRMAN MULVEY: Tom, why would the change in fuel cost be a percent of total cost instead of just the percent change in fuel cost? The total cost would also increase. Wouldn't it? And that wouldn't lower the change in fuel cost as the percent of total cost and would other costs increase also?

MR. O'CONNOR: Yes, total cost can be moving during that same time period, but what this is telling you -- we're back on the previous line. What this is telling you is that as we move from 2004 to 2005, fuel really got to be a serious problem and looking at the NS, we looked at NS in Jay's data, but NS in 2005, fuel was roughly 11 percent. NS is not

doing too bad when you have an RCAF that's at 12 percent, 10/12 percent. But, 10 or 12 percent is not going to be welcomed by BN for whom fuel is 19 percent nor UP for whom fuel is 20 percent.

That's the kind of a problem that you get into with the RCAF. As long as RCAF stays as a national figure, this is kind of a structure problem here.

There is another thing, too, to bear in mind. There is an all inclusive index less fuel. The all inclusive index less fuel until fairly recent years, I want to say partway through 2004, 2005 and beyond if you graph it and we don't have this particular graph in this particular presentation, but if graph it, you'll see that the RCAF less fuel and the RCAF including fuel track very closely together.

In 2004 and certainly in 2005 and beyond, they begin to diverge. When they begin to diverge, this kind of a problem with fuel and fuel cost recovery is going to be a typical problem that you're going to be hearing about from both railroads and shippers. It's a structure problem.

Okay. Now, this graph we just looked at. Let's go back to page four. Just take a quick look at page four and now, let's go to page six. That's the difference in cost. This is the fuel surcharge. It is utterly impossible for that cost difference to be run against this fuel surcharge uniformly and somebody is not recovering a different amount. That's mathematically impossible.

Now, the fuel surcharges claimed by BN and UP are virtually identical. The fuel surcharges claimed by KCS, NS and CSXT are also virtually identical. There is, of course, a difference between the eastern carriers and the west and the KCS joined the eastern carriers in roughly the end of 2004. But, that's an amazing graph.

Here is what we were able to piece together and Kim gets most of the credit for coming up with this data. This data was pieced together out of SEC filings. This data should be available for every railroad at the period that you want and when you have this data available, all of the ambiguities and uncertainties about whether there's an over recovery

or an under recovery will disappear.

We take line one the 2005 fuel costs, line two the 2004 fuel costs, line three is simply the difference. That's the increase in fuel costs as submitted to the SEC. It really should be submitted to STB. That's the increase in fuel costs. That's the amount that one would expect a surcharge to recover.

Some of the railroads, BN and NS and UP, we were able to identify an amount of fuel surcharge revenue that they reported. Most of this is direct. Some of it came indirectly through Wall Street analyst reports. It should be coming from the STB. This is a simple piece of information and with this piece of information, all the ambiguity goes away. You've got the facts. You've already got the principle. Then you'll have the facts. Then you're there. That's all.

Okay. The next slide, I would submit that the class one railroads’ fuel surcharge structure is unsupported, certainly unsupported on data that's been provided or that we've been able to come up with or we

heard here today and it appears to be structurally inequitable. I would submit further that that practice is almost by definition unreasonable.

Similar shipments transported in the same train can and do have vastly different fuel surcharges. We submitted that in evidence. No need to dwell on it here. Anybody could come and replicate that same analysis. You would get exactly the same result.

Central city to central city, different commodities, different revenue, different fuel surcharge. Everything else is the same.

Here's the plan that we would recommend for your consideration. First, require uniform railroad reporting of railroad fuel costs. Not a big deal. They're copying it. It's there.

The relevant fuel surcharge measure is the change in fuel cost. Not the total, but the change and the definition of the base period becomes critical. It is definitely not 2001 as we heard a couple of times here today. It is not 2001.

For both the base period and the

subsequent period, fuel cost will be related we'd recommend to a simple and readily measured service unit. Revenue ton miles comes to mind. There are lots of others that could work.

But, railroads would also report the actual fuel surcharge revenues they collect during each period and they would distinguish, this is important, they would distinguish the non-fuel surcharge traffic from the fuel surcharge traffic so we wouldn't be guessing about it.

Now, where did I get that idea? I got that idea from the announcement that CSX made in 2000 when they announced their first fuel surcharge and it was authored by our current Secretary of the Treasury who was then President of CSX. But, that's his idea.

I think it's a good idea and he said that was the way he would apply the fuel surcharge. He would not apply a fuel surcharge to traffic to which is should not be applied. He defined as part of that traffic RCAF traffic, RCAF suggested traffic, traffic that had a contract.

Then we go to step five, comparisons of

the fuel cost incurred and the fuel revenues received becomes a simple matter of arithmetic. Whether you have an overcharge or an undercharge, you can then correct it in the following period be that a month or a quarter.

This is very similar to the RCAF forecasting adjustment that is automatic. I mean they do their best at the RCAF forecast and as you know from looking at the RCAF forecast, that it's never been right. I don't think there's a single quarter it's ever been right in its history. That's the way forecasts are.

So, you have an adjustment once you got the actual data. You look at the actual data and you apply a forecast correctly.

That is our recommendation and we appreciate the opportunity to be before you and we may have even finished close to on time.

Thank you. Kim is the coauthor of this. He's allowing me to speak here, but he's the coauthor.

CHAIRMAN BUTTREY: Thank you very much.

MR. O'CONNOR: Okay.

MR. ALI AWAN: Good afternoon, Chairman Buttrey and Vice Chairman Mulvey and Board staff members.

The view is quite different from this side of the dais I must say and it's good to see you all again.

CHAIRMAN BUTTREY: It's good to see you, too.

MR. ALI AWAN: Thank you. As you know, my name is Mazhar Ali Awan and I am a Managing Director at Transportation Economics, a consulting group that assists electric utilities and other shippers to understand how transportation and regulatory issues affect their businesses.

Aside from litigations for it, Transportation Economics has helped shippers with plant studies, cost analysis for various rail movements, project feasibility analyses and other types of economic research and forecasting.

Much of what I wanted to cover today has already been covered by other speakers. So, I'm going to leave out a lot of that portion and yield back the

balance of my time.

Let me start by saying that railroads are entitled to cover their fuel expenses. I don't think a single shipper today has said to the contrary. Moreover, railroads should be free to bear as much or as little risk as they want with regard to changes in fuel prices.

Traditionally, railroads have accomplished this through at least three different mechanisms. The first one escalation clauses and contracts, hedging programs and the third one being fuel surcharges.

Escalation charges are based on some factor of real cost and allow railroads to recoup fuel expenses. Of course, if prices drop, the savings are passed along to the shippers.

Hedging inevitably raises the expected fuel price. There is a cost to be paid for the benefit of smoothing out price volatility.

In addition, any hedging program carries with it a small, but a very real risk of a rogue trader. A trader that guesses wrong and then doubles up his bets and potentially single handedly wipes out

the firm.

Hedging programs used in conjunction with fuel surcharges are more worrisome and really are double dipping, but actually, the more you think about it they're really triple dipping or a triple recovery of fuel expenses.

Ideally, a hedging program would be effective or prudent only where a carrier did not have recourse to adjusting rates to accommodate added fuel expense.

I've traveled much in the last year since leaving the Board, year and a half since leaving the Board and aside from service concerns, the biggest concern that shippers have had throughout the country has been the fuel surcharge expense that they've been forced to bear.

I think the questions that the Board really needs to ask itself and the shipping community and the railroads are what is a proper fuel surcharge? Two, under what circumstances would a fuel surcharge become an unreasonable practice and three, what can the Board do to facilitate private sector initiatives

to develop an appropriate fuel surcharge mechanism?

Let me begin by saying that a fuel surcharge ought to be a pass-through mechanism of additional fuel expenses and that's unexpected changes in fuel expenses. So, surcharges that capture more revenue than the totality of a movement's fuel costs are really not a surcharge.

An appropriate fuel surcharge is a pass-through mechanism not a call-back mechanism. A mechanism that captures more revenue than the change in fuel price is implicitly and surreptitiously a rate increase.

An appropriate fuel surcharge should capture the change in fuel prices from a common starting point. It makes little sense to ask the shipper who's built a new plant to pay a 15 percent fuel surcharge when they haven't moved anything yet.

Stepping back for a second, I think this whole problem with the fuel surcharge and the reason why you hear so much outcry about this and concern from both the railroads and the shipping community is really an information asymmetry problem.

The Board can very easily change this. There have been other shippers during the day who recommended that we go to SEC filings and various -- and require the railroads to file additional data. I don't think that needs to be really done and I'm going to explain that more fully in a minute.

The Board requires the railroads to file R1 statements every year and in those R1 statements is a category for fuel expenses. So, the Board already has the data it needs to determine what the fuel expenses for the various railroads have been for the previous year and the Board processes these R1 statements that the railroads submit into its uniform rail costing system, the URCS costing system, and the data exists within the Phase II part of the URCS costing system.

Now, the Board can very easily change its asymmetric problem by tweaking the Phase III program which the Board sells to all interested parties at a nominal expense. I think it's $50. So, there's a plug for the Board's IT department, and really change the dynamic of what people are talking about out in

the industry.

So, with these changes in the URCS system that we've proposed and which I'll explain a little bit more in a minute, this information will allow shippers to really assess the surcharges that they believe are either onerous. They can use this information to find out that, in fact, they are reasonable and at the same time, the carriers can use this data to determine whether their fuel surcharges are too high and effectively, they would have to explain to the shippers why their fuel surcharges are so high.

So, it really changes the dynamic of the conversation going on in the private sector by providing the industry more information.

Now, in my written statement, in Transportation Economics' written statement, we have enunciated five principles that the Board should employ in assessing fuel surcharges and I won't repeat those here in the interest of time.

What I did want to do was I know that Tom did an excellent job showing you the macro level of

the effect of fuel costs on railroads and the surcharges that they've imposed and the difference between the two and I think in keeping with the national rail transportation policy which really states that the Board should allow the private sector to function as much as possible on its own without interference from the Board, we really need to look at a micro analysis to see which shippers are really being affected and how do we remedy those particular instances.

Transportation Economics was asked by Highroad Consulting to apply URCS to nearly two dozen movements to isolate fuel cost associated with these movements and to compare these expenses to fuel surcharges applied to these shippers and we did this and we required -- we did not require -- we didn't have to go to the SEC filings to get this data. All we did was look into the URCS figures that the Board reports at the end of the year usually around September every year for each of the rail carriers.

And if you look through the URCS tables and they're voluminous, almost 400 pages per railroad,

you can go through the tables and you can find the unit cost associated with each one of the elements that one would think would contribute to fuel expense and those elements are actually identified in the URCS program through the regression equations that are used by URCS and rightfully, gross ton miles one would think would be a very important factor in determining fuel cost as would locomotive running miles and if you keep going through once you find those two variables, you find that there is yard switching and road switching that also contribute to fuel expense for the railroads.

And basically, that's what we did. We got the unit cost for the gross ton miles, the unit cost for the locomotive running miles and switching that would be associated with these particular movement that we analyzed. We added a gross overhead ratio to that and used the movement characteristics developed using URCS and we got very interesting results.

The exact model that we used is included in our written testimony.

I would note that there really is not

reason to use West Texas crude or the highway diesel cost or any of these other indices because this information exists within URCS. So, why not use the Board's costing methodology or the costing data that the Board already has to figure out where we are with respect to fuel cost or fuel surcharges.

Essentially we assume the URCS regressions that fuel expense was based on trailing weight, the number of locomotives used in the movement and the length of movement. In our analysis, we found that the cost for each of the shippers that we studied they were paying fuel surcharges that exceeded the total fuel expense developed using URCS Phase II and Phase III data and movement characteristics. That's the total fuel expense.

Stated differently, the fuel surcharge itself was greater than the total fuel expense for the movement, while the base rate already includes a component for fuel within that rate. In fact, these fuel surcharges often exceeded by several multiples the total fuel cost estimated by URCS. We're just talking about the fuel surcharge now.

CHAIRMAN BUTTREY: What was the order of magnitude of that difference?

MR. ALI AWAN: It varied from if I remember correctly 75 to 200 percent. Is that correct? Okay.

I also wanted to mention that railroads should not be allowed to turn to non-contract shippers to cover the cost of fuel associated with long-term contracts that do not possess pass-through mechanisms.

Now, the Board on the stand alone rate case ties has been very concerned with cross subsidy concerns and it should be concerned with this I think on this factor, too because this practice should be considered a cross subsidy. An impermissible cross subsidy.

Concluding, the Board asked in the notice for the hearing that the shippers show that railroads were labeling a rate increase as a fuel surcharge and to show when a rate increase is not directly or closely correlated to increases in cost of fuel for a particular movement to which the surcharge is applied.

Our empirical research into this inquiry

shows that the movements that we analyze, the recovery of fuel expense was, in fact, greater than the fuel cost incurred by the respective originating and terminating railroads.

The Board also asked how the reporting requirements of the railroads should be adjusted to provide rail customers with better information on a carrier's fuel costs and the revenue collected through fuel surcharges. We agree with the railroads that the answer to that is the data is already collected and exists in a usable form within URCS.

The Board simply needs to add a data output in the phase three process to show what the fuel costs are for the movement that has been analyzed.

The railroads have testified that developing fuel costs for each of these thousands traffic would be onerous. This is not the case. URCS could be used as a tool by shippers to determine what their fuel expense is for each of their movements and they could use this data to negotiate with the railroads. This would go a long way in giving

shippers the needed information to assess fuel surcharges made by railroads as reasonable or unreasonable.

CHAIRMAN BUTTREY: Excuse me. Your time is up. So, if you could just briefly sum up.

MR. ALI AWAN: I have --

CHAIRMAN BUTTREY: Maybe 30 seconds to summarize.

MR. ALI AWAN: Okay. Well, actually, I'm pretty much done. I'm happy to take any question that you might have.

VICE CHAIRMAN MULVEY: What about the data time line with URCS data? Is that a problem at all? URCS data is not as current as you might like?

MR. ALI AWAN: Right. You usually have about a year/year and a half --

VICE CHAIRMAN MULVEY: Year and a half.

MR. ALI AWAN: -- backlog depending on how quickly the data is processed.

You can index those numbers back quite easily. So, I don't think that's going to be too much of a problem or up if you want.

VICE CHAIRMAN MULVEY: Um-hum.

MR. ALI AWAN: It can be done because those indices exist. So, it's a very simple computation.

VICE CHAIRMAN MULVEY: Yes. It does strike me that some of these things can be done with today's modern computers, and given the availability of high speed computers that the railroads have, we have here and having people like you on board, should be more doable and not quite as onerous as it's made out to be.

MR. ALI AWAN: I agree.

CHAIRMAN BUTTREY: Ms. Dearder, you may proceed.

MS. DEARDEN: I'm Sandra Dearden with Highroad Consulting and I thank you for the opportunity to present our views in this proceeding.

I filed a statement in the proceeding. I'm not going to cover all those points, but I think I would like to cover a few points and also clarify some of the disconnect that you identified, Chairman, today in what the railroads are presenting versus what

the shippers are saying.

I think the railroads' point of view that they're under recovering their fuel expenses is probably accurate, but what they're doing is they're looking at the big picture and the total fuel costs where the customers, rail customers, who are paying surcharges under the standard surcharge programs are overpaying for fuel.

As Awan said, we prepared cost evidence for four clients who also filed statements into this proceeding. It's important to note that the fuel surcharges that we used in the analysis were the average fuel surcharges paid in 2005. The reason we did that is to protect the confidentiality of the clients' rates and so because the surcharges starting escalating at the back end of 2005 and are much higher in 2006, that was somewhat of a conservative approach.

We studied 25 lanes and in every case, the fuel surcharges were at least four times the total cost of fuel on the move.

In the CSX filing, I noted that they said that fuel is an integral part of their rate

negotiations. We recently helped a client to determine where to build a new manufacturing facility in New York and they've announced and they're going forward. That plant will open in 2007.

So, in the negotiations, we asked why the standard fuel surcharge program would apply since the fuel costs that applied in 2001 and 2002 would not be relevant to shipments that would start occurring in 2007, but they were totally inflexible on that position.

Oh, another thing that happened with another negotiation with a client was when we started talking about addressing the fuel surcharges with that railroad. They said we have embraced the rail fuel surcharges and we need the money because we have this new theme which is re-investability and re-investability is they need the money to reinvest capital into their system because of deferred maintenance and the need to increase capacity. It seems to me that that is not what the purpose of the fuels surcharges are.

In our filing, we have a number of

recommendations and I'd just like to touch on a couple. We would like for the Board to adopt some principles on what to do about fuel surcharges and we would recommend that when needed and not for -- we hope that this can be worked out between the shippers and the carriers, but that you have a mediation process and that reparations be considered when we can prove overcharges.

Also, as Awan suggested, the fuel cost should be reported as a separated line item in the URCS data and also I'd like to request that any actions that come out of this proceeding also apply on exempt traffic.

CHAIRMAN BUTTREY: Thank you very much.

MS. DEARDEN: Yes.

CHAIRMAN BUTTREY: Yes, sir, you may proceed.

MR. BEHE: Hi. Thank you for the privilege.

My name is Mike Behe and for the past six years, our small firm, Freight Resources Network, has been serving the information needs of rail shippers.

Now, we were founded by former Conrail executives. During that six years, we have grown our customer list to where it now includes over 200 of the largest rail shippers in North America. Many of them are here today.

It is relevant to note that our customers make regular use of the information in the STB's public waybill form.

In its notice announcing this public hearing, the Board stated that in this hearing shippers and railroads are asked to comment on whether and how railroad reporting requirement should be adjusted to provide rail customers with better information on a carrier's fuel costs and maybe more importantly, the revenues collected through fuel surcharges.

The Board goes on to say making this information publicly available should enable shippers to better identify and protect against inappropriate surcharges and to more reliably forecast their future transportation costs.

Make no mistake about it, information does

help rail shippers manage their transportation costs.

You've heard the shippers claim over recovery and the railroads claim under recovery. I want to quote the first speaker of the day. I'm the last speaker of the day. I'd like to quote the first speaker of the day the Honorable Brian Schweitzer, Governor of Montana, said that "The devil is in the details" and I think he's right.

In written and spoken testimony, the Board has heard that highly-rated chemical shipments pay higher surcharges than low-rated mineral shipments. Fuel surcharges on wheat run higher than corn. Movements involving railroad provided equipment pay higher surcharges that similar moves in private equipment and you've either read or heard other examples obviously.

Yet, none of these cost recovery disparities can be contributed to differences in the railroad's fuel consumption.

Consistent with the Board's request as to how you might adjust railroad reporting requirements, FRN recommends that the STB move quickly to collect

detailed fuel surcharge revenue data from sample railroad freight bills and include it in the public version of the carload waybill sample.

Now, the Board has heard testimony from other witnesses today implying the need for such an initiative and over the past few months, FRN has heard similar comments from many of our customers. We, therefore, recommend that the Board require the railroads to submit their fuel surcharge revenues for each sampled freight bill and that this revenue appear in the public waybill file as a separate and distinct data field. Surcharge revenues are too significant and evidently too permanent to continue to ignore them in this sampling process.

Now, in order to protect the confidentiality of any contracted-base freight rates, we recommend that the Board adopt the following reporting requirements. In situations where the railroad applies a percentage to the actual freight weight to determine the fuel surcharge amount and where the base freight rate is in tariff or public price form, the fuel surcharge revenues would be

captured and displayed exactly as they are billed.

However, if the base freight rate is a confidential contract, then obviously under the percentage arrangement revealing the surcharge would reveal the contract. The fuel surcharge revenues would be disguised using the same method applied to the corresponding base contract freight rate.

When the railroad utilizes a mileage-based method for calculating the fuel surcharge or any other method that may be devised in the future that does not involve use of the base freight rate in its derivation, the fuel surcharge revenues would be captured and displayed exactly as they appear on the freight bill.

In closing, we respectfully encourage the Board to, one, immediately begin collecting this data from the railroad. Two, include fuel surcharge revenues in a separate and distinct data field in the public waybill file and do so at the earliest possible opportunity and three, because timely data is worth a lot more than late data, take every available means to accelerate the processing of and advancing the

periodic release date for the public waybill file.

Very grateful to have the opportunity to share these views with you today.

CHAIRMAN BUTTREY: We thank you very much for being here sharing that with us.

I'd like to open up the panel again if I could for not necessarily rebuttal, but an opportunity to speak to anything any other panelist said. You all seem to be sort of saying the same things, but there are some differences that I detected anyway and anybody on the panel could have a closing statement if they'd like to do that.

MR. O'CONNOR: I'd like to take that opportunity.

First, Awan, I have the greatest respect for him. He's highly skilled, but I've been thinking about the proposal that he just offered and let me be a railroad guy just for a minute and come at that from a different direction.

I will have the data that you didn't require me to report, but I have it. You don't have it. Awan doesn't have it because I didn't report it

and if you follow this action plan or Jay's plan, you will have more data to work with. Both sides will eliminate the problem of lack of a transparency.

Okay. So, I'll have more data than you will have as we walk into the negotiations. We'll both know URCS, but I will know more about it than you do. I will know, for example, that the factors that drive the URCS' unit costs are not only the regression results. There are factors imbedded in URCS that go all the way back to rail form A. Equated switch factors is the primarily incidence. It goes back to the 1940s.

So, you're coming at me with URCS. I'm coming after you with the actual knowledge of whether over recovered.

Cut to the rail TOFC. It's the largest growth area for rail right now and it's a problem for rail because the profit margins are weak in rail TOFC and the volume is growing and they're going to be pressing hard on this.

The factors is in URCS that deal with rail TOFC go back to the 1970s. Way before double stack.

Double stack came on during my watch at the AAR. I was AVP of Economics and I got a call one afternoon from a shipping line. I won't say the name, but their initials are APL and they began asking questions about TOFC and later that week, I got a call from a railroad and I won't say their name, but their initials are UP. Same kind of questions and basically, the upshot of that was APL came to UP and said we have a new idea and UP said well, it might work. Might not. We'll sell you the whole frame. Good luck. And it worked.

That meant that the factors that described the 1970s would not describe the 1990s.

So, there's a role for micro in this, but you must have the macro data to compute that simple piece of information that we've spent the day debating. Did we over recover or under recover? They know. You don't. I'd like to know.

CHAIRMAN BUTTREY: Anyone else?

MR. ROMAN: I thought I'd also just add a few words and that is what I'm amazed at with this fuel surcharge is that this isn't rocket science. This is pretty much bean counting. Numbers that we go

through in our fuel surcharge study, this is bean counting and all we're really looking for is to eliminate some of the uncertainty in the numbers.

Railroads submit an awful lot of data to the STB and from my perspective, you got to know where you are before you know where you can get to and there's been a lot of numbers presented here today and a lot of them with incremental cost increases from the base time frame. Need to be focusing on what's the total fuel cost and what's the total revenue that they're collecting from you because you got to know where you are before you know where you can get to and by just changing a little bit more of reporting to the railroads, I think it can be simplified.

I think it can be streamlined and the biggest thing is for both the Board and the shipping community to have the beans available to count so that we don't have to be sitting in a room like this all day and listening to two dramatically different stories. We all have to be working from the same page.

And anything that can come out of this

hearing that will do that will make this even though it's a very long day, will make it a very constructive day.

VICE CHAIRMAN MULVEY: You know, it's bean counting that on its face it would seem to be something that you could do fairly quickly, but I remind you that the highest IQs are not astrophysicists or medical doctors, but CPAs and there's probably a reason for that. It can sometimes be very, very difficult to tease out the data.

What would seem to be a fairly simple calculation, as you've seen today often is not. We have the railroads doing their calculations and saying here's what it is. We're undercollecting. And the shippers doing their shippers' calculations and having them vary quite a bit, too. Even if those have not been consistent, they all consistently said the railroads are under collecting.

Clearly, we do need the data, but clearly we need to get the data in a format where we can do our own calculation and decide what, in fact, it is costing and what, in fact, is being charged.

My guess is it's the second piece of that that might be more difficult to tease out.

MR. ROMAN: Well, there are also some other -- you've heard things a lot of different ways in here. The issue of hedging and where the benefit and loss from hedging goes. I mean there are some decisions that need to be made from the Board's side of it, but you still need all the information even to make an educated decision on some of those things and anything we do to further that is going to tell us a lot about where we are now and probably give us a pretty good road map of where we need to get to.

VICE CHAIRMAN MULVEY: Hedging is certainly a complicating factor. We've had some of the shippers say that hedging shouldn't be on the table. That that's a risk that the railroads take and therefore, even though if they are paying that for the fuel, that's a risk that they took and we'll just take the hedging activity off the table in doing the calculations.

Others have said no, hedging is an important consideration and we should include it. So,

it goes both ways. You're right.

MR. AWAN: I would add with all due respect to Tom that using URCS and providing that information to shippers would lessen the asymmetry problem that is really the crux of the matter here and as a threshold matter, you know, if you can show that your fuel surcharge is in excess of the total fuel cost associated with that movement, then you've made a very strong showing that the fuel surcharge is unreasonable and if you can show that the fuel surcharge is greater than the delta between what the fuel cost was and basically the change in fuel cost, then you've had a weak showing that the fuel surcharge may be in excess of what a proper fuel surcharge might be.

So, as a threshold matter, I think it really empowers the shipping community to go out there and find out hey, is this a realistic shipping fuel surcharge or not and now, should we move forward on it and from that point forward, I think I would defer to Tom that more data might be required to make a more exact assessment of where you really are.

CHAIRMAN BUTTREY: We are coming up on the end time for these rebuttals.

MR. O'CONNOR: I agree with my friend Awan and we submitted a couple of figures that show exactly Awan's point. It shows that the percent variance from the average fuel surcharge depending on the commodity can be 200, 300, 400, 500 percent which establishes the point that you're driving to.

That pertains by the way whether we're looking at average fuel surcharge for commodities, we selected Houston to LA to Vegas. We also looked at Chicago to the New Jersey region. One on the east. One on the west. And looked at a variety of commodities.

Although we were working at the request of the American Chemistry Council, we found that they particularly disadvantaged. We found that nobody was helped by this current method. Nobody.

