# PX0935-PX0964

Filed Under Seal

# EXHIBIT

# PX0965

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STRATES SHOWS, INC.,**<br>**10600 Orange Avenue,**<br>**High Point, Florida 32824,**<br>**on behalf of itself and all others similarly situated,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**ASSOCIATION OF AMERICAN RAILROADS, BNSF RAILWAY COMPANY, CSX TRANSPORTATION, INC., KANSAS CITY SOUTHERN RAILWAY COMPANY, NORFOLK SOUTHERN RAILWAY COMPANY, AND UNION PACIFIC RAILROAD COMPANY,**<br><br>**Defendants.** | **Civil Action No. ______________**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Strates Shows, Inc. ("Strates Shows" or "Plaintiff"), individually and on behalf of a class of all those similarly situated, brings this action for damages under the antitrust laws of the United States against Defendants Association of American Railroads, BNSF Railway Company, CSX Transportation, Inc., Kansas City Southern Railway Company, Norfolk Southern Railway Company, and Union Pacific Railroad Company, alleging as follows:

## DEFINITIONS

1. "Class I Railroads" are line haul freight railroads with 2005 operating revenue in excess of $319.3 million. There are currently seven Class I railroads operating in the United States: (1) BNSF Railway Company, (2) CSX Transportation, Inc., (3) Grand Trunk Corporation, (4) Kansas City Southern Railway Company, (5) Norfolk Southern Railway

Company, (6) Soo Line Railroad Company, and (7) Union Pacific Railroad Company. The Soo Line Railroad is owned by Canadian Pacific Railway. The Grand Trunk Corporation is owned by the Canadian National Railway.

2. "Defendants" refers to all six named Defendants in this action, while "Railroad Defendants" refers to the five railroad company Defendants (BNSF, CXS, Kansas City Southern, Norfolk Southern, and Union Pacific).

3. "Rail Fuel Surcharge" or "Surcharge" is a separate fee charged to shippers by the Railroad Defendants for agreed-upon freight transportation, ostensibly to compensate for unforeseen increases in the cost of fuel.

4. "Unregulated freight" means rail freight transportation services where the rates are set by private contracts or through other means exempt from rate regulation under federal law.

**NATURE OF THE ACTION**

5. This is an antitrust class action alleging that Defendants conspired to fix, raise, maintain, or stabilize prices of unregulated rail freight transportation services sold in the United States by imposing agreed upon "Rail Fuel Surcharges" (as defined above) on rail freight shipments from July 1, 2003 to the present (the "Class Period"), in violation of Section 1 of the Sherman Antitrust Act.

6. Plaintiff alleges that Defendants computed the Rail Fuel Surcharges as a percentage of the customers' base freight rate, rather than actual fuel consumption, and agreed upon the use of common indices and trigger points for adjusting the percentages monthly. Defendants published Rail Fuel Surcharges on the Internet to facilitate coordination and the detection of any deviation from collusive pricing. Defendants maintained uniformity of Rail

Fuel Surcharges throughout the Class Period by agreeing to compute the surcharges as a percentage of the rail freight transport base rate and by agreeing upon common indices, timing, and trigger points for adjusting the percentages.

7. Although the purported purpose of a Rail Fuel Surcharge is to allow recovery by a railroad of an unanticipated fuel cost increase, Defendants, by working in concert, were able to use Rail Fuel Surcharges as revenue generators and profit centers.

8. The Railroad Defendants would not have naturally implemented and adjusted the Rail Fuel Surcharges independently. By working in concert, Defendants were able to set and maintain Rail Fuel Surcharges at inflated levels.

9. During the Class Period, railroad industry analysts took note of the curious "convergence" in Rail Fuel Surcharge methodologies adopted by the Railroad Defendants. For example, after concluding in 2003 that Rail Fuel Surcharges charged by the Railroad Defendants were "not supported" by fuel cost increases, one analyst stated that she was "puzzled by the fact that the railroads appear to be matching fuel surcharges rather than developing their own pricing initiatives." The analyst noted further that "the way to gain significant market share is to lead the competition rather than following the competition."

10. As a result of this price-fixing conspiracy, Defendants restrained competition for unregulated rail freight transportation services and caused injury to the business and property of Plaintiff and members of the proposed Class. Plaintiff and the Class members paid higher prices for unregulated rail freight transportation than would have been the case in the absence of Defendants' unlawful activities alleged herein.

11. Plaintiff seeks damages on behalf of itself and the proposed Class for Rail Fuel Surcharges imposed on rail freight shipments made pursuant to private transportation contracts

and through other means exempt from rate regulation under federal law. Plaintiff does not seek, on behalf of itself or the Class, damages or relief arising from any fuel surcharges imposed on rate-regulated freight transportation.

## JURISDICTION AND VENUE

12. Plaintiff brings this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, as the result of Defendants' violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

13. Subject-matter jurisdiction is proper pursuant to 28 U.S.C. § 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

14. Venue is proper in this district pursuant 28 U.S.C. § 1391(b) and (c) and by Section 12 of the Clayton Act, 15 U.S.C. § 22.

15. Defendants maintain offices, have agents, or transact business within this judicial District; a substantial part of the events giving rise to the claim for relief occurred in this District; and Defendants regularly and continuously conduct business in interstate commerce that is carried out in part in this District.

16. This Court has personal jurisdiction over Defendants because, *inter alia*, each Defendant: (a) transacted business in this District; (b) directly or indirectly sold and delivered rail transportation services in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

## PARTIES

17. Plaintiff Strates Shows, Inc. ("Strates Shows" or "Plaintiff") is a corporation organized under the laws of the State of Delaware, with its principal place of business at 10600 Orange Avenue, Orlando, Florida, 32824.

18. Strates Shows purchased unregulated rail freight transportation service directly from one or more of the Defendants during the Class Period and was assessed a Rail Fuel Surcharge.

19. Defendant Association of American Railroads ("AAR") is a trade association located in Washington, D.C. Among other things, AAR publishes key indexes used to compute unregulated rail freight charges, engages in lobbying on behalf of its members, gathers and maintains a variety of information relating to rail freight service, and issues publications. AAR offers various tiers of membership, with "full membership" being available only to Class I railroads. It is governed by a board of directors that includes the top executives of each Class I railroad in the United States. According to AAR's Internet site: "Full membership offers the broadest array of AAR member benefits, including legislative and legal matters, safety, operations, research, and communications. Benefits include all those provided to Associate Members, as well as additional information provided through AAR committees. Full member assessments are set on a sliding scale based on the member's gross freight service revenues (or passenger revenues, in the case of passenger railroads). Full member railroads with gross freight revenues exceeding certain thresholds are eligible for a seat on AAR's Board of Directors." The Railroad Defendants named in this action are all full members of the AAR and their chief executive officers are members of the AAR board of directors.

20. Defendant BNSF Railway Company ("BNSF") has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131. BNSF is a wholly owned subsidiary of the Burlington Northern Santa Fe Corporation, the holding company formed by the September 22, 1995 merger of Burlington Northern and Santa Fe Corporation. BNSF is the second largest railroad network in North America and operates 32,000 route miles of railroad. BNSF has offices and rail lines throughout the western United States, extending into the Southeastern states and maintains a government affairs office at 500 New Jersey Ave., N.W., Suite 550, Washington, D.C. 20001.

21. Defendant CSX Transportation, Inc. ("CSX") has its principal place of business at 500 Water St., Jacksonville, Florida 32202. CSX is a major freight railroad operating primarily in the eastern United States and Canada. CSX links commercial markets in 23 states, the District of Columbia, and certain Canadian provinces. CSX has railway lines throughout the eastern United States and maintains a government relations office at 1331 Pennsylvania Ave., N.W., Suite 560, Washington, D.C. 20004.

22. Defendant Kansas City Southern Railway Company ("KCSR") has its principal place of business at 427 W. 12th St., Kansas City, Missouri 64105. KCSR owns and operates major freight railroad in ten states across the central and south central United States.

23. Defendant Norfolk Southern Railway Company ("NS") has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510. NS is a major freight railroad operating primarily in the eastern United States. NS serves all major eastern ports and connects with rail partners in the West, linking customers to markets around the world. NS operates an intermodal terminal at 1000 S. Vandorn St., Washington, D.C. 20001 and maintains a government relations office at 1500 K Street, N.W., #375, Washington, D.C. 20005.

24. Defendant Union Pacific Railroad Company ("UP") has its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179. UP is the largest freight railroad in the United States. UP serves primarily the western two-thirds of the United States and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country. UP maintains an office at 600 13th Street, N.W., #340, Washington, D.C. 20005.

## CLASS ACTION ALLEGATIONS

25. Plaintiff brings this action on behalf of itself and all others similarly situated (the Class") pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3). The Class is defined as follows:

> All purchasers of rail freight transportation services from Defendants, through use of private railroad-shipper contracts or through other means exempt from rate regulation under federal law, as to which Defendants assessed a Rail Fuel Surcharge, at any time from at least as early as July 2003 to the present (the "Class Period"). Excluded from the Class are Defendants, any subsidiaries or affiliates of Defendants, any of Defendants' co-conspirators, whether or not named as a Defendant in this Complaint, and all governmental entities (the "Class").

26. Plaintiff does not know the exact size of the Class, since such information is in the exclusive control of the Defendants. Due to the nature of the trade and commerce involved, however, Plaintiff believes that the Class is so numerous and geographically dispersed throughout the United States as to render joinder of all Class members impracticable. Plaintiff further believes the member of the Class can be readily ascertained from Defendants' books and records.

27. Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and all members of the Class directly purchased unregulated rail freight transportation from Defendants, on which Defendants imposed the artificially inflated Rail Fuel Surcharges.

Plaintiff and Class members sustained damages by paying inflated prices for the unregulated rail freight transportation as a result of Defendants' illegal conduct.

28. Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and antitrust litigation.

29. There are questions of law or fact common to the Class, including but not limited to the following:

a. Whether Defendants conspired, contracted, or combined with others, for the purpose of and with the effect of raising, fixing, maintaining, pegging, or stabilizing the price of Rail Fuel Surcharges applied to unregulated rail freight transportation services purchased by the Class;

b. Whether Defendants' conduct violated the federal antitrust laws; and

c. Whether Defendants' conduct caused injury to the business and property of Plaintiff and the Class and, if so, the proper measure of damages.

30. These and other questions of law and fact are common to the Class, and predominate over any questions affecting only individual Class members.

31. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action would achieve substantial economies of time, effort, and expense and would assure uniformity of decision as to persons

similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

## FACTUAL ALLEGATIONS

### The Heavily Regulated Railroad Industry Is Deregulated, Beginning In The Late 1970s

32. In the 1970s, the freight railroad industry—then closely regulated by the federal government—was experiencing serious economic trouble with rising operating costs, financial losses, and corporate bankruptcies. In response, Congress passed the Railroad Revitalization and Regulatory Reform Act of 1976 and the Staggers Rail Act of 1980, which together largely deregulated the industry.

33. As a result of this legislation, railroads and shippers could enter into private rail freight contracts. In contracts for rail freight transportation in markets where railroads faced effective competition or in contracts where rates were privately negotiated between the railroad and the shipper, the freight rates are unregulated by government agencies. Because shippers in some areas may not have competitive alternatives ("captive shippers"), Congress gave the Interstate Commerce Commission ("ICC") authority to establish a process under which captive shippers could obtain relief from unreasonably high rates. The ICC was later abolished by the Interstate Commerce Commission Termination Act of 1995, and its relevant rail freight regulatory functions were transferred to the Surface Transportation Board ("STB").

34. The STB continues to regulate certain aspects of the freight railroad industry. Railroads, for example, have a common carrier obligation to provide rail service upon reasonable request. 49 U.S.C. 11101(a). They can provide that service under rates and terms agreed to in a confidential contract with the shipper, 49 U.S.C. 10709, or under openly available common carriage rates and service terms. 49 U.S.C. 11101. Rates and service terms established by

contract are generally not subject to STB regulation, except for limited protections against discrimination involving agricultural goods. 49 U.S.C. 10709(b), (c).

35. This lawsuit deals only with rail freight not regulated by the STB, which comprises approximately 80 percent of the rail freight market.

**After Deregulation, The Rail Freight Industry Became Highly Concentrated**

36. The railroad freight industry became highly concentrated after Congress deregulated railroads. In 1976, there were 63 Class I railroads operating in the United States. By early 2000, the railroad industry had become so concentrated that further consolidation was unlikely if not impossible. On March 17, 2000, the STB imposed a moratorium on any major railroad merger proposals.

37. Currently, the five Railroad Defendants named in this action operate more than 90 percent of all domestic railroad track and are responsible for more than 90 percent of the total ton-miles of Class I rail freight shipped in the United States.

**The Railroads Abandoned Freight Contracts With Fuel-Cost-Escalation Provisions, Thereby Facilitating Their Conspiracy To Fix Rail Freight Transportation Prices Using Agreed Upon Rail Fuel Surcharges.**

38. As railroads contracted for freight transportation services, they increasingly required shippers to enter freight contracts with cost escalation provisions often tied to the "Rail Cost Adjustment Factor" ("RCAF"). The RCAF is published by Defendant AAR's Policy and Economics committee based in Washington, D.C., and includes fuel prices as a component of the cost escalation factor. In the fourth quarter of 2002, the AAR—which is controlled by the major Class I railroads—published a RCAF without fuel as a component, which they called the "All Inclusive Index Less Fuel ("ALL-LF"). The ALL-LF facilitated Defendants' ability to assess separate Rail Fuel Surcharges and to coordinate that practice.

39. Following publication of the ALL-LF, the Railroad Defendants instituted Rail Fuel Surcharges as a separate line item on bills submitted to shippers. When the price of oil rose in late 2003 and early 2004, Defendants used monthly changes to their Rail Fuel Surcharges as an easy way to increase revenues without having to renegotiate individual contracts. Of course, success was only possible if all the Railroad Defendants played along and did not undercut each other.

40. In or about late March 2003, top executives of the five Railroad Defendants attended the Spring 2003 National Freight Transportation Association ("NFTA") meeting at the Greenbrier Resort in West Virginia, which is owned by Defendant CSX. According to its Internet site, the "object of the [NFTA] is to provide a forum for transportation executives of industrial firms and transportation companies to consider and discuss" various developments affecting the transportation industry.

41. NFTA meetings facilitate the development of personal relationships amongst the attendees. The Spring NFTA 2003 meeting allowed Defendants' top executives ample cover to meet and conspire at meals, on the golf course, and at other resort facilities. Thus, the meeting provided numerous opportunities for Defendants' top executives to discuss and agree upon the specifics of the Rail Fuel Surcharges that were then implemented in or around July 2003.

42. The key element of Defendants' price-fixing conspiracy was an agreement by the Railroad Defendants to act in concert with one another in demanding Rail Fuel Surcharges from shippers and by agreeing to apply Rail Fuel Surcharges computed as a percentage of the base rail freight rate paid by customers.

43. Such a revenue-based fuel surcharge bore no direct relationship to actual increases in fuel costs. According to the STB, the Railroad Defendants have essentially

conceded that the Surcharges are not a means of recovering increased fuel costs associated with the movement of freight, but are rather a "revenue enhancement measure" intended to achieve across-the-board increases in the prices charged by Defendants for rail freight transportation. *Rail Fuel Surcharges*, Surface Transportation Board, Decision, STB Ex Parte No. 661 at 7 (Jan. 25, 2007).

44. The Railroad Defendants implemented and maintained their agreement by publicly announcing surcharge increases and posting the monthly fuel surcharge percentages on their Internet sites. This allowed them to monitor and enforce Rail Fuel Surcharge levels.

45. As a result of Defendants' concerted action, prices of rail freight transportation services charged to Class members were raised to or maintained at supracompetitive levels throughout the Class Period.

46. Further, AAR meetings and events provided cover for the Railroad Defendants to discuss, agree upon, and maintain a common course of action with respect to Rail Fuel Surcharge.

**Implementation Of The Rail Fuel Surcharge Agreement**

47. As early as June of 2003, BNSF and UP agreed to coordinate their Rail Fuel Surcharge prices. Prior to this time, the UP carload fuel surcharge was adjusted monthly based on the West Texas Intermediate ("WTI") Crude Oil Index while the BNSF carload fuel surcharge was based on the U.S. Department of Energy (DOE) On-Highway Diesel Fuel Price Index ("HDF"). In or about June of 2003, however, UP switched to the HDF Index pursuant to an agreement with the BNSF. From then on BNSF and UP moved in lockstep with each other both charging the exact same Rail Fuel Surcharge for each month of the Class Period.

48. BNSF and UP agreed to administer the HDF index in precisely the same way. Whenever the U.S. average price of diesel fuel as measured by the HDF Index equaled or was lower than $1.35 per gallon, no surcharge was applied. When the HDF Index exceeded $1.35 per gallon, however, BNSF and UP both applied a surcharge of 0.5 percent for every five cent increase above $1.35 per gallon. So, for example, if the HDF Index rose 50 cents to $1.85 per gallon, BNSF and UP would apply a surcharge of 5 percent. The surcharge would increase/decrease 10 percent for every $1 dollar increase/decrease in the HDF Index and corresponding increments thereof.

49. BNSF and UP also coordinated when they would change their fuel surcharge. They agreed that the Surcharge would be announced the first day of the month following a change in the Index and would become effective the month after that. So, for example, if the HDF Index average price changed in January, BNSF and UP would announce their new Rail Fuel Surcharge percentage on February 1, and then apply the surcharge to shipments in March. BNSF and UP published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

50. Using the HDF index, BNSF and UP moved in lockstep and charged virtually identical Rail Fuel Surcharges on a monthly basis throughout the Class Period.

51. The Fuel Surcharge Percentages charged by BNSF and UP for carload shipments varied before the Class Period began, but were identical starting in July, 2003.

52. The choice to use the HDF Index for fuel surcharges was arbitrary. Also arbitrary were the decisions to set the trigger point at $1.35 per gallon, announce the surcharges on the first day of the month following a change in the Index, and to apply the surcharge in the second calendar month after the change in the Index. It is not plausible to suggest that such conduct

stems from independent decision-making. Rather, the parallel conduct in conjunction with other factors evidences the existence of an agreement in violation of Section 1 of the Sherman Act. It defies reason to suggest that BNSF and UP, facing myriad differences in economic factors and business demands and requirements, would independently arrive at the same conclusions regarding: (1) the use of Rail Fuel Surcharges, (2) use of the same fuel index, (3) calculating the Surcharges based on a percentage of the freight rate rather than actual fuel consumption, (4) use of the same trigger point for application of the Surcharges, (5) the dates on which Surcharges would be announced, (6) the dates on which Surcharges would become effective, and (7) the amount of the Surcharges.

53. In short, the fact that BNSF and UP both chose and adhered to this same combination of features for their Rail Fuel Surcharge programs shows that they coordinated their behavior. The similarities are both too precise and too comprehensive to have been arrived at independently.

54. In February 2004 or earlier, Defendants CSX and NS agreed to base their fuel surcharge programs on the average monthly price of West Texas Intermediate ("WTI") Crude Oil as published in the *Wall Street Journal*. Indeed, not only did these railroads agree to use the WTI index (as opposed to many other available indices); they too agreed to administer the index in precisely the same way.

55. Specifically, after an initial period in which their selected WTI trigger price differed, CSX and NS agreed to apply a fuel surcharge whenever the monthly average WTI price exceeded $23 per barrel. When that happened, Defendants' rates were increased 0.4 percent for every $1 dollar that the price of WTI oil exceeded $23 per barrel. So, for example, if the price of WTI oil was $28 per barrel, the fuel surcharge percentage would be 2 percent. The Rail Fuel

Surcharge would be adjusted upward/downward by 2 percent for every $5 increase/decrease in the WTI average price.

56. CSX and NS also coordinated when they would change their fuel surcharge—two calendar months after the WTI index had adjusted, thereby using the fuel surcharge price timing used by BNSF and UP. For example, if the WTI average price exceeded $23 per barrel in January, the CSX and NS would assess the applicable fuel surcharge percentage to all bills of lading dated in the month of March. In this way, CSX and NS could apply exactly the same fuel surcharge percentage month after month. CSX and NS published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

57. The net result is that there was uniformity among CSX and NS in the monthly surcharge percentages they charged customers for most of the Class Period.

58. The Fuel Surcharge Percentages charged by CSX and NS for carload shipments varied before the Class Period, but were identical starting in February 2004, and they also were identical to those of KCSR starting in June of 2005, when KCSR joined the conspiracy.

59. The choice to use the WTI index for fuel surcharges was arbitrary. Also arbitrary was the decision to set the trigger point at $23 per barrel and to apply the surcharge in the second calendar month after the average price of WTI oil had changed. Given Defendants' convergence on such arbitrary conclusions, Defendants' conduct cannot stem from independent decision. Rather, Defendants' conduct is evidence of an agreement in violation of § 1. It defies logic that Defendants, facing myriad differences in economic factors and business demands and requirements, would independently make the same decisions regarding: (1) the use of Rail Fuel Surcharges, (2) use of the same fuel index, (3) calculating the Surcharges based on a percentage of the freight rate rather than actual fuel consumption, (4) use of the same trigger point for

application of the Surcharges, (5) the dates on which Surcharges would become effective, and (6) the amount of the Surcharges.

60. In short, the fact that CSX and NS both chose and adhered to this same combination of features for their Rail Fuel Surcharge programs shows that they coordinated their behavior. The similarities are too precise and too comprehensive to have been arrived at independently.

61. The Railroad Defendants operate geographically dispersed, multibillion dollar corporations with thousands of locomotives, and other pieces of heavy railroad equipment, and have massive fuel requirements. The Railroad Defendants acquire fuel at different prices at different times to meet their various business requirements. The specific minutiae of Defendants' parallel behavior as described herein could not have resulted from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advanced understanding among the parties.

62. The Railroad Defendants' use of the Rail Fuel Surcharges was not routine free market conduct. In addition to the practical impossibility that each Railroad Defendant would make so many of the very same Rail Fuel Surcharge business decisions, such a convergence would simply not occur in an free market. In a truly competitive market, the levying of surcharges by one or a few railroads based on a percentage of a customer's base rate—bearing no relation to the actual costs of fuel consumed—should create competition on surcharges by other railroads seeking to gain business. Here, the Railroad Defendants did not compete and the only plausible explanation for that lack of competition is that the Railroad Defendants had entered into an unlawful agreement.

**Defendants Used Surcharges To Fix Rail Freight Prices And Increase Profits, Not To Recover Costs**

63. Defendants, from the beginning of the Class Period and before, fixed the price of the Rail Fuel Surcharges in order to artificially increase the prices of rail freight transportation services. The surcharges were not a cost recovery mechanism, they were a revenue generating profit center. By computing the Rail Fuel Surcharge as a percentage of the base rate charged to the shipper, the Railroad Defendants ensured that there would be no real correlation between the rate increase and the increase in fuel costs for the particular shipment to which the surcharge was applied.

64. By using the price-fixed Rail Fuel Surcharges to set prices for rail freight transportation services, the Railroad Defendants realized billions of dollars in extra revenues during the Class Period from Plaintiff and members of the proposed Class.

**The STB Ruled That Defendants' Surcharges Constitute An "Unreasonable Practice"**

65. In January 2007, the STB served an administrative decision concluding that the railroads' practice of computing Rail Fuel Surcharges as a percentage of base rates for regulated rail freight transport was "a misleading and ultimately unreasonable practice" because the fuel surcharges are not tied to the fuel consumption associated with the individual movements to which they are applied. *Rail Fuel Surcharges*, Surface Transportation Board, Decision, STB Ex Parte No. 661 (Jan. 25, 2007). The STB directed railroads to stop this unreasonable practice. *Id.*

66. Although the STB's decision applied only to regulated freight, the Railroad Defendants followed the same unreasonable practices with regard to the unregulated freight that is the subject of this complaint.

67. The STB has also issued a Notice of Proposed Rulemaking in which it has proposed rules to monitor the freight railroads' monthly fuel costs, consumption, and revenue from Rail Fuel Surcharges.

**<u>ANTITRUST "PLUS FACTORS"</u>**

68. Antitrust "plus factors" further support the allegation that Defendants agreed to fix prices for Rail Fuel Surcharges. The rail transportation industry is marked by certain structural and other characteristics that make a price-fixing cartel feasible:

a. <u>The railroad industry is highly concentrated</u>. The Railroad Defendants in this case are the five largest remaining domestic Class I railroads following decades of mergers and consolidation. The Railroad Defendants account for more than 90 percent of the nation's rail freight traffic. Such high concentration facilitates the possibility of a price-fixing cartel.

b. <u>There are significant barriers to entry into the railroad industry</u>. To compete, railroads must invest in a vast network of tracks, stations, yards, and switching facilities. Such infrastructure takes decades to develop and requires onerous regulatory and environmental reviews and approval. Land or easements are often needed, necessitating the involvement of multiple local governments and the exercise of eminent domain power. Because rail infrastructure is of minimal value for other purposes, and rail networks are difficult to assemble, the fixed costs are largely sunk, creating significant entry barriers. Entry also requires that a new entrant capture a significant market share from existing carriers. Entry is thus both expensive and risky.

c. <u>The Rail Fuel Surcharges were highly standardized</u>. The Railroad Defendants structured their Rail Fuel Surcharges as a percentage of base rates and then published the percentages on their websites so the colluding railroads could police the conspiracy without frequent communications. It is well recognized that markets having uniform and homogeneous products or services are susceptible to price fixing.

d. The railroad industry has a history of price fixing and other anti-competitive behavior. In the first antitrust case dealing with the railroad industry, *United States v. Trans-Missouri Freight Ass'n*, 166 U.S. 290 (1897), the railroad cartel argued that it must fix prices or the industry would go bankrupt. Prior to deregulation, railroads engaged in open price fixing through establishment of "rate bureaus" and "rate-making committees." Although these bodies disappeared from public view after deregulation, the railroad industry has continued to engage in market manipulation, unreasonable rate practices, and other discriminatory practices against a wide spectrum of freight customers.

e. The CEOs of the Railroad Defendants are all board members of the AAR, which facilitates transfer of pricing information. The AAR describes itself as "the central coordinating and research agency of the North American rail industry." Full membership, however, is available only to Class I railroads operating in the United States, five of which are Defendants in this action. The AAR Board meets regularly and board members (and their staff) regularly communicate between meetings.

f. Defendants acted in contravention of their individual economic interests. The Railroad Defendants did not behave as if they were in a competitive market:

i) Defendants failed to compete on the Surcharges. In a truly competitive market, rational railroads levying surcharges based on a percentage of a customer's freight rate—bearing no relation to the actual costs of fuel consumed and therefore not actually crucial to cost recovery—would compete on the basis of surcharges in order to lower a customer's overall bill and thereby gain business. Shippers from many different industries, some with significant economic power, tried to negotiate the fuel surcharge

percentages, but were told by the Railroad Defendants that the Rail Fuel Surcharges were "not negotiable." Several national shipper organizations met with each of the Railroad Defendants to encourage them to reexamine the methods used to assess Rail Fuel Surcharges. Among the Defendants, only BNSF agreed to make responsive changes to its surcharge program, and that was only for grain and coal shipments coming from certain regions where the BNSF is the only carrier. The other Railroad Defendants refused to address the concerns of their customers.

ii) Defendants' behavior alienated customers. At or about the time Railroad Defendants agreed to fix the Rail Fuel Surcharge prices, they largely switched from offering long-term contracts to offering contracts that were "re-priced" in new negotiations semi-annually, quarterly or monthly. Previously, the Railroad Defendants had allowed, and often preferred, long term contracts ranging up to five years with clauses that did not permit rate increases beyond a certain point or that excluded fuel surcharges altogether. The Railroad Defendants made this switch even though most shippers preferred the former system in order to minimize risk. In a competitive environment, forcing customers to assume greater risks without any offsetting benefit (such as lower prices) would cause customers to seek alternatives, which should promote competition between carriers for their business. Here, all Railroad Defendants raised prices and did not offer any compensation to customers for assuming additional risk. This behavior gives rise to an inference of price fixing.

iii) Defendants changed billing practices to expose each other's prices. The Railroad Defendants sometimes stopped offering "through rates," in which a shipper would receive a single bill from either the originating shipper or the termination railroad

and a single fee would be allocated among the railroads that shipped. Instead, the Railroad Defendants moved to what is known in the industry as "Rule 11 pricing." Under Rule 11 pricing, where a shipment requires movement on more than one carrier, the two rates are stated separately rather than as one quote for the entire shipment. The Railroad Defendants made this change as part of their conspiracy for two reasons: to provide transparency as to what each railroad was charging on multiple line shipments and to allow each railroad to apply the agreed-upon Rail Fuel Surcharge in its own territory.

g. During the Class Period, rail freight demand grew, but each Defendant's market share remained stable. Finally, demand for rail freight transportation services grew substantially during the period of the conspiracy, and yet the Railroad Defendants' market shares remained relatively stable and constant. The fact that market shares did not did not fluctuate significantly during a period of demand growth is further indication that the Railroad Defendants agreed to price fix rather than to compete for new sales.

## INTERSTATE TRADE AND COMMERCE

69. During the Class Period, the Railroad Defendants transported more than 90 percent of all rail freight shipments within the United States. According to the STB, railway operating revenues for all Class I freight railroads was more than $52 billion in 2006.

70. The activities of Defendants and their co-conspirators were within the flow of, and substantially affected, interstate and international commerce. During the Class Period, Defendants and their co-conspirators sold and carried out rail shipments in a continuous and uninterrupted flow of interstate and foreign commerce to shippers and customers throughout the

United States. Each Defendant and their co-conspirators used instrumentalities of interstate or foreign commerce, or both, to sell and market rail freight transportation services.

71. The unlawful activities of Defendants and the unnamed co-conspirators have had a direct, substantial, and reasonably foreseeable effect on interstate and international commerce.

## ANTITRUST INJURY TO PLAINTIFF AND THE CLASS

72. The unlawful conduct, combination or conspiracy alleged herein had and is having the following effects, among others:

a. The prices paid by Plaintiff and the Class for unregulated rail freight transportation services were fixed or stabilized at supracompetitive levels;

b. The Rail Fuel Surcharges charged to Plaintiff and the Class for unregulated rail freight transportation were been fixed or stabilized at supracompetitive levels;

c. Plaintiff and the Class have been deprived of the benefits of free, open, and unrestricted competition in the market for unregulated rail freight transportation; and

d. Competition in establishing the prices paid in the United States for unregulated rail freight transportation has been unlawfully restrained, suppressed and eliminated.

73. By reason of the violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act, Plaintiff and the members of the Class have sustained injury to their business or property. The injury sustained by the plaintiff and the Class is the payment of supracompetitive prices for unregulated rail freight transportation as a result of Defendants' illegal contract, combination, and conspiracy to restrain trade as alleged. This is an antitrust injury of the type that the federal laws were meant to punish and prevent.

**COUNT I**

**(Violation of § 1 of the Sherman Act and § 4 of the Clayton Act)**

74. Plaintiff incorporates by reference the allegations in the above paragraphs as if they were fully set forth herein.

75. Defendants entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

76. The contract, combination, or conspiracy resulted in an agreement, understanding or concerted action between and among Defendants in furtherance of which Defendants fixed, maintained, and standardized prices for Rail Fuel Surcharges for rail freight transportation handled through private contracts and other means exempt from regulation. Such contract, combination, or conspiracy constitutes a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

77. Defendants' contract, combination, agreement, understanding, or concerted action occurred within the flow of, and substantially affected, interstate and international commerce. Defendants' unlawful conduct was through mutual understandings or agreements by, between and among Defendants.

78. The contract, combination or conspiracy has had the following effects:

a. Prices charged to Plaintiff and the Class for unregulated rail freight transportation services were fixed and/or maintained at supracompetitive levels;

b. Prices charged to Plaintiff and the Class for Rail Fuel Surcharges applied to unregulated rail freight transportation were fixed and/or maintained at supracompetitive levels;

c. Plaintiff and the Class have been deprived of the benefits of free, open and unrestricted competition in the market for rail freight transportation services; and

d. Competition in establishing the prices paid, customers of, and territories for rail freight transportation services has been unlawfully restrained, suppressed and eliminated.

79. As a proximate result of Defendants' unlawful conduct, Plaintiff and the Class have suffered injury in that they have paid supracompetitive prices for unregulated rail freight transportation services during the Class Period.

WHEREFORE, Plaintiff prays for relief as follows:

A. That the Court determine that this action may be maintained as a class action under Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiff be denominated as class representative, and that Plaintiff's counsel be appointed as counsel for the Class;

B. That the unlawful contract, combination, and conspiracy alleged in Count I be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

C. That Plaintiff and the Class recover compensatory damages, as provided by law, determined to have been sustained as to each of them, and that judgment be entered against Defendants on behalf of Plaintiff and each and every member of the Class;

D. That each of the Defendants' respective officers, directors, agents, and employees, and all other persons acting on behalf of or in concert with them, be permanently enjoined and restrained from, directly or indirectly, continuing or maintaining the combination, conspiracy, or agreement alleged in this case;

E. That Plaintiff and the Class recover treble damages, as provided by law;

F. That Plaintiff and the Class recover their costs of the suit, including attorney's fees, as provided by law; and

G. For such further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

Dated: June 25, 2007 By: [signature]

Michael D. Hausfeld (D.C. Bar #153742)
Benjamin D. Brown (D.C. Bar #495836)
**COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.**
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC 20005
Phone: (202) 408-4600
Fax: (202) 408-4699
Email: mhausfeld@cmht.com, bbrown@cmht.com

Michael J. Boni
Joanne Zack
Joshua D. Snyder
**BONI & ZACK LLC**
15 St. Asaphs Rd.
Bala Cynwyd, PA 19004
Tel: 610-822-0200
Fax: 610-822-0206
Email: mboni@bonizack.com; jzack@bonizack.com;
jsnyder@bonizack.com

Arthur N. Bailey
**ARTHUR N. BAILEY & ASSOCIATES**
111 West Second Street, Suite 4500
Jamestown, N.Y. 14701
Phone: (716) 664-2967
Fax: (716) 664-2983

***Attorneys for Plaintiff Strates Shows, Inc. and the Proposed Class***

07-1127
RMC

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| STRATES SHOWS, INC.<br>10600 Orange Avenue<br>High Point, Florida 32824<br>88888 | Association of American Railroads, et al. |
| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF Palm Beach<br>(EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT<br>(IN U.S. PLAINTIFF CASES ONLY)<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |
| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)<br>Benjamin D. Brown<br>Cohen Milstein Hausfeld & Toll, PLLC<br>1100 New York Avenue, NW, Suite 500 West<br>Washington, DC 20005<br>(202) 408-4600 | ATTORNEYS (IF KNOWN)<br>Case: 1:07-cv-01127<br>Assigned To : Collyer, Rosemary M.<br>Assign. Date : 6/25/2007<br>Description: Antitrust |

JURY ACTION

## II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ⦿ 3 Federal Question (U.S. Government Not a Party)
- ○ 2 U.S. Government Defendant
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZEN[SHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX] FOR PLAINTIFF [AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT

**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

### ⦿ A. *Antitrust*

- [X] 410 Antitrust

### ○ B. *Personal Injury/ Malpractice*

- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Medical Malpractice
- ☐ 365 Product Liability
- ☐ 368 Asbestos Product Liability

### ○ C. *Administrative Agency Review*

- ☐ 151 Medicare Act

**Social Security:**
- ☐ 861 HIA ((1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g)
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g)

**Other Statutes**
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

### ○ D. *Temporary Restraining Order/Preliminary Injunction*

**Any nature of suit from any category may be selected for this category of case assignment.**

***(If Antitrust, then A governs)***

### ○ E. *General Civil (Other)* OR ○ F. *Pro Se General Civil*

**Real Property**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**Personal Property**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**Bankruptcy**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**Property Rights**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**Federal Tax Suits**
- ☐ 870 Taxes (US plaintiff or defendant
- ☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
- ☐ 610 Agriculture
- ☐ 620 Other Food &Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**Other Statutes**
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation

- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 900 Appeal of fee determination under equal access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

(6)

| | | | |
|---|---|---|---|
| ○ G. *Habeas Corpus/ 2255*<br>☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ○ H. *Employment Discrimination*<br>☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br>*(If pro se, select this deck)* | ○ I. *FOIA/PRIVACY ACT*<br>☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br>*(If pro se, select this deck)* | ○ J. *Student Loan*<br>☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |
| ○ K. *Labor/ERISA (non-employment)*<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ○ L. *Other Civil Rights (non-employment)*<br>☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ○ M. *Contract*<br>☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ○ N. *Three-Judge Court*<br>☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding ○ 2 Removed from State Court ○ 3 Remanded from Appellate Court ○ 4 Reinstated or Reopened ○ 5 Transferred from another district (specify) ○ 6 Multi district Litigation ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Sherman Act, Section 1, Price Fixing

**VII. REQUESTED IN COMPLAINT** [X] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 **DEMAND $** ____ Check YES only if demanded in complaint

**JURY DEMAND:** YES [X] NO ☐

**VIII. RELATED CASE(S) IF ANY** (See instruction) YES [X] NO ☐ If yes, please complete related case form.

**DATE** June 25, 2007 **SIGNATURE OF ATTORNEY OF RECORD** [signature]

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The **JS-44** civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

**I.** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

**III.** CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

**IV.** CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

**VI.** CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

**VIII.** RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

# EXHIBIT

# PX0966

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | MDL Docket No. 1869<br>Misc. No. 07-489 (PLF) |
| This document relates to:<br><br>ALL CASES | **SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**<u>SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT</u>**

Plaintiffs, individually and on behalf of a class of all those similarly situated, bring this action for damages under the antitrust laws of the United States against Defendants, and allege as follows:

**NATURE OF THE ACTION**

1. This is an antitrust class action charging the four largest United States-based Class I railroads with price fixing in violation of Section 1 of the Sherman Act. Plaintiffs bring this action on behalf of themselves and a proposed class of direct purchasers who purchased unregulated rail freight transportation services directly from Defendants from July 1, 2003 until at least June 30, 2007 (the "Class Period") and who were assessed a rail fuel surcharge for the agreed-upon transportation. As used herein, the term "unregulated" refers to rail freight transportation services where the rates are set by private contracts or through other means exempt from rate regulation under federal law.

2. Defendants BNSF Railway Company ("BNSF"), Union Pacific Railroad Company ("UP"), CSX Transportation, Inc. ("CSX") and Norfolk Southern Railway Company ("NS") (together, "Defendants") conspired to use rail fuel surcharges, which were added to

customers' bills, as a means to fix, raise, maintain, and/or stabilize prices of rail freight transportation services sold in the United States. A rail fuel surcharge ("Rail Fuel Surcharge") is a separately-identified fee that is charged by the railroads for the agreed-upon transportation, purportedly to compensate for increases in the cost of fuel. Through their collective action, however, the Defendants conspired to impose Rail Fuel Surcharges that far exceeded any increases in the Defendants' fuel costs, and thereby collected billions of dollars of additional profits during the four year period of the conspiracy.

3. In the early 2000s, the Defendants sought to increase their revenues by raising prices. However, unlike in the past era of full regulation of the railroad industry, when the railroads could have applied to the Interstate Commerce Commission (the "ICC") for across-the-board rate increases, the railroads now no longer could do so as a result of deregulation that began in the early 1980s with the Staggers Act. Given deregulation, the only practicable way the railroads now could increase prices across-the-board was through the mechanism of a uniform surcharge applied to as many customers as possible.

4. Defendants BNSF, UP, CSX and NS – which together control about 90% of rail freight traffic in the United States – conspired in 2003 to use an artificially high surcharge, purportedly to cover fuel costs, as the means to raise rates across the board, and thereby increase profits. But this plan faced a significant hurdle: as of 2003, the great majority of rail freight transportation agreements included rate escalation provisions that weighted a variety of cost factors, including fuel, based on an index called the All Inclusive Index ( the "AII") which was published by the railroad trade organization known as the Association of American Railroads (the "AAR"). The AII (and a related index called the Rail Cost Adjustment Factor ("RCAF") which is based on the AII) already permitted full recovery by the railroads of actual fuel cost

increases, no matter how large. By weighting different cost factors, the AII and related RCAF accounted accurately for the impact of particular cost increases (e.g., for fuel). James R. Young, the President of UP, acknowledged during an October 2004 earnings call that the RCAF "looks at actual costs through the industry."

5. To overcome this obstacle, Defendants BNSF, UP, CSX and NS devised and embarked on a scheme to remove fuel from the AII, so that a separate "fuel surcharge" could then be applied as a percentage against the total cost of the freight transportation. This permitted these major railroads to achieve their desired, and mutually agreed, result: an effective percentage rate increase that could be broadly applied to rail freight customers.

6. The Defendants implemented their conspiracy through a number of collective actions.

7. In July 2003, the two major western railroads – Defendants BNSF and UP (together, the "Western Railroads") – agreed to implement the same fuel surcharge program, resulting in the exact same fuel surcharges. Up until this time, fuel surcharges had been applied only intermittently, and to the extent surcharges were used at all, the railroads had different fuel surcharge rates, reflecting (among other things) that each railroad had different fuel costs. In July 2003, however, BNSF and UP for the first time agreed to coordinate their fuel surcharges and base them on the U.S. Department of Energy (DOE) On-Highway Diesel Fuel Price Index (the "HDF Index"). BNSF and UP began to charge the exact same fuel surcharges pursuant to their agreement, using the HDF Index, and continued to do so through at least mid-2007.

8. Even after BNSF and UP took this collective action, however, a major barrier to widespread use of the fuel surcharges – the existing cost escalation indexes (the RCAF and the AII on which it was based) – remained, as noted above. Defendants BNSF, UP, CSX and NS

then conspired to take collective action at the AAR to remove this obstacle. These four defendant railroads control and dominate the AAR, and the CEOs of these railroads are all board members of the AAR, which describes itself as "the central coordinating and research agency of the North American rail industry." The AAR Board meets regularly and board members (and their staff) regularly communicate between meetings.

9. In the Fall of 2003 at meetings of the AAR, Defendants BNSF, UP, CSX and NS conspired to cause the AAR to develop and publish a new cost escalation index with fuel removed. Pursuant to the agreement and collective action of BNSF, UP, CSX and NS, the AAR in December 2003 announced the establishment of the new cost escalation index, called the All Inclusive Index Less Fuel ("AIILF"). The AAR's official publication, entitled "AAR Railroad Cost Indexes," stated that the new index "is calculated using the same components and methods as the All-Inclusive Index uses for the Rail Cost Adjustment Factor, with the exception of the exclusion of the fuel component." This announcement, and the underlying removal of fuel from the AII and RCAF, was the collective action of BNSF, UP, CSX and NS. A senior officer of defendant BNSF, for example, admitted in 2004 that Matthew K. Rose, BNSF's Chairman, President and CEO "led the charge on" the AAR's 2003 adoption of the new index without fuel.

10. Never before in its history had the AAR created a cost escalation index without a fuel cost component. As UP's James R. Young acknowledged in a July 2007 interview, the new Rail Fuel Surcharges as applied to rail freight were "really unique to the railroad industry. Three, four years ago they were really non-existent."

11. The collective action by BNSF, UP, CSX and NS in December 2003 allowed the Defendants to apply the new, separate and artificially high Rail Fuel Surcharges broadly to their customers, since fuel would no longer automatically be covered by standard rate escalation

clauses. UP's Young admitted, during an October 2004 earnings call, that UP was now "getting away from the RCAF" and "putting in the specific fuel recovery mechanism in areas that historically would have used RCAF." According to Young, by July 2007 approximately "eighty to ninety percent" of UP's business had "some kind of fuel surcharge mechanism that gets passed on to the customer."

12. Almost immediately following the collective action that led to the establishment of the "AIILF" price escalation index without fuel, and in furtherance of the conspiracy, Defendants CSX and NS (together, the "Eastern Railroads"), which previously had different fuel surcharges, now announced that each would apply identical fuel surcharges based on the West Texas Intermediate (or "WTI") Index (which in early 2004 was at a higher rate than the HDF Index that the Western Railroads simultaneously started to use in July 2003). This announcement by the Eastern Railroads, coming on the heels of the collective action in late 2003 to remove fuel from the AII and RCAF, was the result of their conspiracy with the Western Railroads to impose artificially high Rail Fuel Surcharges in a coordinated fashion. The Eastern Railroads charged the exact same fuel surcharges, through at least mid-2007.

13. With the AIILF they had put in place, and in furtherance of the conspiracy, Defendants BNSF, UP, CSX and NS now each applied the fuel surcharge the same way: as a percentage multiplier of the *total* base rate for the rail freight transportation. That is, while the fuel factor in the AII and RCAF had been "weighted" to reflect the relative impact of fuel costs as compared to other cost factors, Defendants now were able to apply the percentage increase in fuel costs triggered by the applicable index to the *entire* cost of the freight transport. Thus, for example, if the percentage increase triggered by the applicable fuel index was 15 %, then by applying the fuel surcharge the Defendants would raise the entire cost of the freight transport by

15 % – even though fuel accounted for only a portion of the total rail transport cost (which is what the AII and RCAF indexes had been designed to reflect). This agreed approach yielded the Defendants billions of dollars of additional profits.

14. BNSF, UP, CSX and NS maintained their conspiracy during the Class Period by uniformly computing the surcharges as a percentage of the rail freight transport base rate, and by agreeing upon common trigger points for adjusting the percentages monthly. The Defendants also published their Rail Fuel Surcharges on their websites to facilitate coordination and the detection of any deviation from collusive pricing. The Defendants also declined to undercut one another on fuel surcharge prices, even though the surcharges far exceeded each Defendant's actual increases in fuel costs.

15. BNSF, UP, CSX and NS also took other collective actions to enforce the conspiracy and make it effective. For example, pursuant to the conspiracy, they largely stopped entering into long-term contracts and entered instead into contracts for periods of approximately 30 days, or with 30-day cancellation provisions – making it easier to implement the fuel surcharges, which were adjusted monthly. The Defendants also limited the previously prevailing practice, in circumstances where more than one railroad (usually an eastern and a western railroad) was involved in long-distance freight transport, of sending a customer a single bill for the entire transport. Instead, the Defendants, pursuant to the conspiracy, increasingly switched to having each railroad on a multi-railroad trip send a separate bill (and thus each could separately impose its own fuel surcharge). This facilitated each Defendant recouping its share of the supracompetitive profits from the Fuel Surcharge program imposed by the conspiracy. Such a switch to separate invoicing on multi-railroad trips could be accomplished only through collective action of the Defendants. The Defendants also began refusing to negotiate discounts

on rail freight rates – even in circumstances where individual railroads had previously been willing to do so.

16. In a ruling in early 2007, the Surface Transportation Board ("STB"), which has authority over rate-regulated freight traffic that is not within the class alleged here, found that the Defendants' rail fuel surcharges, as applied to STB-regulated freight traffic, were "unreasonable" and did not relate to the railroads' actual cost of fuel. The STB expressly stated that it lacks jurisdiction over the private contracts, and other freight traffic exempt from rate regulation, that is the subject of this Complaint. In its ruling, the STB explained that:

> After considering all of the comments, we affirm the preliminary conclusion in the August decision that it is an unreasonable practice to compute fuel surcharges as a percentage of the base rates. Because railroads rely on differential pricing, under which rates are dependent on factors other than costs, a surcharge that is tied to the level of the base rate, rather than to fuel consumption for the movement to which the surcharge is applied, cannot fairly be described as merely a cost recovery mechanism. Rather, a fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting the actual increase in fuel costs for handling the particular traffic to which the surcharge is applied. Two shippers may have traffic with identical fuel costs, but if one starts out with a higher base rate (because, for example, it has fewer transportation alternatives), it will pay dramatically more in fuel surcharges.

*See Surface Transportation Board Decision, Rail Fuel Surcharges* (STB Ex Parte No. 661, January 26, 2007) at 6.

17. An independent 2007 study commissioned by the American Chemistry Council and Consumers United for Rail Equity ("CURE") found that the difference between Defendants' rail fuel surcharge revenue (as publicly reported or estimated) and Defendants' publicly reported actual fuel costs during the period from 2003 through the First Quarter of 2007 came to over $6 billion.

18. Each of the Defendants has disclosed that it has received a state grand jury subpoena and/or state grand jury inquiry concerning the Rail Fuel Surcharges. In an SEC Form

10-K dated February 22, 2008, Defendant CSX stated that "[i]n July 2007, CSXT received a grand jury subpoena from the New Jersey Office of the Attorney General seeking information related to the same fuel surcharges that are the subject of the purported class actions. It is possible that additional federal or state agencies could initiate investigations into similar matters." (CSX Corp., 10-K, February 22, 2008 at 99). In an SEC Form 10-K dated February 15, 2008, Defendant BNSF stated that "[t]he Company is also responding to a state grand jury subpoena requesting production of information related to fuel surcharges." (BNSF Railway Company, 10-K, February 15, 2008 at 10). In an SEC Form 10-K dated February 15, 2008, Defendant Norfolk Southern stated that "NS received a subpoena from a state grand jury on July 13, 2007, requesting documents and materials relating to the setting of fuel surcharges. NS is cooperating with the state in its investigation." (Norfolk Southern, 10-K, February 15, 2008 at K16). And in an SEC Form 10-K dated February 28, 2008, Defendant UP disclosed that "the Attorney General of a state outside our service area issued a grand jury subpoena to us requesting documents pertaining to our fuel surcharge program. We met with representatives of this Attorney General's office, and we plan to have additional meetings in the future in an effort to resolve that office's interest in this matter." (Union Pacific Corp., 10-K, February 28, 2008 at 15).

19. As a direct and proximate result of the price fixing conspiracy alleged herein, Defendants have restrained competition in the market for rate-unregulated rail freight transportation services and injured Plaintiffs and each Class member in their business and property. Plaintiffs and the members of the Class have each paid a higher price for unregulated rail freight transportation than they would have paid absent the concerted unlawful activity alleged herein.

20. Plaintiffs seek damages on behalf of themselves and the Class for Rail Fuel Surcharges imposed on rail freight shipments made under private transportation contracts and through other means exempt from rate regulation under federal law. Plaintiffs do not seek, on behalf of themselves or the Class, damages or relief arising from fuel surcharges imposed on rate-regulated freight transportation.

**PARTIES**

21. Plaintiff Dust Pro, Inc. ("Dust Pro") is a corporation organized under the laws of the State of Arizona, with its principal place of business at 3224 West Brown Street, Phoenix, Arizona 85051. During the Class Period, Dust Pro manufactured and distributed soil stabilizers used to inhibit dust on dirt surfaces. Dust Pro purchased unregulated rail freight transportation directly from one or more of the Defendants during the Class Period, and during the Class Period one or more of the Defendants assessed Rail Fuel Surcharges on Dust Pro in connection with that unregulated rail freight transportation. The prices Dust Pro paid to Defendants for unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the prices Dust Pro would have paid absent the conspiracy alleged herein. Dust Pro has therefore been injured in its business and property by reason of Defendants' antitrust violations.

22. Plaintiff Carter Distributing Company ("Carter Distributing") is a corporation organized under the laws of the State of Tennessee with its principal place of business at 1305 Broad Street, Chattanooga, Tennessee 37041. During the Class Period, Carter Distributing distributed beer. Carter Distributing purchased unregulated rail freight transportation directly from one or more of the Defendants during the Class Period, and during the Class Period one or more of the Defendants assessed Rail Fuel Surcharges on Carter Distributing in connection with that unregulated rail freight transportation. The prices Carter Distributing paid to Defendants for unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed

were greater than the prices Carter Distributing would have paid absent the conspiracy alleged herein. Carter Distributing has therefore been injured in its business and property by reason of Defendants' antitrust violations.

23. Plaintiff Strates Shows, Inc. ("Strates Shows") is a corporation organized under the laws of the State of Delaware, with its principal place of business at 10600 Orange Avenue, Orlando, Florida 32824. During the Class Period Strates Shows operated a traveling carnival that provided amusement rides, games, food and merchandise concessions to fairs and festivals throughout the United States**.** Strates Shows purchased unregulated rail freight transportation directly from one or more of the Defendants during the Class Period, and during the Class Period one or more of the Defendants assessed Rail Fuel Surcharges on Strates Shows in connection with that unregulated rail freight transportation. The prices Strates Shows paid to Defendants for unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the prices Strates Shows would have paid absent the conspiracy alleged herein. Strates Shows has therefore been injured in its business and property by reason of Defendants' antitrust violations.

24. Plaintiff US Magnesium LLC ("US Magnesium") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 238 North 2200 West, Salt Lake City, Utah 84116-2921. During the Class Period, US Magnesium manufactured magnesium, chlorine, ferric chloride and other products. US Magnesium has annual sales in excess of $100 million, and pays in excess of $2.5 million per year in rail freight charges. US Magnesium purchased unregulated rail freight transportation directly from one or more of the Defendants during the Class Period, and during the Class Period one or more of the Defendants assessed Rail Fuel Surcharges on US Magnesium in connection with that unregulated

rail freight transportation. The prices US Magnesium paid to Defendants for unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the prices US Magnesium would have paid absent the conspiracy alleged herein. US Magnesium has therefore been injured in its business and property by reason of Defendants' antitrust violations.

25. Plaintiff Zinifex Taylor Chemicals, Inc. ("Zinifex") is a corporation organized under the laws of the State of Tennessee, with its principal place of business at 1800 Zinc Plant Road, Clarksville, Tennessee 37040. Zinifex is a subsidiary of Nyrstar NV, the world's largest zinc producer. During the Class Period, Zinifex manufactured sulfuric acid and other chemical products. Zinifex purchased unregulated rail freight transportation directly from one or more of the Defendants during the Class Period, and during the Class Period one or more of the Defendants assessed Rail Fuel Surcharges on Zinifex in connection with that unregulated rail freight transportation. The prices Zinifex paid to Defendants for unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the prices Zinifex would have paid absent the conspiracy alleged herein. Zinifex has therefore been injured in its business and property by reason of Defendants' antitrust violations.

26. Plaintiff Donnelly Commodities Inc. ("Donnelly Commodities") is a corporation organized under the laws of the State of New York with its principal place of business at 12 Manor Road, Smithtown, NY 11787. During the Class Period, Donnelly Commodities was a freight consolidator. Donnelly Commodities purchased unregulated rail freight transportation directly from one or more of the Defendants during the Class Period, and during the Class Period one or more of the Defendants assessed Rail Fuel Surcharges on Donnelly Commodities in connection with that unregulated rail freight transportation. The prices Donnelly Commodities

paid to Defendants for unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the prices Donnelly Commodities would have paid absent the conspiracy alleged herein. Donnelly Commodities has therefore been injured in its business and property by reason of Defendants' antitrust violations.

27. Plaintiff Dakota Granite Company ("Dakota Granite") is a South Dakota corporation with its principal place of business at 14964 484th Street, Milbank, South Dakota 57252. Dakota Granite quarries, manufactures, and sells granite slabs, tile, monuments, mausoleums, columbariums, civic memorials, and blocks, and fabricates custom granite countertops, feature pieces, and building components. Dakota Granite's products are used extensively throughout the world in various building and interior design applications. Dakota Granite purchased unregulated rail freight transportation directly from one or more of the Defendants during the Class Period, and during the Class Period one or more of the Defendants assessed Rail Fuel Surcharges on Dakota Granite in connection with that unregulated rail freight transportation. The prices Dakota Granite paid to Defendants for unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the prices Dakota Granite would have paid absent the conspiracy alleged herein. Dakota Granite has therefore been injured in its business and property by reason of Defendants' antitrust violations.

28. Plaintiff Olin Corporation ("Olin") is a corporation organized under the laws of the State of Virginia, with its principal place of business at 190 Carondelet Plaza, Suite 1530, Clayton, MO 63105. During the Class Period, Olin, through its Olin Chlor Alkali Products Division, manufactured and distributed various chemicals and chemical products including chlorine, caustic soda, sodium hypochlorite, potassium hydroxide, hydrochloric acid, hydrogen and other chemicals and chemical products. Olin purchased unregulated rail freight

transportation directly from one or more of the Defendants during the Class Period, and during the Class Period one or more of the Defendants assessed Rail Fuel Surcharges on Olin in connection with that unregulated rail freight transportation. The prices Olin paid to Defendants for unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the prices Olin would have paid absent the conspiracy alleged herein. Olin has therefore been injured in its business and property by reason of Defendants' antitrust violations.

29. Defendant CSX Transportation, Inc. ("CSX") has its principal place of business at 500 Water St., Jacksonville, Florida 32202. CSX is a major freight railroad operating primarily in the eastern United States and Canada. CSX links commercial markets in 23 states, the District of Columbia, and certain Canadian provinces. CSX has railway lines throughout the eastern United States, including rail lines within this District, and maintains a government relations office at 1331 Pennsylvania Ave., N.W., Suite 560, Washington, D.C. 20004.

30. Defendant Norfolk Southern Railway Company ("NS") has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510. NS is a major freight railroad operating primarily in the eastern United States. NS serves all major eastern ports and connects with rail partners in the West, linking customers to markets around the world. NS operates an intermodal terminal at 1000 S. Van Dorn St., in Alexandria, Virginia, and maintains a government relations office at 1500 K Street, N.W., #375, Washington, D.C. 20005.

31. Defendant BNSF Railway Company ("BNSF") has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131. BNSF originates and terminates traffic within this District by providing rail transportation in interchange service with CSX and NS. BNSF is a wholly owned subsidiary Burlington Northern Santa Fe Corporation, the holding company formed by the September 22, 1995 merger of Burlington Northern and Santa Fe

Corporation. BNSF is the second largest railroad network in North America and operates 32,000 route miles of railroad. BNSF has offices and rail lines throughout the western United States, extending into the Southeastern states and maintains a government affairs office at 500 New Jersey Ave., N.W., Suite 550, Washington, D.C. 20001.

32. Defendant Union Pacific Railroad Company ("UP") has its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179. UP is the largest freight railroad in the United States. UP serves primarily the western two-thirds of the United States and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including Washington, D.C.). UP maintains an office at 600 13th Street, N.W., #340, Washington, D.C. 20005.

**JURISDICTION AND VENUE**

33. This action is brought under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and reasonable attorneys fees and costs from Defendants for the injuries sustained by Plaintiffs and members of the Class by reasons of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

34. Jurisdiction of this Court is founded on 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337.

35. Venue is proper in this judicial District pursuant to 15 U.S.C. § 15(a) and 22 and 28 U.S.C. § 1391, because during the Class Period one or more of the Defendants resided, transacted business, were found, or had agents in this District, and a substantial part of the events giving rise to Plaintiffs' claims occurred and a substantial portion of the affected interstate trade and commerce described below, has been carried out, in this District.

36. Venue is also proper because this action has been transferred to this

District by the Judicial Panel on Multidistrict Litigation for consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407(a).

37. This Court has personal jurisdiction over each Defendant because, inter alia, each: (a) transacted business in this District; (b) directly or indirectly sold and delivered rail transportation services in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

**CLASS ACTION ALLEGATIONS**

38. Plaintiffs bring this action as a class action under Rules 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and others similarly situated. The proposed "Class" is defined as:

> All direct purchasers of rail freight transportation services from Defendants, through use of private railroad-shipper contracts or through other means exempt from rate regulation under federal law, as to which Defendants assessed a Rail Fuel Surcharge, at any time from July 1, 2003 until at least June 30, 2007 (the "Class Period"). Excluded from the Class are Defendants, any subsidiaries or affiliates of Defendants, and any of Defendants' co-conspirators, whether or not named as a Defendant in this Complaint and all federal governmental entities.

39. The Class is numerous and geographically dispersed, and, given the magnitude of the commerce involved, joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs believe that there are many thousands of members of the Class and that their identities can be readily ascertained from Defendants' books and records.

40. Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiffs and all members of the Class directly purchased unregulated rail freight transportation

from Defendants, with respect to which Defendants imposed the artificially inflated Rail Fuel Surcharges established and maintained by the actions of Defendants in connection with the restraint of trade alleged herein. Plaintiffs and the members of the Class have all sustained damage in that they paid inflated prices for the unregulated rail freight transportation services at issue as a result of Defendants' conduct in violation of federal law.

41. Plaintiffs will fairly and adequately protect the interests of the members of the Class and are represented by counsel competent and experienced in class action and antitrust litigation.

42. Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

a. Whether Defendants conspired, contracted or combined with others, for the purpose and with the effect of raising, fixing, maintaining, pegging, or stabilizing the price of Rail Fuel Surcharges applied to unregulated rail freight transportation services purchased by the Class;

b. Whether Defendants undertook actions to conceal the unlawful conspiracies, contracts or combinations described herein;

c. Whether Defendants' conduct violated the federal antitrust laws; and

d. Whether Defendants' conduct caused injury to the business and property of Plaintiffs and the Class and, if so, the proper measure of damages.

43. A class action is superior to any other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens

upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort and expense and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

44. The interests of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical. The Class has a strong and pervasive community of interest, and prosecution of the action through representatives would be unobjectionable. The amounts at stake for Class members, while substantial in the aggregate, are not great enough individually to enable them to maintain separate suits against Defendants. No difficulty is anticipated in the management of this action as a class action.

## INTERSTATE TRADE AND COMMERCE

45. During the Class Period, Defendants accounted for over 90 percent of all rail shipments within the United States. The AAR Policy and Economics Department reported that railroad total operating revenue in the United States in 2006 exceeded $52 billion.

46. The activities of Defendants and their co-conspirators were within the flow of, and substantially affected interstate commerce. During the Class Period, Defendants sold and carried out rail shipments in a continuous and uninterrupted flow of interstate commerce to shippers and customers throughout the United States. Each Defendant and their co-conspirators used instrumentalities of interstate commerce to sell and market rail freight transportation services.

47. The unlawful activities of Defendants have had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

Case 1:07-mc-00489-BAH-GMH Document 824 Filed 02/23/10 Page 18 of 466

## DEREGULATION OF THE RAILROAD INDUSTRY

48. Congress deregulated the railroad industry with passage of the Staggers Rail Act of 1980 ("Staggers Act"). This landmark legislation marked a dramatic change in the evolution of U.S. railroads. After decades of regulatory control over virtually every aspect of their economic operations, railroads were free to set market rates for rail transportation.

49. Prior to the Staggers Act, railroads for freight transport generally would only charge the published tariff rates filed by the railroads with the ICC. During that era of full regulation, railroads could apply to the ICC for across-the-board rate increases, which could lawfully be implemented on a collective basis.

50. Today, by contrast, 80 percent or more of all rail shipments move under private transportation contracts, which are not rate-regulated, or are otherwise exempt from rate regulation. For all of this rate-unregulated traffic, the railroads cannot turn to some agency – like the previously-existing ICC – to obtain across-the-board increases in freight rates, nor can the railroads lawfully collude to set those rates.

51. Since 1980, the number of Class I railroads has declined dramatically, from 35 at the time of passage of the Staggers Act to just seven today (two of which are owned by Canadian entities).[1] The railroad industry is now highly concentrated: four of these railroads – Defendants BNSF, UP, CSX and NS – operate more than 90 percent of all railroad track in the U.S. and in 2006 accounted for nearly $50 billion in total annual revenue. Given the high fixed

[1] A Class I railroad is one having revenues in excess of $250 million in 1991 dollars ($319.3 million in 2005 dollars). There are currently seven Class I railroads operating in the United States: (1) BNSF; (2) UP; (3) CSX; (4) NS; (5) Kansas City Railway Company; (6) Soo Line Railroad Co.; and (7) Grand Trunk Corporation. The Soo Line Railroad is owned by Canadian Pacific Railway. The Grand Trunk Corporation is owned by the Canadian National Railway.

costs in the railroad industry and its significant barriers to entry (i.e., the need to invest in a vast network of tracks, stations, yards, and switching facilities that take decades to develop, and require onerous regulatory and environmental reviews and approval), there is only a fringe or niche market of smaller carriers, and the competition offered by these small carriers is negligible.

52. Although the reason for deregulation of the railroad industry was to promote competition and lower freight rates, it is now clear that the opposite has come true – railroads are collectively charging shippers supracompetitive rates.

**THE DEFENDANTS INTRODUCE FUEL SURCHARGES**

53. By the early 2000's, the industry had consolidated to the point where further mergers were unlikely if not impossible. In response to the proposed Burlington Northern Santa Fe and Canadian National Railway Co. merger, the STB, which succeeded the ICC, introduced a moratorium on new mergers and then promulgated more stringent standards for merger review. At the same time, railroads were experiencing surging freight demand and tight capacity.

54. In this environment, Defendants lacked the legal means to implement a traditional across-the-board price increase. As a result of deregulation, Defendants could no longer ask the ICC or its successor, the STB, for across-the-board rate increases. Thus, the only practicable way to increase prices across-the-board and increase revenues in the short term was through the mechanism of a uniform surcharge applied to as many customers as possible. Under the guise of rising fuel prices, Defendants colluded to create and implement the Rail Fuel Surcharges as a means to implement what effectively operate as across-the-board rate increases.

55. Since passage of the Staggers Act in 1980, railroads had increasingly entered into private freight transportation contracts that included cost escalation provisions often tied to the AII and the RCAF (which is based on the AII). Both the RCAF and the AII were published by the AAR, and both indexes included fuel costs as a factor. The AII and RCAF weighted a

number of cost factors – labor, fuel, materials & supplies, equipment rents, depreciation, interest, and other expenses – so that the actual impact of particular cost increases (e.g., for fuel) would be reflected in the index. Any actual increase in fuel costs, no matter how large, would be captured in the AII and RCAF. The indexes, and the weighted factors within them, were designed for this purpose.

56. In 2003, Defendants BNSF, UP, CSX and NS seized upon fuel as the means to create the type of across-the-board rate increase for which these railroads, in the era of deregulation, could no longer apply to a regulatory body. As alleged above, the Defendants embarked upon and implemented an agreed plan to remove fuel from the AII (and thus from the RCAF based on the AII), and thereby permit separate "fuel surcharges" to be widely applied. With fuel no longer weighted against other cost factors, the separate "fuel surcharges" could be used simply to raise total freight prices by a given percentage – and that is precisely what these four railroads proceeded to do.

57. Prior to 2003, at least some of the Defendants imposed so-called "fuel surcharges" on private rail freight transportation, but (a) these fuel surcharges were applied only in isolated instances, and (b) each of the Defendants had different fuel surcharge rates, reflecting, *inter alia*, the differing fuel costs of each railroad. At that time, such surcharges were the exception, with the AII and RCAF indexes widely used to capture fuel costs and other costs. All of that changed in 2003, however, when the Defendants took a series of coordinated actions to switch to a new system that would allow the widespread use of Rail Fuel Surcharges as a revenue enhancement mechanism.

58. From at least the Spring of 2003 and continuing through the present, the top executives of each of the Defendants met regularly at restaurants, and recreational and

conference facilities to discuss their industry. For example, at biannual meetings of the National Freight Transportation Association ("NFTA"), executives of the Defendants met to consider and discuss developments in the railroad industry. Defendants' top executives also met and discussed their industry when they came to Washington, D.C. for AAR board meetings. The Spring 2003 meeting of the NFTA occurred from April 2nd to April 6th, at the Wigwam resort, in Litchfield Park, Arizona.

59. Within just months of the Spring 2003 NFTA meeting, and as early as July 2003, the two Western Railroads, BNSF and UP, suddenly began to coordinate their Rail Fuel Surcharges. Prior to this time, the UP fuel surcharge had been adjusted monthly based on the WTI Index. The BNSF fuel surcharge had been based on the HDF Index. In or about July 2003, however, UP switched to the HDF Index pursuant to an agreement with the BNSF. From that point on, the Western Railroads moved in lockstep and charged the exact same Rail Fuel Surcharge percentage for each month of the Class Period.

60. BNSF and UP agreed to administer the HDF Index in precisely the same way. Whenever the U.S. average price of diesel fuel as measured by the HDF Index equaled or was lower than $1.35 per gallon, no surcharge was applied. When the HDF Index exceeded $1.35 per gallon, however, BNSF and UP both applied a surcharge of 0.5 percent for every five cent increase above $1.35 per gallon. So, for example, if the HDF Index rose to $1.55 per gallon, BNSF and UP would apply a surcharge of 2 percent. The surcharge would increase 2 percent for every 20 cents increase in the HDF Index.

61. The Western Railroads also coordinated when they would change their fuel surcharge. They agreed that the Rail Fuel Surcharge would be applied to shipments beginning the second month after the month in which there was a change in the HDF Index average price

calculation. So, for example, if the HDF Index average price changed in January, the Western Railroads would announce their new Rail Fuel Surcharge percentage on February 1 (always on the first day of the month), and then apply the surcharge to shipments in March. The Western Railroads published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

62. The Western Railroads' agreed-upon coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary and complex combination of features for their Rail Fuel Surcharge programs, including use of the HDF Index for fuel surcharges, setting the trigger point at $1.35 per gallon of diesel fuel, and applying the surcharge in the second calendar month after the HDF Index average price had changed. The similarities are both too precise and too comprehensive to have been independent responses to any common market phenomenon that the Defendants were facing.

63. UP's move to the same fuel price index used by BNSF in July of 2003 is striking evidence of concerted conduct in light of the fact that just two months before, UP had announced a different modification to its existing fuel surcharge program. In April of 2003, UP made modifications to the trigger points it used for adjusting surcharges in its program, but did not change the index it employed. The fact that, just two months later, UP switched indices and began charging exactly the same surcharges as BNSF is further evidence that this switch was the result of concerted conduct.

64. Even after having agreed to coordinated their fuel surcharges, however, BNSF and UP still faced the significant barrier to widespread use of fuel surcharges: specifically, the widely used private contracts had cost escalation provisions that already accounted for fuel. BNSF, UP, CSX and NS agreed to solve this problem by conspiring to remove fuel from the

widely used cost escalation indexes, thereby paving the way for widespread imposition of the new fuel surcharge program in which all four of the Defendants could participate, and from which all four could earn excessive profits.

65. In the fall of 2003, BNSF and UP initiated an effort in the AAR to get all Defendants to agree on a fuel surcharge program that would enable the Defendants to take fuel costs out of the weighted RCAF and AII (which already permitted the Defendants to recover all of their fuel costs), and instead apply artificially high Rail Fuel Surcharges as a revenue enhancement mechanism: that is, use the "surcharge" to charge a percentage increase on the total cost of the freight transport, regardless of the actual cost of fuel for that transport job. Through meetings and discussions within the AAR board on October 2-3, December 11-12 and otherwise in 2003, Defendants BNSF, UP, CSX and NS agreed to create and implement coordinated fuel surcharge programs, and to enforce their program through a variety of means discussed herein.

66. Pursuant to the agreements among Defendants BNSF, UP, CSX and NS, the Defendants, which dominate the AAR board, caused the AAR to announce in December 2003 the creation of an unprecedented, new All Inclusive Index Less Fuel (the AIILF) – that is, a cost escalation index without fuel as a component. This new index was similar to the AII and the RCAF, except that this new index excluded fuel as a component. The AAR announcement in December 2003 stated: "This issue of AAR Railroad Cost Indexes inaugurates a new index: the All-Inclusive Index Less Fuel. This index is calculated using the same components and methods as the All-Inclusive Index uses for the Rail Cost Adjustment Factor, with the exception of the exclusion of the fuel component." This announcement, and the underlying decision to create the new index, were the collective action of the Defendants, and could not have been accomplished without the conspiracy. The new AIILF specified the fourth quarter of 2002 as its base period.

67. Defendants BNSF, UP, CSX and NS conspired to cause the AAR to inaugurate the AIILF so that they could begin assessing separate, stand-alone Rail Fuel Surcharges, applied against the total cost of rail freight transportation, and coordinate that practice. The creation of this new index was an important, carefully-planned step taken collectively by the Defendants to allow implementation and continuation of their price fixing conspiracy – a conspiracy that would enable the Defendants to widely impose price increases on the entire cost of rail freight transport and thereby obtain additional revenues far beyond any actual increases in fuel costs. This step was a notable departure from past practice, and marked the first time that the AAR created a cost escalation index without a fuel cost component.

68. Defendant BNSF has admitted that it worked through the AAR to accomplish this revenue-generating measure in 2003. When asked how BNSF would be able to apply the new revenue-based fuel surcharges into contracts with coal shippers, John Lanigan, BNSF's Chief Marketing Officer, responded that BNSF would be able to do so because of the changes made to the RCAF through the AAR. Referring to Matthew K. Rose, BNSF's Chairman, President, and CEO, Lanigan stated: "What happened last year, *and Matt led the charge on there*, is that there's a new index that [the AAR] has that's basically an index without fuel. … So we'll do RCAF less fuel plus a direct fuel surcharge in the future." (emphasis added).

69. Almost immediately after the announcement in December 2003 of the new AIILF (the cost escalation index without fuel), and pursuant to the conspiracy, the two Eastern Railroads, Defendants CSX and NS, suddenly moved into lockstep with fuel surcharges based on the WTI Index. This move into lockstep was part and parcel of, and flowed from, the aforementioned agreements reached and implemented by BNSF, UP, CSX and NS in late 2003.

70. Specifically, the Eastern Railroads agreed to apply a fuel surcharge whenever the monthly average WTI price exceeded $23 per barrel of crude oil. When that happened, the Eastern Railroads' rates were increased 0.4 percent for every $1 that the price of WTI oil exceeded $23 per barrel. So, for example, if the price of WTI oil was $28 per barrel, the fuel surcharge percentage would be 2 percent. The Rail Fuel Surcharge would be adjusted upward at 2 percent for every $5 increase in the WTI average price.

71. The Eastern Railroads also coordinated when they would change their fuel surcharge – two calendar months after the WTI Index had adjusted, thereby adopting the same fuel surcharge price timing used by the Western Railroads. For example, if the WTI average price exceeded $23 per barrel in January, the Eastern Railroads would assess the applicable fuel surcharge percentage to all bills of lading dated in the month of March. In this way, Defendants could apply exactly the same fuel surcharge percentage month after month. The Eastern Railroads published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

72. The Eastern Railroads' coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary and complex combination of features for their Rail Fuel Surcharge programs: including using the WTI Index for fuel surcharges, setting the trigger point at $23 per barrel, and applying the surcharge in the second calendar month after the average price of WTI oil had changed. The similarities, and the coordination with the Western Railroads, are too precise and too comprehensive to have been independent responses to any common market phenomenon that the Defendants were facing.

73. Thus, following the conspiratorial publication of the AIILF, Defendants BNSF, UP, CSX and NS began to apply Rail Fuel Surcharges as a separate item on shippers' bills. The

Defendants used monthly changes to their Rail Fuel Surcharges as an easy way to increase revenues in an across the board manner.

74. There was no legitimate business justification or natural explanation for the collective action of BNSF, UP, CSX and NS to cause the AAR to adopt and publish the AIILF. Such a "revenue-based" fuel surcharge bore no direct relationship to Defendants' actual increase in fuel costs. The fuel surcharge program was not a cost recovery mechanism, but a revenue enhancement measure that could only have been accomplished by the Defendants' conspiratorial action of removing fuel from the widely used cost escalation indexes. The AII and RCAF both included a fuel cost component, and the Defendants had used these indices for decades to measure fuel-cost increases. As an empirical matter, the fuel component of the AII and RCAF would have permitted the Defendants to recover all of their increased fuel costs throughout the conspiracy period. Thus, the motivation of BNSF, UP, CSX and NS in collectively causing the adoption of the AIILF could not have been greater fuel cost recovery or more efficient fuel cost recovery.

75. The actions by Defendants thus were not independent responses to a common problem of increasing fuel costs. Rather, the only purpose in taking these collective actions was to begin assessing a stand-alone fuel surcharge applied to *revenue* (*i.e.,* the entire base rate for the freight shipment), not costs; to act in concert with one another in setting fuel surcharge prices and demanding them from shippers and customers; and to ensure collective enforcement of the program. That is, pursuant to their conspiracy, Defendants would now be able to apply the supposed fuel cost increase percentage to the *entire cost of the freight* shipment (notwithstanding that fuel only accounts for a portion of the costs of the shipment). Through this collective action, Defendants BNSF, UP, CSX and NS planned to use the stand-alone fuel surcharge as an easy

way to dramatically increase profits without having to wait for new rail capacity to come on line to meet growing demand – so long as these railroads participated by not competing on fuel surcharge prices to undercut one another.

76. The creation and publication of a cost escalation index without a fuel component was not required by any regulatory body, nor was it necessary for any Defendant to institute independently its own individual fuel surcharge program. Instead, the creation of the Rail Fuel Surcharge program starting in 2003 was the joint action by BNSF, UP, CSX and NS to achieve their collective goal of generating additional profits through implementing revenue-based fuel surcharges.

77. As a result of the concerted action among BNSF, UP, CSX and NS, prices of Rail Fuel Surcharges charged to rail shippers and customers (members of the Class) were raised to or maintained at supra-competitive levels during the Class Period.

**IMPLEMENTATION OF THE SCHEME: THE FUEL SURCHARGES IMPOSED BY THE DEFENDANTS**

78. As detailed above, Defendants BNSF, UP, CSX and NS agreed in 2003 to remove fuel from the AII and RCAF, and thereby permit the application of separate Rail Fuel Surcharges as a multiplier percentage of the base rate charged for the rail freight transportation involved. This meant that the Fuel Surcharge could operate as a means to impose an effective across-the-board rate increase, and thereby raise revenue far beyond the actual costs of fuel (which could have continued to be recovered through the AII and RCAF). Defendants applied these surcharges not only to published tariff rates, but to the private contracts, and other traffic, not subject to rate regulation under federal law (*i.e.*, the unregulated rates at issue here).

79. With the conspiracy underway, the two Western Railroads, using the HDF index, moved in lockstep and charged virtually identical Rail Fuel Surcharges on a monthly basis throughout the Class Period.

80. The chart below shows that the Fuel Surcharge percentages charged by the Western Railroads for freight shipments varied before the Class Period began, but were identical starting in July 2003:

**MONTHLY SURCHARGE PERCENTAGES -- WESTERN RAILROADS**

| MONTH | BNSF | UP |
|---|---|---|
| Jun-02 | 1 | 0 |
| Jul-02 | 1 | 0 |
| Aug-02 | 0 | 0 |
| Sep-02 | 0 | 0 |
| Oct-02 | 1% | 0 |
| Nov-02 | 2% | 0 |
| Dec-02 | 2.5% | 0 |
| Jan-03 | 2% | 2 |
| Feb-03 | 2% | 2 |
| Mar-03 | 2.5% | 2 |
| Apr-03 | 4.5% | 2 |
| May-03 | 2% | 2 |
| Jun-03 | 3.0% | 2.0% |
| **Jul-03** | **2.5%** | **2.5%** |
| Aug-03 | 2.0% | 2.0% |
| Sep-03 | 2.0% | 2.0% |
| Oct-03 | 2.5% | 2.5% |
| Nov-03 | 2.5% | 2.5% |
| Dec-03 | 2.5% | 2.5% |
| Jan-04 | 2.5% | 2.5% |
| Feb-04 | 2.5% | 2.5% |
| Mar-04 | 3.5% | 3.5% |
| Apr-04 | 3.5% | 3.5% |
| May-04 | 4.0% | 4.0% |
| Jun-04 | 4.5% | 4.5% |
| Jul-04 | 5.0% | 5.0% |
| Aug-04 | 5.0% | 5.0% |
| Sep-04 | 5.0% | 5.0% |
| Oct-04 | 6.0% | 6.0% |
| Nov-04 | 7.0% | 7.0% |

Case 1:07-mc-00489-PLF-AK Document 824 Filed 12/23/14 Page 29 of 416

| MONTH | BNSF | UP |
|---|---|---|
| Dec-04 | 9.0% | 9.0% |
| Jan-05 | 9.0% | 9.0% |
| Feb-05 | 8.0% | 8.0% |
| Mar-05 | 7.5% | 7.5% |
| Apr-05 | 8.0% | 8.0% |
| May-05 | 10.0% | 10.0% |
| Jun-05 | 10.5% | 10.5% |
| Jul-05 | 9.5% | 9.5% |
| Aug-05 | 10.5% | 10.5% |
| Sep-05 | 11.5% | 11.5% |
| Oct-05 | 13.0% | 13.0% |
| Nov-05 | 16.0% | 16.0% |
| Dec-05 | 18.5% | 18.5% |
| Jan-06 | 13.5% | 13.5% |
| Feb-06 | 12.0% | 12.0% |
| Mar-06 | 12.5% | 12.5% |
| Apr-06 | 12.5% | 12.5% |
| May-06 | 13.5% | 13.5% |
| Jun-06 | 15.0% | 15.0% |
| Jul-06 | 16.5% | 16.5% |
| Aug-06 | 16.5% | 16.5% |
| Sep-06 | 17.0% | 17.0% |
| Oct-06 | 18.0% | 18.0% |
| Nov-06 | 15.5% | 15.5% |
| Dec-06 | 13.0% | 13.0% |
| Jan-07 | 13.0% | 13.0% |
| Feb-07 | 14.0% | 14.0% |
| Mar-07 | 12.5% | 12.5% |
| Apr-07 | 12.5% | 12.5% |
| May-07 | 14.5% | 14.5% |
| Jun-07 | 16.0% | 16.0% |

81. As detailed above, there also was uniformity among the Eastern Railroads in the monthly surcharge percentages, based on the WTI Index, that they charged customers for most of the Class Period.

82. The chart below shows that the Fuel Surcharge percentages charged by Defendants CSX and NS for carload shipments varied before the Class Period, but were identical starting in March 2004:

**MONTHLY SURCHARGE PERCENTAGES -- EASTERN RAILROADS**

| MONTH | CSX | NS |
|---|---|---|
| Jun-03 | 2.4% | 2% |
| Jul-03 | 2.4% | 2% |
| Aug-03 | 3.2% | 2% |
| Sep-03 | 3.2% | 2% |
| Oct-03 | 3.6% | 2% |
| Nov-03 | 2.4% | 2.0% |
| Dec-03 | 3.2% | 2.0% |
| Jan-04 | 3.6% | 2.0% |
| Feb-04 | 4.0% | 2% |
| **Mar-04** | **4.8%** | **4.8%** |
| Apr-04 | 4.8% | 4.8% |
| May-04 | 5.6% | 5.6% |
| Jun-04 | 5.6% | 5.6% |
| Jul-04 | 7.2% | 7.2% |
| Aug-04 | 6.4% | 6.4% |
| Sep-04 | 7.2% | 7.2% |
| Oct-04 | 8.8% | 8.8% |
| Nov-04 | 9.2% | 9.2% |
| Dec-04 | 12.4% | 12.4% |
| Jan-05 | 10.4% | 10.4% |
| Feb-05 | 8.4% | 8.4% |
| Mar-05 | 9.6% | 9.6% |
| Apr-05 | 10.0% | 10.0% |
| May-05 | 12.8% | 12.8% |
| Jun-05 | 12.4% | 12.4% |
| Jul-05 | 10.8% | 10.8% |
| Aug-05 | 13.6% | 13.6% |
| Sep-05 | 14.4% | 14.4% |
| Oct-05 | 16.8% | 16.8% |
| Nov-05 | 17.2% | 17.2% |
| Dec-05 | 16.0% | 16.0% |
| Jan-06 | 14.4% | 14.4% |
| Feb-06 | 14.8% | 14.8% |
| Mar-06 | 17.2% | 17.2% |
| Apr-06 | 15.6% | 15.6% |
| May-06 | 16.0% | 16.0% |
| Jun-06 | 18.8% | 18.8% |
| Jul-06 | 19.2% | 19.2% |
| Aug-06 | 19.2% | 19.2% |
| Sep-06 | 20.8% | 20.8% |
| Oct-06 | 20.4% | 20.4% |
| Nov-06 | 16.4% | 16.4% |

| MONTH | CSX | NS |
|---|---|---|
| Dec-06 | 14.4% | 14.4% |
| Jan-07 | 14.8% | 14.8% |
| Feb-07 | 16.0% | 16.0% |
| Mar-07 | 12.8% | 12.8% |
| Apr-07 | 14.8% | 14.8% |
| May-07 | 15.2% | 15.2% |
| Jun-07 | 16.4% | 16.4% |

83. In stark contrast to this uniformity in Fuel Surcharge percentages, fuel cost as a percentage of operating cost and fuel efficiency differs widely among the Defendant railroads. Absent collusion, it is extremely unlikely that Defendants, in both the east and the west, would independently price their Rail Fuel Surcharges to arrive at the identical percentage month after month, year after year, for a period of more than three years. The fact that Defendants moved in uniform lockstep for a period of nearly 38 months indicates that Defendants were coordinating their behavior and conspired to fix prices for Rail Fuel Surcharges. In addition, the advance announcements of each Defendant's Fuel Surcharges was an important implementation and enforcement mechanism for the conspiracy.

84. Railroad industry analysts took note of the curious "convergence" in Rail Fuel Surcharge methodologies adopted by the Defendants. For example, after concluding in 2003 that the Rail Fuel Surcharges charged by the Defendants were "not supported" by fuel cost increases, one analyst stated that she was "puzzled by the fact that the railroads appear to be matching fuel surcharges rather than developing their own pricing initiatives." The analyst noted further that "the way to gain significant market share is to lead the competition rather than following the competition." ("Following the Competition" *Traffic World*, July 14, 2003).

85. Defendants' use of retail price indices in furtherance of the conspiracy also allowed them to over-recover their actual fuel costs. An independent study commissioned by the American Chemistry Council and Consumers United for Rail Equity ("CURE") found that the

difference between Defendants' rail fuel surcharge revenue (as publicly reported or estimated) and Defendants' publicly reported actual fuel costs during the period from 2003 through the First Quarter of 2007 came to over $6 billion.

86. BNSF's average cost for diesel fuel in 3rd Quarter 2003 was $0.846 per gallon and its average cost of diesel fuel for 3rd Quarter 2004 was $0.988 per gallon. Thus, BNSF's cost of fuel increased 14.4% from 3rd Quarter 2003 to 2004. In contrast, the surcharge charged by BNSF based on the HDF 3rd Quarter 2003 price was $1.46 per gallon and $1.83 per gallon in 3rd Quarter 2004, amounting to a 25.3% increase. As a result of this disparity in increase percentages, shippers purchasing from BNSF paid 11% more than the actual price BNSF paid for fuel from 3rd Quarter 2003 to 2004. Shippers of unregulated freight from the other Defendants similarly overpaid during this and other periods particularly since the inflated percentage increase was applied to the entire rate at issue not merely to the fuel cost component of that rate. Another reason why Defendants' Rail Fuel Surcharges were not a natural reaction to increased fuel costs is that the surcharge levels disregarded gains in fuel efficiency. As explained in a 2007 AAR publication, the Defendants' fuel efficiency is "constantly improving." BNSF, for example, disclosed in 2005 that it had achieved a 9% improvement in fuel efficiency over the prior ten years. In 2006, the railroads could, on average, move one ton of freight 423 miles on one gallon of diesel fuel. By calculating fuel surcharges as a percentage of the shipping rate, the Defendants deflected attention from the cost savings they achieved through fuel efficiency gains.

87. There is no independent business justification to explain Defendants' behavior. Their uniform pricing of fuel surcharges for more than a three-year period could not have happened by chance or coincidence. Nor was it an expected response to a common business problem. Any actual increased fuel costs experienced by the Defendants would have been

covered by the AII and RCAF. The uniform pricing could only have been achieved by an express agreement followed by collective action – i.e., decoupling fuel prices from the historical railroad cost indices and agreeing to follow new and complex indices and trigger points for computing the stand-alone fuel surcharge percentages. The Defendants' purpose was to use generally increasing fuel costs as a cover for implementing what were, in effect, across-the-board rate increases.

88. In agreeing to collude on fuel surcharges, each Defendant was acting against its independent short-term, economic self-interest. In a competitive environment, free of collusion, carriers with lower fuel costs could impose a lower surcharge and thereby increase market share at the expense of competing railroads. Rather than engage in such competitive behavior, Defendants instead restricted their freedom to price competitively and adhered to an industry-wide pattern of uniform fuel surcharge pricing based on the total cost of the freight.

**OTHER ELEMENTS OF THE CONSPIRACY**

89. At or about the time the Defendants agreed to fix the Rail Fuel Surcharge prices, the Defendants also took other steps in furtherance of the conspiracy. They largely switched from offering long-term contracts (the terms of which were secret) to offering contracts that were "re-priced" as often as monthly. Previously, Defendants had allowed, and often preferred, long-term contracts ranging up to five years with clauses that did not permit rate increases beyond a certain point, usually governed by the AII or the RCAF, or that excluded fuel surcharges altogether.

90. This collective movement away from long-term contracts meant that Defendants no longer offered discounts to increase market share and their pricing became more visible to each other.

Case 1:07-mc-00489-PLF-GMH Document 229-24 Filed 12/22/10 Page 4 of 46

91. Defendants made this switch even though most shippers preferred the former system in order to minimize risk and make costs more predictable. In a competitive environment, forcing customers to assume greater risks without any offsetting benefit (such as lower prices) would cause customers to seek alternatives, which should promote competition between carriers for their business. Here, all Defendants raised prices and did not offer any compensation to customers for assuming additional risk. Similarly, in a competitive market, one would expect that the railroads would seek, as they had in the past, to reduce their own risks and lock-in market share by entering into long-term contracts. The Defendants, however, collectively refused to offer long-term contracts and took no steps to minimize their own risks from fluctuations in demand. This coordinated behavior was hardly routine market conduct.

92. In furtherance of the conspiracy, Defendants also declined to negotiate discounts on the Fuel Surcharges and overall contract rates, even though prior to mid-2003 it had been customary for the Defendants at least to entertain such negotiations. Shippers from many different industries, some with significant economic power, tried to negotiate the fuel surcharge percentages, but were told by the Defendants (who had previously been willing to negotiate discounts on rail freight rates) that the Rail Fuel Surcharges were "not negotiable." By way of example, during the relevant period the Archer-Daniels-Midland Company ("ADM") approached individual Defendants to discuss hedging opportunities to allow ADM and the railroads certainty and a method for cost-containment. The railroads, acting against their own individual interests, refused to enter into hedging contracts with ADM.

93. In addition, several national shipper organizations met with each of the Defendants to encourage them to reexamine the methods used to assess Rail Fuel Surcharges. Among the Defendants, only BNSF agreed to make responsive changes to its surcharge program,

and that was only for grain and coal shipments coming from certain regions where the BNSF is the only carrier. That is, BNSF reduced fuel surcharges on traffic where it faced no competition from the UP, and thus would not violate the agreement to fix competitive prices. The other Defendants refused to address the concerns of their customers.

94. In furtherance of the conspiracy, Defendants also decreased the use of "through rates," in which a customer would receive a single bill from either the originating railroad or the termination railroad on a long-distance trip involving more than one railroad (so that a single fee would be allocated among the railroads that shipped). Instead, where a shipment requires movement on more than one railroad, the Defendants moved increasingly to having rates billed separately for each railroad, rather than as one quote for the entire shipment. Defendants made this change, which could only result from their collective action, as part of their conspiracy for two reasons: to provide transparency as to what each railroad was charging on multiple line shipments and to allow each Defendant to bill separately for its applicable fuel surcharge.

95. Defendants also agreed that none of the conspirators would be undercutting agreed pricing or "stealing" market share by using their increasing revenues to subsidize discounting of underlying rates. As demonstrated in the table that follows, Defendants' market shares remained stable following the 2003 agreements.

| Railroad Market Share: Originated Tons and Carloads 2003 - 2006 [1] | | | | | |
|---|---|---|---|---|---|
| | | | | | |
| | | **2003** | **2004** | **2005** | **2006** |
| **BNSF** | | | | | |
| | Carloads Originated | 7,662,699 | 8,237,466 | 8,727,121 | 9,335,024 |
| | Percent of Total Originated Carloads | 28.4% | 29.2% | 30.2% | 31.2% |
| | | | | | |
| | Tons Originated | 460,789,676 | 483,296,128 | 498,121,970 | 539,511,527 |
| | Percent of Total Originated Tons | 27.8% | 28.3% | 28.7% | 30.1% |
| | | | | | |
| | | | | | |
| **CSXT** | | | | | |
| | Carloads Originated | 6,470,386 | 6,611,766 | 6,537,293 | 6,607,931 |
| | Percent of Total Originated Carloads | 24.0% | 23.4% | 22.6% | 22.1% |
| | | | | | |
| | Tons Originated | 391,993,962 | 403,152,732 | 409,486,655 | 414,266,429 |
| | Percent of Total Originated Tons | 23.7% | 23.6% | 23.6% | 23.1% |
| | | | | | |
| | | | | | |
| **NS** | | | | | |
| | Carloads Originated | 5,115,859 | 5,524,545 | 5,800,390 | 5,824,813 |
| | Percent of Total Originated Carloads | 19.0% | 19.6% | 20.0% | 19.5% |
| | | | | | |
| | Tons Originated | 306,322,113 | 319,014,426 | 325,779,848 | 323,407,280 |
| | Percent of Total Originated Tons | 18.5% | 18.7% | 18.8% | 18.1% |
| | | | | | |
| | | | | | |
| **UP** | | | | | |
| | Carloads Originated | 7,692,160 | 7,831,823 | 7,874,879 | 8,132,004 |
| | Percent of Total Originated Carloads | 28.6% | 27.8% | 27.2% | 27.2% |
| | | | | | |
| | Tons Originated | 497,373,006 | 503,052,146 | 503,056,340 | 514,357,111 |
| | Percent of Total Originated Tons | 30.0% | 29.4% | 29.0% | 28.7% |
| | | | | | |
| | | | | | |
| Total | | | | | |
| | Carloads Originated | 26,941,104 | 28,205,600 | 28,939,683 | 29,899,772 |
| | Tons Originated | 1,656,478,757 | 1,708,515,432 | 1,736,444,813 | 1,791,542,347 |
| | | | | | |
| | | | | | |
| 1 | AAR Railroad Facts and Analysis of Class I Railroads | | | | |

**THE STB DECISION**

96. On January 25, 2007, the STB, which regulates certain aspects of the railroad industry, issued an administrative decision concluding that the railroads' practice of computing Rail Fuel Surcharges as a percentage of base rate for rate-regulated rail freight transport was an "unreasonable practice," because the fuel surcharges are not tied to the fuel consumption

associated with the individual movements to which they are applied. *Rail Fuel Surcharges*, STB Ex Parte No. 661 (Jan. 25, 2007).

97. The STB's decision addressed rate-regulated rail freight traffic only (which is not the subject of this Complaint). The STB expressly stated that its jurisdiction did not reach rail freight traffic under private contract or otherwise exempted from rate regulation.

98. Pursuant to their conspiracy, Defendants applied the same unreasonable fuel surcharge practices addressed by the STB to the private rail freight transportation contracts, and other unregulated freight transport, at issue in this case.

**DEFENDANTS' SUPRACOMPETITIVE PROFITS**

99. Defendants reaped huge, supracompetitive profits as a result of the success of their conspiracy. Through their agreement to coordinate on Rail Fuel Surcharges, Defendants realized billions of dollars in revenues during the Class Period in excess of their actual increase in fuel costs from the specific customers on whom they imposed the surcharge. During the period of the conspiracy (July 2003 to at least June 30, 2007), Defendants increased their market capitalization from approximately $40 billion to approximately $105 billion, or an increase of about 160 percent. The AAR Policy and Economics Department reported that railroad total operating revenue in the United States increased from $36.6 billion in 2003 to over $52 billion in 2006. These dramatic increases are at least in part attributable to fuel surcharge revenue realized by Defendants through their price fixing conspiracy. As the head of UP, James Young, admitted in 2007, "three, four years ago [the Rail Fuel Surcharges] were really non-existent," and "it's only been the last couple of years that . . . the financial returns in this business has [sic] started to move in the right direction."

100. The unlawful conduct, combination or conspiracy alleged herein had and is having the following effects, among others:

a. The Rail Fuel Surcharges charged to Plaintiffs and the Class for unregulated rail freight transportation have been fixed or stabilized at supra-competitive levels;

b. Plaintiffs and the Class have been deprived of the benefits of free, open and unrestricted competition in the market for unregulated rail freight transportation; and

c. competition in establishing the prices paid in the United States for unregulated rail freight transportation has been unlawfully restrained, suppressed and eliminated.

101. By reason of the violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act, Plaintiffs and the members of the Class have sustained injury to their business or property. The injuries sustained by the Plaintiffs and the Class are the payment of supracompetitive prices for Rail Fuel Surcharges applied to unregulated rail freight transportation throughout the United States as a result of Defendants' illegal contract, combination, and conspiracy to restrain trade as alleged. This is an antitrust injury of the type that the federal laws were meant to punish and prevent.

**COUNT I**

**(Violation Of Section 1 Of The Sherman**
Act And Section 4 Of The Clayton Act)

102. Plaintiffs incorporate by reference the allegations in the above paragraphs as if they were fully set forth herein.

103. Defendants entered into and engaged in a contract, combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

104. The contract, combination or conspiracy resulted in an agreement, understanding or concerted action between and among Defendants in furtherance of which Defendants fixed, maintained, and standardized prices for Rail Fuel Surcharges for rail freight transportation handled through private contracts and other means exempt from regulation. Such contract, combination, or conspiracy constitutes a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

105. Defendants' contract, combination, agreement, understanding or concerted action occurred within the flow of, and substantially affected, interstate and international commerce. Defendants' unlawful conduct was through mutual understandings or agreements by, between and among Defendants.

106. The contract, combination or conspiracy has had the following effects:

a. Prices charged to Plaintiffs and the Class for Rail Fuel Surcharges applied to unregulated rail freight transportation were fixed and/or maintained at supra competitive levels;

b. Plaintiffs and the Class have been deprived of the benefits of free, open and unrestricted competition in the market for rail freight transportation services; and

c. competition in establishing the prices paid, customers of, and territories for rail freight transportation services has been unlawfully restrained, suppressed and eliminated.

107. As a proximate result of Defendants' unlawful conduct, Plaintiffs and the Class have suffered injury in that they have paid supracompetitive prices for Rail Fuel Surcharges applied to unregulated rail freight transportation services during the Class Period.

WHEREFORE, Plaintiffs pray for relief as follows:

(1) That the Court determine that this action may be maintained as a class action under Rules 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, that Plaintiffs be denominated as class representative, and that Plaintiffs' counsel be appointed as counsel for the Class;

(2) That the unlawful contract, combination and conspiracy alleged in Count I be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(3) That Plaintiffs and the Class recover compensatory damages, as provided by law, determined to have been sustained as to each of them, and that judgment be entered against Defendants on behalf of Plaintiffs and each and every member of the Class;

(4) That each of the Defendants' respective officers, directors, agents and employees, and all other persons acting on behalf of or in concert with them, be permanently enjoined and restrained from, directly or indirectly, continuing or maintaining the combination, conspiracy, or agreement alleged in this case;

(5) That Plaintiff and the Class recover treble damages, as provided by law;

(6) That Plaintiffs and the Class recover their costs of the suit, including attorneys' fees, as provided by law; and

(7) For such further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demands a jury trial as to all issues triable by a jury.

Dated: December 31, 2009

<table>
<tr>
<td><u>/s/ Stephen R. Neuwirth</u><br>Stephen R. Neuwirth<br>Daniel L. Brockett<br>Marc L. Greenwald<br>Sami H. Rashid<br>Joseph D. Hammond<br>QUINN EMANUEL URQUHART OLIVER<br>& HEDGES, LLP<br>51 Madison Avenue, 22nd Floor<br>New York, New York 10010<br>Telephone: (212) 849-7000<br>Facsimile: (212) 849-7100<br>Email: stephenneuwirth@quinnemanuel.com</td>
<td><u>/s/ Michael D. Hausfeld</u><br>Michael D. Hausfeld<br>William P. Butterfield<br>HAUSFELD LLP<br>1700 K Street NW, Suite 650<br>Washington, DC 20006<br>Telephone: (202) 540-7200<br>Facsimile: (202) 540-7201<br>Email: mhausfeld@hausfeldllp.com<br><br>Steig D. Olson<br>HAUSFELD LLP<br>11 Broadway, Suite 615<br>New York, NY 10004<br>Telephone: (212) 830-9850<br>Facsimile: (212) 480-8560<br>Email: solson@hausfeldllp.com</td>
</tr>
<tr>
<td colspan="2">Interim Co-Lead Class Counsel<br>for the Proposed Direct Purchaser Class</td>
</tr>
</table>

# PX0967-PX0990

Filed Under Seal

# EXHIBIT

# PX0991

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION<br><br>This document relates to:<br><br>ALL CASES | MDL Docket No. 1869<br>Misc. No. 07-489 (PLF) |

**NOTICE OF FILING OF**
**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

Direct Purchaser Plaintiffs hereby file the attached Consolidated Amended Class Action Complaint.

Dated: April 15, 2008

| | |
|---|---|
| By: /s/ Stephen Neuwirth<br>Stephen Neuwirth<br>Daniel Brockett<br>Sami H. Rashid<br>QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP<br>51 Madison Avenue, 22nd Floor<br>New York, New York 10010<br>(212) 849-7000 | By: /s/ Michael D. Hausfeld<br>Michael D. Hausfeld (D.C. Bar #153742)<br>Benjamin D. Brown (D.C. Bar #495836)<br>COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.<br>1100 New York Avenue NW<br>Suite 500, West Tower<br>Washington, DC 20005<br>(202) 408-4600<br><br>Steig D. Olson<br>COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.<br>150 E. 52nd Street, 30th Floor<br>New York, NY 10022<br>(212) 838-7797 |

*Interim Co-Lead Class Counsel*
*for the Proposed Direct Purchaser Class*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | MDL Docket No. 1869<br>Misc. No. 07-489 (PLF) |
| This document relates to:<br><br>ALL CASES | **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Plaintiffs, individually and on behalf of a class of all those similarly situated, bring this action for damages under the antitrust laws of the United States against Defendants, and allege as follows:

### NATURE OF THE ACTION

1. This is an antitrust class action charging the four largest United States-based Class I railroads with price fixing in violation of Section 1 of the Sherman Act. Plaintiffs bring this action on behalf of themselves and a proposed class of direct purchasers who purchased unregulated rail freight transportation services directly from Defendants from July 1, 2003 until at least June 30, 2007 (the “Class Period”) and who were assessed a rail fuel surcharge for the agreed-upon transportation. As used herein, the term “unregulated” refers to rail freight transportation services where the rates are set by private contracts or through other means exempt from rate regulation under federal law.

2. Defendants BNSF Railway Company (“BNSF”), Union Pacific Railroad Company (“UP”), CSX Transportation, Inc. (“CSX”) and Norfolk Southern Railway Company (“NS”) (together, “Defendants”) conspired to use rail fuel surcharges, which were added to

customers' bills, as a means to fix, raise, maintain, and/or stabilize prices of rail freight transportation services sold in the United States. A rail fuel surcharge ("Rail Fuel Surcharge") is a separately-identified fee that is charged by the railroads for the agreed-upon transportation, purportedly to compensate for increases in the cost of fuel. Through their collective action, however, the Defendants conspired to impose Rail Fuel Surcharges that far exceeded any increases in the Defendants' fuel costs, and thereby collected billions of dollars of additional profits during the four year period of the conspiracy.

3. In the early 2000s, the Defendants sought to increase their revenues by raising prices. However, unlike in the past era of full regulation of the railroad industry, when the railroads could have applied to the Interstate Commerce Commission (the "ICC") for across-the-board rate increases, the railroads now no longer could do so as a result of deregulation that began in the early 1980s with the Staggers Act. Given deregulation, the only practicable way the railroads now could increase prices across-the-board was through the mechanism of a uniform surcharge applied to as many customers as possible.

4. Defendants BNSF, UP, CSX and NS – which together control about 90% of rail freight traffic in the United States – conspired in 2003 to use an artificially high surcharge, purportedly to cover fuel costs, as the means to raise rates across the board, and thereby increase profits. But this plan faced a significant hurdle: as of 2003, the great majority of rail freight transportation agreements included rate escalation provisions that weighted a variety of cost factors, including fuel, based on an index called the All Inclusive Index ( the "AII") which was published by the railroad trade organization known as the Association of American Railroads (the "AAR"). The AII (and a related index called the Rail Cost Adjustment Factor ("RCAF") which is based on the AII) already permitted full recovery by the railroads of actual fuel cost

increases, no matter how large. By weighting different cost factors, the AII and related RCAF accounted accurately for the impact of particular cost increases (e.g., for fuel). James R. Young, the President of UP, acknowledged during an October 2004 earnings call that the RCAF "looks at actual costs through the industry."

5. To overcome this obstacle, Defendants BNSF, UP, CSX and NS devised and embarked on a scheme to remove fuel from the AII, so that a separate "fuel surcharge" could then be applied as a percentage against the total cost of the freight transportation. This permitted these major railroads to achieve their desired, and mutually agreed, result: an effective percentage rate increase that could be broadly applied to rail freight customers.

6. The Defendants implemented their conspiracy through a number of collective actions.

7. In July 2003, the two major western railroads – Defendants BNSF and UP (together, the "Western Railroads") – agreed to implement the same fuel surcharge program, resulting in the exact same fuel surcharges. Up until this time, fuel surcharges had been applied only intermittently, and to the extent surcharges were used at all, the railroads had different fuel surcharge rates, reflecting (among other things) that each railroad had different fuel costs. In July 2003, however, BNSF and UP for the first time agreed to coordinate their fuel surcharges and base them on the U.S. Department of Energy (DOE) On-Highway Diesel Fuel Price Index (the "HDF Index"). BNSF and UP began to charge the exact same fuel surcharges pursuant to their agreement, using the HDF Index, and continued to do so through at least mid-2007.

8. Even after BNSF and UP took this collective action, however, a major barrier to widespread use of the fuel surcharges – the existing cost escalation indexes (the RCAF and the AII on which it was based) – remained, as noted above. Defendants BNSF, UP, CSX and NS

then conspired to take collective action at the AAR to remove this obstacle. These four defendant railroads control and dominate the AAR, and the CEOs of these railroads are all board members of the AAR, which describes itself as "the central coordinating and research agency of the North American rail industry." The AAR Board meets regularly and board members (and their staff) regularly communicate between meetings.

9. In the Fall of 2003 at meetings of the AAR, Defendants BNSF, UP, CSX and NS conspired to cause the AAR to develop and publish a new cost escalation index with fuel removed. Pursuant to the agreement and collective action of BNSF, UP, CSX and NS, the AAR in December 2003 announced the establishment of the new cost escalation index, called the All Inclusive Index Less Fuel ("AIILF"). The AAR's official publication, entitled "AAR Railroad Cost Indexes," stated that the new index "is calculated using the same components and methods as the All-Inclusive Index uses for the Rail Cost Adjustment Factor, with the exception of the exclusion of the fuel component." This announcement, and the underlying removal of fuel from the AII and RCAF, was the collective action of BNSF, UP, CSX and NS. A senior officer of defendant BNSF, for example, admitted in 2004 that Matthew K. Rose, BNSF's Chairman, President and CEO "led the charge on" the AAR's 2003 adoption of the new index without fuel.

10. Never before in its history had the AAR created a cost escalation index without a fuel cost component. As UP's James R. Young acknowledged in a July 2007 interview, the new Rail Fuel Surcharges as applied to rail freight were "really unique to the railroad industry. Three, four years ago they were really non-existent."

11. The collective action by BNSF, UP, CSX and NS in December 2003 allowed the Defendants to apply the new, separate and artificially high Rail Fuel Surcharges broadly to their customers, since fuel would no longer automatically be covered by standard rate escalation

clauses. UP's Young admitted, during an October 2004 earnings call, that UP was now "getting away from the RCAF" and "putting in the specific fuel recovery mechanism in areas that historically would have used RCAF." According to Young, by July 2007 approximately "eighty to ninety percent" of UP's business had "some kind of fuel surcharge mechanism that gets passed on to the customer."

12. Almost immediately following the collective action that led to the establishment of the "AIILF" price escalation index without fuel, and in furtherance of the conspiracy, Defendants CSX and NS (together, the "Eastern Railroads"), which previously had different fuel surcharges, now announced that each would apply identical fuel surcharges based on the West Texas Intermediate (or "WTI") Index (which in early 2004 was at a higher rate than the HDF Index that the Western Railroads simultaneously started to use in July 2003). This announcement by the Eastern Railroads, coming on the heels of the collective action in late 2003 to remove fuel from the AII and RCAF, was the result of their conspiracy with the Western Railroads to impose artificially high Rail Fuel Surcharges in a coordinated fashion. The Eastern Railroads charged the exact same fuel surcharges, through at least mid-2007.

13. With the AIILF they had put in place, and in furtherance of the conspiracy, Defendants BNSF, UP, CSX and NS now each applied the fuel surcharge the same way: as a percentage multiplier of the *total* base rate for the rail freight transportation. That is, while the fuel factor in the AII and RCAF had been "weighted" to reflect the relative impact of fuel costs as compared to other cost factors, Defendants now were able to apply the percentage increase in fuel costs triggered by the applicable index to the *entire* cost of the freight transport. Thus, for example, if the percentage increase triggered by the applicable fuel index was 15 %, then by applying the fuel surcharge the Defendants would raise the entire cost of the freight transport by

15 % – even though fuel accounted for only a portion of the total rail transport cost (which is what the AII and RCAF indexes had been designed to reflect). This agreed approach yielded the Defendants billions of dollars of additional profits.

14. BNSF, UP, CSX and NS maintained their conspiracy during the Class Period by uniformly computing the surcharges as a percentage of the rail freight transport base rate, and by agreeing upon common trigger points for adjusting the percentages monthly. The Defendants also published their Rail Fuel Surcharges on their websites to facilitate coordination and the detection of any deviation from collusive pricing. The Defendants also declined to undercut one another on fuel surcharge prices, even though the surcharges far exceeded each Defendant's actual increases in fuel costs.

15. BNSF, UP, CSX and NS also took other collective actions to enforce the conspiracy and make it effective. For example, pursuant to the conspiracy, they largely stopped entering into long-term contracts and entered instead into contracts for periods of approximately 30 days, or with 30-day cancellation provisions – making it easier to implement the fuel surcharges, which were adjusted monthly. The Defendants also limited the previously prevailing practice, in circumstances where more than one railroad (usually an eastern and a western railroad) was involved in long-distance freight transport, of sending a customer a single bill for the entire transport. Instead, the Defendants, pursuant to the conspiracy, increasingly switched to having each railroad on a multi-railroad trip send a separate bill (and thus each could separately impose its own fuel surcharge). This facilitated each Defendant recouping its share of the supracompetitive profits from the Fuel Surcharge program imposed by the conspiracy. Such a switch to separate invoicing on multi-railroad trips could be accomplished only through collective action of the Defendants. The Defendants also began refusing to negotiate discounts

on rail freight rates – even in circumstances where individual railroads had previously been willing to do so.

16. In a ruling in early 2007, the Surface Transportation Board ("STB"), which has authority over rate-regulated freight traffic that is not within the class alleged here, found that the Defendants' rail fuel surcharges, as applied to STB-regulated freight traffic, were "unreasonable" and did not relate to the railroads' actual cost of fuel. The STB expressly stated that it lacks jurisdiction over the private contracts, and other freight traffic exempt from rate regulation, that is the subject of this Complaint. In its ruling, the STB explained that:

> After considering all of the comments, we affirm the preliminary conclusion in the August decision that it is an unreasonable practice to compute fuel surcharges as a percentage of the base rates. Because railroads rely on differential pricing, under which rates are dependent on factors other than costs, a surcharge that is tied to the level of the base rate, rather than to fuel consumption for the movement to which the surcharge is applied, cannot fairly be described as merely a cost recovery mechanism. Rather, a fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting the actual increase in fuel costs for handling the particular traffic to which the surcharge is applied. Two shippers may have traffic with identical fuel costs, but if one starts out with a higher base rate (because, for example, it has fewer transportation alternatives), it will pay dramatically more in fuel surcharges.

*See Surface Transportation Board Decision, Rail Fuel Surcharges* (STB Ex Parte No. 661, January 26, 2007) at 6.

17. An independent 2007 study commissioned by the American Chemistry Council and Consumers United for Rail Equity ("CURE") found that the difference between Defendants' rail fuel surcharge revenue (as publicly reported or estimated) and Defendants' publicly reported actual fuel costs during the period from 2003 through the First Quarter of 2007 came to over $6 billion.

18. Each of the Defendants has disclosed that it has received a state grand jury subpoena and/or state grand jury inquiry concerning the Rail Fuel Surcharges. In an SEC Form

10-K dated February 22, 2008, Defendant CSX stated that "[i]n July 2007, CSXT received a grand jury subpoena from the New Jersey Office of the Attorney General seeking information related to the same fuel surcharges that are the subject of the purported class actions. It is possible that additional federal or state agencies could initiate investigations into similar matters." (CSX Corp., 10-K, February 22, 2008 at 99). In an SEC Form 10-K dated February 15, 2008, Defendant BNSF stated that "[t]he Company is also responding to a state grand jury subpoena requesting production of information related to fuel surcharges." (BNSF Railway Company, 10-K, February 15, 2008 at 10). In an SEC Form 10-K dated February 15, 2008, Defendant Norfolk Southern stated that "NS received a subpoena from a state grand jury on July 13, 2007, requesting documents and materials relating to the setting of fuel surcharges. NS is cooperating with the state in its investigation." (Norfolk Southern, 10-K, February 15, 2008 at K16). And in an SEC Form 10-K dated February 28, 2008, Defendant UP disclosed that "the Attorney General of a state outside our service area issued a grand jury subpoena to us requesting documents pertaining to our fuel surcharge program. We met with representatives of this Attorney General's office, and we plan to have additional meetings in the future in an effort to resolve that office's interest in this matter." (Union Pacific Corp., 10-K, February 28, 2008 at 15).

19. As a direct and proximate result of the price fixing conspiracy alleged herein, Defendants have restrained competition in the market for rate-unregulated rail freight transportation services and injured Plaintiffs and each Class member in their business and property. Plaintiffs and the members of the Class have each paid a higher price for unregulated rail freight transportation than they would have paid absent the concerted unlawful activity alleged herein.

20. Plaintiffs seek damages on behalf of themselves and the Class for Rail Fuel Surcharges imposed on rail freight shipments made under private transportation contracts and through other means exempt from rate regulation under federal law. Plaintiffs do not seek, on behalf of themselves or the Class, damages or relief arising from fuel surcharges imposed on rate-regulated freight transportation.

**PARTIES**

21. Plaintiff Dust Pro, Inc. ("Dust Pro") is a corporation organized under the laws of the State of Arizona, with its principal place of business at 3224 West Brown Street, Phoenix, Arizona 85051. During the Class Period, Dust Pro manufactured and distributed soil stabilizers used to inhibit dust on dirt surfaces. Dust Pro purchased unregulated rail freight transportation directly from one or more of the Defendants during the Class Period, and during the Class Period one or more of the Defendants assessed Rail Fuel Surcharges on Dust Pro in connection with that unregulated rail freight transportation. The prices Dust Pro paid to Defendants for unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the prices Dust Pro would have paid absent the conspiracy alleged herein. Dust Pro has therefore been injured in its business and property by reason of Defendants' antitrust violations.

22. Plaintiff Carter Distributing Company ("Carter Distributing") is a corporation organized under the laws of the State of Tennessee with its principal place of business at 1305 Broad Street, Chattanooga, Tennessee 37041. During the Class Period, Carter Distributing distributed beer. Carter Distributing purchased unregulated rail freight transportation directly from one or more of the Defendants during the Class Period, and during the Class Period one or more of the Defendants assessed Rail Fuel Surcharges on Carter Distributing in connection with that unregulated rail freight transportation. The prices Carter Distributing paid to Defendants for unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed

were greater than the prices Carter Distributing would have paid absent the conspiracy alleged herein. Carter Distributing has therefore been injured in its business and property by reason of Defendants' antitrust violations.

23. Plaintiff Strates Shows, Inc. ("Strates Shows") is a corporation organized under the laws of the State of Delaware, with its principal place of business at 10600 Orange Avenue, Orlando, Florida 32824. During the Class Period Strates Shows operated a traveling carnival that provided amusement rides, games, food and merchandise concessions to fairs and festivals throughout the United States**.** Strates Shows purchased unregulated rail freight transportation directly from one or more of the Defendants during the Class Period, and during the Class Period one or more of the Defendants assessed Rail Fuel Surcharges on Strates Shows in connection with that unregulated rail freight transportation. The prices Strates Shows paid to Defendants for unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the prices Strates Shows would have paid absent the conspiracy alleged herein. Strates Shows has therefore been injured in its business and property by reason of Defendants' antitrust violations.

24. Plaintiff US Magnesium LLC ("US Magnesium") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 238 North 2200 West, Salt Lake City, Utah 84116-2921. During the Class Period, US Magnesium manufactured magnesium, chlorine, ferric chloride and other products. US Magnesium has annual sales in excess of $100 million, and pays in excess of $2.5 million per year in rail freight charges. US Magnesium purchased unregulated rail freight transportation directly from one or more of the Defendants during the Class Period, and during the Class Period one or more of the Defendants assessed Rail Fuel Surcharges on US Magnesium in connection with that unregulated

rail freight transportation. The prices US Magnesium paid to Defendants for unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the prices US Magnesium would have paid absent the conspiracy alleged herein. US Magnesium has therefore been injured in its business and property by reason of Defendants' antitrust violations.

25. Plaintiff Zinifex Taylor Chemicals, Inc. ("Zinifex") is a corporation organized under the laws of the State of Tennessee, with its principal place of business at 1800 Zinc Plant Road, Clarksville, Tennessee 37040. Zinifex is a subsidiary of Nyrstar NV, the world's largest zinc producer. During the Class Period, Zinifex manufactured sulfuric acid and other chemical products. Zinifex purchased unregulated rail freight transportation directly from one or more of the Defendants during the Class Period, and during the Class Period one or more of the Defendants assessed Rail Fuel Surcharges on Zinifex in connection with that unregulated rail freight transportation. The prices Zinifex paid to Defendants for unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the prices Zinifex would have paid absent the conspiracy alleged herein. Zinifex has therefore been injured in its business and property by reason of Defendants' antitrust violations.

26. Plaintiff Donnelly Commodities Inc. ("Donnelly Commodities") is a corporation organized under the laws of the State of New York with its principal place of business at 12 Manor Road, Smithtown, NY 11787. During the Class Period, Donnelly Commodities was a freight consolidator. Donnelly Commodities purchased unregulated rail freight transportation directly from one or more of the Defendants during the Class Period, and during the Class Period one or more of the Defendants assessed Rail Fuel Surcharges on Donnelly Commodities in connection with that unregulated rail freight transportation. The prices Donnelly Commodities

paid to Defendants for unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the prices Donnelly Commodities would have paid absent the conspiracy alleged herein. Donnelly Commodities has therefore been injured in its business and property by reason of Defendants' antitrust violations.

27. Plaintiff Dakota Granite Company ("Dakota Granite") is a South Dakota corporation with its principal place of business at 14964 484th Street, Milbank, South Dakota 57252. Dakota Granite quarries, manufactures, and sells granite slabs, tile, monuments, mausoleums, columbariums, civic memorials, and blocks, and fabricates custom granite countertops, feature pieces, and building components. Dakota Granite's products are used extensively throughout the world in various building and interior design applications. Dakota Granite purchased unregulated rail freight transportation directly from one or more of the Defendants during the Class Period, and during the Class Period one or more of the Defendants assessed Rail Fuel Surcharges on Dakota Granite in connection with that unregulated rail freight transportation. The prices Dakota Granite paid to Defendants for unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the prices Dakota Granite would have paid absent the conspiracy alleged herein. Dakota Granite has therefore been injured in its business and property by reason of Defendants' antitrust violations.

28. Plaintiff Cedar Creek Wholesale, Inc. ("Cedar Creek") is a corporation organized under the laws of the State of Oklahoma, with its principal place of business at 6500 S 145th E Ave., Broken Arrow, OK 74013. During the Class Period, Cedar Creek was a distributor of building materials, including various types of wood products. Cedar Creek purchased unregulated rail freight transportation directly from one or more of the Defendants during the Class Period, and during the Class Period one or more of the Defendants assessed Rail Fuel

Surcharges on Cedar Creek in connection with that unregulated rail freight transportation. The prices Cedar Creek paid to Defendants for unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the prices Cedar Creek would have paid absent the conspiracy alleged herein. Cedar Creek has therefore been injured in its business and property by reason of Defendants' antitrust violations.

29. Defendant CSX Transportation, Inc. ("CSX") has its principal place of business at 500 Water St., Jacksonville, Florida 32202. CSX is a major freight railroad operating primarily in the eastern United States and Canada. CSX links commercial markets in 23 states, the District of Columbia, and certain Canadian provinces. CSX has railway lines throughout the eastern United States, including rail lines within this District, and maintains a government relations office at 1331 Pennsylvania Ave., N.W., Suite 560, Washington, D.C. 20004.

30. Defendant Norfolk Southern Railway Company ("NS") has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510. NS is a major freight railroad operating primarily in the eastern United States. NS serves all major eastern ports and connects with rail partners in the West, linking customers to markets around the world. NS operates an intermodal terminal at 1000 S. Van Dorn St., in Alexandria, Virginia, and maintains a government relations office at 1500 K Street, N.W., #375, Washington, D.C. 20005.

31. Defendant BNSF Railway Company ("BNSF") has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131. BNSF originates and terminates traffic within this District by providing rail transportation in interchange service with CSX and NS. BNSF is a wholly owned subsidiary Burlington Northern Santa Fe Corporation, the holding company formed by the September 22, 1995 merger of Burlington Northern and Santa Fe Corporation. BNSF is the second largest railroad network in North America and operates 32,000

route miles of railroad. BNSF has offices and rail lines throughout the western United States, extending into the Southeastern states and maintains a government affairs office at 500 New Jersey Ave., N.W., Suite 550, Washington, D.C. 20001.

32. Defendant Union Pacific Railroad Company ("UP") has its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179. UP is the largest freight railroad in the United States. UP serves primarily the western two-thirds of the United States and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including Washington, D.C.). UP maintains an office at 600 13th Street, N.W., #340, Washington, D.C. 20005.

**JURISDICTION AND VENUE**

33. This action is brought under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and reasonable attorneys fees and costs from Defendants for the injuries sustained by Plaintiffs and members of the Class by reasons of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

34. Jurisdiction of this Court is founded on 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337.

35. Venue is proper in this judicial District pursuant to 15 U.S.C. § 15(a) and 22 and 28 U.S.C. § 1391, because during the Class Period one or more of the Defendants resided, transacted business, were found, or had agents in this District, and a substantial part of the events giving rise to Plaintiffs' claims occurred and a substantial portion of the affected interstate trade and commerce described below, has been carried out, in this District.

36. Venue is also proper because this action has been transferred to this District by the Judicial Panel on Multidistrict Litigation for consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407(a).

37. This Court has personal jurisdiction over each Defendant because, inter alia, each: (a) transacted business in this District; (b) directly or indirectly sold and delivered rail transportation services in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

**CLASS ACTION ALLEGATIONS**

38. Plaintiffs bring this action as a class action under Rules 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and others similarly situated. The proposed "Class" is defined as:

> All direct purchasers of rail freight transportation services from Defendants, through use of private railroad-shipper contracts or through other means exempt from rate regulation under federal law, as to which Defendants assessed a Rail Fuel Surcharge, at any time from July 1, 2003 until at least June 30, 2007 (the "Class Period"). Excluded from the Class are Defendants, any subsidiaries or affiliates of Defendants, and any of Defendants' co-conspirators, whether or not named as a Defendant in this Complaint and all federal governmental entities.

39. The Class is numerous and geographically dispersed, and, given the magnitude of the commerce involved, joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs believe that there are many thousands of members of the Class and that their identities can be readily ascertained from Defendants' books and records.

40. Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiffs and all members of the Class directly purchased unregulated rail freight transportation from Defendants, with respect to which Defendants imposed the artificially inflated Rail Fuel Surcharges established and maintained by the actions of Defendants in connection with the

restraint of trade alleged herein. Plaintiffs and the members of the Class have all sustained damage in that they paid inflated prices for the unregulated rail freight transportation services at issue as a result of Defendants' conduct in violation of federal law.

41. Plaintiffs will fairly and adequately protect the interests of the members of the Class and are represented by counsel competent and experienced in class action and antitrust litigation.

42. Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

a. Whether Defendants conspired, contracted or combined with others, for the purpose and with the effect of raising, fixing, maintaining, pegging, or stabilizing the price of Rail Fuel Surcharges applied to unregulated rail freight transportation services purchased by the Class;

b. Whether Defendants undertook actions to conceal the unlawful conspiracies, contracts or combinations described herein;

c. Whether Defendants' conduct violated the federal antitrust laws; and

d. Whether Defendants' conduct caused injury to the business and property of Plaintiffs and the Class and, if so, the proper measure of damages.

43. A class action is superior to any other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would

achieve substantial economies of time, effort and expense and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

44. The interests of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical. The Class has a strong and pervasive community of interest, and prosecution of the action through representatives would be unobjectionable. The amounts at stake for Class members, while substantial in the aggregate, are not great enough individually to enable them to maintain separate suits against Defendants. No difficulty is anticipated in the management of this action as a class action.

## INTERSTATE TRADE AND COMMERCE

45. During the Class Period, Defendants accounted for over 90 percent of all rail shipments within the United States. The AAR Policy and Economics Department reported that railroad total operating revenue in the United States in 2006 exceeded $52 billion.

46. The activities of Defendants and their co-conspirators were within the flow of, and substantially affected interstate commerce. During the Class Period, Defendants sold and carried out rail shipments in a continuous and uninterrupted flow of interstate commerce to shippers and customers throughout the United States. Each Defendant and their co-conspirators used instrumentalities of interstate commerce to sell and market rail freight transportation services.

47. The unlawful activities of Defendants have had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

## DEREGULATION OF THE RAILROAD INDUSTRY

48. Congress deregulated the railroad industry with passage of the Staggers Rail Act of 1980 (“Staggers Act”). This landmark legislation marked a dramatic change in the evolution

of U.S. railroads. After decades of regulatory control over virtually every aspect of their economic operations, railroads were free to set market rates for rail transportation.

49. Prior to the Staggers Act, railroads for freight transport generally would only charge the published tariff rates filed by the railroads with the ICC. During that era of full regulation, railroads could apply to the ICC for across-the-board rate increases, which could lawfully be implemented on a collective basis.

50. Today, by contrast, 80 percent or more of all rail shipments move under private transportation contracts, which are not rate-regulated, or are otherwise exempt from rate regulation. For all of this rate-unregulated traffic, the railroads cannot turn to some agency – like the previously-existing ICC – to obtain across-the-board increases in freight rates, nor can the railroads lawfully collude to set those rates.

51. Since 1980, the number of Class I railroads has declined dramatically, from 35 at the time of passage of the Staggers Act to just seven today (two of which are owned by Canadian entities).[1] The railroad industry is now highly concentrated: four of these railroads – Defendants BNSF, UP, CSX and NS – operate more than 90 percent of all railroad track in the U.S. and in 2006 accounted for nearly $50 billion in total annual revenue. Given the high fixed costs in the railroad industry and its significant barriers to entry (i.e., the need to invest in a vast network of tracks, stations, yards, and switching facilities that take decades to develop, and

[1] A Class I railroad is one having revenues in excess of $250 million in 1991 dollars ($319.3 million in 2005 dollars). There are currently seven Class I railroads operating in the United States: (1) BNSF; (2) UP; (3) CSX; (4) NS; (5) Kansas City Railway Company; (6) Soo Line Railroad Co.; and (7) Grand Trunk Corporation. The Soo Line Railroad is owned by Canadian Pacific Railway. The Grand Trunk Corporation is owned by the Canadian National Railway.

require onerous regulatory and environmental reviews and approval), there is only a fringe or niche market of smaller carriers, and the competition offered by these small carriers is negligible.

52. Although the reason for deregulation of the railroad industry was to promote competition and lower freight rates, it is now clear that the opposite has come true – railroads are collectively charging shippers supracompetitive rates.

**THE DEFENDANTS INTRODUCE FUEL SURCHARGES**

53. By the early 2000's, the industry had consolidated to the point where further mergers were unlikely if not impossible. In response to the proposed Burlington Northern Santa Fe and Canadian National Railway Co. merger, the STB, which succeeded the ICC, introduced a moratorium on new mergers and then promulgated more stringent standards for merger review. At the same time, railroads were experiencing surging freight demand and tight capacity.

54. In this environment, Defendants lacked the legal means to implement a traditional across-the-board price increase. As a result of deregulation, Defendants could no longer ask the ICC or its successor, the STB, for across-the-board rate increases. Thus, the only practicable way to increase prices across-the-board and increase revenues in the short term was through the mechanism of a uniform surcharge applied to as many customers as possible. Under the guise of rising fuel prices, Defendants colluded to create and implement the Rail Fuel Surcharges as a means to implement what effectively operate as across-the-board rate increases.

55. Since passage of the Staggers Act in 1980, railroads had increasingly entered into private freight transportation contracts that included cost escalation provisions often tied to the AII and the RCAF (which is based on the AII). Both the RCAF and the AII were published by the AAR, and both indexes included fuel costs as a factor. The AII and RCAF weighted a number of cost factors – labor, fuel, materials & supplies, equipment rents, depreciation, interest, and other expenses – so that the actual impact of particular cost increases (e.g., for fuel) would

be reflected in the index. Any actual increase in fuel costs, no matter how large, would be captured in the AII and RCAF. The indexes, and the weighted factors within them, were designed for this purpose.

56. In 2003, Defendants BNSF, UP, CSX and NS seized upon fuel as the means to create the type of across-the-board rate increase for which these railroads, in the era of deregulation, could no longer apply to a regulatory body. As alleged above, the Defendants embarked upon and implemented an agreed plan to remove fuel from the AII (and thus from the RCAF based on the AII), and thereby permit separate "fuel surcharges" to be widely applied. With fuel no longer weighted against other cost factors, the separate "fuel surcharges" could be used simply to raise total freight prices by a given percentage – and that is precisely what these four railroads proceeded to do.

57. Prior to 2003, at least some of the Defendants imposed so-called "fuel surcharges" on private rail freight transportation, but (a) these fuel surcharges were applied only in isolated instances, and (b) each of the Defendants had different fuel surcharge rates, reflecting, *inter alia*, the differing fuel costs of each railroad. At that time, such surcharges were the exception, with the AII and RCAF indexes widely used to capture fuel costs and other costs. All of that changed in 2003, however, when the Defendants took a series of coordinated actions to switch to a new system that would allow the widespread use of Rail Fuel Surcharges as a revenue enhancement mechanism.

58. From at least the Spring of 2003 and continuing through the present, the top executives of each of the Defendants met regularly at restaurants, and recreational and conference facilities to discuss their industry. For example, at biannual meetings of the National Freight Transportation Association ("NFTA"), executives of the Defendants met to consider and

Case 1:07-mc-00489-PLF Document 229-8 Filed 12/24/08 Page 21 of 46

discuss developments in the railroad industry. Defendants' top executives also met and discussed their industry when they came to Washington, D.C. for AAR board meetings. The Spring 2003 meeting of the NFTA occurred from April 2nd to April 6th, at the Wigwam resort, in Litchfield Park, Arizona.

59. Within just months of the Spring 2003 NFTA meeting, and as early as July 2003, the two Western Railroads, BNSF and UP, suddenly began to coordinate their Rail Fuel Surcharges. Prior to this time, the UP fuel surcharge had been adjusted monthly based on the WTI Index. The BNSF fuel surcharge had been based on the HDF Index. In or about July 2003, however, UP switched to the HDF Index pursuant to an agreement with the BNSF. From that point on, the Western Railroads moved in lockstep and charged the exact same Rail Fuel Surcharge percentage for each month of the Class Period.

60. BNSF and UP agreed to administer the HDF Index in precisely the same way. Whenever the U.S. average price of diesel fuel as measured by the HDF Index equaled or was lower than $1.35 per gallon, no surcharge was applied. When the HDF Index exceeded $1.35 per gallon, however, BNSF and UP both applied a surcharge of 0.5 percent for every five cent increase above $1.35 per gallon. So, for example, if the HDF Index rose to $1.55 per gallon, BNSF and UP would apply a surcharge of 2 percent. The surcharge would increase 2 percent for every 20 cents increase in the HDF Index.

61. The Western Railroads also coordinated when they would change their fuel surcharge. They agreed that the Rail Fuel Surcharge would be applied to shipments beginning the second month after the month in which there was a change in the HDF Index average price calculation. So, for example, if the HDF Index average price changed in January, the Western Railroads would announce their new Rail Fuel Surcharge percentage on February 1 (always on

the first day of the month), and then apply the surcharge to shipments in March. The Western Railroads published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

62. The Western Railroads' agreed-upon coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary and complex combination of features for their Rail Fuel Surcharge programs, including use of the HDF Index for fuel surcharges, setting the trigger point at $1.35 per gallon of diesel fuel, and applying the surcharge in the second calendar month after the HDF Index average price had changed. The similarities are both too precise and too comprehensive to have been independent responses to any common market phenomenon that the Defendants were facing.

63. UP's move to the same fuel price index used by BNSF in July of 2003 is striking evidence of concerted conduct in light of the fact that just two months before, UP had announced a different modification to its existing fuel surcharge program. In April of 2003, UP made modifications to the trigger points it used for adjusting surcharges in its program, but did not change the index it employed. The fact that, just two months later, UP switched indices and began charging exactly the same surcharges as BNSF is further evidence that this switch was the result of concerted conduct.

64. Even after having agreed to coordinated their fuel surcharges, however, BNSF and UP still faced the significant barrier to widespread use of fuel surcharges: specifically, the widely used private contracts had cost escalation provisions that already accounted for fuel. BNSF, UP, CSX and NS agreed to solve this problem by conspiring to remove fuel from the widely used cost escalation indexes, thereby paving the way for widespread imposition of the

new fuel surcharge program in which all four of the Defendants could participate, and from which all four could earn excessive profits.

65. In the fall of 2003, BNSF and UP initiated an effort in the AAR to get all Defendants to agree on a fuel surcharge program that would enable the Defendants to take fuel costs out of the weighted RCAF and AII (which already permitted the Defendants to recover all of their fuel costs), and instead apply artificially high Rail Fuel Surcharges as a revenue enhancement mechanism: that is, use the "surcharge" to charge a percentage increase on the total cost of the freight transport, regardless of the actual cost of fuel for that transport job. Through meetings and discussions within the AAR board on October 2-3, December 11-12 and otherwise in 2003, Defendants BNSF, UP, CSX and NS agreed to create and implement coordinated fuel surcharge programs, and to enforce their program through a variety of means discussed herein.

66. Pursuant to the agreements among Defendants BNSF, UP, CSX and NS, the Defendants, which dominate the AAR board, caused the AAR to announce in December 2003 the creation of an unprecedented, new All Inclusive Index Less Fuel (the AIILF) – that is, a cost escalation index without fuel as a component. This new index was similar to the AII and the RCAF, except that this new index excluded fuel as a component. The AAR announcement in December 2003 stated: "This issue of AAR Railroad Cost Indexes inaugurates a new index: the All-Inclusive Index Less Fuel. This index is calculated using the same components and methods as the All-Inclusive Index uses for the Rail Cost Adjustment Factor, with the exception of the exclusion of the fuel component." This announcement, and the underlying decision to create the new index, were the collective action of the Defendants, and could not have been accomplished without the conspiracy. The new AIILF specified the fourth quarter of 2002 as its base period.

67. Defendants BNSF, UP, CSX and NS conspired to cause the AAR to inaugurate the AIILF so that they could begin assessing separate, stand-alone Rail Fuel Surcharges, applied against the total cost of rail freight transportation, and coordinate that practice. The creation of this new index was an important, carefully-planned step taken collectively by the Defendants to allow implementation and continuation of their price fixing conspiracy – a conspiracy that would enable the Defendants to widely impose price increases on the entire cost of rail freight transport and thereby obtain additional revenues far beyond any actual increases in fuel costs. This step was a notable departure from past practice, and marked the first time that the AAR created a cost escalation index without a fuel cost component.

68. Defendant BNSF has admitted that it worked through the AAR to accomplish this revenue-generating measure in 2003. When asked how BNSF would be able to apply the new revenue-based fuel surcharges into contracts with coal shippers, John Lanigan, BNSF's Chief Marketing Officer, responded that BNSF would be able to do so because of the changes made to the RCAF through the AAR. Referring to Matthew K. Rose, BNSF's Chairman, President, and CEO, Lanigan stated: "What happened last year, *and Matt led the charge on there,* is that there's a new index that [the AAR] has that's basically an index without fuel. … So we'll do RCAF less fuel plus a direct fuel surcharge in the future." (emphasis added).

69. Almost immediately after the announcement in December 2003 of the new AIILF (the cost escalation index without fuel), and pursuant to the conspiracy, the two Eastern Railroads, Defendants CSX and NS, suddenly moved into lockstep with fuel surcharges based on the WTI Index. This move into lockstep was part and parcel of, and flowed from, the aforementioned agreements reached and implemented by BNSF, UP, CSX and NS in late 2003.

70. Specifically, the Eastern Railroads agreed to apply a fuel surcharge whenever the monthly average WTI price exceeded $23 per barrel of crude oil. When that happened, the Eastern Railroads' rates were increased 0.4 percent for every $1 that the price of WTI oil exceeded $23 per barrel. So, for example, if the price of WTI oil was $28 per barrel, the fuel surcharge percentage would be 2 percent. The Rail Fuel Surcharge would be adjusted upward at 2 percent for every $5 increase in the WTI average price.

71. The Eastern Railroads also coordinated when they would change their fuel surcharge – two calendar months after the WTI Index had adjusted, thereby adopting the same fuel surcharge price timing used by the Western Railroads. For example, if the WTI average price exceeded $23 per barrel in January, the Eastern Railroads would assess the applicable fuel surcharge percentage to all bills of lading dated in the month of March. In this way, Defendants could apply exactly the same fuel surcharge percentage month after month. The Eastern Railroads published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

72. The Eastern Railroads' coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary and complex combination of features for their Rail Fuel Surcharge programs: including using the WTI Index for fuel surcharges, setting the trigger point at $23 per barrel, and applying the surcharge in the second calendar month after the average price of WTI oil had changed. The similarities, and the coordination with the Western Railroads, are too precise and too comprehensive to have been independent responses to any common market phenomenon that the Defendants were facing.

73. Thus, following the conspiratorial publication of the AIILF, Defendants BNSF, UP, CSX and NS began to apply Rail Fuel Surcharges as a separate item on shippers' bills. The

Defendants used monthly changes to their Rail Fuel Surcharges as an easy way to increase revenues in an across the board manner.

74. There was no legitimate business justification or natural explanation for the collective action of BNSF, UP, CSX and NS to cause the AAR to adopt and publish the AIILF. Such a "revenue-based" fuel surcharge bore no direct relationship to Defendants' actual increase in fuel costs. The fuel surcharge program was not a cost recovery mechanism, but a revenue enhancement measure that could only have been accomplished by the Defendants' conspiratorial action of removing fuel from the widely used cost escalation indexes. The AII and RCAF both included a fuel cost component, and the Defendants had used these indices for decades to measure fuel-cost increases. As an empirical matter, the fuel component of the AII and RCAF would have permitted the Defendants to recover all of their increased fuel costs throughout the conspiracy period. Thus, the motivation of BNSF, UP, CSX and NS in collectively causing the adoption of the AIILF could not have been greater fuel cost recovery or more efficient fuel cost recovery.

75. The actions by Defendants thus were not independent responses to a common problem of increasing fuel costs. Rather, the only purpose in taking these collective actions was to begin assessing a stand-alone fuel surcharge applied to *revenue* (*i.e.*, the entire base rate for the freight shipment), not costs; to act in concert with one another in setting fuel surcharge prices and demanding them from shippers and customers; and to ensure collective enforcement of the program. That is, pursuant to their conspiracy, Defendants would now be able to apply the supposed fuel cost increase percentage to the *entire cost of the freight* shipment (notwithstanding that fuel only accounts for a portion of the costs of the shipment). Through this collective action, Defendants BNSF, UP, CSX and NS planned to use the stand-alone fuel surcharge as an easy

way to dramatically increase profits without having to wait for new rail capacity to come on line to meet growing demand – so long as these railroads participated by not competing on fuel surcharge prices to undercut one another.

76. The creation and publication of a cost escalation index without a fuel component was not required by any regulatory body, nor was it necessary for any Defendant to institute independently its own individual fuel surcharge program. Instead, the creation of the Rail Fuel Surcharge program starting in 2003 was the joint action by BNSF, UP, CSX and NS to achieve their collective goal of generating additional profits through implementing revenue-based fuel surcharges.

77. As a result of the concerted action among BNSF, UP, CSX and NS, prices of Rail Fuel Surcharges charged to rail shippers and customers (members of the Class) were raised to or maintained at supra-competitive levels during the Class Period.

**IMPLEMENTATION OF THE SCHEME: THE FUEL SURCHARGES IMPOSED BY THE DEFENDANTS**

78. As detailed above, Defendants BNSF, UP, CSX and NS agreed in 2003 to remove fuel from the AII and RCAF, and thereby permit the application of separate Rail Fuel Surcharges as a multiplier percentage of the base rate charged for the rail freight transportation involved. This meant that the Fuel Surcharge could operate as a means to impose an effective across-the-board rate increase, and thereby raise revenue far beyond the actual costs of fuel (which could have continued to be recovered through the AII and RCAF). Defendants applied these surcharges not only to published tariff rates, but to the private contracts, and other traffic, not subject to rate regulation under federal law (*i.e.*, the unregulated rates at issue here).

79. With the conspiracy underway, the two Western Railroads, using the HDF index, moved in lockstep and charged virtually identical Rail Fuel Surcharges on a monthly basis throughout the Class Period.

80. The chart below shows that the Fuel Surcharge percentages charged by the Western Railroads for freight shipments varied before the Class Period began, but were identical starting in July 2003:

**MONTHLY SURCHARGE PERCENTAGES -- WESTERN RAILROADS**

| MONTH | BNSF | UP |
|---|---|---|
| Jun-02 | 1 | 0 |
| Jul-02 | 1 | 0 |
| Aug-02 | 0 | 0 |
| Sep-02 | 0 | 0 |
| Oct-02 | 1% | 0 |
| Nov-02 | 2% | 0 |
| Dec-02 | 2.5% | 0 |
| Jan-03 | 2% | 2 |
| Feb-03 | 2% | 2 |
| Mar-03 | 2.5% | 2 |
| Apr-03 | 4.5% | 2 |
| May-03 | 2% | 2 |
| Jun-03 | 3.0% | 2.0% |
| **Jul-03** | **2.5%** | **2.5%** |
| Aug-03 | 2.0% | 2.0% |
| Sep-03 | 2.0% | 2.0% |
| Oct-03 | 2.5% | 2.5% |
| Nov-03 | 2.5% | 2.5% |
| Dec-03 | 2.5% | 2.5% |
| Jan-04 | 2.5% | 2.5% |
| Feb-04 | 2.5% | 2.5% |
| Mar-04 | 3.5% | 3.5% |
| Apr-04 | 3.5% | 3.5% |
| May-04 | 4.0% | 4.0% |
| Jun-04 | 4.5% | 4.5% |
| Jul-04 | 5.0% | 5.0% |
| Aug-04 | 5.0% | 5.0% |
| Sep-04 | 5.0% | 5.0% |
| Oct-04 | 6.0% | 6.0% |
| Nov-04 | 7.0% | 7.0% |

| MONTH | BNSF | UP |
|---|---|---|
| Dec-04 | 9.0% | 9.0% |
| Jan-05 | 9.0% | 9.0% |
| Feb-05 | 8.0% | 8.0% |
| Mar-05 | 7.5% | 7.5% |
| Apr-05 | 8.0% | 8.0% |
| May-05 | 10.0% | 10.0% |
| Jun-05 | 10.5% | 10.5% |
| Jul-05 | 9.5% | 9.5% |
| Aug-05 | 10.5% | 10.5% |
| Sep-05 | 11.5% | 11.5% |
| Oct-05 | 13.0% | 13.0% |
| Nov-05 | 16.0% | 16.0% |
| Dec-05 | 18.5% | 18.5% |
| Jan-06 | 13.5% | 13.5% |
| Feb-06 | 12.0% | 12.0% |
| Mar-06 | 12.5% | 12.5% |
| Apr-06 | 12.5% | 12.5% |
| May-06 | 13.5% | 13.5% |
| Jun-06 | 15.0% | 15.0% |
| Jul-06 | 16.5% | 16.5% |
| Aug-06 | 16.5% | 16.5% |
| Sep-06 | 17.0% | 17.0% |
| Oct-06 | 18.0% | 18.0% |
| Nov-06 | 15.5% | 15.5% |
| Dec-06 | 13.0% | 13.0% |
| Jan-07 | 13.0% | 13.0% |
| Feb-07 | 14.0% | 14.0% |
| Mar-07 | 12.5% | 12.5% |
| Apr-07 | 12.5% | 12.5% |
| May-07 | 14.5% | 14.5% |
| Jun-07 | 16.0% | 16.0% |

81. As detailed above, there also was uniformity among the Eastern Railroads in the monthly surcharge percentages, based on the WTI Index, that they charged customers for most of the Class Period.

82. The chart below shows that the Fuel Surcharge percentages charged by Defendants CSX and NS for carload shipments varied before the Class Period, but were identical starting in March 2004:

**MONTHLY SURCHARGE PERCENTAGES -- EASTERN RAILROADS**

| MONTH | CSX | NS |
|---|---|---|
| Jun-03 | 2.4% | 2% |
| Jul-03 | 2.4% | 2% |
| Aug-03 | 3.2% | 2% |
| Sep-03 | 3.2% | 2% |
| Oct-03 | 3.6% | 2% |
| Nov-03 | 2.4% | 2.0% |
| Dec-03 | 3.2% | 2.0% |
| Jan-04 | 3.6% | 2.0% |
| Feb-04 | 4.0% | 2% |
| **Mar-04** | **4.8%** | **4.8%** |
| Apr-04 | 4.8% | 4.8% |
| May-04 | 5.6% | 5.6% |
| Jun-04 | 5.6% | 5.6% |
| Jul-04 | 7.2% | 7.2% |
| Aug-04 | 6.4% | 6.4% |
| Sep-04 | 7.2% | 7.2% |
| Oct-04 | 8.8% | 8.8% |
| Nov-04 | 9.2% | 9.2% |
| Dec-04 | 12.4% | 12.4% |
| Jan-05 | 10.4% | 10.4% |
| Feb-05 | 8.4% | 8.4% |
| Mar-05 | 9.6% | 9.6% |
| Apr-05 | 10.0% | 10.0% |
| May-05 | 12.8% | 12.8% |
| Jun-05 | 12.4% | 12.4% |
| Jul-05 | 10.8% | 10.8% |
| Aug-05 | 13.6% | 13.6% |
| Sep-05 | 14.4% | 14.4% |
| Oct-05 | 16.8% | 16.8% |
| Nov-05 | 17.2% | 17.2% |
| Dec-05 | 16.0% | 16.0% |
| Jan-06 | 14.4% | 14.4% |
| Feb-06 | 14.8% | 14.8% |
| Mar-06 | 17.2% | 17.2% |
| Apr-06 | 15.6% | 15.6% |
| May-06 | 16.0% | 16.0% |
| Jun-06 | 18.8% | 18.8% |
| Jul-06 | 19.2% | 19.2% |
| Aug-06 | 19.2% | 19.2% |
| Sep-06 | 20.8% | 20.8% |
| Oct-06 | 20.4% | 20.4% |
| Nov-06 | 16.4% | 16.4% |

| MONTH | CSX | NS |
|---|---|---|
| Dec-06 | 14.4% | 14.4% |
| Jan-07 | 14.8% | 14.8% |
| Feb-07 | 16.0% | 16.0% |
| Mar-07 | 12.8% | 12.8% |
| Apr-07 | 14.8% | 14.8% |
| May-07 | 15.2% | 15.2% |
| Jun-07 | 16.4% | 16.4% |

83. In stark contrast to this uniformity in Fuel Surcharge percentages, fuel cost as a percentage of operating cost and fuel efficiency differs widely among the Defendant railroads. Absent collusion, it is extremely unlikely that Defendants, in both the east and the west, would independently price their Rail Fuel Surcharges to arrive at the identical percentage month after month, year after year, for a period of more than three years. The fact that Defendants moved in uniform lockstep for a period of nearly 38 months indicates that Defendants were coordinating their behavior and conspired to fix prices for Rail Fuel Surcharges. In addition, the advance announcements of each Defendant's Fuel Surcharges was an important implementation and enforcement mechanism for the conspiracy.

84. Railroad industry analysts took note of the curious "convergence" in Rail Fuel Surcharge methodologies adopted by the Defendants. For example, after concluding in 2003 that the Rail Fuel Surcharges charged by the Defendants were "not supported" by fuel cost increases, one analyst stated that she was "puzzled by the fact that the railroads appear to be matching fuel surcharges rather than developing their own pricing initiatives." The analyst noted further that "the way to gain significant market share is to lead the competition rather than following the competition." ("Following the Competition" *Traffic World*, July 14, 2003).

85. Defendants' use of retail price indices in furtherance of the conspiracy also allowed them to over-recover their actual fuel costs. An independent study commissioned by the American Chemistry Council and Consumers United for Rail Equity ("CURE") found that the

difference between Defendants' rail fuel surcharge revenue (as publicly reported or estimated) and Defendants' publicly reported actual fuel costs during the period from 2003 through the First Quarter of 2007 came to over $6 billion.

86. BNSF's average cost for diesel fuel in 3rd Quarter 2003 was $0.846 per gallon and its average cost of diesel fuel for 3rd Quarter 2004 was $0.988 per gallon. Thus, BNSF's cost of fuel increased 14.4% from 3rd Quarter 2003 to 2004. In contrast, the surcharge charged by BNSF based on the HDF 3rd Quarter 2003 price was $1.46 per gallon and $1.83 per gallon in 3rd Quarter 2004, amounting to a 25.3% increase. As a result of this disparity in increase percentages, shippers purchasing from BNSF paid 11% more than the actual price BNSF paid for fuel from 3rd Quarter 2003 to 2004. Shippers of unregulated freight from the other Defendants similarly overpaid during this and other periods particularly since the inflated percentage increase was applied to the entire rate at issue not merely to the fuel cost component of that rate. Another reason why Defendants' Rail Fuel Surcharges were not a natural reaction to increased fuel costs is that the surcharge levels disregarded gains in fuel efficiency. As explained in a 2007 AAR publication, the Defendants' fuel efficiency is "constantly improving." BNSF, for example, disclosed in 2005 that it had achieved a 9% improvement in fuel efficiency over the prior ten years. In 2006, the railroads could, on average, move one ton of freight 423 miles on one gallon of diesel fuel. By calculating fuel surcharges as a percentage of the shipping rate, the Defendants deflected attention from the cost savings they achieved through fuel efficiency gains.

87. There is no independent business justification to explain Defendants' behavior. Their uniform pricing of fuel surcharges for more than a three-year period could not have happened by chance or coincidence. Nor was it an expected response to a common business problem. Any actual increased fuel costs experienced by the Defendants would have been

covered by the AII and RCAF. The uniform pricing could only have been achieved by an express agreement followed by collective action – i.e., decoupling fuel prices from the historical railroad cost indices and agreeing to follow new and complex indices and trigger points for computing the stand-alone fuel surcharge percentages. The Defendants' purpose was to use generally increasing fuel costs as a cover for implementing what were, in effect, across-the-board rate increases.

88. In agreeing to collude on fuel surcharges, each Defendant was acting against its independent short-term, economic self-interest. In a competitive environment, free of collusion, carriers with lower fuel costs could impose a lower surcharge and thereby increase market share at the expense of competing railroads. Rather than engage in such competitive behavior, Defendants instead restricted their freedom to price competitively and adhered to an industry-wide pattern of uniform fuel surcharge pricing based on the total cost of the freight.

**OTHER ELEMENTS OF THE CONSPIRACY**

89. At or about the time the Defendants agreed to fix the Rail Fuel Surcharge prices, the Defendants also took other steps in furtherance of the conspiracy. They largely switched from offering long-term contracts (the terms of which were secret) to offering contracts that were "re-priced" as often as monthly. Previously, Defendants had allowed, and often preferred, long-term contracts ranging up to five years with clauses that did not permit rate increases beyond a certain point, usually governed by the AII or the RCAF, or that excluded fuel surcharges altogether.

90. This collective movement away from long-term contracts meant that Defendants no longer offered discounts to increase market share and their pricing became more visible to each other.

91. Defendants made this switch even though most shippers preferred the former system in order to minimize risk and make costs more predictable. In a competitive environment, forcing customers to assume greater risks without any offsetting benefit (such as lower prices) would cause customers to seek alternatives, which should promote competition between carriers for their business. Here, all Defendants raised prices and did not offer any compensation to customers for assuming additional risk. Similarly, in a competitive market, one would expect that the railroads would seek, as they had in the past, to reduce their own risks and lock-in market share by entering into long-term contracts. The Defendants, however, collectively refused to offer long-term contracts and took no steps to minimize their own risks from fluctuations in demand. This coordinated behavior was hardly routine market conduct.

92. In furtherance of the conspiracy, Defendants also declined to negotiate discounts on the Fuel Surcharges and overall contract rates, even though prior to mid-2003 it had been customary for the Defendants at least to entertain such negotiations. Shippers from many different industries, some with significant economic power, tried to negotiate the fuel surcharge percentages, but were told by the Defendants (who had previously been willing to negotiate discounts on rail freight rates) that the Rail Fuel Surcharges were "not negotiable." By way of example, during the relevant period the Archer-Daniels-Midland Company ("ADM") approached individual Defendants to discuss hedging opportunities to allow ADM and the railroads certainty and a method for cost-containment. The railroads, acting against their own individual interests, refused to enter into hedging contracts with ADM.

93. In addition, several national shipper organizations met with each of the Defendants to encourage them to reexamine the methods used to assess Rail Fuel Surcharges. Among the Defendants, only BNSF agreed to make responsive changes to its surcharge program,

and that was only for grain and coal shipments coming from certain regions where the BNSF is the only carrier. That is, BNSF reduced fuel surcharges on traffic where it faced no competition from the UP, and thus would not violate the agreement to fix competitive prices. The other Defendants refused to address the concerns of their customers.

94. In furtherance of the conspiracy, Defendants also decreased the use of "through rates," in which a customer would receive a single bill from either the originating railroad or the termination railroad on a long-distance trip involving more than one railroad (so that a single fee would be allocated among the railroads that shipped). Instead, where a shipment requires movement on more than one railroad, the Defendants moved increasingly to having rates billed separately for each railroad, rather than as one quote for the entire shipment. Defendants made this change, which could only result from their collective action, as part of their conspiracy for two reasons: to provide transparency as to what each railroad was charging on multiple line shipments and to allow each Defendant to bill separately for its applicable fuel surcharge.

95. Defendants also agreed that none of the conspirators would be undercutting agreed pricing or "stealing" market share by using their increasing revenues to subsidize discounting of underlying rates. As demonstrated in the table that follows, Defendants' market shares remained stable following the 2003 agreements.

**Railroad Market Share: Originated Tons and Carloads 2003 - 2006** [1]

| | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|
| **BNSF** | | | | |
| Carloads Originated | 7,662,699 | 8,237,466 | 8,727,121 | 9,335,024 |
| Percent of Total Originated Carloads | 28.4% | 29.2% | 30.2% | 31.2% |
| Tons Originated | 460,789,676 | 483,296,128 | 498,121,970 | 539,511,527 |
| Percent of Total Originated Tons | 27.8% | 28.3% | 28.7% | 30.1% |
| **CSXT** | | | | |
| Carloads Originated | 6,470,386 | 6,611,766 | 6,537,293 | 6,607,931 |
| Percent of Total Originated Carloads | 24.0% | 23.4% | 22.6% | 22.1% |
| Tons Originated | 391,993,962 | 403,152,732 | 409,486,655 | 414,266,429 |
| Percent of Total Originated Tons | 23.7% | 23.6% | 23.6% | 23.1% |
| **NS** | | | | |
| Carloads Originated | 5,115,859 | 5,524,545 | 5,800,390 | 5,824,813 |
| Percent of Total Originated Carloads | 19.0% | 19.6% | 20.0% | 19.5% |
| Tons Originated | 306,322,113 | 319,014,426 | 325,779,848 | 323,407,280 |
| Percent of Total Originated Tons | 18.5% | 18.7% | 18.8% | 18.1% |
| **UP** | | | | |
| Carloads Originated | 7,692,160 | 7,831,823 | 7,874,879 | 8,132,004 |
| Percent of Total Originated Carloads | 28.6% | 27.8% | 27.2% | 27.2% |
| Tons Originated | 497,373,006 | 503,052,146 | 503,056,340 | 514,357,111 |
| Percent of Total Originated Tons | 30.0% | 29.4% | 29.0% | 28.7% |
| Total | | | | |
| Carloads Originated | 26,941,104 | 28,205,600 | 28,939,683 | 29,899,772 |
| Tons Originated | 1,656,478,757 | 1,708,515,432 | 1,736,444,813 | 1,791,542,347 |

1 AAR Railroad Facts and Analysis of Class I Railroads

**THE STB DECISION**

96. On January 25, 2007, the STB, which regulates certain aspects of the railroad industry, issued an administrative decision concluding that the railroads' practice of computing Rail Fuel Surcharges as a percentage of base rate for rate-regulated rail freight transport was an "unreasonable practice," because the fuel surcharges are not tied to the fuel consumption

associated with the individual movements to which they are applied. *Rail Fuel Surcharges*, STB Ex Parte No. 661 (Jan. 25, 2007).

97. The STB's decision addressed rate-regulated rail freight traffic only (which is not the subject of this Complaint). The STB expressly stated that its jurisdiction did not reach rail freight traffic under private contract or otherwise exempted from rate regulation.

98. Pursuant to their conspiracy, Defendants applied the same unreasonable fuel surcharge practices addressed by the STB to the private rail freight transportation contracts, and other unregulated freight transport, at issue in this case.

**DEFENDANTS' SUPRACOMPETITIVE PROFITS**

99. Defendants reaped huge, supracompetitive profits as a result of the success of their conspiracy. Through their agreement to coordinate on Rail Fuel Surcharges, Defendants realized billions of dollars in revenues during the Class Period in excess of their actual increase in fuel costs from the specific customers on whom they imposed the surcharge. During the period of the conspiracy (July 2003 to at least June 30, 2007), Defendants increased their market capitalization from approximately $40 billion to approximately $105 billion, or an increase of about 160 percent. The AAR Policy and Economics Department reported that railroad total operating revenue in the United States increased from $36.6 billion in 2003 to over $52 billion in 2006. These dramatic increases are at least in part attributable to fuel surcharge revenue realized by Defendants through their price fixing conspiracy. As the head of UP, James Young, admitted in 2007, "three, four years ago [the Rail Fuel Surcharges] were really non-existent," and "it's only been the last couple of years that . . . the financial returns in this business has [sic] started to move in the right direction."

100. The unlawful conduct, combination or conspiracy alleged herein had and is having the following effects, among others:

Case 1:07-mc-00489-BAH Document 280-1 Filed 11/24/08 Page 38 of 46

a. The Rail Fuel Surcharges charged to Plaintiffs and the Class for unregulated rail freight transportation have been fixed or stabilized at supra-competitive levels;

b. Plaintiffs and the Class have been deprived of the benefits of free, open and unrestricted competition in the market for unregulated rail freight transportation; and

c. competition in establishing the prices paid in the United States for unregulated rail freight transportation has been unlawfully restrained, suppressed and eliminated.

101. By reason of the violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act, Plaintiffs and the members of the Class have sustained injury to their business or property. The injuries sustained by the Plaintiffs and the Class are the payment of supracompetitive prices for Rail Fuel Surcharges applied to unregulated rail freight transportation throughout the United States as a result of Defendants' illegal contract, combination, and conspiracy to restrain trade as alleged. This is an antitrust injury of the type that the federal laws were meant to punish and prevent.

**COUNT I**

**(Violation Of Section 1 Of The Sherman**
**<u>Act And Section 4 Of The Clayton Act)</u>**

102. Plaintiffs incorporate by reference the allegations in the above paragraphs as if they were fully set forth herein.

103. Defendants entered into and engaged in a contract, combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

104. The contract, combination or conspiracy resulted in an agreement, understanding or concerted action between and among Defendants in furtherance of which Defendants fixed, maintained, and standardized prices for Rail Fuel Surcharges for rail freight transportation handled through private contracts and other means exempt from regulation. Such contract, combination, or conspiracy constitutes a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

105. Defendants' contract, combination, agreement, understanding or concerted action occurred within the flow of, and substantially affected, interstate and international commerce. Defendants' unlawful conduct was through mutual understandings or agreements by, between and among Defendants.

106. The contract, combination or conspiracy has had the following effects:

a. Prices charged to Plaintiffs and the Class for Rail Fuel Surcharges applied to unregulated rail freight transportation were fixed and/or maintained at supra competitive levels;

b. Plaintiffs and the Class have been deprived of the benefits of free, open and unrestricted competition in the market for rail freight transportation services; and

c. competition in establishing the prices paid, customers of, and territories for rail freight transportation services has been unlawfully restrained, suppressed and eliminated.

107. As a proximate result of Defendants' unlawful conduct, Plaintiffs and the Class have suffered injury in that they have paid supracompetitive prices for Rail Fuel Surcharges applied to unregulated rail freight transportation services during the Class Period.

WHEREFORE, Plaintiffs pray for relief as follows:

(1) That the Court determine that this action may be maintained as a class action under Rules 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, that Plaintiffs be denominated as class representative, and that Plaintiffs' counsel be appointed as counsel for the Class;

(2) That the unlawful contract, combination and conspiracy alleged in Count I be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(3) That Plaintiffs and the Class recover compensatory damages, as provided by law, determined to have been sustained as to each of them, and that judgment be entered against Defendants on behalf of Plaintiffs and each and every member of the Class;

(4) That each of the Defendants' respective officers, directors, agents and employees, and all other persons acting on behalf of or in concert with them, be permanently enjoined and restrained from, directly or indirectly, continuing or maintaining the combination, conspiracy, or agreement alleged in this case;

(5) That Plaintiff and the Class recover treble damages, as provided by law;

(6) That Plaintiffs and the Class recover their costs of the suit, including attorneys' fees, as provided by law; and

(7) For such further relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demands a jury trial as to all issues triable by a jury.

Dated: April 15, 2008

| | |
|---|---|
| By: /s/ Stephen Neuwirth<br>Stephen Neuwirth<br>Daniel Brockett<br>Sami H. Rashid<br>QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP<br>51 Madison Avenue, 22nd Floor<br>New York, New York 10010<br>(212) 849-7000 | By: /s/ Michael D. Hausfeld<br>Michael D. Hausfeld (D.C. Bar #153742)<br>Benjamin D. Brown (D.C. Bar #495836)<br>COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.<br>1100 New York Avenue NW<br>Suite 500, West Tower<br>Washington, DC 20005<br>(202) 408-4600<br><br>Steig D. Olson<br>COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.<br>150 E. 52nd Street, 30th Floor<br>New York, NY 10022<br>(212) 838-7797 |
| *Interim Co-Lead Class Counsel for the Proposed Direct Purchaser Class* | |

# PX0992

Filed Under Seal

# EXHIBIT

# PX0993

# A STUDY OF COMPETITION IN THE U.S. FREIGHT RAILROAD INDUSTRY AND ANALYSIS OF PROPOSALS THAT MIGHT ENHANCE COMPETITION

## Revised Final Report

Laurits R. Christensen Associates, Inc.
Madison, WI

November 2009

Executive Summary of Revised Final Report

Prepared for
The Surface Transportation Board
Washington, DC

## Preface to Revised Final Report

In November 2008, Christensen Associates issued *A Study of Competition in the U.S. Freight Railroad Industry and Analysis of Proposals that Might Enhance Competition*. We believed our analysis was based on revenue information from the unmasked Customer Waybill Sample (CWS). However, it has since been discovered that we were provided with a mixture of masked and unmasked CWS revenue data for years 2001-2006, with the effect that masked revenues were used in portions of our analysis. Additionally, the Surface Transportation Board revised CWS data from 1990-1999 that were used to develop data on long-term trends in shipment volumes, revenue, and characteristics. Consequently, the Surface Transportation Board has retained Christensen Associates to revise the original report with the corrected CWS revenue information as well as to update the results with 2007 and 2008 information that has become available since the original report was released.

Using unmasked revenues has generally minor effects on the econometric pricing analysis presented in Chapters 11-15. The corrected analysis shows generally similar responsiveness of revenue per ton-mile to cost-related shipment characteristics and market structure factors as the originally published study. Since unmasked revenues are lower overall than masked revenues, distributions of the revenue-to-variable cost ratio (R/VC) for shipment tonnage and ton-miles reported in Chapter 11 shifted downward, with markedly lower shares above 300 percent R/VC and higher shares below 100 percent R/VC.

Some of the price indexes presented in Chapter 8 also relied on CWS revenues. Using unmasked revenues in the computation of these indexes does not result in any significant changes to our analysis presented in Chapter 8.

In the process of revising the analysis, we also made corrections to Chapter 10 where we originally used nominal values rather than real (constant 2000 dollar) values for revenue per ton mile, average total cost, average variable cost, and average fixed cost. The use of nominal values resulted in an understatement of these values for 1987-1999 and an overstatement of these values for 2001-2006, which have been corrected in this release with the use of real values. However, our crucial finding in Chapter 10—that the recent increase in revenue per ton-mile appears to be the result of cost increases and not due to the increased exercise of market power—remains unchanged.

In addition to the affected chapters, there are some changes in chapters where references are made to the affected chapters. Specifically, the sections of the Executive Summary, and Chapters 18, 22, and 23 that refer to the results of the affected chapters have been revised.

This revision corrects the original report through the period 2006. An update to the study using the newly available 2007 and 2008 data is forthcoming as a separate document.

# Report Contents


## ACKNOWLEDGEMENTS

## ABBREVIATIONS

## EXECUTIVE SUMMARY

## VOLUME 1: DESCRIPTION OF THE U.S. FREIGHT RAILROAD INDUSTRY

ABBREVIATIONS

LIST OF FIGURES

LIST OF TABLES

CHAPTER 1 INTRODUCTION AND OVERVIEW OF VOLUME 1

CHAPTER 2 OVERVIEW OF THE U.S. RAILROAD INDUSTRY

CHAPTER 3 ECONOMIC CHARACTERISTICS OF NETWORK INDUSTRIES WITH COMPARISONS TO THE RAILROAD INDUSTRY

CHAPTER 4 REVIEW OF ECONOMIC STUDIES OF RAILROAD PRICING, COSTS, PRODUCTIVITY, AND INDUSTRY STRUCTURE

CHAPTER 5 THE CURRENT CONCERNS ABOUT THE PERFORMANCE OF THE U.S. FREIGHT INDUSTRY

REFERENCES

## VOLUME 2: ANALYSIS OF COMPETITION, CAPACITY, AND SERVICE QUALITY

ABBREVIATIONS

LIST OF FIGURES

LIST OF TABLES

CHAPTER 6 INTRODUCTION AND OVERVIEW OF VOLUME 2

CHAPTER 7 DATA AND METHODOLOGY

CHAPTER 8 OVERVIEW OF INDUSTRY PERFORMANCE

CHAPTER 9 RAILROAD COSTS AND TECHNOLOGY

CHAPTER 10 AN OVERVIEW OF COSTS AND REVENUE

CHAPTER 11 RAILROAD PRICING BEHAVIOR

CHAPTER 12 ANALYSIS OF COMPETITION: COAL

CHAPTER 13 ANALYSIS OF COMPETITION: CORN AND WHEAT

CHAPTER 14 ANALYSIS OF COMPETITION: CHEMICALS

CHAPTER 15 ANALYSIS OF COMPETITION: INTERMODAL SHIPMENTS

**CHAPTER 16 ANALYSIS OF RAILROAD CAPACITY**

**CHAPTER 17 SERVICE QUALITY**

**CHAPTER 18 CONCLUSIONS ON THE STATE OF COMPETITION IN THE U.S. FREIGHT RAILROAD INDUSTRY**

**REFERENCES**

## VOLUME 3: POLICY ANALYSIS AND FUTURE DIRECTIONS FOR RESEARCH

**ABBREVIATIONS**

**LIST OF FIGURES**

**LIST OF TABLES**

**CHAPTER 19 INTRODUCTION AND OVERVIEW OF VOLUME 3**

**CHAPTER 20 HISTORICAL AND CURRENT RAILROAD LEGISLATION AND REGULATION**

**CHAPTER 21 DESCRIPTION OF RECENT RAILROAD INDUSTRY POLICY PROPOSALS**

**CHAPTER 22 ECONOMIC ANALYSIS OF PROPOSED POLICY CHANGES**

**CHAPTER 23 CONCLUSIONS AND FUTURE DIRECTIONS**

**REFERENCES**

## Acknowledgements

The primary authors of this report are Kelly Eakin, Mark Meitzen, Thomas Bozzo, and Philip Schoech. These authors received insightful guidance from senior members of the Christensen Associates Railroad Study Team, Joseph Swanson of Jos. Swanson & Co. and Northwestern University (project manager), and Douglas Caves and Laurits Christensen (both of Christensen Associates). We also received valuable contributions from the other senior members of our study team, Wesley Wilson of the University of Oregon (who was also largely responsible for Chapter 4) and John Hudson of Northwestern University.

Dave Armstrong was the lead data analyst for the project. Rita Sweeney was the primary editor of this report and Teresa Sholts was the production manager. Key contributions to chapters of this study were made by Casey Schuster (Chapters 20 and 21) and Michael Welsh (Chapter 2). Jane Hosking served as our head librarian. The following Christensen Associates personnel also contributed to this project: Carl Degen, Tammy Droessler, Marlies Hilbrink, Michelle Lindauer, Emilie Rivers, and Brad Wagner.

We received valuable insights and contributions from the members of our Advisory Panel, who are listed in the Appendix to Chapter 5.

In addition, we would like to thank the following individuals for assistance in obtaining data used in this study: Nick Marathon of the U.S. Department of Agriculture; Craig Rocky, John Gray, Clyde Crimmel, and Frank Hardesty of the Association of American Railroads; Steve Brown of the U.S. Government Accountability Office; John Larkin of Stifel Nicolaus; William Greene of Morgan Stanley; Francetta Willett of the U.S. Bureau of Labor Statistics; Mac Frampton and Paul Aguiar of the U.S. Surface Transportation Board; Douglas Benson of the Upper Great Plains Transportation Institute; and Dennis Weisman of Kansas State University.

We also want to thank all the stakeholders who participated in our study in one way or another, providing valuable information, institutional knowledge, and insights.

William Brennan of the STB Office of Economics served as the STB project manager and our liaison with the STB. He was always prompt and helpful in his responses to our inquiries. He managed the project in a manner completely consistent with the stated goal of this project—an independent assessment of the U.S. freight railroad industry.

Inevitably, we have inadvertently forgotten to include someone on this list. We apologize for the oversight and offer our sincere gratitude.

# ABBREVIATIONS

| | |
|---|---|
| 3-R Act | Regional Rail Reorganization Act of 1973 |
| 4-R Act | Railroad Revitalization and Regulatory Reform Act of 1976 |
| AAR | Association of American Railroads |
| AFC | Average Fixed Cost |
| ATC | Average Total Cost |
| AVC | Average Variable Cost |
| BEA | Bureau of Economic Analysis |
| BLS | Bureau of Labor Statistics |
| the Board | Surface Transportation Board |
| BNSF | Burlington Northern Santa Fe |
| CAPM | Capital Asset Pricing Model |
| CBO | Congressional Budget Office |
| CCO | Common Carrier Obligation |
| CFR or C.F.R. | Code of Federal Regulations |
| CMP | Constrained Market Pricing |
| CN | Canadian National |
| the Commission | Interstate Commerce Commission |
| CP | Canadian Pacific |
| CSX | CSX Corporation |
| CWS | Carload Waybill Sample |
| DCF | Discounted Cash Flow |
| DOJ | Department of Justice |
| DOT | Department of Transportation |
| FCC | Federal Communications Commission |
| FDC | Fully Distributed Costing (methodology) |
| FTC | Federal Trade Commission |
| GAO | Government Accountability Office |
| GDP | Gross Domestic Product |
| ICC | Interstate Commerce Commission (also referred to as “the Commission”) |
| ICCTA | ICC Termination Act of 1995 |
| KCS | Kansas City Southern |
| MC | Marginal Cost |

| | |
|---|---|
| MFP | Multi-Factor Productivity |
| NS | Norfolk Southern |
| PAF | Productivity Adjustment Factor |
| PPI | Producer Price Index |
| R/VC | Revenue to Variable Cost ratio |
| R-1 | Form R-1 data from Class I railroads' Annual Reports filed with the STB |
| RCAF | Rail Cost Adjustment Factor |
| RCAF-A | Adjusted RCAF |
| RCAF-U | Unadjusted RCAF |
| RPM | Railroad Performance Measures |
| RPTM | Revenue per Ton-Mile |
| SAC | Stand-Alone Cost (methodology) |
| SARR | Stand-Alone Railroad (analysis) |
| SPLC | Standard Point Location Code |
| STB | Surface Transportation Board |
| STCC | Standard Transportation Commodity Code |
| TFP | Total Factor Productivity |
| TTX | TTX Company |
| UP | Union Pacific |
| URCS | Uniform Rail Costing System |
| USC or U.S.C. | United States Code |
| USO | Universal Service Obligation |
| USDA | U.S. Department of Agriculture |

# Executive Summary Contents

EXECUTIVE SUMMARY .... ES-1

INTRODUCTION .... ES-1
The 2006 GAO Report .... ES-1
The Current Study .... ES-3
Organization of this Executive Summary .... ES-4
ES1 CURRENT STATE OF COMPETITION IN U.S. FREIGHT RAILROAD INDUSTRY .... ES-6
Characteristics of U.S. Freight Railroad Traffic .... ES-6
Structure of U.S. Freight Railroad Industry .... ES-8
Assessment of Shipper Captivity .... ES-10
R/VC Data Issues .... ES-11
R/VC and Market Structure Factors .... ES-12
Evaluating "Captivity" and Market Structure Factors .... ES-14
Trends in Rates .... ES-15
Trends in Input Prices and Productivity .... ES-16
Trends in Economic Costs .... ES-18
Economies of Density and Differential Pricing by Commodity .... ES-22
Financial Viability .... ES-26
ES2 CURRENT AND NEAR-FUTURE CAPACITY CONSTRAINTS .... ES-27
ES3 CAPACITY INVESTMENT .... ES-30
ES4 IMPACT OF CAPACITY CONSTRAINTS ON COMPETITION .... ES-32
Stakeholder Feedback on Causes of Capacity Constraints .... ES-32
Assessment of the Impact of Capacity Constraints .... ES-33
ES5 SERVICE QUALITY ISSUES .... ES-34
Stakeholder Feedback on Service Quality .... ES-34
Train Speed as an Indicator of Service Quality .... ES-35
Variability in Average Speed by Train Type .... ES-37
ES6 IMPLICATIONS FOR PROPOSED POLICY CHANGES .... ES-38
ES7 CONCLUSIONS AND FUTURE RESEARCH DIRECTIONS .... ES-42
Captivity and Effective Competition .... ES-43
Service Quality .... ES-43
Capacity .... ES-43
Cost Shifting .... ES-43
Fuel Surcharges .... ES-44
Issues Related to Class II and Class III Railroads .... ES-44
Critical Evaluation of Rail Demand Growth Projections .... ES-44
Reduction in Railroad Network Access .... ES-44

# LIST OF FIGURES

Figure ES-1 Class I Proportions of U.S. Railroad Miles of Track Owned and Operated 1987-2006 ..... ES-9
Figure ES-2 Class I Ratio of Net Ton-Miles to Total Track Miles 1987-2006 ..... ES-10
Figure ES-3 R/VC Averages by Origin County for Wheat Shipments 2001-2006 Carload Waybill Sample ..... ES-13
Figure ES-4 County-Level Effects of Market Structure Variables in Wheat Pricing Models on Real Revenue per Ton-Mile ..... ES0-14
Figure ES-5 Industry-Wide Indexes Constructed from Carload Waybill Sample 1987 = 100 ..... ES-15
Figure ES-6 RCAF-A, 1989-2008 ..... ES-16
Figure ES-7 MFP Growth Differential: Railroad Industry v. Private Business Sector ..... ES-18
Figure ES-8 Class I Average Total Cost, Average Variable Cost, and Average Fixed Cost (Year 2000 Dollars) ..... ES-19
Figure ES-9 Class I Industry Markup Ratios ..... ES-20
Figure ES-10 Class I Industry Ratio of Average RPTM to Average Total Cost ..... ES-21
Figure ES-11 Railroad Industry Lerner Markup Index ..... ES-22
Figure ES-12 Earnings per share 1997-2006 ..... ES-27
Figure ES-13 Capital Spending/Revenue 1997-2006 ..... ES-31
Figure ES-14 Changes in Average Speed by railroad and Train Type, 1999-2005 ..... ES-36
Figure ES-15 Stylized Representation of Railroad Interchange and Length-of-Haul Economies ..... ES-41

# LIST OF TABLES

TABLE ES-1 TON-MILES OF FREIGHT BY MODE ..... ES-7
TABLE ES-2 RAIL SHIPMENTS BY COMMODITY GROUPING, 2007 ..... ES-7
TABLE ES-3 PERCENT OF TONS AND TON-MILES BY R/VC CATEGORY 2000-2001 V. 2005-2006 CARLOAD WAYBILL SAMPLE DATA ..... ES-11
TABLE ES-4 CORRELATIONS OF ORIGIN COUNTY* R/VC WITH REVENUE PER TON-MILE AND MARKET STRUCTURE FACTORS, 2001-2006 DATA, SELECTED COMMODITIES ..... ES-12
TABLE ES-5 GROWTH IN RCAF-U COMPONENTS AVERAGE ANNUAL GROWTH IN PRICES, 1994Q1-2008Q2 ..... ES-17
TABLE ES-6 MEDIAN ESTIMATED ADJUSTED MARGINAL COSTS AND LERNER MARKUP INDEXES ..... ES-23
TABLE ES-7 VARIABILITY IN AVERAGE TRAIN SPEED BY RAILROAD AND TRAIN TYPE ..... ES-38
TABLE ES-8 LIKELY ECONOMIC EFFECTS OF VARIOUS OPEN-ASSESS PROPOSALS ..... ES-39

# EXECUTIVE SUMMARY

# A Study of Competition in the U.S. Freight Railroad Industry and Analysis of Proposals that Might Enhance Competition

## INTRODUCTION

This report presents the findings of an independent study of the competitive state of the U.S. freight railroad industry performed by the study team assembled by Christensen Associates and commissioned by the U.S. Surface Transportation Board (STB). In conducting this study, the Christensen Associates study team has received cooperation from the STB and numerous railroad industry stakeholders including railroads, various shipper group organizations, numerous individual shippers, government organizations, academics, and other stakeholders. The study team also assembled an Advisory Panel with representatives from a broad cross-section of industries, groups, and stakeholders. While valuable insights and assistance were obtained by the study team from these various groups, no individual, government agency, railroad, shipper, or any other industry stakeholder has influenced the findings of this study. The findings presented and conclusions reached in this report are the professional judgments and opinions of the Christensen Associates railroad study team.

The U.S. freight railroad industry has undergone a remarkable transformation since 1980 when Congress passed The Staggers Rail Act. In the decades preceding the passage of this seminal act, railroads suffered traffic losses that led to widespread insolvencies. The deregulation of the railroad industry ushered in increased market flexibility, competitive and differential rates for rail service, and a climate open to innovation. In the years following the passage of The Staggers Act, the railroad industry experienced dramatic reductions in costs and increased productivity, which yielded higher returns for carriers and lower inflation-adjusted rates for shippers. Thus both railroads and their customers benefited from regulatory reform.

## The 2006 GAO Report

Despite the benefits of deregulation, including improved financial performance of railroads and constant dollar rate declines, the railroad industry's stakeholders continue to be concerned over competition, captivity, rates, service performance, and financial viability. Largely due to Congressional concern over the appropriate balancing of railroad and

shipper interests, and the continued viability and ability of the railroad industry to fulfill demands for its services, the U.S. Government Accountability Office (GAO) has issued several reports on the freight railroad industry since the passage of the Staggers Act:

> Policymakers continue to believe that the federal government should provide a viable process to protect shippers against unreasonably high rates, as well as address competition issues, while still balancing the interests of both railroads and shippers. Over the past 10 years, significant consolidation has taken place in the freight railroad industry, while railroads—particularly Class I railroads—have seen their productivity and financial health improve. Railroad officials worry that any attempt to increase economic regulation will reduce carriers' ability to earn sufficient revenues and limit future infrastructure investment. At the same time, a number of academic and government studies are predicting a significant increase in the demand for freight rail over the next 10 to 15 years.[1]

The 2006 GAO report noted that, after a long-term downward trend in railroad rates since passage of the Staggers Act, increases began to occur in the early 2000s:

> Between 1985 and 2000, rail rates generally declined, but then increased slightly from 2001 through 2004. Although rates have declined since 1985, they have not done so uniformly, and rates for some commodities are significantly higher than rates for others. Several factors could have contributed to recent rate increases, including broad changes in the domestic and world economy, the emergence of a capacity constrained environment in which demand exceeds supply, and consolidation in the 1990s in the industry leading to changes in competition. Other costs, such as fuel surcharges, have also shifted to shippers, …[2]

---

[1] Government Accountability Office, *Freight Railroads: Industry Health Has Improved, but Concerns about Competition and Capacity Should Be Addressed*, GAO-07-94, October 6, 2006, pp. 1-2.

[2] Government Accountability Office, *Freight Railroads: Industry Health Has Improved, but Concerns about Competition and Capacity Should Be Addressed*, GAO-07-94, October 6, 2006, p. 3.

The question posed by the GAO was whether the observed pattern in railroad rates was the reflection of economic market forces or "a possible abuse of market power:"

> Some concerns about competition and captivity in the industry remain because traffic is concentrated in fewer railroads. It is difficult to determine precisely how many shippers are captive because available proxy measures can overstate or understate captivity. In addition, STB does not accurately collect railroad revenue data. Nevertheless, our analysis of available measures indicates that the extent of captivity appears to be dropping, but the percentage of industry traffic traveling at rates substantially over the statutory threshold for rate relief has increased. For example, the amount of traffic traveling at rates over 300 percent of the railroad's variable cost increased from 4 percent in 1985 to 6 percent in 2004. Furthermore, some areas with access to one Class I railroad have higher percentages of traffic traveling at rates that exceed the statutory threshold for rate relief. These findings may reflect reasonable economic practices by the railroads in an environment of excess demand, or they may indicate a possible abuse of market power.[3]

## The Current Study

Based on these observations and concerns, the GAO recommended that the STB conduct a rigorous analysis of the state of U.S. railroad competition:

> We are recommending that STB conduct a rigorous analysis of the state of competition nationwide and, where appropriate, consider the range of actions available to address problems associated with the potential abuse of market power.[4]

[3] Government Accountability Office, *Freight Railroads: Industry Health Has Improved, but Concerns about Competition and Capacity Should Be Addressed*, GAO-07-94, October 6, 2006, p. 3.

[4] Government Accountability Office, *Freight Railroads: Industry Health Has Improved, but Concerns about Competition and Capacity Should Be Addressed*, GAO-07-94, October 6, 2006, pp. 3-4.

In response to the GAO's call for further study, the STB released an RFP for an analysis of the current state of competition in the U.S. railroad industry. A contract was subsequently awarded to the team assembled by Christensen Associates. As part of this study, we were directed to consider actions to address problems associated with the exercise of market power in the railroad industry.

Prior to initiating quantitative research, we conducted a qualitative research phase of our project. This qualitative phase primarily consisted of obtaining input from a broad spectrum of railroad industry stakeholders. The purpose of our qualitative research was to obtain railroad industry stakeholders' input on the important issues facing the industry—e.g., competition, rates, capacity, service quality—and to ensure, to the extent possible,[5] that these perspectives were considered in our study. We conducted our qualitative research in a manner that provided open access to any stakeholder who desired to provide input to us. We accomplished this through two approaches for soliciting input. First, we initiated contact with stakeholders in various targeted groups and conducted interviews in person and also over the phone. In addition to initiating contact with stakeholders, we established a website (www.lrca.com/railroadstudy) to provide a means by which any interested party could reach us. We obtained extensive stakeholder input that greatly assisted in the focus of our research efforts and also indicated areas where further investigation is warranted.

Our report is organized in three volumes: Volume 1 presents a description of the U.S. freight railroad industry. Volume 2 contains our quantitative analysis of industry competition, capacity, and service quality. Volume 3 presents our analysis of policy changes that others have proposed for the railroad industry.

## Organization of this Executive Summary

In our approach to analyzing the competitive state of the U.S. freight railroad industry, we identified five fundamental questions. This Executive Summary reports the key findings of our study in relation to these questions:

- What is the current state of competition in the U.S. railroad industry?
- What are the current and near future capacity constraints in the U.S. railroad industry?
- How do competition and regulation in the railroad industry impact capacity investment?

[5] Some of the issues raised by stakeholders were outside the scope of our study, while data limitations prevented us from thoroughly examining a few issues.

- How do capacity constraints impact competition?
- How do competition, capacity constraints, and other factors influence the quality of service?

In focusing on these questions, our study also sheds light on whether the current situation reflects reasonable economic practices by the railroads. Addressing these questions also provides important input into our economic analysis of recent proposals for railroad industry policy changes. Our study finds that:

- Class I railroads' rates (real revenue per ton-mile) were substantially above short-run marginal cost in 2006.
- Economies of density and fixed costs require railroad pricing above short-run marginal cost to achieve revenue sufficiency.
- For most years in the 1987 to 2006 period of our study, the Class I railroad industry does not appear to be earning above normal profit.
- The increase in railroad rates experienced in recent years is the result of declining productivity growth and increased costs rather than the increased exercise of market power.
- Railroads use differential pricing to recover their total costs.
- Different commodity groups face different markups of railroad rates over marginal costs.
- Within commodity groups, shippers with no or very limited transportation options tend to pay higher rates than shippers with the same shipment characteristics who enjoy more or better transportation alternatives.
- The ratio of revenue to URCS variable cost (R/VC) is weakly correlated with market structure factors that affect shipper "captivity," and is not a reliable indicator of market dominance.
- Capacity "tightness" is primarily due to congestion at terminals or other specific network locations. Terminal congestion in the 2003-2005 period was linked to service performance declines during that time period.
- Current market circumstances imply that providing significant rate relief to certain groups of shippers will likely result in rate increases for other shippers or threaten railroad financial viability.
- Incremental policies such as reciprocal switching and terminal agreements have a greater likelihood of resolving shipper

concerns via competitive response, and have a lower risk of leading to adverse changes in industry structure, costs, and operations.

- Some shippers will not benefit from efforts to enhance railroad competition, implying the necessity of continued regulatory oversight.

While the GAO posed the question of whether recent performance of the U.S. freight railroad industry is indicative of "a possible abuse of market power," our analysis provides evidence on whether there has been a change in the exercise of market power by U.S. railroads. By definition, the setting of price above marginal cost is what economists consider to be an exercise of market power, but exercise does not imply abuse. To address the question of whether there has been an "abuse of market power" would require judgments as to the fairness of the distribution of value between the railroads and the shippers, and on the distribution of the overhead cost collection among the shippers. These judgments are policy questions and not resolvable through economic analysis alone. Instead, we have answered the economic questions of the extent to which recent railroad pricing behavior reflects changing cost conditions, and the extent to which it represents an increase in the overall exercise of market power. Furthermore, our analysis sheds light on how recent railroad pricing behavior has shifted the burden of overhead cost collection among the different sets of shippers.

## ES1 Current State of Competition in U.S. Freight Railroad Industry

### Characteristics of U.S. Freight Railroad Traffic

Since 1980, railroads have been gaining an increasing share of U.S. freight shipments (see Table ES-1). According to data complied by the U.S. Department of Transportation, railroads accounted for about 27 percent of the ton-miles of U.S. freight moved in 1980. By 2005, the share of ton-miles attributed to railroads increased to about 38 percent.[6]

[6] National Transportation Statistics 2008, U.S. Department of Transportation, Research and Innovative Technology Administration, Bureau of Transportation Statistics.

**TABLE ES-1**
**TON-MILES OF FREIGHT BY MODE**[7]

| | 1980 | 1985 | 1990 | 1995 | 2000 | 2005 |
|---|---|---|---|---|---|---|
| **Total** | 3,404,015 | 3,313,968 | 3,621,943 | 4,104,235 | 4,328,642 | 4,537,921 |
| Air Carrier | 4,840 | 6,710 | 10,420 | 12,720 | 15,810 | 15,731 |
| Intercity Truck | 629,675 | 716,808 | 848,779 | 1,034,041 | 1,192,825 | 1,293,326 |
| Rail | 932,000 | 876,209 | 1,064,408 | 1,317,010 | 1,546,319 | 1,733,777 |
| Domestic Water | 921,835 | 892,971 | 833,544 | 807,728 | 645,799 | 591,276 |
| Pipeline | 915,666 | 821,270 | 864,792 | 932,737 | 927,889 | 903,811 |
| Rail Share | 27% | 26% | 29% | 32% | 36% | 38% |

Table ES-2 indicates that a wide variety of commodities are transported by railroads.

**TABLE ES-2**
**RAIL SHIPMENTS BY COMMODITY GROUPING, 2007**[8]

| | Tons Originated (thousands) | Tons Originated percent | Gross Revenue (millions) | Gross Revenue percent |
|---|---|---|---|---|
| Coal | 849,630 | 43.8% | $11,471 | 21.0% |
| Chemicals & allied products | 177,612 | 9.2% | $6,885 | 12.6% |
| Farm products | 152,242 | 7.8% | $4,529 | 8.3% |
| Nonmetallic minerals | 137,556 | 7.1% | $1,527 | 2.8% |
| Misc. mixed shipments* | 124,531 | 6.4% | $7,863 | 14.4% |
| Food & kindred products | 105,457 | 5.4% | $4,041 | 7.4% |
| Metallic ores | 59,162 | 3.1% | $542 | 1.0% |
| Metals & allied products | 57,046 | 2.9% | $2,353 | 4.3% |
| Petroleum & coke | 56,262 | 2.9% | $1,797 | 3.3% |
| Stone, clay, & glass products | 48,115 | 2.5% | $1,607 | 2.9% |
| Waste & scrap materials | 48,034 | 2.5% | $1,276 | 2.3% |
| Lumber & wood products | 36,152 | 1.9% | $1,987 | 3.6% |
| Pulp, paper, & allied products | 35,269 | 1.8% | $2,100 | 3.8% |
| Motor vehicle equipment | 31,682 | 1.6% | $4,016 | 7.3% |
| All other commodities | 20,989 | 1.1% | $2,642 | 4.8% |
| **Total** | 1,939,738 | 100.0% | $54,637 | 100.0% |

* The misc. mixed shipments category consists primarily of intermodal shipments.

In terms of tons originated, coal represents, by far, the largest proportion of railroad shipments. Chemicals, farm products, nonmetallic minerals, and miscellaneous mixed shipments are also relatively large categories in terms of tons originated. Examining the proportions of railroad gross

[7] National Transportation Statistics 2008, U.S. Department of Transportation, Research and Innovative Technology Administration, Bureau of Transportation Statistics.

[8] Class I Railroad Statistics, Association of American Railroads, July 17, 2008.

revenues by commodity group, coal is still the largest category but, reflecting its low-value, bulk commodity status, does not stand out as much from the other commodity groups in terms of revenue as it does in terms of tonnage. The miscellaneous mixed shipments category, which consists primarily of intermodal shipments, represented only 6.4 percent of 2007 tons originated but accounted for 14.4 percent of railroad revenues.[9] This is a reflection of the high value of intermodal railroad services. Other categories that represent relatively large proportions of railroad revenues include chemicals, farm products, food, and motor vehicle equipment. While railroads play a key role in overall U.S. freight shipments, shippers of certain commodities are especially reliant on rail transportation. For example, the Association of American Railroads (AAR) reports that 70 percent of domestically produced automobiles,[10] 70 percent of coal delivered to power plants,[11] and about 35 percent of the U.S. grain harvest all move by rail.[12]

## Structure of U.S. Freight Railroad Industry

Consolidations in the railroad industry have reduced the number of Class I railroads from about forty around the time of the passage of the Staggers Act to the current seven.[13] While the number of Class I railroads has declined, the total number of railroads has increased from about 490 in the mid-1980s to the current 559.[14] The number of Class I railroad employees declined from over 450,000 in 1980 to 167,000 in 2007.[15] Non-Class I employment has declined in proportion to Class I employment reductions so that the percent of industry employment by non-Class I railroads has remained at approximately ten percent.

Regional and shortline railroads own and/or operate an increasing proportion of the nation's railroad infrastructure. Overall, both total miles of road owned and miles of road operated by all U.S. railroads have fallen between 1987 and 2006. However, both measures have fallen more sharply for Class I railroads than for all railroads in the U.S. Between

[9] Class I Railroad Statistics, Association of American Railroads, July 17, 2008.

[10] "The Economic Impact of America's Freight Railroads," Association of American Railroads, August 2008, p. 2. The percentage reported here does not include imported automobiles transported by railroad from ports on both coasts.

[11] "Railroads and Coal," Association of American Railroads, July 2008, p. 3.

[12] "Railroads and Grain," Association of American Railroads, July 2008, p. 5.

[13] "The Effects of Rail Mergers on the Number of Class I Railroads and Shipper Captivity," Association of American Railroads, August 2008, p. 1.

[14] "Railroad Ten-Year Trends," American Association of Railroads, Vol. 7, p. 10; and "Class I Railroad Statistics, 2007," Association of American Railroads.

[15] "Class I Railroad Statistics, 2007," Association of American Railroads; "Railroad Ten-Year Trends," Association of American Railroads, Vol. 7, p. 10.

1987 and 2006, miles of track operated declined by 18.9 percent for Class I railroads versus a decline of 5.9 percent for all U.S. railroads. Similarly, miles of track owned declined by 26.8 percent for Class I railroads versus a decline of 20.9 percent for all U.S. railroads over this period.[16] The proportions of total industry miles owned and miles operated by Class I railroads have fallen from over 80 percent of the industry totals in the 1980s to about 77 percent (owned) and 70 percent (operated) today, as the number of smaller railroads has increased significantly over this period. As Figure ES-1 shows, the decline has recently been greater for the Class I proportion of miles operated, reflecting spinoffs in the operation of Class I-owned trackage to other railroad classes.

**FIGURE ES-1**
**CLASS I PROPORTIONS OF U.S. RAILROAD MILES OF TRACK OWNED AND OPERATED 1987-2006**




While total Class I miles of track have declined, usage of that track has intensified as Class I revenue ton-miles have grown continuously over the study time period. Between 1987 and 1999, Class I net ton-miles grew by 51.5 percent, compared to a 19.9 percent decline in total track miles. Between 1999 and 2006, Class I net ton-miles grew by 23.1 percent, compared to a 1.7 percent decline in total track miles.[17]

The increasingly intensive use of Class I track miles is illustrated in Figure ES-2, which charts the Class I ratio of net ton-miles to total track

[16] "Railroad Ten-Year Trends," American Association of Railroads, Vol. 24, p. 10; "Class I Railroad Statistics, 2007," Association of American Railroads; and "Railroad Ten-Year Trends," American Association of Railroads, Vol. 7, p. 10. The reported values do not include data for Canadian railroads with U.S. operations.

[17] Net ton-mile data are from R-1 Annual Reports, Schedule 755, Line 114, Column B.

miles. This increasingly intensive use of railroad networks results in lower per-unit costs—a reflection of economies of density.

**FIGURE ES-2**
**CLASS I RATIO OF NET TON-MILES TO TOTAL TRACK MILES**
**1987-2006**




## Assessment of Shipper Captivity

The analysis of shipper captivity in the 2006 GAO report includes the computation of shares of shipments generating revenues in excess of 180 percent and 300 percent of URCS variable cost, and discussion of changes in those shares over time. GAO presented its analysis in the context of the statutory role played by the 180 percent revenue/variable cost (R/VC) threshold in triggering rate reviews, and the limited availability of data to properly measure or serve as proxies for shipper captivity:

> Nevertheless, our analysis of available measures indicates that the extent of captivity appears to be dropping, but the percentage of industry traffic traveling at rates substantially over the statutory threshold for rate relief has increased. For example, the amount of traffic traveling at rates over 300 percent of the railroad's variable cost increased from 4 percent in 1985 to 6 percent in 2004. Furthermore, some areas with access to one Class I railroad have higher percentages of traffic traveling at rates that exceed the statutory threshold for rate relief.[18]

[18] Government Accountability Office, *Freight Railroads: Industry Health Has Improved, but Concerns about Competition and Capacity Should Be Addressed*, GAO-07-94, October 6, 2006, p. 3.

In Chapter 11, we examined 2000-2001 and 2005-2006 Carload Waybill Sample data and found that the fractions of tonnage and ton-miles exceeding 180 percent R/VC were relatively constant, but the fractions exceeding 300 percent R/VC increased (see Table ES-3). Our results are consistent with the direction of the GAO findings. We also examined the shares of traffic traveling at rates less than 100 percent R/VC, which are substantial and, interestingly, also increased between the two periods.

**TABLE ES-3**
**PERCENT OF TONS AND TON-MILES BY R/VC CATEGORY**
**2000-2001 V. 2005-2006 CARLOAD WAYBILL SAMPLE DATA**

| | Percent of Tons by R/VC Category | | | | |
|---|---|---|---|---|---|
| **Period** | **R/VC < 100 Percent** | **R/VC between 100 and 180 Percent** | **R/VC between 180 and 300 Percent** | **R/VC > 300 Percent** | **Subtotal R/VC > 180 Percent** |
| 2000-2001 | 16% | 50% | 28% | 6% | 34% |
| 2005-2006 | 21% | 45% | 25% | 9% | 34% |

| | Percent of Ton-Miles by R/VC Category | | | | |
|---|---|---|---|---|---|
| **Period** | **R/VC < 100 Percent** | **R/VC between 100 and 180 Percent** | **R/VC between 180 and 300 Percent** | **R/VC > 300 Percent** | **Subtotal R/VC > 180 Percent** |
| 2000-2001 | 22% | 57% | 19% | 2% | 21% |
| 2005-2006 | 29% | 51% | 16% | 4% | 19% |

## R/VC Data Issues

In Chapter 11, we discussed two main issues with the R/VC data in the CWS that we believe make this ratio an unreliable indicator of market-dominant behavior. First, there is evidence of methodological changes that might materially affect the measured shares of shipments exceeding 180 percent R/VC. Second, captivity measures based on categorizing shipment-level R/VC (or markup) data are dependent on good alignment of actual and measured costs, particularly for extreme values of R/VC, but the large shares of tons and ton-miles with R/VC below 100 percent suggest that measured and actual variable costs are not well-aligned in the tails of the R/VC distribution.

R/VC ranges remain large even after aggregation over time and geography. For example, the county-level R/VC ratios for wheat shipments range from 43 percent to 516 percent. While substantial variation in actual R/VC is certainly possible, the R/VC variations are large relative to the estimated effects of the market structure factors in the pricing models. As we illustrate in Figures ES-3 and ES-4, the implication is that much of the R/VC variation is related to factors other than market structure features that determine shipper captivity.

## R/VC and Market Structure Factors

From an economic perspective, “relative captivity” arises for shippers whose next best alternatives do not effectively constrain railroad rates. The effects of captivity may be continuous and have no definite relationship to markup thresholds. For instance, a shipper may pay a rail rate under the 180 percent R/VC threshold and nevertheless experience a degree of “captivity” relative to other shippers with similar cost characteristics because other shippers have better access to intramodal or intermodal competition that results in lower rail rates. Conceptually, more appropriate measures of captivity should focus on the effects of the transportation market structure on rail rates—and, by extension, markups—rather than on markups as indicators, *per se*, of market-dominant behavior. In this regard, the GAO was justified in examining additional measures using information on market structure, such as rates and R/VC in areas without Class I railroad competition.[19]

Furthermore, the R/VC ratio does not appear to perform well as a proxy for conceptually more appropriate market structure measures. We find that R/VC is weakly related to measures of railroad and water competition. Table ES-4 shows correlations between county-level R/VC ratios and market structure factors for selected commodities.

**TABLE ES-4**
**CORRELATIONS OF ORIGIN COUNTY* R/VC WITH REVENUE PER TON-MILE AND MARKET STRUCTURE FACTORS, 2001-2006 DATA, SELECTED COMMODITIES**

| | Correlation Coefficient with R/VC Ratio | | | | | |
|---|---|---|---|---|---|---|
| **Commodity Group** | **RPTM** | **Distance to Water (Origin)** | **Distance to Water (Destination)** | **Railroad Competition at Origin** | **Railroad Competition at Destination** | **Econometric Market Structure Shifter** |
| Chemicals | 0.29 | -0.02 | 0.00 | -0.12 | -0.11 | 0.14 |
| Coal | 0.65 | -0.23 | 0.06 | -0.25 | -0.13 | 0.01 |
| Corn | 0.19 | -0.02 | 0.11 | -0.03 | -0.03 | 0.01 |
| Intermodal | 0.10 | -0.04 | 0.12 | -0.04 | -0.23 | 0.19 |
| Transportation | 0.15 | -0.16 | -0.15 | 0.04 | -0.01 | -0.06 |
| Wheat | 0.21 | 0.21 | -0.03 | -0.07 | 0.07 | 0.19 |

* Note: Coal based on destination county data.

As reported in Chapter 12, our coal pricing models find evidence of strong competitive effects from railroad competition at the destination counties, but the correlation between county-level R/VC and our measure of destination competition is only -0.13.

[19] Government Accountability Office, *Freight Railroads: Industry Health Has Improved, but Concerns about Competition and Capacity Should Be Addressed*, GAO-07-94, October 6, 2006, p. 36.

Using wheat as an example, the correlation between R/VC and the distance to water at origin in Table ES-4 is 0.21. Comparing Figures ES-3 and ES-4 reveals the relatively weak correlation. Figure ES-3 shows relatively high R/VC ratios in some areas implicated in wheat shippers' "captivity" complaints—notably, the far northern Plains—but not in other areas well-removed from water alternatives such as western Kansas. Figure ES-3 also shows high R/VC ratios in Pacific Northwest counties and other areas that would be expected to have better modal alternatives. The pricing models for wheat imply a strong effect of distance from the origin county to water transportation on wheat rates; that effect dominates the market structure effect as seen in Figure ES-4. These results are typical of the weak relationships between R/VC and market structure measures observed for other commodities.

**FIGURE ES-3**
**R/VC AVERAGES BY ORIGIN COUNTY FOR WHEAT SHIPMENTS**
**2001-2006 CARLOAD WAYBILL SAMPLE**



**FIGURE ES-4**
**COUNTY-LEVEL EFFECTS OF MARKET STRUCTURE VARIABLES IN WHEAT PRICING MODELS ON REAL REVENUE PER TON-MILE**




## Evaluating "Captivity" and Market Structure Factors

The R/VC ratio, applied prudently, may be able to identify categories of shipments that travel at high rates relative to costs, but the R/VC ratio is not very useful as an indicator of the presence of market structure factors that would increase a shipper's "captivity" to an individual railroad. The weak relationships between R/VC ratios and market structure factors illustrated in Table ES-4 imply that correctly assessing the presence of market-dominant behavior requires direct assessment of relevant market structure factors. Thus, regulatory reforms that would establish R/VC tests as the sole quantitative indicator of a railroad's market dominance are not appropriate.

In contrast, analyses of railroad rates (real revenue per ton-mile or RPTM) using data sources such as the CWS can indicate the effects of railroad and water competition factors on RPTM directly. These analyses permit us to identify market structure factors that have greater effects on RPTM by commodity, and also counties with combinations of market structure factors that will tend to increase a shipper's relative captivity.

## Trends in Rates

While overall railroad prices were fairly stable-to-declining for a long period of time in the post-Staggers Act period, rates have increased substantially in the last few years. Figure ES-5 shows industry-wide rate indexes for the period 1987 through 2006. In addition to the industry-wide index constructed by the GAO, and the U.S. Bureau of Labor Statistics' Producer Price Index, we constructed two rate indexes from information contained in the Carload Waybill Sample. As described in Chapter 8, these two indexes are designed to address some of the conceptual weaknesses that have previously been attributed to the GAO index and the Producer Price Index. Because the GAO noted that there had been a substantial increase in miscellaneous charges in recent years, which may reflect fuel surcharge billings, we constructed one index based on freight revenues reported in the Carload Waybill Sample ("Freight Rate"), and a second index based on total revenue (including miscellaneous charges – "Freight/Misc"). The indexes that we constructed showed very little overall price change between 1987 and 2004, but these rate indexes showed increases exceeding seven percent per year (in nominal dollars) in 2005 and 2006. The four reported rate indexes represent overall trends for the railroad industry, but do not reflect significant differences that exist among the rates paid by different commodities. Chapter 8 (among several other chapters in Volume 2) provides more detail on rate changes by commodity.

**FIGURE ES-5**
**INDUSTRY-WIDE INDEXES CONSTRUCTED FROM CARLOAD WAYBILL SAMPLE**
**1987 = 100**



## Trends in Input Prices and Productivity

As illustrated in Figure ES-5 above, since the early 2000s, rates generally began to go up, creating questions about the exercise of market power in the increasingly concentrated railroad industry.[20] Much of the observed increase in rail rates can be explained by examining railroad industry input prices and productivity growth.

The STB's rail cost adjustment factor, unadjusted for productivity gains (RCAF-U) represents trends in railroad input prices. It is based on the All-Inclusive Index for Class I railroads, maintained by the Association of American Railroads (AAR). The All-Inclusive Index measures price changes for the major components of the railroad industry's operating expenses—labor, fuel, materials and supplies, equipment rents, depreciation, interest, and other expenses. The second element of the STB's RCAF methodology is the productivity adjustment factor (PAF), which represents trends in output per unit of input. The final element of this methodology is the productivity-adjusted rail cost adjustment factor (RCAF-A), which is obtained by dividing the RCAF-U by the PAF. By construction, RCAF-A measures trends in the railroad industry's unit costs, as it represents the difference between input price growth and productivity growth.

Figure ES-6 shows the quarterly RCAF-A from the Quarter 1 of 1989 through the Quarter 2 of 2008.

**FIGURE ES-6**
**RCAF-A, 1989-2008**




[20] For example, see Government Accountability Office, *Freight Railroads Industry Health Has Improved, but Concerns about Competition and Capacity Should Be Addressed*, GAO-07-94, October 6, 2006, pp. 11-15.

The RCAF-A series illustrates the net impact of input price increases and productivity increases on the railroad industry's unit costs. As detailed in Chapter 8, in recent years railroad input price growth has generally increased across most categories (not only fuel) and, at the same time, industry productivity growth has slowed. Thus, overall railroad unit costs, measured by RCAF-A have gone up in recent years after reaching a minimum in Quarter 3 of 2002.

Table ES-5 provides details on the sources of railroad input price growth. It shows the average annual rates of nominal input price growth for labor, fuel, materials and services, equipment rents, depreciation, interest, and other expenses between Quarter 1 of 1994 (the first instance RCAF-U component detail was available) and Quarter 2 of 2008. This table also shows the average annual rates of input price growth for two sub-periods, Quarter 1 of 1994 to Quarter 3 of 2002 (when RCAF-A reached a minimum) and Quarter 3 of 2002 to Quarter 2 of 2008. The table illustrates that the increase in fuel costs has been much greater in the second sub-period. However, with the exception of interest (which has only a cost weight of 2.7 percent in the 2008 RCAF-U), all other railroad input prices grew faster in the second sub-period than in the first sub-period.

**TABLE ES-5**
**GROWTH IN RCAF-U COMPONENTS**
**AVERAGE ANNUAL GROWTH IN PRICES, 1994Q1-2008Q2**

| | 1Q94-2Q08 | 1Q94-3Q02 | 3Q02-2Q08 | 1Q00-2Q08 |
|---|---|---|---|---|
| Labor | 2.8% | 2.4% | 3.5% | 3.0% |
| Fuel | 11.4% | 3.2% | 23.9% | 15.9% |
| M&S | 3.2% | 0.6% | 7.0% | 5.1% |
| Equip. Rents | 1.3% | 1.0% | 1.8% | 1.5% |
| Depreciation | 2.3% | 0.7% | 4.8% | 3.2% |
| Interest | -2.8% | -2.5% | -3.3% | -1.0% |
| Other | 2.1% | 1.0% | 3.8% | 2.7% |
| | | | | |
| RCAF-U | 3.4% | 1.5% | 6.3% | 4.5% |

The productivity trends in the STB's PAF measure generally follow railroad industry productivity trends measured by the U.S. Bureau of Labor Statistics (BLS). The BLS maintains a multifactor productivity (MFP) index for the railroad industry, which extends back to 1959 (PAF is available only back to 1989). The MFP index for railroads shows that while productivity increased during the pre-Staggers era, there was a substantial increase in railroad productivity growth during the 1980s and into the 1990s. Beginning in the 1990s, the rate of productivity growth began to decrease (i.e., productivity growth was less rapid) ,to the point where productivity growth between 2003 and 2006 was below that achieved during the pre-Staggers era. Figure ES-7 shows the average

differential between railroad productivity growth and the productivity growth in the private business sector of the U.S. economy by decade. Railroad productivity growth was much more rapid than the productivity growth in the U.S. private business sector up until 2000, but since 2000 the railroad industry and the U.S. private business sector have had very similar rates of productivity growth.

**FIGURE ES-7**
**MFP GROWTH DIFFERENTIAL: RAILROAD INDUSTRY V. PRIVATE BUSINESS SECTOR**




Both the STB and BLS measures of the railroad industry's productivity confirm a slowdown in industry productivity growth in this decade. One effect of this slowing productivity growth is a diminished ability of railroads to absorb increases in their input prices in recent years.

## Trends in Economic Costs

Figure ES-8 provides information in constant dollars on Class I annual average total cost of shipping a ton-mile (ATC), as well as its components, average variable cost (AVC) and average fixed cost (AFC), based on R-1 data. With the exception of 1991, ATC and AVC declined over the 1987-1996 period. ATC and AVC increased slightly between 1997 and 2000, and then decreased slightly between 2001 and 2003. ATC then increased in 2004 and 2005, but declined in 2006. Figure ES-8 shows that the 2006 ATC value is well below its 1987 level. AVC increased slightly over the 2004-2006 period. AFC decreased slightly through 1994, trended upward during the 1995-1997 period, and then gradually declined through 2003. More recently, AFC increased substantially in 2004 and 2005, as is consistent with the explanation of major road enhancements occurring over that period.[21]

[21] AFC decreased in 2006 to approximately its 2004 level..

**FIGURE ES-8**
**CLASS I AVERAGE TOTAL COST, AVERAGE VARIABLE COST, AND AVERAGE FIXED COST**
**(YEAR 2000 DOLLARS)**




Figure ES-9 presents three different markup ratios for the Class I railroad industry. The top series shows the ratio of the average revenue per ton-mile to marginal cost (RPTM/MC). This ratio reflects the extent to which market power is being exercised in the railroad industry. By definition, the setting of price above marginal cost is the exercise of market power, but exercise does not imply abuse. The industry gained market power (i.e., increasing RPTM/MC ratio) primarily during the periods of marginal cost decreases, while it ceded some of that market power during the periods of marginal cost increases. The industry-wide RPTM/MC ratio peaked at 217 percent in 1994 and has ranged in recent years between 150 and 170 percent.

**FIGURE ES-9**
**CLASS I INDUSTRY MARKUP RATIOS**




The second series in Figure ES-9 displays the revenue per ton-mile to average variable cost ratio (RPTM/AVC). This ratio is conceptually equivalent to the revenue to variable cost ratio (R/VC) that is a threshold measure of market dominance in captive shipper rate cases. The RPTM/AVC ratio has gradually increased from 117 percent to 137 percent over the twenty-year study period. Interestingly, we note that the industry-wide RPTM/AVC measure remains well below the 180 percent R/VC threshold used by the STB in captive shipper rate cases. We further note that the RPTM/AVC ratio does not track very well with the market power indicator of RPTM/MC. This lack of correspondence may be indicative of the weakness of the R/VC measure as an indicator of market power abuse.[22]

The third series in Figure ES-9 shows the revenue per ton-mile to average total cost ratio (RPTM/ATC). This graph conveys the information about *revenue sufficiency* for the overall industry. Values of the RPTM/ATC ratio greater than or equal to 100 percent indicate that revenues are greater than or equal to total costs, while values less than 100 percent imply that revenues are insufficient to cover total costs. The graph, based on R-1 data, shows that the industry has remained close to being revenue adequate for most years in our study, but more often than not it has fallen short.

[22] We are not suggesting that the aggregate average rate to the aggregate average variable cost ratio presented in Figure ES-9 is the appropriate R/VC measure for rate cases. The R/VC measure used in rate cases is market-, shipper-, railroad-, and route-specific. We further note that the R/VC measure is based on the Uniform Rail Costing System (URCS), while our RPTM/AVC ratio is based on R-1 data.

Case 1:07-mc-00489-BAH Document 1229-8 Filed 11/22/24 Page 154 of 466



Figure ES-10 changes the vertical scale to focus on the RPTM/ATC ratio for the Class I railroad industry. As noted above, this ratio is a measure of industry revenue sufficiency (indicated by RPTM/ATC = 100 percent). It can be seen that the industry has flirted with revenue sufficiency for a number of years, but has only achieved or surpassed it a few times in the mid-1990s and in 2006 (1993 = 100.0%, 1994 = 101.7%, 1996 = 100.0%, 2006 =104.1%).[23] Furthermore, the 2006 value of RPTM/ATC was preceded by a sizeable drop in 2004, which was the RPTM/ATC ratio's lowest point since 1991.

**FIGURE ES-10**
**CLASS I INDUSTRY RATIO OF AVERAGE RPTM TO AVERAGE TOTAL COST**




Figure ES-11 displays the Lerner Markup Index (LMI) for the Class I railroad industry.[24] It shows that between 1987 and 1994, pricing power steadily increased. However, the industry was still below revenue sufficiency during most of this period until 1994 (see Figure ES-10). Thus,

[23] We note that the measures of costs that we develop from the R-1 data do not include any current assets, such as cash. Furthermore, our calculations are based on some variables defined for the econometric analysis undertaken in Chapter 9 and may not conform to a conventional financial analysis. Thus, the ratio of revenue to cost presented in Figure ES-10 is revealing, but should not be viewed as the definitive indicator of revenue sufficiency. Also, as reported in Chapter 10, when the railroads are examined individually, we find that BNSF and NS each had thirteen of twenty years where the R-1 reported revenues matched or exceeded costs, UP had eight of twenty years with revenues greater than or equal to costs, and CSX had only three revenue-sufficient years in the time frame of our analysis.

[24] The Lerner Markup Index is defined as the ratio of the difference between price and marginal cost to the price, which in this case is equal to (RPTM − MC) / RPTM. As discussed in Chapter 10, the Lerner Markup Index is a measure of market power. The Lerner Markup Index is also known as the Lerner Index or the Lerner Market Power Index, and it is sometimes abbreviated as LMI in this report and elsewhere in the literature.

the rapidly-increasing LMI does not indicate that market power has been exercised by railroads with resulting excess profits, but rather indicates a movement toward revenue sufficiency. As detailed in Chapter 10, from 1995 to 1999, the LMI generally decreased with increasing marginal costs. Between 2000 and 2003, there was some recovery of the industry's pricing power, largely resulting from declining marginal costs as documented in Chapter 10. Again, however, viewing these results in the context of revenue sufficiency, this run-up in the LMI does not correspond to railroads achieving excessive levels of profit. Since 2003, the LMI has declined back to its 1999 level as percentage increases in marginal cost have outpaced percentage increases in price.

**FIGURE ES-11**
**RAILROAD INDUSTRY LERNER MARKUP INDEX**




## Economies of Density and Differential Pricing by Commodity

Economies of density arise when the average cost of serving customers decreases as the volume of business increases over a network. When economies of density are present, marginal cost pricing does not produce enough revenue to cover a firm's total cost, and alternative pricing or funding mechanisms must be found. Differential pricing (i.e., charging different price markups over marginal costs to different customers or customer classes) is recognized in the economic literature as a pricing method that might be used to achieve revenue sufficiency in the presence of economies of density.

As is the case with other network industries, the railroad industry engages in differential pricing, where different customer groups face different levels of price markups over marginal costs. Since the passage of the Staggers Act, freight rail transportation rates have been largely

deregulated, as discussed in Chapter 20, with the Surface Transportation Board providing a regulatory backstop for captive shippers. As the quotation below illustrates, differential pricing is acknowledged by policy as a method by which railroads achieve revenue adequacy, with the STB determining whether the degree of differential pricing is reasonable if a rate is challenged.

> When there is a challenge to the reasonableness of a rail rate charged for captive traffic, [the STB's] regulatory task is to determine whether the degree of differential pricing--i.e., the amount by which the revenues derived from the traffic at issue exceed the long-run marginal cost (LRMC) of handling the traffic—is reasonable.[25]

Table ES-6 shows the median values of estimated adjusted marginal costs and Lerner Markup Indexes by commodity for the 2001-2003 and 2004-2006 periods.

**TABLE ES-6**
**MEDIAN ESTIMATED ADJUSTED MARGINAL COSTS AND LERNER MARKUP INDEXES BY COMMODITY AND PERIOD**
**CLASS I RAILROADS**

| | Adjusted MC* | | LMI | |
|---|---|---|---|---|
| **Commodity** | **2001-2003** | **2004-2006** | **2001-2003** | **2004-2006** |
| Farm Products (Aggregate) | 0.9 | 0.9 | 0.60 | 0.58 |
| Barley | 0.8 | 0.6 | 0.66 | 0.72 |
| Corn | 0.6 | 0.6 | 0.70 | 0.71 |
| Wheat | 0.8 | 0.7 | 0.66 | 0.69 |
| Soybeans | 0.9 | 0.9 | 0.61 | 0.56 |
| Metallic Ores | 2.3 | 2.7 | 0.41 | 0.39 |
| Coal | 1.0 | 0.9 | 0.39 | 0.45 |
| Nonmetallic Minerals | 1.8 | 2.3 | 0.46 | 0.30 |
| Food Products | 1.2 | 1.3 | 0.55 | 0.53 |
| Lumber or Wood Products | 1.4 | 1.4 | 0.58 | 0.56 |
| Chemicals | 1.6 | 1.6 | 0.59 | 0.54 |
| Petroleum or Coal Products | 1.6 | 1.5 | 0.60 | 0.58 |
| Clay, Concrete, Glass, or Stone Products | 1.7 | 1.7 | 0.57 | 0.56 |
| Primary Metal Products | 1.8 | 2.2 | 0.52 | 0.47 |
| Transportation Equipment | 4.9 | 5.1 | 0.45 | 0.35 |
| Intermodal Shipments | 4.3 | 4.3 | -0.51 | -0.54 |

*2000 Q1 cents per ton-mile.

[25] *Rate Guidelines—Non-Coal Proceedings*, Ex Parte No. 347 (Sub-No. 2) (STB served December 31, 1996), p. 4.

The marginal cost and markup estimates presented in Table ES-6 provide an indication of whether recent rate increases have been mainly cost-driven or markup-driven. With respect to marginal costs, it shows that despite the industry-wide increase in marginal costs in 2004-2006 (see Chapter 10), different patterns appear across the listed commodities. Some shippers apparently were able to avoid, to some extent, the "generic"[26] increases in costs by adopting lower-cost shipment characteristics. For example, we observe that average car loadings and length of haul increased materially for coal shipments between the 2001-2003 and 2004-2006 periods, partly due to the increasing share of Powder River Basin coal in total coal shipments. These cost-saving changes in shipment characteristics for coal helped to offset the generic increase in marginal cost per ton-mile in the latter period. Thus, the estimated adjusted marginal costs for coal declined slightly between the two periods; the adjusted marginal cost would have been higher in the latter period without the cost-reducing changes in coal shipment characteristics. However, the data presented in Table ES-6 do not reflect any adjustment costs that coal shippers (or other shippers for that matter) may have incurred in adopting lower-cost shipment characteristics. In contrast, shipments of nonmetallic minerals and primary metal products did not exhibit substantial cost-saving changes in their tons per car and length-of-haul characteristics between the two periods; with little offset from shipment-characteristic changes, the estimated marginal costs for these two commodity groups increased in the latter period.

We believe that our negative LMI estimates for intermodal shipments are anomalies resulting from data limitations for intermodal shipment characteristics in the CWS dataset. Intermodal shipments have some low-cost characteristics that are not included in the CWS dataset and therefore cannot be incorporated in our estimated pricing models and adjusted marginal cost calculations. Intermodal shipments are billed and recorded as single-carload shipments, but tend to travel long distances as a unit, thereby avoiding substantial switching and classification costs typical of non-intermodal, single-carload shipments. Additional data on intermodal shipments, including service characteristics, would produce more accurate estimates of the actual markups for intermodal shipments. Since intermodal shipments represent a large share of the railroad industry's revenues, improved data collection on these shipments is highly desirable. We expect that with better information on intermodal shipments' actual costs our pricing models would yield positive estimated markups for intermodal shipments, but still relatively low markups compared to other commodities.

The estimated LMIs are declining from 2001-2003 to 2004-2006 for 12 of the 16 commodity groups. Three of the LMI increases are for

[26] We use the term "generic" to refer to industry-wide increases across commodities.

grains that already had high estimated markups. It should be noted that the relatively constant or declining LMIs for commodities other than grains and coal do not reflect constant shipment characteristics. In our qualitative research phase, we heard from shippers (particularly coal shippers) who noted that long-term, low-priced rail contracts had expired in this time frame and were replaced by higher-priced contracts or tariff rates.[27] Such changes increase incentives for shippers to form shipments with lower-cost characteristics to partly offset the less favorable terms. We observe material shifts to lower-cost characteristics for various commodities in the CWS data, suggesting that shippers as a whole have some ability to substitute less costly shipment characteristics. However, shippers who are unable to adjust their shipping practices towards lower-cost characteristics may face substantial rate increases in periods of increasing industry costs.

From our analysis of particular commodity groups, we find generally expected effects on rail rates from increasing railroad competition at the origin and from increasing the distance from the origin to the nearest available water transportation. That is, rates generally tend to be lower given increased competition from other railroads or from increased proximity to water transportation alternatives at the origin, and higher for shippers with more limited railroad and water options at the origin. However, the existence of competitive responses is double-edged. Such responses illustrate the extent to which shippers who lack railroad or intermodal alternatives are at least relatively “captive” and pay higher rates (which may or may not exceed quantitative markup thresholds for market-dominance tests) for shipments with the same cost characteristics as those of more favorably situated shippers. Furthermore, in situations where other modes of transportation, such as water (and not potential railroad competition), provide the effective constraint on rail rates, policies to enhance railroad competition will not benefit captive shippers.

The result that shippers with fewer transportation alternatives pay higher rates is not unexpected in light of our findings from the industry-wide variable cost model of Chapter 9 and the constrained market-dominance model of Chapter 11. Railroads’ economies of density imply that they must implement positive markups over marginal cost per ton-mile, on average, in order to cover their total variable and “quasi-fixed” costs. Employing such local market power as is available is one means by which railroads achieve “revenue adequacy.”

From Chapters 11 through 15, our results with respect to a single railroad serving the origin county indicate that rail rates are commonly higher than they would be in the presence of even very limited railroad competition. Railroads appear to exercise some degree of local market

[27] Long-term contracts may contribute to the stickiness of rates to the extent that they do not allow for the immediate pass-through of railroad cost increases to shippers.

power where possible, but are tempered by the prospect that large markups may elicit regulatory attention if not direct intervention. That is, monopoly railroads may effectively cede some market power to avoid regulatory scrutiny.

## Financial Viability

By nearly all measures, the performance of the railroad industry has improved dramatically since the passage of the Staggers Act. The 2006 GAO report notes that "[t]here is widespread consensus that the freight rail industry had benefited from the Staggers Rail Act," and that "[f]reight railroads' improved financial health is illustrated by a general increase in return on investment since 1980, ..."[28]

The results of our econometric analysis of the railroad industry's revenue sufficiency are generally consistent with the benchmarking of railroad financial performance we performed in Chapter 8. We examined the railroad industry's earnings relative to the STB's determination of the industry's cost of equity and also relative to the earnings of benchmark industries. Regarding the comparison to the STB's determination of the cost of equity, we note that there was controversy surrounding the CAPM methodology recently adopted by the STB for determining a railroad's cost of equity.[29] Recognizing this controversy, a comparison of return on shareholders' equity for railroads to the STB's CAPM measure of the cost of equity for railroads, shows returns in excess of the cost of equity from 2000 through 2005 (with variation by individual railroad). However, using the STB's previous DCF method shows that railroads did not earn their cost of capital over the period of analysis (1997 to 2005). Given the methodological controversies and the divergence of these results, our assessment is that it is difficult to draw conclusions about whether the railroad industry has generated excessive profits, particularly when earlier observations using either the DCF or the CAPM methodology had shown the opposite result.

Although the railroad industry's earnings have increased in recent years, they do not appear to be excessive from a financial market perspective. Among the financial metrics we examined, one commonly cited financial measure is earnings per share (EPS). We found that over our analysis period, 1997 to 2006, there were many similarities among the

[28] Government Accountability Office, *Freight Railroads Industry Health Has Improved, but Concerns about Competition and Capacity Should Be Addressed*, GAO-07-94, October 6, 2006, p. 9. We provide a more complete discussion of the railroad industry's financial performance in Chapter 8.

[29] For example, see Petition of the Association of American Railroads to Institute a Rulemaking Proceeding to Adopt a Replacement Cost Methodology to Determine Railroad Revenue Adequacy, May 1, 2008.

financial performances of the railroad industry, the electric utilities industry, and the S&P 500 composite. Figure ES-12 shows that, in the last few years, the upward trend in the railroad industry's EPS is somewhat greater than the trend shown for the S&P 500 composite.[30]

**FIGURE ES-12**
**EARNINGS PER SHARE**
**1997-2006**




| | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|---|---|---|---|
| Rail | 1.00 | 0.74 | 0.85 | 0.86 | 0.91 | 1.02 | 1.03 | 1.22 | 1.64 | 2.20 |
| Util | 1.00 | 1.01 | 1.09 | 0.41 | 1.25 | 1.01 | 1.18 | 1.23 | 1.34 | 1.48 |
| S&P 500 | 1.00 | 0.95 | 1.21 | 1.26 | 0.62 | 0.69 | 1.23 | 1.47 | 1.76 | 2.05 |

## ES2 CURRENT AND NEAR-FUTURE CAPACITY CONSTRAINTS

A railroad's capacity can be generally thought of as anything that affects a railroad's ability to transport shipments (in a given amount of time) over its network. Thus, capacity is analogous to the factors affecting throughput in a communications or data network. From a physical inputs perspective, factors that affect a railroad's ability to transport shipments generally depend on the amount of capital (e.g., way and structures, railcars, locomotives, and signaling systems) and labor of various skill levels employed by the railroad. The amount of effective capacity available to provide services from a given quantity of production inputs (i.e., productivity) will be affected by factors such as technological innovations (often embodied in capital), work rules and other regulations, railroad operating practices, and learning by doing. The railroad's ability to adjust capacity depends on its ability to adjust these various types of capital and labor inputs as well as other attributes, with some more easily adjusted than others.

A very important influence on a railroad's capacity is the existence of congestion at points in its network. In fact, while other measures of capacity along a given route may indicate sufficient capacity to meet

[30] The electric utilities and railroad industries showed very similar EPS growth between 1997 and 2004.

demand, congestion at terminals, ports, highly congested urban areas, or other specific network locations is often a binding constraint on the utilization of route or network capacity.[31] Moreover, congestion at these localized points often affects network-wide performance. This is similar to the effects of blocking or congestion in other types of networks. For example, congestion at specific points in communications and data networks caused by capacity limits in switches or routers creates a restriction in network throughput despite the virtually unlimited capacity of fiber optic cable.

In Chapter 16 we conclude that, from numerous perspectives, there currently do not appear to be global or network-wide rail capacity constraints. Rather, as often occurs in network industries, congestion at various points or corridors in railroad networks appears to be the major culprit in capacity-related performance issues over the last ten years.[32] From a network-wide perspective, as discussed above, Class I total track mileage has stabilized over the last ten years, and the usage of track has become more intense as ton-miles per mile of track has grown continuously. Other studies have found that rail corridors are generally not constrained and our econometric results indicate that, in the aggregate, excess way and structures capacity exists. However, while such results can eliminate potential reasons for network congestion, congestion at terminals or other specific network locations is often a binding constraint on the utilization of route capacity or network-wide capacity. For example, we found increases in terminal congestion (with each Class I railroad having specific terminals that were particularly affected) in the 2003-2005 period were linked to service performance issues during that time period.

In September of 2007, Cambridge Systematics published a study sponsored by the Association of American Railroads on railroad infrastructure needs.[33] This study shows few current problems with available freight railroad infrastructure capacity as 88 percent of corridor mileage is below capacity, and less than one percent is above capacity. Our Class I industry variable cost function results from Chapter 9 (and also reported in Chapter 16) show that the industry as a whole still has an excess amount of way and structures capital. These results are consistent with the conclusion reached by a number of economic researchers that the railroad industry still has a considerable amount of overall excess

---

[31] James McClellan, "Railroad Capacity Issues," in *Research to Enhance Rail Network Performance*, Transportation Research Board, 2007, p. 32.

[32] The investigation of railroad network congestion is limited, to some extent, by data availability. As we indicate below, Burton has developed a promising approach to evaluate the need for additional investment at particular network locations.

[33] Cambridge Systematics, *National Rail Freight Infrastructure Capacity and Investment Study*, prepared for the Association of American Railroads, September 2007.

capacity,[34] and the Cambridge Systematics study that concludes there presently is more than adequate capacity on most railroad network corridors. It is important to note, however, that these studies do not imply or conclude that there are no localized capacity shortages or choke points on individual segments of a railroad's network.

The result that railroads do not suffer from an overall capacity shortage (despite localized constraints) is not surprising given the "lumpiness" of most railroad capital investments. As noted in Chapter 3, network industries, including the railroad industry, often are capital-intensive and need to make capital investments in large increments. Furthermore, once these investments are made the capital is either costly to remove or its resale value is small. For these reasons, the amount of capital being used at any one time will not necessarily be at its optimal level, resulting in either an excess or shortage of capacity.

Regarding congestion at localized points in railroad networks, we examined the terminal dwell time data in the Railroad Performance Measures (RPM) dataset.[35] The RPM data indicate that, while each railroad has a somewhat unique pattern, one similarity that stands out is a general increase in terminal dwell times in the 2003-2004 period, followed by a decline in dwell times in 2005. The general increase in terminal dwell times during the mid-2000s indicates greater congestion at particular points in the railroad networks. Moreover, individual terminals differed considerably in the variability of their dwell times, suggesting that those terminals with the longest dwell times and largest variability might be affected by capacity constraints. Other descriptive measures indicate that the late 1990s and early 2000s witnessed declines in the railcar fleet, offset by greater railcar capacity, and increases in locomotive units and horsepower.

A recent study by the Rand Corporation noted that, in order to determine capacity needs at particular points of the network, much more

[34] For example, see Ann F. Friedlaender, Ernst R. Berndt, Judy Shaw-Er Wang Chiang, Mark Showalter, and Christopher A. Vellturo, "Rail Costs and Capital Adjustments in a Quasi-Regulated Environment," *Journal of Transport Economics and Policy*, May 1993, pp. 131-152; and John D. Bitzan and Theodore Keeler, "Economies of Density and Regulatory Change in the U.S. Railroad Freight Industry," *Journal of Law and Economics*, February 2007, pp. 157-179.

[35] Association of American Railroads, at http://www.railroadpm.org/Definitions.aspx:

> Terminal Dwell is the average time a car resides at the specified terminal location expressed in hours. The measurement begins with a customer release, received interchange, or train arrival event and ends with a customer placement (actual or constructive), delivered or offered in interchange, or train departure event. Cars that move through a terminal on a run-through train are excluded, as are stored, bad ordered, and maintenance of way cars.

Chapter 16 notes some limitations of the RPM terminal dwell time data.

detailed information on the network is required than what is currently publicly available.[36] Burton developed a promising approach to evaluate the need for and cost of additional railroad capacity at particular points of the railroad network.[37] His approach is based on a statistical analysis of railroad traffic levels on particular route segments and the characteristics of those route segments. Using a cross-section of route segments, he developed an econometric model that can be used to predict the available capacity on different network segments based on observed traffic data.

Regarding future capacity constraints, we concluded that recent increases in railroad capital spending, combined with a relatively weak economy, indicate that any capacity tightness that may have existed at the beginning of this decade has likely loosened in recent years. Thus, with the caveat that congestion issues are likely to continue to exist at localized points and cause service performance issues, near-term system wide railroad capacity constraints are not likely to be a major issue. Regarding the longer-term forecasts of capacity constraints, we concluded that forecasting capacity needs thirty years into the future (as is done in the Cambridge Systematics study) is difficult, at best, and is very sensitive to projections of future economic activity. Thus, it is our assessment that one must treat these forecasts of future capacity needs as tentative, at best, particularly given the current economic climate the U.S.

## ES3 CAPACITY INVESTMENT

As discussed above, our analysis of railroad capacity indicates that while there is currently no systematic shortage of capacity in the railroad industry, there is evidence of localized capacity problems at various points in the rail network. Although the Cambridge Systematics study concluded that infrastructure investment of $148 billion (in 2007 dollars) would be needed to keep pace with projected economic growth in the United States along with the U.S. Department of Transportation's forecasts for railroad transportation demand, this study also showed that there currently are very few capacity problems in the rail network. Furthermore, this study's projected infrastructure investment requirement was based on a thirty-year forecast of railroad transportation demand. Over the thirty-year forecast period, if actual demand for freight railroad transportation matches the forecast, and if there are no additions to railroad capacity during the intervening time period, 30 percent of rail corridor mileage will be above capacity, while only 44 percent will be below capacity. Forecasting rail capacity needs thirty years into the future is, at best, a difficult project, and

[36] Brian A. Weatherford, Henry H. Willis, and David S. Ortiz, *Infrastructure, Safety, and Environment: A Review of Capacity and Performance Data,* Rand Corporation, 2008, p. xii.

[37] Mark l. Burton, "Measuring the Cost of Incremental Railroad Capacity: A GIS Approach," http://www.njrati.org/files/research/papers/adobe/TPUG-01.pdf.

the conclusions of the Cambridge Systematics study are sensitive to the economic projections that drive freight commodity flow forecasts, future decisions about plant locations, availability of other transportation modes, and changes in business operations.

Our analysis in Chapter 10 also indicates that in the aggregate the value of investments in railroad infrastructure is less than the current price of those investments. Thus, while investment opportunities on certain nodes or links may pass an economic benefit-cost test, there do not appear to be strong economic incentives for the railroad industry to make global or extensive infrastructure investments at this time. Our analysis in Chapter 8 also indicates that the railroad industry's capital spending has remained a near-constant share of its revenue. This is similar to the pattern in the electric utilities industry, which is an industry similar to railroads in terms of infrastructure needs.

In Chapter 8, we compare the railroad industry's capital spending patterns to the benchmark industries we examined.[38] With the exceptions of 2002 and 2006, the railroad industry had the highest shares of its revenues devoted to capital spending. Figure ES-13 presents data on the capital spending to revenue ratios for the railroad and the electric utilities industries. This figure shows that the gap between the railroad and electric utilities industries considerably narrowed over time.

**FIGURE ES-13**
**CAPITAL SPENDING/REVENUE**
**1997-2006**




| | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|---|---|---|---|
| Rail | 17.8% | 19.6% | 16.4% | 14.3% | 14.2% | 14.1% | 15.4% | 14.4% | 14.6% | 14.7% |
| Util | 10.6% | 10.5% | 12.6% | 12.3% | 11.5% | 16.3% | 13.0% | 12.8% | 13.2% | 15.8% |

While railroad investment has increased in both real and nominal terms in recent years,[39] there has been no increase in the railroad

[38] The benchmark industries are electric utilities, freight transportation, food processing, and chemicals.

[39] See Chapter 16.

industry's capital spending to revenue ratio induced by higher profits. One perspective is that, after a period of unusual activity, financial metrics reflect that the railroad industry is settling into a rate of capital expenditures that allows for maintenance and slow, steady growth.[40]

Railroad infrastructure may provide some public benefits that could potentially be addressed through targeted incentives. Investment in railroad infrastructure may provide an attractive transportation alternative to some shippers who currently rely on truck transportation for their shipping needs. Moving more truck transportation to rail would relieve highway congestion and reduce pollution. But these benefits will not influence a railroad's investment decisions, which are driven solely by the railroad's private return on investment. Public benefits do not factor into the railroad industry's investment decisions.

## ES4 Impact of Capacity Constraints on Competition

### Stakeholder Feedback on Causes of Capacity Constraints

As we report in Chapter 5, a generally held opinion among the stakeholders who provided input to us is that the rail industry has gone from excess capacity to "tighter" capacity in the last few years. Other widely held opinions are that rail capacity investment is lagging demand growth (aside from cyclical or seasonal factors), and that railroads are using rate increases to ration scarce capacity and prioritize traffic on their networks. However, opinions differ regarding why capacity has tightened and the effects of this tightening.

- Some stakeholders are of the opinion that the lag in capacity growth is intentional and used by the railroads so they can raise rates—i.e., it is another aspect of the railroads' exercise of market power. In this regard, some are of the opinion that railroads have been "sitting on their hands" regarding capacity investment until the last few years.
- A contrasting opinion is that lags in capacity additions are not the result of the exercise of market power, but these lags are viewed as normal for an industry when faced with making investment decisions of such magnitude. Individuals expressing this view observed that the industry has recently made a significant transition to tighter capacity after years of excess capacity where cost cutting and capacity reductions were the primary focus.

[40] John G. Larkin and Daniel S. Taylor, *Railroads: Striving to Drive Improved Return on Invested Capital*, Legg Mason Wood Walker, Inc., Summer 2004, p. 24.

- Also adding to the investment lag, in some cases, is the involvement with the public sector—e.g., obtaining permits and/or funding.

## Assessment of the Impact of Capacity Constraints

As noted in Chapter 3, network industries, including the railroad industry, often are capital-intensive and need to make capital investments in large increments. Furthermore, once these investments are made the capital is either costly to remove or its resale value is small. For these reasons, the amount of capital utilization at any one time will not necessarily be at its optimal level, resulting in either an excess or shortage of capacity.

In Chapter 16 we conclude that congestion at various points or corridors in railroad networks appears to be the major culprit in capacity-related performance issues over the last ten years, and not system-wide lack of capacity. This phenomenon is common in network industries as, for example, in communications networks congestion at network nodes constrains throughput despite almost limitless fiber optic capacity throughout the network. Also, as discussed below, in our stakeholder interviews it was expressed that tight capacity is often related to location-specific constraints in rail networks or in the wider transportation network that are beyond the control of railroads (e.g., ports, highways). Furthermore, our econometric evidence indicates that the price of capital is currently greater than capital's value of marginal product, which implies that the railroad industry is not withholding cost-effective investment.

A concern expressed by several of the shippers we interviewed, and also raised in the GAO report,[41] was that recent capacity constraints may have allowed or caused an increase in the market power of the railroads. Our analysis of the markup of rates over marginal costs, as reflected in the Lerner Markup Index, shows no major changes in the overall Lerner Markup Index since the late 1990s. At the commodity-specific level, we see little in the way of systematic changes in markups by commodity. Between the 2001-2003 and the 2004-2006 periods, we observe moderate increases in the Lerner Markup Index for barley, corn, wheat, and coal, while the LMI declines for aggregate farm products and the eleven other commodity groups in our analysis. Thus, we conclude that recent capacity constraints did not increase the overall exercise of market power by railroads, but coincided with some redistribution of relative markups across commodities.

[41] Government Accountability Office, *Freight Railroads: Industry Health Has Improved, but Concerns about Competition and Capacity Should Be Addressed*, GAO-07-94, October 6, 2006, p. 3.

## ES5 SERVICE QUALITY ISSUES

### Stakeholder Feedback on Service Quality

As we report in Chapter 5, a number of shippers we interviewed expressed the theme that service quality has deteriorated as rates have increased. (A caveat to this perception is that service has improved somewhat over the last few years when compared to 2004-2005). Many shippers stated that service variability is the most important issue and causes them the most problems. Much of the problem with service variability was attributed by these shippers to reductions in rail competition. Moreover, many shippers stated that new contracts rarely include any performance standards or penalties for not meeting standards, so there is an increasing lack of railroad accountability.

Part of the service quality issue was seen as an outcome of deteriorating communications between railroads and shippers. This communication problem appears to have several dimensions:

- Many shippers said that railroads were increasingly adopting a “take it or leave it” attitude.
- The greater use of internet-based communications versus direct access to railroad personnel.
- Inability of railroad bureaucracies to respond to changing conditions.

Two aspects of service quality brought up in our stakeholder interviews were additional costs placed on shippers because of service quality problems, and sources of service quality problems. The additional cost factors, which shippers claimed they incur as a result of railroad service quality problems, include:

- The need to hold additional inventories because of uncertain/variable deliveries. In this regard, some shippers said that consistency of service is more important than speed.
- The need to have larger fleets of railcars to ensure adequate deliveries.
- The need to dedicate shipper personnel to the monitoring of railroad performance.
- Congestion in ports caused by additional lead time used as a hedge against service variance.

Regarding the sources of service quality problems, the following were mentioned as possible causes or contributing factors:

- Tight capacity and the "fragility" of the railroad network. Shippers expressed the opinion that with the railroad network operating at close to its capacity, it does not take much to upset the fluidity of the railroad network.
- Tight capacity is often related to location-specific constraints or "choke points" in rail networks.
- Rail service problems can also be related to congestion points in the wider transportation network—ports, terminals, highways—that are beyond the railroads' control.
- Shipper-caused problems—e.g., slow unloading.
- Railroad management structures that impede the ability to improve service or solve problems despite good intentions. In this regard, we heard that railroads are good at serving "cookie cutter" business but have trouble when conditions deviate from the norm. We also heard that because railroads tend to be very large and dispersed businesses, it can be difficult for a railroad to ensure that decisions made at one level/location are actually carried out at lower levels or distant locations.
- Market-dominant firms can be less concerned with providing good service.
- One shipper stated that one reason rail service has deteriorated is because railroads are forcing routing protocols on shippers under the guise of operating efficiency, but these forced routes offer no better (or even worse) transit times than previously allowed routes.

## Train Speed as an Indicator of Service Quality

As discussed in Chapter 17, average train speed is a proxy for service quality, and changes in average speed represent changes in performance and service quality. The Railroad Performance Measures (RPM) data allow us to calculate average train speeds across a railroad's network but do not allow for route-specific or corridor-specific analysis, nor do the RPM data allow an evaluation of on-time performance or variability of performance from a shipper's perspective.[42] The average train speeds calculated from RPM data provide a crude, aggregate proxy for the railroad service performance received by shippers. Our Advisory Panel noted that railroads as well as many shippers record and keep data

[42]Association of American Railroads, at http://www.railroadpm.org/Definitions.aspx:

> Train Speed measures the line-haul movement between terminals. The average speed is calculated by dividing train-miles by total hours operated, excluding yard and local trains, passenger trains, maintenance of way trains, and terminal time.

on service metrics such as cycle times. While such information is likely confidential, it was suggested that the STB may need to require the reporting of this type of data—possibly by route or by commodity—to better identify and rectify service quality issues.[43]

Comparisons of changes in average speed across train types provide an indication of changes in service quality across customers of these train types.[44] Figure ES-14 present changes in average speed by train type between January 1999 and September 2005 for each of the Class I railroads.[45] Changes in service quality across shipper classes would be suggested if particular train types have changes in average speeds that are markedly different than the changes in average speeds of other train types. For example, in our stakeholder interviews, the opinion was expressed that high-margin services such as intermodal receive preferential service to the determinant of other commodity groups. Therefore, although it is admittedly at a very aggregate level, if we observe the average speed for intermodal increasing relative to the average speed of other train types, this would be evidence supporting the opinion voiced by theses stakeholders.

**FIGURE ES-14**
**CHANGES IN AVERAGE SPEED BY RAILROAD AND TRAIN TYPE, 1999-2005**




From Figure ES-14, there does not appear to be any strong bias toward intermodal, as its average speed declined for all railroads except

[43] The STB's Rail Energy Transportation Advisory Committee has formed a Performance Measure Subcommittee to investigate performance reporting.

[44] Comparisons across railroads are not necessarily meaningful.

[45] As we discuss in Chapters 16 and 17, definitional changes in RPM data implemented in October 2005 make comparisons of data before and after these changes problematic. Therefore, our analysis of RPM data is conducted for two separate periods.

NS over the 1999-2005 period, and its speed worsened relative to the overall average for all the railroads.[46] In fact, the change in intermodal's speed was below the change in average speed of coal units and manifest for most railroads over this time period. Therefore, there does not appear to be any systematic bias in favor of intermodal shipments over this time period.

## Variability in Average Speed by Train Type

Not only do average speeds have implications for service quality, but variability in speed is also important. In fact, one of the major complaints we heard from shippers regarding service quality was that variability in railroad performance was a larger problem than the absolute level of performance. Shippers found unpredictable service performance to be more costly and problematic to deal with than service that resulted in longer but predictable delivery performance.

The variability in average train speed by railroad and train type (and, presumably, the resulting variability in delivery performance to shippers) is measured by the coefficient of variation (CV), which is the ratio of the standard deviation of train speed to average train speed. Table ES-7 presents CVs of train speed by railroad and train type stated as a percent of average speed.[47] For each railroad, examining CVs across train types reveals that the lowest CV in most cases is for intermodal, especially during the 1999 to September 2005 period. Grain units and coal units typically have the highest CVs. Thus, the implication is that even though its average speed generally declined over this period, intermodal typically received the most predictable service. On the other hand, coal units and grain units received the least predictable service.

[46] This may be due, in part, to major construction projects noted elsewhere in this study.

[47] Again, comparisons across railroads are not necessarily meaningful.

**TABLE ES-7**
**VARIABILITY IN AVERAGE TRAIN SPEED BY RAILROAD AND TRAIN TYPE**

Measured by the Coefficients of Variation

| | Inter modal | Manifest | Multi level | Coal Unit | Grain Unit |
|---|---|---|---|---|---|
| **1999-Sept. 2005** | | | | | |
| BNSF | 3.6% | 3.6% | 4.2% | 4.9% | 4.6% |
| CN | 3.9% | 5.1% | 6.1% | 8.0% | 9.4% |
| CP | 5.1% | 5.6% | 6.8% | 5.9% | 7.3% |
| CSX | 3.5% | 5.1% | 6.3% | 4.4% | 6.3% |
| KCS | 5.5% | 7.0% | 5.6% | 8.2% | 8.9% |
| NS | 3.2% | 4.4% | 5.4% | 4.5% | 7.1% |
| UP | 3.6% | 3.5% | 3.9% | 4.9% | 5.1% |
| **2006-2007** | | | | | |
| BNSF | 3.8% | 4.3% | 3.9% | 4.4% | 4.4% |
| CN | 3.5% | 3.5% | 5.3% | 5.9% | 4.5% |
| CP | 4.0% | 3.6% | 5.9% | 8.9% | 5.2% |
| CSX | 3.4% | 3.8% | 4.5% | 3.4% | 4.3% |
| KCS | 6.0% | 4.6% | 6.0% | 6.5% | 5.2% |
| NS | 3.6% | 4.1% | 5.1% | 3.6% | 5.7% |
| UP | 3.6% | 3.1% | 3.2% | 4.2% | 3.7% |

## ES6 IMPLICATIONS FOR PROPOSED POLICY CHANGES

The economic context in which we assessed the various recent proposals for policy changes in the railroad industry is that there have been periods of both increasing and declining exercise of market power over the last twenty years. During that time frame, it does not appear that excess net revenues were generated in periods when the exercise of market power increased, as the railroad industry was attempting to achieve revenue sufficiency. Only in the most recent year of our analysis does industry revenue noticeably exceed industry cost, using our R-1 based measure. Furthermore, the recent increases in revenue per ton-mile appear to be largely the result of increases in fixed and marginal costs—related to increases in the railroad industry’s input prices and diminishing productivity growth—and not due to an increased exercise of market power. While recognizing that differential pricing and the exercise of local market power is necessary to achieve financial viability, in both our qualitative and quantitative research, we did find concerns about shipper captivity and railroad performance.

The 2006 GAO report discussed four open access proposals (three of which have been included in recently proposed legislation) to address competitive concerns: reciprocal switching agreements, requiring the quotation of bottleneck rates, terminal agreements, and trackage rights

agreements. We examined these proposals in Chapter 22. Table ES-8 recreates our summary of the likely economic effects of these open-access proposals. The assumption made for each of these proposals is that, although these types of open-access arrangements would be mandated to some degree, the terms of access are allowed to be determined through voluntary negotiations between railroads, with STB oversight of the process. To the extent that the terms of access are set according to some legislative or regulatory formula that differs from the outcome of voluntary negotiations, the economic effects of these open-access proposals become less predictable.

**TABLE ES-8**
**LIKELY ECONOMIC EFFECTS OF VARIOUS OPEN-ASSESS PROPOSALS**

| | Reciprocal Switching | Bottleneck Rates | Terminal Agreements | Trackage Rights |
|---|---|---|---|---|
| Economies of Density | Potential gains | Gains unlikely | Potential gains | Potential gains |
| Length-of-Haul Economies | Small loss | Potentially large loss | No gain to small gain | No gain to small gain |
| Vertical Economies | Small loss | Potentially large loss | Small loss | Potentially large loss |
| Investment Incentives | Small effect | Potentially large effect | Small effect | Potentially large effect |
| Railroad Profitability | Small effect | Potentially large effect | Small effect | Potentially large effect |
| Coordination Costs | Small to moderate | Small to moderate | Small to moderate | Potentially large |
| Competitive Response | Most likely | Least likely | Most likely | Somewhat likely |
| Shipper Gains | Most likely | Least likely | Most likely | Somewhat likely |

Our assessment that, overall, the railroad industry is pricing at levels generating earnings that maintain or slightly exceed those necessary to ensure financial viability implies that there is little room to provide significant "rate relief" to certain groups of shippers without requiring increases in rates for other shippers or threatening the railroads' financial viability. Thus, distributional effects among shipper groups, as well as between shippers and railroads, are primary considerations of proposed policy changes. While economic analysis may be able to quantify benefits and costs to specific stakeholders given more precise policy proposals, the cost/benefit balance is ultimately to be struck by policymakers.

Given the current structure and performance of the railroad industry, we find that certain "open-access" proposals, such as reciprocal switching and terminal agreements, are more likely to create favorable economic benefit/cost conditions than more sweeping access reforms. Some policy initiatives such as requirements to offer bottleneck rates or trackage rights over any route segment, may not be workable due to coordination issues, or may not be effective because the economics of the proposed policy change (e.g., loss of length-of-haul economies, and/or vertical economies) are unlikely to produce the anticipated degree of competitive response.

For example, Figure ES-15 illustrates the stylized fact that length-of-haul economies are diminished as interchange between two railroads (assumed for the purpose of this illustration to be equally efficient) occurs further from an endpoint of a movement; the adverse effect on costs is maximized when the interchange occurs at the mid-point of the end-to-end movement. The magnitudes of the effects shown in Figure ES-15 are consistent with the length-of-haul effects on revenue per ton-mile estimated in our pricing models and, by implication, the length-of-haul effects on marginal costs. As we discuss in Chapter 22, reciprocal switching agreements, which occur a limited distance from an endpoint—indicated by the shaded areas in Figure ES-15—will result in higher costs per ton-mile on the short "bottleneck" segment relative to an end-to-end movement, but there will be relatively little loss of efficiency for the longer-haul segment. Thus, because they have lower risks of adverse cost consequences, we believe that "incremental" policies such as reciprocal switching and terminal agreements have a greater likelihood of resolving shipper concerns via competitive response, without leading to material adverse changes to railroad costs and efficiency.

**FIGURE ES-15**
**STYLIZED REPRESENTATION OF RAILROAD INTERCHANGE AND LENGTH-OF-HAUL ECONOMIES**




Nevertheless, we can identify certain proposals we believe would result in economic harm for both shippers and railroads, such as the implementation of cost standards in the STB's rate review process that are based on economically discredited methodologies, and a strictly quantitative assessment of market dominance based solely on the R/VC ratio. Regarding the assessment of market dominance using R/VC alone, the weak relationships between R/VC ratios and market structure factors imply that correctly assessing the presence of market-dominant behavior requires direct assessment of relevant market structure factors as in the current regulatory scheme. Thus, regulatory changes that would establish R/VC tests as the sole quantitative indicator of a railroad's market dominance would not be appropriate.

We also recognize that policies to introduce greater competition in the railroad industry will not necessarily benefit all shippers. Some shippers are truly captive because of factors such as geographic location and/or low shipper density. Therefore, effective regulatory oversight will still be important regardless of any efforts to induce greater competitive responses in the railroad industry. Improvements in the STB's oversight and processes, such as the recent efforts to improve its simplified methods, are important. Also, as discussed in Chapter 22, to the extent the threat or possibility of final offer arbitration promotes parties to negotiate and reach voluntary agreements or resolve disputes, as suggested by a number of stakeholders we interviewed, it would improve the functioning of private

markets without imposing additional regulatory burdens. However, if matters are not resolved between parties and matters do go to arbitration, there are real concerns whether the process will produce outcomes consistent with competitive market outcomes, particularly if arbitrators are not experienced in the complexities of railroad economics. Additionally, factors such as improved reporting of service quality data in industry service metrics and shipment-level CWS data can lead to a better understanding of railroad performance and shipper behavior.

In order to succeed, any of the policy reform proposals must address important implementation details. Based on the experiences of the railroad industry and other industries with legislated access policies, the most challenging and time-consuming aspects of implementing policy changes is working out the details of access terms and pricing, and doing so in a way that enhances, not diminishes, economic efficiency. Not only can the terms of access have an effect on the degree to which open access occurs, but it can have important effects on incumbents' investment behaviors. None of the current policy proposals address these details and, therefore, the risks entailed in implementing these policies as written carry the very real possibility of unintended and economically harmful outcomes.

## ES7 Conclusions and Future Research Directions

This report presents the findings of an independent study of the competitive state of the U.S. freight railroad industry performed by the study team assembled by Christensen Associates and commissioned by the U.S. Surface Transportation Board (STB). Over the course of this 14-month study, the Christensen Associates study team has received cooperation from the STB and numerous railroad industry stakeholders including railroads, various shipper group organizations, numerous individual shippers, government organizations, academics, and other stakeholders. While valuable insights and assistance were obtained by the study team through this process, no individual, government agency, railroad, shipper, or any other industry stakeholder has exerted any influence on the findings of this study. The findings presented and conclusions reached in this report represent the professional judgments and opinions of the Christensen Associates railroad study team.

In addition to the research the Christensen Associates study team performed in the course of our year-long study and our conclusions from that research, we believe there are a number of areas where future research efforts would improve the understanding of the U.S. freight railroad industry. A number of these potential research issues came up during the course of our stakeholder interview process but were outside the scope of the current study. In the case of some issues, the current lack of adequate data prevents a thorough empirical examination. We see other areas as a

natural extension of the research we have performed for this study. The topical list below is in no particular order of importance, nor is it meant to be an exhaustive list of pertinent topics in the railroad industry that merit further investigation.

## Captivity and Effective Competition

The weak relationships we found between R/VC ratios and market structure factors imply that correctly assessing the presence of market-dominant behavior requires direct assessment of relevant market structure factors. A better empirical understanding of the economic dimensions of rail shipper captivity is critical, particularly in light of proposed regulatory reforms that would establish R/VC tests as the sole quantitative indicator of a railroad's market dominance.

## Service Quality

To evaluate many of the shippers' service quality concerns at more than aggregate or anecdotal levels, data that capture service performance metrics at a disaggregate level are necessary. As we noted, one member of our Advisor Panel indicated to us that railroads as well as many shippers record and keep data on service metrics such as cycle times. While such information is likely confidential, it was suggested that the STB may need to require the reporting of this type of data—possibly by route or by commodity—to better identify and rectify service quality issues. As one step in this direction, perhaps the reporting of complaint statistics on the STB website could be expanded (without breaching confidentiality).

## Capacity

Another area that would benefit from a more disaggregate analysis is railroad capacity, particularly given our conclusion that capacity "tightness" issues have most likely been due to localized congestion and constraints, and not because of a system-wide lack of capacity. Also, more disaggregated RPM-type data on railroad performance would be helpful to better investigate capacity issues as well as service quality concerns. Another aspect of railroad capacity that was brought up in our stakeholder interview process is whether railroad equipment markets operate efficiently, supplying the appropriate amount of equipment.

## Cost Shifting

A number of stakeholders indicated to us that there has been a significant amount of "cost shifting" in recent years, whereby costs or investments that were previously undertaken by railroads are now the burden of shippers. Examples of cost shifting to shippers include increases in investments in track and storage facilities, loading and unloading

facilities, car ownership and maintenance, and accessorial charges. We have been able to examine some of these issues—for example, the increase in third-party car ownership and our empirical results that indicate rates are generally lower across a number of commodity groups when shipper-owned cars are used. However, many of the cost-shifting issues appear to require additional data to enable a thorough empirical investigation. To the extent such issues are critical to shippers, the STB may consider requesting that appropriate data be made available to investigate these cost-shifting concerns.

### Fuel Surcharges

Although the STB has recently begun to collect data on fuel surcharges, these data have not been collected long enough at this point in time to perform a reasonable analysis. For example, the effectiveness of the new STB rules on fuel surcharges has yet to be fully evaluated.

### Issues Related to Class II and Class III Railroads

As discussed in Chapter 5, some smaller railroads expressed a number of concerns, including the relationship between smaller and Class I railroads with respect to Class I's "cherry-picking" traffic, and Class I's offering non-competitive rates. In addition, because many smaller railroads have had to undertake significantly greater investments (proportionately speaking) than Class I railroads, the question is whether shortline networks are underfunded.

### Critical Evaluation of Rail Demand Growth Projections

There are a number of studies that project a widening gap between the demand for rail services and railroad capacity. These demand projections provide a basis for projecting investment needs and support for the importance of continued railroad earnings growth. Because of the important implications of these demand projections, there needs to be a critical evaluation of these projections and future rail capacity needs.

### Reduction in Railroad Network Access

A concern expressed to us by a number of agricultural shippers was the reduction in railroad network access points. As discussed in Chapter 5, potential research questions here include the extent of reduced access, whether it has resulted in railroad efficiency gains and overall benefits to shippers, and whether it has shifted costs to other modes of transportation (such as increased highway maintenance costs).

# EXECUTIVE SUMMARY REFERENCES


Association of American Railroads, "Class I Railroad Statistics," July 17, 2008.

Association of American Railroads, "The Economic Impact of America's Freight Railroads," August 2008.

Association of American Railroads, "The Effects of Rail Mergers on the Number of Class I Railroads and Shipper Captivity," August 2008.

Association of American Railroads, "Petition of the Association of American Railroads to Institute a Rulemaking Proceeding to Adopt a Replacement Cost Methodology to Determine Railroad Revenue Adequacy," Motion filed with the STB, May 1, 2008.

Association of American Railroads, Railroad Performance Measures covering the 1987 through 2006 time frame, found at http://www.railroadpm.org/.

Association of American Railroads, "Railroad Ten-Year Trends: 1980-1989," Vol. 7.

Association of American Railroads, "Railroad Ten-Year Trends: 1990-1999," Vol. 17.

Association of American Railroads, "Railroad Ten-Year Trends: 1997-2006," Vol. 24.

Association of American Railroads, "Railroads and Coal," July 2008.

Association of American Railroads, "Railroads and Grain," July 2008.

John D. Bitzan and Theodore Keeler, "Economies of Density and Regulatory Change in the U.S. Railroad Freight Industry," *Journal of Law and Economics*, February 2007, pp. 157-179.

Mark L. Burton, "Measuring the Cost of Incremental Railroad Capacity: A GIS Approach," at http://www.njrati.org/files/research/papers/adobe/TPUG-01.pdf.

Cambridge Systematics, *National Rail Freight Infrastructure Capacity and Investment Study*, prepared for the Association of American Railroads, September 2007.

Ann F. Friedlaender, Ernst R. Berndt, Judy S. W. Chiang, Mark Showalter, and Christopher A. Vellturo, "Rail Costs and Capital Adjustments in a Quasi-Regulated Environment," *Journal of Transport Economics and Policy*, 27(2), May 1993, pp. 131-152.

Government Accountability Office, *Freight Railroads: Industry Health Has Improved, but Concerns about Competition and Capacity Should Be Addressed*, GAO-07-94, October 6, 2006.

John G. Larkin and Daniel S. Taylor, *Railroads: Striving to Drive Improved Return on Invested Capital*, (Baltimore, MD: Legg Mason Wood Walker, Inc.), 2004.

James McClellan, "Railroad Capacity Issues," in *Research to Enhance Rail Network Performance*, Transportation Research Board, 2007.

Surface Transportation Board, Class I Railroad Annual Report (Form R-1), Reports filed by all Class I railroads, 1987 through 2006.

Surface Transportation Board, Uniform Rail Costing System, described at http://www.stb.dot.gov/stb/industry/urcs.html.

STB *Rate Guidelines–Non-Coal Proceedings*, Ex Parte No. 347 (Sub No. 2) (STB served December 31, 1996).

U.S. Department of Transportation, "National Transportation Statistics," 2008.

Brian A. Weatherford, Henry H. Willis, and David S. Ortiz, *Infrastructure, Safety, and Environment: A Review of Capacity and Performance Data*, Rand Corporation, 2008.

# EXHIBIT

# PX0994



# National Rail Freight Infrastructure Capacity and Investment Study

*prepared for*

Association of American Railroads

*by*

Cambridge Systematics, Inc.

September 2007

www.camsys.com

CAMBRIDGE SYSTEMATICS

*final report*

# National Rail Freight Infrastructure Capacity and Investment Study

*prepared for*

Association of American Railroads

*prepared by*

Cambridge Systematics, Inc.
100 Cambridge Park Drive, Suite 400
Cambridge, Massachusetts 02140

*date*

September 2007

# Table of Contents

**Executive Summary ........ ES-1**

**1.0 Objective ........ 1-1**

**2.0 Background ........ 2-1**

**3.0 Methodology ........ 3-1**

**4.0 Current Train Volumes and Capacity ........ 4-1**
- 4.1 Primary Corridors ........ 4-1
- 4.2 Current Volumes ........ 4-2
- 4.3 Current Capacity ........ 4-5
- 4.4 Current Volumes Compared to Current Capacity ........ 4-8
- 4.5 Current Railroad Investment in Capacity ........ 4-11

**5.0 Future Train Volumes and Capacity ........ 5-1**
- 5.1 Future Volumes ........ 5-1
- 5.2 Future Volumes Compared to Current Capacity ........ 5-5

**6.0 Rail Capacity Improvements ........ 6-1**
- 6.1 Capacity Improvements ........ 6-1
- 6.2 Future Volumes Compared to Future Capacity ........ 6-2

**7.0 Investment Requirements ........ 7-1**
- 7.1 Cost of Improvements ........ 7-1
- 7.2 Cost Savings from Productivity Improvements ........ 7-4
- 7.3 Railroad Investment Capacity ........ 7-5
- 7.4 Investment Requirements for Class I Railroads ........ 7-6

**8.0 Conclusions ........ 8-1**

**A. National Rail Freight Infrastructure Capacity and Investment Study: Methodology ........ A-1**
- A.1 Introduction ........ A-1
- A.2 Line Capacity Expansion ........ A-2
- A.3 Intermodal and Carload Terminals, and Service Facility Capacity Expansion ........ A-19

# List of Tables


Table 4.1 Typical Number of Cars or Intermodal Units by Train Service Type .......... 4-3

Table 4.2 Average Capacities of Typical Rail-Freight Corridors *Trains per Day* .......... 4-7

Table 4.3 Volume-to-Capacity Ratios and Level of Service (LOS) Grades .......... 4-8

Table 4.4 Primary Rail Corridor Mileage by Current Level of Service Grade *Current Volumes and Current Capacity* .......... 4-10

Table 5.1 Primary Rail Corridor Mileage by Future Level of Service Grade *2035 without Improvements* .......... 5-6

Table 6.1 Average Capacities of Typical Rail-Freight Corridors *Trains per Day* .......... 6-1

Table 6.2 Primary Rail Corridor Mileage by Future Level of Service Grade *2035 with Improvements* .......... 6-3

Table 7.1 Cost of Rail Freight Infrastructure Improvements *Millions of 2007 Dollars* .......... 7-2

Table 7.2 Average Unit Costs .......... 7-3

Table A.1 Empty Return Ratios Used in the STB's URCS Phase 3 and Waybill Costing Programs *All Cars, 2005 Ratios* .......... A-5

Table A.2 Average Train Length *Number of Cars* .......... A-6

Table A.3 $FAF^{2.2}$ Commodity Assignment to Rail Service Type for Establishing Forecast Growth Rates .......... A-8

# List of Figures

Figure 2.1 Vehicle Miles of Travel and Lane Miles *1980 to 2005* .......... 2-2

Figure 2.2 Rail Freight Ton-Miles and Track Miles *Class I Railroads, 1980 to 2006* .......... 2-3

Figure 2.3 Total Logistics Cost *Percentage of Gross Domestic Product* .......... 2-4

Figure 2.4 Truck and Rail Market Shares in Ton-Miles *2005 and 2035* .......... 2-6

Figure 4.1 National Rail Freight Network and Primary Rail Freight Corridors .......... 4-1

Figure 4.2 Primary Rail Freight Corridors .......... 4-2

Figure 4.3 Current Corridor Volumes by Primary Rail Freight Corridor *2005 Freight Trains and 2007 Passenger Trains per Day* .......... 4-4

Figure 4.4 Current Train Volumes Compared to Current Train Capacity .......... 4-10

Figure 4.5 Class I Railroad Operating Expenditures *2006* .......... 4-11

Figure 5.1 Future Corridor Volumes by Primary Rail Freight Corridor *2035 Freight Trains and 2007 Passenger Trains per Day* .......... 5-2

Figure 5.2 Growth in Trains per Day from 2005 to 2035 by Primary Rail Corridor .......... 5-3

Figure 5.3 Percentage Growth in Trains per Day from 2005 to 2035 by Primary Rail Corridor .......... 5-4

Figure 5.4 Future Corridor Volumes Compared to Current Corridor Capacity *2035 without Improvements* .......... 5-5

Figure 6.1 Future Train Volumes Compared to Future Train Capacity *2035 with Improvements* .......... 6-3

Figure 7.1 Capital Investment and Income *Class I Railroads, 1981 to 2006, in Current Dollars* .......... 7-5

Figure 8.1 Percentage of Rail-Freight Primary Corridor Route Miles by Level of Service Grade in 2005, 2035 without Capacity Improvements, and 2035 with Capacity Improvements .......... 8-1

Figure A.1 National Rail Network and Primary Rail Corridors .......... A-3

Figure A.2 2005 and 2035 Train Volumes Compared to Current Train Capacity .......... A-13

Figure A.3 Future Train Volumes Compared to Future Train Capacity *2035 with Improvements* .......... A-15

# Acknowledgments

This study was prepared by Cambridge Systematics, Inc. under contract to the Association of American Railroads. The major authors of the study were Lance R. Grenzeback, David T. Hunt, and Daniel F. Beagan. The key contributing staff were John Lewis, Siddharth A. Pandit, Jessica E. Tump, Thomas C. Messer, and Nathan R. Higgins.

The AAR's steering committee provided invaluable information and advice to the consultant team throughout the study. Their time and effort were very much appreciated.

- BNSF Railway
  - Peter J. Rickershauser
  - Nathan M. Asplund
  - Christopher Bigoness
- CSX Transportation
  - Lester (Les) M. Passa
  - Lawrence Ratcliffe
- Norfolk Southern
  - Daniel Mazur
  - Jackie Corletto
- Union Pacific
  - John T. Gray
  - John H. Ransom
  - Eric Wilson
  - Simon J. Hjelm
- Association of American Railroads
  - Craig F. Rockey, Project Manager
  - Frank Hardesty, Deputy Project Manager
  - Paul Posey
  - Dan Saphire

The assistance of the American Short Line and Regional Railroad Association, CN, Canadian Pacific, and Kansas City Southern was also appreciated.

# Executive Summary

This study is an assessment of the long-term capacity expansion needs of the continental U.S. freight railroads. It provides a first approximation of the rail freight infrastructure improvements and investments needed to meet the U.S. Department of Transportation's (U.S. DOT) projected demand for rail freight transportation in 2035. The U.S. DOT estimates that the demand for rail freight transportation—measured in tonnage—will increase 88 percent by 2035.

The study was commissioned by the Association of American Railroads (AAR) at the request of the National Surface Transportation Policy and Revenue Study Commission. The Commission is charged by Congress to develop a plan of improvements to the nation's surface transportation systems that will meet the needs of the United States for the 21st century.

The study focuses on 52,340 miles of primary rail freight corridors, which carry the preponderance of rail freight traffic.[1] These corridors, which constitute about one-third of all continental U.S. rail freight miles, are expected to absorb the bulk of the forecast traffic and nearly all of the investment to expand capacity.

The study estimates the need for new tracks, signals, bridges, tunnels, terminals, and service facilities in the primary corridors. The study does not estimate the cost of acquiring additional land, locomotives, and freight cars, or the cost of replacing and updating existing track, facilities, locomotives, and freight cars. The study assumes no shift in modal tonnage shares among rail, truck, and water beyond those projected by the U.S. DOT.

The study does not forecast passenger rail demand or estimate future passenger rail capacity needs; however, capacity is provided for the long-distance Amtrak and local commuter passenger rail services that are currently operated over rail freight lines. Additional investment, beyond that projected in this report, will be needed if the freight railroads host increased levels of passenger rail service. The Commission has convened a passenger rail committee that is studying the need for improvements and investments to support passenger rail demand through 2035. The findings of that committee will be reported separately.

This study estimates that an investment of $148 billion (in 2007 dollars) for infrastructure expansion over the next 28 years is required to keep pace with economic growth and meet the U.S. DOT's forecast demand. Of this amount, the Class I freight railroads' share is projected to be $135 billion and the short line

[1] Nearly all of these primary corridor miles are owned and operated by the seven Class I freight railroads: BNSF Railway, Canadian National (Grand Trunk Corporation), Canadian Pacific (Soo Line), CSX Transportation, Kansas City Southern, Norfolk Southern, and Union Pacific. There are more than 550 short line and regional freight railroads.

and regional freight railroads' share is projected to be $13 billion. Without this investment, 30 percent of the rail miles in the primary corridors will be operating above capacity by 2035, causing severe congestion that will affect every region of the country and potentially shift freight to an already heavily congested highway system.

The investment requirement is driven by three factors: demand, current system capacity, and infrastructure expansion costs. The U.S. DOT estimates that population growth, economic development, and trade will almost double the demand for rail freight transportation by 2035. The projected rate of growth over the next 30 years is not extraordinary, but it comes after two decades of growth in rail freight tonnage that has absorbed much of the excess capacity in the existing rail freight system. Most of the moderate-cost capacity expansions have already been made; future capacity expansions will be purchased at a higher cost because they will require expensive new bridges and tunnels and more track and larger terminals in developed areas.

Meeting the U.S. DOT's forecast demand will require the Class I freight railroads to increase their investment in infrastructure expansion. The Class I railroads anticipate that they will be able to generate approximately $96 billion of their $135 billion share through increased earnings from revenue growth, higher volumes, and productivity improvements, while continuing to renew existing infrastructure and equipment. This would leave a balance for the Class I freight railroads of $39 billion or about $1.4 billion per year to be funded from railroad investment tax incentives, public-private partnerships, or other sources.

These investment projections assume that the market will support rail freight prices sufficient to sustain long-term capital investments. If regulatory changes or unfunded legislative mandates reduce railroad earnings and productivity, investment and capacity expansion will be slower and the freight railroads will be less able to meet the U.S. DOT's forecast demand.

The findings of this study provide a starting point for assessing future rail freight capacity and investment requirements. The findings outline the improvements and investments required for the railroads to carry the freight tonnage forecast by the U.S. DOT. Additional work is needed to determine how much more capacity and investment would be needed for the railroads to increase their share of freight tonnage and reduce the rate of growth in truck traffic on highways. Finally, the forecasts and improvement estimates in this study do not fully anticipate future changes in markets, technology, regulation, and the business plans of shippers and carriers. Each could significantly reshape freight transportation demand, freight flow patterns, and railroad productivity, and, thus, rail freight infrastructure investment needs.

In summary, the findings point clearly to the need for more investment in rail freight infrastructure and a national strategy that supports rail capacity expansion and investment.

# 1.0 Objective

The objective of this study is to identify rail freight infrastructure improvements and investments in the continental U.S. rail network that will allow the freight railroads to meet the U.S. Department of Transportation's (U.S. DOT) projected demand for rail freight transportation in 2035. The U.S. DOT estimates that the demand for rail freight transportation—measured in tonnage—will increase 88 percent by 2035. This projected rate of growth over the next 30 years is not extraordinary, but it comes after two decades of growth in rail freight tonnage that has absorbed much of the excess capacity in the existing rail freight system. The study assumes no shift in modal tonnage shares among rail, truck, and water beyond those projected by the U.S. DOT.

The study looks at infrastructure improvements that expand the capacity of rail lines, bridges, tunnels, terminals, and service facilities along the 52,340 miles of primary rail corridors within the U.S. owned and operated primarily by the seven Class I railroads—BNSF Railway, Canadian National (Grand Trunk Corporation), Canadian Pacific (Soo Line), CSX Transportation, Kansas City Southern, Norfolk Southern, and Union Pacific. These primary corridors constitute about one-third of all U.S. rail miles and carry the preponderance of rail freight traffic.

The investment estimates include capital costs for expansion only; that is, the cost of the new rail lines and support facilities needed to accommodate future demand. The estimates do not include costs to maintain and operate the new rail lines and support facilities; acquire additional locomotives and railcars to provide services; or operate, maintain, and replace existing rail lines and facilities. Finally, the study does not include the costs to rail shippers to accommodate growth in rail traffic volumes at their facilities. The study does include a general estimate of the investment required to bring the weight-bearing capacity of Class I branch lines and short line and regional railroad lines up to current standards.

The findings of this study provide a starting point for assessing future rail freight capacity and investment requirements. The findings outline the improvements and investments required for the railroads to carry the freight tonnage forecast by the U.S. DOT. Additional work is needed to determine how much more capacity and investment would be needed for the railroads to increase their share of freight tonnage and reduce the rate of growth in truck traffic on highways. Finally, the forecasts and improvement estimates in this study do not fully anticipate future changes in markets, technology, regulation, and the business plans of shippers and carriers. Each could significantly reshape freight transportation demand, freight flow patterns, and railroad productivity, and, thus, rail freight infrastructure investment needs.

# 2.0 Background

The study was done at the request of the National Surface Transportation Policy and Revenue Study Commission. The Commission was established by Congress in 2005 to provide a national vision and recommendations that will "preserve and enhance the surface transportation system to meet the needs of the United States for the 21st century."[2] The Commission is charged with completing a comprehensive study of the national surface transportation system and the Highway Trust Fund, then developing a conceptual plan with alternative approaches to ensure that the system continues to serve the needs of the United States.

Since May 2006, the Commission has met regularly to hear about the challenges facing America's surface transportation network. The Commissioners have heard testimony from national transportation advocates, policymakers, industry, labor, and the general public. Congress is actively following the activities of the Commission, and the Commission's report (anticipated in December 2007) is expected to provide information that will be helpful to Congress as it considers reauthorization of the Federal surface transportation programs in 2009.

Over the course of its hearings, the Commission has expressed concern about the capacity and future of the nation's freight transportation systems. Freight transportation is vitally important to domestic economic productivity, the international competitiveness of American businesses, and the economic well-being of all Americans.

The demand for transportation is pressing the capacity of the nation's transportation systems, especially its critical highway and rail freight transportation infrastructure. On the highway system, vehicle-miles of travel grew by 96 percent between 1980 and 2005, while lane miles of road increased by only 5.7 percent. Figure 2.1, based on Federal Highway Administration (FHWA) statistics, illustrates the widening gap between vehicle-miles of travel and roadway capacity.

[2] See Section 1909 of the Safe, Accountable, Flexible, Efficient Transportation Equity Act—A Legacy for Users (SAFETEA-LU).

**Figure 2.1 Vehicle Miles of Travel and Lane Miles**
*1980 to 2005*




Source: Federal Highway Administration, *Highway Statistics*.

The result has been increasing highway congestion. The Texas Transportation Institute reports that over the decade between 1993 and 2003, the cost of highway congestion in the nation's urban areas increased from $39.4 billion to $63.1 billion, an increase of 60.2 percent.[3] The U.S. DOT estimates that the cost of congestion across all modes of transportation could be three times as high—approaching $200 billion per year—if productivity losses, costs associated with cargo delays, and other economic impacts are included. These include losses accruing to auto drivers, freight carriers, businesses, consumers, and the general public.[4]

As the cost of highway congestion has increased, public policy-makers at all levels of government have started looking to the railroads to carry more freight to relieve truck and highway congestion, and to help conserve energy, reduce engine emissions, and improve safety. Shippers, too, have started looking to railroads to carry more longer-distance shipments, especially as the costs of truck fuel and labor have increased.

---

3 David Schrank and Tim Lomax, *The 2005 Urban Mobility Report*, Texas Transportation Institute, May 2005, available at http://mobility.tamu.edu.

4 U.S. Department of Transportation, *National Strategy to Reduce Congestion on America's Transportation Network*, Washington, D.C., March 2007. See http://www.fightgridlocknow.gov/docs/conginitoverview070301.htm.

However, the growing demand for freight transportation is also pressing the capacity of the nation's rail freight system. Ton-miles of rail freight (one ton of freight moved one mile counts as one ton-mile) carried over the national rail system have doubled since 1980, and the density of train traffic—measured in ton-miles per mile of track—has tripled since 1980. Figure 2.2 illustrates the widening gap between ton-miles of rail travel and track miles.[5]

**Figure 2.2 Rail Freight Ton-Miles and Track Miles**
*Class I Railroads, 1980 to 2006*




Source: AAR and Annual Report Form R-1.

The tightening of system capacity across all modes of freight transportation has likely contributed to the first notable increase in total logistics cost in over 25 years. Total logistics cost is the cost of managing, moving, and storing goods. Figure 2.3 shows the total logistics cost as a percentage of the U.S. gross domestic product (GDP).

[5] Association of American Railroads data and Annual Report Form R-1.

**Figure 2.3 Total Logistics Cost**
*Percentage of Gross Domestic Product*




Source: *State of Logistics Report*, Council of Supply Chain Management Professionals, 2006.

Logistics costs rose through the 1970s to a high of about 16 percent of GDP in 1980, reflecting rising fuel prices, increasing interest rates, and deteriorating productivity across the freight transportation system. Renewed investment in highways, economic deregulation of the freight transportation industry in the early 1980s, adoption of new technologies, and lower interest rates drove down the costs of truck, rail, air, and water freight transportation. The total logistics cost declined through the 1980s and 1990s to a low of about 8.6 percent of GDP in 2003. Businesses and consumers benefited because lower transportation costs resulted in lower-cost goods and better access to global markets.

But the total logistics cost is rising again. In 2006, the total logistics cost was 9.9 percent of GDP.[6] The change reflects recent increases in fuel prices and increases in congestion on the nation's highways and rail lines and at its international trade gateways and ports. Freight shippers and carriers are worried that the productivity of the nation's freight systems may continue to drop and that logistics costs may rise further, undermining future domestic economic productivity, international competitiveness, and economic growth.

[6] Rosalyn A. Wilson, *State of Logistics Report*, Council of Supply Chain Management Professionals, 2006 and 2007.

Freight shippers and carriers are especially concerned about the future capacity and productivity of the freight system because the demand for freight transportation is projected to nearly double by 2035. The U.S. DOT Freight Analysis Framework (FAF Version 2.2) estimates that the demand for freight transportation will grow from 19.3 billion tons today to 37.2 billion tons in 2035, an increase of about 93 percent.[7]

To absorb this growth and maintain their existing shares of the freight transportation market, the nation's truck and rail freight systems must increase their capacity and productivity substantially. Trucks and the highway system must add capacity to handle 98 percent more tonnage. And railroads must add capacity to handle 88 percent more tonnage. The U.S. DOT estimates assume no shift in modal tonnage shares among rail and truck beyond those created by structural changes in the economy (i.e., different growth rates across freight-generating industries).

The anticipated rates of growth for the U.S. economy and freight transportation demand are about the same as those experienced over the last 30 years; however, much of the capacity existing or created over those years has been filled, leaving the nation with a need to provide new capacity through expanded infrastructure and improved productivity.[8]

Figure 2.4 shows the relative shares of freight—measured in ton-miles—carried by truck and rail in 2005.[9] If railroads cannot carry their share in 2035, then freight will be shed to trucks and an already heavily congested highway system. Conversely, if trucks cannot carry their share in 2035, then freight must be shifted to rail and the capacity of the rail system expanded even more than currently forecast.

---

[7] See U.S. Department of Transportation, Freight Analysis Framework, *Freight Facts and Figures* at http://www.ops.fhwa.dot.gov/freight/. This study uses the current Freight Analysis Framework (FAF Version 2.2) forecasts.

[8] Global Insight, Inc. forecasts that the U.S. economy will grow at a compound annual rate of about 2.8 percent over the next 30 years. Source: Global Insight, Inc. in *Freight Demand and Logistics Bottom Line Report* prepared by Cambridge Systematics, Inc. for the American Association of State Highway and Transportation Officials (AASHTO), (forthcoming, 2007).

[9] Ton-miles estimated by Global Insight for the AASHTO *Freight Demand and Logistics Bottom Line Report*.

**Figure 2.4 Truck and Rail Market Shares in Ton-Miles**
*2005 and 2035*




Source: Cambridge Systematics, Inc., based on Global Insight, Inc. freight demand forecasts.

In response to these projections and concerns, the Commission asked the Association of American Railroads (AAR) to assess the capacity of the nation's rail system to accommodate the estimated increase in freight-rail traffic. The AAR, supported by the four largest Class I railroads – the BNSF Railway, CSX Transportation, the Norfolk Southern Corporation, and the Union Pacific Railroad – undertook this study to estimate the additional rail freight capacity and investment required to meet the U.S. DOT forecast.

This study is a hallmark study, the first effort of its kind. The U.S. DOT and the Federal Highway Administration (FHWA) have developed national infrastructure needs and cost estimates for the publicly owned highway systems, but no comparable, long-term, national estimates have been developed for the rail system. The railroads are publicly traded or privately owned companies, and the planning horizons for railroad capital projects typically do not extend out 30 years. And neither the U.S. DOT nor individual state DOTs have comprehensive rail infrastructure databases suitable for long-term planning. This study is the first collective assessment by the major freight railroads of their long-term capacity expansion and investment needs.

# 3.0 Methodology

This study provides a first approximation of the rail freight infrastructure improvements and investments in the continental U.S. rail network that will allow the freight railroads to meet the U.S. DOT's projected demand for rail freight transportation in 2035. It addresses two major rail freight infrastructure elements:

- Line expansion:
  - Upgrades to the Class I railroad system mainline tracks and signal control systems;
  - Improvements to significant rail bridges and tunnels;[10]
  - Upgrades to Class I railroad secondary mainlines and branch lines to accommodate 286,000-pound freight cars; and
  - Upgrades to short line and regional railroad tracks and bridges to accommodate 286,000-pound freight cars.[11]
- Facility expansion:
  - Expansion of carload terminals, intermodal yards, and international gateway facilities owned by railroads; and
  - Expansion of Class I railroad service and support facilities such as fueling stations and maintenance facilities.

---

[10] Included in this category are expansions of major bridges and tunnels (or construction of new parallel bridges and tunnels) to add rail capacity along a corridor, and corridor overhead clearance projects, which typically involve raising dozens of highway bridges crossing a rail line to permit the movement of double-stacked intermodal container trains.

[11] Most Class I railroad tracks and bridges have been designed or reconstructed to carry railcars weighing 286,000 pounds, and some Class I lines accommodate railcars weighing up to 315,000 pounds. Older rail lines, including some Class I railroad secondary mainlines and branch lines and about half of the short line and regional railroad tracks and bridges, were designed and constructed to carry railcars weighing up to 263,000 pounds. The heavier, "standard," 286,000-pound cars can be operated over many lines designed for lighter cars, but usually at very low speeds.

The study includes the cost of designing and constructing these improvements, but does not include the cost of acquiring real estate to accommodate new rail lines and terminals.[12] This is consistent with the approach used in national highway system needs and investment studies, which do not estimate the cost of acquiring real estate for widening or adding highways. The study does not include the cost of capital depreciation or the cost of buying additional locomotives and rail cars to expand service. Railroad maintenance and operating costs are not included, for either existing or expanded lines and facilities.

The study assumes that capacity is provided for long-distance Amtrak and local commuter passenger rail services that are currently operated over rail freight lines, but the study does not forecast the need for new passenger rail services or the necessary capacity to support passenger rail growth. The Commission has convened a passenger rail committee that is studying the need for improvements and investments to support passenger-rail demand through 2035. The findings of that committee will be reported separately.

This study estimates rail line capacity and investment requirements by:

- Dividing the continental U.S. Class I railroad network into primary corridors;
- Establishing current corridor volume in freight and passenger trains per day for each primary corridor, based on 2005 Surface Transportation Board Carload Waybill data, the most recent comprehensive information available;
- Estimating current corridor capacity in trains per day for each primary corridor, based on current information;
- Comparing current corridor volume to current corridor capacity;
- Estimating future corridor volume in trains per day, using U.S. DOT's Freight Analysis Framework Version 2.2 forecasts of rail freight demand in 2035 by type of commodity and by the origin and destination locations of shipments moving within the U.S. and through international land and port gateways;
- Comparing the future corridor volume to current corridor capacity;

[12] Current capital expenditures by the Class I railroads for expansion of lines and terminals (as reported in Section 4.5) include the cost of acquiring real estate. However, with the exception of land acquired for new or expanded intermodal terminals, the cost of real estate acquisition has been a small part of current capital expenditures because most new rail lines have been constructed within existing railroad-owned rights-of-way. As the space in existing rights-of-way is used up, the cost of acquiring real estate for new lines is expected to be a larger percentage of capital expenditures for expansion. The real estate costs will be in addition to the infrastructure costs estimated in this study.

- Determining the additional capacity needed to accommodate future train volumes at an acceptable level of service reliability;
- Identifying the rail line and signal control system improvements required to provide the additional capacity; and
- Estimating the costs of the improvements.

The study estimates the need for expansion of Class I railroad carload terminals, intermodal yards, and railroad-owned international gateway facilities by analyzing the projected increases in the number of railcars and intermodal units (containers and truck trailers) handled at major facilities and comparing them to current handling capacity. Expansion costs are estimated using unit costs per railcar or intermodal container, or estimated using recent and comparable terminal expansion project costs. Estimates of the cost of expanding service and support facilities such as fueling stations were provided by the railroads based on the anticipated changes in the number and type of trains.

Finally, the study estimates the capacity and investment requirements for secondary mainlines, branch lines, and short line and regional railroads by updating information from a prior study of short line system investment needs commissioned by the American Short Line and Regional Railroad Association.[13]

Wherever possible, the analysis is based upon existing and publicly available data sources. The key sources of data are the following:

- Oak Ridge National Laboratory (ORNL) Center for Transportation Analysis' Rail Network (Version 5-5) is used to develop a primary corridor network model and identify the key corridor characteristics such as the number of tracks and type of signal system;
- The U.S. DOT Surface Transportation Board's (STB) 2005 Carload Waybill Sample is used to estimate current corridor volumes based on 2005 loaded-car movements;
- Data from the Surface Transportation Board's Uniform Rail Costing System (URCS) on empty-return ratios by railroad, car type, and car ownership are used to estimate empty car movements;
- The U.S. DOT's Freight Analysis Framework (FAF Version 2.2) forecast is used to establish rail freight traffic growth by type of train service (e.g., intermodal train, manifest/carload train, auto train, and bulk train) from 2005 to 2035;

---

[13] Zeta-Tech Associates, Inc., *An Estimation of the Investment in Track and Structures Needed to Handle 286,000-Pound Rail Cars*, prepared for the American Short Line and Regional Railroad Association, May 26, 2000.

- Data from the railroads and the AAR are used to estimate the capacity in trains per day for archetypical rail corridors representing different combinations of number of tracks and signal types. The capacities of the archetypical rail corridors are used to identify the improvements needed to accommodate future train volumes.
- Data from the Class I railroads, the AAR, and published construction industry information are used to estimate the cost of adding tracks, upgrading signal systems, expanding terminals, and adding rail-support facilities.

Appendix A describes the technical methodology in more detail.

# 4.0 Current Train Volumes and Capacity

## 4.1 Primary Corridors

The study focuses on the primary rail corridors within the national rail freight system. Figure 4.1 shows the national rail network. The primary corridors for each of the seven Class I railroads are shown in color; all other rail lines are shown in gray.

**Figure 4.1 National Rail Freight Network and Primary Rail Freight Corridors**




Source: Cambridge Systematics, Inc.

Figure 4.2 shows just the primary corridors used for this study of rail freight capacity. The primary corridors were designated by the Class I railroads for this study. The primary corridors represent the higher-volume corridors for rail freight. The primary corridors total about 52,340 miles of road (or centerline miles), representing about half of all Class I-operated miles in the U.S. and about one-third of the 140,810 miles in the U.S. rail freight network. For comparison, the Interstate Highway System comprises about 47,000 route miles, and the National Highway System, which adds other major U.S. and state freight highways, comprises about 162,000 route miles.

**Figure 4.2 Primary Rail Freight Corridors**




Source: Cambridge Systematics, Inc.

## 4.2 CURRENT VOLUMES

Current corridor volumes in trains per day were established for each primary corridor using data from the Surface Transportation Board's 2005 Carload Waybill Sample. The Waybill Sample is an annual survey of railcar movements on the national rail network. The survey collects information from a sample of loaded, revenue-producing railcar movements. The data include information about the commodity shipped, the type of railcar used, the origin and destination station of the shipment, any interchanges between railroads, and the names of railroads handling the shipment. The sample data are statistically expanded to represent 100 percent of the loaded revenue railcar moves in a year. The Waybill Sample is used in many regulatory proceedings and is generally considered an accurate reflection of U.S. railroad shipments. The 2005 Waybill Sample is the most recent comprehensive data available.

The Waybill Sample does not collect information about empty, non-revenue-producing railcar movements. These were estimated using information from the Uniform Rail Costing System (URCS) on empty-return ratios by railroad, car type, and car ownership. The number of empty, non-revenue-producing railcar movements were added to the number of loaded, revenue-producing railcar movements to estimate total railcar movements.

The number of carloads moving on the rail system varies daily, weekly, and seasonally. To select a representative day, the distribution of the number of carload movements for each day in 2005 was examined and the volume for the 85th percentile day was selected for analysis. This approach is consistent with the analysis procedures for highway needs studies.

The carload volumes were then allocated among four types of train service based on the commodity being carried and the type of operation:

1. **Auto Train Service –** For assembled automobiles, vans, and trucks moving in multilevel cars;
2. **Bulk Train Service –** For grain, coal, and similar bulk commodities moving in unit trains;
3. **Intermodal Train Service –** For commodities moving in containers or truck trailers on flat cars or specialized intermodal cars; and
4. **General-Merchandise Train Service –** Everything else, including commodities moved in box cars and tank cars.

The number of trains of each type needed to move the cars were estimated using information on the typical number of cars hauled by train service type, as summarized in Table 4.1. The number of intermodal trains needed is based on the number of intermodal units (e.g., container-on-flat-car [COFC] units and trailer-on-flat-car [TOFC] units). Separate calculations were made for Eastern and Western Class I railroads because differences in regional geography and topography allow Western railroads to operate longer trains.[14]

### Table 4.1 Typical Number of Cars or Intermodal Units by Train Service Type

| Type of Train Service | Eastern Railroads | Western Railroads |
|---|---|---|
| Auto | 57.0 | 63.9 |
| Bulk | 86.0 | 112.4 |
| General Merchandise | 82.0 | 80.7 |
| Intermodal (TOFC/COFC count) | 110.7 | 164.3 |

Source: Class I railroad data.

[14] For details, see Appendix A.

Finally, the number of long-distance Amtrak and local commuter passenger rail trains operating over the primary rail freight corridors was added to the number of freight trains to calculate the total number of trains per day per corridor. The number of passenger trains was estimated from published information on Amtrak and commuter passenger rail schedules for 2007.

Figure 4.3 maps the current corridor volumes in trains per day for the primary rail freight corridors. The number of trains per day is indicated by the width of the corridor line. The thinnest line indicates that a corridor carries up to 15 trains per day; the widest line indicates that a corridor carries between 100 and 200 trains per day.

**Figure 4.3 Current Corridor Volumes by Primary Rail Freight Corridor**
*2005 Freight Trains and 2007 Passenger Trains per Day*




Source: Cambridge Systematics, Inc.

Note: Volumes are for the 85th percentile day.

## 4.3 Current Capacity

To determine whether a corridor is congested, current volume was compared to current capacity. Three variables were used to estimate the current capacity of the primary corridors: the number of tracks, the type of control system, and the mix of train types.[15]

- **Tracks –** Most sections of the national rail freight system are single-tracked with multiple sidings for trains to meet and pass each other, and a significant portion of the heaviest-volume corridors are double-tracked. A limited number of sections have three or four tracks.
- **Control System –** The type of control system affects capacity by maintaining a safe spacing between trains meeting and passing on the same track. There are three major types of signal systems:
  - **Automatic Block Signaling (ABS)** is a signal system that controls when a train can advance into the next track block. A block is a section of track with traffic control signals at each end. The length of the block is based on the length of a typical train and the distance needed to stop the train in a safe manner. When a train exits a block, the signal changes to yellow, indicating to the engineer of a following train that the block is now empty, but that the following train should be prepared to stop before entering the next block (currently occupied by the train ahead). Automatic block signaling is governed by block occupancy and cannot be controlled by a railroad dispatcher from a remote location.
  - **Centralized Traffic Control (CTC)** and **Traffic Control System (TCS)** are systems that use electrical circuits in the tracks to monitor the location of trains, allowing railroad dispatchers to control train movements from a remote location, typically a central dispatching office. CTC and TCS increase capacity by detecting track occupancy and allowing dispatchers to safely decrease the spacing between trains because the signal systems automatically prevent trains from entering sections of track already occupied by other trains.
  - **No Signal (N/S)** and **Track Warrant Control (TWC)** are basic train control systems that require the train crew to obtain permission or warrants

[15]The capacity of rail corridors is determined by a large number of factors, including the number of tracks, the frequency and length of sidings, the capacity of the yards and terminals along a corridor to receive the traffic, the type of control systems, the terrain, the mix of train types, the power of the locomotives, track speed, and individual railroad operating practices. Complete, consistent, and current information on all these factors was not available for the study, so the capacity of the primary corridors was estimated using only the three dominant factors (e.g., number of tracks, type of signal system, and mix of train types).

before entering a section of track. Crews receive track warrants by radio, phone, or electronic transmission from dispatcher. TWC is used on low-volume track instead of more expensive ABS or CTC/TCS systems.

- **Train Types –** The mix of train types determines the speed and spacing of trains on a track. Different types of trains operate at different speeds and have different braking capabilities. A corridor that serves a single type of train will usually accommodate more trains per day than a corridor that serves a mix of train types. Trains of the single type can be operated at similar speeds and with more uniform spacing between the trains because they have similar braking capabilities. This increases the total number of trains that can traverse the corridor per day. When trains of different types—each with different length, speed, and braking characteristics—use a corridor, greater spacing is required to ensure safe braking distances. As a result, the average speed drops, reducing the total number of trains that can traverse the corridor per day. For the study, trains were grouped into three train-type groups based on their operating characteristics:
  - **Train-Type Group 1 –** includes merchandise/carload trains and bulk coal and grain trains. These trains tend to haul heavier, bulkier commodities such as coal, grain, gravel, and phosphates, and operate at slower speeds.
  - **Train-Type Group 2 –** includes intermodal trains and multilevel auto carriers hauling assembled automobiles. These trains tend to operate at higher speeds because they are lighter than merchandise and bulk trains and are run to more exacting schedules.
  - **Train-Type Group 3 –** includes passenger trains such as Amtrak's long-distance trains and local commuter rail trains. Passenger trains operate at high speeds and on fixed schedules, similar to the speeds and schedules of intermodal trains. They require close control to ensure safe operation and stopping distances, especially when operating along corridors carrying merchandise trains or a mix of merchandise and intermodal trains. By law, Amtrak passenger trains operating over rail freight lines must be given priority; this means that when Amtrak trains meet or overtake freight trains, the freight trains are shunted to sidings or parallel lines until the passenger train has passed.

There are eight combinations of number of tracks and type of signal system that are in common use across the primary corridors today. Table 4.2 lists the combinations, along with five- and six-track corridor types, which are used in this study to accommodate future demand. The first column lists the number of tracks, and the second column lists the type of control system. For each combination of number of tracks and type of control system, the maximum number of trains that can typically be accommodated is determined by the mix of train types operating along the corridor. The third column in the table lists the maximum practical capacity in trains per day that can be accommodated if multiple train types (e.g., merchandise, bulk, and passenger trains) use the corridor. The

rightmost column lists the maximum practical capacity in trains per day that can be accommodated if a single train type (e.g., all intermodal trains) uses the corridor.

**Table 4.2 Average Capacities of Typical Rail-Freight Corridors**
*Trains per Day*

| | | Trains per Day | |
|---|---|---|---|
| Number of Tracks | Type of Control | Practical Maximum If Multiple Train Types Use Corridor* | Practical Maximum If Single Train Type Uses Corridor** |
| 1 | N/S or TWC | 16 | 20 |
| 1 | ABS | 18 | 25 |
| 2 | N/S or TWC | 28 | 35 |
| 1 | CTC or TCS | 30 | 48 |
| 2 | ABS | 53 | 80 |
| 2 | CTC or TCS | 75 | 100 |
| 3 | CTC or TCS | 133 | 163 |
| 4 | CTC or TCS | 173 | 230 |
| 5 | CTC or TCS | 248 | 340 |
| 6 | CTC or TCS | 360 | 415 |

Key: N/S-TWC – No Signal/Track Warrant Control.
ABS – Automatic Block Signaling.
CTC-TCS – Centralized Traffic Control/Traffic Control System.

Notes: * For example, a mix of merchandise, intermodal, and passenger trains.
** For example, all intermodal trains.

The table presents average capacities for typical rail freight corridors. The actual capacities of the corridors were estimated using railroad-specific capacity tables. At the request of the railroads, these detailed capacity tables were not included in this report to protect confidential railroad business information.

Source: Class I railroad data aggregated by Cambridge Systematics, Inc.

Typically, a corridor serving multiple train types will have a lower capacity than a corridor serving a single train type. For example, a railroad corridor with two tracks, a centralized traffic control (CTC) system, and a mix of merchandise/bulk trains, intermodal/auto trains, and passenger trains would typically operate at a capacity of about 75 trains per day. The same corridor, serving all merchandise trains, would typically operate at a capacity of about 100 trains per day.

For the study, each primary corridor in the national rail network was assigned a capacity based its actual number of tracks, type of control system, and mix of train types. The calculated capacity of each corridor was reviewed with the railroads. The railroads made adjustments to update network information and better represent their actual corridor train volumes and capacities.

## 4.4 Current Volumes Compared to Current Capacity

Current corridor volumes were compared to current corridor capacity to assess congestion levels. This was done by calculating a volume-to-capacity ratio expressed as a level of service (LOS) grade. The LOS grades are listed in Table 4.3.

**Table 4.3 Volume-to-Capacity Ratios and Level of Service (LOS) Grades**

| LOS Grade | Description | | Volume/Capacity Ratio |
|---|---|---|---|
| A | Below Capacity | Low to moderate train flows with capacity to accommodate maintenance and recover from incidents | 0.0 to 0.2 |
| B | | | 0.2 to 0.4 |
| C | | | 0.4 to 0.7 |
| D | Near Capacity | Heavy train flow with moderate capacity to accommodate maintenance and recover from incidents | 0.7 to 0.8 |
| E | At Capacity | Very heavy train flow with very limited capacity to accommodate maintenance and recover from incidents | 0.8 to 1.0 |
| F | Above Capacity | Unstable flows; service breakdown conditions | > 1.00 |

Source: Cambridge Systematics, Inc.

Rail corridors operating at LOS A, B, or C are operating below capacity; they carry train flows with sufficient unused capacity to accommodate maintenance work and recover quickly from incidents such as weather delays, equipment failures, and minor accidents. Corridors operating at LOS D are operating near capacity; they carry heavy train flows with only moderate capacity to accommodate maintenance and recover from incidents. Corridors operating at LOS E are operating at capacity; they carry very heavy train flows and have very limited capacity to accommodate maintenance and recover from incidents without substantial service delays. Corridors operating at LOS F are operating above capacity; train flows are unstable, and congestion and service delays are persistent and substantial. The LOS grades and descriptions correspond generally to the LOS grades used in highway system capacity and investment requirements studies.

A rail corridor that is operating at a volume-to-capacity ratio of 0.7 (the boundary between LOS C and LOS D), is operating at 70 percent of its theoretical maximum capacity. This is considered to be the corridor's practical capacity because a portion of the theoretical maximum capacity is lost to maintenance, weather delays, equipment failures, and other factors. A corridor operating at LOS C will have stable train flows, ensuring that schedules can be met reliably and safely, and permitting timely recovery from service disruptions. At LOS D, a corridor will have stable operations under normal conditions, but service can quickly become unstable with unplanned and unanticipated disruptions. At volume-to-capacity ratios significantly greater than 0.8 (e.g., at LOS E or F), train flow rates and schedule reliability deteriorate and it takes longer and longer to recover from disruptions. To provide acceptable and competitive service to shippers and receivers, railroads typically aim to operate rail corridors at LOS C/D or better.

Figure 4.4 maps the volume-to-capacity ratios, expressed as LOS grades, for each primary rail corridor, based on current train volumes and current capacity.[16] For legibility, rail corridors operating at LOS A, B and C (below practical capacity) have been mapped in green. Corridors operating at LOS D (near practical capacity) have been mapped in yellow, and corridors operating at LOS E (at practical capacity) have been mapped in orange. Rail corridors operating at LOS F (above capacity) have been mapped in red.

Analysis of the current levels of service, summarized in Table 4.4, shows that 88 percent of today's primary corridor mileage is operating below practical capacity (LOS A/B/C), 12 percent is near or at practical capacity (LOS D/E), and less than 1 percent is operating above capacity (LOS F).

[16] Current volumes are based primarily on shipment volumes reported in the 2005 STB Carload Waybill Sample. These volumes do not reflect fully recent increases in coal shipments moving from Western coal fields (e.g., Powder River Basin) to Eastern utilities nor the recent increases in intermodal containers delivered by water to East Coast ports and transferred to rail for inland delivery. Current capacity is based on 2007 information.

### Figure 4.4 Current Train Volumes Compared to Current Train Capacity




Source: Cambridge Systematics, Inc.

Note: Volumes are for the 85th percentile day.

### Table 4.4 Primary Rail Corridor Mileage by Current Level of Service Grade
*Current Volumes and Current Capacity*

| LOS Grade | Total Mileage | Percentage |
|---|---|---|
| A | 9,719 | 19% |
| B | 15,417 | 30% |
| C | 20,683 | 39% |
| D | 4,952 | 9% |
| E | 1,461 | 3% |
| F | 108 | <1% |
| Totals | 52,340 | 100% |

Source: Cambridge Systematics, Inc.

## 4.5 Current Railroad Investment in Capacity

The Class I railroads generated $52.2 billion in revenue in 2006 and incurred $41 billion in operating expenses.[17] After deducting interest charges, taxes and other miscellaneous items, the Class I railroads earned a net income of $6.5 billion in 2006.

Of the $41 billion in expenses, $21.1 billion (40 percent of revenue) was spent on transportation, which includes the costs of train crews and fuel; $8.5 billion (16 percent of revenue) on equipment; $6.8 billion (13 percent of revenue) on maintenance of roadway (e.g., rails, ties, ballast and substructure) and structures (e.g., bridges, tunnels, service building, etc.); and $4.6 billion (9 percent of revenue) on general and administrative costs. A breakdown of the operating expenditures is shown in Figure 4.5.

**Figure 4.5 Class I Railroad Operating Expenditures**
*2006*




Source: American Association of Railroads.

In 2006, the Class I railroads' capital expenditures totaled $8.5 billion. Of this, $1.5 billion (about 18 percent) was spent on equipment, and $7.0 billion (about

[17] In 2006, the operations and maintenance (O&M) cost for Class I railroads was $210,380 per mile of track and $359,097 per mile of road. This O&M cost is a fully burdened cost including transportation, equipment maintenance, G&A (but not maintenance of way and structures), and capital expenditures for equipment (but not way and structures). Depreciation is deducted to avoid double-counting. The calculations are based on 162,056 miles of operated track and 94,942 miles of road, less miles operated under trackage rights to avoid double-counting. This information is for the seven Class I railroads, U.S. operations only.

82 percent) on roadway and structures.[18] These capital expenditures include amounts for renewal of the existing roadway, structures, and equipment, as well as expenditures for expansion to serve additional traffic.

Combining operating and capital spending and adjusting for depreciation, 40 percent of the Class I railroads' revenue is spend on maintenance, replacement, or expansion of their track, structures, and equipment.[19] In 2006, the Class I railroads spent $10.6 billion maintaining and improving their infrastructure, and another $8.7 billion on equipment.[20]

The AAR estimates that the Class I railroads will spend approximately $1.9 billion in 2007 for expansion of capacity through the construction of new roadway and structures. This is the highest level of investment for expansion in recent years and reflects a steady increase in investment in expansion of roadway and structures. The Class I railroads invested $1.1 billion in expansion of roadway and structures in 2005. The Class I railroads invested $1.4 billion in infrastructure expansion in 2006. This was in addition to an expenditure of $17.9 billion for renewal of roadway, structures, and equipment and additions to locomotives and freight cars. The average annual investment in infrastructure expansion over the three year period from 2005 to 2006 was $1.5 billion per year.[21]

As these numbers demonstrate, rail transportation is capital intensive, requiring high levels of spending on infrastructure such as track, bridges, and signals; locomotives, freight cars, and maintenance equipment; and information technology. From 1996 through 2005, Class I railroad capital expenditures averaged 17 percent of revenue. (The comparable figure for the average U.S. manufacturer was 3 percent of revenue.) Railroad capital expenditures for ties alone have exceeded $1 billion every year since 2003, and spending for rail has been even higher.

Even though the railroads must invest heavily in infrastructure, the railroads have had substantial surplus capacity in the rail network for many years. This has enabled them to absorb traffic growth with relatively modest additional capital commitments to expand infrastructure. With this surplus capacity largely absorbed by two decades of growth and with major traffic increases in the past few years, an increasing portion of the capital investment in roadway and structures has been devoted to capacity expansion. And with traffic growth through 2035 expected to be significant, increasing amounts of capital will need to be devoted to expansion.

---

[18] These capital expenditures do not include some equipment that was acquired under operating leases.

[19] Capital expenditures plus operating expenses for infrastructure and equipment, minus depreciation to avoid double-counting capital spending.

[20] Association of American Railroads economists estimate that each $1 billion of investment in rail infrastructure generates over 20,000 jobs.

[21] Association of American Railroads data.

# 5.0 Future Train Volumes and Capacity

## 5.1 Future Volumes

2035 train volumes were projected using economic growth and commodity forecasts from the U.S. DOT's Freight Analysis Framework (FAF Version 2.2). The FAF forecasts are national freight transportation estimates covering all types of shipments by truck, rail, water, pipeline, and air. The U.S. DOT and the Federal Highway Administration use the FAF forecasts to analyze truck freight demand and help estimate highway capacity needs and investment requirements.

The FAF forecasts consider growth in population, the economy, and international trade. Forecasts of the demand for freight transportation are derived by examining production, consumption, and trade by major industry sector and economic region in the U.S., North America, and the rest of the world. The rail freight forecasts cover over 40 categories of commodities and estimate the volume of each type of commodity moving among 138 economic zones (114 zones representing economic areas and international trade gateways within the U.S., and 24 zones representing economic areas in Canada, Mexico, and overseas).

The forecasts are driven by demand only; they are not constrained by supply. This means that if an industry grows and the industry currently ships and receives a commodity by rail, then the industry will ship and receive more of that commodity by rail in the future. Conversely, if an industry declines and the industry currently ships and receives a commodity by rail, then the industry will ship and receive less by rail in the future. The forecasts assume that the rail system (and other freight modes) will have the capacity to meet the future demand. The forecasts also do not attempt to presuppose how markets and demand will change in response to future, but unknown, changes in technology, regulation, and politics. The forecasts are a starting point for consideration of the effect of future demand on infrastructure capacity and investment requirements, but are not comprehensive in their estimation of future freight demand.

The FAF Version 2.2 2035 commodity forecasts were used to develop weighted growth rates for the four types of train services—auto train service (for finished automobiles), bulk train service (for grain, coal, and similar bulk commodities), intermodal train service (for commodities moving in containers or truck trailer on flat cars or specialized intermodal cars), and general-merchandise train service (for everything else, including commodities moved in box cars and tank cars). The growth rates were applied to the number of 2005 trains to approximate the number of 2035 trains. The number of passenger trains was held at 2007 levels and added to the estimated number of freight trains in 2035.

Case 1:07-mc-00489-BAH Document 1229-8 Filed 11/22/24 Page 220 of 466



Figure 5.1 maps the future corridor volumes in trains per day for the primary rail freight corridors. The number of trains per day is indicated by the width of the corridor line. The thinnest line indicates that a corridor carries up to 15 trains per day; the widest line indicates that a corridor carries between 300 and 400 trains per day.

**Figure 5.1 Future Corridor Volumes by Primary Rail Freight Corridor**
*2035 Freight Trains and 2007 Passenger Trains per Day*




Source: Cambridge Systematics, Inc.

Note: Volumes are for the 85th percentile day.

Figure 5.2 compares current and future volumes by primary corridor. The figure shows the growth in trains per day between the 2005 volumes and the 2035 volumes. The growth is indicated by the width and color of the corridor line. A thin black line indicates that a corridor will carry up to 30 additional trains per day by 2035; a green line indicates that a corridor will carry between 30 and 80 additional trains per day; and a thick black line indicates that a corridor will carry between 80 and 200 additional trains per day.

**Figure 5.2 Growth in Trains per Day from 2005 to 2035 by Primary Rail Corridor**




Source: Cambridge Systematics, Inc.

Note: Volumes are for the 85th percentile day.

Figure 5.3 also compares current and future volumes by primary corridor, but the figure shows the percentage growth in trains per day from 2005 to 2035. The percentage growth is indicated by the width and color of the corridor line. A thin black line indicates that a corridor will carry up to 50 percent more trains per day by 2035; a blue line indicates that a corridor will carry between 50 and 100 percent more trains per day; and a thick black line indicates that a corridor will carry over 100 percent more trains per day.

**Figure 5.3 Percentage Growth in Trains per Day from 2005 to 2035 by Primary Rail Corridor**




Source: Cambridge Systematics, Inc.

Note: Volumes are for the 85th percentile day.

## 5.2 Future Volumes Compared to Current Capacity

Future volumes were compared to current capacity to estimate future volume-to-capacity ratios. This information was used to determine where demand will exceed capacity and where improvements will be required to avoid congestion. Figure 5.4 compares 2035 volumes in trains per day to current corridor capacity. The volume-to-capacity ratios are expressed as LOS grades for each primary rail corridor. Again, for legibility, rail corridors operating at LOS A, B, and C (below practical capacity) have been mapped in green. Corridors operating at LOS D (near practical capacity) have been mapped in yellow, and corridors operating at LOS E (at practical capacity) have been mapped in orange. Rail corridors operating at LOS F (above capacity) have been mapped in red.

**Figure 5.4 Future Corridor Volumes Compared to Current Corridor Capacity**
*2035 without Improvements*




Source: Cambridge Systematics, Inc.

Note: Volumes are for the 85th percentile day.

Analysis of the 2035 levels of service, summarized in Table 5.1, shows that—without improvements—45 percent of primary corridor mileage will be operating below capacity (LOS A/B/C), 25 percent will be operating near or at capacity (LOS D/E), and 30 percent will be operating above capacity (LOS F). The resulting level of congestion would affect nearly every region of the country and would likely shut down the national rail network.

**Table 5.1 Primary Rail Corridor Mileage by Future Level of Service Grade**
*2035 without Improvements*

| LOS Grade | Total Mileage | Percentage |
|---|---|---|
| A | 4,895 | 9% |
| B | 6,626 | 13% |
| C | 11,708 | 23% |
| D | 5,353 | 10% |
| E | 7,980 | 15% |
| F | 15,778 | 30% |
| Totals | 52,340 | 100% |

Source: Cambridge Systematics, Inc.

# 6.0 Rail Capacity Improvements

## 6.1 Capacity Improvements

Rail improvements were determined by comparing the current capacity in each primary corridor to the capacity needed to accommodate future train volumes. Capacities estimates were based on the capacities of typical rail corridor combinations of tracks, controls, and mix of train types as shown in Table 6.1. (This table was described in Section 4.0 and is repeated here for reference.)

**Table 6.1 Average Capacities of Typical Rail-Freight Corridors**
*Trains per Day*

| | | Trains per Day | |
|---|---|---|---|
| **Number of Tracks** | **Type of Control** | **Practical Maximum If Multiple Train Types Use Corridor*** | **Practical Maximum If Single Train Type Uses Corridor**** |
| 1 | N/S or TWC | 16 | 20 |
| 1 | ABS | 18 | 25 |
| 2 | N/S or TWC | 28 | 35 |
| 1 | CTC or TCS | 30 | 48 |
| 2 | ABS | 53 | 80 |
| 2 | CTC or TCS | 75 | 100 |
| 3 | CTC or TCS | 133 | 163 |
| 4 | CTC or TCS | 173 | 230 |
| 5 | CTC or TCS | 248 | 340 |
| 6 | CTC or TCS | 360 | 415 |

Key: N/S-TWC – No Signal/Track Warrant Control.
ABS – Automatic Block Signaling.
CTC-TCS – Centralized Traffic Control/Traffic Control System.

Notes: * For example, merchandise, intermodal, and passenger trains.
** For example, all intermodal trains.

The table presents average capacities for typical rail freight corridors. The actual capacities of the corridors were estimated using railroad-specific capacity tables. At the request of the railroads, these detailed capacity tables were not included in this report to protect confidential railroad business information.

Source: Class I railroad data aggregated by Cambridge Systematics, Inc.

For example, if a corridor with "one track and N/S-TWC control," which today accommodates 15 trains per day, must accommodate 35 trains per day in 2035, it is upgraded to "one track with CTC-TCS control," which accommodates 30 to 48 trains per day, depending on the mix of train types operating in the corridor.

To avoid double-counting improvements that are currently programmed or underway, new improvements were selected to accommodate only forecast demand, not to correct current capacity shortfalls. If a corridor is at or above capacity today and needs additional capacity to accommodate future demand, improvements were programmed to bring the volume-to-capacity ratio back to the current ratio. For example, if the current volume-to-capacity ratio of a corridor is 0.85 and the future volume-to-capacity ratio without improvements is estimated to be 1.6, improvements were made to bring the volume-to-capacity ratio back to 0.85, not to 0.70. If a corridor is below capacity today and needs additional capacity to accommodate future demand, improvements were selected to bring the volume-to-capacity ratio up to a maximum of 0.70.

## 6.2 Future Volumes Compared to Future Capacity

Figure 6.1 compares projected future corridor volumes in trains per day to projected future corridor capacity assuming that the necessary improvements are made. The volume-to-capacity ratios are expressed as LOS grades for each primary rail corridor. Again, rail corridors operating at LOS A, B and C (below practical capacity) have been mapped in green. Corridors operating at LOS D (near practical capacity) have been mapped in yellow, and corridors operating at LOS E (at practical capacity) have been mapped in orange. Rail corridors operating at LOS F (above capacity) have been mapped in red.

Analysis of the 2035 levels of service, summarized in Table 6.2, shows that—with improvements—97 percent of primary corridor mileage will be operating below capacity (LOS A/B/C), 2 percent will be near or at capacity (LOS D/E), and less than 1 percent will be operating above capacity (LOS F).

**Figure 6.1 Future Train Volumes Compared to Future Train Capacity**
*2035 with Improvements*




Source: Cambridge Systematics, Inc.

Note: Volumes are for the 85th percentile day.

**Table 6.2 Primary Rail Corridor Mileage by Future Level of Service Grade**
*2035 with Improvements*

| LOS Grade | Total Mileage | Percentage |
|---|---|---|
| A | 4,895 | 9% |
| B | 15,198 | 29% |
| C | 31,036 | 59% |
| D | 608 | 1% |
| E | 597 | 1% |
| F | 6 | <1% |
| Totals | 52,340 | 100% |

Source: Cambridge Systematics, Inc.

# 7.0 Investment Requirements

## 7.1 Cost of Improvements

The cost of improvements needed to accommodate rail freight demand in 2035 is estimated at $148 billion (in 2007 dollars). The Class I freight railroads' share of this cost is projected to be $135 billion; the short line and regional freight railroads' share is projected to be $13 billion. The cost estimates cover:

- Line expansion:
  - Upgrades to mainline tracks and signal control systems;
  - Improvements to significant rail bridges and tunnels;
  - Upgrades to Class I railroad secondary mainlines and branch lines to accommodate 286,000-pound freight cars; and
  - Upgrades to short line and regional railroad tracks and bridges to accommodate 286,000-pound freight cars.
- Facility expansion:
  - Expansion of carload terminals, intermodal yards, and international gateway facilities owned by railroads; and
  - Expansion of Class I railroad service and support facilities such as fueling stations and maintenance facilities.

Table 7.1 summarizes the investments required by type of improvement for the Class I and the short line and regional railroads.

**Table 7.1 Cost of Rail Freight Infrastructure Improvements**
*Millions of 2007 Dollars*

| | Class I Freight Railroads | Short Line and Regional Freight Railroads | Totals |
|---|---|---|---|
| Line Haul Expansion | $94,750 | $320 | $95,070 |
| Major Bridges, Tunnels, and Clearance | $19,400 | $5,000 | $24,400 |
| Branch Line Upgrades | $2,390 | $7,230 | $9,620 |
| Intermodal Terminal Expansion | $9,320 | | $9,320 |
| Carload Terminal Expansion | $6,620 | | $6,620 |
| Service Facilities | $2,550 | | $2,550 |
| **Totals** | **$135,030** | **$12,550** | **$147,580** |

Source: Cambridge Systematics, Inc.

Notes: All estimates exclude real estate acquisition costs, consistent with national highway needs analysis study practices.

Line expansion costs for short line and regional railroads are only for segments used to connect the primary corridors, not the entire system.

The category Major Bridges, Tunnels, and Clearance covers very large projects such as expansion of major bridges and tunnels (or construction of new parallel bridges and tunnels) and corridor overhead clearance projects that are not adequately accounted for by per mile unit costs.

The category Branch Line Upgrades covers upgrades to secondary main and branch lines to meet 286,000-pound weight-limit standards for the Class I railroads. A preliminary analysis shows limited need to upgrade the capacity of secondary mainlines and branch lines.

Line expansion cost estimates were based on per mile construction costs to upgrade from one level of corridor capacity to another. Table 7.2 lists the average construction cost per mile for each set of upgrades. For example, upgrading a corridor from “one track and N/S-TWC control” to “one track with CTC-TCS control” would cost $700,000 per mile. All costs are reported in current (2007) dollars.

## Table 7.2 Average Unit Costs

| From | | To | | Construction Cost (per mile) |
|---|---|---|---|---|
| **Tracks** | **Control** | **Tracks** | **Control** | |
| 1 | N/S-TWC | 1 | CTC-TCS | $700,000 |
| 2 | NS-TWC | 2 | CTC-TCS | $700,000 |
| 1 | ABS | 1 | CTC-TCS | $500,000 |
| 2 | ABS | 2 | CTC-TCS | $600,000 |
| 1 | CTC-TCS | 2 | CTC-TCS | $3,800,000 |
| 2 | CTC-TCS | 3 | CTC-TCS | $4,400,000 |
| 3 | CTC-TCS | 4 | CTC-TCS | $4,400,000 |
| 4 | CTC-TCS | 5 | CTC-TCS | $4,400,000 |
| 5 | CTC-TCS | 6 | CTC-TCS | $4,400,000 |

Key: N/S-TWC – No Signal/Track Warrant Control.
ABS – Automatic Block Signaling.
CTC-TCS – Centralized Traffic Control/Traffic Control System.

Note: The table presents average costs for typical rail freight corridors. The actual costs of the corridors were estimated using railroad-specific capacity tables. Per mile construction costs for Eastern rail corridors were higher than the averages presented in the table because of the number of urbanized areas, hilly terrain, and numerous river crossings. Conversely, per mile construction costs for Western rail corridors in non-urban areas were lower than the averages presented in the table because of the prevalence of flatter, non-urbanized areas along some Western railroad primary corridors. At the request of the railroads, the railroad-specific cost tables were not included in this report to protect confidential railroad business information.

Source: Cambridge Systematics based on Association of American Railroads and Class I railroads' data.

Expansion costs for major bridges and tunnels were estimated separately for each facility based on the cost of recent and comparable projects. Expansion costs for facilities such as intermodal yards, carload terminals, fueling stations, and maintenance facilities were estimated using the anticipated number of intermodal units, cars, and trains operating in the corridor.

The estimates do not include all line expansion costs on short line and regional railroads, nor the cost of expanding tunnels, bridges, and service facilities on the short lines and regionals. Neither the Class I nor the short line and regional railroad estimates include the cost of additional real estate, the cost to maintain or replace existing rail lines and facilities, or the cost to acquire additional locomotives and railcars.

Appendix A provides more information on the cost estimating methods.

## 7.2 Cost Savings from Productivity Improvements

The recommended improvements and the cost estimates assume that the future demand for rail freight transportation will be met by using current technology and existing rail corridors. The analysis also assumes that there will be no shift in freight traffic among modes (i.e., rail, truck, water), and no significant changes in regulation or other factors that could change the demand for or supply of rail freight services.

However, there are alternative futures that could, and eventually should, be examined. These include futures that assume significant changes in rail technology, major shifts in markets or trade patterns, and new innovations in railroad operations. A full examination of these alternative futures was not attempted for this first approximation study. However, a preliminary estimate was made of the potential cost savings from productivity improvements.

The railroads anticipate that they can improve train productivity by up to 0.5 percent per year over the 28-year period from 2007 to 2035. The productivity would be gained by carrying more freight over each primary rail corridor. This would be done by increasing the number of trains, hauling more cars per train, and loading railcars more efficiently to make better use of the 286,000-pound capacity of current railcars. These improvements would allow the railroads to carry the same amount of rail freight in 2035, but carry it with fewer trains.

A 0.5 percent productivity improvement would reduce the number of trains to about 87 percent of the initial 2035 forecast number of trains. This would reduce capacity expansion needs in many corridors, reducing the cost of line expansion across all railroads from $148 billion to about $121 billion.[22] The Class I freight railroads' share for infrastructure expansion would be reduced from $135 billion to $109 billion, a savings of $26 billion. The short line and regional freight railroads' share of capital expenditures would be reduced from $12.6 billion to $12.3 billion, a savings of about $0.3 billion.

[22] Productivity improvements are only applied to line costs, not to terminals, yards, facilities, etc.

## 7.3 RAILROAD INVESTMENT CAPACITY

In general, Class I railroad capital expenditures have tracked income, as shown in Figure 7.1, increasing consistently (in current dollars) since the economic deregulation of the railroad industry in 1980. Class I capital expenditures for infrastructure expansion totaled $1.1 billion in 2005 and $1.4 billion in 2006. The AAR estimates that Class I capital expenditures for infrastructure expansion will total $1.9 billion in 2007.

**Figure 7.1 Capital Investment and Income**
*Class I Railroads, 1981 to 2006, in Current Dollars*




Source: American Association of Railroads data.

If rail revenues grow proportionally to rail tonnage, currently forecast to increase by 88 percent by 2035, and if the railroads maintain their current level of effort for expansion, then the Class I railroads will invest cumulatively about $70 billion over the 28-year period.

## 7.4 Investment Requirements for Class I Railroads

The estimated cost of the improvements needed to accommodate rail freight demand in 2035 is $148 billion. Of this amount, the Class I freight railroads' share is projected to be $135 billion.

The Class I railroads anticipate that they will be able to generate approximately $96 billion of their $135 billion share through increased earnings from revenue growth, higher volumes, and productivity improvements, while continuing to renew existing infrastructure and equipment. If revenue and capital expenditures for expansion follow the growth in rail tonnage, as the railroads expect, the Class I railroads could realize about $70 billion of the $135 billion from growth. And if the Class I railroads can continue to achieve train productivity gains of up to 0.5 percent per year, the railroads could realize savings of $26 billion in reduced capital expenditures. This would leave a balance for the Class I freight railroads of $39 billion or about $1.4 billion per year to be funded from railroad investment tax incentives, public-private partnerships, or other sources.

These investment projections assume that the market will support rail freight prices sufficient to sustain long-term capital investments. If regulatory changes or unfunded legislative mandates reduce railroad earnings and productivity, investment and capacity expansion will be slower and the freight railroads may not be able to meet the U.S. DOT's forecast demand.

# 8.0 Conclusions

On first approximation, the investment in the continental U.S. rail network required to allow the freight railroads to meet the U.S. DOT's projected demand for rail freight transportation is $148 billion (in 2007 dollars). This level of investment would enable the freight railroads to keep pace with economic growth and meet the U.S. DOT's forecast demand for rail freight transportation in 2035.

The impact of the investment is illustrated in Figure 8.1, which compares the percentage of primary rail freight corridor miles by LOS grade and year.

**Figure 8.1 Percentage of Rail-Freight Primary Corridor Route Miles by Level of Service Grade in 2005, 2035 without Capacity Improvements, and 2035 with Capacity Improvements**




Source: Cambridge Systematics, Inc.

The left column shows the percentage of miles by LOS grade for the current rail system (2005 train volumes on the 85th percentile day compared to 2007 capacity). Red indicates the percentage of miles operating above capacity; yellow and orange the percentage of miles near or at capacity; and green, the percentage of miles below capacity. The center column shows the percentage of miles by LOS grade for the primary corridors in 2035 without improvements. Thirty percent of the rail miles in the primary corridors will be operating above capacity, causing severe congestion that will affect every region of the country and potentially shift freight to an already heavily congested highway system. Finally, the right column shows the estimated LOS grades in 2035 with improvements. The

improvements sharply reduce the number of primary corridor miles operating above capacity.

Meeting the U.S. DOT's forecast demand will require the Class I freight railroads to increase their investment in infrastructure expansion. The AAR estimates that between 2005 and 2007, Class I freight railroad capital expenditures for infrastructure expansion averaged $1.5 billion per year. To meet the U.S. DOT's forecast demand for 2035, the Class I freight railroads must invest $135 billion over the next 28 years or about $4.8 billion per year.

The Class I freight railroads anticipate that they will be able to meet most of this increase in investment through growth and productivity gains. If revenue and capital expenditures for expansion follow the growth in rail tonnage, the Class I railroads could realize about $70 billion of the $135 billion from growth. And if the Class I railroads can continue to achieve train productivity gains of up to 0.5 percent per year, the railroads could realize savings of $26 billion in reduced capital expenditures. This would leave a balance for the Class I freight railroads of $39 billion or about $1.4 billion per year to be funded from railroad investment tax incentives, public-private partnerships, or other sources.

These investment projections assume that the market will support rail freight prices sufficient to sustain long-term capital investments. If regulatory changes or unfunded legislative mandates reduce railroad earnings and productivity, investment and capacity expansion will be slower and the freight railroads may not be able to meet the U.S. DOT's forecast demand.

The findings of this study provide a starting point for assessing future rail freight capacity and investment requirements. The findings outline the improvements and investments required for the railroads to carry the freight tonnage forecast by the U.S. DOT. Additional work is needed to determine how much more capacity and investment would be needed for the railroads to increase their share of freight tonnage and reduce the rate of growth in truck traffic on highways. Finally, the forecasts and improvement estimates in this study do not fully anticipate future changes in markets, technology, regulation, and the business plans of shippers and carriers. Each could significantly reshape freight transportation demand, freight flow patterns, and railroad productivity, and, thus, rail freight infrastructure investment needs.

In summary, the findings point clearly to the need for more investment in rail freight infrastructure and a national strategy that supports rail capacity expansion and investment.

# A. National Rail Freight Infrastructure Capacity and Investment Study: Methodology

## A.1 INTRODUCTION

The objective of this study is to identify rail freight infrastructure improvements and investments in the continental U.S. rail network that will allow the freight railroads to meet the U.S. Department of Transportation's (DOT) projected demand for rail-freight transportation in 2035. This requires an understanding of the current and forecasted demand for rail services and the current and projected capacity of the rail network. The study encompasses the continental United States rail system.

The general approach was to divide the continental U.S. Class I railroad network into primary corridors; establish the volume of trains in 2005 and 2035; compare those volumes to current capacity; determine the additional capacity needed to accommodate 2035 volumes; identify the types of improvements warranted; and estimate the investment needed for these improvements. The improvements can be divided into line expansion and facility expansion, each with multiple components.

- Line expansion includes:
  - Upgrades to the Class I system mainlines control systems and/or number of tracks;
  - Improvements to significant bridges, tunnels, clearances, and other items above average costs;
  - Upgrades to Class I railroad secondary mainlines and branch lines to accommodate 286,000-pound freight cars; and
  - Upgrades to short line and regional railroad track and bridges to accommodate 286,000-pound freight cars.
- Facility expansion includes:
  - Expansion of capacity at Class I railroad-owned intermodal facilities, including terminals, ports and gateways;
  - Expansion of capacity at carload terminals (e.g., classification yards); and
  - Expansion of capacity at Class I railroad-owned service facilities (e.g., fueling stations, maintenance facilities).

# A.2 LINE CAPACITY EXPANSION

The work steps to estimate the cost of expanding line capacity along primary Class I railroad corridors to meet U.S. DOT projected demand was as follows:

1. Divide the continental U.S. Class I railroad network into primary corridors;[23]
2. Establish the number of freight trains for a day representing the 85th percentile of the maximum trains per day from the 2005 Surface Transportation Board (STB) Carload Waybill Sample (Waybill);
3. Establish the number of scheduled passenger trains for a current average weekday, and combine with the freight trains;
4. Estimate the number of freight trains per day in 2035 by applying forecast rates from the Freight Analysis Framework Version 2.2 to the 2005 STB Waybill. Passenger train volumes were held constant;
5. Estimate the current capacity on the nation's primary rail corridors in trains per day based on current track configurations;
6. Compare the 2005 and 2035 freight and passenger trains per day to the current capacity, and identify the types of improvements necessary to maintain reliable rail service in 2035;
7. Estimate the construction costs of the improvement lines;
8. Estimate the cost of significant bridges, tunnels, clearance projects, etc.; and
9. Estimate the cost to upgrade all Class I branch lines and all short line and regional lines that are currently below 286,000-pound weight standards to the current standard.

Each of these is described in more detail in the following sections.

### Divide the Continental U.S. Class I Railroad Network into Primary Corridors

The initial work step was to divide the continental U.S. Class I railroad network into primary corridors. The corridors are mainline track and represent the lanes that haul the majority of the freight rail traffic. A corridor is roughly homogeneous with respect to traffic mix and type of infrastructure (i.e., number of tracks and control system).

[23] The Class I railroads covered in this study are BNSF, CN (U.S. operations), CP (U.S. operations), CSX, KCS, NS, and UP.

The beginnings and ends of the corridors are major urban areas corresponding with the U.S. Department of Transportation Freight Analysis Framework Version 2.2 ($FAF^{2.2}$) zones, major rail traffic generators such as the Powder River Basin coal fields, port complexes, and major rail traffic junctions.

Each of the Class I railroads participating in the study provided to Cambridge Systematics (CS) a map of their recommended primary corridors. CS aggregated this information into a national network of primary corridors for use in this study.

**Figure A.1 National Rail Network and Primary Rail Corridors**




Source: Cambridge Systematics, Inc.

The primary corridors were then mapped to a network combining the Oak Ridge National Laboratory (ORNL) Center for Transportation Analysis Rail Network Version 5-5 containing infrastructure attributes, with a network developed for the Tennessee Department of Transportation that assigns rail flows using minimum distance paths. In the course of this project the TDOT network was revised to include missing links with information from the ORNL network. The mapping was done in TransCAD, a commercially available transportation network modeling program.

## Establish the Number of Freight Trains Operating on an 85th Percentile Day along Each Corridor in 2005

Data from the 2005 Surface Transportation Board Carload Waybill Sample was used to establish the total number of trains operating in each corridor with the following caveats:[24]

- Northbound Canadian traffic and southbound Mexican traffic will not be accounted for fully in this study because much of this traffic is absent from the Waybill Sample. Traffic terminating in Canada and Mexico (both U.S. originations and pass-through NAFTA traffic) often is waybilled to the U.S. border crossing, but much of the northbound Canadian traffic and southbound Mexican traffic is not reported.
- The Waybill Sample will not provide a complete picture of rail shipments end-to-end. The Waybill Sample is subject to "re-waybilling" (Rule 11 traffic) at key junctions such as Chicago. For example, one waybill may be written to cover a shipment from Los Angeles to Chicago, and a second waybill written to cover the same shipment as it moves on from Chicago to New York. This reporting practice makes it difficult to trace the entire route of some rail shipment. This issue did not affect the estimate of the number of trains operating in each corridor, and no effort was made to "link" these movements.

The Waybill Sample, which represents loaded revenue movements on the railroads, was adjusted to account for empty rail car moves. To estimate the empty car movements, empty return ratios were supplied by the AAR from the Uniform Rail Costing System (URCS), as shown in Table A.1. CS matched the empty return ratios to the Waybill data based on origin railroad, car type, and the car ownership flag. Table A.1 represents averaged empty return ratios for all cars ownerships – railroad, private, and leased. For a car ownership flag in the STB Waybill of "railroad" or "Trailer Train," specific ratios for railroad-owned cars were used. For a car ownership flag of "private," the privately owned car ratios were used. When the loaded car originated on a Class I carrier, the ratios for that carrier were applied. When a short line or regional railroad originated the load, the empty ratio was based on the East or West average, depending on whether the load originated east or west of the Mississippi River.

The carloads and intermodal units in the Waybill Sample were multiplied by the appropriate empty return ratio, reverse routed to represent the return movement from destination to origin, and then appended to the loaded cars in the Waybill. The assumption of reverse routing of the empties does not accurately reflect railroad operations, but it does place the correct amount of empty car miles on the network and it offers a reasonable approximation for this analysis.

---

[24] The Waybill Sample is expanded to represent 100 percent of the movements on U.S. railroads.

**Table A.1 Empty Return Ratios Used in the STB's URCS Phase 3 and Waybill Costing Programs**
*All Cars, 2005 Ratios*

| URCS CT Number | Car Type | BNSF | CN (U.S.) | CP (U.S.) | CSX | KCS | NS | UP | East | West |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Box – 40-foot | 1.33 | 1.72 | 1.75 | 1.59 | 1.52 | 1.72 | 1.38 | 1.65 | 1.38 |
| 2 | Box – 50-foot | 1.33 | 1.72 | 1.75 | 1.59 | 1.52 | 1.72 | 1.38 | 1.65 | 1.38 |
| 3 | Box – Equipped | 1.69 | 1.89 | 1.86 | 1.87 | 1.76 | 1.99 | 1.76 | 1.92 | 1.74 |
| 4 | Gondola – Plain | 1.96 | 1.86 | 2.31 | 1.94 | 1.97 | 1.91 | 2.36 | 1.92 | 2.26 |
| 5 | Gondola – Equipped | 1.85 | 2.11 | 1.98 | 1.83 | 2.00 | 1.89 | 1.89 | 1.86 | 1.88 |
| 6 | Hopper – Covered | 1.77 | 1.98 | 1.82 | 1.94 | 2.02 | 2.04 | 2.01 | 1.99 | 1.90 |
| 7 | Hopper – Open Top General | 1.94 | 1.92 | 2.14 | 1.95 | 1.94 | 1.96 | 2.09 | 1.95 | 2.05 |
| 8 | Hopper – Open Top Special | 1.96 | 2.03 | 2.11 | 1.95 | 2.00 | 2.01 | 2.13 | 1.98 | 2.09 |
| 9 | Reefer – Mechanical | 1.73 | 1.73 | 1.36 | 1.77 | 1.51 | 1.93 | 1.75 | 1.79 | 1.74 |
| 10 | Reefer – Nonmechanical | 1.58 | 2.35 | 1.88 | 1.93 | 5.42 | 1.81 | 1.86 | 1.90 | 1.72 |
| 11 | Flat – Intermodal | 1.15 | 1.18 | 1.10 | 1.15 | 1.05 | 1.09 | 1.15 | 1.12 | 1.15 |
| 12 | Flat – Multilevel | 1.27 | 1.45 | 1.38 | 1.54 | 1.19 | 1.59 | 1.45 | 1.55 | 1.41 |
| 13 | Flat – General | 2.41 | 2.47 | 2.24 | 1.79 | 1.94 | 2.66 | 201 | 2.29 | 2.16 |
| 14 | Flat – Other | 1.74 | 2.03 | 1.94 | 1.84 | 1.90 | 2.05 | 1.88 | 1.95 | 1.82 |
| 15 | Tank < 22,000 Gallons | 1.47 | 1.70 | 6.16 | 1.97 | 2.01 | 2.01 | 2.08 | 1.98 | 1.80 |
| 16 | Tank >= 22,000 Gallons | 1.54 | 1.88 | 2.30 | 2.01 | 2.06 | 2.03 | 2.04 | 2.02 | 1.83 |
| 17 | All Other Freight Cars | 1.34 | 1.70 | 2.56 | 1.94 | 2.04 | 1.52 | 2.03 | 1.69 | 1.59 |
| 18 | Average Freight Car | 1.51 | 1.85 | 1.59 | 1.75 | 1.83 | 1.70 | 1.82 | 1.74 | 1.69 |

Note: Empty Return Ratio defined as total miles divided by loaded miles. Ratios in spreadsheet are available to six significant digits – only three shown above. Ratios for 40-foot Box Cars use same value as 50-foot Box Car as a default. URCS Phase 3 and Waybill costing use ratios for All Other Freight Cars as defaults for railroad-owned tank cars.

Source: AAR, from the Uniform Rail Costing System.

Annual cars were then converted into average daily cars. This was done by first summarizing the Waybill Sample by waybill date and number of cars. The volume from the day representing the 85th percentile (based on volume of cars) was used to scale the annual volume to a daily volume. The 85th percentile threshold is consistent with highway capacity analysis methods.[25] This multiplier to convert annual cars and intermodal units in the Waybill Sample to an 85th percentile day was 0.00357. An 85th percentile day has 9.9 percent more cars than a 50th percentile day in the 2005 Waybill Sample.

The cars were subdivided into four service types – intermodal, bulk, general merchandise, and auto – the same four defined in the Waybill Sample. For each service type, the number of daily cars was converted into daily trains based on average train lengths supplied by BNSF, CSX, NS and UP. For the other railroads, CS estimated the train lengths. Table A.2 contains the average values used for eastern and western railroads. Intermodal unit train conversions were based on TOFC/COFC counts rather than cars. Adjustments were made in some corridors (e.g., Powder River Basin) to reflect actual operations of significantly longer trains.

**Table A.2 Average Train Length**
*Number of Cars*

| Type of Service | Eastern Railroads | Western Railroads |
|---|---|---|
| Auto | 57.0 | 63.9 |
| Bulk | 86.0 | 112.4 |
| General Merchandise | 82.0 | 80.7 |
| Intermodal (TOFC/COFC count) | 110.7 | 164.3 |

Source: Class I Railroad data averaged by Cambridge Systematics, Inc.

The next step was to unlink the trips. The Waybill Sample has records with a junction frequency up to six, indicating that seven railroads participated in the move (six junctions). The unlinked records break these apart so that each "trip" is only for a single railroad. The geographic endpoints of the trip can either be the origin and destination, or the junction location. These are generically referred to as the on-point and off-point. The Waybill does not have information on internal routings and classifications on an individual railroad.

The final step was to assign the train estimates to the ORNL rail network, using an all or nothing assignment in TransCAD. After combining the freight and

[25] This method of scaling the annual volume based on the 85th percentile is preferred over simply selecting the traffic on the day representing the 85th percentile. Scaling the annual volume will provide a more robust distribution of traffic over the rail lines that accounts for seasonality, instead of a snapshot of traffic for a single day.

passenger trains (see next section), density maps were developed and provided to BNSF, CSX, NS, and UP for review. The AAR reviewed the traffic density maps for CN, CP, and KCS. Corrections were made to the assignments and volumes when needed, and new maps were generated for further review.

As in all cases with this study, care was taken not to distribute confidential data about one railroad to the other railroads. Only the AAR and CS had access to the full information.

## Establish the Current Number of Passenger Trains per Day

In addition to the total number of freight trains, the number of passenger trains operating on the network was determined. This includes estimates of Amtrak service, and commuter services such as the Virginia Railway Express and the Southeastern Pennsylvania Transportation Agency that make significant use of freight railroad lines. Not every commuter service was included, only those operating on the primary corridor network.

Most of the train information was obtained from available published schedules. Although the term "train" is used, it should more appropriately be called a "trip." A train that goes out and back was counted as two "trains." An average day was considered to be a weekday, not a weekend or holiday.

The passenger train estimates were assigned directly to the ORNL rail network using TransCAD, rather than applying a traffic assignment algorithm. Passenger train maps were generated and distributed to the study participants for review and comment.

The final step was to add the daily passenger train counts directly to the freight trains that had been assigned to the network.

## Establish the Forecasted Number of Train Equivalents Operating Along Each Corridor for the Year 2035

The U.S. Department of Transportation's Freight Analysis Framework Version 2.2 ($FAF^{2.2}$) provides an estimate of all freight traffic moving in the U.S. by origin, destination, commodity, and mode. It has a 2002 base year and forecasts from 2010 to 2035 in five-year increments. The geography is based on 138 zones, with 114 zones in the U.S. It includes domestic traffic, North American traffic (Canada and Mexico border crossings, with the gateway location), and international traffic (by foreign region and U.S. zone, with an intermediate port). $FAF^{2.2}$ contains seven different modes of transportation: air and truck, other intermodal, pipeline and unknown, rail, truck, truck-rail, and water.

CS used the $FAF^{2.2}$ forecasts for 2035 for the rail and truck-rail modes by origin, destination, and commodity. The rail and truck-rail modes were combined into a single set of forecasts rates. The Waybill data was geographically matched to the $FAF^{2.2}$ zones by using a translation table mapping county to zone. Since the Waybill "starts" and "stops" trips at ports, the international forecasts were

included in the forecast rates based on the location of the port. For example, a move from Europe to the Atlanta zone with a port of Charleston, was considered a Charleston – Atlanta move and the forecasts rates were blended with the domestic forecast rates for other Charleston – Atlanta traffic by commodity. Rates by commodity for both Canadian and Mexican traffic were developed, and applied to Waybill data originating or terminating in those countries.

$FAF^{2.2}$ uses Standard Classification of Transported Goods (SCTG) codes. CS developed weighted averages of the forecast growth rates to establish growth factors for the general merchandise, intermodal, bulk and auto service types, based on the assignments in Table A.3. Weighted forecast growth rates for each service type were calculated for each $FAF^{2.2}$ origin-destination zone.

**Table A.3 $FAF^{2.2}$ Commodity Assignment to Rail Service Type for Establishing Forecast Growth Rates**

| Auto | Bulk | Intermodal | Merchandise |
|---|---|---|---|
| • Motorized vehicles | • Animal feed<br>• Cereal grains<br>• Coal<br>• Coal-n.e.c.<br>• Metallic ores<br>• Gravel<br>• Nonmetallic minerals | • Alcoholic beverages<br>• Electronics<br>• Furniture<br>• Machinery<br>• Meat/seafood<br>• Miscellaneous manufactured products<br>• Mixed freight<br>• Pharmaceuticals<br>• Plastics/rubber<br>• Precision instruments<br>• Printed products<br>• Textiles/leather<br>• Tobacco products<br>• Transport equipment | • Articles-base metal<br>• Base metals<br>• Basic chemicals<br>• Building stone<br>• Chemical products<br>• Crude petroleum<br>• Fertilizers<br>• Fuel oils<br>• Gasoline<br>• Live animals/fish<br>• Logs<br>• Milled grain products<br>• Natural sands<br>• Nonmetal mineral products<br>• Other agriculture products<br>• Other foodstuffs<br>• Unknown<br>• Waste/scrap<br>• Wood products<br>• Newsprint/paper<br>• Paper articles |

The 2035 forecast growth rates were applied to the 2005 base-year loaded and empty cars by $FAF^{2.2}$ origin-destination zone and railroad service type. (The rates were adjusted to reflect the difference between the $FAF^{2.2}$ 2002 base year the Waybill 2005 survey year). This makes the assumption that empty return ratios will be the same in 2035 as they were in 2005. For empty cars, the forecast rate was based on the last commodity hauled. The forecast number of loaded and empty cars were converted into average trains per day, using the same conversion factors established for the 2005 data (i.e., average train lengths were held constant.)

The number of passenger trains was held at current levels. This study did not attempt to forecast 2035 passenger rail demand and service. A separate study is being conducted to develop passenger rail needs for presentation to the Commission.

The forecasted 2035 freight trains were then assigned to the ORNL rail network using an all or nothing assignment based on minimum distances, adjusted to reflect current rail road operating restrictions validated against existing volumes. Current passenger trains were added directly to the network to provide the complete 2035 year volumes. The results was mapped and sent to the railroads for review.

## Estimate the Current Capacity for Each of the Primary Corridors

The capacity of the primary rail corridors was determined by defining a set of archetypical corridors, based on track and type of control, and then defining the capacity in terms of trains per day. Readily available information was supplied by the railroads participating in this study drawing from previously performed simulation studies. The information ranged from generic data to simulation results of specific corridors and general knowledge of operations.

CS used this information to identify a set of archetypical corridors that represented the various track and control combinations present along the corridors. The number of tracks was 1, 2, 3, or 4 and the type of controls included no signal or track warrant control (N/S-TWC), automated block signal (ABS), and centralized traffic control or train control system (CTC-TCS). To accommodate future demand, archetypical corridors of 5 and 6 tracks were added.

Comparison of the capacity information from each railroad yielded a range of values. One reason for this range was the mix of trains on the line. Lines with a nearly homogenous train mix have a higher capacity than lines with a mixture of train types. To adjust for this, each archetype was assigned a lower and an upper bound for the maximum number of trains. The lower bound was defined as the maximum number of trains per day, assuming an equal mix of merchandise-bulk, intermodal-auto, and passenger trains (one-third each). The upper bound was defined as the maximum number of trains per day, assuming 100 percent one type, and 0 percent of the other two types (complete homogeneity). To move between the lower bound and the upper bound, the standard deviation of the

train mix was used to scale the range between the bounds. For a train mix of 33 percent, 33 percent, and 33 percent for each of the three types, the standard deviation is zero; therefore a zero adjustment is added to the lower bound. A train mix of 100 percent, 0 percent, and 0 percent yields a standard deviation of 0.47, which was scaled to produce a factor that added to the lower bound equaled the upper bound.[26] A standard deviation falling between the minimum of zero and the maximum of 0.47 produced a capacity somewhere between the lower and upper bounds. Table A.4 contains the archetypes used in this study, along with the lower and upper capacity bounds.

Another reason for differences in capacity is due to differences in geography and topography. For similar types of track, a regions with longer runs and greater distances between urban areas can achieve higher speeds and greater throughput than areas with short runs and more closely spaced urban areas. Therefore, different capacity tables were developed based on regional variations. Table A.4 contains the average lower and upper maximum capacity bounds for the archetypes used in this study.

Rail capacity can take two forms. The "theoretical capacity" is the maximum number of trains assuming perfect conditions. The "practical capacity" considers factors such as possible disruptions, maintenance, human decisions, weather, possible equipment failures, supply and demand imbalances, and seasonal demand. Practical capacity is about 70 percent of the theoretical capacity and provides reliable service; it is similar to a highway level of service of C or D (described in the next section). At higher percentages, rail congestion increases and service reliability begins to deteriorate. The values established in Table A.4 represent practical capacity.

Using the number of tracks and the control system information from the ORNL rail network, CS developed a series of maps of track characteristics that were reviewed by the railroads. The track characteristics information was updated using feedback from the railroads, and then each of the primary rail corridors was assigned to one of the archetypes in Table A.4. Using the capacity for each archetype, and adjusting between the lower and upper bounds based on the standard deviation of the train mix, a practical capacity in trains per day was assigned to each of the primary corridors.

---

[26] The population standard deviation, not the sample standard deviation, was used since the three data points representing the percent mix of merchandise/bulk, intermodal/auto, and passenger encompasses the entire population.

**Table A.4 Average Capacities of Archetypical Rail Corridors**
*Trains per Day*

| | | Trains per Day | |
|---|---|---|---|
| Number of Tracks | Type of Control | Practical Maximum If Multiple Train Types Use Corridor* | Practical Maximum If Single Train Type Uses Corridor** |
| 1 | N/S or TWC | 16 | 20 |
| 1 | ABS | 18 | 25 |
| 2 | N/S or TWC | 28 | 35 |
| 1 | CTC or TCS | 30 | 48 |
| 2 | ABS | 53 | 80 |
| 2 | CTC or TCS | 75 | 100 |
| 3 | CTC or TCS | 133 | 163 |
| 4 | CTC or TCS | 173 | 230 |
| 5 | CTC or TCS | 248 | 340 |
| 6 | CTC or TCS | 360 | 415 |

Key: N/S-TWC – No Signal/Track Warrant Control.
ABS – Automatic Block Signaling.
CTC-TCS – Centralized Traffic Control/Traffic Control System.

Notes: * For example, a mix of merchandise, intermodal, and passenger trains.
** For example, all intermodal trains.

Source: Class I railroads' data aggregated by Cambridge Systematics, Inc.

## Compare the 2005 and 2035 Train Volumes to the Current Capacity, and Identify the Types of Improvements Needed to Maintain Reliable Rail Service in 2035

Current corridor volumes were compared to current corridor capacity to assess congestion levels. This was done by calculating a volume-to-capacity ratio expressed as a level of service (LOS) grade. The LOS grades are listed in Table A.5. The LOS designations and descriptions correspond to the LOS designations used in highway system capacity and investment requirements studies.

**Table A.5 Volume-to-Capacity Ratios and Level of Service (LOS) Grades**

| LOS Grade | Description | | Volume/Capacity Ratio |
|---|---|---|---|
| A | Below Capacity | Low to moderate train flows with capacity to accommodate maintenance and recover from incidents | 0.0 to 0.2 |
| B | | | 0.2 to 0.4 |
| C | | | 0.4 to 0.7 |
| D | Near Capacity | Heavy train flow with moderate capacity to accommodate maintenance and recover from incidents | 0.7 to 0.8 |
| E | At Capacity | Very heavy train flow with very limited capacity to accommo-date maintenance and recover from incidents | 0.8 to 1.0 |
| F | Above Capacity | Unstable flows; service break-down conditions | > 1.00 |

Source: Cambridge Systematics, Inc.

Rail corridors operating at LOS A, B or C are operating below capacity; they carry light to moderate train flows with sufficient unused capacity to accommodate maintenance work and recover quickly from incidents such weather delays, equipment failures, and minor accidents. Corridors operating at LOS D are operating near capacity; they carry heavy train flows with moderate capacity to accommodate maintenance and recover from incidents. Corridors operating at LOS E are operating at capacity; they carry very heavy train flows and have very limited capacity to accommodate maintenance and recover from incidents without substantial service delays. Corridors operating at LOS F are operating above capacity; train flows are unstable, and congestion and service delays are persistent and substantial. The LOS grades and descriptions correspond generally to the LOS grades used in highway system capacity and investment requirements studies.

Maps of the volume-to-capacity ratios, expressed as LOS classes, for the primary rail corridors are shown in Figure A.2. Rail corridors operating under capacity (at LOS A, B, or C) have been mapped in green, corridors operating near capacity (LOS D) have been mapped in yellow, rail corridors operating at capacity (LOS E) have been mapped in orange, and rail corridors operating over capacity (LOS F) have been mapped in red. Current volumes are those reported in the 2005 STB Waybill Sample (factored for empties and using an 85th percentile day). These volumes do not reflect fully recent trends, such as the increase in coal shipments moving from the Powder River Basin in Wyoming and Montana to Eastern utilities, nor the recent increase in intermodal containers delivered to East Coast marine ports and transferred to rail for inland delivery. Current capacity is the capacity as of 2007, and does not represent planned expansion.

**Figure A.2 2005 and 2035 Train Volumes Compared to Current Train Capacity**




Source: Cambridge Systematics, Inc.

Rail capacity line expansion improvements were estimated by identifying the upgrades to current capacity needed to accommodate future train volumes. To avoid double-counting improvements that are currently programmed or

underway, new improvements were selected to accommodate only forecast demand, not to correct current capacity shortfalls. If a corridor is below capacity today and needs additional capacity to accommodate future demand, improvements were selected to bring the volume-to-capacity ratio up to a maximum of 0.70. If a corridor is at or above capacity today and needs additional capacity to accommodate future demand, improvements were programmed to bring the volume-to-capacity ratio back to the current ratio. For example, if the current volume-to-capacity ratio of a corridor is 0.85 and the future volume-to-capacity ratio without improvements is estimated to be 1.6, improvements were made to bring the volume-to-capacity ratio back to 0.85, not to 0.70.

The hierarchy of corridor upgrades is shown in Table A.6. This hierarchy was used to expand from one archetypical corridor to another, until the capacity of the corridor could accommodate the forecasted 2035 volumes at a LOS of C or at current LOS if already operating at LOS D, E, or F. For example, if a corridor with "one track and N/S-TWC control" that today accommodates 16 to 20 trains per day needs to accommodate 35 trains per day in 2035, it would be upgraded to "one track with CTC-TCS control." As a rule, upgrades were selected to provide the appropriate level of service at the least cost. For the primary corridors under consideration, it was determined that any new construction would at a minimum involve a one-track CTC system (e.g., no expansion of lines operating on track warrants or with ABS on the primary corridors).

**Table A.6 Hierarchy of Archetypical Rail-Freight Corridors**
*Practical Capacity in Trains per Day*

| From | | | | To | | | |
|---|---|---|---|---|---|---|---|
| Number of Tracks | Control | Lower Bound | Upper Bound | Number of Tracks | Control | Lower Bound | Upper Bound |
| 1 | NS-TWC | 16 | 20 | 1 | CTC-TCS | 30 | 48 |
| 2 | NS-TWC | 28 | 35 | 2 | CTC-TCS | 75 | 100 |
| 1 | ABS | 18 | 25 | 1 | CTC-TCS | 30 | 48 |
| 2 | ABS | 53 | 80 | 2 | CTC-TCS | 75 | 100 |
| 1 | CTC-TCS | 30 | 48 | 2 | CTC-TCS | 75 | 100 |
| 2 | CTC-TCS | 75 | 100 | 3 | CTC-TCS | 133 | 163 |
| 3 | CTC-TCS | 133 | 163 | 4 | CTC-TCS | 173 | 230 |
| 4 | CTC-TCS | 173 | 230 | 5 | CTC-TCS | 248 | 340 |
| 5 | CTC-TCS | 248 | 340 | 6 | CTC-TCS | 360 | 415 |

Source: Class I railroads' data aggregated by Cambridge Systematics, Inc.

Note: N/S-TWC is No Signal and Track Warrant Control. ABS is Automatic Block Signaling. CTC-TCS is Centralized Traffic Control and Traffic Control System.

Figure A.3 compares future corridor volumes in trains per day to future corridor capacity assuming the necessary improvements are made. The volume-to-capacity ratios are expressed as LOS classes for each primary rail corridor. This map should look similar to the 2005 map in Figure A.2, since the goal was not to improve a corridor beyond the current level of service. This is not entirely possible due to the step-function nature of adding capacity. Adding an additional track can cause the LOS to drop several levels.

**Figure A.3 Future Train Volumes Compared to Future Train Capacity**
*2035 with Improvements*




Source: Cambridge Systematics, Inc.

## Estimate the Construction Costs of the Improvement Lines

The costs to upgrade from one level of corridor capacity to another are listed in Table A.7. The costs are in unit costs per mile for construction. All costs are reported in current (2007) dollars. In the example cited above, upgrading a corridor from "one track and N/S-TWC control" to "one track with CTC-TCS control" would cost $700,000 per mile for construction. This is inclusive of design, engineering, and installation expenses. It is exclusive of any real estate costs.

Table A.7 presents average costs for typical rail freight corridors. The actual costs of the corridors were estimated using railroad-specific capacity tables. Per mile construction costs for Eastern rail corridors were about 25 percent higher than the averages presented in the table because of the number of urbanized areas, hilly terrain, and numerous river crossings. At the request of the railroads, the railroad-specific cost tables were not included in this report to protect confidential railroad business information.

**Table A.7 Hierarchy of Archetypical Rail-Freight Corridors**
*Unit Cost to Upgrade Lines*

| From | | To | | Average Construction Cost Per Mile |
|---|---|---|---|---|
| Number of Tracks | Control | Number of Tracks | Control | |
| 1 | NS-TWC | 1 | CTC-TCS | $700,000 |
| 2 | NS-TWC | 2 | CTC-TCS | $700,000 |
| 1 | ABS | 1 | CTC-TCS | $500,000 |
| 2 | ABS | 2 | CTC-TCS | $600,000 |
| 1 | CTC-TCS | 2 | CTC-TCS | $3,800,000 |
| 2 | CTC-TCS | 3 | CTC-TCS | $4,400,000 |
| 3 | CTC-TCS | 4 | CTC-TCS | $4,400,000 |
| 4 | CTC-TCS | 5 | CTC-TCS | $4,400,000 |
| 5 | CTC-TCS | 6 | CTC-TCS | $4,400,000 |

Source: AAR and Class I railroads' data aggregated by Cambridge Systematics, Inc.

The costs in Table A.7 are additive. To expand from a one track CTC to a three track CTC would cost $8.2 million per mile ($3.8 million plus $4.4 million). The lower cost to go from one to two tracks (as opposed to 2 to 3 and 3 to 4) reflects cost savings from connecting existing sidings, less need to upgrade drainage, and other savings. The costs to maintain this additional track is not included in the total.

## Estimate the Cost of Significant Bridges, Tunnels, Clearance Projects, etc.

Significant projects that are well outside the average unit cost in Table A.7, such as bridges spanning the Mississippi or Ohio River or expensive new or expanded tunnels and clearances, were included as additional costs in this study. The railroads, using maps provided by CS of where and how much capacity would be needed in 2035, individually provided estimates for significant structures.

It should be noted that these estimates are not based on detailed engineering studies, and therefore only provide a rough approximation. In most cases, the estimates were based on averages ranging from $200 to $300 million per structure. A detailed list of these projects is not contained in the report, since the cost estimates are average and should not be attributed to a specific project.

A significant structures cost estimate was developed for CN, CP, and KCS by prorating the total significant structures cost by the ratio of the line haul expansion cost for these three railroads to the total line haul expansion cost.

## Estimate the Cost to Upgrade Class I Branch Lines and Short Line and Regional Railroad Lines Currently Below 286,000-Pound Standards to Current Standards

The American Short Line and Regional Railroad Association (ASLRRA) released a report in 2000 that identified $6.9 billion in costs (1999 dollars) to upgrade the track of America's short line and regional railroads to accommodate the current standard weight of 286,000-pounds. This estimate was updated as part of this study. The update involved:

- The cost was inflated to represent 2007 dollars based on a construction price index developed from the U.S. Bureau of Labor statistics. This raised the cost from $6.9 billion to $10.8 billion.
- The cost of upgrading bridges was removed, and an ASLRRA provided estimate of $5 billion was included as a significant structures costs for short line and regional railroads.
- The AAR provided an estimate 898 route miles that has been upgraded between 2004 and 2007, an average of 299 miles per year. Using this ratio, an estimate of 2,395 miles were assumed to be upgraded to 286,000-pound standards between 1999 and 2007.
- The inflated cost to upgrade was reduced to reflect track already upgraded.

The final estimate for upgrading short line and regional railroad track to accommodate 286,000-pound loads is $7.2 billion (in 2007 dollars). The calculations are contained in Table A.8.

For the Class I railroad's branch lines, an average cost to upgrade was calculated at $300,000 per mile using the revised estimates from the ASLRRA. The miles of track not 286,000-pound ready was provided by BNSF, CSXT, NS, and UP. For CN, CP, and KCS, the estimated cost was prorated from the ratio of line expansion costs for those three railroads to the total line expansion costs.

## Table A.8 Estimation of Cost to Upgrade Short Line and Regional Railroads to 286,000-Pound Weight Standard

| Year | Inflation | Cost (Millions) | Cost Less Bridges (Millions) | Total Miles | Miles/Year Upgraded (2005 to 2007) | Estimated Miles Upgraded (1999 to 2007) | Assume 50 Percent Not 286,000-Ready (2007) | Estimated Percent Upgraded Since 1999 | Estimated Cost to Upgrade (Millions) | Cost/Mile to Use for Class I (Millions) |
|---|---|---|---|---|---|---|---|---|---|---|
| 1999 | N/A | $6,861 | $5,100 | 49,985 | N/A | N/A | N/A | N/A | N/A | N/A |
| 2007 | 0.575 | $10,806 | $8,033 | 48,194 | 299 | 2,395 | 24,097 | 9.94% | $7,234 | $0.300 |

Source: 1999 Information from ASLRRA *An Estimation of the Investment in Track and Structures Needed to Handle 286,000-pound Rail Cars*.

Note: Assumption of 50 percent not 286,000 ready provided by AAR. Based on 22,256 miles (46 percent) not 286,000 ready in 2004 less 898 miles upgraded between 2004 and 2007. Exact percentage unavailable since 10 percent of track has unknown weight limit.

# A.3 Intermodal and Carload Terminals, and Service Facility Capacity Expansion

The work steps to estimate the cost of expanding terminal and facility capacity necessary for the Class I railroads to meet U.S. DOT projected demand was as follows:

- Expansion of capacity at Class I railroad-owned intermodal facilities, including terminals, ports and gateways;
- Expansion of capacity at carload terminals; and
- Expansion of capacity at Class I railroad-owned service (e.g., fueling stations, maintenance facilities).

## Expand Capacity at Class I Railroad-Owned Intermodal Facilities, Including Terminals, Ports and Gateways

The cost of expanding intermodal facilities, whether they are intermodal yards, railroad-owned port facilities, or international gateways, was provided by the railroads. CS provided to each study participant a table of on-point and off-point volumes by county and railroad service type for 2005 and 2035. The railroads individually provided costs estimates for expanding the largest and most important intermodal facilities to accommodate the projected growth between 2005 and 2035. Consistent with other parts of this study, real estate costs were excluded.

It should be noted that these estimates are not based on detailed engineering studies, and therefore only provide a rough approximation. A detailed list of these projects is not contained in the report, since the cost estimates are average and should not be attributed to a specific project.

An intermodal facility cost estimate was developed for CN, CP, and KCS by pro-rating the total intermodal facility expansion cost by the ratio of the line haul expansion cost for these three railroads to the total line haul expansion cost.

Additional maintenance costs for these new and expanded intermodal facilities are not included.

## Expand Capacity at Carload Terminals

The cost of expanding carload facilities (e.g., classification yards) was provided by the railroads. CS provided to each study participant a table of on-point and off-point volumes by county and railroad service type for 2005 and 2035. The railroads individually provided costs estimates for expanding the largest and most important carload facilities to accommodate the projected growth between 2005 and 2035. Consistent with other parts of this study, real estate costs were excluded.

It should be noted that these estimates are not based on detailed engineering studies, and therefore only provide a rough approximation. A detailed list of these projects is not contained in the report, since the cost estimates are average and should not be attributed to a specific project.

A carload facility cost estimate was developed for CN, CP, and KCS by prorating the total carload facility expansion cost by the ratio of the line haul expansion cost for these three railroads to the total line haul expansion cost.

Additional maintenance costs for these new and expanded carload facilities are not included.

## Expand Capacity at Class I Railroad-Owned Service Facilities

The cost of expanding service facilities (e.g., fueling, car shops) was provided by the railroads. CS provided to each study participant a table of on-point and off-point volumes by county and railroad service type for 2005 and 2035, and a series of maps showing traffic volumes by corridor for 2035. The railroads individually provided costs estimates for expanding service facilities to accommodate the projected growth between 2005 and 2035. Consistent with other parts of this study, real estate costs were excluded.

It should be noted that these estimates are not based on detailed engineering studies, and therefore only provide a rough approximation. A detailed list of these projects is not contained in the report, since the cost estimates are average and should not be attributed to a specific project.

A service facility cost estimate was developed for CN, CP, and KCS by prorating the total service facility expansion cost by the ratio of the line haul expansion cost for these three railroads to the total line haul expansion cost.

Additional maintenance costs for these new and expanded service facilities are not included.

www.camsys.com CAMBRIDGE SYSTEMATICS

*prepared for* Association of American Railroads

*by* Cambridge Systematics, Inc.

# PX0995-PX1008

# Filed Under Seal

# EXHIBIT

# PX1009

# TOTAL $ SPEND & ANALYSIS OF SAVINGS

8/04

## RECAP OF TOTAL SAVINGS & COST AVOIDANCE

| | SAVINGS | | |
|---|---|---|---|
| **TOTAL SPEND 6 YRS** | **RATES** | **$11,217,934** | |
| **$120,699,155** | **OTHER** | **$3,644,605** | |
| | **TOTAL 6 YRS** | **$14,862,539** | 12% |

**RATES - RECAP INCLUDING ESCALATORS MINUS RATE FREEZE**

| | CURR.SPEND* | YR1 | YR2** | YR3** | YR4** | YR5** | YR6** | TOTAL |
|---|---|---|---|---|---|---|---|---|
| **OLD RATES** | 20,556,391 | 21,538,703 | 21,303,511 | 21,682,651 | 22,068,671 | 22,461,696 | 22,861,857 | 131,917,089 |
| **NEW RATES** | - | 19,490,761 | 19,866,400 | 19,734,351 | 20,130,215 | 20,533,397 | 20,944,032 | 120,699,155 |
| **SAVINGS** | | 2,047,942 | 1,437,111 | 1,948,301 | 1,938,456 | 1,928,300 | 1,917,825 | **$11,217,934** |

*(Net of mi. credits) **(No FSC. Assumes WTI under $32 bbl)
Basis: LY + 75% RCAFU on UP + FSC ~6 mo + 25% Add for RCAFU on Connecting Carriers.

**RATE FREEZE SAVINGS ON NEW RATES**

| | YR1 | YR2 | TOTAL |
|---|---|---|---|
| UP | $290,162 | $294,514 | **$584,676** |

2 Yr. Freeze @ 1.5% per Yr.

**FUEL SURCHARGE ESCALATOR***

| | | YR1* | YR2** | YR3 | YR4 | YR5 | YR6 |
|---|---|---|---|---|---|---|---|
| UP | NONE in 1st half 2004.Saving us 6% FSC | $109,525 | $110,620 | 0 | 0 | 0 | 0 |
| CSXT | NONE | 0 | 0 | 0 | 0 | 0 | 0 |
| NS | Same freeze as origin carrier | $35,568 | $35,923 | $36,642 | $37,375 | $38,122 | $38,885 |

Threshhold for charge is $32 per bbl WTIcrude. 2% for each $5 over. **2% incr. 1/1/06 - 6/30/06 (deferred FSC)
*.0075 (Adj for Eff. last 6 mo.only)
CSXT Volume deducted due to 0 FSC.

6 YR SPEND **$442,659**

**RATE ESCALATOR - RCAFU**

| | | YR1 | YR2 | YR3 | YR4 | YR5 | YR6 |
|---|---|---|---|---|---|---|---|
| UP | 75% of RCAFU Eff. Yr 3 | 0 | 0 | $118,363 | $120,138 | $121,940 | $123,770 |
| CSXT | 100% RCAFU Eff. 8/1/05 | 0 | $94,847 | $96,744 | $98,679 | $100,652 | $102,666 |
| OTHER | 100% RCAFU Eff. 8/1/05 | 0 | $134,249 | $136,934 | $139,673 | $142,466 | $145,315 |
| TOTAL | | 0 | $229,096 | $352,041 | $358,490 | $365,059 | **$371,751** |

(NOTE: 75% of RCAFU equates to approx. 1.5%, 100% = ~2%)

**ONE-TIME ACCESSORIAL CREDIT & ADDED COST AVOIDANCE**

Storage paid in 2003 = $254,960
Demurrage paid in 2003 = $3,225
Total open invoices = $816,725 (currently in dispute status) **UP will excuse this amount.**
By increasing free Storage spots to 600 loads and 300 empties, it is anticipated that storage billing costs will be virtually eliminated based on historical high car counts.
Anticipated cost avoidance going forward ~ $258,000 per Yr. x 6 Yrs. = ~$1,548,000
**TOTAL AVOIDANCE AND SAVINGS 6 Yrs. = ~$2,364,725**

**FORWARD STORAGE FACILITATION**

UP is offering free forward storage in both Northern and Southern California.
This will reduce transit times by locating stored inventory closer to users.
Reduced transit times allow for smaller fleet size.
Trucking cost on emergency shipments will be reduced.

**TRACK CONSTRUCTION REBATE** (Minus Cost-of-Money calculation)

| | |
|---|---|
| **1.3 MM $** | Westlake builds, RR reimburses @ $200 per car shipped (~$100k/mo.) |
| ($20,120) | Cash Flow Analysis @ .0875 Int.Rate ~$20,120 |
| **$1,279,880** | TOTAL SAVINGS |

*NOTE - It is estimated that operating efficiencies created by having additional trackage for QC and Weekend hold cars will help reduce transit times and thereby help reduce fleet size saving up to $50,000 per Yr. (10 cars) **$300,000 savings over 6 Yrs.**

Part of this construction is for added track needed for WPT Heavy feedstock project.

**CONNECTING CARRIERS SPEND**

| | YR1 | YR2 | YR3 | YR4 | YR5 | YR6 | TOTAL |
|---|---|---|---|---|---|---|---|
| CSXT Spend | $4,742,353 | $4,837,200 | $4,933,944 | $5,032,623 | $5,133,275 | $5,235,941 | $29,915,336 |
| Other Spend | $6,712,451 | $6,846,700 | $6,983,634 | $7,123,307 | $7,265,773 | $7,411,088 | $42,342,953 |
| Total | $11,454,804 | $11,683,900 | $11,917,578 | $12,155,930 | $12,399,048 | $12,647,029 | $72,258,289 |

| ALL RAIL SHIPMENTS 9-1-03 THROUGH 2-26-04 | | | | | | *************RATES************** | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | # | 12 Mo. | | UP Curr | | UP Curr | UP Curr | UP Curr | New | New | | UP | Connect. | CSXT |
| DEST. | ST. | POUNDS | Cars | Cars | ROUTE | full mi. | Mi. | 0 mi. | p/c 0mi | TotSpnd | p/c 0mi | Spend | Diff. | Portion | Carriers | Portion |
| ABERDEEN | NC | 776650 | 4 | 8 | UP-NEWOR-CSXT-ABRDN-ACWR | 1.87 | 1057 | 1.59 | 3051 | 24411 | 4802 | 38416 | 14005 | 4008 | 34408 | |
| AGINCOURT | ON | 1125200 | 6 | 12 | UP-CHGO-CPRS | 2.91 | 1489 | 2.51 | 4828 | 57934 | 2703 | 32436 | -25498 | 14400 | 18036 | |
| AKRON | OH | 4022750 | 21 | 42 | UP-ESTL-CSXT | 2.54 | 1217 | 2.22 | 4256 | 178757 | 4346 | 182532 | 3775 | 52332 | 130200 | |
| ALLENTOWN | PA | 196500 | 1 | 2 | UP-ESTL-NS | 3.33 | 1433 | 2.95 | 5663 | 11326 | 6842 | 13684 | 2358 | 2492 | 11192 | |
| ANAHEIM | CA | 1346350 | 7 | 14 | UP-LKCHA-BNSF | 2.81 | 1675 | 2.37 | 4541 | 63573 | 5170 | 72380 | 8807 | 6258 | 66122 | |
| APOPKA | FL | 196150 | 1 | 2 | UP-NEWOR-CSXT-ORLND-FCEN | 2.60 | 928 | 2.35 | 4519 | 9037 | 4519 | 9038 | 1 | 1002 | 8036 | |
| APPLETON | WI | 6726300 | 35 | 70 | UP-CHGO-CN | 2.10 | 1240 | 1.77 | 3400 | 237972 | 2630 | 184100 | -53872 | 84000 | 100100 | |
| ARLINGTON | TX | 189350 | 1 | 2 | UP | 1.65 | 375 | 1.55 | 2977 | 5954 | 3400 | 6800 | 847 | 6800 | 0 | |
| ASHEBORO | NC | 5620150 | 29 | 58 | UP-NEWOR-NS | 2.30 | 979 | 2.04 | 3917 | 227169 | 4934 | 286172 | 59003 | 29058 | 257114 | |
| ATTLEBORO | MA | 190200 | 1 | 2 | UP-ESTL-CSXT | 3.70 | 1667 | 3.26 | 6254 | 12508 | 6416 | 12832 | 324 | 2492 | 10340 | |
| AUBURN | WA | 380950 | 2 | 4 | UP-LKCHA-BNSF | 3.49 | 2503 | 2.83 | 5424 | 21697 | 5170 | 20680 | -1017 | 1788 | 18892 | |
| AURORA | IL | 367850 | 2 | 4 | UP-MEMPH-BNSF | 1.95 | 1042 | 1.67 | 3213 | 12850 | 4269 | 17076 | 4226 | 5112 | 11964 | |
| AZUSA | CA | 393100 | 2 | 4 | UP | 2.16 | 1783 | 1.69 | 3238 | 12951 | 3400 | 13600 | 649 | 13600 | 0 | |
| BATTLEBOR | NC | 2467650 | 13 | 26 | UP-NEWOR-CSXT | 3.35 | 1122 | 3.05 | 5860 | 152354 | 5313 | 138138 | -14216 | 13026 | 125112 | |
| BEDFORD | NY | 7056900 | 37 | 74 | UP-ESTL-CSXT-FPONJ-NYA | 2.95 | 1541 | 2.54 | 4878 | 360979 | 4354 | 322196 | -38783 | 92204 | 229992 | |
| BLOOMINGT | MN | 393450 | 2 | 4 | UP-CHGO-CPRS | 2.78 | 1202 | 2.46 | 4725 | 18898 | 3264 | 13056 | -5842 | 4800 | 8256 | |
| BOLTON | ON | 13016600 | 68 | 136 | UP-CHGO-CPRS | 2.91 | 1472 | 2.52 | 4836 | 657761 | 3119 | 424184 | -233577 | 163200 | 260984 | |
| BOWGREEN | KY | 961850 | 5 | 10 | UP-MEMPH-CSXT | 2.15 | 693 | 1.97 | 3775 | 37746 | 3971 | 39710 | 1964 | 12780 | 26930 | |
| BRENTWOOD | MO | 190200 | 1 | 2 | UP | 0.86 | 800 | 0.65 | 1243 | 2486 | 1246 | 2492 | 6 | 2492 | 0 | |
| BROARROW | OK | 378850 | 2 | 4 | UP | 1.97 | 529 | 1.83 | 3513 | 14050 | 3044 | 12176 | -1874 | 12176 | 0 | |
| BUSHJCT | NY | 389800 | 2 | 4 | UP-ESTL-CSXT-GNVLL-NYCH | 2.92 | 1502 | 2.52 | 4840 | 19362 | 4352 | 17408 | -1954 | 4984 | 12424 | |
| BUENAPARK | CA | 196550 | 1 | 2 | UP | 2.16 | 1775 | 1.69 | 3242 | 6484 | 3400 | 6800 | 316 | 6800 | 0 | |
| CALGARY | AB | 562300 | 3 | 6 | UP-CHGO-CN | 3.60 | 2254 | 3.00 | 5762 | 34575 | 3900 | 23400 | -11175 | 7200 | 16200 | |
| CALGARY | AB | 579900 | 3 | 6 | UP-CHGO-CPRS | 3.73 | 2254 | 3.13 | 6012 | 36072 | 3808 | 22848 | -13224 | 7200 | 15648 | |
| CAPDELAMA | PQ | 190600 | 1 | 2 | UP-CHGO-CPRS | 2.80 | 1939 | 2.28 | 4387 | 8774 | 4387 | 8774 | 0 | 2400 | 6374 | |
| CARLSTADT | NJ | 1158450 | 6 | 12 | UP-ESTL-NS | 2.90 | 1494 | 2.50 | 4806 | 57673 | 5681 | 68172 | 10499 | 14952 | 53220 | |
| CARROLLTO | OH | 953550 | 5 | 10 | UP-ESTL-CSXT-GRNWH-WE | 2.38 | 1224 | 2.05 | 3945 | 39454 | 3756 | 37560 | -1894 | 12460 | 25100 | |
| CARROLLTO | TX | 1525050 | 8 | 16 | UP | 1.01 | 398 | 0.90 | 1736 | 27780 | 1715 | 27440 | -340 | 27440 | 0 | |
| CARSTREAM | IL | 6323850 | 33 | 66 | UP-CHGO-CN | 2.13 | 1056 | 1.85 | 3551 | 234369 | 2300 | 151800 | -82569 | 79200 | 72600 | |
| CARTHAGE | MO | 1898050 | 10 | 20 | UP | 1.27 | 846 | 1.05 | 2007 | 40139 | 2069 | 41380 | 1241 | 41380 | 0 | |
| CELINA | OH | 369200 | 2 | 4 | UP-ESTL-CSXT-LIMA-RJCW | 2.28 | 1104 | 1.99 | 3815 | 15258 | 2646 | 10584 | -4674 | 4984 | 5600 | |
| CHARLOTTE | NC | 1860470 | 10 | 20 | UP-NEWOR-CSXT | 2.45 | 899 | 2.21 | 4246 | 84910 | 4127 | 82540 | -2370 | 10020 | 72520 | |
| CHARNY | PQ | 198700 | 1 | 2 | UP-CHGO-CN | 2.99 | 2028 | 2.45 | 4707 | 9413 | 3800 | 7600 | -1813 | 2400 | 5200 | |
| CHICAGO | IL | 4867750 | 25 | 50 | UP | 1.41 | 1039 | 1.13 | 2177 | 108866 | 1200 | 60000 | -48866 | 60000 | 0 | |
| CHIFALLS | WI | 190200 | 1 | 2 | UP | 2.82 | 1203 | 2.50 | 4801 | 9602 | 4679 | 9358 | -244 | 9358 | 0 | |
| CHIHEIGHT | IL | 1550800 | 8 | 16 | UP | 1.41 | 1092 | 1.12 | 2150 | 34404 | 1200 | 19200 | -15204 | 19200 | 0 | |
| CHINO | CA | 12148350 | 63 | 126 | UP | 2.16 | 1662 | 1.72 | 3300 | 415747 | 3400 | 428400 | 12653 | 428400 | 0 | |
| CINCINNAT | OH | 197400 | 1 | 2 | UP-ESTL-CSXT | 2.36 | 981 | 2.10 | 4031 | 8062 | 2060 | 4120 | -3942 | 2492 | 1628 | |
| CITINDUST | CA | 3418350 | 18 | 36 | UP | 2.16 | 1679 | 1.71 | 3291 | 118473 | 3400 | 122400 | 3927 | 122400 | 0 | |
| CLARKSBUR | WV | 190050 | 1 | 2 | UP-NEWOR-CSXT | 3.67 | 1190 | 3.35 | 6440 | 12879 | 4933 | 9866 | -3013 | 1002 | 8864 | |
| CLEVELAND | OH | 192900 | 1 | 2 | UP-ESTL-CSXT | 1.96 | 1010 | 1.69 | 3248 | 6496 | 2459 | 4918 | -1578 | 2492 | 2426 | |
| COLDWATER | OH | 1357150 | 7 | 14 | UP-SALM-CSXT | 2.82 | 968 | 2.56 | 4921 | 68890 | 3692 | 51688 | -17202 | 17444 | 34244 | |
| COLUMBIAN | OH | 200550 | 1 | 2 | UP-ESTL-CSXT-LOLVL-CQPA | 2.15 | 1151 | 1.84 | 3541 | 7082 | 2782 | 5564 | -1518 | 2492 | 3072 | |
| COLUMBUS | OH | 400800 | 2 | 4 | UP-ESTL-CSXT | 1.93 | 1089 | 1.64 | 3150 | 12601 | 2545 | 10180 | -2421 | 4984 | 5196 | |
| COLUMBUS | GA | 575250 | 3 | 6 | UP-NEWOR-NS | 1.49 | 581 | 1.34 | 2564 | 15387 | 3137 | 18822 | 3435 | 3006 | 15816 | |
| COMPTON | CA | 951700 | 5 | 10 | UP | 2.16 | 2121 | 1.60 | 3065 | 30655 | 3400 | 34000 | 3345 | 34000 | 0 | |
| CONCORD | ON | 3992800 | 21 | 42 | UP-CHGO-CN | 2.54 | 1489 | 2.14 | 4117 | 172931 | 2350 | 98700 | -74231 | 50400 | 48300 | |
| CONCORD | ON | 1139800 | 6 | 12 | UP-CHGO-CPRS | 2.54 | 1489 | 2.14 | 4117 | 49409 | 2945 | 35340 | -14069 | 14400 | 20940 | |
| CORONA | CA | 4343990 | 23 | 46 | UP-LKCHAS-BNSF | 2.81 | 1655 | 2.37 | 4551 | 209353 | 5170 | 237820 | 28467 | 20562 | 217258 | |
| COTTGROVE | MN | 6684250 | 35 | 70 | UP-CHGO-CPRS | 2.78 | 1210 | 2.46 | 4721 | 330435 | 3264 | 228480 | -101955 | 84000 | 144480 | |
| CROSSETT | AR | 4044250 | 21 | 42 | UP-FDYCE-ALM | 1.09 | 248 | 1.02 | 1966 | 82585 | 2005 | 84210 | 1625 | 46200 | 38010 | |
| CROSSETT | AR | 962350 | 5 | 10 | KCS-MONRO-ALM | 1.09 | 248 | 1.02 | 1966 | 19663 | 1518 | 15180 | -4483 | 0 | 15180 | |
| CUCAMONGA | CA | 369000 | 2 | 4 | UP-LKCHA-BNSF | 2.81 | 1654 | 2.37 | 4552 | 18207 | 5170 | 20680 | 2473 | 1788 | 18892 | |
| DALLAS | TX | 1972450 | 10 | 20 | UP | 0.90 | 381 | 0.80 | 1534 | 30674 | 1521 | 30420 | -254 | 30420 | 0 | |
| DALTON | GA | 386750 | 2 | 4 | UP-NEWOR-NS | 1.67 | 705 | 1.48 | 2847 | 11387 | 3571 | 14284 | 2897 | 2004 | 12280 | |

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DEFIANCE | OH | 199500 | 1 | 2 | UP-SALM-CSXT | 2.11 | 967 | 1.85 | 3558 | 7116 | 3412 | 6824 | -292 | 2492 | 4332 |
| DELANO | PA | 4031550 | 21 | 42 | UP-ESTL-NS | 3.26 | 1389 | 2.89 | 5551 | 233134 | 6653 | 279426 | 46292 | 52332 | 227094 |
| DONORA | PA | 3139960 | 16 | 32 | UP-ESTL-NS | 2.85 | 1214 | 2.53 | 4853 | 155292 | 5679 | 181728 | 26436 | 39872 | 141856 |
| DRUMHELLE | AB | 379900 | 2 | 4 | UP-CHGO-CN | 4.02 | 2250 | 3.42 | 6571 | 26284 | 5000 | 20000 | -6284 | 4800 | 15200 |
| EASTMAN | GA | 2410250 | 13 | 26 | UP-NEWOR-NS | 1.93 | 701 | 1.74 | 3348 | 87050 | 4153 | 107978 | 20928 | 13026 | 94952 |
| ECHICAGO | IL | 201000 | 1 | 2 | UP | 1.41 | 1039 | 1.13 | 2177 | 4355 | 2438 | 4876 | 521 | 4876 | 0 |
| EDMONTON | AB | 190250 | 1 | 2 | UP-CHGO-CPRS | 3.83 | 2409 | 3.19 | 6125 | 12250 | 4024 | 8048 | -4202 | 2400 | 5648 |
| ELIZABETH | NJ | 380950 | 2 | 4 | UP-ESTL-CSXT | 2.58 | 1482 | 2.19 | 4198 | 16791 | 3351 | 13404 | -3387 | 4984 | 8420 |
| ELKGROVIL | IL | 293170 | 2 | 4 | UP | 1.98 | 869 | 1.75 | 3358 | 13434 | 2829 | 11316 | -2118 | 11316 | 0 |
| ELPASO | TX | 581750 | 3 | 6 | UP | 1.15 | 894 | 0.91 | 1752 | 10512 | 1678 | 10068 | -444 | 10068 | 0 |
| ELYRIA | OH | 963550 | 5 | 10 | UP-ESTL-CSXT | 2.90 | 1213 | 2.58 | 4949 | 49494 | 4230 | 42300 | -7194 | 12460 | 29840 |
| EMORRIS | IL | 3461750 | 18 | 36 | UP-CHTS-EJE | 1.69 | 1030 | 1.42 | 2720 | 97902 | 1675 | 60300 | -37602 | 43200 | 17100 |
| ESTLOUIS | IL | 589200 | 3 | 6 | UP | 0.86 | 780 | 0.65 | 1253 | 7520 | 1246 | 7476 | -44 | 7476 | 0 |
| EUCLID | OH | 390800 | 2 | 4 | UP-ESTL-NS | 2.57 | 1244 | 2.24 | 4300 | 17200 | 5227 | 20908 | 3708 | 4984 | 15924 |
| FAIRMONT | MN | 1526600 | 8 | 16 | UP | 2.71 | 1167 | 2.40 | 4608 | 73728 | 4502 | 72032 | -1696 | 72032 | 0 |
| FARNHAM | PQ | 358800 | 2 | 4 | UP-CHGO-CPRS | 3.17 | 1800 | 2.69 | 5168 | 20674 | 3940 | 15760 | -4914 | 4800 | 10960 |
| FINDERNE | NJ | 3846250 | 20 | 40 | UP-ESTL-NS | 2.81 | 1549 | 2.40 | 4605 | 184208 | 5601 | 224040 | 39832 | 49840 | 174200 |
| FLANDERS | NJ | 571950 | 3 | 6 | UP-ESTL-NS-LKJC-ME | 3.00 | 1457 | 2.61 | 5017 | 30102 | 3708 | 22248 | -7854 | 7476 | 14772 |
| FLEMINGTO | NJ | 5678350 | 30 | 60 | UP-ESTL-NS | 2.53 | 1449 | 2.15 | 4119 | 247117 | 4773 | 286380 | 39263 | 74760 | 211620 |
| FLINT | MI | 6714500 | 35 | 70 | UP-ESTL-CSXT | 3.11 | 1280 | 2.77 | 5318 | 372288 | 3670 | 256900 | -115388 | 87220 | 169680 |
| FONDULAC | WI | 4012450 | 21 | 42 | UP-CHGO-CN | 1.90 | 1200 | 1.58 | 3036 | 127512 | 2630 | 110460 | -17052 | 50400 | 60060 |
| FRANKLIN | KY | 6172100 | 32 | 64 | UP-MEMPH-CSXT | 2.08 | 860 | 1.85 | 3555 | 227520 | 3971 | 254144 | 26624 | 81792 | 172352 |
| FREMONT | IN | 396850 | 2 | 4 | UP-ESTL-NS | 1.85 | 1024 | 1.58 | 3030 | 12119 | 3538 | 14152 | 2033 | 4984 | 9168 |
| FTLAUDERD | FL | 195800 | 1 | 2 | UP-NEWOR-CSXT | 2.84 | 1004 | 2.57 | 4941 | 9882 | 5341 | 10682 | 800 | 1002 | 9680 |
| FTPIERCE | FL | 2502200 | 13 | 26 | UP-NEWOR-CSXT-JACVL-FEC | 2.00 | 1043 | 1.72 | 3308 | 86010 | 3093 | 80418 | -5592 | 13026 | 67392 |
| FTWAYNE | IN | 198300 | 1 | 2 | UP-ESTL-NS | 1.80 | 979 | 1.54 | 2957 | 5913 | 4230 | 8460 | 2547 | 2492 | 5968 |
| FTWORTH | TX | 1566250 | 8 | 16 | UP | 0.90 | 340 | 0.81 | 1555 | 24874 | 1490 | 23840 | -1034 | 23840 | 0 |
| FULLERTON | CA | 190650 | 1 | 2 | UP-LKCHA-BNSF | 2.81 | 1664 | 2.37 | 4547 | 9093 | 3400 | 6800 | -2293 | 4478 | 2322 |
| FULTON | KY | 790300 | 4 | 8 | UP-MEMPH-CN | 1.49 | 552 | 1.34 | 2579 | 20634 | 2878 | 23024 | 2390 | 10224 | 12800 |
| GAINESVIL | TX | 355600 | 2 | 4 | BNSF | 2.08 | 453 | 1.96 | 3763 | 15050 | 4210 | 16840 | 1790 | 0 | 16840 |
| GARFIELD | NJ | 762600 | 4 | 8 | UP-ESTL-NS | 2.90 | 1492 | 2.50 | 4807 | 38457 | 5679 | 45432 | 6975 | 9968 | 35464 |
| GARGROVE | CA | 596450 | 3 | 6 | UP | 2.63 | 1669 | 2.19 | 4198 | 25190 | 3400 | 20400 | -4790 | 20400 | 0 |
| GARLAND | TX | 2067350 | 11 | 22 | UP | 1.01 | 750 | 0.81 | 1557 | 34247 | 1714 | 37708 | 3461 | 37708 | 0 |
| GIRARD | PA | 400400 | 2 | 4 | UP-ESTL-NS | 2.40 | 1236 | 2.07 | 3978 | 15911 | 5582 | 22328 | 6417 | 4984 | 17344 |
| GLEFALLS | NY | 387850 | 2 | 4 | UP-CHGO-CPRS | 3.14 | 1669 | 2.70 | 5178 | 20710 | 4517 | 18068 | -2642 | 4800 | 13268 |
| GOSHEN | IN | 1194650 | 6 | 12 | UP-ESTL-NS | 2.25 | 909 | 2.01 | 3856 | 46277 | 4539 | 54468 | 8191 | 14952 | 39516 |
| GRANDVIEW | MO | 2105900 | 11 | 22 | UP-LKCHA-KCS | 1.41 | 753 | 1.21 | 2323 | 51110 | 3151 | 69322 | 18212 | 9834 | 59488 |
| GRAPRAIRI | TX | 3139750 | 16 | 32 | UP | 1.20 | 388 | 1.10 | 2106 | 67396 | 2110 | 67520 | 124 | 67520 | 0 |
| GREENVILL | SC | 1717900 | 9 | 18 | UP-NEWOR-NS | 1.82 | 800 | 1.61 | 3086 | 55555 | 3860 | 69480 | 13925 | 9018 | 60462 |
| GREER | SC | 386750 | 2 | 4 | UP-NEWOR-NS | 2.00 | 863 | 1.77 | 3400 | 13599 | 4310 | 17240 | 3641 | 2004 | 15236 |
| GUADALAJA | JA | 2521500 | 13 | 26 | KCS-LARED-TFM (Laredo 495 Mi.) | 3.27 | 495 | 3.14 | 6026 | 156675 | 4337 | 112762 | -43913 | 0 | 112762 |
| HAMILTON | ON | 5038600 | 26 | 52 | UP-CHGO-CPRS | 2.91 | 1448 | 2.53 | 4849 | 252133 | 2703 | 140556 | -111577 | 62400 | 78156 |
| HASLET | TX | 190200 | 1 | 2 | UP-LKCHA-BNSF | 0.92 | 486 | 0.79 | 1519 | 3037 | 2247 | 4494 | 1457 | 894 | 3600 |
| HAWTHORNE | NJ | 195650 | 1 | 2 | UP-ESTL-NS | 2.95 | 1484 | 2.56 | 4907 | 9814 | 5804 | 11608 | 1794 | 2492 | 9116 |
| HAZLETON | PA | 7097250 | 37 | 74 | UP-ESTL-NS | 2.75 | 1407 | 2.38 | 4562 | 337620 | 5348 | 395752 | 58132 | 92204 | 303548 |
| HEMINGWAY | SC | 572350 | 3 | 6 | UP-NEWOR-CSXT | 3.15 | 1041 | 2.87 | 5517 | 33103 | 4751 | 28506 | -4597 | 3006 | 25500 |
| HIGPOINT | NC | 5017250 | 26 | 52 | UP-ESTL-NS | 2.12 | 973 | 1.86 | 3574 | 185857 | 4495 | 233740 | 47883 | 64792 | 168948 |
| HIGPOINT | NC | 1537300 | 8 | 16 | UP-NEWOR-NS | 2.12 | 973 | 1.86 | 3574 | 57187 | 4495 | 71920 | 14733 | 8016 | 63904 |
| HILLSIDE | NJ | 4392650 | 23 | 46 | UP-ESTL-CSXT | 2.73 | 1497 | 2.33 | 4478 | 205994 | 3328 | 153088 | -52906 | 57316 | 95772 |
| HOUSTON | TX | 93988870 | 490 | 980 | UP | 0.32 | 144 | 0.28 | 541 | 530141 | 608 | 595840 | 65699 | 595840 | 0 |
| HUDSON | WI | 367700 | 2 | 4 | UP | 2.82 | 1399 | 2.45 | 4701 | 18804 | 5136 | 20544 | 1740 | 20544 | 0 |
| IBERVILLE | PQ | 199600 | 1 | 2 | UP-CHGO-CPRS | 2.47 | 1830 | 1.98 | 3809 | 7618 | 3940 | 7880 | 262 | 2400 | 5480 |
| INDIAPLIS | IN | 190400 | 1 | 2 | UP-SALM-CSXT | 1.98 | 860 | 1.75 | 3363 | 6726 | 3512 | 7024 | 298 | 2492 | 4532 |
| JACKSON | TN | 972800 | 5 | 10 | UP-NEWOR-CSXT | 1.69 | 588 | 1.53 | 2945 | 29449 | 2758 | 27580 | -1869 | 5010 | 22570 |
| JEAN | NV | 1978050 | 10 | 20 | UP | 2.63 | 1610 | 2.20 | 4229 | 84570 | 3942 | 78840 | -5730 | 78840 | 0 |
| JERCITY | NJ | 1935750 | 10 | 20 | UP-ESTL-CSXT | 2.70 | 1487 | 2.31 | 4426 | 88513 | 3625 | 72500 | -16013 | 24920 | 47580 |
| JOHNSTOWN | CO | 580400 | 3 | 6 | UP | 2.16 | 1151 | 1.85 | 3560 | 21361 | 3872 | 23232 | 1871 | 23232 | 0 |
| KALAMAZOO | MI | 1126150 | 6 | 12 | UP-CHGO-NS | 2.07 | 1138 | 1.77 | 3394 | 40728 | 3458 | 41496 | 768 | 14400 | 27096 |
| KALAMAZOO | MI | 1357350 | 7 | 14 | UP-CHGO-NS | 2.07 | 1138 | 1.77 | 3394 | 47516 | 3458 | 48412 | 896 | 16800 | 31612 |

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| KALAMAZOO | MI | 579300 | 3 | 6 | UP-CHGO-NS | 2.07 | 1138 | 1.77 | 3394 | 20364 | 3458 | 20748 | 384 | 7200 | 13548 |
| KANCITY | MO | 594900 | 3 | 6 | UP | 0.86 | 926 | 0.61 | 1179 | 7074 | 1285 | 7710 | 636 | 7710 | 0 |
| LACHINE | PQ | 1325750 | 7 | 14 | UP-CHGO-CPRS | 3.17 | 1800 | 2.69 | 5168 | 72358 | 3238 | 45332 | -27026 | 16800 | 28532 |
| LAGRANGE | NL | 379150 | 2 | 4 | KCS-LARED-TFM (Laredo 495 Mi.) | 2.78 | 495 | 2.65 | 5085 | 20341 | 2535 | 10140 | -10201 | 0 | 10140 |
| LAKEVILLE | MN | 3235650 | 17 | 34 | UP-CHGO-CPRS | 2.21 | 1187 | 1.89 | 3638 | 123686 | 3275 | 111350 | -12336 | 40800 | 70550 |
| LAMAR | MO | 2908550 | 15 | 30 | UP | 2.21 | 619 | 2.05 | 3928 | 117825 | 3859 | 115770 | -2055 | 115770 | 0 |
| LAMIRADA | CA | 12111290 | 63 | 126 | UP | 2.16 | 1695 | 1.71 | 3283 | 413627 | 3400 | 428400 | 14773 | 428400 | 0 |
| LANETT | AL | 597750 | 3 | 6 | UP-NEWOR-CSXT | 1.83 | 612 | 1.67 | 3201 | 19209 | 3248 | 19488 | 279 | 3006 | 16482 |
| LAPORTE | TX | 3624350 | 19 | 38 | UP | 0.61 | 143 | 0.57 | 1098 | 41734 | 1066 | 40508 | -1226 | 40508 | 0 |
| LAVALTRIE | PQ | 191550 | 1 | 2 | UP-CHGO-CPRS | 3.19 | 1911 | 2.68 | 5150 | 10300 | 3689 | 7378 | -2922 | 2400 | 4978 |
| LAVERNE | CA | 194550 | 1 | 2 | UP | 2.16 | 1814 | 1.68 | 3222 | 6444 | 3400 | 6800 | 356 | 6800 | 0 |
| LAWRENCE | MA | 387500 | 2 | 4 | UP-ESTL-CSXT-ROTTJ-ST | 2.98 | 1732 | 2.52 | 4838 | 19353 | 4848 | 19392 | 39 | 4984 | 14408 |
| LAWRENCEB | TN | 1651720 | 9 | 18 | UP-MEMPH-CSXT-NATCO-TSRR | 2.06 | 665 | 1.88 | 3616 | 65089 | 4636 | 83448 | 18359 | 23004 | 60444 |
| LAWRENCEV | GA | 1368100 | 7 | 14 | UP-NEWOR-CSXT | 2.02 | 683 | 1.84 | 3530 | 49421 | 3366 | 47124 | -2297 | 7014 | 40110 |
| LEBANON | TN | 7322050 | 38 | 76 | UP-MEMPH-CSXT-VINHI-NERR | 2.50 | 699 | 2.31 | 4444 | 337707 | 4741 | 360316 | 22609 | 97128 | 263188 |
| LEOMINSTE | MA | 194350 | 1 | 2 | UP-SALM-CXST | 2.72 | 1743 | 2.26 | 4333 | 8667 | 4164 | 8328 | -339 | 2492 | 5836 |
| LIMA | OH | 1910300 | 10 | 20 | UP-SALM-CSXT | 2.72 | 989 | 2.46 | 4718 | 94360 | 3475 | 69500 | -24860 | 24920 | 44580 |
| LINDSAY | CA | 587700 | 3 | 6 | UP | 2.16 | 1874 | 1.66 | 3191 | 19149 | 3400 | 20400 | 1251 | 20400 | 0 |
| LODI | NJ | 197900 | 1 | 2 | UP-ESTL-CSXT-SYRAC-NYSW | 2.83 | 1493 | 2.43 | 4672 | 9344 | 4629 | 9258 | -86 | 2492 | 6766 |
| LOGANDALE | NV | 576050 | 3 | 6 | UP | 3.81 | 1676 | 3.36 | 6460 | 38763 | 6643 | 39858 | 1095 | 39858 | 0 |
| LONDON | ON | 394400 | 2 | 4 | UP-CHGO-CN | 2.77 | 1434 | 2.39 | 4587 | 18348 | 2200 | 8800 | -9548 | 4800 | 4000 |
| LORENZO | IL | 580500 | 3 | 6 | UP-MEMPH-BNSF | 1.81 | 975 | 1.55 | 2978 | 17868 | 3425 | 20550 | 2682 | 7668 | 12882 |
| LOUISVILL | KY | 725800 | 4 | 8 | UP-ESTL-CSXT | 2.54 | 807 | 2.33 | 4465 | 35722 | 2994 | 23952 | -11770 | 9968 | 13984 |
| LULISLJUN | BC | 167250 | 1 | 2 | UP-CHGO-CN | 4.53 | 2628 | 3.83 | 7357 | 14715 | 4700 | 9400 | -5315 | 2400 | 7000 |
| LYNDHURST | NJ | 578240 | 3 | 6 | UP-ESTL-NS | 2.90 | 1490 | 2.50 | 4808 | 28849 | 5683 | 34098 | 5249 | 7476 | 26622 |
| MACEDON | NY | 13382400 | 70 | 140 | UP-SALM-CSXT | 2.70 | 1505 | 2.30 | 4416 | 618303 | 4544 | 636160 | 17857 | 174440 | 461720 |
| MARSHVILL | NC | 390600 | 2 | 4 | UP-NEWOR-CSXT | 2.77 | 934 | 2.52 | 4842 | 19368 | 4127 | 16508 | -2860 | 2004 | 14504 |
| MATTHEWS | NC | 18426200 | 96 | 192 | UP-NEWOR-CSXT | 2.61 | 912 | 2.37 | 4546 | 872847 | 4127 | 792384 | -80463 | 96192 | 696192 |
| MCDONOUGH | GA | 775250 | 4 | 8 | UP-NEWOR-NS | 1.87 | 718 | 1.68 | 3224 | 25794 | 4073 | 32584 | 6790 | 4008 | 28576 |
| MEDLEY | FL | 387400 | 2 | 4 | UP-NEWOR-CSXT-JACVL-FEC | 2.25 | 1049 | 1.97 | 3785 | 15140 | 3549 | 14196 | -944 | 2004 | 12192 |
| MENASHA | WI | 1186300 | 6 | 12 | UP-CHGO-CN | 2.14 | 1240 | 1.81 | 3476 | 41717 | 2630 | 31560 | -10157 | 14400 | 17160 |
| MESQUITE | TX | 193800 | 1 | 2 | UP | 1.88 | 372 | 1.78 | 3420 | 6840 | 3396 | 6792 | -48 | 6792 | 0 |
| MIAMI | FL | 182650 | 1 | 2 | UP-NEWOR-CSXT-JACVL-FEC | 3.50 | 1059 | 3.22 | 6180 | 12360 | 4693 | 9386 | -2974 | 1002 | 8384 |
| MIDLAND | IL | 190550 | 1 | 2 | UP-SALM-CSXT | 2.02 | 893 | 1.78 | 3423 | 6846 | 3423 | 6846 | 0 | 2492 | 4354 |
| MINNEAPOL | MN | 2075800 | 11 | 22 | UP-CHGO-CPRS | 2.78 | 1202 | 2.46 | 4725 | 103941 | 3264 | 71808 | -32133 | 26400 | 45408 |
| MISAUGA | ON | 398500 | 2 | 4 | UP-CHGO-CPRS-TRNTO-CN | 2.93 | 1619 | 2.50 | 4800 | 19200 | 2970 | 11880 | -7320 | 4800 | 7080 |
| MOGADORE | OH | 777150 | 4 | 8 | UP-ESTL-CSXT-GRNWH-WE | 2.12 | 1222 | 1.80 | 3447 | 27577 | 3114 | 24912 | -2665 | 9968 | 14944 |
| MONROE | LA | 11995940 | 62 | 124 | UP | 1.02 | 199 | 0.97 | 1857 | 230257 | 754 | 93496 | -136761 | 93496 | 0 |
| MONROE | LA | 923550 | 5 | 10 | KCS | 0.85 | 199 | 0.80 | 1531 | 15305 | 1531 | 15310 | 5 | 0 | 15310 |
| MONROEVIL | OH | 198700 | 1 | 2 | UP-ESTL-CSXT-GRNWH-WE | 2.10 | 1087 | 1.81 | 3478 | 6955 | 3370 | 6740 | -215 | 2492 | 4248 |
| MONTERREY | NL | 3262450 | 17 | 34 | KCS-LARED-TFM (Laredo 495 Mi.) | 1.89 | 495 | 1.76 | 3376 | 114796 | 2535 | 86190 | -28606 | 0 | 86190 |
| MONTGOMER | AL | 12901350 | 67 | 134 | UP-NEWOR-CSXT | 2.03 | 493 | 1.90 | 3646 | 488587 | 2930 | 392620 | -95967 | 67134 | 325486 |
| MONTPELIE | OH | 397400 | 2 | 4 | UP-ESTL-NS | 2.57 | 1037 | 2.29 | 4406 | 17622 | 5333 | 21332 | 3710 | 4984 | 16348 |
| MONTREAL | PQ | 768250 | 4 | 8 | UP-CHGO-CPRS | 3.20 | 1830 | 2.71 | 5211 | 41686 | 3238 | 25904 | -15782 | 9600 | 16304 |
| MORRISTOW | TN | 3944600 | 21 | 42 | UP-MEMPH-NS | 2.34 | 831 | 2.12 | 4069 | 170898 | 4079 | 171318 | 420 | 53676 | 117642 |
| MORROW | GA | 396600 | 2 | 4 | UP-NEWOR-NS | 1.55 | 650 | 1.38 | 2645 | 10578 | 3264 | 13056 | 2478 | 2004 | 11052 |
| MUSCATINE | IA | 795750 | 4 | 8 | UP-KCITY-IMRL | 2.12 | 1043 | 1.84 | 3538 | 28308 | 3157 | 25256 | -3052 | 10280 | 14976 |
| NASHVILLE | TN | 1340250 | 7 | 14 | UP-MEMPHIS-CSXT | 2.08 | 712 | 1.89 | 3630 | 50827 | 4461 | 62454 | 11627 | 17892 | 44562 |
| NCHICAGO | IL | 192000 | 1 | 2 | UP-WAKGN-EJE | 1.90 | 1079 | 1.61 | 3098 | 6195 | 1675 | 3350 | -2845 | 2400 | 950 |
| NEWARK | NJ | 769050 | 4 | 8 | UP-ESTL-CSXT | 2.58 | 1483 | 2.19 | 4197 | 33578 | 3309 | 26472 | -7106 | 9968 | 16504 |
| NEWCASTLE | DE | 7688150 | 40 | 80 | UP-ESTL-NS | 2.40 | 1370 | 2.04 | 3909 | 312744 | 4454 | 356320 | 43576 | 99680 | 256640 |
| NEWTON | BC | 200350 | 1 | 2 | UP-STPAU-CPRS-NWSTR-SRY | 3.88 | 1800 | 3.40 | 6532 | 13063 | 6334 | 12668 | -395 | 2400 | 10268 |
| NEWWESTMI | BC | 190300 | 1 | 2 | UP-STPAU-CPRS-NWSTR-SRY | 3.88 | 3541 | 2.94 | 5644 | 11287 | 5734 | 11468 | 181 | 2400 | 9068 |
| NLEOMINST | MA | 1931100 | 10 | 20 | UP-ESTL-CSXT-ROTTJ-ST | 2.50 | 1704 | 2.05 | 3931 | 78619 | 4164 | 83280 | 4661 | 24920 | 58360 |
| NLITROCK | AR | 5889000 | 31 | 62 | UP | 1.34 | 394 | 1.24 | 2372 | 147055 | 1180 | 73160 | -73895 | 73160 | 0 |
| NORCROSS | GA | 4715000 | 25 | 50 | UP-NEWOR-NS | 1.25 | 675 | 1.07 | 2056 | 102788 | 2501 | 125050 | 22263 | 25050 | 100000 |
| NPORTLAND | OR | 6097000 | 32 | 64 | UP-PORTL-PT | 3.46 | 2435 | 2.81 | 5401 | 345686 | 5289 | 338496 | -7190 | 325056 | 13440 |
| OAKWOOD | GA | 1141450 | 6 | 12 | UP-NEWOR-NS | 1.74 | 702 | 1.55 | 2983 | 35793 | 3731 | 44772 | 8979 | 6012 | 38760 |
| OKCITY | OK | 984750 | 5 | 10 | UP | 1.77 | 588 | 1.61 | 3099 | 30985 | 1847 | 18470 | -12515 | 18470 | 0 |

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OLDSAYBRO | CT | 1548050 | 8 | 16 | UP-ESTL-NS-BUFF-CPRS-NLOND-PW | 3.20 | 1678 | 2.75 | 5288 | 84612 | 4796 | 76736 | -7876 | 19936 | 56800 |
| ORANGE | TX | 11337750 | 59 | 118 | UP | 0.37 | 36 | 0.36 | 692 | 81661 | 685 | 80830 | -831 | 80830 | 0 |
| ORLANDO | FL | 3265150 | 17 | 34 | UP-NEWOR-CSXT | 2.60 | 825 | 2.38 | 4571 | 155423 | 4409 | 149906 | -5517 | 17034 | 132872 |
| PATERSON | NJ | 777650 | 4 | 8 | UP-ESTL-CSXT | 2.37 | 1489 | 1.97 | 3791 | 30328 | 3587 | 28696 | -1632 | 9968 | 18728 |
| PEEVER | SD | 196650 | 1 | 2 | UP-STPAU-TCWR | 3.34 | 1358 | 2.98 | 5720 | 11440 | 5862 | 11724 | 284 | 2400 | 9324 |
| PENSACOLA | FL | 190550 | 1 | 2 | UP-NEWOR-CSXT | 1.37 | 457 | 1.25 | 2397 | 4795 | 2182 | 4364 | -431 | 1002 | 3362 |
| PENTACO | DF | 1542600 | 8 | 16 | UP-LARED-TFM (Laredo 495 Mi.) | 3.27 | 495 | 3.14 | 6026 | 96415 | 4919 | 78704 | -17711 | 34560 | 44144 |
| PHOENIX | AZ | 587250 | 3 | 6 | UP | 2.38 | 1308 | 2.03 | 3903 | 23415 | 2461 | 14766 | -8649 | 14766 | 0 |
| PIQUA | OH | 383000 | 2 | 4 | UP-ESTL-CSXT | 2.63 | 979 | 2.37 | 4550 | 18201 | 3753 | 15012 | -3189 | 4984 | 10028 |
| PITTSTON | PA | 8920550 | 46 | 92 | UP-ESTL-NS | 2.74 | 1456 | 2.35 | 4518 | 415678 | 5900 | 542800 | 127122 | 114632 | 428168 |
| PLEASANPR | WI | 1940650 | 10 | 20 | UP-CHGO-CPRS | 2.77 | 1094 | 2.48 | 4760 | 95209 | 2678 | 53560 | -41649 | 24000 | 29560 |
| POMONA | CA | 387850 | 2 | 4 | UP | 2.16 | 1669 | 1.72 | 3296 | 13184 | 3400 | 13600 | 416 | 13600 | 0 |
| PORTLAND | OR | 1187100 | 6 | 12 | UP | 3.42 | 2498 | 2.76 | 5292 | 63509 | 5079 | 60948 | -2561 | 60948 | 0 |
| PRESTO | UT | 761650 | 4 | 8 | UP | 3.04 | 1683 | 2.59 | 4978 | 39828 | 4955 | 39640 | -188 | 39640 | 0 |
| PRYOR | OK | 2507800 | 13 | 26 | UP | 1.77 | 535 | 1.63 | 3126 | 81264 | 3069 | 79794 | -1470 | 79794 | 0 |
| READING | PA | 593650 | 3 | 6 | UP-ESTL-NS | 3.17 | 1444 | 2.79 | 5350 | 32100 | 5024 | 30144 | -1956 | 7476 | 22668 |
| REMINGTON | VA | 760950 | 4 | 8 | UP-NEWOR-NS | 2.51 | 1203 | 2.19 | 4206 | 33645 | 6959 | 55672 | 22027 | 4008 | 51664 |
| RHINELAND | WI | 179050 | 1 | 2 | UP-CHGO-CN | 3.61 | 1355 | 3.25 | 6240 | 12480 | 3335 | 6670 | -5810 | 2400 | 4270 |
| RICLAKE | WI | 189700 | 1 | 2 | UP-CHGO-CN | 2.54 | 1372 | 2.18 | 4177 | 8354 | 3420 | 6840 | -1514 | 2400 | 4440 |
| RICHMSLIP | BC | 180950 | 1 | 2 | UP-CHGO-CN | 4.80 | 2628 | 4.10 | 7876 | 15751 | 4700 | 9400 | -6351 | 2400 | 7000 |
| ROCMT | VA | 380100 | 2 | 4 | UP-NEWOR-NS | 3.39 | 1111 | 3.09 | 5942 | 23769 | 5942 | 23768 | -1 | 2004 | 21764 |
| RUSSELLVI | AR | 381300 | 2 | 4 | UP | 1.66 | 469 | 1.54 | 2948 | 11792 | 2912 | 11648 | -144 | 11648 | 0 |
| SADBROOK | NJ | 955050 | 5 | 10 | UP-ESTL-CSXT-SYRAC-NYSW | 2.83 | 1463 | 2.44 | 4687 | 46875 | 3587 | 35870 | -11005 | 12460 | 23410 |
| SAGINAW | TX | 1761950 | 9 | 18 | UP-LKCHA-BNSF | 0.92 | 411 | 0.81 | 1557 | 28022 | 2247 | 40446 | 12424 | 8046 | 32400 |
| SANBERNAR | CA | 396450 | 2 | 4 | UP-LKCHA-BNSF | 2.81 | 1765 | 2.34 | 4495 | 17980 | 5170 | 20680 | 2700 | 1788 | 18892 |
| SANFESPRI | CA | 921850 | 5 | 10 | UP-LKCHA-BNSF | 2.81 | 684 | 2.63 | 5046 | 50464 | 5170 | 51700 | 1236 | 4470 | 47230 |
| SANLEANDR | CA | 186550 | 1 | 2 | UP | 2.63 | 2060 | 2.08 | 3999 | 7998 | 3400 | 6800 | -1198 | 6800 | 0 |
| SANMARCOS | CA | 380000 | 2 | 4 | UP-LKCHA-BNSF | 2.81 | 1626 | 2.38 | 4566 | 18264 | 5170 | 20680 | 2416 | 1788 | 18892 |
| SANTAANA | CA | 990250 | 5 | 10 | UP | 2.16 | 2060 | 1.61 | 3097 | 30966 | 3400 | 34000 | 3034 | 34000 | 0 |
| SBOSTON | VA | 2880650 | 15 | 30 | UP-NEWOR-NS | 2.52 | 1063 | 2.24 | 4296 | 128888 | 5416 | 162480 | 33592 | 15030 | 147450 |
| SBOUBROOK | NJ | 388850 | 2 | 4 | UP-ESTL-CSXT | 2.73 | 1463 | 2.34 | 4495 | 17982 | 3669 | 14676 | -3306 | 4984 | 9692 |
| SENATOBIA | MS | 361900 | 2 | 4 | UP-NEWOR-CN | 1.92 | 467 | 1.80 | 3448 | 13793 | 2101 | 8404 | -5389 | 2004 | 6400 |
| SENOIA | GA | 6458130 | 34 | 68 | UP-NEWOR-NS | 1.68 | 626 | 1.51 | 2906 | 197631 | 3607 | 245276 | 47645 | 34068 | 211208 |
| SHARON | PA | 580100 | 3 | 6 | UP-ESTL-NS | 2.03 | 1274 | 1.69 | 3248 | 19487 | 3786 | 22716 | 3229 | 7476 | 15240 |
| SHELBYVIL | KY | 521500 | 3 | 6 | UP-ESTL-CSXT-WINCH-RJCC | 1.93 | 997 | 1.67 | 3197 | 19183 | 2646 | 15876 | -3307 | 7476 | 8400 |
| SIOFALLS | SD | 3679450 | 19 | 38 | UP-ESTL-BNSF | 2.81 | 1139 | 2.51 | 4814 | 182944 | 5115 | 194370 | 11426 | 47348 | 147022 |
| SMITHSONI | GA | 1762650 | 9 | 18 | UP-NEWOR-CSXT-SAVAN-GC | 1.59 | 681 | 1.41 | 2705 | 48699 | 2648 | 47664 | -1035 | 9018 | 38646 |
| SNOBOY | CA | 387100 | 2 | 4 | UP | 2.63 | 2190 | 2.05 | 3933 | 15731 | 3400 | 13600 | -2131 | 13600 | 0 |
| SPARTA | MI | 1338000 | 7 | 14 | UP-ESTL-CSXT | 2.76 | 1196 | 2.44 | 4689 | 65649 | 3774 | 52836 | -12813 | 17444 | 35392 |
| SPARTANBU | SC | 163450 | 1 | 2 | UP-NEWOR-NS | 2.22 | 855 | 1.99 | 3826 | 7653 | 4444 | 8888 | 1235 | 1002 | 7886 |
| STERRETT | TX | 16092220 | 84 | 168 | UP | 1.22 | 362 | 1.12 | 2158 | 362507 | 2096 | 352128 | -10379 | 352128 | 0 |
| STLAURENT | PQ | 3062200 | 16 | 32 | UP-CHGO-CN | 3.14 | 1274 | 2.80 | 5379 | 172130 | 2975 | 95200 | -76930 | 38400 | 56800 |
| STLOUIS | MO | 582250 | 3 | 6 | UP | 0.86 | 800 | 0.65 | 1243 | 7459 | 1309 | 7854 | 395 | 7854 | 0 |
| STMARYS | GA | 9236600 | 48 | 96 | UP-NEWOR-CSXT-KGSLD-SM | 2.63 | 773 | 2.42 | 4655 | 446916 | 4925 | 472800 | 25884 | 48096 | 424704 |
| STOPOINT | NC | 2492300 | 13 | 26 | UP-NEWOR-NS | 2.54 | 933 | 2.29 | 4401 | 114425 | 5583 | 145158 | 30733 | 13026 | 132132 |
| STPAUL | MN | 191200 | 1 | 2 | UP | 2.46 | 1205 | 2.14 | 4109 | 8217 | 4171 | 8342 | 125 | 8342 | 0 |
| STRATFORD | ON | 366200 | 2 | 4 | UP-CHGO-CN | 2.74 | 1472 | 2.35 | 4510 | 18040 | 2645 | 10580 | -7460 | 4800 | 5780 |
| STREATOR | IL | 761050 | 4 | 8 | UP-MEMPH-BNSF | 2.53 | 995 | 2.27 | 4350 | 34801 | 4269 | 34152 | -649 | 10224 | 23928 |
| SUMMIT | MS | 1537000 | 8 | 16 | UP-NEWOR-CN | 0.91 | 226 | 0.85 | 1632 | 26111 | 1801 | 28816 | 2705 | 8016 | 20800 |
| TACOMA | WA | 781400 | 4 | 8 | UP | 2.94 | 2516 | 2.27 | 4362 | 34893 | 4863 | 38904 | 4011 | 38904 | 0 |
| TAMPA | FL | 199700 | 1 | 2 | UP-NEWOR-CSXT | 2.96 | 913 | 2.72 | 5218 | 10435 | 4650 | 9300 | -1135 | 1002 | 8298 |
| TEMPE | AZ | 194200 | 1 | 2 | UP | 2.41 | 1332 | 2.06 | 3948 | 7896 | 2467 | 4934 | -2962 | 4934 | 0 |
| TERHAUTE | IN | 15145930 | 79 | 158 | UP-CHGO-CPRS | 1.67 | 896 | 1.43 | 2749 | 434412 | 2520 | 398160 | -36252 | 189600 | 208560 |
| THOMASVIL | NC | 898200 | 5 | 10 | UP-NEWOR-NS | 2.12 | 964 | 1.86 | 3579 | 35788 | 4499 | 44990 | 9202 | 5010 | 39980 |
| TLALNEPAN | EM | 1158250 | 6 | 12 | KCS-TFM | 3.16 | 495 | 3.03 | 5815 | 69777 | 4919 | 59028 | -10749 | 0 | 59028 |
| TORRANCE | CA | 766700 | 4 | 8 | UP-LKCHA-BNSF | 2.81 | 1706 | 2.36 | 4525 | 36201 | 5170 | 41360 | 5159 | 3576 | 37784 |
| TRURO | NS | 2310600 | 12 | 24 | UP-CHGO-CN | 4.96 | 2234 | 4.37 | 8384 | 201213 | 6500 | 156000 | -45213 | 28800 | 127200 |
| TUPELO | MS | 2120200 | 11 | 22 | BNSF | 1.60 | 492 | 1.47 | 2821 | 62064 | 3617 | 79574 | 17510 | 0 | 79574 |
| URBANA | OH | 2966900 | 15 | 30 | UP-ESTL-CSXT-FAYNE-IOCR | 2.47 | 994 | 2.21 | 4235 | 127064 | 2530 | 75900 | -51164 | 37380 | 38520 |

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| VALDOSTA | GA | 792100 | 4 | 8 | UP-NEWOR-CSXT | 1.67 | 753 | 1.47 | 2822 | 22579 | 2707 | 21656 | -923 | 4008 | 17648 | |
| VALLA | CA | 2120300 | 11 | 22 | UP | 2.16 | 1684 | 1.71 | 3288 | 72344 | 3365 | 74030 | 1686 | 74030 | 0 | |
| VANCOUVER | BC | 186300 | 1 | 2 | UP-CHGO-CN | 4.91 | 3232 | 4.05 | 7779 | 15558 | 4700 | 9400 | -6158 | 2400 | 7000 | |
| VARENNES | PQ | 194200 | 1 | 2 | UP-CHGO-CN | 3.13 | 2030 | 2.59 | 4974 | 9949 | 3400 | 6800 | -3149 | 2400 | 4400 | |
| VERNON | CA | 567400 | 3 | 6 | UP | 2.16 | 1696 | 1.71 | 3282 | 19693 | 3400 | 20400 | 707 | 20400 | 0 | |
| VERSAILLE | CT | 568350 | 3 | 6 | UP-ESTL-CSXT-WRCTR-PW | 3.21 | 1641 | 2.77 | 5326 | 31958 | 4677 | 28062 | -3896 | 7476 | 20586 | |
| VICTORIA | TX | 1313400 | 7 | 14 | UP | 0.72 | 271 | 0.65 | 1244 | 17419 | 1191 | 16674 | -745 | 16674 | 0 | |
| VILLAPARK | IL | 190900 | 1 | 2 | UP-CHGO-CN | 2.12 | 935 | 1.87 | 3594 | 7187 | 2300 | 4600 | -2587 | 2400 | 2200 | |
| WARE | MA | 1346050 | 7 | 14 | UP-ESTL-CSXT-PALMR-MCER | 2.47 | 1648 | 2.03 | 3902 | 54627 | 3574 | 50036 | -4591 | 17444 | 32592 | |
| WAUSAU | WI | 957850 | 5 | 10 | UP-CHGO-CN | 2.30 | 1284 | 1.96 | 3761 | 37612 | 3200 | 32000 | -5612 | 12000 | 20000 | |
| WESTBORO | MA | 2029800 | 11 | 22 | UP-SALM-CSXT | 3.39 | 1692 | 2.94 | 5646 | 124209 | 6068 | 133496 | 9287 | 27412 | 106084 | |
| WEYAUWEGA | WI | 3082550 | 16 | 32 | UP-CHGO-CN | 2.63 | 1262 | 2.29 | 4406 | 140991 | 2770 | 88640 | -52351 | 38400 | 50240 | |
| WHEELING | IL | 185800 | 1 | 2 | UP-CHGO-CN | 1.88 | 975 | 1.62 | 3112 | 6225 | 2300 | 4600 | -1625 | 2400 | 2200 | |
| WINCHESTE | VA | 396550 | 2 | 4 | UP-NEWOR-NS | 2.32 | 1287 | 1.98 | 3798 | 15192 | 4153 | 16612 | 1420 | 2004 | 14608 | |
| WINNIPEG | MB | 2862000 | 15 | 30 | UP-CHGO-CPRS | 2.74 | 1594 | 2.32 | 4448 | 133436 | 3497 | 104910 | -28526 | 36000 | 68910 | |
| WMONROE | LA | 376300 | 2 | 4 | UP | 1.02 | 199 | 0.97 | 1857 | 7428 | 754 | 3016 | -4412 | 3016 | 0 | |
| WORCESTER | MA | 1540350 | 8 | 16 | UP-ESTL-CSXT-WRCTR-PW | 2.63 | 1731 | 2.17 | 4167 | 66669 | 4171 | 66736 | 67 | 19936 | 46800 | |
| YAKIMA | WA | 3830200 | 20 | 40 | UP | 3.46 | 2358 | 2.83 | 5441 | 217625 | 4982 | 199280 | -18345 | 199280 | 0 | |
| YONKERS | NY | 3241300 | 17 | 34 | UP-SALM-CSXT | 3.50 | 1550 | 3.09 | 5930 | 201603 | 5556 | 188904 | -12699 | 42364 | 146540 | |
| | | 603083180 | 3141 | 6286 | | | | | | **$20,556,391** | | **$19,345,668** | **$1,210,723** | **$7,890,864** | **$11,454,804** | $4,742,353 |
| | | Volume | | Cars | | | Total Spend Curr.Rates - 0 Mi. | | | | | | | 41% | 59% | CSXT |
| | | | | | | | | | | | | SAVINGS | 6% | | | |

**FUEL SURCHARGE AND RATE INCREASE SCHEDULE**




* Fuel Surcharge for 7/1/04 through 12/31/04 deferred at agreed upon rate of 2%.
6 month deferral @ 2% incr. to be reapplied from 1/1/06 through 6/30/06.

# PX1010-PX1019

Filed Under Seal

# EXHIBIT

# PX1020

Item 3035 – BNSF Railcar Loading Rules – issued December 11, 2006 – Effective January 1, 2007) (New Item) ... 19
Item 3040A - Charge - Sugar Covered Hopper Cars Rejected for Cleaning, ... 19
Cancelled Effective October 31, 2001 ... 19
Item 3060 - Charge - Detention on Heavy Duty Flat Cars ... 20
Item 3080G - Charge – Extended Use Fee – For Cars Held for Loading and Unloading on Foreign Carriers - Issued February 27, 2006 – Effective March 18, 2006 ... 21
Item 3100 - Charge - Attendants/Riders Accompanying Freight Shipments ... 22
Item 3120 - Charge - On Traffic of Exceptional Dimensions or Weight ... 23
Item 3140G - Charge - Document Delay Charges on Export Traffic to Mexico – Issued January 10, 2007 – Effective February 1, 2007 ... 23
Item 3150B – Document Delay Charges on Grain Shuttle Trains Destined Stations in Mexico – Issued March 3, 2006 – Effective April 3, 2006 ... 24
Item 3180A - Charge - Failure to Complete Unloading of Bentonite Clay, Cancelled Effective October 31, 2001 ... 25
Item 3200A - Charge - Failure to Complete Unloading of Industrial Sand, ... 25
Cancelled Effective October 31, 2001 ... 25
Item 3220 - Charge - Free Time and Detention on Cars Delivered to Water Carriers at Vancouver, BC ... 26
Item 3240 - Charge - Hazardous Materials Destined to Canada ... 26
Item 3250 – Failure to Complete Unloading of Railcars – Issued February 14, 2007 – Effective March 7, 2007 ... 27
Item 3251 – Covered Hoppers Unfit for Movement Due to Residue/Debris on the Exterior of the Car -Issued August 10, 2006 – Effective September 1, 2006 ... 27
... 27
Item 3255 – Charge for Permanently Securing or Welding Apparatus to Heavy Duty Railcars – Issued February 14, 2007 – Effective March 7, 2007 ... 27
Item 3260B - Charge - Failure to Complete Unloading of Sugar, Issued December 11, 2002 – Effective January 1, 2003 ... 28
Item 3261 – Application of Barrier Seals Upon Completion of Unloading of Bulk Sugar Hopper Cars – Issued October 20, 2005 – Effective November 10, 2005 ... 28
Item 3265A – Charge – Failure to Complete Unloading of Sugar Beet Pulp Pellets ... 29
Cancelled Effective October 31, 2001 ... 29
Item 3280 - Charge - Shipments Held for Orders ... 30
Item 3300G - Charge - Special Freight Train Service – Issued March 17, 2006 – Effective May 1, 2006 ... 32
Item 3320 - Charge - Turning of Empty Unit Train Cars ... 33
Item 3340 - Charge - Destination Detention on Sugar Cars ... 33
Item 3350 – Charge – Ride Quality Testing or Monitoring Equipment, Issued November 9, 2001 – Effective December 1, 2001 ... 33
Item 3375H - Charge – Fuel Surcharge – (Issued April 3, 2007 – Effective April 25, 2007) (Increase) ... 35
Item 3380B - Charge – Fuel Surcharge on Coal Unit Train and Trainload Shipments – (Issued April 3, 2007 – Effective April 25, 2007) (Increase) ... 39
Item 3381A - Charge – Mileage-based Fuel Surcharge on Coal Unit Train and Trainload Shipments – (Issued April 3, 2007 – Effective April 25, 2007) (Increase) ... 40
Item 3400E – Credit Terms, - Issued July 7, 2005 – Effective July 27, 2005 ... 42
Item 3500A– Charge, Furnished Equipment Used for Offline Movements (See Exceptions 1, 2 and 3) – Issued February 24, 2004 – Effective March 15, 2004 ... 43

**SECTION 4 - Regulations Governing Currency Exchange On Traffic From, To, And Between Stations In Canada ... 44**
Item 4000 - Application ... 44
Item 4020 - Basis Rate of Exchange ... 44

***Item 3375H - Charge – Fuel Surcharge – (Issued April 3, 2007 – Effective April 25, 2007) (Increase)***

All tables in Sections A and B herein are calculated by determining the average price of Highway Diesel Fuel (HDF) in the month two months prior to the effective date of the Fuel Surcharge (FSC). Per example below, the HDF as calculated in May will be used for the applicable FSC in July.

**Example:**




SECTION A: Applying on carload traffic of EXEMPT commodities and all carload traffic moving under non-public rates with the following exceptions; this section does not apply when in conflict with Section B, Item 3375-Series, Item 3380-Series and Item 3381-Series of BNSF Rules Book 6100-Series herein. For a list of EXEMPT commodities, refer to STB Cite: 49CFR1039.11 at http://www.access.gpo.gov/nara/cfr/waisidx_00/49cfr1039_00.html.

Shipments made under pricin g documents referring hereto will be subject to a fuel surcharge, when applicable. When the U. S. Average Price of Retail On-Highway Diesel Fuel (HDF) monthly average equals or exceeds $1.25 per gallon, in the second calendar month prior to the month in which the fuel surcharge applies, a fuel surcharge, as shown in the Fuel Surcharge Table, will be applied to the total freight charges for each shipment waybill dated on or after the 1st day of the second following calendar month.

The fuel surcharge rates will be adjusted monthly. The Fuel Surcharge Table will be subject to periodic review. The fuel surcharge shall be included on the invoice for freight charges for each shipment.

The source for the price of HDF will be the U. S. Department of Energy's, EIA Retail On-Highway Diesel Prices Report, whose weekly average price is available on BNSF WebPages at:
http://www.bnsf.com/tools/prices/fuelsurcharge/index.html

**Fuel Surcharge Table**

| Time Periods Average Price of HDF Between | Applicable Fuel Surcharge | Time Periods Average Price of HDF Between | Applicable Fuel Surcharge |
|---|---|---|---|
| $1.25 to $1.299 | 0.5% | $1.90 to $1.949 | 7.0% |
| $1.30 to $1.349 | 1.0% | $1.95 to $1.999 | 7.5% |
| $1.35 to $1.399 | 1.5% | $2.00 to $2.049 | 8.0% |
| $1.40 to $1.449 | 2.0% | $2.05 to $2.099 | 8.5% |
| $1.45 to $1.499 | 2.5% | $2.10 to $2.149 | 9.0% |
| $1.50 to $1.549 | 3.0% | $2.15 to $2.199 | 9.5% |
| $1.55 to $1.599 | 3.5% | $2.20 to $2.249 | 10.0% |
| $1.60 to $1.649 | 4.0% | $2.25 to $2.299 | 10.5% |
| $1.65 to $1.699 | 4.5% | $2.30 to $2.349 | 11.0% |
| $1.70 to $1.749 | 5.0% | $2.35 to $2.399 | 11.5% |
| $1.75 to $1.799 | 5.5% | $2.40 to $2.449 | 12.0% |
| $1.80 to $1.849 | 6.0% | $2.45 to $2.499 | 12.5% |
| $1.85 to $1.899 | 6.5% | $2.50 to $2.549 | 13.0% |

(Item continued on next page)

*Item 3375H - Charge – Fuel Surcharge (Item Continued)*

**Fuel Surcharge Table**

| Time Periods Average Price of HDF Between | Applicable Fuel Surcharge | Time Periods Average Price of HDF Between | Applicable Fuel Surcharge |
|---|---|---|---|
| $2.55 to $2.599 | 13.5% | $2.80 to $2.849 | 16.0% |
| $2.60 to $2.649 | 14.0% | $2.85 to $2.899 | 16.5% |
| $2.65 to $2.699 | 14.5% | $2.90 to $2.949 | 17.0% |
| $2.70 to $2.749 | 15.0% | $2.95 to $2.999 | 17.5% |
| $2.75 to $2.799 | 15.5% | $3.00 to $3.049 | 18.0% |

Each $0.05 per gallon increase thereafter, apply an additional 0.5%

***Example:***

For a Fuel Surcharge applied for shipments in the month of April, assuming the prior Time Period's (February) average monthly price of HDF was $2.488 Per Gallon, April's Fuel Surcharge Rate (FSR) would be 12.5%. Thus, for each $100.00 of freight charges applicable to a shipment referring hereto the Fuel Surcharge would be $12.50.

---

SECTION B: Applying on Interline, Local Shipments (Routed BNSF Direct), Accounting Rule 11, Junction Settlement Short Lines of Agricultural Commodities and all Carload shipments of non-contract, non-boxcar regulated commodities moving on public rates. For a list of Agricultural Commodities, refer to BNSF web page at http://www.bnsf.com/tools/prices/fuelsurcharge/agstccs.html For a list of EXEMPT commodities, refer to STB Cite: 49CFR1039.11 at http://www.access.gpo.gov/nara/cfr/waisidx_00/49cfr1039_00.html.

Junction Settlement Carriers appear in the revenue route. To determine if the Short Line in question is a Junction Settlement Carrier, access BNSF web page under Customer Tools then Short Line Partners, http://domino.bnsf.com/website/shortlin.nsf/.

Shipments made pursuant to pricing documents referring hereto will be subject to a Mileage Based Fuel Surcharge (MBFS), when applicable. The MBFS will be calculated by multiplying the applicable fuel surcharge per mile times the number of miles per shipment.

The applicable fuel surcharge per mile, as shown in the Fuel Surcharge Table, will be determined by using the U. S. Average Price of Retail On-Highway Diesel Fuel (HDF). When the HDF monthly average equals or exceeds $1.25 per gallon, in the second calendar month prior to the month in which the MBFS applies, an MBFS will be applied to the total freight charges for each shipment waybill dated on or after the 1st day of the second following calendar month.

The MBFS will be adjusted monthly. The Fuel Surcharge Table will be subject to periodic review. The MBFS shall be included on the invoice for freight charges for each shipment.

The source for the price of HDF will be the U. S. Department of Energy's, EIA Retail On-Highway Diesel Prices Report, whose weekly average price is available on BNSF WebPages at: http://www.bnsf.com/tools/prices/fuelsurcharge/index.html

(Item continued on next page)

***Item 3375H - Charge – Fuel Surcharge (Item Continued)***

Mileage calculations will be based on Railway Miles as published in BNSF web page under Customer Tools then Rail Mileage Inquiry, http://www.bnsf.com/bnsf.was5/RailMiles/RMCentralController. The mileage calculation will apply between each shipment's billed origin and destination.

Application of PC*Miler Rail from ALK Technologies will be used for mileage-based fuel surcharge on Interline traffic based on the revenue route and applicable interchange with connecting carrier.

Exception: For Agricultural commodities, Pacific North West (PNW) export destinations will be grouped using Seattle, WA as destination upon which the mileage-based fuel surcharge will be calculated for all whole grain (STCC 011) shipments from all BNSF origin states except California, Oregon, or Washington.. Export destinations will be as follows:

**PNW Group:** Rivergate, OR, Portland, OR, Kalama, WA, Longview, WA, Seattle, WA, Tacoma, WA and Vancouver, WA. As an example, the fuel surcharge from Alton, ND to Vancouver, WA will be calculated using the miles from Alton, ND to Seattle, WA (1,496 miles).

Texas Gulf export facilities will be grouped using Houston, TX as the destination upon which the mileage-based fuel surcharge will be calculated for all whole grain (STCC 011 and STCC 2041979) shipments. Export destinations will be as follows:

**Texas Gulf Group:** Beaumont, Corpus Christi, Galena Park, Galveston, Houston and Port of Brownsville, TX. Shipments must be unloaded at these destinations. As an example, the fuel surcharge from Wichita, KS to Galveston, TX will be calculated using the miles from Wichita, KS to Houston, TX (646 miles).

**Fuel Surcharge Table**

| Time Periods Average Price of HDF Between | Fuel Surcharge Cents per Mile | Time Periods Average Price of HDF Between | Fuel Surcharge Cents per Mile |
|---|---|---|---|
| $0.00 to $1.249 | 0.00 | $2.13 to $2.169 | 0.23 |
| $1.25 to $1.289 | 0.01 | $2.17 to $2.209 | 0.24 |
| $1.29 to $1.329 | 0.02 | $2.21 to $2.249 | 0.25 |
| $1.33 to $1.369 | 0.03 | $2.25 to $2.289 | 0.26 |
| $1.37 to $1.409 | 0.04 | $2.29 to $2.329 | 0.27 |
| $1.41 to $1.449 | 0.05 | $2.33 to $2.369 | 0.28 |
| $1.45 to $1.489 | 0.06 | $2.37 to $2.409 | 0.29 |
| $1.49 to $1.529 | 0.07 | $2.41 to $2.449 | 0.30 |
| $1.53 to $1.569 | 0.08 | $2.45 to $2.489 | 0.31 |
| $1.57 to $1.609 | 0.09 | $2.49 to $2.529 | 0.32 |
| $1.61 to $1.649 | 0.10 | $2.53 to $2.569 | 0.33 |
| $1.65 to $1.689 | 0.11 | $2.57 to $2.609 | 0.34 |
| $1.69 to $1.729 | 0.12 | $2.61 to $2.649 | 0.35 |
| $1.73 to $1.769 | 0.13 | $2.65 to $2.689 | 0.36 |
| $1.77 to $1.809 | 0.14 | $2.69 to $2.729 | 0.37 |
| $1.81 to $1.849 | 0.15 | $2.73 to $2.769 | 0.38 |
| $1.85 to $1.889 | 0.16 | $2.77 to $2.809 | 0.39 |
| $1.89 to $1.929 | 0.17 | $2.81 to $2.849 | 0.40 |
| $1.93 to $1.969 | 0.18 | $2.85 to $2.889 | 0.41 |
| $1.97 to $2.009 | 0.19 | $2.89 to $2.929 | 0.42 |

(Item continued on next page)

*Item 3375H - Charge – Fuel Surcharge (Item Concluded)*

**Fuel Surcharge Table**

| Time Periods Average Price of HDF Between | Fuel Surcharge Cents per Mile | Time Periods Average Price of HDF Between | Fuel Surcharge Cents per Mile |
|---|---|---|---|
| $2.01 to $2.049 | 0.20 | $2.93 to $2.969 | 0.43 |
| $2.05 to $2.089 | 0.21 | $2.97 to $3.009 | 0.44 |
| $2.09 to $2.129 | 0.22 | $3.01 to $3.049 | 0.45 |

Each $0.04 per gallon increase thereafter, apply an additional $0.01 per mile

Example:
If February's average monthly price of HDF is $2.488 Per Gallon then the MBFS applied in April would be $0.31 per mile. Thus, for a shipment traveling 1,010 railway miles a Fuel Surcharge of $313.10 would apply.

---

# PX1021-PX1038

Filed Under Seal

# EXHIBIT

# PX1039

# THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY
# BNSF RULES BOOK 6100-A
(Cancels BNSF Rules Book 6100))

**CONTAINING**
**RULES, REGULATIONS AND SPECIAL CHARGES**
**GOVERNING**
**THE TRANSPORTATION OF FREIGHT**
**ON**
**THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY**
**IN**
**THE UNITED STATES AND CANADA**
**AND**
**REGULATIONS GOVERNING CURRENCY EXCHANGE ON TRAFFIC**
**FROM, TO AND BETWEEN STATIONS IN CANADA**
**AND**
**CAR HIRE ON TRAFFIC TO OR FROM MEXICO**

**For explanation of abbreviations / reference marks, see Item 110**

**ALSO APPLICABLE ON INTRASTATE TRAFFIC**

**ISSUED DECEMBER 29, 2000** **EFFECTIVE JANUARY 1, 2001**

**Issued by J. C. Engstrom, P. O. Box 961069, Ft. Worth, TX 76161-0069**

Table of Contents

Item 100 - BNSF Web Site ..... 4
Item 110 - Explanation of Abbreviations and Reference Marks ..... 4
Item 120 - Method of Canceling Items ..... 5
Item 130 - Notification of Changes ..... 5

**SECTION 1 - General Rules And Regulations ..... 6**
Item 1000 - Description of Governing Classification ..... 6
Item 1020 - Station Lists and Conditions ..... 6
Item 1040 - Explosives and Dangerous Articles ..... 6
Item 1060 - Reference to Tariffs, Items, Notes, Rules, etc. ..... 6
Item 1080 - Omnibus Clause ..... 6
Item 1100 - Application of Items to Non-Regulated Traffic ..... 7
Item 1120 - Consecutive Numbers ..... 7
Item 1130 – Car Capacity, Issued August 10, 2001 – Effective September 1, 2001 ..... 7

**SECTION 2 - Specific Rules And Regulations - Without Charges ..... 8**
Item 2000 - Charges Payable in United States Funds ..... 8
Item 2020 - Deductible on Loss or Damage of Iron or Steel Scrap ..... 8
Item 2040 - Defective Cars, Minimum Weights on Shipments Loaded In ..... 8
Item 2060 - Definition of "Intrastate" and "Interstate" Traffic ..... 8
Item 2080 - Distance, Method of Obtaining ..... 8
Item 2100 - Emergency Routing ..... 9
Item 2120 - Freight Damaged in Transit Between Stations on BNSF and CSP ..... 9
Item 2140 - Transaction Privileges and Educational Excise Taxes on Arizona Intrastate Traffic ..... 9
Item 2160 - Gross Receipts Tax on New Mexico Intrastate Traffic ..... 9
Item 2180 - Mileage Allowance Application ..... 9
Item 2200 - Order Bills of Lading, Non-Acceptance on Grain to Mexico ..... 10
Item 2220 - Receipt and Delivery of Freight, Restrictions On ..... 10
Item 2240 - Refused or Unclaimed Freight ..... 10
Item 2250A – Rule Governing Security-Type Seals Application, Issued January 31, 2002 – Effective March 1, 2002 ..... 10
Item 2260 - Return of Refused or Rejected Shipments ..... 11
Item 2270 – Cargo Loss, Damage and Delay Provisions/Liability Restriction - Issued April 04, 2002 – Effective April 05, 2002 ..... 11
Item 2280 - Rules Governing Transportation of Railway Passenger Cars ..... 13
Item 2320 – Prices Required Prior to Shipment, Issued October 10, 2001 – Effective November 1, 2001 ..... 13
Item 2340 – Method of Calculating Rail Cost Adjustment Factor Based Price Adjustments, Issued March 22, 2002 – Effective March 23, 2002 (Item Eliminated) ..... 14
Item 2360 – Electronic Movement Instructions for Scrap Paper, (Issued May 7, 2003 – Effective July 1, 2003) (New Item) (Increase) ..... 14

**SECTION 3 - Specific Rules and Regulations - With Charges ..... 15**
Item 3000B - Charge - Cancellation of Car Order, Issued July 11, 2002 – Effective August 1, 2002 ..... 15
Item 3020A - Charge - Cleaning and Disinfecting Cars, Cancelled Effective October 31, 2001 ..... 15
Item 3040A - Charge - Sugar Covered Hopper Cars Rejected for Cleaning, ..... 15
Cancelled Effective October 31, 2001 ..... 15
Item 3060 - Charge - Detention on Heavy Duty Flat Cars ..... 15
Item 3080C - Charge – Detention on Mechanical Refrigerator Cars, Issued November 15, 2002 – Effective December 1, 2002 ..... 16
Item 3100 - Charge - Attendants/Riders Accompanying Freight Shipments ..... 17
Item 3120 - Charge - On Traffic of Exceptional Dimensions or Weight ..... 18

Item 3140A - Charge - Document Delay Charges on Export Traffic to Mexico, Issued November 29, 2001 – Effective December 24, 2001 ........ 18
Item 3180A - Charge - Failure to Complete Unloading of Bentonite Clay, Cancelled Effective October 31, 2001 ........ 19
Item 3200A - Charge - Failure to Complete Unloading of Industrial Sand, ........ 19
Cancelled Effective October 31, 2001 ........ 19
Item 3220 - Charge - Free Time and Detention on Cars Delivered to Water Carriers at Vancouver, BC ........ 20
Item 3240 - Charge - Hazardous Materials Destined to Canada ........ 20
Item 3250 – Failure to Complete Unloading of Railcars, ........ 20
Issued October 10, 2001 – Effective November 1, 2001 ........ 20
Item 3260B - Charge - Failure to Complete Unloading of Sugar, Issued December 11, 2002 – Effective January 1, 2003 ........ 21
Item 3265A – Charge – Failure to Complete Unloading of Sugar Beet Pulp Pellets ........ 21
Cancelled Effective October 31, 2001 ........ 21
Item 3280 - Charge - Shipments Held for Orders ........ 21
Item 3300C - Charge - Special Freight Train Service – Issued February 28, 2003 – Effective March 21, 2003 23
Item 3320 - Charge - Turning of Empty Unit Train Cars ........ 24
Item 3340 - Charge - Destination Detention on Sugar Cars ........ 24
Item 3350 – Charge – Ride Quality Testing or Monitoring Equipment, Issued November 9, 2001 – Effective December 1, 2001 ........ 24
Item 3375C - Charge – Fuel Surcharge, (Issued May 7, 2003 – Effective June 1, 2003) (Increase) ........ 25
Item 3400D – Credit Terms, Issued February 24, 2003 – Effective February 25, 2003 ........ 26

**SECTION 4 - Regulations Governing Currency Exchange On Traffic From, To, And Between Stations In Canada ........ 28**
Item 4000 - Application ........ 28
Item 4020 - Basis Rate of Exchange ........ 28
Item 4040 - Governing Date for Application of Surcharge or Discount ........ 28
Item 4060 - Surcharge or Discount to be Shown on Freight Bills ........ 28

**SECTION 4A - Applicable when United States Currency Is At A *Premium* In Relation To Canadian Currency (Effective January 4, 2001) ........ 29**
Item 4100 - Surcharge ........ 29
Item 4120 - Domestic Traffic ........ 29

**SECTION 4B - Applicable when United States Currency is at a *Discount* in relation to Canadian Currency (Effective January 4, 2001) ........ 30**
Item 4200 - Discount or Surcharge ........ 30
Item 4220 - Domestic Traffic ........ 30

**SECTION 5 – Section Cancelled in Last Revision with an Effective Date of December 24, 2001 ........ 31**
Item 5000 – Item Cancelled Account Obsolete ........ 31
Item 5040 – Item Cancelled Account Obsolete ........ 32
Item 5060 – Item Cancelled Account Obsolete ........ 33
Item 5080 – Item Cancelled Account Obsolete ........ 34
Item 5100 – Item Cancelled Account Obsolete ........ 35

**SECTION 6 – Rules And Other Governing Provisions Specific Rules and Regulations Governing Frozen And Non-Frozen Commodities Requiring Mechanical Protective Service (transferred from BNERM 1), Issued January 16, 2001 – Effective January 17, 2001 ........ 36**

**Rules in Section 6 Take Precedence Over Any Conflicting Rules In This Book, Or In Section 1 of BNERM 1. ........ 36**
Item 6000 - Mechanical Refrigerated Equipment Furnished By Carrier ........ 36

Issued January 16, 2001 – Effective January 17, 2001 .... 36
Item 6020 - Private Owned Or Leased Cryogenic (CO2) Equipment .... 36
Item 6030 – Private Owned or Leased Mechanical Refrigerated Equipment, Issued March 6, 2002 – Effective April 1, 2002 .... 36
Item 6040A - Rules Governing Mechanical Protective Service or (MPS), Issued May 25, 2001 – Effective June 15, 2001 .... 37
Item 6060A - Operation Of BNSF Owned Or Controlled Mechanical Units, Issued March 8, 2002 – Effective April 1, 2002 .... 38
Item 6080 - Empty Movement Of Privately Owned Cars .... 38
Item 6100 - Return Of Pallets, Pallet Sides, Platforms, Skids, Dunnage, Etc. .... 38
Item 6120 - Offer Of Section 11706 ('Carmack') Liability .... 38
Item 6120 - Offer Of Section 11706 ('Carmack') Liability (Concluded) .... 39
Item 6140A - Loss And Damage Provisions/Liability Restrictions, Issued May 25, 2001 – Effective June 15, 2001 .... 39
Item 6160 - Claim Procedures, Issued January 16, 2001 – Effective January 17, 2001 .... 41
Item 6180 - Mechanical Protective Service Charges BNSF Owned Or Controlled Mechanical Refrigerated Cars Charges In Dollars Per Car .... 43
Item 6200 - Stopping .... 44
Item 6220 - Mexico .... 44
Item 6240A - Cleaning Fees, Issued November 12, 2002 – Effective January 1, 2003 .... 44

*Item 100 - BNSF Web Site*

This Book is now available on the Internet for viewing or sending directly to your printer. The BNSF Home Page address is http://www.bnsf.com. BNSF has provided a link to the Adobe Homepage so that Acrobat Reader software can be downloaded onto your computer allowing you to print a copy, on your Personal Computer, that will mirror the hard copy you now get via mail. BNSF is also exploring ways to send interested parties an EMail message whenever an amendment or reissue of this Book takes place. Our ultimate goal is to have you, the user of this Book, obtain your copy of the printed information contained in this Book directly from the BNSF web site. **Beginning January 1, 2001 an annual $100 subscription fee will be assessed for those who wish to receive a hard copy through the mail.**

If, at this time, you are not prepared to obtain a copy of this Book directly from the BNSF web site, then a hard copy of this Book will be mailed to you, provided you furnish, to the address shown below, a formal written request for a printed copy. This formal request is required on an annual basis in accordance with the Surface Transportation Board's recent policy decision under Ex Parte 528, Disclosure, Publication, and Notice of Change of Rates and Other Service Terms for Rail Common Carriage.

If your company is already using the Internet and you visit the BNSF web site, your comments regarding access to the Book would be appreciated. If you are not currently using the Internet, your comments regarding the above concept would also be appreciated. All comments should be directed to:

Manager Auxiliary Prices
The Burlington Northern and Santa Fe Railway Company
P. O. Box 961069
Ft. Worth, TX 76161-0069

*Item 110 - Explanation of Abbreviations and Reference Marks*

| ABBREVIATION | EXPLANATION |
|---|---|
| BNSF | Burlington Northern and Santa Fe Railway Company, The |
| BOE | Bureau of Explosives |
| CFR | Code of Federal Regulations |
| CSP | Camas Prairie Railnet, Inc |
| OPSL | Official List of Open and Prepay Stations |
| NSRQ | Norfolk Southern Rate Quotation |
| RER | Official Railway Equipment Register |
| TM | The Texas Mexican Railway Company |
| UFC | Uniform Freight Classification |
| US | United States |

| REFERENCE MARK | EXPLANATION |
|---|---|
| (A) | Denotes increase. |
| (B) | Denotes reduction. |
| (C) | Denotes changes in wording which result in neither increases nor reductions in charges. |

*Item 120 - Method of Canceling Items*

As this book is revised, numbered items with letter suffixes will be used in alphabetical sequence starting with A. Example: Item 3000-A cancels item 3000, and item 3000-B cancels item 3000-A in a prior revision, which in turn cancelled item 3000.

*Item 130 - Notification of Changes*

1. As items in this book are revised, the remarks "Increase, Reduction or Change in Wording" will be shown in parenthesis to the right of the effective date of the item.

   Example:

   **Item 1000 – Description of Governing Classification**
   Issued March 1, 2001 – Effective April 1, 2001 **(Change in Wording)**

2. In addition, the effective date of the revised item will be added in parenthesis to the Table of Contents on page 1 to identify which item(s) have been changed.

   Example:

   Item 1000 – Description of Governing Classification **(Effective April 1, 2001)**

3. The paragraph that has been changed within the item will contain one of the following reference marks placed at the end of the paragraph.

   (A) Denotes Increase.
   (B) Denotes reduction. `
   (C) Denotes changes in wording which result in neither increases nor reductions in charges.

   Example:

   The term "Uniform Freight Classification", when used herein, means UFC 6000-Series. **(C)**

## SECTION 1 - General Rules And Regulations

***Item 1000 - Description of Governing Classification***

The term "Uniform Freight Classification", when used herein, means UFC 6000-Series.

***Item 1020 - Station Lists and Conditions***

This Book is governed by OPSL 6000-Series to the extent shown below:

A. For additions and abandonments of stations, and, except as otherwise shown herein, for prepay requirements, changes in names of stations, restrictions as to acceptance or delivery of freight, and changes in station facilities. When a station is abandoned as of a date specified in OPSL 6000-Series, the rates from and to such station are inapplicable on and after that date.

B. For geographical locations of stations.

C. For the identification of stations when stations are shown or referred to by numbers.

***Item 1040 - Explosives and Dangerous Articles***

For rules and regulations governing the transportation of explosives and other dangerous articles, also specifications for shipping containers, and restrictions governing the acceptance and transportation of explosives and other dangerous articles, see BOE 6000-Series.

***Item 1060 - Reference to Tariffs, Items, Notes, Rules, etc.***

Where reference is made in this Book to tariffs, items, notes, rules, etc., such references are continuous and include supplements to and successive issues of such tariffs and reissues of such items, notes, rules, etc.

***Item 1080 - Omnibus Clause***

Except as otherwise provided, shipments made under rates referring to this Book are entitled to the following services: Car service, demurrage, drayage, diversion, inspection, reconsignment, stopping, storing, switching, transfer, weighing and other Terminal Services, and are subject to the charges therefor, if any, of the carrier performing the service.

---

***Item 1100 - Application of Items to Non-Regulated Traffic***

On non-regulated rail traffic, such as that transported under an exempt transportation contract, under an exempt rate quotation, or under an exempt rate memorandum, except to the extent that special provisions for accessorial services to be provided by BNSF are stated within the transportation contract, exempt rate quotation or exempt rate memorandum, the rules, regulations and charges for such accessorial services will be as set forth in tariffs or books to which BNSF is a party and shall apply to the same extent and in the same manner as if the subject transportation had been regulated.

As a partial listing of the accessorial services described herein, and not in limitation thereof, accessorial services are defined to include demurrage, detention of freight cars, diversion, holding cars, inspection, protective service, reconsignment, reweighing, special freight train service, spotting, stoppage to complete loading or partly unload, storage, switching, transit, weighing, and other services not specified above.

---

***Item 1120 - Consecutive Numbers***

Where consecutive numbers are represented in this Book by the first and last numbers connected by the work "to" or a hyphen, they will be understood to include both of the numbers shown and all numbers in between the first and last numbers.

If the first number only bears a reference mark, such reference mark also applies to the last number shown and to all numbers between the first and last numbers.

---

***Item 1130 – Car Capacity, Issued August 10, 2001 – Effective September 1, 2001***

Car capacity parameters, formerly based on Nominal Capacity, are now based on Load Limit. For marked capacities, lengths, dimensions and cubical capacities of cars, see Equipment Characteristics at http://www.bnsf.com/cws/eqpumler/index.html.

## SECTION 2 - Specific Rules And Regulations - Without Charges

### *Item 2000 - Charges Payable in United States Funds*

Except as otherwise provided, rates and charges in this Book, and those making reference to this Book, are stated in money of the United States and are payable in United States' dollars or its equivalent.

---

### *Item 2020 - Deductible on Loss or Damage of Iron or Steel Scrap*

No claim or suit for the physical loss or damage to any shipment of Iron or Steel Scrap, transported via BNSF, shall be made or filed by a Customer for amounts of $250.00 or less (Minimum Claim Amount). If customer's proven loss or damage is in excess of the Minimum Claim Amount, the Minimum Claim Amount shall be deducted from any claim made against carrier(s) for any shipments transported by the carrier(s).

---

### *Item 2040 - Defective Cars, Minimum Weights on Shipments Loaded In*

If, by reason of the character, construction, or age of equipment furnished, the minimum carload weight, as specified in the tariffs or classifications, cannot be loaded, the minimum weight to be charged for on shipments loaded therein shall not exceed the safe loading capacity as determined by the Operating, Transportation or Inspection Departments.

---

### *Item 2060 - Definition of "Intrastate" and "Interstate" Traffic*

A. The term "Intrastate Traffic" applies to traffic having origin, destination and entire transportation within the same state.

B. The term "Interstate Traffic" applies to:

   1. Traffic having origin in one state and destination in another state; or

   2. Traffic having origin and destination within the same state when transported via a route operating through another state.

---

### *Item 2080 - Distance, Method of Obtaining*

Various charges in documents referring to this Book are based on mileages. To determine miles refer to BNSF Internet Public Rate Retrieval or BNSF Rail Mileage Inquiry at BNSF.com. When rates are not shown for exact distances, use rates for next greater distance.

---

---

*Item 2100 - Emergency Routing*

Rates in documents referring to this Book will apply only via the routes and junction points authorized therein, except that when in the case of pronounced traffic congestion (not an embargo), washout, wreck, or other similar emergency, or through carrier's error, carriers forward shipment via other junction points of the same carriers, the rate to apply will be that specified in the document referring to this Book but not higher than the rate applicable via the route of movement.

---

*Item 2120 - Freight Damaged in Transit Between Stations on BNSF and CSP*

The following applies on freight shipments that are damaged in transit when moving via the BNSF from or to stations on the CSP.

1. Shipments damaged in transit and refused by consignees, will, upon order of the Director, Freight Claims, Topeka, KS, be returned to shippers via the route and line over which such shipments moved, free of any charges, or, at carrier's option, be forwarded to such point on its lines that offer the best facilities or opportunities for advantageous disposal.

2. Shipments refused by consignees owing to causes for which the carrier is wholly responsible, will, upon order of the Director, Freight Claims, Topeka, KS, be returned to shippers free of any charges, in the same manner as provided for shipments damaged in transit.

---

*Item 2140 - Transaction Privileges and Educational Excise Taxes on Arizona Intrastate Traffic*

All carload rates and charges in connection with Arizona intrastate traffic are subject to the Arizona transaction privileges and educational excise taxes in effect at the time of shipment.

---

*Item 2160 - Gross Receipts Tax on New Mexico Intrastate Traffic*

All carload rates and charges in connection with New Mexico intrastate traffic are subject to the New Mexico Gross Receipts Tax in effect at the time of shipment.

---

*Item 2180 - Mileage Allowance Application*

By use of rates making reference to this Book, shipper warrants that its interest in the equipment used under rates subject to this Book is sufficient to permit it to waive full payment of mileage allowance. Shipper will, and BNSF will not, be liable for mileage allowances in excess of the above obligation. In the event that a party other than the shipper using these rates submits a claim to railroad for mileage allowance payments in excess of BNSF's obligation under this tariff, shipper shall, at BNSF's option, either (1) release, defend and indemnify BNSF from said claim including attorney's fees and cost of litigation, or (2) reimburse BNSF for excess mileage allowances paid by BNSF within thirty (30) days of notice by BNSF.

---

---

***Item 2200 - Order Bills of Lading, Non-Acceptance on Grain to Mexico***

Shipments of Grain and Grain Products, as defined in Tariff BNSF 4022-4023 Series, from BNSF origins to destinations in Mexico may only be made under a Straight Bill of Lading. Order Bills of Lading for shipments of Grain and Grain Products billed to destinations in Mexico will not be accepted by the BNSF.

---

***Item 2220 - Receipt and Delivery of Freight, Restrictions On***

Nothing in tariffs to which BNSF is a party shall require BNSF to receive or deliver any carload or less than carload shipment when such receipt or delivery is impracticable because of any riot, strike, picketing or other labor disturbance.

---

***Item 2240 - Refused or Unclaimed Freight***

The following practice will be followed in the handling of freight which is refused or unclaimed.

A. Non-Perishable Freight Consignee, as described in the waybill, will be notified promptly of the arrival of shipments at destination. In case of refusal by consignee to accept the freight, or if freight is unclaimed five days after notice of arrival has been duly sent or given, consignor will be sent a notice showing:

   Name of consignee
   Description of freight
   Point of origin and date of shipment whether property has been refused or remains unclaimed;

   which notice should also state substantially that if disposition is not arranged for, the property will be subject to sale as provided in Section 4, Paragraph (b) of the Uniform Bill of Lading as published in Tariff UFC 6000-Series.

B. Perishable Freight Consignee will be notified promptly of the arrival of perishable freight, but whenever necessary to prevent loss or waste, perishable freight which is refused, unclaimed or undelivered may be sold at the discretion of the carrier, without advertising and without further notice, as provided in Section 4, Paragraph (c) of the Uniform Bill of Lading as published in Tariff UFC 6000-Series.

---

***Item 2250A – Rule Governing Security-Type Seals Application, Issued January 31, 2002 – Effective March 1, 2002***

It is the shipper's responsibility to protect the safety and integrity of their lading, including but not limited to, the application of security-type seals to shipments for prevention of unauthorized access to lading. While in its custody, BNSF acknowledges its responsibility to maintain the integrity of the lading commensurate with its applicable common carrier or contract carrier obligation. However, the mere presence of a broken seal or missing seal, alone does not deem the lading to be contaminated or adulterated. Accordingly, BNSF will not acknowledge responsibility for alleged contamination or adulteration unless there is evidence to support same. Likewise, the shipper is responsible to provide documentary evidence that each shipment is properly protected with security seals prior to release at origin.

---

*Item 2260 - Return of Refused or Rejected Shipments*

A. When a shipment has reached destination but is refused or rejected and not unloaded and is returned to the original point or a directly intermediate point, the return movement will be subject to (1) the rate, minimum weight and route from the original point in effect on date shipment is tendered for return, or (2) to the rate, minimum weight and route applicable for such return movement, if lower.

B. When the refused or rejected shipment moved to destination from a transit station on a reshipping or transit balance rate, the return movement to the transit station will be subject to (1) the local or joint carload rate, minimum weight and route from the transit station to destination in effect on date shipment is tendered for return, or (2) to the rate, minimum weight and route applied for such return movement, if lower.

C. When a refused or rejected car was part of a shipment subject to multiple car or unit train rates, the return movement will be subject to (1) the applicable single car rate, minimum weight and route from the original shipping point to destination in effect on date shipment is tendered for return, or (2) to the rate, minimum weight and route applied for such return movement, if lower.

D. The provision of this item do not apply to Coal (STCC 11).

---

*Item 2270 – Cargo Loss, Damage and Delay Provisions/Liability Restriction - Issued April 04, 2002 – Effective April 05, 2002*

The provisions of 49 U.S. C. § 11706 do NOT apply to shipments which are governed by the terms of this Rule Book.

Carrier* will not be liable for loss, damage or delay to lading caused by an Act of God, a public enemy, the authority of law, labor strikes, acts of civil disobedience, the inherent nature or character of the lading, natural shrinkage, an act or default of the shipper/consignor, owner or consignee/receiver, or from any cause whatsoever which occurs while the lading is not in the actual physical custody and control of Carrier.

Shipper is responsible for proper and lawful packaging, loading, stacking, blocking, bracing and ventilation of the cargo. Shifting of a load enroute is, of itself, not evidence of Carrier mishandling. If other than a vehicle** with mechanical protection against heat and cold is requested by the shipper/consignor, Carrier is not responsible for the deterioration of the product which may occur because of temperature within the vehicle. Shipper is responsible for affixing a seal to each vehicle door or hatch.

Shipper acknowledges and accepts the inherent tendency of perishable goods to deteriorate or decay. Carrier is not liable for the decline of goods as is reasonably expected to occur while enroute. Carrier is not liable for the decline of goods attributable to disease or decay within the goods when loaded.

Carrier is not liable for shortage of lading unless there is physical evidence of unauthorized forced entry into the vehicle while in Carrier's possession. Shortage claims must be verified and supported by an actual tally of packages loaded at origin and an actual tally of packages unloaded at destination. Origin and destination seal records must be furnished.

Carrier agrees to transport shipments with reasonable dispatch. Carrier does not guarantee rail service within any particular time frame. Carriers maximum liability for cargo is the lower of its original cost or the cost of replacement. Carrier is not liable for special or consequential damages or for damages due to market decline. Carrier will not be responsible for any loss, damage or delay to cargo that occurs outside of the United States or Canada.

(Item continued on next page)

*Item 2270 – Cargo Loss, Damage and Delay Provisions/Liability Restrictions (Continued)*

A claimant must mitigate its damage by acceptance of damaged cargo unless the goods are totally worthless. A claimant may not abandon damaged goods to Carrier when the damaged lading retains more than minimal value. Product that is abandoned to Carrier in an undamaged condition will be sold and the salvage proceeds only, less salvage expenses, will be remitted to the owner.

There shall be no presumption of carrier fault for the loss, damage or delay of cargo. The burden of proof to establish the culpability of Carrier is upon the claimant. Carrier is not liable for any loss, damage or delay of cargo, except where Carrier's intentional act or omission, gross negligence or simple negligence is the direct and proximate cause of the injury. If Carrier's act or omission is not the sole cause of the injury but contributes to the loss, damage or delay to the cargo, then Carrier will be liable only for that portion of the injury as corresponds to its comparative culpability.

Carrier's maximum liability per vehicle is $ 250,000.00. BNSF will not be liable for damage where BNSF's liability is determined to be $250.00 or less per vehicle. No claim will be filed or paid for injury to lading of less than $ 250.00 per vehicle. (Not applicable when in conflict with Item 6160 of this Rules Book.) (C)

**Filing of Claim**

As a condition precedent to the recovery on any claim, Carrier and shipper/consignor must be notified promptly upon discovery of the injury to cargo and Carrier must be allowed to inspect the lading. Failure of Carrier to inspect the cargo will not constitute an admission of liability by Carrier or alter the burden of proof on claimant to establish the liability of Carrier.

If the location of the loss, damage or delay to the cargo is known to the claimant, the claim must be filed with that rail carrier on whose line the injury occurred. Otherwise, the claim may be filed with any linehaul rail carrier in the route of movement.

As a condition precedent for recovery against Carrier, a claim for loss, damage or delay to the cargo must be filed within nine months of the date of delivery of nine months of the reasonably anticipated date of delivery if delivery is not made. Should Carrier decline a claim, suit thereon may not be brought more than nine months after the date of Carrier's written declination. Federal carrier law governs the determination of liability; no State or common law causes of action will be recognized. A lawsuit against Carrier based on indemnification must satisfy the aforestated time limitations for filing a claim and for initiating a lawsuit.

A claim must be in writing and must include the following documentation:

Information identifying the rail shipment, including vehicle initial and number, shipper's/consignor's and consignee's/receiver's name, address and telephone number, shipping date, and commodity.

Origin records or certification on the condition and quantity of the lading at the time the goods were tendered to the origin carrier.

Destination records or certification on the condition and quantity of the lading at the time the goods were received from the destination carrier.

A demand for payment of a specific amount, with a statement of the formula or basis on which the damages are calculated, plus evidence in support of the calculation.

Documentation as to disposition of damaged lading and the salvage proceeds therefrom.

On a fresh fruit or vegetable claim, origin and destination USDA inspection reports or the Canadian government equivalent.

(Item continued on next page)

### *Item 2270 – Cargo Loss, Damage and Delay Provisions/Liability Restrictions (Concluded)*

A freight loss, damage or delay claim filed with BNSF is to be mailed to:

Director, Freight Claims
Burlington Northern Santa Fe Railway
Post Office Box 1738
Topeka, Kansas 66601

**Full Liability Transportation Service**

As an alternative to the foregoing Restricted Liability provisions, Carrier offers Full Liability transportation subject to the terms and conditions of 49 U.S.C.§ 11706 (Carmack Amendment) at a rate or charge higher than that applicable to transportation under restricted liability terms. If the shipper elects the Carmack Amendment alternative, it must: (a) not later than the time that the railcar is ordered for loading, notify Carrier of its intention to subject the shipment to 49 U.S.C. § 11706 and obtain from the Carrier the applicable transportation rate or charge; (b) place on the bill of lading or shipping order the notation "Shipment is subject to 49 U.S.C. § 11706"; and acknowledge that the linehaul transportation charge will be billed 'prepaid'. The shipper's failure to comply strictly with all of the requirements for transportation subject to 49 U.S.C. § 11706 shall create a conclusive presumption that the shipment is intended for transport on the Restricted Liability terms of this Item.

* "Carrier" includes BNSF Railway and all of its connecting linehaul and switching railroads on any shipment for which this Rule Book applies.
** "Vehicle" includes a railcar of any description, a trailer, or a container.

---

### *Item 2280 - Rules Governing Transportation of Railway Passenger Cars*

Except as otherwise provided, BNSF will not accept for transportation over its line or for placement or storage on its tracks or in its yards any railway passenger car or railroad business car, with or without passengers.

---

### *Item 2320 – Prices Required Prior to Shipment, Issued October 10, 2001 – Effective November 1, 2001*

BNSF will issue freight bills based on rates that are in effect at the time shipments are tendered to us for movement. Please show the applicable price authority number on your bills of lading (e.g., BNSFQ 12345).

BNSF will not allow backdated pricing to cover carload shipments where the customer tendered a shipment prior to a price agreement or after a price agreement has expired. If no other price is in place at the time of movement, existing public prices will be used. For joint line shipments, if an existing through price is not in place, then BNSF will rate and bill these as Rule 11 shipments. This means each line haul railroad will bill the customer for their portion of the shipment

---

***Item 2340 – Method of Calculating Rail Cost Adjustment Factor Based Price Adjustments, Issued March 22, 2002 – Effective March 23, 2002 (Item Eliminated)***

***Item 2360 – Electronic Movement Instructions for Scrap Paper, (Issued May 7, 2003 – Effective July 1, 2003) (New Item) (Increase)***

BNSF will no longer accept or process movement instructions (bill of lading, switch instructions) for scrap paper other than by the electronic methods listed below:

a. System to System Electronic Data Interchange (EDI).
b. BNSF Shipping Instruction tool on the Internet.
c. Rail Industry Shipping Instructions tool on the Internet.
d. Agilink – PC – based billing package.
e. Fax to Third Party billing service.

BNSF will also require complete billing prior to the movement in order to ensure efficient handling of the shipment. If a car is released from the loading facility without billing instructions, the standard demurrage charge per Item 1100-Series of BNSF Demurrage Book 6004-Series will apply plus $75 per day for holding charges until billing is provided by an appropriate method. Consignor / Loader will also be subject to switching charges as outlined in BNSF Switching Book 8005-Series.

## SECTION 3 - Specific Rules and Regulations - With Charges

### *Item 3000B - Charge - Cancellation of Car Order, Issued July 11, 2002 – Effective August 1, 2002*

A. The provisions of this paragraph are no longer applicable.

B. A cancellation charge of $75.00 per car, except Mechanical Refrigerator cars a charge of $300.00 per car, will be applied whenever a car that is already applied to a car order and that car order is canceled, reduced or changed. One of the following conditions must be met before charges are applicable:

1. If order is for equipment furnished by BNSF, cars must be spotted at industry at the time the order is canceled, reduced, or changed (See EXCEPTION); or

2. If order is for equipment furnished by a foreign carrier, cars must be placed on interchange track, already received by BNSF, or spotted at industry at the time the order is canceled, reduced or changed.

3. If order is for equipment ordered by foreign carrier from BNSF, cars must be placed on interchange track or already delivered to foreign carrier at time the order is canceled, reduced or changed (See NOTE).

EXCEPTION: The cancellation charge does not apply to BNSF owned or leased equipment ordered to load commodities covered by Tariff BNSF 4022-Series and BNSF 4023-Series. For provisions to apply see Item 12163 of BNSF 4022-Series and BNSF 4023-Series.

NOTE: BNSF will not absorb any charges assessed by a foreign carrier for the handling of a car ordered and not used in transportation service. Any charges assessed by the foreign carrier will be billed to the party canceling the order.

---

### *Item 3020A - Charge - Cleaning and Disinfecting Cars, Cancelled Effective October 31, 2001*

When BNSF is required to disinfect or clean a box car under State, Federal, County, or Municipal regulations, a charge of $234.00 per car will be assessed against the freight payor of the shipment for which such cleaning and disinfecting is made. This charge will be in addition to any applicable charge for fumigation.

---

### *Item 3040A - Charge - Sugar Covered Hopper Cars Rejected for Cleaning, Cancelled Effective October 31, 2001*

Empty Covered Hopper Cars, last containing Sugar (STCC 20-621 and 20-629), rejected for cleaning will be subject to a charge of $800 when the prior load was originated by the current shipper rejecting the car.

---

### *Item 3060 - Charge - Detention on Heavy Duty Flat Cars*

For detention and use charges on heavy duty flat cars, see Tariff RPS 6740-Series.

---

***Item 3080C - Charge – Detention on Mechanical Refrigerator Cars, Issued November 15, 2002 – Effective December 1, 2002***

This item applies only on railroad owned or railroad controlled Mechanical Refrigerator Cars. The charges herein apply whether or not the refrigeration unit is running. In determining the assessment of charges, Sundays will be considered chargeable days and the 12 Holidays as listed in BNSF Demurrage Book 6004, Item 140 series will be considered free days. (See Exception 1)

Detention will be calculated from the first 12:01 a.m. after loaded cars are actually placed at destination, or are constructively placed either short of destination or at destination, and will continue until such time as cars are released empty back to the railroad. After three days, detention charges of $50.00 per day per car for cars with inside length of 63 feet or less and $100.00 per day per car for cars with inside length greater than 63 feet will be assessed against the party unloading the railcars. Also, detention will be calculated from the first 12:01 a.m. after empty cars are actually placed at origin, or are constructively placed either short of origin or at origin, or if actually placed prior to the date ordered from the first 12:01 of the order date, and will continue until such time as cars are released as a load with proper billing. After three days, detention charges of $50.00 per day per car for cars with inside length of 63 feet or less and $100.00 per day per car for cars with inside length greater than 63 feet will be assessed against the party loading the railcars.

All detention charges will be issued by BNSF and are payable to BNSF whether the loader or unloader is located on the BNSF, served through reciprocal switching or is located offline from the BNSF.

Exception:

1. This exception applies to mechanical refrigerator cars moving in BNSF revenue line haul service. When actual placement for loading or unloading is on Friday or Saturday, the Saturday preceding the first Sunday is non-chargeable and the first Sunday is non-chargeable. All subsequent Saturdays and Sundays are chargeable.

***Item 3100 - Charge - Attendants/Riders Accompanying Freight Shipments***

A. This item applies for transportation in freight service of each attendant/rider accompanying freight shipments where such transportation is reasonably required. This item will apply only when advance arrangements have been made between the party to accompany freight shipment and BNSF. Each attendant/rider accompanying a shipment under the provisions of this item must execute a BNSF Release Form in accordance with Rule 43 of the Uniform Freight Classification Tariff UFC 6000-Series prior to movement of shipment. Bill of lading covering shipment must indicate when attendant/rider will accompany the shipment, number of such attendants/riders, and points between which they are to accompany the shipment. BNSF is not required to furnish special accommodations for person(s) riding freight trains.

B. The one-way charge for each attendant/rider accompanying freight shipments is as follows:

BNSF Charge Per Attendant/Rider

| BNSF Mileage | Charge Per Attendant/Rider |
|---|---|
| 1000 or less | $250.00 |
| 1001 to 2000 | $400.00 |
| 2000 and over | $650.00 |

To determine miles, refer to BNSF Internet Public Rate Retrieval or BNSF6003 Rail Mileage Inquiry at www. BNSF.com.

*Item 3120 - Charge - On Traffic of Exceptional Dimensions or Weight*

Traffic of exceptional dimensions or weight, which can only be handled subject to restrictions when accompanied by representatives of the Track and Signal Departments to remove and replace switch stands, targets, and dwarf signals, reinforcing of bridges or track or any extra work required to be done over and above normal handling by representatives of Car or Engineering Department to accompany load for safety reasons, will be subject to additional charges over and above the freight charges based on actual cost incurred by BNSF for services performed.

---

*Item 3140A - Charge - Document Delay Charges on Export Traffic to Mexico, Issued November 29, 2001 – Effective December 24, 2001*

Carload shipments moving from the United States to Mexico via any Texas-Mexico border crossing points are subject to the following provisions when held on the BNSF awaiting clearance of Mexican Customs and release for entry into Mexico.

A. Calculations of Charges:

1. Seventy-two (72) hours free time will be allowed for the surrender of all documentation necessary for the clearance of Mexican Customs and release for entry into Mexico.

2. Free time will be computed from the first 12:01 a.m. after "Despacho Previo" (See Note) notification. Saturdays, Sundays, and holidays will be excluded in the computation of free time except as noted below.

   Note: "Despacho Previo" is a Mexican Customs' program to pre-document exports from the United States into Mexico prior to the interchange of cars to a Mexican railroad.

3. Following the expiration of free time, a Document Delay charge of $50.00 per car, per day, or fraction thereof, will be assessed until the car is released for entry into Mexico.

4. Saturdays, Sundays, and holidays, occurring subsequent to any chargeable day, will be considered chargeable days.

B. Notification and Release:

1. "Despacho Previo" notification will be sent or given by the BNSF to the consignee, or party designated by the shipper to receive same, when unit enters the BNSF computer system through customer shipping instructions or interchange receipt from connections carriers.

2. Cars will be considered to be "released" for entry into Mexico when all of the following requirements have been met:

   (a) All freight and accessorial charges due the BNSF have been paid; and

   (b) All requirements to legally export the shipment from the United States to Mexico have been met, and the required documents are furnished to the BNSF; and

(continued on next page)

---

*Item 3140A - Charge - Document Delay Charges on Export Traffic to Mexico (concluded)*

(c) All requirements to legally import the shipments into Mexico have been met and proof furnished to the BNSF.
(d) Shipping instructions have been received by the Mexican rail carrier.

C. Holidays:

The following United States and Mexican holidays will be recognized as holidays in the calculation of charges:

New Year's Day – January 1
Martin Luther King Day – Third Monday of January
Constitution Day - February 5
Presidents Birthday – Third Monday of February
Birthday of Benito Juarez - March 21
Good Friday – Friday before Easter Sunday
Labor Day - May 1
Memorial Day – Last Monday of May
Independence Day – July 4
Labor Day – First Monday of September
Independence Day – September 16
Anniversary of Mexican Revolution - November 20
Thanksgiving Day – Fourth Thursday of November
Christmas Day – December 25

---

*Item 3180A - Charge - Failure to Complete Unloading of Bentonite Clay, Cancelled Effective October 31, 2001*

Open-top or covered hopper cars of Bentonite Clay (STCC 14-511-10 and 32-952-32), which are released from unloading, but have not been completely unloaded, will incur a cleaning charge of $350.00 per car. Such charge will be assessed against the consignee or party responsible for releasing the car before all of the lading has been removed. Refer to Rules 14 and 27 in Tariff UFC 6000-Series.

---

*Item 3200A - Charge - Failure to Complete Unloading of Industrial Sand, Cancelled Effective October 31, 2001*

Covered hopper cars of Industrial Sand (STCC 14-413), which are released from unloading, but have not been completely unloaded, will incur a cleaning charge for any material over 1,000 pounds at a rate of $75.00 for each 2,000 pounds of material over the first 1,000 pounds. Such charge will be assessed against the consignee or party responsible for releasing the car before all of the lading has been removed. Refer to Rule 27 in Tariff UFC 6000-Series.

---

---

*Item 3220 - Charge - Free Time and Detention on Cars Delivered to Water Carriers at Vancouver, BC*

This item applies on all railroad and railroad controlled cars for which BNSF pays or receives per diem, including BNSF owned or leased cars.

A. Seven (7) days free time will be allowed from the arrival of loaded or the availability of empty cars for delivery to a water carrier at the BNSF terminal yard in Vancouver, BC, and shall be considered delivered following notification.

B. Free time will begin at the first 12:01 a.m. following telephone notification, confirmed by Fax transmission of the arrival of loaded cars; or the telephone notification of empty cars available at the BNSF terminal yard in Vancouver, BC.

C. After expiration of the free time, the following detention charges apply:

   $20.00 per car per day for each of the first fourteen (14) days; and
   $60.00 per car per day for each subsequent day.

D. Once detention charges commence, charges are applicable until cars are returned to BNSF tracks in Vancouver, BC.

E. Traffic subject to the provisions of this item are not subject to the provisions of BNSF Demurrage Book 6004-Series, except that the provisions of Item 110 (Charges on Cars Containing Explosives or Hazardous Materials) to BNSF Demurrage Book 6004-Series will apply.

---

*Item 3240 - Charge - Hazardous Materials Destined to Canada*

When a shipment of Hazardous Materials arrives at a border crossing between the United States and Canada without proper documentation in compliance with Canadian Transport Commission Regulations, including the Canadian Hazardous Materials Description and proper Canadian Hazardous Materials Placards attached to the car, and the shipment must be held by BNSF at the border crossing, a charge of $88.00 per day, or portion of a day, will be assessed from the first 7:00 a.m. following notice to the consignor that the shipment is being held awaiting proper documentation and/or placards.

Demurrage and storage charges named in BNSF Demurrage Book 6004-Series will also apply.

---

*Item 3250 – Failure to Complete Unloading of Railcars,*
*Issued October 10, 2001 – Effective November 1, 2001*

Upon arrival and placement of railcars for unloading at destination, unloader will be responsible for unloading equipment in a manner which does not damage equipment, and for releasing equipment in a condition suitable for reloading by another shipper. Customers who refuse or fail to remove all lading, dunnage blocking, bracing, strapping, debris or other material that was part of the inbound shipment, secure interior loading devices, and close doors will be subject to a penalty charge of $500.00 per car plus the actual cost incurred by BNSF to remedy this situation.

---

***Item 3260B - Charge - Failure to Complete Unloading of Sugar, Issued December 11, 2002 – Effective January 1, 2003***

When Covered Hopper Cars of sugar, which are released from unloading, but have not been completely unloaded, are returned to the original shipping point for reasons other than carrier's error, the return will be subject to one of the following conditions, whichever is lower, with a minimum charge of $750: (1) to the rate, minimum weight, and route applicable for such return movement; or (2) the rate, minimum weight, and route from the original point in effect on the date shipment is tendered for return, to the actual weight of the return movement.

Cars will be considered as completely unloaded if the sugar remaining in the car does note exceed three (3) percent of the weight of the last loaded movement.

Cars originating at Billings, MT; Lovell, WY; Longmont, CO; Sterling, CO; Rocky Ford, CO; Ft. Morgan, CO; Bayard, NE; Mitchell, NE; or Scottsbluff, NE may be returned to Billings, MT; Scottsbluff, NE; or Sterling, CO in lieu of the original shipping point. The return will be subject to the rate, minimum weight, and route as though Billings, MT, Scottsbluff, NE, or Sterling, CO was the original shipping point.

Cars originating in Sidney, MT, Drayton, ND; East Grand Forks, MN; Hillsboro, ND; Redco, ND; Crookston, MN,; Wilds, MN; Bingham, MN or Moorehead, MN may be returned to Sidney, MT, Drayton, ND; East Grand Forks, MN; Hillsboro, ND; Redco, ND; Crookston, MN; Wilds, MN; Bingham, MN or Moorehead, MN in lieu of the original shipping point. The return will be subject to the rate, minimum weight and route as though Sidney, MT, Drayton, ND; East Grand Forks, MN; Hillsboro, ND; Redco, ND; Crookston, MN; Wilds, MN; Bingham, MN or Moorehead, MN were the original shipping point.

---

***Item 3265A – Charge – Failure to Complete Unloading of Sugar Beet Pulp Pellets***
***Cancelled Effective October 31, 2001***

Covered Hopper Cars of Sugar Beet Pulp Pellets (STCC 20-619), which are released from unloading, but have not been completely unloaded, will incur a cleaning charge of $350.00 per car. Such charge will be assessed against the Unloader of the car responsible for releasing the car before all of the lading has been removed. Refer to Rule 27 in Tariff UFC 6000-Series.

---

***Item 3280 - Charge - Shipments Held for Orders***

A. Carload shipments covered by "Order" or "Order Notify" Bills of Lading, or carload shipments covered by "Straight" Bills of Lading showing consignment to one party with instructions therein, or on which instructions are otherwise given to:

   1. Notify or advise another party and deliver only upon surrender of written order; or

   2. Deliver only upon surrender of original bill of lading; or

(continued on next page)

***Item 3280 - Charge - Shipments Held for Orders (concluded)***

3. When consigned in any other manner which imposes upon the carrier the obligation not to make delivery except upon surrender of original bill of lading or written order;

will not be moved to the designated place of delivery until bill of lading or written order has been surrendered or indemnity bond or other substitute security therefore as defined in Rule 7 of Uniform Freight Classification is given, subject to the provisions in this item and Exceptions 1 and 2 named below.

B. When the place of delivery is designated in the bill of lading or otherwise designated, prior to the arrival of car at destination, and delivery is made to such designated place of delivery, provided a shipment is actually held for surrender of the bill of lading or written order or substitute security as defined in Rule 7 of Uniform Freight Classification, the following charges will apply:

1. When bill of lading or written order is surrendered or indemnity bond or other substitute security is given to an authorized representative of the line-haul delivering carrier prior to arrival at destination, there is no charge.

2. When bill of lading or written order is surrendered or indemnity bond or other substitute security is given..

   (a) To the line-haul delivering carrier at other than destination, after car has arrived at billed destination; or

   (b) To the line-haul delivering carrier at destination or first available hold point prior to destination after notice of arrival is sent or given consignee or party entitled to receive same. If notice of arrival is sent or given consignee or party entitled to receive same on a Sunday or Holiday, as described in Item 1010 of BNSF Demurrage Book 6004-series, the bill of lading or written order does not have to be surrendered or indemnity bond or other substitute security does not have to be given until the first business day following the Sunday or Holiday; or

   (c) To any participating line-haul carrier, other than delivering carrier:

   Charge is $150.00 per car, not to exceed $600.00 per bill of lading, and is in addition to any other charges that may accrue (i.e., switching, demurrage, storage, etc.)

EXCEPTIONS:

1. Surrender of bills of lading, written orders or other required documents by means of U.S. Mail will be allowed. When mail service is used, the time of mailing by the party which undertakes to surrender such bill of lading, written order or other required document shall be deemed to be the time of surrender. In the case of dispute as to the time of mailing, the postmark date shall govern.

2. When the original bill of lading or written order covering a shipment is not available, the shipment may be delivered in advance of the surrender of the bill of lading or written order as provided in Rule 7 of the Uniform Freight Classification.

***Item 3300C - Charge - Special Freight Train Service – Issued February 28, 2003 – Effective March 21, 2003***

A. Definition of Special Freight Train Service.

1. A train which is operated on an expedited schedule or under special service or transportation requirements specified by the consignor, consignee or the agent of either.
2. A train which is assembled in accordance with instructions given to a rail carrier by the consignor, consignee or the agent of either.
3. A train which is necessary in order to comply with service or other transportation requirements specified by any party to the movement
4. If the special train has cars for more than one destination, each stop will constitute a special run and charges for the special movement will be assessed from shipping point to first destination, from first destination to second destination, each as a separate and complete transaction.

B. Requirements for Special Freight Train Service.

Consignee, consignor or the agent of either must request this service in writing or by electronic device to BNSF Marketing/Sales Representative. Requests must be made in sufficient time to enable this carrier and all other carriers to consummate whatever arrangement or agreement which may be necessary to facilitate the movement of such trains. Requests should include, but are not limited to the following information: Date service is required or service window, if applicable; Routing, including origin and destination; Car initial(s) and number(s); Letter of authorization to bill charges, including appropriate patron codes, etc.

C. Furnishing of Special Freight Train Service.

Upon request, service will be provided at the convenience of all carriers involved in the movement.

D. Charges for Special Freight Train Service.

BNSF charges are as follows and will be calculated over the actual distance (route) operated by the special train at a charge of $62.00 per mile subject to a minimum charge of $9,000.00. This charge is in addition to published or contract freight rates. Charges for other carriers involved in joint line or local movements will be handled under the provisions of Accounting Rule 11. BNSF will assess a $2,500 surcharge to any requesting party that cancels a special train once BNSF has officially assigned crew and power.

E. Switching Charges for Special Freight Train Service.

Switching charges will be assessed as outlined in Special Switching Service items in applicable BNSF switching tariffs.

F. Distances.

To determine miles, refer to BNSF Internet Public Rate Retrieval or BNSF mileage Inquiry at BNSF.Com using the actual route of the movement.

***Item 3320 - Charge - Turning of Empty Unit Train Cars***

Upon request of the car owner or lessee, BNSF will turn an entire unit train of empty cars on railroad owned tracks or privately owned loop tracks at a time and place convenient for normal carrier operations, subject to a charge of $1,575.00 per turn. This charge will not apply in connection with cars for loading of Grain or Grain Products moving under rates in Tariff BNSF 4022-Series.

***Item 3340 - Charge - Destination Detention on Sugar Cars***

This item to apply to shipments of Sugar (STCC 20-621 and 20-629) moving in Covered Hopper Cars which are railroad owned or railroad controlled.

Detention will be calculated from the first 12:01 a.m. after loaded cars are actually placed, constructively placed either short of destination or at destination, and will continue until such time as cars are released empty back to the railroad. After five days, detention charges of $50 per day per car will be assessed against the Consignor of the railcars. These charges are in addition to any demurrage charges which may also apply.

***Item 3350 – Charge – Ride Quality Testing or Monitoring Equipment, Issued November 9, 2001 – Effective December 1, 2001***

When customers request ride quality testing or monitoring of shipments to satisfy their own internal objectives apart from any joint effort with BNSF Damage Prevention, BNSF will, for a charge, provide test equipment to customers along with instructions for the proper activation, placement and recovery of the device(s). BNSF will also download test data from the device(s) and provide a written report of the results. Customers will be responsible for the activation, placement and recovery of the test device(s), thus meeting the requirements of their particular shipping schedules.

Devices currently available from BNSF Damage Prevention for testing and the per trip cost (for one device and report) are:

| | |
|---|---|
| Snap Shock Plus single axis | $165.00 |
| Snap Shock Plus triple axis | $250.00 |

BNSF will use its best efforts to provide a reliable device for the test(s); however, due to the inherent nature of the device, a failure may occur in route. BNSF is not responsible for any failure(s) of the device(s) or the consequences either direct or indirect caused by the failure(s). In the event that a complete recording of the trip is not produced as a result of the failure of the device (excluding improper activation, placement or recovery), charges will be waived. In the event that any device(s) are lost, missing or not recovered during the course of the test(s), the customer agrees to reimburse BNSF for the list price of the device(s).

For further information please call your BNSF Marketing Representative at 1-888-428-2673, option 3, or the Damage Prevention Team at 1-785-435-3082.

*Item 3375C - Charge – Fuel Surcharge, (Issued May 7, 2003 – Effective June 1, 2003) (Increase)*

Shipments made under pricing documents referring hereto may be subject to a fuel surcharge, if applicable. When the U. S. Average Price of Retail On-Highway Diesel Fuel (HDF) for the month (Time Period) equals or exceeds $1.25 per gallon a surcharge may be applied to the total freight charges for each shipment waybill dated on or after the 1st of the second following month. Such fuel surcharge shall be included on the bill for freight charges for each shipment. Miscellaneous and accessorial charges shall not be subject to the fuel surcharge.

Fuel Surcharge Rates (FSR) will be adjusted monthly. The Fuel Surcharge Table will be subject to periodic review.

FSR = See Table Below.
Where FSR = Fuel Surcharge Rate.
HDF = prior Time Periods U. S. Average monthly price of Retail On-Highway Diesel Fuel.
Time Period = second prior month.

The source for the price of HDF will be the U. S. Department of Energy's, EIA Retail On-Highway Diesel Prices Report, whose weekly average price is available on their WebPages at: "http://www/eia.doe.gov". Select "Gasoline and Diesel Fuel Update". Then select "On Highway Diesel Prices" and the HDF prices are displayed.

**Fuel Surcharge Table**

| **Time Periods Average Price of HDF Between** | **Applicable Fuel Surcharge** |
|---|---|
| $1.25 to $1.299 | 0.5% |
| $1.30 to $1.349 | 1.0% |
| $1.35 to $1.399 | 1.5% |
| $1.40 to $1.449 | 2.0% |
| $1.45 to $1.499 | 2.5% |
| $1.50 to $1.549 | 3.0% |
| $1.55 to $1.599 | 3.5% |
| $1.60 to $1.649 | 4.0% |
| $1.65 to $1.699 | 4.5% |
| $1.70 to $1.749 | 5.0% |
| $1.75 to $1.799 | 5.5% |
| $1.80 to $1.849 | 6.0% |
| $1.85 to $1.899 | 6.5% |
| $1.90 to $1.949 | 7.0% |

Each $0.05 per gallon increase thereafter, apply an additional 0.5%

*Example:*

For a Fuel Surcharge applied for shipments in the month of July, assuming the prior Time Period's (May) average monthly price of HDF was $1.556 Per Gallon. Therefore, July's FSR would be 3.5%.

Thus, for each $10.00 of freight charges applicable to a shipment referring hereto the Fuel Surcharge would be $0.35.

*Item 3400D – Credit Terms, Issued February 24, 2003 – Effective February 25, 2003*

If credit is extended to Applicant for the payment of transportation charges, Applicant agrees to pay such transportation charges within the following time periods:

(a) Freight Charges – 15 Calendar days from the date of the freight bill.
(b) Miscellaneous charges (e.g. demurrage, switching, weighing) – 30 calendar days from the date of the miscellaneous bill.
(c) Additional charges for freight transportation and related services (e.g. balance due bills) – 30 calendar days from the date of bill for additional charges.

NOTE: Errors discovered in bills by customers should be corrected by them and paid accordingly. Payment of all bills, including those corrected by customers, must be made within the credit period. Payment of bills alleged to be incorrect will not prejudice patron's claims, filed within the statutory period, for refund of overcharges. If customers receive bills that they feel they are not responsible for paying, they must notify the carrier within the credit terms that they are not responsible for paying the bills.

Payment of an amount less than stated on a BNSF invoice will be considered as payment on account and not as payment in full, not withstanding any notation to the contrary as payment on the payor's remittance. Acceptance by BNSF of the lesser amount will not constitute an accord and satisfaction. The payor will be advised of any remaining balance deemed due after application of the remitted funds.

FINANCE CHARGES: **(See Exceptions 1 and 2)**
The Burlington Northern and Santa Fe Railway will assess a finance charge of .033% per day (12% per annum) on unpaid bills for freight and miscellaneous charges, including demurrage, switching and weighing, which are past our credit terms. The finance charge continues to accrue daily until the date payment is received by BNSF, not the date payment is made or the date postmarked on the payment.

Customers with past due amounts will receive a finance charge invoice each month. Finance charges will be assessed on delinquent bills for freight or miscellaneous charges as of the end of the month reduced by amounts in dispute and any payments received by month end but not posted.

Exception 1: Assessment of Finance charges on Demurrage & private car storage charges only will be extended to 60 calendar days from the bill date.
Exception 2: Each month the Burlington Northern Santa Fe Railway will calculate an average Weighted Days To Pay (WDTP) on all freight and miscellaneous charges for each customer. The WDTP will be determined by calculating the average number of days a customer has taken to pay freight and miscellaneous charges over a preceding three-month period. If the WDTP does not exceed established credit terms then no finance charges will be applied for the month in which finance charges would have otherwise applied. If the WDTP exceeds the credit terms, the finance charges will accrue as stated above.

Item continued on next page

***Item 3400D – Credit Terms (Concluded)***

DISCOUNT FOR ELECTRONIC PAYMENT OF DEMURRAGE AND PRIVATE CAR STORAGE CHANGES:

A twenty percent (20%) discount will be given if all monthly bills at a single location are paid within 30 days of the billing date if the following conditions are met:

1. BNSF web-enabled tools are used to suitably manage equipment orders and any demurrage disputes where applicable.
2. All demurrage and private car storage bills as defined in BNSF Demurrage Book 6004 and BNSF Private Car Storage Book 6005 for a single location must be paid in full less the discount within 30 days of billed date.
3. Payments must be received electronically.

The following is a link to Customer Tools at BNSF's web site: http://www.bnsf.com/business/

## SECTION 4 - Regulations Governing Currency Exchange On Traffic From, To, And Between Stations In Canada

### *Item 4000 - Application*

Except as provided for in the EXCEPTION below, the provisions of this Section and Sections 4A and 4B, apply only when specific reference is made to this Section in individual rate documents.

The regulations in this Section, and Sections 4A and 4B, governing the assessment and collection of charges on international freight traffic, in either direction between points in Canada and points in the United States, must be observed.

EXCEPTION: When traffic is moving under NSRQ 4401-Series, the provisions of this Section, and Sections 4A and 4B will apply.

### *Item 4020 - Basis Rate of Exchange*

For the purpose of determining the rate of surcharge and discount, as referred to in this Section, and Sections 4A and 4B, the following will apply:

The rate of exchange quoted for New York funds by the Wall Street Journal on the last day of each month will govern from the first to the fourteenth (inclusive) of the following month. Similarly, such quotation on the fourteenth will govern from the fifteenth to the last day (inclusive) of such month. Should the governing date fall on a Saturday, Sunday or United States legal holiday, the quotation of the preceding day will govern.

### *Item 4040 - Governing Date for Application of Surcharge or Discount*

The governing date for the application of surcharge or discount will be the date of the bill of lading.

### *Item 4060 - Surcharge or Discount to be Shown on Freight Bills*

The surcharge or discount will be shown as a separate item on the freight bill

## SECTION 4A - Applicable when United States Currency Is At A *Premium* In Relation To Canadian Currency (Effective January 4, 2001)

### *Item 4100 - Surcharge*

Issued January 3, 2001 – Effective January 4, 2001

The following will apply when converting Canadian Currency to U.S. Currency on traffic and to the extent indicated in Item 4120.

| When Rate of Exchange is: (See Item 4020) | Amount of surcharge or Additional collection |
|---|---|
| 1. Less than 7/8 of 1%. | None. |
| 2. Not less than 7/8 of 1% and not more than 1%. | 1/2 of 1%. |
| 3. Over 1%. | 60% of rate of exchange |

In determining the surcharge, when the rate of exchange is more than 1%, fractions less than 1/2 will be disregarded and fractions of 1/2 or over will be counted as 1%.

---

### *Item 4120 - Domestic Traffic*

The following will apply between Canada and the United States in both directions including advanced charges payable to United States Carriers.

| Application | Amount of surcharge on Additional collection |
|---|---|
| 1. On all shipments including advanced charges payable to United States carriers when such charges are payable and collected in Canada.<br><br>The surcharge should be added to the total through charges and must be assessed in all cases where the charges are collected at points in Canada, whether paid in Canadian or United States currency.<br><br>Such surcharge will accrue entirely to the Canadian carrier. | As per Paragraphs 2 (See NOTE). and 3 of Item 4100. |
| NOTE: Advanced charges, including customs duty and customs entry fees, payable entirely in the United States when such charges are payable and collected in 100% of rate of Canada Exchange. | 100% of Rate of Exchange |
| 2. When all charges are paid in United States Points in United States currency. | None |

## SECTION 4B - Applicable when United States Currency is at a *Discount* in relation to Canadian Currency (Effective January 4, 2001)

***Item 4200 - Discount or Surcharge***

Issued January 3, 2001 – Effective January 4, 2001

The following will apply to the extent indicated in Item 4220.

| **When Rate of Exchange is: (See Item 4020)** | **Surcharge or Additional collection** |
|---|---|
| Less than 7/8 of 1%. | None. |
| Not less than 7/8 of 1% and not more than 1.25%. | 1/2 of 1%. |
| Over 1.25%. | 40% of rate of exchange |
| | **DISCOUNT (Allowance)** |
| Less than 7/8 of 1%. | None. |
| Not less than 7/8 of 1% and not more than 1%. | 1/2 of 1%. |
| Over 1%. | 60% of rate of exchange |

In determining the rate of surcharge and the rate of discount, when the rate of exchange is more than shown in this item, fractions less than 1/2 will be disregarded and fractions of 1/2 or over will be counted as 1%.

***Item 4220 - Domestic Traffic***

A. The following will apply on traffic from Canada to the United States.

| **Application** | **Discount Allowance** |
|---|---|
| All charges, when prepaid, must be paid in Canadian Currency. | As per Paragraph 2 of Item 4200. |
| | **Surcharge or additional Collection to be prepaid** |
| All charges when billed "collect". | As per Paragraph 1 of Item 4200 |

B. The following will apply on traffic from the United States to Canada.

| **Application** | **Surcharge or additional Collection** |
|---|---|
| All charges, when "prepaid" | As per Paragraph 1 of Item 4200. |
| | **Discount Allowance** |
| All charges when billed "collect". | As per Paragraph 2 of Item 4200 |

## SECTION 5 – Section Cancelled in Last Revision with an Effective Date of December 24, 2001

*Item 5000 – Item Cancelled Account Obsolete*

*Item 5040 – Item Cancelled Account Obsolete*

*Item 5060 – Item Cancelled Account Obsolete*

*Item 5080 – Item Cancelled Account Obsolete*

*Item 5100 – Item Cancelled Account Obsolete*

**SECTION 6 – Rules And Other Governing Provisions Specific Rules and Regulations Governing Frozen And Non-Frozen Commodities Requiring Mechanical Protective Service (transferred from BNERM 1), Issued January 16, 2001 – Effective January 17, 2001**

**Rules in Section 6 Take Precedence Over Any Conflicting Rules In This Book, Or In Section 1 of BNERM 1.**

***Item 6000 - Mechanical Refrigerated Equipment Furnished By Carrier***
***Issued January 16, 2001 – Effective January 17, 2001***

Mechanical refrigerated equipment furnished by railroads will not be required to maintain a temperature of lower than minus 5 degrees Fahrenheit. Shipper shall indemnify and hold harmless the railroads involved for any damage to commodity if a lower temperature is required.

Responsibility for adequate blocking, bracing, packaging and loading of the shipment lies entirely with the shipper. Shipper has responsibility for starting the refrigeration unit, setting thermostat to the billed temperature and ensuring proper cooling prior to releasing the shipment for movement. Carriers will not be responsible for damages resulting from non-compliance.

***Item 6020 - Private Owned Or Leased Cryogenic (CO2) Equipment***

When movements are in cryogenic cars (CO2), shipper will be responsible for the cost of supplying the proper amount of carbon dioxide (CO2) for any car used in conjunction with rates published in this section. Shipper shall indemnify and hold harmless the railroad(s) involved for damage to commodity due to temperature variation in cryogenic cars.

When empty, cars are subject to the provisions of Tariff and ICC RPS 6007-Series Tariff.

***Item 6030 – Private Owned or Leased Mechanical Refrigerated Equipment, Issued March 6, 2002 – Effective April 1, 2002***

When movements are in privately owned or controlled Mechanical Refrigerated Cars, shipper will be responsible for all aspects of Mechanical Protective Service including but not limited to fueling, monitoring, preventative maintenance and running repairs on refrigeration unit and all costs associated with same. Shipper shall indemnify and hold harmless the railroad(s) involved for damage to commodity due to temperature variation in privately owned or controlled mechanical refrigerated cars.

When empty, cars are subject to the provisions of Tariff and ICC RIC 6007-Series Tariff.

***Item 6040A - Rules Governing Mechanical Protective Service or (MPS), Issued May 25, 2001 – Effective June 15, 2001***

1. Rule 705 - Frozen commodities

(a) Frozen commodities transported under mechanical protective service in BNSF owned or controlled mechanical refrigerator cars are subject to charges shown in item 6180 herein. Applicable charges in mechanical cars other than BNSF shall be governed by the rules and provisions of car owner.

(b) Shipper must place on bill of lading and shipping order, and agent must place on waybill, the following notation:

"MECHANICAL PROTECTIVE SERVICE - RULE 705"

(c) When shipments are moving under rates that include mechanical protective service, agent must endorse the waybill with the following notation:

"RATE PER CAR INCLUDES MPS CHARGE"

2. Rule 710 - Non-frozen commodities

(a) Charges as published herein will apply on non-frozen commodities transported under mechanical protective service.

(b) Shipper must indicate on the exempt bill of lading, shipping order and freight waybill, the following notation:

"MECHANICAL PROTECTIVE SERVICE - NON-FROZEN COMMODITY, RULE 710. PRECOOLED LOAD, OPTIMUM TEMPERATURE INSIDE CAR _____ DEGREES."

(c) Prior to loading, all commodities must be precooled to the temperature desired for shipping. Any claim for lading loss or damage will be subject to compromise or declination if lading was not pre-cooled prior to loading. The burden of proof will be on the shipper to provide evidence of origin temperature of lading at time of loading.

(d) When shipments are moving under rates that include mechanical protective service, agent must endorse the waybill as follows:

BNSF cars: "RATE PER CAR INCLUDES BNSF MPS CHARGE."

Foreign cars: "RATE PER CAR INCLUDES FOREIGN MPS CHARGE."

3. Rule 720 - Mechanical car used for shipments where MPS not ordered

When a mechanical refrigerator car is furnished for railroad's convenience and shipper does not order MPS, the mechanical unit will not be operated and MPS will not apply. Shipper must specify on bill lading, and agent must place on waybill, the following notation:

"MECHANICAL PROTECTIVE SERVICE NOT ORDERED - RULE 720. DO NOT OPERATE MECHANICAL."

***Item 6060A - Operation Of BNSF Owned Or Controlled Mechanical Units, Issued March 8, 2002 – Effective April 1, 2002***

While mechanical units are being used by railroad, railroad shall perform such in transit temperature inspections as may be necessary and proper, at its expense. Railroad shall also perform routine servicing and running repairs to units. Railroad shall bill car owner, and car owner shall pay railroad, for services performed (other than inspection) and supplies furnished on the following basis:

1. Bills for fuel supplied or lube oil furnished mechanical cars should show equipment reference, service date, service location, gallons of fuel supplied and should be supported by information stating whether equipment was empty or loaded when service was performed and/or waybill date and number.

2. Bills for the pretrip inspection made prior to okaying car for loading, for the purpose of testing unit to determine that it is functioning satisfactorily or in need or repairs, will be rendered on the basis of $25.00 per car.

3. Refrigerant, antifreeze, supplies and repairs to units shall be billed as provided for in the field and office manuals of the code of interchange rules promulgated by the Association of American Railroads.

***Item 6080 - Empty Movement Of Privately Owned Cars***

The provisions of this item apply to rates published on shipments in cars of private ownership with the provision that the use of such cars is not subject to the payment of mileage allowances or to the provisions of Mileage Tariff and ICC RPS 6007-Series. Except as may otherwise be specifically provided in the Exempt rate quote, circular or memorandum, such rates include the movement of the empty car or cars to the point of prior loading via the reverse of the loaded route. Any other empty movement by the BNSF will be subject to charges provided in the applicable BNSF Tariff.

***Item 6100 - Return Of Pallets, Pallet Sides, Platforms, Skids, Dunnage, Etc.***

Return of Pallets, Pallet Sides, Platforms, Skids, Dunnage, etc. shall not be included in rates for temperature controlled shipments (Rules 705 and 710).

***Item 6120 - Offer Of Section 11706 ('Carmack') Liability***

BNSF offers the opportunity to ship temperature controlled commodities (Rules 705 and 710) pursuant to the terms and conditions of 49 U.S.C. Section 11706 (Carmack) liability, as an alternative to the claims provisions in this BNSF Rules Book, BNSF-6100 Series. Shipments made pursuant to the claim provisions of Section 11706 (Carmack) will be charged a higher rate, and the following conditions must be met in full:

(1) Not later than the time a car is ordered for loading the shipper must notify BNSF or its designated representative of the intention to make the shipment subject to the claim provision of 49 U.S.C. Section 11706 (Carmack). At that time the shipper must advise BNSF where and when the car will be available for BNSF representatives to inspect the loading and the loading method.

(Item continued on next page)

***Item 6120 - Offer Of Section 11706 ('Carmack') Liability (Concluded)***

(2) The shipping order and receipt must be endorsed prior to the shipment, "The Shipment is subject to the Claim Terms of 49 U.S.C. Section 11706."

(3) Transportation charges must be prepaid.

Unless the shipper complies in full with the conditions stated above for application of Section 11706 liability, the shipment will be conclusively deemed to move under the 'alternate liability' terms and conditions of BNSF Rules Book, BNSF-6100 Series, and there will be a conclusive presumption that the shipper has given his written declaration and/or that the shipper and carrier have entered into a written agreement to this effect.

***Item 6140A - Loss And Damage Provisions/Liability Restrictions, Issued May 25, 2001 – Effective June 15, 2001***

A. Upon tender of a shipment of exempt commodities as described in this contract. accompanied by the verbal shipping order (phone transmittal) and/or Electronic Data Interchange (EDI) transfer completed by shipper, BNSF will give its receipt for the goods and its acceptance of said billing instruction. to be performed in accordance with the contract. Acceptance of the shipping order by BNSF shall also be by verbal acceptance and/or confirmation of EDI transfer. In all matters described herein, BNSF acts as principal only with respect to transportation over its own line.

B. Carriers will not be liable for loss, damage or delay caused in whole or in part by an Act of God, a public enemy, the authority of law, riots, strikes, acts of civil disobedience, inherent quality or characteristic of the commodity, natural shrinkage, an act or default of the shipper, owner or receiver or from shipments stopped and held in-transit at the request of the shipper, owner, or receiver.

C. BNSF agrees to transport shipment over its line with reasonable dispatch. BNSF and connecting carrier do not guarantee rail service on any scheduled time frame.

D. BNSF and connecting carrier shall not be liable for breakage or bruising damage to lading unless shipper provides physical evidence of railroad negligence. Shifting of a load, alone, shall not be considered as evidence of such negligence

E. BNSF and connecting carrier shall not be liable for deterioration resulting from improper loading or overloading of the equipment or from the use of containers or stacking methods which do not permit the adequate flow of air throughout the load.

F. BNSF and connecting carriers shall not be liable for market decline.

G. BNSF and connecting carriers shall not be liable for shortage unless there is physical evidence of forced entry to the transportation equipment. Shortage claims must be verified and supported by an actual tally of packages loaded at origin and an actual tally of packages unloaded at destination. In addition, origin and destination seal records must be furnished.

*Item 6140A - Loss And Damage Provisions/Liability Restrictions (continued)*

H. In no event shall BNSF and connecting carriers be liable for lading replacement costs or for special or consequential damages.

I. Shippers and/or consignee must mitigate damage situations by accepting the damaged cargo unless it is totally worthless. Shippers and/or consignees may not abandon damaged or partially damaged shipments to the railroad when the damaged shipments retain substantial value. Product that is abandoned to the carrier in an undamaged condition shall be sold for the account of whom concerned and salvage proceeds only, less any salvaging expenses incurred shall be remitted to the beneficial owner.

J. Carriers do not undertake to overcome the inherent tendencies of perishable goods to deteriorate or decay. Carrier has no liability for deterioration when the amount of deterioration could reasonably be expected to occur during normal rail transport. When the amount of deterioration is intensified due to diseases or due to decayed or damaged condition of the perishable goods at rail origin, rail carrier has no liability for this intensified deterioration.

K. In the event an act or omission of any party involved in the transportation process (shipper, carrier, receiver) is not the sole cause but contributes to any loss or damage, each party will be liable for only that portion of the loss or damage which was reasonably caused by its negligence. If the loss or damage results from the concurrence of an act or omission by BNSF and an act of God, then the liability of BNSF shall be no greater than the percentage of proven causal negligence of BNSF.

L. Carrier has no liability for deterioration of perishable goods when carrier refrigeration equipment functions properly within 10 degrees of the billed instruction (as monitored and recorded from the railcar's thermometer) and shipment is handled with reasonable dispatch.

M. On shipments where it is determined that the commodity pulp (body) temperature is something other than the billed temperature, it will not be BNSF's responsibility to bring said commodity's pulp temperature down to conform to billing temperature. When records indicate that the mechanical refrigeration unit was properly operating, carrier(s) will not be responsible for lading off condition.

N. Carrier shall not be liable for product loss arising from any cause, including temperature, after notice of constructive placement availability at the billed destination. Subsequent to such notice carriers will not be responsible for temperature monitoring, fuel, etc.

O. When handling perishable boxcar shipments in foreign line marked equipment, BNSF will be extended its longest line haul. Longest line haul shall mean BNSF's nearest point of interchange to the foreign carrier's billed origin location. Point of interchange shall be as identified in the Official Railroad Station List (OPSL 6000 including supplements) and subject to BNSF operating convenience. When BNSF is by necessity a switch carrier only, or does not receive its longest haul, BNSF will not be liable in full or part for any product claim. It will be shipper's responsibility to ensure that proper rate and route authorities are published.

Any Mechanical Protective Service performed by BNSF when handling perishable boxcar shipments in foreign line marked equipment shall be billed to the car owner in accordance with AAR interchange rules. If the shipment is in non-compliance of this section, and BNSF performs proper MPS service, BNSF will not participate in any freight claim payment. In the event that BNSF fails to exercise due diligence in the correction of an off-temperature condition than BNSF will participate in the distribution of any freight claim payment in accordance with AAR freight claim rules.

(Item continued on next page)

***Item 6140A - Loss And Damage Provisions/Liability Restrictions (concluded)***

P. The shipper and consignee shall indemnify and hold harmless the carrier from any loss, damage, personal injuries and/or death resulting from failure to comply with the provisions contained herein. Acceptance of shipment by the carrier for transportation shall not be a waiver of this liability.

***Item 6160 - Claim Procedures, Issued January 16, 2001 – Effective January 17, 2001***

A. The rates and charges agreed upon for the shipment and the terms, conditions and provisions herein stated require that the shipper only, whether acting as principal or agent, must file any claim for loss and damage exclusively with BNSF or carrier on whose line the loss, damage, injury or delay occurred.

B. As a precedent to recovery for any loss or damage to lading, claims must be received by BNSF or carrier on whose line the loss, damage, injury or delay occurred, in writing from the shipper within three months after delivery of the shipment at its final railroad destination or, in the case of failure to make delivery, then within three months after a reasonable time for delivery has elapsed. BNSF shall pay, decline or offer to compromise claims within three months from the date received.

*C.* As a condition precedent to recovery of any claim, the consignee must immediately notify the destination carrier, shipper and BNSF upon discovery of any damage and allow destination carrier or its agent to inspect. Such notification to carrier and shipper must be made within 24 hours of notification of shipment's arrival. Failure of the rail carrier to inspect damaged cargo for whatever reason will not relieve the burden of the claiming party to establish that cargo was received in a damaged condition nor will it be considered an admission of liability by the rail carrier.

D. All written claims must include the following documentation:

1. A demand for payment of a specific amount.

2. Information identifying the rail shipment including equipment initials and number, shipper and receiver's name, shipping date and commodity.

3. Origin records or certification as to the condition and quantity of the lading at the time tendered to the origin rail carrier.

4. Destination records as to the condition and quantity of the lading at the time received from the destination rail carrier.

5. Verification of the amount claimed including original invoices, repair bills and account of sales.

6. Evidence as to the disposition of the damaged lading.

7. On fresh fruits and vegetables, origin and destination USDA inspections or Canadian government equivalent

(Item continued on next page)

***Item 6160 - Claim Procedures, (Concluded)***

E. All loss and damage lading claims filed with BNSF must be mailed to:

Director, Freight Claims
Burlington Northern Santa Fe Railway Company
PO Box 1738
Topeka, KS 66601

F. Carrier's liability will not exceed the actual amount of physical loss or damage sustained to the lading including proven costs through mitigating the loss or damage. Claim calculation as well as any claim payment shall not exceed the delivered value of FOB origin invoice plus freight to destination, less the gross account of sales, plus a reasonable commission on those sales.

G. Claims or lawsuits for less than $1000.00 shall not be filed and no claim shall be paid if the amount of loss or damage is found to be under $1000.00 per carload.

H. Any suit against BNSF or its connecting carriers based on transportation provided under the terms of this circular shall be commenced within one year from the date of delivery, or in the case of failure to make delivery then within one year after a reasonable time for delivery has elapsed. Such suit shall be filed in the state or province of origin on or interchange to BNSF.

I. Any claim or suit not filed in strict accordance with the terms and conditions of this circular shall be void.

*Item 6180 - Mechanical Protective Service Charges BNSF Owned Or Controlled Mechanical Refrigerated Cars Charges In Dollars Per Car*

FRESH AND FROZEN COMMODITIES

| GROUP 1 | GROUP 2 | GROUP 3 | GROUP 4 |
|---|---|---|---|
| ARIZONA | ARKANSAS | ALABAMA | DISTRICT OF COLUMBIA |
| ALBERTA | ILLINOIS | GEORGIA | CONNECTICUT |
| BRITISH COLUMBIA | IOWA | INDIANA | DELAWARE |
| CALIFORNIA | KANSAS | KENTUCKY | FLORIDA |
| COLORADO | LOUISIANA | MICHIGAN | MAINE |
| IDAHO | MANITOBA | MISSISSIPPI | MARYLAND |
| MONTANA | MINNESOTA | OHIO | MASSACHUESETTS |
| NEVADA | MISSOURI | ONTARIO | NEW BRUNSWICK |
| NEW MEXICO | NEBRASKA | TENESSEE | NEW HAMPSHIRE |
| OREGON | NORTH DAKOTA | WEST VIRGINIA | NEW JERSEY |
| UTAH | OKLAHOMA | | NEW YORK |
| WASHINGTON | SASKATCHEWAN | | NORTH CAROLINA |
| WYOMING | SOUTH DAKOTA | | NOVA SCOTIA |
| | TEXAS | | PENNSYLVANIA |
| | WISCONSIN | | PRINCE EDWARD ISLAND |
| | | | RHODE ISLAND |
| | | | SOUTH CAROLINA |
| | | | VERMONT |
| | | | VIRGINIA |

| TO GROUP \ FROM GROUP | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| 1 | 500 | 550 | 600 | 650 |
| 2 | 550 | 500 | 550 | 600 |
| 3 | 600 | 550 | 500 | 550 |
| 4 | 650 | 600 | 550 | 500 |

SEATTLE, WA TO ALASKA = $650 PER CAR

INTRASTATE MECHANICAL PROTECTIVE SERVICE CHARGES = $250 PER CAR

MPS charges for all shipments in BNSF owned or controlled mechanical refrigerated cars where BNSF does not appear as a linehaul carrier in the route, will be $2000.

### *Item 6200 - Stopping*

Stopping to complete loading or for partial unloading of cars with temperature controlled shipments (Rules 705 and 710) is not allowed.

### *Item 6220 - Mexico*

Mechanical refrigerated cars owned or controlled by BNSF are not permitted to move into Mexico unless the governing rate document clearly states that rate applies for shipments destined to specified points in Mexico. If a mechanical refrigerated car moves into Mexico as a result of billing to a destination in Mexico in violation of this condition, the party who billed the car will be subject to a charge of $10,000 in addition to applicable charges for movement of commodity. If a mechanical refrigerated car moved to Mexico in violation of this condition sustains loss or damage from any cause, the party billing such car shall also be liable for such loss and damage. Failure of any Railroad to prevent the movement of the car to Mexico shall not constitute a waiver of BNSF's right to enforce this item.

### *Item 6240A - Cleaning Fees, Issued November 12, 2002 – Effective January 1, 2003*

Mechanical refrigerated cars received by BNSF requiring cleaning, including removal of debris, dunnage, pallets, tie down materials, food or any other object not an inherent part of the mechanical refrigerated car will be subject to $500 cleaning fee. This fee will be assessed against the last party unloading the equipment prior to BNSF receipt of car in interchange or received in switch service from industry.

Mechanical refrigerated cars spotted to industry for loading and subsequently rejected by the loading party due to cars requiring cleaning including removal of debris, dunnage, pallets, tie down materials, food or any other object not an inherent part of the mechanical refrigerated car will be subject to a $1,000 fee covering but not limited to transportation, cleaning and opportunity cost. This fee will be assessed against the last party unloading the equipment prior to BNSF receipt of car in interchange or received in switch service from industry.

**END**

# PX1040-PX1085

Filed Under Seal

# EXHIBIT PX1086

April 27, 2006

By E-Filing

The Honorable Vernon A. Williams
Secretary
Surface Transportation Board
1925 K Street, N.W.
Washington, D.C. 20423-0001

Re: Ex Parte No. 661 – Rail Fuel Surcharges – Comments

Dear Mr. Williams:

Enclosed for filing in the above proceeding are the comments of Robert M. Knight, Jr., Executive Vice President-Finance and Chief Financial Officer of Union Pacific Corporation and Union Pacific Railroad.

Please direct any questions about these comments or Union Pacific's participation in this proceeding to me at (402) 544-3897 or the e-mail address listed below.

Sincerely,

Lawrence E. Wzorek

Lawrence E. Wzorek
Assistant Vice President - Law
UNION PACIFIC RAILROAD
1400 Douglas St., Stop 1580, Omaha, NE 68179-1580
ph. (402) 544-3897 fx. (402) 501-0129
lewzorek@up.com

*Contains Color Images*

BEFORE THE
SURFACE TRANSPORTATION BOARD

---

STB EX PARTE NO. 661
RAIL FUEL SURCHARGES

---

COMMENTS OF
UNION PACIFIC RAILROAD COMPANY

---

PRESENTED BY

ROBERT M. KNIGHT, JR.

EXECUTIVE VICE PRESIDENT-FINANCE
AND CHIEF FINANCIAL OFFICER

UNION PACIFIC CORPORATION
UNION PACIFIC RAILROAD COMPANY

Date of Submission: April 27, 2006
Date of Public Hearing: May 11, 2006

BEFORE THE
SURFACE TRANSPORTATION BOARD

---

STB EX PARTE NO. 661
RAIL FUEL SURCHARGES

---

COMMENTS OF
UNION PACIFIC RAILROAD COMPANY

---

## INTRODUCTION

My name is Rob Knight. I am the Executive Vice President-Finance and Chief Financial Officer of Union Pacific Corporation and Union Pacific Railroad. I was named to this position in January 2004. I am responsible for all financial activities of both the Corporation and Union Pacific Railroad.

I began my career with Union Pacific Corporation in 1980 and have held a variety of positions in Audit, Accounting, Finance, Human Resources, Quality, and Marketing and Sales. In 1996, I was named vice president, Quality; in 1999, vice president and general manager, Energy in Union Pacific Railroad's Marketing & Sales Department. In 2000, I became vice president and general manager, Automotive, again in the Marketing & Sales Department. I returned to Finance in May 2002, when I became senior vice president, Finance of Union Pacific Corporation, the position I held before my election to my current position. I have a bachelor's degree in business administration from Kansas State University and a master's degree in business administration from Southern Illinois University.

My experience in both Marketing and Finance at Union Pacific has provided me with a unique perspective on Union Pacific's fuel surcharge program. I have spoken with customers, our investors, Wall Street analysts, and others about our need to recover our fuel costs. This issue is of critical importance to Union Pacific. As I will explain, we must recover our fuel costs in order not only to serve our customers, but also to protect our shareholders and employees, who depend on our economic viability.

## SUMMARY OF UP'S POSITION

Let me summarize Union Pacific's position on our fuel surcharge program:

- UP has a comprehensive fuel surcharge program that began for carload traffic in 2002 to offset the high price of diesel fuel. This program has evolved in response to customer comments and input.

- UP does not have a fuel surcharge on 100% of its customers' shipments—although we would like to be able to recover from all shippers. This is a product of the history of the commercial relationships with our customers—large and small—that have developed over time.
    - UP's traffic mix includes regulated, exempt, and contract traffic.
    - Some older contracts do not have fuel surcharge provisions, and those customers have resisted UP's requests for fuel surcharges.
    - New price documents include fuel surcharge provisions.

- UP's fuel surcharge revenue does not fully cover our incremental fuel cost increase.
    - In 2004, UP recovered 52% of incremental fuel costs (i.e., cost above 75¢/gal.).
    - In 2005, UP recovered 74%. Even if all of UP's business in 2005 had been subject to the Highway Diesel Fuel surcharge, UP would have recovered just 99% of its incremental fuel cost.
    - In 2006, UP expects to recover about 90% of its incremental fuel-related cost.

- Due to increasing fuel prices, UP had more than $800 million in unrecovered incremental diesel fuel costs from 2003 through 2005, not including nearly $150 million for other fuel-related expenses.
  - This amounts to a subsidy of shippers at the expense of UP shareholders and employees.

- UP continues to make huge capital investments in its system, although UP does not yet earn its cost of capital.

- Unrecovered fuel costs impair UP's ability to invest in its railroad to meet the increased demand for rail transportation.

- UP must recover 100% of its fuel costs, but UP does not intend to recover through its fuel surcharge program more than 100% of its total fuel expense above 75 cents per gallon.

- UP has been receptive to customers' comments about our fuel surcharge program; and, in fact, our current program was modified from our original plan to be responsive to customer feedback.

- UP wants a fuel surcharge program that
  - enables UP to recover fully its cost of fuel;
  - is responsive to customers;
  - is fair/equitable; and
  - is easy to administer for both UP and its customers.

## HISTORY OF UP'S FUEL COSTS

Union Pacific consumes a huge quantity of diesel fuel. So do other railroads. However, the geographic scope of Union Pacific's system, as well as our traffic mix and the terrain over which we operate, means that Union Pacific uses more diesel fuel than virtually any of the other railroads.

In 2005, UP consumed nearly 1.35 billion gallons of diesel fuel. We have worked diligently to control our consumption. We have invested in more fuel-efficient locomotives and implemented programs to conserve fuel. The following slide depicts the steps UP has taken to reduce fuel consumption.

[Slide #1]




Nevertheless, fuel consumption has grown with the record demand for our rail service.

As the Board well knows, there have been substantial increases in the price of a barrel of oil over the last few years. That trend continues today. The increase in oil prices translates directly into the ever-increasing price we pay for diesel fuel.

The following chart shows the staggering increase in the cost of a gallon of diesel fuel in just the last few years.

[Slide #2]




Our average price for the 1.35 billion gallons last year was $1.77 per gallon, up 55 cents from $1.22 per gallon in 2004. Our average price for a gallon of fuel during the fourth quarter of 2005 was $2.08 per gallon. This resulted in UP spending a total of $2.4 billion on locomotive fuel in 2005.

Fuel prices continue to rise. On April 20, 2006, UP announced its first quarter earnings. We stated that our fuel cost in the first quarter was $1.87 per gallon, up from $1.45 in the first quarter of 2005—but our cost of fuel as of the date of our earnings announcement had risen to $2.10 per gallon.

In addition to diesel fuel, UP purchases electricity and other utilities, as well as gasoline, lubricants, and other fuels for our operations. In 2005 that added $240 million to our costs, up nearly $100 million from 2002 levels. In the first quarter of 2006, our combined fuel and utilities bills totaled $692 million. That category alone represented



UPNJ-07-0000230
UPFSC0000307

22% of our operating expenses. In the first quarter of 2002, fuel and utilities were only 10% of UP's total operating expenses in the quarter.

The chart referred to above [Slide #2] also demonstrates that UP's average fuel cost per gallon averaged 70 cents per gallon from 1992 through 2001, and then remained around 73 cents per gallon from 1997 through 2002. Consequently, when UP began to see the run up in fuel costs, expecting that they would return to lower levels in the foreseeable future, we designed our fuel surcharge program with 75 cents per gallon as the base cost, with a view to collecting the incremental cost above that amount through our fuel surcharge program.

## UNION PACIFIC'S FUEL SURCHARGE PROGRAM

In its Notice of Hearing, the STB asked the railroads to explain the manner in which they calculate and charge their customers fuel surcharges. The Board also asked whether the fuel surcharges fairly reflect the increasing fuel cost of the movements to which they are applied.

Like most companies that have a fuel surcharge program, Union Pacific determines the fuel surcharge to be added to a customer's freight bill by referring to a publicly available index and periodic changes in that index. The fuel surcharge is calculated as a percentage that is applied to the customer's freight bill to determine the total amount of the transportation charge for a particular movement.

UP's fuel surcharge program began around September 2000, when we initiated a series of fuel surcharge provisions on intermodal traffic that was not under contracts. However, these early fuel surcharge provisions did not refer to any index.

On December 1, 2002, UP implemented its first standard fuel surcharge for carload business. The fuel surcharge was based on the price of West Texas Intermediate crude oil (WTI). A fuel surcharge was applied to the pertinent freight bills when the price of WTI oil, as published in *The Wall Street Journal*, exceeded $28 per barrel for 30 consecutive days. The surcharge was applied in 2% increments for every $5 per barrel the WTI exceeded $28 per barrel.

In March 2003, customers informed UP that rapid swings in the WTI prices and the structure of UP's WTI fuel surcharge program impeded customers' ability to budget for fuel surcharge increases. This customer feedback caused UP to re-evaluate the formula of its "standard" fuel surcharge program. Consequently, in April 2003, after further discussions with customers, UP converted the WTI carload surcharge basis from the WTI price published for 30 consecutive days in *The Wall Street Journal* to a WTI monthly average price. We also modified the surcharge schedule to initiate the fuel surcharge and calculate it at 0.4% for each dollar tier above the monthly average of $23 per barrel.

We continued to receive feedback from our customers on our fuel surcharge program. As a result of this customer input, UP linked its standard carload fuel surcharge in June 2003 to the Highway Diesel Fuel (HDF) Index published by the Department of Energy, because we concluded that the HDF is better aligned with the fluctuations in the diesel fuel price that UP pays. Additionally, the HDF is the fuel index used by the trucking industry as well as other carriers with whom we compete for business. It is easier to apply and more widely accepted by our customers as an index with which they are familiar. In moving from the WTI monthly average price calculation

that began at $23.01 per barrel, UP implemented the HDF fuel surcharge at $1.35 per gallon (approximately 80 cents per gallon for UP's fuel price), which was equivalent to approximately $25.50 per barrel under WTI (an increase in the base price of oil from which the fuel surcharge applied).

Union Pacific administers the HDF fuel surcharge program in this manner:

- The fuel surcharge is adjusted on a monthly basis.
- The basis for the surcharge is determined by the HDF for a calendar month, as reported weekly on the DOE website.
- If the average monthly price of HDF equals or exceeds $1.35 per gallon, a surcharge beginning at 1.5% applies. (The $1.35 per gallon equates to a UP fuel price of approximately 80 cents per gallon, while our cost recovery calculation begins at 75 cents per gallon.)
- For every five-cent increase above $1.35 per gallon, the surcharge increases by 0.5%.
- When the average DOE price drops below $1.35 per gallon, no fuel surcharge will apply.
- The surcharge is billed to applicable shipments beginning the second month following the month on which the DOE average price calculation was based. (For example: the average reported DOE price for the month of May 2005 determined the fuel surcharge applied throughout the month of July 2005.) Although UP originally planned to have only a one-month lag, our customers convinced us to go to the second month.
- The HDF program is designed to recover 100% of the incremental fuel expense above 75 cents per gallon if all shipments were covered by this program.

Union Pacific's coal business has a separate fuel surcharge program. Historically, most of our coal business moved under long-term contracts with a variety of escalation provisions. We attempted to simplify the administration of our coal business transportation rates and terms. Consequently, in November 2004, UP established a fuel surcharge for its coal business that is HDF-based. The surcharge begins at the

rate of 1.5% when the HDF index is at $1.35 per gallon. The surcharge increases 0.5% for each additional increase of five cents per gallon up to $1.60 per gallon. After $1.60 per gallon, the surcharge increases 0.75% for each additional five cents per gallon. The variation from the standard HDF program is designed to cover the higher costs associated with the increased fuel consumption on unit coal trains which carry more tonnage than manifest trains.

Our Intermodal Group has determined that the fuel surcharge for intermodal traffic should be calculated based on the HDF, but slightly differently from our carload fuel surcharge because of the comparable nature of this business with motor carriers. As a result, the base for our Intermodal HDF index is $1.25 per gallon (rather than the $1.35 per gallon for carload business). It is calculated by determining the percentage change between the base index and the previous month change. It increases approximately 0.6% for each additional change of four cents per gallon in the index.

It has been UP's experience that the HDF-based fuel surcharge more accurately reflects the change in UP's diesel fuel costs. The attached chart shows the correlation between the HDF index and UP's fuel cost back to 1994.

[Slide #3]

## HDF Surcharge - Customer Driven
***Highly Correlated to UP Fuel Costs***




**UP IS NOT FULLY RECOVERING ITS INCREASED FUEL COST**

There has been much discussion about the amount of money railroads receive from their fuel surcharges. One thing is certain: Union Pacific is not recovering the full incremental increase in the cost of its fuel via our fuel surcharge program.

Where possible, Union Pacific applies a fuel surcharge in order to capture its incremental cost of fuel above 75 cents a gallon. However, UP does not recover a fuel surcharge on 100% of the shipments we handle. The fuel surcharge is linked to the price document the shipper uses.

Union Pacific handles traffic under published rates regulated by the STB, as well as other shipments that are exempt commodities moving under public circular prices



UPNJ-07-0000235
UPFSC0000312

that are not regulated by the STB. Numerous shipments also move under rail transportation contracts.

During 2005, approximately 80% of our rail transportation revenue was derived from transportation contracts or private rate documents pertinent to a particular shipper. Approximately 20% of our revenue came from traffic moving under published rates, some of which are regulated while others are in exempt public price circulars.

Commercial agreements from the past preclude Union Pacific from applying a fuel surcharge to all of its business. These limitations are being reduced over time. In 2004, our fuel surcharge program produced revenue that recovered 52% of the incremental cost of fuel above 75 cents per gallon. In 2005, when we paid approximately $2.4 billion for locomotive fuel, our fuel surcharge revenue amounted to $1.017 billion, as we reported in our Form 10K to the SEC. Seventy-eight percent of UP's revenue base in 2005 was subject to some form of fuel surcharge. UP recovered the equivalent of 74% of our incremental fuel cost. This demonstrates that UP is not over-collecting from our customer base in total.

There is a significant amount of incremental fuel expense that UP is not recovering via fuel surcharges. In fact, from 2003 through 2005, UP did not recover more than $800 million in additional diesel fuel cost. That is depicted on the following chart. This does not include the nearly $150 million in incremental fuel-related expenses (e.g., utilities, etc.).

[Slide #4]

## UP Incremental Fuel Recovery




UP is still not recovering 100% of its incremental fuel expense in 2006. During the first quarter of 2006, we recovered around 90% of our incremental diesel fuel expense. This was a 26% improvement over our 73% recovery in the first quarter of 2005. In essence, Union Pacific and its shareholders have been subsidizing and continue to subsidize the higher cost of fuel for shippers on our railroad.

UP would prefer that every one of its customers pays to offset the higher price for diesel fuel—but they do not. This is a result of the marketplace dynamics. Our commercial relationships with many of our customers have developed over a long period of time. Some customers entered into long-term transportation agreements years ago, when the price of fuel was much lower and we had excess rail capacity to fill. Some of these contracts contain no fuel surcharge formula, while others have a price

adjustment provision based on a formula that gives inadequate weight to the cost of fuel.

Union Pacific is applying a fuel surcharge on every freight bill that it can. We are including a fuel surcharge mechanism in new transportation rate documents, whether that document is a tariff, an exempt circular, or a transportation contract. We will continue to pursue full recovery of our incremental fuel costs.

In the meantime, UP cannot undo or ignore the commercial arrangements it has with some of its customers—who, as a result of negotiations prior to 2003, secured a favorable arrangement before the run up in fuel prices. UP has approached some of these customers who enjoy rates without fuel surcharges (some of whom add fuel surcharges to bills they present to their customers) to determine whether they would agree to modifications that would allow UP to recover at least a part of the increased costs. While a small number of these customers were willing to help us offset our added fuel costs, the vast majority have rejected our request. UP is not able to simply walk away from that business or impose a fuel surcharge just yet.

## UP RESPONSIVENESS TO CUSTOMERS

Union Pacific has not adopted a fuel surcharge program without listening to our customers. If we wanted to simplify our recovery process and minimize our exposure for unattained fuel costs, we would adopt one fuel surcharge factor. Instead we have four basic indices in place today. We have also accommodated quite a few variations to those indices as a result of past negotiations.

Some customers may pay more than the actual incremental cost of fuel we use to handle their particular shipments. Some pay less. While this may appear inequitable

to some, we believe standard surcharges are the most appropriate and reasonable way to manage a fair, equitable and easily administered fuel surcharge program.

Union Pacific adopted a fuel surcharge at a time when it appeared that the increase in fuel prices would be temporary or transitory. We did not anticipate that the rising cost of fuel would continue virtually unabated for as long as it has. Although this does not appear likely today, there is still a possibility that the price of oil and, consequently, the cost of diesel fuel will decline in the coming months and years. In fact, there have been periodic monthly declines in the surcharge during its use by UP. The use of our current fuel surcharge mechanism means that, as the price of fuel declines, so will the surcharge. In fact, fuel price declines have historically followed significant increases in oil prices that occurred, for example, during the mid-1970's, mid-1980's, and early 1990's.

The Board will hear from an array of participants in this proceeding. Some will tell you that the STB should mandate a fuel surcharge formula that guarantees that each shipper will pay no more than the cost of the fuel used for that particular customer's movements. While that may sound like a desirable goal, it is more difficult than simply calculating the mileage between the origin and destination. Other factors would have to be considered in a formula designed to link the charge to the fuel actually consumed. Those include the weight of the shipment, the terrain over which it travels (e.g., 100 miles over the Rockies is not the same as 100 miles across the plains of the Midwest), weather, train configuration, locomotive type, terminal switching, geographic fuel price differences, etc. Currently, the railroad industry does not have a single master rail mileage table that the freight billing railroad could use to calculate an interline

mileage surcharge. Additionally, customers would need a similar capability in order to maintain accounts payable records.

Shippers and railroads desire simplicity in the formula used. Otherwise, the administrative burden for the railroad of calculating the surcharge and for the customer of auditing or verifying the surcharge becomes insurmountable. It is simply not practical to have a unique fuel surcharge program for individual customers that takes into consideration all of the complex variables associated with their shipments.

## CAPITAL INVESTMENT DEPENDS ON ADEQUATE RETURNS

As the STB is well aware, the rail industry is capital intensive. Railroads spend more of their revenue dollars on capital investments than any other industry. During the period of 1995 through 2004, railroads spent an average of nearly 18% of their revenue dollars on capital items.

**[Slide #5]**






UPNJ-07-0000240
UPFSC0000317

But Class I railroads have not achieved an adequate return on that investment.

The capital demands on railroads continue to be extensive—particularly now that there has been a dramatic increase in rail shipments, and that trend is expected to continue well into the future. Railroads are working to meet that demand by making capital expenditures at record levels. Union Pacific alone has spent approximately $26 billion in capital investments over the past 11 years.

In 2005, we spent more than $2.8 billion and plan to spend about the same amount in 2006. More than one-half of that amount is to maintain our track and physical plant, while another $485 million is projected for growth capacity and commercial facilities. These are investments that take time to design, build and put into service so they necessarily require an authorization in anticipation of a recovery on the investments.

**[Slide #6]**






UPNJ-07-0000241
UPFSC0000318

Meanwhile, however, Union Pacific has not earned a return on its investment in capital expenditures that necessarily justifies investing as much as we have invested or as we plan to invest. The following chart depicts this point.

[Slide #7]




Nevertheless, Union Pacific has been willing—so far—to make these continued investments with a view that Union Pacific will eventually earn a return on all it has put into its transportation system for track, locomotives, freight cars, commercial facilities, and technology.

The fuel surcharge program is an integral part of Union Pacific's plan to attain reinvestability. As the attached graph indicates, fuel surcharge revenue has not covered the incremental fuel expense, much less the cost of capital.



UPNJ-07-0000242
UPFSC0000319

[Slide #8]




That in turn has contributed to an inadequate return on UP's investment in its business.

It is crucial that railroads be permitted to recover fully their variable costs, like fuel. If Union Pacific cannot recover those costs, it certainly cannot afford to continue to make the annual multi-billion dollar investments needed to meet the demands on our rail network.

**CONCLUSION**

We do expect to eventually recover all our incremental fuel costs by means of our fuel surcharge program. But we are not there yet. No one involved with transportation likes high fuel prices. UP certainly does not. Nevertheless, our intent to recover our higher fuel costs has not dampened the demand for our services. But only by recovering our full costs and improving our returns will we be able to continue to

invest in our rail franchise to the benefit of our customers, our employees, and our investors. Changes that involve complex calculations and numerous resources to administer and audit are not practical.

# PX1087-PX1126

# Filed Under Seal

# EXHIBIT

# PX1127

UNITED STATES OF AMERICA

+ + + + +

SURFACE TRANSPORTATION BOARD

PUBLIC HEARING

RAIL FUEL SURCHARGES

EX PARTE 661

+ + + + +

THURSDAY, MAY 11, 2006

+ + + + +

The Public Hearing convened in Hearing Suite 760, 1925 K Street, N.W., Washington, D.C. 20423-0001, pursuant to notice at 9:00 a.m., Chairman Douglas Buttrey presiding.

SURFACE TRANSPORTATION MEMBERS PRESENT:

DOUGLAS BUTTREY Chairman
FRANCIS MULVEY Vice Chairman

PANELISTS:

GOVERNOR BRIAN SCHWEITZERA
TERRY WHITESIDE, WHEAT & BARLEY COMMISSIONS
STEVEN STREGE NORTH DAKOTA GRAIN DEALERS ASSOCIATION
DAN MACK NATIONAL GRAIN & FEED ASSOCIATION
JUDY GILLIES THE FERTILIZER INSTITUTE
ERIC WILKEY TRANSPORTATION, ELEVATOR, & GRAIN MERCHANTS ASSOCIATION
TERRY VOSS AG PROCESSING
GEORGE TELFER ALLIANCE OF AUTOMOBILE MANUFACTURERS/DAIMLER CHRYSLER

| | |
|---|---|
| ROBERT NEFF | AMEREN ENERGY FUELS & SERVICES |
| JAY ROMAN | AMEREN ENERGY FUELS & SERVICES/ESCALATION CONSULTANTS |
| THOMAS CROWLEY | WESTERN COAL TRAFFIC LEAGUE |
| PETER PFOHL | WESTERN COAL TRAFFIC LEAGUE |
| BILL MOHL | ENTERGY CORPORATION |
| THOMAS WILCOX | THE AES CORPORATION |
| AMES HELLER | CONCERNED CAPTIVE COAL SHIPPERS |
| MICHAEL LOFTUS | CONCERNED CAPTIVE COAL SHIPPERS |
| STEPHEN POCSIK | TOTAL PETROCHEMICALS USA, INC. |
| MICHAEL MCBRIDE | TOTAL PETROCHEMICALS USA, INC./EDISON ELECTRIC INSTITUTE |
| STEVE SHARP | ARKANSAS ELECTRIC COOPERATIVE CORP. |
| DIANE ELHAKIM | DEGUSSA CORPORATION |
| DAVID WEISEL | POTLATCH FOREST PRODUCT CORP. |
| JAMES CONWAY | GRIFFIN INDUSTRIES |
| DANIEL SLAVIN | GRANITEROCK |
| JOHN FICKER | THE NATIONAL INDUSTRIAL TRANSPORTATION LEAGUE |
| CURT WARFEL | THE NATIONAL INDUSTRIAL TRANSPORTATION LEAGUE |
| THOMAS SCHICK | AMERICAN CHEMISTRY COUNCIL |
| CHARLES LINDERMAN | EDISON ELECTRIC INSTITUTE |
| TOM HUNT | BNSF RAILWAY COMPANY |
| JAMES FOOTE | CANADIAN NATIONAL RAILWAY CO. |
| MARCELLA SZEL | CANADIAN PACIFIC RAILWAY |
| CHRISTOPHER JENKINS | CSX TRANSPORTATION |
| DONALD SEALE | NORFOLK SOUTHERN RAILWAY CO. |
| ROBERT KNIGHT | UNION PACIFIC RAILROAD CO. |
| ROBERT DINGMAN | OIL CREEK & TITUSVILLE LINES |
| TOM O'CONNOR | SNAVELY KING MAJOROS O'CONNOR & LEE, INC. |
| MAZHAR ALI AWAN | TRANSPORTATION ECONOMICS, INC. |
| SANDRA DEARDEN | HIGHROAD CONSULTING, LTD. |
| MICHAEL BEHE | FREIGHT RESOURCES NETWORK, LLC. |

A G E N D A

Opening Remarks - Chairman Buttrey . . . . . . . . 5

Opening Remarks - Vice Chairman Mulvey . . . . . . 11

PANEL I - GOVERNMENT
The Honorable Brian Schweitzer, Gov. Of Montana . 12

PANEL II A - WITNESSES
Eric Wilkey, Arizona Grain . . . . . . . . . . . . 33
Terry Voss, Ag Processing . . . . . . . . . . . . . 36
Dan Mack, Transportation for Feed . . . . . . . . 40
Steven Strege, North Dakota Grain Dealers Assoc . 49
Terry Whiteside, Wheat and Barley Commission . . 57
Judy Gillies, J.R. Simplot Company . . . . . . . . 62

PANEL II B - WITNESSES
Peter Pfohl, Western Coal Traffic League . . . . . 83
Thomas Crowley, Western Coal Traffic League . . . 88
Bill Mohl, Entergy Corporation . . . . . . . . . . 91
Thomas Wilcox, AES Corporation . . . . . . . . . 101
George Telfer, Daimler Chrysler . . . . . . . . . 111
Robert Neff, Ameren Energy . . . . . . . . . . . 121
Jay Roman, Ameren Energy . . . . . . . . . . . . 126

PANEL II C - WITNESSES
Michael Loftus, Concerned Captive Coal Shippers 148
James Heller, Concerned Captive Coal Shippers . 151
Daniel V. Slavin, Graniterock . . . . . . . . . 168
Steve Sharp, Arkansas Electric Cooperative Corp 174
Diane Elhakim, Degussa Corporation . . . . . . . 180
James Conway, Griffin Industries . . . . . . . . 186
David Weisel, Potlatch Forest Product Corp . . 192
Stephen Pocsik, Total Petrochemicals USA, Inc . 201
Michael McBride, Total Petrochemicals USA, Inc. 206

Panel III: Trade Associations
John Ficker, The National Industrial
Transportation League . . . . . . . . . . . 227
Curt Warfel, The National Industrial
Transportation League . . . . . . . . . . . 227
Michael McBride, Edison Electric Institute . . 236
Thomas Schick, American Chemistry Council . . . 242

Railroads

Tom Hunt, BNSF Railway Company . . . . . . . . . . 269
James Foote, Canadian National Railway Company 287
Marcella Szel, Canadian Pacific Railway . . . . 296
Christopher Jenkins, CSX Transportation, Inc. . 314
Donald Seale, Norfolk Southern Railway Company 326
Robert Knight,Union Pacific Railroad Company . 334
Robert Dingman, Jr., Oil Creek and Titusville Lines . . . . . . . . . . . . . . . . . . . 349

Panel IV: Consultants

Jay Roman, Escalation Consultants, Inc. . . . . 357
Tom O'Connor, Snavely King Majoros O'Connor & Lee, Inc. . . . . . . . . . . . . . . . . . 372
Mazhar Ali Awan, Transportation Economics, Inc. 383
Sandra Dearden, Highroad Consulting, Ltd. . . . 396
Michael Behe, Freight Resources Network, LLC . 400

panel. Excuse me. I didn't mean to use the word panel. Vice Chairman Mulvey and I will be asking questions as we have in the other situations.

The first witnesses will be with BNSF Railway Company. We'd ask them to come forward please. We'll take the railroads one at a time.

Thank you very much. You're welcome to proceed.

MR. HUNT: Good afternoon, Chairman Buttrey and Vice Chairman Mulvey.

I'm Tom Hunt. I'm the CFO with Burlington Northern Santa Fe and I appreciate you providing me with the opportunity to speak on this important topic for BNSF.

So, let me address a few key points of our fuel surcharge program.

First of all, the objective of the BNSF fuel surcharge program is to recover the increase in fuel expense and the fuel surcharge program is in response to the high cost of fuel and also the high price volatility. The fuel surcharges are common in many other type of industries such as steamship lines,

utilities, trucking, barges and as was published in the Wall Street Journal last week, we've lawn services and pizza delivery companies instituting fuel surcharges.

The next slide shows that from 2001 to 2005 fuel expenses increased approximately $1.5 billion which is a compounded annual growth rate of 25 percent and this is more than four times the rate of increase in all of our other expenses during this same time period.

This slide illustrates three points. First, fuel has been steadily rising. Second, the price of fuel is very volatile and third, there is a high correlation between highway diesel fuel price and BNSF cost of fuel and the biggest difference between the highway diesel fuel and the BNSF cost is taxes and we use the highway diesel fuel as the fuel surcharge program bench mark because it's a widely accepted public statistic.

But, several have claimed that by using highway diesel fuel we're over recovering as opposed to our own cost and this is not correct as we're

measuring the change over time and unless the spread between the two prices widens significantly which it's clearly not doing on that graph, there's no over recovery occurring.

And let's talk about our hedging program because that's come up through a number of people's discussion today and as it says in the headline of this slide, hedging is independent of fuel surcharge.

Hedging is a cost containment strategy, a risk containment strategy where you lock in a future price or a future range of prices. It's like purchasing insurance and deciding what your deductible should be and what you're limits should be on your property insurance policy. But, there is no free lunch and as shown on the bullets up there, if prices rise, you win. If prices fall, you lose and in 2005, our fuel expense was reduced by 21 percent due to hedging. However, in 1998 when fuel prices were low, our fuel expense was actually increased by 13 percent due to hedging and we, in 1998, did not receive any compensation from our customers for that increase in fuel expense and, therefore, shortfall in

profitability relating to our hedging activities.

And finally, many of our customers are in commodity businesses and they're clearly familiar with hedging strategies.

Well, let's get into the details of the actual surcharge program. The history of our program, and this is before the mileage-based program which started this year, was that the truck fuel surcharge program is widely accepted and recognized and we originally used a percent of freight bill primarily because it was easy to administer and the entry point was adopted based on historical average cost of highway diesel fuel which as we saw earlier has a high correlation to BNSF's price per gallon of the diesel fuel we consume and finally, BNSF charges a lower percent of the freight bill than the truck surcharges.

Well, starting in the first of this year, we moved to a mileage-based program for certain groups and let's talk about that because there's been a lot of commentary today about that program.

Well, first of all, a mileage-based program reflects fuel usage and the tables are built

on a business unit by business unit basis for fuel intensity and the mileage table is based upon rail miles and the intent of our mileage-based program is to only recover our cost above threshold and align the surcharge with fuel consumption. The mileage-based program was initiated for non-interline traffic for coal and agricultural commodities on January 1st, 2006 as a response to our customer concerns. Interline moves on these two commodities still move on a revenue-based surcharge because of the shared movement and therefore, the shared billing between the various carriers.

Consumer and industrial products, our remaining two business units, were not converted to mileage-based upon customer concerns and customer feedback and we expect consumer and industrial products to convert to a mileage-based program over time and if they don't, then we intend to make adjustments to avoid for the potential of over recovery resulting from the compounding effect of rate increases.

Let's actually look at the numbers from

BNSF's perspective and these numbers you can actually tie back to our 10K filed with the SEC. The question is are we over recovering and the answer no, not in any year from 2001 to 2005 nor for the five-year period and if you see the number up in sort of the upper left-hand corner, you can see that we have under recovered over that five-year period by $1.1 billion. Now, this is BNSF fuel expense absent the hedge compared to the recoveries from fuel surcharges.

Also, some assert that we over recover in one line of business and in effect, subsidize others and for the five-year period and for the year 2005, all four of our business units fell short of recovering their cost of fuel.

Three of the business units in 2005 recovered a significant amount, i.e., 75 percent or more of the increase in fuel above base while coal, the other business unit, recovered well under 50 percent above its base.

So, fuel surcharge is clearly not a profit center at BNSF.

But, as I stated earlier, we will continue

to monitor the program and over time do not intend to over recover while still administering a workable program and if we find on a business unit basis over time we are over recovering, we will make adjustments to the program.

So, in conclusion, BNSF's fuel surcharge was implemented to cover escalating fuel cost. BNSF is not fully recovering fuel cost above the base price. BNSF has reacted to customer concerns in the marketplace and BNSF believes that a mileage-based fuel surcharge is the most reasonable and appropriate approach.

And finally, all of the details of our surcharge program are readily available on our website BNSF.com.

Now, that's the end of my slides, but I do have a couple of comments and I modified some of the comments that I made based upon some of the testimony that I've heard this morning, but I do want to touch on two other points that have been brought up this morning and I'm sure they would be things that are clearly on your mind in -- to other people's questions

on them as we've gone through the morning and the early part of the afternoon.

First of all, why is the rate on the mileage-based program for grain greater than coal? Let me give you a couple of things. First of all, I'll start by saying the mileage-based program has only been in effect for four months. So, therefore, we're still working through what I'll call the start up of a new methodology. But, there are clear differences in the business model for coal versus ag.

Difference one, coal moves exclusively in unit train operation. Ag moves some in unit train and some in single car movement.

Second is speed. Coal typically moves at the slowest speed on the railroad while ag moves at a variety of speeds sometimes depending on which train it's on and therefore, the higher the speed, typically, the more horsepower you have. Horsepower being locomotive power and therefore, the more fuel intensity you have.

The third activity that causes a difference between the two is the switching

activities, i.e., activities in the yards where there's fuel being consumed, but not real mileage being added. Coal incurs very little switching activity. Ag, especially, the non-unit train agricultural movements, rather, incur switching activities and then finally weight, which was brought up by one of the individuals earlier, especially on the empty moves. Moving the aluminum cars back as opposed to unit grain trains back clearly causes a difference.

So, I think really the question is not so much why is coal different than ag, but is ag unit train different that ag single car and we have one ag rate. We've debated whether we should actually have two ag rates and that's something I think we'll consider in the future, but right now, we just have the one rate.

But, those are the differences between coal and ag businesses which cause ag to be more fuel intensive than coal.

The second thing I'd like to comment on is this whole issue of RCAF and rail cost adjustment

factor. First of all, we have very few contracts, I mean we're talking a very small percentage that actually have a full RCAF and fuel surcharge on them.

But, from our perspective, RCAF is not really the best recovery methodology and the best match anyway because RCAF is a nationwide average that doesn't reflect the higher fuel usage of a long distance carrier like BNSF.

And secondly, as was indicated in the last panel, the weights aren't necessarily reflective of the current weighting of fuel cost especially for a long haul carrier like BNSF. It really doesn't reflect the volatility and the quickness of the movement.

Then thirdly, there are timing differences and estimations differences that the previous panels have talked about.

And finally, many of our contracts only provide for a percent recovery of RCAF as opposed to full RCAF.

And so, when you add all that up, RCAF has woefully under recovered for us and we don't believe

that there should be any double counting here at all. Actually, we believe the best model should be a mileage-based fuel surcharge coupled with an index that describes an all inclusive less fuel index which would be RCAF absent fuel and we think that's the best model and that would address the concerns of most of the parties that spoke on that topic today.

So, that's the extent of my prepared comments. I'd be ready to answer to questions unless you want to ask questions as a panel.

CHAIRMAN BUTTREY: We're not going to do a panel.

MR. HUNT: Okay.

CHAIRMAN BUTTREY: We'll just ask the questions individually.

MR. HUNT: That would be just fine.

CHAIRMAN BUTTREY: There's been a lot made about who's paying this and who's not paying this and we've heard a little bit of everything really.

Do you have any idea what percentage of your traffic is not paying the fuel charge because there's a contract or for some other reason?

MR. HUNT: We disclose our effectiveness rate and we did it on the last analyst call at around 75 percent expecting we do about 80 percent by the end of this year.

As I indicated through 2005, the business units that clearly had fairly high recovery were coal, or I'm sorry, ag, industrial and consumer products. Coal is the one that clearly is significantly under recovery.

MR. HUNT: And that's because of contracts.

CHAIRMAN BUTTREY: And you can unequivocally state for us today that the fuel increase that you're trying to recover is not the fuel increase that you're losing under contract?

MR. HUNT: Are you saying a cross subsidy between the two?

CHAIRMAN BUTTREY: Right.

MR. HUNT: No, each of the business units and again, from my perspective, you know, we're looking at this on a business unit by business unit basis, each one of them under recovered last year.

CHAIRMAN BUTTREY: Across the board?

MR. HUNT: Yes, all four business units.

CHAIRMAN BUTTREY: Okay. If the indexing methodology that might be adopted in the future was something other than what you're using today, what would you recommend as an alternative?

MR. HUNT: I think something that has a high correlation to the fuel we consume and that -- remember the slide that showed the two lines going in parallel. Something that has a high correlation and if it was something that actually was, you know, an off-highway diesel fuel that was a published statistic, I think there's two things that have to be there, high correlation and public visibility.

You know, as long as we find something like that, I think it's fine. I think, you know, pure oil is not the best because it doesn't include the refining component.

VICE CHAIRMAN MULVEY: Thank you. Your company began to view the RCAF as an inadequate method by which to recapture the increased fuel cost. Couldn't you have petitioned the Board for a change in

the way RCAF is calculated?

MR. HUNT: I imagine we could have. That's probably a bit of, I'll say, almost a regulatory question. I'm not a regulatory attorney.

What we have done is we have calculated an index that essentially mirrors RCAF and therefore, is the all inclusive less fuel and then put the fuel surcharge with that and in most of our contracts that are coming up, that's what we actually are using.

VICE CHAIRMAN MULVEY: So, you have the RCAF with the fuel taken out of it.

MR. HUNT: Right.

VICE CHAIRMAN MULVEY: And then put on the surcharge. So --

MR. HUNT: Correct.

VICE CHAIRMAN MULVEY: -- in your estimation, you're not double dipping in any of these contracts?

MR. HUNT: That's correct and as I said before, there are a very small percentage of contracts that have I'll say a full RCAF and fuel surcharge and that was known at the time we negotiated the contracts

with the customers and that's a small percentage.

VICE CHAIRMAN MULVEY: There's been some charge that the fuel surcharge program does not account for efficiency gains. That the railroads achieve tremendous efficiency gains as they're putting in newer locomotives, replacing the older, less fuel efficient ones.

Is there any way to factor in the fuel efficiency gains or do you think that that's being done?

MR. HUNT: I think over time that needs to be accounted for. I would also say that fuel efficiency is something that moves at almost a fairly glacial pace. A 1 percent improvement in efficiency in a year is a big deal. You know, so it's -- the locomotive -- you think about the turnover in the fleet. We've got over 5,000 over the road locomotives on our property and probably over 6,000 in total counting the road switchers and all that and in a big year, we get 300 new ones. So, it moves at a slow pace.

Over time if we achieve significant

efficiency, we should be adjusting the program to reflect that.

VICE CHAIRMAN MULVEY: You can understand how the shippers feel though. In a sense, some shippers feel that look, you've signed these contracts with other shippers where you've agreed to not levy any fuel surcharges and now, you're coming to us to raise our rates effectively or institute these practices for us to cover the costs of serving others and you can see why the shippers would consider this to be unfair. You made these deals and you signed these contracts. Why shouldn't you bear the burden of the errors in signing contracts that don't allow you to recover all of your costs?

MR. HUNT: And I'd say we do bear the burden of that. That's why in my comments earlier I said coal recovering well less than 50 percent.

The place where we have contracts that are longer term where we've not had I'll say rollover and therefore, an opportunity to negotiate a fuel surcharge is really in coal and that's where we are under recovery and when we think about, you know, the

fuel surcharge I talked about, a 75 percent effectiveness, that the vast majority of that 25 percent difference exists within the coal business group. So, I think we are absorbing that.

VICE CHAIRMAN MULVEY: In one of your charts, the bar chart, titled Cumulative Under Recovery. Fuel expense above threshold. What is a threshold?

MR. HUNT: Well, I'll give you the exact answer.

VICE CHAIRMAN MULVEY: Is that yes.

MR. HUNT: Seventy-three cents BNSF or it's about $1.25 highway diesel fuel.

VICE CHAIRMAN MULVEY: And that's 2001 based?

MR. HUNT: Yes, it's --

VICE CHAIRMAN MULVEY: I was trying to figure out, why the word threshold was used instead of a particular time or a particular number.

MR. HUNT: Our surcharge program is the same for all customers and it's highway diesel fuel and then it starts at $1.25 and ratchets up from

there.

VICE CHAIRMAN MULVEY: But, that suggests that an off-highway diesel fuel would be better because it doesn't take into account a lot of the other charges that are put in highway diesel fuel. How do you feel about that?

MR. HUNT: Back to the question earlier, I think as long as we find an index that has a high correlation to what we burn and is publicly available and agreeable to all parties, I have no problem with that.

VICE CHAIRMAN MULVEY: Thank you.

MR. HUNT: Yes.

VICE CHAIRMAN MULVEY: Doug.

CHAIRMAN BUTTREY: I don't have anything else.

VICE CHAIRMAN MULVEY: Thank you very much.

MR. HUNT: Thank you.

CHAIRMAN BUTTREY: Our next witness is Canadian National. Good afternoon.

MR. FOOTE: Good afternoon, Mr. Chairman,

# PX1128

# Filed Under Seal

# EXHIBIT

# PX1129

UNITED STATES OF AMERICA

+ + + + +

SURFACE TRANSPORTATION BOARD

PUBLIC HEARING

RAIL FUEL SURCHARGES

EX PARTE 661

+ + + + +

THURSDAY, MAY 11, 2006

+ + + + +

The Public Hearing convened in Hearing Suite 760, 1925 K Street, N.W., Washington, D.C. 20423-0001, pursuant to notice at 9:00 a.m., Chairman Douglas Buttrey presiding.

SURFACE TRANSPORTATION MEMBERS PRESENT:

DOUGLAS BUTTREY Chairman
FRANCIS MULVEY Vice Chairman

PANELISTS:

GOVERNOR BRIAN SCHWEITZERA

| | |
|---|---|
| TERRY WHITESIDE, | WHEAT & BARLEY COMMISSIONS |
| STEVEN STREGE | NORTH DAKOTA GRAIN DEALERS ASSOCIATION |
| DAN MACK | NATIONAL GRAIN & FEED ASSOCIATION |
| JUDY GILLIES | THE FERTILIZER INSTITUTE |
| ERIC WILKEY | TRANSPORTATION, ELEVATOR, & GRAIN MERCHANTS ASSOCIATION |
| TERRY VOSS | AG PROCESSING |
| GEORGE TELFER | ALLIANCE OF AUTOMOBILE MANUFACTURERS/DAIMLER CHRYSLER |

| | |
|---|---|
| ROBERT NEFF | AMEREN ENERGY FUELS & SERVICES |
| JAY ROMAN | AMEREN ENERGY FUELS & SERVICES/ESCALATION CONSULTANTS |
| THOMAS CROWLEY | WESTERN COAL TRAFFIC LEAGUE |
| PETER PFOHL | WESTERN COAL TRAFFIC LEAGUE |
| BILL MOHL | ENTERGY CORPORATION |
| THOMAS WILCOX | THE AES CORPORATION |
| AMES HELLER | CONCERNED CAPTIVE COAL SHIPPERS |
| MICHAEL LOFTUS | CONCERNED CAPTIVE COAL SHIPPERS |
| STEPHEN POCSIK | TOTAL PETROCHEMICALS USA, INC. |
| MICHAEL MCBRIDE | TOTAL PETROCHEMICALS USA, INC./EDISON ELECTRIC INSTITUTE |
| STEVE SHARP | ARKANSAS ELECTRIC COOPERATIVE CORP. |
| DIANE ELHAKIM | DEGUSSA CORPORATION |
| DAVID WEISEL | POTLATCH FOREST PRODUCT CORP. |
| JAMES CONWAY | GRIFFIN INDUSTRIES |
| DANIEL SLAVIN | GRANITEROCK |
| JOHN FICKER | THE NATIONAL INDUSTRIAL TRANSPORTATION LEAGUE |
| CURT WARFEL | THE NATIONAL INDUSTRIAL TRANSPORTATION LEAGUE |
| THOMAS SCHICK | AMERICAN CHEMISTRY COUNCIL |
| CHARLES LINDERMAN | EDISON ELECTRIC INSTITUTE |
| TOM HUNT | BNSF RAILWAY COMPANY |
| JAMES FOOTE | CANADIAN NATIONAL RAILWAY CO. |
| MARCELLA SZEL | CANADIAN PACIFIC RAILWAY |
| CHRISTOPHER JENKINS | CSX TRANSPORTATION |
| DONALD SEALE | NORFOLK SOUTHERN RAILWAY CO. |
| ROBERT KNIGHT | UNION PACIFIC RAILROAD CO. |
| ROBERT DINGMAN | OIL CREEK & TITUSVILLE LINES |
| TOM O'CONNOR | SNAVELY KING MAJOROS O'CONNOR & LEE, INC. |
| MAZHAR ALI AWAN | TRANSPORTATION ECONOMICS, INC. |
| SANDRA DEARDEN | HIGHROAD CONSULTING, LTD. |
| MICHAEL BEHE | FREIGHT RESOURCES NETWORK, LLC. |

A G E N D A

Opening Remarks - Chairman Buttrey . . . . . . . . 5

Opening Remarks - Vice Chairman Mulvey . . . . . . 11

PANEL I - GOVERNMENT
The Honorable Brian Schweitzer, Gov. Of Montana . 12

PANEL II A - WITNESSES
Eric Wilkey, Arizona Grain . . . . . . . . . . . . 33
Terry Voss, Ag Processing . . . . . . . . . . . . . 36
Dan Mack, Transportation for Feed . . . . . . . . . 40
Steven Strege, North Dakota Grain Dealers Assoc . 49
Terry Whiteside, Wheat and Barley Commission . . 57
Judy Gillies, J.R. Simplot Company . . . . . . . . 62

PANEL II B - WITNESSES
Peter Pfohl, Western Coal Traffic League . . . . . 83
Thomas Crowley, Western Coal Traffic League . . . 88
Bill Mohl, Entergy Corporation . . . . . . . . . . 91
Thomas Wilcox, AES Corporation . . . . . . . . . 101
George Telfer, Daimler Chrysler . . . . . . . . . 111
Robert Neff, Ameren Energy . . . . . . . . . . . 121
Jay Roman, Ameren Energy . . . . . . . . . . . . 126

PANEL II C - WITNESSES
Michael Loftus, Concerned Captive Coal Shippers 148
James Heller, Concerned Captive Coal Shippers . 151
Daniel V. Slavin, Graniterock . . . . . . . . . 168
Steve Sharp, Arkansas Electric Cooperative Corp 174
Diane Elhakim, Degussa Corporation . . . . . . . 180
James Conway, Griffin Industries . . . . . . . . 186
David Weisel, Potlatch Forest Product Corp . . 192
Stephen Pocsik, Total Petrochemicals USA, Inc . 201
Michael McBride, Total Petrochemicals USA, Inc. 206

Panel III: Trade Associations
John Ficker, The National Industrial
Transportation League . . . . . . . . . . . 227
Curt Warfel, The National Industrial
Transportation League . . . . . . . . . . . 227
Michael McBride, Edison Electric Institute . . 236
Thomas Schick, American Chemistry Council . . . 242

Railroads

Tom Hunt, BNSF Railway Company . . . . . . . . . 269
James Foote, Canadian National Railway Company 287
Marcella Szel, Canadian Pacific Railway . . . . 296
Christopher Jenkins, CSX Transportation, Inc. . 314
Donald Seale, Norfolk Southern Railway Company 326
Robert Knight,Union Pacific Railroad Company . 334
Robert Dingman, Jr., Oil Creek and Titusville Lines . . . . . . . . . . . . . . . . . . 349

Panel IV: Consultants

Jay Roman, Escalation Consultants, Inc. . . . . 357
Tom O'Connor, Snavely King Majoros O'Connor & Lee, Inc. . . . . . . . . . . . . . . . . . 372
Mazhar Ali Awan, Transportation Economics, Inc. 383
Sandra Dearden, Highroad Consulting, Ltd. . . . 396
Michael Behe, Freight Resources Network, LLC . 400

to enhance the capacity to meet the demand that we're seeing. Our capital budget this year is $1,146,000,000. At the end of this year and in a four-year hiring period we will have hired 8,000 employees. A 2,000 employee net gain to the company to handle additional business. We will have spent over $600 million on new locomotives.

All of that is to provide service and these six components are the crux of our fuel surcharge application in the market and we will continue to assess that going forward and do the best we possibly can to make sure that we're matching up total service with value.

Thank you very much.

CHAIRMAN BUTTREY: Thank you, sir.

Maybe you said this in so many words, but I'm asking every single witness that comes here if you could unequivocally state for the record that you're not over recovering your fuel costs.

MR. SEALE: Looking over the last six years since we've had a fuel surcharge, I can state that we have not over recovered over that period of

that time. We continue to work on that. We've got 85 percent of our revenues now covered by some form of fuel surcharge.

The negotiation process is very prevalent in this area. There's a lot of variety to what has been put into place and over that period of time on direct diesel fuel, we have under recovered and then if we look at diesel fuel lubricants and gasoline, that number is larger with respect to the under recovery.

CHAIRMAN BUTTREY: Do you put a number on the under recovery?

MR. SEALE: Only on the direct diesel fuel expense starting at our $23 base.

CHAIRMAN BUTTREY: All fuel.

MR. SEALE: Yes, in 2000, it's $87 million and then if you take in gasoline, lubricants and diesel fuel combined and we all operate huge fleets of wheeled vehicles to support train service. That number climbs to $233 million.

VICE CHAIRMAN MULVEY: Getting back to this rate versus practice debate, is it accurate to

# PX1130-PX1142

# Filed Under Seal

# EXHIBIT

# PX1143

**Page Image Missing**
**BNSF-0511674**

OFN: Conversion\0032\BNSF-002\out\tmp\0012\BNSF-0511674.1258515283859.document
X-Extractor: com.cataphora.apps.converter.railroads.hrr.Converter
Author: Reed W. Harris
Title: ---------------------------------------------------------------------------------
LastSave_DTM: 02/28/2003 09:32:36
Create_DTM: 02/07/2009 06:34:30
3_BEGBATES: BNSF-0511674
3_ENDBATES: BNSF-0511718
3_BEGATTACH: BNSF-0511674
3_ENDATTACH: BNSF-0511718
3_CUSTODIAN_NAME: Arnett, James
3_MSFILE_AUTHOR: Reed W. Harris
3_MSFILE_CREATIONTIME: 02/07/2009 08:34:30 AM CST
3_MSFILE_LASTSAVETIME: 02/28/2003 11:32:36 AM CST
3_MSFILE_TITLE: ---------------------------------------------------------------------------------
1_imagePath: Conversion\0032\BNSF-002\merge\0011\BNSF-0511674.tif

THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY
BNSF RULES BOOK 6100-A
(Cancels BNSF Rules Book 6100))
CONTAINING
RULES, REGULATIONS AND SPECIAL CHARGES
GOVERNING
THE TRANSPORTATION OF FREIGHT
ON
THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY
IN
THE UNITED STATES AND CANADA
AND
REGULATIONS GOVERNING CURRENCY EXCHANGE ON TRAFFIC
FROM, TO AND BETWEEN STATIONS IN CANADA
AND
CAR HIRE ON TRAFFIC TO OR FROM MEXICO
For explanation of abbreviations / reference marks, see Item 110
ALSO APPLICABLE ON INTRASTATE TRAFFIC
ISSUED DECEMBER 29, 2000 EFFECTIVE JANUARY 1, 2001
Issued by J. C. Engstrom, P. O. Box 961069, Ft. Worth, TX 76161-0069

BNSF Rules Book 6100 – A

---

Page 1
Table of Contents
Item 100 - BNSF Web Site
......................................................................................................................4
Item 110 - Explanation of Abbreviations and Reference
Marks..............................................................................4
Item 120 - Method of Canceling Items
......................................................................................................5
Item 130 - Notification of
Changes.........................................................................................................................5
SECTION 1 - General Rules And Regulations
....................................................................................................
6
Item 1000 - Description of Governing
Classification.............................................................................6
Item 1020 - Station Lists and
Conditions..................................................................................................

....................6
Item 1040 - Explosives and Dangerous Articles....................................................................................................6
Item 1060 - Reference to Tariffs, Items, Notes, Rules, etc..................................................................................6
Item 1080 - Omnibus Clause..............................................................................................................................6
Item 1100 - Application of Items to Non-Regulated Traffic................................................................................7
Item 1120 - Consecutive Numbers.......................................................................................................................7
Item 1130 – Car Capacity, Issued August 10, 2001 – Effective September 1, 2001 .............................................7
SECTION 2 - Specific Rules And Regulations - Without Charges..................................................................8
Item 2000 - Charges Payable in United States Funds.........................................................................................8
Item 2020 - Deductible on Loss or Damage of Iron or Steel Scrap......................................................................8
Item 2040 - Defective Cars, Minimum Weights on Shipments Loaded In.........................................................8
Item 2060 - Definition of "Intrastate" and "Interstate" Traffic ........................................................................8
Item 2080 - Distance, Method of Obtaining..........................................................................................................8
Item 2100 - Emergency Routing..........................................................................................................................9
Item 2120 - Freight Damaged in Transit Between Stations on BNSF and CSP ..............................................9
Item 2140 - Transaction Privileges and Educational Excise Taxes on Arizona Intrastate Traffic.......................9
Item 2160 - Gross Receipts Tax on New Mexico Intrastate Traffic ..................................................................9
Item 2180 - Mileage Allowance Application...........................................................................................................9
Item 2200 - Order Bills of Lading, Non-Acceptance on Grain to Mexico..........................................................10
Item 2220 - Receipt and Delivery of Freight, Restrictions On ............................................................................10
Item 2240 - Refused or Unclaimed Freight............................................................................................................10
Item 2250A – Rule Governing Security-Type Seals Application, Issued January 31, 2002 – Effective March 1,

2002.........................................................................................................................................10
Item 2260 - Return of Refused or Rejected Shipments.......................................................................................11
Item 2270 – Cargo Loss, Damage and Delay Provisions/Liability Restriction - Issued April 04, 2002 – Effective
April 05, 2002
..........................................................................................................................................11
Item 2280 - Rules Governing Transportation of Railway Passenger Cars.........................................................13
Item 2320 – Prices Required Prior to Shipment, Issued October 10, 2001 – Effective November 1, 2001 ........13
Item 2340 – Method of Calculating Rail Cost Adjustment Factor Based Price Adjustments, Issued March

22,
2002 – Effective March 23,
2002...........................................................................................................14
SECTION 3 - Specific Rules and Regulations - With
Charges....................................................................................15
Item 3000B - Charge - Cancellation of Car Order, Issued July 11, 2002 – Effective August 1, 2002
................15
Item 3020A - Charge - Cleaning and Disinfecting Cars, Cancelled Effective October 31,
2001.......................15
Item 3040A - Charge - Sugar Covered Hopper Cars Rejected for Cleaning,
......................................................15
Cancelled Effective October 31, 2001
..........................................................................................................15
Item 3060 - Charge - Detention on Heavy Duty Flat
Cars..................................................................................15
Item 3080C - Charge – Detention on Mechanical Refrigerator Cars, Issued November 15, 2002 –
Effective
December 1, 2002
....................................................................................................................................16
Item 3100 - Charge - Attendants/Riders Accompanying Freight
Shipments..................................................17
Item 3120 - Charge - On Traffic of Exceptional Dimensions or
Weight...................................................................18
Item 3140A - Charge - Document Delay Charges on Export Traffic to Mexico, Issued November 29, 2001 –
Effective December 24,
2001..........................................................................................................................18



---


Item 3180A - Charge - Failure to Complete Unloading of Bentonite Clay, Cancelled Effective October
31, 2001

..................................................................................................................................19
Item 3200A - Charge - Failure to Complete Unloading of Industrial
Sand,.........................................................19
Cancelled Effective October 31, 2001
..........................................................................................................19
Item 3220 - Charge - Free Time and Detention on Cars Delivered to Water Carriers at Vancouver,
BC..........20
Item 3240 - Charge - Hazardous Materials Destined to
Canada...........................................................................20
Item 3250 – Failure to Complete Unloading of Railcars,
.......................................................................................20
Issued October 10, 2001 – Effective November 1, 2001
.......................................................................................20
Item 3260B - Charge - Failure to Complete Unloading of Sugar, Issued December 11, 2002 – Effective
January
1,
2003.................................................................................................................21
Item 3265A – Charge – Failure to Complete Unloading of Sugar Beet Pulp Pellets
........................................21
Cancelled Effective October 31, 2001
..........................................................................................................21
Item 3280 - Charge - Shipments Held for

Orders.......................................................................................................21
Item 3300B - Charge - Special Freight Train Service – (Issued February 28, 2003 – Effective March 21, 2003)
(Increase)............................................................................................................................................23
Item 3320 - Charge - Turning of Empty Unit Train Cars .....................................................................................24
Item 3340 - Charge - Destination Detention on Sugar Cars.......................................................................................24
Item 3350 – Charge – Ride Quality Testing or Monitoring Equipment, Issued November 9, 2001 – Effective
December 1, 2001
.........................................................................................................................................24
Item 3375A - Charge – Fuel Surcharge, Issued May 1, 2001 – Effective July 1, 2001.....................................25
Item 3400D – Credit Terms, Issued February 24, 2003 – Effective February 25, 2003.....................................26
SECTION 4 - Regulations Governing Currency Exchange On Traffic From, To, And Between Stations In
Canada.......................................................................................................................................................28
Item 4000 - Application
..............................................................................................................................28
Item 4020 - Basis Rate of Exchange..........................................................................................................................28
Item 4040 - Governing Date for Application of Surcharge or Discount...........................................................28
Item 4060 - Surcharge or Discount to be Shown on Freight Bills ..............................................................28
SECTION 4A - Applicable when United States Currency Is At A Premium In Relation To Canadian Currency (Effective January 4, 2001).............................................................................................................29
Item 4100 - Surcharge.................................................................................................................................29
Item 4120 - Domestic Traffic............................................................................................................................29
SECTION 4B - Applicable when United States Currency is at a Discount in relation to Canadian Currency
(Effective January 4, 2001)
.....................................................................................................................................30
Item 4200 - Discount or Surcharge
.......................................................................................................................30
Item 4220 - Domestic Traffic............................................................................................................................30
SECTION 5 – Section Cancelled in Last Revision with an Effective Date of December 24, 2001 .................31
Item 5000 – Item Cancelled Account Obsolete .........................................................................................31
Item 5040 – Item Cancelled Account Obsolete .........................................................................................32
Item 5060 – Item Cancelled Account Obsolete .........................................................................................33
Item 5080 – Item Cancelled Account Obsolete .........................................................................................34

Item 5100 – Item Cancelled Account Obsolete
.........................................................................................................35
SECTION 6 – Rules And Other Governing Provisions Specific Rules and Regulations Governing Frozen And Non-Frozen Commodities Requiring Mechanical Protective Service (transferred from BNERM 1), Issued January 16, 2001 – Effective January 17, 2001.....................................................................................36
Rules in Section 6 Take Precedence Over Any Conflicting Rules In This Book, Or In Section 1 of BNERM 1.
..........................................................................................................................................................................36
Item 6000 - Mechanical Refrigerated Equipment Furnished By Carrier
...............................................................36
Issued January 16, 2001 – Effective January 17, 2001.....................................................................................36

BNSF Rules Book 6100 – A

---

---



Item 6020 - Private Owned Or Leased Cryogenic ($CO_2$) Equipment...................................................................36
Item 6030 – Private Owned or Leased Mechanical Refrigerated Equipment, Issued March 6, 2002 – Effective April 1, 2002
...................................................................................................................................................36
Item 6040A - Rules Governing Mechanical Protective Service or (MPS), Issued May 25, 2001 – Effective June 15, 2001.......................................................................................................................................37
Item 6060A - Operation Of BNSF Owned Or Controlled Mechanical Units, Issued March 8, 2002 – Effective April 1, 2002
...................................................................................................................................................38
Item 6080 - Empty Movement Of Privately Owned Cars.....................................................................................38
Item 6100 - Return Of Pallets, Pallet Sides, Platforms, Skids, Dunnage, Etc.....................................................38
Item 6120 - Offer Of Section 11706 ('Carmack') Liability...................................................................................38
Item 6120 - Offer Of Section 11706 ('Carmack') Liability (Concluded)
...............................................................39
Item 6140A - Loss And Damage Provisions/Liability Restrictions, Issued May 25, 2001 – Effective June 15, 2001...............................................................................................................................................39
Item 6160 - Claim Procedures, Issued January 16, 2001 – Effective January 17, 2001......................................41
Item 6180 - Mechanical Protective Service Charges BNSF Owned Or Controlled Mechanical Refrigerated Cars
Charges In Dollars Per Car
...................................................................................................................43
Item 6200 - Stopping.............................................................................................................................44
Item 6220 - Mexico...............................................................................................................................44
Item 6240A - Cleaning Fees, Issued November 12, 2002 – Effective January 1, 2003......................................44

Item 100 - BNSF Web Site

This Book is now available on the Internet for viewing or sending directly to your printer. The BNSF Home Page address is http://www.bnsf.com. BNSF has provided a link to the Adobe Homepage so that Acrobat Reader software can be downloaded onto your computer allowing you to print a copy, on your Personal Computer, that will mirror the hard copy you now get via mail. BNSF is also exploring ways to send interested parties an EMail message whenever an amendment or reissue of this Book takes place. Our ultimate goal is to have you, the user of this Book, obtain your copy of the printed information contained in this Book directly from the BNSF web site.

Beginning January 1, 2001 an annual $100 subscription fee will be assessed for those who wish to receive a hard copy through the mail.

If, at this time, you are not prepared to obtain a copy of this Book directly from the BNSF web site, then a hard copy of this Book will be mailed to you, provided you furnish, to the address shown below, a formal written request for a printed copy. This formal request is required on an annual basis in accordance with the Surface Transportation Board's recent policy decision under Ex Parte 528, Disclosure, Publication, and Notice of Change of Rates and Other Service Terms for Rail Common Carriage.

If your company is already using the Internet and you visit the BNSF web site, your comments regarding access to the Book would be appreciated. If you are not currently using the Internet, your comments regarding the above concept would also be appreciated. All comments should be directed to:

Manager Auxiliary Prices
The Burlington Northern and Santa Fe Railway Company
P. O. Box 961069
Ft. Worth, TX 76161-0069

Item 110 - Explanation of Abbreviations and Reference Marks

ABBREVIATION EXPLANATION
BNSF Burlington Northern and Santa Fe Railway Company, The
BOE Bureau of Explosives
CFR Code of Federal Regulations
CSP Camas Prairie Railnet, Inc
OPSL Official List of Open and Prepay Stations
NSRQ Norfolk Southern Rate Quotation
RER Official Railway Equipment Register
TM The Texas Mexican Railway Company
UFC Uniform Freight Classification
US United States

REFERENCE MARK EXPLANATION
(A) Denotes increase.
(B) Denotes reduction.
(C) Denotes changes in wording which result in neither increases nor reductions in charges.

Item 120 - Method of Canceling Items

As this book is revised, numbered items with letter suffixes will be used in alphabetical sequence starting with A.

Example: Item 3000-A cancels item 3000, and item 3000-B cancels item 3000-A in a prior revision, which in turn cancelled item 3000.

Item 130 - Notification of Changes

1. As items in this book are revised, the remarks "Increase, Reduction or Change in Wording" will be shown in parenthesis to the right of the effective date of the item.

Example:

Item 1000 – Description of Governing Classification

Issued March 1, 2001 – Effective April 1, 2001 (Change in Wording)

2. In addition, the effective date of the revised item will be added in parenthesis to the Table of Contents on page 1 to identify which item(s) have been changed.

Example:

Item 1000 – Description of Governing Classification (Effective April 1, 2001)

3. The paragraph that has been changed within the item will contain one of the following reference marks placed at the end of the paragraph.

(A) Denotes Increase.

(B) Denotes reduction. `

(C) Denotes changes in wording which result in neither increases nor reductions in charges.

Example:

The term "Uniform Freight Classification", when used herein, means UFC 6000-Series. (C)

---



SECTION 1 - General Rules And Regulations

Item 1000 - Description of Governing Classification

The term "Uniform Freight Classification", when used herein, means UFC 6000-Series.

---

Item 1020 - Station Lists and Conditions

This Book is governed by OPSL 6000-Series to the extent shown below:

A. For additions and abandonments of stations, and, except as otherwise shown herein, for prepay requirements, changes in names of stations, restrictions as to acceptance or delivery of freight, and changes in station facilities. When a station is abandoned as of a date specified in OPSL 6000-Series, the rates from and to such station are inapplicable on and after that date.

B. For geographical locations of stations.

C. For the identification of stations when stations are shown or referred to by numbers.

---

Item 1040 - Explosives and Dangerous Articles

For rules and regulations governing the transportation of explosives and other dangerous articles, also specifications for shipping containers, and restrictions governing the acceptance and transportation of explosives and other dangerous articles, see BOE 6000-Series.

---

Item 1060 - Reference to Tariffs, Items, Notes, Rules, etc.

Where reference is made in this Book to tariffs, items, notes, rules, etc., such references are continuous and include supplements to and successive issues of such tariffs and reissues of such items, notes, rules, etc.

---

Item 1080 - Omnibus Clause

Except as otherwise provided, shipments made under rates referring to this Book are entitled to the following services: Car service, demurrage, drayage, diversion, inspection, reconsignment, stopping, storing,

switching, transfer, weighing and other Terminal Services, and are subject to the charges therefor, if any, of the carrier performing the service.

---



---



Item 1100 - Application of Items to Non-Regulated Traffic

On non-regulated rail traffic, such as that transported under an exempt transportation contract, under an exempt rate quotation, or under an exempt rate memorandum, except to the extent that special provisions for accessorial services to be provided by BNSF are stated within the transportation contract, exempt rate quotation or exempt rate memorandum, the rules, regulations and charges for such accessorial services will be as set forth in tariffs or books to which BNSF is a party and shall apply to the same extent and in the same manner as if the subject transportation had been regulated.

As a partial listing of the accessorial services described herein, and not in limitation thereof, accessorial services are defined to include demurrage, detention of freight cars, diversion, holding cars, inspection, protective service, reconsignment, reweighing, special freight train service, spotting, stoppage to complete loading or partly unload, storage, switching, transit, weighing, and other services not specified above.

---

Item 1120 - Consecutive Numbers

Where consecutive numbers are represented in this Book by the first and last numbers connected by the work "to" or a hyphen, they will be understood to include both of the numbers shown and all numbers in between the first and last numbers.

If the first number only bears a reference mark, such reference mark also applies to the last number shown and to all numbers between the first and last numbers.

---

Item 1130 – Car Capacity, Issued August 10, 2001 – Effective September 1, 2001

Car capacity parameters, formerly based on Nominal Capacity, are now based on Load Limit. For marked capacities, lengths, dimensions and cubical capacities of cars, see Equipment Characteristics at http://www.bnsf.com/cws/eqpumler/index.html.



---



SECTION 2 - Specific Rules And Regulations - Without Charges

Item 2000 - Charges Payable in United States Funds

Except as otherwise provided, rates and charges in this Book, and those making reference to this Book, are stated in money of the United States and are payable in United States' dollars or its equivalent.

---

Item 2020 - Deductible on Loss or Damage of Iron or Steel Scrap

No claim or suit for the physical loss or damage to any shipment of Iron or Steel Scrap, transported via BNSF, shall be made or filed by a Customer for amounts of $250.00 or less (Minimum Claim Amount). If customer's proven loss or damage is in excess of the Minimum Claim Amount, the Minimum Claim Amount shall be deducted from any claim made against carrier(s) for any shipments transported by the carrier(s).

---

Item 2040 - Defective Cars, Minimum Weights on Shipments Loaded In

If, by reason of the character, construction, or age of equipment furnished, the minimum carload weight, as specified in the tariffs or classifications, cannot be loaded, the minimum weight to be charged for on shipments loaded therein shall not exceed the safe loading capacity as determined by the Operating, Transportation or Inspection Departments.

---

Item 2060 - Definition of "Intrastate" and "Interstate" Traffic

A. The term "Intrastate Traffic" applies to traffic having origin, destination and entire transportation within the same state.

B. The term "Interstate Traffic" applies to:

1. Traffic having origin in one state and destination in another state; or
2. Traffic having origin and destination within the same state when transported via a route operating through another state.

---

Item 2080 - Distance, Method of Obtaining

Various charges in documents referring to this Book are based on mileages. To determine miles refer to BNSF Internet Public Rate Retrieval or BNSF Rail Mileage Inquiry at BNSF.com. When rates are not shown for exact distances, use rates for next greater distance.

---



---



Item 2100 - Emergency Routing

Rates in documents referring to this Book will apply only via the routes and junction points authorized therein, except that when in the case of pronounced traffic congestion (not an embargo), washout, wreck, or other similar emergency, or through carrier's error, carriers forward shipment via other junction points of the same carriers, the rate to apply will be that specified in the document referring to this Book but not higher than the rate applicable via the route of movement.

---

Item 2120 - Freight Damaged in Transit Between Stations on BNSF and CSP

The following applies on freight shipments that are damaged in transit when moving via the BNSF from or to stations on the CSP.

1. Shipments damaged in transit and refused by consignees, will, upon order of the Director, Freight Claims, Topeka, KS, be returned to shippers via the route and line over which such shipments moved, free of any charges, or, at carrier's option, be forwarded to such point on its lines that offer the best facilities or opportunities for advantageous disposal.
2. Shipments refused by consignees owing to causes for which the carrier is wholly responsible, will, upon order of the Director, Freight Claims, Topeka, KS, be returned to shippers free of any charges, in the same manner as provided for shipments damaged in transit.

---

Item 2140 - Transaction Privileges and Educational Excise Taxes on Arizona Intrastate Traffic

All carload rates and charges in connection with Arizona intrastate traffic are subject to the Arizona transaction privileges and educational excise taxes in effect at the time of shipment.

---

Item 2160 - Gross Receipts Tax on New Mexico Intrastate Traffic

All carload rates and charges in connection with New Mexico intrastate traffic are subject to the New Mexico Gross Receipts Tax in effect at the time of shipment.

---

Item 2180 - Mileage Allowance Application

By use of rates making reference to this Book, shipper warrants that its interest in the equipment used under rates subject to this Book is sufficient to permit it to waive full payment of mileage allowance. Shipper will, and BNSF will not, be liable for mileage allowances in excess of the above obligation. In the event that a party other than the shipper using these rates submits a claim to railroad for mileage allowance payments in excess of BNSF's obligation under this tariff, shipper shall, at BNSF's option, either (1) release, defend and indemnify BNSF from said claim including attorney's fees and cost of litigation, or (2) reimburse BNSF for excess mileage allowances paid by BNSF within thirty (30) days of notice by BNSF.

---



Item 2200 - Order Bills of Lading, Non-Acceptance on Grain to Mexico

Shipments of Grain and Grain Products, as defined in Tariff BNSF 4022-4023 Series, from BNSF origins to destinations in Mexico may only be made under a Straight Bill of Lading. Order Bills of Lading for shipments of Grain and Grain Products billed to destinations in Mexico will not be accepted by the BNSF.

---

Item 2220 - Receipt and Delivery of Freight, Restrictions On

Nothing in tariffs to which BNSF is a party shall require BNSF to receive or deliver any carload or less than carload shipment when such receipt or delivery is impracticable because of any riot, strike, picketing or other labor disturbance.

---

Item 2240 - Refused or Unclaimed Freight

The following practice will be followed in the handling of freight which is refused or unclaimed.

A. Non-Perishable Freight Consignee, as described in the waybill, will be notified promptly of the arrival of shipments at destination. In case of refusal by consignee to accept the freight, or if freight is unclaimed five days after notice of arrival has been duly sent or given, consignor will be sent a notice showing:

Name of consignee

Description of freight

Point of origin and date of shipment whether property has been refused or remains unclaimed;

which notice should also state substantially that if disposition is not arranged for, the property will be subject to sale as provided in Section 4, Paragraph (b) of the Uniform Bill of Lading as published in Tariff UFC 6000-Series.

B. Perishable Freight Consignee will be notified promptly of the arrival of perishable freight, but whenever necessary to prevent loss or waste, perishable freight which is refused, unclaimed or undelivered may be sold at the discretion of the carrier, without advertising and without further notice, as provided in Section 4, Paragraph (c) of the Uniform Bill of Lading as published in Tariff UFC 6000-Series.

---

Item 2250A – Rule Governing Security-Type Seals Application, Issued January 31, 2002 – Effective March 1,

2002

It is the shipper's responsibility to protect the safety and integrity of their lading, including but not limited to, the application of security-type seals to shipments for prevention of unauthorized access to lading. While in its custody, BNSF acknowledges its responsibility to maintain the integrity of the lading commensurate with its applicable common carrier or contract carrier obligation. However, the mere presence of a broken seal or missing seal, alone does not deem the lading to be contaminated or adulterated. Accordingly, BNSF will not acknowledge responsibility for alleged contamination or adulteration unless there is evidence to support same. Likewise, the shipper is responsible to provide documentary evidence that each shipment is properly protected with security seals prior to release at origin.



---



Item 2260 - Return of Refused or Rejected Shipments

A. When a shipment has reached destination but is refused or rejected and not unloaded and is returned to the original point or a directly intermediate point, the return movement will be subject to (1) the rate, minimum weight and route from the original point in effect on date shipment is tendered for return, or (2) to the rate, minimum weight and route applicable for such return movement, if lower.

B. When the refused or rejected shipment moved to destination from a transit station on a reshipping or transit balance rate, the return movement to the transit station will be subject to (1) the local or joint carload rate, minimum weight and route from the transit station to destination in effect on date shipment is tendered for return, or (2) to the rate, minimum weight and route applied for such return movement, if lower.

C. When a refused or rejected car was part of a shipment subject to multiple car or unit train rates, the return movement will be subject to (1) the applicable single car rate, minimum weight and route from the original shipping point to destination in effect on date shipment is tendered for return, or (2) to the rate, minimum weight and route applied for such return movement, if lower.

D. The provision of this item do not apply to Coal (STCC 11).

---

Item 2270 – Cargo Loss, Damage and Delay Provisions/Liability Restriction - Issued April 04, 2002 – Effective April 05, 2002

The provisions of 49 U.S. C. § 11706 do NOT apply to shipments which are governed by the terms of this Rule Book.

Carrier* will not be liable for loss, damage or delay to lading caused by an Act of God, a public enemy, the authority of law, labor strikes, acts of civil disobedience, the inherent nature or character of the lading, natural shrinkage, an act or default of the shipper/consignor, owner or consignee/receiver, or from any cause whatsoever which occurs while the lading is not in the actual physical custody and control of Carrier.

Shipper is responsible for proper and lawful packaging, loading, stacking, blocking, bracing and ventilation of the cargo. Shifting of a load enroute is, of itself, not evidence of Carrier mishandling. If other than a vehicle** with mechanical protection against heat and cold is requested by the shipper/consignor, Carrier is not responsible for

the deterioration of the product which may occur because of temperature within the vehicle. Shipper is responsible for affixing a seal to each vehicle door or hatch.
Shipper acknowledges and accepts the inherent tendency of perishable goods to deteriorate or decay. Carrier is not liable for the decline of goods as is reasonably expected to occur while enroute. Carrier is not liable for the decline of goods attributable to disease or decay within the goods when loaded.
Carrier is not liable for shortage of lading unless there is physical evidence of unauthorized forced entry into the vehicle while in Carrier's possession. Shortage claims must be verified and supported by an actual tally of packages loaded at origin and an actual tally of packages unloaded at destination. Origin and destination seal records must be furnished.
Carrier agrees to transport shipments with reasonable dispatch. Carrier does not guarantee rail service within any particular time frame. Carriers maximum liability for cargo is the lower of its original cost or the cost of replacement. Carrier is not liable for special or consequential damages or for damages due to market decline.
Carrier will not be responsible for any loss, damage or delay to cargo that occurs outside of the United States or Canada. (Item continued on next page)



---



Item 2270 – Cargo Loss, Damage and Delay Provisions/Liability Restrictions (Continued)
A claimant must mitigate its damage by acceptance of damaged cargo unless the goods are totally worthless. A claimant may not abandon damaged goods to Carrier when the damaged lading retains more than minimal value.
Product that is abandoned to Carrier in an undamaged condition will be sold and the salvage proceeds only, less salvage expenses, will be remitted to the owner.
There shall be no presumption of carrier fault for the loss, damage or delay of cargo. The burden of proof to establish the culpability of Carrier is upon the claimant. Carrier is not liable for any loss, damage or delay of cargo, except where Carrier's intentional act or omission, gross negligence or simple negligence is the direct and proximate cause of the injury. If Carrier's act or omission is not the sole cause of the injury but contributes to the loss, damage or delay to the cargo, then Carrier will be liable only for that portion of the injury as corresponds to its comparative culpability.
Carrier's maximum liability per vehicle is $ 250,000.00. BNSF will not be liable for damage where BNSF's liability is determined to be $250.00 or less per vehicle. No claim will be filed or paid for injury to lading of less than $ 250.00 per vehicle. (Not applicable when in conflict with Item 6160 of this Rules Book.) (C)
Filing of Claim
As a condition precedent to the recovery on any claim, Carrier and shipper/consignor must be notified promptly upon discovery of the injury to cargo and Carrier must be allowed to inspect the lading. Failure of Carrier to inspect the cargo will not constitute an admission of liability by Carrier or alter the burden of proof on claimant to establish the liability of Carrier.
If the location of the loss, damage or delay to the cargo is known to the claimant, the claim must be filed with that rail carrier on whose line the injury occurred. Otherwise, the claim may be filed with any linehaul

rail carrier in the route of movement.

As a condition precedent for recovery against Carrier, a claim for loss, damage or delay to the cargo must be filed within nine months of the date of delivery of nine months of the reasonably anticipated date of delivery if delivery is not made. Should Carrier decline a claim, suit thereon may not be brought more than nine months after the date of Carrier's written declination. Federal carrier law governs the determination of liability; no State or common law causes of action will be recognized. A lawsuit against Carrier based on indemnification must satisfy the aforestated time limitations for filing a claim and for initiating a lawsuit.

A claim must be in writing and must include the following documentation:

Information identifying the rail shipment, including vehicle initial and number, shipper's/consignor's and consignee's/receiver's name, address and telephone number, shipping date, and commodity.

Origin records or certification on the condition and quantity of the lading at the time the goods were tendered to the origin carrier.

Destination records or certification on the condition and quantity of the lading at the time the goods were received from the destination carrier.

A demand for payment of a specific amount, with a statement of the formula or basis on which the damages are calculated, plus evidence in support of the calculation.

Documentation as to disposition of damaged lading and the salvage proceeds therefrom.

On a fresh fruit or vegetable claim, origin and destination USDA inspection reports or the Canadian government equivalent. (Item continued on next page)



---



Item 2270 – Cargo Loss, Damage and Delay Provisions/Liability Restrictions (Concluded)

A freight loss, damage or delay claim filed with BNSF is to be mailed to:

Director, Freight Claims
Burlington Northern Santa Fe Railway
Post Office Box 1738
Topeka, Kansas 66601

Full Liability Transportation Service

As an alternative to the foregoing Restricted Liability provisions, Carrier offers Full Liability transportation subject to the terms and conditions of 49 U.S.C.§ 11706 (Carmack Amendment) at a rate or charge higher than that applicable to transportation under restricted liability terms. If the shipper elects the Carmack Amendment alternative, it must: (a) not later than the time that the railcar is ordered for loading, notify Carrier of its intention to subject the shipment to 49 U.S.C. § 11706 and obtain from the Carrier the applicable transportation rate or charge; (b) place on the bill of lading or shipping order the notation "Shipment is subject to 49 U.S.C. § 11706"; and acknowledge that the linehaul transportation charge will be billed 'prepaid'. The shipper's failure to comply strictly with all of the requirements for transportation subject to 49 U.S.C. § 11706 shall create a conclusive presumption that the shipment is intended for transport on the Restricted Liability terms of this Item.

* "Carrier" includes BNSF Railway and all of its connecting linehaul and switching railroads on any shipment for which this Rule Book applies.

** "Vehicle" includes a railcar of any description, a trailer, or a container.

Item 2280 - Rules Governing Transportation of Railway Passenger Cars

Except as otherwise provided, BNSF will not accept for transportation over its line or for placement or storage on its tracks or in its yards any railway passenger car or railroad business car, with or without passengers.

Item 2320 – Prices Required Prior to Shipment, Issued October 10, 2001 – Effective November 1, 2001

BNSF will issue freight bills based on rates that are in effect at the time shipments are tendered to us for movement. Please show the applicable price authority number on your bills of lading (e.g., BNSFQ 12345).

BNSF will not allow backdated pricing to cover carload shipments where the customer tendered a shipment prior to a price agreement or after a price agreement has expired. If no other price is in place at the time of movement, existing public prices will be used. For joint line shipments, if an existing through price is not in place, then BNSF will rate and bill these as Rule 11 shipments. This means each line haul railroad will bill the customer for their portion of the shipment





Item 2340 – Method of Calculating Rail Cost Adjustment Factor Based Price Adjustments, Issued March 22, 2002 – Effective March 23, 2002





SECTION 3 - Specific Rules and Regulations - With Charges

Item 3000B - Charge - Cancellation of Car Order, Issued July 11, 2002 – Effective August 1, 2002

A. The provisions of this paragraph are no longer applicable.

B. A cancellation charge of $75.00 per car, except Mechanical Refrigerator cars a charge of $300.00 per car, will be applied whenever a car that is already applied to a car order and that car order is canceled, reduced or changed. One of the following conditions must be met before charges are applicable:

1. If order is for equipment furnished by BNSF, cars must be spotted at industry at the time the order is canceled, reduced, or changed (See EXCEPTION); or
2. If order is for equipment furnished by a foreign carrier, cars must be placed on interchange track, already received by BNSF, or spotted at industry at the time the order is canceled, reduced or changed.
3. If order is for equipment ordered by foreign carrier from BNSF, cars must be placed on interchange track or already delivered to foreign carrier at time the order is canceled, reduced or changed (See NOTE).

EXCEPTION: The cancellation charge does not apply to BNSF owned or leased equipment ordered to load commodities covered by Tariff BNSF 4022-Series and BNSF 4023-Series. For provisions to apply see Item 12163 of BNSF 4022-Series and BNSF 4023-Series.

NOTE: BNSF will not absorb any charges assessed by a foreign carrier for the handling of a car ordered and not used in transportation service. Any charges assessed by the foreign carrier will be billed to the party canceling the order.

Item 3020A - Charge - Cleaning and Disinfecting Cars, Cancelled Effective October 31, 2001
When BNSF is required to disinfect or clean a box car under State, Federal, County, or Municipal regulations, a
charge of $234.00 per car will be assessed against the freight payor of the shipment for which such cleaning and
disinfecting is made. This charge will be in addition to any applicable charge for fumigation.

Item 3040A - Charge - Sugar Covered Hopper Cars Rejected for Cleaning,
Cancelled Effective October 31, 2001
Empty Covered Hopper Cars, last containing Sugar (STCC 20-621 and 20-629), rejected for cleaning will be
subject to a charge of $800 when the prior load was originated by the current shipper rejecting the car.

Item 3060 - Charge - Detention on Heavy Duty Flat Cars
For detention and use charges on heavy duty flat cars, see Tariff RPS 6740-Series.


Item 3080C - Charge – Detention on Mechanical Refrigerator Cars, Issued November 15, 2002 – Effective
December 1, 2002
This item applies only on railroad owned or railroad controlled Mechanical Refrigerator Cars. The charges herein
apply whether or not the refrigeration unit is running. In determining the assessment of charges, Sundays will be
considered chargeable days and the 12 Holidays as listed in BNSF Demurrage Book 6004, Item 140 series will be
considered free days. (See Exception 1)
Detention will be calculated from the first 12:01 a.m. after loaded cars are actually placed at destination, or are
constructively placed either short of destination or at destination, and will continue until such time as cars are
released empty back to the railroad. After three days, detention charges of $50.00 per day per car for cars with
inside length of 63 feet or less and $100.00 per day per car for cars with inside length greater than 63 feet will be
assessed against the party unloading the railcars. Also, detention will be calculated from the first 12:01 a.m. after
empty cars are actually placed at origin, or are constructively placed either short of origin or at origin, or if
actually placed prior to the date ordered from the first 12:01 of the order date, and will continue until such time as
cars are released as a load with proper billing. After three days, detention charges of $50.00 per day per car for
cars with inside length of 63 feet or less and $100.00 per day per car for cars with inside length greater than 63
feet will be assessed against the party loading the railcars.
All detention charges will be issued by BNSF and are payable to BNSF whether the loader or unloader is located
on the BNSF, served through reciprocal switching or is located offline from the BNSF.
Exception:
1. This exception applies to mechanical refrigerator cars moving in BNSF revenue line haul service. When actual
placement for loading or unloading is on Friday or Saturday, the Saturday preceding the first Sunday is non-
chargeable and the first Sunday is non-chargeable. All subsequent Saturdays and Sundays are chargeable.

Item 3100 - Charge - Attendants/Riders Accompanying Freight Shipments

A. This item applies for transportation in freight service of each attendant/rider accompanying freight shipments where such transportation is reasonably required. This item will apply only when advance arrangements have been made between the party to accompany freight shipment and BNSF. Each attendant/rider accompanying a shipment under the provisions of this item must execute a BNSF Release Form in accordance with Rule 43 of the Uniform Freight Classification Tariff UFC 6000-Series prior to movement of shipment. Bill of lading covering shipment must indicate when attendant/rider will accompany the shipment, number of such attendants/riders, and points between which they are to accompany the shipment. BNSF is not required to furnish special accommodations for person(s) riding freight trains.

B. The one-way charge for each attendant/rider accompanying freight shipments is as follows:

BNSF Charge Per Attendant/Rider

BNSF Mileage Charge Per Attendant/Rider

1000 or less $250.00

1001 to 2000 $400.00

2000 and over $650.00

To determine miles, refer to BNSF Internet Public Rate Retrieval or BNSF6003 Rail Mileage Inquiry at www.BNSF.com.





Item 3120 - Charge - On Traffic of Exceptional Dimensions or Weight

Traffic of exceptional dimensions or weight, which can only be handled subject to restrictions when accompanied by representatives of the Track and Signal Departments to remove and replace switch stands, targets, and dwarf signals, reinforcing of bridges or track or any extra work required to be done over and above normal handling by representatives of Car or Engineering Department to accompany load for safety reasons, will be subject to additional charges over and above the freight charges based on actual cost incurred by BNSF for services performed.

Item 3140A - Charge - Document Delay Charges on Export Traffic to Mexico, Issued November 29, 2001 – Effective December 24, 2001

Carload shipments moving from the United States to Mexico via any Texas-Mexico border crossing points are subject to the following provisions when held on the BNSF awaiting clearance of Mexican Customs and release for entry into Mexico.

A. Calculations of Charges:

1. Seventy-two (72) hours free time will be allowed for the surrender of all documentation necessary for the clearance of Mexican Customs and release for entry into Mexico.

2. Free time will be computed from the first 12:01 a.m. after "Despacho Previo" (See Note) notification. Saturdays, Sundays, and holidays will be excluded in the computation of free time except as noted below.

Note: "Despacho Previo" is a Mexican Customs' program to pre-document exports from the United States

into Mexico prior to the interchange of cars to a Mexican railroad.

3. Following the expiration of free time, a Document Delay charge of $50.00 per car, per day, or fraction thereof, will be assessed until the car is released for entry into Mexico.

4. Saturdays, Sundays, and holidays, occurring subsequent to any chargeable day, will be considered chargeable days.

B. Notification and Release:

1. "Despacho Previo" notification will be sent or given by the BNSF to the consignee, or party designated by the shipper to receive same, when unit enters the BNSF computer system through customer shipping instructions or interchange receipt from connections carriers.

2. Cars will be considered to be "released" for entry into Mexico when all of the following requirements have been met:

(a) All freight and accessorial charges due the BNSF have been paid; and

(b) All requirements to legally export the shipment from the United States to Mexico have been met, and the required documents are furnished to the BNSF; and

(continued on next page)



---



Item 3140A - Charge - Document Delay Charges on Export Traffic to Mexico (concluded)

(c) All requirements to legally import the shipments into Mexico have been met and proof furnished to the BNSF.

(d) Shipping instructions have been received by the Mexican rail carrier.

C. Holidays:

The following United States and Mexican holidays will be recognized as holidays in the calculation of charges:

New Year’s Day – January 1
Martin Luther King Day – Third Monday of January
Constitution Day - February 5
Presidents Birthday – Third Monday of February
Birthday of Benito Juarez - March 21
Good Friday – Friday before Easter Sunday
Labor Day - May 1
Memorial Day – Last Monday of May
Independence Day – July 4
Labor Day – First Monday of September
Independence Day – September 16
Anniversary of Mexican Revolution - November 20
Thanksgiving Day – Fourth Thursday of November
Christmas Day – December 25

---

Item 3180A - Charge - Failure to Complete Unloading of Bentonite Clay, Cancelled Effective October 31, 2001

Open-top or covered hopper cars of Bentonite Clay (STCC 14-511-10 and 32-952-32), which are released from unloading, but have not been completely unloaded, will incur a cleaning charge of $350.00 per car. Such charge will be assessed against the consignee or party responsible for releasing the car before all of the lading has been removed. Refer to Rules 14 and 27 in Tariff UFC 6000-Series.

---

Item 3200A - Charge - Failure to Complete Unloading of Industrial Sand,
Cancelled Effective October 31, 2001

Covered hopper cars of Industrial Sand (STCC 14-413), which are released from unloading, but have not been completely unloaded, will incur a cleaning charge for any material over 1,000 pounds at a rate of $75.00 for each 2,000 pounds of material over the first 1,000 pounds. Such charge will be assessed against the

consignee or party
responsible for releasing the car before all of the lading has been removed. Refer to Rule 27 in Tariff UFC 6000-Series.

---



---

Item 3220 - Charge - Free Time and Detention on Cars Delivered to Water Carriers at Vancouver, BC

This item applies on all railroad and railroad controlled cars for which BNSF pays or receives per diem, including BNSF owned or leased cars.

A. Seven (7) days free time will be allowed from the arrival of loaded or the availability of empty cars for delivery to a water carrier at the BNSF terminal yard in Vancouver, BC, and shall be considered delivered following notification.

B. Free time will begin at the first 12:01 a.m. following telephone notification, confirmed by Fax transmission of the arrival of loaded cars; or the telephone notification of empty cars available at the BNSF terminal yard in Vancouver, BC.

C. After expiration of the free time, the following detention charges apply:

$20.00 per car per day for each of the first fourteen (14) days; and

$60.00 per car per day for each subsequent day.

D. Once detention charges commence, charges are applicable until cars are returned to BNSF tracks in Vancouver, BC.

E. Traffic subject to the provisions of this item are not subject to the provisions of BNSF Demurrage Book 6004-Series, except that the provisions of Item 110 (Charges on Cars Containing Explosives or Hazardous Materials) to BNSF Demurrage Book 6004-Series will apply.

---

Item 3240 - Charge - Hazardous Materials Destined to Canada

When a shipment of Hazardous Materials arrives at a border crossing between the United States and Canada without proper documentation in compliance with Canadian Transport Commission Regulations, including the Canadian Hazardous Materials Description and proper Canadian Hazardous Materials Placards attached to the car, and the shipment must be held by BNSF at the border crossing, a charge of $88.00 per day, or portion of a day, will be assessed from the first 7:00 a.m. following notice to the consignor that the shipment is being held awaiting proper documentation and/or placards.

Demurrage and storage charges named in BNSF Demurrage Book 6004-Series will also apply.

---

Item 3250 – Failure to Complete Unloading of Railcars,
Issued October 10, 2001 – Effective November 1, 2001

Upon arrival and placement of railcars for unloading at destination, unloader will be responsible for unloading equipment in a manner which does not damage equipment, and for releasing equipment in a condition suitable for reloading by another shipper. Customers who refuse or fail to remove all lading, dunnage blocking, bracing, strapping, debris or other material that was part of the inbound shipment, secure interior loading devices, and close doors will be subject to a penalty charge of $500.00 per car plus the actual cost incurred by BNSF to remedy this situation.

Item 3260B - Charge - Failure to Complete Unloading of Sugar, Issued December 11, 2002 – Effective January 1, 2003

When Covered Hopper Cars of sugar, which are released from unloading, but have not been completely unloaded, are returned to the original shipping point for reasons other than carrier's error, the return will be subject to one of the following conditions, whichever is lower, with a minimum charge of $750: (1) to the rate, minimum weight, and route applicable for such return movement; or (2) the rate, minimum weight, and route from the original point in effect on the date shipment is tendered for return, to the actual weight of the return movement.

Cars will be considered as completely unloaded if the sugar remaining in the car does note exceed three (3) percent of the weight of the last loaded movement.

Cars originating at Billings, MT; Lovell, WY; Longmont, CO; Sterling, CO; Rocky Ford, CO; Ft. Morgan, CO; Bayard, NE; Mitchell, NE; or Scottsbluff, NE may be returned to Billings, MT; Scottsbluff, NE; or Sterling, CO in lieu of the original shipping point. The return will be subject to the rate, minimum weight, and route as though Billings, MT, Scottsbluff, NE, or Sterling, CO was the original shipping point.

Cars originating in Sidney, MT, Drayton, ND; East Grand Forks, MN; Hillsboro, ND; Redco, ND; Crookston, MN,; Wilds, MN; Bingham, MN or Moorehead, MN may be returned to Sidney, MT, Drayton, ND; East Grand Forks, MN; Hillsboro, ND; Redco, ND; Crookston, MN; Wilds, MN; Bingham, MN or Moorehead, MN in lieu of the original shipping point. The return will be subject to the rate, minimum weight and route as though Sidney, MT, Drayton, ND; East Grand Forks, MN; Hillsboro, ND; Redco, ND; Crookston, MN; Wilds, MN; Bingham, MN or Moorehead, MN were the original shipping point.

Item 3265A – Charge – Failure to Complete Unloading of Sugar Beet Pulp Pellets
Cancelled Effective October 31, 2001

Covered Hopper Cars of Sugar Beet Pulp Pellets (STCC 20-619), which are released from unloading, but have not been completely unloaded, will incur a cleaning charge of $350.00 per car. Such charge will be assessed against the Unloader of the car responsible for releasing the car before all of the lading has been removed. Refer to Rule 27 in Tariff UFC 6000-Series.

Item 3280 - Charge - Shipments Held for Orders

A. Carload shipments covered by "Order" or "Order Notify" Bills of Lading, or carload shipments covered by "Straight" Bills of Lading showing consignment to one party with instructions therein, or on which instructions are otherwise given to:

1. Notify or advise another party and deliver only upon surrender of written order; or
2. Deliver only upon surrender of original bill of lading; or

(continued on next page)





Item 3280 - Charge - Shipments Held for Orders (concluded)

3. When consigned in any other manner which imposes upon the carrier the obligation not to make delivery except upon surrender of original bill of lading or written order;

will not be moved to the designated place of delivery until bill of lading or written order has been surrendered

or indemnity bond or other substitute security therefore as defined in Rule 7 of Uniform Freight Classification is given, subject to the provisions in this item and Exceptions 1 and 2 named below.

B. When the place of delivery is designated in the bill of lading or otherwise designated, prior to the arrival of car at destination, and delivery is made to such designated place of delivery, provided a shipment is actually held for surrender of the bill of lading or written order or substitute security as defined in Rule 7 of Uniform Freight Classification, the following charges will apply:

1. When bill of lading or written order is surrendered or indemnity bond or other substitute security is given to an authorized representative of the line-haul delivering carrier prior to arrival at destination, there is no charge.

2. When bill of lading or written order is surrendered or indemnity bond or other substitute security is given..

(a) To the line-haul delivering carrier at other than destination, after car has arrived at billed destination; or

(b) To the line-haul delivering carrier at destination or first available hold point prior to destination after notice of arrival is sent or given consignee or party entitled to receive same. If notice of arrival is sent or given consignee or party entitled to receive same on a Sunday or Holiday, as described in Item 1010 of BNSF Demurrage Book 6004-series, the bill of lading or written order does not have to be surrendered or indemnity bond or other substitute security does not have to be given until the first business day following the Sunday or Holiday; or

(c) To any participating line-haul carrier, other than delivering carrier:

Charge is $150.00 per car, not to exceed $600.00 per bill of lading, and is in addition to any other charges that may accrue (i.e., switching, demurrage, storage, etc.)

EXCEPTIONS:

1. Surrender of bills of lading, written orders or other required documents by means of U.S. Mail will be allowed. When mail service is used, the time of mailing by the party which undertakes to surrender such bill of lading, written order or other required document shall be deemed to be the time of surrender. In the case of dispute as to the time of mailing, the postmark date shall govern.

2. When the original bill of lading or written order covering a shipment is not available, the shipment may be delivered in advance of the surrender of the bill of lading or written order as provided in Rule 7 of the Uniform Freight Classification.

---



Item 3300C - Charge - Special Freight Train Service – (Issued February 28, 2003 – Effective March 21, 2003)

(Increase)

A. Definition of Special Freight Train Service.

1. A train which is operated on an expedited schedule or under special service or transportation requirements specified by the consignor, consignee or the agent of either.

2. A train which is assembled in accordance with instructions given to a rail carrier by the consignor, consignee or the agent of either.

3. A train which is necessary in order to comply with service or other transportation requirements specified by any party to the movement

4. If the special train has cars for more than one destination, each stop will constitute a special run and charges for the special movement will be assessed from shipping point to first destination, from first destination to second destination, each as a separate and complete transaction.

B. Requirements for Special Freight Train Service.

Consignee, consignor or the agent of either must request this service in writing or by electronic device to BNSF Marketing/Sales Representative. Requests must be made in sufficient time to enable this carrier and all other carriers to consummate whatever arrangement or agreement which may be necessary to facilitate the movement of such trains. Requests should include, but are not limited to the following information: Date service is required or service window, if applicable; Routing, including origin and destination; Car initial(s) and number(s); Letter of authorization to bill charges, including appropriate patron codes, etc.

C. Furnishing of Special Freight Train Service.

Upon request, service will be provided at the convenience of all carriers involved in the movement.

D. Charges for Special Freight Train Service.

BNSF charges are as follows and will be calculated over the actual distance (route) operated by the special train at a charge of $62.00 per mile subject to a minimum charge of $9,000.00. This charge is in addition to published or contract freight rates. Charges for other carriers involved in joint line or local movements will be handled under the provisions of Accounting Rule 11. BNSF will assess a $2,500 surcharge to any requesting party that cancels a special train once BNSF has officially assigned crew and power. (A)

E. Switching Charges for Special Freight Train Service.

Switching charges will be assessed as outlined in Special Switching Service items in applicable BNSF switching tariffs.

F. Distances.

To determine miles, refer to BNSF Internet Public Rate Retrieval or BNSF mileage Inquiry at BNSF.Com using the actual route of the movement.

---



---



Item 3320 - Charge - Turning of Empty Unit Train Cars

Upon request of the car owner or lessee, BNSF will turn an entire unit train of empty cars on railroad owned tracks or privately owned loop tracks at a time and place convenient for normal carrier operations, subject to a charge of $1,575.00 per turn. This charge will not apply in connection with cars for loading of Grain or Grain Products moving under rates in Tariff BNSF 4022-Series.

---

Item 3340 - Charge - Destination Detention on Sugar Cars

This item to apply to shipments of Sugar (STCC 20-621 and 20-629) moving in Covered Hopper Cars which are railroad owned or railroad controlled.

Detention will be calculated from the first 12:01 a.m. after loaded cars are actually placed, constructively placed either short of destination or at destination, and will continue until such time as cars are released empty back to the railroad. After five days, detention charges of $50 per day per car will be assessed against the Consignor of the railcars. These charges are in addition to any demurrage charges which may also apply.

---

Item 3350 – Charge – Ride Quality Testing or Monitoring Equipment, Issued November 9, 2001 – Effective December 1, 2001

When customers request ride quality testing or monitoring of shipments to satisfy their own internal objectives apart from any joint effort with BNSF Damage Prevention, BNSF will, for a charge, provide test equipment to customers along with instructions for the proper activation, placement and recovery of the device(s). BNSF will also download test data from the device(s) and provide a written report of the results. Customers will be responsible for the activation, placement and recovery of the test device(s), thus meeting the requirements of their particular shipping schedules.
Devices currently available from BNSF Damage Prevention for testing and the per trip cost (for one device and report) are:
Snap Shock Plus single axis $165.00
Snap Shock Plus triple axis $250.00
BNSF will use its best efforts to provide a reliable device for the test(s); however, due to the inherent nature of the device, a failure may occur in route. BNSF is not responsible for any failure(s) of the device(s) or the consequences either direct or indirect caused by the failure(s). In the event that a complete recording of the trip is not produced as a result of the failure of the device (excluding improper activation, placement or recovery), charges will be waived. In the event that any device(s) are lost, missing or not recovered during the course of the test(s), the customer agrees to reimburse BNSF for the list price of the device(s).
For further information please call your BNSF Marketing Representative at 1-888-428-2673, option 3, or the Damage Prevention Team at 1-785-435-3082.

---


Item 3375A - Charge – Fuel Surcharge, Issued May 1, 2001 – Effective July 1, 2001
Shipments made under pricing documents referring hereto may be subject to a fuel surcharge, if applicable. When the U. S. Average Price of Retail On-Highway Diesel Fuel (HDF) for the month (Time Period) equals or exceeds $1.30 per gallon a surcharge may be applied to the total freight charges for each shipment waybill dated on or after the 1st of the second following month. Such fuel surcharge shall be included on the bill for freight charges for each shipment. Miscellaneous and accessorial charges shall not be subject to the fuel surcharge.

Fuel Surcharge Rates (FSR) will be adjusted monthly. The Fuel Surcharge Table will be subject to annual review, for changes in the 5 year rolling average price of HDF, and BNSF’s Fuel Intensity, per BNSF’s annual report.
FSR = See Table Below.
Where FSR = Fuel Surcharge Rate.
HDF = prior Time Periods U. S. Average monthly price of Retail On-Highway Diesel Fuel.
Time Period = second prior month.
Fuel Surcharge applies only when the FSR equals or exceeds 1%.

The source for the price of HDF will be the U. S. Department of Energy’s, EIA Retail On-Highway Diesel Prices Report, whose weekly average price is available on their WebPages at: “http://www/eia.doe.gov”. Select “Gasoline and Diesel Fuel Update”. Then select “On Highway Diesel Prices” and the HDF prices are displayed.
Fuel Surcharge Table

Time Periods Average
Price of HDF Between Applicable Fuel
Surcharge

| | |
|---|---|
| $1.30 to $1.349 | 1.0% |
| $1.35 to $1.399 | 1.5% |
| $1.40 to $1.449 | 2.0% |
| $1.45 to $1.499 | 2.5% |
| $1.50 to $1.549 | 3.0% |
| $1.55 to $1.599 | 3.5% |
| $1.60 to $1.649 | 4.0% |
| $1.65 to $1.699 | 4.5% |
| $1.70 to $1.749 | 5.0% |
| $1.75 to $1.799 | 5.5% |
| $1.80 to $1.849 | 6.0% |
| $1.85 to $1.899 | 6.5% |
| $1.90 to $1.949 | 7.0% |

Each $0.05 per gallon increase thereafter, apply an additional 0.5%

Example:

For a Fuel Surcharge applied for shipments in the month of July, assuming the prior Time Period's (May) average monthly price of HDF was $1.556 Per Gallon. Therefore, July's FSR would be 3.5%.

Thus, for each $10.00 of freight charges applicable to a shipment referring hereto the Fuel Surcharge would be $0.35.





Item 3400D – Credit Terms, Issued February 24, 2003 – Effective February 25, 2003

If credit is extended to Applicant for the payment of transportation charges, Applicant agrees to pay such transportation charges within the following time periods:

(a) Freight Charges – 15 Calendar days from the date of the freight bill.

(b) Miscellaneous charges (e.g. demurrage, switching, weighing) – 30 calendar days from the date of the miscellaneous bill.

(c) Additional charges for freight transportation and related services (e.g. balance due bills) – 30 calendar days from the date of bill for additional charges.

NOTE: Errors discovered in bills by customers should be corrected by them and paid accordingly. Payment of all bills, including those corrected by customers, must be made within the credit period. Payment of bills alleged to be incorrect will not prejudice patron's claims, filed within the statutory period, for refund of overcharges. If customers receive bills that they feel they are not responsible for paying, they must notify the carrier within the credit terms that they are not responsible for paying the bills.

Payment of an amount less than stated on a BNSF invoice will be considered as payment on account and not as payment in full, not withstanding any notation to the contrary as payment on the payor's remittance. Acceptance by BNSF of the lesser amount will not constitute an accord and satisfaction. The payor will be advised of any remaining balance deemed due after application of the remitted funds.

FINANCE CHARGES: (See Exceptions 1 and 2)

The Burlington Northern and Santa Fe Railway will assess a finance charge of .033% per day (12% per annum) on unpaid bills for freight and miscellaneous charges, including demurrage, switching and weighing, which are past our credit terms. The finance charge continues to accrue daily until the date payment is received by BNSF, not the date payment is made or the date postmarked on the payment.

Customers with past due amounts will receive a finance charge invoice each month. Finance charges

will be assessed on delinquent bills for freight or miscellaneous charges as of the end of the month reduced by amounts in dispute and any payments received by month end but not posted.

Exception 1: Assessment of Finance charges on Demurrage & private car storage charges only will be extended to 60 calendar days from the bill date.

Exception 2: Each month the Burlington Northern Santa Fe Railway will calculate an average Weighted Days To Pay (WDTP) on all freight and miscellaneous charges for each customer. The WDTP will be determined by calculating the average number of days a customer has taken to pay freight and miscellaneous charges over a preceding three-month period. If the WDTP does not exceed established credit terms then no finance charges will be applied for the month in which finance charges would have otherwise applied. If the WDTP exceeds the credit terms, the finance charges will accrue as stated above.

Item continued on next page



Item 3400D – Credit Terms (Concluded)

DISCOUNT FOR ELECTRONIC PAYMENT OF DEMURRAGE AND PRIVATE CAR STORAGE CHANGES:

A twenty percent (20%) discount will be given if all monthly bills at a single location are paid within 30 days of the billing date if the following conditions are met:

1. BNSF web-enabled tools are used to suitably manage equipment orders and any demurrage disputes where applicable.
2. All demurrage and private car storage bills as defined in BNSF Demurrage Book 6004 and BNSF Private Car Storage Book 6005 for a single location must be paid in full less the discount within 30 days of billed date.
3. Payments must be received electronically.

The following is a link to Customer Tools at BNSF’s web site: http://www.bnsf.com/business/



SECTION 4 - Regulations Governing Currency Exchange On Traffic From, To, And Between Stations In Canada

Item 4000 - Application

Except as provided for in the EXCEPTION below, the provisions of this Section and Sections 4A and 4B, apply only when specific reference is made to this Section in individual rate documents.

The regulations in this Section, and Sections 4A and 4B, governing the assessment and collection of charges on international freight traffic, in either direction between points in Canada and points in the United States, must be observed.

EXCEPTION: When traffic is moving under NSRQ 4401-Series, the provisions of this Section, and Sections 4A and 4B will apply.

Item 4020 - Basis Rate of Exchange

For the purpose of determining the rate of surcharge and discount, as referred to in this Section, and Sections 4A and 4B, the following will apply:

The rate of exchange quoted for New York funds by the Wall Street Journal on the last day of each month will govern from the first to the fourteenth (inclusive) of the following month. Similarly, such quotation on the fourteenth will govern from the fifteenth to the last day (inclusive) of such month. Should the governing date fall on a Saturday, Sunday or United States legal holiday, the quotation of the preceding day will govern.

---

Item 4040 - Governing Date for Application of Surcharge or Discount

The governing date for the application of surcharge or discount will be the date of the bill of lading.

---

Item 4060 - Surcharge or Discount to be Shown on Freight Bills

The surcharge or discount will be shown as a separate item on the freight bill



---



SECTION 4A - Applicable when United States Currency Is At A Premium In Relation To Canadian Currency (Effective January 4, 2001)

Item 4100 - Surcharge

Issued January 3, 2001 – Effective January 4, 2001

The following will apply when converting Canadian Currency to U.S. Currency on traffic and to the extent indicated in Item 4120.

When Rate of Exchange is: (See Item 4020) Amount of surcharge or Additional collection

1. Less than 7/8 of 1%. None.
2. Not less than 7/8 of 1% and not more than 1%. 1/2 of 1%.
3. Over 1%. 60% of rate of exchange

In determining the surcharge, when the rate of exchange is more than 1%, fractions less than 1/2 will be disregarded and fractions of 1/2 or over will be counted as 1%.

---

Item 4120 - Domestic Traffic

The following will apply between Canada and the United States in both directions including advanced charges payable to United States Carriers. Application Amount of surcharge on Additional collection

1. On all shipments including advanced charges payable to United States carriers when such charges are payable and collected in Canada.
The surcharge should be added to the total through charges and must be assessed in all cases where the charges are collected at points in Canada, whether paid in Canadian or United States currency.
Such surcharge will accrue entirely to the Canadian carrier.
NOTE: Advanced charges, including customs duty and customs entry fees, payable entirely in the United States when such charges are payable and collected in 100% of rate of Canada Exchange. As per Paragraphs 2 (See NOTE). and 3 of Item 4100.
100% of Rate of Exchange
2. When all charges are paid in United States Points in United States currency. None



---

SECTION 4B - Applicable when United States Currency is at a Discount in relation to Canadian Currency (Effective January 4, 2001)

Item 4200 - Discount or Surcharge

Issued January 3, 2001 – Effective January 4, 2001

The following will apply to the extent indicated in Item 4220.

When Rate of Exchange is: (See Item 4020) Surcharge or Additional collection

Less than 7/8 of 1%. None.

Not less than 7/8 of 1% and not more than 1.25%. 1/2 of 1%.

Over 1.25%. 40% of rate of exchange

DISCOUNT (Allowance)

Less than 7/8 of 1%. None.

Not less than 7/8 of 1% and not more than 1%. 1/2 of 1%.

Over 1%. 60% of rate of exchange

In determining the rate of surcharge and the rate of discount, when the rate of exchange is more than shown in this item, fractions less than 1/2 will be disregarded and fractions of 1/2 or over will be counted as 1%.

---

Item 4220 - Domestic Traffic

A. The following will apply on traffic from Canada to the United States.

Application Discount Allowance

All charges, when prepaid, must be paid in Canadian Currency. As per Paragraph 2 of Item 4200.

Surcharge or additional Collection to be prepaid

All charges when billed "collect". As per Paragraph 1 of Item 4200

B. The following will apply on traffic from the United States to Canada.

Application Surcharge or additional Collection

All charges, when "prepaid" As per Paragraph 1 of Item 4200.

Discount Allowance

All charges when billed "collect". As per Paragraph 2 of Item 4200



---



SECTION 5 – Section Cancelled in Last Revision with an Effective Date of December 24, 2001

---

Item 5000 – Item Cancelled Account Obsolete



---



Item 5040 – Item Cancelled Account Obsolete



---



Item 5060 – Item Cancelled Account Obsolete



---

Page 34
Item 5080 – Item Cancelled Account Obsolete



Page 35
Item 5100 – Item Cancelled Account Obsolete



Page 36
SECTION 6 – Rules And Other Governing Provisions Specific Rules and Regulations Governing Frozen And Non-Frozen Commodities Requiring Mechanical Protective Service (transferred from BNERM 1), Issued January 16, 2001 – Effective January 17, 2001
Rules in Section 6 Take Precedence Over Any Conflicting Rules In This Book, Or In Section 1 of BNERM 1.

Item 6000 - Mechanical Refrigerated Equipment Furnished By Carrier
Issued January 16, 2001 – Effective January 17, 2001
Mechanical refrigerated equipment furnished by railroads will not be required to maintain a temperature of lower than minus 5 degrees Fahrenheit. Shipper shall indemnify and hold harmless the railroads involved for any damage to commodity if a lower temperature is required.
Responsibility for adequate blocking, bracing, packaging and loading of the shipment lies entirely with the shipper. Shipper has responsibility for starting the refrigeration unit, setting thermostat to the billed temperature and ensuring proper cooling prior to releasing the shipment for movement. Carriers will not be responsible for damages resulting from non-compliance.
Item 6020 - Private Owned Or Leased Cryogenic (CO2) Equipment
When movements are in cryogenic cars (CO2), shipper will be responsible for the cost of supplying the proper amount of carbon dioxide (CO2) for any car used in conjunction with rates published in this section. Shipper shall indemnify and hold harmless the railroad(s) involved for damage to commodity due to temperature variation in cryogenic cars.
When empty, cars are subject to the provisions of Tariff and ICC RPS 6007-Series Tariff.
Item 6030 – Private Owned or Leased Mechanical Refrigerated Equipment, Issued March 6, 2002 – Effective April 1, 2002
When movements are in privately owned or controlled Mechanical Refrigerated Cars, shipper will be responsible for all aspects of Mechanical Protective Service including but not limited to fueling, monitoring, preventative maintenance and running repairs on refrigeration unit and all costs associated with same. Shipper shall indemnify and hold harmless the railroad(s) involved for damage to commodity due to temperature variation in privately owned or controlled mechanical refrigerated cars.
When empty, cars are subject to the provisions of Tariff and ICC RIC 6007-Series Tariff.



Page 37
Item 6040A - Rules Governing Mechanical Protective Service or (MPS), Issued May 25, 2001 – Effective June

15, 2001
1. Rule 705 - Frozen commodities
(a) Frozen commodities transported under mechanical protective service in BNSF owned or controlled mechanical refrigerator cars are subject to charges shown in item 6180 herein. Applicable charges in mechanical cars other than BNSF shall be governed by the rules and provisions of car owner.
(b) Shipper must place on bill of lading and shipping order, and agent must place on waybill, the following notation:
"MECHANICAL PROTECTIVE SERVICE - RULE 705"
(c) When shipments are moving under rates that include mechanical protective service, agent must endorse the waybill with the following notation:
"RATE PER CAR INCLUDES MPS CHARGE"
2. Rule 710 - Non-frozen commodities
(a) Charges as published herein will apply on non-frozen commodities transported under mechanical protective service.
(b) Shipper must indicate on the exempt bill of lading, shipping order and freight waybill, the following notation:
"MECHANICAL PROTECTIVE SERVICE - NON-FROZEN COMMODITY, RULE 710. PRECOOLED LOAD, OPTIMUM TEMPERATURE INSIDE CAR _____ DEGREES."
(c) Prior to loading, all commodities must be precooled to the temperature desired for shipping. Any claim for lading loss or damage will be subject to compromise or declination if lading was not pre-cooled prior to loading.
The burden of proof will be on the shipper to provide evidence of origin temperature of lading at time of loading.
(d) When shipments are moving under rates that include mechanical protective service, agent must endorse the waybill as follows:
BNSF cars: "RATE PER CAR INCLUDES BNSF MPS CHARGE."
Foreign cars: "RATE PER CAR INCLUDES FOREIGN MPS CHARGE."
3. Rule 720 - Mechanical car used for shipments where MPS not ordered
When a mechanical refrigerator car is furnished for railroad's convenience and shipper does not order MPS, the mechanical unit will not be operated and MPS will not apply. Shipper must specify on bill lading, and agent must place on waybill, the following notation:
"MECHANICAL PROTECTIVE SERVICE NOT ORDERED - RULE 720. DO NOT OPERATE MECHANICAL."




Item 6060A - Operation Of BNSF Owned Or Controlled Mechanical Units, Issued March 8, 2002 – Effective April 1, 2002
While mechanical units are being used by railroad, railroad shall perform such in transit temperature inspections as may be necessary and proper, at its expense. Railroad shall also perform routine servicing and running repairs to units. Railroad shall bill car owner, and car owner shall pay railroad, for services performed (other than inspection) and supplies furnished on the following basis:
1. Bills for fuel supplied or lube oil furnished mechanical cars should show equipment reference, service date, service location, gallons of fuel supplied and should be supported by information stating whether equipment was empty or loaded when service was performed and/or waybill date and number.
2. Bills for the pretrip inspection made prior to okaying car for loading, for the purpose of testing unit to determine that it is functioning satisfactorily or in need or repairs, will be rendered on the basis of $25.00 per car.

3. Refrigerant, antifreeze, supplies and repairs to units shall be billed as provided for in the field and office manuals of the code of interchange rules promulgated by the Association of American Railroads.

Item 6080 - Empty Movement Of Privately Owned Cars

The provisions of this item apply to rates published on shipments in cars of private ownership with the provision that the use of such cars is not subject to the payment of mileage allowances or to the provisions of Mileage Tariff and ICC RPS 6007-Series. Except as may otherwise be specifically provided in the Exempt rate quote, circular or memorandum, such rates include the movement of the empty car or cars to the point of prior loading via the reverse of the loaded route. Any other empty movement by the BNSF will be subject to charges provided in the applicable BNSF Tariff.

Item 6100 - Return Of Pallets, Pallet Sides, Platforms, Skids, Dunnage, Etc.

Return of Pallets, Pallet Sides, Platforms, Skids, Dunnage, etc. shall not be included in rates for temperature controlled shipments (Rules 705 and 710).

Item 6120 - Offer Of Section 11706 ('Carmack') Liability

BNSF offers the opportunity to ship temperature controlled commodities (Rules 705 and 710) pursuant to the terms and conditions of 49 U.S.C. Section 11706 (Carmack) liability, as an alternative to the claims provisions in this BNSF Rules Book, BNSF-6100 Series. Shipments made pursuant to the claim provisions of Section 11706 (Carmack) will be charged a higher rate, and the following conditions must be met in full:

(1) Not later than the time a car is ordered for loading the shipper must notify BNSF or its designated representative of the intention to make the shipment subject to the claim provision of 49 U.S.C. Section 11706 (Carmack). At that time the shipper must advise BNSF where and when the car will be available for BNSF representatives to inspect the loading and the loading method.

(Item continued on next page)



---



Item 6120 - Offer Of Section 11706 ('Carmack') Liability (Concluded)

(2) The shipping order and receipt must be endorsed prior to the shipment, "The Shipment is subject to the Claim Terms of 49 U.S.C. Section 11706."

(3) Transportation charges must be prepaid.

Unless the shipper complies in full with the conditions stated above for application of Section 11706 liability, the shipment will be conclusively deemed to move under the 'alternate liability' terms and conditions of BNSF Rules Book, BNSF-6100 Series, and there will be a conclusive presumption that the shipper has given his written declaration and/or that the shipper and carrier have entered into a written agreement to this effect.

Item 6140A - Loss And Damage Provisions/Liability Restrictions, Issued May 25, 2001 – Effective June 15, 2001

A. Upon tender of a shipment of exempt commodities as described in this contract. accompanied by the verbal shipping order (phone transmittal) and/or Electronic Data Interchange (EDI) transfer completed by shipper, BNSF will give its receipt for the goods and its acceptance of said billing instruction. to be performed in accordance with the contract. Acceptance of the shipping order by BNSF shall also be by verbal acceptance and/or confirmation of

EDI transfer. In all matters described herein, BNSF acts as principal only with respect to transportation over its
own line.
B. Carriers will not be liable for loss, damage or delay caused in whole or in part by an Act of God, a public
enemy, the authority of law, riots, strikes, acts of civil disobedience, inherent quality or characteristic of the
commodity, natural shrinkage, an act or default of the shipper, owner or receiver or from shipments stopped and
held in-transit at the request of the shipper, owner, or receiver.
C. BNSF agrees to transport shipment over its line with reasonable dispatch. BNSF and connecting carrier do not
guarantee rail service on any scheduled time frame.
D. BNSF and connecting carrier shall not be liable for breakage or bruising damage to lading unless shipper
provides physical evidence of railroad negligence. Shifting of a load, alone, shall not be considered as evidence of
such negligence
E.BNSF and connecting carrier shall not be liable for deterioration resulting from improper loading or
overloading of the equipment or from the use of containers or stacking methods which do not permit the adequate
flow of air throughout the load.
F. BNSF and connecting carriers shall not be liable for market decline.
G. BNSF and connecting carriers shall not be liable for shortage unless there is physical evidence of forced entry
to the transportation equipment. Shortage claims must be verified and supported by an actual tally of packages
loaded at origin and an actual tally of packages unloaded at destination. In addition, origin and destination seal
records must be furnished.



---


H. In no event shall BNSF and connecting carriers be liable for lading replacement costs or for special or
consequential damages.
I. Shippers and/or consignee must mitigate damage situations by accepting the damaged cargo unless it is totally
worthless. Shippers and/or consignees may not abandon damaged or partially damaged shipments to the railroad
when the damaged shipments retain substantial value. Product that is abandoned to the carrier in an undamaged
condition shall be sold for the account of whom concerned and salvage proceeds only, less any salvaging
expenses incurred shall be remitted to the beneficial owner.
J. Carriers do not undertake to overcome the inherent tendencies of perishable goods to deteriorate or decay.
Carrier has no liability for deterioration when the amount of deterioration could reasonably be expected to occur
during normal rail transport. When the amount of deterioration is intensified due to diseases or due to decayed or
damaged condition of the perishable goods at rail origin, rail carrier has no liability for this intensified
deterioration.
K. In the event an act or omission of any party involved in the transportation process (shipper, carrier, receiver) is
not the sole cause but contributes to any loss or damage, each party will be liable for only that portion of the loss
or damage which was reasonably caused by its negligence. If the loss or damage results from the concurrence of

an act or omission by BNSF and an act of God, then the liability of BNSF shall be no greater than the percentage of proven causal negligence of BNSF.

L. Carrier has no liability for deterioration of perishable goods when carrier refrigeration equipment functions properly within 10 degrees of the billed instruction (as monitored and recorded from the railcar's thermometer) and shipment is handled with reasonable dispatch.

M. On shipments where it is determined that the commodity pulp (body) temperature is something other than the billed temperature, it will not be BNSF's responsibility to bring said commodity's pulp temperature down to conform to billing temperature. When records indicate that the mechanical refrigeration unit was properly operating, carrier(s) will not be responsible for lading off condition.

N. Carrier shall not be liable for product loss arising from any cause, including temperature, after notice of constructive placement availability at the billed destination. Subsequent to such notice carriers will not be responsible for temperature monitoring, fuel, etc.

O. When handling perishable boxcar shipments in foreign line marked equipment, BNSF will be extended its longest line haul. Longest line haul shall mean BNSF's nearest point of interchange to the foreign carrier's billed origin location. Point of interchange shall be as identified in the Official Railroad Station List (OPSL 6000 including supplements) and subject to BNSF operating convenience. When BNSF is by necessity a switch carrier only, or does not receive its longest haul, BNSF will not be liable in full or part for any product claim. It will be shipper's responsibility to ensure that proper rate and route authorities are published.

Any Mechanical Protective Service performed by BNSF when handling perishable boxcar shipments in foreign line marked equipment shall be billed to the car owner in accordance with AAR interchange rules. If the shipment is in non-compliance of this section, and BNSF performs proper MPS service, BNSF will not participate in any freight claim payment. In the event that BNSF fails to exercise due diligence in the correction of an off-temperature condition than BNSF will participate in the distribution of any freight claim payment in accordance with AAR freight claim rules. (Item continued on next page)



---



Item 6140A - Loss And Damage Provisions/Liability Restrictions (concluded)

P. The shipper and consignee shall indemnify and hold harmless the carrier from any loss, damage, personal injuries and/or death resulting from failure to comply with the provisions contained herein. Acceptance of shipment by the carrier for transportation shall not be a waiver of this liability.

---

Item 6160 - Claim Procedures, Issued January 16, 2001 – Effective January 17, 2001

A. The rates and charges agreed upon for the shipment and the terms, conditions and provisions herein stated require that the shipper only, whether acting as principal or agent, must file any claim for loss and damage exclusively with BNSF or carrier on whose line the loss, damage, injury or delay occurred.

B. As a precedent to recovery for any loss or damage to lading, claims must be received by BNSF or carrier on whose line the loss, damage, injury or delay occurred, in writing from the shipper within three months after

delivery of the shipment at its final railroad destination or, in the case of failure to make delivery, then within three months after a reasonable time for delivery has elapsed. BNSF shall pay, decline or offer to compromise claims within three months from the date received.

C. As a condition precedent to recovery of any claim, the consignee must immediately notify the destination carrier, shipper and BNSF upon discovery of any damage and allow destination carrier or its agent to inspect. Such notification to carrier and shipper must be made within 24 hours of notification of shipment's arrival. Failure of the rail carrier to inspect damaged cargo for whatever reason will not relieve the burden of the claiming party to establish that cargo was received in a damaged condition nor will it be considered an admission of liability by the rail carrier.

D. All written claims must include the following documentation:

1. A demand for payment of a specific amount.
2. Information identifying the rail shipment including equipment initials and number, shipper and receiver's name, shipping date and commodity.
3. Origin records or certification as to the condition and quantity of the lading at the time tendered to the origin rail carrier.
4. Destination records as to the condition and quantity of the lading at the time received from the destination rail carrier.
5. Verification of the amount claimed including original invoices, repair bills and account of sales.
6. Evidence as to the disposition of the damaged lading.
7. On fresh fruits and vegetables, origin and destination USDA inspections or Canadian government equivalent

(Item continued on next page)



---



Item 6160 - Claim Procedures, (Concluded)

E. All loss and damage lading claims filed with BNSF must be mailed to:

Director, Freight Claims
Burlington Northern Santa Fe Railway Company
PO Box 1738
Topeka, KS 66601

F. Carrier's liability will not exceed the actual amount of physical loss or damage sustained to the lading including proven costs through mitigating the loss or damage. Claim calculation as well as any claim payment shall not exceed the delivered value of FOB origin invoice plus freight to destination, less the gross account of sales, plus a reasonable commission on those sales.

G. Claims or lawsuits for less than $1000.00 shall not be filed and no claim shall be paid if the amount of loss or damage is found to be under $1000.00 per carload.

H. Any suit against BNSF or its connecting carriers based on transportation provided under the terms of this circular shall be commenced within one year from the date of delivery, or in the case of failure to make delivery then within one year after a reasonable time for delivery has elapsed. Such suit shall be filed in the state or province of origin on or interchange to BNSF.

I. Any claim or suit not filed in strict accordance with the terms and conditions of this circular shall be void.

---


Item 6180 - Mechanical Protective Service Charges BNSF Owned Or Controlled Mechanical Refrigerated Cars Charges In Dollars Per Car FRESH AND FROZEN COMMODITIES
GROUP 1 GROUP 2 GROUP 3 GROUP 4
ARIZONA ARKANSAS ALABAMA DISTRICT OF COLUMBIA
ALBERTA ILLINOIS GEORGIA CONNECTICUT
BRITISH COLUMBIA IOWA INDIANA DELAWARE
CALIFORNIA KANSAS KENTUCKY FLORIDA
COLORADO LOUISIANA MICHIGAN MAINE
IDAHO MANITOBA MISSISSIPPI MARYLAND
MONTANA MINNESOTA OHIO MASSACHUESETTS
NEVADA MISSOURI ONTARIO NEW BRUNSWICK
NEW MEXICO NEBRASKA TENESSEE NEW HAMPSHIRE
OREGON NORTH DAKOTA WEST VIRGINIA NEW JERSEY
UTAH OKLAHOMA NEW YORK
WASHINGTON SASKATCHEWAN NORTH CAROLINA
WYOMING SOUTH DAKOTA NOVA SCOTIA
TEXAS PENNSYLVANIA
WISCONSIN PRINCE EDWARD ISLAND
RHODE ISLAND
SOUTH CAROLINA
VERMONT
VIRGINIA
FROM GROUP 1 2 3 4
TO GROUP
1 500 550 600 650
2 550 500 550 600
3 600 550 500 550
4 650 600 550 500

---

SEATTLE, WA TO ALASKA = $650 PER CAR
INTRASTATE MECHANICAL PROTECTIVE SERVICE CHARGES = $250 PER CAR
MPS charges for all shipments in BNSF owned or controlled mechanical refrigerated cars where BNSF does not
appear as a linehaul carrier in the route, will be $2000.

---



---


Item 6200 - Stopping
Stopping to complete loading or for partial unloading of cars with temperature controlled shipments (Rules 705
and 710) is not allowed.
Item 6220 - Mexico
Mechanical refrigerated cars owned or controlled by BNSF are not permitted to move into Mexico unless the
governing rate document clearly states that rate applies for shipments destined to specified points in Mexico. If a
mechanical refrigerated car moves into Mexico as a result of billing to a destination in Mexico in violation of this
condition, the party who billed the car will be subject to a charge of $10,000 in addition to applicable charges for
movement of commodity. If a mechanical refrigerated car moved to Mexico in violation of this condition sustains
loss or damage from any cause, the party billing such car shall also be liable for such loss and damage. Failure of
any Railroad to prevent the movement of the car to Mexico shall not constitute a waiver of BNSF's right to

enforce this item.

Item 6240A - Cleaning Fees, Issued November 12, 2002 – Effective January 1, 2003

Mechanical refrigerated cars received by BNSF requiring cleaning, including removal of debris, dunnage, pallets, tie down materials, food or any other object not an inherent part of the mechanical refrigerated car will be subject to $500 cleaning fee. This fee will be assessed against the last party unloading the equipment prior to BNSF receipt of car in interchange or received in switch service from industry.

Mechanical refrigerated cars spotted to industry for loading and subsequently rejected by the loading party due to cars requiring cleaning including removal of debris, dunnage, pallets, tie down materials, food or any other object not an inherent part of the mechanical refrigerated car will be subject to a $1,000 fee covering but not limited to transportation, cleaning and opportunity cost. This fee will be assessed against the last party unloading the equipment prior to BNSF receipt of car in interchange or received in switch service from industry.

END

# PX1144-PX1165

Filed Under Seal

# EXHIBIT PX1166

# Intentionally Omitted

# PX1167-PX1169

# Filed Under Seal

# EXHIBIT

# PX1170

**BEFORE THE**
**SURFACE TRANSPORTATION BOARD**

---

**EX PARTE 661**

---

**RAIL FUEL SURCHARGES**

---

**WRITTEN STATEMENT OF**
**NORFOLK SOUTHERN CORPORATION**

---

James A. Hixon
William A. Galanko
George A. Aspatore
John M. Scheib
Norfolk Southern Corporation
Three Commercial Place
Norfolk, VA 23510
(757) 629-2657

G. Paul Moates
Paul A. Hemmersbaugh
Matthew J. Warren
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000
(202) 736-8711 (Fax)

*Attorneys for Norfolk Southern Railway Company*

Dated: April 27, 2006

**WRITTEN STATEMENT OF NORFOLK SOUTHERN CORPORATION**

I am Donald W. Seale, and I serve as Executive Vice-President and Chief Marketing Officer of Norfolk Southern Corporation. In 1976, I started my career with the Norfolk and Western Railway Company, a Norfolk Southern predecessor company, and have served in numerous positions primarily in marketing and sales over the past 30 years.

In this testimony, I will provide an overview of what Norfolk Southern has experienced in the fuel market and the ways in which Norfolk Southern has tried to respond to the shift in the fuel market, including implementation of fuel surcharge programs – which we have always viewed as an energy surcharge. I will then review Norfolk Southern's original and modified fuel surcharge programs for public rate authorities for non-intermodal traffic and explain our recently announced new fuel surcharge program for such public rate authorities.[1] Additionally, I will discuss the expected ramifications in the transportation marketplace from implementation of this new program.

As with many rail issues, the best place to start is with an understanding of the commercial realities. The marketplace for fuel has dramatically changed and Norfolk Southern has responded by adopting, and now twice refining, a fuel surcharge program to respond to that change. That dramatic increase in the price of oil, has given Norfolk Southern a competitive advantage against other modes of transportation that we recognize in our total price of transportation – transportation rate plus other charges, including a fuel surcharge. At the same time, we have continued to see the traffic levels

[1] "Public rate authorities" are tariff prices for customers who have not entered into a contract with Norfolk Southern.

on our railroad grow and to increase capital investment as we work to have the capacity needed to serve our customers.

## I. The Fuel Market Has Dramatically Changed and the Days of $20 Per Barrel Oil Appear to Be Gone For Good.

From 1987 until early 2003, the oil markets were generally stable and predictable. Oil for the most part fluctuated around $20 per barrel for most of the period and between $20 and $30 per barrel since 2000. Norfolk Southern thought – indeed hoped—that the oil price increases we began to see as 2003 progressed were temporary. Many others did as well. For example, in May 2004, UBS Investment Research forecasted declines in the price of West Texas Intermediate Crude Oil ("WTI") to $26 per barrel in 2005.[2] In November 2004, James Mulva, Chief Executive Officer of ConocoPhillips, the third largest U.S. oil company, predicted that the price of WTI would slide to an average of $26 per barrel in 2006.[3] Likewise, the federal government's Energy Information Agency ("EIA") predicted on multiple occasions in 2004 and 2005 that oil prices would decline. It now appears that there has been a fundamental and structural change in this market. The old baseline of about $20-$25 per barrel is no more.

It is our best guess – and I emphasize that it is only a guess – that most of the time from this point forward we will see oil at $60 per barrel or more. Like many other companies, Norfolk Southern monitors the oil market as a proxy for the expected price of its fuel and has attempted to adjust to the shift in the oil market and to the resulting

---

2 *Lower Energy Prices? Fall from High Prices Is Forecast*, Industry Week, at 73 (May 2004).

3 *Around the Region*, Houston Chronicle News Service, at 3 (Nov. 18, 2004).

changes in the transportation market. But it has been challenging to keep up with the dramatic and rapid shift.

Prior to early 2003, the oil market was relatively predictable. While there were spikes and troughs in the market, generally the price of WTI ranged between $20 and $30 per barrel range. Chart 1 below shows the price of WTI from 1987 to the present.[4]

**CHART 1: HISTORIC PRICE OF WTI**




This stability through 2003 meant that forecasters were generally able to predict the fuel market. For example, the EIA's oil price forecast was generally accurate even at the end of this period of stability. Although in 1999 it incorrectly estimated the timing of the impact of a new Organization of Petroleum Exporting Countries agreement that restricted oil production, its other predictions during this period were very good. Indeed, EIA's predictions from 1999 to early 2003 were generally correct. For example:

[4] Data source is http://tonto.eia.doe.gov/dnav/pet/hist/rwtcM.htm.

- In January 2000, EIA accurately predicted a $5 per barrel increase in the price of WTI.
- In July 2000, EIA accurately forecasted the price of WTI to end 2000 above $25 per barrel and to decline to $22 per barrel in 2001.
- In January 2001, EIA accurately predicted the price of WTI at $27 per barrel in 2001 with a decline to around $22 per barrel in 2002.
- In July 2001, EIA forecasted that the price of WTI would be around $28 per barrel for 2001 and 2002, which was generally correct except for the decline in price of WTI to about $20 per barrel in late 2001 and early 2002.
- In January 2002, EIA accurately predicted an increase in the price of WTI by the end of 2002.
- In July 2002, EIA predicted that the price of WTI would be around $26 per barrel in 2002, which was generally correct except at the end of the year when there was a strike by oil workers in Venezuela. It also accurately forecasted that the price of WTI would increase to about $29 per barrel in 2003.
- In March 2003, EIA accurately forecasted a decline in the price of WTI to around $27 by the end of 2003.

In part, EIA was so accurate because the price of WTI fluctuated, based on events, between $20 and $30 per barrel.

This relatively stable and predictable period of fuel prices ended in mid-2003. From that point until today, oil prices climbed significantly and the fuel market appears to have undergone a fundamental and structural shift. That upward shift in the market was unpredictable – ruining the previously good track record of EIA and some of the leading private sector experts on oil.

For example, in July 2003, EIA predicted that the price of WTI would be $26 per barrel by the end of 2004, which represented a decline of about $5 per barrel from the

price of WTI at the time of the prediction. Instead, the price of WTI skyrocketed by about $13 per barrel over that period.

Moreover, in subsequent EIA forecasts, its predictions were consistently wrong as the price of WTI continued to climb. For example:

- In April 2004, it forecasted the price of WTI to be $30 per barrel in 2004. Instead it rose through the high $40s and even went above $50 per barrel. It also predicted that the price of WTI would decline from $30 per barrel during 2005. (Instead the price of WTI shot through the $50 per barrel range.)

- In January 2005, EIA forecasted $42 to $43 per barrel throughout 2005 and 2006. (But we are now seeing prices over $70 per barrel.)

- In May 2005, EIA predicated that the price of WTI would be $50 per barrel throughout 2005 and 2006. (Again, we are now seeing prices over $70 per barrel.)

Only in its more recent forecasts has EIA begun to recognize that higher oil prices appear to be here to stay. In September 2005 and in January 2006, it estimated that the price of WTI for 2005 through 2007 would be between $61 and $62 per barrel. The idea that fuel prices will remain at this high level is also supported by the forward curve – which shows the price buyers are willing to pay at a specific time in the future – for light sweet crude oil, which shows prices between $69 and $76 per barrel through 2012.[5] However, the oil prices we are hoping for as well as EIA's predictions of $61-62 per barrel through 2007 may be too low.

EIA data are helpful to illustrate the fundamental change in the marketplace that has occurred since January 2003, although it is only one source of data that Norfolk

[5] Forward curve available at http://www.nymex.com/. Data referenced in the text is as of April 26, 2006. Even now there are ambiguities about what will happen in the fuel market in the future. Even as EIA and the future curve for light sweet crude oil show prices going higher, some private forecasting companies, such as Moody's and Global Insight, predict declines of varying degrees between now and the end of 2008.

Southern uses to understand the fuel market. This government agency has access to supply and demand information that is available to few others. Yet, even it has struggled since January 2003 to understand and to forecast accurately the transition in the fuel market. Like EIA and others, Norfolk Southern has closely monitored the fuel market and has struggled to adapt to the change. As explained in the next section, Norfolk Southern has responded on several occasions to the effects on its business and in the transportation marketplace that have resulted from increases in oil prices.

## II. Norfolk Southern Has Continually Monitored and Responded to the Changing Fuel Market.

Fuel is a major expense for Norfolk Southern. Norfolk Southern consumes over 500 million gallons per year. Last year, Norfolk Southern incurred $875 million in operating expense for fuel.[6] This level of expense was 47% higher than the prior year, although Norfolk Southern consumed only 2% more fuel than the prior year.

Like other railroads and other transportation companies, Norfolk Southern looks for ways to limit the impact of fluctuations in the price of fuel. As the upward shift in the oil market began, Norfolk Southern realized it had to act. Although Norfolk Southern had hoped oil prices were climbing only temporarily, it adopted its first fuel surcharge program on non-intermodal public rate authorities in 2000, which I will refer to as the "original fuel surcharge." In March 2004, Norfolk Southern refined its fuel surcharge to

---

6 This figure excludes any hedge benefits.

be more responsive to fluctuations in the price of oil, which at that time was continuing to rise. I will refer to this fuel surcharge program as the "modified fuel surcharge."[7]

**A. Norfolk Southern Adopted and Refined a Fuel Surcharge Program.**

Norfolk Southern's original fuel surcharge applied whenever the price of WTI was greater than $28.00 for 30 consecutive Wall Street Journal publication days. At that point, the applicable fuel surcharge percentage was 2% of the line-haul rate.

The applicable fuel surcharge percentage would change after the daily price of WTI, as published in the Wall Street Journal, was higher than the next higher or lower trigger point for 30 consecutive days. The trigger points increased from $28.00 in $5.00 increments, while the applicable fuel surcharge percentage increased in increments of 2%. The following tables illustrate the WTI trigger points and applicable fuel surcharge percentages:

| WTI price for 30 consecutive days above . . . | Fuel Surcharge Percentage |
|---|---|
| $28.00 | 2% |
| $33.00 | 4% |
| $38.00 | 6% |
| $43.00 | 8% |
| $48.00 | 10% |

[7] The fuel surcharges described herein apply to regulated and exempt traffic, except intermodal, that is not under contract. Norfolk Southern also includes fuel surcharges in contracts, which by statute are outside the regulatory regime pursuant to 49 USC 10709.

| WTI price for 30 consecutive days below . . . | Fuel Surcharge Percentage |
|---|---|
| $28.00 | 0% |
| $33.00 | 2% |
| $38.00 | 4% |
| $43.00 | 6% |
| $48.00 | 8% |

Thus, if the fuel surcharge percentage was 8% and for 30 consecutive publication days the Wall Street Journal reported the WTI price at less than $43.00 per barrel (but greater than $38), then the applicable fuel surcharge percentage would decline to 6%. Conversely if the Wall Street Journal reported the WTI price for 30 consecutive days was greater than $48.00 per barrel (but less than $53), then the applicable fuel surcharge percentage would rise to 10%.

Because the fuel surcharge changed only after 30 consecutive days of the price of WTI being above or below a trigger point, it was less reflective of the fuel market. The $5.00 increments for the trigger points and the larger spread in the applicable percentages also made this fuel surcharge less reflective of the fuel market. For example, on January 13, 2003, the price of WTI had been below $48 per barrel for 29 consecutive days as reported in the Wall Street Journal. But on the 30th day, the price was reported at $48.38. Accordingly, the customers did not get a reduction in the fuel surcharge.

In addition, the change could occur at any time during the month, which made it hard for customers to plan.

On March 1, 2004, Norfolk Southern began using its modified fuel surcharge program, which addressed many of the weaknesses in its original fuel surcharge. This modified fuel surcharge program remains applicable to many of the rates published before July 1, 2006.

The modified fuel surcharge is based on the monthly average price of WTI. The average monthly WTI price for a given calendar month is determined by adding the daily WTI prices published in the Wall Street Journal during a calendar month,[8] and dividing the result by the number of days so published. The result is rounded to the nearest cent.

A fuel surcharge applies when the monthly average WTI price exceeds $23.00. Norfolk Southern assesses a fuel surcharge two calendar months later. Thus, if the WTI Average Price exceeds $23.00 in January, Norfolk Southern assesses the applicable fuel surcharge percentage to all bills of lading dated in the month of March. The applicable fuel surcharge percentage, if any, changes monthly.

The applicable fuel surcharge equals 0.4% of the line-haul freight rate for every $1.00, or portion thereof, in excess of $23.00. A few examples illustrate the way the fuel surcharge works:

| WTI Average Monthly Price Per Barrel | Fuel Surcharge Percentage |
|---|---|
| $23.00 and below | No Surcharge |
| $23.01-$24.00 | 0.4% |
| $24.01-$25.00 | 0.8% |
| $25.01-$26.00 | 1.2% |

For April 2006, Norfolk Southern's fuel surcharge is 15.6%.

This program had important benefits over the original fuel surcharge program. First, the fuel surcharge changed every month, which meant it was more closely tied to the fuel markets. Second, the fuel charge was also more closely tied to the fuel markets because it changed in smaller increments (0.4%) and with smaller fluctuations in the monthly average WTI price (every $1.00). Third, it provided additional lead time for

8 If the Wall Street Journal ceases publication of the price of WTI, Norfolk Southern would employ a suitable substitute source of price.

customers to prepare for a change in the fuel surcharge. Fourth, it was easier to administer because customers knew the fuel surcharge would be recalculated monthly and would not change during the month.

### B. The Fuel Market Has Made the Original and Modified Fuel Surcharge Programs Outdated.

Norfolk Southern's fuel surcharge programs were a response to the rising oil prices described above. They were consistent with what other railroads were doing at the time. They were also consistent with the fuel surcharge mechanisms approved by the Interstate Commerce Commission during the oil crisis of the 1970s in that they applied as a percentage of the line-haul rate.[9]

When Norfolk Southern adopted its original and modified fuel surcharges it established trigger points in the $20s, which is where the market generally had been in the recent past and was then-forecasted to be. While these fuel surcharges were in effect, Norfolk Southern became more successful at recovering its fuel costs. In several earlier years, the increase in Norfolk Southern's fuel surcharge revenue was less, sometimes substantially less, than its increased diesel fuel, gasoline, and lubricant expenses. But, in 2005 with the highest oil prices since we adopted a fuel surcharge program, Norfolk Southern's increase in fuel surcharge revenue exceeded the increase in its diesel fuel, gasoline, and lubricants expenses.

Norfolk Southern's 2005 experience is similar to other transportation companies. For example, Federal Express reported in its 2005 Annual Report that its "fuel surcharge

---

[9] Fuel Related Increases, X-305-A, Investigation and Suspension Docket No. 8968, 349 I.C.C. 173 (Feb. 26, 1975).

revenue more than offset higher jet fuel prices in 2005." In addition, in 2005, Swift Transportation had year-over-year revenues from fuel surcharges that were greater than its year-over-year increase in fuel costs, whereas it had not in 2004.[10]

Although we do not believe that a year-over-year comparison is the proper way to analyze fuel surcharge recovery, the fuel prices that we saw in 2005 caused us to look harder at what sustained higher oil prices would mean for Norfolk Southern and our customers. For some time, Norfolk Southern has been examining the fuel markets and evaluating possible responses. The ongoing dialogue with the Board, which includes this hearing, over issues related to fuel have helped sharpen our focus and crystallize our thinking. We now believe a new baseline is appropriate in light of the trend in oil prices over the last 12 to 24 months. We hold this belief despite the fact that there are still uncertainties about the price of oil and its impacts on Norfolk Southern. Recognizing that no fuel surcharge will ever be perfect, we decided to refine our fuel surcharge program a second time

## III. Norfolk Southern's New Fuel Surcharge Program Responds to Change in Fuel Market.

On April 24, 2006, Norfolk Southern announced a new fuel surcharge program for public rate authorities for non-intermodal traffic in response to what it perceives as persistently higher oil prices. Norfolk Southern's new fuel surcharge program is based on the monthly average price of WTI, which is calculated in the same way as under the

[10] According to its 2005 10-K, Swift's fuel costs were $164 million more than in 2004 while its fuel surcharge revenue was $202 million more than in 2004. Comparatively, Swift's fuel costs in 2004 were $120 million more than in 2003 while its fuel surcharge revenue in 2004 was $101 million more than in 2003. Based on data in Securities and Exchange Commission Form 10-K filed by Swift Transportation on March 6, 2006, available at www.sec.gov.

old fuel surcharge program. The applicable fuel surcharge, if any, will change monthly and will still apply two calendar months later.

However, a fuel surcharge will apply when the monthly average WTI price exceeds $64.00, rather than when it exceeds $23.00. In addition, the applicable fuel surcharge will be 0.3%, rather than 0.4%, of the line-haul freight rate for every $1.00, or portion thereof, in excess of $64.00.

Norfolk Southern's decision to reduce its fuel surcharge percentage is consistent with what other transportation companies have done. Last year, Federal Express lowered its fuel surcharge index by 2%.[11] Canadian National also reduced its fuel surcharge last year on two occasions.[12] Similarly, United Parcel Service also reduced its fuel surcharge index by 2% on domestic and international air traffic effective January 2006.[13] A few examples illustrate the way the new fuel surcharge will work:

| WTI Average Price Per Barrel | Fuel Surcharge Percentage |
|---|---|
| $64.00 and below | No Surcharge |
| $64.01-$65.00 | 0.3% |
| $65.01-$66.00 | 0.6% |
| $66.01-$67.00 | 0.9% |

During the period in which we considered and planned to make this refinement, we thought it would result in customers paying no fuel surcharge. For example, based on the average price of WTI in February and March, shippers subject to this fuel surcharge would have paid no fuel surcharge at all.

11 Securities and Exchange Commission Form 10-K filed by Federal Express Corporation on July 14, 2005, at 23, available at www.sec.gov.

12 Canadian National Railway Company CN 7401-A Fuel Surcharge Notice, available at http://www.cn.ca/customer_centre/services_support/supp_services_tariffs/en_KFChargeableServices.shtml

13 Securities and Exchange Commission Form 10-K filed by United Parcel Service on Mar. 14, 2006, at 26-27, available at www.sec.gov.

But fuel prices remain volatile for a variety of reasons including what is happening in Iran, the growing consumption in China, and a host of other factors. For example, since the Board announced this hearing, the price of WTI has increased from $61.78 per barrel (March 14, 2006) to $68.38 per barrel (April 26, 2006), and was almost $74 per barrel at one point during this period. In light of the continued volatility and uncertainty in the oil market, Norfolk Southern will continue to monitor the oil market and will consider further refinements to its fuel surcharges as appropriate.

We are aware that some parties to this hearing have expressed concerns over the fairness of how fuel surcharges are applied in the rail industry. Norfolk Southern has looked and continues to look at ways to address this problem, including creating a mileage-based fuel surcharge program. However, any solution to this issue is complex and would result in some shippers paying more than they currently pay in fuel surcharges.

In addition, attempting to tailor a fuel surcharge to each individual movement, of which there are hundreds of thousands on Norfolk Southern, would be expensive, time consuming and, at the end of the day, most likely impossible. There are too many variables that determine how much fuel is needed for each individual movement. Those variables include the weight of the loaded car, the grade over which the car must travel, the total number of miles the car must be transported, whether the car is moved in a unit train, how many locomotives are on the train, and how many times the car must be switched. As a result Norfolk Southern would have to calculate and bill thousands of different fuel surcharges for each of the movements. This would be no small task given the 64,000 lanes in which our traffic moves and the 1,925 commodities (excluding

intermodal) different STCC codes of commodities we carry. Accordingly, it is nearly impossible – given the number of customers Norfolk Southern has and the even larger number of individual movements it handles – to calibrate any fuel surcharge program to recover the incremental cost of fuel.

## IV. Demand Continues to Grow, and Norfolk Southern's Total Price for Transportation Will Remain at Market Levels So That It Can Continue to Aggressively Invest In Capacity.

Since we adopted our original fuel surcharge, traffic on Norfolk Southern has grown steadily. Between 2000 and 2005, our traffic volume is up 14%, which compares to 1.1% growth in the Low Tech Industrial Production Index over the same period. And our volumes continue to grow. Traffic volumes were up 5% in the first quarter of 2006 compared to the first quarter of 2005.

We strive to set our overall prices at market levels, and we will continue to do so. We use the market as our gauge when negotiating contract arrangements and when determining the appropriate level of our public rate authorities.

We will continue to set our rates at market levels. Accordingly, a lower fuel surcharge will often mean a higher base transportation rate as we set our prices at the optimal market level. So a different fuel surcharge does not necessarily mean that customers' transportation bills will decline, which is not unusual when demand is so strong. For example, when Federal Express lowered its fuel surcharge index by 2% last year, it increased its average list price by 4.6%.[14] Similarly, when United Parcel Service

[14] Securities and Exchange Commission Form 10-K filed by Federal Express Corporation on July 14, 2005, at 23, available at www.sec.gov.

reduced its fuel surcharge index by 2% on domestic and international air effective January 2006, it did so only after taking a 5.5% rate increase.[15]

Maintaining rates at market levels is critically important in these times of increasing freight transportation demand. We all know that the U.S Department of Transportation has estimated that the demand for freight transportation will increase by 55 percent by 2020 and that the American Association of State Highway and Transportation Officials projected that freight tonnage will grow by almost 57 percent between 2000 and 2020. Norfolk Southern is seeing that growth. Last year our intermodal volume was up 9% in units, coal volume was up 3% in carloads, and construction materials and metals, forest products, and agriculture shipments were each up 2% in carloads. This year has started with similarly robust demand.

At the Board's Hearing on the 25th Anniversary of the Staggers Rail Act of 1980: A Review and Look Ahead, Mr. Stephen C. Tobias, Vice Chairman and Chief Operating Officer of Norfolk Southern Corporation, testified to the capacity needs of our railroad – not just to meet the increasing demand we are facing but to be able to respond to the events that affect our ability to serve our customers, such as Hurricane Katrina.[16] Those needs include expanded infrastructure as well as investments in technology – not to mention simply maintaining our existing network.

For 2006, our capital budget is about $1.2 billion – almost one-half a billion dollars, or 65 percent, more than in 2002. Norfolk Southern is purchasing 120 new locomotives and is rehabilitating 420 locomotives this year in addition to the 491

---

15 Securities and Exchange Commission Form 10-K filed by United Parcel Service on Mar. 14, 2006, at 26-27, available at www.sec.gov.

16 Written Testimony of Stephen C. Tobias, Ex Parte 658, Hearing on the 25th Anniversary of the Staggers Rail Act of 1980: A Review and Look Ahead (submitted Oct. 12, 2005).

locomotives it rehabilitated last year. We are also investing heavily in some of the corridors on which we see further growth, including the Heartland Corridor project, which when completed will permit double-stack intermodal service from the Port of Norfolk to Columbus, Ohio. Maintaining market rates will help us to grow our capacity to meet this nation's transportation needs.

## V. Reporting Requirements.

The Board's order regarding this hearing asked the parties to address "whether and how [the Board's reporting requirements] should be adjusted to provide rail customers with better information on a carrier's fuel costs and the revenues collected through fuel surcharges."

NS already provides public information in response to the requirements of the Board. Each year, Norfolk Southern files its R-1 with the Board. It also files with the Board quarterly data. Moreover, Norfolk Southern also provides a considerable amount of financial information to the public through its filings with the Securities Exchange Commission. Accordingly, Norfolk Southern does not think additional reporting would serve much purpose.

Nevertheless, if the Board determined that there was some value in adding yet further reporting requirements, Norfolk Southern asks that any reporting obligation be prospective only and that the Board allow us at least 90 days to modify our systems to minimize the cost of compliance.

## VI. Conclusion

Like so many other companies, Norfolk Southern has had to conduct its business in the face of dramatic increases in the price of oil and has struggled to understand and respond to those increases. At the same time, it has faced unprecedented demand for its rail services – a demand that shows no signs of abating and that requires us to continue aggressively to invest in capacity on our railroad.

Our new fuel surcharge program responds to what we believe is a fundamental and structural shift in the oil market to sustained higher fuel prices. However, our latest announcement is only the most recent in a series of actions Norfolk Southern has taken during this shift in the fuel market and the resulting changes in the transportation marketplace. As events warrant, we will continue to respond to the oil market and the changes it produces in the transportation marketplace.

## CERTIFICATE OF SERVICE

I verify that on this day, April 27, 2006, I have caused copies of the Written Statement of Norfolk Southern Corporation to be served upon all parties of record in this proceeding by first-class mail or more expeditious method of delivery.

Matthew J. Warren

# PX1171-PX1200

# Filed Under Seal

# EXHIBIT

# PX1201

Final Event Transcript of CSX conference call, 24-Jul-03 11:00am
2003-07-24 16:15 (New York)

Q2 2003 CSX Earnings Conference Call

Boston, Jul 24, 2003 (CCBN StreetEvents) -- Event Transcript of CSX conference call, 24-Jul-03 11:00am ET.

THIS CCBN STREETEVENTS TRANSCRIPT IS AVAILABLE AS PART OF A FREE TRIAL UNTIL JULY 28TH. TO ACCESS TRANSCRIPTS AFTER THIS DATE, YOU NEED TO BE A STREETEVENTS SUBSCRIBER. FOR ADDITIONAL INFORMATION, PLEASE TYPE CCBN <GO> OR CONTACT CCBN STREETEVENTS CLIENT SERVICE AT +44(0)20.7648.1295 (Europe), 617.603.7773 (United States), OR BLOOMBERG@CCBN.COM.

================================================================================
=
Corporate Participants
================================================================================
=
* Michael Ward
  CSX - Chairman President and Chief Executive Officer
* Oscar Munoz
  CSX - Executive Vice President and Chief Financial Officer
* Michael Giftos
  CSX - Executive Vice President and Chief Commercial Officer
* Alan Crown
  CSX - Executive Vice President and Chief Operating Officer

================================================================================
=
Conference Call Participants
================================================================================
=
* Tom Wadowitz
  Bear Stearns - Analyst
* Scott Flower
  Salomon Smith Barney - Analyst
* Gary Avalon
  Credit Suisse First Boston - Analyst
* John Barnes
  Deutsche Banc - Analyst
* Jeff Goff
  Fulcrum Global Partners - Analyst
* Ken Hackstra
  Merrill Lynch - Analyst
* Tony
  - Analyst

================================================================================
=
Presentation

--------------------------------------------------------------------------------
Operator [1]
--------------------------------------------------------------------------------
Good morning, everybody. Before we get started just want to remind that today's presentation will include forward-looking statements and that actual results might differ from any forecasted information presented here today. Factors might effect actual relates and also listed CSX annual report. With that I will now turn the call over to your host, Mr. Michael Ward, please go ahead, sir.

--------------------------------------------------------------------------------
Michael Ward, CSX - Chairman President and Chief Executive Officer [2]
--------------------------------------------------------------------------------
Well, good morning and welcome to CSX second quarter earnings release presentation, I appreciate you joining us today. With me today I have Michael Giftos our Chief Commercial Officer, Oscar Munoz, Chief Financial Officer and Al Crown our Chief Operating Officer.

You've seen the numbers and, in my view, we had sort of a tough quarter here in the second quarter. As you know, our business model is to pull both levers, grow the revenue and reduce the cost through productivity and through that we'll dramatically increase our operating income.

If we look at our results for the second quarter, one of those two levers worked well. Our revenues were up about $53 million, approximately 3%. Unfortunately our productivity lever didn't work real well in the second quarter. Our costs were up about $87 million, about 6% with the resultant impact on the operating income being down $34 million year-over-year. We're not real pleased with those results and we're taking steps to address the issues that we had here in the second quarter and as we do that we're looking at everything we do.

Everything is subject to reexamination except for two things; our dedication to service and our dedication to safety, besides that we're examining everything we do. So if I look at this quarter, first and foremost and it's painful we didn't run the railroad real well in this second quarter and I like to talk a little bit more about that in a minute but first I'd like to touch on two other issues that did impact us this quarter.

One, as you know, fuel prices continued to stay high, West Texas intermediate's been over $30 for most of the quarter. Year-over-year our fuel price, our fuel price impact on our cost was about $23 million. Our fuel surcharge mechanism did help mitigate that but it was still up fairly dramatically on a year-over-year basis.

I've mentioned to you before, we have been examining whether we should engage in some hedging activity in order to put more stability into the fuel price element of our cost structure and we will be engaging in a fuel hedging program that will help the stability in the out years that Oscar will detail a little bit more later.

In addition, as you know, we did absorb $17 million in expenses to account for our new asbestos claims in the state of West Virginia. This expense, as you

know, is not any admission of fault. It's a correct accounting treatment, and our company will vigorously defend every one of these illegitimate claims because we do believe some of these are illegitimate claims. As you are aware, we did receive approximately 1,500 claims in West Virginia, filed in June a few days before the venue law change in the state of West Virginia was to take effect.

We do applaud the West Virginia legislature for their actions and we think this will really help us in getting any future claims in the appropriate venue and then we're glad West Virginia took that action. Unfortunately, West Virginia's only one of 50 states, and the national legislation being proposed on asbestos reform we think is very critical to start bringing some judicial fairness to this process. We'd like to let you know we are actively engaged in helping to promote that legislation and to promote some judicial fairness. Tough issue, and lots of hurdles but we think it's the way to go.

While those issues did impact us, I think most importantly, we didn't run the railroad at the level we are capable of in the second quarter. We didn't make the productivity gains required to offset the inflation and the volume growth which we set out to do and reduced network fluidity we experienced really caused a significant increase in some of our labor expenses and some of or other expenses that offset some of those strong revenue gains that we experienced in the quarter.

Failure to resolve these issues and return to the year-over-year improvement in propositions operations and profitability in not an option for us so our job is going to return to the basics of running our railroad in a disciplined manner, running it to plan. You may recall we did that in 2001 and 2002 and as we did that it had some very favorable benefits to us.

Our service improved which helped us with our modal conversions and our value pricing. Our cost structures got the efficiency of running a disciplined railroad. That's where we're heading, going back to that same kind of operation.

Obviously that raises the question how do we lose our discipline? We had a pretty good thing going. What happened? Really what happened is, as you know, we've had some weather challenges this year. And one of the things happened as we were working our way through that weather challenges we got into the habit, the practice of making a lot of tactical decisions. There were a lot of well-meaning people trying to make decisions to help the operation out increase the fluidity in the terminal. Serve a customer well and they were making a decisions that from their perspective looked to be good ones to help our railroad.

Unfortunately, as you know, railroads are gigantic network operations and sometimes those tactical decisions really hurt the overall operation of the network. So what we're doing is we're going back to our focus of running to the plan and having the discipline around doing that.

Over the last 30 days we've made some personnel changes and some organizational changes in the operating side of our railroad and we find we are starting to regain our focus and our discipline. First thing we did is we delayered some of

our operations. We accelerated some of the head-count reductions that we had planned to do later in the year into the current period.

We redeployed some people and put more people in first-line supervisor positions directly driving execution of the plan and we did a process of really doing a job of increasing the clarity around roles and responsibilities. So far we're seeing some encouraging signs but we're not out of the woods. If you think about velocity that's probably one of the better measures of overall network fluidity.

If we look in the past few weeks, 11 of our 12 divisions, we have 12 on our railroad, 11 of our 12 divisions all except the Atlanta divisions have improved the velocity during June so we're starting to make progress but we still lag where we were in 2002. If we look at the first couple weeks of July, we're running at about 21.3 miles per hour which was 1 1/2 miles slower than same period last year most of that is around the Atlanta division.

If you look at the impact of Atlanta alone, it's about one-mile-an-hour of that mile and a half. We got S.W.A.T. teams, some of our most seasoned professionals down there pulling the Atlanta division to figure out what's going on and we're comfortable that'll rebound as well. We also made a key personnel change in our southern region is our largest region. It's about 40% of our system and it's our most challenging.

We brought a fellow named Mike Peterson who's running his western region and reassigned him to the southern region. On the western region, Mike had our best performance of all of our five regions in safety, in service and in cost performance and we're comfortable Mike's going to bring that same leadership to the southern region, our biggest region and really help us increase the fluidity there.

So overall in operations, we've taken action to restore the discipline. We're encouraged by the results we've seen so far but there's still a lot to do. Despite these operational challenges though, we are demonstrating we can grow the business at a sustainable rate.

In the second quarter we hit a milestone over the last 2 1/2 years we've now converted over a million truckloads of business back to the railroad and while we did run an insufficient operation here in the second quarter, we didn't take our eye off of serving the customer and their requirements during that period so we continue to see our value pricing and our modal conversions have and their vibrancy and as Mike will tell you shortly we're growing the market for rails, getting yield improvements and seeing new volumes from the various new product offering offerings his team is coming up with. As we improve the operating efficiency we'll see a lot more of that revenue fall into the bottom line.

I'm going to ask Oscar to take you through the numbers but before I do, just like to make a few comments about Oscar. I introduced him on our conference call last time that Oscar had joined us; to remind you Oscar from AT&T where he was the CFO of their consumer services division which was about a $10 billion division of AT&T..

I've worked with Oscar for two months and here's what I can tell you. He has brought a new perspective and fresh ideas to our team and we hoped he would bring that to the table and he is. He's going to be a tremendous help to us as we examine our productivity issues and think about new initiatives that we can embark upon. Some of you have met Oscar and those that have you can see his energy, you can see his focus and I think he's really going to be a very positive influence for him, he's going to a good challenging partner that we need in the financial role so I'm encouraged and pleased to introduce Oscar.

Now that I'm embarrassed him, I'll turn the podium over to Oscar Munoz

--------------------------------------------------------------------------------
Oscar Munoz, CSX - Executive Vice President and Chief Financial Officer [3]
--------------------------------------------------------------------------------
Thank you, Michael. Good morning everybody, it is nice to see a few friendly, smiling faces.

I'm going to walk through a couple of different things today. Clearly the financials from a consolidated perspective, all the various components of CSX and more detail into the surface transportation area and then, I thought it was important partly from my learning but as well as being able to project some results of some objectives that we've talked about before, primarily staffing levels and some objectives we set out to you certainly free cash generation and as well as the balance sheet strengths or debt levels all in and I thought that was important to kind of brief everybody through.

Our presentation that we do from a GAAP perspective is not always indicative of what we actually have, so, I thought that was important. With all that aside let's go through the consolidated information.

I just want to note first chart, first caveat, 02 has in it CSX lines which was conveyed earlier this year to a Carlyle gain and it creates a bit of an optic with regards to performance so consolidated revenue was down $131 million but the loss of CSX lines over last year masked $53 million revenue increase from surface transportation, again, we will talk about that in a little bit. Expenses are down 95, same optic obviously, cycling expenses from CSX but consolidated income of 285, down 36 from last year. The net impact on that 36 from lines is about $6 million just for your information.

Other income up 15, that's the real estate sale that we announced last month and then interest expense for the quarter of $105 million, down 11, obviously everyone knows interest rate situation today is driving the majority of that. So net earnings of 127, EPS of 59 versus a reported 63 last year.

And so now if we could, let's dissect the operating income line just a bit more. Surface transportation, operating income was down 34 predominantly due to a lot of things that Michael talk about, certainly our insufficiencies in running the railroad. The asbestos one time thing and I also understand we had last year this quarter a contract dispute settlement of about a net $11 million so all of those things added to that, but we'll talk a little bit more about that in a second.

International terminals, our world terminals situation operating income was 17 up just $1 million over last year. A little bit of deeper review of that, $4 million down in revenue offset by expenses a lot of that revenue was in the eastern or the the Asian sector.

Other operating income of $9 million relates predominantly to the minority interest we have in the terminals. A lot of terminals that we own a minority interest so that's the component pieces. So net-net terminals is about $2 million down year over year. Other income and resorts up to the real estate sales to triangle and then miscellaneous about $6 million is really interest income, lower cash balances and lower yields on some of the marketable securities so that's kind of the consolidated look.

And if I could let's go to the surface transportation, very detailed page here. Let me get the quick highlights. Revenue was up $53 million as you can see on the top, 3% on an increase of about 2% in volume. Mike Giftos will certainly talk more about that in a second so let me focus on the rest of the chart. If you go down the expense column down to total expense you see the 87 that Mike mentioned earlier. 6% resulting in a operating income of about 259 for surface transportation versus 293 last year. Our operating ratio, or what I am beginning more of a reversed margin, certainly declined from 84, declined to 86.3 from 84 last year, a couple of points.

So let's go back up to the expense line item detail there. We have a flash document that you've all received that is very detailed and has the accounting explanations of what happened line by line. I'm not prone to talk through information you already have. I do want to make a couple of points with regard to some of the line items. Clearly the labor and benefits is one of the largest in the first up there of $22 million.

As Michael said, the staffing reductions and the productivity initiatives that we do have in place just weren't enough to offset some of the operating inefficiencies in the railroad, one But two, there is a volume aspect to this business meaning we are generating more volume and more revenue and that does have some cost so that's part of the increase as well and then we have a mark to market on some deferred compensation plans that at the quarter end given the market we had to book of about $7 million so lots of different components.

As you go down to the next line of MS&L and l that is where the asbestos litigation was booked. Offset by a property tax settlement that we had in New York of about 7. So the net number you see there.

The next line probably inland transportation is the next really big line item. Again, this prior-year contract dispute settlement is in this line over prior year so we're cycling that so that's driving some of the negative number there. The actual number on this line is 15. We had a net number somewhere else net to 11 but the 15 is there and then an additional issue there, we had running the business there created some other inefficiency.

Depreciation was up over prior. That is not a run rate. You'll ask we have about $20 to $25 million in depreciation year-over-year and so some things were prior year and the FAS 143 and the combination of those is creating this optic

for this quarter but for full year you can expect 20 to 25, so no concern there. Fuel, as Michael said, the total variance was 24 and 23 of it was price. Area, this is impacted not only this sector but, frankly, most of industry. Pricing continues to be relatively high.

We do have the benefit from Mike Giftos's great work on the fuel surcharge which offsets some of this expense from an operating income perspective, but we're also engaging in a fuel hedging program. This is a mechanical approach we'll buy 6 to 24 months ahead and. It really is a process that will be really structured and controlled. We're targeting an 80% level and given the forward-looking part of this or the forward part of this, we will be fully hedged kind of in late '05 and so you can just do the math.

You know, I guess if you take 1/18th of 80% starting six to seven months ago the beginning of March we'll start getting 4 or 5% per month, ending '04 with probably a 48, 50% number and average of 24 for the year and working from there. So other than the math, the story is there that fuel will continue to be something we manage and work through, but, again, we're taking the right steps and, of course, the surcharge is a big component of that for us.

So I step back. My first quarter I look at this page as detailed as it is, but, you know, from what I understand from what I hear and read of the work and conversations we've had with you all. We've talked predominantly about two levers. One is revenue and the other is expense management and, as Michael said, we are doing well on one, and again, Mike Giftos will talk to that. The expenses are our issue. So I'd like to maybe offer kind of a different perspective that you'll see from me rather than just always looking at sort of the detailed P&L version.

The next page as I walk you through this, this is just a different perspective on the same subject. And P&L's are hard to look at sometimes because they're just absolute numbers. In order to manage and control certain expenses you have to look at them in a way that break them down into chunks that are manageable, so, what I did for the quarter this is a simple bridge, a waterfall chart, depending on what you call it but on the left side you start with the operating expenses from last year.

I've taken the liberty of adjusting for that $11 million settlement just so that we just have less stuff on the chart. So you start with the expenses and you just kind of work from there. Clearly the asbestos thing which is the first one is by all intensive purposes, at least in my analysis, more than likely a one-time charge, something that's not going to recur on a regular basis. Real issue for us but nevertheless more than likely one time.

Fuel, we talk a little bit about this. This is the direct price impact, again, between the hedging and the surcharge program, the whole impact of this over time the OI impact will be mitigated and so I think we're making at least the right moves from a long-term perspective as you look forward in your projections.

The next three items, depreciation, volume, again volume component that I talk about earlier, and, of course, the general inflation and other, and I think

you'll forgive me, $12 million on that one five, that's less than 1%, even in deflationary times that we talk about we do have labor contracts that increases. So those are the things that we got to work through.

Next chart, Oscar, but what does it mean. Well, what it means to me is that that circled item is the challenge that we face. There are always going to be things that happen to this business as I've learn in the short period of time.

But we've got to address and focus on the things we know are definitely going to happen. We have inflation, we will have volume clearly with our spending levels and capital we have additional depreciation so those are the things we've got to attacked and plan to attack. Unfortunately due to what some of the things we've talked about we weren't able to do that this quarter.

So going forward what do we do? Our action point, and again it's hard for me to describe these in detail giving given my limited knowledge but I'll tell you how I look at them. First is a general operating improvement and whether it's the delayering or organizational concepts that Alice put together.

Whether it's the visible metrics that we're beginning to see, whether it's the dissection of aggregate systemic metrics like very loss if I for the whole corporation. You break it down into the component pieces, it does tell a very different picture it does tell me that we know how to focus and we know where the issues are, let's go after those and I think that's very critical when you begin to fix something.

You can't always fix a general systemic average, you can fix things in different places and I think the Atlanta example is a very good one with regard to that. The other proof I have behind us I have looked at the past and I've looked at the history and we have been at different levels before and I think that's important.

Having been there, at least mathematically tells me that we can get there again so a ways to go, some work to be done, but nevertheless a process.

Next, we have, as Michael said, accelerated our staffing reductions that we had planned for the year. I'll talk in another chart about that but, again, we had a certain kind of plan with regard with regard to the balance of the year. We've taken a fairly assertive approach given our operational inefficiencies and Al Crown has done the bulk of these and we've accelerated all of those reductions predominantly in place right now and that on a go-ahead go forward basis will help the fluidity, operationally, as I understand but I know what it will do for us is decrease obviously our carrying cost or fixed cost relating to the staffing.

And last but not least and I think where I add hopefully some good issues and something I'll call cost transformation, not so much just general cost take out of productivity kind of things. We have to really think hard and you heard Michael say that there isn't anything that we're not going to go through specifics around this, clearly, I see a great opportunity from a technology and a process perspective of taking kind of our end to end work flow from when a customer orders to when there's payment, there's a lot of procedural systematic

technology procedures that we can make a lot of headway in. We have issues so that's one issue.

There's potential issues around outsourcing. Certainly labor inefficiencies, we have very, very complicated labor contracts. I think working towards simplification, working closer with our union partners to ensure that we are both productive and leading to a better bottom line for us and questions with regard to rationalization and things with that nature and we've been studying those and the team has been very receptive both from an operational and commercial perspective. I think we're looking hard into those areas and so those are the kind of things that you'll see from us.

Now, these aren't short term. These aren't tomorrow. We will give and bring specifics and actions around some of these things over the next few quarters, but, again, that's the kind of thought process when I breakdown a quarter that looks at these kind of areas rather than just the financial piece.

So that's kind of a close on the financial aspect let me give you the updates that I promised on the initiatives; staffing, free cash and balance sheet strength. I think the headline on this says it all. We think, have issued a number of about 900 for the course of the year. We are going to make that and we'll make that pretty handily with some of the work that we've just done recently.

The chart, it's hard to read a little bit but generally what it should tell you, what it tells me is two things; one from a slope perspective, over the last three years or so we have reduced staffing in aggregate. The second thing it tells me that, especially in the second, in '02 and '03 there's a seasonality aspect that he is normal thing we do. That's a thing we called in gains and maintenance of work that gets done but the key and critical number is that on an absolute head count level we are down 451 people year-over-year and again with as we report in the third quarter, you'll see that number increase and that number of 900 met.

Next, free cash, bottom line $94 million for the six months. You won't be able to get the dots to that necessarily on our flash or GAAP statements for lots of different reasons so let me just walk through it as quickly as I can. The first line cash from operating activities, that excludes the unwinding of our accounts receivable financing program during the quarter and also a couple quarters ago as well.

From, if you think from an economic perspective, financing activity and so it's excluded from free cash. We have replaced that AR financing with on balance sheet debt in due of the favorable interest rate environment so we've removed in the number in this particular calculation is 380. Just to make the numbers work and visible.

Cash from operations on the first line is still down 166, a component thing, certainly our operating income earnings of approximately $35 to, $40 million is part of that impact. We did make a certain retirement payment to a former executive that impacts that number pretty handily and then we have some tax payments in that figure that affect that. So capital expenditures on are on

plan, our stated annual goal is what it is. We've not moved off that. We'll certainly make that number.

Other investing activities, that is the cash received from the disposition or the conveyance of our CSX line. Dividends are what they are and of course, Conrail cash is coming in and so that's your 94 down a bit from prior year.

The second objective or one of the objectives we've spoken is with regards to what our free cash might be for '03, we've mentioned the number of 300. I'm still confident that that number will be reached so that's an expectation of a couple hundred million in the back half of the year, very similar to our cash generation last second half. A little bit higher but certainly that's what we had last year that we hopefully will not have this year is the New Orleans litigation payment and our capital level spending in the back half will also contribute to that so, we're confident that the 300 objective will be met for this year.

Then last and certainly not least is our debt. Our balance sheet strength. This is a chart that I like to call, again, our reporting is not as transparent as you would think. We actually have debt, real debt, that is not on our balance sheet and we have debt on our balance sheet that's actually not real debt.

So that's the layman's version of it and, a financial joke I guess, no one's getting, but thank you. So let's start from the top really. Balance sheet debt has increased by approximately 252. The main reason for this is the net effect of unwinding AR financing and also that we're borrowing back more money from our Conrail which is the second line from that. Again it's a note embedded in our long-term debt that really isn't debt for us and then moving down to the off balance sheet, you see the huge reduction there.

The majority of that being the fact that accounts receivable financing was moved off this line and an additional, an additionally we took present value from CSX line conveyance that affected this number so movement between line items on this sheet but, again, it's important to know where they're all moving to.

Conrail reduced their debt and that's our 42% portion of it and then the further reduced by obviously the less cash on hand to get the numbers that you see there. So net-net debt down 259 year-over-year and shareholders equity increases by 168 and that is obviously a function of increased net earnings or net income during the year.

All in, we're all at a 55 all in debt ratio down two points from a year ago. I think that's a good point as I think we've said publicly. 50/50 is our stated goal and clearly a focus that we have.

EBITDA coverage, you see a slight improvement there and to curtail a potential question that I've heard that might come up with regards to dividends and such, we still firmly believe that our stated goal of increasing cash and reducing our debt maintaining a strong triple B and, of course, getting to a 50% all in debt is our continued focus and which think that's the best thing to do at this point for our shareholders. So I'm feeling really strong with regards to some of the

work that we've told you about. Is well in line with what we expected, staffing. We'll look at those areas and move into continued free cash and balance sheet.

Just to finalize real quick, as I look forward, things that we as a corporation and things that I will hopefully help with is clearly first is just kind of a financial discipline and rigor. Hopefully the theme of this conversation that I just had, you know, we're going to be about making commitments and making them and when we do we'll tell you why, when we don't we'll tell you why and more importantly we'll what we're doing about fixing them. It is a bit of a transparent industry.

I've been shocked and amazed about how much information you have on a, frankly, daily basis that's different from my old business. So we're going to be transparent, let's continue to be transparent, and we'll share all our information. The team has their head down and focused on the right things so I'm excited about that possibility.

Important but more importantly, second bullet with regards to all the different initiatives that we have, I mean, we have great programs in place. I've been very impressed with some of the stuff that one of our executives back at home is performing with regards to not only six sigma but the process improvement woo avenue had good teaming efforts around them and I think that is going to pay off, again not a short-term issue but never the less that program as well.

More importantly around all these things when we say PICT or six sigma or whatever it is I want to start bringing what I call proof points and that's a basing simple concept what I say, what anybody in our organization says something there's something fundamentally specific and quantifiable that you guys can latch on to that says I think that makes sense, and we'll continue to improve that we can measure ourselves against that. So that's where we're headed.

The last thing on revenue, that's another lever that we have. I'm, frankly, staying away from it. It's looking good. Mike's doing a terrific job and he's going to tell you all about it. So, Mike?

--------------------------------------------------------------------------------
Michael Giftos, CSX - Executive Vice President and Chief Commercial Officer [4]
--------------------------------------------------------------------------------
Thank you, Oscar and again welcome to this second-quarter earnings release.

In the second quarter we continued to operate in a challenging economic environment, you're all aware of that. We continued in an environment of economic uncertainty, but we also continue our focus on yield.

We also continue our focus on modal conversion and with those, even in this environment, we enjoyed a year-over-year revenue growth of some $53 million. And we continued to see the yield improvement that I've been showing you in the past several quarters of the overall for the company we achieved that 3% growth with revenue per car yield improvement for the entire organization of about 1%.

And you'll see as we move through the various commodity sectors some of the yield improvements were significantly better than that. We achieved these yield improvements through a variety of things.

Of course, we had our fuel surcharge program that's reflected in there. That's some $17 million of revenue we collected this quarter from that program. That's 15 more than we collected last year. We had some mix impact but our continued focus which we will continue on price as well. All commodity groups with the exception of our auto group showed year-over-year improvement in operating revenues.

Let's look at auto sector first. This is the first time after five consecutive years that the auto did not improve revenue. They were down $3% or $7 million. Carloads were down 6% and the yield improved 3.3%. I think we all know it drove that year-over-year volume decline. Production declined to 2.4 million units in the second quarter down 9% from where they were the year before. That's the lowest level that we've seen in the second quarter production since 1998.

The auto producers continue to focus on incentives. The production in sales continue to exceed my expectations. This is an area that we'll watch carefully as we move through the year and we hope the incentives continue, the economy picks up and we see an improvement in auto sales as we move through the year.

We told you last time that we expected our coal revenues to improve in the quarter and they did and this is after five. Five consecutive quarters of revenue decline, our coal revenues were up 4.3% some $17 million on an increase of 2.2% in carloads with yields improving about 2% as well. Largely driven by increased volume, increased sales, now utility market, the utility business at CSX represents about 70% of our coal sales.

Our northern utility business was up 16% or $20 million. Our southern utility business was up 12% or $18 million. The strength of the utility market was offset by declines some weakness in our export traffic. Our industrial traffic.

Our coal, coke and iron ore businesses as well as our river traffic. Those offset the truck performance in our utility market. We expect this performance to continue as we move through the year.

We have some interesting conflicting signals out there on the one hand: we've seen exceptionally cool weather in the eastern part of the United States for the last several months. Electricity generation east of the Mississippi river in the month of June was down 7% from a year ago. In the early part of July, we see similar declines in electricity generation.

Nevertheless with gas prices at historic highs, as long as we produce some electricity we're confident that coal will get more than its fair share, and we're confident that we'll see the continue replenishment of stockpiles and if we return to warmer weather coal will do well.

Merchandise sector, this is the fifth consecutive quarter of year-over-year revenue growth. Year-over-year growth that's occurred in a bad economy. Revenue is up 4% or 1.3% growth in carloads as yield showed a nice improvement of 3.6%.

With the exception of our chemical business, where the revenue was essentially flat on a 4% decline in carload, all other commodity sectors enjoyed year-over-year revenue growth.

Let's look at a couple of those. The metal business was up 8% on carload of 8%. Sheet steel continues to be strong as we continue to enjoy significant modal conversions in that area and benefit from exports in that area. Our forest and industrial area was up 5% on essentially flat car loads. Building products remain strong in response to the strong housing industry.

News print and our other print business is strong more than offsetting continued weakness we see in the important brown paper sector. Our chemicals business, as I indicated earlier, was essentially flat. We know what's going on there. That's perhaps one of the better barometers of the over all the economic activity in the country. We continue to see very high feed-stock cost that are driving lean inventories. We need an uptick in the economy, a reduction in some those feed stock cars to get that sector moving the direction we'd like.

Our emerging market group had a terrific quarter again, up some 10% in total revenue, $11 million, 10% increase in revenue on a 8% increase in carloads.

In our first quarter, which drove the growth in the emerging growth was the exceptional military moves, up $17 million year-over-year in the first quarter. Again, a nice pickup and only $4 million this quarter. What was driving the growth in that sector, we expect it to continue perform well, the growth in our waste business, aggregate business and possibly with some additional return of some that have military cargo we could have a terrific plus in that in the second quarter as well.

Our intermodal sector, its fifth consecutive quarter of gains up 6% on 5% volume growth. The second quarter as a challenging quarter in the intermodal sector last year you may recall there was an increase of pre shipping in anticipation of the west coast labor strike. The volume against that we've been average has been closer to 9% and if it wasn't for that west coast anticipated labor strike I think we would have seen that type of behavior in performance this past quarter. Tough comparisons.

In a domestic market, it was up some 14% in revenue or $24 million on a 9.5% increase in carloads. The domestic market has been performance was driven by an increase in the number of CSX u 50 ft. containers that we added to our fleet.

That's marketing initiative that we talked about a year ago, we're now averaging about 1,000 units a week that we're achieving off of load board and we expect that to increase, that accounted of $10 million year-over-year revenue improvement in the domestic sector. It was also positively impacted by a growing trend of transloading loading the industrial 40 foot boxes into the 53 foot containers. So we saw some transloading that also contributed to the growth in the domestic sector. As we move to the international sector we see that our revenue is down about $3 million on volume that's up.

What's going on there, well, again, that transloading of the international box into the domestic sector is clearly reflect in these numbers. Additionally we've

seen some all water diversions to east coast ports following last year. The change in mix is large largely a function of two things. We had a significant decrease because of that transloading in our loaded volume. Loads were down 7%, carry an average revenue per car of $457 while empties were up 9% and carry an average revenue per empty of $225 so the mix effect contributed to the decline in revenue per car in the international sector.

As is customary we have our forward looking slide where I share with you how we see our markets performing as we go forward and it's an interesting mix. We see that our auto sector, I have that in the unfavorable category. It's only partially there, just slightly there. We expect second, we second third quarter production to be down about 3% that can change as incentives kick in and customers start buying more, but what we see today based upon production levels we expect our year-over-year performance moving forward for the foreseeable future to be slightly unfavorable.

The chemical sector I also have in the unfavorable category for the reasons I explained to you earlier. High feed start cost coupled with relatively weak economies lead me to believe that with we're going to continue to look at chemical traffic in the unfavorable category for the foreseeable future.

As we move into the flat categories; two of them. Metals and phosphorus. As you recall last year a terrific year in that commodity sector a banner year and I think replicating that would be a terrific accomplish. Phosphate territory was operating at 97% of capacity, it's doing very well now and I think flat perform is what I expect there.

The metals business, well, I think we'll continue to see healthy modal conversions, strength in our pipe business but I'm worried about the auto sector and the important contribution that the metals industry provides to that sector so we see that at the flat line at this point in time. In the favorable items we have five commodities, we have our coal business for all the reasons I've explained to you earlier. First of all, we have fairly easy year-over-year comparisons. We have historic high gas prices. We expect to continue to replenish inventories. The weather is a concern, this weather has been exceptionally mild, but I still believe we'll be looking at some overall year or year strength from the coal industry.

With modal conversions, I expect that will continue to perform as it has for the past several quarters. Same with the merging markets the strength of our waste business which has been growing nicely the aggregates business particularly in the south and with some possible assist from the military cargo that we shipped over there in the early part of this year that could perform very very nicely.

Our forest and industrial sector is doing quite well and I expect that to continue with strength on our news print and our printing products and building materials more than off secretary any weakness we see in the brown paper area. In our agriculture and food product lines are doing well. Food areas enjoying significant modal conversion, refrigerated products with the express lane product growing at a 7% rate. A stronger harvest, compared against some relatively weak comparisons a year ago leave me encouraged in that sector as

well.

So in conclusion, I'm cautiously optimistic about what we're facing. concerned about the direction of the economy but even if the economy continues in this sideways movement we've been experiencing in the past, I think we can do quite well.

I think we can continue to take trucks off the highway and I'm encouraged. We know our coal business is strengthening versus last year. You can be assured that we'll continue our focus on yield as well as modal conversions and with truckers facing exceptionally high cost high cost with respect to insurance, with respect to drivers, with some new federal regulations affecting emission controls and their capital structure.

The rail truck comparison in economics is favoring railroads, that will certainly help us with our improved service to gain modal conversions, so the second half recovery that we expected last year and the second half recovery that we expected the year before, if that should occur our cautious optimistic could become quite optimistic and I look forward to your questions, thank you.

--------------------------------------------------------------------------------
Michael Ward, CSX - Chairman President and Chief Executive Officer [5]
--------------------------------------------------------------------------------
Thank you, Michael.

As you can see from Mike's forward-looking slides we see some good growth possibilities in some of our markets a few a little bit challenged, as far as the economy, and I think to add to Michael's comments, we all know what it is going to be, but we've been able to sustain growth greater than GDP and industrial production growth and we expect to be able to do that regardless of what the economy is. Fuel will still be a challenge going forward. Amazingly prices hang up in that 30, 31 range so that could be a challenge for us going to forward.

On the operation side I'm feeling good that over the next couple quarters we will get back to the kind of service, the kind of discipline and cost structure we saw in 2001 and 2002. We've done it before. We know how to do it and it's just a matter of us executing it, and we're on the right path. More to do, but we're on the right path.

As Oscar showed you we had that $35 million, $36 million worth of not offsetting some of our inflationary cost, our volume cost that we think we can do on a sustained basis. Running plans are going to help that. In addition we'll have to be challenging, our car practices, examining everything we do, employing technology to what we produced in the second quarter.

With that I'd like to open up for questions and answers. I would ask before you have start your question if you'll please identify yourself and your affiliation please. Tom.?

================================================================================
=

Questions and Answers

--------------------------------------------------------------------------------

Tom Wadowitz, Bear Stearns - Analyst [1]

--------------------------------------------------------------------------------

Hi, it's Tom Wadowitz from Bear Stearns. Two questions for you here.

One that you mentioned Atlanta was an issue, and wonder if you can give me a little background. What caused the issue to start in Atlanta? Was there a specific weather issue there? Was there a change in volume mix and maybe give us a further sense of at least initially what you're seeing that you think needs to change there?

--------------------------------------------------------------------------------

Michael Ward, CSX - Chairman President and Chief Executive Officer [2]

--------------------------------------------------------------------------------

I'll be glad to address that. I'd like to ask Al Crown our Chief Operating Officer if he could address that please.

--------------------------------------------------------------------------------

Alan Crown, CSX - Executive Vice President and Chief Operating Officer [3]

--------------------------------------------------------------------------------

Tom, it's probably a little bit of all of that. We've had some pretty severe rains and we've had some lightning strikes and tornadoes. It started out but clearly one of our problems is around the management that we had down there so making the changes in management we think will move it faster ahead.

As it got into tactical, they truly kept going that way and instead of grabbing the bull and going back to plan, they kept going tactical. We're working around the I know structure things the tracks are safe but we lost a lot of the momentum we had put into the tracks so we've got extra people working so we can get the speed up between our terminals, they have a lot of work to do around them and we've got people in place to do that.

--------------------------------------------------------------------------------

Tom Wadowitz, Bear Stearns - Analyst [4]

--------------------------------------------------------------------------------

Okay. In terms of mix, has mix ban big effect in terms of network operation or is that not really --

--------------------------------------------------------------------------------

Alan Crown, CSX - Executive Vice President and Chief Operating Officer [5]

--------------------------------------------------------------------------------

I haven't seen mix being a affect. We've got more business but I don't see it as a big change.

--------------------------------------------------------------------------------

Tom Wadowitz, Bear Stearns - Analyst [6]

--------------------------------------------------------------------------------

Okay. One for Mike Giftos, if I can here. The effect on pricing or TL conversions given that the service hasn't been quite where you wanted it to be and just also with the idea you've been in a pretty strong pricing story for a while, is that log down at all or do you still feel confident you'll get the

pricing gains you're looking for?

--------------------------------------------------------------------------------
Michael Giftos, CSX - Executive Vice President and Chief Commercial Officer [7]
--------------------------------------------------------------------------------
Let me take the first question first if I may. One of the things that we've done, one of the things you've heard from both Alan and Michael we spent a lot of money on our operations to in part keep our service levels as high as we possibly could.

So we didn't compromise cost and service perhaps as we move forward and our operations get better we expect the cost to come up. From our customers's perspective our service hasn't been as bad as the operations have been from our internal perspective.

Some of our time sensitive customers have clearly experienced the effects of some of our service challenges more than others but the vast majority of them have not experienced significant deterioration in the service. So I remain very optimistic that we'll be continue to able to enjoy modal conversions because I'm equally optimistic that the quality of is service is going to continue to improve.

With respect to the pricing question I remain convinced that we can continue to enjoy pricing increases as we move forward. The comparative truck rail economics are favorable. The value proposition that we have today will allow us to continue to achieve price increases.

As I said in the past I'd like the economy to improve. I'd like some of my customers to being doing better. So it's not so painful. While it has slowed down, I think I told everybody earlier in the year that our price plan for the year is around $100 million, and we're tracking better than that that's compared with 150 for the prior two years and I think we can continue to stay at that level even in this economic environment.

--------------------------------------------------------------------------------
Tom Wadowitz, Bear Stearns - Analyst [8]
--------------------------------------------------------------------------------
In terms of head counts reduction, Oscar, I think you said 900, I thought you said you'd be done by the end of the third quarter. Is that interpreted correctly?

--------------------------------------------------------------------------------
Oscar Munoz, CSX - Executive Vice President and Chief Financial Officer [9]
--------------------------------------------------------------------------------
That's a full year by 900 but accelerated parts of it to make sure we make that.

--------------------------------------------------------------------------------
Tom Wadowitz, Bear Stearns - Analyst [10]
--------------------------------------------------------------------------------
And can you give us a feel when you predict the original release on this. But

is this both white collar other blue collar or just white collar, 900 people.

--------------------------------------------------------------------------------
Oscar Munoz, CSX - Executive Vice President and Chief Financial Officer [11]
--------------------------------------------------------------------------------
It's a combination of both.

--------------------------------------------------------------------------------
Tom Wadowitz, Bear Stearns - Analyst [12]
--------------------------------------------------------------------------------
And Oscar, I don't know if it's for you or Michael, your velocity and other service metrics and operating metrics that would have been much better back in 2001, you look at where you are now, is there any way to try to quantify what your cost would have been or how much savings you would have you would have had in the second quarter had you run more efficiently?

--------------------------------------------------------------------------------
Michael Ward, CSX - Chairman President and Chief Executive Officer [13]
--------------------------------------------------------------------------------
That's a tough question to answer. Those are complicated network issues. Actually we're running below our levels of 2002. I think we're actually still above what we were doing in 2001 in most of the key measures.

--------------------------------------------------------------------------------
Tom Wadowitz, Bear Stearns - Analyst [14]
--------------------------------------------------------------------------------
Okay.

--------------------------------------------------------------------------------
Michael Ward, CSX - Chairman President and Chief Executive Officer [15]
--------------------------------------------------------------------------------
But I would say that the $35 million that Oscar had up there, as you know part of what we set out to do was to increase our productivity to offset the volume and the inflation and, by and large, we were doing that so I'd say a minimum of that is that $35 million. The quantifying that exactly and telling you how to precisely do that I don't think we could but I'd say it was in the 35 to $40 million range.

--------------------------------------------------------------------------------
Tom Wadowitz, Bear Stearns - Analyst [16]
--------------------------------------------------------------------------------
For Mike, coal pricing, do you have a feel for, are there any contracts that have come up recently for any of those that will be coming up between now and year end and your sense of the rail/water competition bids?

--------------------------------------------------------------------------------
Michael Ward, CSX - Chairman President and Chief Executive Officer [17]
--------------------------------------------------------------------------------
In the second quarter of this year we had no contracts up for renewal. In the last quarter of this year we'll have about $430 million worth of business up for renewal so the second quarter I don't have any percentages to share with you.

I expect we'll continue to be able to enjoy nice increases in those contracts. Perhaps not as high as the near double-digit increases we achieved last year, but I'm aspiring to something north of 5%.

Scott. Could you identify yourself, please?

--------------------------------------------------------------------------------

Scott Flower, Salomon Smith Barney - Analyst [18]

--------------------------------------------------------------------------------

Scott Flower with Salomon Smith Barney. Couple questions for Mike and one for Oscar. I was wondering in the core, can you give us some sense how much do you think mix affects but how much did mix affect your pricing. The RPU is not a perfect measure of questioning and then a follow-up question after that.

--------------------------------------------------------------------------------

Oscar Munoz, CSX - Executive Vice President and Chief Financial Officer [19]

--------------------------------------------------------------------------------

That is a tough one to break out specific specifically but I think we achieved our goal in the second quarter of achieving about $31 million increased revenue from price. So when you look at the price effect on the total revenue, this $31 million in there from new price.

If I look at the total yield change, I think about a third of it is mix and a third to a half is price.

--------------------------------------------------------------------------------

Scott Flower, Salomon Smith Barney - Analyst [20]

--------------------------------------------------------------------------------

Okay because the reason I ask that if I take out the $17 million less the $2 million last year in surcharge and run it against the average loads it's basically up three basis points that's why I was asking about mix effect versus price, if you look at that superficially it doesn't look as pricing is quite is a good, if I strip out the fuel surcharge.

--------------------------------------------------------------------------------

Oscar Munoz, CSX - Executive Vice President and Chief Financial Officer [21]

--------------------------------------------------------------------------------

If you strip out the fuel surcharge, you have to look by commodity area.

--------------------------------------------------------------------------------

Scott Flower, Salomon Smith Barney - Analyst [22]

--------------------------------------------------------------------------------

Right. And then I guess the other quick question, if I look at equipment rentals and I look in the flash it talks about renegotiating car higher rates. Is that sustainable, obviously the ops weren't where you wanted to be. The velocity wasn't where you wanted to be and equipment rents dropped. Were the renegotiations on those cars rates on a going forward basis or were there catch ups?

--------------------------------------------------------------------------------

Michael Ward, CSX - Chairman President and Chief Executive Officer [23]

--------------------------------------------------------------------------------

Basically, Scott, we renegotiated a number of our car hire contracts to produce favorability. There was a small element of reclaims in there but 50% to 60% of it was actual renegotiation of rates that would go forward.

--------------------------------------------------------------------------------
Scott Flower, Salomon Smith Barney - Analyst [24]
--------------------------------------------------------------------------------
Okay, so then 30 or 40% was actual recapture from earlier in the year?

--------------------------------------------------------------------------------
Michael Ward, CSX - Chairman President and Chief Executive Officer [25]
--------------------------------------------------------------------------------
Right. Gary? Id please.

--------------------------------------------------------------------------------
Gary Avalon, Credit Suisse First Boston - Analyst [26]
--------------------------------------------------------------------------------
First Boston, Credit Suisse First Boston. Gary Avalon Mike, I wanted to ask you if you could update us a little bit on some long term goals. You've talk in the past about where you'd like operating ratio to get to. It's not gotten there. Can you give us a sense of what you're thinking and to follow on the second question, also for you, how much latitude does Oscar have to do whatever he needs to do?

--------------------------------------------------------------------------------
Michael Ward, CSX - Chairman President and Chief Executive Officer [27]
--------------------------------------------------------------------------------
Well, there's two good and challenging questions, Gary.

To deal with the first one first, as you know we stated I guess it was about a year and a half ago we thought by 2004 we can grow the revenues a billion and keep the cost flat in the operating ratio We did put caveats around that. The fuel price stayed reasonably that we got the ever receding bonanza and economic recovery that michael alluded to earlier and achieving that 80 in the '04 horizon is not a realistic goal at this point given where the economy and where fuel prices are.

I would say and then I'm a little hesitant to exactly calibrate here but I think that's probably an '05 target now and what we hope to do and Oscar mentioned proof points to you what we want to be able to do, we have shown some good evidence that we can grow our revenue and we think that's sustainable. We also know we need to put an additional productivity ideas on the table. We've got our RRC's, our recording that will help us but additional ideas we need to keep up. As we come up with proof points and quantify what those are worth we'll be able to give you a better gauge on that. Gary

So within the next couple quarters we'll probably be able to set more realistic targets of where we need to be. But we still believe we can get to 80% and we think we can continue to show good several points improvement year-over-year and some of it will depend on the economy and fuel and we will come up with some additional productivity ideas.

On your second question of Oscar's latitude, I think Oscar going to have a lot of latitude. With all due respect, he has got some learning to do. This is a complicated business and he has some knowledge with the telecommunications background.

But we invited Oscar in because we wanted to get fresh ideas and challenging perspectives and I don't think Al would mine me quoting him on in this, he says the more I see him, the more I like him and I can tell over time I am going to love him and hate him and that's the way a relationship should be of a good challenging partner. So clearly we're going to give Oscar a lot of room to be a good challenging partner with us and we are going to give him some knowledge he doesn't have and the combination of the two should produce some pretty good results for our shareholders.

--------------------------------------------------------------------------------
Gary Avalon, Credit Suisse First Boston - Analyst [28]
--------------------------------------------------------------------------------
Thank you.

--------------------------------------------------------------------------------
John Barnes, Deutsche Banc - Analyst [29]
--------------------------------------------------------------------------------
John Barnes with Deutsche Banc. Can you comment briefly on where you see coal inventories on the CSX system and secondly, given the amount of rain we had and the spring and the beginning of the summer, some of the rivers in the eastern U.S. are a little bit unsafe for barge traffic have you been able able to pick up market share from barge?

--------------------------------------------------------------------------------
Oscar Munoz, CSX - Executive Vice President and Chief Financial Officer [30]
--------------------------------------------------------------------------------
We think inventories are pretty close of where we'd expect to be at target levels. Maybe slightly up in the northern part of our network so the inventories are in pretty good shape as best we can tell.

We're constantly looking at barge competitive traffic and we've had a number of modal conversion initiatives, some of which I've talked about in the past offsetting some of those structural losses I shared with you earlier in the year serving a number of utilities that previously received their traffic by river system or truck deliveries so we're constantly looking at those and making some terrific progress, and it's been important to us.

--------------------------------------------------------------------------------
John Barnes, Deutsche Banc - Analyst [31]
--------------------------------------------------------------------------------
Thank you and then Michael, it was about this time a year ago you began to run into some infrastructure issues with heat and that type of thing. And going in to the latter part of the summer, is there anything you're doing on a proactive basis to prepare for that and should we see system velocity while improved over a year ago should it stay constant with these levels or maybe even trend down a little bit with those proactive levels.

--------------------------------------------------------------------------------
Michael Ward, CSX - Chairman President and Chief Executive Officer [32]
--------------------------------------------------------------------------------
I'd like Al Crown to address that if he could, please.

--------------------------------------------------------------------------------
Alan Crown, CSX - Executive Vice President and Chief Operating Officer [33]
--------------------------------------------------------------------------------
John, we've changed the way we've done heat orders. We look at the specific locations and limit the amount of railroad that we slow down. Can you hear it okay? And that makes it just as safe but it keeps trains running at a higher velocity so we shouldn't see those kind of problems that we had before.

--------------------------------------------------------------------------------
Michael Ward, CSX - Chairman President and Chief Executive Officer [34]
--------------------------------------------------------------------------------
It was last year when we had heat issues we would take a whole division out which had a dramatic impact and we've developed over the winter of doing that on a more pinpoint basis so we can highlight the places that are at risk of derailment or Sun King so we think it won't be as nearly a disruptive an issue. We've been putting good money into our track structure so it's stronger track structure out there so I don't think it'll be a big issue for us this third quarter.

--------------------------------------------------------------------------------
John Barnes, Deutsche Banc - Analyst [35]
--------------------------------------------------------------------------------
Thanks.

--------------------------------------------------------------------------------
Jeff Goff, Fulcrum Global Partners - Analyst [36]
--------------------------------------------------------------------------------
I want to come back to Mike.

--------------------------------------------------------------------------------
Michael Ward, CSX - Chairman President and Chief Executive Officer [37]
--------------------------------------------------------------------------------
Identify yourself.

--------------------------------------------------------------------------------
Jeff Goff, Fulcrum Global Partners - Analyst [38]
--------------------------------------------------------------------------------
Jeff Goff, Fulcrum Global Partners. Thank you. I want to come back to Scott Flower's question on pricing. You mentioned the $31 million increase in pricing. Let me slice it a different way, you were up about 1% on revenue per car about 1% was the fuel surcharge. I'm going to guess roughly a third of your business is tied to RCAPs and I'd ask you in the question to let me know what that number is.

That is up 2 to 3% and so you've got another few percent that way. If I do the math it basically implies outside the fuel surcharge revenue per unit went down. Auto and chemical are weak, intermodal and coal are strong, I realize there's a

mix issue. But I am going to guess that it's not more than a hundred bases points so the implication is you're not raising prices more than 1% on the rest of your business. Why is that so and is that a fair assessment?

--------------------------------------------------------------------------------

Michael Ward, CSX - Chairman President and Chief Executive Officer [39]

--------------------------------------------------------------------------------

I'd be careful about averaging averages but let me answer your RCAP question first, about 20% of our business is subject to RCAP and we have a number of RCAP that are capped at a certain percentage, so it is something that we've been working on fixing that because I don't like RCAPs that are capped.

We'll either have a fuel surcharge or an index that captures fuel and we'll be satisfied if RCAP is at 80% and that's a policy that we put in place three years ago. So about 20% of our business is subject to RCAPs. You have to look at our individual commodity sectors to get a better understanding of the pricing picture. If you look at our coal business revenue per car was up 1.9% to $19 million. It's easy to dissect coal than it is the entire merchandise network with mix changes. Out that have $19 million, $7 of it was mix, $2 of it was fuel surcharge and $12 of it was price. Price from contracts carry forward and the modest amount of that business is subject to RCAP

If you start getting into our other individual lines it's tough measuring the precise impact in each commodity area I get a constant contract he review presented to me. The second quarter contract and merchandise that came up for renewal averaged a 2.8% price increase.

And so it's information like that coupled with those of you who know me, my uncompromising focus on price that gives me an awful lot of confidence that we're not going to lose our focus on it, we will continue to get pricing.

--------------------------------------------------------------------------------

Jeff Goff, Fulcrum Global Partners - Analyst [40]

--------------------------------------------------------------------------------

That's what I wanted to hear, thanks.

--------------------------------------------------------------------------------

Ken Hackstra, Merrill Lynch - Analyst [41]

--------------------------------------------------------------------------------

Thanks, Mike. Ken Hackstra from Merrill Lynch To follow up on chemicals business, you started off by talking about how we're seeing weakness that right now and you expect that going forward. What are the trends that you're seeing, is there something specific and just a quick one for Oscar. When do you, I'm sorry, when do you guys expect the Conrail break up for the folks there are on the income statement?

--------------------------------------------------------------------------------

Oscar Munoz, CSX - Executive Vice President and Chief Financial Officer [42]

--------------------------------------------------------------------------------

Chemicals, chemicals in one of our commodity areas that most closely mirrors the overall economic action any of the in the economy, with a sideways economy coupled with extremely high feed stock prices, propane and it's very, very high,

natural gas prices are in excess of five and [INAUDIBLE] so production levels are being kept low not only in response to weak demand but an obvious desire not to build up inventory.

In fact, we've seen in the United States this past year significant increases in imported plastics, something that hadn't occurred in prior years as producers in the Middle East are able to produce with much lower feed-stock cost. What we need to have happen in the chemical sector in my opinion is we need strength in the economy, we need the basic feed-stock cost to come more in balance before we see more of a pickup there.

--------------------------------------------------------------------------------
Michael Ward, CSX - Chairman President and Chief Executive Officer [43]
--------------------------------------------------------------------------------
On your other question it's more appropriate that I answer that than Oscar as I am more familiar with some of the history around that. As you know we've applied to both the service transportation board and to the Internal Revenue Service for spin of our basically a tax-free spin of the assets we and Norfolk Southern now lease from Conrail to us as the shareholders of Conrail.

There's really three critical elements. STB approval, I don't anticipate that being a huge issue because we're into the changing commercial access that our customers have which I think the main thing they would be focused on, and that's likely to be a six to nine month process, and we're challenged that we only have one commissioner on a three person commission at this point so we've expecting that to be a six to nine month process. Secondly an internal revenue service review and that probably is also a six to nine month process. We need to get consent from Conrail debt holders at this point so we've got three critical elements. Without any one of those, we're not going forward because one of the main benefits of this transaction is really better operational and financial transparency of our results.

You know, as Oscar had to lead you through today understanding where our debt is and what's real debt and what's sort of not real debt and where's the cash flows I think it will give us better transparency and also better transparency in our operations but I don't think it's a huge, if you will, economic difference. So we think it's a good thing to do but we won't proceed unless we get the approvals of all three so we're probably looking at if you figure there's going to be longer relief times, at least a nine month process to get all three parties in sync.

--------------------------------------------------------------------------------
Tony, - Analyst [44]
--------------------------------------------------------------------------------
Mike, questions, Tony has a question for Mike Giftos. You were excited or at least optimistic about intermodal, you mentioned domestic. I wonder what you thought it would be in a year-over-year given last year. If you can give a net new business number, given the new products what is the net numbers for new business?

--------------------------------------------------------------------------------
Michael Giftos, CSX - Executive Vice President and Chief Commercial Officer

[45]

--------------------------------------------------------------------------------

We're optimistic with respect to both the international and domestic sector as we move forward in the intermodal area. The transloading area which tends to cause the international numbers to be understated will continue, so it's a little bit hard to predict that. We've seen some volumes that's been fairly light on the west coast recently. But the year-over-year comparisons as we move into the second half should be a little bit easier because of the strength related activity.

How you add it all up and come up with a number as precise as you want is probably a little too challenging to me now and I am disinclined to do that but I think we'll see very nice intermodal pick up year-over-year in parts of because of our modal conversions that we've enjoyed the success that have load truck initiative the new product CSX introduced about a year ago.

It'll continue to drive additional volume growth and also the new containers, the new 50 foot, three foot containers, some will 2,000 of them versus a year ago that we've introduced into the marketplace all of which are turning at very, very attractive rates.

Your second question was the modal conversions, net new business from modal conversions in merchandise is $22 million in the second quarter. Intermodal, I tend to think of all that as modal new businesses so if you think about the total merchandise sector as $22 million working of revenue, that's the net number in the merchandise sector. And you can see the intermodal dal number is essentially all new business.

--------------------------------------------------------------------------------

Michael Ward, CSX - Chairman President and Chief Executive Officer [46]

--------------------------------------------------------------------------------

So, with that I would like to thank you, again for your attendance today and your interest in our corporation. Thank you very much.

------------------------ DISCLAIMER ------------------------

This note is not a company press release. The information is provided through CCBN StreetEvents, a service of CCBN, and is subject to change at any time. View terms and conditions:
http://www.ccbn.com/services/institutional/services_inst_terms.html

CCBN reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from

those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE
AN ACCCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES CCBN OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS
WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE
MAKING ANY INVESTMENT OR OTHER DECISIONS.
Provider ID: 0758360E
-0- Jul/24/2003 20:15 GMT

# PX1202-PX1210

Filed Under Seal