**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION<br><br>This document relates to: ALL CASES | MDL Docket No. 1869<br>Misc. No. 07-0489 (BAH/GMH) |
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION (NO. II)<br>This document relates to: ALL CASES | MDL Docket No. 2925<br>Misc. No. 20-8 (BAH)<br><br>**Public Version**<br><br>**Oral Argument Requested** |

**Plaintiffs' Reply Memorandum of Law in Support of Motion to Exclude Defendants' Expert Avram S. Tucker**

# Table of Contents

Introduction ........ 1

Argument ........ 3

I. Mr. Tucker's Opinions about Plaintiffs' Econometric Models Should Be Excluded ........ 3

- A. Mr. Tucker is unqualified to assess Plaintiffs' econometric models ........ 3
- B. Mr. Tucker cannot reliably critique regressions he did not review ........ 5
- C. Mr. Tucker's assertions about Plaintiffs' regressions cannot help a jury ........ 7
- D. Mr. Tucker's "quantitative" analyses are inadmissible ........ 9

II. Mr. Tucker Does Not Use a Reliable Methodology ........ 11

- A. Mr. Tucker's "forensic analysis" is impermissibly vague and subjective ........ 11
- B. Mr. Tucker's unrelated accounting experience cannot bridge the gap ........ 14
- C. Mr. Tucker's analysis is not replicable or falsifiable ........ 17

III. Mr. Tucker Cannot Testify About the Parties' "Real-World" Experiences ........ 19

- A. Defendants would improperly sideline the jury ........ 19
- B. Mr. Tucker's one-sided approach to the record compounds its inadmissibility ........ 23

Conclusion ........ 24

## Table of Authorities

**Cases** **Page(s)**

*Ala. Aircraft Indus. v. Boeing Co.*,
2019 WL 13172372 (N.D. Ala. July 1, 2019) ....................19

*Am. Gen. Life Ins. Co. v. Schoenthal Fam., LLC*,
555 F.3d 1331 (11th Cir. 2009) ....................18

*Amini Innovation v. Anthony Calif.*,
2006 WL 6855371 (C.D. Cal. Sept. 21, 2006) ....................5

*Andrews v. Plains All Am. Pipeline, L.P.*,
No. 2:15-cv-04113 (C.D. Cal. Nov. 10, 2021) ....................7

*Barnes v. District of Columbia*,
924 F.Supp.2d 74 (D.D.C. 2013) ....................18

*Bazarian Int'l Fin. Assocs. v. Desarrollos Aerohotelco*,
315 F.Supp.3d 101 (D.D.C. 2018) ....................14, 20

*Campbell v. Nat'l R.R. Passenger Corp.*,
311 F. Supp. 3d 281 (D.D.C. 2018) ....................15

*Chesapeake Climate Action Network v. Export-Import Bank of the U.S.*, 78
F.Supp.3d 208 (D.D.C. 2015) ....................9

*Chevron TCI, Inc. v. Capitol House Hotel Manager, LLC*,
2021 WL 2638036 (M.D. La. June 25, 2021) ....................15

*Clay v. Ford Motor Co.*,
215 F.3d 663 (6th Cir. 2000) ....................18

*Companhia Energetica Potiguar v. Caterpillar*,
2017 WL 10775768 (S.D. Fla. June 12, 2017) ....................5

*Evans v. Aramark Sports & Ent. Servs., LLC*,
2022 WL 19520781 (D.D.C. Nov. 22, 2022) ....................12

*Groobert v. President & Dirs. of Georgetown Coll.*,
219 F.Supp.2d 1 (D.D.C. 2002) ....................14

*Hangarter v. Provident Life & Acc. Ins. Co.*,
373 F.3d 998 (9th Cir. 2004) ....................18

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)....................17

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
32 F.Supp.3d 453 (S.D.N.Y. 2014) ....................21

*In re Mushroom Direct Purchaser Antitrust Litig.*,
2015 WL 5766929 (E.D. Pa. Aug. 27, 2015) ....................16

*Nimely v. City of New York*,
414 F.3d 381 (2d Cir. 2005)....................9, 11

*Oddi v. Ford Motor Co.*,
234 F.3d 136 (3d Cir. 2000)....................11

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
638 F.Supp.3d 227 (E.D.N.Y. 2022) ....................21, 22

*In re Processed Egg Prods. Antitrust Litig.*,
81 F. Supp. 3d 412 (E.D. Pa. 2015) ....................22

*ProtoComm Corp. v. Novell Advanced Servs.*,
171 F.Supp.2d 473 (E.D. Pa. 2001) ....................12

*In re Rezulin Prods. Liab. Litig.*,
309 F.Supp.2d 531 (S.D.N.Y. 2004)....................23, 24

*Salazar v. Driver Provider Phoenix LLC*,
2024 WL 1406312 (D. Ariz. Apr. 2, 2024) ....................15

*Savidge v. Pharm-Save, Inc.*,
2023 WL 2755305 (W.D. Ky. Mar. 31, 2023) ....................15

*Stecyk v. Bell Helicopter Textron*,
295 F.3d 408 (3d Cir. 2002)....................15

*TC Sys. v. Town of Colonie*,
213 F.Supp.2d 171 (N.D.N.Y. 2002)....................5

*In re U.S. Fin. Sec. Litig.*,
609 F.2d 411 (9th Cir. 1979) ....................19

*UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*,
949 F.3d 825 (3d Cir. 2020)....................17

*United States v. DynCorp Int'l LLC*,
715 F.Supp.3d 45 (D.D.C. 2024)....................6

*United States v. Jakobetz*,
955 F.2d 786 (2d Cir. 1992)....................19

*United States v. Lee*,
502 F.3d 691 (7th Cir. 2007) ....................4

*United States v. McGill*,
815 F.3d 846 (D.C. Cir. 2016) ....................2

*United States v. Northrop Grumman Corp.*,
2003 WL 27366881 (C.D. Cal. Jan. 6, 2003) ....................22

*United States v. Second Chance Body Armor, Inc*., 289 F.Supp.3d 145 (D.D.C. 2018) ....................2, 15, 24

*United States v. Stagliano*, 729 F.Supp.2d 222 (D.D.C. 2010) ....................14

*Washington v. Kellwood Co.*, 105 F.Supp.3d 293 (S.D.N.Y. 2015)....................15, 21

**Other Authorities**

Fed. R. Evid. 702 .................... *passim*

## Introduction

Defendants' opposition does not fix the flaws that render Mr. Tucker's opinions inadmissible:

- His only expertise concerns accounting, but he offers no accounting-related opinions.
- He cannot reliably critique Plaintiffs' econometric analyses because he did not review those analyses and does not know how they work.
- He cannot articulate the principles and methods controlling his own analysis, so does not offer the repeatable or verifiable opinions *Daubert* requires.
- He cannot use "forensic analysis" to offer sweeping opinions beyond what that analysis can sustain, let alone about the "real-world experiences" of these litigants.

Defendants cite no case allowing an expert without training or practical knowledge in econometric models to offer opinions about them. Defendants cite no case allowing a forensic accountant to offer non-accounting opinions about antitrust causation, regressions, or the supposedly "valid" reasons why alleged conspirators undertook key conduct. And Defendants cite no case allowing an accountant to tell the jury about the parties' "real-world experiences." This case should not be the first. Mr. Tucker's expert disclosures should be excluded on three separate grounds.

***First***, Mr. Tucker cannot opine about Plaintiffs' experts' econometric modeling because he lacks the necessary qualifications or training and did not review those models before critiquing them. That is equally true for the "assumptions" in those models, because Mr. Tucker does not know what Plaintiffs' experts "assumed." Defendants attempt to save a portion of Mr. Tucker's analysis by splitting it two parts, claiming he (1) "quantitatively" assessed Plaintiffs' econometric results and (2) "qualitatively" reviewed documents and deposition testimony to support that analysis. Mr. Tucker rejected that separation in his deposition, insisting his quantitative and

qualitative analyses are "one analysis together." MDL II Tr. at 95:10–12.[1] And they fail *Daubert* whether considered together or separately. The Court should prelude Mr. Tucker from testifying about Plaintiff experts' econometric models, regressions, assumptions, or damages estimates.

***Second***, Mr. Tucker's opinions rely on an undefined, untested, and unreliable methodology. Defendants primarily use Mr. Tucker's own opinions, rather than validating external sources, to describe and support his methodology. His criterion for selecting materials remains undisclosed, his analysis cannot be replicated, and he has never applied this methodology in a case like this. This fails the *Daubert* reliability test and renders Mr. Tucker's opinions entirely inadmissible.

***Third***, Mr. Tucker's lengthy narrative on the documentary record does not help the jury and is therefore inadmissible under Rule 702(a). Mr. Tucker has no special training or experience reading and interpreting these types of documents, and there is no reason to think the jury needs his help. The jury can readily understand the documents Mr. Tucker narrates without him reading them aloud from the witness stand and offering his personal interpretation of them. The Court should bar Mr. Tucker from reciting or paraphrasing the documentary evidence.

Defendants do not carry their burden of proving Mr. Tucker's testimony is admissible. *See United States v. McGill*, 815 F.3d 846, 903 (D.C. Cir. 2016) (proponent of expert testimony "bears the burden to establish the admissibility of the testimony and the qualifications of the expert"). The Court should exclude Mr. Tucker's expert disclosures in MDL I and MDL II.

[1] Mr. Tucker's reports and depositions are attached as Exhibits 1 to 4 to Plaintiffs' Motion to Exclude Avram. S. Tucker ("Mot."). *See* Mot. 1 n.1; MDL I ECF No. 1175; MDL II ECF No. 996. Plaintiffs sequentially number their exhibits, so Exhibits 1–19 are attached to Plaintiffs' Motion and Exhibits 20–28 are attached to this brief.

## Argument

### I. Mr. Tucker's Opinions about Plaintiffs' Econometric Models Should Be Excluded

Defendants want Mr. Tucker (an accountant) to opine on the adequacy and reliability of econometric models—primarily regression analyses—offered by Plaintiffs' experts. Mr. Tucker claims to have examined Plaintiffs' experts' "methods and calculations to see whether those damage calculations were supported, based on reasonable assumptions, and reliably calculate plaintiff-specific damages that could be attributed to the alleged conspiracy," MDL II Rpt. ¶ 5, and to have determined that Plaintiffs' experts' "approach[es]" are "flawed," even opining they fail to demonstrate "causation" of damages, *id.* ¶¶ 71–72, 323. Mr. Tucker's opinions about Plaintiff experts' econometric models, regressions, assumptions, or damages estimates should be excluded as unreliable and unhelpful to the jury because Mr. Tucker is not qualified in econometrics, did not even look at these econometric models, and makes assertions that rely on incorrect assumptions about how those models work.