VICE CHAIRMAN MULVEY: Thank you very much. We have finished.

CHAIRMAN BUTTREY: Well, since Mr. Strege's still in the room, I'll commit to him that

we're going to separate the wheat from the chafe.

Thank you very much. This hearing is concluded.

(Whereupon, the hearing was concluded at 5:44 p.m.)

# EXHIBIT

# PX0846

CN

www.cn.ca

**Law**

Theodore K. Kalick
Senior U.S. Regulatory Counsel

601 Pennsylvania Avenue, NW
Suite 500 North Building
Washington, D.C. 20004

**T** 202-347-7840
**F** 202-347-8237

April 27, 2006

**By Electronic Filing**

Honorable Vernon A. Williams, Secretary
Surface Transportation Board
1925 K Street, N.W.
Washington, D.C. 20423-0001

Re: Ex Parte No. 661, *Rail Fuel Surcharges*

Dear Mr. Williams:

Pursuant to the Board's notice of public hearing in the above-entitled proceeding, served March 14, 2006, Canadian National Railway Company ("CN") submits for the record the enclosed statement.

Sincerely,

Theodore K. Kalick

Theodore K. Kalick

**BEFORE THE**
**SURFACE TRANSPORTATION BOARD**

---

**EX PARTE NO. 661**

---

**RAIL FUEL SURCHARGES**

---

# STATEMENT OF CANADIAN NATIONAL RAILWAY COMPANY


James M. Foote
Executive Vice President, Sales & Marketing
Canadian National Railway Company
455 North Cityfront Plaza Drive
Chicago, IL 60611-5317
(312) 755-7842

Theodore K. Kalick
Senior U.S. Regulatory Counsel
Canadian National Railway Company
601 Pennsylvania Ave., N.W.
North Building, Suite 500
Washington, D.C. 20004
(202) 347-7840

Jean-Jacques Ruest
Vice President, Marketing
Canadian National Railway Company
935 rue de la Gauchetiere, Ouest
Montreal, QC
H3B, 2M9, CA
(514) 399-6734

**BEFORE THE**
**SURFACE TRANSPORATION BOARD**

---

**EX PARTE NO. 661**

---

**RAIL FUEL SURCHARGES**

---

**STATEMENT OF**
**CANADIAN NATIONAL RAILWAY COMPANY**

In this proceeding, the Board has called a public hearing to address concerns that fuel surcharges collected by railroads "are designed to recover amounts over and above increased fuel costs." CN does not conduct its business in that way. When CN decides to increase prices for its transportation services, services that we expect will generate earnings for the Company, those prices are reflected in our base rates.

CN did not establish a fuel surcharge to increase profits. Instead, CN has designed and implemented the surcharge to recover, with minimum burden on our customers, the increases in fuel expenses we have experienced in a volatile fuel market. In the markets that we face for our business, and for our customers whose business we value, it would be self-defeating for CN to exploit the surcharge in any other way.

In evaluating over the past several years how to address increasing fuel expenses, CN would be the first to acknowledge that there may be a number of approaches for the recovery of such costs. The complexity of the matter, however, ensures that no approach is problem-free or necessarily preferable. As such, the drivers of CN's fuel surcharge are the same as for any other business decision: what makes sense, is reasonable, and

contributes to the railroad's long-term capabilities to provide quality rail service to our customers. We believe that CN's fuel surcharge is market responsive, simple in its application, and equitably and fairly applied. As it has been implemented, our strategy is to drive for universal application of the fuel surcharge, without discounts, across our customer base that will enable us to deliver the lowest possible surcharge to recover the increased fuel expenses we are incurring.

## CN'S FUEL SURCHARGE

The application of CN's fuel surcharge has been a dynamic process, one that has evolved significantly since its inception. The fuel surcharge was introduced initially in CN Tariff 7400 in May 2001. Its implementation in that tariff, and in two subsequent iterations in April and October of 2005 in CN Tariff 7401, reflected the reality that fuel costs were becoming a compelling economic issue for our customers and CN to a degree that required heightened monitoring and a cost-recovery mechanism apart from the base rates for our transportation services.

CN applies the fuel surcharge as a percentage of our revenues, based on the monthly average per-barrel price of West Texas Intermediate (WTI) crude oil as published in the Wall Street Journal, and in its current form in CN Tariff 7401, application of the surcharge is triggered when the price of WTI crude is $25 per barrel and above.[1] The surcharge reflects the relationship of CN's total fuel expenses to total revenues, and in any monthly period is intended to recover CN's increased fuel expenses from across our customer base after WTI crude prices reach the $25 per barrel threshold.

[1] In CN Tariff 7400, application of the surcharge started when the price of WTI crude reached $24 per barrel. In either circumstance, CN's fuel costs reflective of WTI crude prices below the surcharge-commencing level are factored into CN's base rates.

For ease of application, the surcharge amount is increased (or decreased) at incremental amounts reflective of that relationship based on a defined increase (or decrease) in the price of WTI crude. Thus, for each additional $1 per barrel in WTI crude oil above $25, CN's fuel surcharge increases by 0.25%.[2]

CN's objective since the inception of the fuel surcharge has been to apply the surcharge equally to all of our customers. Some customers, seeking favored treatment, have resisted that approach. But as confidential contracts have expired and we have worked further with our customers, we are achieving an increasingly universal, equitable, and more affordable surcharge application. In April 2005, CN adopted CN Tariff 7401 that reduced surcharge rates approximately 25% below those in CN Tariff 7400. Driven by efforts to gain even wider coverage and eliminate remaining variances from the tariff, and with surcharge-application rates in the second half of 2005 approaching 75% of our customer base, we reduced surcharge rates an additional 15% in a subsequent modification to CN Tariff 7401 in October 2005.[3] As a percentage of carrier revenues, CN's fuel surcharge rates are currently the lowest in the industry.

To make the fuel surcharge further responsive to market and customer needs, CN Tariff 7401 also modified the period used for measuring changes in the price of WTI crude oil and the timing of surcharge adjustments. In its original form in CN Tariff 7400, the surcharge was calculated and adjusted on a quarterly basis, with surcharge amounts

---

[2] A decrease of $1 per barrel in WTI crude would likewise reduce the fuel surcharge by 0.25% until the WTI price reached $25. Any reduction in the WTI price below $25 would avoid application of the surcharge.

[3] A fuel surcharge comparison of the revised CN Tariff 7401 (October 2005) with surcharges in CN Tariff 7400 (May 2001) and the initial version of CN Tariff 7401 (April 2005), along with a copy of CN Tariff 7401 and the schedule outlining the application of surcharge amounts, are provided as an Attachment to this statement.

changing in 2% increments upon a $5 per barrel average increase (or decrease) in the price of WTI crude in the previous quarter. CN Tariff 7401 now directs calculation of the fuel surcharge on a monthly basis and has also decreased the trigger for surcharge changes from the original $5 increment in CN Tariff 7400 to $1, allowing for a more timely response to changes (decreases as well as increases) in the price of WTI. Moreover, unlike CN Tariff 7400, any surcharge adjustment that is made pursuant to CN Tariff 7401 is based upon changes in the price for WTI measured in the second calendar month prior to the adjustment, allowing our customers to receive 20 days' advance notice of any changes and time to respond internally and to their own markets.

**CN'S FUEL SURCHARGE REASONABLY BALANCES EQUITY AND SIMPLICITY**

Central to CN's efforts to establish a market-responsive mechanism to equitably recover increased fuel costs is to ensure that the mechanism is workable. As much as any other concern, our customers insist that the surcharge mechanism be simple to understand, easy and straightforward to administer, and minimize the chances for dispute (providing, for example, for invoicing that minimizes tracking and customer billing issues).[4] CN's revenue-based surcharge has satisfied these goals. As with other business matters, the balance between equity and simplicity in CN's design and application of the fuel surcharge allows CN and our customers to concentrate more on central issues concerning the delivery of more effective and innovative transportation services.

---

[4] Also, CN does not just provide local service. Much of our business is in interline service with other rail carriers, requiring payments to and from connecting carriers under the industry's Interline Settlement System (ISS). The ISS can only process interline settlements incorporating fuel surcharges when the surcharges are stated as a percentage of revenues.

CN, of course, is aware of the call in some quarters for rail carriers to convert to mileage-based fuel surcharges on the grounds that revenue-based surcharges over-recover increases in fuel expense and do not distribute fuel cost recovery precisely due to differences in fuel cost per dollar of revenue for differently rated traffic. CN would suggest that, in its application, a fuel surcharge based on car miles is not likely to be significantly more equitable, if at all, since fuel cost per car mile can vary widely depending on characteristics such as tons per car, empty return ratio, track conditions, geography, weather, and other factors affecting service. Moreover, in contrast to a revenue-based surcharge, a mileage-based surcharge invariably will be more complex, customer unfriendly, and present a greater menu of potential disputes, starting with the issue of methodologies and systems for calculating, tracking, and administering applicable mileage.[5] In CN's judgment, the minor improvement in equity that might possibly be gained by using a mileage-based fuel surcharge is less than meets the eye and would not justify the increased complexity and costs that CN and our customers would likely face as a result of such a system.

Claims regarding the over-recovery of revenue-based surcharges are also misplaced, at least for CN. Many such claims assume that railroads apply the fuel surcharge to 100% of their traffic. While some customers may be assessed a fuel surcharge on all of their own traffic, it is not a valid measure of whether CN is over-

---

[5] Customers having experience with mileage-based trucking fuel surcharges, for example, may be accustomed to mileage measurements based on highway miles, which can differ significantly from rail miles, let alone differences in rail miles that are presented upon routing changes. Further, necessary modifications to the ISS and the Electronic Data Interchange (EDI) to accommodate mileage-based surcharges applied to interline traffic are likely to take several years to implement at significant cost to carriers and their customers.

recovering on the fuel surcharge as a whole. It is well known that, while CN has significantly increased application of the fuel surcharge to our traffic base since its inception in 2001, contractual considerations still preclude universal application.

Further, such claims typically fail to remove hedging gains from reported fuel costs. Like other Class 1 carriers, we have suspended our hedging program at CN and will have no hedging by late 2006. More fundamentally, hedging does not protect against rising fuel prices; it only flattens out costs over time, and parties are just as likely to lose as gain on hedging activities in any given year. CN believes that any analysis of railroad fuel costs the Board may wish to conduct must be based solely on current market prices.

Finally, there is the inherent risk that the fuel surcharge will not fully compensate CN for its increased fuel expenses. On average, crude oil represents about 75% of locomotive diesel prices, and carriers are exposed to fluctuating refinery and retail margins as well. Refinery margins are likely to be pushed up by low-sulfur regulations beginning as early as mid-2006 in markets where we buy the same products as trucks, and could be further increased if, as predicted, the upcoming hurricane season proves difficult in refining areas.

In sum, when properly measured and placed in context, since its inception five years ago, CN's revenue-based surcharge has not over-recovered our increase in fuel expenses. Instead, consistent with steps that CN has taken previously that have already led to significantly reduced fuel surcharge rates, and with a mechanism that is simple to apply and administer, we are committed to the goal of bringing all of our customers onto CN Tariff 7401 as soon as possible and implementing the surcharge across our customer base. Such universal application, we believe, affords CN the most effective, efficient,

and equitable way to recover our fuel expenses, while delivering to our customers the lowest surcharge possible.

Respectfully submitted,

Theodore K. Kalick

Theodore K. Kalick
Senior U.S. Regulatory Counsel
Canadian National Railway Company
601 Pennsylvania Ave., N.W.
North Building, Suite 500
Washington, D.C. 20004
(202) 347-7840

James M. Foote
Executive Vice President, Sales & Marketing
Canadian National Railway Company
455 North Cityfront Plaza Drive
Chicago, IL 60611-5317
(312) 755-7842

Jean-Jacques Ruest
Vice President, Marketing
Canadian National Railway Company
935 rue de la Gauchetiere, Ouest
Montreal, QC
H3B, 2M9, CA
(514) 399-6734

Dated: April 27, 2006

**ATTACHMENT**

CANADIAN NATIONAL RAILWAY COMPANY
CN 7401-A FUEL SURCHARGE NOTICE

| WTI Crude Oil* | Former Tariff CN 7400 | Tariff CN 7401 (April 2005) | Revised CN 7401 (Oct 2005) |
|---|---|---|---|
| **$20** | | | |
| $21 | | | |
| $22 | | | |
| $23 | | | |
| $24 | 2.0% | | |
| **$25** | **2.0%** | **1.50%** | **1.50%** |
| $26 | 2.0% | 1.80% | 1.75% |
| $27 | 4.0% | 2.10% | 2.00% |
| $28 | 4.0% | 2.40% | 2.25% |
| $29 | 4.0% | 2.70% | 2.50% |
| **$30** | **4.0%** | **3.00%** | **2.75%** |
| $31 | 4.0% | 3.30% | 3.00% |
| $32 | 6.0% | 3.60% | 3.25% |
| $33 | 6.0% | 3.90% | 3.50% |
| $34 | 6.0% | 4.20% | 3.75% |
| **$35** | **6.0%** | **4.50%** | **4.00%** |
| $36 | 6.0% | 4.80% | 4.25% |
| $37 | 8.0% | 5.10% | 4.50% |
| $38 | 8.0% | 5.40% | 4.75% |
| $39 | 8.0% | 5.70% | 5.00% |
| **$40** | **8.0%** | **6.00%** | **5.25%** |
| $41 | 8.0% | 6.30% | 5.50% |
| $42 | 10.0% | 6.60% | 5.75% |
| $43 | 10.0% | 6.90% | 6.00% |
| $44 | 10.0% | 7.20% | 6.25% |
| **$45** | **10.0%** | **7.50%** | **6.50%** |
| $46 | 10.0% | 7.80% | 6.75% |
| $47 | 12.0% | 8.10% | 7.00% |
| $48 | 12.0% | 8.40% | 7.25% |
| $49 | 12.0% | 8.70% | 7.50% |
| **$50** | **12.0%** | **9.00%** | **7.75%** |
| $51 | 12.0% | 9.30% | 8.00% |
| $52 | 14.0% | 9.60% | 8.25% |
| $53 | 14.0% | 9.90% | 8.50% |
| $54 | 14.0% | 10.20% | 8.75% |
| **$55** | **14.0%** | **10.50%** | **9.00%** |
| $56 | 14.0% | 10.80% | 9.25% |
| $57 | 16.0% | 11.10% | 9.50% |
| $58 | 16.0% | 11.40% | 9.75% |
| $59 | 16.0% | 11.70% | 10.00% |
| **$60** | **16.0%** | **12.00%** | **10.25%** |
| $61 | 16.0% | 12.30% | 10.50% |
| $62 | 18.0% | 12.60% | 10.75% |
| $63 | 18.0% | 12.90% | 11.00% |
| $64 | 18.0% | 13.20% | 11.25% |
| **$65** | **18.0%** | **13.50%** | **11.50%** |
| $66 | 18.0% | 13.80% | 11.75% |
| $67 | 20.0% | 14.10% | 12.00% |
| $68 | 20.0% | 14.40% | 12.25% |
| $69 | 20.0% | 14.70% | 12.50% |
| **$70** | **20.0%** | **15.00%** | **12.75%** |
| $71 | 20.0% | 15.30% | 13.00% |
| $72 | 22.0% | 15.60% | 13.25% |
| $73 | 22.0% | 15.90% | 13.50% |
| $74 | 22.0% | 16.20% | 13.75% |
| **$75** | **22.0%** | **16.50%** | **14.00%** |
| $76 | 22.0% | 16.80% | 14.25% |
| $77 | 24.0% | 17.10% | 14.50% |
| $78 | 24.0% | 17.40% | 14.75% |
| $79 | 24.0% | 17.70% | 15.00% |
| **$80** | **24.0%** | **18.00%** | **15.25%** |
| $81 | 24.0% | 18.30% | 15.50% |
| $82 | 26.0% | 18.60% | 15.75% |
| $83 | 26.0% | 18.90% | 16.00% |
| $84 | 26.0% | 19.20% | 16.25% |
| **$85** | **26.0%** | **19.50%** | **16.50%** |



CN
NEW VERSION

# CANADIAN NATIONAL RAILWAY COMPANY

---

## TARIFF CN 7401-A
cancels CN 7401

---

## APPLICATION OF FUEL SURCHARGE

---

ISSUED: SEPTEMBER 21, 2005 EFFECTIVE: OCTOBER 1, 2005

---

CANADIAN NATIONAL RAILWAY COMPANY is contracting in its own name and for and on behalf of GRAND TRUNK WESTERN RAILROAD INCORPORATED (GTW), DULUTH, WINNIPEG AND PACIFIC RAILWAY COMPANY (DWP), ILLINOIS CENTRAL RAILROAD COMPANY (IC), CHICAGO CENTRAL & PACIFIC RAILROAD COMPANY (CC), CEDAR RIVER RAILROAD COMPANY (CEDR), WISCONSIN CENTRAL LIMITED (WC), ALGOMA CENTRAL RAILROAD INC (AC), (SSAM), FOX VALLEY & WESTERN LTD (FVW) AND WISCONSIN CHICAGO LINK LTD (WCCL), DULUTH, MISSABE AND IRON RANGE RAILWAY COMPANY (DMIR), BESSEMER AND LAKE ERIE RAILROAD COMPANY (BLE), THE PITTSBURGH & CONNEAUT DOCK COMPANY, BC RAIL PARTNERSHIP AND BC RAIL LTD. (BCOL) and these companies do business under the name of and are collectively referred to as "CANADIAN NATIONAL" (CN).

Issued by Price Maintenance and Distribution, Automated Invoicing,
Canadian National Railway Company, P.O. Box 8100, Montreal, P.Q. H3C 3N4

 (©Canadian National Railway Company 2005)
(Printed in Canada) 

**ITEM 100**

**FUEL SURCHARGE**

CN will apply a fuel surcharge to the line haul freight charge(s) based on the monthly average price of West Texas Intermediate (WTI) crude oil, as published in the Wall Street Journal (WSJ).

The formula for determining the monthly average price of WTI crude oil is determined by adding the daily WTI prices published in the WSJ during a given month, and dividing the result by the number of days so published. The result is rounded to the nearest cent.

When the WTI crude oil monthly average price equals or exceeds $25.00 in the second calendar month prior to the month in which the fuel surcharge is applied, the fuel surcharge will be calculated starting from a base of 1.5% of the line haul freight charge. For each additional $1.00 per barrel of WTI crude oil above $25.00, the fuel surcharge will increase by an incremental 0.25%. For example, the surcharge amount in April will be calculated from the average WTI crude oil price during February.

The date of surcharge shall be applied as follows:

| **WTI Average Price During the Calendar Month** | **...is used to calculate the surcharge on:** |
|---|---|
| January | March 1 |
| February | April 1 |
| March | May 1 |
| April | June 1 |
| May | July 1 |
| June | August 1 |
| July | September 1 |
| August | October 1 |
| September | November 1 |
| October | December 1 |
| November | January 1 |
| December | February 1 |

Notification of any fuel surcharge changes will be posted a minimum of 20 days prior to the beginning of each calendar month on the CN website at www.cn.ca/fuelsurcharge and forms part of this tariff.

The fuel surcharge shall be applied according to the following schedule:

| West Texas Intermediate Crude Oil (Price per Barrel $US) | Surcharge | West Texas Intermediate Crude Oil (Price per Barrel $US) | Surcharge |
|---|---|---|---|
| Less than $25.00 | No surcharge | $56.00 - $56.99 | 9.25% |
| $25.00 - $25.99 | 1.50% | $57.00 - $57.99 | 9.50% |
| $26.00 - $26.99 | 1.75% | $58.00 - $58.99 | 9.75% |
| $27.00 - $27.99 | 2.00% | $59.00 - $59.99 | 10.00% |
| $28.00 - $28.99 | 2.25% | $60.00 - $60.99 | 10.25% |
| $29.00 - $29.99 | 2.50% | $61.00 - $61.99 | 10.50% |
| $30.00 - $30.99 | 2.75% | $62.00 - $62.99 | 10.75% |
| $31.00 - $31.99 | 3.00% | $63.00 - $63.99 | 11.00% |
| $32.00 - $32.99 | 3.25% | $64.00 - $64.99 | 11.25% |
| $33.00 - $33.99 | 3.50% | $65.00 - $65.99 | 11.50% |
| $34.00 - $34.99 | 3.75% | $66.00 - $66.99 | 11.75% |
| $35.00 - $35.99 | 4.00% | $67.00 - $67.99 | 12.00% |
| $36.00 - $36.99 | 4.25% | $68.00 - $68.99 | 12.25% |
| $37.00 - $37.99 | 4.50% | $69.00 - $69.99 | 12.50% |
| $38.00 - $38.99 | 4.75% | $70.00 - $70.99 | 12.75% |
| $39.00 - $39.99 | 5.00% | $71.00 - $71.99 | 13.00% |
| $40.00 - $40.99 | 5.25% | $72.00 - $72.99 | 13.25% |
| $41.00 - $41.99 | 5.50% | $73.00 - $73.99 | 13.50% |
| $42.00 - $42.99 | 5.75% | $74.00 - $74.99 | 13.75% |
| $43.00 – $43.99 | 6.00% | $75.00 - $75.99 | 14.00% |
| $44.00 - $44.99 | 6.25% | $76.00 - $76.99 | 14.25% |
| $45.00 - $45.99 | 6.50% | $77.00 - $77.99 | 14.50% |
| $46.00 - $46.99 | 6.75% | $78.00 - $78.99 | 14.75% |
| $47.00 - $47.99 | 7.00% | $79.00 - $79.99 | 15.00% |
| $48.00 – $48.99 | 7.25% | $80.00 - $80.99 | 15.25% |
| $49.00 - $49.99 | 7.50% | $81.00 - $81.99 | 15.50% |
| $50.00 - $50.99 | 7.75% | $82.00 - $82.99 | 15.75% |
| $51.00 - $51.99 | 8.00% | $83.00 - $83.99 | 16.00% |
| $52.00 - $52.99 | 8.25% | $84.00 - $84.99 | 16.25% |
| $53.00 - $53.99 | 8.50% | $85.00 - $85.99 | 16.50% |
| $54.00 - $54.99 | 8.75% | Each $1.00 US incremental increase thereafter | Additional 0.25%* |
| $55.00 - $55.99 | 9.00% | | |

* For example, $86.00 - $86.99 = 16.75%, $87.00 - $87.99 = 17.00%, etc.

**ITEM 200**

**APPLICATION**

This fuel surcharge tariff, CN 7401, applies to all publications that directly reference the tariff CN 7401. All other publications referencing fuel surcharges will default to tariff CN 7400.

# PX0847-PX0914

# Filed Under Seal

# EXHIBIT

# PX0915

KeyCite Yellow Flag - Negative Treatment
Decision Clarified by RAILROAD COST RECOVERY PROCEDURES, I.C.C., September 23, 1981

364 I.C.C. 841, 1981 WL 22792

SURFACE TRANSPORTATION BOARD (S.T.B.)

RAILROAD COST RECOVERY PROCEDURES

Decided April 8, 1981
EX PARTE NO. 290 (SUB-NO. 2)
(49 CFR 1102)

****1** By the Commission, Acting Chairman Alexis, Commissioners Gresham, Clapp, Trantum, and Gilliam.

***841** AGENCY: Interstate Commerce Commission.

ACTION: Final rules.

SUMMARY: The Commission adopts a cost recovery index in accordance with the requirements of section 203 of the Staggers Rail Act of 1980. This index revises existing rules and procedures for the filing of general rate increases by railroads. These rules are intended to simplify and expedite recovery of cost increases through the use of a zone of reasonableness, the top of which is based on an index of railroad costs.

EFFECTIVE DATE: 30 days from publication in the Federal Register.

FOR FURTHER INFORMATION CONTACT:

Richard Felder (202) 275-7656

or

Barry Harris (202) 275-0810

SUPPLEMENTARY INFORMATION:

BACKGROUND

By advance notice of proposed rulemaking served April 28, 1980 (45 F.R. 29103, May 1, 1980), we indicated our intention to revise procedures for filing railroad general rate increases by an inflation index. This was followed by a notice of proposed rulemaking issued November 21, 1980 (45 FR 81217, December 10, 1980). In the interim, the Staggers Rail Act of 1980 (Rail Act) became law, giving the Commission new statutory duties and authority with respect to adjusting rail rates to reflect inflation. Three sections of the Rail Act affect Commission authority in the rail general increase area. Section 203 of the Rail Act provides that the Commission shall publish a 'rail cost adjustment factor,' at least quarterly, as a basis for a zone of rail rate flexibility for individual carrier rate changes. Section 206 of the Rail Act provides that the Commission ***842** may prescribe a percentage rate increase or rate index for rail carriers in order to compensate for cost increases caused by inflation. Increases permitted under section 206 would go into effect automatically unless carriers notify the Commission that they wish to exclude all or part of their rates from the increase. Any increases taken under section 206 would limit the increases available under

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

section 203. Finally, section 219(f) of the Rail Act provides that the Commission may not take any action to eliminate general rate increases before April 1, 1982.

In this proceeding, we are implementing the requirements of section 203. Section 203 reads, in part, as follows:

> Commencing with the fourth quarter of 1980, the Commission shall, as often as practicable but in no event less often than quarterly, publish a rail cost adjustment factor which shall be a fraction, the numerator of which is the latest published Index of Railroad Costs (which index shall be compiled or verified by the Commission, with appropriate adjustments to reflect the changing composition of railroad costs, including the quality and mix of material and labor), and the denominator of which is the same index for the fourth quarter of 1980 * * *.

****2** In addition, we have concluded that the section 203 index should be used as a basis for collective rate increases as well as independent carrier actions. For this reason we are replacing our existing rules governing rail general increases (49 CFR 1102) with the rules discussed here. We think this is appropriate given that the index required by section 203 is calculated on the basis of industrywide, rather than individual carrier cost increases.

As indicated in the notice, we have also decided, particularly in light of the discretionary nature of section 206 of the Rail Act, not to implement it at this time. Given the permissive language of section 206, it is clear that Congress did not intend it to be the exclusive means of implementing general increases. Section 206 requires that all rail rates be raised to the index level, unless a carrier notified the Commission that it wishes to exclude one or more of its rates. Since all parties to a joint rate must join in such a notice of exclusion, section 206 is a less efficient means of cost recoupment than the section 203.