#### A. <u>Mr. Tucker is unqualified to assess Plaintiffs' econometric models</u>

Mr. Tucker has no "specialized knowledge," training, or expertise in regression analyses or other econometric tools. FED. R. EVID. 702(a). When pressed under oath, Mr. Tucker could not answer basic questions about regressions (MDL II Tr. at 387:10–20):

> Q: What does a regression of Y on X mean to you?
> A: I didn't study the regressions and would not be able to respond to that.
> Q: Not even as a general matter?
> A: That's correct.
> Q: What does it mean to you if a regression of Y on X has a causal interpretation?
> Defense counsel: Objection to form.
> A: I would ask the experts that analyzed the [regression] analysis that question.

Defendants offer no response to Mr. Tucker's sworn concessions, which demonstrate he lacks the training or knowledge necessary to reliably assess Plaintiffs' experts' regressions or the

econometric analyses based on them.

Defendants instead rely on Mr. Tucker's "decades of experience" (Opp. 10) and "on-the-job training in forensic analyses" (Opp. 7). That is not enough. To satisfy Rule 702, experience is relevant only if it allows an expert to perform the task at hand. Consider the Fifth Circuit's opinion in *Van Winkle v. Rogers*, where "part of a tire" came loose from a tractor trailer and struck the plaintiff. 82 F.4th 370, 373 (5th Cir. 2023). The driver sought to admit a "trucking and safety expert" with "62 years of hands-on experience in the trucking business" who had been admitted "as an expert in commercial trucking safety standards and practices in similar cases." *Id.* at 379–80. But in deposition, that expert conceded he had no experience studying, consulting on, or manufacturing tires or tire treading. Because the expert "admitted his lack of qualification and expertise," the district court properly excluded him. *Id.* at 380.

So too here: Mr. Tucker may have experience serving as an expert witness "in similar cases" or as an accountant, but he lacks experience working with or studying regressions. (Otherwise, he could have explained how a regression works in deposition.) His admitted lack of qualification and expertise thus requires exclusion. *See United States v. Lee*, 502 F.3d 691, 698 (7th Cir. 2007) (14-year law enforcement officer could not testify about gunshot residue patterns and use of fingerprints for testing because he lacked "formalized training or experience").

Contrary to Defendants' argument, Opp. 8–10 & n.8, Plaintiffs do *not* argue Mr. Tucker is unqualified strictly because he "is not an economist, econometrician, or statistician." In addition to Mr. Tucker's lack of relevant formal training—he has a bachelor's degree in business and no other degree—Mr. Tucker *confirmed* his unfamiliarity with regression analyses under oath when he could not answer basic questions about them. MDL II Tr. at 387:10–20. An expert who admits his lack of qualifications cannot testify. *See Van Winkle*, 82 F.4th at 380.

Nor do Plaintiffs seek a categorical rule that no accountant may testify about econometrics. Perhaps an accountant could testify about regressions if he knew how they function, did not "defer" to other experts about them, and studied the regressions he critiques. But that is not Mr. Tucker. Defendants' cases (Opp. 9–10 & n.8) involve experts with the kinds of qualifications Mr. Tucker lacks. *See Amini Innovation v. Anthony Calif.*, 2006 WL 6855371, at *1 (C.D. Cal. Sept. 21, 2006) (expert qualified because he earned a Ph.D. and "teaches and publishes on the subject" of his report); *TC Sys. v. Town of Colonie*, 213 F.Supp.2d 171, 178 (N.D.N.Y. 2002) (engineer allowed to rebut economic and accounting testimony because he had experience and knowledge in the subject of his testimony); *Companhia Energetica Potiguar v. Caterpillar*, 2017 WL 10775768, at *35 (S.D. Fla. June 12, 2017), *R&R adopted*, 2017 WL 10775767 (S.D. Fla. Dec. 14, 2017) (engineer and auditor allowed to critique damages analysis because he had previously calculated damages in the same industry using the same methodology). Mr. Tucker has no relevant advanced degree, has never taught or published on econometrics, does not have experience and knowledge in regressions, and has never calculated damages using (or otherwise made use of) complex regressions like the ones here.

B. Mr. Tucker cannot reliably critique regressions he did not review

An expert must understand a model to reliably critique its assumptions, functions, or results. That is the teaching of *Parsi v. Daioleslam*, in which the court was "unable to understand" how the plaintiff's expert could "opine on whether defendant's writings were properly substantiated" without first "investigating defendant's source materials in any systematic way" and found that "the 'facts and data' [the expert] relied on were patently insufficient for the task he was given." 852 F.Supp.2d 82, 89 (D.D.C. 2012). Even if Mr. Tucker was qualified, he still could not reliably critique Plaintiffs' econometric analyses because he did not look at those models and does not know how they operate or what variables they include. MDL II Tr. 407:9–415:3; Mot. 8.

Defendants argue otherwise based on cases in which the expert was qualified to assess, and reviewed, the model he criticized. Defendants cite *Minebea Co. v. Papst*, Opp. 9, but the forensic accountant there was "simply using his acknowledged expertise, training and knowledge to identify flaws in [the opposing party's] damages theories." No. 97-cv-0590 (PLF), 2005 WL 1459704, at *6 (D.D.C. June 21, 2005). The same is true for *Abraham v. Ocwen Loan Serv.*, Opp. 9, where the financial expert had relevant higher education and experience in "financial issues" to opine on "financial events and consequences." 321 F.R.D. 125, 144 n.9, 145 (E.D. Pa. 2017).

To avoid the problem with proffering an expert to critique a model he did not review, Defendants say Mr. Tucker "was not tasked with analyzing the controls, variables, or other inner workings of the Plaintiff experts' economic models." Opp. 9. Yet that is the entire point of Plaintiffs' argument. Mr. Tucker was not asked to, did not, and admittedly could not assess the "mechanics" of that analysis—which necessarily include the variables and assumptions built into those models. It is internally inconsistent and incorrect for Defendants to then argue (as they do in the next sentence) that Mr. Tucker can critique the "major assumptions and opinions of the Plaintiff experts." Opp. 9. The "major assumptions" *are* the mechanics of a regression model; the "opinions" each expert draws come from the model. Mr. Tucker did not review those models or their "mechanics" and therefore cannot credibly critique their assumptions or output.[2]

Defendants do not cite a single case in which Mr. Tucker—or any expert—opined on a regression model that they did not review. Nor has any court allowed Mr. Tucker to rebut an "economists' damages regression analyses using forensic analysis" (Opp. 10). Defendants'

[2] Defendants suggest Mr. Tucker "deferred to" other experts for this analysis, Opp. 9 n.7, but that merely confirms that Mr. Tucker cannot do this work or offer opinions that flow from his own considerations. "This is because deferring to others" about the subject of one's testimony "is rarely a 'reliable principle [or] method[].'" *United States v. DynCorp Int'l LLC*, 715 F.Supp.3d 45, 67 (D.D.C. 2024) (alterations in original) (quoting FED. R. EVID. 702(c)).

insistence to the contrary, Opp. 9–11, does not withstand scrutiny:

- In *United States ex rel. Morsell v. NortonLifeLock, Inc.*, Mr. Tucker actually "reviewed" the "relatively simple" damages model (not a regression) he critiqued. Tr. of Bench Trial at 4404:14–4406:7, No. 1:12-cv-00800 (RC), ECF No. 336. Those are critical differences. Mr. Tucker *did not review* the sophisticated econometric work he criticizes in this case.

- The *Andrews* court did not endorse Mr. Tucker's methodologies or his qualifications, and instead addressed whether Mr. Tucker's analysis was "duplicative" or procedurally improper. *See* Order Den. Pls.' Mot. in Lim. at 8–9, *Andrews v. Plains All Am. Pipeline, L.P.*, No. 2:15-cv-04113 (C.D. Cal. Nov. 10, 2021), ECF No. 900 (denying as premature challenge to exclude Mr. Tucker's testimony as duplicative); Order Granting in Part & Den. in Part Pls.' Mot. for Class Certification, & Den. Mot. to Strike at 7 & n.2, ECF No. 257 (denying motion to strike without prejudice on procedural grounds).

- In *FDIC v. Van Dellen*, the court did not allow Mr. Tucker to testify on causation, and did not otherwise hold Mr. Tucker qualified to testify about regressions. 2012 WL 12886491, at *5 (C.D. Cal. Oct. 18, 2012).

- In *Krys v. Aaron*, the court permitted Mr. Tucker to opine about bankruptcy issues because of experience in testifying about "bankruptcy (including solvency, fraudulent conveyance and valuation)," testifying "in bankruptcy cases," and evaluating "the solvency of companies." 112 F.Supp.3d 181, 199–201 (D.N.J. 2015) (internal quotation marks omitted). Mr. Tucker's bankruptcy experience is irrelevant here.

- In *PG&E Co. v. Howard P. Foley Co.*, there was evidence "Mr. Tucker has expertise in the area of construction contract bidding," allowing him to testify on that topic. 1993 WL 299219, at *6 (N.D. Cal. July 27, 1993). This has nothing to do with regressions.

- In *Steves & Sons, Inc. v. JELD-WEN, Inc.*, Mr. Tucker applied a methodology not involving regressions that was "logical and reliable" to calculate damages. 2019 WL 6138200, at *2 (E.D. Va. Nov. 19, 2019). That non-regression methodology used rules and procedures to manipulate inputs (he "multiplied the overcharge per type of doorskin by the number of doorskins purchased") to generate an output ("Steves' overall amount of damages"). *Id.* at *4. Mr. Tucker offers no such analyses here.

It is telling that Defendants cannot identify a single case where Mr. Tucker—a professional expert with decades of experience—offered the type of analysis and opinions he seeks to give here.

C. <u>Mr. Tucker's assertions about Plaintiffs' regressions cannot help a jury</u>

Because Mr. Tucker did not look at and could not analyze the models, he makes assertions about how they work that are incorrect. Nothing helpful to the jury can come from that testimony.