*Choice of an index*.—As proposed in the notice, the Commission finds the most acceptable measure of changes in rail costs for our purposes to be the input price index compiled by the Association of American Railroads (AAR), as modified by the Commission. These modifications include the augmentation of the AAR index with an index that measures changes in the cost of durable assets.

The modified index will be used until the AAR's all-inclusive index is ready (as we anticipate it will be by mid-1981). When the new AAR index is available for analysis we will then determine if it should be ***843** employed, or whether an index developed by the Commission should be substituted. The modified AAR index is set forth in appendix A. It is designed to measure the impact of inflation on the labor, material, and service inputs required by railroads, and is available on a timely basis. The Commission will verify and closely monitor its effectiveness to ensure that inflation in rail cost is accurately measured.

Specifically, we will assist in the development of audit and investigative systems for future index calculations that will:

1. Determine that the methodology used by the AAR is mathematically and statistically sound and consistent from year to year.

2. Check for errors in application of the methodology including errors of calculations and transcription.

3. Audit underlying data at the railroad level to verify the factual integrity of the index at the data source. This step will include an investigation of data outliers and various cross-checks for internal consistency in the data.

4. Compare the AAR index with other data sources such as Bureau of Labor Statistics data and Commission cost data.

The initial analysis of the AAR index by the Commission has not disclosed any systematic bias that would make its use inappropriate in this initial determination, except that it does not reflect the current mix of input factors. We will remedy this

deficiency by updating the weighting of each category of cost included in the AAR index. Categories of costs in the AAR index are currently weighted in proportion to their relative portion of total costs as reported by all class I railroads in 1974. We shall apply instead the proportion each category represents of total costs as reported by all class I railroads in their Annual Reports R-1 for 1979. We will work with the AAR during the next several months to improve further the index and ensure equitable treatment of all component costs.

****3** Many participants in this proceeding have opposed the use of the AAR index on the grounds that it is a 'price' index as opposed to a 'cost' index and is, therefore, incompatible with the intent of Congress as expressed in Section 203 of the Rail Act. Since a price index reflects inflationary increases in rail input prices, while a cost index reflects inflationary increases in cost per unit of rail service, the two are not always equivalent. This issue is closely related to the 'productivity adjustment' issue addressed by many participants, and will be dealt with later in this decision.

Another objection to use of the AAR index raised by some of the participants (*e.g.*, the National Industrial Traffic League) is that it is improper for the Commission to use an inflation index developed by the beneficiaries of that index—that is, the railroads themselves. The Commission does not believe this to be a valid criticism for the following reasons:
***844** 1. The AAR index is the only index that specifically reflects inflationary increases in rail costs and that is available to the Commission within the short time period allotted.

2. The Commission and others have often used the AAR index, or components of it, in the past, generally without challenge. (For example, the carload cost scales published by the Commission and often cited by shippers in rate cases, and escalator clauses, based on the AAR index and incorporated in at least two dozen rail/shipper contracts in the last year.)

3. As indicated above, the Commission will carefully monitor the index and correct any errors that may be found.

Since certain inflation-related increases in costs are not currently reflected in the AAR index (i.e., the cost of durable assets), we suggested in the notice of proposed rulemaking that the Producer Price Index (PPI) be used on an interim basis to measure these excluded items.

A number of participants have criticized the proposed use of the PPI for this purpose. The U.S. Department of Transportation (DOT), for example, proposed that we assume inflation to affect items not covered by the AAR index the same way it affects those items currently covered. We note, however, that the existing AAR index may overstate increases in capital costs due to the weight given to rapidly escalating fuel costs and reject the DOT proposal for that reason.

On the other hand, several participants (for example the Western Coal Traffic League (WCTL) and other coal interests, the Edison Electric Institute and the Chemical Manufacturers Association) also believe the PPI, overstates inflationary cost increases in the items not covered by the AAR index, but offer no feasible alternative treatment of those items not covered by the AAR index. Not to adjust those items for inflation at all would be to assume that they experience no cost increases as a result of inflation, which would clearly be unrealistic.

We again stress that the PPI will be used on an interim basis only. When the all-inclusive AAR index becomes available, we will use that in preference to the PPI. Alternatively, we are considering substituting a composite rail asset index developed by the Commission for measuring cost changes in durable asset accounts if implementation of the all-inclusive AAR index is not feasible in a reasonable time period. This proposed Commission index is described in the next section of this decision. We expect to invite comments on its merits as a substitute for the all-inclusive index.

****4** The table below illustrates the application of the modified AAR and PPI index for the year 1979. The weighting factors reflect the proportion of total costs attributable to each category of inputs, reported by class I railroads in their 1979 Annual Reports R-1.

***845** *Composite AAR and PPI index (1967 unit index = 100)*

| Category | 1979 Unit index (I) | 1979 Weighting factor (W) | W x I |
|---|---|---|---|
| Salaries, wages and supplements.......... | 303.8 | 0.531 | 161.3 |
| Fuel....................................................... | 606.4 | 0.101 | 61.2 |
| Other material and supplies................. | 252.5 | 0.133 | 33.6 |
| Purchased service................................. | [1] 235.6 | 0.142 | 33.5 |
| General................................................. | [1] 235.6 | 0.060 | 14.1 |
| Passenger.............................................. | [1] 235.6 | 0.033 | 7.8 |
| | | | 311.5 |

*ICC composite index*.—The ICC composite index mentioned above is a continuation of an index series for durable asset accounts that was published by the Commission prior to 1967. Values of the index from 1967 have been updated through the application of other well-known indexes on a primary and investment account basis that have been reported continuously during this period. These accounts are described in appendix B. The selection of such an index series was based upon matching each selected index to the class of assets contained in the primary account. Each account index is weighted by the proportion of investment in that account to arrive at a calculated composite index for all durable accounts. Because accurate data are not available, this composite index excludes the land account.

After further consideration, we now believe the ICC composite index may better measure changes in rail asset costs than the PPI because: (1) the indixes used to construct it are being used in other Commission proceedings, thereby providing consistency; (2) the indixes were developed in consideration of railroad properties only, thereby providing uniformity of application; and (3) it uses the index components that are specifically matched to the contents of the primary account.

In addition to those costs directly covered by the ICC composite index, there are certain residual costs that ideally should be reflected in the rail cost adjustment factor. The Commission proposes that such costs be developed and factored into the rail cost adjustment factor.

*Productivity adjustment*.—In our notice, we pointed out that the productivity adjustment issue had been extensively discussed in our earlier notice in this proceeding, but we again invited comments on our proposal not to adjust the rail cost adjustment factor for productivity increases. Once again, many parties contended that a productivity adjustment should be made. Their basic argument is that the AAR index, which is an ***846** index of the costs of railroad transportation *inputs*, necessarily overstates the increase in the cost of producing railroad *outputs* (transportation services), to the extent productivity increases occur. We do not dispute the fact that productivity increases cause the costs of outputs to rise less rapidly than the costs of inputs; this is true by definition. In the light of comments received, however, we would like to explain more fully our reasons for continuing to believe that an input cost index, such as the AAR index, rather than an output cost index (i.e., one taking productivity into account), should be used for the purposes of section 203 of the Rail Act.

****5** At the outset, we note that the Rail Act does not specify whether an input cost index or an output cost index is to be used as the rail cost adjustment factor. Instead, the Rail Act leaves this matter up to the Commission, as a matter of policy, to be

determined in a manner consistent with the purpose of the Rail Act as a whole. In broad terms, we believe that the purpose of section 203 is to permit rail carriers to neutralize the effects of inflation through rate increases with minimal regulatory intervention. We see the rail cost adjustment factor as a reference point stabilized against inflation in the costs of goods and services the rail industry must purchase. From this reference point, the rail industry is to be free to make selective rate increases or decreases, as market conditions dictate, under the many other provisions of the Rail Act offering the railroads flexibility in changing their individual rates. Thus, while a rail cost adjustment factor based on an input cost index does not guarantee railroads full protection against inflation regardless of market conditions, it does remove unnecessary regulatory constraints on the attempts of railroads to cope with inflation. In keeping with this broad policy determination, several specific issues related to productivity adjustments must be addressed.

Several of the participants have disputed the initial view, presented in our notice, that rail productivity is impossible to measure due to a number of methodological problems. For example, the WCTL cites several studies of rail productivity some of which have apparently been accepted by the railroads. On further consideration, we now conclude that methodological problems of productivity measurement alone (although grave) do not preclude the development of productivity measures. We nevertheless question the reliability of such measures and as a matter of policy do not believe that their use is justified.

Some participants, particularly certain coal interests, disagree with the proposition, stated in our notice, that adjustment for rail productivity growth creates disincentives for rail efficiency. They contend that because the adjustment would reflect only average productivity growth, railroads with greater than average productivity gains would continue to ***847** benefit from their better than average performance. As far as it goes, this argument is correct, but we note that it cuts both ways. Although an adjustment based on average productivity gains would not entirely eliminate incentives to railroads with better than average performance, it might unfairly penalize railroads with worse than average performance, when the conditions of improved performance are beyond the carrier's control. (As a hypothetical example, suppose a productivity breakthrough occurred for bulk commodities such as coal and grain; such a breakthrough would improve industry average statistics, but would be of little benefit to railroads whose traffic was predominantly nonbulk in nature.) This defect could be cured only by making the productivity adjustment on a carrier-by-carrier basis. However, it is uncontested in the record that a carrier-by-carrier productivity adjustment would itself undermine railroad incentives.

****6** It is also argued by some participants that a productivity adjustment is appropriate because productivity gains are typically passed along to consumers under competitive (unregulated) market conditions. We agree that this will often happen, but there is an important exception. The exception occurs when the competitive firms' revenues fail to cover their economic costs. Economic costs include the cost of capital, as well as operating expenses. Our past findings in revenue adequacy proceedings have been that few railroads earn revenues sufficient to cover their full economic costs. Thus, cost savings from productivity gains would not be passed on to shippers to the extent that such savings were required by the railroads to cover economic costs. A forced passthrough of these cost savings via the index would not create the investment climate that Congress seeks to promote in the railroad industry.

In sum, we will not adjust the rail cost index to reflect productivity gains as long as the railroad industry continues to earn inadequate revenues. We believe that this position is consistent with the intent of Congress that the index be used solely for the purpose of neutralizing the effects of inflation on regulation of the railroad industry. We with to note that this decision does not preclude any railroad from passing through any or all cost savings from productivity gains. If an individual carrier wishes to pass on some of these cost savings to shippers, it may do so by taking less than the full increases permitted by the index.

*Treatment of profit and fixed expenses*.—In our notice, we asked for comment on whether an adjustment should be made to the rail cost adjustment factor to take into account profits and nonrecurring costs. After consideration of the comments submitted in this proceeding, we find no convincing reason for making such an adjustment. For the ***848** reasons stated below, we believe that any such adjustment would be inconsistent with the intent of Congress that the index be used to neutralize the effects of inflation on the railroad industry, since it would frustrate the railroads' ability to earn normal profits.

So-called 'normal' profit (that is, accounting profit including the cost of capital) and fixed (nonrecurring) costs representing long-lived used and useful capital assets are part of full economic costs, and must not be treated differently than those elements of cost that railroad accounting conventions classify as variable. It is a well-accepted principle of ratemaking that if revenues are not allowed to cover prospective costs of new assets, and to cover a normal profit on invested capital, the industry will be unable to attract necessary investment funds, to the ultimate detriment of shippers. To make a downward adjustment of the rail cost adjustment factor to exclude all profit and nonvariable expenses, would then, clearly be inconsistent with the principle of neutralizing the rail industry against the effects of cost inflation.

****7** It has been suggested that while normal profit and long-term costs should be covered by the rail cost adjustment factor, profit in excess of normal, and return on investment not used and useful, should be excluded. There are legitimate controversies surrounding these issues. These controversies are being addressed fully in our proceeding Ex Parte No. 393, *Standards for Railroad Revenue Adequacy*, 364 I.C.C. 803 (1981). We believe that they need not be addressed here. Our findings in Ex Parte No. 393 suggest that the total value of nonused and nonuseful plant, and the total value of excess profits, are both very small in relation to railroad costs. Any changes over time in the ratio of these items to total rail costs would have only a slight effect on the rate of change of the rail cost adjustment factor. To invite sustained litigation for so little obvious benefit seems to us dubious as a matter of regulatory policy.

Some participants in this proceeding contend that even though railroads may not be earning excess profits overall, they may be earning excess profits on particular rates, and that those rates should thus not be subject to escalation by the full rail cost adjustment factor. We do not agree. Even assuming for the sake of argument that some rail rates may generate excessive profits for carriers not earning adequate revenues overall (or that some rail rates may contain undesirable cross-subsidies), we do not see this proceeding as the proper forum for resolving the problem. As stated above, the sole issue in this proceeding is the rate at which rates can increase to neutralize cost inflation. If shippers or carriers believe certain individual rates are unreasonably high in the base period, the correct solution is to address the reasonableness of the specific rate, rather than the method of adjusting rates. We will continue to assess the ***849** reasonableness of rates either on a case-by-case basis for individual rates or, in the case of broad categories of rates, by such proceedings as Ex Parte No. 347 (Sub-No. 1), *Coal Rate Guidelines—Nationwide*, 364 I.C.C. 360 (1980).

Finally, it has been argued that the rail cost adjustment factor should be adjusted to exclude profits because the Rail Act provides other channels, such as selective rate increases, through which the real (inflation adjusted) value of profits can be maintained. [1] Quite aside from the theoretical argument that normal profit is in fact a component of economic cost, we reject the suggestion that profits be excluded from the rail cost adjustment factor on grounds of administrative burden. We have consistently encouraged selective rate adjustments, both upward and downward. Nonetheless, if the real value of rail profits could be protected against inflationary erosion only by selective rate adjustments, the number of adjustments that railroads would have to make just to stay even with inflation would greatly increase. This would result in unnecessary additional regulatory proceedings and attendant costs for shippers, carriers, and the Commission alike. Such a course would run counter to our intention, and that of Congress, to streamline regulatory procedures, and reduce regulatory lag and administrative costs.

****8** *Frequency of adjustment*.—Section 203 of the Rail Act provides that the Commission shall publish the rail cost adjustment factor as often as practicable, but in no event less often than quarterly. Too long a period between adjustments can create a problem of regulatory lag. With regulatory lag, full cost recovery is never achieved because new cost increases occur before adjustment to past cost increases is permitted. In our notice, we proposed permitting quarterly increases based on the rail cost adjustment factor as projected to the midpoint of the quarter to which the rate changes will be applicable. This proposal occasioned little opposition, but we think it important, nonetheless, to restate our reasons for proceeding in this way. We believe that quarterly filings will provide a substantial administrative savings to shippers, carriers, and the Commission in comparison with monthly filings. At the same time, by employing a forecasted index, we will reduce regulatory lag to a level roughly equivalent to that which monthly change would achieve. In our notice, we recognized that under the forecasted quarterly index approach, rate increases in the first month of each quarter would slightly exceed those that would be allowed for the same month if we were using a monthly adjustment factor that did not involve forecasting. We also noted, ***850** however, that in the last

month of the quarter, rate increases would fall slightly short of those obtainable under the monthly method. However, we see the lower costs and reduction in regulatory lag that result from the forecasting approach as outweighing these monthly, and ultimately counterbalanced, imprecisions.

As indicated in the notice, we find the forecasting method (autoregression without intercept) outlined by AAR witnesses Roberts and Kellman to be reasonable. The Commission will propose revision if any problems arise, and will entertain any specific suggestions for improvement of the forecasting method made by any interested party. As explained in our order, to avoid the possibility of cumulative forecasting error, we will require that, for each quarter, the allowable percentage increase be calculated on the basis of the forecasted, rather than actual, cost increases for the previous quarter. This prevents any party from benefiting or being penalized by a forecast error in any quarter when the net change for the next quarter is calculated. In our notice, we offered the following example: assume that actual and forecasted cost indexes for the second quarter of a given year are 100 and 103 respectively, and that the forecasted index for the third quarter (using the second quarter actual as a base) is 105. The allowable increase for the third quarter would be (105-103)/103 = 0.019 (that is, 1.9 percent), rather than (105-100)/100 - 0.05 (that is, 5 percent). In this way, the difference between the forecasted and real cost increases of the second quarter would be offset in the third quarter index.

****9** We have decided to require the AAR, no later than 20 days before the end of each quarter, to calculate and submit to the Commission the actual index as of the midpoint of the current quarter and the forecasted index for the midpoint of the next quarter. Thus, for example, on March 10 of any year, the AAR would submit the actual index as it stood on February 15 of that year, together with the index as it is forecasted to stand as of May 15. The Commission would verify the index and make it available to the public at least 10 days before the end of the quarter. Railroads would then be able to raise their rates —individually or collectively—up to the level of the index any time after the first day of the quarter to which the forecasted index applies. (In the example given above, railroads could, any time after April 1, take increases up to the level of the index as forecasted to May 15, using the forecasted February 15 index as a reference point to avoid cumulative forecasting error.)

In addition to directives governing the frequency of the index, subsection 203(a) of the Rail Act also directs the Commission to make periodic adjustments in the index to reflect the changing composition of railroad costs. This adjustment would require that the weights applied to the ***851** various input prices used in calculating the index be updated to reflect any changes in the importance of each input as a percent of total railroad costs. Because of seasonal fluctuations in the composition of railroad costs, adjustments in these weights cannot be practicably made more frequently than annually. Therefore, the Commission has decided that such adjustments will be made on an annual basis.

As noted above, most of the participants in this proceeding did not protest these procedures. Those who did protest did not raise major issues. For example, DOT argues that 10 days were insufficient for the Commission to verify the index. In response, we emphasize that all errors in any given index need not be corrected prior to this publication. Errors in earlier indexes can be rectified through appropriate adjustments in later ones. We believe this approach superior to the alternative of a less frequent adjustment. Such an alternative would extend the regulatory lag that we are trying to reduce through this rulemaking. In sum, the comments in this proceeding provided us with no strong justification for altering the procedures proposed in the notice for implementing the AAR index.

*Averaging*.—The railroads continue to argue in favor of rules permitting them to submit a package of rate changes that average out to the allowed index—with some of the changes above and others below the increase permitted by the index. As stated in the notice, a central benefit of the rules established here, in comparison with past general rate increase procedures, is to divorce the problem of inflationary cost recovery from that of changes in the rate structure. Both are necessary, but the mixing of the two in past general rate increase proceedings has, resulted in heavy procedural burdens.

****10** We acknowledge that to the extent flag-outs and holddowns occur, carriers will not be able, through these procedures, to recover the full cost increase as measured by the index. For two reasons, however, we believe it is not necessary to offer an iron-clad guarantee of recovery of the full index under these new rules. Our first reason is that our proposal to reduce regulatory lag

through forecasting of the index may well in itself be sufficient to ensure more complete cost recovery than has been possible under our existing general increase procedures. In addition, we believe that the Rail Act provides ample opportunities in addition to the index to raise individual rates by a factor exceeding the rail cost adjustment factor. We call attention particularly to the 6-percent annual adjustment permitted under section 10707a(c)(1). It is our goal in this and other proceedings not to guarantee through any set of rules or procedures a particular level of revenues for any railroad, but to assure that ***852** needless regulatory barriers do not prevent railroads from earning such revenues.

*Regional differences*.—The railroads proposed that carriers be permitted to increase their rates by the amount of the AAR index for the Nation as a whole, or the index for their own region, whichever is greater. In our notice, we tentatively rejected this proposal, on the grounds that it would permit the actual national average level of rates to increase more rapidly than the national average of costs. Further, as one participant indicated, it would be equally rational to require the railroads to use the lower of the regional and national indexes.

None of the comments offered new or persuasive reasons for abandoning this line of reasoning. We therefore, deny the railroad request for regional indexes.

*Collective ratemaking under the proposed rules*.—In our advance notice, we raised the possibility that increases under the index not be fully available for rate changes made collectively within the rate bureaus. In the subsequent notice we withdrew this possibility, and we continue to believe that it would be improper to use our rules covering inflationary cost recovery as a means for effecting changes in collective ratemaking. Further, subsection 219(f) of the Rail Act states that, 'the Commission may not take any action with respect to the elimination of general rate increases or decreases prior to April 1, 1982.' As to the interaction between independent and collective rate adjustments, we must ensure that, pursuant to new section 10707a(b)(3), carriers do not use the index to increase individual rates to cover inflation after they have recovered these same inflation costs collectively. We will, in another proceeding, propose rules governing the tariff filing of rates under section 10707a, similar to the rules we have established for the motor carrier zone of rate flexibility filings. These rules require that a carrier clearly indicate that portion of the zone remaining available for use on individual rates. We believe that the timing of individual and collective inflation adjustments may not be used to effect double recovery. This position was not seriously contested.

****11** *Fuel surcharge*.—As indicated in the notice, the procedures established in this decision will permit railroads to recover fuel cost increases along with other cost increases on a quarterly basis. Regulatory lag will be minimal under the proposed forecasting method. Maintaining a separate surcharge mechanism for fuel would, in our view, serve no useful purpose once these rules are in place, and would, in fact, only complicate the operation of the new system. All parties will benefit from avoiding separate tariff supplements for fuel increases. Special Permission 79-2620, which allows the filing of fuel cost surcharges on short notice, will no longer be available to railroads.

***853** RAILROAD COST RECOVERY PROCEDURES

Title 49, Part 1102, Section 1102.1 is amended by revising to read as follows:

Sec. 1102.1 Railroad Cost Recovery Procedures

(a) Rail carriers may adjust rates and charges quarterly in order to compensate for inflationary cost increases. The quarterly adjustment shall not for any rate exceed the percentage change in the Association of American Railroads' Index of Railroad Material Prices and Wage Rates as supplemented by the Producer Price Index for those costs not covered by the AAR Index. The Commission will make modifications or revisions to the index, as necessary. Until at least April 1, 1982, these procedures are available for collective adjustment of rates.

(b) The allowable increase will be based on a projection of the index to the midpoint of the quarter to which the index will apply. In order to avoid cumulative forecasting error, the percentage change must be calculated from a comparison of the forecast

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

index for the midpoint of the quarter during which the rates will be in effect with the forecast index for the midpoint of the previous quarter.

(c) The AAR must file with the Commission no later than 20 days before the end of each quarter its calculation of the actual index as of the midpoint of the current quarter and the forecasted index for the midpoint of the next quarter.

(d) Tariffs containing adjustments under the provisions of this rule may be filed to become effective on not less than 1 day's notice.

(e) Increases in rates consistent with these standards will not be investigated or suspended by the Commission unless the filing results in a double recovery of inflation-based cost increases.

CONCLUSION

This decision will not significantly affect the quality of the human environment or conservation of energy resources. Although this proceeding is not subject to Public Law 96-354, it is our opinion that it will not have a significant adverse impact on a substantial number of small entities. The AAR may immediately submit the actual index of the midpoint of the first quarter of 1981 and the forecasted index for the second quarter of 1981. As of the effective date of this decision, rail carriers may implement rate increases in accordance with the revised rules contained in 49 CFR 1102.1.

****12 *854** Authority: 49 U.S.C. 10321, 10701a, 5 U.S.C. 553.

APPENDIX A

*Description of the methodology used in computing the AAR's indexes of railroad material prices and wage rates*

JAMES LUNDGREN MATHEMATICAL STATISTICIAN

OFFICE OF POLICY AND ANALYSIS INTERSTATE COMMERCE COMMISSION JULY 1980

*Introduction*.—The Economics and Finance Department of the AAR has compiled indexes showing trends in average unit prices of railroad fuel, material and supplies, and wage rates since 1933. The indexes for fuel, material and supplies are designed to measure only changes in prices. They do not measure changes in volumes or total costs of such purchases. The indexes for wage rates reflect changes in the average straight-time hourly rate for all railroad employees, but do not reflect changes in the level of employment or productivity. A second wage index is also computed which reflects in addition to the straight-time hourly rate: payroll taxes, health and welfare benefits, and allowances for paid vacations and holidays.

*Price data*.—The 65 items for which price data are presently gathered were chosen by a special committee of railroad purchasing agents. (See appendix A-1 for a listing of these items.) These items were each selected on a judgment basis to be typical (representative) of its class of railroad purchases. They collectively account for 91 percent of all materials and supplies (including fuel) purchased by class I railroads. The following three criteria were used in choosing this list: (1) the item is purchased by the railroads in large quantities, (2) the item is purchased by most roads, and (3) the item's price trend closely parallels the price trend of related materials. The list is periodically updated to reflect changes in the pattern of railroad purchases. It was last updated January 1975 and will be updated again when the new index is implemented. At that time 6 items will be removed from this list of 65 items. These six include car lining, insulated rail joint, track bolts, portland cement, paper grain doors, and unmounted airbrake hose. These six items represented less than 2 percent of purchases in 1974.

There are now 10 railroads which report their list price for each of these 65 items four times a year (January 1, April 1, July 1, and October 1). These 10 railroads which account for approximately two-thirds of all class I railroad purchases are:

Eastern roads:
Chessie System

Consolidated Rail Corporation

Southern roads:
Illinois Central Gulf

Louisville & Nashville

Southern System

***855** Western roads:
Atchison, Topeka & Santa Fe

Burlington Northern

Missouri Pacific

Southern Pacific

Union Pacific

*Item sport indexes*.—A Laspeyres index weighting system is used to compute an index for each of the 65 items using the following formula:

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE
The 65 spot price indexes computed in this manner for each of the three regions (195 indexes) are then combined into four general groups, as follows:
****13** 1. Fuel (1 item),

2. Forest products (8 items),

3. Iron and steel products (23 items), and

4. Miscellaneous products (33 items).

The following formula is used to combine item spot indexes into group spot indexes:

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE
***856** Similarly the national spot index for each group k at time t would be:

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE
The total materials and supplies spot price index for time t and region r is:

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

It should be noted that the item spot indexes ($I_{tjkr}$) were computed by using January 1, 1975 as a base. Therefore in order to publish indexes with 1967 as a base year, each of the indexes was multiplied by its respective 1967 base year index for January 1, 1975. For example:

$I_{t67} = (I_{t75}) (I_{7567})$

Where:

$I_t67$ = an index for time t using base year 1967.