One of Mr. Tucker's main critiques is that Plaintiffs' models purportedly ignore plaintiff-specific issues and variables. Mr. Tucker claims Plaintiffs put forward "generalized analyses and assumptions" (Opp. 18) based on "aggregating and averaging" that overlook "Plaintiff shippers' real-world experiences" (Opp. 2).[3] That is factually wrong, revealing Mr. Tucker's ignorance about the models he purports to critique. For example, in MDL II, Dr. Marx adjusted Dr. Bernheim's estimate of market-wide overcharges for plaintiff-specific circumstances by using a multi-variable regression. That regression relied on sophisticated econometric tools to account for each plaintiff's contracting and shipping history. *See, e.g.*, Ex. 20, Depo. Tr. of Dr. Leslie Marx, Jan. 25, 2024, at 487:2–7, 500:10–501:16 (Dr. Marx ran a "gamma regression" and generated a plaintiff-specific "gamma coefficient"). As Defendants concede, Mr. Tucker did not review these "inner workings of the Plaintiff experts' econometric models." Opp. 9. Mr. Tucker fundamentally misunderstands Dr. Marx's opinions, so misstates her "assumptions" and responds to something she is not doing. Allowing him to testify to these analyses will do nothing but confuse the jury.[4]

Take another example: Mr. Tucker wrongly says Plaintiffs' experts needed to consider demand for rail transportation (and trucking competition) during the conspiracy, but did not. *See* MDL II Tr. at 234:19–235:21. But Mr. Tucker was unaware of what demand variables, for example, Plaintiff expert Dr. McClave used in his model. *See* MDL I Tr. at 174:22–175:10; *see also* MDL II Tr. at 369:24–370:6 (Mr. Tucker unaware of "control variables" used by Drs. Bernheim or Marx). Unlike Mr. Tucker, Defendants' econometric experts recognized and

[3] Plaintiffs respond to Defendants' "average damages" argument in their separate *Daubert* brief. *See* Pl.'s Opp. Average Damages, MDL II ECF No. 1029 (Nov. 4, 2024), at 20–46 (explaining how Plaintiffs' experts appropriately address plaintiff-specific factors, separate lawful from conspiratorial conduct, and consider overall economic trends).

[4] Mr. Tucker's misapprehensions litter Defendants' brief too. For example, Dr. Marx did not "conclud[e] that all shippers experienced the same injury and suffered damages based on the same average rate of damages." Opp. 3; *cf.* Pls.' Opp. Average Damages 21–29.

acknowledged that Plaintiffs' experts *did* control for demand. *See, e.g.*, Ex. 21, Carlton MDL II Rpt., at 73 n.177 (defense expert Dr. Carlton recognizing Drs. McClave and Leitzinger "include a control for intermodal demand"), 90 n.217 (Dr. Bernheim includes "controls for demands and costs"), 97 & n.236 (discussing Dr. McClave's two demand control variables).

Mr. Tucker's mistaken accusations are unsurprising because he did not (and apparently lacks the ability to) review the models. Instead, Mr. Tucker apparently relies on other experts' *written descriptions* of those models. *See, e.g.*, MDL II Tr. 155:8–157:4. But those descriptions are summaries, written in layman's terms to provide an overview; they are no substitute for reviewing the intricacies of the models themselves. What Mr. Tucker has done is akin to critiquing a book based on its back-cover blurb.

D. <u>Mr. Tucker's "quantitative" analyses are inadmissible</u>

Trying to salvage some of Mr. Tucker's testimony, Defendants point to his "quantitative analyses" about fuel surcharge payments, revenue, and coverage. Opp. 12–15. These quantitative analyses are a small subset of his overall opinions. But Defendants now bring them to the fore, hoping they can salvage his disclosures. They cannot.

The fact that Mr. Tucker—a trained accountant—can perform computations that purportedly quantify types of fuel surcharges or fuel-surcharge revenue (his "quantitative" analysis) does not mean he can use the results of those calculations to criticize complex econometric models he did not analyze or leapfrog from those basic calculations to broad conclusions about Plaintiffs' regressions and assumptions. That jump is not based on any reliable methodology. *See Nimely v. City of New York*, 414 F.3d 381, 399 (2d Cir. 2005); *Chesapeake Climate Action Network v. Export-Import Bank of the U.S.*, 78 F.Supp.3d 208 (D.D.C. 2015) (court "unable to bridge the gap" between expert's review of "certain documents" and his "series of

conclusions”). Defendants’ examples (Opp. 9–15) illustrate the unbridged gap between Mr. Tucker’s math and his opinions.

**Pre-conspiracy fuel surcharges** (Opp. 13–14). Mr. Tucker calculated the percentage of price authorities with fuel surcharges (and related revenues) before the conspiracy. Opp. 13. Those calculations have no bearing on Plaintiffs’ experts’ assumptions and regressions, particularly because Plaintiffs’ regressions account for pre-conspiracy fuel surcharges. *See* Ex. 22, Bernheim/Marx MDL II Rpt., ¶¶ 181–184, 203–228, 263–266; Ex. 23, Jacobs MDL II Reply Rpt., ¶¶ 60–109, 248–253; Ex. 24, Jacobs MDL II Rpt., ¶¶ 441–450, 467–478, 500–503.; Ex. 25, McClave MDL II Rpt., §§ 6.1–6.3, 6.5.[5]

**Changes to fuel-surcharge formulas** (Opp. 13–14). Mr. Tucker compared revenues under pre-conspiracy and conspiracy FSC formulas. That math does not “test[] the Plaintiff experts’ opinions that fuel surcharges became non-negotiable,” Opp. 14, because it does not consider (let alone undermine) the variables and assumptions built into Plaintiffs’ models.

**Fuel surcharge “negotiability analysis”** (Opp. 14–15). Mr. Tucker calculated revenue from “nonstandard” fuel surcharges and “identified” contracts without fuel surcharges. Plaintiffs do not dispute Mr. Tucker’s ability to do that simple arithmetic.[6] But Mr. Tucker cannot use this analysis to challenge “Plaintiff experts’ assertions[] that the alleged conspiracy created overcharges based on the Defendants’ use of FSCs” as “unsupported and inconsistent with” the evidentiary record. *See* MDL II Rpt. ¶ 196. To make such a claim, Mr. Tucker at a minimum would need to parse the econometric models Plaintiffs used to estimate overcharges.

[5] Plaintiffs attached these complete expert reports to their summary-judgment opposition papers. ECF No. 1014; *see* PX770 (Bernheim/Marx MDL II Rpt.); PX985 (McClave MDL II Rpt.); PX819 (Jacobs MDL II Rpt.); PX989 (Jacobs MDL II Reply Rpt.).

[6] Mr. Tucker did not reliably determine whether a fuel surcharge was standard or non-standard. *See* MDL II Tr. at 507:14–526:16.

Mr. Tucker testified his quantitative and qualitative analyses are "one analysis together." MDL II Tr. at 95:6–12. Defendants cannot now segregate the two in the hopes of saving them both. But even if the Court concludes that Mr. Tucker may perform the simple calculations proffered in his reports, the Court should prohibit him from using those calculations to critique Plaintiffs' models, regressions, and assumptions. Those workstreams are worlds apart.

## II. Mr. Tucker Does Not Use a Reliable Methodology

### A. Mr. Tucker's "forensic analysis" is impermissibly vague and subjective

Mr. Tucker has no reliable methodology on which to base his opinions. A methodology is a "body of methods, rules, and postulates employed by a discipline: a particular procedure o[r] set of procedures." *Oddi v. Ford Motor Co.*, 234 F.3d 136, 156 n.20 (3d Cir. 2000); *see* Mot. 15. Defendants do not dispute that definition. Yet Mr. Tucker's analysis does not use a particular set of procedures to generate outputs.

Defendants' opposition does not identify a single method, rule, or postulate Mr. Tucker used to reach his opinions. It instead describes the inputs (documents or data he selected) and the outputs (his opinions), skipping over the crucial step that distinguishes expert testimony from advocacy and *ipse dixit*: a reliable method for moving from those inputs to those outputs. For example, Defendants claim Mr. Tucker used an undefined "qualitative analysis" to "search[] for" "anomalies and inconsistencies," Opp. 23, but offer no explanation as to what procedure he followed to do so, what metrics or rules he used to assess "anomalies," or how another expert could replicate his work. "[S]uch a leap is the essence of unverifiable subjectivity, amounting to the sort of *ipse dixit* connection between methodology and conclusion that the district court has the duty to exclude under Rule 702." *Nimely*, 414 F.3d at 399.

Defendants also say Mr. Tucker "follow[ed] the trail of each Plaintiff shipper's contracting history." Opp. 15. That too is neither a method nor rule, and it is unclear what Mr. Tucker did (if

anything) to follow that trail and sleuth out his conclusions. What is clear—because Mr. Tucker conceded the point under oath—is that he did not review every negotiation or every contract, MDL II Tr. at 89:24–90:1; 94:18–95:5; 422:15–423:8, and instead made choices about what to review based on his predetermined conclusions. No discernable method or rule governed his decision about what to consider and what not to consider.

Mr. Tucker's "forensic analysis" is no more cogent than the "forensic psychiatric assessment" deemed unreliable in *Sacchetti v. Gallaudet*, where the challenged expert "simply assert[ed] that he provided a 'forensic psychiatric assessment' based on his "review of a range of records in connection with the events" at issue in that case. 344 F.Supp.3d 233, 248 (D.D.C. 2018) (cleaned up). That approach, like Mr. Tucker's, fails because the expert "d[id] not explain what a forensic psychiatric assessment typically involves or how exactly it was undertaken in this case." *Id.* Rather, the expert testified only that "'forensic psychiatry' is a catchall term for 'working within legal matters where there's a specific context to the clinical question.'" *Id.* at 248–49.

Mr. Tucker offered similarly circular explanations of his methods: "[w]hen I'm addressing an assertion of a plaintiff expert regarding the FSCs or negotiations, I look at information that relates to FSCs and negotiations." MDL II Tr. at 95:14–17. Defendants call that "a painstaking investigation of the vast contracting history for each Plaintiff shipper, following the paper trail of the history of negotiations between the parties." Opp. 32. But this is more of the same; it "is not explanation" of what Mr. Tucker did in this case, but rather a platitude that leaves his "inferences unspoken and so unexaminable by this Court." *Evans v. Aramark Sports & Ent. Servs., LLC*, 2022 WL 19520781, at *14 (D.D.C. Nov. 22, 2022); *cf. ProtoComm Corp. v. Novell Advanced Servs.*, 171 F.Supp.2d 473, 479–81 (E.D. Pa. 2001) (finding accountant reliable because he detailed a "14 stage process" for his analysis, the *first* of which was "read[ing] certain relevant documents").

Besides, as Mr. Tucker admitted in deposition, his review of the "paper trail" was far from "painstaking." MDL II Tr. at 374:14–19, 524:8–525:10.