Appendix A-3 contains an example of these group spot indexes by region and for the United States.

***857** *Item charge-out indexes*.—So far we have described the computation of spot price indexes which reflect the price of items at the time of purchase. Charge-out indexes are computed to reflect the approximate purchase price of items as they are used. This is done by allowing the charge-out index to lag behind the spot price index by the average length of time fuel, or materials and supplies are held in stock or on hand before being used.

Inventory turnover and advice from purchasing officers have been used to determine that fuels were generally kept on hand in 1 month's supply and all other materials and supplies in about 3 month's supply. The lag time for materials and supplies other than fuel was found by dividing the inventory value by the amount purchased in 1 year (both from the Annual Report Form R-1, ICC) and multiplying this quotient by 12 months. Since the inventory for fuel is not known, the lag time for fuel was a subjective estimate based upon the advice of purchasing officers.

Because of the 3-month lag time a quarterly charge-out index for all material and supplies except fuel is equal to its spot price index for the prior quarter.

The quarterly charge-out indexes for fuel need to be interpolated since their lag is only 1 month. This is done by adding two thirds of the current quarter's spot price index to one third of the prior quarter's spot price index to get the current charge-out index for fuel. For example, April's charge-out index for fuel is equal to two-thirds of April's spot price index for fuel plus one-third of January's spot price index for fuel. These computations are made on the January 1, 1975 base indexes which are combined where desired and then changed to reflect 1967 as a base year just as in the spot price index. Appendix A-4 shows these charge-out indexes for fuel, and materials and supplies.

*Wage index*.—The average annual straight time rates of pay are computed by dividing the latest annual straight time compensation by straight time hours paid for from the Interstate Commerce Commission statement A-300, 'Wage Statistics of Class I Railroads in the United States.' Each average is then divided by the corresponding average straight time rate of pay in 1967 (and multiplied by 100) to get a straight time wage rate index using base year 1967.

****14** Quarterly updates to the straight time wage rate index are computed by checking the union contracts. There are over 20 unions serving railroad workers. However, in recent history they have always had the same pattern of increases. Also although the unions do not represent all railroad employees (management being the major exception), they do represent approximately 95 percent and the other 5 percent are assumed to receive similar pay changes as union workers.

Another set of indexes is developed which reflects wages and supplements. The annual total of wages and supplements is computed by adding straight time compensation to payroll taxes and health and welfare benefits (Annual Report Form R-1, ICC) plus other allowances (ICC Wage Statistics Forms A and B). Payroll taxes include retirement, medicare, unemployment insurance, and supplemental annuities. Other allowances includes holiday and vacation pay. This total of wages and supplements is divided by annual straight time hours paid for (ICC Wage Statistics Forms A and B) and the result is changed into index form with 1967 as the base year.

These supplements are updated quarterly by information from the National Railway Labor Conference and the Railroad Retirement Board.

Appendix A-4 contains quarterly wage rate indexes and wages and supplements as well as indexes showing the combined effect of these with materials and supplies, and/or fuel. Weighting factors used to combine these indexes are based upon the total dollars spent by all class I railroads in 1974 in each of these four categories by region or for the United States (as reported in the ICC's Wage Statistics Forms A and B, the Annual Report Form R-1, and the AAR's special study Form MS-74.)

***858** *Annual indexes.*—Appendix A-5 contains a table of AAR's Annual Indexes of Chargeout Prices and Wage Rates. The annual indexes of wage rates, and wages and supplements are developed as described in the prior section 'Wage index.'

The annual indexes for fuel, and materials and supplies are developed from the quarterly spot price index with weighting factors to allow for the lag times. The annual charge-out index for fuel for year n is computed by using the following formula:

$$I_{nf} = (5/6)\ (.25)\ (I_{jn}) + .25\ (I_{an} + I_{yn} + I_{on}) + (1/6))\ .25)\ (I_j(n + 1))$$

Where:

$I_{nf}$ = charge-out fuel index for year n,

$I_{jn}$ = spot price index for January during year n,

$I_{an}$ = spot price index for April during year n,

$I_{yn}$ = spot price index for July during year n,

$I_{on}$ = spot price index for October during year n,

$I_j(n+1)$ = spot price index for January during year n+1.

The annual charge-out index for materials and supplies other than fuel for year n is computed by using the following formula:

$$I_{nm\&s} = .125(I_{o(n-1)} + I_{on}) + .25\ (I_{jn} + I_{an} + I_{yn})$$

Where:

$I_{nm\&s}$ = charge-out material and supplies index for year n, and the other indexes in the above equation use the same notation as in the fuel index equation but now refer to the material and supplies indexes.

****15** The same weighting techniques are used to combine these indexes as are used in the quarterly indexes. (The weighting factors are based upon total dollars spent by all class I railroads in 1974 in each category.)

*Unit adjustments*.—The specifications used to describe each of the 65 items in the materials and supplies indexes are not always the same from one railroad to the next. For example one railroad might use 115-pound rail and another might use 135-pound rail. Normally, these differences do not affect the validity of the indexes. However, if one railroad switches from 115 to 135-pound rail the result would be quite noticeable if an adjustment were not made.

When a different unit is used by a railroad for 1 of the 65 items the new unit price is multiplied by the ratio of the prior quarter's unit price to the new units price in the prior quarters. For example:

Adjusted April unit price = (new units April Price) x (old units January price)/(new units January price)

This adjustment factor (for January in this example) would need to be used until after the next special study.

*Retroactive pay increases*.—Occasionally union wage contracts are not finalized until after the old contracts have expired. In such cases the increase in pay must be paid retroactively. No projections are made for retroactive pay increases. However, these increases do represent a cost to the railroads which is for the most part accrued over the time period prior to the actual payment of retroactive pay. To display more stability in a gradually changing index, the indexes are revised (after publication if necessary) to reflect retroactive pay increases during the period over which they were earned rather than when they were paid.

***859** APPENDIX A-1

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

***866** APPENDIX A-2

The attached Form MS-74 Purchases of Fuel, Material and Supplies, Calendar Year 1974 was completed by all class I railroads for 1974 as a special study to update the weighting factors for combining the item indexes for materials and supplies. A similar special study will be conducted for 1980.

It should be noted that there are only 32 items on Form MS-74 compared with 65 items on Form P-74-1 (attachment A) which is completed by the 10 selected railroads. Each of the list of 32 items is the sum of one or more items from the list of 65 items and each of the 65 items is contained in one of the 32 items. Therefore, to develop an estimate of the total purchases for each of the 65 items it is sometimes necessary to estimate its proportion of the total cost of one of the 32 items. This is done by using information collected from the 10 railroads on Form P-74-1. For example if 10 percent of the cost of wooden crossties for the 10 railroads is for bridge ties then it is assumed that 10 percent of all class I railroad's cost of wooden crossties is for bridge ties.

***867** APPENDIX A-3

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

***869** APPENDIX A-4

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

***870** APPENDIX A-5

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE
TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

***873** APPENDIX B

****16** The following accounts are used in creating the ICC Composite Index for durable assets:

1 Engineering

3 Grading

4 Other Right-Of-Way Expenditures

5 Tunnels and Subways

6 Bridges, Trestles, and Culverts

7 Elevated Structures

8 Ties

9 Rail

10 Other Track Material

11 Ballast

12 Track Laying and Surfacing

13 Fences, Snow Sheds, and Signs

16 Station and Office Buildings

17 Roadway Buildings

18 Water Stations

19 Fuel Stations

20 Shops and Enginehouses

21 Grain Elevators

22 Storage Warehouses

23 Wharves and Docks

24 Coal and Ore Wharves

25 TOFC/COFC Terminals

26 Communication System

27 Signals and Interlockers

29 Power Plants

31 Power-Transmission Systems

35 Miscellaneous Structures

37 Roadway Machines

38 Roadway Small Tools

39 Public Improvements-Construction

44 Shop Machinery

45 Power-Plant Machinery

52 Locomotives

53 Freight-Train Cars

54 Passenger-Tain Cars

55 Highway Revenue Equipment

56 Flating Equipment

57 Work Equipment

58 Miscellaneous Equipment

I.C.C.

## Footnotes

1 Using PPI, annual average, all commodities.

1 The rate flexibility provided by these channels is intended to help the railroads to protect their profits from inflation. We believe, however, that Congress also intended that this additional flexibility be used, where appropriate, by the railroads to improve their real earnings. This issue is discussed above.

364 I.C.C. 841, 1981 WL 22792

End of Document © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# PX0916-PX0926

Filed Under Seal

# EXHIBIT

# PX0927

PROPRIETARY

# ExxonMobil - RAIL FREIGHT
# NS Review

May 20, 2004

# Railroad Overview

- *There are 7 Class 1 railroads*

| | | | |
|---|---|---|---|
| Union Pacific (UP) | Canadian National (CN) | Canadian Pacific (CP) | CSX |
| Burlington Northern (BNSF) | Norfolk Southern (NS) | Kansas City Southern (KCS) | |

- *Most ExxonMobil facilities/ plants are served by at least two railroads allowing competitive bidding. Railroads serving our origin points /plants (UP, BNSF, CN, KCS) deliver 85% of railcar volume to interchange locations and transfer to destination carriers - e.g., CSX and NS*
- *Destination carriers take traffic at interchange points (e.g., St.Louis / Chicago / New Orleans) and deliver to EM customers*
  - *Majority of our customers East of the Mississippi river are only served by either CSX or NS*
  - *Majority of open locations are transloading terminals*
    - *Total NS / CSX traffic: 8,268 open // 22,856 closed*
  - *CSX rates have always been considerably cheaper than NS, resulting in CSX handling the majority of open traffic ( 70% CSX - 30% NS)*



Proprietary

# Contract Review

## Eastern United Sates - Rail Freight

- **Norfolk Southern**
  - *Plastics contract NS-C-16846 // Liquids NS-C-15816*
    - *expires 5/31/04*
    - *$32.5M annual spend ($2M increase over last year)*
  - *Terms and Conditions - requires client endorsement // DOAG 4 review*
  - *Commercial Terms -*
    - *30%+ rate increase with unacceptable terms*
- **CSX**
  - *Plastics contract CSX-C-63853 // Liquids CSX-C-66606*
    - *expires 5/31/04*
    - *$37.5M annual spend*
  - *Terms and Conditions complete*
  - *Commercial Terms - 2%-4% rate increase*



Proprietary

# Negotiation Environment

## "Perfect Storm" for Rate Increases

- *Economic recovery equates to increase in rail demand*
- *Fuel prices increased - railroads passing on increase to shippers*
- *Recent rail rate case decisions by the Surface Transportation Board have encouraged railroads to increase rates (specifically NS)*
- *Reduced competition from truck industry*
  - *Hours of Service, truck driver shortage, diesel fuel price impact, stricter emission standards*

- **Examples : Recent ExxonMobil cases**
  - 2004. CN attempted to increase rates by 15% at Sarnia (SPEP). Countered by establishing a rail operational plan that introduced competition (CSX) into Ontario market. Outcome: 5% rate reduction
  - 2004. UP attempted to increase rates by 12% at Beaumont (BPEP) while in the middle of a significant system-wide operational failure. UP currently handles 95% of BPEP traffic. Countered with proposal to BNSF to obtain the majority of volume. Expected outcome neutral to 2% rate reduction.



**Proprietary**

# NS Background

**Why now? :**

- **NS History:**
  - *Incorporated in 1980 - Merger of Norfolk and Western Railway and Southern Railway*
  - *1999 - Assumed operations of a portion of Conrail (50% increase in track / employees)*
  - *ExxonMobil - NS contract signed in 1999*
    - *Organizationally not prepared to change marketing methodology*
- **Current Agreements:**
  - *Contract is an ExxonMobil document*
  - *Norfolk Southern awarded minimal competitive volume*
    - *Rates normally 10-15% higher than CSX*
    - *Less willing to trade rate reductions for additional volume*
    - *NS dissatisfied with how contract was awarded in 1999*
- **Recent History:**
  - *'RDC Partnership' scrapped by ExxonMobil after Modalgistics / NS support deemed one-sided*
  - *Recent (45 days ago) price requests were typically 6-8% higher than comparable routes*



Proprietary

# NS Background

## Contract Negotiation Background:

### Terms and Conditions:

- *ExxonMobil attempted to begin negotiations July 03*
- *NS response Dec 03 only deleted objectionable terms*
- *Discussions / Negotiations started in earnest March 04*
- *NS has declined all attempts to negotiate / meet in person*
- *Clear by May that NS intent was to default all conditions to Tariff terms*

### Commercial Terms (Rates):

- *Bid (rates) delayed until NS adequately addressed Master Agreement Terms and Conditions*
- *Bid released April 7*
- *NS a week late in responding - provided bid package Friday afternoon, May 14*
- *NS account representative 'unavailable' until May 24th*
- *Contract expires May 31st*

### Contract Extension:

- *NS unwilling to extend current contract Terns and Conditions*
- *1 week extension of commercial terms (rates) only with EM acceptance of Master Contract*



**Proprietary**

# NS Proposal Review

- **Terms and Conditions:**
  - *Equates to turning Agreement into NS tariff and Rules of Carriage (NS rules that NS can change at will)*
  - *DOAG 4 approval required - Law will not red light*
- **Commercial Terms (Rates):**
  - *2 Year term (ExxonMobil requested 4 years to synchronize with origin / destination contracts)*
  - *Escalation - flat 10% at 12 months*
  - *Fuel surcharge - Currently @ 5.8% (base at $23 price per barrel for WTI Crude Oil)*
  - *Volume Requirement - 95% of all product consumed at destination (all modes)*
    - *Transloading prohibited*
    - *$1500 per car - liquidated damages*
  - *Price increases range to 30-40% increase*
    - *Very small incentive for awarding additional volume*
  - *Increases in switch charges and short line rail rates not absorbed (any price increase by 3rd party switch provider at interchange or short line at destination will result in a direct price increase).*

# NS Proposal Review

- **Prices not linked to NS cost**
  - *Hazardous material tanker cars freight rates are lower for identical plastics movements*
  - *Railroads determined to retain (or add to) Plastics 'Premium'*
  - *Fuel Surcharge*
    - *Diesel fuel expenses increased 11%*
    - *Diesel fuel represents 7% of operating expenses*
    - *Actual fuel cost increases $3.10 per car // fuel surcharge collects $47.50 per railcar*

- **NS financial performance (2002 to 2003)**
  - *NS operating revenues increases 3% (2002 to 2003)*
  - *Railway operating expenses up 6% (includes 2% due to invol. Separation program)*
    - *ExxonMobil escalation for 2003 = 2%*
  - *Chemical shipments = 6% of NS shipments // 12% of total revenue*



Proprietary

# NS Proposal Review

## Economic impact // options for Polymers

- *Accept the NS proposal: Cost is $14M additional (vs. today)*
  - *Unknown end-state based on NS definition of 'retaining existing lanes'*
  - *Expect NS to increase rates from original proposal if they do not get all open point*
  - *Additional unknown cost of switch charge increases*
  - *Parts of Terms and Conditions very difficult for ExxonMobil to monitor and adhere to*
- *Move all competitive points to CSX and accept NS tariff on closed points: Cost is $18.5M additional (vs. today)*
  - *Other Business' Additional Costs (vs. today):*
    - *L&S - $3.8M*
    - *Intermediates - $1.9M*
    - *Basic Chemical - $378K*
- *Ship via CSX to closest transload point for all closed NS served customers. Deliver last leg via truck. Cost is $10M additional (vs. today)*
  - *Willingness / ability of customers to accept truck delivery*
  - *Regional truck capacity / availability*



Proprietary

# NS Strategy Summary

## NS Strategy:

- *Use semi-monopoly position to dictate terms and rates*
- *Focus on increasing rates to closed destinations*
- *Delay negotiations until 11th hour*
- *Take-it-or-leave-it proposal*
- *Relative positions*
  - *ExxonMobil - lose with all options*
  - *NS position - lose only with significant loss of closed points (truck option)*

## Possible Future Strategies:

- *IF ExxonMobil accepts NS offer*
  - *Automatic 10% Increase at 1 year*
  - *Repeat 'hardball' performance after 2 years (additional rate increases)*
  - *Demonstrates NS leverage ability to other shippers*
  - *ExxonMobil assumes all risks (any future cost increases (switch, fuel, etc.) passed to ExxonMobil)*
- *If ExxonMobil ships via NS Tariff rates:*
  - *NS can raise tariff rates*
- *If ExxonMobil trucks product to NS destinations:*
  - *"Who blinks first"*
  - *NS will cancel EM Lease Tracks*



Proprietary

# Strategy Recommendation

- **CSX:**
  - *Do not let CSX know current situation with NS (and the possibility of CSX handling all open traffic)*
    - *Information may change CSX rate strategy*
  - *Complete CSX negotiations by 5/28 and conclude CSX agreement*
  - *Award all open lanes according to original plan - destinations that meet ExxonMobil operational requirements (transit times , variability, etc.), Network Optimization Model (RDC, forward packaging, etc.), and rate reduction model*
  - *Do not award destinations that were originally planned for NS. Negotiate favorable rates for these points without committing volume (use rates as a back-up or possibility of shipping a small portion of traffic via CSX)*

- **Norfolk Southern:**
  - *Reject NS Terms and Conditions and rate increases*
  - *Revert to Tariff June 1 (Reject NS negotiation delay tactic and pressure to sign contract under their conditions) - will cost Polymers around ~ 1.5 M/month until trucks can be implemented*
  - *Continue negotiations with NS - terms and conditions // rates*
    - *Determine their resolve to execute their strategy*
  - *Reroute all open points to CSX (including terminal traffic)*
  - *Implement transition to truck for selected customers // minimize use of NS services*
    - *Demonstrate ExxonMobil resolve to reject monopoly threats*
  - *Reopen negotiations (utilizing open points retained from CSX agreement to obtain favorable terms and reasonable rates)*
    - *If NS is willing to negotiate*



**Proprietary**

# EXHIBIT

# PX0928

WILLIAM L. SLOVER
C. MICHAEL LOFTUS
JOHN H. LE SEUR
KELVIN J. DOWD
ROBERT D. ROSENBERG
CHRISTOPHER A. MILLS
FRANK J. PERGOLIZZI
ANDREW B. KOLESAR III
PETER A. PFOHL
DANIEL M. JAFFE

OF COUNSEL
DONALD G. AVERY

SLOVER & LOFTUS
ATTORNEYS AT LAW
1224 SEVENTEENTH STREET, N. W.
WASHINGTON, D. C. 20036-3003

TELEPHONE:
(202) 347-7170
FAX:
(202) 347-3619
WRITER'S E-MAIL:

OCT 2 2006 RECEIVED

October 2, 2006

217710

ENTERED
Office of Proceedings
OCT 2 - 2006
Part of
Public Record

**VIA HAND DELIVERY**

The Honorable Vernon Williams
Secretary
Surface Transportation Board
1925 K Street, N.W.
Room 711
Washington, DC 20423

Re: Ex Parte No. 661, *Rail Fuel Surcharges*

Dear Secretary Williams:

Enclosed for filing in the referenced proceeding, please find an original and ten copies of the Comments of the Western Coal Traffic League, along with three computer discs which contain the filing.

An additional copy of the Statement also is enclosed. Kindly indicate receipt and filing by time-stamping this copy and returning it to the bearer of this letter.

Thank you for your attention to this matter.

Sincerely,

Peter A. Pfohl

Peter A. Pfohl
An Attorney for the
Western Coal Traffic League

Enclosures

217710

RECEIVED OCT 2 2006

**BEFORE THE**
**SURFACE TRANSPORTATION BOARD**

| | | |
|---|---|---|
| **RAIL FUEL SURCHARGES** | ) | **Ex Parte No. 661** |

ENTERED
Office of Proceedings
OCT 2 - 2006
Part of
Public Record

**COMMENTS OF THE**
**WESTERN COAL TRAFFIC LEAGUE**

WESTERN COAL TRAFFIC LEAGUE

Of Counsel:

Slover & Loftus
1224 Seventeenth Street, N.W.
Washington, D.C. 20036

By: William L. Slover
Peter A. Pfohl
Slover & Loftus
1224 Seventeenth Street, N.W.
Washington, D.C. 20036

It's Attorneys

Dated: October 2, 2006

OCT 2 2006 RECEIVED

**BEFORE THE**
**SURFACE TRANSPORTATION BOARD**

| | | |
|---|---|---|
| **RAIL FUEL SURCHARGES** | ) | **Ex Parte No. 661** |

**COMMENTS OF THE**
**WESTERN COAL TRAFFIC LEAGUE**

These Comments are submitted by the Western Coal Traffic League ("WCTL" or "League") in response to the decision served by the Surface Transportation Board ("STB" or "Board") in the above-captioned proceeding on August 3, 2006 ("Decision") proposing to adopt measures pertaining to railroad practices in imposing fuel surcharges. For the reasons set forth in WCTL's April 27, 2006 Statement in this proceeding ("WCTL April 27 Statement"), the League strongly agrees that the carriers' current fuel surcharge programs as applied constitute unreasonable practices as they do not accurately reflect changes in the carriers' fuel expenses for the individual movements to which the surcharge applies. The League also agrees that, if fuel surcharge programs are deemed necessary in emergency situations to address unexpected and precipitous increases in costs, appropriate measures must be adopted to ensure that such programs are fairly and equitably applied and in conformance with the principles and measures set forth in the Decision and as further described below.

## IDENTITY AND INTEREST

WCTL is an association whose membership is composed of organizations that purchase and transport coal mined west of the Mississippi.[1] WCTL members transport over 140 million tons of coal annually, nearly all of which moves by rail. WCTL has actively participated for many years before the Board and its predecessor, the Interstate Commerce Commission ("ICC"), including in proceedings addressing substantive and procedural rules governing railroad regulatory and cost reporting requirements, and on initiatives designed to prevent railroad practices or conduct that contravenes the law. WCTL also submitted a statement and participated in the Board's May 11, 2006 hearing in this proceeding. From the perspective of coal shippers, the railroads' fuel surcharge programs essentially act as an added tax on commerce, which ultimately must be paid by electricity ratepayers as part of their monthly electric bills. Because WCTL members, and their ratepayers, must pay the significant fuel cost demands of the railroads as a supplement to their rates, WCTL has a direct and substantial interest in the subject matter of this proceeding.

---

[1] WCTL members include the following 19 entities: Alliant Energy; Ameren Energy Fuels and Services; Arizona Electric Power Cooperative, Inc.; Arizona Public Service; CLECO Corporation; City of Austin, Texas; CPS Energy; Kansas City Power & Light Company; Lower Colorado River Authority; MidAmerican Energy Company; Minnesota Power; Nebraska Public Power District; Omaha Public Power District; Texas Genco, LP; Texas Municipal Power Agency; Western Farmers Electric Cooperative; Western Fuels Association, Inc.; Wisconsin Public Service Corporation; and Xcel Energy.

## INTRODUCTION

WCTL commends the Board for initiating the measures identified in its Decision to address the substantial and verified problems associated with the railroads' current fuel surcharge programs. As the Board recognizes in its Decision, and as verified in WCTL's April 27 Statement, the overwhelming evidence, which is virtually undisputed by the railroads, establishes that the railroads' current fuel surcharge programs are not designed or established to recover the increased cost of fuel for a particular movement to which the surcharge is applied. See Decision at 2-5. Instead, the carriers are utilizing these programs as a means of reaping substantial over-recoveries above and beyond the carriers' actual costs of service. See WCTL April 27 Statement at 11-13.

In its Decision, the Board agrees with WCTL and concludes that it is an unreasonable practice "for railroads to compute fuel surcharges as a percentage of existing rates" in the manner that is currently being employed by each of the Nation's Class I carriers. Id. at 4-5. The Board further concludes that the practice of "double dipping" by railroads, i.e., imposing fuel surcharges on movements that are already subject to rate adjustment mechanisms that factor in changes in fuel costs, is an unreasonable practice. Id. at 5. In order to address the identified problems associated with the railroads' fuel surcharge programs, the Board proposes the following measures to apply to all classes of railroad traffic:

- It is an unreasonable practice for railroads to impose fuel surcharges that are a percentage of existing rail rates (id. at 4-5);

- Any railroad fuel surcharge program must be tied to "those attributes of a movement that directly affect the amount of fuel consumed" (id. at 5);

- The practice of "double dipping" by railroads in the recoupment of fuel costs through fuel surcharge programs constitutes an unreasonable practice (id. at 5-6);

- All Class I railroads must use a single, uniform index, the EIA's "U.S. No. 2 Diesel Retail Sales by All Sellers (Cents per Gallon)" to measure changes in fuel prices (id. at 6); and

- All Class I railroads must report pertinent fuel-related information to the STB monthly, in order to allow the Board and the public to better monitor carriers' fuel surcharge practices (id.).

WCTL addresses these proposed measures in the comments below. Additionally, WCTL has asked Thomas D. Crowley and Daniel L. Fapp of L. E. Peabody & Associates, Inc. to provide expert economic analysis and testimony related to aspects of the Decision pertaining to the implementation of an appropriate fuel surcharge mechanism, the use of appropriate fuel price indices, and appropriate railroad reporting requirements. Their testimony is incorporated into these comments and included in the

attached joint Verified Statement.[2]

WCTL agrees that the adoption of the Board's proposed measures, as clarified and supplemented in the manner set forth in these Comments, is necessary to ensure that any required fuel cost recovery program fully and accurately reflects changes in the carriers' fuel prices for movements to which the surcharge applies, and that such programs are fairly and equitably applied.

## I.

## The Lack of Demonstrated Need for Fuel Surcharge Programs

### A. Available Fuel Adjustment Mechanisms Adequately Protect Parties from Changes in Fuel Prices

As an initial matter, and prior to turning to the specific measures proposed by the Board, WCTL emphasizes that railroads can be made whole for any fuel price changes using the fuel component of an established industry price adjustment mechanism, the Rail Cost Adjustment Factor ("RCAF"). See V.S. Crowley/Fapp at 4-8. WCTL addressed fully the use of the RCAF as an appropriate, fair, and time-tested fuel cost recovery mechanism in its April 27 Statement. See WCTL April 27 Statement at 13-16.