Nor does the American Institute of Certified Public Accountants (AICPA) provide support for Mr. Tucker's methodology. As explained in Plaintiffs' motion (Mot. 9–14), AICPA's written materials confirm that forensic accounting is a tool for uncovering accounting fraud. Defendants argue that "the AICPA literature is 'very general'" and "at a high level." Opp. 34 (quoting MDL II Tr. at 342:23–343:4). But the opposite is true; AICPA, in the sources cited by Mr. Tucker, *specifically* states that forensic examinations are used "to confirm the existence of fraud." Ex. 5, AICPA Fraud Task Force of Forensic & Litig. Servs. Comm., *Special Report: Forensic Procedures and Specialists: Useful Tools and Techniques* (2006), at 1. AICPA also details "seven investigative techniques . . . that are designed to detect fraudulent behavior" (*id.* at 3–6, 15) none of which Mr. Tucker used here. Mot. 11–12.

Defendants try to shoehorn Mr. Tucker's work into some of those techniques. They substitute reviewing depositions for AICPA's "interviews of knowledgeable persons," reading documents for AICPA's "background investigation" and "confidential sources," and doing math for AICPA's "analysis of financial transactions." Opp. 35. That substitution fails because AICPA makes clear these techniques are used "to determine or understand possible motives (incentives and pressures) for perpetrating fraud" and "in conducting a fraud investigation." Ex. 5 at 3, 6.

Defendants also conflate inputs (reviewing discovery materials) with methodology. What Defendants describe as Mr. Tucker's "forensic analysis" amounts to reading and summarizing select evidence. Mot. 15. Courts in this circuit have been clear that "'reading,' standing alone, is [not] an acceptable methodology." *See Parsi*, 852 F.Supp.2d at 89. And the question is not whether Mr. Tucker relied on the "best-available evidence" (Opp. 35), but whether his work follows the

AICPA guidelines *he* cites for *his* own purported methodology. It does not, both because Mr. Tucker did not deploy the AICPA's investigative techniques and because those guidelines apply to fraud investigations, which Mr. Tucker is not doing here.[7]

Defendants finally argue that forensic accounting involves "special skills." Opp. 26 (citation omitted). And they gesture to Mr. Tucker's certified mastery of "Litigation Services Concepts, Methodologies, and Procedures, including quantification of economic damages, as well as Investigative and Fraud Risk Management" and his "familiarity with antitrust concepts, as well as concepts of common law governing contracts and torts." *Id*. These buzzwords do not help Mr. Tucker here because they provide no methodology by which he got from the documents he chose to review to the opinions he wants to offer.[8] *Accord United States v. Stagliano*, 729 F.Supp.2d 222, 229 (D.D.C. 2010) (excluding expert because her "methodology—what little can be gleaned from it—is so nebulous, subjective, and lacking in rigor and detail as to cast serious doubt, not only on the reliability of her opinion testimony, but on its usefulness to the jury as well").

B. <u>Mr. Tucker's unrelated accounting experience cannot bridge the gap</u>

Defendants insist Mr. Tucker's accounting and litigation experience renders his opinions reliable. Opp. 37–38. This Court has explained the standard for experience-based expert testimony: "An expert witness who is relying solely or primarily on experience must explain how that experience leads to the conclusion reached and how that experience is reliably applied to the facts, rather than expect a court to simply take the expert's word for it." *Bazarian Int'l Fin. Assocs. v.*

[7] These flaws doom Mr. Tucker's disclosures even if, as Defendants claim, he is qualified based on his experience. Courts "particularly emphasize" a methodology's "[g]eneral acceptance in the community . . . when reliability focuses on experience." *Groobert v. President & Dirs. of Georgetown Coll.*, 219 F.Supp.2d 1, 8 (D.D.C. 2002) (citations omitted). Mr. Tucker's "forensic analysis," not used to detect fraud or perform an audit, is not generally accepted by any community.

[8] AICPA's Code of Professional Conduct (Opp. 26) also provides no methods or principles.

*Desarrollos Aerohotelco*, 315 F.Supp.3d 101, 111 (D.D.C. 2018) (cleaned up). Mr. Tucker cannot meet that standard here because all he offers is his word.

Defendants say Mr. Tucker is a "veteran damages expert," "forensic accountant," and "CPA," who has lectured on "accounting, finance, economics, contract administration, and management," Opp. 33, but do not explain how that experience was reliably applied in this case. Defendants never "explain *how* [Mr. Tucker's] experience or specific knowledge informed any of his conclusions in this case." *See Sacchetti*, 344 F.Supp.3d at 249 (emphasis added).

Every case Defendants cite to support of their assertion that Mr. Tucker's experience alone can bridge the methodological gap is inapplicable because each involves an accountant performing traditional accounting work—which Mr. Tucker did not do here:

- In *United States v. Second Chance Body Armor, Inc*., 289 F.Supp.3d 145, 162–63 (D.D.C. 2018), an accountant analyzed invoices, sales data, and reimbursement data to provide accounting-related opinions.

- In *Salazar v. Driver Provider Phoenix LLC*, 2024 WL 1406312, at *3 (D. Ariz. Apr. 2, 2024), an "accounting expert [testified] about his calculations of potential overtime and minimum wages," but could not testify to non-accounting issues, like "what constitutes working time and non-working time."

- In *Savidge v. Pharm-Save, Inc.*, 2023 WL 2755305, at *17, 19 (W.D. Ky. Mar. 31, 2023), an accountant valued time and expenses using a "fair market value approach."

- In *Chevron TCI, Inc. v. Capitol House Hotel Manager, LLC*, 2021 WL 2638036, at *1 (M.D. La. June 25, 2021), a CPA "conduct[ed] calculations based on the audited financials of Operator and arrive[d] at factual conclusions regarding sums due."

- In *Washington v. Kellwood Co.*, 105 F.Supp.3d 293, 308–09 (S.D.N.Y. 2015), an accountant with "extensive experience in the field of business valuations" valued "a business." [9]

---

[9] In *Blue Buffalo v. Wilbur-Ellis Co.*, Opp. 25, the qualifications of the expert were not challenged. 2024 WL 111712, at *5 (E.D. Mo. Jan. 10, 2024). Not so here. Defendants also cite *Campbell v. National R.R. Passenger*, 311 F. Supp. 3d 281, 300 (D.D.C. 2018), and *Stecyk v. Bell Helicopter Textron*, 295 F.3d 408, 414 (3d Cir. 2002), but these cases are irrelevant because Plaintiffs do not argue that Mr. Tucker's reliance on record evidence was improper, but rather that he never adequately explained how that data supports his conclusions.

Mr. Tucker undoubtedly has the experience to analyze invoices, perform valuations, or audit financials—none of which is at issue here—but his sweeping opinions about antitrust causation, regressions, shipper-railroad negotiations, and the "valid" reasons Defendants adopted fuel surcharges go far beyond an accountant's domain. Defendants cite no cases in which a forensic accountant's math and selective review of documents qualified him to opine on the reliability of regression models or antitrust causation (which Mr. Tucker defines as the "link between liability assertions and claimed damages," MDL II Rpt. ¶¶ 19, 392).[10] They have no law to bridge that gap.

Nor does Mr. Tucker's experience as a professional expert do the trick. Defendants argue Mr. Tucker is experienced because he has testified "hundreds" of times before, including "in more than a dozen antitrust matters." *See* Opp. 6–7. But Defendants proffer two citations to support that claim (Opp. 7), and both miss the mark: In *PG&E v. Howard P. Foley Co.*, the court credited Mr. Tucker's "expertise in the area of construction contract bidding," which is not at issue here. 1993 WL 299219 at *6. And in *Steves & Sons v. JELD-WEN*, Mr. Tucker presented "three general categories of damages," none of which involved "forensic analysis" or regressions. Tr. of Trial at 1154–55, No. 3:16-cv-545 (E.D. Va. May 31, 2019), ECF No. 1907-1 (overcharge calculation based on "analyzing costs"); *id.* at 1199–200 (calculating "defect" damages), 1206–07 (calculating "lost profits"), 1232. For each of those categories, Mr. Tucker articulated rules and postulates used to reach his opinions. *See, e.g.*, *id.* at 1206–07 ("standard method for determining lost profits").

Finally, Defendants rely heavily on *In re Packaged Seafood Products Antitrust Litigation*, Opp. 37–38, where the court found the accountants' analysis was "adequately explained" and

---

[10] Nor would it make sense for such an expert to use "*real-world*" bean-counting to challenge econometricians' regression and causation opinions premised on modeling a *but-for* world. *See In re Mushroom Direct Purchaser Antitrust Litig.*, 2015 WL 5766929, at *5 (E.D. Pa. Aug. 27, 2015) (defendants' expert's attempt to use "absolute values" of mushroom output and prices to rebut regression analyses that modeled but-for world violated Rule 702).

admissible "[g]iven the subject matter and types of opinions [they] rendered and [their] knowledge and experience." 2024 WL 1269863, at *10, 14 (S.D. Cal. Mar. 25, 2024). The "subject matter and types of opinions . . . rendered" in *Packaged Seafood*, *id.*, had nothing to do with regressions or antitrust causation. There, the court's analysis turned on the fact that the experts used their "specialized knowledge in the field of forensic accounting" to testify about *accounting-related matters* (*e.g.*, an entity's bankruptcy, whether one entity controlled another, whether an entity benefitted financially from certain business decisions). *Id.* at *2. Here, Mr. Tucker's proposed opinions have *nothing to do with accounting*—he simply makes conclusory statements about Plaintiffs' experts' econometric methodologies and antitrust causation, based on his own subjective beliefs about regressions he did not review and could not substantively assess. Mr. Tucker cannot substitute his irrelevant experience for a reliable methodology.

C. Mr. Tucker's analysis is not replicable or falsifiable

Mr. Tucker must explain his inputs, procedures, and rules in such a way that his work can be tested, replicated, and verified by others. But Defendants do not argue that another expert—not even another forensic accountant—could retrace Mr. Tucker's steps and reach the same conclusions. Those failures require Mr. Tucker's exclusion. *Cf. UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 834 (3d Cir. 2020) ("It is impossible to test a hypothesis generated by [the expert's] subjective methodology because the only person capable of testing or falsifying the hypothesis is the creator of the methodology." (cleaned up)).

Defendants claim Mr. Tucker's opinions need not satisfy foundational requirements of *Daubert*—like replication and falsification—because his methodology is not scientific. *See* Opp. 5–6. Not so. Courts have "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable," *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999), and frequently assess non-scientific methodologies using *Daubert* factors,

*Clay v. Ford Motor Co.*, 215 F.3d 663, 667 (6th Cir. 2000). Expert testimony falls outside *Daubert* if it is "not contingent upon a particular methodology or technical framework." *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1018 (9th Cir. 2004).