The RCAF is the longstanding, preferred railroad cost index methodology adopted by the ICC[3] and the STB. See WCTL April 27 Statement at 13-15. The RCAF

[2] Mr. Crowley previously sponsored the economic analysis included with WCTL's April 27 Statement. Messrs. Crowley and Fapp's Verified Statement is referred to herein as V.S. Crowley/Fapp.

[3] See Rail Cost Recovery Procedures, 364 I.C.C. 841 (1981).

has been widely incorporated into rail carriers' private contracts and common carrier pricing authorities, it is well-known to railroads and shippers, and it is straightforward to apply. The Board has ordered the implementation of the RCAF as a means of protecting railroads' and shippers' interests in accurately tracking carrier cost changes. Id. at 14; V.S. Crowley/Fapp at 5. The index is also readily available, as Congress has directed the Board to publish the RCAF on at least a quarterly basis. See WCTL April 27 Statement at 13. Additionally, as demonstrated in WCTL's April 27 Statement, the RCAF's fuel index has very closely tracked the carriers' price per gallon fuel costs. Id. at 16 and Exhibit 2.

In his oral testimony before the Board at its May 11, 2006 hearing, BNSF's Chief Financial Officer, Tom Hunt, testified that "from our perspective, RCAF is not really the best recovery methodology and the best match anyway because RCAF is a nationwide average that doesn't reflect the higher fuel usage of a long distance carrier like BNSF." May 11, 2006 Hearing Transcript at 265. This statement is unsupported and incorrect, as demonstrated in WCTL's April 27 Statement in Exhibit 2.

The fact that cost recovery procedures utilizing 100 percent of the RCAF fully recover the railroads' changes in fuel prices is supported through additional analysis conducted by Messrs. Crowley and Fapp. See V.S. Crowley/Fapp at 5-7. As demonstrated in their further study, changes in the fuel component of the RCAF fuel index are "in almost perfect lock-step" correlation with changes in BNSF Railway

Company's ("BNSF's") and Union Pacific Railroad Company's ("UP's") fuel prices. Id. at 6.

Another criticism offered by the Chief Financial Officer of UP, Robert Knight, at the Board's May 11, 2006 hearing was alleged problems associated with the "lead time" or so-called "lag" effect presented by the use of the RCAF. May 11, 2006 Hearing Transcript at 329-30. As the Board is aware, under current procedures, the Association of American Railroads ("AAR") forecasts average diesel fuel prices, which are submitted to the STB the month prior to the beginning of the quarter, and these forecasts are then corrected for the actual railroad fuel prices two quarters later as part of the forecast error applied to the RCAF. See WCTL April 27 Statement at 13. This procedure for submission of forecasted and actual price changes in the RCAF obviously may produce some "lag" in a carrier's recovery of actual fuel costs in circumstances where fuel prices are increasing over the involved period.

This issue is not serious, and should in no way foreclose the Board from relying on the RCAF fuel component as part of this proceeding, for several reasons. First, any lag effect does not in any way prevent the carriers from fully recovering their fuel costs, since all costs will be fully recovered over time, through the forecast error correction process. Second, any lag impact is very minimal, given the very high correlation that has been evident over time between the RCAF and the changes in the carriers' rail fuel prices. See V.S. Crowley/Fapp at 7. Third, any lag effect goes both

ways. In times of fuel price decreases, such as are occurring in the market today, the carrier will be over-collecting for the current quarter, based on the fact that the RCAF for the current quarter is based upon carrier fuel cost data from two quarters ago. Conversely, in times of fuel price increases, the carrier will be under-collecting for the current quarter, based on the same fact that the RCAF similarly is based upon carrier fuel cost data from two quarters ago. Over time, things will even out, and the carrier will be made whole. Id. at 7-8.

Additionally, given the financial vibrancy of the railroad industry today, even in those months where a lag may mean some delay in carrier fuel-cost recoveries, there is no immediate carrier financial need to abandon the RCAF fuel index and substitute a less effective and/or unproven replacement mechanism. Further, in the past, the ICC has rejected requests for the substitution of standard industry adjustment clauses with a general fuel surcharge:

> As a matter of general business practice, the vast majority of transportation contracts currently used in the industry contain rate adjustment clauses in anticipation of just such circumstances as escalations in fuel costs. To the limited extent that certain contract carriers may not have provided for such contingencies in their agreements with shippers, the corrective measures urged by petitioner to alter commercial realities and adjust the competitive balance would appear to contravene our determination in other contexts that contract carriers and shippers alike prefer flexibility over any form of protectionism the commission may be in a position to offer.

Ex Parte No. MC-215, Petition of the American Trucking Association to Provide Motor

Carriers Relief from Increased Federal Fuel Taxes and Other Federally Mandated Fuel Price Increases, (ICC served Sept. 20, 1993), 1993 WL 366900 at *4.

If the Board has any remaining doubts about the lag effect, the solution may be simply to substitute or enhance the RCAF in the manner suggested by Vice Chairman Mulvey with "a new RCAF which would come out monthly just reflecting the fuel and then one that comes out quarterly reflecting the other components." May 11, 2006 Hearing Transcript at 330.

In sum, the carriers have apparently decided to move away from the RCAF (at least insofar as incorporating the RCAF's fuel index) by implementing more lucrative fuel surcharges mechanisms that have operated to the economic detriment of their customers and the Nation's commerce. Those mechanisms have been demonstrated to overcompensate the carriers for their increases in fuel costs. The Board has correctly determined that the utilization of the most prevalent carrier-implemented surcharge mechanism (based on a percentage of the involved rail rates), constitutes an unreasonable practice. Rather than authorizing the carriers to implement wholly new unproven methods for recovering fuel costs, the Board has an obvious and unassailable fallback mechanism: the RCAF.

B. If Fuel Surcharge Programs are Allowed to Be Implemented, They Should Be Authorized Only in Limited Circumstances for a Temporary Duration

Notwithstanding the fact that there is no demonstrated need for fuel surcharge programs given the availability of standard industry adjustment mechanisms such as the RCAF to protect the parties against changes in carrier fuel costs, if the Board still concludes that dedicated fuel surcharge programs are necessary, it must take appropriate steps to ensure that such programs are not of indefinite duration.

As set forth in WCTL's April 27 Statement (at 19-21), historically, fuel surcharge programs have been sparingly authorized when necessary in emergency situations, but these programs were not allowed to continue in perpetuity. As stated by the ICC:

> [G]enerally, it is not a sound and orderly ratemaking practice to isolate a single operating tax from all other operating expenses, and maintain a surcharge based thereon. . . . Moreover, if this practice were followed to its logical extreme, rates might gradually be broken down into a multitude of surcharges, each set up for a particular expense. Such a practice, obviously, does not foster or promote the simplification of tariff publication.

Increases in Freight Rates and Charges to Offset Retirement Tax Increases – 1973, 350 I.C.C. 673, 712 (1975); see also id. ("[w]hile, for good and sufficient reasons, a surcharge might be authorized for temporary periods, it creates a disability which mitigates against authorizing any extended period of application"); id. at 713 ("we insist that each [of the imposed surcharges] be phased out as quickly as they have served their

temporary purpose, incorporating the provisions thereof into the rate tariffs"); Effect of Modifying Proclamation No. 3279 and Other Anticipated Energy Conservation Measures on the Operation of Carriers Subject to the Interstate Commerce Act, 350 I.C.C. 563, 572 (1975) ("Energy Conservation Measures") (surcharges are appropriate in "unusual situations" and where of "temporary duration"); Increased Freight Rates, 1951, 281 I.C.C. 557, 638 (1951) (same).

Typically, fuel surcharge programs have been limited to one year in duration. See Energy Conservation Measures, 350 I.C.C. at 581; Increases in Freight Rates and Charges to Offset Retirement Tax Increases – 1973, 350 I.C.C. at 722.

As previously demonstrated in WCTL's April 27 Statement, carriers' fuel surcharge programs in their current form by all appearances are attempts to implement an ongoing revenue enhancement plan of indefinite duration. For example, for coal, UP reports that its "fuel surcharge will be included on all repriced business" and that all of its newly negotiated "long-term contracts" will include UP's "standard fuel surcharge." UP 2005 Analyst Fact Book at 11, 20. UP's public pricing Circular 111, which also contains UP's coal fuel surcharge program, is typically used to cover shipments for three years. Thus, the programs have been, and are designed to be, in effect for far longer than a temporary period for which fuel surcharge programs have been previously authorized. See e.g., Central Forwarding, Inc. v. I.C.C., 698 F.2d 1226, 1271 (5th Cir. 1983) (carrier attempts to utilize fuel surcharge program as means of "regulat[ing] [carrier]

compensation on a permanent basis" are strictly proscribed as an unlawful "ongoing reimbursement plan").

The Board's Decision does not address the duration of time in which the carriers may implement fuel surcharge programs. WCTL submits that, if fuel surcharge programs are still deemed necessary, and are authorized to be implemented by carriers, they should be of temporary duration of no more than one year, which is consistent with governing precedent. After a year, in order to continue its surcharge program, a carrier should be required to demonstrate that there is no other mechanism (e.g., the RCAF) available to adequately protect it against an emergency situation of precipitous fuel price increases.

II.

Implementing a Fair and Equitable Surcharge Mechanism

WCTL submits that, for the above stated reasons, carriers should be required to rely upon the RCAF as the preferred cost index methodology for recouping fuel price increases. If the railroads are allowed to continue to collect fuel surcharges for any specified period of time, which WCTL submits is not necessary, the Board has an obligation to ensure that any such program is fair and equitable, and includes certain essential components.

A. The Essential Components of a Fuel Surcharge Mechanism

WCTL submits that the Board is correct that surcharges must link to the operating parameters of individual movements, but two additional essential components are only sparsely addressed by the Board's proposal as discussed below.

1. Aligning the Fuel Surcharge's Base Period with the Base Period of the Underlying Rail Rate

WCTL demonstrated in its April 27 Statement that the manner in which the carriers' fuel surcharge programs are established is suspect in light of the fact that they include initial "strike" fuel price levels for the implementation of surcharges that reflect fuel prices from several years ago. See WCTL April 27 Statement at 24. The Board's Decision at least indirectly addresses the need to readjust the programs to reflect the current market reality of sustained higher fuel prices, stating that "we believe [it] is an unreasonable practice [to apply] what the railroads label a fuel surcharge in a manner that is not limited to recouping increased fuel costs that are not reflected in the base rate." Decision at 4. The Board's Decision also states that fuel surcharges must be linked to actual carrier operations and costs for a given movement. Id. at 5. Addressing this important base period issue is essential in implementing any carrier surcharge program.

In their accompanying testimony, Messrs. Crowley and Fapp address the problems associated with the carriers' failure to utilize threshold fuel prices that are tied to the level of the price of fuel at the time when a rate is initiated. See V.S. Crowley/Fapp at 8-11. Messrs. Crowley and Fapp analyzed the threshold fuel price levels to which

surcharges are being applied by UP and BNSF. See id. at 9-11. UP and BNSF implemented their fuel surcharge programs in 2002. When implemented, UP's threshold rate for imposing fuel surcharges was when the Energy Information Administration's ("EIA's") Retail On-Highway Diesel Price index ("HDF") reached $1.35 per gallon, and BNSF's mileage-based surcharge began when the HDF reached $1.249 per gallon. Id.

At the time of implementing their fuel surcharge programs in 2002, UP and BNSF paid, on average, approximately $0.73 per gallon of fuel. Id. at 10. Meanwhile, in 2Q06, UP and BNSF paid, on average, $2.15 and $1.83, respectively, per gallon of fuel. See id. However, for rates established by UP and BNSF in 2Q06, both carriers retain their fuel surcharge threshold levels established in 2002. In other words, UP and BNSF have thus far failed to change their fuel surcharge programs since they were implemented to reflect changes in their embedded price of fuel in rail rates that take into account current market realities of higher fuel prices. Id. at 11.

This means that a customer initiating new service today with UP and BNSF must pay base rates that have embedded fuel prices as of today's date, yet that customer has the added burden of paying fuel surcharges based upon 2002 fuel surcharge threshold levels that are far below those embedded in its current rate. It has been well-advertised that railroad rates have been increasing significantly in the last several years, and more than cover the carriers' increases in fuel costs. However, UP and BNSF continue to rely on a surcharge rate threshold that was established four years ago when they paid $0.72

per gallon of fuel -- at fuel price levels that were 40 percent and 34 percent below UP and BNSF's 2Q06 levels, respectively -- providing the carriers an unfair and added economic windfall on any rates established after 2002. Id. at 10-11.

The above situation presents a clear problem that must be addressed to avoid economic windfalls to the carriers. The solution is straightforward: require the carriers to link the base time period in the fuel surcharge threshold price level to the base period in the rail rates entered. Id. at 11-12. In other words, if a carrier issues a rate in 1Q06, then the base time period for the fuel surcharge must equal the railroad's 1Q06 time period for setting the rate. Thus, the fuel price inherent in the transportation rate is tied directly to the fuel recovery base period, which ensures equity in the application of the surcharge program. Id.

It is a relatively simple exercise for the carriers to link the threshold fuel price to a rate, and the carriers should be required to do so. Id. Also, readjusting the threshold surcharge levels to correlate to the time period when the underlying freight rate was established is not difficult.[4]

2. Equitable Application of Fuel Surcharges

Another important matter the Board's Decision does not address is the need for fuel surcharge programs to be applied in a manner that ensures equity in risk-sharing

[4] In fact, Norfolk Southern Railway rebased its fuel surcharge threshold in the summer of 2006 to reflect changes in its imbedded price of fuel in rail rates, but other carriers did not do the same. Id.

between railroads and shippers. Under the carriers' current fuel surcharge programs, railroads are protected because they are compensated for any increases in fuel prices above the base period fuel prices. However, there is asymmetric risk because shippers are not protected against falling fuel prices below the base period fuel prices. Under the carriers' current programs, if carriers' fuel prices fall below the base period fuel prices, a carrier keeps the difference. Id. at 16. That is unfair and requires correction.

To ensure fairness and equity, any fuel surcharge program should be required to apply a credit if the railroad's fuel price declines below the fuel base price when the underlying transportation rate was established. Id.

B. Suggested Fair and Equitable Fuel Surcharge Mechanism

WCTL has asked Messrs. Crowley and Fapp to develop a fair and equitable single fuel surcharge mechanism as a possible alternative to implementation of the RCAF that fully offsets actual changes in railroad fuel prices, is tied to "those attributes of a movement that directly affect the amount of fuel consumed" (Decision at 5), and is simple to apply. The formula they have developed is set forth and discussed in their verified statement. Id. at 17-18. The proposed formula relies on publicly available or readily available data from carriers, including average fuel consumption per loaded car-mile, the loaded standard mileage for the movement, the railroad's average price per gallon of fuel during the month the rate was implemented, and the railroad's average price per gallon of fuel as currently reported. Id.

The proposed formula addresses the Board's concerns by tying fuel costs to the attributes of the individual movement to which it is applied. It also ensures that fuel surcharges are "limited to recouping increased fuel costs that are not reflected in the base rate" (Decision at 4), by tying the fuel price inherent in the transportation rate to the fuel recovery base period. The proposed fuel surcharge mechanism is simple to apply and it protects both railroads and shippers. It protects railroads by compensating them for increases in fuel prices above the base period fuel price when the involved transportation rate was implemented. It protects shippers from being saddled with risks of higher fuel prices without being able to obtain commensurate surcharge recovery when fuel prices fall. Id. WCTL commends this mechanism to the Board's favorable attention.

1. The Need for a Uniform Fuel Price Index

WCTL also asked Messrs. Crowley and Fapp to review the Board's proposal to require the use of the EIA's No. 2 Diesel Retail Sales index to gauge changes in Class I railroad fuel prices. As Messrs. Crowley and Fapp explain, because data on the carriers' actual change in fuel prices is readily available, and it is a simple process to utilize this information in accounting for changes in railroad fuel prices, it is not necessary for the Board to require carriers to utilize a third-party fuel price index. V.S. Crowley Fapp at 19-20. WCTL's proposed fuel surcharge formula relies on readily available actual carrier fuel data, and thus there is no need to use a third-party fuel price index in applying its proposed formula. Id.

However, if the Board chooses not to use actual changes in railroad fuel prices, then the No. 2 Diesel Retail Sales index is a suitable substitute, provided however, that the STB requires the carriers to link the base period of the fuel surcharge to the base period of the underlying transportation rate. Id. This linking issue is essential to ensuring that any fuel surcharge program "is limited to recouping increased fuel costs that are not reflected in the base rate" and is appropriately linked to actual carrier operations and costs for a given movement. Decision at 4, 5.

III.

Railroad Reporting Requirements

The Board proposes that each carrier accurately report meaningful fuel cost and revenue data in a manner that allows the public to see whether, and the extent to which, fuel surcharges accurately reflect a carrier's increased cost of fuel. Decision at 6.

WCTL has also asked Messrs. Crowley and Fapp to address the Board's proposed reporting requirements. On review, they explain that several carrier reporting issues need to be addressed and/or supplemented, including the need to ensure that the statistics are reported on a consistent, common basis, and that meaningful supplemental information is provided to enable the public to better assess fuel price recovery by types of traffic. Id. at 21-23.

Another critical missing piece of information is whether the total revenues each railroad collects pertaining to fuel costs, both those recovered from surcharge and

non-surcharge fuel price recovery mechanisms, offset the carrier's total increases in the price of fuel paid. Id. at 23. In this proceeding, each carrier has testified that its total revenue collections from fuel surcharge programs in and of themselves have not covered their total increases in fuel prices. But this leaves out a substantial amount of traffic that may not technically be paying segregated "fuel surcharges," but nevertheless is paying for fuel price increases under some other applicable adjustment mechanism governing the movement. Id. In order to get the full picture of fuel associated revenues, and whether there is over-recovery of fuel costs by the railroads, WCTL submits that the Board should require Class I railroads to report the amount of funds recovered through both fuel surcharge and non-surcharge fuel cost recovery mechanisms by commodity and interchange group. Id.

## CONCLUSION

WCTL appreciates the opportunity to submit these Comments, and it respectfully requests that the Board adopt the measures included in its Decision, as supplemented herein.

Respectfully submitted,

THE WESTERN COAL TRAFFIC LEAGUE

Of Counsel:

Slover & Loftus
1224 Seventeenth Street, N.W.
Washington, D.C. 20036

Dated: October 2, 2006

By: William L. Slover *Peter A. Pfohl*
Peter A. Pfohl
Slover & Loftus
1224 Seventeenth Street, N.W.
Washington, D.C. 20036

It's Attorneys

CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of October, 2006, I have caused to be served a copy of the foregoing Comments of the Western Coal Traffic League upon all parties of record to this case by first-class mail, postage prepaid.

Peter A. Pfohl

BNSF-0655751

CROWLEY/FAPP

VERIFIED STATEMENT OF THOMAS D. CROWLEY AND DANIEL L. FAPP

## I. INTRODUCTION

We are Thomas D. Crowley and Daniel L. Fapp. We are economists and, respectively, the President and Assistant Vice President of L. E. Peabody & Associates, Inc., an economic consulting firm that specializes in solving economic, transportation, marketing, and fuel supply problems. Mr. Crowley has spent most of his consulting career of over thirty-five (35) years evaluating fuel supply issues and railroad operations, including railroad costs, prices, financing, capacity and equipment planning issues. His assignments in these matters have been commissioned by railroads, producers, and shippers of different commodities. A copy of his credentials is included as Exhibit No. 1 to this verified statement.

Mr. Fapp has been with L. E. Peabody & Associates, Inc. since 1997. During this time, he has worked on numerous projects dealing with railroad revenue, cost and operational issues. Prior to joining L. E. Peabody & Associates, Inc., Mr. Fapp was employed by BHP Copper Inc. in the role of Transportation Manager - Finance and Administration, and where he also served as an officer of the three BHP Copper Inc. subsidiary railroads, The San Manual Arizona Railroad, the BHP Arizona (formerly Magma Arizona) Railroad and the BHP Nevada Railroad. A copy of his credentials is included as Exhibit No. 2 to this verified statement.

We have been requested by counsel for the Western Coal Traffic League ("WCTL") to address certain issues arising from the Surface Transportation Board's ("STB") decision in Ex Parte No. 661, *Rail Fuel Surcharges*, served August 3, 2006 ("Ex Parte 661"). Specifically,

counsel for WCTL have requested that we address the following issues: (1) the development of a methodology for fairly and equitably recovering changes in railroad fuel prices as a means to address unexpected and precipitous price increases;[1] (2) the appropriate fuel index to measure changes in railroad fuel prices; and (3) the railroads' reporting requirements surrounding fuel surcharges.

Our testimony is discussed further below under the following topical headings:

II. Fuel Surcharge Mechanism

III. Fuel Price Indices

IV. Railroad Reporting Requirements

[1]The STB used the terms "fuel price" and "fuel cost" interchangeably at several points in its Ex Parte 661 decision. There is a distinction, however, between a railroad's "fuel price" and its "fuel cost." Fuel price reflects the amount of money railroads pay for fuel. Fuel cost reflects how efficiently a railroad utilizes the fuel it purchases, i.e., the impact of the change in fuel price, productivity and operating factors.

## II. FUEL SURCHARGE MECHANISM

The STB instituted this proceeding to inquire as to the fuel surcharge practices employed by the railroad industry for purportedly recouping their rapid increases in fuel costs due to increasing fuel prices.[2] The major western coal hauling railroads, including The BNSF Railway Company ("BNSF") and the Union Pacific Railroad Company ("UP"), began implementing fuel surcharge programs in the last four years as the price of diesel fuel substantially increased above historic price ranges. In all cases, the railroads imposed fuel surcharge programs which based the fuel surcharge on a percentage of the total freight charges for each shipment.[3] The STB has found that the railroads' revenue-based fuel surcharges have little, if any, correlation between an increase in the railroads' costs of fuel due to higher fuel prices and the levels of the shippers' rates, and, therefore, has ruled that the revenue-based fuel surcharges are an unreasonable practice. The STB now seeks to develop a means for computing a surcharge that more closely links changes in railroad fuel prices to the surcharge levied, and takes into consideration the attributes of the underlying rail movement that directly affect the amount of fuel consumed.[4]

We agree with the STB as to the unreasonableness of the railroads' revenue-based fuel surcharges. However, we believe that the STB's Ex Parte 661 decision does not address

---

[2] See Ex Parte 661 at 1.

[3] Beginning January 2006, the BNSF began employing a surcharge based on loaded train-miles for some coal and grain shipments. The STB identifies this approach as a "mileage-based fuel surcharge" as opposed to a "revenue-based fuel surcharge" levied by BNSF on commodities other than coal/grain and by other railroads.

[4] See Ex Parte 661 at 5.

additional unreasonable attributes of the railroads' fuel surcharge programs. First, as a threshold issue, evidence indicates that the need for any fuel surcharge is unnecessary since rate adjustment approaches using the STB approved Rail Cost Adjustment Factor ("RCAF") currently recover costs associated with changes in railroad fuel prices. Second, any reasonable and equitable fuel surcharge approach, assuming one is even required in certain extraordinary situations, must link the timing of the surcharge threshold price level to the timing of the underlying rate. Third, as suggested by the STB, the fuel surcharge mechanism must account for each movement's operational attributes while being relatively simple to apply. Fourth, any fuel surcharge must not lead to windfall gains for the railroad and unfairly shift the risks of fuel price increases to shippers. We discuss each of these issues, plus present a fair and equitable fuel surcharge approach, below.

## A. THE RCAF FULLY RECOVERS CHANGES IN CARRIER FUEL PRICES

As we demonstrated in WCTL's Opening Statement in this proceeding filed on April 27, 2006, current railroad cost recovery procedures utilizing 100 percent of the RCAF already recover the western coal railroads' changes in fuel prices.[5] As further demonstrated below, the application of the RCAF as a rate adjustment mechanism does truly recover changes in railroad fuel prices.

[5] See WCTL Opening Statement Exhibit No. 2.

The Interstate Commerce Commission ("ICC") instructed in Railroad Cost Recovery Procedures[6] that the Association of American Railroads ("AAR") develop and file, and the ICC, and subsequently the STB, review and approve the quarterly RCAF index. In constructing the RCAF, the AAR estimates price changes in seven (7) expense categories - labor, materials and supplies, equipment rents, depreciation, interest, other items and fuel. From these estimates, the AAR develops updated quarterly indices for each cost expense category.[7] The AAR weighs each of the categories based on historic weighting factors, sums the weighted expense factors to develop the Preliminary RCAF, and adjusts the Preliminary RCAF for a forecast error factor to develop the final quarterly RCAF index. Many railroads and their shippers subsequently use the RCAF, or portions thereof, to adjust contractual and common carrier rail rates, and the STB has sanctioned and/or ordered its use in many proceedings as a reasonable means of protecting the parties interests.

Because the AAR develops the RCAF index using estimated changes in railroad prices, some may argue that the use of the RCAF to adjust rail rates will not recover actual changes in railroad fuel prices. As indicated above, we demonstrated in WCTL's Opening Statement in this proceeding that changes in the fuel portion of the RCAF index have recovered changes in railroad fuel prices. To further confirm this finding, we developed another test that measures the

[6]See Railroad Cost Recovery Procedures, 1 I.C.C.2d 207 (1984).
[7]See, for example, STB Ex Parte No. 290 (Sub-No. 5) (2006-4), Quarterly Rail Cost Adjustment Factor, served September 14, 2006.

correlation between changes in UP's and BNSF's fuel prices and changes in the RCAF fuel index.[8] We have displayed the results of our test in Table I below.

**Table 1**
**Correlation Between Changes In Railroad Fuel Prices and the RCAF Fuel Component**

| Railroad (1) | Correlation Coefficient Between Changes In Railroad Fuel Prices and the Fuel Component of the RCAF (2) |
|---|---|
| 1.BNSF | 0.973 |
| 2.UP | 0.969 |

Source: Exhibit No. 3.