Defendants' citations (Opp. 5–6) confirm that exception is narrow. Expert testimony about an industry's customs and practices, for example, need not be replicable or testable because it turns on "personal knowledge or experience." *See Am. Gen. Life Ins. Co. v. Schoenthal Fam., LLC*, 555 F.3d 1331, 1338–39 (11th Cir. 2009); *Hangarter*, 373 F.3d at 1015–18. The same is true when an expert is "among the first to provide this type of expert testimony" about a "highly particular" issue that has not attracted "scrutiny." *Barnes v. District of Columbia*, 924 F.Supp.2d 74, 96–98 (D.D.C. 2013) (testimony about whether the government overdetained inmates).

Mr. Tucker does not opine about industry standards or walk on uncharted ground. Just the opposite: Mr. Tucker's technical framework—forensic accounting—is subject to promulgated standards and principles, including from AICPA, in a regulated and professionalized industry. *See, e.g.*, Opp. 2 (Mr. Tucker is a CPA and "certified in Financial Forensics" by AICPA), 26–27 (citing AICPA literature to defend Mr. Tucker's work). If Defendants are correct that Mr. Tucker "used the same approaches and analyzes the same data that other experts in the field use," Opp. 4, and that "[o]ther damages experts have used similar methodologies in forming their opinions," Opp. 29, then his opinions are subject to *Daubert* and must be capable of replication and verification.

The fact that some of Mr. Tucker's *quantitative* work is replicable, *see* Opp. 31–32, does not render his subjective opinions admissible. Math can be verified—but the conclusions Mr. Tucker draws from that math cannot be, because Mr. Tucker does not offer a replicable methodology to move from the quantitative to his qualitative opinions.

## III. Mr. Tucker Cannot Testify About the Parties' "Real-World" Experiences

Mr. Tucker's narration of the factual record—which consumes much of his reports and plaintiff-specific appendices—is also inadmissible because it will not help the jury. Defendants attempt to salvage this testimony by claiming Mr. Tucker explains the "Plaintiff shippers' real-world experiences, as reflected in the voluminous record of contracts and negotiations." Opp. 2; *see also* Opp. 2 ("real-world facts concerning each individual Plaintiff"), 12 ("real-world evidence"), 18 ("real-world experiences"), 20 ("real-world facts and circumstances"). But the *real world* is the domain of those who lived it—percipient fact witnesses, including the hundreds of executives, employees, and negotiators deposed in these MDLs—and, almost two decades after the relevant conduct in this case, is reflected in emails and contracts a lay jury can understand. Allowing Mr. Tucker to testify about the parties' "real world" experience would supplant the jury's role as factfinder. *Accord Ala. Aircraft Indus. v. Boeing Co.*, 2019 WL 13172372, at *6 (N.D. Ala. July 1, 2019) (prohibiting Mr. Tucker from reciting or paraphrasing documentary record).

### A. <u>Defendants would improperly sideline the jury</u>

Defendants defend Mr. Tucker by questioning the abilities of a lay jury, arguing that "jurors lack the specialized expertise and knowledge necessary to perform the quantitative analyses or the explanatory qualitative analyses of the parties' contracting and negotiation histories." Opp. 3; *see also, e.g.*, Opp. 19 ("average juror" cannot understand how negotiations and contracts impact damages). Defendants' position is meritless.

First, jurors routinely hear and decide complex commercial matters like this one. *See, e.g.*, *In re U.S. Fin. Sec. Litig.*, 609 F.2d 411, 431 (9th Cir. 1979) ("acknowledg[ing] the complicated nature of the evidence and issues associated with the accounting and financial questions involved in antitrust and securities cases," but making clear "experience demonstrates that juries are capable of sorting out complex factual issues and applying the law to them"); *United States v. Jakobetz*,

955 F.2d 786, 796 (2d Cir. 1992) ("Despite the difficulties involved in cases with novel, complex, and confusing evidence, the jury must retain its fact-finding function.").

On Defendants' conception, jurors cannot comprehend commercial negotiations or contracts, so dueling experts must recite the record to inform the jury about each side's "real-world experiences." That is not the law. This Court in *Bazarian* prevented a real-estate expert from testifying about the commercial relationship between sophisticated parties, because the "proposed testimony essentially usurps, rather than aids, the jury's role in weighing the evidence and finding the facts" and "can be accurately and intelligibly described to the jury, who, as persons of common understanding, are perfectly capable of comprehending the primary facts and of drawing correct conclusions from them." 315 F.Supp.3d at 122–23 (cleaned up). Just like the expert in *Bazarian*, Mr. Tucker cannot provide "a recitation of what occurred in the relationship among [the parties], as a factual matter, relying largely on [Defendants'] version of the facts." *Id.* at 122.

Second, Mr. Tucker's assessment of the documentary record is not a "lengthy and sophisticated analysis" that merely "contains some relatively simple steps." Opp. 19 (quoting *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 638 F.Supp.3d 227, 312 (E.D.N.Y. 2022)). Consider Mr. Tucker's appendix for plaintiff Louisiana Pacific. *See* Ex. 10, App. B for Plaintiff Louisiana-Pacific Corporation (appended to MDL II Rpt.), at 2–6. What Defendants claim to be a complex "database" that no juror could possibly understand is, as relevant here, just seven double-spaced pages with three sections. In the first, "Shipping Alternatives / Competition," Mr. Tucker selectively restates portions of about 10 pages of deposition testimony from fact witnesses and screenshots and verbatim quotes four documents. In the second, "Deposition and Documentary Evidence of Louisiana Pacific Contract Negotiations," Mr. Tucker quotes and paraphrases 32 lines of deposition testimony from fact witnesses. And in the third,

"Analysis of Louisiana Pacific's Price Authorities," Mr. Tucker provides four sentences of information about two contracts. *Id*. Louisiana Pacific's appendix is no outlier—this is the bare-bones approach Mr. Tucker took with every other shipper, reciting select contracts and emails.[11]

A juror does not need any "specialized expertise and knowledge," Opp. 3, to understand a few lines of testimony or how a fuel surcharge works. That is fatal to Mr. Tucker's proposed testimony because experts can summarize documentary evidence, unconnected from any expert methodology or specialized knowledge, "only to the extent that the documents would not be comprehensible to the average layperson," like with "technical financial documents" and "various audit opinions." *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 32 F.Supp.3d 453, 462 (S.D.N.Y. 2014). That is not the case here. Indeed, Mr. Tucker admits he has no expertise in "railroad contracting or negotiating." *See, e.g.*, MDL II Tr. 399:22–400:11 (admitting he has never negotiated or advised on a long-term contract in any freight industry). Just like in *United States v. Washington*, where the D.C. Circuit concluded that an expert cannot act as a paid spokesperson for one side's version of the facts, Mr. Tucker selectively narrates the factual record. 106 F.3d 983, 1009 (D.C. Cir. 1997). Defendants cannot distinguish *Washington* by saying Mr. Tucker undertook some "specialized and extensive analysis," Opp. 20, because he did not.

Mr. Tucker's analysis is also not comparable to the analysis at issue in *Payment Card*. There, the challenged expert was an *economist* who restated record evidence to "lay a foundation"

---

[11] Contracts: *See, e.g.*, Ex. 26, Appendix B for Plaintiff ABF Freight System Inc. (appended to MDL II Rpt.), at § IV(c)(iv) & n.9 (restating substance of contracts); *id.* at § IV(a)(iv) & n.18 (same); *id.* at §§VI (same); Ex. 27, Appendix B for Plaintiff Air Products and Chemicals, Inc. (appended to MDL II Rpt.), at §§ IV(c)(ii)–(iii) & nn.36–38 (same); § VI (same). Emails: *See, e.g.*, Ex. 26, App. B – ABF Freight, at § III(a)(i) & n.4 (restating substance of emails); *id.* at §§ IV(a)(i)–(iii), (v) & nn.14–16, 19 (same); Ex. 27, App. B – Air Products, at §§ III(a)(iii)–(iv) & nn.8, 11 (same); *id.* at §§ III(b)(i)–(ii), (viii) & nn.11–13, 15, 24 (same); *id.* at §§IV(b)–(e) & nn. 29–35, 39–41, 43–44 (same); *id.* at §§ V(b) & n.45 (same); *id.* at §§ VI(b)(i)(3) & n.57 (same).

to critique other economists' damages opinions. *See Payment Card*, 638 F.Supp.3d. at 310, 312; *see also id.* at 307 ("As a rebuttal expert, Mr. Kaplan may critique Plaintiffs' experts' models from an economic perspective[.]"); *In re Processed Egg Prods. Antitrust Litig.*, 81 F. Supp. 3d 412, 422 (E.D. Pa. 2015) ("[A]n economist not only should, but must, examine the factual record to arrive at his opinion[.]"). Unlike Mr. Tucker, the *Payment Card* expert actually reviewed—and was qualified to opine upon—the opposing expert's methodology before claiming that certain record evidence conflicted with that methodology. 638 F.Supp.3d at 310–13. His training and qualification were the "expert skill," *id.* at 312 (citation omitted), that distinguishes his use of documentary evidence from Mr. Tucker, who instead makes broad and *inaccurate* statements about Plaintiffs' experts' "assumptions" and models he did not review. *See supra* Section I.B.

Third, Defendants argue that because the record is large, an expert must present it to the jury. For example, Defendants suggest *Alabama Aircraft*—in which the court barred Mr. Tucker from reciting evidence to the jury—is inapt because this case involves "hundreds of contracts" and "more than a hundred mostly large corporate plaintiffs." Opp. 20. And Defendants analogize to *Northrop Grumman*—in which the court allowed Mr. Tucker to submit a statistical "database"—because Mr. Tucker attached "118 Appendix Bs to his report." Opp. 21–22; *see United States v. Northrop Grumman*, 2003 WL 27366881, at *4–7 (C.D. Cal. Jan. 6, 2003). But this is a multi-district litigation with more than 100 *individual* cases, each of which will be tried separately. Even Mr. Tucker purports to summarize the "real-world facts" for each plaintiff in an appendix with less than 25 pages of double-spaced text each—that is manageable for a jury without his recitation.

Many complex cases have large records; if this is an issue at all, it can be addressed by the parties stipulating to agreed-upon facts or as a matter of judicial management (*e.g.*, length of trial, number of witnesses). And Mr. Tucker did not create some kind of complicated "database" here—

he quotes and summarizes documents directly, with no analysis other than restating Defendants' legal arguments. *Cf. In re Rezulin Prods. Liab. Litig.*, 309 F.Supp.2d 531, 551 (S.D.N.Y. 2004) (excluding expert's recitation of facts because such material must be "presented through percipient witnesses and documentary evidence," and expert's "glosses" served "only to buttress plaintiffs' theory of the case").