As Table 1 above shows, changes in the railroads' fuel prices show an almost perfect correlation with changes in the fuel component of the RCAF. Thus, on average, the RCAF's fuel component moves in almost perfect lock-step with the UP's and BNSF's fuel prices. This indicates that any rate adjustment mechanism that relies upon 100 percent of the change in the

[8]Correlation analysis indicates the strength of linear association between two variables. A correlation coefficient of "1" indicates perfect positive correlation between the two variables, while correlation coefficient of "-1" indicates perfect negative correlation. A correlation coefficient of "0" indicates no correlation between the variables.

RCAF, or the RCAF fuel component, will closely recover any costs associated with changes in railroad fuel prices.[9]

Furthermore, any so-called "lag" between forecasted and actual price changes in the RCAF resulting from the fact that actual price changes are not known until two (2) quarters after the development and approval of the index through the application of the forecast error factor is not a problem. As demonstrated above in Table 1, changes in rail fuel prices correlate almost perfectly with changes in the RCAF fuel index. If there were a large lag impact, one would expect a much lower correlation between changes in the railroads' fuel prices and the RCAF fuel index. In other words, because the correlation coefficients shown above in Table 1 nearly equal one, quarterly changes in the RCAF fuel index closely track, on average, quarterly changes in railroad fuel prices. If there were a lag impact, we would expect lower correlation coefficients, i.e., less than the 0.969 and 0.973, since the changes in the RCAF fuel index and the fuel prices would be "out of step," and not present the strong association shown. Additionally, even if a lag did exist, the lag would only negatively impact the railroads if fuel prices only increased, but never decreased. During times of falling fuel prices, as fuel prices are now experiencing, the railroads would actually benefit from a lag effect in the RCAF because it would allow the railroads to over recover their changes in fuel costs associated with falling fuel prices. Thus, the RCAF is a fair and effective method for railroads to adjust for changes in fuel prices, it is already

---

[9]Whether the RCAF index used is adjusted or not adjusted for productivity is irrelevant since both the RCAF, Unadjusted for Productivity ("RCAF-U") and the RCAF, Adjusted for Productivity ("RCAF-A") incorporate the change in the RCAF fuel index component. The latter index, the RCAF-A, also adjusts for changes in railroad productivity.

published quarterly by the STB and is a well-known established mechanism for recovering changes in fuel prices.

**B. THE STB MUST APPROVE A FAIR AND EQUITABLE <u>SURCHARGE MECHANISM</u>**

If the STB allows the railroads to continue to apply fuel surcharges, notwithstanding the fact that current rate adjustment factors regularly utilized by the railroad industry fully recover changes in fuel prices, the STB must uphold its promise to ensure that the railroads implement fair and equitable fuel price recovery approaches. We believe that the STB's search for a fair and appropriate fuel adjustment mechanism could and should start and end with the RCAF. However, should the Board seek out an alternative mechanism, based on our experiences, a fair and equitable fuel surcharge instrument: 1) would align the fuel surcharge's base period with the base period of the underlying rail rate; 2) would link the surcharge to the movement's primary operating attributes; and 3) would compensate the railroad for increases in fuel prices while protecting shippers from carrier windfall financial gains at their expense when there are falling fuel prices. We explain each aspect of a fair surcharge instrument below.

**1. <u>Linking Rate and Surcharge Time Periods</u>**

As WCTL indicated in its Opening Statement in this proceeding, the UP's current revenue-based fuel surcharge and the BNSF's revenue-based and mileage-based fuel surcharges irreparably suffer from failures to link the base time period when a rail rate is implemented with

the base time period when the fuel surcharge threshold triggering price level is implemented.[10] In other words, the timing of the fuel costs embedded in BNSF's and UP's rail rates do not necessarily reflect the timing of the price levels of the railroads' fuel surcharges. For example, a 2006 quoted rail rate will reflect the railroad's 2006 fuel costs. If a fuel surcharge is applied to that rate and the fuel surcharge reflects changes in fuel prices beginning in 2002 (base period), an obvious over recovery occurs. This discontinuity between the railroad's fuel cost when it implemented its rates and its fuel price when it implemented its fuel surcharge threshold price leads to a windfall gain for the railroad because it is recovering more than their current price of fuel on the movement.

Under its current fuel surcharge approach, the UP begins applying fuel surcharges to applicable traffic rates when the Energy Information Administration's ("EIA") Retail On-Highway Diesel Price index ("HDF") reaches $1.35 per gallon.[11] Similarly, BNSF begins applying its revenue-based fuel surcharge when the HDF passes $1.239 per gallon, and its mileage-based surcharge when the HDF passes $1.249 per gallon.[12] The UP and BNSF apply these fuel surcharges whether they implemented the underlying rail rate in 2002 or 2006. The primary inequity stems from the failure of the surcharge threshold price to adjust to reflect the timing of the published issue rail rate. Simply stated, the railroads hold the surcharge threshold fuel prices constant without regard to known changes in fuel price increases and the fact that they have increased base rail rates to cover higher fuel costs.

---

[10] See WCTL Opening Statement at 24.
[11] See UP's website at www.uprr.com/customers/energy/coal/surcharge.shtml.
[12] See BNSF's website at www.bnsf.com/tools/prices/fuelsurcharge/index.html.

Analysis of the UP's and BNSF's historic fuel prices and historic HDF prices shows that the UP and BNSF implicitly assume that the embedded price of fuel in rail rates subject to fuel surcharges equals the price of fuel the railroads paid in 2002. Specifically, UP implicitly assumes its embedded fuel price base period is 4Q02, while BNSF implicitly assumes its fuel price base period is 1Q02.[13] A review of their respective financial reports shows that UP and BNSF paid, on average, $0.725 and $0.724, respectively, for a gallon of fuel in 2002.[14] By 2Q06, the UP's and BNSF's prices of fuel have increased to $2.15 and $1.83 per gallon, respectively.[15]

It is understandable that both railroads would seek to recover the increase in fuel prices for rates established when they paid approximately $0.73 per gallon. But both railroads have made it well known that they have raised rail rates in the last few years across their customer base in part due to claimed higher fuel prices. Generally, as the price of production inputs increase, holding

[13]These time periods were developed by running a regression analysis of BNSF's and UP's reported fuel price per gallon against HDF fuel prices. The resulting regression equations were used to develop UP's and BNSF's price of fuel on a dollar per gallon basis at the threshold HDF fuel price indicated in the respective carrier's fuel surcharges. The two time periods referenced represent the latest time periods in which UP's and BNSF's respective fuel price per gallon were at the HDF threshold price level.

[14]See BNSF's Fourth Quarter 2002 Investor's Report and UP's 2002 Analysts Fact Book.

[15]See BNSF's Second Quarter 2006 Investor's Report and UP's Second Quarter 2006 Overview.

all else constant, the railroads will adjust their rates to reflect their higher cost of operations.[16] Therefore, a rail rate established in 2Q06 would have embedded in it an implicit price of fuel equal to BNSF's $1.83 per gallon in 2Q06 or UP's $2.15 per gallon in 2Q06. One can reasonably conclude that the railroads have run-up their rates, in part, due to higher fuel costs. Stated differently, the railroads have raised rates in part due to higher fuel prices. However, under the UP's and BNSF's current fuel surcharge programs, a shipper with a rate established in 2Q06 would pay the same fuel surcharge as if its rate was established in 2002. This is true even though the more current rate already takes into consideration the increased price of fuel.

It is not unheard of for a railroad to rebase its fuel surcharge threshold to reflect changes in the embedded price of fuel in rail rates. The Norfolk Southern Railway ("NS") instituted a fuel surcharge mechanism in March, 2004 when its average price of fuel equaled approximately $0.83 per gallon. NS's fuel surcharge approach, which applied to rates quoted under NS Conditions of Carriage 1-Series or NS Conditions of Carriage 2-Series, had a threshold fuel price level of $23.00 per barrel of West Texas Intermediate ("WTI") crude.[17] In July of this year, NS rebased its fuel surcharge to 2006 fuel price levels for rates issued in mid-year 2006.[18] Under the revised NS fuel surcharge, the threshold WTI crude price level increased to $64.00 per barrel,

---

[16]It is well established that the railroads do not base their entire rates on costs, and can and do engage in demand-based differential pricing. See Ex Parte 661 at 4. With that being said, as the ICC stated in its Coal Rate Guidelines decision, it is not economically rational for a railroad to price below its directly variable costs, which would include its cost of fuel. Therefore, as the price of fuel increases, one would rationally expect railroads to increase their rates, holding all production economies constant.

[17]Unlike UP and BNSF, NS and its eastern U.S. counterpart, CSX Transportation, linked their fuel surcharges to changes in WTI crude prices.

[18]See NS Tariff NS 8003.

meaning that at existing WTI crude price levels, customers covered under the revised NS fuel surcharge mechanism would face no fuel surcharge.

The railroads can effectively link the applicable threshold fuel surcharge price to the period in which a rate is implemented. As the STB explained, the railroads' information management capabilities have expanded greatly in the last 20 years, and adjusting revenue programs to account for rebasing price levels is not a great burden.[19] The railroads already retain the time period in which they established the underlying rail rate. Moreover, the STB proposes as part of this proceeding to require the railroads to report their monthly fuel prices. It would require little effort beyond that currently employed to use actual base rate fuel prices in any fuel surcharge application.

In sum, to ensure fairness and equity in the application of any fuel surcharge program, the railroads must link the base time period in the fuel surcharge threshold price level to the base period in the rail rates. Thus, if a railroad issues a rate in 1Q06, then the base time period for the fuel surcharge must equal the railroad's 1Q06 time period for implementing the rate. By not linking the two periods and continuing to apply a fuel surcharge based on 2002 railroad fuel price levels in connection with a 2006 base rate, the railroads fuel surcharge programs are inequitable and unreasonable.

---

[19] See Ex Parte 661 at 5.

**2. Fuel Surcharges Must Link to Operating Parameters**

As explained above, the UP currently uses a single revenue-based fuel surcharge to apply fuel surcharges to applicable rates. The BNSF also currently uses a revenue-based fuel surcharge program applicable to non-coal and non-agricultural movements, and a mileage-based fuel surcharge instrument which is currently applicable only to certain unit coal train and agricultural shipments.[20] The STB agrees with WCTL's uncontroverted evidence in its Opening Statement and recognizes that UP's and BNSF's revenue-based fuel surcharges are unreasonable since they include no reasonable link to the railroads' operations for the movement involved.[21]

To remedy this issue, the STB proposes to require the railroads to tie their fuel surcharge programs to those attributes of a movement that directly impact the amount of fuel consumed. The STB believes that, at a minimum, the key attributes should include mileage, with preferred

[20] See BNSF's website at www.bnsf.com/tools/prices/fuelsurcharge/index.html for details of the BNSF's fuel surcharge programs.
[21] See Ex Parte 661 at 4.

approaches including both mileage and weight.[22]

The STB's inclusion of weight and mileage attributes is a movement in the right direction. We believe, though, that any equitable surcharge program must include additional attributes as well. The STB, and the ICC before it, recognized that unit train operations are more efficient, and thus, less expensive (per unit transported) to operate than non-unit train operations. A fuel surcharge mechanism should therefore also include the recognition of the efficiencies of unit-train operations.

BNSF is currently taking this approach in its existing mileage-based fuel surcharge program for unit coal trains. BNSF has included in its unit coal train mileage-based fuel surcharge mechanism an implicit fuel consumption rate of 0.167 gallons per loaded car-mile.[23] Based on BNSF's implicit fuel consumption rate for unit-coal trains, BNSF 2005 fuel consumption and BNSF total car-miles by train type, we have estimated the fuel consumption for BNSF's unit and non-unit train operations. We display our calculations in Exhibit No. 4 to this Verified Statement and summarize the results in Table 2 below.

---

[22] See Ex Parte 661 at 5.

[23] The BNSF's coal unit-train fuel surcharge assumes each $0.06 per gallon increase in fuel prices equals a $0.01 per car-mile increase in the fuel surcharge. This would mean that BNSF's unit-coal trains consume 0.167 gallons per loaded car-mile assuming that BNSF's mileage-based fuel surcharge is equal to the fuel consumption per loaded car-mile multiplied by the number of car-miles multiplied by the change in fuel price.

Table 2
**BNSF Fuel Consumption Per Loaded Car-Mile For Unit Train and Non-Unit Train Operations**

| Train Type | Fuel Consumption Per Loaded Car-Mile (Gallon) |
|---|---|
| (1) | (2) |
| 1.Unit Train | 0.167 |
| 2.Non-Unit Train | 0.253 |

Source: Exhibit No. 4.

As shown in Table 2 above, BNSF's estimated fuel consumption for unit train and non-unit train operations equals 0.167 and 0.253 gallons per loaded car-mile, respectively. Given the close similarity in BNSF's and UP's operations, we believe that UP would achieve similar fuel consumption rates in its unit and non-unit train operations.[24]

Including weight, mileage and train type as attributes in a fuel surcharge formula would provide a more equitable answer than just using mileage alone. While the actual weight may be the ideal metric to use to develop a fuel surcharge, and is suitable for use when it involves the movement of coal in unit trains, it is impractical for use in an industry-wide application since many shipments are rated on a per-carload or per-container basis. For example, BNSF applies its

[24]This assumption is supported by the fact that the vast majority of both railroads' coal shipments originate in the same location, the Powder River Basin, and are transported over similar distances to similar locations.

coal unit train mileage-based fuel surcharge on a carload basis rather than on a weight basis.[25] One may presume that BNSF took this approach for both convenience and universal applicability. Therefore, for consistency purposes, and to further the goal of simplicity in fuel surcharge application, the operating characteristic should be based on the number of cars and not the total weight transported, which may be unknown.

1. **Declining Fuel Prices Should Not Provide Windfall Gains**

The railroads began imposing fuel surcharges for the ostensive reason that they needed such programs in order to recoup sudden increases in their fuel prices. Shippers generally recognize that the railroads are interested in recovering the increased costs they incur from raising fuel prices.[26] This generality also has a corollary in that shippers generally expect that the railroads will share in the gains brought about by falling fuel prices. Therefore, in those instances where railroad fuel surcharges are authorized to be implemented if the railroads' fuel prices increase above a base price level, then a fuel surcharge would be applicable. Similarly, if the railroads' fuel price declines below the base price, credits should be applied. In this fashion, the fuel surcharge protects railroads from unexpected spikes in fuel prices, while a negative fuel surcharge, or fuel credit, protects shippers from windfall railroad gains at their expense.

---

[25] See BNSF's website at www.bnsf.com/tools/prices/fuelsurcharge/coalunittrain.html for full details of the BNSF's mileage-based fuel surcharges for coal.

[26] See Ex Parte 661 at 2.

## C. A FORMULA FOR AN EQUITABLE FUEL SURCHARGE

Given the above discussion about the attributes of a fair and equitable fuel surcharge, as an alternative to implementation of RCAF, we have developed a fuel surcharge formula that both protects railroads from dramatic increases in fuel prices, while allowing shippers to share the benefits commensurate with the increased risk born by the surcharges imposed. Specifically, our fuel surcharge per carload approach includes the following:

***Fuel Surcharge = GPC x Mileage x (Current Fuel Price - Base Fuel Price)***

Where:

| | | |
|---|---|---|
| GPC | = | Average Fuel Consumption Per Loaded Car-Mile By Shipment Type (see Table 2 above) |
| Mileage | = | The loaded standard mileage for the movement |
| Current Fuel Price | = | The railroad's average price per gallon of fuel as reported in the previous month |
| Base Fuel Price | = | The railroad's average price per gallon of fuel during the month the rate was implemented. |

The above fuel surcharge formula fully and fairly offsets actual changes in railroad fuel prices. Additionally, the formula benefits both shippers and railroads in its simplicity of implementation. The railroads' fuel consumption per loaded car-mile can easily be estimated from publicly available railroad operating statistics. Similarly, both parties can determine the loaded mileage for each movement based on railroad mileage calculators or commercially available mileage statistics. Railroads, in the normal course of business, track their fuel expenses on a monthly basis, and reporting the average monthly fuel price paid on a one month delayed

basis is of no great burden to the railroads. Finally, as indicated above, a railroad should have no issues linking its monthly reported fuel price to the base period of the underlying rail rate.

The above proposed formula also benefits both railroads and shippers in its equitability of risk sharing. It compensates a railroad for any increases in fuel prices above the base period fuel price, thus protecting it from unexpected peaks in fuel prices. It links the fuel charge to the railroad's operation for the particular movement thereby ensuring the railroad's fuel price recovery maintains some nexus to the movement. It protects a shipper from absorbing the risks of higher fuel prices without sharing the commensurate gains from falling fuel prices. And finally, it directly ties the fuel price inherent in the transportation rate to the fuel recovery base period.

## III. FUEL PRICE INDICES

The STB proposes to require all Class I railroads to use a single, uniform index to measure changes in fuel prices. Pursuant to this proposal, the STB suggests that the best index available to gauge changes in railroad fuel prices is the EIA's No. 2 Diesel Retail Sales index also known as the HDF index.[27] This is based on the assertion that the No. 2 Diesel Retail Sales index is the most broad based fuel price index published by the EIA, and the changes strongly correlate with changes in other fuel price indices, including the EIA's Refiner Prices of Petroleum Products to End Users index and the AAR's Fuel Cost index. In addition, the STB believes that because the EIA publishes the No. 2 Diesel Retail Sales index with only a one (1) month lag, it is a better index than others which have two to three month lags.[28]

As we explained above, there is no real need to utilize a third-party fuel price index to account for changes in railroad fuel prices due to the ability of the railroads to utilize their actual change in fuel prices in any fuel surcharge mechanism developed. The railroads customarily produce operating expense information on a monthly basis. It is a simple process to utilize the railroad's fuel price information on a one-month lagged basis in any fuel surcharge application.

If the STB ultimately chooses to not use actual changes in railroad fuel prices, then we believe the No. 2 Diesel Retail Sales index is a suitable substitute, with one caveat. Whatever

---

[27]In its historic tables, EIA refers to this index as the No. 2 Diesel Retail Sales index and in its weekly and monthly updates, EIA refers to this index as HDF. These indexes are interchangeable.

[28]See Ex Parte 661 at 6.

fuel price index is eventually chosen, whether it be actual fuel prices, the No. 2 Diesel Retail Sales index, or another fuel index, as explained above, the STB must require that the railroads link the base period of the fuel surcharge to the base period of the underlying rail rate. Not linking the fuel surcharge base period to the base period of the rate may lead to a windfall gains by the railroads, and violate the STB's admonishment of linking fuel surcharges to actual operations and costs.

## IV. RAILROAD REPORTING REQUIREMENTS

The STB proposes to require the Class I railroads to file on a monthly basis data regarding their fuel usage and prices. Specifically, the STB believes that, at a minimum, the railroads should report the following information:

1. Total fuel expense;
2. Total fuel consumed;
3. Increases or decreases in price of fuel;
4. Revenue from fuel surcharges;
5. Revenue from fuel surcharges collected on joint shipments with Class II and III railroads;
6. Fuel surcharge revenues shared with the Class II and III carriers;
7. The ton-miles on which the fuel surcharge was applied; and
8. Total ton-miles.

While we agree that the above operating and financial metrics would be helpful in judging the impact and effects of the railroads' fuel price recovery programs, we also believe that the proposed reporting requirements have several shortcomings. First, many of the reporting statistics are reported on inconsistent bases. For example, the STB's proposal requires the railroads to report the first three reporting statistics - total fuel expense, total fuel consumed and increases or decreases in fuel prices - on a system-wide basis. However, the STB's proposal would have the railroads report the next three statistics - revenue from fuel surcharges, revenues from fuel surcharges revenues collected on joint shipments with Class II and Class III carriers,

and fuel surcharge revenues shared with the Class II and Class III carriers - for only a subset of the railroads' total traffic. Effective management should seek to require the railroads to report all statistics on a common basis.

Second, the above reporting requirements do not allow shippers, or the STB, to determine if, or by how much, railroads would continue to "double dip" recovery of changes in fuel prices. In other words, the proposed reporting requirements do not reflect the recovery of changes in fuel prices from other rate adjustment mechanisms such as through the application of the RCAF which includes changes in railroad fuel prices.

Third, the proposed traffic categories are too narrow and would not allow the STB and shippers to adequately determine if one type of traffic or traffic group is disproportionately supplying a majority of the railroad's fuel price recovery (again, this requires a review of other non-fuel surcharge rate adjustment mechanism data under which railroads recover changes in railroad fuel prices).

To eliminate the above shortcomings in the STB's proposed reporting requirements, we recommend that the STB expand the breadth and depth of the statistics reported by the railroads. Specifically, we recommend that the STB require the railroads to report each statistic in their monthly report by major commodity group as reported in the railroad's financial reports, and separated between interchange and non-interchange traffic. Such reporting metrics, along with total revenue, ton-miles, car-miles and train-miles by commodity and interchange category,

would provide some clarity in the railroads' reporting of their fuel surcharge programs, and help foster some of the reporting transparency sought by the Board and shippers.[29]

In addition, we recommend that the STB require the Class I railroads to report the amount of funds recovered through both fuel surcharge and non-surcharge fuel price recovery mechanisms by each commodity and interchange group. The railroads have attempted to portray their fuel surcharge programs as being unable to recover all increases in the price of fuel due their inability to apply fuel surcharges to all movements.[30] The railroads support their argument by comparing their cumulative increases in fuel costs attributable to changes in fuel prices to their total fuel surcharge revenues. These comparisons, though, do not reveal whether the railroads are actually recovering losses due to higher fuel prices because they exclude increases in revenues from non-fuel surcharge recovery mechanisms such as the fuel component in the RCAF. Having the railroads report revenues associated with surcharge and non-surcharge based fuel price recovery methods would show whether the railroads are truly not recovering costs associated with increased fuel prices, and provide the transparency to substantiate their claims.

---

[29]See Ex Parte 661 at 3.
[30]Id.

## VERIFICATION

COMMONWEALTH OF VIRGINIA )
)
CITY OF ALEXANDRIA )

I, THOMAS D. CROWLEY, verify under penalty of perjury that I have read the foregoing Verified Statement of Thomas D. Crowley, that I know the contents thereof, and that the same are true and correct. Further, I certify that I am qualified and authorized to file this statement.

Thomas D. Crowley

Sworn to and subscribed
before me this day of September 29,2006.

Anthony V. Evanshaw III
Notary Public for the State of Virginia

My Commission expires: September 30, 2007

# VERIFICATION

COMMONWEALTH OF VIRGINIA )
)
CITY OF ALEXANDRIA )

I, DANIEL L. FAPP, verify under penalty of perjury that I have read the foregoing Verified Statement of Daniel L. Fapp, that I know the contents thereof, and that the same are true and correct. Further, I certify that I am qualified and authorized to file this statement.

Daniel L. Fapp

Sworn to and subscribed
before me this day of September 29,2006.

Anthony V. Evanshaw III
Notary Public for the State of Virginia

My Commission expires: September 30, 2007

BNSF-0655777

## STATEMENT OF QUALIFICATIONS

My name is Thomas D. Crowley. I am an economist and President of the economic consulting firm of L. E. Peabody & Associates, Inc. The firm's offices are located at 1501 Duke Street, Suite 200, Alexandria, Virginia 22314 and 5901 N. Cicero Avenue, Suite 504, Chicago, Illinois 60646.

I am a graduate of the University of Maine from which I obtained a Bachelor of Science degree in Economics. I have also taken graduate courses in transportation at George Washington University in Washington, D.C. I spent three years in the United States Army and since February 1971 have been employed by L. E. Peabody & Associates, Inc.

I am a member of the American Economic Association, the Transportation Research Forum, and the American Railway Engineering and Maintenance-of-Way Association.

The firm of L. E. Peabody & Associates, Inc. specializes in solving economic, marketing and transportation problems. As an economic consultant, I have organized and directed economic studies and prepared reports for railroads, freight forwarders and other carriers, for shippers, for associations and for state governments and other public bodies dealing with transportation and related economic problems. Examples of studies I have participated in include organizing and directing traffic, operational and cost analyses in connection with multiple car movements, unit train operations for coal and other commodities, freight forwarder facilities, TOFC/COFC rail facilities, divisions of through rail rates, operating commuter passenger service, and other studies dealing with markets and the transportation by different modes of various commodities from both eastern and western origins to various destinations in the United States. The nature of these

**STATEMENT OF QUALIFICATIONS**

studies enabled me to become familiar with the operating practices and accounting procedures utilized by railroads in the normal course of business.

Additionally, I have inspected and studied both railroad terminal and line-haul facilities used in handling various commodities, and in particular unit train coal movements from the Powder River Basin to various utility destinations in the midwestern and western portions of the United States and from the Eastern Coal Fields to various destinations in the Mid-Atlantic, northeastern and southeastern portions of the United States. These operational reviews and studies were used as a basis for the determination of the traffic and operating characteristics for specific movements of coal and numerous other commodities handled by rail.

I have frequently been called upon to develop and coordinate economic and operational studies relative to the acquisition of coal and the rail transportation of coal on behalf of electric utility companies. My responsibilities in these undertakings included the analyses of rail routes, rail operations and an assessment of the relative efficiency and costs of railroad operations over those routes. I have also analyzed and made recommendations regarding the acquisition of railcars according to the specific needs of various coal shippers. The results of these analyses have been employed in order to assist shippers in the development and negotiation of rail transportation contracts which optimize operational efficiency and cost effectiveness.

Moreover, I have developed numerous variable cost calculations utilizing the various formulas employed by the Interstate Commerce Commission ("ICC") and the Surface Transportation Board ("STB") for the development of variable costs for common carriers, with particular emphasis on

**STATEMENT OF QUALIFICATIONS**

the basis and use of Rail Form A and its replacement costing formula the Uniform Railroad Costing System ("URCS"). I have utilized Rail Form A/URCS costing principles since the beginning of my career with L. E. Peabody & Associates Inc. in 1971.