B. Mr. Tucker's one-sided approach to the record compounds its inadmissibility

Another fatal problem with Mr. Tucker's recitation of the record is that he decides disputed fact issues by favoring Defendants' legal arguments and theories. Tellingly, Defendants' opposition does not respond to the many examples Plaintiffs cited (Mot. 22) in which Defendants, during the conspiracy, told Plaintiffs that fuel surcharges were not negotiable. *Mr. Tucker does not mention any of these examples in his reports*, despite claiming to document "real-world" negotiations and forensically analyze whether "fuel surcharges became non-negotiable during the alleged conspiracy period." *See* Opp. 14. Mr. Tucker simply omitted any parts of the evidentiary record that did not support Defendants' legal arguments. This one-sided approach confirms Mr. Tucker's recitation of facts is not helpful to the jury.

Defendants' own authority confirms that Mr. Tucker's proposed testimony is inadmissible. They cite *Scott v. Chipotle*, in which the court permitted an expert to use statements from two witnesses "to illustrate a point" the expert was qualified to opine about (the defendant's employment practices). 315 F.R.D. 33, 47 (S.D.N.Y. 2016). But the court excluded testimony from that same expert when he "simply parrot[ed] a witness's prior statement," because the expert did not "use . . . that statement to support a larger point" or provide any "independent analysis or conclusion." *Id.* Merely "repeat[ing]" a party's "legal theory and then quot[ing]" the evidentiary record to support that legal theory *is not helpful expert testimony*—because the deponent is "perfectly capable of offering this testimony at trial; and the jury does not need [the expert's]

repetition to understand such testimony." *Id.*; *accord Rezulin Prods. Liab. Litig.*, 309 F. Supp. at 551. That is precisely what Mr. Tucker does here. He parrots documents and deposition testimony, and then tacks on an "expert" opinion merely restating Defendants' theory (*e.g.*, fuel surcharges were negotiable). What was impermissible in *Scott* is impermissible here too.[12]

Indeed, if Mr. Tucker found evidence undercutting his pre-ordained conclusions, he simply deleted the entire opinion from the relevant appendix. For example, Mr. Tucker included sections "Shipping Alternatives / Competition" and "Deposition and Documentary Evidence of [Shipper] Contract Negotiations" in many of his appendices that purport to identify (among other things) instances where a given plaintiff managed to avoid a fuel surcharge. Yet he omitted these sections from Appendix B for plaintiffs Arkema and ArrMaz. Defendants say Mr. Tucker omitted sections only "[i]f Mr. Tucker's forensic analysis identified no evidence pertinent to that section for a given Plaintiff." Opp. 28 n.18. But there *was* "pertinent" and relevant evidence in the record about Arkema and ArrMaz's "Contract Negotiations"—Arkema and ArrMaz's corporate representative testified, "all of our rail contracts had a rail fuel surcharge in there because it wasn't something I could negotiate" and that "rail fuel surcharges were given to us with little to no, I should say with no options." Ex. 28, Tr. of 30(b)(6) Dep. of Stephen Trombetta, Oct. 18, 2022, at 55:4–16, 109:16–20. No matter whether Mr. Tucker reviewed and omitted this evidence because it was unhelpful for Defendants or simply missed it in his "painstaking investigation" (Opp. 32), the results are an unreliable, unhelpful distortion of the record.

**Conclusion**

The Court should exclude Mr. Tucker's opinions in MDL I and MDL II.

---

[12] Defendants' other authority is inapt. *See Second Chance Body Armor*, 289 F. Supp. 3d at 162 (D.D.C. 2018) (expert not merely reciting evidence, but instead manipulating data and performing additional "calculations").

Respectfully submitted,

Dated: December 19, 2024

*/s/ Michael D. Hausfeld*
Michael D. Hausfeld
Brian A. Ratner
Sathya S. Gosselin
Melinda R. Coolidge
Swathi Bojedla
Theodore F. DiSalvo
James Hamilton

HAUSFELD LLP
888 16th Street, NW, Suite 300
Washington, DC 20006
(202) 540-7200
mhausfeld@hausfeld.com
bratner@hausfeld.com
sgosselin@hausfeld.com
mcoolidge@hausfeld.com
sbojedla@hausfeld.com
tdisalvo@hausfeld.com
jhamilton@hausfeld.com

*Attorneys for Donnelly Commodities Incorporated*, *Strates Shows, Inc.*, *American Honda Motor Co., Inc.*; *BMW Manufacturing Co., LLC and BMW of North America, LLC; Boise Cascade Company; Central Transport International, Inc., Central Transport, Inc., Logistics Insight Corp., and Transport Communications Systems II, L.L.C.; CONSOL Energy, Inc.; CRH Americas, Inc., Preferred Materials, Inc., Ash Grove Cement Company, The Shelly Company, Big River Industries, Inc., Oldcastle APG West, Inc., and Pennsy Supply Inc.; Crowley Maritime Corporation, Crowley Logistics, Inc., and Crowley Liner Services, Inc.; Grand River Dam Authority; J.R. Simplot Co.; Lansing Board of Water & Light; Linde AG; Praxair, Inc.; Lotte Global Logistics (North America), Inc.; Louisiana-Pacific Corporation; Lyondell Chemical Company; LyondellBasell Acetyls, LLC; Equistar Chemicals, LP; MillerCoors, LLC; Newell*

*/s/ Sami H. Rashid*
Sami H. Rashid
Richard I. Werder, Jr.
Alexandre J. Tschumi
Alexandria ("Alexee") Deep Conroy
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
samirashid@quinnemanuel.com
rickwerder@quinnemanuel.com
alextschumi@quinnemanuel.com
alexeeconroy@quinnemanuel.com

Alicia Cobb
QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
Telephone: (206) 905-7000
Facsimile: (206) 905-7100
aliciacobb@quinnemanuel.com

Viola Trebicka
Jennifer English
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100
violatrebicka@quinnemanuel.com
jenniferenglish@quinnemanuel.com

*Attorneys for Plaintiffs Dust Pro, Inc., Olin Corporation, U.S. Magnesium, Alcoa Corporation, Arconic, Inc.; Alcoa Fuels, Inc.; Alcoa Power Generating, Inc.; Eastalco Aluminum Company; Intalco Aluminum, LLC; Reynolds Metal Company; Alcoa*

*Recycling Southeast, LLC; Peabody Investments Corporation, Peabody Energy Corporation, Peabody Natural Resources Company, Peabody Midwest Mining LLC, Peabody Powder River Mining LLC, Peabody Coulterville Mining, LLC, Peabody Coalsales, LLC f/k/a Coalsales, LLC, Coalsales II, LLC f/k/a Peabody Coalsales Company, Peabody Coaltrade, LLC f/k/a Coaltrade, LLC and Peabody Coaltrade, Inc., Twentymile Coal, LLC f/k/a Twentymile Coal Company; American Land Holdings of Illinois, LLC; American Land Holdings of Indiana, LLC; Peabody Electricity, LLC; Roseburg Forest Products Co.; Sims Group USA Holdings Corporation (f/k/a Sims Hugo Neu Corporation), Metal Management, Inc., Simsmetal East LLC (f/k/a Sims Hugo Neu East LLC and Hugo Neu Schnitzer East), Metal Management Northeast, Inc., Metal Management Pittsburgh, Inc., SMM New England Corporation (f/k/a Metal Management Connecticut, Inc.), SMM Southeast LLC, Metal Management Midwest, Inc., Metal Management Indiana, Inc., Metal Management Ohio, Inc., Sims Southwest Corporation (f/k/a Proler Southwest LP and Proler Southwest Corporation), SMM South Corporation (f/k/a Metal Management Alabama, Inc.), Metal Management Memphis, L.L.C., Sims Group USA Corporation, Simsmetal West LLC (f/k/a Sims Hugo Neu West LLC), and Schiabo Larovo Corporation; Suzuki Motor of America, Inc., Suzuki Motor USA, LLC; TMS International, LLC; Total Petrochemicals & Refining USA, Inc.; Trammo, Inc.; Transrail, Inc.; Tropicana Products, Inc., Frito-Lay, Inc., and Bottling Group, LLC operating as Pepsi Beverages Company; U.S. Silica Co.*

/s/ *William J. Blechman*
Richard Alan Arnold
William J. Blechman
Douglas H. Patton
Michael A. Ponzoli
Joshua B. Gray

*World Alumina, LLC; Alumax Mill Products, Inc.; The Amalgamated Sugar Company, LLC; American Rock Salt Company LLC; AP Møller – Mærsk A/S; Mærsk Inc.; Maersk Line UK Limited; Axiall Corporation; Axiall, LLC; Westlake Styrene LLC; Westlake Petrochemicals LLC; Westlake Polymers LLC; Westlake Vinyls Inc.; Westlake Vinyls Company LP; WPT LLC; Westlake Longview Corporation; Westlake Management Services, Inc.; BASF Corporation; BASF Catalysts LLC; Cognis USA LLC; ProCat Testing LLC; California Steel Industries, Inc.; Campbell Soup Supply Company L.L.C.; Campbell Company of Canada; Campbell FoodService Company; Joseph Campbell Company; CertainTeed LLC; Saint-Gobain Ceramics & Plastics, Inc.; Bird Incorporated' CertainTeed Canada, Inc.; CertainTeed Gypsum & Ceiling Manufacturing, Inc.; CertainTeed Gypsum Manufacturing, Inc.; CertainTeed Gypsum NC, Inc.; CertainTeed Gypsum West Virginia, Inc.; CertainTeed Gypsum, Inc.; CertainTeed Ceilings Corporation; CertainTeed Gypsum and Ceilings USA, Inc.; Coffeyville Resources Nitrogen Fertilizers, LLC; ConAgra Brands, Inc. f/k/a/ ConAgra Foods, Inc.; Virginia Electric and Power Company,; Dominion Energy Fuel Services, Inc.; Dominion Energy South Carolina, Inc.; Duke Energy Carolinas, LLC; Duke Energy Florida, LLC; Duke Energy Progress, LLC; Duke Energy Indiana, LLC; Duke Energy Kentucky, LLC; Duke Energy Ohio, LLC; Progress Fuels, LLC; DEGS of Narrows, LLC; Duke Energy Generation Services, Inc.; Eastman Chemical Company; Solutia Inc.; Taminco Corporation; Exxon Mobil Corporation; ExxonMobil Oil Corporation; ExxonMobil Global Services Company; Imperial Oil; Imperial Oil Limited; Canada Imperial Oil Limited; Grain Craft, Inc.; Southeastern Mills, Inc.; Hyundai Motor America, Inc.; IPSCO Tubulars Inc.; IPSCO Koppel Tubulars, LLC; IPSCO Tubulars*