I have frequently presented both oral and written testimony before the ICC, STB, Federal Energy Regulatory Commission, Railroad Accounting Principles Board, Postal Rate Commission and numerous state regulatory commissions, federal courts and state courts. This testimony was generally related to the development of variable cost of service calculations, rail traffic and operating patterns, fuel supply economics, contract interpretations, economic principles concerning the maximum level of rates, implementation of maximum rate principles, and calculation of reparations or damages, including interest. I presented testimony before the Congress of the United States, Committee on Transportation and Infrastructure on the status of rail competition in the western United States. I have also presented testimony in a number of court and arbitration proceedings concerning the level of rates, rate adjustment procedures, rail operating procedures and other economic components of specific contracts.

Since the implementation of the *Staggers Rail Act of 1980*, which clarified that rail carriers could enter into transportation contracts with shippers, I have been actively involved in negotiating transportation contracts on behalf of coal shippers. Specifically, I have advised utilities concerning coal transportation rates based on market conditions and carrier competition, movement specific service commitments, specific cost-based rate adjustment provisions, contract reopeners that recognize changes in productivity and cost-based ancillary charges.

## STATEMENT OF QUALIFICATIONS

I have been actively engaged in negotiating coal supply contracts for various users throughout the United States. In addition, I have analyzed the economic impact of buying out, brokering, and modifying existing coal supply agreements. My coal supply assignments have encompassed analyzing alternative coals to determine the impact on the delivered price of operating and maintenance costs, unloading costs, shrinkage factor and by-product savings.

I have developed different economic analyses for over sixty (60) electric utility companies located in all parts of the United States, and for major associations, including American Paper Institute, American Petroleum Institute, Chemical Manufacturers Association, Coal Exporters Association, Edison Electric Institute, Mail Order Association of America, National Coal Association, National Industrial Transportation League, North America Freight Car Association, the Fertilizer Institute and Western Coal Traffic League. In addition, I have assisted numerous government agencies, major industries and major railroad companies in solving various economic problems.

In the two Western rail mergers that resulted in the creation of BNSF Railway Company and Union Pacific Railroad Company and in the acquisition of Conrail by Norfolk Southern Railroad Company and CSXT, I reviewed the railroads' applications including their supporting traffic, cost and operating data and provided detailed evidence supporting requests for conditions designed to maintain the competitive rail environment that existed before the proposed mergers and acquisition. In these proceedings, I represented shipper interests, including plastic, chemical, coal, paper and steel shippers.

## STATEMENT OF QUALIFICATIONS

I have participated in various proceedings involved with the division of through rail rates. For example, I participated in ICC Docket No. 35585, *Akron, Canton & Youngstown Railroad Company, et al. v. Aberdeen and Rockfish Railroad Company, et al.* which was a complaint filed by the northern and midwestern rail lines to change the primary north-south divisions. I was personally involved in all traffic, operating and cost aspects of this proceeding on behalf of the northern and midwestern rail lines. I was the lead witness on behalf of the Long Island Rail Road in ICC Docket No. 36874, *Notice of Intent to File Division Complaint by the Long Island Rail Road Company*.

As a result of my extensive economic consulting practice since 1971 and my participating in maximum-rate, rail merger, and rule-making proceedings before various government and private governing bodies, I have become thoroughly familiar with the operations, practices and costs of the rail carriers that move coal over the major coal routes in the United States.

**STATEMENT OF QUALIFICATIONS**

My name is Daniel L. Fapp. I am Assistant Vice President of the economic consulting firm of L. E. Peabody & Associates, Inc. The firm's offices are located at 1501 Duke Street, Suite 200, Alexandria, VA 22314 and 5901 N. Cicero Avenue, Suite 504, Chicago, IL 60646.

I received a Bachelor of Science degree in Business Administration with an option in Marketing (cum laude) from the California State University, Northridge in 1987, and a Master of Business Administration degree from the University of Arizona's Eller School of Management in 1993, specializing in finance and operations management. I am also a member of Beta Gamma Sigma, the national honor society for collegiate schools of business.

I have been employed by L. E. Peabody & Associates, Inc. since December 1997. Prior to joining L. E. Peabody & Associates, Inc., I was employed by BHP Copper Inc. in the role of Transportation Manager - Finance and Administration, and where I also served as an officer of the three BHP Copper Inc. subsidiary railroads, The San Manual Arizona Railroad, the BHP Arizona (formerly Magma Arizona) Railroad and the BHP Nevada Railroad. I have also held operations management positions with Arizona Lithographers in Tucson, AZ and MCA-Universal Studios in Universal City, CA.

While at BHP Copper Inc., I was responsible for all financial and administrative functions of the company's transportation group. I also directed the BHP Copper Inc. subsidiary railroads' cost and revenue accounting staff, and managed the San Manuel Arizona Railroad's and BHP Arizona Railroad's dispatchers and the railroad dispatching functions. I served on the company's Commercial and Transportation Management Team and the company's Railroad Acquisition Team

**STATEMENT OF QUALIFICATIONS**

where I was responsible for evaluating the acquisition of new railroads. While with MCA-Universal Studios, I held several operations management positions, including Tour Operations Manager, where my duties included vehicle routing and scheduling, personnel scheduling, forecasting facilities utilization, and designing and performing queuing analyses.

As part of my work for L. E. Peabody & Associates, Inc., I have performed and directed numerous projects and analyses undertaken on behalf of utility companies, short line railroads, bulk shippers, and industry and trade associations. Examples of studies which I have participated in organizing and directing include, traffic, operational and cost analyses in connection with the rail movement of coal, metallic ores, pulp and paper products, and other commodities. I have also analyzed multiple car movements, unit train operations, divisions of through rail rates and switching operations throughout the United States. The nature of these studies enabled me to become familiar with the operating procedures utilized by railroads in the normal course of business.

Since 1997, I have participated in the development of cost of service analyses for the movement of coal over the major eastern and western coal-hauling railroads. I have conducted on-site studies of switching, detention and line-haul activities relating to the handling of coal. I have also participated in and managed several projects assisting short-line railroads. In these engagements, I assisted short-line railroads in their negotiations with connecting Class I carriers, performed railroad property and business evaluations, and worked on rail line abandonment projects.

I have been frequently called upon to perform financial analyses and assessments of Class I, Class II and Class III railroad companies. In addition, I have developed various financial models

**STATEMENT OF QUALIFICATIONS**

exploring alternative methods of transportation contracting and cost assessment, developed corporate profitability and cost studies, and evaluated capital expenditure requirements.

In my tenure with L. E. Peabody & Associates, Inc., I have assisted in the development and presentation of traffic and revenue forecasts, operating expense forecasts, and discounted cash-flow models which were presented in numerous proceedings before the STB. I presented evidence applying the STB's stand-alone cost procedures in Docket Number 42057, Public Service Company of Colorado d/b/a Xcel Energy v. The Burlington Northern and Santa Fe Railway Company, and in Docket Number 42071, Otter Tail Power Company v. BNSF Railway Company. In addition, my reports have been used as evidence before the Nevada State Tax Commission.

Exhibit No. 3
Page 1 of 3

## Quarterly Adjusted Rail Cost Adjustment Factor Fuel Index

| | Time Period | RCAF Fuel Index 1/ | Forecast Error 1/ | Adjusted Forecast Error 2/ | Fuel Weight 1/ | Previous Quarter's Weighted Average Index 1/ | Previous Quarter's Linked Index 1/ | Linking Factor 3/ | Linked Adjusted Forecast Error 4/ | Adjusted RCAF Fuel Index Value 5/ |
|---|---|---|---|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) |
| 1. | 1Q 1997 | 96.5 | 0.003 | 0.003 | 7.3 | 174.4 | 170.4 | 1.0235 | 0.307 | 96.52 |
| 2. | 2Q 1997 | 78.8 | 0.008 | 0.008 | 7.3 | 178.8 | 174.7 | 1.0235 | 0.819 | 78.86 |
| 3. | 3Q 1997 | 83.1 | -0.001 | -0.001 | 7.3 | 177.8 | 173.7 | 1.0236 | -0.102 | 83.09 |
| 4. | 4Q 1997 | 80.7 | 0.000 | 0.000 | 8.9 | 178.4 | 174.6 | 1.0218 | 0.000 | 80.70 |
| 5. | 1Q 1998 | 81.3 | -0.001 | -0.001 | 8.9 | 177.0 | 173.2 | 1.0219 | -0.113 | 81.29 |
| 6. | 2Q 1998 | 70.3 | 0.006 | 0.007 | 8.9 | 176.5 | 172.7 | 1.0220 | 0.677 | 70.36 |
| 7. | 3Q 1998 | 71.3 | -0.003 | -0.003 | 8.9 | 175.3 | 171.5 | 1.0222 | -0.339 | 71.27 |
| 8. | 4Q 1998 | 68.3 | 0.002 | 0.002 | 8.6 | 178.6 | 173.4 | 1.0300 | 0.227 | 68.32 |
| 9. | 1Q 1999 | 63.1 | -0.003 | -0.003 | 8.6 | 178.5 | 173.3 | 1.0300 | -0.341 | 63.07 |
| 10. | 2Q 1999 | 55.2 | -0.001 | -0.001 | 8.6 | 178.2 | 173.0 | 1.0301 | -0.114 | 55.19 |
| 11. | 3Q 1999 | 66.3 | -0.004 | -0.004 | 8.6 | 177.3 | 172.1 | 1.0302 | -0.455 | 66.26 |
| 12. | 4Q 1999 | 75.9 | 0.006 | 0.007 | 7.0 | 179.5 | 174.2 | 1.0304 | 0.683 | 75.95 |
| 13. | 1Q 2000 | 90.1 | 0.007 | 0.008 | 7.0 | 179.4 | 174.1 | 1.0304 | 0.796 | 90.16 |
| 14. | 2Q 2000 | 102.6 | 0.009 | 0.010 | 7.0 | 184.9 | 179.4 | 1.0307 | 1.024 | 102.67 |
| 15. | 3Q 2000 | 98.7 | 0.002 | 0.002 | 7.0 | 185.8 | 180.3 | 1.0305 | 0.228 | 98.72 |
| 16. | 4Q 2000 | 123.4 | 0.003 | 0.003 | 7.1 | 186.9 | 181.6 | 1.0292 | 0.341 | 123.42 |
| 17. | 1Q 2001 | 129.7 | 0.006 | 0.007 | 7.1 | 188.1 | 182.9 | 1.0284 | 0.681 | 129.75 |
| 18. | 2Q 2001 | 102.7 | 0.004 | 0.004 | 7.1 | 192.2 | 186.9 | 1.0284 | 0.454 | 102.73 |
| 19. | 3Q 2001 | 108.3 | 0.000 | 0.000 | 7.1 | 190.9 | 185.6 | 1.0286 | 0.000 | 108.30 |
| 20. | 4Q 2001 | 108.5 | 0.004 | 0.004 | 10.7 | 187.7 | 186.9 | 1.0043 | 0.443 | 108.55 |
| 21. | 1Q 2002 | 87.4 | 0.000 | 0.000 | 10.7 | 186.9 | 186.1 | 1.0043 | 0.000 | 87.40 |
| 22. | 2Q 2002 | 82.5 | -0.002 | -0.002 | 10.7 | 187.2 | 186.4 | 1.0043 | -0.222 | 82.48 |
| 23. | 3Q 2002 | 94.4 | -0.010 | -0.011 | 10.7 | 185.0 | 184.2 | 1.0043 | -1.109 | 94.28 |
| 24. | 4Q 2002 | 103.5 | 0.012 | 0.015 | 10.5 | 188.1 | 185.6 | 1.0135 | 1.488 | 103.66 |
| 25. | 1Q 2003 | 100.7 | 0.004 | 0.005 | 10.5 | 192.5 | 189.9 | 1.0137 | 0.496 | 100.75 |
| 26. | 2Q 2003 | 130.4 | 0.009 | 0.011 | 10.5 | 193.2 | 190.6 | 1.0136 | 1.116 | 130.52 |
| 27. | 3Q 2003 | 106.3 | 0.014 | 0.017 | 10.5 | 196.9 | 194.3 | 1.0134 | 1.735 | 106.48 |
| 28. | 4Q 2003 | 113.3 | -0.003 | -0.004 | 9.0 | 197.0 | 193.3 | 1.0191 | -0.374 | 113.27 |
| 29. | 1Q 2004 | 110.8 | 0.007 | 0.009 | 9.0 | 199.6 | 195.9 | 1.0189 | 0.872 | 110.88 |
| 30. | 2Q 2004 | 120.8 | 0.007 | 0.009 | 9.0 | 199.3 | 195.6 | 1.0189 | 0.872 | 120.88 |
| 31. | 3Q 2004 | 137.7 | 0.016 | 0.020 | 9.0 | 200.8 | 197.1 | 1.0188 | 1.994 | 137.88 |
| 32. | 4Q 2004 | 148.3 | 0.022 | 0.027 | 10.6 | 205.7 | 202.6 | 1.0153 | 2.732 | 148.59 |

BNSF-0655788

Exhibit No. 3
Page 2 of 3

| | Time Period (1) | RCAF Fuel Index 1/ (2) | Forecast Error 1/ (3) | Adjusted Forecast Error 2/ (4) | Fuel Weight 1/ (5) | Previous Quarter's Weighted Average Index 1/ (6) | Previous Quarter's Linked Index 1/ (7) | Linking Factor 3/ (8) | Linked Adjusted Forecast Error 4/ (9) | Adjusted RCAF Fuel Index Value 5/ (10) |
|---|---|---|---|---|---|---|---|---|---|---|
| 33. | 1Q 2005 | 171.5 | 0.010 | 0.012 | 10.6 | 209.7 | 206.5 | 1.0155 | 1.242 | 171.63 |
| 34. | 2Q 2005 | 186.9 | 0.030 | 0.037 | 10.6 | 214.0 | 210.7 | 1.0157 | 3.727 | 187.30 |
| 35. | 3Q 2005 | 193.6 | 0.006 | 0.007 | 10.6 | 218.3 | 214.9 | 1.0158 | 0.746 | 193.68 |
| 36. | 4Q 2005 | 276.2 | 0.012 | 0.015 | 12.1 | 219.1 | 217.0 | 1.0097 | 1.482 | 276.38 |
| 37. | 1Q 2006 | 226.4 | 0.011 | 0.013 | 12.1 | 227.5 | 225.3 | 1.0098 | 1.359 | 226.56 |
| 38. | 2Q 2006 | 227.9 | 0.013 | 0.016 | 12.1 | 226.1 | 223.9 | 1.0098 | 1.606 | 228.09 |

1/ Source: STB Decisions in Ex Parte No. 290, Quarterly Rail Cost Adjustment Factor
2/ Adjusted to reflect the rebasing of the RCAF-U in 4Q 1997 and 4Q 2002.
3/ Column (6) ÷ Column (7). Linking is necessitated by annual changes in weighting factors.
4/ Column (3) x Column (8) x 100
5/ Column (2) + [(Column (5) ÷ 100) x Column 9]. To allocate the forecast error to the fuel component of the RCAF

Exhibit No. 3
Page 3 of 3

## Correlation Between The RCAF Fuel Index And UP And BNSF Fuel Prices

| | Time Period (1) | Adjusted RCAF Fuel Index Value 1/ (2) | BNSF Quarterly Fuel Price (Cents/Gallon) 2/ (3) | UP Quarterly Fuel Price (Cents/Gallon) 3/ (4) |
|---|---|---|---|---|
| 1. | 1Q 1997 | 96.52 | 72.8 | 75.0 |
| 2. | 2Q 1997 | 78.86 | 69.2 | 71.0 |
| 3. | 3Q 1997 | 83.09 | 64.8 | 67.0 |
| 4. | 4Q 1997 | 80.70 | 66.9 | 70.0 |
| 5. | 1Q 1998 | 81.29 | 63.3 | 64.0 |
| 6. | 2Q 1998 | 70.36 | 63.5 | 63.0 |
| 7. | 3Q 1998 | 71.27 | 62.4 | 60.0 |
| 8. | 4Q 1998 | 68.32 | 61.4 | 60.0 |
| 9. | 1Q 1999 | 63.07 | 56.3 | 50.0 |
| 10. | 2Q 1999 | 55.19 | 58.5 | 56.0 |
| 11. | 3Q 1999 | 66.26 | 57.6 | 56.0 |
| 12. | 4Q 1999 | 75.95 | 63.2 | 60.0 |
| 13. | 1Q 2000 | 90.16 | 72.3 | 81.0 |
| 14. | 2Q 2000 | 102.67 | 76.6 | 84.0 |
| 15. | 3Q 2000 | 98.72 | 78.8 | 92.0 |
| 16. | 4Q 2000 | 123.42 | 89.7 | 103.0 |
| 17. | 1Q 2001 | 129.75 | 86.5 | 92.0 |
| 18. | 2Q 2001 | 102.73 | 84.0 | 92.0 |
| 19. | 3Q 2001 | 108.30 | 82.5 | 86.0 |
| 20. | 4Q 2001 | 108.55 | 77.7 | 81.0 |
| 21. | 1Q 2002 | 87.40 | 65.0 | 61.0 |
| 22. | 2Q 2002 | 82.48 | 73.1 | 72.0 |
| 23. | 3Q 2002 | 94.28 | 73.9 | 75.0 |
| 24. | 4Q 2002 | 103.66 | 77.7 | 81.0 |
| 25. | 1Q 2003 | 100.75 | 93.8 | 100.0 |
| 26. | 2Q 2003 | 130.52 | 88.6 | 88.0 |
| 27. | 3Q 2003 | 106.48 | 88.0 | 90.0 |
| 28. | 4Q 2003 | 113.27 | 85.4 | 89.0 |
| 29. | 1Q 2004 | 110.88 | 86.7 | 102.0 |
| 30. | 2Q 2004 | 120.88 | 96.7 | 116.0 |
| 31. | 3Q 2004 | 137.88 | 98.8 | 125.0 |
| 32. | 4Q 2004 | 148.59 | 114.1 | 146.0 |
| 33. | 1Q 2005 | 171.63 | 113.3 | 145.0 |
| 34. | 2Q 2005 | 187.30 | 132.5 | 167.0 |
| 35. | 3Q 2005 | 193.68 | 143.0 | 188.0 |
| 36. | 4Q 2005 | 276.38 | 169.1 | 208.0 |
| 37. | 1Q 2006 | 226.56 | 155.8 | 187.0 |
| 38. | 2Q 2006 | 228.09 | 183.0 | 215.0 |
| 39. | **Correlation 4/** | --- | **0.973** | **0.969** |

1/ Source: Pages 1 and 2, Column (10)
2/ Source: BNSF Quarterly Investor Reports and Quarterly Earnings Releases
3/ Source: UP Annual Analysts Fact Books and Quarterly Earnings Releases
4/ Correlation between Adjusted RCAF Fuel Index (Column (2)) and BNSF's and UP's Quarterly Fuel Prices (Columns (3) and (4)).

**Development of BNSF's 2005 Average Fuel Consumption Per Car-Mile By Train Type**

| | Item (1) | Source (2) | Statistics (3) |
|---|---|---|---|
| 1. | Total Fuel Consumption (gallons) | Schedule 750, Line 4 | 1,402,347,000 |
| 2. | Loaded Railroad Car-Miles (thousands) | Schedule 755, Line 30 | 2,184,694 |
| 3. | Loaded Private Car-Miles (thousands) | Schedule 755, Line 64 | 2,376,939 |
| 4. | Total Work Equipment and Company Freight Car-Miles (thousands) | Schedule 755, Line 83 | 56,382 |
| 5. | Total No Payment Car-Miles (thousands) | Schedule 755, Line 84 | 3,789,621 |
| 6. | Total Unit Train Car-Miles (thousands) | Schedule 755, Line 85 | 5,504,457 |
| 7. | Estimated Total Loaded Car-Miles (thousands) | L. 2 + L. 3 + (L. 4 ÷ 2) + (L. 5 ÷ 2) | 6,484,635 |
| 8. | Estimated Non-Unit Train Loaded Car-Miles (thousands) | L. 7 - (L. 6 ÷ 2) | 3,732,406 |
| 9. | Estimated System Average Fuel Consumption Per Loaded Car-Mile (gallons) | (L. 1 ÷ 1,000) ÷ L. 7 | 0.216 |
| 10. | Average Fuel Consumption Per Loaded Car-Mile For Unit Trains (gallons) | BNSF Mileage-Based Fuel Surcharge 1/ | 0.167 |
| 11. | Estimated Fuel Consumption Per Loaded Car-Mile for Non-Unit Trains (gallons) | [(L. 1 ÷ 1,000) - (L. 6 x L. 10 ÷ 2)] ÷ L. 8 | 0.253 |

1/ BNSF 's coal unit-train mileage-based fuel surcharge assumes each $0.06 increase in fuel prices equals a $0.01 per car-mile increase in the fuel surcharge. This indicates that BNSF's unit-trains consume 0.167 gallons per loaded car-mile assuming that the mileage-based fuel surcharge is equal to the fuel consumption per loaded car-mile multiplied by the number of car-miles multiplied by the change in fuel price.

# PX0929

# Filed Under Seal

# EXHIBIT PX0930

229258

**BEFORE THE**
**SURFACE TRANSPORTATION BOARD**

| | | |
|---|---|---|
| COMPETITION IN THE RAILROAD INDUSTRY | ) | STB Ex Parte No. 705 |

ENTERED
Office of Proceedings
APR 13 2011
Part of
Public Record

# COMMENTS OF THE WESTERN COAL TRAFFIC LEAGUE

WESTERN COAL TRAFFIC LEAGUE

William L. Slover
John H. LeSeur
Robert D. Rosenberg
Peter A. Pfohl
Stephanie A. Archuleta
Slover & Loftus LLP
1224 Seventeenth Street, N.W.
Washington, D.C. 20036
(202) 347-7170

Its Attorneys

Of Counsel:

Slover & Loftus LLP
1224 Seventeenth Street, N.W.
Washington, D.C. 20036
(202) 347-7170

April 12, 2011

**BEFORE THE**
**SURFACE TRANSPORTATION BOARD**

| | | |
|---|---|---|
| COMPETITION IN THE RAILROAD INDUSTRY | ) ) ) ) ) ) | STB Ex Parte No. 705 |

## COMMENTS OF THE WESTERN COAL TRAFFIC LEAGUE

## PREFACE

The Western Coal Traffic League ("WCTL" or "League") hereby submits the following comments in response to the Notice ("Notice") that the Board served in the above-captioned proceeding on January 11, 2011. The Notice seeks comments on "the current state of competition in the railroad industry and possibly policy alternatives to facilitate more competition, where appropriate." Notice at 1. WCTL appreciates the opportunity to submit these comments.

These Comments consist of (1) a statement by member representative Duane L Richards, Chief Executive Officer of Western Fuels Association, Inc., who also serves as President of the League; (2) a joint statement by Frederick R. Warren-Boulton and Kenneth C. Baseman, economists and Principals with MiCRA, an economics consulting and research firm; and (3) counsel's legal argument, which is accompanied by exhibits prepared by L.E. Peabody and Associates, Inc., an economic consulting firm.

**BEFORE THE**
**SURFACE TRANSPORTATION BOARD**

---

**EX PARTE NO. 705**
**COMPETITION IN THE RAILROAD INDUSTRY**

---

**VERIFIED STATEMENT OF**
**DUANE L. RICHARDS**
**ON BEHALF OF THE**
**WESTERN COAL TRAFFIC LEAGUE**

My name is Duane L. Richards and I am Chief Executive Officer of Western Fuels Association, Inc. My business address is 1100 West 116th Avenue, Westminster, Colorado 80234. I appear in this proceeding on behalf of the Western Coal Traffic League ("WCTL" or "League"). My company is a member of WCTL and I am the League's President. I have spent my entire career in positions directly involved with the production, sale, purchase, and transportation of western coal.

At the very outset, I will commend the Board for its institution of this formal proceeding titled COMPETITION IN THE RAILROAD INDUSTRY. Your decision to explore the current state of competition in the railroad industry is both timely and, in the view of our League, urgently necessary. Rail competition for western coal transportation business is a subject of intense concern to the League's membership. Indeed, I believe I can fairly say that the state of railroad competition in the west is the single most important issue to all but our few remaining members with captive stations. For the past several years, WCTL has itself investigated the status of rail competition in

the west and we welcome this opportunity to share our views, findings and fears with the Board. My comments today will focus solely upon the railroad carriage of coal mined in the West.

ABOUT WCTL

WCTL is a voluntary association whose membership is composed exclusively of organizations which purchase and transport coal from origins west of the Mississippi River. WCTL members collectively consume more than 170 million tons of western coal annually nearly all of which is moved by rail. Our members include investor-owned electric utilities, electric cooperatives, state power authorities and municipalities. I list our members in Exhibit 1 to this statement. Collectively we pay the railroads of the west over $1.7 billion each year in coal freight charges.

WCTL was formed in 1978 for the purpose of advancing and protecting the interests of electric ratepayers on whose monthly electric bills appeared all costs connected with the utilization of coal by their electric suppliers. Since its formation, WCTL has been active continuously before the Surface Transportation Board and its predecessor, the Interstate Commerce Commission, in nearly every major proceeding the agency has initiated and WCTL has initiated several proceedings on its own. WCTL was also an active participant in the hearings and related events which led up to the enactment of the Staggers Act in 1980. All of WCTL's energies are expended on behalf of the millions of electric ratepayers for whose interests it serves as steward.

THE TRANSPORTATION OF COAL BY RAIL IN THE WEST

I believe it is a fair statement to say that coal traffic is the Golden Goose of western railroading. Coal traffic is steady, voluminous, easily transportable and exceedingly profitable. Coal is far and away the leading revenue producer for both UP and BNSF. In 2008, they earned nearly $8 billion from transporting coal ($3.76 billion for UP and $4.19 billion for BNSF). More importantly, western coal traffic is highly profitable to the western roads as my Chart I reveals:

Chart I




(Source: L. E. Peabody & Associates, Inc.)

BNSF's Chairman has recognized the great value of coal traffic to his railroad:

> "As far as coal, I do know the numbers and understand the profitability. Coal is the most profitable commodity we haul." (Matt Rose Meets with Workforce at Town Hall, Powder River Reflection, p. 6 (September/October 2003)).