KENNY NACHWALTER, P.A.
1441 Brickell Avenue
Suite 1100
Miami, Florida 33131
Tel: (305) 373-1000
E-mail: raa@knpa.com
wblechman@knpa.com
dpatton@knpa.com
mponzoli@knpa.com
jgray@knpa.com

*Attorneys for Plaintiffs Cemex, Inc., Clearwater Paper Corporation, The Goodyear Tire & Rubber Company, Kraft Heinz Foods Company, Heidelberg Materials US, Inc. (f.k.a. Lehigh Hanson, Inc.), PotlatchDeltic Corporation, Rayonier Advanced Materials Inc., Sterling Steel Company LLC., UPM-Kymmene, Inc., and Unilever ASCC AG*

/s/ *Jason M. Powers*
Jason M. Powers
VINSON & ELKINS L.L.P.
845 Texas Avenue, Suite 4700
Houston, Texas 77002
(713) 758-2522
(713) 615-5809 (Facsimile)
jpowers@velaw.com

Craig P. Seebald (D.C. Bar No. 438968)
VINSON & ELKINS L.L.P.
2200 Pennsylvania Avenue, N.W.
Suite 500 West
Washington, DC 20037
(202) 639-6500
(202) 639-6604 (Facsimile)
cseebald@velaw.com

/s/ *John H. LeSeur*
John H. LeSeur (D.C. Bar No. 293357)
Frank J. Pergolizzi (D.C. Bar No. 405174)
Peter A. Pfohl (D.C. Bar No. 456854) Daniel M. Jaffe (D.C. Bar No. 461185) SLOVER & LOFTUS LLP
1828 L Street, NW
Suite 1000

*(KY), LLC; TMK NSG, LLC; Keystone Fuels, LLC; Conemaugh Fuels, LLC; Kia Motors America, Inc.; Lafarge North America, Inc., Holcim (US) Inc.; Aggregate Industries Management, Inc.; Aggregate Industries - SWR, Inc.; Aggregate Industries Northeast Region, Inc.; Aggregate Industries - MWR, Inc.; Bardon, Inc. (dba Aggregate Industries Mid-Atlantic Region); Cement Transport, LTD; Geocycle LLC; Systech Environmental Corporation; Lafarge PNW, Inc.; Lattimore Materials Corp.; Mercedes-Benz USA, LLC; Motiva Enterprises LLC; NLMK USA, Inc.; NLMK Pennsylvania, LLC; Sharon Coating, LLC; NOVA Chemicals, Inc.; NOVA Chemicals Corporation; NOVA Chemicals (Canada) Ltd.; Old World Industries, LLC; PCS Sales (USA), Inc.; Agrium (U.S.), Inc.; PCS Phosphate Company, Inc.; White Springs Agricultural Chemicals, Inc; PCS Nitrogen, Inc.; Phillips 66 Company; Shell Chemical LP, Shell Chemicals Canada (f/k/a Shell Chemicals Canada Ltd.) by its managing partner Shell Canada Ltd.; Pennzoil-Quaker State Company (formerly d/b/a SOPUS Products); Shell Trading (US) Company; Equilon Enterprises LLC (d/b/a Shell Oil Products US or SOPUS); Talen Energy Supply, LLC f/k/a PPL Energy Supply, LLC, on behalf of itself and its subsidiaries and affiliates; Talen Energy Marketing, LLC f/k/a PPL EnergyPlus, LLC; Talen Generation, LLC f/k/a PPL Generation, LLC (successor in interest to PPL Coal Supply, LLC); Talen Montana, LLC f/k/a PPL Montana, LLC; Martins Creek, LLC f/k/a PPL Martins Creek, LLC; Brunner Island, LLC f/k/a PPL Brunner Island, LLC; Montour, LLC f/k/a PPL Montour, LLC; United Parcel Service, Inc., an Ohio Corporation; UPS Ground Freight, Inc.; Vulcan Materials Company; Legacy Vulcan, LLC; Florida Rock Industries, Inc.; Atlantic Granite LLC; CalMat Co.; Vulcan Aggregates Company, LLC; Vulcan Construction Materials, LLC; Fulton*

Washington, D.C. 20036
(202) 347-7170
(202) 347-3619 (Facsimile)
jhl@sloverandloftus.com
fjp@sloverandloftus.com
pap@sloverandloftus.com
dmj@sloverandloftus.com

*Attorneys for Plaintiffs AK Steel Corporation; Bel-Ray Company, LLC; Calumet Branded Products, LLC; Calumet Cotton Valley Refining, LLC; Calumet Dickinson Refining, LLC; Calumet Karns City Refining, LLC; Calumet Montana Refining, LLC; Calumet Operating, LLC; Calumet Princeton Refining, LLC; Calumet Refining, LLC; Calumet Shreveport Refining, LLC; Calumet Specialty Products Partners, L.P.; CF Industries, Inc.; Dairyland Power Cooperative; Dyno Nobel, Inc.; Entergy Arkansas, LLC; Entergy Louisiana, LLC; Constellation Energy Generation, LLC, f/k/a Exelon Generation Company, LLC; Kurlin Company, LLC; NorFalco LLC; NorFalco Sales; North Star BlueScope Steel LLC; Steelscape, LLC; and Wisconsin Electric Power Company*

*Concrete Company, LLC; McCartney Construction Company, Inc.; Calhoun Asphalt Company, Inc.; Harper Brothers, LLC; Virginia Concrete Company, LLC; Azusa Rock, LLC; Triangle Rock Products, LLC; Aggregates USA, LLC; Chem-Marine Corporation of South Carolina; DMG Equipment Company, LLC; R. C. Smith Companies, LLC; Aggregates USA (Macon), LLC; Aggregates USA (Savannah), LLC; Aggregates USA (Sparta), LLC; WestRock Company; WestRock Coated Board, LLC; WestRock Virginia, LLC; WestRock Texas, L.P.; WestRock CP, LLC; WestRock Southeast, LLC; WestRock Northwest, LLC; WestRock Mill Company, LLC; WestRock – Solvay, LLC; WestRock Minnesota Corporation; WestRock Kraft Paper, LLC; WestRock Container, LLC; WestRock Longview, LLC; Smurfit-Stone Container Canada Inc.; The J.M. Smucker Company; General Motors LLC; Kennecott Utah Copper LLC; and U.S. Borax Inc.*

*/s/ David C. Eddy*

David C. Eddy (DC Bar No. 250712)
Dennis J. Lynch (admitted *pro hac vice*)
Travis C. Wheeler (DC Bar No. 484023)
MAYNARD NEXSEN PC
1230 Main Street, Suite 700
Columbia, S.C. 29201
Tel: (803) 771-8900
deddy@nexsenpruet.com
dlynch@nexsenpruet.com
twheeler@nexsenpruet.com

*Attorneys for Plaintiffs Domtar Corporation; Ford Motor Company; South Carolina Public Service Authority; Anheuser-Busch, LLC; Anheuser-Busch Companies, LLC; Nestlé Purina PetCare Company; and Nestlé USA, Inc.*

*/s/ Joseph M. Vanek*

Joseph M. Vanek
David P. Germaine (admitted *pro hac vice*)
Martin Amaro (admitted *pro hac vice*)
SPERLING & SLATER, LLC
55 West Monroe Street, 32nd Floor
Chicago, Illinois 60603
Tel: (312) 641-3200
Fax: (312) 641-6492
jvanek@sperling-law.com
dgermaine@sperling-law.com
mamaro@sperling-law.com

*Attorneys for Plaintiff Mitsubishi Motors North America, Inc.*

/s/ *Raj Mathur*
Geoffrey L. Harrison
Shawn Raymond
Adam Carlis
Alexandra Foulkes Grafton
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
(713) 651-9366
gharrison@susmangodfrey.com
sraymond@susmangodfrey.com
acarlis@susmangodfrey.com
afoulkesgrafton@susmangodfrey.com

Raj Mathur
Scott Glass
SUSMAN GODFREY, L.L.P.
One Manhattan West, 50th Floor
New York, NY 10001
Telephone: 212-336-8330
rmathur@susmangodfrey.com
sglass@susmangodfrey.com

*Attorneys for Donnelly Commodities Incorporated, Strates Shows, Inc., Arkema Inc.; ArrMaz Products Inc.; Boise Cascade Company; CONSOL Energy, Inc.; CRH Americas, Inc., Preferred Materials, Inc., Ash Grove Cement Company, The Shelly Company, Big River Industries, Inc., Oldcastle APG West, Inc., and Pennsy Supply Inc.; Crowley Maritime Corporation, Crowley Logistics, Inc., and Crowley Liner Services, Inc.; Grand River Dam Authority; J.R. Simplot Co.; Lansing Board of Water & Light; Lotte Global Logistics (North America), Inc.; Lyondell Chemical Company; LyondellBasell Acetyls, LLC; Equistar Chemicals, LP; MillerCoors, LLC; Peabody Investments Corporation, Peabody Energy Corporation, Peabody Natural Resources Company, Peabody Midwest Mining LLC, Peabody Powder River Mining LLC, Peabody Coulterville Mining, LLC, Peabody Coalsales, LLC f/k/a Coalsales, LLC, Coalsales II, LLC f/k/a Peabody Coalsales Company, Peabody Coaltrade, LLC f/k/a Coaltrade, LLC and*

/s/ *Sandra L. Brown*
Sandra L. Brown (D.C. Bar No. 452988)
David A. Wilson (D.C. Bar No. 430400)
David E. Benz (D.C. Bar No. 485868)
Joe Smith (D.C. Bar. No. 1010223)
THOMPSON HINE LLP
1919 M Street N.W. Suite 700
Washington, D.C. 20036
Tel: (202) 331-8800
Fax: (202) 331-8330
sandra.brown@thompsonhine.com
david.wilson@thompsonhine.com
david.benz@thompsonhine.com
joe.smith@thompsonhine.com

Robert F. Ware
Jennifer S. Roach
Caitlin R. Thomas
THOMPSON HINE LLP
127 Public Square, Suite 3900
Cleveland, Ohio 44114
Tel: (216) 566-5500
Fax: (216) 566-5800
rob.ware@thompsonhine.com
jennifer.roach@thompsonhine.com
caitlin.thomas@thompsonhine.com

*Attorneys for Plaintiffs Alabama Power Company, Georgia Power Company and Mississippi Power Company; Northern Indiana Public Service Company LLC; and Union Electric Company d/b/a Ameren Missouri and Ameren Development Company*