Because coal traffic is the most critical component of rail commerce in the west, the state of western rail competition for coal transportation business becomes the single most important consideration in evaluating the state of western rail competition generally.

The best place to begin an examination of the current state of rail competition for western coal traffic is with a brief review of the state of rail competition during the 10-year period between the inception of modern western coal movements *circa* 1974 and the introduction of head-to-head rail competition in the Powder River Basin ("PRB") in 1984.

RAILROAD COMPETITION IN THE WEST–1974-1984

Prior to the Arab Oil Embargo of the early 1970s, coal traffic in the west was a relatively minor player in the traffic mix of the rail carriers of the West. For example in 1970, BN hauled only 8.2 million tons of coal and UP 2.3 million. All of the western roads together hauled only 27 million tons. (Source: Minerals Yearbook – 1970, U.S. Bureau of Mines). Western coal was primarily consumed by a few cement plants and other industries which used small amounts of coal.

The "Coal Rush" in the west was ushered in by the United States government through its enactment of the Energy Policy and Conservation Act of 1975

and the Powerplant and Industrial Fuel Use Act of 1978. These new laws compelled the wholesale conversion by American industry from oil and gas to coal. Because the industries and utilities in the west were uniquely dependent upon oil and gas, the impact of these new laws on both western energy users and western railroads became a dramatic one in short order. My chart below shows the rapid growth in western coal production and western rail traffic following the intervention of the federal government into the national energy market:

Chart II

| **Western Coal Production and Coal Tons Originated by Western Railroads** | | |
|---|---|---|
| Year | Western Coal Production (million tons) | Western Railroad Originated Coal Movements (million tons) |
| 1970 | 44.9 | 27.0 |
| 1975 | 110.9 | 64.1 |
| 1980 | 251.0 | 178.6 |
| 1985 | 324.9 | 227.4 |
| 1990 | 398.9 | 279.2 |
| 1995 | 488.7 | 337.2 |
| 2000 | 566.1 | 415.7 |
| 2005 | 637.7 | 501.0 |
| 2009 | 624.9 | 494.6 |

(Source: U.S. Dept. of the Interior, Bureau of Mines; U.S. Dept. of Energy, Energy Information Administration; individual railroad annual QCS statements filed with the ICC/STB).

Several major railroads participated in the surging market for coal transportation business in the west during this time including Burlington Northern, Union Pacific, Southern Pacific, MKT, Missouri Pacific, KCS, D&RGW, C&NW and Santa Fe. While nearly every new shipper and receiver of western coal was captive to a single

destination rail carrier, there was, nonetheless, a moderate level of rail competition in the west during this era in the form of origin competition. The principal coal hauling carriers of the west each served major western mining regions:

| CARRIER | PRIMARY COAL ORIGIN(S) |
|---|---|
| Union Pacific | Hanna Basin, WY |
| Burlington Northern | PRB, WY & MT |
| D&RGW/Southern Pacific | Colorado, Utah |
| Santa Fe | San Juan Basin, NM |

The various mines and producers at these coal producing origins competed for the coal purchase business of our members and the rail carriers serving the mines also competed to enable coal purchases and sales from mines on their respective lines. There was also a modicum of healthy rail competition for some of the intermediate legs of our members' mine to destination movements. For example, in the 1980s our member Arizona Electric Power Cooperative, Inc. purchased coals in Colorado which it originated on D&RGW and terminated in Arizona on Southern Pacific. However, both BN and Santa Fe could participate in the haul between SP and the D&RGW legs and they, in fact, competed vigorously for this bridge traffic

As I said, however, the overall state of competition in the west between 1974 and 1984 could at best be described as only lukewarm because of the widespread captivity of coal shippers at their destinations. Every then-member of our League was served by only a single railroad at destination in 1980. This widespread captivity of coal shippers at their destinations fostered monopoly rail pricing which in turn led to a torrent

of maximum reasonable rate cases before the Interstate Commerce Commission including cases brought by our members from Houston, San Antonio, Omaha, Corpus Christi and elsewhere. During this period coal traffic moved primarily in common carriage and the going market rate for a ton of coal in a unit train of shipper cars during the early 1980s was *circa* 17 mills per ton mile or $17.00 for a haul of 1000 miles. These were the rate levels which our members and others challenged before the agency as unreasonably high.

The rail transportation circumstances and conditions which I describe remained largely static until 1984. In that year, with WCTL's vigorous support, C&NW initiated new rail service to the so-called southern PRB mines and it immediately began to engage in head-to-head competition with BN for origin PRB coal traffic.

RAILROAD COMPETITION IN THE WEST 1984 - 2004

C&NW teamed up with UP on numerous joint movements out of the PRB and together they provided formidable competition to the incumbent BN. The introduction of rail competition to the nation's largest coal producing region inaugurated an era of vigorous rail competition for coal traffic amongst the western carriers. C&NW and UP were aggressive with both their prices and services in seeking new PRB coal customers. BN was compelled to try and meet or beat their price and service proposals in order to retain or to attract new PRB coal traffic. The superior prices and services which emerged from this new rail competition in the PRB also prompted SP, D&RGW and Santa Fe to become more competitive in order to try and keep the coals on their lines in the fuel mixes of the consumers.

Nor was the emergence of competition in the PRB lost on the very large number of captive railroad transportation customers who immediately began looking for ways and means to end their captivity in order to access the new rail competition between BN and CNW/UP. Regrettably, it soon became apparent that meaningful assistance in these endeavors was not to come from this agency which for reasons best known to itself took a highly restrictive view of the so-called Competitive Access Provisions of the Staggers Act (49 U.S.C. § 11102). While WCTL believes that the agency misinterpreted and misapplied these provisions, its members quickly became resigned to the fact that there would be no dissuading the agency from its mistaken view.

Accordingly, many of our captive members, as well as many other major shippers and receivers of western coal, undertook ambitious self-help projects to reach a second rail carrier by constructing new rail trackage (i.e., Nebraska Public Power District, Western Farmers); securing trackage rights (CPS of San Antonio); and creating short line rail carriers (MidAmerican). These types of self-help projects, aided where necessary by the agency, resulted in a greatly increased level of rail competition in the west. I list in my Exhibit No. 2 examples of the "competition" projects of the sort which I have in mind and which were undertaken after 1984.

As I observed earlier in my remarks, the pre-competition rate on PRB unit coal train traffic in shipper-owned railroad cars was *circa* 17 mills per ton mile or $17.00 for a 1000 mile haul. By the end of the century, competitive market rates had dropped dramatically. In Ex Parte 575, we presented evidence to the Board that competitive PRB coal rates had fallen from over 17 mills per ton mile in 1983 to under 10 mills and lower

in 2000. During this same period, other essential rail rate and service terms became extremely responsive to the requirements of the coal shipping community. Thus carriers offered to guarantee the delivery of agreed upon quantities of coal during agreed upon time frames in accordance with agreed upon monthly schedules. In some instances, they also offered to agree to adjust their rates each year to reflect true changes in service costs. Nearly all western coal moved pursuant to contract rates. All the while, as I have shown, the usage of western coal was increasing dramatically. Between 1980 and 2004 western coal production rose from 250 million tons to over 600 million tons. Nearly all of this enormous volume of coal moved by rail or partially by rail to destination.

Had the Board held this hearing in 2003, the then President of our League, the late David Laffere of Kansas City Power & Light, would have appeared before you and he would have extolled the high quality of rail transportation in the west for most of our members' coal transportation business and the resultant reasonable rates. He would also have expressed content with the carriers' service offerings, even if at times, the actual service did not meet expectations. He would have portrayed a competition state where all but the captive coal shippers were fully satisfied. At the same time, the railroads were highly profitable and were making the capital investments which their profitable coal traffic required and warranted. Life was good!

While the range and scope of competitive rail services grew steadily after 1984 as more and more coal receivers terminated their captivity, a parallel development was taking place in the rail industry in the west which greatly concerned and troubled our members; namely, a serial rail merger movement. While WCTL has been a very active

proponent of pro-competitive rail initiatives such as the extension of services by the C&NW and the DM&E into the PRB, it has been equally vigorous in its opposition to the many different rail mergers, amalgamations and acquisitions which took place by and between various western railroads during this same period.

Most of WCTL's members had been exploited in the late 1970s and early 1980s by a western railroad with market power. Having thereafter enjoyed, for many years, the multiple benefits of healthy railroad competition, they did not want to see a return to the "bad old days" of monopoly rail pricing. For this reason, WCTL vigorously opposed the CNW/UP, the BN/Santa Fe and the UP/SP mergers. WCTL averred that these mergers threatened to directly diminish competition in the west by eliminating CNW, SP and Santa Fe from the competitive rail mix. More importantly, WCTL was convinced that the permission of a rail duopoly in the west would lead directly to anti-competitive practices and the inevitable return to the same sort of monopoly pricing of coal traffic in the west with which the modern western coal transportation era had begun in the early 1970s.

In his opposition testimony before the Board in the UP/SP merger proceedings, WCTL witness, Professor George H. Borts, was unequivocal in his assertions that conditions and circumstances in the western rail market for coal transportation were such that the end products of a rail duopoly would be the collusive demise of competition and higher rates for the coal shipping public:

> "Most economists, including myself, subscribe to the theory that the more concentrated a market is, the more likely it is that producers will engage in anti-competitive activities

> intended to increase consumer prices." (UP/SP Merger, Fin. Docket No. 32760, V.S. of George Borts, p. 4)
>
> x x x
>
> "The conditions in this market are conducive to market sharing and tacit acceptance of rate increases by the carriers." (UP/SP Merger, Fin. Docket No. 32760, V.S. of George Borts, p. 21).

To the same effect, Dr. W. R. Majure testifying for the United States Department of Justice stated:

> "... because the merger leaves only two major railroads throughout the West and significantly increases the number of markets where they are the only two competitors, it also increases the likelihood of tacit collusion and higher prices...." (UP/SP Merger, Fin. Docket No. 32760, V.S. of W. Robert Majure, p. 54).

Notwithstanding the straightforward predictions by these distinguished economists of future rail collusion and higher prices, based upon extensive factual data and economic theory, the Board chose instead to go along with the railroad vision of the future of western competition as presented by their spokesman, Dr. Robert Willig. Dr. Willig argued that after the mergers there would be intense competition "in which each railroad independently pursues its own interests ...." (UP/SP Merger, Fin. Docket No. 32760, V.S. of Robert Willig, p. 601).

In dismissing the fears, claims and evidence of WCTL and DOJ that its endorsement of the mergers would lead to collusion, higher prices, and fewer services on western coal rail traffic, the Board reasoned as follows:

> It is true that tacit collusion is more likely in two-firm markets, where one firm can anticipate the other's response, than in multi-firm markets. Multi-market contact, which will

> take place here, can also facilitate tacit collusion. Nevertheless, other important factors indicate that these carriers [BNSF and UP] are more likely to compete than tacitly collude. One significant factor here is the heterogeneity of rail service, which would make it very difficult to maintain a tacitly agreed rate level.
>
> Another factor making tacit collusion unlikely is the secrecy about rail price and service offerings that now characterizes the rail industry. Contracts between railroads and shippers for major movements are now the rule, and railroads are no longer required to file public tariffs for the remainder of their traffic. Contracts often incorporate detailed specifications for a wide variety of service aspects. Confidentiality clauses in those contracts effectively deter collusive action because information about these competitive actions is shielded from competitors.
>
> The significant economies of density and of scope exhibited by railroads also make tacit collusion less likely.... <u>Given all these factors, we do not think that tacit collusion is a likely outcome for this traffic.</u> (UP/SP Merger, 1 S.T.B. 233, 570) (emphasis supplied).

History would prove that both Dr. Willig and the Board had it right – **but not for long!**

Following the emergence of the railroad duopoly in the west in 1997, BNSF and UP continued as the "intense competitors" which Dr. Willig predicted and they vied with each other in the PRB for both new coal movements and for movements whose contracts were expiring. Many of our members happily benefitted from this intense competition and would, for example, first place their contract business with BNSF and at the expiration of a contract place it with UP.

Despite the intense level of competition between BNSF and UP for coal transportation business they continued to enjoy enviable growth and profitability. Nonetheless, by 2000 the carriers were becoming increasingly unhappy and began to

complain publicly about what they perceived as the low level of their PRB coal rates. BNSF's Mr. Rose appeared before the Congress to bemoan the fact that "competitive pressures" were forcing coal rates downwards such that they were 42 percent lower in 2001 than in 1980 (Statement of Matthew K. Rose, Before the US Senate Committee on Commerce, Science, and Transportation, Subcommittee on Surface Transportation and Merchant Marine, at p. 34 (May 9, 2001). UP complained similarly. Their joint solution to their claimed problems with these low coal rates and their perceived ill effects of intense competition for coal traffic was the creation and implementation of the so-called practice of **"Public Pricing"** for their coal transportation services.

THE DEMISE OF COMPETITION FOR COAL TRAFFIC IN THE WEST 2004 -?

In early 2003, BNSF announced it was ending its practice of contracting for the movement of all PRB coal and instituting the mandatory new use of a common carrier schedule instead. The schedule was BNSF 90068 which set forth common carrier rates to various BNSF destinations. All of the rates therein were markedly higher than the previous market level for PRB rates. Whereas market rates at the time were in single digit mills per ton mile, BNSF's rates in No. 90068 were very much higher. BNSF made no secret of why it had turned to public pricing. In a speech to another western coal group in which Mr. Rose announced BNSF's intention to switch to tariffs, he underscored BNSF's needs to raise its coal rates (BNSF CEO Matt Rose Addresses WTCA Today (Sept. 10, 2002)). Unlike a conventional tariff, No. 90068 also set forth in some detail, similar to that found in contracts, the other terms and conditions of BNSF's

coal carriage under No. 90068. These terms were of course, non-negotiable and applicable to all shippers.

BNSF's attempt to force its public pricing on competitive PRB coal movements could, of course, succeed only if UP followed suit, since no rational coal shipper with two carrier service would use the exceedingly high rates and inferior service terms in No. 90068 if UP were still offering single digit market rates not to mention the many various other transportation terms more favorable than the ones in BNSF's tariff.

UP was still so offering, and as a consequence in 2003, after BNSF's promulgation of No. 90068, UP quickly captured the contract business of our member, OPPD, a former BN customer. Thereafter, BNSF itself immediately resumed contracting for coal traffic and secured new contracts with other former UP customers. While BNSF's public pricing program failed to gain traction in the market in 2003, BNSF continued to hold out to the public the high rates listed in schedule No. 90068 while at the same time it was entering into new contracts.

The other shoe dropped in early 2004 when UP decided to pursue its own version of public pricing. It did so by sending a letter to all of its customers announcing, like BNSF had previously, its intention to cease completely the future contracting for coal traffic and to commence all carriage of coal exclusively by publicly posted rates and terms (see my Exhibit No. 3). With UP's decision in early 2004 to cease contracting, both of the western roads were on record as willing to haul coal only in accordance with the prices (high) and terms (minimal services) set forth in their public tariffs.

While BNSF and UP introduced their mandatory public pricing programs with great fanfare, the truth of the matter is that other than serving as vehicles for signaling specific prices to one another these schedules were more ignored than employed in actual coal transportation transactions. While I have not attempted to determine how much coal traffic moved or moves under the respective public schedules, I believe it to be fairly minimal because each carrier, without any public announcements, soon returned to its former practices of using private contracts when customers sought their coal transportation services. Today, as prior to 2004, contracting is the primary medium whereby each western carrier furnishes its competitive rail services on western coal originations. Nonetheless, they continue to hold out their public prices.

The post-2004 contracting process, however, bore no resemblance to the pre-2004 process and practice. In the first place, all of the carrier rate proposals, after 2004, to potential customers were sky high in comparison to the pre-2004 market levels. My next chart depicts this disparity (i.e., 2004 vs. 2009).

Chart III




(Source: American Coal Council's Implementing Fuel Flexibility Strategies Conference, July 20-21, 2010, Chicago, Presentation of Jamie Heller, "The Market for Fuel & Transportation.")

As my Chart III reveals, between 2003 and 2010 the going rate level for coal transportation in the west nearly **tripled**. Even AAR's own generalized data confirms these same enormous increases in the prices for railroad coal transportation after 2004.

Chart IV




(Source: The Rail Transportation of Coal – Vol. 11, p. 39.)

Not only did the price proposals for services go skyrocketing after 2004, the competitive tenor changed as I detail in my Chart V.

Chart V

| Railroads Pre-Consolidation Competitive Behavior | Railroads Pubic Pricing Behavior |
|---|---|
| Two carriers aggressively competing for business. | Major increases in base rates |
| Negotiated, longer term contracts (e.g., 5-10 years) | Insistence upon short term agreements |
| Negotiated, the rate adjustment provisions promulgated by the STB, incorporating carrier productivity savings (e.g., RCAF-A) and reflecting actual fuel costs | Imposition of carrier-favorable rate adjustment mechanisms promulgated by the AAR, unadjusted for productivity savings and excluding fuel |
| Negotiated, reasonable service standards, cycle times, etc., with shippers receiving make-up service for missing movements, liquidated damages, etc. | General refusal to establish any service standards, cycle times, etc. |
| No surcharges | Imposition of fuel surcharges through carrier tariffs |
| Negotiated, reasonable accessorial fees/standards | Imposition of accessorial fees/standards through carrier tariffs |

Additionally, unlike competition in the 1996-2004 period in which big coal transportation accounts changed hands regularly, after 2004 the incumbent carrier invariably prevailed in keeping its account. While the railroads impose needless and unreasonable secrecy and confidentiality on their pricing and contracting activities, one has to assume that if the winning railroad bid after 2004 for a shipper's business was nearly triple the old contract price, the losing bid had to have been even higher. What a reversal in form!

In recent STB hearings, Professor Willig has argued that the enormous increases in rail prices which began in 2004 were offset by increasing costs:

> Price increases in the face of increasing marginal costs are not indicative of an abuse of market power. Rather, they are entirely consistent with – and expected in – competitive markets. (STB Ex Parte No. 704, V.S. of R. Willig, AAR Testimony filed Jan. 31, 2011, p. 54).

The facts do not support Dr. Willig's claims. While western coal rates have indisputably gone ballistic since 2004, there is no evidence that service costs have

increased proportionately. As my next chart discloses, average prices for coal transportation after 2004 rose far more than did the underlying service costs. The result? Burgeoning western rail profits!

Chart VI

**Average Revenue And Variable Cost Per Ton-Mile,**
**<u>And Annual Contribution For Western Coal Transportation</u>**
1984 - 2010




(Source: L. E. Peabody & Associates, Inc.)

Today, 2011, rail competition for coal traffic in the west has **ceased**. The best proof of this fact is that a captive western coal shipper is better off today than a shipper with two carrier ("competitive") service. This is so because, as I can attest from personal experience, a captive shipper has the right and ability to try to secure relief from predatory rail prices from this agency pursuant to the <u>Coal Rate Guidelines</u>. Competitive

shippers have no alternative to collusive prices. As my final chart confirms, the market ("competitive") rates for coal transportation in the west are now at **higher** levels than the ceilings which the Board imposes under the Coal Rate Guidelines for captive traffic.

Chart VII




(Source: L. E. Peabody & Associates, Inc.)

It bears noting that the anomalous situation I describe has come as no surprise to BNSF whose Chairman presciently predicted it in 2009:

> "... one of the reasons that we have had pressure from customers and markets is that the percent of captive traffic produced a higher margin than the non-captive traffic to, in some cases, 20, 25, 30% and that cost caused a lot of disconcern. And I can see us in a period of time in the future,

> where non-captive traffic will actually return significantly more than captive traffic." (Corrected Transcript from the JP Morgan Aviation & Transportation Conference, March 11, 2009, p. 10) (emphasis supplied).

I appear before you today to say that the time of which Mr. Rose spoke has come!

As I believe I have made very clear on our members' behalf, rail competition for western coal transportation business no longer exists and so-called competitive shippers are being made to pay more than those shippers whose rates are regulated by this agency. Under the circumstances that exist today, I trust the Board will find it easy to understand that most of our members who are without the service of two carriers are not eager to join their competitive brethren by gaining access to competition and thereby losing the protections of your Coal Rate Guidelines. Accordingly, while our counsel will comment on several of the specific items listed in the Notice, I will instead turn to what we as a League believe the Board must do to rectify the deplorable competitive conditions which exist in the west today and which I have described and documented for you.

MARKET DOMINANCE REVISION

As it is administered today, the Board equates service from two rail carriers with effective competition. As I have demonstrated, this view is a fallacious one insofar as western coal transportation is concerned. In order to achieve the goals of the Staggers Act, given the transportation circumstances and conditions which now exist in the west, the Board must clarify its Market Dominance rules so as to find BNSF and UP to be

Market Dominant over western coal transportation. The blueprint for so administering the provision was supplied by the Congress when it created Market Dominance:

> "The key to this new provision is in the definition of market dominance. Market dominance is defined in terms of the lack of effective competition by any mode. Defining market dominance in terms of lack of effective competition avoids the problem of defining monopoly power .... Under this definition, the publishing carrier need not have monopoly power. Rather, the test will be whether the market itself is sufficiently competitive to insure just and reasonable rates. <u>Thus, the Commission will be able to regulate maximum rates in oligopoly or concentrated markets as well as in monopoly markets.</u>" 1976 4R Act, Senate Rep. 94-499, p. 47 (emphasis added).

The rates which the Board imposes on captive traffic in maximum reasonable rate cases are by definition "maximum reasonable" rates. The many rates higher than these prescribed rates, which are now being imposed by BNSF and UP on so-called competitive movements are *a fortiorari* unreasonable. Because competition can no longer be relied upon to advance and fulfill the goals of the <u>Staggers Act</u>, the Board must step in to insure that those goals are reachable. The Board cannot cure the anti-competitive circumstances in the west which it enabled by unscrambling the mergers so as to restore more competition. The only viable solution lies in a clarification of the Board's administration of the Market Dominance concept so that the Board finds that coal shippers in the west are served by Market Dominant railroads.

CONCLUSION

While, in some quarters, coal is in disfavor today, coal is nonetheless the bedrock of our nation's energy supply and coal will so remain for the foreseeable future,

and perhaps forever. Western coal, and PRB coal in particular, dwarf all other sources of domestic coals. Because reasonably priced energy is critical to the national interest and because western coal is our most important and reliable source of reasonably priced energy, the Board must immediately take the steps our League recommends so as to prevent the western railroads from further exploitation of their valuable resource and its users.

I thank you for this opportunity to present our League's views and position on this most timely subject and I hope for the sakes of the nation's electric rate payers that the Board takes steps to oversee the restoration in the west of reasonable rail rates and services responsive to the needs of coal shippers.

**VERIFICATION**

I, Duane Richards, verify that I have read the foregoing Statement, know the contents thereof, and that the same are true as stated to the best of my knowledge, information and belief. Further, I certify that I am qualified and authorized to file this statement.

Duane Richards /rh
Duane Richards

Executed on April 11th, 2011

# Exhibit 1

WCTL Membership

Ameren Energy Fuels & Services

Arizona Electric Power Cooperative

Central Louisiana Electric Company

City of Austin, Texas

CPS Energy

Entergy Services, Inc.

Fayette Power Project

Kansas City Power & Light

MidAmerican Energy Company

Minnesota Power

Nebraska Public Power District

Omaha Public Power District

Texas Municipal Power Agency

Western Farmers Electric Cooperative

Western Fuels Association, Inc.

Wisconsin Public Service Corp.

Xcel Energy, Inc.

# Exhibit 2

# Representative Line Construction Projects

| **Utility/Plant** | **Line Length** | **Incumbent Rail Carrier** | **New Carrier** |
|---|---|---|---|
| MidAmerican/Council Bluffs | 3 miles | BN | UP |
| Nebraska Public Power District/Gentleman | 9.2 miles | BN | UP |
| Houston L. & P./Parish | 10.7 miles | BN | UP |
| Western Farmers/Hugo | 14 miles | Kiamichi | TOE |

# Exhibit 3

Energy

# Circular 111 Overview

## Simplified SPRB Coal Pricing

On March 3, 2004, Union Pacific began introducing a new pricing mechanism for coal shipped from the Southern Powder River Basin (SPRB) in Wyoming. It is found in UP Circular 111. Circular 111 went into effect March 31, 2004.

The program will eventually expand to include all of Union Pacific's SPRB business. Initially, it covers specific destinations to which Union Pacific currently is, or could be, transporting coal and where contracts are set to expire during the next three years. The covered destinations are listed in UP Circular 111.

The program consists of standard terms and conditions set forth in UP Circular 111 and a separate set of non-confidential rate items applicable to specific destinations covered by the Circular. Union Pacific will share the rate items only with customers who are eligible to ship under Circular 111.

Under Circular 111, Union Pacific's customers will have two basic options: a spot market option and a three-year commitment option. The first option is a basic plan intended for infrequent coal moves. The second option reflects commitments from both parties for term, volume, rates and, when shippers furnish their own equipment, service. Rates with annual escalators are set for the commitment period. Both options include a fuel recovery mechanism.

Union Pacific adopted this program to simplify the way customers do business with Union Pacific for SPRB coal rail service. Instead of very complicated and lengthy contracts that consume significant resources to negotiate and manage, Circular 111 and the associated rate items set forth straightforward and fair terms and conditions that Union Pacific believes will meet the needs of all coal shippers. The rate items communicate to current and potential customers in a more straightforward way the revenue needs that Union Pacific has concluded it must achieve from the coal business to those destinations in order to support ongoing capital investments to handle existing and growing coal volumes. The rate items provide Union Pacific's customers with sufficient information so they can evaluate their position relative to other rail users covered by the program. This mechanism also allows Union Pacific to better respond to large price swings in the price of fuel used to transport coal.

Coal transportation demands substantial capital for track and equipment. Union Pacific can continue to invest in SPRB coal transportation as long as the financial returns on that transportation are sufficient to justify the necessary level of investment. Union Pacific has designed this program so that its customers will understand that their rates, terms and conditions reflect a fair sharing in the overall financial burden associated with Union Pacific's significant coal-related capital needs.

# PX0931-PX0934

Filed Under Seal