/s/ *Kristopher S. Davis*
Kristopher S. Davis (CA #193452)
George T. Caplan (CA #043821)
FAEGRE DRINKER BIDDLE & REATH LLP
1800 Century Park East, Suite 1500
Los Angeles, California 90067
Tel: (310) 203-4000
Fax: (310) 229-1285
kristopher.davis@faegredrinker.com
george.caplan@faegredrinker.com

*Peabody Coaltrade, Inc., Twentymile Coal, LLC f/k/a Twentymile Coal Company; American Land Holdings of Illinois, LLC; American Land Holdings of Indiana, LLC; Peabody Electricity, LLC; Roseburg Forest Products Co.; Sims Group USA Holdings Corporation (f/k/a Sims Hugo Neu Corporation), Metal Management, Inc., Simsmetal East LLC (f/k/a Sims Hugo Neu East LLC and Hugo Neu Schnitzer East), Metal Management Northeast, Inc., Metal Management Pittsburgh, Inc., SMM New England Corporation (f/k/a Metal Management Connecticut, Inc.), SMM Southeast LLC, Metal Management Midwest, Inc., Metal Management Indiana, Inc., Metal Management Ohio, Inc., Sims Southwest Corporation (f/k/a Proler Southwest LP and Proler Southwest Corporation), SMM South Corporation (f/k/a Metal Management Alabama, Inc.), Metal Management Memphis, L.L.C., Sims Group USA Corporation, Simsmetal West LLC (f/k/a Sims Hugo Neu West LLC), and Schiabo Larovo Corporation; Suzuki Motor of America, Inc., Suzuki Motor USA, LLC; TMS International, LLC; Total Petrochemicals & Refining USA, Inc.; Trammo, Inc.; Transrail, Inc.; Tropicana Products, Inc., Frito-Lay, Inc., and Bottling Group, LLC operating as Pepsi Beverages Company; U.S. Silica Co.*

William L. Roberts (MN # 0212763)
Jonathan W. Dettmann (MN # 0265032)
Craig S. Coleman (MN # 0325491)
FAEGRE DRINKER BIDDLE & REATH LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402
Tel: (612) 766-7000
Fax: (612) 766-1600
william.roberts@faegredrinker.com
jon.dettmann@faegredrinker.com
craig.coleman@faegredrinker.com

*Attorneys for Plaintiffs American Zinc Recycling Corp., Ascend Performance Materials Operations LLC, Ingredion Incorporated, The Heritage Group dba Asphalt Refining Company, Asphalt Materials, Inc., Bituminous Materials and Supply, L.P., Emulsicoat, Inc., Laketon Refining Corporation, Heritage Environmental Services, LLC, Rineco Chemical Industries, LLC, Heritage Transport, LLC, Pizo Operating Company, LLC, and CHS Inc.*

*/s/ Kirk T. May*
Kirk T. May
William D. Beil
GM LAW PC
1201 Walnut, Suite 2000
Kansas City, Missouri 64106
PH: 816-471-7700
FX: 816-471-2221
Email: kirkm@ gmlawpc.com
Email: billb@ gmlawpc.com

*Attorneys for Plaintiffs Lansing Ethanol Services, LLC, et al.*

*/s/ David J. Lender*
David J. Lender (admitted *pro hac vice*)
Eric S. Hochstadt (admitted *pro hac vice*)
Luna Barrington (admitted *pro hac vice*)
Sarah Ryu (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Fax: (212) 310-8007
david.lender@weil.com
eric.hochstadt@weil.com

luna.barrington@weil.com
sarah.ryu@weil.com

*Attorneys for Plaintiffs Cleveland-Cliffs Steel LLC (f/k/a ArcelorMittal USA LLC) and ArcelorMittal Dofasco G.P.*

/s/ *Benjamin D. Brown*
Benjamin D. Brown (D.C. Bar. No. 495836)
Robert A. Braun (D.C. Bar No. 1023352)
Sabrina Merold (D.C. Bar No. 1738065)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue,
N.W. Fifth Floor
Washington, D.C. 20005
Tel: (202) 408-4600
bbrown@cohenmilstein.com
rbraun@cohenmilstein.com
smerold@cohenmilstein.com

*Attorneys for Plaintiffs Kawasaki Kisen Kaisha, Ltd., "K" Line America, Inc., Yang Ming Marine Transport Corp., Yang Ming (America) Corp., Nippon Yusen Kabushiki Kaisha, NYK Line (North America) Inc., Mitsui O.S.K. Lines, Ltd., and MOLAM Legacy, Inc.*

/s/ *James P. Denvir*
James P. Denvir (D.C. Bar No. 284554)
Scott E. Gant (D.C. Bar No. 455392)
BOIES SCHILLER FLEXNER LLP
1401 New York Ave, NW
Washington, DC 20005
Phone 202 237 2727
Fax 202 237 6131
jdenvir@bsfllp.com
sgant@bsfllp.com

Stuart H. Singer (*pro hac vice*)
James Grippando (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP

/s/ *Michael Schaper*
Edward D. Hassi (D.C. Bar No. 1026776)
Leah S. Martin (D.C. Bar No. 1029757)
DEBEVOISE & PLIMPTON LLP
801 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: (202) 383-8000
Fax: (202) 383 8118
E-mail: thassi@debevoise.com
lmartin@debevoise.com

Michael Schaper
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, NY 10001
Tel: (212) 909 6000
Fax: (212) 909 6836
mschaper@debevoise.com

*Attorneys for Plaintiffs Toyota Motor Sales, U.S.A., Inc. and Toyota Canada Inc.*

/s/ *Nathan P. Eimer*
Nathan P. Eimer (*pro hac vice*)
Daniel D. Birk (*pro hac vice*)
Susan Razzano (*pro hac vice*)
Benjamin Waldin (D.D.C. Bar No. IL0061)
EIMER STAHL LLP
224 South Michigan Avenue
Suite 1100
Chicago, IL 60604
Telephone: (312) 660-7600
Fax: (312) 692-1718
neimer@eimerstahl.com
dbirk@eimerstahl.com
srazzano@eimerstahl.com

401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33301
Telephone: (954) 356-0011
ssinger@bsfllp.com
jgrippando@bsfllp.com

*Attorneys for Plaintiffs Domino Foods, Inc., E.I. du Pont de Nemours and Company, and The General Electric Company*

/s/ *Frank M. Lowrey IV*
Frank M. Lowrey IV (*pro hac vice*)
lowrey@bmelaw.com
Tiana S. Mykkeltvedt (*pro hac vice*)
mykkeltvedt@bmelaw.com
Matthew R. Sellers
sellers@bmelaw.com
BONDURANT MIXSON & ELMORE LLP
1201 West Peachtree Street, N.E., Suite 3900
Atlanta, Georgia 30309
Tel: (404) 881-4100
Fax: (404) 881-4111

*Attorneys for Plaintiff The General Electric Company*

/s/ *Michael C. Dell'Angelo*
Michael C. Dell'Angelo
Michael J. Kane
Michaela L. Wallin
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
mdellangelo@bm.net
mkane@bm.net
mwallin@bm.net

Daniel J. Walker
BERGER MONTAGUE PC
1001 G Street, NW
Suite 400 East
Washington, D.C. 20001
(202) 559-9740
dwalker@bm.net

bwaldin@eimerstahl.com

Ryan J. Walsh (D.C. Bar No. 1029407)
EIMER STAHL LLP
10 East Doty Street
Suite 800
Madison, WI 53703
Telephone: (608) 441-5798
Fax: (608) 441-5707
Email: rwalsh@eimerstahl.com

*Attorneys for Plaintiffs The Dow Chemical Company, Union Carbide Corporation, Amerchol Corporation, Umetco Minerals Corporation, Gerdau Ameristeel Corporation, Gerdau Ameristeel US Inc., Gerdau Ameristeel Perth Amboy Inc., Gerdau Ameristeel Sayreville Inc., Chaparral Steel Company, Chaparral Steel Midlothian, LP, Chaparral (Virginia) Inc., Sheffield Steel Corporation, Gerdau Macsteel, Inc., International Paper Company, GenOn Energy Management, LLC, GenOn Power Midwest LP, and GenOn REMA, LLC*

/s/ *Daniel B. Goldman*
Daniel B. Goldman
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-9100
Fax: (212) 715-8000
dgoldman@kramerlevin.com

*Attorneys for Plaintiffs The Procter & Gamble Company, The Procter & Gamble Distributing LLC, The Procter & Gamble Manufacturing Company, The Procter & Gamble Paper Products Company*, Tronox *Inc., and Tronox US Holdings Inc.*

Sophia Rios
BERGER MONTAGUE PC
8241 La Mesa Blvd.
La Mesa, CA 91942
Tel: (619) 489-0300
Fax: (215) 875-4604
srios@bm.net

*Attorneys for Plaintiffs High Level Management Venturers, Century Aluminum Company, Century Aluminum of Kentucky, GP, NSA, GP, Century Aluminum of West Virginia, Inc., Century Aluminum of South Carolina, Inc., Andre M. Toffel, Trustee, on behalf of New Wei, Inc., et al., jointly administered bankruptcy estates, and ABF Freight System Inc.*

*/s/ Leo D. Caseria*

Leo D. Caseria (DC Bar No. 1655936)
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
2099 Pennsylvania Ave., N.W., Suite 100
Washington, D.C. 20006-6801
Tel. (202) 747-1925
Fax (202) 747-1901
lcaseria@sheppardmullin.com

Helen C. Eckert
Joy O. Siu
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
Four Embarcadero Center, 17th Floor
San Francisco, CA 94111-4109
Telephone: (415) 434-9100
Facsimile: (415) 434-3947
heckert@sheppardmullin.com
jsiu@sheppardmullin.com

*Attorneys for Plaintiff CalPortland Company*

*/s/ Ronald J. Aranoff*

Ronald J. Aranoff
Fletcher W. Strong
William J. Hagan
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, NY 10110
Tel: (212) 382-3300
Fax: (212) 382-0050
raranoff@wmd-law.com
fstrong@wmd-law.com
whagan@wmd-law.com

*Attorneys for Plaintiff Air Products and Chemicals, Inc.*

*/s/ Conte C. Cicala*

Conte C. Cicala (CA Bar No. 173554)
Clyde & Co US LLP
Four Embarcadero Center, Suite 1350
San Francisco, California 94111
Telephone: (415) 365-9800
Facsimile: (415) 365-9801
conte.cicala@clydeco.us

*Attorneys for Plaintiff Mitsui O.S.K. Lines, Ltd. and MOLAM Legacy, Inc.*

**Certificate of Service**

I certify that on December 19, 2024, a copy of the foregoing was filed with the Clerk of the Court using the CM/ECF electronic filing system and was served by secure transfer on all counsel of record in the above-captioned matters.

*/s/ Raj Mathur*